Kenner 04 28 11                                  1

1    UNITED STATES
     SECURITIES AND EXCHANGE COMMISSION
2

3    In the Matter of:
                          )    File No. NY-8125
4    DIAMANTE DEL MAR     )

5

6    WITNESS:   PHILIP KENNER

7
     PAGES:     1-289
8
     PLACE:     Securities and Exchange Commission
9               3 World Financial Center
                New York, New York 10281
10
     DATE:      April 28, 2011
11

12              The above-entitled matter came on for hearing

13   at 9:50 a.m.

14

15

16

17

18

19

20

21

22

23

24

25

                                                 2

1

TR-SEC00000001

Kenner 04 28 11

2    APPEARANCES:

3

4    On behalf of the Securities and Exchange Commission:

5

6         CHRISTOPHER CASTANO, ESQ.

7         JUSTIN SMITH, ESQ.

8         Enforcement Division

9         Securities and Exchange Commission

10        3 World Financial Center

11        New York, New York 10281

12

13   On behalf of the Witness:

14

15        MICHAEL STOLPER, ESQ.

16        LAW OFFICES OF THE STOLPER GROUP

17        155 Avenue of the Americas

18        New York, New York 10013

19

20

21

22

23

24

25

☐                                                                3

1              P R O C E E D I N G S

2              MR. CASTANO:  We are on the record at 9:50

3    a.m., Thursday, April 28, 2011.

4              Mr. Kenner, the Formal Order of Investigation

Page 2

Kenner 04 28 11

5    authorizes me to administer the oath.   At this time,

6    please raise your right hand.

7              Whereupon,

8                   PHILIP KENNER,

9    after having been first duly sworn, was examined and

10   testified as follows:

11   EXAMINATION BY

12   MR. CASTANO:

13        Q.   State and spell your full name for the

14   record.

15        A.   Philip Andrew Kenner, P-H-I-L-I-P,

16   A-N-D-R-E-W, K-E-N-N-E-R.

17        Q.   Mr. Kenner, for purposes of SEC fact-finding

18   investigations, nothing is really off the record.  Any

19   substantive conversation we have off the record will be

20   summarized when we go back on the record.

21             The Commission controls the record.  The

22   reporter will only go off the record at my direction.

23   Any request to go off the record should be made to me.

24             The usual policy is not to go off the record

25   while a question is pending.  To the extent you need to

4

1    use the restroom or need a break or need to consult with

2    counsel let me know and we will go off the record.

3             The usual practice is while a question is

4    pending, we will not go off the record.

5             The court reporter takes down everything we

6    say.  Obviously the court reporter with the equipment here

7    can't take down a head nod to indicate yes or to indicate

Page 3

TR-SEC00000003

Kenner 04 28 11

8    no.   I ask that your responses be made in a vocal tone.

9         Do you understand?

10        A.   Yes, I do.

11        Q.   Try not to begin to answer a question until I

12   finish asking the question.

13        The record will be much clearer if only one

14   person is speaking at a time.  Of course Justin and I will

15   reciprocate, we will not ask questions while you're

16   speaking.

17        As I'm sure your attorney has told you, if

18   you don't understand a question or you're confused by a

19   question, please let me know and I will do my best to

20   clarify the question.

21        My name is Christopher Castano, as you know.

22   With me is Justin Smith, an attorney in the SEC's regional

23   office.

24        I will ask most of the questions today, but

25   at times Mr. Smith may ask some questions or some

                                                          5

1   follow-up questions.

2        Only one person will be asking you a question

3   at a time.  As I said before, we are not going to be

4   asking questions one after another.  One person will ask

5   you a question at a time.

6        This is a formal investigation by the United

7   States Securities and Exchange Commission in Diamante Del

8   Mar NY-8125, to determine if there have been violations of

9   certain provisions of the federal securities laws.

10        However, facts gathered in this investigation

Page 4

Kenner 04 28 11

11   may constitute violations of other state or federal, civil

12   or criminal statutes.

13          Prior to the opening of the record, you were

14   provided with the Commission's Supplemental Information

15   Form 1662.   That's been marked as Diamante Exhibit 1.

16   It's before you, Mr. Kenner.

17          Mr. Kenner, have you had an opportunity to

18   review Exhibit 1?

19          A.   Yes, I have.

20          Q.   Have you had an opportunity to review the

21   Formal Order, which is also in front of you but not marked

22   as an exhibit?

23          A.   Yes, I have.

24          Q.   Are you being represented by counsel today?

25          A.   Yes, I am.


                                                          6


1           MR. CASTANO:   Would counsel please identify

2    himself for the record?

3           MR. STOLPER:   Michael Stolper representing

4    Phil Kenner.

5           MR. CASTANO:   Are you appearing here today in

6    any other capacity other than Mr. Kenner's counsel?

7           MR. STOLPER:   Just as Mr. Kenner's counsel.

8           Q.   Mr. Kenner, are you taking any drugs or

9    medication that would affect your ability to recall and

10   answer questions truthfully?

11          A.   I am not.

12          Q.   Without telling me about any conversation you

13   had in preparation for today's testimony, what documents

Page 5

Kenner 04 28 11

14   did you review in preparation for today's testimony?

15          A.   I read and reviewed the subpoena that your

16   office had sent me several months back when Mr. Stolper

17   got involved with the case.

18                I also read and reviewed the transcripts from

19   the deposition we took in California of Mr. Ken Jowdy in

20   January of 2010, taken by attorney Ronald Richards.

21          Q.   Did you review any other documents?

22          A.   I don't believe so.

23          Q.   When you said the subpoena, your attorney got

24   involved in the case, was it just one subpoena or multiple

25   subpoenas?

7

1          A.   I don't recall.   It was something mailed

2   from your office.

3          Q.   Was it a subpoena directed to you, yourself,

4   or to, perhaps, an entity that you are affiliated with in

5   some manner?

6          A.   I think it was the most recent one that you

7   guys had sent outlining the parameters of documents that

8   you had hoped for me to turn over for you guys.

9          Q.   Mr. Kenner, I'm showing you what has been

10   previously marked as Diamante Exhibit 5.

11                This is a subpoena that was sent to Mr.

12   Kenner on October 1, 2009.

13                Please take a moment to review.

14                MR. STOLPER:  Is this one of the subpoenas

15   that was attached to your motion to compel?

16                MR. CASTANO:  Correct.

Page 6

Kenner 04 28 11

17     A.   All right.

18     Q.   Mr. Kenner, have you seen Diamante Exhibit 5

19   before?

20     A.   I believe I have.

21     Q.   Is this the subpoena that was sent to you on

22   or around October 1, 2009?

23          MR. STOLPER:   You're asking him whether that

24   was sent on October 1, 2009?

25     Q.   I'm asking if this is the subpoena that was

8

1   sent to you on or around October 1, 2009?

2     A.   I don't recall specifically.

3     Q.   When was the last time, if at all, you had

4   seen Diamante Exhibit 5?

5     A.   I don't recall this document specifically.

6     Q.   Do you recall generally that the SEC sent you

7   a subpoena directed to you, not to any entity you may be

8   affiliated with?

9     A.   I believe so.

10     Q.   Are you aware of any other subpoenas sent to

11   you requesting documents from the SEC besides Diamante

12   Exhibit 5?

13     A.   I'm not aware.

14     Q.   Again, that question was not any entities

15   that you may be affiliated with, but it was a subpoena

16   sent by the SEC directly to you.

17          Do you understand the question?

18     A.   Yes.

19   BY MR. SMITH:

TR-SEC00000007

Kenner 04 28 11

20   Q.   You mentioned that you had reviewed a

21 subpoena in preparation for today's testimony, is that the

22 subpoena you reviewed?

23       A.   I don't recall.   This doesn't look like the

24 one I reviewed.

25       Q.   So you think it was a different one?

9

1       A.   I believe so, I believe so.

2  BY MR. CASTANO:

3       Q.   Diamante Exhibit 5 calls for you to produce

4  certain documents.

5            Can you please describe any search that you

6  conducted to produce documents that would be responsive to

7  Diamante Exhibit 5?

8       A.   I recall searching all the file folders that

9  I have at my office.

10           I recall searching my laptop computer that I

11 use.

12           And I recall searching through several boxes

13 where I had retained records that were still in my

14 possession.

15      Q.   You mentioned reviewing documents at your

16 office.

17           Where is your office located?

18      A.   It's at

19 Arizona.

20      Q.   Has that been your office since 2002 or have

21 you moved offices?

22      A.   That's primarily been my office.

Page 8

Kenner 04 28 11

23      Q.   Do you have any other offices besides that

24   Arizona office you just mentioned?

25      A.   No, I do not.

10

1   BY MR. SMITH:.

2        Q.   During the time period 2002 to the present,

3   have you had any other offices other than that office?

4        A.   Not anything significant.   I've worked out

5   of my home in Mexico.   I've worked out of my residence in

6   Nevada.

7             But my office address has remained the same

8   for simplicity.

9        Q.   Any other places you've worked out of other

10   than your residence in Mexico and residence in Nevada?

11       A.   Not as a general office space, no.

12            I travel, I have traveled considerably.

13       Q.   Apart from your travels, any other location

14   you've worked in?

15       A.   Not that I'm aware of.

16       Q.   What is the address of the residence in

17   Mexico?

18       A.   It is -- it's in the Pedregral subdivision.

19   I'm not aware of the street address.

20            It's in Los Cabos, Mexico.   I'm not aware of

21   the zip code.

22            In Nevada,                              ,

23   Las Vegas, Nevada 89101.

24       Q.   What is your current address?

25       A.   It is the Las Vegas address.

TR-SEC00000009

Kenner 04 28 11

11

1        Q.   Since 2002, have you had any other personal
2   addresses other than these two that you just mentioned?
3        A.   Yes.
4        Q.   How many?
5        A.   I believe one other.
6        Q.   What is the address?
7        A.   It was                            , I believe,
8   Las Vegas, Nevada 89103.
9        Q.   What is the time period that you lived there?
10       A.   I believe sometime in 2007 until sometime in
11   2009.
12            And then I moved to that ^^^
13   address.
14       Q.   And before 2007?
15       A.   I resided at that        address.
16       Q.   Which          address?
17       A.   The Scottsdale, Arizona address.   That's
18   also my office.
19   BY MR. CASTANO:
20       Q.   You mentioned a laptop.
21            Is that the same laptop you maintained from
22   2002, or have you had different computers and laptops?
23       A.   I've had many laptops since.
24       Q.   The laptop that you say you searched for
25   documents, is that a laptop you currently have?

12

Page 10

TR-SEC00000010

Kenner 04 28 11

1          A.   Yes, it is.
2          Q.   Can you just generally tell me how you would
3    go back if you were transferring information, perhaps from
4    one computer to another, as you have a new computer,
5    perhaps?
6          A.   I was unable to transfer the last time as my
7    computer was broken by some TSA agents who dropped it as I
8    was traveling one day.
9               So I had a total loss of my hard drive the
10   last time I changed laptops.
11         Q.   Do you still have that laptop?
12         A.   I do not.
13         Q.   What did you do with it?
14         A.   I took it to an Apple repair center and they
15   were unable to repair it at all.   And they said they
16   would put it in the recycling program.
17         Q.   Prior to that laptop, did you have another
18   computer?
19         A.   Yes.
20         Q.   Where is that computer?
21         A.   I don't know.
22              It was most likely donated at that point.
23   BY MR. SMITH:
24         Q.   You've had your current laptop since the
25   previous one was broken by the TSA?

                                                          13

1          A.   I believe so.
2          Q.   When was it broken?
3          A.   I don't recall.
                      Page 11

Kenner 04 28 11

4          Q.    Approximately?

5          A.    Perhaps 2 to 3 years I've had my current

6    laptop.

7          Q.    So approximately 2008?

8          A.    Approximately 2008.

9          Q.    Where do you maintain E-mail and other

10   electronic documents?

11         A.    On my laptop.

12         Q.    Any other place?

13         A.    I do not.

14         Q.    Any backup?

15         A.    I do not have any backup.

16         Q.    Do you have any external hard drives in which

17   you keep data?

18         A.    I do not.

19         Q.    Other than your current laptop, there's no

20   other source for any E-mail or electronic documents that

21   you have?

22         A.    I do not.

23   BY MR. CASTANO:

24         Q.    Diamante Exhibit 5, the document in front of

25   you, besides yourself and the search that you conducted

                                                              14

1    either at your office or on your laptop, did you speak to

2    anyone else about documents that may be responsive to

3    Diamante Exhibit 5?

4          A.    I don't believe so.

5          Q.    There's no assistants that you spoke to that

6    may have maintained documents that are responsive to

Page 12

TR-SEC00000012

Kenner 04 28 11

7   Diamante Exhibit 5?

8       A.   There was only one assistant that I had, and

9   she had stolen my former backup hard drive.   And would

10  not return it.

11      Q.   Who is this assistant?

12      A.   Former assistant, Kristine Myrick,

13  K-R-I-S-T-I-N-E, M-Y-R-I-C-K.

14      Q.   How did she steal it?

15      A.   She was my office manager until early 2007,

16  and maintained all of my backup files, and when she was

17  terminated for cause she -- against our settlement

18  agreement -- she kept her laptop, which is a company

19  laptop.   She kept our company backup hard drive, and

20  refused with her attorney to return those documents.

21      Q.   Did she just have one laptop and one external

22  hard drive?   Or did she have multiple laptops and

23  multiple external hard drives?

24      A.   With the business she had one laptop and one

25  external hard drive.

15

1       Q.   Besides this former assistant, and besides

2   any conversations you had with attorneys, did you discuss

3   searching for documents with anyone else?

4       A.   I don't believe so.

5       Q.   To your knowledge, are you withholding any

6   documents pursuant to any privilege?

7       A.   I don't believe so.

8       Q.   To your knowledge, have you produced all

9   responsive documents pursuant to the subpoena that's

Page 13

TR-SEC00000013

Kenner 04 28 11

10    Diamante Exhibit 5 in front of you?

11         A.   Yes.

12              MR. STOLPER:  Chris, you may also want to

13    note in terms of production that some of the documents,

14    but not all of the documents that Myrick had taken from

15    Phil unlawfully back in '07 were subsequently produced in

16    litigation and were then produced to you, to the SEC.

17              Some of which you have he now has but didn't

18    have at the time.

19         Q.   Mr. Kenner, are there any records that are no

20    longer in your possession or control besides certain

21    records that your former assistant took that are

22    responsive to the subpoena but you just don't have them

23    anymore?

24              MR. STOLPER:  I'm confused by the question.

25         A.   I'm not sure I understand.

                                                        16

1          Q.   Are there any records that are no longer in

2     your possession or control that were once responsive to

3     Diamante Exhibit 5?

4          A.   Other than my former assistant maintained?

5          Q.   Yes.

6          A.   I don't believe so.

7          Q.   Are there any records no longer in your

8     possession or control that were destroyed for whatever

9     reason?

10         A.   No.

11         Q.   That might include documents that were

12    destroyed when the TSA dropped your computer.

Page 14

TR-SEC00000014

Kenner 04 28 11

13      A.   I'm confused then, I'm sorry.

14      Q.   No problem.

15           Let's go through it again.

16      A.   Okay.

17      Q.   Besides the laptop that was dropped, are you

18 aware of any documents that were destroyed that were

19 responsive to Diamante Exhibit 5?

20      A.   None by me.

21 BY MR. SMITH:.

22      Q.   I guess the question is:   Other than the

23 documents that you produced, are there any documents that

24 would have been responsive to the subpoena that are no

25 longer in existence because they were deleted, because

                                                    17

1 they were thrown away, because they were destroyed in the

2 TSA instance or because of any other reason?

3           MR. STOLPER:   Documents that were in his

4 possession at some point in time?

5      Q.   Documents that existed, to your knowledge,

6 whether in your possession or anyone else's possession

7 that would have been responsive to Exhibit 5.

8           MR. STOLPER:   I would just say, Exhibit 5,

9 you're asking for a lot of documents about a lot of

10 entities.   Obviously there are a lot of people involved

11 in those entities than Phil.   I think you're asking what

12 he had in his possession.

13           MR. SMITH:   I'm asking his knowledge, whether

14 they had documents in their possession.   If he doesn't

15 have any knowledge as to their destruction, that's fine.

Page 15

TR-SEC00000015

Kenner 04 28 11

16          Q.   I'm asking to your knowledge whether there

17   are any documents responsive to Exhibit 5 have been

18   destroyed.

19          MR. STOLPER:   Obviously Ken Jowdy would have

20   documents.  Are you asking him to say:  Well, Ken Jowdy

21   would have documents, this person would have documents, et

22   cetera?

23          MR. SMITH:   No.  I'm asking about documents

24   that have been destroyed.

25          Q.   If you know Ken Jowdy destroyed documents,

18

1    let us know.  I'm just asking about documents that have

2    been destroyed.

3          To your knowledge, have any documents that

4    would be responsive to that subpoena been destroyed?

5          A.   First, none by me.

6          And second, I'm not aware of any documents

7    that anyone else had in their possession that may or may

8    not have been destroyed.

9          Q.   Who, to your knowledge, other than yourself

10   and Ms. Myrick would have documents responsive to the

11   subpoena?

12          You mentioned Ken Jowdy.  Is he someone, to

13   your knowledge, who would have documents responsive to the

14   subpoena?

15          A.   Absolutely.  If you don't mind, I'll go

16   through each of the paragraphs and I can tell you who

17   maybe had responsive documents, if that would help.

18          MR. STOLPER:   Sure.

Page 16

TR-SEC00000016

Kenner 04 28 11

19    We should note if you see him grimacing and
20    losing his breath, while he's not on any medication he
21    foolishly broke his ribs playing hockey, he's got two
22    broken ribs and two cartilage tears.  If you see
23    grimacing, it's not because of the grilling of the
24    examination.
25        THE WITNESS:    I may lose my breath on

19

1    occasion because of it.
2        A.    With Standard Advisers, it would just be
3    myself and Kristine Myrick.
4        With Legacy Properties, of which I had no
5    involvement with that corporation, I would believe that
6    Ken Jowdy, Bill Najam, Ken Ayers, Fernando Garcia, Masood
7    Bhatti, Larry Markowitz, Patricia Formisano, Matt Bolland,
8    Mark Thalmann, and perhaps Lois Kagan.
9        Big Isle V, Little Isle, Big Isle IV, Kau
10    Holding, Ula Makika, Na' Alehu Ventures.
11        Let me stop at Ula Makika.
12        Those ventures which would be paragraph 8
13    through 12, would just be me.
14        Na' Alehu Ventures, documents could be in the
15    possession of myself, Alan Warden, Masood Bhatti, Bill
16    Najam and Ken Jowdy.
17        Diamante Cabo San Lucas, paragraph 14, would
18    be the same inclusive list as paragraph 7, legacy
19    properties.
20        Diamante Del Mar, paragraph 15 would be Ken
21    Jowdy, Bill Najam, Larry Markowitz, Matt Bolland, Mark
Page 17

TR-SEC00000017

Kenner 04 28 11

22  Thalmann, Patricia Formisano, attorney Fernando Garcia,

23  Edward Essa.

24          Teknik Digital Arts, Impact Protective,

25  Codefire, Integrated Telecommunications, Ecser Holding,

20

1   and Tek Connect, which were paragraphs 16, 17, 18, 19, 21,

2   24, any documents I had I would have turned over already

3   to you guys and anything else I would assume would be held

4   by those companies.

5   BY MR. CASTANO:

6          Q.   Do you know the individuals at those

7   companies that may have maintained records that are

8   responsive to the subpoena?

9          A.   I know who the managers of those companies

10  would have been, Teknik Digital Arts, John Ward, Impact

11  Protective, Mark Monica, or their accountant Mike Lanni,

12  Codefire is also John Ward, Integrated Telecommunications,

13  James Milana, Ecser Holding, Moses Goodman, Tek Connect,

14  Robert Thompson.

15          And then in paragraph 20, Arizona Air Park

16  would be Tommy Constantine.

17          Paragraph 22, Big Isle Ventures would be me,

18  I turned over everything I had.

19          Baja Development Corp. would be Ken Jowdy,

20  Bill Najam, Ken Jowdy's father, Taffy Jowdy, Sr., Mark

21  Thalmann.

22          And then the people at Hudson United Bank,

23  which is now something else.

24  BY MR. SMITH:

Page 18

Kenner 04 28 11

25          Q.   TD Bank, Bank North.

                                                                    21

1          A.   I think that's it.   I didn't deal with them

2     much after they were Hudson United other than we

3     subpoenaed them in one of the cases, one of my clients had

4     to sue Ken Jowdy for the money he had lent.

5               And I believe I turned over the documents I

6     received from that subpoena, I think it was TD Bank or TD

7     Bank North, that sounds familiar.

8               Paragraph 25, Almaden Restaurant and

9     paragraph 26, Big O are not related to me.   They are both

10    Owen Nolan's private ventures.   I don't believe I had

11    anything to turn over.

12              I think that was it.

13    BY MR. CASTANO:

14         Q.   Besides Arizona Airpark, would Tommy

15    Constantine have any documents responsive to any of the

16    other entities that appear in Diamante Exhibit 5?

17         A.   He would have settlement documents that took

18    place between myself and my friends, and Ken Jowdy and his

19    entities when Jowdy was trying to absolve himself of all

20    of his wrongdoings in Cabo San Lucas and all the other

21    partnerships we had.

22              And those settlement documents, I think I

23    turned some of them over to you guys.   But I don't have a

24    comprehensive group of them because there were many

25    iterations, would have occurred between the spring of

                              Page 19

Kenner 04 28 11

1    2007, when I began to pursue Ken Jowdy on behalf of myself

2    and my clients, and commenced approximately December 2008

3    when Jowdy, his attorney Tom Harvey, and Masood Bhatti

4    terminated any settlement arrangements with us.    Or

5    attempted settlement arrangements.

6            And they would be related to Diamante Del

7    Mar, Diamante Cabo San Lucas, perhaps Baja Development

8    Corporation in as much that that's where Ken Jowdy took in

9    and received most of the money from myself and my friends

10   as part of a global settlement effort to absolve him of

11   his issues with us.

12           MR. STOLPER:  You say commenced, you mean

13   terminated?

14           THE WITNESS:    I'm sorry, terminated.

15       A.    Terminated.

16       Q.    Any of these entities, for any of these

17   entities and the individuals you mentioned who may be

18   affiliated with these entities, did you have any

19   conversations with them about responsive documents

20   pursuant to Diamante Exhibit 5?

21       A.    I don't believe so.

22       Q.    And you understood the question meaning after

23   you received that subpoena, at some point did you pick up

24   the phone and have a conversation with any of these

25   individuals, perhaps Tommy Constantine or others asking

1    them:  Hey, do you have responsive documents, I received

Page 20

TR-SEC00000020

Kenner 04 28 11

2   a subpoena from the SEC, I need this or I need that?

3        A.   I don't believe so.

4        Q.   I want to show you what has been previously

5   marked as Diamante Exhibit 18.  This is a subpoena sent on

6   or around October 1, 2009 to Philip Kenner for a company

7   named Standard Advisors, Inc.

8             Please take a moment to review.

9             MR. STOLPER:  Was that also attached to your

10  motion to compel?

11            MR. CASTANO:  Correct.

12       Q.   In the interest of speed, I'll put a few

13  different documents before you.

14       A.   That's fine.

15            MR. CASTANO:  Exhibit 9, a subpoena sent to

16  Big Island V Ventures LLC addressed to Mr. Kenner which

17  has been previously marked as Diamante Exhibit 9.

18            A subpoena sent to Little Island 4, Diamante

19  Exhibit 20, which I'm showing Mr. Kenner.

20            A subpoena sent to Big Island IV Ventures

21  LLC, Diamante Exhibit 10, which has been previously marked

22  as Diamante Exhibit 10, I'm showing Mr. Kenner.

23       Q.   Let's just do those few first.

24            Have you seen Diamante Exhibits 18, 9, 20 and

25  10 before?

☐

24

1        A.   I believe I have.

2             MR. STOLPER:  They are part of the motion to

3   compel.

4             MR. CASTANO:  Yes.

Page 21

Kenner 04 28 11

5          Q.   Have you seen them before?

6          A.   I believe I have, yes.

7          Q.   To your knowledge, have you produced all

8    responsive documents pursuant to these subpoenas?

9          A.   Yes.

10         Q.   Likewise, we discussed the subpoena sent to

11   you directly.

12              Where did you look for documents responsive

13   to these subpoenas?

14         A.   The same place as I did for the response to

15   Exhibit 5.

16         Q.   And if I were to show you any other

17   subpoenas, would your answer be the same?

18         A.   Yes.

19         Q.   Did you have any discussions with any

20   individuals besides attorneys about responsive documents

21   to Exhibits 18, 9, 20 and 10?

22         A.   I don't believe so.

23         Q.   Are you aware of any records that are no

24   longer in your possession or control that were once

25   responsive to Diamante Exhibit 18 --

                                                        25

1               MR. STOLPER:   All the subpoenas in front of

2    him?

3          Q.   All the subpoenas in front of you, 10, 20, 9

4    and 18?

5          A.   I am not aware of any others.

6          Q.   Have you destroyed any documents that were

7    responsive to the subpoenas in front of you?

Page 22

Kenner 04 28 11

8       A.   I have not.

9       Q.   I'll take these back.

10   BY MR. SMITH:

11      Q.   Have any documents responsive to any of those

12   subpoenas been withheld on the ground of privilege?

13      A.   Not that I'm aware of.

14      Q.   Or withheld for any other purpose?

15      A.   Not that I'm aware of.

16   BY MR. CASTANO:

17      Q.   I'm showing you what has been previously

18   marked as Diamante Exhibit 11, a subpoena sent to Baja

19   Development Corp.

20          Diamante Exhibit 14, which is a subpoena sent

21   to Big Island Ventures LLC.

22          Diamante Exhibit 19, which is a subpoena sent

23   to Na' Alehu Ventures 2006 LLC.

24          Diamante Exhibit 22, which is a subpoena sent

25   to Ula Makika LLC.

26

1           Exhibit 15, a subpoena sent to Kau Holding

2    Company LLC.

3           MR. CASTANO:  I'm showing Mr. Kenner the

4    Diamante exhibit.

5       Q.   Please take a moment to review.

6           MR. STOLPER:  Those were all part of your

7    subpoena enforcement action?

8           MR. CASTANO:  Right.

9       A.   Chris, if I can assume that these are all the

10   exact copies of what was sent during that subpoena

Page 23

Kenner 04 28 11

11    enforcement activity, then I have seen these documents.

12         Q.   And these subpoenas, Exhibits 15, 22, 19, 14,

13    11, called for you on behalf of the entities to produce

14    certain documents.

15              Have you now produced all responsive

16    documents that you have in your possession or control that

17    are responsive to these subpoenas?

18         A.   Yes.

19         Q.   Where did you search for documents responsive

20    to these subpoenas or exhibits that are in front of you?

21         A.   The same places I did for Exhibit 5.

22         Q.   To your knowledge, are you withholding any

23    documents on the basis of any privilege?

24         A.   I am not.

25         Q.   Are there any records that are no longer in

                                                          27

1     your possession or control that were once responsive to

2     the exhibits in front of you?

3          A.   Not that I'm aware of.

4          Q.   Have you destroyed any documents that were

5     once responsive to the exhibits in front of you?

6          A.   I have not.

7          Q.   We'll take them back, thank you.

8     BY MR. SMITH:

9          Q.   Just a quick question.  You mentioned in

10    three locations, you mentioned places where you looked for

11    responsive documents to the subpoenas, one being paper

12    files that you kept in your office, second being a laptop,

13    and the third being some other storage boxes where you had

                          Page 24

TR-SEC00000024

Kenner 04 28 11

14    stored some paper files; is that right?

15          A.   Yes.

16          Q.   Is there any other location where any

17    potentially responsive documents could be?

18          A.   I don't believe so.

19    BY MR. CASTANO:

20          Q.   And that applies to other people who may have

21    responsive documents?

22          A.   That is correct, I assume he was asking about

23    my specific --

24                MR. SMITH:   Your possession.

25          Q.   Between 2002 and present, did you ever have

28

1    any storage facilities?

2          A.   No.

3          Q.   Did you ever store documents or maintain

4    documents at                              ?

5          A.   That is the only location.

6          Q.   That wasn't a test question.  I just wanted

7    to make sure I had the exact address correct.

8          A.   Yes, it's too bad, that was an easy test.

9          Q.   I want to shift gears a little bit and talk a

10    little bit about your background.

11                What is your Social Security number?

12          A.                       .

13          Q.   Have you ever used any other Social Security

14    number?

15          A.   No.

16          Q.   What is your date of birth?

Page 25

Kenner 04 28 11

17    A.

18    Q.    Where were you born?

19    A.    Buffalo, New York.

20    Q.    Did you grow up in Buffalo, New York?

21    A.    Yes.

22    Q.    What is your country of citizenship?

23    A.    U.S.A.

24    Q.    Are you currently married?

25    A.    No.

29

1    Q.    Were you ever married in the past?

2    A.    Yes.

3    Q.    How many times were you married?

4    A.    Once.

5    Q.    What is your ex-wife's name?

6    A.    Tracy Kenner.

7    Q.    Does she still have that name?

8    A.    Yes.

9    Q.    Do you have any children?

10    A.    Yes.

11    Q.    How many children do you have?

12    A.    Two.

13    Q.    What are their names?

14    A.

15    Q.    What is your current address?

16    A.                              , Las Vegas,

17    Nevada 89101.

18    Q.    How long has that been your current address?

19    A.    Approximately two years.

Page 26

TR-SEC00000026

Kenner 04 28 11

20      Q.   Prior to that, where did you live?

21      A.                              |, Las Vegas,

22   Nevada, 89103.

23      Q.   How long did you live there?

24      A.   Approximately 2 years.

25      Q.   Then prior to that, where did you live?

0                                                           30

1       A.                         , Scottsdale, Arizona,

2   85259.

3       Q.   Prior to that, do you recall?

4       A.   I lived in Boston -- excuse me, I lived in

5   Arizona, I lived at                    , Scottsdale,

6   Arizona.

7       Q.   When did you first move to

8     ', approximately?

9       A.   Approximately 2001.

10      Q.   For any of the residences you mentioned, I

11   guess starting with                  Road and going

12   forward, do you own any of these homes or do you rent

13   them?

14      A.   I do not own any of them.

15      Q.   Did you ever own any of them?

16      A.   I used to own        with my ex-wife.

17      Q.   I don't want to get into personal details

18   here.

19           Does your wife own that home now?

20      A.   Yes.

21      Q.   And is that pursuant to some agreement you

22   had concerning the breakup of your marriage?

Page 27

TR-SEC00000027

Kenner 04 28 11

23     A.   Yes.

24     Q.   Do you know if the mortgage is paid on that?

25     A.   Yes.

31

1          MR. SMITH:   It is paid, the mortgage is paid

2     on that house?

3          Q.   It's paid in full?

4          A.   No, it's not.

5               I had thought you meant is it being paid.

6          Q.   Paid up-to-date.

7               Do you know who is paying the mortgage?

8          A.   I have been paying it recently.

9          Q.   Is that pursuant to your settlement with your

10     wife?

11         A.   Yes.

12         Q.   You mentioned some other homes earlier in

13     testimony, a home in Mexico?

14         A.   Yes.

15         Q.   Is that a vacation home?

16         A.   No.

17         Q.   Is that a home you own?

18         A.   It's a home that I used to own.

19         Q.   Tell me about that.

20         A.   It was a home that I purchased when I was

21     working on the development in Mexico at Diamante Cabo San

22     Lucas.

23              Prior to the separation of the partnership

24     issues with Ken Jowdy and Bill Najam and the rest of the

25     Mexican gentlemen that lined up on his side, I used that

Page 28

TR-SEC00000028

Kenner 04 28 11

32

1    home for hospitality and for guests of Diamante Cabo San

2    Lucas, our development down there.

3            Q.   Was there a home that you had in your name,

4    in your title?

5            A.   It was held in a Mexican bank trust.

6            Q.   Who owned the trust?

7            A.   I was the beneficiary of the trust.   All

8    property owned by Mexican citizens is held in what is

9    called a Fedi Comiso trust and a trustee by a Mexican

10   bank.

11           Q.   How did you pay for that property?

12           A.   I paid cash for that property.

13           Q.   Where did you get the cash from?

14           A.   The cash I borrowed from John Kaiser, a

15   business partner of mine after we had sold a project home

16   that we had built, renovated and sold.

17           Q.   When, approximately?

18           A.   2008.

19           Q.   How much did you pay for the Mexican property

20   to the trust?

21           A.   I believe about $1.5 million.

22           Q.   All that money came from the sale -- tell me

23   where that money came from?

24           A.   It came from the sale of a renovation project

25   that John Kaiser and I did.

33

TR-SEC00000029

Kenner 04 28 11

1     Q.   Where was the renovation project?

2     A.   In Hermosa Beach, California.

3     Q.   Was it a residence or building?

4     A.   A residence.

5     Q.   Where did you get the monies to purchase the

6   property in California?

7     A.   John and I borrowed the money from friends

8   and family.

9     Q.   From who?

10    A.   Primarily John Kaiser's friends and family.

11    Q.   Do you know who they were?

12    A.   Not specifically.

13    Q.   Would John Kaiser know?

14    A.   Yes, I'm sure he would know.

15    Q.   Would anyone else know?

16    A.   I don't believe so.

17    Q.   How much did you borrow from your friends or

18   family?

19    A.   I don't recall specifically.

20    Q.   Was it more than $1 million?

21    A.   It was not.

22    Q.   More than 500,000?

23    A.   I don't believe so.

24    Q.   More than 200,000?

25    A.   It could have been in the $200,000 range.

34

1     Q.   And who did you borrow that money from?

2     A.   It would have been my own money.

3     Q.   It would have been your money that you had?

Page 30

TR-SEC00000030

Kenner 04 28 11

4          A.   Yes.

5          Q.   So you didn't borrow any money?

6          A.   My wife and I were splitting at the time, so
7    I don't know how to delineate what was hers, what was
8    mine.

9          Q.   So it was your money that you had with your
10   wife?

11         A.   That is correct.

12         Q.   And that money had come from --

13         A.   Our lines of credit.

14         Q.   Where were the lines of credit?

15         A.   Wells Fargo Bank.

16         Q.   Anyplace else?

17         A.   No.

18         Q.   Besides the property in California and the
19   property in Mexico and the property at
20      , were there any other properties since 2002 that you
21   owned?

22         A.   No.

23         Q.   Beside the property in California, property
24   in Mexico that we just discussed and
25      , are there any properties that you might have owned

                                                            35

1    through an affiliate or an entity that you are affiliated
2    with in any way?

3          A.   Not that I'm aware of.

4    BY MR. SMITH:

5          Q.   The Mexico house you said you bought around
6    2008?

                          Page 31

Kenner 04 28 11

```
 7          A.   I believe so.
 8          Q.   And it was sold?
 9          A.   It was foreclosed on.
10          Q.   When was that?
11          A.   I think the proceeding is still going on in
12 Mexico.   But for safety reasons I have not been involved
13 in that for about a year now.
14          Q.   For safety reasons?
15          A.   Yes, that's correct.
16          Q.   Who is involved in it?
17          A.   The bank who is interested in taking the home
18 bank.
19          Q.   And that home was paid for in cash?
20          A.   That's correct.
21          Q.   That you borrowed from John Kaiser?
22          A.   That's correct.
23          Q.   Did you ever pay him back?
24          A.   I did not.
25          Q.   Why is the home being foreclosed on, to your
```

0                                                          36

```
 1 knowledge?
 2          A.   Because subsequently, in order to finance
 3 some of the litigation expenses going after Ken Jowdy and
 4 the United States and Mexico, John Kaiser and I agreed to
 5 take a loan out against the home and we did.
 6          And we had been unable -- we thought we would
 7 have quick resolution with Ken Jowdy in 2008-2009 as the
 8 pressures mounted.   But contrary to our belief, we were
 9 unable to come to resolution with Ken Jowdy in Mexico.
```
                            Page 32

TR-SEC00000032

Kenner 04 28 11

10    And the home has now gone on to foreclosure.

11          Q.    How much was the loan taken out on the house?

12          A.    I believe approximately $1.5 million.

13          Q.    What was the appraised value of the house at

14    the time?

15          A.    I believe close to $3 million.

16          Q.    Where was the loan taken out from?

17          A.    International Bank in Texas.

18          Q.    In whose name?

19          A.    In my name.

20          Q.    John Kaiser's name as well or just yours?

21          A.    Just mine.

22          Q.    Has any portion of that loan been repaid?

23          A.    Just through a series of monthly payments

24    until approximately a year ago.

25          Q.    How much was paid up until that point?

                                                                    37

1           A.    I don't recall.

2           Q.    Approximately?

3           A.    The monthly payments were in the neighborhood

4     of $12,000 on the loan.

5           Q.    About how many months did you pay?

6           A.    I don't recall.   But I stopped paying about

7     a year ago.

8           Q.    The loan was taken out approximately when?

9           A.    Early 2008.   Not long after the initial cash

10    closing.

11          Q.    And you made all payments until about a year

12    ago?

Page 33

TR-SEC00000033

Kenner 04 28 11

13     A.   Yes.

14     Q.   Why did you stop making payments?

15     A.   Because there weren't enough funds to either

16   continue to pursue Ken Jowdy in Mexico on behalf of myself

17   and my clients, or keep a house and let Ken Jowdy get away

18   with stealing our funds in Mexico.

19     Q.   So is International Bank involved in the

20   foreclosure action?

21     A.   I don't know.

22     Q.   Did you have a dispute with International

23   Bank?

24     A.   I have a loan that they would like to get

25   repaid.   And to be frank, I wish I could repay it.

38

1     Q.   Have they sued you?

2     A.   I don't believe so.

3     Q.   The house in California was purchased when?

4     A.   In 2006, I believe.

5     Q.   Was it sold?

6     A.   Yes, it was.

7     Q.   When?

8     A.   In late 2007.

9     Q.   What was the purchase price?

10     A.   $5 million.

11     Q.   What was the sale price?

12     A.   $8.5 million.

13     Q.   How much of that did you realize?

14     A.   I don't recall.

15     Q.   Approximately?

Page 34

Kenner 04 28 11

16      A.    Can you at least describe what you mean, how

17   much did I realize.

18      Q.    I understood that you said it was purchased

19   by you and John Kaiser; is that right?

20      A.    Yes.

21      Q.    My assumption, correct me if I'm wrong, did

22   you both share in the profits made on the sale of that

23   house?

24      A.    I paid for the -- the home was in my name so

25   I paid the taxes on the home.

39

1       Q.    Were there profits in the sale?

2       A.    Yes, there were.

3       Q.    How much?

4       A.    There were about 7 or $800,000 of profit.

5       Q.    How much of that was yours?

6       A.    I'd have to check with John Kaiser.

7       Q.    Did you split it with John?

8       A.    In some manner, with we did, yes.

9       Q.    Did you split it with anyone else?

10      A.    No.

11      Q.    Do you think you got more than half?

12      A.    No.

13      Q.    What's your best recollection, approximately,

14   how much you got?

15      A.    I really don't recall.

16      Q.    Less than half?

17      A.    Less than half.

18      Q.    Less than a quarter?

Page 35

Kenner 04 28 11

19         A.    Perhaps less than a quarter.

20    BY MR. CASTANO:

21         Q.    The house in Mexico, was that a residential

22    house or did you use it for entertaining as well?

23         A.    It was primarily for entertaining.

24         Q.    You first purchased it in 2008?

25         A.    I believe.

40

1          Q.    Do you recall when in 2008?

2          A.    I don't.

3          Q.    Did you purchase it after or before you began

4     pursuing Jowdy for various claims?

5          A.    We began pursuing Ken Jowdy in the middle of

6     2007, but in an attempt to amicably resolve many issues

7     with Ken Jowdy, we did not begin litigation until you guys

8     became aware in 2009, in the United States.

9                And perhaps a little earlier in Mexico, in

10    2008.

11         Q.    You mentioned you used the house for

12    entertaining?

13         A.    Yes.

14         Q.    Who were you entertaining?

15         A.    At the time, I was still attempting, and

16    believing, that we were going to resolve the issues with

17    Ken Jowdy.   The biggest problem we ran into is, I

18    believe, Masood Bhatti at Lehman Brothers, because of the

19    way they had cooked the internal books at Diamante, didn't

20    want anybody else to get involved or get their hands on

21    the project.

Page 36

Kenner 04 28 11

22          So I spent 18 months fruitlessly negotiating

23   with Ken Jowdy a settlement where myself or someone I

24   assisted in bringing in would take over and professionally

25   run the development on behalf of myself and the rest of

                                                                    41

1    the investors.

2           So during that period of time, I continued to

3    bring friends, friends of theirs and other potential real

4    estate buyers down to the property, people who represented

5    hotel groups, I would bring them down and let them stay

6    and entertain them, assuming we were moving forward with

7    the project without Ken Jowdy based on what I was being

8    told through the negotiations.

9           Q.   What property?

10          A.   Diamante Cabo San Lucas.

11          Q.   Any other project?

12          A.   The global resolution we were trying to reach

13   included Diamante Del Mar as well.

14          Q.   You were bringing investors down for

15   investments in Diamante Del Mar in 2008?

16          A.   No.

17          Q.   Can you explain to me?

18          A.   I was entertaining individuals who I was

19   hoping would buy our hotel site, would buy residential

20   properties around the golf course that was being built, et

21   cetera.

22          Q.   And that's for Diamante Cabo San Lucas?

23          A.   That's correct.

24          Q.   We'll turn a little more to that later in

                              Page 37

Kenner 04 28 11

25    testimony, either today or tomorrow.

                                                              42

1           A.   Chris, do you mind if we take a break?

2                MR. CASTANO:  We are off the record at 10:47

3    a.m.

4                (Recess.)

5                MR. CASTANO:  We are back on the record at

6    10:57 a.m.

7                Mr. Kenner, while we were off the record,

8    were there any substantive conversations between

9    ourselves, the staff here, and you?

10               THE WITNESS:    None.

11               MR. CASTANO:  While we were off the record,

12   Mike mentioned that there might be something concerning

13   Tommy Constantine and whether Tommy Constantine may have

14   destroyed records.

15               I'm not going to ask Mr. Kenner about any

16   such conversations or information that he may know about

17   concerning whether Mr. Constantine has, in fact, or

18   perhaps, altered or destroyed any records.

19   BY MR. CASTANO:

20          Q.   Mr. Kenner, can you tell me anything about

21   that?

22          A.   I have not witnessed any document destruction

23   in person with him, but I believe based on conversation

24   that I have had with him in the past that it would be a

25   normal business practice for him to not save and store

Page 38

TR-SEC00000038

Kenner 04 28 11

43

1  documents that he thought were detrimental to his person

2  or his business practices.

3          Q.    You said a lot there.    Let's just break it

4  down.

5                I suppose we should just start with:    Who is

6  Tommy Constantine?

7          A.    He is a former business partner of many of my

8  clients and a former acquaintance of mine.

9          Q.    When did you first meet Tommy Constantine?

10         A.    In or about 2002.

11         Q.    Is Tommy Constantine known by any other

12  names?

13         A.    I believe he is formerly known as Tommy

14  Hormivitis.

15         Q.    Can you spell that for the record?

16         A.    I don't think so.

17         Q.    Can you try?

18         A.    Okay.   H-O-R-M-I-V-I-T-I-S, that may be

19  close.

20         Q.    Do you know why he changed his name?

21         A.    I believe he changed his name after he got

22  out of prison and wanted to create a new image for

23  himself.

24         Q.    Do you know what he was in prison for?

25         A.    I believe he was in prison for drug

44

1   trafficking.

Page 39

TR-SEC00000039

Kenner 04 28 11

2      Q.   When did you learn that he was in prison for

3   drug trafficking?

4      A.   Approximately 2007.

5      Q.   How did you learn that?

6      A.   He told me.

7      Q.   Did anything prompt you to ask him, or did he

8   just volunteer it?

9      A.   He volunteered it in and around the time he

10   began assisting in the negotiations of the global

11   settlement with Ken Jowdy and Bill Najam and Masood Bhatti

12   from Lehman Brothers.

13      Q.   We are going to talk about Tommy Constantine

14   later in the testimony, but just a moment ago you

15   mentioned it was a standard business practice to destroy

16   documents, and I certainly don't want to be putting words

17   in your mouth, that he felt were in sum or substance

18   detrimental to him.

19          Can you tell me a little bit about that?

20      A.   Just based on my interactions over the years

21   with him, his typical business practice was not to leave

22   much of a trail of discussions, a trail of communications,

23   or trail of business materials.

24          And it all made sense to me in 2007 when he

25   was having ongoing discussions with Ken Jowdy and Ken

45

1   Jowdy's legal counsel at the time in a settlement to try

2   and absolve Jowdy of all the wrongdoings with myself and

3   my friends and clients.

4      Q.   When you say it all made sense to you, what

Page 40

                              Kenner 04 28 11
5    do you mean?

6         A.   When he disclosed to me that he had formerly

7    been in prison for drug trafficking, the stories he had

8    always told or alluded about his business mannerisms made

9    sense with what my interpretation of was a guy who lived

10   always under the watchful eye of being an ex con.

11        Q.   Is that something you just surmised on your

12   own or is that something he said to you?

13        A.   Maybe you can ask that again.

14        Q.   No problem.

15             You mentioned just now that Constantine would

16   not necessarily retain information and documents because

17   he was an ex con.

18             Did he say to you in substance:   Hey, I

19   don't retain everything because I'm an ex con, and being

20   an ex con gives me certain insight into retaining

21   documents and, therefore I'm not going to retain

22   documents?

23        A.   In very similar conversations he would allude

24   to that context, as well as any time I would send him

25   anything substantive related to funds that were being


                                                        46


1    advanced to him, that he was uncomfortable with, he would

2    immediately follow with a phone call, and chew me out for

3    putting something in writing.

4             And that would occur on many occasions.   Not

5    just with me, but I know John Kaiser had told me the same

6    when he started to raise flags with Constantine in

7    2008-2009.

                         Page 41

Kenner 04 28 11

8     Q.   When you say he would chew you out for

9   sending funds, did you say?

10      A.   When I would loan him money, or John Kaiser

11   would loan him money and we would send an E-mail to

12   corroborate:   We just lent you $17,000 so you could close

13   on your -- so you could pay the final engineering bill for

14   your airplane hangar.   He would call and immediately say:

15   Don't ever send stuff like that, I know it's there and you

16   know it's there, you don't need to send that stuff in case

17   we ever get in litigation together.

18          That was always his biggest concern, fear.

19      Q.   We'll talk about more of this later.

20          Just generally, though, right now, did you

21   ever have any loan agreements, written loan agreements

22   with Tommy Constantine?

23      A.   There were several agreements that I sent

24   along to you guys.   I'm not sure if they're qualified as

25   loan agreements or consulting agreements.   But I sent you

47

1   everything that we had, and there were several oral

2   agreements that we could never get Constantine to sign off

3   on.

4      Q.   Putting aside that Mr. Constantine may have

5   called you up and said:   Why are you confirming this

6   because of any potential litigation, do you know whether

7   Tommy Constantine ever said to you in any way that:   I'm

8   going to immediately destroy this E-mail or I'm going to

9   immediately destroy this document?

10      A.   Not in those specific terms, no.

Page 42

Kenner 04 28 11

11       Q.   Do you know what terms he used, if any?

12       A.   I surmised based on the way he would react to

13   E-mails coming across his desk that he wasn't comfortable

14   with, that he was, in fact, not in the practice of keeping

15   documents or substantive information around.

16       Q.   Mr. Kenner, what I'm trying to ask is:

17   You're surmising it, what is the basis of your surmise,

18   why do you have this belief?

19       A.   I'm going to suggest that in general, dealing

20   with him for approximately a five-year period of time, his

21   mannerisms all led me to believe that by the time we no

22   longer were acquaintances, business partners.

23       Q.   Just so that the record is clear, you've

24   never seen Mr. Constantine destroy any documents?

25       A.   I have not.


                                                            48


1        Q.   And just so that the record is clear, Mr.

2    Constantine has never affirmatively told you:  I have

3    destroyed these documents?

4        A.   He has never told me affirmatively.

5        Q.   You're just basing this based on your general

6    understanding of Mr. Constantine based on dealing with him

7    in your business relationships?

8        A.   That is correct.

9        Q.   And there is no written document via E-mail

10   or otherwise concerning Mr. Constantine and his record

11   retention practices that you're aware of?

12       A.   I'm not sure I understood that.

13       Q.   I can ask the question again.

Page 43

Kenner 04 28 11

14      You're not aware of any written E-mail or

15 otherwise business practices of Tommy Constantine

16 concerning record retention, are you?

17      A.   Not that I'm aware of.

18           MR. STOLPER:  Chris, before you go on to a

19 different subject, I just wanted to clarify that this was

20 prompted by your earlier question at the first session:

21 Do you know of anybody that would have information in

22 response to Exhibit Number 5 that may have destroyed

23 documents.

24           As Phil has testified, he doesn't know that

25 Tommy Constantine has destroyed documents, but it raised a

49

1 good question in his mind and in mine and we thought we

2 would share it with you off the record and now he's

3 fleshed it out.

4           MR. CASTANO:  Thank you.

5      Q.   Mr. Kenner, do you have any -- we discussed

6 homes, do you have any other assets, for example, perhaps

7 a car?

8      A.   I have a car.

9      Q.   Do you have multiple cars or just one?

10      A.   Just one.

11      Q.   What kind of car do you have?

12      A.   I have a 2008 Hummer H 2.

13      Q.   Do you have any other cars?

14      A.   I do not.

15      Q.   Since 2002, have you had multiple cars or

16 just the Hummer?

Page 44

TR-SEC00000044

Kenner 04 28 11

17    A.   I've had multiple cars.

18    Q.   Can you tell me about them?

19    A.   I owned a few cars from my wife, which I

20  don't recall what they are.

21         I used to have a car that I had as a child

22  that I had to sell to raise some money to pay for some

23  litigation expenses.

24    Q.   What was that?

25    A.   It was a 1963 Corvette.

50

1     Q.   When did you first purchase that car,

2   approximately?

3     A.   20 years ago.

4          I had another pickup truck that I used to

5   move materials around that I sold to a friend to raise

6   money for litigation and living expenses.

7          I believe that's it.

8     Q.   Do you own any jewelry?

9     A.   No.

10    Q.   Do you have any pensions?

11    A.   None.

12    Q.   Any 401(k)s?

13    A.   No, I cashed them out to pay for litigation

14  expenses.

15    Q.   When you say you cashed out a 401(k), how

16  much was the 401(k) valued at before you cashed it out?

17    A.   Over $100,000.

18    Q.   Where did the funds in the 401(k) come from?

19    A.   From salary, earnings, since I was 20 years

Page 45

TR-SEC00000045

                        Kenner 04 28 11
20  old.
21        Q.   Where was the 401(k) held?
22        A.   It was last at Charles Schwab.
23        Q.   Do you remember when the 401(k) was
24  established, approximately?
25        A.   About 20 years ago.

                                                    51

1         Q.   Do you own any stocks?
2         A.   I do not.
3         Q.   When I say stocks, I'm referring to any
4   publicly traded stocks?
5         A.   I do not.
6         Q.   Between 2002 and the present, have you owned
7   any publicly traded stocks?
8         A.   Yes.
9         Q.   Which ones?
10        A.   I've had stock portfolios for years through
11  the 401(k), through my 401(k) and my individual holding
12  account.
13        Q.   Would it be fair to say you've owned between
14  2002 and present, 50 equities, 100 equities?
15        A.   Yes.
16        Q.   During that time period, did you trade stocks
17  actively?
18        A.   No, I'm a very passive guy in all aspects of
19  my --
20        Q.   What do you think the peak value of your
21  equity stock position was between 2002 and 2011, the
22  present?

                        Page 46

Kenner 04 28 11

23        A.    Perhaps $500,000 range.

24        Q.    Between 2002 and 2011, the present, whenever

25   you sold it, do you recall when you sold the stocks?

                                                        52

1         A.    I do not.

2         Q.    Was it 2009?

3         A.    I began to slowly liquidate stuff around my

4    divorce, and then subsequently to pay for litigation

5    expenses.

6         Q.    Do you know where the monies came from to

7    purchase the stocks, meaning to purchase equities, where

8    did that money come from?

9         A.    From -- majority came from income.

10              I was a very successful business manager in

11   leading up until 2001-2002, and I started to gain a lot of

12   national attention for the size of my sports and

13   entertainment practice, and by 2003 I was billing between

14   750 and a million dollars a year for a really great

15   business that I ran as a business manager.

16        Q.    That was prior to 2003?

17        A.    That was -- the peak was approximately 2003.

18        Q.    And the monies that you made during that time

19   period, were they used to purchase the stock positions

20   that you had?

21        A.    Yes.

22        Q.    Do you have any safes, like a safe in your

23   house?

24        A.    No.

25        Q.    Do you store cash at all in any way?

                         Page 47

Kenner 04 28 11

53

1        A.   No.

2        Q.   Do you have a safe deposit box?

3        A.   No.

4        Q.   During the time period of 2002 through
5    present, did you have a safe deposit box or safe?

6        A.   No.

7        Q.   Do you store cash on anyone's behalf?

8        A.   No.

9        Q.   To the extent you know, between 2002 and
10   present, what phone numbers have you regularly used?

11       A.   617-901-1156.   And my current 480-235-4193.

12       Q.   Are these cell phones?

13       A.   Cell phones.

14       Q.   Both cell phones?

15       A.   Yes.

16       Q.   The 617 number, do you still have that
17   number?

18       A.   I do not.

19       Q.   When did you stop using that phone number?

20       A.   I don't recall.

21       Q.   These are the only two phones that you've
22   used regularly since 2002?

23       A.   That's correct.

24       Q.   Did your Arizona house, the 10705 East Cactus
25   Road have a landline?

54

Page 48

Kenner 04 28 11

1          A.    It does not.

2          Q.    How about the two other properties that

3    you've mentioned, I think both in Las Vegas, did they have

4    landlines?

5          A.    They do not.

6          Q.    Who are the carriers for the two phones, the

7    two cell phone numbers you mentioned?

8          A.    They would have both been AT&T, I believe.

9          Q.    Do you have any fax numbers that you use?

10         A.    I used to have a fax number.

11         Q.    When you say used to, what do you mean by

12   that?

13         A.    I no longer have it.

14         Q.    What was that fax number, if you know?

15         A.    I don't recall.

16         Q.    Where was that fax number?

17         A.    It was eFax service.

18         Q.    What does that mean?

19         A.    EFax is an electronic number that they would

20   just transfer to your E-mail account.

21         Q.    Meaning if you received a fax it would be

22   essentially PDF'd on to your E-mail account?

23         A.    That is correct.

24         Q.    You don't recall that number?

25         A.    I don't.


                                                        55


1          Q.    During what time period did you have that fax

2    number?

3          A.    Up until a couple of years ago.
                        Page 49

Kenner 04 28 11

4      Q.   What E-mail addresses have you used regularly

5  in the last -- since 2002?

6      A.   phil@standardadvisors.com.

7           kenner33@gmail.com.

8           And pak33@mac.com.

9      Q.   Any others?

10     A.   Not that I recall.

11     Q.   Did you have an E-mail address at any

12  Diamante entities?

13     A.   I believe there was one but I never used it.

14     Q.   You never used it?

15     A.   I don't believe so.

16     Q.   Do you recall ever signing onto it, at least

17  once?

18     A.   I'm sure I did.

19     Q.   Do you recall what the E-mail address was?

20     A.   I think the tag name was:  @diamantelife.com.

21  But I don't remember what my name was on it.

22     Q.   Did you ever use anyone els E-mail address

23  since 2002?

24     A.   Not that I recall.

25     Q.   You don't recall using anyone else's E-mail

56

1  address?

2      A.   Not that I recall.

3      Q.   I understand on occasion you might have to

4  pick up someone else's cell phone to make a phone call,

5  but do you recall ever regularly using someone else's

6  phone to make phone calls?

Page 50

TR-SEC00000050

Kenner 04 28 11

7        A.   No.

8        Q.   Have you ever been an officer or director of

9   a publicly held company?

10        A.   I don't believe so.

11   BY MR. SMITH:

12        Q.   You mentioned the standardadvisors.com

13   address, what time period did you use that address?

14        A.   From 2003 until approximately 2007.

15        Q.   And you mentioned a G mail?

16        A.   Yes.

17        Q.   What time period did you use that address?

18        A.   From approximately 2005 until current.

19        Q.   And you mentioned a mac.com address?

20        A.   Yes.

21        Q.   What time period did you use that address?

22        A.   Approximately the same.

23        Q.   2005 to current?

24        A.   Yes.

25        Q.   And you mentioned the diamantelife.com that

57

1   you; I guess, rarely used, what time period would that

2   have been used when it was rarely used?

3        A.   I believe it was set up in and around 2006.

4   But I rarely used it.   It may still be active today.

5        Q.   Can you access it?

6        A.   I don't think so.

7        Q.   Do you know how to access it?

8        A.   I do not.

9        Q.   Do you know whether anyone knows how to

Page 51

TR-SEC00000051

Kenner 04 28 11

10   access it?

11        A.   I would assume Matt Bolland.

12        Q.   Presumably you didn't access it or didn't try

13   to access it in looking for documents in response to any

14   subpoenas?

15        A.   That would be correct.

16        Q.   The standardadvisors.com address that you

17   said closed around 2007, what happened to the E-mail?

18        A.   I tried to contact the server company that we

19   used to use.

20        Q.   What company was that?

21        A.   It was a hosted company, but I don't recall

22   who it was.   I tried to contact to see if they had any

23   backup of any E-mails, and there was not just in pursuant

24   to the subpoena, Exhibit 5, but for all the litigation I

25   was going through with Ken Jowdy to see if there was other

0                                                    58

1    documents I could retrieve, and they told me they don't

2    store or save any E-mail traffic.

3             So when I lost that E-mail service, it was

4    gone.

5        Q.   So your understanding is that none of the

6    E-mail that existed on that account exists or is not even

7    retrievable?

8        A.   That is correct.   The only E-mails we would

9    be able to see would be the ones provided by Ken Jowdy or

10   in subsequent litigation with Kristine Myrick that her

11   attorney had originally withheld and then subsequently

12   released to us.

Page 52

TR-SEC00000052

Kenner 04 28 11

13          And I turned over all of the ones that I did

14    see the old Standard Advisors E-mail address.

15          Q.    Did the E-mail hosting service that hosted

16    for Standard Advisors, I assume they hosted for everyone

17    that had a standardadvisors.com E-mail address?

18          A.    That's correct.

19          Q.    Did they stop hosting for everyone in 2007?

20          A.    Yes.

21          Q.    So the E-mail that exists from

22    standardadvisors.com, to your knowledge, how does it exist

23    if no one can access their accounts?

24          A.    There were just paper E-mails or electronic

25    E-mails that Kristine Myrick will retained on her company

                                                          59

1     hard drive, and some of which were turned over to us and I

2     turned all of those over to you guys in the second

3     production.

4          Q.    Did you save any standardadvisors.com E-mail

5     messages off of that E-mail server; in other words, did

6     you save any to your hard drive or otherwise?

7          A.    No.

8          Q.    Did you print any E-mail messages from that

9     server?

10          A.    No, I did not.

11          Q.    The G mail and mac.com accounts you still

12    maintain?

13          A.    Yes.

14          Q.    And did you search both accounts for

15    responsive documents, for documents responsive to the

Page 53

Kenner 04 28 11

16    various subpoenas that we discussed earlier?

17         A.   Yes, we did.

18              MR. SMITH:   Thank you.

19    BY MR. CASTANO:

20         Q.   For the mac and G mail E-mail addresses, have

21    you in any way in the last five years gone through the

22    archive or the historic E-mails that you had in there and

23    deleted any E-mails that may have been responsive to any

24    of the various exhibits or subpoenas that were sent to you

25    the or entities you're affiliated with?

                                                            60

1          A.   No.

2          Q.   The 401(k) you had, just so that the record

3     is clear, where was that account?

4          A.   I believe at Charles Schwab.

5          Q.   And the securities accounts that you had for

6     the equities positions that you had during the period of

7     2002 to present, where were they?

8          A.   I believe they were at Charles Schwab.

9          Q.   Do you know if you had any securities or

10    brokerage accounts at any other broker-dealer or business?

11         A.   At Merrill Lynch at one point.

12         Q.   When was that?

13         A.   Prior to moving them to Charles Schwab.

14         Q.   When did you move to Charles Schwab,

15    approximately?

16         A.   Approximately 2004, 2005.

17    BY MR. SMITH:

18         Q.   That was the regular account or the 401(k)?

Page 54

TR-SEC00000054

Kenner 04 28 11

19      A.   I believe just the regular account.

20           I believe -- and then -- I'm sorry, let me

21  restate that.

22           I believe both accounts moved, my regular

23  account which was joint with my wife, I believe, and then

24  my IRA/401(k) account.

25      Q.   Just to be clear, in 2002, which, I guess, is

61

1   the initial part of the time frame we're talking about,

2   you had two brokerage accounts or two accounts that could

3   hold or trade securities, one being a 401(k) account, one

4   being a non-retirement account?

5       A.   If you don't mind co-mingling the term

6   401(k)/IRA.  As I moved from company to company, I would

7   take the 401(k) money, move it to my IRA which was

8   custodied at Merrill Lynch at the time.

9            So I kept doing that until 2003 when I

10  initiated my own business.

11      Q.   And putting aside the retirement accounts,

12  you also, in 2002, had a Merrill Lynch retirement

13  brokerage account?

14      A.   Yes.

15      Q.   Any other brokerage accounts at that time?

16      A.   I don't believe so.

17      Q.   Moving forward over time, you at some point

18  in 2004 or 2005 transferred the 401(k) -- at that point,

19  it would all have been an IRA?

20      A.   Yes.

21      Q.   You transferred from the Merrill Lynch to the
                        Page 55

Kenner 04 28 11

22    Charles Schwab account?

23         A.    That's correct.

24         Q.    Going forward from that time to the present,

25    have you had any other retirement brokerage accounts?

                                                          62

1          A.    I don't believe so.

2          Q.    To this day, do you maintain the Charles

3     Schwab retirement account?

4          A.    I do not.

5          Q.    That was liquidated?

6          A.    It was liquidated.

7          Q.    Your best recollection of when it was

8     liquidated, finally?

9          A.    In the last two years.

10         Q.    And in 2004-2005, for the non-retirement

11    brokerage account you transferred from Merrill Lynch to

12    Charles Schwab as well?

13         A.    It would have been in the same time period,

14    correct.

15         Q.    And do you still maintain that account?

16         A.    I do not.

17         Q.    When did you terminate that account, finally?

18         A.    I believe that was liquidated in '07-'08 as

19    well.

20         Q.    Now, for the entire time period, 2002 to

21    present, other than the accounts you just listed, Merrill

22    Lynch and Charles Schwab, have you had any other account

23    through which you can trade securities?

24         A.    I don't believe so.

                         Page 56

Kenner 04 28 11

25    BY MR. CASTANO:

0

                                                                         63

 1           Q.   The securities or brokerage accounts that we
 2    just discussed, did you ever have any accounts in any
 3    other names, meaning maybe account in your children's
 4    names or your wife's name or an entity's name between 2002
 5    and the present?
 6           A.   Did I have any?
 7           Q.   Yes.
 8                MR. STOLPER:  You mean for his benefit?
 9                MR. CASTANO:  For his benefit or in any way
10    affiliated with.
11           Q.   Meaning it's a brokerage accounts in your
12    child's name and you're affiliated with it in some
13    capacity?
14           A.   Okay.
15                My daughter has an education investment
16    account that I believe is at Vanguard.   I believe that's
17    it.
18           Q.   That's it?
19           A.   That's it.
20           Q.   Is that education account funded?
21           A.   Yes, it is funded.
22           Q.   Where do those funds come from?
23           A.   From me and my wife.
24           Q.   From salary that you've earned over the
25    years?

0

                              Page 57

TR-SEC00000057

Kenner 04 28 11

64

1      A.   There's about $500 in that account.

2      Q.   Any other accounts?

3      A.   No, not that I'm aware of.

4      Q.   For any entity you may be affiliated with,

5   for example, Standard Advisors, just for example, do you

6   know if Standard Advisors had an equity account?

7      A.   No, they did not.

8      Q.   Any other entity you might have been

9   affiliated with have an equity account?

10     A.   No, they did not.

11     Q.   For example, Diamante Del Mar may have had an

12  equity account through Ken Jowdy but you're not aware of

13  that?

14     A.   That's correct.

15     Q.   Shifting gears between bank accounts, between

16  2002 and present, where have you maintained bank accounts

17  in your name, we'll start with your name then we'll go

18  with bank accounts you might have maintained jointly or

19  bank accounts you may have maintained on behalf of any

20  entity you're affiliated with.

21          Why don't we start with bank accounts you may

22  have maintained in your name from 2002 to present?

23     A.   Accounts in my name would have been held at

24  Wells Fargo bank, and at Bank of America.

25     Q.   That's between 2002 and present?

0                                                        65

1      A.   That's correct.

Page 58

Kenner 04 28 11

2    Q.    Anywhere else?

3    A.    There's a -- I had a Mexican bank account at

4 Santander Serfin after the financing or refinancing of

5 that Cabo home.

6          And I believe that's it.

7    Q.    Bank accounts held jointly being your wife's

8 name or one of your children's names or anyone you might

9 own a joint account with?

10         A.    There are no other joint accounts, perhaps

11 with my wife it would have been at Wells Fargo and/or Bank

12 of America.

13         Q.    Finally, turning to any entities you might be

14 affiliated with, for example, Standard Advisors, where did

15 you maintain bank accounts?

16         A.    For Standard Advisors, it would have been

17 Wells Fargo and then Bank of America.

18         Q.    Anywhere else?

19         A.    I don't believe so.

20         Q.    How about for any other entity that you might

21 be affiliated with?

22         A.    The Guy Dog account would have been at Wells

23 Fargo and then at Bank of America.

24               And then bank accounts that I used for the

25 Hawaii project and affiliated groups were all held at

66

1 Northern Trust Bank.

2               And I don't think anywhere else.

3    Q.    You mentioned a company called Guy Dog?

4    A.    Yes.

Page 59

TR-SEC00000059

Kenner 04 28 11

5      Q.   What is Guy Dog?

6      A.   It was a consulting company that I had, that

7   I used for introducing -- it was a consulting company.

8      Q.   Were you the owner of it?

9      A.   Yes.

10     Q.   We're going to turn to some of these entities

11   a little bit later in testimony?

12   BY MR. SMITH:

13     Q.   On the bank accounts, for your accounts,

14   Wells Fargo, what time period did you maintain the Wells

15   Fargo account?

16     A.   I think the transition from Wells Fargo to

17   Bank of America for all of those entities, for any of

18   those individuals or joint, would have been in the last

19   two years.

20          So it would have been solely Wells Fargo and

21   then stop.   And then solely Bank of America going

22   forward.

23     Q.   And that change was about 2009?

24     A.   Yes.   Approximately.

25     Q.   You currently have a Bank of America account

67

1   in your own name?

2      A.   I do not.

3      Q.   When did that account close?

4      A.   About a year and a half ago.

5      Q.   How long did you have the account at Bank of

6   America?

7      A.   6 to 9 months, perhaps.

Page 60

Kenner 04 28 11

8       Q.    Do you currently have any joint account with

9   your wife?

10      A.    I'm not married.

11      Q.    With your ex-wife?

12      A.    No, I do not.

13      Q.    At some point you had a Bank of America

14  account with your ex-wife?

15      A.    I did not.

16      Q.    I understood you to say earlier that you had

17  a joint account initially with your wife and perhaps

18  ex-wife, depending on the time period, initially with

19  Wells Fargo and then Bank of America?

20      A.    First at Wells Fargo, then the divorce

21  occurred and any Bank of America bank was just myself.

22      Q.    You never had a bank account with your

23  ex-wife at Bank of America?

24      A.    No, I did not.

25      Q.    Is there currently a Standard Advisors

68

1   account at Bank of America?

2       A.    I don't think so.

3       Q.    What is your understanding of the account

4   that used to exist for Standard Advisors at Bank of

5   America?

6       A.    In what context, I'm sorry.

7       Q.    I believe you said you had a bank account

8   with -- that Standard Advisors had a bank account with

9   Bank of America?

10      A.    Yes.

Page 61

TR-SEC00000061

Kenner 04 28 11

11      Q.      Standard Advisors no longer has that account?

12      A.      That's correct.

13      Q.      What is your understanding of when they had

14 closed?

15      A.      I'm sorry, I didn't understand the earlier

16 question.

17      Q.      That's all right, it may not have been clear.

18      A.      In late 2009, perhaps.

19      Q.      What about for Guy Dog, does Guy Dog

20 currently have a Bank of America account?

21      A.      Yes, it does.

22      Q.      Is there still a bank account at Northern

23 Trust Bank?

24      A.      I don't believe there is any accounts at

25 Northern Trust Bank.


                                                        69


1      Q.      To your knowledge, when did they close?

2      A.      Perhaps around the end of 2008.

3      Q.      And you mentioned the Mexican accounts in

4 Santander Serfin when was that account opened?

5      A.      I believe in early 2008.

6      Q.      When did it close, if it's closed?

7      A.      It is closed.

8              I believe it closed six months later.

9 BY MR. CASTANO:

10      Q.      Mr. Kenner, before today, have you ever been

11 a defendant or ever testified in an SEC investigation?

12      A.      No, I have not.

13      Q.      Before today, have you ever testified or been

                                Page 62

Kenner 04 28 11

14    a defendant or respondent in an investigation by any Stock

15    Exchange or self-regulatory organization?

16         A.   I have not.

17         Q.   Before today, have you ever testified or been

18    a defendant or ever met with any state or federal agency

19    or actor?

20         A.   I don't believe so.

21              MR. STOLPER:  The question was have you ever

22    met with?

23              MR. CASTANO:  Yes.

24         Q.   Have you ever met with, for example, an FBI

25    agent or IRS agent?

70

1         A.   I believe I spoke with you on the phone, and

2    met Matt Galiatto and Scott Romanowski two years ago, plus

3    or minus, right after we filed the two lawsuits against

4    Ken Jowdy in California.

5         Q.   Beside that conversation, did you ever speak

6    to any other agents?

7         A.   I don't believe so.

8         Q.   That includes any Mexican agents?

9              MR. STOLPER:  You probably need to qualify

10    that, you mean investigating Phil?

11              MR. CASTANO:  Yes.

12         Q.   Basically the question is:   Have you ever

13    spoken to any federal or state agents besides that

14    conversation we had two years ago with the SEC and the

15    FBI?

16              MR. STOLPER:  We can break it up between the

TR-SEC00000063

Kenner 04 28 11

17  U.S. and Mexico, because Mexico is a different story.

18        Q.    Let's keep it here domestically first.

19              Besides the conversation you mentioned, you

20  just testified about, have you ever had any other

21  conversations with any state or federal or local law

22  enforcement or regulatory agency?

23        A.    I spoke with, several years ago -- I spoke

24  with the head of NHL Security several times in the last

25  few years, who I believe is a former federal official in

71

1   one of the agencies about two separate threats that had

2   been set on myself and my children.

3               I believe the first threat when I was

4   assisting one of my clients at the time, keeping funds

5   away from his father, he had purported his relationship

6   with the Chicago mob and that he was an exiled Chicago mob

7   guy but if I didn't let him take control of his son's

8   money he was going to bring harm to my children and

9   myself.

10              I contacted who I believe was the head of NHL

11  Security at that time, who dealt with some of his former

12  colleagues and I was told they went and paid a visit to my

13  client's father, told him any future contact with me,

14  threats or otherwise, would be dealt with.

15              And that's when I -- that was the first

16  communication I believe I had.

17              And that would have occurred in and around

18  2003.

19              I was subsequently threatened by another

Page 64

Kenner 04 28 11

20  former client of mine, that the next communication he

21  would have with me would be my last.    And I also

22  contacted NHL Security about that.

23          Both times -- let me think about this -- the

24  first communication would have had to occur in

25  approximately 2006, because when the problem came up, I

72

1  spoke with a guy named John Banky who you may be aware was

2  hired by Ken Jowdy as his director of security, and John

3  who was a nice gentleman to me was former director Louie

4  Freeds, special assistant for 9 years, so I trusted that

5  if I shared that information with John he would direct me

6  in the right way and he is the one who told me to contact

7  NHL and at the time he told me even as a former director

8  -- assistant to the director -- he still had full unabated

9  access to the FBI, to the files, and to the resources of

10  it.

11          So he's the one who directed me to go forward

12  and contact NHL Security.

13          I did not speak with him about the second

14  instance.    I just contacted NHL Security myself.

15      Q.    Besides the former FBI agent who was working

16  for or affiliated with Ken Jowdy in some way, have you

17  ever spoken to any state, federal or local law enforcement

18  or regulatory agent?

19          MR. STOLPER:    Other than what he testified

20  about?

21          MR. CASTANO:    Yes.

22      A.    Do you mean the local police?

Page 65

TR-SEC00000065

Kenner 04 28 11

23    Q.    Local police, anyone.

24    A.    I've had the local police come visit the

25    residence at 10705 East Cactus Road several times because

73

1    of vandalism, break-ins and damage to the property since I

2    began litigation with Ken Jowdy in Mexico in 2008.

3            Besides that, I don't believe so.

4            MR. STOLPER:  What about noise complaints?

5            THE WITNESS:    No noise complaints.

6    Q.    Basically I'm interested in any conversations

7    you may have had similar to this one.

8    A.    I understand.

9            I believe that's all I recall.

10    Q.    Who were the two clients, if I understood

11    your testimony correctly, that threatened you?

12    A.    The first was the father of Bates Battaglia.

13            The second former client is Dan Boyle.

14    Q.    The first threat occurred approximately when,

15    and the second threat occurred approximately when?

16    A.    The first occurred approximately 2006, I

17    recall, because that's when I originally had met John

18    Banky, and I recall the conversation with John who

19    directed me how to handle the threats.

20            The second occurred in approximately 2008

21    with Dan Boyle.

22    BY MR. SMITH:

23    Q.    I thought you had said the first was 2003?

24    A.    I misspoke.    I remembered it was after I

25    started my own business.    But the conversation --

Page 66

TR-SEC00000066

Kenner 04 28 11

☐                                                                                          74

1    immediately after it happened, I was with John Banky,

2    because he's the one who told me how to handle it.    I

3    didn't meet John until '06.    That was?    '06 I had the

4    problem with the Battaglias.    Sorry.

5    BY MR. CASTANO:

6         Q.    Can you tell me a little bit about any

7    foreign, Mexican or otherwise, interaction you've had with

8    any state actor or agent?

9         A.    Over the last few years beginning in

10   approximately 2008, I've dealt with a gentleman out of the

11   federal police in Mexico.    I believe he's the head

12   administrator for the federal police who has assisted in

13   our criminal pursuit of Ken Jowdy in Mexico.

14              He has assisted in arranging meetings for me

15   with the former governor, Governor Agundez, which

16   subsequently led to several meetings with the former

17   District Attorney of Baja south, which is about the lower

18   half of the Baja peninsula.

19              Both of those gentlemen, former Governor

20   Agundez who just changed office on the 5th of April after

21   a 6-year term and the former District Attorney are no

22   longer in office, but both of them have proved to be of no

23   use or no assistance in the pursuit of justice in Mexico

24   at the state level.

25              During my negotiating period with Ken Jowdy

☐                                                                                          75

Page 67

TR-SEC00000067

Kenner 04 28 11

1    in '07 and '08, in spite of his oral representations and

2    our efforts through documenting a settlement agreement, he

3    and his attorney, Fernando Garcia spent millions of

4    dollars paying the governor's office and the District

5    Attorney's office to protect Ken Jowdy from our pursuit at

6    the state level.

7            The head administrator for the federal police

8    assisted me since late 2008 at the federal level pursuing

9    Ken Jowdy for frauds he's committed down there to myself

10   and to several other individuals.

11           I was with him as recent as a week and a half

12   ago.

13       Q.   When you say "him," who are you referring to?

14       A.   A gentleman named Ricardo Duarte, and to the

15   best of my understanding of the Mexican system, he is the

16   head administrator for Baja Sur for the federal police,

17   and he has assisted me now in obtaining through the court

18   system an $11 million verdict against Ken Jowdy for fraud

19   in Mexico.

20           I've also obtained a federal arrest warrant

21   for Ken Jowdy in Mexico.

22           Subsequent to the governor's office blocking

23   our arrest and detainment of Ken Jowdy to resolve all of

24   these multiple frauds in Mexico, the governor's office

25   interfered with a federal detention of Mr. Jowdy,

76

1    approximately six weeks ago.

2            At that time, our attorney and the head

3    federal administrator were contacted by Mr. Jowdy's

Page 68

Kenner 04 28 11

4    attorney, Fernando Garcia and offered $100,000 cash each

5    to bury the case in Mexico.

6              Both, to the best of my knowledge, turned

7    down those offers, but we were unable, although we were at

8    the entry to the property where Mr. Jowdy was believed to

9    be that day after a 7-day surveillance, we had obtained

10   finally a private search warrant which I believe has just

11   been translated over the last week to English for the rest

12   of my friends and colleagues to see, to understand the

13   progress we've made, but the governor's office prior to

14   April 5, blocked our ability to enter the property with

15   the federal police, with a loophole that mandates a state

16   official in Mexico deliver the search warrant, deliver the

17   arrest warrant, and monitor and document the activity.

18             Ricardo Duarte has assisted in all of those

19   processes, including, now, also, acquiring precautionary

20   liens against the Diamante Cabo property to cover the

21   damages for fraud that Ken Jowdy has brought upon myself

22   and my colleagues.

23        Q.   Have you produced all the Mexican legal

24   paperwork?

25        A.   The Mexican -- I don't know what we've

0                                                                  77

1    produced as far as Mexican documents.

2              They are very difficult to obtain even for

3    myself.

4              I did produce -- I produced a couple of

5    things, I believe, and if there's any documents that are

6    still coming from my attorney in Mexico, I'm glad to

Page 69

TR-SEC00000069

Kenner 04 28 11

7   continue to turn those over as we pursue.

8            In fact, they're in Cabo San Lucas today,

9   with another hearing date, I believe tomorrow, to

10  synergize our federal efforts with the states support of

11  those federal efforts.

12           I did turn over -- let me back up one step.

13           In Mexico, when we submit paperwork, it all

14  goes to the municipal public office and the notario's

15  office and everything is an original handwritten page and

16  they all get entered into binders that then get stamped

17  and maintained at those offices.   And they don't allow us

18  to go in and just make copies of our documents once

19  they've been stamped and actually manually signed off on

20  by the different offices.

21           I did turn over some documents to you guys

22  that Ken Jowdy used in his defense in one of the cases

23  where my colleagues and I sued him in Arizona, that his

24  attorney had removed some of the documents from the Cabo

25  San Lucas office through some people he had paid off and

78

1   then restamped those documents and forged the notario's

2   signatures on them to hide his contacts in the Cabo San

3   Lucas municipal public and notario offices.   So I did

4   turn those over to you guys.

5       Q.   What was that case, was there a District

6   Court action filed in the United States?

7       A.   I apologize for not understanding the legal

8   system in its entirety.   But I believe it was a state

9   case in Arizona where myself and my Hawaiian partners sued

Page 70

TR-SEC00000070

Kenner 04 28 11

10    Ken Jowdy for approximately $5.5 million of loans that

11    remained unpaid.

12          Q.    What was the disposition of that case, if you

13    know?

14          A.    It was ultimately dismissed with prejudice.

15          Ken Jowdy's initial defense in that case

16    which was completely astonishing was that the monies that

17    were transferred to him for his benefit and to his

18    control, were not loans, but they were investments that we

19    had made, my friends and I, from 2004 until 2006.

20          But under testimony several times, he has

21    refused to acknowledge why there were never any documents

22    that acknowledged those purported investments as his

23    defense suggest.

24          Q.    Was that dismissed with prejudice against

25    you?

                                                              79

1           A.    Yes, it was.

2           Q.    Did you file as plaintiff in that case?

3           A.    I was a plaintiff because of some unpaid

4     funds that he owed me, and also my attorney at the time

5     said the case would have more weight if I filed as a

6     plaintiff.

7           Q.    Just so you know, I don't want to know about

8     any conversations you had with any attorney?

9           A.    Okay.

10          Q.    Besides that Arizona case, are you involved

11    in any other litigations in the United States, or

12    arbitrations in the United States, or have you been since

                        Page 71

TR-SEC00000071

Kenner 04 28 11

13    2002?

14                MR. STOLPER:  Chris, before you proceed with

15    that question, you had asked him about the disposition of

16    the case.

17                I think procedurally, you may want to explain

18    to Chris as he asked about the disposition, where in the

19    case was it when it was dismissed.   It was not tried;

20    right?

21          A.    It was not tried.

22          Q.    The records speak for themselves.

23                Was there a final disposition in the case, to

24    your knowledge?

25          A.    I'm not sure I understand what that means.

                                                              80

1           Q.    In the Arizona case that you were just

2     discussing, was there a final disposition in the case?

3           A.    Can you just describe in layman's terms what

4     you mean by "disposition"?

5           Q.    Was there a judge's order that dismissed the

6     case or a judge's order that in some way finalized that

7     action?

8           A.    Yes.

9           Q.    Was that a judge's order to finalize the

10    action against your claims against Jowdy; is that correct?

11          A.    Yes, they were.

12          Q.    Was the case dismissed?

13          A.    It was dismissed.

14          Q.    By a federal judge?

15          A.    I believe it was a state judge.   But I don't

                            Page 72

TR-SEC00000072

Kenner 04 28 11

16   recall.

17          Q.   A federal or state judge?

18          A.   Yes.

19               And it was dismissed, because while we were

20   in "pro per" for our LLC's changing attorneys, Jowdy's

21   attorneys made an ex parte request to the judge to

22   terminate the case alleging that I was refusing to show up

23   for the second day of a deposition, which was untrue.

24   And the judge asked in written order for me to write a

25   letter to him why I was refusing to show up by a certain

81

1    day.

2                I had already shown up for day 2 of that

3    deposition, and while I was attempting to obtain

4    additional legal counsel under the constraints of legal

5    funds, the judge issued the dismissal without prejudice

6    and I couldn't get an attorney at the time to come in and

7    take on that case.

8                But Mr. Jowdy had spent in the one year,

9    approximately $270,000 of our budget money in Cabo San

10   Lucas to defend himself in that personal action.

11          Q.   How do you know that?

12          A.   Because there's a $270,000 judgment against

13   me for legal fees.

14          Q.   In that case?

15          A.   In that case.

16          Q.   How do you know that it was monies from Cabo

17   San Lucas?

18          A.   Because Mr. Jowdy has testified in several

                        Page 73

Kenner 04 28 11

19   different venues that he was willing to and has taken all

20   of his legal fees from the Cabo San Lucas budget.

21        Q.   You have seen that in testimony transcripts?

22        A.   I saw the transcript, I was present during

23   several of those testimonies.

24        Q.   Let's talk about any other arbitrations or

25   litigations you've been involved in since 2002.


                                                          82


1              Can you just start, besides that Arizona case

2    we just discussed, can you name some of them?

3    BY MR. SMITH:

4         Q.   Before you do that, when was it dismissed,

5    approximately?

6         A.   Most or all of the Ken Jowdy activity has

7    occurred in the last three years, so some time in that

8    period.   I just don't recall because we have been chasing

9    him in many different jurisdictions.

10             MR. CASTANO:   Before we move on to this.

11   It's 11:55, we can beat the rush right now if we go to

12   lunch.

13             Why don't we plan to come back sharply at

14   12:45?   That gives us a 50-minute lunch and we'll beat

15   the lines.

16             We plan to go to late in the afternoon.

17             As of right now it's very much looking like

18   we will go a little bit into tomorrow, perhaps a nice or

19   significant portion of tomorrow.

20             We are off the record at 11:55 a.m.

21             (Whereupon, a luncheon recess was taken at
                                Page 74

Kenner 04 28 11

22    11:55 a.m.)

23

24                              *    *    *

25

⬚                                                                            83

1

2                    A F T E R N O O N    S E S S I O N

3                         (Time noted:  12:45 p.m.)

4

5                    MR. CASTANO:  We are on the record at 12:45

6    p.m.

7                    Mr. Kenner, while we were off the record,

8    were there any substantive conversations between the

9    Commission staff and yourself?

10                   THE WITNESS:    No, there were not.

11   BY MR. CASTANO:

12        Q.    Prior to going off the record, we were asking

13   some questions about some private litigations you may have

14   been involved with?

15                   I want to run through some of them.

16                   Are you aware of a private litigation

17   involving yourself and Owen and Diane Nolan?

18        A.    Yes.

19        Q.    Are you aware of a litigation involving Ethan

20   Moreau and Tommy Constantine?

21        A.    Yes.

22        Q.    Are you aware of a litigation involving

23   Steven Hilton and Constantine Management Group?

24        A.    Yes.

                        Page 75

Kenner 04 28 11

25          Q.    Are you involved or know about a litigation

84

1    concerning yourself and Kristine Myrick?

2          A.    Yes.

3          Q.    Is there just one litigation involving her or

4    multiple?

5          A.    One.

6          Q.    How about a litigation involving yourself and

7    Ken Jowdy that's currently pending in the Superior Court

8    in California?

9          A.    No.

10         Q.    Is that not pending anymore?

11         A.    No longer pending.

12         Q.    What happened with that case?

13         A.    It was dismissed against Jowdy.

14         Q.    What do you mean by, dismissed against Jowdy?

15         A.    I believe you're talking about Jowdy's

16   plaintiff suit against myself and some of my colleagues

17   that he owed a lot of money to.   I believe it was the

18   malicious prosecution case he brought.

19              The case was dismissed against Jowdy under a

20   slap motion for a number of plaintiffs and then as a

21   result they dismissed the case against me in my favor

22   prior to me filing the same slap motion.

23              I believe the only open litigation as far as

24   I'm aware in that case is Jowdy versus Constantine.   I

25   think he may be the only plaintiff -- only defendant still

TR-SEC00000076

Kenner 04 28 11

85

1   in that case.
2          Q.   Are you aware of a case involving yourself
3   and Nick James?
4          A.   Yes.
5          Q.   Is that currently pending?
6          A.   No, resolved.
7          Q.   How about Joe Juneau versus yourself and
8   other entities?
9          A.   I'm aware.
10         Q.   Is that pending?
11         A.   No, it was dismissed.
12         Q.   How about Ethan Moreau against yourself?
13         A.   It was dismissed.
14         Q.   Glen Murray versus Ken Jowdy?
15         A.   That went to trial.
16         Q.   How about Greg de Vries and others versus
17  Jowdy?
18         A.   That was -- we dismissed that case.
19         Q.   When you say "we," who are you referring to?
20         A.   All of the plaintiffs.   There were
21  approximately 19 plaintiffs between that case and the next
22  one.   Which I believe was probably titled Nash.
23         Q.   Nash versus Jowdy, was that dismissed as
24  well?
25         A.   Yes.

86

1          Q.   Are you aware of any other litigations that

Page 77

TR-SEC00000077

Kenner 04 28 11

2  you in any way are affiliated with besides the ones I just
3  mentioned, outside of Mexico?
4      A.   What time period?
5      Q.   Between 2002 and present?
6      A.   I believe there was other.  It was in 2003
7  -- excuse me.  I believe there are two more, one that we
8  discussed earlier which was the Arizona case, that was
9  myself and my Hawaii colleagues against Ken Jowdy.
10          And the other was in 2003 in California.  I
11  sued my former employer, Assante.
12      Q.   Besides that, are you aware of any other
13  litigations either in District Court, State Court or in
14  any type of arbitration or administrative-type setting?
15      A.   I believe there was one other that was Jozef
16  Stumpel versus me, that was also dismissed.
17          MR. STOLPER:   Counterclaims.
18      A.   I'm sorry, there is still an open
19  counterclaim in a lawsuit that myself and other colleagues
20  filed against Tommy Constantine in Arizona that he
21  counterclaimed against a bunch of non-plaintiffs, of which
22  I was one of the non-plaintiffs.
23      Q.   Have you produced all the paperwork to the
24  extent you have it; motions, complaints?
25      A.   Everything that I have I did send along.

87

1      Q.   Are you aware of anything else?
2      A.   I am not.
3          If there are others, I know there's been a
4  few.

Page 78

Kenner 04 28 11

5          MR. STOLPER:  Since I'm counsel in the

6     Constantine litigation in Arizona, the last case that he

7     referenced, he's not a plaintiff, so he has very little of

8     the record that he would have in his possession, but if

9     there is anything you needed, I have everything.

10          Q.  Have you ever been indicted, convicted or

11     pled guilty to any crime besides misdemeanor, traffic

12     infractions?

13          A.  Not that I'm aware of.

14          Q.  Did you attend college?

15          A.  Yes.

16          Q.  Where did you attend college?

17          A.  Rensselaer Polytech Institute.

18          Q.  Did you graduate?

19          A.  Yes.

20          Q.  What year did you graduate?

21          A.  1991.

22          Q.  Did you have a degree?

23          A.  Yes.

24          Q.  What was the degree in?

25          A.  I believe a BS in science.

⬜                                                              88

1          Q.  Did you go to graduate school?

2          A.  I did not.

3          Q.  Do you hold any professional licenses such as

4     a securities license?

5          A.  I do not.

6          Q.  Have you ever held a securities license?

7          A.  Yes.

Page 79

TR-SEC00000079

Kenner 04 28 11

8      Q.   Which, do you recall which securities license

9  you held?

10      A.   Yes, Series 7, Series 63 and the Series 65.

11      Q.   Have those lapsed, expired?

12      A.   Yes.

13      Q.   When did they lapse or expire?

14      A.   I believe sometime in 2005.

15      Q.   Do you know why they lapsed or expired?

16      A.   My securities attorney that assisted in the

17  2003 litigation with Assante told me it was unnecessary

18  for me to continue to hold them.

19      Q.   You mentioned Assante, can you spell that for

20  the record?

21      A.   A-S-S-A-N-T-E.

22      Q.   What was Assante's full name?

23      A.   I think there were several names.   One may

24  have been Assante Global Advisers.   Assante Asset

25  Management.

89

1        They went by a number of different names, RWB

2  Advisers out of San Jose, California.

3      Q.   Was that Assante?

4      A.   It was an Assante owned entity, yes.

5      Q.   And what time did you work for Assante?

6      A.   In 1999 until 2003.

7      Q.   And how many clients, roughly, did you have

8  at Assante?

9      A.   Approximately 135 clients.

10      Q.   Were any of them NHL hockey players?

TR-SEC00000080

Kenner 04 28 11

11        A.   Yes.

12        Q.   How many, approximately?

13        A.   Approximately 85 -- I'm sorry, approximately

14   65.

15             MR. SMITH:   That includes players and former

16   players.

17             THE WITNESS:    Yes.

18        Q.   Was Assante registered with the Commission in

19   any way or any SRO?

20        A.   I'm not sure.

21        Q.   Do you know if you've ever been affiliated

22   with any entity that was registered with the SEC or any

23   self-regulatory organization?

24        A.   I'm not sure.

25        Q.   Before I ask you some questions about

90

1    Assante, are you a member, between 2002 and present, have

2    you been a member of any social clubs or country clubs?

3         A.   I don't believe so.

4         Q.   When did you first start working at Assante

5    in '99?

6         A.   I don't recall what time of year.

7         Q.   Do you recall how you got the job?

8         A.   Yes.

9         Q.   Can you tell me about that?

10        A.   I was recruited by a couple of people at

11   Assante which was a publicly traded Canadian firm, I

12   believe they were a broker-dealer in Canada.

13             The Chairman of the company decided he was

Page 81

Kenner 04 28 11

14 going to expand to the United States, he was going to

15 start operations in California, in the Los Angeles area.

16          He went out, his name is Marty Weinberg, he

17 was the CEO and founder of Assante formerly known, I

18 believe, as Lauren Ward out of Canada, and Marty went out

19 and acquired a number of sports agencies like Lee

20 Steinberg in football, Dave Dunne in football, Jeff Moorad

21 in baseball, Mike Gillis in hockey.

22          Dan Fagan in basketball, and a series of

23 other business managers like myself.  And they approached

24 me with the assistance of one of the accounting groups

25 that he had acquired at Assante, and asked me to come in

0

91

1 and run the business management practice on the sports

2 side in 1999.

3          Q.   When you say run the business management

4 sports side, what does that mean in layman's terms?

5          A.   At the time there were very few business

6 managers in sports who were in the practice of managing

7 individuals and out sourcing all of their respective

8 needs, and I was one of the few who had done that

9 successfully until 1999.

10          Outsourcing of those services would include

11 finding banks for mortgages, for credit facilities, for

12 checking/savings account.

13          They would include finding attorneys for

14 estate planning work or other legal issues.

15          It would include finding insurance advisers

16 for disability insurance, which is a very large part of

Page 82

Kenner 04 28 11

17    the sports practice.    Life insurance needs, other

18    insurance-related necessities of high net worth

19    individuals.

20              And on a day-to-day basis, I would do my work

21    as a third member of a client's family, per se, and assist

22    them in finding all those other individuals to take care

23    of the different issues that would come up in their lives,

24    including finding an investment advisory firm to handle

25    their assets, and as simple as helping them buy and sell

92

1    homes as they were traded.

2              Q.    At Assante Global Advisers, did you ever

3    recommend equities or stocks to any of your clients?

4              A.    I did not.

5              MR. STOLPER:    He's not sure if the entity was

6    called that, he thinks it's one of the trade names they

7    had.

8              Q.    Did you understand the question?

9              A.    Yes.

10             Q.    So whatever the entity was at Assante,

11    between 1999 and 2003, did you ever discuss stocks or

12    equities or investment opportunities with any of your

13    clients?

14             A.    I think that was kind of a broad question.

15                  Maybe I can answer it in two parts.

16                  The discussion of investments occurred all

17    the time with my clients, because they wanted to know what

18    was going on in their life and they needed a layman's term

19    explanation for how either their insurance portfolio

Page 83

Kenner 04 28 11

20    worked or how their estate plan worked or how they worked

21    in constant with their savings plan.

22             So, yes, at all times as a business manager,

23    I would discuss how their investments and their different

24    portfolios would work, including but not limited to their

25    debt portfolios on homes that they had for current living

                                                              93

1     or retirement living.

2              But as far as recommending a particular

3     security, it wasn't my job, much to say I wouldn't

4     recommend an estate planning technique for them.   We

5     would outsource all of those applications to the

6     professionals, to insurance advisers, to attorneys, to

7     investment advisory firms that would handle those

8     particular bases.

9         Q.    Just so the record is clear, while you were

10    at Assante, whatever it was called officially, between

11    1999 and 2003 you never discussed with a client of yours

12    purchasing or not purchasing a particular equity that was

13    traded, for example, on a publicly traded exchange?

14        A.    I don't believe so.

15        Q.    Between 1993 and -- between 1999 and 2003,

16    while you were at Assante, did you ever recommend any

17    private placements for any of your clients?

18        A.    I don't believe so.

19        Q.    Did there come a time -- we'll go back a

20    step.

21             Prior to being at Assante, where were you?

22        A.    I was at State Street Research in Boston,

                          Page 84

Kenner 04 28 11

23    Massachusetts.

24            Q.    How long were you there for?

25            A.    I believe 2 and a half years.

94

1            Q.    What is State Street Research?

2            A.    It was an institutional advisory firm.

3            Q.    When you say institutional advisory firm,

4    what does that mean?

5            A.    Good question.

6                  It was a firm who handled primarily

7    institutional money.   They were investment advisers, and

8    handled approximately $60 billion in assets.

9            Q.    What was your function there?

10            A.    The same as it was later at Assante, and then

11    at Standard Advisors, it was to go out and find new

12    clients and then handle them as a business manager.

13            Q.    While you were at the Boston location, what

14    was the exact name of it?

15            A.    State Street Research.

16            Q.    State Street Research, did you ever recommend

17    that any of your clients purchase any equities?

18            A.    No.

19            Q.    How about private placement?

20            A.    No.

21            Q.    Prior to State Street Research, where were

22    you?

23            A.    I was at Freedom Capital Management.

24            Q.    Where was that?

25            A.    Also in Boston.

Page 85

TR-SEC00000085

Kenner 04 28 11

1      Q.   I'm curious, why would you need securities
2  licenses if you weren't recommending that your clients
3  purchase any equities?
4      A.   I thought at the time when I was with Freedom
5  Capital and at the recommendation of the President of our
6  company, John Donello, that it would be good for me since
7  I'm around the world helping people understand, that it
8  would be better for me to understand what exactly it was
9  that was being presented as a service.
10     Q.   Did you ever discuss with any of your clients
11 while you were at Assante, maybe not purchasing or selling
12 a particular equity, but discuss generally the merits of
13 whether they should invest in any particular equities that
14 are publicly traded?
15     A.   In particular, no.
16     Q.   In general?
17     A.   Absolutely.
18     Q.   So you would have a conversation about
19 whether they should purchase an equity or not?
20     A.   Yes.
21     Q.   Can you tell me about that?
22     A.   Sure.
23          The theoretical basis behind having equities
24 in your portfolio versus fixed income in your portfolio
25 versus having money in your savings account and helping

96

Page 86

TR-SEC00000086

Kenner 04 28 11

1    them understand the difference or the dynamic, dealing

2    with a very unique clientele who typically ends their

3    learning curve in their mid 30s, and has a 40-year

4    timeline to preserve what they've accumulated and then

5    attempt to live off it for the duration of their lifetime.

6            So the merits of an equity debt, of owning

7    your home for cash or understanding what all that was, I

8    believe that was my responsibility to my clients, and

9    that's what they paid me for.

10           Q.    During this time period, the time period

11   being 1999 through 2003, did you ever discuss the merits

12   of any private placement with any of your clients?

13           A.    Absolutely.

14           Q.    Tell me about that.

15           A.    The same discussion as I would with fixed

16   income, with equities, with high risk.

17           In the sports and entertainment world I as

18   much as an athlete, entertainer, as a business manager,

19   became a target of people seeking capital for investments.

20   And I've been approached with hundreds of deals for people

21   to look at.   And on a regular basis my clients would be

22   approached with deal after deal as a target for private

23   investments.

24           So I would discuss the merits of high risk,

25   intermediate risk, low risk, fixed income, and what all

⬚

97

1    that really meant to my clientele.

2            Q.    Did there come a time that you left Assante?

3            A.    Yes.

Page 87

TR-SEC00000087

Kenner 04 28 11

```
 4        Q.   And when was that?

 5        A.   April 1st, 2003.

 6        Q.   Did you leave under amicable conditions or

 7   did you leave under other conditions?

 8        A.   Litigious situation.

 9        Q.   What happened?

10        A.   I had been -- I no longer was enamored by

11   their internal business practices, and I felt it best for

12   myself and my group of clients to seek a better

13   environment to manage and maintain the business that they

14   had become a custom over a decade and a half of me

15   handling them.

16   BY MR. SMITH:

17        Q.   Can we jump back for just a minute and hold

18   where we are where you're discussing your separation from

19   Assante?

20             I just wanted to understand a little better

21   what the setup was between State Street and Assante.

22             You were an employee of State Street?

23        A.   Yes.

24        Q.   How were you compensated?

25        A.   I was paid a salary.
```

98

```
 1        Q.   Bonus?

 2        A.   I believe so.

 3        Q.   Any other income from the firm?

 4        A.   No.

 5        Q.   Or from your clients directly?

 6        A.   No.
```
                    Page 88

Kenner 04 28 11

7        Q.   What was your salary?

8        A.   I don't recall.

9        Q.   Approximately?

10       A.   A couple hundred thousand dollars, salary and

11  bonus.

12       Q.   Combined?

13       A.   Yes.

14       Q.   Annual?

15       A.   Yes.

16       Q.   The kind of work, I take it, you did for each

17  of your clients was roughly comparable, in other words,

18  you did the same service for each of your clients, more or

19  less?

20       A.   Yes.

21       Q.   I just want to understand how it worked.

22            You said, I think, State Street had about 60

23  billion or so in assets under management.

24       A.   Yes.

25       Q.   When you were speaking to your clients about

⬜                                                          99

1  their investments or their investment portfolio, was that

2  their investment with State Street?

3        A.   Yes.

4        Q.   Did you put them into other investments or

5  just State Street?

6        A.   I believe the portfolio managers at State

7  Street utilized some outside advisers as well or outside

8  funds to compliment what the State Street portfolio

9  managers were doing.

Page 89

Kenner 04 28 11

10          Q.    Were those investment decisions made by

11    portfolio managers at State Street?

12          A.    Yes.

13          Q.    So suppose you had a client when you were at

14    State Street, putting aside the insurance, the mortgage,

15    which is their investment portfolio, what would you do,

16    what would you do for your client?

17          A.    First, we would talk, typically myself, my

18    client and if there was a significant other, we would

19    discuss as a group what their savings, what their career

20    goals were and what their objectives were.   And as a

21    result of what type of spending habits, which is really

22    the driving force behind how we would discuss saving

23    versus spending and what they would need in the future, we

24    would come with -- we would come together with a layman's

25    term approach on how much money they would need in the

                                                          100

1    future to sustain a particular lifestyle.

2              And typically we would use some very basic

3    numbers like 4 percent for fixed income investments, 9 or

4    10 percent for equity investments, in a global dynamic

5    portfolio.

6              And 12 to 15 percent in a private equity

7    portfolio.

8              I believe those were all numbers that State

9    Street had furnished to me and Freedom Capital had

10    furnished to me as general investment numbers.

11          Q.    Sort of guidelines for what you might

12    recommend for a particular client?

Page 90

Kenner 04 28 11

13    A.    Guidelines of what would make sense for a

14  player who may be making 250,000 a year, 2 and a half

15  million a year or 10 million a year, based on what kind of

16  annual expenditures they expected and expected for not

17  just their playing days but for the rest of their lives.

18    Q.    And the percentages that they would put into

19  different kinds of investments, whether it's private

20  equity, whether it's securities, that would vary depending

21  on both the income level of the player and also the

22  investment goals and spending habits of them?

23    A.    Yes.

24    Q.    You received guidelines from State Street

25  with respect to that?

101

1    A.    Yes.

2    Q.    You would have this discussion, come up with

3  some sort of allocation?

4    A.    Yes.

5    Q.    And then what?

6    A.    Frankly, it's just an academic allocation.

7  You just take the numbers, annualize it, you come up with

8  what we believe would be attainable, achievable on an

9  annual basis and make sure that was commence rate with

10  potential spending habits of each of the client.

11        In fact, I think I turned over some of those

12  planning pages, some of what I turned over, excuse me, are

13  planning pages that I still had from years past, so you

14  can see how rudimentary it really was.

15        And at Freedom Capital and subsequently at

Page 91

Kenner 04 28 11

16  State Street, I would deal with the internal portfolio

17  managers and tell them a recap of the conversation, my

18  planning notes, and say:   Here's what the income is,

19  here's what the taxes are, here's what the spending levels

20  are, this is what we're trying to achieve and then they

21  would typically implement an equity or a debt or an

22  alternative investment portfolio structure, and from time

23  to time they would actually meet directly with the client

24  as well.   If clients cared to meet with anybody else but

25  myself.

                                                    102

1           Q.   Did you speak with multiple portfolio

2   managers?   In other words, did you speak with someone at

3   State Street in portfolio management with regard to the

4   equities portions, that:   Based on my conversation we

5   want to have 10 percent allocated to equities, 15 percent

6   private equity, would you speak to the portfolio manager

7   with respect to the equities and then a different

8   portfolio manager with respect to private equity and a

9   different portfolio with regard to government debt and

10  whatever else you had?

11          A.   Over time it changed.

12               If we can assume back in 1993 when I started

13  in the business, there really was no blue print for how to

14  handle this particular type of individual because the

15  longevity of their earnings is so much different than just

16  the normal businessman who may achieve great success.

17               So the dynamic of how those portfolios got

18  built by the different portfolio managers continued to

                        Page 92

Kenner 04 28 11

19    change albeit for the better, I believe, until I got to

20    Assante in 1999.

21         Q.    I guess my question, though is:   when you

22    would talk to a portfolio manager about a particular

23    client, would that portfolio manager design the entire

24    portfolio for that client or would there be one portfolio

25    manager who would deal with, say, the equity portion and a

103

1     different one that would deal with the private equity

2     investment and a different manager -- or was there one

3     person that oversaw all their investments?

4          A.    It's a good question because it's really kind

5     of a complex migration.

6               At Freedom Capital, I dealt primarily with

7     one portfolio manager and the president of our company to

8     start with who would assist in the allocation of funds.

9               They would typically deal with our fixed

10    income portfolio people.   They would deal with other

11    broker-dealers where there are alternative investment

12    vehicles.   And the one individual would begin to

13    implement that.

14              As my client base grew from approximately

15    zero to 65 clients, we began to bring an additional

16    portfolio manager on, we would have portfolio management

17    meetings, they would ask me questions about what this

18    client base was really like, because they were typically

19    dealing with institutional investors at the time.

20         Q.    when you say portfolio management meetings,

21    these are meetings you would have outside the presence of

Page 93

Kenner 04 28 11

22    the client with portfolio managers say at State Street?

23          A.    Yes, first at Freedom Capital and when I

24    moved the business to State Street Research, I brought one

25    of the portfolio managers with me, and we began to

104

1     interact with a larger group of institutional managers

2     inside State Street Research.

3          Freedom Capital, I believe, was about a $7

4     billion firm on the management side.   We moved to a

5     larger firm, so there was a greater dynamic of investments

6     available.

7          So then I worked with, again, a larger

8     committee, if you would call it, to talk about the dynamic

9     in the world.

10          They would handle inside a 50 percent bond

11    portfolio where that goes, inside a 50 percent stock

12    portfolio where that goes, international, domestic, value,

13    growth.

14          I would sit in those meetings, if they had

15    questions about what these people were really like as a

16    translator, really, for my client's needs.   But then also

17    so I could hear, if you want to call it in a very

18    sophisticated financial sense, what these meetings are

19    really like, and I could take it back to my client and his

20    wife and say:   This is what the guys are working on, this

21    is why when we talked about simplistically what are we

22    trying to accomplish, this is the implementation of that

23    plan when it gets into the office.

24          And what the portfolio guys are doing.

Page 94

Kenner 04 28 11

25          Q.    What was your role in determining that

105

1     allocation that you presented to the client after the

2     meeting?

3          A.    It was really determined with the clients

4     telling me what they needed at all times.

5                So as we would talk first in a very simple

6     way:   You're earning a million dollars this year, you're

7     going to have about 500,000 after taxes, you want to spend

8     $20,000 a month which is going to be 240,000 this year,

9     you're going to save $260,000.

10               We then talk about:   Do you feel good about

11    paying some of your mortgage down, do you want to go buy a

12    cottage in Canada with that money.   You have $260,000,

13    let's determine what makes you feel good.

14               If we put it all into bonds at 4 percent,

15    you'll get income based on that, $10,000 a year, plus or

16    minus.

17         Q.    Presumably you made recommendations with

18    regard to whether they should get a cottage in Canada or 4

19    percent in bonds?

20         A.    No, the amazing thing in that business is in

21    my job, it's been mischaracterized over the years, people

22    think I'm a broker, people thing I'm an accountant, people

23    think I'm an attorney.   My job is really to take a

24    somewhat uneducated athlete and family who may or may not

25    have a college degree, and have to deal with the life

Page 95

TR-SEC00000095

Kenner 04 28 11

106

1   consequences of winning the lottery.

2            These are very fortunate people that didn't

3   have the life experience to learn about money, and you

4   become 19 years old and get a half a million dollars

5   dropped on and they needed somebody who they felt like

6   they can talk in an inner circle way.

7        Q.   I understand.

8            You have a conversation with the client, then

9   you go back to the portfolio managers and have -- at later

10  stages have meetings with multiple managers and at those

11  meetings you discuss how -- what would be an advisable way

12  for the client to have their resources allocated across

13  different kinds of investments.

14       A.   Yes.

15       Q.   I think you said that the percentages of the

16  different kinds of investments would be given to you by

17  State Street when you were at State Street?

18       A.   That's fair.

19       Q.   And would you alter those percentages?

20            MR. STOLPER:   Would Phil alter those

21  percentages?

22       A.   Would I alter historical performance numbers?

23       Q.   Maybe I'm misunderstanding the numbers that

24  are given to you.

25            I thought you said State Street would provide

107

1   a suggested allocation for a particular client, saying:

Page 96

Kenner 04 28 11

2   We at State Street think this kind of client should have

3   10 percent in stock, 5 percent in government bonds, should

4   have 20 percent in private equity, what have you.

5         Was that sort of allocation given to you by

6   State Street.

7         A.   I understand the question.   I'm sorry.   I

8   was answering from a different perspective.

9         After my conversations with the clients where

10  we would determine what they were going to save and really

11  what their goal was, I would then go back and talk with

12  the portfolio managers or the committee or whomever was

13  involved on the advisory side and we would come up with

14  what they thought the appropriate allocation was.

15  Typically as simple as 50 percent stocks, 50 percent bonds

16  for that 260 grand example.

17        Then on the 130 and 130 the portfolio manager

18  for the equity side would determine:   We have so much in

19  domestic, so much international, so much value, so much

20  growth.  They would tell me that's what we should do with

21  the 50 percent, it seems correct.

22        Then on fixed income, a lot of times the

23  equity managers would play the liaison to the debts

24  portfolio managers and they would come back and say:

25  Short-term, intermediate term, long term duration, U.S.

108

1   government, international fixed income, municipal,

2   non-municipal debt for these clients.

3         And certainly much more sophisticated than

4   most of my clients would want to know the percentage of

Page 97

TR-SEC00000097

Kenner 04 28 11

5    growth value of the portfolio and duration of fixed

6    income, I would typically go back with the message and

7    say:   We came up with 50/50 in your living room.   I went

8    back, the portfolio guy said that's appropriate.   Next

9    month you will have a statement with the new

10   implementation.

11        Q.   And you would sign off or there might be

12   further discussion?

13        A.   On an annual basis or on a

14   contract-by-contract basis, again, depending on how good

15   they are, we all know the stories of pro athletes who blow

16   through all their money and don't know any Bert, if I had

17   a client who signed a 5 year, $25 million deal and in year

18   one he's supposed to save a million-5 and he agreed he

19   needed all of it in fixed income, if at the end of the

20   year we only had $500,000 saved, we would go back in year

21   two of that contract and say:   You missed the mark

22   horribly because you bought X, Y and Z and we would flesh

23   out the reasons why so they can understand.

24        I'm not their parent, I have no control over

25   their fund, I would voice a reason for them.


                                                           109


1         And in year two, we would look at the plan

2    and say:  All right, you have four years and 20 million

3    left, that's all you have.  We missed the mark in year

4    one, let's understand why, let's set up for year two.

5         But if that particular example made it

6    through all 5 years, had 12 million in the bank like the

7    projection said we would based on savings and spending

Page 98

Kenner 04 28 11

8   which is really all I cared about, at that point we

9   wouldn't have another stock/bond conversation until it

10   came time for his new contract.

11          And that's when we would typically say:  Do I

12   have enough to retire if I maintain my spending number.

13   If I don't, how many more years, how much money do I need,

14   can I live in Canada, can I live here.

15          Decisions that the husbands and wives would

16   usually make and I just happened to have the experience a

17   hundred times over because I had a hundred clients.

18          Q.   I think when you were at State Street it was

19   State Street that was providing the investment management,

20   I understand you said in some cases the portfolio managers

21   might have some of the funds outside State Street but it

22   was State Street providing the investment management

23   services?

24          A.   Correct.

25          Q.   Would State Street also provide the other

110

1   kinds of services that you talked about, the mortgage, the

2   insurance, the home buying, things of that sort?

3          A.   They didn't provide any product in those

4   categories, so -- they didn't provide any of those

5   products.  But the service of trying to find an

6   appropriate insurance for property, casualty, disability,

7   life, insurance provider, fell on my shoulders right from

8   day one.

9          Q.   Were there relationships that State Street

10   had or would you just say:  Look, I'll go to Met Life,

Page 99

Kenner 04 28 11

11  I'll go to AIG or whoever?

12  A.  I believe Freedom Capital -- I believe Met

13  Life, if you hadn't said it, I wouldn't have remembered,

14  became the parent company at one point.  When there were

15  insurance-related issues, they asked to bring one of the

16  Met Life people in.

17  My typical plan was much the same, I didn't

18  really deal with a lot of regular high net worth wealthy

19  businessmen.  The age dynamic and the year dynamic and

20  earning dynamic was different than kids earn money to 35,

21  then wonder what I do.  The makeup of the client was so

22  different.

23  On the insurance side, it was very easy to

24  find the three great providers on the disability side,

25  because they represented 95 percent of sports disability

111

1  work.  So you wouldn't go to Allstate and ask if they

2  could do a disability policy, which they could, or Met

3  Life.  But it wasn't going to go through a Lloyds

4  underwriting sell, it wasn't going to get the best points

5  in the marketplace.

6  Much the same as I did it at Freedom Capital,

7  I went and found those appropriate people when I was at

8  State Street, I found a lot of those same people when I

9  was at Assante.  The business is dynamic, so there were

10  insurance guys, mortgage guys, disability guys that were

11  there in '93 that weren't there in '98.  And there were

12  ones in '93 I didn't know.  When I met them in '99, I

13  thought they were best in the world at what they do.

Page 100

Kenner 04 28 11

14    Dynamically --

15          Q.    I follow the changes.

16                But it sounds like State Street provided the

17    investment management.   They did not provide support for

18    any of the other services that you were providing to

19    client, such that you had to go to third-party entities?

20          A.    I think that's appropriate.

21          Q.    When you went to Assante, did Assante have

22    similar services to State Street; in other words, did they

23    manage investments the way State Street did?

24          A.    No.

25          Q.    How did it work, you would have a client when

                                                            112

1     you were at Assante, and presumably you needed to provide

2     the same kinds of services in terms of investment advice

3     or putting together a portfolio for a client?

4           A.    Yes.

5           Q.    But you weren't tied to a particular entity

6     the way you were at State Street, in which you would

7     basically put them in State Street products?

8           A.    That is correct.

9           Q.    What did you do?

10          A.    That is probably the one dynamic change and

11    one of the attractions to then being in the more

12    independent position at Assante, not having direct

13    affiliation to a portfolio management team.

14                The benefit of it was we can go out to the

15    marketplace and not have our hands tied.

16                The set up at Assante, though, much like I

                          Page 101

TR-SEC00000101

Kenner 04 28 11

17    had portfolio managers or a committee that helped

18    determine allocation on equity debt and private, at

19    Freedom Capital, at State Street Research, at Assante,

20    there was an advisory group that would handle the

21    allocations, the dissemination of a portfolio strategy,

22    all the paperwork behind creating this portfolio on the

23    equity and debt side.

24              And then they would be in charge of going out

25    and finding out:   Is it Blackrock, is it Lehman's fixed

113

1     income munies.  What different third party in the

2     marketplace was going to handle all the different pieces

3     of an 8 or 10 or 12 piece portfolio.

4               And the lion's share of that money, which was

5     also part of the better dynamic ran through a group out of

6     Santa Monica called Dimensional Fund Advisors, which I

7     believe is one of the larger institutional portfolio

8     managers, and also a passive index like strategy.

9               Again, trying to get away from anybody

10    interested in:   Do I buy Coke, do I buy Pepsi, and

11    engaging in that kind of rhetoric.

12         Q.    Am I correct, it sounds like what you're

13    saying is that your role was basically the same at State

14    Street as it was at Assante.

15              At Assante, after you would have the client

16    meeting, you would go and have a meeting with, I guess,

17    the investment adviser, I don't know how you characterize

18    it, the ones that you said would put together a portfolio,

19    suggested portfolio for a client?

Page 102

TR-SEC00000102

Kenner 04 28 11

20      A.   Yes.

21      Q.   And was that --

22      A.   It was a migration of 2, to 3, whoever Marty

23 Weinberg flew from in Canada for a meeting of the month.

24      Q.   That would include allocation across

25 different types of assets, and then within asset category

114

1 how specifically the investments would be allocated?

2      A.   That's correct.

3      Q.   And then you would take that back to the

4 client and say:   Here's what we, Assante, are

5 recommending as being appropriate for you?

6      A.   Yes.

7           The one major difference when I got to

8 Assante, the reason they brought me in is, inasmuch as

9 they wanted my client base of about 60 clients that I

10 brought with me, they wanted me to then be that same

11 presentation individual for all of the Lee Steinberg, Dave

12 Dunne, Jeff Moorad, Dan Fagan, Eugene Parker, Mike Gillis,

13 sports client to be able to present.

14           The one piece of the dynamic that did change

15 was instead of me meeting the clients one-on-one, I was

16 then brought in by Jeff Moorad to sit down with Manny

17 Ramirez and say:   Manny, we're about to sign an 8 year

18 $160 million deal, Jeff has asked me to come and present

19 to you, Manny, sit down.

20           Maybe Manny's dad would be there from time to

21 time and there would be a large dynamic of people that

22 would see it, would hear the presentation, would then

Page 103

Kenner 04 28 11

23   review the final proposal, and then would collectively

24   sign off.

25            So at that point there were more advisers in

                                                              115

1    the mix.   Manny Ramirez would have his own accountant who

2    would then want to review everything, there were a lot of

3    professionals, more than had been in the past.

4         Q.   Would that include the Assante committee or

5    individuals who were always making the particular

6    investment recommendations?

7         A.   They wouldn't typically be in the final

8    presentation.   We wouldn't have a round table of 15

9    people, as an example, when I went to deal with Quincy

10   Carter when he was drafted making the quarter back in the

11   Dallas Cowboys, we had Quincy's mom, who was also present,

12   Eugene Parker who was his agent, his Reverend was always

13   there and his girlfriend at the time was always with us.

14            So it would be just me presenting what

15   Assante had brought to the table.

16            This group of people didn't want to hear from

17   a value oriented committee member and a debt oriented

18   committee member because it didn't mean anything to these

19   people.

20        Q.   You served as essentially the funnel for

21   those people in dealing with the clients?

22        A.   I would take the sophisticated presentation

23   of the portfolio, and I would sit at a table and say to

24   either the client or to his group of advisers:   Here at

25   Assante, here's what we can provide.

                        Page 104

Case 2:13-cr-00607-JFB-AYS   Document 401-6   Filed 10/07/16   Page 106 of 270 PageID #: 10264

1              If you're missing an estate attorney, we some

2     in our network.   If you're missing a disability insurance

3     person, we have that this our network.

4          Q.   There was a network of people at Assante, or

5     would that be incumbent upon you to go find whoever it is,

6     the real estate attorney or the life insurance provider,

7     or was there a network that the company used?

8          A.   It was a little of both.   Assante wanted to

9     create some teeth into that market, they tried to forge

10    some relationships themselves.

11             But in the same line, if I had a disability

12    insurance guy that was the best on the planet, they

13    weren't -- although from time to time they tried to force

14    their own people through the system, I still had to

15    represent to the client:   Here's the guy who represents

16    70 percent of major league baseball and the NFL for

17    signing a $10 million disability deal, this is the guy.

18             The disability guy would then make the

19    presentation to the person.   If I brought in an estate

20    attorney, I may be present at some of those meetings but

21    the estate attorney dealt directly with the clients.

22         Q.   How were you compensated at Assante?

23         A.   Salary and bonus.

24         Q.   Any other compensation?

25         A.   I don't believe so.

TR-SEC00000105

Kenner 04 28 11

1       Q.   What was your salary when you were at

2  Assante?

3       A.   It was base, 250,000 a year.

4       Q.   And what was your bonus?

5       A.   I had several million dollars in bonuses that

6  I walked away from as part of the litigation.

7       Q.   Were you ever paid a bonus during the time at

8  Assante?

9       A.   I'm sure I was.   I'm sure I was.

10      Q.   How much?

11      A.   I don't recall.   And I don't recall

12  generally, I'm sorry.

13      Q.   Was it on the order of a million dollars?

14      A.   It was not.

15           It was supposed to be a portion of that

16  several million dollar bonus based on my activity of

17  bringing my clients over and ultimately they reneged on a

18  large share of that.

19      Q.   I understand you don't know the amount, order

20  of magnitude, 10,000, 100,000, you said it wasn't a

21  million?

22      A.   It was probably less than 100,000 a year.

23           MR. STOLPER:  You're asking about bonus.

24      Q.   The bonus.

25           The salary, I understood you had a base?

118

1       A.   250.

2       Q.   What was your bonus based on, you mentioned

3  that there was an initial bonus when you first started,

Page 106

TR-SEC00000106

Kenner 04 28 11

4   based on bringing clients over?

5        A.   Yes.

6        Q.   And how was that bonus structured?

7        A.   I told them I had about 65 clients plus or

8   minus that I would bring over.   And they said if you can

9   do that, we'll pay you X number of dollars to bring them

10  over.

11       Q.   Like per client, if you ended up bringing 60

12  out of 65 you would get some percentage?

13       A.   I don't recall, I don't recall.

14       Q.   Aside from the initial, what was the basis

15  for future bonuses?

16       A.   I don't remember what the bonus basis was.

17       Q.   You don't remember any of the criteria?

18       A.   No, I do not.

19            MR. SMITH:   Sorry, it was a bit of a detour.

20            THE WITNESS:    I do actually forget when you

21  said:   Hold that last thought.

22            MR. SMITH:   When you were talking about the

23  separation from Assante.

24  BY MR. CASTANO:

25       Q.   In or around 2003 you separated from Assante?

119

1        A.   Yes.

2        Q.   You mentioned there was a litigation

3   involving Assante?

4        A.   Yes.

5        Q.   And yourself?

6        A.   Yes.

Page 107

TR-SEC00000107

Kenner 04 28 11

7        Q.   Did you file suit against Assante or did

8   Assante file suit against you?

9        A.   I was the plaintiff.

10       Q.   What did you allege?

11       A.   A series of bad business practices, and the

12  ultimate attempt was just to break my non-compete

13  agreement which they ultimately did about six months

14  later, and allowed me to walk with the 65 clients that I

15  identified were my clients that I had brought to Assante.

16       Q.   Did it settle out of court?

17       A.   Yes.

18       Q.   Was the case filed in a state court?

19       A.   It was in California, and I believe it was a

20  state court filing.

21       Q.   The settlement, you got your clients, you're

22  allowed to break the non-compete clause, and that was it?

23       A.   I had to walk away from all the bonus money

24  that they owed me.

25       Q.   That was generally the end of the settlement,

120

1   or generally the terms of the settlement?

2        A.   I believe so.

3        Q.   Did you pay them any money?

4        A.   I don't believe so.

5        Q.   Did they make any allegations against you,

6   any type of counterclaim?

7        A.   They tried to enjoin me from doing business.

8             They actually filed a suit or attempted to

9   file a suit -- I filed in California.   They immediately

Page 108

Kenner 04 28 11

10    tried to file a suit against me in Arizona.    They served

11    my ex-wife on Good Friday with an ex parte hearing for

12    Monday after Easter alleging that the California case had

13    been thrown out, and that there was no pending case any

14    longer.

15              But they, I believe, sued me as plaintiff and

16    myself as the defendant, and they tried to bully the judge

17    into stopping me from talking to my clients or doing

18    business for a 6-month period of time.

19              And the judge gave us about a two-week time

20    period of non-activity which allowed me to keep dealing

21    with my clients, and at that point the Judge called us

22    back in and reprimanded them for lying to the court in

23    Arizona, I don't know the legal term, he held off on any

24    opinion saying there is an outstanding case in Arizona,

25    and he got mad at their Arizona attorneys for alleging

                                                         121

1    that the case had been dismissed.

2              And then everything else happened in

3    California.

4         Q.    We're going to shift gears now.

5              I want to talk to you a little bit about

6    Diamante Del Mar.

7              What is Diamante Del Mar?

8         A.    Diamante Del Mar is a real estate development

9    in El Rosario, Mexico, which is in north Baja.

10        Q.    What is the business of Diamante Del Mar?

11        A.    Diamante Del Mar was established by Ken Jowdy

12    and Bill Najam to create a 10,000 acre golf course resort,

                              Page 109

Kenner 04 28 11

13  residential environment.

14      Q.   When did you first learn about Diamante Del

15  Mar?

16      A.   I believe sometime in 2002.

17      Q.   How did you learn about it?

18      A.   Two of my hockey clients had asked me to go

19  to New York City and meet with a gentleman named Ken Jowdy

20  who they were friend with, and told me it was affiliated

21  with baseball players and had relationships much the same

22  as I did with a significant number of NHL players.

23      Q.   Who were the two NHL hockey players?

24      A.   Byron Dafoe and Jason Allison.

25      Q.   Is that the first time you heard the name Ken

122

1  Jowdy?

2      A.   Yes.

3      Q.   Did they mention Diamante Del Mar or did they

4  mention Ken Jowdy, or did they mention both?

5      A.   They mentioned Ken Jowdy, Diamante Del Mar

6  and also a restaurant that Ken Jowdy was opening in the

7  meat packing district in New York.

8      Q.   And you believe this was in 2002?

9      A.   I believe so.

10      Q.   Did you, in fact, meet with Mr. Jowdy?

11      A.   Yes.

12      Q.   Where did you meet with him?

13      A.   At his restaurant in the meat packing

14  district.

15      Q.   What was name of that restaurant?

Page 110

TR-SEC00000110

Kenner 04 28 11

16      A.   "Trust".

17      Q.   Did you have multiple meetings with Mr. Jowdy

18  or did you just have one meeting with Mr. Jowdy around

19  this time?

20      A.   I met with him several times in 2002 in the

21  immediate weeks or month following that first meeting.

22      Q.   Where did they take place?

23      A.   At least the first one and maybe another took

24  place at the restaurant, at Trust.

25           I believe there was one or two other meetings

123

1   in the city, in New York City.   And then I only recall

2   this through other testimony so I just want to be clear,

3   that I believe one of the next meetings occurred in Texas.

4            But on my own prior to hearing other

5   testimony I didn't recall that being one of the next

6   meetings but it's been suggested that it was.

7       Q.   Do you recall whether you in fact had

8   meetings with Mr. Jowdy in 2002 in New York?

9       A.   Yes.

10      Q.   At that very first meeting with Mr. Jowdy,

11  what did you guys discuss?

12      A.   I was first there to talk about his

13  restaurant that Jason Allison and Byron Dafoe wanted to

14  invest in.

15           I was told by them that Roger Clemens and

16  Andy Pettitte --

17      Q.   When you say you were told by them --

18      A.   By Jason Allison and Byron Dafoe prior to the

Page 111

TR-SEC00000111

Kenner 04 28 11

19    meeting that Roger Clemens and Andy Pettitte were also
20    investors in this restaurant, in Trust.
21            So they asked me to go there and they also
22    asked if I liked it, if I would invest with them in Trust
23    as well, suggesting I could then keep an eye on what was
24    going on better than they could while they were traveling.
25        Q.    Suggesting or did they say that to you?

124

1        A.    Saying.
2        Q.    There were two individuals that said to you:
3    If you're an investor you can also watch over our
4    investment?
5        A.    That's correct.
6            I went to New York, had that first meeting,
7    we spent the first hour -- I spent the first hour
8    listening to Ken Jowdy telling me about his restaurant
9    history, talk about his family, talk about this new
10   restaurant, talk about the meat packing district becoming
11   this up and coming neighborhood for nightlife and for
12   restaurants.
13           And during that period he told me what he had
14   offered to Allison and Dafoe as far as an investment went.
15           That was to invest $47,500 into the
16   restaurant.
17           He told me that the deal was done and he was
18   surprised I was there.   But he was glad he was meeting me
19   because they had told Ken Jowdy about me in the past and
20   my relationship with other hockey players.
21       Q.    At this first meeting was Diamante Del Mar
                    Page 112

TR-SEC00000112

Kenner 04 28 11

22   discussed?

23        A.   Briefly.

24        Q.   Tell me what he said, by he, I mean Ken

25   Jowdy?

125

1         A.   Ken Jowdy told me that Jason Allison and

2    Byron Dafoe told him I liked playing golf and I enjoy golf

3    and we spoke quite a bit about golf that particular day.

4              Here in end of the meeting he said:   If you

5    really like golf, can I show you something in my office,

6    and we went up to his office.   And he pulled out some

7    blue prints and some graphic drawings of the first

8    rendition of the 10,000 acre Diamante Del Mar property.

9              He told me that he had spent several years,

10   since 1997 or '98, so it was about 4 or 5 years at that

11   point, working to acquire the land.   And the land he now

12   owned, it was in his control, and the final stages of

13   being able to develop were going to be based on being able

14   to change the land in Mexico from Ejido, Ejido leasehold

15   land to our U.S. equivalent of fee simple title and that

16   he would need some money to do that.

17        Q.   Did he say he owned it or did he say he was

18   in the process of gaining ownership of the land?

19        A.   He told me from day one he owned it and he

20   spent 4 to 5 years putting it in his control.   So now

21   they could convert the Ejido leasehold interest, which is

22   a Mexican Indian interest in the property to a Fedi Comiso

23   Trust, or a fee simple title as he described it to me that

24   day.

Page 113

TR-SEC00000113

Kenner 04 28 11

25          Q.   That day did he say he had fee simple or the

126

1    functional equivalent of fee simple in Mexico?

2          A.   No.

3          Q.   He said he was still in the process of doing

4    it?

5          A.   Yes.

6          Q.   What else did he say about Diamante Del Mar?

7          A.   He was very excited about the years he had

8    spent there.   But he told me that if he thought in 1997

9    or '98 that it was going to be a 5 year process for him to

10   own the property, and gain control of the process from the

11   Ejidos, he doesn't think he would have started the process

12   again.

13              But he was proud of where he was.

14              And then at that point when had been together

15   several hours and we had traded a lot of:   I know these

16   peoples stories.   And he said he knew these peoples

17   stories.   And we had a lot of what I believe at the time

18   common acquaintances.

19              And he was excited that the baseball players

20   and the hockey players would mix very nicely as friends

21   and other.

22         Q.   When he was talking to you about the Diamante

23   Del Mar land acquisition, or the fee simple acquisition,

24   what did you say to him, if anything?

25         A.   I did a considerable amount of listening that

Page 114

TR-SEC00000114

Kenner 04 28 11

1    day.

2         Q.    Were any investment opportunities discussed

3    at that very first meeting?

4         A.    He discussed with me -- again, he told me

5    that Jason Allison and Byron Dafoe were going to invest

6    with him.

7         Q.    In Diamante Del Mar?

8         A.    Diamante Del Mar.   But he told me before he

9    felt comfortable he needed money to make sure he could

10   ensure that title process was going to go from leasehold

11   to, we'll use the term fee simple.

12        Q.    Those two individuals, they were your

13   clients, correct?

14        A.    Yes, they were.

15        Q.    Did you know prior to that meeting whether

16   they were considering an investment in Diamante Del Mar?

17        A.    I did not.

18        Q.    That was news to you?

19        A.    That was news to me.

20        Q.    Is that unusual, meaning do you learn from

21   third parties that your clients are interested in

22   something that you didn't know about?

23        A.    All the time.

24        Q.    What else, if anything, was said that day?

25        A.    I don't recall much else.

128

1         Q.    Did Mr. Jowdy give you any brochures or

Page 115

Kenner 04 28 11

```
 2   information about Diamante Del Mar?
 3        A.   I don't believe so.
 4             The only material we reviewed, I believe, was
 5   that site map.
 6        Q.   Do you recall when that meeting was held in
 7   2002?
 8        A.   I do not.
 9        Q.   Was it warm out, was it cold out?
10        A.   I don't think it was cold out.
11        Q.   Do you recall how long after that first
12   initial meeting you either talked on the phone with Mr.
13   Jowdy or met with Mr. Jowdy in person?
14        A.   I do not.
15        Q.   Was it six months, three months?
16        A.   It was less than one month.
17        Q.   Was that a meeting in person?
18        A.   What I recall, and I've attempted to replay
19   those 2002 days for a lot of the litigation we've gone
20   through, but to the best of my recollection, is that over
21   the following six months I had an ongoing communication
22   with Ken Jowdy and met Bill Najam as well, his
23   brother-in-law who is the attorney, so it was represented
24   to me on the investment, a lot of phone calls took place
25   between us, a series of meetings, I'm going to say between
```

129

```
 1   4 and 6 meetings took place.
 2             I also was asked by Ken Jowdy to join him and
 3   a gentleman named Rob Berdict who became an employee of
 4   the company to go down and visit the property soon after
```

Page 116

Kenner 04 28 11

5    my initial visit at Trust.

6           Q.    When you say the company, who are you

7    referring to, Diamante?

8           A.    Yes.    I don't want to speak out of turn, but

9    I'm assuming Rob Berdict was an employee of Diamante Del

10   Mar.

11                Ken Jowdy, as we found out through a lot of

12   litigation, had a lot of shell companies, that he ran a

13   lot of money through.

14                So it's been quite a process to figure out

15   who actually is an employee of where and where monies

16   actually went.    I want to be clear about that.

17                Robert worked for the Diamante umbrella

18   somewhere.

19          Q.    After that first meeting, perhaps within that

20   first month after that first meeting, did there come a

21   time where Mr. Jowdy started to discuss with you in any

22   more substantive way an investment opportunity for

23   yourself perhaps or some of your clients in Diamante Del

24   Mar?

25          A.    For me.

130

1           Q.    What did he say?

2           A.    He told me that at the point that he had

3    taken the property and acquired it, he had spent all of

4    his money, which he also said was part Roger Clemens

5    money, part family money, and insinuated to me other

6    baseball players that we had discussed.

7                 But certainly Roger Clemens as a fact, he had

Page 117

Kenner 04 28 11

8  mentioned many, many times to me was his investment

9  partner.

10          That he had spent the approximate $4 million

11  it took to acquire the land and get it to that Ejido

12  leasehold point where he had control, and then convert to

13  title.

14          He told me it would cost about another 300,

15  $350,000 to finish that process in Mexico, at least to get

16  the first 8,000 acres of the 10,000 to a fee simple point,

17  where then development could occur and the former owners,

18  the Ejidos, would not have any claim against the property

19  for -- ongoing.

20      Q.  Did he ever, did Mr. Jowdy offer you an

21  opportunity to make an investment in Diamante Del Mar?

22      A.  Yes.

23      Q.  What exactly did he say?

24      A.  He offered me a 10 percent stake in the

25  company for the legal fees that he needed to make that

131

1  happen.

2          Q.  How much money was he asking for?

3          A.  It turned out to be about $350,000.

4          Q.  He was going to give you 10 percent stake in

5  Diamante Del Mar for $350,000?

6          A.  Yes.

7          Q.  What happened, did you say yes, did you say

8  no?

9          A.  I said yes.

10             I said yes after I had visited the property

Page 118

Kenner 04 28 11

11  and had met Fernando Garcia, the attorney, had met Bill

12  Najam, his brother-in-law who was handling all the legal

13  for him.

14       Q.  So in what year did you make your $350,000

15  investment?

16       A.  In 2002.

17       Q.  Did there come a time you received a title at

18  Diamante Del Mar, meaning an employee title?

19       A.  I was a sales rep for Diamante.

20       Q.  When did you receive that title,

21  approximately?

22       A.  I don't know if there was a formal acceptance

23  or recognition of it.

24       But when Ken Jowdy and Bill Najam hired a

25  securities firm here in New York City to put together an

132

1  offering in 2002, they told me that they wanted to

2  represent -- that myself and my consulting company, Guy

3  Dog were the paid consultants to be, I believe, the sales

4  manager, the sales represent for Diamante Del Mar.

5       So when Larry Markowitz at Salans Law created

6  the securities offering for us, in there I met with Larry

7  at least one time, maybe two or three times, so Larry

8  could understand what my background was, what I did for a

9  regular job, and what my role was going to be with

10  Diamante Del Mar.

11  BY MR. SMITH:

12       Q.  This arrangement, Guy Dog and yourself as

13  marketing manager, that occurred at the same time as the

Page 119

Kenner 04 28 11

14   $350,000 investment or subsequently?

15          A.   On or about the same time.

16          Q.   It was all being sort of negotiated or

17   discussed together?

18          A.   Discussed.

19          Q.   And what were going to be the terms for you

20   or Guy Dog, was it you, personally --

21          A.   It was Guy Dog.

22          Q.   -- for Guy Dog as marketing manager?

23          A.   Essentially what Ken Jowdy told me was that

24   he needed to be in New York and present here with the

25   attorneys.   He lived here, he ran this restaurant, Trust,

133

1    which I ultimately invested in as well.

2                I gave Ken Jowdy $25,000 for that investment

3    in the restaurant.

4                He told me that because he's a New York guy

5    and there was going to be a lot of visitations to the El

6    Rosario property, to Diamante Del Mar, it would be

7    tremendous if he had someone on the west coast like myself

8    to be able to take people on trips, on day excursions from

9    San Diego to El Rosario and back by computer plane.   He

10   was excited to have me on as a sales rep.

11               And I probably took 25 to 30 trips over the

12   first two years down to the property, escorting people

13   that Ken Jowdy knew for the most part.

14          Q.   What were the terms of the arrangement for

15   Guy Dog, in other words, how were you compensated?

16          A.   Guy Dog was paid, I believe, $14,000 a month

Page 120

TR-SEC00000120

Kenner 04 28 11

17  by Ken Jowdy -- one of the entities in the Diamante
18  umbrella, I don't recall where it was from.
19           And then I ultimately, because it was going
20  to be taxing on me -- I believe that started in -- I don't
21  think I began to get paid until maybe 2003, if I recall,
22  and it was about 14,000 a month.
23           And that only lasted for about six months, I
24  believe.   And then Ken Jowdy told me:   Look, we're
25  getting some momentum, there's banks interested, I've got

134

1  a lot of California developers interested, he was having
2  me fly down people from, I believe it was Hill Glazier who
3  is one of the big land architects at the time.
4           He had me bring down Tom Layman the golfer,
5  to look at the property.
6           I was down there to show Davis Love, the Tom
7  Fazio people, who is the biggest architect in the world
8  the property.   He said:   We're running tight on budget
9  money, do you mind not taking salary, but it looks like
10  we're about to hit a home run.
11           So after about six months the salary for the
12  consulting stopped.
13       Q.   Did it ever resume?
14       A.   It did not.
15       Q.   Did you ever receive any further
16  compensation?
17       A.   I did not.
18       Q.   Other than the $14,000 a month that Guy Dog
19  received for, I think you said about six months, was there

Page 121

TR-SEC00000121

Kenner 04 28 11

20   any other compensation that you received in connection

21   with your work as marketing manager?

22        A.   No.

23             MR. CASTANO:   We are going to come back to

24   some of those questions of compensation with Diamante Del

25   Mar shortly.

                                                        135

1              Let's take a three-minute break or two-minute

2    break.

3              We are off the record at 1:54.

4              (Recess.)

5              MR. CASTANO:   We are back on the record at

6    2:02 p.m.

7              Mr. Kenner, when we were off the record, were

8    there any substantive conversations between the Commission

9    staff and yourself?

10             THE WITNESS:   There were not.

11   BY MR. CASTANO:

12        Q.   Just so we're clear, when we talk about

13   Diamante Del Mar and your position, you were a marketing

14   sales manager, is that correct?

15        A.   That's fair to say.

16        Q.   And the name of the entity that was the

17   consultant to Diamante Del Mar, was that GDM 33 LLC or was

18   that another entity by the name of Guy Dog?

19        A.   They're the same.

20        Q.   And GDM 33, what does that stand for?

21        A.   Guy Dog Management.

22        Q.   Was does 33 stand for?

Page 122

Kenner 04 28 11

23      A.   My college hockey number.

24      Q.   Are you the owner of GDM 33?

25      A.   Yes.

136

1       Q.   Are you still the owner of GDM 33?

2       A.   Yes.

3       Q.   Is there any other entity affiliated with GDM

4  33 that might not be an LLC but might be an "Inc."?

5       A.   Not that I'm aware of.

6       Q.   Are you only aware of one GDM 33 entity?

7       A.   Yes.

8  BY MR. SMITH:

9       Q.   Are you the 100 percent owner?

10      A.   Yes.

11      Q.   Discuss GDM 33 have employees?

12      A.   No, it does not.

13  BY MR. CASTANO:

14      Q.   Are you the only owner of GDM 33?

15      A.   Yes.

16           MR. CASTANO:  I have to step out of the room.

17  I apologize.

18  BY MR. SMITH:

19      Q.   Diamante Del Mar, is there one entity by that

20  name or I think you said there were multiple Diamante Del

21  Mar entities?

22      A.   The best I understand is that Diamante Del

23  Mar was the U.S. entity that owned the control of the El

24  Rosario piece of property.

25           I believe underneath Diamante Del Mar Ken

Page 123

TR-SEC00000123

Kenner 04 28 11

137

1    Jowdy and Bill Najam may have established a series of

2    other Mexican corporations and/or U.S. corporations that

3    they used for an unlimited purpose.

4         So I'm not very -- I'm not very well spoken

5    on how their corporate structure is set up.   I've tried

6    for the last 4 years to figure it out, but it hasn't been

7    very easy.

8         Q.   Let's try to take you back a little on 4

9    years of research.

10        What can you tell me about the structure?

11   You mentioned you think there are various wholly owned

12   subsidiaries under Diamante Del Mar.

13        A.   Yes.

14        In testimony that we elicited from Ken Jowdy

15   in January of 2010 which I turned over to you guys, Jowdy

16   acknowledges his 100 percent ownership and/or control of a

17   series of LLCs in the United States.

18        He also has a series of Mexican entities that

19   are under his control that have been used from time to

20   time for both the Diamante Del Mar property and the

21   Diamante Cabo San Lucas properties.   The Mexican entities

22   that I dealt with are LOR management, and the suffix on

23   those I believe is Sa de CV.

24        Q.   Is that an entity under Diamante Del Mar or

25   Diamante Cabo San Lucas?

138

Page 124

TR-SEC00000124

Kenner 04 28 11

1     A.    That is one of the things I haven't been able
2   to tie all the lines to.
3           There is another entity that he has used,
4   these are typically for receiving partnership funds in one
5   form or another.
6           The other is --
7     Q.    Partnership fund?
8     A.    Partnership funds for Diamante Del Mar or
9   Diamante Cabo San Lucas.
10          LOR management, I believe --
11    Q.    Before we get to that, what partnership are
12  you referring to?
13    A.    Again, I don't want to mischaracterize the
14  entities, but the Diamante Del Mar group of investors, if
15  that's more clear, and the Cabo San Lucas group of
16  investors, when Jowdy would ask for those funds from
17  myself or from others, LOR management was one of the
18  entities he would ask for the funds to be wired to.
19          So I always assumed those were management
20  entities related to the different -- to the different
21  projects.
22    Q.    Let me backtrack for a second then.
23          You had previously invested $350,000 in
24  Diamante Del Mar.
25    A.    Yes.

                                                      139

1     Q.    And how did you effect payment?
2     A.    Cash.
3     Q.    Dollar bills, checks?
                    Page 125

Kenner 04 28 11

4      A.   Dollar bills.

5      Q.   $350,000 in bills?

6      A.   Yes.

7      Q.   Who did you give that to?

8      A.   To Ken Jowdy.

9      Q.   Where?

10     A.   A myriad of places.   Some in New York City,
11  some in California.

12     Q.   How did you get 350,000 in dollar bills?

13     A.   A good portion of it I received from my
14  father when he passed away.

15          And the remainder I always kept cash as a
16  kid, and as an adult, when I would receive funds I would
17  cash checks and keep cash.

18     Q.   This is an awful lot of cash?

19     A.   Yes.

20     Q.   This isn't like a kid's $20 bill?

21     A.   That's correct.

22     Q.   How much did you get from your father?

23     A.   About half a million dollars.

24     Q.   In cash?

25     A.   Yes.

☐

140

1      Q.   What denominations?

2      A.   20s, 100s, 50s.

3          My father was a private investigator, and he
4  always dealt with kidnappings and others.  He always just
5  told me to keep cash around.

6      Q.   When did you receive that from your father?

Page 126

TR-SEC00000126

Kenner 04 28 11

```
7       A.   After he passed away.
8       Q.   Approximately what time?
9       A.   I don't recall what year, late '90s.
10      Q.   What did you do with --
11      A.   Mid to late '90s.
12      Q.   $500,000 in U.S. currency?
13      A.   Yes.
14      Q.   What did you do with it?
15      A.   I just kept it.
16      Q.   Where?
17      A.   I kept it in my house, wherever I lived at
18   the time.
19      Q.   In a safe?
20      A.   No.
21      Q.   Where did you keep it?
22      A.   I typically keep it in a duffle bag in my
23   closet.
24      Q.   How long did you keep that?
25           Let me ask you:  How much of that cash did
```

```
1    you use to fund $350,000 investment, all of it?
2       A.   For the most part, yes.
3       Q.   For the most part did you get cash from other
4    sources as well?
5       A.   Just whatever I saved.  I didn't -- the
6    money from my father I didn't keep in one duffle bag, and
7    keep my 10 or 20 or 30,000 of cash in my other duffle bag.
8    I just -- I always kept money --
9       Q.   How much cash did you have following the
```

Page 127

TR-SEC00000127

Kenner 04 28 11

10    $350,000 investment?

11          A.    Probably another 150 left.

12          Q.    What happened to that 150,000 subsequently?

13          A.    I would just use it to pay bills, do

14    renovation on one of my homes.

15          Q.    Is there any of it left?

16          A.    No.

17          Q.    Most entities won't accept payment in large

18    amounts in cash, what kind of bills would you use to pay

19    in cash?

20          A.    Contractors, renovation supplies.

21          Q.    House contractors?

22          A.    Yes.

23          Q.    On what house?

24          A.    First on my home in Boston when I renovated

25    that before I sold it.   And for any landscaping work I

142

1     did in Arizona, when I moved to Arizona.

2           Q.    When did you sell the house in Boston?

3           A.    I believe 1999.

4           Q.    But the investments that you made, the

5     350,000, was about 2002, late 2002?

6           A.    That's correct.

7           Q.    Going forward from that period of time, you

8     had about 150,000 in cash?

9           A.    More or less.

10          Q.    And what was that used for?

11          A.    For landscape, renovations I made to my first

12    house in Arizona, to my second house in Arizona.

Page 128

Kenner 04 28 11

13      Q.   I have forgotten, I thought you rented -- you

14   owned how many houses in Arizona?

15      A.   There were two that we discussed.

16      Q.   That you owned?

17      A.   Yes.

18      Q.   And you renovated both of them?

19      A.   I added a pool and backyard landscape to my

20   first house when I moved in.

21           Then when I moved to my second house, I added

22   a guest house and renovated the pool.

23      Q.   Did you use the cash for any other purpose?

24      A.   Not that I recall.

25      Q.   How did it come about that you decided to

143

1    make the $350,000 investment in cash?

2       A.   Ken Jowdy asked if I could give him cash,

3    ultimately he told me he had to pay all the Mexican

4    officials, Mexican people in cash, that they were people

5    that didn't typically have bank accounts.

6            And when he was dealing with the Ejido

7    Indians, he told me that all of his transactions in Mexico

8    had been cash transactions.

9       Q.   Did that strike you as odd or not?

10      A.   Not especially when I went down there and

11   realized there wasn't bank in El Rosario.

12      Q.   Presumably the people in Mexico need to be

13   paid in Mexican currency?

14      A.   Most of the Mexicans take U.S. dollars.

15   They are a lot happier to get U.S. dollars than pesos.

Page 129

TR-SEC00000129

Kenner 04 28 11

16        Q.    I think you said you made the investment over
17   a period of time in different meetings with Ken Jowdy?
18        A.    Yes.
19        Q.    About how many times?
20        A.    I don't recall.
21        Q.    You think it was complete by 2002?
22        A.    It was probably complete by mid 2003.
23        Q.    What was your understanding of the entity to
24   which that money was being -- in which that money was
25   being invested?

                                                              144

1         A.    I understood that he was using it for legal
2    fees and title fees in Mexico.   And that's why I wasn't
3    getting any 10 percent equity position in Diamante Del
4    Mar.
5         Q.    You were receiving a 10 percent equity
6    position in Diamante Del Mar?
7         A.    I think I remember Baja Management.
8         Q.    Is there a particular entity in which you
9    were receiving entity?
10        A.    I think I remember a Baja Management, which
11   equates to management in Diamante Del Mar which ultimately
12   works out to a 10 percent.
13        Q.    You think, or is that your understanding?
14        A.    I think.   It's my understanding.
15        Q.    You're not sure?
16        A.    I'm not 100 percent sure.
17        Q.    And what is Baja Management?
18        A.    Baja Management is another one of the
                           Page 130

DAY ①
2/2

Kenner 04 28 11

19  companies that Bill Najam and Ken Jowdy and later

20  Markowitz set up to hold other partners.

21          I believe they set it up as the managing

22  member entity for Diamante Del Mar.

23          Q.   What kind of legal organization is Baja

24  Management?

25          A.   I believe all of his LLCs are Delaware LLCs.

145

1           Q.   And Baja Management is an LLC?

2           A.   I believe it is.

3           Q.   Your understanding is that in exchange for

4   your investment you receive 10 percent of that LLC?

5           A.   Correct.

6           Q.   Did you receive any certificates to that

7   effect?

8           A.   I had received K-1s from Ken Jowdy reflecting

9   that.

10          Q.   These are tax documents?

11          A.   Yes.

12          Q.   Did you receive any sort of corporate

13  documents indicating your ownership?

14          A.   I believe I received -- they had me sign some

15  subscription agreements at one point in time for it.

16          Q.   Did you receive some evidence of your 10

17  percent ownership?

18          A.   Yes.   I don't think the 10 percent ownership

19  has ever been questioned by Ken Jowdy, Bill Najam, even in

20  our negotiations to settle plaintiff's settlement over all

21  of the issues.

Page 131

Kenner 04 28 11

22      Q.   And the other owners of Baja Management are

23   Ken Jowdy, Bill Najam?

24      A.   Yes.

25      Q.   Anyone else?

146

1       A.   I believe there are several other NHL --

2    former NHL players, Byron Dafoe, Jason Allison, Dimitri

3    Khristich, Joe Juneau, Owen Nolan, and Jason Woolley.

4       Q.   Anyone else?

5       A.   Not that I'm aware of.

6       Q.   Do you know what Najam's ownership percentage

7    is?

8       A.   I believe it's 5 percent of the overall

9    Diamante Del Mar.

10      Q.   Which percentage of Baja Management?

11      A.   I don't know how they breakdown the ownership

12   inside of Baja Management.   But as it relates to Diamante

13   Del Mar, I believe Najam has a 5 percent stake in the

14   overall company.

15      Q.   You don't have a stake in Baja Management

16   LLC?

17      A.   I do not.

18      Q.   Do you know Jowdy's stake in Baja Management

19   LLC?

20      A.   Not specifically.   I believe he's

21   approximately a 70 percent owner.

22      Q.   Of the whole Diamante project?

23      A.   Of the whole Diamante Del Mar project.

24      Q.   Your understanding is that Baja Management

Page 132

Kenner 04 28 11

25    owned what?

147

1         A.    I believe Baja Management --
2         Q.    Was it the managing member?
3         A.    Was the managing member entity for Diamante
4    Del Mar.
5         Q.    Diamante Del Mar is a Delaware LLC?
6         A.    A U.S. Delaware LLC.
7               I believe some of the leasehold land is still
8    inside LOR management, which is a Mexican entity.
9               There are two other Mexican entities whose
10   names have popped up in our Mexican litigation that I
11   don't recall the names right now, but they're complete
12   Spanish names that didn't ring a bell to me.
13              The other name in addition to LOR management
14   in Mexico that Jowdy has used received funds for both
15   projects, was Propiedades DDM.
16              I believe that's also an Sa de CV, I believe
17   that's equivalent to one of our LLC corporation names.
18        Q.    What is your understanding of these entities,
19   where they fit in the Diamante corporate structure?
20        A.    I believe these are entities that Fernando
21   Garcia, the attorney in Mexico set up to receive fund for
22   Jowdy for the different corporations, for the different
23   projects.
24        Q.    Are there corporations or did you mean
25   projects?

Page 133

Kenner 04 28 11

148

1          A.    I'll restate it.

2                I believe Fernando Garcia set up those two

3    Mexican entities as pass through entities to receive cash,

4    to be disbursed in Mexico, separate and apart from

5    whatever bank accounts Jowdy and Garcia used to operate

6    Diamante Del Mar or operate Diamante Cabo San Lucas.

7          Q.    Do they sit anywhere?  You mentioned that

8    Jowdy had set up entities that I think were wholly owned

9    by Diamante Del Mar, the Delaware LLC.

10               Are these among those?

11         A.    Yes.

12               Those, I believe, are 99 percent controlled

13   by Ken Jowdy and 1 percent controlled by Fernando Garcia.

14               Jowdy testified to that in deposition.

15         Q.    So they are not owned by Diamante, they are

16   owned by Jowdy personally?

17         A.    I believe so.

18         Q.    Are there subsidiaries to Diamante Del Mar?

19         A.    There are no entities that I can recall their

20   names.  But I know that Najam and Jowdy had used several

21   other entities to pass money out of the Diamante Del Mar

22   structure into other operations.

23         Q.    You don't remember the names?

24         A.    I do not, but in the January 2010 deposition,

25   there's a whole series of LLCs that you guys can see.

149

1          Q.    Are there other entities affiliated with

Page 134

Kenner 04 28 11

2   Diamante Del Mar LLC that you recall?

3        A.   The lion's share of the money that Ken Jowdy

4   received from my friends when they invested in Diamante

5   Del Mar ran through a company called Baja Development

6   Corporation.

7             That I have seen his father sign for, Taffy

8   Jowdy, Sr., I've seen his friend Mark Thalmann sign.   But

9   Jowdy has testified in several places that he owns and

10  controls and always has owned and controlled 100 percent

11  of Baja Development Corporation.

12            The lion's share of the Diamante Del Mar

13  funds, that's where Ken Jowdy asked for them to be sent.

14       Q.   Wires or checks made out to an account in the

15  name of Baja Development Corp.?

16       A.   Correct, and loans that he had taken out from

17  some people he also took out in Baja Development

18  Corporation.

19            Now, he had told me from day 1 that Baja

20  Development Corporation, and I had no reason to

21  second-guess it, was his Development Corporation he was

22  using for the Baja project.   Which had not been named at

23  the time I originally met him.

24       Q.   Are you aware of the role, if any, of Baja

25  Development Corp. in the Diamante project?

                                                    150

1        A.   I believe he used it just to wash employee

2   through on his way to Diamante Del Mar or whatever else he

3   chose to use the fund for.

4        Q.   Did the money go to Diamante Del Mar?

                      Page 135

TR-SEC00000135

Kenner 04 28 11

5      A.   I haven't seen the bank record from that far

6   back, we were unable to acquire them.

7      Q.   You made an investment, as you understand, in

8   Baja Management?

9      A.   That's where Bill Najam and Ken Jowdy

10   ultimately put my investment.   I didn't ask to delineate

11   am I a Diamante Del Mar guy, am I a Baja Management guy.

12         I just, again, in the transaction he said

13   you'll get a 10 percent equity stake.   I got it.   The

14   way that the numbers work out between Baja Management and

15   the ownership that that has in Diamante Del Mar.

16         There's never been any question about my 10

17   percent?

18      Q.   When you say 10 percent equity stake in

19   Diamante Del Mar, what does that mean?

20      A.   I think simplistic, it appears of the 100

21   percent ownership in the property, I own a 10 percent

22   stake of it.

23      Q.   Meaning that you would have --

24      A.   If they sold Diamante Del Mar for $100, I

25   would receive $10, that was net of all debt.

151

1      Q.   What about proceed from the development?

2      A.   There have never been.

3      Q.   Right, but anticipated proceeds, what was

4   your understanding of any returns that you would maybe, if

5   any?

6      A.   That I would receive my original investment

7   money back as well as once all the investment money went

Page 136

TR-SEC00000136

Kenner 04 28 11

8    back, 3 or $4 million that Ken Jowdy told me he put into

9    the project, plus my money, plus anyone else's money, once

10   that was all paid back then I would receive 10 cents of

11   every profit dollar going forward.

12          Q.   Did you have any contract?

13          A.   I only believe I signed Baja Management

14   paperwork that Bill Najam and Markowitz gave me to sign.

15          Q.   What did that consist of?

16          A.   I think it consisted of my 10 percent equity

17   stake in the project.

18          Q.   When you say paperwork, was that a contract?

19          A.   No, I believe it was just a subscription

20   agreement.

21          MR. CASTANO:   So the record is clear, I just

22   returned to the testimony room.

23          Q.   Other than the $350,000 that you invested

24   that ended up being in Baja Management, did you make any

25   other investment in Diamante Del Mar or any of the

                                                        152

1    affiliated or related corporate entities having to do with

2    the Diamante Del Mar project?

3          A.   I believe over time I had sent Ken Jowdy

4    additional funds when he needed -- when he said he was low

5    on cash or had other bills to pay.   And I don't recall

6    the amounts other than for Diamante Del Mar.   They may

7    have totaled another 75 to $100,000 over time.

8          Q.   Over what period of time?

9          A.   Through 2006.

10         Q.   Starting in --

                        Page 137

Kenner 04 28 11

11      A.   2002.

12      Q.   In addition to the -- you hadn't finished --

13      A.   In addition to the 350, there were subsequent

14 bills where Ken, who was a very gregarious guy would say:

15 Phil, I got to pay the architects $22,000, can you send it

16 to me, it's very urgent, these are our guys.

17           So I would send him the funds.

18      Q.   But I assume those subsequent investments

19 didn't take place until after mid 2003 because your

20 original 350,000 hadn't -- the investment hadn't been

21 completed until mid 2003?

22      A.   Correct.

23      Q.   So that would have been between 2003 and

24 2007?

25      A.   2006.

153

1           In 2006 we financed the Cabo deal, so that's

2 how we know there was a break point.

3      Q.   In what format -- did you understand those to

4 be loans or equity investments or some other type of

5 investment, talking,000 about the 75,000 or 100,000 you

6 sent at his request?

7      A.   I assume they were loans to the company and

8 he would pay me back when he could.

9      Q.   Any documentation about these transactions?

10      A.   No.

11      Q.   It was all oral?

12      A.   Yes.

13      Q.   About how many times did you make these

Page 138

TR-SEC00000138

Kenner 04 28 11

14   payments?

15          A.   2 or 3 or 4 times.

16          Q.   The amounts would have been 20, 25, 30,000?

17          A.   Yes.

18          Q.   And in what format did you make these

19   contributions, were these cash?

20          A.   No, the ones I recall were wire transfers.

21               I just recall them in 2009 and 2010 in

22   reviewing documents for litigation, that's when I

23   recalled, because I saw them on bank statements.

24          Q.   You had forgotten you had given 75 to

25   $100,000 to him?

154

1          A.   Yes.   It sounds strange but I didn't recall

2   that.   I knew that I had helped with different wire

3   transfers over time and we had just gone through the 125

4   million dollar funding with Lehman Brothers, so relative

5   to the big picture I knew that he appreciated I helped.

6          Q.   These were your personal funds?

7          A.   Correct.

8          Q.   You wired them from your Wells Fargo account?

9          A.   I don't recall.   They may have come out of

10   my Standard Advisors account, my Guy Dog account or they

11   may have come out of my personal account, I just don't

12   recall.

13          Q.   Could they have come out of any other account

14   other than the Standard Advisors account, the Guy Dog

15   account and your personal account?

16          A.   I don't think so.

Page 139

Kenner 04 28 11

17          Q.   Do think they all came from the same account
18   or different account?
19          A.   I just don't recall at this time.
20               I just recall seeing wire transfers to him.
21          Q.   What was the source of those funds?
22          A.   My income.
23          Q.   Your income, this was your previous income
24   that you had received when you were working for Assante or
25   subsequently?

                                                          155

1          A.   Subsequent.   Or just savings that were still
2   around from my Assante days.
3               MR. STOLPER:   I don't think you've asked him
4   about your income at Assante.
5               MR. SMITH:   We haven't.   Which we can get to
6   now.
7               MR. CASTANO:   Can we take a two-minute break
8   so I can catch up.   We're just going to step outside.
9               We are off the record at 2:32 p.m.
10              (Recess.)
11              MR. CASTANO:   We are back on the record at
12   2:36 p.m.
13              Mr. Kenner, while we were off the record,
14   were there any substantive conversations between the
15   Commission staff and yourself?
16              THE WITNESS:   There were not.
17   BY MR. CASTANO:
18         Q.   I want to continue your discussion of
19   Diamante Del Mar.

                        Page 140

                          Kenner 04 28 11
20              This might have been some areas you covered

21      so just forgive me.

22              When you made your $350,000 investment,

23      besides what might have been a subscription agreement, did

24      you receive anything else from Diamante Del Mar in

25      writing?

                                                            156

1           A.    No.

2               MR. SMITH:  Or from any other Diamante Del

3       Mar related entity evidence in your investment.

4               THE WITNESS:    No.

5               MR. STOLPER:  Other than the K-1s he

6       testified to.

7               MR. SMITH:  You didn't receive them at the

8       time of your investment, did you?

9               THE WITNESS:    No, I received them the years

10      following.

11          Q.    You made a $350,000 investment in cash?

12          A.    Yes.

13          Q.    And did you receive any E-mail or

14      acknowledgment or receipt that you, in fact, made a

15      $350,000 cash investment in Diamante Del Mar?

16          A.    Not that I recall.

17          Q.    This was in 2002 or 3?

18          A.    In both, correct.

19          Q.    And you had just met Mr. Jowdy?

20          A.    About six months earlier, yes.

21          Q.    Had you ever given anyone $350,000 in cash

22      that you just met without receiving some type of receipt?

                          Page 141

Kenner 04 28 11

23      A.   No.

24      Q.   This is the first time?

25      A.   That was the first time, yes.

157

1       Q.   Have you done something similar to this,
2    meaning cash investment without a receipt?

3       A.   I had given people cash since, yes.

4       Q.   Upwards of $350,000?

5       A.   Not as much as that.

6       Q.   I'll just ask for myself, I'm not testifying,
7    I would have a hard time giving someone any amount of cash
8    for a business transaction without some type of receipt.

9            I'm going to use my words:  Why were you so
10   trusting of giving $350,000 in cash to Mr. Jowdy?

11      A.   At the time I met him, he seemed a very
12   trustworthy guy, I spent a lot of time on the phone with
13   him.   Got involved in the investment opportunity at
14   Diamante Del Mar.

15           Subsequent to that, I received the paperwork
16   I expected, I received my K-1s that represented my
17   investment.   Still to this day, I believe there's no
18   issue with the contribution and the -- my equity stake.

19           So in the context of a lot of stuff that's
20   happened in this world, I don't feel like I've been misled
21   in that element of what I invested in and what I received.

22           So I don't have an issue with that.

23      Q.   The K-1s, did you mention you also received a
24   subscription agreement?

25      A.   I believe I did.

Page 142

TR-SEC00000142

Kenner 04 28 11

158

```
 1        Q.   Do you recall when you received that
 2   subscription agreement?
 3        A.   In '02 or '03.
 4        Q.   Is that a document you still have in your
 5   possession?
 6        A.   I think I sent it to you guys.
 7             MR. STOLPER:  Can we just state on the record
 8   that he said a number of times very informally:  I've
 9   given it to you guys, I've sent it to you guys, he's
10   obviously referring to the document production we made
11   three different ways to you.
12             MR. CASTANO:  Is there anything specific you
13   want to add?
14             MR. STOLPER:  No, when there is a transcript
15   later on we know what he's talking about.
16        Q.   When you say you have given it to us guys you
17   are talking about the production after the SEC's
18   enforcement action in January of 2011 in which you have
19   given us documents in various different ways, so to speak,
20   you're referring to that production, correct?
21        A.   Exactly.
22        Q.   Do you recall whether you received a private
23   placement memorandum concerning Diamante Del Mar?
24        A.   I don't believe I did.
25        Q.   Do you recall ever receiving a private
```

159

Page 143

Kenner 04 28 11

1   placement memorandum on Diamante Del Mar at any time
2   period?
3           A.   For myself?
4           Q.   Yes.
5           A.   I don't believe so.
6           Q.   Do you recall ever reviewing the Diamante Del
7   Mar private placement memorandum?
8           A.   Yes.
9           Q.   Do you recall when you first reviewed the
10  Diamante Del Mar private placement memorandum?
11          A.   I believe here in New York City with Larry
12  Markowitz.
13          Q.   When was that?
14          A.   That was in that same period of time,
15  2002-2003.
16          Q.   Did the Diamante Del Mar private placement
17  memorandum you reviewed have any reference to any entity
18  you're affiliated with or yourself?
19          A.   Yes.
20          Q.   Was the information about your entity or
21  yourself accurate in the private placement memorandum?
22          A.   I believe it was.
23          Q.   Do you recall having any conversations with
24  anyone about whether information in the private placement
25  memorandum was accurate and complete?

160

1           A.   I recall my conversations with Larry
2   Markowitz, Bill Najam and Ken Jowdy related to the
3   construction of that document that is under Bill Najam and
                        Page 144

TR-SEC00000144

Kenner 04 28 11

4   Larry Markowitz's care.

5           Q.   Did you have any concerns about the document

6   or have any questions about the document?

7           A.   Not necessarily.

8           Q.   Did you draft the document?

9           A.   No.

10          Q.   Do you know who drafted the Diamante private

11  placement memorandum?

12          A.   I believe Larry Markowitz did.

13          Q.   Did he draft it in consultation with you,

14  receiving any input from you?

15          A.   Yes.

16          Q.   What portions of the private placement

17  memorandum to the extent you recall did he ask you

18  questions about, that he inputted later into the memo?

19          A.   I don't recall what the subscription

20  agreement or offering said specifically.

21              But my presence in New York with Larry which

22  was repeated again, related to Cabo San Lucas and repeated

23  again related to Hawaii.

24              Larry was the consistent securities attorney

25  that was used through that whole process.

0

161

1               He wanted to get to know me and what my

2   business was and what my background was before he put the

3   information about myself and the consulting firm in the

4   offering.

5               So I didn't review draft to tell Larry:   You

6   need to change the wording.   That was his job, he was the

Page 145

Kenner 04 28 11

7   lawyer, he was the securities adviser.

8         I was just meeting with Larry in an open

9   table format to tell him what I do, who I represent, so he

10  could accurately portray that in the offering at the time.

11      Q.  Did you ever review a draft of any offering

12  materials by Diamante Del Mar?

13      A.  I'm assuming -- excuse me, strike that.

14         I reviewed documents with Larry Markowitz,

15  Bill Najam and Ken Jowdy on that particular visit related

16  to the Diamante Del Mar offering.

17         That's why I was asked to come to town to New

18  York City at the time.

19      MR. STOLPER:  Can we clarify, Markowitz

20  wasn't your lawyer, I want to make sure there isn't

21  privilege coming out the door here.

22      A.  Larry Markowitz was not my lawyer.

23      MR. STOLPER:  when you asked him about

24  conversations you did not have a lawyer at the time.

25      THE WITNESS:   I did not have a lawyer at

162

1   the time.

2  BY MR. SMITH:

3      Q.  Najam was lawyer, too, right?

4      A.  It was represented to me that Najam was a

5  25-year lawyer in the state of Massachusetts.

6      Q.  Also not your lawyer?

7      A.  Also not my lawyer.   Ken Jowdy's

8  brother-in-law.

9  BY MR. CASTANO:

Page 146

TR-SEC00000146

Kenner 04 28 11

10      Q.   Earlier you had mentioned in testimony that
11   at the end of the Trust restaurant presentation, Mr. Jowdy
12   brought you upstairs and showed you some maps and plans of
13   Diamante's golf course or land; is that correct?

14      A.   He brought me into his office.

15      Q.   Did he then also show you offering materials,
16   not just simply maps of the land, did he show you some
17   offering materials concerning Diamante Del Mar?

18      A.   No, there was nothing else.

19      Q.   So you only reviewed a map?

20      A.   I looked at a single color topo map with the
21   architectural did he picks of the property on it.

22      Q.   I want to make sure the record is clear, when
23   did you first review any kind of offering material by
24   Diamante Del Mar?

25           MR. STOLPER:   Are you looking for a date or

163

1    looking for in relation to his own investment?

2       Q.   A date, and then we can do to your own
3    investment?

4       A.   Sometime in 2002, I believe I was with
5    Markowitz, Najam and Jowdy to review that.

6       Q.   When you say "that," are you referring to --

7       A.   The offering memorandum that we have been
8    discussing.

9       Q.   And was there any type of other offering
10   document besides a private placement memorandum?

11      A.   Not that I'm aware of.

12      Q.   And you reviewed that after you made your
                        Page 147

Kenner 04 28 11

13    $350,000 cash investment?

14              A.    After I began giving Ken Jowdy --

15              Q.    Did you give him 350 in one shot or spurts of

16    cash?

17              A.    Spurts of cash as he would request it for

18    expenses.

19              Q.    In 2002, did you invest in the total of

20    $350,000?

21              A.    No.

22                    It lasted over about 9 to 12 months into

23    2003.

24              Q.    Did you ever have a conversation with anyone

25    at Diamante Del Mar, Mr. Jowdy or otherwise about bringing

164

1    in other investors that you might know into the Diamante

2    Del Mar fold?

3              A.    I would assume we had a number of

4    conversations about investment people I knew, investors I

5    would know, developers I know that may want to take down a

6    piece of the property.

7                    So, really, just an open conversation about

8    the whole scope of Diamante Del Mar.

9              Q.    Who was that conversation with?

10             A.    Ken Jowdy.

11             Q.    Anyone else?

12             A.    Typically not.

13                    Ken Jowdy is a control, control, control guy.

14    So everything that would pass through any element of a

15    company he had his fingerprints on everything.

Page 148

Kenner 04 28 11

16          Q.   What did you say to Mr. Jowdy specifically
17   about people you knew who might want to invest or perhaps
18   other real estate individuals or people in real estate who
19   might want to have a piece of the property?
20          A.   I don't recall specifically.
21          Q.   Do you recall generally?
22          A.   I think my general conversations the first
23   two years with Ken Jowdy were related to which baseball
24   players he wanted me to come -- assist in visiting the
25   property.

                                                          165

1                I introduced him to a series of developers, I
2   assisted in the transport of a number of golf-related
3   people, Tom Layman, Tom Fazio's group, visiting the
4   property.
5                I made several visits with friend of mine who
6   ended up being partners in the Diamante Del Mar deal.
7                And I made a series of visits to the property
8   to visit -- with prospects that Ken Jowdy asked me to take
9   down in my role.
10               And then around the country, typically
11   without Jowdy he would ask me -- Ken Jowdy would ask me to
12   go visit other people as my other business allowed me to
13   travel around the country, to meet with other people in
14   different cities that he said were interested in either
15   buying a portion of the land, being an early stage
16   investor, being a founding member, a series of different
17   initiatives that he and Bill Najam were constructing for
18   the property.
                        Page 149

Kenner 04 28 11

19          Q.    I just want to be clear, when you're going

20    down to Diamante Del Mar to view the property with clients

21    or potential clients or potential investors, are you

22    pitching them an investment opportunity in Diamante Del

23    Mar, or are you just going down there to show them the

24    property and not doing any type of pitching?

25                MR. STOLPER:   If we were in a civil case as

166

1     opposed to an SEC enforcement action, I would say the

2     question is objectionable, you have a compound.    There is

3     a third alternative to that.

4          Q.    Did you understand the question?

5                MR. STOLPER:   Why don't you break it into

6     pieces?

7          Q.    Did you bring investors or potential

8     investors down to visit the property, Diamante Del Mar?

9          A.    Yes.

10         Q.    While you were down there, what did you say

11    to them, if anything?

12         A.    I would tell them the story that Ken Jowdy

13    had told me about from 1997 to present, what he did to

14    acquire this piece of land.

15               And I would tell them about the golf

16    architects, Hill Glazier.   I would talk to him about

17    traveling with Tom Layman.   I would talk to him about Tom

18    Fazio.

19               I would talk to him about the support of the

20    local officials and the other Ejido Indians that I had

21    met, and lay out the presentation of here's where the golf

Page 150

Kenner 04 28 11

22    course is going to be on the plans, here is where the spa

23    and tennis clubs are going to be, and here is where the

24    winery is going to be.

25              And as we began constructing the runway on

0

167

1     the property, we'd spend time on the runway, meeting with

2     the supervisors, the Americans that were down doing work

3     on the project.

4              Q.   For the story you told about acquiring the

5     fee simple, did you ever see any legal work to confirm

6     whether in fact fee simple was being acquired?

7              A.   I have not reviewed the Mexican Fedi Comiso

8     trust documents at any point in time.

9              Q.   Did anyone ever tell you, besides Mr. Jowdy

10    in the conversations we discussed, whether fee simple in

11    Mexican legal terms was being acquired?

12             A.   Yes.   From the time I started to help he

13    would tell me, and Fernando Garcia his attorney would tell

14    me that the process was continuing, we're getting close to

15    fee simple.

16             And at one point, a group of the land

17    polygons totaling a little over 8,000 of the 10,000 acres

18    I was originally introduced to, I was told had been

19    converted to that fee simple type of title.

20             Q.   Who told you that?

21             A.   Both Ken Jowdy and Fernando Garcia.

22             Q.   Did you --

23             A.   And I believe, just to add clarity, in late

24    2006 when Ken Jowdy took the land that we owned for cash

Page 151

Kenner 04 28 11

25    and put a $3 million mortgage on the property for no

168

1     benefit to us, the loan documents that I saw and was able

2     to review a year and a half later reflected title

3     insurance on a clean 8,000 plus acre piece of land.

4              So the stories did line up as a result of

5     that funding.

6         Q.   What did you tell potential investors about

7     Diamante Del Mar?

8         A.   I would tell them I was an investor in the

9     project.   And I would discuss the vision of the project.

10    And what we had hoped to do for the next 5 to 10 years.

11        Q.   What else did you tell them?

12        A.   That was the general basis for all of my

13    conversation.   I didn't really know much more than that.

14    BY MR. SMITH:

15        Q.   The purpose was to solicit their investment

16    in the project?

17        A.   The groups that would come down were

18    typically Ken Jowdy guys, and my role wasn't with Ken

19    Jowdy, it was really to tell them about the vision of the

20    project.   I think as I've learned later the reason is

21    he's not very comfortable speaking about the vision, and

22    describing the elements of the project.   And he thought I

23    was a good --

24        Q.   You were marketing?

25        A.   I was a good marketing guy.

Page 152

Kenner 04 28 11

169

1          Q.    They were potential investors in the project,
2    as opposed to potential home buyers or golfer, these were
3    people who were presumably potential investors in the
4    project?
5          A.    I think most of the guys I brought down were
6    potential home buyers and golf members, I believe that's
7    how they were always referred to, as a golf member.
8                There was always an opportunity available if
9    people wanted to take on an investment portion of it.
10   But if that had occurred, I would turn over that to Bill
11   Najam who was dealing regularly with Larry Markowitz to
12   create whatever offering that they needed which was first,
13   I think, I believe they called it a founder drive and then
14   a charter member and then some subsequent offering that I
15   don't recall what it is.
16               But when someone would be interested in the
17   investment side, I would turn it over to Bill Najam.
18         Q.    Was a golf course built at the time you were
19   taking --
20         A.    Nothing was built.
21         Q.    No homes were built?
22         A.    Nothing was built.
23         Q.    But these people, your understanding was that
24   they were coming down as prospective golfers or home
25   buyers, not as prospective investors?

170

1          A.    I believe the membership offering which would
Page 153

Kenner 04 28 11

2      be, I think as you classify it, a home buyer --

3           Q.   I don't want to classify it as anything, why

4      don't you tell me how you would classify it?

5           A.   I was addressing the question, so there's

6      synergy between the question and the answer.

7                The people that I believe were coming down

8      were under the understanding they were going to be early

9      buyers of home sites, golf memberships and fractional

10     owners of one of the fractional products that Bill Najam

11     and Ken Jowdy were putting together.

12               So had I escorted you to the property, I

13     would have let you know that one of the things that were

14     available was a series of home sites, and Ken Jowdy and

15     Bill Najam had created a topographical map with all of the

16     golf home sites surrounding the future Davis Love and Tom

17     Fazio course.

18               And those home sites, Ken Jowdy would place

19     the names of the people that he told me were already

20     buyers, investors, et cetera, in the project.

21               Those included gentlemen like Andy Pettitte,

22     Mark McGuire, Roger Clemens, a series of Jowdy's relatives

23     and a number of baseball players I wasn't aware of.

24     BY MR. CASTANO:

25          Q.   Mr. Jowdy told you those people you just

⬚                                                            171

1      mentioned were investors in Diamante Del Mar?

2           A.   Yes.

3           Q.   Did you see any documents to confirm that?

4           A.   I did not.

Page 154

Kenner 04 28 11

5      Q.   Did you tell any of your client that those

6   people you just mentioned were investors in Diamante Del

7   Mar?

8      A.   I don't recall if I told them or not.

9         But as we would discuss Ken Jowdy and keep in

10  mind the topo map that he created on the Diamante site had

11  all the names on the home sites which was part of either

12  the investor or golf member package.

13        So the only way Ken Jowdy would have put a

14  Mark McGuire tag on that home sites, it wasn't hidden, it

15  was about the size of this desk, you would see a tag that

16  said Mark McGuire --

17     Q.   My question was did you ever tell any

18  investor or client of yours that those individuals you

19  just mentioned, Roger Clemens and others were, in fact,

20  investors in Diamante Del Mar?

21     A.   To the best of my understanding --

22        MR. STOLPER:  You used the word investor

23  twice in that sentence.   I think that mischaracterizes

24  what he said.

25        A, he has no investors; and B, there was no

172

1   one there investing.

2        MR. CASTANO:  I think the question was clear.

3        MR. STOLPER:  You can read it back.

4     Q.   Did you ever tell any potential clients or

5  potential investors that Roger Clemens and others were in

6  fact investors or equity owners of Diamante Del Mar?

7     A.   I would assume that I did.

Page 155

Kenner 04 28 11

8      Q.   And what would be the basis of that?

9      A.   Ken Jowdy told me that McGuire and Pettitte

10   and Clemens were his partners and investors or equity

11   members.

12     Q.   Did you ever see any documents confirming

13   ownership?

14     A.   No.

15     Q.   Or any equity interest in Diamante Del Mar?

16     A.   No, I did not.

17     Q.   From those individuals?

18     A.   I did not.   I didn't have any communication

19   with those gentlemen.

20     Q.   How many of your clients invested in Diamante

21   Del Mar?

22     A.   I think about 15 of them.

23     Q.   Do you know their names?

24     A.   Yes.

25     Q.   Who are they?

173

1      A.   I'll do my best to list them.

2           I named 6, I believe already, which I can

3   rename if you'd like.

4      Q.   Please.

5      A.   Jason Allison, Byron Dafoe, Joe Juneau, Owen

6   Nolan, Dimitri Khristich, Jason Woolley, and then there

7   would be Mattias Norstrom, Jozef Stumpel, Vladimir

8   Tsyplakov, Glen Murray, Greg de Vries and perhaps the

9   easiest way to get that comprehensive list would be the

10   list of plaintiffs in the de Vries and others versus

Page 156

Kenner 04 28 11

11    Jowdy.

12          Q.    Mr. Kenner, this isn't a memory test, I

13    appreciate you named the clients that you can remember.

14                Is it your testimony there are documents that

15    would have this information in it?

16          A.    Absolutely.    And I believe I turned over as

17    a result of the request, documents that would let you know

18    that.

19          Q.    Were these clients of Mr. Jowdy's in any way?

20          A.    I don't believe so.

21          Q.    These were your clients?

22          A.    Yes.

23          Q.    Were these clients that you had during the

24    course of your career in your job you had had from various

25    companies you went through, Assante and forward?


                                                          174


1          A.    That's correct.

2          Q.    Were these clients every Standard Advisors,

3    Inc.?

4          A.    I think most of them were.

5    BY MR. SMITH:

6          Q.    What is the difference between a client of

7    Standard Advisors, Inc. and a client of yours?

8          A.    Some of them didn't come with me.    Some of

9    my Assante clients didn't come to Standard Advisors.

10          Q.    So in the list that you just gave, in the

11    list that's -- in the list of investors of this project,

12    when you refer to your clients, that could be either

13    clients who were with you at Assante or clients that were

Page 157

TR-SEC00000157

Kenner 04 28 11

14    with you at Standard Advisors?

15          A.    Yes.

16          Q.    And there was some overlap but they weren't

17    identical?

18          A.    They were not identical.

19    BY MR. CASTANO:

20          Q.    Your clients, the clients that invested in

21    Diamante Del Mar, when I say investment, let's be clear,

22    were they equity investors, did they purchase an equity

23    interest in Diamante Del Mar?

24          A.    Yes.

25          Q.    Did each one of your clients purchase an

175

1     equity interest in Diamante Del Mar?

2                MR. STOLPER:   Each one of which clients?   The

3     names he gave?

4          Q.    The 15 names or so that you just mentioned?

5          A.    Yes, they were all equity.

6          Q.    Just so we're clear, not every one of your

7     clients invested in Diamante Del Mar?

8          A.    That is correct.

9          Q.    Just the 15 or so clients that we've just

10    mentioned here?

11          A.    That is correct.

12          Q.    Besides the 15 or so clients that invested, I

13    understand it could be upward of 19, it could be a little

14    bit lower, were there any other clients of yours that

15    invested in Diamante Del Mar?

16          A.    I don't believe so.

Page 158

Kenner 04 28 11

17          Q.    What did you tell your clients, these 15 or

18   so investors about an investment opportunity in Diamante

19   Del Mar before they made their investment?

20               MR. STOLPER:  I'm going to object to that you

21   assume he's the one who told them something in order for

22   them to invest.

23               He's already testified that two of them --

24               MR. CASTANO:  We'll have to go through this

25   one after another.

176

1          Q.    Did you solicit any of your clients to make

2    an investment in Diamante Del Mar?

3          A.    No.

4          Q.    You never spoke to any of your clients about

5    investment into Diamante Del Mar?

6          A.    Not for their benefit.

7               MR. CASTANO:  Off the record.   It's 3:04.

8               (Recess).

9               MR. CASTANO:  We are back on the record at

10   3:14 p.m.

11               While we were off the record, Mr. Kenner,

12   were there any substantive conversations between the

13   Commission staff and yourself?

14          A.    There were not.

15          Q.    Before we went off the record, I was asking

16   questions about potential investments in Diamante Del Mar.

17               Why don't I just break this down very

18   specifically.

19               Was Owen Nolan a client of yours?

Page 159

TR-SEC00000159

Kenner 04 28 11

20      A.   Yes, he was.

21      Q.   Is Owen Nolan a client of yours now?

22      A.   He is not.

23      Q.   Did there come a time where you discussed

24  Diamante with Owen Nolan?

25      A.   Many times.

177

1       Q.   When was that, when did you first have a

2  conversation with Owen Nolan about an investment in

3  Diamante Del Mar?

4       A.   My first Diamante Del Mar conversation was

5  with Owen Nolan happened around my first visit to Diamante

6  Del Mar.   Owen Nolan and I used to talk every day,

7  several times a day.

8       Q.   When was your first visit to Diamante Del

9  Mar, approximately?

10      A.   In 2002, I believe.

11      Q.   What did you say to Owen Nolan about Diamante

12  Del Mar?

13      A.   I recall speaking with Owen about my trip to

14  Diamante Del Mar.   I recall telling him about my

15  investment in Diamante Del Mar.

16           And I recall telling him about my role that I

17  was going to play to help work on the development.

18  BY MR. SMITH:

19      Q.   This is your role as marketing manager that

20  we have been discussing?

21      A.   Yes.

22  BY MR. CASTANO:

Page 160

Kenner 04 28 11

23      Q.   What else did you say to Owen about Diamante

24  Del Mar?

25      A.   I don't recall.


178


1      Q.   Do you know when Mr. Nolan first made an

2  investment in Diamante Del Mar?

3      A.   I believe in 2002.   But I'm not 100 percent

4  sure.

5      Q.   Did you discuss with Mr. Nolan an investment

6  opportunity in Diamante Del Mar?

7      A.   I recall talking to Owen about -- Owen Nolan

8  about my involvement in the company.   And Owen loved

9  talking about it because he was a land speculator himself

10  and was really excited.   He had just purchased a 1,200

11  acre piece of land in San Jose, California that I helped

12  him acquire, so he really enjoyed the land discussions.

13          And Owen and I didn't have a lot in common to

14  talk about.   So that was very easy for us to discuss.

15      Q.   Did Owen Nolan make an equity investment in

16  Diamante Del Mar?

17      A.   Yes, I believe he did.

18      Q.   Did you discuss with Mr. Nolan his equity

19  investment in Diamante Del Mar?

20      A.   I'm sure I spoke to him about his equity

21  investment.

22      Q.   What did you say, if anything, to Mr. Nolan

23  about his equity investment in Diamante Del Mar?

24      A.   I don't recall.

25      Q.   Do you recall whether he would receive a

Page 161

Kenner 04 28 11

179

```
 1    percentage ownership of Diamante Del Mar?
 2              A.    Yes.
 3              Q.    With his investment?
 4              A.    I believe yes.
 5    BY MR. SMITH:
 6              Q.    I wasn't sure about the answer to the
 7    question that Chris asked previously, about prior to his
 8    investment whether you discussed the possibility of his
 9    investment in Diamante Del Mar.
10              A.    I don't recall the timing of the investment
11    discussions.   Owen and I used to speak every day several
12    times a day.
13              Q.    You said you visited sometime in 2002 for the
14    first time Diamante Del Mar?
15              A.    I believe so.
16              Q.    And as you said you spoke to him multiple
17    type a day, right around that time you spoke to him about
18    your visit?
19              A.    Yes.
20              Q.    Did you speak to him about his prospective
21    investment?
22              A.    I don't recall the conversation other than
23    discussing my visit, how excited I was.
24              Q.    Did he express any interest in investing?
25              A.    He was very excited about the land
```

180

Page 162

TR-SEC00000162

Kenner 04 28 11

1    investments.

2         Q.   I'm sorry?

3         A.   He was very excited about land investments in

4    general.

5         Q.   Was he interested in investing in Diamante

6    Del Mar?

7         A.   I believe he was.   He and his wife came down

8    as their first opportunity by helicopter to see the

9    property.

10        Q.   Did he ask you any questions about how to go

11   about investing?

12        A.   I'm sure he did.

13        Q.   Did you explain to him how you went about

14   investing?

15        A.   I told him how I got involved with Ken Jowdy,

16   and the hockey world being very small and most of the guys

17   having played with one another at some level growing up,

18   they all knew each other.

19             So it created comfort when I told Owen Nolan

20   -- and I also spoke with Joe Juneau at the same time

21   because we also used to speak on a daily basis, he is

22   another guy who loved land investments and had done some

23   significant ones on his own.

24        Q.   Did you enjoy your trip?  I assume you did

25   because you invested?

                                              181

1         A.   Yes, it was a great trip.

2         Q.   You thought it was a good investment at the

3    time?

Page 163

Kenner 04 28 11

4      A.   I was very excited about it.

5      Q.   Did you tell Owen Nolan that you thought it
6  was a good investment?

7      A.   I told him I was very excited about the land
8  and what was going on.

9           Owen is quite a gambler so he was always
10  looking for something to create this fix in him.  Much the
11  same Joe Juneau was as well.   That's why they liked
12  talking to me because I could tell them things they didn't
13  know about necessarily.

14      Q.   How risky did you view this investment at the
15  time you invested?

16      A.   In what context, what scale.

17      Q.   You just described him as a gambler, you had
18  just made or committed to a $350,000 investment, obviously
19  you could have put $300,000 in a duffle bag, the S&P 500,
20  T bills, how risky did you view this investment in
21  Diamante Del Mar at the time you made the investment?

22      A.   I viewed it, personally, as a moderate risk
23  investment because the land was cash owned land.   And so
24  I felt really good about it.

25           In fact, even to this day minus the $3

                                                          182

1  million loan that Bill Najam and Ken Jowdy took out on the
2  property, I'd still be thrilled if that land were owned
3  and unencumbered and not in some state of forbearance or
4  foreclosure, we would still have a 10,000 acre piece of
5  land that KPMG had appraised at over $6 million at one
6  point.

                    Page 164

TR-SEC00000164

Kenner 04 28 11

7       Q.    When you spoke with Mr. Nolan after the

8  visit, did you discuss your sense of riskiness of the

9  investment?

10      A.    If I did, and I don't recall specifically,

11  but in the context of the conversation I'm sure I would

12  have told them Mexican land is high risk relative to the

13  1,200 acres he just bought on the outskirts of San Jose,

14  California, for cash.

15      But Owen Nolan was a guy who used to gamble

16  $100,000 a week in football.   So in our collective world,

17  that's outrageous.   But to him, he was making 3.5 million

18  and on his way to making $30 million.   So to him these

19  numbers were not -- risk to him was a relative deal.

20      He went out and got a thousand professional

21  penalty minutes, so he would fight every night.   To me

22  that's risk.

23      Q.    Did you recommend that he make the investment

24  in Diamante Del Mar?

25      A.    I don't believe so.

183

1      In the course of conversations with all these

2  guys, I hope I can convey well enough that after years of

3  dealing with these guys we became like family or like

4  friends in a very close way, when I would go visit Owen

5  and his future wife, they would demand that I would stay

6  with them.

7      When his son passed away, I was the first

8  person to ask to come to town and spend time with them.

9  When their daughter was born, I was there for over a week

Page 165

Kenner 04 28 11

10    with the family.

11          So we would spend 24 hours a day sitting

12    together talking about life.

13          There was really no context of my life or

14    their life that wasn't sitting around the table with your

15    family.

16          That was one of the things, I think, that

17    brought comfort to everybody.   If I was interested in

18    doing something, these are guys that said:   If you're

19    there, I want to be there.

20          So the context of offering, soliciting, I

21    just want to be real clear, my role was to maybe be the

22    education that these guys weren't.   And that was the

23    trust that they put in me.

24          And the second part of that is when I started

25    the business in 1993, I was brought in to the business,

☐

184

1     asked to be in it by a guy named Joe Juneau, who I was at

2     Rensselaer with, who is an Aerospace engineer and he would

3     tell all these guys:   Phil is the smartest guy I know.

4          So when a hockey player who Sports

5     Illustrated named the smartest athlete in the world told

6     his constituents, whether it be Eric Lindros or Mark

7     Messier or Owen Nolan or Jason Allison:   Phil is a great

8     guy, he was the best man at my wedding, smartest guy in

9     RPI, there was an inherent level of trust that was built

10    up, and we were all about the same age so we all got along

11    like brothers.

12    BY MR. CASTANO:

Page 166

Kenner 04 28 11

13      Q.   I want to make sure the question was

14   answered.

15           Did you recommend to Owen Nolan in any way

16   that he make an equity investment in Diamante Del Mar?

17      A.   I don't recall a specific recommendation.

18           If I can put it in the context of spending

19   hours in discussions, at some point if Owen said:  "You're

20   there, do you think it's a good idea for me," maybe in the

21   context of all those discussions we talked about earlier

22   where I know he's a gambler, the money that sits liquid

23   goes out to the bookies, money that sits liquid he trades

24   like crazy on his ETRADE account.

25           In the first year and a half he lost a

185

1   million-5 on his ETRADE account, I'm not trying to be

2   evasive.  So if he said:  What do you think, is this a

3   good thing.  I would be glad to say:  Yeah, Owen, I think

4   this is good.

5           Because I'm worried about him as a friend not

6   having after career cash flow and I view private equity

7   stuff as ongoing cash flow that they couldn't get their

8   hands on.

9           Owen was a guy I was aggressively paying his

10   mortgage down on.  Because I knew he couldn't get his

11   hands on that money unless it was an emergency.

12      Q.   So the answer is you may have, you just don't

13   recall?

14      A.   I don't recall specifically.

15      Q.   Did you ever tell Owen Nolan or any other
                    Page 167

Kenner 04 28 11

16   equity investor in Diamante Del Mar that they would not

17   lose their principal?

18        MR. STOLPER:  You're talking about beyond his

19   clients?

20        Q.   Your clients?

21        A.   I don't recall.

22        Q.   Do you know why an investor would say that

23   you said that, any 1 of your clients?

24        A.   I don't know why someone would say that.

25   But those are not words that I would utter in any

                                                        186

1   investment.

2        Q.   Words or substance, did you ever tell any

3   investor --

4        MR. STOLPER:  Let him finish his answer, you

5   cut him off twice.

6        Do you have something to say, Phil?

7        A.   I just wanted to finish, Chris, I'm sorry.

8        I was just trying to say that would not

9   typically be words that would come out of my mouth in the

10  context of anything these guys would do or I would do.

11       That they would have a guarantee that they

12  wouldn't lose money.   Many of us had just come through a

13  1999 stock market debacle, so they all understood what

14  they thought was free money in the mid '90s when they were

15  all gambling on ETRADE accounts, in 1999 you could lose

16  all your money in minutes.

17       Several of them had been involved in a gold

18  mine scandal up in Canada. They were all very aware that

                        Page 168

Kenner 04 28 11

19    big volumes of money could disappear very quickly.

20              So I don't think even those words would have

21    had -- would have resonated with anybody after seeing

22    millions disappear in these different uncontrolled

23    environments.

24         Q.   I'm doing the best I can to speed this up.

25    It's going to take a long time.


                                                          187


1               Mr. Kenner, again, did you ever inform any

2     investors in words or substance that their principal

3     investment in Diamante Del Mar was safe?

4          A.   Not that I recall.

5          Q.   Mr. Kenner, in words or substance, did you

6     ever inform any investors or any of your clients in word

7     or substance that they would not lose their principal

8     investment in Diamante Del Mar?

9          A.   Not that I recall.

10         Q.   Do you know why anyone would say that you

11    said that?

12         A.   I don't.

13         Q.   Did you ever have any conversations with any

14    of your clients about what Diamante Del Mar would do with

15    the investor proceeds that were raised?

16         A.   Yes.

17         Q.   What did you tell them, if anything?

18         A.   What I recall is telling them the same thing

19    Ken Jowdy had originally told me, and that was that the

20    investments were going -- any money that was raised was

21    going to be used for infrastructure to make the property

                              Page 169

Kenner 04 28 11

22    more valuable.

23            And the one thing when I was asked earlier if

24    I had comfort in the project itself, my greatest comfort

25    was that it was owned for cash, it was no mortgage on it.

188

1    We weren't leveraging the property when I first got

2    involved, when Jason Allison and Byron Dafoe were getting

3    involved.

4            So my comfort that we owned a piece of land

5    for cash and nobody could take it away from us, in that

6    context I felt very comfortable that we couldn't lose our

7    money, that it would always be there.

8            In fact, today, even under the circumstances

9    the land is still there, it's in forbearance and the guys

10   at KSI in New Jersey when I spoke to them last, they asked

11   me if I would make an offer to them to just buy the debt.

12   They didn't really want the land, they just wanted

13   somebody to pay off the debt that Ken Jowdy had put on the

14   land.

15   BY MR. SMITH:

16       Q.   So because it was real estate and real estate

17   in which there was no outstanding mortgage that gave you

18   greater comfort than some other kind of financial

19   investment as to the likely head of return of principal?

20       A.   Absolutely. It does for me, even today in our

21   crazy -- I live on the West Coast and nobody's home values

22   are worth anything.

23       Q.   Was that a part of the conversation you had

24   with Mr. Nolan around the time you visited the property?

Page 170

TR-SEC00000170

Kenner 04 28 11

25          A.   I think in the same context that he wanted to

189

1    borrow money originally to buy his hunting farm in San

2    Jose, I told him paying $1.6 million cash meant that he

3    would always have it, and it would be secure, in the

4    context of land being secure and you own it.

5               So in the context of that and tens of hours

6    of conversations with him, on a weekly basis, I'm sure

7    that was part of the substance of the conversation.   It

8    gave me great comfort.

9    BY MR. CASTANO:

10          Q.   Did you have any conversations with any of

11   your clients about the fact that the land was owned

12   essentially without any mortgage?

13          A.   I'm sure each one of them that we discussed.

14               That was a really comforting point to know

15   that the land was owned.

16          Q.   What context was that discussed, was it

17   discussed in the context of a potential equity investment?

18          A.   It was generally discussed in the context of

19   that's why I was comfortable with it, that I'm sure that's

20   why Ken Jowdy's baseball friends that had invested in the

21   property per Ken Jowdy were comfortable with it.

22               Again, we were dealing with Mexico, which the

23   discomfort there was that Vicente Fox had just recently

24   taken over and the government and everything were

25   changing.   But the comfort was that it was Jowdy, it was

Page 171

TR-SEC00000171

Kenner 04 28 11

190

```
 1    owned for land, it was a number of baseball players that
 2    we looked up to and I was comfortable that it was not a
 3    mortgaged property.
 4            Q.   Did you convey those few things that you just
 5    said, the baseball players were involved, there was no
 6    mortgage on the property, I believe there might have been
 7    some other items you just mentioned, to your clients in
 8    the context of an equity investment in Diamante Del Mar?
 9            A.   I think in the context of this is what I just
10    did, guys felt comforted and absolutely I told them about
11    Clemens.   I was enamored that Roger Clemens was an
12    investor in the deal, he was a sports hero of mine growing
13    up, I thought that was cool.
14                Everything I could do to check on it, visit
15    the property on several occasions, it continued to check
16    out.
17                The early monies that came in started the
18    construction of a 6,000 foot concrete runway, to me until
19    2007 it all still fit.
20            Q.   How much money did you raise for Diamante Del
21    Mar?
22                MR. STOLPER:   Objection.   He didn't raise --
23    you're assuming he raised money.
24            Q.   Mr. Kenner, did you raise any money for
25    Diamante Del Mar?
```

191

```
 1            A.   I think I don't want to miscategorize again
```

Page 172

TR-SEC00000172

Kenner 04-28-11

2    my role in all of it.

3            I have a lot of clients that ended up as

4    investors in Diamante Del Mar.   And the majority of them

5    I'm going to feel comfortable in suggesting, learned about

6    Diamante Del Mar through my discussions or discussions

7    with teammates of theirs.   And there was ultimately about

8    9 to $10 million raised, I believe for Mr. Jowdy's

9    development in Diamante.

10   BY MR. SMITH:

11           Q.   From your clients?

12           A.   Yes.   I believe so.

13           Q.   You said that some of your clients learned

14   about Diamante Del Mar from discussions with you?

15           A.   Yes, I can clarify that.

16               There's probably two very specific ways guys

17   understood that I was in Mexico a lot.

18               These are clients that I had handled for a

19   decade at that point, for the most part.

20               And I spoke to them on a daily or at least a

21   weekly basis every week for a decade.

22               So if I would go to Mexico in 2002, it would

23   be an unusual activity for me.

24               So in the context of me returning I told all

25   of the guys what I was doing down there.   We were all

0                                                      192

1    friends, we talked about girlfriends, we talk about

2    children being born, we talked about getting married, et

3    cetera.

4               Like we would in family.

Page 173

Kenner 04 28 11

5        So there's a portion of them that found out

6   from me that I was down there, that I had invested and

7   that I was excited about this piece of real estate and

8   this investment opportunity for myself.

9        And two of the biggest loud mouths I ever

10   managed in hockey were Jason Allison and Byron Dafoe, who

11   then disseminated a lot of that information about their

12   future involvement with Ken Jowdy, the relationship with

13   the baseball players, the investment in the restaurant,

14   and I would feel -- I would get calls from different

15   players that played with those guys saying:   I understand

16   Byron and Jason just invested in a property, can you tell

17   me.

18        I would say:  I know all about it, I was just

19   there, I'm an investor in it.

20        Q.   Can you put names on those categories, in

21   other words, the first category being the ones in which

22   you were sort of the primary source, the initial source

23   for their knowledge every Diamante Del Mar?

24        A.   Sure.

25        I think Owen Nolan learned about it from my

193

1   first visit down there, I told him I was going down and

2   when I came back he had 64 questions for me.

3        Dafoe and Allison as we discussed before were

4   two guys that knew about it originally.

5        Q.   And they were the ones that had introduced

6   you to Ken Jowdy?

7        A.   Yes.

Page 174

Kenner 04 28 11

8          Q.    Did they also know about Diamante Del Mar

9    before you did?

10         A.    Yes, that was one of the other reasons I went

11   to visit Ken Jowdy here, and that's when I learned that

12   they had already, in theory, committed to the investment.

13              I think Dimitri Khristich, Joe Juneau and

14   Jason Woolley played hockey with Allison and Dafoe, so

15   those guys all found out about it from their days in

16   Washington together.

17         Q.    In other words, they learned about it from

18   Allison and Dafoe before learning about it from you?

19         A.    Yes, in the same time frame.  I don't want

20   to tell you there's a strict delineation that Joe Juneau

21   did not hear about it from me, he heard about it from

22   those guys in the locker room.   But Woolley, Dafoe,

23   Allison and Khristich all played for the Washington

24   Capitals.

25         Q.    I'm trying to stick category by category.

                                                        194

1              Understanding it all happened around the same

2    time, but the ones that learned about it from you --

3          A.    I would say Owen Nolan learned about it

4    because of my trip down there.

5              I'd say Joe Juneau probably knew about it

6    because of my trip down there, another guy I spoke to on a

7    daily basis.

8    BY MR. CASTANO:

9          Q.    We can go name by name to make it easier.

10             I think we talked a little bit about Mr.

                    Page 175

Kenner 04 28 11

11    Nolan.

12              Why don't we moved to Dimitri Khristich?

13              Did Mr. Khristich make an investment in

14    Diamante Del Mar?

15        A.   Yes.

16        Q.   Did Mr. Khristich make an investment in

17    Diamante Del Mar after or before you made your equity

18    investment?

19        A.   I believe everybody was after.

20              MR. SMITH:  I thought Allison and Dafoe were

21    before.

22              THE WITNESS:    Their money didn't transfer

23    until sometime later.

24              MR. SMITH:  Did they make a commitment before

25    then?

195

1               THE WITNESS:    They did.

2               MR. SMITH:  Anybody else other than those two

3     make a commitment to invest before you committed to

4     invest.

5               THE WITNESS:    No, nobody knew about it,

6     including myself, until I visited with Ken Jowdy here in

7     New York.

8               MR. SMITH:  I understand Allison and Dafoe

9     did know about it before you?

10              THE WITNESS:    Yes.

11              MR. SMITH:  Other than those two, did anybody

12    know about it or make a commitment to invest before you

13    committed to invest?

Page 176

TR-SEC00000176

Kenner 04 28 11

14          THE WITNESS:    Not that I'm aware, none

15   related to me.

16          Q.   What did you say, if anything, to Mr.

17   Khristich about an investment opportunity in Diamante Del

18   Mar?

19          A.   I believe Khristich was a teammate of Byron

20   Dafoe and Jason Allison's, as was Joe Juneau and Jason

21   Woolly at the time.

22              And on one of my visits to Washington, I

23   would typically spend days in a row there as I had 8 to 10

24   clients on the Washington Capitals.   So at lunch, dinner,

25   breakfast, Dafoe and Allison spoke openly about their

                                                        196

1    investment down in Mexico, Juneau and I, I stayed at his

2    house all the time, we would sit up and talk all through

3    the night about it.

4              Dimitri Khristich is one of the teammates who

5    was always around; in fact, it was his wife that was

6    really excited about it, his ex-wife now.

7          Q.   Mr. Kenner, the question was, what did you

8    say, if anything, to Mr. Khristich prior to him making his

9    equity investment in Diamante Del Mar about Diamante Del

10   Mar?

11             I'm not interested, so the record is clear

12   for purposes of trying to get through this as quickly as

13   we can, getting through this tomorrow, I understand there

14   might be other conversations and we can get to that, but

15   it's what you said, not what Joe Juneau and someone else

16   were having a conversation while you were sitting there?

                    Page 177

Kenner 04 28 11

17          We're asking what you said to Mr. Khristich
18   prior to him making his investment.
19        A.    Maybe this will help simplify this as well, I
20   know we're trying to get some clarity to all this.
21          Whether it be Mr. Khristich, or Mr. Woolley
22   or Mr. Norstrom or Mr. Stumpel, any of these guys would
23   have found out about my visits to Diamante Del Mar one way
24   or another, either I told them I was just there, they
25   asked me or they heard I had been there.

                                                      197

1          In the context of any future conversations,
2   we would talk openly about what I did there, about an
3   investment, opportunities that are there.   They had asked
4   if I invested there, I would be very forthright with them.
5   They asked if I would be involved in the future.   I told
6   them about my role to go down and help Ken Jowdy to help
7   promote and sell the project as a real estate guy.
8          And ultimately each one of them before -- if
9   they didn't know Ken Jowdy and they were enamored by the
10   group of guys that was going to invest they would ask me
11   what my thoughts were about it as a safe investment, as a
12   moderate risk investment, where it fit in with their stuff
13   and could they do it.
14          My answer would be in the context of if it
15   was appropriate I think it's okay for you guys.   If it's
16   something you're interested in, I would be very open with
17   it.
18          I didn't encourage anyone that it was
19   important that they do it or else.   And I never

Page 178

TR-SEC00000178

Kenner 04 28 11

20  discouraged anybody that really wanted to do it.

21          MR. STOLPER:  Chris's question was:   Do you

22  have any specific -- do you have any recollections of

23  specific conversations with Khristich over this particular

24  investment.

25          THE WITNESS:   I do not.

198

1          Q.   Do you have any general recollection of any

2   conversations you may have had with Mr. Khristich about an

3   equity investment in Diamante Del Mar?

4          MR. STOLPER:   Other than what he just

5   testified to?

6          MR. CASTANO:   Yes.

7          A.   No, not anything.

8   BY MR. SMITH:

9          Q.   We can go through person by person, but we

10  spent a fair amount of time talking about the discussions

11  you had with Owen Nolan around the time of your visit.

12          Would you say that the discussions that you

13  had with all of the other clients that you had were

14  substantially the same as the ones you had with Owen Nolan

15  around that time?

16          A.   Yes.   As significant or insignificant as

17  those conversations would be, and even to me at the point

18  it was still very simple, there is a piece of land, you

19  invested in it, Mr. Jowdy owns it for cash, he has a lot

20  of baseball friends in the deal.  I would tell him who.

21  Ken Jowdy told me who were part of the deal.   That was

22  really kind of the end of the deal.

Page 179

Kenner 04 28 11
23          Mr. Najam and Mr. Jowdy then with Larry
24   Markowitz prepared all the subscription agreements, and I
25   would tell Najam or Jowdy some guys are asking about the

                                              199

 1   investment, can I send it to them.   Some of the guys want
 2   to send it on to their attorneys, their accountants,
 3   hockey agents, to look at the paperwork.
 4          And when some of them would call me about the
 5   details of it, I would tell them what I know about the
 6   offering that was outside of the scope of what was
 7   actually written on the paperwork.   Which was I went and
 8   visited the property, I invested in it and I was very
 9   encouraged to have some involvement in the deal.
10          Just to clear up the Khristich deal, 99
11   percent of the conversations with Khristich took place
12   with his wife in '02, '03, probably the end of 2004.
13       Q.   You mean with his wife and not with him or
14   with both of them?
15       A.   The conversation was he and his wife -- his
16   wife and I and he would either be present or not present.
17          But typically disinterested.   She ran the
18   finances in the family and she was best friends with Joe
19   Juneau's wife to be.
20   BY MR. CASTANO:
21       Q.   Did you ever say to any one of the investors,
22   your clients, 15 or 19 or so individual that invested in
23   Diamante Del Mar that they should affirmatively invest in
24   Diamante Del Mar?
25       A.   It's possible.   It's possible in the context
                         Page 180

TR-SEC00000180

Kenner 04 28 11

200

1    of all of our discussions.

2        Q.   Besides the approximately $14,000 you

3    received for approximately six months, did you receive any

4    other funds from Diamante Del Mar?

5        A.   I would assume just reimbursement for

6    expenses I incurred.

7        Q.   How much was that, approximately?

8        A.   Could have been a couple of thousand dollars

9    per trip.

10       Q.   Do you know if it was over $100,000?

11       A.   I don't think so.

12       Q.   The entire universe of monies you received

13   from Diamante Del Mar would be roughly $14,000 over six

14   months, plus some travel expenses, approximately $100,000

15   or so?

16       A.   That's safe to say.

17       Q.   We all know that those numbers are moving

18   targets so to speak.

19            Is it fair to say they are materially

20   accurate?

21       A.   Yes.

22            There was no other cash exchanged for

23   Diamante Del Mar purpose, other than reimbursements of

24   expenses I laid out for the company.

25       Q.   Did any of the entities you're affiliated

201

Page 181

TR-SEC00000181

Kenner 04 28 11

1    with, for example Standard Advisors, receive funds from
2    Diamante Del Mar?
3           A.    I don't believe so.
4                 MR. CASTANO:  Let's mark this as Diamante Del
5    Mar Exhibit 29.
6                 (Diamante Del Mar Exhibit 29, Confidential
7    offering memorandum, marked for identification, as of this
8    date.)
9                 MR. CASTANO:  For the record, Diamante
10   Exhibit 29 is the Diamante Del Mar confidential offering
11   memorandum dated November 1, 2002.
12          Q.    Please take a moment to review that.
13          A.    Chris, can I ask, is this a copy that I sent
14   you guys?
15          Q.    I can't answer that question.
16                MR. STOLPER:  No, because we don't have page
17   numbers on it.
18          A.    Respecting time, is there anything specific
19   you want me to look at?
20          Q.    The first question is:  Have you seen
21   Diamante Exhibit 29 before?
22          A.    I believe I have.
23          Q.    Is this the Diamante offering memo we talked
24   about earlier?
25          A.    I believe it is.

202

1           Q.    Do you know when you approximately received
2    this document?
3           A.    Are you referring to the first time I may
                        Page 182

Kenner 04 28 11

4  have seen it?

5       Q.   Yes.

6       A.   I'm going to guess in 2003 time frame.   If

7  it's the same one or similar to the one I was with Larry

8  Markowitz, Bill Najam and Ken Jowdy.

9       Q.   Did you ever give Diamante Exhibit 29, or a

10  document very similar to it, be that an offering

11  memorandum for Diamante, to any of your clients?

12            MR. STOLPER:   I think he testified to that

13  already.

14       A.   I probably -- to provide clarity, I probably

15  handed this to each one of them that became equity

16  investors as their business manager and any paperwork they

17  would sign.

18       Q.   Do you know if you gave it to them prior to

19  them making their investment or after?

20       A.   I believe there were two -- again, this is

21  stuff that's fleshed out through some of the other

22  litigation, so I'm telling you stuff that I recall based

23  on the last four years proceeding, is that the initial 6

24  gentlemen, Byron Dafoe, Jason Allison, Owen Nolan, Joe

25  Juneau, Dimitri Khristich and Jason Woolley, I believe

                                                    203

1  those gentlemen all received a promissory note from Bill

2  Najam and Ken Jowdy when they initially put their funds

3  with Ken Jowdy in Baja Development Corporation.

4            Subsequent to that, I believe those guys --

5  that transaction kind of took place as they transferred

6  funds, Ken Jowdy gave them a promissory note.

                   Page 183

Kenner 04 28 11

7   BY MR. SMITH:

8          Q.   Let me interrupt you there.   That sounds like

9   a debt investment, were they making an equity investment

10  or was this a loan?

11         A.   I can clarify, it's a good question.

12              The intention was an equity investment.

13  Bill Najam and Ken Jowdy were very adamant that they were

14  almost completed -- had almost finished with Larry

15  Markowitz the offering memorandums, but they had some

16  commitments to development cost, et cetera.

17              So I didn't see anything wrong with it.   And

18  frankly, I don't believe I still see anything wrong with

19  it, as they transferred the funds, Jowdy and Najam offered

20  a promissory note to the entity Baja Development

21  Corporation which Jowdy told me was the development

22  company for Diamante.

23              They received a promissory note for the money

24  that they put in, and then some short period of time later

25  they were given the Baja Management offering which I

204

1   believe is almost identical to this, if I remember

2   conversations with Larry Markowitz correctly.

3              And that promissory note was then exchanged

4   for the Baja Management interest.   And at the same time

5   -- so those 6 gentlemen received the offering from Baja

6   Management in exchange for their Baja Development

7   Corporation promissory note.

8          Q.   There was a separate Baja Management offering

9   memorandum?

Page 184

Kenner 04 28 11

10        A.    I believe so.    And that's what I believe

11   those 6 guys signed which would have been the same one I

12   signed.

13   BY MR. CASTANO:

14        Q.    Meaning signed a subscription agreement for

15   Baja Management, not signed a private placement?    Or do

16   you know?

17        A.    I don't know.

18              Again, I don't want to be mischaracterizing

19   that it was a subscription, it was a private placement

20   memorandum, it was an offering. Those terms to me are all

21   kind of the same paperwork that Larry Markowitz provided:

22   Here's what the guys need to sign.

23              So the first 6 to be clear sent their money

24   to Baja Development Corporation, which we now know is Ken

25   Jowdy's sole entity.    We did not know at the time.    I

205

1    thought it was in the corporate account, that there was

2    interest of all the individuals, including myself at the

3    time.

4              Those promissory notes, then, at a later

5    date, were then exchanged for Baja Management paperwork,

6    each one of the guys signed, and if at some point a guy

7    said signing, after signing: "I changed my mind, I'm not

8    interested," each of those guys, I believe went and

9    visited the property themselves or with their wife's, and

10   at that point if they said:    This is not what I thought

11   it was going to be, I'm out --

12              In fact, one guy who is a client and is still

Page 185

Kenner 04 28 11

13    an acquaintance of mine, he put his money in and he never

14    got a chance to go down with his wife and he said:    I

15    changed my mind.   And I believe Ken Jowdy sent him his

16    money back.

17                So there was no issue like:   You're in,

18    you're stuck.

19                Each one of those guys came down and several

20    of them brought additional friends down to invest other

21    hockey players.

22                This offering, which then probably was the

23    remainder of that 15 to 19 guys, the guys would get the

24    offering, once they told me that they were interested in

25    being an equity member of Diamante Del Mar.

206

1                And they would receive it and then many of

2     them had them reviewed by their attorneys, accountants,

3     their agents.   And then the agents and accountants and

4     attorneys would call me, ask about it all, and I would

5     say:   In addition to what you read, I've been there six

6     times, 8 times, 10 times, Roger Clemens, Andy Pettitte,

7     Jason Giambi, Mark McGuire, these are all friends of

8     Jowdy's, he's told me they're investors.

9     BY MR. SMITH:

10         Q.   For the first 6 investors that you mentioned

11    they initially received a promissory note, that promissory

12    note converted into equity in Baja Management?

13         A.   Correct.

14         Q.   They did not receive prior to their

15    investment this offering memorandum for Diamante Del Mar,

Page 186

TR-SEC00000186

Kenner 04 28 11

16    that's been marked as Exhibit 29?

17         A.   I don't believe so.

18         Q.   But the other subsequent investors did

19    receive that offering memo that's marked as Exhibit 29

20    before their investment?

21         A.   That's correct.

22         Q.   Did they receive that from you?

23         A.   I'm sure each one of them got it from me,

24    they would get -- I would help them fill it out and then I

25    would send it back to Bill Najam.


                                                              207


 1              I did that in the course of my business for

 2    everything, my guys would sign.

 3         Q.   Your understanding is they did that prior to

 4    committing to invest?

 5         A.   I would imagine yes.

 6         Q.   What about the initial 6, is it your

 7    understanding that they ever received an offering memo

 8    like the one in Exhibit 29?

 9              MR. STOLPER:  He testified to that already.

10              MR. SMITH:  The answer was no, I thought.

11              MR. STOLPER:  The answer was yes.   It was

12    identical, roughly, to that.

13         Q.   Let me be more clear.

14              They didn't receive, to your knowledge, an

15    offering memo for Diamante Del Mar, I'm talking about the

16    original 6, even subsequent to their investment?

17         A.   Not for Diamante Del Mar, to the best of my

18    recollection.
                            Page 187

Kenner 04 28 11

19        I believe they only received Baja Management
20  paperwork.   That would be the best I would be able to
21  recall.
22              MR. STOLPER:  Did you ask him which paperwork
23  he had received?  I think he testified to it before.
24        Q.    Which paperwork did you receive?
25        A.    I believe it was the Baja Management

                                                        208

1   paperwork that the original 6 also received.
2         Q.    And you testified as well that you reviewed
3   this one, the Diamante Del Mar one, right?
4         A.    To be very specific, the details of any of
5   the paperwork that was related to my involvement, Larry
6   Markowitz would make me review it and ask me if it was
7   okay, if it was accurate after he learned about what I did
8   as a business manager, in order to make sure there was as
9   much disclosure as he felt comfortable presenting.
10        Q.    And that includes both the Diamante Del Mar
11  offering memorandum as well as the Baja Management
12  paperwork, whatever it may have been, whether it was a
13  subscription agreement or offering memorandum or
14  otherwise?
15        A.    I don't recall what's in the Baja Management
16  offering, without reviewing the document.
17             My recollection would be it is certainly in
18  whatever the Diamante Del Mar paperwork is.   I haven't
19  looked at the Baja Management paperwork in eight years.
20        Q.    I think the record might be getting confused.
21  I want to break it apart.
                    Page 188

Kenner 04 28 11

22          I think you testified to this previously, I
23   want to make sure it's clear.
24          Do you recall reviewing in connection with
25   Markowitz, the Diamante Del Mar offering memorandum?

209

1          A.   I believe that's correct.
2          Q.   But that's not the document that you received
3   in connection with your investment in Diamante Del Mar,
4   right?
5          A.   I believe that is also correct.
6          Q.   The document that you did receive in
7   connection with your investment in Diamante Del Mar was
8   some sort of Baja Management document, whether it was an
9   offering memorandum, subscription agreement or otherwise?
10          A.   Correct.
11          Q.   You're not sure exactly what form of document
12   that was?
13          A.   No, but I did -- it was turned over to you
14   guys, the one that I signed.   You have a copy of that,
15   whatever that is, you do have a copy, that I believe my
16   wife and I signed at the time.
17          Q.   You did or did not have input into the
18   drafting of that document with Mr. Markowitz prior to his
19   finalization and your signing it?
20          A.   I had discussions with Mr. Markowitz about
21   the content that was related to me.
22          The rest of it was out of scope for me.
23   BY MR. CASTANO:
24          Q.   Mr. Kenner, the investor proceeds from your
                          Page 189

Kenner 04 28 11

25    clients, did they come through any bank account that you

210

1    controlled or did they all go from your clients directly

2    to Jowdy or whatever Jowdy entities he set up?

3         A.    Directly to Ken Jowdy on all occasions.

4         Q.    No money ever came through or touched any of

5    your accounts before going to Jowdy account?

6         A.    To the best of my recollection, never.

7         Q.    We're only talking about Diamante Del Mar,

8    we're not talking about any other investments right now?

9         A.    To the best of my recollection, never.

10        Q.    Did you ever discuss with any of your

11   clients, Diamante Del Mar's private placement, that is

12   Diamante Exhibit 29 in front of you, use of proceeds that

13   is contained inside the actual offering memorandum?

14        A.    At no level greater than Ken Jowdy said we're

15   using all of the initial monies that he's raising to start

16   building out infrastructure, a runway, drill a well site

17   so the property would be worth more money.

18        Q.    Just so we're clear, none of your clients or

19   any of their agents, be it attorneys or accountants, ever

20   called you and said:   Hey, I want to direct your

21   attention to page 6, this is the page where we discuss the

22   use of offering proceeds, can we discuss it with you?

23        A.    Not that I recall specifically.

24        Q.    I want to direct your attention to page 16 of

25   Diamante Exhibit 29.

Page 190

TR-SEC00000190

Kenner 04 28 11

211

1           MR. STOLPER:  Before you ask a question, I
2    want to clarify something.
3           (Witness and counsel confer.)
4       Q.  Mr. Kenner, I'm sorry to interrupt you.
5       A.  I'm on 16.
6       Q.  Is there anything you wanted to correct in
7    the record right now?
8       A.  No, we're okay.
9       Q.  Mr. Kenner, did you ever tell any of your
10   clients that you would receive consulting fees or some
11   sort of fee for or from Diamante Del Mar?
12      A.  Yes.
13      Q.  What did you tell them?
14      A.  Exactly as you just said.
15      Q.  Can you say it in your own words?
16      A.  Sure.
17          I said that part of my involvement in
18   Diamante Del Mar is that I was going to get paid as a
19   consultant to assist in the real estate development.
20      Q.  Did you tell them how much money that would
21   be?
22      A.  Yes.
23      Q.  What did you tell them?
24      A.  I told them I was getting paid $14,000 a
25   month.

212

1       Q.  Did you tell them that prior to them making

Page 191

Kenner 04 28 11

```
2    their investment?
3         A.   Yes.
4         Q.   Did you know that $14,000 a month would be
5    approximately what you would receive?
6         A.   I think we talked -- when I spoke with Ken
7    Jowdy about it I believe it was going to be somewhere
8    between 15 and 20,000 a month.   And how he came to
9    14,000, at some point, I don't know.
10             But that's what I believe it ended up being.
11   BY MR. SMITH:
12        Q.   Just to be clear, these were payments to Guy
13   Dog?
14        A.   That's correct.
15        Q.   And the payments you said were made in 2003
16   for about six months, and no payments subsequent to that?
17        A.   That's correct.
18        Q.   And the payments were made by what entity?
19        A.   I don't recall.
20        Q.   One of the Diamante entities?
21        A.   I don't recall.   Something Ken Jowdy
22   controlled, because it never seemed peculiar where it was
23   coming from.
24        Q.   The payments were made in what form; check,
25   wire transfer?
```

213

```
1         A.   I don't recall.   But I'm assuming it was one
2    of the two.
3         Q.   If it was a check it would have been made out
4    to Guy Dog?
```

Page 192

Kenner 04 28 11

5     A.   Yes.

6     Q.   If it was a wire transfer, it would have been

7  payable to a Guy Dog account?

8     A.   Yes.

9     Q.   I think you testified to this before but I

10  just want to be clear, subsequent to 2003, you didn't

11  receive any payments from any Diamante Del Mar entity or

12  Jowdy controlled entity?

13     A.   That's a different question than we went

14  through earlier.

15     Q.   Maybe I misunderstood.   Let me ask that

16  question.

17          Did you, subsequent to 2003, receive any

18  payments from a Diamante Del Mar entity?

19     A.   I don't believe so.

20     Q.   Did any entity, organization of which you are

21  affiliated or owned like Guy Dog, receive any payments

22  from a Diamante Del Mar entity subsequent to 2003?

23     A.   I don't believe so.

24     Q.   Did you receive any payments subsequent to

25  2003 from any Ken Jowdy controlled entity?

214

1     A.   I believe I did.

2     Q.   From what entity?

3     A.   When we went to Diamante Cabo San Lucas, then

4  he was in charge of the Diamante Cabo San Lucas project,

5  and I became a sales affiliate.

6     Q.   I'll cut you off there, we'll get into

7  Diamante Cabo San Lucas.

Page 193

Kenner 04 28 11

8    BY MR. CASTANO:

9         Q.    Just so the record is clear, Mr. Kenner, are

10   you certain of the fees and reimbursement for related

11   travel expenses you had, that it was roughly $100,000,

12   could it have been upwards of $300,000?

13              MR. STOLPER:   Fees?

14        Q.    Reimbursement costs you had associated with

15   Diamante Del Mar, you mentioned earlier in testimony today

16   that it was approximately $100,000.

17              Do you know if it could have been more than

18   that?

19        A.    Anything is possible.   But related

20   specifically to Diamante Del Mar, I believe my

21   reimbursements were limited to paying for airplanes, cars,

22   travel and jet fuel.

23        Q.    The $14,000 you received each month, Guy Dog

24   would receive that money?

25        A.    Yes.


□                                                           215


1         Q.    The reimbursements that you received from

2    Diamante Del Mar, was that sent to Guy Dog or was that

3    sent to a personal account of yours?

4         A.    I don't recall.

5         Q.    If we were to look at whatever credit card

6    bills or bills that you had, for example, maybe an

7    American Express card bill, with funds that seemed to be

8    going from Diamante Del Mar to paying your American

9    Express card bill, we would see every one of those

10   transactions in your American Express card bill as being a

Page 194

TR-SEC00000194

Kenner 04 28 11

11   Diamante Del Mar expense?

12        A.   If I can clarify:   Any expenses that would

13   have been Diamante Del Mar related were most likely paid

14   for by credit card by me and then submitted to Bill Najam

15   for reimbursement.

16             On occasion I may have paid cash for gas in

17   Mexico for the planes to come back and forth, and I would

18   tell Bill Najam it was $1,800 to fill up the plane,

19   whatever it was.

20             And he would also reimburse me.

21             But those expenses were not paid any other

22   way other than credit card or occasionally cash for gas, I

23   believe.

24        Q.   Do you know if any bank account associated

25   with Diamante Del Mar ever directly paid your credit card

                                                      216

1    bills?

2         A.   Yes.

3         Q.   If I were to look -- which credit card would

4    that be?

5         A.   Most likely my American Express card.

6         Q.   If I were to look at the American Express

7    bills for that time period would it just show nothing by

8    Diamante Del Mar expenses?

9         A.   No.

10        Q.   Would it show personal expenses of yours?

11        A.   It would show some personal but also my very

12   significant business travel.

13        Q.   The question becomes:  Why would Diamante Del

                        Page 195

Kenner 04 28 11

14  Mar pay an American Express bill that included your

15  personal expenses?

16          A.     They weren't paying my personal expenses.

17                 They were reimbursing me for expenses I would

18  layout on behalf of the company.

19                 As example, starting in 2003, December, Ken

20  Jowdy hosted an annual golf event down in Cabo San Lucas.

21  And he would bring me in a significant number of what I

22  believed were his close friends, baseball players, and

23  they would spend 4 or 5 days in Cabo San Lucas.

24                 The hotel bills would run $25,000 for that

25  visit.

217

1                  The airplanes would run $30,000 for that

2  visit.

3                  The greens fees would run $22,000 for that

4  visit.

5                  The different venues we would rent out may

6  run $10,000 a night for those visits.

7                  At the time he asked if I could put those

8  expenses on my credit card, and he would reimburse me when

9  he had funds available to reimburse me.

10                 So where he reimbursed me from, if it was

11  Propiedades DDM Mexican account or a Diamante Del Mar

12  account or a Baja Development account, I don't recall

13  where he sent those funds from.  But my credit card would

14  have Phil Kenner expenses, would have Standard Advisors

15  expenses, and would have Guy Dog related travel expenses

16  and would have Diamante expenses.

Page 196

Kenner 04 28 11

17        And Ken Jowdy was not always available to

18   make payment immediately as I would lay out the fees in

19   December.   He wouldn't necessarily pay it off in January,

20   so many times I would have to pay the credit card bills, I

21   would give Bill Najam the running total of what it was and

22   then when they would borrow money, receive money, Najam or

23   Jowdy would effectuate a payment to the credit card for

24   those expenses to me.

25        Q.   I want to break down a bunch of things you

218

1    said, I want to make sure the record is clear, we have

2    asked this question a few times.

3             How much approximately do you believe you

4    were reimbursed for Diamante Del Mar expenses?

5        A.   I think the same number we talked about

6    earlier, and that's 50 to 100,000 for Diamante Del Mar

7    expenses.

8        Q.   I'm not talking about any other expenses.

9        A.   Just because I know it's a gray area in

10   between, I don't know that I can even delineate when guys

11   flew down to a Cabo San Lucas golf event in '05 when we

12   were about to close with Lehman Brothers on the '06

13   transaction, and is that a Diamante Del Mar expense, is it

14   a Diamante Cabo San Lucas expense for a company that

15   didn't exist yet?

16            I just want to be clear, it wasn't as if

17   Diamante Del Mar was a South American deal and everything

18   happened in South America.   And Diamante Del Mar Cabo San

19   Lucas was in Mexico and there's a definitive line between

Page 197

Kenner 04 28 11

20    the activities.

21            Q.    I'm asking about Diamante Del Mar.

22            A.    I believe it's about 50 to 100 grand in

23    expenses.    That would have been Diamante Del Mar

24    specific.

25            Q.    These expenses, do you have receipts for

                                                          219

1    them?    You mentioned that you sent receipts to Bill

2    Najam.

3            A.    Yes.

4            Q.    Do you have the receipts or the invoices that

5    you sent to him?

6            A.    I do not.

7            Q.    You sent him original copies?

8            A.    I would send him the original receipts in an

9    envelope.

10            Q.    And if I'm looking at American Express record

11    for you, and I see Diamante Del Mar payments being made

12    from the Diamante Del Mar bank account to your American

13    Express card account, will I see personal expenses of

14    yours on those accounts being paid by Diamante Del Mar?

15            A.    Absolutely.

16            Q.    Personal expenses, not expenses related to

17    your business?

18            A.    Absolutely.

19            Q.    Why would I be seeing that?

20            A.    That's what I was trying to describe before.

21                  Let's say in December of '04, I laid out

22    $100,000 in expenses, either cash in Mexico for the golf

Page 198

Kenner 04 28 11

23      people, cash for gas, or greens fees, hotel expense, et

24      cetera, most of the time they would charge airplane

25      flights for all the different guests on my card starting

220

1       in November, December.  And many times I wouldn't be

2       reimbursed by Jowdy or Najam until not even January but

3       maybe February or March.

4                   And I wasn't pressed for the cash

5       month-to-month personally.  So I would pay the bill, they

6       were still always good for it, so they would eventually,

7       when they had cash available, Bill Najam would say:

8       70,000 bucks is still outstanding to Phil for expenses and

9       he may pay that in March.

10                  Instead of sending it to me, I said:  Bill,

11      you've got my American Express information, just send it

12      to me.

13                  If it was a credit to me at American Express,

14      I traveled a lot, I traveled 300 days a year to 300

15      different cities for my standard business, I knew I was

16      going to run up the expenses again in the next month or

17      two for my own business.

18                  So I didn't need Bill Najam to say:  60,000

19      was Diamante Cabo, 10,000 was Del Mar, we'll send you two

20      separate checks.  I said:  They're expenses, I charged

21      them, send it American Express, I'll eat up the balance.

22          Q.   Just so we're clear, in your possession and

23      control, do you have any of these receipts for bills that

24      you laid out for Diamante Del Mar?

25          A.   I don't believe so.

Page 199

TR-SEC00000199

Kenner 04 28 11

221

1       Q.   You don't have any of them?

2       A.   I don't believe so.

3       Q.   Your cash payments in Mexico to whoever you

4    had to make a cash payment to, you don't have a receipt

5    for that?

6       A.   I don't believe I have any of that stuff.  I

7    turned that over to Najam, and frankly, I was reimbursed

8    for everything I felt I needed to be reimbursed for.  It

9    was never an issue to me.

10           I know several other people who have lawsuits

11   against Ken Jowdy for those same issues that they weren't

12   reimbursed.

13      Q.   Here's the question I have.  I'm seeing

14   Diamante Del Mar funds going out from Diamante Del Mar to

15   your personal bank accounts or to your personal credit

16   cards.  I'm not seeing any corresponding invoices or

17   receipts from you.

18           So can you explain to me why Diamante Del Mar

19   is using investor proceeds to pay your personal expenses?

20           MR. STOLPER:  I'm going to suggest he has

21   already testified to that.  I think the answer is given.

22   I think you actually have the receipts, you just don't

23   have cash receipts but you have the receipts of those

24   expenses because you need to look on the preceding months

25   of American Express if I understand his testimony

222

TR-SEC00000200

Kenner 04 28 11

1    correctly.

2                He was being reimbursed for American Express

3    charges and for cash charges.   In some instances, he was

4    made, they just paid his American Express bill.

5                I imagine, based on your testimony, they

6    would just need to look at months preceding that to see

7    your expenses in Mexico that were Diamante Del Mar

8    related, is that correct?

9                THE WITNESS:    That's correct.

10                MR. CASTANO:   His testimony was also he paid

11   cash and send invoices --

12                MR. STOLPER:   There is some percentage that

13   would be reimbursed but not all your reimbursements were

14   through American Express, right?

15                THE WITNESS:    Not all of them were.

16        Q.    Where were the other reimbursements to?

17        A.    I think Bill Najam would send me a check from

18   time to time and I would just cash the check.

19        Q.    Did he make it in the name of cash?

20        A.    He would make it out to Phil Kenner.

21        Q.    From Diamante Del Mar bank accounts?

22        A.    It could have been from Baja Development

23   Corporation, it could have been from Diamante Del Mar.

24   It could have been from one of the Mexican bank account.

25                I recall cashing checks in Mexico that they

                                                            223

1    had drawn on Mexican banks for reimbursements.

2                I wasn't in charge of Jowdy and Najam's

3    bookkeeping, so if they paid me a reimbursement of 70,000,
                              Page 201

TR-SEC00000201

Kenner 04 28 11

4    which I recall is one of the transfers that went to

5    American Express, where it came from, I didn't frankly

6    care where it came from.   I had laid out the expenses an

7    they paid me back.

8              There's other employees from Diamante that

9    Jowdy didn't pay back and they filed litigation in Mexico

10   for those causes.

11             Of all my issues, I didn't have a problem

12   getting reimbursed for any of the expenses I had laid out.

13   BY MR. SMITH:

14        Q.   I'm confused about one thing about what you

15   just testified to.

16             I understand from your explanation, I think I

17   understand from what Mike just said, that you were being

18   reimbursed, obviously there were some checks that were cut

19   to you, you were being reimbursed also through payments

20   made to your American Express account.

21             And I heard you say on the one hand that you

22   were being reimbursed for personal expenses.   But I

23   thought in the explanation that you gave you said that you

24   were not in fact reimbursed for personal expenses, you

25   were reimbursed for business expenses only, it's just that

☐                                                    224

1    the timing of the reimbursement and the amounts of the

2    reimbursement might not match up exactly because you're

3    being made sort of on an as you go basis?

4         A.   I think you're about 90 percent of the way

5    clear, I'll say it again for clarity.

6              I believe Chris asked if we isolate just the
                         Page 202

Kenner 04 28 11

7      American Express card that I used at the time, if there

8      were personal expenses on that American Express card.

9      The answer is yes.

10            I also suggested there are Standard Advisors

11     expenses on that credit card, yes.

12            There would also be Mexican-related expenses

13     on those credit cards -- on that credit card.

14     Q.    Business expenses related to your travel?

15     A.    Business expenses related to my travel, not

16     just in Mexico, but I had to go to London for a visit with

17     Ken Jowdy and I would pay for our travel.

18            I would have to fly to New York for meetings

19     with Ken Jowdy.   I had to fly to Portland, Oregon to meet

20     the design team.   I had to fly to Denver.

21            Those travels were also on that same American

22     Express card.   I typically had just the one card that I

23     used.   There wasn't a limit on it.   I could pay it off,

24     I wasn't in jeopardy of not at the time.

25            So personal, Standard Advisors,

225

1      Mexico-related.

2            I never sat and delineated:   Is this a

3      Diamante Del Mar expense or is this a Cabo San Lucas

4      expense.   Likewise, Ken Jowdy and Bill Najam never asked

5      me to.

6            When I fly, I referred to some cash payments,

7      the cash payments were some lunches, dinners, at places in

8      Mexico that don't take credit card.

9            And then on several occasions if we're buying

Page 203

Kenner 04 28 11

10    jet fuel you could get it for $4 a gallon for cash and you

11    would pay $5.50 a gallon for a credit.

12              I would take $1,200 and I would pay cash.

13    And the guy would hand me a receipt and write 1,200.    And

14    I would hand that in to Bill Najam as well.

15              I never had a dispute with any of them.

16              So that would occur October, November,

17    December, January.    And I was in daily contact with those

18    guys, I never felt like I was getting stiffed on my

19    expenses.    And they would tell me:    We have an extra

20    $70,000.

21              Because I remember that being a larger number

22    that when expenses had added up -- and they said:    All

23    right, we'll send the 70,000. They sent it to American

24    Express, it hit my card and I was satisfied with my

25    expenses.

                                                            226

1               Q.    It sound like the answer to the question of

2     whether you were reimbursed for personal expenses is "no"?

3               A.    That's correct, I was not reimbursed for

4     personal expenses.    I was reimbursed for Mexico related

5     business expenses.    And Bill Najam would ask me to send

6     in the receipts or confirmations related to all of that.

7               Sometimes it was the actual credit card

8     statements I would send Najam with respect to the

9     November/December expenses which were typically the

10    highest annually because of the golf event that Ken Jowdy

11    and Diamante would throw.

12              Q.    Aside from the receipts, which I think we

                        Page 204

TR-SEC00000204

Kenner 04 28 11

13    talked about and you don't have the actual receipts for

14    the expenses that you incurred, do you have any other

15    documents, expense reports, that might not have the actual

16    receipts that might show the submissions that you were

17    making in totals?

18            A.    I do not.

19            MR. STOLPER:  Did you ever have something

20    like that?

21            THE WITNESS:    I may have.    Again, I'm

22    going to say again, it was never an issue, they always

23    paid me back for my expenses so I didn't ever go back to

24    see if I could recreate or find them during some period of

25    acrimony, I didn't have any issues with them until long

                                                                227

1    after --

2            MR. STOLPER:  They may not be able to get it

3    from you because you don't have it.    Maybe they'll get it

4    from somebody else.

5            They need to know as a matter of business

6    record, did you generate an expense report when you

7    submitted these to Najam or did you submit it in an

8    envelope.

9            A.    I believe it was just receipts in an envelope

10   with a total.

11           Q.    Where you would write the total on a separate

12   piece of paper?

13           A.    I believe so.    Maybe I wrote it on the

14   envelope.    But I would submit all the receipts to those

15   guys.

                            Page 205

Kenner 04 28 11

16          MR. STOLPER:  One thing that Phil has

17    clarified with me that I think would be important, you can

18    ask him how you like, I asked him:   what percentages of

19    expenses that he submitted to Diamante Del Mar were cash

20    relative to his credit card expenses in terms of your

21    ability to recreate these expenses and he said --

22          THE WITNESS:     10 percent, perhaps.

23      Q.   10 percent cash?

24      A.   10 percent cash.

25          MR. STOLPER:  At least 90 percent, if not

228

1    more of the expenses that he was reimbursed for you should

2    have a paper trail for, if you have his credit cards.

3          THE WITNESS:     Or Najam has them on his

4    books.

5      Q.   Najam would have presumably the receipts.

6      A.   Yes.

7      Q.   And the credit card statement would not have

8    the receipts, but the credit card would show the charge

9    themselves?

10     A.   Yes.

11   BY MR. CASTANO:

12     Q.   Diamante Del Mar payments, I think your

13   testimony was there might have been payments made from

14   some Mexican bank accounts to reimburse you?

15     A.   Yes.

16     Q.   Do you know how much that was?

17     A.   I don't.

18     Q.   Do you know how much in total, you received

Page 206

Kenner 04 28 11

19    from Diamante Del Mar bank accounts, be it Mexico or the
20    United States?   Again, we're talking Diamante Del Mar,
21    we're not talking about any other entity?
22              MR. STOLPER:  Talking about fees and
23    expenses.
24         Q.   Fees and expenses?
25         A.   Fees including the 14,000 a month?

                                                      229

1          Q.   Yes.
2          A.   I believe the consulting payment was about
3     six months of payments.   I still believe even though
4     we've beaten it up pretty good, I think we're still 50 to
5     100 grand worth of Diamante Del Mar related expenses.
6               And then there were significant Cabo
7     expenses.
8               So again, to be clear, I didn't control any
9     of the bank accounts, I have no access to any of the
10    Mexico related entities.   So if Najam made me that
11    $70,000 out of Del Mar, that's where he chose or Ken Jowdy
12    chose to pay it out.   It's probably where they had money
13    sitting that day.
14              When I said:   Guys, enough is enough, it's
15    time to pay the expenses.   "Okay, we have 70, we'll pay
16    it."
17              They'd pay it from wherever, if it came from
18    Jowdy's dad's account I wouldn't have said:   why is your
19    dad paying the expense.
20              But I'm not even sure I'm aware where it came
21    from at the time they made the payments.
                        Page 207

TR-SEC00000207

Kenner 04 28 11

22        Q.   At the time they made the payments -- we're

23   not going to discuss Diamante Cabo San Lucas right now --

24   at the time they made the payments did you know where the

25   monies came from?

☐

230

1        A.   I don't believe so.

2        Q.   Could you have learned where the monies came

3   from, meaning if you looked at your American Express

4   statement you would see where the money was from?

5        A.   I'd have to look.   I don't know.

6             Even if it says Diamante Del Mar, I'm not

7   sure even at that point or even sitting here today I could

8   delineate that the $22,000 in greens fees to the Cabo Del

9   Sol property for the 45 people that played, I'm into the

10   sure I could tell you it's Cabo related or Del Mar

11   related.

12            There were two projects.   The first project

13   started and it stalled.

14            Ken Jowdy, his idea which we all agreed with,

15   the investors, myself, let's go look at Cabo San Lucas for

16   some land.   We tried several times to find properties, we

17   finally found the one we closed on.   There was -- I

18   think, 90 percent of the investors are the same group of

19   guys, because they liked what we did there even though it

20   stalled, and we had a lot of excitement to go to Cabo San

21   Lucas, and a number of them, including Owen Nolan came

22   down several times, Owen Nolan threw a fishing event down

23   there to help the project, brought down a bunch of

24   celebrities, to help us in Cabo San Lucas.

Page 208

Kenner 04 28 11

25          Owen Nolan was short on cash when the Cabo

☐

231

1    deal went through, and he said:  Please hold me a spot

2    until my Toronto Maple Leaf settlement comes through 6 or

3    8 months later.  Ken Jowdy held a spot for him in the Cabo

4    deal, he was so excited.  He got made by the Toronto Maple

5    Leafs, insurance settlement, when he had no cash in his

6    pocket in '06 and Owen sent money to Ken Jowdy six months

7    after the closing because he was so enamored by the deal.

8          So I hope that helps you understand, we

9    didn't have a real delineation.  I still don't in my mind,

10   what expenses were Del Mar, what were Cabo, but I didn't

11   control where any of those funds came from to reimburse me

12   for expenses.

13          Q.    At the time, did you know that Diamante Del

14   Mar investor proceeds were being used for another project

15   to pay expenses, for example, your reimbursement for

16   Diamante Cabo San Lucas?

17          A.    I don't think I did.

18          Q.    When you say you don't think you did --

19          A.    Even today, I still don't question where the

20   expense money came from, even if I knew it was coming from

21   Del Mar, because so much of it was Del Mar and Cabo, it

22   seemed to have such a blurred line.

23          Q.    Sitting here today, do you know if in 2005

24   you knew if Diamante Del Mar investor proceed were going

25   to be used to reimburse Diamante Cabo San Lucas expenses?

☐

Page 209

TR-SEC00000209

Kenner 04 28 11

232

1      A.   In 2005, there was no Diamante Cabo San
2  Lucas.   We were working with Lehman Brothers to acquire,
3  which ended up in April of '06.
4  BY MR. SMITH:
5      Q.   When did you first have Cabo San Lucas
6  expenses?
7      A.   Again, the first golf event down there, I
8  believe, was December of '03, so if we want to qualify
9  some of those expenses as promoting Del Mar to a group of
10  people, and Cabo being the ultimate goal of being down
11  there, maybe in '03 Cabo San Lucas expenses were being
12  incurred.
13           There was no project until '06.
14           When we closed the Lehman loan -- go ahead.
15  BY MR. CASTANO:
16      Q.   When did you first start bringing investors
17  -- when did investors, generally, start going to see a
18  Cabo San Lucas property?
19      A.   In -- sometime in 2005, the Cabo property
20  that we acquired I was on it for the first time, mid 2005,
21  early 2005.
22           But prior to that, the 9 months prior we were
23  at a different site called Santa Maria Bay.
24           For the 6, the months prior to that we were
25  attempting to acquire Querencia Golf Club.

233

1           Almost from my first visit to Cabo San Lucas
Page 210

Kenner 04 28 11

2    in December '03, I may have been there one time prior for

3    Ken Jowdy's first time big golf event, we were in the

4    process of trying to establish a Cabo San Lucas site.    I

5    don't know what Najam and Jowdy did to utilize fund for

6    that place for expenses for the other because I believe we

7    were trying to merge them.    The concept was to merge them

8    as a sister property at the time.

9              So we had a stalled project up north which is

10   more off the beaten path, and Cabo San Lucas still to this

11   day is the number 1 tourist golf destination, golf

12   destination, in Mexico.

13   BY MR. SMITH:

14        Q.    When was it stalled in Diamante Del Mar?

15        A.    I don't think there is a definitive date that

16   all of a sudden we said or Ken Jowdy said:    I can't put

17   effort here any longer.    But I think Ken had started to

18   make the decision, again he controlled 100 percent of the

19   decisions, he took input from him but his decision to

20   spend time in Cabo San Lucas was conveyed to me in

21   probably 2004.

22              And I conveyed that to any of the guys that

23   he didn't communicate with personally and said:    Here's

24   what's going on at Del Mar, the property value is going

25   up, and I believe we had just gone from a $33 million KPMG

234

1    appraisal to a $69 million appraisal.    The guys were all

2    happy, we owned the land for cash, the value is going up.

3    And the guys were all told either by me or by their

4    friends or by Ken Jowdy that we were going to try and

Page 211

Kenner 04 28 11

5    acquire something in Cabo to create a presence in the

6    tourist capital of Mexico.

7                    And that was probably 2004, maybe two years

8    after we had engaged at Del Mar.

9           Q.    Was the notion that you would use proceeds

10   from the same investors as Diamante to fund the Cabo

11   property?

12          A.    I think the cross over of investors

13   ultimately became about 95 percent of the same guys.

14                  They all knew about it and they all --

15          Q.    Was any approval granted by the investors to

16   use investors funds that were designated for Diamante for

17   the Cabo property?

18          A.    I understand what you're asking.

19                  I don't think -- this is my opinion by

20   looking at bank statements I received from subpoenas and

21   other cases, I don't believe they were really Del Mar

22   funds any more by late '04.

23                  I think that was one of the reasons Jowdy

24   wanted to go to Cabo, to try and create the ability to

25   bring a real banking institution.

235

1           Q.    What do you mean there were no Del Mar funds

2    as of 2004?

3           A.    From bank record I've seen, mid 2004, I don't

4    believe there were many assets left understand his and

5    Bill Najam's control.

6    BY MR. CASTANO:

7           Q.    Do you know that at the time?

Page 212

Kenner 04 28 11

8      A.   I did not.   I did not.

9           MR. STOLPER:  Tell him when you learned it.

10   That's the obvious question he wants to know.

11          A.   I began to learn that they had cash flow

12   issues a little bit in the summer of '04 because he

13   started to borrow money from my friends and I.   And then

14   until the closing in 2006.

15          Q.   This is a question we should have asked

16   earlier, the 15 or so clients of yours that invested in

17   Diamante Del Mar, how much did they invest each?

18          A.   $500,000 a piece.

19          Q.   And when you had a conversation with Jowdy

20   that we're going to move south, this isn't looking so good

21   anymore --

22          MR. STOLPER:  Who is saying that?

23          Q.   When you had a conversation with Jowdy,

24   "we're moving south," did you get on the phone with your

25   clients and say:  Why, this deal is not going forward,

236

1    we're going to go someplace else.

2           What, if anything, did you tell your clients?

3           A.   The conversation would consist of these basic

4    principals:

5           The Del Mar land that was worth 11 million by

6    KPMG appraisal in '02 was now being appraised at about 68

7    million by KPMG.

8           But Jowdy has been unable to secure any

9    institutional financing to move the project along to build

10   out the resort, the golf, finish the air strip --

Page 213

Kenner 04 28 11

11     Q.   I don't mean to interrupt.

12          That institutional financing, was that brand

13  new news to the investors? Earlier I asked what else did

14  you tell any of your clients.

15          Did you tell your clients at the time or

16  prior to them making their investment: Hey, we need some

17  of your money because one of the things we're looking to

18  do is get an institutional investor to make an investment

19  in Diamante Del Mar.

20     A.   No.

21          I believe what Ken Jowdy and Bill Najam had

22  always represented to me was that as I can go out and help

23  convert all of his baseball friends, Ken Griffey, Jr.,

24  Dave Howard, the likes of the guys that are heroes to us

25  in the baseball world, I believed he could bring in about

 

237

1  100 baseball players by having me bring them to the

2  property and see it and his phase 1 development expenses

3  were in the neighborhood of $50 million.

4     Q.   There was no conversations, correct me if I'm

5  wrong, with investors, or your clients, about

6  institutional investors such as Lehman Brothers coming in

7  and investing in Diamante Del Mar at the time they made

8  their investments?

9     A.   I don't believe so.

10    Q.   So right now when you were testifying: Hey,

11  we're going south, using my own words, because we can't

12  get an institutional investor, in my own words, when did

13  they first learn, or your clients first learn, that there

Page 214

Kenner 04 28 11

14    was a possibility that an institutional investor might be

15    introduced to the Diamante Del Mar project?

16         A.    In and about 2004, I was introduced through a

17    friend in New York to Lehman Brothers, in addition to

18    another -- a number of other big banking resources.

19              And the gentleman from Lehman that I first

20    was introduced to, Masood Bhatti said he wanted to come

21    and look at the Diamante Del Mar project.

22              Ken Jowdy was there, I believe Ken Ayers,

23    Bill Najam, majority of the guys that Jowdy had around him

24    were there on that visit with Masood Bhatti.

25              And I believe many of my guys who I spoke

238

1    with regularly knew that I was excited that we had an

2    institutional bank coming down to, perhaps, put money into

3    Del Mar and it wasn't going to move along at the pace we

4    had proceeded.

5              And on that trip we went not jus to Del Mar

6    but we continued on and flew down to Cabo San Lucas so

7    Masood Bhatti could look at Querencia, Tom Fazio's private

8    golf club in Cabo San Lucas.

9              On that trip it was as much Ken Jowdy's idea

10    to go to Cabo as it was Masood Bhatti's recommendation

11    that if you want to develop Del Mar, which he really liked

12    the property a lot, he said in his perspective we need to

13    pursue a Cabo San Lucas environment, create some success

14    and he, himself, at Lehman would push through a

15    development loan for Del Mar.

16              To me, it made all the sense in the world.

Page 215

TR-SEC00000215

Kenner 04 28 11

17  He wanted to be able to sell to Lehman himself a Cabo San

18  Lucas development.   And subsequently as we were

19  successful in Cabo he would be able to do the financing

20  through Lehman Brothers at Del Mar.

21          That's basically what I told the guys and all

22  of them were in support.   They said that sounds great,

23  did you find a place in Cabo yet.   And we had secured a

24  bit at Querencia which eventually fell through with some

25  issues between Bhatti and Jowdy who didn't get along at

239

1  first.

2          We tried to acquire a second property.   We

3  were in very early initial conversations on a place called

4  Santa Maria Bay, one of the big hoteliers ultimately

5  started construction on.

6          And then finally the golf pro that Ken Jowdy

7  had hired away from Querencia told Jowdy there was another

8  property, which ultimately was the one when we ended up

9  acquiring.

10          Many of the guys that were at Del Mar, came

11  down to Cabo San Lucas, loved it.   Brought their families

12  down on subsequent visits and we proceeded from early '05

13  until April of '06 to work on the acquisition of that --

14  the Cabo San Lucas deal.

15          Q.   Did any of your client ask:  Where is my

16  $500,000 in Diamante Del Mar?

17          A.   In what context of where is my money.

18          Q.   It's 2004, you're generally talking about how

19  Diamante Del Mar is going to --

Page 216

Kenner 04 28 11

20      A.   Wait.

21      Q.   Did any of your clients say:   What do you

22  mean wait, what happened to my $500,000, what happened to

23  my investment in Diamante Del Mar?

24      A.   None of them.

25      Q.   Not one?

240

1       A.   No the one.

2       Q.   Not one of your clients asked you any

3  questions about what happened to their Diamante Del Mar

4  investment?

5       A.   No, after our conversation they understood

6  the property value had continued to go up.   And instead

7  of spending down trying to bring in investors at a half

8  million or a million dollars at a commitment, they all saw

9  the prospect of going to Cabo San Lucas, to the tourist

10  center and golf center of Mexico.

11      Q.   Did the clients, your clients, believe in

12  word or substance through you, that their $500,000

13  investment was secured by the land value?

14      A.   Yes.   And so did I.

15      Q.   Did you convey that to them?

16      A.   Yes, we still at that period of time owned

17  the land for cash.

18      Q.   So you said to your clients in words or

19  substance, I don't want to put any words in your mouth,

20  that your $500,000 investment is secure because it's

21  secured by the land value?

22      A.   Probably not in those exact terms.

Page 217

Kenner 04 28 11

23          But:  We own a piece of land that KPMG just

24   appraised for 68 million and there's no debt on it, so

25   patience is still going to be good.


                                                      241


1               At that time there was a proposal for a

2    billion dollar or multibillion dollar shipping point to

3    put into the land about 20 or 30 miles north of us in what

4    used to be a remote area, to assist in the Long Beach

5    shipping area.   It was very exciting.

6               There was a lot of reasons to just wait and

7    let the land -- I conveyed all that to the guys.   And

8    everyone seemed to be very comfortable and frankly every

9    one of them that I was talking to at the time asked:   Can

10   we get involved in the new one, how are the projects going

11   to work together. And I did my best to answer.

12          Q.   Were any of your clients informed that any

13   funds for Diamante Del Mar would be used for Diamante Cabo

14   San Lucas?

15          A.   Not by me.

16          Q.   Did there ever come a time that you've

17   learned that Diamante Del Mar funds were ever used for

18   Diamante Cabo San Lucas?

19          A.   Sure.

20          Q.   When did you first learn that?

21          A.   Can you ask the question again?   I want to

22   make sure I get the entities in the proper order.

23          Q.   Did there ever come a time that you learned

24   that Diamante Del Mar investor proceeds were used for the

25   Diamante Cabo San Lucas project?

                         Page 218

Kenner 04 28 11

☐

242

1          A.    In the bigger picture I became aware after
2    2008 when we were able to start receiving bank record from
3    subpoenas with Ken Jowdy, that many of the Diamante Del
4    Mar funds were not used at Diamante Del Mar.
5                Where they were ultimately used, I'm going to
6    suggest that if we categorize flying around in private
7    jets that were rented for Jowdy and Clemens and Pettitte
8    and his wife to fly places together in the United States
9    and that somehow promoted Diamante Del Mar, then it does.
10               But not the way that I would operate a budget
11   when we're trying to develop a program.
12               There were a lot of funds that I don't know I
13   can specifically say he took 100 grand out of Del Mar and
14   went and paid it to the seller of the Cabo property.   Or
15   used it for an expense in Cabo that had no relation to the
16   -- or benefit to Diamante Del Mar.   I'm not sure I can
17   say that.
18               But I can tell you from the bank records, the
19   limited bank records I've seen, there's red flags all over
20   and it drives me crazy to see what actually happened with
21   the Del Mar money and the expenses he used it for.
22          Q.    Is there anything you wish to clarify?
23          A.    It's more cumulative than clarification.
24               In 2008, again through discovery in some of
25   the other cases, is the time when I realized that Ken

☐

243

Page 219

Kenner 04 28 11

1   Jowdy did not own the land at Diamante Del Mar.

2         I realized at that point that 3 or $4 million

3   that the land cost was paid for with my money and my

4   clients' money, and it wasn't paid for by Ken Jowdy prior

5   to meeting me.

6         That, in addition to finding out that Ken

7   Jowdy after the Cabo financing in the spring of '06, he

8   and Bill Najam five months later had financed a $3 million

9   loan and collateralized the entire $6 million piece of

10  property to KSI.

11     Q.   What is KSI?

12     A.   It's a hard money group out of New Jersey.

13     Q.   What does hard money group mean?

14     A.   A high interest rate borderline usurious

15  lenders.

16         If I had it in my possession -- I've seen it,

17  if I had it in my possession I sent it to you guys, I

18  don't recall if I do have that loan arrangement or not.

19         But what I did see through banking records is

20  that $3 million loan, now 6 years later leveraged land

21  that actually my clients and I paid for, approximately

22  $800,000 went to KSI for lending fees of the 3 million.

23         Approximately $800,000 Jowdy took out and

24  either gave to his cousin Edward Essa or gave to his own

25  controlled company LOR Management as a repayment of land

    ⬜

244

1   expenses which we know he didn't have any land expenses at

2   that time.

3         So he took 800,000 out for his cousin and he

Page 220

TR-SEC00000220

Kenner 04 28 11

4    -- to reimburse.

5            He also took 30,000 out to reimburse a friend

6    of his who had put up some additional investment money in

7    Del Mar for a home site.

8            And then the balance of the million plus he

9    used some of it to pay ongoing fees, and some he paid some

10   old bills with.

11           But as an investor we were then left with a

12   piece of land in Del Mar that no longer is owned free and

13   clear, that I no longer felt secure about, but I didn't

14   find out about that until 2008, until somebody actually

15   sent me an Internet story that said:   KSI Capital had

16   financed a large development property for Bill Najam and

17   Ken Jowdy in El Rosario, Mexico.

18           Q.   I believe your testimony earlier today was

19   that in 2002, Ken Jowdy was on the verge of acquiring fee

20   simple or the Mexican equivalent of fee simple?

21           A.   Yes.

22           Q.   And that he needed $350,000 from you to help

23   push that along; is that correct?

24           A.   Yes.

25           Q.   Did there ever come a time when you spoke to

245

1    your clients about their investment proceeds being used to

2    pay for the fee simple title in Diamante Del Mar?

3            A.   No.

4            Q.   And did there ever come a time that Mr.

5    Jowdy, in 2002 or 2003 or thereabouts said to you:   We

6    have acquired fee simple title in Diamante Del Mar?

Page 221

Kenner 04 28 11

7         A.   I don't believe how I came to know that the

8    process had completed, there was no grand celebration

9    about it.

10              But I spoke to Jowdy several times a week

11   from that point forward until late '07, and I spoke

12   several times a month to his attorney, Fernando Garcia.

13   And certainly on most visits to Mexico I would see

14   Fernando Garcia.   And there was always a progress report

15   that:   We're through the last stage, we're about to be

16   issued a fee simple, a Fedi Comiso property.

17              It was those two years, ultimately it did

18   happen because they ended up with U.S. title insurance on

19   it, at least the 8,000 acres.

20        Q.   So let me summarize:   2002, 2003, 2004

21   you're having conversations on a weekly basis or so with

22   Jowdy and the Mexican attorney where we're getting updates

23   on the progress towards obtaining fee simple, the Mexican

24   equivalent of fee simple?

25        A.   Yes.

246

1         Q.   At some point late in 2004-2005, you don't

2    learn from the Mexican attorney or Jowdy that:   Hey, we

3    acquired the Mexican fee simple being but rather we now

4    have American Title Insurance?

5              So you just assumed, tell me if I'm wrong

6    here, that Diamante Del Mar had, in fact, acquired Mexican

7    fee simple from the property.

8         A.   I believe my knowledge of it came from the

9    title insurance side, because that was the first request

Page 222

Kenner 04 28 11

10    banks would make, and I believe Lehman asked if you had

11    U.S. title insurance, which at that time my understanding

12    was it would only occur if you had the fee simple

13    equivalent in Mexico.

14         Q.   Did Mr. Jowdy or the Mexican attorney or

15    anyone inform you that Diamante Del Mar, in fact, had

16    acquired fee simple or Mexican fee simple?

17         A.   At some point, yes.

18         Q.   Do you recall when that was or who it was?

19         A.   I don't believe it would have been Bill

20    Najam.   It would have been Ken Jowdy and Fernando Garcia.

21    And I don't recall when.

22              By prior to 2006, certainly.

23              And in our visit with Masood Bhatti from

24    Lehman Brothers, I believe that was in late 2004 or 2005.

25              So that's when, if I can say that's when I

247

1     made my assumption that it had all completed, based on the

2     general conversations that were going on.   And that may

3     have included Jowdy telling Bhatti on the airplane:   We've

4     got title insurance after the fee simple.

5              I remember the title insurance, that was the

6     big issue.

7         Q.   In 2004, you had some conversations with your

8     clients about transitioning to another location?

9         A.   Yes.

10        Q.   And you mentioned earlier today in testimony

11    that one of the things you had said, it was my words, and

12    you put it into your own words, that their investment was

Page 223

Kenner 04 28 11

13   secured by the property.   But it wasn't until 2005 that

14   you learn that from Jowdy that you, in fact, had Mexican

15   fee simple.

16          So how could it be that you were telling your

17   clients that their investment was secured by the property

18   when in fact Mexican fee simple was not effectuated?

19          A.   I think, to be clear on it, the process

20   played out as it was told to me, is that once the lease

21   hold interest was in our control, effectively there was no

22   turning back on the process.

23          And that's what I was told originally by

24   Jowdy, and in fact that's really what happened.   The

25   final titling process, they did tell me, would take

248

1   sometime.   It wasn't you just walk in, file one document,

2   it happens.

3          It's a long process.   Which I believe

4   included down meetings, Jowdy's father visiting El Rosario

5   several times to talk with the elders about the votes, et

6   cetera.

7          My understanding, and it turned out this way,

8   that once that fee simple title process was under Garcia,

9   Najam and Jowdy's control, it's a surety it just has to go

10   through the planning of it, through the protocol, excuse

11   me.

12          Q.   Just so the record is clear, sitting here

13   today, do you know if Diamante Del Mar in fact has Mexican

14   fee simple on the property in El Rosario?

15          A.   I do not.

Page 224

TR-SEC00000224

Kenner 04 28 11

16          Q.   Sitting here today, do you believe, based on

17   some civil discovery you've done, that there are

18   encumbrances on the property and liens on the property?

19          A.   In conversations that I've had with the

20   principals at KSI.

21   BY MR. SMITH:

22          Q.   At the time that your clients were making

23   investments in Diamante Del Mar, what was your

24   understanding of the purpose to which those funds would be

25   put?

249

1          A.   The infrastructure.

2          Q.   Infrastructure?

3          A.   Infrastructure.

4          Q.   Meaning building the golf course, building

5    houses?

6          A.   Building the amenities that were part of the

7    phase 1, which was a runway, landing strip for the

8    property, customs and immigration on the property, 3 or 4

9    mile access road from the air strip to the water.

10               The water well drilling to create a water

11   source on property.

12               All the requisite water testing.

13               The initiation of the pad sites for the hotel

14   Hacienda site.

15               The preliminary work for the Tom Fazio

16   designed golf course.

17               The initial pad work for the fractional

18   sites, and the initial pad work for some of the model

Page 225

Kenner 04 28 11

19    homes.

20         Q.    Were they, in fact, used for that purpose?

21         A.    There's a runway on the property and that's

22    it.

23    BY MR. CASTANO:

24         Q.    All those items you just mentioned prior to

25    your clients making an investment in Diamante Del Mar, did

250

1    you generally discuss those items with your clients and

2    that their monies would be used for those purposes?

3         A.    Yes, yes, that's what I was told by Ken

4    Jowdy.    And in fact, he had produced a video that laid

5    out the phase 1 elements of what was going to happen at

6    Del Mar and he asked me also to pass that along to all of

7    our clients, friends, investors, et cetera.

8         Q.    Did you ever have a conversation with Jowdy

9    or anyone at Diamante Del Mar that: Hey, we built a

10    runway, I told all my investors that the monies were going

11    to be used to build housing and drill a well, what

12    happened, how come that didn't happen with their monies?

13         A.    It was after the completion of the first half

14    of the runway, which is 6,000 feet long, full length, but

15    only 75 feet wide, half the width which you can still land

16    on, it's about in 2004, that was about the time he made a

17    global decision to start heading south, as we discussed

18    before.

19              So I never really asked about what's left in

20    the bank, why isn't this stuff done.

21              And it was kind of mid- to late 2004 when he

Page 226

TR-SEC00000226

Kenner 04 28 11

22    started to ask for some loans from myself and my friends

23    to keep the momentum going in Cabo San Lucas for Querencia

24    at the time and then Santa Maria Bay and ultimately the

25    Diamante site we acquired.

251

1     BY MR. SMITH:

2          Q.    What was your understanding at the time you

3     made your investment, when you made the $350,000

4     investment and your clients ended up investing -- what did

5     you say, about 9 million --

6          A.    Yes.

7          Q.    -- was your understanding that further

8     financing would be needed, or further investment would be

9     needed to complete the development?

10         A.    Certainly, it's a 10,000 acre piece of land,

11    so hundreds of millions of dollars would ultimately be

12    necessary to build out the full project as Ken Jowdy had

13    first presented.

14               But even inside the 3,500 acre golf resort

15    development that he wanted to create, my understanding was

16    he had such a portfolio of baseball friends, and their

17    related business friends, which I always certainly

18    believed was far greater than the hockey world I lived in

19    and the related business friend and the hockey world, that

20    Jowdy was going to be able to bring all of his baseball

21    friend in as investors, or members to buy those home site

22    packages, membership packages, fractional packages.

23               And he had always portrayed that it would be

24    easy for him to get to 100 guys out of the baseball

Page 227

TR-SEC00000227

Kenner 04 28 11

25    friends and family that he had if we can get the fee

252

1    simple title and that stuff would start to roll in.

2            And he entertained a lot of baseball players,

3    a lot of baseball players.

4        Q.    What was your understanding about how much

5    was needed just for that piece, I think you said 3,500 --

6    the small piece of the development?

7        A.    I think phase 1 of that development was going

8    to cost approximately $50 million.  And that's why he

9    would consistently suggest that he could easily get to 100

10   members in the development through his baseball friend and

11   family.   At half a million dollars a piece would be $50

12   million to create phase 1 and there was always talk that

13   that momentum would lead to whatever else he decided to do

14   on the property with the remaining 6,500 acres.

15           MR. CASTANO:  Mark this as Diamante Exhibit

16   30.

17           (Diamante Del Mar Exhibit 30, Presentation,

18   marked for identification, as of this date.)

19           THE WITNESS:    Before you go to the exhibit,

20   in the Del Mar offering memorandum, I also wanted to point

21   out one of the other levels of comfort I had about getting

22   involved with the golf side of it.

23           Mr. Jowdy said Billy Andrade who is a current

24   or former professional golfer, certainly in '02 was a top

25   20 player, I believe, was always purported to be a very

Page 228

Kenner 04 28 11

253

1   personal friend of Ken Jowdy's, which would also help us
2   through the golf world and I was told involved Fazio and
3   Davis Love's group, and it was his lead marketing name
4   that he used with me at all times related to golf and it
5   was in the offering that he had prepared for us.
6   BY MR. CASTANO:
7        Q.   Did he have a function?
8        A.   He had no function.
9             In fact, I found out in '03 I found out
10  Andrade would not speak to Jowdy any longer, didn't trust
11  him.
12       Q.   Did you let your clients know that?
13       A.   Let me restate that.
14            When I found out that Andrade was no longer
15  an acquaintance of Jowdy's, I told them all that he
16  wasn't.
17            But at that time we were already dealing with
18  Tom Layman, Davis Love and Tom Fazio.   It didn't seem to
19  be much of an issue.   And Jowdy had a good story for that
20  as well:  His wife didn't like Jowdy so she wouldn't let
21  him be around. But it was one or the other convincing
22  factors.
23       Q.   I'm showing you what has been marked as
24  Diamante Exhibit 30, please take a moment to review.
25            Have you seen Diamante Exhibit 30 before?

254

1        A.   I don't recall seeing this.   Although, it's

Page 229

Kenner 04 28 11

2    got a Nolan Bates stamp.

3         Q.   You've never seen this document before or you

4    don't recall?

5         A.   I don't recall this document.   But I don't

6    see the Nolan Bates stamp on it.

7         Q.   Do you know if this document was given to

8    Diamante investors, meaning some of your clients?

9         A.   I don't believe so.

10        Q.   Do you know how any of your clients might

11   have this in their possession, did they receive it from

12   Diamante Del Mar directly, to your knowledge?

13        A.   I don't believe so.   This looks like a

14   document that attorney Michael Meeks may have written up.

15        Q.   You don't know if this is a document created

16   by Diamante or Michael Meeks?

17        A.   I don't know who created.   I know the two of

18   them were working together.

19        Q.   When you say the two of them, who are you

20   referring to?

21        A.   The Diamante principals; Ken Jowdy, Bill

22   Najam and Michael Meeks.

23        Q.   Understanding Michael Meeks or Diamante Del

24   Mar may have produced this or someone else, do you know if

25   the information contained on Diamante Del Mar is accurate,

255

1    meaning the first page letter and organizational chart on

2    the second page, or is there anything in here that you

3    believe is inaccurate?

4         A.   The second page is a Diamante Cabo San Lucas.

Page 230

Kenner 04 28 11

5    I can't confirm all the numbers.

6           I do know that Masood Bhatti's interest in

7    the Cabo project is correct.

8           Q.   You believe the second page of Diamante

9    Exhibit 30 is referring to Diamante Cabo San Lucas?

10          A.   Yes, it is.

11          Q.   And the first page, do you know if that's

12   referring to Diamante Del Mar?

13          A.   I haven't read it.   But I see the 10,000

14   acres, I assume it's a Del Mar.

15          Q.   This isn't a test, but looking at this right

16   now, reading it over, do you believe that the information

17   contained on the first page of Diamante Exhibit 30 is

18   accurate?

19          A.   You have to give me a few minutes to read it

20   if you don't mind.

21          I could see the two other Mexican

22   corporations, I couldn't think of the names, in the second

23   paragraph, about line 8.

24          MR. CASTANO:   Just so the record is clear,

25   I'm going to be stepping out, Justin will finish up.   We

256

1    will try tomorrow morning to start at 9 and go as fast as

2    we can.

3           MR. STOLPER:   Can we take a two-minute break

4    right now?

5           MR. CASTANO:   Yes, we are off the record at

6    5:11.

7           (Recess.)

Page 231

Kenner 04 28 11

8      MR. SMITH:  Back on the record at 5:23.

9          Mr. Kenner, did you have any substantive

10   conversations with SEC staff during the break?

11          THE WITNESS:    I did not.

12   BY MR. SMITH:

13      Q.   Mr. Kenner, you are looking at Exhibit 30,

14   which you have before you.

15          Have you had a chance to review the first

16   page?

17      A.   I have not, but I will right now.

18          I've finished reading it.

19      Q.   I think the question that Chris will asked

20   before you took a more detailed look at it was on the

21   first page of this document, 30, is it an accurate

22   description of the Diamante Del Mar project?

23      A.   I don't believe so.

24      Q.   In what way is it not accurate?

25      A.   Perhaps we can go line by line.

☐                                                                257

1      Q.   Sure.

2      A.   Upon reading it, it appears that this was

3   written by Bill Najam or Ken Jowdy for Michael Meeks's

4   benefit, attorney Michael Meeks.

5      Q.   What do you base that conclusion on?

6      A.   The presentation of the information has to

7   come from Jowdy or Najam, they're the only two individuals

8   that would know the context of the information that's been

9   written here.  And to be prepared.

10          They must be the source of this information

Page 232

Kenner 04 28 11

11   and at an early point in the Nolan arbitration in Arizona,

12   we found out -- I found out that Ken Jowdy was working

13   with Michael Meeks to tell him his opinions of me, and we

14   found out early on that that was the case.

15            And in fact, the only subpoenas that were

16   never issued -- that were never delivered in the case, but

17   were requested for every entity that I had ever touched

18   were all of the Ken Jowdy related entities.   And we

19   didn't find out until late in the arbitration that they

20   were never delivered.

21       Q.   So I understand your basis for saying this

22   was prepared by Jowdy or Najam, was that they would be the

23   only ones with knowledge sufficient to draft it?

24            What is your basis for thinking it has

25   anything to do with Meeks?

                                                          258

1        A.   My guess is that this was information that

2    Meeks had prepared, had asked Jowdy and/or an agent to

3    prepare for the Nolan case, there is a Nolan Bates stamp

4    on it.

5        Q.   What makes you think that it has anything to

6    do with Meeks?  Is it just the Nolan Bates stamp?

7        A.   It's the Nolan Bates stamp.   Because I don't

8    believe I produced this in the Nolan case.   I believe

9    this is produced by Nolan -- was produced for Nolan.

10       Q.   It could have been produced by Jowdy, right?

11       A.   It was produced by Jowdy.   It's information

12   that was disseminated in the Nolan case.

13            So produced by Jowdy --

Page 233

TR-SEC00000233

Kenner 04 28 11

14      Q.   It could have been produced by Jowdy but not

15  for the purposes of litigations not drafted for the

16  purpose of litigation or the arbitration?

17      A.   It was produced by Najam and Jowdy, my

18  feeling, for Nolan to have Jowdy's perspective on at least

19  the information that's on the page, as they were working

20  together to try and concoct a reason that Jowdy was an

21  upstanding businessman in Owen Nolan's eyes.

22      Q.   When you say produced, you mean produced in

23  the sense of furnished by Jowdy or do you mean produced in

24  the sense of drafted by Jowdy for that purpose?

25      A.   Drafted by.

259

1       Q.   And your basis for thinking that is just the

2   subject matter on the Nolan Bates --

3       A.   The subject matter at the end of the first

4   paragraph, it says:   We have subscription agreements and

5   no assignments signed by all of the investors in Baja.

6            And we have, I would assume if it's not your

7   office, it's Bill Najam and Ken Jowdy representing to

8   Michael Meeks or someone of the same -- that they've done

9   their end of the process properly.

10      Q.   Why don't we go through it and identify the

11  issues that you have with it.

12      A.   I always believed or was told that Baja

13  Management was a Delaware LLC, so that would be news to

14  me.

15      Q.   You're talking about the second sentence

16  where it refers to Baja Management LLC is a New York LLC?

Page 234

Kenner 04 28 11

17    A.    That's correct.  I always believed that was

18  a Delaware LLC and all of the corporations were Delaware

19  based.

20    Q.    What is the basis for your understanding they

21  were all Delaware LLCs?

22    A.    Bill Najam would always tell me he did all of

23  the LLC work in Delaware for Ken Jowdy.

24    Q.    Did you ever see any of the corporate

25  documents in relation to the LLCs, corporate formation or

260

1   registration documents?

2     A.    I don't believe I ever did.

3     Q.    Going forward?

4     A.    I don't want the word arranged to be

5   misunderstood.

6     Q.    Where are you talking about, are you talking

7   about the sentence starting:  Before both of these

8   entities were created?

9     A.    Correct.

10    Q.    "Phil Kenner arranged for several investors

11  to pour investment capital into Baja Development Corp."

12          Is that inaccurate?

13    A.    I assisted in the application of the

14  paperwork as I would for any -- I didn't arrange for the

15  money to go to Ken Jowdy.

16          It is consistent that Baja Development

17  Corporation in my understanding was an entity initially

18  created by Ken Jowdy to develop the property.  But

19  subsequently he used it as his own clearing house for

Page 235

Kenner 04 28 11

20   cash.

21        Q.    Is the part -- I'm looking now a little bit

22   below where we were just reading:   Baja Development

23   issued notes for $500,000 to each of the investors which

24   notes were then pledged to Baja Management in return for a

25   1 percent interest in DDM and the property?

261

1        A.    Yes.

2        Q.    As I understand it, you received 10 percent

3   equity interest in DDM, in the property?

4        A.    Yes.

5        Q.    That was in exchange for $350,000 investment?

6        A.    Yes.

7        Q.    So why is it that a $500,000 investment by

8   the investors would result in a 1 percent interest in the

9   property?

10        A.    That's what Ken Jowdy and Bill Najam offered.

11        Q.    And were you aware that that was the terms of

12   the investment when the investors were considering

13   investing?

14        A.    Yes.

15        Q.    And in the conversations that we talked about

16   earlier, which you had discussions with some of your

17   clients around the time that they were deciding whether to

18   invest in the project or not, were they aware of the terms

19   of your investment?

20        A.    Yes.

21        Q.    And you told it to them orally?

22        A.    I told it to them orally, I spoke to their

Page 236

Kenner 04 28 11

23    advisers about it, I talked to their attorneys about it.

24         Q.   Was there any concern about that issue

25    expressed by any of the clients to whom you spoke?

262

1          A.   One of the hockey agents for one of the kids

2     who really wanted to get involved per Owen Nolan's

3     suggestion, his agent made a big deal of it.   And I told

4     the agent, the kid was the one who approached me about

5     being involved.   So if he wants to, that's great.   But

6     he's Owen Nolan's friend, he can choose to do what he

7     likes.

8          Q.   Who is that?

9          A.   That was Patrick Marleau.

10         Q.   Patrick Marleau was the player?

11         A.   He was the player.

12         Q.   Who was the agent?

13         A.   Don Baisley.

14         Q.   Did Marleau end up investing?

15         A.   He did not.

16         Q.   Did anyone else raise that issue, in other

17    words, the cost for the percentage interest, equity

18    interest that would be received, raise that issue as one

19    of concern to you?

20         A.   I don't believe so.

21         MR. STOLPER:   I didn't know if you meant to

22    go over -- skip over the sentence about what the initial

23    capital was supposed to be used for?   He was going

24    through it, telling you what was wrong.

25         Q.   Go ahead.   I was looking at it, the other

Page 237

Kenner 04 28 11

263

1    one caught my eye.   If you want to turn to that sentence?

2            A.   Again, I think we discussed this at length

3    but the statement that the initial capital was transferred

4    to DDM or used for the acquisition and development of the

5    property was not consistent with what I was told from the

6    beginning. The acquisition of the property, in my

7    understanding had been completed.

8            Q.   So the issue you have is with the use for the

9    acquisition?

10           A.   That's correct.

11           Q.   And it would be your understanding initial

12   capital was transferred to DDM and the purpose was for

13   development of the property?

14           A.   That's correct.

15           Q.   Does the rest of that first paragraph look

16   accurate to you?

17           A.   Accurate in the context that some of the

18   preceding lines are inaccurate, yes.

19           Q.   What do you mean?

20           A.   I'm assuming that there's a later offering

21   that was prepared in which new investors were given a half

22   percent interest directly in DDM in the property, I can't

23   confirm that.

24           Q.   You don't know?

25           A.   I don't know.

264

Page 238

Kenner 04 28 11

1       We have subscription agreements, I don't know
2   who "we" is, I can assume it's Jowdy and Najam purporting
3   their good deeds.   I don't know if they have those signed
4   documents.

5       Q.   Do you know whether subscription agreements
6   and note assignments were executed by the initial
7   investments in Baja Management?   I know you can't testify
8   as to what "we" have, whoever they may be, but do you know
9   whether such agreements and assignments were executed?

10      A.   I believe they all were.   I don't think
11  there was anything left undone and at the direction of
12  Bill Najam and Larry Markowitz I assumed each of those
13  transactions were handled appropriately and I was never
14  asked to follow up on any of those transactions.

15      MR. STOLPER:  There was something I wanted to
16  clarify for him, I can do it openly with you or whisper it
17  in his ear.

18      MR. SMITH:  Something you want to clarify?

19      MR. STOLPER:  Something he may have
20  overlooked.

21      MR. SMITH:  You can do it however you like.

22      THE WITNESS:   Go ahead.

23      MR. STOLPER:  Isn't it also true that the
24  investors received fractional unit shares of preferential
25  home sites that had value in addition to their percentage

265

1   interest in the entity?

2       THE WITNESS:   That is correct.

3       MR. STOLPER:  Because I think Justin asked
                    Page 239

TR-SEC00000239

Kenner 04 28 11

4    you the question, your 10 percent versus their one

5    percent, maybe you can explain to him why it's more of an

6    apples-to-oranges thing.

7         Q.   From what you're saying, there was additional

8    benefit they received in exchange for their investment in

9    the form of these fractional shares?

10        A.   That is correct.

11        Q.   Can you reiterate what those were?

12        A.   Yes, in addition to the preferred return of

13   their initial capital, I believe the Baja Management

14   members were on a 5-year repayment term on their $500,000

15   and the Diamante Del Mar investors were on a $250,000

16   5-year repayment term on their investment.

17        Q.   I'm sorry, can you spell that out a little

18   bit more?

19        A.   Yes, the $500,000 invested by the Baja,

20   ultimate Baja Management members, Allison Dafoe,

21   Khristich, Juneau, Woolley and Nolan --

22        Q.   Those were the initial ones?

23        A.   Initial ones that transferred to Baja

24   Management, the conversion of the initial Baja Development

25   Corp. Promissory notes, they were supposed to be on a

266

1    5-year repayment term on their initial investment deemed a

2    loan to Baja Management.

3         The Diamante Del Mar guys were under the same

4    guidelines except they received -- they were to receive a

5    $250,000 repayment of their initial $500,000 of that same

6    5-year window.

Page 240

Kenner 04 28 11

7        So as additional investors, members, capital

8    contributions came in, there were certain milestones that

9    were then repaid the Baja Management members, those 6

10   gentlemen, and/or the Diamante Del Mar subsequent members,

11   dozen members.

12        Q.   I'm a little bit confused.

13        The Baja Management investors were the ones

14   that were initially structured as a loan, and was

15   converted into an equity investment?

16        A.   Correct, the original 6.

17        Q.   That's reflected in the first paragraph here,

18   it talks about the notes for 500,000 and that are then

19   pledged for a 1 percent interest in DDM property; is that

20   right?

21        A.   Correct.

22        Q.   I had thought that the subsequent investors,

23   what you're calling the DDM investors, were investing in a

24   straight equity interest, not a loan?

25        A.   They were, to the best of my understanding,

0

267

1    the Baja Management members, even though they converted

2    the promissory note to an equity -- 1 percent equity stake

3    in addition to a few other items I'll list in a moment,

4    were supposed to be repaid by the development within a

5    five-year period of time through a number of different

6    triggers.

7        So even though it was a 1 percent equity

8    stake, there was a 5-year repayment schedule by Ken Jowdy,

9    and that was based on a number of triggers of new members,

Page 241

Kenner 04 28 11

10   new capital contribution, new development dollars, et

11   cetera.

12          Q.   And the payments to them would be made out of

13   new capital contributions?

14          A.   I don't recall the specifics, but I do know

15   it was a 5-year payback schedule.

16          Q.   Which sounds like a loan?

17          A.   Which sounds like a loan.   We would have to

18   go through the security documents to understand it.

19               But that I recall.   The difference --

20          Q.   You don't know what the source of those funds

21   was to be?

22          A.   I believe it was additional new members

23   beyond the investment group, just club members who were

24   also going to then buy home sites, fractional memberships,

25   golf memberships, et cetera.


                                                           268


1          Q.   What is your basis for that understanding?

2          A.   What I recall from some of the offering

3   memorandums, some of the subscription documents that were

4   signed.

5          Q.   Do you remember that in discussions with

6   anyone?

7          A.   With Ken Jowdy or Bill Najam?

8          Q.   Principally, yes, with anyone else as well,

9   who explained to you the basis for the repayment?

10          A.   Those discussions would have taken place with

11   Ken Jowdy, Bill Najam or Larry Markowitz.

12          Q.   Do you remember having such discussions?

Page 242

Kenner 04 28 11

13          A.   Yes.

14          Q.   Do you remember one or more of them explained

15   to you that, as you just said, or the method of repayment

16   that you just described, would be the method of repayment

17   that would be used?

18          A.   I believe the repayment was again based on

19   new capital coming in which at the time would have been

20   under the assumption of new membership, not investors, but

21   new membership.

22          Q.   I understand.

23               But I just want to understand the source, the

24   source you said was both the documents that you saw, and

25   it was also conversations that you had with Jowdy, Najam

269

1    and Markowitz.

2          A.   Correct.

3               In essence, if $500,000 for each of the Baja

4    Management members came back, from that next round of

5    capital, and the Diamante Del Mar guys were going to

6    receive 250 of their $500,000 back over that same period

7    of time, I believe the number came to about 6 or $7

8    million, 5 or $6 million of repayment dollars out of that

9    $50 million phase 1 development pool that was going to

10   come out of the 100 members that Jowdy purported would be

11   easy to attain.

12               So that $50 million budget, I believe, the 5

13   or $6 million repayment would come out of those dollars.

14               And I believe it's in the document somewhere,

15   and certainly in the $50 million phase 1 construction

Page 243

TR-SEC00000243

Kenner 04 28 11

16  numbers.

17          Q.    Did you discuss that repayment plan with your

18  clients who were considering investing?

19          A.    I don't recall.

20          Q.    Do you recall having a conversation about

21  that repayment plan with anyone other than the ones you

22  mentioned, Jowdy, Najam and Markowitz?

23          A.    I don't recall.

24          MR. STOLPER:  You haven't asked him if others

25  have shared that information, I don't want to assume he's

☐                                                                     270

1   the only conduit of information, to the guys who invested.

2           Q.    Do you have any knowledge as to whether

3   anyone else discussed a payment plan with the investors?

4           A.    Certainly, the dissemination of Diamante

5   information, easily could have come through Ken Jowdy,

6   Jason Allison --

7           Q.    I'm asking if you have knowledge of any

8   conversations that took place describing that repayment

9   plan to prospective investors?

10          A.    That repayment plan, I am not familiar with.

11          And then, in addition, each of those members

12  also received a preferred home site which Ken Jowdy

13  suggested would sell for 3 to $400,000 on the property, if

14  the investors were not interested in building that

15  particular -- a home on that particular site, they could

16  resell it as part of the ongoing membership but they were

17  all the preferred home sites on the ocean or on the golf

18  course.

Page 244

Kenner 04 28 11

19      Q.   And they would have the right to those sites?

20      A.   That's correct.   So each one of them chose a

21  particular home site as part of their initial investment,

22  either on the ocean or on the golf course overlooking the

23  ocean.

24      Q.   And that includes both the Baja Management

25  and the DDM investors?

271

1       A.   That's correct.

2       Q.   But not you?

3       A.   But not me.

4            And then also, there was a fractional

5   component to the project that was going to be part of

6   everybody's ownership, and those investors received a

7   certain number of weeks in the Jowdy fractional program

8   for the golf development as well, and those, I believe, he

9   valued in the neighborhood of 175 to 250,000.

10      Q.   What do they represent?

11      A.   I believe it was a 1-8 or 1-6 fractional

12  ownership in some of the Diamante owned Hacienda building,

13  golf town homes, et cetera.   There could be fractional

14  buyers into this resort as well as home buyers on the

15  resort.

16           But each of the Baja Management and Diamante

17  Del Mar investors could also sell those fractional

18  interests as soon as the golf course opened.   They could

19  put them for sale in that 175 to 250 range which is the

20  number Ken Jowdy said he was going to offer those

21  fractionals at.

Page 245

Kenner 04 28 11

22          Q.   Take a look at the second paragraph.

23               MR. STOLPER:  You probably haven't said it

24     for the record, but what he just testified to was not

25     reflected in that first paragraph.

                                                                272

1                MR. SMITH:  Right.

2                MR. STOLPER:  Additional consideration.

3                MR. SMITH:  That's fine.

4          A.   I was not aware the two Mexican corporations

5     equally owning the portion of the 8,000 acres, I was under

6     the assumption that Diamante Del Mar was the direct --

7          Q.   So it's the sentence, "to date some 8,000

8     acres have been privatized in a legal title transfer to

9     two Mexican corporations"?

10         A.   Correct.

11               The 8,000 is approximately the number we

12    discussed earlier that I believed was privatized.   But I

13    didn't know if this is factually accurate, I didn't know

14    until I just read this, that the ownership of those 4,000,

15    plus 4,000 acre privatized parcels are held by two Mexican

16    corporations.

17         Q.   And you don't know, as you sit here today,

18    whether that's accurate or not?

19         A.   I don't know if that's accurate or not.

20         Q.   What about the initial first two sentences in

21    the paragraph, do those appear accurate, to your

22    knowledge?

23         A.   I believe that is a portion of the facts that

24    were given to me that he acquired and controlled the long

                              Page 246

Kenner 04 28 11

25    term leasehold interest which was the last stage before

273

1    fee simple titling which effectively gave him the
2    ownership of the land.
3         Q.    And the interest in the property was in the
4    name of LOR management?
5         A.    I believe that's correct, and when Jowdy took
6    out the $3 million loan in the fall of 2006, LOR
7    Management, I believe, is where he sent hundreds of
8    thousands of dollars to caption repayment of land
9    advances.
10        Q.    What about the rest of the paragraph?
11        A.    I did not know that the 2,000 acres, the
12   final 2,000 has not been privatized.
13             MR. STOLPER:  Do you know if that statement
14   is true?
15             THE WITNESS:    I don't know if that
16   statement is true, it contradicts what I've been told.
17        Q.    What have you been told?
18        A.    That all 12,000 acres have completed titling.
19        Q.    Who has told you that?
20        A.    Ken Jowdy and Fernando Garcia.
21        Q.    Other than those statements, that's the basis
22   for your understanding, no documents or anything like
23   that?
24        A.    That's correct.
25        Q.    Anything else either inaccurate or that you

Page 247

TR-SEC00000247

Kenner 04 28 11

274

1    don't have knowledge of?

2           MR. STOLPER:   Phil, your testimony earlier

3    about title insurance, was that for DDM?

4           THE WITNESS:   Yes, it was.

5    A.    In the last sentence, nobody has, that I'm

6    aware of, has made requests for updated addresses of the

7    investors through me.

8    Q.    Anything else on this first page that strikes

9    you that you think is inaccurate or that you're unaware

10   of?

11   A.    No.

12   Q.    Take a look at the second page.

13          This purports to list on the left-hand side

14   the CSL properties, 2006 LLC, I take it that CSL is Cabo

15   San Lucas?

16   A.    Yes.

17   Q.    A list of non-managing members and their

18   equity interests?

19   A.    Yes.

20   Q.    Is this list accurate and complete to your

21   knowledge?

22   A.    I don't know.

23   Q.    Do you have any basis for knowing who the

24   non-managing members of CSL properties are or were?

25   A.    The Diamante Cabo San Lucas operating

275

1    agreement and/or the CSL property 2006 LLC operating

Page 248

Kenner 04 28 11

2    agreement that I forwarded to you guys would confirm if

3    these names were accurate, but I don't have them and I

4    don't recall.

5           Q.   You don't know off the top of your head?

6           A.   I don't know if that's accurate off the top

7    of my head.

8           Q.   What about for the other column, the Diamante

9    Properties LLC?

10         A.   I do know that the Somerset Properties LLC,

11   which is Masood Bhatti from Lehman Brothers interest, is

12   accurate.

13         The rest of the numbers I'm not sure if those

14   numbers are accurate or not.

15         But generally it looks like the list of names

16   I've seen before.

17         Q.   What is Somerset Properties LLC?

18         A.   I found out long after the closing that

19   Masood Bhatti had given Ken Jowdy, per Ken Jowdy's word,

20   $100,000 to invest in the Cabo San Lucas project, and

21   Somerset Properties was an entity that Masood Bhatti

22   controlled.  At the time, Jowdy told me it was for the

23   benefit of his niece.

24         Q.   This is an investment that Bhatti made in

25   Cabo San Lucas?

276

1         A.   That's what I understand.

2         Q.   It's listed here as Diamante?

3         A.   Diamante Properties was one of the subset

4   LLCs in the Cabo San Lucas project.

Page 249

Kenner 04 28 11

5      Q.   And this was Bhatti's personal investment?

6      A.   Yes.

7      Q.   And do you know anything further about

8  Somerset Properties, other than it is some kind of Bhatti

9  vehicle?

10     A.   No.

11          Jowdy told me that Bhatti told Lehman it was

12  for his niece, I believe, but Jowdy told me to give me

13  further confidence that Masood Bhatti was on our side and

14  would take care of us, he was a great guy, that he wanted

15  to be an active member of the company and what I

16  understood is that he couldn't be as the lender on the

17  deal.

18          MR. SMITH:  Can I ask you to mark this as

19  Exhibit 31.

20          (Diamante Del Mar Exhibit 31, List of Baja

21  Management and Diamante Del Mar members, marked for

22  identification, as of this date.)

23     Q.   I'll show you what has been marked as Exhibit

24  31.

25          MR. SMITH:  I have handed a courtesy copy to

277

1  Mike Stolper.

2      Q.   Take a look at this document and let me know,

3  first of all, if you have seen it before?

4          MR. STOLPER:  We produced it.

5          THE WITNESS:   I don't think I did.

6      Q.   It's got your Bates number, which doesn't

7  necessarily mean you recall seeing it.

Page 250

Kenner 04 28 11

```
8          But it's from your production.
9                If it's a document with which you're
10   unfamiliar, I don't want you to say that you've seen it
11   because it happens to be something you had produced.
12          A.   I understand.
13          Q.   Sitting here today, is this a document that
14   you recall having seen or being familiar with?
15          A.   I do not recall being familiar with this
16   document.
17          Q.   Do you recall having seen it before?
18          A.   I don't recall seeing this document before.
19          Q.   Given that you haven't seen it, or you don't
20   recall having seen it or being familiar with it, do you
21   recognize it or what do you recognize it as purporting to
22   be?
23          A.   Without being able to confirm the list of
24   members in its entirety, it appears to be a representative
25   list of the Baja Management members, and the Diamante Del
```

278

```
1    Mar members as broken out by somebody.
2          Q.   Just judging by the Bates numbers, is this a
3    document that you believe that you received in the Nolan
4    arbitration and then produced to us?
5          A.   It appears to be.  I don't recall seeing
6    this in the Nolan arbitration, though.  But it may have
7    been on the disc that I forwarded to you through counsel.
8          Q.   Taking a look at the document itself, it
9    starts out by saying:  The following individuals are class
10   A members of Baja Management LLC.
```

Page 251

Kenner 04 28 11

11          What are class A members?

12      A.   I don't know.

13      Q.   Are you aware, do you have any knowledge

14  whether there were different classes of members of Baja

15  Management?

16      A.   I don't know.

17      Q.   Have you seen any reference to different

18  classes of members of Baja Management other than in this

19  document here?

20      A.   Not that I recall.

21      Q.   This purports to be a list of investor

22  members of management, managing members of Diamante Del

23  Mar LLC as of August 21, 2004.

24          It looks like the first 6 names are I guess,

25  I think, what you have described as the initial investors

                                                        279

1  or the Baja Management investors in Diamante Del Mar; is

2  that right?

3      A.   Yes.

4      Q.   Subsequent to those first 6, this lists as

5  class B members, 5 further names, including yourself.

6          Do you know what this group of investors -- I

7  understand you said that you don't recall ever having seen

8  different class of investors, but do you recognize what

9  this list of investors is, starting with Kenneth Jowdy,

10  including yourself, William Najam, Suzanne Jabbour and

11  Fernando Manuel Garcia Campuzano?

12      A.   Not anything specific.

13      Q.   Anything in general, was there a separate

Page 252

Kenner 04 28 11

14    group that was distinguished from, say, the Baja

15    Management investors or otherwise?

16         A.    This is information or new news to me that

17    there's a class A or a class B member list.

18         Q.    I understand.

19               I'm not saying that you endorsed that.   What

20    I'm asking is:   Seeing these -- we saw the first 6 which

21    are described here as class A members.

22         A.    Yes.

23         Q.    I'm not saying you endorsed them as being

24    class A members, they are a group you described to us

25    previously as being the initial Seth investors, the Baja

280

1    Management investors.

2               So my question is:   Is there something about

3    the second group here that you knew to be a common group?

4         A.    Let me just tell you who I think the people

5    are, that may answer the question.

6               Obviously Ken Jowdy was the managing member

7    of all of the entities.

8               William Najam was his brother-in-law, acted

9    as inside counsel, Chief Operating Officer for, I believe,

10    all of the entities related to any of the Jowdy endeavors.

11               Suzanne Jabbour, I don't even know who that

12    is.

13         Q.    Have you heard the name?

14         A.    I don't think so.

15               And then Fernando Manuel Garcia Campuzano is

16    Jowdy's attorney and the Diamante Del Mar and Diamante

Page 253

Kenner 04 28 11

17    Cabo San Lucas Mexican attorney.

18         Q.    It looks like all of these people invested at

19    least $10,000.

20              MR. STOLPER:  With interest, though.

21         Q.    You have no knowledge of this separate group

22    of investors as a group?

23         A.    I don't.   I'm not sure why this is on the

24    second page or what this represents.

25              MR. STOLPER:  You don't know that these are

281

1     actually investors.

2          A.    I don't know why this group of names is

3     together.

4          Q.    In terms of investors, you know that Jowdy is

5     an investor?

6          A.    No, I don't.

7          Q.    No, you don't?

8          A.    No, I don't.

9          Q.    You know you're an investor?

10         A.    Yes, I do.

11         Q.    Do you know whether Najam is an investor?

12         A.    I don't know.

13         Q.    You never heard of Jabbour, so you don't know

14    whether she is an investor?

15         A.    I don't.

16         Q.    You don't know whether Garcia is an investor?

17         A.    I don't know if he is.

18         Q.    The next page lists what purports to be class

19    C members, Edward Essa and Carl Essa.

Page 254

Kenner 04 28 11

20        Do you know who they are?

21        A.    They are Ken Jowdy's cousins.

22        Q.    Do you know whether they're investors?

23        A.    I don't know if they are or not.

24              Edward Essa told me he had a lot of money

25    invested with Ken Jowdy but in bank documents over the

282

1     last 4 years I've seen close to a million dollars transfer

2     out of different Diamante accounts under Jowdy's control

3     back to Essa, including a large share of the $3 million

4     loan that has put the project in peril.

5              Carl is his brother who I have spoken with a

6     couple of times through the litigation process.

7              Carl is a large developer in Carolina, North

8     Carolina, I believe.  And he has expressed on several

9     occasions to myself and other former Diamante employees

10    his disgust with Ken and Bill.

11             And he represented to me that he also gave

12    Ken and Bill $500,000 as an investment and has made

13    several attempts, efforts, to --

14        Q.    Carl said that?

15        A.    Carl had told me that personally.

16        Q.    Has Edward ever mentioned the size of his

17    investment, if any?

18        A.    Eddie Essa has always represented that he has

19    given Jowdy millions of dollars, primarily in cash, and

20    always felt like he was out on an island because they

21    treat Eddie like the black sheep of the family, and he has

22    been exposed for millions.  And it was only until I saw

Page 255

Kenner 04 28 11

23    bank statements that I realized that they had paid him

24    back a lot of money.

25              I don't know how much in total, but I know

283

1     that any time Ken would need employee, he would bring

2     Eddie around and ask him to also pay for a lot of items.

3               I didn't know all this until 2008 after Eddie

4     disclosed all of this to me when litigation began.

5         Q.   I take it you don't have any knowledge of

6     their investment other than their oral representations to

7     you?

8         A.   I have not seen documentation.

9         Q.   Now, starting on that page there's a list of

10    what purports to be a list of investor members in Diamante

11    Del Mar LLC, and I think the remaining names are all what

12    purport to be class A members of Diamante Del Mar.

13              Does this list look accurate to you?

14    Correct me if I'm wrong, this looks like the list of what

15    you have referred to as the second group of investors or

16    the DDM investors; is that right?

17        A.   Yes.

18              I don't know if this is complete, but I do

19    recognize all those names.  Scott Erickson is a former

20    baseball player who is originally a friend of Jowdy's.   I

21    don't know if Scott invested any money or not.   Jowdy has

22    always suggested that he did.   Much the same he suggested

23    Clemens and others have.   But I'm not sure if any money

24    ever changed hands.

25              And Matt Franco is also a baseball player, a

Page 256

TR-SEC00000256

Kenner 04 28 11

284

1    friend of Jowdy's.  I don't know how much money he ever
2    transferred or didn't transfer.
3           Q.    Putting Erickson and Franco aside, are all
4    the other names on this list clients of yours?
5           A.    No, they are not.
6           Q.    Which ones are?
7           A.    The rest of them have all been clients of
8    mine except for Raymond Murray, he was a close friend of
9    Ethan Moreau, and Moreau brought him to invest in the
10   project.
11          Q.    Moreau was a client of yours?
12          A.    He was a client of mine.
13          Q.    Excluding Erickson, Murray and Franco, did
14   you speak with all of these investors prior to their
15   investment?
16          A.    Absolutely.
17          Q.    Did you speak to Murray as well prior to this
18   investment?
19          A.    Yes.
20          Q.    Did you speak to Erickson and Franco prior to
21   their investments, if any?
22          A.    Franco just in friendly conversation, but not
23   related to their involvement, if they're in fact involved.
24   And Erickson I don't really know.
25          Q.    I think you said this list -- is this a

285

Page 257

Kenner 04 28 11

1    complete list?  I think you said it wasn't.

2          A.   I'm not sure.

3          Q.   I understand you may not be sure whether it's

4    a complete list of all investors.  I'm just talking about

5    your clients, is it a complete list of your clients or are

6    there more who may not be included in this list?

7          A.   I believe the original 6 Baja members are in

8    fact a complete list.

9               The Diamante Del Mar class A members, I'm not

10   sure if this is a complete list or not.   Although it

11   seems to be complete and I can't think of any off the top

12   of my head that is not on the list.

13              MR. SMITH:  We have come to 6:07 p.m.

14              We are going off the record and resuming

15   tomorrow starting at 9.

16              (Time noted:   6:07 p.m.)

17

18

19

20

21

22

23

24

25

󰀀

286

1

2               I N D E X

3
                        Page 258

Kenner 04 28 11

```
4    WITNESS              EXAMINATION BY              PAGE

5

6    PHILIP KENNER    MR. CASTANO                        3

7

8    EXHIBITS       DESCRIPTION                        PAGE

9

10   Exhibit 29   Confidential offering memorandum     201

11   Exhibit 30   Presentation                         252

12   Exhibit 31   List of Baja Management and          276

13                Diamante Del Mar members

14

15

16

17

18

19

20

21

22

23

24

25
```

287

```
1

2                SCOPIST'S CERTIFICATE

3

4         I, Dolores Cavanagh, hereby certify that the

5    foregoing transcript consisting of 289 pages is a

6    complete, true and accurate transcript of the
```

Page 259

TR-SEC00000259

Kenner 04 28 11

7   investigative hearing, held on April 28, 2011, at 3 World

8   Financial Center, New York, New York, in the Matter of

9   DIAMENTE DEL MAR.

10          I further certify that this proceeding was

11   reported by Robert Bloom and that the foregoing transcript

12   has been scoped by me.

13

14

15

16   _____     _____

17   Dolores Cavanagh          Date

18

19

20

21

22

23

24

25

288

1               UNITED STATES

2       SECURITIES AND EXCHANGE COMMISSION

3             REPORTER'S CERTIFICATE

4

5

6          I, Robert Bloom, reporter, hereby certify that the

7   foregoing transcript of 289 pages is a complete, true and

8   accurate transcript of the testimony indicated, held on

9   April 28, 2011, at 3 World Financial Center, New York, New

Page 260

Kenner 04 28 11

10    York, in the Matter of DIAMENTE DEL MAR.

11          I further certify that this proceeding was

12    reported by me and that the foregoing transcript was

13    prepared under my direction.

14

15

16

17

18    _____       _____

19    Robert Bloom              Date

20

21

22

23

24

25

                                                          289

1

2          PROOFREADER'S CERTIFICATE

3

4    In the Matter of DIAMENTE DEL MAR

5    Witness:  PHILIP KENNER

6    File Number:  NY-8125

7    Date:  April 28, 2011

8    Location:  3 World Financial Center, New York, New York

9

10

11          This is to certify that I, Robert Bloom, the

12    undersigned, do hereby swear and affirm that the attached

                        Page 261

Kenner 04 28 11

13   proceedings before the United States Securities and

14   Exchange Commission were held according to the record and

15   that this is the original, complete, true and accurate

16   transcript that has been compared to the reporting or

17   recording accomplished at the hearing.

18

19   _____        _____

20     ROBERT BLOOM                Date

21

22

23

24

25

TR-SEC00000262

LIST OF INVESTOR MEMBERS

BAJA MANAGEMENT, LLC

Managing Member of

DIAMANTE DEL MAR, LLC

AUGUST 21, 2004

The following individuals are <u>Class A</u> Members of Baja Management, LLC:

$500,000 Notes from Baja Development, Inc. to the following individuals was assigned to Baja Management, LLC for investor interest in the Managing Partner

1.    Jason Woolley



SS#

Interest:  one percent (1.00%)

2.    Dimitri Khristich

SS#

Interest:  one percent (1.00%)

3.    Joe Juneau

SS#



EXHIBIT
31
4/28/16

NOLAN0001139

CONFIDENTIAL TREATMENT REQUESTED

PK_SEC_009772

TR-SEC-00000743

Interest:  one percent (1.00%

4.   Owen Nolan



SS#

Interest:  one percent (1.00%)

5.   Jason P. Allison



SS#

Interest:  one percent (1.00%)

6.   Byron Dafoe



SS#

Interest:  one percent (1.00%)

The following individuals are <u>Class B</u> Members of Baja Management, LLC:

1.   Kenneth A. Jowdy



SS#

Investment:  $110,000

Interest:  Eighty percent (80.00%)

Decreased to Seventy-Five percent (75.00%) in 2006.

CONFIDENTIAL TREATMENT REQUESTED

NOLAN0001140

PK_SEC_009773

TR-SEC-00000744

2.    Phillip Kenner

REDACT

SS#

Investment: $10,000 (account receivable)

Interest:  Five percent (5.00%)

Increased to Ten percent (10.00%) in 2006

3.    William J. Najam, Jr.

REDACT

SS#

Investment: $10,000

Interest: Five percent (5.00%)

4.    Suzanne Jabbour

REDACT

SS#

Investment:  $10,000

Interest:  One percent (1.00%)

5.    Fernando Manuel Garcia Campuzano

REDACT

SS#

Investment:  $10,000 (account receivable)

Interest:  One percent (1.00%)

CONFIDENTIAL TREATMENT REQUESTED

The following individuals are <u>Class C</u> Members of Baja Management, LLC:

1.    Edward J. Essa



SS#

Investment:  $500,000

Interest:  One percent (1.00%)

2.    Carl D. Essa



SS#

Interest:  One percent (1.00%)

LIST OF INVESTOR MEMBERS

DIAMANTE DEL MAR, LLC

AUGUST 21, 2004

The following individuals are <u>Class A</u> Members of Diamante del Mar, LLC

Each Individual has made a $500,000 investment in Diamante del Mar, LLC

1.    Glen Murray



SS#

Interest:  One-half percent (0.500%)

CONFIDENTIAL TREATMENT REQUESTED

NOLAN0001142

PK_SEC_009775

TR-SEC-00000746

2.    Mike Peca



SS#

Interest:  One-half percent (0.500%)

3.    Bryan Berard



SS#

Interest: One-half percent (0.500%)

4.    Chris Simon



SS#

Interest: One-half percent (0.500%)

5.    Mattias Norstrom



SS#

Interest: One-half percent (0.500%)

6.    Jay Mc Kee



SS#

Interest: One-half percent (0.500%)

CONFIDENTIAL TREATMENT REQUESTED

NOLAN0001143

PK_SEC_009776

TR-SEC-00000747

7.    Jozef Stumpel

REDACT

SS#

Interest: One-half percent (0.500%)

8.    Ethan Moreau

REDACT

or

REDACT

SIN
SS#

Interest: One-half percent (0.500%)

9.    Darryl Sydor

REDACT

SS#

Interest: One-half percent (0.500%)

10.   Vladimir Tsyplakov

REDACT

SS#

Interest: One-half percent (0.500%)

---

NOLAN0001144

CONFIDENTIAL TREATMENT REQUESTED

PK_SEC_009777

TR-SEC-00000748

11.  Sergei Gonchar



SS#

Interest: One-half percent (0.500%)

12.  Greg de Vries



SS#

Interest: One-half percent (0.500%)

13.  Scott Erikson

SS#

Interest: One-half percent (0.500%)

14.  Raymond J. Murray



SS#

Interest: On-half percent (0.500%)

15.  Matt Franco (partial payment only)

SS#

Interest:

Paid $50,000 (balance due of $450,000 has not been paid—not a member as yet)

CONFIDENTIAL TREATMENT REQUESTED

NOLAN0001145

PK_SEC_009778

TR-SEC-00000749