Kenner 04 29 11

0290
1  UNITED STATES SECURITIES AND EXCHANGE COMMISSION
2
3  In the Matter of:        )
4  DIAMANTE DEL MAR         )  File No. NY-8125
5
6  WITNESS:   Philip Kenner
7
8  PAGES:     290 through 442
9
10  PLACE:     Securities and Exchange Commission
11             3 World Financial Center
12             New York, New York  10281
13
14  DATE:      Friday, April 29, 2011
15
16             The above-entitled matter came on for hearing,
17  pursuant to notice, at 9:00 a.m.
18
19
20
21
22
23
24
25
0291
1  APPEARANCES:
2
3  On behalf of the Securities and Exchange Commission:
4       CHRISTOPHER CASTANO, ESQ.
5       JUSTIN SMITH, ESQ.
6       GEORGE STEPANIUK, ESQ., ASSISTANT REGIONAL DIRECTOR
7       Division of Enforcement
8       Securities and Exchange Commission
9       3 World Financial Center
10      New York, New York 10281-1022
11
12  On behalf of the Witness:
13       MICHAEL STOLPER, ESQ.
14
15
16
17
18
19
20
21
22
23
24
25
0292
1                    C O N T E N T S
2  WITNESS                              EXAMINATION
3  Philip Kenner                            293
4
5  EXHIBITS:      DESCRIPTION            IDENTIFIED
6     32                                    296
7
8
9
10
                            Page 1

TR-SEC00000263

Kenner 04 29 11

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
0293
1                    P R O C E E D I N G S
2            MR. CASTANO:   We are on the record at 9:43 a.m.
3    Friday, April 29th.  Mr. Kenner, this is day two of your SEC
4    testimony.  While we were off the record either last night or
5    this morning, were there any substantive conversations
6    between the Commission staff and yourself?
7            THE WITNESS:   No, there were not.
8            MR. CASTANO:   Are you being represented by
9    counsel today?
10           THE WITNESS:   Yes, I am.
11           MR. CASTANO:   Will counsel please identify
12   himself for the record.
13           MR. STOLPER:   Michael Stolper on behalf of Phil
14   Kenner.
15       Whereupon,
16                    PHILIP KENNER
17   was recalled as a witness in this matter, and after having
18   been previously sworn, was examined by counsel and testified
19   further as follows:
20                    EXAMINATION
21       BY MR. CASTANO:
22       Q     Mr. Kenner, I want to jump into some topics we
23   talked about yesterday.  What steps, if any, did you take to
24   verify that major league baseball players had made equity
25   investments in Diamante Del Mar?
0294
1        A     None that I recall.
2        Q     And I think your testimony yesterday was that you
3    saw a piece of paper at the project that had various major
4    league baseball players names on it.  Is that correct?
5        A     At the project site there was a topographical map
6    with home sites represented in the Diamante Del Mar project
7    that included Roger Clemens, Mark McGuire, Andy Pettite and
8    several other major league baseball players.
9            MR. SMITH:   You saw a topographical map, was
10   this actually like a 3-D map?
11           THE WITNESS:   It was not, it was --
12           MR. SMITH:   It indicated elevations?
13           THE WITNESS:   It indicated elevations.  It was
14   an elevations map that was colored and all the home sites,
15   golf course, locations were designated.
16       Q     We talked a little bit about this yesterday, the
17   monies that your clients invested in Diamante Del Mar, do
18   you know where those monies went and what they were used
19   for?
20       A     I believe over the last few years we've been able
21   to recreate the destination of the funds to various Ken

Page 2

TR-SEC00000264

Kenner 04 29 11

22  Jowdy accounts but at no time have I seen Ken Dowdy or Bill
23  Nagim records indicating the actual use of those funds with
24  the exception of a small amount of the bank statements that
25  we've been able to extract through other litigation.
0295
1        Q        So the record is clear, the Diamante Del Mar
2   Ellen Rosario property, was there only a runway built on
3   that property or was there other things built on that
4   property?
5        A        From the first visit, from my first visit until
6   the last time I visited the property in approximately 2006
7   the construction changes would have been a 6,000 foot
8   runway, only half the width of a typical runway which I
9   believe was 75 feet instead of a full 150 feet wide, there
10  was a three and a half mile access road that was created
11  from the runway site to the beach to allow easier access to
12  the lower 7,000 acres.  There was a well site created and
13  drilled and the mapping of I believe both golf courses, the
14  Tom Fazio course and the Davis Love course, have been staked
15  and mapped.
16       Q        Were any homes or buildings built?
17       A        None.
18       Q        Did you ever at the time, and this is in the
19  2002, 2003, 2004 time period, see any Diamante Del invoices
20  for any construction projects?
21       A        I never saw any.
22       Q        Who would see that, if anyone?
23       A        Ken Jowdy and Bill Nagim.
24            MR. CASTANO:   I want to mark this as Diamante
25  Exhibit No. 32.
0296
1                          (Diamante Exhibit No. 32 was
2                          marked for identification.)
3            MR. CASTANO:   Here's a courtesy copy.
4            MR. STOLPER:   Thanks.
5        A        Chris, with respect to the baseball players, I
6   had met a number of them with Ken Jowdy during that same
7   time period here in New York City and all indications were
8   as if they were investors, members as Ken Jowdy had
9   suggested.
10       Q        Did Roger Clemens tell you he was an equity
11  investor in Diamante Del Mar?
12       A        Not in those exact words but when I met Roger the
13  first time at Trust Restaurant in New York City, he was very
14  forward in saying the same words that Ken Jowdy did and that
15  was that he loved the project and anything he could
16  personally to help.  So for a guy like Roger Clemens to say
17  that to me made me feel very comfortable that when Ken Jowdy
18  said he was one of our partners, I didn't explore what Ken
19  Jowdy's definition of a partner was at the time because I
20  was hanging around in the hockey world with the equivalent
21  of what Roger Clemens was in the baseball world.  So to me
22  it made sense without having to ask further.
23       Q        Did Roger Clemens ever use any words that "I'm an
24  equity investor" or "I'm an investor in Diamante Del Mar"?
25       A        No, it was always in the terms of partner.
0297
1        Q        Roger Clemens said he was a partner in Diamante
2   Del Mar.
3        A        I don't want to put exact words in Roger's mouth
4   but every indication I can recall from nine years ago was
5   that I was extremely comfortable after meeting Roger and
6   believing Ken Jowdy's words and Roger's comments that he

Page 3

TR-SEC00000265

Kenner 04 29 11

```
 7  loved the program, he loved the project and he would do
 8  anything he could to help me and the rest of the partners.
 9      Q     What I'm having trouble with is I can like
10  something and be interested in something but that doesn't
11  necessarily mean I'm an investor in something.  Did Roger
12  Clemens ever indicate to you that "in fact I have invested
13  money in Diamante Del Mar"?
14      A     He never used those words, no.
15      Q     Did Ken Jowdy ever use those words?
16      A     Ken Jowdy had used those words.
17      Q     what exactly do you remember Ken Jowdy saying
18  about Roger Clemens actually making an equity investment in
19  Diamante Del Mar?
20      A     My recollection was in two Ken Jowdy projects,
21  one was in Atlanta, Georgia called Star Time which Ken Jowdy
22  had insinuated to me that when he had John Barry and Andy
23  Berg who were -- John Barry was an NBA player at the time
24  and an analyst for the NBA and Andy Berg who was his
25  financial advisor and was also on the Diamante Del Mar
0298
 1  roster of supporters in the Diamante Del Mar offering
 2  memorandum we looked at yesterday.  Ken Jowdy had told me
 3  that both Barry and Clemens were investors in his Star Time
 4  project and Jowdy was very proud to tell me that Roger had
 5  made all of his money back, specific to Roger Clemens, had
 6  made all of his money back in that first project and was
 7  also an investor and partner with us at Diamante Del Mar.
 8      Q     Did you ever see any document that confirmed
 9  Roger Clemens was an equity investor in Diamante Del Mar?
10      A     Never.
11      Q     Did you ever ask for any document confirming that
12  Roger Clemens or any other major league baseball player was
13  an equity investor in Diamante Del Mar?
14      A     I never did.
15      Q     I'd like to show you what has been just marked as
16  Diamante Exhibit No. 32.  Please take a moment to review.
17            (Witness perusing document.)
18      MR. SMITH:   Have you seen this document before?
19      THE WITNESS:   I have not, not that I recall.
20      MR. STOLPER:   It looks like there's another
21  bates number on here.  I see where it was produced by us or
22  it came out of Phil's files because of the KJ number.
23      MR. SMITH:   Do you know what the bates number
24  refers to?
25      THE WITNESS:   I do.
0299
 1      MR. STOLPER:   I would assume Ken Jowdy in some
 2  litigation you have with him.  You don't remember?
 3      THE WITNESS:   No.
 4      Q     Mr. Kenner, do you have any idea if this was a
 5  document that was created for purposes of any form of
 6  litigation or document created in or around 2002 or 2003?
 7      A     I've read through page 2.
 8      MR. STOLPER:   Are you sure about the dates,
 9  Chris, in your question?
10      MR. CASTANO:   I'm asking the question, I don't
11  answer questions.
12      MR. STOLPER:   The document is referring to
13  events in 2005, so I don't know why you'd say it was written
14  in 2002 or 2003.
15      MR. CASTANO:   I'm asking Mr. Kenner.
16      A     I don't know what this was, the purpose of this
17  document was but a good portion of this information that
```

Page 4

TR-SEC00000266

Kenner 04 29 11

18  I've read in the first page and a half reflects what Ken
19  Jowdy and Bill Nagim had always spoken to me about in the
20  early planning stages of the project.
21       Q      Counsel for -- Mike points out it does appear
22  that this document might have been drafted not in 2002 or
23  2003 but at a later date.  Noting in the first page a date
24  that appears in the second sentence in March 2005, I know
25  your testimony now is you've never seen this document or you
0300
1  just don't recall seeing it but seeing that date does that
2  refresh your recollection in any way of, one, seeing this
3  document or, two, when this document might have been
4  produced or created?
5       A      I don't recall seeing this document at any point
6  in time, although the information that I read does makes
7  sense from after that 2005 time frame.
8       Q      I want to direct your attention to the very last
9  page, "For additional information please contact," it's on
10  the bottom of the very last page, Mr. Kenner.
11       (Witness perusing document.)
12       Q      I see an e-mail address of pkenner@imc, I guess
13  that's imcingular.com, was that an e-mail address you
14  mentioned yesterday?
15       A      It was not.
16       Q      Can you tell me about that e-mail address?
17       A      That was an e-mail address I may have used back
18  in 2005, 2006.
19       Q      Is that an e-mail address you've actively used?
20       A      I believe it was a two-way pager I used in or
21  around that time.
22       Q      When you say pager, was it a pager or an e-mail
23  address?
24       A      That was an e-mail address.  I referred to it
25  because it was an early BlackBerry device that had that
0301
1  address on it.
2       MR. STOLPER:   It was a device through which he
3  could receive e-mail messages.
4       THE WITNESS:   That's correct, and it was bad at
5  keeping time.
6       Q      Are there any other e-mail addresses between 2002
7  and 2011 besides the e-mail addresses you mentioned
8  yesterday at this e-mail address which might have been
9  connected to a BlackBerry device?
10       A      Not that I recall.
11       MR. STOLPER:   Is that actually accurate?
12       THE WITNESS:   Yes, I recall that address.
13       Q      I want to direct your attention to page 3, the
14  third page of Diamante Exhibit No. 32 --
15       BY MR. SMITH:
16       Q      Before we go on, can you still access e-mail from
17  that account?
18       A      I don't know what happened to that account.
19       Q      How did you access e-mail to that account?
20       A      I had an original BlackBerry pager.
21       Q      And at some point you no longer used that
22  BlackBerry pager?
23       A      That's correct.
24       Q      When was that?
25       A      It was many years ago.
0302
1       Q      Did you continue to access the account after you
2  stopped using that original BlackBerry pager?

Page 5

TR-SEC00000267

Kenner 04 29 11

3       A       I did not.
4               BY MR. CASTANO:
5       Q       Mr. Kenner, do you know if in 2005 your clients
6    had received documents from Diamante Del Mar?
7       A       I don't recall at that point in time.
8       Q       Do you recall ever having any conversations with
9    any of your clients about information or documents they may
10   have been receiving from Diamante Del Mar?
11      A       I don't recall discussions related to documents
12   they would have received from anybody at Diamante Del Mar in
13   that time period.
14      Q       Do you remember having any conversations, we
15   don't have to go through it again but yesterday we discussed
16   2005 or thereabouts a decision was made to go in a different
17   direction in Mexico towards the Diamante Cabo San Lucas
18   property or there was another property and then eventually
19   it evolved into the Diamante Cabo San Lucas?  The question
20   for you is looking at this business plan which this document
21   might have been created in 2005, it appears that they're
22   talking about further steps in furthering the Diamante Del
23   Mar El Rosario property.  Do you recall having any
24   conversations with any of your clients in which they said
25   wait a second, you're informing me that we're shifting
0303
1    gears, my words, but yet I'm receiving information from
2    Diamante Del Mar in writing which talks about furthering the
3    Diamante Del Mar project?
4       A       Excuse me, to be clear about the transition, I
5    believe even 2006, 2007 when everybody in Cabo San Lucas was
6    still working towards the same goal, there was no
7    representation either to me by Ken Jowdy or from me to any
8    of my colleagues that the project at Del Mar had stopped.
9    The development schedule had been augmented based on the
10   market conditions at the time and also following the Masood
11   Bhati Lehman Brothers trip to Diamante Del Mar in
12   approximately 2005 I believe Ken Jowdy, myself and everybody
13   felt comfortable that when we were able to complete the Cabo
14   San Lucas financing which we did achieve with Lehman
15   Brothers in a $125 million acquisition and phase one
16   development loan that pursuant to Masood Bhati's indication
17   to us was success for us in Cabo San Lucas with a loan that
18   they could feel comfortable giving us, it would be no
19   problem whatsoever to then start again the sister project in
20   the north.  So all of the early investors understood this as
21   a very appropriate way to take an investment that was
22   continuing to grow in appraised value at the time that we
23   also owned for cash and as we discussed yesterday, felt very
24   secure that the property wasn't going anywhere as cash
25   owners and all indications that we had created a fee simple
0304
1    title and had created or recreated perhaps a better long
2    term sustainable plan based on what we expected to be
3    success in Cabo San Lucas and frankly achieved.
4       Q       So that we're clear, we're going to have to
5    clarify this now, you informed investors, your clients, in
6    or around 2005 that we're going to put Diamante Del Mar on
7    hold, we're not abandoning it, it's going to go on hold and
8    we're going to move to Cabo San Lucas and we believe we'll
9    get financing from Lehman Brothers on Diamante Del Mar at a
10   future date and we'll then advance the Diamante Del Mar
11   project.  Those are my words.  Tell me what happened in your
12   words.
13      A       That's fairly accurate and in fact in 2004, late
                            Page 6

TR-SEC00000268

Kenner 04 29 11

14  2004 and into 2005 one of my clients in Diamante Del Mar
15  investors, Ethan Moreau, brought one of his close friends,
16  Raymond Murray or Rem Murray to Cabo San Lucas to see what
17  we were trying to finance with Lehman Brothers which
18  ultimately became our Diamante Cabo San Lucas site but
19  through Ethan Moreau's words and the confidence Rem Murray
20  derived from what he had heard from Ethan and what he
21  experienced with us in Cabo decided sometime in 2005 to
22  invest in Diamante Del Mar.  So at no time did we ever
23  indicate nor did I feel as an investor myself that the
24  project had put itself in any peril or jeopardy at that
25  point and I felt as confident as ever that with a six
0305
1  billion dollar shipping port having been on the drawing
2  board with the Mexican government just north of the Del Mar
3  property and our decision not to bleed money into that
4  project that we were jeopardizing perhaps the long term
5  viability of it.
6       Q       Mr. Kenner, did you ever see the Mexican fee
7  symbol documents confirming that Diamante Del Mar owned the
8  property?
9       A    No, I have not.
10      Q    Did you ever see them in 2002?
11      A    I have never seen them.
12      Q    You have never seen them.
13      A    You've never seen them.
14      Q       Did you ever ask Mr. Kenner, "hey, can I see the
15  legal documents confirming Mexican fee symbol"?
16          MR. STOLPER:   Do you mean Jowdy?
17      Q    Mr. Jowdy, excuse me.
18      A    I did ask my self many times but I've never asked
19  Mr. Jowdy, I've never asked Mr. Garcia, the attorney, nor
20  have I asked Mr. Nagim who more likely than not would have
21  been the custodian of those documents.
22      Q       Earlier in your last answer before you talked
23  about what different people said and we can turn to that but
24  I'm more interested in 2005 and I just think between
25  yesterday and today the record is a little muddled now, what
0306
1  you specifically told investors or your clients about
2  Diamante Del Mar and where you were going.  Now I said a
3  bunch of things that might not be accurate.  Did you tell
4  them in words or substance that the Diamante Del Mar is on
5  hold and that we are going to push towards the other
6  projects?
7          MR. STOLPER:   Were you the only source of
8  information?  That's what the question is presuming.
9       Q       Again those are my words and I don't want from
10  you what other hockey players said to one another, what they
11  did, it's what you, Mr. Kenner, informed your clients.
12      A    In the context of 2004, 2005 as we were
13  approaching the conclusion of the Lehman Brothers loan for
14  Cabo San Lucas I was certainly at that time not the only
15  source of discussion about the Mexican development
16  properties, whether it be Diamante Del Mar or Diamante Cabo
17  San Lucas.
18          My assistant at the time, Kristine Frederick, was
19  in as much communication if not more with my clients and
20  other people in our immediate contact as I was, as she was
21  working in a sales and marketing role with us at Diamante.
22  I was one of the sources of information back to my clients,
23  my friends and colleagues at the time.
24          So in or around 2005 it was a very simple message

Page 7

TR-SEC00000269

Kenner 04 29 11

25  that everybody understood and was in agreement with and that
0307
1   was there's a better opportunity to create value at Diamante
2   Del Mar right now by going to Cabo San Lucas, closing on an
3   amazing and beautiful piece of real estate on the ocean two
4   miles from downtown Cabo San Lucas and with Lehman Brothers
5   development loan begin to develop a world class resort that
6   we could then create a sister property to Diamante Del Mar
7   at the time.
8        Q    And those are the words you used, in words or
9   substance?
10       A    In general.  Again that's six years ago.
11       Q    I want to direct your attention to the third page
12  of Diamante Exhibit No. 32, the Management Team, and I want
13  to direct your attention to the fourth line up from the
14  bottom of the first paragraph in the paragraph Management
15  Team, the sentence that reads "Philip A. Kenner will serve
16  as the company's financial consultant."  Do you see that
17  sentence?
18       A    I do.
19       Q    Do you know what that's referring to?
20       A    I do not.
21       Q    Did you ever agree to be Diamante Del Mar's
22  financial consultant?
23       A    I never agreed to be the company's financial
24  consultant, I never reviewed bank records, accounting
25  records, never even met the accountant for the company,
0308
1   never had access to their banks, never had signing authority
2   on anything related to Diamante Del Mar.
3        Q    Were you Diamante Del Mar's financial consultant?
4        A    Absolutely not.
5        Q    Do you know why this exhibit, Diamante Exhibit
6   No. 32, states that you will serve as the company's
7   financial consultant?
8        A    I do not and frankly I'm not even sure what -- if
9   we were both in agreement that I was the financial
10  consultant, I'm not even sure what that would mean.
11            MR. SMITH:   Did you ever have any discussions
12  with anyone about the prospect of you serving as a financial
13  consultant?
14            THE WITNESS:   No.
15            MR. SMITH:   Did you ever have any conversations
16  with anyone about the prospect that you would be promoted or
17  listed as a financial consultant even if you didn't serve in
18  that role?
19            THE WITNESS:   Absolutely not.
20       Q    I want to direct your attention to the fourth
21  page, the very first paragraph, Philip A. Kenner, I want to
22  direct your attention to the last sentence of that
23  paragraph, "Mr. Kenner's primary focus" and I'm reading from
24  the exhibit, "has been to assist the company with the
25  development of its financial plans for the project and to
0309
1   obtain both equity investors and debt financing."  Do you
2   know what that sentence is referring to?
3        A    No, I do not.
4        Q    Is that sentence accurate or inaccurate?
5        A    Inaccurate.
6        Q    Can you tell me why.
7        A    I never worked with Ken Jowdy or Bill Nagim, the
8   two principals who I believed worked specifically on the
9   financial plans.  I don't recall a single meeting I've had

Page 8

TR-SEC00000270

Kenner 04 29 11

10   in the last nine years with the two gentlemen related to any
11   of the financial information on Diamante Del Mar or Diamante
12   Cabo San Lucas.  I believe it to be completely inaccurate.
13        Q        Just so the record is clear, sitting here today
14   you don't know if this document was given to any of your
15   clients?
16        A        I do not know if it has been.  With respect,
17   Chris, to that last line, as far as obtaining debt financing
18   I was the one who ultimately arranged to bring Lehman
19   Brothers through a contact in New York City as I mentioned
20   yesterday to the table.  So as far as debt financing went
21   with the Cabo San Lucas project, I had originally made the
22   introduction of our Mexican development or developments to
23   Lehman Brothers with respect to trying to obtain some
24   institutional financing.
25        Q        Did you obtain debt financing through Lehman
0310
1    Brothers for the Diamante Del Mar El Rosario project?
2         A        Unfortunately not.
3              MR. STOLPER:   Was that your job?
4         A        Let me also be clear, that was not my job to go
5    out and obtain equity investors either.  So really that
6    entire sentence has no effect on what I was really doing.
7         Q        Did approximately fifteen of your clients invest
8    in Diamante Del Mar?
9         A        That's correct.
10        Q        And did they invest after, as we discussed
11   yesterday, having conversations with you?
12        A        Yes.
13              MR. CASTANO:   Did you have followup questions?
14              BY MR. SMITH:
15        Q        Just going back for a second, you mentioned the
16   meetings you had with baseball players with Mr. Jowdy.
17        A        Yes.
18        Q        And then there was some subsequent conversation
19   about Roger Clemens being one of them.
20        A        Yes.
21        Q        Were there other baseball players with whom you
22   met with Mr. Jowdy about the Diamante Del Mar project?
23        A        There were about 25 baseball players that I met
24   with Mr. Jowdy through different periods of time related to
25   Diamante Del Mar and perhaps a point of clarity for the
0311
1    record, yesterday we talked about expenses and we kind of
2    muddled through the area of where expenses were really
3    related to and I should suggest that in 2003 and 2004 on
4    many occasions when Ken Jowdy or myself on behalf of the Del
5    Mar or Cabo projects were bringing investors, potential
6    members, business partners, however you want to qualify the
7    people to Cabo San Lucas.  Many times after the completion
8    of the runway at Del Mar we would fly the planes to Diamante
9    Del Mar and spend three, four, five hours on the property
10   viewing what we expected to be the second project at that
11   time and then continued on to Diamante -- excuse me,
12   continued on to Cabo San Lucas for the purpose of promoting
13   our future efforts in Cabo.  So there was always continuity
14   between trips to Mexico that both projects were viable, they
15   were part of our portfolio.  We had a grander picture much
16   like the other golf development projects that we were hoping
17   to mirror or emulate at the time.
18        Q        Let me just clarify or let me distinguish between
19   baseball players with whom you met who were perspective
20   investors and baseball with whom you met whom you understood

Page 9

TR-SEC00000271

Kenner 04 29 11

```
21  to be investors like Roger Clemens I take it you understood
22  was a partner, was already an investor in Diamante Del Mar.
23       A     That's correct.
24       Q     And the 25 baseball players you mentioned, were
25  those also people you understood to already be investors in
0312
1   Diamante Del Mar?
2        A     Scott Erickson was a baseball who I believed
3   through Ken Jowdy's words was an investor or partner of ours
4   at Diamante Del Mar.  I don't believe I met any of the other
5   baseball players that he had indicated were already
6   involved.
7        Q     And you did have conversations with Scott
8   Erickson?
9        A     Yes, I have had conversations with Scott
10  Erickson.
11       Q     Based on those conversations you understood him
12  to be -- I'm distinguishing conversations between Mr. Jowdy,
13  based on your conversations with Scott Erickson you
14  understood him to be an investor in Diamante Del Mar?
15       A     That's correct.
16       MR. STOLPER:  Did you want to ask -- there were
17  baseball players that were also brought down as not
18  investors but purchasers of homes, did you ever meet any of
19  these baseball players whose names were on the topal map?
20            THE WITNESS:   Not on the topal map at Del Mar.
21            BY MR. CASTANO:
22       Q     Did you ever see any major league baseball
23  player, former or current, document indicating that in fact
24  he was an investor, an equity investor in Diamante Del Mar?
25       A     No, I was never in custody of any of the
0313
1   documents related to the company.
2        Q     And the baseball player you just mentioned, did
3   Mr. Erickson say in words or substance that "I am in fact an
4   equity investor in Diamante Del Mar?
5        A     I don't think Scott said that in those particular
6   words.
7        Q     What words did he use to indicate that he was an
8   equity investor or in the alternative was it something more
9   along the lines of what Roger Clemens said, that "I'm
10  excited about the project, I'm interested in the project and
11  I want to be a partner in the project"?  I said those
12  things, I certainly want you to use your own words.
13       A     I believe much the same that it was indicated to
14  me through Bill Nagim and Ken Jowdy that Roger Clemens was a
15  partner and an investor.  It was also indicated that Scott
16  Erickson was the same.  When I would speak with Scott on
17  several occasions and I don't want to overstate my
18  relationship with Scott because I've met him perhaps three
19  or four times, he was always very interested in what was
20  going on at Diamante Del Mar, wondering if development was
21  going on but I never crossed the line of the relationship
22  that Scott had with Ken Jowdy.  It was his friend and I
23  respected that, so I wasn't ever in a position to create an
24  inquiry into his true partnership role but I always
25  understood Scott was a half million dollar investor at
0314
1   Diamante Del Mar and one of the documents we looked at
2   yesterday which I don't know who produced it in fact has
3   Scott's name on it as one of the Diamante Del Mar partners.
4            MR. STOLPER:   Are you guys changing topics?
5            MR. CASTANO:   No.
```
Page 10

TR-SEC00000272

Kenner 04 29 11

```
 6              MR. STOLPER:    I think you guys left a question
 7  on the table.  On this exhibit he's never seen, so we have
 8  no foundation for it, it says he's supposed to be -- at his
 9  job in the private sector to obtain equity investors.  I
10  would ask him, it's your exam, if he ever told anybody that
11  that was his job there, to obtain equity investors.
12              MR. CASTANO:    Yes.
13              THE WITNESS:    I never have.
14       Q      I think we know the answer.
15       A      I never told it was my job to bring in equity
16  investors.
17       Q      Do you know what CRI Payroll is in relation to
18  Diamante Del Mar?
19       A      Could you give me the name one more time.
20       Q      Yes, it's CRI Payroll.
21       A      I do not know what that is.
22       Q      Do you know if Diamante Del Mar had employees on
23  their payroll?
24       A      I believe Diamante Del Mar had employees, which
25  company it was originated from, I don't know.  What I do
0315
 1  know about creating payroll structure in Mexico is that the
 2  Mexican lawyers and Bill Nagim would always discuss setting
 3  up a separate company for the specific purpose of payroll.
 4  So in the future if there was ever a litigation from an
 5  employee they had no tangible rights to the assets of the
 6  company.
 7       Q      Do you know, I think you and Justin talked a
 8  little bit about this last night, what LOR Management is?
 9       A      Yes.
10       Q      What is LOR Management?
11       A      LOR Management permeates a lot of the issues that
12  I've attempted to resolve the last four years with Ken
13  Jowdy.  Some of this information I've acquired through the
14  last four years of trying to piece together what has
15  occurred to myself and my colleagues.  LOR I believe is the
16  original Mexican company and LOR I believe are the initials
17  for Ken Jowdy's deceased mother.
18       Q      Do you know what her name was?
19       A      I do not, I never met her.  A lot of his acronym
20  companies are all related to his family members' initials.
21  LOR I believe was one of the first entities he created in
22  Mexico to take leasehold interest in Diamante Del Mar.  I
23  believe LOR is still one of the companies that holds some
24  interest in LOR that I wasn't aware of until very recently.
25  I believe all the leasehold interest had been transferred to
0316
 1  a Diamante Del Mar holding of some sort but apparently it's
 2  still in Ken Jowdy's control.  LOR -- Ken Jowdy has had, I
 3  believe he has made two different suggestions as far as his
 4  ownership goes, one in several depositions has been that he
 5  owns LOR 99 percent and his attorney, Fernando Garcia, owns
 6  one percent but in some Mexican litigation that myself and a
 7  couple friends have interest in Ken Jowdy has suggested he
 8  is a 90 percent owner of LOR and Fernando Garcia is a ten
 9  percent owner in LOR in which he has fraudulently tried to
10  sue the former mayor of Cabo San Lucas.
11              LOR is also the company that -- is one of the
12  companies that Ken Jowdy would ask from time to time to have
13  funds wired to him either for the ongoing acquisition of the
14  Cabo San Lucas project in '05 and '06 or it was the
15  destination account for some of the loans that myself and my
16  clients had made to Ken Jowdy during that same period of
```

Page 11

TR-SEC00000273

Kenner 04 29 11

17  time in an effort to acquire the Cabo San Lucas project.
18              BY MR. SMITH:
19      Q       I think you said yesterday, correct me if I'm
20  wrong, that the 75 to 100 thousand dollars that you invested
21  subsequent to your initial $350,000 investment were wires to
22  LOR.  Is that right?
23      A       Let me be clear on that.  I'm not sure where
24  those wire transfers went, that could have been one of the
25  destination accounts but I also want to be clear, I didn't
0317
1   necessarily deem those to be further investment in the
2   company.  I was a partner, I was asked if I could help with
3   some sort term issues, so I felt it my obligation to the
4   company and to my partners when asked if I could help and I
5   could at the time, so I did.
6       Q       Did you understand it to be loans?
7       A       I assumed they were loans without creating a
8   formal document.  I took Ken Jowdy at his word and trusted
9   if I were putting the funds in at whatever point in time we
10  would need to take care of it, they would.
11      Q       By the way on that subject, did you -- is there
12  any record of those loans?
13      A       Of that $75,000 that we're talking about?
14      Q       75,000.
15      A       I would assume by bank transfer.
16      Q       Any other record or any other record indicating
17  what they were other than the fact that the funds were
18  transferred?
19      A       Not that I have.  There may have been some old
20  e-mails I don't have access to any longer.
21      Q       Regardless of whether you have access to it, do
22  you know of any documents at any point existing that show
23  what those money transfers were?
24              MR. STOLPER:   Other than the repayments that
25  went towards those loans.
0318
1               MR. SMITH:   I'll ask about that in a second.
2       Q       I mean at the time of the loan or the money
3   transfers do you know of any documents that exist other than
4   documents that may exist as to the fact of the transfer?
5       A       I am sure there are e-mails from Ken Jowdy to me
6   that indicated he needed a certain amount of money, where to
7   transfer it to as a result of a phone conversation we had.
8       Q       And you recall those e-mail messages?
9       A       Yes.
10      Q       But you don't have them.
11      A       I do not have them.  Ken Jowdy's habit was to
12  e-mail all day long, he was an addicted e-mail junky.
13      Q       I forget from yesterday, was any of that money,
14  loans or otherwise, paid back to you?
15      A       I don't believe so.
16              MR. STOLPER:   The loans?
17              THE WITNESS:   Justin is referring to the
18  subsequent monies I sent to Jowdy for very specific Diamante
19  Del Mar issues.
20              MR. STOLPER:   Sorry.
21      Q       The initial 350,000 investment we spoke about
22  yesterday, is there any record of any kind of that
23  investment?
24      A       Not that I have but in the same context of the
25  subsequent assistance I provided for the company I am sure
0319
1   there are Ken Jowdy to me e-mails saying "We need another X

Page 12

TR-SEC00000274

Kenner 04 29 11

2  dollars to continue the process for Fernando Garcia, here
3  are the instructions where we need to send them, please try
4  to make this happen today."  Everything was very cordial.
5          Q       Then perhaps I'm not understanding.  I understood
6  the initial $350,000 investment although it was made in
7  separate chunks to be one $350,000 investment that you gave
8  at different times as needed and that would be an equity
9  investment.  Is that right?
10         A       Yes.
11         Q       And you understood before you made the first of
12  those payments that you would be making a $350,000
13  investment.
14         A       Approximately, yes.
15         Q       As to that investment you do recall there were
16  e-mail messages recording the fact of that investment?
17         A       I can't say in all certainty there's in its
18  entirety -- every transaction was documented by a
19  reciprocating e-mail from Jowdy but I am very sure that in
20  order to meet him, to make plans about I need another
21  75,000, I need another 50,000 for the titling process that
22  those messages were sent to me.
23         Q       Other than those e-mail messages any other
24  records to your knowledge that have ever existed recording
25  or recognizing your investment?
0320
1          A       Not that I'm aware of.
2                  BY MR. CASTANO:
3          Q       The cash investments you made, did Mr. Jowdy say
4  he needed cash?
5          A       Yes.
6          Q       Why did he need cash?
7          A       As I suggested yesterday and further confirmed
8  when I met with Ed Rodesa, his cousin, in 2007 and 2008 when
9  things started to go bad with Ken Jowdy he always needed
10 cash in Mexico for payments as he suggested there are no
11 banks in El Rosario for the people he had to pay, it was a
12 cash system in Mexico.  They're 30 years behind us as far as
13 technology goes, so everything was cash, cash, cash.
14                 MR. STOLPER:   The question was what's it for.
15         Q       The question was why did Mr. Jowdy need cash.
16                 MR. STOLPER:   Cash versus a check.
17         A       Because he always needed to pay people in cash.
18 Ed Rodesa, his cousin, had indicated to me that he had given
19 Ken millions of dollars in cash and in fact because although
20 they were relatives he had some distrust for Ken Jowdy which
21 he told me and others in '07, '08 he had actually video
22 taped handing pieces of cash to Ken Jowdy so he would have a
23 record of it.
24                 BY MR. SMITH:
25         Q       Who was he paying?
0321
1          A       He was paying Ken Jowdy also.
2          Q       When Ken Jowdy requested cash from you, your
3  understanding was that he would be using that cash to pay
4  other people.
5          A       Yes.
6          Q       Who was he paying?
7          A       People in the titling process.
8          Q       Who?
9          A       I don't know specifically who he was dealing with
10 North Baja but everything I can tell you in Mexico,
11 everybody needs cash to move a process along.
12         Q       Was it your understanding that $350,000 plus or
                                Page 13

Kenner 04 29 11

13  at least $350,000 since that's what you were contributing in
14  cash was needed for the titling process?
15      A    That's what he indicated to me in one of our very
16  early meetings.
17      Q    What did you understand the titling process to
18  consist of?
19      A    In very simple terms to go from the leasehold
20  control that he had acquired by paying for the last or
21  paying for the leasehold control to a fee simple process.  I
22  don't know what the protocol was but it was the same story
23  that Fernando Garcia, the attorney who was handling that
24  process, indicated to me on several on my Mexican visits
25  early with Fernando.
0322
1       Q    And beyond the fact that this was to convert one
2   kind of interest to another kind of interest, do you know
3   any further information about what the steps were in that
4   process or were involved in that process?
5       A    I really don't know anything about the process.
6   Fernando Garcia and Ken Jowdy and Bill Nagim handled all of
7   that.  I went to Ensenada with Ken Jowdy on I believe two
8   occasions to meet with Fernando Garcia and frankly I sat
9   across the street in the car on those two occasions when
10  they went into a meeting that I believed was for the titling
11  process and I sat for hours waiting for them to meet with
12  different individuals.
13      Q    Were they handing over cash at that meeting?
14      A    I don't know what they were doing but that was my
15  understanding of what they were doing.
16      Q    Do you know how much cash they had?
17      A    I don't know how much they had at that time.
18      Q    Do you know how much cash was turned over, if
19  any?
20      A    I don't know if any was turned over.  The last
21  four years really made me question what, if anything, had
22  gone on.
23           BY MR. CASTANO:
24      Q    At the time of your investment in 2002, 2003, the
25  multiple times you gave him cash, do you know how many times
0323
1   you gave him cash, maybe $30,000 here and $40,000 here?
2   Those are my words.
3       A    Four or five times.
4       Q    How did you physically do it?
5       A    I handed it to him.
6       Q    You flew across the country and handed it to him?
7       A    Wherever we met, California or New York.
8       Q    Did you ever give him money in Mexico, cash in
9   New Mexico?
10      A    No, I don't think I did, not in that context, no,
11  I did not.
12           MR. SMITH:   Did you ever take large sums of cash
13  outside the United States?
14           THE WITNESS:   No, I had not.
15      Q    Did you ever receive cash from Diamante Del Mar
16  in Mexico?
17      A    I don't believe so.
18      Q    Did you ever receive any payment whatsoever from
19  Diamante Del Mar in Mexico?
20      A    As I said yesterday, I may have received some
21  checks from Bill Nagim or Ken Jowdy for expenses in Mexico
22  which I'm sure I would have subsequently cashed at a bank
23  down there but nothing of substance.

Page 14

TR-SEC00000276

Kenner 04 29 11

24      Q      Were those checks in your name?
25      A      I'm assuming they were if I cashed them.
0324
1       Q      Do you think you made them out to cash?
2       A      No, I would assume they were made out to my name.
3       Q      Just so we're clear, they would reimburse you for
4   expenses you had by both transferring money to your American
5   Express credit card account as well as giving you checks
6   made out to you in Mexico?
7       A      I believe I was given checks by Bill Nagim also
8   in the U.S. for reimbursements out of one of their operating
9   accounts.
10      Q      We're talking about Diamante Del Mar.
11      A      Again it's as ambiguous as we can be, I really
12  want to suggest that I never created a delineation between
13  this as a Diamante Del Mar event and/or I was working on a
14  deal, Diamante Cabo San Lucas event.  It was a very blurred
15  line between it as far as my involvement and frankly if you
16  asked one of our investors like Jason Woolly who is a
17  Diamante Del Mar investor, he has spent significant time
18  working and for the Diamante Cabo San Lucas project and he
19  has no recorded interest in Diamante Cabo San Lucas.  So all
20  of the individuals, Chris, really believe that it's one big
21  effort.
22      Q      Were any of your clients informed that Diamante
23  Del Mar investor proceeds would be used to reimburse your
24  expenses for the Diamante Cabo San Lucas project?
25      A      I don't think until we talked about it yesterday
0325
1   I even thought there was a distinguishable difference.
2       Q      So you at the time never informed any of your
3   clients that Diamante Del Mar investment proceeds might be
4   used to reimburse you for Diamante Cabo San Lucas expenses.
5       A      No.
6              MR. STOLPER:   I'm going to object to that
7   because it assumes (a) that there is that delineation and it
8   assumes he knew it at the time.
9              MR. CASTANO:   He can answer the question.
10             MR. STOLPER:   If you understand it or otherwise
11  you can give him the same answer you've been giving.
12      A      Again I'm not sure even as I sit here today I can
13  delineate where expenses came from but I also --
14      Q      That's not the question.  The question was did
15  you inform any of your clients that Diamante Del Mar
16  investor proceeds were being used to reimburse you for
17  Diamante Cabo San Lucas project expenses?
18      A      No, because even as I sit here today I'm not sure
19  that I was ever reimbursed by Diamante Del Mar proceeds for
20  Diamante Cabo San Lucas expenses.
21      Q      Did you ever have a conversation with Mr. Jowdy
22  or anyone else at Diamante Del Mar as to where Diamante Del
23  Mar investor proceeds were being used?
24      A      No, I did not.
25      Q      Do you know what KSI Capital is?
0326
1       A      Yes, we discussed them yesterday.  They were the
2   group that lent the three million dollars to Ken Jowdy and
3   Bill Nagim for the Diamante Del Mar project.
4              MR. SMITH:   It was a high interest rate loan.
5   Right?
6              THE WITNESS:   I believe it was a very high
7   interest rate loan.
8              MR. SMITH:   Do you know what the interest rate
                          Page 15

Kenner 04 29 11

```
 9   was?
10              THE WITNESS:   I do not but again as I said
11   yesterday, I believe in 2008, plus or minus, I was sent an
12   internet link to the KSI site saying there was a loan from
13   2006 for a project at Diamante Del Mar which we were all
14   frankly unaware of but I do know based on bank records that
15   I've looked at that when the three million dollar loan which
16   is what I believe it was based on what I've read that only
17   approximately $2.2 million made it to Ken Jowdy's bank
18   account and I believe he put it into his -- I believe he
19   sent it to his own Baja Development Corporation bank
20   account, not a company bank account.  So there was
21   originally about $800,000 in fees on the three million
22   dollar loan and I believe somewhere in the neighborhood of
23   another $800,000 went back to Ken Jowdy through LOR
24   Management and to his cousin Ed Rodesa.
25         Q     Do you know who Moye, M-O-Y-E, and Barbara Wicks
0327
 1   are?
 2         A     I believe they are a couple that was originally
 3   living on the Del Mar property when Ken Jowdy went to El
 4   Rosario in the late 90's.
 5         Q     Do you know why they received or do you know if
 6   they received the Diamante Del Mar investor proceeds?
 7         A     I believe they did.  I've seen it in bank
 8   records.  I believe Ken Jowdy was paying them to leave the
 9   property.
10              MR. STOLPER:   Did you know that when it was
11   happening or did you find that out through litigation?
12              THE WITNESS:   I found that out through
13   litigation later that he had been paying them.
14              BY MR. SMITH:
15         Q     Do you have siblings?
16         A     Yes, I do.
17         Q     How many?
18         A     One.
19         Q     Who?
20         A     Robert Kenner.
21         Q     How old is he?
22         A     I believe he's about 40.
23         Q     What is your father's name?
24         A     My father has passed away but his name was Evan.
25         Q     Evan Kenner?
0328
 1         A     Yes.
 2         Q     When did he die?
 3         A     In the mid 90's I believe.
 4         Q     You don't remember?
 5         A     I don't recall.
 6         Q     You said yesterday you received $500,000 in cash
 7   as an inheritance from your father.
 8         A     Yes.
 9         Q     Did you receive anything else as inheritance?
10         A     An insurance policy and personal goods, personal
11   belongings.
12         Q     What was the value of the insurance policy?
13         A     I believe it was about $70,000.
14         Q     Do you still have that policy?
15         A     No, I received the proceeds from it.
16         Q     What happened to the proceeds, do you still have
17   them?
18         A     I do not.
19         Q     Did your brother Robert receive anything?
```

Page 16

TR-SEC00000278

Kenner 04 29 11

```
20      A     Nothing.
21      Q     He received no inheritance from your father?
22      A     No.
23      Q     Is there any record of the $500,000 cash
24 inheritance that you received?
25      A     I don't believe so.
0329
1       Q     Any will?
2       A     There was a will that gave me all my father's
3  possessions.
4       Q     It didn't specify $500,000 in cash?
5       A     I don't think it specified anything.
6       Q     Were you aware before he died that your father
7  had $500,000 in cash?
8       A     I was not.
9       Q     How did you find that out?
10      A     When I took the house apart that he lived in to
11 put it for sale, I found it.
12            BY MR. CASTANO:
13      Q     Was it in a safe?
14      A     No, it was not.
15      Q     Was it in a duffle bag?
16      A     No, it was in the same duffle bag I kept it in.
17      Q     A personal question, was your father married at
18 the time?
19      A     He was not.
20      Q     Was he divorced?
21      A     He was divorced.
22            BY MR. SMITH:
23      Q     Did anybody else receive anything from your
24 father at the time of his death?
25      A     No, they did not.
0330
1       Q     We may have covered this yesterday, I just can't
2  recall.  Your clients who ended up investing in Diamante Del
3  Mar, I think it was about nine million dollars that he
4  invested, in what form did they make their investments,
5  check, wire transfer?
6       A     I believe they were all by wire transfer,
7  although there may have been one or two by check.
8       Q     Wire transfer to?
9       A     To any one of Ken Jowdy's controlled entities.
10      Q     Not all from the same entity?
11      A     No.
12      Q     Did you find out to which entities each of your
13 clients sent the funds?
14      A     In the last four years I've reached a number.
15      Q     How many different entities was it?
16      A     I believe the entities to the best of my
17 recollection would be Baja Development Corporation, Diamante
18 Del Mar, LOR Management, TLJ Management, Propiedada DDM, a
19 Mexican corporation like LOR.  I believe that's it.
20      Q     Did you have discussions at or around the time
21 that your clients were considering investing or actually
22 investing with regard to any of these entities?  You were
23 discussing with your clients the prospect of their investing
24 in Diamante.  Right?
25      A     We talked about Diamante, correct.
0331
1       Q     Around the time that they were considering
2  investing did you discuss these various entities with them?
3       A     I don't believe so.
4       Q     Were you familiar with these entities at the time
```

Page 17

TR-SEC00000279

Kenner 04 29 11

```
 5    that they were making investments?
 6         A      Only to the extent that it was represented to me
 7    by Ken Jowdy or Bill Nagim that these were different
 8    development entities related to the Del Mar project.
 9         Q      Did you discuss with your clients the entity to
10    which they would be making payment at the time they made
11    payment, at or around the time they made payment?
12         A      I don't think at any time we discussed what the
13    actual entity was and why the funds were going to that
14    particular account but I can tell you all the accounts that
15    the monies were sent to I have in the last four years found
16    out they were all accounts that Ken Jowdy had control over.
17               BY MR. CASTANO:
18         Q      I want to shift gears and talk about Diamante
19    Cabo San Lucas.  I know we touched on it yesterday and we
20    touched a little bit on it this morning.  Again generally
21    what is Diamante Cabo San Lucas?
22         A      It is a resort development in Cabo San Lucas.
23         Q      When did you first learn about Diamante Cabo San
24    Lucas?
25         A      Let me suggest that in or about late 2003 on my
0332
 1    first visit to the Cabo region there were discussions about
 2    acquiring a golf development and/or property to create a
 3    Cabo San Lucas golf resort development.  So the final
 4    Diamante Cabo San Lucas project wasn't seen by me until
 5    early 2005 but as we discussed yesterday there were two
 6    other project sites that we went through different levels of
 7    due diligence with Lehman Brothers to acquire.
 8         Q      When you said you had conversations in 2003, who
 9    did you have those conversations with?
10         A      With Ken Jowdy and Bill Nagim.
11         Q      There were two other projects in Mexico before
12    Diamante Cabo San Lucas was chosen as the project, those
13    other two projects, what were their names again?
14         A      The first site we went to and attempted to
15    acquire is a current resort called Querencia.
16         Q      Could you spell that again.
17         A      I believe it's Q-U-E-R-E-N-C-I-A.
18         Q      Just so the record is clear did anyone, yourself,
19    Phil Kenner, or anyone affiliated with you loosely defined
20    ever make an equity investment in Querencia or pursue that
21    project in a meaningful way?
22         A      From the first time I went to Querencia with Ken
23    Jowdy my belief was that all of the Diamante Del Mar
24    partners were actively engaged in becoming partners in that
25    acquisition and I believe somewhere 250 and 500 thousand
0333
 1    dollars was at least put up as deposit for the potential
 2    acquisition at Querencia.  I believe through the bidding
 3    process we had an accepted offer of approximately sixteen
 4    million dollars to acquire the property which frankly would
 5    have been the real estate home run of the century.  I'm not
 6    sure what happened to that deposit money although I had been
 7    told by Jowdy, Nagim and Ed Rodesa that money had
 8    transferred to a deposit account and I was also told that
 9    Lehman Brothers couldn't close the deal in the required time
10    to make it happen and there was a lot of acrimony between
11    Nagim, Jowdy and Masood Bhati at Lehman who I had brought to
12    the table at the time.
13         Q      This project, where did the 250 to 500 thousand
14    dollars come from for a deposit?
15         A      I don't know.
```

Page 18

Kenner 04 29 11

16    Q    Do you know if it came from any of your clients?
17    A    I do not know.
18    Q    Is it possible it came from your clients?
19    A    It's absolutely possible.
20    Q    And were your clients ever informed that at this
21  time period Diamante Del Mar investor proceeds would be used
22  for a different project?
23    A    I don't know if anyone and specifically I'm not
24  sure I ever said money has transferred for the potential
25  acquisition at Querencia but any or all of my colleagues
0334
1  that I spoke with were excited about the prospect of us
2  working towards an acquisition in Cabo.  So there was never
3  -- but there was never any indication by me that
4  specifically our funds, mine or my colleagues or my clients,
5  was being used for that although I was led to believe by
6  Jowdy, Nagim and Ed Rodesa that somewhere in the
7  neighborhood of 250 to 500 thousand had transferred to a
8  deposit account.
9    Q    And that was roughly in what year?
10    A    I believe that was in early 2004.
11    Q    How long did that process take, meaning was it we
12  didn't go to contract, we made a deposit, Lehman Brothers
13  couldn't close, it all happened within three weeks or was it
14  drawn out over a long period of time?
15    A    I believe the period of time was six to nine
16  months and that's my best estimate today.
17    Q    At the end of the six to nine months, whatever
18  time period it was, did the Jowdy related team then go to
19  another project or during that time period was another
20  project also considered?
21    A    What I was told and there's always a passively
22  involved individual in the process was that Lehman Brothers
23  was incapable of funding the deal in the required time based
24  on the contract.  Querencia's owner at the time required
25  another half million dollar hard deposit to extend I believe
0335
1  90 more days to the closing that Lehman Brothers required.
2  I believe Ken Jowdy tried a number of places to get that
3  money other than coming to me and asking if I would do it or
4  any of our original investors would do it.
5         The next I heard while my clients and I thought
6  we were buying Querencia and closing soon was in December,
7  just prior to December '04 I was told the Querencia deal
8  fell apart for the Lehman Brothers inability to close.  I
9  was told there was a new site that Jowdy was now working on
10  by Ken Jowdy and Bill Nagim called Santa Maria Bay and in
11  December '04 I was taken to that site for the first time
12  with Ken Jowdy and a couple other people to view what would
13  now be the new Diamante Cabo San Lucas site if we could work
14  through the deal.
15    Q    Do you know if a deposit was made at the Santa
16  Maria Bay site?
17    A    I don't believe it was.  There was a lot of
18  acrimony in the early stages of that deal that I've also
19  learned about in hindsight where Ken Jowdy and Bill Nagim
20  got in a fight with the then owner of Santa Maria Bay about
21  a supposed $250,000, plus or minus, deposit that Jowdy
22  alleged vehemently he had sent by wire transfer and that he
23  refused to give reference numbers or let the seller
24  understand where it came from but really held himself out to
25  be an honest guy and called the other guy a liar for saying
0336

Page 19

Kenner 04 29 11

1    he didn't receive it and the deal fell apart very quickly at
2    that point after December '04.
3         Q      Did there come a time then that Diamante Cabo San
4    Lucas, that project, began the process of acquiring a parcel
5    of Diamante Del Mar?
6         A      Yes, right after that fell apart.
7         Q      What time frame are we talking about
8    approximately?
9         A      I'm going to suggest it was immediately after the
10   Santa Maria Bay opportunity fell apart, so very early in
11   2005 and I'm going to suggest that probably the spring of
12   '05 is when I went on the site known as Rancho Cardinal.
13        Q      Spell that.
14        A      R-A-N-C-H-O  C-A-R-D-I-N-A-L, and the Rancho
15   Cardinal site is what we referred to as the new property
16   which became Diamante Cabo San Lucas.
17        Q      Is that the property, Rancho Cardinal, that was
18   eventually closed on by Lehman Brothers?
19        A      That's correct.
20        Q      You learned about this roughly March or so of
21   2005?
22        A      In early 2005, correct.
23        Q      When was the first time you visited that
24   property?
25        A      I believe in the spring of 2005.
0337
1                MR. STOLPER:   Can we take a break, Chris?
2                MR. CASTANO:   Let's go off the record.  We're
3    off the record at 10:56 a.m.
4                (Whereupon, a recess was taken.)
5                MR. CASTANO:   We're back on the record at 11:11
6    a.m.  Mr. Kenner, were there any substantive conversations
7    between the Commission staff and yourself while we were off
8    the record?
9                THE WITNESS:   No, there were not.
10               MR. CASTANO:   I'll note for the record that
11   George Stepaniuk has joined us.
12        Q      Mr. Kenner, before we went off the record we were
13   talking about the Rancho Cardinal property which became the
14   Diamante Cabo San Lucas property.  In or around 2005 did you
15   have any conversations with any of your clients about the
16   Rancho Cardinal Diamante Cabo San Lucas property?
17        A      With all of them.
18        Q      Can you tell me what you said.
19        A      I believe as we've spoken about over the last day
20   plus the opportunity for an additional Mexican development
21   site although we had failed at Querencia and subsequently at
22   Santa Maria Bay there was a new site at Rancho Cardinal that
23   we had negotiated a purchase deal with the then owner of the
24   property.  There was every indication at that point that
25   Lehman Brothers was again ready to finance and had gotten
0338
1    through whatever Mexican hurdles they had for lending and it
2    appeared that in addition to acquire the land in Cabo it was
3    Lehman Brothers through Masood Bhati's voice.  It was his
4    indication to us that a successful acquisition in the
5    beginning of the development in Cabo would lead to financing
6    for development at the Diamante Del Mar site and I
7    transferred that information that I had heard directly from
8    Masood Bhati and then also from Bill Nagim and Ken Jowdy who
9    spent a lot of time with Masood Bhati at the time to all of
10   the Diamante Del Mar colleagues.
11        Q      And those are your clients.

Page 20

TR-SEC00000282

Kenner 04 29 11

12    A     Yes.
13    Q     The Cabo San Lucas property in relation to Lehman
14 Brothers, was Lehman Brothers going to put up all the money
15 for the project including acquisition of the land or were
16 your clients also going to put up some investment proceeds?
17    A     There was an approximate ten percent deposit
18 requirement with Lehman Brothers.
19    Q     Where did the ten percent deposit come from?
20    A     It came from me and my clients.
21    Q     Did you make an investment in Diamante Cabo San
22 Lucas?
23    A     I did.
24    Q     How much did you invest?
25    A     With two of my friends we collectively invested
0339
1 two and a half million dollars for our portion of the
2 development.
3    Q     Who were the two friends?
4    A     Jere Lehtinen.
5    Q     Could you spell that for the record.
6    A     Jere is J-E-R-E, Lehtinen is L-E-H-T-I-N-E-N and
7 the second was Jozef, J-O-Z-E-F, Stumpel, S-T-U-M-P-E-L.
8    Q     How much money did you personally invest in
9 Diamante Cabo San Lucas?
10    A     Less than 100,000 of that two and a half million
11 dollars.
12    Q     Where did you get the less than 100,000?
13    A     From my bank accounts.
14    Q     Where were those proceeds from originally?
15    A     Earnings.
16    Q     Earnings from?
17    A     My job.
18    Q     And where did Mr. Stumpel and Mr. Lehtinen get
19 their investor proceeds?
20    A     Also from their income.
21    MR. SMITH:    By the way, you said less than
22 100,000, I take it on the order of 100,000 or approaching
23 100,000.
24    THE WITNESS:    Approximately 100,000.
25    Q     Did you inform your clients you had made a
0340
1 $100,000 approximate investment in Diamante Cabo San Lucas?
2    A     Yes.
3    Q     Did you use those words or did you say I made an
4 investment but didn't disclose or didn't tell your clients
5 how much it was?
6    A     I'm positive they all knew I put up in the
7 neighborhood of the 100,000 and that myself, Lehtinen and
8 Stumpel had put up in total approximately two and a half
9 million.
10    Q     And what did Mr. Lehtinen and Mr. Stumpel receive
11 in exchange for their approximately $2.4 million investment?
12    A     The LLC that was set up to take those investments
13 owns a 39 percent stake in the Diamante Cabo San Lucas
14 project.
15    Q     How much of that do you own?
16    A     We are partners in that.  They have a preferred
17 return, an annual interest rate they continue to accrue
18 until their principal is paid out and I don't recall the
19 stake they have in the LLC.
20    Q     What did you receive for your approximately
21 $100,000 investment?  What ownership stake did you receive?
22    A     I don't know specifically.  The three of us own a
Page 21

TR-SEC00000283

Kenner 04 29 11

23   39 percent stake in the overall project.
24        Q      And that 39 percent stake, how much of that do
25   you own?
0341
1         A      I don't know exactly.
2         Q      Do you own more than 50 percent of that?
3         A      I think we're approximately one-third, one-third,
4    one-third owners with them receiving a preferred annual
5    interest rate.
6         Q      Is there any document that would indicate the
7    ownership structure?
8         A      I don't know if there is.  There is an
9    arrangement that Lehtinen and Stumpel had with me that I did
10   turn over a production fee, yes.
11        Q      Is that an arrangement that was made at the time
12   or something that was memorialized afterwards?
13        A      I believe it was memorialized when we transacted
14   the funds and transferred them to Ken Jowdy.
15        Q      Did you have any type of title or position at
16   Diamante Cabo San Lucas?
17        A      I don't know if I did or not.
18        Q      Do you know what CSL Properties 2006 LLC is?
19        A      Yes, it was one of the LLC's that held ownership.
20   I believe we looked at a document yesterday that had that
21   LLC and the purported members of it.
22        Q      Are you affiliated with CSL Properties 2006 LLC?
23        A      I believe that's the LLC that my clients and
24   friends are all members of.
25        Q      When you say that, do you mean -- is that where
0342
1    their investor proceeds went to invest in Diamante Cabo San
2    Lucas?
3         A      No, all of their proceeds went directly to a Ken
4    Jowdy controlled entity and the structure of the deal was
5    memorialized by Lehman Brothers and their attorneys and Bill
6    Nagim and Larry Markowitz when it came time for closing.
7         Q      Let's take this one step at a time.  What did you
8    tell your clients, if anything, about an investment
9    opportunity in Diamante Cabo San Lucas?
10        MR. STOLPER:   I'm going to object to that
11   because I think you have to sort of lay out the foundation
12   there.  You're assuming that their investment or the way
13   you're asking the question, you're assuming that anyone who
14   invested invested because of what he said it did.  I think
15   you need to like yesterday put the folks' investment in the
16   context of what actually happened.
17        Q      Did your clients to your knowledge have any
18   conversations with Mr. Jowdy abut an investment opportunity
19   in Diamante Cabo San Lucas?
20        MR. STOLPER:   That you're aware of.
21        A      I'm sure they did.
22        Q      Do you recall sitting here today whether Mr.
23   Jowdy had a conversation with any of your clients about an
24   investment opportunity in Diamante Cabo San Lucas?
25        A      There were a number of my clients who spoke with
0343
1    Ken Jowdy.
2         Q      Did you have any conversations with any of your
3    clients concerning an investment opportunity in Diamante
4    Cabo San Lucas?
5         A      I spoke with certainly all of the Diamante Del
6    Mar members about the process that was going on in Cabo San
7    Lucas as they were aware of the Querencia potential

Page 22

TR-SEC00000284

Kenner 04 29 11

8   acquisition, subsequent Santa Maria Bay acquisition and then
9   subsequently the Rancho Cardinal site.
10       Q     In or around 2005 what did you say to your
11  clients about an investment opportunity in Diamante Cabo San
12  Lucas?
13       A     I believe all the discussions as we've talked
14  about several times so far were all in the context of the
15  transition of focus from Diamante Del Mar to another now
16  pending Cabo San Lucas site.
17       Q     Did there come a time that your clients, any of
18  them, made an investment in Diamante Cabo San Lucas separate
19  and apart from their investment in Diamante Del Mar?
20       A     Yes.
21       Q     Can you tell me about what you said to your
22  clients about an investment opportunity in Diamante Cabo San
23  Lucas.
24       MR. STOLPER:     Again you have a foundational
25  problem, Chris.  You've got to establish that he first spoke
0344
1   to them.  You're assuming something that hasn't been
2   established yet.
3       MR. CASTANO:     I think it's very clear that Mr.
4   Kenner has testified that he spoke to his investors or his
5   clients about an investment in Diamante Cabo San Lucas.  I'm
6   now asking him what he said to them about an investment
7   opportunity separate and apart from the investment that his
8   clients made in Diamante Del Mar.
9       Q     So the question is what did you say, if anything,
10  to your clients about an investment opportunity in Diamante
11  Cabo San Lucas?
12       A     This should be the same as many of the other
13  statements that I've made about the Diamante Cabo San Lucas
14  project.  Much of our efforts in Cabo to create a new
15  destination and further enhance the Diamante Del Mar site up
16  north was driven by the excitement of having Lehman Brothers
17  work with us and create a financing program in Cabo and
18  subsequently another financing opportunity up at Del Mar to
19  begin that project.
20       These conversations occurred over an eighteen
21  month period of time as we discussed Querencia may be the
22  site with Lehman Brothers support and then Santa Maria Bay
23  may be the site with Lehman Brothers support and then
24  ultimately the Rancho Cardinal site.  So each of the clients
25  over that period of time had spoke -- each of the Diamante
0345
1   Del Mar members over that period of time would have had an
2   opportunity to speak with each other on many occasions.
3   They were all friends, a lot of them played on the same
4   teams, they were all professional hockey players who had
5   known each other since kids and they also had an opportunity
6   over that period of time to speak on a number of occasions
7   with Ken Jowdy and also certainly spent a lot of time
8   speaking with my assistant, Christine Myric, who was very
9   aware and was also very proud of being able to disseminate
10  all the new information.
11       Q     Mr. Kenner, as I said to you earlier, that's
12  important information and we can get to it, the question was
13  what did you say, not what did hockey players say to one
14  another, not what did Christine Myric or Ken Jowdy say, the
15  question is directed to you?
16       MR. STOLPER:     He's already testified to that
17  several times.
18       MR. CASTANO:     No, he has not.

Page 23

TR-SEC00000285

Kenner 04 29 11

```
19              MR. STOLPER:    Yes, he has.
20      Q       The question is what did you say when the --
21              MR. STOLPER:    You've got to listen to his
22      answers.
23              MR. CASTANO:    I think the record is very clear.
24              MR. STOLPER:    He said over eighteen months he
25      had conversations.  He had conversations.
0346
1       Q       In 2005 a decision is made to approach the Rancho
2       Cardinal property.  At that point what did you say to your
3       clients about an investment opportunity in Diamante Del Mar
4       concerning the property located at Rancho Cardinal?
5               MR. STOLPER:    Did you say anything at that point
6       in time to your clients?
7               THE WITNESS:    I don't recall anything
8       specifically at that time.
9       Q       Do you know if your clients invested
10      approximately seven million dollars in or around 2005 up
11      until 2006 when the deal closed in a property at Rancho
12      Cardinal?
13      A       I don't believe so.
14      Q       How much, if anything, do you believe your
15      clients invested in a property at Diamante Cabo San Lucas?
16      A       We believe we've invested approximately five
17      million dollars in that project.
18      Q       How is that five million dollars broken down?
19      A       It is approximately two and a half million
20      dollars in the LLC that myself, Jozef Stumpel and Jere
21      Lehtinen are in and the balance of the money was invested I
22      believe in CSL Properties 2006 that we looked at the member
23      list yesterday but it's all designated on the Diamante Cabo
24      San Lucas operating agreement.
25      Q       So that five million dollars, I guess the other
0347
1       2.5 million dollars, where did that come from?
2       A       They were loans from my clients and I to Ken
3       Jowdy.
4       Q       So besides the 2.5 million dollars that you, Mr.
5       Lehtinen and Mr. Stumpel invested, the other 2.5 million
6       dollars was simply loans?
7       A       They were loans to Ken Jowdy, correct.
8       Q       So none of your clients made an equity investment
9       in a Diamante Cabo San Lucas project?
10      A       They invested in the Diamante Cabo San Lucas
11      project, yes, they did.  There was a total of seven million
12      dollars or there is a total of seven million dollars listed
13      on the operating agreements, two and a half million dollars
14      is listed for Baja Ventures 2006 which is the LLC with
15      Stumpel, myself and Lehtinen.  There's two and a half
16      million that's listed as Ken Jowdy's capital contribution
17      through KAJ Holdings and there is two million dollars listed
18      as the capital contribution for CSL Properties 2006.  The
19      other LLC we looked at yesterday I believe was called
20      Diamante Properties and that's the one that the lender from
21      Lehman Brothers has an interest in and had contributed I was
22      told $100,000 for his interest but it's not recognized on
23      the operating agreement.  So to the best of my knowledge
24      Masood Bhati from Lehman Brothers gave that $100,000
25      directly to Ken Jowdy.
0348
1       Q       Let's break it down, so the 2.5 million dollars
2       that went to Baja Ventures, where did that money come from?
3       A       From myself, from Jozef Stumpel and from Jere
```

Page 24

Kenner 04 29 11

```
 4  Lehtinen.
 5      Q     Was that a loan or an equity investment?
 6      A     It was an equity investment in the property.
 7      Q     What did you say to Mr. Lehtinen and Mr. Stumpel
 8  about their equity investment in the property at that time?
 9      A     I don't recall.
10      Q     Is there any documents that would have any
11  information such as an e-mail to Mr. Stumpel and Mr.
12  Lehtinen about what you said their investment was for?
13      A     I don't believe so.
14      Q     Did you tell Mr. Lehtinen or Mr. Stumpel what
15  their investor proceeds would be used for?
16      A     I don't recall.
17      Q     Did you tell Mr. Lehtinen or Mr. Stumpel -- let's
18  back up.  Why would someone make an investment if you didn't
19  explain to them what the investment was?
20            MR. STOLPER:   Objection.  The same objection,
21  Chris.
22      Q     You don't recall having a conversation with Mr.
23  Lehtinen and Mr. Stumpel about what their money would be
24  used for.  Is that correct?
25      A     I believe over that eighteen month period of time
0349
 1  there were a myriad of conversations and our collective
 2  decision to put funds up for the Cabo San Lucas site, I
 3  would believe as I sit here today that we all understood
 4  they were deposit funds for the ten percent contribution
 5  that Lehman Brothers required us to put up to purchase the
 6  land and I don't think there's been any question that the
 7  money ended up in the seller's hands.
 8      Q     Did you tell Mr. Stumpel and Mr. Lehtinen that we
 9  need your investment proceeds, approximately 2.4 million
10  dollars to be used as the deposit for Lehman Brothers?
11      A     I don't recall specifically.
12      Q     Do you recall generally?
13      A     As I sit here today, I believe that any of the
14  funds we transferred to Ken Jowdy's control we all
15  understood they were for the deposit requirement to the
16  seller as our commitment to bring Lehman Brothers in for the
17  rest of the acquisition and phase one development loan of
18  $125 million.
19      Q     Sitting here today you just don't recall having
20  any conversations with Mr. Stumpel or Mr. Lehtinen about
21  just that, that they were for deposits for the Lehman loan?
22      A     I don't remember specifically a conversation.
23            MR. STOLPER:   Hold on a second, Chris.
24            (Witness/attorney consulting.)
25      Q     The other 2.5 million dollars that went to Ken
0350
 1  Jowdy, did that money come from your clients?
 2      A     It came from myself and my friends and some of my
 3  clients.
 4      Q     So not only did you invest $100,000 with Mr.
 5  Stumpel and Mr. Lehtinen, you then invested additional funds
 6  in the Diamante Cabo San Lucas project?
 7      A     They were loans to Ken Jowdy that both he had
 8  assured us he was going to pay back at the closing in the
 9  spring of '06 but also Masood Bhati from Lehman Brothers
10  assured us he was going to pay us back for those funds.
11            BY MR. SMITH:
12      Q     I'm a little bit confused.  I thought you said
13  there was a seven million dollar equity investment and then
14  in addition to that there were loans.  Is that part right?
```

Page 25

Kenner 04 29 11

```
15        A      No, it's almost correct.  The seven million
16  dollars is what is listed as equity contributions on the
17  operating agreement and all these operating agreements were
18  constructed by Bill Nagim, Larry Markowitz and the Lehman
19  Brothers attorneys to satisfy whatever Lehman needed to
20  represent in order to give us the development loan.  The two
21  and a half million dollars that came out of the Lehtinen,
22  Stumpel, Kenner LLC went to the --
23        MR. STOLPER:   which is called Baja Ventures LLC.
24        THE WITNESS:   Baja Ventures 2006.
25        A      -- went to the seller as a deposit.  The two
0351
1  million dollars that is in CSL Properties 2006 also went to
2  the seller.  The two and a half million dollars that Masood
3  Bhati and Ken Jowdy constructed to list as his capital
4  contribution did not come from Ken Jowdy.  They were loans
5  that we had made to Ken Jowdy throughout 2005 and early
6  2006.
7        Q      Let me just interrupt you.  Is that what you were
8  just referring to the loans that were made to Ken Jowdy as
9  part of that capital contribution, was that the 2.5 that was
10  contributed by KAJ Holdings?
11        A      Yes.
12        Q      So you got seven million dollars listed on the
13  operating agreement.  Is that operating agreement -- did it
14  accurately reflect the financing?
15        A      No, the accurate depiction of the funds are what
16  I just described but Masood Bhati, Bill Nagim and Ken Jowdy,
17  Masood being the gentleman from Lehman Brothers, told me
18  that Ken Jowdy is the managing partner, had to represent a
19  significant cash contribution and because they had assured
20  us they were paying those loans back to my clients and I at
21  the closing it was just what I was told Lehman Brothers
22  required in order to create the financing.
23        Q      You understood that to be a misrepresentation to
24  Lehman Brothers so financing could close?
25        A      At the time I'm not sure I thought of it as a
0352
1  misrepresentation, it's what was represented to me by the
2  gentlemen from Lehman Brothers.
3        Q      Let me make sure I understand.  You got 2.5
4  million dollars from Baja Ventures LLC, a deposit.
5        A      Yes.
6        Q      It's your understanding that gives you an equity
7  stake.
8        A      Yes, I believe.
9        Q      Then there's the two million dollar contribution
10  from CSL Properties 2006 also for the deposit.
11        A      Yes.
12        Q      That's an equity contribution.
13        A      Yes, that's what I believe.
14        Q      Then there's the 2.5 million dollar contribution
15  from KAJ Holdings.  Right?
16        A      That's what is listed on the operating agreement.
17        Q      And that's an equity contribution.
18        A      That's what it's listed as, correct.
19        Q      And your understanding was that that $2.5 million
20  was in fact loans that you and others made to Ken Jowdy.
21        A      It is in fact made up of loans that we gave to
22  Ken Jowdy.
23        Q      The entire amount?
24        A      Yes.
25        Q      And your understanding is it was going to be
```

Page 26

TR-SEC00000288

Kenner 04 29 11

0353
1   repaid at closing.
2        A      That's correct.
3        Q      Who participated in those loans?
4        A      Basically the same group of individuals that are
5   also equity members of the two LLC's.
6        Q      And that would be?
7               MR. STOLPER:   The LLC's.
8        A      The LLC's.
9               MR. STOLPER:   Tell him which LLC's.
10       A      The money originated from my investment group out
11  of Hawaii.  We had lent the money to Ken Jowdy on that short
12  term.  My friends and I then lent the money to Ken Jowdy
13  were basically the same group of individuals who had
14  invested at Diamante Del Mar and were also basically the
15  same group of investors that invested at Cabo San Lucas.
16              MR. STOLPER:   What are the names of the two
17  LLC's that lent Jowdy the money?
18              THE WITNESS:   The two LLC's that transferred the
19  money to Jowdy were Little Isle Four and Ula, U-L-A, Makika,
20  M-A-K-I-K-A.
21       Q      That money was transferred to Jowdy personally?
22       A      Yes.
23       Q      And the total amount from the two LLC's was 2.5
24  million?
25       A      No, we transferred him over an eighteen month
0354
1   period of time approximately seven and a half million
2   dollars and he paid us back approximately two million
3   dollars, so there was an outstanding balance of
4   approximately five and a half million and those transfers
5   are all listed out in our original Arizona complaint we
6   filed against Jowdy for non-repayment of the loans and the
7   entire 5.5 was supposed to be paid back to Ula Makika and
8   Little Isle Four at the close of the Cabo San Lucas project.
9        Q      Your understanding was that Jowdy of that 5.5
10  balance used 2.5 that he put into KAJ Holding.
11       A      Yes.
12       Q      And that was used as part of the financing for
13  the deposit?
14       A      That's correct.
15       Q      What happened to the other three million dollars
16  that the two LLC's lent to Jowdy?
17       A      It was also used for contributions to the Cabo
18  San Lucas closing and some related ongoing expenses related
19  to Diamante Del Mar during that period of time.
20              MR. STOLPER:   You said to Justin, he asked you
21  if you sent the money to Jowdy personally and you said yes.
22              THE WITNESS:   Let me clarify that, that's a good
23  point.
24       A      The loans that we made were to Ken Jowdy
25  personally but the transfers which are outlined in that
0355
1   Arizona complaint went to a series of different Ken Jowdy
2   controlled entities such as Diamante Del Mar, Baja
3   Development Corporation, LOR Management, Propiedada DDM, but
4   it's all laid out in the original Arizona complaint which I
5   believe I forwarded to you guys.
6        Q      I assume you've produced all the documents that
7   exist to substantiate the monetary transfers.
8        A      Yes.
9               BY MR. CASTANO:
10       Q      Did you produce all the loan agreements to KAJ
                        Page 27

Kenner 04 29 11

11    Holdings?
12         A      There is no loan agreement to KAJ Holdings, there
13    is simply a revolving line of credit agreement that we made
14    with Ken Jowdy and I did turn that over.
15         Q      When was that line of credit established?
16         A      In mid 2004 he began to borrow smaller amounts of
17    money from us and it was memorialized in and around December
18    2004 which was near the end of the potential Querencia
19    acquisition.
20         Q      These loans that were made to KAJ Holdings, did
21    they come from these Hawaiian properties directly or did
22    they also come from your clients directly, meaning there was
23    no middle man.  The loan went right from the client directly
24    to KAJ Holdings or one of the affiliates?
25         A      Nothing ever went to KAJ Holdings, that was just

0356
1     an LLC the Lehman Brothers set up, had Ken Jowdy set up at
2     closing.  The loans all came from either Little Isle Four or
3     Ula Makika and they went directly to Ken Jowdy controlled
4     entities or there were a few that went to accounts where he
5     owed money and asked that the funds he was borrowing go
6     directly to his obligations.
7             In the Arizona case his defense was that they
8     weren't loans, they were investments in his various entities
9     and when that case was dismissed as we discussed yesterday,
10    a month later he testified in deposition in California that
11    they weren't investments, they were loans.  So it was very
12    comfortable for him to suggest one thing in Arizona and when
13    the case dismissed conveniently, categorize them as
14    something else in California which astonished me when I
15    heard it.
16         Q      When did the Diamante Cabo San Lucas deal close?
17         A      I believe it was in April 2006.
18         Q      Did you have any positions at Diamante Cabo San
19    Lucas?
20         A      I had the same position I had at Diamante Del Mar
21    which was a sales manager although there was no specific
22    title or job description.
23         Q      In terms of its relationship to Diamante Cabo San
24    Lucas, what were the duties and responsibilities of a sales
25    manager?

0357
1             A      I helped put together the group of individuals in
2     Cabo San Lucas and around the United States that were going
3     to help market and promote our new development.  I held
4     weekly sales meetings, I generated leads for the real estate
5     with my team of individual, when Lehman Brothers or
6     specifically Masood Bhati or Lois Kagan were in Cabo, I was
7     in Cabo San Lucas to meet with them and tell them about our
8     marketing prospects.
9          Q      Did you ever have any conversations with Masood
10    Bhati concerning Ken Jowdy's cash investments in Diamante
11    Cabo San Lucas?
12         A      Maybe I'm not sure in what context.
13         Q      Meaning did you ever -- it's a very broad
14    question.  Did you have any conversations with Masood Bhati
15    about Ken Jowdy's cash contribution to Diamante Cabo San
16    Lucas?
17         A      Yes.
18         Q      What did you say to Mr. Masood Bhati?
19         A      There were multiple conversations with Masood
20    about where the money came from for Ken's position.  He was
21    very aware that there was five and a half million dollars

Page 28

TR-SEC00000290

Kenner 04 29 11

22    that Ken Jowdy owed back to our partnership and he assured
23    me that at the closing they would be able to collateralize
24    Jowdy's equity position for the repayment of those funds.
25    There was never any question to Masood Bhati whether or not
0358
1     Ken Jowdy actually owned those funds or whether or not they
2     were loans from us.
3         Q    Do you know if Mr. Bhati informed Lehman Brothers
4     that the funds that Ken Jowdy was putting up through KAJ
5     Holdings was from other sources?
6         A    I never sat in a Lehman Brothers meeting.
7         Q    The question is --
8         A    Where I heard that, no.
9         Q    You never heard that.
10        A    I've never sat in a meeting at Lehman Brothers
11    where Masood Bhati told somebody that was Ken's money or it
12    was not Ken's money.
13        Q    It didn't necessarily have to be the Lehman
14    Brothers meeting.  To your knowledge have you ever heard or
15    participated in a conversation in which Masood Bhati
16    informed or said he informed anyone at Lehman Brothers that
17    KAJ Holdings and Ken Jowdy's cash contribution in KAJ
18    Holdings came from other sources and not Ken Jowdy?
19        A    I don't believe I ever heard Masood misrepresent
20    that to anybody else at Lehman Brothers.
21        Q    How about to anyone else?
22        A    Not that I recall.
23        Q    Did you understand the question?
24        A    I think I did.
25        Q    Let's ask it again.  Do you know if Masood Bhati
0359
1     ever informed anyone be it at Lehman Brothers or outside
2     that Ken Jowdy did not in fact make the cash contributions
3     to KAJ Holdings for the deposit in Diamante Cabo San Lucas?
4         A    The only conversations I participated in that I'm
5     aware of would have taken place regarding that money with
6     Bill Nagim, Ken Jowdy, Masood Bhati and myself.
7         Q    Those were the only conversations?
8         A    Those were the only conversations.
9         Q    Did you ever tell any of your clients that Mr.
10    Jowdy in fact was not the person responsible for the cash
11    contribution to KAJ Holdings for purposes of the deposit
12    made at Lehman Brothers?
13        A    Absolutely.
14        Q    You informed him that?
15        A    Yes.
16        Q    Did you inform your clients in words or substance
17    that for purposes of acquiring the loan that KAJ Holdings
18    would in essence represent to Lehman Brothers that Ken Jowdy
19    was in fact the person who contributed the cash
20    contributions to KAJ Holdings?
21        A    They were all aware of the situation in its
22    entirety.
23             (Witness/attorney consulting)
24        Q    Let me clear up one point that Michael suggests.
25    When we lent the money to Ken Jowdy over that period of
0360
1     time, none of us including myself thought or were aware that
2     Masood Bhati was going to require that Ken Jowdy represent
3     that two and a half million dollars as his personal equity
4     contribution.  We were contributing the money because that's
5     what we believed Lehman Brothers needed as part of the
6     required deposit.  It was only during the creation of the
                              Page 29

TR-SEC00000291

Kenner 04 29 11

7  documents for the purpose of closing that Masood Bhati and
8  Bill Nagim and Ken Jowdy constructed Jowdy's capital
9  contribution position but to myself and partners who loaned
10  him the money, it didn't concern us from our perspective
11  because we just expected to get repaid at the closing of the
12  deal.
13          BY MR. SMITH:
14    Q    What's Little Island Four?
15    A    It's a Delaware LLC.
16    Q    What's your relationship to it?
17    A    I have been the managing member of Little Isle
18  Four.
19          BY MR. CASTANO:
20    Q    Before we move on, were you in fact in all of
21  these entities we discussed reimbursed at closing in any
22  way?
23    A    We were not.
24    Q    When was closing?
25    A    The closing was in April 2006.  In and around

0361

1  that time because it's part of the question you asked, in or
2  around that time Ken Jowdy did make a flurry of smaller
3  repayments totaling approximately $200,000 but those were
4  his last repayment amounts he made just prior to closing.
5    Q    When was that?
6    A    Leading up to that April 2006, probably in the
7  six to eight weeks before the closing.
8    Q    You say started making repayments prior to
9  closing.
10    A    Throughout the term of the loan Ken Jowdy had
11  been making repayments to us.
12    Q    Term of the loan meaning it closed on April 2006.
13    A    I'm sorry, the loan we made to Mr. Jowdy, during
14  the eighteen months approximately that the money was
15  outstanding he was making repayments to us throughout that
16  period which was pursuant to the arrangement we had and the
17  balance was then supposed to be due at closing by
18  collateralizing his equity position.
19          BY MR. SMITH:
20    Q    Now I'm confused.  I thought you had made the
21  contributions, the loans to Ken Jowdy for the purpose of the
22  deposit.
23    A    The loans were made to Ken Jowdy for several
24  purposes.  They were all related to the furthering of the
25  Mexican effort in general, some of the funds were used for

0362

1  the Diamante Del Mar project to sustain its progress at the
2  time albeit slow and the balance of the funds were used by
3  Ken Jowdy to further his deposits and commitments to the
4  seller in Cabo San Lucas.
5    Q    So I understand, the purpose of the loans it
6  sounds twofold, some of the money was to be used for the
7  Diamante Del Mar project and some of it was to be used as a
8  deposit for the seller of the Cabo San Lucas project.
9    A    Deposit and expenses related to the ultimate
10  closing.  Lehman Brothers I believe required Jowdy and Nagim
11  to show an additional approximate three million dollars
12  above the capital contribution numbers which equaled
13  approximately a ten percent deposit on the ultimate or
14  eleven or twelve percent deposit on the ultimate loan they
15  gave us for the property.  So there was about seven million
16  dollars in registered listed capital contributions but I
17  believe on the closing statement Lehman Brothers represents

Page 30

TR-SEC00000292

Kenner 04 29 11

18  contributions of approximately ten and a half million
19  dollars that went to the project through expenses and
20  pre-closing development costs.
21        Q       Let me go back for a minute to the two LLC's.
22  Little Island Four, you mentioned you're the managing
23  member.  When was Little Island Four established?
24        A       In approximately 2002.
25        Q       By whom?  Did you set it up?

0363
1         A       Yes, I set it up.
2         Q       For what purpose?
3         A       It was the original entity, myself and a couple
4   individuals were using to acquire land in Hawaii.
5         Q       Did you have control of Little Island Four?
6         A       Yes.
7         Q       Did you make all decisions with regard to
8   disbursement of funds?
9         A       I made the final decision.
10        Q       When you say the final decision, was there some
11  process that led up to a decision being made with regards to
12  disbursement of funds?
13        A       I had partners that I would discuss whatever
14  activity we were doing through Little Isle Four on a daily
15  basis.
16        Q       Ultimately you had decision making authority?
17        A       Yes.
18        Q       Who were the partners?
19        A       The original partners were Joe Juno, Owen Nolan
20  and John Kaiser.
21        Q       Were you a partner?
22        A       Yes.
23        Q       Any other partners initially?
24        A       Originally no.
25        Q       When did it change?

0364
1         A       It slowly migrated into a larger group of
2   partners as Juno and Nolan and Kristine Myric and I talked
3   about acquiring the first parcel of land in Hawaii.
4         Q       The people who became partners were interested in
5   making investment in the Hawaii land deals you were
6   pursuing?
7         A       Yes.
8         Q       At what point did Little Island Four contemplate
9   investing in the Cabo San Lucas project?
10        A       We never invested in the Cabo San Lucas project
11  but it was approximately 2004 we began to lend money to Ken
12  Jowdy for the purposes we discussed.
13        Q       When I say investment, I don't necessarily mean
14  an equity investment but there were financial contributions
15  made for the purpose of furthering the Cabo San Lucas
16  project.  Is that fair to say?
17        A       And sustain the Diamante Del Mar project.
18        Q       When was that decided?
19        A       In the middle of 2004.
20        BY MR. CASTANO:
21        Q       This is a broad question.  Your partners, were
22  they partners or were they equity investors?
23        MR. STOLPER:     It sounds like a legal conclusion.
24        MR. CASTANO:     I don't know.
25        Q       Did you set up a partnership for Little Island

0365
1   Four or did you have people invest in Little Isle Four?
2         A       I'm not sure I understand the difference but if I

Page 31

TR-SEC00000293

Kenner 04 29 11

3  can just suggest there was an LLC that we set up to take the
4  title to property and each of the contributors of capital
5  were partners of the LLC.
6      Q    So they became partners of the LLC.
7      A    As long as I'm using the proper term.
8          MR. STOLPER:  Or members, is that a more
9  familiar term to you?
10         THE WITNESS:  Members, partners, personally I
11  would use those words interchangeably.
12     Q    What did you tell your partners about a
13  partnership or membership interest in Little Island Four at
14  the time it became partners or members?
15     A    The first two clients of mine that became
16  partners were Joe Juno and Owen Nolan and they actually had
17  asked me if they could invest with me in Hawaii because
18  originally John Kaiser and I were just going to buy the
19  Hawaiian land ourselves and as we talked about yesterday,
20  Juno and Nolan were two guys I spoke to on a daily basis for
21  a ten-year -- Juno I had known for fifteen years at that
22  point.  So they asked me when I was in Hawaii looking for a
23  couple years if I ever found something over there, could
24  they be involved, could we buy it together.
25     Q    The question is what did you say to them?
0366
1      A    I said sure.
2      Q    Did they find the property and then approach you,
3  "hey, we found this property, can you go ahead and do it" or
4  did you find the property knowing full well that you had
5  conversations with them in the past about their interest in
6  purchasing Hawaiian property and then you said to them "hey,
7  I found something," whatever it is that you said to them.
8      A    I understand.  John Kaiser had found the property
9  in Hawaii and I had been going to Hawaii for about three
10  years doing my work with the NFL during the Pro Bowl, so I
11  would typically take time to go look for properties over
12  there.  I was interested in it myself.  I met John Kaiser in
13  and around the time that he found the Hawaiian land through
14  a mutual acquaintance of ours and at that time when I went
15  back over to go look at that land on the big island for the
16  first time both Juno and Nolan were aware I was going back
17  and I thought perhaps I had found something I was interested
18  in.
19     Q    What did you say to them about the property?
20     A    Prior to going over I said an individual I met
21  through an acquaintance of mine have found a piece of land
22  that is available that was being sold by one of the Hawaiian
23  sugar cane companies and the land sounded beautiful and I
24  was going over to take a look at it and during the trip I
25  recall sitting on the property and talking to both Juno and
0367
1  Nolan about how beautiful the land was and what a great
2  opportunity I felt like had landed in our lap and following
3  that again on very daily conversations I talked about the
4  process of putting the land under contract and the initial
5  acquisition of that first small parcel of land.
6      Q    And in terms of their membership or partnership
7  interest in Little Island Four, did there come that they
8  made a financial contribution to the partnership or
9  membership?
10     A    Yes.
11     Q    What, if anything, did you tell them their
12  financial contribution to the partnership or membership
13  would be used for?

Page 32

TR-SEC00000294

Kenner 04 29 11

```
14        A        Generally speaking they were told and were aware
15   that we had a $720,000 acquisition and their funds would be
16   used for the land acquisition and any related legal
17   expenses, closing expenses, real estate expenses, et cetera.
18        Q        Was that prior to the time they made their cash
19   contribution to the membership or partnership?
20        A        Was what prior, I'm sorry?
21        Q        What you just testified as to, the monies would
22   be used for the land acquisition and various legal and title
23   matters.
24        A        I don't recall the sequence of events but as very
25   close friends which Juno, Nolan and myself were at the time
0368
1    we collectively bought a small parcel of land in Hawaii and
2    I then ultimately went through and created Little Isle Four
3    for the purpose of holding title and being the ownership
4    entity that the four of us were ultimately originally
5    partners in.
6         Q        And was Little Island Four the property that was
7    acquired just a property investment meaning it was going to
8    be a vacant piece of land that might increase in value or
9    were you going to do something with the land?
10        A        We bought it as raw land, it was 258 acres and we
11   were going to sub-divide the land over the first year to two
12   of ownership and our ultimate goal was to either sell the
13   broken up parcels and/or build some homes on the property
14   and sell them.
15        Q        And that parcel it up and build homes, did you
16   have conversations about doing those things prior to any
17   partners or memberships making a financial contribution to
18   the partnership or membership?
19        A        I'm sure we did.
20        Q        Do you recall what you might have said to them,
21   any of your partners or members?
22        A        I think I described it as I just said and those
23   were conversations we would have on a daily basis.  Those
24   two gentlemen were very aware of what we as a small group
25   wanted to do with the land.  There was never any
0369
1    misunderstanding that we were just buying raw land and going
2    to sit on it.  We tried from day one to move the development
3    process along.
4         Q        And the first happened in 2002 or so?
5         A        I believe that was in 2002.
6         Q        Did there come a time when other partners or
7    members joined?
8         A        Yes.
9         Q        How many partners or members are part of Little
10   Island Four approximately?
11        A        Fifteen to twenty presently.
12        MR. CASTANO:    It's 12:00, do you want to take a
13   30-minute lunch break?
14        MR. STOLPER:    Do you want to talk about
15   scheduling?
16        MR. CASTANO:    Yes.  It's 12:05, why don't we
17   come back at 12:45 and perhaps let's come back at 12:45
18   sharp.  We're off the record at 12:05.
19        (Whereupon, a luncheon recess was taken.)
20        MR. CASTANO:    We're back on the record at 12:53
21   p.m.  Mr. Kenner, while we were off the record were there
22   any substantive conversations between the Commission staff
23   and yourself?
24        THE WITNESS:    There were not.
```

Page 33

TR-SEC00000295

Kenner 04 29 11

```
25      Q       Mr. Kenner, do you wish to add anything to the
0370
1   record?
2       A       I wanted to clarify that Little Isle is the name
3   and we sometimes referred to it as Little Island, just for
4   clarity.
5       Q       It's Little Isle Four?
6       A       Little Isle Four.
7       Q       Is there a Little Isle One, Two and Three?
8       A       There are not.
9       Q       Is there a Little Isle Five, Six and Seven?
10      A       There is not.
11      Q       Why was it called Little Isle Four?
12      A       Because I used to like to watch Bobbie Orr as a
13  kid, I liked hockey.
14      Q       And Bobbie Orr's number was four?
15      A       That's correct.
16      Q       Where was Little Isle Four incorporated, if
17  anywhere?
18      A       It's registered in Delaware.
19      Q       When you say registered in Delaware, what do you
20  mean?
21      A       To the best of my understanding it's a Delaware
22  LLC and I'm not sure much beyond that.
23      Q       Between 2002 and 2005 did it have a principal
24  place of business?
25      A       Not that I'm aware of.
0371
1       Q       Did it have any offices?
2       A       It did not.
3       Q       And I know we touched briefly before we went on
4   break, were you the managing member of Little Isle Four?
5       A       Yes, I was.
6       Q       Were there any employees of Little Isle Four?
7       A       I don't think so.
8       Q       Were there any consultants of Little Isle Four?
9       A       There were a number of consultants we had for
10  Little Isle Four.
11      Q       Were they entities or individuals?
12      A       I believe they were individuals.
13      Q       Do you know who they were or are?
14      A       Some of them were Tim Gaarn, Tommy Constantine,
15  Robert Ga-Day, those are the three that I recall.
16      Q       Did they receive -- in their capacity as
17  consultants, what were their responsibilities?
18      A       Tim Gaarn and Tommy Constantine were assisting in
19  finding institutional financing for me and Robert Ga-Day was
20  assisting in raising institutional financing as well as
21  doing a golf proposal and analysis for us for the Hawaiian
22  properties.
23      Q       I'm sorry, just so I have it, it's Mr.
24  Constantine, Robert Ga-Day and who is the third individual?
25      A       Tim Gaarn, G-A-A-R-N.
0372
1       Q       Do you recall any other individual consultant?
2       A       Not off the top of my head but there were other
3   people we paid to assist in securing financing.
4       Q       Were there any consultant agreements between
5   Little Isle Four or yourself and these three individuals,
6   Mr. Constantine, Mr. Ga-Day and Mr. Gaarn?
7       A       I believe there were and I believe whatever we
8   had we turned over to you guys.
9       Q       What was Mr. Constantine's compensation, if any,
```

Page 34

TR-SEC00000296

Kenner 04 29 11

10    from Little Isle Four?
11         A      Each of the consulting agreements may have also
12    included one or other Hawaiian entities as well, so it may
13    not be just limited to Little Isle but Mr. Constantine
14    received several million dollars from us over a several year
15    period of time to assist in financing.
16         Q      When you say "from us" -- I'm sorry, I didn't
17    mean to interrupt you.  To assist in financing?
18         A      To assist in financing.
19         Q      When you say "received from us," who are you
20    referring to?
21         A      The Hawaiian partners.
22         Q      When you say Hawaiian partners, what are you
23    referring to?
24         A      I'm referring to any of the entities that myself
25    or others had invested that I was in charge of at the time.
0373
1          Q      How many Hawaiian entities are there and what are
2     their names?
3          A      There are a number of them and this may not be an
4     inclusive list but it would include Little Isle Four, Big
5     Isle Four, Big Isle Ventures with a V, Ka'u Holding Company.
6          MR. SMITH:    Spelled.
7          A      K-A-apostrophe-U, Honu'Apo spelled H-O-N-U-
8     apostrophe-A-P-O.  There is Moa'Ula spelled M-O-A-
9     apostrophe-U-L-A and Ula Makika spelled U-L-A  M-A-K-I-K-A.
10         Q      That to your knowledge right now is the list of
11    Hawaiian investments.
12         A      Related companies.
13         Q      Investment related companies.  Now are these all
14    -- what is your relationship to these entities, if any?
15         A      I established each of the entities and was the
16    original managing partner of each of the entities.
17         Q      Approximately what period of time were these
18    entities established?
19         A      Between 2002 and 2006, and then in 2006 to
20    complete that list when we struck our financing deal with
21    Lehman Brothers in Hawaii, they created an entity called
22    Na'Alehu which is spelled N-A-apostrophe-A-L-E-H-U Ventures
23    2006.
24         Q      You might not know this answer but these
25    entities, are they LLC's, are they incorporated in any
0374
1     state?
2          A      I believe they are all Delaware LLC's.
3          Q      Who established them as Delaware LLC's?
4          A      I did.
5          BY MR. SMITH:
6          Q      Did you have legal counsel?
7          A      Yes, I believe different lawyers established them
8     during that period of time.  I don't recall which lawyer
9     did.
10         Q      Multiple lawyers?
11         A      Yes, there were several different lawyers.
12         Q      Retained by you personally?
13         A      I retained them but retained them on behalf of I
14    believe Little Isle Four at the time to establish all these
15    entities.
16         Q      So Little Isle Four was the first of these to be
17    established?
18         A      That's correct.
19         Q      And then Little Isle Four retained various
20    lawyers to establish each of the other entities whose names
                              Page 35

Kenner 04 29 11

21  you've given us?
22       A       Yes.
23       Q       Do you recall the name of any of the attorneys
24  who did that work?
25       A       Not off the top of my head, it was a long time
0375
1   ago.
2                BY MR. CASTANO:
3        Q       We'll turn a little bit more to this but did
4   there come a time that Lehman Brothers invested in Na'Alehu
5   2006?
6        A       I'm not sure I understand the question.
7        Q       We're going to come to more of this but did there
8   come a time that Lehman Brothers invested in a Hawaiian land
9   deal that you had?
10       A       Yes.
11       Q       When was that?
12       A       That was in the fall of 2006.
13       Q       How much did they invest?
14       A       I believe their original contribution was
15  approximately $26 million and prior to their bankruptcy they
16  released another sixteen million dollars to the managing
17  member of the newly formed joint venture in Alan Warden.
18       Q       Let's turn back and talk a little bit about
19  Little Isle Four.  You mentioned before we went for lunch
20  that there were approximately four or so initial partners or
21  members.  Did there come a time that other people became
22  partners or members in Little Isle Four?
23       A       Yes.
24       Q       When was that approximately?
25       A       Between the initial four partners in 2006.
0376
1        Q       How many approximately partners or investors did
2   Little Isle Four have in total?
3        A       Approximately fifteen.
4        Q       What did you say, if anything, to any of the
5   newer partners or members of Little Isle Four to make them
6   become partners or members?
7        A       Generally speaking I allowed any of the friends
8   or colleagues or clients of mine that asked about Little
9   Isle or more specifically investing in Hawaii with the group
10  of guys who had already started, I told them they could and
11  I didn't have any restriction on who could or could not.
12       Q       Who were these additional people besides the four
13  you mentioned earlier this morning?
14       A       My former assistant, Kristine Myric, Brian
15  Berard, Glenn Murray, Michael Pecker, Matias Nordstrum,
16  Steve Rucchin.
17       Q       Can you spell that for the record.
18       A       R-U-C-C-H-I-N, Dimitri Kristich, Vladimir
19  Tsyplakov.
20       Q       Can you spell that for the record.
21       A       T-S-Y-P-L-A-K-O-V.  I don't recall who else off
22  the top of my head but there were another half dozen or so.
23       Q       These additional partners or members, did they
24  become partners or members or did they make an equity
25  investment in Little Isle Four?
0377
1        A       My best understanding of that concept is that
2   they contributed cash and became partners as we acquired
3   additional parcels of land.
4        Q       When you say your best understanding, what do you
5   mean by that?

Page 36

TR-SEC00000298

Kenner 04 29 11

6      A      It sounded as if you asked the question in two
7  parts, were they equity investors or were they partners and
8  my understanding as I sit here is that they were one and the
9  same, so I didn't necessarily understand the question.
10      Q      While the record speaks for itself, I believe I'm
11  a little confused.  Were the additional individuals equity
12  investors or partners or members in Little Isle Four?
13          MR. STEPANIUK:    I think if I can help clarify, I
14  think with an LLC at some level everybody is a member, there
15  are different classes of membership, so some members have
16  more management authority, so they may be more akin to
17  partners in a traditional partnership.  So they may be one
18  and the same but I think Chris is just trying to find out
19  whether they put money into the entity and acquired some
20  interest in the entity.
21      A      I think to clarify for all of us, my
22  understanding was that they all became members or partners
23  of the LLC when they contributed cash or capital to the
24  Hawaiian group.
25      Q      And there was no other entity affiliated with
0378
1  Little Isle Four that in some way enabled anyone who made a
2  cash contribution to become an equity investor in Little
3  Isle Four.
4      A      Some of the funds were not transferred from the
5  new investors directly to Little Isle Four, some of the
6  funds were transferred to Big Isle Four or Big Isle Five as
7  we were -- as the entities that were taking possession on
8  title of the new development parcels but in my mind and as
9  represented in all the documentation for the investors, the
10  money that went to Big Isle Four was for their membership or
11  partner interest in Little Isle Four.  If their initial
12  contribution went to Big Isle Five, it was more semantics
13  than anything else.  It was for their Little Isle Four
14  partnership.
15      Q      I'm clearly not the sharpest knife in the drawer
16  and George can tell you all about that but I'm very lost
17  right now.  If I am one of these individuals after the first
18  four partners or members, am I acquiring a partnership or
19  membership interest in Little Isle Four or am I acquiring a
20  partnership or membership in another entity?
21      A      All of the individuals who contributed capital to
22  any portion of our Hawaiian projects all became new members
23  of Little Isle Four as they contributed regardless of which
24  account their initial contribution went to.
25      Q      So is it fair to say that an individual, for
0379
1  example Michael Peca, was told you're making an investment
2  in Little Isle Four but that money is going to go to Ka'U
3  Holding instead but you will be a member or partner of
4  Little Isle Four?  That's just an example, I'm certainly not
5  suggesting that happened.
6      A      Each of the subsequent LLC's that were set up
7  after Little Isle Four were set up for the purpose of
8  holding one of the incremental land acquisitions because
9  they were non-contiguous parcels that we were acquiring from
10  the sugar cane company.  I don't think there were even
11  general conversations that as an individual became a new
12  member of Little Isle Four that there were going to be other
13  entities that held the property.  My discussions that I had
14  with the different partners was all about we are all part of
15  this grand picture of land acquisition and future
16  development plans.

Page 37

TR-SEC00000299

Kenner 04 29 11

17            BY MR. SMITH:
18      Q      Before you go, Chris, to answer George's
19  question, did you ever have different classes or treatments
20  of people within Little Isle Four?
21      A      There were not.
22      Q      Just a group of members.
23      A      That's correct.
24            MR. STEPANIUK:   I think there has to be one
25  managing member.
0380
1            THE WITNESS:   Yes, there was one managing member
2  and it was me.
3            MR. STEPANIUK:   Everybody else was just a
4  member.
5            THE WITNESS:   That's correct.
6      Q      You were managing member of every LLC.
7      A      I was.
8      Q      And were documents provided to prospective
9  investors in each of the LLC's prior to their investment?
10      A      Not that I'm aware of.
11      Q      Were any documents provided to the investors at
12  the time of their investment recognizing their investment in
13  the LLC's?
14      A      I'm sure there were not documents given at each
15  investment period at each new investor but on a three to
16  six-month rolling basis as new members came in I would redo
17  the operating agreement for Little Isle Four and give
18  everyone the new agreement with everybody's new allocated
19  interest.
20            MR. STOLPER:   Hang on a second, I want to
21  clarify something.
22            (Witness/attorney consulting.)
23            MR. SMITH:   I've got to run.
24            MR. STOLPER:   He was going to clarify your
25  question.
0381
1      A      Little Isle Four was the sole owner of each of
2  those other entities that were set up and they were really
3  set up just to protect the investors from any liability
4  issues but Little Isle Four owned all those other entities.
5            MR. STEPANIUK:   So the investors -- the people
6  invested were only investing in Little Isle Four.
7      Q      All the other LLC's were wholly owned subs of
8  Little Isle Four?
9      A      They were when they were initially set up,
10  correct.
11      Q      And they were going forward?  Did that change?
12      A      It changed as -- when I spoke with Lehman
13  Brothers first about financing us in 2005 when Masood Bhati
14  had flown to Hawaii to see the property and meet with me and
15  he suggested that I break out my ownership from my clients'
16  ownership from other partners' ownership.  So several other
17  entities then became the subsidiary owners of Little Isle
18  Four and Big Isle Five, Ka'U Holding, et cetera.
19            MR. SMITH:   I'm going to step out, I'll return.
20            BY MR. STEPANIUK:
21      Q      Just on that point, who did people write checks
22  to?  I got confused because I understood your prior answer
23  to suggest that sometimes people put money into one LLC or
24  another LLC but ultimately the asset they wanted to invest
25  in was Little Isle Four.  Now it sounds like maybe it's the
0382
1  other way around where things flowed through Little Isle
                        Page 38

Kenner 04 29 11

```
 2   Four and then Little Isle Four owns different entities that
 3   own land.
 4        A     The second explanation is correct.  The majority
 5   of the money flowed into Little Isle Four.  There were a few
 6   occasions when we had deposits due on incremental parcels
 7   where the deposit money was transferred directly to the
 8   deposit account for the parcel but it was for the purpose of
 9   the Little Isle Four ownership in those subsequent parcels.
10        Q     Just to make sure I understand, say I'm an
11   investor in Big Isle Four, the deposit is due, I write my
12   check directly to Big Isle Four.
13        A     Yes.
14        Q     Does the operating agreement for Little Isle Four
15   then get amended to show me as a member of Little Isle Four?
16        A     That's correct.
17        Q     Does it also show me as a member of Big Isle
18   Four?
19        A     No, it does not.
20        Q     Okay.  I write the check to Big Isle Four but in
21   exchange for my check I get an interest in Little Isle Four.
22        A     That's correct.
23        Q     That was true in every case.
24        A     That's correct.
25        Q     Regardless of who the check is written to.
0383
 1        A     Yes, or wire transfer which was typically the
 2   method we used.
 3              MR. STEPANIUK:    Thanks.
 4              BY MR. CASTANO:
 5        Q     Have all of the operating agreements been
 6   produced?
 7        A     Every operating agreement that I still have was
 8   produced for you.
 9        Q     And did you produce -- did you provide those
10   operating agreements to Little Isle investors?
11        A     Yes.
12        Q     At the time.
13        A     At each time there was a new operating agreement,
14   yes.
15        Q     All of these Hawaiian deals, how many of your
16   clients invested in them approximately?
17        A     Approximately fifteen.
18        Q     It's the same fifteen that we discussed for
19   Little Isle Four?
20        A     Yes.
21        Q     Between 2003 or so and 2006 what were your
22   clients told by you, if anything about what their monies
23   would be used for?
24        A     They were told as partners exactly what we did
25   use the money for and up until the 2006 Lehman closing was
0384
 1   approximately 90 percent land acquisition and ten percent
 2   operations.
 3        Q     90 percent land acquisition where?
 4        A     In Hawaii.
 5        Q     And ten percent?
 6        A     Were operating expenses.
 7        Q     Where were those operating expenses?  Were they
 8   operating expenses related to the Hawaiian property?
 9        A     Yes.
10        Q     At that time did you have an assistant, Ms.
11   Myric?
12        A     Yes.
```

Page 39

TR-SEC00000301

Kenner 04 29 11

13      Q       Was there any other assistants?
14      A       She was an assistant of my business management
15   practice, she was not an assistant related to Hawaii.
16      Q       Besides the consultants, and I believe you've
17   answered this question but I want to make sure, Mr.
18   Constantine, Mr. Ga-Day and Mr. Gaarn, were there any other
19   employees of the Hawaiian entities?
20      A       Yes.
21      Q       Who were they?
22      A       There were several employees, there was Chris
23   Manfredi, there was a woman named Brenda Iokepa-Moses.
24      Q       Can you spell that.
25      A       I think it's I-O-K-E-P-A-dash-M-O-S-E-S.   There
0385
1    was Christopher Hawkins, Nicholas James, Laine Donlan, that
2    may be everybody.
3       Q       Could there be another employee?
4       A       There could be.
5       Q       Before I ask some questions about them, I just
6    want to go back.  You mentioned what the monies would be
7    used for with Little Isle Four.  What else, if anything, did
8    you say to any of the Little Isle partners or members about
9    their interest in the Little Isle project before they made
10   an investment?
11      A       I don't know if there was much else.
12      Q       Did you discuss with them and I believe before we
13   went for lunch you might have mentioned perhaps building
14   some developments on the property.  Is it fair to say that
15   perhaps before an individual made an investment in Little
16   Isle Four you had a conversation with him regarding whether
17   projects would be built on the property itself?
18      A       Absolutely.
19      Q       Can you tell me a little about that.
20      A       It was really just a basic conversation we had
21   earlier that we had an opportunity to acquire several
22   parcels of land on the big island.  It was a once in a
23   lifetime opportunity because of the breakup of a 100 year
24   old sugar company and the dissolution of their land holdings
25   and that our plan was to sub-divide the different parcels
0386
1    over time and begin a residential development and then seek
2    resort partners over a period of time and we ended up
3    acquiring approximately 6,000 acres of land on the big
4    island with about two miles of Hawaiian beach frontage and
5    at the time of the Lehman closing in the fall of 2006 the
6    land was appraised by KPMG for approximately $105 million.
7       Q       Before the closing were any projects ever built
8    on any land?
9       A       They were not.  We spent -- to address that we
10   spent about four years in the planning department with the
11   planning director, Chris Hewen and the locals trying to push
12   together the re-subdivision plan which it is still in the
13   Planning Department even after the Lehman closing.  It's a
14   very long arduous process.
15      Q       When did that process begin?
16      A       It began immediately following the acquisition of
17   the very first parcel which was the 258 acre parcel.
18      Q       What year was that?
19      A       I believe it was early -- excuse me, in and
20   around 2003 is the first purchase.
21      Q       At that point did the process begin of I guess
22   working with the local governments in terms of the parceling
23   of land?  At that time did that process begin?
                        Page 40

TR-SEC00000302

Kenner 04 29 11

24      A      Yes, it did.
25      Q      And at that time were there, I'm using my word,
0387
1   delays with that process?
2      A      The process in Hawaii is just a very slow moving
3   process, so I wouldn't characterize it as delays.  The
4   process itself is just very slow.  The planning department
5   also in Hawaii on the big island became overwhelmed with the
6   70,000 acres that were sold by the sugar cane company and
7   all of the collected proposals by potential developers to
8   start breaking up and re-subdividing land.
9      Q      Were investors in Little Isle Four informed of
10  the Planning Department's delays or the slow process, not
11  necessarily delays, prior to their making their investments?
12     A      At the time of the investments I don't think we
13  believed anything was slow or being delayed.  Today as we
14  look back we can see how long of a process it is but our
15  understanding is it would be an eighteen to thirty-six month
16  process so that we were still in that window and we were
17  still regularly meeting with our attorneys, our architects,
18  our land planners, Chris Hewen, the government planning
19  director and any of the other locals.
20     Q      Is it fair to say, tell me if it's not fair to
21  say, that all the Hawaiian entities for purposes of deposits
22  made into these entities were treated as one Hawaiian entity
23  or did you separate the various bank accounts?  I guess the
24  question is did you treat the entities differently for
25  purposes of monies that came into the entities?
0388
1      A      If I understand the question correctly, I don't
2   think there was any different treatment between the
3   different bank accounts for any particular reason.
4      Q      Did each one of the entities, approximately eight
5   Hawaiian entities you mentioned, have their own separate
6   bank accounts or was there one bank account for each of the
7   entities?
8      A      I believe we set up a bank account for each
9   entity.
10     Q      Where were these bank accounts set up?
11     A      They were at Northern Trust Bank.
12     Q      Any other banks?
13     A      Not that I recall.
14           MR. STEPANIUK:   So you mean each entity had its
15  own individual bank account.
16           THE WITNESS:   Yes, I believe it did.
17     Q      Did Ula Makika have its own bank account?
18     A      Yes, it did.
19     Q      I want to talk to you a little bit about Ula
20  Makika.  What is Ula Makika?
21     A      Ula Makika was an LLC I set up at the
22  recommendation of one of the attorneys I was speaking with
23  at the time to create just a buffer entity between the
24  investor pool in Little Isle Four and what I attempted -- my
25  best effort was to pay consultants or pay expenses or
0389
1   ultimately when we loaned the money to Ken Jowdy.  So it was
2   really just a buffer LLC that Little Isle Four owned but it
3   was really from a litigation perspective to try and separate
4   my high profile friends from any potential litigation.
5      Q      So Ula Makika is a little bit different than the
6   Hawaiian entities in that it's not an entity, and tell me if
7   I'm wrong, that was used to acquire subdivisions of Hawaiian
8   lands.

Page 41

TR-SEC00000303

Kenner 04 29 11

9      A      That's correct.  It was primarily set up as just
10  a pass through buffer to try to protect all of us.
11      Q      I'm jumping back here, Little Isle Four, was
12  there any type of private placement or offering memorandum
13  given to any investors?
14      A      No, there was not.
15      Q      And were Little Isle investors informed of the
16  consultants, who the consultants were to Little Isle Four?
17      A      Yes, but I'm sure every consultant wasn't
18  announced to every member but in the context of our normal
19  reporting that I would do face to face with my clients and
20  my partners it would be disclosed that we had hired
21  consultants, we were paying consultants to assist in the
22  larger fund raising.
23      Q      How much money was raised from your clients --
24  withdrawn.  How much money did your clients invest in Little
25  Isle Four?  That's excluding the Lehman Brothers investment.
0390
1      A      I think the total was about eight million dollars
2  that we used for land acquisition and related land expenses
3  and approximately another five million dollars that
4  subsequently became loans to Ken Jowdy.
5      Q      So in total you raised -- in total your clients
6  invested approximately $13 million in Little Isle Four?
7      A      There was approximately $13 million invested by
8  all of the partners, not all of them were clients of mine.
9      Q      How much of that $13 million came from your
10  clients?
11      A      I would guess around $11 million.
12      Q      And the other two million dollars came from?
13      A      Other partners that were not my clients.
14      Q      Who were they?
15      A      John Kaiser, Jerry Glatt, I don't recall who else
16  it may have been.  The lion share came from John Kaiser.
17          MR. STOLPER:    Juno?
18      A      Joe Juno who was not my client at that time was
19  also a major contributor.
20          BY MR. STEPANIUK:
21      Q      How did you distinguish between -- let me say
22  that differently.  What was it that made you consider some
23  of these people clients but others not clients?
24      A      Some of them are just my friends.  They weren't
25  all athletes, they weren't clients as part of my normal
0391
1  business management practice.
2      Q      But were some of the clients also your friends
3  and vice versa?
4      A      All of them became because we effectively grew up
5  together.
6      Q      To me it's sort of a blurry between whose a
7  client versus who -- who's just a client versus who's just a
8  friend versus who's both client and friend.
9          MR. STOLPER:    It may be a function of yesterday
10  because he went through it yesterday.  He had to have
11  contracts with these guys and they were paying him
12  quarterly?
13          THE WITNESS:    Yes.
14          MR. STOLPER:    They paid him quarterly for
15  business management services and the various jobs that he
16  had.  So there's a lot of fuzzy lines, that's one the black
17  lines.
18      Q      Clients were people with whom you had a written
19  business management contract with.

Page 42

TR-SEC00000304

Kenner 04 29 11

20      A      Arrangement with but certainly all of them became
21  very close friends.  I described it yesterday, so its an
22  astute observation that these clients when I would travel, I
23  explained to Justin and Chris yesterday, I would stay at
24  their homes.  We would travel and see each other on
25  vacations.  During all star breaks we would go places
0392
1   together, so I really became part of their family and that
2   was effectively my role as a business manager in this very
3   nitch business that I was in.
4          MR. STEPANIUK:    Thanks.
5          BY MR. CASTANO:
6       Q      I want to break this down a little bit.  You
7   raised a total of -- withdrawn.  Thirteen million dollars is
8   invested in Little Isle Four.  That's correct?
9       A      I believe so.
10      Q      And your testimony here today is that five
11  million dollars of that was to be used for the Mexican land
12  deals in some variation as you testified earlier this
13  morning.
14      A      As loans to Ken Jowdy that he used for that
15  purpose.
16      Q      Were all fifteen or so of your clients informed
17  that monies would be used that were going into Little Isle
18  bank accounts to be then used for the Mexican projects?
19      A      Absolutely.
20      Q      Every one of your clients?
21      A      Every one of them.
22          MR. STOLPER:    Can we just clarify something
23  because I think in the question you were asking at the time
24  folks were putting money into Little Isle Four did they know
25  that the money would be used subsequently to loan and I
0393
1   don't know if you knew at the time in 2002, 2003, 2004 when
2   people were putting money into Hawaii, did you know you
3   would do a revolving line of credit with Jowdy in '04?  Just
4   clarify for him the timing of this.
5          THE WITNESS:    Thank you for the clarity.
6       A      At the time that we all became initial members or
7   partners with Little Isle there was no predetermined goal to
8   lend money to Ken Jowdy for that purpose.  I would assume
9   the majority of the funds as I think back were put in and
10  committed to Little Isle Four prior to the middle of 2004.
11  So there was never an intention originally that we were
12  going to be a lending vehicle although when the opportunity
13  came about it appeared to be a very good opportunity for us.
14      Q      when did that opportunity come about?
15      A      We began lending money to Ken Jowdy in the summer
16  of 2004.
17      Q      How did you notify, if at all, your clients that
18  Little Isle monies would be used to lend to Ken Jowdy and
19  the Mexican land deals?
20          MR. STOLPER:    You mean limited to his clients or
21  just to the members of Little Isle Four?
22          MR. CASTANO:    His clients and then we can do the
23  members.  There's a few additional.
24          MR. STOLPER:    I don't know if you just meant to
25  focus on the clients.
0394
1          MR. CASTANO:    I want to focus on his clients for
2   now.
3       A      My clients that were members of Little Isle Four,
4   I spoke to all of them on the phone on a daily or weekly

Page 43

TR-SEC00000305

Kenner 04 29 11

```
 5   basis.
 6        Q       And you informed them that their investor
 7   proceeds would be used as loans to the Mexican land deals.
 8        A       As loans to Ken Jowdy and that he was using it to
 9   sustain the Del Mar development and further the Cabo San
10   Lucas acquisition.
11        Q       And you told each one of your clients that.
12        A       I told all of my clients that were members of
13   Little Isle.
14            MR. STOLPER:    And some have testified to that
15   effect.
16        Q       And others have testified that they weren't
17   informed.  Is that correct?
18            MR. STOLPER:    They were informed?  Is that what
19   you said?
20            MR. CASTANO:    They were not informed.
21        A       I believe Owen Nolan in our arbitration testified
22   that he was not aware of that and that's the only person.
23        Q       Are you aware of any other individuals?
24        A       I am not aware of any other individuals but Mr.
25   Nolan also stated he didn't -- hasn't read a document in the
0395
 1   last twenty years.
 2            MR. STEPANIUK:    Did you notify your clients in
 3   writing that some Little Isle Four money would be loaned to
 4   Ken Jowdy?
 5            THE WITNESS:    I did not.
 6            MR. STEPANIUK:    How did you notify them?
 7            THE WITNESS:    Verbally.
 8        Q       Did you send any e-mails?
 9        A       I don't believe I sent any.
10        Q       Did Ken Jowdy speak to any of your clients to
11   your knowledge about the loans they were receiving from
12   Little Isle Four?
13        A       Not to my knowledge.
14            MR. STEPANIUK:    Just to follow up on my
15   followup, I asked that because in responding about Mr. Nolan
16   you said he hasn't read a document in twenty years, so I can
17   see the relevance of that observation to whether or not he
18   was notified that money would be lent to Jowdy and you
19   didn't send any documents notifying people money would be
20   lent to Jowdy.  What's the connection?
21            THE WITNESS:    I said it a bit tongue in cheek
22   because in our arbitration he testified over and over that
23   in spite of a magnitude of documents that I had always
24   brought to him he never read a single one or reviewed a
25   single one, everything was always done orally between us
0396
 1   even when I would bring the stacks of documents to him.
 2            MR. STEPANIUK:    So feigned ignorance is what his
 3   contention is.
 4        Q       What was the outcome of the arbitration?  What
 5   did the arbitrators award in terms of monetary damages, if
 6   any?
 7        A       They awarded approximately two million dollars to
 8   Owen Nolan.
 9        Q       Were you to pay that?
10        A       I was to pay that.
11        Q       Have you paid it?
12        A       I have not and it's in exchange.  There was an
13   award asking me to pay him his Hawaiian investment that was
14   outstanding and take his equity stake in the Hawaiian
15   project.
```

Page 44

TR-SEC00000306

Kenner 04 29 11

16      Q       Regardless of how it's come out, have you in any
17  way complied with or compensated Owen Nolan pursuant to the
18  arbitration award in that proceeding?
19      A       I have not.
20      Q       Is there any litigation ongoing about that?
21      A       No.
22      Q       I think you might have answered this, I just want
23  to make sure for the record, were there any e-mails
24  concerning Little Isle investor proceeds being used as a
25  loan to Ken Jowdy that you're aware of?
0397
1       A       Not that I'm aware of.
2       Q       And just to complete the record, any facsimiles
3   or any written documents whatsoever that went to your
4   clients concerning Little Isle Four monies being used as a
5   loan to Ken Jowdy?
6       A       I don't believe so.
7       MR. SMITH:   Chris, before you go on, can you for
8   the benefit of both of us because I don't think you've made
9   this clear, for the clients Chris has been asking you about,
10  did you have an e-mail relationship with those clients or
11  how did you communicate with them on a regular basis?
12      THE WITNESS:   I did not have an e-mail
13  relationship with my clients.  I would speak on the phone
14  with all of my clients on a regular basis amassing
15  approximately ten to twelve thousand minutes a month on the
16  phone.
17      Q       You have communicated with your client by e-mail
18  though.  Correct?
19      A       In the last few years after all the litigation
20  began.
21      Q       So are there any e-mails between you and your
22  clients in 2002?
23      A       None that I'm aware of.
24      Q       Just to be clear, is it your testimony that
25  you've never communicated with your clients prior to
0398
1   approximately 2009 via e-mail or you might have communicated
2   with them sporadically by e-mail?
3       A       Sporadically at the most I would communicate by
4   e-mail.
5       Q       How much compensation did Tommy Constantine
6   receive from Little Isle for?
7       A       A couple million dollars.
8       Q       How much approximately?
9       A       Approximately two million dollars.
10      Q       What was that for?
11      A       It was to assist in acquiring large institutional
12  financing to assist in the future acquisition of land and
13  development money.
14      Q       And what large institutional investor, if any,
15  did Tommy Constantine bring to the Hawaiian land deals?
16      A       He brought a dozen or so hard money individuals
17  that discussed the ten million, fifteen million, thirty
18  million dollar potential loans to us and although we didn't
19  close on any of those deals because they didn't seem
20  appropriate for our goals.
21      Q       What large institutionals, you mentioned five or
22  six, which ones were they?
23      A       They were all hard money lenders.
24      Q       What do you mean by hard money lenders?
25      A       As I described yesterday, individuals or groups
0399

TR-SEC00000307

Kenner 04 29 11

1  that would lend us money at high interest rates, expensive
2  terms.
3      Q    They weren't large institutions like I would
4  think of, like a Lehman Brothers?
5      A    No, they were not.
6      Q    What were their names?
7      A    I don't recall the ones he specifically brought
8  to us and only because I dealt with upwards of 20 or 25
9  potential hard money or money lenders.
10     Q    So there were six -- five or six hard money
11 lenders.  Is there any document that would have that
12 information?
13     A    I don't believe I have any of the correspondence
14 as a result of my old hard drive being stolen by my former
15 employee Myric but one of Constantine's lenders consummated
16 a deal with us and that was James Gardina.
17     Q    Spell that.
18     A    G-A-R-D-I-N-A.
19     Q    So there in fact was a hard lender that lent
20 money to Little Isle Four brought to the table by Tommy
21 Constantine.
22     A    That's correct.
23     Q    I think that's a little bit different than you
24 just testified about.  There was in fact one hard lender
25 that Tommy Constantine brought to the table for Little Isle
0400
1  Four.
2      A    That closed financing with us.
3      Q    How much did he -- how much financing did you
4  receive?
5      A    Three and a half million dollars.
6      Q    What were the terms of that?
7      A    I don't recall.  He was paid off at the closing
8  of the Lehman financing a year later, James Gardina was paid
9  off.
10     Q    And what was Tommy Constantine's compensation for
11 bringing James Gardina to the table?
12     A    It was that approximate two million dollars.
13     Q    So he received two million dollars for a three
14 and a half million dollar loan?
15     A    At a 10,000 foot level, yes.
16     Q    What does a 10,000 foot level mean?
17     A    In very simple terms yes, his total compensation
18 over about a two-year period of time accumulated to
19 approximately two million dollars and as a result of his
20 efforts we ended up with a three and a half million dollar
21 loan from James Gardina which allowed us frankly to be
22 successful in the Lehman financing a year later and I'll
23 explain.  The financing that he put together with Gardina
24 allowed us to complete the transaction for our 2,000 acre
25 parcel which each lender we have brought to the table prior
0401
1  to the Gardina closing was not interested in Hawaiian land
2  that didn't have ocean front property and in fact that was
3  one of the key elements of the Lehman Brothers deal with me
4  is that they wanted Hawaiian ocean front land as part of the
5  development deal.
6           The loan that Gardina put together for us through
7  Constantine allowed us to finish and complete the
8  acquisition of that 2,000 acre parcel that had about a
9  million dollars hard money down and we had extended the
10 closing date to the limit and we were about to lose the
11 parcel and the land and the deposit.
Page 46

TR-SEC00000308

Kenner 04 29 11

12    Q    Did Tommy Constantine receive two million dollars
13 in one lump sum or over the course of time?
14    A    It was a payment over the course of time.
15    Q    Was that in under a year?
16    A    I'm sorry?
17    Q    Was the payment made of two million dollars in
18 under a year?
19    A    No.
20    Q    It was over a year?
21    A    I think I said it was approximately an eighteen
22 to twenty-four month period of time.
23    Q    Could it have been more than two million dollars?
24    A    It could have been.
25    Q    Could it have been three million dollars that
0402
1 Tommy Constantine has received in an eighteen month to
2 twenty-four month period?
3    A    I don't recall.  Two million resonates in my
4 head.
5    Q    Did Tommy Constantine receive any other funds?
6    A    I don't believe so.
7    Q    From Little Isle Four or the Hawaiian land deals.
8    A    I don't believe he received any other funds.
9    Q    Did Tommy Constantine in any way give any of that
10 money back to you or any entity you're affiliated with or
11 any family member of yours?
12    A    He did not.
13    Q    Do you know what Tommy Constantine did with the
14 approximately two million dollars he received from Little
15 Isle Four?
16    A    I do not.
17    Q    Do you know the interest rate terms that Mr.
18 Gardina gave you on the three and a half million dollar
19 loan?
20    A    I do not but the documents are all part of those
21 Lehman closing documents.
22    Q    What else did Mr. Constantine do besides bring
23 five or six lenders including Mr. Gardina to the table?
24    A    That's the summary of what he did for us over
25 that period of time.
0403
1    Q    Did he have any duties and responsibilities
2 physically on the land?
3    A    He did not.
4    Q    So his only function as a consultant was to bring
5 financing through some hard lenders to the table.
6    A    That's correct.
7    Q    Myself not being a businessman, it strikes me as
8 odd that you would or Little Isle Four would pay
9 approximately two million dollars, it could be more than
10 that, for a three and a half million dollar loan.  Can you
11 explain to me why that was done.
12    A    Over that eighteen to twenty-four month period of
13 time he wasn't the only consultant that was paid by us to go
14 find development money and he happened to be one of the
15 successor guys that was able to bring hard money to us or
16 loan money.  The three and a half million wasn't what we
17 were seeking with his assistance, we were seeking between
18 fifteen and thirty million dollars to be able to begin
19 building infrastructure on the different development parcels
20 but when we got to the seventh week of an eight week
21 extension on the ocean front parcel known as White Capuna we
22 were desperate to have a loan close and Mr. Constantine was

Page 47

TR-SEC00000309

Kenner_04 29 11

23  able to come through with the loan for us and at that point
24  after the acquisition of White Capuna we spent the next year
25  dealing with Lehman Brothers to close what became the larger

0404

1   joint venture loan when we realized we were going to have a
2   hard time independent of a big institution coming up with
3   enough financing money to finally develop out what our
4   vision was.
5        Q       So the record is clear, Tommy Constantine was
6   provided compensation for just simply recommending hard
7   lenders to Little Isle Four.  He didn't necessarily or
8   Little Isle Four didn't necessarily have to consummate a
9   deal for him to be compensated.
10       A       No, not just Mr. Constantine but to be clear
11  there were probably half a dozen individuals and hard money
12  people that required money up front prior to closing the
13  compensation including but not limited to Lehman Brothers
14  who required deposit money from us prior to attempting to
15  close a loan.
16       Q       So a hard lender would require money just to
17  speak to?
18       A       Yes.
19       Q       And the only hard lender that you can remember
20  the name of for Little Isle Four brought to you by Tommy
21  Constantine is Mr. Gardina.  Is that correct?
22       A       No, there was another gentleman out of Texas that
23  I don't recall his name at the time but he had arranged for
24  a fifteen million dollar loan from a wealthy individual who
25  had at least through the documentation assured us we were in

0405

1   short order to close I would say in heavy contact with him
2   as was Mr. Constantine at the time and it was a fifteen
3   million dollar loan prior to the Gardina loan and the
4   individual passed away just prior to the closing and his
5   estate decided not to continue in that business.
6        Q       You don't remember that individual's name?
7        A       I don't recall it as I sit here.
8        Q       How about Mr. Ga-Day, how much money did he
9   receive for consulting fees?
10       A       I don't recall.
11       Q       More than a million?
12       A       No.
13       Q       Less than a million?
14       A       Yes.
15       Q       More than 500,000?
16       A       No.
17       Q       More than 100,000?
18       A       I'm only guessing but 100,000 might be the
19  number.
20       Q       How many hard lenders, if any, did Mr. Ga-Day
21  bring to Little Isle Four's attention?
22       A       I don't recall.
23       Q       More than five?
24       A       I don't recall but Mr. Ga-Day as I stated earlier
25  was also putting together a feasibility study for golf for

0406

1   the property as well.  He was a PGA professional and a
2   fifteen year golf director in Mexico.
3        Q       Is it possible that Mr. Ga-Day did not bring one
4   hard lender to Little Isle Four?
5        A       No, he certainly brought.
6        Q       His compensation for consulting fees were for
7   both bringing a hard lender to Little Isle Four as well as

Page 48

TR-SEC00000310

Kenner 04 29 11

```
 8  feasibility studies.
 9      A    Yes.
10      Q    How about Mr. Gaarn?
11      A    His job was to work to bring an investor as well.
12      Q    Hard lenders?
13      A    Any investor.
14      Q    And did Mr. Gaarn bring any hard lenders to
15  Little Isle Four's attention?
16      A    Mr. Gaarn brought several hard money lenders but
17  he is solely responsible for the introduction to Lehman
18  Brothers.
19      Q    What was Mr. Gaarn's compensation?
20      A    I don't recall.
21      Q    Was it more than a million?
22      A    No, it was not.
23      Q    More than $500,000?
24      A    No, it was not.
25      Q    More than $100,000?
0407
 1      A    I don't recall but perhaps again in that same
 2  range but all of the compensation would be on the bank
 3  statements that I transferred, that I sent to you guys.
 4      Q    How much did Lehman Brothers lend to Four or
 5  enter into a transaction with may be a better way to say it?
 6      A    I believe I stated earlier that the initial
 7  Lehman closing in the fall of 2006, they brought 26 million
 8  dollars to the table approximately and then released another
 9  approximate sixteen million dollars to Alan Warden who then
10  became the Masood Bhati appointed manager of the Hawaii deal
11  over a two-year period of time.
12      Q    Now Tim Gaarn was solely responsible for bringing
13  Lehman Brothers to Little Isle Four.
14      A    Yes.
15      Q    Did you have any conversations with Masood Bhati
16  about Little Isle Four and Lehman Brothers?
17      A    With Masood Bhati?
18      Q    Yes.
19      A    I had a significant number of conversations with
20  Masood Bhati.
21      Q    How did Tim Gaarn bring Lehman Brothers to the
22  table if you already had a relationship with Masood Bhati at
23  Lehman Brothers?
24          MR. STOLPER:   Clarify the timing.
25      A    It's reversed.  I met Lehman Brothers and Masood
0408
 1  Bhati through Tim Gaarn.
 2      Q    When was that approximately?
 3      A    Perhaps 2004.
 4      Q    Tim Gaarn is the person who introduced you to
 5  Masood Bhati.  Is that correct?
 6      A    To Lehman Brothers.
 7      Q    And to Masood Bhati or not?
 8      A    Masood Bhati was the person that I first met
 9  through the introduction but I don't think Tim arranged
10  Masood Bhati to be the individual, if that makes sense.
11      Q    Just so I understand this, Tim Gaarn received
12  somewhere under $500,000 for introducing Little Isle to
13  Lehman Brothers who makes an initial investment of 26
14  million and a later investment of sixteen million and
15  receives that amount but Tommy Constantine receives at least
16  or approximately two million dollars for a three and a half
17  million dollar loan.  Can you explain why that is the case.
18          MR. STOLPER:   I think he's explained it three
```

Page 49

TR-SEC00000311

Kenner 04 29 11

19  times already.  I don't think the testimony is Tim Gaarn got
20  paid for only delivering Lehman.
21        Q     What else did Tim Gaarn get paid for?
22        A     He brought a number of hard money lenders to me
23  over that period of time as well.
24        Q     Did any of those deals consummate?
25        A     Just the Lehman Brothers deal.
0409
1         Q     So what I'm just trying to understand now and
2   I'll ask it again, that Tim Gaarn receives a much smaller
3   amount than Tommy Constantine.  Can you explain why Tim
4   Gaarn as consultant received less money than Tommy
5   Constantine?
6         A     I cannot.
7         Q     Was there a written consultant agreement with
8   Tommy Constantine and Little Isle Four?
9         A     Yes.
10        Q     Do we have that in our possession?
11        A     Several of them.
12        Q     How about the consulting agreement with Mr.
13  Ga-Day and Mr. Gaarn?
14        A     Yes.
15        Q     To your knowledge do the consulting agreements
16  speak of compensation that Mr. Constantine, Mr. Ga-Day and
17  Mr. Gaarn would receive?
18        A     Yes.
19        Q     Does it say specific numbers or does it say
20  generally what they would receive at a later date?
21        A     I don't recall.
22        Q     Just to be clear -- withdrawn.  I want to shift
23  gears.  There's a lot of areas we still have to cover.
24  We're going to have to do that on a later date but before we
25  go off the record today there are some other areas I want to
0410
1   cover over the remaining half hour or so we have left.
2         MR. CASTANO:    So the record is clear, Justin
3   Smith has returned to the testimony room at 1:56.
4         MR. STEPANIUK:   Do you need a break?
5         THE WITNESS:    Yes.  George, can we go off the
6   record.
7         MR. STEPANIUK:    Absolutely.
8         MR. CASTANO:    We're off the record at 1:56.
9         (Whereupon, a recess was taken.)
10        MR. CASTANO:    We're on the record at 2:05 p.m.
11  Mr. Kenner, while we were off the record were there any
12  substantive conversations between the Commission staff and
13  yourself?
14        THE WITNESS:    No, there were not.
15        Q     Is there something you wish to clarify before we
16  ask further questions?
17        A     Yes, thank you.  During the period of time we
18  were trying to find financing for the Hawaii project, there
19  were a myriad of people that we paid and during that period
20  of time they were typically hard money people who were
21  asking for money up front to go out and find financing and
22  all of the hard money lenders or consultants were paid
23  different amounts based on what I believed and my partners
24  believed they would deliver for us.  In hindsight I want to
25  make sure it's clear for the record that the three and a
0411
1   half million dollars that Constantine ultimately delivered
2   for us allowed us to complete first the transaction for what
3   was appraised as a $36 million piece of land on the ocean

Page 50

TR-SEC00000312

Kenner 04 29 11

```
 4  but subsequent to that the other 4,000 acres that we had
 5  already owned we could not get financing for it without the
 6  completion of the oceanfront parcel which we were in severe
 7  jeopardy of losing.  So although it was a three and a half
 8  million dollar loan, it was the stepping stone and the
 9  catalyst for us to be able to close that ocean parcel which
10  KPMG approved at $36 million and subsequently allowed Lehman
11  Brothers feel comfortable to bring financing to the table a
12  year later for development purpose.
13            MR. STOLPER:   Why couldn't the 4,000 acres be
14  financed before?
15            THE WITNESS:   Every lender institutional or
16  otherwise including the Bank of Hawaii that I dealt with for
17  quite some time were not interested in parcels of land that
18  didn't have access to the ocean and it put us in a tough
19  situation when we almost lost that parcel.
20            MR. STEPANIUK:   I had a followup, I appreciate
21  the clarification.  Did you ever pay money or did Little
22  Isle Four ever pay money to Tommy Constantine for anything
23  other than services he rendered in looking for potential
24  lenders?
25            THE WITNESS:   I don't believe so.
0412
 1      Q     Do you have a current roster of your clients?
 2            MR. SMITH:   Do you have current clients?
 3            THE WITNESS:   I have several current clients,
 4  yes.
 5      Q     Do you have a current roster meaning the names
 6  and addresses of your current clients?
 7      A     Somewhere I would, yes.
 8      Q     How many clients approximately do you have?
 9      A     Ten.
10      Q     Do you know their names?
11      A     Yes.
12      Q     Can you for the record tell us who your current
13  clients are.
14      A     Brian Berard, Jason Woolly, Glen Murray, Greg
15  DeFrees, Larry Lehtinen, Matias Nordstrum, Darryl Sedore,
16  Turner Stevenson, Bill Ranford, Fatali Yakmanev, Dimitri
17  Kristich, Vladimir Tsyplakov, there may be a few more.
18      Q     That sounds like it's a little more than ten.
19      A     Okay.
20            MR. SMITH:   Are those all current or former NHL
21  players?
22            THE WITNESS:   Yes.
23      Q     One last question, Diamante Del Mar and Diamante
24  Cabo San Lucas, to your knowledge have any of your current
25  or former clients received any of their investment back in
0413
 1  those entities?
 2      A     I don't believe so.
 3      Q     As far Little Isle Four and  the Hawaiian deals,
 4  have any of your current clients or former clients received
 5  any of their investment that they made in the Hawaiian land
 6  deals back?
 7      A     Yes.
 8      Q     Who received it back?
 9      A     All of them.
10      Q     All of their investment?
11      A     No, at the closing of the Lehman deal in the fall
12  of 2006 I negotiated with Lehman Brothers to pay us eleven
13  million dollars at the closing, that would be a return of
14  all of the capital we had invested in the land and then
```

Page 51

TR-SEC00000313

Kenner 04 29 11

15  some.  Just prior to the closing which became typical fodder
16  for Lehman Brothers activities with me and others that I
17  come to find later they reneged on the eleven million
18  dollars and closed and gave us seven million dollars at
19  closing and approximately six million of that was
20  distributed out to all of the Hawaiian partners for their
21  investment.
22            The remainder was used to continue to pay ongoing
23  fees we had related to some of our funds.  There was
24  supposed to be an additional four million dollars paid to us
25  over the eighteen months following our closing with Lehman
0414
1   and Masood Bhati told me that was the only way they could
2   structure it but we spent an inordinate amount of time with
3   the lawyers documenting that the additional four million
4   dollars was virtually guaranteed under all scenarios to be
5   paid to us over that eighteen month period of time based on
6   either milestones that Lehman and Masood's partner, Alan
7   Warden, came up with and in the event that when Alan Warden
8   took over the project the milestones that we identified to
9   receive the additional four million dollars for the
10  partnership, if those couldn't be met that they had to do
11  everything in their power to create new milestones based on
12  some new development plan that would guarantee we would get
13  the four million dollars over that eighteen month period of
14  time and from the day that the closing occurred, it became
15  very, very difficult to communicate with Alan Warden and he
16  certainly never paid us any of that money back.  To answer
17  your question, the partners received a distribution of
18  approximately six million dollars at the closing of the
19  Lehman deal in the fall of 2006.
20       Q     What percentage can you characterize that going
21  back to each individual client or member?
22       A     It turned out to be about 45 percent of their
23  initial investment.  The subsequent four million dollars
24  would have brought them to about 60 percent and then again
25  Masood Bhati had assured me that the additional funds that
0415
1   Ken Jowdy owed us back would be paid in short order as well
2   which we would have at that point had they been repaid by
3   Bhati's promise and word and Jowdy's obligation to us, the
4   Hawaiian partners would have had 130 or 140 percent of their
5   funds returned and we still are 50 percent owners of the
6   land in Hawaii with Alan Warden at the helm of the joint
7   venture.
8            MR. STOLPER:   Which is also true for DDM and
9   Cabo.
10       A     Which is also true for Diamante Del Mar and we're
11  still also forty percent owners in the Cabo San Lucas
12  project and that loan obligation is still outstanding with
13  Mr. Jowdy and subject to the Mexican litigation we discussed
14  yesterday.
15            BY MR. SMITH:
16       Q     What is Casa de Caza Corp.?
17       A     That was the home that Ken Jowdy rented for
18  hospitality in Mexico, in Cabo San Lucas when he first went
19  down there.
20       Q     Over what time period did he rent this home?
21       A     It was for approximately three years I believe
22  terminating in 2008 I believe.
23       Q     So roughly 2005 to 2008?
24       A     Yes.
25       Q     Now Casa de Caza Corp. is a corporation.
                              Page 52

TR-SEC00000314

Kenner 04 29 11

0416
1       A       I think that was the corporation that the former
2   owner of the house had.  It wasn't a corporation that any of
3   our partners had anything to do with.  I believe that was
4   the owner of the home he was leasing.
5       Q       The owner of the home had a corporation called
6   Casa de Caza Corp.?
7       A       Yes.
8       Q       And do you have any idea, do you have any
9   knowledge of the nature of the corporation, whether it's a
10  U.S. corporation, where it was located?
11      A       The owner of the house was a gentleman named
12  Jerry Conrad out of Anaheim, California and he was the one
13  renting the home to Ken Jowdy.  Can you say the name again,
14  please.
15      Q       Casa de Caza, it's Casa de Caza, C-A-Z-A, Corp.
16  I don't know what C-A-Z-A means.
17              MR. STOLPER:   It's Anaheim Spanish for house.
18                             (Laughter)
19      A       That was Jerry Conrad's company.
20      Q       And Ken Jowdy arranged to rent it personally in
21  his name, to your knowledge?
22      A       I think he rented it in the name of one of his
23  LLC's, I believe it was TLJ Management.
24      Q       And could you describe in greater detail what the
25  home was used for.

0417
1       A       I think very simply it was the Mexican residence
2   where Jowdy would stay, other employees would stay and we
3   would run hospitality out of that home.
4       Q       What was the address?
5       A       It's in Pedrigal subdivision in Cabo San Lucas.
6       Q       Correct me if I'm wrong, there was a Mexican home
7   that you had.
8       A       It is the same home.  When Jowdy defaulted --
9   ultimately defaulted on his agreement with Jerry Conrad and
10  our partnership relationship had dissolved, I acquired the
11  home from Jerry Conrad because as I described yesterday, all
12  indications from Jowdy, Nagim and Masood Bhati were that we
13  were working towards a global resolution of all the issues
14  we had with Ken Jowdy and I was going to take over the
15  interim period of managing the project and take over the
16  administrative role, so I acquired the house and was using
17  it for the same purpose.
18      Q       When did you acquire the house?
19      A       I think I said yesterday in about 2008.
20      Q       I remember we did have testimony on this
21  yesterday, I forgot the time period you had the home.  From
22  2008 until?
23      A       That foreclosure debacle we discussed yesterday.
24      Q       And I can't remember the time.
25              MR. STOLPER:   It's still going on.

0418
1       Q       You walked away from it a year ago?
2       A       About a year ago because of safety issues.
3       Q       Okay, and the house came into your possession
4   personally?
5       A       It was acquire by me as the beneficial owner of
6   the Fedicamiso Trust which was the vehicle to acquire the
7   home.
8       Q       You're going to have to break that down a little
9   bit.  The home was originally owned by this corporation
10  called Casa de Caza.

Page 53

TR-SEC00000315

Kenner 04 29 11

```
11      A       Which is Jerry Conrad's.
12      Q       Which is controlled by Jerry Conrad.
13      A       Yes.
14      Q       And it then was transferred into the control of
15 the Fedicamiso Trust.
16      A       I'll try to make it clear.
17      Q       Why don't you break it down.
18      A       Jerry Conrad had been the long time owner of this
19 home and there was a gentleman Ken Jowdy met somehow down in
20 Mexico and he was looking for a home in Cabo San Lucas.
21 Jowdy perhaps on behalf of all of the Cabo San Lucas
22 activity leased the home from Jerry Conrad for a number of
23 years, three years, four years perhaps.  When our
24 relationship soured between Jowdy and I and we were working
25 towards a resolution which appeared as if I were going to
0419
1 take over the management of Diamante Cabo San Lucas and
2 represent the investors and deal with Lehman Brothers, Jowdy
3 was effectively leaving Cabo San Lucas.  So I liked the
4 home, thought it was a good hospitality home, so I acquired
5 it from Jerry Conrad in what I felt was a very good deal at
6 the time, that he was willing to honor.  In acquired the
7 home from Jerry Conrad, I used it for hospitality as we
8 discussed yesterday to bring down hotel groups, potential
9 investors, other banking partners and then it fell into the
10 status it's in now when I walked away.
11      Q       I understand that functionally you acquired it
12 and now I'd like to understand sort of legally how it worked
13 between entities because as you said, it wasn't Jerry
14 Conrad's home in his own name, it was Jerry Conrad's home
15 that he owned through a corporation that he controlled.
16      A       Yes, I'm sorry.
17      Q       So if you could clarify how the home transferred.
18      A       It really is just a simple seller/buyer.  Jerry
19 Conrad's corporation sold it, I bought it.
20      Q       You personally?
21      A       I personally bought it, yes.
22      Q       So Phil Kenner, you bought the home.
23      A       From Jerry Conrad's corporation.
24      Q       And the home was in your name.
25      A       It's in Mexico and unless you're a Mexican
0420
1 everything is owned under what's called a Fedicamiso trust
2 that I mentioned yesterday and then as Americans, we can be
3 the beneficial owner of that trust but there's no
4 distinguishable difference.  It's their version of fee
5 simple as we've been discussing the last two days.
6               MR. STOLPER:   Is there a trust with your name on
7 it?
8               THE WITNESS:   I believe one of the Mexican banks
9 holds -- is the trustee and I believe there's documents that
10 would show me as the beneficial owner of the trust.
11      Q       So in order to buy the home from Jerry Conrad,
12 Jerry Conrad's corporation -- did you pay for it?
13      A       Yes.
14      Q       How much?
15      A       I believe I said about 1.5 million dollars.
16      Q       That was payable to his corporation?
17      A       I don't recall.
18      Q       And the deed is held in the Fedicamiso trust.
19      A       That's correct.
20      Q       Or the benefit of?
21      A       Yes, much the same I believe all the Diamante
```

Page 54

Kenner 04 29 11

```
22  properties are as well.
23      Q    Where did you get the $1.5 million for the house?
24      A    As I said yesterday, they were proceeds from the
25  sale of a construction renovation home that Jim Kaiser and I
0421
 1  had done in California.
 2      Q    Constantine Management Group Ltd., that sounds
 3  like an entity having to do with Tommy Constantine.
 4      A    Yes.
 5      Q    What is it
 6      A    I believe it's the company he used to transact
 7  most of his business through.
 8      Q    Did he have other companies?
 9      A    In what context?  That was the company I was
10  always familiar with, that he would all of his consulting
11  deals with.  I know he's the CEO of several other holding
12  companies.
13      Q    With which you didn't have any dealings.
14      A    No, I certainly did.  One was called Euphora, a
15  prepaid credit card business, another was two more recent
16  partnerships called AZ Falcon Partners and one called AZ
17  Avalon Partners, A-V-A-L-O-N.  I don't know anything else.
18      Q    And AZ Falcon Partners was a partnership?
19      A    I think it's an LLC, I don't have any information
20  more than that about it though.  It's something Tommy
21  Constantine set up.
22      Q    Do you know what it does?
23      A    AZ Falcon Partners is the holding company he set
24  up to hold ownership of a private airplane and AZ Avalon
25  Partners is a company he set up to hold ownership of two
0422
 1  airplane hangars in Scottsdale, Arizona.
 2      Q    Constantine Management Group Ltd., what kind of
 3  entity is that?
 4      A    I think it's defunct right now just based on
 5  information I received through some litigation but I believe
 6  it was an Illinois company and I don't know what type of
 7  entity it was but an Illinois company I believe.
 8      Q    Do you know when it became defunct?
 9      MR. STOLPER:   Earlier than anybody knew, so in
10  the 2000's.
11      A    In the 2000's at some time.
12      Q    You don't know anything more specifically than
13  that.
14      A    I don't.
15      Q    What was its business?
16      A    I think that was the entity he used for all of
17  the consulting deals he used to do in my presence,
18      Q    I think while I was out there might have been
19  some testimony with regard to consulting deals with Tommy
20  Constantine.
21      A    Correct.
22      Q    What is Kabi, K-A-B-I, SA des CV?
23      A    It doesn't ring a bell.
24      Q    It sound familiar?  K-A-B-I SA des CV which I
25  understand from your testimony yesterday sounds like a
0423
 1  Mexican entity.
 2      A    Yes, I don't recall what that name is.
 3      Q    So sitting here today you don't have any
 4  association with the name Kabi, K-A-B-I, however that's
 5  pronounced.
 6      A    It doesn't ring a bell.  The name sounds familiar
```

Page 55

TR-SEC00000317

Kenner 04 29 11

```
 7   but I can't recall in what context it sounds familiar.
 8        Q    Okay.  How about Gilmartin Magence & Ross?  Is
 9   that a law firm?
10        A    It's a law firm in Boston.
11        Q    What connection do you have with Gilmartin
12   Magence & Ross?
13        A    They were a hard money lender that lent money to
14   Tommy Constantine and he was introduced to them through an
15   acquaintance of mine.
16        Q    When you say a hard money lender, do you mean a
17   high interest lender?
18        A    Yes.
19        Q    And did they ever lend money to you or any entity
20   with which you were affiliated?
21        A    They lent money directly to Tommy Constantine for
22   the acquisition of two condo hotel units in Las Vegas.
23        Q    Apart from that did they ever lend money to you
24   or an entity with which you were affiliated apart from this
25   loan to Tommy Constantine?
0424
 1        A    No.  They had asked me because of my relationship
 2   and the introduction to sign a guarantee behind
 3   Constantine's loan but they didn't lend any money to me.
 4        Q    And by you I also mean any entity with which you
 5   were affiliated, we talked about Guide Dog yesterday or
 6   Standard Advisors.  The same answer?
 7        A    That's correct.
 8        Q    Would there have been any reason for you to make
 9   any payments or financial transfers, "you" meaning you or
10   any entity with which you're affiliated, to Gilmartin?
11        A    I believe when Constantine was trying to acquire
12   the loan I believe I sent a $20,000 lender fee to that law
13   firm and then after he closed on the loan I believe I sent a
14   series of payments to keep his loan current.
15        Q    Payments in what amount?
16        A    I believe they were $15,000 a month payments.
17        Q    For how long?
18        A    I'm going to say approximately six months.
19        Q    What was the time period?
20        A    It was in the last few years, 2009 perhaps.
21        Q    Just give me your best estimate, you think 2009?
22        A    Perhaps early 2009
23        Q    And the initial $20,000 you sent, would that also
24   have been in 2009?
25        A    It may have been 2008.
0425
 1        Q    When you say "I sent," was that Philip Kenner or
 2   was it some entity that sent?
 3        A    I believe it was me.
 4        Q    Why did you -- were there any other payments that
 5   you made to Gilmartin?
 6        A    No, if I could explain why I was making those
 7   payments so it's clear for the record.
 8        Q    That's my next question but I just want to make
 9   sure I've got all the payments first.
10        A    I believe those are all the payments related to
11   Gilmartin.
12        Q    Okay.
13        A    There was a transaction that Tommy Constantine
14   had arranged with Ethan Moreau which became the subject of
15   the litigation you asked about yesterday for Constantine to
16   sell his interest in those two units to Ethan Moreau.  In
17   order to complete the transaction, Constantine had to close
```

Page 56

TR-SEC00000318

Kenner 04 29 11

18  on the two units at the condo hotel in Las Vegas and then
19  Moreau had I believe a 30-day period of time to arrange
20  financing and then close and acquire the units from
21  Constantine.  At that time Moreau indicated to me and
22  Constantine he was prepared to close and I was assisting
23  Moreau in getting the financing to close the deal.
24  Constantine at the time had told me he didn't have money to
25  close on the loan nor did he have money to pay the $20,000
0426
1   fee to Gilmartin to initiate the loan nor did he have money
2   to pay the monthly payments which were supposed to be
3   frankly just one payment before Moreau acquired the unit.
4              They got in a dispute after Constantine closed on
5   the two units and I got stuck with deposit money that I had
6   assisted Constantine in putting down on the unit for the
7   purposes of the mortgage.
8        Q    Let me make sure I follow.  Constantine didn't
9   have enough money to close on the two units, you were
10  assisting Moreau and in order to facilitate the closing of
11  the units, you gave money to Constantine so he could close
12  on those units.
13       A    I was assistant both gentlemen.  Constantine
14  needed to close on the units per their agreement and then
15  Moreau needed to buy the units from Constantine.  So I
16  helped Constantine arrange for the financing including
17  making the $20,000 deposit.
18       Q    That's the financing through Gilmartin.
19       A    Yes, and then I was helping Moreau which was part
20  of my normal business practice to arrange for financing so
21  he could acquire the units from Constantine per their
22  agreement.
23       Q    Putting aside your help to Moreau, the assistance
24  you gave to Constantine to allow him to close on the two
25  units, were these payments that you just mentioned that
0427
1   effort?
2        A    Yes.
3        Q    And what the arrangement you had with Constantine
4   with respect to the funds you sent to him?
5        A    When he closed -- the arrangement was when he
6   closed with Moreau, he would give me the money back.
7        Q    Did he close with Moreau?
8        A    He did not.
9        Q    What was the arrangement you had if he didn't
10  close with Moreau?
11       A    There was no arrangement.
12       Q    Did he ever pay you back?
13       A    He did not.
14       Q    Did he pay you back any portion of it?
15       A    No.
16       MR. STEPANIUK:   Why did Mr. Moreau not wind up
17  acquiring the condos?
18       THE WITNESS:   At the time I believe he felt like
19  he was going to be better off to walk away from the deposit
20  he had made to Constantine a few years earlier and it became
21  the source of the final acrimony between myself and Moreau.
22       MR. CASTANO:   Did there come a time when another
23  one of your clients purchased the condo from Tommy
24  Constantine?
25       THE WITNESS:   No, those units were foreclosed on
0428
1   by Gilmartin after I stopped making payments.  I don't know
2   how long after but they were ultimately foreclosed on.

Page 57

TR-SEC00000319

Kenner 04 29 11

```
 3      Q      Did you lose money as a result of this process?
 4      A      Yes, I did.
 5      Q      How much?
 6      A      I lost the $20,000 that was the deposit for the
 7  financing, I lost the approximate six months at $15,000 a
 8  month.
 9      Q      So about 90.
10      A      About 90 and then I also had put up the
11  difference that Gilmartin required of $250,000 so they could
12  close out a loan, a debt ratio that was acceptable to them.
13      Q      I'm sorry, that 250,000 you provided to whom?
14      A      To the escrow company when Constantine was
15  closing.
16      Q      What was the -- how did you make that payment or
17  transfer of funds?
18      A      Wire transfer.
19      Q      To what entity?
20      A      Whatever the escrow company was in Las Vegas.
21      Q      Do you remember the name?
22      A      It might have been Fidelity National Title but it
23  was the escrow company that the Palms Hotel used for all of
24  their transactions.
25      Q      Did you ever recover that $250,000 or any portion
0429
 1  of it?
 2      A      I did not.
 3      Q      Where did these funds, both the 110,000 and the
 4  250,000 dollars, where did those funds come from?
 5      A      From my account.
 6      Q      How did they end up in your account?  Where were
 7  they from originally?
 8      A      I think the origination of them came from the
 9  result of John Kaiser and I selling the home in California.
10  Just to be clear, it could have also been funds that were
11  from my income, my savings as well.
12      Q      This was your estimate was around 2009.  What
13  savings did you have around that time?
14      A      I don't recall.
15      Q      Do you have any sense?
16      A      I don't.  It would have all been in the bank
17  account because I was spending a lot of money on litigation
18  at the time.
19      Q      Do you think it was more or less than $500,000?
20      A      I really don't recall, I'm sorry.
21             BY MR. CASTANO:
22      Q      Before you move on, were you involved in any way
23  in any real estate sale in Las Vegas in the last four years?
24      A      I don't believe so.  Can I ask you to clarify,
25  what do you mean by "involved"?  Because I certainly was
0430
 1  involved --
 2      Q      Besides this transaction were there any other
 3  condo or real estate deals in Las Vegas in which you were
 4  involved in in terms of purchasing or selling?
 5             MR. STOLPER:   Other than the primary residences
 6  he testified about yesterday?
 7             MR. CASTANO:   Yes.
 8      Q      Other than your primary residences.
 9      A      I assisted two other clients of mine in acquiring
10  units at the Palms Hotel.
11      Q      What are the clients names?
12      A      Michael Peca and Jay McGee.
13      Q      Who did they acquire the homes from?
```

Page 58

TR-SEC00000320

Kenner 04 29 11

```
14      A       From the Palms Hotel.
15      Q       Did you own those units in any way?
16      A       I did not.
17      Q       Did anyone you know own those units other than
18 the Palms Hotel?
19      A       I believe John Kaiser and Tommy Constantine had
20 some interest in those.
21      Q       Is it fair to say that John Kaiser and Tommy
22 Constantine sold real estate to Mr. Peca and Mr. McGee?
23      A       No.
24      Q       Can you explain the transaction then.
25      A       I believe Kaiser and Constantine, and I don't
0431
1  know the delineation of it, had deposits on the units from
2  when they became -- when it became time to close the units,
3  Michael Peca and James McGee became partners of theirs to
4  buy those units from the Palms Hotel.
5       Q       Were their deposits, do you recall?
6       A       Pardon me?
7       Q       What were their deposits, Mr. Kaiser and Mr.
8  Constantine?
9       A       I believe Mr. Constantine had made the deposits
10 originally for about $600,000 on each unit.
11      Q       What were the -- did Michael Peca and Mr. McGee
12 purchase separate units or did they buy the same units
13 together?
14      A       Separate.
15      Q       How much did Mr. Peca pay for his unit?
16      A       I believe they both paid about 3.3 million
17 dollars for their units.
18      Q       Were they new properties?
19      A       Yes.
20      Q       When did they purchase them, approximately?
21      A       I believe the Peca transaction occurred in
22 approximately 2008 and the McGee transaction took place
23 perhaps in 2009.
24      Q       What, if anything, did you discuss with Mr. Peca
25 concerning his purchase of this condo at the Palms Hotel in
0432
1  Las Vegas?
2       A       All aspects of the transaction like I would on
3  any of the homes he bought or sold.
4       Q       Did you recommend that he purchase the home?
5       A       I discussed the deal with him in detail and his
6  wife but the deal was between Tommy Constantine and Michael
7  Peca.  My role was always to try and add clarity to the
8  arrangements.
9       Q       Let me ask you this, did you recommend that they
10 go ahead and purchase this unit for $3.3 million?
11      A       I don't recall.
12      Q       Is there any documents or e-mails you might have
13 sent Mr. Peca concerning whether you recommended purchasing
14 this property for $3.3 million?
15      A       Not that I'm aware of.
16      Q       Is it worth $3.3 million today?
17      A       I don't believe so.  I believe the last sale of
18 one of those units was about five million dollars.
19      Q       The same unit?
20      A       Yes.
21      Q       Is it in the same line in the building?
22      A       Yes.
23              BY MR. SMITH:
24      Q       What is Support Payment Clearinghouse?
```

Page 59

TR-SEC00000321

Kenner 04 29 11

```
25      A      I think that's where I pay child support to.
0433
1       Q      What were your child support obligations?
2       A      $8,000 a month.
3       Q      Starting when?
4       A      2006 or 2007.
5       Q      And continuing to the present?
6       A      The obligation continues, correct.
7       Q      The same rate?
8       A      Yes.
9       Q      What is S.B. Trust account?
10      A      I don't know.
11      Q      Is that name at all familiar to you?
12      A      It doesn't sound familiar.
13      Q      You don't think you've ever heard of S.B. Trust
14 account before?  I'm sorry, SBBI Trust account.
15      A      It doesn't ring a bell.
16      Q      What is Peii, P-E-I-I, Publishing?
17      A      That is the publishing entity for Playboy.
18      Q      What's your connection to Peii Publishing?
19      A      That was funds that I paid a bill for Tommy
20 Constantine that he owed Playboy for marketing, advertising
21 pages in Playboy Magazine.
22      Q      How much was the amount of the bill you paid?
23      A      I don't recall.
24      Q      Roughly?
25      A      Maybe $50,000, it was an odd number, it wasn't a
0434
1 round number.
2       Q      I understand.
3       A      Approximately $50,000.
4              MR. STEPANIUK:   Why did you pay his bill for
5 him?
6              THE WITNESS:   He was receiving the money as
7 loans frankly from John Kaiser and I and those were funds
8 that we had and he was in the process of trying to acquire
9 Playboy, the magazine, from Hugh Hefner and he told us if
10 his relationship which was derived from a racing team that
11 Playboy sponsored had to stay in good standing and as I've
12 come to find out with Constantine, every deal he was always
13 working on was always just outside arms length but he was
14 about to achieve greatness and that was an urgent request
15 that he had to pay Playboy Publishing that money.
16      Q      Did you really believe he was about to acquire
17 Playboy Magazine from Hugh Hefner?
18      A      Yes.  I had sat in several meetings in California
19 where he was meeting with other groups that were attempting
20 to acquire the magazine and there were a lot of discussions
21 on whether it was just going to be his entity that was going
22 to acquire it or they were going to work together with
23 Hefner's former president of Playboy.
24              BY MR. STEPANIUK:
25      Q      Did the fact that he apparently didn't have the
0435
1 money to pay the publishing bill give you any reason to
2 doubt the feasibility of him acquiring Playboy?
3       A      It sounds as funny as it probably should but he
4 wasn't funding it with his own money, he was putting
5 together the group of people as a deal maker that was going
6 to acquire or attempt to acquire the company.
7       Q      So why not send him to them for the money for the
8 publishing bill?
9       A      I was an easy mark for him as I've come to find
```

Page 60

TR-SEC00000322

Kenner 04 29 11

10  out.
11        Q      Were you close friends with Mr. Constantine?
12        A      I was a close friend of his for some time which
13  we are not now.
14              BY MR. SMITH:
15        Q      When was the payment?  I think you said you
16  thought it was a loan, you intended it as a loan.
17        A      Yes.
18        Q      When was that?
19        A      I don't recall.
20        Q      Just roughly.
21        A      2008 or 2009.
22        Q      Was it repaid?
23        A      It was not.
24        Q      What is Unitek Racing Inc.?
25        A      Another racing related expense for Tommy
0436
1   Constantine.
2         Q      You mentioned a minute ago a racing team with
3   which Constantine was affiliated.
4         A      He ran a racing program whose main sponsor was
5   Playboy and he was one of the drivers and at any point in
6   time they had between two and six race cars.
7         Q      What's your affiliation with Unitek Racing Inc.?
8         A      None.
9         Q      Is there any reason you would have sent or
10  received money from Unitek Racing?
11        A      The answer will be the same for all of the
12  transfers that ended up in a Constantine --
13        Q      You're saying this is a loan to Tommy
14  Constantine?
15        A      Yes.
16        Q      When was it made?
17        A      All of them would have about the same time, 2008
18  or 2009.  Again it was another urgent call, he was at the
19  track, he owed Unitek 70 grand.  If he didn't pay them that
20  day, he was going to be in breach of all of his racing
21  contracts.  So I acquiesced and lent him the money.
22        Q      Are there any documentation of any of these
23  Constantine related loans?
24        A      Just the banking records.
25        Q      What is Code Fire Acquisition Corp.?
0437
1         A      That is a video game -- publicly traded video
2   game company.
3         Q      What's your connection?
4         A      I put together marketing deals for them
5   originally between Buddy Rice who is the Indy 500 winner at
6   the time and Phil Mickelson and Phil Mickelson's golf
7   instructors with the video game company and in later days I
8   guaranteed a loan on behalf of the company.
9         Q      What is Pacifico Properties SA des CV?
10        A      That is a Mexican company owned by Robert Ga-Day.
11        Q      What's your connection to it?
12        A      Nothing specific.  Robert Ga-Day is a friend of
13  mine.
14        Q      Is there any reason that funds would be
15  transferred to it or from it, from you or to you?  When I
16  say "you," I mean including any of your entities.
17        A      I don't know if you were here earlier but we
18  talked about Robert Ga-Day being a consultant for the
19  project in Hawaii.
20        Q      I missed some of the Ga-Day testimony, so it's

Page 61

TR-SEC00000323

Kenner 04 29 11

21    already been covered.
22          MR. STEPANIUK:   He's a part money loan finder.
23       A    He was a golf director at Diamante for a number
24    of year and he also after I acquired the home in Cabo San
25    Lucas he would take care of the home for me because he's a
0438
1    full time resident down there, so he would take care of all
2    the bill paying and then when we refinanced the home and
3    took the loan out that we discussed yesterday, he would take
4    care of all the banking issues related to the home.
5       Q    I know we're about out.  I just want to ask about
6    two more entities related.  What is an entity called Title
7    Guarantee?
8       A    I assume it's just a title company.
9       Q    Do you know?  We can all understand the name of
10    the entity.  Are you familiar with an entity called Title
11    Guarantee?
12       A    Most specifically I believe it would be related
13    to some of the Hawaiian land acquisition, that would be my
14    best guess.
15       Q    But you don't recall specifically?
16       A    It sounds very familiar that it was the title
17    company that we used in Hawaii, I believe in Hilo, Hawaii.
18       Q    Who is Jose Alberto Castro Salazar?
19       A    Could you say that name again, please.
20       Q    Jose Alberto Castro Salazar.
21       A    I don't know.
22       Q    Does the name sound familiar to you?
23       A    It does not.
24       Q    Alan Zyller, Z-Y-L-L-E-R?
25       A    That sounds like one of the hard money lenders
0439
1    that we dealt with in Hawaii.
2       Q    Shimon Betesh, B-E-T-E-S-H?
3       A    He is a real estate attorney in New York.
4       Q    And you used him for some purpose?
5       A    He was the real estate attorney that used to
6    close all of my clients homes.
7          MR. SMITH:   We're out of time.
8          MR. STOLPER:   Did you get through your list?
9          MR. SMITH:   Not quite.
10          MR. CASTANO:   Mr. Kenner, we're going to go off
11    the record.  As I discussed with your attorney, we'll likely
12    need to bring you back in for testimony.  We'll obviously
13    reach out to your attorney and set a date that
14    works for everyone but we're going to go off the record
15    now.
16          MR. CASTANO:   We're off the record --
17          MR. STEPANIUK:   Before you do that, do you want
18    to give him a chance to clarify anything, make any
19    statements before we go.  You can reserve and do it later.
20          MR. STOLPER:   So reserved.
21          MR. CASTANO:   Now we will go off the record at
22    2:49 p.m.
23          (Whereupon, at 2:49 p.m. the hearing was
24    adjourned.)
25
0440
1
                    C E R T I F I C A T E
2
3          I, Peggy Miller, hereby certify that the foregoing
4    transcript consisting of 153 pages is a complete, true and
5    accurate transcript of the investigative hearing, held on
                          Page 62

TR-SEC00000324

Kenner 04 29 11

6   Friday, April 29, 2011 at 3 World Financial Center, New York,
7   New York, in the matter of Diamante Del Mar.  I further
8   certify that this proceeding was recorded by Pablo Martin and
9   that the foregoing transcript has been typed and proofread by
10  me.
11
12  _____     _____
13  Typist/Proofreader                  Date
14
15
16
17
18
19
20
21
22
23
24
25
0441
1         UNITED STATES SECURITIES AND EXCHANGE COMMISSION
2                   REPORTER'S CERTIFICATE
3
4
5   I, Pablo Martin, reporter, hereby certify that the foregoing
6   transcript of 153 pages is a complete, true, and accurate
7   transcript of the testimony indicated, held on Friday, April
8   29, 2011 at 3 World Financial Plaza, New York, New York in
9   the matter of:
10  Diamante Del Mar
11  I further certify that this proceeding was recorded by me and
12  that the foregoing transcript was prepared under my
13  direction.
14
15  Date: _____
16
17  Official Reporter: _____
18
19
20
21
22
23
24
25
0442
1                   PROOFREADER'S CERTIFICATE
2
3   In the Matter of:   Diamante Del Mar
4   Witness:            Philip Kenner
5   File Number:        NY-8125
6   Date:               Friday, April 29, 2011
7   Location:           3 World Trade Center
8                       New York, New York
9
10            This is to certify that I, Peggy Miller, the
11  undersigned, do hereby swear and affirm that the attached
12  proceedings before the United States Securities and Exchange
13  Commission were held according to the record and that this is
14  the original, complete, true and accurate transcript that has
15  been compared to the reporting or recording accomplished at
16  the hearing.

Page 63

TR-SEC00000325

Kenner 04 29 11

```
17
18    _____    _____
19    Proofreader's Name                 Date
20
21
22
23
24
25
```

TR-SEC00000326



## DIAMANTE DEL MAR CLUB

### EXECUTIVE SUMMARY

Since 1998, Ken Jowdy's Mexican corporation, LOR Management, SA de C.V. (LORSA), has acquired an interest in nearly 10,000 acres of property (the Property) in El Rosario, Baja California, Mexico. In March, 2005, the Company acquired legal, insurable title to the first three parcels of the Property, containing approximately 8000 acres of land with 3+ miles of Pacific coastline. The Property is accessible by car on Route 1, the major north/south highway through the Baja region. It is also now accessible by private jet (a thirty minute flight from San Diego), since Ken's development company, Diamante del Mar, LLC, (Diamante) has constructed a 50 foot by 6000 foot concrete airstrip on the Property. The Property has three and a half miles of spectacular rugged Pacific Ocean coastline and a climate similar to that of San Diego which is only 210 miles to the north. In April, 2005, the Property was appraised by KPMG at $68,900,000. A copy of the appraisal has been provided under separate cover.

The Company has determined that a portion of the Property is ideal for a year round, private, luxury golf development. In order to create a world class facility, Diamante has put together an extremely talented and highly regarded design and development team, led by Tom Fazio and Davis Love III. Unlike most developers, Diamante gave Mr. Fazio and Mr. Love (golf course architects for the first two oceanfront golf courses) the freedom to choose the most dramatic settings for golf without any restrictions. By doing so, Diamante will be creating an extraordinary golf experience with twenty seven holes having direct ocean frontage along two and one half miles of rugged Pacific coastline, and the remaining nine holes having spectacular unobstructed ocean views.

Diamante plans to create an exclusive, secure, very private golf community on approximately 3000 acres of the Property. The Diamante del Mar Club will have a lodge and guest suites with full concierge services and fine dining facilities, a clubhouse, approximately 175 Private Residence Club villas and casitas, 300 private residential home-sites and the Club, a non-equity membership golf club with two championship ocean front golf courses (and possibly a third links style golf course currently planned for the edge of the mesa). When complete, Club members and guests, will enjoy championship golf, state of the art practice facilities, a tennis complex, spa, fitness center, winery and vineyards, equestrian center, swimming facilities, hiking, biking, camping, boating and fishing opportunities, as well as a myriad of other recreational and social services.

The balance of the Property (nearly 7000 acres), including an additional mile of oceanfront, will be held by the Company for future development.

Please visit our web site at www.diamantedelmar.com. The password is EDAC

KJ0165

CONFIDENTIAL TREATMENT REQUESTED

PK_SEC_016462

TR-SEC-00000750

## DIAMANTE DEL MAR CLUB

### PRE-PHASE I ACTIVITIES

Diamante has used the funds to date to finance the Club's pre-development phase, including (1) acquiring a legal interest in additional portions of property; (2) resolving certain title matters; (3) completing various feasibility, environmental and other studies and tests; (4) constructing the initial phase of the concrete airstrip to the point where it can accommodate midsize to large business jets; (5) completing the Fazio golf course design and the preliminary Davis Love III golf course design and (6) completing certain site planning, architectural, engineering and permitting activities.

The Club's infrastructure, including roads, parking lots, staff housing, water, drainage, sewage treatment, electric, fiber optic telecommunications, and other similar improvements will proceed through each of the Phases as needed in accordance with the Master Site Plan.

### BUSINESS PLAN SUMMARY

Diamante has budgeted approximately $275,000,000 for the development of the Diamante del Mar club and related facilities to be expended over the next six years as follows:

### PHASE I

Diamante intends to construct the Club on a phased basis, with Phase I providing half of the private jet airstrip (now constructed and being utilized), the Fazio oceanfront golf course, the golf practice facility, the construction road (now available for use), the main entrance road to the oceanfront core area, the maintenance facility, final designs for the Love golf course and core facilities, as well as a "Hacienda" compound on three and a half acres with initial accommodations for members and guests (pro shop, suites, villas, restaurant, tennis, swimming pool, fitness center, etc). Construction of the core area villas and casitas will also begin during Phase I. Diamante is seeking a bridge loan of $20,000,000. The loan will be used to assist the Company with the development of the initial stages of Phase I and to initiate its membership and home site sales and marketing effort.

KJ0166

CONFIDENTIAL TREATMENT REQUESTED

PK_SEC_016463

TR-SEC-00000751

## PHASE II

Phase II will include construction of the Davis Love III oceanfront golf course, the lodge with guest suites, clubhouse, tennis complex, spa, fitness center, winery and vineyards, equestrian center, recreational facilities and additional villas and casitas.

## PHASE III

Phase III may include a third "links style" golf course to be built on the edge of the mesa, a recreational lake for fishing and water sports and a small marina facility (the airstrip and marina will be available for the use of Members on a non-exclusive basis only).

## MANAGEMENT TEAM

Diamante Del Mar, LLC, (the "Developer"), is a Delaware limited liability company ("Company") formed in September, 2002, for the sole purpose of developing the Resort. The Managing Member of the Company is Baja Management, LLC ("Baja Management"), a New York limited liability company formed at the same time for the sole purpose of managing the Company. Baja Management is exclusively responsible for the management of the business and affairs of the Company and the overall development of the Resort. Kenneth A. Jowdy is the President and Chief Executive Officer of Baja Management is responsible for the selection of the Company's consultants, architects, engineers, other service providers and managers. William J. Najam, Jr. is the Company's Chief Operating Officer and will assist Mr. Jowdy with all aspects of the Company's management. Philip A. Kenner will serve as the Company's financial consultant. Kenneth Ayers will serve as Project Manager for the Resort. Fernando Garcia Campuzano has served as Mexican legal counsel since the inception of the project. Additional information about the Management Team follows:

*Kenneth A. Jowdy* is a businessman and a developer. Mr. Jowdy has been engaged in Mexican resort development since 1998. His company, Diamante del Mar, LLC, has acquired the ownership and development rights to nearly 10,000 acres in El Rosario, Baja California, Mexico, and the Company is in the process of developing an exclusive private golf community and destination resort on a portion of the Property. Mr Jowdy is also in the process of acquiring and developing similar projects in Cabo San Lucas, Mexico that he believes will greatly enhance the development of the Diamante del Mar Club project. Mr. Jowdy has already taken the Diamante project through the Mexican entitlement process, including environmental permitting, with construction of a Tom Fazio designed golf course to begin in 2005. Mr. Jowdy has developed a strong relationship with the federal and local government officials in Mexico, and he will use his experience and relationships to expedite the development process.

KJ0167

CONFIDENTIAL TREATMENT REQUESTED

PK_SEC_016464

TR-SEC-00000752

*Philip A. Kenner* is an entrepreneur who owns and operates several businesses, including a business management firm for high net worth individuals and several land development companies. He has been involved in every aspect of the land development business for the last 10 years. Mr. Kenner has been responsible for all aspects of vertical business development for his companies. Mr. Kenner's development companies have specialized in "Green" development, in order to maintain, utilize and protect characteristics and features of each project's natural surroundings. Mr. Kenner's primary focus has been to assist the Company with the development of its financial plans for the project and to obtain both equity investors and debt financing.

*William J. Najam, Jr.*, is an attorney and developer. During the 1970s, he served as Assistant Secretary and General Counsel of the Massachusetts Department of Transportation and Construction, and was responsible for overseeing the agencies charged with all state building construction. In addition to practicing law in Massachusetts for more than 25 years, Mr. Najam has also been involved as a partner in the development of several condominium projects. His most recent venture was the rehabilitation of base housing at Westover Air Force Base into condominiums. He is currently co-owner of two golf courses in Massachusetts and Florida. In addition to his development experience, he has extensive experience in golf course management.

*Kenneth Ayers* has most recently been serving as the Project Manager for the $200 million Bridges at Rancho Santa Fe Project in San Diego, California. The Bridges is widely regarded as one of the most successful private resort developments in the San Diego area. Mr. Ayers has extensive experience in project management, land acquisition, construction budget analysis, land entitlements, site development, and HOA and CC&R documentation. He also has substantial experience in market feasibility study review, governmental affairs, planning, design, scheduling, purchasing and construction oversight. Ken Ayers has successfully managed a portfolio of over 25 major projects with total budgets in excess of $250 million.

*Fernando Garcia Campuzano* is an attorney licensed to practice law in Mexico and maintains an office in Ensenada, Mexico on the Baja Peninsula. Mr. Garcia has been instrumental in securing the contracts to acquire the Property for the Company. He is an investor in Baja Management. Mr. Garcia is expected to continue to provide legal counsel with regard to real estate matters pertinent to the Property.

The Company has begun the process of interviewing individuals and firms capable of acting as General Manager of the Club facilities. The importance of retaining professionals experienced in the operation of a five star private resort with full concierge services cannot be underestimated. Shortly, the Club will also begin a search for a highly regarded golf course superintendent capable of overseeing the maintenance of the championship golf courses. Additional staff will be added on an as needed basis.

KJ0168

CONFIDENTIAL TREATMENT REQUESTED

PK_SEC_016465

TR-SEC-00000753

## CONSULTANT TEAM

Diamante del Mar, LLC was formed in the fall of 2003 for the purpose of developing the Property.  The philosophy of the Company from the outset has been to retain the very best consultants and staff necessary to market, construct and operate the Club.  In addition to the consultant and management team outlined in the Founder Offering Memorandum, the Company has retained the following renowned persons, firms or entities to assist with various aspects of the project:

...Tom Fazio, Fazio Golf Course Designers, Inc.
...Davis Love III and Love Enterprises and Associates, Inc.
...The Keith Companies, Inc., Engineering
...John Hill, HILL GLAZIER, Architects
...Hillier & Associates, P.A., Membership Legal and Consulting Services
...Holland & Knight, federal legal registration requirements
...William Ellis, Tax Planning
   Bennett Thrasher, Certified Public Accountants & Consultants
...Five Star Productions, Brochure Design, Marketing
...KPMG, Appraisal
...Don Vita, VITA Planning, Landscape, Architecture
...Pinnacle Design, Landscape Architects
...Haro, Kasunich and Associates, Inc., Geotechnical and Coastal Engineers
...Terry Buchen, Golf Agronomy International
...Bob Bryant, Bryant Taylor Golf, golf course irrigation design
...Medall, Aragon Geotechnical, Inc., Earth and Material Sciences
...Landworks Collaborative, Site Planning

For additional information, please contact:

Kenneth A. Jowdy;          REDACT
Philip A. Kenner;          REDACT
William J. Najam, Jr.;          REDACT

KJ0169

CONFIDENTIAL TREATMENT REQUESTED

PK_SEC_016466

TR-SEC-00000754