0443
1
2      UNITED STATES SECURITIES AND EXCHANGE COMMISSION
3
       In the Matter of:
4                                    )
       DIAMANTE DEL MAR              )File No. NY-8125
5                                    )
6
       WITNESS:    PHILIP KENNER
7
8      PAGES:      443 - 689
9
       PLACE:      Room 410
10                 Securities and Exchange Commission
                   3 World Financial Center
11                 New York, New York
12
       DATE:       August 16, 2011
13
14
15                 The above-entitled matter came on for
16     hearing at 10:26 a.m., pursuant to subpoena.
17
18
19
20
21
22
23
24
25
0444
1
2      APPEARANCES:
3
4      On behalf of the Securities and Exchange Commission:
5
6              CHRISTOPHER CASTANO, ESQ.
7              JUSTIN SMITH, ESQ.
8              GEORGE N. STEPANIUK, ESQ., Assistant Regional
9                                          Director
10             Enforcement Division
11             Securities and Exchange Commission
12             3 World Financial Center
13             New York, New York 10281
14
15     On behalf of the witness:
16
17             MICHAEL STOLPER, ESQ.
18             Law Offices of the Stolper Group
19             155 Avenue of the Americas
20             New York, New York 10013
21             212-337-3502
22
23     ALSO PRESENT:    Peter Scutero, Intern
24
25
0445
1                      P R O C E E D I N G S
2              MR. CASTANO:   We are on the record on
3      Tuesday, August 16, 2011 at 10:26 a.m.
4              Mr. Kenner, welcome back.
                                    Page 1

Kenner 08.16.11

```
 5              Just like last time, the Formal Order of
 6  Investigation which was put before you shortly before
 7  we began, authorizes me to administer the oath at
 8  this time.
 9              Please raise your right hand.
10       Whereupon,
11                    PHILIP KENNER,
12  after having been first duly sworn, was examined and
13  testified as follows:
14  EXAMINATION
15  BY MR. CASTANO:
16       Q.  Just like last time, I am going to ask
17  you a few general introductory questions and go over
18  the parameters of an SEC testimony.
19              Please state and spell your name for the
20  record.
21       A.  Philip Andrew Kenner, P-H-I-L-I-P,
22  A-N-D-R-E-W, K-E-N-N-E-R.
23       Q.  Mr. Kenner, as we discussed last time,
24  for purposes of SEC investigations, nothing is really
25  off the record, so any time we go off the record and
0446
 1  we have a substantive conversation, it will be
 2  summarized when we go back on.
 3              Do you understand?
 4       A.  I understand.
 5       Q.  The Commission controls the record.  Any
 6  requests to go off the record should be made by me.
 7  For example, if you needs to use the restroom, just
 8  say, "Can we go off the record?"
 9              If there is a question pending, I will
10  ask that you answer the question before we go off the
11  record.  The court reporter, of course, can take down
12  everything that we say, but with the machine here,
13  obviously, the court reporter can't write down verbal
14  gestures such as a head nod to indicate yes or
15  shaking your head to indicate no.  So I would ask, as
16  we did last time, I ask that you give your answers in
17  a clear, vocal manner.
18              Do you understand?
19       A.  I understand.
20       Q.  Try not to answer any question until I
21  finish asking the question, and I will, of course,
22  return the courtesy.  The record will be much clearer
23  if only one person is speaking at a time.
24              Of course, if you do not understand a
25  question, I am sure your very competent counsel will
0447
 1  speak up and say, "Chris, we didn't understand the
 2  question," but if he doesn't and you don't understand
 3  a question, let me know and I will rephrase the
 4  question.
 5              As you know, my name is Chris Castano,
 6  and with me is Justin Smith.  We are both members of
 7  the New York Regional Office of the United States
 8  Securities and Exchange Commission.  Only one person
 9  today will ask you a question at a time.  So if
10  Justin asks you a question, answer that question.  He
11  might ask you a bunch of follow-up questions.  Same
12  thing with me.  We will not be asking you questions
13  at the same time.
14              George Stepaniuk may also join us at
15  some point.
```

Page 2

Kenner 08.16.11
16          This is an investigation by the United
17 States Securities and Exchange Commission in the
18 matter of Diamante del Mar, that's NY-8125, to
19 determine if there have been violations of the
20 federal securities laws. However, facts gathered in
21 this investigation might constitute violations of
22 other state or federal civil and criminal statutes.
23          Prior to the opening of the record, you
24 were given a copy of the Formal Order and Exhibit 1,
25 that's the SEC's Supplemental Information Form 1662.
0448
1          Did you have an opportunity to review
2 both documents?
3          A.  Yes.
4          Q.  Are you being represented by counsel
5 today?
6          A.  Yes.
7          MR. CASTANO:  Will counsel please
8 identify himself for the record?
9          MR. STOLPER:  Michael Stolper
10 representing Phil Kenner.  And with me is Peter
11 Scutero, S-C-U-T-E-R-O.  He is an intern with me this
12 summer.
13          MR. CASTANO:  Just so that the record
14 is clear, the intern is here observing but will not
15 be participating.
16          Q.  Mr. Kenner, are you taking any
17 medication or drugs that would affect your ability to
18 recall or answer questions truthfully?
19          A.  No.
20          MR. CASTANO:  Michael, are you appearing
21 in any other capacity other than Mr. Kenner's legal
22 counsel?
23          MR. STOLPER:  No.
24          Q.  We will jump around different topics
25 today.  There might be some ground that we covered
0449
1 last time where we might have to go through some
2 introductory questions, but it is my goal to try to
3 focus in on covering new ground today.  So let's just
4 begin with some follow-up questions.
5          On Diamante del Mar and Cabo San Lucas,
6 do you recall whether you provided any members or
7 investors that were your clients with a Diamante del
8 Mar private placement memo or other offering
9 document?
10          A.  Yes.
11          Q.  Do you know when you provided them with
12 those documents?
13          A.  I do not recall.
14          Q.  Did you provide them with the documents
15 at the time that they made their investment?
16          A.  To the best of my recollection, yes.
17          Q.  Was that for both Diamante del Mar and
18 Cabo San Lucas?
19          A.  I don't recall.
20          Q.  Where did you receive the Diamante del
21 Mar private placement memo?
22          A.  Any subscription documents or PPOs that
23 I may have received would have come directly from
24 Bill Najam or Larry Markowitz, the two attorneys
25 representing the Ken Jowdy, J-O-W-D-Y, on the
0450

TR-SEC00000329

Kenner 08.16.11
1    project.
2         Q.   Can you spell Markowitz and Najam.
3         A.   Najam is N-A-J-A-M, William Najam.  And
4    Larry Markowitz is M-A-R-K-O-W-I-T-Z.
5         Q.   And the offering documents for Cabo San
6    Lucas, did you also receive them from those two
7    individuals?
8         A.   Any information regarding the Cabo San
9    Lucas investment, I would have received from one of
10   those three gentlemen, Jowdy Najam or Markowitz.
11        Q.   Just so the record is clear, for both
12   entities, Diamante del Mar and Cabo San Lucas, do you
13   recall whether you gave those offering documents to
14   your clients before they made their investment, at
15   the time they made their investment, or after they
16   made their investment?
17        A.   I don't recall specifically.
18        Q.   Is there any documents such as an e-mail
19   or any type of letter you might have sent that might
20   have this information contained in it?
21        A.   Not that I recall.
22             MR. STOLPER:   Chris, hang on one
23   second.
24             (Witness and counsel confer off the
25   record.)
0451
1         A.   To just clarify, there were a number of
2    members of the Diamante del Mar project who would
3    have received any and all of the subscription
4    agreement or private placement offerings directly
5    from directly Jowdy, Najam or Markowitz, not through
6    me.
7         Q.   Were any of your clients any of those
8    investors?
9         A.   Yes.
10        Q.   So there were clients of yours that
11   would have received document directly from Jowdy and
12   Najam?
13        A.   Correct.  In fact, the first two
14   investors, Byron Dafoe and Jason Allison, I don't
15   what they received from Ken Jowdy.  Because I
16   actually met Ken Jowdy through those two gentlemen
17   after they told me they were investing with him.
18   BY MR. SMITH:
19        Q.   How do you know that subsequent
20   investors who were your clients received offering
21   documents from Jowdy or Najam?
22             Do you understand my question?
23        A.   I don't.
24        Q.   Let me backtrack.
25             I thought you just testified that some
0452
1    of your clients received offering documents not from
2    you but from either Najam or Jowdy.
3         A.   Correct.
4         Q.   How do you know?
5         A.   No.  To be clear, in case it wasn't in
6    prior testimony, I am suggesting that I don't know
7    what Byron Dafoe or Jason Allison received from Ken
8    Jowdy because they were his friends and dealt
9    directly with him.
10        Q.   And the question is:  Putting aside
11   Dafoe and Allison, were there any other of your
                                                    Page 4

Kenner 08.16.11
12    clients who received offering documents from either
13    Jowdy or Najam?
14            A.  Directly?
15            Q.  Yes.
16            A.  I believe yes.
17            Q.  What is that belief based on?
18            A.  The belief is based on the fact that
19    Jowdy had direct communication with a number of
20    clients before, during and after their site visits,
21    before during and after they had invested in the
22    project, Ken Jowdy's project.
23            Q.  But how do you know that he provided
24    them with offering documents?
25            A.  My assumption is based in the
0453
1     understanding that none of them ever asked me after
2     the fact that they were supposed to receive anything
3     from Ken Jowdy, so my assumption was that they
4     received documents from Markowitz, Jowdy or Najam,
5     they handled them directly on their own and sent them
6     back and subsequently asked me to assist in the
7     transfer of funds.
8             Q.  Let me make sure I understand the basis
9     for your belief that they received them directly.
10    Your basis is, number one, that they had
11    communications not including you with your clients
12    and Jowdy and Najam.  And, number two, they didn't
13    ask you for offering documents?
14            A.  Correct.
15            Q.  Did your clients that received documents
16    that you believe from Najam or Markowitz or Jowdy,
17    did they ever say to you or do you remember them ever
18    saying, "Hey, I received a bunch of offering
19    documents for Diamante del Mar," or Cabo San Lucas?
20            A.  I don't recall specifically.
21            Q.  Do you recall if they ever called you up
22    and said, "Hey, I read page 3 of whatever offering
23    documents I received and I have some questions"?
24            Did they ever ask you questions about
25    documents that they received?
0454
1             A.  Not that I recall.
2             Q.  For the clients that -- besides the two
3     clients you mentioned, the other clients and perhaps
4     some other, I guess for the clients that --
5     withdrawn.
6             For the clients that you did provide
7     private placement memos or other offering documents
8     concerning Diamante del Mar and Cabo San Lucas, is it
9     your testimony for both entities that you don't
10    recall specifically when you gave them these offering
11    materials?
12            A.  I don't recall.
13            Q.  And did you retain any documents that
14    you gave your clients such as the offering materials?
15            A.  I did not retain any of them.  Although,
16    after they were signed and executed, I believe Bill
17    Najam used to send me copies of each of those
18    documents.
19            Those documents were subsequently stolen
20    from my office in around 2006, 2007.  And in 2007,
21    prior to the dissension between Jowdy, Najam and
22    myself when I discovered that they had been stealing
                                                    Page 5

Kenner 08.16.11
23   budget money from Cabo San Lucas, I had requested
24   that Bill Najam send along a full copy of documents
25   for all of the investors that I believed were in the
0455
1    Diamante del Mar and Cabo San Lucas. And those, that
2    package that Najam sent me, were forwarded on to each
3    of the individual investors.
4            A.   You mentioned that those documents were
5    stolen.   I think we talked little about this last
6    time.
7            Where were they stolen from?
8            A.   From my office in Scottsdale, Arizona.
9            Q.   Did you file a police report?
10           A.   I did not.
11           Q.   And you believe it was in '06 or '07?
12           A.   That's correct.
13           Q.   Why didn't you file a police report at
14   the time about the stolen documents?
15           A.   There has been lot of things stolen and
16   my home has been vandalized, since I started
17   litigation against Ken Jowdy and Tommy Constantine,
18   and I am just tired of calling the police to my home.
19           Q.   The question is:  Why didn't you report
20   these documents being stolen in '06 or '07 to the
21   police department?
22           A.   I don't recall.
23           Q.   Have you ever reported any theft at your
24   house to the police department?
25           A.   Yes.
0456
1            Q.   Do you recall when the first time is you
2    reported a theft?
3            A.   I don't recall.  Perhaps around 2008 and
4    as recent as a week and a half ago.
5    BY MR. SMITH:
6            Q.   So prior to the theft in 2006 or 2007,
7    you hadn't reported any -- well, had there been any
8    thefts prior to 2006 and 2007 thefts from your office
9    of executed documents?
10           A.   Never.  All of the documents ended up in
11   the possession of Michael Beeks, so somebody working
12   and assisting him, and he was Owen Nolan's attorney.
13   BY MR. CASTANO:
14           Q.   Stolen property ended up in the
15   possession of an attorney?
16           A.   That's correct.
17           Q.   How do you know that?
18           A.   He acknowledged that he had all of my
19   stolen information in depositions that occurred in
20   California in the Kenner versus Myrick case,
21   M-Y-R-I-C-K.  And I forwarded those depositions on to
22   you.
23           Q.   Did you pursue with any criminal
24   authority that an attorney had somehow orchestrated
25   the theft of your documents?
0457
1            A.   I did not.
2            Q.   What were his exact words, did he say,
3    "I caused these documents to be stolen from Kenner"?
4            A.   He acknowledged in deposition, which,
5    again, I turned over to you, that he had documents
6    that were known to be stolen.  He reviewed them and
7    didn't feel he needed to return them to me.

TR-SEC00000332

Kenner 08.16.11
8          Q.    Did you ever report that to any criminal
9    authority?
10         A.    I did not.
11               (Witness and counsel confer off the
12   record.)
13               MR. STOLPER:    Chris, I think the last
14   time you elicited the testimony from him as to who he
15   believed stole the documents, but you may want to for
16   purposes of today's transcript, elicit that.
17               It was in that case, by the way, where
18   Beeks stated in a deposition record what you just
19   testified to?
20               THE WITNESS:    Yes.
21               MR. STOLPER:    Phil was represented by
22   counsel.
23         Q.    I believe you mentioned the documents
24   were stolen by a woman named Myrick?
25         A.    That's correct.
0458
1          Q.    What is her first name?
2          A.    Christine.
3          Q.    And you never reported her theft to any
4    police or criminal authorities, did you?
5          A.    I did not.
6          Q.    I want to shift gears and talk about
7    Standard Advisors, Inc., and is there a difference
8    between Standard Advisors, Inc. and Standard
9    Advisors, LLC?
10         A.    There is not.
11         Q.    what is Standard Advisors, Inc.?
12         A.    A business manager company.
13         Q.    were you the owner?
14         A.    Yes.
15         Q.    what was your affiliation, if any with
16   the company besides ownership?    Did you have a
17   title, were you managing member, officer?
18         A.    I don't know specifically.
19         Q.    were you president?
20         A.    I just assumed I was the owner and
21   operated as such.
22         Q.    was Ms. Myrick employed there with you?
23         A.    Yes, she was.
24         Q.    Did you have any other employees?
25         A.    Stephanie Dixon, D-I-X-O-N.
0459
1          Q.    And what were her duties and
2    responsibilities, if any?
3          A.    They were the same as Christine Myrick
4    as office manager.
5          Q.    what did the duties of office manager
6    entail?
7          A.    Pay bills for the clients, assist in
8    paperwork and transactions, deal with the clients
9    and/or their wives on day-to-day communications.
10   They would help place insurance policies, they would
11   facilitate real estate transactions.  In general,
12   they were the back office staff as I traveled to deal
13   with clients face-to-face.
14         Q.    Any other employees?
15         A.    Not that I recall.
16         Q.    I want to shift gears now and talk a
17   little bit about certain of lines of credit.
18               Generally, what do you understand a line
                                 Page 7

Kenner 08.16.11

```
19  of credit to be?
20          A.  An extension of bank debt.
21          Q.  Have you ever established lines of
22  credit on behalf of anyone?
23          A.  I am not sure I understand specifically
24  the question.
25          Q.  Have you ever participated in
0460
 1  establishing a line of credit on behalf of any of
 2  your clients?
 3          A.  Yes, I have.
 4          Q.  Can you tell me about that.
 5          A.  Many of my clients from time to time
 6  have needed to establish lines of credit either for
 7  personal reasons or business reasons.  And as their
 8  business manager, I would help facilitate that
 9  through whichever banking source they needed or
10  requested that I do so.  If they didn't have a
11  banking source to do it, they would ask me to assist
12  in finding a banking source to do so.
13          Q.  Between 2004 and 2007, how many of your
14  clients established lines of credits, to your
15  knowledge?
16          A.  Approximately ten.
17          Q.  Do you know what the purposes of your
18  clients lines of credit were?
19          A.  It varied from personal and business
20  reasons, for their own benefit and/or several were
21  established to acquire a larger equity percentage in
22  our Hawaii real estate development project.
23          Q.  For the business and acquisition of
24  Hawaiian real estate, were there any written
25  agreements concerning the purpose of the line of
0461
 1  credit as it pertained to acquiring Hawaiian lands?
 2          A.  I am not sure I understand the scope of
 3  the question.
 4          Q.  Let me ask you this:  You mentioned just
 5  now that there were lines of credit established to,
 6  among other things, purchase or acquire Hawaiian
 7  lands.
 8          Were there any written agreements
 9  concerning using lines of credit to purchase Hawaiian
10  lands?
11          MR. STOLPER:   Chris, I think he is
12  having trouble understanding the question.
13          A.  I don't understand the breadth of it.
14          Q.  I will take it step by step.
15          You helped your clients establish lines
16  of credit between 2004 and 2007; is that correct?
17          A.  I believe that's correct.
18          Q.  And your testimony here now is that,
19  among other things, lines of credit were used to
20  acquire Hawaiian land; correct?
21          A.  The lines of credit were established by
22  the clients to acquire a larger equity stake in our
23  Hawaiian real estate company.
24          Q.  And the question is:  The equity stake
25  that your clients acquired through the lines of
0462
 1  credit, were there any written documents
 2  memorializing just that, that lines of credit would
 3  be used to acquire equity shares in the Hawaiian
```

Page 8

Kenner 08.16.11

4  land?
5          A.  There were operating agreements that
6  reflected the varying contributions for equity which
7  represented the different amounts that lines of
8  credit were established for.
9          Q.  So besides the operating agreements was
10 there any specific document that stated what a line
11 of credit could be used for including the acquisition
12 of equity shares in Hawaiian land?
13         A.  I believe the operating agreement was
14 the document that was used to represent what the
15 Hawaiian entities could use.
16         Q.  Are you talking about the Little Isle IV
17 operating agreement?
18         A.  Yes.
19         Q.  And the Little Isle IV operating
20 agreement specifically has provisions in there about
21 lines of credit and what lines of credit can be used?
22         A.  I don't believe it mentioned lines of
23 credit.
24         Q.  Sitting here today, so we are clear, are
25 you aware of any document that discusses lines of
0463
1  credit and the acquisition of equity shares in
2  Hawaiian property besides any operating agreement by
3  Little Isle IV?
4          A.  Not that I am aware.
5              MR. STOLPER:  Can I just float an
6  objection because the question assumes a premise that
7  doesn't seem to make sense to me.
8              MR. CASTANO:  I think the record is
9  clear, but your objection is noted.
10         Q.  Did you ever use any portion of any line
11 of credit from your clients to pay down other
12 clients' lines of credit?
13         A.  The lines of credit were used for all
14 operational expenses for any number of the Hawaiian
15 LLCs, which may from time to time have included the
16 company's obligation to pay for monthly interest
17 payments on those lines of credit.
18         Q.  Just so that we are clear, when a line
19 of credit was used to pay another line of credit of
20 another client, every single penny of that money was
21 used to reverse the line expenses?
22         A.  Can you ask the question again?
23         Q.  Yes.
24             When any portion of any line of credit
25 was used by one client to pay another client's line
0464
1  of credit, was all of that money reimbursement for
2  Hawaiian project expenses?
3              MR. STOLPER:  That's assuming you
4  testified one person's line of credit was used to pay
5  off someone else's line of credit.  I don't know if
6  that's true.  I didn't hear that.
7          A.  Can you ask it one more time to make
8  sure it is clear?
9          Q.  All right.
10             MR. STOLPER:  Why don't he repeat it.
11             (Record read.)
12         A.  It was for the purpose of any
13 operational expenses on behalf of the Hawaiian
14 entity.

Page 9

TR-SEC00000335

Kenner 08.16.11

15      Q.   So the answer is none of that money --
16 to that specific question, the money was, in fact,
17 used to reimburse Hawaiian property expenses?
18      A.   If I understand the question correctly,
19 I think it is yes.
20      Q.   So when there is a line of credit coming
21 in and that money is being used to pay another line
22 of credit by another one of your clients, do you
23 understand that step-by-step money comes in from one
24 line of credit is then going out to pay another line
25 of credit for one of your clients, that is money that
0465
1 is being used to reimburse Hawaiian development
2 costs?
3      A.   Correct, the monthly expenses for the
4 lines of credit were the obligation of our Hawaiian
5 real estate project.
6      Q.   Just so that we are clear --
7      MR. STOLPER:   I was just going to say,
8 we did this last time, and I want to make sure, you
9 keep referring to investors in Hawaii and Cabo and
10 TDM as his clients.
11      If you are doing that, my understanding
12 is you are doing it merely for identification
13 purposes, because there are obviously different
14 groups of people involved.  My understanding with
15 your line of questioning is when you reference
16 clients, it is merely for identification purposes
17 with the understanding that in these transactions,
18 they are not his clients, he is not acting as the
19 business manager of clients.  But these are people
20 who, as he testified the last time, these are all
21 people who are getting together to invest in the
22 project.
23      If you are asking him separately, are
24 you acting as a business manager and are these
25 dealings with your clients, I will object, because
0466
1 that's inconsistent with his testimony.
2      MR. CASTANO:   I don't think I agree
3 with what you just said, but I don't think we have to
4 have an argument over it.  The record is what the
5 record is.
6      MR. STOLPER:   I just want to object when
7 you say clients --
8      MR. CASTANO:   I understand, but I think
9 last time Mr. Kenner went through approximately
10 twenty clients that appear to be investors in Little
11 Isle IV as well as investors in, or members of Little
12 Isle IV, Diamante Cabo San Lucas and Diamante del
13 Mar.
14      We can come back and go client by client
15 for multiple testimony sessions, but I think
16 generally there are approximately twenty clients of
17 Mr. Kenner that were members or investors of these
18 entities.
19      MR. STOLPER:   Not in dispute.
20      MR. CASTANO:   Okay, and whether they
21 are -- I think the record is what the record is, but
22 I think when I talk about lines of credit, I am
23 referring to approximately ten clients of Mr.
24 Kenner's that he just testified right now about, that
25 there were approximately ten clients of his between
                                          Page 10

Kenner 08.16.11

0467
1   2004 and 2007 that took out lines of credit.
2               The questions then were about lines of
3   credit of one of Mr. Kenner's clients, I think that
4   is clear, they are his clients, paying off another
5   member's or another client of his line of credit.
6               Mr. Kenner's testimony is, I think, that
7   money was used to reimburse Hawaiian expenses for
8   various Hawaiian projects.
9       Q.   Is that correct, Mr. Kenner?
10      A.   I believe that is correct.
11              MR. STOLPER:   Chris, I just want to
12  make my -- I am not even objecting.  It is just a
13  clarification of the line of questioning, because
14  everything you said factually I agree with.  There is
15  an inference, though.
16              Chris is also husband and he is an SEC
17  attorney.  If I ask a line of questions and say as an
18  SEC attorney did you buy groceries last night for
19  your wife.  Yes, you are an SEC attorney and you did
20  buy groceries for your wife last night before you got
21  home.  The point is the fact that you are an SEC
22  attorney is completely irrelevant to the narrative of
23  were you buying groceries for your wife last night.
24              In these questions you are saying, with
25  your clients, did your clients.  All I am saying is
0468
1   if the reference to clients is for identification
2   purposes, then I will not have an objection to the
3   line of questioning.  If the purpose of your question
4   is Phil Kenner, as a business manager for your twenty
5   clients or ten clients involved in this deal, acting
6   as a business manager, did you arrange for a line of
7   credit for use in this particular transaction, then I
8   have an objection.  I don't want to slow the day down
9   by objecting to every question where you reference a
10  client.
11              Does that make sense?
12              MR. CASTANO:   It doesn't make sense.
13              The record is what the record is.  I
14  don't know if I fully follow what you are saying.
15  Regardless, I think the record is clear.  You can
16  make your objections.  There may come a time where
17  you can put this all together in some future
18  discussion, but I don't think I follow what you are
19  saying and I don't think it matters what -- I think
20  the record is what the record is.  I think we are
21  making arguments here.
22              Mr. Kenner, again, has approximately
23  twenty clients.  We are talking about the time period
24  2004 to 2007, approximately ten of these clients take
25  out lines of credit.  I believe that's Mr. Kenner's
0469
1   testimony.
2               MR. STOLPER:   When they did that they
3   weren't in the capacity as his clients.  They were in
4   the capacity of a fellow investor in an investment.
5               MR. CASTANO:   That might be fine, and,
6   again, the record is what the record is.
7       Q.   But what I am seeing, Mr. Kenner, is
8   lines of credit coming in and then being used to pay
9   other lines of credit.  Your testimony is that was
10  for reimbursement of various Hawaiian expenses.

Page 11

Kenner 08.16.11
11          The question then was, to you, was every
12 single penny of one client's line of credit, when it
13 was being used to pay another client's line of
14 credit, reimbursement for Hawaiian expenses or was
15 there possibly some other expenses that were being
16 paid, I guess, regardless of what hat you were
17 wearing?
18          A.   To the best of my recollection, all
19 funds that were used by any of the investors, whether
20 they were cash investors or line of credit investors,
21 were all of the funds that were deemed, in my
22 opinion, cash, the responsibility of the LLC.  And
23 they were used solely for expenses related to the
24 projects and the objectives of The Hawaiian Group.
25          Q.   Just so that record is clear, we see one
0470
1 line of credit of one of your clients coming in to
2 pay another line of credit of one of your clients.
3 When that happens, is it your testimony that, well,
4 that line of credit was simply being used a
5 reimbursement for Hawaiian-related expenses?
6          A.   No.  I want make sure we don't mince
7 words because I know we are dancing on a fence top
8 right now.
9          Q.   Okay.
10          A.   If an investor chose to put up a million
11 dollar line of credit, that investor, whether the
12 line of credit was ever used or not for that
13 offering, received the full representative share of
14 equity in the Hawaii project.  Those funds as they
15 were used, whether it was from a line of credit or a
16 cash investment directly from themselves or another
17 investor, were used month over month for the
18 acquisition of land, for infrastructure planning,
19 survey, geo tech work, legal bills, payroll, travel
20 and entertainment expenses.  Some of those
21 obligations also included The Hawaiian Group's
22 ongoing responsibility to make those monthly line of
23 credit interest payments.
24          And that was the agreement that each of
25 the line of credit people were aware of.  That was
0471
1 part of the responsibility at that point in time as
2 long as the Hawaiian group was still solvent.
3          Q.   Is it your testimony, then, that your
4 clients became members of Little Isle IV either by
5 making an equity investment specifically wiring
6 monies, or in the alternative, establishing a line of
7 credit which can be drawn down upon, and that through
8 establishing a line of credit, they also became
9 equity members of Little Isle IV?
10          A.   I believe that's correct.
11          Q.   Just so that we are very clear, when I
12 see in the bank records one client of yours line of
13 credit being paid by another client of yours line of
14 credit, that is, your testimony, was used to
15 reimburse the various Hawaiian projects?
16          A.   I believe that's correct.
17          MR. STOLPER:   In the abstract, that
18 sounds great, but if want to be concrete, put
19 something in front of him.
20          Q.   It is your testimony now that there
21 wouldn't be any other expenses when one client's line
Page 12

Kenner 08.16.11
22  of credit is being paid down by another client's line
23  of credit other than Hawaiian development project and
24  all that encompasses, travel, entertainment and what
25  have you?
0472
1           A.   I don't know what else would fit in
2   other than expenses directly related to investments
3   that The Hawaiian Group made.  Travel and
4   entertainment, ongoing operational expenses, loans to
5   Ken Jowdy, other dealings directly related and for
6   beneficial interest of The Hawaiian Group.
7           Q.   Were there clients of yours that --
8   withdrawn.
9           A.   In fact, at one point in time when one
10  of the line of credit guarantors named Joe Juneau
11  asked to be removed from The Hawaiian Group.  He was
12  the only individual that ever requested he be removed
13  from The Hawaiian Group.
14               I happened to be with Owen Nolan at the
15  time, who had a real dislike for Juneau as a person.
16  He told me to take the money out of his line of
17  credit and pay off the Juneau line of credit to get
18  rid of him from the group.  So they were all aware,
19  including Mr. Nolan, of the funds that were
20  transferred from their line of credit, although the
21  corporation was already authorized to do so.
22          Q.   I understand it might be your testimony
23  that they were all aware.  Are you aware that some of
24  your clients, or former clients, might dispute what
25  you just said?
0473
1           A.   I am sure.
2           Q.   I want to shift gears --
3               MR. STOLPER:   I am going to have a
4   standing objection to the reference to clients based
5   on my explanation before, which you didn't
6   understand, but since you keep relying on the
7   transcript, I will place in transcript my standing
8   objection.
9               MR. CASTANO:   That's fine.
10          Q.   Just so we are clear, Mr. Kenner,
11  between 2004 and 2007 you had approximately twenty
12  clients that invested or were members of Little Isle
13  IV, Diamante Cabo San Lucas and Diamante del Mar; is
14  that correct?
15          A.   That sounds approximately correct.
16          Q.   And just so that we are clear, between
17  2004 and 2007 approximately, you had discussions with
18  your clients about investment opportunities in Little
19  Isle IV, Diamante del Mar and Cabo San Lucas; is that
20  correct?
21          A.   That's correct.
22               (Whereupon, at this time, Mr. Stepaniuk
23  entered the room.)
24               MR. CASTANO:   So the record is clear,
25  George Stepaniuk has just joined us.
0474
1               Let's go off the record at 11:02.
2               (Recess taken.).
3               MR. CASTANO:   We are back on the record
4   at 11:12 a.m.
5           Q.   Mr. Kenner, while we were off the
6   record, were there any substantive conversations
                                                    Page 13

Kenner 08.16.11

7    between the Commission staff and yourself?
8             A.   There were not.
9             Q.   I want to shift gears now and talk about
10   Little Isle IV.  I know the last day we were together
11   we spent a little bit of time at the end talking
12   about Little Isle IV and you answered some questions.
13   Some of this might be repetitive, but there is also
14   some documents with Little Isle IV that we also want
15   to put before you and ask you questions, so let's
16   just begin, I know you talked about it a little bit
17   earlier, what is the business of Little Isle IV?
18            A.   Little Isle IV was an investment group
19   that was investing in the Hawaiian real estate
20   project and other various special projects.
21            Q.   When you say "other various special
22   projects," what are referring to?
23            A.   One of which became loans to Ken Jowdy.
24            Q.   Were there any other projects?
25            A.   Not that I recall specifically.
0475
1             Q.   Any other business ventures?
2             A.   Not that I recall at the time.
3             Q.   And what is your current position at
4    Little Isle IV?
5             A.   I think I am just an investor at this
6    time in Little Isle IV.
7             Q.   Was there a time that you had a
8    different position?
9             A.   Yes, I was a managing member of Little
10   Isle IV for some period of time.
11            Q.   When did you stop being the managing
12   member of Little Isle IV?
13            A.   I don't recall specifically.
14            Q.   2008, 2009?
15            A.   It was after 2006.
16            Q.   Is that after there was some
17   acquisition?
18            A.   Yes, that's after the joint venture with
19   Lehman Brothers.
20            Q.   And prior to the joint venture with
21   Lehman Brothers, what were your duties and
22   responsibilities as a managing member of Little Isle
23   IV?
24            A.   To run the day-to-day operations of the
25   Little Isle IV project.
0476
1             Q.   Were there any other employees?
2             A.   There were no employees of Little Isle
3    IV.
4             Q.   Was there anyone else affiliated before
5    2006 with Little Isle IV?
6             A.   Affiliated in what context?
7             Q.   Meaning not employees, but they might
8    have been a consultant of Little Isle IV.
9             A.   We paid a series of consultants between
10   approximately 2004 and the Lehman closing in 2006 to
11   assist us in market studies, sourcing funds for
12   development, sourcing funds for infrastructure and
13   build out prior to Lehman Brothers getting involved
14   with our project.
15            Q.   Were those the same consultants that
16   were also trying to find hard lenders and various
17   other lenders to lend the company money?

                              Page 14

Case 2:13-cr-00607-JFB-AYS   Document 401-8   Filed 10/07/16   Page 15 of 102 PageID #: 10512

Kenner 08.16.11

```
18              A.    That's correct.
19              Q.    Did Christine Myrick have any position
20    at Little Isle IV?
21              A.    Christine Myrick played a few roles with
22    The Hawaii Group.  She was probably, unfortunately,
23    the loudest voice box of what was going on in Hawaii
24    to induce other people to ask me about becoming
25    members ultimately, which she also became.
0477
1               Q.    What does that mean?    I don't
2     understand.
3               A.    Christine Myrick would speak to more
4     clients on a daily basis than I would and enjoyed
5     bragging about the fact that there were several of
6     our Standard Advisor clients had become members of
7     Little Isle IV and were buying real estate in Hawaii
8     at the time, and as she would discuss that with the
9     different clients, I would subsequently receive phone
10    calls asking why those, the additional clients,
11    weren't being introduced to what we were doing in
12    Hawaii.  So that subsequently led to more discussions
13    with new people who wanted to become members of that
14    entity.
15              Q.    Did she have a role in fund-raising for
16    Little Isle IV?
17              A.    I believe she tried to introduce --
18    strike that.
19                    I believe that she tried to introduce me
20    to several hard money people.  She also was one of
21    the people who introduced me to new Little Isle IV
22    members over time.
23              Q.    Just so we are clear, she wasn't a
24    consultant, she wasn't an employee, but she was doing
25    what appears to be work on behalf of Little Isle IV.
0478
1                     Can you just explain it to me?
2                     MR. STOLPER:   An employee of whom?
3               Q.    Was she an employee of Little Isle IV?
4               A.    She was an employee of Standard Advisors
5     but liked to talk about everything that was going on
6     to anyone that would listen to her.
7               Q.    Explain to me, was she authorized to
8     speak to clients about the all different investments?
9                     Explain it to me like I am a five year
10    old?
11                    MR. STEPANIUK:   Let's say 12.
12              Q.    A 12 year old.
13              A.    Christine Myrick was an office manager
14    for Standard Advisors, but through her manic behavior
15    that stemmed from either her alcohol problem, her
16    drug problem or her sex addiction, liked to make
17    herself feel very important to my different clients
18    or prospective clients of Diamante Cabo San Lucas,
19    Diamante del Mar, or The Hawaiian Group.  So I am not
20    sure she was authorized or unauthorized to speak to
21    them on a myriad of issues that she chose to do so,
22    but she did speak with the clients and the wives on
23    every opportunity she could.
24              Q.    Were you her supervisor?
25              A.    I was.
0479
1               Q.    Were you aware she was speaking to
2     clients about Little Isle IV?
```

Page 15

TR-SEC00000341

Kenner 08.16.11
```
 3          A.  I had asked her on several occasions to
 4    stop promoting and talking to people about the
 5    business that was outside the scope of her daily
 6    responsibilities.
 7          Q.  What did she say to you?
 8          A.  She would typically apologize, ask for
 9    forgiveness, and over approximately a 24 to 36 month
10    period of time, that became her pattern.  Whether it
11    was with alcohol problems, drug problems, sex
12    addiction problems with my clients, or talking out of
13    school to a number of clients, to the point where
14    over a 12 month -- excuse me, over a six-month period
15    of time she was able to maintain and keep her job but
16    she was restricted from communication directly with
17    any of the clients as a condition of her continued
18    employment.
19          She ultimately violated that by sleeping
20    with two more of my clients and was subsequently
21    fired and vowed vindication on me.
22          Q.  when did she leave Little Isle IV?
23          A.  She was never a member.  She was an
24    employee --
25          Q.  when did leave Standard Advisors?
0480
 1          A.  She was told about her termination in
 2    December of '06 or November of '06.  She was told by
 3    me that I would help her find new employment, but a
 4    condition of that would be that she couldn't speak
 5    with the clients because of her manic state.  I had
 6    heard many rumors that she had spread leading up to
 7    that, one of which was about her breast cancer being
 8    the reason that she was being terminated.
 9          Q.  So she left in December or November '06?
10          A.  She was ultimately terminated in
11    February '07, but I continued to pay her and try to
12    help her find a job.
13          Q.  Did she ever receive any compensation
14    for her solicitation efforts for Little Isle IV?
15          A.  She was never an authorized solicitor of
16    Little Isle IV, although --
17          Q.  That wasn't the question.
18          The question was:  Did she ever receive
19    any compensation for her efforts in speaking to
20    clients of Standard Advisors about Little Isle IV?
21          A.  No.
22          Q.  Did she make an investment in Little
23    Isle IV?
24          A.  She did.
25          Q.  How did she make her investment, with
0481
 1    her own money or did she get money from someone?
 2          A.  Her own money.
 3          Q.  How much money did she invest?
 4          A.  $25,000.
 5          Q.  Do you know where she got the $25,000?
 6          A.  I believe she got it from a divorce
 7    settlement.
 8          Q.  Are you an investor in Little Isle IV?
 9          A.  I am.
10          Q.  when did you become an investor in
11    Little Isle IV?
12          A.  I was one of the original investors in
13    Little Isle IV.  Subsequently, after I sued her for
```
Page 16

Kenner 08.16.11

14  slander and defamation, I bought her out of that
15  investment to remove her from all the activities that
16  related to my existing clients.
17          Q.  When was the time period when you became
18  an original investor in Little Isle IV?
19          A.  When Joe Juneau and Owen Nolan and I
20  were originally involved in the project in around
21  2002, 2003.
22          Q.  So it was you, Joe Juneau, who else?
23          A.  Owen Nolan.
24          Q.  Anyone else?
25          A.  John Kaiser.  We were the four original
0482
1   investors.
2           Q.  How much did each individual invest?
3           A.  I don't recall.
4           Q.  Did you invest your own money or did you
5   invest someone else's money?
6           A.  My own money.
7           Q.  where did you get the funds to make an
8   investment Little Isle IV?
9           A.  Savings and income.
10          Q.  Did Little Isle IV have any corporate
11  offices or were they just located at your office at
12  Standard Advisors in Scottsdale?
13          A.  At Standard Advisors' location.
14          Q.  was Little Isle IV formed around the
15  time of the original four investors making an
16  investment?
17          A.  Yes, it was.
18          Q.  And the original four investors who made
19  an investment, what was their percentage ownership of
20  Little Isle IV?
21          A.  I don't recall.
22          Q.  was it 25 percent each or was it some
23  other percentage breakdown?
24          A.  I don't recall.
25          Q.  Do you know if you owned 99 percent of
0483
1   the company and they owned one third of one percent?
2               Do you have any idea of how much?
3           A.  I am sure I didn't own 99 percent and I
4   can split the remaining members at one third, one
5   third and one third of a point each.
6           Q.  Do you know if you owned more than 50
7   percent of Little Isle IV?
8           A.  As I sit here today, I really don't
9   recall.
10          Q.  Do you know if Little Isle IV is
11  incorporated?
12          A.  I don't know.
13          Q.  Do you know if there are documents that
14  would have that type of information?
15              MR. STOLPER:  Do you know what
16  incorporated means?
17              THE WITNESS:  No.
18              MR. STOLPER:  Did you ever create a LLC
19  that became Little Isle IV?
20              THE WITNESS:  Yes.
21              MR. STOLPER:  You filed papers in what
22  state?
23              THE WITNESS:  Delaware.
24              MR. STOLPER:  So the answer to the
                                Page 17

Kenner 08.16.11
25    question is yes, it was incorporated.
0484
1              A.   I misunderstood.
2    BY MR. SMITH:
3              Q.   Was it an LLC?
4              A.   It was an LLC.
5    BY MR. CASTANO:
6              Q.   Do you know where it was incorporated as
7    an LLC?
8              A.   In Delaware.
9              MR. STEPANIUK:   You could say formed.
10             THE WITNESS:   Formed would be a word I
11   would use.   Thanks, George.
12             Q.   In early 2002, 2003, when there were
13   four initial investors, did you receive any
14   consulting fees or any fees from Little Isle IV
15   itself?
16             A.   I don't believe so.
17             Q.   Do you know if anyone received any
18   consulting fees from Little Isle IV?
19             A.   I don't believe so.
20             Q.   At any time after the initial investment
21   by the four investors including yourself, were any
22   persons employed temporarily by Little Isle IV,
23   meaning you brought in a president or officer, until
24   the time of the acquisition or arrangement between
25   Little Isle IV and Lehman Brothers?
0485
1              A.   I don't believe so.
2              Q.   Do you know if Little Isle IV had
3    audited financials prior to the acquisition by Lehman
4    Brothers?
5              A.   I don't recall specifically but Lehman
6    Brothers requested all of our banking statements
7    leading up to the acquisition.   The joint venture,
8    excuse me, to be clear.
9              Q.   Before the joint venture, do you recall
10   if there were any audited financials of any Little
11   Isle IV entities?
12             A.   I don't believe so.
13             Q.   Do you ever recall hiring an accounting
14   firm or CPA firm to perform any type of accounting
15   services for Little Isle IV prior to the joint
16   venture with Lehman Brothers?
17             A.   I don't believe so.
18             Q.   Do you know if Little Isle IV is
19   registered with the SEC or any other regulatory
20   organization?
21             A.   I am not aware.
22             Q.   Just so we are clear, there were four
23   investors in Little Isle IV.   You were at the time
24   the managing member?
25             A.   Yes.
0486
1              Q.   Were you compensated at all for being
2    managing member?
3              A.   I was not.
4              Q.   Did Little Isle IV maintain bank
5    records?
6              A.   Yes.
7              Q.   Do you know where they maintained bank
8    records?
9              A.   Yes.

Page 18

Kenner 08.16.11

```
10          Q.   Where was that?
11          A.   Northern Trust Bank in Phoenix, Arizona.
12          Q.   Did that ever change over time?
13          A.   I don't believe so.
14          Q.   Was there only just one bank account for
15   Little Isle IV?
16          A.   To the best of my recollection.
17          Q.   Did there ever come a time that you
18   discussed an investment opportunity in Little Isle IV
19   with any of your clients?
20               MR. STOLPER:   Can I get that read back?
21               (Record read.)
22               MR. STOLPER:   Same objection as before.
23          A.   To the best of my recollection, I would
24   have clearly discussed what we were doing in Hawaii
25   with any one of my friends or clients that asked what
0487
 1   we were doing in Hawaii.  With Owen Nolan and Joe
 2   Juneau at the time.
 3   BY MR. STEPANIUK:
 4          Q.   Is that in addition to calls that you
 5   got after Christine had told people on the phone
 6   about Little Isle IV?
 7          A.   Can you just say the first part again?
 8          Q.   Yes.  Is that in addition to
 9   conversations you may have had with people told about
10   Little Isle IV by Christine, as you testified
11   earlier?
12          A.   I don't recall where basically all of
13   the clients originally heard about it.  But if you
14   are asking me to guess where most of them heard about
15   it, it was from Christine and her desire to promote
16   what Owen and Joe Juneau and I were doing in Hawaii.
17          Q.   Just so it is clear, you came to learn
18   of her activities in that regard because then you got
19   phone calls from people you knew who wanted to invest
20   in Little Isle IV having talked to Christine?
21          A.   That's correct.
22               And in addition, she held a real estate
23   license and wanted to pursue becoming a real estate
24   broker or agent in Hawaii in order to capture the
25   real estate commissions.  That was one of her goals
0488
 1   in promoting the activity in Hawaii.
 2          Q.   Mr. Kenner, we can go through each
 3   investor or member of Little Isle IV, but did there
 4   come a time that you had a discussion with Brian
 5   Berard about an investment opportunity in Little Isle
 6   IV?
 7          A.   Yes, I spoke with Brian about what Joe
 8   Juneau and Owen Nolan and I were doing in Hawaii.
 9          Q.   And when was that?
10          A.   I don't recall.
11          Q.   Do you know what you told him about an
12   investment opportunity in Little Isle IV?
13               MR. STOLPER:   Objection.  He is
14   characterizing your testimony as describing an
15   investment opportunity.  If that's accurate, answer
16   the question.  If it is not, you need to respond
17   accurately.
18          A.   As each of my clients had become friends
19   over time, they were always interested in what I was
20   doing.  So I don't believe that I was telling them
```

Page 19

Kenner 08.16.11
21  about an investment opportunity that they needed to
22  be a part of. All of my guys were interested in what
23  I did all the time, whether it was travel with a
24  tennis tour, give financial lectures, go to schools,
25  give financial seminars to sports majors, or whether
0489
1  it was being involved with a real estate project in
2  Mexico or Hawaii.
3       Q. Did there ever come a time that you had
4  a conversation with Brian Berard about investing in
5  Little Isle IV?
6       A. To be clear so we don't have to go
7  through the whole list, any individual who ultimately
8  invested in Little Isle IV had a conversation with me
9  about what was going on in the real estate project in
10  Hawaii.
11      Q. What did you say to -- let's just take
12  Mr. Berard, if anything, about Little Isle IV and an
13  opportunity to perhaps be a member of Little Isle IV?
14      A. Whether I was speaking with Mr. Berard
15  or anybody else, I would clearly outline and define
16  our desire to purchase raw land in Hawaii and
17  ultimately turn around and either develop or sell the
18  land for a profit.
19      Q. And would you tell them that prior to
20  them making -- prior to them becoming a member of
21  Little Isle IV?
22      A. I can't imagine any other way they would
23  become a member if they didn't know what was going
24  on.
25      Q. What else, if anything, did you say to
0490
1  Mr. Berard about becoming a member of Little Isle IV?
2       A. I don't recall.
3       Q. Did you discuss with him that monies
4  would be used, at the time Mr. Berard made his
5  investment, for other projects?
6       A. Depending on when someone became a
7  member of Little Isle IV and wanted to ask what the
8  scope of the Hawaii projects were, if there were, as
9  an example, loans at the time outstanding to Ken
10  Jowdy, that would have been discussed. In as much as
11  we would have had a conversation about land that
12  already been purchased in Hawaii, our ongoing
13  infrastructure efforts and our ongoing funding
14  effort.
15      Q. At the time Mr. Berard became a member
16  of Little Isle IV, was he given any documents by you
17  about Little Isle IV?
18      A. I don't recall.
19      Q. Was he given the by-laws of Little Isle
20  IV?
21      A. Every document that we had available,
22  and specifically by-laws and operating agreements for
23  Little Isle IV or any of the other Hawaiian entities,
24  were given to all of the investors.
25      Q. Were they given to the investors prior
0491
1  to them becoming members or actually purchasing
2  membership interest in Little Isle IV?
3       A. Absolutely.
4       Q. Do you know who gave them those
5  documents?

Page 20

TR-SEC00000346

Kenner 08.16.11

6      A.  It would have been me.
7      Q.  Would there have been anyone else?
8      A.  Not that I recall.  Although I may say
9  Christine Myrick may have delivered packages to
10 individuals.
11     Q.  Are you aware of anyone who, putting
12 aside conversations you might have had with your
13 clients or members of Little Isle IV, are you aware
14 of any other individual or group of individuals that
15 were actively trying to solicit investment
16 opportunities in Little Isle IV?
17     A.  I don't know anyone, including myself,
18 that was actively trying to solicit new members into
19 Little Isle IV.
20     Q.  So Ken Jowdy wasn't out there soliciting
21 investment opportunities in Little Isle IV?
22     A.  I don't know.  Not that I am aware of.
23     Q.  And you are not aware of anyone else?
24     A.  I am not aware of conversations that I
25 was not a part of.
0492
1      Q.  At the time Mr. Berard made an
2  investment in or became a member of Little Isle IV,
3  do you know if you had a discussion with him
4  concerning how much money he was going to invest and
5  what he would receive in exchange for his investment?
6      A.  I believe, whether it is Mr. Berard or
7  any of the ultimate members of Little Isle IV, they
8  would have received by-laws or operating agreements
9  for Little Isle IV, and it would have been
10 represented to them that based on whatever they chose
11 to invest, the new partnership breakdown of equity
12 would occur.
13     Q.  Did you have that conversation with
14 them?
15     A.  With each and every one.
16     Q.  So they would say I am investing X
17 amount.  That means you will get a certain of
18 percentage of the LLC back; is that correct?
19     A.  That sounds correct.
20     Q.  Do you recall specifically having those
21 conversations with a certain of number of your
22 clients between 2004 and 2006?
23     A.  Every one of them would have had that
24 conversation to be very clear.  There was no
25 misunderstanding about what they were asking to get
0493
1  involved with.
2      Q.  Did you have any conversations with any
3  of your clients or members of Little Isle IV prior to
4  them making or becoming a member about their
5  principal and whether their principal was safe?
6      A.  Again, and I think we touched on this
7  the last time I was here, using the word "safe" would
8  not have come out of my mouth as far as an investment
9  goes.  It would be incredibly uncharacteristic for me
10 to categorize anything as safe since I was a risk
11 manager for those people.
12     Q.  Just so it is clear, is it your
13 testimony that you never told any member of Little
14 Isle IV that they would not lose their principal
15 investment in Little Isle IV?
16     A.  Absolutely not.

Page 21

Kenner 08.16.11
17          Q.    Besides discussing with members of
18    Little Isle IV who became members of Little Isle IV
19    prior to them making their investment the fact that
20    monies were going to be used to acquire Hawaiian land
21    and to make loans, did you have any other
22    conversations with your clients about Little Isle IV?
23          A.    We talked about a series of potential
24    special projects that would be related to Little Isle
25    IV, in addition to ongoing loans that were
0494
 1    outstanding for the benefit of the company, and the
 2    purchase of the lands and potential development of
 3    those lands.
 4          Q.    Besides those two, the development of
 5    Hawaiian land as well as loans on behalf of Little
 6    Isle IV to other entities and special projects, were
 7    those -- and this is a long-winded question -- were
 8    those items discussed prior to a Little Isle IV
 9    member becoming a member?
10          A.    Again, I think answered this in a
11    similar question earlier, but the entire scope of
12    what was going on with Hawaii would be discussed with
13    anybody that wanted to ask about it, whether they
14    became a member ultimately or not, at their request.
15    The entire scope of current projects, future scope
16    projects, special projects, which would include the
17    likes of coffee farming, a water bottling company
18    with Hawaiian water, a nursery and landscape project,
19    a solar project, all related to the Hawaiian
20    entities.  They were all discussed at length and ad
21    nauseam.
22          Q.    Prior to someone becoming a member
23    Little Isle IV?
24          A.    Always prior.
25          Q.    Do you know how much money was raised
0495
 1    from members of Little Isle IV in total?
 2          A.    As I sit here today, my best guess is
 3    between ten and twelve million dollars.
 4          Q.    So the record is clear, is that
 5    approximately?
 6          A.    Yes.
 7          Q.    The things that you just described, the
 8    various projects to acquire land, develop a nursery,
 9    some solar power, were these things ever memorialized
10    in writing, be it in a prospectus or e-mail to any of
11    your clients?
12          A.    No.  The entire scope of the projects
13    that were ongoing were future consideration projects,
14    were all discussed face-to-face with the clients,
15    with the members or future members.
16          Q.    Why didn't you ever put any of that in
17    writing, those projects, those special projects you
18    discussed?
19          A.    Primarily because I would spend upwards
20    of 300 days a year on the road, sitting in living
21    rooms of my clients.  And they would prefer to have
22    hours and hours of conversation about what was going
23    on as opposed to read a three to five-page document
24    summarizing it.
25                In fact, in Owen Nolan's testimony in
0496
 1    our arbitration, he claims he hasn't read a document
                              Page 22

TR-SEC00000348

Kenner 08.16.11

2   in twenty years, although I brought documents after
3   documents after documents to him.  So we are not
4   dealing with a sophisticated business individual.
5   These were ongoing dynamic conversations that made
6   them feel good about what we were doing.
7        Q.  After a member acquired an interest in
8   Little Isle IV, did you have conversations with them
9   about the project?
10       A.  Ongoing and all the time.  During these
11  years I used to spend over 10,000 minutes a month on
12  the phone talking to my clients endlessly about these
13  issues and their own personal business issues.
14       Q.  Can you tell me about what you told
15  members of Little Isle IV about loans that Little
16  Isle IV was making?
17       A.  Loans to Ken Jowdy.
18       Q.  Were there other loans?
19       A.  I believe that's it.
20       Q.  Can you tell me about that?
21       A.  I told them in 2004/2005 that Ken Jowdy
22  had approached us about lending money to him.  He had
23  proposed to pay us 15 percent interest on the money,
24  and it would be recapitalized when Ken Jowdy was able
25  to acquire financing either on the Diamante del Mar
0497
1   project, which had been ongoing, or the Diamante Cabo
2   San Lucas project at the closing with Lehman
3   Brothers.  And every member to a person was thrilled
4   about the opportunity to do that.
5        Q.  The loan with -- between Little Isle IV
6   and Ken Jowdy, was that memorialized in any way in
7   writing?
8        A.  Yes, it was.
9        Q.  There is a document that has the loan in
10  it?
11       A.  Yes.
12       Q.  And it has the terms of 15 percent
13  interest?
14       A.  Yes, it does.  And it was turned over to
15  you guys.
16           We ended up loaning Ken Jowdy
17  approximately $7 million over that period of time and
18  he repaid us under the terms of the agreement
19  approximately $2 million, and then ultimately refused
20  to continue paying after he closed the Cabo San Lucas
21  deal.
22       Q.  Is there any dispute over the
23  authenticity of the loan document?
24       A.  Yes, there is.
25       Q.  Was there any e-mail of that loan
0498
1   document sent at the time of the loans?
2        A.  Not that I am aware of.
3        Q.  Was that loan document provided to any
4   of Little Isle IV members?
5        A.  I don't recall.
6        Q.  Do you know if that loan document was
7   provided to Lehman Brothers prior to or during their
8   due diligence in late 2005 and 2006?
9        A.  I can only imagine it was because
10  Masood Bhatti was the loan manager at Lehman Brothers
11  had agreed to capitalize Ken Jowdy's equity position
12  in the Cabo San Lucas project to come up with the $7
                          Page 23

                                    Kenner 08.16.11
13    million, plus or minus, that was due under the terms
14    of the agreement at the closing.
15            Q.  Do you know if it was, in fact, or not?
16            A.  I couldn't speak to that end, but Bill
17    Najam and Ken Jowdy may have represented that,
18    because Masood Bhatti was very clear at the closing
19    that he would capitalize Ken Jowdy's equity in the
20    Cabo San Lucas closing in order to repay those loans.
21            And I assume with Lehman Brothers, as we
22    thought of them at the time in 2006, they wouldn't
23    just openly offer up $7 million payout on somebody's
24    words.
25            Q.  How much was loaned from Little Isle IV
0499
1     to Ken Jowdy?
2             A.  Some portion of that $7 million.
3             Q.  Was it 7 million?
4             A.  There were two entities that ended up
5     loaning money through to Ken Jowdy, Little Isle IV
6     and, Ula Makika, U-L-A, M-A-K-I-K-A.  Between the two
7     they represented I believe 100 percent of loan
8     monies.
9             Q.  You mentioned Ula Makika, what was that?
10            A.  It was just an LLC that was set up after
11    the fact to be a buffer between Ken Jowdy and the
12    Little Isle IV members.
13            Q.  Did Ula Makika ever acquire an interest
14    in Little Isle IV?
15            A.  It did not.
16            Q.  Did Ula Makika ever raise money itself?
17            A.  It did not.
18            Q.  Where did Ula Makika get monies?
19            A.  From Little Isle IV or any of the other
20    Hawaiian entities.
21            Q.  And Ula Makika, is that an entity that
22    you are affiliated with?
23            A.  It was a single LLC set up in Delaware
24    solely to be a buffer at one point between the Little
25    Isle IV members and Ken Jowdy.  There was no other
0500
1     purpose for it necessarily.
2     BY MR. SMITH:
3             Q.  What do you mean to be the buffer?
4             A.  In as much as I knew at the time, that
5     the LLCs would protect the members in the event of
6     litigation from being dragged into potential
7     litigation.  At the time it was suggested to me by
8     attorneys that I had that I should set up a separate
9     entity, and as much of the money that could go from
10    Little Isle IV or other entities to Ula Makika and
11    then out as the loans would create a buffer between
12    any of those people in any future litigation.
13            It was legal advice.
14            Q.  So the members of Little Isle IV would
15    provide money to Ula Makika with the intent of that
16    money being lent to Ken Jowdy?
17            A.  And so would others, yes.
18            Q.  And Ken Jowdy would, in fact, receive
19    the loans from Ula Makika?
20            A.  That's correct, just as he had from
21    Little Isle IV.
22            MR. STOLPER:  I think that you
23    testified the last time that Ula Makika is solely
                                    Page 24

Kenner 08.16.11
24    owned, 100 percent owned by Little Isle IV; correct?
25                THE WITNESS:    All of the funding that
0501
 1    went through was owned by -- Ula Makika, I was the
 2    managing member, but all of the funding passed
 3    through from the different various Hawaii investors,
 4    Little Isle IV being one of the groups that I believe
 5    funded money into Ula Makika.
 6                And, in fact, Ken Jowdy as a result of
 7    the loans, actually repaid a significant amount of
 8    money back through Ula Makika.  So that it was used
 9    operationally for the company.
10    BY MR. CASTANO:
11                Q.  Ula Makika and Little Isle IV combined,
12    how much did they lend to Ken Jowdy?
13                A.  I believe around $7 million.  And
14    approximately $2 million was paid back by Ken Jowdy
15    to those entities under the terms of the agreement.
16                Q.  Did you inform the members of the Little
17    Isle IV that approximately 7 million of approximately
18    12 million, essentially more than half of the monies
19    raised, would be lent to Ken Jowdy?
20                A.  As we had discussions ongoing with each
21    of the members, they were all aware that there was
22    significant money being lent to Ken Jowdy.
23                Q.  Did you specifically tell them 7
24    million, more than half, 7 million of 12 million?
25                A.  If they asked and we were discussing the
0502
 1    actual amounts, they were made aware of what the
 2    outstanding balance was to the best of my knowledge
 3    at that time.
 4                Q.  Are there any members that would say
 5    that you didn't tell them this?
 6                A.  I don't know.
 7                Q.  Are you aware of any members that say
 8    you didn't tell them?
 9                A.  Short of Owen Nolan, who we are all
10    aware has been manipulated unfortunately by attorney
11    Michael Meeks and my former employee Christine
12    Myrick, I am not aware of anyone else that would make
13    such statements.
14                Q.  So there is only one person you are
15    aware of?
16                A.  I am only aware of Owen Nolan.
17                Q.  Besides the loan agreement that you
18    talked about before between Little Isle IV and Ken
19    Jowdy, were there any other written documents or
20    e-mails which would memorialize the fact that there
21    was a loan?
22                A.  Not that I am aware of.
23                Let me restate that.  There are e-mails
24    that were turned over to you guys that were part of a
25    2007 effort to negotiate Ken Jowdy out of the Cabo
0503
 1    San Lucas project, where the e-mails back and forth
 2    between Ken Jowdy, Bill Najam and Tommy Constantine
 3    represents that eight and a half million dollars at
 4    that time was the obligation of Ken Jowdy to pay.  So
 5    the e-mail traffic between Jowdy, Najam and
 6    Constantine trying to negotiate a global settlement
 7    between all of the issues that were outstanding with
 8    Ken Jowdy's theft or refusal to repay was all
                                Page 25

Kenner 08.16.11

9    memorialized in e-mails.  So, yes, there were other
10   documents, Chris.  Sorry.
11            Q.  Were there any e-mail documents prior to
12   2006?
13            A.  Not that I recall.
14            Q.  And that document, the loan document
15   that you are talking about, when was that document
16   executed?
17            A.  I believe it was in December of 2004.
18            Q.  Did the loan document discuss how much
19   money was going to be lent by Little Isle IV to Ken
20   Jowdy?
21            A.  It did not.  It was represented as a
22   revolving line of credit.
23            Q.  Who drafted the loan agreement?
24            A.  I did.
25            Q.  Did any lawyer review it?
0504
1            A.  They did not.
2            Q.  Did any of Ken Jowdy's lawyers review it
3    at the time that it was drafted?
4            A.  I don't believe so.
5            Q.  How did you deliver the document to Mr.
6    Jowdy?
7            A.  In person.
8            Q.  Was the document notarized?
9            A.  It was not.  It was signed in Cabo San
10   Lucas.
11            Q.  And it was signed by who?
12            A.  It was signed by myself, it was signed
13   by Ken Jowdy, and it was witnessed by Robert Gaudet.
14            Q.  Did you ever send that document by
15   e-mail to Mr. Jowdy?
16            A.  I did not.  Mr. Jowdy made a copy of the
17   document after the signing, retained the original,
18   and gave me a copy of it.
19            MR. CASTANO:  Do you want to break for
20   lunch right now?
21            MR. STOLPER:  It is up to you.  You
22   may want to take advantage of the fact that you have
23   George here.
24            MR. CASTANO:  That's a good point.
25            Q.  Do you know how loans were treated on
0505
1    Little Isle IV's tax documents for each year?
2            A.  No, I do not.
3            Q.  Did Little Isle IV file tax documents
4    each ear?
5            A.  Little Isle IV had 2006 tax documents.
6            Q.  Did it file tax documents in 2004 and
7    2005?
8            A.  I don't believe so.
9            Q.  why didn't it file tax documents in 2004
10   and 2005?
11            A.  I was under the understanding from the
12   accountants that since there were no taxable activity
13   in the LLCs that they did not need to file.
14            Q.  The interest on the loans wasn't a
15   taxable event?
16            A.  No interest had been paid.  Only
17   principals repayment were made in '04, '05.
18            Ken Jowdy never got his 5 million
19   principal short of beginning to repay interest and it
                        Page 26

Kenner 08.16.11

20  is still accruing to this day.
21  BY MR. SMITH:
22          Q.  What were the terms?
23          A.   To the best of my recollection, 15
24  percent interest due and payable when Ken Jowdy was
25  able to memorialize a loan agreement on either the
0506
1  Diamante del Mar project or the Cabo San Lucas
2  project.
3          Q.  So no principal -- principal has accrued
4  up that point but was not payable until that point?
5          A.  We were treating it and he was treating
6  it like a revolving line of credit.
7          And, in fact, prior to the December '04
8  signing, approximately $250,000 had been lent to him
9  and he had repaid approximately $50,000 of it.  And
10  at that point, we decided to memorialize it.  And he
11  continued to pay back in small sums from time to
12  time.  I am not sure where he got the funds to repay
13  some of those, but he did over time borrow a total of
14  approximately 7 and pay back approximately 2 million,
15  including a flurry of pay backs leading up to the
16  closing in Cabo San Lucas, which gave myself and all
17  of my partners, who were excited about receiving the
18  $7 million back from Jowdy for the outstanding 5
19  million, we were very excited and very confident at
20  that point that he had made a flurry of payments in I
21  believe January, February and March of 2006 just
22  prior to the Lehman Brothers Cabo San Lucas closing.
23          Q.  And your understanding was that the
24  agreement was that any payments that he made would be
25  applied to principal?
0507
1          A.  That's correct.
2          Q.  And that the interest would continue to
3  accrue on whatever the outstanding balance was?
4          A.  Yes, I believe that's correct.
5          Q.  And interest wouldn't be payable until
6  the closing of the entities specified?
7          A.  That is correct.
8  BY MR. CASTANO:
9          Q.  The approximately $7 million that was
10  lent from Little Isle IV to Jowdy, was that all prior
11  to 2006?
12          A.  Yes.  The last activity on those loans
13  were a series of repayments, five or six repayments
14  from Jowdy to us leading up to that pending Lehman
15  Brothers closing.
16          MR. CASTANO:  Let's mark this as
17  Exhibit 33.
18                  (NY-8125 Exhibit Number 33 was
19                  so marked for identification.)
20          Q.  Mr. Kenner, I am showing what has been
21  marked Diamante Exhibit 33.  Please take a moment to
22  review it with your attorney.
23                  (Witness complies.)
24          Q.  Mr. Kenner, have you seen what has been
25  marked Diamante Exhibit 33 before?
0508
1          A.  I believe so.
2          Q.  Do you know what it is?
3          A.  It appears to be e-mail correspondence
4  between myself and William Najam and Ken Jowdy.
                    Page 27

Kenner 08.16.11

5      Q.   Do you know what this e-mail concerns?
6      A.   I believe I do.
7      Q.   Can you tell us about it?
8      A.   At the closing of the Cabo San Lucas
9  project, the seller, I believe what the e-mail was
10 referring to were deposits on Ken Jowdy's behalf that
11 were sent directly to the seller of the Cabo San
12 Lucas project.
13          Bill Najam and Ken Jowdy for the Lehman
14 closing needed to identify the funds that went
15 directly to the seller, Don Atilio Villarino.
16     Q.   Can you spell that?
17     A.   D-O-N, space, A-T-I-L-I-O, space,
18 VILLARINO.
19          Ken Jowdy, which I found out
20 approximately a year later, represented to the seller
21 and to Lehman Brothers that these were investments in
22 the Cabo San Lucas project, not loans that were made
23 to him in order for him to participate in the
24 project.
25          In the closing documents, which I didn't
0509
1  see until early 2007 for the Cabo project, somebody
2  forged my name on two documents for Lehman Brothers
3  representing that these Ula Makika transactions and
4  these Little Isle IV transactions were, in fact,
5  equity investments and they are not loans or
6  otherwise.
7      Q.   Just so that we are clear, Mr. Kenner,
8  you believe that there were $7 million in loans made
9  to Jowdy from Little Isle IV entities prior to 2006?
10     A.   I believe that the gross number of
11 monies that went to him totalled approximately $7
12 million, and the gross number of dollars that came
13 back from Ken Jowdy or other people that he requested
14 to send money back to us under the loan agreement
15 total approximately $2 million.
16     Q.   Just so we are clear, you are positive
17 that those were not investments, the $7 million that
18 came from Ken Jowdy?
19     A.   I am crystal clear.
20          MR. CASTANO:   Let's mark this Diamante
21 Exhibit 34.
22                  (NY-8125 Exhibit Number 34 was
23                  so marked for identification.)
24     Q.   Mr. Kenner, I am showing you has just
25 been marked as Diamante Exhibit 34.  Please take a
0510
1  moment to review it.
2          (Witness complies.)
3      Q.   Mr. Kenner, have you seen Diamante
4  exhibit 34 before?
5      A.   Yes.
6      Q.   Do you know what Diamante Exhibit 34 is?
7      A.   It appears to be string of e-mails
8  between myself and Ken Jowdy.
9      Q.   Generally can you tell me about Diamante
10 Exhibit 34 and what these e-mails concern?
11     A.   They concern the basis for Ken Jowdy's
12 disconnect from me and all of our investment partners
13 as soon as he had Lehman Brothers as his funding
14 partner.
15     Q.   When you say "disconnect," what does
                    Page 28

Kenner 08.16.11
16   that mean?
17          A.   Almost immediately following the closing
18   in Cabo San Lucas, when Jowdy and Masood Bhatti made
19   it apparent they were not going to pay back the loan,
20   Ken Jowdy basically started a campaign by spending
21   travel and entertainment money, looking for new
22   projects to fund, ignoring the Cabo San Lucas project
23   as a whole, and had basically refused most
24   communications with me through the fall 2006 when I
25   continued to ask him about repayment of loans,
0511
1    operational status in Cabo San Lucas that my friends
2    and I had invested in, et cetera.
3          Q.   Besides the 7 million or approximately
4    $7 million in loans to Ken Jowdy from Little Isle IV,
5    did you personally loan Ken Jowdy money at that time?
6          A.   I don't recall the timing of the money
7    that I lent to Ken Jowdy.
8          Q.   Was there a time that you believe you
9    loaned to Ken Jowdy individually?
10         A.   Yes.
11         Q.   How much did you lend to him?
12         A.   I don't remember.
13         Q.   More than a million dollar?
14         A.   No.
15         Q.   More than $100,000?
16         A.   I believe so.
17         Q.   Under $500,000?
18         A.   I would guess so.
19         Q.   Is there any document memorializing the
20   fact that you lent Ken Jowdy money in an individual
21   capacity?
22         A.   At the time I did not memorialize
23   lending my friend money he needed to survive.
24         Q.   Approximately when was that personal
25   loan given to Ken Jowdy.
0512
1          A.   Funds were ongoing between approximately
2    2003 and 2006, when he received the funding from
3    Lehman Brothers and no longer needed me or my
4    investment friends.
5          Q.   You started lending him money in 2003?
6          A.   Approximately.
7          Q.   I am just curious, it is not
8    confrontational.  You referred to him as a friend.  I
9    think your testimony was you met him 2003 and you
10   started lending him money in 2003; is that right?
11         A.   I believe I met him 2001 or 2002, but I
12   don't recall specifically as I sit here, but
13   approximately 2003 was about when he would ask to
14   borrow funds from time to time.
15         Q.   I want to direct your attention to the
16   third page of the Diamante Exhibit 34, about four
17   paragraphs down it begins with -- the paragraph on
18   the last page.
19              You can review it, that's fine.
20         A.   Yes.
21         Q.   The paragraph begins, remember that I
22   raised 9.25 M, I guess that's million, for Diamante
23   del Mar, 7 million for what appears to be Diamante
24   Cabo San Lucas, 1 million for Cabo San Lucas Airport,
25   1 million for Diamante Air, 750 for the Vegas home --
0513

Page 29

TR-SEC00000355

Kenner 08.16.11
1  and so that the record is clear, I am paraphrasing
2  some things that have been shortened here, not
3  reading verbatim -- another 2.5 million out in loans
4  to all those entities, plus others like Star Time.
5            Do you know what that is referring to?
6        A.  At the time I believe I was trying to
7  jog Ken Jowdy's memory that myself and my friends
8  were heavy investors in everything that he was trying
9  to do, and he seemed to, frankly, for the six months
10  following the Cabo San Lucas closing had completely
11  forgotten and neglected all of us.
12        Q.  You mentioned here nearly 2.5 million
13  out in loans.  Is that just a mistake by you?  Was
14  the number closer to 7?
15        A.  The number, Chris, to be very clear, the
16  number never got to 7 million.  The number probably
17  peaked out approximately where it did at $5 million
18  at the closing.  And the 7 million I referred to that
19  they were going to pay us back included that ongoing
20  revolving 15 percent interest.
21        Q.  Before I thought your testimony was
22  clear.  You are saying something different.  The
23  record is what it is.
24            $7 million of the $12 million, all
25  approximately, wasn't loaned from Little Isle IV to
0514
1  Jowdy.  What your testimony now is it was closer to
2  $5 million but that you would be getting back
3  approximately $7 million because of interest or is it
4  something else?
5        A.  I will restate it to be clear, although
6  the testimony speaks for itself, we may be just
7  mincing words.
8            Over the period of the loan to Ken
9  Jowdy, funds were requested by him, if I believed
10  that they were in the interest of the Mexican
11  projects, as was the basis for the loans, we would
12  lend money to Ken Jowdy.  From time to time while the
13  outstanding line of credit was open, Ken Jowdy would
14  repay funds to us.  It wasn't until the spring of
15  2006 that he had asked me to do a final accounting
16  for how much interest and principal was still due.
17            The principal was approximately $5
18  million at the time in the spring of '06.  The
19  interest was approximately $2 million.  A year later
20  I believe the total principal and interest was
21  approximately eight and a half million, which was
22  also memorialized in the e-mail traffic between
23  Najam, Jowdy and Constantine, as the interest
24  continued to accrue.
25        Q.  So that the record is clear, how much
0515
1  did Little Isle IV lend to Jowdy approximately?
2        A.  The gross dollars that went out over
3  time I believe were about 7 million and over that
4  same period of time he repaid approximately 2 million
5  of it.  So it wasn't 7 million out and then 2 million
6  back.
7        Q.  I understand.
8        A.  Again, just to be very clear, because I
9  want to make sure it is clear on the record, the
10  monies would go out and he would may some of it back
11  over that period of time.
                    Page 30

TR-SEC00000356

Kenner 08.16.11
12          Q.   The question was simple:   Approximately
13   how much money did Little Isle IV lend Ken Jowdy?
14               MR. STOLPER:   It is already asked and
15   answered seven times.
16               MR. CASTANO:   Again, I don't
17   understand --
18               MR. STOLPER:   The other two do.
19               MR. CASTANO:   And I am clearly not the
20   sharpest knife in the room, so let's hear it for the
21   dummy.
22          Q.   Go ahead.
23          A.   I will try to say it again because as I
24   am describing it --
25          Q.   Mr. Kenner, let's just be clear.   I am
0516
1    asking one question at a time.   I am not asking how
2    much he paid back.   We will get there.
3               The question is:   Approximately how much
4    money did Little Isle IV lend Ken Jowdy approximately
5    in total?   Not how much did he pay it back.
6          A.   $7 million approximately went out over
7    time to Ken Jowdy as loans.
8          Q.   Approximately how much was paid back?
9          A.   Approximately $2 million over that
10   period of time.
11          Q.   And that time period included up until
12   to the closing by Lehman Brothers?
13          A.   Summer 2004 through spring 2006, which
14   was the Lehman Brothers funding of the Cabo San Lucas
15   project.
16          Q.   Looking at Diamante Exhibit 34 it says
17   here, "and have nearly 2.5 million out in loans."
18               Should that number have been closer to
19   $5 million?
20          A.   I think that number represents 2.5
21   million out perhaps to some of those entities and
22   then I say, "Plus others like Star Time," meaning, as
23   I am typing on a small two-way pager at the time,
24   there are other monies that are also due back that
25   weren't directly sent to those entities.
0517
1          Q.   What is Star Time?
2          A.   Star time is some other entity that Ken
3    Jowdy and his brother owned that borrowed funds.
4          Q.   So the monies went to, that were lent
5    from Little Isle IV, went from Little Isle IV to Ken
6    Jowdy himself and an entity called Star Time?
7          A.   The money would be requested by Jowdy,
8    there would be a story behind each financial request,
9    and then we would wire money to wherever Ken Jowdy
10   asked those funds go.
11               The Star Time deal in particular, Jowdy
12   had said during that period of time that he and his
13   brother were selling their business for a couple of
14   million dollars and they needed legal fees to
15   conclude the deal, and as soon as the deal was done,
16   Ken Jowdy was going to receive a million-five from
17   thee sale of that project that he and brother worked
18   on in Atlanta, and as soon as they did, he would be
19   repaying the full million-five to the loans.
20          Q.   Looking at that same paragraph, it
21   indicates you raised 9.25 million for Diamante del
22   Mar; do you know what that is referring to?
                                              Page 31

Kenner 08.16.11

23        A.  I don't want any words here to be
24  misrepresented, but it should be really clear that I
25  was trying to jog Ken Jowdy's memory that each of the
0518
1   things he wanted to do, whether it was the 9 million
2   for Diamante del Mar or the 7 million of equity that
3   was represented to Lehman Brothers at Cabo San Lucas,
4   et cetera, et cetera, all came after he met me.  And
5   that now, since he got what he wanted, which was his
6   relationship with Lehman Brothers, which he also met
7   through an associate of mine, he now forgot about
8   everything else that was done for him at that point
9   in time and was acting like a big shot who didn't
10  need us.
11        Q.  I appreciate that explanation --
12        A.  Chris, so it is also very clear, I wrote
13  this e-mail off the top of my head as I was writing
14  it.
15        Q.  That's fine.
16        The question was:  "I raised 9.25
17  million for Diamante del Mar," what was that
18  referring to?
19        A.  It refers to what I believe was the nine
20  and a quarter million that he ended with, what I
21  believe is nine and a quarter million, or did at the
22  time.
23        Q.  And that's basically monies you brought
24  to the table?
25        A.  What I am again trying to get Ken Jowdy
0519
1   to recognize in the fall of 2006 is that he had a lot
2   of dreams for development and other ventures prior to
3   meeting me, and after he met me, all of these things
4   occurred because he now was into a circle of people
5   that wanted to also invest in projects and believe in
6   this stuff.
7        I was just merely trying to get his
8   attention.
9        MR. CASTANO:   Why don't we go for lunch
10  now.  We will go off the record at 12:20 p.m.
11        (Lunch recess taken.)
12        MR. CASTANO:   We are back on the record
13  at 1:18 p.m. Tuesday, August 16.
14        Q.  Mr. Kenner, while we were off the
15  record, were there any substantive conversations
16  between the Commission staff and yourself?
17        A.  No.
18        MR. STOLPER:   He would like to clarify
19  something.
20  BY MR. SMITH:
21        Q.  Sure, go ahead.
22        A.  If you don't mind, thank you, Justin.
23        On Exhibit 34 when you were asking about
24  the totals and the loans, again, I stated earlier
25  that I had written this pretty quickly on a two-way
0520
1   Blackberry in response to Ken Jowdy's long response.
2        MR. STOLPER:   Blackberry or a pager?
3        A.  Two-way pager.
4        When you were asking about the two and a
5   half million dollars in loans, I can suggest another
6   two and a half million dollars of the loans is
7   wrapped up in the $7 million for DCSL, so two and a

Page 32

Kenner 08.16.11

8  half of the five million were part of the loans given
9  to Ken Jowdy.  He represents it as his capital
10  account inside the Cabo San Lucas project as a two
11  and a half million dollar contribution.  So, in
12  essence, again, typing fast, I wrote two and a half
13  million dollar loan that went to Jowdy for his
14  capital accounts inside that $7 million was
15  misrepresented on the operating agreement and then
16  another two and a half million.
17            And, again, I wrote it very quickly
18  trying to make the point that we have been around
19  here for a bunch of years, my friends and I.  Don't
20  forget about us six months after you finally got the
21  golden goose with Lehman Brothers and they are
22  letting you just run free without us.
23       Q.   That's helpful, I actually want to
24  follow up a little bit on that.  That is exactly the
25  line of questions I wanted to ask you.
0521
1            But just initially, this was an exchange
2  that was initiated by you, this message that we are
3  referring to, it starts on the second page and
4  continues on the third page of the document.  That
5  was the first message, the one that says "Subject:
6  Open Issues"?
7       A.   I believe so.
8       Q.   So you were initiating this by pager?
9       A.   Yes.
10       Q.   And referring right to the sentence that
11  you were just referring to in your clarification, it
12  seems like the first part that sentence:  Remember I
13  raised 9.25 for Diamante del Mar, 7 million for Cabo
14  San Lucas, 1 million for the Airport, 1 million for
15  D-Air, 750,000 for the Vegas home, on the one hand.
16  And you also write:  And I have nearly 2.5 million
17  out in loans to all those entities, plus others like
18  Star Time.
19            It sounds like in the first part of that
20  message you are referring to money out that is not
21  loans, and then the 2.5 million is loans, but it
22  sounds like from your clarification, you are
23  explaining that part of that money in the first part
24  of the sentence was actually loan money?
25       A.   Again, if we can go back to 2006 when
0522
1  there was the beginning of the acrimony with Ken
2  Jowdy, in my best effort, I was trying to document or
3  articulate to him in hyperbole and otherwise, funds
4  that he had benefitted from that come from my friends
5  and I.  In that some context, please note that the
6  750 that is represented as for the Vegas home, that
7  was Ken Jowdy's home that he was ultimately sued by
8  Glen Murray in Nevada for, and Ken Jowdy found guilty
9  of borrowing the money and not repaying the loan, and
10  there is now a million dollar plus judgment against
11  Ken Jowdy for that loan.
12            So, again, here, according to your
13  question, that may sound as if it was represented
14  that I raised 750 for that home.  That is not in fact
15  the case.  That was a loan also from someone else Ken
16  Jowdy borrowed money from, he tried to fight it
17  defensively in the Nevada State Court.  He lost.
18  There is a million dollar plus judgment against Ken

Page 33

Kenner 08.16.11
19  Jowdy for those funds that Ken Jowdy borrowed from
20  Glen Murray for that.
21          Q.  Just reading structurally, it looks like
22  first part was non-loans and then the 2.5 million was
23  loans.
24          So if you could just if you look at each
25  of numbers individually, and let me know what portion
0523
1  of them is loan or non-loan or if it is all loans.
2  You've got 9.25 million raised by you for Diamante
3  del Mar.  What was that 9.25 million?
4          A.  If I could be real clear on the language
5  that was used at the time, the statement that I
6  raised the funds, it misrepresents that Ken Jowdy was
7  introduced to all of my clients in some large part
8  because of me.  Now, obviously, we talked about
9  several of my clients that he knew prior to knowing
10  me, but I am just trying to, in a representative way,
11  suggest to him this has all been a benefit to him,
12  and he has now been the benefactor of all of this
13  subsequent to meeting me at some particular time, and
14  to stop avoiding me and my friends because it is not
15  right ethically or morally.
16          To address your question, of the 9.25
17  million, just based on the del Mar offerings, about
18  half of that is equity, half of it is loans.  Of the
19  Cabo San Lucas 7 million, four and a half million are
20  investments from my friends and I, two and a half
21  million is part of the loan that Jowdy represents as
22  his capital account.  The CSL Airport, million
23  dollars, those are equity investments in the airport
24  down in Cabo San Lucas, which is going to be subject
25  to some more litigation for fraud down in Mexico.
0524
1          Q.  That was also by you and your clients?
2          A.  Me and my friends, that's correct.
3          Q.  When you say your friends, the same
4  individuals that we were talking about earlier that
5  we described as your clients?
6          A.  Some, yes.
7          Q.  And some?
8          A.  Some potentially no.  I don't remember
9  the timing of these issues as I sit here today.
10          Diamante Air, plus or minus a million
11  dollars were from clients, friends and myself.
12          Q.  And that was a loan or equity?
13          A.  They were equity, but Ken Jowdy
14  converted the airplanes and he and friends ran it
15  into the ground and left several of us in debt on the
16  planes and walked away.
17          The Vegas home was a loan that he
18  misrepresented and misallocated and Glen Murray took
19  him to trial in Nevada, which I forwarded all those
20  judgments and transcripts to you guys, so those were
21  loans.
22          Two and a half million were loans, the
23  remaining two and a half million that complements the
24  two and a half million loan as capital account in
25  Cabo San Lucas.
0525
1          Q.  The two and a half million in this
2  sentence refers to loans to all of these entities,
3  meaning DDM, DCSL, CSL, D-Air, and the Vegas home?
Page 34

TR-SEC00000360

Kenner 08.16.11

```
 4          A.   Right.
 5          Q.   So there was 2.5 million in loans total?
 6          A.   Let me just suggest in context of the
 7   thousands of e-mails Ken Jowdy and I exchanged over
 8   our relationship, I can't imagine there is more than
 9   two dozen of them that are longer than a paragraph.
10   This is a very frustrating point for my friends  and
11   I to ask why Ken Jowdy is no longer communicating
12   with us --
13          Q.   I think I understand the context.
14          A.   So the fact that there is a long e-mail
15   that I typed on a two-way pager, this is already well
16   beyond the scope of what I would normally send him,
17   so as I am writing this out of frustration and trying
18   to represent the best I can what is going on and why
19   he is behaving the way he is, I am really just trying
20   to get his attention and say, hey, whatever it takes,
21   just pay attention to us, this is just wrong what you
22   are doing.
23          Q.   I understand your context, but within
24   that context I want to understand some of the details
25   here.
```
0526
```
 1          A.   Okay.  And, again, I will tell you it is
 2   five years ago, I am trying to remember the context
 3   of it five years ago, but as I thought about it at
 4   lunch, the other two and a half million dollars plus
 5   or minus that is still out as loans to Jowdy that are
 6   represented on many other documents, whether it be
 7   the original loan agreement that substantiates it,
 8   the bank statements that qualify every dollar that
 9   went to Ken Jowdy or his controlled entities.
10          The one e-mail that I do recall, which
11   is the Jowdy, Masood Bhatti, Bill Najam and Tommy
12   Constantine e-mail, tried to settle things about a
13   year after this --
14          Q.   I appreciate that there are other
15   documents.
16          MR. STOLPER:   The question pending is:
17   Did you make -- you have 2.5 million out in loans to
18   all those entities plus others like Star Time.  So
19   the question he asked was:  Is the two and a half
20   million dollar loans to all the entities referenced
21   in the sentence plus others not specified like Star
22   Time. His question is:  Who are those loans to.
23          MR. SMITH:   That's correct.
24          A.   Thank you both..
25          The underlying loans are all to Ken
```
0527
```
 1   Jowdy personally, so where the funds went, all I am
 2   trying to represent is, to the best I can recall, is
 3   that money went to a lot of sources, a lot of
 4   destinations that Ken Jowdy request they go to, like
 5   Star Time and others.
 6          I think my goal was to say in this
 7   e-mail, look there is a ton of money out there, pay
 8   attention to us.  And I don't think the specifics of
 9   the actual dollars, although I may be very close and
10   accurate on how much is in total --
11          Q.   That's fine.  I understand we are years
12   later, but to the best of your recollection as you
13   sit here today, you refer here to $2.5 million loans
14   to all of those entities.
```

Page 35

TR-SEC00000361

Kenner 08.16.11

15      what I am curious about is what is the
16 breakdown by dollar amount to each of those entities
17 within this $2.5 million total?
18      A.  First, as I sit here today, I don't
19 recall, but I can suggest that it is memorialized in
20 the bank statements, and it is also memorialized in
21 the complaint in Arizona that we sued Ken Jowdy for
22 the outstanding balance of 5 million plus interest.
23      MR. STOLPER:  Clarify for Justin, are
24 there any loans to any of these entities.  That's
25 what he is asking.
0528
1      A.  Yes.
2      MR. STOLPER:  I thought the loans were
3 to Jowdy.
4      THE WITNESS:  Excellent clarification.
5 Thank you.
6      A.  The loans are to Ken Jowdy.  Funds were
7 not sent to a Ken Jowdy personal bank account.  They
8 were sent wherever.
9      Thank you for the clarity.  I hope it is
10 clear.
11      MR. STOLPER:  So your e-mail is wrong.
12      A.  My e-mail is wrong that says particular
13 entities.  It all went to Ken Jowdy.
14      Q.  I thought you said funds went to
15 entities but you had an oral understanding with Jowdy
16 that they were loans to Jowdy personally?
17      A.  Written agreement to Ken Jowdy.
18      Q.  You had a written agreement that there
19 was a $2.5 million --
20      A.  No.  The revolving line of credit we
21 talked about from December '04.
22      Q.  So this $2.5 million refers to that
23 revolving line of credit?
24      A.  That is correct.  And so does two and a
25 half of the 7 in the DCSL
0529
1      MR. STOLPER:  You may want to explain
2 why that makes sense.  Why would a $2.5 million
3 revolving line of credit be treated as capital?  What
4 was his purpose for needing that money?
5      I think you testified last time about
6 it, but it is important for Justin to know that.
7      A.  When the closing in the spring of '06
8 was getting near its finality, Jowdy and Najam told
9 me that Lehman Brothers needed to represent that Ken
10 Jowdy had as much money in the project as the new
11 managing member, as myself or any of the other
12 entities.  So since Jozef Stumbel, Jere Lehtinen and
13 myself had two and a half million dollars in our
14 entity, and that was the largest contribution
15 account, Lehman Brothers told Jowdy that he had to
16 get my permission to list two and a half million on
17 his capital contribution.
18      Q.  Is that the reason why you have 2.5
19 million listed here separately as loans and then 2.5
20 aggregated into the 7 million that was raised for
21 DCSL?
22      A.  As I sit here today, I can guess that
23 would be accurate.
24      Q.  I don't want you to guess.  If you have
25 a recollection.

Page 36

Kenner 08.16.11

0530
1        A.   My recollection is I tried to represent
2   the total gross dollars as best I could in a single
3   e-mail.
4        Q.   Going back to the 7 million here for
5   DCSL, you said 4.5 million of that was equity and 2.5
6   million was this revolving loan that was provided, as
7   I understood testimony from earlier this morning,
8   from Ula Makika as well as Little Isle IV?
9        A.   That is correct.
10       Q.   And the 4.5 million equity, who provided
11  that?
12       A.   That came from approximately 12 of my
13  friends and clients and myself.
14       Q.   How much did you provide of that?
15       A.   I think we talked about approximately
16  $100,000 at the time.
17       Q.   And the other individuals, were those
18  the same people that, the same clients of yours that
19  had invested in Little Isle IV?
20       A.   I would say for the most part there is a
21  heavy crossover between all of the Hawaii members,
22  the Cabo San Lucas members and the Diamante del Mar
23  members.
24       Q.   Were those funds that were provided,
25  referring again specifically not to the loan, but the
0531
1   4.5 million equity, were those funds provided
2   directly by those individuals to Diamante Cabo San
3   Lucas or were they provided sort of through Little
4   Isle IV or some other entity?
5        A.   They were all individually sent directly
6   to Ken Jowdy for the Cabo San Lucas, not through
7   Little Isle IV or any other way related.
8        Q.   Or Ula Makika?
9        A.   No Hawaii-related entities at all.
10  Little Isle IV, Ula Makika or otherwise.
11  BY MR. CASTANO:
12       Q.   I want to talk to you about when the 12
13  clients for Diamante Cabo San Lucas, where the 4.5
14  million came from, you said $100,000 came from you
15  and the rest from your clients.
16            How did that actually physically happen?
17  Did it come from lines of credit or did it come from
18  them wiring money?
19       A.   I believe none of them came from lines
20  of credit.  Certainly none of them came from lines of
21  credit related to lines of credit we talked about
22  before relating to Hawaii.
23            The best I recall today is that 100
24  percent of those funds were wired from their personal
25  individual accounts directly to the entities that Ken
0532
1   Jowdy or his attorney, Fernando Garcia, told me they
2   needed the funds.
3        Q.   Were they wired by the individuals
4   themselves or did you make the wires happen yourself
5   without them physically contacting the bank and doing
6   it?
7        A.   I am sure I assisted in the actual
8   physical transaction for about half of them and I
9   would assume the other half handled the transactions
10  directly themselves.

Page 37

Kenner 08.16.11

11        Q.  When you say "assisted," what does that
12  mean?
13        A.  I had power of attorney over their
14  operating accounts to pay bills and otherwise.
15        Q.  Before you made this transfer, did you
16  contact them and let them know that this was going to
17  happen or did you just do it because you had power of
18  attorney?
19        A.  I never made any transactions solely as
20  power of attorney prior to discussing any
21  transactions with any of my clients at any point in
22  time.
23        Q.  We talked this morning and I want to get
24  back into it briefly, about what you might have said
25  to Little Isle IV members prior to them becoming
0533
1   members.  And I just want to make sure the record is
2   clear that you, in fact, had conversations and that
3   you remember having conversations with them before
4   they became members about Little Isle IV, rather than
5   it would have been your general business practice to
6   have conversations.
7                So the question is:  Do you
8   specifically recall, prior to your clients becoming
9   members of Little Isle IV, having conversations with
10  them about their membership in Little Isle IV?
11        A.  Yes, and specifically on every occasion.
12        Q.  That would be for each one of your
13  clients, so if I were go to down the list, for
14  example, Mr. Bernard, Sergei Gonchar, Joe Juneau,
15  Glen Murray, you recall specifically having
16  conversations with them.
17        A.  With each and every one.
18        Q.  I want to talk to you now about Rodney
19  Dalton.  Who is Rodney Dalton?
20        A.  He was a hard money lender that got
21  introduced to Ken Jowdy and I.
22        Q.  Did there ever come a time that Little
23  Isle IV assets were transferred to him?
24        A.  Yes.
25        Q.  Can you tell me about that?
0534
1         A.  Rodney Dalton had a potential hard money
2   -- strike that.
3                Rodney Dalton represented that he could
4   provide hard money lending through a series of
5   European connections based on collateral that he
6   owned.  He represented very clearly that the funding
7   from this European hard money could not be used for
8   any project in the United States; thus, ruling out
9   any ability for my partners and I to utilize any of
10  that funding in Hawaii.
11               Ken Jowdy had a series of face-to-face
12  meetings with him, of which I attended two very brief
13  ones, I believe.  And at Ken Jowdy's request, he
14  believed he had a deal struck with Rodney Dalton to
15  fund all of the money Jowdy would need both for the
16  Diamante del Mar and the Diamante Cabo San Lucas
17  project.  So Jowdy has asked me, as part of his
18  revolving line of credit, to forward funds to Rodney
19  Dalton, again, secured by Ken Jowdy's interests in
20  the Diamante del Mar project and the future Cabo
21  project to assist him in securing the unlimited
                                             Page 38

Kenner 08.16.11

```
22   funding he needed.
23            Q.   What documents did you see from Rodney
24   Dalton to establish that he had collateral in various
25   assets, if any?
0535
 1            A.   I don't think I saw anything.
 2            Q.   Did you see any documents from Rodney
 3   Dalton?
 4            A.   I don't believe I saw any documents from
 5   Rodney Dalton.
 6            Q.   How much money approximately went from
 7   Little Isle IV to Rodney Dalton?
 8            A.   I think about 900,000.
 9            Q.   Was Rodney Dalton a hard money lender or
10   was he -- did he have anything to do with rubies or
11   jewels of any sort?
12            A.   To the best of my understanding from the
13   two brief meetings I had with him when Ken Jowdy
14   asked me to come along, he talked about a ruby that
15   he had that would be used for collateral for some
16   lending opportunity.
17            Again, there was deal that Ken Jowdy
18   struck with Rodney Dalton, so I wasn't a party to the
19   lending agreement or any discussions they had about
20   how they were going to ultimately do it.
21   BY MR. SMITH:
22            Q.   What was your understanding of the deal?
23            A.   As simple as an outsider, Ken Jowdy
24   would run a lot ideas by me, but much like dozens of
25   hard money lenders, he believed that this guy was the
0536
 1   real deal and he told me that as a result of this
 2   ruby that he had to put up as collateral, that Jowdy
 3   had dealt with one of his relatives, one of Ken
 4   Jowdy's own relatives, to confirm the validity of the
 5   ruby and its existence, et cetera, and that Ken Jowdy
 6   felt very secure that he was going to get funding in
 7   Mexico for both projects and he was very excited
 8   about it, and during his zealousness, asked for me to
 9   forward the money under the terms of his revolving
10   line of credit to Rodney Dalton on maybe two separate
11   occasions, and that the funding was imminent.
12            Q.   I am still a little confused, though,
13   about how the deal was actually to be structured.  I
14   understand you said it was between Ken Jowdy and
15   Rodney Dalton, but what was your understanding of
16   exactly how it worked.
17            Dalton owned a ruby?
18            A.   Again, I am a third party, so I know
19   only limited amounts.
20            Q.   I understand?
21            A.   My understanding was that Dalton owned a
22   ruby, he and his partner, Jim Sheppard, who I believe
23   was American, I believe Dalton was a British citizen,
24   had this ruby that they could collateralize and based
25   on collateral could create an ongoing funding source
0537
 1   and the funding had to be used outside of the United
 2   States for project funding.  That's pretty much the
 3   extent of what I knew.
 4            Q.   Did you understand what they were to
 5   receive in exchange for -- and this funding would be
 6   provided to Ken Jowdy?
```

Page 39

Kenner 08.16.11

```
 7          A.  Yes.
 8          Q.  And what were they to receive in
 9  exchange?
10          A.  I believe interest payments.
11          Q.  Do you know how much?
12          A.  I do not.  Ken Jowdy had his own series
13  of attorneys and relatives who were attorneys and
14  business people who he would count on for this.
15          Q.  Do you know why the funds couldn't be
16  used for projects in the United States?
17          A.  That's what I was told by Ken Jowdy.
18          Q.  But you don't know why?
19          A.  I don't know why.
20  BY MR. CASTANO:
21          Q.  And the agreement was between Mr. Jowdy
22  and Mr. Dalton?
23          A.  That's correct.
24          Q.  You just provided the funding?
25          A.  That's correct.
0538
 1  BY MR. SMITH:
 2          Q.  What was the reason Ken Jowdy requested
 3  the funding from Little Isle IV?
 4          A.  It was part of his revolving line of
 5  credit agreement with us.  My understanding, and
 6  through my experience with a lot of consultants and
 7  hard money guys, they require funds up front as a fee
 8  to be paid to secure the loans that were coming.
 9          Q.  Do you know what the amount of the loans
10  that were supposed to be coming from Rodney Dalton?
11          A.  I do not.
12          Q.  Do you have any idea of the magnitude?
13          A.  I think hundreds of millions of dollars.
14              MR. STOLPER:   Hundreds of millions?
15              THE WITNESS:   Yes.
16          Q.  Secured by a ruby?
17          A.  Secured by a very large ruby.
18          Q.  Was there any other source of collateral
19  on those loans to your understanding?
20          A.  Not that I understand.
21          Q.  Jowdy asked you, Little Isle Iv, to
22  provide I think you said the total was $900,000 to
23  him as part of his revolving line of credit.
24              Do I have that right?
25          A.  That's correct.
0539
 1          Q.  And your understanding the $900,000 was
 2  to be used to provide funds to Dalton in anticipation
 3  of much larger loans in the magnitude of hundreds of
 4  millions of dollars to be provide back to Jowdy?
 5          A.  Yes.  Jowdy was very excited about being
 6  able to fulfill the first $50 million of build out at
 7  Diamante del Mar as a result and the subsequent
 8  acquisition in Cabo San Lucas that he knew would be
 9  in the 75 to $100 million range.
10          Q.  And you never saw any documents
11  reflecting any likelihood that Dalton would be able
12  to provide those funds?
13          A.  Not that I am aware of.
14          Q.  Did he provide in discussions that you
15  had with them any representations on how he would go
16  about obtaining these funds?
17          A.  Not that I recall.
```

Page 40

Kenner 08.16.11
18      Q.   Did Jowdy ever tell you that he had
19  conversations about obtaining those funds?
20      A.   Could you ask the question again?
21      Q.   Did Jowdy ever tell you his
22  understanding about how Dalton would be able to
23  provide those funds?
24      A.   As simple as I can recall, this large
25  ruby that was in Dalton's possession that Jowdy told
0540
1   me his relatives had checked out, would be set up as
2   collateral, and then the monies that Dalton would
3   receive back for the collateral would ultimately be
4   used for some financing deal in Europe, and those
5   financing funds could not come to the United States,
6   which is why Ken Jowdy wanted to borrow the money to
7   use it to help his projects in Mexico.
8   BY MR. CASTANO:
9       Q.   Besides the two meetings with Mr. Dalton
10  that you attended, did you have any other meetings
11  with him?
12      A.   Not that I recall.
13      Q.   Did you have any telephone conversations
14  with him?
15      A.   I don't think so.  I think all phone
16  calls were Ken Jowdy phone calls.  But there was a
17  lot of activity going on, but I don't believe I ever
18  tried to call or spoke with Rodney myself.
19      Q.   Did you communicate in any other way
20  with Mr. Dalton, e-mail or otherwise?
21      A.   I don't think so.  There was a third
22  party who introduced us to Rodney Dalton that I would
23  communicate with from time to time to ask about
24  status.  He would always tell me he was communicating
25  with Rodney Dalton.
0541
1       Q.   Did you send money directly to Mr.
2   Dalton or did you send money to Ken Jowdy?
3       A.   I believe to an account entitled Jim
4   Sheppard for Rodney Dalton.
5       Q.   That was on Ken Jowdy's instruction?
6       A.   Yes, it was.
7       Q.   Who was the third party?
8       A.   Todd Burkhardt, B-U-R-K-H-A-R-D-T.
9       Q.   Someone who you knew or someone Ken
10  Jowdy knew?
11      A.   I met him through some affiliation in
12  the hockey world.
13  BY MR. SMITH:
14      Q.   So he was known to you before being
15  known to Jowdy?
16      A.   I don't recall.  There was a lot of hard
17  money lenders that were introduced to us from a
18  number of different sources.
19  BY MR. CASTANO:
20      Q.   Prior to money being sent to Mr. Dalton
21  -- let's back up.
22               Was money sent from Little Isle IV to
23  Mr. Dalton?
24      A.   I don't recall if it is Ula Makika or
25  Little Isle IV.
0542
1       Q.   Did it come from one of the Hawaiian
2   entities?

Page 41

TR-SEC00000367

Kenner 08.16.11

3      A.   Yes, it did.
4           Q.   Prior to money being sent from Hawaiian
5      entities to Mr. Dalton, did you contact your members
6      of Little Isle IV and let them know monies were going
7      to be shipped from the Hawaiian entities to Mr.
8      Dalton?
9           A.   I don't think so because the loans were
10     being made, again, to Ken Jowdy, which they were all
11     aware of the loans.
12          Q.   This is part of the original loan
13     agreement, the one-page loan agreement?
14          A.   That's correct.
15          Q.   Let me ask you this: It is a one-page
16     loan agreement, it is millions of dollars.  Did you
17     ever have concern that you were lending millions of
18     dollars to Mr. Jowdy and you simply had a one-page
19     loan agreement between him and yourself that wasn't
20     vetted or looked over by any attorneys?
21          A.   At the time there were several factors.
22     First, the revolving line of credit with Ken Jowdy I
23     don't think in 2004 ever had any intention to grow as
24     large as it did in our first initial memorialization
25     of it.
0543
1                The loan agreement should have only been
2      outstanding for about 16 months, from December '04 to
3      the spring of '06.  During that period of time, as
4      Lehman Brothers got involved with the project and we
5      continued to be assured by Masood Bhatti that the
6      deal was getting done and that they would repay the
7      loans, and we were dealing with partner like Ken
8      Jowdy at the time who we all considered our friend.
9                Ken Jowdy was the controlling member of
10     the Diamante del Mar project.  I believe he owned
11     over 70 percent of that project and we had recently
12     received a KPMG appraisal for $69 million for that
13     piece of land.  At the time in '04,'05, and early
14     '06, that land was owned for cash.  So as far as
15     feeling secure or not having any concerns, we had a
16     very wealthy partner who owned a significant 50
17     something million dollars worth of land on one
18     project, we had Lehman Brothers and Masood Bhatti
19     assuring us they were going to close the financing.
20     I said met be Lehman Brothers through a very credible
21     individual in New York, so I had no concerns for
22     that.  And at the time, everything seemed to line up
23     without any issue for us to have to raise any flags.
24               In fact, up to closing in spring of '06,
25     there were no concerns as Ken Jowdy did wire back
0544
1      five or six transactions totalling about a quarter
2      million dollars to show that good faith was occurring
3      and we were ready to close the deal.
4                MR. CASTANO:   Can you read back my
5      question.
6                     (Record read.)
7           A.   No.
8           Q.   The fee simple we talked about last
9      time, did you see any documents confirming that
10     Diamante del Mar and Diamante Cabo San Lucas were, in
11     fact, owned fee simple by Jowdy or the Jowdy
12     entities?
13          A.   As I sit here today, I don't recall if
                              Page 42

Kenner 08.16.11
14  I've ever seen one of those documents specifically
15  outlining the fee simple 100 percent ownership status
16  of the Diamante del Mar or del Mar related entities,
17  although all those documents would have been
18  presented in Spanish if that was the case.  I don't
19  speak Spanish.
20          Q.  Were you ever given the opportunity to
21  review those Spanish documents?
22          A.  I believe I had received at one point in
23  time the documents in Spanish when one of the U.S.
24  title insurance companies had to review them to
25  insure the insurability of that property as a fee
0545
1   simple equivalent piece of land.
2               With respect to Diamante Cabo San Lucas,
3   much the same.  Prior to our understanding and my
4   understanding that Lehman Brothers could lend on that
5   property, it had to pass all the U.S. title insurance
6   issues to be a clear piece of land and fall under the
7   normal guidelines for being the equivalent of fee
8   simple.
9           Q.  Sitting here today, did you have an
10  opportunity to review the Diamante del Mar fee simple
11  documents prior to any of your clients becoming
12  members or investors in Diamante del Mar?
13          A.  I don't recall.
14          Q.  Do you know, sitting here today, whether
15  Diamante del Mar, in fact, or the entity itself or
16  Mr. Jowdy, had ever, in fact, acquired Mexican fee
17  simple?
18          A.  I believe, based on a loan that was made
19  to Ken Jowdy in the fall of 2006 by KSI International
20  in New Jersey, that they went through U.S. titling
21  and U.S. insurability issues, where it be Fidelity
22  National Title or someone similar.  So I believe that
23  may have been the first time that I ever had full
24  confidence that the land had gone through full fee
25  simple titling.  But I had no reason to doubt it at
0546
1   any time prior, certainly because I was given
2   assurance by the Mexican attorney, Fernando Garcia.
3           Q.  Mr. Garcia gave you assurances?
4           A.  Yes.  Mr. Garcia also confirmed, when I
5   first met them in Mexico on my very first trip, that
6   Ken Jowdy had already owned the land.
7           Q.  Again, he confirmed orally?
8           A.  Yes.
9           Q.  Did he confirm it in writing?
10          A.  I didn't correspond in writing with Mr.
11  Garcia at the time.
12          Q.  Did you ask Mr. Garcia to give you
13  documents establishing that fee simple had been
14  acquired?
15          A.  I don't recall what was given to us as
16  part of those early subscription agreements or
17  offering memorandums with Diamante del Mar, but I did
18  turn it all over to you, what I originally received
19  in '02, '03.
20          Q.  Let's turn back to the Dalton
21  discussions.
22              MR. CASTANO:  We will mark as Diamante
23  Exhibit 35 a collection of various documents.  I
24  don't believe it is one particular document.  For
                          Page 43

TR-SEC00000369

Kenner 08.16.11
25    speed, it has been put together.
0547
1                         (NY-8125 Exhibit Number 35 was
2                          so marked for identification.)
3         Q.   I am showing you, Mr. Kenner, what has
4    been marked Diamante Exhibit 35.
5              Please take a moment to review that.
6              (Witness complies.)
7              MR. STOLPER:   Do you know whose
8    redactions they are?
9              MR. CASTANO:   I can't answer that
10   question.
11             MR. STOLPER:   Chris, I am just noting
12   there are redactions --
13             MR. CASTANO:   You can make your notice
14   on the record.
15             MR. STOLPER:   I just want to know are
16   those SEC redactions.
17             MR. CASTANO:   I can't answer any of
18   your questions.  The document is in front of him.
19   You can make objections if you want.
20             MR. STOLPER:   You guys are not allowed
21   to say if you redacted them or not?
22             MR. CASTANO:   I am not answering the
23   question.
24             MR. STOLPER:   If you are not answering
25   because you are not allowed, because usually in a
0548
1    civil case when you have redactions because somebody
2    is establishing privilege, they say, they take
3    responsibility for that.  So if the witness is being
4    presented with a document --
5              MR. CASTANO:   I am not taking
6    responsibility for anything.  This is the document I
7    am putting before your client.  You can make whatever
8    objections you want.
9              MR. STOLPER:   I am just asking for a
10   courtesy response to my question.
11             MR. CASTANO:   I am not going to give
12   you an answer where this document came from, who
13   redacted it.  I can't.  I am not.
14        Q.   Mr. Kenner, have you seen Diamante
15   Exhibit 35 before?
16        A.   I think I have seen at least most of
17   that.
18        Q.   I know that different pages, the first
19   question is, the first document on the top, do you
20   know who redacted this document, if anyone?
21        A.   I believe Ken Jowdy or one of his
22   attorneys redacted it.
23        Q.   Looking at the first page of Diamante
24   Exhibit 35, it's an e-mail.  It appears there might
25   have been two documents that may have been attached
0549
1    to this e-mail.
2                         Do you know if next two pages of the
3    document are those two documents that were attached,
4    that would be pages 2 and 3 of Diamante Exhibit 35?
5        A.   I don't know if they are or not but I
6    have seen those documents.
7        Q.   Do you know who Todd Burkhardt is?
8        A.   That's the gentleman we talked about
9    before.  That's the gentleman I would speak with from
                              Page 44

Kenner 08.16.11

10     time to time because he was working on other
11     financing for me in Hawaii.
12     BY MR. SMITH:
13            Q.   This is the person who introduced you
14     and/or Jowdy to Dalton?
15            A.   And some guy named Jim Sheppard.  I
16     never met Jim Sheppard, but I am sure Jowdy had met
17     with them.
18            Q.   Mr. Kenner, I want to direct your
19     attention to second and third page of Diamante
20     Exhibit 35 when your attorney is done looking at it?
21            MR. STOLPER:   You can ask questions.
22            Q.   Have you seen the second and third page
23     of Diamante Exhibit 35 before?
24            A.   I believe I have seen these before.
25            Q.   The agreement on the third page, have
0550
 1     you seen that before?
 2            A.   I believe I have.
 3            Q.   I think the testimony earlier was that
 4     you don't recall or you believe there was no
 5     agreement between Mr. Dalton and yourself.
 6            Is that right or do you believe there
 7     was, in fact, an agreement between yourself and Mr.
 8     Dalton looking at this document?
 9            A.   I recognize this document as perhaps
10     being one that was sent but I don't recall ever
11     signing a document like this.
12            Q.   Do you know why you would receive this
13     document?
14            A.   I believe the e-mail came from, if these
15     two pages are, in fact, the attachment that did come
16     with the original e-mail, I believe they would have
17     come from Todd Burkhardt, so it would have been
18     normal for Burkhardt to send something to me to give
19     to Jowdy.
20            Q.   Do you know why it would be an agreement
21     between yourself and Mr. Jowdy and Mr. Dalton, or was
22     it an agreement just between Mr. Dalton and Mr.
23     Jowdy?
24            A.   I don't believe I signed a document like
25     this.
0551
 1            Q.   Do you know if this agreement accurately
 2     memorializes the terms by which you were lending
 3     money through Mr. Jowdy to Mr. Dalton?
 4            A.   I don't know the arrangement Mr. Jowdy
 5     and Mr. Dalton ultimately agreed to.
 6            Q.   So just so the record is clear, you
 7     never signed this agreement?
 8            A.   I do not believe I ever signed this
 9     agreement.
10            Q.   And is the information contained in the
11     agreement, the loan to Rodney Dalton, is this
12     accurate, in your view, or is this inaccurate?
13            A.   I don't recall.
14            Q.   Do you know if Mr. Dalton was going to
15     take the monies that you were transferring to him
16     through Little Isle IV or the Hawaiian entities, and
17     use it as an investment?
18            A.   I don't know what his intention was.
19            Q.   So this third page of Diamante Exhibit
20     35 says, "The funds from the credit line will be

Page 45

Kenner 08.16.11

21  placed into an investment."
22          Is that something that was not your
23  understanding?
24      A.  I don't know the details of what Ken
25  Jowdy and Rodney Dalton worked on.
0552
1       Q.  When you received this, did you call Mr.
2   Jowdy and say, "Hey, what is going on"?
3       A.  I think I actually forwarded an e-mail
4   making a joke about the paperwork.
5       Q.  Did you subsequently have conversations
6   with Mr. Jowdy about the terms that appear in this
7   agreement?
8       A.  Ken Jowdy and I at that point in time
9   probably spoke several times a day.
10      Q.  Did you have a conversation with him?
11      A.  I am sure I had several conversations
12  with him about his optimism and excitement about
13  getting these funds.
14      Q.  Did you have a conversation specifically
15  about the agreement and the terms that appear to be
16  in the agreement between yourself and Mr. Dalton?
17      A.  I don't recall.
18      Q.  Do you remember having a conversation
19  with anyone else that might recall, for example,
20  maybe you spoke to an assistant or someone else about
21  these terms?
22      A.  Not that I recall.
23      Q.  Do you know if you wrote any type of
24  letter or e-mail about the terms of this agreement?
25      A.  I don't recall.
0553
1       Q.  Looking at this agreement, the third
2   page of Diamante Exhibit 35, do you believe that this
3   is the terms that were ultimately agreed on between
4   Mr. Dalton Mr. Jowdy?
5       A.  I have no idea.
6       Q.  Just looking at this, it doesn't seem to
7   be that there is going to be monies transferred for,
8   I believe your testimony was upwards of $50 million
9   in funding.  It seems, rather, that Mr. Dalton is
10  placing a line of credit or some monies that might be
11  received in an investment.  So I guess what I am
12  trying to figure out is where is the disconnect.
13  Meaning, it seems your testimony was that this was a
14  hard money lender but this, rather, looks like from
15  the terms of the agreement that something else is
16  happening.
17          Can you explain?
18      A.  I cannot explain.  I dealt with Mr.
19  Jowdy on this, who had asked for funds to be
20  transferred based on some agreement he had with
21  Rodney Dalton.  Again, Ken Jowdy I used to speak on a
22  daily basis, so much of his excitement of over this,
23  I was aware of the excitement but not the details.
24  He used to deal with his brother-in-law and attorney
25  Bill Najam with respect to any lenders he was
0554
1   approach for the Mexican project.
2       Q.  I want to direct your attention about
3   three or four pages further into the document, to an
4   e-mail dated Tuesday, March 8th.  You just talked
5   about details or the lack thereof, do you see the
                            Page 46

Kenner 08.16.11

6   e-mail dated March 8, 2005 at 4:27?
7           A.   Yes.
8           Q.   I believe it is from you.
9                Have you seen this e-mail before?
10          A.   It looks familiar.
11          Q.   Do you know if you sent this e-mail?
12          A.   It appears I did.
13          Q.   It says, "Todd, please call him.  Until
14  you get him tonight about ruby, please discuss all
15  options with him RE selling, getting a LOC, et
16  cetera, that we might want to explore now pending the
17  info payment on the 22nd.  Please let me know how it
18  goes."
19               Was there going to be a payment on the
20  22nd of March?
21          A.   I believe Ken Jowdy requested a second
22  payment to Rodney Dalton.
23          Q.   That's from you?
24          A.   Yes, it was a further extension of the
25  line of credit.
0555
1   BY MR. SMITH:
2           Q.   Do you know how much that second payment
3   was?
4           A.   I believe it was 125,000.
5           Q.   And there had been one previous payment?
6           A.   750,000.
7           Q.   Was there additional payments or was the
8   total $875,000?
9           A.   I think it was 875.
10  BY MR. CASTANO:
11          Q.   I want to direct your attention two more
12  pages in to an e-mail dated Monday, June 13, 2005.
13  It is a one-page document.
14          A.   What was date on that?
15          Q.   Monday, June 13, 2005.
16          A.   Okay.
17          Q.   Mr. Kenner, have you seen this before?
18          A.   I believe so.
19          Q.   "Rodney money," do you know what this
20  e-mail is concerning?
21          A.   I believe Jowdy had just spoken with me
22  prior to this e-mail suggesting that his
23  conversations with Rodney assured him that money was
24  coming and he needed a bank account established
25  immediately as if the money were pending within 24
0556
1   hours.  The first of many, many distributions to
2   Jowdy.
3           Q.   You write here, "I think we need to
4   start creating a very, very clean record at this
5   point."
6                Do you know what that refers to?
7           A.   I think I was referring to the fact that
8   Ken Jowdy was always requesting a lot funds into
9   different bank accounts, and if there was going to be
10  a funding source that needed to be repaid, which was
11  going to be Mr. Dalton, then it should come out of a
12  brand new bank account instead of one of Jowdy's
13  commingled accounts that he used for multiple
14  purposes.
15          Q.   So we are clear, you believed that Mr.
16  Dalton was going to be a hard money lender?
                        Page 47

Kenner 08.16.11

17    A.    That's correct.
18    Q.    You didn't have any understanding that
19  the money was going toward investment of some kind?
20    A.    Again, my understanding was that Mr.
21  Dalton had a very large ruby he was using as
22  collateral, and based on that collateral, he was able
23  to do something with some European banks to create a
24  funding source.
25           If that's what is referred to as an
0557
 1  investment, that may have been it, but it was
 2  European banks that would create this ongoing funding
 3  source based on his collateral.
 4    Q.    What did you tell the Hawaiian partners,
 5  be it Little Isle IV or Ula Makika, about transfers
 6  to Mr. Dalton, if anything?
 7    A.    I don't believe we discussed much of
 8  anything with those guys because it all fell under
 9  the terms of ongoing loans being paid to Ken Jowdy.
10    Q.    If it was, in fact, an investment that
11  wasn't a loan to Ken Jowdy, but an investment in a
12  ruby, would that have been -- excuse me, an
13  investment securitized by a ruby, would that have
14  been something you would have discussed with your
15  clients?
16    A.    If you are asking if our Hawaii Group
17  was investing in a ruby --
18    Q.    Well, the question is whether they were
19  investing in something securitized by a ruby, would
20  you have to tell your clients or members of Little
21  Isle IV?
22    A.    If the Hawaiian members --
23           MR. STOLPER:    I am going to object.
24  The question is unclear.
25           MR. CASTANO:    I agree with you,
0558
 1  Michael.
 2    Q.    If, in fact, monies being transferred
 3  from Mr. Dalton were for an investment securitized by
 4  a ruby or something else, is that something you would
 5  have to tell your clients or members of Little Isle
 6  IV?
 7           MR. STOLPER:    Investment in what?
 8    A.    Investment in what?
 9    Q.    In whatever it is that Mr. Dalton was
10  investing ing in.
11    A.    Much the same as any other special
12  projects that we discussed openly and freely with all
13  of the members.  If this deal with Mr. Dalton was an
14  investment for the benefit of the Hawaii members,
15  absolutely we would have talked about it.
16           (whereupon, at this time, Mr. Stepaniuk
17  entered the room.)
18    Q.    Just so we are clear, you didn't have
19  conversation with any Little Isle IV members about
20  the investment or the loans that went to Mr. Dalton?
21    A.    In no context did I perceive that this
22  was an investment of some sort in Mr. Dalton or
23  through Mr. Dalton in anything.  The conversations
24  would have ended at Ken Jowdy just requested some
25  more money and our running total is approximately X
0559
 1  dollars.

Page 48

TR-SEC00000374

Kenner 08.16.11

2        Q.  The problem I am having with this is
3  that the monies don't go to Mr. Jowdy, the monies go
4  to Mr. Dalton.  And there appears to be at least an
5  agreement that you received that doesn't necessarily
6  talk about hard money lending, but, rather, appears
7  to be talking about an investment securitized by
8  something.
9        Did you do any follow-up to or due
10  diligence to find out exactly what was happening
11  here?
12        A.  The money, again, was at the request of
13  Ken Jowdy for projects that would be -- for project
14  funding outside the United States. So until you asked
15  the question just a few minutes ago, I have never
16  even once, until this moment, thought about any of
17  this as some sort of an investment in Mr. Dalton.
18        Q.  Or investment opportunity through Mr.
19  Dalton?
20        A.  That is correct.  Never once until just
21  a few minutes ago when you mentioned it.
22        MR. STOLPER:  But the document, Chris,
23  the investment, the reference, my inference is that
24  the document says it is an investment in either DDM
25  or Cabo San Lucas.
0560
1        MR. CASTANO:  I don't know what you are
2  referring to, and I am not trying to difficult.  I am
3  looking at the agreement and I am not seeing on page
4  3 of Exhibit 35 saying it's an investment in Diamante
5  Cabo San Lucas or Diamante del Mar.
6        MR. STOLPER:  It says "fund from a
7  credit line will be placed into an investment,"
8  that's consistent with what he testified before you
9  showed him the document.
10        MR. CASTANO:  I thought Mr. Kenner's
11  testimony was clear that Mr. Dalton was a hard money
12  lender and monies were being lent to Mr. Dalton with
13  the hopes of securitizing more lending for the
14  Diamante or Mexican entities.
15        A.  Let me clarify.  First, I did not
16  represent that the monies were being lent to Mr.
17  Dalton.  I represented earlier that they were fees,
18  front-end fees, again, as all the hard money lenders
19  we encountered during those years.
20        Q.  Okay.
21        A.  And then the reference to it being some
22  sort of an investment, I think that I attempted to
23  clarify.  That was I believe those fees helped Mr.
24  Dalton secure the arrangement with his collateralized
25  ruby to receive European bank funding that would then
0561
1  be able to be a loan to the Mexican entities.  That's
2  the best I know about this.
3        The inference to it being some sort of
4  investment back to us or we were putting money into
5  some investment is brand new.  It is the first I ever
6  heard of this in your questions.
7        Q.  The ruby, did you ever see any documents
8  supporting that Mr. Dalton had a very valuable ruby?
9        A.  I never saw anything.
10        Q.  Did you ask to see any documents that
11  Mr. Dalton owned a very expensive piece of jewelry or
12  ruby?

Page 49

Kenner 08.16.11
13          A.  No.  But Mr. Jowdy told me that he had
14   received documents and shared it with a jeweler
15   relative of his to confirm whatever he was working
16   on.
17   BY MR. SMITH:
18          Q.  You referred to forwarding these
19   documents and making a joke to Jowdy.
20          A.  Yes.
21          Q.  Is that a reference to the first page of
22   the document?
23          A.  I believe so.
24          Q.  And you write, "This is great.  We
25   should keep the script writer around in case we need
0562
1   revisions on any Diamante website."
2          A.  Yes.
3          Q.  What did you mean?
4          A.  I meant that this looked like it was
5   written by a third grader, and Ken Jowdy and I
6   carried on a very tongue in cheek relationship by
7   text message when things were good and we were
8   friendly.  So I was making fun of the materials that
9   were forwarded along.
10          Q.  And did he reply?
11          A.  I don't recall.
12          Q.  Do you recall -- whether he replied by
13   e-mail or not, do you recall having any kind of
14   conversation with him about doesn't this look
15   ridiculous, like it is written by a third grader?
16          A.  Best I recall is as a result of whatever
17   arrangement he was trying to make with Rodney Dalton,
18   he told me his attorney, Tom Harvey, was reviewing
19   documents with respect to this loan arrangement,
20   because it appeared to be the finale of all of his
21   funding efforts.
22          Q.  Meaning Tom harvey was reviewing this
23   draft agreement?
24          A.  I don't know if Tom harvey reviewed this
25   draft agreement or they found a six-year old to
0563
1   review the draft agreement, but I was told by Ken
2   Jowdy that his relationship with Rodney Dalton and
3   the pending loan that Dalton was going to provide for
4   the Mexican entities was all being reviewed by Tom
5   harvey.  And as I said earlier, everything that Jowdy
6   touched was also reviewed by Bill Najam, who is an
7   attorney as well, his brother in law.
8          Q.  And you don't know what the results of
9   that review were with respect to the transaction?
10          A.  I do not.  All I was requested as part
11   of our open revolving line of credit was to forward
12   money to bank accounts that Jowdy provided as part of
13   loan arrangement we had with Ken Jowdy.
14   BY MR. CASTANO:
15          Q.  You mentioned you felt that was written
16   by a six-year old or sixth grader?
17          A.  Something tongue in cheek to that
18   effect.
19          Q.  Did you contact Mr. Jowdy and say, "What
20   are we doing?  Why would we lend money to a guy who
21   sent us this document that on its face seems to be
22   written by someone who doesn't know what he is
23   doing"?

Page 50

TR-SEC00000376

Kenner 08.16.11
24          A.  I don't recall a conversation with him
25  other than what is memorialized here in the text
0564
1  message.  I can only assume that whatever Mr. Jowdy
2  was going forward with, he was doing it under advice
3  of counsel, either Tom harvey or Bill Najam or both.
4          Q.  I know we talked about Tommy Constantine
5  last time, but --
6              MR. SMITH:  Just let me ask this
7  question.
8  BY MR. SMITH:
9          Q.  I think you testified Little Isle IV
10  ended up providing 875,000 to Jowdy for the
11  transaction -- excuse me.  On instructions of Jowdy
12  was provided to Dalton and Sheppard; is that right?
13          A.  I believe so.
14          Q.  Do you know whether any funds came back
15  from Dalton and/or Sheppard?
16          A.  I do not.  I, in fact, have been trying
17  for five years to get ahold of Ken Jowdy's bank
18  records to see what went on on that side of the
19  Chinese wall.
20  BY MR. CASTANO:
21          Q.  We talked a little last time about Tommy
22  Constantine.  Did Little Isle IV, the Hawaiian
23  entities, provide Tommy Constantine with fees for
24  hard money lenders?
25          A.  If you don't mind, I didn't hear you.
0565
1          Q.  Sure.  We talked a little last time
2  about Tommy Constantine.
3              The question is:  Did Tommy Constantine
4  receive from Little Isle IV, the Hawaiian entities,
5  finder fees for hard money lenders?
6          A.  He received consulting fees, not finder
7  fees.
8          Q.  And those consulting fees were for his
9  efforts in locating money lenders; is that right?
10          A.  That's correct.
11          Q.  Those were for no other purpose, the
12  consulting fees were for no other purposes other than
13  finder fees?
14          A.  They were consulting fees to go find
15  funding for the Hawaiian entities.
16          Q.  And Tommy Constantine never provided
17  anyone at Little Isle IV with drugs or anything like
18  that; is that correct?
19          A.  Not that I am aware of.
20          Q.  And Tommy Constantine received the funds
21  just for those purposes?
22          A.  That's correct.
23          Q.  The consulting?
24          A.  Yes.  I am a little taken back by the
25  drug comment.
0566
1          Q.  Mr. Kenner, do you know if the Little
2  Isle IV bylaws authorized you to lend money?
3          A.  Yes.
4          Q.  You believe it did?
5          A.  Yes.
6          Q.  And do you believe the Little Isle IV
7  operating agreement allowed you to lend money?
8          A.  Yes.

Page 51

Kenner 08.16.11

9          Q.   Do you believe the Little Isle IV bylaws
10   authorize you to lend money to non-Hawaiian land
11   acquisition projects?
12          A.   Yes.
13          Q.   Do you believe the Little Isle IV
14   limited liability agreement authorized you to lend
15   money to non-Hawaiian projects?
16          A.   Yes, and let me make one clear
17   statement.
18              The Little Isle IV bylaws and operating
19   agreement through both the special projects provision
20   and one amendment to the agreement sometime in '04, I
21   believe, authorized the use of funding special
22   projects, whether it be loans or otherwise.
23              When we closed the joint venture
24   agreement with Lehman Brothers in the fall of 2006,
25   that was a sticking point with Lehman Brothers, that

0567
1    they didn't want to allow us to any longer be able to
2    use Little Isle IV or any of our Hawaiian entities to
3    also lend funds.  So we had significant discussions
4    with Lehman about that.  And they made us, at the
5    closing of the fall of '06 funding agreement, redo
6    our operating agreement and remove all provisions
7    that would allow us to act as a lending source or any
8    other way.  They rewrote the operating agreement, so
9    it would basically make us nothing but passive
10   investors from that point forward.
11          Q.   Was there a Little Isle IV operating
12   agreement or limited liability agreement prior to the
13   agreement that was reached with Lehman Brothers?
14          A.   There were several of them.
15          Q.   Have they all been provided to us?
16          A.   I believe everything I have in my
17   possession I gave to you guys.
18          Q.   Do you know if the limited liability
19   agreements prior to the Lehman limited liability
20   agreement concerning Little Isle IV has been provided
21   to us?
22          A.   what I can answer is that everything
23   that I believe was ever presented certainly to the
24   Nolan arbitration, which included, I believe, all of
25   the bylaws and operating agreements prior to the

0568
1    closing and the one we used for the closing have all
2    been provided.
3              MR. CASTANO:   Let's mark this Diamante
4    Exhibit 36.
5                     (NY-8125 Exhibit Number 36 was
6                     so marked for identification.)
7              MR. CASTANO:   And can we mark this
8    Diamante Exhibit 37.
9                     (NY-8125 Exhibit Number 37 was
10                    so marked for identification.)
11          Q.   Mr. Kenner, I am showing you what has
12   been marked Diamante Exhibits 36 and 37.  They both
13   appear to be bylaws for Little Isle IV LLC.
14              Please take a moment to review them.
15              (Witness complies.)
16          Q.   Just so the record is clear, I misread
17   the document on top.  Exhibit 36 is bylaws for Big
18   Island VI Ventures.  And 37 is bylaws for Big Island
19   IV Ventures LLC.

Page 52

Kenner 08.16.11
20            Let's focus on Diamante Exhibit 37, Mr.
21  Kenner.  I will take back Diamante Exhibit 36.
22            (Handing.)
23        A.  Chris, at the next opportunity when can
24  we take a break?
25            MR. CASTANO:   Okay.  Let's take a break
0569
 1  now before we ask any questions.
 2            We are off the record at 2:27 p.m.
 3            (Recess taken.)
 4            MR. CASTANO:   We are on the record at
 5  2:41 p.m.
 6  BY MR. CASTANO:
 7        A.  Mr. Kenner, while we were off the record
 8  were there any substantive conversations between the
 9  Commission staff and yourself?
10        A.  There were not.
11        Q.  Diamante Exhibit 37 is before you.
12            Have you had an opportunity to review
13  it?
14        A.  I have not yet.
15        Q.  Please do.
16            (Witness complies.)
17        A.  Okay.
18        Q.  Mr. Kenner, have you seen Diamante
19  Exhibit 37 before?
20        A.  Yes, I have.
21        Q.  What is Diamante Exhibit 37?
22        A.  Exhibit 37 is one of the early versions
23  of bylaws for Little Isle IV.
24        Q.  Are there other versions of bylaws?
25        A.  I believe there were one or two other
0570
 1  versions.
 2        Q.  For Little Isle IV?
 3        A.  Yes, before the first version was then
 4  changed to be called the operating agreement.
 5        Q.  Just to be clear, there were other
 6  versions of bylaws for Little Isle IV before there
 7  was an operating agreement?
 8        A.  I believe so.
 9        Q.  Do you know if those have been produced
10  to us?
11        A.  I don't recall.
12        Q.  Do you know where they are?
13        A.  Anything I had in my possession, was
14  able to find, were turned over.
15        Q.  Do you know if in any other litigations
16  or any other arbitrations there have been produced
17  multiple copies of different bylaws for Little Isle
18  IV?
19        A.  I believe so.
20        Q.  And looking at this particular bylaws of
21  Little Isle IV, I want to direct your attention to
22  last page; is that your signature?
23        A.  I believe it is.
24        Q.  When you say you believe it is, is it a
25  possibility it is not your signature and someone
0571
 1  forged it?
 2        A.  I believe it is mine.
 3        Q.  Do you know when this bylaw for Little
 4  Isle IV was in operation?

Page 53

Kenner 08.16.11

5      A.   Solely based on the time stamp, which
6  appears to have been a faxed copy of this, I believe
7  it was in effect in and around December of '03.
8      Q.   That's the time stamp that appears on
9  the bottom of the very first page and appears to be
10  on every page as well?
11      A.   I believe so.
12      Q.   Did you draft this or did someone else
13  draft it?
14      A.   I believe I drafted it.
15      Q.   Did you draft it in consultation with an
16  attorney?
17      A.   I did not.
18      Q.   Did anyone review it after you drafted
19  it?
20      A.   It was reviewed by a number of people
21  including, but not limited to, Joe Juneau, Owen
22  Nolan, John Kaiser, Chris Manfredi, Christopher
23  Hawkins.
24      Q.   And what was it reviewed for?
25      A.   For agreement.
0572
1      Q.   I want to direct your attention --
2  besides those four or five individuals that you just
3  mentioned, was it given to anyone else for any other
4  purpose?
5      A.   Not that I recall at the time.
6      Q.   Do you know if members of Little Isle
7  IV, besides those individuals you just mentioned,
8  received the bylaws of Little Isle IV?
9      A.   I believe each one them did.
10      Q.   So each time someone became a member,
11  they received the bylaws?
12      A.   No, that is not accurate.
13           The by-laws were changed and the
14  percentages were changed approximately five times
15  prior to the fall of 2006 Lehman funding of the
16  project, and during those five periods of time, the
17  bylaws or the subsequent operating agreement would be
18  disseminated amongst the members.
19      Q.   Prior to someone becoming a member of
20  Little Isle IV, were they provided bylaws of some
21  sort?
22      A.   Yes.
23      Q.   And who provided it to them?
24      A.   I did.
25      Q.   Did anyone else, to your knowledge?
0573
1      A.   As we said earlier, they may have been
2  distributed by other people.
3  BY MR. SMITH:
4      Q.   You specifically recall distributing to
5  each of the investors in Little Isle IV the operative
6  bylaws before they became investors?
7      A.   I can confirm that each of the members
8  did receive them, whether it came directly from
9  myself or somebody else, before they became a new
10  member they would have received the current version
11  of the bylaws.
12      Q.   You said they would have. Did they, in
13  fact, receive?
14      A.   Yes.
15      Q.   How do you know that?

Page 54

Kenner 08.16.11

16          A.   In any meeting I had with people
17   requesting information about becoming a member, I
18   would either have a copy of it myself and hand it to
19   them, or if I didn't have an extra paper copy of it,
20   I would have made a request to one of my assistants
21   to e-mail a copy or mail a copy to the people.
22          Q.   It sounds like you say would have either
23   had a copy or you would have made a request.  It
24   sounds like you are remembering your practice at the
25   time.
0574
1          A.   Yes.  I don't want mince words, Justin.
2   I did either deliver in person, when I was there
3   discussing what was going on for the existing members
4   of Little Isle, or if I didn't have a hard copy with
5   me, we would have sent out a message while I was in
6   the meeting asking somebody to sends it to them by
7   e-mail or by mail at the time.
8          Q.   So for each of the investors in Little
9   Isle IV, you could identify whether you provided that
10   member with a copy in a meeting before they became an
11   investor or you had it provided in similar fashion
12   before they became an investor?
13          A.   Correct.
14          Q.   And in all cases, you specifically
15   recall for each investor that you, in fact, provided
16   the operative bylaws before they became an investor?
17          A.   Yes.
18   BY MR. CASTANO:
19          Q.   As bylaws changed and new versions of
20   bylaws were written, is that the case, were new
21   versions of bylaws were written?
22          A.   They were.
23          Q.   How many total versions of bylaws are
24   there?
25          A.   I believe between bylaws and operating
0575
1   agreements, there may have been four or five prior to
2   the one Lehman Brothers wrote for us.
3          Q.   I just want to focus on the by-laws now.
4   We will shift gears to the operating agreement next.
5          How many bylaws were written for Little
6   Isle IV?
7          A.   I don't recall.
8          Q.   Was there more than one?
9          A.   I don't recall.
10          I do recall there was a transition from
11   using the term bylaws to the term operating
12   agreement.  And to me it is just semantics.
13          Q.   Just so we are clear, are you aware of
14   any other bylaws for Little Isle IV, not operating
15   agreements, just by-laws?
16          A.   I am not sure.
17          Q.   Just so that we are clear, you talked
18   about before there being multiple versions of bylaws.
19          Could you have been thinking of it as
20   multiple versions of the operating agreements?
21          A.   Again, I am using the terms
22   interchangeably.  I don't recall whether I named the
23   first one bylaw and any subsequent one operating
24   agreement.
25          Q.   I want to direct your attention to the
0576

Page 55

TR-SEC00000381

Kenner 08.16.11

1   first page of Diamante Exhibit 37, Article 2, The
2   Purpose, Section 1, "Little Isle IV LLC is an
3   organized group of investors established to invest in
4   land development projects in Hawaii."
5                   Is that accurate?
6           A.   The recital of it?
7           Q.   Yes.
8           A.   I believe that's what it says.
9           Q.   Is that your understanding of what
10  Little Isle IV LLC's purpose was?
11          A.   In 2002 and 2003, that was the original
12  purpose of the investments.
13          Q.   And did there come a time that the
14  purpose of the investments changed?
15          A.   Yes.
16          Q.   When was that?
17          A.   That was sometime in 2004 when we were
18  approached as a group by Ken Jowdy to offer loans to
19  Ken Jowdy to facilitate assistance with the del Mar
20  and future Cabo San Lucas projects.
21          Q.   At that time in 2004, were the bylaws
22  amended?
23          A.   Whether they were bylaws or operating
24  agreement, yes, they were amended.
25          Q.   And this operating agreement, did it
0577
1   contain written terms that authorized you to lend
2   money to Ken Jowdy or to others?
3           A.   Yes.
4           Q.   And do we have a copy of that?
5           A.   I don't know.
6           Q.   Do you know anyone who has a copy of
7   that?
8           A.   I would have to ask other people if they
9   have a copy of it or not.  Everything I had in my
10  possession, considering the documents and the theft
11  that occurred that we discussed earlier, has been
12  turned over.
13          Q.   Mr. Kenner, this seems like a pretty
14  important document.
15                   Do you know if it exists or not?
16          A.   I am sure it exists.
17          Q.   Do you have it in your possession, to
18  your knowledge?
19          A.   Everything that I had in my possession,
20  I turned over to you guys.
21          Q.   Like I said, I think this is an
22  important document.  Do you know if you have a copy
23  of it or not?
24                   I understand you are saying to me I have
25  turned over everything to you.  Do you have a copy of
0578
1   this important document?
2           A.   I do not know if I have a copy of it or
3   not.  Everything I had in my possession, subsequent
4   to the theft, I have turned over.  If it is something
5   that I haven't turned over, it may be in other
6   people's possession.
7           Q.   Are you saying you might have it, Chris,
8   I turned over everything I have.  Or are you saying I
9   turned everything over and, no, I just don't have
10  this document?
11          A.   I am saying I turned everything that I
                        Page 56

Kenner 08.16.11

12  had in my possession.  If there are documents that I
13  did not have in my possession but I am aware of, they
14  may exist and other people would have them.
15              MR. STOLPER:   That's not the answer to
16  the question.
17              THE WITNESS:   I am not following the
18  question.
19              MR. STOLPER:   Let me get to end of it.
20              Here is the question:   Do you know when
21  you made the production, because you reviewed all the
22  documents before you gave them to Jay and me, did you
23  see this document as part of your production?
24              He wants to know what is the likelihood
25  that you produced it to him.  He knows that you
0579
 1  turned everything relevant over.  He needs to know is
 2  it in there, because he hasn't had a chance to review
 3  everything.
 4          A.   I don't recall as I sit here today how
 5  many by-laws and operating agreements in total were
 6  turned over to you guys.  I do recall during the
 7  Nolan arbitration there were as many as four, to the
 8  best of my recollection, that were present during
 9  that arbitration.
10  BY MR. CASTANO:
11          Q.   When you say four, would it be four
12  by-laws that were present?
13          A.   I can't delineate, as I sit here, if
14  there was more than one bylaw, but bylaws, operating
15  agreement, operating agreement, operating agreement.
16          Q.   The operating agreement, you are
17  referring to more than four operating agreements or
18  bylaws for Little Isle IV or other Hawaiian entities
19  that somehow swallowed up or became affiliated with
20  Little Isle IV?
21          A.   No.  I believe specific to Little Isle
22  IV.
23  BY MR. SMITH:
24          Q.   I thought about five minutes ago you
25  thought that there were five.
0580
 1              Is your best recollection that there
 2  were four or five?
 3          A.   You are speaking accurately.  The fifth
 4  one, I believe, would have been the Lehman Brothers,
 5  the final one.
 6              MR. STOLPER:   His question was how many
 7  before Lehman.
 8          Q.   So four before Lehman?
 9          A.   That's correct, as I sit here today.
10              MR. STOLPER:   Chris, it is the
11  governing document.  So it may be easier to refer to
12  it that way.  Whether it is labeled by-laws,
13  operating agreement, it is the governing document and
14  it would be easier to refer to them that way.
15              MR. CASTANO:   Michael, let's go off the
16  record and go outside for a second at 2:56 p.m.
17              MR. STOLPER:   Sure.
18              (Discussion held off the record.)
19              MR. CASTANO:   We are back on the record
20  at 3:05 p.m.
21          Q.   Mr. Kenner, while we were off the
22  record, were there any substantive conversations
                                    Page 57

Kenner 08.16.11
23    between Commission staff and yourself?
24              A.   There were not.
25              Q.   Just so that the record is clear, Mr.
0581
1     Kenner, sitting here today you don't know if there
2     were multiple versions of the bylaws.  You just don't
3     recall?
4                   The bylaws, we are not talking about the
5     operating agreement?
6              A.   Now we are getting in semantics of the
7     words again or did we agree to call it the governing
8     document.
9                   MR. STEPANIUK:   Chris is asking
10    specific about a document titled bylaws to the
11    exclusion of any other document.
12              Q.   Sitting here today, are you aware any
13    other versions of the bylaws, the document that
14    appears in front of you, meaning that you have seen
15    other versions?
16                   MR. STOLPER:   The document entitled
17    "Bylaws"?
18                   MR. CASTANO:   Yes, the bylaws for
19    Little Isle IV.
20              A.   I don't recall.
21              Q.   Is it possible one exists?
22              A.   It is possible.
23              Q.   In terms of other governing agreements,
24    are you aware of other ones that might exist?
25              A.   Yes.
0582
1              Q.   How many -- and do you know what that
2     document was called?
3              A.   I believe it would have been referred to
4     as the operating agreement for Little Isle IV.
5              Q.   Is it also possible it was called the
6     limited liability agreement or Little Isle IV?
7              A.   It is possible it was also called a
8     limited liability agreement for Little Isle IV.
9              Q.   And that agreement, there might have
10    been multiple versions?
11              A.   That's correct.
12              Q.   Do you know, sitting here today, whether
13    that has been produced to us?
14              A.   Based on discussions we have already
15    had, I am not sure if has been produced or not, but I
16    have discussed, while we were off the record, that I
17    will go back and look through the total production
18    that we did send out to you guys as expedited as we
19    could and see if there are documents that are
20    missing.
21              Q.   In that production -- excuse me, in
22    those documents, I think you mentioned earlier that
23    the purpose section of the limited liability
24    agreements or the operating agreements may have made
25    reference to loans that Little Isle IV can make; is
0583
1     that right?
2              A.   I don't believe it was in the purpose
3     section.  I believe it was in the projects section.
4                   MR. STOLPER:   What number is that?
5                   THE WITNESS:   That would be Article 9.
6              Q.   That's a different document.  We are
7     talking about the operating agreement and the bylaws,
                              Page 58

Kenner 08.16.11

8  right, so it could be a different section; is that
9  right?
10           A.   It could be a different section.
11           Q.   I know I don't have a document in front
12  of you, but sitting here today, do you know if any
13  operating agreement mentioned that Little Isle IV
14  could make loans outside of the Little Isle IV
15  universe of Hawaiian land investing?
16           A.   I am 100 percent sure.
17           Q.   And there is a document that says that?
18           A.   Yes, there was.
19           Q.   And do you know if this was a document
20  that was used in the Nolan arbitration?
21           A.   I believe it was in the Nolan
22  production, correct.
23           Q.   Did this document say you were
24  authorized, as managing member, to make loans outside
25  of -- in words or substance I get it, this is not
0584
1   what the document probably says, in fact, but
2   generally did it say that you were authorized to make
3   loans outside of the Little Isle IV Hawaiian
4   universe?
5            A.   Absolutely.
6            Q.   It said that in writing?
7            A.   Yes, it did.
8            Q.   And it said it in writing.  Sitting here
9   today, do you recall if this was something that was
10  part of the Nolan arbitration?
11           A.   I believe it was.
12           MR. STOLPER:   When you say "part," was
13  it just produced or was there testimony with respect
14  to it?
15
16           THE WITNESS:   I believe there was some
17  testimony related to that agreement and its existence
18  and the language.  Not all of the documents in the
19  Nolan case that were produced were admitted as
20  evidence during the arbitration, but I am 100 percent
21  sure that that document was available during the
22  arbitration.
23           Q.   Do you know if it was discussed during
24  the arbitration?
25           A.   There were questions regarding the
0585
1   existence of that language and the ability to do so,
2   but during the arbitration, to the best of my
3   recollection, in the five days we spent less than ten
4   minutes in Q & A about the ability for Little Isle IV
5   to loan money outside the scope of its Hawaiian real
6   estate.
7   BY MR. STEPANIUK:
8            Q.   When did you last see a Little Isle IV
9   governing document other than what we have shown you
10  here today?
11           A.   Certainly during the Nolan arbitration,
12  which I don't recall the dates of that arbitration,
13  perhaps 2008.  And after that, I don't believe there
14  were any more open litigation that had any reference
15  to Little Isle that I needed to go back and look
16  through those documents.  So perhaps during the
17  arbitration in 2008 or 2009, I forget when it was,
18  was the last time I had seen that grouping of
Page 59

TR-SEC00000385

Kenner 08.16.11

19    documents that had to be put together in production.
20            Q.   Other than the ones we have shown you
21    here today?
22            A.   Other than the ones you have shown me
23    here today.
24    BY MR. CASTANO:
25            Q.   I will direct your attention to the
0586
1     third page, the special projects page.  Take a moment
2     to review Article 10, Special Projects.
3                 (Witness complies.)
4            A.   Yes.
5     BY MR. SMITH:
6            Q.   You testified that, as I understand it,
7     the bylaws or operating agreement that we don't have
8     that existed subsequent to this one allowed the
9     lending of funds to Ken Jowdy?
10           A.   To outside entities, correct.
11           Q.   Including Ken Jowdy?
12           A.   Yes.  It did not specifically name Ken
13    Jowdy.
14           Q.   But it did allow lending funds to
15    outside entities?
16           A.   Yes, it did.
17           Q.   Is it also the case this set of bylaws
18    do not allow the lending of funds to outside
19    entities?
20           A.   I believe it is ambiguous as to whether
21    or not it does.  That's based on the questions I am
22    receiving from you guys.  I believe that under
23    special projects if the objectives of the LLC were to
24    earn money as an investment and what we deemed was a
25    reasonable investment, if it was consistent with the
0587
1     overall objectives of the LLC, and I believe the
2     objectives were to earn money for the members, I
3     believe we did have authorization under special
4     projects.
5                 It was more clearly defined in later
6     versions of those governing documents and
7     specifically in early to mid 2006, it was a real
8     sticking point with Lehman, that they didn't want us
9     to leave that language in the agreements any longer.
10    Thus, they made us sign brand new operating
11    agreements that were tailored to their specifications
12    for what they wanted Little Isle or any other future
13    entity to be able to lend or not lend.
14           Q.   I thought your testimony earlier had
15    been that the bylaws or operating agreements, the
16    governing documents, were amended subsequent to this
17    one to allow lending to outside entities; is that
18    right?
19           A.   Let me be real clear.  I believe that
20    the special projects section already allows us to do
21    that under these bylaws, this version of the by-laws.
22                 There were subsequent amendments that
23    were very specific when it came to dealing with
24    lending, which ultimately became the Ken Jowdy loans.
25    That section and that language was forced by Lehman
0588
1     Brothers for us to take out in 2006.  And I know that
2     document was turned over to you.
3            Q.   The language allowing lending to outside
                                Page 60

TR-SEC00000386

Kenner 08.16.11

4  entities was forced out by Lehman Brothers, but I
5  thought you testified earlier that it was initially
6  put in subsequent to this set of bylaws to allow
7  lending to outside entities?
8       A.   It was done, to be very clear, so it
9  could not be left open for interpretation prior to us
10  lending money to Ken Jowdy.
11       Q.   What was the cause for doubt as to the
12  clarity of these operating agreements -- excuse me,
13  these by-laws?
14       A.   I think I was being proactive with the
15  partners to make sure it was very clear as opposed to
16  leaving it open for interpretation.
17       Q.   Was that pursuant to some discussions
18  that you had prior to amending to, I guess as you
19  said to more that explicitly clarify that lending
20  money to outside entities was permissible?
21       A.   No, I don't believe so.  But in context
22  of by-laws, operating agreements and limited
23  liability agreements, as we continued to migrate from
24  the first draft to the final draft that Lehman
25  authorized, there were subsequent changes through it,
0589
1  the language changed, and, again, to create
2  subsequent clarity some of the language changed based
3  on exactly what was going on, to make it very clear
4  in layman terms.
5       These were not agreements drafted by
6  lawyers.  I was drafting them.
7       Q.   Was there anything that occurred that
8  made this set of bylaws less than clear on that
9  point?
10       A.   To me, no.
11       Q.   What was the motivating factor, what
12  caused you to suddenly realize that it might be
13  better to have them amended to provide greater
14  clarity on the lending point?
15       A.   I don't think it was anything that
16  suddenly led me to that.  I think during one of our
17  subsequent additional member distributions of a newer
18  version of the bylaws, operating agreement, limited
19  liability agreement, that language was added.
20  BY MR. CASTANO:
21       Q.   You mentioned earlier that one of the
22  endeavors or objectives was to make money.
23       Turning back to the first page, Article
24  2, The Purpose, why didn't you put a clause in there
25  that said in words or substance:  While we are
0590
1  interested in investing in Hawaiian land, we are
2  going to consider all opportunities that come along
3  to further the membership's interest in making money
4  even if it is not necessarily connected to
5  establishing or investing in land development
6  projects in Hawaii?
7       A.   In as much as we want to split hairs
8  about special projects, whether it allowed as an
9  objective to make money, the loans that we felt were
10  secure, I did, as the managing member, this also
11  wouldn't address our desire to create a water
12  bottling company, or to have created a landscape
13  nursery company that we felt also fell within the
14  scope of special projects.

Page 61

TR-SEC00000387

Kenner 08.16.11
15          Q.   There seems to be a difference, and tell
16   me if I am wrong, you actually lent money.  Did you
17   establish a Hawaiian water bottling company?
18          A.   We got right to the doorstep of
19   establishing that, as we did get into purchase and
20   sale contracts with an existing landscaping company,
21   as did we also get right to the doorstep to acquire
22   land to have the quarry.
23          Q.   Have that all been provided, all the
24   documents and correspondence with water companies and
25   all that information?
0591
1          A.   I don't know where those documents
2   exist.
3          Q.   So they haven't been produced?
4          A.   Not that I believe.
5          Q.   Any contracts entered into with any
6   water bottling company, plastic company?
7          A.   No.  What you would have received is
8   purchase contracts on the land that have the quarries
9   on it.  You would have purchase and sale contracts
10   for land that has the nursery on it.
11          Q.   Do we have those contracts?
12          A.   I believe you do.  Those were options
13   that were still open and available to us at the
14   closing and the subsequent managing member decided
15   not to pursue it.
16               MR. CASTANO:   I want to mark this as
17   Diamante Exhibit 38.
18                    (NY-8125 Exhibit Number 38 was
19                     so marked for identification.)
20          Q.   Mr. Kenner, would you like clarify
21   something?
22          A.   Sure.  Just to clarify, relative to the
23   amendments that occurred to the governing documents,
24   I am not sure that in 2003 or 2002 when the original
25   by-laws or governing documents were established that
0592
1   it was a consideration of ours in the early stage to
2   provide lending to anybody else.
3               I think that became an option down the
4   road that migrated into the subsequent versions of
5   the bylaws, operating agreements or limited liability
6   agreements.
7   BY MR. SMITH:
8          Q.   Your testimony, though, was that even
9   prior to that point, prior to that migration, that
10   this version of the bylaws allow lending to outside
11   entities?
12          A.   I think it is grand in scope and allows
13   us to pursue any number of those things that we
14   talked about, whether it be a nursery, a rock quarry
15   or a lending.
16          Q.   What provision in the bylaws allows the
17   lending in particular?
18          A.   Again, by definition it's an
19   interpretation of what I felt the overall objectives
20   of the LLC were, and I delineate that from what you
21   perceive as the purpose of the LLC.  The purpose
22   would be a land investment, and I don't see a rock
23   quarry or a nursery or a lending option as falling
24   inside the scope of that.
25               Had we concluded one of those land
                          Page 62

Kenner 08.16.11

0593
1   purchases that held the rock quarry, land purchase
2   that held the nursery, or if we thought we were about
3   to finish those, I believe the bylaws would have been
4   changed again to include language that would be very
5   clear about that, so there would be no question among
6   the members does this full inside scope.
7           I was trying to be very proactive during
8   these additional changes in the bylaws, but as I sit
9   here and have had to review this document that
10  drafted in '02 or '03 infinitum, I believe when I
11  read special projects, the overall objective of the
12  group was to make money.  And if lending money at 15
13  percent interest to what we believed was a secure
14  investor, I believe it falls under special projects.
15  And had Mr. Jowdy paid us in '06, as he was supposed
16  to, we would have had incredibly happy investors.  We
17  were defrauded by one of our closest friends and ally
18  at the time.
19          Q.  Just so I understand, your testimony is
20  that lending was allowed in addition to the various
21  other projects you described, based on the purpose of
22  the project was to make money?
23          A.  Based on the objectives of the project
24  was to make money.
25          Q.  And is that objective specified anywhere
0594
1   in the bylaws?
2           A.  I believe in the special projects,
3   "Special projects shall be established by Little Isle
4   IV to promote the gathering of information in
5   specialized areas related to all endeavors of the
6   LLC, assuming that they are relevant to the overall
7   objectives of the LLC."  And I believe the overall
8   objective of the LLC was to make money.
9           Q.  Where is that objective specified?
10          A.  I don't think it is.  That's my point,
11  when we got to the future versions of the bylaws or
12  operating agreements, I tried to take a proactive
13  approach to put it in there.
14          Q.  Putting aside the future versions, just
15  referring specifically to this version, the sentence
16  you just read indicates that "The special projects
17  shall be established by Little Isle IV LLC to promote
18  the gathering of information in specialized areas
19  related to all endeavors of the LLC, assuming they
20  are relevant to the overall objectives of the LLC."
21          So the projects would have to be
22  relevant to the overall objectives of the LLC.  You
23  testified making money is not specified as an
24  objective of the LLC; is that right?
25          MR. STOLPER:  I also note that there is
0595
1   no section that is says "Objectives of the LLC."
2           MR. SMITH:  I understand.
3           A.  That's my point.  Again, I am not a
4   lawyer.  This was drafted up for five or six friends
5   to feel comfortable that there was a governing
6   document at the beginning.  I believe it did address
7   all those.  In hindsight as I look at it as I sit
8   higher today, it addresses the grander scope of the
9   overall objectives of the entity was to make money.
10  I don't know for what other purpose we would be

Page 63

Kenner 08.16.11

11  involved in the business if it wasn't to make money.
12       Q.  There is section that describes the
13  purpose of the LLC?
14       A.  I am talking about what I perceive here
15  reading this today, eight years later, is our
16  objective is to go to Hawaii and gather up group of
17  friends ultimately to invest and make money.
18       Q.  But the document itself has a purpose
19  section that says that the purpose is to establish
20  and invest in land development projects in Hawaii?
21       A.  Justin, again, as we split hairs here,
22  there isn't an objective section.  So if we want to
23  split hairs on the bylaws, it would have been more
24  appropriate if I was trying to put together -- again,
25  this was drafted very quickly for the purpose of
0596
1  several friends -- I would have referred to that as
2  the overall purpose of the LLC.  I am telling you the
3  objective of the LLC was to make money.  The purpose
4  was to originally go to Hawaii.
5       Q.  So you are distinguishing between the
6  objectives and purposes of the LLC?
7       A.  Yes.
8       Q.  And the unspecified objective was to
9  make money and the purpose was something else?
10       A.  I believe the purpose, again, I am not a
11  lawyer and I wasn't drafting this with a legal
12  background.  The definition of this agreement was to
13  create a general sense that we knew what we were
14  doing amongst a group of five or six friends.
15            As that grew larger, there were
16  amendments made to the bylaws and subsequent
17  operating agreements that more specifically addressed
18  some of those issues, one of which was the specific
19  lending that we were going to consider as part of the
20  projects.
21            MR. STOLPER:  When you drafted this,
22  you wrote the words "Special Projects" there.  Was
23  that intended to be limited to Hawaii and the land
24  acquisition in Hawaii?
25            THE WITNESS:  Not at all.
0597
1  BY MR. CASTANO:
2       Q.  Why didn't you say that then?
3       A.  As we sit here today, Chris, we could
4  have listed 15 more paragraphs that outlined
5  everything and anything we would ever do for the
6  following decade, but that wasn't the purpose for
7  drafting this up.  It was really to make guys feel
8  like, as we purchased the very first piece of land
9  which totalled $720,000, that everybody felt like
10  they had a piece of paper to show their wives.
11       Q.  Do you know that there are members of
12  Little Isle IV that believe you never told never told
13  that the money wasn't going to go to Hawaii projects?
14  Whether you believe them or not, there are people out
15  there that say that; is that correct?
16            MR. STOLPER:  People unspecified?
17            MR. CASTANO:  There are members of
18  Little Isle IV that say that.
19            MR. STOLPER:  You have to name them.
20  You can't ask a general question like that.  He has
21  already testified there is one person, Owen Nolan.
                    Page 64

Kenner 08.16.11
22          Q.  Is there anyone else, Mr. Kenner?
23          A.  No that I believe.
24          Q.  Have you ever heard anyone else say
25   that?
0598
1           A.  Only Owen Nolan.
2           Q.  No one else has ever said that?
3           A.  I heard Christine Myrick say it.  She is
4    no longer a member of the group.
5           Q.  Did Mr. Boyle ever say that?  Mr. Dan
6    Boyle, did he ever say he didn't know his money was
7    going to be used for other things other than an
8    investment in Little Isle IV?
9           A.  No, I don't believe that is what I
10   recall.  The only thing I remember from Dan Boyle was
11   after he was having an affair with Christine Myrick,
12   he began to question five years of what was going on.
13          Q.  Did Mr. Boyle ever say that he didn't
14   know his money was going for other purposes other
15   than Little Isle IV?
16          A.  I believe there is an affidavit that he
17   signed on behalf of Mr. Meeks and Mr. Nolan for the
18   arbitration but it was certainly an affidavit drafted
19   by Mr. Meeks for Mr. Boyle to sign.
20          Q.  Regardless, did Mr. Boyle sign an
21   affidavit that said in words or substance that he
22   didn't know that his money and his investment in
23   Little Isle IV would be used for loans, to your
24   knowledge?
25          A.  I have read an affidavit by Mr. Boyle
0599
1    that I believed was very inconsistent with any
2    conversation that I ever had with Mr. Boyle.
3               Mr. Boyle fell at odds with me when I
4    caught him having an affair with Ms. Myrick which led
5    to her subsequent termination and he was afraid in
6    the Nolan case that he and his wife would be called
7    to testify.  He subsequently sent me a threatening
8    e-mail through Darryl Sadore (ph) telling me the next
9    time he saw me would be my last time.  And I believe
10   that was also turned over to you guys.
11          Q.  Besides Mr. Nolan and Mr. Boyle, is
12   there anyone else that would they didn't know, to
13   your knowledge,  that their investment in Little Isle
14   IV would be used for loans and other purpose other
15   than an investment for development in Hawaiian
16   properties?
17          A.  Not to my knowledge.
18              MR. STOLPER:   Are you clear on the
19   timing of the questions?  You may want to be more
20   precise about that.
21              MR. CASTANO:   I thought the question
22   was precise.
23              MR. STOLPER:   It wasn't with respect to
24   timing.  You asked the question has anyone ever said
25   that they weren't told that monies they were
0600
1    investing in Little Isle IV would be used outside
2    Little Isle IV 4, but there is no qualification as to
3    when they were told that.
4               MR. CASTANO:   It isn't what they were
5    told.  It is what they say.
6           Q.  Is there any investor in Little Isle IV
                          Page 65

Kenner 08.16.11

```
 7   or member of Little Isle IV who would say that they
 8   weren't told that their monies would be used for
 9   purposes of developing Hawaiian property?
10          MR. STOLPER:   They were not told at any
11   time, as opposed to when they invested?
12          Q.  Is there anyone who would say it,
13   period.  I guess your testimony is I disagree with
14   them.
15          I am asking are you aware of anyone who
16   would say they weren't told or provided written
17   documents that said their monies would be used not
18   for Little Isle IV development of Hawaiian
19   properties, but instead, to be sent off as loans to
20   other entities?
21          A.  I believe other than Owen Nolan and
22   anyone else that attorney Michael Meeks or Christine
23   Myrick had manipulated, I can't imagine anybody that
24   would have said that.
25          As I sit here today, I can't even
0601
 1   confirm that I believe Dan Boyle would sit here and
 2   say that.  I can only confirm that I believe Owen
 3   Nolan would say that or attempt to say that, as he
 4   did in testimony.
 5          Q.  Did you see an affidavit that Mr. Boyle
 6   created?
 7          A.  Yes, I turned it over to you guys.
 8          Q.  Did Mr. Boyle say in the affidavit that
 9   he didn't know in words or substance that his
10   investment in Little Isle IV was going to be used for
11   loans to other entities?
12          A.  I don't recall specifically what his
13   affidavit said.  Although I know he took an adverse
14   role to what his investment was.
15          Q.  Mr. Kenner, you remember specifically
16   providing us with Mr. Boyle's affidavit?
17          A.  Yes, I do.
18          Q.  Just so the record is clear, you can't
19   remember whether you provided us with an operating
20   agreement or bylaws that discusses in detail, in
21   words or substance, that loans can be made by Little
22   Isle IV to other entities?
23          A.  I actually, in fact, recall that because
24   when I was putting together the production for you
25   guys, I was very bothered to come across the threat
0602
 1   that Dan Boyle had made to me through Darryl Sadore,
 2   so when I did, it triggered me to go back and reading
 3   his affidavit -- excuse me, not reading his
 4   affidavit, getting the affidavits that Mr. Meeks had
 5   asked people to sign on Mr. Nolan's behalf.  That's
 6   why I recall the Dan Boyle affidavit, because I sent
 7   several to you.
 8          Q.  Have you ever asked anyone to sign an
 9   affidavit on your behalf?
10          MR. STOLPER:   In general?
11          Q.  Yes.  In any arbitrations you have been
12   involved in in the last five years?
13          A.  I have only been involved in one
14   arbitration.
15          Q.  Have you ever asked anyone to sign an
16   affidavit on your behalf for any litigation or
17   arbitrations in the last five or six years?
```

Page 66

Kenner 08.16.11

```
18        A.  Yes.
19  BY MR. STEPANIUK:
20        Q.  I want to address the distinction Mr.
21  Stolper was making.  I think the questions Chris has
22  been asking you have been answering refer to anybody
23  ever saying that they were never told at any time
24  that Little Isle funds could or would be used for not
25  Hawaiian land development purposes.
0603
1              Now I want to ask more narrowly, are you
2  aware of anyone who has said that they were not told
3  at the time they invested in Little Isle that Little
4  Isle funds could or would be used for non-Hawaiian
5  land development purposes?
6        A.  I don't believe anybody could say that
7  in truth.
8        Q.  Aside from truth or falsity of any such
9  statements that might have been made, are you aware
10  of anyone making such statements?
11        A.  I believe Owen Nolan.  And I believe
12  also through rumor that Christine Myrick has been
13  making those accusations to many people as she could
14  get an audience after she was terminated.
15        Q.  Anybody else?
16        A.  Not that I am aware of.
17        Q.  So it is the same group of people who
18  say they were never told as who say they weren't told
19  at the time that they invested?
20        A.  That's correct, to the best of my
21  knowledge.
22  BY MR. CASTANO:
23        Q.  Besides Mr. Nolan, are there any
24  proceedings with you and anyone else?
25        A.  Not that I believe.
0604
1        Q.  In the last five or six years?
2            MR. STOLPER:  Proceedings meaning?
3            MR. CASTANO:  Broadly defined,
4  arbitrations in court, litigation.
5        A.  There have been quite a few.
6        Q.  Putting aside your disputes with Mr.
7  Jowdy, were there any disputes between you and Mr.
8  Juneau?
9        A.  Yes, there were.
10        Q.  Anyone else?  Any other former clients
11  of yours or anyone else?
12        A.  Ethan Moreau and Jozef Stumbel.
13        Q.  Has Tommy Constantine sued you for any
14  reason?
15        A.  He filed a cross-complaint against me in
16  a case that I was not a plaintiff in.
17            MR. STOLPER:  Counterclaim.
18        A.  Counterclaim.
19        Q.  Let's move to a document that has been
20  previously marked about 15 minutes ago, Exhibit 38.
21            Please take a moment to review that.
22            (Witness complies.)
23        Q.  Mr. Kenner, what is Diamante Exhibit 38?
24        A.  Exhibit 38 a limited liability company
25  agreement for Little Isle IV that was authored and
0605
1  produced by Lehman Brothers as a requirement for the
2  closing that happened in the fall of 2006.
```

Page 67

Kenner 08.16.11

3      Q.   Are you aware of other limited liability
4  agreements for Little Isle IV?
5      A.   I believe there was at least one
6  governing agreement that was titled limited liability
7  company agreement prior to this one.
8      Q.   Just so that we are clear, between
9  bylaws and limited liability company agreements, you
10 believe that there might be three or four documents
11 prior to this one?
12     A.   Yes, I believe there were several
13 documents prior to this one, as we have discussed.
14     Q.   Are there any ones after this date, to
15 your knowledge, any limited liability company
16 agreements for Little Isle IV after April 26, 2006?
17     A.   This was the last one.
18     Q.   And there are no other ones?
19     A.   This was the last one.
20          (Witness and counsel confer.)
21          MR. STOLPER:   We should note for the
22 record that Exhibit 38 does not appear to reference
23 any other documents other than the bylaws.  It also
24 seems to be sloppy in its form in that on the very
25 first the very first whereas clause refers to Big
0606
1  Isle VI as opposed to Little Isle IV.  So I am not
2  sure how much attention to detail the scriber here
3  had.
4      Q.   Did you review this document Mr. Kenner?
5      A.   Yes.
6      Q.   Did you review it before this document
7  was signed by various members of Little Isle IV?
8      A.   I don't recall.
9      Q.   Do you know if, in fact, this document
10 was signed by the members of Little Isle IV?
11     A.   Based upon review of the document today,
12 I believe it was.
13     Q.   Do you know how these signatures got on
14 this document?
15     A.   At the time the execution of this
16 document was required, I believe I faxed a copy of
17 this document to each and every one of the members
18 and each and every member, in turn, faxed me back
19 their signature pages.
20     Q.   Is there any allegations that you are
21 aware of of anyone saying you forged their signatures
22 on this document?
23     A.   On this document, I am not aware.
24     Q.   Turning to page 10 of the document,
25 membership and percentages.
0607
1      A.   I am on page 10.
2      Q.   I note there is various percentages and
3  membership interest?
4      A.   Yes.
5      Q.   Looking at that, is that accurate and
6  credit for the time this document was signed?
7      A.   It appears to be.
8      Q.   Were you only a .01 percent owner
9  membership interest in Little Isle IV?
10     A.   At that point I was.  That's how Lehman
11 Brothers wanted me to be listed as the managing
12 member of the entity, as .01.
13     Q.   Did there come a time where that

Page 68

Kenner 08.16.11

```
14   percentage increased?
15         A.   Yes, after I bought Christine Myrick out
16   of her shares.
17         Q.   And how much did she have?
18         A.   It says she .56 percent.
19         Q.   So your interest increased to .57
20   percent; is that correct?
21         A.   If I were still a managing member at
22   that time, yes.  If not, it increased to .56.
23         Q.   And did there ever come a time that you
24   became a larger membership owner of Little Isle IV?
25         A.   From that point forward, no.
0608
 1         Q.   From that point forward meaning from the
 2   time you acquired Christine Myrick's position?
 3         A.   Correct.
 4         Q.   Do you know if after April 26, 2006
 5   Little Isle IV ever made any loans to any other
 6   entity?
 7         A.   I don't believe so.
 8         Q.   Are you certain of that?
 9         A.   I am fairly certain.
10         Q.   when did you cease being managing member
11   of Little Isle IV?
12         A.   Sometime after the closing in the fall
13   of 2006.
14         Q.   And who became managing member?
15         A.   I believe John Kaiser became the
16   managing member and still is managing member.
17         Q.   what role did you have at Little Isle IV
18   after fall 2006?
19         A.   Just managing member until I believe
20   that transfer occurred.
21         Q.   And were bank accounts transferred at
22   that time?  Meaning at the time Lehman Brothers
23   acquired Little Isle IV, were the accounts
24   transferred to Lehman Brothers?
25         A.   No.
0609
 1         Q.   Who were they put in possession of, if
 2   anyone?
 3         A.   There was no cash left in the bank
 4   accounts.
 5         Q.   Okay, I will take it back, thank you.
 6         A.   Can I just look at it for one moment.
 7         Q.   Sure.
 8              (Witness and counsel confer.)
 9         Q.   I know we discussed a little earlier the
10   total investor proceeds that I believe you said, or
11   membership contributions to Little Isle IV prior to
12   Lehman's involvement was approximately $11 million,
13   give or take; is that right?
14         A.   That's approximate.
15         Q.   Could that number be a little bit lower?
16         A.   Could be.
17         Q.   Could it be upwards of maybe only $8
18   million?
19         A.   No.
20         Q.   You believe it is more than that?
21         A.   Yes.
22              MR. CASTANO:   Please mark this as
23   Diamante Exhibit 39.
24                   (NY-8125 Exhibit Number 39 was
                              Page 69
```

                                    Kenner 08.16.11
25                        so marked for identification.)
0610
 1              Q.  I am showing you what has been marked
 2    Diamante Exhibit 39.
 3                   Please take a moment to review that.
 4                   (Witness complies.)
 5              A.  Okay.
 6              Q.  Mr. Kenner, have you seen Diamante
 7    Exhibit 39?
 8              A.  Yes, I have.
 9              Q.  What is Diamante Exhibit 39?
10              A.  Exhibit 39 is a letter that was authored
11    by Bill Najam and attorneys for Lehman Brothers to
12    memorialize the joint venture agreement between our
13    Hawaiian entities and Alan Warden and Windwalker and
14    it also outlined all of the disclosure and
15    participation I had and the other members had for
16    contribution sake and ongoing participation, and it
17    asked for each one of the Little Isle members to
18    acknowledge all of these disclosures and grant
19    authority to act and consummate a joint venture
20    agreement.
21              Q.  Did send this letter?
22              A.  Yes, I did.
23              Q.  Did you sign this letter?
24              A.  Yes,I did.
25              Q.  Is everything in this letter accurate,
0611
 1    to your knowledge?
 2              A.  To the best of my knowledge, it is.
 3              Q.  When you were speaking to Mr. Najam
 4    about the letter, did you have any conversations with
 5    him about what the content of the letter should be?
 6              A.  Not in particular, no.
 7              Q.  How about in general?
 8              A.  The letter was presented to me by Mr.
 9    Najam and the Lehman attorneys saying this is what
10    they would accept as a disclosure.  My contribution
11    to it was a breakdown of the percentages that they
12    needed for the partners.  Everything else was
13    presented to me as this is what we needs as a
14    disclosure signed.
15              Q.  I note on page six this document is
16    signed, but you believe you did sign this letter at
17    some point?
18              A.  Yes.
19              Q.  Do you believe you signed this letter on
20    or around July 21, 2006?
21              A.  Yes.
22              Q.  I want to direct your attention to the
23    fourth paragraph, "The total investment today of the
24    company, our partners and me, in a parcel is
25    approximately $8 million."
0612
 1              A.  That's correct.
 2              Q.  We talked a little bit earlier about how
 3    much was invested in Little Isle IV.
 4              A.  Yes.
 5              Q.  Do you believe that number is closer --
 6    maybe it wasn't $11 million, it was $8 million, or is
 7    there something I am missing?
 8              A.  I think you may be missing something so
 9    perhaps I can clear it up.  I heard these comments
                            Page 70

Kenner 08.16.11

10    from a lot people over the last few years.
11              That paragraph represents the $8 million
12    cash that was invested and spent on land parcels and
13    development costs up until the point of the joint
14    venture.  The 11 or 12 or 13 million dollars we
15    talked about before would also include the
16    outstanding loans at that point in time that were
17    made to Ken Jowdy.  But this was not letter written
18    by Lehman Brothers to disclose the state of the union
19    of the Little Isle partnership.
20              This is clearly and solely a letter that
21    they needed as disclosure for each of the Little Isle
22    IV members to understand the content, context and
23    direction of the new joint venture so they could get
24    them to sign off on it.
25         Q.  So why wasn't there something that said
0613
1     that the total amount raised was 13 million.  You are
2     saying it was 8 million?
3          A.  That's not correct.
4              I am saying that the letter is accurate.
5     It says the total investment to date of the company,
6     our partners and me, in the parcels, and the parcels
7     is referring to what we were contributing to the
8     joint venture, totals approximately $8 million.
9              MR. STOLPER:  Parcels is a defined
10    term.
11         Q.  Mr. Kenner, so we are clear, the monies
12    that were coming in to Little Isle IV, did you break
13    it down in any way at the time, meaning we are going
14    to take in $8 million, we are going to use that $8
15    million to acquire land, and these $4 million that
16    came in we are going to give to or send to the Jowdy
17    entities as a loan?
18              MR. STOLPER:  Objection, it has been
19    asked and answered, and he has also testified that at
20    the time that the monies were raised initially,
21    monies were not, they didn't have any anticipation or
22    expectation to lending to Jowdy.  So when you ask
23    that question you are simplifying five years of
24    history into one false premise.  That's my problem.
25         Q.  Were there any written documents, Mr.
0614
1     Kenner, about how you would go about in any way
2     distinguishing monies that came in?
3          A.  Distinguishing them to who?
4          Q.  Means monies would be used for the
5     Hawaiian acquisition and then other monies would be
6     used to send to Jowdy.
7              Were there any written documents about
8     this?
9          A.  No specific documents.
10             MR. STOLPER:  Other than the bylaws
11    that we already have testimony on.
12         Q.  Do the bank records show approximately
13    $8 million or $11 million coming in to Little Isle IV
14    during the period of 2003 through 2006?
15         A.  Yes, I believe so.
16         Q.  Was there any monies invested in cash?
17         A.  I don't believe so.
18         Q.  So your testimony is that monies that
19    went to fund the land were approximately $8 million?
20         A.  That's correct.  And that total I had to
                           Page 71

Kenner 08.16.11
21    represent to Lehman Brothers prior to this letter
22    being written.
23             Q.   How come this letter doesn't have any
24    information about the lending to Jowdy from Little
25    Isle IV?
0615
1                  MR. STOLPER:   Asked and answered.
2             Q.   Why doesn't the letter have it?
3                  MR. STOLPER:   He has already answered
4     that.
5             Q.   Can you answer it again for the
6     slow-witted person here?
7             A.   This letter was drafted by Bill Najam
8     and Lehman Brothers' counsel as the disclosure
9     requirement they needed to close the joint venture.
10    This was not a state of the union Little Isle IV
11    all-encompassing letter.
12                 There are several other things that this
13    letter does not disclose that are relevant or
14    irrelevant to the actually closing of the joint
15    venture.
16            Q.   It strikes me as odd that it gets into
17    lot of detail but you didn't include or asked for it
18    to be included the approximately $5 million loans to
19    Jowdy.
20                 Was that discussed in any way with Najam
21    or counsel?
22            A.   In fact, in the spring of 2006, at the
23    closing of the Cabo deal, that same Lehman counsel
24    and the same Bill Najam were involved with it.  They
25    were very aware in the spring of '06 that Jowdy owed
0616
1     up approximately $7 million at the time.  They were
2     all aware of that.
3                  The same gentlemen are the ones who
4     constructed this letter.  So I can't speak for Masood
5     Bhatti or what he didn't want his other superiors at
6     Lehman Brothers to know, but this was apparently a
7     letter that had to go to, as I was told, to Lehman's
8     committee to approve this loan.
9                  Just to get a flavor of how long these
10    negotiations were going on, that operating agreement
11    that we looked at from April 26th was being pressed
12    on me as if we were closing the loan originally at
13    the end of April.  And the last requirement was to
14    take out the lending provision in the operating
15    agreement.  This is now three months later, and after
16    more acrimony, they are now requiring a disclosure
17    letter on top of all the operating agreements.
18            Q.   Did you send this to your clients?
19            A.   Yes, I did.  I sent this out to all the
20    members of Little Isle IV?
21            Q.   Did you have any conversations with them
22    about, wait a second, we are talking about the $8
23    million used to develop the property, but there is an
24    outstanding $5 million out there or there are loans
25    out there that should probably also be included?
0617
1                  Did you have any conversations with
2     anyone?
3                  MR. STOLPER:   Objection.  You are
4     injecting an irrelevant point into a transaction that
5     has nothing to do with the loans.

Page 72

TR-SEC00000398

Kenner 08.16.11
 6          MR. CASTANO:    I think it is relevant
 7  and I am allowed to ask it.
 8          MR. STOLPER:    Well, you are wrong.
 9          MR. CASTANO:    You can think I am wrong
10  but I am allowed to ask the question.
11          MR. STOLPER:    You also said it is odd.
12  The only thing odd is your question.
13          MR. CASTANO:    That's fine.  We are
14  allowed to ask the questions.  You can object.
15          MR. STOLPER:    I am.
16      Q.   This is document that went to your
17  clients, we are talking about 4 or $5 million,
18  perhaps even more, that went to loans.  The letter
19  doesn't say anything --
20          MR. STOLPER:    It shouldn't if you know
21  anything about disclosure letters.
22      Q.   Do you know why it doesn't say anything?
23      A.   Because it is a disclosure letter, as I
24  answered before.  This was not a state of the union
25  letter for Little Isle IV members.
0618
 1      Q.   It does seem to be very detailed
 2  including all the transactions and consolidations.
 3          MR. STOLPER:    But you are not focusing
 4  -- tell him what the disclosure is for.  He doesn't
 5  seem to get it.
 6      A.   The disclosure was for Lehman Brothers'
 7  committee to understand that the members of Little
 8  Isle IV knew all the components of the joint venture
 9  that was about to happen between the Hawaii members
10  and Alan Worden's group and Windwalker.  That is what
11  this disclosure letter was for.  It was not a state
12  of the union letter.
13          MR. STOLPER:    Forget state of union.
14  Did it have anything to do with the loans?
15          THE WITNESS:    No.
16          MR. STOLPER:    Do the loans impact the
17  shareholder changes that are reflected here?
18          THE WITNESS:    Absolutely not.
19  BY MR. CASTANO:
20      Q.   Did you have any conversations with
21  anyone about whether that should be included, the
22  loans that went to Jowdy?
23      A.   I don't recall.
24      Q.   You don't recall having a conversation
25  with anyone included in Jowdy's universe, Mr. Najam
0619
 1  or otherwise, about should the letter also include
 2  the fact that approximately one fourth to one third
 3  of our money raised went to loans to Mr. Jowdy's
 4  entities?
 5          MR. STOLPER:    Same objection.
 6      Q.   The question is:  Did you have any
 7  conversations?
 8          MR. STOLPER:    He already answered that.
 9  He doesn't recall.
10      Q.   You don't recall?
11      A.   I don't recall specific conversations.
12      Q.   Do you recall a general conversation?
13      A.   I remember a lot of general
14  conversations with both Masood Bhatti and Bill Najam
15  about their reassurances that Ken Jowdy, through
16  Masood Bhatti's words and Lehman's slush fund, were
                        Page 73

Kenner 08.16.11

17  going to pay back those loans.  Ultimately, at the
18  end of the day, this letter was placed in front of me
19  as the disclosure letter that Lehman needed to put in
20  front of their committee.  When I say Lehman, I mean
21  Masood Bhatti needed to put in front of his
22  committee, so each of the Little Isle IV members
23  would have awareness that this joint venture was
24  occurring.  It was very simple.
25  BY MR. SMITH:
0620
 1          Q.  I have one question.
 2              You testified that in the spring of 2006
 3  the amount owed by Jowdy to Little Isle IV was about
 4  $7 million?
 5          A.  Yes.
 6          Q.  And I thought you had testified earlier
 7  that the peak amount was $5 million or was that just
 8  principal?
 9          A.  Principal.
10          Q.  So at this point, $2 million or so of
11  interest had already accrued?
12          A.  Yes.
13          Q.  And what's the current amount owed?
14  Have you calculated it?
15          A.  I stopped at about 10 million.
16  BY MR. CASTANO:
17          Q.  Were there any conversations with Lehman
18  Brothers concerning the one-page loan document that
19  you referenced earlier in your testimony?
20          A.  I missed the first half of your
21  question.
22          Q.  Were there any conversations with Lehman
23  Brothers concerning that one-page loan document that
24  you referenced earlier in your testimony?  The loan
25  document with the 15 percent interest rate that you
0621
 1  talked about.
 2          A.  The conversations that were related to
 3  the loan to Ken Jowdy were that Masood Bhatti was
 4  aware of it and was going to make good on Jowdy's
 5  loans at the closing of the 2006 Cabo document.
 6          Q.  Do you know if Lehman Brothers acquired
 7  the one-page loan document?
 8          A.  As I believe you asked me that before
 9  and it is still the same answer, Masood Bhatti
10  represented to me clearly that they were going to pay
11  off Ken Jowdy's loans to our Hawaiian investors at
12  the close of Cabo deal by collateralizing his equity.
13              I can only imagine that Masood Bhatti
14  didn't just take Ken Jowdy on his word, that there
15  was $7 million plus or minus due to Hawaiian people
16  at that time, that he had asked for backup.  I did
17  not deliver backup to Masood Bhatti, but I can only
18  imagine Lehman Brothers wasn't going to cut a blank
19  $7 million check or represent to me that they were
20  going to do that.
21          Q.  Did they, in fact, give you $7 million
22  at the closing?
23          A.  At the close of Cabo?
24          Q.  Yes.
25          A.  Absolutely not.
0622
 1          Q.  Did you ever get that $7 million?

Page 74

Kenner 08.16.11
2    A.   No.  It is part of the outstanding money
3  that we sued for in Arizona and we are still pursuing
4  in Mexico.
5    Q.   Was that lawsuit that was withdrawn or
6  however disposed of in Arizona, ever refiled in the
7  United States?
8    A.   It was not.  It is being pursued in
9  Mexico.
10    Q.   Did you ever sue Masood Bhatti for the
11  $7 million or Lehman Brothers?
12    (Witness and counsel confer.)
13    A.   We have not to this date sued Masood
14  Bhatti or Lehman Brothers.
15    Q.   Are you planning to sue Masood Bhatti or
16  Lehman Brothers on behalf of Little Isle or yourself?
17    MR. STOLPER:   It is something he is
18  considering but doesn't want get into details.
19    Q.   I don't want to ask any attorney-client
20  privilege.
21    The question is:  Are you considering
22  that?
23    MR. STOLPER:   You can say yes without
24  waiving privilege.
25    A.   I am considering all remedies to still
0623
1  retrieve the funds that were lent to Ken Jowdy,
2  including continuing the federal arrest warrant
3  prosecution of him in Mexico and the million dollar
4  bench trial in Nevada and the $11 million judgment in
5  Mexico.
6    Q.   Did any of your clients ever invest in
7  any Avalon entity, to your knowledge?
8    A.   Yes.
9    Q.   What was that what the name of the
10  entity?
11    A.   I don't recall the specific name, but
12  the airplane hangars and original land that is
13  underneath it, Tommy Constantine always referred to
14  as Avalon.
15    Q.   Were you in any way a managing member or
16  involved in the property as an owner or a principal?
17    A.   I believe at one point I was supposed to
18  be and I believe I was unable to come up with the
19  capital at the time to invest in it.
20    Q.   Were you ever a principal or managing
21  member of any of those entities or otherwise
22  employed?
23    A.   I don't think so.
24    Q.   How many of your clients were involved
25  in Avalon?
0624
1    A.   There were three investors.
2    Q.   Do you know who they were?
3    A.   Yes.  Joe Juneau, Jozef Stumbel and Owen
4  Nolan.
5    Q.   Did they make any money on that
6  investment or did they lose their principal?
7    A.   The buildings are still there.  I
8  believe Joe Juneau requested his funds back and was
9  paid back.  I believe Owen Nolan was offered his
10  money back and refused to take it back.  And Jozef
11  Stumbel is still an ongoing partner in that project.
12    Q.   So you never made an investment in that?
Page 75

TR-SEC00000401

Kenner 08.16.11
```
13            A.   I don't believe I did.
14            Q.   Did you ever discuss an investment
15   opportunity in any of the Avalon entities with those
16   three clients of yours?
17            A.   I believe I talked about all the details
18   of that land and holdings in that project.
19            Q.   What did you say to them about those
20   projects and when?
21            A.   I don't recall.
22            Q.   Do you know when it was?
23            A.   I do not.
24            Q.   Was it in 2000?
25            A.   The best I can guess, so we don't have
0625
 1   to go down numbers game again, is it was somewhere
 2   between 2003 and 2005.
 3            Q.   Were you compensated in any way by
 4   Avalon?
 5            A.   I was not.  In fact, they still owe me
 6   money.
 7            Q.   For what?
 8            A.   For expenses I laid out to assist in
 9   project development.
10            Q.   Were you supposed to be compensated by
11   Avalon in any way?
12            A.   No.
13            Q.   Can you tell me about the expenses that
14   you laid out?
15            A.   It was approximately $20,000 that they
16   needed for permits for electricity hookups, and they
17   were being pressured by the builder so I lent the
18   project the money.
19            Q.   And where did you get the money to lend
20   to the project?
21            A.   Income and savings.
22            Q.   And that money didn't come from any
23   Little Isle IV account?
24            A.   Income and savings.
25            Q.   So there will be no transfers in Little
0626
 1   Isle IV bank account records to any Avalon entity or
 2   anyone affiliated with any Avalon entity concerning
 3   that $20,000; is that right?
 4            A.   That's correct.
 5            Q.   And you weren't paid in any way for any
 6   type of solicitation or any type of effort to raise
 7   money on behalf of Avalon?
 8            A.   I was not.
 9            Q.   What is Tech Connect?
10            A.   It is a bankrupt education company.
11            Q.   When you say "education company," what
12   are you referring to?
13            A.   I believe they provided back-end
14   hardware solutions, software solutions to K through
15   12 schools.
16            Q.   When you say "bankrupt," how do you know
17   it is bankrupt?
18            A.   I saw bankruptcy papers.
19            Q.   Were any of your clients invested in
20   Tech Connect?
21            A.   Yes.
22            Q.   Who was invested i Tech Connect?
23            A.   I don't recall.
```
Page 76

TR-SEC00000402

Kenner 08.16.11

24       Q.  More than ten of your clients?
25       A.  I don't recall.
0627
1       Q.  Do you know how they came to become
2 investors in Tech Connect?
3       A.  I don't recall.
4       Q.  Did you have discussions with them prior
5 to them making an investment in Tech Connect?
6       A.  In many of their investor meetings with
7 the CEO of the company, I sat in on the meetings.
8       Q.  Did you have any conversations with any
9 of your clients about an investment opportunity in
10 Tech Connect prior to them making an investment?
11      A.  I believe I had many conversations with
12 them, but as a result of them having a face-to-face
13 meeting with the CEO of the company.
14      Q.  What did you say to them about their
15 opportunity to invest in Tech Connect prior to them
16 making their investment?
17      A.  I don't recall.
18      Q.  Do you know when this was?
19      A.  Prior to 2006.
20      Q.  Were you also an investor or shareholder
21 or member of Tech Connect?
22      A.  I was not.
23      Q.  Were you compensated in any way, gifts
24 or otherwise, for soliciting investments in Tech
25 Connect?
0628
1       A.  I was not.
2       Q.  Generally, I may have asked this, do you
3 know how many of your clients invested in Tech
4 Connect?
5       A.  I don't recall.
6       Q.  More than ten?
7       A.  I really don't recall.
8       Q.  Do you think all of your clients, maybe
9 20 clients, invested in Tech Connect?
10      A.  No.
11      Q.  Do you think it was more than five?
12      A.  I don't recall.
13      Q.  Do you have their documents or any
14 documents concerning Tech Connect?
15      A.  I don't believe I do.
16      Q.  Did any documents come through you
17 concerning Tech Connect which you provided to your
18 clients?
19      A.  When their signed subscription
20 agreements were forwarded back, they were sent to me
21 but they were also part of that subsequent theft in
22 2007.
23      Q.  Who do you suspect committed that theft?
24      A.  Christine Myrick.
25      Q.  Did you ever confront her with that?
0629
1       A.  It was confronted many times during
2 deposition.  And both herself and Michael Meeks,
3 attorney Meeks, said they possessed all the documents
4 that came out of my office but they refused to turn
5 them over.
6       Q.  Tech Connect is bankrupt; correct?
7       A.  I believe they filed bankruptcy.
8       Q.  Do you know how much your clients

Page 77

TR-SEC00000403

Kenner 08.16.11

 9  generally invested in Tech Connect, did they invest
10  $10,000, $100,000, $500,000 each?
11          A.   I don't recall.
12          Q.   Do you know if it was more than a
13  million dollars each?
14          A.   I don't believe so.
15          Q.   Do you have any documents in your
16  possession that would enable you to determine which
17  one of your clients invested in Tech Connect?
18          A.   I don't believe so.
19          Q.   And sitting here today, you don't
20  remember what you specifically said or generally said
21  to your clients about Tech Connect prior to them
22  making an investment in Tech Connect?
23          A.   I do not.
24          Q.   Do you know if you ever reviewed any of
25  Tech Connect's operating agreements or financials
0630
 1  prior to your clients making an investment in Tech
 2  Connect?
 3          A.   I recall reviewing ongoing documents
 4  from Tech Connect and at perhaps reading the offering
 5  agreements, subscription agreements and offering
 6  memorandums.
 7          Q.   But you don't have those documents now?
 8          A.   No, I don't.
 9          Q.   Do you know if Tech Connect had audited
10  financials or not?
11          A.   I believe they did.
12          Q.   Do you remember seeing them?
13          A.   I believe I did.
14          MR. STOLPER:   Chris, Tech Connect came
15  up in background with him the first time around.  I
16  don't understand, you are now doing a line of
17  questioning as if it had something to do with
18  Diamante del Mar or --
19          MR. CASTANO:   SEC subpoenas and SEC
20  investigations are kind of broad, and we are allowed
21  to ask various questions.  This is within the scope
22  of a certain subpoena enforcement action --
23          MR. STOLPER:   So you are saying this
24  falls under the order directing private
25  investigations and designating officers to take
0631
 1  testimony?
 2          MR. CASTANO:   I believe certainly the
 3  formal order is broad enough to encompass asking
 4  questions of Phil Kenner and various entities he is
 5  affiliated with.
 6          If you have an objection, I have no
 7  problem going back and getting a new subpoena
 8  entitled with different entities and bringing Mr.
 9  Kenner back to ask the same questions, but I believe
10  the formal order is certainly broad enough for us to
11  ask these questions.  They are the same investors.
12          MR. STEPANIUK:   I bet I can find some
13  language in here.
14          MR. STOLPER:   Just asking.  I will
15  state my objection.  You keep going.
16          MR. CASTANO:   Okay.
17          Q.   Ecser Holding Corporation; do you know
18  what that is?
19          A.   Yes.

Page 78

TR-SEC00000404

Kenner 08.16.11

20          Q.  What is it?
21          A.  It is a company that I believe has a
22  commercial patent on rubber recycling.
23          Q.  Do you know if it is an ongoing entity
24  or a bankruptcy?
25          A.  I believe it is an ongoing entity.
0632
1           Q.  Do you know if any of your clients
2   invested in it?
3           A.  Yes.
4           Q.  How many of your clients?
5           A.  I don't recall.
6           Q.  Do you know if your clients had any
7   conversations with you about Ecser Corporation before
8   investing in it?
9           A.  I believe all of them did.
10          Q.  Do you know how many of your clients?
11          A.  I don't recall.
12          Q.  More than ten?
13          A.  I don't believe so.
14          Q.  Do you know what you said to your
15  clients prior to them making an investment in Ecser
16  Holding Corporation?
17          A.  All I can imagine is I clarified
18  information they received from the CEO of Ecser.
19          Q.  How do you pronounce it?
20          A.  Ecser, E-C-S-E-R.
21          Q.  Were you in any way an investor or
22  member of Ecser Holding Corporation?
23          A.  I was not.
24          Q.  Were you employed in any way or
25  affiliated as a consultant at Ecser Holding
0633
1   Corporation?
2           A.  I was not.
3           Q.  Were you compensated in any way by Ecser
4   Holding Corporation?
5           A.  I was not.
6           Q.  Did you review whatever offering
7   materials Ecser Corporation provided to your clients?
8           A.  I am sure I saw all of the agreements.
9           Q.  When was this approximately?
10          A.  Between 2003 and 2006.
11          Q.  Do you know if any of your clients made
12  money on Ecser Corporation?
13          A.  I don't know.
14          Q.  Have you asked any of your clients if
15  they made money on Ecser Corporation?
16          A.  I have not recently.
17          Q.  What is Arizona Airpark LLC?
18          A.  I think that was an entity related to
19  Avalon that I don't believe has any -- was never
20  established.
21          Q.  Do you know if any of your clients
22  invested in Arizona Airpark LLC?
23          A.  I don't think it is a real entity.
24          Q.  What is Integrated Telecommunications?
25          A.  It's a telecom corporation.
0634
1           Q.  Do you know if any of your clients
2   invested in Integrated Telecommunications?
3           A.  Yes, they did.
4           Q.  Do you know how many of your clients
                        Page 79

Kenner 08.16.11

```
 5   invested in Integrated Telecommunications?
 6           A.   I do not.
 7           Q.   More than ten?
 8           A.   I don't believe so.
 9           Q.   Do you recall having conversations with
10   any of your clients about an investment opportunity
11   in Integrated Telecommunications prior to your
12   clients making an investment?
13           A.   Yes.
14           Q.   Do you know what you discussed?
15           A.   I am sure I clarified conversations they
16   had with the president of Integrated
17   Telecommunications prior to them making their initial
18   investments.
19           Q.   When you say "clarify," what do you
20   mean?
21           A.   Typically, again, my role as a business
22   manager, was to take and participate in conversations
23   between my clients and other outside individuals they
24   were considering investing or getting in business
25   with.  And after those meetings, clients would ask me
0635
 1   what did they really say, can you explain what they
 2   meant by something.
 3                That was my role that I played with each
 4   of the clients.
 5           Q.   Was Integrated Telecommunications a
 6   start-up, meaning was there a private placement or
 7   subscription agreement?
 8           A.   I believe so.
 9           Q.   Did you review those with your clients?
10           A.   I believe I did.
11           Q.   I'm sorry if I asked this, I am getting
12   confused.
13                Were you an investor in Integrated
14   Telecommunications?
15           A.   I was not.
16           Q.   Were you compensated in any way by
17   Integrated Telecommunications for anything?
18           A.   I was not.
19           Q.   The entities that I have just mentioned,
20   there are a few and we can go through them again; do
21   you know if Tommy Constantine is in any way
22   affiliated with these entities?
23           A.   I believe the only one you mentioned was
24   Avalon.
25           Q.   He was affiliated with Avalon?
0636
 1           A.   It was originally his land.
 2           Q.   Is Integrated Telecommunications an
 3   ongoing concern?
 4           A.   An ongoing?
 5           Q.   Is it a business that is still
 6   operating?
 7           A.   Yes, I believe it is.
 8           Q.   Do you know if any your clients made
 9   money on Integrated Telecommunications?
10           A.   I believe they have.
11           Q.   How do you know that?
12           A.   Because I recall depositing checks from
13   Integrated Telecommunications into their respective
14   accounts.
15           Q.   Checks bigger than the principal that
```

Page 80

Kenner 08.16.11

16  they invested?
17          A.  I don't recall.
18          Q.  Do you have any documents that would
19  indicate that?
20          A.  I do not.
21          Q.  Code Fire Acquisition Corp.; what's
22  that?
23          A.  It was a video game company.
24          Q.  Were you affiliated with that company in
25  any way?
0637
1           A.  I did a lot of work for that company
2  after some my clients started to invest.
3           Q.  When you say "did a lot work," did you
4  have a position?  Were you an employee, a consultant?
5           A.  I was a consultant.
6           Q.  Were you compensated?
7           A.  I believe I was compensated.
8           Q.  Do you know what the terms of your
9  compensation were?
10          A.  By introducing the gaming company to
11  high profile athletes, I was compensated with shares
12  of the company or options in the company.
13          Q.  And did you introduce it just to your
14  clients or to other professional athletes?
15          A.  I discussed Code Fire Acquisition with
16  many people in the sports industry, some of which
17  were my clients.
18          Q.  You were compensated with shares you
19  said?
20          A.  Options, I believe.
21          Q.  When was this approximately that you
22  became involved as a consultant for Code Fire?
23          A.  Between 2002 to 2004.
24          Q.  Is Code Fire Acquisition Corp. an entity
25  that is continuing in business?
0638
1           A.  I believe it's a successor company.  It
2  has filed bankruptcy.
3           Q.  Do you know how much you were -- excuse
4  me.
5               Besides the options or shares, did you
6  receive any other compensation?
7           A.  I did not.
8           Q.  Do you know how many of your clients
9  invested in Code Fire?
10          A.  I do not.
11          Q.  More than ten?
12          A.  I don't recall.
13          Q.  Do you recall how much they might have
14  invested?
15          A.  I do not recall.
16          Q.  100,000, 500,000?  Do you remember if it
17  was big investments or smaller investments?  Big and
18  small being relative, I am sure.
19          A.  I believe smaller investments relatively
20  speaking.
21          Q.  Did you review offering documents with
22  your clients for Code Fire?
23          A.  Yes, I did.
24          Q.  Was that prior to them making an
25  investment?
0639

Page 81

Kenner 08.16.11

1    A.   Typically, yes.
2         Q.   Now did you disclose to your clients
3    that you were receiving options for being involved
4    with Code Fire?
5         A.   For bringing deals to the table, such as
6    Phil Nicholson, I brought to develop a game at the
7    company.  Buddy Rice, who was the Indy 500 winner at
8    the time.  Both were related to my client base.
9         I also brought an endorsement deal to
10   Owen Nolan at the time.  I also received compensation
11   for a portion of that.
12        Q.   My question was:  Did you disclose to
13   your clients that you had received compensation from
14   Code Fire in the form of options prior to them making
15   an investment in Code Fire?
16        A.   No, because all of the consulting was
17   done after they had become investors.  The company
18   asked me to introduce them to all the high profile
19   athletes and entertainers I knew.
20        Q.   After they became investors, did you
21   then disclose to them upon entering into a consulting
22   arrangement with Code Fire Acquisition Corp. that you
23   would now be receiving compensation from the company?
24        A.   For the endorsement deals, yes.
25        Q.   And was there a written consulting
0640
1    agreement with Code Fire and yourself?
2         A.   I believe there was.
3         Q.   Do you have that written agreement?
4         A.   If I have it, it would have been
5    forwarded to you guys.  I don't recall that
6    specifically in the production though.
7         Q.   Do you know if any your clients made
8    money with Code Fire Acquisition Corp.?
9         A.   I don't think so.
10        Q.   What is Impact Protective Equipment?
11        A.   And if I may just say, at the end of
12   Code Fire Acquisition Corp.'s existence, I signed a
13   guarantee for the company that I am now stuck with.
14        Q.   What was that about?
15        A.   It was a $2 million guarantee for the
16   company, and the company went bankrupt.  The bank has
17   now pursued me for repayments.
18        Q.   What was the guarantee for?
19        A.   Operating capital to keep the company
20   alive.
21        Q.   Did you lend money to them or you just
22   signed a guarantee?
23        A.   I just signed a guarantee.
24        Q.   Did you receive anything back in
25   exchange for that?
0641
1         A.   I believe I received about $5,000 that I
2    had to use for legal fees to review the documents,
3    and I believe I was supposed receive compensation of
4    shares.  That didn't play out because the option
5    terms were never reached.
6         Q.   This was all in 2004?
7         A.   This was probably after 2006.
8         Q.   What is Impact Protective Equipment?
9         A.   It was a shoulder pad, football shoulder
10   pad company.
11        Q.   Did any of your invest in Impact
                         Page 82

TR-SEC00000408

Kenner 08.16.11

```
12   Protective Equipment?
13         A.   Yes.
14         Q.   Do you know how many clients?
15         A.   I do not recall.
16         Q.   Were you investor in Impact Protective
17   Equipment?
18         A.   I was not.
19         Q.   Were you in any way affiliated with
20   Impact Protective Equipment?
21         A.   I was not.
22         Q.   Do you know when your clients invested
23   in Impact Protective Equipment approximately?
24         A.   Between 2003 and 2005.
25              They asked me to participate on the
0642
 1   board, but I refused.
 2         Q.   Is Impact Protective Equipment a
 3   business that is still continuing?
 4         A.   I believe they just filed for bankruptcy
 5   last year.
 6         Q.   Do you know if any of your clients made
 7   money on Impact Protective Equipment?
 8         A.   I believe they did not.
 9         Q.   Prior to your clients making an
10   investment in Impact Protective Equipment, do you
11   recall if you had any conversations with them about
12   their investment opportunity in Impact Protective
13   Equipment?
14         A.   Again, in the same context of all the
15   other ones that you have asked and may still ask, I
16   would speak to them to clarify what they had heard
17   from the presidents of the company, respective
18   companies.
19         Q.   Did you also review subscription
20   agreements or offering materials they might have
21   received?
22         A.   Yes, I did.
23         Q.   Do you know approximately how many
24   clients invested in Impact Protective Equipment?
25         A.   I do not recall.
0643
 1         Q.   Do you know what Technic Digital Arts
 2   is?
 3         A.   That was the successor company to Code
 4   Fire.  Same answers.
 5         Q.   What is Escher -- it is similar to one
 6   company we said and might be the same, Escher
 7   Holdings, E-S-C-H-E-R, Holdings; is that similar to
 8   the other holding company?
 9         A.   I don't recognize that name but it must
10   be.
11         Q.   Do you know if there was a car recycling
12   business that your clients might have invested in, a
13   car tire recycling business?
14         A.   That is Ecser.  That's the rubber
15   recycling company.
16         Q.   That's the entity we spoke about
17   earlier?
18         A.   Ecser, yes.
19              MR. CASTANO:   Why don't we go off the
20   record at 4:24 p.m.
21              (Recess taken.)
22              MR. CASTANO:   We are back on the record
```
Page 83

Kenner 08.16.11

23   at 4:40 p.m..
24           Q.   Mr. Kenner, while we were off the
25   record, were there any conversations between the
0644
 1   Commission staff and yourself?
 2           A.   None at all.
 3           Q.   Mr. Kenner, I went through a bunch of
 4   entities before we went off the record, including
 5   Technic Digital Arts, and what have you.  I can go
 6   through each one again, but are you aware of any
 7   fraud litigations concerning these entities, meaning
 8   the entities didn't use the monies they received for
 9   the purposes for which they were supposed to use the
10   monies?
11           MR. STEPANIUK:   Do you mean fraud or
12   litigation or fraud litigation?
13           Q.   We can do two questions; it was a
14   compound question.
15           Are you aware of any litigations
16   involving these entities, besides the Nolan
17   arbitration?
18           MR. STEPANIUK:   And other than
19   bankruptcy proceedings.
20           A.   Are you referring to past or current?
21           Q.   Past or current litigations involving
22   any of these entities, besides bankruptcy and besides
23   the allegations made by Owen Nolan in the
24   arbitration.
25           A.   There is litigation regarding Eufora,
0645
 1   which you didn't mention earlier.  There is
 2   litigation in Mexico current regarding Diamante Cabo
 3   San Lucas and Ken Jowdy.  And in the past there was
 4   litigation in California regarding Ken Jowdy and
 5   Diamante del Mar as defendants.  Also in California,
 6   Ken Jowdy and Diamante Cabo San Lucas as defendants.
 7           Q.   Mr. Kenner, I apologize.  What I am
 8   talking about are the entities that we just went
 9   through:  Code Fire, Integrated, Ecser, Technic,
10   Impact Protective Equipment, Avalon.
11           Are you aware of any litigations
12   involving these entities, from 2003 to present,
13   besides bankruptcies or allegations Mr. Nolan made
14   against you in an arbitration?
15           A.   No.  Other than they were some of the
16   same list as the Nolan arbitration.  And the
17   identical list was also listed in the Juneau and the
18   Moreau litigation.
19           Q.   The Juneau and Moreau litigation against
20   you?
21           A.   That's correct.
22           Q.   Do you know if Juneau or Moreau alleged
23   that they were unaware of Little Isle IV monies being
24   used as loans to other entities?
25           A.   I don't know.
0646
 1           Q.   Are you aware of or involved in --
 2   withdraw that question.
 3           Have you been involved in any
 4   conversations with your clients concerning any
 5   securities, broadly defined, in the last three years?
 6           A.   I apologize but I am not sure I
 7   understand the total scope of the question.
                            Page 84

Kenner 08.16.11
```
 8          Q.   Let me rephrase.
 9               In the last three years, have any of
10   your clients had any conversations with you
11   whatsoever concerning an offering of any type of
12   securities?
13          A.   I don't think so.
14          Q.   To your knowledge, have any of your
15   clients invested in any securities that weren't
16   publicly traded in the last three years?
17          A.   Not that I am aware of.
18          Q.   We've discussed a number of entities
19   including entities that are Diamante del Mar
20   entities, Little Isle IV entities, plus all of these
21   entities.
22               Has that slowed down, meaning you not
23   having conversations with your clients about
24   investing in start-up companies?
25               And "start-up" and "slow down" may be
0647
 1   the wrong phrase, but it seems like there are
 2   certainly a number of entities that your clients
 3   invested in that were start-ups.  I think your
 4   testimony now is that in the last three years you
 5   haven't had any conversations about that, nor do your
 6   know if they have invested in those type of entities.
 7               Is there a reason for that?
 8          A.   The primary and sole reason is for the
 9   last three years I have been inundated on the
10   offensive as a plaintiff or representative of
11   plaintiffs in litigation in the United States and
12   Mexico in multiple jurisdictions going after Ken
13   Jowdy for his numerous frauds that are well
14   documented and Tommy Constantine and his numerous
15   frauds that are well documented.  And that has
16   engulfed 95 percent of my work efforts over the last
17   three years.
18          Q.   How are you currently making money, if
19   at all?
20          A.   Still as an adviser to some of the
21   clients.
22          Q.   How much are you compensated for your
23   advisory services currently?
24          A.   I am not sure I understand.
25          Q.   How much do your clients compensate you
0648
 1   for your investment advisory services?
 2          A.   It varies based on prearranged
 3   agreements with each one of them.
 4          Q.   How much did you your clients compensate
 5   you last year approximately?
 6          A.   Between 125 and $150,000.
 7          Q.   How many clients do you currently have?
 8          A.   Between 15 and 20.
 9          Q.   Are you compensated in any other way?
10          A.   Not in the last few years.
11   BY MR. STEPANIUK:
12          Q.   I understood your prior answer when you
13   referred to it varies to refer to the amount of
14   compensation for particular clients.
15               But putting aside the amount and what
16   that turned out to be, can you describe what the
17   nature of the compensation arrangements is?  I know
18   you probably went into it last time you were here.  I
```
Page 85

Kenner 08.16.11

19  apologize, I wasn't here and it is an important point
20  and I want make sure I understand it.
21          A.   I have acted for last two decades
22  primarily as a business manager handling day-to-day
23  business affairs, whatever that may be, for my
24  clients and their family.  It may range from
25  establishing bank accounts or helping them set up
0649
1   investment accounts, to assistance in buying and
2   selling homes, setting up life insurance plans,
3   reviewing outside private equity deals that they
4   bring to the table, to booking family vacations, to
5   finding dogs or automobiles that they want to give to
6   their reciprocating spouse as gifts, to dealing with
7   credit issues, et cetera.
8           I am effectively considered a third
9   adult member of their family and help with their
10  decision, and they rely on me for that.
11          Q.   And what is the structure of the
12  compensation arrangements that you have with clients
13  for those services?
14          A.   Over the last few years, it has really
15  been just an agreed upon number.
16          Q.   You mean a flat fee?
17          A.   A flat fee.
18          Q.   Is that the case with respect to every
19  client, it has been a flat fee over the last few
20  years?
21          A.   Plus or minus.  It's a flat fee or a
22  general range.
23          Q.   Was there a different arrangement that
24  you had in prior years with clients as far as
25  compensation received and how it was calculated?
0650
1           A.   In 2003, when I left Assante Global
2   Advisors in California and had to sue them for a
3   bunch of security issues, they settled with me out of
4   court to avoid your involvement and interaction in
5   all of their wrongdoings and scams, my initial
6   advisory fee was .5 percent of the agreed-upon assets
7   I would oversee on behalf of the family.
8           And the scope of those agreed-upon
9   assets would be negotiated client by client.  It may
10  be overseeing their checking accounts, their
11  investment accounts.  It may be overseeing equity
12  balances in their homes.
13          Q.   Whatever the assets under management
14  were?
15          A.   Whatever assets they wanted me look at.
16  If they didn't want me to pay attention to their
17  homes, their mortgages, it would excluded.  If they
18  wanted me involved in the debt analysis of the home,
19  ongoing pay down structure, whatever those assets
20  were, fell under the scope of that half of a point
21  annual fee.
22          Q.   So it was annual?
23          A.   Annual, and it capped out at 50,000 per
24  client.
25          Q.   At what point during the year was the
0651
1   value of the agreed-upon assets you managed?
2           A.   Quarterly.
3           Q.   When did that compensation arrangement

Page 86

Kenner 08.16.11

4    change?
5          A.   In and around 2008, when I didn't really
6    change my dynamic role, not only to just help with
7    their family affairs but, really, to become a
8    litigation manager, going after all the people.
9          Q.   Part of what you refer to you spent the
10   last three years doing?
11         A.   Yes.
12         Q.   How about your advice with respect to
13   any other role you had with respect to investments
14   such as the ones you talked about more recently,
15   Technic, Avalon, but also including Diamante del Mar,
16   Little Isle, the video game venture, Digital Arts,
17   was that included in the five percent agreed-upon
18   assets or was that separate?
19         A.   I appreciate your confidence, but it was
20   .5 percent.
21         Q.   Did I say five percent?
22         A.   Yes.  I appreciate that.  I didn't have
23   the balls to try that one.
24         Q.   In case the IRS reads this also.
25         A.   The assets we would agree upon would be
0652
1    same as if, let's say $100,000 stayed in a checking
2    account or went to their institutional investment
3    account, paid down 100 grand on their home debt or
4    went to a private equity investment.  If it was
5    included in the bucket of assets to review, it was
6    not relevant to me.
7          Q.   So whether you advise them to invest in
8    this company or to do something else with the money,
9    it didn't matter, you got compensated for advising
10   them with respect to the use of that particular
11   assets?
12         A.   Where that $100 went was not relevant.
13         Q.   You got .5 percent of it each year,
14   whatever you advised them to do with it at the end of
15   day?
16         A.   Correct.
17         Q.   Anything else about the compensation
18   arrangement with the folks we have been referring to
19   all day as your clients that we haven't covered?
20         A.   The only other incremental arrangements
21   that were made, that we talked about on the last
22   visit with you guys, had to do with managing member
23   compensation in Hawaii after the joint venture, which
24   was $100,000 a year payable from our side of the
25   joint venture and I believe I suspended that
0653
1    approximately 9 to 12 months into the compensation
2    because Alan Warden and Lehman Brothers were screwing
3    us out of that entire deal we did.
4               And at Diamante del Mar, starting in '03
5    or '04, and it was disclosed in the offering
6    agreement, this was a consulting arrangement with one
7    of my LLCs at the time to compensate I believe total
8    compensation, it was supposed to be I believe 240,000
9    a year, 20,000 a month, but I believe after
10   approximately four payments or so, I also suspended
11   that when Jowdy was unable to bring in extra
12   financing.
13              About a third of that was actually paid
14   back out to Christine Myrick for covering more of my
                         Page 87

Kenner 08.16.11

15  day-to-day business management business, so she
16  received additional compensation as a result of that
17  back in those days.
18          Then in 2006, when we closed Cabo San
19  Lucas deal, I began to receive as a sales consultant
20  $10,000 a month to head up the sales team trying to
21  sell real estate in Cabo San Lucas on the project
22  site.  And that continued for approximately 18 months
23  until I challenged Ken Jowdy and his frauds with
24  respect to the corporation, and he terminated myself
25  and the entire sales program.
0654
1           Q.  And correct me if I am wrong, the
2   compensation you received from Little Isle, Diamante
3   del Mar and Cabo San Lucas, that was indirectly paid
4   by your clients to the extent they were investors in
5   the entities?
6           A.  Indirectly, that would be true.
7           Q.  And that would be compensation directly
8   came from the entities themselves, the LLCs?
9           A.  That's correct.
10          Q.  Did you negotiate any employment
11  contracts for any of your clients?
12          A.  No, I did not act as their agent.  I did
13  review and alter some of them as a result of
14  negotiations that went on, but I was brought in as a
15  consultant by the player, but I was not the agent.
16          Q.  Did you negotiate any sponsorship or
17  endorsement contracts for any of your clients?
18          A.  Yes, I did.
19          Q.  You mentioned one with a game company --
20          A.  Yes.
21          Q.  -- with respect to Nolan.
22              Did you do others?
23          A.  I believe with Tech Connect there were
24  shares or options granted to my clients for doing
25  some marketing efforts.  I negotiated a number of
0655
1   endorsement deals for Owen Nolan for some merchandise
2   memorabilia corporations, for some equipment
3   manufacturers.  I set up number of appearances for
4   different clients, including Owen Nolan, to be paid
5   compensation for appearances.
6           I can't recall what else off the top of
7   my head.
8           Q.  Were you separately compensated by Nolan
9   and the others you just mentioned in the last answer
10  for those services?
11          A.  No, I was not.
12          Q.  Were you compensated at all?
13          A.  I was not, other than the ones we talked
14  about earlier.
15          Q.  Were those services with respect to
16  endorsement deals, memorabilia, and the like, were
17  they included in the .5 percent of the agreed-upon
18  assets?
19          A.  I guess in the event that Nolan made a
20  quarter million dollars and deposited 150,000 after
21  tax, and it became one of his assets, yes.
22          Q.  Otherwise, you did not receive
23  compensation?
24          A.  No, it was part of my general business
25  services.

Page 88

TR-SEC00000414

Kenner 08.16.11

0656
1  BY MR. CASTANO:
2          Q.  We talked about this last time, just
3  briefly the Nolan arbitration award, have you in any
4  way paid any of that?
5          A.  I have not.
6          Q.  Is there any ongoing litigation about
7  you paying, to your knowledge?
8          A.  There is not.
9          Q.  Has he taken any steps to enforce that
10  arbitration award?
11          A.  He has not.
12          Q.  Have you heard anything about him taking
13  steps to enforce the arbitration award and collect?
14          A.  I have not.
15          Q.  Have you filed bankruptcy at any time?
16          A.  I have not.
17          MR. CASTANO:    I want to mark this as
18  Diamante Exhibit 40.
19                      (NY-8125 Exhibit Number 40 was
20                       so marked for identification.)
21          Q.  I am showing you, Mr. Kenner, what has
22  been marked Diamante Exhibit 40.
23          Please take a moment to review that.
24          (Witness complies.)
25          MR. STOLPER:    Chris, our copy has an
0657
1  underscore on it.  Did you give us the wrong one?
2          MR. STEPANIUK:    Here is a clean one.
3          MR. STOLPER:    Should he read the whole
4  thing?
5          MR. CASTANO:    He doesn't have to.   He
6  should take his time to review it, of course.
7          Q.  Mr. Kenner, have you seen Diamante
8  Exhibit 40 before?
9          A.  Yes, I have.
10          Q.  What is Diamante Exhibit 40?
11          A.  An affidavit signed by Sergei Gonchar
12  specifically for the arbitration hearing in Arizona
13  with Nolan.
14          Q.  Who wrote, to your knowledge, Diamante
15  Exhibit 40?
16          A.  I believe it was a combination of myself
17  and one of my attorneys.
18          Q.  I don't want to get into any
19  conversations you had with your attorney.
20          Do you know why you wrote this
21  declaration?
22          A.  Yes, because --
23          Q.  In part, sorry.
24          A.  In part, because Sergei Gonchar was
25  unable to travel to Arizona at the time of the
0658
1  hearing.
2          Q.  Sergei Gonchar is one of your clients;
3  is that right?
4          A.  Yes.
5          Q.  And do you know where he is from
6  originally?
7          A.  St. Petersburg, Russia.
8          Q.  Do you know when he got to the United
9  States?
10          A.  In the mid '90s.

Page 89

Kenner 08.16.11

11      Q.  Do you know if Mr. Gonchar took English
12  classes while he was in Russia or did he come here
13  and not speak the language?
14      A.  I believe he spoke decent English when
15  he got here.
16      Q.  Are sure about that?
17      A.  Yes.  When I met him in the mid '90s,
18  his English was good enough for he and I to
19  communicate one on one.
20      Q.  Do you know if he can read English?
21      A.  I don't know if he can read English but
22  his English skills are very significant compared to
23  most of the other foreign players I've dealt with
24  over the years.
25      Q.  Have you ever asked him if he could read
0659
1   English?
2       A.  I have not, nor have I asked Owen Nolan
3   if he could read English.
4       Q.  Is Owen Nolan from the United States?
5       A.  He was born in Belfast, Ireland, grew up
6   in Toronto and has one language, English.  But after
7   arbitration, I still don't know to this day if Owen
8   Nolan can read.
9       Q.  Do you know sitting here today --
10  withdrawn.
11          Would you be surprised to learn that Mr.
12  Gonchar can't read English?
13      A.  I would be shocked that he couldn't
14  read.
15      Q.  Do you think he could read every single
16  word in this affidavit?
17      A.  That I can't speak to, but I know he is
18  a very sophisticated individual who, at almost all of
19  our face-to-face meetings, would carry a dictionary
20  with him and a paper to write down words that he
21  wasn't familiar with, and we would spend a lot of
22  time defining words.
23      Q.  When is the last time you spoke to Mr.
24  Gonchar?
25      A.  My last correspondence with him was in
0660
1   the last few weeks.
2       Q.  How often do you speak to him over the
3   last year, let's say?
4       A.  On average, about once a month I believe
5   I communicated with him.
6       Q.  Do you know if you had any
7   communications with Mr. Gonchar about any
8   investigation by any civil or criminal agency
9   concerning Diamante and any of the entities you are
10  affiliated with?
11          MR. STOLPER:   Is there a time frame on
12  that?
13          MR. CASTANO:   Over the last two years.
14      A.  I don't recall.  I am aware he was
15  subpoenaed to come to New York to testify, I believe
16  in Ken Jowdy's grand jury investigation.
17          Other than that, I don't believe we've
18  had many or any conversations about ongoing
19  investigations.
20      Q.  Did Mr. Gonchar in any way tell you
21  anything about being subpoenaed to appear in a Ken

Page 90

Kenner 08.16.11
22    Jowdy or Philip Kenner subpoena investigation by some
23    entity?
24              A.  He told me that he was subpoenaed to go
25    to New York.
0661
1                Q.  Did he say anything else?
2                A.  Just that he was subpoenaed to go to New
3     York.
4                Q.  Did you have any substantive
5     conversations with him about what the contents of
6     that conversation might be?
7                A.  No, because I was still, as I am as I
8     sit here today, unaware of what the contents would
9     be.
10               Q.  You didn't have any conversations with
11    him whatsoever about his subpoena to New York other
12    than he said to you, "I was subpoenaed."  And you
13    said, "Okay," and there was no further conversations.
14               A.  I don't believe so.
15               Q.  Were there other affidavits in the Nolan
16    arbitration that you drafted?
17               A.  There were a number that I turned over
18    to you.
19               Q.  The question is:  Were there any other
20    affidavits in the Nolan arbitration which you drafted
21    in part in conjunction with your attorney?
22               A.  Yes.
23               Q.  Do you know how many there were?
24               A.  I do not.
25               Q.  Do you know if there more than ten?
0662
1                A.  I do not.  But I recall turning them all
2     over as a result of that Dan Boyle action we talked
3     about earlier.
4     BY MR. SMITH:
5                Q.  Do you know how Mr. Gonchar received the
6     draft of the affidavit that you and your attorney
7     drafted?
8                A.  I would assume by fax.
9                Q.  Did you send it to him?
10               A.  I don't recall.
11               Q.  Do you know whether he reviewed the
12    affidavit before signing it?
13               A.  I would assume he did.
14               Q.  Did you have any conversation with him
15    about it?
16               A.  I asked him if he had any questions, if
17    anything seemed inaccurate would he express it to me.
18    He said yes.  That's all I am aware of.
19               Q.  I'm sorry, subsequent to his receiving
20    the draft affidavit and before signing it, you had a
21    conversation with him about the affidavit?
22               A.  That I don't know.
23               After he received it by fax, I had a
24    conversation with him to see if all of the facts in
25    the affidavit were accurate.  And to the best of his
0663
1     knowledge, he said they were and he faxed it back to
2     me.
3                I don't know when he signed it.
4                Q.  But when he faxed it back to you it was
5     a signed version that he faxed back to you?
6                A.  Yes.

Page 91

Kenner 08.16.11
```
 7           Q.  Did he make any changes to the draft
 8  that he had received?
 9           A.  I don't recall.
10           Q.  You don't recall any changes being made
11  by him?
12           A.  I don't recall any changes that were
13  made by him.
14           Q.  You mentioned one conversation.
15               Did you have any other conversation with
16  him before receiving the signed affidavit back from
17  him?
18               MR. STOLPER:   About the affidavit?
19           Q.  About the affidavit.
20           A.  No.  I believe it all happened within 24
21  hours and I believe it happened during the
22  arbitration.
23  BY MR. STEPANIUK:
24           Q.  What was the source of the facts
25  asserted in the affidavit you and your attorney
0664
 1  drafted?
 2           A.  The truth.
 3           Q.  I meant more where were the facts and
 4  information obtained from.  I hear you are saying you
 5  believe the facts to be true, but what was the source
 6  of the information?
 7           A.  Again, as I read this now four years
 8  later, as I skimmed through it, I believe all of the
 9  information was a direct reflection of information
10  that Sergei and I had discussed over years and years
11  of being in business, manager and client.  This was a
12  very specific affidavit responding to allegations by
13  attorney Meeks and Owen Nolan.
14           Q.  So it was based on your own recollection
15  of the events and circumstances and conversations at
16  issue?
17           A.  Both mine and Sergei Gonchar.
18           Q.  Did you talk to Sergei Gonchar before
19  preparing the affidavit?
20           A.  I asked him if I prepared a statement of
21  facts based on our conversations in the past if he
22  would be willing to sign the affidavit since he could
23  not appear for trial.
24               He said he would have no problem.  I
25  prepared it with my attorney at the time, faxed it to
0665
 1  him.  We had a conversation, I wanted to make sure it
 2  was very clear what was written, no
 3  misrepresentations to be misunderstood in the future.
 4  He read it, said he was very clear, had no specific
 5  questions.  I received a fax copy back.
 6           Q.  Is what you just described the full
 7  extent of your communications with Mr. Gonchar
 8  concerning this affidavit?
 9           A.  To the best of my recollection.
10  BY MR. CASTANO:
11           Q.  Have you acquired any new clients in the
12  last three years?
13           A.  No.
14           Q.  The Nolan arbitration award, did you
15  disclose that to your clients?
16           A.  Every one of them.
17           Q.  Have you disclosed all the lawsuits that
```
                              Page 92

```
                                        Kenner 08.16.11
18   you are involved in to your clients?
19           A.   Every one of them.
20           Q.   How did you disclose it to them?
21           A.   In phone or in person.  I told everyone
22   about every lawsuit out there.
23           Q.   Did you ever notify clients in writing
24   about the lawsuits?
25           A.   No.
0666
 1               MR. STEPANIUK:   Let's go off the record
 2   for one second.
 3               (Recess taken.)
 4   BY MR. CASTANO:
 5           Q.   We should be wrapping up shortly, I
 6   appreciate your patience, but before we go off the
 7   record, have you discussed the SEC investigation with
 8   any of your clients?
 9           A.   They are all aware I have made several
10   trips to New York.
11           Q.   What have you informed your clients, if
12   anything, about the SEC's investigation?
13           A.   That I have made several trips to New
14   York.
15           Q.   That's what you said to them?
16           A.   Yes.
17           Q.   Did you say you made several trips to
18   New York to go to the SEC or did you say I made
19   several trips to New York because I am being
20   investigated by someone?
21           A.   To the best of my recollection, I have
22   told them I am going back to New York for some
23   additional interviews.  I don't recall if I told them
24   who specifically I was meeting with or not, but I
25   have represented that, as I have pretty much about
0667
 1   everything that has gone on in the last two decades,
 2   that I am here.
 3           Q.   Have you specifically told your clients
 4   that you are being investigated by the Securities and
 5   Exchange Commission?
 6           A.   No, because I have continued to show up
 7   here to interview and help with information
 8   gathering.
 9           Q.   Do you think it is information that your
10   clients would want to know especially as an
11   investment adviser?
12           A.   In what context?
13           Q.   I am just asking you.  It is a question
14   to you: Do you think your clients would want to know
15   that the SEC is bringing you in for testimony?
16           A.   Yes, they are all aware I am in New York
17   giving testimony.
18           Q.   For the Securities and Exchange
19   Commission?
20           A.   I don't know if I told them for the
21   Securities and Exchange Commission, but they
22   understand the scope of what's going on with Ken
23   Jowdy and --
24           Q.   Just so we are clear, have you informed
25   your clients that you are giving testimony before the
0668
 1   Securities and Exchange Commission?
 2           A.   I am not sure all of them I have said it
                              Page 93
```

Kenner 08.16.11
3    that directly to them, other than I am meeting with,
4    I have met with Securities and Exchange Commission
5    people and that I have been asked to come back for
6    separate interviews.
7          Q.   I'm sorry again, but just so we are
8    clear, have you said to your clients, each of them,
9    "I have met with the Securities and Exchange
10   Commission, I am going to back for a second round of
11   interviews," or have you said, "I am going back for a
12   second round of interviews concerning the Jowdy
13   investigation and all of that"?
14            The question, I think, is specific.
15   Have you informed your clients that you are being --
16   or that you are giving testimony before the
17   Securities and Exchange Commission?
18         A.   I don't recall specifically.
19         Q.   Have you informed your clients that
20   there was a federal lawsuit brought against you by
21   the Securities and Exchange Commission seeking
22   production of documents?
23         A.   Yes.
24         Q.   You disclosed that to each one of your
25   clients?
0669
1          A.   I believe I told each one that I was
2    asked to produce any and all documents related to
3    everything that I have done, they have done, we've
4    done.
5          Q.   Did you tell your clients specifically
6    that there was a lawsuit brought seeking those
7    documents?
8              MR. STOLPER:   I don't know if that's
9    accurate.
10             MR. CASTANO:   Well, we did bring a
11   lawsuit.
12             MR. STOLPER:   It's an enforcement
13   subpoena.
14             MR. CASTANO:   Fine.
15         Q.   Did you tell clients that the SEC
16   brought an enforcement proceeding against you seeking
17   compulsion of documents from you?
18         A.   I don't think I used those specific
19   terms because it wouldn't be relevant to them, but if
20   I can say it in layman's terms, I told them that
21   there has been a formal request made in New York for
22   me to turn over any and all documents related to
23   anything that we have done as a group, speaking about
24   myself and my clients, and that I've complied with
25   that request and turned over a significant number of
0670
1    documents.
2          Q.   Just so we are clear, did you tell your
3    clients that the SEC filed suit against you seeking a
4    subpoena enforcement action for you to produce
5    documents?
6              MR. STOLPER:   I am going to object to
7    that question.  I don't think it's an accurate
8    characterization.  I also think it is a bit
9    misleading and he has already asked and answered it.
10             MR. CASTANO:   No.  He said there is a
11   formal request for documents.  The question is very
12   specific.
13         Q.   We have filed a lawsuit against you --
                                              Page 94

TR-SEC00000420

Kenner 08.16.11

14          MR. STOLPER:    That's your terminology.
15          MR. STEPANIUK:    Just so we can agree on
16   terminology, why don't we call it a subpoena
17   enforcement proceeding.
18          Q.  Did you tell your clients that the SEC
19   in federal court filed a subpoena enforcement action
20   against you?
21          A.  In my own words, yes.
22          Q.  Did you say that it was filed in federal
23   court?
24          A.  Until you just said it, I couldn't tell
25   you which court it was filed in.
0671
1          Q.  Did you review the subpoena enforcement
2   documents that were filed against you?
3          A.  I believe I saw them.
4          Q.  Did you see that it was filed in federal
5   court?
6          A.  I apologize, because I am, although I
7   have been an acting litigation manager for the last
8   three or four years, a lot of this is foreign
9   territory to me because I am not an attorney.  So to
10   me court is court, and I continue to learn as I go
11   along.
12              So I was very clear with all of them,
13   not to mince words again, but I was very clear that
14   you guys made a formal request in New York court to
15   have me turn over any and all documents related to
16   any and all activities in the broadest scope.
17          Q.  So we are clear, you told your clients
18   that the SEC, not you guys, the SEC in court has
19   requested documents from me?
20          A.  I believe so.
21          Q.  When you say you believe so, it was only
22   six months ago, do you know for certain whether you
23   told your clients whether the SEC had requested
24   documents from you in court?
25          A.  To the best of my recollection, I
0672
1   believe that is true.
2          Q.  So if we were to speak with each one of
3   your clients and ask that question, they would say,
4   "Yes, Mr. Kenner told us that the SEC sought
5   documents from us in court"?
6          A.  I don't see why they wouldn't.
7          MR. STOLPER:    To be clear, there is a
8   transcript, so I will state this:  The U.S.
9   Attorney's Office is conducting its own
10   investigation, as I am sure you are well aware, about
11   Mr. Jowdy and perhaps others, and FBI agents have
12   reached out and investigators have reached out to all
13   of his clients at varying times and degrees.  And
14   most of those clients and people that you are asking
15   him about now, live outside of New York and have,
16   because -- I am not going to speak to the causes as
17   to why, but the actions of the SEC and the actions of
18   the U.S. Attorney's Office, all relating to Jowdy are
19   sometimes viewed without the separation and
20   distinction that you would otherwise appreciate or
21   think of.
22              So when people are -- when he is
23   dialoguing with his clients, sometimes the
24   distinction between what the U.S. Attorney's Office
                                        Page 95

Kenner 08.16.11

25  is doing and what the SEC is doing and what he is
0673
 1  doing, in response to either of those things, is not
 2  always clear, because to everybody, including Phil,
 3  this is really about Jowdy, Jowdy's fraud, and what
 4  are we doing to collect those monies and hold him
 5  accountable, both here and in Mexico.
 6              And I left out Mexico, but it is all
 7  part of the same dialogue that he is having.  So you
 8  are asking for a precise pinpoint, in your mind
 9  accurate questions about did he tell his clients
10  about the SEC enforcement action in New York.  And he
11  is testifying here under oath, and I have been privy
12  to some of those conversations, and the intent is to
13  share information about what is going on.
14              If that's your concern, that's certainly
15  what is happening.  But I don't know if the level of
16  precision that you are asking him to respond to is in
17  place.  And that's part of dilemma with your
18  question.
19              MR. CASTANO:   Again, the record speaks
20  for itself.  I don't know if I agree with everything
21  you said or disagree with it.
22              Mr. Kenner does have approximately
23  twenty clients currently and one of the questions to
24  Mr. Kenner was --
25              MR. STOLPER:   Do you have twenty
0674
 1  clients now?
 2              MR. CASTANO:   I said approximately.
 3              THE WITNESS:   Approximately.
 4              MR. CASTANO:   -- whether those clients
 5  he represents and is compensated by are aware of the
 6  SEC filing an action in court to get documents from
 7  you.
 8       Q.   So, again, I think your testimony is,
 9  tell me if I am wrong, that, yes, I let all of my
10  clients know the SEC filed a court action to get
11  documents from me?
12       A.   To the best of my knowledge, yes.
13              MR. STOLPER:   It could be as equally
14  accurate that he has informed all of his clients that
15  he is cooperating with the SEC, he has produced a
16  large number of documents and has agreed voluntarily
17  to come --
18              MR. CASTANO:   This is not voluntarily.
19  This is pursuant to subpoena.
20              MR. STOLPER:   Well, that level of
21  precision he doesn't have to share with clients.
22              MR. CASTANO:   That is not the question.
23              The question is:  Did he tell them.  His
24  answer is:  I believe so.
25       Q.   Do you know for certain whether you told
0675
 1  them?
 2       A.   To the best of my recollection, yes.
 3              MR. STOLPER:   Did you tell them that
 4  you had to be here or that you were here?
 5              THE WITNESS:   I don't --
 6              MR. CASTANO:   That is not the question.
 7       Q.   The question was very specific.
 8              Did you tell your clients that the SEC
 9  had filed an action in court to compel document

Page 96

Kenner 08.16.11

```
10   production from you?
11          A.   I do not use those terms.
12          Q.   Did you tell your clients that the SEC
13   had filed an action in court to get documents from
14   you?
15          A.   Yes.
16          Q.   Did you tell your clients that the SEC
17   had filed in court an action against you to compel
18   your testimony before the SEC?
19          A.   I don't recall.
20          Q.   Do you think that's something your
21   clients should know, especially given the fact that
22   you advise them on financial matters among other
23   things?
24          A.   Well, I believe what I represented to
25   them was as a result of the filing, the federal
0676
1    filing, as you suggest, to subpoena production of
2    documents, that I have been asked to come to New York
3    and I have come to New York to go through those
4    documents and any other questions that you guys have.
5             I don't know if the level of precision
6    that you are asking the question even would register
7    with a number of my clients.  So, again, in the
8    context of was there an action filed to procure
9    documents from me by the SEC, yes.  Are there ongoing
10   interviews, investigation, et cetera, based on your
11   actions in the federal court, I assume, of New York
12   to make that happen.  Yes, they are aware.  They are
13   also aware I am here for the second time, and I also
14   told them this may not be the last time.
15   BY MR. STEPANIUK:
16          Q.   In those conversations, were you asked
17   what questions you were asked while you were here?
18          A.   No, I don't believe so.
19          Q.   Were you asked by any of your clients
20   what subjects were covered while you were here?
21          A.   I believe the topics that they were
22   interested in were did we cover Mexican Ken Jowdy
23   issues.  And I told them yes, we talked about Ken
24   Jowdy and Mexico, and they said good.
25          Q.   Who asked those questions?
0677
1          A.   I don't recall specifically.
2          Q.   Apart from being asked what topics were
3    covered, did you, yourself, inform any of your
4    clients about the subject matter of your testimony
5    the last time you were here?
6          A.   I don't believe so.
7          Q.   What else, if anything, did you and your
8    clients discuss with respect to your experience here
9    in New York?
10          A.   There were a number of questions from
11   clients who I don't recall specifically who they
12   were, but the general questions were:  Were you able
13   to talk about the money we gave Ken Jowdy and how we
14   feel about not having it back?
15             And I said in general, yes, we talked a
16   lot about Ken Jowdy and the monies that changed
17   hands.
18          Q.   And did you tell them anything else?
19          A.   I don't think so.
20             These are very simple people who just
```

Page 97

Kenner 08.16.11

21   want to know that I am still fighting for them here
22   in and in Mexico to recover those funds from Ken
23   Jowdy.
24          Q.   In the course of your conversations
25   about your appearance here today or proceedings filed
0678
 1   in court with respect to documents and testimony, did
 2   you inquire as to any of your clients as to whether
 3   they have been contacted by the SEC?
 4          A.   I don't believe I asked any of them.
 5          Q.   Other than your clients, as we have been
 6   discussing and your attorney obviously, with who
 7   else, if anyone, have you discussed your experience
 8   here in New York before us?
 9          A.   I believe it has been limited to clients
10   and my attorneys.
11              MR. STOLPER:   Did you talk to Sergei
12   Gonchar about the SEC?
13              THE WITNESS:   I don't think I did.
14              MR. STOLPER:   You may want to clarify.
15          A.   Sergei is not a client of mine at this
16   time.
17              MR. CASTANO:   The questions were
18   concerning current clients about the SEC's
19   investigation.
20              MR. STOLPER:   I didn't realize Sergei
21   wasn't a current client.
22   BY MR. STEPANIUK:
23          Q.   Let me ask this: would any of your
24   answers to my questions have changed if we were to
25   include former clients in the questions?
0679
 1          A.   If I can paraphrase, have I spoken with
 2   any of my former clients to discuss --
 3          Q.   Either your appearance here before us or
 4   the court proceeding that we filed with respect to
 5   documents?
 6          A.   I don't believe so because, as I sit
 7   here today, I don't believe I am in contact with any
 8   of my former clients or have been in a very
 9   significant period of time.
10          Q.   How did it come to be that Sergei is no
11   longer a client?
12          A.   My opinion is that Sergei finally got
13   fed up with the legal process, not understanding it,
14   and ended up a very manipulated kid in an ongoing
15   business relationship he has with Tommy Constantine,
16   who took approximately $2 million from Sergei.
17          Q.   When is the last time you spoke with
18   Sergei?
19          A.   We had communication in the last few
20   weeks.
21          Q.   What was the subject of that
22   communication?
23          A.   I had sent him a message asking if he
24   wanted to give me a call, I had some important
25   information for him about a California case.
0680
 1          Q.   Does that case have anything to do with
 2   anything we talked about here today?
 3          A.   He is one of two defendants left in a
 4   lawsuit that Ken Jowdy brought upon about ten of us
 5   for malicious prosecution.

Page 98

TR-SEC00000424

Kenner 08.16.11

```
 6         Q.  When did Sergei cease being your client?
 7         A.  Six to nine months ago perhaps.
 8         Q.  Other than Sergei, is there anyone else
 9  that was a client at the time of the investment
10  transactions we are discussing here today but is no
11  longer client?
12         A.  I think the majority of the guys.  It
13  has been a static group.
14         Q.  Anyone other than Sergei Gonchar that is
15  no longer a client?
16         A.  Not that I can think of.
17  BY MR. CASTANO:
18         Q.  You mentioned $2 million that he lost
19  through Tommy Constantine.
20             Were those Tommy Constantine related
21  businesses?
22         A.  Yes.
23         Q.  Between the Tommy Constantine related
24  businesses and the Diamante entities and the Hawaiian
25  entities, did Mr. Gonchar invest approximately or
0681
 1  become a member of an entity for $4 million?
 2         A.  I'm sorry, I got lost in that question.
 3         Q.  No problem.
 4             Between all the various entities that
 5  Mr. Gonchar has invested in, be it the Hawaiian
 6  entities, the Mexican entities that we have discussed
 7  last few days, the Diamante Air Group, and various
 8  other investments he might have made through
 9  investments in Eufora, for example, do you know if
10  Mr. Gonchar invested approximately $4 million in
11  these entities?
12         A.  That sounds approximately right.
13         Q.  And out of that $4 million, do you know
14  if Mr. Gonchar has received anything back for those
15  investments in those various entities?
16         A.  I can't speak for what he has done with
17  Tommy Constantine, although I do know Gonchar was
18  paid monthly fees by Constantine on one of the deals,
19  I believe the Eufora deal.
20             In the Hawaiian investment, he was
21  repaid in '06 about 40 percent of his initial
22  investment.
23         Q.  Along with all the other clients?
24         A.  Along with all other clients.
25             The Cabo San Lucas and Diamante del Mar
0682
 1  investments have been subject to ongoing litigation
 2  here and in Mexico because of Jowdy's
 3  misappropriation of those found, so none of us
 4  received anything in those two deals for our
 5  investments.
 6             Jowdy defrauded both Gonchar and the
 7  Diamante Air deal leaving us with a million dollar
 8  debt, as it states in his affidavit.
 9             I think that covered all the entities
10  you were asking about.
11         Q.  The 40 percent that came to Little Isle
12  IV in 2006, that came from Lehman Brothers?
13         A.  Yes.
14         Q.  Was every investor paid 40 percent of
15  whatever their investment was?
16         A.  Yes.
```

Page 99

Kenner 08.16.11

```
17          Q.  So if you invested $1 million, you got
18   40 percent back, if you invested $100,000, you still
19   got 40 percent back?
20          A.  That's correct.
21   BY MR. SMITH:
22          Q.  It was 40 percent of the total
23   investment that each investor had paid up to the
24   point of payment from Lehman Brothers?
25          A.  That is correct.
0683
 1   BY MR. CASTANO:
 2          Q.  Has anyone suggested to you what answers
 3   you should give or what your testimony should be here
 4   before the Commission?
 5          A.  No.
 6          Q.  Have you told or suggested to anyone
 7   what they should say or what answers they should give
 8   in any SEC testimony?
 9          A.  No.
10          Q.  Have you told or suggested to anyone
11   what to say or what answers they should give before
12   any grand jury or criminal investigative body?
13          A.  No.
14          MR. CASTANO:  Mr. Kenner, at this time,
15   we are going to go off the record.  We have no
16   further questions for today.  Oftentimes, we have to
17   call people back as we learn more information.  I
18   hope that doesn't happen, but it is a possibility.
19   If that does happen, we will reach out to your
20   attorney, Michael.
21          THE WITNESS:  Okay.
22          MR. CASTANO:  Before we go off the
23   record, do you want to clarify anything?
24          MR. STOLPER:  The only thing I would
25   clarify was that I think in your line of questioning,
0684
 1   which may not come through in the transcript, whether
 2   he disclosed that the SEC has sought enforcement of
 3   subpoenas to his clients, I think that the suggestion
 4   in your question was that it was something negative
 5   that he should disclose to his clients as sort of a
 6   warning or red flag to his clients who are relying on
 7   him.
 8          And I think that the conversations that
 9   I have been a part of, without waiving privilege, and
10   also my own view is that my view of SEC's involvement
11   in this whole Diamante del Mar, et al, is a welcome
12   one and that we and Mr. Kenner, are really looking to
13   the SEC to enforce the securities laws against Mr.
14   Jowdy and those who did wrong here.  And we see it as
15   a welcome thing, as a positive thing.
16          So the tenor of the conversations with
17   Phil's friends, co-investors, clients, is that this
18   is a welcome thing and that maybe because we are
19   having this direct communication with the SEC, and
20   then perhaps subsequently with the U.S. Attorney's
21   office, that maybe they will finally get some justice
22   out of this.
23          And I know I have said that off the
24   record with you and I just wanted to clarify that in
25   response to that line of questioning.  Just a point
0685
 1   of information.
```

TR-SEC00000426

Kenner 08.16.11
2          MR. STEPANIUK:    Just to say something
3    in response, nothing about our questions suggested
4    one way or the other that we want people to tell
5    other people that they appear here as a general
6    proposition.  Obviously, there are circumstances
7    under which that is appropriate.  But as a general
8    matter, nothing about our questions suggests that we
9    expect all witnesses to tell other interested parties
10   that they are appearing here today.  In case that's
11   not clear for anybody who might ever read this
12   transcript.
13          MR. STOLPER:    Good clarification.  It
14   certainly created confusion on this side of the
15   table.
16          MR. CASTANO:    We also don't represent
17   anyone other than the Commission.  We don't speak for
18   the U.S. Attorney's Office or any other body.  We
19   only speak for the Commission.
20          MR. STOLPER:    Understood.
21          MR. CASTANO:    All right, we are off the
22   record at 5:38 p.m.
23          (Time noted: 5:38 p.m.)
24
25
0686
1
2                     I N D E X
3
4    WITNESS               EXAMINATION BY          PAGE
5
6    P. Kenner          Mr. Castano               445
7
8                        EXHIBITS
9
10   NY-8125            DESCRIPTION               PAGE
11
12      33           E-mail correspondence       507
13      34           E-mail correspondence       509
14      35           Various documents           547
15      36           Bylaws                      568
16      37           Bylaws                      568
17      38           Limited Liability Agreement 591
18      39           July 21, 2006 letter        609
19      40           Sergei Gonchar affidavit    656
20
21
22
23
24
25
0687
1
2                  SCOPIST CERTIFICATE
3
4            I, MARGARET EUSTACE, hereby certify that
5    the foregoing transcript consisting of 247 pages is a
6    complete, true and accurate transcript of the
7    investigative hearing, held on Tuesday, August 16,
8    2011, at 3 World Financial Center, New York, New
9    York, in the matter of DIAMANTE DEL MAR.
10           I, further certify that this proceeding
11   was reported by Margaret Eustace and that the
12   foregoing transcript has been scoped by me.
                         Page 101

Kenner 08.16.11

```
13
14
15
16
17   Margaret Eustace              Date
18
19
20
21
22
23
24
25
0688
 1
 2
 3                   UNITED STATES
 4         SECURITIES AND EXCHANGE COMMISSION
 5               REPORTER'S CERTIFICATE
 6
 7          I, Margaret Eustace, reporter, hereby certify
 8  that the foregoing transcript of 247 pages is a
 9  complete, true and accurate transcript of the
10  testimony indicated, held on August 16, 2011, at 3
11  World Financial Center, New York, New York, in the
12  Matter of DIAMANTE DEL MAR.
13          I further certify that this proceeding
14  was reported by me and that the foregoing transcript
15  was prepared under my direction.
16
17
18
19   Margaret Eustace              Date
20
21
22
23
24
25
0689
 1              PROOFREADER'S CERTIFICATE
 2
 3  In the Matter of:      DIAMANTE DEL MAR
 4  Witness:               PHILIP KENNER
 5  File Number:           NY-8125
 6  Date:                  August 16, 2011
 7  Location:              3 World Financial Center,
 8                         New York, New York
 9
10          This is to certify that I, Margaret
11  Eustace, the undersigned, do hereby swear and affirm
12  that the attached proceedings before the United
13  States Securities and Exchange Commission were held
14  according to the record and that this is the
15  original, complete, true and accurate transcript that
16  has been compared to the reporting or recording
17  accomplished at the hearing.
18
19
20     MARGARET EUSTACE              Date
21
22
23
                    Page 102
```

TR-SEC00000428