1

ROUGH DRAFT

IMPORTANT NOTE: This file contains strictly a rough
draft of proceedings indicated. All recipients of
this file, by their review, agree and acknowledge
that this file and its contents may not be used for
any purpose as though it is the final, fully-edited
transcript of proceedings. The contents of this file
may not be (1) quoted from, (2) used as a reference
in other documents or during future proceedings or
(3) be relied upon other than for
note-taking/recollection purposes of counsel in
attendance at proceedings indicated. This is not a
certified transcript of proceedings and is intended
only for use within the parameters set forth above.

DEPOSITION OF PHILIP KENNER

Reported by: Sarah Safier, CCR No. 808

2

1 APPEARANCES:
2 For the Plaintiff: LARS K. EVENSEN, ESQ.
          Holland & Hart
3         3800 Howard Hughes Parkway
          Tenth Floor
4         Las Vegas, Nevada 89169
5 For the Defendant: PATRICIA LEE, ESQ.
          Hutchison & Steffen, LLC
6         Peccole Professional Park
          10080 West Alta Drive
7         Suite 200
          Las Vegas, Nevada 89145
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

3

1     (NRCP 30(b)(4) was waived by the parties.)
2  Whereupon --
3       PHILIP KENNER, having been first duly sworn
4  to tell the truth, the whole truth and nothing but
5  the truth, was examined and testified as follows:
6              * * * * *
7              EXAMINATION
8  BY MS. LEE:
9     Q   Mr. Kenner, can you please state and spell
10 your full name for the record?
11    A   Phillip Andrew Kenner, P-h-i-l-i-p
12 A-n-d-r-e-w K-e-n-n-e-r.
13    Q   And can you state your address, your
14 residential address for the record?
15    A
16    Q   Is that where you are currently residing?
17    A   Yes.
18    Q   And how long have you been at that address?
19    A   Just under one year.
20    Q   Prior to that, where did you live?
21    A
22
23    Q   How long have you been in Las Vegas as a
24 resident?
25    A   About three years.

4

1     Q   And then immediately prior to moving to Las
2  Vegas, where did you live?
3     A   Arizona.
4     Q   What part of Arizona?
5     A   Scottsdale.
6          MR. EVENSEN: Patty, as a housekeeping
7  matter, you had asked me a question about Mr. Kenner
8  and whether I represent him and so forth, So I just
9  want to get clear it on the record.
10         MS. LEE: Right. I was going to go into
11 that after I got through the formalities, but if want
12 to jump into that now, that's fine.
13         MR. EVENSEN: The law firm of Holland & Hart
14 represents Philip Kenner as an agent of Glen Murray,
15 not as Philip Kenner individually. Do you understand
16 what I'm saying?
17         MS. LEE: No.
18         MR. EVENSEN: Phil Kenner is the agent of
19 Glen Murray as a business manager acting on his
20 behalf as an agent. Phil Kenner as an individual is
21 not Glen Murray obviously and so in his capacity as
22 an agent, we're representing him in that capacity,
23 not as an individual.
24         MS. LEE: Okay. It's a little confusing for
25 me still, but I will accept your representation.



Government
Exhibit
FORF 102
13-CR-607(JFB)

## 5

1  BY MS. LEE:
2      Q    So is it your understanding, Mr. Kenner,
3  that you are represented here by counsel today?
4      A    In the capacity as agent for Glen Murray,
5  yes.
6      Q    Is that really just kind of a difference
7  without a distinction in terms of conversations you
8  may have had with Mr. -- I mean, I guess my question
9  is -- obviously the reason I want to know is for
10  privileged communications.
11          MR. EVENSEN:  Certainly.
12          MS. LEE:  Any conversations that you have
13  with -- any conversations Mr. Kenner has had with
14  your firm with regards to Glen Murray, you are going
15  to assert privilege, is that correct?
16          MR. EVENSEN:  Acting in his capacity as the
17  agent, yes, absolutely.
18          MS. LEE:  And what about any issues that may
19  arise as to Mr. Kenner's own personal liability or
20  potential liability with regards to the issues in
21  dispute and any conversations he may have had with
22  your firm with regards to that?
23          MR. EVENSEN:  Had we had any conversations
24  with him in his individual capacity, then there would
25  not be any privilege on that.

## 6

1          MS. LEE:  Okay.
2          MR. EVENSEN:  But in his individual
3  capacity, not acting on behalf of my client, Glen
4  Murray.
5          MS. LEE:  I'll have to admit, still sketchy,
6  but I'll respect that privilege for now and reserve
7  our right to, you know, contest it later if
8  necessary.
9          MR. EVENSEN:  Sure.
10  BY MS. LEE:
11      Q    Okay.  Mr. Kenner, have you ever had your
12  deposition taken before?
13      A    Yes.
14      Q    On how many occasions?
15      A    Two.
16      Q    And why were you being deposed and were you
17  a party to an action or a witness in an action?
18      A    I was a party to an action in both cases.
19      Q    Were you the plaintiff in those actions or
20  defendant?
21      A    One of each.
22      Q    For the action in which you were a
23  plaintiff, who was the defendant?
24      A    I don't recall the name.
25      Q    What was the nature of the dispute?

## 7

1      A    It was a dispute related to a car that I
2  owned.
3      Q    Was it a dispute with the financing agency
4  or the car dealership or anyone around that type of
5  dispute?
6      A    Yes.
7      Q    And how long ago was that?
8      A    Almost 20 years ago.
9      Q    And was that in Arizona?
10      A    No.
11      Q    Where was that litigation?
12      A    New York.
13      Q    How did that litigation resolve itself?
14      A    I prevailed.
15      Q    Okay.  And in the matter where you were a
16  defendant, who was the plaintiff?
17      A    Christine Myrick.
18      Q    What was the nature of that litigation?
19      A    I sued her in California for slander and
20  defamation.
21      Q    So you were actually the plaintiff in that
22  case, not the defendant?
23      A    Yes.
24      Q    Okay, I misunderstood you.  I thought you
25  said you had been a plaintiff in one and a defendant

## 8

1  in the other, but you had actually been a plaintiff
2  in both?
3      A    Correct.
4      Q    And that was in California, you said?
5      A    Yes.
6      Q    And how did that litigation resolve itself?
7      A    Pending.
8      Q    It's still pending?
9      A    Yes.
10      Q    And how long ago were you deposed with
11  relation to this action, Christine Myrick?
12      A    In the last 120 days.
13      Q    Who is your counsel in that litigation?
14      A    Epstein Becker.
15      Q    Well, I understand that you have some
16  background experience with depositions.  I won't take
17  up too much of your time going over the rules.
18          As you know, there's a court reporter here
19  and she will be transcribing everything that we say
20  today back and forth.
21          By the way, I'm Patricia Lee.  I'm here on
22  behalf of Mr. Jowdy.
23          Because she is taking a transcript, it's
24  important that we try not to talk over one another.
25  I will respectfully wait for you to finish your

9

1  complete answer before jumping into the next question
2  and if you could just wait for me to finish my full
3  question just so we get it on the record.  I know
4  that in normal conversation you can kind of
5  anticipate what's going to be asked and you can just
6  jump in with the answer, but if we could just try not
7  to talk over each other, that will make for a clear
8  record.
9        Also, nonverbal gestures won't be able to be
10  captured on the record, so nodding your head and
11  shrugging your shoulders will not be captured by the
12  record.  So if you could answer all my questions
13  verbally, that will help out a lot.
14        If you don't understand any of the questions
15  that I have asked you, please ask me to either repeat
16  it if you didn't hear it or clarify it or rephrase it
17  if you didn't understand it.  If you answer the
18  question that I have asked, we will assume that you
19  understood the question.
20        The oath that you just took is the same oath
21  that you would take in a court of law, carrying with
22  it the same penalties of perjury.
23        If you need to take any breaks, please let
24  us know, we are not here to hold you hostage, if you
25  need to use the the restroom or just need a break.

10

1        My only request is that if there's a
2  question pending that you please respond to that
3  question before we go off of the record to take a
4  break.
5        It's my understanding that Mr. Evensen is
6  here as your counsel in your capacity as an agent for
7  Murray.  So I assume that he will be making
8  objections throughout the deposition.  He is making
9  those objections to preserve those objections for the
10  record and unless he instructs you not to answer the
11  question, you still need to go ahead and answer the
12  question after his objection has been completed.  Do
13  you understand that?
14    A   Yes.
15    Q   Are you on any medications or any type of
16  mind-altering substances that would affect your
17  testimony here today?
18    A   No.
19    Q   Do you know the plaintiff, Glen Murray?
20    A   Yes.
21    Q   And how do you know him?
22    A   I'm his business manager.
23    Q   How did you come to be his business manager?
24    A   I was introduced to Glen 17 years ago.
25    Q   And 17 years ago, were you acting as his

11

1  business manager?
2    A   Shortly thereafter, I was.
3    Q   And under what circumstances did you meet
4  Mr. Murray?
5    A   He was looking for a business manager.
6    Q   Okay.  And where was Mr. Murray living at
7  the time that you met him?
8    A   Boston, Massachusetts.
9    Q   And where were you living?
10    A   Boston, Massachusetts.
11    Q   Have you maintained a continuous business
12  relationship with Glen Murray for approximately
13  17 years?
14    A   Yes.
15    Q   Other than being a business manager for Glen
16  Murray, did you have any other type of business
17  relationship with Mr. Murray?
18    A   I don't know that I understand the question.
19    Q   Okay.  Well, let me ask this.  What do you
20  do for Mr. Murray in your capacity as a business
21  manager?  And if it has changed at any point
22  throughout the 17 years, please let me know that as
23  well.
24    A   There's been no significant change in my
25  capacity with Glen Murray.

12

1    Q   And so what do you do as a business manager
2  for Glen Murray?  What do you do for him?
3    A   I handle his daily bills, manage his family
4  issues and assist in his life planning issues.
5    Q   Anything else?
6    A   No.
7    Q   Do you have any contractual relationship
8  with him to provide these services?
9    A   Yes.
10    Q   And when did you enter into that contract?
11    A   2003.
12    Q   So prior to 2003, you were acting as
13  Mr. Murray's business manager without a contract?
14    A   No.
15    Q   Did you start acting as business manager in
16  2003?
17    A   No.
18    Q   So did you have a different contract with
19  him before 2003?
20    A   Yes.
21    Q   So in 2003 -- well, I'm sorry, strike that.
22        When was the first time you entered into a
23  contract with Mr. Murray for your business management
24  services?
25    A   Approximately 1994.

13

1    Q    And then after 1994, what subsequent
2    contracts -- when did you enter into any subsequent
3    contracts with Mr. Murray for your business
4    management services?
5    A    I don't recall the other years other than
6    2003.
7    Q    Were there some interim contracts between
8    '94 and 2003 that you just can't remember the dates?
9    A    Yes.
10   Q    And was there something significant about
11   the 2003 contract that makes it stick out in your
12   mind?
13   A    No.
14   Q    Why was there a new contract in 2003?
15   A    I was with a new company at that time.
16   Q    I see.  Was the impetus for the changing of
17   contracts always in conjunction with you moving to a
18   different company?
19   A    Yes.
20   Q    In 1994, what company were you working for?
21   A    Freedom Capital Management.
22   Q    What was your job title there?
23   A    Vice president.
24   Q    And was that a Massachusetts corporation?
25   A    I don't know.

14

1    Q    Did it have a Massachusetts office?
2    A    Yes.
3    Q    Was the contract then between Freedom
4    Capital Management and Glen Murray or yourself
5    individually and Glen Murray?
6    A    I don't recall.
7    Q    When did you start working for Freedom
8    Capital Management?
9    A    1994.
10   Q    And how long did you work for them?
11   A    A few years.
12   Q    So to approximately 1997, does that sound
13   about right?
14   A    Sure.
15   Q    As vice president of Freedom Capital
16   Management, what were your duties?
17   A    I was a service provider and a marketing rep
18   for the company.
19   Q    So when you say service provider, would that
20   include all of the services that you listed for me
21   earlier with regards to what you have done for Glen
22   Murray as a business manager?
23   A    Sure.
24   Q    And why did you leave Freedom Capital
25   Management in approximately 1997?

15

1    A    To go to another firm.
2    Q    And what firm was that?
3    A    State Street Research.
4    Q    And what kind of company is that?
5    A    It's an institutional investment firm.
6    Q    Was it a Massachusetts corporation?
7    A    I don't know.
8    Q    Did it have an office in Massachusetts?
9    A    Yes.
10   Q    Is that the office you were working out of?
11   A    Yes.
12   Q    So what was your title at State Street
13   Research?
14   A    Vice president.
15   Q    And what were your duties as vice president
16   of State Street Research?
17   A    I was a service provider and a marketing
18   rep.
19   Q    And do you recall whether or not
20   Mr. Murray's contract changed in 1997 or at the time
21   that you left to go to State Street Research?
22   A    I don't think he had a contract.
23   Q    So were you providing him services without a
24   contract during this period?
25   A    No.

16

1    Q    Okay.  I guess I'm just a little confused
2    because you said the first time you had a contract
3    with -- and correct me if I'm mischaracterizing your
4    testimony.  The first time you had a contract with
5    Mr. Murray was in 1994 when you were working for
6    Freedom Capital Management, is that right?
7    A    I believe there was an agreement.
8    Q    Is there a difference in your mind between a
9    contract and an agreement?
10   A    I believe so.
11   Q    To you, what is the difference between a
12   contract and an agreement?
13   MR. EVENSEN:  Objection to the extent it
14   calls for a legal conclusion.
15   BY MS. LEE:
16   Q    You can go ahead and answer the question.
17   A    I don't know, but it seems to be different
18   to me.
19   Q    Did you have something in writing with
20   Mr. Murray in 1994 that you characterize as an
21   agreement?
22   A    I believe there was an agreement in place in
23   1994.
24   Q    Was it in writing?
25   A    Yes.

## 17

1  Q   And signed by Mr. Murray?
2  A   I would assume so.
3  Q   So then in 1997 when you went to State
4  Street Research, was there a different agreement with
5  Mr. Murray?
6  A   I would believe so.
7  Q   Did you ever have any contracts with
8  Mr. Murray?
9  A   No.
10  Q   So just agreements?
11  A   Correct.
12  Q   And how long were you with State Street
13  Research?
14  A   A couple years.
15  Q   So to approximately 1999, --
16  A   Sure.
17  Q   -- does that sound right?  Okay.
18      And why did you leave?
19  A   To go to a new company.
20  Q   What was the name of that company?
21  A   Assante Global Advisors.
22  Q   And what did that company do?
23  A   They were a business management advisory
24  firm.
25  Q   And what was your title there?

## 18

1  A   I don't recall.
2  Q   What were your duties there?
3  A   I was a service provider and a marketing
4  rep.
5  Q   And when you say service provider, were you
6  handling the daily business of your clients, managing
7  their family issues and assisting in life planning
8  issues as you were for Mr. Murray?
9  A   Yes.
10  Q   Approximately how many clients did you have
11  with as Assante Global Advisors, you, personally, in
12  your capacity as an employee?
13  A   It varied throughout my term.
14  Q   What's the most you ever had?
15      MR. EVENSEN:  If you can recall.
16      THE WITNESS:  I don't recall.
17  BY MS. LEE:
18  Q   And just for the record, just to avoid that
19  objection in the future, all these questions are if
20  you can recall obviously.  If you don't recall, you
21  can say you don't recall.
22      I am entitled, however, to your best
23  estimate, if you can give me an estimation of how
24  many clients you had.  I mean, this was back in 1999,
25  I don't exact you to remember the exact number, but

## 19

1  if you have an estimate.  For instance, was it more
2  than ten?
3  A   Yes.
4  Q   Was it more than 20?
5  A   Yes.
6  Q   Was it more than 50?
7  A   Yes.
8  Q   More than 100?
9  A   I don't recall.
10  Q   And how long were you with Assante Global
11  Advisors?
12  A   About four years.
13  Q   So that takes us up to about 2003.  Was
14  Assante Global Advisors a Massachusetts corporation?
15  A   I don't know.
16  Q   Did it have an office in Massachusetts?
17  A   I don't know.
18  Q   Where were you physically located when you
19  were working for Assante Global Advisors?
20  A   In Arizona.
21  Q   When did you move from Massachusetts to
22  Arizona?
23  A   Approximately 1998.
24  Q   And did you move in order to work for
25  Assante Global Advisors?

## 20

1  A   No.
2  Q   Why did you move to Arizona?
3  A   I wanted to move.
4  Q   Okay.  Fair enough.
5      Why did you leave Assante Global Advisors in
6  2003?
7  A   To go to a new firm.
8  Q   And what was that new firm?
9  A   Standard Advisors.
10  Q   When you went to Assante Global Advisors in
11  1999, did Mr. Murray's agreement then change so that
12  it could be in privity with Assante Global Advisors?
13  A   I didn't understand the question.
14  Q   Okay.  Did Mr. Murray enter into a new
15  agreement with you in 1999, when you moved over to
16  Assante Global Advisors?
17  A   Yes.
18  Q   And do you recall whether or not that
19  contract was between you and him personally or
20  between Assante Global Advisors and Murray?
21  A   I don't recall.
22  Q   Did you have any ownership interest in
23  Assante Global Advisors?
24  A   No.
25  Q   Did you have any ownership interest in State

| 21 |
|---|
| 1   Street Research? |
| 2      A.   No. |
| 3      Q.   Did you have any ownership interest in |
| 4   Freedom Capital Management? |
| 5      A.   No. |
| 6      Q.   And what does Standard Advisors do?  What |
| 7   does that company do? |
| 8      A.   It's a business management firm. |
| 9      Q.   What was your title there? |
| 10      A.   President. |
| 11      Q.   What were your duties as president of the |
| 12   company? |
| 13      A.   I was a service advisor and a marketing rep |
| 14   for the company. |
| 15      Q.   How many employees did that company have or |
| 16   does that company have? |
| 17      A.   I don't understand the question. |
| 18      Q.   How many people are working for that |
| 19   company?  How many employees does it have? |
| 20      A.   When? |
| 21      Q.   At the time you started working there? |
| 22      A.   One. |
| 23      Q.   One, I'm sorry.  I thought you asked me |
| 24   when. |
| 25      A.   I did ask you when. |

| 22 |
|---|
| 1      Q.   Are you still with that company today? |
| 2      A.   Yes. |
| 3      Q.   How many employees does that company have |
| 4   now? |
| 5      A.   One. |
| 6      Q.   Is that you? |
| 7      A.   No. |
| 8      Q.   So you are not employed by this company |
| 9   today? |
| 10      A.   No. |
| 11      Q.   When did you cease to become employed by |
| 12   Standard Advisors? |
| 13      A.   I advise for the company. |
| 14      Q.   So you are not an employee of that company? |
| 15      A.   I'm not a paid employee of the company. |
| 16      Q.   Are you what's called a 1099 independent |
| 17   consulting contractor for that company? |
| 18      A.   I don't know. |
| 19      Q.   How do you get paid by that company? |
| 20      A.   I don't. |
| 21      Q.   So you provide services for that company but |
| 22   you don't get paid for it? |
| 23      A.   That's correct. |
| 24      Q.   How do you make your money?  What does your |
| 25   source of income come from? |

| 23 |
|---|
| 1          MR. EVENSEN:  I'm going to object.  I think |
| 2   you're getting a far afield unless you want to lay |
| 3   some background to that, Patty. |
| 4   BY MS. LEE: |
| 5      Q.   Go ahead and answer that question unless |
| 6   Lars is advising you not to answer. |
| 7      A.   I'm not sure I understand the question. |
| 8      Q.   Are you employed by anybody? |
| 9      A.   I am not. |
| 10      Q.   So how do you earn a living is my question? |
| 11      A.   I work on real estate development projects. |
| 12      Q.   In what capacity? |
| 13      A.   As an advisor. |
| 14      Q.   How many real estate development projects do |
| 15   you have -- are you currently advising? |
| 16      A.   One. |
| 17      Q.   What is the name of that project |
| 18   development? |
| 19      A.   It's called Na'alehu Ventures. |
| 20      Q.   I will guess from the name that that's in |
| 21   Hawaii? |
| 22      A.   Yes. |
| 23      Q.   Do you know what island it's on in Hawaii? |
| 24      A.   Big Island. |
| 25      Q.   And how long have you been consulting on |

| 24 |
|---|
| 1   that project or advising on that project? |
| 2      A.   For a few years. |
| 3      Q.   So since approximately 2006? |
| 4      A.   Yes. |
| 5      Q.   And do you get paid as an advisor for the |
| 6   Na'alehu Ventures project? |
| 7      A.   I have, yes. |
| 8      Q.   Who pays you?  Who do you work for? |
| 9      A.   For Na'alehu Ventures. |
| 10      Q.   Do you have a contractual relationship with |
| 11   them? |
| 12      A.   I believe so. |
| 13      Q.   So you believe there's a signed agreement |
| 14   between yourself and Na'alehu Ventures for consulting |
| 15   services? |
| 16      A.   I believe there's some agreement. |
| 17      Q.   Okay.  Do you know who the proprietors or |
| 18   individuals are behind the Na'alehu Ventures company? |
| 19      A.   I'm not sure I understand your question. |
| 20      Q.   Okay.  Is Na'alehu Ventures a corporation or |
| 21   is that just the name of the project development? |
| 22      A.   I don't believe it's either. |
| 23      Q.   What is it? |
| 24      A.   It's an LLC. |
| 25      Q.   Okay.  And do you know who the members of |

## 25

1  that LLC are?
2    A  I know who some of the members are, yes.
3    Q  Can you give me the names of the ones that
4  you know?
5    A  There is Hawaii Ventures 2006; Na'alehu
6  Management; JN Development; Little Isle IV; Maka Koa
7  and Paniolo Nui.
8    Q  And do you have any ownership in any of
9  those entities that you just listed, any ownership
10  interest?
11    A  Yes.
12    Q  Which ones?
13    A  Hawaii Ventures 2006.
14    Q  Any other ones?
15    A  I don't know specifically.
16    Q  Do you know if you have any ownership
17  interest in Little Isle IV?
18    A  I don't recall specifically if I do.
19    Q  Is it possible that you own part of that
20  company?
21    A  It's possible.
22    Q  What percentage of Hawaii Ventures 2006 do
23  you own?
24    A  I believe ten percent.
25    Q  Is that an LLC or a corporation?

## 26

1    A  LLC.
2    Q  Are you a managing member of that LLC?
3    A  I believe I am.
4    Q  Who is the managing member for Little Isle
5  IV?
6    A  I am.
7    Q  How long have you been the managing member
8  for Little Isle IV?
9    A  Approximately six years.
10    Q  What phase is that development in in Hawaii?
11    A  I don't understand.
12    Q  Is it close to completion?
13    A  No.
14    Q  Would you characterize it as being in it's
15  infancy, kind of somewhere in the middle or I think
16  you said it's not close to completion?
17    A  Infancy.
18    Q  Is Standard Advisors an LLC or a
19  corporation?
20    A  It is an LLC.
21    Q  Are you a managing member of that LLC?
22    A  Yes.
23    Q  Are you an owner of that LLC?
24    A  Yes.
25    Q  What percentage of that company do you own?

## 27

1    A  100 percent.
2    Q  So did you start that company in 2003?
3    A  Yes.
4    Q  And who is the one employee that you had in
5  2003?
6    A  I believe it was me.
7    Q  Who is the one employee that you have today?
8    A  Stephanie Dixon.
9    Q  Is that D-i-x-o-n?
10    A  Yes.
11    Q  How long has Stephanie been with you?
12    MR. EVENSEN:  You mean how long has she been
13  with Standard Advisors?
14    MS. LEE:  Right, I'm sorry.  Thanks, Lars.
15  BY MS. LEE:
16    Q  How long has she been an employee of
17  Standard Advisors?
18    A  Off and on for five years.
19    Q  What is her title there?
20    A  I don't know if she has one.
21    Q  What are her duties?
22    A  She is a daily service rep.
23    Q  What does that entail?
24    A  She assists Standard Advisors' clients in
25  any daily family business needs.

## 28

1    Q  Does Ms. Dixon hold any licenses or
2  certifications?
3    A  She's a notary.
4    Q  Is she registered with the Securities and
5  Exchange Commission, do you know?
6    A  I don't know.
7    Q  Does she hold a Series 7 license, do you
8  know?
9    A  I don't know.
10    Q  Is she a CPA?
11    A  I don't believe so.
12    Q  Is she salaried or hourly?
13    A  Salaried.
14    Q  What is her annual salary today?
15    A  I don't recall.
16    Q  Is it more than $30,000?
17    A  Yes.
18    Q  More than 50?
19    A  It's probably around 50.
20    Q  Okay.  And what's the address for Standard
21  Advisors, LLC?
22    A  10705 East Cactus Road, Scottsdale, Arizona.
23    Q  Does it own it's own building or is it a
24  commercial tenant?
25    MR. EVENSEN:  Object as to relevancy.

---

29

1  BY MS. LEE:
2      Q   Go ahead.
3      A   Neither.
4      Q   What is that space that you just gave me the
5  address for?
6      A   It's a mailing address.
7      Q   Is it just like a PO Box?
8      A   It's just a mailing address.
9      Q   Where does Stephanie physically work?
10     A   In Austin, Texas.
11     Q   I see.  Is that ████████ is that a
12  residential address?
13     A   Yes.
14     Q   Who lives there?
15     A   Nobody.
16     Q   It's just a vacant residential address?
17     A   Nobody resides there.
18     Q   So it's vacant?
19     A   I don't think it's vacant.
20     Q   Why do you say that if nobody resides there?
21     A   It's a home I used to live in.
22     Q   Okay.  Do you own that property?
23     A   No.
24     Q   Who owns it?
25     A   My ex-wife.

---

30

1      Q   Does she reside there?
2      A   No.
3      Q   And so have you ever been paid by Standard
4  Advisors, LLC as an employe?
5      A   I don't recall.
6      Q   Do you take membership distributions on an
7  annual basis or on some type of frequent basis?
8      A   In what context?
9      Q   Oh, I'm sorry.  Do you know what a
10  membership distribution is?
11     A   Not necessarily.
12     Q   Do you take any money for yourself
13  personally out of Standard Advisors, LLC?
14     A   No.
15     Q   And to the best of your recollection, have
16  you ever taken any money for yourself out of Standard
17  Advisors, LLC?
18     A   I don't know.
19     Q   Is that company still in existence today?
20     A   Yes.
21     Q   And when you started Standard Advisors in
22  '03, did Mr. Murray's contract or agreement then
23  change again?  I believe you testified that it had.
24         MR. EVENSEN:  Asked and answered then.
25

---

31

1  BY MS. LEE:
2      Q   Yes, I'm sorry, I forgot that I asked that.
3  I'll just take your last answer as the answer to my
4  question.
5         Since 2003, have you entered into any
6  different contracts or agreements with Mr. Murray?
7      A   I don't believe so.
8      Q   And is that contract or agreement between
9  Mr. Murray and Standard Advisors or between yourself
10  personally and Mr. Murray?
11     A   I believe it's with Mr. Murray and Standard
12  Advisors.
13     Q   Since 2003, have you worked for any other
14  companies besides Standard Advisors, LLC?
15     A   Yes.
16     Q   What other companies have you worked for?
17     A   I worked for Diamonte Del Mar.  Excuse me,
18  Diamonte Cabo San Lucas.
19     Q   Any other companies?
20     A   I don't think so.
21     Q   And so you were an employee of Diamonte Cabo
22  San Lucas?
23     A   I don't know.
24     Q   So it's possible you were an employee but
25  you may have been an independent consultant advisor

---

32

1  possibly?
2      A   I don't know.
3      Q   Okay.  What were you doing for Diamonte Cabo
4  San Lucas?
5      A   I was doing marketing and sales work.
6      Q   And is Diamonte Cabo San Lucas the name of a
7  company?
8      A   I don't know.
9      Q   Is it associated with a development or
10  project, land development in Cabo San Lucas?
11     A   To the best of my recollection.
12     Q   Are you still working there now?
13     A   No.
14     Q   When did you do work for Diamonte Cabo San
15  Lucas, when did you start doing work for them?
16     A   Approximately summer, 2005.
17     Q   And then how long did you do work for them?
18  When was the last time you did any work for them?
19     A   Approximately summer, 2007.
20         Can we take a break?
21     Q   Sure.
22         (Thereupon, a recess was taken from.
23         11:20 a.m. until 11:30 a.m.)
24  BY MS. LEE:
25     Q   If we can go back onto the record.

## 33

1  Mr. Kenner, I'm sure you are aware that the oath
2  continues throughout the entire duration of the
3  deposition even after reconvening from our break.
4       And I will have to ask you to please not use
5  your cell phone or any other electronic devices
6  throughout this deposition, I'm sorry, but if you
7  need to text somebody or something we could do it
8  during the break, but not during the course of your
9  deposition for obvious reasons.
10   A   I'm turning it off.
11   Q   Okay, perfect.
12       During your time as an either consultant
13  advisor or employee for the Na'alehu Ventures, LLC,
14  were you being engaged in your personal capacity as
15  Mr. Kenner or as Standard Advisors, LLC?
16       MR. EVENSEN: Object, vague. I don't think
17  I understand the question.
18  BY MS. LEE:
19   Q   Did you understand the question?
20   A   I did not.
21   Q   So at some point you did some work for
22  Na'alehu Ventures, LLC?
23   A   Yes.
24   Q   Do you act through your company or did you
25  just do that separate and apart from your company,

## 34

1  Standard Advisors, LLC?
2   A   I did not do it for Standard Advisors.
3   Q   So you were being personally paid on this
4  job, the Na'alehu Ventures?
5   A   I believe so.
6   Q   And who was paying you?
7   A   Na'alehu Ventures.
8   Q   The LLC itself?
9   A   Yes.
10   Q   So the checks would say Na'alehu Ventures,
11  LLC to Kenner?
12   A   I don't recall.
13   Q   And what was the agreement in terms of how
14  you were to be paid and how much you were to be paid
15  for that, for your work on that project?
16       MR. EVENSEN: Object to relevancy.
17  BY MS. LEE:
18   Q   Go ahead.
19   A   I don't recall the details of it.
20   Q   Were you being paid a salary or were you
21  being paid -- was it based on some type of
22  performance or was it a salary?
23       MR. EVENSEN: Object as to relevancy.
24       MS. LEE: And I'm just going to interject
25  here that I appreciate your objections and, of

## 35

1  course, continue to make them, but the questions that
2  I'm asking now are clearly not within the perview of
3  your agency relationship with Mr. Murray. So I deem
4  it inappropriate if Mr. Evansen instructed you not to
5  respond to this line of questioning.
6       MR. EVENSEN: I didn't instruct him and,
7  Patty, can we go talk on the patio for a minute?
8       MS. LEE: Okay, let's go off the record
9  again.
10       (Thereupon, a recess was taken from.
11       11:33 a.m. until 11:36 a.m.)
12  BY MS. LEE:
13   Q   Thank you for your indulgence. We can go
14  back on the record.
15       MR. EVENSEN: I interrupted you during a
16  question that was pending, Patty, and I apologize for
17  that now that I think about it.
18       MS. LEE: Can you read that question back?
19       (Thereupon, from the record above,
20       the reporter read, to wit:
21       "Q. Were you being paid a salary or
22       were you being paid -- was it based
23       on some type of performance or was
24       it a salary?")
25       THE WITNESS: It was a salary.

## 36

1  BY MS. LEE:
2   Q   How much were you being paid a year?
3   A   I don't recall.
4   Q   Was it more than 50?
5   A   I believe so.
6   Q   Was it more than 100?
7       MR. EVENSEN: $100,000 or $100?
8  BY MS. LEE:
9   Q   Of course, under $100,000. Of course, if
10  you were working for $50 --
11   A   I don't recall.
12   Q   What exactly were you doing for Na'alehu
13  Ventures?
14   A   I was the managing member representing
15  Na'alehu Ventures.
16   Q   So you were a managing member of Na'alehu
17  Ventures, LLC itself?
18   A   No.
19   Q   No? That's a no? I'm sorry, you nodded
20  your head and said no.
21   A   No.
22   Q   You were not a managing member of that LLC?
23   A   That's correct.
24   Q   So when you say you were a managing member,
25  what did you mean by that?

---

37

1     A   I represented the managing member entity for
2   Na'alehu.
3     Q   In what capacity did you represent them?
4     A   My entity was the managing member entity of
5   Na'alehu.
6     Q   Would that be Little Isle IV or Hawaii
7   Ventures 2006?
8     A   No.
9     Q   Neither?
10    A   Neither.
11    Q   Which entity are you referring to when you
12  said your entity represented the managing member?
13    A   Na'alehu Management.
14    Q   Okay.  So do you have any ownership interest
15  in Na'alehu Management?
16    A   I do not.
17    Q   So why do you call it your entity?
18    A   I was the managing member.
19    Q   So what did you do for them on a day-to-day
20  basis?  What were your duties and responsibilities?
21    A   To represent the interests of Na'alehu
22  members.
23    Q   What does that mean?  What did you do,
24  physically do, what were the tasks that you engaged
25  to effectuate that whole, to represent their

---

38

1   interests?
2         MR. EVENSEN:  Do you want to just give me a
3   standing objection to relevancy?
4         MS. LEE:  Sure.
5         THE WITNESS:  I was in charge of the
6   business affairs for Na'alehu with respect to it's
7   members and it's joint venture partner.
8   BY MS. LEE:
9     Q   What type of business affairs?
10    A   Primarily consulting and communication.
11    Q   With whom?
12    A   With members of Na'alehu and the joint
13  venture partner.
14    Q   And what were your consulting about, on how
15  to build the development itself or how the parties
16  were interacting with one another?  I mean, what was
17  the scope of your responsibility?
18    A   To engage in general consulting related to
19  the project.
20    Q   What aspect of the project?
21    A   It's entirety.
22    Q   Were you responsible for financing the
23  project or obtaining the financing for that project?
24    A   I'm not sure I understand the scope of the
25  question.

---

39

1     Q   Well, the project needed money to be
2   developed, is that correct?
3     A   Again, at what time period are we referring
4   to?
5     Q   From the time you worked there in 2006 -- I
6   believe you said you worked there in 2006, and how
7   long were you on that project, from 2006 to what
8   date?
9     A   I'm confused.  I think you just asked me
10  about four questions.
11    Q   Okay.  So let me start with how long were
12  you on the project, the Na'alehu project, from 2006
13  until what date?
14    A   Approximately a year and a half.
15    Q   So probably early 2008 then?
16    A   Approximately.
17    Q   Is that when the project started in 2006 or
18  did you come on to the project that was already under
19  way?
20    A   Again, I'm confused by the compound
21  question.
22    Q   Okay.  What part don't you understand of my
23  question?
24    A   I'm not sure I understood your question.
25    Q   When you started in 2006, had the project

---

40

1   began then or did you -- were you part of the team
2   that started that project?
3     A   The Na'alehu Ventures project started in
4   2006.
5     Q   So you came in at it's inception?
6     A   Yes.
7     Q   Were you part of the team that -- well,
8   strike that.
9         Between 2006 and 2008, was it your job to
10  raise any money to fund this project?
11    A   Can you give me the dates again?
12    Q   Between 2006 and 2008.
13    A   The question is just vague to me.
14    Q   Were you responsible for raising any money
15  at any time for the Na'alehu project, to fund it?
16    A   The Na'alehu Ventures, no.
17    Q   As any entity, were you responsible for
18  bringing money to that project under any of the
19  entities or in your own individual capacity?
20    A   Yes.
21    Q   And through what entity or was it just
22  through yourself that you brought money to that
23  project?
24    A   There were many entities.
25    Q   That you acted through to bring money to the

41

1 project?
2     MR. EVENSEN: Assumes facts not in evidence.
3     THE WITNESS: I'm not sure I understood.
4 BY MS. LEE:
5   Q   What do you mean by there were many
6 entities?  What do you mean by that?
7   A   There were many individuals or entities that
8 money was raised on behalf of.
9   Q   And were you responsible for that?
10  A   Some of it.
11  Q   And where did you get the funding that you
12 brought to this project?
13     MR. EVENSEN: Assumes facts not in evidence.
14     THE WITNESS: Again, the question just seems
15 very vague. I'm not sure I understand.
16 BY MS. LEE:
17  Q   Well, you have already testified that you
18 were responsible for raising some of the money for
19 the project. How did you raise that money?
20  A   It was contributed by myself and friends of
21 mine.
22  Q   Were they clients of yours or just friends?
23  A   Some of both.
24  Q   Was Mr. Murray one of those clients and/or
25 friends that contributed money to that project?

42

1   A   Yes.
2   Q   How much money did Mr. Murray contribute to
3 that project?
4   A   I don't recall.
5   Q   Was it less than a million dollars?
6   A   I don't recall.
7   Q   And did he contribute that money as an
8 investor or as a lender?
9   A   An investor.
10  Q   And did you have any type of contract or
11 agreement with Mr. Murray memorializing his
12 investment in that project?
13  A   I don't recall.
14  Q   Did he ever receive any return on his
15 investment from that project?
16     MR. EVENSEN: Objection to the term return
17 as vague.
18     THE WITNESS: I'm not sure I understand.
19 BY MS. LEE:
20  Q   Did he ever get any money back from his
21 investment?
22  A   I believe so.
23  Q   Do you know how much he got back?
24  A   I do not.
25  Q   And was that investment part of your

43

1 advisory business management scope of work that you
2 have with Mr. Murray?
3     MR. EVENSEN: Can you read the question
4 back, please?
5     (Thereupon, from the record above,
6     the reporter read, to wit:
7     "Q.  And was that investment part of
8     your advisory business management
9     scope of work that you have with
10     Mr. Murray?")
11     THE WITNESS: No.
12 BY MS. LEE:
13  Q   Did you solicit him for that investment or
14 did he just know about it by other means?
15  A   I don't recall.  I didn't solicit him.
16  Q   You did not?
17  A   I did not.
18  Q   If we could go back to what you stated were
19 your kind of duties with regards to Mr. Murray, I
20 think you listed three things and please correct me
21 if I'm wrong.  You said you handle his daily business
22 affairs, you manage his family issues and you assist
23 in life planning issues.  Did I represent that
24 correctly?
25  A   Sounds close.

44

1   Q   What daily business affairs of Mr. Murray's
2 do you manage or handle?
3     MR. EVENSEN: Is that today or over the last
4 17 years, Patty?
5 BY MS. LEE:
6   Q   That's a good question.  Why don't we stick
7 with from 2004 to the present.  What do you do to
8 handle his daily business affairs?
9   A   I assist Mr. Murray and his family with any
10 requests that they have for me.
11  Q   What type of requests?  I mean, is it
12 watching the kids, washing the dog?  I mean, what
13 category of services do you provide in terms of
14 handling their business affairs?
15  A   General family assistance.
16  Q   I don't know what that means, so why don't
17 you give me some examples of some specific things
18 that you do for them, for Mr. Murray's family?
19  A   I would help him in bill paying and
20 generally assist him with any and all third party
21 advisors that he has.
22  Q   What type of third party advisors?
23  A   It could be banks, insurance advisors.
24  Q   Attorneys?
25  A   Could be with attorneys.

---

45

1    Q   Has it ever been with attorneys?
2    A   I believe so.
3    Q   Do you invest money on Mr. Murray's behalf?
4    A   No.
5    Q   Have you ever?
6       MR. EVENSEN:  Objection to the term invest
7    as vague.
8       THE WITNESS:  I don't believe so.
9    BY MS. LEE:
10   Q   Have you ever loaned Mr. Murray's money on
11   his behalf?
12   A   I don't believe so.
13   Q   Have you ever established any financial
14   accounts for Mr. Murray?
15   A   No.
16   Q   Does Mr. Murray deal with you directly or
17   does he have a corporation that deals with you?
18   A   I deal with Mr. Murray.
19   Q   And what is your compensation for being
20   Mr. Murray's business manager from 2004 to the
21   present?
22   A   He pays Standard Advisors for business
23   management services.
24   Q   And how much does he pay Standard Advisors?
25   A   I don't recall.

---

46

1    Q   Is it a monthly rate?
2    A   No.
3    Q   Is it an hourly rate?
4    A   No.
5    Q   Is it a per transaction rate?
6    A   No.
7    Q   How is he billed?
8    A   He is billed quarterly.
9    Q   And is it a flat fee?
10   A   It's an agreed upon number.
11   Q   Is that number agreed upon each quarter?
12   I'm sorry, are you waiting for me to ask
13   another question?  I'm still waiting for you to
14   answer the last one.
15   A   I did.
16   Q   I didn't hear you then.
17   A   No.
18      MR. EVENSEN:  Let's read back the question
19   then.
20      (Thereupon, from the record above,
21      the reporter read, to wit:
22      "Q.  Is that number agreed upon each
23      quarter?")
24   BY MS. LEE:
25   Q   And your answer was no?

---

47

1    A   No.
2    Q   When do you guys agree on that number?
3    A   I believe back in 2003.
4    Q   So in 2003, there was a quarterly rate that
5    was set by and between yourself and Mr. Murray for
6    your services?
7    A   There was an agreement.
8    Q   Right, I understand there was an agreement,
9    but there was an agreed upon rate of payment to
10   Standard Advisors from Mr. Murray set back in 2003?
11   A   Can you read the question back?
12      (Thereupon, from the record above,
13      the reporter read, to wit:
14      "Q.  Right, I understand there was an
15      agreement, but there was an agreed
16      upon rate of payment to Standard
17      Advisors from Mr. Murray set back in
18      2003?")
19      THE WITNESS:  There was an agreement set
20   back in 2003, correct.
21   BY MS. LEE:
22   Q   For the amount that would be paid on a
23   quarterly basis specifically?
24   A   That there there would be a quarterly
25   payment to Standard Advisors by Mr. Murray, yes.

---

48

1    Q   Was that amount of that quarterly payment
2    established back in 2003?
3    A   We agreed in 2003 that there would be a
4    quarterly payment and that was established between
5    Mr. Murray and Standard Advisors in 2003.
6    Q   And was there a number, monetary figure
7    placed on that quarterly payment back in 2003?
8    A   There was not a specific monetary amount.
9    Q   How do you determine how much to charge
10   Mr. Murray on a quarterly basis?
11   A   It's a general consulting number based on
12   the amount of activity that I have for Mr. Murray.
13   Q   I know as attorneys we kind of keep track of
14   our time on an hourly basis and that's how our
15   clients are billed.  How do you quantify or put a
16   value to the amount of work that you have done for
17   Mr. Murray in any given quarter?
18   A   I don't know.
19   Q   You don't know how you come up with --
20   A   I don't track how you track on an hourly
21   basis.
22   Q   So how do you determine how much to charge
23   Mr. Murray in any given quarter?
24   A   It's approximately the same that I've
25   charged him since 2003.

## 49

1    Q   How much is that?
2    A   I don't recall.
3    Q   Who from Standard Advisors would know that?
4    A   I would know that, but I would have to refer
5    to documents I don't have in my presence.
6    Q   What document would you have to refer to to
7    get those numbers?
8    A   I could look at his quarterly billing.
9    Q   Do your quarterly billing statements
10   describe all of the work that Standard Advisors has
11   performed for Mr. Murray in that quarter for which
12   it's being billed?
13   A   No.
14   Q   Is there any -- are there any documents that
15   you provide to Mr. Murray to let him know what you
16   have done for him on a quarterly basis?
17   A   No.
18   Q   How is Mr. Murray kept informed of what work
19   you're doing for him on a quarterly basis, if at all?
20   A   We speak regularly.
21   Q   By phone?
22   A   Sometimes by phone.
23   Q   Sometimes in person?
24   A   Sometimes in person.
25   Q   Do you also communicate by e-mail?

## 50

1    A   I don't know if I communicate by e-mail with
2    Mr. Murray.  Typically, by phone or in person.
3    Q   Is Mr. Murray still in Massachusetts?
4    A   I don't know where Mr. Murray is.
5    Q   Do you know what state he lives in?
6    A   Yes.
7    Q   What state does he live in?
8    A   California.
9    Q   Do you know when he moved to California?
10   A   I do not.
11   Q   Has Mr. Murray been -- does he maintain
12   consistent timely payments to Standard Advisors after
13   being billed?
14   A   Yes.
15   Q   Have you ever brokered any insurance
16   policies for Mr. Murray?
17   A   No.
18   Q   Have you ever purchased or sold homes for
19   Mr. Murray?
20   A   No.
21   Q   Have you ever facilitated the filing of his
22   personal or business tax returns in any way?
23   A   Yes.
24   Q   Were they personal or business or both?
25   A   I would assist in all tax filings for

## 51

1    Mr. Murray.
2    Q   When you say assist, what would you do?
3    A   I would be the liaison between his third
4    party tax advisor.
5    Q   So then would you assist Mr. Murray in
6    actually filling out the necessary tax forms?
7    A   No.
8    Q   So when you say liaison, what did you do as
9    a liaison?
10   A   Assisted the tax advisor and Mr. Murray in
11   gathering his tax information.
12   Q   So would Mr. Murray then communicate to you
13   and you would communicate to the hired tax entity?
14   A   Sometimes.
15   Q   And for what years have you done that for
16   Mr. Murray?
17        MR. EVENSEN:  Done what?
18   BY MS. LEE:
19   Q   Acted as a liason between yourself and third
20   party taxing entities?
21   A   As long as I can recall.
22   Q   Okay.  Are you, yourself, a certified public
23   accountant?
24   A   No.
25   Q   Have you ever advised Mr. Murray with

## 52

1    regards to any will, trusts or estate planning?
2    A   In what capacity, advise?
3    Q   In any capacity.  Have you ever done
4    anything with Mr. Murray with regards to any wills,
5    trusts or estate planning?
6    A   I have assisted as a liaison with attorneys
7    for that purpose.
8    Q   What is your understanding of Mr. Murray's
9    claims against my client, Mr. Jowdy, in this
10   litigation?
11   A   Can you be more specific, please?
12   Q   What is your understanding of why we are
13   here today?  What is this lawsuit all about?
14   A   Mr. Murray loaned Mr. Jowdy funds and would
15   like to be repaid.
16   Q   And what was your role with regards to the
17   funds that were loaned from Murray to Jowdy?
18   A   Mr. Jowdy told me he was looking for funds
19   to acquire three residential units in Las Vegas and
20   asked me if anyone I knew would be willing to loan
21   him money for 30 days at ten percent interest for 30
22   days and Glen Murray agreed that he would do that.
23   Q   So did Mr. Jowdy approach you in person, by
24   phone?  How did he communicate this information to
25   you?

53

1    A   I don't recall.
2    Q   And I assume then that you communicated
3   something to Mr. Murray to convince him to loan Jowdy
4   this money?
5        MR. EVENSEN:  Objection to the term
6   convince.
7        THE WITNESS:  I'm not sure I understood the
8   question.
9   BY MS. LEE:
10   Q   Well, you said that Mr. Jowdy asked you if
11  you knew anyone that could loan him money, is that
12  correct?
13   A   That is correct.
14   Q   What was your response to him?
15   A   I told him I would ask some people that
16  might be able to.
17   Q   And did you?
18   A   I did.
19   Q   And was Mr. Murray one of those people?
20   A   Mr. Murray was one of those people.
21   Q   And what did you say to Mr. Murray when you
22  presented this loan request?
23   A   I don't recall specifically.
24   Q   Okay.  Do you recall generally what you said
25  to Mr. Murray?

54

1    A   Yes.
2    Q   What did you say generally?
3    A   Generally, I recall telling Mr. Murray that
4   his partner in Mexico, Ken Jowdy, was looking for a
5   loan for approximately 30 days and ten percent and I
6   told Mr. Murray that I could not facilitate it myself
7   at the time, but he knew Mr. Jowdy from his
8   investment in Diamonte Del Mar and based on several
9   years of history would appear to be a trustworthy
10  individual and Mr. Murray said, okay, I'll lend him
11  the money for 30 days at ten percent.
12   Q   And how much money did you convey to
13  Mr. Murray that Jowdy needed?
14       MR. EVENSEN:  Objection, lacks foundation,
15  convey that he needed.
16  BY MS. LEE:
17   Q   Go ahead.
18   A   Can you ask the question again, please.
19   Q   How much money did you tell Murray Jowdy
20  needed?
21   A   I believe it was approximately $800,000.
22   Q   And when you said that based on several
23  years of history, were you talking about several
24  years of history with regards to your relationship
25  with Mr. Jowdy or Mr. Murray's relationship with

55

1   Mr. Jowdy?
2    A   Mr. Murray's relationship with Mr. Jowdy.
3    Q   So it's your understanding that Mr. Murray
4   has had some type of relationship with Mr. Jowdy for
5   several years?
6    A   He was an investor in Mr. Jowdy's Diamonte
7   Del Mar project.
8    Q   Personally or through a company?
9    A   Mr. Murray was personally an investor in one
10  of Mr. Jowdy's companies.
11   Q   Did you introduce Mr. Murray to Mr. Jowdy?
12   A   Yes, I did.
13   Q   Did you facilitate in any way Mr. Murray's
14  investment in the Diamonte Del Mar project?
15   A   I introduced Mr. Murray to Mr. Jowdy.
16   Q   And then did you step out of the equation
17  and just let them handle this investment directly or
18  did you play any part in that?
19   A   I was his business advisor, his business
20  manager.
21   Q   So what did you do with regard to this
22  specific investment, Diamonte Del Mar, as
23  Mr. Murray's business advisor?
24   A   As his business manager, I helped Mr. Jowdy
25  and Mr. Murray communicate with respect to paperwork

56

1   like I would do with an accountant or like I would do
2   with an estate planner.
3    Q   Did you ever receive any funds from
4   Mr. Murray to pass along to Mr. Jowdy for the
5   Diamonte Del Mar project?
6    A   No.
7    Q   How much money did Mr. Murray invest in that
8   project?
9    A   $500,000.
10   Q   And this is Diamonte Del Mar, not Diamonte,
11  the Cabo San Lucas one that you spoke of earlier?
12   A   Correct.
13   Q   So once Mr. Murray agreed to give
14  Mr. Jowdy -- well, let me ask this question.  Did
15  Mr. Murray agree to give Mr. Jowdy the entire
16  $800,000?
17   A   Yes.
18   Q   And then did you communicate that back to
19  Mr. Jowdy?
20   A   Yes.
21   Q   What did you tell Mr. Murray with regards to
22  the loan terms, the terms of the loan?
23   A   As I stated before, Mr. Jowdy was looking
24  for approximately $800,000 for 30 days and would pay
25  him a ten percent return.

57

1    Q    And were these properties that Mr. Jowdy was
2  looking to purchase, were those the Palms units?
3    A    Yes.
4    Q    And do you remember how many he was trying
5  to purchase?
6    A    As I stated before, there were three.
7    Q    Okay.  Did you own any units within the
8  Palms at any point?
9    A    No.
10   Q    Did you own any partial interest in any of
11 the units at any point?
12   A    No.
13   Q    Did any companies in which you had ownership
14 interest own any units in the Palms at any point?
15   A    No.
16   Q    Did you invest in any of the Palms units as
17 an investor?
18   A    No.
19   Q    Did you loan any money to anyone for the
20 purposes of -- directly, did you directly loan any
21 money to anyone for the purpose of purchasing units
22 in the Palms?
23       MR. EVENSEN:  Just so I'm clear, when you
24 ask directly, are you saying Mr. Kenner personally or
25 as the agent.

58

1        MS. LEE:  No, just personally, directly.
2        THE WITNESS:  Can you ask the question
3  again?  It was vague.
4        MS. LEE:  Go ahead and read it back.
5        (Thereupon, from the record above,
6        the reporter read, to wit:
7        "Q.  Did you loan any money to anyone
8        for the purposes of -- directly, did
9        you directly loan any money to
10       anyone for the purpose of purchasing
11       units in the Palms?")
12       THE WITNESS:  Can you ask the question
13 again?  It was vague.
14 BY MS. LEE:
15   Q    Sure.  Did you ever loan anybody any money
16 so that they could purchase money in the Palms?  I
17 mean, Mr. Kenner, did you loan any money out of your
18 pocket to anyone?
19   A    Again, the question is very vague.  Can you
20 ask it again, please?
21   Q    Do you know what a loan is?
22   A    Yes.
23   Q    Did you loan anybody any money for the
24 purposes of allowing them to purchase units within
25 the Palms?  And I don't mean as an agent for anyone

59

1  else, I mean you.  Did you loan anybody any money?
2    A    No.
3    Q    Did you loan any money to any entity, so any
4  entities could purchase any units within the Palms?
5    A    No.
6        MR. EVENSEN:  Belated objection and, Patty,
7  in your last question, when you say did you, you mean
8  again as a direct individual?
9        MS. LEE:  As a direct individual, right.
10 BY MS. LEE:
11   Q    Were there any entities that you have any
12 ownership interest in that loaned any money to
13 anybody to purchase interest in the Palms?
14   A    Can you read that question back?
15       (Thereupon, from the record above,
16       the reporter read, to wit:
17       "Q.  Were there any entities that you
18       have any ownership interest in that
19       loaned any money to anybody to
20       purchase interest in the Palms?")
21       THE WITNESS:  I don't believe so.
22 BY MS. LEE:
23   Q    So how soon after that how much time elapsed
24 between the time you communicated to -- I'm sorry,
25 that Murray communicated to you that he would be

60

1  willing to give Jowdy that loan to the time that you
2  told Jowdy that Murray was going to loan him the
3  money?
4    A    I would assume the same day.  Mr. Jowdy was
5  desperate for the money.
6    Q    And how soon after that were the funds
7  actually sent?
8    A    I'm sure within a day.
9    Q    Do you know how those monies were sent?
10   A    By wire transfer.
11   Q    And how do you know that?
12   A    Because that's how they were requested.
13   Q    So you assumed that it was sent by wire
14 transfer because that's the way it was requested or
15 do you have some independent knowledge that it was
16 actually sent by wire transfer?
17   A    I assisted Mr. Murray in wire transferring
18 the funds for Mr. Jowdy's benefit.
19   Q    Were those funds all wired at once or were
20 they wired in increments?
21   A    They were wired in three separate
22 increments.
23   Q    And where were they wired to?
24   A    They were wired to escrow accounts in
25 Mr. Jowdy's name in -- I assume, in Las Vegas.

61

1   Q   So is it your testimony that the funds that
2   Jowdy requested to borrow were -- I'm sorry, let's
3   strike that.
4       Is it your testimony that you had no
5   interest in the money that was being borrowed by
6   Mr. Jowdy?
7   A   Yes.
8   Q   So you didn't in any way need any part of
9   this $800,000 for yourself?
10  A   Absolutely not.
11  Q   Now, what did you tell Mr. Jowdy with
12  regards to this money that was being borrowed from
13  Mr. Murray?
14  A   I told him, to the best of my recollection,
15  that Mr. Murray agreed to the terms he set forth as
16  Mr. Jowdy presented to me, that the funds would be
17  repaid within 30 days plus ten percent interest.
18  Q   Did you ever present Mr. Jowdy with any loan
19  documents or notes?
20  A   No.
21  Q   Did Mr. Murray require any?
22  A   We discussed it, but the terms were so
23  quick, we expected Mr. Jowdy was going to be repaying
24  the loan within 30 days.
25  Q   And so that's why there was never any

62

1   memorialization of this loan in writing?
2   A   I don't recall.
3   Q   Did you guys discuss what would happen if
4   that money was not repaid within 30 days?
5   A   We had no expectation that it wasn't going
6   to be repaid within 30 days.
7   Q   So there was never any discussion as to what
8   would happen if the monies were not paid within those
9   30 days?
10  A   I don't recall any discussions with respect
11  to that. We expected the monies to be repaid within
12  30 days.
13  Q   Did you present Mr. Murray with any
14  documentation evidencing why Jowdy needed this loan?
15  A   I don't recall what documentation Mr. Murray
16  saw.
17  Q   Did you present Mr. Murray with any
18  documentation, whatsoever?
19  A   I don't recall.
20  Q   And when you were presenting this loan to
21  Mr. Murray, were you doing so in your capacity as his
22  business management advisor?
23  A   I don't know if I thought about it.
24  Q   Okay. Well, now that you look back on it,
25  were you doing that in your capacity as his business

63

1   manager or as just a friend?
2   A   I don't recall my state of mind at the time
3   or my thought process. That was several years ago.
4   Q   Well, I would represent to you that it's my
5   understanding that you were Mr. Jowdy's agent with
6   respect to that transaction. Would you
7   characterize -- I'm sorry, Mr. Murray's, that you
8   were Mr. Murray's agent with regards to this
9   transaction. Would you agree with that or disagree
10  with that?
11  A   I'm not sure I understand the specific
12  definition of agent in the context you're presenting.
13  Q   What do you believe an agent to mean?
14      MR. EVENSEN: Objection to the extent it
15  calls for a legal conclusion.
16      Go ahead and answer if you can.
17      THE WITNESS: I don't know if I understand
18  the legal distinction.
19  BY MS. LEE:
20  Q   Okay. Were you asking for the funds as
21  Mr. Jowdy's agent in any way?
22  A   Again, I'm not sure I understand the context
23  of a legal description of agent, in that capacity.
24  Mr. Jowdy asked me as a friend if I could help him
25  personally and I said no and then he asked if I could

64

1   ask any friends of mine.
2   Q   Okay.
3   A   Are we going to break for lunch at some
4   point?
5   Q   Yes. I was going to say this is a good
6   point to break for lunch. Why don't we break -- it
7   looks like it's 12:20. Be back at 1:20?
8       MR. EVENSEN: Sounds good.
9       (Thereupon, a lunch recess was taken from
10          12:17 p.m. until 1:25 p.m.)
11  BY MS. LEE:
12  Q   Let's go back on the record.
13      Mr. Kenner, when were the funds transferred
14  from Mr. Murray to Mr. Jowdy, the loan monies?
15  A   The loan monies were transferred
16  approximately June of 2005.
17  Q   Do you know what Mr. Jowdy did with the
18  money after that?
19  A   I do not.
20  Q   Did you have any further involvement with
21  that money once it was transferred to Mr. Jowdy?
22  A   Other than requesting from time to time for
23  the repayment of the funds, nothing.
24  Q   So you didn't see where the money went after
25  it was transferred to Mr. Jowdy?

65

1    A    No.
2    Q    Do you know whether or not -- well, I
3  believe you testified that the money was actually
4  transferred into an escrow account, is that right?
5    A    No.
6    Q    I'm sorry, to the best of your
7  understanding, where were those funds transferred to?
8    A    They were transferred into three separate
9  escrow accounts.
10   Q    Okay.  And was that because there were three
11  separate units being purchased?
12   A    I believe so.
13   Q    Did you, in any way, alert Mr. Jowdy to this
14  purchasing opportunity at the Palms?
15   A    I don't believe I alerted him to the actual
16  purchase opportunity.
17   Q    Were you aware that there were units for
18  sale the at the Palms?
19   A    Yes.
20   Q    And how did you become aware of that?
21   A    I became aware through some other friends of
22  mine who were acquiring units.
23   Q    And which friends were those?  Can I have
24  their names, please?
25   A    Tommy Constantine and Michael Andretti.

66

1    Q    And they informed you that they were
2  purchasing units at the Palms?
3    A    Yes.
4    Q    Did you facilitate those purchases in any
5  way?
6    MR. EVENSEN:  Which purchases?
7    THE WITNESS:  No.
8  BY MS. LEE:
9    Q    Mr. Constantine's and Mr. Andretti's
10  purchase of their units at the Palms?
11   A    Not at all.
12   Q    Did Mr. Constantine and Mr. Andretti alert
13  you to their purchase of units at the Palms before or
14  after Jowdy requested funds from Mr. Murray?
15   A    Before.
16   Q    Did you, in any way, facilitate Mr. Jowdy's
17  purchase or attempted purchase of any units within
18  the Palms outside of the loan from Murray?
19   A    Mr. Jowdy had asked me to set up a personal
20  meeting for Roger Clemens; his wife, Debbie Clemens
21  and himself to meet with George Maloof at the Palms.
22   George put on a private presentation for
23  Roger and Debbie Clemens and Ken Jowdy that I
24  attended.  At the end of that meeting, Roger and
25  Debbie Clemens took the paperwork and signed a

67

1  purchase and sale agreement to acquire a penthouse
2  unit at the Palms Hotel.  And to the best of my
3  recollection, Mr. Jowdy signed for three units in his
4  name that day.
5    Q    And who are Roger and Debbie Clemens to you?
6    A    I'm not sure I understand.
7    Q    Well, how do you know them?
8    A    I have met them through Mr. Jowdy.
9    Q    Okay.  Do you understand Clemens to have any
10  relationship to Ken Jowdy?
11   A    I'm not sure I understand.
12   Q    What is your understanding of the
13  relationship between the Clemens' and Mr. Jowdy?
14   A    I believe they have been close acquaintances
15  for many years.
16   Q    And Mr. Jowdy asked you to set up a meeting
17  with Mr. Maloof for himself and the Clemens'?
18   A    That's correct.
19   Q    And did you know George Maloof personally?
20   A    Yes.
21   Q    How did you come to know Mr. Maloof?
22   A    Through Tommy Constantine and Michael
23  Andretti.
24   Q    Was that through their purchases of the
25  Palms property?

68

1    A    No.
2    Q    So Mr. Constantine and Mr. Andretti knew the
3  Maloofs or actually George Maloof and introduced you,
4  is that how that worked?
5    A    That's correct.
6    Q    And do you recall when that meeting took
7  place, the private presentation by Mr. Maloof?
8    A    I believe early in 2005.  Debbie Clemens was
9  at the same time presenting a new fashion line that
10  she had designed and was in town.
11   Q    And was it at some point after that meeting
12  that Mr. Jowdy asked him to help you secure funds for
13  the purchase of those units?
14   A    Yes.
15   MR. EVENSEN:  Patty, just for clarification,
16  when you said after that meeting, you mean the
17  meeting with Mr. Maloof, the Clemens' and so forth?
18   MS. LEE:  Yes.  Thank you for that, private
19  presentation.
20  BY MS. LEE:
21   Q    When was the first time you approached
22  Mr. Jowdy about repaying that money to Mr. Murray?
23   A    I don't recall exactly, but I would assume
24  within two months of the original outlay of funds by
25  Mr. Murray.

69

1  Q   Were you communicating with Mr. Murray about
2  the status of those loans?  Of that loan rather?
3  A   I speak with Mr. Murray on a very regular
4  basis about all of his business.
5  Q   Including this loan?
6  A   I don't see any reason why I would not be.
7  Q   Did there come a time where Mr. Murray began
8  to put pressure on you to obtain these funds from
9  Mr. Jowdy?
10  A   I'm not sure I understand what you mean by
11  pressure.
12  Q   Well, what is your understanding of
13  pressure?
14  A   I don't know.  It's varied definitions of
15  pressure.
16  Q   Did you feel like you were being pressured
17  at all by Mr. Murray to obtain those loan funds back
18  from Mr. Jowdy?
19  A   Again, I'm not sure what you mean by
20  pressured.
21  Q   Whatever your definition in your mind is of
22  pressure.
23  Okay.  Well, let me ask it this way.  Was
24  Mr. Murray asking you to obtain those funds back from
25  Mr. Jowdy?

70

1  A   On a regular basis.
2  Q   How frequently?
3  A   I don't recall.
4  Q   Did it make you feel anxious at all that he
5  was asking you this?
6  A   I don't believe I recall my particular
7  emotion during any of those conversations.
8  Q   Okay.  Have you had an opportunity to review
9  the complaint that has been filed in this case by
10  Mr. Murray against Mr. Jowdy?
11  A   Yes.
12  Q   Did you have any involvement in supplying
13  Holland & Hart with the factual basis for that
14  complaint?
15  MR. EVENSEN:  To the extent that it calls
16  for the disclosure of any attorney/client privileged
17  communications with Holland & Hart, I'm going to ask
18  you not to answer.
19  To the extent you can answer the question
20  without revealing any privileged communications, go
21  ahead and do so.
22  THE WITNESS:  Can you ask the question
23  again?
24  (Thereupon, from the record above,
25  the reporter read, to wit:

71

1  "Q.  Did you have any involvement in
2  supplying Holland & Hart with the
3  factual basis for that complaint?")
4  THE WITNESS:  Yes, in the context that I
5  assist Mr. Murray in all aspects of his business
6  affairs.
7  BY MS. LEE:
8  Q   Do you recall there being allegations in the
9  complaint of where the money that Mr. Murray gave --
10  the money that Mr. Jowdy received from Mr. Murray,
11  where those funds went to after he received them?
12  A   I don't recall specifically.
13  Q   Do you have any understanding or knowledge
14  as to money coming from Mr. Murray going to purchase
15  a Las Vegas home?
16  A   I don't believe Mr. Murray owns a Las Vegas
17  home.
18  Q   No, for Mr. Jowdy to purchase a Las Vegas
19  home?
20  MR. EVENSEN:  Read the last two questions
21  again.
22  BY MS. LEE:
23  Q   Let me just ask the question again to
24  clarify.
25  Do you have any understanding as to any part

72

1  of that $800,000 that we have been talking about --
2  do you have any understanding as to part of those
3  funds going to purchase a Las Vegas home for
4  Mr. Jowdy?
5  A   Can you read the question back again?
6  (Thereupon, from the record above,
7  the reporter read, to wit:
8  "Q.  Do you have any understanding as
9  to any part of that $800,000 that we
10  have been talking about -- do you
11  have any understanding as to part of
12  those funds going to purchase a Las
13  Vegas home for Mr. Jowdy?")
14  THE WITNESS:  I believe so.
15  (Thereupon, a recess was taken from.
16  1:46 p.m. until 1:51 p.m.)
17  BY MS. LEE:
18  Q   We're back on the record.
19  I believe when we left, I was asking you
20  whether or not any part of Mr. Murray's money, the
21  $800,000 had gone to purchase a Las Vegas home for
22  Mr. Jowdy and I believe your response was you believe
23  so.
24  A   Can you read back my response?
25  (Thereupon, from the record above,

73

1    the reporter read, to wit:
2    "A.  I believe so")
3    BY MS. LEE:
4    Q    Okay.  So how did you come to that belief or
5    understanding?
6        MR. EVENSEN:  To the extent it calls for
7    attorney/client -- disclosure of attorney/client
8    privilege, I'll ask you not to answer, but to the
9    extent you can answer without disclosing that
10   information, please go ahead and do so.
11       THE WITNESS:  I don't recall when I learned
12   about it.
13   BY MS. LEE:
14   Q    Did you have an understanding as to any
15   deposits that were to be paid on the Palms units by
16   Mr. Jowdy?
17       MR. EVENSEN:  Read the question back,
18   please.
19       (Thereupon, from the record above,
20       the reporter read, to wit:
21       "Q.  Did you have an understanding as
22       to any deposits that were to be paid
23       on the Palms units by Mr. Jowdy?")
24       THE WITNESS:  Did I have an understanding?
25

74

1    BY MS. LEE:
2    Q    Yes.
3    A    Yes.
4    Q    And what is your understanding with regards
5    to any deposits that needed to be made on any of
6    those Palms units by Mr. Jowdy?
7    A    My understanding was that Mr. Jowdy had to
8    make deposits on those Palms units.
9    Q    And were they -- do you know the difference
10   between hard money deposits and soft money deposits?
11       MR. EVENSEN:  To the extent it calls for a
12   legal conclusion.  Go ahead and answer.
13       THE WITNESS:  I believe so.
14   BY MS. LEE:
15   Q    Do you know whether or not Mr. Jowdy had to
16   make hard money deposits on those Palms units or soft
17   money deposits or both?
18   A    I don't know.
19   Q    Did you give Mr. Jowdy any money outside of
20   the Murray funds to pay for any deposits on those
21   Palms units?
22   A    I don't recall.
23   Q    Is it possible that you could have?
24   A    I don't recall.
25   Q    But is it possible that you could have?

75

1    A    Sure, anything's possible.
2    Q    Had you loaned any money to Mr. Jowdy
3    personally in the past?
4        MR. EVENSEN:  Past of when, as of yesterday?
5        MS. LEE:  Yes, as of yesterday.
6        MR. EVENSEN:  Patty, when you say you, you
7    mean him individually?
8        MS. LEE:  Him individually, not as an agent
9    for anyone else.
10       THE WITNESS:  Yes.
11       ///.
12   BY MS. LEE:
13   Q    On how many occasions?
14   A    I don't recall.
15   Q    In what amounts?
16   A    I don't recall off the top of my head.
17   Q    Was it more than $50,000?
18   A    I don't recall the specific amounts.
19   Q    You have no estimate of how much money you
20   have ever loaned to Mr. Jowdy?
21   A    As I sit here today, I don't recall.
22   Q    When was the last time you loaned Mr. Jowdy
23   any money?
24   A    To the best of my recollection, two to three
25   years ago.

76

1    Q    And did Mr. Jowdy ever pay you back on those
2    loans?
3    A    Not in their entirety.
4    Q    Do you have any understanding as to how much
5    Mr. Jowdy still owes you on any of those loans?
6    A    I do not.
7    Q    Have you pursued collection of those monies
8    in any way?
9    A    Yes.
10   Q    What have you done?
11   A    Filed a lawsuit in Arizona against Mr. Jowdy
12   on behalf of myself and several entities.
13   Q    When did you file that action?
14   A    I believe within the last year.
15   Q    And when you said on behalf of yourself and
16   several other entities, what other entities?
17   A    The partners of the Little Isle IV, LLC.
18   Q    Anyone else?
19   A    Not that I recall.
20   Q    How many partners are there in Little Isle
21   IV, LLC?
22   A    I don't know.
23   Q    I believe you testified earlier that you are
24   the managing member of that company?
25   A    That is correct.

77

1    Q   But you don't know how many partners there
2  are in that company?
3    A   I do not.
4    Q   Do you have any estimate of how many
5  partners there are in that company?
6    A   Yes.
7    Q   What is your best estimate?
8    A   Approximately 20.
9    Q   And by partners, do you mean people who have
10 ownership interest in that company?
11   A   Yes.
12   Q   And I believe you stated you don't know
13 whether or not you own any interest in that company?
14   A   That's correct.
15   Q   Who from Little Isle IV, LLC would know
16 that, whether or not you had any ownership interest
17 in that company?
18   A   I would.
19   Q   But you don't know?
20   A   As I sit here right now, I can't tell you
21 off the top of my head.
22   Q   Would you have to look at some document to
23 refresh your memory?
24   A   Yes.
25   Q   What document would you need to see?

78

1    A   The operating agreement of Little Isle IV.
2    Q   Do you know whether or not Mr. Jowdy
3  ultimately purchased units at the Palms?
4    A   I believe he did not.
5    Q   How did you come to that understanding?
6        Actually, let me ask this question, strike
7  that.  When did you come to learn that Mr. Jowdy had
8  not purchased any units at the Palms?
9    A   I don't recall.
10   Q   Was it in the year 2009, this year?
11   A   No.
12   Q   Was it in 2008?
13   A   I don't believe so.
14   Q   Was it in 2007?
15   A   I don't believe so.
16   Q   2006?
17   A   I don't recall.
18   Q   How did you come to know that Mr. Jowdy had
19 not purchased those units?
20   A   I believe Mr. Jowdy had told me.
21   Q   And what did he tell you with respect to
22 that?
23   A   I didn't buy those units.
24   Q   Did he tell you why?
25   A   I don't recall specifically.

79

1    Q   Other than the initial meeting with George
2  Maloof, did you have any interaction with anyone at
3  the Palms on Mr. Jowdy's behalf in terms of
4  purchasing those units?
5    A   I don't recall.
6    Q   Would there be any reason for you to have
7  any interaction with anyone at the Palms for the
8  purposes of Mr. Jowdy purchasing those units?
9    A   There could be.
10   Q   What reasons would those be?
11   A   Mr. Jowdy may have asked me to.
12   Q   Did you have some type of personal
13 relationship with the Palms other than your
14 relationship with George Maloof?
15   A   I don't believe so.
16   Q   Would he be asking you just as a friend to
17 do something or interact with people at the Palms on
18 his behalf?
19       MR. EVENSEN:  You mean George Maloof or do
20 you mean Mr. Jowdy?
21 BY MS. LEE:
22   Q   Mr. Jowdy.
23   A   Can you read the question back?
24       (Thereupon, from the record above,
25       the reporter read, to wit:

80

1        "Q   Would he be asking you just as a
2        friend to do something or interact
3        with people at the Palms on his
4        behalf?")
5        THE WITNESS:  Can you ask the question
6  again?  That appeared to be ambiguous.
7  BY MS. LEE:
8    Q   Well, okay, let me ask it this way.  Did you
9  have any -- had you previously, previous to the Palms
10 deal, ever facilitated any contracts on behalf of
11 Mr. Jowdy for his own personal benefit?
12       MR. EVENSEN:  Object to the predicate to the
13 question, but go ahead and answer it.  It implies
14 facts not in evidence.
15       THE WITNESS:  I don't recall.
16 BY MS. LEE:
17   Q   If you had done any work for Jowdy, and by
18 work I mean spoken to anyone at the Palms on his
19 behalf for the purchase of those units, would you
20 have kept Mr. Murray apprised of those
21 communications?
22       MR. EVENSEN:  Incomplete hypothetical.
23       Go ahead and answer it.
24       THE WITNESS:  In the event that hypothetical
25 situation existed?

81

1    BY MS. LEE:
2        Q    If you had communicated with anyone at the
3    Palms on Mr. Jowdy's behalf, would you have
4    communicated that information to Mr. Murray?  Would
5    that be something that you would communicate to
6    Mr. Murray?
7        A    Well, I don't know.  I'm not sure I
8    understand the context.
9        Q    Well, the context is the purchase of the
10   units at the Palms and whether or not you would have
11   communicated any of your knowledge of that
12   transaction to Mr. Murray as it was occurring?
13       MR. EVENSEN:  Objection, incomplete
14   hypothetical.
15       THE WITNESS:  Again, I'm not sure I
16   understand the question.
17   BY MS. LEE:
18       Q    Did you communicate to Mr. Murray about what
19   was going on with Mr. Jowdy's purchase of the Palms
20   units at the time he was attempting to purchase them?
21       A    Yes.
22       Q    What were you communicating to him?
23       A    Mr. Jowdy needed funds to close on three
24   units at the Palms and had requested a personal loan
25   from Glen Murray.

82

1        Q    After the funds were received from
2    Mr. Jowdy, the $800,000, did Mr. Murray and you
3    communicate about what Jowdy's progress was in terms
4    of purchasing those units?
5        A    No funds were ever received by Mr. Jowdy.
6        Q    I mean Mr. Murray.
7        MR. EVENSEN:  Yes, I was trying to catch it.
8    Your first phrase in had it backwards.
9    BY MS. LEE:
10       Q    So at any time after Mr. Jowdy received the
11   funds from Mr. Murray, did you communicate to
12   Mr. Murray the status of Mr. Jowdy's purchase of
13   those Palms units?
14       A    I don't recall.
15       Q    Do you recall whether or not Mr. Murray was
16   asking you for updates on how that purchase was going
17   with regards to the money he loaned?
18       A    I don't believe so.
19       Q    After 60 days of that loan being
20   outstanding, was Mr. Murray asking you what the
21   status was of the purchase of those units at the
22   Palms?
23       A    No.
24       Q    Did you communicate with Mr. Murray in
25   writing with regards to the status of the repayment

83

1    of that loan from Mr. Jowdy?
2        A    I don't recall.
3        Q    Do you know whether or not Mr. Jowdy owns a
4    house in Las Vegas?
5        A    I don't know.
6        Q    Did you have any involvement with assisting
7    Mr. Jowdy in purchasing a home in Las Vegas?
8        A    Yes.
9        Q    So when was that?
10       A    Several years ago.
11       Q    How many years ago?
12       A    I don't recall.
13       Q    What was your involvement in terms of
14   helping Mr. Jowdy purchase the home?
15       A    He told me that he and his friend, Mark
16   Thalmann, were going to acquire a home in Las Vegas
17   and had asked if I had any banking relationships that
18   could help them close on the home.
19       Q    And what was your response?
20       A    Yes.
21       Q    And did you facilitate a relationship
22   between Mr. Jowdy and Mr. Thalmann and a bank?
23       A    I don't recall specifically.
24       Q    Did you participate in any way in the
25   funding for that home?

84

1        MR. EVENSEN:  Individually?
2    BY MS. LEE:
3        Q    In any capacity.
4        A    It's too broad for me to understand what
5    you're asking.
6        Q    Did you contribute any money to the purchase
7    of that home or help raise money for the purchase of
8    that home or obtain funds for the purchase of that
9    home?
10       MR. EVENSEN:  Objection, compound.
11   BY MS. LEE:
12       Q    Any three of those scenarios, did you do any
13   of those things?
14       A    Can you read the question back?  I got lost
15   in the question.
16       MS. LEE:  If you could just ask one section
17   and stop.  So that way, it won't be compound for Lars
18   and then we'll go on.
19       (Thereupon, from the record above,
20       the reporter read, to wit:
21       "Q.  Did you contribute any money to
22       the purchase of that home -- ")
23       THE WITNESS:  Personally?
24   BY MS. LEE:
25       Q    Personally.

85

1    A   I don't believe so.
2        (Discussion off the record.)
3        THE WITNESS:  Could I get the whole question
4    read back, please?
5        (Thereupon, from the record above,
6        the reporter read, to wit:
7        "Q.  Did you contribute any money to
8        the purchase of that home or help
9        raise money for the purchase of that
10       home or obtain funds for the
11       purchase of that home?")
12   BY MS. LEE:
13   Q   So you just testified that you, yourself,
14   did not contribute any money for the purchase of that
15   home or you don't recall?
16   A   I don't recall.
17   Q   Do you know if any business entities for
18   which you have an ownership interest in contributed
19   monies towards the purchase of that home?
20   A   I believe one of the business entities that
21   I have an interest in loaned Mr. Jowdy and
22   Mr. Thalmann some funds for the purchase of that
23   home.
24   Q   So that was a loan to both Mr. Jowdy and
25   Mr. Thalmann?

86

1    A   It was a loan to Mr. Jowdy.  I don't know
2    how Mr. Jowdy and Mr. Thalmann delineated their
3    obligations.
4    Q   But the company you're referring to loaned
5    the funds to Mr. Jowdy?
6    A   Yes.
7    Q   And how much money was loaned to Mr. Jowdy?
8    A   I believe a couple hundred thousand.
9    Q   Did Mr. Jowdy ever pay that money back?
10   A   I believe so.
11   Q   How soon thereafter?
12   A   I believe a few months later.
13   Q   And is it your testimony as you sit here
14   today you have no knowledge as to whether or not the
15   home that we're talking about right now was in any
16   way funded with Mr. Murray's money?
17       THE WITNESS:  Can you read the question
18   back?
19       (Thereupon, from the record above,
20       the reporter read, to wit:
21       "Q.  And is it your testimony as you
22       sit here today you have no knowledge
23       as to whether or not the home that
24       we're talking about right now was in
25       any way funded with Mr. Murray's

87

1        money?")
2        THE WITNESS:  I've never specifically
3    tracked the funds back to Mr. Murray's money on my
4    own accounting.
5    BY MS. LEE:
6    Q   Do you have any reason to believe that any
7    funding for that home was -- I'm sorry, let me reask
8    that.
9        Do you have any reason to believe that
10   Mr. Murray's money was used for any part of the
11   funding of that home?
12   A   It's possible.
13   Q   But do you have any reason to believe it?
14   Like you said anything is possible, but do you have
15   any specific reason to believe that is the case?
16   A   I believe it's possible.  I don't know why I
17   believe it, but I believe it's possible.
18   Q   But you have no basis for that belief?
19   A   Not specifically.
20   Q   Were you asked at any point in time from
21   Mr. Murray what happened to his $800,000?
22   A   Not specifically.
23   Q   What about generally?
24   A   I was asked when he was going to get his
25   money back.

88

1    Q   But he never asked what happened to it,
2    where did it go, where is it now?
3    A   I'm sure Mr. Murray doesn't care.  He just
4    wants his money back.  It was a 30-day loan that's
5    lasted almost four years now.
6    Q   But my question was, he has never asked you
7    where his money went?
8    A   I don't recall.  Mr. Murray knows that he
9    deposited money into three separate escrow accounts
10   and has been waiting four years to receive his money
11   back.
12   Q   And he did that at your request, is that
13   right?
14   A   No.
15   Q   Whose request did he do it at?
16   A   Mr. Jowdy's request.
17   Q   Did Mr. Jowdy speak with Mr. Murray
18   directly?
19   A   I don't believe so.
20   Q   So you communicated that request to
21   Mr. Murray, isn't that right?
22   A   Correct.
23   Q   The loans that you are suing Mr. Kenner for
24   in the Arizona litigation -- I'm sorry, Mr. Jowdy for
25   in the Arizona litigation, were those -- let me start

89

1   the whole question over.
2       The loans on which you are suing Mr. Jowdy
3   for in the Arizona litigation, were those loans
4   accrued prior to the time you gave him the $200,000
5   loan for the Las Vegas home or after?
6       A   Can you read that question back?
7           (Thereupon, from the record above,
8            the reporter read, to wit:
9           "Q.  The loans on which you are suing
10           Mr. Jowdy for in the Arizona
11           litigation, were those loans accrued
12           prior to the time you gave him the
13           $200,000 loan for the Las Vegas home
14           or after?")
15       THE WITNESS:  The question is too ambiguous
16   for me to answer.
17   BY MS. LEE:
18       Q   Well, you're suing Mr. Jowdy for some loans
19   in Arizona, correct?
20       A   Yes.
21       Q   Were those loans made before you loaned him
22   the $200,000 for the home in Las Vegas?
23       A   Some of them were.
24       Q   Okay.  And then there were some that were
25   after?

90

1       A   I believe so.
2       Q   So the lawsuit in Arizona, does that involve
3   a series of loans?
4       A   Yes.
5       Q   And are those loans made by you, personally,
6   and by Little Isle IV, LLC?
7           MR. EVENSEN:  Asked and answered.
8       Go ahead and answer if you can.
9           THE WITNESS:  I previously answered.
10   BY MS. LEE:
11       Q   Was that a yes?
12       A   Can we go back in the testimony and find my
13   previous answer?
14       Q   Actually, if you can just answer again.
15   That's not a reason not to answer that it was asked
16   before.
17       A   I don't recall the question before, but --
18   my answer before, but I remember answering.
19       Q   I believe what you said was the partners of
20   Little Isle IV, LLC, but is it the partners or the
21   company itself that made loans to Jowdy?
22       A   The company itself.
23       Q   Did you invest any other monies into the Las
24   Vegas home that we have been speaking of?
25       A   Personally?

91

1       Q   Or on behalf of any third party entity?
2       A   Other than what?
3       Q   Other than the $200,000 you already spoke
4   of?
5       A   I don't believe so.
6       Q   Did you raise any money for the purchase of
7   that home?
8       A   I don't believe so.
9           MR. EVENSEN:  Other than the $200,000?
10   BY MS. LEE:
11       Q   Other than the $200,000, right.  Where did
12   you get the $200,000 to loan to Mr. Jowdy towards the
13   purchase price of that home?
14       A   From the entities that are pursuing
15   Mr. Jowdy in Arizona now.
16       Q   Did they loan them to you?
17       A   No.
18       Q   Did they loan them to Mr. Jowdy directly?
19       A   Yes.
20       Q   Are there any other entities besides Little
21   Isle IV, LLC to which you are referring right now?
22       A   Yes.
23       Q   What are the other entities?
24       A   An entity called Ula Makika.
25       Q   Where is that company incorporated?

92

1       A   I don't recall.
2       Q   Do you have any ownership interest in Ula
3   Makika?
4       A   Yes.
5       Q   What percentage of that company do you own?
6       A   100 percent.
7       Q   What does that company do?
8       A   It's a consulting company.
9       Q   Does it engage in the same type of
10   consulting activities as Standard Advisors, LLC?
11       A   No.
12       Q   What consulting activities does Ula Makika
13   engage in?
14       A   General consulting.
15       Q   On what subjects?
16       A   Nothing in particular.
17       Q   How many clients does Ula Makikak have?
18       A   Zero.
19       Q   How many clients did it have at the time it
20   loaned Mr. Jowdy money for the purchase of the Las
21   Vegas home?
22       A   Zero.
23       Q   Where did Ula Makika get the money to loan
24   to Mr. Jowdy?
25       A   From myself and other investors.

93

1    Q    Individual investors or corporate investors
2    or both?
3    A    I would assume individual investors.
4    Q    Were any of these investors your clients for
5    which you were managing their businesses?
6    A    I don't recall at this time.
7    Q    If I could turn your attention back to
8    the -- was there any return on the $200,000 that you
9    loaned to Jowdy for the purchase price of that Las
10   Vegas home?  Did you have any return on that loan,
11   were there any interest payments attached to it, on
12   the repayment terms?
13   A    Mr. Jowdy repaid the loan, plus some portion
14   of interest.
15   Q    Do you recall how much interest was repaid?
16   A    I don't.
17   Q    And what portion of that interest was
18   distributed to the investors?
19   A    100 percent.
20   Q    But the investors owned no part of Ula
21   Makika?
22   A    There were several entities that loaned the
23   monies to Mr. Jowdy.
24   Q    But I'm just talking about Ula Makika?
25   A    I don't recall if Ula Makika had made that

94

1    $200,000 loan or it was Little Isle IV or what
2    contribution percentages came from either.
3    Q    Was it either/or or was it both of those
4    entities?
5    A    I don't recall.
6    Q    If Mr. Jowdy paid those monies to Ula
7    Makika, would it be your deduction that Ula Makika
8    was the one that made the loan?
9    Q    In other words, if we could show that
10   Mr. Jowdy gave $200,000 plus Ula Makika around the
11   time the loan was -- shortly after the loan was made
12   and repayment of that loan, would it be your
13   assumption that Ula Makika was the one that made the
14   loan?
15   A    Not necessarily.
16   Q    Had Ula Makika made Mr. Jowdy any other
17   loans?
18   A    Had in what context?
19   Q    In any context, had it ever loaned Mr. Jowdy
20   any money?
21   A    I don't recall any specific dates of the
22   loans to Mr. Jowdy.
23   Q    I'm not asking for any specific dates.  I'm
24   asking whether or not Ula Makika ever loaned
25   Mr. Jowdy any money?

95

1    A    Yes.
2    Q    Outside of the Las Vegas home property we
3    have just been discussing, has Ula Makika ever loaned
4    Mr. Jowdy any money?
5    A    Yes.
6    Q    On how many occasions?
7    A    I don't recall specifically.
8    Q    Do you recall the amounts?
9    A    I don't recall specifically.
10   Q    Is Ula Makika part of the litigation in
11   Arizona?
12   A    Yes.
13   Q    I believe you testified earlier that you
14   were working for Diamante Cabo San Lucas from the
15   summer of '05 to the summer of '07, is that right?
16   A    I believe so.
17   Q    And you were doing marketing and sales work,
18   is that correct?
19   A    Yes.
20   Q    Were part of your responsibilities raising
21   money or capital for Diamonte Cabo San Lucas?
22       MR. EVENSEN:  Asked and answered.
23   BY MS. LEE:
24   Q    I don't believe it was.  We touched on the
25   Hawaiian one, but not on the Diamonte Cabo San Lucas,

96

1    but go ahead and answer.
2    A    Can you ask the question again?
3    Q    Sure.  Was part of your job with Diamonte
4    Cabo San Lucas raising money for that entity?
5    A    I assisted in raising money for that entity.
6    Q    To what extent?
7    A    To make the funding occur.
8    Q    What did you do, how much money -- let me
9    strike that.
10       How much money did you raise for that
11   project?
12   A    I don't recall specifically.
13   Q    Were you the one that got Glen Murray to
14   invest in that project?
15       MR. EVENSEN:  Assumes facts not in evidence.
16       THE WITNESS:  I don't know if Glen Murray
17   has invested in that entity.
18   BY MS. LEE:
19   Q    Oh, I'm sorry.  I thought you said earlier
20   that --
21       MR. EVENSEN:  Del Mar.
22   BY MS. LEE:
23   Q    I see.  It's Del Mar.  I'm doing the wrong
24   one.  I apologize.
25       Was part of your responsibilities -- let me

97

1  ask this.  Did you ever work for Diamante Del Mar?
2      A   I did not.
3      Q   Did you ever raise any money for Diamante
4  Del Mar?
5      A   I did not.
6      Q   Did you ever get paid from Diamante Del Mar
7  for any reason?
8      A   I did not.
9      Q   Did any of your entities in which you have
10  an ownership interest ever get paid from Diamante Del
11  Mar?
12      A   Yes.
13      Q   Which entities?
14      A   I believe the entity was called GDM 33.
15      Q   And what did GDM 33 do for Diamante Del Mar
16  to get paid?
17      A   GDM 33 did general consulting work for
18  Diamante Del Mar.
19      Q   Who owned GDM 33?
20      A   I did.
21      Q   100 percent?
22      A   Yes.
23      Q   So you did consulting work through GDM for
24  Diamonte Del Mar, is that right?
25      A   Yes.

98

1      Q   And by consulting work, what does that mean?
2      A   General consulting work requested by
3  Diamante Del Mar.
4      Q   Who at Diamante Del Mar were you consulting
5  with?
6      A   Ken Jowdy and Bill Najam.  Subsequently Ken
7  Ayers and other individuals Ken Jowdy had hired.
8      Q   Do you have any ownership interest in
9  Diamante Del Mar?
10      A   I don't believe so.
11      Q   Did you facilitate Mr. Murray's investment
12  into Diamante Del Mar?
13      A   Can you define facilitate?
14      Q   In any way.  In any way did you act as a
15  liaison between Murray and Diamante Del Mar with
16  regards to Mr. Murray's investment?
17      A   Yes.
18      Q   What did you do?
19      A   The same as I do for any deal that
20  Mr. Murray's doing.
21      Q   What is that?
22      A   I would speak as a liaison between
23  Mr. Murray and any principals to facilitate whatever
24  Mr. Murray requested.
25      Q   Did Mr. Murray tell you how much he wanted

99

1  to invest in that?
2      A   Yes.
3      Q   How much was that?
4      A   $500,000.
5      Q   And did he send that money to you or
6  directly to Diamante Del Mar or somewhere else?
7      A   I don't know exactly where he sent it, but
8  it wasn't to me.
9      Q   Were you the one that alerted him to that
10  investment opportunity?
11      A   I don't recall.
12      Q   Do you have any ownership interest by way of
13  an entity of Diamante Del Mar?  So, in other words,
14  are there any entities in which you have an ownership
15  interest in that owns any part of Diamonte Del Mar?
16      A   I'm not sure.
17          (Defendant's Exhibit A was marked for
18          identification.)
19  BY MS. LEE:
20      Q   I'm just going to hand you a document there.
21  If you could take a moment to look over this document
22  and let me know when you're done.
23      Q   All finished?
24      A   Yes.
25      Q   Do you recognize this document, Mr. Kenner?

100

1      A   I do not.
2      Q   Is that your e-mail address located under
3  the original message stamp there?
4      A   Yes.
5      Q   So do you recall ever sending or writing
6  this e-mail to Mr. Jowdy?
7      A   Not specifically.
8      Q   Does it look familiar to you in terms of
9  anything that you would write?
10      A   It could have been.
11      Q   I wanted TO draw your attention to the third
12  to the last paragraph where you're listing a series
13  of projects or entities for which you have raised
14  money.  Do you see that, starting with the word
15  remember?
16      A   I do.
17      Q   And where it says approximately $750,000 for
18  the Vegas home, does that refer to the Las Vegas home
19  we have been discussing?
20      A   I don't know.
21      Q   Are there any other Las Vegas homes for
22  which you helped raise money on Mr. Jowdy's behalf?
23      A   Not that I believe so.
24      Q   And it states that you raised 9.25 for the
25  Diamante Del Mar project.  Was that through your

101

1   company, GDM 33?
2   A   No.
3   Q   Was that just you individually?
4   A   Not necessarily.
5   Q   How did you raise this 9.25 for Diamante Del
6   Mar?
7   A   I'm not sure that I raised $9.25 million for
8   Diamante Del Mar.
9   Q   So this e-mail could be inaccurate?
10   A   I don't remember this e-mail specifically.
11   Q   And it doesn't refresh your memory when you
12   see the 9.25 for Diamante Del Mar?
13       Well, let me ask you this.
14       MR. EVENSEN:  Let him answer.
15       THE WITNESS:  Refresh my memory of what?
16   BY MS. LEE:
17   Q   So let me ask a different question actually
18   then.
19       Does $9.25 million sound about right in
20   terms of how much money you raised for the Diamante
21   Del Mar project?
22   A   I don't know how much money was invested in
23   Diamante Del Mar.
24   Q   Okay.  So what I'm asking is a little bit
25   different.  Not how much money was invested, but how

102

1   much you raised.
2   A   I'm not sure I understand the context of
3   raised.  I'm not a paid broker.
4   Q   Well, here, I'm just using your language
5   here where it says remember that I raised
6   $9.25 million, so when you say you raised
7   $9.25 million, is that how much money you raised for
8   that project?
9   A   If this e-mail is authentic, which I don't
10   understand that it is or it isn't, I would assume the
11   word raised could be defined many ways.
12   Q   Well, if you used the word raised in this
13   e-mail, what was your intent in using that word
14   raised, what did you mean by raised?
15   A   I don't know.  That was many years ago.
16   Q   I believe you testified earlier that as
17   100 percent owner of GDM, you consulted directly on
18   the Diamante Del Mar project through your company,
19   GDM 33, is that right?
20   A   I believe so.
21   Q   And that you further procured funding for
22   that project through this company, is that right?
23   A   I don't believe I testified to that.
24   Q   Is that an accurate statement?
25   A   Can you ask the question again?

103

1   Q   Did you procure any monies for the project,
2   Diamante Del Mar, through GDM 33?
3   A   I don't believe so.
4   Q   What about through any other entity?
5   A   I don't believe so.
6   Q   What about just as yourself individually as
7   a person?
8   A   I don't believe so.
9   Q   But you did facilitate Mr. Murray's
10   investment in this property?
11   A   I acted as a liaison between Mr. Murray and
12   his investment in this property.
13   Q   Did you do that for anyone else with regards
14   to this property?
15   A   I believe so.
16   Q   How many other people?
17   A   I don't recall specifically.
18   Q   As a result of all of those liaison
19   activities, how much money was ultimately invested as
20   a result of that?
21   A   I don't know.
22   Q   Do you have any understanding as to what
23   DCSL as you sit here today?
24   A   Diamante Cabo San Lucas.
25   Q   And what about CSL airport, do you have any

104

1   understanding as to what CSL stands for?
2   A   Cabo San Lucas.
3   Q   What was your involvement in the Diamante
4   Cabo San Lucas project in terms of funding that
5   project?
6       MR. EVENSEN:  Renew my standing objection to
7   relevance.
8       THE WITNESS:  Can you ask the question
9   again?
10   BY MS. LEE:
11   Q   Well, let me ask it a different way.
12       In 2005, what was your involvement in the
13   Diamante Cabo San Lucas project?
14   A   I assisted in the origination of the funding
15   for the project.
16   Q   And were you doing that in your individual
17   capacity or through some other entity in which you
18   had some ownership interest in?
19   A   I believe individually.
20   Q   Were you putting any monies into that
21   project for your own benefit as an investor?
22   A   Yes.
23   Q   How much of your own money did you put into
24   that project?
25   A   I don't recall specifically.

105

1    Q   But you do recall that you put some of your
2  own money into that project?
3    A   Yes.
4    Q   And that was an investment, not a loan?
5    A   Yes.
6    Q   What percentage of this project do you own
7  today?
8    A   I don't know specifically.
9    Q   Did you have any type of understanding or
10  agreement with Ken Jowdy with respect to how this
11  project was to be financed?
12       MR. EVENSEN:  Are you talking about Cabo San
13  Lucas?
14       MS. LEE:  Yes, Diamonte Cabo San Lucas.
15       MR. EVENSEN:  I'm renewing my standing
16  objection to relevancy.
17       THE WITNESS:  There were multitudes of
18  conversations about the Cabo San Lucas project being
19  financed.
20  BY MS. LEE:
21    Q   Did it culminate ultimately into a plan,
22  though, an ultimate plan on how this project was to
23  be financed?
24    A   I'm not sure I know a specific answer to
25  that.

106

1    Q   Did you and Ken sit down and formulate any
2  strategy or plan going forward in terms of how you
3  guys were going to obtain the financing for this
4  project?
5    A   Nothing specific.
6    Q   Was there an expectation that Mr. Jowdy
7  himself would contribute any funds to the Diamante
8  Cabo San Lucas project?
9    A   He never suggested that he would.
10    Q   Was it your understanding that Mr. Jowdy was
11  to own a portion of the project?
12    A   Yes.
13    Q   And what was going to be his contribution
14  then to that project in exchange for his ownership
15  interest?
16    A   It was my understanding that he was going to
17  be the operator and general administrator of the
18  project and spend 12 months a year in Cabo San Lucas
19  operating as general administrator.
20    Q   And in exchange for that, how much of the
21  company was he to own?
22    A   I don't recall specifically.
23    Q   Do you recall whether or not either you or
24  Mr. Jowdy were to be the majority owners of that
25  company?  Of the two of you, were one of you guys

107

1  going to be a greater owner than the other?
2    A   Yes.
3    Q   And who was going to own more?
4    A   I was.
5    Q   Do you know how much more?
6    A   I do not specifically.
7    Q   And what was your contribution then going to
8  be to the Cabo San Lucas project to entitle you to
9  majority ownership of that project?
10    A   Can you ask the question again?
11    Q   Sure.  Can you just read it back?
12       (Thereupon, from the record above,
13       the reporter read, to wit:
14       "Q.  And what was your contribution
15       then going to be to the Cabo San
16       Lucas project to entitle you to
17       majority ownership of that
18       project?")
19       THE WITNESS:  I didn't say I was going to be
20  the majority owner.
21       MS. LEE:  I'm sorry, I thought -- I
22  misunderstood.  Could you read back his response, the
23  whole dialogue about who was going to own more of the
24  company.
25       Are you confused because I'm saying majority

108

1  owner overall, not just as between you two?
2       THE WITNESS:  No.
3       MS. LEE:  That's not why you're confused?  I
4  mean, that's why you are saying --
5       MR. EVENSEN:  Now, I'm really confused.
6       MS. LEE:  Right, right.  Okay.
7       Just go back to the point where we were
8  talking about his majority -- whether or not he was
9  going to own more than Jowdy, if you could read that
10  back.
11       MR. EVENSEN:  While she's looking for that,
12  I'm going to step out real quick.  I just got buzzed
13  on something.  Can I take two minutes?
14       MS. LEE:  Do you want to take a break?
15       MR. EVENSEN:  Yes, let's take a break.
16       MS. LEE:  Okay.
17       (Thereupon, a recess was taken from.
18       2:44 p.m. until 2:51 p.m.)
19       (Thereupon, from the record above,
20       the reporter read, to wit:
21       "Q.  Do you recall whether or not
22       either you or Mr. Jowdy were to be
23       the majority owners of that company?
24       Of the two of you, were one of you
25       guys going to be a greater owner

109

1    than the other?
2    A. Yes.
3    Q. And who was going to own more?
4    A. I was.
5    Q. Do you know how much more?
6    A. I do not specifically.
7    Q. And what was your contribution then
8    going to be to the Cabo San Lucas project
9    to entitle you to majority ownership of
10   that project.")
11   BY MS. LEE:
12   Q   Okay.  So do you understand the question in
13   that context?
14   MR. EVENSEN:  Let's go back to the last
15   question or was that the last question?
16   MS. LEE:  That was the last thing she just
17   read.
18   MR. EVENSEN:  Read the last question, I'm
19   sorry.
20   (Thereupon, from the record above,
21   the reporter read, to wit:
22   "Q.  And what was your contribution
23   then going to be to the Cabo San
24   Lucas project to entitle you to
25   majority ownership of that

110

1    project?")
2    THE WITNESS:  I didn't say I was going to be
3    the majority owner of the project.
4    BY MS. LEE:
5    Q   But it was your understanding that you were
6    going to own more than Ken?
7    A   Yes.
8    Q   And then whatever percentage you were going
9    to own, what was going to be your contribution to
10   that corporation in exchange for your ownership
11   interest in it?
12   A   I don't recall specifically.
13   Q   Did you end up owning some of it?
14   A   Yes.
15   Q   And you don't know what you did to get your
16   ownership interest?
17   A   I do.
18   Q   What did you do?
19   A   I contributed $2.5 million.
20   Q   Was that of your own personal money or was
21   that from somewhere else?
22   A   Those are funds that I sourced myself.
23   Q   That you what yourself, I'm sorry?
24   A   That I sourced myself.
25   Q   And what do you mean by sourced?

111

1    A   They were delivered by me on my behalf.
2    Q   And where did you get this $2.5 million to
3    invest?
4    A   From a couple of other investors in addition
5    to myself.
6    Q   Was any part of that $2.5 million given to
7    you either directly or indirectly from Murray?
8    A   No.  Glen Murray has no involvement in the
9    Diamante Cabo San Lucas project, whatsoever.
10   Q   Was any part of the $2.5 that you invested
11   in Diamante Cabo San Lucas borrowed funds?
12   A   Yes.
13   Q   And did you borrow any of this money from
14   any of your clients?
15   A   Yes.
16   Q   Did any of that $2.5 constitute investments
17   on behalf of third parties?
18   MR. EVENSEN:  Are you talking outside of
19   Glen Murray now at this point?
20   BY MS. LEE:
21   Q   Well, I think you already testified that
22   none of that $2.5 million came from Glen Murray
23   either directly or indirectly, is that correct?
24   A   That's correct.
25   MR. EVENSEN:  Then I'm going to object to

112

1    relevancy, Patty.  I think there's nothing here.
2    BY MS. LEE:
3    Q   Were these funds sent to you directly, the
4    $2.5 million from your various people?
5    MR. EVENSEN:  Object as to relevancy.
6    THE WITNESS:  Some of the funds, yes.
7    BY MS. LEE:
8    Q   Were any of these funds sent directly to
9    Diamante Cabo San Lucas on your behalf?
10   A   I don't recall.
11   Q   How much was sent to you directly?
12   A   I don't recall.
13   Q   Were any of these funds sent to any entities
14   that were owned by you, either in whole or in part?
15   MR. EVENSEN:  Object as to relevance.
16   THE WITNESS:  Can you ask the question
17   again?
18   BY MS. LEE:
19   Q   Were any of the $2.5 million sent to any
20   entities in which you had any ownership interest in?
21   A   I believe so.
22   Q   Was any part of that $2.5 million sent to
23   any entities owned either in whole or in part by
24   Mr. Jowdy?
25   A   I believe so.

113

1    Q   Do you remember how much?
2    A   I do not.
3    Q   Do you know whether or not Mr. Murray is
4  alleging that Mr. Jowdy took part of the $800,000
5  that were loaned and put it into the Diamante Cabo
6  San Lucas project?
7    A   I don't know.
8    Q   You don't know if that's what is being
9  alleged?
10   A   I think my understanding of what is being
11 alleged is that Mr. Jowdy borrowed approximately
12 $800,000 and has failed to repay.
13   Q   No, I understand that because we already
14 covered that.  I'm talking about the broader
15 allegations.
16        Is there any allegation from Mr. Murray --
17 as his agent, are you aware of any allegations that
18 Mr. Murray is making that any part of his $500,000 --
19 $800,000 went into the Diamante Cabo San Lucas
20 project?
21   A   What $500,000?
22   Q   I'm sorry, I said $800,000.  I corrected
23 myself.  $800,000.
24   A   I don't know.
25   Q   So is it fair to say that on the Diamante

114

1  Cabo San Lucas project, as part of that $2.5 million,
2  and we don't know how much of that, but part of that
3  $2.5 million you borrowed from your clients and had
4  that money sent to an entity owned by Ken Jowdy for
5  your benefit?
6    MR. EVENSEN:  Is there a question?
7    MS. LEE:  That was my question.
8    MR. EVENSEN:  Read it back.
9    (Thereupon, from the record above,
10      the reporter read, to wit:
11      "Q.  So is it fair to say that on the
12      Diamante Cabo San Lucas project, as
13      part of that $2.5 million, and we
14      don't know how much of that, but
15      part of that $2.5 million you
16      borrowed from your clients and had
17      that money sent to an entity owned
18      by Ken Jowdy for your benefit?")
19   MR. EVENSEN:  I'm goint to object, I think
20 it misstates prior testimony, mischaracterization.
21 BY MS. LEE:
22   Q   Right.  I wasn't trying to characterize your
23 testimony.  I'm asking, is that a fair statement to
24 say that?
25   A   Can you say it again?  It was very compound

115

1  and I'm not sure I understood it.
2        (Thereupon, from the record above,
3        the reporter read, to wit:
4        "Q.  So is it fair to say that on the
5        Diamante Cabo San Lucas project, as
6        part of that $2.5 million, and we
7        don't know how much of that, but
8        part of that $2.5 million you
9        borrowed from your clients and had
10       that money sent to an entity owned
11       by Ken Jowdy for your benefit?")
12   MR. EVENSEN:  I'll renew my objection.
13   THE WITNESS:  I'm not sure I understand if
14 there's a question in there.
15 BY MS. LEE:
16   Q   I'm just asking is that a fair and accurate
17 representation of what happened?
18   A   Is what a fair and accurate representation
19 of what happened?
20   Q   That you borrowed money from some of your
21 clients as part of this $2.5 million and we don't
22 know how much of it, but some of it you borrowed from
23 your clients, correct?
24        I'm just trying to break it down so it's not
25 compound.  So you did borrow some money from your

116

1  clients as part of that $2.5 million?
2    MR. EVENSEN:  Asked and answered.
3  BY MS. LEE:
4    Q   Is that a yes?
5    A   Yes.
6    Q   And were those borrowed funds then sent to
7  companies owned or controlled by Mr. Jowdy?
8    MR. EVENSEN:  Asked and answered.
9    THE WITNESS:  I believe some of them were.
10 BY MS. LEE:
11   Q   And that was for your benefit?
12   MR. EVENSEN:  Asked and answered.
13   THE WITNESS:  Yes.
14 BY MS. LEE:
15   Q   And do you recall which clients lent you
16 money?
17   MR. EVENSEN:  Asked and answered.
18 BY MS. LEE:
19   Q   I don't think that was actually, but go
20 ahead.
21   A   Yes.
22   Q   Which clients?
23   A   Jozef Stumpel, Yeary Lehtinen.
24   Q   Any others?
25   A   No.

117

1    Q.   Did you have any loan documents with those
2  clients that loaned you the money for that project?
3        MR. EVENSEN:  Objection as to relevance.
4        THE WITNESS:  Yes.
5  BY MS. LEE:
6    Q.   With both or just one?
7    A.   Both.
8    Q.   What were the repayment terms?
9    A.   I don't recall.
10       MR. EVENSEN:  Objection, relevance.
11 BY MS. LEE:
12   Q.   What was the interest rate?
13   A.   I don't recall.
14   Q.   Okay.  What efforts did you make, if any, to
15 try to get Mr. Jowdy to repay those funds to
16 Mr. Murray?
17   A.   I consistently asked Mr. Jowdy to repay the
18 funds to Mr. Murray.
19   Q.   Did you volunteer to assist in procuring
20 funds to repay Mr. Murray?
21   A.   Can you ask the question again?
22   Q.   Did you volunteer to assist Mr. Jowdy in
23 procuring funds to repay Mr. Murray?
24   A.   I don't recall.
25       (Defendant's Exhibit B was marked for

118

1        identification.)
2  BY MS. LEE:
3    Q.   I'm going to hand you this next document
4  here.  Take a moment to look at this e-mail and let
5  me know when you're done.
6  BY MS. LEE:
7    Q.   Do you recognize this e-mail, Mr. Kenner?
8    A.   Not specifically.
9    Q.   Is that your e-mail address after the from,
10 the second from title on this page?
11   A.   Yes, it is.
12   Q.   Do you remember ever informing Mr. Jowdy
13 that Mr. Murray would at some point want to just own
14 the units at the Palms?
15   A.   Can you ask that question again?
16   Q.   Do you ever recall informing Mr. Jowdy that
17 Mr. Murray would eventually just want to own the
18 Palms units?
19   A.   I don't think so.
20   Q.   Do you have any understanding as to what P&S
21 docs mean?
22   A.   I would assume purchase and sale.
23   Q.   Was Mr. Murray really upset with you with
24 regards to this loan?
25   A.   I don't believe so.

119

1    Q.   Do you recall meeting with Mr. Murray in Los
2  Angeles in or around May of '07?
3    A.   I do not.
4    Q.   Do you have any reason to believe that this
5  is not a document sent by you to Mr. Jowdy?
6    A.   Can you ask that again?
7    A.   Sure.  Do you have any reason to believe
8  that this is not an e-mail sent by you to Mr. Jowdy?
9    A.   I don't recall this e-mail specifically.
10   Q.   Other than your lack of recollection, are
11 there any other indicia of fabrication on behalf of
12 this e-mail?
13       MR. EVENSEN:  I'm not sure what you mean by
14 that.  Can you --
15 BY MS. LEE:
16   Q.   Let me just rephrase it then.
17       Do you have any reason to believe that this
18 document was fabricated?
19   A.   I don't have any way to determine whether
20 it's accurate or fabricated as I sit here today.
21   Q.   Is there any reason why you would be
22 representing to Mr. Jowdy that -- well, first let me
23 ask this, I'm sorry.  Does the LB referral funds mean
24 anything to you?
25   A.   I would assume LB stands for Lehman

120

1  Brothers.
2    Q.   And do you have any understanding as to what
3  Lehman Brothers referral funds are?
4    A.   I do.
5    Q.   Can you explain it to me, please?
6    A.   Mr. Jowdy had suggested to me after the .
7  closing of the Diamante Cabo San Lucas deal that he
8  was unable to pay back this loan and/or others at
9  that time and had struck a secret deal with his
10 friend, Masud Bodi at Lehman Brothers.  Masud was
11 going to pay him referral funds as Diamante Cabo San
12 Lucas sold real estate and he personally would be
13 able to use those funds for repayment of obligations
14 that he had.
15   Q.   Do you know if that actually happened?
16   A.   I don't believe anything was ever sold at
17 Diamonte Cabo San Lucas.
18   Q.   Okay.  When you found out that Mr. Jowdy was
19 not going to be able to repay this loan, did you
20 communicate that to Mr. Murray?
21   A.   I think Mr. Murray was very aware that
22 Mr. Jowdy was not repaying his obligation to him.
23   Q.   But once you confirmed with Mr. Jowdy that
24 he was actually unable to repay this loan, because I
25 believe that's what you just testified to, did you

121

1  then communicate that to Mr. Murray?
2      A   I don't believe what I testified to was
3  Mr. Jowdy's inability to repay the loan at any point
4  in particular.
5          MS. LEE:  Can you read back that portion of
6  his testimony where he discusses Mr. Jowdy's
7  inability to repay the loan?
8          (Thereupon, from the record above,
9          the reporter read, to wit:
10         "A.  Mr. Jowdy had suggested to me
11         after the closing of the Diamante
12         Cabo San Lucas deal that he was
13         unable to pay back this loan and/or
14         others at that time -- ")
15 BY MS. LEE:
16     Q   That's the part.  So I believe your
17 testimony just stated that at the time of the closing
18 of the Diamante Cabo San Lucas loan, Mr. Jowdy had
19 communicated to you that he was not going to be able
20 to pay Mr. Murray back, is that right?
21         MR. EVENSEN:  Misconstrues what he said in
22 the record.
23 BY MS. LEE:
24     Q   Was that a correct statement or not?
25     A   I don't think so.

122

1          MS. LEE:  Can you read back what he did say
2  one more time.
3          (Thereupon, from the record above,
4          the reporter read, to wit:
5          "Q.  And do you have any
6          understanding as to what Lehman
7          Brothers referral funds are?
8          A.  I do.
9          Q.  Can you explain it to me, please?
10         A.  Mr. Jowdy had suggested to me after the
11         closing of the Diamante Cabo San Lucas deal
12         that he was unable to pay back this loan
13         and/or others at that time --")
14 BY MS. LEE:
15     Q   Did you communicate that information to
16 Mr. Murray at that time?
17     A   I don't recall.
18     Q   Do you know when the Diamante Cabo San Lucas
19 loan closed?
20     A   Spring of 2006.
21         (Defendant's Exhibit C was marked for
22         identification.)
23 BY MS. LEE:
24     Q   I'm going to hand you another document here.
25 Just take a moment to review this document and let me

123

1  know when you are done.
2          Are you done with that document, Mr. Kenner.
3      A   Uh-huh.
4      Q   Have you ever seen this document before?
5      A   I don't believe so.
6      Q   You don't believe so?
7      A   I don't believe I have.
8      Q   Okay.  Do you own any property in Hawaii or
9  did you ever own any property in Hawaii?
10     A   Yes.
11     Q   And what property do you own in Hawaii?
12     A   I don't own property in Hawaii.
13     Q   When was the last time you owned any
14 property in Hawaii?
15     A   Some time in 2007.
16     Q   And was it a residential property?
17     A   Uh-huh.
18     Q   Is that a yes?
19     A   Yes.
20     Q   And what was the fair market value of that
21 property at the time you sold it?  Or actually, I'm
22 sorry, how much did you sell the property for?
23     A   Approximately $450,000.
24     Q   Do you have any understanding as to who
25 Wayne is in the context of this letter?

124

1      A   I do not.
2      Q   Okay.  I would like to bring your attention
3  back to this Diamante Cabo San Lucas property.
4          (Defendant's Exhibit D was marked for
5          identification.)
6  BY MS. LEE:
7      Q   Mr. Kenner, does this document refresh your
8  recollection at all as to what percentage of Diamante
9  Cabo San Lucas is owned by you?
10         MR. EVENSEN:  Are we going to see the other
11 30 pages or just this one?
12         MS. LEE:  Just this one.
13         THE WITNESS:  Out of context, I can't say
14 specifically, but it looks familiar.
15 BY MS. LEE:
16     Q   It doesn't refresh your recollection as to
17 whether or not you or entities in which you have
18 ownership, what percentage is owned by them of this
19 company?
20     A   According to this piece of paper, I can read
21 it back to you and give you the numbers.
22     Q   Do the numbers here seem strange to you or
23 do they seem within the realm of possibility?
24     A   Of?
25     Q   Of how much ownership Baha Ventures 2006 and

125

1  CSL Properties 206 own of Diamante Cabo San Lucas?
2    A   It looks familiar.
3    Q   Now, I know you discussed having contributed
4  $2.5 million to this project.  Do you recall also
5  contributing $2.0 million to this project?
6    A   Can you define contributing?
7    Q   In any way providing money?  I guess you
8  called it sourcing in your response earlier.  Did you
9  source another $2 million on this project?
10   A   No, I don't believe so.
11   Q   Where did this $2 million come from that
12 makes up this eight percent?
13   A   If that number is accurate, it came from
14 friends and clients.
15   Q   Are these different friends and clients than
16 the ones you were discussing before?
17   A   Before what?
18   Q   For the $2.5 million portion of your
19 sourcing, are they the same group of investors and
20 friends or a different group of investors and
21 friends?
22   A   Different.
23   Q   Which clients make up this $2 million?
24   A   I don't recall.
25   Q   And were they investments or loans?

126

1    A   Investments.
2    Q   Do you have any understanding as to why the
3  disparity in percentages with the $2.5 million
4  entitling 39 percent and the $2.0 million only
5  entitling eight percent?
6    A   Yes.
7    Q   Can you explain that to me?
8    A   No, I can't.
9    Q   Are you refusing to explain it to me or are
10 you saying you don't know how to articulate it or why
11 can't you explain it to me?
12   A   The final percentages were made up by Ken
13 Jowdy and his brother-in-law, Bill Najam and I can't
14 explain why these were the final percentages.
15   Q   So you had nothing to do with the
16 distribution of percentages, is that right?
17   A   As reflected on this piece of paper, no.
18   Q   Do you recall when the distribution was
19 allocated in this manner, when Mr. Jowdy and his
20 brother did this, do you have any understanding as to
21 when that occurred?
22   A   I would assume prior to the first time that
23 I saw this document.
24   Q   When did you first see this document?
25   A   I believe I saw this document for the first

127

1  time in 2007.
2    Q   Prior to that, had you seen a different
3  distribution represented on paper?
4    MR. EVENSEN:  I object as to relevancy.  We
5  have had testimony that Glen Murray doesn't have any
6  interest in this.  I'm not sure -- you know, you're
7  entitled to discover whatever information there is,
8  but I'm at a loss at this point how this is relevant
9  to this case.
10 BY MS. LEE:
11   Q   Go ahead and answer the question.
12   A   I don't remember the question.
13   Q   Had you ever seen any different
14 representation in terms of how these percentages
15 would be distributed prior to 2007 --
16   A   Can you read the question back?
17   Q   -- or earlier in 2007?
18   A   Can you read the question back, please.
19     (Thereupon, from the record above,
20     the reporter read, to wit:
21     "Q.  Had you ever seen any different
22     representation in terms of how these
23     percentages would be distributed
24     prior to 2007 or earlier in 2007")
25     THE WITNESS:  I don't recall if I've seen

128

1  that or not.
2  BY MS. LEE:
3    Q   Did you have any different understanding as
4  to how these percentages would be allocated?
5    A   Yes.
6    Q   What was your understanding of how it should
7  have been allocated?
8    A   The original allocation that I was presented
9  was for me to have a larger equity interest than
10 Mr. Jowdy.
11   Q   To your knowledge, did Mr. Jowdy ever repay
12 any part of that loan back to Mr. Murray?
13   MR. EVENSEN:  Which loan?
14   MS. LEE:  Are there more than one?
15   MR. EVENSEN:  I guess I'm not sure what you
16 meant.  I misunderstood the question.
17 BY MS. LEE:
18   Q   I'm sorry, let me just ask it again.
19     To your knowledge, did Mr. Jowdy ever repay
20 Mr. Murray any part of that $800,000 loan?
21   A   No.
22   Q   Are you familiar with a gentleman, attorney
23 by the name of Paul Augustine?
24   A   Yes.
25   Q   Is he your lawyer for any purpose?

129

1    A   Yes.
2    Q   Was he your lawyer on any matters involving
3  my client, Mr. Jowdy?
4    A   Yes.
5    Q   And which matters is he representing you
6  with respect to my client?
7    A   Mr. Augustine is my general counsel.
8    Q   Is he participating in the Arizona
9  litigation at all?
10    A   Mr. Augustine is my general counsel with
11  respect to all litigation.
12    Q   Has he made an appearance in the Arizona
13  litigation, meaning has he formally appeared?
14    A   I don't know.
15        MR. EVENSEN:  I'm going to object as to
16  relevancy.
17  BY MS. LEE:
18    Q   Is Mr. Augustine Mr. Murray's attorney, to
19  your knowledge?
20    A   I believe Mr. Augustine represents
21  Mr. Murray.
22    Q   Did you facilitate that retention?
23    A   Yes.
24    Q   Do you know a gentleman by the name of John
25  Keiser?

130

1    A   Yes.
2    Q   Who is Mr. Keiser or, I'm sorry, how do you
3  know him?
4    A   He is a friend of mine.
5    Q   Do you know whether Mr. Keiser has ever
6  loaned money to Mr. Jowdy?
7    A   I believe so.
8    Q   Do you know how much money Mr. Keiser loaned
9  to Mr. Jowdy?
10    A   No.
11    Q   Do you know when?
12    A   No.
13    Q   Do you know if it was in the form of cash?
14    A   I don't know.
15    Q   Sorry to keep hopping back and forth.  I'm
16  just trying to speed this up.
17        (Defendant's Exhibit E was marked for
18        identification.)
19  BY MS. LEE:
20    Q   Can you take a look at that document,
21  Mr. Kenner, and just let me know when you are done
22  with that.
23        Have you ever seen this letter before?
24    A   I don't think so.
25    Q   Did you contribute in any way to it's

131

1  authorship?
2    A   I don't believe I did.
3    Q   Is that a -- well, let me lay a foundation.
4  Are you familiar with Mr. Murray's signature having
5  worked with him for 17 years?
6    A   I've seen Mr. Murray's signature over the
7  last 17 years.
8    Q   Are you familiar with it enough to identify
9  his signature?
10    A   I am not.
11    Q   So you couldn't tell me whether or not this
12  was his signature or not?
13    A   I cannot.
14    Q   Is it your understanding that Mr. Augustine
15  is representing Mr. Murray with respect to his
16  dealings with Mr. Jowdy?
17        MR. EVENSEN:  In this proceeding or in some
18  other proceeding?
19  BY MS. LEE:
20    Q   I'm trying to figure out what this letter is
21  about, so in any proceeding?
22    A   I believe he is acting as general counsel
23  for Mr. Murray.
24    Q   Okay.  In the same way he is acting as
25  general counsel as you?

132

1    A   Not necessarily.
2        MS. LEE:  Can we go off the record.  I am
3  probably just going to go through a series of
4  documents for authentication purposes which will
5  probably go pretty quickly, but I wanted to just go
6  through them real quickly.
7        (Thereupon, a recess was taken from.
8        3:25 p.m. until 3:31 p.m.)
9        ///
10  BY MS. LEE:
11    Q   If we can go back on the record.
12        At the time you asked Mr. Murray for the
13  money for Jowdy, what was your understanding as to
14  Jowdy's creditworthiness at that time?
15    A   I believed Ken Jowdy was completely
16  creditworthy.
17    Q   And based on what?
18    A   Based on the fact that we had transacted
19  business for over three years with Mr. Jowdy without
20  concern and that Mr. Jowdy had represented that he
21  was a significant owner in a $30 to $40 million piece
22  of real estate that Mr. Murray was also involved with
23  in Mexico.
24    Q   And so based on those two things, your
25  history in dealings -- I'm sorry, when you say we had

---

133

1  had significant dealings with him, who did you mean
2  by we?
3     A  Glen Murray, myself and many other clients
4  and friends of mine.
5     Q  So you had no reason to believe in 2005 that
6  Mr. Jowdy was not a creditworthy candidate to borrow
7  funds from Murray?
8     A  That is correct.
9       (Defendant's Exhibit F was marked for
10      identification.)
11     ///
12  BY MS. LEE:
13     Q  Can you just take a look at this document
14  and let me know when you're done?
15      MR. EVENSEN:  Does it have a Bates number on
16  it?
17      MS. LEE:  It doesn't, I'm sorry.
18      MR. EVENSEN:  Okay.  Tell me what federal
19  case that's from.
20      MS. LEE:  This, I believe, and this is just
21  my understanding, is that this is part of the
22  information that was produced in the Arizona
23  litigation that we discussed earlier.
24      MR. EVENSEN:  Okay.
25

---

134

1  BY MS. LEE:
2     Q  Do you recognize that document that you just
3  read?
4     A  I do.
5     Q  And is that your signature there at the
6  bottom?
7     A  It looks like my signature.
8     Q  So do you remember signing this document?
9     A  Yes, I do.
10     Q  So that is your signature, is that right?
11     A  I didn't deliver this document here today,
12  but it looks like my signature.
13     Q  So you're saying it may not be a true and
14  accurate copy of this document, but you have seen
15  this document before?
16     A  Yes.
17     Q  Do you know who authored this document?
18     A  Yes.
19     Q  Who authored it?
20     A  I did.
21     Q  And I didn't really go into your background,
22  but you're not an attorney, is that right?
23     A  That is correct.
24     Q  And what was the purpose of this document?
25     A  It's a loan document.

---

135

1     Q  From whom to whom?
2     A  Do you want me to read the loan document?
3     Q  No.  As the author of the document, I just
4  want you to tell me who were the parties to this
5  agreement.
6      MR. EVENSEN:  Objection, the document speaks
7  for itself.
8      Answer if you can.
9      THE WITNESS:  Kenneth Aboud Jowdy as the
10  borrower and Philip A. Kenner as an individual and
11  Little Isle IV, LLC as lenders and any other related
12  individual or entity involved in the future by
13  Kenner.
14  BY MS. LEE:
15     Q  Okay.  And was this document signed by
16  everybody on December 7, 2004 or were they signed at
17  different times?
18     A  It was signed at different times.
19     Q  And how much money was loaned under this
20  agreement?
21     A  In total, approximately $8 million.
22     Q  And how would the borrower go about securing
23  loan funds under this agreement from the lender or
24  lenders?
25      MR. EVENSEN:  Can you read that back one

---

136

1  more time?
2      (Thereupon, from the record above,
3      the reporter read, to wit:
4      "Q.  And how would the borrower go
5      about securing loan funds under this
6      agreement from the lender or
7      lenders?")
8      MR. EVENSEN:  Object just to the use of
9  securing from a borrower.
10      THE WITNESS:  And I'm not sure I understand
11  the question.
12  BY MS. LEE:
13     Q  Well, if Mr. Jowdy needed money under this
14  agreement, how would he get it?
15     A  Mr. Jowdy would typically call me and say, I
16  need money wired to some particular account in his
17  control or some other third party entity that he owed
18  funds to.
19     Q  Is this agreement still in effect today?
20     A  Until the funds are repaid.
21     Q  Can Mr. Jowdy continue to tap into this line
22  of credit?
23     A  No.
24     Q  When was the last time Mr. Jowdy was
25  permitted to receive funds pursuant to this

---

137

1  agreement?
2    A  I don't recall specifically.
3    Q  What year?
4    A  I don't recall specifically.
5    Q  Was it this year?
6    A  It was not 2009.
7    Q  Was it 2008?
8    A  I don't believe it was 2008.
9    Q  2007?
10   A  I don't recall.
11   Q  Why was Mr. Jowdy no longer able to tap into
12 this line of credit?
13   A  Mr. Jowdy had become in default of this per
14 the terms of the agreement.
15   Q  Was he in default of this agreement at the
16 time he took out loans with Murray?
17   A  No.
18   Q  So if Mr. Jowdy needed funding for the Palms
19 unit, why didn't you just give him the money through
20 this line of credit as opposed to securing a loan
21 from Mr. Murray, particularly since it's a higher
22 interest rate?
23   A  I'm not sure I'm supposed to be securing
24 loans for Mr. Jowdy in the context you just asked.
25 Can you ask the question again?

---

138

1    Q  Sure.  I'll ask it a different way actually.
2       If this revolving line of credit was
3 available to Mr. Jowdy at the time he needed
4 $800,000, why didn't you just give him the money
5 under this agreement?
6    A  I'm not Mr. Jowdy.  You'd have to ask him.
7    Q  But when he asked you for money, why didn't
8 you just give it to him out of -- as a lender under
9 this agreement as opposed to getting the funding from
10 some third party source?
11   A  You'd have to ask Mr. Jowdy why he wanted
12 funding the way he did.
13   Q  So you're saying it was at Mr. -- well, let
14 me ask you this way.  Had Mr. Jowdy -- could
15 Mr. Jowdy have borrowed $800,000 under this revolving
16 line of credit in 2005?
17   A  I didn't see why not.
18   Q  And according to this, it says at a rate
19 of -- what is the interest rate on the monies under
20 this loan agreement?
21   A  Would you like me to read the document
22 again?
23   Q  If you could just tell me what the interest
24 rate is and if you have to refer to the document to
25 do that, then yes.

---

139

1    A  Rate of 15 percent per annum.
2    Q  Did Mr. Jowdy ask you for the money first
3 before asking you to get the funds from someone else,
4 the loaned funds?
5    A  I'm not sure I understand what you're
6 referring to.
7    Q  So Mr. Jowdy approached you seeking money
8 for the Palms, is that an accurate statement?
9    A  Mr. Jowdy told me he needed funds for the
10 Palms units he was purchasing, correct.
11   Q  When he told you that, did he ask you for
12 the money?
13   A  He originally asked me for the money.
14   Q  And what was your response?
15   A  No.
16   Q  And why did you tell him no?
17   A  I don't recall at the time.
18   Q  Have you ever had occasion to submit
19 financial statements to any lending institution in an
20 effort to obtain funding?
21      MR. EVENSEN:  On behalf of Mr. Murray?
22 BY MS. LEE:
23   Q  On behalf of yourself or on behalf of any
24 entity in which you have an ownership interest?
25      MR. EVENSEN:  I'll object as to relevancy as

---

140

1 it relates to this matter.
2      THE WITNESS:  I'm not sure what this has to
3 do with Mr. Murray in this case with Mr. Jowdy.
4 BY MS. LEE:
5    Q  Go ahead and answer the question.
6    A  I don't recall specifically.
7    Q  Do you recall submitting a financial
8 statement to Lehman Brothers?
9    A  I do not recall specifically.
10   Q  Do you recall the -- going back to that loan
11 document that you just reviewed, do you recall the
12 impetus for that loan document?  In other words, why
13 it was created?
14   A  For a loan.
15   Q  For one loan or several loans?
16   A  It was a revolving line of credit.
17   Q  Was this done at your insistence or did
18 Mr. Jowdy insist on this contract or did some third
19 party insist on this contract?
20   A  I insisted.
21      MR. EVENSEN:  You're referring to the loan
22 document?
23 BY MS. LEE:
24   Q  The loan document, right.
25      So that was at your insistence that this

---

141

1  document was created?
2  A  Yes.
3  Q  So let's see here.  Have you ever borrowed
4  money from Mr. Jowdy?
5  A  I don't believe so.
6  Q  Have you ever borrowed money from Mark
7  Thalmann?
8  A  I don't believe so.
9  Q  Are you currently involved in any other
10  litigation besides this -- I'm sorry, you're not
11  involved in this one, the Arizona litigation?
12  A  Can you ask the question again?  I'm not
13  sure what you just said.
14  Q  Are you involved in any other litigation
15  besides the Arizona litigation currently?
16  MR. EVENSEN:  As it relates to Glen Murray
17  or as it relates to Mr. Kenner individually?
18  BY MS. LEE:
19  Q  Just in any litigation.  Are you involved in
20  any litigation other than the Arizona litigation
21  right now?
22  A  Which Arizona litigation?
23  Q  The one against Mr. Jowdy.
24  A  Yes.
25  Q  How many other lawsuits are you involved in

---

142

1  right now as a party?
2  A  Five.
3  Q  And are you a plaintiff, a defendant or both
4  in those actions?
5  A  Both.
6  Q  Of the five, how many cases are you a
7  plaintiff?
8  A  I believe two of them.
9  Q  And is one of those the Jowdy litigation in
10  Arizona?
11  A  No.
12  Q  So that's in addition to the Arizona
13  litigation?
14  A  You asked in addition to.
15  Q  Okay.  All right.  And where are the matters
16  currently pending for those five litigations, which
17  states?
18  A  Arizona and California.
19  Q  Do any of those litigations involve any of
20  your clients?
21  A  No.
22  Q  Any of your former clients?
23  A  Yes.
24  Q  How many of those five involve your former
25  clients?

---

143

1  A  Three of them.
2  Q  And in those three, are you the defendant or
3  a defendant?
4  A  I am a defendant.  And can you explain again
5  how this is relevant to Glen Murray and Mr. Jowdy's
6  issue?
7  Q  I'm sorry, I'm not here to answer questions.
8  I'm here to ask them.
9  What are the nature of the claims involved
10  in those three actions?
11  MR. EVENSEN:  Objection, this is -- Patty,
12  this isn't even relevant to this matter.  I mean, I
13  think you're going far afield at this point.
14  BY MS. LEE:
15  Q  Go ahead.
16  A  I don't recall specifically.
17  (Defendant's Exhibit G was marked for
18  identification.)
19  BY MS. LEE;
20  Q  I'm going to just hand you that document
21  right there.  If you can just take a look at that
22  first page, can you tell me if this is one of the
23  actions that's currently pending of the five you just
24  mentioned?
25  A  It looks familiar.

---

144

1  Q  Are you being sued by Joe Juneau presently?
2  A  Yes.
3  (Defendant's Exhibit H was marked for
4  identification.)
5  BY MS. LEE:
6  Q  I'll hand you this next document.  We will
7  just be going through a series of documents.  Do you
8  recognize your signature at the bottom of this
9  document?
10  A  It looks like it could be my signature.
11  Q  Do you recall signing this document?
12  A  I recall signing a document similar to this,
13  yes.
14  Q  And do you recall stating that you are the
15  attorney in fact for Glen Murray on that signed
16  document?
17  A  I think the document speaks for itself.
18  Q  Do you recall writing that?
19  A  It makes sense that I would.
20  Q  Has Mr. Murray ever executed a Power of
21  Attorney for you?
22  A  Yes.
23  Q  And who was that Power of Attorney given to?
24  Who was the document given to?
25  A  The institutional service group at Charles

## 145

1 Schwab.
2 Q   So Charles Schwab should have on file a
3 Power of Attorney executed by Glen Murray in your
4 favor?
5 A   I don't keep their records.
6 Q   But you submitted one to Charles Schwab?
7 A   I believe so.
8 Q   Do you recognize this as part of the funds
9 that were being wired from Mr. Murray to Mr. Jowdy as
10 part of this $800,000 loan?
11 A   I believe so.
12 Q   Does that date accurately reflect the time
13 in which those funds were sent?
14 A   I don't believe so.
15 Q   Do you think that's just an error?
16 A   I believe so.
17 Q   Did you secure any funding from Mr. Murray
18 on anyone else's behalf for the Palms units?
19 A   I'm not sure I understood the question.
20 Q   Did you go to Mr. Murray asking if he could
21 loan money to anybody else so that they could
22 purchase Palms units?
23 A   I don't believe so.
24    (Defendant's Exhibit I was marked for
25    identification.)

## 146

1 BY MS. LEE:
2 Q   If you could take a look at that document,
3 just let me know when you're done.
4    Mr. Kenner, is that your signature at the
5 bottom of that document?
6 A   It appears to be my signature.
7    MS. LEE: And I don't know if this is the
8 same document.  What is the Bates number on the
9 bottom of that document, Lars?
10    MR. EVENSEN:  One is 14 and the other 15,
11 one in the amount of $80,000 and the other in the
12 amount of $567,000.
13 BY MS. LEE:
14 Q   For the G 00014 and that's the little Bates
15 stamp down there at the bottom, does this document
16 also appear to be a reflection of the wired funds
17 from Mr. Murray to Mr. Jowdy for the Palms purchase?
18 A   That was asked and answered.
19    I believe it was a different document.  Am I
20 asking the same document?  Okay, I'm sorry, for the
21 15a document then.  I'm sorry, I have the same
22 document twice, so I don't know which is which.
23    For GM00015, same question.
24 A   I believe it is.
25    MR. EVENSEN: As a housekeeping, Patty, at

## 147

1 the end of the day, I would like to get a copy of all
2 the exhibits.  Here's 14 and 15 back to you.
3    (Defendant's Exhibit J was marked for
4    identification.)
5 BY MS. LEE:
6 Q   Can you take a look at the next document I
7 handed you, Mr. Kenner.  And for the record it's
8 GM00016.
9    Is that your signature at the bottom of that
10 document?
11 A   It appears to be.
12 Q   Is this $143,260 reflected on this document
13 part of the money that Murray sent to Jowdy as part
14 of the $800,000 loan?
15 A   I believe so.
16    (Defendant's Exhibit K was marked for
17    identification.)
18 BY MS. LEE:
19 Q   I'm handing you another document.  Just let
20 me know when you're done reviewing that document.
21    Do you recall seeing this e-mail before?
22 A   Not specifically.
23 Q   Is that your e-mail address at the top under
24 original message, ▮▮▮▮▮▮.com?
25 A   Yes.

## 148

1 Q   Do you know a Joshua Bluman?
2 A   I do.
3 Q   Who is Joshua Bluman?
4 A   He is a mortgage broker or was a mortgage
5 broker, to the best of my knowledge.
6 Q   And do you have any understanding as to what
7 this e-mail is about or this string of e-mails?
8 A   Out of context, it's not 100 percent clear.
9 Q   Do you have a best estimate of what this
10 e-mail is about, based on just this one page?
11    MR. EVENSEN:  To the extent you can answer,
12 but not to speculate.
13    THE WITNESS:  I cannot speculate on what
14 this is specifically.
15    Can we take a break?
16    MS. LEE:  Sure, your counsel just left
17 anyways.
18    (Thereupon, a recess was taken at
19    3:58 p.m. until 4:06 p.m.)
20    (Defendant's Exhibit L was marked for
21    identification.)
22 BY MS. LEE:
23 Q   I'm going to hand you another document,
24 moving on to the next one and this should have a
25 Bates number of 00021.

149

1  BY MS. LEE:
2      Q   Do you recognize this e-mail?
3      A   Not specifically.
4      Q   Do you know what this e-mail is about or
5  what it's discussing?
6      A   I really don't.  It seems to be a -- I
7  really don't.
8      Q   Okay.  Again, is that your e-mail address
9  there, ████████ com?
10     A   Yes.
11         (Defendant's Exhibit M was marked for
12         identification.)
13  BY MS. LEE:
14     Q   And then this next document here is Bates
15  Number 00063, if you could take a look at that.
16         Do you recognize this e-mail?
17     A   Not specifically.
18     Q   Do you have any understanding as to what you
19  were saying in this e-mail?
20     A   Nothing more than the documents speaking for
21  itself.
22     Q   Well, I'll represent to you that I don't
23  know what this document is saying, so if you can
24  interpret what you were saying here in different
25  words, that would be helpful.

150

1      A   Mark, can you please get a statement from
2  your bank with the balance as of the date your home
3  closing money went into the account.
4      Q   Let's take that sentence.  What home closing
5  were you talking about there?
6      A   As I sit here today, I don't recall.
7      Q   What account were you talking about?
8      A   I don't know as I sit here today.
9      Q   What new loan were you talking about in the
10  next sentence, that info plus the appraisal is all we
11  need to wrap up the new loan or wrap the new loan up
12  quickly?
13     A   I don't recall based on this limited amount
14  of information.
15     Q   What about the $1.2 million docs you
16  received are only for the application process, does
17  that -- what is that referring to?
18     A   It looks like the $1.2 million in docs that
19  Mark received are only for the application process.
20     Q   Do you know which application process you're
21  talking about?
22     A   I have no idea.
23     Q   Is this another e-mail account of yours,
24  ████████ com?
25     A   Yes, it is.

151

1          (Defendant's Exhibit N was marked for
2          identification.)
3  BY MS. LEE:
4      Q   Okay.  I'll hand you this next document.
5  For the record, this is Bates Number 00016.
6          Do you recall ever seeing this e-mail
7  before?
8      A   I don't recall specifically.
9      Q   Do you know who Kris Clare is?
10     A   I do not.
11     Q   Other than loaning Mr. Jowdy $200,000 for
12  the purchase of the Innisbrook property and I'm going
13  to represent to you that is the Las Vegas property we
14  have been discussing, did you have any other
15  involvement in that purchase?
16         MR. EVENSEN:  I think it assumes a fact not
17  in evidence that he knew the house he was helping
18  with was on Innisbrook, but otherwise go ahead and
19  answer the question.
20         THE WITNESS:  I believe that was answered
21  prior.
22  BY MS. LEE:
23     Q   Whether or not you had any other involvement
24  other than loaning funds?
25     A   Yes.

152

1      Q   What was your response?  You have to refresh
2  my memory.
3      A   Could we go back and find it?
4      Q   Why can't you just give me your answer as
5  you sit here today and recollect it?
6      A   I think I already did.
7      Q   Well, I would like to hear it again.
8      A   Can you ask the question again?
9      Q   Other than loaning Mr. Jowdy $200,000 for
10  the purpose of that Las Vegas property, the home, did
11  you have any other involvement with regards to the
12  purchase of that home?
13         MR. EVENSEN:  As Glen Mr. Murray's agent,
14  individually or both?
15  BY MS. LEE:
16     Q   In any capacity.
17     A   Yes.
18     Q   What other involvement did you have?
19     A   As I testified prior, Mr. Jowdy had asked if
20  I could assist in any banking institutions that would
21  assist him and Mr. Thalmann in their financing.
22     Q   I do recall you saying that.  Did you work
23  with any real estate brokers with respect to that
24  property?
25     A   No.

153

1    Q    Did you locate a financing institution that
2  they could borrow from to buy that house?
3    A    I introduced Mr. Jowdy and Mr. Thalmann to
4  several banking institutions.
5    Q    Do you know if they ended up using any of
6  the ones that you introduced them to?
7    A    I can't confirm that.  Mr. Jowdy and
8  Mr. Thalmann didn't share the details of their
9  transaction with me.
10   Q    Did you ever communicate with any third
11 parties on behalf of Mr. Jowdy or Mr. Thalmann with
12 respect to the purchase of that home?
13   A    I think I just testified to that.
14   Q    Did you talk to Joshua Bluman with regards
15 to the purchase of that home for Mr. Jowdy and
16 Mr. Thalmann?
17   A    Yes.
18   Q    And I believe you stated that Mr. Bluman is
19 a real estate broker, is that what you said?
20   A    No, it's not what I said.
21   Q    Mortgage broker.  Is that right, he is a
22 mortgage broker?
23   A    I don't know if he is.
24   Q    What is your understanding as to what he
25 does for a living?

154

1    A    I don't know.
2         (Defendant's Exhibit O was marked for
3  identification.)
4  BY MS. LEE:
5    Q    I'll hand you these documents here.  For the
6  record, these are Bates Number GM00005 through
7  consecutively GM00008.  If you could take a look at
8  this or these documents and let me know when you're
9  done.  Actually I think that last page is not part of
10 this e-mail string, but.
11        All done?
12   A    I'm not sure what you want me to do.
13   Q    Just review and let me know when you're
14 done.
15        Do you recognize this e-mail string,
16 Mr. Kenner?
17   A    I'm not finished.
18   Q    Oh, I'm sorry.
19        Are you all finished?
20   A    Yes.
21   Q    Do you recognize this e-mail string?
22   A    It looks familiar.
23        MR. EVENSEN:  Patty, I'm a little concerned.
24 We produced those, but it looks to me like there's an
25 attorney/client communication in this string between

155

1  Mr. Kenner and all I see is in the two line on the
2  first thing, it's [redacted]  I assume it's some
3  law firm in Idaho.  I'm just guessing.  As a side
4  note later on, maybe that's something we will come
5  back to.
6         MS. LEE:  I guess for the record, it was
7  produced by you.
8         MR. EVENSEN:  It may have been an
9  unintentional waiver is all I'm saying.
10        MS. LEE:  Okay.  Noted.
11 BY MS. LEE:
12   Q    Who is Bob Gaudet?
13   A    A friend.
14   Q    What were you discussing with Mr. Gaudet on
15 Page GM00008?  That's the very last page of this
16 packet.
17        MR. EVENSEN:  We may have the same issue on
18 this e-mail as I'm looking at the top line.  I don't
19 know that for sure, I just want you to make a note of
20 it.
21 BY MS. LEE:
22   Q    Do you have any recollection as to what you
23 were discussing with Mr. Gaudet in this e-mail?
24   A    It doesn't look like I was discussing
25 anything with Mr. Gaudet in this e-mail.

156

1    Q    Do you have any understanding as to what
2  Mr. Gaudet was discussing with you in this e-mail?
3    A    It looks like he was contacting someone
4  regarding a loan repayment.  It was a request of a
5  money or a loan for the Palms deal and that it
6  mentions a 30-day repayment.
7    Q    Any idea what Palms deal he is referring to
8  here?
9    A    Well, it looks like it's referencing a
10 Wayne.  It looks like it's referencing perhaps this
11 letter you presented earlier.
12   Q    For the record, I believe we're talking
13 about what was marked in the record as Exhibit C
14 previously.  Do you believe that attachment may have
15 been that Exhibit C?
16   A    It may have been.
17   Q    But as you sit here today, do you know what
18 Bob Gaudet was talking about with regards to the
19 Palms deal?
20   A    It appears to be similar to the deal that
21 Mr. Jowdy had asked me to ask around for.
22   Q    And do you know why Mr. Gaudet would be
23 involved in any way in that transaction or that
24 financing?
25   A    I understood Mr. Jowdy had asked any and all

157

1    sources he had for financing assistance.
2        Q   So is Mr. Gaudet responding to your request
3    to him to give Jowdy money for that deal?
4        A   No.
5        Q   What is this in response to, because it
6    appears to be directed to you, not Mr. Jowdy?
7        A   Correct.
8        Q   So why would Mr. Gaudet be discussing this
9    with you?
10       MR. EVENSEN:   Calls for speculation.
11       THE WITNESS:   This was an e-mail forwarded
12   2008, three years after the funding.
13   BY MS. LEE:
14       Q   So why would he be discussing this with you
15   in 2008?
16       A   I don't recall.
17       Q   And despite that being 2008, you believe it
18   has something to do with the Jowdy Palms deal?
19       A   Uh-huh.
20       Q   Is that a yes?
21       A   Yes.
22       Q   And why do you believe that?  What in this
23   e-mail causes you to believe that?
24       A   It looks as if the terms Mr. Jowdy had
25   presented are the same as Mr. Gaudet as suggested in

158

1    this e-mail.  And the reference to Wayne in the prior
2    document you gave me appears to represent Mr. Jowdy
3    representing to Wayne his interest in repaying a loan
4    in 30 days --
5        Q   Have you ever been involved --
6        A   -- related to the Palms deal.
7        Q   I'm sorry, I apologize.  I thought you were
8    done.
9        Have you ever been involved in business with
10   Mr. Gaudet?
11       A   Yes.
12       Q   In what capacity?
13       A   We were both employees at Diamante Cabo San
14   Lucas.
15       Q   What was his role in Diamonte Cabo San
16   Lucas?
17       A   I don't know specifically.
18       Q   Were there any other real estate ventures
19   besides Diamante Cabo San Lucas that you and
20   Mr. Gaudet were both involved in?
21       A   No.
22       Q   Have you ever used him as a consultant,
23   either in your personal capacity or for any of the
24   entities for which you have an ownership interest?
25       A   Can you ask that question again so I can

159

1    understand it, please?
2        (Thereupon, from the record above,
3        the reporter read, to wit:
4        "Q.  Have you ever used him as a
5        consultant, either in your personal
6        capacity or for any of the entities
7        for which you have an ownership
8        interest?")
9        THE WITNESS:  Yes.
10   BY MS. LEE:
11       Q   On how many occasions?
12       A   I don't recall specifically.
13       Q   More than five?
14       A   I don't think so.
15       Q   And were those in your individual capacity
16   or in your capacity as an owner of a company?
17       A   I don't recall specifically.
18       Q   What did he consult you on?
19       A   Business transactions.
20       Q   With whom?
21       A   Assistance in funding.
22       Q   And when did he do this?
23       A   I believe in the summer of 2006.
24       Q   Was it with regards to any specific project
25   in particular?

160

1        A   In 2006, yes.
2        Q   What project was that?
3        A   The real estate development in Hawaii.
4        Q   Was that the Na'alehu Ventures that we
5    discussed earlier?
6        A   Yes.
7        Q   As to the remainder of this e-mail string,
8    from Pages 5 through 7, what is being discussed here
9    if you can remember?
10       MR. EVENSEN:  Are you talking about only
11   where his name refers or are you referring to the
12   entirety?
13   BY MS. LEE:
14       Q   Well, to the extent you know what is being
15   discussed here.
16       A   Based on the dates of these e-mails, it
17   appears that Mr. Gaudet and acquaintances of his are
18   looking for additional hard money perhaps to repay
19   Glen Murray's loan to Mr. Jowdy.
20       Q   Do you have any knowledge or understanding
21   as to why those gentlemen would be looking to repay
22   that loan on Mr. Jowdy's behalf?
23       A   Again, these dates appear to be within that
24   30-day window Mr. Jowdy had promised to pay back Glen
25   Murray.

161

```
 1      Q   And maybe I misunderstood what you said.
 2   Are you saying that these communications appear to be
 3   Mr. Gaudet and an associate of his discussing
 4   repaying Mr. Murray that money that was loaned to
 5   Jowdy?
 6      A   It appears that way, based on the dates of
 7   of the correspondences.
 8      Q   Do you have any idea why they would
 9   undertake to do that on behalf of Mr. Jowdy's behalf?
10      A   It appears they were requested to do so.
11      Q   By whom?
12      A   It appears by Mr. Jowdy.
13      Q   Can you point to the place in this e-mail
14   chain that leads you to believe that Mr. Jowdy was
15   the one that requested or instructed them to try to
16   secure funding to repay Mr. Murray?
17      A   It appears on GM00008 that there was a
18   document titled Wayne bracket one doc that appears to
19   coinside with a letter from Mr. Jowdy to a gentleman
20   named Wayne with collateral and repayment terms.
21         It looks like on GM00007 that's Mr. Gaudet's
22   acquaintances are checking with fast hard money
23   lenders who appear to be very expensive.
24         It appears on GM00006 that a John Mahoney is
25   referring to the person looking for the money as a
```

162

```
 1   resident of Las Vegas and very rich and just need
 2   interim financing --
 3      Q   Did you ask or instruct Mr. Gaudet to assist
 4   Mr. Jowdy in obtaining financing?
 5      A   Excuse me.
 6      Q   I'm sorry, I thought you were done.
 7      A   And on GM00005, in the e-mail dated April
 8   14, 2008, it looks as if Bob Gaudet is confirming all
 9   the prior e-mails are related to Palms/KJ, which I
10   would assume means Ken Jowdy.
11      Q   Okay.  Thank you.
12         Did you ever instruct Mr. Gaudet to obtain
13   loans or monies for Mr. Jowdy so that Mr. Jowdy could
14   purchase the Palms units?
15      A   No.
16      Q   Did Mr. Gaudet have any relationship with
17   Mr. Jowdy, to your knowledge?
18      A   Yes.
19      Q   Were they friends or business associates or
20   both, to your knowledge?
21      A   I believe they were both.
22      Q   Did Mr. Jowdy meet Mr. Gaudet through you?
23      A   No.
24      Q   Did you meet Mr. Gaudet through Jowdy?
25      A   Yes.
```

163

```
 1      Q   Do you know who John Mahoney is?
 2      A   Yes.
 3      Q   And who is he?
 4      A   He is a friend of Bob Gaudet's.
 5      Q   Do you have any personal direct relationship
 6   with Mr. Mahoney?
 7      A   Not specifically.
 8      Q   Up at the top there, it says to
 9                              com.  Do you have any understanding as
10   to who that is?
11      A   Yes.
12      Q   Who is that?
13      A   Paul Augustine.
14      Q   Do you and Mr. Augustine have any business
15   relationships other than attorney/client?
16      A   I don't believe so.
17      Q   Has he ever invested funds through you or
18   with you?
19      A   No.
20      Q   Does he have any ownership interest in any
21   of the same companies in which you have an ownership
22   interest?
23      A   No.
24         (Defendant's Exhibit P was marked for
25         identification.)
```

164

```
 1   BY MS. LEEE:
 2      Q   I'll hand you this next document.  If you
 3   could just take a moment to review that document and
 4   let me know when you're done.
 5         Are you done?
 6      A   (Witness nods head.)
 7      Q   Do you recognize this e-mail string,
 8   Mr. Kenner?
 9      A   Not specifically.
10      Q   Do you recall ever having any communications
11   with Mary Connelly on Mr. Thalmann's behalf?
12      A   I believe so.
13      Q   For what purpose?
14      A   Again, Mr. Jowdy and Mr. Thalmann had
15   requested my assistance now for the second time in
16   refinancing their home in Las Vegas.
17      Q   So this was about refinancing, not the
18   original purchase?
19      A   I believe so.
20      Q   So you assisted in both the original
21   purchase and the refinancing, is that correct?
22      A   I was asked to introduce them to potential
23   lenders that they could finance through.
24      Q   And then what about refinancing, did they
25   ask you separately for that?
```

165

1    A  I believe they asked me a second time to
2    assist them in financing again.
3    Q  And you believe that this, at least on
4    Page 64 at the top there, that this communication
5    deals with the refinancing of that Las Vegas
6    property?
7    A  I believe so.
8        (Defendant's Exhibit Q was marked for
9        identification.)
10   BY MS. LEE:
11   Q  I'll hand you this next document.  For the
12   records, it's Bates Number 00017.  If you can take a
13   look at that and let me know when you're done.
14   A  Yes.
15   Q  Do you recognize this e-mail string?
16   A  Not specifically.
17   Q  Do you have any understanding as to what is
18   being discussed here?
19   A  It looks like Mr. Jowdy is looking for
20   confirmation that Glen Murray is going to lend him
21   the money as he requested for the Palms deal.
22   Q  Was Mark Thalmann involved in that process
23   at all just with the original loan from Murray to
24   Jowdy, to your knowledge?
25       MR. EVENSEN:  When you say in that process,

166

1    are you talking about the property or the Palms deal?
2        MS. LEE:  The Palms deal, the original
3    $800,000 loan.
4        THE WITNESS:  Can you ask me one more time
5    so we're clear?
6    BY MS. LEE:
7    Q  Sure.  Did Mr. Thalmann have any involvement
8    with regards to Mr. Murray's loan to Mr. Jowdy for
9    the $800,000?
10   A  Not between Mr. Murray and Mr. Jowdy.
11   Q  Okay.  To your knowledge, did he have any
12   involvement in that transaction, whatsoever?
13   A  I don't know what he does for Mr. Jowdy.
14   Q  Just to your knowledge is what I was asking?
15   A  No.
16   Q  Do you hold any professional licenses?
17   A  No.
18   Q  Have you ever?
19   A  Yes.
20   Q  What professional licenses have you
21   previously held?
22   A  Securities licenses 7, 63 and 65.
23   Q  When was the last time you had a Series 7
24   license?
25   A  Over five years ago.

167

1    Q  And why are you no longer licensed as a
2    Series 7 agent?  So what happened five years ago that
3    you are no longer licensed with your Series 7
4    license?
5    A  It was not renewed.
6    Q  What does the renewal process entail?
7    A  I don't recall.
8    Q  How long were you licensed as Series 7?
9    A  Over five years.
10   Q  When was the last time you held a Series 63
11   license?
12   A  I don't recall.
13   Q  More than five years ago?
14   A  Yes.
15   Q  More than ten years ago?
16   A  The last time?
17   Q  Yes.
18   A  More than five years ago.
19   Q  Was it more than ten years ago?
20   A  Yes, I held it more than ten years ago.
21   Q  So was it the same thing, you just didn't
22   renew it?
23   A  Correct.
24   Q  When was the last time you held a Series 65
25   license?

168

1    A  They were all the same.
2    Q  I'm sorry?
3    A  They were all relinquished at the same time.
4    Q  The 7, 63 and 65 were?
5    A  Yes.
6    Q  And all because you chose not to renew them?
7    A  Yes.
8    Q  Do you hold any other professional licenses
9    or certifications or have you held any -- let me ask
10   the first question.  Do you currently hold any other
11   licenses or certifications?
12   A  I do not.
13   Q  Other than the Series 7, 63 and 65, have you
14   ever held any other licenses or certifications?
15   A  I don't believe so.
16   Q  Do you have any college degrees?
17   A  Yes.
18   Q  What college degrees do you hold?
19   A  I have a management degree.
20   Q  From where?
21   A  Rensselaer Polytechnic Institute.
22   Q  Where is that located?
23   A  Troy, New York.
24   Q  When did you obtain that degree?
25   A  1991.

---

169

1    Q    Are you a licensed agent with any state
2    within the United States?
3    A    No.
4    Q    Are you a licensed real estate broker within
5    any state in the United States?
6    A    No.
7         (Defendant's Exhibit R was marked for
8         identification.)
9    BY MS. LEE:
10   Q    I'm just going to hand you this article
11   here.  If you could just take a look at that, let me
12   know when you're done.
13   A    Yes.
14   Q    Have you ever seen this article before?
15   A    Specifically, no.
16   Q    Do you know whether or not, when they refer
17   to Juneau in this article, if they're referring to
18   the lawsuit that I presented to you earlier?
19   A    I would assume so.
20   Q    And if you would take a look here, kind of
21   like the third full paragraph -- is it third?  It's
22   hard to tell here.  I'm just going to show you on my
23   paper here, it starts with a source familiar with the
24   case says, do you see that on your paper?
25   A    Yes, I do.

---

170

1    Q    Is that Tommy Constantine, the same Tommy
2    Constantine we were discussing earlier?
3    A    Yes.
4    Q    Do you have a business relationship with
5    Mr. Constantine as well as being his friend?
6    A    I do not.
7    Q    Have you ever had any business relationships
8    with Tommy Constantine?
9    A    In what context?
10   Q    In any context?
11   A    I was a business partner of his in an entity
12   years ago.
13   Q    What was that entity called?
14   A    Euphora.
15   Q    And what did that company do?
16   A    It was a credit card and prepaid card
17   company.
18   Q    And when is the last time that company
19   operated?  When was the last time that company
20   operated?
21   A    That company is still in operation.
22   Q    So are you and Mr. Constantine still
23   business partners in that entity?
24   A    No.
25   Q    Is Mr. Constantine no longer a member of

---

171

1    that entity or is it yourself?
2    A    I am no longer involved with that company.
3    Q    When was the last time you had any
4    involvement with that company?
5    A    In approximately 2005.  And, again, I'm
6    confused how this has anything to do with Glen Murray
7    and Ken Jowdy.
8    Q    Did Mr. Constantine ever invest any money
9    with you?
10   A    I don't believe so.
11   MR. EVENSEN:  Patty, I think you are getting
12   far flung here and I will object to relevance.
13   BY MS. LEE:
14   Q    Can you look in this second section here
15   where it starts, Juneau isn't the only hockey player,
16   do you see where it starts out with that sentence?
17   A    I do.
18   Q    A little bit later in that paragraph it
19   mentions Jozef Stumpel.  Is that the same gentleman
20   you referred to earlier that invested part of that
21   $2.5 million in the Diamante Cabo San Lucas project?
22   A    That is the same gentleman.
23   MR. EVENSEN:  Objection, relevance.
24   (Defendant's Exhibit S was marked for
25   identification.)

---

172

1    BY MS. LEE:
2    Q    If you could just take a look at this
3    document and just focus specifically on the part that
4    starts with Tommy Constantine on the bottom there.
5    It's a very short article.
6    Have you ever seen this article before?
7    A    I have not specifically.
8    Q    Do you know if Tommy Constantine also goes
9    by the name or formally gone by the name Tommy
10   Marovitis?
11   A    Yes.
12   MS. LEE:  Why don't we take a short break,
13   like five minutes and then I should be able to wrap
14   this up.
15   (Thereupon, a recess was taken from.
16   4:50 p.m. until 4:58 p.m.)
17   BY MS. LEE:
18   Q    We can go back on the record.
19   Mr. Kenner, are you aware of any fraud
20   charges or other criminal charges pending against
21   Mr. Jowdy in Mexico?
22   MR. EVENSEN:  Objection, relevancy.
23   THE WITNESS:  Can you read the question
24   back?
25   (Thereupon, from the record above,

173

1     the reporter read, to wit:
2     "Q.  Mr. Kenner, are you aware of any
3     fraud charges or other criminal
4     charges pending against Mr. Jowdy in
5     Mexico?")
6     THE WITNESS:  I don't know specifically.
7  BY MS. LEE:
8     Q   Do you know generally?
9     A   I don't know generally.
10    Q   Have you lodged any complaints with any
11 authorities in Mexico about Mr. Jowdy?
12    A   No.
13    Q   Has anyone else, to your knowledge, that you
14 know made any criminal complaints to any authorities
15 in Mexico against or about Mr. Jowdy?
16    A   I don't know.
17    MR. EVENSEN:  Objection, relevancy.
18 BY MS. LEE:
19    Q   Do you know if there's an arrest warrant for
20 Mr. Jowdy in Mexico?
21    A   I don't know.
22    MR. EVENSEN:  Continuing objection to all
23 this.
24 BY MS. LEE:
25    Q   I'm going to represent on the record that

174

1  during our deposition, during a break, a process
2  server, through deception --
3     MR. EVENSEN:  I disagree with that, Patty.
4  BY MS. LEE:
5     Q   I'll tell you what our receptionist said.
6  She said that the process server stated to our
7  receptionist that he had some emergency documents
8  from Mr. Evensen's office that needed to get to him
9  immediately.
10    Based on that, our receptionist let the
11 server in and my client was subsequently served with
12 a complaint.  In this complaint, there's several
13 plaintiffs, including Glen Murray.  Are you at all
14 knowledgeable of any other complaint that Mr. Murray
15 is bringing against Mr. Jowdy.
16    MR. EVENSEN:  Other than these two?  The one
17 we're here talking about today?
18 BY MS. LEE:
19    Q   The one we're here talking about today, but
20 I'm asking if you know of any other complaints, other
21 than the one that we're involved in on this $800,000
22 loan?
23    A   That Mr. Murray is directly involved with?
24    Q   Yes.
25    A   Yes.

175

1     Q   Can you tell me what the nature of that
2  complaint is?
3     A   It is the Arizona case that Mr. Murray is a
4  partner in with Little Isle IV.
5     Q   I'm sorry, what was that last part?
6     A   Little Isle IV versus Ken Jowdy.
7     Q   Are you aware of any other lawsuits that
8  Mr. Murray, in his individual capacity, but not as a
9  partner of any company, in his individual capacity
10 has brought or intends to bring against Mr. Jowdy?
11    MR. EVENSEN:  Object to the extent it calls
12 for speculation.
13    THE WITNESS:  I can't speculate what
14 Mr. Murray does with his outside advisors.
15 BY MS. LEE:
16    Q   Have you discussed any other lawsuits
17 involving Mr. Murray against Mr. Jowdy with
18 Mr. Murray?
19    MR. EVENSEN:  To the extent it calls for
20 attorney/client privilege, I'll instruct you not to
21 answer, but to the extent you can answer, go ahead.
22 BY MS. LEE:
23    Q   And I'm not talking about any conversations
24 you had with him and anyone from Mr. Evensen's office
25 or any of the lawyers.  I'm asking whether or not you

176

1  had any conversations with Mr. Murray directly about
2  any other litigation against Mr. Jowdy other than the
3  $800,000 loan?
4     A   I believe any communication of that nature
5  would have been protected by attorney/client
6  privilege.
7     Q   You think it would have been?
8     A   Yes.
9     Q   So you have only discussed any other
10 lawsuits with Mr. Murray in the presence of an
11 attorney?
12    A   Can you ask that question again?
13    Q   You have only communicated with Mr. Murray
14 about any lawsuits involving my client, Mr. Jowdy, in
15 the presence of an attorney?
16    A   I believe so.
17    Q   Do you believe that Mr. Jowdy has committed
18 any illegal acts in Mexico?
19    MR. EVENSEN:  Objection, relevance.
20    THE WITNESS:  I can't speculate.  I don't
21 know Mr. Jowdy's business.
22 BY MS. LEE:
23    Q   Have you ever witnessed him performing any
24 illegal acts in Mexico?
25    A   Can you define what an illegal act in Mexico

177

1 would be?
2    Q   I assume it would be the same as any illegal
3 act here. Have you ever witnessed Mr. Jowdy behave
4 in a way that you would construe to be illegal while
5 he was in Mexico?
6    A   I'm not a Mexican attorney, so can you
7 define what behave and witness would be?
8    Q   Witness means to look, to observe to see and
9 behave means Mr. Jowdy's conduct, have you ever
10 observed any conduct on behalf of Mr. Jowdy that you
11 would characterize as illegal, understanding that
12 you're not an attorney?
13    A   Can you give me an example, so I understand
14 what you're asking?
15    Q   Well, I would like probably give you a
16 million examples. Have you ever seen him kill
17 anybody, beat anybody up, take any money in the form
18 of a bribe, anything that you would characterize as
19 being illegal?
20    A   Not in person.
21    Q   Have you heard of Mr. Jowdy performing any
22 illegal acts?
23       MR. EVENSEN:  Calls for speculation.
24       THE WITNESS:  I don't want to speculate
25 today.

178

1 BY MS. LEE:
2    Q   I'm not asking you to speculate. I'm
3 asking, has anyone ever told you that Mr. Jowdy has
4 performed any illegal acts?
5    A   In Mexico?
6    Q   In Mexico.
7       MR. EVENSEN:  To the extent it calls for a
8 legal conclusion in Mexican law, I'll object.
9 BY MS. LEE:
10    Q   I understand, of course, you're not a lawyer
11 in Mexico, but I think that common sense dictates
12 what would and would not be illegal.
13    A   At this time, I don't recall.
14    Q   Have you ever witnessed anyone handing
15 Mr. Jowdy any sum of cash in Mexico?
16       MR. EVENSEN:  Can you read that question
17 back.
18       (Thereupon, from the record above,
19       the reporter read, to wit:
20       "Q.  Have you ever witnessed anyone
21       handing Mr. Jowdy any sum of cash in
22       Mexico?")
23       THE WITNESS:  I don't recall specifically.
24 BY MS. LEE:
25    Q   Do you recall generally?

179

1    A   I don't recall generally at this time.
2    Q   What about anyone giving Mr. Jowdy any
3 amount of cash in the United States, do you recall
4 that, ever seeing that?
5    A   Yes, I do.
6    Q   When?
7    A   I don't recall specifically.
8    Q   From whom?
9    A   From me in particular.
10    Q   Is that all part of the loans that we
11 discussed earlier that you had made to Mr. Jowdy?
12    A   Yes.
13    Q   Outside of the context of loans, did you
14 ever give Mr. Jowdy any cash at any other time for
15 any reason?
16    A   I'm sure I did.
17    Q   And how much in cash have you given
18 Mr. Jowdy?
19    A   I don't recall.
20    Q   When you loaned Mr. Jowdy monies under that
21 revolving line of credit we discussed earlier, how
22 did you keep track of how much you were lending him?
23    A   There are bank statements from the lending
24 accounts.
25    Q   Lending accounts held by who?

180

1    A   By the plaintiffs in the lawsuit.
2    Q   And where did the money come from to loan
3 Mr. Jowdy? And I'm sorry, I'm talking just
4 specifically about the cash payments that you made to
5 Mr. Jowdy, where did that cash come from?
6    A   In what context?
7    Q   Well, when you handed Mr. Jowdy cash as part
8 of the -- these universal loans that you made to him
9 over time, where would you obtain that cash from?
10    A   Could have been any number of sources.
11    Q   So it wasn't always from the same source,
12 they were varying sources?
13    A   Sure.
14    Q   So other than you handing him cash in the
15 United States, have you ever witnessed anyone else
16 giving him cash?
17    A   Not that I recall.
18       MS. LEE:  Okay. Well, I don't think I have
19 any further questions. Thank you for your time
20 today.
21       MR. EVENSEN:  I have no questions of this
22 witness at this time.
23
24
25

181

1          ROUGH DRAFT
2
3    IMPORTANT NOTE:  This file contains strictly a rough
4    draft of proceedings indicated.  All recipients of
5    this file, by their review, agree and acknowledge
6    that this file and its contents may not be used for
7    any purpose as though it is the final, fully-edited
8    transcript of proceedings.  The contents of this file
9    may not be (1) quoted from, (2) used as a reference
10   in other documents or during future proceedings or
11   (3) be relied upon other than for
12   note-taking/recollection purposes of counsel in
13   attendance at proceedings indicated.  This is not a
14   certified transcript of proceedings and is intended
15   only for use within the parameters set forth above.
16
17          DEPOSITION OF PHILIP KENNER
18
19
20
21
22
23
24
25   Reported by:  Sarah Safier, CCR No. 808

ROUGH DRAFT Deposition of Philip Kenner                    6/18/09
                        Murray v. Jowdy

1

| A | | | | |
|---|---|---|---|---|
| **able** | 33:24 98:14 | 22:13 52:2 | 10:6 57:25 | 58:4 63:16 |
| 9:9 53:16 | 176:25 | **advised** | 58:25 63:5 | 70:21 73:10 |
| 120:13,19 | 177:3 | 51:25 | 63:8,12,13 | 74:12 80:13 |
| 121:19 | **acted** | **advising** | 63:21,23 | 80:23 90:8 |
| 137:11 | 40:25 51:19 | 23:6,15 24:1 | 75:8 113:17 | 96:1 116:20 |
| 172:13 | 103:11 | **advisor** | 152:13 | 127:11 |
| **Aboud** | **acting** | 21:13 23:13 | 167:2 169:1 | 140:5 |
| 135:9 | 4:19 5:16 | 24:5 31:25 | **ago** | 143:15 |
| **absolutely** | 6:3 10:25 | 33:13 51:4 | 7:7,8 8:10 | 151:18 |
| 5:17 61:10 | 12:12,15 | 51:10 55:19 | 10:24,25 | 175:21 |
| **accept** | 131:22,24 | 55:23 62:22 | 63:3 75:25 | **airport** |
| 4:25 | **action** | **advisors** | 83:10,11 | 103:25 |
| **account** | 6:17,17,18 | 17:21 18:11 | 102:15 | **alert** |
| 65:4 136:16 | 6:22 8:11 | 19:11,14,19 | 166:25 | 65:13 66:12 |
| 150:3,7,23 | 76:13 | 19:25 20:5 | 167:2,13,15 | **alerted** |
| **accountant** | **actions** | 20:9,10,12 | 167:18,19 | 65:15 99:9 |
| 51:23 56:1 | 6:19 142:4 | 20:16,20,23 | 167:20 | **allegation** |
| **accounting** | 143:10,23 | 21:6 22:12 | 170:12 | 113:16 |
| 87:4 | **activities** | 26:18 27:13 | **agree** | **allegations** |
| **accounts** | 92:10,12 | 27:17,24 | 1:5 47:2 | 71:8 113:15 |
| 45:14 60:24 | 103:19 | 28:21 30:4 | 56:15 63:9 | 113:17 |
| 65:9 88:9 | **activity** | 30:13,17,21 | 181:5 | **alleged** |
| 179:24,25 | 48:12 | 31:9,12,14 | **agreed** | 113:9,11 |
| **accrued** | **acts** | 33:15 34:1 | 46:10,11,22 | **alleging** |
| 89:4,11 | 176:18,24 | 34:2 44:21 | 47:9,15 | 113:4 |
| **accurate** | 177:22 | 44:22,23 | 48:3 52:22 | **allocated** |
| 102:24 | 178:4 | 45:22,24 | 56:13 61:15 | 126:19 128:4 |
| 115:16,18 | **actual** | 47:10,17,25 | **agreement** | 128:7 |
| 119:20 | 65:15 | 48:5 49:3 | 16:7,9,12,21 | **allocation** |
| 125:13 | **addition** | 49:10 50:12 | 16:22 17:4 | 128:8 |
| 134:14 | 111:4 142:12 | 92:10 | 20:11,15 | **allowing** |
| 139:8 | 142:14 | 175:14 | 24:13,16 | 58:24 |
| **accurately** | **additional** | **advisory** | 30:22 31:8 | **Alta** |
| 145:12 | 160:18 | 17:23 43:1,8 | 34:13 42:11 | 2:6 |
| **acknowledge** | **address** | **affairs** | 47:7,8,15 | **ambiguous** |
| 1:5 181:5 | 3:13,14,18 | 38:6,9 43:22 | 47:19 67:1 | 80:6 89:15 |
| **acquainta...** | 28:20 29:5 | 44:1,8,14 | 78:1 105:10 | **amount** |
| 67:14 160:17 | 29:6,8,12 | 71:6 | 135:5,20,23 | 47:22 48:1,8 |
| 161:22 | 29:16 100:2 | **affect** | 136:6,14,19 | 48:12,16 |
| **acquire** | 118:9 | 10:16 | 137:1,14,15 | 146:11,12 |
| 52:19 67:1 | 147:23 | **afield** | 138:5,9,20 | 150:13 |
| 83:16 | 149:8 | 23:2 143:13 | **agreements** | 179:3 |
| **acquiring** | **administr...** | **agency** | 17:10 31:6 | **amounts** |
| 65:22 | 106:17,19 | 7:3 35:3 | **ahead** | 75:15,18 |
| **act** | **admit** | **agent** | 10:11 16:16 | 95:8 |
| | 6:5 | 4:14,18,20 | 23:5 29:2 | **andI** |
| | **advise** | 4:22 5:4,17 | 34:18 54:17 | 35:16 |

ROUGH DRAFT Deposition of Philip Kenner                    6/18/09
Murray v. Jowdy

2

Andretti
65:25 66:12
  67:23 68:2
Andretti's
66:9
Andrew
3:11
and/or
41:24 120:8
121:13
122:13
Angeles
119:2
annual
28:14 30:7
annum
139:1
answer
9:1,6,12,17
10:10,11
16:16 23:5
23:6 31:3,3
46:14,25
63:16 70:18
70:19 73:8
73:9 74:12
80:13,23
89:16 90:8
90:13,14,15
90:18 96:1
101:14
105:24
127:11
135:8 140:5
143:7
148:11
151:19
152:4
175:21,21
answered
30:24 90:7,9
95:22 116:2
116:8,12,17
146:18
151:20
answering
90:18

anticipate
9:5
anxious
70:4
anybody
23:8 58:15
58:23 59:1
59:13,19
145:21
177:17,17
anything's
75:1
anyways
148:17
apart
33:25
apologize
35:16 96:24
158:7
appear
54:9 146:16
160:23
161:2,23
appearance
129:12
APPEARANCES
2:1
appeared
80:6 129:13
appears
146:6 147:11
156:20
157:6 158:2
160:17
161:6,10,12
161:17,18
161:24
application
150:16,19,20
appraisal
150:10
appreciate
34:25
apprised
80:20
approach
52:23

approached
68:21 139:7
approxima...
11:12 12:25
14:12,25
17:15 18:10
19:23 24:3
26:9 32:16
32:19 39:14
39:16 48:24
54:5,21
56:24 64:16
77:8 100:17
113:11
123:23
135:21
171:5
April
162:7
Arizona
4:3,4 7:9
19:20,22
20:2 28:22
76:11 88:24
88:25 89:3
89:10,19
90:2 91:15
95:11 129:8
129:12
133:22
141:11,15
141:20,22
142:10,12
142:18
175:3
arrest
173:19
article
169:10,14,17
172:5,6
articulate
126:10
asked
4:7 9:5,15
9:18 21:23
30:24 31:2
39:9 52:20

53:10 63:24
63:25 66:19
67:16 68:12
79:11 83:17
87:20,24
88:1,6 90:7
90:15 95:22
116:2,8,12
116:17
117:17
132:12
137:24
138:7
139:13
142:14
146:18
152:19
156:21,25
164:22
165:1
asking
35:2 63:20
69:24 70:5
72:19 79:16
80:1 82:16
82:20 84:5
94:23,24
101:24
114:23
115:16
139:3
145:20
146:20
166:14
174:20
175:25
177:14
178:2,3
aspect
38:20
aspects
71:5
Assante
17:21 18:11
19:10,14,19
19:25 20:5
20:10,12,16

20:20,23
assert
5:15
assist
12:4 43:22
44:9,20
50:25 51:2
51:5 71:5
117:19,22
152:20,21
162:3 165:2
assistance
44:15 157:1
159:21
164:15
assisted
51:10 52:6
60:17 96:5
104:14
164:20
assisting
18:7 83:6
assists
27:24
associate
161:3
associated
32:9
associates
162:19
assume
9:18 10:7
17:2 53:2
60:4,25
68:23 93:3
102:10
118:22
119:25
126:22
155:2
162:10
169:19
177:2
assumed
60:13
assumes
41:2,13

ROUGH DRAFT Deposition of Philip Kenner                6/18/09
Murray v. Jowdy

3

| | | | | |
|---|---|---|---|---|
| 96:15 | 102:9 | 69:17,24 | 54:22 | 164:11 |
| 151:16 | authentic... | 72:5,18,24 | 132:17,18 | 177:10 |
| **assumption** | 132:4 | 73:17 76:1 | 132:24 | **behave** |
| 94:13 | **author** | 79:23 84:14 | 148:10 | 177:3,7,9 |
| **attached** | 135:3 | 85:4 86:9 | 150:13 | **Belated** |
| 93:11 | **authored** | 86:18 87:3 | 160:16 | 59:6 |
| **attachment** | 134:17,19 | 87:25 88:4 | 161:6 | **belief** |
| 156:14 | **authorities** | 88:11 89:6 | 174:10 | 73:4 87:18 |
| **attempted** | 173:11,14 | 90:12 93:7 | **basis** | **believe** |
| 66:17 | **authorship** | 107:11,22 | 30:7,7 37:20 | 16:7,10,22 |
| **attempting** | 131:1 | 108:7,10 | 47:23 48:10 | 17:6 24:12 |
| 81:20 | **available** | 109:14 | 48:14,21 | 24:13,16,22 |
| **attendance** | 138:3 | 114:8 120:8 | 49:16,19 | 25:24 26:3 |
| 1:13 181:13 | **Avenue** | 121:5,13,20 | 69:4 70:1 | 27:6 28:11 |
| **attended** | 3:15 | 122:1,12 | 70:13 71:3 | 30:23 31:7 |
| 66:24 | **avoid** | 124:3,21 | 87:18 | 31:11 34:5 |
| **attention** | 18:18 | 127:16,18 | **Bates** | 36:5 39:6 |
| 93:7 100:11 | **aware** | 128:12 | 133:15 146:8 | 42:22 45:2 |
| 124:2 | 33:1 65:17 | 130:15 | 146:14 | 45:8,12 |
| **attorney** | 65:20,21 | 132:11 | 148:25 | 47:3 54:21 |
| 128:22 | 113:17 | 135:25 | 149:14 | 59:21 63:13 |
| 129:18 | 120:21 | 140:10 | 151:5 154:6 | 65:3,12,15 |
| 134:22 | 172:19 | 147:2 152:3 | 165:12 | 67:14 68:8 |
| 144:15,21 | 173:2 175:7 | 155:5 | **beat** | 70:6 71:16 |
| 144:23 | **Ayers** | 160:24 | 177:17 | 72:14,19,22 |
| 145:3 | 98:7 | 172:18,24 | **Becker** | 72:22 73:2 |
| 176:11,15 | **A-n-d-r-e-w** | 178:17 | 8:14 | 74:13 76:14 |
| 177:6,12 | 3:12 | **background** | **began** | 76:23 77:12 |
| **attorneys** | **a.m** | 8:16 23:3 | 40:1 69:7 | 78:4,13,15 |
| 44:24,25 | 32:23,23 | 134:21 | **behalf** | 78:20 79:15 |
| 45:1 48:13 | 35:11,11 | **backwards** | 4:20 6:3 | 82:18 85:1 |
| 52:6 | | 82:8 | 8:22 41:8 | 85:20 86:8 |
| **attorney/...** | —— **B** —— | **Baha** | 45:3,11 | 86:10,12 |
| 70:16 73:7,7 | **B** | 124:25 | 76:12,15 | 87:6,9,13 |
| 154:25 | 117:25 | **balance** | 79:3,18 | 87:15,16,17 |
| 163:15 | **back** | 150:2 | 80:4,10,19 | 87:17 88:19 |
| 175:20 | 8:20 18:24 | **bank** | 81:3 91:1 | 90:1,19 |
| 176:5 | 32:25 35:14 | 83:22 150:2 | 100:22 | 91:5,8 |
| **Augustine** | 35:18 42:20 | 179:23 | 111:1,17 | 95:13,16,24 |
| 128:23 129:7 | 42:23 43:4 | **banking** | 112:9 | 97:14 98:10 |
| 129:10,18 | 43:18 46:18 | 83:17 152:20 | 119:11 | 100:23 |
| 129:20 | 47:3,10,11 | 153:4 | 139:21,23 | 102:16,20 |
| 131:14 | 47:17,20 | **banks** | 139:23 | 102:23 |
| 163:13,14 | 48:2,7 | 44:23 | 145:18 | 103:3,5,8 |
| **Austin** | 56:18 58:4 | **based** | 153:11 | 103:15 |
| 29:10 | 59:14 62:24 | 34:21 35:22 | 160:22 | 104:19 |
| **authentic** | 64:7,12 | 48:11 54:8 | 161:9,9 | 112:21,25 |

116:9
118:25
119:4,7,17
120:16,25
121:2,16
123:5,6,7
125:10
126:25
129:20
130:7 131:2
131:22
133:5,20
137:8 141:5
141:8 142:8
145:7,11,14
145:16,23
146:19,24
147:15
151:20
153:18
156:12,14
157:17,22
157:23
159:23
161:14
162:21
163:16
164:12,19
165:1,3,7
168:15
171:10
176:4,16,17
**believed**
132:15
**benefit**
60:18 80:11
104:21
114:5,18
115:11
116:11
**best**
18:22 30:15
32:11 61:14
65:6 67:2
75:24 77:7
148:5,9
**Big**

23:24
**bill**
44:19 98:6
126:13
**billed**
46:7,8 48:15
49:12 50:13
**billing**
49:8,9
**bills**
12:3
**bit**
101:24
171:18
**Bluman**
148:1,3
153:14,18
**Bob**
155:12
156:18
162:8 163:4
**Bodi**
120:10
**borrow**
61:2 111:13
115:25
133:6 153:2
**borrowed**
61:5,12
111:11
113:11
114:3,16
115:9,20,22
116:6
138:15
141:3,6
**borrower**
135:10,22
136:4,9
**Boston**
11:8,10
**bottom**
134:6 144:8
146:5,9,15
147:9 172:4
**Box**
29:7

**bracket**
161:18
**break**
9:25 10:4
32:20 33:3
33:8 64:3,6
64:6 108:14
108:15
115:24
148:15
172:12
174:1
**breaks**
9:23
**bribe**
177:18
**bring**
40:25 124:2
175:10
**bringing**
40:18 174:15
**broad**
84:4
**broader**
113:14
**broker**
102:3 148:4
148:5
153:19,21
153:22
169:4
**brokered**
50:15
**brokers**
152:23
**brother**
126:20
**Brothers**
120:1,3,10
122:7 140:8
**brother-i...**
126:13
**brought**
40:22 41:12
175:10
**build**
38:15

**building**
28:23
**business**
4:19 10:22
10:23 11:1
11:5,11,15
11:16,20
12:1,13,15
12:23 13:3
14:22 17:23
18:6 21:8
27:25 38:6
38:9 43:1,8
43:21 44:1
44:8,14
45:20,22
50:22,24
55:19,19,23
55:24 62:22
62:25 69:4
71:5 85:17
85:20
132:19
158:9
159:19
162:19
163:14
170:4,7,11
170:23
176:21
**businesses**
93:5
**buy**
78:23 153:2
**buzzed**
108:12

C

C
122:21
156:13,15
**Cabo**
31:18,21
32:3,6,10
32:14 56:11
95:14,21,25
96:4 103:24

104:2,4,13
105:12,14
105:18
106:8,18
107:8,15
109:8,23
111:9,11
112:9 113:5
113:19
114:1,12
115:5 120:7
120:11,17
121:12,18
122:11,18
124:3,9
125:1
158:13,15
158:19
171:21
**Cactus**
28:22 29:11
**California**
7:19 8:4
50:8,9
142:18
**call**
37:17 136:15
**called**
22:16 23:19
91:24 97:14
125:8
170:13
**calls**
16:14 63:15
70:15 73:6
74:11
157:10
175:11,19
177:23
178:7
**candidate**
133:6
**capacity**
4:21,22 5:4
5:16,24 6:3
10:6 11:20
11:25 18:12

23:12 33:14
37:3 40:19
52:2,3
62:21,25
63:23 84:3
104:17
152:16
158:12,23
159:6,15,16
175:8,9
**capital**
13:21 14:4,8
14:15,24
16:6 21:4
95:21
**captured**
9:10,11
**car**
7:1,4
**card**
170:16,16
**care**
88:3
**carrying**
9:21
**case**
7:22 70:9
87:15 127:9
133:19
140:3
169:24
175:3
**cases**
6:18 142:6
**cash**
130:13
178:15,21
179:3,14,17
180:4,5,7,9
180:14,16
**catch**
82:7
**category**
44:13
**causes**
157:23
**CCR**

1:25 181:25
**cease**
22:11
**cell**
33:5
**Certainly**
5:11
**certifica...**
28:2 168:9
168:11,14
**certified**
1:14 51:22
181:14
**chain**
161:14
**change**
11:24 20:11
30:23
**changed**
11:21 15:20
**changing**
13:16
**characterize**
16:20 26:14
63:7 114:22
177:11,18
**charge**
38:5 48:9,22
**charged**
48:25
**charges**
172:20,20
173:3,4
**Charles**
144:25 145:2
145:6
**checking**
161:22
**checks**
34:10
**chose**
168:6
**Christine**
7:17 8:11
**circumsta...**
11:3

**claims**
52:9 143:9
**Clare**
151:9
**clarifica...**
68:15
**clarify**
9:16 71:24
**clear**
4:9 9:7
57:23 148:8
166:5
**clearly**
35:2
**Clemens**
66:20,20,23
66:25 67:5
67:9,13,17
68:8,17
**client**
6:3 52:9
129:3,6
174:11
176:14
**clients**
18:6,10,24
27:24 41:22
41:24 48:15
92:17,19
93:4 111:14
114:3,16
115:9,21,23
116:1,15,22
117:2
125:14,15
125:23
133:3
142:20,22
142:25
**close**
26:12,16
43:25 67:14
81:23 83:18
**closed**
122:19
**closing**
120:7 121:11

121:17
122:11
150:3,4
**coinside**
161:19
**collateral**
161:20
**collection**
76:7
**college**
168:16,18
**come**
10:23 22:25
39:18 48:19
67:21 69:7
73:4 78:5,7
78:18
125:11
155:4 180:2
180:5
**coming**
71:14
**commercial**
28:24
**Commission**
28:5
**committed**
176:17
**common**
178:11
**communicate**
49:25 50:1
51:12,13
52:24 55:25
56:18 81:5
81:18 82:3
82:11,24
120:20
121:1
122:15
153:10
**communicated**
53:2 59:24
59:25 81:2
81:4,11
88:20
121:19

176:13
**communica...**
69:1 81:22
**communica...**
38:10 154:25
165:4 176:4
**communica...**
5:10 70:17
70:20 80:21
161:2
164:10
**companies**
31:14,16,19
55:10 57:13
116:7
163:21
**company**
13:15,18,20
14:18 15:4
17:19,20,22
21:7,12,14
21:15,16,19
22:1,3,8,13
22:14,15,17
22:19,21
24:18 25:20
26:25 27:2
30:19 32:7
33:24,25
55:8 76:24
77:2,5,10
77:13,17
86:4 90:21
90:22 91:25
92:5,7,8
101:1
102:18,22
106:21,25
107:24
108:23
124:19
159:16
170:15,17
170:18,19
170:21
171:2,4
175:9

compensation
45:19
complaint
70:9,14 71:3
71:9 174:12
174:12,14
175:2
complaints
173:10,14
174:20
complete
9:1
completed
10:12
completely
132:15
completion
26:12,16
compound
39:20 84:10
84:17
114:25
115:25
concern
132:20
concerned
154:23
conclusion
16:14 63:15
74:12 178:8
conduct
177:9,10
confirm
153:7
confirmation
165:20
confirmed
120:23
confirming
162:8
confused
16:1 39:9,20
107:25
108:3,5
171:6
confusing
4:24

conjunction
13:17
Connelly
164:11
consecuti...
154:7
consistent
50:12
consistently
117:17
Constantine
65:25 66:12
67:22 68:2
170:1,2,5,8
170:22,25
171:8 172:4
172:8
Constanti...
66:9
constitute
111:16
construe
177:4
consult
159:18
consultant
31:25 33:12
158:22
159:5
consulted
102:17
consulting
22:17 23:25
24:14 38:10
38:14,18
48:11 92:8
92:10,12,14
97:17,23
98:1,2,4
contacting
156:3
contains
1:3 181:3
contents
1:6,8 181:6
181:8
contest

6:7
context
30:8 63:12
63:22 71:4
81:8,9
94:18,19
102:2
109:13
123:25
124:13
137:24
148:8 170:9
170:10
179:13
180:6
continue
35:1 136:21
continues
33:2
Continuing
173:22
continuous
11:11
contract
12:10,13,18
12:23 13:11
13:14 14:3
15:20,22,24
16:2,4,9,12
20:19 30:22
31:8 42:10
140:18,19
contractor
22:17
contracts
13:2,3,7,17
17:7 31:6
80:10
contractual
12:7 24:10
contribute
42:2,7 84:6
84:21 85:7
85:14 106:7
130:25
contributed
41:20,25

85:18
110:19
125:3
contributing
125:5,6
contribution
94:2 106:13
107:7,14
109:7,22
110:9
control
136:17
controlled
116:7
conversation
9:4
conversat...
5:7,12,13,21
5:23 70:7
105:18
175:23
176:1
convey
54:12,15
convince
53:3,6
copy
134:14 147:1
corporate
93:1
corporation
13:24 15:6
19:14 24:20
25:25 26:19
45:17
110:10
correct
5:15 8:3
16:3 17:11
22:23 36:23
39:2 43:20
47:20 53:12
53:13 56:12
67:18 68:5
76:25 77:14
88:22 89:19
95:18

111:23,24
115:23
121:24
133:8
134:23
139:10
157:7
164:21
167:23
corrected
113:22
correctly
43:24
correspon...
161:7
counsel
1:12 5:3
8:13 10:6
129:7,10
131:22,25
148:16
181:12
couple
17:14 86:8
111:4
course
33:8 35:1
36:9,9
178:10
court
8:18 9:21
covered
113:14
CPA
28:10
created
140:13 141:1
credit
136:22
137:12,20
138:2,16
140:16
170:16
179:21
creditwor...
132:14
creditworthy

ROUGH DRAFT Deposition of Philip Kenner                    6/18/09
Murray v. Jowdy

7

| | | | | |
|---|---|---|---|---|
| 132:16 | 37:19 | 122:21 | delivered | 97:6,10,15 |
| 133:6 | DCSL | 124:4 | 111:1 | 97:18 98:3 |
| criminal | 103:23 | 130:17 | deposed | 98:4,12,15 |
| 172:20 173:3 | deal | 133:9 | 6:16 8:10 | 99:6,13 |
| 173:14 | 45:16,18 | 143:17 | deposited | 100:25 |
| CSL | 80:10 98:19 | 144:3 | 88:9 | 101:5,12,20 |
| 103:25 104:1 | 120:7,9 | 145:24 | deposition | 101:23 |
| 125:1 | 121:12 | 147:3,16 | 1:17 6:12 | 102:18 |
| culminate | 122:11 | 148:20 | 10:8 33:3,6 | 103:2,24 |
| 105:21 | 156:5,7,19 | 149:11 | 33:9 174:1 | 104:3,13 |
| currently | 156:20 | 151:1 154:2 | 181:17 | 106:7 111:9 |
| 3:16 23:15 | 157:3,18 | 163:24 | depositions | 111:11 |
| 141:9,15 | 158:6 | 165:8 169:7 | 8:16 | 112:9 113:5 |
| 142:16 | 165:21 | 171:24 | deposits | 113:19,25 |
| 143:23 | 166:1,2 | define | 73:15,22 | 114:12 |
| 168:10 | dealership | 98:13 125:6 | 74:5,8,10 | 115:5 120:7 |
| | 7:4 | 176:25 | 74:10,16,17 | 120:11 |
| ___ | dealings | 177:7 | 74:20 | 121:11,18 |
| D | 131:16 | defined | describe | 122:11,18 |
| D | 132:25 | 102:11 | 49:10 | 124:3,8 |
| 124:4 | 133:1 | definition | description | 125:1 |
| daily | deals | 63:12 69:21 | 63:23 | 158:13 |
| 12:3 18:6 | 45:17 165:5 | definitions | designed | 171:21 |
| 27:22,25 | Dean | 69:14 | 68:10 | Diamonte |
| 43:21 44:1 | 3:21 | degree | desperate | 31:17,18,21 |
| 44:8 | Debbie | 168:19,24 | 60:5 | 32:3,6,14 |
| date | 66:20,23,25 | degrees | despite | 54:8 55:6 |
| 39:8,13 | 67:5 68:8 | 168:16,18 | 157:17 | 55:14,22 |
| 145:12 | December | Del | details | 56:5,10,10 |
| 150:2 | 135:16 | 31:17 54:8 | 34:19 153:8 | 95:21,25 |
| dated | deception | 55:7,14,22 | determine | 96:3 97:24 |
| 162:7 | 174:2 | 56:5,10 | 48:9,22 | 98:9 99:15 |
| dates | deduction | 96:21,23 | 119:19 | 101:8 |
| 13:8 40:11 | 94:7 | 97:1,4,6,10 | developed | 105:14 |
| 94:21,23 | deem | 97:15,18,24 | 39:2 | 120:17 |
| 160:16,23 | 35:3 | 98:3,4,9,12 | development | 158:15,19 |
| 161:6 | defamation | 98:15 99:6 | 23:11,14,18 | dictates |
| day | 7:20 | 99:13,15 | 24:21 25:6 | 178:11 |
| 60:4,8 67:4 | default | 100:25 | 26:10 32:9 | difference |
| 147:1 | 137:13,15 | 101:5,8,12 | 32:10 38:15 | 5:6 16:8,11 |
| days | defendant | 101:21,23 | 160:3 | 74:9 |
| 8:12 52:21 | 2:5 6:20,23 | 102:18 | devices | different |
| 52:22 54:5 | 7:16,22,25 | 103:2 | 33:5 | 12:18 13:18 |
| 54:11 56:24 | 142:3 143:2 | delineated | dialogue | 16:17 17:4 |
| 61:17,24 | 143:3,4 | 86:2 | 107:23 | 31:6 101:17 |
| 62:4,6,9,12 | Defendant's | deliver | Diamante | 101:25 |
| 82:19 158:4 | 99:17 117:25 | 134:11 | 95:14 97:1,3 | 104:11 |
| day-to-day | | | | |

ROUGH DRAFT Deposition of Philip Kenner                    6/18/09
Murray v. Jowdy

8

| | | | | |
|---|---|---|---|---|
| 125:22 | 155:24 | 134:25 | 181:4 | 117:14 |
| 127:2,13,21 | 156:2 157:8 | 135:2,3,6 | **draw** | **eight** |
| 128:3 | 157:14 | 135:15 | 100:11 | 125:12 126:5 |
| 135:17,18 | 161:3 170:2 | 138:21,24 | **Drive** | **either** |
| 138:1 | **discussion** | 140:11,12 | 2:6 3:21 | 9:15 24:22 |
| 146:19 | 62:7 85:2 | 140:22,24 | **duly** | 33:12 94:2 |
| 149:24 | **discussions** | 141:1 | 3:3 | 106:23 |
| **direct** | 62:10 | 143:20 | **duration** | 108:22 |
| 59:8,9 163:5 | **disparity** | 144:6,9,11 | 33:2 | 111:7,23 |
| **directed** | 126:3 | 144:12,16 | **duties** | 112:14,23 |
| 157:6 | **dispute** | 144:17,24 | 14:16 15:15 | 158:23 |
| **directly** | 5:21 6:25 | 146:2,5,8,9 | 18:2 21:11 | 159:5 |
| 45:16 55:17 | 7:1,3,5 | 146:15,19 | 27:21 37:20 | **either/or** |
| 57:20,20,24 | **distinction** | 146:20,21 | 43:19 | 94:3 |
| 58:1,8,9 | 5:7 63:18 | 146:22 | **D-i-x-o-n** | **elapsed** |
| 88:18 91:18 | **distributed** | 147:6,10,12 | 27:9 | 59:23 |
| 99:6 102:17 | 93:18 127:15 | 147:19,20 | | **electronic** |
| 111:7,23 | 127:23 | 148:23 | _____ | 33:5 |
| 112:3,8,11 | **distribution** | 149:14,23 | E | **else's** |
| 174:23 | 30:10 126:16 | 151:4 158:2 | **E** | 145:18 |
| 176:1 | 126:18 | 161:18 | 130:17 | **emergency** |
| **disagree** | 127:3 | 164:2,3 | **earlier** | 174:7 |
| 63:9 174:3 | **distribut...** | 165:11 | 14:21 56:11 | **emotion** |
| **disclosing** | 30:6 | 172:3 | 76:23 95:13 | 70:7 |
| 73:9 | **Dixon** | **documenta...** | 96:19 | **employe** |
| **disclosure** | 27:8 28:1 | 62:14,15,18 | 102:16 | 30:4 |
| 70:16 73:7 | **doc** | **documents** | 125:8 | **employed** |
| **discover** | 161:18 | 1:10 49:5,14 | 127:17,24 | 22:8,11 23:8 |
| 127:7 | **docs** | 61:19 117:1 | 133:23 | **employee** |
| **discuss** | 118:21 | 132:4 144:7 | 156:11 | 18:12 22:14 |
| 62:3 | 150:15,18 | 149:20 | 160:5 | 22:15 27:4 |
| **discussed** | **document** | 154:5,8 | 169:18 | 27:7,16 |
| 61:22 125:3 | 49:6 77:22 | 174:7 | 170:2 | 31:21,24 |
| 133:23 | 77:25 99:20 | 181:10 | 171:20 | 33:13 |
| 160:5,8,15 | 99:21,25 | **dog** | 179:11,21 | **employees** |
| 165:18 | 118:3 119:5 | 44:12 | **early** | 21:15,19 |
| 175:16 | 119:18 | **doing** | 39:15 68:8 | 22:3 158:13 |
| 176:9 | 122:24,25 | 32:3,5,15 | **earn** | **ended** |
| 179:11,21 | 123:2,4 | 36:12 49:19 | 23:10 | 153:5 |
| **discusses** | 124:7 | 62:21,25 | **East** | **engage** |
| 121:6 | 126:23,24 | 95:17 96:23 | 28:22 | 38:18 92:9 |
| **discussing** | 126:25 | 98:20 | **effect** | 92:13 |
| 95:3 100:19 | 130:20 | 104:16 | 136:19 | **engaged** |
| 125:16 | 133:13 | **dollars** | **effectuate** | 33:14 37:24 |
| 149:5 | 134:2,8,11 | 42:5 | 37:25 | **entail** |
| 151:14 | 134:14,15 | **draft** | **effort** | 27:23 167:6 |
| 155:14,23 | 134:17,24 | 1:1,4 181:1 | 139:20 | **enter** |
| | | | **efforts** | |

ROUGH DRAFT Deposition of Philip Kenner                                    6/18/09
Murray v. Jowdy

9

| | | | | |
|---|---|---|---|---|
| 12:10 13:2 | 139:24 | 34:23 35:6 | 148:11 | 110:10 |
| 20:14 | 170:11,13 | 35:15 36:7 | 151:16 | Excuse |
| entered | 170:23 | 38:2 41:2 | 152:13 | 31:17 162:5 |
| 12:22 31:5 | 171:1 | 41:13 42:16 | 154:23 | executed |
| entire | Epstein | 43:3 44:3 | 155:8,17 | 144:20 145:3 |
| 33:2 56:15 | 8:14 | 45:6 46:18 | 157:10 | Exhibit |
| entirety | equation | 51:17 53:5 | 160:10 | 99:17 117:25 |
| 38:21 76:3 | 55:16 | 54:14 57:23 | 165:25 | 122:21 |
| 160:12 | equity | 59:6 63:14 | 171:11,23 | 124:4 |
| entities | 128:9 | 64:8 66:6 | 172:22 | 130:17 |
| 25:9 40:19 | error | 68:15 70:15 | 173:17,22 | 133:9 |
| 40:24 41:6 | 145:15 | 71:20 73:6 | 174:3,16 | 143:17 |
| 41:7 51:20 | escrow | 73:17 74:11 | 175:11,19 | 144:3 |
| 59:4,11,17 | 60:24 65:4,9 | 75:4,6 | 176:19 | 145:24 |
| 76:12,16,16 | 88:9 | 79:19 80:12 | 177:23 | 147:3,16 |
| 85:17,20 | ESQ | 80:22 81:13 | 178:7,16 | 148:20 |
| 91:14,20,23 | 2:2,5 | 82:7 84:1 | 180:21 | 149:11 |
| 93:22 94:4 | established | 84:10 90:7 | Evensen's | 151:1 154:2 |
| 97:9,13 | 45:13 48:2,4 | 91:9 95:22 | 174:8 175:24 | 156:13,15 |
| 99:14 | estate | 96:15,21 | event | 163:24 |
| 100:13 | 23:11,14 | 101:14 | 80:24 | 165:8 169:7 |
| 112:13,20 | 52:1,5 56:2 | 104:6 | eventually | 171:24 |
| 112:23 | 120:12 | 105:12,15 | 118:17 | exhibits |
| 124:17 | 132:22 | 108:5,11,15 | everybody | 147:2 |
| 158:24 | 152:23 | 109:14,18 | 135:16 | existed |
| 159:6 | 153:19 | 111:18,25 | evidence | 80:25 |
| entitle | 158:18 | 112:5,15 | 41:2,13 | existence |
| 107:8,16 | 160:3 169:4 | 114:6,8,19 | 80:14 96:15 | 30:19 |
| 109:9,24 | estimate | 115:12 | 151:17 | expectation |
| entitled | 18:23 19:1 | 116:2,8,12 | evidencing | 62:5 106:6 |
| 18:22 127:7 | 75:19 77:4 | 116:17 | 62:14 | expected |
| entitling | 77:7 148:9 | 117:3,10 | exact | 61:23 62:11 |
| 126:4,5 | estimation | 119:13 | 18:25,25 | expensive |
| entity | 18:23 | 121:21 | exactly | 161:23 |
| 37:1,4,4,11 | Euphora | 124:10 | 36:12 68:23 | experience |
| 37:12,17 | 170:14 | 127:4 | 99:7 | 8:16 |
| 40:17,21 | Evansen | 128:13,15 | EXAMINATION | explain |
| 51:13 59:3 | 35:4 | 129:15 | 3:7 | 120:5 122:9 |
| 91:1,24 | Evensen | 131:17 | examined | 126:7,9,11 |
| 96:4,5,17 | 2:2 4:6,13 | 133:15,18 | 3:5 | 126:14 |
| 97:14 99:13 | 4:18 5:11 | 133:24 | example | 143:4 |
| 103:4 | 5:16,23 6:2 | 135:6,25 | 177:13 | extent |
| 104:17 | 6:9 10:5 | 136:8 | examples | 16:13 63:14 |
| 114:4,17 | 16:13 18:15 | 139:21,25 | 44:17 177:16 | 70:15,19 |
| 115:10 | 23:1 27:12 | 140:21 | exchange | 73:6,9 |
| 135:12 | 28:25 30:24 | 141:16 | 28:5 106:14 | 74:11 96:6 |
| 136:17 | 33:16 34:16 | 143:11 | 106:20 | 148:11 |
| | | 146:10,25 | | |

ROUGH DRAFT Deposition of Philip Kenner                    6/18/09
                    Murray v. Jowdy

| | | | | |
|---|---|---|---|---|
| 160:14 | facilitated | file | 3:3 12:22 | 68:17 |
| 175:11,19 | 50:21 80:10 | 1:3,5,6,8 | 16:2,4 | 130:15 |
| 175:21 | fact | 76:13 145:2 | 68:21 82:8 | 181:15 |
| 178:7 | 132:18 | 181:3,5,6,8 | 119:22 | forward |
| ex-wife | 144:15 | filed | 126:22,24 | 106:2 |
| 29:25 | 151:16 | 70:9 76:11 | 126:25 | forwarded |
| e-mail | facts | filing | 139:2 | 157:11 |
| 49:25 50:1 | 41:2,13 | 50:21 | 143:22 | found |
| 100:2,6 | 80:14 96:15 | filings | 155:2 | 120:18 |
| 101:9,10 | factual | 50:25 | 168:10 | foundation |
| 102:9,13 | 70:13 71:3 | filling | five | 54:14 131:3 |
| 118:4,7,9 | failed | 51:6 | 27:18 142:2 | four |
| 119:8,9,12 | 113:12 | final | 142:6,16,24 | 19:12 39:10 |
| 147:21,23 | fair | 1:7 126:12 | 143:23 | 88:5,10 |
| 148:7,10 | 20:4 113:25 | 126:14 | 159:13 | fraud |
| 149:2,4,8 | 114:11,23 | 181:7 | 166:25 | 172:19 173:3 |
| 149:16,19 | 115:4,16,18 | finance | 167:2,9,13 | Freedom |
| 150:23 | 123:20 | 164:23 | 167:18 | 13:21 14:3,7 |
| 151:6 | familiar | financed | 172:13 | 14:15,24 |
| 154:10,15 | 100:8 124:14 | 105:11,19,23 | flat | 16:6 21:4 |
| 154:21 | 125:2 | financial | 46:9 | frequent |
| 155:18,23 | 128:22 | 45:13 139:19 | Floor | 30:7 |
| 155:25 | 131:4,8 | 140:7 | 2:3 | frequently |
| 156:2 | 143:25 | financing | flung | 70:2 |
| 157:11,23 | 154:22 | 7:3 38:22,23 | 171:12 | friend |
| 158:1 160:7 | 169:23 | 106:3 | focus | 63:1,24 |
| 161:13 | family | 152:21 | 172:3 | 79:16 80:2 |
| 162:7 164:7 | 12:3 18:7 | 153:1 | follows | 83:15 |
| 165:15 | 27:25 43:22 | 156:24 | 3:5 | 120:10 |
| e-mails | 44:9,15,18 | 157:1 162:2 | forgot | 130:4 |
| 148:7 160:16 | far | 162:4 165:2 | 31:2 | 155:13 |
| 162:9 | 23:2 143:13 | find | form | 163:4 170:5 |
| | 171:12 | 90:12 152:3 | 130:13 | friends |
| **F** | fashion | fine | 177:17 | 41:20,22,25 |
| F | 68:9 | 4:12 | formalities | 64:1 65:21 |
| 133:9 | fast | finish | 4:11 | 65:23 |
| fabricated | 161:22 | 8:25 9:2 | formally | 125:14,15 |
| 119:18,20 | favor | finished | 129:13 172:9 | 125:20,21 |
| fabrication | 145:4 | 99:23 154:17 | former | 133:4 |
| 119:11 | federal | 154:19 | 142:22,24 | 162:19 |
| facilitate | 133:18 | firm | forms | full |
| 54:6 55:13 | fee | 4:13 5:14,22 | 51:6 | 3:10 9:2 |
| 66:4,16 | 46:9 | 15:1,2,5 | formulate | 169:21 |
| 83:21 98:11 | feel | 17:24 20:7 | 106:1 | fully-edited |
| 98:13,23 | 69:16 70:4 | 20:8 21:8 | forth | 1:7 181:7 |
| 103:9 | figure | 155:3 | 1:15 4:8 | fund |
| 129:22 | 48:6 131:20 | first | 8:20 61:15 | 40:10,15 |

ROUGH DRAFT Deposition of Philip Kenner                              6/18/09
                            Murray v. Jowdy

                                                                        11

| | | | | |
|---|---|---|---|---|
| **funded** | 163:17 | **gentleman** | 143:5 | 132:11 |
| 86:16,25 | **further** | 128:22 | 144:15 | 134:21 |
| **funding** | 64:20 102:21 | 129:24 | 145:3 | 135:22 |
| 41:11 83:25 | 180:19 | 161:19 | 152:13 | 136:4 140:5 |
| 87:7,11 | **future** | 171:19,22 | 160:19,24 | 143:15 |
| 96:7 102:21 | 1:10 18:19 | **gentlemen** | 165:20 | 145:20 |
| 104:4,14 | 135:12 | 160:21 | 171:6 | 151:18 |
| 137:18 | 181:10 | **George** | 174:13 | 152:3 |
| 138:9,12 | | 66:21,22 | **Global** | 172:18 |
| 139:20 | **G** | 67:19 68:3 | 17:21 18:11 | 175:21 |
| 145:17 | G | 79:1,14,19 | 19:10,14,19 | **goes** |
| 157:12 | 143:17 | **gestures** | 19:25 20:5 | 172:8 |
| 159:21 | 146:14 | 9:9 | 20:10,12,16 | **going** |
| 161:16 | **gathering** | **getting** | 20:20,23 | 4:10 5:14 |
| **funds** | 51:11 | 23:2 138:9 | **GM00005** | 8:17 9:5 |
| 52:14,17,18 | **Gaudet** | 171:11 | 154:6 162:7 | 23:1 34:24 |
| 56:3 60:6 | 155:12,14,23 | **give** | **GM00006** | 60:2 61:23 |
| 60:18,19 | 155:25 | 18:23 25:3 | 161:24 | 62:5 64:3,5 |
| 61:1,16 | 156:2,18,22 | 38:2 40:11 | **GM00007** | 70:17 71:14 |
| 63:20 64:13 | 157:2,8,25 | 44:17 56:13 | 161:21 | 72:3,12 |
| 64:23 65:7 | 158:10,20 | 56:15 60:1 | **GM00008** | 81:19 82:16 |
| 66:14 68:12 | 160:17 | 74:19 | 154:7 155:15 | 83:16 87:24 |
| 68:24 69:8 | 161:3 162:3 | 124:21 | 161:17 | 99:20 106:2 |
| 69:17,24 | 162:8,12,16 | 137:19 | **GM00015** | 106:3,13,16 |
| 71:11 72:3 | 162:22,24 | 138:4,8 | 146:23 | 107:1,3,7 |
| 72:12 74:20 | **Gaudet's** | 152:4 157:3 | **GM00016** | 107:15,19 |
| 81:23 82:1 | 161:21 163:4 | 177:13,15 | 147:8 | 107:23 |
| 82:5,11 | **GDM** | 179:14 | **go** | 108:9,12,25 |
| 84:8 85:10 | 97:14,15,17 | **given** | 4:10 10:3,11 | 109:3,8,23 |
| 85:22 86:5 | 97:19,23 | 48:17,23 | 15:1,21 | 110:2,6,8,9 |
| 87:3 106:7 | 101:1 | 111:6 | 16:16 17:19 | 111:25 |
| 110:22 | 102:17,19 | 144:23,24 | 20:7 23:5 | 118:3 |
| 111:11 | 103:2 | 179:17 | 29:2 32:25 | 120:11,19 |
| 112:3,6,8 | **general** | **giving** | 34:18 35:7 | 121:19 |
| 112:13 | 38:18 44:15 | 179:2 180:16 | 35:8,13 | 122:24 |
| 116:6 | 48:11 92:14 | **Glen** | 43:18 54:17 | 124:10 |
| 117:15,18 | 97:17 98:2 | 4:14,19,21 | 58:4 63:16 | 129:15 |
| 117:20,23 | 106:17,19 | 5:4,14 6:3 | 64:12 70:20 | 132:3 |
| 119:23 | 129:7,10 | 10:19,24 | 73:10 74:12 | 140:10 |
| 120:3,11,13 | 131:22,25 | 11:12,15,25 | 80:13,23 | 143:13,20 |
| 122:7 133:7 | **generally** | 12:2 14:4,5 | 84:18 88:2 | 144:7 |
| 135:23 | 44:20 53:24 | 14:21 52:22 | 90:8,12 | 148:23 |
| 136:5,18,20 | 54:2,3 | 81:25 96:13 | 96:1 108:7 | 151:12 |
| 136:25 | 87:23 173:8 | 96:16 111:8 | 109:14 | 165:20 |
| 139:3,4,9 | 173:9 | 111:19,22 | 116:19 | 169:10,22 |
| 145:8,13 | 178:25 | 127:5 133:3 | 127:11 | 173:25 |
| 146:16 | 179:1 | 141:16 | 132:2,3,5,5 | **goint** |
| 151:24 | | | | 114:19 |

ROUGH DRAFT Deposition of Philip Kenner                    6/18/09
Murray v. Jowdy

12

| | | | | |
|---|---|---|---|---|
| **good** | 62:3,8 | 149:25 | 9:24 | **illegal** |
| 44:6 64:5,8 | **happened** | **helping** | **Hotel** | 176:18,24,25 |
| **greater** | 87:21 88:1 | 83:14 151:17 | 67:2 | 177:2,4,11 |
| 107:1 108:25 | 115:17,19 | **higher** | **hourly** | 177:19,22 |
| **group** | 120:15 | 137:21 | 28:12 46:3 | 178:4,12 |
| 125:19,20 | 167:2 | **hired** | 48:14,20 | **immediately** |
| 144:25 | **hard** | 51:13 98:7 | **house** | 4:1 174:9 |
| **guess** | 74:10,16 | **history** | 83:4 151:17 | **impetus** |
| 5:8 16:1 | 160:18 | 54:9,23,24 | 153:2 | 13:16 140:12 |
| 23:20 125:7 | 161:22 | 132:25 | **housekeeping** | **implies** |
| 128:15 | 169:22 | **hockey** | 4:6 146:25 | 80:13 |
| 155:6 | **Hart** | 171:15 | **Howard** | **important** |
| **guessing** | 2:2 4:13 | **hold** | 2:3 | 1:3 8:24 |
| 155:3 | 70:13,17 | 9:24 28:1,7 | **Hughes** | 181:3 |
| **guys** | 71:2 | 166:16 | 2:3 | **inability** |
| 47:2 62:3 | **Hawaii** | 168:8,10,18 | **hundred** | 121:3,7 |
| 106:3,25 | 23:21,23 | **Holland** | 86:8 | **inaccurate** |
| 108:25 | 25:5,13,22 | 2:2 4:13 | **Hutchison** | 101:9 |
| | 26:10 37:6 | 70:13,17 | 2:5 | **inappropr...** |
| ——— | 123:8,9,11 | 71:2 | **hypothetical** | 35:4 |
| **H** | 123:12,14 | **home** | 80:22,24 | **inception** |
| **H** | 160:3 | 29:21 71:15 | 81:14 | 40:5 |
| 144:3 | **Hawaiian** | 71:17,19 | | **include** |
| **half** | 95:25 | 72:3,13,21 | ——— | 14:20 |
| 39:14 | **head** | 83:7,14,16 | **I** | **including** |
| **hand** | 9:10 36:20 | 83:18,25 | **Idaho** | 69:5 174:13 |
| 99:20 118:3 | 75:16 77:21 | 84:7,8,9,22 | 155:3 | **income** |
| 122:24 | 164:6 | 85:8,10,11 | **idea** | 22:25 |
| 143:20 | **hear** | 85:15,19,23 | 150:22 156:7 | **incomplete** |
| 144:6 | 9:16 46:16 | 86:15,23 | 161:8 | 80:22 81:13 |
| 148:23 | 152:7 | 87:7,11 | **identific...** | **incorporated** |
| 151:4 154:5 | **heard** | 89:5,13,22 | 99:18 118:1 | 91:25 |
| 164:2 | 177:21 | 90:24 91:7 | 122:22 | **increments** |
| 165:11 | **held** | 91:13 92:21 | 124:5 | 60:20,22 |
| 169:10 | 166:21 | 93:10 95:2 | 130:18 | **independent** |
| **handed** | 167:10,20 | 100:18,18 | 133:10 | 22:16 31:25 |
| 147:7 180:7 | 167:24 | 150:2,4 | 143:18 | 60:15 |
| **handing** | 168:9,14 | 152:10,12 | 144:4 | **indicated** |
| 147:19 | 179:25 | 153:12,15 | 145:25 | 1:4,13 181:4 |
| 178:14,21 | **help** | 164:16 | 147:4,17 | 181:13 |
| 180:14 | 9:13 44:19 | **homes** | 148:21 | **indicia** |
| **handle** | 63:24 68:12 | 50:18 100:21 | 149:12 | 119:11 |
| 12:3 43:21 | 83:18 84:7 | **Hoover** | 151:2 154:3 | **indirectly** |
| 44:2,8 | 85:8 | 3:15 | 163:25 | 111:7,23 |
| 55:17 | **helped** | **hopping** | 165:9 169:8 | **individual** |
| **handling** | 55:24 100:22 | 130:15 | 171:25 | 4:20,23 5:24 |
| 18:6 44:14 | **helpful** | **hostage** | **identify** | |
| **happen** | | | 131:8 | |

6:2 40:19
54:10 59:8
59:9 93:1,3
104:16
135:10,12
159:15
175:8,9
**individually**
4:15 14:5
75:7,8 84:1
101:3 103:6
104:19
141:17
152:14
**individuals**
24:18 41:7
98:7
**indulgence**
35:13
**infancy**
26:15,17
**info**
150:10
**information**
51:11 52:24
73:10 81:4
122:15
127:7
133:22
150:14
**informed**
49:18 66:1
**informing**
118:12,16
**initial**
79:1
**Innisbrook**
151:12,18
**insist**
140:18,19
**insisted**
140:20
**insistence**
140:17,25
**instance**
19:1
**Institute**

168:21
**institution**
139:19 153:1
**instituti...**
15:5 144:25
**institutions**
152:20 153:4
**instruct**
35:6 162:3
162:12
175:20
**instructed**
35:4 161:15
**instructs**
10:10
**insurance**
44:23 50:15
**intended**
1:14 181:14
**intends**
175:10
**intent**
102:13
**interact**
79:17 80:2
**interacting**
38:16
**interaction**
79:2,7
**interest**
20:22,25
21:3 25:10
25:17 37:14
52:21 57:10
57:14 59:12
59:13,18,20
61:5,17
77:10,13,16
85:18,21
92:2 93:11
93:14,15,17
97:10 98:8
99:12,15
104:18
106:15
110:11,16
112:20

117:12
127:6 128:9
137:22
138:19,23
139:24
158:3,24
159:8
163:20,22
**interests**
37:21 38:1
**interim**
13:7 162:2
**interject**
34:24
**interpret**
149:24
**interrupted**
35:15
**introduce**
55:11 164:22
**introduced**
10:24 55:15
68:3 153:3
153:6
**invest**
45:3,6 56:7
57:16 90:23
96:14 99:1
111:3 171:8
**invested**
96:17 101:22
101:25
103:19
111:10
163:17
171:20
**investment**
15:5 42:12
42:15,21,25
43:7,13
54:8 55:14
55:17,22
98:11,16
99:10
103:10,12
105:4
**investments**

111:16
125:25
126:1
**investor**
42:8,9 55:6
55:9 57:17
104:21
**investors**
92:25 93:1,1
93:3,4,18
93:20 111:4
125:19,20
**involve**
90:2 142:19
142:24
**involved**
132:22
135:12
141:9,11,16
141:19,25
143:9
156:23
158:5,9,20
165:22
171:2
174:21,23
**involvement**
64:20 70:12
71:1 83:6
83:13 104:3
104:12
111:8
151:15,23
152:11,18
166:7,12
171:4
**involving**
129:2 175:17
176:14
**island**
23:23,24
**Isle**
25:6,17 26:4
26:8 37:6
76:17,20
77:15 78:1
90:6,20

91:21 94:1
135:11
175:4,6
**issue**
143:6 155:17
**issues**
5:18,20 12:4
12:4 18:7,8
43:22,23
**IV**
25:6,17 26:5
26:8 37:6
76:17,21
77:15 78:1
90:6,20
91:21 94:1
135:11
175:4,6

---

| J |
| --- |

**J**
147:3
**JN**
25:6
**job**
13:22 34:4
40:9 96:3
**Joe**
144:1
**John**
129:24
161:24
163:1
**joint**
38:7,12
**Joshua**
148:1,3
153:14
**Jowdy**
8:22 52:9,14
52:17,18,23
53:3,10
54:4,7,13
54:19,25
55:1,2,4,11
55:15,24
56:4,14,15

ROUGH DRAFT Deposition of Philip Kenner                    6/18/09
                    Murray v. Jowdy

                                                                14

| | | | | |
|---|---|---|---|---|
| 56:19,23 | 116:7 | 172:21 | **Keiser** | 26:15 43:19 |
| 57:1 60:1,2 | 117:15,17 | 173:4,11,15 | 129:25 130:2 | 48:13 |
| 60:4 61:2,6 | 117:22 | 173:20 | 130:5,8 | 169:20 |
| 61:11,16,18 | 118:12,16 | 174:15 | **Ken** | **knew** |
| 61:23 62:14 | 119:5,8,22 | 175:6,10,17 | 54:4 66:23 | 52:20 53:11 |
| 63:24 64:14 | 120:6,18,22 | 176:2,14,17 | 67:10 98:6 | 54:7 68:2 |
| 64:17,21,25 | 120:23 | 177:3,20,21 | 98:6,7 | 151:17 |
| 65:13 66:14 | 121:10,18 | 178:3,15,21 | 105:10 | **know** |
| 66:19,23 | 122:10 | 179:2,11,14 | 106:1 110:6 | 5:9 6:7 8:18 |
| 67:3,8,10 | 126:13,19 | 179:18,20 | 114:4,18 | 9:3,24 |
| 67:13,16 | 128:10,11 | 180:3,5,7 | 115:11 | 10:19,21 |
| 68:12,22 | 128:19 | **Jowdy's** | 126:12 | 11:18,22 |
| 69:9,18,25 | 129:3 130:6 | 55:6,10 | 132:15 | 13:25 15:7 |
| 70:10 71:10 | 130:9 | 60:18,25 | 162:10 | 16:17 19:15 |
| 71:18 72:4 | 131:16 | 63:5,21 | 171:7 175:6 | 19:17 22:18 |
| 72:13,22 | 132:13,15 | 66:16 79:3 | **Kenner** | 23:23 24:17 |
| 73:16,23 | 132:19,20 | 81:3,19 | 1:17 3:3,9 | 24:25 25:2 |
| 74:6,7,15 | 133:6 135:9 | 82:3,12 | 3:11 4:7,14 | 25:4,15,16 |
| 74:19 75:2 | 136:13,15 | 88:16 | 4:15,18,20 | 27:20 28:5 |
| 75:20,22 | 136:21,24 | 100:22 | 5:2,13 6:11 | 28:6,8,9 |
| 76:1,5,11 | 137:11,13 | 121:3,6 | 33:1,15 | 30:9,18 |
| 78:2,7,18 | 137:18,24 | 132:14 | 34:11 57:24 | 31:23 32:2 |
| 78:20 79:8 | 138:3,6,11 | 143:5 | 58:17 64:13 | 32:8 42:23 |
| 79:11,20,22 | 138:14,15 | 160:22 | 88:23 99:25 | 43:14 44:16 |
| 80:11,17 | 139:2,7,9 | 161:9 | 118:7 123:2 | 48:13,18,19 |
| 81:23 82:2 | 140:3,18 | 176:21 | 124:7 | 49:3,4,15 |
| 82:5,10 | 141:4,23 | 177:9 | 130:21 | 50:1,4,5,9 |
| 83:1,3,7,14 | 142:9 145:9 | **Jozef** | 135:10,13 | 58:21 60:9 |
| 83:22 85:21 | 146:17 | 116:23 | 141:17 | 60:11 62:23 |
| 85:24 86:1 | 147:13 | 171:19 | 146:4 147:7 | 63:17 64:17 |
| 86:2,5,7,9 | 151:11 | **jump** | 154:16 | 65:2 67:7 |
| 88:17,24 | 152:9,19 | 4:12 9:6 | 155:1 164:8 | 67:19,21 |
| 89:2,10,18 | 153:3,7,11 | **jumping** | 172:19 | 69:14 74:9 |
| 90:21 91:12 | 153:15 | 9:1 | 173:2 | 74:15,18 |
| 91:15,18 | 156:21,25 | **June** | 181:17 | 76:22 77:1 |
| 92:20,24 | 157:3,6,18 | 64:16 | **Kenner's** | 77:12,15,19 |
| 93:9,13,23 | 157:24 | **Juneau** | 5:19 | 78:2,18 |
| 94:6,10,16 | 158:2 | 144:1 169:17 | **Kenneth** | 81:7 83:3,5 |
| 94:19,22,25 | 160:19,24 | 171:15 | 135:9 | 85:17 86:1 |
| 95:4 98:6,7 | 161:5,12,14 | | **kept** | 87:16 96:16 |
| 100:6 | 161:19 | **K** | 49:18 80:20 | 99:7,22 |
| 105:10 | 162:4,10,13 | **K** | **kids** | 100:20 |
| 106:6,10,24 | 162:13,17 | 2:2 147:16 | 44:12 | 101:22 |
| 108:9,22 | 162:22,24 | **keep** | **kill** | 102:15 |
| 112:24 | 164:14 | 48:13 130:15 | 177:16 | 103:21 |
| 113:4,11 | 165:19,24 | 145:5 | **kind** | 105:8,24 |
| 114:4,18 | 166:8,10,13 | 179:22 | 5:6 9:4 15:4 | 107:5 109:5 |
| 115:11 | 171:7 | | | 110:15 |

ROUGH DRAFT Deposition of Philip Kenner                6/18/09
Murray v. Jowdy

15

| | | | | |
|---|---|---|---|---|
| 113:3,7,8 | 166:11,14 | 88:5 | 47:21 51:18 | 134:1 |
| 113:24 | 173:13 | **law** | 53:9 54:16 | 135:14 |
| 114:2,14 | **knowledge...** | 4:13 9:21 | 58:1,4,14 | 136:12 |
| 115:7,22 | 174:14 | 155:3 178:8 | 59:9,10,22 | 139:22 |
| 118:5 | **knows** | **lawsuit** | 63:19 64:11 | 140:4,23 |
| 120:15 | 88:8 | 52:13 76:11 | 66:8 68:18 | 141:18 |
| 122:18 | **Koa** | 90:2 169:18 | 68:20 71:7 | 143:14,19 |
| 123:1 125:3 | 25:6 | 180:1 | 71:22 72:17 | 144:5 146:1 |
| 126:10 | **Kris** | **lawsuits** | 73:3,13 | 146:7,13 |
| 127:6 | 151:9 | 141:25 175:7 | 74:1,14 | 147:5,18 |
| 129:14,24 | **K-e-n-n-e-r** | 175:16 | 75:5,8,12 | 148:16,22 |
| 130:3,5,8 | 3:12 | 176:10,14 | 79:21 80:7 | 149:1,13 |
| 130:11,13 | | **lawyer** | 80:16 81:1 | 151:3,22 |
| 130:14,21 | ___L___ | 128:25 129:2 | 81:17 82:9 | 152:15 |
| 133:14 | **L** | 178:10 | 84:2,11,16 | 154:4 155:6 |
| 134:17 | 148:20 | **lawyers** | 84:24 85:12 | 155:10,11 |
| 146:3,7,22 | **lack** | 175:25 | 87:5 89:17 | 155:21 |
| 147:20 | 119:10 | **lay** | 90:10 91:10 | 157:13 |
| 148:1 149:4 | **lacks** | 23:2 131:3 | 95:23 96:18 | 159:10 |
| 149:23 | 54:14 | **LB** | 96:22 99:19 | 160:13 |
| 150:8,20 | **land** | 119:23,25 | 101:16 | 165:10 |
| 151:9 153:5 | 32:10 | **leads** | 104:10 | 166:2,6 |
| 153:23 | **language** | 161:14 | 105:14,20 | 169:9 |
| 154:1,8,13 | 102:4 | **learn** | 107:21 | 171:13 |
| 155:19 | **larger** | 78:7 | 108:3,6,14 | 172:1,12,17 |
| 156:17,22 | 128:9 | **learned** | 108:16 | 173:7,18,24 |
| 158:17 | **Lars** | 73:11 | 109:11,16 | 174:4,18 |
| 160:14 | 2:2 23:6 | **leave** | 110:4 | 175:15,22 |
| 163:1 164:4 | 27:14 84:17 | 14:24 17:18 | 111:20 | 176:22 |
| 165:13 | 146:9 | 20:5 | 112:2,7,18 | 178:1,9,24 |
| 166:13 | **Las** | **Lee** | 114:7,21 | 180:18 |
| 169:12,16 | 2:4,7 3:15 | 2:5 3:8 4:10 | 115:15 | **LEEE** |
| 172:8 173:6 | 3:21,23 4:1 | 4:17,24 5:1 | 116:3,10,14 | 164:1 |
| 173:8,9,14 | 52:19 60:25 | 5:12,18 6:1 | 116:18 | **left** |
| 173:16,19 | 71:15,16,18 | 6:5,10 8:21 | 117:5,11 | 15:21 72:19 |
| 173:21 | 72:3,12,21 | 16:15 18:17 | 118:2,6 | 148:16 |
| 174:20 | 83:4,7,16 | 23:4 27:14 | 119:15 | **legal** |
| 176:21 | 89:5,13,22 | 27:15 29:1 | 121:5,15,23 | 16:14 63:15 |
| **knowledge** | 90:23 92:20 | 31:1 32:24 | 122:1,14,23 | 63:18,23 |
| 60:15 71:13 | 93:9 95:2 | 33:18 34:17 | 124:6,12,15 | 74:12 178:8 |
| 81:11 86:14 | 100:18,21 | 34:24 35:8 | 127:10 | **Lehman** |
| 86:22 | 151:13 | 35:12,18 | 128:2,14,17 | 119:25 120:3 |
| 128:11,19 | 152:10 | 36:1,8 38:4 | 129:17 | 120:10 |
| 129:19 | 162:1 | 38:8 41:4 | 130:19 | 122:6 140:8 |
| 148:5 | 164:16 | 41:16 42:19 | 131:19 | **Lehtinen** |
| 160:20 | 165:5 | 43:12 44:5 | 132:2,10 | 116:23 |
| 162:17,20 | **lasted** | 45:9 46:24 | 133:12,17 | **lend** |
| 165:24 | | | 133:20 | |

16

| | | | | |
|---|---|---|---|---|
| 54:10 | life | 175:4,6 | 92:23 93:10 | 152:9 |
| 165:20 | 12:4 18:7 | **live** | 93:13 94:1 | **loans** |
| **lender** | 43:23 | 3:20 4:2 | 94:8,11,11 | 69:2 76:2,5 |
| 42:8 135:23 | **limited** | 29:21 50:7 | 94:12,14 | 88:23 89:2 |
| 136:6 138:8 | 150:13 | **lived** | 105:4 117:1 | 89:3,9,11 |
| **lenders** | **line** | 3:21 | 118:24 | 89:18,21 |
| 135:11,24 | 35:5 68:9 | **lives** | 120:8,19,24 | 90:3,5,21 |
| 136:7 | 136:21 | 29:14 50:5 | 121:3,7,13 | 94:17,22 |
| 161:23 | 137:12,20 | **living** | 121:18 | 125:25 |
| 164:23 | 138:2,16 | 11:6,9 23:10 | 122:12,19 | 137:16,24 |
| **lending** | 140:16 | 153:25 | 128:12,13 | 140:15 |
| 139:19 | 155:1,18 | **LLC** | 128:20 | 162:13 |
| 179:22,23 | 179:21 | 2:5 24:24 | 134:25 | 179:10,13 |
| 179:25 | **listed** | 25:1,25 | 135:2,23 | 180:8 |
| **lent** | 14:20 25:9 | 26:1,2,18 | 136:5 | **locate** |
| 116:15 | 43:20 | 26:20,21,23 | 137:20 | 153:1 |
| **letter** | **listing** | 28:21 30:4 | 138:20 | **located** |
| 123:25 | 100:12 | 30:13,17 | 140:10,12 | 19:18 100:2 |
| 130:23 | **litigation** | 31:14 33:13 | 140:14,15 | 168:22 |
| 131:20 | 7:11,13,18 | 33:15,22 | 140:21,24 | **lodged** |
| 156:11 | 8:6,13 | 34:1,8,11 | 145:10,21 | 173:10 |
| 161:19 | 52:10 88:24 | 36:17,22 | 147:14 | **long** |
| **let's** | 88:25 89:3 | 76:17,21 | 150:9,11,11 | 3:18,23 7:7 |
| 35:8 46:18 | 89:11 95:10 | 77:15 90:6 | 156:4,5 | 8:10 14:10 |
| 61:2 64:12 | 129:9,11,13 | 90:20 91:21 | 158:3 | 17:12 19:10 |
| 108:15 | 133:23 | 92:10 | 160:19,22 | 23:25 26:7 |
| 109:14 | 141:10,11 | 135:11 | 165:23 | 27:11,12,16 |
| 141:3 150:4 | 141:14,15 | **loan** | 166:3,8 | 32:17 39:7 |
| **liability** | 141:19,20 | 52:20 53:3 | 174:22 | 39:11 51:21 |
| 5:19,20 | 141:20,22 | 53:11,22 | 176:3 180:2 | 167:8 |
| **liaison** | 142:9,13 | 54:5 56:22 | **loaned** | **longer** |
| 51:3,8,9 | 176:2 | 56:22 57:19 | 45:10 52:14 | 137:11 167:1 |
| 52:6 98:15 | **litigations** | 57:20 58:7 | 52:17 59:12 | 167:3 |
| 98:22 | 142:16,19 | 58:9,15,17 | 59:19 75:2 | 170:25 |
| 103:11,18 | **little** | 58:21,23 | 75:20,22 | 171:2 |
| **liason** | 4:24 16:1 | 59:1,3 60:1 | 82:17 85:21 | **look** |
| 51:19 | 25:6,17 | 60:2 61:18 | 86:4,7 | 49:8 62:24 |
| **license** | 26:4,8 37:6 | 61:24 62:1 | 89:21 92:20 | 77:22 99:21 |
| 28:7 166:24 | 76:17,20 | 62:14,20 | 93:9,22 | 100:8 118:4 |
| 167:4,11,25 | 77:15 78:1 | 64:14,15 | 94:19,24 | 130:20 |
| **licensed** | 90:6,20 | 66:18 69:2 | 95:3 113:5 | 133:13 |
| 167:1,3,8 | 91:20 94:1 | 69:5,17 | 117:2 130:6 | 143:21 |
| 169:1,4 | 101:24 | 81:24 82:19 | 130:8 | 146:2 147:6 |
| **licenses** | 135:11 | 83:1 85:24 | 135:19 | 149:15 |
| 28:1 166:16 | 146:14 | 86:1 88:4 | 139:4 161:4 | 154:7 |
| 166:20,22 | 154:23 | 89:5,13 | 179:20 | 155:24 |
| 168:8,11,14 | 171:18 | 91:12,16,18 | **loaning** | 165:13 |
| | | | 151:11,24 | |

ROUGH DRAFT Deposition of Philip Kenner                           6/18/09
Murray v. Jowdy

17

| | | | | |
|---|---|---|---|---|
| 171:14 | 115:5 120:7 | 67:19,21 | 101:21,23 | 143:12 |
| 172:2 177:8 | 120:12,17 | 68:3,7,17 | 102:18 | matters |
| looking | 121:12,18 | 79:2,14,19 | 103:2 | 129:2,5 |
| 11:5 52:18 | 122:11,18 | Maloofs | Mark | 142:15 |
| 54:4 56:23 | 124:3,9 | 68:3 | 83:15 141:6 | mean |
| 57:2 108:11 | 125:1 | manage | 150:1,19 | 5:8 18:24 |
| 155:18 | 158:14,16 | 12:3 43:22 | 165:22 | 27:12 36:25 |
| 160:18,21 | 158:19 | 44:2 | marked | 37:23 38:16 |
| 161:25 | 171:21 | management | 99:17 117:25 | 41:5,6 |
| 165:19 | lunch | 12:23 13:4 | 122:21 | 44:11,12 |
| looks | 64:3,6,9 | 13:21 14:4 | 124:4 | 58:17,25 |
| 64:7 124:14 | ——————— | 14:8,16,25 | 130:17 | 59:1,7 |
| 125:2 134:7 | M | 16:6 17:23 | 133:9 | 63:13 68:16 |
| 134:12 | M | 21:4,8 25:6 | 143:17 | 69:10,19 |
| 143:25 | 149:11 | 37:13,15 | 144:3 | 75:7 77:9 |
| 144:10 | Mahoney | 43:1,8 | 145:24 | 79:19,20 |
| 150:18 | 161:24 163:1 | 45:23 62:22 | 147:3,16 | 80:18 82:6 |
| 154:22,24 | 163:6 | 168:19 | 148:20 | 98:1 102:14 |
| 156:3,9,10 | mailing | manager | 149:11 | 108:4 |
| 157:24 | 29:6,8 | 4:19 10:22 | 151:1 154:2 | 110:25 |
| 161:21 | maintain | 10:23 11:1 | 156:13 | 118:21 |
| 162:8 | 50:11 | 11:5,15,21 | 163:24 | 119:13,23 |
| 165:19 | maintained | 12:1,13,15 | 165:8 169:7 | 133:1 |
| Los | 11:11 | 14:22 45:20 | 171:24 | 143:12 |
| 119:1 | majority | 55:20,24 | market | meaning |
| loss | 106:24 107:9 | 63:1 | 123:20 | 129:13 |
| 127:8 | 107:17,20 | managing | marketing | means |
| lost | 107:25 | 18:6 26:2,4 | 14:17 15:17 | 43:14 44:16 |
| 84:14 | 108:8,23 | 26:7,21 | 18:3 21:13 | 162:10 |
| lot | 109:9,25 | 36:14,16,22 | 32:5 95:17 | 177:8,9 |
| 9:13 | 110:3 | 36:24 37:1 | Marovitis | meant |
| Lucas | Maka | 37:4,12,18 | 172:10 | 128:16 |
| 31:18,22 | 25:6 | 76:24 93:5 | Martin | medications |
| 32:4,6,10 | Makika | manner | 3:21 | 10:15 |
| 32:15 56:11 | 91:24 92:3 | 126:19 | Mary | meet |
| 95:14,21,25 | 92:12,23 | Mar | 164:11 | 11:3 66:21 |
| 96:4 103:24 | 93:21,24,25 | 31:17 54:8 | Massachus... | 162:22,24 |
| 104:2,4,13 | 94:7,7,10 | 55:7,14,22 | 11:8,10 | meeting |
| 105:13,14 | 94:13,16,24 | 56:5,10 | 13:24 14:1 | 66:20,24 |
| 105:18 | 95:3,10 | 96:21,23 | 15:6,8 | 67:16 68:6 |
| 106:8,18 | Makikak | 97:1,4,6,11 | 19:14,16,21 | 68:11,16,17 |
| 107:8,16 | 92:17 | 97:15,18,24 | 50:3 | 79:1 119:1 |
| 109:8,24 | making | 98:3,4,9,12 | Masud | member |
| 111:9,11 | 10:7,8 | 98:15 99:6 | 120:10,10 | 26:2,4,7,21 |
| 112:9 113:6 | 113:18 | 99:13,15 | matter | 36:14,16,22 |
| 113:19 | Maloof | 100:25 | 4:7 7:15 | 36:24 37:1 |
| 114:1,12 | 66:21 67:17 | 101:6,8,12 | 140:1 | 37:4,12,18 |

ROUGH DRAFT Deposition of Philip Kenner          6/18/09
Murray v. Jowdy

18

| | | | | |
|---|---|---|---|---|
| 76:24 | 114:1,3,13 | 40:10,14,18 | 115:25 | 148:24 |
| 170:25 | 114:15 | 40:22,25 | 116:16 | multitudes |
| members | 115:6,8,21 | 41:8,18,19 | 117:2 125:7 | 105:17 |
| 24:25 25:2 | 116:1 125:4 | 41:25 42:2 | 130:6,8 | Murray |
| 37:22 38:7 | 125:5,9,11 | 42:7,20 | 132:13 | 4:14,19,21 |
| 38:12 | 125:18,23 | 45:3,10 | 135:19 | 5:4,14 6:4 |
| membership | 126:3,4 | 52:21 53:4 | 136:13,16 | 10:7,19 |
| 30:6,10 | 132:21 | 53:11 54:11 | 137:19 | 11:4,6,12 |
| memoriali... | 135:21 | 54:12,19 | 138:4,7 | 11:16,17,20 |
| 62:1 | 150:15,18 | 56:7 57:19 | 139:2,7,12 | 11:25 12:2 |
| memoriali... | 171:21 | 57:21 58:7 | 139:13 | 12:23 13:3 |
| 42:11 | 177:16 | 58:9,15,16 | 141:4,6 | 14:4,5,22 |
| memory | mind | 58:17,23 | 145:21 | 16:5,20 |
| 77:23 101:11 | 13:12 16:8 | 59:1,3,12 | 147:13 | 17:1,5,8 |
| 101:15 | 63:2 69:21 | 59:19 60:3 | 150:3 156:5 | 18:8 20:14 |
| 152:2 | mind-alte... | 60:5 61:5 | 157:3 | 20:20 31:6 |
| mentioned | 10:16 | 61:12 62:4 | 160:18 | 31:9,10,11 |
| 143:24 | mine | 64:18,21,24 | 161:4,22,25 | 35:3 41:24 |
| mentions | 41:21 64:1 | 65:3 68:22 | 165:21 | 42:2,11 |
| 156:6 171:19 | 65:22 130:4 | 71:9,10,14 | 171:8 | 43:2,10,19 |
| message | 133:4 | 72:20 74:10 | 177:17 | 44:9 45:14 |
| 100:3 147:24 | minute | 74:10,16,17 | 180:2 | 45:16,18 |
| met | 35:7 | 74:19 75:2 | monies | 47:5,10,17 |
| 11:7 67:8 | minutes | 75:19,23 | 60:9 62:8,11 | 47:25 48:5 |
| Mexican | 108:13 | 82:17 84:6 | 64:14,15 | 48:10,12,17 |
| 177:6 178:8 | 172:13 | 84:7,21 | 76:7 85:19 | 48:23 49:11 |
| Mexico | mischarac... | 85:7,9,14 | 90:23 93:23 | 49:15,18 |
| 54:4 132:23 | 114:20 | 86:7,9,16 | 94:6 103:1 | 50:2,3,4,11 |
| 172:21 | mischarac... | 87:1,3,10 | 104:20 | 50:16,19 |
| 173:5,11,15 | 16:3 | 87:25 88:4 | 138:19 | 51:1,5,10 |
| 173:20 | Misconstrues | 88:7,9,10 | 162:13 | 51:12,16,25 |
| 176:18,24 | 121:21 | 91:6 92:20 | 179:20 | 52:4,14,17 |
| 176:25 | misstates | 92:23 94:20 | monthly | 52:22 53:3 |
| 177:5 178:5 | 114:20 | 94:25 95:4 | 46:1 | 53:19,20,21 |
| 178:6,11,15 | misunders... | 95:21 96:4 | months | 53:25 54:3 |
| 178:22 | 7:24 107:22 | 96:5,8,10 | 68:24 86:12 | 54:6,10,13 |
| Michael | 128:16 | 97:3 99:5 | 106:18 | 54:19 55:3 |
| 65:25 67:22 | 161:1 | 100:14,22 | mortgage | 55:9,11,15 |
| middle | moment | 101:20,22 | 148:4,4 | 55:25 56:4 |
| 26:15 | 99:21 118:4 | 101:25 | 153:21,22 | 56:7,13,15 |
| million | 122:25 | 102:7 | move | 56:21 59:25 |
| 42:5 101:7 | 164:3 | 103:19 | 19:21,24 | 60:2,17 |
| 101:19 | monetary | 104:23 | 20:2,3 | 61:13,15,21 |
| 102:6,7 | 48:6,8 | 105:2 | moved | 62:13,15,17 |
| 110:19 | money | 110:20 | 20:15 50:9 | 62:21 64:14 |
| 111:2,6,22 | 22:24 30:12 | 111:13 | moving | 66:14,18 |
| 112:4,19,22 | 30:16 39:1 | 114:4,17 | 4:1 13:17 | 68:22,25 |
| | | 115:10,20 | | 69:1,3,7,17 |

ROUGH DRAFT Deposition of Philip Kenner                6/18/09

Murray v. Jowdy

19

| | | | | |
|---|---|---|---|---|
| 69:24 70:10 | 175:3,8,14 | 23:19 24:6,9 | 68:9 150:9 | 154:2 |
| 71:5,9,10 | 175:17,18 | 24:14,18,20 | 150:11,11 | oath |
| 71:14,16 | 176:1,10,13 | 25:5 33:13 | 168:23 | 9:20,20 33:1 |
| 74:20 80:20 | Murray's | 33:22 34:4 | nodded | object |
| 81:4,6,12 | 12:13 15:20 | 34:7,10 | 36:19 | 23:1 28:25 |
| 81:18,25 | 20:11 30:22 | 36:12,15,16 | nodding | 33:16 34:16 |
| 82:2,6,11 | 44:1,18 | 37:2,5,13 | 9:10 | 34:23 80:12 |
| 82:12,15,20 | 45:3,10,20 | 37:15,21 | nods | 111:25 |
| 82:24 87:21 | 52:8 54:25 | 38:6,12 | 164:6 | 112:5,15 |
| 88:3,8,17 | 55:2,13,23 | 39:12 40:3 | nonverbal | 114:19 |
| 88:21 96:13 | 63:7,8 | 40:15,16 | 9:9 | 127:4 |
| 96:16 98:15 | 72:20 86:16 | 160:4 | normal | 129:15 |
| 98:23,24,25 | 86:25 87:3 | necessarily | 9:4 | 136:8 |
| 103:11 | 87:10 98:11 | 30:11 94:15 | notary | 139:25 |
| 111:7,8,19 | 98:16,20 | 101:4 132:1 | 28:3 | 171:12 |
| 111:22 | 103:9 | necessary | note | 175:11 |
| 113:3,16,18 | 129:18 | 6:8 51:6 | 1:3 155:4,19 | 178:8 |
| 117:16,18 | 131:4,6 | need | 181:3 | objection |
| 117:20,23 | 152:13 | 9:23,25,25 | Noted | 10:12 16:13 |
| 118:13,17 | 160:19 | 10:11 33:7 | 155:10 | 18:19 38:3 |
| 118:23 | 166:8 | 61:8 77:25 | notes | 42:16 45:6 |
| 119:1 | Myrick | 136:16 | 61:19 | 53:5 54:14 |
| 120:20,21 | 7:17 8:11 | 150:11 | note-taki... | 59:6 63:14 |
| 121:1,20 | | 162:1 | 1:12 181:12 | 81:13 84:10 |
| 122:16 | ——— N ——— | needed | NRCP | 104:6 |
| 127:5 | | 39:1 54:13 | 3:1 | 105:16 |
| 128:12,20 | N | 54:15,20 | Nui | 115:12 |
| 129:21 | 151:1 | 62:14 74:5 | 25:7 | 117:3,10 |
| 131:15,23 | Najam | 81:23 | number | 135:6 |
| 132:12,22 | 98:6 126:13 | 136:13 | 18:25 46:10 | 143:11 |
| 133:3,7 | name | 137:18 | 46:11,22 | 171:23 |
| 137:16,21 | 3:10 6:24 | 138:3 139:9 | 47:2 48:6 | 172:22 |
| 139:21 | 17:20 23:17 | 174:8 | 48:11 | 173:17,22 |
| 140:3 | 23:20 24:21 | needs | 125:13 | 176:19 |
| 141:16 | 32:6 60:25 | 27:25 | 133:15 | objections |
| 143:5 | 67:4 128:23 | Neither | 146:8 | 10:8,9,9 |
| 144:15,20 | 129:24 | 29:3 37:9,10 | 148:25 | 34:25 |
| 145:3,9,17 | 160:11 | Nevada | 149:15 | obligation |
| 145:20 | 172:9,9 | 2:4,7 3:15 | 151:5 154:6 | 120:22 |
| 146:17 | named | never | 165:12 | obligations |
| 147:13 | 161:20 | 61:25 62:7 | 180:10 | 86:3 120:13 |
| 160:25 | names | 87:2 88:1,6 | numbers | observe |
| 161:4,16 | 25:3 65:24 | 106:9 | 49:7 124:21 | 177:8 |
| 165:20,23 | nature | new | 124:22 | observed |
| 166:10 | 6:25 7:18 | 7:12 13:14 | | 177:10 |
| 171:6 | 143:9 175:1 | 13:15 17:19 | ——— O ——— | obtain |
| 174:13,14 | 176:4 | 20:7,8,14 | | 69:8,17,24 |
| 174:23 | Na'alehu | | O | |

84:8 85:10
106:3
139:20
162:12
168:24
180:9
**obtaining**
38:23 162:4
**obvious**
33:9
**obviously**
4:21 5:9
18:20
**occasion**
139:18
**occasions**
6:14 75:13
95:6 159:11
**occur**
96:7
**occurred**
126:21
**occurring**
81:12
**office**
14:1 15:8,10
19:16 174:8
175:24
**Oh**
30:9 96:19
154:18
**okay**
4:24 6:1,11
7:15,24
11:6,19
16:1 17:17
20:4,14
24:17,20,25
28:20 29:22
32:3 33:11
35:8 37:14
39:11,22
51:22 53:24
54:10 57:7
62:24 63:20
64:2 65:10
67:9 69:23

70:8 73:4
80:8 89:24
101:24
108:6,16
109:12
117:14
120:18
123:8 124:2
131:24
133:18,24
135:15
142:15
146:20
149:8 151:4
155:10
162:11
166:11
180:18
**once**
56:13 60:19
64:21
120:23
**ones**
25:3,12,14
125:16
153:6
**operated**
170:19,20
**operating**
78:1 106:19
**operation**
170:21
**operator**
106:17
**opportunity**
65:14,16
70:8 99:10
**opposed**
137:20 138:9
**order**
19:24
**original**
68:24 100:3
128:8
147:24
164:18,20
165:23

166:2
**originally**
139:13
**origination**
104:14
**outlay**
68:24
**outside**
66:18 74:19
95:2 111:18
175:14
179:13
**outstanding**
82:20
**overall**
108:1
**owed**
136:17
**owes**
76:5
**owned**
7:2 93:20
97:19
112:14,23
114:4,17
115:10
116:7
123:13
124:9,18
**owner**
26:23 102:17
107:1,20
108:1,25
110:3
132:21
159:16
**owners**
106:24
108:23
**ownership**
20:22,25
21:3 25:8,9
25:16 37:14
57:13 59:12
59:18 77:10
77:16 85:18
92:2 97:10

98:8 99:12
99:14
104:18
106:14
107:9,17
109:9,25
110:10,16
112:20
124:18,25
139:24
158:24
159:7
163:20,21
**owning**
110:13
**owns**
29:24 71:16
83:3 99:15

---

**P**
**P**
163:24
**packet**
155:16
**page**
118:10
143:22
148:10
154:9
155:15,15
165:4
**pages**
124:11 160:8
**paid**
22:15,19,22
24:5 30:3
34:3,14,14
34:20,21
35:21,22
36:2 47:22
62:8 73:15
73:22 94:6
97:6,10,16
102:3
**Palms**
57:2,8,14,16
57:22 58:11

58:16,25
59:4,13,20
65:14,18
66:2,10,13
66:18,21
67:2,25
73:15,23
74:6,8,16
74:21 78:3
78:8 79:3,7
79:13,17
80:3,9,18
81:3,10,19
81:24 82:13
82:22
118:14,18
137:18
139:8,10
145:18,22
146:17
156:5,7,19
157:18
158:6
162:14
165:21
166:1,2
**Palms/KJ**
162:9
**Paniolo**
25:7
**paper**
124:20
126:17
127:3
169:23,24
**paperwork**
55:25 66:25
**paragraph**
100:12
169:21
171:18
**parameters**
1:15 181:15
**Park**
2:6
**Parkway**
2:3

ROUGH DRAFT Deposition of Philip Kenner                    6/18/09
Murray v. Jowdy

21

| | | | | |
|---|---|---|---|---|
| **part** | 153:11 | 34:6 44:19 | 127:14,23 | **Philip** |
| 4:4 25:19 | **partner** | **payment** | 128:4 | 1:17 3:3 |
| 39:22 40:1 | 38:7,13 54:4 | 47:9,16,25 | **perfect** | 4:14,15 |
| 40:7 42:25 | 170:11 | 48:1,4,7 | 33:11 | 135:10 |
| 43:7 55:18 | 175:4,9 | **payments** | **performance** | 181:17 |
| 61:8 71:25 | **partners** | 50:12 93:11 | 34:22 35:23 | **Phillip** |
| 72:2,9,11 | 76:17,20 | 180:4 | **performed** | 3:11 |
| 72:20 87:10 | 77:1,5,9 | **pays** | 49:11 178:4 | **phil@stan...** |
| 93:20 95:10 | 90:19,20 | 24:8 45:22 | **performing** | 147:24 149:9 |
| 95:20 96:3 | 170:23 | **Peccole** | 176:23 | **phone** |
| 96:25 99:15 | **party** | 2:6 | 177:21 | 33:5 49:21 |
| 111:6,10 | 6:17,18 | **penalties** | **period** | 49:22 50:2 |
| 112:14,22 | 44:20,22 | 9:22 | 15:24 39:3 | 52:24 |
| 112:23 | 51:4,20 | **pending** | **perjury** | **phrase** |
| 113:4,18 | 91:1 136:17 | 8:7,8 10:2 | 9:22 | 82:8 |
| 114:1,2,13 | 138:10 | 35:16 | **permitted** | **physically** |
| 114:15 | 140:19 | 142:16 | 136:25 | 19:18 29:9 |
| 115:6,8,21 | 142:1 | 143:23 | **person** | 37:24 |
| 116:1 | **pass** | 172:20 | 49:23,24 | **piece** |
| 121:16 | 56:4 | 173:4 | 50:2 52:23 | 124:20 |
| 128:12,20 | **patio** | **penthouse** | 103:7 | 126:17 |
| 133:21 | 35:7 | 67:1 | 161:25 | 132:21 |
| 145:8,10 | **Patricia** | **people** | 177:20 | **pja@amlaw...** |
| 147:13,13 | 2:5 8:21 | 21:18 53:15 | **personal** | 155:2 |
| 154:9 | **Patty** | 53:19,20 | 5:19 33:14 | **pja@amlaw...** |
| 171:20 | 4:6 23:3 | 77:9 79:17 | 50:22,24 | 163:9 |
| 172:3 175:5 | 35:7,16 | 80:3 103:16 | 66:19 79:12 | **pkenner@i...** |
| 179:10 | 44:4 59:6 | 112:4 | 80:11 81:24 | 150:24 |
| 180:7 | 68:15 75:6 | **percent** | 110:20 | **place** |
| **partial** | 112:1 | 25:24 27:1 | 158:23 | 16:22 68:7 |
| 57:10 | 143:11 | 52:21 54:5 | 159:5 163:5 | 161:13 |
| **participate** | 146:25 | 54:11 56:25 | **personally** | **placed** |
| 83:24 | 154:23 | 61:17 92:6 | 18:11 20:19 | 48:7 |
| **participa...** | 171:11 | 93:19 97:21 | 30:13 31:10 | **plaintiff** |
| 129:8 | 174:3 | 102:17 | 34:3 55:8,9 | 2:2 6:19,23 |
| **particular** | **Paul** | 125:12 | 57:24 58:1 | 7:16,21,25 |
| 70:6 92:16 | 128:23 | 126:4,5 | 63:25 67:19 | 8:1 10:19 |
| 121:4 | 163:13 | 139:1 148:8 | 75:3 84:23 | 142:3,7 |
| 136:16 | **pay** | **percentage** | 84:25 90:5 | **plaintiffs** |
| 159:25 | 45:24 56:24 | 25:22 26:25 | 90:25 | 174:13 180:1 |
| 179:9 | 74:20 76:1 | 92:5 105:6 | 120:12 | **plan** |
| **particularly** | 86:9 120:8 | 110:8 124:8 | **perview** | 105:21,22 |
| 137:21 | 120:11 | 124:18 | 35:2 | 106:2 |
| **parties** | 121:13,20 | **percentages** | **phase** | **planner** |
| 3:1 38:15 | 122:12 | 94:2 126:3 | 26:10 | 56:2 |
| 111:17 | 160:24 | 126:12,14 | **Phil** | **planning** |
| 135:4 | **paying** | 126:16 | 4:18,20 | 12:4 18:7 |

ROUGH DRAFT Deposition of Philip Kenner                    6/18/09
                     Murray v. Jowdy

                                                              22

| | | | | |
|---|---|---|---|---|
| 43:23 52:1 | possible | pressured | 1:4,8,10,13 | 104:21,24 |
| 52:5 | 25:19,21 | 69:16,20 | 1:14 181:4 | 105:2,6,11 |
| play | 31:24 74:23 | pretty | 181:8,10,13 | 105:18,22 |
| 55:18 | 74:25 75:1 | 132:5 | 181:14 | 106:4,8,11 |
| player | 87:12,14,16 | prevailed | process | 106:14,18 |
| 171:15 | 87:17 | 7:14 | 63:3 150:16 | 107:8,9,16 |
| please | possibly | previous | 150:19,20 | 107:18 |
| 3:9 9:15,23 | 32:1 | 80:9 90:13 | 165:22,25 | 109:8,10,24 |
| 10:2 11:22 | potential | previously | 167:6 174:1 | 110:1,3 |
| 33:4 43:4 | 5:20 164:22 | 80:9 90:9 | 174:6 | 111:9 113:6 |
| 43:20 52:11 | Power | 156:14 | procure | 113:20 |
| 54:18 58:20 | 144:20,23 | 166:21 | 103:1 | 114:1,12 |
| 65:24 73:10 | 145:3 | price | procured | 115:5 117:2 |
| 73:18 85:4 | predicate | 91:13 93:9 | 102:21 | 125:4,5,9 |
| 120:5 122:9 | 80:12 | Primarily | procuring | 159:24 |
| 127:18 | prepaid | 38:10 | 117:19,23 | 160:2 |
| 150:1 159:1 | 170:16 | principals | produced | 171:15 |
| plus | presence | 98:23 | 133:22 | projects |
| 61:17 93:13 | 49:5 176:10 | prior | 154:24 | 23:11,14 |
| 94:10 | 176:15 | 3:20 4:1 | 155:7 | 100:13 |
| 150:10 | present | 12:12 89:4 | professional | promised |
| PO | 44:7 45:21 | 89:12 | 2:6 166:16 | 160:24 |
| 29:7 | 61:18 62:13 | 114:20 | 166:20 | properties |
| pocket | 62:17 | 126:22 | 168:8 | 57:1 125:1 |
| 58:18 | presentation | 127:2,15,24 | progress | property |
| point | 66:22 68:7 | 151:21 | 82:3 | 29:22 67:25 |
| 11:21 33:21 | 68:19 | 152:19 | project | 95:2 103:10 |
| 57:8,11,14 | presented | 158:1 162:9 | 23:17 24:1,1 | 103:12,14 |
| 64:4,6 | 53:22 61:16 | private | 24:6,21 | 123:8,9,11 |
| 68:11 87:20 | 128:8 | 66:22 68:7 | 32:10 34:15 | 123:12,14 |
| 108:7 | 156:11 | 68:18 | 38:19,20,23 | 123:16,21 |
| 111:19 | 157:25 | privilege | 38:23 39:1 | 123:22 |
| 118:13 | 169:18 | 5:15,25 6:6 | 39:7,12,12 | 124:3 |
| 121:3 127:8 | presenting | 73:8 175:20 | 39:17,18,25 | 151:12,13 |
| 143:13 | 62:20 63:12 | 176:6 | 40:2,3,10 | 152:10,24 |
| 161:13 | 68:9 | privileged | 40:15,18,23 | 165:6 166:1 |
| policies | presently | 5:10 70:16 | 41:1,12,19 | proprietors |
| 50:16 | 144:1 | 70:20 | 41:25 42:3 | 24:17 |
| Polytechnic | preserve | privity | 42:12,15 | protected |
| 168:21 | 10:9 | 20:12 | 55:7,14 | 176:5 |
| portion | president | probably | 56:5,8 | provide |
| 93:13,17 | 13:23 14:15 | 28:19 39:15 | 96:11,14 | 12:8 22:21 |
| 106:11 | 15:14,15 | 132:3,5 | 100:25 | 44:13 49:15 |
| 121:5 | 21:10,11 | 177:15 | 101:21 | provider |
| 125:18 | pressure | proceeding | 102:8,18,22 | 14:17,19 |
| possibility | 69:8,11,13 | 131:17,18,21 | 103:1 104:4 | 15:17 18:3 |
| 124:23 | 69:15,22 | proceedings | 104:5,13,15 | 18:5 |

ROUGH DRAFT Deposition of Philip Kenner                          6/18/09
Murray v. Jowdy

23

| | | | | |
|---|---|---|---|---|
| providing | 181:7 | 10:12 11:18 | 168:10 | 139:1 |
| 15:23 125:7 | purposes | 16:16 20:13 | 172:23 | read |
| public | 1:12 57:20 | 21:17 23:5 | 176:12 | 35:18,20 |
| 51:22 | 58:8,24 | 23:7,10 | 178:16 | 43:3,6 |
| purchase | 79:8 132:4 | 24:19 31:4 | questioning | 46:18,21 |
| 57:2,5 58:16 | 181:12 | 33:17,19 | 35:5 | 47:11,13 |
| 58:24 59:4 | pursuant | 35:16,18 | questions | 58:4,6 |
| 59:13,20 | 136:25 | 38:25 39:21 | 9:12,14 | 59:14,16 |
| 65:16 66:10 | pursued | 39:23,24 | 18:19 35:1 | 70:25 71:20 |
| 66:13,17,17 | 76:7 | 40:13 41:14 | 39:10 71:20 | 72:5,7,24 |
| 67:1 68:13 | pursuing | 43:3 44:6 | 143:7 | 73:1,17,20 |
| 71:14,18 | 91:14 | 46:13,18 | 180:19,21 | 79:23,25 |
| 72:3,12,21 | put | 47:11 53:8 | quick | 84:14,20 |
| 80:19 81:9 | 48:15 66:22 | 54:18 56:14 | 61:23 108:12 | 85:4,6 |
| 81:19,20 | 69:8 104:23 | 58:2,12,19 | quickly | 86:17,20 |
| 82:12,16,21 | 105:1 113:5 | 59:7,14 | 132:5,6 | 89:6,8 |
| 83:14 84:6 | putting | 70:19,22 | 150:12 | 107:11,13 |
| 84:7,8,22 | 104:20 | 71:23 72:5 | quoted | 107:22 |
| 85:8,9,11 | P&S | 73:17 78:6 | 1:9 181:9 | 108:9,20 |
| 85:14,19,22 | 118:20 | 79:23 80:5 | | 109:17,18 |
| 91:6,13 | P-h-i-l-i-p | 80:13 81:16 | R | 109:21 |
| 92:20 93:9 | 3:11 | 84:14,15 | R | 114:8,10 |
| 118:22 | p.m | 85:3 86:17 | 169:7 | 115:3 121:5 |
| 145:22 | 64:10,10 | 88:6 89:1,6 | raise | 121:9 122:1 |
| 146:17 | 72:16,16 | 89:15 90:17 | 40:10 41:19 | 122:4 |
| 151:12,15 | 108:18,18 | 96:2 101:17 | 84:7 85:9 | 124:20 |
| 152:12 | 132:8,8 | 102:25 | 91:6 96:10 | 127:16,18 |
| 153:12,15 | 148:19,19 | 104:8 | 97:3 100:22 | 127:20 |
| 162:14 | 172:16,16 | 107:10 | 101:5 | 134:3 135:2 |
| 164:18,21 | | 109:12,15 | raised | 135:25 |
| purchased | Q | 109:15,18 | 41:8 100:13 | 136:3 |
| 50:18 65:11 | quantify | 112:16 | 100:24 | 138:21 |
| 78:3,8,19 | 48:15 | 114:6,7 | 101:7,20 | 159:3 |
| purchases | quarter | 115:14 | 102:1,3,5,6 | 172:23 |
| 66:4,6 67:24 | 46:11,23 | 117:21 | 102:7,11,12 | 173:1 |
| purchasing | 48:17,23 | 118:15 | 102:14,14 | 178:16,19 |
| 57:21 58:10 | 49:11 | 127:11,12 | raising | real |
| 65:14 66:2 | quarterly | 127:16,18 | 40:14 41:18 | 23:11,14 |
| 79:4,8 82:4 | 46:8 47:4,23 | 128:16 | 95:20 96:4 | 108:12 |
| 83:7 139:10 | 47:24 48:1 | 136:11 | 96:5 | 120:12 |
| purpose | 48:4,7,10 | 137:25 | rate | 132:6,22 |
| 1:7 52:7 | 49:8,9,16 | 140:5 | 46:1,3,5 | 152:23 |
| 57:21 58:10 | 49:19 | 141:12 | 47:4,9,16 | 153:19 |
| 128:25 | question | 145:19 | 117:12 | 158:18 |
| 134:24 | 4:7 5:8 9:1 | 146:23 | 137:22 | 160:3 169:4 |
| 152:10 | 9:3,18,19 | 151:19 | 138:18,19 | really |
| 164:13 | 10:2,3,11 | 152:8 | 138:24 | 5:6 108:5 |
| | | 158:25 | | 118:23 |

134:21
149:6,7
**realm**
124:23
**reask**
87:7
**reason**
5:9 69:6
79:6 87:6,9
87:13,15
90:15 97:7
119:4,7,17
119:21
133:5
179:15
**reasons**
33:9 79:10
**recall**
6:24 13:5
14:6 15:19
18:1,15,16
18:20,20,21
19:9 20:18
20:21 25:18
28:15 30:5
34:12,19
36:3,11
42:4,6,13
43:15 45:25
49:2 51:21
53:1,23,24
54:3 62:2
62:10,15,19
63:2 68:6
68:23 70:3
70:6 71:8
71:12 73:11
74:22,24
75:14,16,18
75:21 76:19
78:9,17,25
79:5 80:15
82:14,15
83:2,12,23
85:15,16
88:8 90:17
92:1 93:6

93:15,25
94:5,21
95:7,8,9
96:12 99:11
100:5
103:17
104:25
105:1
106:22,23
108:21
110:12
112:10,12
116:15
117:9,13,24
118:16
119:1,9
122:17
125:4,24
126:18
127:25
137:2,4,10
139:17
140:6,7,9
140:10,11
143:16
144:11,12
144:14,18
147:21
150:6,13
151:6,8
152:22
157:16
159:12,17
164:10
167:7,12
178:13,23
178:25
179:1,3,7
179:19
180:17
**receive**
42:14 56:3
88:10
136:25
**received**
71:10,11
82:1,5,10
150:16,19

**receptionist**
174:5,7,10
**recess**
32:22 35:10
64:9 72:15
108:17
132:7
148:18
172:15
**recipients**
1:4 181:4
**recognize**
99:25 118:7
134:2 144:8
145:8 149:2
149:16
154:15,21
164:7
165:15
**recollect**
152:5
**recollection**
30:15 32:11
61:14 67:3
75:24
119:10
124:8,16
155:22
**reconvening**
33:3
**record**
3:10,14 4:9
9:3,8,10,12
10:3,10
18:18 32:25
35:8,14,19
43:5 46:20
47:12 58:5
59:15 64:12
70:24 72:6
72:18,25
73:19 79:24
84:19 85:2
85:5 86:19
89:7 107:12
108:19
109:20

114:9 115:2
121:8,22
122:3
127:19
132:2,11
136:2 147:7
151:5 154:6
155:6
156:12,13
159:2
172:18,25
173:25
178:18
**records**
145:5 165:12
**refer**
49:4,6
100:18
138:24
169:16
**reference**
1:9 158:1
181:9
**referencing**
156:9,10
**referral**
119:23 120:3
120:11
122:7
**referred**
171:20
**referring**
37:11 39:3
86:4 91:21
139:6
140:21
150:17
156:7
160:11
161:25
169:17
**refers**
160:11
**refinancing**
164:16,17,21
164:24
165:5

**reflect**
145:12
**reflected**
126:17
147:12
**reflection**
146:16
**refresh**
77:23 101:11
101:15
124:7,16
152:1
**refusing**
126:9
**regard**
55:21
**regarding**
156:4
**regards**
5:14,20,22
14:21 43:19
52:1,4,16
54:24 56:21
61:12 63:8
74:4 82:17
82:25 98:16
103:13
118:24
152:11
153:14
156:18
159:24
166:8
**registered**
28:4
**regular**
69:3 70:1
**regularly**
49:20
**related**
7:1 38:18
135:11
158:6 162:9
**relates**
140:1 141:16
141:17
**relation**

| | | | | |
|---|---|---|---|---|
| 8:11 | renew | reporter | requested | responding |
| **relationship** | 104:6 115:12 | 8:18 35:20 | 60:12,14 | 157:2 |
| 11:12,17 | 167:22 | 43:6 46:21 | 61:2 66:14 | **response** |
| 12:7 24:10 | 168:6 | 47:13 58:6 | 81:24 98:2 | 53:14 72:22 |
| 35:3 54:24 | **renewal** | 59:16 70:25 | 98:24 | 72:24 83:19 |
| 54:25 55:2 | 167:6 | 72:7 73:1 | 161:10,15 | 107:22 |
| 55:4 67:10 | **renewed** | 73:20 79:25 | 164:15 | 125:8 |
| 67:13 79:13 | 167:5 | 84:20 85:6 | 165:21 | 139:14 |
| 79:14 83:21 | **renewing** | 86:20 89:8 | **requesting** | 152:1 157:5 |
| 162:16 | 105:15 | 107:13 | 64:22 | **responsib...** |
| 163:5 170:4 | **Rensselaer** | 108:20 | **requests** | 37:20 95:20 |
| **relations...** | 168:21 | 109:21 | 44:10,11 | 96:25 |
| 83:17 163:15 | **rep** | 114:10 | **require** | **responsib...** |
| 170:7 | 14:17 15:18 | 115:3 121:9 | 61:21 | 38:17 |
| **relevance** | 18:4 21:13 | 122:4 | **Research** | **responsible** |
| 104:7 112:15 | 27:22 | 127:20 | 15:3,13,16 | 38:22 40:14 |
| 117:3,10 | **repaid** | 136:3 159:3 | 15:21 17:4 | 40:17 41:9 |
| 171:12,23 | 52:15 61:17 | 173:1 | 17:13 21:1 | 41:18 |
| 176:19 | 62:4,6,11 | 178:19 | **reserve** | **restroom** |
| **relevancy** | 93:13,15 | **represent** | 6:6 | 9:25 |
| 28:25 34:16 | 136:20 | 4:8 37:3,21 | **reside** | **result** |
| 34:23 38:3 | **repay** | 37:25 43:23 | 30:1 | 103:18,20 |
| 105:16 | 113:12 | 63:4 149:22 | **resident** | **retention** |
| 112:1,5 | 117:15,17 | 151:13 | 3:24 162:1 | 129:22 |
| 127:4 | 117:20,23 | 158:2 | **residential** | **return** |
| 129:16 | 120:19,24 | 173:25 | 3:14 29:12 | 42:14,16 |
| 139:25 | 121:3,7 | **represent...** | 29:16 52:19 | 56:25 93:8 |
| 172:22 | 128:11,19 | 4:25 115:17 | 123:16 | 93:10 |
| 173:17 | 160:18,21 | 115:18 | **resides** | **returns** |
| **relevant** | 161:16 | 127:14,22 | 29:17,20 | 50:22 |
| 127:8 143:5 | **repaying** | **represented** | **residing** | **revealing** |
| 143:12 | 61:23 68:22 | 5:3 37:1,12 | 3:16 | 70:20 |
| **relied** | 120:22 | 127:3 | **resolve** | **review** |
| 1:11 181:11 | 158:3 161:4 | 132:20 | 7:13 8:6 | 1:5 70:8 |
| **relinquished** | **repayment** | **representing** | **respect** | 122:25 |
| 168:3 | 64:23 82:25 | 4:22 36:14 | 6:6 38:6 | 154:13 |
| **remainder** | 93:12 94:12 | 119:22 | 55:25 62:10 | 164:3 181:5 |
| 160:7 | 117:8 | 129:5 | 63:6 78:21 | **reviewed** |
| **remember** | 120:13 | 131:15 | 105:10 | 140:11 |
| 13:8 18:25 | 156:4,6 | 158:3 | 129:6,11 | **reviewing** |
| 57:4 90:18 | 161:20 | **represents** | 131:15 | 147:20 |
| 100:15 | **repeat** | 4:14 129:20 | 152:23 | **revolving** |
| 101:10 | 9:15 | **request** | 153:12 | 138:2,15 |
| 102:5 113:1 | **rephrase** | 10:1 53:22 | **respectfully** | 140:16 |
| 118:12 | 9:16 119:16 | 88:12,15,16 | 8:25 | 179:21 |
| 127:12 | **Reported** | 88:20 156:4 | **respond** | **rich** |
| 134:8 160:9 | 1:25 181:25 | 157:2 | 10:2 35:5 | 162:1 |

ROUGH DRAFT Deposition of Philip Kenner                    6/18/09
Murray v. Jowdy

26

| | | | | |
|---|---|---|---|---|
| **right** | **sale** | 100:17 102:5 | **seeking** | 167:10,24 |
| 4:10 6:7 | 65:18 67:1 | 138:18 | 139:7 | 168:13 |
| 14:13 16:6 | 118:22 | 163:8 | **seen** | **served** |
| 17:17 27:14 | **sales** | 169:24 | 123:4 127:2 | 174:11 |
| 47:8,14 | 32:5 95:17 | **scenarios** | 127:13,21 | **server** |
| 59:9 65:4 | **San** | 84:12 | 127:25 | 174:2,6,11 |
| 77:20 86:15 | 31:18,22 | **Schwab** | 130:23 | **service** |
| 86:24 88:13 | 32:4,6,10 | 145:1,2,6 | 131:6 | 14:17,19 |
| 88:21 91:11 | 32:14 56:11 | **scope** | 134:14 | 15:17 18:3 |
| 91:21 95:15 | 95:14,21,25 | 38:17,24 | 169:14 | 18:5 21:13 |
| 97:24 | 96:4 103:24 | 43:1,9 | 172:6 | 27:22 |
| 101:19 | 104:2,4,13 | **Scottsdale** | 177:16 | 144:25 |
| 102:19,22 | 105:12,14 | 4:5 28:22 | **sell** | **services** |
| 108:6,6 | 105:18 | **second** | 123:22 | 12:8,24 13:4 |
| 114:22 | 106:8,18 | 118:10 | **send** | 14:20 15:23 |
| 121:20 | 107:8,15 | 164:15 | 99:5 | 22:21 24:15 |
| 126:16 | 109:8,23 | 165:1 | **sending** | 44:13 45:23 |
| 134:10,22 | 111:9,11 | 171:14 | 100:5 | 47:6 |
| 140:24 | 112:9 113:6 | **secret** | **sense** | **set** |
| 141:21 | 113:19 | 120:9 | 144:19 | 1:15 47:5,10 |
| 142:1,15 | 114:1,12 | **section** | 178:11 | 47:17,19 |
| 143:21 | 115:5 120:7 | 84:16 171:14 | **sent** | 61:15 66:19 |
| 153:21 | 120:11,17 | **secure** | 60:7,9,13,16 | 67:16 |
| **Road** | 121:12,18 | 68:12 145:17 | 99:7 112:3 | 181:15 |
| 28:22 29:11 | 122:11,18 | 161:16 | 112:8,11,13 | **share** |
| **Roger** | 124:3,9 | **securing** | 112:19,22 | 153:8 |
| 66:20,23,24 | 125:1 | 135:22 136:5 | 114:4,17 | **short** |
| 67:5 | 158:13,15 | 136:9 | 115:10 | 172:5,12 |
| **role** | 158:19 | 137:20,23 | 116:6 119:5 | **shortly** |
| 52:16 158:15 | 171:21 | **Securities** | 119:8 | 11:2 94:11 |
| **rough** | **Sarah** | 28:4 166:22 | 145:13 | **shoulders** |
| 1:1,3 181:1 | 1:25 181:25 | **see** | 147:13 | 9:11 |
| 181:3 | **saw** | 13:16 29:11 | **sentence** | **show** |
| **rules** | 62:16 126:23 | 64:24 69:6 | 150:4,10 | 94:9 169:22 |
| 8:17 | 126:25 | 77:25 96:23 | 171:16 | **shrugging** |
| | **saying** | 100:14 | **separate** | 9:11 |
| _____S_____ | 4:16 57:24 | 101:12 | 33:25 60:21 | **side** |
| **S** | 107:25 | 124:10 | 65:8,11 | 155:3 |
| 171:24 | 108:4 | 126:24 | 88:9 | **signature** |
| **Safier** | 126:10 | 138:17 | **separately** | 131:4,6,9,12 |
| 1:25 181:25 | 134:13 | 141:3 155:1 | 164:25 | 134:5,7,10 |
| **salaried** | 138:13 | 169:24 | **series** | 134:12 |
| 28:12,13 | 149:19,23 | 171:16 | 28:7 90:3 | 144:8,10 |
| **salary** | 149:24 | 177:8 | 100:12 | 146:4,6 |
| 28:14 34:20 | 152:22 | **seeing** | 132:3 144:7 | 147:9 |
| 34:22 35:21 | 155:9 161:2 | 147:21 151:6 | 166:23 | **signed** |
| 35:24,25 | **says** | 179:4 | 167:2,3,8 | 17:1 24:13 |

ROUGH DRAFT Deposition of Philip Kenner                    6/18/09
Murray v. Jowdy

27

| | | | | |
|---|---|---|---|---|
| 66:25 67:3 | 31:2 33:6 | **speaks** | 176:20 | 40:2,3 |
| 135:15,16 | 36:19 46:12 | 135:6 144:17 | 177:24 | **starting** |
| 135:18 | 59:24 61:2 | **specific** | 178:2 | 100:14 |
| 144:15 | 63:7 65:6 | 44:17 48:8 | **speculation** | **starts** |
| **significant** | 87:7 88:24 | 52:11 55:22 | 157:10 | 169:23 |
| 11:24 13:10 | 96:19 | 63:11 75:18 | 175:12 | 171:15,16 |
| 132:21 | 107:21 | 87:15 94:21 | 177:23 | 172:4 |
| 133:1 | 109:19 | 94:23 | **speed** | **state** |
| **signing** | 110:23 | 105:24 | 130:16 | 3:9,13 15:3 |
| 134:8 144:11 | 113:22 | 106:5 | **spell** | 15:12,16,21 |
| 144:12 | 119:23 | 159:24 | 3:9 | 17:3,12 |
| **similar** | 123:22 | **specifically** | **spend** | 20:25 50:5 |
| 144:12 | 128:18 | 25:15,18 | 106:18 | 50:7 63:2 |
| 156:20 | 130:2,15 | 47:23 53:23 | **spoke** | 169:1,5 |
| **sit** | 132:25 | 71:12 78:25 | 56:11 91:3 | **stated** |
| 75:21 77:20 | 133:17 | 83:23 87:2 | **spoken** | 43:18 56:23 |
| 86:13,22 | 141:10 | 87:19,22 | 80:18 | 57:6 77:12 |
| 103:23 | 143:7 | 95:7,9 | **Spring** | 121:17 |
| 106:1 | 146:20,21 | 96:12 100:7 | 122:20 | 153:18 |
| 119:20 | 154:18 | 101:10 | **stamp** | 174:6 |
| 150:6,8 | 158:7 162:6 | 103:17 | 100:3 146:15 | **statement** |
| 152:5 | 168:2 175:5 | 104:25 | **Standard** | 102:24 |
| 156:17 | 180:3 | 105:8 | 20:9 21:6 | 114:23 |
| **situation** | **sound** | 106:22 | 22:12 26:18 | 121:24 |
| 80:25 | 14:12 17:17 | 107:6 109:6 | 27:13,17,24 | 139:8 140:8 |
| **six** | 101:19 | 110:12 | 28:20 30:3 | 150:1 |
| 26:9 | **Sounds** | 118:8 119:9 | 30:13,16,21 | **statements** |
| **sketchy** | 43:25 64:8 | 124:14 | 31:9,11,14 | 49:9 139:19 |
| 6:5 | **source** | 137:2,4 | 33:15 34:1 | 179:23 |
| **slander** | 22:25 125:9 | 140:6,9 | 34:2 45:22 | **states** |
| 7:19 | 138:10 | 143:16 | 45:24 47:10 | 100:24 |
| **soft** | 169:23 | 147:22 | 47:16,25 | 142:17 |
| 74:10,16 | 180:11 | 148:14 | 48:5 49:3 | 169:2,5 |
| **sold** | **sourced** | 149:3,17 | 49:10 50:12 | 179:3 |
| 50:18 120:12 | 110:22,24,25 | 151:8 | 92:10 | 180:15 |
| 120:16 | **sources** | 158:17 | **standing** | **stating** |
| 123:21 | 157:1 180:10 | 159:12,17 | 38:3 104:6 | 144:14 |
| **solicit** | 180:12 | 163:7 164:9 | 105:15 | **status** |
| 43:13,15 | **sourcing** | 165:16 | **stands** | 69:2 82:12 |
| **somebody** | 125:8,19 | 169:15 | 104:1 119:25 | 82:21,25 |
| 33:7 | **space** | 172:3,7 | **start** | **Steffen** |
| **soon** | 29:4 | 173:6 | 12:15 14:7 | 2:5 |
| 59:23 60:6 | **speak** | 178:23 | 27:2 32:15 | **step** |
| 86:11 | 49:20 69:3 | 179:7 180:4 | 39:11 88:25 | 55:16 108:12 |
| **sorry** | 88:17 98:22 | **speculate** | **started** | **Stephanie** |
| 12:21 21:23 | **speaking** | 148:12,13 | 21:21 30:21 | 27:8,11 29:9 |
| 27:14 30:9 | 90:24 149:20 | 175:13 | 39:17,25 | **stick** |

13:11 44:6
stop
84:17
strange
124:22
strategy
106:2
Street
15:3,12,16
  15:21 17:4
  17:12 21:1
strictly
1:3 181:3
strike
12:21 40:8
  61:3 78:6
  96:9
string
148:7 154:10
  154:15,21
  154:25
  160:7 164:7
  165:15
struck
120:9
Stumpel
116:23
  171:19
subjects
92:15
submit
139:18
submitted
145:6
submitting
140:7
subsequent
13:1,2
subsequently
98:6 174:11
substances
10:16
sued
7:19 144:1
suggested
106:9 120:6
  121:10

122:10
157:25
suing
88:23 89:2,9
  89:18
Suite
2:7
sum
178:15,21
summer
32:16,19
  95:15,15
  159:23
supplying
70:12 71:2
supposed
137:23
sure
6:9 14:14,23
  17:16 23:7
  24:19 32:21
  33:1 38:4
  38:24 39:24
  41:3,15
  42:18 53:7
  58:15 60:8
  63:11,22
  67:6,11
  69:10,19
  75:1 81:7
  81:15 88:3
  96:3 99:16
  101:7 102:2
  105:24
  107:11
  115:1,13
  119:7,13
  127:6
  128:15
  136:10
  137:23
  138:1 139:5
  140:2
  141:13
  145:19
  148:16
  154:12

155:19
166:7
179:16
180:13
sworn
3:3

_____
                T
take
8:16 9:21,23
  10:3 30:6
  30:12 31:3
  32:20 99:21
  108:13,14
  108:15
  118:4
  122:25
  130:20
  133:13
  143:21
  146:2 147:6
  148:15
  149:15
  150:4 154:7
  164:3
  165:12
  169:11,20
  172:2,12
  177:17
taken
6:12 30:16
  32:22 35:10
  64:9 72:15
  108:17
  132:7
  148:18
  172:15
takes
19:13
talk
8:24 9:7
  35:7 153:14
talking
54:23 72:1
  72:10 86:15
  86:24 93:24
  105:12

108:8
111:18
113:14
150:5,7,9
150:21
156:12,18
160:10
166:1
174:17,19
175:23
180:3
tap
136:21
137:11
tasks
37:24
tax
50:22,25
  51:4,6,10
  51:11,13
taxing
51:20
team
40:1,7
tell
3:4 54:19
  56:21 61:11
  77:20 78:21
  78:24 98:25
  131:11
  133:18
  135:4
  138:23
  139:16
  143:22
  169:22
  174:5 175:1
telling
54:3
ten
19:2 25:24
  52:21 54:5
  54:11 56:25
  61:17
  167:15,19
  167:20
tenant

28:24
Tenth
2:3
term
18:13 42:16
  45:6 53:5
terms
5:7 34:13
  44:13 56:22
  56:22 61:15
  61:22 79:3
  82:3 83:13
  93:12 100:8
  101:20
  104:4 106:2
  117:8
  127:14,22
  137:14
  157:24
  161:20
testified
3:5 30:23
  41:17 65:3
  76:23 85:13
  95:13
  102:16,23
  111:21
  120:25
  121:2
  152:19
  153:13
testimony
10:17 16:4
  61:1,4
  86:13,21
  90:12
  114:20,23
  121:6,17
  127:5
Texas
29:10
text
33:7
Thalmann
83:16,22
  85:22,25
  86:2 141:7

ROUGH DRAFT Deposition of Philip Kenner                                    6/18/09

Murray v. Jowdy

29

152:21
153:3,8,11
153:16
164:14
165:22
166:7
**Thalmann's**
164:11
**Thank**
35:13 68:18
162:11
180:19
**Thanks**
27:14
**Therupon**
132:7
**thing**
109:16 155:2
167:21
**things**
43:20 44:17
84:13
132:24
**think**
15:22 23:1
26:15 29:19
31:20 33:16
35:17 39:9
43:20
111:21
112:1
113:10
114:19
116:19
118:19
120:21
121:25
130:24
143:13
144:17
145:15
151:16
152:6
153:13
154:9
159:14
171:11

176:7
178:11
180:18
**third**
44:20,22
51:3,19
91:1 100:11
111:17
136:17
138:10
140:18
153:10
169:21,21
**thought**
7:24 21:23
62:23 63:3
96:19
107:21
158:7 162:6
**thousand**
86:8
**three**
3:25 43:20
52:19 57:6
60:21 65:8
65:10 67:3
75:24 81:23
84:12 88:9
132:19
143:1,2,10
157:12
**time**
8:17 11:7
12:22 13:15
15:20 16:2
16:4 21:21
32:18 33:12
39:3,5
40:15 48:14
54:7 59:23
59:24 60:1
63:2 64:22
64:22 68:9
68:21 69:7
75:22 81:20
82:10 87:20
89:4,12

92:19 93:6
94:11 120:9
121:14,17
122:2,13,16
123:13,15
123:21
126:22
127:1
132:12,14
136:1,24
137:16
138:3
139:17
145:12
164:15
165:1 166:4
166:23
167:10,16
167:24
168:3
170:18,19
171:3
178:13
179:1,14
180:9,19,22
**timely**
50:12
**times**
135:17,18
**title**
13:22 15:12
17:25 21:9
27:19
118:10
**titled**
161:18
**today**
5:3 8:20
10:17 22:1
22:9 27:7
28:14 30:19
44:3 52:13
75:21 86:14
86:22
103:23
105:7
119:20

134:11
136:19
150:6,8
152:5
156:17
174:17,19
177:25
180:20
**told**
52:18 53:15
54:6 60:2
61:14 78:20
83:15 139:9
139:11
178:3
**Tommy**
65:25 67:22
170:1,1,8
172:4,8,9
**top**
75:16 77:21
147:23
155:18
163:8 165:4
**total**
135:21
**touched**
95:24
**town**
68:10
**track**
48:13,20,20
179:22
**tracked**
87:3
**transacted**
132:18
**transaction**
46:5 63:6,9
81:12 153:9
156:23
166:12
**transactions**
159:19
**transcribing**
8:19
**transcript**

1:8,14 8:23
181:8,14
**transfer**
60:10,14,16
**transferred**
64:13,15,21
64:25 65:4
65:7,8
**transferring**
60:17
**Troy**
168:23
**true**
134:13
**trusts**
52:1,5
**trustworthy**
54:9
**truth**
3:4,4,5
**try**
8:24 9:6
117:15
161:15
**trying**
57:4 82:7
114:22
115:24
130:16
131:20
**turn**
93:7
**turning**
33:10
**twice**
146:22
**two**
6:15 68:24
71:20 75:24
106:25
108:1,13,24
132:24
142:8 155:1
174:16
**type**
7:4 10:15
11:16 30:7

ROUGH DRAFT Deposition of Philip Kenner                    6/18/09
Murray v. Jowdy

30

34:21 35:23
38:9 42:10
44:11,22
55:4 79:12
92:9 105:9
**typically**
50:2 136:15

**U**

**Uh-huh**
123:3,17
157:19
**Ula**
91:24 92:2
92:12,17,23
93:20,24,25
94:6,7,10
94:13,16,24
95:3,10
**ultimate**
105:22
**ultimately**
78:3 103:19
105:21
**unable**
120:8,24
121:13
122:12
**understand**
4:15 8:15
9:14,17
10:13 11:18
20:13 21:17
23:7 24:19
26:11 33:17
33:19 38:24
39:22 41:15
42:18 47:8
47:14 63:11
63:17,22
67:6,9,11
69:10 81:8
81:16 84:4
102:2,10
109:12
113:13
115:13

136:10
139:5 159:1
177:13
178:10
**understan...**
5:2 10:5
52:8,12
55:3 63:5
65:7 67:12
69:12 71:13
71:25 72:2
72:8,11
73:5,14,21
73:24 74:4
74:7 76:4
78:5 103:22
104:1 105:9
106:10,16
110:5
113:10
118:20
120:2 122:6
123:24
126:2,20
128:3,6
131:14
132:13
133:21
148:6
149:18
153:24
156:1
160:20
163:9
165:17
177:11
**understood**
9:19 39:24
41:3 53:7
115:1
145:19
156:25
**undertake**
161:9
**unintenti...**
155:9
**unit**

67:2 137:19
**United**
169:2,5
179:3
180:15
**units**
52:19 57:2,7
57:11,14,16
57:21 58:11
58:24 59:4
65:11,17,22
66:2,10,13
66:17 67:3
68:13 73:15
73:23 74:6
74:8,16,21
78:3,8,19
78:23 79:4
79:8 80:19
81:10,20,24
82:4,13,21
118:14,18
139:10
145:18,22
162:14
**universal**
180:8
**updates**
82:16
**upset**
118:23
**use**
1:15 9:25
33:4 120:13
136:8
181:15

**V**

**vacant**
29:16,18,19
**vague**
33:16 40:13
41:15 42:17
45:7 58:3
58:13,19
**value**
48:16 123:20

**varied**
18:13 69:14
**various**
112:4
**varying**
180:12
**Vegas**
2:4,7 3:15
3:22,23 4:2
52:19 60:25
71:15,16,18
72:3,13,21
83:4,7,16
89:5,13,22
90:24 92:21
93:10 95:2
100:18,18
100:21
151:13
152:10
162:1
164:16
165:5
**venture**
38:7,13
**ventures**
23:19 24:6,9
24:14,18,20
25:5,13,22
33:13,22
34:4,7,10
36:13,15,17
37:7 40:3
40:16
124:25
158:18
160:4
**verbally**
9:13
**versus**
175:6
**vice**
13:23 14:15
15:14,15
**volunteer**
117:19,22

**W**

**wait**
8:25 9:2
**waiting**
46:12,13
88:10
**waived**
3:1
**waiver**
155:9
**want**
4:9,11 5:9
23:2 38:2
108:14
118:13,17
135:2,4
154:12
155:19
177:24
**wanted**
20:3 98:25
100:11
132:5
138:11
**wants**
88:4
**warrant**
173:19
**washing**
44:12
**wasn't**
62:5 99:8
114:22
180:11
**watching**
44:12
**way**
8:21 39:19
50:22 55:13
60:14 61:8
63:21 65:13
66:5,16
69:23 76:8
80:8 83:24
84:17 86:16
86:25 98:14
98:14 99:12

ROUGH DRAFT Deposition of Philip Kenner                    6/18/09

Murray v. Jowdy

31

| | | | | |
|---|---|---|---|---|
| 104:11 | 60:23,24 | 117:4 | 131:5 | 167:15,18 |
| 119:19 | 136:16 | 124:13 | **working** | 167:19,20 |
| 125:7 | 145:9 | 127:25 | 13:20 14:7 | 170:12 |
| 130:25 | 146:16 | 135:9 | 15:10 16:5 | **Yeary** |
| 131:24 | **wit** | 136:10 | 19:19 21:18 | 116:23 |
| 138:1,12,14 | 35:20 43:6 | 140:2 | 21:21 32:12 | **yesterday** |
| 156:23 | 46:21 47:13 | 148:13 | 36:10 95:14 | 75:4,5 |
| 161:6 177:4 | 58:6 59:16 | 151:20 | **wrap** | **York** |
| **Wayne** | 70:25 72:7 | 157:11 | 150:11,11 | 7:12 168:23 |
| 123:25 | 73:1,20 | 159:9 164:6 | 172:13 | |
| 156:10 | 79:25 84:20 | 166:4 | **write** | **Z** |
| 158:1,3 | 85:6 86:20 | 172:23 | 100:9 | |
| 161:18,20 | 89:8 107:13 | 173:6 | **writing** | **Zero** |
| **ways** | 108:20 | 175:13 | 16:19,24 | 92:18,22 |
| 102:11 | 109:21 | 176:20 | 62:1 82:25 | |
| **went** | 114:10 | 177:7,8,24 | 100:5 | **$** |
| 17:3 20:10 | 115:3 121:9 | 178:23 | 144:18 | |
| 64:24 71:11 | 122:4 | 180:22 | **wrong** | $1.2 |
| 88:7 113:19 | 127:20 | **witnessed** | 43:21 96:23 | 150:15,18 |
| 150:3 | 136:3 159:3 | 176:23 177:3 | | $100 |
| **West** | 173:1 | 178:14,20 | **Y** | 36:7 |
| 2:6 | 178:19 | 180:15 | | $100,000 |
| **we'll** | **witness** | **word** | **year** | 36:7,9 |
| 84:18 | 6:17 18:16 | 100:14 | 3:19 36:2 | $143,260 |
| **we're** | 35:25 38:5 | 102:11,12 | 39:14 76:14 | 147:12 |
| 4:22 72:18 | 41:3,14 | 102:13 | 78:10,10 | $2 |
| 86:15,24 | 42:18 43:11 | **words** | 106:18 | 125:9,11,23 |
| 156:12 | 45:8 47:19 | 94:9 99:13 | 137:3,5 | $2.0 |
| 166:5 | 53:7 58:2 | 140:12 | **years** | 125:5 126:4 |
| 174:17,19 | 58:12 59:21 | 149:25 | 3:25 7:8 | $2.5 |
| 174:21 | 63:17 66:7 | **work** | 10:24,25 | 110:19 111:2 |
| **whatsoever** | 70:22 71:4 | 14:10 19:24 | 11:13,22 | 111:6,10,16 |
| 62:18 111:9 | 72:14 73:11 | 23:11 24:8 | 13:5 14:11 | 111:22 |
| 166:12 | 73:24 74:13 | 29:9 32:5 | 17:14 19:12 | 112:4,19,22 |
| **wife** | 75:10 80:5 | 32:14,15,17 | 24:2 26:9 | 114:1,3,13 |
| 66:20 | 80:15,24 | 32:18 33:21 | 27:18 44:4 | 114:15 |
| **willing** | 81:15 84:23 | 34:15 43:1 | 51:15 54:9 | 115:6,8,21 |
| 52:20 60:1 | 85:3 86:17 | 43:9 48:16 | 54:23,24 | 116:1 125:4 |
| **wills** | 87:2 89:15 | 49:10,18 | 55:5 63:3 | 125:18 |
| 52:4 | 90:9 96:16 | 80:17,18 | 67:15 75:25 | 126:3 |
| **window** | 101:15 | 95:17 97:1 | 83:10,11 | 171:21 |
| 160:24 | 104:8 | 97:17,23 | 88:5,10 | $200,000 |
| **wire** | 105:17 | 98:1,2 | 102:15 | 89:4,13,22 |
| 60:10,13,16 | 107:19 | 152:22 | 131:5,7 | 91:3,9,11 |
| 60:17 | 108:2 110:2 | **worked** | 132:19 | 91:12 93:8 |
| **wired** | 112:6,16 | 31:13,16,17 | 157:12 | 94:1,10 |
| 60:19,20,21 | 115:13 | 39:5,6 68:4 | 166:25 | 151:11 |
| | 116:9,13 | | 167:2,9,13 | 152:9 |
| | | | | $30 |

ROUGH DRAFT Deposition of Philip Kenner                6/18/09

Murray v. Jowdy

32

| | | | | |
|---|---|---|---|---|
| 132:21 | 00021 | 12:20 | 13:6,8,11 | 3 |
| $30,000 | 148:25 | 64:7 | 13:14 19:13 | 1:11 181:11 |
| 28:16 | 00063 | 120 | 20:6 27:2,5 | 3:25 |
| $40 | 149:15 | 8:12 | 31:5,13 | 132:8 |
| 132:21 | 03 | 14 | 47:3,4,10 | 3:31 |
| $450,000 | 30:22 | 146:10 147:2 | 47:18,20 | 132:8 |
| 123:23 | 05 | 162:8 | 48:2,3,5,7 | 3:58 |
| $50 | 95:15 | 15 | 48:25 | 148:19 |
| 36:10 | 07 | 139:1 146:10 | 2004 | 30 |
| $50,000 | 95:15 119:2 | 147:2 | 44:7 45:20 | 52:21,21 |
| 75:17 | | 15a | 135:16 | 54:5,11 |
| $500,000 | _____ 1 | 146:21 | 2005 | 56:24 61:17 |
| 56:9 99:4 | 1 | 17 | 32:16 64:16 | 61:24 62:4 |
| 113:18,21 | 1:9 181:9 | 10:24,25 | 68:8 104:12 | 62:6,9,12 |
| $567,000 | 1:20 | 11:13,22 | 133:5 | 124:11 |
| 146:12 | 64:7 | 44:4 131:5 | 138:16 | 158:4 |
| $750,000 | 1:25 | 131:7 | 171:5 | 30(b)(4) |
| 100:17 | 64:10 | 1991 | 2006 | 3:1 |
| $8 | 1:46 | 168:25 | 24:3 25:5,13 | 30-day |
| 135:21 | 72:16 | 1994 | 25:22 37:7 | 88:4 156:6 |
| $80,000 | 1:51 | 12:25 13:1 | 39:5,6,7,12 | 160:24 |
| 146:11 | 72:16 | 13:20 14:9 | 39:17,25 | 33 |
| $800,000 | 100 | 16:5,20,23 | 40:4,9,12 | 97:14,15,17 |
| 54:21 56:16 | 19:8 27:1 | 1997 | 78:16 | 97:19 101:1 |
| 56:24 61:9 | 36:6 92:6 | 14:12,25 | 122:20 | 102:19 |
| 72:1,9,21 | 93:19 97:21 | 15:20 17:3 | 124:25 | 103:2 |
| 82:2 87:21 | 102:17 | 1998 | 159:23 | 3800 |
| 113:4,12,19 | 148:8 | 19:23 | 160:1 | 2:3 |
| 113:22,23 | 10080 | 1999 | 2007 | 39 |
| 128:20 | 2:6 | 17:15 18:24 | 32:19 78:14 | 126:4 |
| 138:4,15 | 10705 | 20:11,15 | 123:15 | |
| 145:10 | 28:22 29:11 | | 127:1,15,17 | _____ 4 |
| 147:14 | 1099 | _____ 2 | 127:24,24 | 4:06 |
| 166:3,9 | 22:16 | 2 | 137:9 | 148:19 |
| 174:21 | 11:20 | 1:9 181:9 | 2008 | 4:50 |
| 176:3 | 32:23 | 2:44 | 39:15 40:9 | 172:16 |
| $9.25 | 11:30 | 108:18 | 40:12 78:12 | 4:58 |
| 101:7,19 | 32:23 | 2:51 | 137:7,8 | 172:16 |
| 102:6,7 | 11:33 | 108:18 | 157:12,15 | 4525 |
| | 35:11 | 20 | 157:17 | 3:21 |
| _____ 0 | 11:36 | 7:8 19:4 | 162:8 | |
| 00014 | 35:11 | 77:8 | 2009 | _____ 5 |
| 146:14 | 12 | 200 | 78:10 137:6 | 5 |
| 00016 | 106:18 | 2:7 3:15 | 206 | 160:8 |
| 151:5 | 12:17 | 2003 | 125:1 | 50 |
| 00017 | 64:10 | 12:11,12,16 | | 19:6 28:18 |
| 165:12 | | 12:19,21 | _____ 3 | 28:19 36:4 |

ROUGH DRAFT Deposition of Philip Kenner                    6/18/09
                    Murray v. Jowdy

                                                                    33

| 6 |
| --- |
| **60** |
| 82:19 |
| **63** |
| 166:22 |
|  167:10 |
|  168:4,13 |
| **64** |
| 165:4 |
| **65** |
| 166:22 |
|  167:24 |
|  168:4,13 |

| 7 |
| --- |
| **7** |
| 28:7 135:16 |
|  160:8 |
|  166:22,23 |
|  167:2,3,8 |
|  168:4,13 |

| 8 |
| --- |
| **808** |
| 1:25 181:25 |
| **89103** |
| 3:15 |
| **89145** |
| 2:7 |
| **89169** |
| 2:4 |

| 9 |
| --- |
| **9.25** |
| 100:24 101:5 |
|  101:12 |
| **94** |
| 13:8 |

1

1   TRAN

2

3                          DISTRICT COURT

4                      CLARK COUNTY, NEVADA

5   GLEN MURRAY,                    )
                                    )
6          Plaintiff,               )
                                    )     CASE NO. A571984
7          v.                       )
                                    )     DEPT. 22
8   KENNETH JOWDY                   )
                                    )
9          Defendant.               )
                                    )
10  _____    )

11      BEFORE THE HONORABLE SUSAN JOHNSON, DISTRICT COURT JUDGE

12                 MONDAY, DECEMBER 1, 2010

13                  **REPORTER'S TRANSCRIPT**
                    **BENCH TRIAL – DAY 1**
14

15  APPEARANCES:

16    For the Plaintiff:      RONALD N. RICHARDS, ESQ.
                              ROSS GOODMAN, ESQ.
17

18    For the Defendant:      PATRICIA LEE, ESQ.
                              MICHAEL WALL, ESQ.
19                            KATHERINE BRANSON, ESQ.

20

21

22

23

24  RECORDED BY:  NORMA RAMIREZ, COURT RECORDER

25

2

# TABLE OF CONTENTS

Page

December 1, 2010

Trial to the Court

Plaintiff's Witness(es):

Glen Murray ........................................... 68

Robert Gaudet ......................................... 163

Philip Kenner ......................................... 222


Defendant's Witness(es):

None

3

EXHIBITS

                                                              Page

PLAINTIFF'S:

     Exhibit(s) 74, 108-113, 124......................  26

     Exhibit 109 .......................................  75

     Exhibit 114 .......................................  84

     Exhibit 122 .......................................  172

     Exhibit 121 .......................................  206

     Exhibit 120 .......................................  209

     Exhibit 131 .......................................  213

     Exhibit 129 .......................................  250


DEFENDANT'S:

     Exhibit(s) A-81, A-84.............................  27

     Exhibit A-93 ......................................  187

     Exhibit A-89 ......................................  198

4

```
 1        WEDNESDAY, DECEMBER 1, 2010 AT 10:16 A.M.

 2        THE MARSHAL:  All rise.  Department 22 now in session.

 3   The Honorable Susan Johnson presiding.

 4        THE COURT:  You may be seated.

 5        MS. LEE:  Thank you, Your Honor.

 6        THE COURT:  We are here on the case of Murray v. Jowdy,

 7   Case Number A-571984.  Would counsel please identify

 8   themselves for the record?

 9        MR. RICHARDS:  Good morning, Your Honor, Ronald Richards

10   appearing for Glen Murray, who's also present to my right.

11        MR. GOODMAN:  Ross Goodman, Your Honor, on behalf of the

12   Plaintiff.

13        THE COURT:  Okay.

14        MS. LEE:  Good morning, Your Honor, Patricia Lee on

15   behalf of the Defendant, Ken Jowdy, who I also have here

16   today.

17        MR. WALL:  I'm Michael Wall also on behalf of Ken Jowdy.

18        MS. BRANSON:  I'm Katherine Branson also on behalf of Ken

19   Jowdy.

20        THE COURT:  Okay.  And this is the time set for trial.

21   Are we ready to proceed?

22        MR. RICHARDS:  Yes, Your Honor.  We'd like to move to

23   exclude any witnesses at this time.

24        THE COURT:  Okay, at this time, if there's anyone here

25   who is expected to testify at the trial, I ask that you leave
```

1    the courtroom and please just be present right outside and you

2    will be called.

3         MR. RICHARDS:   There's the Defendant's brother,

4    Taffy(phonetic) Jowdy, who is a potential rebuttal witness in

5    this case.  I just noticed him in Court.

6         THE COURT:  Well, if he stays in the courtroom, he won't

7    be able to testify.

8         MR. RICHARDS:  And that's why I'm moving to exclude

9    witnesses.

10        THE COURT:  Okay.

11        MS. LEE:  Your Honor, he wasn't listed as a witness in

12   this case.  I can't imagine what he -- what knowledge he's had

13   in this case.  His name hasn't come up once in this

14   litigation.

15        THE COURT:  Okay.  Well, he's not going to be testifying,

16   right?

17        MS. LEE:  We're -- no.

18        THE COURT:  Okay.

19        MR. RICHARDS:  I said I may be calling him as a rebuttal

20   witness.

21        MS. LEE:  Well, he hasn't subpoenaed his appearance to be

22   here today so he's not a witness for -- he's not on any

23   witness list.  He's not been subpoenaed to appear here today.

24        THE COURT:  Have you identified him as a witness?

25        MR. RICHARDS:  Well, I only -- I didn't identify him

```
 1    because he's a rebuttal witness based on the information that
 2    they're going to show related to companies that he's involved
 3    in and loans that his company received.  So I didn't
 4    anticipate that he would be a rebuttal witness.  I didn't
 5    think he'd even be here.  He doesn't live in Nevada.  So when
 6    I saw him --
 7         THE COURT:  Well, if you haven't identified him as a
 8    potential witness, counsel, you're not going to call him.
 9         MR. RICHARDS:  Well, I didn't know I needed to identify a
10    rebuttal witness.  Okay, that's fine.
11         THE COURT:  You're going to need to identify him.
12         MR. RICHARDS:  All right.
13         THE COURT:  Oh, we also have a third-party defendant?
14         MS. LEE:  Yes, we do, Your Honor.
15         THE COURT:  Okay, counsel, one little problem we have is
16    you can't mess with captions.  I don't have full captions here
17    on my thing, on my calendar.  Okay.  I have to have full
18    captions because I don't know who all the parties are if I
19    don't have a caption.
20         MS. LEE:  I'm sorry, a caption on what documents?
21         THE COURT:  Well, we apparently have a third-party
22    defendant and I don't know that.
23         MS. LEE:  Oh, I see what you're saying.  Okay.  Yes, Your
24    Honor, he was added later and you're right, we did not do a
25    full caption.  I apologize for that.
```

7

```
1       THE COURT:  Okay.  All right.  All parties are guilty of
2   this.  Do not change captions.  I want full captions, correct
3   captions.  Okay?
4       MR. RICHARDS:  Yes, Your Honor.
5       THE COURT:  All right.  All right, counsel.
6       MR. RICHARDS:  If I could have the PowerPoint I guess.
7   You want me to refer that -- okay, thank you.
8       THE CLERK:  Okay.
9       MR. RICHARDS:  Ready?
10      MR. GOODMAN:  Yeah.
11      MR. RICHARDS:  Good morning, Your Honor, my name's Ronald
12  Richards and I represent the Plaintiff, Glen Murray, in this
13  case.  Next slide.
14          Just so the Court knows, Glen Murray was a
15  professional hockey player for 17 years, played for various
16  teams in the NHL and had a very illustrious career.  Go to the
17  next slide please.
18          He's from originally Canada and played a lot of the
19  season for the Boston Bruins, Pittsburg Penguins, and the Los
20  Angeles Kings and he retired in November of 2008.  You can go
21  to the next slide please.  One more.
22          In 2008, Mr. Murray had an ankle injury which ended
23  his career and he hasn't been able to play since then.  This
24  case is a very simple case, Your Honor.  The case that we're
25  dealing with is Mr. Murray lent money to the Defendant, Ken
```

8

1    Jowdy, and was expecting a very short return of this loan.

2    You can go to the next slide please.

3            Exhibits 108 and 109 are going to show the Court

4    that money came from a Charles Schwab account.  Elmo please.

5        THE CLERK:  Okay.

6        MR. RICHARDS:  From Mr. Murray's Charles Schwab account.

7        MR. GOODMAN:  You want to try and zoom it in more.

8        MR. RICHARDS:  Okay.  It came from -- I'm just showing

9    this so the Court gets a general overview.  I'm not going to

10   point out each specific transaction.  Basically, what Mr.

11   Murray did is he wired money from his Charles Schwab account

12   which was located at Charles Schwab in the form of separate

13   wires.  Those wires --

14       THE COURT:  Okay, what did that show me?  I didn't -- I

15   just saw a balance.

16       MR. RICHARDS:  Oh, I was just showing you the actual

17   account and I have the three wires, but I just wanted to just

18   give you just a demonstrative --

19       THE COURT:  Just show that there is an account?

20       MR. RICHARDS:  Yes, here I'll just show you.  The page

21   with the wires on it is right here.  I just didn't want to

22   take up a lot of time in opening statement.  These are where

23   the three wires are.  From Mr. Murray's account to an escrow

24   in Las Vegas, Nevada.

25       THE COURT:  So approximately $800,000?

9

1        MR. RICHARDS:  $791,000, yeah.  On August 12th, 2005, Mr.

2   Murray wired, sent a series of three wires to an escrow

3   account in Las Vegas, Nevada, in the name of Ken Jowdy for

4   some three condominiums at the Palms Casino.  And so the first

5   exhibit I was showing you is just evidence that the money came

6   from Mr. Murray's account and then it went to a Stewart Title

7   account and the funds are reflective on the Stewart Title

8   ledger, which will look like this and which you'll see in

9   evidence and it'll show the three credits in the Stewart Title

10  account.

11       And basically this was an account opened up at

12  Stewart Title by the buyer, Ken Jowdy, as you'll see to

13  purchase three separate condominiums at the Palms Place Hotel

14  and Casino.  During that time, it was very hot in Las Vegas to

15  get these type of properties so there was a lot of people

16  trying to buy condos at that time.  And this was a deposit

17  that Mr. Jowdy had placed to purchase.  And so those exhibits,

18  Exhibits 109 and 108 just show that the money was wired from

19  Mr. Murray's account to the escrow.

20       Mr. Jowdy had originally went to the Palms Place

21  Casino in February of '05 and these are registration deposits

22  where -- which Mr. Jowdy was a visitor at the casino and you

23  fill out a form and you indicate the three units that you're

24  going to register.  So there's one, two, and three and then

25  there's Mr. Jowdy's signature.  Basically, these are the same

1    units that we're going to be dealing with throughout this

2    case.  So this kind of -- this case starts really in February

3    16th of 2005 when he goes there to register these condos.

4           If you can go back to the PowerPoint please.  So

5    Exhibits 108 and 109 showed you how the money went from

6    Charles Schwab to Stewart Title.  The next slide.  And then

7    Exhibit 74 will show you the beginning of this case when Mr.

8    Jowdy registers the condos.

9           And then Exhibit 111 which I'm going to show you in

10   a second is going to show you evidence of two things.  One is

11   Mr. Jowdy provided a check for $150,000 to the Palms to lock

12   in these deposits and it came from Mr. Jowdy's company.  We

13   can go back to the Elmo.  This is a copy of the check which

14   was issued on 4/11/05, signed by Ken Jowdy and it references

15   the three same casinos (sic) that are on the deposit receipt

16   that I showed you earlier.  So now in April of '05, Mr. Jowdy,

17   the evidence will show you he owns, exclusive owner and

18   operator of TLJ Management and Mr. Jowdy issued this check to

19   pay for these condominiums and puts a deposit down on the

20   condominium.

21          And so the Court understands, the Palms and other

22   hotels at that time would allow these condos to be bought in

23   stages.  So the next money that needed to come in in order to

24   secure your right to buy the condos is the $791,000 that Mr.

25   Murray ended up wiring in August of 2005.  So that's sort of

11

```
1    the progression so you have a background.
2            The next document that I'm going to show you is
3    Exhibit 110 and that's a voluminous exhibit and we'll go
4    through that when we start the trial.  But basically, what the
5    exhibit's going to show you is that after Mr. Jowdy initially
6    registered the condo, he then has to fill out a formal
7    document reserving the agreement and Mr. Jowdy uses his own
8    tax ID number with the transaction and basically reserves the
9    condominiums and the deposit for all three, they're three
10   identical agreements.  And now basically it gives Mr. Jowdy
11   the legal right to buy these condos.
12           And what's required of him is for him to make a
13   progress payment of the $791,000.  And so once Mr. Jowdy
14   initiates this process, he needs to do something.  He has to
15   start looking for money.  And he uses two different
16   individuals to try to get this money.  Because at that time,
17   if you don't put up the money, you lose your right to buy the
18   condo.  And what the evidence is going to show you during that
19   time, it's incredible how things change in five years in Las
20   Vegas, but at that time, people were going crazy to buy these
21   condos and they were selling them, flipping them and to not
22   lose your right to buy the condo was important for the owner
23   of the deposit.  So once Mr. Jowdy had paid the 150,000, he
24   then needed to get the 791.  So if we can go back to the --
25           THE CLERK:  Uh-huh.
```

1      MR. RICHARDS:  He was looking for two people.  So, next

2   slide.  One more.  The two people he was using to get this

3   money are going to be -- are Bob Gaudet and Phil Kenner.  At

4   that time, Bob Gaudet and Phil Kenner did not know each other

5   at all.  Bob Gaudet worked for Ken Jowdy.  He had a great

6   relationship with Ken Jowdy.  He was very fond of Ken Jowdy

7   and the evidence is going to show, you are going to hear Bob

8   Gaudet, we had to get him in here from Cabo San Lucas to

9   testify in this case, he's going to tell you that at the time

10  Mr. Jowdy was shopping a deal to get $800,000 for a short term

11  loan that would be repaid within 30 to 45 days and the person

12  that would fund the short term loan would get a ten percent

13  return.  And Bob's going to tell you the different funding

14  sources he was trying to get to accomplish this loan.

15       At the same time, Mr. Jowdy was using Mr. Kenner,

16  who the evidence is going to show you that over the last seven

17  years, there's no person in the planet that has given Mr.

18  Jowdy more money than Phil Kenner through his clients and

19  through his connections and he's been the only source of money

20  that Mr. Jowdy's ever received when he's raised money and so

21  he, of course, asks Mr. Kenner, can you find me anybody that

22  will make this investment.

23       So Mr. Kenner started looking around also.  You have

24  two parallel people that don't know each other that are trying

25  to find the same exact investment.  And why one is going to be

13

```
 1    cooperative, the other is they're both offering the same exact
 2    terms on behalf of Mr. Jowdy so he could keep these deposit
 3    (sic).
 4            As it turns out, Mr. Kenner contacts my client, Mr.
 5    Glen Murray, who at the time is in the middle of his hockey
 6    season and so the Court understands when you're in the middle
 7    of the hockey season, it's almost like being in a full-time
 8    jury trial the whole season.  It's so busy going from place to
 9    place to place, that there's not a lot of sitting around time.
10        THE COURT:  Well, let me ask you this.
11        MR. RICHARDS:  Yep.
12        THE COURT:  This is about 2005 and he had the ankle
13    injury in 2008.  He wasn't playing obviously, right?
14        MR. RICHARDS:  In 2005, he was playing.
15        THE COURT:  He was playing?
16        MR. RICHARDS:  Yeah, the ankle injury was in 2008.
17        THE COURT:  Right.
18        MR. RICHARDS:  So he was playing in August of 2005, he
19    was still playing.
20        THE COURT:  Okay.  I thought you said that this took him
21    out of the NHL?
22        MR. RICHARDS:  No.  The ankle injury took him out of the
23    NHL in 2008, November of 2008.
24        THE COURT:  Okay, I got '98.  Okay.
25        MR. RICHARDS:  Sorry.
```

14

1       THE COURT:  2008, got it.

2       MR. RICHARDS:  Yes, Your Honor.  He ended his -- he

3  played 17 seasons.

4       THE COURT:  Now I got you.

5       MR. RICHARDS:  His career ended unfortunately by an

6  unfortunate ankle injury in 2008.

7       THE COURT:  Got it.

8       MR. RICHARDS:  And I could tell the Court that 17 years

9  is a very long time for a hockey player anyway, but he's in

10  very good shape and had a very good -- didn't, you know -- was

11  able to survive a lot of checks and injuries.  So he just --

12  this injury -- could not recover from this injury.

13       THE COURT:  Okay.

14       MR. RICHARDS:  So --

15       THE COURT:  So he's in the hockey season?  I interrupted

16  you.

17       MR. RICHARDS:  Yeah, he's not in the hockey season in

18  August, but I'm just explaining to the Court, which will be

19  relevant later, that when they're in the hockey season,

20  they're very busy and they don't always have the time to

21  respond to every single inquiry as things come up.

22       Like if you -- in the middle of the hockey season, a

23  hockey player is doing a lot of different things and not

24  always looking at some passive loans or investments which will

25  be relevant when I explain to the Court in the case why things

15

1    take a month or two or three between contacts with Mr. Murray

2    because he's busy playing hockey during the season.  When he's

3    off season, he's much easier to reach.  All right.

4            Now, what happens is is Mr. Kenner tells Mr. Murray

5    "your business partner, Mr. Jowdy, needs a short term loan."

6    Now Mr. Jowdy's not a stranger to Mr. Murray.  They know each

7    other because Mr. Murray gave Mr. Jowdy $500,000 previously to

8    invest in one of Mr. Jowdy's real estate deals.  So they are

9    not strangers.  He feels very comfortable, in '05, with Mr.

10   Jowdy who holds himself out to be a large owner of very

11   expensive Cabo -- Baja, California real estate.  And at the

12   same time, Mr. Jowdy had raised millions of dollars from

13   friends of Mr. Murray's who are also hockey players and so

14   he's an investment pool with 20 to 22 hockey players that Mr.

15   Murray knows most of them and Mr. Jowdy is in control of all

16   their money in a real estate project in Mexico.

17           So when he hears Mr. Jowdy needs this money, he's

18   not that concerned, he's talking to Mr. Kenner and Mr. Murray

19   is very comfortable at the time because he's wiring the money

20   to an escrow account where he's listed as the originator on

21   the bank order so everybody knows the money's coming from him.

22   It's going to the Palms and the Court may not appreciate this,

23   but folks from California and other places, we think we give a

24   casino money or a casino's involved, we're going to get the

25   money back.  They don't just take it.  So there's a comfort

16

1    level in wiring money to an investment that the casino is in

2    charge.

3            I mean if the casino says they're going to repay the

4    money if the deal doesn't go through, most people outside of

5    Nevada are confident in the casino that the money will get

6    repaid.  And in this case, the evidence will show you that if

7    the Palms deal didn't go through, meaning Mr. Jowdy couldn't

8    get the funds there in time, then at that point, it was all

9    refundable to the parties.  There was no risk of loss of these

10   deposits.  So the 150,000 would get refunded to Mr. Jowdy and

11   the 791,000 would get refunded to Mr. Murray.  So no one was

12   concerned about risk if this thing didn't go through.  It was

13   a very short window Mr. Jowdy had to come up with this money

14   or the deal just gets killed.

15           Meanwhile, at the same time, you have Mr. Gaudet

16   also trying to pitch the deal.  Next slide please.  And those

17   are the terms of the agreement, a 30 to 45-day return, ten

18   percent of the money and Mr. Murray felt very comfortable

19   because like I said this wasn't a stranger.  This was Ken

20   Jowdy, someone that was in control of a large amount of money

21   and at that time Mr. Murray had no reason to believe that Mr.

22   Jowdy wouldn't send the money back if the Palms deal didn't go

23   through.

24           Now, next slide please.  Exhibit 119 is a very

25   important exhibit because what it's going to show is we were

17

1  able to subpoena objective records from the title company,

2  Stewart Title, and what it's going to show and I'm going to --

3  you can go to the Elmo please.  You have a very critical email

4  on August 11th from Mr. Jowdy.  And Mr. Jowdy says in the

5  email that he says, "Sandra, I never received a response to my

6  last email.  So I am just sending you the wires and I assume

7  that one of four things will occur.  You accept the money and

8  the deal is done," meaning he's going to be able to move onto

9  the next phase of the condo purchase.  "You accept the money

10  and charge the market price for the units," meaning that if

11  they were going to say that the -- see the market was rising

12  believe it or not on these deposits.

13       I mean it's so hard to believe just in five years,

14  but the market was going up and so he wanted to keep the

15  prices locked on the option that he paid in April of '05

16  because one thing the Palms could do is they could say hey,

17  you didn't pay the progress payment when you were supposed to,

18  now the market value on these unbuilt condos has gone up, so

19  you got to pay more money.  I mean they were selling an

20  increase without even the thing being built yet if it's so

21  unbelievable at that time.

22       Now, the third choice he said is "You hold the money

23  in a position to take other units as they become available,"

24  meaning that if the units that he lost his deposit on were

25  sold, he wanted three other ones.  Or four, "You return the

18

money.  I've put them in order of what I would like to see

happen but I will accept whatever you decide to do.  Thank

you, Ken."

            Now at no time does Mr. Jowdy, and the evidence will

be unequivocal in this, say I'm really buying this condo for

Mr. Kenner, for my brother, for my mother, none of it is

there.  He's making what I believe and I believe Mr. Jowdy

will have to testify to, these were truthful representations

to the Palms.  I don't believe he was pretending to buy the

property for somebody else at the time.  And what he really

wanted is just for the deal to go through because Mr. Jowdy

knew even in his own email that the value of those condos had

risen from the time he originally put the deposit down to the

time that he sent this email.  So he really didn't want to

lose this because he already has built-in appreciation in his

deposit.  And so that's why this email is very important.

            And then the rest of the exhibit which we'll go

through when we do the trial, you're going to see a series of

emails where only Mr. Jowdy goes back and forth with a woman

named Sandra Bond who's in charge of the title, back and forth

about the wire, the status of the money, because while he's

busy writing her saying please don't give away my deposit, he

knows Kenner is working on Glen Murray to get this loan and

I'm going to show you an email in a second which Mr. Jowdy

before he sends this first email, he actually sends a draft to

19

1    Kenner and says can I send this email because he didn't want

2    to send it if the money was never going to come and I'll show

3    you this email in a second, where Phil Kenner writes back to

4    Ken Jowdy "we got to talk to The Muzz."  Now, Mr. Murray's

5    nickname is The Muzz.  So he says "I got to wait and see if

6    The Muzz is going to do this deal" because he didn't want --

7    he couldn't commit to Mr. Jowdy that this funding was really

8    going to come through.

9         And Exhibit 119, we'll just show the Court, a

10   plethora of emails where Mr. Jowdy is feverishly riding the

11   title to try to keep them from keeping this deal open or the

12   person that's responsible at the Palms.  I think that's, you

13   know -- she's the intermediary there.  Sandra Bond is the

14   person at the Palms that's in charge of the deposits and so

15   she could kill the deal and Mr. Jowdy is trying to keep her

16   from not killing the deal.

17        So if we go to the next slide please.  Okay, this is

18   -- what happens then is Mr. Jowdy ends up canceling the deal

19   because the Palms ultimately tells him they're going to take

20   option four of his last email, "we're going to refund the

21   money."  And so what Mr. Jowdy does is he issues an Exhibit

22   112, I'm going to show you -- go back to the Elmo please.  He

23   says, he gets a letter from the Palms to Ken Jowdy via

24   certified mail, and the Palms indicates they're going to

25   refund all of his money.  And this is on August 24th, 2005.

1    So this is the end of the transaction.  For my client's

2    purposes and for this case, we believe at this point the

3    transaction's over, Mr. Jowdy timely or untimely by not

4    getting the wire in on time to the escrow because he couldn't

5    get the funding, but it came in late, the transaction gets

6    canceled and Mr. Jowdy requests the refund and releases the

7    deposits.  And the money goes back and the deposits are

8    returned.

9          All right.  Now, from a timeline perspective, it's

10   our position that the case is over on August 24, 2005.  This

11   is, you know, not a very complex case.  The money should have

12   just been returned to Mr. Murray and that's it.  We can go

13   back to the next slide.  There's two critical emails here,

14   Your Honor.  The rest of the case boils down really to these

15   emails.  On August -- I'm going to show you these emails in a

16   second.  On August 11, 2005, Kenner tells Jowdy they're

17   waiting for Glen Murray to fund the short term loan which puts

18   off Jowdy's email to Stewart Title which he sends about four

19   hours later because he finally got word that Murray's going to

20   do the deal and fund it, and then there's a subsequent email

21   on August 22nd, 2005, that Kenner asks for the money to be

22   returned to Jowdy or to Glen Murray.  And let me show you

23   these emails.  You can go to the Elmo please.

24         Enforcing for the Court, you know, since we had time

25   on this case, I really was able to pare this case down to a

21

1     very few documents because it's not a complicated case.  This

2     is the email that Ken Jowdy sends to Phil Kenner and it goes

3     up with respect to it's at 8:15 in the morning, Kenner's

4     responding to Jowdy, because he wants to send this draft to

5     Sandra Bond.  He doesn't want to send her the draft until he

6     knows he's getting the funding from Glen Murray.  It's perfect

7     objective evidence as to what's going on here and Phil Kenner,

8     and you'll hear his testimony, himself, "will testify as soon

9     as I hear from Muzz."

10            Because Mr. Jowdy tells Kenner "obviously I've not

11    sent this but I would like to.  Please give me the go ahead."

12    He wants the go ahead and Mr. Jowdy would like the Court, when

13    he testifies, to believe that he's just waiting for Mr. Kenner

14    because it's really Mr. Kenner's condo.

15            But you're not going to see Mr. Kenner's name

16    anywhere related to the purchase and Mr. Kenner says "yeah, as

17    soon as I hear from The Muzz" because that's consistent with

18    the objective evidence that will show you that Mr. Murray

19    hasn't greenlighted his willingness to fund this short term

20    loan.

21        THE COURT:  Before you go on, you're showing me a lot of

22    emails.  I'm assuming that all of these documents you're

23    showing me has been admitted into evidence?

24        MR. RICHARDS:  Yes.

25        THE COURT:  I mean have you stipulated?

1 MS. LEE:  We have not, I don't know if we've stipulated

2 to all of these, the emails.

3 THE COURT:  Well, why are we being -- why am I being

4 shown these if we haven't stipulated to these things?

5 MR. RICHARDS:  You stipulated to these yesterday.  What

6 are you talking about?  These are the Stewart Title documents.

7 MS. LEE:  This email was in the Stewart Title as well?

8 MR. RICHARDS:  This is your document.  You produced it.

9 017, this is your -- we --

10 MS. LEE:  Okay.  Yes, Your Honor, that's fine.

11 THE COURT:  Okay.  Well maybe --

12 MR. RICHARDS:  I'm only showing documents we stipulated

13 to.

14 THE COURT:  Okay.  Well, another problem, you may

15 stipulate to it but the Court hasn't accepted it either.

16 MR. RICHARDS:  Oh, all right.

17 THE COURT:  I mean I'm just -- I'm like well we were --

18 we haven't gone through stipulating to exhibits that you're

19 showing me in opening.  Have you gone through and stipulated

20 and got it number set so we can go through these and I can go

21 ahead and get them into the Court record?

22 MR. RICHARDS:  Yes, Your Honor, I marked all the exhibits

23 -- this is Exhibit 124.  Yes.

24 THE COURT:  Okay, what exhibits have been admitted?

25 Let's go through Plaintiff's exhibits first.

23

```
 1        MS. LEE:  Well, we stipulate, Your Honor, sorry, we

 2   stipulate to authenticity, not necessarily relevance or

 3   anything like that.  But we have stipulated to the

 4   authenticity of these documents.

 5        THE COURT:  Of all exhibits?

 6        MS. LEE:  No, no, no.  Of the ones that we're going to go

 7   through now with Your Honor.

 8        THE COURT:  Okay.  Well, before I see them, they should

 9   be admitted into evidence.  So let's -- tell me the numbers

10   that have been admitted into evidence. All of them.

11        MR. RICHARDS:  124.

12        MS. LEE:  And is that -- and when you say 124 --

13        THE COURT:  Okay, you've got them in order, right? Like 1

14   through whatever?  I want them in order.

15        MS. LEE:  We do in Plaintiff's exhibits.  I don't know

16   what -- are numbering system is obviously different.  So I

17   don't know --

18        MR. RICHARDS:  I can go back.  I just followed -- our

19   exhibits start I think at -- we're 1 through 100 and

20   something.

21        THE COURT:  Okay.  Well I mean I -- we've got to follow

22   the procedure here.  Do you have a list of exhibits because I

23   don't on mine.

24        MR. RICHARDS:  I have an exhibit, sure I have an exhibit

25   list.
```

1      MS. LEE:  I think, Your Honor, our paralegal produced a

2  list of documents to your Clerk yesterday.

3      THE COURT:  Well, okay, we --

4      MS. LEE:  But those are just our --

5      THE COURT:  Okay.  I need a list of exhibits.  The clerk

6  has a list of the exhibits and then we need to go through and

7  mark which ones have been admitted if you're going to use them

8  in your opening.

9      MR. RICHARDS:  All right.

10     MS. LEE:  Well, I'll stipulate that the document that was

11 just shown has been admitted, the 17 with the Bates number 17

12 on the bottom.

13     THE COURT:  Okay, we're not going to be admitting them as

14 we go.

15     MS. LEE:  Oh, I'm sorry.

16     THE COURT:  I'd rather --

17     MR. RICHARDS:  Oh, sure, Your Honor.  Okay.  We'll admit

18 -- I'll start with exhibit -- I have a list, it's Exhibit 74

19 of the first document I showed.

20     THE COURT:  Okay, now you have stipulated to all these

21 exhibits, right?

22     MS. LEE:  I don't know what their Exhibit 74 is.

23     THE COURT:  Okay.  I hate to do this to you in the middle

24 of your opening, counsel.

25     MR. RICHARDS:  That's all right.

25

1      THE COURT:  But I think we better take a break.

2      MS. LEE:  Sure.

3      THE COURT:  I'm going to need an exhibit list.  Maybe Ms.

4  Clerk can go ahead and make me a copy of hers.

5      MS. LEE:  Sure.

6      THE COURT:  And then I want you to stipulate to whatever

7  exhibit you plan to show me in your opening.

8      MR. RICHARDS:  No problem.

9      THE COURT:  In fact, I'd prefer whatever you've got in

10  the very beginning what you stipulate to.  It just makes it go

11  a lot faster.

12      MS. LEE:  Sure.

13      MR. RICHARDS:  I just want the Court to know we did spend

14  three hours on the phone and went through everything.

15      MS. LEE:  It wasn't three hours, but yeah, we were on the

16  phone.

17      MR. RICHARDS:  Yeah, I mean but we did -- I just want the

18  Court to know we do have --

19      MS. LEE:  We did meet beforehand, right.

20      THE COURT:  Okay.  One at a time.  Court recorder is very

21  good, but she can't take you both down at the same time.

22      MS. LEE:  Oh, sorry, Your Honor.

23      THE COURT:  All right.  I'm going to take a break.  Then

24  whenever I come back I'll have a list and then you can tell me

25  okay, we've stipulated to Plaintiff's Exhibits X, Y, Z,

26

```
 1   whatever it is.  Okay.  And then we'll go through your
 2   opening.  All right.
 3        MS. LEE:  Thank you, Your Honor.
 4        MR. RICHARDS:  Thank you.
 5        THE COURT:  All right.
 6        [Recess]
 7        THE COURT:  Okay.  Counsel, we're ready to proceed.  I
 8   just want to make sure that I acknowledge the appearance Mr.
 9   Kenner, third-party defendant, I had not done that before when
10   we were talking about this.
11             What exhibits will we stipulate to?
12        MR. RICHARDS:  We can read them again.  We gave them to
13   your clerk while you were at recess.
14        THE COURT:  Right.
15        MR. RICHARDS:  We're stipulating to Plaintiff's Exhibit
16   74 --
17        THE COURT:  Let me get to that, I'm sorry.
18        MR. RICHARDS:  No problem.
19        THE COURT:  Okay, 74.
20        MR. RICHARDS:  108 through 113.
21        THE COURT:  Okay.
22        MR. RICHARDS:  119.
23        THE COURT:  Okay.
24        MR. RICHARDS:  And 124.
25        THE COURT:  124, okay.
```

27

1          MR. RICHARDS:  That's for opening statement.

2          THE COURT:  Okay.

3          MS. LEE:  And I believe I gave you two, also from our

4     side.

5          THE CLERK:  For Defendants, Your Honor, there's just two.

6          THE COURT:  Okay.  And the exhibits that we've agreed to

7     with respect to Defense?

8          MS. LEE:  I'm sorry.  I did it right above it.  I think

9     84 is one of them.

10          THE CLERK:  A-81 and A-84.

11          MS. LEE:  Yeah.  A-81, Your Honor.

12          THE COURT:  Okay.  Hold on just second, let me get to it.

13     A-81 and then A-84?

14          MS. LEE:  Correct.

15          THE COURT:  Okay.  Great.  All right.  Thank you.

16          MS. LEE:  Thank you, Your Honor.

17          THE COURT:  All right.  Counsel, you may proceed.

18          MR. RICHARDS:  Thank you, Your Honor, sorry for the mix-

19     up.

20          THE COURT:  That's okay.  We just got to get these things

21     done beforehand, it just makes it go a lot faster.  All right.

22          MR. RICHARDS:  Okay.  If we can go back to the

23     PowerPoint, please.

24          So, Your Honor, if you could just pretend you were

25     riveted up until this point?

1      THE COURT:  I am riveted.

2      MR. RICHARDS:  All right.  Thank you.  Because I don't

3 want to feel like -- my client's going to think I've messed,

4 and --

5      THE COURT:  You're fine.

6      MR. RICHARDS:  -- we have a disruption.  All right.

7      THE COURT:  I'm riveted.

8      MR. RICHARDS:  Thank you.

9      THE COURT:  I'm there.

10      MR. RICHARDS:  Thank you, Your Honor.  I appreciate it.

11      THE COURT:  Okay.

12      MR. RICHARDS:  So, we're at this critical stage here

13 where I went through, you know, all these emails and pulled

14 for the Court the two most significant emails, which is a

15 critical email exchange between Mr. Kenner and Mr. Jowdy.

16      And directing to this slide, we're right at the

17 precipice before Mr. Murray funds.  I walked the Court through

18 the entire transaction, and then I just circled back to this

19 critical time period.

20      On August 11 Kenner is telling Mr. Jowdy that

21 they're waiting for Mr. Murray to fund the loan.  And then on

22 August 22nd Kenner asked for the money to be returned to Glen

23 Murray.  Now, if -- that's Exhibit 124.  That's Exhibit 124.

24 And if you could go to the ELMO, please.

25      This is the email from Phil Kenner to Mr. Jowdy.

29

1    And the time period, and I showed the Court the documents from

2    the Palms and the cancellation refunding the money.  This is a

3    critical time period, because what the Court needs to

4    understand, the evidence will show you, is that when word that

5    Mr. Jowdy wasn't going to be able to keep the deposit going,

6    it was knowledge that it was going to have to be returned

7    because the deal just fell apart, and the Palms wasn't going

8    to honor the deposit any longer.

9         So this, you'll see over the course of this case

10   that Mr. Ken (sic) or Mr. Jowdy, and this is an undisputed

11   fact, communicate a lot by email.  So there's a lot of emails.

12   Which is good, because every single thing in this case is

13   always tied to an email, except for what happens after this

14   August 22nd period.

15        We have this email which is very unequivocal in the

16   Court.  This was produced by Mr. Jowdy himself, and we

17   appreciate him keeping those emails for us.  The -- Mr. Kenner

18   says, "Please let me know when you send it.  I need to speak

19   with Glen, so the sooner the better."

20        And it'll -- this is the same account.  The evidence

21   will show you that wired the money to Mr. Jowdy.  And in the

22   subject matter it says "Murray Palms $$" because Mr. Kenner

23   obviously, and Mr. Murray were expecting this transaction to

24   be done.  And Mr. Kenner had knowledge, even before Mr. Murray

25   that the deal just didn't go through, and he knew the

1  cancellation and the return of the money was forthcoming.

2         The evidence will show you Mr. Murray didn't know

3  exactly, wasn't focusing exactly when this money would be

4  returned, because he assumed the Palms isn't going to cut you

5  a check within five second of the escrow being cancelled.

6         But what the objective evidence is, is Mr. Kenner

7  unequivocally request the money returned, and it shows that

8  Mr. Jowdy knew that he was supposed to return the money.

9  Because when you contrast that to this email, the August 7th,

10  email, or August 11th email, at 8/15 in the morning, Mr.

11  Kenner said, "As soon as I hear from Muzz."  Because Mr. Jowdy

12  is saying, "Should I send this email to the Palms?"

13         And the reason why these are very important is,

14  because it again shows Mr. Jowdy knows that Murray is lending

15  him this money, it corroborates the entire transaction.

16  Because what you'll never find in evidence in this case and

17  you'll never see, is a single email from Mr. Jowdy after the

18  August 22nd request from Mr. Kenner, saying:  I'm going to

19  wire the money to Mexico, into my house in Vegas, and to do

20  other deals.

21         You never see one email from Mr. Kenner or Mr. Jowdy

22  about this.  Where in the evidence, when you look at all the

23  evidence in this case, you're going to see a complete evidence

24  pool of emails tied to every transactions between these guys,

25  because they're in different States.  They write to each other

31

```
 1    all the time, and everybody is getting along.
 2            You have to understand the concept at that time, is
 3    Mr. Murray has invested $500,000 with Mr. Jowdy who's raised
 4    millions of dollars from all these professional athletes, and
 5    everybody's getting along and emails are going back and forth
 6    all the time, and you'll never find an email produced by Mr.
 7    Jowdy in this entire case that says:  Hey, I'm going to ship
 8    the money somewhere else.
 9            You see the demand by Kenner, and then the only
10    other evidence you're going to see in this case, is emails
11    from Mr. Kenner saying:  When are we giving this guy the money
12    back.  And the testimony is going to be clear that Mr. Kenner
13    did nothing after this date but try to get the money back from
14    Mr. Jowdy.
15            Now if we can go back to the PowerPoint, please.
16    Mr. Jowdy, though, in discovery had an explanation for this
17    email.  This is an exact verbatim copy of the transcript,
18    which was shown to counsel, they've agreed I could publish it.
19            Prior counsel in this case showed Mr. Jowdy the
20    email saying:  You know, I'm showing you the email.  It says
21    that you're supposed to give the money back.  What's going on
22    with this email?  And this is Mr. Jowdy's testimony.  It was
23    Phil saying that the money needed to be sent to Glen, which
24    meant that Phil was going to send me the money to send to
25    Glen.
```

32

1    Now, that's what Mr. Jowdy said this email said.

2    And if we can go back to the ELMO, please.  This is what Mr.

3    Jowdy says, it says in the email.  That somehow in this email

4    he grafted this other language, that was his testimony that

5    this was really not a request to send the money back with

6    wiring coordinates, but it was really a request that he

7    augmented to this email saying it really meant that Mr. Kenner

8    was going to send him the money, to then send back to Mr.

9    Murray.

10    In any event, no matter which way you reconcile the

11    email or Mr. Jowdy's testimony, his own testimony I the

12    deposition corroborates that he knew that he was supposed to

13    send the money back to Mr. Murray, either by getting it from

14    Mr. Kenner, or sending it himself.

15    So no matter what explanation he has for it, it's

16    not really significant, because his subsequent testimony two

17    years later, clearly shows, or years later, shows that he was

18    expecting to return the money, either getting it from Mr.

19    Kenner, or returning it himself.

20    And go back to the PowerPoint, please.  The next

21    slide is Jowdy wires the money without the consent to Murray.

22    And like I said, I promised the Court, our case would stop

23    here.  Because on August 25th, I'm going to publish this,

24    please on the ELMO.  On August 25th you have the series of

25    three outgoing wire receipts --

33

1       THE COURT:   Now what exhibit is this one?

2       MR. RICHARDS:   113.

3       THE COURT:   And this was one of the ones admitted.   Okay.

4       MR. RICHARDS:   Yes, Your Honor.

5       THE COURT:   Okay.

6       MR. RICHARDS:   Now, what you have here is, on August

7   25th, the only person in the world that had the ability to

8   control this money was Ken Jowdy, and Ken Jowdy instructed

9   Stewart Title to wire the money to his bank account to a

10  company he exclusively owns and controls, and is the sole

11  officer of.

12          So he wires it basically back to himself instead of

13  Mr. Murray.   I'd love to produce an email to the Court that

14  shows why Mr. Jowdy wired the money.   But what you'll find in

15  this case is there's not a single email attached to this wire.

16          So it wasn't until years later during the discovery

17  in the case, the evidence will show you that Mr. Murray was

18  shocked to find out that the money was wired to Mr. Jowdy;

19  that he wired it to somewhere else.   There's no other email

20  that has any attachment to this case.

21          And so I can't produce any evidence to explain why

22  he did it.   But the explanation is, because Phil said it was

23  okay.   So there's some explanation, that's what the evidence

24  is going to show you.   But certainly Mr. Murray is going to

25  tell you, he would have never given Mr. Jowdy another $791,000

1    to wire into some further Mexican investments or to his house

2    in Las Vegas, because Mr. Jowdy already had $500,000 of his

3    money.  And that was the most Mr. Murray was going to invest

4    with Mr. Jowdy in a real estate investment that was somewhere

5    potentially outside the United States.

6            And so in this particular case, this exhibit,

7    there's just three separate wires that Mr. Jowdy shows he was

8    the one that volitionally caused these wires to be

9    transferred.  There was nobody else that had legal authority

10   but Ken Jowdy to order that these monies.

11           And the objective evidence is in fact that Mr. Jowdy

12   wired these monies to benefit himself.  They went to an

13   account that was his.

14           Go back to the PowerPoint, please.  Where did the

15   money go?  Well, because of the discovery in this case, we

16   found, and I want to tell the Court, the only reason why I'm

17   offering this evidence, is not because we want to get into how

18   Mr. Jowdy spent the money, and his issues with Mr. Kenner,

19   because that's not what this case is about.  This case is

20   about Mr. Murray and his money.  But I wanted to show the

21   Court that the only person that had an economic interest in

22   these funds is Mr. Jowdy, so I had to take one more step and

23   just simply show where the money went.

24           So if we can publish Exhibit 114.  $412,000 went to

25   Fidelity Title to pay for, if you look at the originating bank

35

1   info, Ken Jowdy, Mark Thalmann in escrow, the evidence is

2   going to show you it just went to buy a house for Mr. Jowdy.

3   That's it, it's right here in Vegas.  You can take a look at

4   it.

5        So that's the first part that benefited.  The second

6   part is it went to Mr. Jowdy's company, Propiedades DDM.  The

7   evidence is going to show you Mr. Jowdy owns 99 percent of the

8   company.  The other one percent is a figurehead, a Mexican

9   attorney.  And we're fortunate enough that he's going to fly

10  in and testify.

11       But the money all goes to Mr. Jowdy for his home,

12  and an entity he controlled.  And I just want to show the

13  Court that my client didn't benefit from it.

14       If Mr. Jowdy wants to put on evidence that somehow

15  indirectly Mr. Kenner benefited, it's not our issue.  Our

16  issue certainly, the evidence will be undisputed that Mr.

17  Murray didn't benefit from this.

18       And lastly, the objective --

19       THE COURT:  Do you have a date on this one?

20       MR. RICHARDS:  Yeah.  When was this subsequently wired

21  out?

22       THE COURT:  Yeah --

23       MS. LEE:  August 29th.

24       MR. RICHARDS:  August 29th.

25       THE COURT:  Well, where is that?

1          MS. LEE:  I don't know if it's on that document, but I

2     know that's it.

3          UNIDENTIFIED SPEAKER:  The very top right.

4          MS. LEE:  The very top right?

5          MR. RICHARDS:  Oh, yeah.  Right here, sorry.  August

6     29th.

7          THE COURT:  Okay.

8          MR. RICHARDS:  Yeah.  Within a short time period Mr.

9     Jowdy wires the money back out August 29th to close on his

10    house in Vegas, and to close on his -- to put in his company.

11    But my client had no knowledge of that.  He was just

12    expecting, the evidence will show you when he testifies, that

13    the money would be returned if the Palms' deal didn't go

14    through.  Otherwise he wouldn't have done the deal.  That's

15    what -- that's what my client's testimony is.

16          And I don't think Defendant is going to contend that

17    my client wasn't told that.  I believe that the corroborate

18    that they don't have any dispute that my client was told he

19    was going to get his money back.  Just -- they're going to

20    claim he was told by Phil Kenner.

21          Now, the house that was ultimately purchased in

22    Vegas and -- was a house that Mr. Jowdy is on title with as a

23    joint tenant with a person by the name of Mark Thalmann.

24    They're going to be testifying in this case.

25          And the position that Mr. Jowdy, the evidence will

37

1    show is taken, is that the house, even though he's exclusively

2    serviced the debt for the last five years, and the loan is in

3    the name of Mark Thalmann, it's secretly a part of Phil

4    Kenner; Phil Kenner has a secret interest in this house.

5            It's not a documented interest, it's not a titled

6    interest, but he owns a third of the house.  And evidence will

7    show you in this case that there'd be no business reason for

8    someone to buy a house and take all the debt in your name, but

9    then give the ownership to other people.

10           There'd be no reason for someone, which the debt I

11   believe the evidence will show you presently is 1.5 million on

12   the house.  Mark Thalmann is the exclusive party on the loan,

13   but the evidence is going to show you that Mark Thalmann only

14   owns a third of a house that he owes 1.5 million in a State

15   where there's no anti-deficiency statute.

16           So the evidence will show you from an objective

17   analysis, we believe that no one would make a business

18   decision to accumulate 1.5 million in debt, to only own a

19   third of a property, there's be no reason.

20           With respect to the -- with respect to the money,

21   that's where the money ended up, in those two vehicles.  All

22   the while Mr. Murray, who is actively dealing with his hockey

23   career, has been waiting to get the money back.

24           The evidence is going to show you that at this time

25   Mr. Murray also is concerned that Mr. Jowdy is trying to make

1    these investments work in Mexico where he has a large amount

2    of money, millions, and millions of dollars in Mexico.  And

3    Mr. Murray is partners with all these other hockey players.

4              So he was hoping, the evidence will show you, that

5    Mr. Jowdy would eventually just return this money to him.  And

6    so ultimately when he realized that it just wasn't going to

7    happen, and also that this Mexican investment wasn't going

8    anywhere.  And the evidence will show you not a dollar has

9    ever been returned to any of these investors is probably over

10   $10 million that they're out in this one particular

11   investment, that Mr. Murray finally had to file this lawsuit.

12             He was hoping, and the evidence will show you that

13   for the last couple of years that somehow Mr. Jowdy would just

14   return his money.  That's all he's ever wanted, was the return

15   of his money.  He's never received any sort of consideration,

16   or credit, or payment from anybody in the world with respect

17   to this debt.

18             He's still out the money.  He would like the money

19   back.  He's been retired for two years, and this money would

20   mean a lot to him and his family if it could now be finally

21   returned, because the evidence unequivocally will show you,

22   the only one that's benefited from this money that had control

23   of this money was Ken Jowdy.

24             And that's why Mr. Jowdy's been unjustly enriched,

25   as well as breach the oral agreement that was made with

39

1    respect the short use of these proceeds.

2         MS. LEE:   Good morning, Your Honor.

3              One thing that I liked that Mr. Richards said, so we

4    don't have to continue, he hit the nail on top of the head, is

5    that exactly.   Mr. Kenner was the only source of money that my

6    client ever used to fund projects that they jointly went into.

7    Mr. Kenner was the money guy.   Our guy has a background, Mr.

8    Jowdy, and he will testify in his testimony, his background is

9    in commercial real estate development.

10             He's the guy on the ground day-to-day developing the

11   projects.   When he met Phil Kenner, Phil Kenner and him were

12   introduced intentionally for the purpose of trying to build

13   and fund a project in Mexico.

14             Now there are two different projects in Mexico.   One

15   is called Diamante Del Mar, Diamante Del Mar, and the other

16   one is Diamante Cabo San Lucas.   And the reason that's

17   relevant, Your Honor, is because Phil Kenner represents a

18   series of hockey players, high net worth individuals.   He's

19   the one that has the funding resources, my client does not.

20             So when they get together and they decide they're

21   going to develop this property in Diamante Del Mar, Kenner is

22   the guy that's going to go out and get the money for it, and

23   he doesn't deny that.   He goes out, he calls it "sourcing."   I

24   went out and I sourced the funds, I got the money for that

25   project.

40

1          One of the people that he got the money for that

2    project was from Mr. Murray.  Mr. Murray invested $500,000 in

3    the Diamante Del Mar project.  And Mr. Murray himself

4    testified it was Phil Kenner who came to him and solicited him

5    to invest his money in that project.

6          And he will also testify, if he's consistent with

7    his deposition transcript, that he's only had one conversation

8    in all this time.  From the time in 2002 when he invested his

9    money in that Mexican property, to today in Court.

10          He's only had one loan conversation with my client,

11    and that was back in 2002, several years before this supposed

12    loan ever transacted.

13          So there's supposed to be this enormous amount of

14    trust that Mr. Murray is placing in my client, after he's only

15    spoken to him once.  And then doesn't speak to him when this

16    supposed loan becomes delinquent, 30 to 45 days later.  No, he

17    doesn't speak to him, he doesn't speak to him not 30 days, not

18    45 days later, not a year later, not two years later.

19          To this day he's never spoken to my client about

20    this money.  And it's a substantial amount of money, it's

21    $791,000, he never has one conversation with him.  And so the

22    evidence will show that his knowledge of this transaction,

23    being a loan, comes from one source and one source only, and

24    that's Mr. Kenner.

25          And his deposition transcript will show, or we'll

41

```
 1    just get the testimony from him, that if he's consistent with
 2    his deposition transcript, when I ask him the question:
 3                "Q  Other than what Mr. Kenner has told you, do
 4          you have any other evidence, documentary or
 5          otherwise, that the money that you gave to Mr. Jowdy
 6          was supposed to be a loan?
 7                "A  Do I have any other documents?
 8                "Q  Any other evidence, documents or otherwise?
 9                "A  No.
10                "Q  So it's just solely Mr. Kenner's
11          representations to you, that's the only evidence
12          that you have.
13                "A  Yes.
14        MS. LEE:  Now, Your Honor, there's a reason why they stop
15    the transaction with the money going back into Baja
16    Development.  Baja Development is a company that is owned 100
17    percent by my client, we don't deny that.
18                In fact, there are very many facts that Mr. Richards
19    talked about in his opening statement that we're not going to
20    deny.  First fact, that money came from Glenn Murray's
21    Charles Schwab account facilitated by Phil Kenner.  Phil
22    Kenner is the one that submitted the request to Charles
23    Schwab.  He signs the request as attorney in fact for Glenn
24    Murray.  You'll see a document that says that.  You'll see
25    three documents that's saying that because there's three
```

42

1    different wires.

2              He submits there documents to Charles Schwab, Phil

3    Kenner and at the top it says, "Urgent, please rush.  We need

4    this money to go into these escrow accounts at the Palms."

5    And we don't deny that that money was wired to the Palms and

6    it hit three escrow accounts that were setup in Mr. Jowdy's

7    name.

8              Then the deal falls through.  We don't deny that

9    once the deal falls through the money goes into another entity

10   owned and controlled by my client, Baja Development; it goes

11   into that entity on August 29th.  That same day, and Mr.

12   Richards is saying:  Oh, it went here, it went there, our

13   analysis is done.  But it didn't go here and there, it went

14   two places.

15             It went to a home in Las Vegas on Innisbrook and

16   we'll be referring to that property as the Innisbrook

17   property.  And it was owned formerly by George Maloof who is a

18   close and personal friend of Mr. Kenner's, and he won't deny

19   that went to Innisbrook and then some money went over to Cabo

20   San Lucas.

21             So the second project in Mexico that Mr. Kenner and

22   Mr. Jowdy developed together is the project called Diamante

23   Cabo San Lucas.  So they have Diamante Del Mar where Mr.

24   Murray has invested, and then Diamante Cabo San Lucas where

25   another $500,000 of Kenner's money, however -- they're going

43

1   to try to characterize that as Murray's money and that's fine,

2   because they've admitted that Kenner is the agent for Glen

3   Murray.

4           They've pled it in their complaint, throughout their

5   proceedings.  As a matter of fact counsel, opposing counsel,

6   not this firm today, but represented Mr. Kenner in his

7   deposition as an agent for Mr. Murray.

8           So he said, "I'm here today representing Mr. Kenner

9   as an agent for Mr. Murray."  So he was represented at his

10  deposition by counsel, by the same counsel that was

11  representing Mr. Murray.

12          So he's an agent.  This is the characterization of

13  their relationship and that's fine.  Because as an agent, if

14  he was an agent when the money went in, he's an agent when the

15  money comes out.

16          Now they want you to stop the analysis with just

17  where the money went and we're not going to dispute that.  The

18  money went into a home of which my client has a 50 percent

19  joint tenancy interest on paper with Mark Thalmann; and you'll

20  hear testimony from Mr. Thalmann as well.

21          Then the other -- another $500,000 goes down to

22  Diamante Cabo San Lucas into an entity that we're going to

23  call PDDM, just because I can't pronounce it.  It's

24  Propiedades De -- and I apologize, I just don't get the

25  pronunciation.  It's a Mexican entity and we consistently

1    refer to it throughout this litigation as PDDM.

2         And that company at the time was held 99 percent in

3    my client's name and one percent by Mr. Fernando Garcia, who

4    is a licensed attorney in Mexico, and he'll be here to talk

5    about things associated with that company.

6         Now the reason why they don't want Your Honor to get

7    into the transaction after the Palms, because what happens is,

8    and you have to -- this is all in August of 2005.

9         So in August of 2005 Glenn Murray's money hits the

10   escrow accounts.  It's wired on August 12th.  It hits the

11   Palms on August 18th, and then it goes back out to Baja

12   Development on August 29th.

13        Now what else is happening in August at that time?

14   Well, on August 5th Mr. Kenner through his company that he

15   solely owns and controls called Ula Makika, he wires $200,000

16   into an escrow account on the Innisbrook property.

17        Why does he do that?  Because originally as

18   communications will show in emails, he intended to own that

19   Innisbrook property 50/50 with Mr. Jowdy; that was the

20   original intent of that home.  Again, George Maloof is the

21   seller of that home.

22        Mr. Kenner introduced, or arranged for a meeting at

23   the Palms, by the way, with Mr. Maloof so we can get these

24   Palm units sold.  It was a big presentation that he did for my

25   client and for Mr. Kenner together, because the original

45

1   intent there was that they were going to own these Palm units

2   together.  Even though he couldn't put his name on it because

3   he made representations to my client that he already owned

4   three.

5           And as Mr. Richard said these Palm units were going

6   like hotcakes.  And they had a restriction that you could only

7   own up to three units.  So Mr. Kenner comes to my client says:

8   Hey, I already have my name on three of these Palm units, but

9   if you lend your name to it, what we'll do is I'll go get the

10  funding for it, just like I do for every other project we do

11  together, I'll be the one that goes gets the money.  I'll go

12  get the money.  Whichever way I need to go get the money.  You

13  put your name on it and then we'll flip it.

14          Because as Mr. Richards said, people were doing that

15  back them.  They were buying them, they were flipping them,

16  they were getting a profit, and that's what Mr. Kenner wanted

17  to do; that's what Mr. Jowdy wanted to do with Mr. Kenner.

18          So also in August going back to the Innisbrook

19  property you'll show, and this is an exhibit we stipulated to,

20  this is Plaintiff's Exhibit 81, you show that $200,000

21  leaves --

22      THE COURT:  And this is one of your exhibits, right?

23      MS. LEE:  Yes, Your Honor, 81.

24      THE COURT:  Okay.

25      MS. LEE:  A-81, I'm sorry.  A-81.  Two hundred thousand

46

1    dollars leaves Ula Makika which is Phil Kenner's entity.  He

2    owns it 100 percent.  And here's the transfer that shows that

3    $200,000 goes out.

4          And then we have the document showing where the

5    money went to, which is Plaintiff's Exhibit A-84, which is a

6    larger volume of documents, however this particular document

7    is Bate Stamped MERFID 0030.  And it shows that the money is

8    going from Ula Makika to Fidelity National Title Agency.  That

9    is the company, the title company that was receiving the funds

10   to fund that Innisbrook property.

11         Why is Mr. Kenner sending $200,000 to this

12   Innisbrook property on August 5th?  Because the intent was

13   they were going to own this house together.  Now when they

14   were trying to seek financing for the home they realized they

15   don't have the credit to do this.  It is a $1.6 million home.

16   They don't have the credit to be able to finance this home.

17         So they turn to Mark Thalmann who's a good friend of

18   Mr. Jowdy's and say hey, your credit score's over 800.  You

19   put your name on this home.  I'll get the hard money down for

20   it, says Mr. Kenner.  I'll make sure that we get all the

21   initial financing we need.

22         And then Mr. Jowdy, you make sure that the mortgage

23   payments are maintained and we'll use this home as our Las

24   Vegas base.  It's going to be an office space for us.  It's

25   going to be the place where we put people when we're

47

1    entertaining in Las Vegas.  Our clients, our respective

2    buyers.  Let's buy this home together.

3            So they do it.  And everybody starts to fulfill

4    their obligations.  Mr. Kenner puts in $200,000 in the

5    beginning.  Mr. Thalmann loans his name on the documents.  And

6    although Mr. Kenner wants you to believe that he had nothing

7    to do with the money once it left the Palms.  "I have no

8    knowledge, I have no understanding", he had all the knowledge,

9    he had all the understanding, and he had all the control in

10   terms of where that money went.

11           He says, "Hey, the Palms deal failed", but instead

12   of sending it back to Murray put $412,000 on the Innisbrook

13   property because my $200,000 is now at risk.

14           As of August 29th, and you'll see the document from

15   the seller's agent that says, it's an addendum to the title

16   documents and it says, money must -- "the $412,000 must be in

17   the account by August 29th or the people have to vacate the

18   property."  And the $200,000 was nonrefundable.  And that was

19   Mr. Kenner's money.

20           So they still needed an additional $412,000.  So he

21   wires the $412,000, my client, at the instruction of Mr.

22   Murray's agent, Mr. Kenner, and puts that money into that to

23   fund that account.

24           So then what happens after that?  Hallelujah, they

25   get the house.  And then what does Mr. Kenner do?  He starts

48

1   to immediately refinance the home, because he wants his money

2   back out of the house.

3            He's already put 412, he's put 200.  He wants his

4   money back out of the house.  He immediately has the home

5   refinanced.  And even though Mr. Thalmann is the one that

6   signs off on the refinancing documents you will see that all

7   the activity behind the scenes, emails going between Mr.

8   Kenner and the mortgage broker; Mr. Kenner and the title

9   agent; Mr. Kenner and the real estate agent; he is the one

10  that is manipulating this deal through his friends, his real

11  estate friends.

12           You don't see any emails between Mr. Jowdy or Mr.

13  Thalmann to these people, these people are communicating with

14  Mr. Kenner.  He is orchestrating the financing for this home.

15           So the 412 goes there.  His money is saved, his

16  200,000 is saved.  He immediately refinances the home a few

17  weeks later.  Who buys a home and refinances it a few weeks

18  later?  And as a result of that refinance an additional

19  $288,000 is pulled out of the home.  And that $288,000 goes

20  directly to Mr. Kenner.  Directly to Mr. Kenner.  That is Mr.

21  -- if that was supposed to be Mr. Murray's money then he

22  should have given it back to Mr. Murray at that time.  If it

23  was Mr. Murray's money when it went in, it should have been

24  his money when it went out.

25           So then he pulls out the 288.  And then a few months

49

1 later he arranges for a home equity line of credit on this

2 home and pulls out an additional 150.  And we can show that

3 150 again going to Ula Makika, his company.

4   So if anyone's been enriched Your Honor, by this

5 transaction it certainly hasn't been my client who's been

6 stuck with the mortgage of $10,000 every month since 2005, and

7 now is under water on this home, substantially under water on

8 this home.

9   It certainly isn't Mark Thalmann who's obligated on

10 paper on this loan for the next 30 years, it's Mr. Kenner.  He

11 gets all the money that he puts into this house out.  All of

12 it.  Every single penny of it.

13   The other $500,000 -- now you'll see there's 791 of

14 Mr. Murray's money goes into the Palms, but 941,000 goes out.

15 That includes an additional $150,000 deposit on the Palms,

16 which they're not claiming is his money.  But $941,000 comes

17 out, or 900 -- yeah, $940,000; 412,000 goes here to the house.

18 The other $500,000 goes to Diamante Cabo San Lucas.

19   And the reason why we have Mr. Garcia coming in to

20 testify, because he will acknowledge there is this company

21 called PDDM that was intentionally setup as the funding

22 vehicle for the down payment on this property.  The entire

23 purchase price for that property was $70 million.  The initial

24 deposit on that account was $7 million.

25   And Mr. Kenner's responsibility, because he owns 39

50

1   percent of that property, he's an equity owner in that

2   property, he owns 39 percent of that property.  In exchange

3   for his ownership interest his job, his duty, the only thing

4   that he was supposed to do to get that interest was to fund

5   the initial $7 million.  That was his job.  And he says that

6   in his deposition.

7           There was no expectation that my client was going to

8   go out and get that money.  He was responsible for getting

9   that money.  And that deal was supposed to close in April.

10  They should have had that $7 million in Mexico by April.  The

11  seller is getting nervous and the seller is threatening to

12  pull the rug out underneath him.

13          All the money that's gone in there so far is now

14  hard money.  It can't come back out.  And if I could show,

15  Your Honor, a demonstrative of that.  And it's -- and it may

16  seem confusing at first, Your Honor, but it's really important

17  to understand the funding -- the initial funding of that $7

18  million, because that's where the $500,000 of Mr. Murray's

19  money went.

20          If I could have that --

21      [Pause]

22      THE COURT:  Counsel, if you want to move around to be

23  able to look at the exhibit I have no problem with that.

24      MR. RICHARDS:  Thank you, Your Honor.

25      MS. LEE:  As Mr. Garcia will testify -- can you hear me?

51

1       THE CLERK:  Is it on?  Is the light green?

2       MS. LEE:  Yes.

3       THE CLERK:  Okay.

4       MS. LEE:  Okay.  Oh, is it -- can you hear me, Your

5    Honor?  Okay.

6       THE COURT:  I can.

7       MR. KENNER:  Ms. Lee, can I move up front?

8       MS. LEE:  Yeah, absolutely.  The Court will --

9       THE COURT:  You can come on over there by the officer.

10       MS. LEE:  Thank you for your indulgence.

11       THE COURT:  Can you see?

12       MR. KENNER:  Yes, I can.

13       THE COURT:  Okay.

14       MS. LEE:  So how did Kenner get the money to fund his

15    initial $7 million investment in his property which in

16    exchange he got 39 percent of?  He has a series of wires going

17    from -- and Little Isle IV is another entity controlled by Mr.

18    Kenner.  He doesn't deny that.  He's the managing member for

19    this entity.  He controls this entity.

20            Money leaves Little Isle IV and goes directly to the

21    seller.  Money goes from Little Isle IV again on May 17th and

22    goes directly to the seller.  This is in Mexico.

23            Then on the 17th, the same day, money goes out from

24    Ula Makika to the seller.  And as we've discussed Ula Makika

25    is 100 percent Phil Kenner's company.  May 18th, Ula Makika to

52

1    the seller.

2            Then he starts taking out loans -- then he runs out

3    of money himself.  These are his companies.  He starts running

4    out of money.  He admittedly gets loans from two of his hockey

5    player clients, Mr. Lehtinen and Mr. Stumpel  And those funds

6    go to PDDM for his benefit.  Because this is the funding

7    entity through which they've setup to run money through if

8    they need to.

9            This is -- and my client does own 99 percent of it,

10   but he receives no benefits from these monies coming into

11   PDDM, they go directly up to the seller.  And Mr. Kenner, if

12   he's consistent with his testimony in deposition will testify,

13   yeah, he got money from these guys to help fund my ownership

14   interest in the company.  And, yeah, they sent the money to

15   PDDM, and then that money went out to the seller.

16           So there's nothing unusual about money going into

17   this Mexican entity to benefit Mr. Kenner; there's nothing

18   unusual about that, just because it's 99 percent owned.

19           And later you will see that that company was

20   dissolved, a new company was setup, Diamante Cabo San Lucas

21   LLC and that is the entity that Mr. Kenner owns 39 percent of.

22           June 8th, money goes into Lower Management, which is

23   another company that was set up also in Mexico for the

24   purposes of funding this Mexican property.  It goes from Lower

25   Management to PDDM again, out to the seller.

53

1          On July 9th --

2      THE COURT:  Okay.  What was the last one?

3      MS. LEE:  Oh, sorry.  Sure.

4          On June 7th, this is part of the money that Mr.

5  Supple sends.  It's kind of a circuitous route as to how it

6  gets to PDDM, but it's Lower Management sends $500,000 to

7  PDDM, and of that $4500 goes to the seller.

8          And this will be brought out more clearly in Mr.

9  Garcia's testimony, but originally it's part of this 1.6

10 million that Mr. Supple sent to the property, one of Mr.

11 Kenner's clients.

12          Sorry.  July 19th, Little Isle IV, Mr. Kenner's

13 company sends money to PDDM to help fund his ownership

14 interest in the property.  Goes out to the seller.

15          On August 29th, this is where money -- Murray's

16 money went.  You'll see from August 29th the money leaving the

17 Palms going directly into this company.  And yes, it goes to

18 PDDM and then it goes to the seller for Mr. Kenner's benefit.

19          And then you start to see, Your Honor, and I won't

20 run through each of these names, it'll come out more in

21 testimony, that Mr. Kenner is frantically trying to fund the

22 rest of this money, because now we're in August.  We're in

23 August of 2005.  The deal was supposed to be done by April of

24 2005.

25          The seller could have at any time pulled the plug at

54

1    that point and says, "I'm not doing the deal anymore.   The

2    money that you've invested so far is hard money, it's

3    nonrefundable."  And he'd already invested $5 million up to

4    this point.   So he desperately needs to get the balance to

5    make up the $6.6 million.

6            So he starts tapping into his hockey player clients.

7    These are all hockey players, these are all his clients.   Each

8    and every one of them.   And they start putting money into

9    PDDM, PDDM, PDDM, PDDM, and going out to the seller.

10           So now at the end of the day he has funded his

11   ownership interest in the property to the tune of $7 million.

12   And we have an email where he admits that to my client.   He

13   says, "Hey", and it's in a larger context of an email where he

14   is feeling disrespected.   And he says, "I've done a lot for

15   you.   I put -- I raised $7 million for Diamante Cabo San

16   Lucas.   I raised $750,000 for the Las Vegas home."   That's an

17   important email, Your Honor.   So he admits this.

18           So of course they want to stop the analysis at the

19   Palms, because they don't want the Court to see that this

20   money then goes for the benefit of Mr. Murray's agent, Mr.

21   Kenner.   Again, they've only had one conversation back in 2002

22   on an unrelated matter having nothing to do with this loan.

23           So the claims that they bring, Your Honor, are

24   breach of contract, and as Your Honor knows, they have to have

25   an offer to prove a breach of contract.   There was no offer.

1    My client did not authorize Mr. Kenner to go to Mr. Murray and

2    ask for funding in the form of a loan.  He never asked for it.

3    There's nothing in writing to ask for it.  There's nothing in

4    four years that evidences writing for it.

5           And I like that Mr. Richards says that my client and

6    Mr. Kenner communicated all the time by email.  Where are the

7    emails that say, this was a loan made to you, give the money

8    back?  There's no emails that say that.  Give the money back.

9    It's never been memorialized in writing.  There's not any --

10   there's no evidence to show that Mr. Kenner was consistently

11   asking my client for this money back on behalf of his client.

12          As a matter of fact Mr. Murray testified in his

13   deposition that Mr. Kenner had told him that the funds -- that

14   the Palms units had been successfully purchased.  He told him

15   that in 2005, around July or August of 2005 is his testimony,

16   Mr. Kenner tells Mr. Murray the Palms units were actually

17   successfully purchased.  And it wasn't until 2008 that he has

18   to come to him and say, "Actually they weren't purchased."

19   And that is Mr. Murray's testimony that he gave in his

20   deposition.

21          So Mr. Kenner's handprints are all over this.  Now I

22   don't know whether or not Mr. Kenner then went to Mr. Murray

23   and actually represented this as a loan to Jowdy, I don't know

24   if that happened, But to have a contract my client had to be

25   in on it.  There had to be a meeting of the minds.

56

1          There was no meeting of the minds here.   My client

2     did not agree to take this money in the form of a loan and

3     there's no document that evidences that.   Nor are there any

4     documents that show what the terms of repayment on this loan

5     were supposed to be, ten percent 30 days.

6          And in fact, Mr. Murray in his deposition he says,

7     "Oh, it was 30 to 45 days."   Well, which was it?   Was it 30

8     days, was it 45 days?   This is $791,000.   And you don't know

9     if it was 30 days or 45 days.   The terms are not definite.

10         And finally, Your Honor, so they have no breach of

11    contract, have no breach of contract.   They can't show offer.

12    They can't show meeting of the minds.   And they can't show

13    unjust enrichment either, Your Honor.

14         That's their other big claim, is unjust enrichment,

15    because our client was not unjustly enriched, not a single

16    dollar went to enrich my client.   Every single dollar that

17    went into this transaction was controlled by Mr. Kenner, Mr.

18    Murray's agent, who they say is his agent.

19         In their complaint they say that he's the agent.

20    And his knowledge is then imputed to Mr. Murray.   So if he has

21    a quam with anybody it's Mr. Murray -- I mean, I'm sorry.   I

22    get these people mixed up all the time, Mr. Kenner.   His quam

23    is with his agent, Mr. Kenner.   All of his communications were

24    with Mr. Kenner.   All of our communications were with Mr.

25    Kenner.

57

1        So there's no unjust enrichment here.  He pulls all

2   the money out of the house.  He walks away with money in his

3   pocket, we're stuck paying the note on it.

4        He gets his interest in the property down in Cabo

5   San Lucas fully funded and he gets 39 percent of the property.

6   Why is that $500,000 from Baja Development any different than

7   all of the other wire transfers that went into that account

8   for his benefit?  Suddenly my client is going to put $500,000

9   into the funding of this down payment.  It doesn't make sense,

10  Your Honor.

11        So we don't have unjust enrichment.  And the last

12  claim is a constructive trust.  They have to show that there's

13  a confidential relationship between my client and Mr. Murray

14  with regards to this transaction.

15        Nobody denies the fact that they never even had a

16  conversation.  There's no confidential relationship being

17  created here between Mr. Jowdy and Mr. Murray.  They've never

18  even spoken about this loan.  For four years they've never

19  spoken about this loan.

20        The first time Mr. Jowdy gets notice that Mr. Murray

21  believes that this is a loan is the lawsuit.  He gets sued and

22  he's shocked.  He has no idea what's going on with this.  This

23  is just shocking to him because Mr. Kenner always gets the

24  money for the projects, that's his job.

25        He goes out, he finds the money.  This was no

58

1  different than all the other times that he went out and found

2  money for all these different projects.  For the home in Las

3  Vegas.  For the project in Diamante Del Mar.  For the project

4  in Diamante Cabo San Lucas.  For the Palms units themselves.

5       He was going out and finding the funding.  He was

6  the money guy.  Our guy was not the money guy.  And he was

7  taking it from his clients, such as Mr. Murray and all of

8  these other clients of his; this transaction was no different.

9       So because they can't prove the essential elements

10  of their claim Your Honor, their claims must fail.  And if

11  they have a case against anyone it'll be Mr. Kenner.

12       Thank you.

13     THE COURT:  Mr. Kenner, would you like to give an opening

14  statement?

15     MR. KENNER:  Yes, Your Honor.

16     THE COURT:  Okay.

17     MR. RICHARDS:  Your Honor, if we could take a five minute

18  bathroom break, or --

19     THE COURT:  We can go ahead and do that.  Why don't we go

20  ahead and take a five minute break?

21     [Recess]

22     THE CLERK:  On the record, Your Honor.

23     THE COURT:  Okay.  Mr. Kenner.

24     MR. KENNER:  Thank you, Your Honor.  Your Honor, first,

25  I'd like to just apologize that I'm here in pro per as a

59

1    result of the last seven or eight years as a business partner

2    of Mr. Jowdy's, which all the transactions that he will show

3    in evidence throughout this trial.  Myself and my colleagues,

4    Mr. Murray, and dozens of other professional athletes have

5    invested over $20 million cash with Mr. Jowdy and his

6    investments, and we have not been returned a single dollar

7    from any of those investments.  So I've ultimately become a

8    victim of some of Mr. Jowdy's business dealings with me.

9            The other unfortunate fact here is that, as a

10   continuation of the project that Ms. Lee has referred to in

11   Cabo San Lucas, Mr. Jowdy has testified it's in evidence in

12   his deposition from January 2010, that he has all of his legal

13   fees for all of the different lawsuits that he has pending are

14   being paid by the Cabo San Lucas line of credit, further

15   encumbering the debt that -- on the project that we are --

16   myself and a number of my colleagues are investors in.

17           Ms. Lee referred to me as Mr. Murray's business

18   manager.  I am, in fact, his business manager and have been

19   for about 17 years, as well as a very close friend of Mr.

20   Murray and his family.  We've effectively grown up together

21   the last half of our lives.

22           THE COURT:  Are you also his sports agent?

23           MR. KENNER:  I am not.

24           THE COURT:  Okay.

25           MR. KENNER:  Thank you.

1       Over that period of time, you know, I handled day-

2  to-day business transactions for Mr. Murray, and I have for

3  hundreds of other pro athletes and entertainers.  I handle

4  their mortgages.  I handle real estate transactions.  I handle

5  life insurance.  I handle legal matters for them as a third --

6  by tracking down third-party counsel.

7       So in the context of what I do and the relationship

8  I developed with Mr. Jowdy, it became very clear to him that I

9  would be beneficial to help him not just for funding some of

10  the projects or some commitments for those, but when it came

11  to personal transactions, like his purchase of the Innisbrook

12  home for he and Mr. Thalmann, that I was a good person to go

13  to, to assist in getting mortgages for the property.

14       Ms. Lee referred to me as the managing member and

15  100 percent owner of Ula Makika, where the original $200,000

16  wire transfer came from for Mr. Jowdy and Mr. Thalmann's home

17  at Innisbrook.  I am the managing member, but Ula Makika is an

18  LLC that is part of a larger group of LLC's that Mr. Murray

19  and myself and about 25 other people are members of.

20       The $200,000 that they referred to as Mr. Kenner's

21  money, and I believe the exhibit is still up on ELMO, the

22  $200,000 was part of another larger separate unrelated loan

23  personally made to Mr. Jowdy from 2004 until about 2006.  That

24  was a loan where he had an open revolving line of credit with

25  Mr. Murray, myself, and all of our Hawaiian developer

61

1    partners.  And Mr. Jowdy had requested that $200,000 for a

2    short-term benefit.  And when the refi- -- the original

3    refinance that Ms. Lee refers to, Mr. Jowdy was merely

4    repaying 238,000 not the 288,000 that she mentioned.  I think

5    she just misspoke, but the 238,000 from the first refinance.

6    It was, effectively, a repayment of that initial down payment

7    Mr. Jowdy needed for the -- his personal refinance here in Las

8    Vegas.

9            That current loan that we are dealing with that was

10   given from our Hawaiian partners, Mr. Murray, myself, and

11   another few dozen people to Mr. Jowdy still has an outstanding

12   loan balance of over $5 million, not accruing interest over

13   the last five years -- not including accrued interest.

14           Ms. Lee also refers to Kenner's credit as not being

15   very great at the time.  So they -- Mr. Jowdy had to bring in

16   Mr. Thalmann, his childhood friend, from Danbury, Connecticut

17   to provide credit assistance.  That's also not accurate.  In

18   fact, approximately a year later, I had received my own

19   personal $4 million loan on a residence at that time.  So as

20   we know, the credit markets go bad credit in '05 doesn't make

21   good credit in '06, especially to receive a $4 million loan at

22   that point in time.

23           One of the issues that Mr. Jowdy and Mr. Thalmann

24   were put under a lot of pressure during 2005 is the Maloof

25   house or the Innisbrook house that they were looking to close

62

1    for their own benefit, and did take joint tenancy, 50/50.

2    That home Mr. Thalmann and Mr. Jowdy had resided in for nearly

3    four months prior to the closing at Mr. Maloof's offering.  So

4    at that time, Mr. Jowdy and his relationship, which was also a

5    personal relationship with Mr. Maloof, had become very

6    strained, as he was expecting to have closed that home

7    approximately 60 days earlier.

8              So you will hear from Ms. Lee, and I respect her

9    opinion that I was constantly under pressure to provide funds

10   for Mr. Jowdy.  But in his own testimony in a January 2010

11   deposition that Mr. Richards had taken --

12       MS. LEE:  Your Honor, I'm just going to object to any

13   reference to this January deposition.  This is not the

14   deposition that was taken in this case.  I don't know what

15   deposition he's referring to.  I --

16       THE COURT:  I understand.

17       MS. LEE:  Okay.

18       THE COURT:  I'd be more concerned if this were a jury

19   trial, but it is a bench trial.  And I think you all are going

20   to have to trust me to ferret out what is the relevant

21   evidence, what is not relevant evidence, and so forth.  So

22   I'll go ahead and listen to what Mr. Kenner has to say.  So

23   I'm going to go ahead and overrule.

24             Go ahead.

25       MR. KENNER:  Thank you, Your Honor.  The -- in that

63

1   January 2010 testimony, Mr. Jowdy made what I considered, in

2   my presence, an outlandish statement that referred to my

3   obligation to endlessly fund whatever business dealings

4   Mr. Jowdy had.  And he also had made it later in that

5   deposition transcript we can provide.  Mr. Jowdy's

6   representation that his first Mexican project came to a

7   standstill because I was no longer able to provide funding for

8   him, which is not really part of an investment.  It just makes

9   no sense that I would be responsible to continue to fund and

10  fund and fund.  Mr. Jowdy is the operator, as they call him,

11  would have no responsibility to continue a project without me.

12         Ms. Lee does a nice job of documenting a number of

13  wire transfers that did go from entities that I was the

14  managing member of, or loans that I personally took out in

15  order to help fund the Cabo San Lucas project.  So I

16  appreciate her trying to create some kind of clarity.  But as

17  you can see, there were a lot of transactions and a lot of

18  confusion if you're trying to step into this and look at it in

19  a vacuum.

20         The funds that I had raised actually were $2.5

21  million that are represented on there, went into my own

22  personal capital account, and they were wire transferred, and

23  they are represented on her board.  Two million dollars,

24  subsequently, she does represent came from a number of my

25  clients and colleagues, and that is represented in their

1    capital account in the Diamante Cabo San Lucas property.

2            And the $2.5 million that Mr. Jowdy has on his -- in

3    his capital account were loans that he had taken out from our

4    group of investors in Hawaii.  So my responsibility was to

5    continue to fund and assist.  But Mr. Jowdy does represent a

6    $2.5 million capital account in that project, and they were

7    derived from loans that are still outstanding to Mr. Murray,

8    myself, and our Hawaiian partners.

9            In July -- or excuse me.  In August of 2005, when

10   all of these transactions done in the Palms, in the Innisbrook

11   home, and that $500,000 transfer to Mexico occurred,

12   Mr. Jowdy, on August 10th, who, through counsel, has suggested

13   I was responsible for 100 percent of the funding as my secret

14   interest in Mr. Jowdy's home, there's an email from Mr. Jowdy

15   to myself on August 10th, showing the stress that he was

16   having, that the home had to be closed in two days, and that

17   Mr. Thalmann was looking for the balance of the funds, thought

18   he could scrape together about $60,000 at that point in time.

19           The $200,000 that Mr. Jowdy received as a deposit

20   were not my funds.  They were part of a loan.  So in my

21   opinion, and to be frank, had Mr. Jowdy lost that hard deposit

22   for a home that he and Mark Thalmann had lived in for four

23   months, approximately, those funds were still Mr. Jowdy's

24   responsibility to be repaid as part of a greater loan to our

25   group of members in Hawaii.

65

1          One of the other issues that Mr. Jowdy will raise,

2     which will be refuted in evidence, most of which Mr. Jowdy has

3     provided to the Court as evidence in this trial, is that the

4     Palms, frankly, had no restrictions on the number of units

5     that one buyer could acquire.  Mr. Jowdy makes reference,

6     through his counsel, that three -- only three units could be

7     purchased by any individual person.  But through his own

8     discovery and subpoenas of the Palms, there's evidence in

9     front of the Court that will refute that specifically.

10          At the time, if I had preferred to have a straw man,

11    as he'll refer to me during the trial, I certainly would have

12    used somebody that was related to me, or an LLC, or some other

13    entity to take possession of those units.  And I had really no

14    need for Mr. Jowdy if, in fact, his theory were appropriate.

15          When -- a few more items.  Mr. Murray, I do transact

16    business on his behalf.  And but for the purpose of this

17    transaction with Mr. Jowdy, which is, frankly, the only

18    transaction relevant to the Court, Mr. Murray authorized me as

19    attorney of fact to make those three wire transfers.  And I do

20    not conduct business as a general or blanket power of attorney

21    for Mr. Murray.

22          It is solely as attorney in fact on that particular

23    transaction.  And then Mr. Lee suggests that over the

24    subsequent number of years, there is no email traffic where I

25    request Murray's funds be returned.  That is not true.  There

1    are several emails, some of which Mr. Jowdy actually provided

2    in discovery to us that suggest that I was looking for the

3    recovery of the funds, including the most important one, which

4    is on August 22nd, prior to Mr. Jowdy taking the funds and

5    wiring them out for his own benefit.

6            The case is very simple in my eyes.  It's a contract

7    between Mr. Murray and Mr. Jowdy.  There's no evidence at hand

8    that suggests that I was a part to or a beneficiary of the

9    contract between the two gentlemen.  I handle these types of

10   transactions all the time on behalf of my clients, and have

11   for almost two decades.  The -- there will be no evidence

12   produced by Mr. Jowdy that shows I'm responsible for the

13   repayment of the funds.

14           And Mr. Jowdy, frankly, added me as a third party

15   Defendant after about 11 months in the case and just as

16   discovery was coming close to close.  And from that point

17   forward, Mr. Jowdy did not take my deposition again.  He did

18   not bring in additional people for deposition, and he did not

19   bring any new evidence to the table that had not already been

20   flushed out in discovery.  But I recall by reading through the

21   pleadings that Mr. Murray's original attorney had objected to

22   the third party addition at the eleventh hour.

23           And Ms. Lee, her pleadings suggested that they had

24   found some new evidence and had to continue discovery, that it

25   was very important to their case.  So if I read and recall

67

```
1    properly, their excuse for bringing me in 11 months after the
2    case, when they had already produced all of the discovery,
3    they really were just trying again to delay this trial
4    proceeding.
5            I appreciate your time, Your Honor, listening to the
6    evidence.  And I'm confident that the evidence that has
7    already been put forth in discovery and will be shown to the
8    Court will show that this is a very simple contract between
9    Mr. Murray and Mr. Jowdy [indiscernible].  Thank you, Your
10   Honor.
11        THE COURT:  Okay.  First witness.
12        MR. RICHARDS:  Plaintiff calls Mr. Glen Murray.
13        THE COURT:  We're going to need to make sure that all the
14   witnesses are standing by the podium, so that the court clerk
15   can see.
16                GLEN MURRAY, PLAINTIFF, SWORN
17        MR. RICHARDS:  Your Honor.
18        THE COURT:  Yes.
19        MR. RICHARDS:  Does the Court want me to direct from the
20   podium or the table?
21        THE COURT:  You know, it's your trial.  You can do
22   whatever you want.  The only thing I require, if you want to
23   move about, make sure that we have you heard by a microphone.
24   We do have the portable.  We have microphones, of course, at
25   the podium and at the tables.  Okay.
```

1        THE CLERK:  Sir, please state your first and last name.

2    Spell them both for the record.

3        THE WITNESS:  Glen Murray, G-L-E-N, M-U-R-R-A-Y.

4                    DIRECT EXAMINATION

5    BY MR. RICHARDS:

6        Q    Okay.  Good morning, Mr. Murray.

7        A    Hi.

8        Q    Presently, can you tell the Court where you reside?

9        A    [REDACTED]

10       Q    And briefly tell the Court your occupation in August

11   of 2005.

12       A    I was a professional hockey player.

13       Q    And what team did you play for?

14       A    The Boston Bruins.

15       Q    And presently, what do you do?

16       A    I am a retired hockey player.

17       Q    And why did you retire?  When did you retire?

18       A    I retired in September/October of '08.

19       Q    And why did you retire?

20       A    I retired because I had an ankle injury.

21       Q    In August of 2005, did you know someone by the name

22   of Ken Jowdy?

23       A    Yes.

24       Q    Can you point him out in the Court, please?

25       A    He's right next to Ms. Lee.

69

```
 1          MR. RICHARDS:  Let the record reflect he's identified the
 2     Defendant, Ken Jowdy.
 3     BY MR. RICHARDS:
 4          Q     Tell the Court how you knew Mr. Jowdy.
 5          A     I knew Mr. Jowdy through a real estate deal in
 6     Mexico.
 7          Q     And what business was that?
 8          A     It was to deal with land in Mexico, Diamante Del
 9     Mar.
10          Q     And did you consider him a partner in that deal?
11          A     Yes.
12          Q     So prior to August of 2005, had you ever given money
13     to Mr. Jowdy before?
14          A     Yes.
15          Q     And how much money had you given him?
16          A     The money was $500,000.
17          Q     Had you ever given anybody other than Mr. Jowdy more
18     than $500,000 in your entire life?
19          A     No, I hadn't.
20          Q     Would it be -- so would it be fair to say that prior
21     to August of 2005, that no other person other than Mr. Jowdy
22     had received a larger dollar amount from you?
23          MS. LEE:  Objection, leading.
24          THE COURT:  You are leading.  Sustained.
25     BY MR. RICHARDS:
```

70

1          Q       Had you ever given anybody -- was that the largest

2     amount of money you'd ever given somebody in your life?

3          A       Yes.

4          Q       Prior to August of 2005, what personal knowledge did

5     you have relating to investments Ken Jowdy received regarding

6     real estate?

7          A       Repeat the question.  Sorry.

8          Q       Prior to 2005, what personal knowledge did you have

9     with respect to monies Ken Jowdy received from other NHL

10    players with respect to land in Mexico?

11         A       There was -- where I had invested my money in

12    Diamante Del Mar, there was 20 to 22 other colleagues that I

13    had played with, friends that I play with, that had invested

14    $500,000 each.

15         Q       Okay.  And did you know most or all of these 22 to

16    -- 20 to 22 players?

17         A       Yes.

18         Q       Were any of those players friends of yours?

19         A       Yes.

20         Q       I'm taking your attention to August of 2005.  At the

21    time, were you made aware of a business opportunity in Las

22    Vegas, Nevada?

23         A       Yes.

24         Q       And who made you aware of it?

25         A       My business manager, Phil Kenner.

71

1          Q     And what was your understanding of the terms of the

2     transaction?

3          A     My understanding was that Mr. Jowdy needed 800,000

4     -- $791,000.  He was in a pinch to buy three different units

5     at the Palms in August of '05.

6          Q     Okay.  And what was your understanding with respect

7     to the terms of when it would be repaid?

8          A     The understanding was if I loaned him the money,

9     within the next 30 to 45 days, with a 10 percent interest, I

10    would be paid back my monies.

11         Q     With a 10 percent interest?

12         A     Yes.

13         Q     And were you concerned about wiring funds to an

14    escrow account at Stewart Title for three Palms condominiums

15    on behalf of Mr. Jowdy?

16         A     No.

17         Q     Why not?

18    THE COURT:  Now real quick, are we talking about 10

19    percent per annum or 10 percent for the 45 days, or the period

20    of time?

21    THE WITNESS:  Ten percent for the period of time.

22    THE COURT:  Okay.  All right.  Thank you.

23    BY MR. RICHARDS:

24         Q     Okay.  I'll repeat the question.  Were you concerned

25    about wiring funds to an escrow account at Stewart Title for

1  three Palm condominiums on behalf of Mr. Jowdy?

2      A    No.

3      Q    Why not?

4      A    Well, I was wiring money into a hotel, which was the

5  Palms Casino in Las Vegas.  I was a business partner with

6  Mr. Jowdy.  I trusted Mr. Jowdy.  And he was in a pinch, and I

7  wanted to help him.

8      Q    Okay.  Was the fact that the money was going into an

9  escrow account at Stewart Title important to your decision?

10     A    Yes.

11     Q    Why?

12     MS. LEE:  Objection, leading.  This line of questioning

13  is leading, Your Honor.

14     THE COURT:  You are leading, counsel.  Why don't you just

15  go ahead and just ask the question?

16  BY MR. RICHARDS:

17     Q    Well, why was the fact that the money was going into

18  an account other than Mr. Jowdy's bank account important to

19  you?

20     MS. LEE:  Leading.  You're suggesting the answer in the

21  question.

22     THE COURT:  Wait, wait, wait.  Counsel, I understand.

23     MS. LEE:  Sorry.  I'm sorry.

24     THE COURT:  I'm sustaining.

25  BY MR. RICHARDS:

73

1      Q      Did you have an opinion as to what -- the type of

2   account the funds were going to be wired into?

3      A      Yes, I knew the money was being wired into a Palms

4   escrow account in Mr. Jowdy's name.  It made me more

5   comfortable wiring it into a Palms escrow account, because if

6   the deal did fall through, I realized that the Palms would

7   just wire my money back.

8      Q      What was your understanding, now that you mention

9   that, if the Palms deal was cancel?

10      A      My understanding, if the Palms deal was canceled,

11   it's quite simple, my $791,000 comes back to my Charles Schwab

12   account.

13      Q      With respect to the use -- I'm going to ask you a

14   question about the use of these proceeds.  Did the fact that

15   you corroborated that this money was being used to secure a

16   piece of Palms --

17      MS. LEE:  Objection, leading.

18      THE COURT:  Well, let him get the question out.

19         Go ahead.

20   BY MR. RICHARDS:

21      Q      Did the knowledge that this money was going to be

22   used to purchase a piece of Palms real estate have an impact

23   on your decision to do this deal?

24      A      Yes.

25      Q      Why is that?

74

1      A    It was -- the Palms is a hotel in Las Vegas.  It's

2  quite reputable.  I understood that if the deal -- or the deal

3  did go through -- either way, that I was going to get my money

4  back within 30 to 45 days if the deal did go through.  And if

5  it didn't go through, I would get my money back right away.

6      Q    And if the deal did go through, what was your

7  understanding as to where your -- what your money would be

8  secured by or invested in?

9      A    It was the three different units at the Palms that

10  my $791,000 was going to.

11      Q    And were those facts as to how your money was going

12  to be used very important to you or not important to you?

13      A    Very important.

14      Q    Okay.  Why is that?

15      A    Because it was only for -- you know, as I said

16  before, Mr. Jowdy was a business partner, and I felt

17  comfortable that he was using it for those units and no other

18  deals that belonged to him, just the certain Palms, Las Vegas

19  units.

20      THE COURT:  Just so that I'm clear, did you ever get your

21  $500,000 back that you initially invested in the Mexico

22  properties?

23      THE WITNESS:  No.

24      THE COURT:  Okay.  Are you making a claim for that here?

25      THE WITNESS:  No.

75

1          MR. RICHARDS:  No.

2          THE COURT:  Okay.

3          MR. RICHARDS:  We're just here on the 791.

4          THE COURT:  Okay.

5    BY MR. RICHARDS:

6          Q    All right.  I'm going to --

7          [Counsel Confer]

8    BY MR. RICHARDS:

9          Q    I'm going to -- is the --

10         [Counsel Confer]

11   BY MR. RICHARDS:

12         Q    I'm going to show you -- let's put the right exhibit

13   up.  I'm going to show you Exhibit 109, which is your Charles

14   Schwab account.  It's previously -- if you just take a look on

15   the screen.  And I'm going to point your attention to -- okay.

16   I'm going to show the wire -- I'm showing you a copy of what's

17   admitted into evidence.  This is your Charles Schwab account.

18   Do you see that?

19         A    Yes.

20         Q    And these are the funds that were wired --

21         THE COURT:  Why don't you have him testify to it,

22   counsel.

23         MR. RICHARDS:  Yeah, go ahead.  Yeah, sorry.

24         THE COURT:  This is your statement from Schwab?

25         THE WITNESS:  Yes.

1        THE COURT:  Okay.

2        MR. RICHARDS:  All right.

3        THE COURT:  And what are these transaction?

4        THE WITNESS:  These are the transactions.  This five --

5        THE COURT:  By the way, you can touch the screen.

6        THE WITNESS:  All right.

7        THE COURT:  And guess what?  It will do all sorts of

8   things, okay.  So go ahead.

9        THE WITNESS:  So the first one is the -- whoa.  The --

10       THE COURT:  That's all right.  Here, you want to try it

11  again?  Go ahead.

12       THE WITNESS:  I'm not even going to touch it.  Just the

13  567,400, the 143,260, and the 80,750 are the three wires for

14  the units at the Palms.

15       THE COURT:  Okay.  Hold on a second, counsel.

16       MR. RICHARDS:  Sorry, Your Honor.

17       THE COURT:  That's all right.  You're just going a little

18  fast for me.

19       MR. RICHARDS:  Sorry.  I thought you'd rule just on our

20  opening statements and we'd be done.

21       THE COURT:  Well, I tried.  Okay, go ahead.

22  BY MR. RICHARDS:

23       Q    All right.  Now those -- what are those three --

24  those are -- what do those three wires represent?

25       A    They represent the three wires that went into the

1   Palms units in Vegas.

2       Q    All right.  And then I'm showing you the title

3   ledger from Stewart Title.  What does the title ledger

4   represent?

5       A    The title ledger represents where the -- my monies

6   from my Charles Schwab went into Mr. Jowdy's title ledger.

7       Q    So there's no doubt in your mind that your money

8   went from Charles Schwab to this title?

9       A    One hundred percent.

10      Q    All right.  Now, so we have three amounts, 567,400,

11  143,260, and 87,750, for a total of 791,410.  Is that the

12  total?

13      A    Correct.

14      Q    Did you wire any additional money besides that

15  money?

16      A    No.

17      Q    What was your understanding of what these wires were

18  going to accomplish for Mr. Jowdy?

19      A    They were going to purchase the three units at the

20  Palms Hotel in Vegas.

21      Q    All right.  And before the time you discovered that

22  -- at any time before you discovered that these units were not

23  sold to Mr. Jowdy, have these monies ever been repaid to you?

24      A    No.

25      Q    Did you ever inquire as to what happened to the

78

1  monies at Stewart Title that you had wired?

2      A    Yes.

3      Q    And what did you find out happened?

4      A    I found out that Mr. Jowdy had used my monies that

5  came from my Charles Schwab to use for other deals for

6  himself.

7      Q    I'm going to show you Exhibit 113, which is three

8  outgoing wire transfers from Stewart Title to Baja Development

9  Corp. of Hudson Bank, on August 25th, 2005.  Do you see those?

10     A    Yes.

11     Q    Okay.  And did you ever authorize Mr. Jowdy to wire

12  your funds to Baja Development Corp.?

13     A    No.

14     Q    Did you ever authorize Mr. Jowdy to move those funds

15  out of the Palms escrow to another deal?

16     A    No.

17     Q    At any time, did you ever authorize -- did you ever

18  give permission for anyone to transfer those funds out of the

19  Palms escrow account?

20     A    No.

21     Q    Did you ever intend to lend Mr. Jowdy money for any

22  other deal other than the Palms condo purchase?

23     A    No.

24     Q    Why not?

25     A    Because he was asking for just the Palms, and I

79

1    wasn't interested in any other deals.

2        Q    Would you have felt comfortable putting your money

3    in any other deals at that point in time?

4        A    No.

5        Q    After you didn't receive the funds back from the

6    Palms escrow, what did you do in response?

7        A    I inquired about them.

8        Q    And who did you talk to?

9        A    My business manager, Phil Kenner.

10       Q    And when did you start talking to Mr. Kenner about

11   this?

12       A    Around January of '06.

13       Q    Okay.  And were you playing professional hockey at

14   the time?

15       A    Yes.

16       Q    And are things a little busy during the hockey

17   season?

18       MS. LEE:  Objection, leading.

19       THE COURT:  You are.

20       MR. RICHARDS:  Okay.

21       THE COURT:  You are leading.

22       MR. RICHARDS:  Sorry.

23       THE COURT:  That's sustained.

24   BY MR. RICHARDS:

25       Q    Can you tell the Court why there was a delay between

1   August of '05 to January of '06?

2       A    Well, the delay was because I was playing

3   professional hockey.  And at the time, being a professional

4   hockey player, it's quite busy.  We practice every day.  We

5   play every other night.  We travel to different cities around

6   the country.  I had a young family, three kids.  There was --

7   you know, there's a lot of things that go on with our

8   schedule.  It's kind of a different schedule than any other

9   profession.  So that's when I came upon to inquire about it in

10  January of '06.

11      Q    All right.  And did you care about this money during

12  the time period from August of '05 to January of '06?

13      A    Yes.

14      Q    Was your lack of inquiry a result of -- was it

15  caused by you not caring about the money?

16      A    No.

17      MS. LEE:  Objection, leading.

18      THE COURT:  You are leading.  Sustained.

19  BY MR. RICHARDS:

20      Q    What would you -- besides your schedule of -- your

21  hockey schedule and practice schedule, would you attribute

22  your lack of inquiry to any other reason besides your

23  professional commitments?

24      A    No.

25      THE COURT:  I'm sorry.  I don't know that I got --

1        MR. RICHARDS:  I said would you attribute your lack of

2   inquiry to something other than your professional commitments.

3        THE COURT:  Okay.

4        MR. RICHARDS:  Basically, I just wanted --

5        THE COURT:  I understand.

6        MR. RICHARDS:  Okay.

7        THE COURT:  Okay.

8   BY MR. RICHARDS:

9        Q    Was there any other reason --

10       A    No.

11       Q    -- as to why, besides your professional obligations,

12   that you weren't calling and saying where is my money?

13       A    No.

14       Q    All right.  Now at some point, did you realize

15   Mr. Jowdy was not going to return the money?

16       A    Yes.

17       Q    All right.  I'm going to show you Exhibit 114, which

18   is the August 29th wire receipt to Propiedades DDM and the

19   other one to Fidelity Title --

20       THE COURT:  Wait, wait, wait.  Before you -- take it down

21   from my screen then, because it's not admitted yet.

22       MR. RICHARDS:  113 is not admitted?

23       THE CLERK:  You said 114.

24       MR. RICHARDS:  Oh, 114?

25       THE COURT:  You said 114.

1        MR. RICHARDS:  Yeah, I did.  Oh, all right.  Well --

2        THE COURT:  Well, you need to either get a stipulation

3  for the admission or --

4        MS. LEE:  Lay some foundation.

5        THE COURT:  -- you need to lay the foundation with this

6  witness.

7        [Counsel Confer]

8        MS. LEE:  We don't have any objections as to

9  authenticity, Your Honor, but we would object on competence.

10       I guess you still have to lay the foundation as to why

11  this witness is --

12       THE COURT:  Well, either you --

13       MS. LEE:  Oh.

14       THE COURT:  Are you stipulating to the admission of the

15  exhibit?

16       MS. LEE:  Admission, no.

17       THE COURT:  Okay.  Then --

18       MS. LEE:  No, not stipulation to the admission of the

19  exhibit, Your Honor.  No.

20       THE COURT:  Okay.  Then go ahead and lay the foundation

21  for this witness.

22         And he still can see it on his screen, right?

23       THE CLERK:  Yes.

24       THE COURT:  Okay.  Just make sure I don't see it until

25  it's admitted.  Okay.  Go ahead and lay the foundation.

1        He's showing you Exhibit 114.

2        MR. RICHARDS:  Well, this is what I'm -- my issue is.  We

3   -- this is a document produced.  I don't need to -- if the

4   document is admissible, I can show the witness the document

5   for the purposes of -- why would I need to lay the foundation

6   when we've already agreed the document is admissible?  It's --

7        THE COURT:  Well, wait a minute.  She just said she

8   didn't agree to -- that it was admitted into evidence.

9        MR. RICHARDS:  But it's going to come into evidence.  I

10  mean that's what I'm trying to -- I don't understand what --

11  why we would play a semantics.  We've already agreed that all

12  the Jowdy documents that they produced are coming into

13  evidence.  That's --

14       THE COURT:  She's telling me it's not --

15       MR. RICHARDS:  That --

16       MS. LEE:  Your Honor, I'm just saying that this witness

17  is not competent to testify about this.  I don't object to the

18  document itself.  I object to it coming in through this

19  witness, who has no knowledge of this --

20       THE COURT:  Okay.

21       MS. LEE:  I would just object to -- so --

22       THE COURT:  All right.  Well, we are either stipulating

23  to the admission of the document or we're not?

24       MS. LEE:  Oh, sure.

25       THE COURT:  I mean I can't see it until it's admitted.

1      MS. LEE:  Okay, Your Honor.  Yeah, we'll stipulate to the

2  admission of this document.

3      THE COURT:  Okay.  Exhibit 114 is admitted.

4      [Plaintiff's Exhibit 114 Received]

5      THE CLERK:  Yes, Your Honor.

6      THE COURT:  Okay.

7      MR. RICHARDS:  Okay, thank you.

8      THE COURT:  Now you can go ahead and put it up on my

9  screen.

10     MR. RICHARDS:  All right.  I can represent to the Court

11  I'm only going to show documents that I know that there's not

12  going to be a foundational objection.

13     THE COURT:  Well, I understand.

14     MR. RICHARDS:  Yeah.

15     THE COURT:  But I need to make sure the record is clear,

16  because if I'm seeing documents that are not admitted

17  exhibits, then we've got a problem.

18     MR. RICHARDS:  Yeah, I know.

19     THE COURT:  I'm the fact finder.

20     MR. RICHARDS:  I just want to tell her that I understood

21  what documents I was -- there would not be a stipulation.  I'd

22  have to have the witness here to lay the foundation.

23     THE COURT:  Right.

24     MR. RICHARDS:  The custodian of records are not ones we

25  were disagreeing over.

1        THE COURT:  Okay.

2        MR. RICHARDS:  Okay.

3   BY MR. RICHARDS:

4        Q     Now I'm showing you, which is now admitted into

5   evidence, two wire receipts for $412,385.42 to a title company

6   in Las Vegas, Nevada, for Ken Jowdy and Mark Thalmann, related

7   to an escrow.  Do you see that?

8        A     Yes.

9        Q     Okay.  And then I'm showing another one.

10       THE COURT:  Okay.  Now how much?  421,385 what?  You're

11  kind of moving around a little fast for me.

12       MR. RICHARDS:  Sorry, Your Honor.

13       THE COURT:  That's all right.  Forty-two, okay.

14       MR. RICHARDS:  412,385.42.

15       THE COURT:  And it's going into an escrow account on

16  behalf of Mr. Thalmann and Mr. Jowdy?

17       MR. RICHARDS:  Correct.

18       THE COURT:  Okay.  Have you seen this document before?

19       THE WITNESS:  No.

20       THE COURT:  Okay.

21  BY MR. RICHARDS:

22       Q     And I'm showing you this document, which is a Hudson

23  Bank wire receipt, showing $500,000 going into Propiedades

24  DDM, or as Ms. Lee once used, PPDM [sic].

25       MR. RICHARDS:  Is that the acronym?

1      MS. LEE:  PDDM, I believe.

2  BY MR. RICHARDS:

3      Q   Okay, PDDM.  The PDDM account for $500,000, that was

4  sent on August 29th, 2005.  Do you see that?

5      A   Yes.

6      Q   Okay.  Did you --

7      THE COURT:  Have you ever seen these documents before?

8      THE WITNESS:  No.

9      THE COURT:  Okay.

10  BY MR. RICHARDS:

11      Q   Did you ever give permission for your money to be

12  sent to Mr. Jowdy's home escrow in Las Vegas, Nevada?

13      A   No.

14      Q   And did you ever give permission for Mr. Jowdy to

15  send -- to invest money in -- or send money to PDDM?

16      A   No.

17      Q   Do you have any personal knowledge if the money that

18  was wired from Baja Development Corp. to the escrow in Las

19  Vegas, or PDDM, was your money that you originally gave Mr.

20  Jowdy on August 12, 2005?

21      A   Repeat the question.

22      Q   Do you have any personal knowledge that the two

23  wires that I just showed you is the same money that you leant

24  Mr. Jowdy on August 12, 2005?

25      A   No.

87

```
 1        Q    Okay.  So at any time, has anybody shown you that
 2   the money that Mr. Jowdy is now claiming was originally your
 3   August 12th loan is the same money that went into PDDM or the
 4   house in Las Vegas?
 5        A    No.
 6        Q    Okay.  For your purposes, do you care what Mr. Jowdy
 7   did after he did not return the money from the Palms deal?
 8        MS. LEE:  Objection, leading.
 9        THE COURT:  Sustained.
10   BY MR. RICHARDS:
11        Q    Was it your -- did you have any concern as to what
12   happened to the money after the Palms deal was cancelled?
13        A    Yes.
14        Q    Okay.  And what was that?
15        A    I was wondering where my -- since I found out about
16   the Palms deal falling through, where was my $791,000?
17        Q    Okay.  But with respect to the money not being
18   returned to you, did you have a -- did you ever have any
19   concern as to -- was it your expectation that the money was
20   going to ever be sent anywhere else after the Palms deal being
21   canceled?
22        MS. LEE:  Objection, leading.
23        THE COURT:  Oh, I'm going to allow that.  Overruled.
24        THE WITNESS:  No, the only reason I have done this deal
25   was because I -- my understanding was a business partner, as
```

88

1    I've said before, Mr. Jowdy, was in a pinch and needed

2    $791,000 to get these three units.  And the money, when I

3    would get it back, was going nowhere else but my Charles

4    Schwab account.

5    BY MR. RICHARDS:

6        Q    You've sat here and looked at all these flow charts,

7    all this lawyers talking about what happened to this money

8    after the Palms deal was cancelled.  And so, I want to -- I

9    just want to make sure you heard all that.  Now my question is

10   at the time you were lending this money, did anybody ever tell

11   you anything about all these other transactions?

12       A    No.

13       Q    Were you a party to any of these transactions?

14       A    No.

15       Q    Did you ever -- were you ever involved in any of

16   these -- all these other transactions that were on these flow

17   charts?

18       A    No.

19       Q    Now at some point in time, did you realize Mr. Jowdy

20   was not going to pay you the money -- going to return the

21   money as fast as you expected?

22       A    Yes.

23       Q    Okay.  Why didn't you file a lawsuit right away?

24       A    Well, there's a few reasons why I didn't file a

25   lawsuit.  As I've said before, I was playing professional

1    hockey.  I was dealing with an ankle injury.  As I said

2    before, we play --

3        THE COURT:  Oh, that was -- the ankle injury was three

4    years later, right?

5        THE WITNESS:  No, but I've -- this is in '05, because

6    I've had many ankle injuries.  Just --

7        THE COURT:  You had another --

8        THE WITNESS:  The last ankle injury made me retire,

9    because I had so many.

10       THE COURT:  Got it.  So you had an ankle injury in 2005.

11       THE WITNESS:  2005.  Getting over trying to, you know --

12   making sure IO was healthy enough to play the whole -- the

13   long season, which is eight or nine months.

14       THE COURT:  By the way, what was the ankle injury in

15   2005?

16       THE WITNESS:  The ankle injury was a sprain, which I had

17   Cortisone shots in it to be able to play.

18       THE COURT:  Okay.  And which ankle?

19       THE WITNESS:  The right ankle.

20       THE COURT:  How long were you laid up?

21       THE WITNESS:  Well, I actually was only -- missed three

22   days.

23       THE COURT:  Okay.  Go ahead.  I'm sorry.  That's --

24       THE WITNESS:  So --

25       THE COURT:  -- all right.

1    THE WITNESS:  -- the other reason for not filing a

2   lawsuit, I -- is because I was involved with Mr. Jowdy as a

3   business partner in Mexico.  I was with 20 or 22 other of my

4   colleagues throughout the NHL.  I didn't want to bring any

5   more lawsuits or any lawsuits, because my colleagues also had

6   $500,000 each involved with Mr. Jowdy.  And I don't think it

7   would have been good for the company where we put our money in

8   Mexico with a lawsuit coming on in '05 with Mr. Jowdy.

9   BY MR. RICHARDS:

10       Q    At some point, I'm assuming you authorized the

11   filing of this lawsuit?

12       A    Yes.

13       Q    And since you wired the funds in August of '05, has

14   Mr. Jowdy ever repaid you a dime?

15       A    No.

16       Q    On any investment?

17       A    No.

18       Q    Has anyone acting on behalf of Mr. Jowdy, in any

19   capacity, ever paid you a dime on any investment?

20       A    No.

21       Q    On this loan?

22       A    No.

23       Q    Have you ever accepted any other interests in Mr.

24   Jowdy's real estate deals to compensate you for this loan?

25       A    No.

91

```
 1        Q    Have you ever received anything of value of any
 2   kind, whether it's stock, interest, in anything from Mr. Jowdy
 3   to repay you for this loan?
 4        A    No.
 5        MR. RICHARDS:  I'll pass the witness.
 6        THE COURT:  Okay.
 7             Cross-examination.
 8        MS. LEE:  I'm sorry, Your Honor.  Your Honor, it's about
 9   10 till right now.  Did you want to break for lunch?
10        THE COURT:  I will be breaking for lunch.
11        MS. LEE:  Okay.  All right.  I just didn't want to -- so,
12   it will probably just be interrupted.  Okay.
13        MR. RICHARDS:  It happens.
14        MS. LEE:  Right.  I just didn't want to --
15        MR. RICHARDS:  I did it strategically for you.
16        MS. LEE:  Yeah.
17                         CROSS-EXAMINATION
18   BY MS. LEE:
19        Q    Good afternoon, Mr. Murray.  How are you today?
20        A    Great, thank you.
21        Q    Now, Mr. Murray, you and I have met at least on one
22   other occasion; isn't that right?
23        A    Correct.
24        Q    And do you recall me taking your deposition here in
25   Las Vegas, on August 4th of 2009?
```

1       A    Correct.

2       MS. LEE:  Your Honor, I have the unsealed transcript of

3  Mr. Murray here.  I'd like to publish it to the Court at this

4  time, and open it and present it to the witness.

5       THE COURT:  Okay.  You need to give that to me.

6       MS. LEE:  Oh, sorry.  Yeah, I don't open it.

7       THE COURT:  That's all right.

8            Here you go.

9  BY MS. LEE:

10      Q    Now, Mr. Murray, do you recall, during that

11  deposition, me asking you the question of why you waited so

12  long to sue for this money?

13      A    Yes.

14      Q    And do you recall what your response was?

15      A    No, I don't.

16      Q    Well, if I could have you turn to page 88 of your

17  deposition transcript.

18      A    Okay.

19      Q    If you look -- if you could just look at line 11.

20  And I will read the question.  If you could just read your

21  answer out loud for the Court.

22      THE COURT:  Well, do you want to ask --

23      MS. LEE:  Oh.

24      THE COURT:  -- if it -- because he hasn't disputed

25  anything.  He just says that he doesn't recall what he said.

1    Is this going to refresh his recollection or --

2         MS. LEE:  Sure.  Well, I was just going to try to get the

3    testimony as he stated it in his transcript, but --

4         THE COURT:  Okay.

5    BY MS. LEE:

6         Q    Is this -- if you could read from lines 11 through

7    25 and see if that refreshes your recollection as to what your

8    response was on that date.

9         THE COURT:  When was the deposition taken?

10        MS. LEE:  This was August 4th of 2009, Your Honor.

11        THE COURT:  August 25th, 2009?

12        MS. LEE:  I'm sorry.  August 4th --

13        THE COURT:  Okay.

14        MS. LEE:  -- of 2009.

15        THE COURT:  Thank you.

16        THE WITNESS:  Okay, I read it.

17   BY MS. LEE:

18        Q    And when I asked you the question what prompted you

19   to file this lawsuit after four years, what was your response?

20        A    I want my money back.

21        Q    And then I asked but why wait for four years.  And

22   what was your response?

23        MR. RICHARDS:  I'm going to object, Your Honor, to the

24   extent that it calls for attorney/client privilege.  Those

25   objections aren't waived.  And those -- why he files a lawsuit

94

```
 1    goes to the heart of attorney/client communication.
 2          MS. LEE:  Your Honor, he asked --
 3          THE COURT:  Oh, I don't think so.
 4          MR. RICHARDS:  All right.
 5          THE COURT:  Overruled.
 6          MS. LEE:  Right.  Yeah, Your Honor.  And -- thank you.
 7          THE COURT:  Go ahead.  And you filed your lawsuit because
 8    you wanted your money back.
 9          THE WITNESS:  Of course.
10          THE COURT:  Okay.  Why'd you wait four years?
11          THE WITNESS:  Well, why?  I just explained.  Because I
12    was in business with Mr. Jowdy.  I was playing professional
13    hockey.  Twenty or 22 other of my colleagues, NHL players, had
14    invested $500,000 into another business venture in Diamante
15    Del Mar.  And I'm a nice guy.  I thought, you know --
16    obviously, a really nice guy for lending Mr. Jowdy $791,000.
17    And I wanted to give him the benefit of the doubt that he
18    would -- my money would eventually come back to my account.
19          THE COURT:  Okay.  Is that what you said in August?
20          THE WITNESS:  I didn't say that, no.  I said --
21          MS. LEE:  Your Honor, and that's why I was having him
22    read through it.  So --
23          THE WITNESS:  -- I want my money back.  That's what I
24    said.
25    BY MS. LEE:
```

95

1     Q     And after that, when I say but why wait four years,

2  what was your response?

3     A     I said not sure, dumb.

4     Q     Right.  So when I asked you the question in 2009,

5  why you waited four years, you didn't give me all of these

6  explanations about concern for your fellow hockey players, did

7  you?

8     MR. RICHARDS:  I'm going to object as it misstates the

9  testimony.  There was no question that limited his --

10    THE COURT:  Overruled.  And no speaking objections, okay.

11    MR. RICHARDS:  All right.

12    THE COURT:  Just give me what the objection is.

13 Overruled.

14        Go ahead.

15    THE WITNESS:  Your question was did I mention my -- no, I

16 did not, not in this deposition.

17 BY MS. LEE:

18    Q     You didn't mention anything about an ankle injury

19 when I asked you about why you waited four years, did you?

20    A     No, not at the time.  No.

21    Q     You didn't mention being busy with your hockey

22 season or your family when I asked you that question, did you?

23    A     No, not at the time.

24    Q     But yet, today, a whole year later, you have all of

25 these explanations for the Court as to why you waited for

96

1    years.

2         A    Well, of course.  I prepared for the trial.

3         Q    Now, Mr. Murray, you have never had any

4    conversations with my client about this proposed loan, have

5    you?

6         A    No.

7         Q    And all of these important facts, as your counsel

8    has characterized them, in terms of why you invested in this

9    Palms units through my client, all of those important facts

10   came from Phil Kenner, didn't they?

11        A    Correct.

12        Q    In fact, everything that you know about this

13   lawsuit, other than the fact that money left your account,

14   came from Mr. Kenner, didn't it?

15        A    Correct.

16        Q    And despite the fact -- well, and you've only had

17   one conversation with my client ever, isn't that correct?

18        A    Correct.

19        Q    And based on that one conversation, is it your

20   testimony to the Court today that you trusted Mr. Jowdy so

21   much to give him $795 -- 1,000 in the form of a loan?

22        A    Well, of course.  I was already in business with him

23   in Mexico.  I had already given him $500,000 with -- along

24   with 20 or 22 other of my colleagues.  Yes.

25        Q    But you never had any --

1       A       That was my reasoning to trust him.

2       Q       Despite the fact that you'd only spoken to him once?

3       A       Yes.

4       Q       And you don't have anything in writing memorializing

5    this loan, do you?

6       A       No.

7       Q       And these terms that you have for this loan, is it

8    your understanding that it was supposed to be for 30 days or

9    for 45 days?

10      A       Well, between 30 and 45 days.

11      Q       And your understanding is that it was supposed to be

12   at 10 percent for those 30 to 45 days?

13      A       Correct.

14      Q       And it's further your understanding that that loan

15   was going to be secured with the Palms units themselves?

16      A       Of course, yes.

17      Q       And all of these terms were never memorialized in

18   writing, is that right?

19      A       Yes.

20      Q       And isn't it true that your agent, Mr. Kenner, told

21   you in 2005 that the Palms units had actually been purchased,

22   that they were successfully purchased?

23      A       Repeat the question.

24      Q       Isn't it true that, in 2005, Mr. Kenner informed you

25   that Mr. Jowdy had successfully purchased those units?

1          A     Yes, we had assumed that -- the money went through

2    into the Palms escrow.  So yes.  Yes to your question.

3          Q     And in fact, he didn't tell you anything different

4    than that until 2008, isn't that correct?

5          A     Repeat the question.  Until 2008?

6          Q     You did not know that the Palms deal had fallen

7    through until 2008, isn't that right?

8          A     Correct.

9          MR. RICHARDS:  Your Honor, if the witness doesn't

10   understand the question --

11         THE WITNESS:  Well --

12         MS. LEE:  I'm --

13         THE COURT:  Well, wait.  You can get this out on

14   redirect.

15         MR. RICHARDS:  Okay.  I mean --

16         THE COURT:  The question was did you become aware that

17   the units were not successfully purchased until 2008?

18         THE WITNESS:  No.  Within the year passed of the

19   transaction date, I understood that the money did not go

20   through to the Palms.

21         THE COURT:  So --

22         THE WITNESS:  Within the year passed.

23         THE COURT:  Go ahead.

24         THE WITNESS:  Sorry.

25         THE COURT:  When did you first learn that the Palms units

99

1    were not successfully purchased?

2        THE WITNESS:  Within the year passed of the transaction

3    date.

4        THE COURT:  So about August of '06?

5        THE WITNESS:  Within that timeframe, yes.

6        THE COURT:  Okay.

7    BY MS. LEE:

8        Q    Now that's not the testimony that you gave at your

9    deposition, is it?

10       A    I don't know.  I don't recall.

11       Q    If you could turn your attention to page 86 of the

12   deposition before you.

13       A    Eighty-six?

14       Q    Yes, sir.

15       A    Okay.

16       Q    Can you please read -- well, actually, I'll just

17   read you the question.  And if you could just answer the

18   question -- read the answer to the Court, so the Court has an

19   understanding of what your testimony was on that date?

20       MR. RICHARDS:  That's -- I'm going to object as improper

21   impeachment.

22       MS. LEE:  Your Honor, under the --

23       THE COURT:  Overruled.

24       MS. LEE:  Thank you.

25       THE COURT:  Go ahead.

```
1    BY MS. LEE:
2         Q    Did Mr. Kenner ever inform you at any point in time
3    -- and I'm sorry.  I'm starting on page 86 on line 22.  Did
4    Mr. Kenner ever inform you at any point in time that Mr. Jowdy
5    had actually purchased -- successfully purchased the units at
6    the Palms?  Please read your answer, sir.
7         A    Yes, he told me that he did.
8         Q    And when did he tell you that?
9         A    I'm not exactly sure.
10        Q    Was it in 2005, when you made the loan?
11        A    Want me to read?
12        Q    Yes, please.
13        THE COURT:  Well, I was going to say.  Where are we going
14   with this?  Because this part, I mean -- are you impeaching
15   him with this or what are we doing?
16        MS. LEE:  No, Your Honor.  I believe under the rules we
17   can use the deposition for any purpose.  I'm just trying to
18   get his testimony out to the Court as he made it that day, as
19   he testified that day.
20        MR. RICHARDS:  I'm just going to object as improper
21   impeachment.
22        THE COURT:  I -- sustained.
23        MR. GOODMAN:  Your Honor, if I may.
24        MR. RICHARDS:  I'm going to object to tag team lawyering.
25   If there's one --
```

101

1    MR. GOODMAN:  I'm not tag team lawyering.  I'm arguing a

2  legal point, Your Honor.

3    MR. RICHARDS:  It's not fair if she's doing the --

4    THE COURT:  Well, I would say that she should be the one

5  to discuss this.  But this would probably be a good time for a

6  break, and we could probably discuss it over the lunch hour.

7    MS LEE:  All right, Your Honor.

8    THE COURT:  Okay.

9    MR. GOODMAN:  Thank you, Your Honor.

10    THE COURT:  Okay.  We'll go ahead and come on back.  How

11  is the traffic downstairs?  I want to make -- it is very busy?

12  Okay.  I want to make sure the attorneys and everybody gets

13  lunch.  So why don't we come back here about 1:30.

14    MR. RICHARDS:  Thank you.

15    THE COURT:  It's just that it is very busy downstairs.

16    MS. LEE:  Thank you, Your Honor.

17    THE COURT:  Okay, thank you.

18    MS. LEE:  Thanks.

19    THE COURT:  You can leave it right there.  Thank you.

20    [Recess]

21    THE MARSHAL:  All rise.  Department 22 in session, the

22  Honorable Susan Johnson presiding.

23    THE COURT:  Okay.  Are we ready to proceed?

24    MS. LEE:  I believe -- what is that?

25    THE COURT:  Okay.  Sir, if you would please take the

1    witness stand.  That's the hydraulics.  I don't know why it

2    does that.  And, sir, I just want to remind you, you have been

3    sworn.

4         THE WITNESS:  Yes.

5         THE COURT:  Okay.  Counsel?

6         MS. LEE:  Okay.  I believe when we left, we were having a

7    bit of an evidentiary discussion on the purposes for which

8    depositions could be used in Court proceedings.  And if I

9    could turn your Court's attention to Nevada Rule of Civil

10   Procedure 32, which I appreciate you may not have in front of

11   you, but that is the rule that governs the use of depositions

12   in Court proceedings in our jurisdiction.

13        And essentially, it says, "Any part or all of a

14   deposition can be used against any party who was present or

15   represented at the taking of a deposition in accordance with

16   any of the following provisions."  And then there is two

17   subsections.

18        The first subsection -- or there's several

19   subsections, but there's two that are relevant, the first and

20   the second.

21        The first subsection says, "Any deposition may be

22   used by any party for the purpose of contradicting or

23   impeaching the testimony of deponent as a witness or for any

24   purpose permitted by the Nevada Rules of Evidence."

25        The second section says, "The deposition of a party

1   or an agent of the party may be used in an adverse -- may be

2   used by an adverse party for any purpose." So, if and --

3        THE COURT:  Okay.  What part are you looking?

4        MS. LEE:  Subsection A(2) there.

5        THE COURT:  A(2)?

6        MS. LEE:  A(2), yes.  So, the first subsection just talks

7   about deposition use by anybody.  The second section talks

8   about deposition used against a party to the case.  So --

9        MR. RICHARDS:  Your Honor, for the record there's no

10  dispute here.  I don't know why we are going over this.  We

11  were --

12       MS. LEE:  Just to say that we can use a deposition

13  transcript not just for impeachment purposes.  We can use it

14  for any purpose.

15       MR. RICHARDS:  We agree.

16       MS. LEE:  And the purpose is that I want -- when I was

17  having him read it for the record is because I want that on

18  the record --

19       MR. RICHARDS:  We --

20       MS. LEE:  -- and I want that to be in the record.  That's

21  the purpose for which I was having him read it.

22       MR. RICHARDS:  We disagree.

23       MS. LEE:  So it doesn't necessarily --

24       THE COURT:  Okay.

25       MS. LEE:  Oh, I'm sorry.

1       THE COURT:  Number one, Counsel, one at a time in this

2   Court, okay.  I want to listen to Ms. Lee and then I'll be

3   happy to listen to you, but I am not going to have this back,

4   forth, back, forth, back, forth.  This is not like Law & Order

5   or anything.  We will go by procedure.

6       Ms. Lee, I'm listening to you.

7       MS. LEE:  All right.  So that and I think it's just

8   important to distinguish between subsection one and subsection

9   2 and I guess Mr. Richardson doesn't agree that we can use it

10  for any purpose.  And so, to me, that means, and of course

11  Your Honor is here to make that distinction or difference or

12  ruling.

13      For me, any purpose means any purpose, that we can

14  use it for any purpose, not just for impeachment.  That I can

15  have Mr. Murray here, who is a party to the case, read his

16  deposition into the record if I would like to have that

17  deposition reflected in the record as he testified on the day

18  that I took his deposition.

19      THE COURT:  Okay.  Counsel?

20      MR. RICHARDS:  Yes, Your Honor.  I agree that you can use

21  the deposition for any purpose.  What I was objecting to

22  before the break was Ms. Lee having my client parrot the

23  deposition.  Ms. Lee could read the deposition and cite the

24  page and line that she wants to read into the record.  You

25  don't have the witness just parrot testimony.  That's

1    improper.  That was my objection.  That's my --

2        THE COURT:  I understand, and frankly, I agree, Ms. Lee.

3        MS. LEE:  Okay, Your Honor.

4        THE COURT:  You can go ahead and point it out, but I

5    think it's kind of silly to have him parrot what he's already

6    said in the deposition, okay?

7        MS. LEE:  Okay.  So I can just then read it into the --

8        THE COURT:  Right.

9        MS. LEE:  -- read of record?  Okay.  Thank you, Your

10   Honor.

11       THE COURT:  That's fine.

12       MS. LEE:  Okay.  Thank you for that page.

13       MR. RICHARDS:  Oh, one question on procedure, Your Honor.

14   If I do want to make an objection to preserve evidence, am I

15   allowed to cut in at that point?

16       THE COURT:  You can --

17       MR. RICHARDS:  That's all I was trying to do during her

18   argument because I thought -- I didn't want the record to

19   think I was silent, and that's why.

20       THE COURT:  Okay.  No, I would rather her finish her

21   argument.  But with respect to questions, certainly you can

22   object.  And I want to know the form of the objection.  I

23   don't like speaking objections.  We'll never get anything done

24   if I allow attorneys to go on and on and on and on and on.

25           So, just give me the form of the objection and I'll

106

1    be happy to rule on it, okay?

2         MR. RICHARDS:  Thank you.

3         THE COURT:  All right.  Ms. Lee?

4         MS. LEE:  Thank you, Your Honor.

5                   CROSS-EXAMINATION CONTINUED

6    BY MS. LEE:

7         Q    Welcome back, Mr. Murray.  I'd like to jump back a

8    little bit in terms of going through how you establish this

9    trust of my client, Mr. Jowdy, so much so that you loaned him,

10   according to you, $791,000.

11        You reference a transaction whereby you invested

12   $500,000 into a property in Mexico, is that right?

13        A    Yes.

14        Q    And did you write a check personally to my client,

15   Ken Jowdy?

16        A    No, I wired -- it was a wire that goes through into

17   an account with Jowdy's name -- Mr. Jowdy's name on it.

18        Q    Was it a bank account held by Mr. Jowdy or was it a

19   corporate bank account?

20        A    I can't recall actually.

21        Q    And are you an owner of any part of that property in

22   Mexico that you invested in?

23        MR. RICHARDS:  Objection, foundation.  Calls for a legal

24   conclusion.

25        THE COURT:  Overruled.  He can go with what his

1    understanding is.

2         THE WITNESS:  My understanding is I owned a piece of the

3    land with 20, 22 other of my colleagues and other people that

4    were involved with it.  So, yes, I understand -- my perception

5    is, yes, I owned a piece of that land in Mexico.

6    BY MS. LEE:

7         Q    And Mr. Kenner owns a piece of that land in Mexico

8    too, doesn't he?

9         MR. RICHARDS:  Foundation, lack of personal knowledge.

10        THE COURT:  If he knows, he can answer.  Overruled.

11        THE WITNESS:  Repeat the question again, sorry.

12   BY MS. LEE:

13        Q    And Mr. Kenner is also an owner in that property

14   too, is he not?

15        MR. RICHARDS:  Objection, vague as to property.

16        THE COURT:  Do you understand what property we're talking

17   about?

18        THE WITNESS:  The Diamante Del Mar.

19        MS. LEE:  Correct.

20        THE WITNESS:  Is that what you're talking about?

21        MS. LEE:  Yes, sir.

22        THE COURT:  Okay, overruled.  Go ahead.

23        THE WITNESS:  Yes, he does.

24   BY MS. LEE:

25        Q    And at the time that you invested your money into

108

1    that property, did you have a discussion with my client about

2    investing your money into that property?

3        A    Well, again, we were a team.  We were a group.

4        Q    I'm sorry.  Just -- I'm sorry.  Is there just -- did

5    you personally have a discussion with my client about

6    investing money in that?

7        MR. RICHARDS:  Your Honor, my objection is she didn't let

8    him finish his answer.  It wasn't a yes or no question.

9        THE COURT:  Okay, I understand.  Ms. Lee, you do need to

10   let him finish his answer.

11       MS. LEE:  I apologize, Your Honor.

12       THE WITNESS:  Again, we were a team.  I mean business

13   partners, all of us together.  So, as you understand, I've

14   said before, Phil was my business manager.  I've had him for

15   years.  I've had him for 14, 15 years at the time.  He

16   communicated with Mr. Jowdy.  And that was my assumption, that

17   he was communicating with Mr. Jowdy.  Why would I need to go

18   and talk to Mr. Jowdy while my business manager is

19   communicating with him for me?

20   BY MS. LEE:

21       Q    And you trusted your business manager, Mr. Kenner,

22   did you not?  You trusted your business manager, Mr. Kenner?

23       A    Yes.

24       Q    And based on the trust that you have in Mr. Kenner

25   and the representations that he was making to you, that's why

1    you invested your money in the Diamante Del Mar project?

2         MR. RICHARDS:  Objection, relevance, outside the scope,

3    compound.

4         THE COURT:  Overruled.  Go ahead.

5         THE WITNESS:  Again, sorry.

6         MS. LEE:  I guess we don't have the luxury of having the

7    question read back.

8         THE COURT:  Oh, she can read it back.

9         MS. LEE:  Oh, could you read that back then?  I

10   apologize.  For the record.

11        THE CLERK:  And based on the trust on Mr. Kenner --

12        [Pause]

13        MS. LEE:  I can just ask the question.

14        THE COURT:  Well, that's okay.  That's --

15        THE COURT:  Well, that's okay.  She can -- you can even

16   record it if you want, play it.

17        THE CLERK:  I'm trying to get it.

18        [Pause]

19        [Audio Tape Played in Courtroom]

20        MR. RICHARDS:  Compound.

21        MS. LEE:  So you don't have the luxury of having the

22   question read back.

23        THE COURT:  She can do that.

24        MS. LEE:  Oh, could you read that back then for Mr.

25   Kenner.

1     [End of Audio Tape Played in Courtroom]

2     THE CLERK:  It just has to be backed up a little bit

3  more.  Sorry.

4     [Audio Tape Played in Courtroom]

5  BY MS. LEE:

6        "Q  And you trusted your business manager, Mr.

7        Kenner, did you not?  You trusted your business

8        manager, Mr. Kenner?

9        "A  Yes.

10       "Q  And based on the trust that you have in Mr.

11       Kenner and the representations that he was making to

12       you, that's why you invested your money in the

13       Diamante Del Mar project?

14     MR. RICHARDS:  Objection, relevance, outside the scope,

15  compound.

16     THE COURT:  Overruled.  Go ahead.

17     [End of Audio Tape Played in Courtroom]

18     THE WITNESS:  So, yes, I trusted my business manager, Mr.

19  Kenner, enough that he trusted Mr. Jowdy, yes.

20  BY MS. LEE:

21     Q   So the sole basis for your trust in Mr. Jowdy is

22  because of things that Mr. Kenner was telling you?

23     MR. RICHARDS:  Objection, misstates his prior testimony.

24     MS. LEE:  It's a different question.

25     THE COURT:  Overruled.  And, sir, one thing that might

111

1   also be helpful, if we could put the microphone --

2       THE WITNESS:  Oh, I'm sorry.

3       THE COURT:  We just want to make sure you're heard.

4   That's all.  Okay, go ahead.

5       THE WITNESS:  Yes, I did trust my business manager, Phil

6   Kenner.

7   BY MS. LEE:

8       Q    Mr. Jowdy never personally gave you any reason to

9   trust him, did he?  Not directly?

10      A    Well, why wouldn't I trust him that he was business

11  partners with my business manager, and those two together,

12  yes, I did trust them both.

13      Q    But my client never personally interacted with you

14  such that you could get direct confidence and trust in him

15  through your interactions with Mr. Jowdy?

16      A    Well, like I said again, that I trusted my business

17  manager that he trusted Mr. Jowdy, so yes, I trusted them

18  both.

19      Q    And that trust in my client is an indirect trust?

20      MR. RICHARDS:  Objection, vague as an indirect trust.  I

21  don't think that -- vague.  It's a --

22      THE COURT:  Overruled, but your --

23      MR. RICHARDS:  -- argumentative.

24      THE COURT:  You're asking it over and over again.  Go

25  ahead and answer the question again.

```
 1        THE WITNESS:  Yes, I trusted my business manager, Phil
 2   Kenner, and I trusted Mr. Jowdy because they were a team
 3   together as business managers or business partners and I put
 4   my trust in him, yes.
 5   BY MS. LEE:
 6        Q    Thank you.  And after you didn't receive a return on
 7   your investment in that property, did you ever contact Mr.
 8   Jowdy to discuss that?
 9        MR. RICHARDS:  Objection as to time, vague as to
10   property.
11        THE COURT:  Lay the foundation.  Sustained.
12   BY MS. LEE:
13        Q    You invested your property in -- you invested in
14   that Diamante Del Mar property in 2002, is that correct?
15        A    Yes.
16        Q    And I believe you testified through Mr. Richardson
17   that you have not received any benefit or return on that
18   investment.
19        A    It's Mr. Richards, by the way.
20        Q    Richards, I'm sorry, Mr. Richards.
21        A    No, I did not get any investment return on the
22   Diamante Del Mar.
23        Q    And did you ever contact Mr. Jowdy to discuss why?
24        A    Again, I didn't see any -- there was no reason for
25   me to contact Mr. Jowdy because my business manager was my
```

1    person that he talked to Mr. Jowdy for me, so why would I want

2    to ask the same questions that I'm asking Mr. Kenner that he

3    already communicates with Mr. Jowdy?

4         Q    Did it ever occur to you to try to confirm this

5    information that Mr. Kenner was telling you with Mr. Jowdy

6    directly?

7         A    I had it confirmed.  My business manager told me.

8         Q    But did it ever occur to you to go to Mr. Jowdy and

9    confirm what Mr. Kenner was telling you?

10        A    No, like again like I said.  Why would I need to if

11   he was already communicating with Mr. Jowdy?  I had my trust

12   in my business manager.

13        Q    And is it that same trust upon which you loaned or

14   supposedly loaned my client the $791,000?

15        MR. RICHARDS:  Objection, vague as to trust.  It's not

16   defined, just trust.

17        THE COURT:  Well, see, you're giving me speaking

18   objections.  Just --

19        MR. RICHARDS:  All right.  Vague as to the word trust,

20   there's no foundation to time.

21        THE COURT:  Well, okay, again your doing speaking

22   objections.  Just say vague.

23        MR. RICHARDS:  Vague.

24        THE COURT:  Okay.  I am overruling.  Go ahead.

25   BY MS. LEE:

114

1     Q   So, is it the same trust that you had through Kenner

2  that caused you and induced you to invest money in Diamante

3  Del Mar?  Is it that same trust that inspired you to loan Mr.

4  Jowdy $791,000?

5     MR. RICHARDS:  Objection as to the form of the question.

6     THE COURT:  Overruled.

7     THE WITNESS:  Again, and I know I've said it before.  We

8  were business partners in Mexico, Diamante Del Mar.  I had put

9  $500,000 of my own money in the land in Diamante Del Mar.  I

10  trusted Mr. Jowdy.  I trusted Mr. Jowdy because I trusted my

11  business manager.  They were -- we were all partners and that

12  is the reason -- and he was in a pinch.  And I felt like I

13  wanted to help him and I did.

14  BY MS. LEE:

15     Q   And he was in a pinch according to Phil Kenner,

16  correct?

17     A   Well, according to Phil Kenner, from -- yes, because

18  Mr. Jowdy would tell him that.

19     Q   Were you present during any conversations that Mr.

20  Kenner had with Mr. Jowdy regarding this loan?

21     A   I didn't need to be.  I saw them in the list of

22  discovery.

23     Q   So your answer to my question is no, you were never

24  present during any conversations that my client had with Mr.

25  Kenner regarding this loan?

1      A     No, of course not.  He lives in Mexico.  I live in

2   California.

3      Q     Thank you.  Did Mr. Kenner tell you when he

4   approached you for this loan that he himself intended to

5   own -- have some equity ownership in these Palms units?

6      A     Meaning the money that I was sending over to Mr.

7   Jowdy?  That he would own those three units?

8      Q     That he would have any ownership interest in those

9   three units, correct?

10     A     No.

11     Q     Did he tell you that he -- did Mr. Kenner ever tell

12  you that he was the one that set up the initial meeting, the

13  marketing meeting for those Palm units, with Mr. Maloof

14  himself, and my client?

15     A     No, I did not know that.

16     Q     Have you made any attempts to directly contact my

17  client with regards to this loan since the time you made it?

18     MR. RICHARDS:  Asked and answered, relevance, has a

19  lawyer.

20     THE COURT:  Sustained.

21     MS. LEE:  Well, I think we already testified that you

22  didn't contact my client.  Did you ever attempt to make?  And

23  I believe there's a distinction there, Your Honor.  Did you

24  ever attempt to make direct contact with my client?

25     MR. RICHARDS:  Objection as to who -- he has a lawyer.

116

1   There's --

2        THE COURT:  Well, I understand that.

3        MR. RICHARDS:  Yeah.

4        THE COURT:  The question is did you attempt to contact

5   him about the loan.  I'm going to overruled.

6        THE WITNESS:  Through my business manager, I did, of

7   course, but --

8   BY MS. LEE:

9        Q    Okay.  And -- I'm sorry.  Go ahead.

10       A    Did he ever try to contact me to tell me my money

11  was --

12       THE COURT:  No, no, no, no, the question is -- she gets

13  to ask the questions.

14       THE WITNESS:  Okay.

15       THE COURT:  You have to answer.  Okay?

16       THE WITNESS:  Okay.

17       THE COURT:  All right.  Counsel?

18  BY MS. LEE:

19       Q    And I'm sorry.

20       A    Sorry about that.

21       Q    Were you done with your answer?  I didn't want to

22  cut you off.  And you testified that you are very busy as a

23  hockey player at or around the time that this initial funding

24  went out, is that correct?

25       A    Yeah, of course, busy being a hockey player,

117

1    being -- doing everyday life things that we're -- you know, I

2    don't want to harp on it, but when you play professional

3    sport, there is a lot of time being on the road, being away

4    from family, doing a lot of different things that that's why a

5    lot of people have business managers that they trust and they

6    help us out with certain things.

7        Q    I don't dispute that, but do you have an off season?

8    Like any other professional sport, do you have an off season?

9        A    There is an off season, but there isn't an off

10   season, meaning that professional hockey, the regular season

11   is from September to hopefully June when you go to the finals.

12   And it's an all year round sport because nowadays, as everyone

13   sees, the NFL, the baseball, there's no time to be taking off.

14   The more important time is in the off season when you have to

15   get your body ready to be able to make it through a grueling

16   season of, you know, 82 games of 8 months and hopefully 9

17   months because if you win the whole thing.

18        So, yes, it's -- per se, it's called an off season,

19   but there's no stoppage, meaning you always keep skating.  You

20   always get your body ready.

21       Q    During your off season, did you contact Mr. Kenner

22   more frequently regarding this alleged loan than you did on

23   your on seasons?

24       MR. RICHARDS:  Vague as to time.

25       THE COURT:  Sustained.

118

BY MS. LEE:

    Q    In the four years that this loan was outstanding before you sued my client, on how many occasions did you ask Mr. Kenner about the status of your money?

    A    All the time.

    Q    Consistently?

    A    Whenever I would talk to him.

    Q    And what was he telling you?

    A    He was telling me that Mr. Jowdy was trying to get the money together to pay me back.

    Q    Did he say how?

    A    No, I didn't ask how.  I just -- I assumed that it would just be wired right back into my account at Charles Schwab.

    Q    At what point?

    A    Well, we first made discussions probably around January of '06.  I started asking about, you know, where my money was.  So, within a year passed through the transaction date, you know, I started to wonder where my money was.  But again, I didn't file a lawsuit because, as I testified before. We were a group.  We were a team.  Like I know I use the analogy team all the time, but we were a team and I didn't want to disrupt what was going on with our other investment in Mexico.

    Q    Well, short of filing your lawsuit, sir, did you

119

```
 1    attempt to get this loan memorialized in writing at any point
 2    after it became due?
 3         MR. RICHARDS:  Objection, calls for a legal conclusion.
 4    He -- no one is alleging -- oh, relevance.
 5         THE COURT:  Overruled.
 6         MR. RICHARDS:  Argumentative.
 7         THE COURT:  Go ahead.
 8         THE WITNESS:  Say it again, sorry, because --
 9    BY MS. LEE:
10         Q    Short of filing a lawsuit, did you try to have this
11    loan memorialized in writing at the point that you became
12    concerned that this money was outstanding?
13         A    Well, I started getting concerned in January of '06.
14    That's when I started to get concerned because I thought it
15    would be a quick deal that, you know, if he -- Mr. Jowdy did
16    get the Palms units, then it would be within 30 to 45 days
17    that I would get my money back.  And if he didn't -- I assumed
18    that if he didn't get the units, that the money would come
19    right back to my Charles Schwab account.
20         Q    And that was your assumption?
21         A    Yes.
22         Q    So, in January of '06, between January of '06 and
23    the time you filed the lawsuit, did you make any attempts to
24    get this loan in writing?  Did you say to your business
25    manager, "Please go get this in writing for me?  I'm becoming
```

120

1    concerned about my investment," or something to that extent?

2         MR. RICHARDS:  It's argumentative.  It assumes that he

3    was required to do this.

4         THE COURT:  I understand, Counsel.

5         MR. RICHARDS:  All right.

6         THE COURT:  Overruled.  Go ahead.

7         THE WITNESS:  I didn't think I had to because it was all

8    in the discovery of the emails back and forth, so no.

9    BY MS. LEE:

10        Q    So the answer to that question is no?  And before

11   you loaned this money to my client, did you ask Mr. Kenner

12   what his credit rating was?

13        MR. RICHARDS:  Outside the scope, relevance, calls for

14   hearsay.

15        THE COURT:  It is outside the scope, sustained.

16        MR. RICHARDS:  Well, I just want the Court to know I did

17   tell Counsel I wouldn't go nuts if she wanted to double use

18   the witnesses so we could just get them done, so I said that,

19   but I want to be honest about it.  I did say we could go

20   outside the scope.

21        THE COURT:  Well, is that -- though that was your

22   objection though, Counsel.

23        MR. RICHARDS:  Yeah, I know because I do it

24   instinctively, but I just remembered it.  I'm just saying my

25   other objection was hearsay about his credit rating,

1    foundation.  That was lack of --

2         THE COURT:  Well, he's a party to the lawsuit, right?

3         MR. RICHARDS:  No, no, no.  He wanted to know about Mr.

4    Kenner's credit rating.

5         MS. LEE:  No, I --

6         THE COURT:  I know.  The question was did you ask Mr.

7    Kenner about his credit rating.

8         MR. RICHARDS:  My objection would then be relevance.  I

9    want to withdraw the outside the scope objection and say

10   relevance.

11        MS. LEE:  Okay, let me clarify --

12        THE COURT:  Wait, wait, wait, I'm going to overrule.

13        MS. LEE:  Sorry.

14        THE COURT:  Go ahead.

15        MR. RICHARDS:  All right.

16   BY MS. LEE:

17        Q    All right.  And allow me to clarify my question.

18   What I intended to ask was did you ever ask Mr. Kenner about

19   Mr. Jowdy's credit rating at the time you loaned this money?

20        A    No.

21        Q    Did you ever ask about his credit worthiness?

22        A    Why would I need to?

23        Q    Because you were loaning him --

24        THE COURT:  Well, no, no, no, no.

25        THE WITNESS:  Sorry.

1        THE COURT:  Ask the -- the question is did you ever do

2   it.

3        THE WITNESS:  No.

4        THE COURT:  Okay.

5   BY MS. LEE:

6        Q    And this is, according to you, the most money you've

7   ever lent to anybody ever, is that correct?

8        A    Yes.

9        Q    And you didn't ask Mr. Kenner whether or not Jowdy

10  was good for it?

11       MR. RICHARDS:  Well, that's --

12       THE COURT:  Your objection?

13       MR. RICHARDS:  I was going to say it misstates his prior

14  testimony.  That's -- but then she asked a different question.

15       THE COURT:  Okay.

16       MR. RICHARDS:  Yeah.

17       THE COURT:  Go ahead.

18       THE WITNESS:  Say it again.

19  BY MS. LEE:

20       Q    Sure.

21       A    Sorry.

22       Q    So this is the most money you've ever loaned to

23  anyone ever?  You never asked Mr. Kenner what Jowdy's credit

24  rating was?

25       A    No, I didn't need to because they were partners in,

123

```
1    again, Mexico in other real estate deals and I didn't need to

2    ask.  No, I didn't.

3         Q    Did you ever ask Mr. Kenner was Jowdy's credit

4    worthiness was?

5         A    What's credit worthiness mean?

6         Q    Well, did you ever ask him whether or not he had the

7    ability to repay this loan?

8         A    Well, I would assume he did because he's a --

9         Q    No, I'm asking you whether or not you -- I'm sorry.

10        A    -- a commercial real estate.

11        Q    Did you ever ask him that question?

12        A    Did I ever ask Mr. Jowdy that question?

13        Q    Mr. Kenner the question whether or not -- let me

14   start over.  Did you ever ask Mr. Kenner whether or not Jowdy

15   had the ability to repay this loan?

16        A    No.

17        Q    And did you -- so, I'm sorry.  Is it your testimony

18   that Mr. Kenner acted as your agent with respect to this loan

19   transaction?

20        MR. RICHARDS:  Objection, calls for a legal conclusion,

21   vague.

22        THE COURT:  I'm going to overrule if he knows.

23        THE WITNESS:  He was my business manager.  I wouldn't say

24   agent.  I would say I've been with him for so long.  He was my

25   business manager.  And I wouldn't say agent.  I would say
```

124

1    business manager.

2    BY MS. LEE:

3         Q    So, was he in charge of your money as far as

4    facilitating this loan transaction?

5         A    As far as this loan, yes.  As far as this loan from

6    Mr. Jowdy, yes.

7         Q    And did you ever authorize Mr. Kenner to

8    subsequently move any part of your money into a home in Las

9    Vegas in which he had a personal financial interest?

10        MR. RICHARDS:  Objection, no foundation, assumes a fact

11   not in evidence.

12        THE COURT:  Lay some foundation, sustained.

13   BY MS. LEE:

14        Q    Did you ever authorize Mr. Kenner to move your money

15   out of the Palms deal into a residential home in Las Vegas?

16        A    Well, how could he move the money out of the Palms

17   deal?  It was in Mr. Jowdy's name and store title.

18        Q    If you could --

19        THE COURT:  Okay.  Again, listen to her question.  Just

20   answer the question.  Don't ask her how.  Your job is just to

21   answer her question, all right?

22        THE WITNESS:  Okay.

23   BY MS. LEE:

24        Q    So, did you ever authorize Mr. Kenner to move your

25   money out of the Palms deal into a home in Las Vegas?

125

```
1        A     No.

2        Q     Did you ever authorize Mr. Kenner to move any part

3   of your money to any part --

4        A     The only authorization --

5        Q     I'm sorry.  Let me finish my question.

6        THE COURT:  All right, now.  She's really good.

7        THE WITNESS:  Okay.

8        THE COURT:  But she can't take you both down at the same

9   time.  You've got to be very careful about not talking over

10  each other, all right?  Let her get her question out.

11       THE WITNESS:  That's my fault.

12       THE COURT:  That's all right.  And I understand.  In

13  normal, everyday language, we interrupt each other all day

14  long.  My kids interrupt me all the time.  But during right

15  now, since we've got a Court reporter, let her get her

16  question out.  Then her job is to let you get your answer out,

17  okay?  All right.  Counsel?

18  BY MS. LEE:

19       Q     Did you ever authorize Phil Kenner to move any part

20  of your money, once it left the Palms deal, to go into Cabo

21  San Lucas project?

22       MR. RICHARDS:  Assumed a fact not in evidence.

23       THE COURT:  Overruled.

24       THE WITNESS:  I authorized Mr. Kenner a power of attorney

25  to move the wires from my Charles Schwab to the Palms escrow
```

126

1    at the Stewart Title in Mr. Jowdy's name.

2    BY MS. LEE:

3        Q    Did you authorize him to do anything else other than

4    that with respect to your money?

5        A    No.

6        Q    And did you have any understanding at that time in

7    2005, August of 2005, that Mr. Kenner had any money invested

8    in this residential property in Las Vegas called -- that we're

9    referring to as the Innisbrook property?

10       A    No.  Did you mean did I know or did I think that he

11   was involved with this?

12       Q    Did you have any understanding or knowledge --

13       A    No.

14       Q    -- that Mr. Kenner --

15       A    No, none.

16       Q    -- had any money invested in this Las Vegas home?

17       A    No.

18       Q    Did you at any time come to the understanding that

19   Mr. Kenner had money invested into that Las Vegas home?

20       A    No, isn't that the same question you just asked me?

21       Q    No, I asked you about August of 2005.  Since August

22   of 2005, have you ever come to realize or understand that Mr.

23   Kenner had a financial stake in that Las Vegas home?

24       A    No.

25       Q    As you sit here today, do you have any knowledge or

127

1   understanding as to whether or not Mr. Kenner put any money

2   into that Las Vegas home?

3        MR. RICHARDS:  Objection, outside the scope, lack of --

4   or sorry.  Lack of personal knowledge, argumentative,

5   relevance.

6        THE COURT:  Overruled.

7   BY MS. LEE:

8        Q    You can answer.

9        A    No.

10       Q    Now, I assume that you've read your complaint in

11  this case at some point.  Is that a fair statement?

12       A    Of course.

13       Q    And in your complaint, did you allege that certain

14  of your funds went into this Innisbrook property?

15       MR. RICHARDS:  I'm going to object.  It's improper to

16  question him about a compliant with no foundation.  The lawyer

17  wrote it.

18       THE COURT:  Counsel, he filed it.  I expect that he's

19  read it and he knows exactly what it says and that he is ready

20  to verify everything that's in his complaint.

21       MR. RICHARDS:  But it was unverified.

22       THE COURT:  I don't care.  Other than it does -- either

23  he -- that is his complaint.  It is not just some lawyer's

24  little fuddy-duddy thing.  He better be prepared to answer any

25  questions about the complaint filed, so I'm going to overrule

```
1    that.

2         THE WITNESS:  Repeat the --

3         THE COURT:  Go ahead.

4         THE WITNESS:  Repeat the question, please.

5    BY MS. LEE:

6         Q    Sure.  Are you aware of an allegation that you make

7    in your complaint that part of your money went to go fund this

8    Las Vegas home?

9         A    Yes.

10        Q    How did you know that?

11        A    Through the discovery of the emails and different

12   things that came together and through discussions with my

13   lawyers.

14        MR. RICHARDS:  I'm going to object and move to strike.

15   It's attorney-client privilege a lot.  This is going to -- to

16   ask him how he found out about things, for the lawyer to

17   write --

18        THE COURT:  He said he read about emails.  That's fine.

19   And through discovery.

20        MR. RICHARDS:  Well, then he also said and through

21   discussions with his lawyers.

22        THE COURT:  Well, I'm not going to consider discussions

23   with lawyer.

24        MR. RICHARDS:  All right.

25        THE COURT:  Okay.  That -- sir, if there's any questions
```

129

1    that are directed to where you acquired information through

2    attorney/client privileged info -- you know, your talks with

3    your lawyer, you don't need to go there, okay?  But if you saw

4    documentation, that's a different deal, okay?

5         THE WITNESS:  Okay.

6         THE COURT:  Because I can't make any rulings that are

7    based upon information you acquired through a privilege, okay?

8    All right.

9    BY MS. LEE:

10        Q    So, I'm sorry.  You said that you reviewed

11   subsequently.  When did you review these emails?

12        A    After filing the complaint.

13        Q    How did you know to allege in the complaint that

14   $412,000 of your money went into this Las Vegas home if you

15   didn't read those emails until after you filed the complaint?

16        MR. RICHARDS:  I'm going to object to the form of the

17   question.  The lawyer wrote the complaint.

18        MS. LEE:  Again, it's a speaking objection.

19        THE COURT:  I understand, overruled.

20        MS. LEE:  You can answer.

21        MR. RICHARDS:  It's also a legal conclusion.

22        THE COURT:  Overruled.

23        THE WITNESS:  Through the discovery.

24   BY MS. LEE:

25        Q    After the complaint was already filed?

1      A     Yes.

2      Q     So, I guess what I'm struggling with here, Mr.

3 Murray, is how did you have this information and knowledge at

4 the time the complaint was filed?

5      MR. RICHARDS:  I'm going to object.  There was an amended

6 complaint.  Which complaint are we talking about?

7      THE COURT:  Counsel, why don't you go ahead and clarify

8 that?

9      MS. LEE:  Sure, if I can just look at the -- I don't

10 understand that there was -- oh.

11      MR. RICHARDS:  You don't?

12      MS. LEE:  Either complaint.  Pick one.  The amended

13 complaint.

14      MR. RICHARDS:  That's --

15 BY MS. LEE:

16      Q     The amended complaint.

17      A     My complaint in all of this is I lent Mr. Jowdy

18 $791,000 for three units in the Palms.  And my understanding

19 was within 30 to 45 days that I would get my money back 10

20 percent interest.  That is my complaint to Mr. Jowdy that I

21 wanted my money back.

22      Q     Okay, and I appreciate that, sir.  However, your

23 complaint alleges far more things than just what you've said

24 here today.  And so what I'm trying to understand is where do

25 you get the basis for making these allegations against my

131

1    client because we have to defend it?

2        MR. RICHARDS:  My objection is relevant, Your Honor.

3        MS. LEE:  So, my question is --

4        MR. RICHARDS:  It's relevance.  How is it probative?

5    It's an undue consumption of time.

6        THE COURT:  Okay, Counsel.  This is my -- when someone

7    files a complaint, they better have a factual basis for it.

8    She is entitled to explore the factual basis that he filed his

9    complaint.

10       MR. RICHARDS:  Okay.

11       THE COURT:  Okay.  She's entitled to it, whether it's the

12   first amended complaint, whether or not it's the original

13   complaint.  She has the right to explore that.  So I am

14   overruling all objections based upon that, okay?  Go ahead.

15       THE WITNESS:  So you're asking me where did I get the

16   information?

17   BY MS. LEE:

18       Q    Correct.

19       A    Well, I got the information from my business

20   manager, Phil, which got everything together with when I hired

21   a lawyer and I went through with my lawyer.

22       Q    So, Phil Kenner is the one that told you that some

23   of your money had gone into this residential property in Las

24   Vegas?

25       A    What he had found out about.  You know, I didn't

1   give authorizations for my money that went into the Palms

2   escrow to kind of be spread out in other deals obviously

3   without my permission because I thought my money was going to

4   be coming back to me.

5        Q    And I believe you, Mr. Murray. I do believe that you

6   had that belief.  But my question is how did you know, as

7   you've alleged in your complaint, that the money that left my

8   client's escrow accounts at the Palms went to fund this house

9   in Las Vegas?  How did you know about that transaction?

10       MR. RICHARDS:  I'm going to object as to time.

11       THE COURT:  Overruled.

12       THE WITNESS:  Through the paperwork through my -- from my

13   business manager.

14   BY MS. LEE:

15       Q    What paperwork?

16       A    Just through the discovery that was on the sheets

17   that I would look at.

18       Q    After this litigation was initiated?

19       A    After the litigation was --

20       Q    After this -- after you filed your lawsuit?

21       A    I don't recall.  I mean I would assume it was

22   before.  I don't recall the exact time.

23       Q    And in your complaint, you also allege that Mr.

24   Jowdy had obtained several previous loans with the assistance

25   of Mr. Kenner, isn't that right?

1      A     He had received more loans for the Diamante Del Mar

2    or the --

3      Q     Sir, in your complaint you allege that Jowdy had

4    sought and obtained several previous loans with the assistance

5    of Kenner.

6      A     Yes.

7      Q     That's your allegation?  How do you know that?

8      A     Through my business manager, Phil Kenner.

9      Q     So your understanding of where your money went

10   afterwards as far as funding this home, your knowledge of that

11   came from Mr. Kenner.  Is that your testimony?

12     A     Yes.

13     Q     And do you know how Mr. Kenner knows?  Do you know

14   how Mr. Kenner found out that information?

15     A     No.

16     Q     Okay.  And are you also aware that in your

17   complaint, you refer to Mr. Kenner as your agent for this

18   transaction?

19     A     If it says it there, then maybe I did, but I guess I

20   apologize if I didn't know that.

21     Q     Don't apologize for your knowledge.

22          MR. RICHARDS:  Your Honor, my objection is if she's going

23   to ask him about the complaint, she should show him.  It's not

24   a memory test.  I mean the complaint is not in front of him.

25          THE COURT:  Well, I understand that, but she's asking him

1    about if he remembers it.  He doesn't need the document.  If

2    he needs the document, we need to show it to him.  I'm

3    assuming he's testifying as to his knowledge of what was

4    stated in the complaint.

5    BY MS. LEE:

6        Q    And do you know whether or not my client ever

7    authorized Phil Kenner to ask you for a loan on his behalf?

8        A    Do I know?

9        Q    Yes.

10       A    Well, through discovery and through emails back and

11   forth with Mr. Jowdy and Mr. Kenner, that's how I realized.

12       Q    When did -- at what point did you realize that?

13       A    At discovery.

14       Q    Through this case?

15       A    Yes.

16       Q    So, to be clear, my client never directly asked you

17   personally by email, by fax, or in person to borrow money?

18       MR. RICHARDS:  Asked and answered, compound.

19       THE COURT:  Sustained.

20       MS. LEE:  I have no further questions, Your Honor, at

21   this time.

22       THE COURT:  Okay.  Counsel, I don't know how we should

23   work this.  I'm assuming that Mr. Murray did not sue Mr.

24   Kenner.  I'll have to go through just to double check that.

25       MR. RICHARDS:  Correct.

135

1      THE COURT:  But given that, are you going to -- is there

2  any reason to have him question Mr. Murray?  I would think

3  that that would deal with a third party claim.

4      MR. RICHARDS:  Yeah, we -- I don't believe he will be

5  questioning Mr. Murray on --

6      THE COURT:  Well, some trials they do and some trials

7  they don't.

8      MR. RICHARDS:  I mean that --

9      THE COURT:  You know what?  I'm going to go ahead --

10     MS. LEE:  Just ask him.

11     THE COURT:  -- and allow him to question Mr. Murray.

12     MR. KENNER:  I have no questions, Your Honor.

13     THE COURT:  All right.  Thank you.  That takes care of

14  that.  Redirect?

15     MR. RICHARDS:  Thank you.

16                   REDIRECT EXAMINATION

17  BY MR. RICHARDS:

18     Q    Now, Mr. Murray, directing your attention to the

19  last questions about how you were getting information about

20  this transaction.  In August of 2005, were you communicating

21  with Mr. Kenner about this transaction?

22     A    Yes, I was communicating with Mr. Kenner and he was

23  communicating with Mr. Jowdy.

24     Q    And when you looked at emails later on at some point

25  after these communications with Mr. Kenner, did they -- were

1    they consistent or inconsistent with your communications with

2    Mr. Kenner?

3        A    Consistent.

4        Q    Okay.  And prior to lending this money, were you

5    given terms by Mr. Kenner that Mr. Jowdy told Mr. Kenner?

6        A    Terms, yes --

7        Q    About the loan.

8        A    -- the terms would be, as I said before, 10 percent

9    interest on my -- the money that Mr. Jowdy needed for the

10   three Palms units in Vegas that within 30 to 45 days my money

11   would be returned.

12       Q    Okay.  Now --

13   THE COURT:  Along with ten percent interest?

14   THE WITNESS:  Yes.

15   THE COURT:  Okay.

16   BY MR. RICHARDS:

17       Q    Okay.  Was there anything unusual to you in August

18   of 2005 that Mr. Kenner was telling you that Mr. Jowdy was

19   looking for money and wanted someone to loan him money?  Was

20   that unusual to you?

21       A    No.

22       Q    Okay.  Why not?

23       A    Because they were business partners and they --

24   that's how Mr. Jowdy would go through Mr. Kenner to get these

25   -- to raise this money for certain projects.

137

1      Q    When you gave Mr. Kenner permission to sign the

2  power of attorney on your Charles Schwab account, did that

3  include him doing anything other than basically authorizing

4  him to sign or to wire those three wires to the Stewart Title

5  escrow?

6      A    No, it was just that specific transaction from

7  Charles Schwab to the escrow in Stewart Title.

8      Q    Instead of you physically walking in and doing it?

9      A    Yes.

10     Q    Okay.  At any time did you ever sign any other

11  document that allowed Phil Kenner to do anything else with any

12  other money other than that?

13     A    No.

14     Q    All right.  So, when you put in your complaint that

15  you said he was your agent for that transaction, what did you

16  mean?  What does that mean to you?

17     A    That means to me he's representing me.  I gave him

18  the power of attorney for that specific transaction.

19     Q    Did it mean that you gave him some permission that

20  Mr. Kenner --

21     MS. LEE:  Objection.  Oh, I'm sorry.

22     MR. RICHARDS:  What?

23     MS. LEE:  Sorry.  Go ahead.

24  BY MR. RICHARDS:

25     Q    Okay.  Did you ever -- did that mean to you that you

138

1    gave Mr. Kenner permission to do whatever he wanted with your

2    money?

3         A    Of course not.

4         Q    Okay.  What was the reason why you couldn't just do

5    the wire yourself in August of 2005 instead of Mr. Kenner?

6         A    Well, the reasoning is it's quite simple.  It's he

7    is my business manager.  He was the power of attorney.  I was

8    busy getting ready for my upcoming season like I've explained

9    a few times.  I had a family, had all these other things, and

10   this is why, you know, these players and these professional

11   hockey players have these business managers.

12        Q    Was there anything unusual to you about having your

13   business manager handle the ministerial task of sending a wire

14   to Mr. Jowdy?

15        A    No, not at all.

16        Q    Now, you testified earlier to the Court about in the

17   response to one of the Court's questions that you only missed

18   three days because of this injury to your ankle in '05.  Do

19   you remember that testimony?

20        A    Well, that, yes.

21        Q    Do you remember that testimony?

22        A    Yes, I do.

23        Q    Okay.  Can you clarify what exactly that injury --

24   how that injury affected your ability and what time

25   commitments it took?

139

1        A      Well, that was the one time, like I explained

2    earlier.  That was one time that I missed two or three days.

3    That was one Cortisone shot.  That season I had probably

4    between five to seven Cortisone shots during the whole season,

5    so my ankle was a degenerate ankle and it was getting

6    progressively worse.  I was coming at the tail end of my

7    career.

8              And I did miss a lot of time during that season and

9    the '05, '06 season.  And I missed more time because of my

10   ankle in the '06, '07.  And then my last season that I played

11   was '07, '08.  And that's why I had to retire because it's

12   obviously not good to get a lot of Cortisone shots in your

13   ankle, so that kind of masked the problem that I was having.

14       Q      Yeah, I'm going to show you Exhibit 124, which is

15   already in evidence.  Could I have the ELMO, please?

16              Okay.  If you could take a look at the -- this is

17   the August 22, 2005 email from Mr. Kenner to Mr. Jowdy asking

18   that the money be sent back.  Do you see that?

19       A      Yes.

20       Q      And have you seen this email before?

21       A      Yes.

22       Q      Okay.  Is this email consistent or inconsistent with

23   the information Mr. Kenner was giving you with respect to

24   getting your money returned?

25       A      Consistent.

1     Q    Okay.  So, was the email the only -- was Mr. Kenner

2  telling you that he was only -- was the only way you finding

3  out as to what Mr. Kenner was telling Mr. Jowdy by looking at

4  this email?  Were there other communications between you and

5  Mr. Kenner?

6     A    Of course.

7     Q    So, when you saw this email after the transaction

8  date, did this email corroborate what Mr. Kenner told you or

9  was inconsistent?

10    A    It was consistent.

11    Q    I'm showing you another email, same exhibit, from

12 Mr. Jowdy sending an email to Mr. Kenner regarding what he

13 should do with respect to a communication to the Palms.  And

14 do you see an email here from Mr. Kenner saying that, "As soon

15 as I hear from Muzz?"  Do you see that?

16    A    Yes.

17    Q    Okay.  And have you seen this email before?

18    A    Yes.

19    Q    All right.  Who's Muzz?

20    A    That's me.

21    Q    Okay.  And this email was sent on August 11, 2005,

22 at 8:15 in the morning.  Do you see that?

23    A    Yes, I do.

24    Q    Okay.  Were you having conversations with Mr. Kenner

25 on August 11, 2005, at 8:15 in the morning or around that time

141

1    about possibly funding this loan?

2        A    Was I talking to Mr. Kenner at 8:15 on August 11th?

3        Q    No, no, around that time.

4        A    Around that time, of course.

5        Q    Okay.  And so after 8:15 in the morning on August 1,

6    2005, did you ultimately give Mr. Kenner permission to fund

7    the loan to Mr. Jowdy?

8        A    Yes.

9        Q    And after this transaction occurred and you saw

10   these emails, were they consistent or inconsistent with what

11   you authorized?

12       A    Very consistent.

13       Q    And in your course of -- because not all of us have

14   a business manager, so I just want to just clarify so

15   mechanically we all understand how this works.  When you -- in

16   other transactions, would your business manager go and do

17   things for you like put a down payment on your car or some

18   other --

19       MS. LEE:  Objection, leading, sorry.

20       MR. RICHARDS:  I'm just asking him.  What --

21       THE COURT:  What -- I'm going to allow this.  Go ahead.

22   BY MR. RICHARDS:

23       Q    What other -- would your business manager normally

24   do other things for you in the course of your relationship?

25       A    Of course.  So he would -- for an example, he would

1    get me in contact with the right, if I was going to refinance

2    my house or he had a contact with buying a vehicle.  And he

3    would email me or call me with that contact and I would make

4    the call myself.

5         Q    Okay.  And when -- and in this case when he said, "I

6    want you to loan some money to Mr. Jowdy.  He's looking for

7    money.  These are the terms."  Was it consistent with what he

8    was telling you that you were wiring it to an account in the

9    name of Ken Jowdy at an escrow?

10        A    Yes.

11        Q    Okay.  If he said, "I want you to wire it to someone

12   other than Ken Jowdy," would that have been troubling to you?

13        A    Yes.

14        Q    Okay.  So, after you didn't get paid and you looked

15   at all the documents in this case, did you see any document

16   that was inconsistent from what Phil Kenner represented to you

17   about this loan?

18        A    No.

19        Q    So, was there any surprise at all?

20        A    No.

21        Q    And is it normal in your relationship with your

22   business manager for him to assist you and your family with

23   certain transactions?

24        A    Of course.

25        Q    And ultimately though, who has to make the decision

143

1    to wire your money?

2        A    Myself.

3        Q    So, Phil Kenner, has Phil Kenner ever wired money

4    out of your account without your permission?

5        A    Of course not.

6        Q    Okay.  In this particular case, would it be fair or

7    unfair to say that you had a lot of conversations with Mr.

8    Kenner about whether you were going to loan this money to Mr.

9    Jowdy?

10       A    Yes, we had a lot of conversations.

11       Q    When you authorized the wire receipt -- oh, let me

12   strike that.  When you looked at the documents from Stewart

13   Title or from the bank, when you looked at the wire documents,

14   were you concerned that your name or did it reassure you or

15   not whether your name was going to be on the wire as the

16   person sending the wire?

17       A    It reassured me that I was wiring those three

18   separate wires to Mr. Jowdy's escrow account at Stewart Title

19   into the Palms Hotel.

20       Q    And did the wire come -- the wire came from -- did

21   it make a difference to you that the wire was coming from an

22   account in your name?

23       A    Did it make a difference if it was coming from me to

24   Mr. Jowdy?

25       Q    Yeah.  I'm trying to focus your attention on why

144

1   this transaction in your mind was very clear it was going from

2   you to Mr. Jowdy, what you analyzed at the time.

3       A    I analyzed that I was lending money to Mr. Jowdy for

4   the three units at the Palms.

5       Q    And did you have personal knowledge that the money

6   was going from your account to Mr. Jowdy's escrow?

7       A    Yes.

8       Q    And prior to authorizing Mr. Kenner to do the wire,

9   did you ask him, "How is the money going to go from point A to

10  point B and where?"

11      A    Yes.

12      Q    Okay.  And specifically what did Mr. Kenner tell you

13  with respect to this authorization you were giving him from

14  your Charles Schwab account?

15      A    It would go from Charles Schwab into a Palms escrow

16  Stewart Title escrow account for the three units at the Palms.

17      Q    Okay.  And was it your under -- did you have an

18  understanding or not that this money was already earmarked

19  toward three units?

20      A    Yes, it was purposely for those three units.

21      Q    One sec, Your Honor.

22      [Counsel Confer]

23  BY MR. RICHARDS:

24      Q    All right.  You heard some questions about calling

25  Mr. Jowdy in this case.  Do you remember those question?  Like

145

1   why did -- you heard -- Counsel was asking you why didn't you

2   call -- you haven't called Mr. Jowdy to ask him for this money

3   in three years?

4        A    Well, I mean because I've talked about it before

5   because of the, you know -- we got together as we were -- as a

6   team together we had all this money invested in the Mexico.

7   And finally at the end of these, you know, three years that we

8   got together as a group or my colleagues that are invested in

9   Mexico.  And we said, "You know, we have no return on our

10  money.  We should, you know, file a lawsuit."

11       Q    Yeah, but let me just focus you on calling.  Counsel

12  was asking you is -- you know, "Mr. Murray, you've never

13  called Mr. Jowdy in three years to ask him about this loan?"

14  Remember those questions?

15       A    Yes, yes.

16       Q    Just get your attention on that, okay?  After

17  January of '06 when you testified to the Court that you

18  started to look into this more aggressively, what was the

19  reason why you didn't call Mr. Jowdy directly?

20       A    I did -- you know, I had my business manager.  He

21  was communicating.  Why would I need to communicate with Mr.

22  Jowdy when Mr. Jowdy was communicating with Mr. Kenner?

23       Q    Okay.  Did Mr. Kenner ever tell you at any time,

24  "Hey, Mr. Jowdy is ignoring my calls," in January of '06?

25       A    No.

146

1     Q   Okay.  In January of '06, would it be fair to say

2 that your relationship with Mr. Jowdy was not strained in

3 January of '06?

4     A   It was very --

5    MS. LEE:  Your Honor, this is leading.

6    THE COURT:  You are leading.

7    MR. RICHARDS:  All right, sorry.

8 BY MR. RICHARDS:

9     Q   Was your relationship strained with Mr. Jowdy in

10 January of '06?

11     A   No.

12     Q   Okay.  So, was Mr. Kenner indicating to you at any

13 time in January of '06 that somehow Mr. Jowdy was denying that

14 this was a loan?

15     A   No.

16     Q   At any time, did Mr. Jowdy ever call you and say,

17 "Hey, I want to discuss this loan?"

18     A   No.

19     Q   How did you know that Mr. Jowdy knew that you gave

20 him the money?

21     A   Because my money, the money that came from my

22 Charles Schwab account and from my name went into an escrow,

23 Stewart Title, in his name.  And I would assume it showed

24 where the money came from.

25     Q   Now, showing you Exhibit 124, the August 22nd email,

147

1    did you have any reason to suspect that when Mr. Kenner told

2    you he sent this email that Mr. Jowdy didn't agree with it?

3         A    No.

4         Q    Okay.  If Mr. Kenner had showed you an email from

5    Mr. Jowdy saying, "What are you talking about," would you have

6    handled things differently?

7         A    Yes.

8         Q    Okay.  Did anybody at any time ever tell you that

9    Mr. Jowdy responded to this email saying that there was

10   something wrong with it?

11        A    No.

12        Q    Okay.  When you heard Mr. Jowdy's deposition

13   testimony or when you read or -- I don't know if you were

14   there or not.  I can't remember.  I wasn't there, but when you

15   saw my opening statement when I quoted Mr. Jowdy's explanation

16   of what this email meant, that this email really meant Phil

17   was going to give him the money to pay back to you, did you

18   agree with that position?

19        A    One hundred percent, no.

20        Q    Why not?

21        A    Because I lent -- I didn't lend the money to Mr.

22   Kenner.  I lent the money to Mr. Jowdy.

23        Q    And then when you looked at the emails and you saw

24   that around 12:00 on August 11th, Mr. Jowdy ended up sending

25   this email to Stewart Title after Mr. Kenner said, "As soon as

148

1   he hears from the Muzz."  Was that consistent with what

2   everyone had told you was going on with this transaction?

3        A    Yes.

4        Q    Have you ever seen an email from Mr. Jowdy in three

5   years that -- or prior to filing this lawsuit that denied that

6   you lent him the money?

7        A    No.

8        Q    Has Mr. Jowdy ever written you and said that, "I

9   never lent you this money?"

10       A    No.

11       Q    When was the -- did it come as a surprise to you to

12  hear without hearing a prior denial by Mr. Jowdy that he lent

13  you this money for the first time after he retains Counsel,

14  that all of a sudden, he hasn't agreed to borrow this money?

15  Did that come as a surprise to you?

16       A    Yes.

17       Q    If someone had told you prior to September of '08

18  when you had filed this lawsuit that Mr. Jowdy was now taking

19  the position that this wasn't a loan, would that have

20  accelerated your decision to file a lawsuit?

21       A    Yes.

22       Q    How fast would you predict or would you -- how fast

23  would you have filed the lawsuit if someone told you in

24  January of '06 that Mr. Jowdy was denying this was even a

25  loan?

149

1        A    Right away.

2        Q    Okay.  And why were you hoping that even as of the

3    time of your deposition in this case that Mr. Jowdy would just

4    return your money?  Why were you hoping that?

5        A    Well, I was hoping because, you know, again, we had

6    20 to 22 other colleagues that had a lot of money involved

7    with another entity that I didn't want to disrupt.  And I was

8    -- you know, if it was me, I was hoping he was going to pay

9    the money back.  I was giving him the benefit of the doubt

10   that he was going to pay me back.

11       Q    Okay.  I'm going to direct your attention to the

12   deposition.  The day you came for the deposition, did Mr.

13   Evanson [phonetic] prepare you at all for that deposition?

14       A    No.

15       Q    Was he even there in the morning?

16       A    No.

17       Q    Okay.  And had you even met the -- had you met the

18   lawyer that represented you in that deposition prior to taking

19   the deposition?

20       A    The lawyer that stood in for Mr. Evanson?

21       Q    Yeah.

22       A    No.

23       Q    Never met him before?

24       A    Not until I sat down at the deposition.

25       Q    That was the first time?

150

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Had that lawyer prepped you before the deposition? |
| 3 | A | No. |

4    THE COURT:  You know, you're getting into attorney/client

5    stuff.

6    MS. LEE:  I was going to say that.

7    MR. RICHARDS:  No.  I'm not asking what was said.  I just

8    asked him if he'd ever met him.

9    THE COURT:  Well, prep?  Did he prep you?

10    MR. RICHARDS:  I'll withdraw the question.  Sorry.

11    THE COURT:  Okay.

12    BY MR. RICHARDS:

13    Q    All right.  When you were in your deposition and you

14    heard Counsel say that you never told her -- Ms. Lee said you

15    never told her other reasons why you delayed in filing the

16    lawsuit.  Did she ever specifically ask you the question, are

17    there any other reasons why you didn't file the lawsuit?

18    A    No.

19    Q    That you can remember, that question?

20    A    That, no.

21    Q    And prior to going to trial in this case, did you

22    spend more time thinking about all the issues in this lawsuit?

23    A    Yes.

24    Q    Were you hoping not to go to trial on this case?

25    A    Yes, I was --

151

1    Q    Okay.

2    A    -- hoping not to go to trial.

3    Q    If you had your choice, what would it be?

4    A    To just my -- for my money to be returned.

5    Q    Okay.  And so as the trial got closer, did you spend

6   more time thinking about the various issues?

7    A    Yes.

8    Q    Directing your attention to Mr. Jowdy, the questions

9   about Mr. Jowdy's credit rating.  Why were -- were you

10  concerned about whether Mr. Jowdy had a good Experian report

11  at the time you wired money to Stewart Title account?

12   A    No.

13   Q    Why not?

14   A    Because I knew that he was -- I was lending him

15  money.  It didn't matter.  I mean I was lending him money

16  through -- you know, we had already -- he had already had

17  $500,000 of my money and 20 to 22 other colleagues of $500,000

18  each, so we trusted him as a group.

19   Q    Okay.  Did you wire the money to Mr. Jowdy's

20  personal account?

21   A    No.

22   Q    Okay.  Would you have done that?

23   A    No.

24   Q    All right.  So when you wired the money, what was

25  your expectation if the deal didn't go through?  I think you

152

1    testified to this already, but I just wanted --

2        A    My expectation would be that if the deal didn't go

3    through, it was quite simple.  The money would be wired back

4    into my Charles Schwab account.

5        Q    Okay.  So, were you relying on whether Mr. Jowdy had

6    the ability to pay you back at the time if the deal didn't go

7    through?

8        A    No.

9        Q    Okay.  Now I want to focus if the deal did go

10   through what was your understanding as to where your money

11   would be sitting if the deal went through.

12       A    If the deal went through, my money would be sitting

13   at the Palms in the escrow account and within 30 to 45 days,

14   as I've said before, with a 10 percent interest, it would be

15   returned.

16       Q    Okay.  And you heard in my opening statement and you

17   heard some -- Ms. Lee in her opening statement talking about

18   that people were -- that these deposits were being flipped.

19   Do you understand that concept?

20       A    I think so.

21       Q    That people were selling the deposits.

22       A    Right.

23       Q    Why, if you could testify to, why were you not

24   concerned if this money was sitting in a Palms escrow account

25   if the deal did go through?  Why from a risk standpoint did

153

1    that not concern you?

2         A    Because I would assume that the Palms would

3    absolutely return my money if the deal fell through.

4         Q    But let's say and I'm -- because she was asking you

5    about your evaluation of his creditworthiness.  Let's assume

6    the deal went through.  Why wasn't that a concern of yours if

7    it did go through and the money stayed as a deposit with

8    respect to you getting repaid?

9         A    Well, because then I would assume that I would own

10   these Palms hotel units.

11        Q    Okay.  Did you have any questions -- did you have

12   any conversations with Mr. Kenner that if the deal did go

13   through, and at that time, you know, the market was going up.

14   Did anybody have -- did you have any conversations with him

15   about getting your money returned if the deal did go through?

16        A    If the deal did go through --

17        Q    Yeah.

18        A    -- then I would get my money returned within 30 to

19   45 days.

20        Q    And so is that a different situation than you just

21   basically lending Ken Jowdy money so he can do what he wants

22   with it?

23        A    Yeah, I thought it was a safe -- it was very safe at

24   the time because it's going into a Palms escrow.  It can't be

25   distributed out to other things.  I thought it was it's either

154

1    a no deal or it is a deal and the money stays in there and

2    it's into the Palms, you know, Las Vegas Casino Resort.

3        Q    Okay.  And so not asking you to go through the

4    specific mechanics of this, but is that -- do you understand

5    the difference between that and just basically giving Mr.

6    Jowdy an unsecured loan?

7        A    Yes.

8        Q    You understand that -- why is that a difference in

9    your mind?

10       A    Well, if I just give him -- hand him a check for

11   $791,000, it's he can do with whatever he wants to.  I knew

12   that it goes into an escrow account, it stays there and it

13   can't be distributed out.

14       Q    And do you have an understanding what the term use

15   of funds means, how someone is going to use money that you're

16   giving them?

17       A    No.

18       Q    Did Mr. Kenner explain to you how this money was

19   going to be used and that's why you did the deal?

20       A    Yes, he explained --

21       Q    Okay.  And I just need you to -- just so we're all

22   on the same page.  What was your understanding from Mr. Kenner

23   and from then what you authorized how these funds were going

24   to be used?

25       A    These funds were going to be used for the three

155

1    different separate units at the Palms.

2         Q    Counsel, I just have one more question, I think.

3    Counsel asked you about did you find out all the information

4    about this lawsuit from Mr. Kenner or did you learn all the --

5    her question was did you learn all the facts from the law --

6    about this lawsuit from Mr. Kenner?  Do you remember that

7    question?

8         A    Yes, I remember that question.

9         Q    You said yes.  Is that entirely accurate?

10        A    That is not entirely accurate.

11        Q    Okay.  Can you clarify what you meant by that?

12        A    Well, I -- you know, I hired a lawyer and my lawyer,

13   you, and I went through all the paperwork and all the

14   discovery.  That's all.

15        Q    I'm talking about even before me.  I wasn't the

16   first lawyer on the case, remember?  You had the --

17        A    Oh, no, I remember Mr. Anderson [phonetic] was the

18   other first lawyer and we went through it together.

19        Q    Okay.  After you hired the lawyer, and this is just

20   a yes or no question, did you start to see documents from this

21   case?

22        A    Yes.

23        Q    Okay.  Out of all the documents that you saw in this

24   case, were they consistent with the original understanding

25   that Mr. Kenner told you when you funded this loan?

1    A    Yes.

2    Q    Counsel asked you why didn't you call Mr. Jowdy to

3  get it verbal that he was agreeing to pay you back.  Do you

4  remember that question?

5    A    Yes.

6    Q    Okay.  Why didn't you call Mr. Jowdy to say, "Hey,

7  are you agreeing that you're going to pay me back?"  Why

8  didn't you do that?

9    A    Well, again, through my business manager.  He had

10  already got -- he was already communicating to Mr. Jowdy, so

11  that was my communication through my business manager with Mr.

12  Jowdy.

13    Q    And would it have been usual or unusual for you to

14  pick up the phone and call Mr. Jowdy to reconfirm what your

15  business manager had already told you?

16    A    It would be unusual.

17    Q    Okay.  And when you looked at the emails in this

18  case and all the documents that have been provided by Mr.

19  Jowdy, are they consistent with what your business manager

20  told you?

21    A    Yes.

22    Q    I have nothing further.

23    THE COURT:  Okay.  Just a moment though, Counsel.  I've

24  just got a couple of questions.

25    MR. RICHARDS:  Oh, yeah.

1    THE COURT:  You may want to follow up and then we'll

2    allow Counsel to recross.

3    THE COURT:  First of all, I just want to make sure I

4    understand your relationship with Mr. Kenner.  I'm gathering

5    that you and he had dealings with respect to investments

6    including things that may be dealing with cars and down

7    payments on homes, things of that nature.  Was it also of --

8    like, for example, did he pay your household bills?

9    THE WITNESS:  Not at all.  I was strictly in charge of --

10   you know, I did all our household bills, paid for my own cars,

11   did all my transactions myself.

12   THE COURT:  Okay.  So when he's your business manager,

13   then he deals with your investments and things of that nature?

14   THE WITNESS:  The bigger things, yeah.  Like I mean I

15   didn't need someone to tell me or show me that I needed to

16   write a check for $25,000 for a car or whatever it may be.

17   THE COURT:  But he would be the one to tell you where to

18   get a good deal on a car?

19   THE WITNESS:  Well, he, yeah, if he didn't -- yeah,

20   exactly, yes.

21   THE COURT:  Okay.  Why are you called Muzz?

22   THE WITNESS:  Good question.  I started when I was 18 and

23   just a veteran guy, last name Murray, we're going to call you

24   Muzz.

25   THE COURT:  Okay.

1        THE WITNESS:  It's kind of strange, I know.

2        THE COURT:  All right.  Counsel, I'll let you go ahead

3   and follow up if you have any.

4        MR. RICHARDS:  No, Your Honor.

5        THE COURT:  And then, Counsel, I'll let you recross.

6        MR. RICHARDS:  No, Your Honor.

7        THE COURT:  Okay.

8                      RECROSS-EXAMINATION

9   BY MS. LEE:

10       Q    Mr. Murray, other than those two emails that were

11   placed on the ELMO here before you, did you see any other

12   emails discussing this loan between my client and Mr. Kenner?

13       A    I don't recall.

14       Q    Would you expect there to be some communications

15   between our clients discussing this money if it's true that

16   Mr. Kenner was trying to get this money back from Mr. Jowdy?

17       MR. RICHARDS:  I'm going to -- misstates the client,

18   misstates the testimony and calls for speculation.

19       THE COURT:  Overruled.

20       THE WITNESS:  You're asking me if there was more?

21

22   BY MS. LEE:

23       Q    No, I would say would you expect that if Mr. Kenner

24   was out trying to get your money back from Mr. Jowdy that

25   there would be some written communications between my client

159

1    and Mr. Jowdy --

2         A    Yes.

3         Q    -- doing that?  Have you seen any such

4    communications?

5         A    I don't recall.

6         Q    And then would it make any sense for Mr. Kenner to

7    show you any documents that were inconsistent with what he was

8    telling you?

9         MR. RICHARDS:  Objection, calls for speculation.

10        THE COURT:  It kind of does.  I'm going to sustain that

11   one.

12   BY MS. LEE:

13        Q    And then you testified, I believe and if I heard you

14   correctly, that Mr. Kenner would initiate these contacts for

15   you and initiate these transactions for you, but that you

16   would follow up with a phone call.

17        MR. RICHARDS:  Objection, vague as to contacts and

18   transactions.

19        THE COURT:  Sustained, rephrase.

20   BY MS. LEE:

21        Q    Well, for instance, I think you testified that, at

22   least in your deposition and here today, that he did other

23   things for you, is that correct, Mr. Kenner did other things

24   for you?

25        A    Meaning?

160

1       Q      Did he make investments on your behalf?

2       A      No.

3       Q      Did he introduce you to investment opportunities?

4       A      Yes.

5       Q      And based on those introductions, you invested in a

6   project in Hawaii called Nalove [phonetic] Ventures; did you

7   not?

8       A      Yes.

9       MR. RICHARDS:  Now that I'm going to object outside the

10  scope because I don't -- yeah.

11      THE COURT:  You know something?  We are getting outside

12  the scope.

13      MR. RICHARDS:  Yeah.

14      THE COURT:  I can understand whenever we have direct and

15  then we have cross.

16      MR. RICHARDS:  Right.

17      THE COURT:  But once you get into the redirect and

18  recross, I want to stick to just the scope, so I'm going to

19  sustain that one.

20      [Pause]

21

22  BY MS. LEE:

23      Q   Are there any other specific documents that you've

24  seen in this case or communications or letters that are

25  consistent or support Mr. Kenner's version of the events and

161

```
1    with respect to this transaction?
2         MR. RICHARDS:  Overbroad.
3         THE COURT:  You mean other than what's already been
4    shown?  I'd have to --
5         MS. LEE:  Other than what's already been shown.
6         THE COURT:  Go ahead.
7         THE WITNESS:  No.
8         [Pause]
9         MS. LEE:  I don't have any further questions.
10        THE COURT:  Okay.
11        MS. LEE:  Thank you.
12        THE COURT:  Thank you, sir.  You may step down.  I'll
13   take that.
14        MR. RICHARDS:  I just --
15        THE COURT:   Next witness?
16        MR. RICHARDS:  Can I just get a three minute bathroom
17   break, please?
18        THE COURT:  Yes, Counsel, you can.
19        MR. RICHARDS:  Thanks.
20        THE COURT:  We'll take a break.
21        [Recess]
22        THE MARSHAL:  Come to order. Court is in session.
23        THE COURT:  You may be seated.  Okay, counsel, just an
24   FYI.  I looked at my calendar for tomorrow, and it appears we
25   can start at 10:30 tomorrow.
```

1      MS. LEE:  Okay.

2      THE COURT:  Okay.  If I'm a little bit late on finishing

3   up my calendar, please, just be a little patient with me.  But

4   I'm pretty certain we can start in the morning.

5          So with that said, next witness.

6      MR. RICHARDS:  Thank you.  Plaintiff calls Bob Gaudet.

7   Your Honor, how does he get up there, to the right?

8      MS. LEE:  Oh, I'm sorry.

9      THE COURT:  Okay.  Number one, officer.

10     THE MARSHAL:  Yes, ma'am.

11     THE COURT:  We need to --

12         Mr. Gaudet, if you would just stand right by the

13  podium and face the court clerk.

14     THE CLERK:  Raise your right hand, please.

15         ROBERT GAUDET, PLAINTIFF'S WITNESS, SWORN

16     THE CLERK:  Sir, please state your first and last name.

17  Spell them both for the record.

18     THE WITNESS:  Robert Gaudet.  Did you say spell them?

19     THE CLERK:  Yes, please.

20     THE COURT:  Yes.

21     THE WITNESS:  Robert, R-O-B-E-R-T.  Gaudet is G-A-U-D-E-

22  T.

23                    DIRECT EXAMINATION

24  BY MR. RICHARDS:

25     Q    Thank you.  Thank you for flying in here today,

163

```
1    Mr. Gaudet.

2         A     Pleasure.

3         Q     Can you briefly tell the Court, in the summer of

4    2005, who were you working for?

5         A     Summer of 2005, it was around April that I was hired

6    by Mr. Jowdy, April of '05.

7         Q     And do you see Mr. Jowdy in court today?

8         A     Yes, I do.

9         Q     And where is he?

10        A     Front row, second in.

11        Q     The handsome gentleman in the blue tie?

12        A     Correct.

13   MR. RICHARDS:  Okay.  Let the record reflect he has

14   identified Mr. Jowdy.

15   BY MR. RICHARDS:

16        Q     Now in the summer and fall of 2005, how often did

17   you communicate with Mr. Jowdy?

18        A     Quite frequently.  We initially had met sometime in

19   '04.  It was golf related, development related.  So we had

20   many conversations.

21        Q     What is your -- just as an aside, your background in

22   golf, or occupation in that area?

23        A     I've been a member of the PGA of Canada since 1990.

24   So 16-year resident of Mexico working in that industry, golf

25   and development.
```

1      Q     And where do you presently live?

2      A     Cabo San Lucas, Mexico.

3      Q     All right.  And when you were -- in the summer and

4  fall of 2005, did you only talk to Mr. Jowdy about business?

5      A     In the summer of 2005?

6      Q     Yeah, that's the timeframe I'm going to ask you.  I

7  said -- when I asked you did you communicate with Mr. Jowdy,

8  my next question is did you guys only talk about business?

9      A     No.  We actually had developed a fairly significant

10  friendship.  You know, we'd met again early mid '04.  So we

11  had talked many things, golf, mutual friends, mutual

12  interests, family, you know, including sports.  It's just

13  various topics.

14      Q     And did Mr. Jowdy ever request for you to look for

15  money for a condominium in Las Vegas, Nevada?

16      A     Yes.

17      Q     Okay.  And what condominium was that?

18      A     Palms Place.

19      Q     And when, if you remember, in '05, did he start

20  requesting you to look for money for the Palms Place condos?

21      A     I don't remember exactly, but it would have been

22  early summer or mid-summer of '05.

23      Q     And prior to that, did Mr. Jowdy ever ask you to

24  look for funds before the Palms request?

25      A     Yes, pre to summer of '05, there was an interest in

1  pursuing a project or property in Cabo.  So there were other

2  circumstances of interest for monies.

3       Q    And what was your job title with Mr. Jowdy?

4       A    Director of golf operations and director of sales

5  for Mexico.

6       Q    Why would Mister -- if you know, why did -- you --

7  what was your understanding as to why Mr. Jowdy had you try to

8  look for money for him?

9       A    What was my understanding?

10      Q    Yeah.  Why did -- why would you help him with that?

11      A    Why would I help him?

12      Q    Yeah.  Why was you -- why were you skilled to help

13 him with that?

14      A    You know, we initially had met through Tom Fazio's

15 office.  Tom Fazio is a fairly regarded golf course architect.

16 I was involved with a golf course that he had designed.  So I

17 had a good affiliation with some fairly high net worth

18 individuals, both friends and associates.  I think he was

19 aware that I had some, you know, friends from the region who

20 were involved in other golf developments, real estate

21 developments that carried a fairly significant worth.  So I

22 supposed that'd be the reason.

23      Q    Did you have any wealthy contacts in Cabo?

24      A    Several, yes.  I spent -- '05, I spent, gosh, I'm

25 [indiscernible] time delays.  I was there in 19 -- mid '90s.

```
 1    So I had developed quite a list of significant friends as far
 2    as net worth goes.
 3         Q    Did Jowdy ever tell you that he was able to -- well,
 4    let me strike that.  Did you ever -- let me show you.  If you
 5    could just turn.
 6         MR. RICHARDS:  Does he have an exhibit book up there,
 7    Your Honor?
 8         THE COURT:  Which one do you need?
 9         MR. RICHARDS:  120.
10    BY MR. RICHARDS:
11         Q    I'm going to show you a document.  I just want you
12    to read it to yourself for a minute.  Just turn to 120.
13         A    All right.
14         Q    I'm showing you an email dated August 5th, 2005.  Do
15    you recognize that email account?
16         A    Excuse me.  Yes, I do.
17         Q    Okay.  And it's an email being sent to John Mahoney.
18    Do you -- is that an email account person you know?
19         A    Yes, he's a longtime friend of mine.
20         Q    Okay.  Did you send this email to John Mahoney on
21    August 5th, 2005?
22         A    Yes, I did.
23         MR. RICHARDS:  I'd like to move for the admission of this
24    email.
25         MS. LEE:  I would like to know whether or not it was --
```

167

1    the email as you see it before you has been produced in this

2    litigation.

3         MR. RICHARDS:  Yes.

4         MS. LEE:  I don't know that -- there's two -- just to

5    clarify, Your Honor, there were two versions.  I know what

6    email they're talking about, and there's one that has a little

7    bit more information on it than the one that was produced in

8    this litigation.  And it has an additional dialogue happening

9    at the top of the email string.  That was --

10        THE COURT:  Do you have the exhibit right in front of

11   you?

12        MS. LEE:   I believe it was part of Phil Kenner's --

13        THE COURT:  Well, you should have a set of Plaintiff's

14   exhibits in front of you.  You don't have those?

15        MR. RICHARDS:  She does.

16        MS. LEE:  Oh, of Plaintiff's Exhibits?

17        THE COURT:  Yeah.

18        MS. LEE:  Oh, I'm sorry.  I thought you meant his

19   exhibits.  Yeah, I have -- I know what -- ours are --

20        THE COURT:  Well, look at the exhibit and tell me if you

21   have an objection to it.  I'd like to hear I you have an

22   objection.

23        MS. LEE:  My assistant is getting it for me.  I did -- we

24   were not expecting Mr. Gaudet this afternoon.  I apologize,

25   Your Honor.  We thought --

1        MR. RICHARDS:  He wants to get back to Cabo.

2        MS. LEE:  I know.

3        THE COURT:  I understand.

4        MS. LEE:  I do too.  If you -- some room on the plane

5   with me, that would be great.

6        THE COURT:  But right now, we need to make sure we're on

7   the same page here.

8        MS. LEE:  Because there was one version that was produced

9   in this case and then a subsequent version that was emailed to

10  me by opposing counsel that were marked as Kenner trial

11  exhibits.  And they contained the same emails that were

12  produced.  However, there's an additional --

13       THE COURT:  Do you have the book?

14       MS. LEE:  Yeah.

15       THE COURT:  All right.  I'd like to see -- have you look

16  at that and see if you have an objection to it.

17       [Pause]

18       MR. RICHARDS:  That's why I had to fly him here, because

19  she wouldn't -- it's his email.

20       THE COURT:  I understand.

21       [Counsel Confer]

22       MS. LEE:  It's our exhibit A-83.

23       THE COURT:  Okay.  Counsel, maybe I'm not making myself

24  clear.

25       MS. LEE:  I'm sorry.

169

1     THE COURT:  The exhibit is Plaintiff's Exhibit 120.  I

2     want you to look at Plaintiff's Exhibit 120.  If you have an

3     objection to it, I'd like to hear your objection, because then

4     I'll rule on the admissibility of it.

5     [Counsel Confer]

6     MS. LEE:  This document that I'm looking at in here, Your

7     Honor, has not been produced in this litigation.

8     MR. RICHARDS:  How do you know?

9     MS. LEE:  Because all of your emails from Mr. Gaudet are

10    -- the complete universe of document that reference Mr. Gaudet

11    are within the first GM-1 through GM-19 that you guys

12    produced.  There's no other document -- emails from Mr. Gaudet

13    throughout your productions.

14    MR. RICHARDS:  So what are you saying, they start here?

15    MS. LEE:  They start wherever you guys produced them?

16    MR. GOODMAN:  Are you talking about the ones with the GM

17    designation?

18    MS. LEE:  Yes.  They start at GM-05.

19    THE COURT:  Is this something that we should take a break

20    and let you talk for a few minutes?  Okay.  We'll take about a

21    five-minute break.

22    MR. RICHARDS:  All right.

23    [Recess]

24    THE MARSHAL:  Come to order.  Court is back in session.

25    THE COURT:  Sir, you may have a seat.  And I just want to

1    remind you, you've been sworn.

2         THE WITNESS:  Thank you.

3         THE COURT:  Okay.  All right, counsel.  Have we resolved

4    the issue with Exhibit 120?

5         MR. RICHARDS:  Yes, for --

6         THE COURT:  And?

7         MR. RICHARDS:  For now.  I just wanted to tell the Court

8    that Mr. Kenner had given us some emails which were produced

9    late by Mr. Goodman's office.  So I'll just deal with that

10   issue later.  But I just wanted the Court to know that that's

11   what the -- that's mechanically what transpired.  Mr. Kenner

12   gave them to us.  We then produced them to the Defendants.

13         So it may be a moot point.  We still may argue that

14   they should come in if it's necessary, but there is other

15   emails we agree were timely produced by Mr. Murray's counsel

16   that cover the same subject matter.  So --

17         THE COURT:  Okay.  So why don't we go ahead and go

18   through those.

19         MR. RICHARDS:  Yeah.

20         THE COURT:  So --

21         MR. RICHARDS:  I'm just trying to explain to the Court we

22   weren't like hiding.  You know, we were --

23         THE COURT:  I understand.

24         MR. RICHARDS:  We got them from Mr. Kenner as pro per.

25   We turned them over.  I believe Mr. Goodman did a few weeks

171

1    ago when they did this conference.  Okay.

2         THE COURT:  Okay.  Let's -- okay.  So you're withdrawing

3    right now Exhibit 120?

4         MR. RICHARDS:  I'm not going to try to admit it right

5    now.  That's correct.

6         THE COURT:  Okay.

7                    DIRECT EXAMINATION CONTINUED

8    BY MR. RICHARDS:

9         Q    Mr. Gaudet, why don't you go to Exhibit 122 first?

10   Let's try -- start with that.  I'm going to show you an email

11   dated August 9th, 2005, at 9:45 in the morning.  You see that?

12        A    Yes, I do.

13        Q    Okay.  It's --

14        A    August 9th, 9:45, yes.

15        Q    Who -- is that an -- is your email account

16   BGaudet01@yahoo.com?

17        A    Yes, it is.

18        Q    Okay.  And did you send an email to John Mahoney on

19   that date?

20        A    Yes, I did.

21        Q    Okay.  Who is John Mahoney?

22        A    John Mahoney is a longtime friend of mine, pretty

23   good net worth himself, and has a network of people.  He's

24   been an independent insurance man for a bunch of years, sold

25   his business, et cetera, several times.  And I went to him on

172

1    one account to see if he could either be a contributor or if

2    he knew of any of his other friends that might want to be a

3    contributor, as Jowdy was looking for, specifically, $800,000

4    with a 30-day repayment of $80,000.

5         Q    Okay.  And what was the 80,000 for?  Was that a

6    percentage of the principal?

7         A    Percentage of the principal.

8         Q    What percentage was that?

9         A    It would be 10 percent.

10        Q    All right.  And was this August 9th email related to

11   those efforts to get him that loan?

12        A    Yes, it was.

13        Q    Okay.

14   MR. RICHARDS:  I'd like to move for admission of 122.

15   MS. LEE:  No objection, Your Honor.

16   THE COURT:  Okay.  It's admitted.

17   [Plaintiff's Exhibit 122 Received]

18   THE COURT:  You can go ahead and show it.

19   MR. RICHARDS:  Thank you.

20   BY MR. RICHARDS:

21        Q    All right.  I'm going to show you the email on the

22   screen.  It says:  John, I've spoke with Hubba.  He is working

23   on contacting his hard lender, Mr. Black.  Hopefully, he will

24   get a return call soon.  Thanks, Bob.

25             All right.  Why were you -- what was the -- what

173

does this email mean with respect to hard lender?

A     That was a -- the initial communication was to John Mahoney.  And then John had reached out to a Vegas friend of his, which was Bill Mazenkas, which his nickname is Hubba. Bill said he had known or has knowledge of a few people that might be interested in lending money, short-term, hard, et cetera, as some early contacts weren't really interested in doing anything on a 30, 40, 50, 60-day time period, no matter what the interest was.

Q     Okay.

A     So Bill had -- Hubba had reached out to a Mr. Bart. He's Canadian, as my friend, John Mahoney, is Canadian.  So he thought that was a better relationship, because John, I think, wanted to share in the negotiation of creating a loan.

Q     All right.  Let's look at the second page of this exhibit.

THE COURT:  Okay.  Well, just -- who is Mr. Black?

THE WITNESS:  I've never met him.  He's a friend of Hubba from this --

THE COURT:  Okay.

THE WITNESS:  -- particular email.

MR. RICHARDS:  Okay.

THE WITNESS:  He is the person that was represented as the person that does hard money lending.

THE COURT:  Okay.  And then Mr. Bart?

174

1        THE WITNESS:  Black Bart is what he nicknamed himself.

2        THE COURT:  Oh, so John is also -- John Mahoney is known

3    as Black Bart?

4        THE WITNESS:  John Mahoney was the first person I

5    communicated to.  John Mahoney communicated to Hubba.  And

6    then Hubba communicated to Black Bart.  That was the train of

7    communication.

8        THE COURT:  Okay.

9        THE WITNESS:  Yeah.  John Mahoney is one name only.

10   Hubba and Bill -- I'll refer to him in his first name.  But

11   Hubba is the second person.  And Hubba is the person that knew

12   Black Bart.

13       THE COURT:  Got it.

14       THE WITNESS:  Does that make sense?

15       THE COURT:  I got it.

16       THE WITNESS:  Good.

17       THE COURT:  Okay.

18   BY MR. RICHARDS:

19       Q    All right.  The email says:  Hi, John.  Black Bart

20   charges somewhere around 12 points and five points up front.

21   If you like, have your friend give me a call, and I'll keep

22   looking around.  Hubba.

23            Who is Hubba, if you know, referring to when he said

24   your friend?

25       A    He would be referring to me.  John didn't disclose

175

1    that he was necessarily -- I know Hubba as well.  He used to

2    live in Cabo.  But John wasn't referring to Hubba -- or pardon

3    me.  John was not disclosing to Hubba that he was actually

4    helping me at the time.  He did later, because I spoke with

5    Hubba, which you'll see by email.

6        Q    You look at the next part of the string, from John

7    Mahoney to W-M Hubba Mazenkas?

8        A    That's about as good as I could do as well.

9        Q    Okay.  It says this fellow is a resident of Las

10   Vegas and very rich.  Just needs interim financing.  Okay.

11   Who, if you know, is John referring to?

12       A    John is referring to Ken Jowdy.

13       Q    Okay.  And that's the resident of Vegas that's very

14   rich?

15       A    That's correct.

16       Q    That needs interim financing?

17       A    Apparently, correct, yes.

18       Q    Okay.  What was your understanding from Ken Jowdy as

19   to why he needed interim financing?

20       A    Well, related to this seek of funds in August, it

21   was just for the Palms, you know.  On some other emails, he

22   had --

23       Q    Just this email.

24       A    Well, I think part of this email stream he had

25   included some of his personal information, some information on

176

1    the Palms units, photos, et cetera, just to keep the reason

2    behind getting the money. It was specifically for the Palms.

3        Q    Okay. The last page of this exhibit, it says: Hi,

4    John. I checked with my friend and lender, Ken Casten.

5    Firstly, he can't think of any lender who lends money for only

6    30 days. Also, as a non-resident, it would be very difficult

7    for you to get involved in the process. Do you see that?

8        A    Yes, I do.

9        Q    Okay. And what was your understanding of what Hubba

10   was referring to?

11       A    I don't recall on that one. That was communication

12   between John and Hubba, but it looks like that is just another

13   person he's looking to get short term money, 30-day money

14   under those terms that Ken offered. You know, 10 percent, 30

15   days.

16       MS. LEE:  Your Honor, I would object as a competence. He

17   wasn't a part of -- directly on this email stream.

18       THE COURT:  I understand. He's just going by his

19   personal understanding. So I'm going to overrule.

20   BY MR. RICHARDS:

21       Q    Was your assignment from -- was your directive from

22   Mr. Jowdy just to try to find him money for the short term

23   loan?

24       A    He --

25       MS. LEE:  Leading.

177

1          MR. RICHARDS:  I'm sorry.

2          THE COURT:  I'm going to overrule.

3               Go ahead.

4          THE WITNESS:  Just repeat the question.  Pardon me.

5    BY MR. RICHARDS:

6          Q    Was your assignment from Mister -- directive from

7    Mr. Jowdy to try to find him this short term loan?

8          A    Yes.  He was very interested in me helping him first

9    short term money, in August, specifically for the Palms units.

10   You know, he'd expressed a great interest in eventually

11   residing there and us utilizing it as business, you know,

12   hospitality, you know, personal visits, whatever it might be,

13   as there was multi-units involved.  So, you know, there was a

14   strong interest in getting this done.

15         Q    Okay.

16         A    You know, he showed picture references many times.

17         Q    On August 4, 2005, did you send an email to Byron

18   Hill?

19         A    Yes.

20         Q    Okay.  And what did you ask Byron Hill in the email?

21         A    Quite similar to what I'd asked John.  I had shared

22   with Byron, who was a big -- he was a developer in Cabo.  He's

23   also Canadian, a Canadian friend of mine.  Same thing.

24   Looking for $800,000, will pay $80 -- will pay $80,000 return,

25   10 percent interest after 30 days.  And again, I had forwarded

178

```
 1    Byron Hill all the emails that Ken had forwarded to me, which
 2    was specifically for the Palms units.  So it showed photos,
 3    and I think it even showed the units that the interest was in.
 4         Q    Can you take a look at Exhibit 121, please?  Just
 5    look at it for yourself.
 6         A    Okay, 121, first page.
 7         Q    Yeah.  Did Mr. Jowdy ever send you a link to the
 8    Palms Place web site for you to show people?
 9         A    Yes.
10         Q    And what was your understanding as to what you were
11    supposed to do with that link?
12         A    I -- my understanding was that it would help the
13    person to realize what the short term money was to go towards.
14    It wasn't just going to a personal -- well, a personal effect,
15    yes.  But it was just showing the end result of where the
16    money was going.
17         Q    You mean the use of funds?
18         A    Use of funds, thank you.
19         Q    Was that a talking point that Mr. Jowdy wanted you
20    to convey that the funds were going to be used for this
21    purpose?
22         A    Yes.
23         Q    All right.  And did you ever send an email to John
24    Mahoney outlining the terms of this deal on August 5th, 2005?
25         A    Emails and voice, yes.
```

179

```
 1        Q     Okay.  And what terms did you offer John Mahoney?

 2        A     Identical, the 10 percent, 30-day stuff.

 3        Q     Okay.  So at least from the emails that I've seen

 4   and from your testimony, how many people would you say you

 5   pitched this proposal for Mr. Jowdy to?

 6        A     Initially, I had reached out to, you know, possibly

 7   upwards of 20 persons.  And then I had second level

 8   communications with the John, the Hubba, the Byron, and Wayne

 9   McClay [phonetic].  There was probably about six to eight -- I

10   don't recall exactly -- persons that I had second level

11   conversations.

12              They had requested more information, you know,

13   wanted to know more background on Jowdy, little things like

14   that.  Tried to help him with that.  Never was able to secure,

15   you know, a short term deal for him.

16        Q     Okay.  If you could turn to Exhibit 131.  Did

17   Mr. Jowdy ever give you a letter to send to Wayne?

18        A     Yes, Wayne was one of the outreaches that John

19   Mahoney had gotten to.

20        Q     And in the letter, did you ever put any talking

21   points about Mr. Jowdy's assets?

22        A     We had spoken.  I had spoken with Mr. Jowdy about

23   the assets, and that was just a letter that showed or

24   confirmed what we spoke of, as I had -- I think I might have

25   even requested something that I could -- yeah, I did.  I
```

1    requested something that I could forward off to Wayne, as he

2    wanted more information, more support to why he was lending

3    money.

4         Q    Did Mr. Jowdy ever tell you why he wanted to get

5    this short term loan so badly with respect to this Palms deal?

6    Did he ever tell you what was his motivation, if you can

7    remember?

8         A    Yeah.  Well, his motivation, first off, would be the

9    extreme interest in acquiring the units.

10        Q    Did he tell you he was going to make or lose money

11   on the units?

12        A    No, it was definitely going to be a profitable

13   situation in the future.  I don't know the terms or the

14   mentality behind when that was going to be profitable, if it

15   was going to be utilized and then sold at a future date.  I

16   don't know those specifics.  But I just know there's a high

17   level of excitement about acquiring those units.

18        Q    Okay.  Do you see Phil Kenner in this room?

19        A    Yes, I do.

20        Q    Where is he?

21        A    In the third row, second row.  Yes.

22        Q    In August of '05, did you know Phil Kenner?

23        A    Not in August of '05, no.

24        Q    And at some point, did Mr. Jowdy tell you that he

25   didn't need you to work on this loan anymore?

181

1       A    I don't recall there ever being an absolute stop to

2    seek.

3       Q    Did he ever tell you he got funding from a guy named

4    Glen Murray?

5       A    I know Glen Murray's name had come up on a few

6    occasions.  I'm just trying to recall.  Because on one of the

7    emails that I had received from Jowdy, it was showing that

8    there was deposits in place.  But I don't know specifically if

9    it was deposits in place or those were the deposits that were

10   required.  So I can't speak on that.  But I know Mr. Murray's

11   name came up.  I know there was monies that Murray had passed.

12   But the channeling and how the mechanics of that was, I really

13   wouldn't know specifically.  But I know he was a part of it,

14   and there was some pressure for repayment.  But again,

15   specifically, it would be hard for me to.

16      Q    Did you ever have a conversation with Mr. Jowdy

17   about Murray wanting to get repaid around August -- or around

18   the time you were working for him in August of '05?

19      A    You know, again, I know Murray's name was always in

20   a -- not always.  Murray's name was in conversation.  But

21   specifically him -- Ken saying that I need to get Murray's

22   money back, I can't say that for sure.  But I know he was in

23   the mix.

24      Q    Did Mr. Jowdy ever tell you how he got funding for

25   the Palms deposit?

182

1     A     That, quite possibly, is where I'm kind of having a

2     hard time coming up with the history of it, is -- you know, I

3     just made mention that I wasn't sure if the deposits were

4     already in place or if they were required, and then was it Mr.

5     Murray that had already contributed and was looking for

6     repayment.  I just know that those multiple issues were on the

7     table.

8     Q     But would there have been another way for you to

9     hear about the name Glen Murray other than Mr. Jowdy at that

10    point, in August of '05?

11    A     TSN Sports.

12    Q     No, no.  Besides he's a hockey -- I'm talking about

13    Mr. Murray and Mr. Jowdy having any business together with

14    respect to these Palms Place deposits.

15    A     That would be the only one that would be reasonable.

16    Q     I know it was five years ago.  But anyway --

17    A     Yeah, sorry.

18    Q     -- thank you very much for flying up here.  I

19    appreciate it.

20    THE COURT:  Cross.

21    MR. RICHARDS:  Yeah, pass.

22    MS. LEE:  Thank you, Your Honor.

23                         CROSS-EXAMINATION

24    BY MS. LEE:

25    Q     Good afternoon, Mr. Gaudet.

1      A      Hello.

2      Q      My name is Patricia Lee, and I represent Mr. Jowdy

3  in this action.  And I'll just be asking you a few questions

4  here.  Were there any emails -- you know, we went through some

5  emails here between you and Mr. Mahoney and Hubba Mazenkas,

6  and all these other people.  Were there any emails between my

7  client and yourself where you're keeping him apprised of all

8  of these funding efforts?

9      A      Yeah, he had -- Ken had sent me several emails with

10  information.  As I continued to reach out to different people,

11  most of these people were always requesting more information,

12  whether it be background of Mr. Jowdy or tell me again what

13  this money is going towards.  You know, so there was always,

14  you know, a circle -- a recircling of hey, we need to talk,

15  you know.  As the effort got more challenging, then the

16  communications became more active.

17      Q      And so, in terms of the emails that have been

18  produced in this case, did you give those emails to Mr. Kenner

19  for the purposes of producing them in this case?

20      A      Yes.

21      Q      But you did not give Mr. Kenner any emails between

22  yourself and my client directly --

23      A      I gave every --

24      Q      -- discussing -- I'm sorry.  And let me just finish

25  the question -- discussing this loan, did you?

184

1       A    I didn't keep a file of all of our communications.

2    However, when this became an issue, I did do -- I was

3    searching for any document that I could find related.  And

4    those were the documents that I found.

5       Q    The ones that you've seen here today?

6       A    That's correct.

7       Q    So even though you had massive communications with

8    my client regarding this loan, you couldn't find those

9    documents?

10      A    If I went back, I might be able to find more.  But,

11   you know, the history channels only show so many messages.

12   Those are all I could find.  And many of our communications

13   were, in fact, in voice.  So, you know, if you want me to --

14      Q    But I'm just focusing on the written communication.

15      A    On the written?

16      Q    So --

17      A    Because I could speak expansively on some of our

18   voice communications if you have a need.

19      Q    No, I'm just -- I'm talking about written right now.

20      A    Okay.

21      Q    Around August of 2005, when you're trying to find

22   this financing --

23      A    Yes.

24      Q    Your testimony through the direct was that there

25   were a lot of communications between you and Mr. Jowdy

185

1    discussing this through email.

2         A    Yes.

3         Q    And although you were able to find the emails that

4    you saw here today and produce them through Mr. Kenner, you

5    were not able to find one single email between yourself and

6    Mr. Jowdy discussing this loan?

7         A    I think if you looked at the email headers, I think

8    you may find that some of them were originated from Mr. Jowdy,

9    which, to me, makes communication between me and Jowdy.  The

10   reason why I got -- on one of the emails where I got his net

11   worth statement, the Palms Place email address, you know, if

12   you find one of the headers, it'll show as an attachment

13   multiple messages from Mr. Jowdy.  And then included in this

14   Wayne letter is an attachment to a communication that Jowdy

15   initiated with myself.  So yes, there's many of them.  And

16   again, a lot of the single emails would, in turn, become voice

17   conversations.  So one email could be, you know, hundreds of

18   hours of voice afterwards.  So --

19        Q    Mr. Gaudet, I'm going to show you the emails that

20   you were just shown today, or at least as they were produced

21   in this litigation by us -- or by opposing party here.

22        THE COURT:  Has that been admitted?

23        MS. LEE:  It should be the same exact one.

24        MR. RICHARDS:  You want to just show it to me?

25        MS. LEE:  Sure, I'll just show it to you.

186

1        [Counsel Confer]

2        MS. LEE:  All right, Your Honor.  Apparently, they have a

3    little bit of a different version.  This is actually the

4    version that was produced by them in litigation.

5        THE COURT:  Well, I understand.  What exhibit are you

6    offering?  And then it's -- I've got something on my screen.

7    We need to turn it off until you admit it, unless it's

8    stipulated for admission.

9        MR. RICHARDS:   I stipulate for admission.

10       THE COURT:  Which exhibit is it?

11       MS. LEE:  It would be our --

12       [Counsel Confer]

13       THE COURT:  Okay, counsel, one thing I would recommend

14   before we start tomorrow.  Get together.  Tell me the list of

15   all the stipulated exhibits.  We will be done no later than

16   noon on Friday.  I am going to warn you about that, because we

17   are just going at a snail's pace.  And it's because we're not

18   getting together to stipulate to exhibits, and we're going

19   through this.  But A-83 is stipulated to, is that what I

20   understand?

21       MS. LEE:  Well, the entire exhibit contains, actually,

22   all of their produced documents.  I am specifically just

23   referring to GM-05 through 07.

24       THE COURT:  Okay.  Well, we're not admitting part of an

25   exhibit unless we have -- are going to call it a different

187

```
1    exhibit.  You want to call it the next one in order, A-93?
2         MS. LEE:  If I could, Your Honor.
3         THE COURT:  Okay.
4         MS. LEE:  So GM-05 through GM-07 within that exhibit.
5         THE COURT:  Any problem with that?
6         MR. RICHARDS:  No.
7         THE COURT:  Okay.  Let's go ahead and admit what was
8    going to be Bates Number, what, 05 through 07 of A-83 as A-93.
9    And that will be admitted.
10        [Defendant's Exhibit A-93 Received]
11        THE COURT:  Okay.  Let's go ahead.
12        MR. RICHARDS:  Maybe I misheard.  I thought we were just
13   going to admit the whole exhibit.  If we're not -- I'm not
14   going to -- under the rule of completeness, I want to admit
15   the whole exhibit.  I thought --
16        THE COURT:  I understand, but she only wanted to admit
17   part.  You said it's okay.
18        MR. RICHARDS:  I'm sorry.  I misunderstood.  I thought
19   you said you wanted me to just -- I'm not objecting, like I
20   said, to the whole exhibit.  I don't know why we'd only admit
21   a portion of it.  It makes --
22        THE COURT:  Because that's all she wants to admit.  Now
23   you can move to admit the rest of it later if you want, or we
24   can get together and stipulate to exhibits, which I wanted you
25   to do yesterday before we started trial.
```

188

```
 1       MR. RICHARDS:  Your Honor, just to be clear, I just want
 2   you to understand this.  We -- I don't even have an exhibit
 3   book from them.  They never gave me one.  Otherwise, I would
 4   have done that yesterday.  And I still don't have one even
 5   today.
 6       THE COURT:  Well, you're going to get one after work,
 7   aren't we?
 8       MR. RICHARDS:  Yes.
 9       MS. LEE:  And we don't have an exhibit for them, either
10   of --
11       THE COURT:  Well, you better make one available, counsel,
12   because I want you all to agree or disagree about what
13   exhibits are going to be admitted.  Otherwise, we're going to
14   spend a lot of time -- I've got seven books here from the
15   defense.  I've got two large books from the Plaintiff.  And
16   we're going to spend an awful lot of time admitting exhibits
17   in and going through the foundational process when we may not
18   need to.
19       MS. LEE:  I agree, Your Honor.  I apologize for that.
20       THE COURT:  And we will be done by noon on Friday.
21       MS. LEE:  Okay.  Thank you, Your Honor.
22       [Counsel Confer]
23       THE COURT:  Go ahead and lay the foundation for Exhibit
24   A-93.
25       MS. LEE:  I don't believe he has my binder up there, Your
```

```
 1    Honor.  So he wouldn't be able to --
 2         THE COURT:  Okay.  Well, you can go ahead and let's get
 3    him -- which binder is it?
 4         MS. LEE:  It would be the --
 5         [Counsel Confer]
 6         MS. LEE:  A-83, okay.
 7         THE COURT:  And it's 05 through --
 8         MS. LEE:  Yes, Your Honor.
 9         THE COURT:  -- 07.
10         MS. LEE:  But they're in chronological order and Bate
11    Stamps.
12         THE COURT:  Okay.  There you go.
13    BY MS. LEE:
14         Q    Mr. Gaudet, could you take a look at this email?
15         A    Okay.
16         Q    Is this the same email, in sum and substance, that
17    you just went through with counsel, with the exception of some
18    forwarding information on top?
19         A    Yeah, it appears to be.  Yes.
20         MS. LEE:  I'd move to admit it at this time, Your Honor.
21    It was produced by them.
22         THE COURT:  Okay.  And it's Exhibit 122?
23         MS. LEE:  Their --
24         THE COURT:  Whenever you were talking about the same
25    email, is that --
```

| | |
|---|---|
| 1 | MS. LEE:  Oh, right. |
| 2 | THE COURT:  -- 122? |
| 3 | MS. LEE:  I believe that was their 122, Your Honor. |
| 4 | THE COURT:  Counsel, your objection? |
| 5 | [Counsel Confer] |
| 6 | MR. RICHARDS:  I have no objection to -- no objection. |
| 7 | THE COURT:  Okay.  Exhibit A -- Defense Exhibit A-94 or |
| 8 | 93? |
| 9 | MS. LEE:  93. |
| 10 | THE COURT:  93 is admitted. |
| 11 | Okay.  You can go ahead and put it up on the screen, |
| 12 | so I can see it. |
| 13 | And, Ms. Recorder. |
| 14 | THE COURT RECORDER:  Yes. |
| 15 | THE COURT:  Thank you. |
| 16 | THE COURT RECORDER:  Uh-huh. |
| 17 | BY MS. LEE: |
| 18 | Q     Now you said that if we looked at this email, we |
| 19 | might see a forward from Mr. Jowdy to someone else, where his |
| 20 | name is actually on it, or a forward from you to Mr. Jowdy. |
| 21 | Do you see anywhere on here where this email was forwarded to |
| 22 | Mr. Jowdy at all? |
| 23 | A     Yeah, I didn't say specifically this email, but -- |
| 24 | so for that reason, I don't see it on there. |
| 25 | Q     Were there any emails that you saw today that |

191

```
1   were -- that show --
2        THE COURT:  Counsel, you can't --
3        MS. LEE:  Oh, I'm sorry.
4        THE COURT:  -- flip it on and off, and --
5        MS. LEE:  I'm sorry.  Yes, I apologize, Your Honor.
6        THE COURT:  Since I'm the fact finder, I've got to see
7   where you're going --
8        MS. LEE:  Yes, absolutely.
9        THE COURT:  -- and all that.
10       MS. LEE:  I'm sorry, Your Honor.
11       THE COURT:  Okay.  So this is forwarded from -- the John
12  Mahoney email was forwarded up here?  I mean I'm just trying
13  to understand where you're going.
14       MS. LEE:  Yes, Your Honor.  If you look -- and I guess
15  the witness can testify.
16  BY MS. LEE:
17       Q    Where does the email string start where you are
18  speaking with Mr. Mahoney on this exhibit, '05?
19       A    That was a question to me?
20       Q    Yes.
21       A    August 9th, 2005, where it starts there, to John
22  Mahoney from Bob Gaudet.
23       Q    Okay.
24       A    Regarding loan.
25       Q    And then right above that, do you have an
```

192

```
 1    understanding as to what that -- that's discussing the email
 2    right above it, from --
 3         A    Do you want make --
 4         Q    -- Phil Kenner to Bob Gaudet?
 5         A    Yeah.  From Bob -- Phil to Bob.  I can assume what
 6    it is.
 7         Q    Well, it's to you, correct?
 8         A    It's to me from Phil Kenner, yes.
 9         Q    Right.  Do you recall receiving this?
10         A    I don't recall specifically, but it -- by virtue of
11    the email, it looks like I did.
12         Q    Okay.  But nowhere on this document or the document
13    that we've reviewed today is there anything being forwarded to
14    my client.
15         A    Not on this document here, no.
16         Q    And in fact, the other document that you testified
17    to, the other email that you were shown -- because you were
18    only shown two emails; is that correct?
19         A    Only two emails, yes.
20         Q    And the second email that you reviewed also didn't
21    have any forwarding information either to Mr. Jowdy, did it?
22         A    Right.  But I think I made it clear that all the
23    information I did receive to allow me to go out there and seek
24    $800,000, 10 percent, 30-days wasn't something that I came up
25    with.  It was something that was requested by me -- or by
```

193

```
 1    Jowdy for me to go out and seek.  And --
 2         Q    Isn't it true that --
 3         A    -- his instructions were very specific.
 4         Q    Isn't it that you did know Mr. Kenner at the time
 5    that this transaction was happening?
 6         A    On what level would you be asking?
 7         Q    On any level.  Did you know Mr. Kenner at all?  I
 8    believe you testified that you didn't know him.
 9         A    Correct.
10         Q    So I'm just trying to explore that.  Did you know
11    Mr. Kenner at the time that these emails were going through?
12    And that's around August of 2005.
13         A    In August -- when I was seeking funds for Jowdy to
14    purpose the Palms or to repay somebody for the palms, and as
15    we found out, it's Mr. Murray -- you know, if I give you when
16    I might have met Mr. Kenner -- you know, I really never knew
17    him to any level as far as what his involvement was with Jowdy
18    and/or anybody else in our movements until 2006.
19         Q    I'm sorry.  The question is did you know him in
20    August of 2005.
21         A    So I'm trying to create an understanding of how I
22    know him.  And --
23         Q    Did you know him?  In August of 2005, did you know
24    Mr. Kenner?
25         A    I did not know him in August of 2005. I knew him
```

194

1  once the project in Coba San Lucas closed, which was in '06.

2       Q    So prior --

3       A    Previous to that --

4       Q    I'm sorry.

5       A    -- I might have been in a baseball stadium or some

6  stadium, not knowingly, but I never knew what his -- even when

7  the project closed, I wasn't even certain that his involvement

8  in the project was anything specific.  So it was a lot of gray

9  areas in the early stages, and I don't know specifically who

10 he was.

11      Q    You don't --

12      A    So again, I'll just repeat.  I -- right now, I'm

13 sitting here saying no, I did not know him in 2005.

14      Q    Well, that is a very long answer, Mr. Gaudet.  Did

15 you not work with Mister --

16      A    Would you like me to repeat it?

17      Q    No, not at all.

18      A    Okay, good.

19      THE COURT:  Okay.  Mr. Gaudet, another problem we're

20 having, you're starting to talk over the lawyer.  Understand,

21 the court reporter is very good, but she can't take you both

22 down at the same time.

23      THE WITNESS:  Thank you.

24      THE COURT:  All right, counsel.

25      MS. LEE:  Yes.

195

BY MS. LEE:

    Q    Isn't it true that you were working down at Diamante Cabo San Lucas in August of 2005?

    A    In August of 2005, yes.

    Q    And isn't it true that Mr. Kenner was also working down at Diamante Cabo San Lucas in August of 2005?

    A    Not when I was working there.

    Q    So we should not see any email communications between yourself and Mr. Kenner prior to 2006.  Is that your testimony, because you did not know him?

    A    I did not know him.  I didn't have any communications with him.

    Q    So my question is we shouldn't see any email communications between yourself and Mr. Kenner for any reason between -- until 2006 and after.  Is that --

    A    To the best of my knowledge, yes.  I don't -- I was trying to -- the reason why my comments went deeper than what you obviously requested is I was trying to determine when I might have had a stronger meeting with him which would say I knew him at a specific time period.  Right now, I sit here and say until 2006, when the property closed, Diamante Cabo San Lucas, that's my triggering mechanism to say that's when I knew Mr. Kenner.

    Q    Did you ever sign as a witness on Mr. Kenner's behalf for a revolving line of credit at any time?

196

```
 1        A    Yes, I did.

 2        MR. RICHARDS:  Withdrawn.

 3        THE WITNESS:  Yes, I did.

 4  BY MS. LEE:

 5        Q    And when did you sign that agreement?

 6        A    I don't recall, but it was at a party, an event.

 7        MS. LEE:  May I approach the witness, Your Honor?

 8        MR. RICHARDS:  Now I'm just going to object as to

 9  relevance and an offer of proof.  Is this after the loan or --

10        MS. LEE:  This is going to establish that Mister --

11        THE COURT:  I'm going to -- go ahead and lay a little

12  foundation.

13        MS. LEE:  Sure.

14        THE COURT:  Okay.

15  BY MS. LEE:

16        Q    But this revolving line of credit, you don't know

17  what year you signed as a witness for Mr. Kenner on this

18  revolving line of credit?

19        A    I don't recall when it was.

20        Q    Can you turn in your exhibit binder to Tab A-83?

21        MS. LEE:  Does he have our binder?

22        THE COURT:  No, he doesn't.

23        MS. LEE:  I'm sorry.

24        THE COURT:  I took the one exhibit out.

25        MS. LEE:  I apologize.
```

1          THE COURT:  Okay.  Is it the same?

2          MS. LEE:  A-83.  Yeah, the same binder.

3          THE COURT:  Okay.  And it's --

4          MS. LEE:  I'm sorry, no.  A-83, I'm not sure which binder

5     that particular exhibit is in.

6          THE COURT:  A-83 is in this binder.

7          MS. LEE:  Oh, it is.  Okay.

8          THE COURT:  Okay.

9          MS. LEE:  That's the.

10         THE COURT:  There you go.

11         THE WITNESS:  Uh-huh.

12         MS. LEE:  I'm sorry, Your Honor.  It's A-89, volume

13    seven.  I was -- I confused myself.

14         THE COURT:  Why don't you go ahead and give that back to

15    me?  Thanks.

16    BY MS. LEE:

17         Q    If you could turn to Exhibit A-89.  Are you there?

18         A    I am here, yes.

19         Q    Can you turn to the second page of that exhibit,

20    please?

21         A    Yes.

22         Q    Is that your signature there as witness?

23         A    Yes, it is.

24         Q    Do you recall signing this?

25         A    I do.

1      Q    Can you look at the first pages of that document?

2      A    Yes

3      Q    And can you tell the Court what date this document

4    was entered into?

5      A    12/7/2004.

6      MS. LEE:  Your Honor, I'd like to move to admit this

7    exhibit.  He's authenticated his signature on it.

8      MR. RICHARDS:  No objection.

9      THE COURT:  Okay.  It's admitted.

10     [Defendant's Exhibit A-89 Received]

11     THE CLERK:  Your Honor, was that A-89?

12     THE COURT:  A-8-9.

13     THE CLERK:  Thank you.

14   BY MS. LEE:

15     Q    So this revolving line of credit -- and I'm not

16   asking you to testify as to its contents.  But that's your

17   signature on this revolving line of credit, as a witness for

18   Phil Kenner; is that right?

19     A    I witnessed two signatures.  And the person that I

20   knew was Ken Jowdy.  I was just asked to witness two

21   signatures.  So --

22     Q    So Mr. Jowdy facilitated your signature on this

23   document; is that what you're saying?

24     A    I'm sorry?

25     Q    Mr. Jowdy facilitated your signature on this

199

1    personal line of credit?  Is that --

2        A    He requested for me to witness, yes.

3        Q    Did you actually sit down and witness it?  Did you

4    sit there and look at Mr. Kenner while he was signing this

5    document?

6        A    I witnessed two signatures, correct.

7        Q    But when you say witness, what does that mean to

8    you?

9        A    I watched two signatures.

10       Q    So you watched Mr. Kenner sign this document?

11       A    Correct.

12       Q    And on the first page, that was back in December of

13   2004, correct?

14       A    That is correct.

15       Q    So you had met Mr. Kenner at least by December of

16   2004?

17       A    Maybe I didn't explain myself clearly when I was

18   speaking.  There was several occasions that I would have met

19   through different time zones, but I didn't know him until we

20   put the Diamante deal together.

21       Q    Gotcha.  And Mr. Kenner didn't talk to you at all

22   about this deal, this Palms deal, about wanting to raise money

23   for the Palms?

24       A    No, he did not.

25       Q    And it's your testimony -- because I notice how,

1    throughout these emails, my client is never mentioned by name,

2    isn't that correct?  The two emails that you saw, my client is

3    never mentioned by name.  It's always some rich friend in Las

4    Vegas, some guy who needs interim financing.  But did you ever

5    see his name on any of these documents?

6         A    On those documents that we looked at today --

7         Q    Yes.

8         A    -- there was only two of them, correct?

9         Q    Yes.  In either of those two documents, did you see

10   my client's name anywhere on those documents?

11        A    Do you have those documents, so that I could just --

12        Q    Sure.  Well, in the form that you produced them or

13   that opposing counsel -- they're in the binder, the first

14   binder that you got.

15        A    Okay.

16        Q    And I believe there were --

17        A    Here's one that says Ken would write a personal

18   check for the full amount.

19        Q    No.  Don't read -- don't just start reading stuff,

20   sir.  Wait for a question, please.

21        A    I thought there was a question.

22        MR. RICHARDS:  Your Honor, his name is on 120 -- 118.  Or

23   excuse me.

24        MS. LEE:  What are the two that you showed him today?

25        MR. RICHARDS:  I showed him Exhibit 120 and --

1        MS. LEE:  No, we objected to that one.

2        MR. RICHARDS:  Your Honor, I just wanted you to know

3    she's opened up the door for me to show him these emails,

4    because she's challenged his credibility.

5        THE COURT:  I understand.

6        MR. RICHARDS:  So I'm going to go into them.

7        THE COURT:  You can bring it out in redirect.

8        MR. RICHARDS:  All right.  I've showed him 120 and 121,

9    and I can show --

10       THE COURT:  Well, you can talk about that on your

11   redirect, okay?

12       MR. RICHARDS:  No problem.

13       THE COURT:  It's her cross right now.

14       MR. RICHARDS:  All right.

15   BY MS. LEE:

16       Q    So in producing these documents to Mr. Kenner to

17   help him in this lawsuit --

18       A    Uh-huh.

19       Q    Well, let me ask you this.  When did you really get

20   to know Mr. Kenner then?

21       A    Again, it was in '06 when the property was closed,

22   when the property was purchased or acquired.

23       Q    And then what was your relationship with Mr. Kenner

24   thereafter?

25       A    In -- specifically thereafter --

202

1       Q    After 2006.

2       A    We -- our friendship had grown from that point in

3    2006.

4       THE COURT:   Now when we're talking about the property,

5    are we talking about the Palms or are we talking about the

6    Cabo property?

7       THE WITNESS:   The Cabo property.

8       MS. LEE:   The Cabo property.

9       THE COURT:   Oh, okay.

10      THE WITNESS:   In 2006.

11      THE COURT:   Okay.

12      THE WITNESS:   Yes.

13   BY MS. LEE:

14      Q    Where you were both employed?

15      A    I don't know what Phil Kenner's relationship was

16   other than he was a person in 2000 and -- I don't know what

17   his employment record or his employment established with Jowdy

18   and/or the project.

19      Q    Did you have any understanding that he owned part of

20   the project in Cabo San Lucas?

21      A    Again, specifically at that timeframe in early '06,

22   no, I did not.

23      Q    Did you ever come to have an understanding that he

24   owned part of that project in Diamante Cabo San Lucas?

25      A    Yes, I did, eventually.

1    Q    And when did you first learn that?

2    A    I'm trying to remember the dates, because I'm on as

3    a percentage shareholder in one of the Diamante LLC's.  So at

4    the time that I signed that document, Phil Kenner's was on

5    that -- Phil Kenner's name was on that document as well.  So

6    there's just, as time went on, more evidence that he was a

7    significant partner.  Exactly when that was -- you know, I

8    know he was in and out of town frequently in early '06,

9    leading up to the purchase and acquisition of the Diamante

10   Cabo project.

11        So, you know, again, specifically, I never spent much

12   time with him pre-2006 other than the odd passing.  And again,

13   in -- from my recollection, most of those meetings were just

14   with large groups of people.  So it wasn't like I was sitting

15   next to Mr. Kenner and chatting with him.  He's non-associated

16   to me.

17        I'm just trying to recollect when our relationship grew,

18   and it would have been after we realized that we were both

19   involved in the Diamante Cabo project in 2006.

20   Q    Oh.  So this was a realization that you had in 2006?

21   A    Realization?

22   Q    This is a realization that you came to in 2006?

23   A    No, it just became more common that we were both

24   involved in something at the same time.  And that was the --

25   Q    I'm sorry.  Go ahead.

1        A     And that was the Diamante Cabo project.

2        Q     And then after 2006, what was your relationship with

3    him?  That was --

4        A     I'm not sure if I understand that.  What was my

5    relationship?

6        Q     With Mr. Kenner?

7        A     How it had grown or did it continue?  What's --

8        Q     Well, you said that you really didn't really have

9    one with him before this 2006 time period.

10       A     Now there -- sorry.

11       Q     So from 2006 to the present, what has your

12   relationship evolved -- what was the evolution of your

13   relationship between 2006 and the present date?

14       A     The evolution was, in 2006, Diamante Cabo became a

15   project, which I worked for since '05.  So, you know, again,

16   his reoccurring visits and involvement grew our relationship.

17   The more times he spent in Cabo, the more times we had a

18   chance to cross paths.  And that's, again, when the project

19   became in 2006.

20       Q     Did you guys have any separate business dealings

21   with one another?

22       A     Yes, we did.

23       Q     Can you explain what those business dealings were

24   and to what extent you had these business dealings?

25       A     Yes, there was one that was another property

1    interest, which began late 2006.  I believe October 2006, we

2    engaged in a -- well, we never engaged.  He joined me on a

3    property acquisition several miles away from Diamante.

4         Q    Oh, so it was also in Mexico?

5         A    I'm sorry?

6         Q    It was also in Mexico?

7         A    Yes, it was also in Mexico.

8         Q    Any other business dealings that you had with Mr.

9    Kenner?

10        A    No.  We talked about a lot of different

11   opportunities and looked at a bunch of different things, but

12   no, that was it.

13        Q    Okay.

14        MS. LEE:  I reserve on recross.

15        MR. RICHARDS:  Thanks.

16                       REDIRECT EXAMINATION

17   BY MR. RICHARDS:

18        Q    Can you turn to Exhibit 121, please?  I'm directing

19   your attention to an email from Ken Jowdy to you with the

20   subject wire transfer info for Palms Place units.  Do you see

21   that?

22        A    I do, yes.

23        Q    Remember counsel's question where she said did you

24   receive any emails from Mr. Jowdy with his name on it?  Is

25   that one of the emails you received?

206

 1        A     Yes, Ken Jowdy from DDM Golf.  His email, which gave

 2   me the wire transfer specifics for the Palms Place, the Palms

 3   Place link, and then I think that was the email that would

 4   have had the photo content of -- I think it was artist

 5   renderings of the units.

 6        MR. RICHARDS:  I'd like to move to admit Exhibit 121,

 7   please.

 8        THE COURT:  Any objection?

 9        MS. LEE:  No, Your Honor.

10        THE COURT:  It's admitted.

11        [Plaintiff's Exhibit 121 Received]

12        MR. RICHARDS:  Okay.

13   BY MR. RICHARDS:

14        Q     I'd like to have you take a look at this exhibit.

15   We're going to stop on the top here.  This is a -- an email

16   from you to Byron Hill on August 4th, 2005, at 10:53, where

17   you say:  Byron, find attached referenced documents to support

18   position.  Ken is willing to give a person guaranty on this

19   short term loan.  As I mentioned on the phone, 800,000 equal

20   80,000 return in a 30-day term.  Ken, do you mean Ken Jowdy?

21        A     Yes, correct.

22        Q     Okay.  And if we go down the email, it says:  The

23   link is a website to PalmsPlace.com.  You see that?

24        A     Yes, I do.

25        Q     And then, this is from the same string that you

207

1   print out.  It says Sandra Bonne [phonetic].  Is that the

2   person at Palms Place that the wire is supposed to go to?

3       A    I only assume so.  I never had a conversation with

4   Sandra or email communications, but that was a forward from

5   Mr. Jowdy.

6       Q    Well, here's page two of that forward, where it

7   lists -- where it says:  Kenny, to assist you with your wire

8   transfers for the Palm Place suites, below are the escrow

9   numbers, and it identifies the total amount due, 791,410,

10  which is the same amount that Mr. Murray wired.  Are you aware

11  of that?

12      A    Yes.

13      Q    All right.  Now did Mr. Jowdy provide the wire

14  information so you could show the lenders where any funding

15  would go?

16      MS. LEE:  Objection, speculation.

17      THE COURT:  Overruled.

18      THE WITNESS:  That was specifically why.  He gave me a

19  link -- pardon me.  He gave me wire instructions, photo

20  contents, website, all the specifics for the channel of where

21  the 800,000 short term loan to go -- loan is to go.

22  BY MR. RICHARDS:

23      Q    Can you see at the last page of the email that's in

24  evidence, Sandra Bull in Palms Place sales.  See that?

25      A    Yes.

1          Q     Okay.

2          MR. RICHARDS:  See that, Your Honor?

3          THE COURT:  Yeah, I just -- when you said Bull, and I

4     thought it was Bonne.

5          THE WITNESS:  Bonne, yeah.

6          MR. RICHARDS:  Oh, sorry, Bonne.  I couldn't see my --

7          THE COURT:  That's all right.

8          MR. RICHARDS:  I just got whatever they're called,

9     bifocals, recently.

10    BY MR. RICHARDS:

11         Q     All right.  If you could take a look at Exhibit 120.

12    Remember counsel's questions where she was asking you was

13    there any emails with respect to the loan?  I think -- yeah,

14    okay.  The -- if you could take a look at Exhibit 120, where

15    counsel asked you do you see Ken's name mentioned anywhere on

16    these emails.  Remember those questions?

17         A     Yes, I do.  Yes.

18         Q     Okay.  On Exhibit 120, do you see Ken's name

19    mentioned on an email dated August 5th, 2005?

20         A     Yes, I do.

21         MR. RICHARDS:  I move to admit Exhibit 120.

22         MS. LEE:  Objection, Your Honor.  I don't believe we

23    opened the door to that document.

24         THE COURT:  Well, you did open the door to whether or not

25    he got emails from Mr. Jowdy.

209

1        MS. LEE:  Let me just see.

2        MR. RICHARDS:  She also tried to attack his credibility,

3   whether Ken's name was mentioned in the emails.  This email is

4   -- will rebut that attack on his credibility, because it shows

5   that Ken will -- it's an email with the offer for Ken.

6        MS. LEE:  Your Honor, this email doesn't have Mr. Jowdy's

7   -- it was not a forward to or from Mr. Jowdy.  We object to

8   that email coming in.  I do not --

9        THE COURT:  Well, does it mention Mr. Jowdy?

10       MR. RICHARDS:  Yes.  Ken would write a personal check for

11   the full amount.

12       MS. LEE:  Well, can you just not read it out loud to the

13   Court before I --

14       MR. RICHARDS:  Right here.  You really contest there's

15   another Ken out there?

16       MS. LEE:  No, okay.

17       MR. RICHARDS:  All right.

18       THE COURT:  Okay.  It's admitted.

19       [Plaintiff's Exhibit 120 Received]

20       MS. LEE:  It does mention Ken.

21       THE COURT:  I'll admit it.

22       MR. RICHARDS:  Thank you.

23   BY MR. RICHARDS:

24       Q    So if you take a look here, this email that you sent

25   on August 5th, 2005, you're asking J.D., any luck on the

1    800,000.  Do you see that?

2        A    Yes.

3        Q    Is that -- is Ken, at the time, trying to get you to

4    get this money around August 5th, 2005?

5        A    Yes, this was ongoing communication that I had with

6    John Mahoney.  And it would have been stimulated -- my email

7    to John Mahoney asking if there was any luck was stimulated by

8    Ken asking me how are you making out in getting the 800,

9    because I thought --

10       Q    All right.

11       A    -- we were getting close with a couple people.

12       Q    I want you to look at the language very carefully

13   after this, Mr. Gaudet, where you say Ken would write a

14   personal check for the full amount paid for 30 days.  Did Mr.

15   Jowdy authorize you to make a representation that he

16   personally would repay the money?

17       A    Absolutely, yes.

18       Q    And what was your understanding of why Mr. Jowdy

19   would allow you to make a representation that he personally

20   would repay the money, as far as your ability to get someone

21   to be more -- to make the loan more attractive?  Do you have

22   any recollection of why he authorized you to make that

23   representation?

24       A    You know, he knew that I had a significant friend

25   that had the net worth that could do such a thing, a short

211

1   term loan.

2       Q    No, no.  I want you to listen to my question.  Mr.

3   Jowdy authorized you to say Ken would write a personal check

4   for the full amount paid for 30 days.  He didn't say Ronald

5   Richards would pay it or some company.  He said Ken would

6   write a personal check.  Do you remember specifically why Ken

7   wanted you to have -- be allowed to say that he personally

8   would pay the money back?

9       A    I think that just gave more credibility to him

10  wanting the money and needing it right away, needing it soon.

11  Ken would write a personal check for the full amount paid in

12  30 days.

13      Q    That's different than like, let's say, Cabo San

14  Lucas, Diamante Del Mar, or some other entity.

15      A    It was a personal reason, obviously.  Yes.

16      Q    If you look at the next line.  Obviously, with his

17  ventures going on, he could not jeopardize any issue with this

18  type of loan.  Did you have an understanding as to why you

19  were authorized to say that he wouldn't want to jeopardize or,

20  you know, create a problem when he had all these other

21  ventures going?

22      A    When he had forward me one of the other emails that

23  had his personal net worth statement, issues regarding

24  Diamante Del Mar as far as an appraisal that was done on the

25  property, showing a certain value, he was willing to

212

1    collateralize this short term loan with anything that he was

2    attached to, any of his other business interests, to acquire

3    this $800,000 short loan -- short term loan.  So that was

4    based on our conversations and communications that he'd

5    personally guaranty it and would use any of his assets.

6         Q    Okay.  Can you turn to page 122?  In this

7    attachment, there's a -- on the top of page 122, there's a

8    file name of a document that I'll represent to you is printed

9    out on 131.  So if you could take a look at this.  Does

10   this -- was there -- did Mr. Jowdy ever send you a letter that

11   you were authorized to send to someone named Wayne, listing

12   the type of assets he'd be willing to encumber, which the

13   letter is printed out in 131?

14        A    Yes.  I'm looking at 131, and yes.

15        Q    Okay.

16        A    That was -- pardon me.  That was because of our

17   ongoing communications that he -- Wayne had wanted more --

18   like I said earlier, wanted -- as I talked further with these

19   people, they wanted more information.  Tell us more about the

20   assets that he's listing.  Tell us more about his personal

21   ability to repay this.  So when I went back to Jowdy, this is

22   the information or the letter that he had written to give

23   Wayne, in this particular case, information on what was being

24   attached.

25        MR. RICHARDS:  Okay.  I'd like to move to admit 131.

213

```
 1          THE COURT:  Any objection?

 2          MS. LEE:  I don't know what their 131 is, Your Honor.  I

 3   don't have their --

 4          THE COURT:  You don't have the book?

 5          MS. LEE:  I don't.

 6               You're just submitting this in isolation?

 7          MR. RICHARDS:  Just that, yeah.  Just what he has.

 8          THE COURT:  Okay.  Did Plaintiffs give defense their book

 9   of exhibits?

10          MR. RICHARDS:  Neither side, for some reason, I don't

11   know, has given each other exhibits.  I ordered an exhibit

12   book for them, but I was in L.A.  And for some reason, none of

13   us have given each other.  But we're going to clear that up

14   after court today.  So I didn't know about it, Your Honor,

15   until just now.  I honestly would normally do that.

16               I didn't know [indiscernible].

17          THE COURT:  Okay.  Any objection to 131?

18          MS. LEE:  No, Your Honor.

19          THE COURT:  Okay.  It's admitted.

20          [Plaintiff's Exhibit 131 Received]

21

22   BY MR. RICHARDS:

23          Q    If you can take a look at the letter that you -- Mr.

24   Jowdy authorized, where it says thank you, Ken Jowdy.

25          A    Yes.
```

214

1          Q    If you could take a look at this letter.  There's

2    detailed information in this letter that I'm assuming -- if we

3    can take look at some of the paragraphs on here.  It says sale

4    of four equity spots -- or let me strike that.  It says:

5    Again, thank you for your assistance.  Bob has informed me

6    that your lender would like to know how the money will be

7    repaid in 30 days.  Okay.  And this is around August of 2005?

8          A    Yes.

9          Q    All right.  And there are several things that will

10   happen in that time period, all of which will enable me to

11   make the repayment.  Do you see that?

12         A    Yes, I do.

13         Q    And so, did Mr. Jowdy provide five different ways he

14   was going to get this money back, so you could -- you were

15   authorized to explain this to the lenders?

16         A    Yes.  We had talked about these five different ways

17   of how he was going to be -- how it was going to be possible

18   for him to repay the 800.  So each one of those were options

19   that we discussed.  Yes.

20         Q    Okay.  And so, one of the first ways he authorized

21   you to say, that he could sell four of his equity spots at

22   Diamante Del Mar, correct?

23         A    Yeah, He had said there were pending sales.  So in

24   the pipeline, hopefully, to be converted, yes.

25         Q    All right.  And sitting here today, do you know if

215

1   those sales ever went through?

2       A    I do not.

3       Q    Okay.  And then there's sale of my business, Star

4   Time Entertainment.  Do you see that?

5       A    Yes.

6       Q    Are you aware that Taffy Jowdy owns Startime

7   Entertainment, and he's sitting here in court?

8       A    I'm not sure where the ownership structure was, but

9   I'm familiar with the name Startime.

10      Q    All right.  And then he lists additional reasons on

11  there as to how he was going to -- how he could pay this money

12  back.  And then he provides a personal cell phone number.

13      A    Uh-huh.

14      Q    Is that affiliated with Mr. Jowdy?

15      A    I believe it was, yes.

16      Q    All right.  So the purpose of this letter was to

17  make your potential lenders feel comfortable that Mr. Jowdy

18  had the ability to repay them back if that -- you know, to

19  help you, would give you some talking points.

20      A    Yes.  This one was drafted specifically for Wayne.

21  So yes.

22      Q    Okay.  And then on Exhibit 122, if you can just take

23  a look.  I think I showed you that already.

24      MR. RICHARDS:  I just need to -- I'm just going to move

25  to admit it, because it has the document attached to it.

1      THE COURT:  Hasn't it already been admitted?

2      MR. RICHARDS:  Yeah, I think.

3      THE CLERK:  122 has.

4      MR. RICHARDS:  Is 122 in?

5      THE COURT:  122 has already been admitted.

6      MR. RICHARDS:  Oh, great.  Okay.  I don't need to worry

7  about that then.  Thanks.  All right.  One second, Your Honor.

8      [Counsel Confer]

9      MR. RICHARDS:  No further questions.

10      THE COURT:  Recross.

11      MS. LEE:  Yes, Your Honor.  Just one question.

12                      RECROSS-EXAMINATION

13  BY MS. LEE:

14      Q    If you could turn back to that last Wayne letter

15  that counsel just put before you.

16      A    Yes.

17      THE COURT:  Exhibit 131.

18      THE WITNESS:  Thank you.

19  BY MS. LEE:

20      Q    The fifth item, which was conveniently skipped over

21  by --

22      MR. RICHARDS:  I object.

23      THE COURT:  Yeah, counsel.  Don't do that.

24      MR. RICHARDS:  I can -- I didn't -- 3 through 5 I didn't

25  talk about.

217

```
 1         THE COURT:  Well --
 2         MS. LEE:  Okay.  I apologize, Your Honor.
 3         THE COURT:  -- I'm going to sustain that objection.
 4         MS. LEE:  I apologize.
 5   BY MS. LEE:
 6         Q    On item number 5, what did you understand that
 7   was -- what was being offered to be pledged in item number 5?
 8         A    These were just all drafted talking points for me.
 9   And if it had to be discussed further, then it was going to be
10   directed back to Jowdy.  And that's why he included a phone
11   number.
12         Q    Okay.  So this --
13         A    They weren't for me to say or represent.  It was for
14   me to initiate further conversations with, in this case,
15   Wayne.
16         Q    Okay.  So this wasn't a letter that -- in your mind,
17   that Mr. Jowdy was giving to you to give to Wayne?
18         A    It was a letter that Mr. Jowdy gave to me to give to
19   Wayne, yes.
20         Q    It was, okay.  So with item number 5, I'm trying to
21   understand.  What is your understanding of what was being
22   pledged or offered to be pledged in item number 5 on this
23   document.
24         MR. RICHARDS:  Foundation, misstates his testimony.  He
25   said he was a transmitter.
```

```
 1          THE COURT:  Overruled.
 2              Go ahead.
 3          THE WITNESS:  Repeat the question, please.
 4    BY MS. LEE:
 5          Q    What was your understanding as to what was being
 6    offered or being pledged to be offered in item number 5 on
 7    this letter?
 8          A    I think we were still in the -- you know, trying to
 9    figure out how this was going to be possible.  So Wayne was
10    looking for more credibility as far as who he was lending the
11    money to.  So Mr. Jowdy wrote this letter to explain how it
12    was going to be possible for him to repay.
13          Q    All right.  But my question is just directing your
14    attention specifically to paragraph number 5.  Have you read
15    that to yourself?
16          A    I could reread it right now.
17          Q    If you could read it to yourself, please.  As a
18    matter of fact, if I could just read it to the Court out loud.
19    I'll just read it out loud.
20          MR. RICHARDS:  Was that -- is that a question?
21          MS. LEE:  I'm going to read it to the witness and then
22    ask a question based on it.
23          THE COURT:  Go ahead.
24          MR. RICHARDS:  All right.
25    BY MS. LEE:
```

219

```
 1        Q    Mortgage on property worth 30 million in Hawaii and
 2   owned by Phil Kenner.  Phil has $15 million committed to fund
 3   before August 19th, and he will the necessary dollars for
 4   repayment out of his funding.  I will get you any details on
 5   this, and I can, but this is only a fallback position for me,
 6   as I fully expect any of the first three items to be
 7   sufficient.
 8             Did you have any understanding as to what was being
 9   offered in paragraph number five?
10        A    It would be just the same as the other four.  It was
11   an outline of what Mr. Jowdy was going to be able to do to
12   repay a loan.  It wasn't -- I wasn't getting the loan, so it
13   wasn't my stuff. It was just trying to be a communicator.
14        Q    So did you have any understanding as to what was
15   being pledged?
16        MR. RICHARDS:  Asked and answered.
17        THE COURT:  Overruled.
18        THE WITNESS:  What was the --
19        MS. LEE:  Your Honor, I think it's been asked but not
20   answered.
21
22   BY MS. LEE:
23        Q    Do you understand what's being pledged?  Because you
24   said that you understood some of these other things that --
25   the actual assets.  You understood the assets that were being
```

220

```
 1    pledged.  You had some knowledge about the assets being

 2    pledged.  Do you have any of that same understanding with

 3    respect to what's being pledged in item number 5?

 4         A     So if you ask me specifically about 5, I didn't know

 5    anything about what number 5 was other than Jowdy had a

 6    connection to number 5.  Whatever it was, I don't know.  It

 7    was a --

 8         Q     Number 5 --

 9         A     I was just passing information to the guy that was

10    entrusting me to get him information.  So when I went back to

11    Mr. Jowdy for more information, this is what he sent me.  I

12    clipped it and sent it.  I never clipped it.  I just

13    reforwarded it to John and then to Wayne.  And if they wanted

14    to discuss each one of those points, I would have to refer

15    them to Mr. Jowdy, because that's all I was doing was saying

16    help me get more information to these guys if you want

17    these -- this person to consider giving you a loan.  And

18    that's the extent of it.  How every one of those sentences

19    broke down and what they related to, I have no idea.

20         Q     And did you have any understanding as to who Phil

21    Kenner was at this time?

22         A     No, I -- I would say no, I don't.

23         Q     You did not?

24         A     I did not.

25         Q     Okay.  Thank you.
```

1      MS. LEE:  No further questions,

2      THE COURT:  Sir, you may step down.  Thank you.

3      THE WITNESS:  Thank you.

4      THE COURT:  If you would --

5      THE WITNESS:  You want your book back?

6      THE COURT:  Yeah, I want all that stuff in front of you

7  back, okay?

8      MR. RICHARDS:  Just a bathroom break for a minute or --

9      THE COURT:  Okay.

10      MR. RICHARDS:  Just a -- I'll come right back.

11      THE COURT:  Okay.  Why don't you go real quick and I --

12  we'll just sit here and -- because I don't want to take too

13  many other breaks.

14      [Recess]

15      THE COURT:  Okay.  Well, I want to wait until my -- until

16  Officer Black comes back, too.

17      MR. RICHARDS:  Oh, okay.  No problem.  I just --

18      [Pause]

19      MS. LEE:  Your Honor, do you have any understanding as to

20  what time we're going to be going to today?

21      MR. RICHARDS:  5:00.

22      THE COURT:  Until 5:00.

23      MS. LEE:  5:00?  Okay.

24      THE COURT:  We end at 5:00 every day.

25      MS. LEE:  Okay.  Thank you.  Just wanted to double check.

1       [Pause]

2       THE COURT:  Okay.  You want to go ahead and let's get

3   started?

4       MR. RICHARDS:  Yeah.  Yeah.

5       THE COURT:  Okay.  Your next witness?

6       MR. RICHARDS:  Yes.  We'll call Phil Kenner, please.

7       MR. KENNER:  Your Honor, do you mind if I bring my own

8   water up?

9       THE COURT:  Sure.

10      MR. KENNER:  Okay.

11      THE COURT:  Okay.  Stand right -- up, up, up.  You need

12  to raise your right hand.

13          PHILIP KENNER, PLAINTIFF'S WITNESS, SWORN

14      THE CLERK:  Thank you.  Sir, please state your first and

15  last name, spell them both for the record.

16      THE WITNESS:  Philip Kenner, P-H-I-L-I-P, last name K-E-

17  N-N-E-R.

18      THE COURT:  Okay.  Counsel?

19              DIRECT EXAMINATION

20  BY MR. RICHARDS:

21      Q    Good afternoon, Mr. Kenner.  I'm going to ask you

22  some questions about the August, 2005 transaction with Mr.

23  Murray, okay?

24      A    Yes.

25      Q    Prior to August of 2005, was Mr. Jowdy -- did Mr.

223

1    Jowdy seek out your assistance in helping him get financing?

2        A    Yes.

3        Q    Okay.  Can you tell the Court exactly what was that

4    -- do you remember when he was asking you prior to August of

5    '05, what month and year?

6        A    In general, in 2002.

7        Q    No, no.  I'm talking about -- I only want to talk

8    about this transaction.

9        A    Okay.

10       Q    Okay?  Not in general.  I don't want to get into all

11   your other issues.  Just in this transaction, when did he ask

12   you for assistance in this transaction?

13       A    After his immediate meeting -- his initial meeting

14   at the Palms in February of 2005, when he signed the purchase

15   and sale contracts for the three units, Mr. Jowdy asked me to

16   start talking to people about raising funds for him.

17       Q    Okay.  Can you look in the book in Exhibit 74,

18   please.

19       THE COURT:  Okay.

20       MS. LEE:  Can I see it?  Just -- we don't have it here.

21       THE CLERK:  74?

22       THE COURT:  Plaintiff's Exhibit 74?

23       MR. RICHARDS:  Yes.

24       THE COURT:  Here you go, sir.

25       THE WITNESS:  Thank you.

```
1        MR. RICHARDS:  Yeah.  Thank you.

2        [Pause]

3        MR. RICHARDS:  Okay.  I believe these are in evidence

4   already.  74?

5        THE COURT:  Exhibit --

6        THE CLERK:  It's been stipulated to, Your Honor.

7        MR. RICHARDS:  Right.

8        THE COURT:  Okay.  It was?

9        THE CLERK:  74?  Yes.

10       THE COURT:  Let me just double-check.  It was.  Okay.

11  Thank you.

12       MR. RICHARDS:  Great.

13  BY MR. RICHARDS:

14       Q    Mr. Kenner, now --

15       A    Yes?

16       Q    -- I'm showing you the deposit receipt from -- that

17  Mr. Jowdy signed where it says, Ken Jowdy, visitor

18  registration form, and it identifies the unit number, February

19  16th.  Do you recognize that as his signature?

20       A    Yes.

21       Q    Okay.  Now, with respect to this deposit receipt for

22  unit number 50413, 50414, and there's apparently 50416, these

23  -- are these the same three deposits that ultimately Mr.

24  Murray wired funds to Mr. Jowdy for the same ones?

25       A    You bet.
```

225

1      Q    Okay.  And after that time, Mr. Jowdy was -- it's

2  your testimony that he was asking you to help him possibly get

3  additional financing for these deposits?

4      A    That's correct.

5      Q    Okay.  Can you just explain to the Court --

6      THE COURT:  Okay.  Mr. Kenner?  I'm going to need you to

7  pull that microphone a little closer to you.

8      THE WITNESS:  Of course.

9      THE COURT:  We need to make sure you're heard.  Okay?

10     THE WITNESS:  Okay.

11     THE COURT:  You're kind of leaning back.  And if we need

12 to, we can either put a portable mic or if you can get up a

13 little closer to that, or we can get the hand mic, too.  So --

14     THE WITNESS:  Okay.  I'll try and speak louder so --

15     THE COURT:  Okay.  Thank you.

16     THE WITNESS:  -- if you don't mind, Your Honor --

17 BY MR. RICHARDS:

18     Q    Mr. Kenner, can you explain to the Court -- because

19 I -- when we say the word, deposit, this wasn't for condos

20 that were already built, is that correct?

21     A    That's correct.

22     Q    All right.  So at that time, just briefly, what was

23 going on with respect to deposits at the Palms Place Casino?

24 You know, why was it attractive for people?

25     A    It -- these particular units were being offered by

1   Mr. Maloof to a select group of his friends, one of which was

2   Mr. Jowdy at the time.  And in the early stage, it was the

3   best purchasing price that Mr. Maloof had offered.  And by the

4   time he opened up the first round to the public, I believe the

5   deposit values were somewhere between ten and 20 percent

6   higher.

7        Q    Okay.  So for lack of a better words (sic), was

8   there a play on locking in the deposits and then waiting?

9        A    Yes, there was.

10       Q    And so from a business standpoint, it -- how did,

11  like, people like Mr. Jowdy benefit from getting this early

12  referral -- early freeze on the purchase price?

13       A    The Palms' units went through about five or six

14  phase increases, so this was phase one and by far the lowest

15  price point.  I believe Mr. Jowdy's penthouse unit, and I'm

16  not sure which of these three it is, started in the 3.3 range.

17  And before construction, I believe, the last one that was sold

18  as a flip was a $5 million unit before construction finished.

19  So there was significant -- and it was certainly during the

20  Las Vegas frenzy, real estate frenzy.

21       Q    Okay.  So initially, did -- after Mr. Jowdy signed

22  the deposit or the visitor -- that visitor registration form,

23  at some point did Mr. Jowdy deposit -- make a payment as far

24  as $150,000 check is concerned?

25       A    Yes, he did.

1    Q    Okay.  And what was the purpose of initially paying

2    the 150,000?

3    A    There were three deposit -- initial deposits

4    required.  So with Mr. Jowdy's penthouse unit, there was

5    $100,000 deposit required.  And on the second and third units,

6    which were smaller units, there were two $25,000 deposits

7    required.  And those, I believe, were required within about 60

8    days of his original signature.

9    Q    Okay.  So initially, Mr. Jowdy wrote a check, I

10   believe, from TLJ Management?

11   A    Yes.

12   Q    All right.  And then after that, what was Mr. Jowdy

13   required to do to keep the deposit intact?

14   A    I believe within about five months of the -- four or

15   five months of the initial signature, which was in February,

16   he had to ante up the rest of the money for a full 20 percent

17   deposit on each of the units.  And that was the money we -- he

18   had asked me to source out.

19   Q    All right.  And were you -- let's see.  Exhibit

20   111 --

21   THE WITNESS:  I need a new book, Your Honor.

22   THE COURT:  Uh-huh.

23   BY MR. RICHARDS:

24   Q    If you take a look at Exhibit 111.

25   THE COURT:  111?

228

1          MR. RICHARDS:  Yes.

2          THE COURT:  Okay.

3          MR. RICHARDS:  That's in evidence already.

4          THE WITNESS:  Thank you.

5   BY MR. RICHARDS:

6          Q    I can put it on the screen, if you want to just look

7   at your screen.

8          A    Okay.

9          Q    Okay.  So this check written from TLJ Management

10  Corp. was for Mr. Jowdy's company?

11         A    Yes.

12         Q    Mr. Jowdy's signature?

13         A    Yes.

14         Q    Okay.  And this was for the same three units that I

15  showed you on the 219 deposit receipt?

16         A    I believe so.

17         Q    And it's for $150,000?

18         A    That is correct.

19         Q    Stewart Title was the same title company where --

20  that was handling the transaction?

21         A    Yes.

22         Q    All right.  Now, at that time, was it your

23  understanding that the 150,000 was refundable?

24         A    Yes.

25         Q    And what was your understanding as far as the value

229

```
1    of those deposits from April of 2005 to August 2005?

2         A    I believe they had increased somewhere in the

3    neighborhood of 20 to 25 percent in value.

4         Q    So were you -- did you have any sort of ownership

5    interest in those deposits?

6         A    None.

7         Q    Were you going to get a piece of the profits of that

8    appreciation from Mr. Jowdy?

9         A    No.

10        Q    Was that your money that Mr. Jowdy paid the $150,000

11   for?

12        A    No.

13        Q    Are you claiming that that's any part of your money?

14        A    No.

15        Q    If the property had quadrupled, would you think Mr.

16   Jowdy owed you any money?

17        A    No.

18        Q    Now, with respect to --

19        THE COURT:  Can I ask you this?  Then why do it?

20        THE WITNESS:  Because it --

21        THE COURT:  What was your -- what were you going to get

22   out of this?

23        MR. RICHARDS:  Your Honor, he didn't do anything yet.

24        THE WITNESS:  I didn't.

25        THE COURT:  Well --
```

230

```
 1        MR. RICHARDS:  I don't mean to -- I hope I didn't ask the
 2   wrong question.  He hasn't done anything yet.
 3        THE WITNESS:  I haven't done anything yet.
 4        THE COURT:  Okay.
 5        MR. RICHARDS:  I don't want the Court -- I didn't want to
 6   confuse the --
 7        THE COURT:  Okay.  Well --
 8        MR. RICHARDS:  Oh, sorry.
 9        THE COURT:  Let me ask the question, okay?
10        MR. RICHARDS:  Sure.
11        THE COURT:  You were asked to get financing for these
12   condos, right?
13        THE WITNESS:  Yes, I was.
14        THE COURT:  Okay.  Why would you do that if you're not
15   getting something out of it?  I guess I -- that's kind of
16   where -- I mean, I would assume you had some sort of a
17   business arrangement.  Why would you do this?
18        THE WITNESS:  I was a business manager for over 100
19   professional athletes and entertainers.  So much the same, I
20   would arrange financing for Mr. Murray on several home
21   purchases, people for cars, people for other real estate
22   transactions.  And I never received anything out of that.
23        THE COURT:  So bottom line, you were going to be -- as a
24   business manager, you get a fee from you clients is what --
25        THE WITNESS:  Yes, that's correct.
```

1      THE COURT:  Okay.  Do you -- just so that I'm clear -- I

2 mean, it may not be relevant to this, but do you get a -- like

3 an annual fee or do you get a percentage of your investments

4 with your clients or --

5      THE WITNESS:  It's an annual fee.

6      THE COURT:  An annual fee?

7      THE WITNESS:  Yes.

8      THE COURT:  Okay.  Just like a regular investment advisor

9 would get?

10      THE WITNESS:  Similar, yes.

11      THE COURT:  Okay.  Is your fee based upon a percentage of

12 what you're managing, or is it just a drop-dead fee?

13      THE WITNESS:  It's typically a negotiated drop-dead fee.

14      THE COURT:  Got it.  All right.  Thank you.  All right.

15      MR. RICHARDS:  Okay.  And based on your question, Your

16 Honor, I do got -- I'm going to back up because I think I need

17 to lay a little more foundation.  That's my fault.

18 BY MR. RICHARDS:

19      Q    In August of '05, were you and Mr. Jowdy friends?

20      A    Yes.

21      Q    And did -- would it -- did you have a lot of your

22 clients' money in his real estate deals?

23      MS. LEE:  Objection.  Leading.

24      MR. RICHARDS:  Sorry.

25      THE COURT:  Well, I know I kind of promoted the

232

1    conversation.  I mean, I understand.  It's a bench trial.

2    I'll let him go.

3         MS. LEE:  All right.  I understand, Your Honor.

4         THE COURT:  I'll -- I'm going to overrule.

5         MR. RICHARDS:  Thanks.  Yeah, I'm just trying to get to

6    the point here.

7         MS. LEE:  All right.

8         MR. RICHARDS:  I don't think we're worried about Phil

9    being [indiscernible].

10   BY MR. RICHARDS:

11        Q    Okay.  The -- and at that time, would -- if Mr.

12   Jowdy asked you to do him a -- let me ask -- strike that.  To

13   make some phone calls to get him financing on these Palm Place

14   Casinos, was that a big chore for you to do?

15        A    It was not.

16        Q    Okay.  And did -- were you aware that Mr. Jowdy was

17   also trying to get financing from other sources?

18        A    I don't recall at the time.

19        Q    Okay.  And -- but in August of '05, you would have

20   been happy if Mr. Jowdy made money; is that fair to say?

21        A    Absolutely.

22        Q    Okay.  You were friends?

23        A    We were very good friends.

24        Q    Yeah.  And so if -- and you owned -- you had an

25   interest in real estate that a lot of your clients invested

233

1    millions of dollars in at that time, right?

2        A    That is correct.

3        Q    So when you -- and in August of '05, you saw that --

4    did you believe that if Mr. Jowdy was able to get this short-

5    term loan, that then he would preserve his deposit with the

6    Palms that he could later then sell or make a profit on?

7        A    Yes.

8        Q    Okay.  So was your -- going now to the Court's

9    question, was your motive -- what's in it for you is really

10   the question.  Did you derive a benefit from seeing Mr. Jowdy

11   make money in August of '05?

12       A    I did not.  But I -- it was -- he was a very good

13   friend of mine, and it was easy for me to do it.

14       Q    I mean a personal benefit, like you -- were you

15   happy to have your friend make money?

16       A    Absolutely.  One -- excuse me.  Yes, 100 percent

17   happy.

18       Q    Okay.  So you'd get the satisfaction of it?

19       A    Correct.

20       Q    All right.

21   MS. LEE:  That's a little bit leading.

22   MR. RICHARDS:  Sorry.  Okay.

23   THE COURT:  I understand. Go ahead.

24   BY MR. RICHARDS:

25       Q    And just like your -- did you have any belief at the

234

```
 1    time that if you made money in the real estate you invested

 2    with Mr. Jowdy, that he'd be upset if you made money?

 3         A    Absolutely not.

 4         Q    Okay.  So you guys were rooting for each other?

 5         A    Yes.

 6         Q    All right.  So now directing your attention to your

 7    sourcing of the money, how many people would you say you spoke

 8    to to try to do this deal for Mr. Jowdy?

 9         A    Probably at least 15.

10         Q    And what terms did you pitch for Mr. Jowdy?

11         A    It was a 30 day loan at ten percent interest.  And

12    Mr. Jowdy would personally pay it back.

13         Q    And was it similar to the terms you heard Mr. Gaudet

14    testify to?

15         A    Identical.

16         Q    Okay.  And at the time, were -- was Mr. Gaudet

17    talking to you that -- or that he -- or telling you that he

18    was making the same pitch to other lenders on behalf of Mr.

19    Jowdy?

20         A    I did not know Mr. Gaudet at that time.

21         Q    Okay.  And -- but is it possible you could have been

22    in the same country or same event as Mr. Gaudet?

23         A    Absolutely.

24         Q    Okay.

25         A    Mr. Jowdy threw a lot of events in Cabo San Lucas.
```

235

```
1    And I was down there.
2         Q    All right.  Now, with respect to the people you were
3    speaking to, any of the lenders that's in evidence that you
4    saw Mr. Gaudet testify, did you have a relationship with any
5    of those lenders like Hubba or WM or Wayne?
6         A    In 2005, no.
7         Q    In 2005?
8         A    No.
9         Q    Okay.  And at some point, you -- let me strike that.
10   Before you called 20 people, did you ever have an express
11   conversation with Mr. Jowdy as to what he would be willing to
12   do with respect to you soliciting loan terms for him?
13        A    I'm not sure I understand.
14        Q    Okay.  Before you started calling people to see if
15   you can get him -- sourcing this capital, did you get -- did
16   you have a conversation with Mr. Jowdy as to what you'd be
17   allowed to offer on his behalf?
18        A    Absolutely.
19        Q    Okay.  You wouldn't just start calling people, would
20   you?
21        A    Absolutely not.
22        Q    Saying, I'm just -- I need -- my friend needs to
23   borrow money?
24        A    Absolutely not.
25        Q    Okay.  So when did you first remember having a
```

236

1    conversation with him about what he'd be willing to do to the

2    lender if you got one?

3        A    In February, he told me that he may need some

4    assistance in sourcing the funds if some of his deals that he

5    was working on separately didn't come through.  He placed the

6    deposit in April of '05 out of his own TLJ Management funds,

7    which I wasn't aware of until after -- until discovery where

8    he got the funds or where they originated.

9        But then by summer of 2005, he was starting to get into a

10   panic about needing the funds to deliver to the Palms because

11   he was -- at that time, he and his friend Mark Thalmann had

12   already lived in Mr. Maloof's house for several months without

13   closing on it, and there was a lot of tension at the time

14   between Mr. Jowdy and Mr. Maloof.

15       Q    Okay.  And with respect to the Palms place deposit,

16   was it your understanding if he didn't come up with the money

17   that they would just not allow him to continue to be a

18   depositor?

19       A    That's correct.

20       Q    All right.  So if you can take a look in the book on

21   Exhibit 119, which is in evidence.  And it -- if you take a

22   look, it's a series of emails --

23       THE WITNESS:  Your Honor, somebody has a sticker in here,

24   and I'm not sure if I -- I'm not sure what's on it, but I'm

25   not sure if I'm supposed to see it or not.

237

1        THE COURT:  Oh.  Let me see.

2        THE WITNESS:  I just know this is -- I don't know whose

3   that is, so I don't know if I'm supposed to be --

4        THE CLERK:  Your Honor, that's just the Clerk's

5   exhibit --

6        THE COURT:  Okay.  That's -- don't worry about it.

7   That's my Clerk's note.

8        THE WITNESS:  Okay.  I definitely don't want to screw up

9   her notes.

10  BY MR. RICHARDS:

11       Q    Okay.  I'm showing you 119, the first page of 119.

12  And this is -- you remember the earlier testimony from today

13  where I showed Glen Murray that Mr. Jowdy had sent you this

14  email like prior -- you know, at 8:00 in the morning where you

15  said you had to check with the Muzz?

16       A    Yes.

17       Q    Okay.  And your understanding, who's the Muzz?

18       A    It's the Plaintiff.

19       Q    All right.  Now, why did you tell Mr. Jowdy at 8:00

20  in the morning on August 11th at 12 -- at 8:00 in the morning,

21  2005, why you had to check with the Muzz first before he

22  should send the email to Sandra Bonne?

23       A    Because at that time, Mr. Jowdy knew that Glen

24  Murray was going to be the most likely source and he was

25  considering doing it.  I had met originally with Mr. Murray in

238

1   July, almost three weeks earlier, to originally present the

2   opportunity.

3        Q     Okay.  And did Mr. Jowdy specifically authorize you

4   to present the opportunity to Mr. Murray?

5        A     Yes.

6        Q     Okay.  Was Mr. Jowdy aware that Mr. Murray was your

7   client?

8        A     Yes.

9        Q     And how do you know he was aware?

10       A     Because Mr. Murray in 2002 had invested at Diamante

11  Del Mar, Mr. Jowdy's original real estate development.

12       Q     And how much did he invest?

13       A     $500,000.

14       Q     And was Mr. Jowdy -- was there anything unusual

15  about you telling Mr. Jowdy, I'm going to get some money from

16  Mr. Murray to see if he's interested in this transaction?

17       A     Nothing unusual.

18       Q     Okay.  And why in your mind did you think this would

19  be a simple transaction between the two of them?

20       A     They were -- at the time, they knew of each other

21  very well from being co-partners in the Diamante Del Mar

22  transaction.  And the Palms units, as we all remember, in 2005

23  were going through a real estate boom.  The funds were being

24  deposited directly into a secure escrow account.  And Mr.

25  Jowdy at the time was a very close friend of mine and, as Mr.

239

1    Murray referred to him, a team member of all of ours.  And --

2        Q    And how close a friend was Mr. Murray?

3        A    To?

4        Q    To you?

5        A    He was a very close friend.  We had known each other

6    since we were in our early '20s.

7        Q    So was this what we call a friendly transaction?

8        A    Completely.

9        Q    All right.  And with respect to this money, were you

10   made aware of whether or not it would be clear that Mr. Murray

11   was sending the money to Mr. Jowdy?

12       A    It was very clear.

13       Q    Okay.  Did you have specific conversations with Mr.

14   Jowdy as to how the money was going to get from Mr. Murray's

15   account to Stewart Title?

16       A    Very clear.

17       Q    Okay.  And what specifically did you tell Mr. Jowdy?

18       A    I said I could get the transaction done if Mr.

19   Murray would agree to it.

20       Q    And did you discuss the specific terms with Mr.

21   Jowdy?

22       A    Yes, I did.

23       Q    And what terms were those?

24       A    He would repay the funds to whatever lender, which

25   ended being Mr. Murray, within 30 days with a ten percent

240

1    return.

2         Q    Okay.  Now, you hear Mr. Murray say he thought it

3    was 30 to 45 days.  Is that a significant variance as far as

4    the deal you had?

5         A    It was not, considering it was a ten percent return.

6    It wasn't an annual ten percent where we'd have to recalculate

7    based on the time of the loan.

8         Q    Okay.  Did you leave some -- did you leave any room

9    for the Palms and any slippage or fatigue on them getting the

10   money returned?

11        A    It's possible.

12        Q    Yeah.  And with respect to Mr. Jowdy, before you

13   signed the wire transfer instruction from Mr. Murray's

14   account, did you specifically tell Mr. Jowdy anything about

15   that you were going to now go through with this transaction

16   and get him to agree to it?

17        A    Yes.

18        Q    Okay.  Specifically, what did you tell Mr. Jowdy

19   before you signed the wiring instructions to wire the money

20   into the Stewart Title account with his name on it?

21        A    On August 11th, Mr. Jowdy had told me that he had

22   been receiving communications from the Palms for about ten

23   days where they were frantic to receive the wire, and he had

24   put them off for that week and a half.  On the morning of the

25   11th or the night of the 10th, Mr. Jowdy had sent me the email

241

1    asking if it would be okay to send this to Sandra Bonne.   And

2    that's when I responded and said, "as soon as I hear from

3    Muzz."

4         So at the -- on the 11th of August, Glen Murray and I

5    were able to speak that morning and I confirmed with Glen that

6    he would be willing to do the transaction.   And at about

7    noontime, when Ken Jowdy knew that he was going to be

8    receiving the funds from Glen Murray, he sent that email to

9    the Palms with the four choices that he would be comfortable

10   with with the Palms.

11        Q    Okay.  Was Mr. Jowdy sending you the email on the

12   morning of the 11th because it was really you buying the

13   units?

14        A    No.

15        Q    Okay.  When he sent you the email, was it your

16   understanding he was seeking approval based on an expectation

17   of receiving the loan from Mr. Murray or because he needed

18   your permission to send an email to the Palms?

19        A    He was waiting for the expectation that Mr. Murray

20   was going to fund the loan.

21        Q    Now on 12:08 on August 11th, we actually have the

22   email then from the Stewart Title file that shows what Mr.

23   Jowdy sent, which is consistent with your email where you say

24   we're going to wait for the Muzz, which then shows the

25   proposed email which is identical to the email he ultimately

242

1    sent; is that correct?

2         A    That is correct.

3         Q    All right.  So on the next page of the Stewart Title

4    email, Mr. Jowdy is sending Sandra Bonne:

5                   "Sandra, I can resend the wire in the morning.

6              The cutoff is 2:00 p.m.  Or I can FedEx a check

7              where you want today.  I do not have any other

8              option.  I would hate to lose these condos over

9              this, but I understand that you've been waiting for

10             the money.  I will be able to check my emails in an

11             hour."

12        Now, I don't see your name on this email.  Were you --

13   did Mr. Jowdy BCC you on this?

14        A    I do not believe so.

15        Q    Okay.  And when Mr. Jowdy said, "I would hate to

16   lose these condos over this", is he really meaning you would

17   hate to lose them?

18        A    No.

19        MS. LEE:  Objection.  Speculation.

20        MR. RICHARDS:  Okay.

21        THE COURT:  Well, if he knows.

22        MR. RICHARDS:  If he knows.

23        THE COURT:  But it is speculation.

24        MR. RICHARDS:  Okay.

25   BY MR. RICHARDS:

243

| | | |
|---|---|---|
| 1 | Q | Did you -- |
| 2 | A | No. |
| 3 | Q | Did -- |
| 4 | A | No, they were not my condos. |

5    Q    Okay.  Did Mr. Jowdy ever convey to you that he did

6  not want to lose the condos?

7    A    Yes.

8    Q    Okay.  Tell the Court specifically what Mr. Jowdy

9  said with respect to his desire not to lose the condos.

10    A    This -- these condos, Mr. Jowdy was very excited

11  about because at the time he was looking to become a permanent

12  resident of Las Vegas, and he wanted to live in the penthouse

13  unit upon completion.  And he was very excited to be able to

14  use the other two units for hospitality and for guests.

15    I believe Ms. Lee earlier told us that Mr. Jowdy -- the

16  home that he was acquiring was going to be used for the

17  business, for Diamante.  And Mr. Jowdy went so far to tell me

18  that once he got this deposit from Glen Murray and didn't lose

19  the units, that he was going to continue to try and find money

20  to fully pay Mr. Maloof for the units and then ask him if he

21  could move into the regular Palms Hotel while the other units

22  were under construction.

23    Q    Now, on August 9th at 12:11 p.m., Mr. Jowdy sends an

24  email to Sandra Bonne at Palms Place saying, "Second response

25  re: wire transfer info."  In it, he says, "Sandra, I am

244

```
 1    dealing with this through my Mexican attorney," who I believe
 2    we're going to hear is Fernando Garcia, "who handles my
 3    accounts in Mexico.  He is telling me that the wire was
 4    rejected and the money has been returned."  Okay?  Do you
 5    believe that that was a true statement, that a wire was
 6    rejected?
 7         A    Absolutely not.
 8         Q    Okay.  And why is that?
 9         A    Because there was no money in Mexico that Mister --
10    that I'm aware of that Mr. Jowdy was sending to the Palms two
11    days before he was asking -- continuing to ask for Mr. Murray
12    to send the money.  If he had the money, he would have been
13    able to send it from Mexico.
14         Q    And you heard the prior representation by his own
15    attorney that you or your clients are the only source of any
16    capital Mr. Jowdy has ever received?
17         A    That's correct.
18         Q    And so do you have any reason -- did Mr. Jowdy ever
19    clear it with you before he could lie to the Palms?
20         A    No, he did not.  I wasn't aware of this email string
21    until discovery.
22         Q    Let's turn to page -- the next page.  Mr. Jowdy says
23    -- or Sandra writes him that, "We have to resolve this today,"
24    because --
25         THE COURT:  Okay.  We -- I can't see it.
```

```
 1        MR. RICHARDS:  Sorry.

 2        THE COURT:  Could you push it down so we can see --

 3        MR. RICHARDS:  Yeah.

 4        THE COURT:  -- what was -- well, down.  Okay?

 5        MR. RICHARDS:  Sorry.

 6        THE COURT:  That's all right.

 7        MR. RICHARDS:  I didn't realize it wasn't on the screen.

 8   I apologize.

 9        THE COURT:  Okay.

10   BY MR. RICHARDS:

11        Q    Okay.  Now, did Mr. Jowdy discuss with you he was

12   engaging in some sort of masquerade with the Palms to keep

13   them going?

14        A    He told me he was stringing them along.

15        Q    And did these emails corroborate that he was

16   stringing them along?

17        A    Absolutely.

18        Q    All right.  And in order -- did you instruct Mr.

19   Jowdy to lie to the Palms to string them along?

20        A    Absolutely not.

21        Q    And was Maloof a personal friend of yours?

22        A    Yes.

23        Q    So you -- would you engage in some sort of chicanery

24   with respect to his business?

25        A    Absolutely not.
```

1     Q   All right.  Now, if we go down to the next email

2 from Mr. Jowdy, which was taken from the Palms records here:

3            "Sandra, the bank is going to let me know the

4            status in the morning.  I will let you know what

5            they say and have a fed reference number to you.

6            Please email me if you hear anything on your end.

7            Thank you.  Kenny."

8     Now, at that time, had Mr. Murray agreed to fund this

9 loan?

10     A   No.

11     Q   So when Mr. Jowdy is referring to a fed reference

12 number, does he mean a fed wire number?

13     A   Yes.

14     Q   Okay.  And would -- did --

15     MS. LEE:  Speculation.  Sorry.  Belated.

16 BY MR. RICHARDS:

17     Q   What is your understanding of a fed reference

18 number?

19     A   It would be a fed wire number --

20     Q   Okay.

21     A   -- they would be synonymous.

22     Q   Would it be fair to say you've done over 5,000 wires

23 in your professional career?

24     A   It would be fair to say.

25     Q   Okay.  Is it -- is that a common vernacular, fed

247

1    reference number?

2        A    Yes.

3        Q    All right.  Did Mr. Jowdy -- do you believe that Mr.

4    Jowdy really had -- was going to get a fed reference number

5    for Sandra?

6        A    On August 9th, absolutely not.

7        Q    And would it be fair to say that your relationship

8    was close enough to him that if he actually had the ability to

9    borrow this money, he would have told you so you weren't

10   wasting your time?

11       MS. LEE:  Objection.  Leading.

12       MR. RICHARDS:  Okay.

13       THE COURT:  Sustained.

14   BY MR. RICHARDS:

15       Q    Do you believe if Mr. Jowdy had a fed reference wire

16   -- some other source of funding where he was going to --

17   waiting for a fed reference wire number, that you would have

18   known about it?

19       A    At the time, no, because Mr. Jowdy in the beginning

20   of August was calling me a dozen times a day asking if I had

21   any luck with any of the potential lenders.

22       Q    Okay.  So you believe this is just a false

23   statement?

24       A    Yes, I do.

25       Q    All right.  Now, if we now have the Palms at --

1    Sandra is saying she's still waiting for the wires and she's

2    hoping that they are not MIA somewhere out there.  So this

3    whole series of wires, is this a complete fabrication that Mr.

4    Jowdy sent these wires?

5        A    I believe it is.

6        MS. LEE:  Objection.  Speculation.

7        THE WITNESS:  Sorry.

8        THE COURT:  I'm going to overrule.  Go ahead and answer.

9        THE WITNESS:  I believe it is.

10       THE COURT:  Okay.

11   BY MR. RICHARDS:

12       Q    And I'll just -- if -- the exhibit is actually

13   backwards, so just -- if we can go to the last -- to the page

14   96 Bate stamp here?  This started -- if you take a look of

15   (sic) August 1st and then to August 4th, this started on

16   August 1st and went on for about a week, this cat and mouse

17   game.  Is that correct?

18       A    Nine days, it looks like.

19       Q    All right.  And in those nine days, at any time --

20   did you ever -- or let me -- strike that.  Did you ever ask

21   Mr. Jowdy what he was telling the Palms to keep pretending

22   that he sent wires?

23       A    I did not.

24       Q    Okay.  Did he ever ask you if it was a good idea to

25   pretend to the Palms he sent a wire?

249

1    MS. LEE:  Objection.  Leading.

2    THE COURT:  Overruled.  Go ahead.

3    THE WITNESS:  I lost -- got lost on the question.

4  BY MR. RICHARDS:

5    Q    I said, did he ever ask you if it was a good idea to

6  pretend to the Palms that he was sending a wire?

7    A    He never asked.

8    Q    Okay.  If he had asked you, would you told him

9  that's -- would you have told him that's a good idea?

10   A    I would not have.

11   Q    Did you ever instruct Mr. Jowdy to engage in a

12  machination with the Palms that he had really wired -- sent

13  wires?

14   A    Absolutely not.

15   Q    If you had found out in August of '05 that Mr. Jowdy

16  was fabricating that he had sent wires to the Palms, what

17  would you have done?

18   A    I probably would have told him it wasn't a very

19  smart idea for him to do that to our friend, Mr. Maloof.

20   Q    Okay.  Now, directing your attention to the actual

21  transaction now, you then get to the point where on -- where

22  you have Mr. Murray on, I believe, the 12th of August wire the

23  funds and you wire the funds in this case?

24   A    That is correct.

25   Q    Okay.  Now, let me show you Exhibit 129.  You can

```
1    just take a look at 129.

2         [Counsel Confer]

3    BY MR. RICHARDS:

4         Q    Can you take a look at 129?

5         A    Yes.

6         MR. RICHARDS:  I'm going to move to admit 129.

7         THE COURT:  Any objection?

8         MS. LEE:  No.

9         MR. RICHARDS:  Okay.

10        THE COURT:  It's admitted.

11        [Plaintiff's Exhibit 129 Received]

12   BY MR. RICHARDS:

13        Q    Take a look at 129.  What is 129?

14        A    129 is a letter -- an email, it

15   ██████████████████████████████  from Sandra Bonne

16   at the Palms.

17        Q    Okay.  Did you know Mr. Andretti?

18        A    Yes, I did.

19        Q    Okay.  And specifically, I see Michael has one, two,

20   three, four, five, six, seven deposits for condos.  Do you see

21   that?

22        A    It looks like six to me.  It looks like six

23   deposits.

24        Q    Six, that's correct.  Sorry.  Six deposits.

25        A    Okay.
```

251

1      Q   Okay.  And you heard Mr. Jowdy's attorney's argument

2 in her opening statement that there was some sort of

3 restriction on deposits.  Do you remember that?

4      MS. LEE:  Objection.  I'm sorry, I just -- it

5 misrepresents my opening statement.  I didn't say that there

6 was a restriction.

7      THE COURT:  I -- okay.  I understand.  I'm going to

8 overrule.

9      MS. LEE:  okay.

10      THE COURT:  Go ahead.

11      THE WITNESS:  Yes, I recall.

12 BY MR. RICHARDS:

13      Q   Okay.  Were you aware of any restriction on your --

14 on the ability to put down deposits?

15      A   I was not.

16      Q   Okay.  And did that have any factor at all --

17      THE COURT:  Or the units to reserve, or the number of

18 units you could reserve?

19      THE WITNESS:  I was not aware of any restriction.

20      THE COURT:  Okay.

21

22 BY MR. RICHARDS:

23      Q   Okay.  And in fact, if you take a look at the six

24 that Michael Andretti has, were you aware that he had six?

25      A   Yes, I was.

1       Q    Okay.  And if there was a restriction and you needed

2   to put a deposit in somebody else's name, would you pick Ken

3   Jowdy?

4       A    I would not.

5       Q    Okay.  And without getting -- having you list

6   everybody else you would have picked, was there people from --

7   family people or closer people to your life that you would

8   have act as your nominee than someone that you could be

9   adversarial with if your business disputes erupted?

10      MS. LEE:  Object.  Object as to leading.

11      THE COURT:  That is argumentative.

12      MR. RICHARDS:  Okay.

13      MS. LEE:  That's very leading, Your Honor.

14      THE COURT:  I'm going to sustain that one.  Could you --

15      MR. RICHARDS:  Yeah.

16   BY MR. RICHARDS:

17      Q    Why wouldn't have Ken -- why would Ken Jowdy not

18   have been the candidate to act as your nominee on Palms'

19   deposits in August of '05?

20      A    I could have put them in my wife's name at the time

21   if there was a restriction.

22      Q    Okay.  Are you familiar with forming companies?

23      A    Yes, I am.

24      Q    Trusts?

25      A    Yes, I am.

253

1     Q    Okay.  So there -- you -- was the motivation for the

2  -- for keeping Mr. Jowdy's deposit intact with the Palms

3  anything other than helping Mr. Jowdy make money?

4     A    Not that I'm aware of.

5     Q    Okay.  Did you ever see a single email in this case

6  that corroborates a suggestion that somehow you're going to

7  benefit from -- you would have benefited somehow from Mr.

8  Jowdy keeping the deposit?

9     A    I have not.

10     Q    Okay.  When you sent the wire from Mr. Murray to Mr.

11  Jowdy's escrow account, were you hoping that the deal would go

12  through?

13     A    Yes.

14     Q    Okay.  So wasn't -- when you -- at the time that you

15  had the wire come from Mr. Murray to Mr. Jowdy, were you --

16  did you have any belief that the deal was going to be

17  terminated by the Palms?

18     A    I did not.

19     Q    Okay.  Did that come as a surprise to you?

20     A    It did.

21     Q    All right.  And when you found out that the -- that

22  there was a problem with the deal -- I want to show you an

23  email that we previously marked that you sent on August 22,

24  2009 to Mr. Jowdy.  Well, let me strike that.  First, if you

25  can take a look at Exhibit 125?  What is 125?

254

1        A      It's a -- it appears to be a net wealth -- my net

2    wealth statement from February, 2006 that Mr. Jowdy produced.

3        Q      Okay.  And anywhere on there do you claim an

4    interest in Mr. Jowdy's -- in -- let me strike that.   In

5    anywhere do you claim an interest in any sort of home of Mr.

6    Jowdy's?

7        A      I do not.

8        Q      All right.  Okay.  And then if you could --

9        A      Specifically no interest in his Las Vegas house.

10       Q      Right.  Specifically.

11       A      No interest.

12       Q      And if you could take a look at Exhibit 118?  Is 118

13   in evidence?

14       THE CLERK:  No.

15       MR. RICHARDS:  Okay.  I'm going to move to admit 118.

16       MS. LEE:  I don't have those.

17       MR. RICHARDS:  All right.  Well, I think I already have

18   this email.  Let me just get the one that's admitted.  Sorry.

19   Let me just pull it up.  Or let me back up.  Do I have this

20   already in evidence?  Okay.  124, just look at 124.  Oh, wait.

21   No, that's not it.  Yeah, 124.  That's why I didn't see it.

22   Okay.

23   BY MR. RICHARDS:

24       Q      Go back to 124, that's in evidence, the second page.

25   Here's the email that we've shown today a couple times.  But

1   now it's relevant.  If you could take a look at that email.

2   It's on the screen in front of you.

3       THE COURT:  You know, something just occurred to me,

4   counsel.

5       MR. RICHARDS:  What?

6       THE COURT:  Are we going to have some difficulty in terms

7   of personal financial information?  I notice that you didn't

8   admit in Mr. Kenner's financial statement, which I think is

9   wise.

10      MR. RICHARDS:  Right.

11      THE COURT:  But are we going to have a problem with this

12  exhibit?  Is it one that should be redacted with respect to

13  numbers and things of that nature?

14      MR. RICHARDS:  Let me just -- it may be irrelevant.  Let

15  me just ask.

16      [Counsel Confer]

17      THE WITNESS:  We should redact, Your Honor.  That is an

18  account number --

19      THE COURT:  That's what I'm thinking about --

20      MR. RICHARDS:  Well, it -- I mean, I could redact -- I

21  mean, I could redact it.

22      THE COURT:  Well, I was going to say, does anybody have

23  any problem if we're getting into wire numbers or things of

24  that nature that we redact that personal information?

25      MR. RICHARDS:  No, we agree to do that.

256

 1        MS. LEE:  I -- well, I -- I'm sorry.  Go ahead.

 2        MR. RICHARDS:  Yeah, we --

 3        THE COURT:  Go ahead.

 4        MS. LEE:  I can tell you that before these counsel got

 5   involved, that the prior counsel and I had an agreement that

 6   if we were going to offer or introduce any documents in this

 7   case, that all Social Security numbers would be redacted.  Our

 8   set to the Court has all Social Security numbers redacted.

 9   And Lars also said that he would redact any account numbers as

10   well.

11        THE COURT:  Okay.

12        MR. GOODMAN:  Well, and -- and, Your Honor, if I can

13   just respond to that?  Our only conversation -- I mean, I

14   don't know what prior counsel's agreement was, was to redact

15   the Social Security numbers, which we did in our Plaintiff's

16   exhibits.  So we just left the last four digits of the Social

17   Security numbers.  But obviously, I mean this is our client's

18   account information, so I would prefer to have redacted that

19   as well.

20        THE COURT:  All right.  Ms. Clerk, on exhibit -- this --

21   what's being shown to me right now is Exhibit 124, right?

22   That's on the ELMO?

23        MR. RICHARDS:  Yes.  Yeah.

24        THE COURT:  We're going to redact -- just how about the

25   bank wire number, the account number, and -- what is down at

257

```
1    the bottom?  I can't see cause it's not --

2         THE WITNESS:  That's it.  That's all --

3         MR. GOODMAN:   Ron, if you can just --

4         MR. RICHARDS:  Your Honor, this is the only really

5    relevant thing that needs to be redacted.

6         THE COURT:  Well, what about this right here, that one

7    right there?

8         MR. GOODMAN:   Just 2101.

9         MR. RICHARDS:  That's just Charles Schwab's general

10   account, like their -- their general, you know, for thousands

11   and thousands of depositors.  It's not really a secret.

12        THE COURT:  Okay.  So the only thing we need to worry

13   about is where the one that says for the account of Glen

14   Murray?

15        MR. RICHARDS:  Yes, Your Honor, that would be it.

16        THE COURT:  What about the bank address as far as the

17   wire number?

18        MR. RICHARDS:  No, it's just a -- that's a publicly --

19   public -- that's just their ABA number for Citibank.

20        THE COURT:  Okay.

21        MR. RICHARDS:  That's who holds that account. There's no

22   value --

23        MR. GOODMAN:   That's the routing number, Your Honor, of

24   the bank.

25        THE COURT:  Okay.
```

258

1          MR. RICHARDS:  Yeah, it's not a secret.

2          THE COURT:  All right.  Then at the bottom, we're going

3     to redact the account number.  I don't need that information

4     in order to render a decision.

5          MR. RICHARDS:  Okay.

6          THE COURT:  Okay?

7                    DIRECT EXAMINATION CONTINUED

8     BY MR. RICHARDS:

9          Q    All right.  So Mr. Kenner, if you can take a look at

10     that document real quickly there?  Now, on August 22 -- prior

11     to August 22nd, I'm assuming that you found out some

12     information about the -- about the Palms' escrow.  Is that

13     correct or incorrect?

14          A    The timeframe is approximately correct.

15          Q    All right.  So explain what you found out prior --

16     around August 22, 2005.

17          A    I had wired Mr. Murray's money to the Palms' escrows

18     on his behalf for Mr. Jowdy on the 12th of August.  Between

19     the 12th of August and the 18th of August, I had confirmed

20     with Mr. Jowdy that the deposit had cleared and closed.  And

21     Mr. Murray referred to that earlier as being confirmed that

22     the wire had closed.  Mr. Jowdy notified me on or about the

23     20th or 21st of August that the Palms had rejected his escrow

24     and they were going to cancel it.  So I sent this email back

25     to Mr. Jowdy in the subject line, "Murray Palms $$", to,

259

1    "Please let me know when you send it.  I was going to speak

2    with Glen, so the sooner the better."

3         And as I recall, the reason I needed to speak with Glen

4    about in, in addition to just returning the funds, was that

5    Mr. Jowdy said, I know that the deal didn't go through so

6    would you talk to Muzz and see if it's okay if I don't pay him

7    the ten percent, but I'll figure it out with him later, if I

8    can just return the funds cause I got no benefit from them.

9         Q    In that -- so was Mr. Jowdy surprised that the Palms

10   didn't accept his deposit?

11        A    I think he was disappointed.

12        [Counsel Confer]

13   BY MR. RICHARDS:

14        Q    Okay.  So -- because you saw the letter in the same

15   exhibit that Mr. Jowdy -- his first choice where he says, "I

16   have put them in order of what I would like to see happen,"

17   his first choice is, "You accept the money and the deal is

18   done as is."  You see that?

19        A    Yes.

20        Q    Okay.  And then the second is, "You accept the money

21   and charge the market price for the units."  Do you see that?

22        A    Yes.

23        Q    What did he mean by that?

24        A    He would have been willing at the time, because he

25   was so desperate to keep the penthouse and the two other units

260

```
1    because it was in his future plans, that he would have been
2    willing to pay the 20 percent up-charge approximately that the
3    units were selling for at that time, six months after his
4    original contracts.
5         Q    Okay.  Now, when you sent this email to Mr. Jowdy
6    and he asked you if Mr. Murray would waive the ten percent,
7    were you authorized to renegotiate the deal?
8         A    By Mr. Jowdy, yes.
9         Q    No.  By Mr. Jowdy.  But by Mr. Murray, my client,
10   were you authorized to waive any interest?
11        A  .  I was not.
12        Q    Okay.  So you were going to -- if -- had Mr. Jowdy
13   immediately wired back the money, you may have -- would you
14   have possibly tried to accommodate your two friends?
15        A    Absolutely.
16        Q    Okay.  But this never happened?
17        A    It never happened.
18        Q    All right.  Now, at some point did -- oh, on August
19   22, 2005, did Mr. Jowdy at any time write you back and say,
20   after you sent this email, why would I send the money back to
21   Glen Murray or something to that effect?
22        A    He did not.
23        Q    Okay.  If Mr. Jowdy had done anything -- or if Mr.
24   Jowdy had done anything that led you to believe that he was
25   not going to pay Mr. Murray back on August 22nd after you
```

261

1    wrote that email, would that have changed your course of

2    conduct?

3        A    Absolutely.

4        Q    Okay.  Did you have any reason to believe that Mr.

5    Jowdy was not going to pay Mr. Murray back on August 22nd when

6    you sent that email?

7        A    Absolutely not.

8        Q    Okay.

9    THE COURT:  Would this be a good time to take a break?

10   MR. RICHARDS:  Sure.

11   THE COURT:  Okay.

12   MS. LEE:  I agree.  I'm --

13   THE COURT:  It's 5:00.  Again, I think we can get started

14   at 10:30.  I do have a calendar that starts at 9:00 in the

15   morning, so you can leave your things here, but I'm going to

16   need you to put them to the side, anything you want to leave

17   here, so you don't have to cart everything back to your

18   office.

19   MS. LEE:  And we'll be --

20   MR. GOODMAN:    Judge, on Friday, since we're concluding

21   at 12:00, what do you think the beginning -- or the start time

22   will be Friday?

23   THE COURT:  On Friday?

24   MR. GOODMAN:    Yeah.

25   THE COURT:  8:30.

262

```
1        MR. GOODMAN:   Okay.

2        MS. LEE:  Thank you, Your Honor.

3        THE COURT:  And we will go until 5:00 tomorrow.

4        MR. GOODMAN:   Very good.  Thank you.

5        THE COURT:  Okay?

6           [Recess]

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

263

1    ATTEST:    I do hereby certify that I have truly and correctly
     transcribed the audio/video recording in the above-entitled
2    case to the best of my ability.

3

4

5

6

7

8

9

10

11

12

13   ANTOINETTE M. FRANKS, Transcriber

14

15

16

17

18

19

20

21

22

23

24

25

1

1   TRAN

2

3                           DISTRICT COURT

4                      CLARK COUNTY, NEVADA

5   GLEN MURRAY,                )
                                )
6            Plaintiff,         )
                                )   CASE NO. 08-A-571984
7            v.                 )
                                )   DEPT. XXII
8   KENNETH JOWDY,              )
                                )
9            Defendant.         )
    _____ )

10

11    BEFORE THE HONORABLE SUSAN JOHNSON, DISTRICT COURT JUDGE

12                   THURSDAY, DECEMBER 2, 2010

13                     **REPORTER'S TRANSCRIPT**
                      **BENCH TRIAL - DAY 2**

14

15  APPEARANCES:

16    For the Plaintiff:       RONALD N. RICHARDS, ESQ.
                               ROSS C. GOODMAN, ESQ.
17

18

19    For the Defendant:       PATRICIA LEE, ESQ.
                               MICHAEL K. WALL, ESQ.
20                             KATHERINE BRANSON

21

22

23

24  RECORDED BY:  NORMA RAMIREZ, COURT RECORDER

25

2

# TABLE OF CONTENTS

                                                                    Page

December 2, 2010

Bench Trial – Day 2

Plaintiff's Witness(es):

Phil Kenner (Resumed)................................... 5

Ken Jowdy ............................................ 106


Defendant's Witness(es):

Ken Jowdy ............................................ 117

3

<div align="center">

1             <u>EXHIBITS</u>

</div>

2

3

4                                                            <u>Page</u>

5  <u>PLAINTIFF'S</u>:

6     None ............................................

7

8  <u>DEFENDANT'S</u>:

9     Exhibit(s) A-94.................................. 150

10    Exhibit(s) A-11.................................. 155

11    Exhibit(s) A-65.................................. 158

12    Exhibit(s) A-95.................................. 164

13    Exhibit(s) A-96.................................. 167

14    Exhibit(s) A-32.................................. 168

15    Exhibit(s) A-97.................................. 188

16

17

18

19

20

21

22

23

24

25

4

1          THURSDAY, DECEMBER 2, 2010 AT 10:40 A.M.

2       THE MARSHAL:  All rise.  Department 22 now in session,

3    the Honorable Susan Johnson presiding.

4       THE COURT:  Good morning, counsel.  You may all have a

5    seat.  Okay.  Are we ready to proceed?

6       MR. RICHARDS:  On behalf of Plaintiff, we are, Your

7    Honor.  We were in the middle of the direct of Phil Kenner.

8       THE COURT:  Okay.

9       MR. RICHARDS:  All right.  May I recall Mr. Kenner?

10      THE COURT:  Mr. Kenner.  And you can go ahead and come on

11   up here, sir.  Good morning.  And I just want to remind you,

12   sir, you have been sworn.

13       PHILIP KENNER, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

14      THE WITNESS:  Yes.

15      THE COURT:  Okay.  Counsel.

16      MR. RICHARDS:  Thank you.  Your Honor, I'm going to read

17   from a portion of Mr. Jowdy's deposition transcript into the

18   record, on page 14, at line 11.

19      MS. LEE:  Mr. Jowdy's?

20      MR. RICHARDS:  Yeah, Mr. Jowdy's.

21      THE COURT:  Are you going to be asking him a question

22   about it?

23      MR. RICHARDS:  Yeah.

24      THE COURT:  Okay.

25      MR. RICHARDS:  Remember, you cited the rule for the

1    Court?

2         MS. LEE:  I was just trying to be clear that you --

3         MR. RICHARDS:  Mr. Jowdy --

4         MS. LEE:  -- were you citing his deposition --

5         MR. RICHARDS:  That's correct.

6         MS. LEE:  -- and it wasn't --

7         MR. RICHARDS:  That's correct.

8                      DIRECT EXAMINATION [RESUMED]

9    BY MR. RICHARDS:

10        Q    Answer:  I know that --

11                  "Q  So you don't know what the source of the

12             900" --

13             And then it's cut off.

14                  "A  I know that $791,000 came from Glen

15             Murray."

16             Do you agree with that testimony that Mr. Jowdy made

17   in his deposition?

18        A    Yes, I do.

19        MS. LEE:  Objection, foundation.  I don't know what

20   context this --

21        THE COURT:  Okay.  Well, overruled.

22        MS. LEE:  Sorry, I didn't mean to -- speaking objection.

23   BY MR. RICHARDS:

24        Q    All right.  There's a -- I'm going to read another

25   part of Mr. Jowdy's deposition, page 13, line 4.

6

```
1              "A  So there was 412,000 that needed to be
2         paid, and Phil instructed me to take the money from
3         Glen Murray that was in the deposit for the Palms
4         and pay the $412,000."
5      Do you agree with that testimony?
6      A    I do not?
7      Q    Okay.  And why not?
8      A    First of all, if I were to take my client's money,
9   it would be complete fraud and misrepresentation, because I
10  wasn't authorized to do so, after a 15-year relationship with
11  my friend and client, who is also friends with 90 percent of
12  client base.  And I'd expect if something like that were ever
13  to happen, Mr. Murray would -- I'd be in the Defendant's chair
14  today with Mr. Murray.
15     Q    Now is it -- is there any -- have you seen any email
16  or any document from your office that would even remotely
17  support such a contention that you told Mr. Jowdy to wire
18  money to himself?
19     A    Absolutely not.
20     Q    And I'm going to read on page 13, line 8, from Mr.
21  Jowdy's deposition.
22             "Q  Do you know if the $200,000 from Phil
23         Kenner came from Phil Kenner personally or did it
24         come from some other source?
25             "A  I don't know."
```

1      Now, yesterday, you heard in my colleague's opening

2  statement that, somehow, you had a concern about $200,000.  Do

3  you remember that argument?

4      A    I do.

5      Q    Okay.  Now --

6      THE COURT:  Not argument.  It should have been a

7  statement, just to give me a purview -- preview --

8      MR. RICHARDS:  Sorry.

9      THE COURT:  That's all right.

10     MR. RICHARDS:  Yeah, an opening statement.  I didn't know

11 how to characterize it because it wasn't evidence, but --

12     THE COURT:  I understand.

13     MR. RICHARDS:  -- from her opening statement.  I'm sorry,

14 Your Honor.

15     THE COURT:  That's all right.

16 BY MR. RICHARDS:

17     Q    From my colleague's opening statement.  Do you

18 remember that part of the statement?

19     A    I do.

20     Q    Okay.  And there was a representation in the opening

21 statement that the money came from a company named Ula Makika.

22 Do you remember that?

23     A    Yes, I do.

24     Q    Okay.  Now did Ula Makika get that money from you,

25 Phil Kenner, personally?

8

```
 1        A     No, it did not.
 2        Q     Okay.  And that money -- did that money come from an
 3   investor pool or -- not investor pool, a pool of --
 4        MS. LEE:  Objection, leading.  Sorry.
 5        MR. RICHARDS:  I'm asking him.
 6        THE COURT:  No, overruled.
 7        MS. LEE:  Okay.
 8        MR. RICHARDS:  Yeah.
 9        THE COURT:  Go ahead.
10        MR. RICHARDS:  It's foundational.
11   BY MR. RICHARDS:
12        Q     Did that money come from a group of 25 individuals
13   or so?
14        A     Yes, it did.
15        MS. LEE:  Objection, leading, Your Honor.
16        THE COURT:  Well, it is, but he's giving me some
17   foundation.  I'm going to overrule.
18             Go ahead.
19        MR. RICHARDS:  All right.
20   BY MR. RICHARDS:
21        Q     Now, so did you have a personal stake in the 200,000
22   that Ula Makika lent to Mr. Jowdy?
23        A     No more than the other 25 investors.
24        Q     Okay.  So did you have a bigger stake in making sure
25   Mr. Murray didn't lose his 800,000 or the Ula Makika loan?
```

9

1          A    I was more concerned about Mr. Murray's 800,000.

2          Q    All right.

3          A    I certainly wouldn't jeopardize a 15-year

4     relationship with Mr. Murray to protect $200,000 of a loan

5     that Mr. Jowdy had taken from us.

6          Q    From money that -- was that money -- that money

7     obviously wasn't from you then, listening to your testimony.

8          A    It was not.  It was not from me.

9          Q    Okay.  So was there any evidence that you would

10    sacrifice 800,000, which is about four to one of money you

11    know came from Mr. Murray versus money from -- which would be

12    broken up from 25 other people?

13         A    Absolutely not.

14         MS. LEE:  Objection, leading.

15         THE COURT:  He is leading.  And, in fact, it doesn't

16    really help me that much.  Why don't you just ask him the

17    direct question?  I'd rather hear from the witness as opposed

18    to hearing you --

19         MR. RICHARDS:  Sorry.  I'm not trying to --

20         THE COURT:  I --

21         MR. RICHARDS:  I honestly am not trying to lead him.  I'm

22    just trying to have him focus for foundation, so we don't --

23         THE COURT:  I understand.

24         MR. RICHARDS:  -- we move it along.

25         THE COURT:  Just ask him the direct question.  I assume

1  you've prepared him for this testimony today?

2      MR. RICHARDS:  Well, I got to tell you, Your Honor, I was

3  busy more dealing with my client, but --

4      THE COURT:  I understand.

5      MR. RICHARDS:  -- you know.  All right.

6      THE COURT:  But go ahead and ask him the direct question.

7  It just -- it -- I just get more out of it is what I'm telling

8  you.

9      MR. RICHARDS:  Okay.

10  BY MR. RICHARDS:

11      Q    Can you explain to the Court why you strongly -- if

12  you -- do you strongly disagree with the contention that you

13  had a personal interest in the $200,000?

14      A    Strongly disagree.

15      Q    Okay.  Can you explain to the Court why you strongly

16  disagree?

17      A    Because the $200,000 came from a revolving line of

18  credit that Mr. Jowdy had taken out from a group of investors

19  in Hawaii.  And if the $200,000 was lost in the home

20  transaction, if it, in fact, were hard, which I'm not -- I

21  wasn't sure at the time that it ever was, Mr. Jowdy would

22  still be personally responsible under the terms of the

23  revolving line of credit.  It was not a concern of mine

24  whether or not the $200,000 was lost as hard money or it

25  wasn't lost.  But I certainly have a fiduciary responsibility

11

1   to Mr. Murray and the $800,000, and we conducted ourselves

2   appropriate in the transaction with Mr. Murray and Mr. Jowdy.

3       Q    At any time, do you have any correspondence from

4   Mr. Jowdy that would suggest that the $200,000 that was leant

5   to him, somehow, you had an ownership interest in that money?

6       A    I do not.

7       Q    Were you surprised or not surprised to hear that

8   claim?

9       A    Very surprised.

10      Q    Okay.  I want to read from Mr. Jowdy's deposition on

11  page 50, lines 11 through 15.

12           "Q  At that point, when you were looking for

13           that secondary source, did they tell you that the

14           money was coming from Glen Murray?

15           "A  He told me that he was going to be able to

16           get the money from Glen Murray.  Yes."

17      Do you agree that Mr. Jowdy was aware?  Do you agree with

18  that testimony?

19      A    I do.

20      Q    All right.

21      MR. RICHARDS:  May I have the ELMO, please?

22  BY MR. RICHARDS:

23      Q    Showing you Exhibit 124, which is that --

24      MR. RICHARDS:  Oh, I've got to turn it on.

25      THE MARSHAL:  Yeah.

12

```
 1        MR. RICHARDS:  Sorry, thank you.

 2  BY MR. RICHARDS:

 3        Q    Okay.  With respect -- I'm just going to -- okay.

 4  I'm going to read from Mr. Jowdy's deposition on page 129,

 5  line 21.  I'll represent to you that this is Exhibit 49 in the

 6  deposition.

 7                 "Q  And what was 49?

 8                 "A  It was Phil saying that money needed to be

 9             sent to Glen, which meant that Phil was going to

10             send me the money to send to Glen."

11        And he's referring to this exhibit for -- and I'll

12  represent to you that's true.  Do you want -- is that -- do

13  you agree with that testimony?

14        A    I do not.

15        Q    Okay.  Why does that -- does that testimony make any

16  sense to you whatsoever?

17        A    It makes no sense that ten days after Glen Murray

18  sent him the money.  It's even in the subject of the email.

19  It says the Murray Palms money.

20        Q    Can you point it out to the Court?  Because you sent

21  the email.

22        A    It says Murray Palms money at the top.  So it makes

23  no sense to me that after Mr. Jowdy, on the 21st, told me that

24  he needed Glen's wiring instructions to send the money back,

25  that he would send the money -- he wouldn't send it to Mr.
```

13

1    Murray's account.

2        Q    Did you ever have a conversation with Mr. Jowdy as

3    to why he's adding language to an email that's not there?

4        A    It makes no sense to me that I would be sending

5    money to Mr. Jowdy ten days after Glen Murray borrowed the

6    money from him, so he could give money back from me?  It makes

7    no sense.  It's like chasing your own tail.

8        Q    Did you ever have a conversation with Mr. Jowdy

9    that, somehow, you had an extra 800,000 lying around to send

10   to him?

11       A    If I did, I certainly may have taken down the

12   transaction myself and not introduced Mr. Murray at the time.

13   It makes no sense.

14       MR. RICHARDS:  I'll pass the witness.

15       THE COURT:  Cross.

16       MS. LEE:  Yes, Your Honor.  Your Honor, can I go ahead

17   and publish Mr. Kenner's deposition at this time?

18       THE COURT:  Okay.

19       [Pause]

20       MS. LEE:  May I approach the clerk, Your Honor?

21       THE COURT:  Sure.

22            There you go, sir.

23                        CROSS-EXAMINATION

24   BY MS. LEE:

25       Q    Good morning, Mr. Kenner.  You arranged the initial

14

```
 1    meeting between my client, yourself, and Mr. Maloof regarding
 2    these Palms units; did you not?
 3         A    Yes, I did.
 4         Q    And you attended that meeting, didn't you?
 5         A    I did.
 6         Q    And you knew about this funding opportunity at the
 7    Palms, because you had other clients who already had money in
 8    the Palms, trying to purchase units at the Palms as well, did
 9    you not?
10         A    I'm not sure I understand what funding opportunity
11    you're talking about.
12         Q    You had other clients of yours that had money into
13    the Palms deal at that time that you arranged a meeting with
14    my client and Mr. Maloof; did you not?
15         MR. RICHARDS:  Foundation as to deal, vague.
16         THE COURT:  I'm going to sustain that.  Lay some more
17    foundation.
18         MS. LEE:  Sure.
19    BY MS. LEE:
20         Q    Did you have any clients at that time who had any
21    ownership interest at the Palms?
22         A    I did not.
23         Q    Did you have any clients at the time that alerted
24    you to investments opportunities at the Palm?
25         A    I did not.
```

15

1       Q     Do you recall me taking your deposition in this

2    case, on June 18th, 2009?

3       A     I recall the deposition.

4       Q     And do you recall telling me during that deposition

5    that you were made aware of funding opportunities at the Palms

6    through your two clients, Tommy Constantine [phonetic] and

7    Mr. Andretti [phonetic]?

8       A     I do not.

9       Q     Okay.

10   MR. RICHARDS:  Foundation, that those are clients.

11   BY MS. LEE:

12      Q     Are those your clients?

13   THE COURT:  Okay.  Well, first of all, let me go ahead

14   and rule on the --

15   MS. LEE:  Oh, I'm sorry, Your Honor.

16   THE COURT:  I'm going to overrule.  Go ahead.

17   [Pause]

18   THE COURT:  Are the Andretti's your clients?

19   THE WITNESS:  They are not.

20   THE COURT:  Okay.  Who is the other one that you --

21   MS. LEE:  Mr. Constantine.

22   THE COURT:  Is he your client?

23   THE WITNESS:  He is not.

24   THE COURT:  Okay.

25

1   BY MS. LEE:

2       Q    Okay.  Can you please turn to page 66 of the

3   deposition transcript before you?

4            Are you there?

5       A    Yes.

6       Q    Okay.  I'm just going to go ahead and read this, and

7   you can tell me if this refreshes your recollection as to what

8   you testified to on June 18th.

9                "Q  Were you aware that there were units for

10               sale at the Palms?

11               "A  Yes.

12               "Q  And how did you become aware of that?

13               "A  I became aware of it through some of other

14               friends of mine who were acquiring units.

15               "Q  And which friends were those?  Can I have

16               their names, please?

17               "A  Tommy Constantine and Michael Andretti.

18               "Q  And they informed you that they were

19               purchasing units at the Palms?

20               "A  Yes."

21       So you were aware of the purchasing opportunities at the

22   Palms through your friends -- and I'm sorry.  I guess not

23   client, but your friends, Mario -- Mr. Andretti, rather, and

24   Mr. Constantine?

25       A    Yes, I was.

17

1    Q    So it wasn't like my client was coming to you and
2    you were, for the first, were hearing about Palms --
3    purchasing opportunities at the Palms.
4    A    I'm not sure I follow that.  Could you repeat --
5    Q    At the time that you arranged the meeting with
6    Mr. Maloof, yourself, and my client, you already knew that
7    there were purchasing opportunities at the Palms.
8    A    I was aware of it.  Mr. Jowdy had asked me to
9    arrange the meeting for himself and Roger Clemens and his wife
10   [indiscernible] Mr. Maloof.
11        Ms. Lee, make no mistake about it though.
12   Mr. Jowdy, separate and apart from my relationship with
13   Mr. Maloof, was already an acquaintance of Mr. Maloof.
14   Q    Do you recall -- I'm sorry.  Do you recall hearing
15   Mr. Gaudet's testimony yesterday in court?  Bob Gaudet.  Do
16   you recall him testifying here yesterday in court?
17   A    Yes, I do.
18   Q    Okay.  Do you recall him testifying to a revolving
19   line of credit?
20   A    No, I do not.
21   Q    Okay.  Well, I'll submit to you that this was
22   admitted yesterday through Mr. Gaudet and authenticated.  And
23   this is Plaintiff's Exhibit Number 89, A-89.
24        MR. RICHARDS:  What exhibit is it, A-89?
25        MS. LEE:  A-89.

18

```
 1          THE COURT:  Well, was this the part of 93?

 2          MS. LEE:  No, Your Honor.  This is the --

 3          THE COURT:  Did we admit 89?  I know that -- I remember

 4   seeing this, but I thought this one was --

 5          THE CLERK:  A-89 is admitted.

 6          THE COURT:  A-89 is -- okay, fine.  Thank you.

 7   BY MS. LEE:

 8      Q    Can you take a look at that document at your tab A-

 9   89, at your -- oh, I guess you don't have A-89.

10          MS. LEE:  We took the binders back from Your Honor.

11   Can we hand the witness A-89 for his --

12          MR. RICHARDS:  He can see it in the screen.

13          MS. LEE:  Oh, that's true.

14          MR. RICHARDS:  Yeah.

15   BY MS. LEE:

16      Q    Do you see this document here before you?

17      A    I can see what you can see on the screen.

18      Q    Okay.  And this is a revolving line of credit

19   between yourself and Mr. Jowdy, is it not?

20      A    We are two of the parties, it appears.

21      Q    And Mr. Jowdy is the borrower, and you are the

22   lender, along with Little Isle IV LLC, is that correct?

23          MR. RICHARDS:  My objection is the document speaks for

24   itself.

25          THE COURT:  Well, she's asking questions about it.  So
```

19

```
 1    I'm going to overrule.
 2            Go ahead.
 3       THE WITNESS:  It appears they are all parties to this
 4    agreement.
 5    BY MS. LEE:
 6       Q    And you drafted this document, did you not?
 7       A    Yes, I did.
 8       Q    And this is a revolving line of credit that my
 9    client had available to him at the time that you were running
10    around trying to find him money for the Palms; is that right?
11       A    That is correct.
12       Q    So he had this revolving line of credit, which --
13    and what was the interest rate on this revolving line of
14    credit in terms of the repayment interest rate?
15       A    Could you put the document back up, please?
16       Q    Do you not -- you don't have an independent
17    recollection?
18       A    I may, but we have the document in front of us.  It
19    appears 15 percent per annum.
20       Q    And do you remember discussing this revolving line
21    of credit during your deposition?
22       A    I do not.
23       Q    Well, if you could turn to page 137 of your
24    deposition transcript.  And I'm just going to go ahead and
25    read into the record our exchange during this time.
```

20

1         "Q  Well, if Mr. Jowdy needed money under this

2     agreement" --

3     MS. LEE:  And I'll represent to the Court that it is this

4  agreement to which we're referring right now.

5  BY MS. LEE:

6         "Q  How would he get it?

7         "A  Mr. Jowdy would typically call me and say I

8     need money wired to some particular account in his

9     control or some other third party entity that he

10     owed funds to.

11         "Q  Is this agreement still in effect today?

12         "A  Until the funds are repaid.

13         "Q  Can Mr. Jowdy continue to tap into this

14     line of credit?

15         "A  No.

16         "Q  When was the last time Mr. Jowdy was

17     permitted to receive funds pursuant to this line of

18     agreement?

19         "A  I don't recall."

20     And then if you skip down to line 11 on page 138:

21         "Q  Why was Mr. Jowdy no longer able to tap

22     into this line of credit?

23         "A  Mr. Jowdy had become in default of this per

24     the terms of the agreement.

25         "Q  Was he in default of this agreement at the

21

1         time he took out loans with Murray?

2            "A   No.

3            "Q   So if Mr. Jowdy needed funding for the

4         Palms unit, why didn't you just give him the money

5         through this line of credit as opposed to securing a

6         loan from Mr. Murray, particularly since it's at a

7         higher interest rate?

8            "A   I'm not sure I'm supposed to be securing

9         loans for Mr. Jowdy in the context you just asked.

10        Can you ask the question again?

11           "Q   Sure, I'll ask it a different way actually.

12        If this revolving line of credit was available to

13        Mr. Jowdy at the time he needed $800,000, why didn't

14        you just give him the money under this agreement?

15          "A   I'm not Mr. Jowdy.  You'd have to ask him.

16          "Q   But when he asked you for money, you didn't

17        -- you just give it to him as a lender under this

18        agreement as opposed to getting the funding from

19        some third party.

20          "A   You'd have to ask Mr. Jowdy why he wanted

21        funding that way.

22          "Q   So you're saying it was at -- well, let me

23        ask you this way.  Had Mister -- could Mr. Jowdy

24        have borrowed $800,000 under this revolving line of

25        credit in 2005?

22

```
1                     "A  I don't see why not."
2         Did I read that correctly?
3         A     You read a very specific statement that I answered
4    very specifically at the time.
5         THE COURT:  You have a question about this?
6         MS. LEE:  Yes.
7         THE COURT:  Okay.
8    BY MS. LEE:
9         Q    Does it make any sense to you, Mr. Kenner, that if
10   my client had access to funds, that he would have you pounding
11   the pavement, running around, contacting no less than 15 of
12   your clients, and calling you 10 times a day, asking if the
13   money has hit, and is desperately trying to find money for
14   these Palms units, according to you, that if he had this line
15   of credit available to him at an interest rate of 15 percent
16   that he could have tapped into at that time, that he wouldn't
17   have just tapped into that?  Does that make sense to you?
18        MR. RICHARDS:  Speculation.
19        THE COURT:  Overruled.
20        THE WITNESS:  Who said that he had access to this line of
21   credit for a personal investment?
22   BY MS. LEE:
23        Q    I'm sorry.  Don't ask -- I'm asking you the
24   questions.  So the question was does it make sense to you, if
25   he had access to this line of credit, which you in your
```

23

1    testimony had said if -- could he have -- could Mr. Jowdy have

2    borrowed $800,000 under this revolving line of credit in 2005?

3    I don't see why not.  Does it make sense to you that if he

4    could have done that, that he didn't do it?

5         A    You asked me, at the time, could Mr. Jowdy have

6    borrowed -- after you made a statement, could Mr. Jowdy have

7    borrowed $800,000 under the revolving line of credit in '05.

8    Of course, he could have.  But Mr. Jowdy didn't ask me to

9    borrow $800,000 for what the purpose of the personally

10   guaranteed loans were, and those were his investments in

11   Mexico.  He made it -- you made it very clear in the opening

12   statement yesterday that Mr. Jowdy was acquiring the

13   Innisbrook house for the purpose of office space and

14   hospitality.  But it is very clear to the rest of the Court

15   and the evidence has been provided that Mr. Jowdy was

16   acquiring those units for his personal use.  And he wanted to

17   live there as his residence.

18        Also, you asked me why didn't Mr. Jowdy request

19   those from the line of credit.  Perhaps he did and he was told

20   he couldn't have it, because he was borrowing those funds to

21   further procure the investments that he was the director of in

22   Cabo San Lucas at the time and Diamante Del Mar.

23        Q    That was a very long question -- I mean very long

24   answer.

25        MR. RICHARDS:  I'm going to -- it's argumentative.  It

24

```
1    was a long question.
2         THE COURT:  It is.  It is.  But go ahead.
3         MS. LEE:  But I'm trying to ferret out the response.
4    BY MS. LEE:
5         Q    Would you agree that had Mr. Murray [sic] taken out
6    money under this line of credit at 15 percent, under the terms
7    that you say this loan was taken out of, 30 days at 15
8    percent, he would only be paying 1.2 percent for that 30 days
9    as opposed to the 10 percent that you represent the loan was
10   actually for?
11        A    I would not have loaned Mr. Murray money out of this
12   line of credit.
13        Q    And why is that?
14        A    Mr. Murray wasn't a party to this agreement.
15        Q    I'm sorry.  Mr. Jowdy.
16        A    I'm confused now.  I was trying to pay attention to
17   your question.
18        Q    Right.  And I apologize for that.  I get you guys'
19   names confused all the time.  So the question was had Mr.
20   Jowdy applied the terms of this revolving credit to this
21   supposed loan that was only supposed to be outstanding for 30
22   days, he would have only had accrued 1.2 percent interest on
23   those borrowed funds, would he not have?  Under the terms of
24   this agreement before you.
25        A    I don't know.
```

1       Q    Well, if you have 15 percent per annum, that breaks

2  down to roughly 1.2 percent per month, does it not?

3       A    I believe it does.

4       Q    And although he had access to those funds, he didn't

5  borrow against it to fund these Palm units.

6       A    To fund his personal Palm units?  Absolutely not.

7       Q    Now this --

8       A    The monies under this revolving line of credit, Mr.

9  Jowdy used the entire funds, and he's testified to it in the

10  past, that he's used the entire funds for his projects in

11  Mexico.

12       Q    Okay.  Well, does this agreement say that anywhere?

13  Because his name personally is on this revolving line of

14  credit.  There's not corporate entity tied to it.  He is the

15  borrower, would you agree?

16      MR. RICHARDS:  Argumentative, legal conclusion, document

17  speaks for itself.

18      THE COURT:  Overruled.

19      THE WITNESS:  Could you ask the question again, please?

20  BY MS. LEE:

21       Q    Would you agree that Mr. Kenneth Jowdy, in his

22  personal capacity as an individual, is the borrower under this

23  agreement?

24       A    Yes, he is the borrower under this agreement.

25       Q    There's no corporate entity that's trying to borrow

```
 1    money under this revolving line of credit that you drafted, is
 2    it?
 3         A     There is not, but I am not a lawyer.  And we tried
 4    to document the verbal agreement, the oral agreement that had
 5    started months earlier, and this was our best attempt at it.
 6         Q     Right.
 7         A     So, obviously, at the time, Mr. Jowdy was looking
 8    for the funds and didn't get the money from this line of
 9    credit.  And it's because he had to ask me for the line of
10    credit access.  And if there was that issue at hand, why
11    wouldn't he still be borrowing today?  He's not borrowing,
12    because he has no access to the funds, because I have to
13    authorize it.
14         THE COURT:  Go ahead.
15    BY MS. LEE:
16         Q     Now you said something very interesting, that you
17    were -- it was important that you guys memorialized this
18    agreement in writing.  Is there any reason why you didn't
19    memorialize this loan, this supposed loan, from your client
20    Glen Murray to my client Mr. Jowdy, in writing?
21         A     There's no particular reason.
22         Q     And you've done dozens of these transactions in the
23    past, where you're brokering or facilitating deals between
24    your clients and third parties, have you?
25         A     No, I have not.
```

27

1    Q    Was this a -- so this was an isolated incident?

2    A    This was one of the few.

3    THE COURT RECORDER:  I'm sorry.  I can't hear.

4    THE COURT:  We can't hear you, sir.

5    THE WITNESS:  I'm sorry.

6    THE COURT:  That's all right.

7    THE WITNESS:  This is one of the few.

8    BY MS. LEE:

9    Q    Well, isn't it true that for your clients you act as

10   a liaison between them and third parties, such as attorneys,

11   such as insurance brokers, such as CPA's, and you are

12   brokering these communications?

13   MR. RICHARDS:  Overbroad, foundation.

14   THE COURT:  Overruled.

15   THE WITNESS:  Yes, I do.

16   BY MS. LEE:

17   Q    And with your experience in that, would you agree

18   with me that it's important to have these types of

19   transactions in writing?

20   A    I would say if I'm brokering a relationship, as you

21   described, between one of my clients and an attorney, that

22   when they are put together through my brokering, as you call

23   it, Mr. Richards and Mr. Murray, or Mr. Goodman and Mr. Murray

24   deal with their own agreements.  This is a very isolated

25   incident, where I had to document an issue with Mr. Jowdy.

28

1      Q     But you did not document that issue with Mr. Jowdy

2   and Glen Murray?

3      A     We did not.

4      Q     But you did document a power of attorney that you

5   sent to Charles Schwab to be able to pull the money out of Mr.

6   Murray's account, didn't you?

7      A     Charles Schwab demanded that they have a signed

8   authorization by Mr. Murray.

9      Q     And you facilitated that document?

10      A     I don't recall.  You're also misunderstanding the

11   point that Mr. Jowdy, when he finally was authorized to get

12   the money, was under extreme pressure, as we now see in

13   hindsight, to get that money.

14      Q     I'm sorry.  If you could just wait for a question

15   before just -- I think that was answered.

16            So under this revolving line of credit, if I could

17   turn your attention back to it, Mr. Jowdy is the borrower.

18   And according to the terms of the -- of this revolving line of

19   credit, it states --

20      [Counsel Confer]

21      MS. LEE:  Oh, I'm sorry, Your Honor.  They're asking me a

22   question.  We have Mr. Gamley [phonetic] from my office.  He's

23   an attorney --

24      MR. RICHARDS:  Oh, great.

25      MS. LEE:  -- from my firm.  He wanted to know if it was a

29

1    witness.

2         THE WITNESS:  Ms. Lee, do you mind if I actually get the

3    hard copy of this, so I can read it while you've got it half

4    on the screen, please?

5         THE COURT:  Okay.

6         THE CLERK:  Which one is it?

7         MS. LEE:  I don't have a problem with that.

8         THE COURT:  It's Exhibit 89, A-89.

9         THE COURT:  Here you go.

10        THE WITNESS:  Thank you.

11        THE COURT:  Uh-huh.

12   BY MS. LEE:

13        Q    Do you have that before you, Mr. Kenner?

14        A    Yes, I do.

15        Q    Okay.  So in that first paragraph there, towards the

16   bottom, it states:

17             Subject to the other terms and conditions hereof,

18   borrower, that's Mr. Jowdy, may borrow, repay, and reborrow

19   hereunder until the principal balance and all interest sums

20   payable hereunder are paid in full, as follows, in lawful

21   money of the United States of America.

22        Did I read that correct?

23        A    I believe you did.

24        Q    Now is there anything else in this document that you

25   drafted that limits the purposes for which he can borrow this

1    money?

2         A    I would say the next sentence.

3         THE COURT:  Can you move this, so I can read it, counsel?

4         MS. LEE:  Oh, I'm sorry, Your Honor.

5         THE COURT:  Counsel, unfortunately, I can only see half

6    of it too.

7         MS. LEE:  I'm wondering if I can make this --

8         THE COURT:  You can make it smaller

9         THE CLERK:  Yeah, there's a zoom button.

10        MR. RICHARDS:  Does Your Honor just want to borrow my

11   book for a minute?

12        MS. LEE:  I don't know how this --

13        THE COURT:  No.  I would rather look at it on screen.

14        MS. LEE:  I don't know what the zoom button is.

15        THE COURT:  Hold on just a moment.

16        [Counsel Confer]

17        MS. LEE:  Okay, Your Honor.

18        THE COURT:  Okay.

19        MS. LEE:  I'm going to try to make this -- sorry, that's

20   probably too small.

21        THE COURT:  Okay.  We're looking at number one?

22        MS. LEE:  Well, I was reading in this here, where my

23   finger is here.

24        THE COURT:  Okay.

25        MS. LEE:  Subject to the other terms and conditions

31

```
1    hereof, borrower may borrow, repay, reborrow hereunder until

2    the principal balance and all interest sums payable hereunder

3    are paid in full, as follows, in lawful money of the United

4    State of America.

5    BY MS. LEE:

6        Q     And then my question to you, Mr. Kenner, was is

7    there anything in this document that limits the purpose for

8    which Mr. Jowdy can borrow funds under this revolving line of

9    agreement -- of credit?

10       A     The same answer, the next --

11       Q     Could you repeat your answer, please?

12       A     The next line of the paragraph.

13       Q     So lenders have no obligation to refinance or extend

14   the terms of this agreement with borrower?

15       A     Correct.

16       Q     How is that -- because you drafted this agreement,

17   so I want to get inside of your mind when you're drafting

18   that.  How does that limit the purpose for which my client can

19   access money under this revolving line of credit?

20       MR. RICHARDS:  Parol evidence.

21       THE COURT:  I'll -- I'm going to overrule.  Go ahead.

22       THE WITNESS:  It's about as clear as a layman can draft

23   that sentence.  The lender, which is myself and myself on

24   behalf of Little Isle IV at the time, have no obligation to

25   refinance or extend.
```

```
 1   BY MS. LEE:

 2       Q    But does that limit the purpose for which he can

 3   borrow the funds?  Does it say you can only borrow the funds

 4   if you're going to use these funds for a specific purpose?

 5       A    It does not say why, but it says we're under no

 6   obligation to do so.  There wasn't -- Mr. Jowdy knew what the

 7   original agreement was.  And if we went through all of the --

 8       MS. LEE:  Your Honor, instruct the witness not to testify

 9   as to what Mr. Jowdy knew.

10   BY MS. LEE:

11       Q    But go ahead.

12       THE COURT:  Okay.  I understand, counsel.  I'm trying to

13   understand where you're going with this.

14       MS. LEE:  Okay.

15       THE COURT:  So that's why --

16       MS. LEE:  Sure.  And this is very important, Your Honor.

17   So I'm going to spend a little time with it, because --

18       MR. RICHARDS:  Your Honor, I'm going to object on a

19   relevancy ground, because, one, I didn't bring this up.  It's

20   not proving my case.

21       THE COURT:  Well, I understand, but you've made an

22   agreement --

23       MR. RICHARDS:  Right.

24       THE COURT:  -- that you can go outside the scope with

25   respect to cross is what I understand --
```

33

1        MR. RICHARDS:  Right.

2        THE COURT:  -- it to be.

3            So, first of all, sir, since we've got you up here,

4    what is this?  Let's just go right from the get-go.  What is

5    this?

6        THE WITNESS:  This is a revolving line of credit in 2004,

7    when Mr. Jowdy and myself and the 20 to 25 other investors

8    were all on very good terms, very close in friends and a team,

9    as the Plaintiff suggested yesterday.  Mr. Jowdy was

10   constantly looking for funds and had approached me, and asked

11   if I could put together some short term money for him at the

12   time.

13       THE COURT:  Okay.  And how much was this line of credit?

14       THE WITNESS:  It was an open-ended revolving line.  And,

15   Your Honor, to give you the timeline, in the middle of 2004,

16   mid to fall of 2004, Mr. Jowdy had originally requested funds.

17   For the first three or four months, he continued to tell me

18   that he had -- he and his brother, who was in the courtroom

19   yesterday, Taffy Jowdy, were selling their Startime

20   Entertainment deal in Atlanta, Georgia.  They were going to

21   make a million-and-a-half, or two-and-a-half, or $3.5 million

22   all cash.  So he would constantly come to me and ask for short

23   term money, professing that they were about to sell this

24   Startime Entertainment commercial complex.

25            As far as I know, that never happened, and it

34

```
 1   eventually went bankrupt.  But that building was always the
 2   carat for me to lend money to Mr. Jowdy.  So in the mid to
 3   fall of '04, we lent about $250,000 to Mr. Jowdy out of our
 4   group of investors in Hawaii, a completely separate project.
 5   Mr. Murray, myself, and about 25 of our friends were involved
 6   in.
 7        THE COURT:  Okay.  But that had nothing to do with this
 8   line of credit, right?
 9        THE WITNESS:  This is the line of credit.  Little Isle IV
10   is the Hawaiian group --
11        THE COURT:  Okay.  That's the --
12        THE WITNESS:  -- that lent Mr. Jowdy the money.
13        THE COURT:  -- Ula Makika.
14        THE WITNESS:  Ula Makika and Little Isle IV.
15        THE COURT:  Got it.  Okay.
16        THE WITNESS:  They're both related.
17        THE COURT:  Okay.
18        THE WITNESS:  And in here, it actually states, after
19   Little Isle IV being the second lenders -- second two lenders,
20   and any other related individual or entities involved in the
21   future by Kenner.  Ula Makika and Little Isle IV work
22   synonymously in -- almost as alter egos in Hawaii.  And as
23   Mr. Richards suggested earlier, Ula Makika was set up as a
24   buffer between my Little Isle investments and the group of
25   investors, and lending money to outside sources.  We had lent
```

35

1    money to several other places.

2         So under the terms, Mr. Jowdy borrowed about a

3    quarter million dollars in the summer of '04.  And by the fall

4    of '04, he hadn't repaid the funds yet.  So at that time, I

5    chose to memorialize this, because he was asking for even more

6    funds, I think several hundred thousand dollars more, and the

7    loan was going to get larger.  But it was an ongoing revolving

8    line.

9         And at that time, Your Honor, if I can create some

10   clarity to all this, there were two projects, Diamante Del

11   Mar, which had been ongoing for several years and was in

12   constant need of capital, even though Mr. Murray and myself

13   and our friends had raised about $10 million for it.

14   Mr. Jowdy was constructing and doing hospitality on the

15   project but had not raised any other source of funds, although

16   he was looking everywhere for those funds.  So he was

17   constantly in need of short term cash to pay construction

18   people, pay hospitality, and pay bills.

19        In the fall, about this same time in 2005, we were

20   in pursuit -- from 2004, 2005, and into early 2006, we were in

21   pursuit of several different properties in Cabo San Lucas,

22   because the North Baja property was having a hard time getting

23   attention as remote destination.  Cabo San Lucas is Cabo San

24   Lucas, and it's already a tourist trap.  So we were in pursuit

25   of several different locations down there.  Mr. Jowdy was then

36

1   in need of lifestyle money and project money to pursue the

2   efforts down in Cabo San Lucas.  Thus, he came to ask for a

3   considerable amount of money.

4          The money, right now, outstanding is over $5 million

5   of principal that has not been repaid.  But under the terms of

6   this agreement, Mr. Jowdy did get about $7 million, and over

7   the terms of this agreement, did pay back about $2 million to

8   us.  So he confirmed the agreement by accepting the money.  He

9   confirmed the agreement by paying some of our loan money back.

10       THE COURT:  Okay.

11       THE WITNESS:  So this was the -- my attempt -- I'm not a

12   lawyer.  I have no law background.  This was my attempt to

13   memorialize, because I have 25 other partners, and some of

14   them had asked me if we're going to lend money to Jowdy on an

15   ongoing basis, can we please memorialize this.  And that's

16   what my attempt was to do here.  So it doesn't -- it didn't

17   outline every permutation that we could ever imagine would

18   happen, as Ms. Lee is suggesting.  It doesn't say Mr. Jowdy is

19   restricted from personal use, but this all ended up as

20   Mr. Jowdy's benefit, all of the money we sent.

21       THE COURT:  Okay.  So by summer of 2005, what was owed on

22   this line of credit by Mr. Jowdy?

23       THE WITNESS:  To the best of my recollection, probably

24   $2.5 million.

25       THE COURT:  Okay.

1    THE WITNESS:  And in fact, at the exact same time in

2  August, as I said, this was all for Mr. Jowdy's pursuit of our

3  Mexican development projects.  When he asked for the $200,000

4  loan for the original deposit for Mr. Maloof's home on

5  Innisbrook, we gave it to him in the exact same timeframe, on

6  August 5th.  That money was wired to the Innisbrook property

7  as a hard deposit at Mr. Jowdy's request, because as Ms. Lee

8  suggested in her opening statement, Mr. Jowdy was acquiring

9  Mr. Maloof's home at Innisbrook to be used for office purposes

10  and hospitality for Diamante.

11    THE COURT:  Okay.  And it came out of this line of

12  credit?

13    THE WITNESS:  Yes, it did.

14    THE COURT:  Got it.  Okay, thank you.

15      Go ahead.

16    MS. LEE:  Thank you.

17  BY MS. LEE:

18    Q    And the explanation that you just gave to the Court

19  today, when I asked you in your deposition in June of '05

20  [sic] whether or not Mr. Jowdy could have borrowed money out

21  of this line of credit to fund the $800,000 that he needed for

22  the Palms, your answer was you would have to ask Mr. Jowdy why

23  he didn't want the money funded that way.  Is that your

24  recollection?

25    MR. RICHARDS:  I'm going to just object.  It wasn't in

1    June of '05, the deposition.

2          MS. LEE:  I'm sorry.  Of '09.  I apologize.

3    BY MS. LEE:

4          Q    In June of '09, when I took your deposition.

5          A    Can we just open up to the transcript?  I think you

6    just read it, but I don't recall what some of these long

7    questions and answers -- If you'd tell me where we were,

8    please.

9          Q    Well, I'll just read it to you.

10               "Q  But when he asked you for money, why

11          didn't --"

12    THE COURT:  Well, can we get to the page?  What page?

13    MS. LEE:  Oh, sure.  Sure, 139.

14    THE COURT:  Okay.

15    THE WITNESS:  Thank you.

16    MS. LEE:  Line 7.

17    THE WITNESS:  Okay.

18    BY MS. LEE:

19          Q    I'm sorry, line 2.

20               "Q  So if this revolving line of credit was

21          available to Mr. Jowdy at the time he needed

22          $800,000, why didn't you just give him the money

23          under this agreement?

24               "A  I'm not Mr. Jowdy.  You'd have to ask him."

25    But I was asking you, just like the Court asked you.  And

1   you didn't give me that explanation, did you, that you just

2   gave to the Court today?

3       A    You're asking me why Mr. Jowdy didn't ask for the

4   money.  I just said you have to ask Mr. Jowdy.  I can't answer

5   for him.  You were asking me to speculate, at the time, why

6   Mr. Jowdy didn't make that request.  Perhaps he did.  You were

7   asking me to speculate as to why Mr. Jowdy may not have asked

8   for it.

9       Q    Why would he just ask for it?  If you had this

10  revolving line of credit available to him, and your testimony

11  is here that he could have borrowed $800,000 under this line

12  of credit --

13      MR. RICHARDS:  It calls for speculation.

14  BY MS. LEE:

15      Q    Could Mr. Jowdy have borrowed $800,000 under this

16  line of credit in 2005?

17      A    Absolutely.

18      Q    At the time that this deal was going on, this whole

19  Glen Murray transaction was going on?

20      A    Absolutely, he could have.

21      Q    Okay.

22      A    But not related to the Palms transaction.  You asked

23  me in my deposition --

24      Q    And again -- I'm sorry.

25      A    -- as well.  And I said --

1    Q    Again, if you -- is there anything in this document

2    that we're looking at here today that says that Mr. Murray is

3    -- I mean Mr. Jowdy is limited in terms of what he can do with

4    the funds that he's borrowing?

5    A    In the written agreement, there is not.

6    Q    Okay.  And that's -- that was what I -- the question

7    I had for you.

8         In terms of the home on Innisbrook, it is your

9    contention that you never had any intentions of owning any

10   part of this home?

11   A    That is not my contention.

12   Q    So did you, at one point, have intent to own part of

13   this home, this Innisbrook property?

14   A    Yes.  When Mr. Jowdy made the original agreement

15   with Mr. Maloof, he asked me if I'd like to have a 50 percent

16   interest in the home, and I said that would be fine.

17   Q    And why would he just offer you 50 percent interest

18   in the home?  What was -- what were you going to do for that

19   50 percent interest?

20   A    I don't recall at the time.

21   Q    Oh, so perhaps it was -- you don't know if it was a

22   gift or you were going to do something in exchange for that?

23   A    I'm sure it certainly wasn't a gift.

24   Q    But you don't have any specific recollection as to

25   why my client would spontaneously just offer you 50 percent of

41

1    this Innisbrook property?

2         MR. RICHARDS:  Objection, no foundation, spontaneously.

3         THE COURT:  Yeah.  Could you lay some foundation for me?

4    I'm having some difficulty following.

5         MS. LEE:  Sure.

6         THE COURT:  So I'm going to sustain this one.

7    BY MS. LEE:

8         Q    What was your involvement in terms of this

9    Innisbrook property?  Did you have any involvement?  What was

10   the extent of your involvement and interactions with the

11   transactions involving the Innisbrook property?

12        A    Originally, Mr. Jowdy had agreed with Mr. Maloof to

13   purchase the home at Innisbrook.  Subsequent, sometime later,

14   he asked me if I would like to be a 50 percent partner in it,

15   related to Diamante and the work office we were going to

16   create there.  I said that would be fine.  No terms of any

17   sort were created.

18             Shortly after that, he told me that his childhood

19   friend, Mark Thalmann, was selling his business and his home

20   on the East Coast and was moving to Las Vegas, and they wanted

21   to buy the home together.  At the time, I said that's fine.

22   And at that point, I no longer was involved with any potential

23   equity in the home.  But at the time, Mr. Thalmann then took

24   over that responsibility, whatever that was, with Mr. Jowdy.

25   And normal to my relationship with Mr. Jowdy or Mr. Murray, or

42

1   if, Ms. Lee, if you had asked me for some help to source a

2   mortgage.  I did for my friends what they asked.

3        Q    So you went out and sourced this mortgage for this

4   loan on the Innisbrook property?

5        A    Absolutely.

6        Q    And you also put down 200 --

7        A    I used to 15 to 25 mortgages a year for my clients.

8   It's very easy.  It's very commonplace for me.

9        Q    And you also put $200,000, you -- from your Ula

10  Makika account into the title company to fund the down payment

11  on that home, did you not?

12       MR. RICHARDS:  Objection as to the characterization, no

13  foundation, assumes a fact not in evidence.

14       THE COURT:  I'm going to overrule.

15            Go ahead.

16       THE WITNESS:  You're suggesting that I put the money

17  down?  No, I did not.

18  BY MS. LEE:

19       Q    For clarification, you are 100 percent owner of Ula

20  Makika, are you not?

21       A    I am not.

22       Q    Did you testify at your deposition that you were 100

23  percent owner of Ula Makika?

24       A    At some point when I opened the company I was.  But

25  again, Ula Makika is a pass-through entity we use to buffer

43

1    all of the clients in Little Isle IV, ultimately, from lenders

2    and other transactions.  And that's consistent with what we

3    did with all of the Ula Makika.

4         Q    Can you turn to page 93 of your deposition, please?

5         A    Under 93 of your deposition, at page 3, I ask you:

6              "Q  Do you have any ownership interest in Ula

7         Makika?

8              "A  Yes.

9              "Q  What percentage of that company do you own?

10             "A  100 percent."

11        Is that correct?

12        A    That is correct.

13        Q    So what is it?  Do you own 100 percent or do you not

14   own 100 percent?

15        A    There is no -- there has been no activity in Ula

16   Makika since 2006.  So there's nothing that exists any longer.

17        Q    Okay.  Sir, I'm sorry.  My question is --

18        MS. LEE:  Move to strike as nonresponsive.

19   BY MS. LEE:

20        Q    My question is do you or do you not own 100 percent

21   of Ula Makika?

22        A    I would say, for tax purposes, I do.  But there's

23   been no activity since the end of the loans to Mr. Jowdy in

24   2006.

25        Q    Well, this company that you testified to in your

44

1    deposition, that you owned 100 percent of, sent money to the

2    title company for the down -- for part of the down payment on

3    the Innisbrook property.  Did you not facilitate that?

4        A    Yes, I did facilitate it --

5        Q    Okay.

6        A    -- under the terms of the revolving line of credit.

7    And in fact, Mr. Jowdy paid me back at his first refinance,

8    six weeks after the close.

9        Q    And you arranged for that refinancing, didn't you,

10   Mr. Kenner?

11       A    Absolutely, I did.

12       Q    And then the $238,000 that came out of that

13   refinancing, you took every penny of it, didn't you?

14       A    No, I did not.

15       Q    You did not?  Where -- who took the money?

16       A    It went back to Ula Makika, and ultimately back to

17   the investors that put the money into the loan agreement.

18       Q    But it went back to Ula Makika, which was 100

19   percent your company.

20       A    At the time, no.

21       Q    At what time?

22       A    2005, when this transaction took place.

23       Q    When did Ula Makika become 100 percent your company?

24       A    Effectively, it's a passive entity that was being

25   used as a pass-through.  So all entitlements to Ula Makika

45

1    were always part of Little Isle IV and about eight other LLC's

2    in Hawaii.

3        MS. LEE:  I'm going to move to strike as nonresponsive.

4        THE COURT:  Counsel, I'm going to deny your request to

5    move to strike.  I mean I'm trying to figure out what's going

6    on here.  So I'm not -- I'm going to deny your motion as well

7    as the previous one.

8        MS. LEE:  Okay.  Thank you, Your Honor.

9    BY MS. LEE:

10       Q    So your testimony today is that at the time this

11   transaction happened, you did not own 100 percent of Ula

12   Makika?

13       A    I did not.

14       Q    Did you wire the funds from Ula Makika to the title

15   company to fund the Innisbrook property, the $200,000 to fund

16   the down payment on the Innisbrook property?

17       A    Yes, I did.

18       Q    And then, after that, you started immediately

19   arranging for refinancing on that home, did you not?

20       A    Yes, I did.

21       Q    And when the home was ultimately refinanced, the

22   money that came out of that refinance, the $238,000, every

23   penny of it went to Ula Makika, did it not?

24       A    Yes, it did.

25       Q    And then after that, you started to arrange for a

46

```
1    home equity line of credit on that same home, didn't you?
2         A    I don't recall.
3         MS. LEE:  Could we pass the witness Exhibit Number 64 and
4    -- I'm sorry -- Exhibit Number 64 from Plaintiff's exhibit
5    numbers, A-64?  Oh, I'm sorry.  That's the wrong one.  I
6    apologize.  I'm sorry, 44.
7         THE CLERK:  A-44 or --
8         MS. LEE:  A-44, please.
9         THE COURT:  Has that been admitted into evidence yet?
10        MS. LEE:  No, that -- I'm just going to try to lay some
11   foundation.
12        THE COURT:  All right.  Make sure it doesn't come up on
13   my screen then --
14        MS. LEE:  Sure.
15        THE COURT:  -- Ms. Clerk.
16        MS. LEE:  You have our exhibit book?
17        MR. RICHARDS:  Just tell me what it is.
18        MS. LEE:  Oh, I'm sorry.  It's 44, A-44.  Oh, just some
19   emails.
20        [Counsel Confer]
21        THE COURT:  You should have all those books, right?
22        MR. RICHARDS:  I do, but I just -- I have all the books,
23   but I just -- normally, in my experience, counsel says I'm
24   going to show the witness this document, so I see what the
25   witness is going to see.  And then I -- so I -- and that's
```

47

```
 1    what I thought you do.

 2         THE COURT:  Okay.  Well --

 3         MR. RICHARDS:  You know, like I'm going to show the

 4    witness this document, and you show it to counsel and then

 5    show it to the witness.  I just wanted to --

 6         THE COURT:  We're trying to circumvent that a little bit,

 7    okay?

 8         MR. RICHARDS:  Oh, no problem.  I -- all right.

 9         THE COURT:  Okay.  But you know what exhibit we're

10    dealing with now?  I just want to make sure.

11         MR. RICHARDS:  It's A-44?

12         THE COURT:  A-44.

13         MS. LEE:  A-44.

14         THE COURT:  Apple-44.

15         MR. RICHARDS:  I know the exhibit.  Let me just get the

16    book.

17         THE COURT:  Okay.  Let him get the book.

18         MS. LEE:  Oh, sure.  Your Honor, do you mind if we take a

19    bathroom break while he's locating that exhibit?

20         MR. RICHARDS:  I got it.

21         MS. LEE:  Your Honor?

22         THE COURT:  Yes.

23         MS. LEE:  Is it okay if we take a short bathroom break

24    while we're --

25         THE COURT:  Boy, we're taking an awful lot of bathroom
```

48

```
 1    breaks, guys.
 2         MS. LEE:  I'm sorry.  This is the first one I've ever
 3    requested.
 4         THE COURT:  I know it is.  It is, but go ahead and go.
 5    Let's do it very quickly, okay?  Go ahead.
 6         THE WITNESS:  May I be excused from the stand, Your
 7    Honor?
 8         THE COURT:  Yes, you may.
 9         [Recess]
10         THE COURT:  Go ahead and stand up -- sit up here.
11         MS. LEE:  Thank you, Your Honor, for your indulgence.
12         THE COURT:  Okay.  I understand.
13         MR. RICHARDS:  The Plaintiff is right behind me, Your
14    Honor.
15         MS. LEE:  Should I wait for the Plaintiff or --
16         MR. RICHARDS:  No, you don't need to wait.
17         MS. LEE:  Okay.
18         THE COURT:  Well, just a minute.  He's coming in.
19         MR. RICHARDS:  All right.
20         THE COURT:  This is his trial, too.
21         MR. RICHARDS:  Okay.
22         THE COURT:  Sir, I just want to remind you, you've been
23    sworn.
24         THE WITNESS:  Yes, thank you, Your Honor.
25         THE COURT:  Okay.  Let's continue.
```

49

```
 1                 CROSS-EXAMINATION [RESUMED]
 2   BY MS. LEE:
 3        Q    Mr. Kenner, you don't disagree that my client never
 4   had any conversations with Mr. Murray with respect to this,
 5   supposed, loan fund transaction; do you?
 6        A    I'm sorry, could you ask again?  I was actually
 7   looking at A-44 --
 8        Q    Sure, sure.
 9        A    -- I thought we were going back to that.
10        Q    You don't deny that my client never had any
11   conversations with Glen Murray with respect to this supposed
12   loan, do you?
13        A    I'm getting lost in the -- the double negative, I
14   think.  Can you -- just -- if you could just ask it straight,
15   so I make sure I get the question right.
16        Q    I'm sorry, I thought I was asking it straight.  With
17   this -- with respect to this loan, the $791,000 that you're
18   characterizing as a loan, you don't deny that my client never
19   had a conversation with Mr. Murray about that, do you?
20        A    I'm just going to try and answer it straight
21   forward.
22        THE COURT:  Okay.  Okay.  Do you deny whether or not Mr.
23   Jowdy had a conversation with Mr. Murray?
24        THE WITNESS:  I don't believe they had a conversation
25   about this.
```

```
 1          THE COURT:  Okay.
 2     BY MS. LEE:
 3          Q     And in your line of --
 4          THE WITNESS:  I'm sorry, Your Honor.
 5          THE COURT:  That's all right.  No, because I was getting
 6     a little bit --
 7          MS. LEE:  Sure.
 8          THE COURT:  -- I just wanted make sure, but is that clear
 9     for you?
10          MS. LEE:  Yes.
11          THE COURT:  Okay.
12          MS. LEE:  Yes.
13     BY MS. LEE:
14          Q     In fact, you communicated this supposed loan
15     agreement to Mr. Glen Murray; did you not?
16          A     Absolutely, I did.
17          Q     Do you have anything in writing that granted you the
18     authority to make that agreement on my client's behalf?
19          A     I don't believe I have anything in writing from Mr.
20     Jowdy.
21          Q     He -- has he ever assigned you, in this deal, the
22     power of attorney to act on his behalf, in writing?
23          MR. RICHARDS:  Objection.  Foundation and relevance.
24          THE COURT:  Sustained.  Go ahead and lay the foundation.
25
```

51

```
1   BY MS. LEE:
2       Q    Did he ever sign any document, or give you any
3   emails, or give you any writings that granted -- that -- that
4   invested you with the authority to make this loan offer on his
5   behalf?
6       A    I don't recall.
7       Q    And in your line of business, is it fair to say that
8   you understand the importance of having transactions
9   documented in writing?
10      MR. RICHARDS:  Relevance.  Argumentative.
11      THE COURT:  Overruled.  Go ahead.
12      THE WITNESS:  The question seems overbroad to me
13  considering I'm a business --
14      THE COURT:  Can you answer it?
15      THE WITNESS:  I'm not sure I understand the scope of the
16  question, I'm sorry.
17      THE COURT:  Rephrase.
18      MS. LEE:  So, you can't --
19      THE COURT:  Rephrase.
20  BY MS. LEE:
21      Q    In your experience as a business manager, as an
22  agent, is it a fair statement to say -- would you agree with
23  me when I say that it is important to have transactions
24  documented in writing?
25      A    I believe that's a fair statement.
```

1     Q    And is it also a fair statement that, the more

2   important that transaction is, the more important that

3   transaction should be in writing?

4        MR. RICHARDS:  I'm going to vague, foundation, more

5   important.

6        THE COURT:  He can answer it, if he understands it.  I'm

7   going to overrule.  Do you understand?

8        THE WITNESS:  I'm not -- I'm not sure I understand what's

9   more important, who --

10  BY MS. LEE:

11       Q    Well, if it's a -- if it's a critical transition,

12  oh, I'm sorry, if it's a critical transaction that we're

13  talking about --

14       THE COURT:  Counsel, what is critical, what is more

15  important?  I mean, I've had clients --

16       MS. LEE:  Okay.

17       THE COURT:  -- that have had claims with $50, but that

18  was the most important thing in their life.  And so, I guess

19  I'm -- I'm having a little trouble --

20       MS. LEE:  Sure.

21  BY MS. LEE:

22       Q    Well, you heard your -- Mr. Murray testify yesterday

23  that, the $791,000 was very important to him; did you not?

24       A    I believe I heard that.

25       Q    And that he had never, in his life --

53

```
1        THE COURT:  Okay.  Sir, you need to --

2        THE WITNESS:  Oh, I believe I heard that, sorry.

3        THE COURT:  It's all right.

4   BY MS. LEE:

5        Q     And that he had never in his life, ever loaned

6   anybody this kind of money before, ever?

7        A     I believe I heard that.

8        Q     And despite that, you didn't bother to get this

9   transaction in writing; did you?

10       A     We did not put this transaction in writing.

11       Q     And you didn't put it in transaction -- you didn't

12  put this transaction in writing, at the time it happened, and

13  you didn't put this transaction in writing 30 to 45 days

14  later, did you?

15       A     That is also correct.

16       Q     And you didn't put this transaction in writing a

17  year later, did you?

18       A     A contract, no, we did not.  We had an oral

19  contract.

20       Q     You didn't put this -- you didn't reduce this oral

21  contract to writing at any time; did you?

22       A     No, we did not.

23       Q     As a fiduciary or as somebody who is looking out for

24  your best interest of somebody that you've known for years,

25  and years, and years and you're protecting their interest, why
```

54

```
1    wouldn't you go to Mr. Jowdy and say can you sign something
2    memorializing this loan in writing?
3         A    We just never got to that point.
4         Q    In four years?
5         A    Well, Mr. Jowdy and I were not acquaintances, plus
6    or minus, after the spring of 2007.
7         Q    When did you stop communicating with him?
8         A    Approximately spring/summer of 2007.
9         Q    And that was a year before this lawsuit was
10   initiated?
11        A    What was the original complaint date, please?
12        MR. RICHARDS:  I could represent it, I think it was
13   September of '08.
14        THE WITNESS:  So, approximately a year-and-a-half before
15   Mr. Murray filed the lawsuit.
16   BY MS. LEE:
17        Q    You stopped talking to Mr. Jowdy?
18        A    Plus or minus.
19        Q    And in that year-and-a-half, did you instruct Mr.
20   Murray that you were no longer talking to Mr. Jowdy about his
21   money?
22        A    No, that's not, in fact, the case.
23        Q    But you never told Mr. Murray that -- well, were you
24   still communicating with Mr. Jowdy about this loan, a year-
25   and-a-half before this lawsuit was filed?
```

55

1       A    From -- from the spring of 2007 until the end of

2    2008, or about the fall of 2008, there was several

3    intermediaries and attorneys trying to work on a global

4    settlement arrangement with Mr. Jowdy for not just Mr.

5    Murray's money, which was a very critical part in the

6    breakdown in my relationship with Mr. Jowdy, but also the tens

7    of millions of dollars that were laid out to Mr. Jowdy, of

8    which he had never repaid a single dollar to us on any of the

9    equity investments.

10      Q    So, you're saying --

11      A    -- and the outstanding $5 million loan he still had

12   from our Hawaiian investors.  But we had lawyers on both sides

13   working night and day for 14 to 16 months trying to globally

14   settle everything with Mr. Jowdy.  So, to specifically deal

15   with Mr. Murray's single loan to Mr. Jowdy, no we didn't -- we

16   didn't work on that specifically, in a unique vacuum.

17      Q    Did you ever ask Mr. Jowdy to contact Mr. Murray

18   about this loan?

19      A    Mr. Jowdy and I communicated on a daily basis.  He

20   received text messages, emails from me, phone calls all the

21   time and Mr. Jowdy would constantly give me the same answer:

22   "I'm working on it.  Tell them to hang in there.  I'm working

23   on it.  Tell them to hang in there."

24      Q    So, he would --

25      A    All of the correspondence that support that -- that

56

```
 1    relationship in this oral contract that Mr. Jowdy received,
 2    are documents, let me remind you, that you guys produced.  I
 3    don't have any --
 4         Q    And I don't know what documents you're referring to.
 5         A    -- documents that are produced.
 6         Q    But I'm going to just --
 7         A    All of the e --  all of the e --
 8    THE COURT:  Wait, wait, wait.
 9    MS. LEE:  Sorry.
10    THE COURT:  Okay.
11    MS. LEE:  Sorry.
12    THE COURT:  Number one, we cannot --
13    MS. LEE:  Do not talk --
14    THE COURT:  -- talk over each other, at all.  Go ahead
15    and finish, sir, and then, counsel, go ahead and ask a
16    question.
17         THE WITNESS:  I'm sorry, Ms. Lee.  All of the emails that
18    were produced in this case, related to the loan that my
19    requests for Mr. Jowdy to pay the money back.  Whether it be
20    the August 22nd request for him to wire the money back to
21    Charles Schwabb, subject:  Murray Palms money, or a few
22    subsequent requests for money to be sent back to Mr. Jowdy.
23    BY MS. LEE:
24         Q    Okay.  So, I've only seen the Murray Palms document
25    that you referred to, specifically.  Are there any other
```

57

1    specific documents, that you can recollect, that have been

2    produced in this litigation, where you -- by you're asking my

3    client to return money to Mr. Murray?

4         A    Yes, I believe so.

5         Q    And -- and have you seen those documents?

6         A    I -- I'm aware of documents that, I believe, are in

7    evidence with the Court.

8         Q    Where my -- you are instructing my client to pay

9    back Mr. Murray?

10        A    I was asking Mr. Jowdy what we were going to do to

11   pay Mr. Murray back.

12        Q    What we were going to do?

13        A    I consider them all -- I still consider them all my

14   friends at the time.

15        Q    Okay.  So -- so -- so, when you say what we were

16   going to do to pay Mr. Jowdy back, were you -- is that we, as

17   in you and him?

18        A    I have a fiduciary responsibility to Mr. Murray.  I

19   had a friendship at the time with Mr. Jowdy.  And if we're

20   going to get into a semantics debate, I just said we.  I speak

21   very group oriented, team oriented like Mr. Murray suggested

22   yesterday.

23        Q    And despite being part of this team, my client has

24   only spoken to your client on one occasion in 2002; is that

25   correct?

```
 1              MR. RICHARDS:  Asked and answered a few times.
 2              THE COURT:  Go ahead and answer it again.  Overruled.
 3              THE WITNESS:  I believe that's the case, if Mr. Murray
 4     testified to it, I don't see why he wouldn't -- he would be
 5     misrepresenting that.
 6     BY MS. LEE:
 7         Q    Did you ever own any units at the Palms, yourself?
 8              MR. RICHARDS:  Relevance.
 9              THE COURT:  Overruled.
10              THE WITNESS:  No.
11     BY MS. LEE:
12         Q    Did you ever represent to my client that you owned
13     units at the Palms?
14              MR. RICHARDS:  Asked and answered.  Relevance.
15              THE COURT:  Overruled.
16              THE WITNESS:  No.
17     BY MS. LEE:
18         Q    Did you ever represent to anybody else that you
19     owned any interest at the units at the Palms?
20              MR. RICHARDS:  Relevance.
21              THE COURT:  Overruled.
22              THE WITNESS:  I don't believe so.
23              MS. LEE:  I'm sorry, Your Honor, I'm trying to find a
24     document.
25              THE COURT:  That's okay.
```

59

```
 1        [Pause]
 2   BY MS. LEE:
 3        Q    Can you turn to -- can we have the witness look at
 4   Plaintiff's Exhibit A-74?
 5        MR. RICHARDS:  Plaintiff's Exhibit?
 6        MS. LEE:  I'm sorry, Defendant's Exhibit A-74.
 7        THE COURT:  I thought she said A-74.
 8        MS. LEE:  A-74.
 9        THE COURT:  Apple --
10        MS. LEE:  Apple-74.
11        MR. RICHARDS:  I thought she said Plaintiff's Exhibit,
12   that's why I --
13        MS. LEE:  I'm sorry, Defendant's Exhibit A-74.
14        THE COURT:  Is it in either one of those books, sir?
15        THE WITNESS:  I don't think -- I don't believe so.
16        THE COURT:  Okay.
17        [Pause]
18        THE COURT:  The last we have.  Okay.
19        THE WITNESS:  Thank you, Your Honor.
20        THE COURT:  There you go.  And that one has not been --
21        MS. LEE:  No, we have -- I'll lay some foundation for it.
22        THE COURT:  Okay.
23        [Pause]
24   BY MS. LEE:
25        Q    Are you at that exhibit, sir?  On page 362 of that
```

1  exhibit, which is the first page, is that your email address

2  at -- from the tagline?

3       A    I believe so.

4       Q    You believe so or is that your email address?

5       A    It appears to be.

6       Q    Do you recall sending this email to Mr. Jowdy on or

7  around September 3rd of 2009?

8       A    I do not.

9       Q    Oh, I'm sorry, I'm sorry.  On or around February

10  20th of 2006?

11       A    I do not.

12       Q    If you could turn the page.  And I will represent to

13  you that this was part of the trial exhibits that were faxed

14  to my office on your behalf, in terms of documents that you

15  would be using in this case.  Do you recognize this document?

16       A    Yes, I do.

17       Q    And what is this document?

18       A    It appears to be a -- an asset statement from

19  myself --

20       THE COURT:  Okay.  Sir, you're going to have to speak up

21  a little louder.  We're old and crotchety up here and we can't

22  always hear.

23       THE WITNESS:  Sorry, Your Honor.

24       THE COURT:  That's all right.

25       THE WITNESS:  It's -- it appears to be a February 2006

61

```
 1    asset statement for myself.

 2         MS. LEE:  Can I move to admit this exhibit --

 3         MR. RICHARDS:  I'm going to --

 4         THE COURT:  I'm not going to admit personal identifying

 5    information.  But, Counsel, you can go ahead and ask him

 6    questions about it.  I'm concerned about -- and I haven't seen

 7    it, so I have no idea what it says.  But I am concerned about

 8    the nature of it and it getting into the public record.

 9         MS. LEE:  Sure.

10         MR. RICHARDS:  I prefer that they moved it in yesterday

11    or --

12         THE COURT:  But he -- but most certainly ask him

13    questions about it.

14         MS. LEE:  And I believe that Mr. Richards did, in fact,

15    actually refer to it, but he didn't move to admit it.

16         THE COURT:  Right.

17         MR. RICHARDS:  Yes, I have no objections to questions.

18         THE COURT:  Go ahead and ask any question you want.  I'm

19    just concerned --

20         MS. LEE:  Well -- okay.  Well, and maybe this will help

21    alleviate the concern, Your Honor.

22         THE COURT:  And -- and --

23         MS. LEE:  Are there any --

24         THE COURT:  -- counsel, I --

25         MS. LEE:  I'm sorry.
```

1      THE COURT:  -- if there are any particular assets on

2  there, if -- you may even talk about whether or not you want

3  to redact the rest of it, redact account numbers, redact

4  Social Security numbers that may be on the document, and talk

5  about, you know, one thing he owns or something.  If he has --

6  if you all have no problem with that, we may be able to do

7  that.

8      MR. RICHARDS:  I don't believe the document's admissible.

9  I believe it could be used for impeachment.  She can ask

10  questions, that's what I believe.

11      THE COURT:  Well, you can think about what I've just

12  suggested, but I am just concerned about putting somebody's

13  financial statement into evidence.

14      MS. LEE:  And if that is your concern, Your Honor, I

15  would stipulate to redact all of the non-relevant assets

16  listed on this financial statement.  And then, move to admit

17  it.

18      THE COURT:  Okay.  Well, why don't you talk about that

19  over the lunch hour.  It's going to be in about 15 minutes

20  anyway.  But go ahead and ask him questions if you want to.

21      MS. LEE:  Okay.  Sure.

22      THE WITNESS:  Your Honor, am I able to also --

23      THE COURT:  You're a party, you can make whatever

24  statements you want.  But it sounds like you all may need to

25  talk over the lunch hour about that.

63

```
1        MS. LEE:  If I could just get a few questions out about
2   this --
3        THE COURT:  Get some --
4        MS. LEE:  -- now, though.
5        THE COURT:  -- questions about this.
6        MS. LEE:  Sure.  Sure.
7        THE WITNESS:  Thank you.
8   BY MS. LEE:
9        Q    On this financial statement, do you see an entry,
10  under the heading of other current assets; private: Palms
11  Place Penthouse, 50 percent of 660K; do you see that?
12       A    Yes, I do.
13       Q    And underneath that, another entry; private:  Palms
14  Place Penthouse II, 33 percent, 550K; do you see that?
15       A    Yes, I do.
16       Q    And the third entry; private:  Palms Place Studio I,
17  50 percent of 120K; do you see that?
18       A    Yes, I do.
19       Q    And then next entry; private:  Palm Place Studio II,
20  50 percent of 120K; do you see that?
21       A    Yes, I do.
22       Q    And this is your financial statement; is that
23  correct?
24       A    I'm not sure if it's my financial statement or not,
25  but I see that and I represent that we admitted it in our
```

64

1   trial -- trial docs.

2       MR. RICHARDS:  I'm going to object because trial docs are

3   not admitted.  We will provided -- we provide -- my office --

4       THE COURT:  I understand, Counsel.

5       MR. RICHARDS:  -- provided documents in this case, that

6   we received from Phil Kenner, but no one -- I didn't endorse

7   them for admissibility purposes.

8       THE COURT:  I understand.  I understand.

9       MR. RICHARDS:  All right.

10  BY MS. LEE:

11      Q    So, this document, which appears to be an attachment

12  to the first page, that you've admitted is your email address;

13  have you seen this document before?

14      A    Yes, I have.

15      Q    Is this your financial statement as of February of

16  2006?

17      A    I would assume, if it's attached to it, it may have

18  been, correct.

19      Q    Okay.  And it lists as assets, Palm Place units;

20  does it not?

21      A    Four of them.

22      Q    Correct.

23      A    Which contradicts Mr. Jowdy's theory --

24      Q    I'm sorry, the question was just, does it -- does it

25  list the units?  It's a yes or no question.

65

```
 1        A    Yes, it does.

 2        [Pause]

 3   BY MS. LEE:

 4        Q    And this Little Isle IV entity that we've discussed

 5   before, in relationship to the Ula Makika; are you the

 6   managing member of Little Isle IV?

 7        A    I am not.

 8        Q    Were you, at any time, the managing member of that

 9   Little Isle IV?

10        A    Yes, I was.

11        Q    When did you stop becoming the managing member of

12   that Little Isle IV?

13        A    I don't recall.

14        Q    Were you the managing member of Little Isle IV in

15   August of 2005?

16        A    I believe I was.

17        Q    And were you the managing member of Little Isle IV

18   at the time that your deposition was taken, in June of 2009?

19        A    I don't recall.

20        Q    If you could refer your deposition transcript, on

21   page 27, line number 3 through 7, and I'll just read it to

22   you.

23             "Q   Who is the managing member of Little Isle

24             IV?

25             "A   I am.
```

66

1        Does that refresh your recollection as to whether or not

2   you were the managing member of Little Isle IV at that time

3   your deposition was taken, in June of 2009?

4        A    I may have been in June of 2009.

5        Q    Do you have any reason to believe that your

6   testimony that you gave here was wrong?

7        A    It may have been.  There was a transfer at some

8   point, in the last 24 to 26 months.  I just don't recall

9   exactly, as I sit here today, when it was.

10        Q    But on this day, when I asked the question, who is

11   the managing member of Little Isle IV, you respond "I am"; is

12   that correct?

13        MR. RICHARDS:  Asked and answered.

14        THE COURT:  It is, but go ahead and answer again.

15        THE WITNESS:  I believe that's what I said.

16   BY MS. LEE:

17        Q    And it is your contention that you don't know what

18   Mr. Jowdy did, at the time that the complaint was brought?  Is

19   it your contention that you don't know what Mr. Jowdy -- oh,

20   I'm sorry, at the time that I took your deposition, was it

21   your contention that you don't know what Mr. Jowdy did with

22   that money, that the money, Mr. Murray's money that went into

23   the Baja Development account?

24        A    I don't recall.

25        Q    Okay.  If I could turn your attention to page 65 of

67

1    your deposition.  And turn your attention to line 15, I'm just

2    going to read that:

3                    "Q  Mr. Kenner, when were the funds transferred

4              from Mr. Murray to Mr. Jowdy, the loan money?

5                    "A  The loan monies were transferred

6              approximately June of 2005.

7                    "Q  Do you know what Mr. Jowdy did with the

8              money after that?

9                    "A  I do not.

10   Does that refresh your recollection?

11   A    Sure, but again, I --

12   Q    I'm sorry, it's a yes -- I just want a yes or no

13   answer.  Does that refresh your recollection?

14   MR. RICHARDS:  He can't answer for a yes --

15   THE COURT:  Wait, wait, wait, Counsel.  Go ahead and ask

16   a question.  Go ahead, what?

17   BY MS. LEE:

18   Q    Does this refresh your recollection as to whether or

19   not you knew what Mr. Jowdy did with the money after it left

20   Baja Development?

21   A    Does it refresh my recollection of what he did with

22   it?  I don't know --

23   Q    Well, I just re-read -- if I could just put it back

24   into context in which I was reading it.

25   MR. RICHARDS:  Well, that's -- now she's testifying.

68

```
 1        MS. LEE:  Question --
 2        THE COURT:  Well, she's asking him the question, if it
 3   refreshes his recollection, and I guess I'm having trouble,
 4   because he said he didn't know then.  He just said he didn't
 5   know before.  So, I'm having trouble with the connection.  Go
 6   ahead.
 7        THE WITNESS:  Well --
 8        MS. LEE:  Well, I think he said he didn't remember
 9   whether or not he knew, at the time I took his deposition,
10   what happened to the money.
11        THE COURT:  Well, he said he, in the deposition that you
12   just read, that he didn't know.
13        MS. LEE:  Well, he -- today he said he didn't remember if
14   he knew or not.
15        THE COURT:  Well, and then, he said he didn't know.
16        MS. LEE:  Okay.  I'm sorry, Your Honor.  I'm --
17        THE COURT:  And -- or did you --
18        MS. LEE:  Apparently I'm not coming across --
19        THE COURT:  -- read wrong?
20        MS. LEE:  All right.  So, let me just ask the question.
21   BY MS. LEE:
22        Q    Do you know -- at the time that I took your
23   deposition, did you have any understanding as to what happened
24   to your client's money after you wired into the Palms?
25        A    I don't recall.
```

1    Q    But when I asked you at the time of the deposition,

2    do you know what happened to Mr. Jowdy -- do you know what Mr.

3    Jowdy did with the money after that, you responded I do not,

4    you do not know what happened to that money afterwards.

5    A    I read the same thing you did.  That's what I see on

6    the -- in the --

7    Q    At the time I took your deposition, your contention

8    was, wasn't it, that you had no idea what Mr. Jowdy did with

9    his money after the fact?

10   MR. RICHARDS:  As -- objection as to time and relevance,

11   at what time.

12   MS. LEE:  At the time I took his deposition.

13   MR. RICHARDS:  I know.  At what time -- I'm talking about

14   the money, did you not know at what time happened to the

15   money, at what point in time after the August 12th wire.  I

16   don't know; have no idea.

17   THE COURT:  Okay.  I'll -- I'll go ahead and sustain that

18   one.  Go ahead and lay --

19   MS. LEE:  Sure.

20   THE COURT:  -- the foundation for it.

21   BY MS. LEE:

22   Q    Between the time that the monies were transferred

23   into my client's account in 2005 to the time that I took your

24   deposition, did you have any understanding as to what happened

25   to your client's money, after it went into the Palms?

70

```
 1        A    I believe at some point in there, I may have -- I
 2   may have had some knowledge.
 3        Q    And -- in between that period of time, you may have
 4   had some knowledge?
 5        A    What I -- what I also want to point out though,
 6   is -- is the -- the answer part of what you read.  So, that's
 7   all I want to refer to is, you know, I said they were
 8   transferred in approximately June of 2005, and I know it was
 9   actually two months later.  So, I had prepared for this
10   deposition to the point where I thought I was going to be
11   asked about Mr. Jowdy borrowing the money.  And this seemed
12   like it was not --
13        Q    So --
14        A    -- what I prepared for, so what I knew at the time
15   for the day of that deposition --
16        Q    So, did you have any --
17        A    -- was my recollection.
18        Q    Did you have any understanding, at the time I took
19   your deposition -- do you have any understanding, at the time
20   I took your deposition, what Mr. Jowdy did with the money
21   after you transferred it?
22        MR. RICHARDS:  Relevance.  At the time of the deposition,
23   what is understanding --
24        THE COURT:  Overruled.  I'm trying to figure it out.  Go
25   ahead and answer the question, if you know.
```

71

1      THE WITNESS:  I don't recall.  I don't recall what I

2  remembered 18 months ago.

3  BY MS. LEE:

4      Q    Do you recall there being a specific allegation, at

5  Mr. Murray's complaint, that money from the Palms went into

6  fund this Nevada home, this Innisbrook property?

7      MR. RICHARDS:  That's an improper question for him to

8  comment on a complaint.

9      THE COURT:  Sir, do you know where the money went?

10     THE WITNESS:  I -- I read it in the complaint that it was

11  -- let me -- let me ask Your Honor, are we talking about now

12  that I've seen all the discovery, do I know where the money

13  has gone?

14     THE COURT:  Well --

15     THE WITNESS:  That's where I'm confused and everybody's

16  confused in that.

17     THE COURT:  I want your personal knowledge.  Do you know

18  where the money went, not what somebody told you, do you know

19  where the money went?

20     THE WITNESS:  Yes, I do.

21     THE COURT:  Okay.  Where'd the money go?

22     THE WITNESS:  The money went from Mr. Murray's account to

23  the Palms --

24     MR. RICHARDS:  I'm going to object, because --

25     THE COURT:  I want to know, Counsel.  I asked the

72

1    question, you can't object to what I ask.

2         MR. RICHARDS:  No, because that's what I'm saying, you

3    told him not to rely on what other people told him.  He's

4    testifying now, like he has personal knowledge, and he --

5         THE COURT:  I just asked if he had personal knowledge, he

6    said yes.  I want know what it is, sir.

7         THE WITNESS:  Okay.  Mr. Murray had transferred the money

8    to the three Palms escrow accounts from Mr. Jowdy.

9         THE COURT:  Okay.

10        THE WITNESS:  I have, since, found out that the money

11   went to Mr. Jowdy's Baja Development Corporation account,

12   after the failed escrows.

13        THE COURT:  Okay.

14        THE WITNESS:  Then I found out that, the exact same day,

15   Mr. Jowdy transferred $500,000 to his personal account in

16   Mexico.  He also wired-transferred $412,000 to the closing of

17   the home he and Mr. Thalmann purchased.  I believe there was

18   also another $29,000 that remained in that account from the --

19        THE COURT:  That account, meaning Baja?

20        THE WITNESS:  Baja Development account.

21        THE COURT:  Okay.

22        THE WITNESS:  Then I'm not sure what they did with that

23   money afterwards.

24        THE COURT:  Okay.

25

73

1    BY MS. LEE:

2        Q    And how -- how did you come to know that

3    information?

4        A    Through all of the discovery.

5        Q    So, you didn't know at the time that the -- so, you

6    mean the discovery in this case; is that -- is that what

7    you're referring to?

8        A    I believe so.

9        Q    Okay.

10       THE COURT:  Can I ask you something else, okay?  You know

11   the $791,000 went into the Palms, and then, it went into the

12   Baja Development; do you know what the balance was in the Baja

13   Development account before the $791,000 was transferred to it?

14       THE WITNESS:  I believe zero.

15       THE COURT:  Okay.  That's your understanding?

16       THE WITNESS:  That's my understanding.

17       THE COURT:  Okay.

18       MS. LEE:  And, Your Honor, just to --

19       THE WITNESS:  And it's my understanding, because it's a

20   document that Mr. Thalmann produced approximately three years

21   after the transaction.

22       THE COURT:  Okay.

23       THE WITNESS:  That was turned over to us.

24       THE COURT:  Okay.

25       MS. LEE:  So, for the purpose of the complaint, where

1     it's being alleged that the money went into the Las Vegas

2     account, the Las Vegas home account, did you supply that

3     information for the purposes of that complaint?

4          MR. RICHARDS:  I'm going to object.  That opine on the

5     attorney-client privilege.  If he's acting as his agent, and

6     giving information, it -- it's improper for him to comment on

7     a complaint, or how we got the information --

8          THE COURT:  He doesn't have an attorney.  She's asking

9     about his personal knowledge.  I'm going to overrule.  Go

10    ahead.

11         THE WITNESS:  Can you ask the question one more time?

12    BY MS. LEE:

13         Q     Sure.

14         A     I got lost in the comments.

15         Q     Did you supply that fact, the fact that the money

16    went from the Baja Development account to the Innisbrook

17    property; did you supply that fact to Mr. Murray's counsel for

18    the purposes of preparing the complaint?

19         MR. RICHARDS:  Objection.  Attorney-client privilege.

20         THE COURT:  You don't have attorney-client with this --

21         MR. RICHARDS:  I don't think the Court -- sorry, it is,

22    but the privilege is with Murray and his lawyer.  If they --

23    if his agent or manager is giving information to his lawyer,

24    that's privilege.

25         THE COURT:  Well, if he's giving information to you, it

75

```
1    is not privileged.

2         MR. RICHARDS:  Well --

3         THE COURT:  You or if he's giving information to Mr.

4    Murray's lawyer, that is not privileged.

5         MR. RICHARDS:  Why -- what is the -- okay, then.  What's

6    the relevance --

7         THE COURT:  I want to know, okay?

8         MR. RICHARDS:  Fine.  Fine.

9         THE COURT:  Sir, could you answer the question?

10        THE WITNESS:  Yes, Your Honor.  I believe I did tell -- I

11   did provide that information.

12   BY MS. LEE:

13        Q    So, you had some -- I'm sorry.

14        THE COURT:  Okay, okay.  Now, with that --

15        MS. LEE:  Okay.

16        THE COURT:  -- we're going to take a break for lunch.

17        MS. LEE:  Sure.

18        THE COURT:  How's the traffic downstairs?

19        THE BAILIFF:  Moderate, ma'am.

20        THE COURT:  So, can we be back here at 1:15?

21        MS. LEE:  Sure, Your Honor.

22        MR. RICHARDS:  Sure, Your Honor.

23        THE COURT:  Okay.  Let's be back here at 1:15.  And make

24   our trips to the restrooms before we start, okay?

25        MS. LEE:  Sure, Your Honor.
```

1         MR. RICHARDS:  Yes.

2         THE COURT:  And we will be taking a break midway, okay?

3    All right.  Thank you.

4         THE WITNESS:  Thank you.

5         MR. RICHARDS:  Thank you.

6         MS. LEE:  Thank you.

7         [Recess]

8         THE MARSHAL:  -- the Honorable Susan Johnson presiding.

9         THE COURT:  Okay.  Mr. Kenner, come on up.

10        PHILIP KENNER, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

11        THE COURT:  Okay.  Sir, I just want to remind you you've

12   been sworn.

13        THE WITNESS:  Yes, Your Honor.

14        THE COURT:  Okay.

15                    CROSS-EXAMINATION [RESUMED]

16   BY MS. LEE:

17        Q    Welcome back, Mr. Kenner.  When did you tell

18   Mr. Murray that the Palms deal had fallen through?

19        A    As I recall, within the first year that -- after the

20   transaction happened.

21        Q·   Then I would like to -- sorry, I have the wrong

22   transcript.  If I could direct your attention back to your

23   deposition transcript, to page 107.  And I'm just going to

24   start reading from line 7 out loud:

25             "Was there an expectation that Mr. Jowdy

1      himself would contribute any funds to the Diamante

2      Cabo San Lucas project?

3           "Answer: He never suggested that he would.

4           "Question: Was it your understanding that

5      Mr. Jowdy was to own a portion of the project?

6           "Answer: Yes.

7           "Question: And what was going to be his

8      contribution then to that project in exchange for

9      his ownership interest?

10          "Answer: It was my understanding that he was

11     going to be the operator and general administrator

12     with the project, and spend 12 months a year in Cabo

13     San Lucas operating as a general administrator."

14     Were those the questions asked and the answers given

15  on the day of this deposition?

16     A     I believe they were.

17     Q     Okay.  And just to clarify a little bit about your

18  background, you're not a licensed agent, are you, Mr. Kenner?

19     MR. RICHARDS:  Objection; vague.  Agent of what?

20  BY MS. LEE:

21     Q     Are you licensed as an --

22     THE COURT:  Okay.  Wait, wait, wait.

23     MS. LEE:  Oh, sorry.  I'm sorry, Your Honor.

24     THE COURT:  I'm going to sustain.  Go ahead.

25

1   BY MS. LEE:

2       Q    I'm sorry.  Are you a lic -- do you hold any agency

3   licenses?

4       A    I'm not understanding what that means.

5       Q    Are you a licensed agent?

6       MR. RICHARDS:  Objection; no foundation, vague.

7       THE COURT:  Sustained.

8   BY MS. LEE:

9       Q    Are you a licensed investment broker?

10      MR. RICHARDS:  Objection; vague, no foundation.  That's

11  the thing.  That's a profession.

12      THE COURT:  Lay some foundation, counsel.  I'm going to

13  sustain.

14  BY MS. LEE:

15      Q    Do you hold any professional licenses or

16  certifications?

17      A    I do not.

18      Q    That's all.

19      MS. LEE:  No further questions at this time, Your Honor.

20      THE COURT:  Okay.  Redirect?

21      MR. RICHARDS:  Thank you, Your Honor.

22                        REDIRECT EXAMINATION

23  BY MR. RICHARDS:

24      Q    All right.  When you testified that -- when you

25  testified, Mr. Kenner, that the -- Mr. Jowdy didn't request

79

```
 1    the funds for his Palm units from the credit line that counsel

 2    admitted, I think was that 130 -- what was that A-1 --

 3         MS. LEE:  I'm not following your question.

 4         MR. RICHARDS:  The credit line document, was that Exhibit

 5    A-131 or Exhibit 131?

 6         MS. LEE:  Credit line document?

 7         MS. BRANSON:  A-89.

 8         MR. RICHARDS:  A-89.

 9         MS. LEE:  Oh, I'm sorry.

10         MR. RICHARDS:  Sorry.

11         MS. LEE:  Yes, I'm sorry.

12         MR. RICHARDS:  Okay.  Because I don't --

13         MS. LEE:  I didn't know --

14         MR. RICHARDS:  Okay.  Because I don't -- because -- all

15    right.

16         [Pause]

17         MR. RICHARDS:  Okay, here it is.  Sorry.

18    BY MR. RICHARDS:

19         Q    Yeah, the document that's admitted A-89.  Did

20    counsel -- when counsel asked you when Mr. Jowdy, did he ask

21    you for a -- to access the credit line for the Palms

22    transaction and you said no, would you have approved an -- the

23    credit line being used for that purpose?

24         A    Absolutely not.

25         Q    Why not?
```

```
 1         A    Because the understanding be -- about the line of

 2    credit --

 3         Q    Can you speak up, Mr. Kenner --

 4         A    Yes.

 5         Q    -- just in the microphone for the clerk?

 6         A    The line of credit was set up for the purpose of

 7    continuing to forward the development under Mr. Jowdy's

 8    guidance at Diamante Del Mar and the future acquisition at

 9    Diamante Cabo San Lucas, and the Palms units were not related

10    to the future development.

11         And in fact the line of credit, which came from a group

12    of approximately 25 investors in Hawaii, had a very

13    significant crossover to all of the investors at Diamante Del

14    Mar, and subsequently Diamante Cabo San Lucas.  So all of the

15    investors would have been very comfortable knowing that we

16    were going to help sustain one project and fortify the

17    position on the second project.

18         Q    Okay.  Even though this is really far afield from

19    our case, because it's been raised I got to just ask you just

20    a few more questions on this.  Are you -- when you say

21    crossover, do -- when you -- were the investors in Cabo --

22    Diamante Cabo San Lucas similar individuals as the capital

23    investors or capital members of Little Isle IV?

24         A    Absolutely.

25         Q    Okay.  And just so we don't keep using these generic
```

81

1      terms, what were they -- what was the occupation of --

2      predominantly of the members of Little Isle IV?

3          A      Professional athletes.

4          Q      All right.  And those are the same professional

5      athletes that were investors in Mr. Jowdy's Diamante Baja and

6      Diamante Cabo San Lucas?

7          A      That's correct.

8          Q      All right.  Now you heard testimony about -- or you

9      testified about, in response to counsel's questions, about Ula

10     Makika being a pass-through entity.  Do you remember that?

11         A      Yes, I do.

12         Q      Okay.  Explain to the judge why you use a pass-

13     through entity when you're dealing with getting money from

14     another entity that's made up primarily of professional

15     athletes.  Explain to her what the business reason is why you

16     do that, because that's not coming out clear.  You need to

17     make that clear.

18         A      The reason that we set up Ula Makika was to shield

19     and protect the investors in Little Isle IV.  So if there was

20     ever an issue with the loans that we created to any of the

21     people we lent money to, the suing entity would be Ula Makika

22     and the members would not get dragged into litigation to

23     create some sideshow in a high profile lawsuit.

24         Q      So if -- so when you have the member -- people that

25     put up money for Little Isle IV to provide the capital, are

1    you saying that you wouldn't want them deposed or bothered

2    during their playing seasons?  I mean you just need to expand

3    on this a little more so it's very clear why you don't have

4    LLC members that are professional athletes have a direct

5    connection to transactions made on behalf of that group.

6        A    In any business transaction when we're dealing with

7    large sums of money, multi-million dollar transactions and

8    very high-profile individuals, we always did our best to

9    protect the identity and create anonymity for each of the

10   investors.

11       So by setting up a second shell entity in order to pass-

12   through funds for the purpose of loans or outside contact, we

13   did our very best to always transact through an entity that

14   would be, I guess, protective of the actual capital

15   contributors.

16       I really would not like Mr. Murray or any of his

17   colleagues to get dragged in during their nine-month hockey

18   season or three-month off-season into a courtroom if we can

19   avoid it at all costs.

20       Q    Okay.  And when you say people like Mr. Murray, was

21   people that would invest in Little Isle IV, did they have any

22   other -- were they required to do anything else besides

23   contribute their money?

24       A    They were not.

25       Q    Okay.  So would they have a lot of knowledge as to

83

1   what decisions were being made with respect to various

2   business deals?

3        A    Typically not.

4        Q    Okay.  So is that -- is this something that is

5   normal or abnormal in your business, to create a second entity

6   to handle the day-to-day transactions?

7        A    Very normal.

8        Q    Would this be analogous to a servicing entity

9   servicing investment loans, like in residential real estate?

10       A    Absolutely.

11       MS. LEE:  Objection; leading.

12       THE COURT:  You are leading.

13       MR. RICHARDS:  Okay.

14  BY MR. RICHARDS:

15       Q    Do you see this type of arrangement in other areas

16  of business in your 25 years experience?

17       A    Yes.  This wasn't something that I -- a protocol I

18  came up with.  It was very commonplace in the lending

19  industry.

20       Q    Sometimes when you buy a house for a professional

21  athlete do you ever buy it in a name other than theirs?

22       A    Absolutely.

23       Q    Okay.  Just explain to the Court why you do that.

24       A    We would buy it in the name of a trust in order to

25  keep the ownership out of public records.  These are very high

84

```
 1    profile individuals that fans and others are interested in
 2    what information they can gather.
 3         Q    If a borrower knew that they could harass or bother
 4    professional athletes that actually lent the money because
 5    there was a closer tie-in, is that ever a concern of yours?
 6         A    Absolutely.  I want to make sure that the media
 7    handlers for these professional athletes aren't aggravated at
 8    me for not protecting their clients and their images.
 9         Q    So has it been your experience and practice over the
10    last 25 years that this is a -- this structure accomplishes
11    that, yes or no?
12         A    Yes.
13         Q    All right.  Now with respect to Charles Schwab,
14    counsel brought that up, that that authorization was in
15    writing.  Did you request it in writing?
16         A    Mr. Murray requested it in writing.
17         Q    And was that based on what Mr. Murray wanted or what
18    Charles Schwab requires?
19         A    Charles Schwab.
20         Q    Okay.  So if Charles Schwab -- if there was a way to
21    do this orally, would you have been opposed to that?
22         A    Not at all.
23         Q    All right.  Now directing your attention to the
24    exhibit that counsel showed you, which was, I think, Exhibit
25    A-74.  It was a financial statement you had.
```

85

1      A      Yes.

2      Q      Okay.  Counsel specifically asked you -- first as a

3  preliminary question, do you own -- have you ever represented

4  that you own a unit in the Palms Casino or Hotel?  Do you

5  remember that question?

6      A      Yes, I do.

7      Q      Okay.  And did you answer that question truthfully?

8      A      Yes, I did.

9      Q      And when she asked you to ask -- to identify whether

10  on the financial statement it said -- does it say Palms Hotel

11  and you said yes, did you want to talk some more?

12      A      Yes, I did.

13      Q      Why didn't you talk some more when she gave you the

14  yes or no question?

15      A      I was trying to be polite to Ms. Lee, who I have

16  respect for, when she said I just asked a yes or no question

17  and put her hand up.  So I stopped talking so I wouldn't speak

18  over her.

19      Q      Have you previously been instructed if you can

20  answer the question without making an answer that's more than,

21  you know, that's nonresponsive, you've been instructed not to

22  do that by numerous attorneys over the years?

23      A      Correct.

24      Q      All right.  So now when you answer the question

25  truthfully, why don't you own a unit in the Palms Hotel, can

86

1    you tell me now?  I'm asking you an open-ended question, why

2    is that a correct statement, that you've never represented to

3    anybody that you own a unit in the Palms Hotel?

4         A    First of all, I never have owned a unit in the Palms

5    Hotel.  And the financial statement represents in 2006 four

6    deposit interests that I had at the time.  And in 2008, 2009

7    when those units went for closing I did not participate in any

8    of the closings.  In fact I forfeited two of the deposits and

9    was paid back my deposit on the other two.

10        Q    Okay.

11        A    So I never have owned a unit at the Palms Hotel.

12        Q    So when Ms. Lee asked you the direct question, "have

13   you ever represented to Mr. Jowdy or a third party that you

14   owned a unit in the Palms Hotel", did you want to give her an

15   accurate answer?

16        A    Yes, I did.

17        Q    And do you still stand by that answer, that you have

18   never represented you owned a unit in the Palms Hotel?

19        A    That is correct.

20        Q    In your mind, is there a big difference between

21   owning a deposit and owning a unit?

22        A    Absolutely.

23        Q    And how many times have your -- has your name or on

24   behalf of you or your client, been written on what's called an

25   offer to purchase real estate?

1      A      Dozens and dozens.

2      Q      And do you consider that -- do you consider when you

3  do that that you own the unit you're making the offer on?

4      A      Not until --

5      MS. LEE:  Objection; leading.

6      THE WITNESS:  -- there's a closing.

7      MS. LEE:  Objection; leading.

8      THE COURT:  Overruled.

9      MR. RICHARDS:  All right.

10  BY MR. RICHARDS:

11      Q      Now on that financial statement that Ms. Lee

12  presented to you does it show anywhere that you own Ula

13  Makika?

14      A      It does not.

15      Q      All right.  Does it show -- does it list -- how many

16  Palms deposit units or deposits does it show on the financial

17  statement?

18      A      Four.

19      Q      Okay.  Is that consistent or inconsistent with her

20  opening statement, that there was somehow a restriction on the

21  amount of deposits somebody could have?

22      A      Inconsistent.

23      Q      And does it list on that financial statement a Las

24  Vegas house that apparently you heard in her opening statement

25  that you own a third of?  Does it list that on there?

```
 1        A    It does not.

 2        Q    Okay.

 3        MR. RICHARDS:  One second, Your Honor.

 4        [Counsel Confer]

 5   BY MR. RICHARDS:

 6        Q    Okay.  Just a couple more questions here and I'll be

 7   done.  Ms. Lee questioned you about why didn't you, you know,

 8   over the years try to get Mr. Jowdy to put the Murray loan

 9   agreement in writing after he had already completed the

10   transaction.  Do you remember those questions?

11        A    Yes, I do.

12        Q    All right.  Would it -- do you believe it would have

13   been futile to put the contract in writing after '07?

14        A    Yes, I do.

15        MS. LEE:  Objection; leading, Your Honor.

16        THE COURT:  You are leading.

17        MR. RICHARDS:  Okay.  Why -- sorry.

18   BY MR. RICHARDS:

19        Q    Why do you think it'd be futile to put the

20   contract --

21        MS. LEE:  Objection.

22        THE COURT:  Why didn't you put it in writing?

23        MR. RICHARDS:  At any time?

24        THE COURT:  Yeah.  Why didn't you put this document in

25   writing at any time?
```

89

1      THE WITNESS:  Mr. Jowdy always professed he was right

2    about to make the payment back to us, so I didn't feel it was

3    necessary.  And then by early 2007 when we were at odds, it

4    would have been impossible.  And thus, we negotiated for 18

5    months for a settlement of the 20 plus million dollars

6    Mr. Jowdy had --

7      THE COURT:  Okay.  I don't need to hear about any

8    settlements.  So --

9      MR. RICHARDS:  Yeah, he's not going to discuss the --

10   he's just saying that -- he's explaining to you why he didn't

11   put that in writing --

12     THE COURT:  Got it.

13     MR. RICHARDS:  -- because he was dealing with other

14   things.

15     THE COURT:  Okay.

16     MR. RICHARDS:  -- with Mr. Jowdy.

17     THE COURT:  Got it.  All right.

18     MR. RICHARDS:  Okay.

19   BY MR. RICHARDS:

20     Q    The -- but I want to focus you narrowly on that,

21   Mr. Kenner.  Did -- would -- how would you characterize the

22   impact his failure to pay back the Murray loan had on your

23   relationship?

24     A    It was a big burden on me and really started to

25   question the friendship and the business relationship that we

1  had.

2       Q    What impact did it have on the deterioration of your

3  relationship, specifically the Murray loan?

4       A    It was very detrimental to the relationship

5  Mr. Jowdy and I had.

6       Q    All right.  Now directing your focus about

7  authority.  Again, I remember I asked you on direct whether it

8  was unusual or not for you to get money or source money for

9  Mr. Jowdy and then him agree to those terms.  You remember

10 that?

11      A    Yes.

12      Q    Okay.  And when you got the loan for Mr. Jowdy, did

13 Mr. Jowdy give you any indication that somehow when the money

14 came into his account to get the units that somehow he was

15 dissatisfied with the result?

16      MS. LEE:  Your Honor, that's beyond the scope of cross.

17      MR. RICHARDS:  Beyond the scope of cross?

18      THE COURT:  Yeah, you -- we're not going beyond the scope

19 of cross, not here.  Understand that we can open it up for

20 cross so that we don't have to bring witnesses back, but you

21 can't go beyond the scope of cross and she can't go beyond the

22 scope of your --

23      MR. RICHARDS:  I agree, but let me tell you what I'm

24 responding to, because I highlighted it.  She -- Ms. Lee

25 questioned him about this transaction, why wasn't it in

1   writing, and again, brought into question his authority to do

2   the transaction.  She had a whole series of questions toward

3   Mr. Kenner in her cross that I --

4        THE COURT:  Ask your question again.

5        MR. RICHARDS:  I said -- well --

6        THE COURT:  Just ask it again.

7        MR. RICHARDS:  Okay.  I said directing your attention to

8   whether or not you had the authority to engage in this

9   transaction for Mr. Jowdy.  That was -- I was following up her

10  question.

11       THE COURT:  Okay.

12  BY MR. RICHARDS:

13       Q    Did Mr. Jowdy at any time complain when you got the

14  money from Mr. Murray and had it wired into his account?

15       A    Never.

16       Q    And if Mr. Jowdy had expressed any concern about

17  receiving this money, would you have immediately unwound this

18  deal?

19       MS. LEE:  Objection; leading.

20       MR. RICHARDS:  I'm asking him.

21       THE COURT:  I'm going to allow him to ask it.  Go -- I'm

22  going to overrule.

23       THE WITNESS:  Immediately.

24  BY MR. RICHARDS:

25       Q    If you had saw any indication from Mr. Jowdy that

1    somehow he did not want $791,000, would you have done this

2    transaction?

3         A    Absolutely not.

4         Q    Okay.  So would it have been reasonable or

5    unreasonable at the time to have a doubt in your mind that --

6    after -- have a doubt in your mind that Mr. Jowdy somehow did

7    not want to do this deal with Mr. Murray that you negotiated?

8         A    No doubt.

9         Q    Okay.  And there was -- was there any -- you heard

10   the evidence that I read into the record, Mr. Jowdy's

11   deposition testimony that he knew the money was coming from

12   Mr. Murray.  If someone, either Mr. Murray or Mr. Jowdy, had

13   somehow indicated that this isn't what either party wanted,

14   what would you have done?

15        A    We would have either stopped or unwound the

16   transaction.

17        Q    And I asked you yesterday, was this a friendly

18   transaction.  You remember that question?

19        MS. LEE:  Objection; beyond the scope of cross, Your

20   Honor.

21        MR. RICHARDS:  It --

22        THE COURT:  Wait, wait, wait.  Okay.  I'm going to allow

23   him to ask it.  Overruled.  Go ahead.

24        MR. RICHARDS:  Okay.

25

1    BY MR. RICHARDS:

2        Q      You -- going back to the issue of why wasn't it in

3    writing.  At the time, was this a friendly transaction between

4    you and Mr. Murray?

5        A      Yes, it was.

6        Q      I mean so would it have been -- would it have been

7    consistent with your business practice with Mr. Jowdy that you

8    would arrange for a short-term loan to benefit your friend

9    Mr. Murray and to benefit Mr. Jowdy because you'd been doing

10   this over and over again for him?

11       A      Yes.

12       Q      So was there anything unusual for this short-term

13   loan as to why you didn't have Mr. Jowdy immediately send --

14   sign a written agreement at the time?

15       A      Can you ask the question --

16       Q      I said was there anything that you -- that stood out

17   to you that when you did this transaction between Murray and

18   Jowdy that somehow you needed to have a written agreement

19   contemporaneous with the transaction?

20       A      Not at all.

21       Q      And when you found out the transaction fell apart

22   with the Palms did you waste any time in emailing Mr. Jowdy

23   anything?

24       A      I did not.

25       Q      And Exhibit 124, which is that August 22nd email,

94

```
 1    which is this email here where it's the Murray Palms money,

 2    did you feel that you needed -- was that the only thing you

 3    did besides send him the email?

 4         A    We spoke on the phone and confirmed that it was

 5    going to come and he needed the wiring instructions to send it

 6    back.

 7         Q    Now you suggested that this email, of course, was

 8    produced by Mr. Jowdy.  Do you remember that?

 9         A    Yes, I do.

10         Q    Did you have any -- it's from five years ago.  Did

11    you suffer any sort of issue with respect to a hard drive that

12    you had that possibly could have contained other emails?

13         A    Yes, I did.

14         MS. LEE:  Objection, Your Honor.  This is beyond the

15    scope of cross --

16         THE COURT:  This is beyond the scope.

17         MR. RICHARDS:  All right.

18         MS. LEE:  -- and leading.

19         THE COURT:  Sustained.

20         MR. RICHARDS:  All right.

21    BY MR. RICHARDS:

22         Q    There -- Ms. Lee asked you did you send any

23    subsequent emails to Mr. Jowdy about this matter?

24         A    Yes, I did.

25         Q    Okay.  And did you send him emails in October of '06
```

95

```
 1    about this matter?
 2         A    Yes, I did.
 3         Q    And did you send him emails in '07 about this
 4    matter?
 5         A    Yes, I did.
 6         Q    And was there ever a time between you finally
 7    severed your ties in '07 that you didn't mention to Mr. Jowdy
 8    that you'd like to get Mr. Murray's money back?
 9         A    Never.
10         Q    Okay.  Did you feel that you were in a little bit of
11    a pickle from the end of this transaction in '05 to the
12    beginning of '07 with respect to all this money you had
13    outstanding to Mr. Jowdy, over $20 million?
14         A    Yes.
15         Q    And it wasn't being repaid?
16         A    Yes.
17         Q    Has any of this money been repaid except for the
18    money you testified to on the credit line?  But I'm talking
19    about the investor money; has any of that been repaid?
20         A    Zero.
21         Q    All right.  So Mr. Murray's problem was that --
22    would it be fair -- well, let me re-ask the question.  Was
23    this one of many problems you were having with Mr. Jowdy?
24         A    Yes, it was.
25         Q    Is there ever -- have you ever been sent an email
```

96

1     ever from Mr. Jowdy that says "I don't know what you're
2     talking about about this Murray loan.  I have no idea what
3     you're talking about, Phil"?
4         A    Never.
5         Q    Have you ever seen an email like that?
6         A    I have not.
7         Q    Has Mr. Jowdy produced an email that says "I don't
8     know what you're talking about.  What loan are you talking
9     about?"
10        A    I've never seen anything like that.
11        Q    And would that have changed your course of conduct
12    if you ever saw an email after August 22nd, 2005 or a verbal
13    representation by Mr. Jowdy that somehow he didn't know what
14    you were talking about?
15        A    Of course it would.
16        Q    Do you know what the term lulling means, lulling,
17    when someone's telling you they're going to do something?
18        A    I believe so.
19        Q    Okay.  Would it be fair or unfair to say that
20    Mr. Jowdy was lulling you?
21        MS. LEE:  Objection, Your Honor.
22        THE WITNESS:  It would be fair to say.
23        THE COURT:  What's the objection?
24        MR. RICHARDS:  What's the objection?
25        MS. LEE:  I don't know, beyond the scope of cross.  It's

97

1   irrelevant, it's leading.

2       THE COURT:  Well, it is beyond the scope of cross.  So

3   sustained.

4       MR. RICHARDS:  Nothing further.

5       THE COURT:  Okay.  Recross?

6       MS. LEE:  Your Honor, as -- I'm sorry.

7   [Counsel Confer]

8       MS. LEE:  Your Honor, at this time can I again renew my

9   motion to admit Exhibit A-74, which is the financial document

10  from which opposing counsel was questioning.  This is the

11  assets that Mr. Kenner has testified to.  I'm sorry, the

12  assets -- the document that we never -- we had some questions

13  about maybe redacting.  I'd like to revisit that as to whether

14  or not I can move to admit these documents now --

15      THE COURT:  Okay.

16      MR. RICHARDS:  Your -- my --

17      MS. LEE:  -- there's been a foundation laid.

18      MR. RICHARDS:  My objection would be that when I sent the

19  documents over to Ms. Lee she said no documents are coming in

20  from this production because it was after the production date,

21  and I said that's fine.  So she can't selectively pick from

22  those exhibits and then only admit the ones she wants.  If she

23  wants to admit all 21 exhibits, I have no objection.  But

24  Ms. Lee can't now just say I only want to admit the ones I

25  like.  Otherwise we're going to admit the whole stack of the

98

1    Kenner exhibits.

2           I think that we covered the document enough in the

3    record that the Court understands what's on it, what's not on

4    it.  I don't -- I would object to any financial information

5    putting in there because it's problematic and it's personal

6    information.  And that's why I did not move it into evidence

7    at the time.

8           I don't believe the document is going to be

9    probative of anything else because we've already covered the

10   parts that are relevant.  But I would move to open all of the

11   exhibits I produced to her that Kenner gave us if we're going

12   to do that, because you can't just selectively take the

13   documents you like out of there and not admit the other ones

14   on a discovery issue.

15       THE COURT:  Let's just talk about the one.  What is it

16   that you want to do?

17       MS. LEE:  Sure, Your Honor.  And if I could just respond

18   quickly to that.  I did not say that I would not allow the

19   admission of this document.  This document was produced in

20   this litigation.  It's Bate num -- it's Bates stamped with our

21   Bates number.  It was produced in litigation.

22          Mr. Kenner's trial exhibits contained both documents

23   that had been produced in this litigation and not produced in

24   this litigation.  When I had my conversation with counsel I

25   said anything that hasn't been produced in this litigation I'm

99

1   not going to stipulate to, but if it's been produced in this

2   litigation then I'm not going to try to get it out at this

3   time.  This was produced in litigation by us, timely, long

4   time ago.  So just for that reason --

5            And the reason that we want -- that we're submitting

6   it, Your Honor, is because it's just -- it shows that he's

7   representing to a third party that he has a ownership interest

8   in the Palms.

9        THE COURT:  Okay.  Well, I'm concerned about the other

10   stuff.  I mean I think what you're going to need to do before

11   -- I mean is to give me a redacted version to look at.

12       MS. LEE:  Sure.

13       THE COURT:  I can make a ruling at that point about what

14   you want to admit in.

15       MS. LEE:  Sure.

16       THE COURT:  I don't need to know all of Mr. Kenner's

17   stuff from other entities, what, you know, what his balance

18   sheet is, but I'd like to see what you want to admit in and

19   then I can make a ruling on that.  It's a little tough for me

20   to say yeah, I'll do it, when I don't even know what I'm

21   looking at.

22       MS. LEE:  I understand, Your Honor.  And I could, with

23   counsel, go over and make a proposed redacted.  And I can just

24   redact everything except for those Palms transactions.

25       THE COURT:  Well, and then --

1     MS. LEE:  And there's no account numbers on this

2    document.  There's no bank account numbers or anything like

3    that.  It's just a list of assets and a list of --

4     THE COURT:  Why don't you redact it and renew your

5    motion.

6     MS. LEE:  Okay.

7     THE COURT:  I'll consider it at that point.

8     MR. RICHARDS:  Just -- and just one last thing for the

9    record.  The -- if counsel's offering it for the purpose of

10   saying he owns an -- he owns units in the Palms, that's an

11   inappropriate record to do that because the document -- and

12   it's been testified to.  He's never owned a condo in the

13   Palms.

14    THE COURT:  Counsel, I understand --

15    MR. RICHARDS:  Yeah.

16    THE COURT:  -- but it still is evidence.  And I want to

17   see what the -- what she's proposing on the redacted level

18   before I even consider it.  I don't know what we're talking

19   about right now.

20    MR. RICHARDS:  All right.

21    THE COURT:  Okay?  I might not see it as that big a deal.

22   I mean he's already testified to certain things that are in

23   the document.

24    MR. RICHARDS:  Right.

25    THE COURT:  So -- all right.  Renew your motion once you

1    redact the document and I'll consider it.

2         MS. LEE:  I will, Your Honor.

3                        RECROSS-EXAMINATION

4    BY MS. LEE:

5         Q    In terms of this revolving line of credit,

6    Mr. Kenner, when you just told Mr. Richards that at no point

7    were these funds to be used other than for the purpose for

8    which you stated to Mr. Richards, did you ever give different

9    testimony at any other time regarding that issue?

10        A    I don't recall.

11        THE COURT:  You need to speak up, sir.

12        THE WITNESS:  I'm sorry.

13        THE COURT:  That's all right.

14        THE WITNESS:  I don't recall.

15   BY MS. LEE:

16        Q    Do you recall being involved in litigation in

17   Arizona with -- against my client?

18        MR. RICHARDS:  This is outside the scope now.

19        THE COURT:  Well, she's impeaching because you -- it kind

20   of -- it got brought out.

21        MR. RICHARDS:  All right.

22   BY MS. LEE:

23        Q    I'm sorry.  Do you recall being -- suing my client

24   in Arizona about this document, this very document in Arizona?

25        THE COURT:  You're talking about A-89, right?

1      MS. LEE:  Yes, Your Honor.

2      THE COURT:  Okay.

3      MS. LEE:  The revolving line of credit.

4      THE WITNESS:  Yes, I do.

5   BY MS. LEE:

6      Q    Do you recall giving a deposition in that case in

7   Arizona?

8      A    Yes, I do.

9      Q    Do you recall telling the questioner that Mr. Jowdy

10   could use those money -- those monies under that line of

11   credit for any purpose?

12      A    I don't recall.

13      MS. LEE:  Your Honor, we have a deposition transcript

14   from that proceeding.

15      THE COURT:  Well, why don't -- what you can do is show

16   him the document --

17      MS. LEE:  Sure.

18      THE COURT:  -- and ask if it refreshes his recollection.

19   I would say just the page.  Or you could --

20      MS. LEE:  Sure.

21      THE COURT:  -- show him the book, I don't care.

22      MS. LEE:  May I approach, Your Honor?

23      THE COURT:  Sure.

24      MS. LEE:  I'm going to show the witness the cover page so

25   we can put this into context.

103

```
1           THE COURT:  And when was this in Arizona?
2           MS. LEE:  This litigation or this transcript was
3    December 4th of 2009.
4           THE COURT:  In which case?
5           MS. LEE:  This is the Little Isle IV, LLC, Ula Makika,
6    LLC, and Philip Kenner v. Ken Jowdy, filed in the United
7    States District Court of Arizona, Civil Case Number CV09-142-
8    PHX-S as in Sam, R-B as in boy.
9    BY MS. LEE:
10          Q    Do you recall giving your deposition on December 4th
11   of 2009 in that action?
12          A    Yes, I do.
13          Q    I'm going to turn your attention to page 286 of that
14   and ask you to read to yourself lines 7 through 11.  See if
15   that refreshes your -- if you could just focus on the section
16   that I -- 7 through 11, and I'm going to ask if that refreshes
17   your recollection as to what testimony you gave in that case.
18          THE WITNESS:  Your Honor, am I allowed to read other
19   pages in the deposition --
20          THE COURT:  Well --
21          THE WITNESS:  -- so I can refresh my --
22          THE COURT:  -- she's asking you if those refresh your
23   recollection.  If they do, they do; if they don't, they don't.
24          THE WITNESS:  Okay, I understand.
25          [Witness reviewing document]
```

1        THE WITNESS:  I don't recall this specific testimony.

2    BY MS. LEE:

3        Q    Do you dispute that you gave it?

4        MR. RICHARDS:  Objection.  That's improper impeachment.

5        THE COURT:  He's already said that he gave -- that he

6    testified in that deposition.

7    BY MS. LEE:

8        Q    So --

9        THE COURT:  The question is does it refresh his

10   recollection.

11       MS. LEE:  But it does --

12       THE COURT:  He says no.

13   BY MS. LEE:

14       Q    -- refresh your recollection and it does not.  Would

15   you agree with me that in that -- on that day that you

16   remember testifying that the question that was asked to you

17   was "Let me ask you this" --

18       MR. RICHARDS:  You can't -- this is improper impeachment.

19       THE COURT:  It is.  Sustained.

20   BY MS. LEE:

21       Q    Is what you said in this -- on this day consistent

22   with the type -- the testimony you gave here today?

23       MR. RICHARDS:  That's argumentative.  He said he didn't

24   -- it didn't refresh his recollection.

25       MS. LEE:  Right, but --

 1          THE COURT:  Sustained.

 2   BY MS. LEE:

 3          Q    Is what you read here today consistent with the

 4   testimony you gave here today?

 5          MR. RICHARDS:  Objection.

 6          THE COURT:  It's the same question.

 7   BY MS. LEE:

 8          Q    Would you disagree with me in this litigation in

 9   Arizona that you were saying that my client could use those

10   funds --

11          MR. RICHARDS:  I'm going to object.  It's improper --

12          THE COURT:  Wait, wait, wait.  I'd first like to hear the

13   question.  Okay?

14          MR. RICHARDS:  All right.

15          THE COURT:  Go ahead.

16   BY MS. LEE:

17          Q    On this deposition day did you represent to the

18   person asking you questions that Mr. Jowdy could use those

19   funds any way he wanted to?

20          MR. RICHARDS:  Objection; asked and answered.  Improper

21   impeachment and it -- asked and answered.

22          THE COURT:  I'm going to go ahead and let him answer it.

23   It is a bench trial.  Overruled.

24          THE WITNESS:  I don't recall.

25          MS. LEE:  I have no further questions, Your Honor.

1      THE COURT:  Okay.  Sir, you may step down.  Thank you.

2      THE WITNESS:  Thank you, Your Honor.  Would you like all

3  these back?

4      THE COURT:  I'm going to need all of them back.

5      [Pause]

6      THE COURT:  Thank you, Officer.

7          Okay.  Next witness.

8      MR. RICHARDS:  The Plaintiff briefly calls Ken Jowdy.

9      THE COURT:  Okay.

10          KEN JOWDY, PLAINTIFF'S WITNESS, SWORN

11      THE CLERK:  Please state your first and last name, spell

12  them both for the record.

13      THE WITNESS:  Kenneth A. Jowdy, K-E-N-N-E-T-H, J-O-W-D-Y.

14              DIRECT EXAMINATION

15  BY MR. RICHARDS:

16      Q    Can you please turn to Exhibit A-89?

17      THE COURT:  Hold on a second.  We need to give him the

18  book.

19      [Pause]

20      THE COURT:  There you go.

21      THE WITNESS:  Thank you.

22      THE COURT:  Uh-huh.

23  BY MR. RICHARDS:

24      Q    It's at the back.  There's little tabs buried under

25  those.

1      A    Sorry.

2      Q    Hey, no problem.  You'd go to the second page

3 please, Mr. Jowdy.

4      A    Yes.

5      Q    Did you witness Mr. Kenner sign that document?

6      A    No.

7      Q    Did you witness Mister -- did Mr. Gaudet witness --

8 you heard Mr. Gaudet's testimony yesterday that he witnessed

9 Mr. Kenner sign the document.  Were you present when Mr.

10 Gaudet signed the document?

11     A    No.

12     Q    And this document, I see it has your name on it and

13 a signature on there.  Is that your signature on the document?

14     A    No.

15     Q    No?

16     A    Absolutely not.

17     Q    So you had your attorney admit this document into

18 evidence and it's not your signature.  Is that your position?

19     A    It's not my signature.

20     Q    No, answer my question please.  Just let me ask the

21 question again.  You sat here and had your attorney --

22     MS. LEE:  Objection -- I'm sorry.

23 BY MR. RICHARDS:

24     Q    -- admit this document into evidence --

25     MS. LEE:  Objection; attorney --

108

BY MR. RICHARDS:

Q     -- knowing that it's not your signature?

MS. LEE:  Objection; attorney-client privilege, work product --

THE COURT:  I'm going to sustain that one, counsel.

BY MR. RICHARDS:

Q     Why did -- what was the purpose of offering this document into evidence -- let me strike that.  Isn't it true you offered this document into evidence to try to imply that the money was coming from -- potentially could be coming from this credit line?

MS. LEE:  Objection; leading.

THE COURT:  He can lead.

MR. RICHARDS:  It's cross-examine.

THE COURT:  He can lead.  It's -- I understand --

MR. RICHARDS:  Can lead on cross-examination.

THE COURT:  Wait a minute, counsel.

MR. WALL:  This is not a cross-examination.

THE COURT:  One can talk at a time.  I realize this is on direct, but I'm going to allow you to treat him as a hostile witness because I appreciate you're on opposite sides.  So I'm going to allow him to lead.  Go ahead.

BY MR. RICHARDS:

Q     Did you hear -- understand my question?

A     Repeat the question.

109

```
 1        Q     The question was isn't it true that you admitted
 2   this document to argue that the funding -- that there was
 3   funding available for -- from Phil Kenner to borrow for this
 4   purchase on Innisbrook?
 5        A     I believe this, as far as I'm concerned, this
 6   document was -- is admitted to show that Phil Kenner's been
 7   lying about a lot of things.  And this is one of the things
 8   that he's been lying about.  And at this time -- and I can go
 9   through the whole story if you'd like.  And --
10        Q     I just want you to answer my question.
11        A     Well, the question --
12        Q     You disagree with why it was being admitted.  Is
13   that your position?
14        A     I think it's admitted to show that Phil Kenner's
15   been in a lot of litigation and a lot of places over the
16   course of the last two years.  And this is one document that
17   he's talked about with me that is not an accurate document.
18        But when it goes to this case and what he's suing for me
19   here, it shows how ridiculous this lawsuit is to say that that
20   loan was a -- that was a loan to me.  Because if he's going to
21   state under oath in several jurisdictions that I had -- this
22   was open to me, why would that ever happen?
23        So at some point you have to answer to all the different
24   stories that are in several different litigations that I --
25   that we've been dealing with for the last two years.  I mean
```

1    you asked the question, I have to answer it.

2         Q    Okay.  Who admitted the document, me or your lawyer?

3         A    Our lawyer, my lawyer.

4         Q    You understand that we didn't admit the document?

5         A    I understand.

6         Q    And when Bob Gaudet was here testifying your lawyer

7    asked him is this his signature.  Remember that?

8         A    Absolutely.

9         Q    And then moved to admit the document as a legitimate

10   document.

11        MS. LEE:  Objection as to the -- what I was doing.

12        THE COURT:  Well, I --

13        MR. RICHARDS:  Your Honor --

14        THE COURT:  Wait, wait, wait.  Counsel, this is something

15   you can argue to me in closing.  I appreciate where you're

16   going.

17        MS. LEE:  Argumentative.

18        THE COURT:  Go ahead and ask the next question.

19   BY MR. RICHARDS:

20        Q    Okay.  Isn't it true, Mr. Jowdy, that you took the

21   position in the Arizona litigation that this document had no

22   legal significance whatsoever?

23        A    Yes.

24        MR. RICHARDS:  Okay.  Your Honor, I'm going to move to

25   strike the document because he's judicially estopped from

111

1    coming in in Nevada and saying that this document is

2    legitimate, and therefore there was funding available.

3        How could his lawyer not disclose this to the Court and

4    say that we're offering it for this purpose, and then we

5    discover that Mr. Jowdy filed a declaration saying the

6    document has no legal significance, then argue in front of

7    this Court this document has significance?  They're two

8    entirely inconsistent positions.  Both -- that's not right.

9            He didn't -- they're the proponent of the document.

10   A lawyer can't move a document in evidence knowing it's --

11   that their own client says it's illegitimate and a forgery

12   without disclosing it.  It implied to all of us sitting here

13   that the document was legally viable.  They're the proponent

14   of the document.  You can't knowingly admit a document in

15   evidence that you know is false without disclosing it to the

16   Court or qualifying, saying we're admitting it to show

17   something else.  They had moved it in as a substantive

18   document, that that was a legal credit line.

19           You sat here for question after question; they used

20   it to attack Mr. Kenner's credibility saying you had a valid

21   credit agreement and you've heard hours and hours of questions

22   about that the use of the proceeds were unlimited versus for

23   the projects in Mexico.  And then now all of a sudden he's

24   going to take the position in this case that the document is

25   completely legally irrelevant because it's a forgery?  That's

1    completely inappropriate to do in a case.

2          And I have a declaration I'll represent to you in

3    the Arizona case that Mr. Jowdy signed under oath on February

4    27, 2009 that I pulled off Pacer last night where he says this

5    document is complete fabricated, he doesn't subscribe to it

6    and it's completely irrelevant; that it has no legal

7    significance.  How -- why -- what's the point of offering it

8    then?

9          MR. WALL:  Since this goes to argument, Your Honor, I

10   would request the opportunity to respond.  Had he waited for

11   us to put Mr. Jowdy on the stand, we would have had Mr. Jowdy

12   testify just as he has now and as we will have him testify,

13   that it's a forgery.  The reason we have admitted this

14   document and brought this document is because Mr. Kenner

15   continues to claim that it is not a forgery.  And it's incon

16   -- the document as it's written is inconsistent with his

17   testimony and makes his testimony make no sense.

18         But the document itself is a forgery and the reason we're

19   admitting it is because it goes directly to the credibility of

20   Mr. Kenner.  And Mr. Kenner's credibility is everything in

21   this case, because we only have two stories here of firsthand

22   witnesses: Mr. Kenner and Mr. Jowdy.  And that's why this

23   document is coming in.  It is to show that it's a forged

24   document.  And if it's not a forged document as he has claimed

25   in two other jurisdictions, then Mr. Jowdy had access to the

113

1   funds.  But Mr. Jowdy didn't have access to those funds

2   because it's a forged document.

3       That document goes directly to Mr. Kenner's credibility

4   and that's why we've admitted it.  We did not admit it for the

5   purpose of saying that it's a legitimate document and at no

6   time did we intimate that it was a legitimate document.  We

7   asked Mr. Jow -- Mr. Kenner if it was a legitimate document

8   and he falsely testified to Your Honor here on the stand,

9   contrary to his testimony in two other juris -- contrary to

10  the -- what happened in two other jurisdictions, that it is a

11  -- in fact a true document.  It's not a true document.

12          If it's a true document, it contradicts his

13  testimony directly.  If it's a false document as we claim, it

14  goes to show that Mr. Kenner is not being honest with Your

15  Honor.  That document had -- he's premature in his argument

16  that we have tried to bring -- to spring something on the

17  Court.  This testimony would have been first and foremost in

18  our testimony when Mr. Jowdy was put on the stand, that this

19  document is a forgery.  The fact that this document is a

20  forgery is one of the lynchpins of this case.

21      MR. RICHARDS:  Your Honor --

22      THE COURT:  Okay, okay.

23      MR. RICHARDS:  I got to respond to the --

24      THE COURT:  Wait, wait, wait.

25      MR. RICHARDS:  Yeah.

```
 1        THE COURT:  Right now I'm going to deny your motion to
 2   exclude or strike this document.  Sounds like closing
 3   arguments are going to be quite interesting.  So let's go
 4   ahead and continue with the examination of this witness.
 5        MR. RICHARDS:  There's one thing though about Bob Gaudet,
 6   by not disclosing it --
 7        THE COURT:  Counsel, let's move on.  Okay?  We have very
 8   limited time.  I'm concerned about getting this trial done.
 9        MR. RICHARDS:  That was -- I only called Mr. Jowdy for
10   that purpose, because it was raised as to Mr. Gaudet.  It was
11   never brought up.  And the document was admitted through Mr.
12   Gaudet, so I can't now cross-examine Mr. Gaudet because this
13   whole use was shielded.  And now we're prejudiced by it
14   because Mr. Gaudet was brought in to say did you witness the
15   document, is that your signature, no attack on his
16   credibility.  Now the document's completely irrelevant.  I
17   thought it was a relevant document based on their admission.
18        THE COURT:  Counsel, I've already made my decision.
19        MR. RICHARDS:  All right.  I mean I just -- that was the
20   only reason why I called Mr. Jowdy.  I'm now surprised he's
21   taking this position.
22        THE COURT:  Okay.  I understand.
23        MR. WALL:  Your Honor --
24        THE COURT:  Okay.  Do you want to cross-examine?  Now
25   we're only talking about this document.  Okay?  Because I
```

1    assume you're going to bring him in your case in chief.

2        MS. LEE:  Yes, Your Honor.

3        MR. WALL:  I just want to make a record that what he just

4    said, I --

5        THE COURT:  I understand --

6        MR. WALL:  -- I need to respond --

7        THE COURT:  -- counsel.

8        MR. WALL:  -- to later.

9        THE COURT:  Let's go ahead and sit down.  I've heard

10   arguments, I've made my ruling.

11       MR. WALL:  Understand.

12                    CROSS-EXAMINATION

13   BY MS. LEE:

14       Q    Hello, Mr. Jowdy.  I'm sorry, you wanted to tell

15   your whole story in terms of this document and why, in your

16   mind, this document is relevant to this case, despite the fact

17   that no one's disputing that it's a fraud.  You've not

18   testified inconsistently, not here, not in Arizona, not in

19   California.  You've always maintained that this document is a

20   fraud.  Why then have we -- have you -- why do you think it's

21   relevant to this case?

22       MR. RICHARDS:  That calls for a narrative.  And if it's

23   not a legally viable document, it's irrelevant.  It's just --

24   we're not --

25       THE COURT:  I'm going to -- counsel, it is a bench trial.

1    I'm going to hear it.  Okay?  If it's -- if we had a jury here

2    I'd be a lot more concerned, but you guys have got to all

3    trust me that I'm going to be ferreting all these things out.

4    Okay?  Sir.

5         THE WITNESS:  Well, I think Mr. Wall did a great job of

6    explaining why I think it's valid and appropriate in this

7    case.  The fact of the matter is that it's obvious, one way or

8    the other, that either this -- if you want to take the

9    position that this is an actual document, which it's not, then

10   this whole trial that we're in doesn't make any sense.

11        If you take the position that it's a forged document,

12   which it is, it says that Mr. Kenner has been lying under oath

13   for, as far as I know, the last two years.  And not just about

14   this, but about many things.  And if this is a credibility

15   issue, then that needs to be taken into account.  And this

16   will come down to, I would imagine, two people and two

17   stories, and two very different stories.  So to be able to

18   tell this story as a forgery is extremely important to me in

19   this case.

20   BY MS. LEE:

21        Q     Thank you.

22        MS. LEE:  While we have him on the stand, Your Honor, can

23   I just proceed with my direct, unless he wanted to --

24        THE COURT:  Well, it's still Plaintiff's case --

25        MS. LEE:  I'm sorry.

117

| | |
|---|---|
| 1 | THE COURT:  -- in chief. |
| 2 | MS. LEE:  Yes, I'm sorry.  Did you want to recross? |
| 3 | THE COURT:  Any redirect? |
| 4 | MR. RICHARDS:  No. |
| 5 | THE COURT:  Okay, sir.  You may step down. |
| 6 | THE WITNESS:  May I step down? |
| 7 | THE COURT:  Yes, you may step down. |
| 8 | MR. RICHARDS:  Plaintiff rests. |
| 9 | THE COURT:  Okay. |
| 10 | MS. LEE:  Your Honor, we'd call -- Defendant calls |
| 11 | Mr. Jowdy, Ken Jowdy. |
| 12 | THE COURT:  Okay.  Do we need to have him re-sworn? |
| 13 | MR. RICHARDS:  No. |
| 14 | THE COURT:  Okay.  Sir.  I know this may sound |
| 15 | procedural, but we need to get it right.  Okay? |
| 16 | MR. RICHARDS:  I agree. |
| 17 | KENNETH A. JOWDY, DEFENDANT'S WITNESS, PREVIOUSLY SWORN |
| 18 | THE COURT:  Okay, sir.  I just want to remind you you |
| 19 | have been sworn.  Okay? |
| 20 | THE WITNESS:  Thank you. |
| 21 | THE COURT:  Okay.  Okay, Ms. Lee. |
| 22 | MS. LEE:  Thank you, Your Honor. |
| 23 | DIRECT EXAMINATION |
| 24 | BY MS. LEE: |
| 25 | Q    Mr. Jowdy, can you give the Court some indication of |

1   your background, your trade, what you do for a living?

2        A    I'm a developer in Cabo San Lucas, a real estate

3   developer.  I've been involved in real estate in Mexico since

4   1998.  Right now we're developing 1,500 acres in Cabo San

5   Lucas called Diamante Cabo San Lucas.

6        Q    And in 1998, what project were you developing in

7   Mexico?

8        A    In 1998, I'd actually just first, found a piece of

9   property in a town called El Rosario, which is a small town in

10  northern Baja, and was able to accumulate 10,000 acres.  And

11  between 1998 and the year 2002 put together -- it was all

12  under leases, there was Indian land.  Was able to get it all

13  under clear title in those four, four and a half years.  So

14  that's what happened between 1998 and 2002, and then that

15  became Diamante Del Mar, which you heard Mr. Murray testify as

16  being a investor in.

17       Q    And do you know Mr. Kenner?

18       A    Yes.

19       Q    Is he in the courtroom today?

20       A    Yes.

21       Q    Could you please identify for the Court where he is?

22       A    Right over your left shoulder.

23       MS. LEE:  Let the record reflect that he's identified

24  Mr. Kenner as who he is.

25       THE COURT:  Okay.

119

BY MS. LEE:

Q     And when did you meet Mr. Kenner?

A     Met Mr. Kenner in the spring of 2002, somewhere around the spring of 2002.

Q     And under what circumstances?

A     I was friends with a couple of his clients.  We had talked about the property that I had in Mexico and they thought that they might be interested in that.  They said that if they were going to be interested in doing anything with me, that I needed to talk to Phil Kenner.  So they introduced me to Phil Kenner.

Q     And who did they -- who was Mr. Phil Kenner?  Why did they think that he would be able to do anything?

A     He's their investment advisor.

Q     Okay.  And I'm going to ask -- I know that you and I talk a lot, but that we just wait till the complete question is asked and then an answer, just so we have a clean record.

A     I'm sorry.

Q     I'm sorry, so your understanding of Mr. Kenner before you met him was that he was a -- an investment --

A     Advisor.

Q     I'm sorry?

A     Advisor.

Q     Advisor?

A     Yes.

1      Q     Okay.  And so when was the first time that you

2   actually met Mr. Kenner in person?

3      A     Again, I think it was the spring, maybe early summer

4   of 2002.

5      Q     And what did you guys discuss when you first met?

6      A     Well, the purpose of the meeting was set up by two

7   of his clients.  So at that time we discussed some of the

8   things that I was doing in Mexico.

9      Q     Okay.

10     A     In very broad, general terms.

11     Q     Okay.  And then did you meet with him again at some

12  point?

13     A     I'm not sure if there was another meeting, but I --

14  the meeting that I remember next that probably was the next

15  meeting was in August of 2002.

16     Q     Okay.  What did you guys discuss during that

17  meeting?

18     A     Basically the project in El Rosario.  We got into a

19  little bit more specifics as to what we were wanting to do,

20  trying to do.  We were at a point at that time where we had

21  gotten our title, we were ready to purchase land.  We were

22  ready to go from a 90-year lease to clear title purchase,

23  which was that four and a half years of work that I did prior

24  to that.

25      So it was something that would be more attractive to

1    outsiders because it's a clean title, more like we do land

2    transactions here in United States.  So Phil represented that

3    he had many high net worth clients and that he could be the

4    person to help raise funds.

5         Q    And then did he do that?

6         A    He did.

7         Q    Okay.  And how did he do that?

8         A    Well, that meeting that I remember was August 2nd.

9    By August 5th he had one of his clients wire, I believe

10   $150,000 in that period of time, and then after that another

11   $100,000 by the end of that week.  And then that's how that

12   started.  And he ended up, through a course of two or three

13   years, probably two years, raising the money to do what we

14   were trying to do at that point.

15        Q    And is -- again, is that just -- did you say through

16   his clients?

17        A    Through his clients, yes.

18        Q    And was Mr. Murray one of the investors that

19   Mr. Kenner had gotten to invest in that property?

20        A    I believe Mr. Murray invested in December of 2002.

21        Q    Okay.  Had you facilitated Mr. Murray's investment

22   into that property at all?

23        A    No.  Mr. Kenner --

24        MR. RICHARDS:  Nonresponsive.  She said have you, he said

25   no, and now he's talking --

```
 1          THE COURT:  Okay, I understand.

 2          Sir, wait until she gets her question out.  Okay?

 3          Go ahead.  I'm going to sustain that one.

 4   BY MS. LEE:

 5      Q    Did you have something else that you wanted to say

 6   in response to my question?

 7      A    Just --

 8          THE COURT:  What was your question?  Go ahead and repeat

 9   your -- ask your question.

10          MS. LEE:  Oh, right.

11   BY MS. LEE:

12      Q    My question was did you do anything to facilitate

13   Mr. Murray's investment into that property?

14      A    No.  I was just going to --

15          THE COURT:  Into the Rosario property?

16          MS. LEE:  Into the Rosario property.

17          THE COURT:  Okay.  So Mr. Murray sent money to you in

18   December of '02.  And what was that for?

19          THE WITNESS:  An investment into Diamante Del Mar.  By

20   the time December had come we had put together private

21   placement, which we didn't have in place when I first met

22   Mr. Kenner.  So that private -- so Mr. Murray was part of that

23   private placement offering --

24          THE COURT:  Which is --

25          THE WITNESS:  -- memorandum.
```

123

1          THE COURT:  -- the Diamante Del Mar in El Rosario; right?

2          THE WITNESS:  Yes.

3          THE COURT:  Okay.  So we are still talking about the --

4          THE WITNESS:  Yes.

5          THE COURT:  -- El Rosario property?

6          THE WITNESS:  Yes.

7          MS. LEE:  Okay.

8          THE COURT:  And how much did Mr. Murray invest in

9    December of '02?

10         THE WITNESS:  $500,000.

11         THE COURT:  Okay.

12   BY MS. LEE:

13         Q    Did you have any interactions with Mr. Murray in

14   that time period when he was investing into Rosario?

15         A    I met Mr. Murray once.  I'm not certain if it was

16   before or after his investment.  Since he invested in -- since

17   I met Phil in August of 2002 and he invested in December of

18   2002, as Mr. Murray's explained, he's a professional hockey

19   player.  I would assume that I didn't meet him till the --

20   that off-season, which would have been -- but I met him once

21   in, I assume, that next off-season, but I'm not sure.

22         Q    Besides only meeting him once, did you ever have any

23   other significant interactions with him around that time such

24   that a mutual feeling of trust would be generated?

25         MR. RICHARDS:  Leading.

124

1        THE COURT:  That is leading.  Sustained.

2   BY MS. LEE:

3        Q     Did you have any other -- other than not having met

4   him except for that one time, did you have any other

5   significant or -- interactions with Mr. Murray at that time

6   that he was investing?

7        A     I've had no other interactions with Mr. Murray at

8   any time.

9        Q     Okay.

10       THE COURT:  Tell me about the one meeting you had with

11  Mr. Murray.

12       THE WITNESS:  I remember that he flew down to the

13  property in El Rosario.  That's -- I don't remember much of

14  what was discussed.  I remember that Phil was bringing some of

15  his clients so they can go and see the property.  Now this

16  property is 200 miles south of San Diego.  It was in a fairly

17  remote area.  We accumulated 10,000 very beautiful acres of

18  Pacific coastline, but it's a four and a half hour drive from

19  San Diego.  So we flew a plane.  I remember flying down to El

20  Rosario and --

21       THE COURT:  And was Mr. Murray with you?

22       THE WITNESS:  I'm pretty certain I flew that one trip

23  with Mr. Murray.

24       THE COURT:  Okay.  How long was the plane flight?

25       THE WITNESS:  Well, there's a couple stops because you

125

1    have to check into Customs, but I think the total might have

2    been about an hour and a half, hour, hour and a half.

3         THE COURT:  Okay.  So you had an hour and a half flight?

4         THE WITNESS:  Uh-huh.

5         THE COURT:  Is that a yes?

6         THE WITNESS:  Yes, I'm sorry.

7         THE COURT:  Okay.  And then I take it that you and he

8    looked at the property?

9         THE WITNESS:  Well, Phil Kenner was there also.

10        THE COURT:  Okay.  I take it that you, Mr. Kenner and

11   Mr. Murray looked at the property?

12        THE WITNESS:  Yes.

13        THE COURT:  Okay.  How long did that take?

14        THE WITNESS:  May have taken a couple hours.

15        THE COURT:  Okay.  So -- and then it was an hour and a

16   half plane ride back?

17        THE WITNESS:  Roughly, yes.

18        THE COURT:  Okay.  So we're talking about at least five

19   hours of time that you spent with him?

20        THE WITNESS:  Roughly, yes.

21        THE COURT:  Any more time during that visit?

22        THE WITNESS:  None that I remember.

23        THE COURT:  Okay.  And what did you all talk about?

24        THE WITNESS:  I don't really recall any specifics.  I

25   don't really recall.  I just -- the only thing I recall is

126

```
 1    flying down with Mr. Murray.  There were several flights and
 2    several times that I went down personally.  I don't recall the
 3    specifics.  I know that Mr. Kenner would tell him about what
 4    the plans were.  That's kind of -- they were friends of
 5    Mr. Kenner's.  He would pretty much lead those discussions.
 6          THE COURT:  I take it there -- did they ask you questions
 7    about the project?
 8          THE WITNESS:  I'm sure that people did, yes.
 9          THE COURT:  Okay.  Did Mr. Murray ask you questions about
10    the project?
11          THE WITNESS:  I don't recall.
12          THE COURT:  Okay.  Keep going, counsel.  I'm sorry, I --
13          MS. LEE:  Sure.  No, I appreciate that, Your Honor.
14    BY MS. LEE:
15          Q     Then if I could take -- and this was all back in
16    2002 did you say?
17          A     Yes.
18          Q     Okay.
19          A     Well -- I'm sorry.
20          Q     I'm sorry.
21          A     I didn't mean to interrupt you.
22          Q     No, go ahead.
23          A     I -- it probably wasn't until -- I don't recall, but
24    I'm just saying just going by the hockey season, it probably
25    wasn't till that off-season.  So --
```

1    MR. RICHARDS:  I'm going to object, move to strike; lack

2  of personal knowledge.  He's just -- he's speculating.

3    THE COURT:  Oh, he's saying it's during the off-season

4  and Mr. Murray told me when the off-season was.  I'm going to

5  go with it.  Go ahead.

6  BY MS. LEE:

7    Q    I'm sorry.  So to the best of your recollection,

8  this occurred around 2002?

9    A    Like I said, it was -- the trip down was probably in

10  2003 because --

11    Q    Oh, 2003, okay.

12    A    -- he invested his money in December of 2002.

13    Q    Okay.

14    A    So it would have been really, according to the

15  schedule with Mr. Murray, it would have been impossible to, I

16  think, take him down at that -- before that.

17    Q    So he would have -- such that he would have already

18  invested his money?

19    A    Yes.

20    Q    And then you would have --

21    MR. RICHARDS:  This is leading.

22    MS. LEE:  I'm sorry, I'm just trying to understand.

23    THE COURT:  Well, just be careful.  Just --

24    MS. LEE:  Sure.

25    THE COURT:  -- go ahead and ask direct questions.

```
 1         MS. LEE:  Sure, okay.

 2    BY MS. LEE:

 3         Q    So the -- to the best of your recollection, the

 4    money was deposited in the end of 0 --

 5         A    2002.

 6         Q    Two.  And then you had the subsequent meeting in

 7    2003?

 8         A    Three.

 9         Q    Three, okay.  And between 2003 and 2005, in August

10    of 2005, which is the relevant period for which these trans --

11    this transaction has taken place -- when I say this

12    transaction I mean this alleged loan.  Between 2000 --

13         THE COURT:  Now we're talking about the 791 loan?

14         MS. LEE:  Yes.

15         THE COURT:  Okay.

16    BY MS. LEE:

17         Q    Between 2003 and August of 2005, did you ever have

18    any discussions with Mr. Murray?

19         A    No.

20         Q    Did you ever have any written correspondence with

21    Mr. Murray?

22         A    I had no communications whatsoever.

23         Q    And in 2005 -- you've been in court this whole time.

24    You've heard testimony regarding this transaction involving

25    the Palms deal.  And my question is if you could just explain
```

129

1    to the Court what this Palms deal transaction was all about?

2         MR. RICHARDS:  Calls for a narrative.

3         THE COURT:  I'm going to let him go ahead.  I'm going to

4    overrule.  Go ahead.

5         THE WITNESS:  Well, I first found out about the units at

6    the Palms through Mr. Kenner.  I believe that was February of

7    '05, I don't know the exact date.  Mr. Kenner told me that

8    there was an opportunity there, that he had locked up three

9    units and that was the most that you can put in your name, and

10   asked me if I wanted to purchase units at the Palms.

11        And basically I told him that at the time, which he was

12   well aware of, that I didn't have the financial capability to

13   do that.  And he said not to worry about that, he would put up

14   the funds.  He just had to put my name down on it and we were

15   able to get the first phase financing, and the Palms units

16   were going up and more than likely there'd be an opportunity

17   to possibly flip them and make some money.

18   BY MS. LEE:

19        Q    Now when he made this representation to you

20   regarding him owning three units at the Palms did you then go

21   and verify whether or not that representation was true?

22        A    No.

23        Q    So as you sit here today, do you know whether or not

24   there was such a restriction at the Palms?

25        MR. RICHARDS:  This is leading, Your Honor.  I mean --

1      THE COURT:  You are leading.

2      MS. LEE:  Oh, sorry, Your Honor.

3      THE COURT:  Okay.  Sustained.

4      MR. RICHARDS:  Move to strike that last answer.

5      THE COURT:  I'm going to overrule.

6  BY MS. LEE:

7      Q    And was it -- was there anything unusual about what

8  Mr. Kenner was proposing to you at that time in terms of how

9  you guys were going to fund this, the Palms units?

10     MR. RICHARDS:  Objection; vague, leading.

11     THE COURT:  Sustained.

12 BY MS. LEE:

13     Q    Was this, to use Mr. Richards' words, is this -- was

14 this unusual or usual, that he would come to you and say I'm

15 going to put this money into this investment?

16     A    I wouldn't say it was unusual.  But just to be

17 clear, to do something like that where all I'm putting is my

18 name on it, that had never happened before.  I mean there were

19 certain things that I did where I worked, you know, and I was

20 the operator and I -- or I was the person going to find

21 something or doing -- that Phil had provided funds for, but

22 just to -- to just put your name and do it, that had never

23 happened before, no.  That was unusual.

24     Q    So you had this initial meeting.  Did the -- did you

25 have this initial meeting at the Palms?

1       A   We had an initial meeting at the Palms.  I was also

2   friends with George Maloof, as Mr. Kenner stated.  He did set

3   up the meeting because he had already bought the Palms, or at

4   least told me he bought the Palms, or -- I don't know how you

5   want to clarify it as, put a deposit down or whatever, if

6   that's ownership, or however -- what the technical word would

7   be, but he said that he had already done that.  So he arranged

8   the meeting and we went.

9       Q   And was he present at the meeting?

10      A   Yes.

11      Q   Okay.  And then what's the next thing that happened

12  after that meeting regarding these Palms units?

13      A   I believe that we received some paperwork that

14  needed to be filled out and returned back to the Palms.

15      Q   Then what was the next thing that happened with

16  regards to this property?

17      A   There had to be a deposit.  The way it worked was

18  two units needed a $25,000 deposit and one unit needed a

19  $100,000 deposit.  This was refundable money.  So that money

20  was sent, I believe in April of '05.

21      Q   And then after that soft money -- as you call it, a

22  soft money deposit?

23      MR. RICHARDS:  Leading.

24      THE WITNESS:  It was nonrefundable, yes.

25      THE COURT:  Yeah, counsel.  I'm going to sustain that,

```
1    but you are leading.
2         MS. LEE:  Okay, I'm sorry.
3         THE COURT:  Ask direct questions.
4         MS. LEE:  Sure, sure.
5         THE COURT:  It tells me a lot more whenever I listen --
6         MS. LEE:  I understand, Your Honor.
7         THE COURT:  -- to the witness.
8    BY MS. LEE:
9         Q    And then after April of 2005 when -- well, was it --
10   was that deposit made?
11        A    Yes.
12        Q    Okay.  And then what was the next thing that
13   happened after that deposit made with respect to that
14   property?
15        A    Next thing that needed to happen was -- the way I
16   understood it, they could take refundable money until they had
17   gotten to a certain point with either their -- enough units
18   sold where they had to find -- because they weren't built.
19   They were -- so I guess they needed to sell enough units where
20   they can get the financing to start to construct.
21        So as soon as they had -- and this was just my
22   understanding.  I don't know if it was accurate.  As soon as
23   they had enough deposits, they can go to get nonrefundable
24   money and then start construction.
25        Q    And do you recall when or if that phase ever
```

1    occurred?

2         A    It did.

3         Q    And do you recall when that occurred?

4         A    That would be in the summer of 2005.

5         Q    So what happens in the summer of 2005 with respect

6    to this property?

7         A    At some point they gave notice that the -- whatever

8    the balance between the $150,000 and the -- what would amount

9    to 20 percent of your purchase price needed to be deposited.

10   So I don't know when the notice came.  It may have come in

11   June or July.  You had a certain -- some time to do that, but

12   sometime in that summer.

13        Q    Do you -- I'm sorry.  Okay, go ahead.

14        A    That's it.

15        Q    And how much -- and did you receive that notice?

16        A    Yes.

17        Q    And how much was expected?  What was the amount that

18   was listed in that notice that needed to be funded?

19        MR. RICHARDS:  Hearsay.

20        THE COURT:  Well, he's already testified to it and I

21   think I've seen it.

22        MR. RICHARDS:  All right.

23        THE COURT:  Go ahead, I'm going to overrule.

24        THE WITNESS:  The total amount for the three -- I don't

25   know the numbers broken up, but the total --

134

```
 1          THE COURT:  But it was 20 percent.
 2          THE WITNESS:  Oh yeah.  No, I'm sorry.  The percentage
 3   amount or the total dollar amount?
 4   BY MS. LEE:
 5      Q     Well, let's do both.
 6      A     The percentage amount would be 20 percent, and it
 7   would add up to the $791,000 that's --
 8      Q     And is that including the 150, or in addition to the
 9   150?
10      A     That's in addition to the 150.
11      Q     Okay.  And when was that 791 due?
12      A     I'd like to say sometime in July, but I don't know
13   if it's -- probably mid to late July, mid July.
14      Q     And was that 791 deposited for those three condo
15   units at the time it became due?
16      A     No.
17      Q     And why not?
18      A     Well, as I discussed, what the arrangement was,
19   there was no expectation of me to put up the funds.  And at
20   the time, in the summer of 2005, there was a lot going on, a
21   lot going on --
22          MR. RICHARDS:  This is nonresponsive.
23          THE COURT:  Overruled.
24          THE WITNESS:  There was a lot going on.  Mr. Kenner was
25   responsible for funding the Palms.  The summer of 2005 he had
```

1   a lot of pressure, a lot of money pressure, and he wasn't able

2   to make that deposit at the time that it was due.

3   BY MS. LEE:

4        Q    And what was your understanding of what money

5   pressure he was facing?

6        MR. RICHARDS:  Foundation.

7        THE COURT:  Well, he's already testified a little bit to

8   it.  I'm going to overrule.  Go ahead.

9        THE WITNESS:  He had at that time two projects that he

10  was responsible for funding.  One was in Hawaii and one was in

11  Cabo San Lucas.  I would say that they -- the pressure in Cabo

12  San Lucas was probably the biggest at that point in time

13  because --

14       MR. RICHARDS:  I'm going to object, Your Honor, if he's

15  going to start talking about contracts and risk in Cabo

16  without any foundation.  It's hearsay.  We have -- this is a

17  completely collateral matter.  We have no discovery --

18       MS. LEE:  This isn't --

19       THE COURT:  I know --

20       MS. LEE:  It's a speaking --

21       THE COURT:  -- but we've been talk --

22       MS. LEE:  -- objection.

23       THE COURT:  Wait, wait, wait.

24       MS. LEE:  I'm sorry.

25       THE COURT:  Okay.  We've been talking about collateral

136

1    matters all through this trial.

2          MR. RICHARDS:  We haven't.  Not --

3          THE COURT:  I understand.

4          MR. RICHARDS:  You know, we have -- we've been very

5    careful to stay away from collateral matters.  But what I'm

6    concerned about is now Mr. Jowdy's going to provide testimony

7    about risk that are based upon contracts and documents that

8    aren't in discovery, aren't in evidence, and I can't cross-

9    examine and there's no foundation.  I mean that's what I'm

10   concerned about.  He's going to throw out risk there without

11   any way for me to corroborate or cross-examine the risk.

12         THE COURT:  Okay, I understand.  We're going to go

13   through it a little bit.  I'm going to overrule.

14             Okay.  Now the Cabo project, is that the Diamante

15   Cabo San Lucas?

16         THE WITNESS:  Diamante Cabo San Lucas, yes.

17         THE COURT:  Okay.

18   BY MS. LEE:

19       Q     And just so we could establish how you would know

20   this information, what was your role at Diamante Cabo San

21   Lucas?

22       A     As I said earlier, there would be certain projects

23   where I would be the operations person.  I would be the person

24   -- I found the property, I'd work the property.  And in that

25   particular case, that was 1,500 acres in Cabo San Lucas.  We

137

1    went under contract in January of 2005.

2         MR. RICHARDS:  I'm going to object to anything about the

3    contract unless the Spanish contract is here, translated, it

4    was produced, and we can review it.

5         THE COURT:  Counsel, I understand.

6         MR. RICHARDS:  All right.

7         THE COURT:  If we were -- if we had a jury here, I'd be

8    concerned about it.  I don't even know that I'm going to

9    consider any of this stuff, but it would be helpful for me to

10   know a little bit about the background.

11        MR. RICHARDS:  All right.

12        THE COURT:  Okay?  Go ahead.

13        THE WITNESS:  So that was a $65 million property

14   purchase, of which 10 percent needed to be in by 90 days.  We

15   had 90 days to do due diligence and within that 90 days we

16   needed to pay $6.5 million.

17        THE COURT:  Well, let me ask you this since I've got you

18   here.  You've got the Diamante Del Mar and the El Rosario

19   thing.  Did that ever come to fruition?

20        THE WITNESS:  No.

21        THE COURT:  Okay.  Whatever happened to all that money,

22   for example, the 500,000 that Mr. Murray invested?

23        THE WITNESS:  That property's still there.  He still owns

24   it.  What hap -- if you -- can I give you a two-minute?

25        THE COURT:  Okay, very quickly, yeah.

138

1     THE WITNESS:  Okay.  When we were going through that

2  process with Diamante Del Mar and Phil was the person that was

3  raising money, we hit the -- basically a wall of funding.  And

4  we needed to go to the next round and bring a lender in.  We

5  had owned the property, we needed to bring a lender in to

6  execute the plan that we wanted to do.

7     As we started to bring these lenders in, institutional

8  lenders or -- they all liked the project, liked what we were

9  doing, but they didn't like the area so much as it was a

10  remote area and they felt -- all the money at that point in

11  time, which is now about 2003, was going to Cabo San Lucas.

12     So at that time, we felt that -- we didn't decide

13  that we were going to do a project in Cabo San Lucas at that

14  time, but we felt that if we were going to have any success in

15  the Baja at all, we needed to have a presence in Cabo San

16  Lucas.  So in middle to late 2003 we rented a house in Cabo

17  San Lucas, started to spend some more time in Cabo San Lucas,

18  and started to get somewhat of a presence in that area.  And

19  then --

20     THE COURT:  Okay.  So I take it there's still a plan to

21  develop Diamante Del Mar?

22     THE WITNESS:  Yes, yes.

23     THE COURT:  Okay.

24     MS. LEE:  Okay.

25

139

1    BY MS. LEE:

2        Q    And so with respect to the 10 percent deposit on the

3    Cabo San Lucas entity -- well, I'm sorry, let me ask you this.

4    Was there any corporate entity that was associated with that

5    Diamante Cabo San Lucas project in the beginning?

6        A    When we first went under contract on that property

7    it needed to be in a Mexican corporation's name.  We had

8    Propiedades DDM was set up for Diamante Del Mar.  It was never

9    used.  So we put the contract in that entity's name.

10        Q    Okay.

11        A    Knowing that at some point we would -- that just

12    meant that we would -- that the contract was there.  We can

13    assign it as we wanted to when we wanted to.

14        Q    Okay.  And so did you have an ownership interest in

15    the PDDM?

16        A    I did.

17        Q    Okay.  And in terms of the 10 percent, how would you

18    know that that was a funding obligation of that property?

19        MR. RICHARDS:  Hearsay, contracts.

20        THE COURT:  Now are we -- when you say that property?

21        MS. LEE:  Diamante Cabo San Lucas.

22        THE COURT:  Okay.

23        MS. LEE:  So -- and I'm sorry, Your Honor, if I could be

24    allowed to just --

25        THE COURT:  Okay.  I was going to say we are getting into

1  a prob -- I mean I appreciate I need to know a little bit

2  about it, but we also need to focus more on this deal here,

3  because --

4       MS. LEE:  Exactly.

5       THE COURT:  I mean it was important for me to kind of

6  understand the relationship a little bit, but let's go ahead

7  and stick to the 791.

8       MS. LEE:  Okay.

9  BY MS. LEE:

10      Q    So in terms of what you meant by Mr. Kenner

11  experiencing a lot of financial pressure at that time, can you

12  continue to explain what --

13      MR. RICHARDS:  I'm going to object.  You just asked her

14  to stick to the 791.  Now it's relevance.  We're going to now

15  go back to get at the contract?

16      THE COURT:   Let's just go to the 791.  Let's let -- I

17  mean unless you --

18      MS. LEE:  Okay.

19      THE COURT:  -- are laying some foundation for this thing,

20  but we are getting a little bit afield on this.

21      MS. LEE:  Sure, Your Honor.  And I apologize, but I don't

22  want to confuse, or confuse the issues rather.

23  BY MS. LEE:

24      Q    So the money doesn't make it to the Palms on time;

25  is that right?

141

1      A      Correct.

2      Q      And why doesn't the money make it to the Palms on

3  time?

4      A      Because Phil Kenner was supposed to fund it and he

5  had other very pressing funding obligations at that time.

6      Q      And I think you've mentioned two developments?

7      A      Yes.

8      Q      Okay.  And can you -- so what was he telling you at

9  this time?

10     A      Well, I knew at this time that he was actively

11  seeking a hard money loan.  He had property in Hawaii that he

12  had equity in that property.  He was actively seeking a hard

13  money loan during that period of time to do a number of

14  things.  It would have finished the funding in Cabo and it

15  would have facilitated the money for the Palms, and it would

16  have helped him do some of the things that he was looking to

17  do with that property in Hawaii.

18     Q      Okay.

19     THE COURT:  Okay.  Let's turn to -- okay, back to --

20  okay.  The money doesn't get to the Palms on time so I take it

21  the deal doesn't go through.  You lose the three condos, or

22  the right to own the three condos, and you get your deposits

23  back; right?

24     THE WITNESS:  Yes.

25     THE COURT:  Okay.  Let's go then to you've got -- you've

1   still got the 791; right?

2           THE WITNESS:  Yes.

3           THE COURT:  Okay.  Let's go to that.  What happens then?

4           THE WITNESS:  At the time that we knew that the Palms

5   deal had not gone through -- we basically knew that before the

6   money was sent in the first place.

7           MR. RICHARDS:  Objection; no foundation.

8           THE WITNESS:  I can --

9           THE COURT:  Well, okay.

10          MR. RICHARDS:  Nonresponsive.

11          THE COURT:  Wait, wait, wait.  Let me listen, okay?

12  Overruled, go ahead.

13          THE WITNESS:  I got a letter on August 9th saying that

14  the deal was off basically.

15          MR. RICHARDS:  I'm going to object.  There's no letter.

16  We don't even have this letter.

17          THE COURT:  Counsel --

18          MR. RICHARDS:  It's hearsay.

19          THE COURT:  -- let me listen please.

20          MR. RICHARDS:  Sorry, sorry.

21          THE COURT:  Okay.  Overruled.

22              Okay.  So you find out on August 9th that the deal

23  is not going to go through because the money's not there?

24          THE WITNESS:  Right.

25          THE COURT:  But the money comes in on August 12th?

1          THE WITNESS:  August 12th.

2          THE COURT:  So why didn't you say on August 9th, "Phil,

3     sorry, deal's off.  I can't get the condos.  Don't worry about

4     the 791"?

5          THE WITNESS:  I sent Phil a letter, an email, which

6     they've already discussed, I believe, saying the different

7     options.  We had -- Phil and I had discussed what the options

8     were.  We had scrambled to get -- I mean it was embarrassing

9     yesterday to listen to the fact that the money's being sent,

10    it wasn't being sent.  Phil was -- he was trying to raise the

11    money.  He was telling me the money was going to be there.  I

12    was saying the money was going to be there and it was never

13    showing up.  So that created an embarrassing string of emails.

14          So when that was over -- and that ended on August

15    9th when they told me basically the deal was over, which was

16    kind of a relief at that point because like I said, that was

17    an embarrassing string of emails that I'd just gone through

18    and had to hear over again yesterday in court.  So after I got

19    that letter -- it was mailed on August 9th, may have gotten it

20    on August 11.  I don't know exactly when I got it.

21          THE COURT:  Okay.  We don't have it here in court though;

22    right?

23          THE WITNESS:  It should be.

24          MS. LEE:  We do have it, Your Honor.  I'm just trying to

25    figure out which exhibit it was.  It's part of our big

144

1    exhibit.

2         THE COURT:  I take it that counsel's seen it?

3         MS. LEE:  Yes.  It's our A-70.  And they were -- I'm

4    sorry.  They're the C-O-R documents from the Palms themselves.

5         THE WITNESS:  No, it's A-64.

6         MS. LEE:  A-64.  And we stipulated that the C-O-R

7    document -- this is the August 9th letter that was produced by

8    the Palms in response to our custodian of records subpoena.

9         [Pause]

10        MS. LEE:  And if I could, just for Your Honor's

11   convenience and --

12        THE COURT:  Well, okay.

13        MS. LEE:  I'm sorry.

14        THE COURT:  I can't see it until --

15        MS. LEE:  Oh, I'm sorry.  That's right.

16   BY MS. LEE:

17        Q    In this August 9th letter that you're referring to,

18   Mr. Jowdy, can you turn to Plaintiff's Exhibit A-11.

19        THE COURT:  That's --

20        MS. LEE:  Oh, I don't know if he has that in front of

21   him.

22        THE COURT:  Plaintiff's Exhibit?

23        MS. LEE:  I'm sorry, defendant's.  I keep getting our

24   sides mixed up.  Defendant's Exhibit A-11.  And I don't know

25   if you have those in front of you.

145

1        THE COURT:  Defense Exhibit A-11.  Okay.

2        THE WITNESS:  Thank you.

3        THE COURT:  Uh-huh.

4        [Counsel Confer]

5        MS. LEE:  Oh.  Oh, I'm sorry, Your Honor.  This was

6   stipulated to and it should be in.

7        THE COURT:  Well, hold on.  Let me see.  I don't have it

8   as in, do you?

9        THE CLERK:  No.

10       MS. LEE:  Oh, no?  Okay.

11       THE COURT:  No.  The only exhibit that they stipulated in

12  that I've got -- I've got A-84 and A-81.  And then A --

13       MS. LEE:  I'm sorry, Your Honor.

14       THE COURT:  -- 93.

15       MS. LEE:  Okay.  We were mistaken then.  I'm sorry.  If

16  you could turn to A-11.

17  BY MS. LEE:

18       Q    What is -- is this the letter that was -- that you

19  received on or around August 9th --

20       MR. RICHARDS:  I'm going to --

21  BY MS. LEE:

22       Q    -- from the Palms?

23       MR. RICHARDS:  -- object.  There's no foundation.

24       THE COURT:  She's trying to lay it, counsel.

25       THE WITNESS:  This --

1     MR. RICHARDS:  She's leading him.

2     THE COURT:  What is this document, sir?

3     THE WITNESS:  I'm looking at this email.  This is a --

4  BY MS. LEE:

5     Q   Oh, I'm sorry.

6     MS. BRANSON:  It's A-64.

7     MS. LEE:  Oh, I thought you said it was A-11.

8     MS. BRANSON:  The letter is in the Palm documents;

9  correct?  And that would be tab A-64.

10     MS. LEE:  I'm sorry, it's A-64, Your Honor.

11     THE COURT:  A-64.

12     MS. LEE:  It's in Volume 1.

13     THE COURT:  It's in Volume 1?

14     MS. LEE:  Volume 1.

15     MS. BRANSON:  Yes, the last tab.

16     THE WITNESS:  That's not it either.

17     MS. LEE:  I'm sorry, wrong one, Ken.

18     THE COURT:  Okay.  Which one is it, counsel, because I've

19  got my poor clerk here trying to figure out where we're --

20     MS. LEE:  It's in Volume 1.

21     THE WITNESS:  I don't think it's A-64 either.  I'm sorry.

22     THE COURT:  Okay.  Where is it?

23     MS. LEE:  Do you have A-64?

24     [Counsel Confer]

25     THE COURT:  Oh, there's -- he has two volumes in front of

1    him.

2    BY MS. LEE:

3         Q    Do you see the tab that says A-64?

4         A    Yes.

5         Q    Okay.

6         THE COURT:  Okay, you've got it.

7    BY MS. LEE:

8         Q    Within that tab can you flip to the Bates number on

9    the bottom that says J-100?

10        A    Yes.

11        MS. LEE:  Can I just approach, Your Honor, and just show

12   him --

13        THE WITNESS:  Sorry, I've got it.  I'm sorry, I'm sorry,

14   Your Honor.

15        THE COURT:  Okay.  That's all right.  That's all right.

16   Do you have it now?

17        THE WITNESS:  I have it.  I apologize.

18        THE COURT:  Okay.  And it's J-100?

19        MS. LEE:  J-100.

20        THE COURT:  Okay.

21        MS. LEE:  It's in that series.

22        THE COURT:  What is that document, sir?

23        THE WITNESS:  This is a letter dated August 9th that

24   says --

25        THE COURT:  No, not what it says.

148

```
1          THE WITNESS:  Okay.
2          THE COURT:  What is the document?  It's a letter dated
3     August 9th and from who to who?
4          THE WITNESS:  From the Palms to me.
5          THE COURT:  Okay.  And you received that letter?
6          THE WITNESS:  Yes.
7          THE COURT:  Okay.
8          MR. RICHARDS:  My objection is when did he receive it.
9     It's a letter -- a certified letter to his house in Vegas.
10    There's no --
11         THE COURT:  Well, well, well, wait.  When did you get the
12    letter, sir?
13         THE WITNESS:  I don't know exactly.
14         THE COURT:  Okay.  But you got the letter sometime after
15    the date of August 9th; right?
16         THE WITNESS:  Yes.
17         MS. LEE:  Your Honor, I'd like to move --
18         THE COURT:  Any objection --
19         MS. LEE:  I'm sorry.
20         THE COURT:  -- to its admission?
21         MR. RICHARDS:  On that testimony, no.
22         THE COURT:  Okay.  Do you want to just admit this
23    document, or are we talking about the entire Exhibit A-64,
24    what are we doing?
25         MS. LEE:  I'm sorry, Your Honor, we have created this
```

149

1  problem for ourselves.  I would like to just move to admit

2  this document.

3      THE COURT:  Okay.  It'll be A-94, next one in order.  Is

4  that what we have?

5      THE CLERK:  Yes, Your Honor.

6      THE COURT:  Okay.  And that's the August 9th letter from

7  the Palms to Mr. Jowdy.

8      THE CLERK:  Can we have the Bate --

9      MS. LEE:  J-100.

10      THE COURT:  Okay.  What about -- I can only see from

11  where I'm sitting here, but there is -- I don't need to see it

12  right now, but it appears that there's a document underneath

13  it that indicates like a -- I'm assuming it's a certificate of

14  when it was mailed.  Do you want that as part of the exhibit?

15      MR. RICHARDS:  Yeah, let me get the exhibit out.

16      [Counsel Confer]

17      THE COURT:  Just a second, I can't hear it.  I don't want

18  to hear it until I know whether or not they're going to be

19  okay with the admission of it or whether they want it to be

20  part of the admission of it.

21      MR. KENNER:  Your Honor, while we're looking for the

22  document, do you mind if we took a few minute bathroom break?

23      THE COURT:  Okay.  Do you guys want to take a 10-minute

24  break?  Why don't we take a 10-minute break.  Okay?

25      MS. LEE:  All right.  Thank you, Your Honor.

1        [Recess]

2        THE MARSHAL:  Come to order.

3        THE COURT:  Okay, Mr. Jowdy.

4        MR. RICHARDS:  Your Honor, for the record, we're going to

5    agree to admit the August 9th, 2005 letter with the certified

6    receipt behind it.

7        THE COURT:  As Exhibit A-94?

8        MS. LEE:  A-94, yes.

9        MR. RICHARDS:  Yes, Your Honor.  Would that -- that --

10       THE COURT:  All right.  It's admitted as a two-page

11   exhibit.

12       [Defendant's Exhibit A-94 Received]

13       MR. RICHARDS:  J100 and J101 on the bottom.  Thank you.

14       THE COURT:  Okay.  And sir, I just want to remind you

15   you've been sworn.

16       THE WITNESS:  Okay.

17       THE COURT:  Okay.

18                   DIRECT EXAMINATION [RESUMED]

19   BY MS. LEE:

20       Q    Okay, so we were going through the chronology of

21   what was happening in August and at this time funding and

22   those documents have been admitted so we'll put it up on the

23   ELMO.

24       THE COURT:  You know I haven't made things clear,

25   counsel. Just so that we are clear, whenever you show me your

1    copies, we are agreeing that these are copies of what's been

2    admitted, right?

3         MR. RICHARDS:  Right.

4         MS. LEE:  Right.

5         THE COURT:  I mean as opposed to getting the actual

6    exhibit.  Okay.  I just want to make sure we've got an

7    agreement here.

8         MR. RICHARDS:  We do, Your Honor.

9         THE COURT:  Ms. Lee, would you also agree?

10        MS. LEE:  I'm sorry, I don't think I understand what

11   you're saying.

12        THE COURT:  Okay, you like you've just shown me a copy.

13   You don't have the actual exhibit that you're showing me.

14        MS. LEE:  Right.  Right.

15        THE COURT:  Okay.

16        MS. LEE:  This is a copy of the exhibit.

17        THE COURT:  So we're going to agree that it's okay to

18   show copies of these?

19        MS. LEE:  Right, yes, yes.  Yeah, that's agreed.

20        THE COURT:  All right.

21   BY MS. LEE:

22        Q    Okay.  So is this the letter to which you were

23   referring on August 9th?

24        A    Yes, it is.

25        Q    And what's your understanding of this letter, what

152

1   it's conveying to you?

2        MR. RICHARDS:  Well, I'm going to object because there

3   was no testimony when he received the letter.  And the

4   email --

5        MS. LEE:  Oh, I'm sorry --

6        MR. RICHARDS:  -- that's now --

7        THE COURT:  Just lay some foundation.  I'm going to

8   sustain.  Go ahead.

9   BY MS. LEE:

10       Q    So this is the second part of it?  Does -- what is

11  this document?

12       A    Looks like a return receipt confirmation.

13       MR. RICHARDS:  I'll represent, Your Honor, it's a

14  certified --

15       THE COURT:  Okay, counsel, I understand.  Sir, in looking

16  at the two documents, which are Exhibit A-94 does this -- do

17  looking at these documents refresh your recollection in any

18  way as to when you actually received the August 9th letter?

19       THE WITNESS:  I believe I received it on August 10th but

20  I can't say for sure.  It also says via email but I would

21  assume it was either August 10th or August 11th, but I would

22  assume August 10th.

23       THE COURT:  Did you receive it before or after you got

24  the funds from Mr. Murray?

25       THE WITNESS:  Before.

1          THE COURT:  Okay.

2   BY MS. LEE:

3          Q     Okay.  So by August 9th, you received this email and

4   that was going to be my next question, Your Honor, by this

5   date you had not received the funds from Murray.  Then what

6   happens next after this August 9th letter with respect to the

7   Palms deal?

8          A     There were discussions with Mr. Kenner and I wrote

9   that email that outlined after the discussions with Mr. Kenner

10   what the email had outlined, what some options would be for

11   the purchase of the Palms units if there was still a

12   possibility.

13          MS. LEE:  And Your Honor, this is an email that they've

14   relied upon and this -- I'm sorry.

15          THE COURT:  Okay, could you show me the email please?;

16          MS. LEE:  Sure, it's --

17          THE COURT:  And it's which one?

18          MS. LEE:  This is Defendant's Exhibit A-11.

19          THE COURT:  Well, well, wait.

20          MS. LEE:  Oh, I'm sorry.

21          THE COURT:  Okay.  I can't see if it hasn't been admitted

22   but don't we have the string of emails that it was a Plaintiff

23   exhibit?

24          MR. RICHARDS:  Yeah.

25          MS. LEE:  Defendant's exhibit just has the one page.

1    THE COURT:  I understand, but it's not admitted.  I just

2    to want to make sure we've got the right exhibits that I'm

3    looking at.

4        MS. LEE:  Sure.  I'll represent to you this is the actual

5    one that was produced in discovery and I'll just because I

6    spoke with counsel before this.  He did say he didn't have a

7    problem with this one.

8        THE COURT:  Well, let me ask you.  Plaintiff's counsel,

9    Mr. Richards?

10        MR. RICHARDS:  Yeah.

11        THE COURT:  Do you have a problem with the admission of

12    A-11?

13        MR. RICHARDS:  I don't, Your Honor, as long as the Court

14    recognizes that we presented you the whole string and, you

15    know --

16        THE COURT:  Well, I understand.  A-11 --

17        MR. RICHARDS:  If you don't want to feel -- oh, sorry,

18    Your Honor.  I just don't want the Court to feel burdened that

19    it's getting duplicative exhibits when our exhibit has

20    everything.  I don't mind if she uses the evidence that's in.

21    I mean I don't know what the --

22        THE COURT:  She wants to use her own exhibit.

23        MR. RICHARDS:  All right.

24        THE COURT:  Now A-11 is just one page?

25        MS. LEE:  From actually I don't even know if there is

1    more than one page in this.  I'm sorry.

2         THE COURT:  Ms. Lee.  Is Exhibit A-11 one page?

3         MS. LEE:  Yes, Your Honor.

4         THE COURT:  All right.  They're stipulating to the

5    admission of the exhibit.  Are you okay with that?

6         MR. RICHARDS:  Yes.

7         THE COURT:  All right.  Let's go ahead and admit A-11.

8         [Defendant's Exhibit A-11 Received]

9         THE COURT:  All right.  Let me look at that.

10        MS. LEE:  Okay.

11   BY MS. LEE:

12        Q    What is this email?

13        THE COURT:  Well, I need to -- hold on.

14        MS. LEE:  Sorry.

15        THE COURT:  You took it down because I can't look at it

16   until it's admitted.

17        MS. LEE:  Sorry.

18        THE COURT:  Okay, go ahead.

19        MS. LEE:  Okay.  I'm sorry.

20        THE COURT:  And could you make it to where I can see the

21   whole thing?

22        MS. LEE:  Yes, I think so.  If we zoom out or maybe just

23   -- can you see that, Your Honor?

24        THE COURT:  Well, I just want to see the entire -- okay.

25        MS. LEE:  It's just not fitting on the --

1          THE COURT:  Well, make it a little smaller then.

2          MS. LEE:  Okay.  I think that is the entirety of it.

3          THE COURT:  Okay.

4          MS. LEE:  Okay.

5     BY MS. LEE:

6          Q     Now, Mr. Jowdy, what is this email?

7          A     The last letter that we just discussed, we knew that

8     the money had not been received by the Palms in time.  So

9     after discussions with Mr. Kenner, I wrote this email, I sent

10    it to him for his permission to send out but I couldn't send

11    that email unless he told me that the money was actually going

12    to go.  We had already lost the deal.  This was a possibility

13    to revive it.  And like I said there were discussions with Mr.

14    Kenner as to what these points are and how they were going to

15    be.  I just said let me know if I can send it.

16         Q     And by this date, August 11th, had the money been

17    sent?

18         A     No.

19         Q     Okay.

20         THE COURT:  Whoa, whoa, let me read it again.

21         MS. LEE:  Oh, I'm sorry.  I'm sorry, Your Honor.

22         THE COURT:  Okay, so you sent this -- you wanted to send

23    this to Sandra after the deal fell through, right?

24         THE WITNESS:  Yes.

25         THE COURT:  Okay.

1      MR. RICHARDS:  Your Honor, just -- I just have one

2  objection.  There's no evidence that the deal fell through and

3  in fact the evidence is going to be the opposite.  There's

4  no --

5      THE COURT:  Well, I'm listening to his -- you can bring

6  all that out in redirect, I mean in cross, okay?

7      MS. LEE:  Okay.

8      MR. RICHARDS:  All right.

9      THE COURT:  Okay, right now, I'm understanding the money

10  did not come through, he's testified that he got the letter

11  saying sorry, the deal's done.  So and then he sends this

12  email after or he wants to send the email after it.  He's

13  tried to get permission from Mr. Kenner.  So you could -- if

14  it's not that way, you can get that out on cross.  All right.

15  BY MS. LEE:

16      Q     And that on this email, the response from Mr. Kenner

17  is as soon as I hear from Muzz and what did you understand him

18  to mean when he wrote that to you?  What did you take that to

19  mean?

20      A     He was referring to Glen Murray.

21      Q     Right, but what did he mean by that?

22      A     I would imagine he needed to see if he was going to

23  be able to borrow the money from Glen Murray.

24      Q     Okay.  Did you have any conversations with him after

25  you sent him this email?

A Yes.

Q And what did you guys discuss?

A Well, he basically told me that he was sending the money and it was okay to send the email.

Q And did he send the money?

A Yes.

Q When did he send the money?

A August the 12th.

Q So the next day?

A I believe he said he was sending it that day. I think it hit the Palms account -- so, yes, the next day.

MS. LEE: And Your Honor, again, discussed this with counsel, this is Defendant's Exhibit 65.

THE COURT: Okay.

MS. LEE: And Defendant's Exhibit 65.

MR. RICHARDS: Yeah, no objection.

MS. LEE: No objection.

THE COURT: A-65 is admitted.

[Defendant's Exhibit A-65 Received]

BY MS. LEE:

Q Do you recall seeing this document in the litigation?

A Yes.

Q Okay. And do you see there where it has three transactions to which we are referring, August 12th, August

1   12th, August 12th?  And then the corresponding numbers.  What

2   is your understanding of what that was --

3       THE COURT:  And counsel, counsel, could you make it a

4   little smaller so we can see it?

5       MS. LEE:  I'm sorry.

6       THE COURT:  Okay, that's good.

7       MS. LEE:  Okay.

8   BY MS. LEE:

9       Q    Was is your understanding as to what those August

10  12th transactions represent?

11      A    The three wires that were sent to the Palms.

12      Q    Okay.  So have the 9th, the 11th and the 12th, is

13  that the documents that we've discussed so far.  Do you know

14  when the money -- so we know it leaves on the 12th, do you

15  know when it actually hits the Palms account, your Palms

16  escrow accounts?

17      A    I believe it was on August 18th.

18      Q    And did you hear from the Palms on August 18th with

19  regards to that -- receiving those funds on that date?

20      MR. RICHARDS:  Hearsay.  Like I said if she shows a

21  document, that's different.  But just to now discuss something

22  he heard from the Palms.

23      THE COURT:  Let's go ahead and -- sustained.

24  BY MS. LEE:

25      Q    Did the Palms contact you on that day after they

160

1    received the funds?

2        A    Yes.

3        THE COURT:  And we're talking about it -- your testimony

4    was this wire which was sent on August 12th did not actually

5    get into the Palm escrow account until August 18?

6        THE WITNESS:  I was surprised by that also because when

7    we did get a notice that it hit the escrow and I think my

8    email says I'm surprised because we sent it last week.  But I

9    think that the documents do show that it hit on August 18th.

10       MS. LEE:  And Your Honor, we have a document to that

11   extent and I'm having my Clerk pull that.

12   BY MS. LEE:

13       Q    But you did hear from the Palms after they received

14   that money?

15       A    Yes.

16       MS. LEE:  Okay.  If I can show counsel.

17       MR. RICHARDS:  Thank you.

18       [Counsel Confer]

19       MR. RICHARDS:  Your Honor, just that I have no objection

20   to the admission of the document but outside of --

21       MS. LEE:  And he can -- I'm sorry --

22       MR. RICHARDS:  Outside of him testifying anything other

23   than what the document says would be hearsay because the

24   document -- the six days between the day the wire said and

25   this ledger doesn't mean that they didn't receive it before

161

1    then.  So I'm just saying the document is a document that's a

2    ledger but it doesn't have anything else on there.  So I'm

3    saying the fact when it posts doesn't coincide with when they

4    received it.

5         THE COURT:  Well, I understand, but that gets into other

6    issues.  The question I want to know right now is do you have

7    a problem with the admission of this exhibit.  I assume she

8    wants to offer it.  Ms. Lee?

9         MR. RICHARDS:  No, I don't.

10        THE COURT:  Okay.

11        MS. LEE:  I do.

12        THE COURT:  Ms. Lee, which exhibit is it?

13        MS. LEE:  This is our Exhibit A-84.

14        THE COURT:  And it's just one page, right?

15        MS. LEE:  No, unfortunately, Your Honor, it's not.

16        THE COURT:  Well, and A-84 was admitted.

17        MS. LEE:  Oh, the whole thing was admitted?

18        THE COURT:  Yeah.

19        MS. LEE:  Okay.  Great then.  This is MURSTNV001 within

20   the package of A-84 documents that were already admitted.

21        THE COURT:  Okay.

22   BY MS. LEE:

23        Q    I'm going to show this to you now.  And these I will

24   represent to you are documents that were subpoenaed from

25   Stewart Title who was the escrow -- who had the escrow

```
 1    accounts into which this deposit was going into, Glen Murray's

 2    money was going into this account.  And do you see the dates

 3    there?

 4         A    Yes, I do.

 5         Q    And is that your understanding that that was the

 6    money that was being wired from Charles Schwab?

 7         MR. RICHARDS:  Objection.  Lack of personal knowledge.

 8         THE COURT:  Well, well, wait.  Let me hear from him.

 9    Overruled.  I want to hear what you have to say.

10         THE WITNESS:  I'm just trying to match up the document.

11    Is that the whole document?

12    BY MS. LEE:

13         Q    This is -- yeah, on this page, this is the whole --

14         THE COURT:  Well, first of all, what is this document,

15    sir?  Do you know what it is?

16         THE WITNESS:  It looks like a ledger for the escrow

17    account possibly.

18         THE COURT:  Okay.  But do you know whose document it is

19    and obviously I can say it looks like a ledger but --

20         THE WITNESS:   I don't -- I do not know.

21         THE COURT:  Okay, he doesn't know what it is.

22    BY MS. LEE:

23         Q    But it was your understanding then that --

24         MR. RICHARDS:  Leading.

25         MS. LEE:  I haven't finished my question.
```

163

1      THE COURT:  Okay, well, go ahead and ask a question.

2  BY MS. LEE:

3      Q    So it's your understanding that the money got there

4  on 4/18?

5      MR. RICHARDS:  Leading.  No foundation.

6      THE COURT:  Well, he's already testified it hit the Palm

7  escrow account on August 18, so I'm going to overrule.

8      MS. LEE:  Okay, thank you.

9  BY MS. LEE:

10     Q    And who from the Palms was contacting you after this

11  money hit?

12     A    Sandra Bohn.

13     Q    And who is she?

14     A    She was just the contact person that I had been

15  dealing with in regard to this transaction.

16     Q    And how did she contact you?

17     A    She sent me -- well, I believe on the 18th, she sent

18  me an email.

19     MS. LEE:  Your Honor, I'm going to just show this

20  document to both counsel if we could stipulate to it.

21     [Counsel Confer]

22     MR. RICHARDS:  Your Honor, my only objection, if there's

23  a whole string under the rule of completeness, the whole

24  document -- we've already admitted into evidence -- I've given

25  some latitude, but you can't just take one part of an email

1    when it's part of a string.  There's a rule --

2        THE COURT:  Counsel, you can cross on it.  And you can

3    bring it up.

4        MR. RICHARDS:  Okay.  I have no objection to

5    admissibility.  Just under the rule of completeness, I think

6    we've already admitted the string.

7        THE COURT:  I understand.  Which exhibit and what is it?

8        MS. LEE:  This is our Exhibit A-64 but it's going to have

9    to be sub-exhibited out.  It's document JO98 and JO99.

10       THE COURT:  Okay.  So you want to admit that as the next

11   one in order?

12       MS. LEE:  Yes, Your Honor.

13       THE COURT:  Okay, it's admitted as A-95 and could you say

14   what those are again?

15       MS. LEE:  Yes, I'm sorry, J098 and J099.

16       THE COURT:  And that's in the A-64.

17       THE CLERK:  Yes, Your Honor.

18       THE COURT:  Okay.  Thank you.  You can show those.

19       [Defendant's Exhibit A-95 Received]

20       MS. LEE:  Sure.

21   BY MS. LEE:

22       Q    Now down at the bottom there, Mr. Jowdy, that's from

23   August 11th and we've already seen emails from August 11th and

24   why did you send this email to Sandra on August 11th?

25       A    I believe that's the email we discussed and as far

1    as the options -- I'm not sure.

2         Q    Does this appear to be in substantially the same

3    form as the email that you sent to Mr. Kenner on the same

4    date?

5         A    Yes.

6         Q    The proposed email that you sent to Mr. Kenner?

7         A    Yes.

8         Q    Okay.  And then why did you send it to Sandra?

9         A    Well, I wanted to check with Mr. Kenner to see if

10   still we're going to keep the -- try to keep the deal alive.

11        MR. RICHARDS:  Non-responsive, move to strike.

12        THE COURT:  Overruled.

13        THE WITNESS:  And when I got a positive response, I sent

14   those.

15   BY MS. LEE:

16        Q    Okay and what do you mean by when you got a positive

17   response?

18        A    He said that he was getting the money and to send

19   the email.

20        Q    Okay.  So he told you to send the email?

21        A    Yes.

22        Q    Okay.  And then right above that, you see on August

23   18th, does that email from Sandra refresh your recollection as

24   to when the Palms received the wired funds?

25        A    Yes.

1      Q    And what date did the Palms receive the wired funds?

2      A    Well, it says they got notification that day so.

3      Q    And what is that day?

4      A    The 18th.

5      Q    And what is Sandra -- what do you understand Sandra

6  to be conveying to you in this email?

7      MR. RICHARDS:  Calls for speculation.

8      THE COURT:  If he knows.  Overruled.

9      THE WITNESS:  What I understood was there was no decision

10  at this time.  And I don't know if that meant that there was

11  an option that was taken or I don't know.

12  BY MS. LEE:

13     Q    Okay.  And then did you subsequently -- she make

14  some reference to Tom Land.  Who is Tom Land?

15     A    I think he was another person that she worked with.

16     Q    And what did she say about Tom Land in this email?

17     A    That he would be -- he would follow up regarding my

18  prior email.

19     Q    And did you ever hear from Mr. Land after this date?

20     A    Yes.

21     Q    On what date did you hear from Mr. Land?

22     A    I believe on the 24th.

23     Q    How did you hear from Mr. Land?

24     A    I believe an email or a letter and an email

25  possibly.

1          MS. LEE:  There's no objection to this one, Your Honor.

2     This is also part of our larger A-64.  If we could sub-mark

3     this --

4          THE COURT:  Okay, what is it?

5          MS. LEE:  Oh, I'm sorry, it's a letter from Mr. Land to

6     Mr. Kenner, I mean Mr. Jowdy.

7          THE COURT:  Okay, you want to offer it as an exhibit?

8          MS. LEE:  Yes, and they are not -- I'm sorry.

9          MR. RICHARDS:  No objection.

10         THE COURT:  Okay, as A-96, is that what that is?

11         THE CLERK:  Yes, Your Honor.

12         THE COURT:  And what is it?  What number is it?

13         MS. LEE:  J090.

14         THE COURT:  J090 from A-64.

15         [Defendant's Exhibit A-96 Received]

16    BY MS. LEE:

17         Q     And is this the letter that you were just referring

18    to, Mr. Jowdy?

19         A     Yes.

20         MS. LEE:  And before the 24th, and I know this wasn't

21    admitted, Your Honor, because they've thrown it up on the ELMO

22    every opportunity but yet -- but I just want to make sure that

23    we're over --

24         MR. RICHARDS:  No objection.

25         MS. LEE:  No objection.  I didn't think so.  This is --

168

1    so this is Defendant's number 32.

2         THE COURT:  Okay, is it one page?

3         MS. LEE:  One page.

4         THE COURT:  Okay.  And has it been admitted yet?

5         THE CLERK:  It's not admitted as a --

6         THE COURT:  Okay, I assume that your stipulating?

7         MR. RICHARDS:  Yes.

8         THE COURT:  Okay, Exhibit A-32 is admitted.

9         [Defendant's Exhibit A-32 Received]

10   BY MS. LEE:

11        Q    So you've seen this email in the context of this

12   litigation, haven't you, Mr. Dowdy?

13        A    Yes, I have.

14        Q    Okay.  And what is this email?

15        MR. GOODMAN:  The document speaks for itself.

16   BY MS. LEE:

17        Q    What did you understand this email to be at the time

18   that you received it?

19        A    Email for wire instructions for Glen Murray.

20        Q    And what happened on August 22nd with regards to

21   this transaction, this Palms transaction?

22        A    I had already had a conversation with Phil Kenner

23   about these funds that were in the escrow, the Palms escrow

24   and he instructed me to have the funds sent to Baja

25   Development.

169

1       Q    Okay.  And then --

2       MR. RICHARDS:  That's non-responsive.

3       THE COURT:  Well, I'm listening, okay.  Overruled. So you

4   had a conversation before this email was sent?

5       THE WITNESS:  Yes.

6       THE COURT:  With Mr. Kenner where he said wire the money

7   to Baja?

8       THE WITNESS:  Yes.

9       THE COURT:  Okay.

10  BY MS. LEE:

11       Q    Okay.  Then how do you explain this email that

12  appears to say or appears to suggest that you were to send the

13  money to Glen Murray?

14       A    Well, there's a few things.  One is I had just had

15  that conversation with Mr. Kenner that day.  Two, and I'm not

16  going to get into everything that was going on about this time

17  but he was still expecting to get other monies in.  So if he

18  had already given me instructions for this money that was with

19  the Palms, then I thought that possibly Phil was going to put

20  other money in that he wanted me to send to Glen.  If the

21  conversation happened that he sent that late that day, and

22  third, the money wasn't in my account.  The money had not

23  gotten to my account.  So there was no money to send anyway.

24  At the end of the day --

25       Q   I think this was on August 22nd.

170

1       A       What's that?

2       Q       You mean on August 22nd?

3       A       Yeah, the money wasn't there.  At the end of the

4    day, I was going to do whatever Mr. Kenner wanted me to do

5    with this money.  So if there were two different instructions

6    on the day and that money was there, it's whatever Phil Kenner

7    wanted me to do with that money, I was going to do.

8       Q       Okay.  So what I'm trying to understand, however, is

9    that you said you had this conversation with him in the

10   morning or earlier that day and he's telling you to put the

11   money into Baja Development. What money is he talking about?

12      A       The money that was with the Palms.

13      Q       Okay.  And later that day, you get this email.  And

14   then what do you make of this email when you get it?

15      A       Again, he was still looking for other funds.  So if

16   he'd already told me to put the Palms money into Baja

17   Development, then -- and I hadn't had that money, I didn't

18   have that money yet, and if money came into Baja Development

19   through another source the next day, then that would go to Mr.

20   Murray.  Or if money came from the Palms the next day, and I

21   had a conversation with Phil and that's what he -- if he

22   changed his mind and that's what he wanted me to do, that's

23   what would have been done.

24      Q       And where was this other money supposed to be coming

25   from?

171

1      MR. RICHARDS:  Speculation and no foundation.

2      THE COURT:  Overruled. Go ahead.  What's your

3  understanding?

4      THE WITNESS:  The whole time throughout this whole

5  process from June, July, August, he was -- his hard money

6  loans were imminent.  That's what happened when we got in that

7  first whole embarrassing string of emails.  It was always

8  imminent and it was still at this point, there's a lot of

9  conversations, a lot of emails going back and forth about this

10  particular funding.

11      THE COURT:  Okay, I'm having trouble understanding this.

12  Okay, you understood from Mr. Kenner that he wanted the

13  791,000 that belonged to Mr. Murray to be sent to Baja, right?

14      THE WITNESS:  Yes.

15      THE COURT:  I'm having trouble understanding that if

16  you've got an email that says subject "Murray Palm money,

17  please let me know when you send it.  I need to speak with

18  Glen, so the sooner the better.  Wire instructions and this is

19  where you're supposed to send it."

20      THE WITNESS:  Okay.  He had -- I had already had a

21  conversation with Phil that day.

22      THE COURT:  Yeah.

23      THE WITNESS:  Where the money was supposed to go.

24      THE COURT:  Okay.

25      THE WITNESS:  If the next day, if I got this overnight,

1  and the next day that money was there, and I talked to Phil,

2  then that's exactly where the money would have went.  On that

3  day.  Now Phil, at this time, there was a lot of things that

4  were happening in Phil Kenner's life.  There was a lot of --

5       THE COURT:  Okay.  I'm still having trouble here.  You

6  have the $791,000 that's in that escrow account, right?

7       THE WITNESS:  Yes.

8       THE COURT:  Okay.  That deal did not go through and then

9  we've got this email that says Murray money -- Murray Palms

10  money, please let me know when you send it because you're

11  going to be getting it I guess into your own account for

12  whatever reason.  And then he says I need to speak to Glen, so

13  the sooner the better.

14       THE WITNESS:  Correct.

15       THE COURT:  And then he gives you wire instructions.  Why

16  would you think -- I mean from getting -- I mean when you got

17  this, didn't you think, wait a minute, he told me to send it

18  to Baja.  Now I'm getting this, so what's going on?

19       THE WITNESS:  I agree with you 100 percent.  If I had the

20  money that day, if these were the instructions that day, the

21  next day, well this is sent overnight.  The money was not

22  there -- on the 24th, the money was not there.  By the time

23  the money got to my account, my instructions with this money

24  were completely different.  Phil Kenner did not get the

25  funding that he was supposed to get in Hawaii.  Phil Kennedy

173

1    had a lot of pressure on him that he was going to lose a lot

2    of money and he gave me different instructions by the time the

3    money hit my account.

4          THE COURT:  Okay.  So you got some instructions after

5    that and said forget this email, send it here?

6          THE WITNESS:  Yes.

7          THE COURT:  Okay.  And previous to this, you got one from

8    him saying send the money to Baja?

9          THE WITNESS:  Correct.  And if I can, I mean and I was

10   just saying, I've seen this email a 100 times in the last two

11   days.  The last thing that I could possibly do at this point

12   was to not send the money where Phil told me to.  He was the

13   finance, the funding source.  There were other things that

14   needed to be funded.  To buy a house or to send it to Cabo San

15   Lucas did me no good if this was the last transaction that

16   would ever happen.

17         Because if I completely disregarded what he asked me to

18   do and I took his friend's money and sent it on something I

19   had no authority to do from him, then I would assume that

20   would be the end of our relationship.  And everything else and

21   all the funding that came after that would never have

22   happened.

23         THE COURT:  Okay.  So -- all right, so before this, you

24   have a previous -- before you get this email, you have a

25   conversation with Mr. Kenner where he says when you get the

1    money, send it to Baja, okay.  And then he sends you this

2    email which is contrary to what your previous conversation is

3    and then when you do get the money, you had gotten different

4    instructions.

5         THE WITNESS:  Yes, I ended up getting the money a full

6    week later.

7         THE COURT:  Okay.  All right.  And then the later

8    instructions were to send it where?

9         THE WITNESS:  $412,000 went to the house in Spanish

10   Trails or whatever you call it, Innisbrook in Las Vegas.

11        THE COURT:  Okay.

12        THE WITNESS:  And $500,000 went to PDDM for to go to the

13   seller in Cabo San Lucas.

14        THE COURT:  Okay.

15   BY MS. LEE:

16        Q    Okay.  So in your mind, what is going on with Kenner

17   in terms of his expectation of getting money?

18        MR. RICHARDS:  That's speculation as to time -- what deal

19   are we talking about?

20        MS. LEE:  I'm sorry.

21        THE COURT:  Well, I would have to say I'm going to

22   sustain that.  I am not sure where you are.

23        MS. LEE:  Sure.

24   BY MS. LEE:

25        Q    So just to clarify, are there two different groups

175

1    of money that we're talking about here in terms of money that

2    you guys discussed that morning and money that this email is

3    supposed to be referring to?

4         A    At the same time, Mr. Kenner is still -- the same

5    sources that he was looking for throughout July and August

6    would have avoided the whole situation with Mr. Murray, he was

7    still -- and that still was imminent.  So that still wasn't

8    happening.  In his mind, yes, absolutely, there were two

9    sources and that unfortunately did not happen.

10        Q    And what were the two sources of money that you just

11   referred to?

12        MR. RICHARDS:  It's hearsay.

13        THE COURT:  If he knows.  If he knows.  I'm going to

14   overrule.  Go ahead.

15        THE WITNESS:  The one source was the refund of this

16   deposit.

17   BY MS. LEE:

18        Q    Okay.

19        A    These deposits.  And the second source was the loan

20   that he was going to take out in Hawaii.  That he had been

21   looking to take out in Hawaii.

22        Q    And how do you know that he was looking to take

23   money out in Hawaii?  How do you know that?

24        A    Because I have a lot of emails, a lot of

25   conversations, we talked all the time.  This was how -- when

1    the money didn't appear on time, that's what he was trying to

2    do.

3         Q    Why were you -- were you involved in that Hawaii

4    funding?  I mean why were you involved in these emails?  These

5    Hawaii emails?

6         A    He would send me emails.  He would keep me up to --

7         MR. RICHARDS:  Compound.

8         THE WITNESS:  Sorry.  He would --

9         THE COURT:  Well, well, wait, go ahead and ask your

10   question.  Sustained.

11   BY MS. LEE:

12        Q    Why would you know about these Hawaii deals?  Were

13   you part of these Hawaii deals?

14        MR. RICHARDS:  Compound.

15        MS. LEE:  Okay.  How --

16        THE COURT:  Sustained.

17   BY MS. LEE:

18        Q    Were you part of these Hawaii deals?

19        A    No.

20        Q    Okay, so why were you on these emails regarding this

21   Hawaii funding that he was supposed to be getting?

22        A    He would keep me up to date because basically I'm --

23   especially in Cabo, we were several months late for a hard

24   money deposit.  He had already had over four and a half

25   million dollars invested in Cabo which was -- of the -- at

1  this point 6.625 million that needed to be there.  So there's

2  6.625 million dollars that needs to be with the seller in Cabo

3  and that needed to be there in April.  He didn't start sending

4  money until May.  As he started sending this money, it was

5  hard money that we had no contractual obligation or that the

6  seller had no contractual obligation to give us.

7       MR. RICHARDS:  Your Honor, that's what I was -- I'm going

8  to move to strike it.  That's exactly what was objected to 20

9  minutes ago that he's going to try to testify about contracts

10  that aren't going to be brought into evidence, that are in

11  Spanish --

12       THE COURT:  I understand.

13       MR. RICHARDS:  -- and I move to strike what the seller in

14  Cabo and the terms of any deal going hard.  There's no

15  evidence of that.

16       THE COURT:  I understand.  I kind of want to stick to

17  what we're doing here, too.  So I'm having trouble following

18  it.

19       MS. LEE:  I know, Your Honor, and I --

20       THE COURT:  And I think we have to stick with what's

21  going on here.  I mean it was -- I needed to know -- I need to

22  know a little bit because I need to know the relationship of

23  the parties. But I'm having trouble understanding all this

24  other stuff when we're really supposed to be sticking with the

25  791.

178

1    MS. LEE:  Well, Your Honor, and if I could and I just --

2    MR. RICHARDS:  Can I just move to strike, Your Honor.

3    THE COURT:  Wait, wait, wait.  No, you may not.

4    MR. RICHARDS:  Okay.

5    THE COURT:  Okay.

6    MS. LEE:  Your Honor and what I'm trying to get Your

7    Honor to understand is that in this Cabo San -- the reason why

8    we keep going back to Cabo is because $500,000 from that

9    failed Palms deal goes into Cabo.  And so I'm trying to -- so

10   the reason why that money went to Cabo is important.  So

11   that's why we keep going back to Cabo.

12       After the deal falls through and the money actually hits

13   his account, which is not until the 29th, the money goes to

14   one of two places.  It goes into this house and it goes into

15   Cabo.  So that's why I'm trying to lay some foundation -- Cabo

16   -- so Your Honor can put this whole transaction in context as

17   to why this money was going to the house and why this money

18   was going into Cabo.

19            And Hawaii is relevant to that and I tried to get to

20   that, this Hawaii deal, in terms of the money that needs to go

21   to -- some money needs to go to Cabo, where is it coming from?

22   MR. RICHARDS:  My only objection is that she can't elicit

23   testimony to him as to some sort of penalty associated with

24   the Cabo deal because there's no documents showing whether

25   this is a liquidated danger or forfeiture.

1       THE COURT:  I agree with that.  I agree.

2       MR. RICHARDS:  And that was my only complaint.

3       MS. LEE:  Well, if I maybe then lay some foundation for

4  his knowledge of that.

5       THE COURT:  Well, you're going to have to lay some

6  foundation.

7       MS. LEE:  Okay.

8       THE COURT:  I'm trying to figure this out.  But this is

9  getting -- and I am a little bit concerned.  We are going to

10  be done by noon tomorrow, right?

11       MR. RICHARDS:  Yeah, we've rested.  And only exactly half

12  the time.

13       THE COURT:  Well, I know but we've got Mr. Kenner's case

14  and we got closing arguments.

15       MS. LEE:  You say you resting --

16       MR. RICHARDS:  We took up only half the time on our case.

17  I intentionally was careful about that.  But my issue is she

18  can't lay the foundation through this witness about contracts

19  in Spanish that aren't in Court, that haven't been translated,

20  that's inadmissible hearsay.

21       MS. LEE:  I can -- I'm sorry, go ahead.

22       MR. RICHARDS:  There's no discovery on it.  This is why I

23  started to object because it's just hearsay about a contract

24  that I can't cross-examine the seller, I can't look at the

25  document, it's extrinsic to this case.  And it's just going to

1   imply somehow that there was this penalty about the money

2   based on a legal agreement in Spanish that has never been

3   provided, never been translated.

4        And so we could rely on the evidence as when we get to

5   trial that there's going to be no contract showing that there

6   was some sort of risk to Mr. Kenner's money that if he didn't

7   get this 500,000 in there, that somehow there would have been

8   a loss to him.  I didn't have to worry about it because I

9   didn't see any agreements about this issue.  And so that's why

10  we're just spinning off, way off into an extrinsic collateral

11  matter.

12       THE COURT:  I understand.

13       MS. LEE:  And this was -- sorry.

14       MR. WALL:  Your Honor, for the record.

15       MS. LEE:  Go ahead.

16       MR. WALL:  We didn't get half the time.  We got half a

17  day tomorrow --

18       THE COURT:  Well, I don't care.

19       MR. WALL:  -- and three hours today.

20       THE COURT:  All I know is you guys did not want to start

21  on Monday.  We will be done by noon tomorrow.  Okay.  So let's

22  go ahead and let's proceed.  Okay.

23       MS. LEE:  Okay.  I'm sorry, if I could just be allowed to

24  respond just --

25       THE COURT:  Very briefly because I mean we can't go

181

```
1    through a complicated stuff that's going on in Mexico when

2    really we're dealing with $791, $791,000 here.  Okay.

3         MS. LEE:  Got you, Your Honor.  Okay, well then let's

4    just move on then timely.

5    BY MS. LEE:

6         Q    So when does the money actually hit your Baja

7    Development account?

8         A    August 29th.

9         Q    And then what happens to the money after it leaves

10   your account?

11        A    $412,000 goes to the house down at Innisbrook and

12   $500,000 --

13        THE COURT:  Okay, we can't hear you, sir.  If you could

14   put that closer to you.

15        THE WITNESS:  I'm sorry.

16        THE COURT:  That's all right.

17        THE WITNESS:  $412,000 goes to the house on Innisbrook

18   and $500,000 goes to Cabo San Lucas.

19        THE COURT:  Okay.  Now sir, my blonde math of 712 minus

20   791 is $121,000.  So we've got 500,000 that went to PDDM, 412

21   that went to the house, where's this other 121,000?

22        THE WITNESS:  It was part of the original $150,000

23   deposit that was refunded.

24        THE COURT:  And that was your money?

25        THE WITNESS:  Well, that was actually Phil Kenner's
```

182

1  money.

2        THE COURT:  Okay, so that's Mr. Kenner's money.

3        THE WITNESS:  Yes.

4        THE COURT:  The 150?

5        THE WITNESS:  Yes.

6        THE COURT:  Okay.  So that left about 29,000 left into --

7        THE WITNESS:  That was in -- that's to pay for expenses

8  and other things that Phil Kenner was funding at the time

9  through Baja Development.

10       THE COURT:  Okay.  Got it.

11 BY MS. LEE:

12       Q    Now why did you send the money to this Innisbrook

13 property in Las Vegas, the $412,000?

14       A    Mr. Kenner instructed me to do that and there was a

15 very strict timeline on that house as far as when the money

16 needed to be in escrow to close on the house on Innisbrook.

17       Q    And what is this house in Innisbrook?  What is the

18 deal with regards to this house on Innisbrook?

19       MR. RICHARDS:  Objection.  Vague.  What is the deal?

20       THE COURT:  Well, I understand.  It's open ended but I'd

21 like to actually hear what he has to say about this.

22       THE WITNESS:  Sometime in the spring of '05, I believe in

23 May, maybe the beginning of May, Mr. Kenner and I were

24 introduced to this opportunity to buy this house in Spanish

25 Trails which is in Innisbrook, it's George Maloof's house. Mr.

183

1    Kenner and I were both friends, we took a look at the house,

2    again the same type of deal.  Mr. Kenner said that he can get

3    80-90 percent financing.  We would split the house 50/50 and

4    we would use it as a base of operations.

5        At that time we were using a house in La Jolla that we

6    were renting and that rental was up either the beginning of

7    June or I believe the beginning of June.  So the decision was

8    made to do that.  Mr. Maloof allowed us, since we were going

9    to go under contract with the house, to move into the house

10   sometime in June of '05.

11   BY MS. LEE:

12       Q    Okay and then what happened after June of '05?

13       A    At that time Mr. Kenner started to -- this is all

14   happening at the same time.  He started to go look for

15   financing.  He said that he has a guy that he deals with all

16   the time, a friend of his, a mortgage broker.  And the idea

17   was for it to be 80-90 percent like I said financing and

18   Mr. Kenner was going to be responsible for putting the

19   mortgage together.

20       Q    And who was the gentleman that Mr. Kenner was

21   dealing with in terms of assisting in the financing of this

22   home?

23       A    Joshua Blueman[phonetic].

24       Q    And do you know Joshua Blueman?

25       A    No.

184

```
1        Q     Had you ever met Joshua Blueman?

2        A     No.

3        Q     So I'm trying to understand.  You guys were going to

4    own this home 50/50 and what were you supposed to do for your

5    50 percent interest in this home?

6        MR. RICHARDS:  I'm going to object.  That's not the title

7    documents, it never came out that way.  So we're going to talk

8    about a deal that never happened.

9        MS. LEE:  Your Honor, this is --

10       THE COURT:  Well, I understand but I need to understand

11   what's going on.  You can get into this in cross.  Okay.  How

12   were you going to -- what were you going to do to earn your 50

13   percent share on this house?

14       THE WITNESS:  Supposed to pay the mortgage.

15       THE COURT:  Okay.

16   BY MS. LEE:

17       Q     And did you pay the mortgage?

18       A     I have until recently, yes.

19       Q     From that time to today, how much money funded as

20   the mortgage on that house?

21       A     I believe over $400,000.

22       Q     And what was Mr. Kenner supposed to do for his 50

23   percent interest in this house?

24       A     He was to put the down payment on and he was going

25   to get the financing.
```

185

1    Q    Okay.  And then did he do that?

2    A    He put the down payment down, yes, and he arranged

3  for the financing but we weren't able to get the 80-90 percent

4  financing.

5    Q    Okay, when you say 80-90 percent financing, what do

6  you mean by that?

7    A    Well, if the house was going to be 1.6 million

8  dollars, 80 percent financing would mean there would be

9  $320,000 down payment that would need to be paid.  Ninety

10  percent would be 1.6 or $160,000, which is what he was trying

11  to do.  He was also trying to create an LLC which he said we

12  would own 50/50 and put the mortgage in that LLC's name.

13    He was unable to do that.  At the time I had a childhood

14  friend, a personal friend, who was moving out to Las Vegas,

15  who had better credit than I did.  I was not going to be able

16  to qualify for the mortgage at that time.  And Phil did not

17  want to have his personal name on the house.  So we instead of

18  it being 50/50 with Phil and I, we brought my friend in who

19  went on the mortgage, Phil was still searching for the

20  mortgage for this person, he went on the mortgage and we did

21  it a third, a third, a third.

22    But Phil did not want to have his name on it.  So when we

23  say a third, a third, a third, it meant if we did sell it at

24  some point, he would get whatever the profits would be, he

25  would get a third of the profits.  But he didn't want his name

186

1   on the title.

2       THE COURT:  Did you have any kind of writing between you

3   three?

4       THE WITNESS:  Nothing in writing, no.

5       THE COURT:  Well, what would you have done if one of you

6   had died?

7       THE WITNESS:  Well --

8       THE COURT:  I mean and there's this handshake deal for a

9   third, a third, a third.  What -- I mean did you guys think

10  about that?

11      THE WITNESS:  Not at the time.

12      THE COURT:  Okay.

13  BY MS. LEE:

14      Q     And when you say a third, a third, a third, what do

15  you mean by a third, a third, a third?  You would each own the

16  house a third, a third, a third?

17      A     If we sold it and there was a profit, it would be

18  split three ways.  I mean at that time we actually thought

19  there might be a profit in real estate.

20      Q     And so does Mr. Kenner go out and find financing for

21  this home?

22      A     He does find financing, yes.

23      Q     Do you have any involvement in arranging that

24  financing?

25      A     No, I do not.

1    Q    And the $200,000 that we're discussing, if I may --

2    MR. RICHARDS:  Yes, no objection.

3    MS. LEE:  Okay.  This is part of Defendant's Exhibit 85

4    and within that series it's -- oh, I'm sorry.  Can I have the

5    witness look at Defendant's Exhibit A-85?

6    THE WITNESS:  I don't have that here.

7    MS. LEE:  Oh, I'm sorry, he doesn't have it.

8    THE COURT:  A-85?

9    MS. BRANSON:  A-85, what Bates number?

10   MS. LEE:  MURFID0030.

11   MS. BRANSON:  0030 would be in A-85, volume 5.

12   BY MS. LEE:

13   Q    And I believe that -- okay, within that document,

14   can you please turn to Bates number MURFID0030?

15   A    Yes.

16   Q    And have you seen this document before?

17   MS. LEE:  No, it's admitted, Your Honor.

18   THE COURT:  Well, what's it admitted as?

19   MS. LEE:  Oh, well, it's --

20   BY MS. LEE:

21   Q    Have you seen this document before?

22   A    No.

23   THE COURT:  Well, first of all, have you stipulated to

24   the admission of this page?

25   MS. LEE:  Yes.

```
1          MR. RICHARDS:  Yeah.

2          THE COURT:  Okay.  Then we need to -- and it's -- and A-

3     85 is more than one page obviously, right?

4          MS. LEE:  Right.  So this --

5          THE COURT:  It's 562 pages?

6          MR. RICHARDS:  Yes.

7          THE COURT:  All right.  And you're taking that one out of

8     A-85 and what would be the next one in order?

9          THE CLERK:  A-97.

10         THE COURT:  A-97.  And what is A-97?

11    BY MS. LEE:

12         Q    I'm sorry, can you tell the Court what A-97 is?

13         A    I'm looking at?

14         THE COURT:  Well, why don't you just tell me what it is?

15         MS. LEE:  Oh, it's a Bank West Nevada document, Your

16    Honor, showing the money going from Ula Makika into --

17         THE COURT:  What's the Bates number?

18         MS. LEE:  Oh, I'm sorry, 0030.  MURFID0030.

19         THE COURT:  Okay.  Did you get that number?

20         THE CLERK:  0030?

21         THE COURT:  And that's MURFID?

22         MS. LEE:  Yeah, M-U-R-F-I-D.

23         THE COURT:  Okay.  It's admitted into evidence as Exhibit

24    A-97.

25         [Defendant's Exhibit A-97 Received]
```

1       THE COURT:  Okay.  Now you can put it down.

2   BY MS. LEE:

3       Q    And have you ever seen this document before?

4       A    I don't believe so.

5       Q    Do you know what Ula Makika is?

6       A    Yes.

7       Q    And what is Ula Makika?

8       MR. RICHARDS:  I'm going to -- it's foundation that does

9   -- he's not an owner.  Just going to let him speculate without

10  any foundation?

11      THE COURT:  Yeah, I was going to say.  If he doesn't know

12  anything about this document.

13      MS. LEE:  Oh, okay, well I'm sorry then, Your Honor.

14  Take this away and then just ask the question.

15      THE COURT:  Okay.

16  BY MS. LEE:

17      Q    Have you ever heard of a company called Ula Makika?

18      A    Yes.

19      Q    And what is Ula Makika to the best of your

20  knowledge?

21      A    It's a company that's owned by Phil Kenner.

22      Q    It's your understanding that he owns the entire

23  company?

24      A    Yes.

25      Q    Okay.  And the money that was coming in to fund the

1   initial $200,000 deposit, where did that come from?

2       A    Ula Makika.

3       Q    Now this $200,000 that was put into the home, was it

4   refundable or non-refundable?

5       MR. RICHARDS:  Your Honor, that's --

6       THE COURT:  Wait, wait, wait.  Now I got 412.

7       MS. LEE:  Oh, I'm sorry.  Still talking about the initial

8   $200,000 that went into the home from Ula Makika.

9       THE COURT:  Okay.  You're going to have to lay foundation

10  for that part.

11  BY MS. LEE:

12      Q    Okay.  So where did the money -- the first $200,000

13  to fund that home, where did that --

14      THE COURT:  Well, what -- okay.  Was there a down payment

15  on the house?  We haven't even got -- I thought 412 was --

16      MS. LEE:  I'm sorry.

17      THE COURT:  -- the down payment.

18      MS. LEE:  Okay, Your Honor, then I'm obviously not doing

19  my job.

20      THE COURT:  Okay.  We need to go back.

21      MS. LEE:  Yes, let me back up.  Yes.

22  BY MS. LEE:

23      Q    So what was the first money that went into that

24  house?

25      A    It was $1,000.

191

1      Q      Okay.  And where did that $1,000 come from?

2      A      It came from me.

3      Q      And what was that $1,000 for?

4      A      Just a good faith deposit, refundable deposit when

5  we agreed to go to contract.

6      Q      And what was the second money that went to that

7  house?

8      A      $200,000.

9      Q      And where did that $200,000 come from?

10     A      Came from Ula Makika.

11     Q      So was that $200,000 refundable or non-refundable?

12     MR. RICHARDS:  That's my objection.  Without the

13  contract --

14     THE COURT:  Well, does he know?  Do you know?

15     MS. LEE:  Do you know?

16     THE WITNESS:  Yes, I know.

17     MR. RICHARDS:  This is my objection respectfully, Your

18  Honor, he would only know from a contract which is hearsay.

19     THE COURT:  Well, you're going to have a lot of fun in

20  cross-examination.  I'm looking forward to hearing about this.

21  Okay.

22     MR. RICHARDS:  Okay, no problem.

23     THE COURT:  So do you know whether or not it was

24  refundable or non-refundable?

25     THE WITNESS:  Yes.

1        THE COURT:  Okay.  What was it?

2        THE WITNESS:  It was non-refundable.

3        THE COURT:  Okay.

4   BY MS. LEE:

5        Q    And was it -- at what point did it -- was it non-

6   refundable?

7        A    Immediately when it was sent.

8        Q    And why was it set up that way?

9        MR. RICHARDS:  Calls for foundation.  Calls for

10  speculation.

11       THE COURT:  Sustained.  Lay the foundation.

12       MS. LEE:  Sure.

13  BY MS. LEE:

14       Q    Was there any reason why that the money that was put

15  in became immediately hard?

16       MR. RICHARDS:  Same objection, foundation.

17       THE COURT:  Yeah, you got to lay some foundation,

18  counsel.

19  BY MS. LEE:

20       Q    That money went from Ula Makika into your account,

21  is that correct?

22       MR. RICHARDS:  Leading.

23       THE WITNESS:  No.

24  BY MS. LEE:

25       Q    I mean into the Stewart Title account for the

193

1   Innisbrook property, is that right?

2       MR. RICHARDS:  Foundation.  That's -- even at Stewart

3   Title.  Move to strike.  Lack of personal knowledge.

4       MS. LEE:  I'm sorry.

5       THE COURT:  Sustained.

6       MR. RICHARDS:  Does it seem relevant, Patricia, just this

7   whole thing?

8       MS. LEE:  I believe it is.

9       THE COURT:  Well, I assume she's laying some foundation

10  for some stuff here.  So that's -- I think it's important to

11  go through it.

12      MR. RICHARDS:  This may be the wrong witness to do all

13  this.

14      THE COURT:  Well, it could be.  I don't know but --

15      MS. LEE:  Is there any way that we could take a short

16  recess, Your Honor?

17      THE COURT:  Okay.  Five, ten minutes.

18      MS. LEE:  Thank you.

19      [Recess]

20      THE CLERK:  Okay, on the record.

21      THE COURT:  Okay, sir.  I just want to remind you you've

22  been sworn.

23      THE WITNESS:  Yes.

24      THE COURT:  Okay, Ms. Lee.

25

194

```
1                   DIRECT EXAMINATION CONTINUED
2    BY MS. LEE:
3         Q    When was the first time you ever understood that
4    this money that was in dispute today was a loan, was supposed
5    to be a loan to you personally?
6         A    When I got served with the complaint.
7         Q    Prior to then, what did you understand this $791,000
8    to be?
9         A    Money that Phil Kenner invested.
10        Q    And did Mr. Kenner -- did you ever authorize
11   Mr. Kenner to make an offer to accept a loan from Mr. Murray?
12        A    Absolutely not.
13        Q    And in this four-year period from the time that you
14   got this money to today, has Mr. Kenner ever said to you this
15   money is a loan from my client Mr. Murray to you?
16        A    No.
17        Q    Has he ever asked you to sign any writings saying
18   that this money, this $791,000, acknowledging that this is a
19   loan to his client [sic]?
20        A    No.
21        Q    And Mr. Murray ever contact you looking for his
22   money back?
23        A    No, he has not.
24        Q    And you heard Mr. Gaudet's testimony in the court
25   yesterday?
```

195

```
1        A    Yes.

2        Q    Do you know Mr. Gaudet?

3        A    I do.

4        Q    And how do you know Mr. Gaudet?

5        A    I met Mr. Gaudet in I would say late 2003.  He was

6   the director of golf at a private country club in Cabo San

7   Lucas.  And the designer of that golf course was the same

8   person that we were working with in Diamante Del Mar.  And

9   that was at the same time that we were going to begin to have

10  a presence in Cabo.  And so, Bob had a -- he had been there

11  for 10 or 12 years at that time, and was in the golf business,

12  and knew a lot of people, and we became friends.  He became

13  our contact in Cabo.

14       Q    And when you say our contact in Mexico, who are you

15  referring to?

16       A    Everyone I was working with, myself, Phil Kenner.

17  Anyone that would go to Cabo, Bob would be, basically, their

18  tour guide.  He --

19       Q    So was Mr. Gaudet living in Cabo San Lucas at the

20  time?

21       A    Yes, he was.

22       Q    And so, he is your contact and guide in Mexico as

23  you guys are going through this process?

24       A    Absolutely.

25       Q    And who all -- who were the core people involved in
```

196

```
1    getting the Diamante Cabo San Lucas process -- sorry --
2    project off the ground?
3         MR. RICHARDS:  Is this relevant in any way.
4         THE COURT:  Well, I take it as more background.
5            Go ahead.
6         THE WITNESS:  At the time, it was myself, who was the
7    person that was responsible for finding the property and
8    putting the operation together.  Phil Kenner was responsible
9    for the -- raising the funds.  Fernando Garcia was our
10   attorney.  Greg Carfiello [phonetic] came in in 2005 when we
11   were putting together the due diligence package for our loan
12   for the Cabo San Lucas project.  And we were small.  It was a
13   small group at that time.
14   BY MS. LEE:
15       Q    Was Bob Gaudet part of this group?
16       A    Bob Gaudet --
17       MR. RICHARDS:  Leading.
18       THE WITNESS:  Yes, he was.
19       MR. RICHARDS:  Leading, foundation.
20       THE COURT:  I understand.  Overruled.
21            Go ahead.
22   BY MS. LEE:
23       Q    And did you have interactions with -- between -- at
24   any time, did you have any interactions whereby you,
25   Mr. Kenner, and Mr. Gaudet were interacting with each other at
```

1    the same time in those initial meetings in 2003?

2        A    2003 all through 2004, all through 2005, absolutely,

3    yes.

4        Q    And what kind of interactions were you, Mr. Kenner,

5    and Mr. Gaudet having between 2003, 2004, 2005?

6        A    I was --

7    MR. RICHARDS:  Objection to the extent that it calls for

8    hearsay to Gaudet.  She could have asked him all those --

9    THE COURT:  I --

10   MR. RICHARDS:  -- questions yesterday but chose not to.

11   THE COURT:  I understand.

12   MS. LEE:  Your Honor --

13   THE COURT:  I understand.  Now I understood your question

14   to be what's the relationship.  And so, for the fact you

15   started out what does -- you know, how does he know

16   Mr. Gaudet.

17   MS. LEE:  Right, Your Honor.  And just one matter of

18   housekeeping, Your Honor.  They are making a lot of speaking

19   objections.  They've probably taken up about an hour of time

20   today making speaking objections.

21   THE COURT:  I understand.

22   MS. LEE:  If we could just stick to your original

23   directive to them to just make the objection and just not do

24   the speaking objection, then we could probably have more time

25   on our side.

```
 1              THE COURT:  Okay.

 2              MS. LEE:  So --

 3              THE COURT:  Let's go.

 4      BY MS. LEE:

 5         Q     And did you hear Mr. Gaudet's testimony yesterday

 6      regarding when he first knew Phil Kenner?

 7         A     I heard him say he didn't know him in 2005, yes.

 8         Q     And in fact, when did he say he first knew Phil

 9      Kenner?

10         A     He said when we closed down the property, which

11      would have been March of 2006, I believe was his testimony.

12         Q     And what's your reaction to that testimony?

13         A     I was --

14              MR. RICHARDS:  It's an improper question.

15              THE COURT:  Overruled.

16              Go ahead.

17              THE WITNESS:  I was shocked, honestly.

18      BY MS. LEE:

19         Q     And why were you shocked?

20         A     Because Bob Gaudet, from the time that I met him in

21      2003, and Phil Kenner, shortly thereafter in 2003 and all

22      through 2004 and 2005, was our main contact in Cabo San Lucas.

23         Q     So --

24         A     If we flew in -- if I flew in to Cabo, and if I was

25      with Phil, Bob Gaudet would pick us up at the airport.  Bob
```

199

1    Gaudet would show us around Cabo.  If we were going to go out

2    for dinner, Bob Gaudet was there.  If we were going for

3    drinks, Bob Gaudet was there.

4         Q    So you guys all knew each -- you guys all had

5    substantial -- so did you guys have substantial interactions

6    with each other then, between 2003 and 2005?

7         A    Absolutely.

8         Q    And in 2005, at the time that you were allegedly

9    seeking this loan, and you heard Mr. Gaudet say that you were

10   the one that went to him asking him to find funding on your

11   behalf, is that correct?

12        A    That is not correct.

13        Q    So what was actually going on with Mr. Gaudet and

14   yourself with respect to finding money for these Palm units?

15        A    As I said, it was Mr. Kenner's responsibility to

16   find the funding for the Palms units.  He was working with

17   Mr. Gaudet.  They were working together to do this.  I have a

18   lot of things from Mr. Gaudet and from Mr. Kenner.  But I can

19   tell you that the fact is that they were working together to

20   procure a loan for themselves, for Phil Kenner.

21        Q    And was it ever your understanding that you were

22   going to be a borrower of the money that was going to fund the

23   Palms units?

24        A    No.

25        Q    Even when Mr. Gaudet was involved with Mr. Kenner

1   trying to find money for the Palms units, did you have that

2   understanding then?

3       A    I was not going to be seeking a loan.

4       Q    So at no time did you ever affirmatively obligate

5   yourself?

6       MR. RICHARDS:  Leading.

7       THE COURT:  Sustained.

8   BY MS. LEE:

9       Q    Did you, at any time, obligate yourself to accept a

10  loan to fund these residential units at the Palms?

11      A    I did not.

12      Q    So the -- if we could go back to the transactions of

13  the home, you said the first money --

14      MS. LEE:  And just to recap, Your Honor.

15  BY MS. LEE:

16      Q    The first money that went in was your $1,000, is

17  that correct?

18      A    Yes.

19      Q    Then what was the next money that went in?

20      A    Two hundred thousand dollars on August 5th.

21      Q    From where?

22      A    From Ula Makika.

23      Q    And then what was the third money that went into the

24  house?

25      A    Well, that second deposit was a nonrefundable

1    deposit.  We were still in the process of looking for the

2    funding.

3         MR. RICHARDS:  Nonresponsive.

4         THE WITNESS:  We did not have --

5         THE COURT:  Okay, wait, wait, wait.

6         THE WITNESS:  I'm sorry.

7         THE COURT:  We're talking about the next deposit, right?

8         MS. LEE:  Right.  When -- yeah, exactly.

9         THE WITNESS:  I'm sorry.

10   BY MS. LEE:

11        Q    When was the next money that went into that house?

12        A    August 29th.

13        Q    And where did that money come from?

14        A    It came from -- after the Palms refunded to Baja

15   Development, Baja Development sent $400,000 to the title --

16   escrow company, the title company for the house.

17        Q    And was that your money that you sent to the home in

18   Las Vegas?

19        A    No, it was not.

20        Q    Did you ever understand that to be your money that

21   you sent into the home in Las Vegas?

22        A    Absolutely not.

23        Q    Whose money did you understand that $412,000 to be?

24        A    Phil Kenner's.

25        Q    Did you ever have any understanding at any time that

1    this $412,000 was your money?

2         A    No, absolutely not.

3         Q    So now the home has all the money it needs.  Does it

4    close?

5         A    It did close, yes.

6         Q    And then what happens after it closed?  Did anything

7    else happen with that house?

8         A    Shortly thereafter, Phil Kenner took out -- or

9    arranged to have a refinance on the house.  So --

10        THE COURT:  Can I ask you this?

11        THE WITNESS:  Sure.

12        THE COURT:  Who is holding the initial note on that

13   house?  Meaning, okay, you've got 1,000, you've got 200,000,

14   you've got 412,000.  Again, that's about 610,000.  You say

15   that the house cost 100 -- 1.6 million.  There's a million

16   dollar mortgage out there.

17        THE WITNESS:  Yes.

18        THE COURT:  Who's holding that note?

19        THE WITNESS:  I believe it was Dream Homes.  I wasn't

20   really that closely involved with the mortgage at that time,

21   and it was only for two -- a month or two, because it got

22   refinanced.  But I think the initial financing was with Dream

23   Homes, but I don't --

24        THE COURT:  And who obtained that?

25        THE WITNESS:  Phil Kenner got it and Mark Thalmann was

1    the signer.

2         THE COURT:  Okay.  All right, thank you.

3    BY MS. LEE:

4         Q    And were either you or Mark -- did you or Mark

5    Thalmann have any involvement in that initial financing from

6    that home, the $1 million of Dream Home money?  Did you guys

7    have any involvement in facilitating that?

8         A    In facilitating it, no.  But Mark Thalmann did sign

9    for it.

10        Q    In terms of the negotiations that led up to the

11   signing by Mark Thalmann, did you guys have any involvement in

12   that?

13        A    No, we did not.

14        Q    Okay.  So then taking you back to after it's fully

15   funded.  You have the million dollars.  You have the .6

16   million dollars.  Then what happens next with that home?

17        A    Phil Kenner arranged for a refinancing within, I

18   don't know, six weeks.  I don't know exactly the time, but it

19   was very quick.

20        Q    And did either yourself or Mr. Thalmann have any

21   involvement with respect to orchestrating that refinancing?

22        A    No, we did not.

23        Q    And how much money was pulled -- how much money was

24   generated from the refinancing of that home?

25        A    I believe that the mortgage went up to 1.28 million.

204

1    So it would $280,000.  It was increased by $280,000.

2         Q     And what happened to that $280,000?

3         A     Two hundred and thirty-eight thousand dollars went

4    directly to Ula Makika.

5         Q     And then, did anything else happen with that home to

6    further encumber that home?

7         A     After that, Mr. Kenner arranged for a home equity

8    loan.  And he was able to secure a $250,000 home equity loan.

9         Q     Okay.  And again, did you -- either yourself or

10   Mr. Thalmann, were you guys ever involved in orchestrating

11   that home equity loan?

12        A     No, we were not.

13        Q     And how much was that home equity loan for?

14        A     Two hundred and fifty thousand dollars.

15        Q     And what happened to that $250,000?

16        A     I believe $150,000 of it went to Ula Makika.  And

17   $75,000 went to another project that Phil Kenner and I were

18   involved with.  And $25,000 went into the house, I would

19   assume to pay mortgage or it's -- I don't know what exactly it

20   went for.  It just went into the house.

21        Q     So of all the money that was taken out of the house

22   from the refinancing and the home equity line, how much of

23   that money went to Ula Makika?

24        A     Three hundred and eighty-eight thousand dollars.

25        Q     And why was that money going to Ula Makika?

205

1          A      Because it was Phil's money.

2          Q      And so, we've accounted for the money that went into

3   the home.   Then there was another $500,000 that left your Baja

4   account and went into Cabo San Lucas, is that right?

5          A      Yes.

6          Q      And was that your money that was going down into

7   Cabo San Lucas?

8          A      No, it was not.

9          Q      Whose money was that that was going down into Cabo

10  San Lucas?

11         A      Phil Kenner's.

12         Q      Did you reap any benefit from that money that went

13  down to Cabo San Lucas?

14         MR. RICHARDS:   I'm going to object unless you're going to

15  define benefit.

16         THE COURT:   Sustained.

17  BY MS. LEE:

18         Q      Did you receive any ownership interest in the Cabo

19  San Lucas property in exchange for that $500,000 that went

20  down to Cabo San Lucas?

21         A      No, I did not.

22         Q      Did anyone receive any ownership interest in

23  exchange for that $500,000 that went down to Mexico?

24         A      Phil --

25         MR. RICHARDS:   Foundation.

206

1          THE COURT:  If he knows.

2          THE WITNESS:  Phil Kenner.

3          THE COURT:  So he got $500,000 ownership in Cabo?

4          THE WITNESS:  Well, his responsibility was to raise all

5     the down payment funds.  And for that, he was going to get 50

6     percent of the project.  So that was part of the down payment

7     funds.

8          MR. RICHARDS:  I'm going to move as nonresponsive.

9     That's not ownership.  He -- the question was did he receive

10    any ownership --

11         MS. LEE:  Again, speaking objections, Your Honor.

12         THE COURT:  Okay, I understand.  Counsel, let's move on.

13    BY MS. LEE:

14         Q    And of this $791,000, did you benefit at all from

15    any of this $791,000?

16         MR. RICHARDS:  Same objection.

17         THE COURT:  Sustained.

18    BY MS. LEE:

19         Q    In the home -- the $412,000 that went into the home,

20    did you benefit?

21         MR. RICHARDS:  Same -- asked and answered, same

22    objection.  Vague.

23         THE COURT:  Well, I guess I'm having trouble, because --

24         MS. LEE:  I'm sorry.

25         THE COURT:  -- obviously, he lived there and all that

```
 1    kind of stuff.
 2         MS. LEE:  Right.  Sure.  Sure.
 3         THE COURT:  I mean where are you going?  It's very vague.
 4    I'm going to sustain.
 5         [Counsel Confer]
 6         MS. LEE:   I have counsel whispering in my ear over here.
 7         [Counsel Confer]
 8    BY MS. LEE:
 9         Q    And so, going back to your original agreement with
10    Mr. Kenner with regards to who was going to do what to have
11    what ownership in this home, did you fulfill your
12    responsibility of paying the mortgage every month?
13         MR. RICHARDS:  I'm going to object, because it misstates
14    the testimony.  There was no agreement.  That agreement
15    never --
16         THE COURT:  Sustained.
17              Lay the foundation.
18    BY MS. LEE:
19         Q    Did you have an understanding that there was an
20    agreement between yourself, Mr. Thalmann, and Mr. Kenner with
21    respect to this home?
22         A    Yes.
23         Q    And what was your understanding of that agreement?
24         MR. RICHARDS:  Statute of frauds.  There was no
25    agreement.
```

208

THE COURT:  I understand where you're going, counsel.
Let me ferret it out, but I need to hear about this, okay?
And it doesn't help to have everybody object every two
seconds, okay?  Let me ferret it out.  Okay.

BY MS. LEE:

Q    What was your understanding of this agreement that
the three of you guys had together?

A    That I would need to be responsible for the
mortgage.  And Mark did pay a little also.  But Phil Kenner
did not have to pay.

Q    Okay.  What was your understanding as to what
everyone's obligations were in terms of owning -- I'm sorry.
Let me ask that a different way.  What was your understanding
of the full agreement between the three of you with respect to
this house, in terms of who would be doing what to earn their
interest in this home?

A    Mark Thalmann was on the mortgage.  Phil Kenner put
the down payment down.  And I pay the majority, not all but
the majority of the mortgage payments.

Q    And Mr. Kenner, did he fulfill his obligations under
that agreement?

A    Yes.

Q    And did he get -- and all the money that he put into
that house, did he get back out?

MR. RICHARDS:  Objection, foundation.

209

1        THE COURT:  Sustained.

2    BY MS. LEE:

3        Q    So what's going on with that house today?  Are

4    you --

5        MR. RICHARDS:  Relevance.

6        THE COURT:  Sustained.

7    BY MS. LEE:

8        Q    Are you currently living in the home?

9        MR. RICHARDS:  Relevance.

10       THE COURT:  I know.  I'm trying to figure out why we're

11   going through this.  I --

12       MR. RICHARDS:  I'll withdraw it.

13       MS. LEE:  Sure, Your Honor.  No, that's okay.

14       THE COURT:  I mean is it necessary to go through it?

15       MS. LEE:  I don't think so, Your Honor.  I'm going to go

16   ahead and pass the witness at this time.

17       THE COURT:  Okay.

18                    CROSS-EXAMINATION

19   BY MR. RICHARDS:

20       Q    Now let me direct your attention to the Court's

21   earlier question about Diamante Del Mar.  You indicated that

22   that investment is still alive, is that -- do you remember

23   that testimony?

24       A    Yes.

25       Q    Okay.  Now that -- you're doing no promotion of that

```
1    investment presently, correct?
2        A    I didn't say that I was.
3        Q    All right.  But it -- isn't it true you previously
4    testified that you had to encumber that property with a high
5    interest loan?
6        A    Yes.
7        Q    And that it's facing foreclosure?
8        A    That's not true.
9        MS. LEE:  Objection.  That -- he --
10       THE WITNESS:  That's not true.
11       THE COURT:  Okay.
12       MS. LEE:  It misstates his --
13       THE COURT:  What's the objection?
14       MS. LEE:  It misstates his testimony.
15       THE COURT:  Sustained.  I think you need to lay some
16   foundation for it.
17   BY MR. RICHARDS:
18       Q    Isn't it true that there's a high interest loan on
19   Diamante Del Mar?
20       A    There is a loan, yes.
21       Q    Is that being serviced?
22       A    We've settled the dispute.  So there's no
23   foreclosure.  There never was a foreclosure if that's where
24   you're going with that.
25       Q    You're not trying to sell any -- you're not trying
```

211

1    to develop that property presently, correct?

2         A    There's a lot of things we're trying to do with that

3    property, yes.

4         Q    You actually --

5         A    I was there about 10 days ago, or two weeks ago,

6    actually.

7         Q    So you're -- we've got to go a little slower.  Just

8    one person at a time.  Did it -- haven't you previously

9    testified that that investment is dead?

10        MS. LEE:  Objection, it --

11        THE WITNESS:  Absolutely not.

12        MS. LEE:  -- misstates the testimony.

13        THE COURT:  Okay.  Okay.  What's the objection?

14        MS. LEE:  It misstates his testimony.

15        MR. RICHARDS:  I don't mean in here.  So if that's what

16   you keep referring to --

17        MS. LEE:  Oh, yeah, I am referring to in here.

18        MR. RICHARDS:  He previously testified.  I'm not talking

19   about in here.  Okay.

20        MS. LEE:  Then objection as to relevance and foundation.

21        THE COURT:  I think you kind of opened the door with that

22   one, but I'm going to overrule.

23             Go ahead.

24   BY MR. RICHARDS:

25        Q    Didn't you previously testify in the Nolan[phonetic]

212

1     arbitration that all the capital counts of the members,

2     including Mr. Murray, are worth zero?

3         A     And I made a mistake when I said that, and I

4     corrected my mistake when you deposed me in January.  And if

5     you'd like to look at that testimony, we can go through that

6     also.

7         Q     Do you -- are you presently suggesting that Mr.

8     Murray's investment is still viable in Diamante Del Mar?

9         A     I said it's still --

10        MS. LEE:  Objection, relevance.

11        THE WITNESS:  I --

12        THE COURT:  Overruled.

13        THE WITNESS:  It's still -- the investment is still

14    alive, and it is viable.  Yes.

15    BY MR. RICHARDS:

16        Q     Is there any debt on the property?

17        A     Yes, there is.

18        Q     How much is the debt?

19        A     3.5 million --

20        MS. LEE:  Objection, relevance.

21        THE WITNESS:  -- dollars.  Sorry.

22        THE COURT:  Okay.  Overruled.

23    BY MR. RICHARDS:

24        Q     Okay.  And isn't it true the property is not

25    generating any income?

1      A      Correct.

2      Q      So who is going to service the debt on the property?

3      A      We are looking for joint venture partners.  I was

4  there last week.  We looked at doing alternative energy on the

5  property, which is the person I was there last week with.

6  It's in northern Baja.  There's still an appraisal that's well

7  above what the -- what is owed on the property.  The latest

8  appraisal was in -- I don't know if it's 2008 or 2009.  But it

9  was still a KPMG appraisal, over $40 million.

10            I'm not saying that you can get that today, because

11  it's not the best time in real estate, for one.  It's not the

12  best time in northern Baja, for two.  So it's not the best

13  time to go and be marketing or selling that project.  But if

14  you asked me if that project is dead, I don't think I've ever

15  testified that that project is dead.  I still spend time on

16  that project, and I still have hopes to do that.  Your

17  question to me was do you hope to develop that someday, and my

18  answer was yes.

19      Q      Okay.

20      A      And that's an honest and truthful answer.

21      Q      Well, it's been about eight years, right?

22      A      It's been eight years since Mr. Murray put his

23  investment in.

24      Q      Isn't it true the investors have not received one

25  dollar return on that investment?

214

```
 1        A    That's true.
 2        Q    Okay.  And then focusing your attention to the Cabo
 3   San Lucas investment.  Isn't it true that none of your
 4   investors have received one dollar return on that investment?
 5        MS. LEE:  Objection as to characterization of those
 6   investors as your investors, and to relevance, Your Honor.
 7        THE COURT:  Overruled.  I understand where you're going.
 8   Go ahead.
 9        THE WITNESS:  They have not received -- been paid back,
10   no.
11   BY MR. RICHARDS:
12        Q    Not a dollar, correct?
13        A    That's --
14        Q    It's just a yes or no, sir.
15        A    No, they have not been.  I have no problem with
16   that, actually.
17        Q    I just want to --
18        A    Okay.
19        Q    -- corroborate.  And so, you've been paid though
20   over $250,000 a year from Diamante Cabo San Lucas, correct?
21        A    Two hundred and forty thousand dollars, yes.
22        Q    Oh, sorry.
23        A    But not --
24        Q    Does that include your Range Rover?
25        A    I don't have a Range Rover, sir.
```

215

1        MS. LEE:  Objection, Your Honor.

2        THE COURT:  Wait, wait, wait.  Let's lay some foundation.

3   And again, I'm going to tell you something.  This is a trial

4   before the bench.  I'm not going to get anywhere if everybody

5   keeps objecting all over the place, okay?  We will be done by

6   noon tomorrow.  Okay.

7        MR. RICHARDS:  All right.

8        THE COURT:  Do you have a Range Rover?

9        THE WITNESS:  I do not have a Range Rover.

10       THE COURT:  Okay.

11  BY MR. RICHARDS:

12       Q    What kind of cars are you afforded when you're in

13  Cabo San Lucas do you drive?

14       A    Right now, a Navigator.

15       Q    Navigator.  Sorry.  Okay.  And when you're in -- and

16  isn't it true that all your legal fees are paid by Diamante

17  Cabo San Lucas?

18       A    If it's related Diamante Cabo San Lucas, yes.

19       Q    Well, they're paying for this case, correct?

20       A    This is related to Diamante Cabo San Lucas, sir.

21       Q    Oh, it is?  Okay.  And isn't it true that you're --

22  that you use funds from Diamante Cabo San Lucas to pay for

23  your living expenses when you're in Cabo San Lucas?

24       A    Yes.

25       Q    And the way that you --

216

1          MS. LEE:  Relevance, Your Honor.

2          THE COURT:  Overruled.

3     BY MR. RICHARDS:

4          Q    And the way that you get those funds is by you keep

5     encumbering Diamante Cabo San Lucas by drawing on the credit

6     line that the bank keeps extending, correct?

7          A    That's not true, actually.

8          MS. LEE:  Objection as to the use of characterization as

9     expunged.

10         THE COURT:  I'm sorry?

11         MR. RICHARDS:  I didn't use the word expunged.

12         MS. LEE:  Oh, I'm sorry, sponged.

13         THE COURT:  Okay.

14         MS. LEE:  Objection as to characterizing my client's

15    conduct as sponging money.

16         MR. RICHARDS:  I never said he was sponging money.

17         MS. LEE:  Oh, I thought you said sponging.

18         MR. RICHARDS:  I never used that word.

19         THE COURT:  Okay, overruled.

20         THE WITNESS:  Say the question again.

21    BY MR. RICHARDS:

22         Q    Sir, you used Mr. Kenner's money, so the Court

23    understands, to buy the property in Diamante Cabo San Lucas'

24    investors, correct?

25         A    Yes.

217

1    Q    And then once you bought the property, you then got

2  a loan from Lehman Brothers to develop the property, correct?

3    A    Yes.

4    Q    And then once that loan was given and Lehman's went

5  bankrupt, and Danske Bank was the bank that had the loan with

6  Lehman's to lend to you, correct?

7    A    Correct.

8    Q    And then in order to keep servicing the property,

9  you had to draw on the credit line that Danske Bank gave you

10 to pay the employees and whatever you're trying to do there,

11 correct?

12   A    Up to a point, yes.

13   Q    Up to a point.  And all that money that Danske Bank

14 has given you is secured by the property, correct?

15   A    Correct.

16   Q    So as the credit line gets higher, the equity goes

17 down, correct?

18   A    If the credit was keep -- kept going up, yes.  But I

19 mean I think that if you're going to say that, then I think --

20   Q    Well, hold on.  Let me just get to the next point.

21   A    Okay.

22   Q    I think we both know this property.  So when -- are

23 you suggesting that there's a limit on how much of a credit

24 line you're given?

25   A    Yes.

218

```
 1        Q     Okay.  Presently, what's the credit line at?

 2        A     Roughly, $130 million.

 3        Q     One hundred and thirty million dollars.  And at some

 4   point -- you haven't sold a lot on Diamante Cabo San Lucas

 5   yet, have you?

 6        A     That's not true.

 7        Q     Oh, you sold lots?

 8        A     Yes, sir.

 9        Q     How many have you sold?

10        A     Probably have contracts on close to 40 lots.

11        Q     But have you sold any?

12        A     We've closed on probably eight to 10 lots.  I don't

13   know exactly, but we've closed, yes.

14        Q     When did you close on those lots?

15        A     In the last two months.

16        Q     Two months.  And the -- all right.  Isn't it true

17   that you operate the project at a negative cash flow?

18        A     That's not true.

19        Q     So the project sustains itself?

20        A     Yes, it does.

21        Q     Okay.  With respect to the -- when was the last time

22   you submitted any financial records to Mr. Kenner or any of

23   his investors showing that the project has produced any

24   income?  If you could cite for the Court any document.

25        A     The Court needs to know --
```

219

1       MS. LEE:  Objection as to foundation.

2       THE COURT:  Overruled.

3           Go ahead.

4       THE WITNESS:  The Court needs to know the litigation that

5   we're in right now.  And it's --

6   BY MR. RICHARDS:

7       Q    Well, that's not my question.  My question --

8       A    Okay.

9       Q    -- is have you submitted a document.

10      A    No, I haven't.

11      Q    Okay.  That's all I'm asking.  Just --

12      A    Okay.

13      Q    Isn't it true you haven't submitted any update,

14  letter, or anything to any of your investors that you've sold

15  any houses in the last two months?  Is that fair to say?

16      A    I have not in the last two months, no.

17      Q    Okay.  No problem.  Now directing your attention --

18  so would it be fair or unfair to say, Mr. Jowdy, that if

19  Danske Bank stops providing a credit line, that the property

20  is in serious risk of foreclosure, if they said we're not

21  giving any more money?

22      A    They haven't given any more money in the last

23  several months.

24      Q    Okay.  And with respect to the lender and the

25  Diamante Del Mar property, are you saying that that lender is

220

```
1    not requiring you to service the debt any longer?

2         A     We reached a settlement, and --

3         Q     So the lien just stays on there?

4         A     The lien is on there, yes.

5         Q     What about as far as the payments are concerned?

6    He's not requiring any interest payments?

7         A     Not at the moment.

8         Q     Oh, so you have a temporary forbearance.

9         A     We've reached a settlement.  There's no -- there was

10   never a foreclosure --

11        Q     Right.

12        A     -- and we reached a settlement.  So --

13        Q     So the settlement will allow you not to pay any

14   interest, is that what you're saying?

15        A     For the time being.

16        MS. LEE:  I'm going to object in terms -- I don't know

17   what the settlement is about.  I don't know if there's a

18   confidentiality --

19        THE COURT:  Well, we haven't any testimony about that.

20   Overruled.

21   BY MR. RICHARDS:

22        Q     Do you -- are the -- with respect to the settlement,

23   is there at some point you're going to have to start paying

24   interest?

25        A     At some point, yes.
```

```
1          Q     And do you know when that is?

2          A     Several months, six months, eight months.  I don't

3     know.

4          Q     Okay.  So in six months.  You don't have the money

5     though to pay for that loan presently, correct?

6          A     Correct.

7          Q     All right.  So if you -- would it be fair or unfair

8     to say that if you can't start paying interest again in six

9     months, then you would lose the property to the hard money

10    lender?  Is that fair to say?

11         A     At some point, if we can't -- I think like anything.

12    I think if no one buys property anywhere, in any development,

13    at some point --

14         Q     I'm just --

15         A     Well, yes.  I mean but that's --

16         Q     I'm just trying to establish.  In this property,

17    isn't that fair to say, you've got to stand still from --

18         A     I just said on any property.

19         Q     I don't want to talk about any property.  I want to

20    talk about this property.  That's the --

21         THE COURT:  Now when you're talking about this property,

22    you're talking about the Diamante Del Mar or --

23         MR. RICHARDS:  Diamante Del Mar, correct.

24         THE COURT:  Right, okay.

25
```

222

BY MR. RICHARDS:

Q    That's the great thing about this job.  We get to ask the questions.  Now with respect to Diamante Del Mar, within six months, if you don't start servicing that $3.5 million debt, then your expectation is the lender will foreclose, correct?

A    I don't know if it's six months.

Q    But approximately, at some --

A    It may be a year.  I don't --

Q    It's not unlimited, right?

A    No, it's not unlimited.

Q    All right.  So is it your understanding that after that -- this forbearance period expires, then you'll have to start -- then you could lose the property if you don't service the debt, correct?

A    Eventually, if they're not repaid, like any other situation, yes.

Q    Okay.  Now directing -- with respect to the -- you talked about -- we talked about the Diamante Del Mar property and the Cabo San Lucas.  And then you testified that you received funds from an entity named Ula Makika, correct?

A    Yes.

Q    And do you disagree with the characterization that you or your related entities have received over $5,000,000 from Ula Makika?

223

1    A    I have not received.

2    Q    No, you or your related entities.  Do you disagree

3    with that?

4    A    I have personally not received anything.  Related

5    entities that most of which Phil Kenner is involved with have

6    received funds over the course of the last eight years, seven

7    years, six years.

8    Q    And you haven't returned any of those funds,

9    correct?

10   A    I don't -- which funds are you talking about.

11   MS. LEE:  Object as to vague.  Which funds are what

12   talking -- what funds are we talking about.

13   THE COURT:  I thought we were talking about $5 million.

14   MR. RICHARDS:  Five million dollars.  That's correct.

15   BY MR. RICHARDS:

16   Q    Have you returned any of that money?

17   THE COURT:  All right.  Am I wrong?

18   MR. RICHARDS:  No, you're not.

19   THE COURT:  Okay.

20   THE WITNESS:  Have I returned any of the $5 million?

21   BY MR. RICHARDS:

22   Q    Yeah.

23   A    No.

24   Q    Thank you.  Now when you talk about receiving funds,

25   you discussed -- you testified that Mr. Murray originally

1    invested $500,000 with a PPM.  Do you remember that testimony?

2         A    Yes.

3         Q    Now you understand when you take money from people

4    for an investment, you understand that you give them a private

5    placement, so they know where their money is going, correct?

6         A    Correct.

7         Q    Now taking that experience in 2002 to the present

8    with respect to the $200,000 that you received from Ula Makika

9    that you've testified to,  you didn't receive a -- you didn't

10   issue a PPM for that money, did you?

11        A    I didn't receive $200,000 from Ula Makika, first of

12   all.

13        Q    Well, Ula Makika went -- the $200,000 was wired from

14   Ula Makika to a house that's in your name presently in Las

15   Vegas, Nevada, correct?

16        A    Correct.

17        Q    All right.  Did you issue a PPM for that money?  Yes

18   or no.

19        A    No.

20        Q    Okay.  And with respect to the $791,000 that Baja

21   Development Corp. -- that you wired to Baja Development Corp.

22   when the Palms Casino refunded the money, did you receive a

23   PPM that Glen Murray subscribed to for that money?  Yes or no.

24        A    No.

25        Q    And with respect to the $791,000, when you directed

225

1    500,000 of it to go to PDDDM, did you receive a private

2    placement for that $500,000?

3         A    At Mr. Kenner's direction, no.

4         Q    No, no.  I'm just asking you, sir, if you --

5         A    Well, you said I directed it, and I didn't.

6         Q    Did you -- I'm asking did you issue a PPM for that

7    $500,000 that PDDM received?  Did you issue on?

8         A    No.

9         Q    And you own 99 percent of PDDM, don't you?

10        A    Yes.

11        Q    Okay.  So did you authorize your company, when you

12   received that money, to issue a private placement?

13        A    No.

14        Q    All right.  And you understand when you first got

15   into this business in 2002, you had no experience in

16   developing raw land, correct?

17        A    Correct.

18        Q    You testified previously that you -- this was

19   something that you never had any experience in, right?

20        A    Correct.

21        Q    And isn't it true that you were involved, briefly,

22   in a project in Tennessee?

23        A    Yes.

24   MS. LEE:  Objection, relevance.

25   MR. RICHARDS:  Well, I'm going to show, Your Honor -- the

```
1    offer of proof is none of his projects has ever made money,

2    ever.

3          THE COURT:  Okay.  Okay.

4          MS. LEE:  Object.

5          THE COURT:  Okay.  I'm going to allow him to go through

6    it a little bit.  I'm going to overrule.

7          MR. RICHARDS:  Okay.

8          THE COURT:  Go ahead.

9    BY MR. RICHARDS:

10         Q     You were in a project involved -- named Laurel Cove,

11   a golf community in Tennessee, correct?

12         A     Yes.

13         Q     And that hasn't made any money for the investors,

14   correct?

15         A     No.

16         Q     And with respect to Boot Ranch in Texas, did that

17   make any money?

18         A     No.  But the --

19         Q     I'm just asking you did it make any money.

20         A     Okay, never mind.

21         Q     No, it didn't, right?

22         A     No.

23         Q     All right.  Now with respect to -- so would it be

24   fair or unfair to say that your profession in real estate

25   development, so far, hasn't been a big return for you or your
```

227

1    investors, except for your salary, correct?

2         A    So far, yes.

3         Q    Okay.  So would it be fair or unfair to say that

4    besides yourself, you have your brother-in-law, Bill Nagen

5    [phonetic], getting paid from your companies, correct?

6         A    Yes.

7         Q    And your brother Taffy Jowdy, he gets paid from your

8    companies, right?

9         A    Sometimes.

10        Q    But so, besides your family members and friends,

11   none of the investors have ever received any of their money

12   back, correct?

13        A    We pay employees.  We have not been able to pay the

14   investors yet.

15        Q    But none of the investors --

16        A    That's different if you say besides your

17   employees --

18        Q    Okay.

19        A    -- who -- some of which include family members and

20   friends.

21        Q    Well, that's another story.  Now with respect to

22   this particular case, you had -- you saw Bob Gaudet up on the

23   witness stand yesterday, correct?

24        A    Yes.

25        Q    And is there a reason why you didn't produce any

228

1    emails showing that Bob Gaudet and Phil Kenner knew each other

2    between 2003 and 2005 to rebut Bob Gaudet's contention?

3         A    I honestly was not prepared for Bob Gaudet to get up

4    here and lie and say he did not meet Phil Kenner.

5         Q    Okay, sir.  Did you ever attempt to depose Bob

6    Gaudet in this case?  Yes or no.

7         A    No.

8         Q    Okay.  Thank you.  Now with respect to the ownership

9    -- well, let me strike that.  You -- since 2002, you've had a

10   chance now, would it be fair to say, to deal with a lot of

11   banks, correct?

12        A    Some, yes.

13        Q    Yeah.  Well, you know that it's not a good idea to

14   lie to banks, correct?

15        A    Correct.

16        Q    And in this -- correct, right?

17        A    Correct.

18        Q    And in this case, you actually obtained a bank loan

19   with Mark Thalmann that, on the loan documents, they state is

20   there anybody that has an undisclosed or equitable interest in

21   the property, correct?

22        MS. LEE:  Objection as to the characterization of this

23   document.  I don't know what he's summarizing, what document

24   he's referring to.

25        THE COURT:  Okay.  Overruled.  I know where he's going.

229

```
1    BY MR. RICHARDS:
2         Q    Go ahead.
3         A    I don't know.
4         Q    Okay.  You understand that -- isn't it true you
5    didn't disclose to the bank that lent the money that there's
6    an unrecorded interest in Phil Kenner, correct?
7         A    Correct.
8         Q    And when you borrowed the money from the bank, you
9    didn't disclose to the bank that the down payment money was
10   coming from Phil Kenner, correct?  You don't really want me to
11   get all the loan documents, do you?
12        A    If you say so.  I don't know.
13        Q    Okay.  Well, you know that when you borrowed the
14   money you represented to the bank that you and Mark Thalmann
15   were living there as your primary residence, correct?
16        A    Correct.
17        Q    All right.  So when you do that, the bank is relying
18   on the fact that all the money that's going -- that's being
19   used is from you, so they know that you have a personal
20   interest in the house, meaning that you don't want to lose it.
21        MS. LEE:  Objection as to competence.
22        MR. RICHARDS:  Competence.
23        THE COURT:  I'm sorry.
24        MS. LEE:  Just that -- foundation, sorry.
25        THE COURT:  Overruled.
```

230

BY MR. RICHARDS:

Q    You understand that's why they want to make sure it's your money, so you have an attachment to the real estate. You understand that, right?

A    Okay.

Q    Okay.  So you didn't tell the bank that the down payment was coming from someone other than Phil Kenner, did you?

A    No.

Q    You'd remember that, right?  Now -- and you didn't -- did you ever have a specific conversation with Mark Thalmann, that he should lie to the bank when he signed those loan documents, pretending that the money was coming from him and you?

A    No.

Q    Okay.  Now I'm going to show you Exhibit 119.

THE COURT:  Is that admitted?

MR. RICHARDS:  Yes, it is.

THE COURT:  Okay.

BY MR. RICHARDS:

Q    Now let's take a look, Mr. Jowdy.  This is the first document that your friend George Maloof, who was letting you live in his house, was sending you in August of '05, correct? This is an email from Sandra Bohn saying this is how the deposit should be broken up.  Do you see that, sir?

231

```
1          A     Yes.

2          Q     And when you got that, you didn't disclose to Sandra

3    that this isn't really you the buyer, it's a guy named Phil

4    Kenner, correct?

5          A     Correct.

6          Q     And did -- is there an email or some document from

7    Phil Kenner saying I want you to lie to the Palms on my

8    behalf?  Do you have any emails like that?

9          A     No.

10         Q     Okay.  And generally, do you lie to people you do

11   business with?

12         A     No.

13         Q     All right.  And I'm assuming that you'd like to

14   consider yourself an ethical person to deal with.  And lying

15   is not something you incorporate in a business transaction,

16   correct?

17         A     Correct.

18         Q     Because you testified that these emails were

19   embarrassing, but they were really -- you were engaging in

20   some sort of lies with the Palms, correct?

21         MS. LEE:  Objection, mischaracterizes his testimony, Your

22   Honor.

23         THE COURT:  I'll let him explain it.  I'm -- overruled.

24         Go ahead.

25         THE WITNESS:  They were embarrassing, and I said that
```

232

1     earlier today.  The fact that we were playing that game,

2     thinking that the money was coming in, saying that the money

3     was coming in, and have it not was embarrassing.

4     BY MR. RICHARDS:

5          Q     Okay.  But, sir, let's take a look at your August

6     4th email, wire transfer info for Palms units.  And then you

7     say -- Sandra tells you: I have Stewart on the lookout for

8     your wires.  I'll let you know what I hear.  And then you had

9     sent -- you send her an email on August 4th, saying:  Sandra,

10    I just wanted to confirm that I received your info and that

11    Stewart Title should receive three separate wires.  I will be

12    on the road, et cetera.

13          Now you didn't have any authorization from anyone

14    that said wires were coming in at that time, did you?

15         A     Well, Phil Kenner was telling me they were, yes.

16         Q     Okay.  So you actually knew that a wire was coming

17    in front -- who's the wire coming in from on August 4th?  Do

18    you know who the sender was?

19         A     Did not know.

20         Q     No.  So you just sent an email to the Palms

21    saying -- and you know, not to trick you, Mr. Jowdy, but you

22    know the other emails are going to say that you actually sent

23    the wires.  You do know that, sir, right?

24         A     I know.  That's all part of the embarrassing string

25    of emails that I referred to.

233

1    Q    Okay.  But without embarrassing you again on the

2    witness stand, because that's what I'm trying to do, didn't

3    you send subsequent emails saying you actually sent the wires?

4    A    Yes.

5    Q    And that was a lie, right?

6    A    Yes.

7    Q    Because you physically did not authorize anybody to

8    send a wire, right?

9    A    Right.

10    Q    And are you really -- like if we could take a look

11    at this one on August 5th.  You actually say to her:  Sandra,

12    the wires were sent Wednesday afternoon from Mexico.  I will

13    do my best to track them down.  Now that was a complete lie,

14    right?

15    A    I thought you said you weren't going to further

16    embarrass me.  Yes.

17    Q    Well, I just want --

18    A    Yes, it was a lie.  I'm sorry.

19    Q    You know, there is a little -- you know.

20    A    I did say.

21    Q    Okay.  But I only -- I won't ask you another

22    question of this unless you're going to really -- you're not

23    going to really tell me Phil Kenner told you to lie, did he?

24    A    He told me that the wires were going.  My mistake.

25    Q    Hold on.  No, I just want you to focus on this

234

1    email.

2         A    I'm going to tell you what my mistake was.  He told

3    me that the wires were being sent.  So they were pressuring me

4    for the emails.  So I said the wires were sent.  I didn't mean

5    it as a lie to begin with, but it turned out -- because they

6    were being sent, and they never got sent.

7         Q    But I just want to make sure, and I won't ask you

8    anymore if you concede this point, Phil Kenner never

9    instructed you to lie to the Palms and say the wires were

10   sent, sir, isn't that correct?

11        A    I don't believe so, no.

12        Q    All right.  And that was a decision that you made on

13   your own to lie to the Palms, not because Phil Kenner, in any

14   way, forced you or pressured you or told you to do that.

15        A    He didn't force me, no.

16        Q    All right.  That's fine.  I'm now going to keep my

17   promise and move on to something else.

18             Now -- okay.  Now you indicated -- or you told the

19   Judge that Phil Kenner had put the money in for the original

20   deposit of these Palms transactions, right?

21        A    Yes.

22        Q    Okay.  I'm going to show you Exhibit 128.  It's in

23   evidence.  And this is your signature on the check.

24        THE CLERK:  I'm sorry, Your Honor.  128 --

25        THE COURT:  Yeah.

1      THE CLERK:  -- is in evidence?

2      MR. RICHARDS:  It's not in evidence?

3      THE CLERK:  No, it's not.

4      MR. RICHARDS:  All right.  Well, I'm moving it into

5   evidence, his check.

6      MS. LEE:  What's the Bates on the bottom?

7      MR. RICHARDS:  MURSTEN004.

8      MS. LEE:  Okay.

9      MR. RICHARDS:  Okay.  Sorry.  I thought it was in

10   evidence.

11      MS. LEE:  I'll stipulate to the admission of that

12   document.

13      THE COURT:  All right.  Exhibit 128 is admitted.

14      MR. RICHARDS:  I think we admitted it in --

15      THE COURT:  I was going to say I think I've already seen

16   it.

17      MR. RICHARDS:  Yeah, you've already seen it.  It was in

18   my opening statement, I think, in another exhibit.  So --

19      THE COURT:  Okay.

20      MR. RICHARDS:  -- sorry about that.

21   BY MR. RICHARDS:

22      Q    All right.  This is the check.  Now I know you said

23   this is Phil Kenner's money, but this is your company on the

24   check, right?

25      A    Yes.

236

1      Q     All right.  And that's your signature on the check.

2   That's not a forgery, right?

3      A     Right.

4      Q     All right.  And the memo for the condo suites, those

5   are the three condos at issue, correct?

6      A     Yes.

7      Q     Now you understand as -- at least -- maybe not in

8   2002 you didn't have a lot of experience.  But I think by this

9   point, you've had probably too much experience.  You know when

10  you send a check to a title company and represent these funds

11  are coming from you, that you have some responsibility that

12  they are your money, right?

13     A     I don't know how that -- I don't understand the

14  question.

15     Q     When you write a check you're representing that

16  you're the payor of the check.  You understand that, right?

17     A     Yes.

18     Q     Okay.  Now do you have an email on April 11, 2005

19  that's sent to Phil Kenner that says look, I'm going to send

20  in the check, but it's not really my money?  Do you have

21  anything like that?

22     A     I don't believe so.

23     Q     Okay.  Do you have any document that you can show me

24  that would suggest that the 150,000 was really not your money,

25  because you wrote the check?

237

1    A    Other than a deposit going into Baja Development at

2    the same time from Phil Kenner.

3    Q    I know.  But this check is from TLJ Management.

4    A    The deposit got transferred to TLJ Management and

5    paid.

6    Q    And was Phil Kenner your manager at the time?  Did

7    he move it from Baja to TLJ?

8    A    He moved it from Little Isle or Ula Makika to Baja

9    Development.

10   Q    And then -- but he can't move money from Baja

11   Development anywhere, can he?

12   A    No.

13   Q    All right.  So you volitionally moved money from

14   Baja Development to TLJ Management, right?

15   A    Yes.

16   Q    All right.  Do you have any -- do you know what a

17   CYA email is?

18   A    Yes, I do.

19   Q    Okay.  Do you have anything that says that just so

20   we could have something to tie in, so years later we wouldn't

21   be arguing over what really happened, that says that you never

22   intended this to be money coming from you?

23   A    No.

24   Q    All right.  And if we look through all the loan

25   documents -- or let me strike that.  Okay.  So at this point,

1    are you suggesting that you were lying to the title company

2    when you sent in the money from your company?  It was really

3    someone else's money?

4         A    I don't know if that suggests a lie, but you can --

5         Q    Well --

6         A    You know the facts.  You can characterize it how you

7    like.

8         Q    Okay.  Well, you heard your lawyer try to

9    rehabilitate you on this issue that there was a cap of three

10   deposits at the Palms Casino.  Remember that?

11        A    Yes.

12        Q    And you're now taking the position that one of the

13   reasons why you did this was to circumvent your belief there

14   was a cap, right?

15        A    It was what Phil Kenner told me.

16        Q    Okay.  But you felt it was true when you sent in

17   this money at that point in '05, correct?

18        A    Correct.

19        Q    And are you saying that you were working with Phil

20   Kenner to deceive the Palms to get around their cap?

21        A    If you would like to characterize it that way, then

22   fine.

23        Q    What -- I mean -- I'm just trying to understand,

24   because you're saying that it was okay to basically lie to the

25   Palms and pretend the money is coming from you, and it was

239

1    really Phil Kenner, just to get around the cap.

2        A    The cap that was explained to me was you can only

3    have three in your name.  So if you put three in someone

4    else's name, that's to me what the rule was.  I don't know if

5    that's a lie or if that's breaking a rule, or if that's going

6    around a rule.  But that's what was told to me was the rule.

7        Q    But I want you to admit -- didn't you say isn't this

8    -- by you sending in this check, you're not suggesting that it

9    really -- you're not really the owner when it says Ken Jowdy

10   is the buyer, are you?

11       A    I don't know what the relevance is.  I don't know --

12       Q    Well, I mean like your name -- most people like to

13   be proud and stand behind their name.  It means something.  So

14   I'm assuming you're --

15       THE COURT:  Now you're getting into some --

16       MS. LEE:  Objection.

17       THE COURT:  -- argument, counsel.

18       MR. RICHARDS:  Sorry.

19       THE COURT:  So --

20       MS. LEE:  Argumentative.

21   BY MR. RICHARDS:

22       Q    What I'm trying to establish, did you have any moral

23   issues with yourself about engaging in some sort of

24   misrepresentation with the Palms that you weren't the real

25   buyer?  Yes or no.

240

1      A     I didn't really see it that way.  So the answer is
2  no.
3      Q     Now that I've brought it to your attention, do you
4  see -- do you think it was still a good idea to do this?
5      A     This isn't a good idea.  Where --
6      Q     Yeah.
7      A     -- we're at isn't a good idea.  But I still don't
8  see that issue.
9      Q     You don't?  All right.  Well, when -- the Judge
10 asked you about this email right here, and you said that prior
11 to that email you had received oral instructions that -- it
12 wasn't clear when the Judge was asking you the question, but I
13 need it clear for the record.  Your testimony is that you
14 received an oral instruction prior to August 22nd, 2005, which
15 told you to send the money to PDDM, correct?
16     A     No, that's wrong.
17     THE COURT:  Wasn't it Baja?
18     THE WITNESS:  Baja.
19 BY MR. RICHARDS:
20     Q     Baja.  But for the -- but it was supposed to be sent
21 to Baja for -- to ultimately go to PDDM, correct?
22     A     Correct.
23     Q     All right.  So you didn't issue a PPM with that
24 $500,000 that you knew was going for Mr. Murray, correct?
25     A     Correct.

241

```
 1        MS. LEE:  Asked and answered.
 2        THE COURT:  Overruled.
 3   BY MR. RICHARDS:
 4        Q    I mean you didn't tie any paperwork with that money
 5   you were receiving at --
 6        A    I did not know what Mr. Kenner's deal was with Mr.
 7   Murray.  So you need to be clear about that.
 8        Q    But you knew you were getting money from -- you knew
 9   you were getting money from somebody, right?
10        A    From the Palms --
11        Q    Right.
12        A    -- escrow account, yes.
13        Q    And you said that, orally, he had given you
14   contradict -- instructions that predated this email, to wire
15   it to Baja.  And then you get a written email which says wire
16   it back to Glen Murray.  We don't dispute it -- you don't
17   dispute that, correct?
18        A    Correct.
19        Q    All right.  So as the Judge pointed out, you get
20   these conflicting instructions, which you know there's going
21   to be this email sitting there to wire money to Phil Murray.
22   Why not send an email saying Phil, which one is it, so there's
23   no dispute, and then produce the email, right?
24        A    I wish I did.  I wish it was that email --
25        Q    I mean because maybe you -- did it really happen
```

242

1      that way?

2          A      Absolutely, it did.  And there was no money to wire

3      that day.  And there wasn't money until August 29th to wire.

4          Q      All right.  And then I -- and then your testimony is

5      that even though you have all these emails, all sorts of

6      emails, Mr. Jowdy, that on August 28th, you got more oral

7      instructions from Phil Kenner.  Do you remember that

8      testimony?

9          MS. LEE:  Mischaracterizes his --

10     BY MR. RICHARDS:

11         Q      You said he orally told you where to send the money,

12     right?

13         A      I don't know if it was August 28th.  I don't know

14     what day it was.  I know I got the money on August 29th, and I

15     know what he instructed me what to do with it.

16         Q      What day did he instruct you to do -- when did --

17     what day did he instruct you on orally to send the money?

18         A      I don't know exactly.  I don't know if it was the

19     same day.  I believe it was probably the same day.

20         Q      Okay.  And where were you when he instructed you to

21     send this money?  Where were you physically located?

22         A      I don't know.

23         Q      Where was Phil Kenner physically located?

24         A      I don't know.

25         Q      Do you have any records of him calling you that day?

243

1      A    I'm sure I do.  I don't know.

2      Q    Did you produce any in this litigation showing phone

3  calls that are tied into this?

4      A    No.

5      Q    And it's your testimony that between August 22nd,

6  2005 and August 29th, 2005, you can't produce a single email

7  related to my client's money.  That's your testimony, except

8  for this August 22nd email that you produced?

9      A    Which I produced.  And no, I can't.

10      Q    Okay.  So your position is that from August 22nd,

11  2005 to August 29th, 2005, the only time there's not an email

12  related to this money is when it's instructions for you to

13  send the money to your own company, is that fair to say?

14      A    I don't believe so, no.  I don't --

15      Q    Well, the only email you have between August 22nd

16  and August 29the on what to do with this money is this email,

17  right?

18      A    Correct.

19      Q    Now the Court mentioned to you that if you have a

20  handshake deal with respect to the house on Innisbrook, that

21  if someone died, how would their interest be protected.

22  Remember that question?

23      A    Yes.

24      Q    Now you have the title with Mark Thalmann as a joint

25  tenant, right?

244

```
1        A     Yes.

2        Q     So if Mark -- unfortunately, if one of you expired,

3   the property goes to the other person, correct?

4        A     Correct.

5        Q     All right.  And you're smart enough to know when you

6   take a joint tenancy, that's what happens, and that's how

7   you're protected, because you get a written deed, correct?

8        A     Correct.

9        Q     And in this case, is it really your testimony that

10  Mark Thalmann undertook a $1.5 million liability, in a state

11  where there's no anti-deficiency statute, to get just a one-

12  third interest in the house?

13       A     That's what happened.

14       Q     And that makes business sense to you?

15       A     We did a lot of things we talked about this

16  courtroom.

17       THE COURT:  Well, that's getting argumentative, counsel.

18       MR. RICHARDS:  All right.

19  BY MR. RICHARDS:

20       Q     Mr. Jowdy, at some point, you know -- your -- is it

21  your position that you and Mr. Thalmann took over -- you took

22  over all the servicing of the debt, correct?

23       A     Most of it not all of it.

24       Q     A lot of it.  And was Diamante Cabo San Lucas, they

25  were paying for the debt?
```

245

```
1      A     No.

2      Q     They never paid?

3      A     No.

4      Q     Okay.  You paid out of your salary?

5      A     Yes.

6      Q     All right.  And the debt -- you took over this debt

7   with Mr. Thalmann, and the only person that doesn't have to

8   service the debt is Mr. Kenner.  And you still believe that he

9   owns a third of the house?

10     A     Yes.

11     Q     Do you remember being asked multiple times why don't

12  you issue a quick claim deed to Mr. Kenner then and give him

13  something in writing to document the interest?

14     A     He didn't want anything to document the interest.

15     Q     Even in the last four years he hasn't wanted

16  anything?

17     A     Does he want to have his name on the house?

18     Q     You want orally --

19     A     Does he want the house?

20     Q     You want to orally move to give him a third in

21  court?

22     A     He can have the whole thing.

23     Q     Okay.  So -- and that's because the properties went

24  down now in value, right?

25     A     Well, they haven't gone up, no.
```

1    Q    Right.

2    A    There's no doubt.

3    Q    And at the time, you suggested that Mr. Kenner --

4    did you ever have access to Mr. Kenner's credit report in

5    2005?

6    A    I don't know.

7    Q    Would it be -- isn't it true you've never -- you

8    never saw Mr. Kenner's credit report in 2005?

9    A    I don't know.

10   Q    You don't remember seeing it?  Okay.  You know the

11   exhibit that counsel showed you, the August 11th, 2005 -- or

12   August 9th, 2005 letter that was sent from the Palms, that was

13   with the certified date of August 10th, that exhibit?

14   A    Right.

15   Q    All right.  Now after that letter was sent, isn't it

16   true that then the Palms indicated that they may still try to

17   work with you on getting this deal, and that's why you still

18   were trying to make efforts to get them the money?

19   A    They didn't indicate that.  We wrote that letter on

20   August 11th.  I don't think there was anything between August

21   9th and August -- and when we wrote the letter in August 11th.

22   Q    Well, no, there was that -- wasn't there that letter

23   that Sandra -- the email Sandra sent back to you saying Tom

24   sent something, we're going to talk about it?

25   A    That was August 18th.

247

```
 1        Q    August 18th.  That's what I mean.  I mean after the
 2   August 10th letter, you got a court -- you got an email from
 3   Sandra that said hey, we -- we're going to look at this now.
 4   The deal wasn't dead after you got the August 10th letter,
 5   right?
 6        A    What happened was on August 9th, the deal was dead.
 7        Q    Right.
 8        A    On August 11th, we wrote to see if it was possible
 9   to revive.  On August 12th, the money went.  And August 18th,
10   we received that letter that you're talking about, just saying
11   Tom Land will get ahold of you to discuss whatever.  And
12   that's the -- to the best of my knowledge, that's what the
13   chronology was.
14        Q    Okay.  That's fair enough.  But it wasn't like -- I
15   just want to clarify for the record.  It's not like Palms
16   responded to you there's no way we're doing the deal.  It was
17   sort of up in the air at that point when you got the August
18   18th email.  Is that a fair characterization?
19        A    Yes.
20        Q    All right.  And at some point after the 18th, around
21   the 24th or 25th, then you got cancellation instructions that
22   you had to sign in order to cancel the deal, so then your
23   money could be returned, correct?
24        A    Yes.
25        Q    All right.  And then you -- and then that's when you
```

248

```
 1    knew the deal was going -- was officially terminated was after
 2    -- around August 25th, 2005, correct?
 3         A   Whatever date that they sent that to me.
 4         Q   All right.
 5         [Counsel Confer]
 6    BY MR. RICHARDS:
 7         Q   All right.  You testified that Mr. Kenner had
 8    arranged for money to be sent back to Ula Makika of $230,000
 9    from the first refinance.  Remember that testimony?
10         A   Yes.
11         Q   Now when you say Mr. Kenner arranged, you didn't
12    give Mr. Kenner a power of attorney, did you?
13         A   No.
14         Q   And isn't it true that Mr. Thalmann had to sign all
15    the loan documents.  And we got so many loan documents.  I
16    mean isn't that true that you guys had to sign all of them?
17         A   Mr. Kenner gave Mr. Thalmann the loan documents, and
18    Mr. Thalmann signed them.
19         Q   Your -- but this is your co-owner of the house.
20         A   Yes.
21         Q   He did it with your consent, correct?
22         A   Yes.
23         Q   Because you had to take one loan out and put another
24    loan on, further encumbering your house, right?
25         A   Correct.
```

249

1      Q     You had to agree to it.  That's why you signed one

2   of the trust deeds, every single one.

3      A     Correct.

4      Q     Right?  Now when you say Mr. Kenner arranged for it,

5   isn't it true the reason why you wired back the $238,000 to

6   Ula Makika was because that was the $200,000 down payment that

7   you had borrowed plus their interest, isn't that correct?

8      A     No, it was not.

9      Q     So you're saying that Mr. Kenner somehow forced you

10  to pay him the interest back to Ula Makika?

11     A     I don't understand the question.

12     Q     Okay, let me back up.  We don't -- we both agree

13  that you got -- you received $200,000 from a company named Ula

14  Makika, right?

15     A     Okay.

16     Q     We agree on that?

17     A     Yes.

18     Q     All right. And then at some point, you get a house

19  that's in your name and Mr. Thalmann's name, correct?

20     A     Correct.

21     Q     And then at some point, you agree with Mr. Thalmann,

22  in the first refinancing, to send money back to Ula Makika.  I

23  could show you the wire receipt that --

24     A     The wire never hit our bank.  Phil Kenner arranged

25  for that loan.  Phil Kenner arranged for that money to be sent

1    directly from Wells Fargo to Ula Makika.  I'm sure Mark had to

2    sign it, but that's what was arranged.  And if --

3         Q    Well, wait.  Let's slow down here.

4         A    All right.

5         Q    I don't -- we've got to -- let's take a deep breath

6    here.

7         A    Okay.  I'll take a deep breath.

8         Q    Mark Thalmann, isn't it true he had to sign a wire

9    transfer authorizing the proceeds from that refinance to go

10   from his account to Ula Makika?  True or false?

11        A    I'm sure he did.

12        Q    All right.  Now you -- there's no -- it's your

13   testimony though you did all that simply because Phil Kenner

14   told you to.  Is that basically your testimony?

15        A    My testimony was that it was his money.

16        Q    All right.  Do you have any email saying hey, Phil,

17   I'm sending you this money back, but I just want you to know

18   that it's really your money, and we shouldn't get any credit

19   for it, because it's your money?  Do you have anything that

20   even discusses you sending the money back?

21        A    No.

22        Q    All right.  And you testified you've done three

23   refinancing on this property, correct?

24        A    I don't think I testified to that.

25        Q    Well, there was a HELOC, and then there was a refi

251

1    of 238, and then there was another one of -- well, there was

2    250.  So there's two refinancing.  So both --

3        MS. LEE:  Objection.  I don't think the second one is a

4    refinancing.

5        THE WITNESS:  Yeah.

6        MS. LEE:  It mischaracterizes testimony.  Sorry.

7        THE COURT:  I understand what it is.

8    BY MR. RICHARDS:

9        Q    Okay.  Well, a HELOC -- you drew down on the equity

10   on the HELOC.

11       MR. RICHARDS:  You know what I'm saying when I say HELOC?

12       THE COURT:  I know that a HELOC is.

13       MR. RICHARDS:  Sorry, Your Honor.  I just want to make

14   sure --

15       THE COURT:  That's all right.

16       MR. RICHARDS:  Okay.

17   BY MR. RICHARDS:

18       Q    So on the 250, you sent another 150 to Ula Makika,

19   correct?

20       A    Correct.

21       Q    And 75,000 went to another project that you were

22   doing -- that you were involved with, correct?

23       A    Correct.

24       Q    Now if you add up all the debt, it's much greater

25   than a third if you just do the straight numbers, right?

1        A    If you add all the debt?

2        Q    If you add up the 238 and the 250, we're almost

3   at -- we're at $500,000, right?

4        A    I don't know where you're getting with it, but that

5   would probably be a third of what?  Is a --

6        Q    I mean what was the house -- did you have any -- the

7   house -- by the time you guys were done leveraging this house,

8   you had $1.5 million in debt.

9        A    Correct.

10       Q    And you're saying you did all of this orally with

11  Phil Kenner, right?

12       A    Correct.

13       Q    And you must have trusted Phil Kenner that if you're

14  sending out this money, he's not going to -- he's going to

15  give you credit for wherever it's supposed to be, because

16  you're agreeing to do all this, right?

17       A    Correct.

18       Q    All with no documents, right?

19       A    A lot with no documents, yes.

20       Q    And so why is it unreasonable for Phil Kenner to

21  come in here and suggest that he negotiated this loan with you

22  and you did the whole deal for Glen Murray, and there was no

23  documents there either?  I mean -- let me withdraw the

24  question for a second.  Is it -- you guys did a bunch of deals

25  with no documents, moving money around, that benefited you all

253

1    the time, correct?

2        A    There were deals done, yes.

3        Q    I mean the Palms -- if the Palm -- you knew when you

4    got -- when you accepted your name on the Palms, you made it

5    look like that wasn't unusual, but that was a good deal for

6    you.  You got a deposit ticket on an appreciating asset,

7    correct?

8        A    Correct.

9        Q    And so, if the thing went up and made money, you

10   were expecting to get a profit of that, right?

11       A    Correct.

12       Q    And then on your house, you -- Phil was providing

13   the down payment.  And if that went up in value, you were

14   getting a profit on that deal too, correct?

15       A    If we paid the mortgage, yes.

16       Q    So you didn't have any problem putting your name as

17   an owner on the deals where you thought you were going to make

18   money.  But on Mr. Murray's deal, you don't claim any

19   ownership on that money.  Is that fair to say?

20       A    I don't have any ownership of that money.

21       Q    I'm just asking why --

22       A    But you've characterized a lot here, and you've

23   characterized -- why didn't you do this with it?  Why would

24   you do this without paperwork?  Why would you do this?  Why

25   would -- and then when it fits your story, then it's a good

```
1   thing or a bad thing.  But then when it doesn't in this case,

2   then you're saying, you know, how could not claim that one.

3   Well, that didn't exist.  There was no loan.  There was

4   nothing to memorialize.

5        Q    And --

6        THE COURT:  Counsel, I was going to -- this -- it is

7   after the hour --

8        MR. RICHARDS:  All right.

9        THE COURT:  -- and I do need to get my staff home.

10       MR. RICHARDS:  All right.

11       THE COURT:  I'm trying to keep down money that is --

12       MR. RICHARDS:  Sorry.

13       THE COURT:  -- the taxpayers have to pay out for

14  overtime.  So we're going to go ahead and recess.  But we will

15  be available at 8:30 tomorrow morning.

16       MR. RICHARDS:  No problem.  Your Honor, one question.

17  Can we -- are we going to be able to reserve like an hour

18  between us for closing tomorrow, because I think -- I just

19  want to make sure we reserve it, so --

20       MS. LEE:  And, Your Honor, if I could just interject here

21  in terms of the timeliness.  First, I know you said earlier

22  that we're going to stop tomorrow at noon.

23       THE COURT:  Right.

24       MS. LEE:  And that we were the one that request -- that

25  we weren't ready to go Monday.  Just for the record, you know,
```

255

1    we were never contacted and asked to go Monday.  That was the

2    first time I ever heard that was even available as an option.

3    Surely, we would have agreed to try to -- so we could have

4    some more time.

5              And so, in terms of the three days, it's really two-

6    and-a-half days, and they take up a day-and-a-half.  And we're

7    going to have a day I guess.  So I guess my suggestion would

8    be if we can't close tomorrow, that we reserve some time after

9    the fact to come back for closing if Your Honor is not willing

10   to have closing at 12:00.  And I know I've done those in

11   trials before this Court -- not this Court but --

12        THE COURT:  Well, we may have to do that.  But I can tell

13   you that we can't do it -- I mean we're going to close at --

14   end the trial by noon tomorrow.

15        MS. LEE:  And then Your Honor is not rejecting the notion

16   that maybe we could come back and do closings at a different

17   date?

18        THE COURT:  If that's what the parties want to do, sure.

19        MR. RICHARDS:  Well, I -- we --

20        THE COURT:  Well --

21        MR. RICHARDS:  Yeah.

22        THE COURT:  We are taking time.

23        MR. RICHARDS:  All right.

24        THE COURT:  I want you to be back here at 8:30 tomorrow.

25        MS. LEE:  Okay.  Thank you.

```
 1        THE COURT:  How many witnesses do you have, counsel?

 2        MS. LEE:  We have two besides Mister -- the completion of

 3   Mr. Jowdy, then we have two other witnesses, who we don't

 4   expect to take as much time as Mister --

 5        MR. RICHARDS:  And just as an offer of proof, Your Honor,

 6   I just -- we should -- before they call him, I really think

 7   that they're cumulative and irrelevant, you know, the lawyer

 8   from Mexico that's going to testify about PDDM and Mark

 9   Thalmann and his roommate.  And I got everything out from him.

10   And it's going to be very cumulative.  I've read his

11   deposition.

12        MS. LEE:  I don't -- it's not going to be.

13        THE COURT:  Well, we're not going --

14        MS. LEE:  I'm sorry.

15        MR. WALL:  It's not and it corroborates -- yeah.

16        THE COURT:  -- to be cumulative, but you're -- they're

17   entitled to call witnesses that they want to call.

18        MR. RICHARDS:  Yeah, that's fine.

19        MR. GOODMAN:  Judge, and my only concern is, in all

20   fairness to Mr. Kenner, who is pro se, I mean there's still,

21   you know --

22        THE COURT:  He's got to be able to produce --

23        MR. GOODMAN:  The Defendants have claims against

24   Mr. Kenner.  He hasn't been able to put on a case at all

25   either.
```

257

1    THE COURT:  I understand.  We have to worry about his

2  too.

3    MS. LEE:  Well, Your Honor --

4    THE COURT:  Mr. Kenner, how many witnesses do you

5  anticipate calling in your case?

6    MR. KENNER:  Perhaps two.

7    MR. RICHARDS:  All right.

8    THE COURT:  Okay.  I'm going to have to talk with the gal

9  in the back who is scheduling my time, to see when we've got

10  time to resume if we don't finish by noon tomorrow.  Okay?

11    MS. LEE:  Thank you, Your Honor.

12    THE COURT:  Okay. Thank you.

13    [Proceedings Concluded at 5:05 P.M.]

14

15

16

17

18

19

20

21

22

23

24

25

258

1    ATTEST:    I do hereby certify that I have truly and correctly
transcribed the audio/video recording in the above-entitled
2    case to the best of my ability.

3

4

5

6

7

8

9

10

11

12

13    _____
ANTOINETTE M. FRANKS, Transcriber

14

15

16

17

18

19

20

21

22

23

24

25

**AVTranz**
E-Reporting and E-Transcription
Phoenix (602) 263-0885 • Tucson (520) 403-8024
Denver (303) 634-2295