SLR:LDM:MMO
F. # 2013R00948

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,

      - against -

PHILLIP A. KENNER,
   also known as,
      "Philip A. Kenner," and
TOMMY C. CONSTANTINE,
   also known as
      "Tommy C. Hormovitis,"

      Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Crim. No. 13-607 (S-2) (JFB)

# GOVERNMENT'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO ENFORCE THE PROTECTIVE ORDER

ROBERT L. CAPERS
UNITED STATES ATTORNEY
Eastern District of New York
610 Federal Plaza
Central Islip, New York 11722

*Of Counsel:*

DIANE LEONARDO
MADELINE O'CONNOR
Assistant United States Attorneys

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................ii

I. PRELIMINARY STATEMENT...........................................................................1

II. ARGUMENT.........................................................................................................2

    A. The Government's Request for a Site Visit Should Be Granted..............2

    B. DCSL's Request to Modify the Protective Order Should Be Denied........6

    C. DCSL's Request to Approve the Proposed Sale of the San Marcos Property Should Be Denied.................................................................................11

    D. DCSL's Request to Approve the Proposed Settlement of the Delaware Litigation Should Be Denied.......................................................................12

III. CONCLUSION...................................................................................................13

## TABLE OF AUTHORITIES

**Federal Cases**

*De Almeida v. United States*, 459 F.3d 377 (2d Cir. 2006) ...................................................... 7, 8

*DSI Assocs. LLC v. United States*, 496 F.3d 175 (2d Cir. 2007) .................................................. 8

*Libretti v. United States*, 516 U.S. 29 (1995) ............................................................................... 8

*United States v. Nicolo*, 597 F. Supp. 2d 342 (W.D.N.Y. 2009) ............................................. 7, 8

*United States v. Regan*, 858 F.2d 115 (2d Cir. 1988) ............................................................. 8, 9

**Federal Statutes**

21 U.S.C. § 853(n) ......................................................................................................................... 8

21 USC § 853(l) ............................................................................................................................. 2

I.      **PRELIMINARY STATEMENT**

The United States of America (the "Government") respectfully submits this memorandum of law in response to the memorandum of Diamante Cabo San Lucas, LLC ("DCSL"), Kenneth Jowdy ("Jowdy"), KAJ Holdings, LLC ("KAJ Holdings"), Diamante Properties, LLC ("Diamante Properties") and Diamante Cabo San Lucas S. de R.I. de C.V. ("DCSL Mexico").[1]

As the Court is aware, by letter dated November 1, 2016, the Government sought the Court's assistance in enforcing the terms of the protective order that was so ordered by the Court on August 21, 2015 (the "Protective Order"), specifically to permit a site visit to the DCSL property and a physical inspection of the books, records, and accountings maintained on site. See Docket Entry ("DE") 408. At a status conference held on November 29, 2016, the Court requested that counsel for DCSL submit in writing its objections to a site visit. See Transcript ("TR") dated November 29, 2016. In addition, the Court requested that counsel for DCSL address its request for Court approval of a proposed sale of property, and a proposed settlement agreement with some of the victims who brought a civil action in Delaware with regard to inspecting the books and records of DCSL and Diamante Del Mar ("DDM").

In addition to seeking Court approval for the two proposals, in its memorandum of law dated December 13, 2016 ("DCSL Br."), DCLS seeks an order from this Court: 1) denying the Government's request for a site visit; 2) modifying the Protective Order; and 3) declaring that Jowdy is the rightful owner of his shares of DCSL held through KAJ Holdings. By letter dated

---

[1] Jowdy, KAJ Holdings, LLC, DCSL, Diamante Properties, and DCSL Mexico are represented by the same counsel. Jowdy's claim that he is unable to properly manage the DCSL entities may, at some point, create a conflict of interest for counsel.

1

December 19, 2016, counsel for Danske Bank joined DCSL's request with regard to modifying the Protective Order. DE 423.

As described below, the relief sought by DCSL and Danske Bank should be denied in its entirety, and the Government's request for an on-site review of the books, records and accountings, and to speak with certain individuals on the premises, should be granted.

## II.   ARGUMENT

### A. The Government's Request For a Site Visit Should Be Granted

By letter dated October 11, 2016, the United States Marshals Service ("Marshals") requested that Jowdy permit them access to the DCSL resort (the "Resort") to conduct a valuation of the property. See Government Exhibit ("GX") 1.[2] The letter set forth the Marshals' reasonable request to review certain financial records and speak with certain individuals, such as the accountant who prepared the records. Jowdy claims that this request, in essence, amounts to a warrantless search being conducted on foreign soil. See DCSL Br. at p. 22. However, pursuant to 21 U.S.C. § 853(l), the Court has jurisdiction to enter the Protective Order "without regard to the location of any property which may be subject to forfeiture." Accordingly, Jowdy's characterization of the Government's request as being a "unauthorized search warrant on foreign soil" is misplaced. The Government is merely seeking information pursuant to a validly issued protective order.

Jowdy has not complied with the Protective Order because he has not provided the Government with, inter alia, the original books and records associated with the maintenance and operation of DCSL. On September 9, 2015, the Government sent a letter to Jowdy's attorneys

---

[2] "GX" refers to Government Exhibits attached hereto.

2

requesting that Jowdy provide the Government with:

1. Profit and Loss Statements (or the equivalent) for the period 2006 to present;
2. Transfer agreements for ownership interests, for example, but not limited to, Mr. Jowdy's transfer of 1% interest to Joseph Juneau, Ethan Moreau, and Owen Nolan;
3. Records of capital contributions for the period 2005 to present;
4. List of bank accounts used by or for the benefit of Diamante Cabo San Lucas, LLC in its formation or to conduct business;
5. Sampling of spreadsheets sent by Diamante Cabo San Lucas, LLC to Danske Bank;
6. Loan agreements and modified loan agreements between Diamante Cabo San Lucas, LLC and Danske Bank;
7. Operating agreements and amended operating agreements for all LLCs involved in the formation or operation of Diamante Cabo San Lucas, including, but not limited to: KAJ Holdings, LLC; Diamante Properties, LLC; PF Ventures, LLC; CSL Properties 2006, LLC; Baja Ventures 2006, LLC; Diamante Club, LLC; Diamante CSL, LLC; and Legacy Properties, LLC; and
8. Records regarding the status of the project at Diamante Cabo San Lucas.

See GX 2, Letter dated September 9, 2015.

On February 23, 2016, the United States sent an additional request for:

1)      Detailed financial statements from August 2015 to the present, including but not limited to, general ledgers for all accounts, both United States and Mexican, relating to the operation of Diamante Cabo San Lucas ("DCSL").
2)      All DCSL credit cards statements from August 2015 to present.
3)      All DCSL records of reimbursements for business and entertainment expenses from August 2015 to present.
4)      Capital contributions for the purchase of Diamante Properties.
5)      A list of any potential large land deals (not in the normal course of everyday business).
6)      Copies of contracts or agreements relating to the use of any outside real estate brokers for regular sales and timeshare sales.
7)      Copies of invoices and payments of all legal expenses or fees being paid directly or indirectly by DCSL.
8)      Copies of all payments to Silver Peak, LLC or its employees from August 2015 to present.
9)      Records regarding Diamante Club, LLC; Diamante CSL, LLC; Diamante Life, S. De R L De CV; Diamante Development, S. de R.L. de C.V.; and Pacifico Associates, S.C., including, but not limited to, operating agreements, informal agreements, general ledgers, expenses, owners and employees.
10)     All monthly construction reports from August 2015 to present.
11)     All employee payroll records.
12)     All corporate tax returns.

See GX 3, Letter dated February 23, 2016.

3

Although DCSL provided some documentation that was responsive to the Government's requests, such as: LLC agreements and formation documents for the relevant LLCs involved in this litigation; initial capital contributions from LLC members at the time of LLC formation; loan agreements and modified loan agreements between Diamante Cabo San Lucas, LLC and Danske Bank; records regarding the status of the project at DCSL; tax returns from 2010 to 2014; and a list of bank accounts used in the operation and formation of Diamante Cabo San Lucas, LLC, the remainder of the documents sent to the Government were primarily self-created spreadsheets that purportedly represent the sales transactions of the various DCSL investment property units, overall operational expenses and losses, and budget projections.

A review of the spreadsheets revealed discrepancies and inconsistencies. For instance, in one spreadsheet produced to the Government, the sale of a DCSL investment unit that was documented in July of 2012 and recorded on a spreadsheet that was sent to Danske Bank in February of 2013, indicated that the unit sold for $51,561. See GX 4. Notably, however, this same transaction was recorded on a spreadsheet created in 2016 with a sale price for the same unit of over $550,000. See GX 5.

The Government has repeatedly spoken with Jowdy's counsel and requested that Jowdy produce the underlying documentation which was used to prepare the spreadsheets, such as, for example, actual invoices; however, Jowdy has refused to do so.

The Government submits that Jowdy's production of summary spreadsheets is not in compliance with the Protective Order, which requires the production of the actual books and records associated with the maintenance and operation of DCSL. As evidenced by the example mentioned above, the Government is unable to determine whether DCSL is being properly

4

preserved for forfeiture when the Government is being provided with little more than summaries of the actual books and records, which may not accurately reflect the true state of DCSL.

Further, the Protective Order does not prevent the Government's ability to review the books, records and monthly accountings on the premises of DCSL. In fact, the Protective Order does not specify where the production of the monthly accountings and review of the books and records should occur. The Government submits that a review of the books, records and monthly accountings at DCSL is proper in this case given their voluminous nature and Jowdy's persistent refusal to cooperate with the Government's requests when given the opportunity to supply the documentation. While Jowdy vehemently argues on the one hand that he has successfully managed DCSL, his steadfast refusal to produce many of the requested documents, to provide the documents used to create the summary spreadsheets, and to permit the Government to visit the property, suggests otherwise, and certainly is concerning. See Declaration of Kenneth Jowdy ("Jowdy Decl.") at ¶ 4. Indeed, Jowdy admits that DCSL is at risk of depreciating and diminishing in value as a default on the bank loan is "a distinct possibility," but he conveniently blames "the cloud of the Protective Order" as the reason. Jowdy Decl. at ¶ 54. The Protective Order, however, does not prevent Jowdy from managing DCSL in the ordinary course of business. Indeed, as discussed more fully below, Jowdy fails to explain how the Protective Order has hampered his ability to conduct business in the ordinary course. While Jowdy asks the Government to approve a multi-million-dollar sale of a portion of DCSL's property, as well as a settlement that depends on the ownership and value of DCSL, he nevertheless refuses to allow the Government access to the property and to review the books and records so that the Government can assess the property and determine the propriety of the sale and the settlement.

Notably, Jowdy's counsel was unable to tell the Government if any appraisal of the

property subject to the sale had been performed prior to the proposed sale, nor were they able to say whether any marketing of the property had been performed or how the prospective buyer had learned about the property for sale. Yet, Jowdy asserts that the proposed sale is an arms-length transaction. In essence, Jowdy asks the Government to accept his word about the accuracy of the spreadsheets and the propriety of the sale and settlement without producing independent, supporting information and documentation.

Danske Bank joined in Jowdy's application to amend the Protective Order and noted that Jowdy's company, KAJ Holdings, LLC, owns 40% of DCSL. See DE 423 at p. 2. Danske Bank further states, apparently in support of modifying the Protective Order, that "most major acts with regard to the Diamante Resort require the joint consent of Danske and the Borrower. For example, no sale of the resort <u>or change in ownership</u> or management of the Resort or the Borrower can occur without Danske's consent." Id. (emphasis supplied). Ostensibly, Danske Bank is not aware that Jowdy gave away a 5% interest in KAJ Holdings to five individuals without Danske Bank approval, and KAJ Holdings now owns only a 35% interest in DCSL. See Jowdy Decl. at ¶ 7.

It is unclear why Jowdy, if he is truly maintaining a transparent operation as he claims, is adamantly opposed to an on-site review of the actual books and records. Based upon the above described discrepancies, the spreadsheets and compilations made by unknown persons are insufficient to demonstrate that the Resort is being properly managed and preserved for forfeiture.

### B. <u>DCSL's Request to Modify the Protective Order Should Be Denied</u>

Jowdy's request that the Court modify the Protective Order should be denied because the Protective Order is aimed at preserving the entire property for forfeiture, rather than specific

6

ownership interests in the property, and because Jowdy has failed to articulate any legitimate need for a modification. In his opposition to the Government's motion to enforce the Protective Order, Jowdy requests that the Protective Order be limited so that it applies only to defendant Philip Kenner's ("Kenner") interest in DCSL purportedly held through Baja Ventures 2006, LLC. See DCSL Br. at p. 19. According to Jowdy, the Government did not make a showing in its application for a Protective Order to justify a restraint on Jowdy's interest in DCSL through KAJ Holdings or a showing that Jowdy had any knowledge or involvement in the fraud. See id. Jowdy's arguments, however, fail to recognize that the Government seeks, inter alia, to forfeit the entire DCSL property as property that was involved in Kenner's and co-defendant Tommy Constantine's money laundering conspiracy. See Government's Memorandum of Law in Support of Entry of an Order of Forfeiture at pp. 20-27. DE 401. Indeed, in granting the Protective Order, the Court found probable cause to believe that the entire DCSL property is subject to forfeiture. See Protective Order at ¶ 9. Thus, the Protective Order is properly aimed at preserving the entire DCSL property for forfeiture, rather than mere portions of the property. See id.

Moreover, at this stage in the forfeiture proceedings, the ownership of DCSL, including Jowdy's purported ownership, is irrelevant. See De Almeida v. United States, 459 F.3d 377, 381 (2d Cir. 2006) (criminal forfeiture is not limited to the property of the defendant; any property involved in the offense of conviction may be forfeited; it is only to protect the due process rights of third parties that there must be a post-trial ancillary proceeding; thus, the Government does not have to establish the defendant's ownership of the property to seize it pending trial or to obtain a preliminary order of forfeiture, and the third party cannot complain that he was forced to wait for the ancillary proceeding to assert his rights); United States v. Nicolo, 597 F. Supp. 2d

342, 346 (W.D.N.Y. 2009) (in the forfeiture phase of the trial, the court "is not to consider and resolve the potentially thorny issues concerning third party ownership of property sought to be forfeited;" if the Government establishes the required nexus to the offense, the property must be forfeited; if the property used to facilitate defendant's money laundering offense belonged to his wife, she will have an opportunity in the ancillary proceeding to make that claim). It is not until a preliminary order of forfeiture has been entered that a third party may assert a claim to the forfeited property. See Libretti v. United States, 516 U.S. 29, 44 (1995) ("Once the Government has secured a stipulation as to forfeitability, third-party claimants can establish their entitlement to a return of the assets only by means of the hearing afforded under 21 U.S.C. § 853(n)."); De Almeida, 459 F.3d at 381 ("An ancillary proceeding is evidently the only avenue for a post-indictment third-party claim to forfeited property."); DSI Assocs. LLC v. United States, 496 F.3d 175, 183-84 (2d Cir. 2007) ("It is similarly well settled that section 853(n) provides the exclusive means by which a third party may lay claim to forfeited assets -- after the preliminary forfeiture order has been entered."). As such, Jowdy's repeated arguments throughout his opposition that the Government cannot forfeit his alleged interest in KAJ Holdings are premature.

Jowdy relies on United States v. Regan, 858 F.2d 115 (2d Cir. 1988) to support his request that the Protective Order be modified. See DCSL Br. at pp. 18-19. However, Regan in fact, supports the Government's position that the Protective Order in this case is proper. In Regan, the potentially forfeitable property included the value of the defendants' partnership interests in the business partnership, the Princeton/Newport Group. Id. at 119. Thus, the defendants were restrained from withdrawing their partnership interests. Id. The restraining order also "prohibit[ed], without prior approval, non-ordinary-course-of-business transactions by

the Princeton/Newport Group and provide[d] for review by a Government-designated monitor." Id. The Princeton/Newport Group challenged the portion of the restraining order that prohibited unapproved transactions which were not in the ordinary course of business. Id.

There is a significant distinction between the restraining order in Regan, which affected all of Princeton/Newport Group's assets, including non-forfeitable property belonging to third parties, see id. at 120, and the Protective Order in this case, which affects only the DCSL property that is forfeitable in its entirety. Moreover, while recognizing that the protective order in Regan affected unindicted third parties, the Second Circuit nevertheless held that the restraining order was necessary to preserve the property for forfeiture. Regan, 858 F.2d at 120-21. The Second Circuit reasoned that an order limited in application to the defendants' partnership interests might have been rejected by the district court as providing inadequate protection of the forfeitable property. Id. at 120. In addition, the Second Circuit observed that the protective order did "not totally freeze the assets of the Princeton/Newport Group but rather limits its transactions, without prior approval, to those in the ordinary course of business and provides for monitoring." Id. at 121. Although the third parties "suggest[ed] that even that order w[ould] impair the Princeton/Newport Group's attractiveness to lenders or investors," the Second Circuit was "unable to gauge the degree or even the existence of such harm, . . . and therefore [was] unwilling to conclude that such a speculative impairment outweigh[ed] the Government's interest in preserving for forfeiture the assets in question." Id.

Here, too, while Jowdy claims that the Protective Order "continues to have a negative effect and hampers development at DCSL," he alleges in only general and conclusory terms that DCSL has been unable to obtain financing for time share installment loans and to market and sell other large parcels of land. See DCSL Br. at p. 10. Jowdy fails to offer any evidence in support of these

9

assertions or to refer to any specific deals that were lost due to the Protective Order. Given that the Protective Order permits the management of the property in the ordinary course of business, it is questionable how the Protective Order could be the reason for these claimed negative impacts.

Further, and contrary to Jowdy's claims that DCSL has been negatively impacted by the Protective Order, a brand new golf course at DCSL, designed by Tiger Woods, opened last week with a gala celebration. See Government Exhibit 6, Diamante Cabo San Lucas Facebook page, December 9, 2016 at 6:34 p.m. ("Getting ready for cocktails, great food, and a Q&A session with Tiger and Ken Jowdy with hundreds of members and guests in attendance. What a great celebration for the Diamante family. #TheOasisShortCourse.")

In addition, in October 2015, an independent appraisal of DCSL, requested by Danske Bank, appraised the entire Resort at $330 million dollars after the Protective Order was granted. And, in June 2016, at a conference for Hotel and Resort Development, Jowdy, as a moderator for a discussion on the "Resurgence of Cabo," represented that:

> Ken Jowdy is the Founder & Chief Executive Officer of Diamante Cabo San Lucas, a luxury resort and real estate development located on the Pacific Coast of Cabo San Lucas, Mexico. Mr. Jowdy has been in the resort and real estate development industry for over 15 years and currently oversees all aspects of the Diamante project including the master planning, design, permitting, construction, finance, sales, and operation of the resort. Diamante is now home to over 150 real estate and shared ownership villas, 2 championship golf courses, a 10-acre man-made Crystal Lagoon, and 5 bar / restaurants among other facilities. Under Mr. Jowdy's direction, the project has generated over $300 million in sales and has attracted more than 5,000 members, establishing it as one of the fastest growing resort development projects in Cabo San Lucas.

See GX 7 (emphasis added).

Finally, within the proposed settlement agreement paperwork from the Delaware lawsuit, described further below, a proposed press release asserts that "residence club and real estate sales are brisk and the Resort is well on its way to meeting its 2016 sales targets for the year." See DCSL Exhibit L, Settlement Agreement, Exhibit E, dated in or about July 2016.

10

In sum, the Protective Order is necessary to preserve the entire DCSL property for forfeiture, and neither Jowdy nor DCSL have set forth any evidence that the issuance of the Protective Order has caused a negative impact on DCSL. Accordingly, DCSL's application to modify the Protective Order should be denied.

### C. DCSL's Request to Approve the Proposed Sale of the San Marcos Property Should Be Denied

On or about September 28, 2016, counsel for DCSL sought the Government's approval for the sale of a parcel of land known as "San Marcos." At a meeting with counsel for DCSL, the Government simply requested an appraisal of the property. To date, an appraisal has not been provided.

The Marshals requested access to the site to complete a valuation of the entire Resort, not just a property appraisal of the smaller San Marcos property. In conjunction with the proposed sale of the San Marcos property, DCSL appears to be amenable to allowing two employees of the Marshals to travel to the Resort to appraise the property, but not to speak with anyone or review original books and records.

However, a valuation of the entire Resort property is necessary in order to value a smaller portion of the property located therein. The fair market value of the approximately 12-acre San Marcos property has not been independently determined by an appraisal.

Counsel for Danske Bank was asked by the Government to provide an appraisal of the San Marcos property, if any such appraisal exists, and to provide information about the marketing of the property. To date, Danske Bank has not responded. Again, it is unclear why, if this proposed sale is truly at market value and at arms-length, neither Danske Bank nor DCSL

11

have obtained an independent appraisal of the San Marcos property or provided marketing information.

### D. DCSL's Request to Approve the Proposed Settlement of the Delaware Litigation Should Be Denied

Counsel for DCSL sought the Government's approval for a settlement agreement in litigation brought in Delaware by shareholders of CSL Properties and Diamante Del Mar ("DDM"). Again, the Government requested additional information from counsel for Jowdy with respect to the terms of the proposed settlement.

Jowdy asserted that members of CSL Properties contributed $2 million dollars to the down payment for DCSL, and, in return, CSL Properties received an 8% interest in DCSL. See Jowdy Decl. at page 7, footnote 4; see also FORFEITURE EXHIBIT 93, at page PK_SEC 015892, attached hereto. However, Jowdy's proposed settlement agreement provides contradictory information. The proposed settlement agreement reflects a $2.3 million capital contribution by CSL Properties. See DCSL Exhibit L at Exhibit E. Thus, the chart of ownership percentages in the proposed settlement agreement differs from the original chart and reflects an additional $300,000 in capital contributions by the hockey player victims. Compare FORFEITURE EXHIBIT 93 with DCSL Exhibit L at Exhibit E. Notably, the Government previously requested that Jowdy provide the books and records which show the capital contributions of CSL Properties and which would explain where the missing $300,000 has been recorded by DCSL since 2006. To date, Jowdy has not provided the accounting.

In addition, the proposed settlement provides for future profits of Jowdy's to be paid directly to the members of CSL Properties. To date, based upon conversations with Jowdy's counsel, Jowdy has not realized profits through KAJ Holdings and he is not sure when, or if, he

12

will realize profits through KAJ Holdings. However, a number of Jowdy controlled entities, such as, Legacy Properties, conduct business with DCSL and receive payments directly from DCSL. It is unclear why KAJ Holdings has not received any profits or distributions.

Nevertheless, the current terms of Jowdy's proposed settlement cannot be approved because KAJ Holdings' ownership interest in DCSL is subject to forfeiture, and Jowdy's ownership interest in KAJ Holdings, if any, will not be determined until the ancillary proceeding. Accordingly, DCSL's request to approve the proposed settlement should be denied.

### III.   CONCLUSION

For the foregoing reasons, the Government's request to enforce the Protective Order should be granted and DCSL's requests to modify the Protective Order and for Court approval of the sale of the San Marcos property and the settlement agreement in the Delaware litigation should be denied.

Dated: Central Islip, New York
       December 22, 2016

Respectfully submitted,

ROBERT L. CAPERS
United States Attorney
Eastern District of New York

By:    /s/ Diane C. Leonardo
Diane C. Leonardo
Madeline O'Connor
Assistant U.S. Attorneys
(631) 715-7854/7870