UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x

UNITED STATES OF AMERICA,

    - against -

PHILLIP A. KENNER,
    also known as,
        "Philip A. Kenner," and
TOMMY C. CONSTANTINE,
    also known as,
        "Tommy C. Hormovitis,"

                Defendants.

--------------------------------------------------------x

Crim. No. 13-607 (S-2) (JFB)

---

**REPLY MEMORANDUM OF DIAMANTE CABO SAN LUCAS, LLC, KENNETH JOWDY, KAJ HOLDINGS, LLC, DIAMANTE PROPERTIES, LLC, AND DIAMANTE CABO SAN LUCAS S. DE R.L. DE C.V. IN SUPPORT OF MODIFICATION OF THE PROTECTIVE ORDER AND APPROVAL OF CERTAIN TRANSACTIONS, AND IN OPPOSITION TO THE GOVERNMENT'S REQUEST FOR SITE ACCESS, DOCUMENTS AND INTERVIEWS BEYOND THE SCOPE OF THE PROTECTIVE ORDER**

---

PEPPER HAMILTON LLP
Thomas McC. Souther, Esq.
620 Eighth Avenue, 37th Floor
New York, New York 10018-1405
Tel. (212) 808-2729

FARRELL FRITZ, P.C.
Kevin P. Mulry, Esq.
1320 RXR Plaza
Uniondale, New York 11556-1320
Tel. (516) 227-0620

**TABLE OF CONTENTS**

**Page No.**

I. The Protective Order Does Not Permit The Government to Conduct a Search of DCSL Parties' Records and the Interrogation of Related Employees ................................ 1

II. The Government has Relied on Conclusory Statements Rather than Facts to Justify the Protective Order ........................................................................................... 4

III. The Proposed Sale of the San Marcos Parcel Is in the Best Interests of the Development ............................................................................................................... 6

IV. The Majority in Interest of the Shareholders Who Were Former Kenner Clients Support the Proposed Settlement ............................................................................... 8

CONCLUSION ........................................................................................................................... 10

Diamante Cabo San Lucas, LLC ("DCSL"), Kenneth Jowdy ("Jowdy"), KAJ Holdings, LLC ("KAJ Holdings"), Diamante Properties, LLC, and Diamante Cabo San Lucas S. De R.L. De C.V. (collectively, the "DCSL Parties") respectfully submit this reply memorandum: (1) in further support of their application (a) for relief from the Post-Conviction Protective Order dated August 21, 2015, DN 330 (the "Protective Order"); (b) for approval of the settlement of civil actions pending in the Delaware Court of Chancery; and (c) for approval of the proposed sale of a parcel of the DCSL property for the San Marcos Condominium Development; and (2) in opposition to the Government's memorandum dated December 22, 2016 (DN 425) seeking access to the DCSL property, compelled interviews of individuals and on-site inspection of documents, all of which go well beyond the provisions of the Protective Order.

## I. The Protective Order Does Not Permit The Government to Conduct a Search of DCSL Parties' Records and the Interrogation of Related Employees

It is remarkable that the Government boldly states that the Protective Order gives them the right to conduct what is tantamount to a warrantless search and forensic audit of the books and records of the Diamante Cabo San Lucas resort development ("Diamante" or the "Subject Property"), but they fail to cite any specific language in the Protective Order that purports to give them that right. Similarly, they claim they are entitled to interview individuals who work at the Diamante resort development project in Mexico, but again they fail to cite any language in the Protective Order that purports to support their position. Moreover, the Government glosses over the fact that this intrusive conduct on the part of the Government is to take place in a foreign country, and the Government simply cites general language in the forfeiture statute that jurisdiction is "without regard to the location of any property which may be subject to forfeiture under this section" to justify this extraterritorial assertion of jurisdiction. See DN 425 at p. 2, and 21 U.S.C. § 853(l). The Government's argument is overly simplistic, because it fails to consider whether the property located in a foreign country that may be subject to forfeiture is

within the actual or constructive control of the district court in which the current action is pending.  See U.S. v. All Funds on Deposit in Any Accounts in the Names of Meza, et al., 63 F. 3d 148 (2d Cir 1995).[1]  The Government's position is misguided.

The Protective Order requires Mr. Jowdy to "provide a monthly accounting of revenues and expenses associated with the management of the Subject Property, which [the Government] shall have the right to inspect."  Protective Order, DN 330 at pp. 4-5 of 29 Page ID #9087-9088.  Such an accounting of revenue and expenses is prepared monthly and provided to the lender, Danske, and it is that monthly accounting that Government has the right to inspect, not the property and the books and records located in Mexico.  Contrary to the Government's assertion that these monthly reports are "summary spreadsheets", the monthly reports are detailed spreadsheets that reflect monthly revenue and expenses for the entire project.  The spreadsheets not only show actual and budgeted revenues and expenses for the month in question, but they also show a cumulative actual and budget comparison for the full calendar year in question.  The monthly reports through the period ending October 31, 2016 have been provided to the Government, and any suggestion on the part of the Government that Mr. Jowdy or any of the DCSL Parties has not complied with the Protective Order is unfair and inaccurate.

The Protective Order further provides, in pertinent part, that Mr. Jowdy produce any books or records associated with the maintenance and operation of the Subject Property within ten (10) business days of any request made by the United States.  Protective Order, DN 330 at p. 5 of 29 Page ID # 9088.  Mr. Jowdy and the DCSL Parties have provided the Government with

---

[1] Although U.S. v. All Funds on Deposit, 63 F. 3d 148 (2d Cir. 1995) is a civil forfeiture action, the Second Circuit's conclusion that "in order to initiate a forfeiture proceeding against property located in a foreign country, the property must be within the actual or constructive control of the district court in which the action is commenced" raises serious questions about the Government's theory that the Diamante resort development project as a whole is subject to forfeiture.  U.S. v. All Funds on Deposit, 63 F. 3d 148, 153; but see U.S. v. Batato, 833 F. 3d 413 (4th Cir. 2016) (holding that the district court in that case had jurisdiction over assets located in foreign countries).  Accordingly, if the entire Diamante resort development project may not be subject to forfeiture because of its location in a foreign country, the DCSL Parties submit that the Court does not have jurisdiction to direct that the Government may conduct site visits to examine the books and records and interview employees in Mexico either.

thousands of pages of documents in response to their requests and have attempted to fully cooperate with the Government since August 2015, as they have since the inception of this investigation. Indeed, on at least eleven occasions since August 24, 2015, counsel for the DCSL Parties has provided documents to the Government, both voluntarily and in response to the Government's requests.[2] Despite the production of thousands of pages of financial documents by the DCSL Parties, the Government never seems satisfied and reverts to its vague, overly broad, and unduly burdensome request that they want to see the "original books and records" of the project. When pressed to articulate what records in particular they are looking to examine, or what if any questions they have about the financial documents produced to date, their response in substance is always the same, we do not know, we just want to see the original books and records. Such a response blatantly demonstrates that their sweeping request to examine the original books and records and invoices is nothing more than a fishing expedition.

The DCSL Parties are willing to continue to provide the Government with the monthly reports that detail the revenues and expenses associated with the management of the Diamante development. These are the same reports that the project's lender, Danske, and Danske's independent advisors receive to monitor the more than $180 million that Danske has at stake in the project. If the Government is seeking more than what is provided to Danske, they should be required to articulate with some specificity what it is they are seeking and why.[3] Mr. Jowdy and the DCSL Parties are not defendants in this case, and they should not be treated as such. They have been unfairly tarnished by the Government's unwarranted characterization of Mr. Jowdy as a co-conspirator, and unjustly maligned as a result. Not only does such a characterization of Mr.

---

[2]   The two document requests referenced on page 3 of the Government memorandum were responded to in writing on September 18, 2015 and October 26, 2015, and March 8, 2016, respectively.

[3]   If such a showing is made and the Court requires production of specific documentation, the Government should pay the costs of assembling and producing the documentation it seeks from non-parties.

3

Jowdy flout the directive of the U.S. Attorney's Manual that "federal prosecutors should remain sensitive to the privacy and reputation interests of uncharged third-parties", but it is damaging to Mr. Jowdy personally and it is harmful to the project.  *See*, United States Attorneys' Manual, 9-27.760 (December 2014).

## II. The Government has Relied on Conclusory Statements Rather than Facts to Justify the Protective Order

The Government ignores the arguments presented by the DCSL Parties in support of their application to modify the Protective Order to restrain only Kenner's interest.  The Government leaves completely unanswered the fact that the Affidavit of FBI Agent Matthew Galioto was conclusory, unsupported by evidence, and factually inaccurate in its description of Jowdy.  DCSL Parties Mem. at 8-9, 11-13, 18-19.  Also, the Government leaves completely unrebutted the evidence demonstrating that Jowdy is a bona fide purchaser for value of his interest in the DCSL property with no knowledge of any fraud by Kenner.  DCSL Parties Mem. at 10-13, 18-19; *see also* Jowdy Declaration.

In August 2015, the Government made an *ex parte* application for a post-conviction protective order to preserve the Subject Property, because the Government purportedly had "reason to believe that the Subject Property is at risk of being sold, transferred, assigned, pledged, distributed, encumbered, wasted, secreted, depreciated, damaged, or diminished in value by the actions of Kenner, Jowdy, and/or any other interested parties if a protective order is not issued."  DN 330 at page 20 of 29 Page ID #9103.  The application relied on the Galioto Affidavit in making that representation to the Court.  The DCSL Parties submit that there is only one paragraph in the Galioto Affidavit that seems to serve as the fundamental basis for that representation, and that is paragraph 33 of the Galioto Affidavit.

4

It is worth revisiting paragraph 33 of the Galioto Affidavit, which states:

> "Upon information and belief, there is a strong likelihood that Jowdy may attempt to sell, transfer, pledge, or assign his interest in the Subject Property to a third party or parties. There are also grounds to believe that Jowdy is not currently fulfilling his fiduciary duties as managing member of the Subject Property and is currently taking measures to waste, damage, depreciate, or generally diminish the value of the Subject Property."

Galioto Affidavit DN 330 at pages 16-17 of 29 Page ID # 9099-9100.

A handwritten footnote added to the end of the second sentence of paragraph 33 further stated "On or about August 13, 2015, during a conference call with members of CSL Properties, Jowdy indicated that he was actively negotiating the sale of his interest in the Subject Property." DN 330 at page 17 of 29 Page ID #9100. In the absence of this handwritten addition to the Galioto Affidavit, paragraph 33 merely made conclusory statements critical of Mr. Jowdy in an attempt to justify the Government's application. The addition of the footnote arguably supports the allegation in the first sentence of paragraph 33, but there is no allegation by Galioto to support the incredibly damning accusation that Mr. Jowdy was not then fulfilling his fiduciary duties as managing member and was taking measures to waste, damage, depreciate, or generally diminish the value of the Subject Property.

Within a matter of days of obtaining the Protective Order, the Government was provided with the details of the Silverpeak transaction, which was what was described on that August 13, 2015 conference call. The Government took no steps to clarify for the Court, to the extent the Court was left with the mistaken impression that Mr. Jowdy was actively negotiating to sell his entire interest in the Diamante project, that such an understanding was inaccurate.

Sixteen months have passed since the Government obtained the Protective Order and was provided with the details of the transaction described on that August 13, 2015 call with the CSL Properties investors. Not only has the Government failed to clarify that inaccurate representation

5

in the Galioto Affidavit, but they have yet to articulate a single fact to support the second sentence of paragraph 33 that accuses Mr. Jowdy of not fulfilling his fiduciary duties. The DCSL Parties submit that the Government used conclusory assertions to wrongfully obtain the Protective Order in the first place, and now it is attempting to expand the scope of the Protective Order to obtain what is in effect a warrantless search of the DCSL Parties' books and records and compelled interviews without articulating any colorable factual basis to justify that action.

The interests of third parties, while generally addressed in an ancillary proceeding, *see* DCSL Parties Mem. at 13 n.2, are unquestionably relevant to the scope of any Protective Order issued by the Court, particularly where the interests of non-defendants are affected. *United States v. Regan*, 858 F.2d 115, 121 (2d Cir. 1988). The Court should consider the DCSL Parties' interests in determining whether to modify the scope of the Protective Order, particularly where there has been an unrebutted showing that the Government's affidavit in support of the Protective Order was deficient and that Jowdy is a bona fide purchaser for value of his interest in the DCSL project with no knowledge of any fraud by Kenner. The Protective Order should be modified to restrain only Kenner's interest, and the Government's request to expand the scope of the Protective Order should be denied.

### III. The Proposed Sale of the San Marcos Parcel Is in the Best Interests of the Development

The Government's suggestion in its memorandum that it "simply requested an appraisal of the property" in connection with the proposed parcel sale is disingenuous, at best. In the meeting on September 28, 2016, and in subsequent telephone conversations with the US Attorney's office and the case agents, and one call that also included the United States Marshals Service ("USMS"), the Government's request went well beyond requesting an appraisal of the property. The DCSL Parties expressed a willingness to facilitate an appraisal, but the Government insisted that any such visit to the property should necessarily include a complete

6

review of the books and records of the project and interviews of a variety of people about subjects going far beyond anything remotely considered related to an appraisal. Moreover, the Government's memorandum conveniently neglects to mention that the Government also was proposing that the case agents, including Agent Galioto, accompany the representatives of the USMS to Mexico and participate in the interviews and the review of the DCSL Parties books and records, because the agents are more familiar with the project's operations than the USMS. The suggestion by the Government that the case agents participate in the site visit raises serious questions about whether the Government is interested in an appraisal of the property, or merely using the request for an appraisal as a pretense to conduct what is tantamount to a warrantless search.

Ironically, when we had a conference call with the Government, including the USMS, the representatives from the USMS indicated they were not appraisers, so they would have to speak with representatives of the DCSL Parties in Mexico to understand the real estate market in Mexico. This seems to conflict with the proposed purpose of sending a US Government representative down to the property to conduct an appraisal.

In addition, Danske, which does understand the Cabo San Lucas market and has $180 million at stake, is fully supportive of the parcel sale. Significantly, the proposal presents an opportunity greater than a mere sale of property, because the purchaser will undertake vertical development of the property. The parcel is also less valuable than other parcels because it is not oceanfront property.

In short, the DCSL Parties were willing to arrange with the Government for an appraisal, but object to a search that goes beyond the requirements of the Protective Order. Moreover, the parcel sale has been examined by Danske and the bank completely supports the sale. The Government's objection to the parcel sale should be rejected and the sale should be approved.

7

### IV. The Majority in Interest of the Shareholders Who Were Former Kenner Clients Support the Proposed Settlement

The Government opposes the proposed settlement and makes a statement in the opening paragraph of that section of its memorandum that could be read to suggest that Mr. Jowdy and the DCSL Parties were not cooperating. The Government states "Again, the Government requested additional information from counsel for Jowdy with respect to the terms of the proposed settlement," Doc 425 at p. 15 of 16 Page ID #11981, but fails to mention what information was requested by the Government, and what if any response they received. One might reasonably construe the Government's memorandum to be suggesting that Mr. Jowdy and the DCSL Parties refused to provide the requested information. The Government knows full well that such a suggestion is inaccurate.

At the meeting with the Government on September 28, 2016 to discuss the settlement that Mr. Jowdy had reached with the majority in interest of the hockey player investors, the Government asked for the production of all of the discovery that had been made available to the plaintiff hockey players in the Delaware litigations. While such an overly broad request seemed a bit excessive in order for the Government to be able to evaluate the terms of the settlement agreement, which was the reason given by the Government to justify the request, the DCSL Parties agreed to provide the requested documentation. On October 13, 2016, counsel for the DCSL Parties forwarded to the Government by overnight courier a CD that contained all of the documents produced by the DCSL Parties in the Delaware litigation.

The majority in interest of the hockey player investors have evaluated the proposed settlement agreement and had the benefit of their own legal counsel advising them as to the merits of the agreement. They have concluded that this settlement agreement presents the best opportunity for them not only to possibly recover their initial investment, but if the Diamante project is successful, to realize a return on that investment. Certainly, not all of the hockey

8

player investors have reached that conclusion, but the majority in interest have. Obviously, there is no guarantee that there will ever be any profits generated for distribution to the DCSL investors. One thing, however, arguably is certain. If the Government continues its dogged pursuit of the forfeiture of Mr. Jowdy's interests and the Subject Property and there is a default under the loan agreement, everybody will lose, because the investor equity in the project, to the extent any currently remains, likely will be eliminated.

The Government essentially presents no reason why it seeks to stand in the way of a settlement that the hockey players agreed to as being in their best interest, after a day-long mediation conference before a former Vice Chancellor of the Delaware Court of Chancery. The Government has simply decided that its judgment of what is in the best interest of the hockey players is better than that of the hockey players. The Court should reject the Government's opposition and approve the settlement of the Delaware litigation.

## **CONCLUSION**

For the reasons stated herein and in the DCSL Parties' original memorandum and the Jowdy Declaration, the DCSL Parties respectfully request that the Court: (a) modify the Post-Conviction Restraining Order dated August 21, 2015 to provide that its restrictions apply only to the interests of the defendant, Philip Kenner; (b) approve the settlement of civil actions pending in the Delaware Court of Chancery; (c) approve the proposed sale of a parcel of the DCSL property for the San Marcos Condominium Development; and (d) deny the Government's request for access to the property, interviews of individuals and on-site inspection of documents, because all of those requests go well beyond the provisions of the Protective Order.

Dated: New York, New York
January 4, 2017

Respectfully Submitted,

PEPPER HAMILTON LLP

*s/ Thomas McC. Souther*

By: _____

Thomas McC. Souther
620 Eighth Avenue, 37th Floor
New York, New York 10018-1405
Tel. (212) 808-2729


FARRELL FRITZ, P.C.

*s/ Kevin P. Mulry*

By: _____

Kevin P. Mulry
1320 RXR Plaza
Uniondale, New York 11556-1320
Tel. (516) 227-0620