F.#2013R00948

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA

      - against -                     No. 13-CR-607 (S-2) (JFB)

PHILLIP A. KENNER,
      also known as
        "Philip A. Kenner," and
TOMMY C. CONSTANTINE,
      also known as
        "Tommy C. Hormovitis,"

           Defendants.

– – – – – – – – – – – – – – – – X

## THE GOVERNMENT'S RESPONSE
## TO KENNER'S SUPPLEMENTAL POST-TRIAL MOTION

ROBERT L. CAPERS
United States Attorney
Eastern District of New York

Saritha Komatireddy
Assistant U.S. Attorney
    (Of Counsel)

PRELIMINARY STATEMENT

On July 9, 2015, following approximately nine weeks of trial, a jury convicted defendant Phillip A. Kenner on six of the nine counts with which he was charged: one count of conspiracy to commit wire fraud (Count One, 18 U.S.C. § 1349), four counts of wire fraud (Counts Two through Four and Seven, 18 U.S.C. §§ 1343), and one count of money laundering conspiracy (Count Nine, 18 U.S.C. § 1956(h)).  The jury acquitted Kenner on three counts of wire fraud (Counts Five, Six, and Eight, 18 U.S.C. §§ 1343).[1]

After the jury verdict, the Court ordered that post-trial motions be filed by August 1, 2015.  On July 29, 2015, Kenner filed a letter stating that he would not file a motion pursuant to Federal Rule of Criminal Procedure 29, but that he intended to join in Constantine's motion pursuant to Federal Rule of Criminal Procedure 33.  ECF No. 325.  On November 23, 2015, Constantine filed his post-trial motion.

On November 28, 2016, Kenner filed a separate motion for a new trial pursuant to Federal Rule of Criminal Procedure 33.  The motion consists of more than 300 pages in argument and more than 650 exhibits.  ECF No. 416.  Except for one document, which is not material, Kenner's motion sets forth no newly discovered evidence.  Instead, in his motion, Kenner essentially attempts to re-litigate the trial on paper — unconstrained by the Federal Rules of Evidence and this Court's trial rulings on relevance and scope — by relying on troves of hearsay from documents produced in pretrial discovery, rehashing theories submitted to the jury at trial, and offering further testimony and argumentation of his own.  The Court should reject Kenner's motion.

---

[1] The government incorporates by reference the facts set forth in its previously filed opposition to Constantine's post-trial motions.  See ECF No. 370.

ARGUMENT

I.     Points I and III of Kenner's Motion are Untimely

      A.     Applicable Law

           A motion for a new trial based upon newly discovered evidence must be made within three years "after the verdict or finding of guilty."  Fed. R. Crim. P. 33(b)(1).  A motion for a new trial on any basis other than newly discovered evidence must be made within 14 days of the verdict.  Fed. R. Crim. P. 33(b)(2).  A court may extend the time for filing a motion (1) before the expiration of the period as prescribed by the rule or as previously extended by the court, or (2) after the prescribed time has expired in cases of "excusable neglect."  Fed. R. Crim. P. 45(b)(1)(B).

      B.     Argument

           In this case, after the jury verdict, the Court ordered that post-trial motions be filed by August 1, 2015.  On July 29, 2015, Kenner filed a letter stating that he would not file a motion pursuant to Federal Rule of Criminal Procedure 29, but that he intended to join in Constantine's motion pursuant to Federal Rule of Criminal Procedure 33 insofar as such motion presented common issues of law and fact for the Court's consideration.  ECF No. 325.  On November 23, 2015, Constantine filed a motion requesting a judgment of acquittal or new trial on all counts of conviction.  More than a year later, on November 28, 2016, Kenner filed this separate motion for a new trial pursuant to Federal Rule of Criminal Procedure 33.

           As Kenner filed this motion after the prescribed time expired, he bears the burden of showing excusable neglect.  Fed. R. Crim. P. 45(b)(1)(B).  He has made no such showing.  Kenner's initial letter to the Court made clear that he would be joining

2

Constantine's motion, not filing his own.  One year later, it appears that Kenner simply

changed his mind.  Although the Court did invite Kenner to submit documents "uncovered . .

. since the trial" as well as certain select testimony for consideration in the context of the

forfeiture determination, ECF No. 416 at 4-5, Kenner's motion includes far more than those

two limited categories.  Nearly all of Kenner's motion relies on documents and testimony

available at trial (not "uncovered . . . since the trial").  Moreover, much of the motion relies

on documents that would have been inadmissible hearsay at trial or otherwise run afoul of

this Court's rulings on relevance and the scope of the case.  Kenner's brazen disregard for

the Court's instructions evidences bad faith.  In addition, it was within Kenner's reasonable

control to file his motion earlier — especially with respect to the portions that rely on

information available at trial — and accepting such a lengthy motion in its entirety at this late

stage risks delaying the resolution of this matter and prejudices the government's ability to

bring closure to the victims in this case.  See United States v. Munoz, 605 F.3d 359, 368 (6th

Cir. 2010) (discussing factors to be considered in determining excusable neglect).

       Kenner requests that the instant motion be deemed nunc pro tunc to the date of

his July 29, 2015 letter.  Nunc pro tunc approval should only be granted in extraordinary

circumstances.  In re Keren Ltd. Partnership, 189 F.3d 86, 87 (2d Cir. 1999).  For the reasons

stated above, extraordinary circumstances are not present either.

II.    A New Trial is Not Warranted

       Rule 33(a) of the Federal Rules of Criminal Procedure provides that "[u]pon

the defendant's motion, the court may vacate any judgment and grant a new trial if the

interest of justice so requires."  Fed. R. Crim. P. 33(a).  Rule 33 motions are granted only in

"extraordinary circumstances" and only if the district court finds that there is "a real concern

that an innocent person may have been convicted." United States v. McCourty, 562 F.3d 458, 475 (2d Cir. 2009) (internal quotation marks omitted). "It is only when it appears that an injustice has been done that there is a need for a new trial in the interest of justice." United States v. Bell, 584 F.3d 478, 483, 487 (2d Cir. 2009) (internal quotation marks omitted).

A.      The Government Did Not Commit a Brady Violation

1.      Applicable Law

A motion for a new trial based on an allegation that the government failed to disclose, or delayed disclosure of, Brady information that was in its possession must establish that (1) the evidence was favorable to the accused, either because it is exculpatory or impeaching; (2) the evidence was suppressed by the prosecution, either willfully or inadvertently; and (3) prejudice ensued — that is, had the information been disclosed, there was a reasonable probability of a different result.  See United States v. Barlow, 732 F. Supp. 2d 1, 15, 17 (E.D.N.Y. 2010).

2.      Argument

Kenner alleges three Brady violations.  The government addresses each in turn. First, Kenner argues that the government committed a Brady violation because it failed to disclose Forfeiture Exhibit 44 until after trial (during the forfeiture proceedings).  Point I at 2. The government did not come into possession of Forfeiture Exhibit 44 until after trial (on August 3, 2015).  Therefore, there is no Brady violation because the government cannot "fail to disclose" evidence that was not in its possession prior to trial.  United States v. Pierce, No. 06-CR-1032, 2011 WL 4001071, at *7 (S.D.N.Y. Aug. 30, 2011).

Even if that were not the case, Kenner's Brady violation claim would fail for several additional reasons.  Forfeiture Exhibit 44 is not material: it is a ledger from Ken

4

Jowdy's attorney that refers to certain moneys from the Hawaii accounts as loans, and on its own, it is inadmissible hearsay. It is furthermore cumulative of other documents and testimony available to Kenner at trial that was either admissible or could have led to admissible evidence on the same point. As Kenner concedes, the government provided Kenner with extensive pretrial discovery — including bank statements, loan documents, emails, proffer notes, deposition testimony, and arbitration testimony, and a similar ledger referring to certain moneys from the Hawaii accounts as loans (R33 315, produced in pretrial discovery as PK_SEC_021195) — from which Kenner could argue that he loaned money to Jowdy and were provided to Kenner by the government in pretrial discovery. Point I at 6-8 (citing various exhibits). In addition, Kenner was free to call Jowdy and Gaudet as witnesses at trial.

Furthermore, regardless of whether Kenner diverted money from the Hawaii project to Mexico as a loan or not, it was a fraudulent and unlawful diversion of investor money because Kenner represented to his investors that he would use their money for the development of the Hawaii project and instead diverted it for another purpose. See, e.g., Tr. 393-397, 703-704 (Pecas testifying that line of credit money was to be used for Hawaii, not loan to Mexico); GX-505.3 (Pecas "never would have done it, if we knew money was going to be loaned anywhere or used for anything other than what we were told, which was Hawaii"); Tr. 2723-2724 (Rucchin); Tr. 4847 (Gonchar).[2]

---

[2] Kenner's continued allegations of fraud and extortion against Jowdy and his attorneys in connection with Mexico investment projects, Point I at 3-5, 13-20, Point II at 2-5, 18, Point III at 1-2, Dixon-Myrick issues at 1-2, Jowdy loan disclosure issues at 1-14, have no bearing here as neither Jowdy nor his attorneys were on trial and the Mexico investment projects were not an object of the conspiracy alleged in the indictment. Indeed, the Court's

Second, Kenner argues that the government committed a <u>Brady</u> violation because it failed to disclose various contracts related to the Los Frailes investment project until after trial (during the forfeiture proceedings), and Kenner claims that he could have used those documents to impeach Kaiser on extrinsic acts of forgery.  Point I at 21.  That is wrong in both respects.  The government produced numerous documents related to the Los Frailes investment project — including the contract between Kenner and Kaiser (R33 101, produced as ED-2146), a version of the same document from Kenner's computer with just Kenner's signature and outgoing fax header on it (produced as PK 123384), and contracts drafted for Privitello, Smith, and Sconzo — on September 12, 2014.  <u>See</u> ECF No. 99 (enclosing ED-2146 to ED-2310).  In any event, these documents would have been of little use at trial because the Los Frailes investment project was not expressly alleged as an object of the conspiracy in Count One and was thus essentially outside of the scope of the government's case at trial; as such, the Court prevented questioning, and issued limiting instructions, to that effect.  Tr. 1485-1486.  In addition, the documents would have been inadmissible for purposes of impeachment because the Federal Rules of Evidence do not permit extrinsic evidence to prove specific instances of conduct, like alleged prior forgeries on collateral matters.  Fed. R. Evid. 608(b).

Third, Kenner argues that the government committed a <u>Brady</u> violation because it failed to disclose two depositions — the October 9, 2014 deposition of Bryan

---

jury charge made clear that individuals not on trial were not the jury's concern.  ECF No. 296 at 30 (instruction regarding "Other Persons Not on Trial")**.**

Berard and the December 18, 2014 deposition of John Kaiser — conducted in connection

with civil litigation in Arizona, and Kenner claims that he was not aware of the depositions

until after trial.  Point I at 27.  That is not true.  Both depositions were available to Kenner

soon after they were taken as Kenner was a litigant in the Paradise Valley litigation and, as

such, had notice of, and access to, the depositions.  Moreover, both depositions were

produced in discovery before trial: Kenner produced Berard's deposition in his reciprocal

discovery production on January 14, 2015, <u>see</u> ECF No. 148 (enclosed as first document in

production); the deposition was thereafter attached to, and discussed in, pretrial motions, <u>see</u>

ECF No. 157-2; and the deposition was also marked for identification at trial and used by

both defendants during the cross-examination of Berard, Tr. 3134, 3199-3204, 3232-3234,

3242-3243.  The government produced Kaiser's deposition in a § 3500 production on March

12, 2015, <u>see</u> ECF No. 179 (enclosed as 3500-JK-11).

      B.    <u>The Referenced Documents are Not Newly Discovered Evidence</u>

          1.    <u>Applicable Law</u>

     "A motion for a new trial based on newly discovered evidence is not favored

and will only be granted when the 'new evidence . . . would probably lead to an acquittal.'"

<u>Orena v. United States</u>, 956 F. Supp. 1071, 1093 (E.D.N.Y. 1997) (Weinstein, J.) (quoting

<u>United States v. Spencer</u>, 4 F.3d 115, 118 (2d Cir.1993)).  "Thus, '[a] district court must

exercise great caution in determining whether to grant a retrial on the ground of newly

discovered evidence, and may grant the motion only in the most extraordinary

circumstances."  <u>Id.</u> (quoting <u>United States v. Imran</u>, 964 F.2d 1313, 1318 (2d Cir.1992)).

The Second Circuit's standard for granting such a motion requires that "(1) the evidence be

newly discovered after trial; (2) facts are alleged from which the court can infer due

diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal."  United States v. Owen, 500 F.3d 83, 88 (2d Cir. 2007).

      2.    Argument

      Kenner alleges two types of "newly discovered" evidence.  The government addresses each in turn.  First, Kenner claims that after the trial, he learned that Constantine's civil attorney Tom Baker had disclosure letters signed by 17 members of Little Isle IV in connection with a civil matter and that this was "previously unknown to Kenner."  Point II at 2.  That is not true.

      The referenced letters (R33 A) were available at the time of trial and were known, or with due diligence could have been known, to Kenner.  Kenner was a party to the civil matter in which the letters were signed — he filed suit, as the letter explains, on behalf of himself as an individual and on behalf of Little Isle IV, LLC and Ula Makika LLC — and was on notice of the communications between Baker and the members of Little Isle IV.  In fact, Kenner facilitated those communications: Kenner admits in his motion that he had Baker send out the disclosure letter to each Little Isle IV member and personally received confirmation through telephone or text after members had signed the letter.  See Jowdy loan disclosure issues at 8-10.  For example, documents produced by the government in discovery on September 11, 2014 included an email in which Kenner sent the letter to victim investor Greg DeVries with the instructions "Return the scan to me."  See ECF No. 96 (enclosing PK_SEC_004161).  The government's discovery production also included the complete, returned letter signed by DeVries.  See id. (enclosing PK_SEC_004162 to PK_SEC_004169).  The DeVries letter made clear that the same letter was also sent to other

8

members of Little Isle IV.  Id. (listing 21 individuals as cc'd).  Indeed, Kenner marked the

letter for identification and referred to it during trial (Kenner Exhibit 231), testifying that the

letter, "dated September 23rd, 2009" and "written by attorney Thomas Baker in Arizona,"

pertained "to the ongoing litigation we had with Ken Jowdy as sued by Little Isle IV, Ula

Makika and myself, Phillip A. Kenner personally" and concerned "the approximate $5

million loan that was outstanding"; Kenner further explained that "Mr. Baker was sending

out quite a detailed approximately seven page disclosure letter to each of the members of

Little Isle IV for their acknowledgement and consent to continue the lawsuit against Mr.

Jowdy under his representation, and a number of those individuals were copied on the letter."

Tr. 4569-4570.  Thus, to the extent that Kenner did not already have each of the letters, he

knew of their existence prior to trial and could have obtained them from Baker; the letters,

therefore, do not constitute newly discovered evidence.  See United States v. Natelli, 553

F.2d 5, 7 (2d Cir. 1977) ("It is basic that a defendant seeking a new trial must establish that

the newly discovered evidence could not with due diligence have been discovered at or

before trial.").

       Moreover, as Kenner concedes, the letters are cumulative of other documents

available to Kenner that he did or could have used to cross-examine victim investors

regarding whether they understood there to be a Jowdy loan.  Point II at 6-22 (referencing

affidavits, authorizations, interview notes, prior testimony, text messages, and other

documents, all produced by the government to the defense prior to trial, including, for

example, R33 304, admitted at trial as GX-2143).

       Second, Kenner claims that he did not see any extension-of-credit documents

until the ninth week of trial when newly-subpoenaed documents arrived from Northern Trust.

Point II at 16, 23.  As an initial matter, the Northern Trust documents produced in response to Kenner's subpoena arrived by June 17, 2015, which was the sixth week of trial.  On that date, they were moved into evidence in their entirety, as Kenner Exhibit 210, and became part of the record.  Tr. 4205-4210.[3]  Accordingly, the Northern Trust documents that arrived in response to Kenner's subpoena were fully available at trial, fully entered into the record at trial, and fully presented to the jury to review and for Kenner to explain during his testimony and argue from in his closing, which he did.  Indeed, during his trial testimony, Kenner stated that he had reviewed all of the documents after they had arrived, and explained how the players had to sign various loan-related documents and FedEx them back to Kenner in order to maintain the lines of credit.  Tr. 4211-4214, 4242-4247.  During his closing argument, Kenner referred the jury to the subpoenaed documents and informed the jury that they would "have an opportunity to review" the documents.  Tr. 5840.

In any event, the Northern Trust documents produced in response to Kenner's subpoena were largely duplicative of documents already produced before trial.  The government obtained and produced numerous Northern Trust documents from various sources, including the bank itself, ECF No. 26 (enclosing DVD of Northern Trust bank documents), as well as from Kenner's home, Kenner's computer, and the files of victim investors.  See, e.g., ECF Nos. 40 & 86 (enclosing documents from Kenner's home); ECF No. 99 (enclosing documents obtained from individuals, e.g., ED-152 to ED-252, ED-399 to ED-579).  These documents included pledge agreements, control agreements, master notes, changes in terms agreements, and disbursement request and authorization forms.  See Point

---

[3] Around the same time, Kenner also described in detail the fax cover sheet he sent to Owen Nolan (R33 502, marked as Kenner Exhibit 211).  Tr. 4213-4214.

II at 26-27 (Kenner conceding that he was in possession of such documents prior to return of subpoena).  The government moved many of these documents into evidence near the outset of the case, including line of credit transaction histories and the written authorizations from line-of-credit holders to Kenner to transfer money from their lines of credit to Little Isle IV. See GX-STIP-1 (stipulating admission of numerous Northern Trust documents); e.g., Tr. 387-388 (reviewing authorization with Peca).

     C.     The Prosecutors Did Not Engage in Misconduct

        Kenner alleges essentially two categories of misconduct.  The government addresses each in turn.

        1.     The Government's Questions and Summations Did Not Deny a Fair Trial

          a.     Applicable Law

        A defendant asserting that a prosecutor's remarks warrant a new trial "face[s] a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of [his] right to a fair trial."  United States v. Locascio, 6 F.3d 924, 945 (2d Cir. 1993).  The Supreme Court has made clear that "[i]nappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding."  United States v. Young, 470 U.S. 1, 11 (1985).  Even statements that amount to prosecutorial misconduct during summation do not warrant reversal unless they cause the defendant "substantial prejudice" in that they "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process."  United States v. Shareef, 190 F.3d 71, 78 (2d Cir. 1999) (quoting Darden v. Wainwright, 477 U.S. 168, 181 (1986), and United States v. LaMorte, 950 F.2d 80, 83 (2d Cir. 1991)); accord United States v. Elias, 285 F.3d 183, 190 (2d Cir. 2002) (quoting Shareef).  Courts consider

three factors to determine whether the statements at issue amount to substantial prejudice:
"the severity of the misconduct, the measures adopted to cure the misconduct, and the
certainty of conviction absent the misconduct."  E.g., Elias, 285 F.3d at 190.  Even in a case
where there is "serious misconduct" — which is not the case here — "proper instructions by
the trial court may suffice to prevent undue prejudice and make the misconduct harmless."
United States v. Walker, 835 F.2d 983, 988 (2d Cir. 1987).

       In evaluating the propriety of a prosecutor's summation, the Second Circuit has
recognized that both the prosecution and the defense "are generally entitled to wide latitude
during closing arguments, so long as they do not misstate the evidence."  United States v.
Tocco, 135 F.3d 116, 130 (2d Cir. 1998).  "A prosecutor is not precluded from vigorous
advocacy, or the use of colorful adjectives, in summation."  United States v. Rivera, 971 F.2d
876, 884 (2d Cir. 1992).  In addition, in evaluating a claim of improper argument, a court
cannot view the challenged remarks in isolation; rather, it "must consider the objectionable
remarks within the context of the entire trial," United States v. Espinal, 981 F.2d 664, 666
(2d Cir. 1992) (citing United States v. Young, 470 U.S. 1, 11-12 (1985)), granting relief only
if the remarks, "viewed against 'the entire argument before the jury,' deprived the defendant
of a fair trial."  Pena, 793 F.2d at 490.

       Moreover, under the invited or fair response doctrine, the defense summation
may open the door to an otherwise inadmissible prosecution rebuttal.  For this reason, even
greater leeway is afforded in rebuttal summations, which are not fully constructed in advance
and are often improvised.  See United States v. Arias-Javier, 392 F. App'x 896, 898-99 (2d
Cir. 2010)(summary order).  "In particular, where the defense summation makes arguments
and allegations against the government, the prosecutor may respond to them in rebuttal."

<u>Tocco</u>, 135 F.3d at 130 (citation omitted); <u>see</u> <u>generally</u> <u>Young</u>, 470 U.S. at 12 (holding that "the reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo").  In addition, a court "will not lightly overturn a conviction solely on the basis of a prosecutor's misstatement in summation."  <u>United States v. Nersesian</u>, 824 F.2d 1294, 1327 (2d Cir.1987) (internal quotation marks omitted).

In sum, disturbing a conviction based on remarks in a prosecutor's summation is a "drastic remedy," warranted only where the challenged remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  <u>Wainwright</u>, 477 U.S. at 181 (1986) (internal quotation marks omitted).

> b.   <u>Argument</u>

Kenner argues that the government's questions in cross-examination asking if Kenner was lying unduly prejudiced him.  Point III at 1, 3.  It is worth noting that, at a substantive level, the government's theory of the case involved showing that Kenner had repeatedly lied to investors about how their money was being used, and then further spun false and ever-more-elaborate stories to perpetuate his fraudulent scheme, point fingers, and evade detection for more than a decade.  Kenner repeated many of those lies and stories during his testimony at trial, both for his own benefit and Constantine's, which evidenced an ongoing conspiracy.  The prosecutor's questions attempted to elicit the fact of this ongoing fraud.  The Second Circuit has explained (in the context of summations) that a prosecutor's references to a defendant lying is "in no way severely improper so as to amount to a denial of due process," particularly where the defendant is on trial for fraud.  <u>United States v. Greenberg</u>, No. 14-CR-4208, 2016 WL 4574482, at *2 (2d Cir. Aug. 31, 2016); <u>see</u> <u>also</u>

United States v. Peterson, 808 F.2d 969, 977 (2d Cir.1987) (noting that "[u]se of the words 'liar' and 'lie' to characterize disputed testimony when the witness's credibility is clearly in issue is ordinarily not improper unless such use is excessive or is likely to be inflammatory"). In all events, this line of questioning was limited, Tr. 5064-5065, the Court sustained Kenner's objections when he made them, and the Court instructed the jury (at the outset and at the end) that if an objection were sustained, they were to ignore the question, Tr. 17, 6024.

Kenner also argues that the government's rebuttal summation was improper. Point III at 5 (number 18).  In protesting the government's rebuttal summation, Kenner essentially offers a sur-rebuttal and terms the arguments with which he disagrees "lies." (R33 E).  His arguments have no merit.  Each aspect of the government's rebuttal summation responded to an argument raised by defense counsel in their summations.  On each point, the government made fair counterarguments, drew from the evidence, and urged the jury (repeatedly) to examine the evidence further and make reasonable inferences from that evidence and from common sense.  That is entirely permissible argument.  See United States v. Williams, 205 F.3d 23, 35 (2d Cir.2000) (internal quotation marks omitted) (during summation, the "government has broad latitude in the inferences it may reasonably suggest to the jury").  The Court clearly instructed the jury that closing argument are just arguments, not evidence, and that it was up to the jury to decide the case based on the evidence in the record.  Tr. 6023, 6091.

2.   The Government Did Not Suborn Perjury

a.   Applicable Law

"Reversal of a conviction based upon allegations of perjured testimony should be granted only with great caution and in the most extraordinary circumstances."  United

14

States v. Zichettello, 208 F.3d 72, 102 (2d Cir. 2000). To prevail on such a claim, the

defendant must show: (1) the witness actually committed perjury; (2) the alleged perjury was

material; (3) the government knew or should have known of the alleged perjury at the time of

trial; and (4) the perjured testimony remained undisclosed during trial. Id. (internal quotation

marks omitted).

      A witness perjures herself when "she gives false testimony concerning a

material matter with the willful intent to provide false testimony, rather than as a result of

confusion, mistake, or faulty memory." United States v. Dunnigan, 507 U.S. 87, 94 (1993).

"The mere fact that a witness's trial testimony is inconsistent with a prior statement does not,

standing alone, show that testimony is false or that the witness committed perjury." Graves

v. Cunningham, No. 09 Civ. 5837, 2010 WL 2942614, at *22 (S.D.N.Y. May 26, 2010)

(internal quotation marks omitted); see also Martinez v. Phillips, No. 04 Civ. 8617, 2009 WL

1108515, at *20 (S.D.N.Y. Apr. 24, 2009) ("simply because a witness's testimony might

have been later contradicted does not mean that the prosecutor purposefully elicited

perjury"); Warren v. Ercole, No. 07 Civ. 3175, 2007 WL 4224642, at *10 (E.D.N.Y. Nov.

27, 2007) (Gleeson, J.) (even if a witness's testimony was internally inconsistent, that "does

not necessarily establish perjury, nor does it prove that the prosecutor knowingly presented

perjured testimony"); United States v. Sanchez, 969 F.2d 1409, 1415 (2d Cir. 1992)

("[d]ifferences in recollection alone do not add up to perjury"); United States v. Gambino, 59

F.3d 353, 365 (2d Cir.1995) ("even a direct conflict in testimony does not in itself constitute

perjury"); United States v. Monteleone, 257 F.3d 210, 219 (2d Cir. 2001) ("Simple

inaccuracies or inconsistencies in testimony do not rise to the level of perjury."); Smithwick

v. Walker, 758 F.Supp. 178, 186 (S.D.N.Y.1991) ("A prior inconsistent statement does not rise to the level of perjury.").

 The Second Circuit has set forth the above standard for making a determination when a defendant claims that newly discovered evidence shows that a government witness committed perjury.  However, Kenner does not submit newly discovered evidence; rather, he argues that various government witnesses committed perjury when compared to the other documents and testimony available at trial.  The Second Circuit has held that, "When the perjury was disclosed during the trial, a new trial should not be granted."  United States v. Cromitie, No. 09-CR-558, 2011 WL 1842219, at *25 (S.D.N.Y. May 10, 2011).  "As long as the jury is alerted to a witness' lies, the jury — the 'appropriate arbiter of the truth' — can sift falsehood from fact and make its own credibility determinations."  Id.

  b. Argument

 Kenner argues that government witnesses gave false testimony — and that the government therefore knowingly suborned perjury — because, Kenner claims, the witnesses' testimony was contradicted by evidence that was available at trial and the witnesses frequently could not recall information.  Point III at 2 (incorporating 15 "reference reports"); Point III at 3-4 (numbers 2-17).

 Much of the content in Kenner's reference reports is unrelated to perjury allegations against government witnesses (where Kenner does not identify specific trial testimony as perjured).  For example, the "Dixon-Myrick issues" and "Jowdy loan disclosure issues" reference reports do not provide a basis for finding perjury by government witnesses as neither Kristine Myrick, Stephanie Dixon, nor Ken Jowdy testified at trial.

Where Kenner does characterize specific testimony as perjured (in the reference reports and in Point III, numbers 2-17), his allegations simply do not meet the standard for a new trial, as his own submissions make clear: they do not rely on newly discovered evidence; they merely revisit points raised in in the cross-examinations of witnesses, defense case testimony, closings, and other information available at trial; and they do not bridge the gap between testimony that may be merely inconsistent or the result of confusion, mistake, or faulty memory, and testimony that was given with willful intent to provide false testimony.  The Court gave Kenner a full opportunity during his own testimony at trial to refute the government's case witness by witness, and Kenner took that opportunity. Having heard all of the testimony, including cross-examinations of government witnesses by both defendants and Kenner's nearly four days of testimony, the jury already made the relevant credibility determinations and convicted on six counts.  Kenner does not provide a new or compelling reason to depart from that verdict.[4]

---

[4]   In light of the volume of Kenner's submissions and in accordance with the Court's guidance on this matter, the government has addressed Kenner's motion by grouping arguments and exhibits into broad categories.  Should the Court require further briefing as to any specific argument or exhibit, the government respectfully requests leave to submit further briefing.

<u>CONCLUSION</u>

For the foregoing reasons, the government respectfully requests that the Court

deny Kenner's motion.

Dated:      Brooklyn, New York
                 January 18, 2017

                                                   Respectfully submitted,

                                                   ROBERT L. CAPERS
                                                   UNITED STATES ATTORNEY
                                                   Eastern District of New York
                                                   Attorney for Plaintiff
                                                   271 Cadman Plaza East
                                                   Brooklyn, New York 11201


                                    By:      ___/s/_____
                                                   Saritha Komatireddy
                                                   Assistant United States Attorney
                                                   (718) 254-6054

cc:      All counsel of record (by ECF)