EUNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

UNITED STATES OF AMERICA

-against-

                                    Ind. No.

PHILLIP A. KENNER,                  13 cr 607 (JFB)

                Defendant.
--------------------------------------------------------X

**_PRO SE_ REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT PHILLIP KENNER'S MOTION FOR A NEW TRIAL PURSUANT TO RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE**

Jeffrey G. Pittell, Esq.
Maher & Pittell, LLP
*Attorneys for Defendant*
42-40 Bell Blvd,  Suite 302
Bayside, New York  11361
(516) 829-2299

## PRELIMINARY STATEMENT

As noted in the *Pro Se* Reply Memorandum of Law is submitted in further support of Defendant Phillip A. Kenner's Motion for a New Trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure (dated February 7, 2017, at p.2, fn.1) the attached submission is Defendant Phillip Kenner's *pro se* reply submitted in further support of the Rule 33 Motion (ECF Docs 416,417) and in reply to the Government's Memorandum submitted in opposition to the Rule 33 Motion (ECF Doc. 440).

## CONCLUSION

Based upon the foregoing reasons, and the reasons set forth in the initial moving papers, it is respectfully requested that the Rule 33 Motion be granted in its entirety.

Dated:     Bayside, New York
           February 13, 2017

                              Respectfully submitted,
                              /s/
                              Jeffrey G. Pittell, Esq.
                              Maher & Pittell, LLP
                              *Attorneys for Defendant*
                              42-40 Bell Blvd,  Suite 302
                              Bayside, New York  11361
                              (516) 829-2299

TO:   Saritha Komatireddy, AUSA
      Phillip Kenner
      All counsel of record via ECF

*Rebuttal to Government Reply to Kenner Rule 33 submission*

### Prosecutorial Misconduct by the government

- <u>**The evidence of perjury is sufficiently material to undermine confidence in the verdict, thus, there is a need to probe the extent of the Government's awareness of the perjury**</u>.

*So, what did the government respond to the devastating and unmistakable perjury (suborned or otherwise) that Kenner's Rule 33 submission highlighted time and time again?*

<u>*Faulty memory, confusion and mistakes!*</u>

*The US justice system as formulated in the original Constitution expected those entrusted with the power of the sovereign and privileged to represent the United States in its courts to be correct on the law and the facts when they threatened someone's life and liberty.  Long ago, in a case called <u>Berger</u>, the Supreme Court set the standard for the conduct of US attorneys:*

> *The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all, and whose interest, therefore, in a criminal prosecution is <u>not</u> that it shall win a case, but that <u>justice shall be done</u>. As such, he is in a peculiar and very definite sense the servant of the law.   He may prosecute with earnestness and vigor – indeed, he should do so.   But, while he may strike hard blows, <u>he is not at liberty to strike foul ones</u>.   It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction, as it is to use every legitimate means to bring about a just one.*

*In the context of <u>Berger</u>, "faulty memory, confusion and mistakes" are what the government choses to blame on <u>all</u> of the witness' statements, clearly contradicting every witness' pre-trial and pro-Kenner confirmations of full support, previous knowledge, and no wrongdoings.   The same individuals, which formed the prejudicial basis for the conviction themes of concealment, non-disclosures and "<u>finger pointing</u>", also contradicting several of the post-trial government disclosures (See Forfeiture-44) and revelations (Jowdy as a co-conspirator), again, supporting Kenner's trial defenses. The government scoffed at Kenner's defense continually throughout the trial, while referring to Kenner as a "<u>liar</u>" and Kenner's representations of supportive documents as "<u>bogus</u>", "<u>fake</u>", "<u>phony</u>" and "<u>supposed</u>" -- but now true!*

*The government wants the court to rely on the same witness testimony who they defend with <u>faulty memory, confusion and mistakes</u> as the basis for the prosecution claims that the witnesses "<u>remember, not being told</u>" about various, critical disclosures, including the widely confirmed 2004 "group decision" to loan Jowdy money from the Hawai'i LLC as clearly explained on March 29, 2011 by Michael Peca, Darryl Sydor and Turner Stevenson (R33 651) to the SDNY Grand Jury in support of Kenner (also confirmed specifically by Berard and Kaiser in 2009 arbitration testimony – See R33 562 and R33 637), while simultaneously vilifying Jowdy.   The government wants to maintain the specific integrity of the conflicting statements from the same witnesses who repeatedly could not verify a single specific detail about meetings, times, places, content with*

1

*Rebuttal to Government Reply to Kenner Rule 33 submission*

*Kenner or even recall communication with Kenner directly thru text &/or signing documents that they actual verified the printing of their own names (see R33 497).*

- Please note that throughout the 2015 trial, the government referred to Jowdy as a Kenner victim of unjust "***finger pointing***" until their November 2016 revisionary epiphany in their well-thought-out, post-forfeiture hearing summation report (*5 months after the conclusion of the hearing*), now corroborating Kenner's June 24, 2009 FBI proffer referring to Jowdy as a charlatan (*or fraudster*).

- Notwithstanding – in late 2016 – after admitting to the "***loans to Jowdy***" thru a Jowdy produced document (***forfeiture-44***) contradicting the government's own claims ***fully prejudicing Kenner at trial*** – the government (*post-Kenner trial*) claimed Jowdy as a co-conspirator (*now alleging criminal behavior – "**only based on alleged representations at trial**" (mentioned in letters between Jowdy's counsel and the government) – despite the surplus of irrefutable evidence raised by Kenner from his June 24, 2009 FBI proffer thru the government's voluminous evidentiary pre-trial production 2013-2015*), none of which points the co-conspiratorial finger at Kenner, nor did the prosecution at trial.

- Instead of addressing the enormous number of clearly misrepresented government witness statements throughout the trial ("*perjury*") in Kenner's Rule 33 Motion, the government wants to suggest that Kenner had access to "*other*" discovery items that could have represented the "***loans to Jowdy***" (*or refuted other alleged perjured statements by government witnesses*), but at every instance in the trial, the government called those items, "***supposed***", "***fake***", "***phony***" and "***bogus***".   ***How would the jury have reacted if after those disparaging comments, the government then admitted forfeiture-44 into evidence?***   That is true prejudice and government defensive double-talk they hope the court will overlook, <u>*or reject the evidence outright*</u> (*as the government requests of the court*), since it conflicts with their made-up trial theories.

- ❖ In context of the new theory of Jowdy liability – the government's representation has a myriad of reformative effects on their trial theories – the least of which would have been Kenner's ability to present a proper defense without being called "***bogus***", "***fake***", "***phony***", "***supposed***", and a "***liar***", producing irreversible prejudice.

It is fundamentally irresponsible for the government to utilize a "***rope-a-dope***" strategy with respect to known evidence to falsely frame their prosecutorial theories on one hand while ignoring them on the other, solely for prosecutorial benefit and absent of the known facts – while knowingly disregarding contradictory evidence in their possession – specifically including Jowdy's own 2-day January 2010 deposition confessional and contradictory FBI proffers (*5 years before trial -- 2010*) acknowledging Hawai'i loans, corporate thefts, and gross mismanagement (***See R33 rebuttal 002-pages 11-13***).

- ❖ ***Although Kenner objects vehemently to all government references to Jowdy as a Kenner co-conspirator (including but not limited to declining Jowdy's 2007, 20% equity bribe plus payments to "go along with the Diamanté frauds" (See R33 039) as well as immediately pursuing Jowdy legally for Kenner and Kenner investors in México and the USA) – Kenner affirms thru voluminous evidence (in the government's possession since Kenner's June 24, 2009 proffer) that Jowdy***

*robbed with malicious and premeditated intent to harm Kenner and Kenner investors in the DDM, Diamante Air, DCSL and the Cabo Airport investments – in addition to disregarding his unpaid loans to the Hawai'i partners, and personally to Stumpel, Norstrom, Kenner, Murray, and Gaudet (admitted by Jowdy in his January 2010 depositions -- totaling tens of millions of dollars of frauds – and ignored as "criminal intent" by Galioto since 2009 – despite clear and convincing evidence that the thefts started the day after the initial August 2002 investment (See R33 023) by Kenner and Kenner investors)...See R33 rebuttal 666a and R33 rebuttal 666.*

Most suspiciously absent from the government's reply, in a conscious effort to avoid their clear guilt of the "*coordinated*" testimony, was Kaiser, Berard, Gaarn, Michael Peca, McKee and others consistent denials of any knowledge of the collective efforts in 2010 to buy the Eufora debt from the existing Eufora lender, a friend of Constantine's (*See Point III at 140-145*).   Not only was Berard and Stolper working together in late 2010 and early 2011 to go after Constantine for his Eufora frauds (*discovered by Stolper's independent investigation team after Gaarn hired them without Kenner's knowledge*), but Berard was continuing to push Kenner and Stolper to pursue Jowdy and Lehman Brothers with the feds (*FBI other than Galioto who was frustrating Kenner and Kenner investors with no follow-up efforts thru early 2011*) – *See R33 rebuttal 027*.   The efforts by the 20 or so AZ Eufora Partners I investors (*under Gaarn as Managing Member since the 2005 consolidation*), led by NY attorney Michael Stolper's investigation and legal team, was coordinated by Gaarn, the same individual who vehemently denied any knowledge of the loan buy out efforts at trial, which would have supported the defense contention that Eufora had huge potential in the pre-paid credit card industry for the investors, based on its multiple patents, and not a pump-and-dump scheme as falsely claimed by the government to the court.  This truth of Eufora's intrinsic value clearly contradicted the government's proffers to the jury that Eufora was only a scam to extract money from investors.   The government's false claim ignores the fact that Kenner, himself, was waiting for a 20% transfer of Eufora shares (*offered at 12% in the August 2010 Constantine settlement offer to Stolper – See R33 439 – page 43 and a previous 10% confirmation after Kaiser mediated the December 2009 loan dispute with Constantine before Kaiser had friends & family wire another $200,000 to Constantine in late December 2009 – See R33 440*) from Constantine for the outstanding "*grocery list loans*" that Kaiser had **ZERO** interest in, despite the adverse fabricated Kaiser and Michiewicz storyline (*See R33 536 and R33 553*).   *Please note that Gonchar's 1.25% new equity in the proposed Eufora operating agreement was for Gonchar's 2009 $500,000 Eufora contribution -- putting in perspective the Kenner "**grocery list loans**" to Constantine and the 12% (of the original 20% deal) offer in August 2010.*   This was further evidenced by Stolper's high-powered investigative and legal team (*including Rudi Giuliani, his CEO, Eric Hatzimemos, and former CIA Agent, Oliver Libby*) hired independently by Gaarn (*not acting as a Kenner-puppet, as the government contrived with Gaarn*) working for a 6% contingency fee of recovered equity in lieu of ongoing fees from the Plaintiffs (*See EDNY – McKee issues – page 11*).

- *Please note that from the government's Rule 16 discovery -- Kenner provided overwhelming email, text, bank statements, signed bank documents, signed authorizations, etcetera that CLEARLY PROVE that each of the alleged victims who testified about the global trial matters PERJURED themselves in front of a knowing prosecution and FBI (hi-lighted in on the list of outrageous was the Kaiser and Michiewicz Tequila bottle fabrications (**See R33 804**)).*

- *The government and FBI sat idly by on each and every instance…and on most occasions assisted in the PERJURY thru leading and mis-leading RE-CROSS questioning to resuscitate their witnesses when they became incapable of following the pre-meditated government "storyline" &/or "pre-fabricated game plan"…*

  - *One gross example, ignored in the government's response, was Kristen Peca's testimony that "he didn't tell me about the commercials that started airing" – Tr.702: 8 to 703: 21. (which clearly was originally planned to say she was informed about them – otherwise questioning the authenticity of an event she was not aware of), corroborating Tyson Nash's false testimony that he saw the commercials at the Eufora offices, which on cross examination was proven false, since the buildings had not been constructed yet.   The coordinated efforts were nothing short of egregious.   For extra deceptive flair, the government had Kristen Peca also testify about why she would not have invested in Eufora had she known about the pledged patents Tr.703: 10-21. Kristen Peca and Komatireddy executed it brilliantly; EXCEPT and specifically since Peca's 2008 Eufora investment occurred approximately 9 months before the patents were pledged, as the government was clearly aware. (See TIMELINE 037 – page 12).   Kristen Peca was never a client of Kenner's and thus, Kenner had zero responsibility to her to share information, only with Michael Peca.   Kristen Peca was hardly ever present at face-to-face meetings with Michael Peca and almost never on the recurring and regular phone calls between Kenner and Michael Peca.   As such, virtually all of her investment knowledge is hearsay and only what her husband chose not to conceal from her for years.*

The government spent almost 5 years investigating Kenner thru Galioto's unsuccessful Indictment bid in the SDNY (*2009 thru 2011 – after proffering about the $25mm in Jowdy frauds*) with three, cherry-picked witnesses (*Michael Peca, Darryl Sydor and Turner Stevenson*) who gave overwhelmingly pro-Kenner and anti-Jowdy testimony to a March 2011 SDNY Grand Jury, but finally crowned in an October 2013 Kenner Indictment based 100% on and only on FBI Agent Galioto's EDNY (*Central Islip*) "**hearsay**" testimony and no alleged victims, just 4 weeks before Kenner's 6-year México legal efforts (*including false detainment on Gun Trafficking charges, physical torture, the murder of Kenner's México attorney, death attempts on Kenner, and ongoing threats – See R33 rebuttal 028*) would have recovered the Diamanté Cabo project thru receivership already granted by the Baja California Sur (*South*), México State Supreme Court and discovered by Jowdy's cabal and FBI agent Galioto.   The receivership recovery would have immediately led to a pre-arranged sale of the project equity and the return of all of the previously stolen funds by Jowdy (*totaling over $25 million of investment and loaned cash – not including the 13 years of embezzlements and racketeering efforts with Lehman Brothers' employees*) to the Kenner and Kenner investors.

This occurred a year after Jowdy vetoed a proposed and agreed upon $20 million buy out of Kenner and Kenner investors from the DCSL project (*arranged by a 3rd party and agreed upon by a Jowdy-friendly group*), thus, returning the lion-share of the Kenner and Kenner investors funds (*see EDNY Issues 008*).   A 2012 settlement would have destroyed Galioto and Jowdy's cabal's efforts to "*punish*" Kenner for taking the 2007 adverse legal position, turning down the 2007 lucrative Jowdy bribes (*See R33 039*), and exposing the truths about Jowdy to the DOJ (*if Kenner could ever avoid the diversionary tactics of Jowdy's*

*overpaid legal team and Galioto*) (***See R33 rebuttal 666a***).   Jowdy and his team were concerned of future DOJ intervention even after all of the investors recovered their funds from the Jowdy frauds (*since 2002*).

The government thru Galioto's religious efforts continued to intimidate each and every pro-Kenner (*or specifically, anti-Jowdy, Berard and Kaiser*) investor and attorney until trial, with the help of Jowdy's NY attorney Tom Harvey, who assisted daily throughout the trial with the Kenner prosecution.

The government summations revealed that e*very John Doe was called*. See Tr.5993: 17-19. The best the government can produce for the court is a multi-tiered position to preserve their trial conviction based on a "***win-at-all-costs***" approach, which grossly included sitting idly by while known perjuries (*suborned or otherwise*) took place on the witness stand with "*every John Doe*".   Specifically, Agent Galioto was present at every proffer meeting since the inception of the Kenner August 2009 SDNY "*Special*" Grand Jury.   Whether Galioto failed to disclose the contradictory statements being made by the witnesses instantly at the 2015 trial (*assuming he did not share the pro-Kenner statements during the investigations with his prosecution team*) to correct the factual inaccuracies for the court, he failed in his burden to do so in the interest of justice.   The government graciously offers United States v. Cromitie (*SDNY*) stating, "*As long as a jury is alerted to a witness lies, the jury -- the 'appropriate arbiter of the truth' -- can sift falsehood from fact and make its own credibility determinations*".   Yet, at no time throughout the trial did the prosecution alert the court or the jury to the contradictory statements by their witnesses; specifically the ones proffered directly to Agent Galioto and identified in his 302(b) materials, thus fully prejudicing Kenner's right to a fair trial.   At no time during the trial did the knowing prosecutorial even ask the court for a sidebar to discuss with the court how to deal with the known factual inaccuracies being proffered by their witnesses.    Instead, the government cajoled their witnesses thru re-direct resuscitations, further intensifying the witness contradictions (*perjuries*).

Instead of the government's responsibility to seek "*justice for all*" (*including their responsibility to Kenner*), the government takes a blanket-adverse position to Kenner's Rule 33 submission in the face of the non-hearsay and real documented evidence.   The government asks the court to ***ignore*** Kenner's presentation of 100% of the supporting evidence in the government's possession confirming that 100% of the investor's had previous, timely and complete knowledge in each and every alleged scheme, despite their trial misrepresentations, solely excusable now based on ***<u>faulty memory, confusion and mistakes</u>***.   The government wants the court to ignore (*as the government has since 2009*) that all protocols related to the investments were properly followed by Kenner, pursuant to signed Letters of Authorization, disclosure statements, and the underlying operating agreements governing the "***control***" of the funds (*specifically in the Hawai'i LLCs*).   The government also wants the court to ignore that Kenner's management decisions were all consistent and pursuant to the various operating agreements, disclosures, authorization letters, and loans secured for investments, ***all signed by the alleged victims***.   The government want the court to otherwise believe the information was concealed from the investors &/or their various independent attorneys, despite the real pro-Kenner evidence, while Kenner administered the various investments.   The government wants the court to ignore that while Kenner sought resolve and resolution thru his the nonstop legal efforts, on behalf of the investor groups, once each and every fraud upon Kenner and Kenner investors was discovered since 2007 (*10 years ago with Jowdy*), specifically in the face of the 2007

documented Jowdy bribes and August 2010 Constantine settlement offers, both of which Kenner declined despite the overwhelming personal benefits to Kenner (*which defies logic if acting as a co-conspirator with either Jowdy or Constantine*), but rather believe that Kenner acted improperly.

*If the government's excuse for Kenner's allegations of witness "perjury" (suborned or otherwise) for the 100% contradictory statements in 2015 to the previous pro-Kenner support (via testimony and signed documents), "significantly closer to the dates of the actual events", is now <u>faulty memory, confusion and mistakes</u>, then clearly the weight of the paperwork evidence plus the prior statements must be enough to question the genuineness of the 2015 witness testimony, or question any potential ulterior motives (like terminating existing &/or pending litigations against the government's witnesses, like Kaiser, Berard, Jowdy, Peca and McKee – due to the November 2013 arrest of Kenner (without bail – see Point III at 88-89)).*

*At every opportunity, the government continues to ignore the real evidence supporting Kenner's defense and contradicting their theories, and simply asks the court to disregard information "<u>against the weight of the evidence</u>", which they had the obligation to review long before the proposed Indictment of Kenner, and at a minimum, before alleging it at trial thru perjured testimonies and false, self-serving theories to "<u>win-at-all-costs</u>".*

*The government's excuse -- <u>faulty memory, confusion and mistakes!</u>*

In the government's preliminary statement, they ask the court to outright reject Kenner's submission, regardless of the truths is reveals due to fear for the consequence of real justice and Kenner's innocence they systematically ignored starting with Galioto's 2009 Grand Jury subpoena termination (*for Kenner's factually-based anti-Jowdy testimony "**as a favor**" to "**someone**"*), thru colossal prosecutorial misconduct that methodically beat a fatigued jury into submission.  Kenner instructed his attorney (*Haley*) to inform the court that Kenner intended to submit a Rule 29 and Rule 33 motion, independent of Constantine, at the end of the trial.  Haley refused to tell the court, and proffered to the contrary.  Post-trial, before the date of the Constantine submission, again, Kenner informed Haley of his desire to submit a Rule 29 and Rule 33 motion to the court for consideration.  Haley refused and bullied Kenner that he needed to cooperate with the government, make no further submissions, and submit to the government's forfeiture requests without contention.  Following the pre-trial and trial strife and conflict between Kenner and Haley, these continued intimidation tactics employed by Haley led to his ultimate termination due to the untenable relationship and Haley's pro-government stance against Kenner.

The government claims "***troves of hearsay from documents***" were the basis for the Kenner submission (*although untrue*), despite the synonymous posturing of each government witness' unsubstantiated hearsay at trial; perhaps now based on ***<u>faulty memory, confusion and mistakes</u>***, as many as 13 years after the actual events took place.

As part and parcel to the court's offer to submit any information that corroborates Kenner's *"perjury"* claims of government witnesses, Kenner clearly apologized on the witness stand to the court regarding his use of the word "**recently**" (*clarifying that Kenner's "actions" of discovery occurred since the trial while reviewing false testimonies – as opposed to the government's narrowly attempted misrepresentation of the courtroom exchange*).  The

perjurious statements were so outlandish that no defense team could have been prepared to systematically unwind the egregious tangled web of lies in real-time.  The government is panicked that the **REAL** documentary evidence, 100% impeaching their witness testimony and prosecutorial foundation, will be received and reviewed by the court. *See April 6, 2016 Forfeiture Hearing -- Tr.206: 21 to 208: 2.*

Second, the government claims that the document evidence would be "*inadmissible hearsay*", although Mr. Conway (*with the court's extended invitation to Kenner's defense*) invited the defense to submit any documents without recalling witnesses to authenticate them.   None of the Kenner submissions would have been rejected under the court's offer, or conversely authenticated by recalling the necessary witnesses.

Third, the government claims that due to "*relevance and scope*", the court would have rejected significant Kenner submissions.   As an example, and despite the court's trial conclusion that the Los Frailes real estate deal was not in the scope of the Indictment charges, the government mentioned "*Los Frailes*" 49 times throughout the trial in connection with alleged victims investments thru Kenner.

To conclude the attack on the veracity of the Kenner submissions, the government calls Kenner's submission of evidence contradicting the trial testimony of government witnesses as "***bad faith***".   The government's desire is for the suborned perjury discoveries to be ignored and disregarded, simply due to the pause it would give the court based on the government's misdeeds and inappropriate conduct.   This is unethical and a furtherance of a fraud on Kenner and the court.   It is unacceptable, unethical, and specifically, "***bad faith***" by the same "***finger pointing***" government.

The government claims that another reason for the rejection of the Kenner submission is to allow closure for the victims.   Notwithstanding the fact that the government delayed the start of the forfeiture hearings for 8 months after trial (*while re-organizing their undisclosed BRADY materials*), with their forfeiture summary submission delayed until about 17 months after trial, they continue to sit idly by while Jowdy and his cabal of attorneys (*all paid for with more stolen Diamanté Cabo funds totaling into the millions of additional diversions from Kenner and Kenner investors*) intimidate the government into not pursuing an Indictment of Jowdy for all of his documented and premeditated crimes perpetrated on Kenner and Kenner investors since August 2002.   If there was any question for the government &/or the courts of Jowdy's true criminal intent and execution assisted by NY Attorney Tom Harvey and the rest of Jowdy's cabal (*all broadcasted by Kenner since 2007, thru his 2009 FBI proffer, and continuing in the recent Pro Se submission to the court -- See R33 rebuttal 666 and R33 rebuttal 666a*), *it is foundationally crystal clear NOW*!

The current settlement agreements with Jowdy in Delaware that the litigation-weary investors and former Kenner clients are proposing to sign are allowing Jowdy to re-pay (***potentially*** in the future after 15 years of embezzlements -- since August 2002, racketeering, and diversions) if, Jowdy, on his new 10-year plan with Danska Bank as represented in their recent submissions to the court (*extending Jowdy's unchecked fraud to 25 years*), can produce any "*profits*" while Jowdy continues his $225,000 per month developer fee confirmed by the government in the January 2017 hearing to the court.   ***Over $30 million of unpaid loans*** (*including interest*) to Jowdy personally remain outstanding in January 2017 (*pursuant to the 2004 Hawai'i loan agreement and Jowdy confessions in his January 2010 2-day deposition in the México Plaintiffs' cases versus Jowdy*) and continually

ignored to the ongoing and collective financial detriment of Kenner and Kenner investors – except those like Berard and Kaiser who have accepted high-paying jobs and other intrinsic benefits for supporting Jowdy (*despite his known and documented crimes – **See R33 rebuttal 027***).

The same two 2009 California cases, which triggered the FBI interest in the Jowdy frauds in June 2009 and immediate re-direction to Kenner 5-weeks later by Galioto (***See TIMELINES 072-page 7 and TIMELINES 071-page 7***), were participated in by all of the government's 2015 witnesses, specifically recognizing $8 million of unpaid debt by Jowdy, personally, to the Hawai'i partners (*Little Isle 4*).   Jowdy's proposed repayment settlement is a joke, at a minimum, considering he is proposing a "*split*" of his potential future profits (*if any*) from equity he clearly stole from Kenner and Kenner investors at the 2006 closing (***see TIMELINE 031***) -- also identified in the Rule 33 submissions and January 2017 Pro Se submissions to the court.   The continuation of the Jowdy crimes and cover-ups under the government's knowing eye is further confirmation that they are afraid of pursuing Jowdy for his known crimes (*represented and documented by Kenner since 2009 to FBI Agent Galioto*) **due to Jowdy's protection by Former FBI Director, Louis Freeh**.   The government's non-action defies all other logic, unless they realize an Indictment of Jowdy for the crimes Kenner "*pointed the finger at*" for the last decade (*since discovered in 2007 – and in the face of physical harm, danger and prosecution threats by Jowdy's cabal*) would contradict their prosecutorial theories and current attempts to continue passing the blame to Kenner.   This is after Galioto's misrepresentations to the Kenner investors, concealing the real and documented truths, since the moment Berard and Kaiser began working with Galioto and Jowdy in México in late 2011 (*just prior to all of the allegedly independent recordings of Kenner by Michael Peca and Kristen Peca and others by Gaarn, Berard and Kaiser*).   A Jowdy Indictment with all of the documented crimes Kenner provided the government for almost a decade thru the recent January 2017 submissions would undermine the 2015 prosecutorial theories and create significant pause for the court to sustain the verdict, specifically due to the "***finger pointing***" prosecutorial themes, *now proven untruthful*.   The government is deftly aware of the thin-ice they are treading on to maintain the Kenner conviction thru unscrupulous tactics in the face of the real contradictory evidence they possessed pre-trial and categorically ignored.

In the interest of justice, according to the government, they want the court to ignore the truths in the Kenner submissions, contradicting the basis for Rule 33(a) of the Federal Rules of Criminal Procedures to vacate any verdict in the interest of justice.

If the government wants to maintain their ***faulty memory, confusion and mistakes*** theory as precedent as the cause of the overwhelming conflicting testimonies by all of their witnesses, which originally supported Kenner and corroborated all of the known documentary evidence, but years later, changed the collective opinions and testimonies now based solely on hearsay, then Kenner should be able to address the court on the merits of **CTE (Chronic Traumatic Encephalopathy)**, the brain trauma of the victims from multiple concussions and relatedly sustained collisions and the resulting scientifically known effects of memory loss.  (***See R33 rebuttal 000***)

The Boston University Center of the study of **Chronic Traumatic Encephalopathy** concluded that the average brain of a 40 year old (*about the age of all of the alleged victims*) – who has suffered repeated concussion symptoms over any extended period of time – will resemble the brain scan of a 70-year-old brain suffering from amnesia and dementia.

Researchers at Johns Hopkins University – psychiatric and behavioral sciences – concluded that the effects of the increase of Tau protein deposits on the brain as a result of repeated concussions and concussion-like collisions have been linked to memory loss and mood disorders (*like Berard choking Gaudet and threatening to kill him in 2014 in México*) -- ***See R33 rebuttal 004***.

The Johns Hopkins study revealed that after an average of 7 years following a last self-reported concussion, NFL players (*identical to NHL players but in a less violent sport*) – showed unusually high levels of the Tau proteins (*or immunostained sections and neurofibrillary tangles*) in 8 of the 12 brain regions.   The Johns Hopkins study concluded this as the benchmark measurement for loss of neurological activity and memory loss, although usually attributed to elderly people suffering from dementia and Alzheimer's disease (*ALS*) at these levels.   The brain scans (*PET scans*) have revealed the ongoing inflammation in response to the injuries.

Autopsies of deceased NHL and NFL players – some from the recent suicides of NHL and NFL players with CTE symptoms – have revealed extensive brain damage, many who exhibited erratic behavior and daily memory disorder prior to their deaths.

An Ohio State University Center for Brain and Spinal Repair neuroscience study confirmed that immune proteins tracked by their study (*Tau clusters*) have also been implicated in a whole myriad of neurological diseases.   Early detection (*during their high impact playing days*) could lead to early retirement to mitigate the accelerated symptoms found in people usually 30-40 years older.

A separate Study at the Boston University School of Medicine showed that 33 of 36 of former players tested post-mortem showed clear symptoms from CTE and additional former players have been confirmed with CTE separately.   A new study list released in November 2016 discovered and confirmed CTE present in 90 of 94 brains of former and deceased professional athletes from concussions.

As examples:
- Nolan testified in 2009 (*arbitration*) and 2015 that he was not even aware of his LOC despite 40+ documents he signed from 2003 thru 2009 with Northern Trust (***See R33 659g1***), the phone calls he initiated with Northern Trust banker Mascarella to discuss his LOC (*see **R33 659g-page 30***) – ***See Tr.2065: 12 to 2066: 2***, &/or the 5-day text conversation with Kenner in December 2007 regarding signing a new LOC renewal package –***See R33 659g-page 22-28 and R33 460*** (*all documented in the Kenner submissions*).
- McKee was could not recall a defense-critical full disclosure, text conversation with Kenner (*& Constantine*) immediately following the GSF full disclosure dinner with he and his wife in Buffalo, NY on May 8, 2009 – ***See R33 401*** (*all documented in the Kenner submissions*).
- Sydor claimed he was unaware of the seizure of his LOC collateral despite a text conversation in March 2009 with Kenner prior to its seizure and subsequent confirmed phone call with Northern Trust banker, Mascarella, even after reviewing the original texts – ***See R33 800 and R33 514***.  Sydor also testified that he had not seen the Northern Trust default letters until a few weeks before his 2015 trial appearance despite his 2009 text to Kenner about specifically receiving the default

letters from Northern Trust (*see R33 800*) (*all documented in the Kenner submissions*).

- Ranford could not recall his GSF contribution transactions despite his unrelated September 17, 2014 deposition in a Arizona lawsuit by him versus Kaiser and Berard when Ranford confirmed his deposit of $100,000, repayment of $100,000, and final distribution of $300,000 just like his July 25, 2012 FBI proffer notes also confirmed two months prior – *See R33 519 and R33 rebuttal 030* (*all documented in the Kenner submissions*).
- Gaarn (*a University of Maryland college football player – also subject to CTE issues*) could not recall that he was a personal owner of Eufora shares thru his Standard Ventures, LLC, despite confirming this initially during his June 5, 2012 FBI proffer -- *See 3500-TG-2 (page 2)*.
- ➢ A multitude of additional examples exist of witness perjury, which is painstakingly laid out, contradicted by real evidence and witness' previous pre-trial statements (*all documented in the Kenner submissions*), perhaps, all given prior to the onset of CTE symptoms and not perjury as the government claims thru ***faulty memory, confusion and mistake***.

Under the United States v. McCourty (2d Cir. 2009) and quoted by the government, "*It is only when it appears an injustice has been done that there is a need for a new trial in the interest of justice*". The government submission of the loans to Jowdy on ***forfeiture-44*** confirm that all of the government attacks on Kenner's trial credibility were unfounded and poisoned Kenner's credibility from Komatireddy's defamatory and knowingly untruthful opening remarks, "*(GSF) This is the fraud where the defendants lie to the investors about who's stealing from them, and find a way to steal from them all over again. The defendants tell the investors that a guy in México, named Ken Jowdy, stole their money and ran away with it...*" (*which apparently Jowdy did*) thru her rebuttal summation slander, "*I thought the most important document in the case was the supposed loan to Ken Jowdy*" and "*Mr. Kenner told you that he used that money to get his piece in the México investment with Ken Jowdy*" (*clearly another bald-faced lie*). Secondly, it is difficult to believe that the government received the ***forfeiture-44*** document (*on August 3, 2015*) from Jowdy's attorneys (*only weeks after the completion of the 10-week trial and 6 years after the 2009 SDNY Grand Jury began with Jowdy's attorneys actively supporting the Indictment efforts versus Kenner as a side-show*), *specifically with no open issues pending*. It also disregards the fact that Jowdy's attorney, Tom Harvey, was present in the EDNY courtroom for the most of the trial. He was actively working hand-in-hand with Michiewicz at every break to evaluate evidence going specifically in front of Kenner during cross-examination. It also raises separate concern for the December 2012 Jowdy proffer session in the EDNY (*which Jowdy traveled from Cabo san Lucas, México to attend with his attorneys*), which produced **NO PROFFER NOTES** or related substantive disclosures to the defense of the discussions that day – as required by Brady (*whether memorialized or not*). The notification of the meeting was not delivered with the original 3500 materials to the defense despite occurring about 6 months earlier, clearly premeditated (*like forgetting to turn over the pre-trial Sydor meeting notes until Sydor confirmed them while on the witness stand – another BRADY violation – not counting the unknown ones from additional witness pre-trial FBI and AUSA interviews*). One question that needs to be answered by the government is, "**Was the August 3, 2015 receipt of Jowdy's confirmation (*forfeiture-44*) the first time they were aware that the funds from Kenner and Kenner investors to Jowdy thru the Hawai'i loans were REAL?**" IF yes, then the government has a real contradiction on their hands considering the abusive characteristics of Kenner's confirmation of the same, as "***phony***", "***supposed***", "***fake***" and

"***bogus***" and the resulting unfairness to Kenner throughout the trial.  IF no, then there are significant prosecutorial undertones that each knowing member of the prosecutorial team should be held accountable for by the court.   In either instance, a reformative action is necessary to correct the egregious contradiction at hand.  In fact, on January 4, 2010 (*during the course of the Kenner investigations by Galioto*), outgoing Assistant Attorney General David Ogden issued a formal memorandum establishing the Justice Department "*guidance*" for Federal Prosecutors to review files and produce *Brady* material to the defense.  The memo established, "*a methodical approach to consideration of discovery obligations that prosecutors should follow in each case to avoid lapses that and result in consequences adverse to the department's pursuit of justice…providing broad and early discovery often promotes the truth-seeking mission of the department and fosters a speedy resolution in many cases…Exculpatory information, <u>regardless if whether the information is memorialized</u>, must be disclosed to the defendant reasonably promptly after discovery*".   This critical and defense-supporting disclosure (*if truly discovered 3-weeks after the conclusion of the trial, and its underlying Jowdy disclosures, for the first time*) was not turned over until Agent Wayne presented it to the court March 9, 2016, **7 months and 6 days after its receipt**.  Please note that the government did not even include ***forfeiture-44***'s defense-critical exculpatory revelation in pre-hearing evidence to substantiate it during their February 12, 2016 hearing, 3-weeks earlier.   As a result of the July 2006 Little Isle 4 signed disclosure (*acknowledging the "**change**" in the Hawai'i deal parameters in the first paragraph of the 7-page document*), the 2009 signed Baker disclosures in the Arizona case (*acknowledging the Hawai'i loans to Jowdy*), the 2009 signed authorizations for Ronald Richards in the California Jowdy cases (*acknowledging the Hawai'i loans to Jowdy*), and the GSF disclosures (*coupled with the Brady or "new evidence" **forfeiture-44** document*), the prosecutorial case based its self-proffering on its own feigned ignorance and not Kenner's concealment, despite ridiculing each and every defense disclosure document .

The witness' voluminous "***misstatements***" based on a "***lack of memory***" after clear and full pre-trial contradicting disclosures (*including affidavits, trial testimony, SDNY Grand Jury testimony, and 3500 interview materials*) were 100% contradicted thru leading questions (*thus premeditated*) and resuscitating re-cross examinations by the government.   This coupled with the basis of the Kenner submissions and the Komatireddy rebuttal summation including deceitful statements that Kenner was "broke" **Tr.5982: 8-13** and "*stole money for Cabo*" **Tr.5996: 19-21** made it categorically impossible for the jury to sort thru the overabundance of trial evidence with an impartial eye.   The government must maintain at least a minimum ethical standard while parsing thru the evidence and statements prepared for prosecution as the Constitutional representative for justice.   They failed at every turn and now ask the court to ignore Kenner's exposé of their deliberate wrongdoings.

The government claims that a motion for a new trial can only be granted if the government failed to disclose or delayed the disclosure of Brady information in the possession of the government that <u>(1) the evidence was favorable to the accused</u>.   This is satisfied with the fabricated Los Fran docs "***signed***" by Kaiser and Privitello for the Los Franiles investment with Kaiser claiming he was the Managing Member of some México company – which he never was (***See EDNY issues 068a-page 12***).   In October 2014, Kaiser and Privitello attempted a coordinated "***framing***" Kenner with the Privitello purchase in Los Franiles from Kenner with fabricated and false statements to FBI agent Galioto and IRS Agent Wayne on October 2, 2014, after Kenner Indictment (***See 3500-NP-5 and 3500-JK-7***).   The Franiles fraud (*of Kaiser's fake documents*) was perpetrated on Privitello by Kaiser, the same person who was alleging a forgery of his name on Hawai'i consulting agreements (*in addition to his*

*same Jowdy-like forgery claims in the contemporaneously adjudicated AZ case with more forgeries as his defense -- and lost by Kaiser and Berard*).   It should be noted that Berard also claimed a forgery in the Arizona case as a co-defendant of Kaiser's on a MA notarized document that EDNY trial witness Donlan was a "*witness*".  Donlan's pro-government testimony in 2015 was to confirm Kenner's alleged "***tracing***" event in 2005 (*on documents that were never turned over to the FBI, never appeared in EDNY evidence, nor ever were requested by the government*) **Tr.3456: 7 to Tr3457: 20.**

Agents Galioto and Wayne followed up with Donlan on September 9, 2014 to assist Kaiser and Berard in their AZ case defense ***versus*** Sydor, Ranford, Nash, Lehtinen and Khristich (**See 3500-LD-2**), but never tuned over any follow-up interview notes with the actual Massachusetts notary, William Medlin.  After learning of the forgery allegations in the AZ case by Berard and Donlan, Kenner retrieved the text conversations confirming the notarized document (**See R33 201a**) was authentic and the text communication confirming Berard mailed it to Kenner via Kenner's FedEx account (**see R33 448, R33 449 and Point III at 43-46**).  Clearly Berard and Donlan co-conspired against Kenner with more unfounded forgery claims in AZ as well as the EDNY.   This "*forgery*" defense strategy, with Berard and Kaiser being represented by the same Arizona counsel as Jowdy, was eerily identical to Jowdy's 2008 claims of "*forgery*" on the 2004 Hawai'i loan agreement to delay his terminal production of evidence in the 2008-09 AZ case.  Jowdy succeeded through unscrupulous legal tactics in AZ and delayed his delivery of the damming accounting documents until two weeks later (*in the California cases – January 2010*).   Notwithstanding, Jowdy used the same allegedly forged document one year later as his main defense exhibit and authenticated it in his December 2010 Nevada trial defense (**see R33 666a at 210-213**) thru document witness, Robert Gaudet.   All of this was known by the government, since Kenner mailed the 4-day transcripts and NV ruling to Galioto, despite his February 2010 to STOP sending evidence to him about Jowdy (*after receiving the January 2010 Jowdy 2-day California confessions from Kenner*) -- **See R33 597, R33 598, and R33 599**.

The court in 2015 rightfully denied the prosecutorial request to claim to the jury that the 2008-09 case was dismissed because of the 2008-09 Jowdy-alleged forgery (**see R33 667**).  Nonetheless, Michiewicz chose to badger Kenner anyhow about the authenticity of the loan agreement (**See R33 400a**) systematically and subconsciously slandering Kenner.  This was systematically coupled by Kaiser's false claims that Kenner told him the 2004 Hawai'i loan agreement was a forgery while unsolicited two times on cross examination (**See R33 567**).  In additional testimony about the authenticity of the 2004 Hawai'i loan agreement, Jowdy's AZ attorneys deposed document witness, Robert Gaudet on July 2, 2009.  Gaudet confirmed his signature again on the document as well as Kaiser's intimate knowledge of the signed loan agreement (**See R33 566a**).   While disregarding the voluminous evidence about the authenticity of the 2004 loan agreement, notwithstanding Jowdy's own December 2010 defense admission of the document (**See R33 666a at 210-213**), the court should recall pre-trial that the government alleged that the 2004 Hawai'i loan agreement was a forgery (*as one of the 4 proposed forgeries*), which they planned to use to support their prosecutorial theories at trial.  The fourth proposed forged document was a México document signed by Kaiser in support of a $1.6 million criminal lawsuit versus Jowdy in México by another defrauded Jowdy-investor, and not an alleged EDNY victim.  Once Kaiser received his high paying *IRS tax-free job* from Jowdy (**see 3500-JK-11-page 129:22 to 130:4**), Kaiser reversed his México affidavit affirmations and claimed his name was a "*forgery*" to the México courts to assist Jowdy, further delaying the pursuit of justice against Jowdy by Kenner and Kenner investors in México.  Shockingly, while in EDNY custody, Kenner

received recordings of conversations between Berard and Gaudet from 2012.   During the recordings, Berard confirmed to Gaudet that he and Kaiser "***signed blank documents***" at the Cabo courthouse in the prosecutor's office for their anti-Jowdy testimonials before they left México.   At approximately 9:40 of the recording in the government's possession, Berard states – ***"We did not make testimonies, we waited outside forever, it took too long, we actually signed FAKE, not FAKE, uhh, we signed BLANK PIECES OF PAPER, with our signatures".***   The Kaiser México document was clearly confirmed by Kaiser's anti-Kenner sidekick, Berard, in the 2012 recording but prejudicially ignored in the government's pre-trial proffers of additional forgeries (*consistent with all pro-Jowdy allies*) slandering Kenner.   At a minimum, the government received the allegations of the México forgery from Kaiser and willfully chose to proffer it to the court, further exposing Kaiser's ability to lie about forgeries that were clearly authentic, no different than the two Constantine-Hawai'i consulting agreements.

Second, (2) the evidence was suppressed by the prosecution, either willfully or inadvertently.   Kaiser's victim, Frank Sconzo, confirmed to FBI agent Galioto that he had sent Kaiser $200,000 in checks for an investment in Los Frailes, México (***See 3500-FS-1, specifically paragraph 2, 4 & 7***).   Kaiser also re-created documents with himself fraudulently as the Managing Member of a México company for Sconzo (*the same as the unsigned Smith documents*).   The Sconzo checks confirming Kaiser's fraud were withheld from Kenner pre-trial (***see EDNY issues 062 – page 15-17***).   Pages 15-17 confirm Galioto's receipt of the Sconzo fax on March 20, 2014 (*before the Kenner trial*) and the fact that Kaiser cashed both of the checks made out to him and kept the funds.   The government attempts to claim Sconzo as a victim of Kenner on ***Forfeiture-1*** despite the concealed *BRADY* materials, which would have allowed the defense to call Sconzo to represent Kaiser's unethical and relevant conduct, just like the newly discovered *BRADY* violation signatures on the fabricated Kaiser and Privitello Los Frailes documents (***See R33 103-page 12***), withheld thru trial.   The defense could have crossed Privitello on the fraudulently "*signed*" agreements as well as his 3500 interview cover-up frauds and lies to the FBI and Criminal Division of the IRS with Kaiser from October 2, 2014 (***See 3500-NP-5 and 3500-JK-7***).   The existence of the fabrications by Kaiser coupled with the "***grocery list***" frauds (***See R33 536 and R33 rebuttal 001***) conceived in concert by the government and Kaiser to deceive the court, the jury, and slander Kenner was more than enough to destroy any Kenner credibility related to the alleged forgeries and the supportive testimony of the misled government expert.   The defense was deprived of all of that due to the *BRADY* violations, which the government is attempting to brush off as not relevant to the Kenner defense.   Of course their position of convenience is offered in the face of their wrongdoings, since *BRADY* suggests that a violation occurs "*if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury*".

If the government's position is that they did not come into possession of ***forfeiture-44*** until August 3, 2015, then the "*newly discovered evidence*" strikes an arrow thru the heart of the government claims of Kenner (*and Constantine*) covered up some actions by falsely claiming, thru "***finger pointing***" that Jowdy stole funds (*which apparently the government is now convinced he did, 8 years after Kenner proffered the Jowdy-theft roadmap in June 2009, leading to Kenner's immediate SDNY Grand Jury and the systematic dismantling of Kenner's 15+ year career by Galioto – See Trial **government exhibit 726-L***).   The government admission of the document 3-weeks after trial opens a quizzical issue.   Why was the document delivered immediately after trial?   What formal request was made by the government to secure this evidence from Jowdy and his attorneys, and ***when was that***

*request made*?   The government used its "*finger pointing*" theme thru Michiewicz' summation by misleading the jury that the underlying conspiracies were built on the "*finger pointing*" foundation, discovered as untruthful, just 3-weeks after trial, yet not reported to the Kenner (*or Constantine*). *Tr.5687: 20-23*.   It should be noted that the government could not even coordinate their proposed lies about Kenner presentation of the MONEY Magazine article to Kaiser and Manfredi in 2003 (*See R33 641 and R33 642*).

The government's overall reliance on the 2015 anti-Kenner hearsay contradicts all known and documented evidence (*including the witness' own previous clairvoyant testimonies*).   It must be represented as either memory disorder (*CTE*) or perjury, as the government "*cannot have their cake and eat it too" – Dr. Seuss.*

Self-servingly, the government takes the position that their own evidence (*forfeiture-44*) used in their forfeiture case-in-chief to attempt a forfeiture nexus clearly backfired as the change in the prosecution team failed to corroborate their trial fabrications with their newly adopted forfeiture strategy, under the duress of finally having to submit solely, non-hearsay based evidence, which their 2015 trial was absent of.   Absent of real proof, the government continues to beat their drum of defiance claiming that because Kenner had voluminous pre-trial discovery production from the government, they somehow satisfied some minuscule standard of fairness (*again disregarding their own BRADY violations, while posturing to the court that Kenner could not or would not have been able to use the exculpatory materials*).   Under *BRADY*, the government has the obligation to turn over all materials (*even absent of request from the defense*) without attempting "*climb into the defense's mind*" about what materials may be beneficial to the defendants.   The government actually raised Kenner's submission of Jowdy accounting records in his Rule 33 materials as a conclusion that Kenner somehow failed in his ability to defend himself, when the actual exhibit (*R33 315*) that the government references refuted all of the slanderous and denigrating comments that the allegations of Jowdy thefts from Kenner and Kenner investors were somehow "*false"* and inappropriate *"finger pointing"*.

In furtherance of their denial of the truth and "*shell-game*" defense tactics, the government wants the court to ignore the "*control*" documents in Hawai'i (*See TIMELINE 046*), once the individual investors all signed their *Letters of Authorization* (*See Peca example – TIMELINE 047*) and *Extension of Credit*, completely identifying their intent to "*Invest funds in Little Isle 4*" (*See NT 2004 Extension of Credit - Nolan-2 in FOLDER 5 -- Northern Trust SUBPOENA)* coupled with Michael Peca's post-seizure texts regarding his "*capital account*" in Hawai'i and not "*some LOC seizure that shocked his wife*" (*See Point III at 22-23*) where Kenner and Michael Peca also discuss the Hawai'i loans to Jowdy, as well Michael Peca's SDNY Grand Jury, pro-Kenner testimony even when he claimed he was "*concerned*" during his 2015 testimony about the Kenner questions (*somehow invalidating his truthful representations in front of a SDNY Grand Jury?*) (*See R33 419*).   The government choses instead of the original 2011 SDNY Grand Jury testimony as supportive evidence to characterize the 2012 Michael Peca self-proffered and contradictory statements to Kenner about "*what he would or would not have approved*", now 7 years after his original approval and only 1 year after his contradicting SDNY Grand Jury statements.   As the court is aware, the relevance of a knowingly recorded contradicting statement by an individual serves no purpose but to bluster for oneself and certainly not generate unique and authentic evidence. Gonchar's 2015 statements about his aversion to the Hawai'i LLC lending deal with Jowdy also contradicts his February 8, 2010 FBI proffer (*over 5 years earlier*) (*see 3500-SG-2 – pages 8-9*) and his 2009 signed affidavit (*see TIMELINE 036 and 3500-SG-4*), conveniently

ignored by the government, specifically in their 3500 materials.   All of the pre-trial knowledge of the Hawai'i loans (*See Point III at 117-119 – re Michael Peca*) ignore the fact that the Hawai'i LLC was authorized to engage in "*lending*" (*See TIMELINE 046*). Notwithstanding all of the individual acknowledgments of the Hawai'i loans to Jowdy from the 2004 "*group*" conference calls (*as acknowledged by Sydor, Michael Peca and Stevenson in their respective 2011 SDNY Grand Jury testimonies*), each of the Hawai'i and México investors signed 2009 full disclosures with their own independent attorney, Tom Baker, in the AZ "*Hawai'i loan case*" versus Jowdy (*See R33 A*) as well as the two California cases versus Jowdy which fully disclosed the $8 million of outstanding loans to Jowdy (*See TIMELINES 072-page 7 and TIMELINES 071-page 7*), without a single complaint or terse word uttered in text, email of otherwise produced by the government as real and documented evidence. In fact, just after the 2009 seizure of collateral, the two main Kenner adversaries in 2015, Kaiser (*as Managing Member of Na'alehu Ventures 2006*) and Berard, gave "*full knowledge*" and supporting testimony about the 2004 loans to Jowdy voluntarily in the 2009 arbitration, Nolan versus Kenner (*See R33 573, R33 311 and R33 562*).  It should be noted that Berard's voluntary testimony (*in May 2009*) occurred immediately after the seizure of his Northern Trust LOC (*April 2009*) and immediately after the same time he told the FBI in 2013 that he returned from Russia (*in March or April 2009*), told the 2015 court that he received a phone call that he lost $1 million (*although it was really about $650,000 and such event ever existed – See R33 587*), told the FBI in a September 12, 2013 proffer that he received a letter confirming his LOC loss (*although no such letter ever existed*), and thought Kenner was *NOT LEGIT – See 3500-BB-1-r*.   It is inconceivable and irresponsible that the government continues to claim a "*lack of knowledge*" with the overwhelming pre-trial testimony, affidavits, SDNY Grand Jury testimony and signed litigation disclosures, Plaintiff participation in the AZ and California "*loan*" cases versus Jowdy (*amongst other evidence*), yet they blindly do.  This is notwithstanding the "*perjury*" by each of the government witnesses could be explained by CTE symptoms.   Either way, the prejudice of inconsistent evidence in 2015 that contradicts previous pre-trial testimony and the underlying support documents years before the trial cannot be enough "weight" to sustain a verdict of guilt related to the Hawai'i management and operations, under the egregious and contemptible circumstances.   Together with the newfound Jowdy disclosures (*whether forfeiture-44 is BRADY or "new evidence" as a result of the government disclosure in March 2017*), each party involved in the lending beginning in 2004 (*affirmed recurrently by the Kaiser FBI proffer October 19, 2010 – See R33 557 also 3500-Kaiser-1-r*), knew about the Hawai'i loans and supported them.   The government also continues to rely on the validity of Kristen Peca's testimony, despite the fact *she was not a Kenner client* (*which the government opportunely overlooks*), nor was she present at even 10% of the face-to-face meetings with Michael Peca since he became a Kenner client in or about 1995.   Kenner owed no duty to her, only Michael Peca (*his client*).   Kristen Peca's flawed testimony (*and government utilized 2012 recorded call with Kenner at trial*) claimed that she would not have approved the "*loans to Jowdy*" (*although her husband confirmed he did, as Kenner's client, to the SDNY Grand Jury – See R33 652*) for some unknown reason, despite the fact it is the sole remaining asset of Na'alehu Ventures 2006 (*worth over $22 million in 2017, if the government would assist Kenner and Little Isle 4 in the collection efforts as requested in 2009*), the loans were the partial basis for the Jowdy-led acquisition at DCSL that the Kenner investors are currently settling with Jowdy to remain a hopeful part of potential future revenues (*despite Jowdy's 15 years of documented embezzlements, diversions and criminal behavior adverse to Kenner and Kenner investors*), and long after the 2009 historic collapse of the global real estate markets and bankruptcy of Lehman Brothers in 2008.   In contradiction, Kristen Peca claimed on the 2012 call (*ignored by the government*) that she believed the Northern Trust LOC was

established "*while she was in Ohio*" (*2008-09*), thus 4 years after her husband established the LOC (*and concealed it, as represented as his own decisions on multiple occurrences in the Kenner submissions*) -- ***See Point III at 189-190***.   Kristen Peca and Michael Peca's glaring 2009 support for Ronald Richards's efforts (*thru the GSF contributions*) versus Jowdy in November 2009 while seeking the repayment by Jowdy of the $8 million Hawai'i loans, acknowledged in both lawsuits; DDM and DCSL – ***See TIMELINES 072-page 7 and TIMELINES 071-page 7)*** thoroughly undermines both of Peca's government-led claims on two issues; one, they had independent knowledge of the information regarding Jowdy's frauds as led by government questioning, and two, they were aware of the loans to Jowdy without discussing their alleged 2015 discontent with their independent attorney (***See TIMELINE 073***).   The government attempted to continue their deceptive scheme by leading Michael Peca through a series of answers claiming he was not "*specifically*" aware of the Hawai'i distributions (***See R33 659a***).   This ignores the government knowledge that Michael Peca (*like all of the Northern Trust LOC Hawai'i investors*) granted full access to their LOC (*for capital accounts* – ***See R33 419 and Point II at 22-23***) and the money belonged to Little Isle 4 immediately (*as Sydor confirmed to the SDNY Grand Jury* – ***See R33 467f***), once they signed the Northern Trust Letter of Authorization.   There was no specific obligation in the Northern Trust Letter of Authorization to confirm each and every transaction by Kenner &/or the LLC, nor was it reasonable, as the government knew and ignored to their prosecutorial benefit.   It was prejudicially misleading and the government executed it brilliantly, witness after witness to prejudice the defendants.   In addition to the contrived "***shock***" incident by Kristen Peca in 2009, proven as a lie in the Kenner submissions based on the Northern Trust FedEx documents and the 2012 recorded calls contradicting Kristen Peca's false 2015 testimony (*again*), Kristen Peca (***See R33 601***) communication via email regarding family plans with Kenner's family in September 2009 (*accompanied by Jowdy loan emails the same day*) showed zero issues with Kenner and undermines her credible claims of distrust in early 2009.   Michael Peca continued the friendly theme thru 2011 actively discussing vacation plans in AZ at Kenner's house only months after his SDNY Grand Jury testimony raised "*concerns*" (***See Point III at 188-119***) although not documented anywhere by Michael Peca until his 2015 newfound Kenner-adverse testimony.

The government objects to ***forfeiture-44*** as a *BRADY* violation, thus alternatively submitting it as "*new evidence*", refutes continuous claims throughout the trial, now contradicted by ***forfeiture-44***.   The government opening remarks claimed Kenner lied to the investors about Jowdy stealing the investment funds and Hawai'i loans. ***See Tr.31: 18-22***.   The government called Kenner a "***liar***" (***See TIMELINE 005 and Tr.5703: 2-10, Tr.5753: 2-12 and Tr.5051: 17 to 5052: 20)***.   These references contradicted the Manfredi FBI proffer on October 12, 2012 (***See 3500-Manfredi-2 – page 2***) when Manfredi clearly told agent Galioto that he and Kaiser invested a *$1,000* deposit – ***not $1 million*** – in the Hawai'i project in 2002-03 and he is *not sure if Kaiser invested any more*.   The Manfredi 2012 FBI proffer statement would be unconditionally impossible if Manfredi, as fabricated by Kaiser in his 2015 testimony confronted Kenner in 2006 about the 2005 $1mm Kaiser invested for his friends & family in Hawai'i -- ***See R33 558***).   Michiewicz defied the court's ruling that the AZ case was not dismissed due to a forgery but disclosed nonetheless the self-serving Kaiser fabrications of Kenner confessing to the 2004 Jowdy signature as a forgery (*in the face of Jowdy's own December 2010 utilization of the loan agreement as authentic* -- ***See R33 011***).   Then, Michiewicz challenged Kenner's credibility about receiving the July 17, 2009 EDNY Grand Jury subpoena of Kenner's testimonial appearance and the subsequent July 27, 2009 termination of the Kenner appearance to assist in a lay-up Jowdy and Najam Indictment (***See R33 rebuttal 005 and R33 rebuttal 006***).   The government

incessantly referred to the Jowdy loans as "*fake*" and "*phony*" (*See Tr.4597: 2 to 4598: 21*) and "*bogus*" (*See Tr. 5708: 3,22 and Tr. 5709: 1*).   The government referred to the loan agreement as "*supposed*" – *See Tr.5707: 25 and Tr.5991: 22*, completing their prejudice of Kenner in spite of the authenticity of the loan agreement (*See R33 011*) and Jowdy's criminal insolence through courtroom perjury in Nevada, Arizona, México and California to deny the loans, and continued thru his perjured declaration in November 2016 to the EDNY court (*See R33 rebuttal 007*).   As a result of the prejudicial and unfounded attacks on Kenner, the court instructed Michiewicz "*not*" to start questions with "*aren't you lying*" or "*isn't it a fact you stole*" as being prejudicial to Kenner.  Unfortunately for the calculated damage already done, the instructions were given out of the presence of the jury, who left with the resonation of Michiewicz's misconduct in tact (*See Tr.5076: 4-16*).   The cumulative damage of the repetitive prejudicial theme to Kenner prohibited the jury from properly separating each prosecutorial "*bell*" that had been rung as a result of the nonstop representations, certainly in light of the "*new evidence*" (*forfeiture-44*).   The final Jowdy straw, for now, as his ongoing negligence, defiance and legal contempt continues to astonish even Kenner after 11 years of pursuing justice related to Jowdy in the face of agent Galioto's efforts to protect him and blame Kenner, Jowdy submitted a fraudulent and perjury-laden declaration (*See R33 rebuttal 007, 025*) in the EDNY court in his reliably typical consequence-free and arrogant conduct (*See R33 rebuttal 666 and R33 rebuttal 666a*).

The government wants the court to ignore the *BRADY* violations, specifically the "*signed*" Frailes document between Kaiser and Privitello, because they withheld it along with the fraudulently cashed checks by Kaiser (*from unknown Frailes investor, Frank Sconzo*).   The fax cover receipt was sent to FBI Agent Galioto on 3/20/2014, long before trial.   The government graciously points out that they turned over the "*unsigned*" versions of the Sconzo, Privitello and Smith agreements for Los Frailes.   It is the government's obligation to turn over "*all*" of the information pre-trial, and allow the defense to determine their own defense strategies, which is paramount to *BRADY* doctrine, *otherwise all exculpatory evidence could be subject to the prosecution's self-serving determinations, fully prejudicing each and every defendant without recourse.*  Had the government fulfilled their *BRADY* obligations, Kenner would have been able to conduct further investigations into what Smith and Sconzo possessed for evidence of their Frailes investment thru Kaiser.  The government felt it was relevant, inasmuch as it was part and parcel to their *forfeiture-1*, relevant conduct calculations.  The unsigned copies of the Frailes agreements could not have reasonably led Kenner to demand thru subpoena additional copies of signed versions, but since the government already possessed at least the Privitello "*signed*" version as well as the "*Sconzo checks*" to Kaiser (*also not turned over – Brady viloations*) and endorsed by Kaiser as another financial fraud (*like the admitted thefts from his mother, Ethel Kaiser, during the 2015 trial*), Kenner could have critically damaged Kaiser's false assertions of "*forgeries*" on the 2004 and 2005 Constantine Hawai'i consulting agreements. Interestingly enough, Kaiser and the government did not allege that the 2006 Constantine Hawai'i consulting agreement (*signed by Kaiser*) was not forged (*PKHOME 12876 to PKHOME 12882*).   All three of the Hawai'i agreements were listed on the "*grocery list*" document that Kaiser mysteriously copied (*unknown to Kenner until 6 days later -- See R33 536 and Point III at 95-96*) – as proven by Kaiser's text on 12/12/2009, and the transcription of Kenner's shorthand for "*Ula + LI4 + NV2006*" converted by Kaiser to "*Hawai'i*" without any conversation with Kenner (*See R33 539 and R33 540*).  This $2.65mm total was separate from Kenner's (*not Kaiser's*) "*grocery list loans*" to Constantine.  Clearly Kaiser was aware of the payments to Constantine from "*Hawai'i*". Again, related to Kaiser's Frailes frauds, the fabricated and "*unsigned*" copies with Kaiser

falsely listed, as a Managing Member, would surely have been followed by a "*signed*" version between Kaiser and the other two investors (*similar to the Privitello documents, only turned over in their forfeiture submissions to Kenner*), thus further confirming Kaiser's unscrupulous and independent actions.   Thankfully, the government also points out another Kaiser and Berard fraud on the AZ court (*known and overlooked by Galioto, Wayne and AUSA Beckmann*) while attempting to divert the courts attention with *R33 101*.   The government claims they turned this document over as a Frailes document, thus upholding their *BRADY* duties at the same time they could have alerted the court to *R33 549* which would have outlined not just the Frailes signed and notarized document between Kenner and Kaiser, but the underlying false forgery claims by Kaiser and Berard in the AZ 2015 trial (*which their forgery claims produced a trial defeat – utilizing the same AZ attorneys as Jowdy*).   *R33 549* also outlines, with actual documentation, the $500,000 Kaiser confirmed to the FBI that he *stole* from his friends & family (*during his October 19, 2010 FBI proffer*), as well as the Kaiser and Berard frauds on the AZ court (*through declarations, depositions and trial testimony – all perjured*) that the same $500,000 that Kaiser paid Kenner for the notarized Frailes deal was *ACTUALLY* for the AZ case (*now claimed 6 years later when Kenner sued Kaiser and Berard for stealing the title to the AZ renovation property after they began working hand-in-hand with Galioto to prosecute Kenner and received IRS tax-free jobs in México from Jowdy*).   The timing of the Kaiser and Berard thefts (*including the Sag Harbor-LedBetter theft with forged and fabricated documents*) cannot be dismissed as coincidence.  The AZ judge confirmed the Berard and Kaiser fraudulent conveyance (*See 055e – paragraph 9, 40 and 57*), which would have been considered a crime if Kenner had done it (*notwithstanding Kaiser and Berard's identical fraudulent conveyance in Sag Harbor, also after their new México employment and Galioto's FBI protection – See R33 055c and R33 055d*).   The government attempts to deflect Kaiser's gross frauds on his friends & family in the Frailes thefts by claiming the Frailes project was not alleged as a fraud in the Indictment, but the Los Frailes project was referenced 49 times during trial in conjunction with the myriad of fund transfers controlled by Kenner, purposely confusing the juries monumental task of deliberation.   Kaiser's fraudulent actions were not on trial, but his credibility with the jury was, as a 9-11 first responder hero, as proposed by the government on direct examination – *See Tr.954: 3 to 955: 8*.   Kaiser's related actions of fabrications and forgery claims (*re—the 2004 and 2005 Hawai'i consulting agreements*) as well as his Jowdy-like AZ forgery defense in the contemporaneous AZ trial with Berard created a pattern for the jury to consider.   Without the Privitello and Kaiser signed Frailes document (*clearly in pre-trial possession of the government*), Kenner could not walk down that rabbit hole in his defense.   This valuable information would have allowed the jury the whole picture, and "*the whole truth, and nothing but the truth*", while determining if the frauds and cover-ups by Kaiser on his own friends & family, unknown to Kenner, were noteworthy when considering the credibility of other "*forgery*" claims to prejudiciously "*point the finger*" at Kenner (*or Constantine*).

The government points out that the Second Circuit's standard for granting a new trial based on newly discovered evidence is…"*only in the most extraordinary circumstances*".   The grossly negligent prosecutorial misconduct coupled with the nonstop witness perjury or CTE-based on *faulty memory, confusion and mistakes* would qualify as extraordinary in any setting.   The government's nonstop rhetoric of "*concealed loans*" from the investors is satisfied by the "*signed*" 2009 acknowledgements in the newly discovered Baker Disclosures (*See R33 A*), without a single government witness' documented complaint.  This is the same disclosure that each and every same Plaintiff was aware of in their two 2009 California filed complaints versus Jowdy for frauds in both México projects; Diamanté

del Mar and DCSL, while acknowledging the $8mm in unpaid loans from Hawai'i to Jowdy (*See TIMELINE 072-page 7 and TIMELINE 071-page 7*).  Instead of addressing the "*What loans?*" issues in either the AZ or California Complaints versus Jowdy, as alleged by the prosecution 6 years later, not one investor offers a objection in 2009, notwithstanding other contemporaneous pro-Kenner testimony and signed affidavits acknowledging all of the loaned funds at the time.   In fact, Kristen Peca sent Ronald Richards a supportive email to confirm her complete trust in the litigation efforts to recover the millions from Jowdy as the two California complaints laid out, further confirming independent communication and knowledge between the investors and their attorneys (*See TIMELINE 073*).   In addition, the relentless government claims throughout the 2015 trial of Kenner being a "*liar*" in testimony about the loans to Jowdy, as well as the supporting documents being  "*fake*", "*bogus*" and "*supposed*" were deafening – despite the government's knowledge of Jowdy's December 2010 authentication and admission of the 2004 Hawai'i loan agreement in his Nevada trial defense to Glen Murray and Kenner for another unpaid loan fraud.   Murray and Kenner won decisively (*See TIMELINE 061*), as the seasoned Nevada judge ferreted out all of the Jowdy lies, specifically contradicted by his own attorneys and accountants who tried to follow the predetermined pattern of defense lies, unsuccessfully.   It was unconscionable that the government would claim 5 years later that the document Jowdy authenticated in December 2010 was "*fake*", "*bogus*", "*phony*" and "*supposed*".   A bare minimum level of ethics is expected before reckless proffers and unsubstantiated claims are bantered about as unquestionable fact.   The *BRADY* non-disclosure of the ill-timed (*and later alleged as received on August 3, 2015*) *forfeiture-44* document, as previously addressed, refuted the "*fake*", "*bogus*", "*phony*" and "*supposed*" claims with a colossal *ACME* sledgehammer.   At a minimum, with the government's post-trial receipt claims, it is critical and massively contradicting government offered, "*new evidence*".   Regardless of which sword the government wants to fall on, the pro-Kenner *forfeiture-44* document must raise great pause with the court related to Kenner's ethical and full disclosure actions as manager of the Hawai'i LLCs, all supported by each and every pre-2015 signed document, affidavit, and government witness testimony, with no contrarian materials offered to substantiate the "*recently fabricated*" claims.

As the government claims Kenner's pre-trial knowledge of the Baker disclosures, Kenner can affirmatively confirm that he received the "*deVries disclosure*" (*Kenner exhibit 231*), but was not in possession of the Michael Peca, Berard, Sydor, Rucchin, or Gonchar signed disclosures to cross-examine them during trial after their false testimony during direct examination by the government.   No other disclosures were available to Kenner. Notwithstanding, the government's desire to distance themselves yet again from damaging evidence clearly undermining their trial fabrications, the Superseding Indictment (*of 4/24/2015*) does not charge Kenner with diversion of the LOC funds.  It only claims diversions related to the Centrum loan, which was properly documented (*See Government 3703*), disclosed (*See R33 rebuttal 010*) and negotiated with Kaiser and Manfredi involved in every step of the transaction (*See PK_SEC_18298, PK_SEC_18151, R33 2000, R33 2002*). In fact, Manfredi and Jowdy negotiated the final $1.5 million loan amount (*see R33 2001*) expected to be 30-day advance (*which the government scoffed at during Kenner testimony despite Kenner's documented truthfulness -- See R33 636*).   Only a few weeks after the Northern Trust LOC collateral seizures, Kaiser's voluntary arbitration testimony in 2009 (*when he was the Managing Member of Na'alehu Ventures 2006 – the Hawai'i LLC*) confirmed that he had "*met many of the Hawai'i investors*" and "*nothing was concealed*" and "*there were no secret handshakes*" (*See R33 031*).   This was at the same time Berard, only weeks after allegedly "*receiving a phone call from Northern Trust*" confirming that his bonds were

already taken (*See Tr.3039 to 3042*), gave voluntary testimony confirming his knowledge of the Jowdy loans and his decision to support it (*See R33 562*).   Berard, like Kaiser, also forgot (*thru CTE or perjury*) that he had voluminous communication with Kenner prior to Berard's independent call with Northern Trust about the "*pending*" seizure of $650,000 prior to its due date; and not $1 million (*See R33 588, R33 rebuttal 011 and R33 rebuttal 666a: 91-108*).   Berard's seizure happened 6 days before the March 2009 loan statement had the due date (*See R33 rebuttal 012*), thus Berard (*like all of the other LOC clients*) had to independently call Northern Trust and confirm that he approved the seizure of collateral in lieu of personal ongoing payments (*like Nolan did without Kenner with the same default letter notifications*), thus Berard had previous and independent knowledge and did not find out about it from a letter when he returned from Russia and considered Kenner illegitimate as he told the FBI on September 12, 2013 (*See R33 588*).

Contrary to the government's hollow statement, Kenner never conceded that the Baker disclosures were cumulative, since none of the government witnesses appeared cognizant (*due to CTE or government prepared pre-trial selective amnesia*) of their previous known acknowledgments of a Jowdy loan.   Cumulative could only be defined if the court already is convinced that any and all other supportive documents have already conceded each and every investor's full and complete awareness.   If the government claims that Kenner could have used other commensurate documents to "*refresh the recollection*" that the Hawai'i investors were completely aware of the loans to Jowdy, then they failed in the representation of true justice, conceding Kenner did fully disclose to the Hawai'i investors properly thru other evidence the government actually possessed pre-trial; which he did. The government did not produce a single primary document (*email, text, disclosure, authorization or otherwise*) that supported non-disclosure or investor confusion at any time pre-trial, *minus a few self-serving statements on one-way recorded calls*.   The government relies on the same witness testimony from investors who could barely recall any investment discussions other than what they clearly claimed to "*NOT HAVE BEEN TOLD*".   They also rely on the Peca 2012 self-serving recorded call statements, despite his contradicting testimony to a SDNY Grand Jury while *under oath* a year earlier (*See R33 419*).   It is contemptibly illogical.

The government takes aim at Kenner's representations to the court that the Northern Trust subpoena documents should be considered new evidence, since the court received them after the close of the government's case.  The subpoena was only partially filled.  In particular, the Sydor documents could not have been all that Northern Trust retained otherwise, they could not have satisfied any federal minimum lending requirements.  In fact, there were a number of documents that the government recovered from the Kenner search and seizure in November 2013 that Northern Trust did not produce, none of which were the "*full disclosure Extension of Credit documents*", highlighting the individuals "*investment in Little Isle 4*" as well as the clear and full dollar amounts (*See R33 rebuttal 013*).   In concert, Nolan, despite having independently signed over 40 documents from 2003 thru 2008 with Northern Trust, and having spoken to Northern Trust banker Mascarella several times independently on the phone (*See Point III at 53*), Nolan's claims of "*no LOC knowledge*" in 2015 (*See Tr.2065: 12 to 2066: 19*), as well as 2009 (*See R33 468, R33 471, R33 475 and Point III at 73*), are mindboggling.   The actual signed Nolan 2004 *Extension of Credit document,* highlighting "*$2,200,000*" and "*investment in Little Isle 4, LLC*", would have proven invaluable with Nolan on cross-examination, as well as every other Northern Trust client who relied on *faulty memory, confusion and mistakes* in 2015 as the basis for the hearsay evidence against Kenner.  The glaringly hollow resonation of the

government's evidence basis and foundation (*and their response excuse*) should not only give the court reason to pause but should resoundingly takes its breath away.   The late arrival date of the Northern Trust subpoena, more than 2 months after the court's initial subpoena and seven weeks into the 9 week trial (*is not only suspicious*), but left the defense no time to seek additional documents from Northern Trust to complete the subpoena, such as the unproduced communication between Northern Trust and their clients like the acknowledgment letter each of them received in 2006 after the Lehman Brothers closing offering to reduce their LOC collateral, which several individuals did (*Nolan, Sydor, and Berard*), thus identifying the prior use of LOC funds but the pay down amounts from the Lehman Brothers closing in August 2006 (*See R33 659b2*).  After Nolan's reduction of LOC and collateral, signed by Nolan with Northern Trust directly, Nolan was able request a $500,000 release of funds.  This timing cannot be coincidence (*See R33 rebuttal 031*).  None of the documents, specifically the *Extension of Credit documents*, were ever seen before the trial with the exception of the 2003 document Berard initially signed (*2003 Extension of Credit)* and the two Little Isle 4 *Extension of Credit documents* signed by Nolan and Juneau and sent to Northern Trust independently via Kenner's FedEx account -- *See R33 502*), notwithstanding both of the <u>coordinated denials</u> of knowledge related to their signed LOC opening in 2003.   It should be noted that Juneau exchanged 2005 emails (*see R33 504a*) with Kenner discussing his Hawai'i investment "*loan*" but told the 2015 trial court that he did not know about his LOC until 2006 – *See Tr.138: 25 to 139: 13* -- (*three years after Juneau signed initially signed for the Little Isle 4 LOC – and <u>never signed by Kenner</u> as the government repeatedly insinuated about each and every LOC investor*).

- Please note that Juneau suffered multiple documented broken jaws from concussion impacts in the first few years of his NHL career years after suffering several debilitating concussions during his college career (1987-91).

The government suggests that the receipt of the Northern Trust subpoena in week 6 (*actually week 7 of trial*) made the documents "***fully available at trial***".   Kenner could not authenticate each individual document (*despite the stipulation to admit the documents*) while creating the *impeachable impact* of witness denials followed by the presentation of the dozens of their own signatures contradicted only by their *faulty memory, confusion and mistakes*.  Kenner was already on the witness stand on June 17, 2015.  The government had closed their case and all witnesses had long-since returned to their respective out-of-state or out-of-country residences.  Also, the Nolan documents were not included in the first received package -- *Tr.4205: 25 to 4206: 8 and Tr.4214: 19-24*, thus further delaying Kenner's ability to even request a supplemental subpoena for the missing Sydor, Nolan, Little Isle 4 documents etcetera until even later in the trial.  Considering the 10+-week turnaround time for the initial subpoena (*See R33 rebuttal 014*), the "*full*" Northern Trust responsive documents would have been useless by the arrival of the supplemental request.  It should be noted that months before trial, Kenner requested a more complete Northern Trust subpoena, to which, the government claimed Kenner was "*unduly harassing*" Northern Trust Bank and on a "*fishing expedition*".   Under no circumstances was the defense able to utilize the Northern Trust documents, and specifically the "*Extension of Credit documents*" with each government witness to impeach them regarding their initial desire to "*invest in Little Isle 4*" with the specifically designated proceeds from their LOC (*See TIMELINE 048 (Peca), TIMELINE 041 (Berard), R33 rebuttal 013 (Nolan), and R33 659d5 (Rucchin)),* then corroborated by their signed Letters of Authorization (*See R33 462a (Nolan), R33 499 (Nolan), R33 580 (Peca), EDNY issues 134 (Rucchin), R33 304 (Sydor), TIMELINE 038 (Gonchar), R33 rebuttal 015 (Murray) and R33 rebuttal 016*), granting the proceeds

to Little Isle 4 for the individual "***capital accounts***" immediately and no longer their own possession (*just like any private equity investment*) (***See R33 467f (Sydor) and R33 419, 652, 659, 581 (Peca)***).   The government continues to ignore the underlying critical fact that the "*control*" of the investment funds was transferred to Little Isle 4 and under the protocols of its operating agreement at that point (***See R33 303***), which Kenner specifically followed, once the investors signed up for the investment "***capital contributions***" thru their respective Northern Trust LOCs.   Not only did Kaiser sign the 2004 operating agreement (*with the specific high-lighted lending provisions*) but he testified in the 2009 arbitration that he specifically raised the $1mm funds for the 15% loan to Jowdy (***See R33 573***), systematically contradicting his 2015 amnesia-based anti-Kenner rhetoric.   His 2009 testimony was followed by his October 19, 2010 FBI proffer where he further confirmed his 5+ individual meetings with Jowdy discussing the merits and promises surrounding the Hawai'i loans (*again despite Kaiser's selective amnesia in 2015*) (***See R33 492***).

The government tries to subtly submit to the court that at ***Tr.4211-4214***, Kenner was receiving the Northern Trust documents from the clients before Northern Trust received them, with a subliminal criminal undertone of restricting direct communication.   The government's representation 100% contradicts the Kenner testimony assuring the court that the individuals used Kenner's FedEx account to send their own-signed documents independently to Northern Trust (*also evidenced on Kenner's FedEx records in the government's possession*).   Thus, each individual had full opportunity to ask Kenner, Northern Trust Bank &/or independent counsel (*like Berard – **See R33 311***) about the contents of the documents prior to execution and mailing (*See Nolan texts December 2007 – **R33 460, 465 and 478***).   Although the government tries to pull the wool over the court's proverbial eyes by claiming the Northern Trust subpoena was "***largely duplicative***", it was NOT!   Not one of the <u>critical</u> **Extension of Credit documents** for the individual LOCs was turned over pre-trial, nor were the devastating monthly statements that Northern Trust delivered (*again, as part of their partial submission*) confirming each LOC client of Northern Trust Bank received multiple Loan Statements at their addresses of record ***BEFORE*** the decision (*on April 1, 2009*), and communication independently with Northern Trust (***See R33 514***), to allow the seizure of collateral (*specifically before each and every due date*).   In spite of the fact that the government knew each LOC client was required to approve the seizure, *before the due dates* of their LOCs (***See R33 rebuttal 012 and TIMELINE 057***), as well as Peca's receipt of a duplicate notice of the loan statement to his alternative Canada address in 2006 (***R33 rebuttal 017***), with copies of all the LOC statements going to the individual clients addresses of record with the bank, all confirmed by Mascarella (***See R33 511***), Komatireddy lied to the jury in rebuttal summation about the circumstances of the client-confirmed seizures directly with the bank (***Tr.5998:20 to 5999:4***), calling Kenner and Kenner's representation of the collective decision prejudiciously "***insane***", <u>*specifically when she knew it was 100% true*</u>.

Then, without an understanding for their desire to flaunt admitting the collective Northern Trust **Letters of Authorization** for LOC fund transfers to Little Isle 4, satisfying the "*investment in Little Isle 4*" (***See R33 rebuttal 013***), and the transfer of "*control*" to Little Isle 4 for the use of proceeds, the government closes their eyes again to the fact that Kaiser, Berard, Michael Peca, Sydor, Stevenson, Norstrom, Gonchar, Stumpel, Lehtinen, and Murray (*incomplete list*) all gave independent confirmations and acknowledgements of the Little Isle 4 use of funds for the Jowdy loans since 2009, without a single contradictory document or statement produced by the government or any witness alleging before the 2012 Galioto, Kaiser and Berard harassments that anyone proceeded at any prior time without complete

and unfettered knowledge of the Little Isle 4 loans to Jowdy.   In fact, each of the 19 México investors independently sued Jowdy, in part, for the $8 million of unpaid Hawai'i loans in 2009 (*with independent attorney, Ronald Richards -- See TIMELINE 072-page 7 and TIMELINE 071-page 7*, as well as the 17 Little Isle 4 Hawai'i investors signing full disclosures in 2008-09 for the Tom Baker-led Arizona loan case versus Jowdy (*See R33 A*). ***Not one adverse complaint emanated from the investor-led litigations***.   Despite Michael Peca's participation in both lawsuits as a Plaintiff (*after signing authorizations for both – and whether or not he "read" the complaints he signed on to participate in – as another government trial theme*), Michael Peca lied to the EDNY that he did not believe that the California suit had anything to do with Jowdy or Hawai'i – *Tr.456: 19 to 457: 5 and Tr.644: 11-16*.   The lie is patently not possible, but, if he were actually telling the truth (*notwithstanding CTE issues*), the court cannot believe he exhibited any personal effort to obtain knowledge from disclosure documents presented to him which he signed &/or litigation he independently participated in which involved over $3 million of his personal investment funds (*thru México and Hawai'i*).   If this is the case, as a Nolan arbitration judge stated to Nolan and his attorney after similar tactics, "***Arbitrator Meyerson: So somebody signs a statement that says, please grant Philip A. Kenner access to a line of credit for direct deposit into Little Isle 4.   Doesn't somebody have to take responsibility for that?***" (*See R33 499*), how could any businessperson be safe from prosecution under the government's prosecutorial approach (*See TIMELINE 074*)?   Michael Peca's perjury overlooks his own email to Ronald Richards with his unknowing wife about full support of Ronald Richards' efforts versus Jowdy (*See TIMELINE 073*).   The responsive email from Michael Peca and Kristen Peca to Ronald Richards is part of an offer, without Kenner present *or even cc'd on the email* between Ronald Richards and all his California litigation clients, to meet with Jowdy, if they would like to at Jowdy's expense to explain how he did not "**steal**" anyone's money or "**did not take loans**" in November 2009 (*with Jowdy's "no loans defense" still active in Nevada and México*) just 2 months before Jowdy confessed in January 2010 to all of the money he received from Hawai'i and other individuals like Kenner, Norstrom, Stumpel, and Gaudet were now "*loans*" within weeks of his fraudulently tactical dismissal in the AZ case.   What was Jowdy going to explain to all of the investors in November 2009?   Was he prepared to tell them that he lied throughout 2008-09 in testimony in the Nolan arbitration (*along with his brother-in-law, Bill Najam – also subject of the Galioto-dismissed 2009 EDNY Grand Jury*) to defame Kenner (*See R33 047, 647*)?   Was Jowdy going to confirm he continued his perjury in his April 2009 Nevada deposition (*See R33 662*) refuting he had any loans with and Kenner, Kenner investor, or LLC, and then finally confirm his crown jewel in the symphony of perjuries with his tactfully successful 2008-09 AZ loans case defense of "*no loans*" and a "*forged loan document*", while avoiding disclosure of the destructive underlying evidence in his possession (*confirming all of the loans*) and withheld from the AZ court thru claims of "*forgery*" and cleverly triggering "*expedited discovery of the loan agreement*" until the December 2009 termination of the case.   This fraud was revealed by Jowdy himself in his December 2010 Nevada trial defense while authenticating the 2004 Hawai'i loan agreement and admitting it at trial as his "*primary*" trial defense exhibit, expressing his full and abated access to the Hawai'i loan funds (*See R33 011*).   The entire Nevada Plaintiff table plus Kenner (*as a 3rd part cross-defendant of Jowdy*) were left dumbfounded in December 2010.   The only superseding astonishment was the 2015 government grandstanding that the loan agreement was now "**fake**", "**bogus**" and "**supposed**", <u>once again 5 years later</u>.

***The government summations***:   Due to the ongoing arrogance of the prosecutorial efforts to "**win-at-all-costs**", they represent a standard government rebuttal to their misconduct

during summation, referencing the typical broad-stroked Second Circuit and other Circuit decisions.   The majority of the summation was based on new theories or facts not in evidence, while claiming they have virtual infinite leeway and liberties to express their "*colorful*" depiction of the trial through their kaleidoscope glasses.   The flagrant nature of the summation representations by Michiewicz and Komatireddy, based on government-known falsities and facts they did not substantiate other than thru witnesses who they now claim are suffering from **faulty memory** (*to Kenner's detriment*), **confusion** (*to Kenner's detriment*), **and mistake** (*to Kenner's detriment*) produced the relevant hearsay foundation to defame and slander Kenner, and ultimately referring to Kenner's documentary supported testimony as the evidentiary basis for an ongoing conspiracy.

Broad-stroke language like, "*standing alone...in an otherwise fair proceeding*" and "*unless they cause the defendant(s) substantial prejudice*" as to "*so infect the trial*", is exactly what the government's wild and foundationless statements created in prejudice.   In separate claims, Komatireddy referred to Kenner as "***broke***" when Gaarn was selling his Eufora shares to repay Kenner nearly $200,000 in loans that had been outstanding for almost 3 years.   Kenner had about $2 million in cash in his various bank accounts, *known to the government*, at that time.   "***Broke***" is flagrantly misleading (*specifically when not true*), in concert with claims that "*desperation*" was the underlying theme to the alleged Eufora sales frauds (*Counts 2, 3 and 4*).   In fact, Komatireddy was aware that Wells Fargo was closing Kenner's accounts within months of his $400,000 plus balances specifically due to FBI communication with the bank, alleging, "*money laundering*" thru Kenner's Wells Fargo accounts.   The government knew exactly why Kenner's account had a ZERO balance, and it had nothing to do with Kenner "***being broke***", and everything to do with the government (*FBI influence*) scripting the account closure (*See R33 653*).   The court is also deftly aware that no bank closes an account down in a month or two even with negative balances in them, without significant outside influence (*i.e. FBI money laundering allegations*).   It was more injurious and unsubstantiated proffer.   Komatireddy's comments about the "***supposed***" loan agreement with Jowdy (*See R33 032*), further supported the known lies Michiewicz proffered about the same Jowdy-authenticated loan agreement as "***fake***" and "***bogus***" during his summation, tying in the trial "*theme*" of the same meritless script. Komatireddy continued her inflammatory lies about the circumstance surrounding the client-confirmed seizures directly with the bank (*Tr.5998: 20 to 5999: 4*), calling Kenner and Kenner's representation of the collective decision prejudiciously "***insane***", specifically when she knew it was 100% true.   Komatireddy kept her momentum alive by falsely contradicting the government's evidence of Kenner's Cabo equity acquisition through his two partner's contributions, Lehtinen and Stumpel, neither of which participated in Galioto's ongoing EDNY threats to assist in his pro-Jowdy slander of Kenner, since they both knew the truths (*See R33 467d and R33 rebuttal 018*).   Galioto had been present at both Jowdy proffers (*3500-KJ-1 and 3500-KJ-3*) when Jowdy independently confirmed the Kenner Baja Ventures 2006 equity was from contributions via Stumpel and Lehtinen. Jowdy also confirms the Stumpel funds (*$1.6 million*) that flowed directly from Stumpel's European account to Jowdy in México (*LOR Management*) was the basis for the Stumpel $1 million in Baja Ventures 2006.   The government's own post-trial spreadsheets corroborate the "*clean*" funds from both Lehtinen and Stumpel as the accounted for $2.5 million capital contribution in Baja Ventures 2006, despite their forfeiture claims to the contrary.   Despite the government's knowledge since 2010, Komatireddy chose to lie and agitate the jury again by claiming; "***He (Kenner) used it (the Hawai'i money) for personal use to get an interest in that resort in Cabo***".   Komatireddy attempts to close the door on her unproven and known false claims that Kenner stole the Hawai'i funds to get his interest in Cabo

(*clearly untrue and known to the government since 2010 – per Jowdy's own words*) by proffering, **"Mr. Kenner told you that he used that money (Hawai'i) to get his piece in the México investment with Ken Jowdy.   You know exactly what that's for.   That's in evidence."**   Kenner clearly **NEVER** testified to anything resembling that outrageously injurious rebuttal summation claim by Komatireddy.   The jury must assume pure and ethical representations by the government (*to not violate their Constitutional, legal and ethical duties*) while relaying factually accurate information to them at all times during trial.  When this is clearly breached for unjust desires, the system in its entirety loses its identity and integrity.   Komatireddy failed the jury, the court, <u>and the defendant(s)</u> with her parlor trick and falsities.   When unsubstantiated proffers based on known falsities are repeatedly strewn on a sponge-like jury, the defendants are unduly and irresponsibly harmed with "**severe prejudice**", fully "**infecting the trial**" (**See R33 E**).   No misconduct of this severe nature is "**harmless**" even with proper instructions; otherwise the practice of summations would be consequentially eliminated from the trial; or conversely the court could have Michael Buffer (*pro boxing and WWE announcer*) introduce the parties for their summations in a more circus-like environment.   The government cannot rely on the court's instructions about self-proffered evidence, to un-ring the meritless claims, if they simply use it to defame the defendant(s) with a "**License to Lie**".   Clearly, that is not the intent of United States v. Tocco (*2nd Circuit 1998*).   "*Vigorous advocacy*" and outright misleading lies are diametrically opposed to *US V. Tocco* and should not be viewed as one in the same.   It is pure government overreach to believe the court would allow known lies at a minimum and support its claims as acceptable, simply by the issuance of "*proper instructions*" from the court.   If the government relies on the context of the entire trial, now allegedly derived in the foundation of witness "**faulty memory, confusion and mistakes**" (*all detrimental to Kenner and the fundamental truth previously confirmed by virtually each of the government's witnesses now conflicting testimonies*), the court must consider Michiewicz' repeated claims of Kenner being a "**liar**" (**See R33 400**) and insinuating the Hawai'i loan agreement being "**phony**" opening the door of misconduct to connect the prosecutorial themes with the false summation proffers.   Please note that at one point, Michiewicz was specifically attacking the EDNY Grand Jury subpoena that <u>his own office</u> issued and rescinded within 10 days (**See Tr. 5048:14 to 5050:20 and R33 rebuttal 005, 006**) once Jowdy hired his defense team (*led by Former FBI Director, Louis Freeh – who was present in Jowdy's initial and full confessional FBI proffers – See 3500-KJ-2 and 3500-KJ-3*), in addition to the references of Northern Trust clients being unaware of the Hawai'i "*use of funds*" from day one (*despite hundreds of bank authorization documents being signed by all of the LOC investors from 2003 thru 2009 fully acknowledging the "use of funds" at all times*).   The government quotes the "*invited or fair response doctrine*" to explain away their lies, but nothing in that doctrine or anywhere else under Federal Rules, does the doctrine "*open the door*" for rebuttal lies*.

Under United States v. Nersesian (*2nd Circuit 1987*), the government quotes a court "*will not lightly overturn a conviction <u>solely</u> on the basis of a prosecutor's misstatement in summation*" (**See R33 E**).   That meritorious statement may hold "*weight*", notwithstanding the cumulative effect of the government's immeasurable full lies, half-truths and perjury (*suborned or otherwise*), all exposed by Kenner in his three Rule 33 reports (**See Point I, II and III**) in addition to the underlying EDNY reports of the specific witness perjury supported by real evidence that the government conveniently overlooked for years to construct a foundationless fairy-tale for the 2015 trial court.   The resounding theme in the government's response is that the real evidence presented by Kenner should be ignored by the court (*despite the contradictory statements of every alleged victim*), specifically the clearly corroborated "**theme**" testimony by multiple witnesses attesting for the same lies in

the face of real text, email and signed disclosure evidence (*like the 2010 Eufora buy out efforts – See R33 rebuttal 032*).   The government misconducts clearly "*so infected the trial with unfairness as to make the resulting conviction a denial of due process*". Wainwright, 477 US at 181 (1986).

The government continues with their defensive position that Kenner's claims of prejudice by being outright called a "*liar*" on multiple occasions, including when Michiewicz clearly knew his demeanor was "*out of bounds*" and continued despite sustained objections (*interjecting the illusion of his personal feelings into the proceedings*).   The government reiterates that the "*liar*" claims were <u>within bounds</u> because of Kenner's "*finger pointing*" to Jowdy for alleged thefts of investor money from Hawai'i and México, which the government vehemently refuted throughout trial and proffered were the basis for the conspiracies (*specifically in Hawai'i thru the GSF efforts*).   Now, this theory is refuted by their own *forfeiture-44* evidence admission, post-trial.   Despite the "*new evidence*" or *BRADY* admission, the government attempts to maintain their position that the "*finger pointing*" of the Jowdy thefts were still a Kenner diversion and concealment.   The continued and erroneous position defies logic, again.   The government's theory, while ignoring all of the evidence in their hands pre-trial, including but not limited to Jowdy's January 2010 confessions in his 2-day deposition and his admissions 2 months later (*March 2010 – 3500-KJ-2*) directly to FBI agent Galioto, were clearly prejudicial (*unless they ignored the real evidence like Berard and Kaiser during years of Kenner-slander*), to frame their case in chief.   Disrespectfully to the court, after revealing *forfeiture-44* (*9 months after trial – even though they apparently received it 3-weeks after trial per their own defensive admission to a Brady claim*) during the government's forfeiture case-in-chief, fully admitting Jowdy's own documented loans from Kenner and Kenner investors including the Hawai'i funds.   Yet, they still proffer to the court that Kenner's "*finger pointing*" about Jowdy thefts was misleading to the investors in an ongoing attempt to conceal Kenner's use of the funds.   Please note that nowhere in the Jowdy 2016 accounting production does he represent to the government that the funds he borrowed and refused to repay (*aka. Theft*) to Kenner and Kenner investors were really "*stolen*" or diverted for Kenner's benefit.   How can the government maintain their trial theory of erroneous "*finger pointing*"?   This improperly continued theme of concealment is improbable with the "*newly discovered evidence*", (*if not BRADY materials as the government defends*), yet either way, the "*new truths*", if presented to the original jury, would have emphatically undermined the main theme of conspiracy and wrongdoings by Kenner from the government's opening remarks thru rebuttal summation in both the alleged Hawai'i and GSF schemes.   The trial theory would have self-inflicted its own defeat.   The government continues to refuse admission of their critical error and extreme prejudice to Kenner in an attempt to dissuade the court from taking the necessary actions and preserve the responsibility of justice for Kenner, in light of the new facts and government evidence.   Certainly under the new evidence utilized by the government in an attempt to create a post-trial nexus to support a dichotomous forfeiture theory to their trial now-falsely proven position, they fail to recognize that the repeated false claims towards Kenner was "*excessive or was likely to be inflammatory*".   See US v. Peterson, (*2nd Circuit 1987*).   The evidence in the government's possession pre-trial confirming that the alleged victims had previous knowledge of all the Hawai'i activity and Jowdy loans included but was not limited to: *Kaiser, Berard and Constantine 2009 arbitration testimony, Norstrom, Stumpel, Lehtinen, Gonchar, Glen Murray, Nash and Michael Peca 2009 signed affidavits, 17 Little Isle 4 members signed Baker disclosures for the AZ Jowdy <u>loans</u> litigation, 19 direct Plaintiff participation in two 2009 California lawsuits versus Jowdy (specifically including the $8mm in unpaid <u>loans</u> to Jowdy from the Hawai'i LLCs in both cases), Michael Peca's 2009 Jowdy <u>loan</u>*

*emails with Kenner,  Gonchar's 2010 FBI proffer, Hughes and Burdick's (Jowdy employees) 2009-10 FBI proffers, Michael Peca, Stevenson and Sydor's 2011 SDNY Grand Jury testimonies (specifically detailing the Jowdy <u>loans</u>), Jowdy's January 2010 2-day deposition's confessions of the <u>loans</u> and the non-desire to repay them, and Jowdy's own admission of the underlying 2004 Hawai'i <u>loan agreement</u> as his primary defense exhibit in December 2010 (in a trial he lost to Kenner and Glen Murray for another unpaid loan -- while employing the same "<u>no loans</u>" defense), etcetera.*

Continuing their theme of ignoring the real evidence but continuing to suggest the contrary to the court, the government claimed, "*the government made fair counterarguments, <u>drew from the evidence</u>...*" and "*government has broad latitude in the inferences it may reasonably suggest to the jury*". See US V. Williams (*2nd Circuit 2000*).  They clearly continue to spew non-factual rhetoric knowing they made summation claims (*echoing foundationless trial claims*) based on known falsities such as: "**kick Nick in the balls**" **Tr.5748** (*knowing it was not Privitello but Nick James who was in deposition with Kenner that same day and 100% unrelated*), "**they were desperate of money**" **Tr.5968** (*when Kenner had no official role in Eufora and Kenner had no desperation, financial or otherwise*), "**to buy Kenner out**" **Tr. 5971** (*when Kenner did not own shares of Eufora misleading the jury*), "**selling <u>their</u> shares in Eufora**" Tr.5970 (*again when Kenner did not own any Eufora shares that were sellable*), they scoff at the fact the "**hangars**" were not even built when Nash and the government were caught lying about the alleged Nash meeting about Eufora commercials – **Tr.5972**, "**these guys were not working out of their homes"** **Tr.5972** (*related to the Eufora commercial perjury cover-up of Nash*) (*while Kenner was exclusively working out of his home from April 1, 2003 – the date Kenner sued his former billion dollar plus, publically traded company (Assante) in California for fraudulent conduct detrimental to his clients and won costing Kenner over $1 million in legal fees and settlement terms to free his clients (**See R33 rebuttal 019**) -- thru November 2013), to Rucchin, "**your advisor is selling his shares** (of Eufora)" **Tr.5974** (*which again Kenner was not*), "**Kenner told you he would advance some money...sometimes for the hangers that they were both on the hook for**" **Tr.5978,** (*Kenner was not an owner of the Hangars thus had no responsibility for the debt or otherwise*), "**Not for the Palms condos which Kristen Peca told you they were never involved with.  They were <u>fed up</u> with the Palms condos**" **Tr.6005** (*despite the fact that Peca breeched the October 2010 agreement (**See R33 412**) with Kenner by withholding the monthly revenues from Kenner while Kenner had already paid $60,000 towards the mortgage, and the unit was worth about $5 million with title solely in Peca's name.  It was categorically impossible for Kristen Peca to be "<u>fed up</u>" with anything to do with the Palms condos at that time, only Kenner could have been fed up with their breech and ongoing revenue thefts from Kenner – and never corrected.  Please note that Kenner notified Peca (just like McKee) in the fall 2013 that he was going to sue him for the revenue spilt and contract breech just before the Kenner Indictment*),  "**Kenner is broke**" **Tr.5982** (*regarding the Wells Fargo accounts that the FBI forced closure of, while Kenner had nearly $2 million in cash in his other bank accounts at that time and had generated about $400,000 in consulting revenues that year alone*), "**stealing...for another deal he is supposed to be paying with his money**" **Tr.5985** (*which Kenner was paying until Kenner was upside-down about $90,000 from the Peca breech and revenue thefts*), "**Mr. Kenner told you that he used that money to get his piece in the México investment with Ken Jowdy.  You know exactly what that's for.  That's in evidence**" **Tr. 5990** (*while nothing was offered as proof at trial and certainly nothing contradicting the Jowdy proffers – including **3500-KJ-6** -- that the Kenner capital account was 100% funded by Kenner's partners, Lehtinen and Stumpel and the underlying debt-equity agreements between Kenner and his partners*), "**I thought the most important document in**

*the case for them was the <u>supposed</u> loan to Ken Jowdy*" **Tr. 5991** (*knowing Jowdy had already confirmed the loan in January 2010 depositions, March 2010 FBI proffers and his December 2010 trial defense*), "**Kenner testified that he created a transfer document, one more of those useless transfer documents, and back-dated it**" **Tr.5983** (*when the government knew that Gentry created the document in 2007 – not Kenner -- to reflect the 2005 transaction as Gaarn specifically told the FBI in his June 5, 2012 FBI proffer (***3500-TG-2***), and not created by Kenner.   It should be noted that the Gaarn proffer notes (***3500-TG-1-r – page 2***) were <u>fraudulently altered</u> to reflect a "2007" transfer date instead of the "2005" date Gaarn told the FBI.   Under 400% magnification, as represented in the EDNY Gaarn reports (***See EDNY -- Gaarn – Standard Ventures Eufora Private stock ownership – page 18-19***), the FBI notes were fraudulently and clearly altered to harm Kenner and support another fabricated government theory. In fact, the Gaarn transfer document was properly reflected in the Eufora corporate tax documents, thus not useless.*), "**I asked him why it went to Constantine Management Group.  He said, Phil told me not to worry about it, it wasn't important.**" **Tr.5979** (*which could not have occurred since Peca would have bee ***REQUIRED*** to give verbal authorization to Charles Schwab <u>before</u> the funds were released, regardless if Kenner signed the Power of Attorney document for the transfer.   Without the client's verbal OK to the custodian (Schwab), no transfer could occur for any individual account including Kenner own account at Schwab*), "**You cannot tell from the notes when they were written, if they were written before the interview <u>or</u> after the interview.**" **Tr.5992** (*which is outrageous on the mere absurdity of the unchecked statement, specifically intended by Komatireddy to refute the Kaiser perjury about not telling the FBI that he met with Jowdy 5-6 times to discuss the loans from Hawai'i (***See 3500-Kaiser-1-r***)*), "**Kenner takes out the whole value of parcel 2 (Hono'apo), sucks the equity out and he is supposed to use that to buy Waikapuna but he doesn't.**" **Tr.5996** (*which was patently false since Hono'apo was appraised for $30 million and the small development loan was $3 million, leaving considerable equity for the expected 30-day loan to Jowdy to be repaid per his own email (***See R33 636, R33 2001***) -- and future loan extensions available from Centrum once the permits were granted.  The government ridiculed the "30-day loan expectation" during forfeiture hearings during Kenner testimony.  The Waikapuna purchase with the acquisition and early development planning loan of $5 million was being negotiated with Lehman Brothers at the same time – and not the eventual $105 million loan over a year after Kenner terminated the "**egregious**" 11th-hour loan terms (***see R33 900***).   No logic or evidence supports the Hono'apo "cross use" of funds for Waikapuna with the 2005 Lehman Brothers deal pending (before termination)*), "**He (Kenner) used it for a personal use to get an interest in that resort in Cabo**" **Tr.5996** (*which has been refuted repeatedly – see above*), "**but Kenner puts them (Lehman Brothers) off for another year and sets up the Urban Expansion loan, a loan that would not have been necessary if he used the Centrum as he was supposed to or let Lehman come in a year early.**" **Tr.5996** (*which is false as Manfredi confirmed to another hard money lender (***See R33 900***), and Centrum was a Hono'apo deal (Big Isle V – ***See R33 2007***) unrelated to the $5mm acquisition and early permitting loan with Lehman Brothers. The 2005 Lehman Brothers deal was not the macro-development deal that was subsequently conceived after the April 2006 meeting (following the closing of the $125 million Diamanté Cabo loan).  Please note that after Kenner, Manfredi and Kaiser dismissed the "**egregious**" Lehman Brothers loan in August 2005, approximate one month <u>after</u> the closing of the July 2005 Centrum loan, making the government theory of cross use of the funds for a suggested Waikapuna closing not possible and out of chronological order, and just another fabrication to fit their "square peg into a round hole".   After the collective decision to terminate the Lehman Brothers deal that would have forced a 100% foreclosure 24 months later on the Waikapuna parcel (known as a typical "**deal-to-steal**" construction by Lehman Brothers in the*

commercial industry where they "swap" the terms on the deal at the 11th hour to "strong-arm" a borrower into untenable terms with no other options, Kenner left Manfredi and Kaiser on the Big Island and flew to Maui (per Kenner's FedEx records) to negotiate the 8-week extension terms with the seller.   The settlement terms cost the Hawai'i partners $451,000 in extension fees before securing the Urban Expansion loan 7 weeks later, and one week before the loss of the Waikapuna parcel and the $451,000 penalty fees.   Other hard moneylenders introduced thru Constantine per his consulting agreements, and signed by Kaiser, (**See R33 rebuttal 020 et. al.**) fell through during the 7-week process, despite diligent efforts by Manfredi and Kenner to close the other deals (all in evidence).   Thus, the Urban Expansion loan was a last resort, completely contradicting all government proffers of conspiracy.   Under the government's theory, had Kenner, Manfredi and Kaiser agreed to the original "egregious" Lehman Brothers loan and lost the property 2 years later in addition to a multi-million dollar loss to Kenner and Kenner investors, there would be no issue, but the exercising of savvy business acumen created a criminal fraud.   This standard is fundamentally unreasonable.   All government references to a fraudulent loan to Jowdy from the Centrum funds systematically undermines the integrity of the fully documented loan (**See R33 002** – as authenticated by Jowdy's defense team in December 2010 – **see R33 011**), and contradicts all of the previously investor acknowledgements (in evidence).   Lehman Brothers' confirmed plan and proposal to Kenner to repay the outstanding $7 million Hawai'i loan (**See TIMELINE 064 – page 11**), Kenner's February 23, 2006 confirmation email to Najam and Jowdy (**Defendant's Exhibit F-29**), where Kenner confirmed, '**The Managing Member role for KJ (Jowdy) will be fine considering 'all funds will be paid'** (leaving no equivocation about Kenner's "**state of mind**" just days before the Cabo closing and expectations of 100% Hawai'i repayment (in concert with the original CM&D report from January 25, 2006 provided to Kenner by Bhatti and Jowdy confirming to Kenner the pending $7mm Hawai'i payout), as well as the Big Isle 5 operating agreement confirming to Centrum the pending use of funds as authorized (**See R33 2007**), "**Mr. Kenner testified that he thought that lines of credit were cash that were sitting around.**" **Tr.5998** (which was never said by Kenner and clearly confused by the government – to their favor – from the pro-Kenner testimony given by Kaiser in the 2009 arbitration when he confirmed to the 3-judge panel, "Better than your money sitting somewhere" (**See R33 669**), fully contradicting Kaiser's 2015 testimony) –, "**Kristen Peca told you that when she got the default letter, she was in shock.**" **Tr.5999** (which directly contradicted Kristen Peca's 2012 recorded call with Kenner when she claimed she learned from a statement that had been <u>emptied out</u> (**See Point III at 187 – confirming Michael Peca concealment from his wife -- not Kenner**) forming a gross fabrication of the "**shocked**" story (**See R33 700**) since the events would have been at 2 months apart and certainly <u>after her invented comments</u> about Kenner's demeanor during the May 8, 2009 GSF meeting in Ohio **Tr. 716:20 to 717: 8.** Her knowledge of the LOC seizure occurred after Michael Peca told Kenner he received his bank statements on May 22, 2009 (**See Point III at 192, and 186-187**), weeks after the face-to-face Ohio GSF meeting when they returned home to Buffalo, NY.   Thus, the Kristen Peca story about signing for a FedEx (or certified mail) which Northern Trust mailed to her Buffalo home <u>could not have occurred</u> while she was living in Ohio, thus confirming the witness perjury (since she should not have been subject to CTE "**excuses**" by the government).   Michael Peca was informed of the first default letter via text and phone by Kenner (**See Point III at 49**) and spoke to Northern Trust before the premature seizure was approved by Michael Peca (**See Point III at 49**), <u>with the actual due date for the loan several days after</u> Peca's approval, thus authorization to seize collateral on April 1 clearly was granted by each LOC client (just like all of the LOC clients – with Sydor and Berard in evidence from the Northern Trust subpoena – **See R33 rebuttal 021 (Peca), TIMELINE 057 (Sydor), R33 rebuttal 012 (Berard)**).   Since Michael Peca was Kenner's client, <u>and not Kristen Peca</u>, Kenner cannot be held responsible by

*the court or government for Michael Peca's concealment of information from his wife, as proven above, thus leaving Kristen Peca's false statements as bias and prejudicial third person hearsay. Michael Peca, Sydor and Rucchin also confirmed independent communication before the due dates with Northern Trust (**See Point III at 20, R33 514**).   The government produced no emails or texts substantiating anyone's dismay or "shock" about the "group seizures".   It should be noted that Nolan (not working with Kenner at the time) chose to independently continue his monthly payments until his settlement with Northern Trust, thus any of the LOC clients could have.   In fact, on March 25, 2009 (6 days before the Peca confirmed seizure) Michael Peca sent Kenner the following text after speaking on the phone, "Made sense after getting the start of that. This isn't my fight. **I'm behind you. I believe in you**. I only give a shit about my $ well being." This certainly contradicts Kristen Peca's fabrication that Michael Peca was laying into Kenner on the phone after she signed for a document that was clearly delivered to a home (in Buffalo) while she was living in Ohio (and just another planned slander of Kenner – whether suborned or not – obviously overlooked by the prosecution).   "...**the hockey players are suddenly realizing they are indebted, in some cases over a million dollars, and started complaining, and started sending desperate emails and phone calls to their financial advisor, Mr. Kenner, the response was: we got a plan for you.   We're going to sue Ken Jowdy.**" Tr. 5689* (which grossly misstated the 40+ documents that each of the LOC clients had signed recognizing the use of their funds in the **Extension of Credit documents** for the "*investment in Little Isle 4* (Hawai'i)" from day 1 (**See TIMELINE 041 (Berard), TIMELINE 048 (Peca), R33 rebuttal 013 (Nolan), R33 659d5 (Rucchin) and EDNY issues 135 (Rucchin)** *with no others turned over in the Northern Trust partially filled subpoena*) as well as the annual **Disbursement Request and Authorization documents** (**See Point III at 65 (Nolan)**, **Point III at 121-22 (Peca)**, **R33 590 (Berard)**, **R33 rebuttal 022 (Sydor – not from the Northern Trust subpoena), et.al.**).   Please note that Jowdy was already being sued in 2008, 6-months prior to the LOC seizures (**See R33 rebuttal 023**), in AZ and México for the unpaid Hawai'i loans (*and other personal loans in México and Nevada*) since 2008.   No portion of the Northern Trust LOC conceded defaults in April 2009 led to a "*new theory*" to sue Jowdy.   The litigation started almost immediately after Jowdy and Tom Harvey terminated the settlement discussions with Kenner, which had been ongoing since June 2007 when Jowdy admitted to the loans in excess of $8.5 million to Kenner and Kenner investors (**See TIMELINE 001**), "**But you will see that the evidence that much of the (GSF) money just disappeared and nothing to do with Ken Jowdy's litigation.**" *Tr.5690* with Komatireddy reiterating the same falsity in her rebuttal summation, "**Only $225,000 went to Ronald Richards for legal fees to fight Ken Jowdy with that Cabo investment, only $225,000.**" *Tr.6004* (while the government misled the jury claiming only $225,000 of the Constantine-controlled GSF distributions were for the legal activity versus Jowdy (**See R33 E at 93-94**) when approximately $500,000 was used.  In fact, as Gonchar testified, the $1.5 million he transferred to Constantine was for "Constantine to be used as he saw fit", in a deal he struck with Constantine independent of Kenner and the other GSF contributors.  Despite Kenner's allegations to the GSF members that Constantine misappropriated funds (based on payments to his own attorneys, etcetera), Gonchar's deal with Constantine covered more that the funds Constantine utilized.   Under that unknown premise, discovered by Kenner in 2015 at trial, Kenner could not have made an accurate assessment to the group of the Constantine use of GSF proceeds, regarding misappropriations.   That deal is between Gonchar and Constantine and cannot be subject to the government's theories of diversion, since only Gonchar could complain about any misuse or frauds related to the $1.5 million deal, **and he did not**.   Every other expense, exclusive of the $1.5 million neither Constantine nor the government specifically designated at trial, was governed by the GSF authorization disclosures returned by each and every contributor.   The AZ and*

California lawsuits in 2008-09 versus Jowdy by the 17 Little Isle 4 members plus Kenner and the 19 México investors sought relief for the $8 million Jowdy failed to repay (*see R33 rebuttal 666a at 35-38*) thus fully disclosed to every Plaintiff.   Kenner cannot be held responsible for investors who refused to read lawsuits, disclosures, authorization letters and emails that explained the details of the efforts to protect the Kenner and Kenner investors funds (*see TIMELINE 074*) as well as the Jowdy México frauds (*see R33 rebuttal 666a*), Michiewicz claims, "*The Stolper lawsuit is one of those things that goes nowhere, this time it is about Eufora, hostile takeover, whatever*."   *Tr. 5760: 24 to 5761: 1*, (*which was Michiewicz simply mocking Kenner's trial testimony that a 4-month independent investigation, followed by months of mediation, followed by Eufora investor attorney-led litigation in AZ (2010) and NY (2011) (all with Kenner on the sidelines, only supporting the investors efforts versus Constantine), and which was only stayed by Constantine's 2012 AZ federal bankruptcy filing was somehow also part of the ongoing conspiracies, and "Did anything come out of that Stolper lawsuit?...No." Tr. 5764* (*which again was wholly prejudicial with the government fully aware that the 2011 EDNY lawsuit filed by Stolper for Privitello, Ethel Kaiser, and two other Kaiser friends was "stayed" by the 2011 Constantine bankruptcy filing in AZ.   After the Constantine bankruptcy was dismissed in AZ in 2015, the government was fully aware that Stolper re-filed the lawsuit in the Central Islip courthouse (for two of the government's alleged victims, Privitello and Ethel Kaiser), thus the government could not have been unaware of its "open" status at the time of the misleading Michiewicz summation.   In addition, Komatireddy chose to follow-up with another supportive lie they knew to be false and misleading when she told the jury in rebuttal summation that the 2nd civil suit versus Constantine was not represented by the same attorney (100% false, as both lawsuits in 2011 and 2015 were filed by NY attorney Stolper), alleging some Kenner lie from the witness stand. (See R33 E at 1-2)  Even in the 2015 re-filing of the Eufora lawsuit versus Constantine, Privitello, Ethel Kaiser and the other December 2009 Eufora investors (all friends & family of Kaiser) do not add Kenner to the civil compliant as a defendant (1 ½ years after the EDNY criminal Indictment led by Kaiser and Berard – see November 13, 2013 NY Daily News article*), which seriously questions the underlying "**factual**" belief of the prosecutorial theory that even though the 4 individuals were not suing Kenner civilly, the government (in the same Central Islip courthouse) considered Kenner part of a conspiracy for the same actual investments*.  It defies logic again, notwithstanding Kenner's "not guilty" results on both overt acts.  Komatireddy continued with her clearly known and false representations of the trial and the underlying evidence in the government's hand as follows, "**And when those lines of credit went into default, those guys got wiped out to the full extent of the loan. They didn't get 40 percent back ever. That's a lie.**" *Tr.6000* (*which the government knew not to be true, specifically since they were aware that Sydor ($1.2mm to $850,000 – see R33 rebuttal 024 – none of which were returned in the 2015 Northern Trust subpoena including the missing new 2006 EXTENSION OF CREDIT document) and Berard ($900,000 to $650,000 – See TIMELINE 069 (900k), TIMELINE 070 (650k) also missing the new 2006 EXTENSION OF CREDIT document) reduced their LOCs by the repayment amounts as a result of a letter that each LOC client received suggesting the option to reduce the collateral came from Kenner instructions, and delivered from Northern Trust Banker, Mascarella (see R33 659b2), and a few investors chose to do. In addition, Rucchin, after the pay down of his LOC (see R33 659d4, 659d) chose to distribute $300,000 from his available funds to Robert Gaudet in México (on March 13, 2007) for a different investment (Los Frailes), thus fully using the Lehman Brothers payoff amount for himself.  Nolan bought out Juneau in March 2007 of the Little Isle 4 LOC (1/2 of which was guaranteed by Nolan).  As a result, Nolan received approximately 3% more equity in Little Isle 4 after the 13.44% at the 2006 closing to 17.6516% (See R33 rebuttal 026), which was disclosed by Nolan in the 2009 arbitration (see*

bate stamp from Nolan) further confirming that Nolan was aware of the LOC investment in Little Isle 4 (Hawai'i), despite the 2009 and 2015 perjurious statements to the respective courts.   The other LOC investors chose to continue their LOCs for future investments in Na'alehu Ventures 2006.   Each of the additional releases of capital post-Lehman Brothers closing would be identified on the Na'alehu Ventures 2006 tax documents as capital accounts (***See R33 054a*** -- all under Kaiser's control since December 2007).   Please note that the government did not turn over any Na'alehu Ventures 2006 tax documents from Kaiser in discovery confirming his documented capital accounts for the investors. Komatireddy continued with her gross misrepresentations by claiming, "***they told you that they did not authorize their money to be used for the defendants" pet projects***…" ***Tr.6003*** (while the government was 100% aware of the $1.5 million arrangement Constantine and Gonchar had since before trial pursuant to Gonchar's proffered disclosures to the prosecutorial team.   The government ignored Gonchar's confirmation of Constantine's use (covering 100% of the Constantine expenses in question, certainly the ones alleged by Kenner).   Second, the government blustered about "***pet projects***" throughout the trial to the jury, while dangling around a *fake tequila bottle*, stolen from Kenner's México home by Kaiser, Berard, Galioto &/or Wayne (as 1 of only 6 that were ever made like that with a Rojo label on a Don Abraham Tequila bottle, the actual manufacturer and distiller).   Even the government rhetoric thru Kaiser that bottles were shipped to him, somehow Kaiser retained one of the bottles (illegally shipped into the USA by a knowing México distributor, directly to Kaiser's home, and Kaiser kept one of the bottles intended for Russia – thus more illogical perjured prejudice).   **(*See R33 804*)**.   The government ignored the fact that they never produced a scintilla of evidence related to any funds misappropriated to "anyone" erroneously from the GSF proceeds for a Kenner tequila company, but summarized it as if they did, causing the intended harm,  "**…the Palms condos.   Constantine was the borrower and Kenner was the guarantor.   Those two were in huge debt, not the players, except for Gonchar.   They needed the money for their own projects.**" ***Tr.6006-6007*** (which grossly prejudiced Kenner since the $1 million loan was for $1.6 million current value condos.   Kenner agreed to Constantine's request to donate the condos to the GSF investment group (with Kenner over $300,000 of cash loaned to Constantine for the Constantine-owned units).   The fact that the Las Vegas real estate market floor fell out in 2010 (losing about 75% value due to the largest global real estate depression since 1929) was not a planned event by Kenner (or Constantine), nor were the rise in government interest rates as insinuated as Kenner's fault (and a fraud on the Kenner investors) by Michiewicz with Kenner on cross-examination.   The government's hindsight driven slander was ridiculously planned and prejudicial, including the comment that Gonchar was somehow involved in the alleged conspiracy and in financial trouble.   Gonchar had just finished a 5yr, $25 million contract (***See R33 rebuttal 029***) and in 2010 signed a new 3 year, $16.5 million contract making marginally him less broke than Kenner according to Komatireddy's absurd defamation of Kenner (when Kenner had about $2 million in cash deposits in his own bank accounts when she told the jury in rebuttal summation that Kenner was "broke") (***See R33 653***).   Komatireddy went on to lie about Kenner claiming he used the Hawai'i funds, as "**LedBetter straight forward.   Kenner admitted to you he used the money for a non-Hawai'i purpose…**" ***Tr.6007***.   Kenner <u>never</u> called the short-term loan to Kaiser "*a non-Hawai'i purpose*".   It was a complete fabrication by Komatireddy.   The Little Isle 4 operating agreement authorized the short-term loan (***See R33 303***).   It was used to secure the Kaiser signature on the Lehman Brothers required authorization (after his partner Manfredi held Kenner hostage as well for a $180,000 payment at closing – minus $8,000 Kenner caught Manfredi stealing through the Hawai'i company credit cards (in evidence), and forgiveness of a $100,000 previous 2005 advance to solve an IRS issue for Manfredi).   Not only did Kaiser demand the short-term loan to buy out two of his previous Sag Harbor partners

*including Manfredi anonymously, now that he was in conflict with him (also in evidence) (as Vincent Tesoriero told the FBI on September 10, 2014) (**See R33 052b**), but the funds were repaid within 11 days.   At the same time, Kenner was owed about $800,000 (all documented deposits) from Little Isle 4 and Na'alehu Ventures 2006.   Kenner had every right to withdraw the funds and pay himself without repaying Little Isle 4 or Na'alehu Ventures 2006, but Kenner did not.   In hindsight, and under the government's misaligned and ridiculous theory, Kenner should have withdrawn the funds personally during the closing.   The Hawai'i funds were loaned to Kaiser and repaid (as Tesoriero also confirmed in September 2014 to Galioto in person), thus none of the funds form the loan purchased any part of the LedBetter property for Kenner, expunging yet another false government misrepresentation purposely adverse to Kenner's real actions.   Thus, it was only straight forward if you do not challenge the government's foundationless claim.   "**Rick Rozenboom came here as a banker...told you he had thousands of pages of records of exactly the money he was overseeing, what it was used for a why.   The victims don't have those records.   That was part of the scheme.**" **Tr6007-6008**.   Although it is nearly impossible to put a finger on the government's grossest lies and misrepresentations, the government, specifically Komatireddy, was 100% aware that the only victims of the deal Rozenboom was involved in were Kenner and Gonchar, and victims of Ken Jowdy (**See R33 049**).   The government again ignored the fact that Jowdy stole over $800,000 from Kenner and 3 other victims thru straight embezzlement and deceit in 2004 and then further defrauded them in 2005 (about one year later) by fabricating a story about plane repairs as the reason why they needed a loan.   Then, Jowdy fabricated false operating agreements "**after**" the bank realized he was not authorized to sign for the loans.   Jowdy went on to steal $430,000 cash from the loan, fraudulently adding it to the balance unknown to Kenner or Gonchar and further embezzling it (between November 2005 – with $290,000 at the loan closing, and another $140,000 fraudulent advance in February 2006, only 3 days before his unannounced $3mm loan on the DDM property, which was systematically looted by himself and his brother-in-law, CFO, and 2009 co-EDNY Grand Jury defendant within 2 months).   At the same time (in 2005) Jowdy also defrauded two other individuals, Gaudet ($125,000) and Weichinger ($475,000 – pledging a plane as collateral he did not own a the time) (**See R33 rebuttal 666a at 66-67**). Notwithstanding all of the Diamanté Air frauds (unprosecuted by Galioto and the government), Komatireddy had the audacity to claim to the jury that somehow anyone other than Gonchar and Kenner (the only two victims in the Rozenboom issues) should have been in possession of the bank records which Kenner and Gonchar only saw for the first time in 2008 after Jowdy purposely defaulted on the $1 million plus loans (with Tom Harvey's recommendation) to punish Kenner and Gonchar's adverse position to him, further harm the original $1.4 million in investment capital, and cause confusion and chaos amongst the cohesive group in 2008-09 pursuing Jowdy in México and the USA with un-abandoned vigor at the time.   Jowdy and Harvey's plan began the process of eroding the group's collective desire to continue fighting versus Jowdy, specifically without Galioto following thru with the 2009 EDNY Grand Jury of Jowdy and Najam after Kenner's all-revealing proffer on June 24, 2009, to protect Jowdy as a "**favor to someone**".   Komatireddy's statements only continued when she claimed McKee could not receive documents in the context of the Rozenboom issues or otherwise, "**When Jay McKee asked for records, he (Kenner) texted him back with just evasion and conspiracy.**" **Tr.6008**.   No texts were admitted in trial suggesting this occurred between Kenner and McKee, nor was McKee ever kept from information, which he confirmed he received from Ronald Richards and Michael Peca independently, in addition to Kenner.*

The government goes on to claim they did not suborn perjury.   This statement on its own is revealing, since the collective representations by the "**entire**" investigative team who

worked religiously with NY Attorney Michael Stolper to buy out the Eufora loan (*debt from Constantine's friend at Neptune Capital*) after the Stolper-led 2010 investigation of the Constantine wrongdoings at Eufora (*including about $1 million of embezzled funds -- in EDNY evidence*), could not remember "*anything*" about the Stolper-led efforts to buy out the Eufora debt (*loan*), notwithstanding it was mentioned in various Stolper letters to the entire Plaintiff group, managed by Gaarn (*in AZ Eufora Partners I*).  Perhaps, the government wants to rely on the fact that the government witnesses "***did not read***" the disclosure letter from their own attorney, independent of Kenner.  "*Reversal of a conviction based upon allegations of perjured testimony should be granted only with great caution and in the most extraordinary circumstances*". See US v. Zichettello (2*nd Circuit 2000*).  As the government points out graciously, to prevail on such a claim, the defendant must show ***(1) the witness actually committed perjury, (2) the alleged perjury was material, (3) the government knew or should have known of the alleged perjury at the time of the trial, and (4) perjured testimony remained undisclosed during trial.***

The government, having chosen not to address the unwinnable fight over the known statements that were clearly proffered by multiple witnesses pre-trial, all supporting Kenner and Kenner full-disclosures and the newly "***misremembered***" trial statements, the government takes the outrageous tact that the government case, which was overwhelmingly based on witness hearsay and not documentary evidence, offers to the court that ***faulty memory, confusing and mistakes*** are the basis for the "*mis-statements*", but the conviction should stand nonetheless.   If this hollow excuse is not enough to cause pause after the voluminous and government corroborated falsities, then the system has failed itself, and perjury (*in any form*) can be overlooked as the government would wish, in each and every instance.   The fundamental "***oath***" that is taken before any witness testimony should categorically be removed from the process, since it holds no relevance to the subsequent testimony, according to this government defensive theory to perjury.

Although the government quotes a series of legal precedents all supporting the lack of perjury based on inconsistent statements, they ignore to their own benefit the single fact that the false testimonies are suspiciously corroborated by other witness' false testimonies related to events that overwhelming text message traffic contradicts in totality.   This cannot be shear coincidence, as the preparation detail of FBI proffer notes with FBI agent Galioto present (*along with Agent Wayne*), also contradict the 2015 statements.   At no time did the government interrupt their witnesses to point out that they previously made contradictory statements, nor at a minimum, did the government ever once ask the court for a recess or sidebar to discuss their concerns for the newly constructed statements directly with the court, otherwise known as "***recently fabricated testimony***".   The government quotes, US v. Monteleone (2*nd Circuit 2001*) "*Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury*", when they were deftly aware that nothing in the "***inconsistencies***" were "***simple***".  (***See Point III at 20-28***).  Michael Peca tells Kenner via text on May 1, 2009, "***Also, NT sent an email to my wifes aol acct. Attatched is the transfer info. She's going to f'n loose it when she sees loan paid***", (*about 5 weeks after Kristen Peca would have allegedly "signed" for the 2nd of two Northern Trust default letters, and been in "shock" about the "loan paid" and "default" notice*) – despite the fact Kenner notified Michael Peca of the first default letter on February 10, 2009 (***See Point III at 16***), "***Northern Trust sent you a letter. Call me when you get it***".   In fact, if Kristen Peca was alerted by the default letter (*contradicting her own 2012 recorded statements to Kenner*), Michael Peca would have chosen to ***NOT TELL*** his wife in February 2009 before the letter(s) arrived, and the Pecas would have had every opportunity to let Northern Trust know before

the seizure that they were going to make the monthly payments, *but they did not*, despite the fact Michael Peca spoke directly to Mascarella and Brill at Northern Trust before his due date and authorized the seizure as planned (***See R33 rebuttal 021 (Peca), TIMELINE 057 (Sydor), R33 rebuttal 012 (Berard)***)).   There can be no alternative explanation but planned perjury by Kristen Peca (*with or without the government's knowledge – perhaps orchestrated by Berard and Kaiser allowing Galioto and Wayne plausible deniability – thus also explaining the unbelievable "tracing" testimony by Berard's best friend, Lanie Donlan – despite her concurring yet proven false testimony in AZ that her name was forged, along with Berard and a MA notary – despite Kenner's produced evidence to the contrary* – **See Point III at 43-46**).   It is obvious that Kristen Peca lied about "*signing*" for the Northern Trust FedEx in Ohio (*where her husband was playing hockey*), **when Northern Trust sent both the February and March default letters to their NY home** (*FedEx and certified mail* – **See EDNY – Peca issues at 48-55**).   Alternatively, Michael Peca *never* told his wife, at all, about the LOC, since Kristen Peca claimed in her 2012, recorded call that she thought the original LOC was signed in 2008-09 (*when they lived in Ohio*), and not 5 years earlier (***See Point III at 189-190***).   *Clearly, Michael Peca concealed the LOC investments from his wife.*   The serious nature of the perjured Kristen Peca testimony should be enough to cast light on the abundance of government-led misconduct to convict Kenner thru a "**win-at-all-costs**" approach, thoroughly neglecting their obligations to Kenner, as a citizen, protected by the same Constitution that the prosecutorial team swore to uphold and defend.   This clear mantra of ignorance continues with the hollow requests to the court in their Rule 33 reply to either ignore all of the uncontestable evidence of perjury and misconduct by the government and its witnesses in Kenner Rule 33 submission, or simply dismiss it as "*faulty memory, confusion and mistakes*".   Under the latter request, the government still wants to maintain the "**full weight of the evidence**" presented through the same perjured hearsay to be enough "*beyond a reasonable doubt*".   Its sheer dichotomy undermines the true ethical standards the prosecutorial team swore to uphold as officers of the court.   Notwithstanding the Kristen Peca dishonesty, Nolan allegedly could not remember (*in 2009 or 2015*) the basic set up of his Northern Trust LOC (*despite signing over 40 documents during a 5 years period of time, mostly directly with Northern Trust*), Nolan could not remember his multiple calls with Northern Trust banker Aaron Mascarella (*assuming he never spoke with anyone else at the bank, either*), which Mascarella hi-lighted in his 2009 deposition (***see Point III at 53***).   Notwithstanding the Mascarella deposition to Nolan's attorney, confirming repeated and direct communication between Mascarella and Nolan, Nolan's attorney sat idly by in 2009 when Nolan lied to the arbitration about "*no knowledge*" of his LOC, identical to the government allowing Nolan's "*lack of knowledge*" claims in 2015, with all of the evidence in their collective hands, as well.   McKee could not recall knowing anything about the GSF details in 2015, even claiming he could not remember returning the GSF "*acceptance and acknowledgement*" (***See R33 402***), despite his detailed text communication with Kenner confirming the dinner conversation details and retained knowledge of the conversation, as follows, "***Thx 4 making the trip bud.. Took in alot from the talk tnite.. Drive safe, be in touch..***" and "***Can u do me a favor.. Can u email me, so I can look at it on paper, everything my 25O turns into.. Nicole was speaking with Tommy when u explained to me all the areas where we are benefiting..***" and "***Hey, also, could u email me what the 3 black sheep are getting in the end result, as well as Tommy bullet points they had 2 agree too.. Tks***", to which Kenner replied, in part, "***Tommy said you will get 1/10th of everything that is acquired of theirs which includes 20% (2% for you) of the airpark building, 1/10th of their 3.64% of their Eufora shares (.364% for you which puts you just over 1% in Eufora) and then a small piece of the jet which TC is still crunching numbers on but it will probably be 1% of it.  TC will send you the bullets they agreed to***

*but has to wait till it's actually signed. Should be a day or two. They have only agreed by email so far. He will also send you the media summary but he wants you to convince the owner of Chef's to send him the tomato sauce Fed Ex.*"   McKee's GSF "*acceptance and acknowledgement*" was received 10 days later (*on May 18, 2009*), thus, McKee had plenty of time to also speak with his close friend, Michael Peca about the GSF, before Michael Peca (*on May 20, 2009*) and his wife (*on May 22, 2009*) returned their independent acknowledgments. (***See Point III at 53 and R33 401***).  Ranford could not remember his July 2012 FBI proffer or his September 2014 Arizona deposition when he confirmed his $300,000 contribution to the GSF (*and details of it*).   In contrast, under duress by Galioto, Ranford steadfastly denied ever telling Galioto on the 2012 phone proffer that he was aware of the $300,000 in the GSF, but rather believed he had $100,000, fully contradicting his own acknowledgment in AZ only 8 months prior (***See Point III at 82-89***).   Although Kaiser could <u>only</u> remember "*everything*" adverse to Kenner throughout his amazing 2015 testimony, Kaiser and the government led the jury to believe the funds Kenner loaned Constantine thru the "**grocery list loans**" somehow belonged to Kaiser (*as another scheme to conceal "**something**"" from Kaiser*).  This fraudulent allegation to the court (*with Kaiser's trial claims of receiving no more than about $300,000 from the approximate $1.7 million due post California beach house sale in December 2007 – **See R33 B, Tr.1020: 11 to 1022: 1***, and ***Tr.1042: 11-24***), the first two months of Kenner's bank statements (*where the sale proceeds were deposited – thus simple to investigate during the 5 year pre-trial investigation by Galioto),* clearly show Kaiser received over $1.1 million <u>*immediately*</u> (*far more than $300,000*), and his (*and Berard's*) 2012-2015 AZ case defense declarations, depositions and trial testimony confirming stealing the title to the Kenner-Kaiser project (***See R33 055e***), corroborated more than the complete balance paid to Kaiser within a few more months. Thus, the government chose to specifically ignore the obvious evidence and lead Kaiser thru the known and defamatory perjury in 2015.   It is not conceivable that the leading questions by the government to Kaiser held unknown answers, and the government learned for the first time about Kaiser's plans to disclose the false statements about the California funds, since the government claimed the non-payment from California in 2007 **<u>was</u>** the **<u>sole</u>** basis for the Indictment Counts 2, 3 and 4.   The government proffered multiple times (*including various sidebar promises to the court – see above*) that the alleged unpaid funds **<u>were the reason for Counts 2, 3 and 4</u>** in the Kenner 2015 Superseding Indictment.   Clearly, the government knew this was false, yet needed the underlying fabrication by Kaiser to support an alternative reality to the fact, Kaiser was broke despite stealing from his friends & family (*after being fully repaid in Hawai'i in 2006 and California in 2007-08*), as Kaiser admitted to in 2015 – ***See EDNY – Kaiser, Berard & Jowdy related issues at 90-92***), and was actually borrowing the funds from Gaarn (*arranged in person in AZ, confirmed via text – **See EDNY -- Gaarn – Standard Ventures Eufora Private stock ownership at 48-49***) and subsequently making his rare contribution to the AZ renovation project while Kenner continued to fund the monthly expenses until Kaiser and Berard stole the title thru a fraudulent conveyance in 2012 (*immediately after accepting employment from Jowdy, tax-free income status in México from Wayne, and protection from Galioto for their adverse-Kenner rampage*).   This was the same fraudulent transfer that Kaiser and Berard executed in Sag Harbor (*with forged and fabricated documents in 2011, unknown to Kenner until Kenner sued them in 2013 defrauding Kenner and Tesoriero – **See R33 055c and R33 055d***).  As a follow-up fraud on the 2015 court, Kaiser emphatically refuted ever telling the FBI about his Hawai'i loan knowledge and multiple meetings with Jowdy in NY since 2003 (*with and without Kenner – and the reference notes confirming Kaiser also shared his independent discussions with Kenner and Berard afterwards – **See 3500-Kaiser-1-r – page 3***), his follow-up meetings (*multiple occasions*) in México, at all times referencing Jowdy's vehement confirmations specifically to

Kaiser that the Hawai'i loan funds would be forthcoming.   To close the "*recently contrived fabrications*" with Galioto and the government, Kaiser testified that he was never aware of his 2005 Hawai'i investment/loans being used as part of the Hawai'i loans to Jowdy (*fully contradicting his 2009 pro-Kenner arbitration testimony acknowledging his full participation in the Jowdy loans*) – ***See R33 556, 557, 669, and 031, and Point III at 103-104.***   For a final chorus, Kaiser decided to fabricate an alleged confrontation meeting initiated by Manfredi with Kenner and himself that never could have occurred, unless Manfredi lied to the FBI in October 2010 about no knowledge of Kaiser investing more than $1,000 – *thus $999,999 short of what the alleged 2006 confrontation meeting claimed to have addressed by Manfredi.* ***(See R33 558, R33 2006 – page 2, and Point III at 103-106).***   Notwithstanding the fact that this is an incomplete list of premeditated prosecutorial misconduct and perjury issues discussed in Kenner's Rule 33 submissions (*chalked full of irrefutable perjury, or "faulty memory…"*), the utter breadth of the government witness' misleading statements could <u>never</u> have been untangled with a throng of attorneys, who were assigned individually to each and every perjuring witness.   To address the clearly unsubstantiated and blatantly contradicted statements repeatedly proffered in the face of the actual evidence (*specifically previously given statements – including to the SDNY Grand Jury*), a fully briefed set of reports and supporting exhibits had to be produced to accurately provide the "***truth, the whole truth…***" through the recently perjured 2016 Ken Jowdy declaration in the EDNY court (***See R33 rebuttal 007 – page 7, and R33 rebuttal 025 – page 9***), perpetuating the Jowdy, Kaiser, Berard and Galioto-led frauds, mistruths, and revisionary history in the face of the real evidence (***See R33 rebuttal 666a and R33 rebuttal 666***).

The government continues their defense of witness perjury by quoting, "*As long as the jury is alerted to witness lies…*", US v. Cromitie (*SDNY 2011*), yet at no point during the trial in front of the jury, did the government raise the issue of factually inaccurate testimony by its witnesses despite the overabundance of prior statements in FBI proffers (*specifically to agent Galioto – including Jowdy March 2010 proffers that contradicted the "**no loans**" assault on Kenner thru nonstop "**finger pointing**" allegations*), previous civil depositions, previous civil trial testimony, previously signed affidavits, previous emails and texts – all pro-Kenner and contradictory to the government's prosecutorial theories.   The government's view of **BRADY** was commensurate with their refusal of specific responsibility to the court, Federal Rules of Evidence, the Constitution and the defendants (*in no specific order*), to review and "***know***" the evidence they obtained pre-trial to make sure, as set forth by the Supreme Court in <u>Berger</u> that, "***…while he may strike hard blows, <u>he is not at liberty to strike foul ones.</u> It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction, as it is to use every legitimate means to bring about a just one.***"

The importance of these government obligations cannot be overstated.   As the Supreme Court explained in its 1999 decision in a case of <u>Strickler v. Green</u>: "***…this court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.***"

Yet, as the military's "***black ops***" handbook offers a specific acronym for this ignorance of the known and available facts and prosecutorial approach, ***BOHICA*** (*Bend Over Here It Comes Again*), Kenner attempted to sustain the indefensible assault.

We must never forget that it is the Supreme Court's directive that a criminal trial is a search for the truth.   Yet in several instances recently, this court has seen troubling failures to

produce exculpatory evidence in violation of the law and blatant disregard and excuses for the misstatement's (*however they occurred*) cumulative effect on the verdict.   The standing consequence of a "***win-at-all-cost***" prosecution is not just an injustice to the instant defendant(s), but moreover an assault on the veracity of the underlying laws that are present to protect the same individuals from inappropriate prosecutorial tactics.   This creates a deleterious and dangerous precedent to all future defendants when substantial underlying evidence, pro-defense, is scoffed at with disdain and disregard simply because it contrasts the government's own perceived privilege that their tactics should be boundless. This would leave the Constitution and the 241 years of subsequent laws and precedents with no more value to justice than the parchment they were originally written on.

Due to the fact the government witnesses showed no personal boundaries for perjury and the government (*the arbiter of the evidence and representative of legal fairness*) showed no desire to refute their own theories by "*identifying the perjury to the court*" (*contradicting US v Cromite*), Kenner's summation reports included not only the vast compilation of prejudicial lies and refuting real evidence, witness by witness (*now more critical under the premise since the misstatements were a result of "faulty memory, confusion and mistakes*"), but was forced to offer selected additional background materials to further prove the insanity behind the prosecutorial theories and the allowed perjury (*even if not suborned – although clearly known*) thru reports chastised by the government (***See EDNY issues – Dixon-Myrick and EDNY – Jowdy loan disclosure issues***).  This mockery was despite the fact that the reports clearly supported the defense assertions that the government witnesses premeditated the perjury; it was previously known to the government and purposely disregarded to their "***win-at-all-cost***" benefit.   The two reports in particular that the government claims as useless actually help the court further understand the vast Jowdy frauds, discovered by Kenner in 2007, and the complete knowledge of all the Hawai'i and México investors, and underlying efforts to take corrective actions (*thru negotiations and then litigation*) and recover the $20+ million in Jowdy frauds, as discovered in 2007.   In addition, the two reports help lay out the efforts by Jowdy's cabal to first bribe Kenner with tens of millions of equity in unrelated Jowdy and Lehman Brothers funded projects while abandoning the two Kenner and Kenner investors México projects, now that Jowdy and his management team (*including Harvey*) had looted the Diamanté del Mar project 2002 thru 2006 (*and $3mm loan in 2006 when there were no more DDM funds*) and had unabated access to the Diamanté Cabo monthly loan advances (*only monitored by Jowdy's co-conspirator from Lehman Brothers, Masood Bhatti*), then threatened Kenner with jail time at the waiting hands of the FBI in 2009 (***See R33 027, TIMELINE 007, and resulting TIMELINE 063***), if Kenner thought his contentions that Jowdy had received "***loans***" from Kenner and Kenner investors (*specifically from the Hawai'i LLCs*) had any merits.  The reports point out that Jowdy 2008-09 malicious defense included threatening the Hawai'i attorneys (***See TIMELINE 002***) that Kenner's Plaintiff claims of loans to Jowdy would be dealt with "*criminally*" and Kenner and Little Isle 4's attorneys would be held complicit if they continued their representation in the case.  *They resigned immediately due to Louis Freeh's presence in the Jowdy matter out of fear for their well0-being and legal practices*.   The reports also highlight Jowdy's cabal's efforts (*led by NY attorney, Tom Harvey*), and Harvey's relentless efforts to intimidate any party adverse to himself and Jowdy thru mafia-like tactics (***See R33 rebuttal 666a at 228-229***), specifically because Harvey carried significant co-conspirator liability if Jowdy were indicted (***see R33 rebuttal 666a and TIMELINE 020***). ***Kenner and Kenner investors could have used Jowdy's admission of the forfeiture-44 information in 2008***.   The reports also include deposition testimony from former Kenner assistants who confirm Northern Trust LOC statements always went to the clients, since

they were in charge of the relationship between the clients and Northern Trust on a daily basis, not Kenner.  The reports finally hi-lighted the fact that Northern Trust banker, Mascarella, had open communication with Owen Nolan (*as well as Kenner's assistants*) for years about his LOC investment, thus contradicting Nolan's "*no knowledge*" perjury (*in 2009 and 2015*), known by his own attorneys since the 2009 Mascarella deposition (*and allowing the 2009 known perjury during arbitration*) and the government, while attempting to use the fraudulent statements as authentic throughout the 2015 trial and forfeiture hearings to defame Kenner through alleged concealment.

In opening remarks, the government claimed –

"***This is the fraud where the defendants lie to the investors about who's stealing from them, and find a way to steal from them all over again.  The defendants tell investors that a guy in México named Ken Jowdy, stole their money and ran away with it...***" ***Tr. 31*** (*when the government had the overwhelming evidence, including but not limited to Jowdy's own January 2010 depositions confessions and his March 2010 FBI proffer confirming he did*). There could be no more damning jumping off point by the government (*only some equally misleading rabbit hole theories*), considering the post-trial disclosure of ***Forfeiture-44*** and in context of the new theory of Jowdy liability – the government's 2016 representation has a myriad of reformative effects on their trial theories – the least of which would have been Kenner's ability to present a proper defense without being called "***bogus***", "***fake***", "***phony***", "***supposed***", and a "***liar***", producing irreversible prejudice.

The government choses to offer assistance to the court by suggesting that they "*grouped arguments and exhibits into broad categories*", as a subtle distraction technique to the overwhelming evidence in Kenner's Rule 33 submissions, simply because they were afraid to address the obvious perjuries with the court – whether suborned, premeditated, individually contrived witness by witness, case by case, or otherwise.   The government is offensively concerned that the court will view the clear perjuries, based on actual evidence the government neglected since 2009, to form their tangled web of theories based on hearsay and foundationless lies allowed at trial.   The government's choice to ignore clear and convincing evidence pre-trial (*and thru their current responsive documents*), skirting over their own offered ***forfeiture-44*** offering (*whether BRADY or new evidence – but controversial nonetheless, as now refuting their own opening remarks thru rebuttal summation's denigration of Kenner for "**finger pointing**" and suing for years based on the "**supposed loans**" claims as the premise for the GSF*).   The government's recurring representation that the "**loans**" claims (*commensurate with the fraudulent 2008-09 Jowdy denial claims*) were somehow the medium for the ongoing conspiracy, although now offered by the government as true while trying to create a non-existent nexus in their forfeiture pursuit, as a Kenner conspiratorial fraud against the investors.   The government's foundationless theory is eroded by their own admission, notwithstanding the newly formed 2016, Jowdy co-conspirator (*or at least a criminal, at a minimum*) perspective.

Again, in context of the new 2016 theory of Jowdy liability – the government's representation has a myriad of reformative effects on their trial theories – the least of which would have been Kenner's ability to present a proper defense without being called "***bogus***", "***fake***", "***phony***", "***supposed***", and a "***liar***", producing irreversible prejudice.   Alternatively, the underlying benefit to the EDNY court resulting from the co-conspirator claims are that the government confirmed Kenner's claims of Jowdy wrongdoing since 2007 and dragged Jowdy's credibility into the EDNY courtroom with his throng of Cabo-budget paid attorneys

(*with more diverted funds*) to defend Jowdy's propensity for lying his way out of each known criminal act thru more documented declaratory lies (*See TIMELINE 024*), while supported by the best defense team money can buy (*again with Kenner and Kenner investors money*), and to perpetuate his 15 years of criminal behavior (*since 2002*) in the USA and México, specifically unchecked by FBI Agent Galioto and the idle government, *wholly afraid of Jowdy's Freeh-led cabal.*

Clearly the focal-basis for the GSF efforts to sue Jowdy for known and unknown frauds was fundamentally correct and based on real Jowdy crimes (*mis-management, embezzlements and now-proven unpaid loans – See forfeiture-44*), and the members of Little Isle 4 and Na'alehu Ventures 2006 possessed full-knowledge of the loans to Jowdy at all times, as well as every reasonable opportunity since 2003 to question Northern Trust &/or Kenner about the "**known use of funds**" from their respective LOC accounts for "**Investment in Little Isle 4**" (*See all witness-signed* **Extension of Credit** *documents and annually-signed* **Disbursement Request and Authorization** *documents*).   The government should be held accountable for the continued desire to "*move the goal posts*" as Attorney LaRusso pointed out pre-trial, now seemingly handled by a larger construction operation.   The grossly documented perjury, undisclosed *BRADY* materials, &/or government proffered "*new evidence*" undoubtedly substantiates reformative effects on the defendant(s) Constitutional right and ability to have had a fair trial, and fully diluting any government trial theory and underlying verdict that now-known perjury in conjunction with their own "*new evidence*" diminishes all government allegations to far less than "*beyond a reasonable doubt*", while questioning the veracity of any foundational basis, in the first instance.

The jury verdict was obtained unlawfully.   The government disregarded the Constitution, the Federal Rules of Criminal Procedure, and well-established Supreme Court case law. Thru "*stunning*" misconduct, the government presented false (*and known false*) evidence on key matters when it elicited testimony from its principle witness, John Kaiser, in an effort to cover their proverbial "*behind*" (*related to Jowdy multiple meetings and the knowledge of the Hawai'i loans with authorization and other false claims like the context of Counts 2, 3 and 4, based on now-proven government-led, Kaiser lies*).   The testimony was false and a "**recent fabrication**".   In essence, the government tricked the jury into returning a tainted verdict, supported by other corroborating evidence also "**recently fabricated**" adverse to Kenner based on false proffers and eventually disregarding the post-trial "*new evidence*" (*depending on when it was really obtained or more specifically in the government's "realm of knowledge"*). It is entirely possible that from the initial Kenner proffer in June 2009 and Galioto's first contact as the head investigator on the original June 2009 Jowdy EDNY Grand Jury with Jowdy's defense team, including his former boss, former FBI Director Louis Freeh, (*in July 2009*) that Galioto, *alone*, has acted "**outside the law**" and specifically withheld exculpatory evidence (*in the government's possession at all times*) from an overwhelmed prosecutorial team (*due to the voluminous evidence*) to frame an adverse-Kenner Indictment and subsequently flawed prosecution.   The overabundance of evidence refuting government witness statements throughout the 2015 trial could have easily been buried by one person (*with partial Agent Wayne cooperation*), systematically leading the remainder of the unknowing prosecutorial team to a reality-altered conclusion, while ignoring voluminous evidence and government proffers to Galioto and Wayne representing a prejudiced picture of the truth, intended to benefit his investigative partners, Kaiser and Berard (*as well as Jowdy*), who since their co-efforts with Galioto began have been highly paid associates of Jowdy and his legal cabal, including Tom Harvey, since their first meetings in 2011 in México.   Many of the government falsities previously mentioned from Opening Remarks

thru two non-factual summaries by the government were based on specific and significant information that Galioto (*& Wayne*) knew the exact opposite to be true (*supporting Kenner's defense*).   The silence from the Prosecution table was deafening.   The newly formed alliance between Galioto, Kaiser and Berard, critically benefitted the Kenner defendants in multiple open lawsuits in Arizona (*versus Kaiser and Berard for thefts and fraud – previously proven by Kenner and adjudicated*), as well as Jowdy's pending criminal demise in México (*scheduled for only one month after Kenner's detainment in November 2013, at the hands of a State Supreme Court order, but with Kenner's presence required – THUS foiled by the Galioto, Kaiser and Berard-led efforts – **See NY Daily News article of November 13, 2013 – Kenner's arrest day**). There was a systematic failure of leadership and responsibility oozing from this case, to prosecute and "**win-at-all-costs**", proving wrongdoing can flourish in the absence of proper leadership, moral compass and ethics.   While there could have been mistakes, it is clear form the evidence that the government engaged in intentional misconduct that violated *Brady,* Federal Rules of Criminal Procedure and the Constitution. While there could have been some mistakes (*since Galioto and Wayne failed to correct even a single known contradicting statement from his original 302 (b) notes*), most of it appears clear, intentional, devious and willful.   In rebuttal summation, Komatireddy even claimed, after Kaiser's known perjury about his infamous October 19, 2010 FBI meeting with Galioto and Romanowski, Kaiser denied telling the FBI "***any***" of the statements about meeting with Jowdy at any time in the past about loans from Hawai'i to Jowdy and the multiple meetings with Jowdy from 2003-2006 as well as Gaudet consulting deals with the Hawai'i project (***See Tr.1110: 18 to 1112: 5, 1120:09 to 1121: 12, 1191: 25 to 1194:20 – R33 492, and 1407: 4 to 1408: 20***), that, "***And it's just as plausible for Mr. Kaiser's testimony was consistent with those notes.   You can't conclude they were inconsistent.***"  In fact, similar Brady issues and overall misconduct, *specifically from the investigation team*, was hi-lighted and exposed with an overturned verdict (*and dismissal with prejudice by Former Attorney General Holder*) in the high-profile case, <u>US v. Alaska Senator Ted Stevens</u> (*only discovered as a result of an FBI agent whistleblower, confirming the difficulty in discovering the cover-ups*). Thankfully in that case, Judge Sullivan held the individuals responsible for the prosecutorial misconduct liable for their misdeeds, even after the dismissal.  Judge Sullivan pointed out, "the events and allegations n this case are too serious and too numerous to be left to an internal investigation that has no outside accountability.   The court has an independent obligation to ensure that any misconduct is fully investigated and addressed in a public forum".   This instant case's similarly echoed misconduct deserves the same attention under its wide-ranging external interests, "**above the law**" influences, and its associated culpabilities.

Perhaps, there is nothing worse in a criminal trial that the government presenting false evidence, manufacturing evidence to suit the occasion in order to get the upper hand. Justice in the life and conduct of the state is possible only as first it resides on the hearts and souls of the citizens and its representatives.

The defense requests that in light of the aforementioned issues, the court grants either a reversal of the verdict (*where it deems appropriate*), &/or the designation for a new trial.