

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

| | |
|---|---|
| SK/JMH | *610 Federal Plaza* |
| F. #2013R00948 | *Central Islip, New York 11722* |

May 15, 2017

By Hand and ECF

The Honorable Joseph F. Bianco
United States District Judge
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

        Re:    United States v. Philip A. Kenner and Tommy C. Constantine
                 Criminal Docket No. 13-607 (JFB)

Dear Judge Bianco:

      The government respectfully submits this letter in response to the objections filed by the defendants to their respective Presentence Investigation Reports in the above-captioned matter. See ECF No. 381 (May 24, 2016) ("Kenner Obj. I"); ECF No. 402 (Oct. 7, 2016) ("Kenner Obj. II"); ECF No. 414 (Nov. 21, 2016) ("Constantine Obj. I"); Letter from S. Talkin (Apr. 24, 2017) ("Constantine Obj. II") (collectively with all Kenner and Constantine Objections, "the Objections"); see also Kenner PSR (Jan. 25, 2016); Constantine PSR (Jan. 21, 2016).

      The Objections — those that are relevant — largely seek reconsideration and re-litigation of issues of fact resolved by the jury at trial. Therefore the government respectfully requests that the Court and the Probation Department reject the Objections as further set forth herein.

      As an initial matter, much of the content of the Objections relates to several fraud schemes that were not before the jury at trial, but are presented in the PSRs as relevant conduct. See, e.g., Constantine PSR at ¶¶ 37-44 (referencing the Palms Resort, Eclipse Aerospace, Los Frailes, Led Better, and Baja Ventures 2006); Kenner PSR at ¶¶ 30-42 (same) (collectively, "the Uncharged Frauds"); compare Constantine Obj. I at 8; Kenner Obj. I at 2-3; Kenner Obj. II at 2. The government respectfully declines to present additional evidence relating to the Uncharged Frauds. While the government respectfully submits that there is no basis to strike discussion of the Uncharged Frauds from the PSRs, the government

will not advocate at sentencing for any particular Guidelines enhancement or departure on the basis of the Uncharged Frauds.[1]

I.      The Hawaii Scheme

Kenner claims that any recovery by victims from Northern Trust in relation to their lines of credit should be credited against his loss calculation. See Kenner Obj. I at 2-3. The government has no objection to crediting any such recoveries by victims in the restitution context, because the purpose of criminal restitution is to "compensate victims for their losses." United States v. Pescatore, 637 F.3d 128, 138 (2d Cir. 2011); see also United States v. Boccagna, 450 F.3d 107, 115 (2d Cir. 2006) ("[A] district court must consider that the purpose of restitution is essentially compensatory: to restore a victim, to the extent money can do so, to the position he occupied before sustaining injury." (citations omitted)); 18 U.S.C. § 3663A(b)(1)(B)(ii) (requiring that any order of restitution credit "the value (as of the date the property is returned) of any part of the property that is returned").

As to the loss calculation, however, there is no basis to deduct any such recoveries by victims from Northern Trust or any other third parties from either the loss calculation or the ultimate forfeiture: "[T]he law does not demand mathematical exactitude in calculating the proceeds subject to forfeiture. Indeed, because the purpose of forfeiture is punitive rather than restitutive, district courts are not required to conduct an investigative audit[.]" United States v. Roberts, 660 F.3d 149, 166 (2d Cir. 2011).[2]

Constantine claims that the victims' lines of credit were replenished after the close of the Lehman deal and that the money he received from the Hawaii accounts was for a legitimate consulting purpose. These claims are belied by the bank records and other evidence presented at trial and were rejected the by jury. See GX-21 (summary chart showing outstanding balances on all lines of credit after the close of the Lehman deal); Tr. at 5994-5995 (Government rebuttal explaining that Constantine did not earn the kickbacks he received from the Hawaii accounts and the Urban Expansion deal).

---

[1]     The government notes that restitution is mandatory as to all losses caused "by the specific conduct that is the basis of the offense of conviction." Hughey v. United States, 495 U.S. 411, 413 (1990); 18 U.S.C. § 3663A. The government reserves the right to present additional evidence as needed in the event of further amendments to the PSRs. See, e.g., Kenner PSR at ¶ 131 (stating a restitution amount of $13,126,542).

[2]     Kenner also demands access to the affidavits of loss from various victims. The government has no objection to Kenner and Constantine reviewing those affidavits. Based on its correspondence with the Probation Department, the government believes these affidavits have already been made available for the defendants' review.

Constantine also claims that he was not involved in establishing the victims' lines of credit or inducing the investors to invest in Hawaii. Constantine Obj. I at ¶ 24. The government does not contend otherwise. The government did present evidence at trial, however, that Constantine received proceeds from the Centrum loan that he used for personal investments. GX-CHART-5 (summary chart showing Constantine using proceeds from Centrum loan to buy interests in Palms Place condos).

II.   The Eufora Scheme

Constantine repeats the arguments that he made at trial that the first phase of the Eufora scheme (where victims' money went straight to Constantine's CMG bank account) was legitimate because he was merely selling his interest, and that the second phase of the Eufora scheme (where victims' money was funneled through the Eufora and Gaarn accounts) did not involve him at all. Constantine Obj. I at ¶ 25. The government addressed these arguments at length in its rebuttal summation and post-trial briefing. See Tr. at 5970-5977 (Government rebuttal explaining that Kenner and Constantine did not inform investors that Constantine was selling his shares and that Eufora paperwork does not support the notion that there was a sale of shares); ECF No. 370 at 7-11 (explaining Constantine's involvement in the money funneled through Gaarn).

Constantine also repeats the arguments that he made at trial that Nicholas Privitello was not defrauded because his investment in Eufora was accounted for in Eufora's books and records as a short-term loan. Constantine Obj. I at ¶ 28. However, Privitello invested $200,000 in Eufora in exchange for a 1.5% interest in the company — not for it to be recorded as a "short-term loan" — and it was undisputed at trial that Privitello never received any interest in the company. See Tr. at 1433 (Privitello's testimony that he sent Constantine $200,000 for a 1.5% interest in Eufora); GX-503.6 (Constantine telling Privitello that he was not a shareholder); Tr. at 5320 (D'Ambrosio's testimony confirming that Privitello had no share of Eufora). Constantine also claims that he never made any representations to Privitello in terms of the use of the investment proceeds. However, Privitello testified at trial that he expected his investment funds to be used for Eufora operations and business expenses, and there was no testimony to the contrary. Tr. at 1433. Constantine's attempt to excuse the diversion of some of Privitello's money for a personal legal expense by claiming it as an offset to an outstanding loan is also spurious: years later, in his bankruptcy petition, Constantine continued to claim that Eufora owed him $1.5 million, GX-8012 at 6, and Constantine's friend and co-worker Mark D'Ambrosio testified at trial that Eufora still owes Constantine $1.5 million, all without any mention of an offset, Tr. at 5329. Constantine's remaining arguments were addressed by the government in its post-trial briefing. ECF No. 370 at 11-14.

Finally, Constantine claims that Eufora had "significant value" before and still does today, and that Eufora only pledged its patents as collateral for a loan many months after the investments relevant to this case were made. As an initial matter, none of these

3

arguments detract from the essence of the Eufora fraud, which at bottom involved the diversion of money from the company to the defendants' personal accounts. In any event, Constantine himself swore under oath that Eufora was not profitable and not worth mentioning, GX-8021R at 4, and internal company emails showed the company in the red at the same time that the defendants were pitching it to investors as promising, GX-4717 (March 2008 company email stating that Eufora's "Operating Balance, after checks clear, is at NEGATIVE $18,384.44"). In addition, Eufora pledged its patents as collateral on February 23, 2009. GX-769. Even after that date, Constantine continued to advertise Eufora as a promising company with valuable patents without disclosing that the patents had been pledged. See Tr. at 1430 (Constantine pitched Privitello in December 2009 and emphasized patents); GX-757 (Constantine portrayed additional interest in Eufora, LLC as a "significant" asset).

### III. The Global Settlement Fund Scheme

Finally, as to defendant Constantine's claim that he did not participate in the GSF scheme, see Constantine Obj. I at 6-8, this claim was extensively litigated at trial, and resolved against Constantine by the jury's verdict. See, e.g., Tr. at 5755 (Government's closing) ("Constantine is about to lose his house . . . what does he do? He engineers this deal . . . basically what it comes down to is to save Constantine from being evicted, shovel his plane to Joe Juneau, and Constantine takes . . . over $450,000 from the Global Settlement Fund so that Edenholm can buy Tommy's house out of foreclosure[.]"); id. at 6004 (Government's rebuttal) (noting that, other than $225,000 sent to Ron Richards for legal fees, "all the GSF money is gone. . . . Tommy Constantine [told the Pecas] that he had someone who was going to go buy Cabo if they could get control . . . That's why [the Pecas] put money into th[e GSF.]").

Moreover, the fact that one of the witnesses — Sergei Gonchar — testified that he authorized Constantine to transfer funds on his behalf does nothing to unseat the testimony by many other victims that they had not authorized similar transfers. See, e.g., Tr. at 6003 (Government's rebuttal) ("Gonchar is the only guy who got a benefit out of the [GSF]. He is the one guy . . . He is not like the other players . . . and he had no idea Constantine was stealing from his line of credit in Hawaii.").

### IV. Application of Particular Sentencing Enhancements

#### A. The PSR Correctly Concluded That There Were More Than Ten Victims

Both defendants object to the two-point enhancement under Guidelines § 2B1.1(b)(2)(A)(i) for the offense having involved "10 or more victims." See Constantine PSR ¶ 62; Kenner PSR ¶ 60; Kenner Obj. I at 3-4; Constantine Obj. I at 9. The PSR correctly applied this enhancement. More than 10 victims testified at trial, each of whom was a victim of the offense conduct, including, for example:

(1) Bryan Berard (see, e.g., Tr. at 3061 (Berard's testimony that he did not "see any money back on the investment" into Eufora));

(2) Joe Juneau (see, e.g., Tr. at 194 (Juneau's testimony that he "never got any money from an[y] Hawaii company" on his Hawaii investment));

(3) Ethel Kaiser (see, e.g., Tr. at 936 (E. Kaiser's testimony that her $70,000 investment in Eufora "went fast" and that she received no explanation));

(4) John Kaiser (see, e.g., Tr. at 1089 (J. Kaiser's testimony that his interest in DCSL in Mexico was "the only investment I have left"));

(5) Jay McKee (see, e.g., Tr. at 1815-22 (McKee's testimony that he intended his $250,000 contribution to the GSF to be used to pay Ron Richards' legal fees for a lawsuit to recover the northern property in Mexico, and not to pay for other projects or expenses));

(6) Tyson Nash (see, e.g., Tr. at 2041 (Nash's testimony that he did not recoup any of his $200,000 deposit into the GSF));

(7) Owen Nolan (see, e.g., Tr. at 2074-75 (Nolan's testimony that he did not recoup any of his $200,000 investment into Eufora));

(8) Kristin Peca (see, e.g., Tr. at 677 (K. Peca's testimony that the Pecas had not authorized Kenner to divert a $100,000 investment in Eufora to his account and that the Pecas never received any documentation of their Eufora investment));

(9) Michael Peca (see, e.g., Tr. at 422-23 (M. Peca's testimony summarizing that his Northern Trust line of credit had been defaulted, that his Hawaii investment had not reaped any return, and that he had not received "any explanation"));

(10) William Ranford (see, e.g., Tr. at 2831-33 (Ranford's testimony that he "knew nothing about" Kenner's transfer of funds for a purported investment in Eufora at the time) id. at 2845 (Ranford's testimony that he received no return on any Eufora investment and didn't know what happened to other transfers of funds, including but not limited to the GSF));

(11) Steve Rucchin (see, e.g., Tr. at 2752 (Rucchin's testimony that he received nothing back on investments in Eufora or the GSF); and

(12) Darryl Sydor (see, e.g., Tr. at 2169 (Sydor's testimony concerning the loss of his Northern Trust line of credit and his initial investment in Eufora).

B.      The Sophistication Enhancement Is Appropriate

Kenner objects to the application of an enhancement for sophistication, under Guidelines § 2B1.1(b)(10)(C), claiming that the fraud scheme was "garden variety." Kenner Obj. I at 4-5; see Kenner PSR at ¶ 61. This objection borders on the frivolous. As the commentary to this Guideline states, "'sophisticated means' means especially complex or especially intricate offense conduct . . . Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." Guidelines § 2B1.1(b)(1)(C), cmt. 9(B).

The PSR correctly concluded that the enhancement applied to both defendants, because "even if each step in the scheme was not elaborate, the total scheme was sophisticated in the way all the steps were linked together[.]" United States v. Jackson, 346 F.3d 22, 25 (2d Cir. 2005). The defendants used multiple real-estate investments and corporate shells to funnel money from the victims' savings to the defendants' personal benefit, hid their activities from the victims, routinely interposed attorneys and other intermediaries to obfuscate the flow of funds and their true uses, and forged documents to cover their tracks. See, e.g., GX-CHART-1 through GX-CHART-20 (summary charts depicting the defendants' use of corporate accounts in the names of Little Isle IV, Ula Makika, Big Isle VI, Led Better, Hermosa Ventures, CMG, Eufora, and AZ Avalon); id. and GX-80 (summary charts depicting the defendants' interposition of attorneys such as Ronald Richards, Ricardo Banciella, Patrick Gonya, Lynn Lagarde, and Alison Ressler); Tr. at 865-879 (Mascarella's testimony explaining Kenner's Ponzi-like use of one victim's line of credit to pay the interest on others' lines of credits — such that victims would not receive notices of default — until all the lines were fully drawn); Tr. at 5729-32 (Government's summation, addressing forgery of documents to make it appear as if victim John Kaiser had authorized payments from Little Isle IV, controlled by Kenner, to the Constantine Management Group, controlled by Kaiser); Tr. at 5734-39 (Government's summation, addressing flow of funds from Brian Berard's line of credit, to the Discovery Harbor lots property, to an account controlled by Kenner in the name of Kenner's son, to Kenner, via structured transactions).

C.      The Obstruction Enhancement Is Warranted As to Both Defendants

Both defendants object to the enhancement, under Guidelines § 3C1.1, for obstruction of justice. See Constantine PSR at ¶ 53; Constantine Obj. I at 8-10; Kenner Obj. I at 5-6. The enhancement applies when a defendant "willfully obstruct[s] or impede[s], or attempt[s] to obstruct or impede the administration of justice" relating to the offense of conviction, so long as the obstructive conduct related to that offense or a closely related offense. Guidelines § 3C1.1.

1.      Kenner's Obstruction Enhancement is Warranted

Kenner continues to contest whether there was a loan agreement with Jowdy. The government stands by the evidence it presented at trial regarding the absence of this

6

agreement, Kenner PSR at ¶ 43, and also notes that there are multiple additional bases to conclude that Kenner obstructed justice in connection with this case.

The PSR also correctly noted that Kenner committed perjury at trial. Kenner PSR at ¶ 43. Kenner testified at length that the Home Depot tape had been altered, inserting elaborate lies about its purported original contents under oath. Tr. at 4413-4418, 4423 (testifying that approximately 27 minutes of the tape were missing and blaming Kaiser for editing the tape); Tr. at 4420 (Kenner's testimony that "I am a hundred percent sure that there was references to Mr. Jowdy and Mr. Free during those portions"); Tr. at 4425 (suggesting that Jowdy was the "bank robber" referenced in the tape and that Jowdy's name had been cut from the recording in that place). A forensic analysis showed that the recording had not been altered since its creation. Tr. at 5623-5625.

In another example, Kenner testified that the victims made a "group decision to allow the lines of credit to go into default." Tr. at 4188; see also Tr. at 5113 (Kenner's testimony that he "spoke to each of the individual clients of [his], each of the hockey players, to discuss that prior to allowing them to go into default"). That testimony was flatly contradicted by Kenner's own recorded statements contemporaneous with the scheme and other evidence presented at trial. GX-506.1 (Kenner telling K. Peca that he stopped making interest payments on the lines of credit because he "ran out of money," and not attributing the action to a collective decision to allow the lines of credit to go into default); GX-506A (Kenner apologizing in response to K. Peca asking why Kenner did not provide advance notice of the default: "I'm saying sorry right now that you didn't get a call before Northern Trust collapsed those lines of credit, okay?").

The PSR also correctly noted that Kenner engaged in obstruction of justice by instructing one of the victims to avoid legal process, Tr. at 2181-2182 (Sydor's testimony that Kenner instructed him to avoid being served with a grand jury subpoena), and that Kenner attempted to interfere with Kaiser's ability to testify at trial. Kenner PSR at ¶ 43.

2. Constantine's Obstruction Enhancement is Warranted

The PSR correctly noted that Constantine generated a forged email message supporting his "consultant fees" relative to Hawaii (an exhibit presented at trial by Constantine's attorney), made various false allegations against the government, and made various spurious allegations about the Home Depot recording, GX 4500, 4500T, among other allegations.[3] See Constantine PSR at ¶¶ 45-48. Any of these acts supports the obstruction

---

[3] Constantine also requests a Fatico hearing regarding the Home Depot tape, GX 4500. No hearing is necessary as the issues relating to this exhibit were thoroughly

7

enhancement. See Guidelines § 3C1.1, cmt. 4 (listing "examples of covered conduct," including "producing or attempting to produce a false, altered, or counterfeit document . . . during an official investigation or judicial proceeding" and "providing materially false information to a judge or magistrate judge," among other examples).

For example: in pretrial motion practice, Constantine swore that the government encouraged a victim investor to dismiss an existing lawsuit against Constantine and file one against Kenner. Constantine PSR at ¶ 48. At trial, the victim investor testified no such effort ever occurred. See Tr. at 1969 (Nash's testimony that Special Agent Galioto did not suggest that Nash discontinue his dispute with Kaiser and in turn commence a lawsuit against Kenner). Constantine also swore that that the Home Depot tape recording had been selectively edited and shortened to leave out another's guilt, this time by Kenner. ECF No. 157 at ¶¶ 51-52.

### D. The Leadership Enhancement Is Warranted As to Both Defendants

Both defendants object to the leadership enhancement under Guidelines § 3B1.1(a). See Constantine PSR at ¶ 52; Kenner PSR at ¶ 50; Kenner Obj. I at 5-6; Constantine Obj. I at 10; Constantine Obj. II at 2. For the enhancement to apply, a defendant must have participated in "criminal activity that . . . was otherwise extensive" as required by Guidelines § 3B1.1(a). As the commentary to this Guideline states, "[I]n assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." Guidelines § 3B1.1, cmt. 3 (emphasis added). As the Second Circuit has stated, the core of the analysis "is based primarily on the number of people involved, criminally and noncriminally, rather than on other possible indices of the extensiveness of the activity." United States v. Carrozzella, 105 F.3d 796, 802 (2d Cir. 1997) (noting that "many characteristics that might ordinarily be considered evidence of 'extensive' activity are dealt with elsewhere in the Guidelines"); United States v. Kent, 821 F.3d 362, 371 (2d Cir. 2016) (requiring sentencing court to consider "the number of knowing and unknowing participants organized" by the defendant and whether any additional factors are "sufficiently related to the 'extensive' nature of the scheme").

The defendants involved a host of participants in their long-running scheme. For example, Kenner included the following individuals, among others, in his scheme to defraud and money laundering efforts: Aaron Mascarella, Tr. at 841, 856 (Kenner used Mascarella to create and manage the Hawaii accounts and lines of credit in the victims'

---

explored at trial. See Constantine PSR at ¶ 45; see also ECF No. 157 at ¶¶ 51-52 (Constantine's pretrial affidavit regarding the Home Depot tape recording).

8

names); Timothy Gaarn, Tr. at 2492-2501 (Kenner used Gaarn to divert the victims' money back to himself); John Kaiser, Tr. at 1047-1048 (Kenner used Kaiser to divert the victims' money back to himself); Lani Donlan, Tr. at 3421-3424 (Kenner used Donlan to assist him with forging paperwork); and C.R. Gentry, Tr. at 4750 (Kenner used Gentry to create a spreadsheet purporting to reflect the victims' interests in Eufora).

Likewise, Constantine included, among others: Ronald Richards, Tr. at 3795-3798 (Constantine used Richards to set up an intermediary account to receive funds for the GSF); Eric Edenholm, Tr. at 1652-1660 (Constantine used Edenholm to purchase Constantine's house out of foreclosure using GSF funds and rent it back to Constantine); James Grdina, Tr. at 2368 (Constantine used Grdina to set up the Urban Expansion loan from which he would receive $2 million in proceeds without putting any money in at the outset); Sue Ellen Ferguson, Tr. at 3377, 4886 and GX-8012 at 5 (Constantine used Ferguson to transfer assets out of his own name to avoid the assets' seizure); as well as Mark D'Ambrosio, Mia Edrozo, and C.R. Gentry, Tr. at 5304 (Constantine used D'Ambrosio, Edrozo, and Gentry to run Eufora).

In the event the Court concludes that the four-point enhancement does not apply, the government respectfully submits that the same evidence summarized above demonstrates that the two-point enhancement of Guidelines § 3B1.1(c) should apply to both defendants. See Guidelines 3B1.1(c) (providing for such an enhancement for any "organizer, leader, manager, or supervisor in any criminal activity" not addressed by Guidelines §§ 3B1.1(a) or (b)); see also Constantine PSR at ¶ 53 (concluding that the two-point enhancement should apply to Constantine as to Count Nine).

### A. The Abuse of Trust Enhancement Is Warranted As to Kenner

Defendant Kenner objects to the two-point enhancement, under Guidelines § 3B1.3, for abuse of a position of trust. See Kenner PSR at ¶ 50. This enhancement applies where a defendant has a role "characterized by professional or managerial discretion," such as in "the case of an embezzlement of a client's funds by an attorney serving as a guardian[.]" Guidelines § 3B1.3. cmt. 1. The sentencing court uses "the perspective of the victim to determine whether a defendant was in a position of trust." United States v. Barrett, 178 F.3d 643, 646 (2d Cir. 1999) (citation omitted).

It was undisputed that Kenner acted as a financial advisor to the victims, a relationship routinely held to constitute a position of trust. See, e.g., United States v. Dona, 50 Fed. Appx. 27, 2002 WL 31478890, at *2 (2d Cir. Nov. 1, 2002) ("[Defendant] clearly occupied a position of trust with [the victim] because he acted as her financial adviser and she gave him complete discretion over her investments solely as a result of his position."). Kenner claims that the PSR fails to specify which scheme resulted in the enhancement. See Kenner Obj. II at 2. Kenner's service as a financial advisor to the victims was a sine qua non of each of the frauds presented at trial. This enhancement is therefore appropriate.

9

    B.    <u>The Misrepresentation Enhancement Is Warranted As to Constantine</u>

Defendant Constantine objects to the two-point enhancement, under Guidelines § 2B1.1(b)(9), for making a "misrepresentation or other fraudulent action during the course of a bankruptcy proceeding." <u>See</u> Constantine PSR at ¶¶ 29, 52, 120; <u>see also</u> Constantine Obj. I at 6, 9. As set forth in the PSR, Constantine falsely stated in his bankruptcy proceeding that another individual owned Eufora. Constantine PSR at ¶ 120. Constantine filed an affidavit from this individual in connection with his objections to the PSR that makes no reference of any kind to Eufora. <u>See</u> Constantine Obj., Ex. A. The schedule of assets filed by Constantine in the bankruptcy proceeding stated that he had "the right [to] buy back for the outsanding [*sic*] balance, currently of $9,643,056.19, the (then 50%) interest he had in Eufora LLC that he transferred to the 2002 Trust, Sue Ellen Ferguson, Trustee in April 2003." GX-8012C at 5. However, official Eufora records admitted at trial showed that Constantine continued to claim an interest in Eufora after 2003. Specifically, the Eufora operating agreement in effect at the time of the bankruptcy proceeding — signed by Constantine and dated February 23, 2009 — showed Constantine still holding an approximate 43% interest in Eufora, <u>see</u> GX-210 at 37, and the Eufora tax returns for 2007 — signed by Constantine and filed on October 6, 2009 — showed Constantine holding a 49% interest in Eufora, <u>see</u> GX-4730 at 18.

V.    <u>The Remaining Objections Are Moot</u>

The defendants make a number of objections that do not affect the ultimate Guidelines calculations and/or which have otherwise been mooted, to which the government briefly responds below:

- Constantine notes his objection to the PSR's reference to Sue Ellen Ferguson as a "victim." Constantine PSR at 11, n.2; <u>see also</u> Constantine Obj. I at 2. The government declines to present additional evidence relating to Ferguson. <u>See</u> Constantine Obj. I, Ex. A.

- Constantine objects to the PSR's inclusion of various prior criminal charges that did not result in convictions. <u>See</u> Constantine Obj. I at 10; Constantine Obj. II at 2; <u>see also</u> Fed. R. Crim. P. 32(d)(2)(A)(i) (providing that PSR's "must also contain . . . *any* prior criminal record" (emphasis added)). Because no criminal history points were assessed, there is no effect upon Constantine's Guidelines exposure, and therefore no basis to amend the PSR.

- Constantine notes his objection to the sentence that states that he never contributed his $1.5 million share of the $5 million Urban Expansion deal, curiously claiming that his proceeds from <u>closing</u> the deal were part of his capital for <u>initiating</u> the deal. Constantine Obj. I at ¶¶ 19-20. These arguments have no effect upon Constantine's Guidelines range and are

10

addressed more fully in the government's supplemental post-trial briefing. ECF No. 438.

- The government takes no position on Constantine's objections to the PSR's reference to SENTRY records. See Constantine PSR at ¶ 103; Constantine Obj. II at 2. Nor does the government take any position on Constantine's objections to the PSR's reference to a helicopter. See Constantine Obj. I at 11; Constantine PSR at ¶¶ 91-92.

- Constantine demands discovery relating to emails between the FBI case agent and Trish Enloe and Thomas Baker of the Baker & Baker firm. See Constantine Obj. I at 8. As discussed at the September 15, 2016 and November 29, 2016, status conferences, the government has already responded to this request by searching for responsive documents and found none. See Tr. of Status Conference (Nov. 29, 2016) at 31. In any event, Constantine does not articulate how any such communications — by "any representative of the NHL players," see ECF No. 394, would have any impact on sentencing in this case.

- Kenner also moves for a downward departure based on a litany of purported government misconduct. Each of the grievances listed were litigated at trial or in pretrial and post-trial proceedings, and the government declines to re-engage with them here.

                                                 Respectfully submitted,

                                                 BRIDGET M. ROHDE
                                                 Acting United States Attorney

By:    /s/
       Saritha Komatireddy
       J. Matthew Haggans
       Assistant U.S. Attorneys
       (718) 254-7000

cc:    All counsel of record (via ECF)
       USPO Shayna Bryant (via email)