# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

―――――――――――――

Nº 13-CR-607 (JFB)

―――――――――――――

UNITED STATES OF AMERICA,

VERSUS

PHILLIP A. KENNER AND TOMMY C. CONSTANTINE,

Defendants.

―――――――――――――

**MEMORANDUM AND ORDER**
October 13, 2017

―――――――――――――

JOSEPH F. BIANCO, District Judge:

On July 9, 2015, following a nine-week trial, a jury convicted defendant Phillip Kenner ("Kenner") of one count of conspiring to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count One of the superseding indictment); four counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2 (Counts Two, Three, Four, and Seven); and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count Nine).[1] (ECF No. 324.) In addition, the jury convicted defendant Tommy C. Constantine ("Constantine," and together with Kenner, "defendants") of one count of conspiring to commit wire fraud (Count One); five counts of wire fraud (Counts Two through Six); and one count of conspiracy to commit money laundering (Count Nine). Now pending before the Court is (1) Constantine's motion for a judgment of acquittal as to all counts or, in the alternative,

for a new trial (ECF No. 346); and (2) Kenner's motion for a new trial (ECF No. 416). For the reasons set forth below, the Court denies both motions.

First, with respect to his motion for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, Constantine argues that there was insufficient evidence to convict him of either conspiracy charge because the government did not prove, beyond a reasonable doubt, that Constantine was a participant in any of three conspiracy objects—namely, defrauding investors in (1) a Hawaii land development project ("the Hawaii Project"); (2) Eufora LLC ("Eufora"), a prepaid credit card company run by Constantine; and (3) a fund for litigation against developer Ken Jowdy ("Jowdy") (the "Global Settlement Fund" or "GSF"). In addition, Constantine contends that there was no evidence connecting him with the wire transfers charged in Counts

―――――――――――――

[1] The jury also acquitted Kenner of three wire fraud counts (Counts Five, Six, and Eight). (ECF No. 324.)

Two through Four of the superseding indictment, and he asserts that the Court should acquit him of the wire fraud charges in Counts Five and Six because the jury acquitted Kenner of those crimes and the evidence at trial showed that Constantine attempted to return the money at issue.

The Court finds all of these arguments unpersuasive. As set forth in greater detail below, the witness testimony and documentary evidence adduced at trial sufficiently established that Constantine agreed with Kenner to participate in all of the objectives of the conspiracy. In particular, bank records show that both defendants routinely diverted third-party funds intended to finance the Hawaii Project, Eufora, and the GSF to pay for undisclosed personal expenditures, such as—in Constantine's case—race cars, rent, and lawsuits unrelated to those investments. Although Constantine argues, with respect to the Hawaii Project and Eufora, that he did not directly solicit money from the victims of those schemes, a reasonable juror could find—after viewing the record in a light most favorable to the government and drawing all inferences in its favor—that Constantine's conversion of the proceeds from those endeavors, coupled with evidence that defendants attempted to conceal their fraud, proved beyond a reasonable doubt that Constantine knowingly participated in those objectives of the conspiracy.

As for the Global Settlement Fund, Constantine contends that the alleged victims authorized all of the contested payments and that a defense witness testified that he permitted Constantine to use his GSF contributions for Constantine's personal expenses. However, although there was evidence at trial that the Global Settlement Fund's purposive ambit was broad and encompassed goals beyond financing litigation against Jowdy, none of the

government's witnesses testified that they approved using the GSF for defendants' individual gain. Moreover, financial statements show that Constantine's personal expenditures from the GSF exceeded the defense witness's investments.

With respect to the wire fraud convictions, Counts Two through Four of the superseding indictment involved money transfers between Kenner and third parties. However, although Constantine did not directly participate in those transactions, a rational juror could find that he was culpable as a co-conspirator based on evidence that (1) the funds came from Eufora investments, and (2) they were a reasonably foreseeable consequence of Constantine and Kenner's unlawful agreement to convert Eufora funds to their personal benefit.

Counts Five and Six also pertain to a Eufora investment, and insofar as Constantine argues that he is entitled to a judgment of acquittal based on the jury's determination that Kenner was not guilty on those charges, an inconsistent verdict for two co-defendants does not provide grounds for Rule 29 relief. Further, a rational juror could conclude that Constantine had the requisite intent to defraud based on evidence that (1) he subsequently used the underlying funds for an undisclosed personal expenditure, and (2) the investor who wired that money never received the Eufora equity that Constantine had promised him. Constantine's contention that he subsequently attempted to return that investment is not a basis for Rule 29 relief because it is well-established Second Circuit case law that, for federal wire fraud charges, scienter is measured at the time of the transaction, and the crime is complete once the fraudulent communication has been sent. Although a juror can consider later actions to determine intent at the time of the transaction, a rational juror could certainly

have concluded that Constantine had the intent to defraud at the time of the investment at issue and only offered to return the money once the fraud was disclosed.

Accordingly, the Court denies Constantine's Rule 29 motion in its entirety because the government proved his guilt beyond a reasonable doubt as to all charges.

Second, Constantine also moves, in the alternative, for a new trial pursuant to Federal Rule of Criminal Procedure 33 on the grounds of jury confusion and newly-discovered evidence.[2]

Constantine argues that the Court should have provided the jury with a special verdict form that would have required them to specify which of the three conspiracy objects provided the basis for Constantine's conviction. However, Constantine waived this argument at trial because he affirmatively withdrew his request for special interrogatories. In addition, assuming *arguendo* that he had not forfeited that claim, there was no error—much less plain error—by the Court because Supreme Court and Second Circuit precedent make clear that a special verdict form is not required in a multi-object conspiracy prosecution. Moreover, the newly-discovered evidence proffered by Constantine does not warrant Rule 33 relief because it existed prior to the trial, and Constantine could have discovered it with due diligence. In any event, it is highly improbable that use of those materials at trial would have affected the jury's verdict. Thus, Constantine's Rule 33 motion is also denied.

Third, Kenner separately moves for a new trial under Rule 33, asserting that (1) the government withheld exculpatory evidence;

(2) there is newly-discovered evidence; and (3) the government committed prosecutorial misconduct. All of these arguments lack merit.

There was no violation of Kenner's due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), because all of the materials at issue were disclosed to Kenner, are cumulative of impeachment evidence that was introduced at trial, or were not in the government's possession prior to trial. Further, there is no likelihood that any of those records would have altered the jury's findings of guilt.

In addition, the newly-discovered evidence encompasses financial documents that Kenner obtained via subpoena during the trial and that he introduced as evidence during his own testimony. Thus, they were fully available to the jury. The remaining documents were either in Kenner's possession or could have been discovered with due diligence before trial, and to the extent he did not have those records, introducing them as evidence would not have led to acquittal given the government's substantial proof of guilt.

Kenner also alleges that the government made inappropriate statements during its cross-examination of him and during its rebuttal summation, and he asserts that the government suborned perjury from several of its witnesses. However, the contested remarks were not so egregious as to deprive Kenner of a fair trial, the Court minimized any prejudice by sustaining contemporaneous objections and properly instructing the jury that questions and summations by counsel do not constitute evidence, and it is unlikely that the verdict

---

[2] Constantine has also filed a supplemental brief raising an additional ground for relief based on ineffective assistance of trial counsel. (ECF No. 483.)

Because that argument is not yet fully submitted, the Court does not consider it here.

would have been different absent those remarks. Further, Kenner's perjury claims merely reiterate the same credibility issues that his counsel vigorously explored at trial on cross-examination of the government's witnesses and during his opening statement and summation. Kenner also testified in great detail as to these issues during the defense case. Therefore, any purported perjury was fully considered by the jury, which—after nine weeks of testimony and the introduction of more than 1,000 exhibits—had ample opportunity to fully evaluate the veracity of each witness in this case, including Kenner.

Finally, with respect to both Constantine's and Kenner's Rule 33 motions, the Court concludes, in its discretion, that a new trial is not warranted because there is no real possibility that an innocent person has been convicted.

\*\*\*

Thus, for these reasons and those that follow, and after careful consideration of the parties' submissions, contentions at oral argument, and the extensive trial record, the Court denies defendants' motions in their entirety.

## I. BACKGROUND

### A. The Trial Evidence

As noted, the trial in this action lasted approximately nine weeks, and the evidence consisted of testimony from over 40 witnesses and more than 1,000 exhibits. In light of this voluminous record, the Court will limit its factual summary to the evidence that is relevant to the instant motions.

In brief, the government advanced three theories of fraud at trial pertaining to the Hawaii Project, Eufora, and the Global Settlement Fund. With respect to the Hawaii

Project, the government introduced evidence demonstrating that Kenner defrauded several professional hockey players who were clients of his. Those witnesses testified that they contributed money to that endeavor based on Kenner's representations that their investments would finance a real estate development in Hawaii; however, Kenner subsequently diverted his clients' money— without their authorization—to another property development in Mexico that involved Jowdy. In addition, witnesses testified that Kenner used several lines of credit in their name to divert money in an unauthorized manner, and when Kenner failed to make interest payments, those accounts were closed, and his clients lost the collateral used to secure those lines of credit. Further, and unbeknownst to Kenner's clients, bank records introduced at trial showed that Constantine received money intended for the Hawaii Project. The government also adduced evidence of forged consulting agreements that purportedly justified those payments, as well as an audio recording of a conversation between Kenner and Constantine indicating that they colluded to conceal their fraud.

Similarly, with respect to Eufora objective, the government demonstrated at trial that Kenner solicited funds from several investors who believed that their money would be used to finance that company. However, bank records and testimony indicated that Constantine converted those investments to cover his personal expenses, such as legal fees, without the investors' authorization. Specifically, the government showed at trial that the transactions underlying the wire fraud charges in Counts Two through Six of the superseding indictment were derived from Eufora investments, and that Kenner and Constantine used that money for unapproved expenditures. Contemporaneous text

messages between Kenner and Constantine from the relevant period also evinced an agreement by defendants to use Eufora money for their personal benefit.

Finally, several government witnesses testified at trial that Kenner and Constantine convinced them to invest in the Global Settlement Fund because they believed that their contributions would principally finance litigation against Jowdy. However, bank records and testimony again demonstrated that both defendants used GSF funds for personal expenses. In particular, the evidence showed that Constantine paid his rent, various legal expenses, and for automotive work with money from the GSF.[3]

## 1. Defendants' Background

Kenner was a financial advisor to several investors, including professional hockey players. (*See, e.g.*, Tr.[4] at 130, 2913-14.) He attended Rensselaer Polytechnic Institute ("RPI") for college, where he roomed and played hockey with government witness Joe Juneau ("Juneau"). (*Id*. at 124-26.)

Constantine was the founder and Chief Executive Officer of Eufora, a prepaid credit card company. (*See, e.g.*, Government Exhibit ("GX")-8021-R.) Constantine was also a professional race car driver. (*See, e.g.*, *id*.; Tr. at 3667.) He and Kenner were longtime business partners, since at least 2002, when they both held positions as officers of Eufora. (Defs.' Exh. C-265.)

## 2. Relevant Witness Testimony and Other Evidence

### a. The Government's Case

#### i. Joe Juneau

##### 1. Direct Testimony

On direct examination, Juneau testified that, after graduating from RPI, he joined the National Hockey League ("NHL") in 1992. (Tr. at 124, 127.) Juneau introduced Kenner to Derek Sanderson, an NHL connection of his who worked at Boston Capital, a financial firm, and Kenner was hired to work at Boston Capital. (*Id*. at 128-29.) Juneau testified that Kenner then went on to work at other financial investment companies and eventually started his own company, Standard Advisors, in 2002. (*Id*. at 132-33.)

Kenner served as Juneau's financial adviser from 1994 through 2007 or 2008. (*Id*. at 130.) Juneau testified that, during this period, Kenner often sent him faxes of investment-related documents to sign that only contained the signature page. (*Id*. at 141-42.) Juneau also said that Kenner did not send him regular summaries of the status of Juneau's various investments. (*Id*. at 142-43.) In or around 2002 or 2003, Kenner spoke with Juneau about investing in the Hawaii Project. (*Id*. at 137-38.) A May 2005 exchange between Kenner and Juneau indicated that Juneau had invested $100,000 in that enterprise. (*Id*. at 145-46; GX-728.) In or around 2006, Kenner informed Juneau of the need to renew a line of credit with Northern Trust Bank ("Northern Trust").

---

[3] Although Kenner has not moved for an acquittal and did not specifically focus on Count Seven of the superseding indictment in his motion for a new trial, the Court notes that the government also demonstrated with overwhelming evidence on that charge, through testimony and documents such as bank records, that Kenner defrauded investors by diverting their

investment funds to a real estate transaction in Sag Harbor, New York.

[4] "Tr." refers to the transcript of the trial in this action, which began on May 4, 2015 and concluded with the jury's verdict on July 9, 2015.

(Tr. at 139.) However, despite being presented at trial with a Northern Trust document dated December 18, 2003 appearing to contain his signature and indicating that Juneau had agreed to open a line of credit with Northern Trust, Juneau testified that he could not recall ever authorizing that account. (*Id*. at 139-40; GX-2152.) Juneau sent Kenner an e-mail asking why the Northern Trust renewal document indicated that he had a $750,000 line of credit when Juneau was under the impression that his Hawaii Project investment was valued at $100,000. (Tr. at 162-67; GX-733.) Juneau said that he never authorized Kenner to invest more than $100,000 in the Hawaii Project on his behalf. (Tr. at 170-71.) Juneau further testified that he never received any return on his investment in the Hawaii Project. (*Id*. at 22-24.)

## 2. Cross-Examination

On cross-examination, Juneau testified that he had lost money on other investments. (*Id*. at 231-36.) He also testified that he could not remember whether he told investigators from the Federal Bureau of Investigation ("FBI") about the Northern Trust line of credit when he met with them in 2009. (*Id*. 245-46.) Juneau further said that Kenner never prohibited him from contacting Northern Trust and that Juneau did in fact speak with a bank official named Aaron Mascarella ("Mascarella") to inquire about the credit line. (*Id*. at 251-52; Defs.' Exh. Kenner-3.) In addition, Juneau said that he had received an e-mail from Mascarella confirming that the Northern Trust line of credit had been paid off, and he also testified that he had signed a form authorizing the line of credit. (Tr. at 253-55; Defs.' Exhs. Kenner-3 and Kenner-2152.) However, notwithstanding that repayment, Juneau said that he terminated his relationship with Kenner in or around the summer of 2005

because Kenner was unresponsive to Juneau's attempts to communicate with him, and Juneau had lost more than $2 million in investments based on what he "belive[d] was getting out of [his] portfolio for different private deals that never came back." (Tr. at 258-60.) Juneau admitted that Kenner never guaranteed any sort of financial return and that he understood the risks associated with investing. (*Id*. at 261-62.) He further acknowledged that he received a communication dated July 21, 2006 that indicated that there were positive developments regarding his Hawaii Project investment. (*Id*. at 296-97; Defs.' Exh. Kenner-2.)

In addition, on cross-examination, Juneau testified that he had met Constantine only once, in or around December 2004. (*Id*. at 298-99.) Juneau had an approximately hour-long lunch with Constantine and Kenner, but did not recall what they discussed. (*Id*. at 299.) He also admitted that he had no contact with Constantine after that meal until Juneau sued Constantine in or around 2008 or 2009. (*Id*. 307-10.) That lawsuit, which Juneau filed to recoup financial losses on his various investments, was subsequently dismissed. (*Id*. at 311.) During settlement discussions involving that lawsuit, Constantine sent Juneau an e-mail stating that Juneau had "been grossly ill-advised by [his] attorneys and their so-called experts, as well as by a couple of disgruntled former colleagues of [Kenner's], who know absolutely nothing about [Constantine] or his business." (*Id*. at 322-23; Defs.' Exh. C-2.) Juneau admitted that, although he never made a profit on any of his investments with Constantine, Constantine did return all of Juneau's money (*id*. at 339), including a refund of his $100,000 investment in Eufora on or around July 7, 2005 via a check sent to him by Kenner (*id*. at 302-07).

### ii. Michael Peca

#### 1. Direct Testimony

Michael Peca ("Peca") is a retired professional hockey player. (Tr. at 370.) He met Kenner in or around 1996 while Peca was playing for the Buffalo Sabers. (*Id*. at 374.) Peca was introduced to Kenner because he was looking for a financial adviser to help him save money. (*Id*.) Their business relationship ended in 2009 after eroding over the preceding two years. (*Id*. at 375.)

On direct examination, Peca testified that Kenner at first pursued a conservative investment strategy, but that changed in or around 2001 after Pena signed a contract with the New York Islanders. (*Id*. at 378.) Peca then began to invest in land development properties and spoke with Kenner about the Hawaii Project in or around 2003. (*Id*. at 378-79.) Peca said he understood that the purpose of the Hawaii Project was to purchase agricultural land to build residential housing. (*Id*. at 379.) He further testified that he did not view the property at issue before agreeing to the investment, but he instead relied on Kenner's description of the Hawaii Project. (*Id*. at 381.)

Peca said that Kenner created an investment company called Little Isle IV LLC ("Little Isle IV") to manage the Hawaii Project, and Peca invested $100,000 in cash and $1.775 million in funding obtained through a line of credit. (*Id*. at 381-82.) Peca opened the line of credit with Northern Trust and secured it via bonds that Peca transferred to Northern Trust from his Charles Schwab investment account, which represented an important part of his family's financial savings. (*Id*. at 383-85.) Peca also testified that Kenner told him to obtain the line of credit from Northern Trust, which Kenner said would have a six-to-nine-month lifespan

and then be repaid in full. (*Id*. at 384-85.) In addition, Peca testified that Kenner represented that the Northern Trust line of credit would only be used to finance vertical construction as part of the Hawaii Project. (*Id*. at 386-87.) Peca also signed a document on or about March 11, 2005, allowing Kenner to access his line of credit with Northern Trust. (*Id*. at 387-88; GX-2142.) On April 4, 2005, Northern Trust bank records show that $1.25 million was drawn on the line of credit, and Peca testified that Kenner never informed him of that transaction. (Tr. 431; GX-2001.) Those funds were used to pay off the line of credit belonging to Owen Nolan ("Nolan"), another former NHL player, and Peca said that he never authorized Kenner to use his line of credit to remunerate Nolan. (Tr. at 431-32.)

After the line of credit became active, Peca received monthly activity reports pertaining to his bond account, but not for the line of credit itself. (*Id*. at 388-89.) On direct testimony, Peca reviewed a Northern Trust bank statement covering the period from October 1, 2006 through October 31, 2006 for an account held by Little Isle IV. (*Id*. at 414-15; GX-2002.) That statement showed that, on October 19, 2006, Little Isle IV received a wire in the amount of $395,000 from Peca's line of credit account with Northern Trust. (Tr. at 415-417; GX-2002.) Other Northern Trust bank account statements reflect that, on that same day, $395,000 was transferred from Little Isle IV to Ula Makika LLC ("Ula Makika"), and from Ula Makika to Led Better Development Company LLC ("Led Better"). (*Id*. at 417-18; GX-2003.) Peca testified that he never authorized Kenner to transfer funds from his Northern Trust account to Led Better and believed that his line of credit would only be used to finance the Hawaii Project. (Tr. at 418-19.) He also said that he later learned from Kenner "well after the fact," in or

around 2010, that a portion of that line of credit was used to loan money to Jowdy. (*Id.* at 423-25.)

Moreover, on or around February 9, 2009, Peca received a letter from Northern Trust indicating that his line of credit was near default. (Tr. at 433-34; GX-716.) Peca said that he immediately contacted Kenner, who assured him not to worry. (Tr. at 435.) However, Peca testified that Northern Trust subsequently held his account in default; as a result, his collateralized bonds were "pretty much completely wiped out," and Peca lost over $1.8 million. (*Id.* at 435-36.) Peca further said that Kenner never explained to him what had caused the default, and Peca did not know what had happened to that money. (*Id.* at 436.) Peca testified that, in or around August 2009, he asked Northern Trust to send all documents pertaining to his line of credit account to Kenner, but when Peca subsequently attempted to review those materials, Kenner told him that someone had broken into his home and stolen them. (*Id.* at 439-40.)

With respect to Eufora, Peca testified that he first heard of that company in 2004 from Kenner. (*Id.* at 441.) He later met Constantine in 2009. (*Id.* at 442-43.) Peca said that he made several investments in Eufora in 2004 and 2008 for a total of $366,000. (*Id.* at 443; *see also* GX-751 and GX-752.) He wired those funds from his Charles Schwab account to Eufora, and Peca said that Kenner executed those transactions. (*Id.*)

For instance, on or about April 4, 2008, Kenner sent a letter instruction directing that $100,000 be wired from Peca's Charles Schwab account to Constantine Management Group Ltd. ("CMG"). (*Id.* at 444-45; GX-753.) At trial, Peca testified that he did not know whether CMG had any connection with

Eufora. (Tr. at 445-46.) Peca said that, after he discovered that wire instruction, he asked Kenner in or around 2011 or 2012 about the purpose of that funds transfer, but Kenner did not provide an explanation. (*Id.* at 446-47, 452.)

In addition, Peca testified that he was familiar with the Global Settlement Fund, which he said was "a legal fund designed for a civil action against Ken Jowdy, with the hopes of the end game being acquiring the northwestern parcel of beach front property in" a real estate development in Mexico. (*Id.* at 420.) Peca said that, in or about 2009, he met with Constantine and Kenner to discuss strategy for the litigation against Jowdy. (*Id.* at 452.) He testified that, at that time, he had not received a return on his investment in the Hawaii Project. (*Id.* at 453.) Constantine began that conversation by introducing himself and explaining the purpose of the Global Settlement Fund. (*Id.* at 453-54.) Peca further testified that Constantine promised that he would "make [Peca] whole in every investment [Peca] ever made to Phil Kenner and" Constantine, although Peca said at trial that Jowdy had no connection to Peca's losses in the Hawaii Project. (*Id.* at 455-57.)

Peca said that he contributed $250,000 to the Global Settlement Fund through a lawyer named Ronald Richards ("Richards"), whom Kenner introduced to Peca. (*Id.* at 421, 459; GX-754.) Peca further testified that he did not know what happened to that money, and he said that Richards informed him, in or around 2011, that the Global Settlement Fund was "gone." (Tr. at 422, 460.) On or about May 18, 2009, Kenner sent Peca and his wife Kristin an e-mail indicating that Richards had received the $250,000 intended for the Global Settlement Fund and that, in return for that contribution, Peca would also receive additional equity in, *inter alia*, Eufora. (*Id.* at

463-65; GX-757.) Specifically, the e-mail stated that:

> In addition to the [GSF] paying for various legal fees, PR Agency fees, as well as other protective advances and settlement costs, you will be receiving transfer of membership agreements from [Constantine] for your acquisition of additional interest in Eufora, LLC, as well as your new LLC and operating agreements reflecting your ownership interest in the Avalon Airpark Real Estate Project, the Falcon 10 aircraft, and the two Palms Place condominium units.

> You may not recall [Constantine] or I mentioning the Palms units in=2 0our [sic] conversation. In any case, because Moreau and [Constantine] settled that case as part of the Global Settlement, he has graciously elected to include you as a beneficiary in the significant equity that exists in those two units as part of this transaction.

> As we discussed, rather than throwing money away only on legal fees, this strategy which effectively acquires significant assets, while providing a legal remedy, is by far our best solution.

(GX-757.)

Peca testified that he never received a return on any investment in Eufora, nor did he receive an explanation from Kenner or Constantine as to how Peca's $250,000 contribution to the Global Settlement Fund was spent. (Tr. at 470-71.) In addition, Peca said that he contributed to the Global Settlement Fund because of his "desperation" to recover his other investments, as Constantine had promised. (*Id*. at 471-72.)

### 2. Cross-Examination

On cross-examination, Peca testified that he never saw Kenner forge another person's signature. (*Id*. at 488-89.) He also said that he never saw the operating agreement or any books and records for Little Isle IV. (*Id*. at 494.) Peca further testified at trial that he was never aware that the line of credit he obtained to fund the Hawaii Project was the source of a loan to Jowdy for a development in Mexico. (*Id*. at 496.) However, he admitted that he had testified before the grand jury that he was aware of a short-term loan made to Jowdy using Little Isle IV's capital account. (*Id*. at 499.) Peca also acknowledged that he never requested records from Northern Trust pertaining to his line of credit account and also did not challenge Kenner when he refused to explain why $100,000 of Peca's funds were wired to CMG. (*Id*. at 504-07.) Moreover, Peca said that Kenner would often just send him the signature page for a document that he needed to sign. (*Id*. at 512-13, 515-17.) He explained that, from to time, he asked Kenner to send the remainder of a document, but said that he generally trusted that everything was in order. (*Id*. at 517.)

Moreover, Peca testified on cross-examination that, on or about November 9, 2009, he received an e-mail from Constantine sent to a group of investors indicating that a buyer had agreed to invest in a Mexico real estate development project and provide the $15 million needed for "settlement costs." (*Id*. at 533-34; Defs.' Exh. C-24.) Peca agreed at trial that this information was consistent with achieving the purpose of the Global Settlement Fund. (Tr. at 534-35.) However, Peca said that this deal with an individual named Robert Sonnenblick ("Sonnenblick") was never consummated. (*Id*. at 536.) In addition, Peca testified that, when he met with Constantine and Kenner in 2009 to discuss the Global Settlement Fund,

Kenner said that he needed money from Peca and the other NHL investors to fight Jowdy or else he risked losing everything. (*Id.* at 538-39.) Nevertheless, he said that it was his understanding from Kenner and Richards that Constantine was in charge of the Global Settlement Fund. (*Id.* at 540.) Peca further testified that he received several e-mails from Constantine in 2009 setting up conference calls to discuss management of the Global Settlement Fund. (*Id.* at 564-69; Defs.' Exhs. C-32, C-33, C-34, C-35, and C-36.) Likewise, Peca said that Constantine kept him and other investors apprised of developments with the Global Settlement Fund through group e-mails. (Tr. at 580.)

### 3. Re-Direct Testimony

On re-direct, Peca testified that he never met Sonnenblick and did not know whether he actually exists, and he also said that he has no records indicating that he holds an interest in Eufora. (*Id.* at 608-09.) In addition, Peca testified that the lawsuit commenced against Jowdy to recoup a loan related to a Mexico development project was dismissed at Richards' request without prejudice, and he said that he never received an accounting of how the Global Settlement Fund legal fees were spent. (*Id.* at 613-15.)

### iii. Shimon Betesh

Shimon Betesh ("Betesh") is a real estate attorney who resides in Queens, New York. (Tr. at 634.) He testified that, in or around October 2006, he was involved in a transaction pertaining to Led Better. (*Id.* at 635.) He said that he was retained by Kenner, who was a member of that company, and that Kenner told him that Led Better was going to buy land for property development. (*Id.* at 635-37.) Led Better wired Betesh $769,000, on or about October 25, 2006, to facilitate that purchase. (*Id.* at 637-38; GX-1401.)

Betesh testified that, on or about that date, Led Better closed on a property at 18 North Haven Way in Sag Harbor, New York (the "Sag Harbor Property") that had a purchase price of $750,000. (*Id.* at 641-43, 649.) He also said that Led Better's organizational documents show that Peca was neither a managing member nor an equity owner of Led Better. (*Id.* at 646-47; GX-703.) Betesh also affirmed that the Sag Harbor Property was located in New York, and not in Hawaii. (Tr. at 649.)

### iv. Kristin Peca

#### 1. Direct Testimony

Kristin Peca ("Mrs. Peca") is the wife of Michael Peca. (Tr. at 660.) She met him in or around 1995 at approximately the time he met Kenner. (*Id.*) Mrs. Peca testified that she and her husband jointly make investment decisions for their family. (*Id.* at 662.)

She further testified that Kenner told her about the Hawaii Project, and she said that she and her husband invested $100,000 that they thought would confer 12 to 13 percent of a 35 percent stake in a company Kenner organized to facilitate that deal. (*Id.* at 666-67.) In addition, Kenner told her that he needed to get a line of credit from a bank that would be collateralized with a bond account that Mrs. Peca and her husband set up. (*Id.* at 667.) Mrs. Peca further testified that Kenner said that none of the bond funds would "ever go missing." (*Id.*) She also said that the bonds used to secure the line of credit was her family's "safety net" in the event of financial hardship. (*Id.* at 668.) Moreover, Mrs. Peca said that she was initially reluctant to use the bonds in this way, but Kenner convinced her otherwise because she believed that he was looking out for family's best interests. (*Id.* at 668-69.) Mrs. Peca further testified that she believed that the line of credit would be used

to fund construction for the Hawaii Project and said that Kenner never told her that it would be used to buy land in Sag Harbor. (*Id.* at 669-70.) She also said that she believed that she would get her money back from the line of credit within six months, but that did not happen. (*Id.* at 670.)

Mrs. Peca said that, when she saw the letter from Northern Trust indicating that the line of credit account was in default, she panicked. (*Id.* at 679-80.) She further testified that her husband contacted Kenner to inquire as to what had happened, and that Kenner told him that the investment in the Hawaii Project was safe. (*Id.* at 680-81.) However, Mrs. Peca said that Kenner stopped returning her phone calls in or around 2009 and was slow in responding to other communications. (*Id.* at 682.)

With respect to Eufora, Mrs. Peca testified that Kenner told her about that investment opportunity and that his friend Constantine was involved, and she said that Kenner represented that Constantine held exclusive patents that allowed individuals with poor credit ratings to build better credit histories. (*Id.* at 671.) Mrs. Peca further testified that she and her husband made two investments in Eufora in 2004 and 2008, and that the latter investment occurred after Kenner told her that Eufora was about to "explode" and needed extra funding to "get us over the last little legal bit." (*Id.* at 672.) She also said that she would not have supported investing in Eufora if she knew that the patents Constantine held were being used as collateral for a loan because that would indicate that the company was in debt. (*Id.* at 673.) In addition, Mrs. Peca said that Kenner never told her that the Eufora investment would go to CMG. (*Id.* at 675.) At trial, she reviewed a statement for a bank account belonging to Constantine and said that it showed that the account received a

$100,000 wire from Peca to CMG on or about April 7, 2008, and that, on the same day, an outgoing wire went from that account to Kenner for the same amount of money. (*Id.* at 676-77; GX-1706.) Mrs. Peca testified that she never authorized Kenner to receive investment funds intended for Eufora. (Tr. at 677.) She also said that she never received any official documentation reflecting the ownership interest that she and her husband held in Eufora and never received a return on that investment. (*Id.* at 678-79.)

In addition, Mrs. Peca testified that she met Constantine in 2009 when he and Kenner came to her home. (*Id.* at 683.) She said that Constantine told her that he had a plan to recoup the Hawaii Project investment through the Global Settlement Fund. (*Id.* at 684.) Mrs. Peca said that Constantine explained that the line of credit was used to make loans to Jowdy and that filing a lawsuit against Jowdy would enable recovery of that money. (*Id.* at 684-85.) Kenner reportedly told her that he did not have the funds to finance that litigation himself and, therefore, needed funding from the Pecas, as well as other investors. (*Id.* at 685.) Mrs. Peca also said that Kenner and Constantine told her that every investor needed to contribute $250,000, or else the Global Settlement Fund would be unsuccessful. (*Id.* at 686.) They also reportedly told her that the money would be kept in an escrow account controlled by Richards (the "Richards Escrow Account"). (*Id.*) Mrs. Peca testified that she told Constantine and Kenner that she was not interested in investing in any other development projects and only wanted the Global Settlement Fund investment to be used for litigation against Jowdy. (*Id.* at 687.) Constantine did not tell her that he would be in charge of the Global Settlement Fund. (*Id.* at 688.)

Mrs. Peca also said that she was never informed that the Global Settlement Fund would be used to pay for Constantine's rent; for race cars or a home that he purchased; or for a personal lawsuit pertaining to Constantine and race cars. (*Id*. at 694-95.) She testified that she would never have authorized her Global Settlement Fund contribution to be used for those purposes. (*Id*. at 696.)

Further, Mrs. Peca testified that Kenner eventually told her that all of the money in the Global Settlement Fund had been used up and that he did not receive any money from that endeavor. (*Id*. at 696, 709.) However, at trial, Mrs. Peca reviewed account statements for the Richards Escrow Account and said that they showed a $250,000 incoming wire transfer from the Pecas received on May 8, 2009 and a $22,425.02 outgoing wire transfer to Kenner on July 30, 2009. (*Id*. at 710-11; GX-1102 and GX-754.)

## 2. Cross-Examination

On cross-examination, Mrs. Peca said that she did not initially contact Northern Trust to inquire about the line of credit default because she believed that Kenner had the necessary information. (Tr. at 713.) She said that, eventually, the Pecas withdrew the power of attorney they had conferred on Kenner so that he could no longer process financial transactions on their behalf. (*Id*. at 715.) Mrs. Peca testified that Kenner told her that someone had stolen the financial documents pertaining to the line of credit account from his home. (*Id*. at 716.) She said that she did not believe him because that explanation "seemed like another one of his conspiracy theory stories." (*Id*. at 717.) Mrs. Peca further testified that she received a packet of information from Kenner pertaining to Little Isle IV, but did not know what had happened to those materials. (*Id*. at

719-21.) In addition, she acknowledged that she thought that Kenner's advice to begin investing in real estate developments like the Hawaii Project was reasonable at the time it was given, and she did not think that he was being deceitful. (*Id*. at 725-26.) Mrs. Peca said that she thought that she did receive some Northern Trust documents from Kenner, but they did not contain the information that the Pecas were looking for. (*Id*. at 752.) She also acknowledged that Kenner had told her that it may take five to twenty years for a real estate investment to become profitable. (*Id*. at 757.)

Mrs. Peca further testified on cross-examination that she believed that Constantine played a role in the Eufora investment. (*Id*. at 729.) She also affirmed that the purpose of the May 2009 meeting involving Kenner, Constantine, and the Pecas was to discuss making a contribution to the Global Settlement Fund. (*Id*. at 770.) Mrs. Peca further testified that she recalled a discussion of how proceeding with the Global Settlement Fund would benefit the Pecas' investment in Eufora. (*Id*. at 771.) She also acknowledged that, approximately ten days after making a $250,000 contribution to the Global Settlement Fund, the Pecas received an e-mail from Kenner requesting permission to use those funds for purposes other than litigation against Jowdy, such as public relations agency fees. (*Id*. at 773-75.)

Likewise, Mrs. Peca admitted that, based on that e-mail, she understood that the Global Settlement Fund had multiple objectives beyond litigation against Jowdy, including acquiring assets. (*Id*. at 777.) She testified that her husband responded to Kenner's e-mail and asked how much equity the Pecas had obtained in Eufora with their contribution to the Global Settlement Fund. (*Id*. at 778-79; Defs.' Exh. C-26.) Moreover,

Mrs. Peca said that she and her husband received an e-mail from Constantine that discussed other uses of the Global Settlement Fund besides litigation against Jowdy. (Tr. at 781-84; Defs.' Exh. C-27.) She also acknowledged that her husband sent an e-mail to Kenner on May 22, 2009 that stated that he understood and accepted the terms of the settlement plan. (Tr. at 785; Defs.' Exh. C-28.) Mrs. Peca said that Constantine set up conference calls to discuss management of the Global Settlement Fund in which she participated. (Tr. at 787-91.) She also testified that, at some point, she requested that Richards return the Pecas' Global Settlement Fund contribution, but she did not recall the exact date of that communication. (*Id.* at 792-93.) Finally, on cross-examination, Mrs. Peca testified that Constantine was not involved in managing the Pecas' investment portfolio and never provided them with any advice regarding the Northern Trust line of credit. (*Id.* at 811.)

### 3. Re-Direct Testimony

On re-direct, Mrs. Peca said that her understanding was that the Global Settlement Fund would be used for litigation against Jowdy and that conversations with Kenner and Constantine confirmed that belief. (*Id.* at 816-17.) She said that she would never have authorized them to spend the Pecas' contribution on personal projects. (*Id.* at 818-19.)

### v. Aaron Mascarella

### 1. Direct Testimony

Aaron Mascarella worked in the Scottsdale, Arizona office of Northern Trust from 1994 to 2011. (Tr. at 837.) He was assigned to the banking division from 1994 to 2005 and then transitioned to the lending division. (*Id.* at 838.)

Mascarella testified that he met Kenner in or around 2003. (*Id.* at 838-39.) He said that a client of his introduced the two of them and identified Kenner as a financial advisor to several NHL players. (*Id.* at 839.) Mascarella further testified that Kenner had lunch with him and a couple of colleagues from Northern Trust, and that Kenner said that he was seeking financing for a project in Hawaii. (*Id.* at 839-40.) In addition, Mascarella said that Kenner proposed moving several of his clients' investment accounts to Northern Trust to use as collateral for a loan. (*Id.* at 840.) He also said that he created several bank accounts for Kenner, including one for Little Isle IV, which were to be used for the Hawaii Project. (*Id.* at 841; *see also* GX-2081-A and GX-2081-B.) In addition, he said that, as the sole member and manager of Little Isle IV, only Kenner was authorized to transfer money into and out of that entity's bank account. (Tr. at 844; *see also* GX-2081-C.) Mascarella testified that Kenner had the same authority with respect to Northern Trust bank accounts for several other companies. (*Id.* at 844-49.)

At trial, Mascarella reviewed a chart prepared by the government that summarized all of the accounts pertaining to Hawaii entities and said that Kenner opened all of those accounts. (*Id.* at 849.) He further testified that he was responsible for managing the lines of credit opened by Kenner with Northern Trust and said that they were secured by individual investment accounts that contained "conservatively invested" bonds and cash. (*Id.* at 850-52.) In addition, Mascarella said that Northern Trust would not have provided loans to Kenner without that collateral. (*Id.* at 851.)

Mascarella further testified that Kenner opened individual lines of credit with Northern Trust for Peca, Nolan, Bryan Berard, Darryl Sydor, Steven Rucchin, Glenn

Murray, Mattias Norstrom, and Sergei Gonchar; and he said that Kenner also obtained a corporate line of credit for Little Isle IV, which was secured by Nolan's and Juneau's investment accounts. (*Id*. at 853-54.) He also said that Kenner was the only person who directed every transfer of money into and out of those lines of credit, and that Kenner said that Northern Trust should only communicate with him regarding the lines of credit. (*Id*. at 856, 859.) Mascarella also said that Kenner told him that the NHL players were too busy to be bothered with decisions pertaining to the lines of credit and instructed Mascarella to send monthly statements for those accounts to Kenner's personal residence. (*Id*. at 859.)

Mascarella also reviewed a March 23, 2007 e-mail from Juneau to Kenner inquiring as to why he had received a notice that his Northern Trust line of credit was in default, as well as Kenner's response saying that he had paid off the line of credit and that everything was in order. (*Id*. at 860-61; Defs.' Exh. Kenner-3.) In addition, Mascarella reviewed a series of Northern Trust account statements that he said indicated that, on March 23, 2007, Kenner had advanced $638,488.76 from Nolan's individual line of credit to pay down $636,603.63 in the Little Isle IV corporate account secured by Juneau's investments. (Tr. at 862-63; GX-2158, GX-2101, and GX-2133.)

Mascarella said that any time an interest payment for a line of credit was past due, he would inform Kenner of that fact, and Kenner would typically ask Mascarella to advance a loan on another line of credit to make the interest payment out of Little Isle IV's account. (Tr. at 864.) For instance, Mascarella said that on April 23, 2007, Kenner took out a $60,000 advance on Peca's line of credit and used it to pay off an $11,000

interest payment due on Peca's account, as well as interest payments for several other lines of credit. (*Id*. at 867-68; GX-22.)

Mascarella also summarized similar transactions that occurred with respect to Peca's line of credit and other lines of credit. In sum, on several occasions, when an interest payment or payments were due for one or more lines of credit, Kenner advanced a loan on a line of credit that had availability (*i.e.*, a line of credit that had not reached its credit cap) and used that loan to pay off the interest due through Little Isle IV's corporate account. (Tr. at 868-75; GX-23–GX-35.)

Mascarella further testified that, in or around 2008, he met with Kenner at Kenner's request to discuss increasing the credit available for the lines of credit. (Tr. at 875-76.) He also said that he did not meet with or contact any of the NHL players about this request. (*Id*. at 876-77.) In addition, Mascarella testified that a senior lender at Northern Trust informed Kenner that the bank needed a full accounting of all advances that had been made on the lines of credit, as well as tax paperwork, before extending the loan limits, and although Kenner said that he would provide that information, he never did. (*Id*. at 877.)

At trial, Mascarella said that, on or around October 16, 2008, the lines of credit were fully drawn, and accordingly, in or around July 2008, Kenner began making interest payments on those accounts by transferring funds from Northern Trust checking accounts for other entities that he controlled, such as Ula Makika, as well as from his personal bank account at Wells Fargo. (*Id*. at 878-79; GX-36, GX-38–40.) In addition, Mascarella said that the line of credits eventually entered default because interest payments were no longer being made. (Tr. at 881-84; GX-20.) In or around

February and March 2009, Mascarella sent letters notifying the NHL players that their lines of credit accounts were in default for failure to make interest payments. (Tr. at 886-88; *see also, e.g.*, GX-2112.) He further testified that, accordingly, Northern Trust seized control of the NHL players' investment accounts and sold the investments therein. (Tr. at 888.)

For instance, on or about March 31, 2009, $1,794,392 from Peca's investment account was used to pay off his line of credit. (*Id*. at 891-92; GX-2162.) Mascarella said that Peca's investment account was valued at a little over $1.8 million prior to that transaction. (Tr. at 892; GX-2162.) Similarly, Mascarella testified that, on March 31, 2009, $595,000 from Bryan Berard's investment account and $1,010,645 from Steve Rucchin's investment account were used to pay off their respective lines of credit. (Tr. at 893-94; GX-2165 and GX-2173.) Finally, Mascarella said that Kenner never secured any line of credit with his own investment account. (Tr. at 894.)

### 2. Cross-Examination

On cross-examination, Mascarella testified that some of the default letters sent by Northern Trust were returned as undeliverable because of incorrect addresses. (*Id*. at 898-99.) He said that neither he nor the bank did anything to obtain the correct addresses. (*Id*. at 899.) Mascarella further testified that using one line of credit to pay off another was not in and of itself worrisome. (*Id*. at 901.) He also said that he never saw Kenner forge another person's signature and said that he never told any of the NHL players that Kenner had prohibited Mascarella from speaking with them directly. (*Id*. at 916, 918.) Finally, Mascarella testified on cross-examination that he never met or communicated with Constantine prior

to the trial and said that, to his knowledge, Constantine did not have anything to do with the Northern Trust lines of credit that Mascarella had discussed. (*Id*. at 922-23.)

### 3. Re-Direct Testimony

On re-direct, Mascarella testified that he exchanged e-mails with Kenner on or about February 18, 2009 indicating that Kenner had received the Northern Trust default letters and promised to pay the outstanding interest payments, but he said that Kenner never did so. (*Id*. at 925-27; GX-6514.)

### vi. Ethel Kaiser

### 1. Direct Testimony

Ethel Kaiser ("Mrs. Kaiser") is the mother of John Kaiser ("Kaiser"), and through him, she met Kenner. (Tr. at 932.) In or around 2005, Kenner and Kaiser asked Mrs. Kaiser to make a loan of $390,000 to the Hawaii Project. (*Id*. at 932-33.) Mrs. Kaiser said that she withdrew that loan from her savings account, and that it was supposed to be re-paid within 30 days with about 12 percent interest. (*Id*. at 933.) Mrs. Kaiser testified that neither the principal nor the interest on that loan were re-paid within 30 days, but she said that her son eventually reimbursed her "[d]own the line." (*Id*. at 934.)

In addition, Mrs. Kaiser testified that she invested $70,000 from her savings in Eufora after speaking with Constantine. (*Id*. at 935-36.) She said that Constantine told her that Eufora "was going to be very, very big" and that she would "make a lot of money." (*Id*. at 936.) However, Mrs. Kaiser testified that she lost that entire investment and never received any explanation as to what had happened to that money. (*Id*.)

### 2. Cross-Examination

On cross-examination, Mrs. Kaiser said that Kaiser advised her that the Hawaii Project was a good investment, but she said that he did not originate the idea for that endeavor. (*Id*. at 937-38.) She further testified that Kaiser repaid her Hawaii Project investment with 12 percent interest and that he had asked her for money to make other investments. (*Id*. at 939.) Mrs. Kaiser said that she always gave her son money when he asked for it with the understanding that it would be re-paid with interest. (*Id*. at 940.)

In addition, Mrs. Kaiser testified that Kenner did not discuss Eufora with her. (*Id*. at 944.) She said that she met Constantine for the first time in or around 2009, when she and her son traveled to Mexico. (*Id*. at 946.) Mrs. Kaiser testified that she spoke with Constantine on the phone about Eufora, but could not recall if that was before or after the Mexico meeting. (*Id*. at 947-48.) She said that only she, Constantine, and Kaiser were on that phone call and that Kaiser did all of the talking. (*Id*. at 948-49.) Mrs. Kaiser further testified that she wired the $70,000 investment to her son in or around 2009. (*Id*. at 950.) In addition, she said that her son would never be involved in an effort to take over Eufora from Constantine. (*Id*. at 951-52.)

### vii. John Kaiser

### 1. Direct Testimony

Kaiser served as a Suffolk County police officer. (Tr. at 954.) He testified that, in or around March 2002, he traveled to the big island of Hawaii with his friend Chris Manfredi ("Manfredi"), and while they were there, they stopped by a real estate office to look at properties, including a 258-acre vacant tract of land. (*Id*. at 955-56, 960.)

Kaiser said that the sale price for that land was $750,000. (*Id*. at 956.) He further testified that he and Manfredi put down $10,000 on that property with the intention of buying and sub-dividing it into residential lots for sale or development. (*Id*. at 957, 960.)

In addition, Kaiser said that he met Kenner in or around 2003 in Hawaii through a friend of Manfredi's. (*Id*. at 960-61.) Kaiser testified that Kenner told him that he was "a financial advisor to a lot of different celebrities . . . and a bunch of hockey players," was worth $500 million, and was interested in purchasing additional acreage for the purpose of real estate development. (*Id*. at 962, 969.)

Kaiser further testified that, from 2003 to approximately 2006, he and Manfredi closed on the purchase of the initial 258-acre parcel and were conducting due diligence with respect to residential development. (*Id*. at 973.) He also said that, in or around the summer of 2005, Kenner contacted him to ask for a $1 million loan for the Hawaii Project. (*Id*. at 975-76.) Kaiser testified that he did not have all of the money needed for this loan, so he solicited funds from family and friends. (*Id*. at 976-77.) Kaiser said that he wired the funds to Kau Holding Company and that Kenner told him that, at the end of 30 days, he would receive $1.1 million in repayment with interest. (*Id*. at 977-78.) However, Kaiser said that he did not receive those funds at the 30-day mark and asked Kenner for the money, who told him to wait, but Kenner never re-paid any portion of that loan. (*Id*. at 978-80.) As a result, Kaiser used $1.2 million in proceeds from the sale of his personal residence to reimburse his family and friends who had contributed to that loan. (*Id*. at 980.) Kaiser further testified that, in or around April 2006, he and Manfredi met with Kenner to discuss the status of the Hawaii

Project, and he learned from Kenner that the $1 million loan was used to fund a development project in Cabo San Lucas, Mexico, rather than in Hawaii. (*Id.* at 983.) He said that he learned that the money went to fund a Jowdy-led development called Diamante Del Mar ("Diamante"). (*Id.* at 986.)

On direct testimony, Kaiser also reviewed two consulting agreements between Little Isle IV and CMG dated December 15, 2004 and June 1, 2005 that he purportedly signed, but he said that his signatures on those documents were not authentic. (*Id.* at 992-94; GX-5104.) He also said that he did not meet Constantine until late 2007 or early 2008 when Kenner introduced the two of them. (Tr. at 996-97.) Kaiser also testified that he and others sold a 50 percent stake in the Sag Harbor property to Kenner and Led Better in or around 2006 for $750,000. (*Id.* at 998-1004; GX-1602.)

In addition, Kaiser said that he was familiar with a man named Timothy Gaarn ("Gaarn"), who he said was involved with Eufora. (Tr. at 1046.) Kaiser testified that he received a $30,000 wire transfer on February 12, 2009 from Gaarn, which he said constituted payment for a construction project in Paradise Valley, Arizona (the "Paradise Valley property") that Kaiser worked on with Kenner.[5] (*Id.* at 1045-47;

GX-2303.) With respect to that transaction, Kaiser testified as follows:

> Q. Why are you getting $30,000, do you recall, from Timothy Gaarn, manager at Eufora at this juncture?
>
> A. Because I was in the process of a build for the [Paradise Valley property]; and Phil Kenner said that Tim Gaarn owed him money and he would send it to me.
>
> Q. Why did you need money for that particular home? Were you developing the [Paradise Valley property]?
>
> A. Because it was under const-ruction. I was getting the materials and labor.

(Tr. at 1047.) However, Kaiser said that, on that same day, he sent $30,000 to Kenner because "Kenner said it was a mistake, that he needed that money. It should have been sent to him directly." (*Id.* at 1047-48; GX-1603 and GX-1721.)

Similarly, Kaiser said that, on February 26, 2009, he transferred $40,300 to Kenner following an equivalent incoming transfer from Gaarn "[b]ecause [Kaiser] was directed from Phil Kenner that was – those funds weren't supposed to be used for the [Paradise

---

[5] The Court specifically instructed the jury that the government's case against defendants did not allege fraud pertaining to the Paradise Valley property or to another project in Hermosa Beach, California (the "Hermosa Beach property") that involved Kenner and Kaiser:

> You heard some testimony yesterday, and you may hear additional testimony today, regarding a property, a Hermosa Beach property. You also may hear some testimony today about another piece of property called the Paradise Valley property.

> I just want to emphasize to you, make clear to you that there are no allegations of fraud with respect to the Hermosa Beach property or with respect to the Paradise Valley property. There are no allegations of fraud by the government in connection with the properties. They are being offered by the government because they are background to the charges that are in the indictment with respect to other properties and investments.

(Tr. at 1039.)

Valley property]. It was an incorrect wire from Timothy Gaarn." (Tr. at 1049-50; GX-1724 and GX-1604.) In addition, Kaiser testified that, on May 22, 2009, he received $25,000 from Kenner. (Tr. at 1050-51; GX-1727.)

With respect to Eufora, Kaiser testified that he learned about that company through Kenner in or around 2007, when Kenner told him that it "was going to be a huge company making millions and millions of dollars" because Constantine owned an important patent. (*Id*. at 1010-11.) He also said that he met with Constantine, who told him that this patent was valuable and that he was looking for investors. (*Id*. at 1013-15.) Kaiser said that he decided to invest $200,000 in Eufora via two wires sent to the Richards Escrow Account in or around December 2009. (*Id*. at 1015, 1057-58; GX-1101.) He said that Constantine solicited those funds from other individuals, including Mrs. Kaiser, and Kaiser said that he relied on Constantine's representations about Eufora to tell them that the investment was a great opportunity. (*Id*. at 1059-60.) In addition, Kaiser testified that Constantine told him that the funds had to be sent to Richards, rather than Eufora, and insisted that the funds would be used for the company. (*Id*. at 1064; GX-JK-1.)

Kaiser further testified that he heard Constantine call several NHL players to offer to buy back their shares in Eufora at half their value and said that they agreed to do so, but Kaiser said that he then spoke with NHL players himself after their conversation with Constantine and advised them not to sell their Eufora equity because Kaiser had seen documents indicating that the company was poised for financial success. (*Id*. at 1065-67.) Kaiser, along with others, later commenced a lawsuit against Constantine to try to recoup the value of their shares in Eufora. (*Id*. at 1069-70.) He said that he never recovered his $200,000 investment. (*Id*. at 1070.)

## 2. Cross-Examination

On cross-examination, Kaiser said that he spoke with Kenner in or around 2006 about lending money to Jowdy with a 15 percent interest rate that was separate from the $1 million loan that Kaiser provided to Kenner and that Kenner subsequently gave to Jowdy. (*Id*. at 1104-05.) He also said that he and Kenner stopped speaking for some time because of a dispute between them and that he believed that Kenner sent him a box of documents related to the Hawaii Project in or around 2010. (*Id*. at 1128-30.) In addition, Kaiser said that between 2003, when he first met Kenner, and August 2006, when Lehman Brothers lent money to the Hawaii Project, he was not aware of any individuals who contributed financing to the Hawaii Project other than Kenner. (*Id*. at 1187-88.) He further testified that, in 2011, he learned from reviewing a "phony" consulting agreement that Kenner had sent to him that a man named Robert Gaudet, a golf professional employed at the Diamante resort in Mexico, was involved in obtaining funding for the Hawaii Project. (*Id*. at 1191-92.) Kaiser also testified that, from 2002 to 2006, Manfredi was involved in developing the Hawaii Project through collecting data necessary to obtain funding that he shared with Kenner. (*Id*. at 1198-1200.) He further said that Constantine and James Grdina ("Grdina") were involved in financing a portion of the Hawaii Project known as the Waikapuna property, the purchase of which closed in or around 2005 or 2006. (*Id*. at 1207-09.)

In addition, Kaiser testified that Lehman Brothers provided a $105 million loan to the Hawaii Project in or around August 2006 and said that there was an approximate payout of $14 to $16 million, approximately $700,000 to $800,000 of which he received via wires to a bank account in the name of Na'alehu Ventures. (*Id*. at 1206, 1217-20; GX-2103.)

Kaiser further reiterated that, prior to the 2006 Lehman Brothers loan, he lent $1 million to Kenner for the Hawaii Project via a 30-day loan wired to the Kau Holding Company. (*Id*. at 1210-15.) He said that, following the payout from the Lehman Brothers loan, he was still owed money from the original $1 million investment that he gave Kenner, a portion of which was used to finance a development in Cabo San Lucas, Mexico. (*Id*. at 1221-23.)

With respect to Eufora, Kaiser testified on cross-examination that he first invested money in that company in 2007 through Kenner prior to meeting Constantine. (*Id*. at 1237-38.) He said that, in total, he invested approximately $1.7 million of his own money in Eufora through Kenner using funds that Kenner owed him for work on another development project. (*Id*. at 1239-41.) Kaiser also said that Kenner told him that those funds were sent to Constantine, and he testified that some of the funds invested in Eufora "went through Mr. Kenner, but others were directed by Mr. Constantine." (*Id*. at 1242, 1250.) He further testified that Kenner gave him a list of the wire transfers pertaining to Kaiser's investments in Eufora and that Kaiser wrote those figures down on a sheet of paper. (*Id*. at 1315-16; Defs.' Exhs. Kenner-37 and C-81.) Kaiser said that Kenner told him that those funds went to a CMG bank account, but that Kaiser had not determined whether that was accurate. (Tr. at 1322-23.) In addition, Kaiser reviewed a CMG bank account statement and said that four April 2007 investments listed in Kaiser's handwritten record did not appear on that statement. (*Id*. at 1327; Defs.' Exh. C-81.) However, those investments did appear on CMG's April 2008 bank statement. (Tr. at 1329-31; GX-1706.) Kaiser also testified that he was aware that Eufora had an outstanding loan that needed to be paid. (Tr. at 1347.)

Kaiser further testified on cross-examination that Kenner told him that Jowdy had stolen or misappropriated money, and that Kaiser had said that Jowdy was a thief in response to a remark by Constantine. (*Id*. at 1236, 1311, 1314.)

### 3. Re-Direct Testimony

On re-direct, Kaiser said that he and other investors brought a lawsuit to determine the status of the patents owned by Eufora. (*Id*. at 1403-04.) He further said that he had not received any information regarding what had happened to his Eufora investments. (*Id*. at 1404-05.) In addition, Kaiser said that Constantine agreed that Kaiser had millions of dollars invested in Eufora. (*Id*. at 1406.) Kaiser also reviewed April 24, 2008 text messages between Constantine and Kenner and said that they indicated that Kenner was going to send CMG $100,000 on that date. (*Id*. at 1412; GX-203-A and GX-204-A.)

With respect to the Hawaii Project, Kaiser testified that he was unaware whether Constantine ever attempted to raise money from others for that endeavor, but he said that Kenner told him that Constantine was involved. (Tr. at 1409-10.) He also said that the approximately $800,000 that he received from the Lehman Brothers loan was for another loan, expenses, and back pay. (*Id*. at 1414.) Kaiser testified that those funds were not recompense for the $1 million loan that he gave Kenner for the Hawaii Project. (*Id*.)

### 4. Re-Cross-Examination

On re-cross-examination, Kaiser acknowledged that he received an e-mail from Constantine disputing whether Kaiser had millions of dollars invested in or owned 20 percent of Eufora. (*Id*. at 1425.)

### viii. Patrick Gonya

Patrick Gonya ("Gonya") is an attorney who practices in Miami, Florida with a law firm that was previously known as Carey Rodriguez Greenberg & Paul ("Carey Rodriguez Greenberg"). (Tr. at 1276-77.) He testified that he represented Constantine and Tommy Constantine Racing LLC, from in or around March 2009 to in or around June 2010, in connection with a commercial litigation matter. (*Id.* at 1277-79; GX-3397.) That case involved a dispute between Constantine's racing team and Pruitt Enterprises, another racing company. (Tr. at 1281.)

Gonya testified that, as payment for the legal work that his law firm performed for Constantine, the firm received $8,000 on or around May 12, 2009; $15,000 on or around October 13, 2009; $3,677.40 on or around October 28, 2009; $13,377.57 on or around December 12, 2009; and $15,000 on or around December 15, 2009. (*Id.* at 1286-88; GX-3321-R.) He further testified that the first three funds transfers came from an account controlled by Richards and the last two transfers came from Alliance Bank on behalf of Eufora. (Tr. at 1286-88; GX-3321.)

In addition, Gonya testified that, during an April 23, 2009 deposition, Constantine said, *inter alia*, that (1) Eufora and his racing programs were not profitable; (2) Kenner was not involved in any of Constantine's business; (3) CMG did not, at that time, have any assets; and (4) he used CMG's bank account to pay for personal expenses like car payments and mortgages. (Tr. at 1289-95; GX-8021-R (deposition testimony).)

On cross-examination, when asked about the funds transfers from Richards' account, Gonya said that he did not know who that money belonged to. (Tr. at 1303.)

### ix. Nicholas Privitello

#### 1. Direct Testimony

Nicholas Privitello ("Privitello") is an electrician who lives on Long Island. (Tr. at 1426-27.) He testified that he met Kenner when he performed work on Kenner's home in Arizona, and Privitello said that Kenner told him that he was involved with investments by hockey players. (*Id.* at 1428-29.)

Privitello said that Kenner spoke with him in late 2009 about Eufora, and he said that Kenner told him that Eufora owned patents related to building credit history and that the company would become very profitable soon. (*Id.* at 1430.) He also testified that Kenner told him that Constantine was the founder of Eufora, and Privitello said that he eventually began communicating with Constantine by phone and e-mail. (*Id.* at 1432.) Privitello said that Constantine told him that Eufora was close to signing deals with big banks and convinced him to invest $200,000 for a 1.5 percent stake in the company, which Privitello wired to the Richards Escrow Account on or about December 7, 2009 via two separate transfers of $150,000 and $50,000. (*Id.* at 1432-33, 1435, 1442-43; *see also, e.g.*, GX-208.1 (e-mail from Kaiser to Privitello forwarding e-mail from Constantine to Kaiser, which states that following "receipt of $200,000, Eufora's members will formally execute a Membership Transfer Consent Form and amend the company's Operating Agreement to reflect a 1.5% interest in Eufora, LLC which shall be held by" Privitello), GX-3302, and GX-3306.) Privitello further testified that he did due diligence on Eufora and verified that the patents were real, and he said that neither Kenner nor Constantine told him that the patents were being held as collateral for a loan. (Tr. at 1434-35.)

In addition, Privitello reviewed statements for the Richards Escrow Account and said that they showed outgoing transfers of $155,000 to AZ Avalon Partners LLC ("AZ Avalon") on December 7, 2009 and $50,000 to Eufora on December 8, 2009. (*Id.* at 1455-56; GX-1101.) Moreover, Eufora's bank account statement showed a December 15, 2009 transfer of $15,000 to Carey Rodriguez Greenberg, the law firm that represented Constantine in his race car litigation. (Tr. at 1456-57; GX-1218.) Privitello testified that did not authorize that his Eufora investment be used to pay legal fees for Constantine's personal lawyer. (Tr. at 1457.) He also said that he did not receive any documentation regarding his Eufora investment, and that Constantine never offered to return Privitello's investment. (*Id.* at 1457, 1478-80.) Moreover, Privitello said that he did not in fact have a 1.5 percent stake in Eufora. (*Id.* at 1480; GX-503.6.)

Privitello said that, in or around May 2012, he recorded a telephone conversation with Constantine during which he attempted to recoup his Eufora investment. (Tr. at 1458.) During that phone call, Constantine said that "[a]ll the money that came to Eufora on behalf of the players, came directly from the players to Eufora . . . So their money went from their bank account to Eufora, LLC's bank account. I know exactly how much money they put in." (GX-503.1.) In addition, Privitello said, "I wrote right on my wire it's for 1.5 percent of the thing," and Constantine asked, "Who received that wire?" (GX-503.2.) Privitello responded, "Ron Richards as of your direction," and Constantine said that Privitello "could have wrote 'f*** you Ronnie and your mother' on that." (*Id.*) Constantine also told Privitello that

the reason that this – your money was directed to the lawyer's office instead of to us is because if we saw how

much money was going directly to us, we'd know exactly where it came from and who, right? . . . But if it goes to Ron Richards' office and then we get one wire from Ron Richards, then we have no idea who the money came from into Ron Richards, then I can put it in whatever name he wants without having to explain sh**.

(GX-503.3.) However, Constantine later said, "You asked me why it went to Ron Richards' account. I have no f***king idea." (GX-503.7.) Moreover, Constantine asked Privitello, "Why didn't you take it back before we spent it?," and Privitello answered, "I don't, I don't, I don't – I mean, look, it was a while ago. I don't think I was ever offered it. I cannot recall any time being offered it." (GX-503.5.) Finally, Constantine told Privitello that "[y]ou weren't shareholders" in response to Privitello's statement that he and others at a Eufora shareholders meeting were not allowed to view an agreement between Eufora and another company. (GX-503.6.)

### 2. Cross-Examination

On cross-examination, Privitello agreed that Kenner was not involved in any of the e-mail communications between Privitello and Constantine regarding Privitello's investment in Eufora, and he agreed that a lawsuit that was filed to enforce his and other investors' interests in Eufora named Constantine as the sole defendant. (Tr. at 1488-92.) Likewise, he said that Kenner never promised him a stake in Eufora in return for his investment. (*Id.* at 1492-93.)

In addition, Privitello testified that he had a conversation with Kaiser prior to his discussion with Constantine regarding Eufora. (*Id.* at 1537.) He also said that he had told Constantine about a "side deal" with

Kaiser whereby he agreed to give Kaiser $50,000 of his investment in Eufora. (*Id.* at 1559-60.) Privitello further testified that he did not recall Constantine offering him or other Eufora investors a reimbursement of their investments at an August 2010 shareholders meeting or during subsequent litigation. (*Id.* at 1590-93, 1595-97, 1602-03, 1634.)

### x. Allison Ressler

Allison Ressler ("Ressler") is a Los Angeles-based attorney with the law firm of Sullivan & Cromwell. (Tr. at 1514.) She met Constantine in or around the fall of 2008, in connection with efforts by Constantine and others to acquire Playboy Enterprises ("Playboy"). (*Id.* at 1515.) Ressler testified that financial records show that Constantine paid $65,000 in legal fees for this transaction via a May 26, 2009 wire from the Richards Escrow Account. (*Id.* at 1519-20; GX-3396 R.) She said on cross-examination that she did not what type of account that was and affirmed that she was not familiar with Eufora. (Tr. at 1520-21.)

### xi. Ricardo Banciella

Ricardo Banciella ("Banciella") is a Miami-based attorney. (Tr. at 1639.) He testified that, while he was employed by the law firm Wampler Buchanan Walker Chabrow Banciella & Stanley, P.A. ("Wampler Buchanan"), Banciella represented Constantine between July 2007 and the fall of 2008, in connection with a dispute over a sponsorship agreement between race car drivers. (*Id.* at 1640-41; GX-3311.) Banciella said that, on or about April 30, 2008, Wampler Buchanan received payments of $36,361.07 and $3,333.31 for that representation, and he said that at the time the representation was terminated in or around October 2008, firm records showed that Constantine still owed approximately $40,000. (Tr. at 1646-48; GX-3312 and GX-3326-R.)

### xii. Eric Edenholm

Eric Edenholm ("Edenholm") is a car salesman who lives in Arizona. (Tr. at 1650-51.) He testified that he met Constantine about 18 to 20 years ago through mutual friends in the racing business. (*Id.* at 1651-52.) Edenholm said that, on or around June 16, 2009, he purchased Constantine's Arizona home and allowed Constantine to continue living there in return for $3,000 in monthly rent. (*Id.* at 1659-60; GX-3608.) Edenholm reviewed his bank account statement and said that incoming $18,000 wires dated November 6, 2009 and January 22, 2010 each represented payment for six months of Constantine's rent and that the first wire came from the Richards Escrow Account. (*Id.* at 1660-61, 1669-70; GX-3059 and GX-3060.) Similarly, Edenholm said that his bank account showed that Constantine's $450,000 payment for an airplane and $75,000 payment for race car-related expenses also came from the Richards Escrow Account. (Tr. at 1661-62; GX-3053.) He also said that he received $15,000 from the Richards Escrow Account as payment for "repayment of an earlier loan, as well as some work that was done on some vehicles." (Tr. at 1670-71.)

### xiii. Jeffrey Bailey

Jeffrey Bailey ("Bailey") lives in Arizona and owns a consulting company called JBAZ Consulting ("JBAZ") that engages in real estate financing. (Tr. at 1696.) He testified that he worked with Constantine on a real estate investment and first spoke with him in 2009 after meeting Constantine through Edenholm. (*Id.* at 1696-97.) Bailey said that he invested in hangers owned by Constantine

to enable Constantine to pay off debt and avoid foreclosure on those properties. (*Id.* at 1697.) He testified that bank statements showed that JBAZ received $384,300 on or about July 13, 2009 from the Richards Escrow Account. (*Id.* at 1728-29; GX-1102.) Likewise, Bailey said that he received several monthly payments of approximately $40,000 from Constantine in 2009, and that each of those payments was pre-dated by an equivalent funds transfer from the Richards Escrow Account to the account of AZ Avalon. (Tr. at 1737-39; GX-1307–GX-1309.) In addition, JBAZ also received a $42,000 payment from AZ Avalon in or around December 2009 that was pre-dated by a $43,000 transfer from Eufora to AZ Avalon. (Tr. at 1739-40; GX-1310.)

### xiv. John McDonald

John McDonald ("McDonald") is a corporate comptroller at Playboy. (Tr. at 1783.) He testified that Playboy had a racing team sponsorship agreement with CMG whereby Constantine purchased advertising pages in Playboy magazine. (*Id.* at 1784-85.) In addition, he said that Playboy's records show that all invoices sent to Constantine by Playboy from August 2007 to September 2008 were paid by funds transferred from bank accounts belonging to CMG and Kenner. (*Id.* at 1796-97; GX-2726.)

### xv. Jay McKee

Jay McKee ("McKee") is a former NHL player who resides in Buffalo, New York. (Tr. at 1907.) He testified that (1) Kenner was his financial advisor (*id.* at 1810-11); (2) he invested in the Diamante project (*id.* at 1811); and (3) Kenner and Constantine convinced him to contribute $250,000 to the Global Settlement Fund, which McKee did to recoup investment losses in Diamante, and gave McKee the impression that Richards would be in control of that money (*id.* at 1811-16; GX-1526). In addition, McKee said that Kenner and Constantine told him that the Global Settlement Fund would be used to cover litigation expenses, public relations agency fees, protective advances, and settlement costs; but he testified that that neither Kenner nor Constantine told him that the Global Settlement Fund would be used to pay lawyers other than Richards. (Tr. at 1820-21.) Moreover, McKee testified that he had made a prior $100,000 investment in Eufora through Constantine, but did not receive any return. (*Id.* at 1825.)

On cross-examination, McKee said that he recalled discussing that the Global Settlement Fund would be used to fund publicity in connection with efforts to recoup investments from Jowdy. (*Id.* at 1875-76.)

### xvi. Tyson Nash

#### 1. Direct Testimony

Tyson Nash ("Nash") is a former NHL player who currently lives in Arizona. (Tr. at 1901.) His testimony is substantially similar to that of the other hockey players. Nash said that (1) Kenner was his financial advisor (*id.* at 1904); (2) he invested $100,000 in the Hawaii Project on or about May 19, 2005 based on Kenner's advice and did not authorize that those funds go to Mexico (*id.* at 1906-08; GX-1524); (3) he spoke with Kenner about the Lehman Brothers loan and believed that he would be receiving a return on his Hawaii Project investment but did not receive as much money as Kenner promised (Tr. at 1909-12); (4) Nash invested $100,000 in Eufora, on or around April 24, 2008, based on Kenner's representation that Constantine owned a valuable patent (*id.* at 1912-14; GX-760); (5) his Eufora investment was transferred to CMG (Tr. at 1916-17; GX-1706); (6) Nash met with Constantine and

said that Constantine told him that his Eufora investment would be used for the production of commercials, which Constantine showed him (Tr. at 1915-16, 1953-54); and (7) Nash contributed to the Global Settlement Fund to recoup his investment in the Diamante project (*id.* at 1918-23).

In addition, Nash testified that, in or around 2012, Constantine sent him a transfer of membership document dated April 24, 2008 that purported to transfer a 0.5 percent stake in Eufora to Nash from CMG. (*Id.* at 1942-43; GX-764.) He said that, when he originally invested in Eufora, he was not told that his funds would be used to buy a stake in the company from Constantine. (Tr. at 1945.)

### 2. Cross-Examination

On cross-examination, Nash testified that Constantine drafted the transfer of membership document in 2012 and backdated it to 2008. (*Id.* at 1946, 2023.) He also said that the overall purpose of the Global Settlement Fund was to recover investments with Jowdy in Mexico, though he said its purposes were "very broad." (*Id.* at 1992-93, 2002.) In addition, he testified that he recalled a meeting of Eufora shareholders where Constantine offered to fully return several individuals' investments in that company. (*Id.* at 2013-15.)

### 3. Re-Direct Testimony

On re-direct, Nash said that he was never reimbursed for either his Eufora investment or his Global Settlement Funds contribution. (*Id.* at 2035.) He also testified that bank records show that a portion of his Eufora investment was sent to Wampler Buchanan and Kenner, and he said that he did not authorize his funds to be used for such purposes. (*Id.* at 2036; GX-1706.) Nash

further testified that, although the Global Settlement Fund had a broad purpose, Constantine never discussed with him using that money for his personal expenses, a lawsuit in Florida, race cars, or the purchase of Playboy. (*Id.* at 2042.)

### xvii. Owen Nolan

Nolan is a former NHL player who resides in California. (Tr. at 2050.) Nolan testified that he (1) invested $200,000 in Eufora in 2003 through Kenner (*id.* at 2058-59); and (2) in or around 2005, he invested $100,000 in the Hawaii Project (*id.* at 2063-64). He said that he never authorized Kenner to open a line of credit in his name with Northern Trust to fund the Hawaii Project, but later learned that Kenner opened a $2.2 million account with that bank. (*Id.* at 2065-66.) Nolan testified that a document purporting to contain his signature and extending a line of credit for a real estate investment does not in fact contain his authentic signature. (*Id.* at 2067-69; GX-2154.) In addition, Nolan testified that he was unaware that the Northern Trust line of credit account in his name had a negative balance of $2,189,796.02 in April 2007 and that funds were borrowed from Peca's line of credit and the lines of credit for other investors to pay interest owed on Nolan's account. (Tr. at 2069-73.) He also said that he never received his Eufora investment back. (*Id.* at 2074-75.)

### xviii. Darryl Sydor

#### 1. Direct Testimony

Darryl Sydor ("Sydor") is a former NHL player who resides in Minnesota. (Tr. at 2157.) He testified that (1) in or around 2003, he invested $500,000 in the Hawaii Project based on advice from Kenner (*id.* at 2163-64); (2) Sydor did not authorize any of those

funds to go to Constantine at that time (*id.* at 2165); (3) Kenner told Sydor that he would receive a portion of his Hawaii Project investment back following the Lehman Brothers loan (*id.* at 2166); and (4) Kenner never told Sydor that $866,200.86 from Sydor's retirement account was used to pay off the Northern Trust line of credit in Sydor's name (*id.* at 2168-69).

With respect to Eufora, Sydor said that he (1) invested $200,000 in or around 2004 and another $50,000 in or around 2008 based on Kenner's advice (*id.* at 2169-71); (2) Sydor did not authorize any of that money to go to CMG or to Playboy (*id.* at 2172-73; GX-1709); (3) CMG's bank account statement shows an incoming July 8, 2008 wire from Sydor for $50,000 and an outgoing wire for $28,000 to Playboy that same day (*id*).

In addition, with respect to the Global Settlement Fund, Sydor said that (1) he invested approximately $250,000 to pay for legal fees related to a dispute of a Mexico real estate project (*id.* at 2175); and (2) Sydor did not authorize Kenner to spend that contribution on any other litigation or on Eufora (*id.* at 2176, 2179).

## 2. Cross-Examination

On cross-examination, Sydor testified that his signature was on a letter to Northern Trust dated November 3, 2014 authorizing Kenner to access his line of credit at Northern Trust. (*Id.* at 2194-95; Defs.' Exh. Kenner-64.) He said that Kenner often sent him documents to sign that were incomplete. (Tr. at 2197.) In addition, Sydor testified that a September 8, 2009 e-mail from him to Constantine indicates that he asked Constantine to "take care of" an outstanding attorney fee related to an employment litigation involving Kenner and a former employee of Kenner's during which Sydor

was deposed. (*Id.* at 2252-53; Defs.' Exh. C-141.)

## 3. Re-Direct Testimony

On re-direct, Sydor testified that he did not believe that Constantine ever offered him a 100 percent refund of his Eufora investment and said that he never got that money back. (Tr. at 2293.) In addition, he denied that his authentic signature was on several exhibits introduced by the defense. (*Id.* at 2294-95.)

### xix. James Grdina

#### 1. Direct Testimony

Grdina resides in Arizona and owns a company that finances specialty cars. (Tr. at 2359.) He testified that he met Constantine in or around 2000 to discuss investing in Kenner's purchase of the Waikapuna property in Hawaii. (*Id.* at 2361.) Grdina said that, to that end, his company at the time, Intrigue Investment Company ("Intrigue"), and CMG formed a company called Urban Expansion, LLC ("Urban Expansion") with a $3.5 million contribution from Intrigue and $1.5 million from CMG. (*Id.* at 2361-62.) Urban Expansion then loaned $3.5 million to Kau Holding Company in or around October 2005 for the purchase of the Waikapuna property. (*Id.* at 2365, 2414; GX-3801.) In addition, Grdina said that loan was for a four-year term and had a 15 percent interest rate. (Tr. at 2371; GX-3802.) He also testified that the Urban Expansion loan had a pre-payment penalty of $2 million, which he said was Constantine's idea. (Tr. at 2371-74; GX-3811.) Moreover, Grdina said that bank records showed that CMG received $330,000 on or about October 31, 2005 from an account that held Intrigue's $3.5 million contribution to the Urban Expansion loan, and Grdina testified that CMG was not owed any fee or payment associated with the Urban

Expansion loan at that time. (Tr. at 2377-78; GX-3819-A.)

Grdina further testified that the Urban Expansion loan was fully re-paid on August 14, 2006, in part with proceeds from the Lehman Brothers loan for a total of $6,936,000. (Tr. at 2378-79.) He said that payment included a portion of the repayment penalty; and Grdina testified that "Intrigue Investment Company received 70 percent of it, $4,855,000, and Constantine Management Group received 30 percent which was approximately $2,081,000." (*Id*. at 2379-80.) However, Grdina said that he later learned that Constantine never actually contributed $1.5 million to the Urban Expansion loan. (Tr. at 2380.)

### 2. Cross-Examination

On cross-examination, Grdina testified that Kenner contributed $100,000 of his own money to the purchase of the Waikapuna property, in addition to the $3.5 million from Intrigue. (*Id*. at 2408-09.) He also said that Kenner personally guaranteed the $3.5 million Intrigue loan via an amended security agreement. (*Id*. at 2410; Defs.' Exh. Kenner-78.)

In addition, Grdina testified that, at one point, he confronted Constantine about his $1.5 million contribution to the Urban Expansion loan, and Grdina said that Constantine did not provide him with documentation during that meeting showing that he had in fact made that investment. (Tr. at 2421.) He also said that he had no objection to the pre-payment penalty. (*Id*. at 2445.)

### 3. Re-Direct Testimony

On re-direct, Grdina said that terms of the Urban Expansion loan did not require

Constantine to stagger his $1.5 million contribution, and he said that that entire amount was due within 10 days of Constantine's signing of the loan operating agreement. (*Id*. at 2466.) He also said that Kenner had no financial interest in the Urban Expansion loan. (*Id*. at 2472; GX-3824.)

### xx. Peter Melley

Peter Melley ("Melley") is an employee of the Financial Industry Regulatory Authority. (Tr. at 2477.) He testified that Kenner was a licensed stockbroker. (*Id*. at 2480-85.)

### xxi. Timothy Gaarn

### 1. Direct Testimony

Gaarn lives in New Jersey and testified on behalf of the government pursuant to a non-prosecution agreement. (Tr. at 2489, 2503.) He met Kenner while Gaarn was working as an independent consultant. (*Id*. at 2490-91.) In addition, Gaarn said that he met Constantine through Kenner. (*Id*. at 2491.) He testified that he sought investors for Eufora based on representations about that company made by Constantine and Kenner. (*Id*. at 2491-92.)

Moreover, Gaarn said that he became a managing member of AZ Eufora Partners ("AZ Eufora"), which owned a portion of Eufora, in or around 2008 or 2009 based on Kenner's request and as a favor to him because Kenner had previously lent Gaarn money. (*Id*. at 2492-95; GX-TG-2.) Gaarn further testified that he opened a Wachovia bank account on behalf of AZ Eufora at or around the time he became a managing member (the "Wachovia Account"). (Tr. at 2496-97; GX-2300.) He also said that he signed a transfer of membership interest agreement in around 2008 that Kenner

backdated to indicate that it was signed on August 1, 2005. (Tr. at 2499-50; GX-TG-2.)

Gaarn testified that, after opening the Wachovia Account, he transferred money out of it at Kenner's request, and he said that he participated in telephone conferences regarding Eufora's operations with Constantine. (Tr. at 2501.) Moreover, he said that, in or around 2010, he and others sued Constantine because Constantine had said that he wanted to sell Eufora's patent, thereby devaluing the company. (*Id*. at 2502, 2544-46.)

In addition, Gaarn said that, on or about December 31, 2008, the Wachovia Account received $100,000 from Eufora, which was pre-dated by a December 29, 2008 transfer from Glen Murray ("Murray") to Eufora. (*Id*. at 2514; GX-2301 and GX-2211.) Gaarn also said that, on December 31, 2008, he transferred $81,127 from the Wachovia Account to Kenner at Kenner's request. (Tr. at 2516; GX-2301.) He further testified that he made withdrawals from that account to pay his own personal expenses with Kenner's knowledge. (Tr. at 2517.) Likewise, Gaarn said that, at Kenner's direction, (1) on or about February 25, 2009, he transferred $13,000 from the Wachovia account to Kenner and "Casa Mr. Loan"; (2) on or about February 25, 2009, he transferred $30,000 to Kenner; (3) in or about April and May 2009, he also transferred $95,000 and $85,000 to Kenner from the Wachovia Account. (Tr. at 2520-24; GX-2303, GX-2305, and GX-2306.)

Moreover, Gaarn said that he also made funds transfers from the Wachovia Account to Kaiser at Kenner's direction, including a $30,000 transfer on or about February 12, 2009 and a $40,300 transfer on or about February 25, 2009; and he said that a May 5, 2009 wire for $100,000 from Eufora to AZ Eufora was pre-dated by a $100,000 wire from William Ranford ("Ranford") to Eufora. (Tr. at 2620-23; GX-2216, GX-2303, and GX-2305.)

Finally, Gaarn said that he was involved in obtaining financing for the Diamante project from Lehman Brothers by introducing Kenner and Jowdy to a contact at Lehman Brothers. (Tr. at 2559-60.)

2. Cross-Examination

On cross-examination, Gaarn denied that the payment he sent from the Wachovia Account to Kenner constituted re-payment of the money that Kenner had previously loaned Gaarn. (*Id*. at 2581.) He also said that the total value of the wires received by the Wachovia Account during the four-month period that he managed the account was approximately $700,000. (*Id*. at 2627.) Gaarn further testified that AZ Eufora was responsible for managing the Eufora investment of the various NHL players who invested in Eufora. (*Id*. at 2627-28.)

Moreover, Gaarn said that Constantine had nothing to do with the favor that Gaarn performed for Kenner in his role at AZ Eufora, and he testified that Kenner directed all of the outgoing funds transfers from the Wachovia Account without, to Gaarn's knowledge, any participation by Constantine. (*Id*. at 2629, 2632-33.)

xxii. William Castro

William Castro ("Castro") testified that, in 2006, he owned Unique Auto Sports. (Tr. at 2694.) He said that, on or around August 15, 2006, Unique Auto Sports received a $17,500 payment from CMG to perform work on a vehicle provided by Constantine. (*Id*. at 2695-96; GX-1733.) He also said that

he filmed a television promotional program for automobiles involving Constantine and his car. (Tr. at 2696.)

### xxiii. Bruce Derreth

Bruce Derreth ("Derreth") works for a company that was previously known as Centrum Financial Services ("Centrum"), which made short-term loans for commercial purposes secured by real estate. (Tr. at 2698.) He said that, on or about June 26, 2005, Kenner applied for a loan from Centrum, and that on July 14, 2005, Centrum issued a $3 million promissory note to Kenner, who also signed a document personally guaranteeing that loan. (*Id*. at 2699-2702; GX-3710, GX-3712, and GX-3713.) In addition, Derreth testified that Kenner signed a document certifying that the loan would be used to develop a 1,500-acre property on Hawaii that was also used to collateralize the Centrum loan. (Tr. at 2703; GX-3703.)

Derreth further testified that, on or about July 19, 2005, Centrum disbursed $2,576,364.54 of the loan to Kenner through Little Isle IV. (Tr. at 2704-5; GX-3720-R and GX-2101.) He also said that Kenner failed to make interest payments on the loan, and as a result, when the loan came due on February 1, 2006, Centrum and Kenner amended the note to loan an additional $700,000 and to extend the due date to August 1, 2006. (Tr. at 2707-08; GX-3714.) In addition, Derreth testified that, on or about August 14, 2006, Centrum received $3,939,333.04 to pay off the loan to Kenner. (Tr. at 2709-10; GX-3719-R.)

### xxiv. Steven Rucchin

#### 1. Direct Testimony

Steven Rucchin ("Rucchin") is another former NHL player. (Tr. at 2717.) He testified that (1) in or around 2003, he invested in the Hawaii Project and opened a $1 million line of credit with Northern Trust based on Kenner's advice (Tr. at 2720-22); (2) at the time Rucchin decided to invest in the Hawaii Project, he did not authorize that his investment be used to fund property in Mexico or to go to Constantine (*id*. at 2723-24); (3) Rucchin did not authorize his Northern Trust line of credit to be used to make interest payments for the lines of credit belonging to other NHL players (*id*. at 2725-26); (4) after he received notice that his line of credit was in default, Rucchin contacted Kenner, who told him not to worry about it (*id*. at 2728); and (5) in or around the fall of 2013, Rucchin learned that he had lost money as a result of that default (*id*. at 2730).

In addition, Rucchin testified that, in or around 2003, he invested $100,000 in Eufora based on Kenner's advice and made an additional $150,000 investment in 2009. (*Id*. at 2731-33; GX-5006 and GX-6004.) He said that Eufora's bank account shows an incoming wire from Rucchin on February 19, 2009 for $100,000 and an outgoing wire to Gaarn for $100,000 on that same day. (Tr. at 2733-34; GX-2213.) Likewise, Rucchin said that records show that, on or about April 17, 2009, he and Murray each invested $50,000 in Eufora, and that the next day, an outgoing wire transferred $100,000 from Eufora to Gaarn. (Tr. at 2734-35; GX-6004 and GX-2215.)

With respect to the Global Settlement Fund, Rucchin testified that, in or around May 2009, he met with Kenner and Constantine at Kenner's request. (Tr. at 2749-50.) He said that he agreed to help fund litigation against Jowdy because he believed that Jowdy was misusing investment funds and that he contributed $50,000 on or about May 22, 2009. (*Id*. at 2750-51; GX-1508.) Rucchin testified that he did not authorize

that his contribution be used to fund Eufora or anything else. (Tr. at 2751.) He said that he never received a return on his Eufora investment or a reimbursement of his Global Settlement Fund contribution. (*Id*. at 2752-53.)

### 2. Cross-Examination

On cross-examination, Rucchin said that he anticipated acquiring a greater share of Eufora in return for his Global Settlement Fund contribution. (*Id*. at 2783-84.) He also said that bank records show that Richards received a $50,000 wire from Rucchin on May 29, 2009. (Tr. at 2789; Defs.' Exh. C-175.) Rucchin testified that he would have no objection to Richards being paid legal fees from the Global Settlement Fund. (Tr. at 2790.) Rucchin further testified that he recalled that his interest in Eufora was held in AZ Eufora. (*Id*. at 2801.) He also said that Constantine had nothing to do with the Northern Trust line of credit. (*Id*. at 2807.)

### xxv. William Ranford

Ranford is another former NHL player. (Tr. at 2813.) He testified that (1) he did not invest in the Hawaii Project (*id*. at 2815); (2) he invested in a Mexico property with which Jowdy was involved (*id*. at 2819); and (3) he decided to invest in Eufora, and as a result, on July 7, 2008, Kenner wired $200,000 on Ranford's behalf to CMG (*id*. at 2820-22; GX-1512). In addition, he said that bank records show that $100,000 was wired from Ranford's account on February 6, 2009 to Eufora, but Ranford said that he did not authorize that transaction and that Kenner did not tell him about it. (Tr. at 2823-24; GX-1513.) Likewise, Ranford testified that, although records show an additional $100,000 transfer from him to Eufora on May 4, 2009, he did not authorize that transaction. (Tr. at 2831-32; GX-1514 and GX-2216.)

With respect to both of the 2009 transfers, Ranford said that he did not know of the subsequent transfers to the Wachovia Account or the payments from the Wachovia Account to Kenner and others. (*E.g.*, Tr. at 2833.)

With respect to the Global Settlement Fund, Ranford said that he contributed $100,000 on June 15, 2009 based on Kenner's representation that that money was necessary to recoup Ranford's investment from Jowdy. (*Id*. at 2834-85; GX-1506; Defs.' Exh. C-177.) He also said that Kenner told him that the Global Settlement Fund would be used "for the legal costs in order to finalize the Mexico deal and the Eufora deal." (Tr. at 2836-37.) However, Ranford said that he did not authorize a subsequent $300,000 transfer on July 16, 2009 to Richards. (*Id*. at 2837-38, 2841; GX-1507.) Moreover, Ranford said that he never received his Eufora investment back and that he did not know what had happened to his Global Settlement Fund contribution. (Tr. at 2845.)

On cross-examination, Ranford testified that bank records show that his $100,000 contribution to the Global Settlement Fund was returned to his account on or about June 12, 2009, but he said that he had no recollection of that refund. (*Id*. at 2875-76; Defs.' Exh. C-180.)

### xxvi. Christopher Manfredi

Manfredi currently works in the coffee industry and primarily lives in Hawaii. (Tr. at 1909-10.) He testified that he first traveled to Hawaii in 2002 with Kaiser and that they entered into a contract to purchase a 258-acre property. (*Id*. at 1910-12.) Manfredi said that he subsequently met Kenner through mutual friends in or around 2003, and that Kenner suggested investing in additional nearby properties. (*Id*. at 2913-20.)

In addition, Manfredi testified that bank records show several transfers of funds intended for the Hawaii Project to CMG, including a $130,000 wire from Little Isle IV on December 30, 2004; and a $37,500 wire from Little Isle IV on April 21, 2005. (*Id.* at 2961-63; GX-1751.) He said that, to his knowledge, Constantine did not perform any work on the Hawaii Project that would have entitled him to such payment. (Tr. at 2962.)

On cross-examination, Manfredi testified that he spoke with Constantine regarding the Hawaii Project, but he said that he did not recall exchanging several e-mails with Constantine introduced as evidence that indicated that Constantine was involved in obtaining financing for the Hawaii Project. (*Id.* at 3004-18; Defs.' Exhs. C-58, C-61, C-181, and C-188.)

xxvii. Brian Berard

Brian Berard ("Berard") is a former NHL player. (Tr. at 3029.) He testified that (1) he met Kenner in or around 1994 (*id.* at 3031); (2) he invested $100,000 in the Hawaii Project via wire to little Isle IV, and Berard thought that money would be used for a down payment on the Hawaii property (*id.* at 3033-35); (3) he opened an approximately $700,000 line of credit with Northern Trust based on Kenner's advice with the understanding that it would be used to make interest payments on the Hawaii Property pending a loan from Lehman Brothers (*id.* at 3035-37); (4) Berard secured that line of credit with $1.1 million in bonds and stocks (*id.* at 3038); (5) he contacted Kenner after receiving a notice of default from Northern Trust, and Kenner told him that the default meant that Berard had obtained a larger share of the Hawaii Project (*id.* at 3040-41); and (6) Berard never received any documentation showing that he had a share in the Hawaii

Project worth more than his original $100,000 investment (*id.* at 3041-42).

With respect to the Global Settlement Fund, Berard said that Kenner and Constantine asked him to contribute $250,000 to finance litigation against Jowdy related to Mexico investments, but Berard said that he did not do so because he lacked the money. (*Id.* at 3050-53, 3056-58.) As for Eufora, Berard said that he invested $100,000 by wire dated December 23, 2003. (*Id.* at 3058-60; GX-723.) Berard said that he had not received any return on that investment. (Tr. at 3061.)

On cross-examination, Berard said that he sent an e-mail to, *inter alia*, Kenner and Kaiser dated March 4, 2011, which stated that he understood that the purposes of the Global Settlement Fund were to pay lawyers' fees for litigation against Jowdy, as well as to buy out the shares of Juneau, Moreau, and Nolan in an unspecified investment. (Tr. at 3141-43; Defs.' Exh. C-183.) That e-mail also said that it was Berard's understanding that Constantine sought his involvement in the Global Settlement Fund because "Tommy was spending the money as fast as it was coming in." (Tr. at 3145; Defs.' Exh. C-183.)

xxviii. Lynne Lagarde

Lynne Lagarde ("Lagarde") is a retired attorney who previously represented Constantine for close to two decades. (Tr. at 3382-83.) She testified that, on or about May 19, 2009, her prior law firm—Early, Curl & Lagarde P.C.—received a wire of $10,000 from the Richards Escrow Account as payment for legal work performed for Constantine. (*Id.* at 3402-03; GX-1102.)

### xxix.  Lani Dolan

Lani Dolan ("Dolan") is a real estate saleswoman. (Tr. at 3419-20.) She testified that she worked for Kenner on the Hawaii Project. (*Id.* at 3420-21.) Dolan said that, in or around 2005, she saw Kenner sign the names of his NHL clients on a document, stating: "The guys that he was—advised for, the hockey guys. He had each one of their signatures on separate pages and he was doing them all on one page." (*Id.* at 3423.) She explained that Kenner "traced" his clients' signatures: "Like Glen Murray's name. He would sign his name and I would photocopy that. Then he would take the next one, Brian Berard, and put it under and sign it onto the same sheet of paper so that all the guys were on one sheet." (*Id.* at 3424.)

### xxx.  Glenn Murray

Murray is a former NHL player. (Tr. at 3474.) He testified that (1) Juneau introduced him to Kenner (*id.* at 3475); (2) he invested $100,000 in the Hawaii Project (*id.* at 3479); (3) he opened a line of credit with Northern Trust secured with $1 million transferred from his Charles Schwab investment account, although Murray could not recall if he agreed to this transaction (*id.* at 3481-82); (4) he did not receive a default notice from Northern Trust (*id.* at 3486); and (5) although records show transfers from Murray's line of credit account to the Northern Trust account of other NHL players, Murray did not owe them any money at the time those transfers occurred (*id.* at 2487-89; GX-28).

With respect to Eufora, Murray said that he made a $166,000 investment in or around 2004 after speaking with Kenner and Constantine about that company. (Tr. at 3490-92; GX-1522.) In addition, Murray said that he did not recall making additional investments in Eufora, notwithstanding that records showed a $100,000 transfer from his account to Eufora on December 29, 2008, although Murray said that he thought he likely authorized this transaction. (Tr. at 3493-95; GX-2211.) However, Murray could not explain a December 31, 2008 transfer of $100,000 from Eufora to the Wachovia Account or a subsequent $81,127 transfer that same day from the Wachovia Account to Kenner. (Tr. at 3494-97; GX-2211 and GX-2301.) Likewise, Murray said that he could not recall authorizing a $100,000 transfer from his account to Eufora on March 19, 2009, and could not explain a March 20, 2009 transfer of $100,000 from Eufora to the Wachovia Account. (Tr. at 3498-3500; GX-2214.)

In addition, Murray testified that he contributed $250,000 to the Global Settlement Fund by wire dated May 19, 2009 to Richards' account. (Tr. at 3501-02; GX-1504.) He said that he received an e-mail that same day from Kenner, copying Constantine, indicating that those funds would be used to acquire additional assets, including a greater interest in Eufora, as well as to finance litigation against Jowdy. (Tr. at 3504-06; GX-GM-1.) Murray testified that he never received any documentation indicating that he acquired an additional share of Eufora and had not received any return on his original investments. (Tr. at 3506-07.)

On cross-examination, Murray testified that he may have received a return in 2006 of $42,533 on his $100,000 Hawaii Project investment, as well as a $385,481.75 payout on his line of credit that same year. (Tr. at 3514-15.) However, on re-direct, Murray said that he did not have any documentation of those payments. (*Id.* at 3585-87.) In addition, he said that Northern Trust records show that the closing balance on his line of credit was $0. (*Id.* at 3598; GX-2178.) On

re-cross-examination, Murray testified that records showed a $42,533 transfer to his Charles Schwab account. (Tr. at 3604-05; Defs.' Exh. Kenner-104.)

### xxxi. John Paul Osborn

John Paul Osborn ("Osborn") is a forensic document examiner, and the Court allowed him to testify as an expert witness. (Tr. at 3615, 3620-21.) He testified that he examined Kaiser's purported signatures on two consulting agreements dated December 15, 2004 and June 1, 2005 and determined them to be inauthentic after comparing them to genuine signatures. (Tr. at 3622-29; GX-5104 and GX-Osborn-1.)

### xxxii. Jackson Stewart

Jackson Stewart ("Stewart") is a California resident who designs and builds race cars and manages racing teams. (Tr. at 3663.) He owns Unitech Racing Incorporated ("Unitech") and used to manage a race team for Constantine. (*Id*. at 3663-64.) Stewart testified that Constantine told him that Constantine owned Eufora, and he said that Constantine introduced him to Kenner in or around 2007. (*Id*. at 3665-66.) He said that, in his opinion, Constantine was not a professional race car driver because he did not make his living off of racing. (*Id*. at 3667.) On direct testimony, Stewart engaged in the following colloquy:

> Q. Did you have a discussion with Mr. Constantine about where he expected money to come in from?
>
> A. As I explained earlier, we talked about the Playboy sponsorship.
>
> Q. Anything else?

A. Towards the end of our relationship, he talked about a deal that he had in Hawaii and a deal that he had in Mexico, always assuring me that when those deals came to fruition, everything was going to be great and there would be plenty of money for everybody.

(*Id*. at 3675.)

### xxxiii. Blake Rosser

Blake Rosser ("Rosser") is a Nevada resident who testified that he worked in the racing business from 2003 to 2006. (Tr. at 3686.) He said that Constantine contacted him in 2005 to sponsor a race car team. (*Id*.) Rosser testified that his company, Vegas Marketing Promotions, received several payments from Constantine, including a $175,000 payment on October 23, 2006 from CMG for the purchase of race cars. (*Id*. at 3692; GX-1735.)

### xxxiv. Ronald Richards

Richards is an attorney and testified that he has represented both Kenner and Constantine. (Tr. at 3794-95.) He said that, in or around May 2009, he had a conversation with Constantine about money being placed in an escrow account in the name of his law firm, the Law Office of Ronald Richards and Associates. (*Id*. at 3795-96.) Richards testified that Constantine told him that the Richards Escrow Account would receive incoming wire transfers, but he did not recall if Constantine told him the identities of the senders, though Richards said that the senders had some relationship to Constantine or Kenner. (*Id*. at 3796-97.) Richards further testified that he knew that hockey players would be among the individuals wiring money into the Richards Escrow Account. (*Id*. at 3797.) In addition, Richards said that

Kenner did not tell him where to send money once it was deposited into that account, but Constantine did provide him with such direction. (*Id*. at 3798.)

Richards further testified that his law firm maintained a separate general corporate account that held advanced fees or fees that were earned, and he said that he transferred money from the Richards Escrow Account to the general account. (*Id*. at 3800-02; GX-RR-1.) He said that his law firm received approximately $335,000 to pursue litigation on behalf of Kenner and the NHL players. (Tr. at 3804; GX-RR-1.)

Moreover, Richards said that all disbursements from the Richards Escrow Account were authorized by Constantine, including a June 4, 2009 $415,000 transfer to Aerospace Reports; a June 8, 2009 $75,000 transfer to Cabin Crafters; a June 2009 transfer of $450,000 to Edenholm Motorsports; and August 2009 transfers of $40,000 and $4,065 to AZ Avalon. (Tr. at 3805-11; GX-1102.) In sum, Richards testified that, assuming the accuracy of the following figures, Constantine authorized disbursements from the escrow account of, *inter alia*, $120,200 to AZ Avalon; $17,260 to AZ Falcon Partners; $161,000 to Cabin Crafters; $26,677.40 to Casey Rodriguez; $540,000 to Edenholm Motorsports; $120,050 to Eufora; $120,000 to Gilmartin, Magence & Ross; $384,300 to JBAZ; and $65,000 to Sullivan & Cromwell. (Tr. at 3812-16.) In addition, he said that Constantine authorized a $22,425.02 payment on July 30, 3009 from the Richards Escrow Account to Kenner. (*Id*. at 3829-30; GX-1102.) Richards further testified that Constantine never directed him as to which funds in the account were designated for the Global Settlement Fund. (Tr. at 3817.)

xxxiv. Christopher Petrellese

Christopher Petrellese ("Petrellese") is a forensic accountant for the FBI. (Tr. at 3909.) He prepared several summary charts and graphs introduced as evidence at trial, including an exhibit that showed that, from December 1, 2004 through March 31, 2006, $247,500 was transferred from Little Isle IV's Northern Trust bank account to CMG. (*Id*. at 3933-34; GX-41.) Moreover, Petrellese testified that, from December 2004 to September 2005, CMG received a net amount of $1,000,900 from Little Isle IV and Ula Makika. (Tr. at 3934; GX-41-B.) He also discussed a summary chart for Eufora's bank account for the period from December 1, 2008 to May 31, 2009 (GX-46-B), stating:

Q. Looking at the Eufora operating account in December 2008, can you tell us what you highlighted in terms of money going in and money going out?

A. Yes. I was asked to look for particular players who sent money into this account and where it went to.

Q. What happened?

A. It appears mostly that the amounts that came in that day, it either went out that day or in the following couple of days.

(Tr. at 3942-43.) For instance, Petrellese said that the chart showed incoming funds from Murray on December 29, 2008 followed by an outgoing transfer to Gaarn two days later. (*Id*. at 3943.)

In addition, Petrellese said that a chart summarizing transactions pertaining to the Wachovia Account showed that approximately 98 percent of the funds

deposited into that account came from Eufora. (*Id.* at 3946-47; GX-49.) He further testified that the chart indicated that $381,127 was transferred from the Wachovia Account to Kenner's Wells Fargo and Bank of America accounts, accounting for roughly 55 percent of all outgoing transfers. (Tr. at 3947; GX-49-B.)

### xxxv. Joshua Wayne

Joshua Wayne ("Wayne") is a special agent with the Internal Revenue Service. (Tr. at 3985.) He similarly testified to summary charts that he created. For instance, he reviewed an exhibit depicting transactions pertaining to the Urban Expansion loan and said that it showed that a little over $2 million of the $6.9 million in proceeds from the Lehman Brothers settlement went to CMG, followed by outgoing transfers to, *inter alia*, Kenner for the payment of a personal loan and to Constantine for the payment of personal expenses, including $130,000 to Unitech; $100,000 for a cash withdrawal; $17,500 to Unique Auto Sports; $115,802.96 to Playboy; and $175,000 to Vegas Marketing Promotions. (*Id.* at 4000-01; GX-Chart-7.)

In addition, Wayne testified as follows regarding other charts that he created:

Q. Turning your attention to Chart 9. Is there additional money that you reviewed at the same time for Mr. Kaiser?

A. That's correct.

Q. Where does that money go?

A. $380,000 on November 1, 2006 is transferred to Ula Makika. Money is then transferred over to CMG Tommy Constantine. Also from Ula Makika

$200,000 is transferred to Phil Kenner.
. . .
Q. I'm going to turn your attention to Chart 10. What happened to the money that Mr. Peca sent for Eufora?

A. It goes to CMG, Tommy Constantine account.

Q. And what happened that same day?

A. The same amount is then transferred over on that same day to Phil Kenner.

Q. What's the amount?

A. $100,000.

Q. Turning to Chart 11. What happens to the money that Mr. Nash sent?

A. It goes to CMG, Tommy Constantine account.

Q. And what happens to the money after that?

A. It goes to Wampler, Buchanan law firm, Kinetic Speed Shop, and Phil Kenner.

Q. Did you review invoices for Wampler and Kinetic Speed Shop?

A. I did.

Q. Can you describe generally what those expenses are for?

A. Wampler was for, related to a lawsuit involving Tommy Constantine and – in Florida and

Kinetic Speed Shop, has to do with cars.

(Tr. at 4004-05; GX-Chart-9.) In addition, Wayne reviewed a text message conversation between Kenner and Constantine and testified as follows:

Q. I'm going to direct your attention to what is in evidence as government Exhibit 203A. Looking at this conversation, do you see on the right it says, I'm sending CMG 100K today. Please send the extra 25K back to me?

A. Yes.

Q. And on the left it says 25K question mark? I need 40K for lawyers and 40K for G T car. Is that Eufora money, question mark. Do you see that?

A. Yes.

Q. Yes on the right side?

A. Yes.

Q. On the left side it says, Are you cool if I just sent the 17K? I'm sorry to nickel and dime you, but I have to lay out 80 straight away and I don't even have enough to afford a – I don't even have enough to get to the meeting in Cabo. Do you see that?

A. Yes.

Q. On the right it says, No problem?

A. Yes.

(Tr. at 4005-06; GX-203-A.) Wayne further testified to additional charts that he created

and said that they depicted payments from Sydor, Murray, Ranford, Rucchin, and Privitello that were subsequently used to pay personal expenditures by Kenner and Constantine. (Tr. at 4007-14; GX-Chart-10–20.) Finally, with respect to the GSF, Wayne said that he prepared a chart summarizing disbursements from the Richards Escrow Account and said that it showed, *inter alia*, a $55,000 wire to the Arizona Bar Foundation as payment to Steve Silver, Constantine's tax attorney. (Tr. at 4015-18; GX-80.)

b. Kenner's Case

i. Vincent Tesoriero

Vincent Tesoriero ("Tesoriero") testified that he served with Kaiser as a police officer in New York City and retired from the New York City Fire Department in 2004. (Tr. at 4106-07.) He said that Kaiser approached him to invest in the Sag Harbor Property and that Kaiser told him that Manfredi would not be part of that deal. (*Id*. at 4107-10.) Tesoriero further testified that Kaiser never provided him with documents in connection with the Sag Harbor Property operating agreement. (*Id*. at 4111.) On cross-examination, Tesoriero said that it was not his understanding that Peca was an investor in the Sag Harbor Property. (*Id*. at 4112-13.)

ii. Phillip Kenner

Kenner's testimony spanned several days of trial. Accordingly, the Court will summarize the testimony that is relevant to the instant motions.

1. Direct Testimony

On direct examination, Kenner asserted that portions of Kaiser's testimony were inaccurate, stating, *inter alia*, that (1) Kenner never told Kaiser that he was worth $500

million during their initial meeting (Tr. at 4130-31); and (2) Kaiser was not owed any money pertaining to the Hawaii Project (*id*. at 4142-43). In addition, he said that Berard was wrong to testify that Kenner never informed him that the Northern Trust line of credit account in his name would be used for loans to Jowdy projects in Mexico. (*Id*. at 4153-54.) Kenner further testified that he did not know why government witnesses, including Berard, failed to recall certain events during their testimony. (*Id*. at 4153-56.)

Likewise, Kenner rebutted the testimony of other witnesses, contending that (1) Donlan's testimony pertaining to Kenner's practice with client signatures was untruthful (*id*. at 4168-69); (2) "Peca was completely aware of the establishment of his line of credit and the purpose behind it" (*id*. at 4169); (3) Kenner never represented to Mrs. Peca that the Northern Trust line of credit would only be open for six to nine months (*id*. at 4183-84); (4) Rucchin was aware of the loss of his line of credit collateral prior to 2013 (*id*. at 4187-93); (5) Sydor did communicate with Northern Trust about the default on his line of credit (*id*. at 4198-4200); (6) Nolan was aware of his line of credit before 2008 (*id*. at 4211-14); (7) Kenner never prohibited Mascarella from communicating with Kenner's clients (*id*. at 4221-22); and (8) Murray was aware that the collateral for his Northern Trust line of credit was seized prior to his testimony at trial (*id*. at 4246-51). In support of this testimony, Kenner introduced several exhibits as evidence, such as text messages and mailing records.

In addition, Kenner said that he never advised his clients that the Hawaii Project was risk-free, contrary to Rucchin's testimony (*id*. at 4268-69), and he said that they did receive a partial return on their Hawaii Project investments (*id*. at 4338-89). He further testified that he would characterize the Northern Trust lines of credit as "pooled funds for the benefit of" Little Isle IV and admitted to using funds from those accounts to pay off interest due on other accounts. (*Id*. at 4282-83.) Kenner said that the various lines of credit holders were aware of those transactions and there was no deceit on his part. (*Id*. at 4283-84.) Moreover, he testified that the investors had "[c]omplete knowledge" that the lines of credit were used to make loans to Jowdy and said that a revolving line of credit loan agreement memorialized the lending relationship between Jowdy and the Hawaii Project entities. (*Id*. at 4288-92; Defs.' Exh. Kenner-214.) Kenner also said that he did not forge Kaiser's signature on either of the CMG consulting agreements. (*Id*. at 4302-06.)

With respect to Eufora, Kenner testified that he did not represent to his clients that their investments would be immediately used for any particular purpose, and he said that he did not deceive them by sending their funds to CMG. (*Id*. at 4346-47.) He also said that he did not have any communications with Privitello regarding Eufora in or around December 2009. (*Id*. at 4362.)

Kenner further testified that, in 2010, he assisted efforts by a group of Eufora investors to attempt a "hostile takeover" of that company and "wrangle control of Eufora on a day to day operation basis away from Mr. Constantine and his management team." (*Id*. at 4366-69.) In addition, Kenner testified that he believed that Constantine had misappropriated money from the Global Settlement Fund. (*Id*. at 4397-98.) He discussed several specific disbursements, including payments to Constantine's lawyers and Eufora. (*Id*. at 4447-51.) Kenner also testified that, in or around August 2010, Kenner spoke with Constantine in a Home

Depot parking lot in Scottsdale, Arizona and recorded that conversation. (*Id*. at 4571-75.)

## 2. Cross-Examination

On cross-examination, Kenner was asked about the revolving line of credit loan agreement with Jowdy, and the following colloquy ensued:

> Q. Well, there is no record, no document that shows any player knew anything about the Jowdy loan except for the one document you produced and offered into evidence during your direct. Correct?
>
> A. That in fact would be the loan agreement with Mr. Jowdy.
>
> Q. And if that loan document proves to be phony, then you are lying. Correct?
>
> MR. HALEY: I object to the form.
>
> THE COURT: Sustained as to form.

(*Id*. at 4598.) Kenner further testified that none of his clients obtained a copy of that loan agreement. (*Id*. at 4599.)

Kenner also said that CMG received funds related to the Hawaii Project pursuant to consulting agreements that Constantine had signed. (*Id*. at 4654-57.) In addition, Kenner testified that a disclosure letter to Hawaii Project investors did not mention Constantine's involvement in that endeavor. (*Id*. at 4657; Defs.' Exh. Kenner-93.) Kenner also acknowledged that the dates on the consulting agreements were backdated. (Tr. 4676-77.)

In addition, on cross-examination, the recording of the August 2010 Home Depot conversation between Kenner and Constantine was played. (Tr. 4773.) The jury heard the following dialogue:

> CONSTANTINE: So, I know you're not gonna believe anything I tell you, but I'm gonna try anyway.
>
> KENNER: Okay.
>
> CONSTANTINE: There's huge misunderstandings between us that cultivated and got exponentially worse when you stopped communicating with me. We have a – and I don't care if you tell them this – we have a bunch of half-wit idiots that you know how smart or stupid they are, in uh, translating for us, which is like a ridiculous game of telephone that I've ever, the most ridiculous. . . . I've said it fifteen times. I understand that you're crazy and you've got big balls, and you understand that I'm crazy and I've got big balls, so we're gonna crash and everybody's gonna die. It's not Jowdy; it's me. And it's not – and I know you, so I have a – everything's done and buttoned up with a bow on it. . . . I fixed your whole life and my whole life, and for some reason in the midst of all this you f***ing blew a gasket and are trying to bury us all. I mean, I don't understand. The whole Eufora thing is done. Everyone thinks we're lying and playing games. . . .
>
> KENNER: I haven't done anything yet.
>
> CONSTANTINE: Yes you have. You – you don't realize what you have. You know the things that were surrounding you that you were afraid of slamming doors in my office? It's

all coming down. And it's gonna be bad, dude. It's gonna be bad for them; it's gonna be bad for all of us.

. . .

Do you know the sh\*\*storm that's gonna come down on you if this thing goes to the mat? Do you have any idea? Do you remember the things that happened? I mean, you think that this is only to protect me? I'm protecting you; I'm protecting Tim too. I'm protecting everybody. And you think that I'm the enemy and you think that you're gonna cut a deal to f\*\*\* me up? They're not gonna f\*\*\*ing pinch the guy who drove the getaway car, they're gonna pinch the guy that f\*\*\*ing robbed the bank. And I know you think I robbed the bank, but I have answers for everything. Everything. In writing, and I'm trying to make it stop.

. . .

I'm gonna apologize to you right now because the way it sounds, it does sound like I'm cutting you out of the loop and I'm being a dick, but I'm not. And you took it, and you ran with it Phil, and you've created a sh\*\*storm that may not be fixable, and I'm here to tell you that I'll put this sh\*\* over here. You're in deep f\*\*\*ing sh\*\* if this stuff happens. You are in deep sh\*\*. The f\*\*\*ing FBI is all over this f\*\*\*ing thing and they're not asking about anybody else and I'm trying to stop you from burning down your own life.

. . .

You know, I don't even have a car anymore. I'm f\*\*\*ing done. Everything is leveraged to the hilt. I'm f\*\*\*ing broker than you are. So, what are they gonna do to me? Lock me up? Big f\*\*\*ing deal. For what, jaywalking? Let's go. I'm not

worried about me. I'm worried about – frankly, I'm worried about you and a couple other people. And I know why they're playing so hardball with Tim, because he has liability too. What do you think is gonna happen when seven hundred thousand dollars shows up, going from the players that already bought it the first time, to the bank account, back to Tim Gaar – to Eufora's bank account – back to Tim Gaarn's account, to your account? Like, this is not gonna look good, right? There's so much sh\*\* that you're not thinking about in this whole equation that needs to just be put to bed and move forward productively, and I'm here to ask you to not blow, burn down the house.

. . .

And Tim? Tim's got friends in high places, but Tim has liability, which is why these people are pushing so hard. Because when I was trying to cover Tim . . . I accidentally got sh\*\* that I wasn't – you think I was trying to burn you but I wasn't trying to burn you.

(GX-4500 and GX-4500-T.)

With respect to his involvement in the attempted "hostile takeover" of Eufora, Kenner said that other Eufora investors advised Privitello not to accept a return of his share in that company. (Tr. at 4953-54.)

### c. Constantine's Case

#### i. Sergei Gonchar

##### 1. Direct Testimony

Sergei Gonchar ("Gonchar") is an NHL player who resides in Florida. (Tr. at 4796.) He testified that he had a business

relationship with Kenner and that he invested in the Hawaii Project and Eufora. (*Id*. at 4788-4801.) Gonchar said that Kenner told him that he opened a Northern Trust line of credit in his name to fund the Hawaii Project that was secured by $1 million from Gonchar's bond portfolio. (*Id*. at 4801.) He further testified that he lost that security when interest payments on the line of credit were not made and subsequently recovered approximately $500,000 from Northern Trust in a settlement agreement. (*Id*. at 4801-02.)

With respect to Eufora, Gonchar said that he invested $250,000 after speaking with Kenner about that company. (*Id*. at 4802-03.)

In addition, Gonchar testified that, after speaking with Kenner and Constantine, he contributed $250,000 to the GSF to fund litigation against Jowdy by wire dated May 5, 2009 to the Richards Escrow Account. (*Id*. at 4805-07; GX-767.) He said that he received an e-mail on May 18, 2009 sent by Kenner that sought approval for a $250,000 contribution to the Global Settlement Fund for, *inter alia*, (1) the payment of legal fees, which Gonchar understood to be related to the Jowdy litigation; (2) public relations fees; (3) settlement costs and protective advances; and (4) the acquisition of an additional interest in Eufora. (Tr. at 4808-12; Defs.' Exh. C-294.) Regarding the Eufora component, Gonchar testified:

> I understood from that that, since we put money into Global Settlement Fund, and Tommy was – the group put money and the return we were going to get percentage of the real estate investment or Eufora company and all those things we were putting money into this return, we were going to get some of the percentage from those businesses.

(Tr. at 4812.) In addition, Gonchar said that he replied "acknowledged and approved" to that e-mail the following day. (*Id*. at 4809.)

Moreover, Gonchar testified that, following that exchange, Constantine asked him if he could use Gonchar's $250,000 contribution to pay his personal expenses:

> Q. Okay. After meeting with Mr. Constantine and Mr. Kenner and after you had received the emails on May 18, 2009, and then acknowledged the authorization on the following day, do you recall having a conversation with Mr. Constantine, shortly thereafter, in regards to your contribution that you made of $250,000?
>
> A. Yes.
>
> Q. Would you tell us what you recall of that conversation?
>
> A. He asked me if he can use some of that money for his personal use and then he will repay me later.
>
> Q. Did he say why he needed to use the money for his personal use?
>
> A. I just don't remember all the details like, but back then I thought it was reasonable and I allowed him to use that.
>
> Q. That is in reference to your original contribution of 250,000. Is that correct?
>
> A. Yes, it is.

(*Id*. at 4817-18; *see also id*. at 4826-27.)

Gonchar further testified that he subsequently made additional wire transfers approximately totaling more than $1 million to the Richards Escrow Account. (*Id.* at 4819-20.) He said that those additional contributions were reflected in (1) a September 9, 2009 transfer of $749,985 from "the g55 foundation (gonchar swiss account)" to the Richards Escrow Account; (2) a November 6, 2009 transfer of $362,355.58 from "the g55 foundation (gonchar swiss account)" to the Richards Escrow Account; and (3) a November 30, 2009 transfer of $138,000 to the Richards Escrow Account. (*Id.*; GX-767.) Gonchar said the September 9, 2009 investment was used to pay a loan that Constantine had taken out to secure patents for Eufora and to increase Gonchar's stake in that company:

> Q.   Could you give us the circum-stances under which made this contribution. Tell us about it.
>
> A.    I remember there was that, I remember that there was a loan was taken by Eufora, and to pay that loan Tommy Constantine put money against – I'm sorry, that Tommy Constantine put patents against the loan, so to get those patents back he need to buy back that loan. So I transferred the money, you know, to that. I mean, this money went to that.

(Tr. at 4820; *see also id.* at 4821-22 (Gonchar stating that that contribution was also used to purchase additional equity in Eufora on his behalf).) Gonchar further testified that his November 6, 2009 contribution to the GSF was also used to acquire a greater share of Eufora:

> I don't remember exactly what that was for. I just remember that for, that also I was getting additional

percentage of the company. But, you know, we talked with [Constantine] and he was back then giving me head's up on what he was doing. Some of the money, he was using it towards the commercial. He was making, you know, he was giving me the reasons like why we need those money. And that's why back then I thought it was reasonable and that's why I give him the money. That's why I transferred the money.

(*Id.* at 4822-23.) Likewise, he said that his final November 30, 2009 GSF contribution was for the purpose of buying more Eufora equity. (*Id.* at 4823.) Gonchar testified that he did not recall authorizing any of his three additional investments in the Global Settlement Fund following his original $250,000 contribution to go towards Constantine's personal use:

> Q. And in regards to this money, did you also discuss with Mr. Constantine his use of that for his own personal expenses?
>
> A. [The November 30, 2009] wire transfer? I don't remember that.
>
> Q. At any point in time after the first conversation regarding the 250, did you give him permission to use monies that you may have transferred?
>
> A. I don't remember that.

(*Id.* at 4823.) However, Gonchar subsequently said that it was his "understanding [that] it was like as long as [Constantine was] going to pay it back, [Gonchar did not] mind him using the money [Gonchar] was putting in," which would "include all of the monies that [Gonchar] had

put into the Ron Richards' account[.]" (*Id.* at 4826-27.)

Finally, Gonchar testified that he hired a forensic accountant to determine whether the money that he and others had contributed to the Global Settlement Fund was being properly spent, and Gonchar said that he remembered being "satisfied" with the investigator's explanation and thought the "money was spent accordingly . . . ." (*Id.* at 4827-29.)

## 2. Cross-Examination

On cross-examination, Gonchar testified that Kenner told him about the Northern Trust line of credit and the bond guaranty after that account had already been opened. (*Id.* at 4845-46.) He also said that the Hawaii Project "[n]ever worked out" and that "[n]obody ever told [him] anything about [Constantine] getting any money from" the Hawaii Project, which he said was separate from Eufora. (*Id.* at 4846-47.) Likewise, when presented with bank records, Gonchar said that he never intended that $330,000 from his line of credit would go to CMG, stating "I wasn't [sic] discuss money going from Hawaiian deal to Constantine Management Group." (*Id.* at 4850-52; GX-2139, GX-2101, and GX-2102.) In addition, he said that he was not informed when the Hawaii deal was presented to him that his investment in the Hawaii Project would be used to fund real estate developments in Mexico. (Tr. at 4847-48.)

With respect to Eufora, Gonchar testified on cross-examination that he believed that by investing in that company, he "was buying stock." (*Id.* at 4853.) He said that Kenner never told him that Constantine was selling his own personal stock in Eufora. (*Id.* at 4855.)

### ii. Mark D'Ambrosio

Mark D'Ambrosio ("D'Ambrosio") resides in Arizona and works in the software industry, and he testified that he met Constantine in 1997 or 1998. (Tr. at 5161-62.) He said that he and Constantine developed the concept for Eufora; that they incorporated the company in or around 2001; and that Constantine, D'Ambrosio, Kenner, Edenholm, Matt Cotrell, and Daniel Kennedy executed Eufora's operating agreement the following year. (*Id.* at 5163-67; Defs.' Exh. C-265.) D'Ambrosio further testified that patents belonging to Eufora were pledged as collateral to obtain a loan in or around 2009 from a company called Neptune Capital. (Tr. at 5218-20.) He said that Gaarn was removed from Eufora's board of directors in or around July 2010 because, among other reasons, Gaarn was part of a group that was trying to buy the Neptune loan. (*Id.* at 5234-36.) In addition, D'Ambrosio testified that the Eufora board approved disbursements to Constantine for the payment of his legal representation at Carey Rodriguez Greenberg. (*Id.* at 5253-54, 5269.) He also said that Privitello never requested that his Eufora investment be returned and said that the company offered to refund Kaiser's and Privitello's $200,000 loans, which were listed as short-term investments. (*Id.* at 5257-59; Defs.' Exh. C-162.) In that regard, D'Ambrosio stated:

> Q. Do you remember at any point during the conference call the issue coming up of returning the moneys to either Mr. Kaiser or Mr. Privitello or anyone involved in the $400,000 we've been talking about?
>
> A. Yes, it was mentioned again after Tommy had previously offered and wanted to wire the money back to them. It was again noted on the call

41

that we wanted to make sure we sent them back their investment.

(*Id*. at 5258.)

In addition, D'Ambrosio said that he was aware that Constantine was involved in obtaining financing for the Hawaii Project. (Tr. at 5181-83.)

### iii. Jeff Foster

Jeff Foster ("Foster") works in the financial services industry. (Tr. at 5404.) He met Constantine in or around 2011 through a mutual acquaintance and said that they discussed Eufora's business. (*Id*. at 5407-10.) Foster testified that, in or around 2013, he and Constantine signed a memorandum of understanding whereby Eufora agreed to purchase 10,000 cards from Foster's business, and in return, Foster's company would perform services for Eufora. (*Id*. at 5410-11.) However, Foster said that he and Constantine could not find a bank to sponsor that transaction and that their deal was put on hold following Constantine's arrest. (*Id*. at 5411.)

### iv. Robert Semple

#### 1. Direct Testimony

Robert Semple ("Semple") resides in Arizona and is a certified public accountant. (Tr. at 5427.) He testified that Gonchar hired him to conduct a forensic review of the Global Settlement Fund. (*Id*. at 5432-34.) Sample said that he and his team analyzed accounting summaries prepared by Richards, Kenner, and accountants at Eufora, as well as additional documents from Constantine and Richards. (*Id*. at 5434-35.) He further testified that Gonchar did not want a formal report and that Gonchar advised Semple that he had given Constantine money through the

Global Settlement Fund for Constantine's personal use. (*Id*. at 5458-60.)

In addition, Semple said that he spoke with Nash about the forensic review and that Nash was satisfied with Semple's explanations for certain payments. (*Id*. at 5461-62.) Moreover, Semple testified that, "consistent with all the emails [he] saw, [he] didn't see anything that was abnormal, with the exception again of some of the expenditures for attorney fees, which Sergei Gonchar said: Look, we authorized those." (*Id*. at 5463.) Semple also said that there were certain expenditures for which he did not have sufficient information to review, such as payments to Sullivan & Cromwell for a proposed Playboy acquisition, but Semple said that Gonchar told him that he and the other NHL players knew of those transactions. (*Id*. at 5496-97.)

#### 2. Cross-Examination

On cross-examination, Semple said that he did not conduct a certified review and did not write a report, stating:

> We didn't write a report. We basically took the report prepared by Mr. Kenner/Richards and then Mr. Richards report which had a running balance in it, combined the two, and then we compared that to a third document prepared by Eufora.

(*Id*. at 5521.) In addition, he testified that his forensic review did not encompass all of the transactions in the Richards Escrow Account, but rather only those that Richards said pertained to the Global Settlement Fund. (*Id*. at 5523-24.) Semple further said that he relied on spreadsheet that Richards sent him and that he did not have any bank statements or wire transfer records for the Richards

Escrow Account when he conducted the forensic review. (*Id*. at 5524-25.)

In addition. Semple testified as follows when asked about the parameters of his review:

> Mr. Gonchar told me that the Global Settlement Fund was an accumulation of funds from roughly 20 players, and the primary purpose of that was the Jowdy litigation, to fund the Jowdy litigation and to fund some PR related to the Jowdy litigation, to make protective payments, to preserve assets that the players were involved in, and to resolve, liquidate some of the issues such as the aircraft.
> . . .
> Q. Okay. So when you were doing this analysis that you were hired to do by Mr. Gonchar as to whether the money was used for its intended purpose, you are looking at whether the money was used for Jowdy litigation, aircraft expenses, the Avalon airpark, Eufora, and other investments that were going into bankruptcy. Is that a fair summary of what you just said?
>
> A. Generally, yes.

(*Id*. at 5525-27.) Semple said that he did not make any determination as to whether the Global Settlement Fund was used for its intended purpose and could not reach such a conclusion because his team "never got copies of some of the bills and other documents that [they] requested from Mr. Richards." (*Id*. at 5528-29.)

### v. William Daniel Kennedy

William Daniel Kennedy ("Kennedy") resides in Arizona. (Tr. at 5589.) He said

that he met Constantine through a mutual friend and they raced cars together. (*Id*. at 5291-94.) Kennedy testified that he became involved in Eufora through his company at the time, C9 Innovations, and said that he signed Eufora's operating agreement, obtaining a 10 percent share. (*Id*. at 5594-95, 5600-01.) He said that he later relinquished two percent of his membership in Eufora to AZ Eufora. (*Id*. at 5602-04; Defs.' Exh. C-266.) Moreover, Kennedy testified that he later transferred four percent of his remaining eight percent stake in Eufora to CMG at Constantine's request. (Tr. at 5605-07.)

### B. Relevant Procedural History

By superseding indictment dated April 22, 2015, the government charged Kenner with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count One); conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count Nine); and seven counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2 (Counts Two through Eight). (ECF No. 214.) In addition, the government charged Constantine with conspiracies to commit wire fraud and money laundering (Counts One and Nine) and five counts of wire fraud (Counts Two through Six). (*Id*.)

Following a trial that began on May 4, 2015 (ECF No. 239), the jury returned a verdict on July 9, 2015 (ECF No. 324). The jury found Constantine guilty on all charges and Kenner guilty on both conspiracy counts. (*Id*.) In addition, the jury found Kenner guilty on the wire fraud charges in Counts Two through Four and Seven in the superseding indictment, but it acquitted him of the wire fraud charges in Counts Five, Six, and Eight. (*Id*.)

By letter dated July 29, 2015, Kenner's trial counsel, Richard Haley, said that Kenner

would not file a Rule 29 motion for a judgment of acquittal with respect to the charges for which Kenner was found guilty, but he said that Kenner intended to join in Constantine's anticipated Rule 33 motion for a new trial "insofar as such motion presents common issues of law and fact for the Court's consideration." (ECF No. 325.)

On November 23, 2015, Constantine filed his Rule 29 and Rule 33 motions. (ECF No. 346.) The government submitted its opposition on April 4, 2016 (ECF No. 370), and Constantine replied on June 9, 2016 (ECF No. 382). Constantine supplemented his motion for a new trial, raising an additional ground of newly-discovered evidence, by brief filed on October 21, 2016. (ECF No. 407.) The government submitted its response to Constantine's supplemental brief on January 16, 2017 (ECF No. 438), and the Court heard oral argument on Constantine's motions on February 17, 2017 (ECF No. 453).

Notwithstanding his trial counsel's prior representation, Kenner filed a separate *pro se* Rule 33 motion for a new trial on November 28, 2016. (ECF No. 416.) The government submitted its opposition on January 18, 2017. (ECF No. 440.) On February 7, 2017, Jeffrey Pittell, Kenner's replacement counsel,[6] filed a reply (ECF No. 447), and Kenner also filed a *pro se* reply on February 13, 2017 (ECF No. 449). After Kenner again replaced his attorney, that counsel, Jesse Siegel, submitted an additional reply on June 6, 2017. (ECF No. 473.) The Court held oral argument on Kenner's Rule 33 motion on June 22, 2017, and Kenner spoke on his own

behalf during that proceeding. (ECF No. 478.)

The Court has fully considered all of the parties' submissions on defendants' instant motions.[7]

## II. STANDARD OF REVIEW

### A. Rule 29 Motion for Acquittal

Pursuant to Rule 29(a), a district court shall enter a judgment of acquittal as to "any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). However, as set forth below, "'[a] defendant bears a heavy burden in seeking to overturn a conviction on grounds that the evidence was insufficient.'" *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (quoting *United States v. Cruz*, 363 F.3d 187, 197 (2d Cir. 2004)); *accord United States v. Pipola*, 83 F.3d 556, 564 (2d Cir. 1996) (citing *Glasser v. United States*, 315 U.S. 60, 80 (1942)); *see also United States v. Tillem*, 906 F.2d 814, 821 (2d Cir. 1990) (stating that motions to challenge sufficiency of evidence "rarely carry the day").

The standard under Rule 29, as articulated by the United States Supreme Court, is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *accord United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008); *Lorenzo*, 534 F.3d at 159; *United States v. Irving*, 452 F.3d 110, 117 (2d

---

[6] As reflected on the docket, Kenner and Constantine have each been represented by multiple attorneys throughout the course of this case, which has, in part, extended the post-trial phase of these proceedings.

[7] As discussed *supra* note 2, Constantine again supplemented his Rule 33 motion on July 7, 2017, asserting that his trial counsel was ineffective. (ECF No. 483.) However, because that argument is not yet fully submitted, the Court does not address it in this Memorandum and Order.

Cir. 2006); *United States v. Temple*, 447 F.3d 130, 136 (2d Cir. 2006). In other words, "'[a] court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" *Temple*, 447 F.3d at 136 (quoting *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999)).

It is important to emphasize that, in evaluating the evidence under this standard, "courts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003); *see also United States v. Florez*, 447 F.3d 145, 154-55 (2d Cir. 2006) ("In assessing sufficiency, we are obliged to view the evidence in its totality and in the light most favorable to the prosecution, mindful that the task of choosing among permissible competing inferences is for the jury, not a reviewing court."); *Guadagna*, 183 F.3d at 130 (holding that court must bear in mind that Rule 29 "does not provide [it] with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury" (alterations in original)).

Therefore, viewing the evidence in the light most favorable to the government means "drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility." *United States v. Arena*, 180 F.3d 380, 391 (2d Cir. 1999); *accord United States v. James*, 239 F.3d 120, 124 (2d Cir. 2000) ("[T]he credibility of witnesses is the province of the jury, and [a court] simply cannot replace the jury's credibility determinations with [its] own."). In examining the sufficiency of the evidence,

the court also should not analyze pieces of evidence in isolation, but rather must consider the evidence in its totality. *See United States v. Rosenthal*, 9 F.3d 1016, 1024 (2d Cir. 1993); *see also Guadagna*, 183 F.3d at 130 (holding that sufficiency test must be applied "to the totality of the government's case and not to each element, as each fact may gain color from others"). Finally, "[d]irect evidence is not required; '[i]n fact, the government is entitled to prove its case solely through circumstantial evidence, provided, of course, that the government still demonstrates each element of the charged offense beyond a reasonable doubt.'" *Lorenzo*, 534 F.3d at 159 (quoting *United States v. Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2004)); *see also Irving*, 452 F.3d at 117 ("A jury may convict on circumstantial evidence alone."); *accord Jackson*, 335 F.3d at 180; *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995). However, "if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002); *accord United States v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005).

In short, "[w]here a court concludes after a full analysis of the evidence in connection with a Rule 29 motion that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter." *Temple*, 447 F.3d at 137 (quoting *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000)). On the other hand, "'in passing upon a motion for a directed verdict of acquittal, . . . if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt, the motion must be granted.'" *Id.* (quoting *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972)).

## B. Rule 33 Motion for a New Trial

Rule 33 states, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A district court may grant a Rule 33 motion only in "extraordinary circumstances," *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009), and only if there exists "'a real concern that an innocent person may have been convicted,'" *United States v. Parkes*, 497 F.3d 220, 232 (2d Cir. 2007) (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)); *accord United States v. Bell*, 584 F.3d 478, 483 (2d Cir. 2009); *see also United States v. Middlemiss*, 217 F.3d 112, 122 (2d Cir. 2000) ("Granting Rule 33 motions is not favored and is done with great caution."). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *Ferguson*, 246 F.3d at 134. In deciding a Rule 33 motion, the Court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (citation omitted).

## III. DISCUSSION

## A. Constantine's Rule 29 Motion

Constantine argues that he is entitled to a judgment of acquittal on all counts because there was insufficient evidence at trial to prove beyond a reasonable doubt that he participated in (1) any of the objects of the conspiracies to commit wire fraud and money laundering—namely, defrauding investors in (a) the Hawaii Project, (b) Eufora, and (c) the Global Settlement Fund; and (2) the transactions underlying the wire fraud charges in Counts Two through Four of the superseding indictment. In addition, Constantine argues that he should be acquitted of the wire fraud charges in Counts Five and Six because the jury found Kenner not guilty on those counts, and the trial evidence proved that Constantine attempted to return the money at issue.

For the reasons that follow, the Court disagrees with all of these arguments and denies Constantine's Rule 29 motion in its entirety.

### 1. Counts One and Nine: The Conspiracy Charges

Constantine advances the same grounds for relief with respect to the Count One conviction for conspiracy to commit fraud, in violation of 18 U.S.C. § 1349; and the Count Nine conviction for conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). (*See* Constantine's Mot. for New Trial and Mot. for J. of Acquittal ("Constantine's Mot. Br."), ECF No. 346, at 3 ("[B]ecause Count 9 merely re-alleged allegations from the wire fraud conspiracy, and failed to specify a single substantive crime or provide any independent evidence of a money laundering conspiracy that stood separately from the wire fraud conspiracy, the failure of the proof common to both conspiracies establishes that this Court should enter an order of acquittal on Count 9 as well.").) Accordingly, the Court will address the sufficiency of the evidence with respect to both conspiracy charges together.

#### a. Applicable Law

18 U.S.C. § 1349 provides that "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 18 U.S.C. § 1349. Likewise,

18 U.S.C. § 1956(h) states that "[a]ny person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." 18 U.S.C. § 1956(h).

"The essence of conspiracy is agreement. In order to convict a defendant of the crime of conspiracy, the government must show that two or more persons entered into a joint enterprise for an unlawful purpose, with awareness of its general nature and extent." *United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010) (collecting cases); *see also United States v. Snow*, 462 F.3d 55, 68 (2d Cir. 2006) ("To be guilty of conspiracy, there must be some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it."). "An individual defendant's membership in a conspiracy may not be established simply by his presence at the scene of a crime, nor by the fact he knows that a crime is being committed." *United States v. Desimone*, 119 F.3d 217, 223 (2d Cir. 1997).

However, "[t]he government's proof of an agreement does not require evidence of a formal or express agreement; it is enough that the parties have a tacit understanding to carry out the prohibited conduct." *United States v. Nusraty*, 867 F.2d 759, 763 (2d Cir. 1989). "Evidence tending to show knowing participation in the conspiracy is also needed, *i.e.*, facts sufficient to draw a logical and convincing connection between circumstantial evidence of an agreement, and the inference that an agreement was in fact made." *United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004) (citations omitted). Further, the Second Circuit has noted that

"[i]n cases of conspiracy, deference to the jury's findings is especially important . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Hawkins*, 547 F.3d 66, 70 (2d Cir. 2008).

The government must also prove that the defendant joined the agreement with the necessary criminal intent. *See United States v. Villegas*, 899 F.2d 1324, 1338 (2d Cir. 1990) ("In order to prove a conspiracy, the government must present 'some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it.'" (quoting *United States v. Sanchez Solis*, 882 F.2d 693, 696 (2d Cir. 1989))). "Both the existence of a conspiracy and a given defendant's participation in it with the requisite knowledge and criminal intent may be established through circumstantial evidence." *Torres*, 604 F.3d at 66 (alteration omitted). As the Second Circuit has explained:

A defendant's knowing and willing participation in a conspiracy may be inferred from . . . her presence at critical stages of the conspiracy that could not be explained by happenstance, or a lack of surprise when discussing the conspiracy with others. It may also be established by evidence that the defendant participated in conversations directly related to the substance of the conspiracy[,] possessed items important to the conspiracy, or engaged in acts exhibiting a consciousness of guilt, such as [making] false exculpatory statements.

*In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93, 113 (2d Cir. 2008) (citations omitted).

b.  Analysis

Here, the superseding indictment alleged a scheme to defraud orchestrated by Kenner and Constantine, asserting that:

> In or about and between August 2002 and April 2013, the defendants KENNER and CONSTANTINE devised, implemented, supervised and executed a scheme to fraudulently induce the player-clients and other individuals (collectively, the "Investors") . . . to invest money by falsely stating that the funds would be invested in real estate in Hawaii, Eufora and an entity known as the "Global Settlement Fund" (hereinafter "GSF") for the benefit of the Investors when, in truth and in fact, as KENNER and CONSTANTINE then and there well knew and believed, a substantial portion of the money would be improperly diverted to bank accounts controlled by KENNER and CONSTANTINE and used for their personal benefit, for unrelated business ventures and to conceal their scheme to defraud.

(Superseding Indictment ("SI"), ECF No. 214, at ¶ 5.)  As discussed more fully *infra*, the Court instructed the jury that the conspiracy charged in Count One had three separate "objects":

> The three crimes alleged to be an object of the conspiracy in Count One

involve wire fraud: the first is the alleged scheme to defraud investors related the Hawaii Land Developments, the second is the alleged scheme to defraud investors related to the Eufora Investments, and the third is the alleged scheme to defraud investors related to the Global Settlement Fund.
> . . .
> The government need not prove that the alleged conspirators entered into an agreement to accomplish all three of the unlawful objectives alleged.  If you find unanimously that two or more persons agreed to commit any of these three objectives, then this element would be proved.

(Jury Charge, ECF No. 296, at 59; *see also id.* at 71 (applying conspiracy instructions to Count Nine).)

In his motion for a judgment of acquittal, Constantine contends that "the Government did not establish that Constantine was a member of either of the charged conspiracies (Counts 1 and 9) . . . [b]ecause as to Constantine there was insufficient evidence to sustain the jury's verdict as to any object of the conspiracy . . . ." (Constantine's Mot. Br. at 1, 3.)  As set forth below, the Court disagrees and concludes that the government adduced sufficient evidence at trial to permit the jury to conclude, beyond a reasonable doubt, that Constantine participated in the scheme to defraud investors in the Hawaii Project, Eufora, and/or the Global Settlement Fund.[8]

---

[8] Moreover, as discussed *infra*, the Court did not err in providing a general verdict form to the jury that did not require them to identify which conspiracy object(s) provided the basis for Constantine's conviction.

i. The Hawaii Project

With respect to Constantine's involvement in the Hawaii Project, the Superseding Indictment charged that:

It was further part of the scheme to defraud that the defendants KENNER and CONSTANTINE unlawfully diverted Investor money for their personal benefit, used money from Investors' lines of credit for unauthorized purposes, including for their personal benefit, and thereby dissipated the Investors' money, bonds and equities.

It was further part of the scheme to defraud that the defendant KENNER obtained mortgage loans on properties purchased with the Investors' money and subsequently diverted the loan proceeds to entities unrelated to the Hawaii land development project, as well as to bank accounts that KENNER and CONSTANTINE controlled.

In or about August 2006, Lehman Brothers Holdings, Inc. ("Lehman") agreed to finance the development of the Hawaii parcels that were purchased using the Investors' money. As part of the financing agreement, Lehman made a $6.8 million payment to a company that the defendant KENNER controlled and a $6.9 million payment to a company that the defendant CONSTANTINE and another individual, whose identity is known to the Grand Jury, controlled. KENNER and CONSTANTINE unlawfully diverted certain money from the Lehman loan proceeds for

unauthorized purposes, including for their personal benefit.

(SI at ¶¶ 8-10.)

Constantine argues that, "[a]s to the Hawaii investments, there was no evidence offered at the trial showing that Constantine had a role in causing investors to invest in the project, or in establishing the lines of credit, and indeed it was confirmed that Constantine did not meet the investors until years after the investment." (Constantine's Mot. Br. at 3.) He points to portions of the government's summation to assert that the "Government itself recognized the lack of any evidence connecting Constantine to Kenner's dealings with investors for the Hawaii land developments" and instead relied on "mere association" to inculpate Constantine in the Hawaii Project fraud—a theory that "was insufficient both as a matter of fact and a matter of law." (Id. at 4-5.) Specifically, Constantine asserts that "the Government's painting of Constantine's conduct with Urban Expansion as part of a fraud towards the investors, was unsupported by any evidence . . . because Constantine had nothing to do with inducing the investors to invest in Hawaii developments . . . ." (Id. at 6.)

In response, the government argues that

[t]estimony and documents showed that Constantine spearheaded the creation of the Urban Expansion Loan that permitted him and Kenner to extract millions from the Hawaii Project; bank records and business records showed that Constantine obtained a steady stream of proceeds from that loan and other aspects of the Hawaii Project; and testimony and documents showed that Constantine was involved in efforts to cover up the Hawaii fraud.

(Gov't Resp. to Defs.' Post-Trial Mots. ("Gov't Opp'n Br."), ECF No. 370, at 24.) The Court agrees.

Setting aside the Urban Expansion and Lehman Brothers loans, there was evidence at trial of payments from Little Isle IV and Ula Makika—Hawaii Project entities controlled by Kenner—to Constantine and his company CMG. For instance, Manfredi testified that bank records showed several transfers of funds intended for the Hawaii Project to CMG, including a $130,000 wire on December 30, 2004 and a $37,500 wire on April 21, 2005—both of which came from Little Isle IV. (Tr. at 2961-63; GX-1751.) He said that, to his knowledge, Constantine did not perform any work on the Hawaii Project that would have entitled him to such payment. (Tr. at 2962.) Moreover, Petrellese testified that, from December 1, 2004 through March 31, 2006, $247,500 was transferred from Little Isle IV's Northern Trust bank account to CMG. (*Id*. at 3933-34; GX-41.) He also said that, from December 2004 to September 2005, CMG received a net amount of $1,000,900 from Little Isle IV and Ula Makika. (Tr. at 3934; GX-41-B.) Similarly, when asked about how Constantine paid for Untiech's services, Stewart testified that Constantine told him about "a deal that he had in Hawaii and a deal that he had in Mexico, always assuring me that when those deals came to fruition, everything was going to be great and there would be plenty of money for everybody." [9] (Tr. at 3675.)

Thus, contrary to Constantine's contention that the government improperly conflated Kenner's conduct with his own, a reasonable juror could find, beyond a

reasonable doubt and based on these transferred funds, that Kenner and Constantine had a "tacit understanding" to use the Hawaii Project investments for their own benefit. *Nusraty*, 867 F.2d at 763; *see also Torres*, 604 F.3d at 66 ("Both the existence of a conspiracy and a given defendant's participation in it with the requisite knowledge and criminal intent may be established through circumstantial evidence."); *In re Terrorist Bombings*, 552 F.3d at 113; *United States v. Friedman*, 300 F.3d 111, 126 (2d Cir. 2002) (holding that receiving a share of the profits from the conspiracy constitutes circumstantial evidence of knowledge of and intent to participate in conspiracy).

It is of no moment that several of the Hawaii Project investors testified that they did not know of Constantine's involvement in that endeavor. (*See, e.g.*, Tr. at 2164-2165 (Sydor); *id*. at 2724 (Rucchin); *id*. at 4851-4852 (Gonchar testifying: "I wasn't discuss money [sic] going from Hawaiian deal to Constantine Management Group.").) As noted, "[i]n cases of conspiracy, deference to the jury's findings is especially important . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *Hawkins*, 547 F.3d at 70. Indeed, a reasonable juror could infer that Constantine dissembled his role in the Hawaii Project conspiracy based on the investors' ignorance and evidence of backdated consulting agreements with forged signatures that purported to pay CMG for work on behalf of Little Isle IV (*see* GX-5104 (December 15, 2004 and June 1, 2006 consulting agreements); Tr. at 992-94 (Kaiser's

---

[9] To the extent that Constantine argues that these payments were for legitimate work that he performed in connection with the Hawaii Project, a rational juror, as discussed *infra*, could have rejected that argument

based on the trial evidence, including, *inter alia*, the testimony regarding Constantine's efforts to conceal his role in the fraud, such as by helping to forge consulting agreements.

testimony that his signature was inauthentic); *id*. at 3622-29 (Osborn's testimony that Kaiser's signatures were not genuine); *id*. at 4676-77 (Kenner's acknowledgement that the agreements were backdated).) *See, e.g.*, *United States v. Davis*, 690 F.3d 127, 133 (2d Cir. 2012) (defendant's efforts to conceal his role in the conspiracy constituted evidence of knowledge and participation).

Moreover, although Constantine is correct that several witnesses testified that he was not involved in opening or managing the Northern Trust lines of credit (*see, e.g.*, Tr. at 811 (Mrs. Peca); *id*. at 922-23 (Mascarella)), the "government need not show that the defendant knew all of the details of the conspiracy, 'so long as he knew its general nature and extent,'" *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008) (quoting *United States v. Rosa*, 17 F.3d 1531, 1543 (2d Cir. 1994)). Indeed, "'a single act may be sufficient for an inference of involvement in a criminal enterprise of substantial scope at least if the act is of a nature justifying an inference of knowledge of the broader conspiracy.'" *Id*. (quoting *United States v. Tramunti*, 513 F.2d 1087, 1112 (2d Cir. 1975)); *see also United States v. Needham*, 377 F. App'x 84, 87 (2d Cir. 2010) (holding that a defendant need not "participate in, or even agree to, every act undertaken on behalf of the alleged conspiracy in order to be culpable as a member" (citing *United States v. Bernstein*, 533 F.2d 775, 792-93 (2d Cir. 1976)). Instead, a

> single conspiracy may be found where there is mutual dependence and assistance among the participants, a common aim or purpose or a permissible inference, from the nature and scope of the operation, that each actor was aware of his part in a larger organization where others performed

> similar roles equally important to the success of the venture.

*United States v. Vanwort*, 887 F.2d 375, 383 (2d Cir. 1989).

Based on the evidence at trial, a reasonable juror could find that Constantine played such a part in the Hawaii Project. In addition to the remuneration discussed above, Constantine was instrumental in securing the Urban Expansion loan. Grdina testified that that loan had a pre-payment penalty of $2 million, which he said was Constantine's idea. (Tr. at 2371-74; GX-3811.) Moreover, Grdina said that bank records showed that CMG received $330,000 on or about October 31, 2005 from an account that held Intrigue's $3.5 million contribution to the Urban Expansion loan, and Grdina testified that CMG was not owed any fee or payment associated with the Urban Expansion loan at that time. (Tr. at 2377-78; GX-3819-A.) Grdina further testified that the Urban Expansion loan was fully re-paid on August 14, 2006, in part with proceeds from the Lehman Brothers loan for a total of $6,936,000. (Tr. at 2378-79.) He said that payment included a portion of the pre-payment penalty, and Grdina testified that "Intrigue Investment Company received 70 percent of it, $4,855,000, and Constantine Management Group received 30 percent which was approximately $2,081,000." (*Id*. at 2379-80.) However, Grdina said that he later learned that Constantine never actually contributed $1.5 million to the Urban Expansion loan. (Tr. at 2380.) In addition, Wayne testified that a little over $2 million of the $6.9 million in proceeds from the Lehman Brothers settlement went to CMG, followed by outgoing transfers to, *inter alia*, Kenner for the payment of a personal loan and to Constantine for the payment of personal expenses, including $130,000 to Unitech; $100,000 for a cash withdrawal; $17,500 to

Unique Auto Sports; $115,802.96 to Playboy; and $175,000 to Vegas Marketing Promotions. (*Id*. at 4000-01; GX-Chart-7.)

In sum, the Hawaii Project evidence showed a long-running and multi-faceted scheme in which Constantine played an integral role by (1) siphoning funds intended to finance that development; (2) manufacturing a fraudulent pretext for those payments; and (3) securing additional funding for the Hawaii Project via loan proceeds that he subsequently diverted to his and Kenner's benefit. *See Needham*, 377 F. App'x 84 at 87. Thus, Constantine's reliance on *United States v. Loveland*, 825 F.3d 555 (9th Cir. 2016), is misplaced. There, the Ninth Circuit overturned a conviction for conspiracy to distribute narcotics due to insufficient evidence of an agreement between the appellant and another group of defendants in the underlying case, holding that "[t]here was no testimony supporting or implying any involvement by anyone in the Sanchez group with whatever reselling [the appellant] might have been doing." *Id*. at 558. In contrast, both Constantine and Kenner dissipated Hawaii Project money, as well as the Lehman Brother payoff of the Urban Expansion loan, for their personal use. Moreover, evidence showed that defendants collaborated to conceal Constantine's role in that scheme via forged contracts. Viewing this evidence in its totality and in a light most favorable to the government, a rational juror could conclude beyond a reasonable doubt that Constantine knew of and participated in the Hawaii Project object of the conspiracy charges, and that he and Kenner had an agreement to coordinate efforts to enrich themselves at the expense of outside investors. *See United States v. McGinn*, 787 F.3d 116, 124 (2d Cir. 2015) ("Here, the government adduced sufficient evidence that defendants knowingly and willingly entered into a conspiracy to defraud investors.

Particularly probative in this regard was the evidence concerning the defendants' joint efforts to divert funds, conceal losses through the creation of false accounting records, and the submission of false documents . . . ."). Accordingly, Constantine's motion for a judgment of acquittal on Counts One and Nine of the superseding indictment is denied.

ii. Eufora

In addition, the evidence pertaining to Eufora constituted an independent basis for a rational juror to find beyond a reasonable doubt that Constantine was guilty of the conspiracy charges.

The superseding indictment alleged:

It was a further part of the scheme to defraud that between February 2008 and May 2009, the defendant KENNER convinced John Does 2 through 4, John Doe 8 and John Doe 9 to invest money in Eufora, in exchange for an ownership interest in the company, by representing to each of them that Eufora was a promising company with great potential for growth. The defendants KENNER and CONSTANTINE then unlawfully diverted certain money for unauthorized purposes, including for their personal benefit.

It was a further part of the scheme to defraud that between December 2008 and May 2009, the defendant KENNER convinced John Doe 4 and John Doe 8 to invest money in Eufora, in exchange for an ownership interest in the company. The defendant KENNER directed Co-Conspirator 1, an individual whose identity is known to the Grand Jury, to divert certain money for

unauthorized purposes, including for KENNER and CONSTANTINE's personal benefit.

It was a further part of the scheme to defraud that between November 2009 and December 2009, the defendants KENNER and CONSTANTINE convinced John Doe 11 to invest money in Eufora, in exchange for an ownership interest in the company. The defendant CONSTANTINE then unlawfully diverted certain money for unauthorized purposes, including for his personal benefit, and disavowed John Doe 11's ownership interest in Eufora.

(SI at ¶¶ 12-14.) Constantine argues that there was insufficient evidence to prove that he participated in the Eufora object of the conspiracy charges because "[i]t was Kenner, not Constantine, who pitched to Kenner's clients the idea of investing in Eufora and induced the investments by the investors listed in the conspiracy count," and "[n]o witness at trial ever described Constantine as acting as their financial advisor, or described conduct that could be characterized as aiding and abetting Kenner in inducing the investments." (Constantine's Mot. Br. at 7-8 (footnote omitted).)

The government responds that sufficient evidence linked Constantine to the Eufora conspiracy by virtue of "[b]ank records and business records [which] showed that Constantine permitted his small company— the company he founded and led—to be used as a cover for himself and Kenner (in turn) to steal money from the investors," as well as evidence "that Constantine personally benefited from the proceeds of nearly all of the investments." (Gov't Opp'n Br. at 25-26.) In addition, the government contends that "recordings and text messages showed

that Constantine coordinated with Kenner about the timing and amount of money that needed to be raised from investors and [that Constantine] knew about all of the money coming into the CMG and Eufora accounts." (*Id*. at 26.) Finally, "testimony and documents showed that Constantine made efforts to cover up the Eufora fraud." (*Id*.) The Court agrees.

As with the Hawaii Project, the evidence at trial demonstrated that Constantine routinely siphoned Eufora investments to cover his personal expenses. Several Eufora investors testified that their investments in that company went to CMG (*see, e.g.*, Tr. at 675 (Mrs. Peca); *id*. at 1322-23 (Kaiser); *id*. at 2172-73 (Sydor)), and Gonya said that, during an April 23, 2009 deposition, Constantine testified, *inter alia*, that (1) Eufora and his racing programs were not profitable; (2) Kenner was not involved in any of Constantine's businesses; (3) CMG did not, at that time, have any assets; and (4) he used CMG's bank account to pay for personal expenses like car payments and mortgages (*id*. at 1289-95; GX-8021-R (deposition transcript)). In addition, several witnesses and documentary evidence substantiated Constantine's use of CMG's and Eufora's funds to pay personal expenses that was not disclosed to investors. (*See generally* GX-Charts 10–20.)

For instance, Gonya testified that, as payment for the legal work that his law firm performed for Constantine, the firm received $13,377.57 on or around December 12, 2009 and $15,000 on or around December 15, 2009. (Tr. at 1286-88; GX-3321.) He further testified that those two transfers came from Alliance Bank on behalf of Eufora. (Tr. at 1286-88; GX-3321.) In addition, Privitello reviewed statements for the Richards Escrow Account and said that they showed outgoing transfers of $155,000 to AZ Avalon on

December 7, 2009 and $50,000 to Eufora on December 8, 2009. (*Id*. at 1455-56; GX-1101.) Moreover, Eufora's bank account statement showed a December 2009 transfer of $15,000 to Carey Rodriguez Greenberg, Gonya's law firm. (Tr. at 1456-57; GX-1218.) Privitello testified that he did not authorize that his Eufora investment be used to pay legal fees for Constantine's personal lawyer. (Tr. at 1457.) Likewise, Bailey testified that JBAZ received a $42,000 payment from AZ Avalon in or around December 2009 that was pre-dated by a $43,000 transfer from Eufora to AZ Avalon. (Tr. at 1739-40; GX-1310.) Similarly, McDonald said that Playboy's records showed that all invoices sent to Constantine by Playboy were paid by funds transferred from bank accounts belonging to CMG and Kenner. (Tr. at 1796-97; GX-2726.)

Moreover, Wayne testified as follows with respect to the summary charts he created depicting cash flows from Eufora to Kenner and Constantine:

Q. I'm going to turn your attention to Chart 10. What happened to the money that Mr. Peca sent for Eufora?

A. It goes to CMG, Tommy Constantine account.

Q. And what happened that same day?

A. The same amount is then transferred over on that same day to Phil Kenner.

Q. What's the amount?

A. $100,000.

Q. Turning to Chart 11. What happens to the money that Mr. Nash sent?

A. It goes to CMG, Tommy Constantine account.

Q. And what happens to the money after that?

A. It goes to Wampler, Buchanan law firm, Kinetic Speed Shop, and Phil Kenner.

Q. Did you review invoices for Wampler and Kinetic Speed Shop?

A. I did.

Q. Can you describe generally what those expenses are for?

A. Wampler was for, related to a lawsuit involving Tommy Constantine and – in Florida and Kinetic Speed Shop, has to do with cars.

(Tr. at 4004-05; GX-Chart-9–11.) In addition, Wayne reviewed a text message conversation that showed that Constantine and Kenner discussed using Eufora funds to cover personal expenditures. (Tr. at 4005-06; GX-203-A and GX-204-A.) During that conversation, which is dated April 24, 2008, Kenner tells Constantine, "I'm sending CMG $100K today. Please send the extra $25K back to me." (GX-203-A and GX-204-A.) Constantine responds, "$25K? I need $40K for lawyers and $40K for GT car. Is that Eufora $?" (*Id*.) Kenner then says, "Yes," and Constantine replies, "Are you cool if I just sent the $17k? I'm sorry to nickel and dime you but I have to lay out 80 straight away and I don't even have enough to get to

the meeting in Cabo." (*Id.*) Kenner responds, "No problem." (*Id.*)

Similarly, other text messages[10] between Kenner and Constantine, as well as contemporaneous wire transfers from Eufora investors, evince an agreement by defendants to use Eufora money for their personal benefit. As discussed, on April 7, 2008, Peca invested $100,000 in Eufora (Tr. at 676-77; GX-1706 and GX-Chart-10), and that same day, Kenner texted Constantine, "The $100 is in your account" (GX-7401). That transaction was followed by a $100,000 transfer from CMG to Kenner. (Tr. at 676-77; GX-1706 and GX-Chart-10.) In addition, on July 7, 2008, Constantine texted Kenner, "If you can get me $ in the next 48 hours, I will go to [U]zbekistan on Wed." (GX-7416.) The following day, Sydor wired $50,000 to CMG, which was followed by a $28,000 payment to Playboy. (Tr. at 2172-73; GX-1709 and GX-Chart-12; *see also* GX-Chart-13 (depicting a $200,000 transfer from Ranford to CMG on July 9, 2008 followed by payments to, *inter alia*, Playboy and Kenner).) Likewise, on January 31, 2009, Constantine asked Kenner, "Any way to get Tom [Baker ("Baker")[11]] something small (like $5k) for Moreau case?" (GX-7448), and on February 20, 2009, he again told Kenner that Baker "wants $5k" (GX-7449). On February 19, 2009, Rucchin wired $100,000 to Eufora, which was followed by a same-day transfer of $100,000 from Eufora to the Wachovia Account, and on February 25, 2009, Gaarn wired $5,000 to Baker. (GX-Chart-16; *see also* GX-2303 (Wachovia Account statement depicting February 25, 2009 outgoing transfer of $5,000 to "TOM BAKER" with reference of "TOMMY CONSTINTINE [sic]").) Moreover, throughout 2008 and 2009, Constantine sent Kenner numerous text message indicating that he was in dire financial straits and asking for money. (*See generally* GX-7401–7455; *see, e.g.*, GX-7406 (May 8, 2008 text from Constantine stating, "I'm in forclosure [sic] with no remedy in 2 hours and 45 minutes. I'm losing F***ing House dude!"); GX-7409 (May 21, 2008 text from Constantine stating, "I need $48K TODAY or I'm finished."); GX-7413 (undated text from Constantine stating, "Im [sic] going down in flames bro. I told you this was going to happen. My only option is to do a value load which will f*** eufora tomorrow but I need to deal with this now."); GX-7414 (July 1, 2008 text from Constantine stating, "I need 30K TOMORROW. Anything you can do would be critical to my survival."); GX-7444 (text from Constantine on or around December 30, 2008, stating, "Can you wire CMG a little dough? It's -$220.").)

Finally, in his August 2010 conversation with Kenner at Home Depot, Constantine indicated that he was aware of the Eufora transactions involving Gaarn and said that he had tried to provide "cover" for Gaarn and others:

> Do you know the sh**storm that's gonna come down on you if this thing goes to the mat? Do you have any idea? Do you remember the things that happened? I mean, you think that this is only to protect me? I'm protecting you; I'm protecting Tim too. I'm protecting everybody. And you think that I'm the enemy and you think that you're gonna cut a deal to f*** me up? They're not gonna f***ing pinch the guy who drove the getaway car, they're gonna pinch the guy that f***ing robbed the bank.

---

[10] These text message were introduced into evidence through the testimony of FBI Special Agent Robert Crisalli. (*See* Tr. at 3969-72.)

[11] As discussed more fully *infra*, Baker was Kenner's civil counsel in an Arizona lawsuit that Kenner filed against Jowdy.

. . .

And I know why they're playing so hardball with Tim, because he has liability too. What do you think is gonna happen when seven hundred thousand dollars shows up, going from the players that already bought it the first time, to the bank account, back to Tim Gaar – to Eufora's bank account – back to Tim Gaarn's account, to your account? Like, this is not gonna look good, right?

. . .

And Tim? Tim's got friends in high places, but Tim has liability, which is why these people are pushing so hard. Because when I was trying to cover Tim . . . I accidentally got sh** that I wasn't – you think I was trying to burn you but I wasn't trying to burn you.

(GX-4500 and GX-4500-T.)

In light of this substantial record, the Court concludes that a rational juror could find, beyond a reasonable doubt, that Constantine participated in the Eufora object of the conspiracy charges. As discussed *supra*, it is not dispositive that Kenner, and not Constantine, approached Peca, Sydor, Rucchin, Ranford, Nash—the "John Does" listed in paragraph 12 of the superseding indictment—and convinced them to invest in Eufora.[12] Again, a defendant need not

"participate in, or even agree to, every act undertaken on behalf of the alleged conspiracy in order to be culpable as a member," *Needham*, 377 F. App'x at 87, and "a single act may be sufficient for an inference of involvement in a criminal enterprise of substantial scope at least if the act is of a nature justifying an inference of knowledge of the broader conspiracy," *Huezo*, 546 F.3d at 180. The key inquiry is whether there was "mutual dependence and assistance" between Kenner and Constantine such that they shared "a common aim or purpose," or whether the evidence "creates a permissible inference, from the nature and scope of the operation, that each actor was aware of his part in a larger organization where others performed similar roles equally important to the success of the venture." *Vanwort*, 887 F.2d at 383.

Here, viewing all the evidence in the light most favorable to the government and drawing all permissible inferences in its favor, a rational juror could conclude, based on bank records and witness testimony, that Constantine regularly diverted money intended for Eufora to pay his personal expenses out of CMG's and Eufora's coffers. In particular, documentary evidence shows that Constantine directly solicited an investment from Privitello—the "John Doe" referenced in paragraph 14 of the superseding indictment—and subsequently sent funds to Gonya's law firm.[13] Such evidence indicates

---

[12] In any case, Constantine's role in the Eufora conspiracy was not limited to behind-the-scenes funds transfers. Mrs. Kaiser testified that she invested $70,000 from her savings in Eufora after speaking with Constantine, who told her that Eufora "was going to be very, very big" and that she would "make a lot of money." (Tr. at 935-36.) Moreover, her son said that he met with Constantine, who told him that this patent was valuable and that he was looking for investors. (*Id*. at 1013-15.) Kaiser testified that he decided to invest $200,000 in Eufora via two wires sent to Richards in or around December 2009. (*Id*. at 1015, 1057-58; GX-1101.) He said that he solicited those

funds from other individuals, including Mrs. Kaiser, and Kaiser said that he relied on Constantine's representations about Eufora to tell them that the investment was a great opportunity. (Tr. at 1059-60.)

[13] As disused further *infra*, the Privitello investment is the basis for the wire fraud charges in Counts Five and Six. The jury acquitted Kenner of those substantive offenses, and Constantine therefore argues that the jury's verdict "confirms the insufficiency of the evidence supporting any finding by the jury with

Constantine's membership in a conspiracy. *See, e.g.*, *Friedman*, 300 F.3d at 126 (holding that a "recei[pt of] a share of the profits from the conspiracy" constitutes "[c]ircumstantial evidence of knowledge and specific intent sufficient to sustain a conviction"); *United States v. Kahale*, No. 09-CR-159 KAM, 2010 WL 3851987, at *18 (E.D.N.Y. Sept. 27, 2010) ("[A]lthough no evidence showed [the defendant's] direct participation in soliciting the victim's] investment, the fact that [the defendant] shared and enjoyed the fruits of that investment supports the jury's permissible inference that [the defendant] . . . intended to defraud [the victim] . . . ."), *aff'd sub nom. United States v. Graham*, 477 F. App'x 818 (2d Cir. 2012). In addition, the text messages and Home Depot audio recording [14] demonstrate that Constantine discussed using Eufora money to pay his personal expenditures with Kenner and concealing Gaarn's involvement in those

diversions. Such coordination also evinces a conspiratorial agreement. [15] *See McGinn*, 787 F.3d at 124; *In re Terrorist Bombings*, 552 F.3d at 113 ("A defendant's knowing and willing participation in a conspiracy may be inferred from . . . a lack of surprise when discussing the conspiracy with others. It may also be established by evidence that the defendant participated in conversations directly related to the substance of the conspiracy . . . .").

Therefore, the Court also concludes that the government adduced sufficient evidence to prove Constantine's knowing participation in the Eufora object of the conspiracy charges beyond a reasonable doubt.

### iii. Global Settlement Fund

Finally, even assuming that there was insufficient evidence to prove Constantine's

---

[14] Constantine argues that the "transcript of the Home Depot tape does not support the government's interpretation of it as an admission by Constantine that he helped cover up fraud with respect to Eufora," but rather shows that Constantine was "highlighting *Kenner's* individual liability, and trying to end the litigation over control of Eufora." (Constantine's Reply in Supp. of Mot. for New Trial and Mot. for J. of Acquittal ("Constantine's Reply Br."), ECF No. 382, at 5-6.) Insofar as portions of that recording indicate that Constantine sought to exculpate himself and incriminate Kenner, it is the role of the jury, and not the Court on a Rule 29 motion, to "choos[e] among

respect to the second object of the conspiracy." (Constantine's Mot. Br. at 12.) However, as noted, the "government need not show that the defendant knew all of the details of the conspiracy, so long as he knew its general nature and extent." *Huezo*, 546 F.3d at 180. Accordingly, the jury's conclusion that Kenner was not culpable for those particular incidents of wire fraud does not negate his role in the overarching conspiracy (which, as Constantine concedes, involved soliciting investments from several victims) or establish that there was no agreement between Kenner and Constantine regarding the general purpose of the Eufora scheme—namely, to convert investments to defendants' personal use.

permissible competing inferences." *Florez*, 447 F.3d at 154-55; *see also Guadagna*, 183 F.3d at 130 (holding that court must bear in mind that Rule 29 "does not provide [it] with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury"). Viewing the Home Depot recording in its totality and in conjunction with the other evidence of collaboration between Kenner and Constantine, *Rosenthal*, 9 F.3d at 1024, a rational juror could conclude that Constantine sought Kenner's assistance in dissembling the Eufora conspiracy.

[15] Constantine also argues that the jury could not have convicted him on the conspiracy charges because "Kenner made allegations of criminal behavior by Constantine relating to Eufora and sought to oust Constantine from any role in Eufora." (Constantine's Mot. Br. at 12.) However, as the government notes, Kenner did not become involved in that "hostile takeover" until 2010 (Tr. at 4366-69), and as set forth *supra*, Constantine and Kenner worked together to divert funds from Eufora in the years prior. Accordingly, a rational juror could find that Constantine and Kenner were involved in a criminal conspiracy prior to any disagreement over the direction of the company.

participation in the Hawaii Project and Eufora objects, the Court would not vacate the convictions for Counts One and Nine because the government proved beyond a reasonable doubt that he was involved in the Global Settlement Fund scheme.

The superseding indictment states that:

It was a further part of the scheme to defraud that between May 2009 and February 2010, the defendants KENNER and CONSTANTINE defrauded certain of the Investors to contribute to an entity known as the GSF, which KENNER and CONSTANTINE represented to be a legal defense fund. The defendants KENNER and CONSTANTINE then unlawfully diverted certain money for unauthorized purposes, including for their personal benefit.

(SI at ¶ 15.)

Constantine admits that, "[i]n contrast to the other alleged objects of the conspiracy, which generally related to Kenner's conduct, for the GSF Constantine did play a significant role." (Constantine's Mot. Br. at 14.) Nevertheless, he contends that there was insufficient evidence of fraudulent conduct by Constantine and insufficient evidence that he had an agreement with Kenner. (*Id*.) Constantine argues that (1) none of the Global Settlement Fund contributors disputed the broad purposes of that enterprise; (2) "Gonchar specifically approved Constantine's use of Gonchar's deposits into Richards' account, including his $250,000 contribution to the GSF, for personal use, so long as he was repaid"; and (3) "Semple, a certified public accountant hired by Gonchar to verify that the GSF money was used for its intended use, concluded that the funds had been used for

the intended purpose, though there were certain expenses for which he could not render a conclusion due to an absence of records." (*Id*. at 14-17 (footnote and citation omitted).) In its opposition brief, the government responds that Constantine advanced all of these arguments at trial, and the jury rejected them. (Gov't Opp'n Br. at 27-31.) The Court agrees with the government and concludes that a rational juror could find Constantine guilty of participating in this objective of the conspiracy beyond a reasonable doubt.

First, while several witnesses did state that they recognized that the Global Settlement Fund had other purposes besides funding litigation against Jowdy, such as paying public relations fees and acquiring additional equity in Eufora (*see, e.g.*, Tr. at 781-85 (Mrs. Peca); *id*. at 1820-21, 1875-76 (McKee); *id*. at 1992-93, 2002 (Nash testifying that the Global Settlement Fund's purposes were "very broad"); *id*. at 3141-43 (Berard)), none—aside from Gonchar—said that they permitted their contributions to be used for payment of defendants' personal expenditures. Indeed, the same witnesses said that defendants never discussed such expenses, including Constantine's payments for race cars, with them. (*Id*. at 818-19 (Mrs. Peca); *id*. at 1820-21 (McKee).) Moreover, the e-mails that Constantine references in his brief that sought approval for using the Global Settlement Fund to, *inter alia*, acquire additional shares of Eufora and pay for "settlement costs" were sent to Global Settlement Fund contributors *after* they wired their money to the Richards Escrow Account, and they also do not mention that Constantine intended to use those funds for his own

interests.[16]  For instance, the May 18, 2009 e-mail that Kenner sent the Pecas stated that:

> In addition to the [GSF] paying for various legal fees, PR Agency fees, as well as other protective advances and settlement costs, you will be receiving transfer of membership agreements from [Constantine] for your acquisition of additional interest in Eufora, LLC, as well as your new LLC and operating agreements reflecting your ownership interest in the Avalon Airpark Real Estate Project, the Falcon 10 aircraft, and the two Palms Place condominium units.
>
> You may not recall [Constantine] or I mentioning the Palms units in=2 Oour [sic] conversation.  In any case, because Moreau and [Constantine] settled that case as part of the Global Settlement, he has graciously elected to include you as a beneficiary in the significant equity that exists in those two units as part of this transaction.
>
> As we discussed, rather than throwing money away only on legal fees, this strategy which effectively acquires significant assets, while providing a legal remedy, is by far our best solution.

(GX-757.)

However, the evidence at trial showed that the Richards Escrow Account—the repository for the GSF contributions—was the font for many of Constantine's individual ventures.  (*See generally* GX-80, GX-1102, and GX-RR-1.)    Ressler testified that financial records show that Constantine paid $65,000 in legal fees for the Playboy transaction via a May 26, 2009 wire from the Richards Escrow Account.  (Tr. at 1519-20; GX-3396-R.)    Likewise, Lagarde testified that, on or about May 19, 2009, her prior law firm received a wire of $10,000 from the Richards Escrow Account as payment for legal work performed for Constantine.  (Tr. at 3402-03; GX-1102.)   In addition, Edenholm said that, on or around June 16, 2009, he purchased Constantine's Arizona home and allowed Constantine to continue living there in return for $3,000 in monthly rent.  (Tr. at 1659-60; GX-3608.)  Edenholm reviewed his bank account statement and said that an incoming $18,000 wire dated November 5, 2009 represented payment for six months of Constantine's rent and came from the Richards Escrow Account.  (Tr. at 1660-61, 1669-70; GX-3059 and GX-3060.)  There is no evidence in the record that any of the government witnesses knew of or authorized these expenditures.  Moreover, Richards said that all disbursements from the Richards Escrow Account, including those to fund Constantine's personal lawsuits, were authorized by Constantine.  (Tr. at 3805-16.)  Richards further testified that Constantine never directed him as to which funds in the account were designated for the Global Settlement Fund.  (*Id*. at 3817.)

Second, defense witness Gonchar testified that he authorized Constantine to use his initial $250,000 Global Settlement Fund contribution for Constantine's personal use and that he subsequently made additional

---

[16] The government further argues that the Global Settlement Fund contributors never acquired the assets mentioned in these e-mails, including a Falcon 10 plane, and that there are no reliable records showing investors' actual interests in Eufora.  (Gov't Opp'n Br. at 288-29.)    Given the plethora of personal expenditures by Constantine using funds from the Richards Escrow Account, and the absence of any evidence that the victims authorized those transactions, the Court need not, and does not, address these arguments.

wire transfers of $749,985; $362,355.58; and $138,000 to the Richards Escrow Account. (*Id.* at 4805-07, 4817-20, 4826-27.) Gonchar initially said that he did not remember telling Constantine that Constantine could use Gonchar's three subsequent GSF contributions for personal expenses, but he later clarified that it was his "understanding it was like as long as [Constantine was] going to pay it back, [Gonchar did not] mind him using the money [Gonchar] was putting in," which would "include all of the monies that [Gonchar] had put into the Ron Richards' account[.]" (*Id.* at 4823, 4826-27.) As a threshold matter, it was the jury's prerogative to reject Gonchar's testimony that he permitted Constantine to use all of his funds for personal expenditures, especially given his initial answer regarding the three subsequent GSF contributions.[17] *See Arena*, 180 F.3d at 391 (2d Cir. 1999). Moreover, even assuming the truth of those statements, the documentary evidence belies Constantine's implicit contention that Gonchar's GSF investments offset Constantine's diversions from that fund.

After Gonchar contributed $250,000 to the GSF on May 5, 2009, there were outgoing payments from the Richards Escrow Account of (1) $75,000 and $15,000 to Edenholm Motorsports for automobile work performed for Constantine; (2) $65,000 to Sullivan & Cromwell for its representation of Constantine in the Playboy matter; (3) $55,000 to the Arizona Bar Foundation Trust Account for Constantine's personal attorney; (4) $26,677.40 to Carey Rodriguez Greenberg for its representation of Constantine in a commercial litigation matter; (5) $18,000 to Edenholm for Constantine's rent; (6) $10,000 to Earl, Curley & Lagarde P.C. for legal work performed for Constantine; and (7) $2,400 to Dickinson Architects, Inc. (Tr. at 1660-61, 1670-71; GX-80, GX-767, and GX-1102.) There was no evidence at trial that any other GSF contributor authorized these expenditures or that they were in any way related to litigation against Jowdy or the Global Settlement Fund's other purported purposes. Moreover, these expenses totaled $267,077.40 and thus exceeded Gonchar's $250,000 investment by $17,077.40.[18]

Insofar as Constantine contends that Gonchar's subsequent contributions account for that differential, Gonchar's testimony and the bank records contradict that argument. Gonchar said that his September 9, 2009 deposit of $749,985 was used to pay a loan that Constantine had taken out to secure

[17] Because Constantine presented a defense case, the jury was "entitled to conclude that [his] version of the events was false and thereby infer [his] guilt," *United States v. Friedman*, 998 F.2d 53, 57 (2d Cir. 1993), or draw inferences in favor of the government, *see United States v. Eisen*, 974 F.2d 246, 259 (2d Cir. 1992) ("[T]he jury is free to draw negative inferences from an untruthful witness's testimony as long as there is affirmative testimony to supplement or corroborate those negative inferences.").

[18] For the purpose of this calculation, the Court highlighted those payments that clearly constituted personal expenditures by Constantine. However, there are a multitude of additional disbursements from the Richards Escrow Account—including a $450,000 payment to Edenholm Motorsports on June 2, 2009 for

the purchase of an aircraft—that arguably do not fall within the GSF's ambit. (*See* GX-80, GX-767, and GX-1102.) That particular transaction was for a Cessna 414 airplane (Tr. at 1657, 2039, 5451; GX-767), and Juneau testified that he received that aircraft from Constantine pursuant to a settlement agreement (Tr. at 332-33). As the government acknowledges, Nash said that he understood from a conversation with defendants that the GSF would also be used to "get rid of some of the bad apples," including Juneau. (Tr. at 1919-22.) Kenner also testified that one of the objectives of the Global Settlement Fund was to buy out Juneau. (Tr. at 4925-26.) However, a reasonable juror could have rejected or given little weight to that testimony and determined that the other GSF contributors did not authorize that payment, as well as other payments, from the Richards Escrow Account.

patents for Eufora and to increase Gonchar's stake in that company (Tr. at 4820-22), and bank statements for the Richards Escrow Account show outgoing transfers on September 9, 2009 of $500,000 to Neptune for a "Eufora loan payoff" and $250,000 to Eufora itself (GX-80, GX-767, and GX-1102). Thus, following those expenses, no additional funds were available to cover Constantine's personal outlays. Similarly, following Gonchar's November 6, 2009 contribution of $362,355.58—which Gonchar testified was for the purchase of additional Eufora equity—the Richards Escrow Account disbursed, on that same day, payments totaling $387,065, including $250,000 to Eufora. (Tr. at 4822-23; GX-80, GX-767, and GX-1102.) Finally, Gonchar also said that he invested $138,000 on November 30, 2009 to acquire more of Eufora (Tr. at 4823), and that same day, $130,000 was transferred from the Richards Escrow Account to Eufora (GX-80, GX-767, and GX-1102), yielding an $8,000 surplus—not enough to account for the $17,077.40 difference between Gonchar's original contribution and Constantine's subsequent expenses. In sum, even if the jury credited Gonchar's testimony that he authorized Constantine to use all of his Global Settlement Fund investments for personal expenditures, Constantine's withdrawals still eclipsed those deposits.

Finally, Semple's testimony was far from exculpatory. He said that he did not conduct a full forensic audit or issue an official report, and he also relied on information provided by Richards, Kenner, and Eufora. (Tr. at 5520-24.) He further testified that his forensic review did not encompass all of the transactions in the Richards Escrow Account, but rather only those that Richards said pertained to the Global Settlement Fund. (Id. at 5523-24.) In addition, Semple did not have any bank statements or wire transfer records for the Richards Escrow Account when he conducted the forensic review. (Id. at 5524-25.) As a result, and as Constantine acknowledges, Semple did not make any determination as to whether the Global Settlement Fund was used for its intended purpose because his team "never got copies of some of the bills and other documents that [they] requested from Mr. Richards." (Id. at 5528-29.) Accordingly, a rational juror could have discounted or accorded little weight to Semple's testimony that he uncovered nothing untoward about the GSF disbursements.

Thus, even crediting the testimony that the Global Settlement Fund's purposive ambit extended beyond financing litigation against Jowdy to encompass additional goals including asset acquisition, there was no evidence at trial (save for Gonchar's testimony) that GSF contributors authorized Constantine to spend their money on his personal pursuits. Even accounting for Gonchar's and Semple's testimony, when viewing the entire record and drawing all inferences in the government's favor, a rational juror could conclude that Constantine participated in the Global Settlement Fund conspiracy based on his repeated and undisclosed use of the Richards Escrow Account for his individual gain through unauthorized diversions that exceeded Gonchar's investments. The jury could have rationally rejected Gonchar's testimony, or, even assuming *arguendo* that the jury credited Gonchar's testimony, the jury could have still rationally found that it could not explain the personal expenditures that exceeded Gonchar's investments. *See Guadagna*, 183 F.3d at 130 (holding that court must bear in mind that Rule 29 "does not provide [it] with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury").

\*\*\*

For the foregoing reasons, the Court finds that there was sufficient evidence for the jury to convict Constantine beyond a reasonable doubt for conspiring to commit wire fraud and money laundering pursuant to Counts One and Nine of the superseding indictment based on his participation in the Hawaii Project, Eufora, and/or GSF objects. Accordingly, the Court denies Constantine's Rule 29 motion with respect to those charges.

### 2. Counts Two through Four: Wire Fraud

Constantine also argues that he is entitled to a judgment of acquittal on the wire fraud charges in Counts Two through Four of the superseding indictment because "[i]t is beyond dispute that none of the transactions in counts 2-4 involved Constantine in any way. Those transactions were a wire from Gaarn's Wachovia account to Kaiser's account (Count 2); a wire from Kaiser's account to Kenner's account (Count 3); and a wire from Kenner's account to Kaiser's account (Count 4)." (Constantine's Mot. Br. at 8.) For the reasons set forth below, the Court concludes that a rational juror could find Constantine guilty beyond a reasonable doubt on all of these charges based on a *Pinkerton* theory of culpability.

### a. Applicable Law

As the Second Circuit has explained: "The 'essential elements of a mail or wire fraud violation are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) the use of the mails or wires to further the scheme.'" *United States v. Shellef*, 507 F.3d 82, 107 (2d Cir. 2007) (quoting *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004)). With respect to the first element, the government must prove "(i) the existence of a scheme to defraud,

(ii) the requisite scienter (or fraudulent intent) on the part of the defendant, and (iii) the materiality of the misrepresentations." *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000) (citations omitted). With respect to the element of fraudulent intent or scienter, "the proof must demonstrate that the defendant had a 'conscious, knowing intent to defraud . . . [and] that the defendant contemplated or intended some harm to the property rights of the victim.'" *Guadagna*, 183 F.3d at 129 (quoting *United States v. Leonard*, 61 F.3d 1181, 1187 (5th Cir. 1995)). Thus, "'[m]isrepresentations amounting only to deceit are insufficient to maintain a mail or wire fraud prosecution.'" *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994) (quoting *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987)). "'Instead, the deceit must be coupled with a contemplated harm to the victim.'" *Id.*

Further, it is a "fundamental tenet of the law of conspiracy," pursuant to the Supreme Court's decision in *Pinkerton v. United States*, that a defendant can be held criminally liable for the reasonably foreseeable acts of his co-conspirator. *United States v. Vario*, 943 F.2d 236, 240 (2d Cir. 1991). As the Second Circuit has explained, "[t]he *Pinkerton* theory permits criminal liability of a conspirator 'for the substantive crimes committed by his co-conspirators to the extent those offenses were reasonably foreseeable consequences of acts furthering the unlawful agreement, even if he did not himself participate in the substantive crimes.'" *United States v. Bala*, 236 F.3d 87, 95 (2d Cir. 2000) (quoting *United States v. Romero*, 897 F.2d 47, 51 (2d Cir. 1990)); *see also United States v. Parkes*, 497 F.3d 220, 232 (2d Cir. 2007) (holding that, with respect to *Pinkerton*, "'a defendant who does not directly commit a substantive offense may nevertheless be liable if the commission of

the conspiracy was reasonably foreseeable to the defendant as a consequence of their agreement'" (quoting *Cephas v. Nash*, 328 F.3d 98, 101 n.3 (2d Cir. 2003))); *accord United States v. Wiley*, 846 F.2d 150 (2d Cir. 1988). "Whether a particular substantive crime is foreseeable and in furtherance of the conspiracy is a factual question to be determined by the jury." *United States v. Bruno*, 873 F.2d 555, 560 (2d Cir. 1989).

Thus, if the jury first concludes that a conspiracy existed and that the defendant knowingly participated in the conspiracy, the jury must next consider whether a particular substantive crime committed by the defendant's co-conspirators was reasonably foreseeable to the defendant and in furtherance of the conspiracy. *See Bala*, 236 F.3d at 95; *accord United States v. Salameh*, 152 F.3d 88, 149 (2d Cir. 1998); *see also United States v. Shi Yan Liu*, 239 F.3d 138, 143 (2d Cir. 2000) (holding that the jury "could consider a *Pinkerton* theory of liability only if they *first* determined that the charged conspiracy existed, and that defendants were members of it"). Accordingly, given this standard, "a defendant may be guilty of a wire fraud violation under a *Pinkerton* theory if: "(1) the defendant conspired to commit [wire fraud]; (2) the [substantive wire fraud offense] was committed in furtherance of the conspiracy; and (3) the offense was a reasonably foreseeable consequence of an act furthering the unlawful agreement." *Rosario v. United States*, 164 F.3d 729, 734 (2d Cir. 1998).

Finally, "[t]o convict a defendant on a theory of aiding and abetting, the government must prove that the underlying crime was committed by a person other than the defendant and that the defendant acted . . . with the specific purpose of bringing about the underlying crime." *United States v. Best*, 219 F.3d 192, 199 (2d Cir. 2000); *see also*

*United States v. Pipola*, 83 F.3d 556, 562 (2d Cir. 1996) ("To show specific intent [to aid and abet] the prosecution must prove the defendant knew of the proposed crime . . . and had an interest in furthering it."); *United States v. Wiley*, 846 F.2d 150, 154 (2d Cir. 1988) (finding that aiding and abetting requires the "specific intent that [the defendant's] act or omission bring about the underlying crime").

b. Analysis

During the trial, the Court inquired as to how the government intended to prove Constantine's culpability with respect to the wire transfers underlying Counts Two through Four, and the government stated that they were "part and parcel of the conspiracy and given the way the money flows back and forth this was essentially Mr. Constantine allowing Mr. Kenner to cash out of Eufora and make some of the money back that he shovels in the direction of Mr. Constantine." (Tr. at 5212.) Accordingly, at the conclusion of the trial, the Court provided the jury with both an aiding and abetting and a *Pinkerton* charge. (Jury Charge at 62-68.)

As discussed below, the Court determines that, although Constantine did not directly participate in any of the wire transfers underlying Counts Two through Four, a rational juror could have convicted him on all of those offenses because each transaction was reasonably foreseeable based on Constantine's conspiratorial agreement with Kenner to defraud Eufora investors. Accordingly, the Court determines that Constantine has failed to meet his "heavy

burden" under Rule 29 and denies his motion with respect to those charges.[19]

In Counts Two through Four, the superseding indictment charged both defendants with wire fraud, in violation of 18 U.S.C. §§ 1343 and 2, for (1) a February 12, 2009 transfer of $30,000 "from an account at Wachovia Bank in Closter, New Jersey to [Kaiser's] TD Bank account in the Eastern District of New York"; (2) a February 26, 2009 transfer of $40,300 "from [Kaiser's] account at TD Bank in the Eastern District of New York to an account in the name of KENNER at Bank of America in Scottsdale, Arizona"; and (3) a May 22, 2009 wire transfer of $25,000 "from KENNER's account at Bank of America in Scottsdale, Arizona to [Kaiser's] Wells Fargo account in the Eastern District of New York." (SI at 7.)

At trial, Kaiser testified that all three transfers pertained to the Paradise Valley and Hermosa Beach properties that he worked on with Kenner,[20] and he said that the February 12, 2009 wire charged in Count Two came from Gaarn and that Kenner told Kaiser that Gaarn owed Kenner money. (Tr. at 1045-51.) Kaiser also said that he immediately returned that $30,000 because Kenner "said it was a mistake, that he needed that money. It should have been sent to him directly." (*Id*. at 1047-48; GX-1603 and GX-1721.) Likewise, Kaiser said that the February 26, 2009 wire charged in Count Three was a reimbursement to Kenner of funds that Gaarn mistakenly sent Kaiser. (Tr. at 1049-50; GX-1724 and GX-1604.)

Further, as Constantine notes, Gaarn testified that he became a managing member of AZ Eufora, which owned a portion of Eufora, in or around 2008 or 2009 based on Kenner's request and as a favor to him because Kenner had previously lent Gaarn money. (Tr. at 2492-95; GX-TG-2.) Gaarn testified that, after opening the Wachovia Account, he transferred money out of it at Kenner's request, and he said that Constantine had nothing to do with the favor that Gaarn performed for Kenner or the Wachovia Account transfers. (Tr. at 2501, 2629, 2632-33.) Accordingly, based on these undisputed facts, Constantine argues that he is entitled to a judgment of acquittal on Counts Two through Four "because every witness – Gaarn, Kaiser, and Kenner – acknowledged that Constantine did not know of, approve or associate himself with" the underlying transactions. (Constantine's Mot. Br. at 11.)

However, as discussed in greater detail in Section III.A.1.ii *supra*, a rational juror could have found, beyond a reasonable doubt, that Constantine participated in the conspiracy to defraud Eufora investors based on, *inter alia*, his use of Eufora and CMG funds for personal expenditures. Thus, the government satisfied the first step of *Pinkerton* by adducing sufficient evidence to show that Constantine knowingly participated in the Eufora conspiracy. *See Bala*, 236 F.3d at 95; *Shi Yan Liu*, 239 F.3d at 143. As a result, Constantine's convictions on Counts Two through Four are valid under *Pinkerton* if the substantive wire fraud offenses were committed in furtherance of the conspiracy

---

[19] Because the Court determines that the government proved Constantine's guilt beyond a reasonable doubt for Counts Two through Four pursuant to a *Pinkerton* theory, it need, and does not address, whether a rational juror could also have found Constantine culpable as an aider and abettor.

[20] As stated *supra* note 5, those property developments were not the subject of any of the fraud charges against defendants. In addition, the government acknowledged that Kaiser was not a victim of the Eufora fraud. (Tr. at 1269.)

and were reasonably foreseeable. *See Rosario*, 164 F.3d at 734.

The Second Circuit has accordingly affirmed wire fraud convictions in cases where the defendant was not directly involved in the underlying transactions because those transactions were part-and-parcel of a larger conspiracy. In *United States v. Zichettello*, 208 F.3d 72 (2d Cir. 2000), "there was no evidence [the defendant] himself used interstate wires in furtherance of the conspiracy" to commit wire fraud; however, the Second Circuit held that "[t]he government need prove only knowledge that a co-conspirator would use the wires in an interstate transmission in furtherance of the conspiracy or that such use of the wires was reasonably foreseeable," and it affirmed the substantive wire fraud conviction on that basis. *Id*. at 105 (citing *United States v. Muni*, 668 F.2d 87, 89 (2d Cir. 1981)). Likewise, in *United States v. Price*, 374 F. App'x 189 (2d Cir. 2010), the defendant argued that his substantive wire fraud conviction could not stand because there was no evidence that the e-mail at issue "was a part of, or in furtherance of, the conspiracy between himself and [the co-defendant] or that he could have reasonably foreseen that the email would be sent." *Id*. at 190-91. The Second Circuit rejected that argument after concluding that the government had proven that the correspondence promoted a continuing conspiracy between the defendants. *Id*. at 191; *see also United States v. Bryser*, 954 F.2d 79, 88-89 (2d Cir. 1992) (affirming convictions for mail and wire fraud based on underlying conspiracy) (citing *United States v. Davis*, 752 F.2d 963, 970 (5th Cir. 1985) (government need not establish that defendant participated in all aspects of a scheme to prove requisite participation for mail fraud conviction)); *United States v. Bernadel*, 490 F. App'x 22, 25 (9th Cir. 2012)

("There was also sufficient evidence to convict Bernadel on a *Pinkerton* theory of liability for the substantive counts of mail fraud (Counts 2-7), wire fraud (Counts 8-14), and bank fraud (Count 15). Although the government did not present evidence directly tying Bernadel to the specific transactions that served as the basis for Counts 2-12 and 14-15, there was adequate evidence to support the conclusion that these transactions were reasonably foreseeable acts committed by codefendants Adorno and Lucero in furtherance of the same overall conspiracy . . . ." (citations and footnote omitted)).

Here, Gaarn, Ranford, and Murray all testified that Ranford's and Murray's Eufora investments were shortly followed by transfers to the Wachovia Account. (*See* Tr. at 2514-24, 2620-23 (Gaarn); *id*. at 2820-33 (Ranford); *id*. at 3490-5000 (Murray); *see also* GX-Charts-14–19.) In addition, Gaarn testified that he made funds transfers from the Wachovia Account to Kaiser at Kenner's direction, including the $30,000 transfer on or about February 12, 2009 charged in Count 2 and the $40,300 transfer on or about February 25, 2009 charged in Count Three. (Tr. at 2620-23; GX-2216, GX-2303, and GX-2305.) Moreover, Gaarn testified that, in or about May 2009, he transferred $95,000 and $85,000 to Kenner from the Wachovia Account. (Tr. at 2520-24; GX-2303, GX-2305, and GX-2306.) In addition, Petrellese said that a chart summarizing transactions pertaining to the Wachovia Account showed that approximately 98 percent of the funds deposited into that account came from Eufora. (Tr. at 3946-47; GX-49.) He further testified that the chart indicated that $381,127 was transferred from the Wachovia Account to Kenner's Wells Fargo and Bank of America accounts, accounting for roughly 55 percent of all outgoing transfers. (Tr. at 3947; GX-49-B.)

Finally, as set forth in Section III.A.1.ii *supra*, Constantine and Kenner engaged in several discussions about using Eufora funds for personal expenditures at or around the time of the wire transfers charged in Counts Two through Four; Constantine used Eufora money for his own expenses during the same period; and Kenner also received Eufora funds from CMG. (*See, e.g.*, GX-Chart 10 (depicting diversion of Peca's Eufora investment from CMG to Kenner); GX-Chart-11 (depicting diversion of Nash's Eufora investment from CMG to Wampler Buchanan and Kenner); GX-Chart-12 (depicting diversion of Sydor Eufora investment from CMG to Playboy); GX-203A and GX-204-A (Constantine telling Kenner via April 24, 2008 text messages, "I need $40K for lawyers and $40K for GT car. Is that Eufora $?").) Moreover, the evidence showed that Constantine received Eufora funds from the Wachovia Account sent by Gaarn (*see* GX-7448 and GX-7449 (Constantine asking Kenner for $5,000 to pay attorney Baker for Moreau case); GX-Chart-16 and GX-2303 (depicting February 19, 2009 wire of $100,000 from Rucchin to Eufora followed by same-day transfer of $100,000 from Eufora to the Wachovia Account and February 25, 2009 transfer of $5,000 to Baker by Gaarn referencing Constantine)), and in the Home Depot audio recording, Constantine indicated an awareness of and efforts to conceal Gaarn's transactions (*see* GX-4500 and GX-4500-T ("I'm protecting you; I'm protecting Tim too. I'm protecting everybody. . . . What do you think is gonna happen when seven hundred thousand dollars shows up, going from the players that already bought it the first time, to the bank account, back to Tim Gaar – to Eufora's bank account – back to Tim Gaarn's account, to your account?")).

In sum, upon viewing the trial evidence in a light most favorable to the government

and drawing all inferences in its favor, a rational juror could conclude that (1) Kenner and Constantine had an agreement to divert Eufora investments to their personal use; (2) the February 12, 2009 transfer of $30,000 from the Wachovia Account to Kaiser (Count Two), the February 26, 2009 transfer of $40,300 from Kaiser to Kenner (Count Three), and the May 22, 2009 wire transfer of $25,000 from Kenner to Kaiser (Count Four) all involved funds obtained from the Eufora victims and thus were in furtherance of defendants' conspiracy; and (3) Constantine could reasonably foresee all of those wire transfers based on his conversations with Kenner regarding Eufora funds, Constantine's own diversion of company assets—including money from the Wachovia Account—and Constantine's statements about Gaarn. Thus, the Court finds that, notwithstanding the absence of any evidence showing that Constantine knew of or was involved in those specific wire transfers, the government adduced sufficient evidence to establish conspiratorial culpability under *Pinkerton* for Counts Two through Four. *See, e.g.*, *Price*, 374 F. App'x at 190-91; *Bernadel*, 490 F. App'x at 25. Accordingly, Constantine's Rule 29 motion is denied with respect to those charges in the superseding indictment.

### 3. Counts Five and Six: Wire Fraud

Finally, Constantine argues that he is entitled to acquittal on the wire fraud charges in Counts Five and Six since (1) the jury acquitted Kenner of those charges, and "that same insufficiency of evidence should have resulted in an acquittal of Constantine as well"; and (2) the government failed to establish that he had the requisite intent to defraud because the "proof showed a business deal gone bad, with a subsequent attempt by Constantine to unwind that deal and return an investment by a hostile investor

bent on ousting Constantine from the company he founded." (Constantine's Mot. Br. at 12.) For the reasons set forth below, the Court disagrees, and concludes that a rational jury could have found him guilty of these counts beyond a reasonable doubt.

### a. Applicable Law

As already discussed, to prove wire fraud in violation of 18 U.S.C. § 1343, the government must establish "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) the use of the mails or wires to further the scheme." *Shellef*, 507 F.3d at 107. With respect to the first element, the government must prove "(i) the existence of a scheme to defraud, (ii) the requisite scienter (or fraudulent intent) on the part of the defendant, and (iii) the materiality of the misrepresentations." *Pierce*, 224 F.3d at 165. As to the element of fraudulent intent or scienter, "the proof must demonstrate that the defendant had a 'conscious, knowing intent to defraud . . . [and] that the defendant contemplated or intended some harm to the property rights of the victim.'" *Guadagna*, 183 F.3d at 129. Thus, "[m]isrepresentations amounting only to deceit are insufficient to maintain a mail or wire fraud prosecution." *D'Amato*, 39 F.3d at 1257. "Instead, the deceit must be coupled with a contemplated harm to the victim." *Id.*

### b. Analysis

Counts Five and Six of the superseding indictment alleged wire fraud based on two December 7, 2009 wire transfers of $150,000 and $50,000 from Privitello to the Richards Escrow Account. (SI at 8.) The government argues that

> Constantine's failure to provide Privitello with any documentation of

his investment, failure to transfer an interest in Eufora to Privitello (while transferring interests in Eufora to others around the same time), and misdirection of Privitello's money (to his attorney's account instead of directly to Eufora) belie the notion that this was a legitimate business transaction.

(Gov't Opp'n Br. at 32-33.) The Court agrees.

As a threshold matter, insofar as Constantine contends that acquittal is warranted based on the fact that the jury found Kenner not guilty on the same charges, that argument is unavailing on a Rule 29 motion because it is well-established that a criminal defendant may not seek review of inconsistent verdicts. In *United States v. Powell*, the Supreme Court explained, "where truly inconsistent verdicts have been reached, '[t]he most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt.'" 469 U.S. 57, 64-65 (1984) (quoting *Dunne v. United States*, 284 U.S. 390, 393 (1932)). The Court noted, "[t]he fact that the inconsistency may be the result of lenity, coupled with the Government's inability to invoke review, suggests that the inconsistent verdicts should not be reviewable." *Id.* at 66. The Court also rejected "a rule that would allow criminal defendants to challenge inconsistent verdicts on the ground that in their case the verdict was not the product of lenity, but of some error that worked against them." *Id.* The Second Circuit has thus routinely denied relief based on a claim of inconsistent verdicts. *See United States v. Gray*, 421 F. App'x 11, 14 (2d Cir. 2011) ("The Supreme Court has held that inconsistency among

verdicts is not a basis for setting aside a conviction."); *United States v. Velasquez*, 173 F.3d 847, 847 (2d Cir. 1999) ("We have reviewed [defendant's] challenge to the jury's verdict, and to the extent that the verdict can be read as inconsistent, it is not amenable to challenge under [*Dunn* and *Powell*]."); *United States v. Acosta*, 17 F.3d 538, 544-45 (2d Cir. 1994) ("Even assuming that the verdict against [defendant] was inconsistent with the verdicts as to his codefendants, we find no basis for relief, for it has been long established that inconsistency in jury verdicts of guilty on some counts and not guilty on others is not a ground for reversal of the verdicts of guilty.").

Given this long-established rule, the Court declines to grant Constantine relief with respect to Counts Five and Six based on an alleged inconsistent verdict.[21] As the Supreme Court noted in *Powell*, however, the defendant "is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence," which the Court undertakes *infra*. 469 U.S. at 478.

With respect to the government's proof, Privitello testified that Constantine told him that Eufora was close to signing deals with big banks and convinced him to invest $200,000 for a 1.5 percent stake in the company, which Privitello wired to the Richards Escrow Account on or about December 7, 2009 via two separate transfers of $150,000 and $50,000. (Tr. at 1432-33, 1435, 1442-43; *see also, e.g.*, GX-208.1, GX-3302, and GX-3306.) An e-mail that Constantine sent Kaiser and that Kaiser forwarded to Privitello stated that, "upon our

receipt of $200,000, Eufora's members will formally execute a Membership Transfer Consent Form and amend the company's Operating Agreement to reflect a 1.5% Interest in Eufora, LLC which shall be held by" Privitello. (GX-208.1.)

However, Privitello said that he did not in fact receive a 1.5 percent stake in Eufora. (Tr. at 1480; GX-503.6.) He also said that he did not receive any documentation regarding his Eufora investment, and that Constantine never offered to return those funds. (Tr. at 1457, 1478-80; *see also* GX-503.5 (recording of Constantine asking Privitello, "Why didn't you take it back before we spent it?," and Privitello answering, "I don't, I don't, I don't – I mean, look, it was a while ago. I don't think I was ever offered it. I cannot recall any time being offered it").) In addition, Privitello reviewed statements for the Richards Escrow Account and said that they showed outgoing transfers of $155,000 to AZ Avalon on December 7, 2009 and $50,000 to Eufora on December 8, 2009. (Tr. at 1455-56; GX-1101.) Moreover, Eufora's bank account statement showed a December 2009 transfer of $15,000 to Carey Rodriguez Greenberg, the law firm that represented Constantine in his race car litigation. (Tr. at 1456-57; GX-1218.) Privitello testified that he did not authorize that his Eufora investment be used to pay legal fees for Constantine's personal lawyer. (Tr. at 1457.)

Accordingly, Constantine admits that, "in contrast to substantive Counts 2-4, there was evidence in the record linking Constantine to the acts pled in Counts 5-6." (Constantine's Mot. Br. at 13.) Nevertheless, he claims that "the attempt by Kenner, Privitello and others

---

[21] Further, as discussed *supra* note 13, there is no merit to Constantine's argument that the acquittal of Kenner on Counts Five and Six demonstrates that "the jury effectively rejected the theory that sufficient evidence existed as proof that Kenner and Constantine were in

a conspiracy involving a criminal object relating to Privitello." (Constantine's Mot. Br. at 12.) A co-conspirator need not engage in every act of a conspiracy. *See Huezo*, 546 F.3d at 180.

to take over Eufora and oust Constantine provides context for the failure of the Privitello investment to result in a transfer of an interest in Eufora, and establishes that no evidence supported a finding that Constantine acted knowingly, willfully, and with specific intent to defraud Privitello . . . ." (*Id.*) To that end, he highlights D'Ambrosio's testimony that Constantine offered to return Privitello's investment (Tr. at 5257-58) and Kenner's testimony that other Eufora investors who were involved in an attempt to take over that company told Privitello not to accept that offer (*id.* at 4953-53).

However, the Second Circuit has "deem[ed] [that] the common law's contemporaneous fraudulent intent principle incorporated into the federal mail and wire fraud statutes." *U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 662 (2d Cir. 2016). In other words, fraudulent intent is measured at the time of the transaction at issue. Further, the crime of wire fraud is "complete at the time [the defendant] sent the relevant communication with the intent to defraud." *United States v. Trudeau*, No. 10-CR-234 (JCH), 2016 WL 614686, at *4 (D. Conn. Feb. 16, 2016) (citing *United States v. Dinome*, 86 F.3d 277, 283 (2d Cir. 1996)), *appeal dismissed* (2d Cir. July 7, 2016). Indeed, a defendant may be culpable for wire fraud even if his scheme is unsuccessful and he never received anything of value from the victim. *See Dinome*, 86 F.3d at 283 (holding that under 18 U.S.C. § 1343, "the government need not prove that the scheme successfully defrauded the intended victim"). As a result, "common-law requirements of 'justifiable reliance' and 'damages[ ]' . . . plainly have no place in the federal fraud statutes" because "[b]y prohibiting the 'scheme to defraud,' rather than the completed fraud, the elements of reliance and damage[s] would clearly be

inconsistent with the statutes Congress enacted." *United States v. Weaver*, 860 F.3d 90, 95 (2d Cir. 2017) (alterations in original) (quoting *Neder v. United States*, 527 U.S. 1, 24-25 (1999)). Thus, the Second Circuit has explained that, to establish wire fraud, "the government need not prove that the victims of the fraud were *actually* injured, but only that defendants *contemplated* some actual harm or injury to their victims." *Id.* (citation omitted).

In other words, the dispositive issue is not whether Constantine offered to refund Privitello's investment, and any attempt by Constantine to shift blame to Privitello for refusing to accept that offer is unavailing. The critical inquiry is whether, at the time of Privitello's investment, Constantine possessed the requisite scienter—*i.e.*, that he had a "conscious, knowing intent to defraud" and "contemplated or intended some harm to the property rights of" Privitello. *Guadagna*, 183 F.3d at 129. Based on the evidence adduced at trial and viewing that proof in favor of the government, a rational juror could have found that Constantine acted with fraudulent intent with respect to Counts Five and Six. First, based on the bank records, the jury could have reasonably concluded that Constantine used a portion of Privitello's investment to pay Carey Rodriguez Greenberg—an expense unrelated to Eufora that Privitello did not authorize. (Tr. at 1456-57; GX-1218.) In addition, Privitello said that he never received a stake in Eufora or any documentation confirming his investment (Tr. at 1457, 1478-1480), and Constantine told him in a 2012 telephone phone call that Privitello was never a shareholder in that company (GX-503.6) and also prevaricated as to why he directed Privitello to send his Eufora investment to the Richards Escrow Account (*compare* GX-503.3 (Constantine stating, "[T]he reason that this – your money was directed to the

lawyer's office instead of to us is because if we saw how much money was going directly to us, we'd know exactly where it came from and who, right? . . . But if it goes to Ron Richards' office and then we get one wire from Ron Richards, then we have no idea who the money came from into Ron Richards, then I can put it in whatever name he wants without having to explain sh**"), *with* GX-503.7 (Constantine stating, "You asked me why it went to Ron Richards' account. I have no f***ing idea"")). Moreover, the jury could have rationally rejected Constantine's contention that the Eufora investors' lawsuit against him provides "context" for why Privitello did not receive a share in Eufora because that litigation arose subsequent to Privitello's investment. Finally, the jury could have rationally found that Constantine only offered to refund money to Privitello once the fraud was uncovered.

For these reasons, the Court upholds Constantine's convictions on Counts Five and Six of the superseding indictment because a rational juror could find that he acted with intent to defraud Privitello, and that all the elements of those counts were met.

\*\*\*

In sum, the Court denies Constantine's Rule 29 motion for a judgment of acquittal in its entirety because he has not carried his "heavy burden" in proving that his convictions were based on insufficient evidence. Viewing the record in a light most favorable to the government, a reasonable juror could find that (1) Constantine participated in the Hawaii Project, Eufora, and/or Global Settlement Fund conspiracy objectives (Counts One and Nine); (2) the wire transfers involving Kenner, Kaiser, and Gaarn were in furtherance of the Eufora conspiracy and reasonably foreseeable to

Constantine (Counts Two through Four); and (3) Constantine acted with fraudulent intent in connection with Privitello's investment in Eufora and was guilty of wire fraud in connection with that investment (Counts Five and Six). Accordingly, the Court sustains the jury's verdict as to Constantine on all counts.

B. Constantine's Rule 33 Motion

In the alternative to a judgement of acquittal, Constantine requests a new trial under Rule 33 based on (1) jury confusion due to the Court's failure to employ a special verdict form, and (2) newly-discovered evidence. For the reasons that follow, the Court concludes that Constantine has not established "extraordinary circumstances" meriting such relief, *McCourty*, 562 F.3d at 475, or that there is "a real concern that an innocent person may have been convicted," *Parkes*, 497 F.3d at 232, and the Court therefore denies his motion.

1. Special Verdict Form

In his moving brief, Constantine argues that the Court erred in failing to give the jury a unanimity instruction; however, in his reply, he asserts instead that the Court should have provided a special verdict form, and he advanced the same claim at oral argument. Moreover, the citations to the trial transcript in Constantine's moving brief reference a discussion between the Court and counsel regarding the propriety of using special interrogatories. Accordingly, the Court construes Constantine's first ground for Rule 33 relief to assert that the Court erred in

failing to provide the jury with a special verdict form.[22]

a. Applicable Law

The Second Circuit has held that a district court "has broad discretion in determining whether to use a special verdict sheet in a complex criminal case . . . ." *United States v. Burrell*, 43 F. App'x 403, 407 (2d Cir. 2002); *see also United States v. Applins*, 637 F.3d 59, 82 (2d Cir. 2011) (rejecting "appellants' argument that their convictions must be reversed because the jury was not required to answer special interrogatories as to which specific predicate acts each defendant agreed would be committed" because the "'decision of whether and how to utilize special interrogatories in such cases [is committed] to the broad discretion of the district court'" (quoting *United States v. Ogando*, 968 F.2d 146, 149 (2d Cir. 1992))). As a result, the Court has affirmed decisions not to provide special verdict forms even in cases involving lengthy trials and numerous witnesses. *See United States v. Raysor*, No. 99-1503(L), 2001 WL 36037731, at *5 (2d Cir. Apr. 29, 2002) (affirming refusal to submit special interrogatories to the jury even though "the trial was twelve weeks long and included over fifty witnesses"); *Ogando*, 968 F.2d at 149 (affirming refusal to submit special interrogatories to the jury even though juror "heard twenty-five Government witnesses and viewed scores of exhibits over six weeks of trial"). Moreover, in *Griffin v. United States*, 502 U.S. 46 (1991), the Supreme Court held that it was permissible for the district court to submit a general verdict form to the jury in a case where (1) the government alleged two separate objects of a single conspiracy charge, and (2) the trial evidence

was sufficient to prove only one of those objects. *Id*. at 48, 58-59.

b. Analysis

As a threshold matter, the government asserts that Constantine has waived this argument because he affirmatively withdrew his request for a special verdict form during the trial. Indeed, prior to summations, Constantine's counsel informed the Court that he was "withdraw[ing] [his] request for a special verdict . . . after looking at it and speaking to [his] client . . . ." (Tr. at 5678.) The Court separately noted that, "though the request was withdrawn, in [its] discretion [the Court] was not going to [provide a special verdict form] in any event" based on *Griffin*'s holding that "the due process clause does not require that in federal prosecutions, [a] general guilty verdict in [a] multiple object conspiracy be set aside if the evidence is inadequate to support conviction as to one object." (*Id*. at 5681-82 (citing *Griffin*, 502 U.S. 46).) Because the "law is well established that if, 'as a tactical matter,' a party raises no objection to a purported error, such inaction 'constitutes a true waiver which will negate even plain error review,'" the Court agrees with the government that Constantine has forfeited his challenge to the general verdict form that the Court submitted to the jury. *United States v. Quinones*, 511 F.3d 289, 321 (2d Cir. 2007) (footnote omitted) (quoting *United States v. Kon Yu-Leung*, 51 F.3d 1116, 1122 (2d Cir. 1995)) (citing, *inter alia*, *United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991) (holding that, where appeal attempts "to evade the consequences of an unsuccessful tactical decision . . . we have no difficulty concluding

---

[22] In any event, as the government notes in its opposition brief (Gov't Opp'n Br. at 38-39), the Court did provide the jury with a unanimity instruction. (*See* Tr. at 6068-69 (instructing the jury that they "must be

unanimous as to the particular unlawful objective" for the conspiracy charged in Count One); *id*. at 6046 (instructing the jury that their "verdict as to each count and each defendant must be unanimous").)

that [appellant] has waived review" of claim)).

Assuming *arguendo* that Constantine had not waived this ground for Rule 33 relief, plain error review would apply. *See United States v. Anderson*, No. 11-1035-CR(L), 2017 WL 1521454, at *4 (2d Cir. Apr. 28, 2017); *United States v. Londono*, No. S100CR.556 (DAB), 2001 WL 1190997, at *3 (S.D.N.Y. Oct. 5, 2001) (holding on a Rule 33 motion that "[h]aving found that the Defendant did not waive his right to contest the substitution, the substitution is reviewed for plain error"); (Constantine's Mot. Br. at 18 (acknowledging application of plain error standard)). "To establish plain error, the defendant must establish (1) error (2) that is plain and (3) affects substantial rights." *United States v. Villafuerte*, 502 F.3d 204, 209 (2d Cir. 2007).

With respect to the first and second prongs, there was no error—much less plain error—because, as set forth above, there is no requirement that a district court use a special verdict sheet in a complex fraud case involving a conspiracy charge with multiple objects, and the Second Circuit has held that submitting special interrogatories is a discretionary determination. *See, e.g.*, *Ogando*, 968 F.2d at 149. Further, as relevant to the "substantial rights" inquiry, the Supreme Court found in *Griffin* that a general verdict in a multi-object conspiracy case does not impair due process protections if the trial evidence sufficiently established the

defendant's participation in one of the objects.[23] 502 U.S. at 58-59.

Nevertheless, Constantine argues that failing to provide a special verdict form prejudiced him because "the evidence was insufficient to sustain any of the three objects of the conspiracy in Count 1." (Constantine's Mot. Br. at 19.) However, the Court has already determined that a rational juror could have found that Constantine participated in any or all of the conspiracy objects. Further, although prior to *Griffin*, the Second Circuit "announced a 'caveat' to the general rule that '[w]here a conspiracy has multiple objectives, a conviction will be upheld so long as evidence is sufficient to show that an appellant agreed to accomplish at least one of the criminal objectives'" in cases that involve "'an overwhelming amount of evidence relevant only to the unproved part of the conspiracy,'" *United States v. Desnoyers*, 637 F.3d 105, 110 (2d Cir. 2011) (quoting *United States v. Papadakis*, 510 F.2d 287, 297 (2d Cir. 1975)), the Second Circuit has not said whether that exception survived *Griffin*. *Id.* In any event, the *Papadakis* caveat is irrelevant here because the government proved all of the conspiracy objects and none predominated the evidence introduced at trial. *See Desnoyers*, 637 F.3d at 110. As summarized in the Court's discussion of each theory, the government presented substantial witness testimony and records relating to each facet of defendants' fraudulent scheme.[24]

---

[23] Constantine argues in his moving brief that "*Griffin* supports that a specific unanimity instruction should have been used" in a multi-object conspiracy case even when a general verdict is employed. (Constantine's Mot. Br. at 19.) As noted *supra*, however, the Court did provide such an instruction to the jury.

[24] To the extent the Constantine suggests that he suffered prejudice because the government's evidence primarily pertained to Kenner, that contention presents an argument for severance, and the Court rejected two motions for severance prior to trial. (*See* ECF Nos. 181 and 227.) Moreover, the Court disagrees with any such characterization of the government's case, which was replete with evidence individually linking Constantine to each objective of the conspiracy.

Thus, for these reasons, the Court denies Constantine's request for a new trial on the ground that it should have provided a special verdict form to the jury because (1) Constantine waived that claim, and (2) in any case, the Court did not commit plain error based on clear Supreme Court and Second Circuit case law.

## 2. Newly-Discovered Evidence

Constantine separately contends that he is entitled to a new trial based on post-trial testimony by Grdina during a September 1, 2016 deposition in a civil lawsuit. (Constantine's Suppl. Mem. in Supp. of Mot. for New Trial and Mot. for J. of Acquittal ("Constantine's Suppl. Br."), ECF No. 407.) During that deposition, Grdina said, in contradiction to his statement at trial, that Constantine did contribute $1.5 million to the Urban Expansion loan:

> Q. Since this lawsuit has been filed, we've had a couple of meetings. And I'm not going to make you go through this stack of documents, but there was a stack of documents and papers that were provided to you in my defense of Mr. Constantine to show you whether or not the $1.5 million contribution was made by Mr. Constantine?
>
> A. That's correct.
>
> Q. After reviewing this stack of documents, is it your understanding now that Mr. Constantine did, in fact, make a one-and-a-half-million-dollar contribution to that entity for the Hawaii property?
>
> A. Based on the documents that were presented and the representations made by Mr. Constantine, the $1.5

million was satisfied. I haven't seen an agreement between Mr. Constantine and Mr. Kenner and his entities to support that, but the transactional history was provided to me.

(Constantine's Suppl. Br., Exh. A.) In addition, Grdina said that his trial testimony that Constantine had not fulfilled his end of the Urban Expansion loan was based solely on what Kenner had told him. (*Id.*)

For the reasons set forth below, the Court concludes that this testimony and the related evidence do not meet the high bar for Rule 33 relief.

### a. Applicable Law

The Second Circuit has held that

> relief under Rule 33 based on newly discovered evidence may be granted only upon a showing that "(1) the evidence [was] newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal.

*United States v. Forbes*, 790 F.3d 403, 406-07 (2d Cir. 2015) (quoting *United States v. Owen*, 500 F.3d 83, 88 (2d Cir. 2007)). Further, "in order to constitute newly discovered evidence, not only must the defendant show that the evidence was discovered after trial, but he must also demonstrate that the evidence 'could not with due diligence have been discovered before or during trial.'" *Id*. at 408-09 (quoting *United*

*States v. Alessi*, 638 F.2d 466, 479 (2d Cir. 1980)).

b.  Analysis

First, insofar as Constantine argues that Grdina recanted his testimony, he

> has the has the burden of establishing the following: "(1) that the testimony recanted was false and material; (2) that without the original testimony[,] the jury probably would have acquitted the defendant; and (3) that the party seeking the new trial was surprised when the false testimony was given or did not know of its falsity until after the trial, and could not with due diligence have discovered it earlier."

*United States v. Lespier*, 266 F. App'x 5, 6-7 (2d Cir. 2008) (quoting *United States v. DiPaolo*, 835 F.2d 46, 49 (2d Cir. 1987)). However, Constantine has failed to satisfy the first part of this test because he has not shown that Grdina falsely testified at trial, where Grdina stated the following in response to questions from the government and Constantine's counsel about the Urban Expansion loan:

> Q.  Did there ever come a time – withdrawn.  I will show you – did there ever come a time you discovered Mr. Constantine ever made a $1.5 million contribution to Urban Expansion?
>
> A.  Yes.
>
> Q.  Did he?
>
> A.  No.
>
> Q.  Made no money contribution?

A.  No, none.

> Q.  Did you learn that before or after you agreed to the split, the 70/30 split which sent off over $2 million to Mr. Constantine?
>
> A.  Afterwards.
> . . .
> Q.  Mr. Grdina, did there come a time when you actually confronted Mr. Constantine about the $1.5 million contribution?
>
> A.  Yes.
>
> Q.  And during that discussion with Mr. Constantine, did he present you with wire transfers and other documentation proving that he had in fact made the 1.5 –
>
> A.  No, he did not.
>
> Q.  – million dollar contribution?
>
> A.  No, he did not.
>
> Q.  Where did this meeting with Mr. Constantine take place?
>
> A.  At his office at one of the airplane hangers.
>
> Q.  Do you remember him presenting you with any documentation?
>
> A.  He had assured me he would provide me the documentation and I still hadn't seen any to this date.

(Tr. at 2380, 2421.)  As summarized above, Grdina subsequently testified during the post-trial deposition that Kenner had previously informed him that Constantine had not contributed his $1.5 million share to the

Urban Expansion loan, and Grdina said that documents provided by Constantine established that he had in fact made that investment. Thus, there is no evidence that Grdina's trial testimony was false: He testified to what he knew at that time and said that he had not seen any records from Constantine corroborating his contribution to Urban Expansion. Further, for the reasons discussed *infra*, even assuming that Grdina's trial testimony was false, Constantine cannot show that the jury would have probably acquitted him of the conspiracy charge because there was sufficient evidence to prove beyond a reasonable doubt that he participated in the Hawaii Project object of the conspiracy charge, as well as the Eufora and the Global Settlement Fund objectives.[25]

Second, the documentation that Constantine purportedly used to elicit Grdina's deposition testimony does not constitute new evidence because it existed prior to the trial in this action and could have been discovered through due diligence. After the February 17, 2017 oral argument on Constantine's motions, he submitted a letter to the Court on March 1, 2017 appending the Grdina deposition exhibits that pertained to the Urban Expansion transaction.[26] (ECF

No. 458.) All of those materials, as summarized below, pre-dated the trial: (1) a September 29, 2006 check from CMG to Constantine's attorney, Todd Lockwood; (2) a June 3, 2008 e-mail from a Stewart Title employee to Constantine with attached escrow receipts; (3-4) January 25, 2007 e-mails from Kenner to Constantine; (5) an August 18, 2009 e-mail from a Palms Place employee to Constantine; (6-7) spreadsheets pertaining to deposits on Palms Place condominiums that were seemingly attached to the August 18, 2009 e-mail; (8-9) excerpts of the transcript for the trial in this action; (10-12) contracts, correspondence, and checks regarding the sale of Palms Place condominiums from the 2005-2008 time period; and (13-15) 2005 and 2006 financial statements for Kenner. Constantine has not shown that these exhibits—several of which contain correspondence from Constantine's own e-mail account—"could not with due diligence have been discovered before or during trial," *Forbes*, 790 F.3d at 409, and the government has represented that it in fact produced Exhibits 1, 2, 7, and 10-14 to Constantine during discovery (*see* Gov't Mar. 3 Letter). Moreover, all of these documents are cumulative of Constantine's efforts at trial—which included presenting

---

[25] For the same reasons, there is no merit to Constantine's argument that a new trial is warranted based on Kenner's post-trial testimony during a forfeiture proceeding before this Court that, contrary to what Kenner said at trial (Tr. at 4397-98), he no longer believed that Constantine had improperly diverted money from the GSF (Constantine's Reply Br. at 8-9; Constantine's Suppl. Br. at 6). First, Kenner made clear during that hearing that he had changed his view because of Gonchar's trial testimony:

Now that I understand what arrangement Mr. Constantine had with Mr. Gonchar and the contribution of one of the deposits into the account, I think my observations were incorrect when I told my clients that I thought [Constantine] misappropriated funds.

(Constantine's Reply Br. at 8 (quoting Tr. of April 4, 2016 Hr'g, ECF No. 377-1, at 254).) Second, for the reasons discussed *supra* and *infra*, it is improbable that, without Kenner's trial testimony, the jury would have acquitted Constantine of the conspiracy charges because there was sufficient additional evidence linking him to all three conspiracy objects.

[26] As the government notes in its response letter, none of these documents were marked or identified during the deposition (Gov't Mar. 3, 2017 Letter, ECF No. 459), and it appears from Grdina's testimony that he may have reviewed these materials prior to the deposition (Constantine's Suppl. Br., Exh. A at 12 (Grdina agreeing that after the civil lawsuit was filed, he reviewed "a stack of documents and papers that were provided to [him] . . . to show [him] whether or not the $1.5 million contribution was made by Mr. Constantine")).

various documents—to elicit testimony from Grdina that Constantine contributed to the Urban Expansion loan (*see, e.g.*, Tr. at 2414, 2419, 2421-27), and "newly discovered evidence [that] merely supports the same allegations" advanced by a defendant does not warrant a new trial under Rule 33, *United States v. Umeh*, 646 F. App'x 96, 99 (2d Cir. 2016).

Finally, it is not likely that introducing the Grdina deposition exhibits at trial would have resulted in Constantine's acquittal on the conspiracy charges. As discussed *supra*, apart from the Urban Expansion transaction, the government introduced evidence linking Constantine to the Hawaii Project fraud scheme through records and testimony showing that Constantine received money from that endeavor. Further, the government also sufficiently proved Constantine's involvement in the Eufora and Global Settlement Fund objectives, either of which was adequate to sustain the jury's verdict. *See Griffin,* 502 U.S. at 58-59.

\*\*\*

Accordingly, the Court denies Constantine's Rule 33 motion on the grounds of jury confusion and newly-discovered evidence because (1) Constantine waived his request for special interrogatories and, in any event, the Court did not commit plain error in providing the jury with a general verdict form; and (2) the Grdina deposition exhibits existed prior to trial and could have been discovered through due diligence, were cumulative of trial evidence, and would not have resulted in Constantine's acquittal on the conspiracy charges. Further, based on the overwhelming evidence of Constantine's culpability on all charges in the superseding indictment, the Court, in its discretion, does not believe that "letting [the] guilty verdict stand would be a manifest injustice." *Ferguson*, 246 F.3d at 134.

## C. Kenner's Rule 33 Motion

Finally, Kenner separately moved for a new trial under Rule 33 via an approximately 300-page *pro se* filing accompanied by a disc containing over 600 exhibits and a "roadmap" brief prepared by his counsel at the time, Jeffrey Pittell. ("Kenner's *Pro Se* Br.," ECF No. 417.) Both the roadmap and Kenner's *pro se* submission identify three grounds for Rule 33 relief: (1) failure by the government to disclose exculpatory information in violation of his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny; (2) newly-discovered evidence; and (3) prosecutorial misconduct. In its opposition brief, the government argues that Kenner's *Brady* and prosecutorial misconduct arguments are time-barred and that the entire motion is meritless. ("Gov't Kenner Opp'n Br.," ECF No. 440.) The reply memorandum submitted by Mr. Pittell asserts that the Court can reach the merits of the *Brady* and prosecutorial misconduct claims based on the "excusable neglect" exception to the timeliness requirement ("Kenner's Reply Br.," ECF No. 447), as does a subsequent letter submitted by Kenner's present counsel, Jesse Siegel ("Kenner's June 6, 2017 Letter," ECF No. 473). Kenner's separate *pro se* reply attaches additional exhibits in support of his motion. ("Kenner's *Pro Se* Reply Br.," ECF No. 449.)

For the reasons set forth below, the Court finds that there was excusable neglect in this case and extends, *nunc pro tunc*, the time to file Kenner's Rule 33 motion to November 28, 2016 notwithstanding Mr. Haley's letter regarding Kenner's intention to join Constantine's request for a new trial. (ECF No. 325.) However, the Court concludes that Kenner has failed to carry his burden of demonstrating "extraordinary circum-stances," *McCourty*, 562 F.3d at 475, or that there is "a real concern that an innocent

person may have been convicted," *Parkes*, 497 F.3d at 232. Further, as with Constantine, the Court does not, in its discretion, believe that "letting [the] guilty verdict stand would be a manifest injustice." *Ferguson*, 246 F.3d at 134. Therefore, Kenner's Rule 33 motion is denied.

### 1. Timeliness

Pursuant to Rule 33(b)(1), a motion for a new trial based upon newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. Fed. R. Crim. P. 33(b)(1). Under Rule 33(b)(2), a motion for a new trial on any other ground must be filed within 14 days after verdict or finding of guilty. Fed. R. Crim. P. 33(b)(2). However, pursuant to Rule 45 of the Federal Rules of Criminal Procedure, such time can be extended, even after the time to file has expired, if there was "excusable neglect." Fed. R. Crim. P. 45(b)(1)(B). The Second Circuit has set forth four factors that the district court should consider in determining whether the "excusable neglect" standard has been met:

> (1) the danger of prejudice to the party opposing the extension; (2) the length of the delay and its potential impact on judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the party seeking the extension; and (4) whether the party seeking the extension acted in good faith.

*Anderson v. Beland (In re Am. Express Fin. Advisors Secs. Litig.*), 672 F.3d 113, 129 (2d Cir. 2011) (citations omitted).

In the instant case, although Kenner's Rule 33 motion was not filed within 14 days of the verdict, the Court finds that there was excusable neglect. Specifically, trial counsel still represented Kenner for months after the verdict on July 9, 2015, and the Court only appointed Mr. Siegel as his replacement on August 1, 2016 (ECF No. 392) following receipt of a letter from Kenner indicating that his relationship with his trial counsel was irretrievably broken (ECF No. 386). Upon being retained, Mr. Seigel had to become familiar with the voluminous record in this case, including exhibits and the *pro se* brief that Kenner had prepared for the forfeiture proceedings. After this review, Mr. Seigel advised Kenner that his *pro se* points appeared to raise grounds for Rule 33 relief and apprised the Court of the same at a September 15, 2016 status conference. (*See* Kenner's *Pro Se* Br. at 5-6; ECF No. 398.) Thus, there are reasons for the delay in Kenner's motion based on his prior representation by trial counsel; Mr. Siegel acted promptly and in good faith to file the motion; and the Court is aware of no prejudice to the government in granting the extension. Given the overlap in the extended briefing schedule for Constantine's motions and Kenner's motion, as well as the ongoing forfeiture proceedings, it is clear that Kenner's delayed motion has not impacted this judicial proceeding in a negative manner. To the extent that the government argues that Kenner acted in bad faith by seeking to re-litigate the trial in his motion and raise irrelevant issues, the Court will address that argument on the merits *infra*. Accordingly, under the particular circumstances of this case, the Court finds that Kenner's failure to separately file a Rule 33 motion until November 28, 2016 constitutes excusable neglect and the Court extends, *nunc pro tunc*, the time to file the motion to that date.

### 2. Merits

For the following reasons, the Court denies Kenner's motion on all grounds.[27] As a preliminary matter, the Court agrees with the government that Kenner's *pro se* filings reiterate much of Kenner's trial testimony and strategy, most notably his attack against Jowdy, who—as the Court the advised the jury—was not on trial. (*See* Jury Charge at 30.) In finding Kenner guilty on six of the nine counts in the superseding indictment—including both conspiracy charges—the jury rejected this line of reasoning, and Kenner has failed to carry his burden to demonstrate a new trial is warranted.

#### a. *Brady* Violations

Kenner's first point in his *pro se* submissions and at oral argument was that the government failed to disclose exculpatory evidence prior to trial—namely, (1) an exhibit the government produced during the forfeiture proceeding ("GX-FORF-44"); (2) documents pertaining to a real estate development in Los Frailes, Mexico involving Privitello and Kaiser (the "Los Frailes project"); and (3) the pre-trial deposition testimony of Berard and Kaiser during civil litigation. The Court finds that none of these constitutes a *Brady* violation.

#### i. Applicable Law

There are three requirements for a *Brady* violation. These are (1) that evidence favorable to the accused was (2) suppressed—either willfully or inadvertently—by the prosecution and (3) that prejudice ensued. *See United States v. Douglas*, 525 F.3d 225, 244-45 (2d Cir. 2008); *accord Strickler v. Greene*, 527 U.S.

263, 281-82 (1999). The third requirement is also sometimes labeled the "materiality" requirement and asks whether, had the information been disclosed, there was a "reasonable probability of a different result." *United States v. Jackson*, 345 F.3d 59, 73 (2d Cir. 2003); *see also Strickler*, 527 U.S. at 289-90; *Ramirez v. Phillips*, No. 04 CIV. 1516 (BMC), 2007 WL 2362138, at *2 (E.D.N.Y. Aug. 14, 2007) ("'Material' means that the information must 'reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" (quoting *Kyles v. Whitley*, 514 U.S. 419, 433 (1995)).

The Second Circuit "has frequently recognized [that] 'evidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence.'" *United States v. Paulino*, 445 F.3d 211, 225 (2d Cir. 2006) (quoting *United States v. Gonzalez*, 110 F.3d 936, 944 (2d Cir. 1997)). Moreover, "[t]he government's duty to disclose is not limited to 'exculpatory' information, it also includes information that could be used to impeach government witnesses, so-called *Giglio* material." *United States v. Madori*, 419 F.3d 159, 169 (2d Cir. 2005) (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)).

However, even where the government learns of exculpatory information during an interview, the government satisfies its *Brady* obligations by informing the defendant that the witness may possess exculpatory evidence. *United States v. Salerno*, 868 F.2d 524, 542 (2d Cir. 1989); *see also United States v. Grossman*, 843 F.2d 78, 85 (2d Cir. 1988) (government not required to turn over

---

[27] As noted, Kenner's filings are lengthy and discursive, and accordingly, the Court focuses its analysis on the salient grounds for relief raised therein.

grand jury testimony where government had informed defense that witness may have provided exculpatory evidence to the grand jury); *United States v. LeRoy*, 687 F.2d 610, 619 (2d Cir. 1982) (government not required to turn over grand jury testimony where defendant "was on notice of the facts necessary for him to take advantage of such [potentially] exculpatory testimony"); *United States v. Upton*, 856 F. Supp. 727, 751 (E.D.N.Y. 1994) ("[T]he government has provided defendants with the names of the grand jury witnesses who might have given exculpatory testimony, and hence the government has fulfilled its *Brady* obligations.")

ii. Analysis

For the following reasons, the Court concludes that Kenner's *Brady* claims have no merit.

First, GX-FORF-44, which is a ledger obtained from Jowdy's attorney (*see* Kenner's Exh. R33 001[28]; *see also* Tr. of Mar. 9, 2016 Hr'g, ECF No. 369, at 13 (Wayne testifying that GX-FORF-44 depicts "money going down to one of the players for Little Isle and another company that Jowdy controlled")), did not come into the government's possession until after the trial (*see* Tr. of Mar. 9, 2016 Hr'g at 13; Kenner's *Pro Se* Reply Br. at 10 (stating that GX-FORF-44 was received on August 3, 2015)). Thus, there was no *Brady* violation because the "government is under no obligation to turn over that which it does not have" at the time of the trial. *United States v. Upton*, 856 F. Supp. 727, 746 (E.D.N.Y. 1994); *see also*

*Morgan v. Salamack*, 735 F.2d 354, 358 (2d Cir. 1984) ("[E]xisting case law clearly reflects that the touchstone of the inquiry . . . is principally whether the prosecutor's office 'possessed' the information in question at the time of the trial."); *Pimentel v. United States*, No. 91 CR. 83 (JFK), 1998 WL 50142, at *5 (S.D.N.Y. Feb. 9, 1998) ("[I]nsofar as the Government did not 'possess' the information at issue, no *Brady* violation could have occurred."). Kenner's supposition that "it is difficult to believe that the government received the forfeiture-44 document (*on August 3, 2015*) from Jowdy's attorneys (*only weeks after the completion of the 10-week trial and 6 years after the 2009 SDNY Grand Jury began with Jowdy's attorneys actively supporting the Indictment efforts versus Kenner as a side-show*)," and because "Jowdy's attorney, Tom Harvey, was present in the EDNY courtroom for the most [sic] of the trial" and "was actively working hand-in-hand with" the government, is baseless. (Kenner's *Pro Se* Reply Br. at 10.) This Court has no reason to doubt the government's representation that it received GX-FORF-44 after completion of the trial.[29]

Further, in any event, Kenner has not shown that GX-FORF-44 was material to his case. He notes that the spreadsheet indicates that certain funds received from Little Isle IV and investors in the Hawaii Project were listed as "loans" to the Jowdy Diamante development and argues that it therefore rebuts the government's contention that he made unauthorized transfers from the Hawaii Project to Jowdy. (Kenner's *Pro Se* Br., Point I, at 1; *see also id.* at 3 ("Kenner loaned funds under the authorization of the Little Isle 4 operating agreement to Jowdy under a loan

___

[28] Citations to "Kenner's Exh. R33" refer to documents that Kenner submitted on a disc in support of his Rule 33 motion.

[29] Kenner's submissions are replete with additional insinuations of collusion between Jowdy and the government, and those unsupported allegations likewise do not deserve any consideration.

agreement.").) However, Kenner misses the point: Irrespective of whether or not he transferred Hawaii Project money to Jowdy pursuant to a *bona fide* loan agreement, several witnesses testified at trial that they never authorized use of their Hawaii Project investments to finance Jowdy-led real estate developments. (*See, e.g.*, Tr. at 393-397, 496 (Peca); *id.* at 703-704 (Mrs. Peca); *id.* at 2723-2724 (Rucchin); *id.* at 4847 (Gonchar).) Moreover, as discussed *supra*, there was evidence at trial that Kenner, without the knowledge or permission of his clients, diverted Hawaii Project funds to Constantine for Constantine's personal use. Accordingly, even if Kenner had introduced GX-FORF-44 at trial, a rational juror could still find that he conspired with Constantine to defraud investors in the Hawaii Project. Therefore, because the government did not possess GX-FORF-44 until after the trial, and that document would not have "put the whole case in such a different light as to undermine confidence in the verdict," *Kyles*, 514 U.S. at 433, Kenner has not established a *Brady* violation.[30]

Second, Kenner argues that the Los Frailes documents he obtained

> would have proven extremely helpful for the defense, specifically since a few of the EDNY alleged victims provided documents that confirm *Kaiser had fabricated other agreements* and signatures to defraud his investor/friends. . . . These forged and fabricated documents would have been priceless to *IMPEACH Kaiser* at trial – *specifically related to forgeries* – as well as statements made by

> Privitello – clearly contrived by Kaiser and Privitello during successive phone interviews with the FBI . . . .

(Kenner's *Pro Se* Br., Point I, at 21.) Based on his *pro se* submissions and his representations at oral argument, Kenner apparently asserts that these materials— which include an October 16, 2008 contract between Kenner and Kaiser assigning an interest in the Los Frailes project (Kenner's Exh. R33 101); an undated agreement between Privitello and Kaiser pertaining to the Los Frailes project (Kenner's Exh. R33 103); and a March 20, 2014 fax from a Dr. Frank Sconzo ("Dr. Sconzo") to FBI Agent Matt Galioto ("Agent Galioto") attaching a February 17, 2008 check for $190,000 and a March 26, 2008 check for $10,000 from Dr. Sconzo to Kaiser for the Los Frailes project (Kenner's Exh. R33 107)—constitute evidence of fraud by Kaiser in connection with the Los Frailes project. Kenner further contends that, had he had these documents in advance of the trial, he would have been able to use them to undermine Kaiser's integrity and call witnesses including Dr. Sconzo to testify impeach Kaiser. (*See* Kenner's *Pro Se* Br. at 21-22 ("With the *FRAUDULENT* Los Frailes contracts – Kenner's defense would have been able to call Los Frailes partner Robert Gaudet to testify that Kaiser had in fact forged and fabricated the documents – unknown to both Kenner and Gaudet.").)

As noted, the government's disclosure duties under *Brady* include impeachment information, and a failure to provide such materials to the defense may warrant a new trial. *See Madori*, 419 F.3d at 169 (citing

---

[30] Moreover, as the government argues and Kenner implicitly concedes in his motion (Kenner's *Pro Se* Br. at 6-8), Kenner had access to other documents that he could have used to show that he loaned Hawaii Project money to Jowdy. As a result, GX-FORF-44 is

cumulative of those materials and thus immaterial under *Brady*. *See Chandras v. McGinnis*, No. 01 CIV. 2519 (LBS), 2002 WL 31946711, at *10 (E.D.N.Y. Nov. 13, 2002) (citing *United States v. Helmsley*, 985 F.2d 1202, 1210 (2d Cir. 1993)).

*Giglio*, 405 U.S. at 154); *United States v. Erbo*, No. 97 CR. 1105 (HB), 2006 WL 2165739, at *3 (S.D.N.Y. July 31, 2006) (citing *Giglio*, 405 U.S. at 153-54.) However, assuming *arguendo* that the Los Frailes project materials are impeaching, Kenner has still failed to establish a *Brady* violation.

As an initial matter, the government has represented that it

> produced numerous documents related to the Los Frailes investment project — including the contract between Kenner and Kaiser (R33 101, produced as ED-2146), a version of the same document from Kenner's computer with just Kenner's signature and outgoing fax header on it (produced as PK 123384), and contracts drafted for Privitello, Smith, and Sconzo — on September 12, 2014.

(Gov't Kenner Opp'n Br. at 6.) Thus, insofar as documents Kenner claims were improperly withheld were in fact disclosed, the government complied with its *Brady* duties. Moreover, even if the government did not produce certain Los Frailes materials prior to trial, those documents were merely cumulative of those that were disclosed and thus do not implicate *Brady*. *See Salerno*, 868 F.2d at 542; *Grossman*, 843 F.2d at 85.

Finally, the Los Frailes project documents were not material to Kenner's defense. As with the Paradise Valley property, the Court specifically instructed the jury that the Los Frailes project was not part of "the subject matter of the case." (Tr. at 1486.) In addition, the Second Circuit has explained that:

> [I]mpeachment evidence has been found to be material where the witness at issue supplied the only evidence linking the defendant(s) to the crime, or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case. In contrast, a new trial is generally not required when the testimony of the witness is corroborated by other testimony, or when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.

*United States v. Payne*, 63 F.3d 1200, 1210 (2d Cir. 1995) (citations omitted). Here, Kaiser was far from the only witness linking Kenner to the conspiracy and substantive charges for which he was found guilty. Numerous other witnesses testified that Kenner was involved in diverting funds from the Hawaii Project (*see, e.g.*, Tr. at 423-25 (Peca); *id.* at 669-70 (Mrs. Peca); *id.* at 2065-69 (Nolan); *id.* at 2163-65 (Sydor); *id.* at 3934 (Petrellese)) and from Eufora (*see, e.g.*, *id.* at 2169-71 (Sydor); *id.* at 2514-24 (Gaarn); *id.* at 2823-32 (Ranford)); and that Kenner was involved in soliciting GSF contributions (*see, e.g.*, *id.* at 2834-35 (Ranford)). Thus, Kaiser did not "suppl[y] the only evidence linking [Kenner] to the crime[s]" charged, and attacking his credibility would not have "undermined a critical element of the prosecution's case." *Payne*, 63 F.3d at 1210. Further, counsel for both Kenner and Constantine cross-examined Kaiser extensively at trial, including about his personal animus towards Kenner (*id.* at 1089-90), his employment by Jowdy (*id.* at 1091), and previous testimony that Kaiser gave during a civil lawsuit that was allegedly inconsistent with his trial testimony (*id.* at

1107-08). Accordingly, questioning Kaiser about his purported Los Frailes fraud would have "merely furnishe[ed] an additional basis on which to impeach" him, and as a result, the Los Frailes materials are "cumulative and cannot be considered 'material' under controlling Second Circuit case law." [31] *Locurto v. United States*, No. 10-CV-4589 (NGG), 2016 WL 7031556, at *2 (E.D.N.Y. Dec. 1, 2016) (citing, *inter alia*, *Parkes*, 497 F.3d at 233); *see also Erbo*, 2006 WL 2165739, at *3 ("The nondisclosure of cumulative or redundant impeachment material generally will not warrant a new trial.").

Third, Kenner argues that the government suppressed depositions of Berard and Kaiser that were respectively taken on October 9, 2014 and December 18, 2014 in connection with a civil proceeding in Arizona. (*See* Kenner's *Pro Se* Br., Point I, at 27-31.) He states that that testimony was "*unknown to Kenner until post-EDNY trial*." (*Id*. at 27.) However, that is not plausible considering that Kenner, by his own admission, filed the underlying lawsuit. (*Id*.; *see also* Kenner's Exh. R33 201.) Moreover, the Berard deposition was used by defense counsel during the cross-examination of Berard at trial (*see, e.g.*, Tr. at 3134), and the government produced Kaiser's deposition prior to trial (*see* Gov't Kenner Opp'n Br. at 7 (citing ECF No. 179)). Thus, there was no suppression of these documents by the government. [32]

\*\*\*

For these reasons, Kenner has failed to establish entitlement to a new trial based on

*Brady* violations. The government did not suppress GX-FORF-44 because it did not have that document prior to trial, and, in any event, it is immaterial. In addition, the Los Frailes project documents are cumulative and immaterial, and the Berard and Kaiser depositions were available to Kenner before the trial.

#### b. Newly-Discovered Evidence

Like Constantine, Kenner moves for a new trial based on newly-discovered evidence consisting of (1) a series of disclosure letters that Kenner obtained from Baker that were counter-signed by members of Little Isle IV (the "Disclosure Letters"); and (2) Northern Trust bank records that Kenner obtained during the trial (the "Northern Trust Documents"). For the reasons that follow, the Court finds that these materials do not warrant Rule 33 relief.

#### i. Applicable Law

As set forth above, the Second Circuit has held that

> relief under Rule 33 based on newly discovered evidence may be granted only upon a showing that (1) the evidence [was] newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal.

---

[31] Further, insofar as the Los Frailes documents "constitute[] extrinsic evidence on a matter bearing only on a witness's credibility," they would have been inadmissible at trial under Federal Rule of Evidence 608(b). *O'Hara v. City of New York*, 570 F. App'x 21, 25 (2d Cir. 2014).

[32] To the extent that Kenner argues that the deposition testimony supports his argument that the government suborned perjury at trial, the Court will discuss that issue *infra*.

*Forbes*, 790 F.3d 403 at 406-07. Further, "in order to constitute newly discovered evidence, not only must the defendant show that the evidence was discovered after trial, but he must also demonstrate that the evidence could not with due diligence have been discovered before or during trial. *Id*. at 408-09.

### ii. Analysis

First, the Disclosure Letters are September 23, 2009 correspondence from Baker, an Arizona attorney, to members of Little Isle IV—including Berard, Sydor, Murray, Gonchar, Peca, Rucchin, and Nash—regarding a civil lawsuit that Kenner filed against Jowdy in Arizona "to recover certain monies loaned to Mr. Jowdy by Mr. Kenner, Little Isle IV, LLC and Ula Makika, LLC." (Kenner's Exh. R33 A.) Those letters inform the recipients that Kenner, Little Isle IV, and Ula Makika are seeking to replace their current counsel with Baker, and they ask the recipients to sign a conflicts waiver form. (*Id*.) Attached to the Disclosure Letters that Kenner submitted to the Court are waivers signed by the Hawaii Project investors identified above (*id*.), which, Kenner argues, contradicts the "Little Isle 4 members whose testimony at the EDNY denied knowledge of the loans to Jowdy from Hawai'i &/or independent knowledge of the loans . . . ." (Kenner's *Pro Se* Br., Point II, at 2).

However, these materials do not meet the standard set forth above because Kenner could have discovered them with due diligence prior to trial. As the Disclosure Letters make clear, Baker represented Kenner in his Arizona litigation against Jowdy, and in an appendix to his Rule 33 motion included on the disc of supporting materials submitted to the Court, Kenner states: "Although all of the Little Isle 4 members were aware of the 2008 lawsuit versus Jowdy for the unpaid $5mm in loans in AZ – *Kenner had Tom Baker send out a 8-page disclosure letter* requiring an acknowledgment and consent letter returned with all pages initialed by the investors to Baker." (Kenner Exh. R33 - Appendix, Jowdy loan disclosure issues at 8 (emphasis added).) Moreover, at trial, Kenner admitted into evidence and discussed an identical September 23, 2009 letter from Baker to Greg deVries (*see* Defs.' Exh. Kenner-231), another Little Isle IV member, stating:

> This was a letter dated September 23rd, 2009, written by attorney Thomas Baker in Arizona with respect to the ongoing litigation we had with Ken Jowdy as sued by Little Isle IV, Ula Makika and myself, Phillip A. Kenner personally, in the U.S. District Court, District of Arizona, with respect to the approximate $5 million loan that was outstanding.
>
> In or about that time I had decided to change legal counsel in the case *and Mr. Baker was sending out quite a detailed approximately seven page disclosure letter to each of the members of Little Isle IV* for their acknowledgment and consent to continue the lawsuit against Mr. Jowdy under his representation, and a number of those individuals were copied on the letter.

(Tr. at 4569-70 (emphasis added).) Thus, Kenner was clearly aware that the Disclosure Letters existed and could have obtained them prior to trial; therefore, they are not newly-

discovered evidence.[33]  *See Forbes*, 790 F.3d at 407-08.  Finally, the jury could have rationally found that the Disclosure Letters were not proof that Kenner informed his clients that he invested Hawaii Project money in Mexico at the time of those transactions, but only evidence that Kenner subsequently commenced a lawsuit to recoup funds from Jowdy.

Second, the Northern Trust Documents—which include sundry authorization forms and statements sent to or signed by Berard, Gonchar, Juneau, Murray, Nolan, Rucchin, and Sydor (*see* Kenner Exh. R33 658)—constitute records that Kenner obtained via a subpoena issued prior to trial and that Kenner offered into evidence (*see* Defs.' Exh. Kenner-210).  Although those materials were thus available to Kenner at trial, he argues that he was not able to use them effectively because they did not arrive until late in the proceeding after the government had rested its case.  (*See* Kenner's *Pro Se* Br., Point II, at 23; *see also* Kenner Exh. R33 529 (Northern Trust subpoena response affidavit dated June 15, 2015).)  However, the record belies that assertion.  After the Court admitted the Northern Trust Documents, Kenner gave testimony that they showed that, *inter alia*, Nolan authorized Kenner to establish a line of credit on his behalf:

> Q.  Now, with reference, sir, to Kenner Exhibit 210, before you took the witness stand today did you have an opportunity to look at those documents?
>
> A.  Yes, sir.

Q.  Specifically, did you have an opportunity to look at the signature that's contained on one or more of those documents?

A.  Yes, sir, I did.

Q.  As relates to those signatures, Mr. Kenner, did you forge any of those signatures?

A.  No, sir.

Q.  Now, Owen Nolan testified in these proceedings.  Do you recall his testimony?

A.  Yes, sir, I was present.
. . .
A.  He told the court that he was first aware of his line of credit, the $2.2 million line of credit, sometime in 2008.

Q.  Well, to your knowledge, sir, was that completely accurate testimony?

A.  It was factually inaccurate.
. . .
A.  There are at least or three [sic] occurrences that I have seen in evidence where there's direct proof that Mr. Nolan was aware.

(Tr. at 4211-14.)  To the extent that Kenner now argues that these materials undermine the testimony of other government witnesses as to their knowledge about the lines of credit, Kenner could have said as much at trial based on his professed familiarity with the Northern Trust Documents.

---

[33] In any event, given that the Disclosure Letters are identical to Kenner's trial exhibit, they are also cumulative.  Further, given that the Disclosure Letters only bear on the Hawaii Project aspect of the government's conspiracy case, and in light of the substantial evidence linking Kenner to the Eufora and GSF objects, introduction of the Disclosure Letters at trial would not have resulted in Kenner's acquittal.

In any event, these records are not material because they, at best, show that various Hawaii Project investors regularly signed documents that, among other things, authorized extensions of their lines of credits. They do not demonstrate that the investors permitted Kenner to transfer their money to Jowdy-led developments in Mexico or to Constantine and CMG. Moreover, they are cumulative of Kenner's repeated efforts at trial to elicit testimony from government witnesses—including through the presentation of documents—that they knew about and authorized various steps that Kenner took to manage the Northern Trust accounts. (*See, e.g.*, Tr. at 512-17 (Peca); *id.* at 2080-81 (Nolan); *id.* at 2194-97 (Sydor).) Notably, in response to these inquiries, several witnesses said that Kenner often sent them documents to sign with missing pages. (*See, e.g.*, *id.* at 141-42 (Juneau); *id.* at 517 (Peca); *id.* at 2197 (Sydor).) Finally, because the Northern Trust Documents are only pertinent to the Hawaii Project aspect of the charged conspiracy, it is unlikely that—even if Kenner had them prior to trial—they would have resulted in acquittal because there was

sufficient evidence implicating him in the Eufora and Global Settlement Fund objects. Under the Supreme Court's decision in *Griffin*, proof of his participation in either scheme sustains the jury's verdict.[34] 502 U.S. at 58-59.

\*\*\*

For these reasons, the Court concludes that neither the Disclosure Letters nor the Northern Trust Documents constitute newly-discovered evidence that merit a new trial because Kenner either had those materials during trial or could have discovered them through due diligence. Further, they are cumulative and immaterial and would not have possibly yielded a favorable verdict for Kenner.

### c. Prosecutorial Misconduct

Lastly, Kenner alleges two species of prosecutorial conduct: that the government (1) made improper remarks during questioning and its rebuttal summation; and (2) suborned perjury. Both of these contentions lack merit.[35]

---

[34] At oral argument, Kenner suggested that his trial counsel was ineffective for failing to recall government witnesses so that they could be cross-examined about the Northern Trust Documents. *See United States v. Velazquez*, 197 F. Supp. 3d 481, 508 (E.D.N.Y. 2016) ("It is well settled that a motion under Rule 33 can be asserted for ineffective assistance of trial counsel." (citing *United States v. Brown*, 623 F.3d 104, 113 n.5 (2d Cir. 2010)). Under the standard promulgated in *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant is required to demonstrate two elements in order to state a successful claim for ineffective assistance of counsel: (1) "counsel's representation fell below an objective standard of reasonableness," *id.* at 688, and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. As noted *supra*, Kenner's counsel engaged in extensive cross-examination of government witnesses regarding the Northern Trust Documents, and the Court believes that any additional questioning would have been

cumulative. Counsel's strategic decision not to recall witnesses and engage in additional cross-examination was therefore not unreasonable.

Moreover, even assuming deficient performance by Kenner's trial counsel in deciding not to recall those witnesses, Kenner did not suffer any prejudice from that decision because he cannot show—in lighr of the Court's conclusions *supra*—that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also Henry v. Poole*, 409 F.3d 48, 63-64 (2d Cir. 2005) ("[T]he question to be asked in assessing the prejudice from counsel's errors . . . is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."). Accordingly, there is no merit to this claim.

[35] Kenner's motion is replete with allegations of false testimony and improper government conduct,

### i. Government's Statements

In order to prevail on a motion for a new trial based on prosecutorial misconduct, a defendant bears the "heavy burden" of demonstrating that the alleged misconduct is "so severe and significant as to result in the denial of their right to a fair trial." *United States v. Locascio*, 6 F.3d 924, 945 (2d Cir. 1993); *see also United States v. Young*, 470 U.S. 1, 11 (1985) ("[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial."); *United States v. Banki*, 685 F.3d 99, 120 (2d Cir. 2012), *as amended* (Feb. 22, 2012) ("A defendant asserting that a prosecutor's remarks warrant a new trial faces a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of his right to a fair trial." (alterations omitted)). During a jury summation, the "government has broad latitude in the inferences it may reasonably suggest to the jury." *United States v. Williams*, 205 F.3d 23, 35 (2d Cir. 2000) (quoting *United States v. Casamento*, 887 F.2d 1141, 1189 (2d Cir. 1989)), *cert. denied*, 493 U.S. 1081 (1990). A court "'will not lightly overturn a conviction solely on the basis of a prosecutor's misstatement in summation.'" *United States v. Nersesian*, 824 F.2d 1294, 1327 (2d Cir. 1987) (quoting *United States v. Cruz,* 797 F.2d 90, 93 n.1 (2d Cir. 1986)). Even summation comments found to be improper will not result in a denial of the defendant's due process rights unless the statements caused "substantial prejudice" to the defendant. *Casamento*, 887 F.2d at 1189.

"When evaluating a claim of improper argument," courts "must consider the objectionable remarks within the context of the entire trial," *Banki*, 685 F.3d at 120, and. "in determining whether an inappropriate remark amounts to prejudicial error," courts consider "the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct," *United States v. Caracappa*, 614 F.3d 30, 41 (2d Cir. 2010) (citation omitted).

Here, as can be discerned from the lengthy *pro se* filings, Kenner challenges questions posed to him by the government during his trial testimony and remarks made during the government's rebuttal summation. (*See* Kenner's *Pro Se* Br., Point III, at 5-6, 171-76.) Neither constitutes reversible error.

First, during cross-examination of Kenner, the following exchanges occurred:

> Q. Well, there is no record, no document that shows any player knew anything about the Jowdy loan except for the one document you produced and offered into evidence during your direct. Correct?
>
> A. That in fact would be the loan agreement with Mr. Jowdy.
>
> Q. And if that loan document proves to be phony, then you are lying. Correct?
>
> MR. HALEY: I object to the form.
>
> THE COURT: Sustained as to form.
> . . .

---

including collusion with third parties like Jowdy. As set forth *infra*, the Court has focused on Kenner's main arguments (many of which were highlighted at oral argument) for purposes of this analysis, but also concludes that his other conclusory and unsubstantiated allegations in this regard are without merit.

Q. Aren't you just making all of this up as you sit there?

A. No, sir.

Q. Aren't you lying about these documents, your interactions with the people who relied upon you to take care of their money? Aren't you just lying about everything?

A. No, sir.

Q. Are you lying about even being summoned to the grand jury and then dropped like a hot potato?

MR. HALEY: Now I will object, your Honor.

THE COURT: Sustained.

MR. HALEY: Thank you.

Q. Aren't you lying about being summoned to the grand jury and then the FBI deciding they were going to favor Mr. Jowdy in Mexico over you. Aren't you lying about that?

MR. HALEY: Judge, I object.

THE COURT: Sustained.

(Tr. at 4598, 5064-65.) These isolated questions were not "so severe and significant as to result in the denial of [Kenner's] right to a fair trial." *Locascio*, 6 F.3d at 945. The Court sustained contemporaneous objections to the government's limited inquiries and repeatedly advised the jury—before, during, and after the trial—that the questions posed by counsel do not constitute evidence.[36] (*See* Tr. at 17, 3612, 6024.) Kenner "has not offered any argument to displace the 'almost invariable assumption of the law that jurors follow their instructions.'" *United States v. Feng Ling Liu*, No. 12-CR-934-01 RA, 2015 WL 4460898, at *10 (S.D.N.Y. July 20, 2015) (quoting *Richardson v. Marsh*, 481 U.S. 200, 206 (1987)), *aff'd sub nom. United States v. Bandrich*, 636 F. App'x 65 (2d Cir. 2016). Finally, as previously discussed, the government adduced overwhelming evidence proving Kenner's guilt with respect to each of his convictions. Thus, the challenged conduct was not severe, the Court mitigated any prejudice by sustaining objections and properly instructing the jury that questions by counsel are not evidence, and Kenner's convictions are certain absent the government's inquires. *See United States v. Guerrero*, 882 F. Supp. 2d 463, 477 (S.D.N.Y. 2011), *aff'd*, 560 F. App'x 110 (2d Cir. 2014) (declining to grant new trial based on single improper question posed by the government because, *inter alia*, the Court struck the responsive testimony and "the prosecutor rephrased the question and moved on to another line of questioning").

Second, in a 116-page addendum to his 300-page motion entitled "Rebuttal-Komatireddy," Kenner essentially attempts to re-litigate the trial by contesting sundry arguments that the government advanced

---

[36] Notably, the Second Circuit has said, in the context of summation arguments by the government in a fraud case, that repeatedly referring to the defendant's "lies . . . fall[s] within the broad latitude that prosecutors are afforded during summation" and were "tailored, in this fraud prosecution, to the circumstances of the case, given [the defendant's] contradictory explanations regarding the unauthorized credit card charges." *United States v. Greenberg*, 659 F. App'x 694, 697 (2d Cir. 2016) (citing *United States v. Peterson*, 808 F.2d 969, 977 (2d Cir. 1987) (noting that the use of the words "liar" or "lie" is not improper depending on context and whether the use is excessive or inflammatory); *United States v. Henry*, 13-CR-91 (RRM), 2015 WL 861743, at *5 n.5 (E.D.N.Y. Feb. 27, 2015) (finding that government's use of the term "lies" 55 times in summation was not excessive or inflammatory "when viewed in context").

during its rebuttal summation and characterizing them as "lies" and "fabrications." (*See, e.g.*, R33 E at 1 ("Komatireddy *LIES* immediately to the jury about there being a different attorney who filed the case versus Constantine."); *id.* at 9 ("This is another attempt by Komatireddy to mislead the jury about what Kenner's actual role as business manager included."); *id.* at 33 ("Komatireddy goes on to LIE – again – and state that Kenner testified during trial that the loans to Jowdy were the reason that Kenner received his equity in Cabo.").) Given that Kenner has submitted what amounts to an across-the-board challenge to the government's remarks, the Court need not—and does not—address each of his claims. Instead, it will assess the entirety of the government's rebuttal summation under the appropriate standard of review.

As noted, the "government has broad latitude in the inferences it may reasonably suggest to the jury" during its summation argument, *Williams*, 205 F.3d at 35, and even improper comments will not result in a due process violation unless the statements caused "substantial prejudice" to the defendant, *Casamento*, 887 F.2d at 1189. Further, "a prosecutor is not precluded from vigorous advocacy, or the use of colorful adjectives in summation," *United States v. Jaswal*, 47 F.3d 539, 544 (2d Cir. 1995) (quoting *United States v. Rivera*, 971 F.2d 876, 884 (2d. Cir. 1992)), and "[a] prosecuting attorney is not an automaton whose role on summation is limited to parroting facts already before the jury. He is an advocate who is expected to prosecute diligently and vigorously, albeit without appeal to prejudice or passion," *United States v. Wilner*, 523 F.2d 68, 74 (2d Cir. 1975). Finally, "[u]nder the invited or fair response doctrine, the defense summation may open the door to an otherwise inadmissible prosecution rebuttal. In particular, where the

defense summation makes arguments and allegations against the government, the prosecutor may respond to them in rebuttal." *United States v. Tocco*, 135 F.3d 116, 130 (2d Cir. 1998) (citing, *inter alia*, *United States v. Robinson*, 485 U.S. 25, 32 (1988)).

Here, there was nothing in the government's rebuttal summation that transgressed the generous boundaries outlined above. The government properly responded to arguments raised by defendants and referenced evidence to support those replies, and it did so without prejudicial or inflammatory remarks. For instance, the government noted that "Kenner argue[d] that he had nothing to do with counts Five and Six" in the superseding indictment and, in rejoinder, told the jury that they had heard Privitello's testimony about his conversations with Kenner and how Kenner had introduced Privitello to Constantine. (Tr. at 5960-62.) Likewise, with respect to Kenner's contention that he did not defraud the Eufora investors, the government read back a verbatim portion of Sydor's trial testimony regarding Kenner's representations to him. (*Id.* at 5970-71.) Further, in response to Kenner's "sugget[ion] for a moment that, you know what, Eufora was a real company," the government pointed to communications from Kenner showing that he was in dire financial straits at the time he solicited investments in that company. (*Id.* at 5980-82.) In sum, having presided over this nine-week trial, this Court can evaluate Kenner's motion

> against the background of the trial testimony. A careful review of [Kenner's submissions], weighed against the trial record and files, demonstrates they do not support the serious charges of constitutional infirmity based upon prosecutorial misconduct; that essentially they are

vague and conclusory, interwoven with much hearsay and irrelevant matter and constitute a palpable attempt to relitigate contested trial issues.

*United States v. Keogh*, 271 F. Supp. 1002, 1006 (S.D.N.Y. 1967) (footnotes omitted), *aff'd in part*, 391 F.2d 138 (2d Cir. 1968); *see also Liu*, 2015 WL 4460898, at *1 ("Although framed as allegations of prosecutorial misconduct, many of these arguments amount to little more than attempts to dispute witness credibility and relitigate evidentiary rulings.").

Moreover, even assuming *arguendo* that any portion of the government's rebuttal summation constituted misconduct (which the Court rejects), the Court minimized any prejudice by instructing the jury that those remarks were not evidence:

As you know, I am now going to give you my instructions on the law. Before I do that, I want to remind you of an instruction I gave you before the summations. It is a very important instruction and I want to repeat it to you. The statements that the attorneys make[], both in their opening statements and in their summations, are not evidence, and to the extent that an attorney says something about the evidence in their summation and your recollection is not consistent with their recollection of what the evidence was, it [is] your recollection that controls. And if there is any question about this in the juror room as you know, you can ask to have the court reporter read back any portion of testimony or you can ask for any exhibit that you wish during your deliberations.

(Tr. at 6017-18.)

Finally, under the third prong of the analysis, given the overwhelming evidence presented at trial, Kenner has failed to show that his convictions were uncertain even in the absence of the government's rebuttal summation.

In sum, in light of all of the factors—including the evidence of guilt at trial, the nature of the comments, and the Court's instructions to the jury—the Court finds that neither the government's cross-examination inquiries nor its rebuttal summation prejudiced Kenner so as to deprive him of a fair trial. Thus, Rule 33 relief is not warranted on these grounds.

### ii. Perjury

Kenner also claims that the government suborned perjury from several of its witnesses. However, because Kenner extensively cross-examined those witnesses as to their prior inconsistent testimony and provided his own testimony as to their misstatements, any possible falsity was fully disclosed to the jury. Thus, Kenner is not entitled to a new trial.

### 1. Applicable Law

"Reversal of a conviction based upon allegations of 'perjured testimony should be granted only with great caution and in the most extraordinary circumstances.'" *Zichettello*, 208 F.3d at 102. "In order to be granted a new trial on the ground that a witness committed perjury, a defendant must show that '(i) the witness actually committed perjury; (ii) the alleged perjury was material; (iii) the government knew or should have known of the perjury at [the] time of trial; and (iv) the perjured testimony remained undisclosed during trial.'" *United States v.*

*Josephberg*, 562 F.3d 478, 494 (2d Cir. 2009) (quoting *Zichettello*, 208 F.3d at 102) (alterations omitted). However, "[d]ifferences in recollection do not constitute perjury, and when testimonial inconsistencies are revealed on cross-examination, the 'jury [i]s entitled to weigh the evidence and decide the credibility issues for itself.'" *Id.* (citation omitted) (quoting *United States v. McCarthy*, 271 F.3d 387, 399 (2d Cir. 2001), *abrogated on other grounds by Eberhart v. United States*, 546 U.S. 12 (2005)); *see also United States v. Joyner*, 201 F.3d 61, 82 (2d Cir. 2000) ("[C]ross-examination and jury instructions regarding witness credibility will normally purge the taint of false testimony.") "It is the task of the jury as the 'appropriate arbiter of the truth' to 'sift[ ] falsehoods from facts' and determine whether an inconsistency in a witness testimony represents intentionally false testimony or instead has innocent provenance such as confusion, mistake, or faulty memory." *Josephberg*, 562 F.3d at 494-95 (quoting *Zichettello*, 208 F.3d at 102).

## 2. Analysis

Here, Kenner principally relies on statements made during civil litigation and grand jury proceedings to argue that several government witnesses lied at trial.[37]

First, Kenner seemingly asserts that McKee falsely testified about whether he knew that the Global Settlement Fund would be used to acquire various assets. (Kenner's *Pro Se* Br., Point III, at 10-11; Kenner Exh. R33 403.) However, on cross-examination, McKee was asked about his response to an e-

mail setting forth the GSF's purposes and gave the following testimony:

> Q. When Phil Kenner discussed with you, and Tommy Constantine discussed with you and your wife the $250,000, I take it your wife was [as] interested as you were in where that money was going?
>
> A. Of course.
>
> Q. And my question is simply this, sir, as relates to this particular e-mail, is or is it not your testimony that -- withdrawn. Is it your testimony that with reference to the content of this e-mail you may not have discussed the content with your wife?
>
> A. That's very possible.
>
> Q. Well, we can agree, sir, is that the e-mail was responded to by someone, correct?
>
> A. Yes.
>
> Q. And who responded acknowledged and approved?
>
> A. I don't recall that's myself [sic] or my wife.

(Tr. at 1834-35.) Thus, to the extent that Kenner now argues that McKee misrepresented his understanding of the GSF, his counsel elicited testimony undermining McKee's credibility at trial and gave the jury an opportunity to resolve any inconsistency in his statements.

---

[37] Insofar as Kenner cites additional materials, such as text messages, in support of his perjury claims, he has not argued that they constitute newly-discovered evidence or that he could not have discovered them prior to trial with due diligence. Regardless, those exhibits "merely furnish[] an additional basis on which to impeach" those witnesses and are therefore cumulative. *Payne*, 63 F.3d at 1210.

Likewise, Kenner also alleges that Sydor lied about whether he permitted his GSF contribution to finance other objectives besides litigation against Jowdy. (Kenner's *Pro Se* Br., Point III, at 12-14; Kenner Exh. R33 404.) On direct testimony, the government asked Sydor about an e-mail from Kenner proposing asset acquisition:

> Q. Now, this e-mail mentions a couple of different investments, including Eufora, an Air Park real estate project, a Falcon aircraft, and two complex condominiums. Do you see that?
>
> A. Yes. Yeah, I see it all. I mean, right now.
>
> Q. Now, at the time that you talked to Mr. Kenner, before you put money into the Global Settlement Fund, did he mention any of that money being used for any of those projects?
>
> A. No. It was for the global settlement of the Mexico situation. As you can see, it's sent from my Blackberry. I probably read over the first little bit, the transfer to Ron Richards for the Global Settlement Fund. On the Blackberry, I probably didn't read this whole e-mail. I would have questioned, you know, the Palms, the airplane, the air park. I mean, I used private planes at the time, but I never really wanted to purchase a plane or invest in an airplane. And I know for a fact that I didn't want to be part of the Palms.

(Tr. at 2177-78.) Again, Kenner's counsel challenged that statement on cross-examination, suggesting, as Kenner does in his motion, that Sydor's representation that he did not fully read Kenner's e-mail was not believable. (*See id.* at 2193-94 ("Q. I understand, sir, your direct testimony, but when you say you probably didn't read through it, at that point in time to the best of your knowledge, was your BlackBerry device functioning where you would have the ability to read the text message that was sent to you and then respond. That's just a question.").) Similarly, Kenner also questioned the Pecas about their knowledge regarding the GSF's goals. (*Id.* at 533-34, 777-85.) Accordingly, based on those inquiries, the jury had the ability to evaluate those witnesses' veracity.

Kenner further alleges that Peca falsely testified that he did not know that his Hawaii Project investment would be used to provide loans to Jowdy. (*See* Kenner's *Pro Se* Br. at 20-23.) However, Kenner also explored this issue at trial, and Peca admitted on cross-examination that he had testified before the grand jury that he was aware of a short-term loan made to Jowdy using Little Isle IV's capital account. (*Id.* at 499-502.) Thus, Kenner impeached Peca with his prior testimony, and any purported perjury was disclosed to the jury.

In addition, Kenner argues that, contrary to his trial testimony, Kaiser admitted during a 2009 arbitration proceeding that he knew that the Hawaii Project funds were used to finance Jowdy loans. (*See* Kenner's *Pro Se* Br., Point III, at 154-55; Kenner Exh. R33 637.) Yet, Kenner presented that testimony to Kaiser at trial on cross-examination, and Kaiser said that he made those statements during the arbitration based on Kenner's representations to him. (Tr. at 1106-09 ("When I testified at Owen Nolan, that's what [I] believed when I testified because as of 2006, Mr. Kenner had told me that when – the same time he told me my money went to Mexico so post that I learned that. And then after this, I learned that the civil litigation

against Kenner Jowdy got thrown out because of a forgery by Mr. Kenner.").) Likewise, Kenner also claims that Berard admitted during that same arbitration proceeding that he knew of the loans to Jowdy from the Hawaii Project (*see* Kenner's Exh. R33 033), but again, Kenner presented that prior testimony at trial on cross-examination (Tr. at 3086-90).

The Court has reviewed Kenner's other allegations of perjury and finds them to be without merit. For purposes of the preceding analysis, the Court focused on the allegations that Kenner identified as most salient during oral argument. However, based on its intimate familiarity with the record in this action, the Court's treatment of those specific assertions of perjury is applicable to the remainder of Kenner's contentions. Kenner's counsel extensively cross-examined each government witness at trial—indeed, the time expended on cross-examination often exceeded the length of direct testimony—and Kenner spent several days on the stand attempting to impugn the honesty of government witnesses with much of the same testimony and documents. The Court has no doubt that, after nine weeks of trial and the admission of more than 1,000 exhibits, the jury had ample opportunity to evaluate the credibility of each and every witness and to consider Kenner's version of events. The Court will not usurp that function by arrogating the power to resolve conflicting statements and narratives.[38] *See Josephberg*, 562 F.3d at 494-95.

\*\*\*

Accordingly, Kenner has not demonstrated that a new trial is warranted. His allegations of *Brady* violations, newly-discovered evidence, and prosecutorial misconduct all lack merit, and he has not established "extraordinary circumstances," *McCourty*, 562 F.3d at 475, or that there is "a real concern that an innocent person may have been convicted," *Parkes*, 497 F.3d at 232. In addition, based on the evidence of Kenner's guilt, the Court does not, in its discretion, believe that "letting [the] guilty verdict stand would be a manifest injustice." *Ferguson*, 246 F.3d at 134. Therefore, Kenner's Rule 33 motion is denied.

## IV. CONCLUSION

For the foregoing reasons, the Court denies Constantine's motion for a judgment of acquittal and motion for a new trial on the basis of jury confusion and newly-discovered evidence,[39] and it denies Kenner's motion for a new trial.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: October 13, 2017
    Central Islip, NY

\*\*\*

The United States is represented by Assistant United States Attorneys Saritha Komatireddy

---

[38] In particular, the Court will not explore Kenner's repeated argument that the government knew that Jowdy stole Hawaii Project funds that were loaned to him. As previously discussed, it is immaterial whether Kenner transferred money to Jowdy via a loan or some other arrangement because witness after witness testified that they never authorized their Hawaii Project investments to go to Jowdy at all. Further, it is irrelevant whether Jowdy also stole from Kenner or

the Hawaii Project investors. Simply put, whether or not Jowdy defrauded Kenner does not vitiate the fraud that Kenner perpetrated on his victims through his various schemes.

[39] The Court reserves decision on Constantine's ineffective assistance of counsel argument in support of his Rule 33 motion.

and Matthew Haggans of the United States Attorney's Office for the Eastern District of New York, 271 Cadman Plaza East, Brooklyn, New York 11201.

Defendant Phillip A. Kenner is represented by Jesse M. Siegel of the Law Offices of Jessie M. Siegel, 233 Broadway, Suite 2701, New York, New York 10279.

Defendant Tommy C. Constantine is represented by Sanford Talkin of Talkin, Muccigrosso & Roberts LLP, 40 Exchange Place, 18th Floor, New York, New York 10005; and by Michael Morrissey of Mitchell Stein Carey P.C., One Renaissance Square, 2 North Central Ave., Suite 1900, Phoenix, Arizona 85004.