**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
                                   |

**UNITED STATES OF AMERICA**     |
                                   |

   **against-**                     |

                                   |                   **Docket No. 13-cr-607 (JFB)**

**PHILLIP A. KENNER and**      |
**TOMMY C. CONSTANTINE,**  |

                                   |

**Defendants.**                     |
-------------------------------------------------------X

 

**Defendant, Kenner –**

**Forfeiture Reply**

## **TABLE OF CONTENTS**

Page

**TABLE OF AUTHORITY**                                                    **3**

**INTRODUCTION**                                                            **5**

**CASE LAW**                                                                **20**

**PART I – Baja Ventures 2006 forfeiture issues**                          **89**

**PART II – Government's Alternative Alleged Nexus To...**                 **153**

**PART III – Defendants Opposition To Government's Rehashing...**          **208**

**CONCLUSION**                                                            **210**

## <u>TABLE OF AUTHORITY</u>

### CASES

<u>Page</u>

*Berger v. United States*, 295 US 78 (1935)                    5, 15, 43
*United States v. Carpaccio* (2d Cir 2007)                     21
*United States v. Gaskin*                                       21
*United States v. Surgent* (EDNY 2009)(Gleeson, J.)            27, 36
*United States v. Croce* (E.D. Pa. 2004)                       27
*Luis v. United States* (2016)                                 28, 31
*United States v. Chamberlain* (4th Cir 2017)                  28
*Honeycutt v. United States* (June 5, 2017).       25, 28-37, 57, 212-214
*United States v. Cano-Flores* (DC Circuit 2015)               28
*United States v. Van Nguyen* (8th Cir 2010)                   28
*United States v. Pitt* (3d Cir 1999)                          28
*United States v. Benevento* (2d Cir 1988)                     28
*Sekhar v. United States* (2013)                               29
*Kaley v. United States* (2014)                                30
*United States v. Palmyra* (1827)                              32
*United States v. Carlyle* (11th Cir. October 18, 2017);       33, 34
*United States v. Gjeli* (3rd Cir 2017)                        34
*United States v. Fruchter* (2d Cir 2005)                      36
*United States v. Uddin* (2d Cir 2009)                         38
*United States v. Nicolo* (WDNY 2009)                          38, 54
*United States v. Boccagna* (2nd Cir. 2006)                    66, 67
*Brady v. Maryland*, 373 US 83,87 (1963)                       122

### STATUTES

*Rule 32.2*                                                    *25*
*Fed. R. Criminal. P. 32.2(b)(1)(B)*                           *21*
*Fed. R. Criminal. P. 32.2 (b)(1)(A)*                          *25*

*18 U.S.C. 3663A*                                              *84*
*18 U.S.C. 3664*                                               *84*
*18 U.S.C. 981*                                                *20, 38, 42*
*18 U.S.C. 981(a)(1)(C)*                                       *33, 34*
*18 U.S.C. 982*                                                *20, 42*
*18 U.S.C. 982(b)(1)*                                          *38*

*21 U.S.C. 853(e)*                                             *28, 31*

*21 U.S.C. 853(a)(1)*                                              *30, 33*
*21 U.S.C. 853(a)(2)(3)).*                                            *30*
*21 U.S.C. 853(o)*                                                    *37*
*21 U.S.C. 853(p)*                              *31, 32, 35, 38, 213, 214*

*28 U.S.C. 2461(c)*                                                *20, 38*
*18 U.S.C. 1001*                                       *27, 44, 88, 122*

### Sentencing Guidelines

*U.S. Sentencing Guidelines Manual 2B1.1, cmt. 3(A)(ii)*            72
*U.S. Sentencing Guidelines Manual 2B1.1, cmt. 3(C)*               *73*

## INTRODUCTION

The Government submitted the "*Government's Memorandum Of Law In Support Of Entry Of An Order Of Forfeiture*" on or about October 7, 2016.   The Government memo was an attempt to summarize their forfeiture position related to Kenner's Baja Ventures 2006 LLC, which holds equity in the Cabo san Lucas development known as Diamante (*Mexico*), amongst other assets.   In addition, it rehashed their trial theories that were exposed as false throughout Kenner's Rule 33 submission, only supported by overwhelming witness hearsay perjury.   The proven contradictions were supported in Kenner's Rule 33 submissions exclusively by empirical evidence (*at all times in the Government's possession pre-trial*).   The Government methodically ignored the empirical evidence to form their prosecutorial theories, specifically *in contradiction* to <u>*all previous*</u>:

- Grand Jury testimony given under oath,
- Civil testimony given under oath,
- Affidavits signed under oath,
- Civil depositions under oath, and
- FBI proffers (*statements carrying criminal consequences for lying*) (*amongst other overwhelming documents in their possession*).

Nonetheless, the empirical evidence was blatantly and systematically contradicted by witnesses' hearsay-laden *faulty memory, confusion and mistakes*[1], while a deliberate prosecutorial table sat silent (*ignoring their unambiguous and prodigious duties to the Court, the defendant, and the Constitution under Berger*).   Per the Supreme Court in 1935, *Berger* reinforced:

> ***The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as***

---

[1] ***Faulty memory, confusion and mistakes*** was the government's primary Rule 33 response to the documented confirmations of perjury and coincidental witness testimony; otherwise known as **not reliable,** however **clearly** illuminating the appearance of previously arranged (*or suborned*) testimony – as exemplified by the apparent "*lack of knowledge*" by EVERY ONE of the main Eufora investors (*Kaiser, Berard, Peca, McKee, Gaarn*) who attempted to <u>*buy the Eufora loan*</u> in 2010 with their independent representatives, Rudy Giuliani, Michael Stolper, and Eric Hatziemos, yet the government allowed the repeated false testimony to stand while disregarding the hundreds of texts between all of the parties, Kenner and their attorneys regarding *that* specific loan-acquisition effort -- in Rule 16 evidence. *See PK132, R33 617 and R33 618.*

*compelling as its obligation to govern at all, and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law.   He may prosecute with earnestness and vigor – indeed, he should do so.   But, while he may strike hard blows, he is not at liberty to strike foul ones.   It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction, as it is to use every legitimate means to bring about a just one.[2]*

---

[2] Amongst other unfounded and agitated attacks on Kenner by Michiewicz on cross-examination, Michiewicz offered to the jury that Kenner's "*conspiracy theory*" perspective that former FBI Director Louis Freeh, the primary attorney for Ken Jowdy related to his 2009 EDNY Grand Jury and SEC investigations could have called in a "*favor*" to divert the attention away from the known and documented frauds of his client (*Jowdy*) to Kenner, was ludicrous because Louis Freeh supported the Bill Clinton impeachment (*however that is related – Tr.5048*).   Michiewicz' derogatory mannerism in the court room (*i.e. crumbling up a piece of evidence in front of Kenner and throwing papers at him on the witness stand*) suggested that Kenner's hollow position was a complete aberration, wholly impossible to ever have occurred through "*abuse of power*" by Freeh and his high-ranking contacts in the FBI, DOJ, and SDNY.   *Tr.5047-5052*.

- This calculated attack on Kenner's veracity was fabricated and foundationless, in direct contradiction to the clear and convincing, underlying empirical evidence to support 100% of Kenner's claims about:
    1) Freeh's inappropriate involvement,
    2) The Jowdy EDNY Grand Jury subpoena termination,
    3) Kenner *NOT* ignoring it "*leaving it hanging out there*", and
    4) Its termination (*known at all times to Michiewicz and his EDNY office who both issued and terminated it with Galioto sitting silently, while personally involved in the entire 2009 process*).

At the time, the jury did not have the massively discovered knowledge of the recent Congressional "*expose*" of another recent Former Director of the FBI, the former Secretary of State, the Deputy Director of the FBI, the FBI Head of Counterintelligence, the Former Attorney General (*who oversaw Jowdy's original 2009 Grand Jury termination and Kenner's 2013 Grand Jury*), the former Deputy Attorney General, the Associate Deputy Attorney General, the number four official in charge of counterintelligence at the DOJ, and others under their command, all *abusing power* at the highest levels in the USA to perform a non-military coup to secure the election of the Presidency of the USA in 2016, through a myriad of now-discovered, coordinated criminal activities and cover-ups, including lying to a Federal Intelligence Surveillance Court ("*FISC*") with undocumented, unverified, and salacious allegations (*paid for thru the same Perkins Coie law firm used by Jowdy, Harvey and Freeh against the Hawai'i investors in the Arizona litigation*), resulting in illegal surveillance of US citizens; and much more.

Once the FBI-DOJ pre-election efforts failed including frauds, lies and cover-ups at the highest level to the FISC to acquire illegal surveillance warrants (*with known false documents*), they leaked Constitutionally protected information (*from the Former FBI Director*) to a non-government person (*at Columbia University*) for the specific intention to begin a Special Counsel investigation (*confessed by the Former FBI Director in a Congressional hearing*) thru the public attention of that media leak.   The Special Counsel, named by one of the government officials [*DAG Rosenstein*] who was also recently "***exposed***" by the Congressional investigation for their

6

**Baja Ventures 2006, LLC:**

**Kenner and two (2) partners own Baja Ventures 2006**; Jozef Stumpel and Jere

Lehtinen through documented debt and equity agreements introduced during the

forfeiture hearings.[3]   Jowdy, himself, confirmed to the FBI thru proffer years before trial

---

heavy cover-up involvement in the plot and perpetuating the lies to the FISC (*for the 4th
surveillance extension*), was their documented "**insurance**" plan to oust the duly elected
President elect of the USA.  Thus, it is "*possible*" that everything was not 100% kosher in the
quashing of the Jowdy investigations and the Kenner witch-hunt.

> Now, when Michiewicz insinuated that Kenner must be proverbially insane (*although
> Komatireddy actually pointed at Kenner and called him "insane" in her rebuttal summation*)
> to believe that Former FBI Director Freeh may have communicated with FBI Agent Galioto
> &/or others in the EDNY (*to quash the 20009 Jowdy/Najam investigations, and subsequently
> Jowdy's SEC inquiries*) and create a SDNY Grand Jury on Kenner less than 2-weeks later was
> preposterous, leaving Kenner to appear to live in a fantasy world of conspiracies.

[3] The FBI tried to scare Kenner's Baja Ventures 2006 partners Lehtinen and Stumpel into
turning against Kenner in 2010, even when every investor openly discussed and knew the
truths; specifically including Berard who was in constant contact with all of the Mexico and
Hawai'i investors and working daily on the litigation **_with_** Kenner VERSUS Constantine and
Jowdy (*before going broke from excessive lifestyle spending, drug and gambling habits, and
accepting a job from Jowdy in Mexico with Kaiser*).

[**RED** from Kenner; **BLACK** from Berard]

| | | | | | |
|---|---|---|---|---|---|
| 151 22 | +14015246 929 Bryan Berard* | 4/28/2010 8:49:58 PM(UTC +0) | Sent | They [FBI] are all over Lehtinen today including his agent, don baizley... | |
| 131 43 | +14015246 929 Bryan Berard* | 4/28/2010 8:50:37 PM(UTC +0) | Read | **Saying what??** | |
| 151 23 | +14015246 929 Bryan Berard* | 4/28/2010 8:52:30 PM(UTC +0) | Sent | The [FBI] agent told jere he's in big trouble and he's worried about jere. | |
| 131 44 | +14015246 929 **Bryan Berard*** | 4/28/2010 8:54:28 PM(UTC +0) | Read | **<u>Tell [FBI] agent [Galioto] to shut the fuck up. Doesn't have a clue.</u>** | |

that 100% of the Baja Ventures 2006 capital account funds came from Stumpel and Lehtinen. Jowdy further confirmed that they were sent to _his_ Mexico accounts (_completely separate from any Hawai'i loans_) during his February 25, 2010 FBI proffer, specifically to FBI Agent Galioto (_and others_). Jowdy also confirmed the independent funds Stumpel and Lehtinen deposited thru Kenner for the Baja Ventures 2006 capital account to the FBI on May 6, 2014, seven (7) plus months after Kenner's Indictment and arrest. With Kenner's confirmation via the Stumpel and Lehtinen debt/equity agreements and the Jowdy confirmation (_albeit short of the total funds Kenner's two [2] partners deposited for the Baja Ventures 2006 equity thru Jowdy, misappropriated by Jowdy for his continuing benefit, which led to several criminal lawsuits filed by Kenner's Baja Ventures 2006 partner Stumpel for the funds diverted by Jowdy in Mexico_), there is no equivocation about the **clean**, **non-co-mingled** source of the Baja Ventures 2006 funds. Yet, the Government attempts to refer to Jowdy as a co-conspirator in 2016 for the first time since the 2009 investigation began, to create a false nexus to the Baja Ventures 2006 equity, fully aware they could not attach to Jowdy as a co-conspirator (_uncharged, and in name only_). By naming Jowdy as a co-conspirator, the Government again tries to move the goalposts of their allegations to arrive at a pre-determined destination, after nearly a decade of calculated and well-documented Jowdy protectionism.

The FBI case agent, systematically chose to avoid any Jowdy pre-trial or trial references notwithstanding Jowdy's own confessions to the FBI in February and March 2010 of receiving the loaned funds (_from the well-known and documented Kenner-led Hawai'i project loans_) for fear of creating a nexus he could not undo. Jowdy's FBI confessions shortly followed his 2-day, January 2010, California deposition confessional about

---

- Please note that this text exchange was a year after the date Berard later claimed to the FBI (_in a 2013 proffer_) that he no longer found Kenner legit (_reversing his proffer only after Berard received a job from Jowdy in Mexico_). Notwithstanding, Berard had already given his voluntary 2009 arbitration testimony (**one year earlier**), confirming the loans to Jowdy from Hawai'i, his underlying knowledge and approvals, his knowledge of pledging his collateral to keep his underlying investments for the LOC leveraged-investment, and confirmations of his signatures on investment deals only after the review of his 3rd party, family attorneys. _See R33 311 @ page 3._

8

receiving 100% of the loans from Kenner personally, from the Hawai'i LLCs, and from other Kenner investment partners, yet brashly announced that he had "*NO PLANS*" to repay anyone (*under FBI protection for his known frauds*).  Jowdy's own attorney affirmed this when stating: "*So what, you gave him a loan?*" only three (3) weeks after Jowdy got his Arizona case dismissed by claiming the loans were not real (*See EDNY issues 018 @290*).   It was a dumbfounding reversal, but again without consequence based on Jowdy's privileged status of protectionism.

The FBI case agent has carried out a well-scripted plan to assist Jowdy and his attorneys to solely carve-out Baja Ventures 2006 from the Cabo san Lucas project like a surgeon and leave Jowdy unencumbered. The arrogance of power exhibited by the FBI case agent has repeatedly abused and undermined the integrity of the judicial system (*while exonerating Jowdy and his cabal <u>before</u> the Jowdy investigation occurred [considering neither Kenner nor any documented Jowdy victim was allowed to give testimony in front of the EDNY Grand Jury originally convened in 2009 – all cancelled by Galioto], and instead, trap Kenner*). The original extortion threat to Kenner April 29, 2009 confirmed this exact plan, sent by Jowdy's complicit attorney, Tom Harvey.  *See TIMELINE 007.*

- Harvey continued with his documented threats (*even with Kenner out of the way*) to any person trying to resolve the conflict with Jowdy other than complete annihilation [*April 1, 2014 email from another mediator for the investors – after Kenner's 11-13-2013 arrest*]:

  > *Ken:*
  > *I have a possible solution to all past, present and future issues in Diamante.*
  > *Give me an hour of your time, just you and I, and we can move the project forward without concern.*
  > *Harvey is just screwing this all up, immediately tell him to lay off the* ***Mexican component for now, or he is going to create issues south of the border beyond OUR control.***

After the failure of Harvey's 2009 extortion attempt on Kenner, Jowdy, Najam and Tom Harvey engineered new fraudulent efforts (*with Kaiser in 2014, now working hand-in-hand to carry out their 5-year plan*), and to illegally transfer Baja Ventures 2006 to John

Kaiser with more **FORGED** documents[4], after Kenner's incarceration, specifically at their collective hands[5].  The Baja Ventures 2006 equity in 2018 _should_ still be legally

---

[4] The documents (_agreements_), **FORGED** with Kenner's signature, were produced by Kaiser after Kenner's detention.  Six (6) months after the Kenner arrest, Harvey, Jowdy, Najam used the forged and fabricated documents with Kaiser to facilitate another attempted "_fraudulent transfer_" of assets belonging to Kenner (_the 3rd in 3 years by Jowdy, Berard and Kaiser_).  The forged documents were produced by Jowdy's attorneys in the 2014 Delaware actions against Jowdy by the remaining investors who sued Jowdy, and echoed the Kenner fraud retorts of Jowdy's cabal since discovered by Kenner in 2007 and immediately exposed to the investment group. _See PK128 (2006) and PK129 (2008).   Addressed in further detail in Footnote 50._

[5] Article: "_Former NHL player Bryan Berard and ex-cop_ [Kaiser] _help feds nail two Arizona men in massive fraud_", November 13, 2013, 1:33pm (_published at the exact same date and moment that Kenner and Constantine were arrested in Arizona_).  This timely article was written by Tom Harvey and Ken Jowdy's close friend, NY Daily News writer, Michael O'Keefe, who worked hand-in-hand in 2007-2008 with Harvey and Jowdy to write **AMERICAN ICON**, about Roger Clemens, Jowdy and Harvey's close friend (_quoting them repeatedly_).

- Please note that while Tom Harvey originally represented Clemens whistleblower, Brian McNamee, in the Senator Mitchell investigations, Jowdy was stealing Cabo investor funds (_from Owen Nolan – thru Jowdy's Baja Development Corp_) and making "_hush payments_" to McNamee, who ended up with selective amnesia by the time he testified at the Clemens Federal Perjury trial years later.  _See PK118_

_Prior to receiving a high-paying bribery job_ from Jowdy and Harvey, **Bryan Berard sent Kenner** the following texts after initially being contacted (_only months earlier_) by Harvey and Jowdy's NY Daily reporter (_Michael O'Keefe_) about the Jowdy frauds (_in a concerted effort with FBI Agent Galioto, only two (2) days apart from the aggressive tactics with Lehtinen and his attorney -- supra_).  Berard had all of the Jowdy embezzlement proof from Kenner, and independently from his attorneys Tom Baker (_Arizona_) and Ronald Richards (_California_), at that time.

[RED from Kenner, BLACK from Berard]:

| | | | | | | |
|---|---|---|---|---|---|---|
| 131 77 | +14015246 929 Bryan Berard* | 4/30/2010 9:48:51 PM(UTC+ 0) | Read | Everything good?? Asked cpl people for Tochs #. No luck. **A reporter called me too. Told him JOwdys a scumbag** | |
| 151 77 | +14015246 929 Bryan Berard* | 5/1/2010 12:06:48 AM(UTC+ 0) | Sent | **Good job with the reporter. Who was it?** | |

controlled by Kenner on behalf of himself and his two (2) partners in Baja Ventures 2006.  No legal notice from Jowdy and Diamante has been received by Kenner since the fraudulent transfer letter[6] was discovered by Kenner and responded to in 2014-2015.  *See Point III[7] @ 38-39 [Kenner response]*.   Three (3) of Kenner's investment partners, Rem Murray, Mattias Norstrom and Jozef Stumpel (*none of which were named victims in the April 22, 2015 Superseding Indictment*) signed and initialed affidavits just prior to the 2015 trial (*See Norstrom 2015 affidavit [PK123a and PK123B], Murray 2015 affidavit [PK124], Stumpel 2014 affidavit [PK154]*), in lieu of EDNY testimony (*after being threatened by Galioto that they would become co-conspirators of Kenner if they chose to testify at the 2015 trial on Kenner's behalf*)[8].

Norstrom's 2015 affidavit went on to confirm his complete knowledge of the Hawai'i loans **with the group** to Jowdy and their unpaid status as follows:

> Hawai'i loan
> In late 2004, Jowdy approached my Business Manager [Kenner] and asked if a group of investors including me from Hawai'i would lend him some bridge funding personally until he could get either the current Diamante del Mar project funded in

| | | | | | | |
|---|---|---|---|---|---|---|
| 131 85 | +14015246 929 Bryan Berard* | 5/1/2010 12:11:12 AM(UTC+0) | Read | **The douchebag from daily news. Told him he's an idiot for printing these articles and he can quote me that I've been to both properties over a dozen times and Jowdy has not done his job.** | |
| 131 86 | +14015246 929 Bryan Berard* | 5/1/2010 12:11:34 AM(UTC+0) | Read | **He shut up right away and said sorry for bothern u. And hung up** | |

[6] *See PK125* -- Jowdy-Kaiser April 2014 Baja Ventures 2006 THEFT FRAUD letter

[7] **Point ##** -- Refers to defendant Kenner's Rule 33 Motion.

[8] Norstrom, Murray and Stumpel 2015 affidavits affirm:

> **John Kaiser** – Former NY Police officer who defrauded the largest shareholder in the Cabo deal [*Kenner*] with **forged documents [***See PK128 and PK129***]** to steal his equity *worth over $100,000,000 in 2014* accompanied by an unauthorized and **fraudulent sign-off** by Jowdy to complete the fraud and theft of Kenner's equity. (*See PK125*)

> 2004 with development money and/or a project in Cabo san Lucas which several were pending at the time funded with a purchase and development loan.
>
> As a group, we agreed to lend him funds at a 15% interest rate.   Jowdy signed an official loan agreement with us in December of 2004.   Although, Jowdy received over $7,000,000 directly from us via wire transfer and repaid over $2,000,000 from December 2004 to April 2006, he later claimed that the funds were "not loans" but rather investments from our group of lenders after he was sued in the USA for not repaying the loans.   In 2010, Jowdy finally confessed that the funds he received from our lending group were actually loans and not the "investments" he declared as his defense in the [Arizona] case.   Jowdy's own NY attorney, Tom Harvey, actually threatened my Business Manager [Kenner] alleging that he [Kenner] stole the funds that Jowdy actually received.   Those funds remain unpaid of which about $1,700,000 in principle still outstanding is mine.

Neither of Kenner's Baja Ventures 2006 partners were alleged victims in the Kenner criminal case.   The testimony given by Kenner in the trial specifically refers to Stumpel and Lehtinen as his partners in the Baja Ventures 2006 LLC. *Tr. 4631-4632, Tr.4736*.[9] One hundred percent (100%) of the funds in the Baja Ventures 2006 capital account are traceable directly to the funds provided by both of Kenner's partners, *as intended by all parties, at all times*.   There are no additional funds, derived from any other source, that contribute to the documented $2.5 million Capital Account interest by Baja Ventures 2006 (*Kenner, Stumpel and Lehtinen*).

The Government's own accounting presented during the forfeiture hearings further confirmed this, contradicting their attempted, false nexus and fraud on this Court.

During Jowdy's 2-day California deposition in January 2010[10], Jowdy specifically

---

[9] **Tr**. -- Refers to transcript pages from the 2015 criminal trial.

[10] Jowdy's 2-day depositions with 100% of the Jowdy loan confessions were delivered to FBI Agent Galioto in February 2010.   Galioto instructed Kenner to "*NEVER send anything else*" to the FBI or the US Attorney's Office without his specific request.   *See EDNY issues 018* and *EDNY issues 019*.

Jowdy's California deposition occurred less than 3-weeks after Jowdy's Arizona "*no loans*" and "*loan document forgery*" defense obtained a summary dismissal under the false defense claims that Kenner had not appeared for day two (2) of his Arizona deposition.   The deposition had already been concluded with new, Little Isle 4 attorney, Tom Baker, on December 2, 2009 (*two weeks before the ex parte dismissal for allegedly not being produced*).

The dismissal was ordered **with prejudice**, fully confusing veteran Arizona attorney Baker. Once armed with the newfound Jowdy confessions (*just weeks later*), Baker was denied by the same Arizona Federal judge to re-open the case with the Jowdy confessions in-hand, further raising alarm bells to the legitimacy of the Louis-Freeh-defense-led dismissal.

With the California case open for 6-months by the deposition dates (*during the Arizona "<u>no loan defense</u>"*), Jowdy's California attorney proffered the following during Q & A:

[Ronald Richards questioning Jowdy @ 290 – January 5, 2010 -- **with John Kaiser present**]
*Q:  Do you know – do you know where we can get an accurate accounting of the checks that were issued and how the money was spent?*
*A [Jowdy]:  For what?*

*Q:  **For Baja Development Corp**.*
*A [Jowdy attorney Crowther]: Objection.  Assumes facts that you're entitled to that.*

*Mr. Richards:  **Well, we wired him money**.*
*Ms. Crowther:  **So what? You gave him a loan**.  That doesn't entitle you to an accounting of how it was spent.  If you want to ask about accountings that you have – Plaintiffs have an interest in the entities, that's different.*

*Jowdy's California attorney spoke freely less than three (3) weeks after the AZ case for **these exact loans** was dismissed after 18-months of Jowdy's Perkins Coie legal team denying the well-known loans (See R33 A), claiming the loan agreement was a "<u>forgery</u>", and the funds Jowdy received were "<u>investments</u>".  Now – they are not!?!*

*The "forgery" defense claims in the Arizona case were despite Jowdy authenticating it less than one (1) year later in a Nevada civil trial [See R33 011**], thus lying to the FBI and the AZ Federal Court**), threatening criminal actions against the two (2) original, Little Isle 4 attorneys for assisting Kenner and Little Isle 4's claims that the funds "were loans" (See TIMELINE 002), and submitting Mexico forged documents to the AZ federal court (See TIMELINE 004).*

<u>*But now in January 2010*</u>*, <u>they were all loans</u>, and Kenner and the Little Isle 4 investors were <u>not</u> entitled to the information.  It is no wonder all of the Little Isle 4 investors could not understand what was happening related to the loans that were:  **REAL (2004-07)**– **NOT REAL (2008-09)** – **REAL (2010)** – **NOT REAL** (2015 EDNY trial) – **and REAL AGAIN** (post trial according to Forf-44, produced by Jowdy and Jowdy's attorneys).  The REAL AGAIN government claim was according to Jowdy and the Government ever-changing story to fit their necessary defense tactics or prosecution theories (solely to protect Jowdy "at all costs").*

*How could it have been NOT REAL according to all of the government trial attacks on Kenner – yet three (3) weeks later (allegedly delivered in the first week of August 2015) – their Forf-44 exculpatory evidence confirmed their prosecutorial attacks were <u>wrong and extremely prejudicial</u>?  Nonetheless, the government sat silent until their forfeiture hearing (9-months later), now demanding its veracity is accepted as some "<u>don't look to close at how we got here</u>" nexus presentation.*

13

- *Somehow, the government asked the Court in their Rule 33 reply to recognize the Forf-44 "new evidence" as they presented, as* **cumulative**. *How? It directly contradicted their specific trial attacks on Kenner.*
    - *If it were* underline{cumulative}, *they defrauded the Court and jury during trial, yet*
    - *If it is* underline{not cumulative}, *then there are significant reformative issues that the jury was not able to digest, fully injuring the defendant Kenner – with "*<u>new evidence</u>*"?*
- ***The government cannot defend either wrong without reformative relief granted to Kenner.***

*To date, it has worked as planned and* **the $31 million plus in loans remain unpaid to Little Isle 4**, *as does the millions personally owed to Kenner, Murray (See TIMELINE 061 @ 25-26), Norstrom, Stumpel, Gaudet and others by Jowdy's legal defiance and FBI Galioto's relentless protective actions.*

The confirmations of bribes by Jowdy's people was made by Jowdy right-hand-man, Greg Carifiello and systematically ignored by the FBI case agent.   Carifiello confirmed to golf course design manager, David Boyden (*as noted by FBI agent Galioto), that "...any bribes that were given to the Mexico Government were classified on the books as consulting fees".  See 3500-DBP-1-r @3.*

In February 2010, Boyden confirmed a number of Jowdy accounting irregularities (*related to his known embezzlements and Bhatti's' [Lehman Brothers] blind—eye*).   Boyden affirmed:

> *"In three years, Boyden saw Ayers about ten times at the property.   Each time he only saw Ayers for a few hours."*
> - *Ken Ayers was Jowdy's lead project manager who submitted the fraudulent monthly accounting records to Lehman Brothers to cover the Jowdy embezzlements from DCSL,* **while Ayers made $408,000 annually plus bonuses**, *equity and expenses from Jowdy for his role in the cover-up scheme.*

Galioto then noted from Boyden: *"Jowdy and Kenner started to not get along after Jowdy closed with Lehman Brothers on the DCSL property.   Jowdy started to focus on other projects in Boot Ranch Texas and Palm Springs CA.  Jowdy also started a company LEGACY PROPERTIES [money laundering proof in Rule 16 evidence, and ignored], excluding Kenner [and the Kenner investors]".*
- *Jowdy tried to bribe Kenner with 20% equity stakes in early 2007 (once confronted by Kenner) plus high-paying managerial jobs in the various projects (confirmed in Jowdy's January 2010 deposition) – yet Kenner* **DECLINED** *(despite the lucrative offer – including FBI protection from Freeh and Behnke for the ongoing frauds).   Kenner rejected it outright. Since Jowdy was abandoning another Kenner and Kenner investor project [first DDM and now DCSL] – with $25 million plus at stake by that point and Jowdy now refusing to repay the loans from Hawai'i, Kenner, Gaudet, Stumpel, Norstrom, etcetera while cutting off communication with the Kenner investor group.  See Mike Peca SDNY Grand Jury confirmation of communication ceasing – See R33 419).*

confirmed that Kenner had no traceable funds to the Baja Ventures 2006 capital account. He confirmed that 100% of those funds came from Kenner's partners, Stumpel and Lehtinen.

> *[January 6, 2010 – Jowdy deposition]*
> *Q: ...But didn't Kenner pay 2.5 million for the 39 percent* [Baja Ventures 2006]*? A [Jowdy]: No.   He didn't put up any money.  He borrowed that money.  He doesn't have any money invested in it.*

In spite of the fact Galioto received the Jowdy depositions from Kenner and the Plaintiffs' attorney independently (*See R33 597*) (*as confirmed by Kenner to Gonchar FOUR [4] days after Gonchar explained to the FBI in his February 8, 2010 proffer (See PK106 -- 3500-SG-2 (page 8-9)) that both Kenner [before the Hawai'i loans] and Jowdy independently told Gonchar about the Hawai'i loans to Jowdy*), Galioto and the Government ignored this (*and every other pre-trial, pro-Kenner confirmation of knowledge thru Kenner*) when they deceptively alleged throughout the trial that Kenner received his Baja Ventures 2006 equity by misappropriating funds from the Hawai'i project.   These repeated and known egregious comments were so misleading that a reasonable juror could not have parsed thru the myriad of evidence to refute the unreliability of the Government's claims thru their closing, full of misleading and unfounded rebuttal summation declarations (*Tr.5990, 5996*), plainly abusing their duty under *Berger*.  These statements cannot find protection under any broad harmless error standard. Yet, the Government was relentless in their known-false and damaging

---

> ▪ *Kenner's allegiance (and MENS REUS, as exercised by Kenner when faced with the criminally conspiratorial offer from Jowdy's cabal) resulted in the decade plus of legal, and physical abuses; including the tortious and malicious acts (since 2007) and of FBI Agent Galioto (since 2009).*

Galioto then noted from Boyden: *"Boyden believes only $6 million went into the DCSL property.  He doesn't know where the rest of the money went."*
> ▪ *$30 million of DCSL budget funds had been spent by the time of the Boyden confirmation.  Boyden had his hands on every DCSL expense in the first four (4) years [2006-2009] until Jowdy fired him for supporting Kenner's efforts with the investors.  No one could have been better informed regarding the REAL DCSL expenses than Boyden.  Boyden ran the day-to-day project site and was a golf-development expert.*

offerings.

The approximate $1 million Jowdy owed Kenner by 2006 is documented in the various Jowdy corporate accounting records (*in Rule 16 evidence*) and the 2008 Arizona lawsuit; *all still unpaid to date*.   These funds do not include millions more Jowdy was sued for personally by Kenner in Mexico. These cases were all dismissed immediately after Jowdy, Kaiser and Berard assisted FBI agent Galioto in having Kenner Indicted and arrested in the USA.   As the Court recalls (*from pre-trial*), the Government claimed that other cases versus Jowdy were dismissed as well, because Kaiser claimed his name was *forged* on a Mexico testimonial document (*for the Stumpel case versus Jowdy in Mexico – for unpaid loans*).   Kaiser's forgery allegation disappeared in the EDNY Courtroom once Kenner pointed out to his attorney (*Haley*) that Berard is caught on a FBI recording confirming that he and Kaiser **_DID SIGN_** the documents in Mexico, which they told the FBI and US Attorney's Office Kaiser did not, *thus <u>obstructing justice</u>*.   Haley conveyed this to the prosecution (*without Kenner's permission*), specifically undermining Kenner's trial defense evidence for impeachment of another false-forgery claim (*emphasis added*). Nonetheless, it confirmed, yet again, that Kaiser and Berard were again willing to lie to Federal authorities (*or in concert with them*) regarding forgeries (*as Kaiser, Berard and Government "tracing witness" Donlan also did in the contemporaneously tried 2015 civil case in AZ [See R33 448], where the judge dismissed the Kaiser and Berard forgery defense claims **with** specific email and text evidence of their working knowledge of the Promissory Notes, which Kaiser indisputably signed*).[11]

It should be noted that the Kenner Indictment also allowed Kaiser and Berard to have their 2012 Arizona fraudulent conveyance case dismissed to their financial windfall (*with*

---

[11] *See TIMELINE 010 @ 4-9 and paragraph 49 (see Point III @ 43-46),*

> *See EDNY issues 005 -- Ranford Promissory Note email copy* (*confirming Kaiser lied about another alleged forgery*), and

> *See EDNY issues 003 -- Email Re- Promissory Note r-SYDOR* (*confirming Kaiser lied about another alleged forgery*).

*Kenner as Plaintiff*), as well as their 2013 Arizona (*Sag Harbor – LedBetter*) case regarding Kaiser and Berard again *forging* Kenner's girl-friend's name on a fabricated operating agreement (*See R33 308 [fake agreement], See real operating agreement @ R33 055d (referenced by Tesoriero -- December 2014 FBI proffer)*).  Kaiser and Berard submitted the *forged* and *fabricated* operating agreement as authentic in the Sag Harbor, NY (*LedBetter*) real estate transaction (*i.e. bank fraud, real estate & mortgage fraud, wire fraud issues in the EDNY*), used the fabricated documents to sell the property, and retained the proceeds illegally.   They benefitted approximately $700,000 from the Sag Harbor sale proceeds, defrauding both Kenner and LedBetter investor and EDNY witness Vincent Tesoriero (*which Tesoriero affirmed to the FBI in his 2014 proffer*).

It should be noted that Kaiser showed no remorse in blatantly robbing his 20-year NYPD officer and long-term friend (*Tesoriero*), identically to Kaiser's $550,000 in thefts from his friends & family in October 2008. Kaiser admitted the 2008 thefts to the FBI in his October 19, 2010 proffer (*See PK27 @7*)[12].    Thus, it was known at all times by Galioto, AUSA Beckman, and IRS agent Wayne, yet ignored when they discovered Kaiser used his friends & family money to purchase a personal interest in another Kenner real estate project with a portion of the funds in October 2008 (*See PK50 @3-7*) despite being admittedly "*broke*"[13] at that exact moment (*See PK50 @8 and 11*), ***never once***

---

[12] In spite of Kaiser's confessions with FBI Agent Galioto present in October 2010, the Court should be cautious as AUSA Komatireddy explained the unreliability of FBI 302(b) notes as follows during rebuttal summation (*Tr.5992*):
*[The Kaiser interview notes]*
> *"What is it?  It's the notes from an investigator from another office, **not the notes of an FBI agent**, an investigator from another office".*

To further discredit the validity of FBI 302(b) notes, Komatireddy alleges that the meeting notes could have been written by the "agent from another office" – **BEFORE** – the meeting?!?  Without hesitation, it was delivered with premeditated precision and conviction:
> *"You can't tell from the notes when they were written, if they were written before the interview or after the interview."*

[13] Kenner, in fact, loaned Kaiser another $120,000 in the month following Kaiser's purchase from Kenner (*still unpaid*) – and directly following Kaiser's admitted "*broke*" status (*See PK 50@11*):
> ***11-3-2008 -- Kenner transfer to Kaiser          $65,000***

demanding any fictitious repayment (*Tr.1020-1023*) from Kenner for either the Hawai'i or California projects in October 2008 (*because he was fully repaid – as documented in Rule 16 bank records*).

Kaiser confessed to the FBI about these fraudulent transactions, robbing his friends & family, and stated (*as noted by the investigating agent*), "*Kenner was not involved*". Regardless of the Kaiser 2010 confession five (5) years before trial, the government seeks money judgment and restitution for Kaiser (*though his handi-capped brothers' funds John Kaiser stole, as documented*), Bobby (*a.k.a. Robert Rizzi*), and a "doctor friend of JK" (*a.k.a. Frank Sconzo and Willy Kruger*) with funds that have clearly been documented by "*an investigator from another office*" (*SDNY Criminal Investigator Scott Romanowski*) as stolen by Kaiser from his closest friends & family and known at all times to Galioto, Wayne, and Beckman, at a minimum. (*See PK50 @2*).   Furthering the unhindered frauds against Kenner, Kaiser and Berard claimed these same $500,000 as funds "they" contributed to the Arizona renovation project (*thus double counting the stolen funds, at least*) and lying to the Arizona Court in their 2015 defense depositions and trial (*which lost*) (*See R33 055e @ paragraph 9, 20, 25-27, 32-34, 49 [alleged forgery signed with Donlan – PK50 @14-16]*).   More notably, Kaiser and Berard were exposed for falsely claiming that both of their names were *forged* in the case (*emphasis added*), utilizing not only a Jowdy-defense tactic, but sharing an attorney that Jowdy was also using in his Arizona (*fake forgery*) case, wholly supported by false claims of fabrications and forgeries (*also later disproved by Jowdy's own authentication in December 2010*) (*See R33 011*).   This 2012 Arizona litigation was a result of the 2nd time (*LedBetter-Sag Harbor, first*) that Berard and Kaiser <u>executed a fraudulent conveyance of title</u> against Kenner since acquiring their Mexico employment from Jowdy and working hand-in-hand with FBI agent Galioto to re-initiate the rhetoric about Kenner stealing the Hawai'i money to buy his Cabo equity (*all proven false thru Rule 16 evidence*). (*See R33 055e @40 and 57*).

---

|  |  |
|---|---|
| *11-12-2008 -- Kenner transfer to Kaiser* | *$48,000* |
| *12-8-2008 -- Kenner transfer to Kaiser* | *$10,000* |

The fraudulent attempt in 2014 to convey the Baja Ventures 2006 equity by Jowdy and Kaiser was the third (3rd) attempt at fraudulent conveyance.   This pattern cannot be supported by any legal justification, without protectionism as clearly executed to shelter Jowdy, Kaiser and Berard's clear criminal acts as a reward for their Galioto support versus Kenner.

**CASE LAW**

Under Rule 32, various *18 U.S.C. 981* and *18 U.S.C. 982* elements, and *28 U.S.C. 2461(c)*, the Government seeks money judgment, restitution and forfeiture as a result of the convicted counts at trial.

The Government theories of "*concealment*" by the defendant's activities with respect to their underlying investments were the basis for their conviction theories.   In spite of their theories, refuted by *every piece* of empirical evidence (*in the Government's possession pre-trial via their own Rule 16 production*), they chose to contradict all of it and pursue the "*concealment*" attack at trial.   Albeit successful on multiple charges thru un-ethically deceptive means (*discussed, infra*), the underlying transactions have all been repeatedly proven to be for the beneficial interest of the same individuals that the Government deemed victims, and repeatedly vetted by the investors independent counsel(s), separate and apart from the defendant, and *not to the benefit of the defendant.*

As a result, there is only a calculable residual and **appreciable gain** for the investors, **not losses** (*supra*).

Defendant will outline the calculations for the Court for each of the alleged victims who gave testimony at trial (*some thru forensic accounting -- where necessary*), since the Government expressly told the jury (*Tr.5993*):

> *"The Government called 39 witnesses in this case, multiple victims, **every John Doe**.  They told you their story.   That's what you have to consider."[14]*

---

[14] The individuals who were named in the superseding Indictment are the John Does, and one Jane Doe (*Ethel Kaiser*) who it was determined at trial was actually robbed by her son, John Kaiser of at least $310,000.   John Kaiser diverted $95,000 of Ethel Kaiser's funds to Bryan Berard.   Kaiser's bank records confirm this diversion on August 23, 2010 when they were both virtually broke [*BNK-MM-000233*], unknown to Ethel (*Tr.940-941*).   Kaiser and Berard's complicity in the Ethel Kaiser theft were not specifically determined but obvious, certainly not commensurate with the conspiratorial efforts with Jowdy's cabal, after acquiring their respective 2012 jobs in Mexico (*a.k.a. bribes from Jowdy and Harvey for complicity*).

The Government never claimed there were additionally alleged victims who did not or could not testify.   In fact, as the Court is aware, the Government "*streamlined*" their original Indictment a month before trial, as a result of multiple originally named victims telling the FBI: "*They were never victims of Kenner, but victims only of Jowdy*".

- This was confirmed to Kenner pre-trial by several investors who were attempting to file new litigation in Mexico versus Jowdy in 2015 (*affidavits infra*), before FBI agent Galioto and FBI agent Michael Cassidy arrested the person who was coordinating the 2015 Mexico City filings on behalf of the investors versus Jowdy.  They arrested the coordinating individual on obstruction of justice charges and foiled the investor's 2015 criminal lawsuit filings (*not including Kenner*) versus Jowdy in Mexico City (*again*) for the 13-years of pilfered Diamante frauds (*thru 2015*) and unpaid loans, not for any other funds [*i.e. Frailes*] as repeatedly misrepresented by the Government in post-trial filings and in their PSR enhancements, provably lacking any truths.

**Burden of Proof:**

Quoting the Government, establishing in forfeiture, the Government can rely on the evidence presented at trial, as well as the additional evidence and exhibits presented during the course of the forfeiture hearing.  *See Fed. R. Criminal. P. 32.2(b)(1)(B)*; *United States v. Carpaccio*, 503 F.3d 103, at 109-110 (2d Cir 2007) ("[W]here the forfeiture is contested, the Court in reaching its decisions may consider evidence not only already in the record, but any additional evidence presented by the parties at a hearing") ((quoting *Gaskin*, 2002 WL459005, at *9

---

In 2005, the **Ka'u Holding Company** bank account was established (*new*) for the Kaiser loan transaction.

Please note that Ethel Kaiser testified (*Tr.933*) that she only invested $390,000 (*fully repaid by her son with 12% interest*) but the Kau Holding Company bank statements from August 2005 show a $700,000 contribution from Ethel, thus Kaiser stole over $310,000 from his mom and *still unknown to her.   See R33 555 -- Kau Holdings August 2005 bank statement.* *This was part of the house of mirrors that Kaiser created around the documented funds he stole from his friends & family (some of which he confessed to the FBI in his October 2010 proffer).*

(WDNY January 8, 2002) (internal quotation marks omitted)).   The Government
relies on several other redundantly quoted cases, as well.

Yet, at no time during the guilt phase of the Government's case do they present any
foundational evidence that funds from any alleged scheme were used to purchase
Baja Ventures 2006 (*owned by Kenner, Stumpel and Lehtinen*).   The Superseding
Indictment (*Document 214*) makes no claims about the Kenner involvement in the
Cabo san Lucas project, any conspiratorial issues with Jowdy, or allegations that the
Cabo project is somehow related to the alleged criminal conduct.   Kenner's Baja
Ventures 2006 funding partners (*Stumpel and Lehtinen*) are *not* named as alleged
*Does.*   Specifically, the Government relies on their fabricated claims (*prosecutorial
misconduct*) during summations to cram in a false nexus:

> During rebuttal summation, Komatireddy lied to the jury about the same
> loaned funds by falsely claiming; "*Mr. Kenner told you that he used that money
> [Hawai'i loans to Jowdy] to get his piece in the Mexico investment with Ken
> Jowdy.  You know exactly what that's for.   That's in evidence.*"   Clearly, <u>Kenner
> never testified to that</u>, nor was it or has it ever been true; and certainly not "*in
> evidence*".   Notwithstanding, the jury was completely polluted with the
> defendant unable to respond after rebuttal summation. *Tr.5990*.

> Komatireddy went on to further mislead the jury during rebuttal summation,
> specifically related to the Baja Ventures 2006 equity, when she claimed, "*He
> [Kenner] used it [the Hawai'i loans to Jowdy] for personal use to get an interest
> in that resort in Cabo.*"   Again, the Government was 100% aware of the source
> of the Baja Ventures 2006 capital account, thus further misleading the jury in
> an attempt to tie up their version of the foundationally flawed "*loans to Jowdy
> conspiracy*". *Tr.5996*.

> This misrepresentation further discolored the jury's perspectives, in spite of
> the Government's well-defined knowledge of the authenticated loans to
> Jowdy (*which Jowdy confessed in his 2-day California deposition in January
> 2010*).   In addition Jowdy's own 2010 defense team authenticated the actual
> 2004 Hawai'i loan agreement in the December 2010 Nevada trial as his
> primary defense exhibit (*See R33 011*).   Nevertheless, Michiewicz attacked
> Kenner about the authenticity of the loan agreement (*Tr.4597-4598*),

insinuating Kenner's dishonesty about the loan agreement, he himself knew to be authentic:

> *Q:  So you would agree with me Mr. Kenner, that if the loan document proves to this jury to be phony, everything you have said in your direct testimony about money going to Mexico and not being stolen is a lie?*

Michiewicz' assault on the known truths continued:

> *Q:  And if that loan document proves to be phony, then you are lying? Correct?*

If Michiewicz' assaults thru well-devised and misleading questions were not enough to leave doubt on the minds of the jurors with no empirically contravening evidence to the document's authenticity (*See R33 011*), **thus real**, Michiewicz continued in summation with more affirmations of known falsities (*Tr.5707-5708*):

> *"...the signing of that supposed document?"*

Michiewicz continues with more affirmations of known falsities (*Tr.5708*):

> *"...the evidence, I submit to you, is that the loan agreement is bogus. Never happened.  Didn't exist.  Created as part of the hall of mirrors as part of the deception and lies to divert attention away from these two men."*

Michiewicz continues with more affirmations of known falsities (*Tr.5708-5709*):

> *"And that's all we got, th[is loan] document, this piece of paper saying: Oh, I hereby loan my clients' money to Ken Jowdy down in Mexico.  But it is more than just that.   The bogus nature of the loan agreement."*

To create his own "*hall of mirrors*", Michiewicz and the prosecutorial team, shut their eyes to the overabundance of supplementary clear and empirical evidentiary disclosures, *by Jowdy himself.*   They included Jowdy's own confessions on 3-24-2010 to the FBI by Jowdy (*with case agent Galioto present*) in *R33 rebuttal 002 -- 3500-KJ-2.*  The entire prosecutorial team IGNORED Jowdy's own 2010 confessions of the Kenner supporting truths, in a fabricated attempt to create a storyline and false nexus (*perhaps in forfeiture forethought*).   All of this disregards that Jowdy disclosed the real truths once he got his Arizona 2008-09 "*no loans*" defense case

dismissed thru unethical means (*all documented including threats to the Little Isle 4 attorneys -- See TIMELINE 002*) of "severe consequences" if they continued to prosecute the money Kenner claimed that Jowdy received as "*loans*" – in spite of Jowdy admissions three (3) weeks after the timely yet surprising dismissal *with prejudice*.   None of the Government's false proffers relied on any empirical evidence (*in fact just the opposite*), fully misleading the jury, injuring the defendant, yet to their detriment, still leaving the forfeiture claims (*for Baja Ventures 2006*) without nexus or merit.

The Government's attempt to add Stumpel and Lehtinen as post trial victims to satisfy nexus (*amongst many others – Forf-1*) is also obvious and amateurish.   The Government has at all times had in their possession the two (2) debt-equity agreements between Kenner-Stumpel and Kenner-Lehtinen (*presented again during the forfeiture proceedings*).   The Government's own accounting (*Forf-36*) leaves no equivocation of the "*clean*" source of the Baja Ventures 2006 capital account funds.

### "Obtained assets"

The legal profession has widely held the belief that if the Government wants to capture property as a result of a plea deal or a trial conviction, the defendants should "*let the property go*" so as "*not to complicate the matter*", or at a last resort, retain subsequent counsel to later deal with the issues.    Kenner was given these exact instructions by his trial attorney (*Haley*) prior to the Pre-Sentence Interview at the Brooklyn Courthouse immediately after the 2015 trial concluded.   Kenner was told:

> "*If you do not want to spend the rest of your life in jail, you need to immediately sign over the Mexico property to the Government.*"

**Kenner clearly refused.**

Forfeiture is as old as biblical times.  Even the Bible (*Exodus 21:28*) authorized the forfeiture of a person's Ox if the Ox gored another man or woman.   But, the version

that Congress enacted over 1700 years later created a well-defined set of rules to limit the overreach of the justice department.   In 2017, the Supreme Court finalized its clarity in *Honeycutt*.

*Rule 32.2* is important for the defendant in a criminal forfeiture case when the Government seeks the forfeiture of specific property.   While the rule provides the amount of money judgment, the court will determine forfeiture during the forfeiture phase of the trial.   It also provides that "*[i]f the Government seeks forfeiture of specific property, the court must determine whether the Government has established the requisite nexus between the property and the offense.*"   *Fed. R. Criminal. P. 32.2 (b)(1)(A).*   Under the relation back doctrine; the Government must prove a nexus. They fail, *infra*, with their own Forf-36 accounting, in addition to the other items in Rule 16 evidence, presented to the Court in defendant's reply brief.   The relation back doctrine operated differently depending on whether the basis for forfeiture is that the property is traceable to proceeds of criminal activity or was involved in the commission of a crime.   Since the acquisition of Baja Ventures 2006 (*by Kenner, Stumpel and Lehtinen*) are wholly unrelated to the concealment allegations at trial, **and** documented exactly as the Baja Ventures 2006 investor's expected their funds to be applied, **and** not part and parcel to either defendant Indictment (*2013 or 2015*).   Thus, the nexus is <u>not</u> provable, nor the property forfeitable.

Nonetheless, the Government tried to circumvent its own 6-year investigation evidence, 10-week trial proffers and resulting decision by changing their theories in order to create a post-trial nexus.   For the first time (*in 2016*), they claimed Jowdy as a co-conspirator.   For the first time, they also claimed Lehtinen and Stumpel as victims.   Neither was true, as all of the empirical evidence affirms, specifically with Kenner turning down the 2007 Jowdy-FBI bribes of money and protection to **actually** become Jowdy co-conspirator (*documented in Najam and Jowdy's own words*) and receive the "*fruits of the crime*".   Clearly, **Kenner refused**.

25

Jowdy's use of the 2004 Hawai'i loan funds were also exactly as authorized and acknowledged pre-trial by every "*under oath*" investor, including but not limited to:

- 2009 civil testimony [*Berard, Kaiser and Constantine (based on 12 month of negotiations with Jowdy and his attorneys)*],
- 2009 civil trial affidavits [*Stumpel, Lehtinen, Norstrom, Peca and Gonchar*],
- 2010 FBI proffers [***Jowdy** himself, Gonchar, Kaiser and Berard (confirmed by Kaiser's own words)*],
- 2011 SDNY Grand Jury testimonies [*Peca, Sydor and Stevenson*],
- 2014 Mexico pre-filing affidavit [*Stumpel*],
- 2015 Mexico pre-filing affidavit [*Norstrom, Murray*], and
- 2017 EDNY affidavit [*Stumpel*].

***None were dissenting***.   In fact, the Little Isle 4 operating agreement [*TIMELINE 046*] specifically allowed for loaning assets of the company, thus further authorized and approved (*identical to the Big Isle 5 operating agreement [R33 2007], utilized in the Centrum loan advance to Jowdy, negotiated between Manfredi and Jowdy [R33 2001]; not Kenner*).

No partial claim can be made under co-mingling theories, as 100% of the funds are traceable to Stumpel and Lehtinen for the $2.5 million Baja Ventures 2006 capital account.   The Excessive Fines Clause of the 8th Amendment limits forfeiture of all partial interests in property, real and personal.  See *United States v. Bajakajian*, 524 U.S. 321 (1998).   The Excessive Fines Clause applies in both civil and criminal forfeiture cases.     If the value of the property is grossly disproportional to the severity of the defendant's crime, the courts are unlikely to compel a sale.

> *For example, if the Government can prove that $50,000 in tainted funds was used to buy, renovate or make payments to principal on a mortgage, and the property is worth $1 million, compelling the sale of the property to pay the $50,000 would likely be deemed in violation of the Eighth Amendment and not permitted.*

*Nonetheless, <u>none</u> of the Baja Ventures 2006 funds come from the charged offenses or recognized in the Superseding Indictment.*

As the Government seeks a money judgment, it should be noted in *United States v. Surgent*[15] that Second Circuit Judge Gleeson demonstrated that money judgments are not authorized by statute.   He provided a detailed, historical-based and reasoned analysis missing from *United States v. Croce* [16] and the decision affirming the validity of money judgment forfeitures.   Equally important, Judge Gleeson demonstrated that the money judgment route, valid or not, should not excuse the Government from having to satisfy its statutorily-mandated burden of tracing the property sought to be forfeited to the criminal activity.

In addition, with money judgments, the Courts usually determine how much property the defendant "*obtained*" as proceeds of the crime or how much property was involved in the money laundering offense.  Under those parameters, it is a simple matter to declare that any number of "*defendants*" (*which specifically does not include Jowdy – by Galioto's design*), conspired together to "*obtain*" the proceeds or launder the property without specifying who actually received what property, *but at all times required to be "obtained" by a defendant or co-conspirator in the case*.   This is the basis for the Government's attempted "*end-around*", co-conspirator claims in 2016 of Jowdy post-forfeiture, reversing their affirmations of Jowdy's "*victim status*" throughout the trial, creating revisionary prosecutorial issues, again injuring the defendant.   In Jowdy's 2016 declaration, Jowdy and his attorneys used their artistic liberties in professing another yet consistent false narrative to the EDNY trial court (*See R33 rebuttal 007*).   This effectively avails Jowdy to *18 U.S.C. 1001* perjury claims in the 2015 EDNY trial Court (*assuming equal justice under the law, if we live in a true Constitutional Republic*).   Jowdy affirmed under oath:

> *"I firmly believe, however, that the biggest challenge that I have had to overcome has been the nearly decade-long campaign orchestrated and promoted by the defendant, Philip Kenner and his clients and associates, to unfairly malign me,*

---

[15] F. Supp. 2d __, 2009 U.S. Dist. LEXIS 72563, 2009 WL 2525137 (EDNY August 17, 2009)(Gleeson, J.)

[16] *United States v. Croce,* 334, F. Supp 2d 781, 785 (E.D. Pa.), *amended on reconsideration*, 345 F. Supp. 492 (E.D. Pa. 2004), *reconsideration denied*, 355 F. Supp. 774 (E.D. Pa. 2005), *reversed and remanded*, 209 Fed. Appx. 208 (3d Cir. 2006).

*sue me, and wrongfully accuse me of improper conduct, ranging from mismanagement of the project to various unfounded criminal and civil complaints."*

### *Honeycutt v. United States:*

The Roberts-led Supreme Court hinted at some dissatisfaction with the state of criminal forfeiture law in recent decisions[17], but the rifle shot came in its June 5, 2017, decision in *Honeycutt v United States*.[18]  Unconcerned with the fact that virtually every Court of Appeals that had addressed the issue had ruled otherwise,[19]

---

[17] See, e.g. *Luis v United States*, 578 U.S. ___, 136 S. Ct. 1083 (Mar. 30, 2016).  *Luis* resolved a split in the Circuits in holding that criminal forfeiture law does not permit the pretrial restraint of substitute property, i.e. property not shown to be proceeds or involved in criminal activity.   The Supreme Court, Justice Breyer, held that pretrial restraint of a defendant's legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment.  *U.S.C.A. Constitutional. Amendment 6.*

- The Sixth Amendment right to counsel grants a defendant "a fair opportunity to secure counsel of his own choice," *Powell v. Alabama,* 287 U.S. 45, 53, 53 S.Ct. 55, 77 L.Ed. 158, that he "can afford to hire," *Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 624, 109 S.Ct. 2646, 105 L.Ed.2d 528. The Supreme Court has consistently referred to the right to counsel of choice as "fundamental."

See also, *United States v. Chamberlain*, 868 F.3d 290, 297 (4th Cir 2017), in which the Circuit Court held that "Section 853(e) does not by its terms permit pretrial restraint of substitute assets" and expressly overruled *Billman* and the quarter-century of decisions from the Fourth Circuit adhering to *Billman*.

> *This specifically forbidden action was carried out by the suffocating lien placed on Kenner's ex-wife's property in 2013 (only being rented by Kenner) without a required hearing, forcing a full foreclosure on the property and a million dollar plus loss to Kenner's ex-wife and children, who had no relationship to the charged Indictment in 2013.   The government knew Kenner had no documented interest in the property, yet filed a lien that prohibited Kenner's ex-wife from selling the property, with a clouded title, before losing it to foreclosure, causing specifically intended collateral harm, and depriving Kenner and his family of funds to hire counsel of choice.*

[18] *Honeycutt v United States*, 137 S. Ct. 1626, 581 U.S. ___, 2017 WL 2407468 (June 5, 2017).

[19] The Supreme Court noted that the Second, Third, Fourth and Eighths Circuits had held in favor of applying joint and several liability to criminal forfeitures, while the DC Circuit had ruled against application of the doctrine.   See *Honeycutt* 2017 WL 2407468, *4 n.1 (citing *United States v. Cano-Flores*, 796 F.3d 83, 91 (DC Circuit 2015); *United States v. Van Nguyen*, 602 F.3d 886, 904 (8th Cir 2010); *United States v. Pitt*, 193 F.3d 751, 765 (3d Cir 1999); *United States v. Benevento*, 836 F.2d 129, 130 (2d Cir 1988) (per curium)); The Sixth Circuit also ruled in favor of joint and several liability in *Honeycutt*, itself, the decision reversed by the Supreme Court.  See *Honeycutt v United States*, 816 F.3d 362 (6th Cir 2016).

the Supreme Court, in a unanimous decision, unequivocally rejected the application of joint and several liabilities in criminal forfeiture cases.[20]

Thus, the legal question presented itself.   The Court identified the question presented as whether the criminal forfeiture statute "*embraces joint and several liability for forfeiture judgment*".   The Court noted that applying this tort doctrine to criminal forfeiture "*would require that each defendant be held liable for a forfeiture judgment based not only on property that he used in or acquired because of the crime, but also on property obtained by his co-conspirator*".[21]

The Court noted initially that application of joint and several liability could result in the forfeiture of untainted assets, which would contravene the limitations of the criminal forfeiture statute.  Further, the Court found that the statute "*defines forfeitable property solely in terms of personal possession or use*", as it specifically "*limits forfeiture to property the defendant* '**obtained…as a result of the crime**". Under the law and ordinary usage, the Court said, "*obtaining*" property means personally acquiring or securing possession of it".

> The term "*received*" and "*obtained*" have maintained a synonymous relationship for over half of a century in both the Oxford and Random House Dictionary of the English Language.
>
> In *Honeycutt v. United States*, 2017 WL 2407468 *6, the Court even cited the dictionary definition of "*obtain*" from 1966, prior to section 853 being enacted (*covering racketeering activities [1970] and substantially expanding to drug related crimes [1984]*).   It also referenced the 1933 edition of the unabridged Oxford English Dictionary, the current edition of Black's Law Dictionary, and a recent decision of its own.   Not surprisingly, the Court found that the definition of "*obtain*" has remained constant through the decades. *Id.* (*citing Random House Dictionary of the English Language 995 [1966]; 7 Oxford English Dictionary 37 [1933]; Black's Law Dictionary 1247 [10th ed. 2014]; Sekhar v United States, 570 U.S.___, 133 S. Ct. 2720 [2013] ["Obtaining property requires…'the acquisition of property'."]*)

---

[20] Justice Gorsuch took no part in the decision.

[21] *Honeycutt v United States*, 2017 WL 2407468, *4.

Further, while *21 U.S.C. 853(a)(1)* provides that forfeitable property may be "*obtained directly, or indirectly*"; obtaining property indirectly **still requires that the defendant actually receive it**.  An example of receiving forfeitable property indirectly would be where funds were paid to the criminal defendant through an intermediary.   But the property must nevertheless be "***obtained***" *by the defendant*, not by someone else.

Finding additional confirmation of the statutory intent to require personal receipt by the defendant, the Court pointed to provisions that limited forfeiture of property used to facilitate a crime "*the person's property*", and limited forfeiture of property related to a continuing criminal enterprise to "*his* [*i.e. the defendants*]*'interest in' the enterprise*".[22]

The Supreme Court looked broadly at *21 U.S.C. 853*.  The statute, the Court found, constantly separates its treatment of tainted from that of untainted property, a crucial distinction that is not preserved by the application of joint and several liability.

First, the relation-back provision of Section *853(c)*, which vests title to the tainted property in the Government upon commission of the act giving rise to forfeiture, applies only to tainted property "*obtained*" as the result of or used to facilitate the crime.

Second, the pre-trial freeze provision of the criminal forfeiture statue similarly applies only to property that the Government proves, <u>at a hearing</u>[23], "*has the requisite connection*" to the charged criminal activity.

---

[22] *Honeycutt v United States*, 2017 WL 2407468, *6 (citing 21 U.S.C. 853(a)(2)(3)).

[23] The required "*hearing*" never occurred prior to placing the lien on Kenner's ex-wife's property, forcing the eventual foreclosure and a million dollar plus loss to an unindicted

Third, the statute's provision for a rebuttal presumption that property is subject to forfeiture applies only to property "*acquired by [the defendant] during the period of the violation*" and where there is "*no likely source for such property*" other than the crime.[24]

For the Supreme Court, however, the clincher was the substitute asset provision, the sole criminal forfeiture statute that specifically authorizes the forfeiture of untainted property from a defendant.   It should be recalled that the forfeiture of substitute assets is permitted, but only if sufficient tainted property of the defendant cannot be located as a result of any "*act or omission of the defendant*".

According to the Court, the substitute asset provision at *21 U.S.C. 853(p)(2)*:

> "*...demonstrates that Congress contemplated situations where the tainted property itself would fall outside the Government reach. To remedy that situation, Congress <u>did not</u> authorize the Government to confiscate substitute property from other defendants or co-conspirator; it authorized the Government to confiscate assets only from the defendant who <u>initially acquired</u>[25] the property and who bears the responsibility for its disposition.*

---

party, *without proper protocols, leaving a specific 6th Amendment issue at hand to be further adjudicated for denying defendant Kenner the ability to retain counsel of choice.*   Prior counsel refused to address the lien freezing issue pre-trial, claiming – "*You cannot fight the government seizures or liens until after trial*".

[24] The government conveniently overlooked the fact that Jowdy also retained documented loaned funds from Kenner, Stumpel, Gaudet, Norstrom, Murray and others, thus confirming the "*other likely sources*".

*Honeycutt v United States*, 2017 WL 2407468, *7 (citing 21 U.S.C. 853(c) (relation back); 853(e)(1) (pretrial restraint); 853(d) (rebuttable presumption); *Luis v United States*, 136 S. Ct. at 1090(relation back applies only to tainted property); *Kaley v United States*, 571 U.S. ___, 134 S. Ct. 1090, 1095 & n.11 (2014) ("forfeiture applies only to specific assets")).

[25] The government faces another hurdle with the funds Gaarn ***initially*** received from selling ***his*** private Eufora stock [*fully documented from 2005 thru 2009 in the Eufora records; taxes, emails, operating agreements, etcetera* – **nothing in contradiction**], but in spite of the independent counsel investigations [*2010-2011*] on behalf of the AZ Eufora Partners I investors (*infra*), the government claimed the *fully vetted* private sales were still, somehow, part of a scheme.

> *Permitting the Government to force other co-conspirators to turn over untainted substitute property would allow the Government to circumvent Congress' carefully constructed statute scheme, which permits forfeiture of substitute property only when the requirements of 853(p) and (a) are satisfied. There is no basis to read such an end run into the statute.*"[26]

The Court applied the rule of narrow construction of forfeiture statutes to criminal forfeiture.  Against this statutory scheme, the Government's contention that the "*bedrock principle*" of joint and several liability of co-conspirators must be read into the statute rang hollow to the Court.   As noted *supra*, the principle that forfeiture statutes must be strictly construed is largely a civil *in rem* forfeiture principle that has rarely been applied in the criminal forfeiture context.   But that is precisely what the Supreme Court did in *Honeycutt*.

The Court pointed out that forfeiture was historically civil in nature.   Traditional forfeiture law kept a strict boundary between *in rem* civil proceedings and any related *in personam* criminal proceeding.[27]   With the enactment of the criminal forfeiture provision of *Section 853*, "Congress altered this distinction…by effectively merging the *in rem* forfeiture proceeding and *in personam* criminal proceeding and by expanding forfeiture to include not just the 'thing' but 'property'…derived from any proceeds' of the crime".

---

**Gaarn initially received the sale proceeds** (*since they were his, and chose to utilize his personal proceeds to loan money to Kaiser [documented in Rule 16 texts] and repay Kenner for his $150,000 plus of unpaid loans.  Gaarn's sales kept his kids in private schools and halted a pending home foreclosure for the Gaarn family, in addition to immediately paying over $100,000 of his own obligations.*

[26] *Honeycutt v United States*, 2017 WL 2407468, *8

[27] *Honeycutt v United States*, 2017 WL 2407468, *9 (quoting the *Palmyra*, 12 Wheat 1, 14-15 (1827) ("[t]he thing [was] primarily considered as the offender, or rather the offence [was] attached primarily to the thing.  … [the forfeiture] "proceeding *in rem* st[ood] independent of, and wholly unaffected by any criminal proceeding *in personam*" against the defendant)).

The Court's point was that Congress may have "*altered*" the distinction between civil *in rem* forfeiture and *in personam* criminal proceedings, but Congress <u>did not</u> eliminate that distinction.  Criminal forfeiture is derived from civil forfeiture and subject to the same limitations:

> As is clear from its text and structure, *853* maintains traditional *in rem* forfeiture's focus on tainted property unless one of the preconditions of *853* exists.  For those who find it relevant, the legislative history confirms as much: Congress altered the traditional system in order to "improve[e] the procedures applicable in forfeiture cases". By adopting an *in personam* aspect to criminal forfeiture, and providing for substitute-asset forfeiture, Congress made it easier for the Government to hold the defendant who <u>*acquired*</u> the tainted property responsible.  Congress <u>*did not*</u>, however, enact any "*significant expansion of the scope of property subject to forfeiture*".[28]

Thus, the Supreme Court held that joint and several liability does **<u>NOT</u>** apply to criminal forfeiture.   Only assets **obtained** directly or indirectly by a defendant are subject to forfeiture.


### The implications of Honeycutt:

The general applicability of *Honeycutt* in this case would seem to be indisputable.

- See *United States v. Carlyle*, ___Fed. App'x ___, 2017 WL 4679564 (11th Cir. October 18, 2017);
    - *As the Court cited in Carlyle, although the forfeiture statute at issue in Honeycutt, 21 U.S.C. 853, is not the same forfeiture statute at issue here [drugs versus wire fraud], 18 U.S.C. 981(a)(1)(c), the two statutes are largely the same in terms of their pertinent language, and so it appears that the Supreme Court's decision would apply to the statute at issue in this present case.*
        - *Compare 21 U.S.C. 853(a)(1) ("Any person convicted of a violation...shall forfeit...any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation.") with 18 U.S.C. (a)(1)(C) ("The following property is subject to forfeiture to the United States...Any property, real or person, which constitutes or is derived from proceeds traceable to a violation.").*

---

[28] *Honeycutt v United States*, 2017 WL 2407468, *9 (quoting S. Rep. 98-225)

- ▪ *Indeed, the Third Circuit has so held.   See United States v. Gjeli, 867 F.3d 418, 427-28 & n.16 (3ʳᵈ Cir 2017) (concluding that Honeycutt applies with equal force to a forfeiture pursuant to 18 U.S.C. 981(a)(1)(C), and remanding to the district court to reconsider its forfeiture ruling).*

  - o *It should be noted that post-Honeycutt, **the government conceded** in Carlyle that the prior inappropriate joint and several liability ruling for <u>money judgment</u> (as applicable from Honeycutt) from the wire fraud scheme simply because <u>Carlyle</u> was a co-conspirator should be reversed, while not "obtaining" the proceeds, or fruits of the scheme.²⁹*

- **See *United States v. Gjeli*, 867 F.3d 418, 427-28 & n.16 (3ʳᵈ Cir 2017) ("*Honeycutt* applies with equal force to a forfeiture pursuant to *18 U.S.C. 981(a)(1)(C)*"), and**

- **See *United States v. Brown, 694 Fed. Appx. 57 (3ʳᵈ Cir 2017) (Thus like 853, 982(a)(2) applies to tainted property only.  The statutes use of "obtained," meanwhile, suggests they the scope of the forfeiture is "define[d]…solely in terms of personal possession or use," and the adverbs "directly" and "indirectly" do not "negate th[at] requirement.")***

- **See *United States v. Lara, 691 Fed. Appx. 244; 2017 U.S. App. LEXIS 11908; 2017 FED App. 0390N (6ᵗʰ Cir),*** *in which the Court has resolved its joint and several liability question, holding that "[Congress] authorized the Government to confiscate assets only from the defendant who <u>initially acquired</u> the property and who bears responsibility for its dissipation."   198 L. Ed. 2d 73, Id. at \*8; see also 198 L. Ed. 2d 73, Id. at \*7-9 (rejecting the application of Pinkerton v. United States, 328 US 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946), (i.e. Conspiracy liability) to 853.*

  - o Under the 6ᵗʰ Circuit's well-defined analysis, defendant Kenner did not initially acquire the private stock proceeds by Constantine &/or Gaarn in 2008-09, nor bore the responsibility of its dissipation (*if somehow the sale of private stock, vetted thoroughly by the investors independent*

---

²⁹ See *Channon v. United States*, 881 F.3d 806 (10th Cir 2018) – the 10th Circuit Court of Appeals has joined the landslide of decisions to remand cases under Title 18 in the same context as the Supreme Court has ruled on Honeycutt (*Title 21*), considering the nearly synonymous language in their respective Forfeiture and Money Judgment provisions.

*counsel [Stolper and his NY based investigative team] is somehow deemed to be illegal despite the exchange of full consideration*).

- ▪ Kenner was simply repaid documented short-term loan amounts by both Constantine and Gaarn as a result of their personal private stock sales in 2008 thru February 2009 (*See R33 055a*); fully documented by Eufora in their February 2009 newly signed operating agreement by all Board Members; *specifically including Gaarn* (*See R33 433*).

- **See *United States v. Purify*, 702 Fed. Appx. 681, 682 (10th Cir 2017)** (The question addressed by *Honeycutt* was "whether, under 853, a defendant may be held joint and severally liable for property that his co-conspirator derived from the crime but that the defendant himself did not acquire[30].) **The answer is no**. *See Honeycutt, 137 S. Ct. 1626, 1630, 198 L. Ed. 2d 73 (2017).*

  "[S]uch liability," the Court held, "is inconsistent with the statutes text and structure".   It went on: "Congress did not authorize the government to confiscate substitute property [*under 853(p)*] from other defendants or co-conspirators; it authorized the government to confiscate assets only from the defendant who <u>initially acquired</u> the property and who <u>bears the responsibility for its dissipation</u>." *Id. at 1634* (*emphasis added*).

  The 10th Circuit Appellate Court also held that, "in the [government's] brief in *Purify*, filed before *Honeycutt* was decided, and citing pre-*Honeycutt* precedent, the government asserted: "a defendant is also vicariously liable for the acts or omissions of his co-defendants *in causing the proceeds of the conspiracy to be dissipated, comingled, or transferred, and thus unavailable for forfeiture*."   Whether or not that *was* an accurate statement of the law, **it is certainly not today**."

- **See *United States v. Contorinis*, 692 F.3d 136, 148 (2nd Cir 2012)** ([The 2nd Circuit Appellate Court] observed that neither the language of the criminal forfeiture statute nor the Circuit case law supported the property that a defendant must forfeit proceeds that "go directly to an innocent third party [*Jowdy – according to the government*] and are never possessed by the

---

[30] *I.e. -- Constantine management fees – if deemed part of some fraud – in contradicting the ten (10) other hard money lenders who were paid up front finder's fees – in Rule 16 evidence (<mark>See Forensic report</mark>).  Similar logic applies to the Constantine and Gaarn private Eufora stock sales, the GSF funds and the Hawai'i loans to Jowdy.*

defendant." *Id @ 147*.  Rather, criminal forfeiture penalties are "usually based on the defendant's actual gain."  *Id at 146*.

The Supreme Court's conclusion that, with the passage of criminal forfeiture laws, "Congress did not…enact any significant expansion of the scope of property subject to forfeiture" *should apply equally to money judgment forfeitures*, which have no basis in traditional civil forfeiture law.   With *Honeycutt*, the Supreme Court has placed criminal forfeiture in the same context of forfeiture jurisprudence as civil forfeiture.  Criminal forfeitures should be disfavored, just like civil forfeiture.  Criminal forfeiture statute should be narrowly construed, just like civil forfeiture statutes.

Money judgment forfeitures are just as inconsistent with the statutory scheme as joint and several liability.   And the invalidity of money judgment forfeitures is proven with the same provisions cited by the Supreme Court to prove the invalidity of joint and several liability, particularly the substitute asset provision, which serves the same purpose that the Government claims can only be satisfied by a money judgment.   Notably, these are some of the same provisions relied upon by Judge Gleeson in *United States v. v Surgent* [31] in finding that money judgment contravene Congress' statutory scheme for criminal forfeiture.

In *Surgent*, Judge Gleeson rejected the numerous cases approving money judgment forfeitures because they all relied in some degree on "the novel proposition that a remedy or sanction not expressly forbidden by Congress is thereby authorized by it."   The reasoning rejected by Judge Gleeson, that any forfeiture remedy not specifically barred by Congress is permissible, is the same reasoning the courts have cited for applying joint and several liability that has now been rejected by the

---

[31] *United States v. v Surgent*, 2009 U.S. Dist LEXIS 72563, *47.
  - *Keene Corp. v. United States,* 508 U.S. 200, 208, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993) ("[I]t is generally presumed that Congress acts intentionally and purposely" when it "includes particular language in one section of a statute but omits it in another[.]" (quoting *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983))).

Supreme Court in *Honeycutt*.    The standard is not whether Congress has forbidden a remedy, *but whether it has specifically authorized it*.

**That is a test – now the law of the land – that applies to all forfeiture sanctions or remedies, civil or criminal**.

The coup de grace of the Honeycutt decision is a footnote rejecting the Government's reliance on *Section 853(o)*, which states, "the provisions of [*853*] shall be liberally construed to effectuate its remedial purposes."[32]    The Court's response to the Government's argument was that "the Court cannot construe a statute in a way that negates its plain text, and here Congress expressly limited forfeiture to tainted property that the defendant '*obtained*'.  …[T]hat limitation is **incompatible** with joint and several liability".

*Section 853(o)* is the provision cited by every court that has authorized money judgment forfeitures.  As the Supreme Court correctly found, the provision is not a license for applying the criminal forfeiture laws in direct contravention of their plain meaning.

Criminal forfeiture statute requires the Government to trace the property sought to be forfeited to a particular defendant.   Both money judgments and joint and several liability contravene this requirement.  If, after *Honeycutt*, prosecutors are finally required to satisfy the tracing requirement, the abuse of criminal forfeiture should be markedly reduced thru adoption of *Honeycutt*.  If not, perhaps, the Supreme Court will take on money judgments directly, leading them to the same demise as joint and several liability.

The Government opens their argument on joint and several liabilities by referencing a racketeering case, See *United States v. Fruchter*, 411 F.3d 377, 384 (2d Cir 2005),

---

[32] *Honeycutt v United States*, 2017 WL 2407468, *9, n2 (quoting 21 U.S.C. 853(o)).

*thus acknowledging the relationship that the Supreme Court and several Circuits have already adopted, opening the door to the relationship between 21 U.S.C. 853 and 18 U.S.C. 981, per their desire*.

If the post forfeiture introduction by the Government to the relationship isn't fully sufficient to apply *Honeycutt*, the Government specifically represents in their Superseding Indictment (*Document 214 @14-15*) that they intend to use the power of *21 U.S.C. 853 (p)* [*substitute asset provision*], as incorporated in *Title 18 U.S.C. 982(b)(1)*[33], to seek forfeiture of any other property of the defendants, up to the value of the forfeitable property described in this forfeiture allegation.

### DCSL (Diamante Cabo san Lucas) Appraisal:

As a result of the DCSL appraisal that the Government ordered in this instant case, in or about 2017, resulting in a gross value of $300,000,000 (*estimate until the original appraisal is delivered*), the Baja Ventures 2006 equity (*net of the approximate Danske Bank debt of $150,000,000*) would result in a Baja Ventures 2006 equity value of approximately $60,000,000 for Kenner and his partners.

Under the Excessive Fines Clause of the Eighth (8th) Amendment, the Government could not force a sale of the Baja Ventures 2006 property to satisfy restitution or money judgment (*specifically not under 853(p)*).

Under *28 U.S.C. 2461* – the Government seeks forfeiture of funds received by defendant as a result of a fraud (citing *United States v. Uddin*, 551 F.3d 176, 181 (2d Cir 2009)), and thus, the Government bears the burden to show which, *if any*, funds the defendant received.  The Government repeatedly quoted *United States v. Nicolo*, but overlooks the salient point that they have not proven Kenner received funds

---

[33] **18 U.S.C. 982(b)(1) --** The forfeiture of property under this section, including any seizure and disposition of the property and any related judicial or administrative proceeding, shall be governed by the provisions of section 413 (other than subsection (d) of that section) of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 853).

from the Hawai'i-Jowdy loans (*only Jowdy*), the LedBetter scheme (*only Kaiser*), the GSF contributions (*Constantine only – or no one pursuant to the interpretation of the Constantine-Gonchar agreement*).

### Hawai'i loans:

In the context of the well-documented Hawai'i loans, *infra*, Kenner received none of the funds that were loaned to Jowdy as part and parcel to his 2004 Hawai'i loan agreement (*authenticated by Jowdy in his Nevada case defense[34], infra, after his deceitful Arizona case defense calling the same loan document a <u>forgery</u>, while denying the underlying loans [which he verified to the FBI three [3] months after the Arizona case dismissal – furthering his frauds on the Courts and the DOJ, orchestrated by his lead attorney, Former FBI Director, Louis Freeh, and Tom Harvey – Jowdy's long-time co-conspirator]*)  (*See TIMELINE 020*).   The loaned funds, once transferred to Jowdy for his expected use in the various Mexico projects[35], became the exclusive responsibility of Jowdy (*per the 2004 Hawai'i loan agreement*).   See *United States v.*

---

[34] In the original Murray v. Jowdy Nevada Complaint [*District Court, Clark County, Nevada – Case No. A571984, Dept. No. XXII – filed September 19, 2008 (nine [9] months before the GSF)*] **for another unpaid loan to Jowdy** -- Murray declared several items in the initial complaint about his <u>personal loan knowledge </u>(*independent from Kenner*):

> ***13. Jowdy had sought and obtained several previous loans [Hawai'i] with the assistance of Kenner.***

> ***15. Murray authorized Kenner to loan Jowdy monies [Nevada and Hawai'i].***

**Murray clearly referenced his 2004 knowledge of the Hawai'i loans to Jowdy and his authorization to do so** after he participated in the initial Hawai'i partners' conference call discussions and approvals prior to the commencement of the loan in October 2004.

[35] Berard gave <u>voluntary</u> testimony in a May 2009 arbitration (*less than two [2] months after the date he told the 2015 trial Court that he did not know his money was even being used and surprisingly lost his collateral – contradicting his own 2009 testimony and **ALL** empirical evidence in the government's possession pre-trial*), affirming (*See R33 311*):

> *"Q: Where did you think the money that Mr. Jowdy  -- were you told where the money was going to be used that was given [to] Mr. Jowdy as far as the Mexican project?  Was there anything you were told about that?*

> *A [Berard]: Basically just loan him the money for the property."*

*Contorinis*, 692 F.3d 136, 148 (2nd Cir 2012).  ([The 2nd Circuit Appellate Court] observed that neither the language of the criminal forfeiture statute nor the Circuit case law supported the property that a defendant must forfeit proceeds that "go directly to an innocent third party [*Jowdy – according to the government*] and are never possessed by the defendant." *Id @ 147*.  Rather, criminal forfeiture penalties are "usually based on the defendant's actual gain."  *Id at 146*.

Jowdy documented some of the loan amounts received on his corporate accounting ledgers[36] further verifying the actual Mexico use of the funds as expected (*per Berard and others pre-trial affirmations*), in spite of the fact that the 2004 agreement was signed directly with Jowdy personally (*on purpose, for collateral*).   The loan agreement noted: (*See R33 002*)

> *"FOR VALUE RECEIVED, the undersigned, Kenneth Aboud Jowdy, **individual** ("Borrower") promises to pay…Little Isle 4, LLC, a Delaware LLC ("Little Isle 4"), ("Lenders")…"*

The expectations of use by Jowdy were confirmed by the lion-share of the Hawai'i/Mexico investors at the earliest "*under oath*" opportunity.[37]

---

[36] See Diamante Air Balance Sheet – *TIMELINE 015* – and -- See DDM Balance Sheet – *R33 041*

[37] There were *no dissenting claims* about the Jowdy loans – until Berard and Kaiser began to work with Jowdy, Harvey and Galioto in 2012.

During the eight (8) prior years of the loan and the agreements existence, the *only* issue was the non-payment by Jowdy after the 2006 DCSL funding by Lehman Brothers.   Kenner adversary, Kaiser, told the FBI (*including Galioto*) on October 19, 2010 (*See 3500-JK-1-r*) (*four [4] years after Jowdy began refusing to repay the loans – and nine [9] months after Kaiser personally witnessed Jowdy confessing to the Hawai'i loans [and millions from Kenner and other Kenner lenders], with Jowdy having no repayment plans during Jowdy's January 2010, 2-day California deposition*), that Jowdy made multiple, in-person requests for the Hawai'i loans "**directly**" to Kaiser in the USA and Mexico and repeated his emphatic promises to repay the loans – **all denied by Kaiser in 2015**. *Tr.1111* (*spinning an incomprehensible answer about never seeing the FBI notes – a.k.a. "obstruction of justice"*), *Tr.1120-1122* (*alleging the FBI notes that FBI agent Galioto witnessed – with his complicit silence from the prosecutorial table during trial – were not what he said about the aforementioned loan meetings with Jowdy, and noted by an experienced agent, "wholly incorrectly"*), albeit "*an investigator from another office*", per Komatireddy (*Tr.5992*).

Ironically, after Kaiser told the FBI in his October 19, 2010 proffer (*See PK27*), that he had five (5) separate meetings with Jowdy in NYC and Mexico, (*PK27 @3*) Kaiser confirmed and the FBI agent noted:

> *"JK [Kaiser] -- never got $ back from KJ [Jowdy]/Mexico"*

At <u>no time</u> did Kaiser claim to the FBI (*consistent with his 2009 arbitration testimony -- See R33 556*) that Kenner was responsible for the repayment of funds to his friends & family advances, designated as "*investments*" by Kaiser during his 2010 FBI proffer (*PK27 @1*).   Yet, during his 2015 testimony, Kaiser claimed that Jowdy had not "*stolen any funds from Hawai'i in his estimation*" (*Tr.1229*).   Thus, even while working for Jowdy (*post-2012*) and with the FBI, if in Kaiser's opinion these funds were "*not stolen*", then Kaiser's ex-policeman training and analysis would also confirm that the 2004 Hawai'i loan amounts to Jowdy are <u>*still outstanding and valid*</u> <u>*(since "not stolen")*</u>, despite his refusal to address them with Jowdy on behalf of his Hawai'i members in Na'alehu Ventures 2006 (*specifically with Kenner unable to logistically do so while incarcerated -- to Jowdy and Kaiser's wide-ranging benefit*). Either way, <u>*stolen or unpaid*</u>, Jowdy has confirmed in multiple jurisdictions that the loans are real (*See Forf-44*) and the underlying loan agreement is valid (*See R33 011*).   Thus, the agreement which is "*titled in the name of Little Isle 4*" is and always has been an "*asset of the company*", **never lost**, despite some investors' recently acquired *faulty memory, confusion and mistakes* (*following five [5] plus years of confirmations under oath, and current confirmations by investors that FBI agent Galioto has not been able to influence them into changing their stories, infra*).

Notwithstanding the previous factual elements of the Hawai'i loans to Jowdy (*supra*), under no circumstances were the properly loaned funds to Jowdy received by a member of any charged "conspiracy" in the instant case, since Jowdy was neither a co-conspirator nor a co-defendant (*indicted, unindicted or otherwise*), per

Galioto's prosecutorial plan.   Thus, under all *18 U.S.C. 981*, *18 U.S.C. 982* and *21 U.S.C. 853* provisions, the funds were never part of a conspiratorial claim by the government.

- One element of the case the government has never tried to proffer or explain is if the funds that Jowdy received were "*not loans*" and neither Kenner nor the Hawai'i investors received any benefit (*documented or not*) from the transfers (*as alleged by the government*), **then what are the funds**, since they have never been documented any other way; except as loans, despite the government's interminable resolve to revise history to fit their 2015 prosecutorial narrative?   "Square pegs" will always be proverbial "square pegs" regardless of the efforts and desires of the anointed.

In fact, prior to the Hawai'i Joint Venture documents being offered and signed by all of the Hawai'i partners (*as a strict requirement by Lehman Brothers to close the funding in August 2006*), Kenner and Hawai'i attorney, Larry Markowitz discussed the potential payouts and the Jowdy loans via email six (6) days before Markowitz and Najam drafted the 7-page disclosure letter for the Hawai'i investors.   Najam confirmed he and Markowitz drafted the JV disclosure for the Hawai'i partners in his 2009 arbitration testimony.[38]   The July 20, 2006 email from Hawai'i Attorney Markowitz stated *(See PK153)*:

---

[38] On day two (2) of the Nolan arbitration, Najam gave voluntary testimony on behalf of Nolan (*after he and Jowdy had structured a settlement deal for the known Jowdy DDM frauds with Nolan – previously alerted by Kenner in 2007 as a whistleblower to the investor group*). Najam confirmed (*@ 361*):

> *Q: Did you participate in the drafting or review of this letter?*
> *A [Najam]: I did.*
>
> *Q: What was your participation?*
> *A [Najam]: The letter was drafted by our attorney, Larry Markowitz, who drafted it at the request of both Lehman Brothers and Windwalker [Hawai'i new JV partner].   And the intention would be a letter sent to all of Phil's investors or clients explaining the **transaction** and asking them to acknowledge that they had an opportunity to review the **transaction** with Phil and were comfortable with it.*

Despite the government's claims that the JV "**transaction letter**", as Najam gave testimony to, should have included the loans to Jowdy (***unrelated to the JV deal – thus knowingly preposterous and grossly misleading***), Najam and Markowitz were 100% aware of the

*"It sounds like some of the equity investors may also be <u>lenders</u> and that they will not be totally taken out at closing."*

- Markowitz was referring to the change in JV closing payout, again at the last minute, from Lehman Brothers, reducing the closing funds from $11 million to $7 million – and replacing the additional $4 million with post-closing milestone payouts – no longer in control of Kenner or the Hawai'i partners (*with Lehman Brothers appointing a new JV partner, Alan Worden*).   It was a take-it-or-leave-it offer, leaving no wiggle room.

Later in the same email disclosure by Kenner, Attorney Markowitz confirmed that he knew the waterfall payments (*after the closing by Lehman Brothers*) would pay for the Jowdy loans, stating:

*"As to your 'waterfall'*
       *1.   Payment of interest due (on the affiliated debt?  If so, maybe this should be item 2)   2.  Payment of bills payable (of course, but maybe should be item 1)  3. **<u>Repayment of loans still open (on the affiliated debt)</u>**  4. Distributions to equity partners..."*

Armed with this information and Najam's previous knowledge of the Jowdy loans as he referenced in his February 6, 2006 email to Kenner about calling the loans to Jowdy, "*investments*" (*wink-wink*) for the Lehman Brothers Cabo closing (*See PK155*), both authors of the Hawai'i JV disclosure letter knew 100% what they were required to write, per Lehman Brothers' requirements.   They were experienced attorneys, but at no time were the Hawai'i loans to Jowdy concealed by Kenner from Markowitz or Najam, as the empirical evidence in Rule 16 production confirms.

Perhaps, Mike Peca in his 2011 SDNY Grand Jury (*in spite of his amnesia in 2015*) gave the most complete and well-articulated affirmations of "*everyone's knowledge*". (*See R33 419).*

---

loan information and properly did not interject it into the Lehman Brothers JV deal points disclosure.
- The government's knowingly false representations of what should be included in the contents of **any** JV disclosure letter were wholly prejudicial and specifically suggested to misrepresent some underhanded scheme was present to the unsophisticated jurors, accepting the government's claims as factually appropriate.
- **This is the clear abuse the Supreme Court designated as improper at the highest levels under *Berger*.**

- *The defendant offers that the Court read the entire Michael Peca SDNY secret Grand Jury testimony in order to establish the transparency "with the group" by Kenner, thru Peca's 2011 well-articulated perspective, <u>before</u> Galioto's promise in 2012 to help convict Kenner and get his "funds back" from Kenner's frozen bank accounts (discussed and refuted on the 5-hour call between Kenner and Kristen Peca).*

AUSA Carrie Capwell delivered the Peca (*Sydor and Stevenson*) SDNY Grand Jury testimonies in 2014 to Kenner after she told Kenner's former attorney that she was not aware of the 2011 Grand Jury (*or the previous, underlying testimonies*) when she called the 2013 EDNY Grand Jury at agent Galioto's demand.   She specifically affirmed about the Grand Jury testimonies: "*You might deem some of the materials in the transcripts to be helpful in the defense*" (*June 18, 2014 -- in ECF*).    Consistent with Capwell's statements, the 2011 Peca testimony confirmed the "*group's awareness*", prior to the undue influence applied by the erroneous Kaiser and Berard revisionary claims (*post-2012*)[39] and the supporting FBI representations that the ongoing investigations could only confirm that:

> "*Kenner stole your money, but we [the FBI] cannot show you how because of the ongoing investigation*".

The majority of the Hawai'i and Mexico investors echoed this refrain to Kenner, pre-arrest.   On multiple occasions, immediately after one (1) of the investors spoke with agent Galioto, the investor would call Kenner to ask about all of their *"own funds"* that Galioto referenced as "*stolen by Kenner"* and were "*never transferred to Jowdy"*; *including but not limited to their individual loans, and the Hawai'i loans.*   Within 24 hours of the Kenner-investor calls (*pre-arrest*), the investors would receive a follow-up call from agent Galioto to inquire if the investor were "*still in communication with Kenner?*" (*Attempting to trap them into an 18 U.S.C. 1001 perjury or obstruction of*

---

[39] Including Kaiser and Berard accusing Kenner of arson and check fraud in Hawai'i. Kristen Peca admitted these outrageous and slanderous claims to Kenner on her 2012 FBI recorded calls.   Greg deVries confirmed the same false representations after his face-to-face meeting with Kaiser and Berard in Peca's living room in 2012.

*justice issue*).   Galioto would <u>always</u> conclude by asking if the investor "*was spending any more money for lawsuits versus Jowdy?*"[40]

After Kenner became aware of his "*tapped phone*" and the non-coincidence of the Galioto follow-up calls, Kenner continued to emphatically explain to the investors whom he updated with Jowdy lawsuit status issues that they would "*most likely*" receive a follow-up call from Galioto in the "*next 24 hours*" after speaking with Kenner about any Jowdy matters.   Kenner demanded that at all times, they "*must*" confirm all communication with Kenner to the FBI and their Jowdy-adverse legal activities "*with Kenner*", so as not to fall into an "*obstruction of justice*" trap by Galioto (*See 3500-RB-1-r (Burdick) @12*).   Kenner recommended to each of them that they arrange communication with a personal attorney on the phone when speaking with the FBI or any law enforcement.   A former FBI Agent personally gave this advice to Kenner.

On one (1) occurrence that Kenner was involved, Glen Murray returned Galioto's call with his attorney (*Ronald Richards*) on the line, per Kenner's advice.   After a short tirade by Galioto about Kenner to Murray, Murray informed Galioto that he had his attorney, Ronald Richards, on the phone.   Galioto immediately referred to Ronald Richards as "*Kenner's attorney*" and said if Murray wanted to communicate "*like that*", he would subpoena Murray to NY and "*see how that goes*".   Galioto immediately hung up. Murray conveyed the highly unusual behavior by Galioto to Kenner, immediately following the call, consistent with other refrains.

_____

[40] In 2012, immediately after Greg deVries and Rem Murray returned from giving testimony in the various Mexico Jowdy criminal cases, while being threatened by Harvey (*email*) and Berard (*texts*) and Jowdy security (*trailing vehicles in Mexico and surveillance by former FBI agents*), Galioto called to tell deVries that he should not be working with Kenner because:
"*There are no cases open in Mexico versus Jowdy.   Kenner has been lying to everyone. I [Galioto] checked on it myself*".

The conspiratorial help by Galioto was epic and unchecked, synonymous with the veil threats by Tom Harvey about FBI-led "*jail time*" to Kenner, Manfredi, Kaiser, and anyone adverse to Jowdy (*all in rule 16 evidence*).

45

No phone tap warrant regarding Kenner has ever been produced, but after more than six (6) identical occurrences, it was more than clear that Kenner's phone had been tapped surreptitiously.

> Less than one (1) month before the Kenner arrest, Kenner and the new, Mexico attorneys discussed Kenner travelling to Mexico in order to gain a temporary visa to facilitate the additional and necessary Court filing for the Kenner investors, with Kenner documented in Mexico the next day.   This visa entry was part of the procedure prior to Kenner's previously arranged December 2013 open testimony in front of the Baja California Sur Mexico Supreme Court.   The round trip was between ten (10) and eleven (11) hours of driving between Phoenix and Mexico the next day.   It is wholly improbable to believe that there was a helicopter ready to follow Kenner from his home in Scottsdale, AZ starting early in the morning for the entire eleven (11) driving-day, including a two (2) hour wait at the border with Kenner in Mexico.   This was not the only occurrence of Kenner being repeatedly followed by a helicopter, and for hours at a time.   Perhaps, the helicopter was intended to _intimidate_ Kenner before he travelled to Mexico to supplement the Jowdy-adverse filings in late 2013, for the Supreme Court appearance, which Jowdy and Galioto discovered was scheduled six (6) weeks later.   Perhaps, this was especially necessary since the 2010 jail house torture of Kenner [_thru Galioto, Harvey, Garcia and Meeks' "gun trafficking" filings with the Mexico PGR about Kenner_] and the subsequent murder of the investor's Mexico attorney were not enough to deter Kenner from his ongoing defense of the investors funds and Jowdy's criminal activity.

Notwithstanding all of the Galioto false rhetoric to try and break up the Jowdy-adverse investors (_led by Kenner's specific legal efforts and multiple USA and Mexico attorneys_), Peca specifically confirmed the Jowdy use of loaned Hawai'i funds to the 2011 SDNY Grand Jury:

> _"$100,000 cash investment that was going towards that [Little Isle 4 capital account].  Then we had lines of credit.  I had one out for $1.7 million that was going to be used at the time.  Here's where a lot of the cross starts to happen.   A short-term loan to Mr. Jowdy, because at the time Cabo – we hadn't gotten the lending from Lehman Brothers yet.  We made a short-term loan until the lending came in.  Once the lending came through they were to pay back the loan, I think in the neighborhood of five-and-a-half million dollars, on the closing.  It was never paid back.  And then communication basically seized at_

> *that point from him [Jowdy].  **That was kind of the whole sticking point as far as __me and the other guys__ with Mr. Jowdy.***
>
> *The 1.7 along with the $100,000 and **whatever else put in this a capital account**, Little Isle 4, I believe."*

Berard, under <u>*voluntary*</u> 2009 arbitration testimony, confirmed his identical expectation:

> *Q: Were you aware that Mr. Kenner got a credit line against some of the securities or investments you had?*
> ***A: Yes.***
> *Q: And later on **were you aware that Mr. Kenner started lending this money to another principle in the Cabo project named Ken Jowdy**?*
> ***A: Yes.***
> *Q: Were you aware that he had disclosed to you that he was going to lend this money at a rate of interest to benefit the investors?*
> ***A: Yes.***
> *Q: Where did you think the money that Mr. Jowdy – were you told where the money was going to be used **that was given Mr. Jowdy** as far as the Mexican project? Was there anything that you were told about that?*
> *A: **Basically just loan him the money for the project**.*

Darryl Sydor re-affirmed the Hawai'i "*group's expectations*" for his Little Isle 4 capital account during his secret 2011 SDNY Grand Jury testimony:

> *"Yes. But then we put it towards a short-term loan for Mr. Jowdy until Lehman Brothers came up with the money that was supposed to be paid back…to Little Isle 4…back to Hawai'i, not me personally."*

Perhaps, completing the sentiments of the Hawai'i investor group (*specifically considering there was a 90% investor-lender cross-over with the two [2] Jowdy-led Mexico projects with the benefactors of the loans from Hawai'i*), Turner Stevenson continued the affirmations for the Hawai'i "*group's expectations*" during his secret 2011 SDNY Grand Jury testimony:

> *Q: When you put up the $100,000 for Hawai'i, did you have any understanding of whether the money could be used to pay for the Mexico project or was it just supposed to go to the Hawai'i project?*
> *A:  In the beginning it was supposed to go to Hawai'i.   Then **I saw** they needed, __**the group of us got together**__, we have this piece of land that's available for*

47

*purchase in Mexico that we need to wait on or get funds on to **transfer as a group** like one big blanket to get money into Cabo and pay for that land to hold it until the loan came.*

*Q:   So you are saying you agreed to transfer some of the money from the Hawai'i project to the Cabo project?*

*A:  **I would say that, YES.***

*Q: Who made that decision?*

*A: **I think all of us as a group**.*

*Q: What do you mean "as a group", who is the group?*

*A:  **All the guys who were invested in it**.*

In the years before the 2015 trial, virtually every Hawai'i investor, **and all under oath**, confirmed their knowledge of the Jowdy loans from Hawai'i and the various underlying purposes (*none dissenting*); including the three (3) substantial 2011 SDNY Grand Jury testimonies (*Peca, Sydor, and Stevenson*), not originally disclosed by Galioto to AUSA Capwell prior to Galioto's request for a Jowdy-timely, Central Islip Grand Jury Indictment of Kenner.

In addition, the two (2) Galioto C.I.s (*Berard and Kaiser – who were ironically employed by Jowdy beginning in 2012*) had voluntarily (*emphasis added*) confirmed in 2009 in the *Nolan v. Kenner* arbitration that they both had full knowledge of the Jowdy loans and approved them.   Kaiser went so far to explain in detail to the three (3) judge arbitration panel that he specifically (*emphasis added*) raised $1 million from his friends & family (*all parties unknown to Kenner at the time*) to participate in the 15% loans to Jowdy, as Kaiser affirmed in 2009:

> "...*But the loans -- even investors I brought in, I said.   Listen.   This guy – I gave 'em the whole story of Ken Jowdy backed by land[41].   Its good.   Better than your money sitting somewhere*".

Six (6) years later, Kaiser (*like the other previous full acknowledgements*) suffered from selective amnesia (*a.k.a. **CTE***), refuted his 2010 FBI proffer statements, and

---

[41] Kaiser was referring to the collateral wording in the 2004 Hawai'i loan agreement for the DDM and (*and any future land deals utilizing the Hawai'i loaned funds*).  Kaiser had the loan agreement in his possession, since it was signed in December 2004; Kaiser confirmed the loan agreement to FBI agent Galioto during his October 19, 2010 proffer (*3500-JK-1-r*).

retracted all of his 2009 arbitration statements, to correspond with Galioto's 2015 foundationless "*concealment*" theory, in flawless synchronicity.

Yet, Kenner *obtained* none of the funds or any of the benefit of the Jowdy loans; *only threats of prison time by Jowdy and Galioto for calling the funds Jowdy received, "**loans**" during litigation to recover them publically (certainly not concealed); now affirmed (Forf-44) by Jowdy's cabal, Galioto and Wayne, and claimed as <u>cumulative</u> knowledge by the Government (despite the outrageous badgering of Kenner during the 2015 trial as "lying" about the loans – and the "bogus" agreement [affirmed by Michiewicz himself, supra] wholly prejudicial to the defendant). Tr.4597-4598.*

The alleged loss (*although it is solely based on the currently uncollected Jowdy loan, and the Government's documented non-interest to help*) is from the Little Isle 4 capital accounts, not the individual investors.   Civilly, the Little Isle 4 investors would need to bring a derivative action versus Little Isle 4, but since "*lending*" is an authorized action of Little Isle 4 per its By-Laws (*See TIMELINE 046*), the civil action would also fail.  The Jowdy loan is and has always been an asset of Little Isle 4 and the Hawai'i partners, thus is cannot be deemed "*lost*" at any point in time, only uncollected due to the outrageous and continuing protection of Jowdy by interested parties.   Nevertheless, Kenner has received zero benefit from the Jowdy loans, perhaps, just the opposite since the first threat of FBI-led jail time by Jowdy's henchman-attorney and co-conspirator, Tom Harvey (*alleging the loans were not real in 2009 perhaps in the only year Jowdy and his cabal supported that ill-fated theory, debunked by their own future affirmations*).  *See TIMELINE 007*.

**LedBetter short-term loan to Kaiser (from Na'alehu Ventures 2006):**
Kaiser's NYPD superior training officer, Vincent Tesoriero, confirmed to the FBI the 2006 LedBetter loan of $395,000 "**to Kaiser**" in 2014 and its specific purpose; get rid of Manfredi, who Kaiser "**wanted out**", to be replaced by Kenner and Berard (*fully contradicting more Kaiser testimony in 2015*).  Tesoriero's affirmation (*See R33 2005*) occurred one (1) year after Kenner's detainment, further confirming the

planned Kaiser trial lies and another failed Government theory, this time disproven by Kaiser's own 20-year friend and NYPD colleague, whom Kaiser and Berard also robbed in this deal.   Kenner received *none* of the 11-day LedBetter loan to Kaiser, which Kaiser repaid, as negotiated (*and as Managing Member of Na'alehu Ventures 2006, Kaiser documented Michael Peca's ongoing capital contribution to the Hawai'i project*).

Kaiser's LedBetter testimony at trial opened many fraudulent and unbelievable evidentiary issues (*confirming his suborned perjury thru leading and well-structured questioning*).   As the Court recalls, Kaiser gave testimony that he and Manfredi "*confronted*" Kenner in spring 2006 about allegedly stealing $1 million of Kaiser's friends & family money (*from their Hawai'i deposits of 2005*) and sending it to Jowdy in Mexico (*Tr.983*)[42].

Chris Manfredi's ("CM") FBI proffer in October 2010 (*seven [7] days before the Kaiser proffer*) refuted the "*confrontation meeting*" by establishing Manfredi only thought Kaiser ("JK") had deposited $1,000 (*not $1 million – a $999,000 difference*) in the project, and "*CM never increased investment, not sure if JK did*".   (*See R33 2006 -- 3500-CM-2-r @2*).   Yet, for the same project Joint Venture Agreement – *signed less than a month later* – Kaiser gave testimony that he "*did not read the agreement*". (*Tr.1132-1133, 1164*).  If that were not enough of a farce to believe from a 15+ year former NYPD police officer who had allegedly just learned of the $1 million theft, Kaiser also claimed he had independent counsel working on the closing materials for him.  Then, after that egregiously false, alleged theft by Kenner (*and not reading the most important legal document in his life a month later, which covered the*

---

[42] Please note that only $135,000 of the $1 million was transferred to Mexico, in spite of Kaiser's 2009 arbitration testimony verifying *the only reason* he raised the friends & family funds was for the Jowdy loans and the residual 15% interest Jowdy agreed to, face-to-face with Kaiser thru multiple meetings, affirming: "*and I met him a couple of times*" – also repeatedly confirmed to the FBI (*Galioto*) thru proffer on October 19, 2010 (*See 3500-JK-1-r*); never once mentioning a single perceived Kenner fraud in the three (3) hour, well-documented FBI meeting, memorialized by "*an investigator from another office, not an FBI agent*" per Komatireddy (*Tr.5992*).

*allegedly stolen funds*), Kaiser chose to hand over control of the Sag Harbor property two (2) months after the Hawai'i JV closing (*while alleging ex post facto that Kenner robbed his friends & family $1 million just months earlier*), and claimed, "*No. I actually – so it was sold, no. I did not see this [LedBetter operating agreement] document at the closing*" (*Tr.1005*).  The Sag Harbor closing attorney [*Shimone Betesh*] confirmed at the 2015 trial Kaiser and his attorney received the operating agreement at the 2006 closing, *but nevertheless Kaiser denied it.*   Confirming Kaiser's perjury, Kaiser's former NYPD trainer, Vincent Tesoriero, told the FBI in 2014 (*one [1] full year after the Kenner arrest*) that he received the operating agreement "*only from Kaiser*", thus the entire fabrication that Kaiser was unaware of the closing percentages and the new partners was a recently fabricated ruse.  (*See R33 2005 -- 3500-VT-1-r*).   Kenner and Tesoriero had never met or even spoken until months after the time of the 2006 closing.   Wayne noted on his interview sheet that Tesoriero affirmed,

> "*Kenner's role in the Sag Harbor deal would be to raise money to build the property. Tesoriero was under the assumption from the start of the 'LedBetter deal' Berard and Kenner were coming in the deal.   Tesoriero received the LedBetter agreement only from Kaiser.*"

Michiewicz, Galioto and Kaiser all knew they were going to fabricate the LedBetter story during trial and defraud the Court.  As a crown jewel of the proffer, Wayne noted,

> "*Kaiser told Tesoriero that they needed to get Manfredi out of the Sag Harbor deal and that Phil Kenner and Bryan Berard were coming in the deal.*"

Thus, Kaiser needed to get Manfredi out because he tried to hold up the Hawai'i closing by demanding a significant payout (*or else he was not signing, noted in several closing attorney emails*), yet Kenner allegedly stole $1 million from his friends & family and was now "*coming in the LedBetter deal*".  In fact, "*Kenner coming in the deal*" would have been two (2) months after Kenner allegedly did not fully repay Kaiser for the 2005, $1 million friends & family loan (*although that is another fabrication as the bank records and closing documents in Rule 16 also prove*). Kenner obtained none of the funds or any benefit of the Kaiser-LedBetter loan. Kenner sued Kaiser and Berard in 2013 for their *forged* and *fabricated* LedBetter

operating agreement and 2nd fraudulent title conveyance (*all after joining Jowdy and FBI agent Galioto's efforts versus Kenner*), in addition to Kenner losing $28,500 tax funds (*and other pre-development expenses*), which Kenner advanced on 5-25-2010 to the LedBetter project, because Kaiser signed to have the Sag Harbor tax records sent to the wrong address at the 2006 closing (*Kaiser's fault; not Kenner's*).

Not only does the string of events defy any and all logic, notwithstanding Kaiser's police background and training, but Kaiser immediately participated in a third (3rd) deal with Kenner, advancing $620,000 the day after he repaid the negotiated LedBetter loan to the Hawai'i partners and approximately $180,000 a month later for the Kenner-Kaiser California renovation project closing, *which was 100% titled in Kenner's name*.   None of the $800,000 deposits came from Kaiser's personal funds (*more borrowed money, and never repaid by Kaiser*), yet he was 100% comfortable giving all of those funds to Kenner (*again*) and leaving the California title in Kenner's name.   The entire series of events cannot be reconciled, with any sense of realism.   This is the case because the revisionary history attempted by Michiewicz, Galioto and Kaiser is so fabricated; no trier of fact could unravel the buffoonery, with the government's repeated affirmations of Kaiser's testimony.

After Kaiser was allegedly "*not paid millions*" by Kenner over two (2) years later (*and after they bought <u>another</u> project together in Arizona*), Kaiser gave voluntary testimony in May 2009:

> *Q: Even now, sitting here in May 2009, is there <u>anything you've uncovered</u>, as someone who obviously knows how to investigate, that Mr. Kenner has done anything inappropriate throughout these transactions?*
> **A [Kaiser]: No**
> *Q: Not one complaint?*
> **A [Kaiser]: No**

If that was not enough surreal Kaiser testimony (<u>*ONLY*</u> *if you believe Kaiser's 2015 recollections*), Tesoriero finished his FBI proffer grandeur by specifically telling Galioto and Wayne that Kaiser borrowed $100,000 for Hawai'i in 2006 and was only

repaid $10,000 (*See 3500-VT-1-r @ paragraph 12)* (*thus another $90,000 loss due to Kaiser frauds*).  **Kenner and the Hawai'i partners <u>NEVER</u> received the $100,000 from Tesoriero thru Kaiser** (*fully robbed by Kaiser*).  This is wholly unknown by Tesoriero, still today.   Notwithstanding the Na'alehu Ventures 2006 closing records confirming Kaiser was 100% fully repaid (*$1,176,000*) for the full $1,100,000 his friends & family deposited pre-JV, thru Kaiser's instructions (*with Kenner never meeting or knowing any of them until many years later*), somehow the Government solicited Kaiser testimony that he was never repaid from the Hawai'i deal, but received only expenses and back pay.

- It should be noted that Kaiser's 2006 &/or 2007 tax returns WILL NOT SHOW any allocated "*back pay*", since the funds were all repaid as loans (*for his friends & family*), *and simply another unchecked lie.*   As a former cop, even Kaiser would have been aware that "*back pay*" (*Tr.1413-1414*) is subject to income taxes, especially because Kaiser always had a personal accountant.

**Regardless of the documented Kaiser frauds on his friends & family, Kenner <u>obtained</u> none of the funds or any benefit of the Kaiser-LedBetter loan.**

*GSF proceeds:*

The GSF contributions also produced a net negative financial loss to Kenner of more than any other GSF contributor for the multitude of unreimbursed expenses and equity that Kenner contributed to the overall GSF assets [*Legal fees, Palms, Falcon 10, Avalon, etcetera – all documented*].   The single distribution of $22,425.52 to Kenner on 7-30-2009 from the GSF funds (*more than 3-months after the initial expenses were incurred and paid by Kenner*) was fully documented GSF expenses (*with receipt submissions to Constantine for approval – further documenting Constantine's full control of the GSF funds, at all times*).   Kenner sustained more of a loss as a result of the Constantine-only spending of the GSF, *as stipulated during trial*, than any other GSF contributor.   Kenner obtained none of the funds or any of the benefits of the GSF expenses, *only net losses*.

The Government attempts to stretch its overreach with the "*but for*" test.   They knew that none of the alleged concealment funds were obtained by Kenner as their own *Forf-44* document confirmed in 2016.   Agent Wayne introduced the 2015 received-document during the forfeiture hearing.   Although the document allegedly was received 3-weeks after the trial (*August 2015*), it documented fully revisionary information.   The Government chose to withhold the hugely exculpatory document until the forfeiture hearings eight (8) months later, solely as an end run attempt to create a nexus for forfeiture.

***Baja Ventures 2006:***
Specifically, all of the Baja Ventures 2006 capital account contributions are accounted for thru Kenner's two (2) partners; Lehtinen and Stumpel (*with documents the Government had in its possession during trial – but ignored to claim Kenner "stole" the Hawai'i funds to buy his Cabo equity*).   *Tr.5990 (Komatireddy)*. The Government attempted to arbitrarily make Lehtinen and Stumpel victims *post-trial* during their resulting forfeiture brief, when neither Kenner partner had made a complaint about their jointly held equity, their guaranteed debt position, nor their partnership with Kenner in Baja Ventures 2006.   Kenner (*and his partners in Baja Ventures 2006*) <u>*obtained*</u> their DCSL equity in spite of what Jowdy did with the unpaid loans; not "*but for*".

Stumpel signed an affidavit supporting the full, acknowledgement and partnership with Kenner and Lehtinen in 2017, two (2) years after the conviction, thus fully aware of the Government's 2015 trial allegations – *See PK126*.   Specifically under *United States v. Nicolo*, 597 F. Supp 2d 342, 346 (WDNY 2009), the Government fails their own "*but for*" test, since no nexus has possibly been established.

The Government's investigative team (*coordinated with Jowdy's attorneys*) knew exactly what their collective "**goals**" were in the Kenner prosecution.   At all times since the Kenner 2009 proffer (*and the supporting FBI proffers by Jowdy employees; Hughes, Burdick and Boyden, <u>directly to Galioto</u>*), the Government was deftly aware

that **Jowdy stole the Hawai'i funds** and multiple other personal loans (*further confirmed <u>by his own FBI admissions</u> in February and March 2010 – minimizing the actual need for 'investigative' brainpower that was 'missing' related to every other overly-documented Jowdy crime evaluation, with his co-conspirators, like Harvey, Najam, and later Berard and Kaiser, amongst others to aid in the cover-up and diversions*). *See Kenner Rule 6(e) Motion @ 21-40*.

The Government also knew that the growing unpaid Hawai'i-Jowdy loans were part of the Constantine-conceived GSF recovery efforts, long after Kenner had launched pre-GSF lawsuits versus Jowdy in Arizona (*2008*), Nevada (*2008*), and Mexico (*2008*) (*also mis-represented by the prosecutorial team thru trial*) to protect the investors from the myriad of unpaid Jowdy loans.

Yet intentionally, Jowdy was not even considered an unindicted co-conspirator (*with or without immunity*) during the multiple Indictment attempts of Kenner.   The Government (*Galioto*) was well-aware that their goal, as outlined by Jowdy attorney (*Tom Harvey – in his April 2009 extortion email to Kenner*) was to "**take**" Kenner's Mexico equity away from him with the help of the FBI (*See TIMELINE 007*), SEC and their complicit NY Daily News media slander plan.   Harvey laid it all out in black-and-white, which was an amazing skill for a private NY attorney (*using his crystal ball – most likely purchased with more stolen Jowdy funds*); unless he had some undue influence over &/or with the FBI (*perhaps, as co-counsel with Louis Freeh on all Jowdy defense matters*)?   Maybe?  Unless, was the FBI directly seeking Harvey's advice on how best to protect Jowdy from Kenner's exposure of the truth, since Harvey's own complicity with Jowdy's frauds was discovered by Kenner (*See TIMELINE 020*) and publicized (*creating another Kenner enemy; after refusing the 2007 bribes and filing the July 2, 2009 California lawsuit versus Harvey and Jowdy for extortion*)?

Thus, in October 2013 (*when Jowdy's co-conspirators learned of Kenner's pending Supreme Court testimony in December 2013*), Harvey and Galioto knew that even

though they were up against a tremendous time crunch to arrest Kenner before Kenner could give testimony to the Supreme Court in Baja California Sur Mexico, immediately ending their 12-year Jowdy-led criminal enterprise (*and many arrests in Mexico for the documented frauds*), they had to make sure Jowdy was not a co-defendant or co-conspirator in the Kenner Indictment, triggering a *future* forfeiture of the DCSL property controlled by Jowdy (*&/or Jowdy stolen equity – See Ex. 50*). That was their prize; exclusively, *their goal*.  They had to keep their eye on the proverbial reward after fully punishing Kenner (*for at least 5 years now in jail*) while continuing to loot the DCSL projects monthly and ignoring the ever-increasing unpaid Little Isle 4-Hawai'i loan values (*an offset asset to the Jowdy loans allegations of loss by the Government, despite **never lost***) and all of the other personal loans to Jowdy by Kenner, Stumpel, Norstrom, Murray, Gaudet and others.

After the 2010 Mexico jailhouse torture of Kenner, the USA jail time was the least they could do to punish Kenner for refusing their well-documented bribes from 2007 (*further confirmed by Jowdy's former golf designer, Dave Boyden, in his February 2010 FBI proffer, infra @ 3500-DBP-1-r*).  But more importantly, they had to circumvent any alleged Jowdy involvement in order to avoid losing the DCSL equity or control thru a future forfeiture proceeding, *potentially out of Galioto's control and influence*.

Galioto accomplished this by telling the investors that Kenner stole their money and never gave it to Jowdy (*before and after trial*).  Then, they had to allege at trial (*thru the Indictment of Kenner*) that the actual loans (*purported as fake just for the trial – reversed apparently three [3] weeks after the trial by Forf-44*) were concealed by Kenner from the investors as his concealment crime (*18 U.S.C. 1956(h)*).  The concealment allegations were _not_ explained to the alleged victims as the crimes in the Indictment that the Government was pursuing.   The witnesses were specifically told by Galioto, Berard and Kaiser that Kenner was arrested and in jail because "*Kenner kept the money*" the investors believed Jowdy had received thru the Hawai'i loans and other personal loans to Jowdy (*all confessed by Jowdy in his January 2010*

*deposition – which Galioto ignored once received).  Ironically, Jowdy actually did receive 100% of the funds and the entire prosecutorial team knew it, now indisputably confirmed thru Forf-44.*

As the 2012 recording between Kenner and Kristen Peca revealed, the investors were told by agent Galioto that after Kenner was convicted of "*stealing their funds and not giving them to Jowdy*" (*refuted by Kenner on the call, wholly untrue and not the actual indicted allegation*), Mike Peca and his wife (*like the remainder of the Hawai'i investors*) would receive all of their money back from Kenner bank accounts (*which Galioto claimed he had frozen with all of the funds*).  Then, post trial, to close the issue of repayment, agent Galioto told the investors that "*Kenner hid the money and we [the FBI] cannot find it*".

None of the Government representations prove any intent by Kenner, since he was never in a position to benefit from the alleged crimes of concealment, nor did Kenner act in any way lacking transparency.

**Restitution --**

***Jowdy loans from Hawai'i:***

As the Government failed in their post-trial Jowdy, co-conspirator, "*end-around*" claims, they cannot recover from the Supreme Court ruling in *Honeycutt*, which confirmed at a minimum that "*fruit of the crime*" had to be "*obtained*" by at least a co-conspirator of the crime, otherwise the Government cannot receive it in forfeiture, money judgment or thru restitution.[43]   The Court should be reminded how rapidly the government backed off their co-conspirator claims of Jowdy once Jowdy's heavy-handed legal team refuted the prosecutorial forfeiture team's

---

[43] Per the government's pre-planned 2013 Indictment and 2015 superseding Indictment, Jowdy is never mentioned as a co-conspirator, thus delineating any nexus of the Jowdy loans from Kenner's benefit for forfeiture, restitution and money judgment per *Honeycutt*. Cleary, Kenner _never obtained_ the funds Jowdy borrowed thru the well-documented and government stipulated ("*cumulative*") loans (*Forf-44*).

representations.   The prosecutorial forfeiture team back-peddled as fast as the government witnesses from their previous "under oath" affirmations, who were told by Galioto to testify, *or else.*

Notwithstanding that Kenner never obtained the Jowdy loans, the investors from Little Isle 4 and the Hawai'i partners still have a significant asset; *the Jowdy loan*. The 2008 Lehman Brothers bankruptcy and the contemporaneous global real estate recession forced the untimely end to the land development portion of the Hawai'i partners JV deal.   Fortunately, the Jowdy loans survived the partnership development problems.   **The loans are collectable**, since Jowdy has carried on the farce (*certainly from an investors perspective*) for 16-years, pretending to be a developer in Mexico, utterly looting the project assets at every instance.

Just because the Government is not interested in assisting the Hawai'i partners (*Jowdy lenders*) to recover the ignored loans, they cannot ignore them for calculation purposes.   The Jowdy loans are an offset asset for the Hawai'i partners (*emphasis added*), **if somehow deemed a loss at all**.   Thus, the partners have a positive financial position, far in excess of any potential loss from the Jowdy loans; known or not (*due to* **CTE** *in 2015, and beyond*).   Specifically, the FBI case agent does not want to assist in the collection of the Hawai'i partner's "asset" (*and now documented in the Government's recent ECF [Document 554] refusal letter (second denial) to meet with Kenner [Document 553] about the documented Jowdy frauds and recovery for the Kenner investors [the alleged victims]*).   Galioto and the Government's refusal is working in concert with Na'alehu Ventures 2006 Managing Member Kaiser, in his compromised role as a Jowdy highly paid collaborator (*with Najam and Harvey*), thus avoiding his Hawai'i members collectable asset and all related fiduciary duties.

**The alleged Hawai'i victims are *NOT* aware of this salient point.**

The Government has the responsibility to calculate the remaining assets (*Jowdy loans*) at the time they request restitution, as well as any other offsets.   The defendant calculates the Jowdy loan's, July 2018 value to exceed **$31 million**.

***Northern Trust litigation offset:***

Several of the Hawai'i investors received hundreds of thousands of dollars each from Northern Trust as part and parcel to an undisclosed settlement, *infra.* Berard, Peca, Gonchar and Nolan confirmed this during the 2015 trial totaling about $2 million.

- ***The defendant requests that the Government receive a copy of the full settlement agreement (for in camera review of the Court – if necessary), in order to apply the gross amount of the respective settlements as an offset to restitution loss.***
- ***The defendant requests that the Government confirm with any other alleged victim on the superseding Indictment, what amount may have been recovered from a similar settlement (and confirmed thru an in camera review of the Court – if necessary).***

Based on 2015 trial testimony, Kenner believes the following (*totaling over $1.9 million*):

- *Tr.3042* [*Berard – over $300,000*],
- *Tr.2074* [*Nolan – over $500,000*],
- *Tr.506* [*Michael Peca – over $600,000*], and
- *Tr.4802* [*Gonchar – over $500,000*]

Incrementally, Juneau and Nolan (*along with non-alleged-victim Ethan Moreau*) also received equity transfers from Jowdy based on his Diamante del Mar frauds[44] (*also*

---

[44] This settlement deal was agreed to in 2008 between Tom Harvey (*for Jowdy*) and the conspiring attorney (*Michael Meeks*) for Nolan, Juneau, Moreau and Myrick, while creating a sideshow for the Jowdy's crimes, since 2008.   Meeks was the attorney Harvey claimed would be sending people to "*see Gaudet*" (*documented threat*) in Los Angeles when Gaudet travelled thru en route to Canada to see his children from Mexico.   *See R33 010*.   Gaudet is the "*witness*" on the 2004 Jowdy-Hawai'i loan agreement that Harvey threatened to "*know who you are supporting*" or else.

ignored by the Government – with 100% of the embezzlement bank documents in Rule 16 evidence).   The Cabo (*DCSL*) equity of 1%, distributed by Jowdy from his stolen DCSL equity pool (*thru KAJ holdings – See Ex. 50 -- TIMELINE 031*) has an approximate value of $3.5 million each (*300mm appraised value minus 150mm Danske debt = 150mm net equity @ 1% = 1.5mm*) (*based on an estimate until the original appraisal is delivered*).   Jowdy's distribution to anyone must be calculated as an offset to whatever perceived loss Nolan &/or Juneau believe they have from the Hawai'i loans to Jowdy.   Ultimately, that transfer alone far outweighs their LOC capital accounts contributions to the Jowdy loans (*already net zero for Juneau after his 2006-07 requested buyout by Nolan [and not a victim of anything in the instant case – as also 100% repaid upon request from Eufora in 2005]*).

Although Kaiser has zero net funds in the Hawai'i partnership since his full repayment in August 2006 (*of his 2005 friends & family loans, supra*), and no other investment funds (*per Manfredi's 3500 proffer of Kaiser's known $1,000 ONLY, supra*), he and Berard received high-paying bribery jobs from Harvey and Jowdy to "*look the other way*" and "*help indict/convict Kenner*".   Kenner believes Berard received a similar transfer (*at a minimum*).

---

Gaudet was also robbed by Jowdy, culminating in millions of dollars of civil and criminal lawsuits filed personally by Gaudet versus Jowdy in Mexico for the same underlying issues Kenner and Kenner investors have faced since Kenner's 2007 discovery of the Jowdy crimes; *including witness intimidation*.

In true Jowdy-Harvey fashion, Gaudet was assaulted by Berard and threatened to be killed "*for continuing to communicate with Kenner*" as Gaudet told the FBI in 2014. *See Ex. 37 @ paragraph 9*.

- Berard's direct attempt to **obstruct justice** was reported to FBI agent Galioto and IRS agent Wayne – six (6) months after Kenner was arrested, thus serving only one (1) purpose by Berard; *threatening intimidation (a.k.a. witness intimidation)*.   The Court should note that no notification by the government prosecutorial team made the Court aware that Berard's illegal activity to dissuade Gaudet from testifying during the Kenner trial in opposition to all of the government theories was directed by either Jowdy's cabal, FBI agent Galioto (*consistent with his previous behavior with Kenner, Murray, Norstrom, deVries and others*), &/or jointly authorized to intimidate pro-Kenner witnesses before the 2015 trial.

- ***The defendant requests that the Government confirm with Berard what DCSL transfer amount he personally recovered from Jowdy.***

Berard was fully deceived by Jowdy in the DDM project, as well as the other Kenner and Kenner investors, totaling about $10,000,000 (*not including the unpaid loans to Baja Development Corp, DDM, etcetera*)[45].   The defendant believes that Berard received the same 1% distribution.  But, if not documented, his salary (*bribe*) from Jowdy should certainly be considered the offset to any loss recovered related to the unpaid Hawai'i loans (*Berard's only nexus to the instant case*).   Kaiser's salaries should be considered the same offset if the Government intends to claim Kaiser (*or the value of Kaiser's documented thefts from his friends & family*) as a money judgment loss, or a loss during a *Fatico* hearing, or part of a guidelines calculation for sentencing.

---

[45] Berard specifically confirmed his Jowdy-victim status for both the **DDM** and **DCSL** projects in 2010 (***four [4] years after the DCSL project began to get looted by Jowdy***) in a 3rd-party affirmation to Harvey's media voice box (*Michael O'Keefe from the NY Daily News*).

[RED from Kenner, BLACK from Berard]:

| | | | | |
|---|---|---|---|---|
| 131 77 | +14015246929 Bryan Berard* | 4/30/2010 9:48:51 PM(UTC+0) | Read | Everything good?? Asked cpl people for Tochs #. No luck. **A reporter called me too. Told him JOwdys a scumbag** |
| 151 77 | +14015246929 Bryan Berard* | 5/1/2010 12:06:48 AM(UTC+0) | Sent | **Good job with the reporter. Who was it?** |
| 131 85 | +14015246929 Bryan Berard* | 5/1/2010 12:11:12 AM(UTC+0) | Read | **The douchebag from daily news. Told him he's an idiot for printing these articles and he can quote me that I've been to both properties over a dozen times and Jowdy has not done his job.** |
| 131 86 | +14015246929 Bryan Berard* | 5/1/2010 12:11:34 AM(UTC+0) | Read | **He shut up right away and said sorry for bothern u. And hung up** |

Ultimately, as a result of the Mexico investors suing Jowdy on a Delaware "*books and records*" lawsuit that went no where, Jowdy's attorneys with the help of FBI agent Galioto, pressured the DDM and DCSL investors into a settlement agreement with Jowdy.

- ***The defendant requests a final copy of the settlement agreement and signatories to calculate a proper offset for the incremental equity they received for the Jowdy frauds related to both projects (which encompasses all of the unpaid Hawai'i loan amounts), further enriching the Hawai'i partners.[46]***

---

[46] Mike Peca addressed the Court in an April 2017 letter, complaining that the Jowdy deal was not appropriate.  But Peca fails to acknowledge that he worked hand-in-hand in 2012 with Jowdy, Harvey, Berard and Kaiser for over a year to attack the Hawai'i-Mexico attorney, Ronald Richards, who was continuing the legal pursuit of Jowdy on his behalf (*and all of the investors*).

- Pecas complaints about Jowdy echo two (2) specific issues.  It highlights that Jowdy's well-documented frauds had received no pressure from "law enforcement" to settle in any meaningful way, in fact in the second (2nd) sense, re-affirmed investor Stumpel's issues with the FBI strong handed approach to supporting Jowdy.

- Stumpel stated in his 2017 affidavit:
  *"Since April 2015, I have heard from Agent Galioto on a few occasions to let me know that Kenner is a thief and Jowdy did nothing wrong.  He is wrong, because I have seen the paperwork and bank records.  Jowdy stole from my friends and me.  I personally know that he scammed Kenner and me.  Now, I have been instructed to sign paperwork giving up some of my rights to Jowdy for the money he has stolen from me for a small piece of the Cabo project that Jowdy also stole from us.  It is incredible that Jowdy stole our money to buy his interest in the project, stole money for 10+ years from the project to pay for his protection and legal fees against the people he stole from, stole some of our equity in Cabo, and I am now being told that signing the deal with Jowdy to receive some of the stolen equity back is my best deal and I need to do it.  I do not understand why Agent Galioto of the FBI is working to protect Jowdy who stole all of our funds and against all of us."*

Peca (*along with Jay McKee*) filed a frivolous Bar complaint in California – ***written by Tom Harvey*** – to further destroy the cohesion of the adverse-Jowdy parties in 2012 (*with Kaiser and Berard working with Jowdy and Harvey*).  Mike Peca fell for their collective scheme, received no value from the fabricated claims, lost the Bar Complaint (*expeditiously dismissed based on no merits*), destroyed more of the cohesiveness of the investors Jowdy defrauded, and then was cast aside a year later without Jowdy and Harvey providing repayment for Jowdy's known thefts, directly from Peca and the other Kenner investors.  It was another dark chapter in the well-orchestrated Jowdy cabal's ongoing criminal existence.

- **Kudos again, this time with Kaiser and Berard's supporting narratives.**

***Northern Trust Bond in offset:***

Over the six (6) to seven (7) year existence of the underlying bond accounts, designed to produce additional revenue streams (*thru tax-free bond interest*) to the LOC investor's accounts while the leveraged approach to investing in the Hawai'i partners deal existed, is also a calculable offset for the alleged loss amounts calculation by the Government to the LOC investors (*assuming that the Government still contends that the LOCs were a part of any artifice*).

- Peca – 2005-2009 – **$300,052** interest offset
- Berard – 2005-2009  – **$129,314** interest offset
- Nolan – 2003-2009  – **$592,878** interest offset

---

Attorney Ronald Richards confirmed in his California Bar complaint reply that Constantine had full control of the GSF funds; *not Kenner*:

> *"The complaints by Ms. Peca and Messrs. Peca, McKee...represent an unfortunate attempt by them to use the State Bar complaint process as a vehicle to seek the return of funds that were properly transmitted to my former client, Tommy Constantine, on behalf of the complainants.*
>
> *It was apparent to me that each of the individuals involved in these transactions (including the Complainants, Constantine, Kenner) all understood that Constantine was handling the transactions for their mutual benefit.*
>
> *In May 2009, each of the complainants authorized Constantine, in his unbridled discretion, to further capitalize their various investments.  These funds were to be used by Constantine for a variety of capital requirements.*
>
> *At no time did the complainants ever suggest, either orally or in writing, that the previously-monitored funds were for me to monitor or that they were to be used exclusively for the payment of legal fees.*
>
> *I provided evidence to the complainants [McKee and Peca] that the funds were distributed to various attorneys and entities at Constantine's discretion.  There is no factual dispute from anyone that Constantine received all of the funds that were wired to him through my client trust account pursuant to the arrangements Constantine had made with the complainants."*

- Mike Peca lied to the Court in 2015 that he could not verify the GSF funds as used pursuant to the GSF expenditure spreadsheet.  (*Tr.652-653*).  Yet, Ronald Richards confirmed that he, himself, gave it to Peca (*& McKee*), and thus, Peca had full access to the proverbial "*horse's mouth*" to ask about its authenticity, further exposing either Peca's **CTE** or *suborned perjury*.

- Sydor – 2005-2009  – **$249,215** interest offset
- Rucchin – 2005-2009  – **$210,113** interest offset

   o   **Total: $1,481,572**

- *Norstrom (NON-VICTIM) – 2005-2009  – $218,943 interest offset*
- *Murray (NON-VICTIM) – 2005-2009  – $243,470 interest offset*
- *Gonchar (NON-VICTIM) – 2005-2009  – $144,339 interest offset*

   o   **Total: $606,752**

- *Juneau FULL BUYOUT – 4 years – 3% -- 1mm -- $120,000 (profit)*

   o   **Total: $2,088,324** (*See PK151*)

Please note that when Berard was specifically asked about the LOC in his voluntary 2009 arbitration testimony, in addition to his knowledge that Little Isle 4 was paying the LOC payments for him **obviously from the Little Isle 4 capital account**, he represented to the Arbitration Panel his knowledge of keeping the underlying collateral to earn interest as part of the LOC leveraged investment strategy:

> "*Basically the company – it was set up.  The company would pay the [LOC] payments.  I would pledge the money, obviously to get the loan for the property.  Again, the company would pay the [LOC] payments, and I wasn't forfeiting all the amount of money for the piece of property.*"

Berard's unfettered knowledge of the leveraged investment plan in Hawai'i and the plans for the LOC interest to be paid "*by the company*" cannot be challenged as unknowing, specifically due to the timing of his voluntary testimony, only weeks after he allegedly received a letter from Northern Trust bank (*which never existed*) explaining that he lost close to $1.1 million.  *See 3500-BB-1-r (Berard) @2.*[47]  It was

---

[47] Please note that Berard had already carried on a text communication with Kenner five (5) days prior to Berard authorizing the planned seizure directly with Northern Trust Bank on a required phone call (*like all of the LOC clients – in Rule 16 evidence*), thus his *ex post facto* representations that he was ever unaware are another unchecked fraud on the EDNY Court.

[Berard in BLACK; Kenner reply in RED]

actually less than $650,000 that Berard gave authorization to seize based on his own pre-seizure texts with Kenner (*not some fake $1.1 million amount*)– creating another suborned and irrefutable perjury issue at trial.

**Diamante del Mar offset:**

The defendant believes that Jowdy transferred 3% equity in the Cabo project (*from his stolen KAJ Holdings equity – See Ex. 50 -- TIMELINE 031*), projected value of approximately $4,500,000 (*based on an estimate until the original appraisal is delivered*).    This offset should be applied to all of the DDM investors (*in addition to the prior Juneau, Nolan, Moreau, Berard settlement offsets, supra*) for the Hawai'i loans that Jowdy received and are traceable to the DDM expenses (*thru Jowdy*).

**Diamante Cabo san Lucas offset:**

Next, the defendant believes that Jowdy transferred an additional 3% equity in the Cabo project (*from his stolen KAJ Holdings equity – See Ex. 50 -- TIMELINE 031*), projected value of approximately $4,500,000 (*based on an estimate until the original appraisal is delivered*).    This offset should be applied to all of the DCSL investors of CSL Properties (*in addition to any incremental Nolan, Berard or others, settlement*

| 6207 | +140152 46929 Bryan Berard* | 3/26/2009 6:53:59 PM(UTC+0) | Read | **When u get chance can we look at *how much money will b freed up after payn off line of credit NT???* Thanks** |
|---|---|---|---|---|
| 7280 | +140152 46929 Bryan Berard* | 3/26/2009 7:00:51 PM(UTC+0) | Sent | **~300k** |
| 6208 | +140152 46929 Bryan Berard* | 3/26/2009 7:04:18 PM(UTC+0) | Read | **Cool thanks!!! When will that b freed Gonna use 200 for a cool oppurtunity will show u and talk 2 u abt it later. Good for all of us n future.** |
| 7282 | +140152 46929 Bryan Berard* | 3/26/2009 7:30:08 PM(UTC+0) | Sent | **Can't wait to hear!** |

*offsets*) for the Hawai'i loans that Jowdy received and are traceable to the DCSL expenses (*thru Jowdy*).

The defendant is fully entitled to the correct offset calculation as a result of any other financial recovery sought &/or received as part of their Hawai'i investments.

The defendant re-affirms that the "offsets" &/or settlements Jowdy and the individual investors agreed to do *NOT* relieve Jowdy and his cabal from the responsibility of the outstanding Hawai'i loans, now calculated at approximately $30.7 million (*close estimate until forensic review is completed*), 13-years later (*post 2006*).   Jowdy's refusal to repay the Hawai'i loans (*to the Hawai'i partners*), fight religiously in every legal venue, and his well-documented frauds on the various Courts, the FBI, the US Attorneys offices (*for over a decade and counting*), *do not relieve him* from his ultimate obligation to pay, nor does it remove it as a "**real asset**" of the Hawai'i partners; *never lost.*   The collectability of the loan has been thwarted for the last five (5) years by the arrest and detainment of Kenner, with the assistance of FBI agent Galioto realized in numerous protection schemes for Jowdy.

Under *United States v. Boccagna[48]*, the Second Circuit Appellate Court remanded the case for recalculations after the District Court utilized an insufficient method to "*offset*" the residual assets of the charged scheme.   In *Boccagna,* the trial Court erred as a matter of law in calculating restitution owed to HUD [*the victim*] pursuant to the Mandatory Victims Restitution Act ("*MVRA*") because of the nominal sale price at which HUD sold the collateral to a city agency [*inside job*] and could not reliably measure offset value where the property had a higher fair market value.   As a result, the District Court finally identified, on remand, the true "*fair market value*" of the residual asset and reset the defendant's restitution lower, accordingly.   The reasoning behind not using the "*fair market value*" in the first instance was that the District Court did not want to confirm that HUD could have received a value in

---

[48] *United States v. Boccagna* (2nd Cir. 2006)

excess of the alleged compensable loss.  Although the MVRA is not designed to award a victim a windfall, the MVRA cannot be ignored when the residual asset [*the home values in Boccagna*] values exceed the compensable loss amount [*the unpaid Hawai'i-Jowdy loans in this instant case*].

In addition, the calculation for restitution is mandated to be the greater loss on the date of the crime or the date of recovery, but in the instant case, the Hawai'i loan has **always** been an asset of the Hawai'i Partners, thus never unaccounted for.   The circumstances surrounding the non-collectability of the loan is not attributable to any loss amount, but moreover, attributable to the various schemes employed by Jowdy, Harvey, Galioto, Kaiser, Berard and other participants in their never-ending deceptions to the Hawai'i investor-partners.   The asset is still an asset of the Hawai'i partners, thus never lost thru any diversion, and non-attributable to a restitution or money judgment amount that would provide a double payment (*i.e. windfall*).

Kenner never obtained the Jowdy loans.  Only Jowdy obtained the funds and their resulting benefits (*to the profit of over a hundred million dollars, solely based in his unending criminal enterprise which began in the first days' of the Kenner investments with Jowdy – See TIMELINE 012 [known as subpoenaed by the US Attorneys office in this instant case to verify the Jowdy crimes the week before trial in 2015 – fully exploiting their fixed trial tactics, and ignored -- regardless of the empirical evidence]*).


***Eufora private stock sales:***

Notwithstanding the fact that the 2008-09 private stock sales by Gaarn and Constantine were fully vetted by Rudy Giuliani's investigative team in 2010-2011, the company had been in the process of a 3rd party valuation, from mid-2008 to January 2009 for a $3 million working capital loan [*from Neptune Capital*].   As a result of the 6-month valuation by Neptune (*during which time Kenner extended another $50,000 in working capital loans to Eufora – without being a documented*

shareholder [*awaiting the Constantine "grocery list" transfers]*), the company received a significant confirmation of intrinsic arms-length value from a 3rd party of $20 million.   There is no contradicting evidence that Neptune made the $3 million working capital loan without full intention of being repaid by the credit related company [*Eufora*].

Giuliani and Stolper's investigative team completed a thorough audit of Gaarn and Constantine's private sales and had no resulting concerns (*over 1 ½ years after the private sales*) in addition to their evaluation of perceived Eufora insider wrongdoings (*after being hired independently by Gaarn – thus not a Kenner puppet as portrayed at trial – specifically with access to Giuliani thru Gaarn's business relationship at the Rockefeller Foundation*).   Gaarn's business relationships were based in NY significance, not accessible to a "**puppet**" of anybody.[49]   The 2010 independent hiring by Gaarn was also confirmed by Stolper in his July 16, 2010 sign-off letter to the AZ Eufora Partners I members of Eufora (*with Gaarn as the Managing Member*).  *See Ex. 1 @6*.

Not only did the 2008-09 private stock sales have an independently confirmed value (*thru Neptune's 2008-09 due diligence*) but two (2) years after the first Constantine sale in 2008, Giuliani's investigative team decided they wanted to purchase the Neptune loan to control Eufora and its assets (*multiple patents and patents pending*) as well as acquire a 6% equity stake thru a contingency fee in lieu of their investigative fees.   The AZ Eufora Partners I members, thru Gaarn, agreed (*See Ex. 1*).   Kenner was not a member of AZ Eufora Partners I or Eufora at the time, thus had no legal standing to create backup records &/or demand actions by Eufora &/or AZ Eufora Partners I (*thru Gaarn or Giuliani's team*); *another pre-trial slander claim by Galioto and Berard to the Eufora members (*learned thru a discussion with William*

---

[49] Please note that Gaarn also made the initial introduction to Lehman Brothers, thru his connection to the former Lehman Brothers Chairman; also not the connections of a **CTE**-laden puppet as portrayed throughout the 2015 trial proceedings.

*Ranford*).   In fact, on August 14, 2009, Eufora CEO Gentry confirmed Kenner's non-involvement in an email to the Board members (*See PK130a*):

> *"Phil [Kenner] is not a member of Eufora or AZ Eufora Partners I LLC."*

Kenner received some funds from the Gaarn private sales that repaid over two (2) years worth of loans from Kenner to Gaarn, personally. With the resulting proceeds, known throughout the Giuliani investigation in 2010, Gaarn also made loans of approximately $140,000 to Kaiser (*despite the false allegations in Counts 2 –3 and 4 to create a venue argument*)[50] and immediately made personal expense payments of over $100,000 (*which included stopping his New Jersey family home foreclosure*).

---

[50] Michiewicz told the Court in sidebar that Counts 2, 3 and 4 were levied versus Kenner because Kaiser was still owed funds in February 2010 by Kenner from their 2007 California home sale (*Tr.1020-1021*).   This unsubstantiated and preposterous claim is refutable by Kenner and Kaiser's own bank records, and ignored by the prosecutorial team in order to circumvent their lack of venue issue for the EDNY trial, with a clearly desperate Kaiser.

Not counting the ridiculous trial claims (*after fully documented repayments in Hawai'i and California*) Kaiser believed he:
> 1) Owned part of Kenner's Cabo home (*Tr.1087*),
> 2) Owned part or all of the "*grocery or shopping list loans*" from Kenner to Constantine and resulting 20% Eufora equity (*Tr.1240, 1404-1405*), &/or
> 3) Owns Kenner's Baja Ventures 2006 equity due to another fake $455,000 renovation loan, and documents Kaiser, Harvey and Jowdy *forged and fabricated* (*See PK128 and PK129*).

Not counting the additional, approximate $4 million in unsubstantiated Kaiser and Michiewicz fraudulent and fabricated claims at trial, *supra*, based on any possible calculation method, Kaiser was already paid $1,165,000 of the original approximate $1.9 million due (*investment and profit*) in the first 4-weeks after the California closing in December 2007 (*See R33 B*).  Kaiser received more than the balance due by the time Kenner and Kaiser purchased and began renovation on their next project in Arizona by mid-summer 2008 (*in Rule 16 evidence – and ignored*).

Under the most favorable calculations for Kaiser, **Kaiser owes Kenner over $1 million** in unpaid advances from the Arizona project – after being fully repaid in California and Hawai'i, based on the fact Kaiser was perpetually BROKE – after borrowing millions from his friends & family and choosing to not repay them when he was repaid their funds *Jowdy-style* (*See R33 528*).   Instead, Kaiser tried to "*double-down*" on his investments (*with his friends & family money*) while the mid-2000s real estate markets appeared to be never-ending and skyrocketing.
> • Not only was Kaiser **fully repaid** as his and Kenner's bank records confirm – the government had possession of the contradicting evidence when they filed the 2013 Indictment with Counts 2, 3 and 4, and during the trial when they claimed

Kaiser's "unpaid" investment from Kenner was the basis for the "criminal wires" in 2009.  **NOW -- All proven false**.

- It should be noted that Kaiser filed a second (2nd) Court affidavit in the EDNY on 6-3-2011 (*Feuerstein – 2:11—cv-02692-JFB-AYS*) related to Eufora and Constantine.   Kaiser's affidavit claimed that he had already given $275,000 to Constantine by April 2007 (*from Kenner's bank account*)…thus these were *more* (?) California repayment funds acquired by Kaiser by February 2009 and misrepresented to the EDNY 2015 Court.

- In Kaiser's Arizona affidavit in 2010 on the same subject matter – Kaiser claimed $2.2 million (*including the NY $275,000 claims*) from Kenner went to Constantine for his benefit (*the full "grocery list loan"*) – thus Kaiser could not have been owed *ANY* funds (*under his won misaligned theory*).  Kaiser would have been millions overpaid if the Michiewicz and Kaiser proffers in 2015 were true – yet, 100% of the empirical evidence proves they LIED and presented known, perjured testimony to create a guilty verdict on 33% of the Indictment Counts, *all fraudulently represented*.  This was another premeditated fraud on Kenner and the EDNY Court; confusing the jury on purpose.
  - Whether it was factually true of not – Kaiser submitted: "*I invested $275,000.00 by April 2007 in exchange for membership interest*".  (*See 2:11—cv-02692 -- Document 4 @ 1 of 70*).

Kaiser confessed to another deal to the FBI (*See 3500-JK-1-r @ 7*), in which he robbed his handi-capped brother (*Keith*), DEA Agent Bobby Rizzi, and a doctor friend of his (*Frank Sconzo – also robbed as part of another documented Kaiser scheme*).   Rizzi and Keith Kaiser appeared in the EDNY courtroom on several occasions throughout the case proceedings, believing Kenner received their funds, not John Kaiser (*as the bank records and documents prove*).  Kaiser went so far to tell the FBI (*Galioto – in the October 2010 proffer*) that, "*PK was not involved in the Palms R/E*" – further distancing Kenner from Kaiser's friends & family schemes.

- FBI Agent Galioto also ignored the proof that Kaiser stole the $550,000 in funds and re-directed $500,000 of it to buy a portion of a Mexico land deal that belonged to Kenner, after Kenner had already purchased his interest.  (*See PK50 -- R33 549*)
- Shockingly, Kaiser and Berard later claimed this same $500,000 was somehow their investment in the Arizona project (*the fraud known to Galioto, and ignored*) – despite 100% of the signed documents refuting it.  This transfer happened within days of Kaiser confirming to Kenner, again, that he was "**broke**" after his alleged $500,000 Arizona investment – clearly impossible with Kaiser's own notarized documents in Rule 16 evidence.

Obviously, the real estate recession caused Kaiser's "*double-down*" strategy to fail and he was desperate for a scapegoat, thus his decision to forgo all prior knowledge of the Jowdy frauds (*calling Jowdy a "thief" repeatedly on recordings at trial, [Tr.1230-1232 – caught lying] and finally admitting it – Tr.1311-1313*), and joining him in Mexico in 2012, with Berard (*also documented as broke from egregious lifestyle spending*).

The government also wants to avoid addressing how Kaiser could have:

- It should not be overlooked that Gaarn made almost five (5) hours of recordings in 2012 for the FBI with Kenner, unknown to Kenner at the time.

- At no time during the recordings -- solely about Eufora -- does Gaarn insinuate that the 2008-09 private stock sales documented by his company (*Standard Ventures*) belonged to Kenner.   In fact, and to the contrary, Gaarn's only concerns were getting advice from Kenner as to how *he* should address *his* underlying IRS tax issues *he had* from *his stock sales*.   Gaarn knew that if he had made a false reference to Kenner owning the stock at any point during the FBI calls (*made over a six [6] month period of time*), Kenner would have refuted his nonsensical statement (*notwithstanding the*

---

1. Received his Hawai'i funds (*in full -- $1.176 million per bank records in Rule 16 evidence*),
2. Received his California funds (*in full – approximate $1.9 million per bank records in Rule 16 evidence*), and also
3. Claimed the "*grocery list*" or "*shopping list*" funds were his (*Tr.1240, 1404-1405*).

Yet -- in 2014 (*immediately after Kenner is arrested with Kaiser and Berard as the two [2] main informants*), Kaiser and Jowdy produce another *forged and fabricated* document with Kenner's signature *forged again* (*See PK128 and PK129*), and utilize it for an illegal transfer of Kenner's Baja Ventures 2006 equity to Kaiser (*See 125*) – while neither Jowdy nor Kaiser had any legal authority to transfer the equity.   **How many times is Kaiser re-claiming all of the funds he was already repaid?**
- The government cannot address the salient issue straight-on, because it would clearly **VOID** their foundationless allegations in **Counts 2, 3 and 4** (*as Kenner still owing Kaiser "more" money, unexplainably*) (*Tr.1020-1021*).

If Kaiser and Jowdy "believed" they were satisfying a Kenner "deal" with Kaiser from 2006 with the Baja Ventures 2006 transfer (*five [5] years after the deal would have authorized the transfer – IF REAL*), then how could Kaiser have still been owed funds in 2009 (*for Counts 2, 3 and 4?  Answer: "He could NOT"*).

And -- why did Kaiser not make those claims in January 2010 when he arrived in California at the Jowdy deposition (*in the California case*) related specifically to the Hawai'i loans and the Cabo project frauds?
- Kaiser would have been the largest owner of the Cabo resort (his equity *worth over $100 million at the time*)...BUT – Kaiser **never** raises this incredible issue with the investors' Cabo attorney (*Ronald Richards*), Kenner, Mexico and Hawai'i investor Woolley, Mexico and Hawai'i investor deVries, Jowdy, Jowdy's California defense attorneys or anyone else present when it could have been memorialized **on the record**.   Instead his silence is all telling.
- Four (4) years later -- Kaiser, Harvey and Jowdy concocted this new medium to steal Kenner's Baja Ventures 2006 equity (*now that Kenner had been Indicted and arrested specifically at their planning and direction with Galioto*).

*Government's false allegations three [3] years later during trial*), thus, Gaarn *never* did.

- o *NO* evidence exists pre-trial that Kenner owned the stock since his transfer to Gaarn (Standard Ventures) in 2005, only supporting evidence that Gaarn always owned it since the 2005 transfer (including the *disgracefully altered* FBI notes to corroborate a false narrative – *See 3500-TG-1-r @2).*
- o The private stock sales fraud allegations ignore the simple truth that if Kenner wanted to sell some of his stock (*if he had owned it*), he would have sold it and not had Gaarn, Kaiser or anyone share in the private stock proceeds, since they both owed Kenner significant funds for unpaid loans at the time.  *It is more illogical tomfoolery*.

Gaarn *initially* received the proceeds, since the Eufora shares belonged to his company, Standard Ventures (*Tr.2570-2571*).   This is documented in multiple trial exhibits and throughout the various forfeiture submissions (*See Eufora taxes @ R33 433h [2005], R33 433i [2006], R33 055B [2007], and R33 055a @35&37 [2010 Eufora operating agreement], PK130, PK130a, PK131, R33 433f [Kenner 80]*), yet Michiewicz asked Gaarn to give testimony that he did not possess any Eufora stock to sell, clearly under duress (*Tr.2666-2667*), after making the same claims of ignorance during cross-examination (*Tr.2628)*.

**Intended loss:**

For the purpose of calculating the Guideline range, loss is defined as the greater of the actual loss (*none in this case as the Government knows, infra*) or the "*intended loss*".   In the Government's reply comments during a July 3, 2018 status conference, the Government claimed they were not seeking actual loss, but purely intended loss to determine restitution and Guideline ranges.

"*Intended loss*" means the pecuniary harm that a defendant purposely sought to inflict.  *U.S. Sentencing Guidelines Manual 2B1.1, cmt. 3(A)(ii)*.   The District Court is not required to calculate loss with absolute precision, but it must make a reasonable

estimate of the loss that is based on available information and supported by a preponderance of the evidence.  *U.S. Sentencing Guidelines Manual 2B1.1, cmt. 3(C).*

In the general schemes described throughout the Government's prosecutorial case-in-chief and in reply during their Rule 33 submissions, they ignored many salient facts to arrive at an un-supported "*loss*" conclusion.

### *In the alleged Hawai'i scheme:*

Kenner received zero benefit from the loans that Jowdy received.   Without a benefit, there is a grave absence of intent, unless the Government now claims that Kenner, *without benefit*, was only attempting to harm his clients and friends of nearly fifteen (15) years by the time the Jowdy loans commenced, after well-documented decisions "***as a group***" to do so (*infra*).

- This alleged "*harm without benefit*" by Kenner would have begun less than 1 ½ years after Kenner risked his entire career to sue his former employee (*Assante -- on April 1, 2003, a billion dollar, publicly traded company*) after Kenner discovered their SEC frauds and exposed them.   The Kenner lawsuit cost Kenner over $1 million, but exposed Assante's frauds on the same clients.   The company finally settled out-of-court with Kenner and released all of his clients from their control (*after attempting to increase their fees 3-4x by creating "ghost funds"*).   The asset management arm of Assante in the USA ceased operations approximately one (1) year after Kenner filed his suit to protect his investors, further verifying Kenner's expose.

Considering several significant facts, <u>contradicting</u> the Guidelines' definition to bring "*pecuniary harm that the defendant purposely sought to inflict*", it is impossible to maintain there was intent or purpose.

1. All prior to the 2015 trial, the Hawai'i-Jowdy loan was confirmed by Kaiser, Berard, Norstrom, Gonchar, Lehtinen, Stumpel, Peca, Sydor, Stevenson, and others in various "<u>*under oath*</u>" proceedings – as **authentic**, **verified** and **approved** at all times.
    a. In addition, all Hawai'i investors (*not aligned with Jowdy – like Nolan, Juneau and Moreau*) also participated first-hand in **multiple lawsuits** to recover the actual unpaid Jowdy loans in Mexico

[*2008-2013*], Nevada [*2007-2010*], Arizona [*2008-09*], and California [*2009-2010*].

2. In February 2006, just prior to the original February 26, 2006 Lehman Brothers-Diamante [*Cabo*] closing, Kenner and Kenner investors were given a 3rd party closing evaluation verifying the $7 million Jowdy and Lehman Brothers intended to pay the Hawai'i investors at the closing for the advanced loans.  *See PK45 [also TIMELINE 064] @11*

   a. Under the circumstances, even Jowdy and Lehman Brothers had acknowledged the Hawai'i loan commitment and the need for Kenner to waive the "*partial repayment clause*" in the 2004 loan agreement.   What Kenner and the investors *did not receive* was the follow-up February 16, 2006, 3rd party disclosure where Jowdy and Lehman Brothers removed the $7 million payment expected by Kenner and Kenner investors in exchange for the 2006 documents sign-off.

   b. Once the February closing date was delayed 30-days until March 26, 2006, Jowdy and Najam actually made a series of Hawai'i loan repayments totaling $360,000 to Ula Makika (*See PK149*) from more stolen and diverted DDM funds (*the KSI Loan – unknown to Kenner and Kenner investors*), further supporting the expectations by Kenner and Kenner investors to receive their Hawai'i loaned funds back.

   c. The Jowdy-loan repayments concluded (*March 24, 2006*) 2-days before the Cabo loan funded (*terminating the re-payments ever received thru Jowdy*). Kenner and Kenner investors gave final signed offs with the repeated promises and recent repayments of the Hawai'i loan amounts, with full confidence to be repaid by Jowdy with Lehman Brothers' [*Masood Bhatti's*] confirmation, shortly after the March 26, 2009 closing (*with the 15% interest accruing on all of the loans*).

3. Months after the Hawai'i JV closing in August 2006, Kenner alerted Jowdy and Najam that the Mexico frauds needed to end via email (*in Rule 16 evidence*).  As a result of the Jowdy non-compliance with the multiple outstanding loans[51], Constantine began to negotiate a settlement with

---

[51] Jowdy confessed to *all* of the loans (*specifically the Hawai'i loans*) in his January 2010 deposition – *except* the pending litigation for the loan with Glen Murray for $791,000 in Nevada (*still unpaid*) – which Jowdy also lost after a 4-day bench trial.   Jowdy's amazing

Jowdy a few months later (*spring 2007*) at which time, Jowdy acknowledged the $8.5 million plus in loaned funds he owed Kenner and Kenner investors. (*See R33 034*).

o   During the January 2010 Jowdy deposition, **Jowdy confirmed** Kenner's actions to recover debt and embezzled funds from Jowdy (*all proven and conclusively outlined in Kenner Rule 6(e) motion (@21-40) and TIMELINE REPORT, from Rule 16 materials.*).   Jowdy affirmed:

> *Q: So why is – what is the – what is the source of – of your inability to speak with Mr. Kenner about – if Mr. Kenner's been the single biggest source of capital contribution, thru him or his clients, since 2003, why is the reason that you cant operate the Cabo san Lucas Project with Mr. Kenner?*
>
> *A [Jowdy]: That's a serious question.*
>
> *Q: Yeah.*
>
> *A [Jowdy]: Okay.  Well, we closed the deal in March of '06.  By October of '06, he was voicing his displeasure with me in a series of emails.  By April of '07, within a year, he was saying that I was mismanaging the project.  By May of '07, he was cancelling all sales calls.  By June and July of '07, he had Tommy Constantine working with him [on a settlement deal – See R33 034]...*

o   Under Kenner's 2006 mens *rea*, if Kenner had diverted loans to Jowdy, unknown to the group of Hawai'i investors, and was being paid by Diamante to be the Cabo sales manager (*which Kenner had already delivered 31 pre-sale confirmations [totaling $62 million in sales]*), what would possess Kenner – after three (3) years of alleged diversions – to "*call out*" Jowdy publically when the "*fruits of the alleged diversion*" were finally available to Kenner for simply "*going*

---

defense was to claim, "*Kenner received all of the funds*" despite specific contradictions by his own accountant's records and his own bank records that were presented at trial.  **They rebuked Jowdy's fabricated claims**.

**Significantly for this instant case** -- Jowdy authenticated the 2004 Hawai'i loan agreement at trial (*previously claimed as a forgery by Jowdy in the Arizona case*) and claimed he had 100% access to those funds that would have been cheaper than the deal with Murray which he claimed he never agreed to – BUT – received $791,000?!?   Jowdy's attorneys cross-examined Kenner for approximately 29-pages of transcript over Jowdy's access to the Hawai'i loan funds; *doubling down on their new claims*.

*along*" with Jowdy and his newly observed mis-management (*second project after DDM*) and the discovered embezzlements?[52]

---

[52] Pursuant to FBI interviews with Jowdy's top two (2) on-site construction managers [*Dave Boyden (3500-DBP-1-r) and Robert Burdick (3500-RB-1-r)*], the FBI noted in February 2010 that they both confirmed Jowdy's mismanagement immediately at the Cabo san Lucas site (*as Jowdy confirmed, supra, in sync with Kenner's expose of Jowdy*), specifically with Jowdy's General Construction manager (*Ken Ayers*) in charge of falsifying and submitting all of the expense reimbursements and expense budgets to Lehman Brothers for approval, effectively completing the embezzlement, diversion process and cover-up.  Ken Ayers was paid $408,000 annually to <u>not be present</u> in Cabo san Lucas (*remaining a full time resident in San Diego and working full-time as the General Manager of "The Bridges Resort at Rancho Sante Fe)"*.  **This is fundamentally unheard of and wholly unreasonable.**

Boyden confirmed Kenner's *mens reus* by confirming to the FBI *[February 16, 2010]*:

- "*In three (3) years, Boyden saw Ayers about ten (10) times at the property.  Each time he saw Ayers, it was only for a few hours.*"
- "*Jowdy and Kenner started to not get along after Jowdy closed with Lehman Brothers on the DCSL property.   Jowdy started to focus on other projects in Boot Ranch Texas, and Palm Springs CA.*"
- "*Boyden believes [after 3 years] approximately six million dollars went to the DCSL property.*"
    - By the end of year-three at DCSL, over $20 million had been expensed, approved and drawn-down by Jowdy, Ayers, Najam, and Harvey in concert with the Lehman Brothers lender [*Bhatti*] (*who approved all of the frauds for a piece of the diversions*).   Virtually no development progress had occurred – identical to the Bhatti-Windwalker fraud in Hawai'i (*of $11 million in draws in 18 months with <u>no development</u> at all – also unchecked after Kenner told the FBI – and ignored by Kaiser as the Managing Member of Na'alehu Ventures 2006 [Hawai'i] in exchange for a job from Jowdy in Mexico*).
- From the Boyden proffer -- "*[Jowdy's best friend]* **Carifiello told Boyden that any bribes** *[for legal protection from Kenner and Kenner investors]* **that were given to the Mexican government were classified on the books as consulting fees**."

Burdick confirmed Kenner's *mens reus* by confirming to the FBI *[February 22, 2010]*:

- "*Jowdy stopped communications.  Jowdy only came down [to Cabo]…when [Louis] Freeh came down 4x's.  Came with family 3x…1-2 times alone*".
- "*2005-2007.  Things started getting 'sticky'.  $ started not being paid.  Jowdy still flying down on jets.  Jowdy secretive on when he came down or people coming down – non-investors*".
- "*Ken Ayers never around; never answered phone.  Came down few times, few hours.*"
- "*Jowdy owes money to Jon Berry [former NBA start and current TNT analyst] for Startime*".
    - Startime was Jowdy's former real estate scheme in GA, which he repaid Roger Clemens $17,000 on September 3, 2002 with stolen DDM money (*one month into the DDM project deposits by Kenner, Khristich and Woolley*) – in Rule 16 evidence as embezzlements.

4.   Constantine and Jowdy verified Jowdy's debt, with full email and settlement agreement evidence (*See R33 909*), to the 2009 arbitration panel (*See PK150*).

5.   The actual 2004 loan agreement was created for the **benefit** of Little Isle 4 members (*as the lender*), and any other future lenders under the loan

---

- Lastly – Burdick told the FBI that he informed Kenner about the Feds calling him in 2010, to which Galioto's raw notes confirmed: "***PK [Kenner] said to talk to them – no problem***".   This contradicts the government's claim that Kenner "*berated*" Kaiser for talking to the FBI in the same year.  *Tr.1032-1036*.
    o   This fabricated event also overlooks the salient point that the Kaiser FBI interview was not scheduled (*they just knocked on his door at home*) – thus why would the FBI agents need to get Kenner's permission to show up at his home like they did to Kaiser?  It is clearly misleading and nonsensical.

Ultimately, this was all previously corroborated by Jowdy's executive secretary in her FBI proffer supporting Kenner's *mens reus [June 29, 2009]*.  As noted specifically by Matt Galioto' raw notes (*only five [5] days after the Kenner full-disclosure proffer of June 24, 2009*), Jowdy executive assistant, Shawn Hughes [*See PK104 -- 3500-SH-1-r*], told the FBI:

- *"Ayers was the head project manager, but Hughes did not know what he did.  She did not see him much."*
- *"Hughes saw lavish spending during her time as Jowdy's employee"*
- *"He tricked a lot of people"*
- *"Jowdy was 'living the life' on other peoples' money"*
- *"When investors asked for an update on the project, Jowdy would <u>always</u> brush it off and say he would get around to it."*

**Not only did Jowdy steal the DDM and DCSL funds (***See Kenner Rule 6(e) motion – submitted July 1, 2018 @ 21-40***) – but also <u>every</u> DCSL employee that met with FBI agent Galioto during his initial "investigation" confirmed the Jowdy frauds, mismanagement and embezzlements that <u>Kenner properly exposed to the investors and then law enforcement, immediately when discovered</u>.**

As the government knows, Kenner also scheduled FBI meetings in June 2009 (*six [6] days after the Kenner proffer – in Rule 16 evidence*) for at least eight (8) DCSL, DDM and Hawai'i investors to speak with the FBI, immediately.   **FBI agent Galioto <u>*canceled*</u> these meetings**.

These meetings would have occurred less than three (3) months after Kenner allegedly had the investors' LOC collateral "*taken*" without their knowledge and for "*usages unknown*" to the investors, thus the meetings that Kenner attempted to set up directly with the FBI, under the government's concealment theory would have been *suicide* for Kenner, but unexplainably, Kenner's *mens reus* was clear and information flow was transparent – *not concealing anything*.

agreement to Jowdy.   (*See R33 002*).   **There was no Kenner beneficial diversion**.

Thus, if Kenner had no benefit, and all parties were aware and have acknowledged it from inception (*or prior thru conference calls to approve it*), how can the Government even allege "*pecuniary harm that the defendant purposely sought to inflict*"?   They cannot.

The current *uncollected* status of the Jowdy loan has no bearing on Kenner's relentless efforts to do so (*11-years and counting by 2018*), *most recently denied by the AUSA's office, specifically*.   In fact, since December 2007, Kaiser has been in the most powerful position (*as Managing Member of the Hawai'i project*) to attempt collection for the members of Na'alehu Ventures 2006, the Hawai'i partners JV roll-up.   Kaiser has ignored the loans for two (2) specific reasons:

1.  Kaiser has no residual benefit from the actual collection of funds from Jowdy (*since he fully cashed out his capital account at the 2006 closing – in spite of his well-documented 2015 perjury on the subject matter*), and
2.  Kaiser has a high-paying job (*tax-free -- somehow*) from Jowdy in Mexico and would jeopardize himself (*like Kenner did in 2007 turning down the Jowdy bribes*) to pursue collections for the Hawai'i investors, whom he has a fiduciary responsibility to represent.

**It should be emphatically noted** (*emphasis added*) that Kenner made multiple attempts to assist the Government in collection of the Hawai'i loans from Jowdy thru two (2) letter submissions to the Government (*See Docket 553 – June 3, 2018*).   The Government <u>declined</u> both offers for Kenner to share the empirical evidence of the known Jowdy thefts and assist in the reclamation of the funds Jowdy has fraudulently possessed since March 26, 2006 without any Government interventions, to the sole detriment of Kenner and Kenner investors.

This **$31 million** loan (*as of July 2018*) is a complete <u>offset</u> for all of the Hawai'i investors who are alleged to be victims of the Jowdy loans (*concealment conspiracy – despite their own affirmations under oath – pre trial*), while only the Government,

Galioto and Jowdy have no interest in the collection and repayment by Jowdy, *not Kenner and Kenner investors*.

***The GSF contributions:***

Under the same "*pecuniary harm*" issue, Kenner received no benefit from the Constantine-conceived GSF plan.   **Without benefit, there can be no intent**.   The sole distribution to Kenner from the GSF was an expense repayment of $22,425.52. The payment was months after Kenner incurred the expenses to help initiate the fund.   Kenner also paid documented ongoing expenses to the fund and released hundreds of thousands of equity contributions to the subsequent LLCs (*Eufora, Avalon, Palms condos, Falcon 10*).

- Kenner paid $20,000 to initiate defense litigation for Constantine directly to Ronald Richards in April 2009 (*in Rule 16 evidence*).   Kenner was denied repayment of that contribution by Constantine at a later date, reconfirming Constantine's control of the GSF funds at all times.

- Kenner contributed $300,000 plus in equity payments to the Palms condos, which Constantine distributed as equity to the GSF contributors, per se (*in Rule 16 evidence*).

- Kenner contributed his equity in the Falcon 10 (*airplane*) as the largest investor (*over $250,000*), which Constantine distributed as equity to the GSF contributors, per se (*in Rule 16 evidence*).   Kenner remained a guarantor of the Falcon 10 after the GSF title-transfer <u>*despite*</u> Constantine removing Kenner as an owner from the final operating agreement (*unknown to Kenner -- once Kenner helped Giuliani's group investigate Constantine in early 2010*) (*all in Rule 16 evidence*).

- Kenner paid thousands of dollars in incurred additional, unreimbursed expenses for travel and hotel fees for Woolley, deVries and Kenner to attend the January 2010 Jowdy depositions.   Kenner also paid for the court reporters (*Kelli Norden and Assoc.*) via Kenner AMEX (*in Rule 16 evidence*) for the two (2) days.

- Kenner incurred unreimbursed expenses for the February 2010 mediation with Jowdy in California for the ten (10) (*or so*) plaintiffs who attended.

- Kenner paid for the various litigation efforts related to Hawai'i-Little Isle 4 from the "*black sheep*" investors, as Constantine denied the litigation expenses (*in Rule 16 evidence*).

- Kenner paid hundreds of thousands of continuing legal expenses in Mexico for the legal efforts versus Jowdy (*related to the unpaid loans, etcetera*), once Constantine refused to send more than the two (2) small payments for the Mexico litigation to the group's Mexico attorneys [*despite fabricated prosecutorial claims about Kenner buying a tequila company that was never bought with the GSF funds*] (*in Rule 16 evidence*).

### The LedBetter loan to Kaiser:

As confirmed, *supra*, thru FBI interviews of Tesoriero (*See R33 2005 -- 3500-VT-1-r*), only Kaiser benefitted from the LedBetter loan – that was re-paid by Kaiser to the Hawai'i accounts 11-days later (*as agreed upon in advance*). Kaiser, as Managing Member of Na'alehu Ventures 2006, credited the additional Mike Peca capital contributions to Na'alehu Ventures 2006 (*post JV closing*) on the tax records for Na'alehu Ventures 2006 and the Na'alehu Ventures 2006 "*books & records*", under Kaiser's management control at all times since December 2007.

- It should be noted that following the 2006 Hawai'i JV, Mike Peca did not revoke or change his access status to his LOC for capital contribution purposes.   In addition, Peca made no reference in March 2011 to the SDNY Grand Jury that Kenner had ever made a draw against his LOC that he determined was unauthorized; *never*.

Finally, Tesoriero confirmed that, "*Kenner was responsible for the construction expenses at the LedBetter project only*".    In fact, Kenner actually initiated the "lis pendens" on the LedBetter property (*against Kaiser*) for the Kaiser loan amount. *See PK107*.   This evidence was collected during the search and seizure of Kenner's home in November 2013, documenting further irrefutable *mens rea* of Kenner.

**Without benefit, there can be no intent**, unless the Government is now claiming that Kenner was diverting funds to 3rd parties (*without a personal benefit*) in order to inflict pecuniary harm on his friends and clients of nearly fifteen (15) years.

The Government stated they were <u>only</u> seeking intended loss in the Kenner case. The "*intended loss*" only claim was the Government's basis for demanding that the Court deny Kenner's request for the DCSL appraisal.   The Government was clear in stating there is "NO LOSS" in the case (*as always known*), only a un-provable intended loss (*they want to pursue for guideline calculations*).

As the court knows – the following example is a true depiction of ***intended loss theory***.

> *A schemer decides to hire a 90-year-old, sick man to buy $10 million in life insurance.   The schemer pays the old man $100,000 to do it, while on his deathbed.   The schemer has **ABC Company** become the beneficiary of the life insurance policy.   The policy premium is $100,000 per month.*

> *Now – the schemer recruits an investor who is promised and will make double (2x) their investment money at the time of payoff.   The schemer gets $100,000 per month out of the "investor" (who is <u>not</u> a knowing part of the scheme) to pay for the monthly insurance premiums.*

> *[SCENARIO 1]: If the old man dies after 12 months ($1,200,000 of premiums paid) – ABC Company would receive a $10,000,000 payout.   Then – the schemer would pay the investor $2,400,000 (2x their investment).   The schemer would keep the resulting $7,600,000 profit.   $10,000,000 minus the $1,200,000 (premiums paid) is the ACTUAL LOSS (to the insurance company from the scheme).   That is simple.*

> *[SCENARIO 2]: Now – assuming the schemer gets caught after 12 payments ($1,200,000 of premiums paid by the investor) and the policy gets <u>cancelled</u>, the "**INTENDED LOSS**" would be $10,000,000 minus the paid in premiums – since there is no ACTUAL LOSS to the insurance company.   The ACTUAL LOSS would be to the "investor" of $1,200,000.*

> ➤ *Thus – SCENARIO 2 – there is $10,000,000 of INTENDED LOSS for sentencing guidelines purposes based on the scheme on the insurance company – BUT there is a $1,200,000 ACTUAL LOSS for RESTITUTION only to the investor.*

**In this case…**

The investors currently (*in 2018 and still accruing*) have a $31+ million loan receivable from Jowdy as a result of the 2004-06 Hawai'i loan that "*every under oath investor*" confirmed prior to the 2015 trial – but all had **CTE** or amnesia about their prior statements during trial (*repeatedly defended by the Government as faulty memory, confusion and mistakes*).   The Hawai'i loan benefactor is in the name of the lender (*Little Isle 4*), **thus the property of the Hawai'i partners, at all times**.

There cannot be INTENDED LOSS.  The asset has never been "*lost*".   Kenner received no benefit from the Jowdy loans.   In fact, once the loans were deemed *BY KENNER* to have "*gone bad*" after the Plan B repayment scheme by Bhatti [*Lehman Brothers*] and Jowdy failed, Kenner exploited the discovered malice by Jowdy's cabal. Kenner's immediate announcement of the then-discovered Jowdy and Harvey frauds (*of non-repayment [a.k.a. theft] – confirmed by Jowdy to the FBI and the California deposition in early 2010*) occurred in Spring 2007, when Kenner turned down the Jowdy-Harvey-FBI bribes – *documented by Najam* by specifically telling Jowdy via email on May 8, 2017, only days after the meeting face-to-face Kenner in Mexico (*See PK101*):

   "*The last thing you need is conflict situation with another partner.*"

After twelve (12) months of failed mediation with Jowdy, Kenner initiated litigation versus Jowdy (*with the investor/lenders*) in Mexico and Arizona in 2008 and California (*in two [2] separate cases*) in 2009, **specifically to recover the loans**.   A 2008-Nevada lawsuit was also filed by Glen Murray versus Jowdy for another $791,000 in unpaid loans (*adjudicated in Murray's favor 4 years later – See R33 015*). No complaints or dissenting objections were lodged by any of the investors who

signed off on the various lawsuits as plaintiffs and testimonial witnesses, with independent counsel in each lawsuit *for years*. *See R33 A*.

The Hawai'i-Jowdy loan scenario may be better explained under the following analogy:

> A manager gets an investor to deposit $1mm for a home purchase and renovation project. The manager buys, registers, and titles the home in the name of the investor's company (***ABC Company***). Then – the manager buys a Picasso painting for $500,000 and also titles it in the name of ABC Company – and hangs it in the house to enhance the home's value for the investor. The manager does not buy insurance on the house. Twelve (12) months later, the house burns down while the manager is working on the house resulting in a total loss for the house (*with no insurance*). When the house was burning, the manager saved the Picasso from inside the home.

> The manager bought the Picasso with the investor funds, and the Picasso belongs to ABC Company (*to the benefit of the investor*). As a result, the investor is able to reclaim the $500,000 painting and not suffer a complete loss (*based on the other unfortunate circumstances*).

> Now -- during the period of time the Picasso was owned by ABC Company, the value of the painting went up to $5 million. The investor not only has an asset worth far more than their original investment of $1 million, but when they decide to collect the new value of the Picasso, they will make a lot of profit. Since the home and the Picasso were in the name of ABC Company and of no specific or personal benefit to the manager separate from the partnership, NO INTENDED LOSS could be assessed. At all times – the manager was in a non-beneficial position with respect to the underlying assets and always in an analogous position to the investor for the decision to buy the Picasso, thus no intent could be alleged. There is NO ACTUAL LOSS (*only profit once the Picasso is sold*) and thus, there is NO INTENDED LOSS and NO ACTUAL LOSS (*just like the Hawai'i loan to Jowdy*).

At all times, the documented and authenticated (*and supported as "cumulative" as the Government claims -- ONLY post-trial*) Hawai'i-Jowdy loan has been **_owned_** by the Hawai'i investors with interest accruing daily to their benefit, as a retained asset of the Hawai'i partners. The funds have *always remained an asset* of the underlying

Hawai'i investors and their respective capital accounts.   **Thus, this <u>asset</u> has never been lost**.   This fails all restitution and forfeiture claims.

As the Court is aware, specifically under *18 U.S.C. 3663A and 3664*, the statute does not permit awards in excess of the victims' loss (*but there is <u>no loss</u> with the Jowdy loan as an asset of the Hawai'i partnership, at all times*).   It cannot award an alleged victim a windfall since they still and always have had the loan and never "*lost it*". Any restitution would provide a double-dip.  Specifically, the statute prohibits any situation in which a victim stands to gain *more in restitution than actually lost.*

***In the Eufora scenario:***

An independent 3rd party lender, Neptune Capital, finished a 6-month *valuation* of Eufora in January 2009, at which time; they funded a $3 million capital loan to Eufora.   Neptune valued Eufora at $20 million as a result of their independent due diligence.   Each 2008-09 private investor (*of Constantine and Gaarn stock – not Kenner*) received stock at the same $20 million valuation.   The company managers documented the stock purchases under Eufora's operating agreement (*by CEO Gentry – see R33 055a*) and AZ Eufora Partners I under its own operating agreement (*by Managing Member Tim Gaarn – See R33 433f, PK130, PK130a*).   Kenner had no legal responsibility for the documentation of the share transfers[53], since Kenner did not hold a management position at Eufora or AZ Eufora Partners I, since 2005

---

[53] Gentry's email *(to the entire Eufora board)* in August 2009 states:

"*I have seen a copy of the Operating Agreement for AZ Eufora Partners I [after all sales complete – and documented by Gaarn as Managing Member] and believe that Phil [Kenner] and/or Tim [Gaarn] would have that.  This would be best if we discussed that on the phone so I can answer questions relative to that.*"

"*As I have mentioned before, whatever you decide to turn over should be sent to Tim Gaarn and he should provide this to the court since Phil is not a member of Eufora or AZ Eufora Partners I LLC.*"

(*repeatedly documented by the Eufora tax records and each and every inter-office communication at Eufora*), nor did Kenner own any principal shares.

One year later (*beginning in March 2010*), an official investigation was conducted by multiple 3rd party investigators including Rudy Giuliani's CEO, Eric Hatziemos, former CIA Agent, Oliver Libby and another NY veteran, corporate attorney (*Michael Stolper*), all hired independently by Gaarn (*See Ex. 1 @6*); *not involving Kenner*.   As a result of their independent 4-month (*March thru June 2010*) investigation, Giuliani's group demanded a **6% contingency fee** for their work in lieu of pay from the investors (*again, not including Kenner*), with the working plan to **acquire the Neptune loan** and change Eufora's management as a result of their planned control of the corporate debt.[54]   That scenario was outlined in a text sent from AZ Eufora

---

[54] Please note that at trial, Berard, Kaiser, Peca and Gaarn (*under duress*), who coordinated the loan buy-out with Giuliani's team, gave perjured testimony that they were not aware.

Yet, Mike Peca exchanged the following with Kenner in July 2010 (*over a year after Kristen Peca allegedly told Kenner and Constantine in the GSF meeting that they were "done with investments" – Tr.717-718*).

To Kenner from Peca (***confirming Michael Peca's EDNY PERJURY – Tr. 604, 609***):

| 14727 | +17163743234 Michael Peca* | 7/14/2010 12:20:53 AM(UTC +0) | R e a d | **If not all willing members get a chance to be part of the loan buyout,** mean more % there may be a lynching. FYI |
|---|---|---|---|---|

Kenner responded in the affirmative to Michael Peca:

| 16913 | +17163743234 Michael Peca* | 7/14/2010 12:21:28 AM(UTC+0) | Sent | **I don't disagree** |
|---|---|---|---|---|
| 16914 | +17163743234 Michael Peca* | 7/14/2010 12:21:46 AM(UTC+0) | Sent | **Why wouldn't they?** |

And Michael Peca responded:

| 14728 | +17163743234 Michael Peca* | 7/14/2010 12:22:58 AM(UTC +0) | R e a d | **Has $ been collected already**? If not who's $ is sitting in escrow? |
|---|---|---|---|---|

Partners I investor Jay McKee to Kenner (*after the investigative team notified all of the AZ Eufora Partners I investors directly, without Kenner*):



| 14797 | +17168034903 Jay McKee* | 7/15/2010 12:03:01 PM(UTC+0) | R e a d | Hopefully you're getting some sleep right now; I am planning on sending the letter this morning.. **Within our package or plan in <u>taking the lender out</u>, where is the 6% for Guilani partners comming from?** |

➤ Please note that Stolper and his investigative team's efforts were disclosed to the entire AZ Eufora Partners I group on or about June 30, 2010, via conference call for the first time.   Two (2) weeks later – McKee sent Kenner the text to confirm Stolper's plans, **which every critical loan-buyout investor "*could not remember*" during the 2015 trial**.

   ➤ The amnesia (*or **CTE***) was utilized to frame a false impression that Eufora was a "*pump-n-dump*" stock and the Constantine and Gaarn private sales were a complete fraud.
      o Unless the NY investigative team (*including Berard, Kaiser, and Eufora CEO Gentry*) is complicit in the alleged private stock cover-up scheme, there is no fraud and no "**INTENDED LOSS**".

There was full consideration received by the Eufora investors with the stock transfers in 2008-09.   Over one (1) year later (*in mid-2010*), Stolper's highly experienced, independent investigation group, re-affirmed the significant intrinsic value of Eufora (*at the conclusion of their 4-month investigation*).   Any detriment to

---

In fact – Michael Peca was so excited to be part of the loan buy out group that he sent the following the next day:



| 14805 | +17163743234 Michael Peca* | 7/15/2010 2:51:46 PM(UTC+0) | R e a d | Never short of hugs in our home. **I'll hug you when this gets done. May kiss you too** |

Peca's texts with Kenner clearly contradict his wife's trial claims during the GSF meeting in 2009, that: "*we're not interested in any more investments or we're done with investments*". The only explanation would be that, again, Kristen Peca was not informed (*concealed as usual by Mike Peca*) about all of the investment issues – ***since she was never Kenner's client***.

   ➤ CLEARLY Mike Peca LIED to the EDNY about his knowledge of the Eufora loan buyout in 2015 *(like Berard, Gaarn and Kaiser also supported thru more grossly proven perjury)* and concealed more investment information from his wife.

the Eufora Company value since late 2010 is a direct result of the Stolper litigation efforts (*signed off on by all of the AZ Eufora Partners I investors – See Ex. 1 @10-18*) or the Galioto-led, FBI investigation.   No loss of value can be attributed to any actions influenced or controlled by Kenner, at any time, while acting in full transparent support of the NY team's investigation and the numerous adverse proceedings Kenner filed for himself and ten (10) other parties versus the Constantine bankruptcy in 2012 – for the same investors (*of Eufora*).

Thus, the Eufora stock value must be calculated at the 2009 "*Neptune loan valuation*" (*re-affirmed over a year later by the 2010 Giuliani valuation*), since outside influence, not related to Kenner, cannot create an artificial loss amount (*ex post facto*), specifically when the investors own attorney (*if not the FBI*), may have been the primary influence on any perceived de-valuation of the stock since the 6% contingency fee was negotiated.[55]

---

[55] The defendants were not charged with Honest Service Fraud, but under the reality that the investors received their documented stock from the Constantine and Gaarn purchases (*on the AZ Eufora Partners I and Eufora, LLC operating agreements*), **the investors received full consideration for their purchases**, as Gonchar affirmed:

> "*All I know that I was, for that I was buying additional, I mean I was getting additional percentage of the company [Eufora].*"

Only Honest Service Fraud would have supported a government theory by statute that they expected their funds to go to Eufora, *and not the seller of the private stock*.   The government produced no trial evidence that the investors were told they were buying **treasury stock**. In fact, with Tyson Nash on the stand, the government had him claim his stock-purchase meeting (*directly with Constantine only*) was at the Eufora office (*Avalon hangars*) – BUT on cross-examination, it was concluded the offices were not built until a much later date *(i.e. CTE or more suborned perjury*).

In addition, Nash affirmed that he received a certificate from Constantine to confirm the stock that he bought from Constantine Management Group, *not Eufora*.   At no point did Nash object to the stock certificate, claim it appeared to be a ruse, or raise it with his independent NY investigative team (*whom he was independently represented by at the time*).

Eufora investor Mattias Norstrom's text to Kenner in 2008 further supported transparency on the day **Norstrom signed off** on his wire transfer to <u>Constantine Management Group</u> to buy Constantine's private Eufora stock (*just like every investor was REQUIRED to do*).

[*March 19, 2008 text communication*]

For this reason, related to the Eufora private stock sales, Kenner cannot be held to any intended loss standard.   In fact, Kenner is still entitled to 20% of the Eufora stock as outlined in Kenner's March 2013 adverse proceeding filed versus Constantine's 2012 Arizona bankruptcy (*for the "grocery list" loans that Kaiser and Michiewicz fraudulently proffered as Kaiser's funds -- Tr.1405*).   It is more than telling that Kaiser made no filing in 2012-13 versus the Constantine bankruptcy when being left off the creditor list &/or the debtors for the outstanding Eufora stock; *because the $1.5 million plus does and has always belonged to Kenner* (*See PK148 @1-9*).

That would be a gross and unexplainable oversight by Kaiser for the $1.5 million plus Kaiser and Michiewicz fraudulently claimed as "*Kaiser's grocery list or shopping list*" to the EDNY.   These perjuries (*suborned or otherwise*) were in both Kaiser's 2012 civil proceeding affidavit versus Constantine (*in front of Judge Feuerstein*)[56] and the 2015 trial Court, subjecting Kaiser to *18 U.S.C. 1001*, yet uncharged for the provable perjuries.

---

*Norstrom:  Got it!  Account name: Constantine Management Group?*

*Kenner: Yes.  That is where the 1% is being transferred from.*

*Norstrom: Sent the fax...*

*Kenner:  I'll confirm. Thx...*

It should be noted (*emphasis added*) that the investors wired their 2008-09 purchase funds from their Schwab investment accounts.  In order to do this, they **_HAD_** to sign the transfer document themselves – **OR** – they had to give a verbal confirmation to _both_ of their investment advisors (*emphasis added*) at Schwab and at their 3rd party investment firm (*GGA in Irvine, California*).   There were **_no scenarios_** that allowed a single dollar of their funds to transfer from their Schwab account to any 3rd party account without their specific knowledge – *even when Kenner signed as the Power of Attorney, solely to initiate the paper process*.   Thus, it is not possible that any investor was unaware of the Constantine Management Group or Gaarn transfers.   This applies to every transfer the investors made from April 2003 thru present (*not just the Eufora wire transfers*).

[56] *See PK156 @ 1-10*

**PART I**

**Baja Ventures 2006 forfeiture issues**

In 2008, immediately after Jowdy and his NY Attorney, Tom Harvey, cancelled the yearlong, and misleading negotiations with *Jowdy's alleged intent* to:

1. Leave the Cabo project and his management position,

2. Negotiate termination-compensation packages for Jowdy's friends (*a.k.a. employees*),

3. Return the majority of his Diamante Cabo san Lucas ("*DCSL*") equity *stolen* at the Lehman Brothers closing to Kenner and Kenner investors (*in exchange for not reporting Jowdy, Najam, Harvey and others to the FBI and DOJ*), and

4. Corroborate the admission of Jowdy's eight million dollars (*$8,000,000*) plus in unpaid loans to Kenner and Kenner investors (*See R33 034*) from whom he would receive "*relief of debt*",[57]

Kenner and Kenner investors collectively filed a series of lawsuits in Mexico and the USA versus Jowdy, albeit constantly derailed by Jowdy graft[58] (*which in 2012, again was*

---

[57] Constantine enlightened the 2009 arbitration panel about his negotiations with Jowdy in 2007-08 (*before Jowdy was sued by Kenner in 2008 for the unpaid Hawai'i loans*) [*Day 5 @874*]:

> "*..at no point in time did he [Jowdy] ever dispute that he owed money.   The point is that repeatedly ad nauseum, he said. tell me what I owe.  Tell me the amount and I will pay it.  There is no reason you should take my 40%, and there is no reason you should remove me from the project.  Tell me what I owe.  I know I owe him the money.  Give me the dollar mount and I will pay it.*"

This testimony directly contradicted Jowdy and Najam's 2009 perjury when they collectively claimed the Hawai'i monies Jowdy received were somehow "*investments*" by Kenner and Kenner investors, but they never received an equity position in any Jowdy company for it.  *See R33 647.*   This contradicting testimony existed because Jowdy's Arizona "*no loans*" defense was active during this period of time, thus catching Jowdy in his own lies (*fully confessed in contradiction by Jowdy to the FBI nine [9] months later*).  *See R33 rebuttal 002 -- 3500-KJ-2 @11-13*

[58] Jowdy and his cabal's payoffs were widely known in Mexico by the investors/lenders adverse to Jowdy at all times.  In 2011, during independent communication (*conference calls, etcetera*), Frailes partner Gaudet and Mike Peca discuss the Jowdy criminal activity (*PK147*):

*dismantled by supposed beneficiary and insider, Kristen Peca, who blindly forwarded the secret Mexico criminal case acknowledgments from Mexico associate Robert Gaudet to Kaiser, Jowdy and Galioto in May 2012),* notifying them for the first time of the new criminal case and allowing Jowdy and his Mexico City attorneys to avoid another arrest warrant in Mexico this time by claiming he had *"no partners; Kenner or anyone in Mexico".*   As a result, physical threats to adverse parties (*like Gaudet*), and payoffs to Mexico Government officials continued (*also confirmed by Robert Gaudet in his July 2, 2009 deposition with Jowdy's AZ attorneys, when Gaudet also confirmed his "***witness***" status and Jowdy's signature on the 2004 Hawai'i loan agreement, despite pending threats of "trouble, if he supported the wrong person" by Tom Harvey and Harvey's acknowledged assistance by former Secret Service and FBI agent John Behnke along with California attorney Michael Meeks*).   *See R33 566a.*[59]

---

May 2, 2011 – Mike Peca: "*Hope all is well.  Wanted to personally thank you for all of your hard work down in Mexico. Particularly in the Jowdy affair.*"

May 3, 2011 – Robert Gaudet: "*Thank you for the kind words!  It is such a waste to have to go through this (all of us) but you have to do what is right.  The pressure is still on with respect to the Jowdy affair!*"

...And.

June 20, 2011 – Mike Peca: "*Just wondering where we are at with respect to closing and having clear title [of the Frailes property].   I was not completely clear how Jowdy somehow was an obstacle.*"

June 25, 2011 – Robert Gaudet: "*The issue with Jowdy aligns with the former Governor and his office who are now being charged with many crimes. I will send the article in separate email. The Governor was Jowdy's protector by way of the millions he paid for the support and personal protection [fake consulting fees on the DCSL budget as confirmed by Jowdy's right-hand-man, Carifiello].   Hard to believe from any perspective!...It is not that Jowdy is so powerful but he has worked hard to be a bona fide criminal.  He has levered the [DCSL] group's assets for favors, used [DCSL] banking funds for payouts etcetera.*"

[59] Without any trepidations for illegal activity, immediately after Kenner proffered to the FBI about the Jowdy, Harvey and Najam thefts of $25 million, Kenner filed a July 2, 2009 lawsuit in California versus Jowdy and Harvey for EXTORTION (*based on Tom Harvey's April 2009 email to Kenner and Kenner investor attorney, Paul Augustine, prophetically about FBI and SEC investigations starting on Kenner because Kenner was claiming in various litigation that the funds Jowdy received were loans*).  **LOANS**!!  Loans (*fake -- according to Harvey in*

<u>6-months after Peca's fully-supportive, SDNY Grand Jury testimony</u>, Peca set up a

---

*2009*) are why Tom Harvey confirmed that Kenner would be "**doing jail time**" at the hands of the FBI in the future.   Well – Tom and his ethics-less team of attorneys continued those threats until the Jowdy 2010 confessions by Jowdy in his California deposition and proffers with the FBI (*with Harvey and Louis Freeh at his side*).   Nonetheless – Harvey decided to threaten Hawai'i partner, Chris Manfredi one month after the Kenner FBI proffer (*reported by Kaiser to Kenner and memorialized to Constantine who was handling the Jowdy negotiations*):

From Kenner to Kaiser –

| 9933 | +16312350308 John Kaiser* | 7/23/2009 12:51:35 PM(UTC+0) | Sent | Going good buddy |
|---|---|---|---|---|

From Kaiser to Kenner (*re: Harvey's call to Manfredi ["SF"]*) –

| 8613 | +16312350308 John Kaiser* | 7/23/2009 6:51:27 PM(UTC+0) | Read | *Good , I spoke w/SF[Manfredi]. Jk* |
|---|---|---|---|---|

From Kenner to Kaiser --

| 9935 | +16312350308 John Kaiser* | 7/23/2009 6:52:29 PM(UTC+0) | Sent | *Anything good? Call you after dinner* |
|---|---|---|---|---|

From Kaiser to Kenner (***re: Harvey's second call***)–



| 8614 | +16312350308 John Kaiser* | 7/23/2009 6:56:18 PM(UTC+0) | Read | *He spoke with that attorney [Harvey] again* |
|---|---|---|---|---|

***Then after Kenner spoke to Kaiser later that same night --***

From Kenner to Constantine (***re: the Kaiser calls about Harvey's threats to Manfredi***) --



| 9943 | +16023635676 Tommy Constantine* | 7/23/2009 9:11:49 PM(UTC+0) | Sent | *Harvey spoke with Manfredi today. <u>Threatened jail time for everyone against Jowdy, including Kaiser</u>.* |
|---|---|---|---|---|

conference call for the Hawai'i-Mexico investors still adverse to Jowdy and trusted at the time[60] -- with all of the evidence of the Jowdy thefts (*also*):

***From Peca to Kenner (re – conference call):***

| 139 98 | +171637432 34 Michael Peca* | 11/24/2011 12:29:45 AM(UTC+0) | R e a d | **Sent an email to everyone. At a party tonight so I can't call anyone. Are you able to do those? If not I will try tomorrow** |
|---|---|---|---|---|

Kenner followed-up with Rucchin and others:

| 195 03 | +19492330046 Steve Rucchin* | 11/24/2011 1:57:17 AM(UTC+0) | Sent | Did you get the email from Peca about a conference call tomorrow night? It is critical info to share...pk |
|---|---|---|---|---|
| 140 04 | +19492330046 Steve Rucchin* | 11/24/2011 1:59:12 AM(UTC+0) | Read | I did not. And haven't had a chance to call u. Was going to call u after thanksgiving, friday |
| 195 06 | +19492330046 Steve Rucchin* | 11/24/2011 2:01:05 AM(UTC+0) | Sent | Peca sent a message for me/us to you at srucchin@nhlpa.com. We are very close in Mexico but its critical to talk with anyone interested ultimately in recovering funds. Good stuff. Happy holidays my friend. Pk |
| 195 16 | +19492330046 Steve Rucchin* | 11/24/2011 2:07:26 AM(UTC+0) | Sent | Instructions for the conference call will go out by early tomorrow from Woolley. |

- This conference call arranged by Peca occurred eight (8) months *after* Peca, Stevenson and Sydor gave their "*as a group*" knowledge testimony to the SDNY Grand Jury – leaving no question as to Peca's mindset and knowledge at the time.

---

[60] The short-list included Steve Rucchin, Turner Stevenson, Jason Woolley, Jay McKee, Jere Lehtinen, Glen Murray, Darryl Sydor, Mike Peca, and Robert Gaudet.   The group discussed who else would be included in future calls to minimize the "**leak**" risks associated with Kenner, Gaudet and others making in-person appearances in Mexico in the various criminal lawsuits versus Jowdy and his cabal, placing them physically at risk after the 2010 Kenner apprehension and jail beatings.

As mentioned, *infra*, Rem Murray, Steve Rucchin and Greg deVries experienced the Harvey and Berard **threats** of civil litigation against them (*via email and texts*) if they gave criminal testimony versus Jowdy in 2012 in Mexico.  Rucchin withdrew from the Mexico testimony under fear of personal safety in Mexico from Jowdy's cabal.

*Anyone protected by the FBI agents like Jowdy, Harvey and Berard exhibited no limits to their threatening behaviors to intimidate witnesses; nor any legal recourse for the clearly criminal actions in the USA.*

Nevertheless, after the group efforts to remain secretive, Kristen Peca was fooled by Berard and Kaiser (*on Jowdy and Harvey's behalf*) in early 2012.   Neither Berard nor Kaiser were invited on the conference call.   Kenner explained that they were working hand-in-hand with Jowdy and Galioto at that time versus the group of investors.   The collective group was furious that they "*changed teams*" after their 2009 arbitration testimony, confirming they knew Jowdy robbed the collective group, after they independently approved the loans to Jowdy.   The entire group knew they both received high-paying jobs in Mexico.   After a McKee's compliment:

From McKee to Kenner:



| 140 16 | +17168034 903 Jay McKee* | 11/24/2011 2:12:43 AM(UTC+0) | R e a d | **Calls like this are great! Look very forward to it** |
|---|---|---|---|---|

Kenner told deVries (*prophetically – since the wife of the guy who set up the call [Kristen Peca], blew everyone's cover to Jowdy's people*):



| 195 38 | +1226921 1974 Greg deVries* | 11/24/2011 4:06:56 AM(UTC+0) | S e n t | **If anyone is dumb enough at this point to leak info, we cannot control it!** |
|---|---|---|---|---|

deVries' wife replied:

| 1402 4 | +12269211974 Greg deVries* | 11/24/2011 4:07:51 AM(UTC+0) | Read | **Lol. I guess. Let's hope for no dummies PK. Suzie** |
|---|---|---|---|---|

Kenner told Peca, who was coordinating the follow-up efforts:



| 196 17 | +17163743234 Michael Peca* | 11/25/2011 4:50:00 PM(UTC+0) | Sent | **LMK who you follow up with. I just spoke to Nash. He wants to talk with you today as well. Any responses yet via email?** |
|---|---|---|---|---|

- Nash and Peca independently discussing the Jowdy loans and legal efforts – without Kenner's involvement.

Robert Gaudet wanted the investor group to know the call was Mike Peca's idea (*for full transparency – specifically with Mike Peca*):

| 1402 0 | +17024807328 Bobby Gaudet* | 11/24/2011 2:16:37 AM(UTC+0) | Read | **Think its import 4 all to knw that mp [Mike Peca] initiated this.** |
|---|---|---|---|---|

Nonetheless, Kristen Peca breached the investor group's secrecy in early 2012 by forwarding the "*new criminal case*" information to Kaiser and Galioto.   The "**leaks**" from fooled investors were the main issue related to Jowdy's preparedness in Mexico to inflict harm on any adverse party (*like his knowledge of the Kenner 2010 testimony, abduction from immigration services and the jailhouse torture – leading to the murder of the investors attorney*), with the bribes and payoffs to the local political leaders in Cabo san Lucas.

Kenner [in RED] expressed this to Stevenson [in BLACK] about himself and Gaudet in the ongoing legal fights and requirements to make in-person statements and appearances:

| 14005 | +14254667663 Turner Stevenson* | 11/24/2011 2:00:26 AM(UTC+0) | Read | R U down there now????? |
|---|---|---|---|---|
| 19508 | +14254667663 Turner Stevenson* | 11/24/2011 2:02:11 AM(UTC+0) | Sent | No. But I'll need to be there soon. It's still very risky for my safety to be there! *[a year plus after the attorney murder and 3-day prison torture of Kenner]* |
| 14014 | +14254667663 Turner Stevenson* | 11/24/2011 2:10:42 AM(UTC+0) | Read | K.....is Jowdys guys still threatening U???? Or Government guys down there??? |
| 19526 | +14254667663 Turner Stevenson* | 11/24/2011 2:12:08 AM(UTC+0) | Sent | JOWDY'S guys. The Government guys are gone *[after Gov. Agundez' arrest]* |
| 14018 | +14254667663 Turner Stevenson* | 11/24/2011 2:14:30 AM(UTC+0) | Read | Is Bobby Gooday all safe???? Is there any worries with him bein down there??? |
| 19531 | +14254667663 Turner Stevenson* | 11/24/2011 2:15:52 AM(UTC+0) | Sent | He hasn't been there much lately for the same safety concerns but he's headed back down next week to help the attorneys. Thank god for his willingness to help. |

After six (6) more months of Mexico Federal investigations about two (2) of the people who threatened Kenner and protected Jowdy and his cabal in Mexico, Kenner sent the following to all of the investors and former Jowdy insiders, some of which had received the same abusive treatment (*although not to the point of Kenner as the whistleblower*):

[**Kenner in RED**; Rem Murray in BLACK]

94

| 16776 | +1586212 3454 Rem Murray* | 5/25/2012 5:13:28 PM(UTC+0) | Sent | **Former Baja Gov. Agundez arrested yesterday in Cabo. The former DA (who threatened to put me in jail for a year for suing jowdy) is under federal investigation now for involvement in organized crime!! Baby steps...** |
|---|---|---|---|---|
| 19623 | +1586212 3454 Rem Murray* | 5/25/2012 5:17:10 PM(UTC+0) | Read | Good to hear. Sounds like they hope to get the acuerdo [arrest warrant] today. |



5-24-2012: Governor Agundez arrested in Cabo san Lucas on bribery and protection schemes (*paid millions by Jowdy and Garcia for Mexico protection from stolen DCSL budget funds*).

[**Kenner in RED**; Rem Murray in BLACK]

| 16825 | +1586212345 4 Rem Murray* | 5/26/2012 12:03:16 AM(UTC+0) | Sent | I wonder if the Gov. will make a good roommate?!? |
|---|---|---|---|---|

| 19663 | +15862123454 Rem Murray* | 5/26/2012 12:05:14 AM(UTC+0) | Read | **For Jowdy?** |
|---|---|---|---|---|
| 19664 | +15862123454 Rem Murray* | 5/26/2012 12:08:51 AM(UTC+0) | Read | **They get it today [arrest warrant for Jowdy]?** |

| 16828 | +1586212 3454 Rem Murray* | 5/26/2012 12:10:03 AM(UTC+0) | Sent | No. The Gov. Agundez arrest pushed all the court activity back to monday. That's great news for us. Are you headed down Monday. Critical week coming up. Can't wait!! |
|---|---|---|---|---|

| 1966 | +158621234 | 5/26/2012 12:12:36 | Read | Not this week. I may go down with Tim |
|---|---|---|---|---|

95

| 5 | 54 Rem Murray* | AM(UTC+0) |  | Campbell in the near future though. |

| 1682 9 | +158621234 54 Rem Murray* | 5/26/2012 12:16:13 AM(UTC+0) | Sent | Ok. Please make sure that you & BG [Gaudet] are on the same page. We cannot handle any delays on our side once the Acuerdo [Jowdy arrest warrant] is in hand. |
| 1683 0 | +158621234 54 Rem Murray* | 5/26/2012 12:17:07 AM(UTC+0) | Sent | Btw. Jowdy took all the photos of him and Gov. Agundez off the diamanté website today! Haha. I'll send all of them to you along with The Agundez arrest photo !!!!! |



*This picture was taken one (1) day after Agundez told Kenner in a meeting at his La Paz Governor's office that he would look into Jowdy's criminality. Agundez professed to Kenner and the investor's attorney in the meeting that **he did not know Jowdy**.*

In 2009, Kenner and Kenner investors were forced to file additional California lawsuits against Jowdy after his frauds (*related to Jowdy's "NO LOAN" defense and allegations of a forgery*) in the 2008-09 Arizona courts and to the FBI got the Arizona case unexpectedly dismissed *with prejudice*.  The Arizona case for the unpaid Jowdy loans was filed 9-months before the initiation of the GSF strategy (*fully discrediting the Government trial theory that the GSF was the first acknowledgment of their theorized, "loan story, GSF cover-up plan" by Kenner and Constantine*).[61]  All of the Hawai'i and

Mexico investors[62] participated as Plaintiffs in the two (2) California cases filed by their independent attorney, Ronald Richards. In these lawsuits, the Complaints included specific language acknowledging the unpaid Jowdy loans from the Hawai'i LLCs.

> *"Mr. Najam was in charge of the corporate governance and while under Jowdy's directions and control, received over eight million dollars ($8,000,000) from a LLC in Hawai'i. Mr. Najam failed to properly account for those funds and has placed the Jowdy investors in a vulnerable and compromised position."[63]*

---

[61] The original case versus Jowdy was filed in Maricopa County Superior Court [**cv2008-026850**] with the individual Hawai'i loan transfer amounts fully and publically disclosed; *transparent.* This filing pre-dated the GSF legal efforts in California after significant Jowdy frauds on the Arizona case (*threatening the original attorneys with criminal time for representing the Hawai'i allegations that Jowdy received loans – See TIMELINE 002*). Clearly, Jowdy confessed to the Hawai'i loans (*and the other personal loans from Kenner and Kenner investors*) in his 2-day California deposition. Then he confessed to the Hawai'i loans to the FBI [*specifically FBI Agent Galioto*][*R33 rebuttal 002 @ pages 12-14*]. The government has stipulated to it (*only post-trial – after calling the loans "supposed", "phony" and "bogus" throughout the trial*), fully injuring Kenner.

The Court has referred to the Jowdy loans in its Rule 33 ruling as authentic. And, post-trial (*at least according to the government*) they received *Forf-44* from Jowdy's own attorneys, closing the loop on any alleged misrepresentations by Kenner about the loans to Jowdy. It is difficult to believe that pre-trial with the loan issue so prominent that the government had Jowdy travel from Cabo san Lucas to Central Islip with his attorney, Tom Harvey (*complicit in the Jowdy cover-ups since 2002 – See TIMELINE 020*) and the meeting produced no notes with Jowdy (*only a proffer agreement; which was also delivered weeks after the deadline to turn over 3500 materials and three (3) months after the actual December 2014 proffer*). *See PK133 and PK133a.*

[62] The Plaintiffs did not include *Nolan, Moreau or Juneau (represented by Michael Meeks)* who were working **with** Jowdy in 2009 after receiving 2008 payoffs via equity transfer of a portion of Jowdy's *stolen* DCSL equity, arranged by Tom Harvey to protect Jowdy and himself from his own complicit frauds.

As Jowdy's long-term attorney, Harvey's original cover-ups and illegal diversions with Jowdy began with his misrepresentations in the 2002 confirmation letter to Owen Nolan and the other DDM (*Jowdy*) investors – *See TIMELINE 020* (*in Rule 16 evidence*). Jowdy, Harvey, Najam, and Garcia **_never_** transferred the title of the Diamante del Mar ("DDM") Mexico properties to Kenner and Kenner investors in spite of their collective $10 million plus investments and the $8 million plus in Hawai'i and personal loans to Jowdy (*See TIMELINE 021*), *further and knowingly defrauding all of them.*

[63] Excerpt from the June 18, 2009 California lawsuit in Los Angeles Superior Court [**BC416082**] versus Jowdy from all of the investors in the Diamante Cabo san Lucas project.

Each identified Plaintiff[64] in the California cases versus Jowdy signed authorizations

---

Specifically, Kenner's two (2) Baja Ventures 2006 partners, Stumpel and Lehtinen are listed as Plaintiffs in the suit as each 5% owners of the LLC.   Furthermore, the lawsuit claims (*See TIMELINE 072 @ page 5*):

> *"Specifically, two of the Plaintiffs Jozef Stumpel and Jere Lehtinen invested in Baja Ventures 2006, LLC which owns 38% of Diamante Cabo san Lucas, LLC."*

[64] The June 18, 2009 California case for **DDM investors** versus Jowdy included: Greg deVries, Jason Woolley, Chris Simon, Mattias Norstrom, Vladimir Tsyplakov, Jay McKee, Raymond Murray, Glen Murray, Bryan Berard, Darryl Sydor, Dimitri Khristich, Sergei Gonchar, Jozef Stumpel, Mike Peca.

The June 18, 2009 California case for **DCSL investors** versus Jowdy included: Tyson Nash, Greg deVries, Turner Stevenson, Mattias Norstrom, Vladimir Tsyplakov, Bryan Berard, Steve Rucchin, Brain Campbell, Darryl Sydor, Dimitri Khristich, Sergei Gonchar, Mike Peca, Jere Lehtinen, Jozef Stumpel.

- It should be noted that Berard made multiple representations to the EDNY Court that he was a participant in the 2009 lawsuits versus Jowdy for the unpaid loans from the Hawai'i investors (*just like his signed participation in the 2008 AZ lawsuit for the unpaid Hawai'i loan [See R33 A – Berard]*), yet Berard claimed **he did not read** the California lawsuits (*Tr.3151-3158*) because Berard testified -- "*At the time I trusted Phil Kenner. He was my manager and I trusted him*" (*Tr.3158*).   This raises several issues related to the Berard testimony and perjury.

  - First, on 9-13-2013, Berard told the FBI (*just prior to the Kenner arrest*) – as noted by Agent Galioto's notes – "*When Berard returned from Russia in March or April 2009, he started to realize that Kenner was not legit*".  *See 3500-BB-1-r @ 3.*
    - Yet, with all of the *alleged* confusion around the Jowdy deals in Mexico and the Hawai'i loans and his LOC (*allegedly having received a FedEx from Northern Trust telling Berard his bonds were all sold – although that letter never existed &/or was **never** produced by Berard or Northern Trust – **because it is another lie***), Berard simply chose not to read the filed lawsuits, "*because he trusted Phil Kenner*", 4-5 months after he no longer found Kenner to be "*legit*" according to the FBI notes.  *It cannot be reconciled.*

  - Second, after the same March or April 2009 statements to the FBI of "*not finding Kenner legit*", Berard voluntarily gave testimony in the May 2009 (*less than two [2] months later*) Nolan arbitration with a disgruntled client. According to Berard's statements to the FBI, he would have been one (1) of those disgruntled people, yet Berard volunteered to testify *UNDER OATH*.
    - In May 2009, Berard **CONFIRMED** to the Arbitration panel (*3 judges*) that he was:
      1) Completely aware of his LOC,

2) Aware of the loans to Jowdy,
3) He approved of them, and
4) He confirmed his expectation that Kenner would coordinate the loan payments by the Hawai'i Company (*Little Isle 4*) for his LOC and others (***despite Kenner being charged with Counts 7 & 8 for exactly what Berard voluntarily confirmed to the Arbitration panel he expected Kenner to do***).  *See R33 311.*

   • The signed 2009 arbitration affidavits by Stumpel, Gonchar, Norstrom, Peca, Lehtinen and other Little Isle 4 members confirmed the same expectations, thus leaving Kenner charged for activity that was documented as **expected**.

• Berard's refrain that he "*trusted*" Kenner who followed the Hawai'i Little Isle 4 By-Laws, which authorized "lending", did NOT breech Kenner's fiduciary responsibilities to the LLC or the underlying members (*See TIMELINE 046*).

• Ranford, Sydor, Nash and Rucchin echoed the identical – "*I trusted Kenner*" mantra at trial, which has left the Hawai'i investors with the $31 million plus Jowdy loan as an asset, resulting in a collectible asset (*regardless of the FBI protection*), which Jowdy and the government have admitted on the record to its validity, in spite of the vicious trial attacks on this salient and unchallengeable point.

• The same individuals, plus Nolan and Kaiser, echoed the "*I did not read*" the documents mantra – thus – leaving Kenner fully disclosed at all times, and the shear *willful blindness* of the investors as the only issue.

• Now – the government claimed that the discrepancies between the pre-trial affirmations of "Jowdy loan knowledge" and "trial amnesia" were based on *faulty memory, confusion and mistakes* – and not anything else – like new truths.

   o Thus – there is *NO* trier of fact that could reasonably assume that Kenner was at fault for:

      i. An fully authorized loan to Jowdy,
      ii. The full pre-trial acknowledgment of **ALL** Hawai'i investors (*no dissenters*),
      iii. Their full participation in a 2008 Arizona lawsuit to recover the unpaid loans from Jowdy (*with Jowdy's multiple proven frauds on the court*),
      iv. Their full participation in two (2) 2009 California lawsuits to recover the unpaid loans from Jowdy (*with Jowdy's deposition confessions that "he has the loans" and "does not plan to repay anyone" -- with FBI protection*),
      v. An asset which *is* titled in the name of the investors at all times, and
      vi. **A collectible asset – if/when the government wants to alert the investors (*as Kenner has repeatedly tried in the face of the Galioto contrarian proffers*) as to the available asset – merely waiting to be collected.**

Ronald Richards filed a third (3rd) lawsuit in California (*July 2, 2009*) for Kenner versus Harvey and Jowdy for EXTORTION [**LA Superior Court, Central District, BC417057**] (*See TIMELINE 063*).   It was related to Jowdy and Harvey's first attempt to steal Kenner Mexico equity from the two (2) Jowdy controlled development projects; *including Baja Ventures 2006.*

Harvey had transmitted an **April 29, 2009** email to Kenner and the investor's attorney, Paul Augustine, stating that Kenner would ***go to jail at the hands of the FBI*** (*while Harvey was working with Louis Freeh to defend Jowdy*) for Kenner claiming that the "***loans to Jowdy***" were real in the 2008 Arizona case.  (*See TIMELINE 007*).

o   Harvey was the Jowdy attorney who later confirmed all of the loans as real in *PK100 -- Forf-44 (August 2015)*, showing zero limits their collective frauds on every court versus Kenner's efforts to rightfully recover the known and documented loans from Jowdy.   Somehow, no prosecution efforts exist with every documented fraud on multiple Federal courts, multiple US Attorneys' Offices, and the documented lies to the FBI, while under Freeh and Galioto's collective protectionism.

In the extortion email, Harvey also reiterated Jowdy's lie that the 2004 Hawai'i loan agreement was a ***forgery*** (*yet used by Jowdy's Nevada defense team – under Harvey's direction -- in December 2010 as <u>authentic</u>, once the 2008-09 Arizona case was dismissed*) – *See R33 011.*

In fact, Harvey was present in an **April 13, 2009** Jowdy deposition in the Nevada case (*two [2] weeks earlier*).  Harvey and Jowdy independently confirmed in the deposition that Harvey had ***no involvement*** in the Hawai'i loans to Jowdy or the Jowdy distribution of the equity to Kenner's Baja Ventures 2006 thru the time of the April 13, 2009 NV deposition.   Despite confirmation of Harvey's non-involvement "***at the time***", Harvey was able to threaten Kenner with FBI jail time two (2) weeks later in the EXTORTION email, ***somehow thru his now-gained historical perspective and grand-personal knowledge***, about some alleged false Kenner claims in the AZ case versus his client, Jowdy (*loan agreement authenticity, $5 million plus in Hawai'i loans; <u>both proven true by Jowdy's own future legal actions with Harvey's guidance</u>* <u>***under oath; now confirming that Jowdy and Harvey lied to the FBI and the AZ federal courts, without consequence***</u>).

[*Jowdy deposition -- Pages 46-47 -- April 13, 2009 – Las Vegas Nevada – in Rule 16 evidence*]

Q:  Did you seek any legal advice from Mr. Harvey as it relates to any of the Diamante entities?
A: No
MR. HARVEY: **At the time**. [*Harvey's own confirmation*]

Q:  Who was the attorney then for the – you indicated earlier that Mr. Kenner had 39 percent and you had 39 percent for the Diamante Cabo san Lucas.  Who is the attorney who set up the Delaware entity?
A: Baker & Hostetler in New York.

directly with their attorney, Ronald Richards, independently, to sue Jowdy for the frauds identified in the two (2) complaints (*after acknowledging receipt of the two [2] lawsuits and independent personal review of each*); specifically including the unpaid Hawai'i loans.  *See TIMELINE 071, TIMELINE 072*.

In response to Jowdy's California attorney's request to individually meet with the Diamante investors and their attorney (*without Kenner present*), Kristen Peca sent her attorney, Ronald Richards, a responsive email confirming her independent assessment of the information in the lawsuit, her harmonized position with Ronald Richards and the other Plaintiffs, stating (*See R33 425*):

[*November 4, 2009*] [65]

> *"We are putting our out trust in you, so we will do whatever you recommend is best for getting our $$ out.*
> *Thanks,*
> *Michael and Kristen Peca"*

---

> Q: and has that –
> A: Larry Margowitz [sic] is the attorney's name.

Another "**jail time**" threat by Harvey was also confirmed in a Kenner-Kaiser-Constantine text communication months later (July 23, 2009) when Harvey was threatening everyone; including Hawai'i COO Manfredi and Kaiser.  *See TIMELINE REPORT @ 228-229*.
  • Please note that this was less than two (2) months after Jowdy and Najam lied to the 2009 arbitration panel about the loans; ***both calling them investments***, in perjurious synchronicity.  *See R33 647*.

Allegedly no earlier than August 2015, Harvey on Jowdy's behalf transmitted the contents of *PK-100 -- Forf-44* to the government, ***fully confirming*** that *even Jowdy documented* all of the funds from Hawai'i and the Kenner investors as loans, *after years of denials to the FBI and various USA and Mexico courts*.

[65] This email string between Peca and Ronald Richards (*excluding Kenner*) was turned over to the government by Jowdy's attorney, Tom Harvey [*BATE STAMP – HARV P-000025 thru HARV P-000026*]; unknown to Kenner.  Mike Peca chose to support Jowdy and Harvey in 2011 (*thru persuading by Kaiser, Berard and Galioto*), against the group of investors still suing Jowdy in Mexico.  Yet, now thru private letter submission to the EDNY court in 2017, Mike Peca changed his position **again** to blame EVERYONE for his decision to participate in the Hawai'i loans to Jowdy (*unknown to his wife*).  Mike Peca further attempted to distance himself from his detailed explanations in the SDNY Grand Jury testimony in 2011 (*See R33 419*), and his knowledge of the Jowdy embezzlement claims Kenner originally raised in 2007 on behalf of the investors, *specifically including Mike Peca*.

In spite of Mike Peca's perjured testimony in 2015 (*Tr.436*), when he claimed no knowledge of the defaults and Kenner's lack of explanations, Mike Peca did NOT mention any of that to the 2011 SDNY Grand Jury, ***under oath***.   In fact, Mike Peca represented exactly the *opposite* with the following statements, when asked how much money he invested in Hawai'i (*thru Little Isle 4's capital account*).   Instead of stating $1.8 million and halting his testimony, he offered a detailed and eloquent narrative of the use of funds and his planned participation in the loans to Jowdy "*as a group*" as follows:

> *A:  "$100,000 cash investment that was going towards that.  Then we had lines of credit.  I had one out for $1.7 million that was going to be used at the time.  Here's where a lot of the cross starts to happen.   A short-term loan to Mr. Jowdy, because at the time Cabo – we hadn't gotten the lending from Lehman Brothers yet.  We made a short-term loan until the lending came in.  Once the lending came through they were to pay back the loan, I think in the neighborhood of five-and-a-half million dollars, on the closing.  It was never paid back.  And then communication basically seized at that point from him [Jowdy].* ***That was kind of the whole sticking point as far as*** me and the other guys ***with Mr. Jowdy.***
>
> *The 1.7 along with the $100,000 and* ***whatever else put in this a capital account****, Little Isle 4, I believe."*

- Please note that Mike Peca told the 2011 Grand Jury that he expected 100% of his Hawai'i funds (**$1.8 million**+) were supposed to be **in** Little Isle 4's capital account and loaned to Jowdy.   Only $440,000 was initially loaned to Jowdy traceable from the Peca funds and Jowdy repaid $200,000 of it after an 8-day period, leaving a net of $240,000 out of the $1.8 million Peca told the SDNY he "*expected*" for the Jowdy loan.
    - With full permission to withdraw the LOC funds, Kenner could have initially withdrawn 100% of the LOC funds from Peca and the others, paid the higher monthly fees for the funds beginning immediately, and co-mingled every dollar from the various LOCs.   Kenner did not.

    - If Kenner had done so, he could have been called 100% and completely incompetent by any reasonable investor, under review.   Instead, the Government tried to wash this salient issue unnoticed throughout trial by insinuating that the LOC funds did not belong to the Little Isle 4 Capital Accounts as independently granted, **rather** remained property of the individual investors – and required individual approvals for every future withdraw.   This was never true.   This Government position ignored the fact that every LOC investor already signed their full permission, one-page **Letter of Authorization** directly with Northern Trust Bank, fully and legally satisfying this issue; all in evidence, yet blatantly ignored.

Mike Peca continued to the 2011 Grand Jury:

> *"The capital account was loaned to Ken Jowdy, our business partner, so there is no need at the time to be worried about anything.   That money was loaned to Ken Jowdy to basically help some of the purchase of the Cabo property so we can get the funding.  And then it was supposed to be a short-term loan."[66]*

- Please note that this also contradicted Mike Peca (*Tr.419, 427*) and Kristen Peca (*Tr.697, 699*) claims that the funds were for "*vertical construction*"; suspiciously never mentioned by Mike Peca to the Grand Jury or by Kristen Peca in over four (4) hours of her 2012 FBI recordings.  This completely disregards the **crucial fact** that Kristen Peca told Kenner on her FBI recordings in 2012 that she was *not* aware of the LOC until sometime in 2008 at the earliest[67], confirming her multiple instances of planned perjury and fully discrediting her alleged participation in the 2005 LOC discussion and her emotional *"baby"* testimony (*Tr.698*) in 2015.

Mike Peca further affirmed to the 2011 Grand Jury, "*under oath*":

> *"I knew 100 percent it was going to Little Isle 4 initially.  Shortly after that the short-term loan was something that took place."*

Mike Peca continued his testimony to the 2011 Grand Jury about signing for his $1.775

---

[66] Specifically, in spite of this Grand Jury direct testimony four (4) years earlier, Mike Peca perjured himself in 2015, claiming the Hawai'i losses had nothing to do with Jowdy. (*Tr.455-457*).

[67] (**@ About 5.45 of the 1:34.50 call**) – In July 2012, Kristen Peca tells Kenner –

> **Kristen Peca** – *Well, I was referencing the earlier stuff that you said, I don't remember a large amount being distributed back to our account and the timing of the years of the loan, **the line of credit, that happened when we were in OHIO [2008 & 2009]. I don't understand how it could have been open for 5 years before that?**  Because we had a bond account going.  Do you mean the Hawai'i; you had a line of credit, but not for us?*

> **Kenner** – *No, no, you guys had lines of credit for 5 years at Northern Trust.*

> **Kristen Peca** – *for 5 years?*

> **Kenner** – for 5 years!   When you were in OHIO [*2009*], that's when the thing [*LOC*] closed.

> - Kristen Peca cannot believe that she is finding out on the FBI phone call in 2012 that her husband, <u>Kenner's client</u>, had concealed that he had a LOC open for 5 years – even though she lied to the EDNY in 2015 that she and her husband waited months before deciding to participate with a 2005 LOC for their Hawai'i investment capital.

million LOC (*which, please note, was originally a $1.6 million LOC in 2005 (See 2005 (March) Master Note 1.6mm – Peca in FOLDER Peca Northern Trust documents).   Mike Peca signed and extended the $1.6 million LOC to $1.775 million only three (3) months after the initial account opening documents*):

> *Q: So when you – did you sign papers to take out a loan in that amount?*
> *A:  Yes*
> *Q: When you signed those papers, where did you think that money was going?*
> **A: It was going to a capital account for Little Isle 4.**

In 2015, Mike Peca forgot all of this to the synchronized benefit of the Government's previously foundationless theories, now being systematically corroborated by all six (6) of the Government witnesses who previously **CONFIRMED** their full and contradictory knowledge and approvals at the time of the loans; *just like Mike Peca*.[68]  This is an impossible statistical anomaly, without logic, that the Government tried to portray as legitimately possible.   The Government theory would have been in grave shape if even one of their 2015 witnesses would have reiterated their "*previous statements*" of full knowledge after the *group decisions* via conference calls to loan Hawai'i funds.   In synchronized manner (*defying probability*).  They did not.

The 2009 California lawsuits (*which Mike Peca participated in*) went on to confirm:

> "*Jowdy has contributed zero of his own capital into the project, yet he was successful in manipulating a forty percent (40%) interest in the project.[69]   He*

---

[68] In spite of Mike Peca receiving a **$598,124.12** distribution from the Hawai'i JV in August 2006 (*as a result of the Lehman Brothers financing following Kenner acquiring **ALL** of the **REQUIRED** Hawai'i investors "sign-offs"; including the $180,000 payoff to Manfredi and the $395,000 short-term loan to Kaiser, repaid 11-days later, to acquire their final approvals*), Mike Peca's claimed he had not received a return (*Tr.453*), perhaps thru **CTE** or *faulty memory, confusion and mistakes.*

[69] Jowdy's 40% Cabo san Lucas equity (*originally thru his personal LLC, KAJ Holdings*) was a fabricated number Jowdy fraudulently claimed to Kenner that Lehman Brothers funding required of him "**for now**" and the equity would be changed back after the funding completed (*See TIMELINE 031*) and $7 million was repaid to the Hawai'i partners and others (*See TIMELINE 064 @ page 11 – from only 3 days earlier*) at the Cabo closing.   Kenner forfeiture testimony (*on April 6, 2016 – Tr.287-291*) confirmed thru *defendant's exhibit f-29* (*PK127*) that Kenner (*still on February 23, 2006*) was expecting the $7 million payment to close the Hawai'i loan, and the remainder of the personal Jowdy loans to be repaid (*only 3 days later at the then-planned February 26 closing, subsequently delayed one more month to March 26, 2006*).

Kenner sent Najam the following:

> *borrowed one hundred percent (100%) of the capital invested into the project on his behalf personally, directly and indirectly from Kenner and various Hockey Players who are Kenner's clients and who are suing Jowdy for non-payment in multiple US jurisdictions.   These loans are in excess of eight million dollars ($8,000,000)."*

Nothing about the Jowdy loans from the Hawai'i LLCs, or the other individuals (*Stumpel, Norstrom, Murray, Kenner, and Gaudet who also personally sued Jowdy in the USA and Mexico for non-repayment of loans*)(*emphasis added*) were refused independent information and knowledge of the loans from Hawai'i.  Nor were any of the loan issues concealed from their various Mexican counsels, their independent Arizona counsels (*Tom*

---

> "***Bill, the Managing Member role for KJ [Jowdy] on Diamonte [sp?] properties is fine, considering 'all funds will be paid'. Please make sure I see some.  Thanks.***"

Please note that Kenner was (*and still is*) due over $500,000 personally from Jowdy in 2006, fully documented on Jowdy accounting records in Rule 16.

*The paid commission noted on the February 16 closing statement* [*See TIMELINE 064*] *was supposed to pay the balance of the Jowdy debt to Kenner and Kenner investors.  **That never happened either**, and **the $17 million sales commission** also went unaccounted for to Jowdy and Bhatti's benefit.*    Jowdy's ill-gotten equity was one of the main issues Jowdy was "*returning*" to the Kenner investors during his initial July 2007 negotiations with Constantine (*for the investors*) so Kenner and Kenner investors would not go to the DOJ and report Jowdy, Najam, and Harvey for their 5+ years of embezzlements known to Kenner by that point in time.  *See R33 034.*   Ironically, a tiny portion of the ill-gotten equity is the "*settlement payment*" in the 2017 Delaware deal that FBI Agent Galioto has "pushed" the Mexico investors to sign with Jowdy.   This is the "no deal" that Mike Peca referenced in his subsequent 2017 letter to the Court [*Docket 482*].

The Court should note that at the same time (*Spring 2007*) as the Constantine mediated negotiations with Jowdy and Najam (*without Tom Harvey "at that time" – See TIMELINE REPORT @ 229-230*), Najam warned Jowdy on May 8, 2007 that (*See PK101*):

> "*I am not so worried about the past failures* [DDM, stolen Hawai'i loans, stolen personal loans, Diamante Air plane frauds, etcetera].
>
> ***The last thing you need is a conflict situation with another partner***"

This email occurred immediately after Kenner turned down the Jowdy, Freeh, Najam, and Harvey BRIBES (*known to Bhatti*) for Kenner to own a 20% interest (*worth tens of millions of dollars to Kenner*) in their new Texas and Tennessee projects (*verified by Jowdy in his January 2010 deposition confessions*), to "*keep his* [*Kenner's*] *mouth shut*" and "*go along with their protected frauds on the Kenner investors*".   ***Najam wrote the email only three (3) days after*** Jowdy, Freeh and Bhatti flew together to the new Texas project on the airplane Jowdy robbed from Kenner and Kenner investors (*Falcon 10*).  *See TIMELINE 009*.

*Baker, Brian Harper, and Jonathan Dessaules*), or their independent California counsels (*Ronald Richards and JT Fox; after the Plaintiffs previous two [2] years involvement in the Arizona case*), &/or their 2009 attorneys from Akin Gump in Washington DC (*pre-GSF*). To the contrary, the Hawai'i loans were a focal point of the multiple litigations in California (*following 18 months in the Arizona court with the same Plaintiffs' active participation*).  If the investors chose "*not to read*" emails and disclosures &/or willfully neglected the transparent documents, it cannot be of Kenner's intent or doing.   Each participating Plaintiff (*19 of them*)[70], specifically including Mike Peca <u>*before*</u> his wife acknowledged on her 2012 FBI call that she even knew about the LOC, in the AZ case (*under Attorney Tom Baker*) signed lawsuit acknowledgments that started out by disclosing (*See R33 A*):

> *You are listed as a member of Little Isle 4, a Delaware Limited Liability Company….The gist of the lawsuit is to recover certain monies loaned to Mr. Jowdy by Mr. Kenner, Little Isle 4 and Ula Makika. Mr. Kenner estimates the*

---

[70] Nineteen (19) of the Little Isle 4 members **signed and initialed** the 8-page Baker disclosure including: Brian Campbell, **Bryan Berard**, **Darryl Sydor**, Dimitri Khristich, Glen Murray, Greg deVries, Jason Woolley, Jere Lehtinen, Jerry Glatt, Mattias Norstrom, **Mike Peca**, Raymond Murray, **Sergei Gonchar**, **Steve Rucchin**, Turner Stevenson, **Tyson Nash**, Vladimir Tsyplakov.

- Peca had independent interactions with Kenner related to the termination of the previous attorneys and the hiring of Attorney Baker before he signed the "***Jowdy loan case disclosure***", further confirming Mike Peca's underlying knowledge of the <u>*Jowdy loans*</u> and the efforts to recover them.  This communication, and signed waiver occurred during the period of time Kristen Peca claimed "*they could not find Kenner for months at times*" (*after the LOC collateral seizure – despite over 500 texts between Kenner and Peca in that twelve [12] month period – in Rule 16 evidence*).  *Tr. 712.*

**[<span style="color:red">Kenner in RED</span> – Peca response in BLACK]**

| | | | | |
|---|---|---|---|---|
| 121 42 | +17163743 234 Michael Peca* | 10/28/20 09 3:10:08 PM(UT C+0) | Sent | <span style="color:red">Please fax the Attorney Tom Baker Waiver to me today. **I need them for Baker to take over the $5-10mm case versus Jowdy for us in AZ. Thx**</span> |
| 105 70 | +17163743 234 Michael Peca* | 10/28/20 09 4:34:09 PM(UT C+0) | Read | **What is the waiver for? Why did other Attys withdraw? You can call me back if you need to explain with a lot of detail.** |

106

*total amount of monies loaned to Mr. Jowdy which have not been repaid to be approximate $5,000,000.[71]*

---

- It should not be overlooked that this correspondence is in concert with the 2011 Mike Peca SDNY Grand Jury testimony when he specifically detailed the loans to Jowdy as the problem between his Hawai'i LOC (*and the Little Isle 4 capital account*) and Jowdy.  *See R33 419.*

*[Mike Peca SDNY Grand Jury testimony @ page 30]*

*A:  "$100,000 cash investment that was going towards that.  Then we had lines of credit.  I had one out for $1.7 million that was going to be used at the time.  Here's where a lot of the cross starts to happen.*  ***A short-term loan to Mr. Jowdy, because at the time Cabo – we hadn't gotten the lending from Lehman Brothers yet.  We made a short-term loan until the lending came in.  Once the lending came through they were to pay back the loan, I think in the neighborhood of five-and-a-half million dollars, on the closing.  It was never paid back.***  *And then communication basically seized at that point from him [Jowdy].*  ***That was kind of the whole sticking point as far as <u>me and the other guys</u> with Mr. Jowdy.***

*The 1.7 along with the $100,000 and* ***whatever else put in this a capital account****, Little Isle 4, I believe."*

---

[71] Please note that prior to Jowdy getting the AZ case dismissed based on an *EX PARTE* filing technicality (*December 2009*), Jowdy claimed the funds from Hawai'i were **investments (not loans)**.  Albeit, Jowdy changed his position 180 degrees only 2-3 weeks later at his January 2010 California deposition, SHOCKING all in attendance (*including Hawai'i investors Kenner, Kaiser, deVries and Woolley*) to which Kenner immediately communicated with Kaiser and Constantine of the perjury and told Constantine that he needed to alert Arizona attorney Baker of the Jowdy, now self-verified frauds on the FBI and the Arizona Courts (*See Point II @ 18-20*).

[*From Kenner to Constantine – during the Jowdy deposition*]

| 13260 | +16023635676 Tommy Constantine* | 1/5/2010 7:18:00 PM(UTC+0) | Sent | **All the funds from Hawaii were for loans and maybe converted to equity!!!!!! But then he said they weren't converted** | |
| 13261 | +16023635676 Tommy Constantine* | 1/5/2010 7:26:16 PM(UTC+0) | Sent | **Baker should have his trump card now!** | |

None of the Hawai'i funds were EVER counted in any CAPITAL ACCOUNT (*by Najam &/or Jowdy*) in *any* Jowdy project **specifically not for Kenner**, yet Jowdy *received* 100% of the funds (*in Rule 16 evidence*) and documented a $2.5 million capital account in the Diamante Cabo project with Lehman Brothers in March 2006 for himself (*with a provably false back*

story [*See PK42*] *in spite of his perjury laden EDNY affidavit to this Court in December 2016, re-confirming his own fraud [See TIMELINE 024 @ page 7 footnote]*).

Jowdy and Najam began their perjurious testimony in the 2009 Nolan arbitration (*See R33 647*) claiming the Hawai'i funds were *underline investments, not loans*, clearly disproven by Jowdy's own revisionary history culminating in his *PK100 -- Forf-44* submission in 2015 (*unsolicited but received by the government only three (3) weeks after the 6-year investigation and 3-month trial*).

Jowdy also chose to lie to the 2009 Arbitration panel that the concealed $3 million 2006 KSI Capital loan (*which eventually caused a full foreclosure and massive investment loss to Kenner and Kenner investors thru 100% Jowdy, Harvey, and Najam concealed frauds*) on the Diamante del Mar project *did not exist in 2009. See R33 664.*   With Jowdy protected by the FBI, he and Najam had no concerns what lies they told in under oath, to the FBI, or in any jurisdiction.

Baker's disclosure (**signed and initialed** *by 19 of the Little Isle 4 members*) went on to disclose Jowdy's 2008-09 fraudulent AZ legal position as:

> *"In summary,* **Mr. Jowdy denies that the monies were loans but rather characterizes them as investments**.  *Mr. Jowdy also asserts that even if the monies were loans, the Statute of Frauds (monies loaned/credit extended* **without a writing in excess of $250,000…**) *and/or applicable Statue of Limitations…precludes their recovery.  Mr. Jowdy also asserts that the Promissory note at issue contains his forged signature."*

- Please note that Jowdy's own counsel **reversed** their position and authenticated the loan agreement (*with the signature witness, Robert Gaudet*) one (1) year later (*December 2010*) in his Nevada trial defense, which he lost to Glen Murray and Kenner (*3rd party, Pro Se defendant*) in another unpaid million-dollar Jowdy loan case.  *See R33 015*.

Please note that Baker fully disclosed to the Little Isle 4 (*Hawai'i*) investors that Jowdy claimed the monies he received were **not loans**, despite the 2015 post-EDNY trial disclosure by Jowdy and Harvey [*PK100 -- Forf-44*] that **the loans were now real**.

- **This is another independent disclosure that all of the government witnesses claimed they never received, thus more perjury &/or CTE.**

Baker fully disclosed the other twelve (12) open or recent lawsuits that related to adverse parties aligned with Jowdy for further transparency in the 8-page disclosure letter.

Baker also fully disclosed to the investors that Jowdy denied that the 2004 Hawai'i loan agreement was authentic (*then, with the help of his legal team, they [with Jowdy] lied to the FBI about it in March 2009 to try and get a favorable forensic evaluation to harm the collective Hawai'i Plaintiffs' legal position*).  When that false tactic failed (*in Rule 16 evidence*), **Jowdy and his legal team used the loan agreement as underline authentic** in the December 2010 Nevada trial as his main defense exhibit [*A-89 Nevada exhibit*] (*in Murray v. Jowdy (v. Kenner – 3rd party defendant to Jowdy's cross claim) – see R33 015*).  Jowdy's

108

The substantial and additional funds that Jowdy personally owed Kenner thru early 2006 remain unpaid to this date, **are not included in the Baja Ventures 2006 capital account**, and are documented on Government Rule 16 documents in evidence.   Any funds that Jowdy received pursuant to the 2004 Hawai'i loan agreement and illegally used, based on his pre-meditated non-payment of the well-documented loans over fourteen (14) years later, are 100% traceable to Jowdy's KAJ Holdings capital account. They are traceable to unpaid loans Jowdy documented *ex post facto* (*once he was confronted by Kenner and Kenner's Hawai'i partners in 2006*) (*also admitted on 3-24-2010 to the FBI by Jowdy in R33 rebuttal 002  -- 3500-KJ-2 [pages 12-14] – yet specifically ignored by the Government to frame their prosecutorial case that the loans were "bogus" [Tr.5708-5709], "phony" [Tr.4597-4598], and "supposed" [Tr.5991]*).

The Government browbeat Kenner that he was a "**liar**" for claiming Jowdy stole the funds [*Tr.5064-5065, Tr.31*][72], the exact strategy Jowdy's attorneys in Arizona employed

---

attorneys authenticated the loan agreement through signature witness, Robert Gaudet (*See R33 011*), to the SHOCK of all in the court room that day (*after three [3] years of staunch denials in three [3] other jurisdictions and four [4] other cases, and the NY Daily News allegations of **that** document forgery against Kenner, directed specifically by Tom Harvey as his April 2009 email suggested*), in concert with "*unnamed FBI sources*".

[72] In order to make these false allegations – insinuating Kenner stole the money that Jowdy received thru the Hawai'i loans ("*bogus*", "*phony*", "*supposed*") – the government had to ignore multiple Jowdy confessions in his 2-day California deposition, all prior to his repeated confessions to FBI agent Galioto in February and March 2010 during his FBI proffers.   It was wholly *unethical* and *prejudicial* to the defendant, *at all times*.

*Page 97 -- Jan 5, 2010 Jowdy depo: "*__ALL  Hawai'i LOANS CONFESSION by Jowdy__*"

> *Q.  But there was an expectation it would be repaid back, wasn't there?*
> *Ms. Crowther [Jowdy's attorney]:  Objection.  Compound.*
>
> **The deponent [Jowdy]:  Some of the money  was -- could have been booked individually as  loans and wouldn't have been possibly turned into equity at some time in the future.**
>
> *By Mr. Richards:  Q.   But was it ever turned into equity?*
>
> **A [Jowdy]: NO**

to scare the **** out of the Little Isle 4 attorneys (*See TIMELINE 002*) and demand their resignation for representing a "loans" position for the Plaintiffs (*See Forf-44 – now OK for Jowdy and the Government to admit with the damage to Kenner and Kenner investors complete*). All of the funds are traceable through Jowdy's bank records that have been in the possession of the FBI since 2009 (*originally referenced by Kenner to the FBI during the June 24, 2009 proffer*), in Rule 16 evidence.  The initial Jowdy thefts occurred one (1) day after the first Kenner investor deposit with Jowdy in August 2002.   Kenner identified this to the FBI on June 24, 2009.  Corroborating Kenner's initial proffer disclosure in 2009, the EDNY AUSA/FBI subpoenaed the August 2002 statement (*only*) from Jowdy's bank **the week before the start of the 2015 trial**, thus, they were 100% _knowledgeable_ that Jowdy **DID STEAL** Kenner and Kenner investors money from day one (1) (*of the DDM project*), yet they claimed in their opening (*Tr.31*) that the claims by Kenner (*& Constantine*) that Jowdy stole funds from investors was a cover-up, somehow. This empirical evidence could not have been lost in the chaos by the Government, since it was specifically subpoenaed within weeks of the start of the trial; and _for some specific reason_. *See TIMELINE 012*.[73]   Ironically, Jowdy's admission of the Hawai'i loans in the

---

*Q.   So sitting here today, do you think it's realistic that -- that these four entities received close to 3.7 million dollars -- or over  3.7 million dollars, and that there's no -- there's no obligation of repayment?*

*A. [Jowdy]:   I want to be clear that you're looking at them in general, and I -- I can say that, in general, I don't think any of it was converted into any equity anywhere.*

[73] Please note that hundreds of thousands of dollars of DEBITS are not traceable with the information on Jowdy's basic monthly bank statements (*in the first four [4] months alone*) -- but the **$657,000** Jowdy directly embezzled from his Baja Development Corp account in the first four (4) months would be enough (*as Kenner proffered on June 24, 2009*) for a further investigation by the FBI case agent (*Galioto*) into the remainder of the Jowdy fund "*distributions*" BEFORE claiming *in the 2015 opening remarks* that Kenner LIED to the investors by claiming Jowdy was stealing their funds, in any context, **since Kenner is apparently 100% accurate in his claims**, at all times (*Tr.31*) – the government was wrong to Kenner's prejudice.

- *Under oath to the FBI (3500-KJ-3 @ 3) in February 2010, Jowdy actually claimed he was "**surprised**" that Kenner and Woolley began to transfer investment funds to his Baja Development Corp account, notwithstanding Kenner had just met with Jowdy in Texas (at Roger Clemens' birthday party) and Jowdy specifically OPENED the Baja*

*Development Corp on August 2, 2002 (days later), transmitted the newly formed account wire instructions to Kenner, and received the initial funds via Woolley wire transfer of $150,000 on August 5th (See TIMELINE 012) .*

- *There is no part of opening a new bank account, transmitting the new wire instructions to Kenner, and receiving funds within three (3) days that could be deemed a "surprise".   Yet, even "surprised", Jowdy began embezzling the funds the next day (August 6th), so at a minimum, the "surprise" worked out well in Jowdy's favor (while still consciously being ignored by the FBI case agent who was involved in the original Jowdy/Najam EDNY Grand Jury and Kenner's "Special Grand Jury" immediately convened after Jowdy was notified thru counsel, Louis Freeh in the first week of July 2009).*

  - *In spite of Jowdy's representations of "surprise", the August 2002 Baja Development Corp bank statement (that the government subpoenaed specifically one week before the start of trial) was systematically ignored to continue framing their "Jowdy is a victim" of Kenner lies intonation from opening remarks thru rebuttal summation.  The government also conveniently overlooked that fact that without further subpoenas, the Jowdy August 2002 statement (alone) confirms at least $417,000 of the first $804,000 that Kenner, Woolley and Khristich invested with Jowdy **was stolen – and immediately**.  Only Kenner, Woolley, and Khristich have a legitimate claim of "surprise".*

In addition, Kenner received **from the government** confirmation of millions *more* Jowdy stole directly and immediately from the Diamante Cabo project (*See Ex. 47– in FOLDER  -- see all Ex.47a thru Ex.47h*) **as soon as** Jowdy had drained the $10 million DDM accounts (*2002-2005*), the concealed DDM $3 million KSI loan (*February-April 2006*) (*which eventually lost the $68 million property to foreclosure, previously cash-owned*), the $1.5 million Diamante Air investments (*2004-2005*), and the subsequent $1.1 million Diamante Air loan (*2005-2006*) (*See TIMELINE REPORT*) (*thru forged and fabricated Jowdy documents*), ALL *before* he robbed the DCSL Cabo Villa deposits (*January-December 2007*) to buy his 50% controlling interest in another Masood Bhatti/Lehman Brothers funded $35 million project (*i.e. racketeering*) (*See PK102 -- DCSL Golf Villa deposit THEFTS by Jowdy (2006) -- and FUNDS Laurel Cove with STOLEN funds*).

When Jowdy was running short on other available cash to steal in August 2006 (*known to the FBI and ignored*), Jowdy received the Diamante Cabo $100,000 investment from Owen Nolan (*into Baja Development Corp – his personal account*) and **stole it**.  This was the same month Jowdy received a $650,000 payment from his new co-conspirator (*Masood Bhatti*) at Lehman Brothers (*unknown to Kenner and Kenner investors – with millions still due from Jowdy for the unpaid loans*).  *See PK118.*  Yet, the government claimed Kenner misled the investors about the Jowdy thefts @ *Tr.31*.   There is nothing interpretable in the Jowdy diversions and crimes.

In spite of every documented theft (*proffered by Kenner to Galioto in the June 24, 2009 interview*), the government claimed from opening remarks (*Tr.31*) thru rebuttal summation that Jowdy was a victim of Kenner (*& Constantine's*) alleging erroneous claims that Jowdy stole from Kenner and Kenner investors since August 2002 (*the first month of recorded*

January 2010 California deposition and the forthright admissions to the FBI in February and March 2010 came only one (1) and three (3) months after Jowdy received the dismissal in the 2008-09 AZ case; utilizing the fraudulent defense tactic that the money he received from Hawai'i were **NEVER** loans, and the loan agreement was a *forgery* (*which Jowdy admitted just one year later, in another jurisdiction; as* __*authentic*__ *in December 2010 in his Nevada defense trial of another unpaid loan, to another Kenner investor [Glen Murray]*).   *See R33 015*.

Simply documented, Baja Ventures 2006 was funded with two (2) agreements between Kenner and his partners, Stumpel and Lehtinen (*See R33 633, R33 634*).   There has

---

*deposits with Jowdy's Baja Development Corp*), when they had __overwhelming evidence__ that Kenner was 100% truthful.   They had the empirical evidence to support Kenner's claims.

- ***The problem with the Kenner truths and empirical evidence were that they contradicted the government theories at their core***.

Jowdy confirmed Kenner's knowledge of his crimes when Jowdy told the FBI on February 25, 2010 that in July 2007, Kenner had threatened to go to the head of Lehman Brothers (*Dick Fuld*) and expose the Jowdy mismanagement and straight embezzlements (*See Ex. 47*) [*only from the start of the Cabo deal*], fully disregarding his prior $20 million in thefts.  Being 100% culpable for the Kenner allegations -- Jowdy immediately negotiated a proposed settlement with Constantine as the mediator and engaged legal counsel on both sides to quickly document the deal (*See R33 034*).   *Ex. 47* confirms Kenner was **right**, and not creating a cover-up.   There was no Kenner-Jowdy conspiracy, specifically since Kenner alerted everyone about the Jowdy thefts, immediately upon initial discovery.

The Kenner equity (*if ill-gotten*), the $250,000 plus commission annual salary in Cabo, the 20% (*$20 million bribe on the Texas and Tennessee projects from Jowdy, Najam, Freeh and Harvey*), the $250,000 salaries from each development project (*like Najam and the rest of the Jowdy co-conspirators*), would have been the "*fruit of the crimes*", **BUT** Kenner exposed them all and walked from the tens of millions available in order to fight for Kenner and Kenner investors for the following eleven (11) years and counting.   It makes no logical sense.

After fourteen (14) years of criminal frauds on Kenner and Kenner investors, Jowdy boldly lied to this EDNY Court December 13, 2016 thru his "*under oath declaration*" about the exact same issues.   *See TIMELINE 024*.

*"I [Jowdy] firmly believe, however, that the biggest challenge I have had to overcome has been the nearly decade-long campaign orchestrated and promoted by the defendant, Philip Kenner and his clients and associates, to unfairly malign me, sue me, and wrongfully accuse me, of improper conduct, ranging from mismanagement of the project [DCSL] to various unfounded criminal and civil complaints.*"

never been a conflict between Kenner and his Baja Ventures 2006 partners in spite of the FBI case agent's aggressive pre-trial tactics to get both of them to turn on Kenner (*supra*).   Both partners refused to discuss their investment alongside Kenner in Baja Ventures 2006 with the FBI, and as a result, no 3500 materials were produced by the Government pre-trial for either partner.

### GOVERNMENT FORF-36:

During the forfeiture hearing, the Government produced *Forf-36* which further confirmed thru their own accounting (*on page 1*) that the $2.5 million capital account for Baja Ventures 2006 was derived from Kenner's partners exclusively and *not* derived from any "alleged conspiratorial behavior" referenced in the trial.   Jere Lehtinen made a direct deposit on 6-7-2005 of $1,500,000 to Ken Jowdy's controlled Propiedades DDM (*Mexico*) account for the sole purpose of it being immediately transferred to the seller of the Cabo san Lucas property (*Atilio Colli Villarino*).   This approved transfer to Jowdy is documented in multiple Government Rule 16 documents.   Lehtinen and Kenner's expectation was that the funds were to be immediately transferred to the seller of the Cabo san Lucas property as part of the pre-closing deposit.   The $1.5 million was included in the Baja Ventures 2006 Capital Account pursuant to the **signed** agreement between Kenner and Lehtinen, in Rule 16 evidence.

The balance of the Baja Ventures 2006 capital account is derived from two (2) places that the Government clearly documented.   First, the Government acknowledges that Stumpel made a $1,600,000 direct deposit from his personal account to Jowdy's LOR Management (*Mexico*) account on 5-23-2005.   This approved transfer to Jowdy is documented in multiple Government Rule 16 documents.   Stumpel and Kenner's expectation were that the funds were to be immediately transferred to the seller of the Cabo san Lucas property as part of the pre-closing deposit.   Jowdy only transferred $600,000 of the funds to the seller, nevertheless, *true to form*; Jowdy misappropriated and concealed from Kenner and Stumpel the distribution of the remaining funds.   This egregious pattern of Jowdy diversions, embezzlements, racketeering, and money laundering were presented to the FBI case Agent (*Galioto*) during Kenner's June 24, 2009

113

proffer, resulting in AUSA Goldberg's immediate request to have Kenner come voluntarily to New York and testify against Jowdy and William Najam (*Jowdy's brother-in-law and Diamante CFO*) in the newly opened EDNY Grand Jury (*See R33 rebuttal 005*).  After Galioto spoke with Jowdy's attorney, Louis Freeh, during the first week of July 2009, three (3) things happened almost immediately.

First, Kenner's AMEX account was subpoenaed by the FBI (*in the SDNY, not in the Jowdy case*), which immediately began to cause problems with Kenner's main business credit source of nearly 20 years.  The heavy use of Kenner's AMEX to support his monthly expenses was only known to Jowdy (*since Jowdy used the card repeatedly, and often without prior permission*). No reasonable logic exists as to why the FBI would have decided less than two (2) weeks after speaking "on the record (*according to produced 302b notes*)" with Kenner, and without mention of any Kenner accounts (*debit or credit*), why they would subpoena his records (*unless directed from a knowing source like Jowdy's attorney*). (*See PK103*)  At that time, Kenner was represented by counsel and cooperating with the EDNY investigation and AUSA Goldberg.  No Jowdy records were subpoenaed in that immediate time frame from 3rd parties.

Second, Galioto cancelled the follow-up interviews with all of Kenner's Hawai'i and Mexico investors.   The interviews were requested by Galioto thru Kenner and Ronald Richards on or about June 30, 2006 (*and arranged and initiated by Kenner [evidenced in Rule 16]*) – the day after Galioto interviewed Jowdy's assistant [*See PK104 -- 3500-SH-1-r*]).   The cancellation was highly suspicious to the Hawai'i investors, considering Jowdy's own executive assistant further confirmed Kenner's evidence supported representations 5-days earlier to FBI Agent Galioto of the Jowdy reckless spending and embezzlements, which Galioto noted from the Hughes proffer:

[*June 29, 2009 – 5 days after the Kenner proffer*]
   *"Hughes saw lavish spending during her time as Jowdy's employee. Jowdy would use private planes from DIAMANTE AIR*[74] *to fly people during breaks in the*

---

[74] *This was another multi-million dollar fraud on Kenner, Gonchar, Sydor, Stumpel and Norstrom by Jowdy and Tom Harvey –* *See R33 049, TIMELINE 034a.*
- Please note that Sydor claimed at trial (*related to his GSF contribution*) that he wanted nothing to do with a Private Airplane, despite the fact he was already an

> *baseball season.   The plane was usually 'filled with girls'.  He tricked a lot of people… **Jowdy was 'living the life' on other people's money**.  <u>When investors asked for an update on the project, Jowdy would always brush it off and say he would get around to it</u>."*

Third, the Kenner EDNY Grand Jury appearance (*See R33 rebuttal 005*) was cancelled (*See R33 rebuttal 006*).   According to the Kenner AMEX subpoena, a SDNY Grand Jury was immediately convened on Kenner on or before July 8, 2009 (*less than 2 weeks after Kenner's $25 million fraud proffers with documentation about Jowdy, Harvey and Najam, further corroborated by two (2) California lawsuits and Jowdy's former executive assistants proffer*), in Louis Freeh's former district (*immediately with a different AUSA*) and not in the EDNY where the initial Jowdy/Najam Grand Jury was convened.  The NY Daily News reported this change of FBI strategy almost immediately thru a "*leak*" at the FBI (*in spite of the secret Kenner Grand Jury*).   The leak from Galioto to Harvey to Harvey's NY Daily News friend (*See TIMELINE 007*) was the obvious conspiratorial slander plan executing pricelessly, as conceived.   Harvey confirmed himself as the link from the FBI to the NY Daly News in his April 2009 extortion email to Kenner and Kenner's attorney as follows:

> *The Daily News has been inundated with new information about Tommy and Phil. In the past, the paper has done a series on a subject over a period of time, and this story, i.e. Tommy and Phil being con men, seems "to have legs", i.e. the paper will probably do a series on their misdeeds.*[75]

---

owner of Diamante Air, LLC (*which owned the Diamante Falcon 10, unless he forgot, again thru faulty memory, confusion and mistakes*). *Tr.2178*.

[75] The only <u>alleged</u> "*misdeeds*" at that time (*April 2009*), *under Harvey's knowledge*, could have been related to the Jowdy projects and the "**loans**" from Hawai'i, which Harvey called a fraud in early 2009 (*and allegedly made-up by Kenner*), quoting,

> "*…especially since Phil says in the Arizona case that he "loaned" Kenny the money*".

Jowdy confessed to the loans to the FBI (*specifically including Galioto*) less than one (1) year later.   Ironically, Harvey's own December 2010 trial authentications (*in Nevada*) as well as Jowdy January 2010 California deposition confessions also confirmed Harvey's threats were bullying tactics to scare Kenner into stop suing Jowdy in the USA and Mexico, *despite the truth*.  Yet, it was enough for Harvey to threaten Kenner with FBI-led jail time (*considering his co-attorney role with former FBI Director Freeh, defending Jowdy's various lawsuits*), quoting,

> "*It is likely Phil and Tommy Constantine are under investigation in California and Arizona*".

In fact, in February 2010, and with uncanny coincidence, immediately after Kenner and Ronald Richards independently forwarded the Jowdy January 2010 2-day confessional deposition about all of the money he stole from Kenner and Kenner investors and refused to repay to FBI agent Galioto (*as Kenner professed in the June 24, 2009 FBI proffer*), the FBI leak was cemented by the NY Daily News, as follows:

> *The players' allegations got the attention of federal prosecutors in New York who launched an investigation last summer.   Now, with the hockey players' lawsuit in shambles, it is possible the focus of the federal probe will shift to Kenner and his associate, a former racecar driver named Tommy Constantine…*

At the 2015 trial, the Government went so far to claim Kenner avoided the Grand Jury subpoena, with Michiewicz knowing full well that the US Marshalls would have arrested Kenner for refusing to appear and ignoring the Grand Jury subpoena.   The prosecutorial assertions were egregious, specifically considering that both the subpoena and dismissal notices came from Michiewicz' own EDNY office, *supra*. In fact, AUSA Michiewicz was the Chief prosecutor from his EDNY office, thus, owing a further duty to the EDNY office and the Court to not make a knowingly false assertion, which carried so much negative weight towards the defendant's integrity in front of the jury.  In addition, Galioto was involved at all times; certainly aware of the subpoena and subsequent termination notice within 10 days (*from July 2009*), yet sat quietly during the Kenner berating, being called a "*liar*". *Tr. 5064-5065*.[76]

---

The Court should not overlook the *PK100 -- Forf-44* spreadsheet prepared and delivered by Harvey, himself, to the FBI and IRS, *after the 2015 trial conclusion*, further confirming Harvey's 2009 "***protected***" threats of FBI-led jail time and NY Daily News slander stories "**with legs**".  *See TIMELINE 007.*

[76] Contradicting the misleading Michiewicz assertions to Kenner about avoiding the Grand Jury subpoena, Kenner sent his Hawai'i clients immediate notification to be available for a FBI interview (*See PK119*), with nothing to hide about the loans to Jowdy, or otherwise in 2009.   This transparency would have been a *suicide* effort if there were major frauds (*like the alleged concealment of the Jowdy loans*), considering that was the crux of the lawsuits in Arizona (*See R33 A*) and California, which attracted the FBI intervention originally (*See TIMELINE 071 and TIMELINE 072*).

116

The Jowdy diversions have been clearly presented in this case and to this Court in Kenner's *Rule 6(e) Motion @ 21-40* and *TIMELINE REPORT* (***clearly enough to Indict Jowdy and his entire 15-year cabal of crimes from Racketeering to money laundering, SEC violations and wire fraud***), confirming Jowdy's tens of millions of thefts from Kenner and Kenner investors, title transfer frauds (*valued at $68.9 million*), all under the direct guidance and cover-up of Jowdy's NY Attorney, Tom Harvey, and Najam since 2002[77]; ***plus*** Masood Bhatti from Lehman Brothers (*and his assisting team*).  In fact, after

---

- Please note that **Sydor – Berard – Gonchar – Murray – Peca – and Norstrom** were all of the Hawai'i LOC clients and had just given up their collateral less than three (3) months earlier.  This would have been a suicide for Kenner to set up the calls if there was anything concealed – or unknown at the time by the investors about the Jowdy loans from Hawai'i.  Only Nolan was not on the notification list – as he had just perjured himself in the 2009 arbitration about his LOC knowledge *at all* – despite his own Northern Trust banker's deposition (*Aaron Mascarella*) months earlier which Mascarella **CONFIRMED** independent communication between he and Nolan without Kenner from 2003-2006 – re-affirming Nolan's propensity to lie (*unless afflicted by **CTE***).

[77] Jowdy's NY attorney **Tom Harvey** was present at all of the pre-trial Jowdy proffers (*in the Jowdy 3500 materials*) and assisted AUSA Michiewicz daily throughout the 2015 trial; specifically preparing evidence and cross examination materials with Kenner on the witness stand at every break.  Harvey and Louis Freeh were Jowdy's two (2) lead attorneys, managing the legal efforts to hide Jowdy and Harvey's crimes since Kenner's discovery in 2007, and divert attention thru "*abuse of power*" to Kenner.   In Jowdy's January 5, 2010 California deposition referring to his July 2009 FBI notices of subpoena, Jowdy confirmed Tom Harvey and Louis Freeh as his two main attorneys:

*BY MR. RICHARDS:*
*2        Q.  WHO'S BEEN DEALING WITH THEM [subpoenas]*
*3        A.  MY ATTORNEY.*
*4        Q.  AND WHO IS THAT?*
*5        A.  **LOUIS FREEH AND TOM HARVEY** AND*
*6    JOEL FRIEDMAN.*

*BY MR. RICHARDS:*
*12        Q.  I MEANT WHO -- WHO ISSUED THE GRAND*
*13    JURY SUBPOENA, NOT WHO SENT IT.  WHO ISSUED IT,*
*14    WHERE -- WHAT GRAND JURY?*
*15        A.  **SOUTHERN DISTRICT OF NEW YORK**.*
*16        Q.  OKAY.  ANY OTHER INVESTIGATIONS*
*17    THAT YOU'RE AWARE OF RELATED TO THIS MATTER?*
*18        A.  WHAT MATTER?*
*19        Q.  RELATED TO YOU, THAT YOU'RE -- THAT*
*20    YOU BELIEVE THAT YOU -- THAT YOU'RE INVOLVED IN OR*
*21    THE FOCUS OF.*
*22        A.  I DON'T BELIEVE SO.*
*23        Q.  WHAT ABOUT AN S.E.C. INVESTIGATION?*

117

```
24        A.  I'M SORRY.  I WOULD HAVE LUMPED
25    THAT AS THE SAME THING, WITH THE GRAND JURY
0028
 1   INVESTIGATION.
 2          BUT THERE IS ONE, YES.
 3        Q.  OKAY.  YOU'RE AWARE THAT THERE'S A
 4   SEPARATE S.E.C. INVESTIGATION?
 5        A.  YES.
 6        Q.  AND IS IT THE SAME -- IS IT THE
 7   SAME TWO LAWYERS THAT ARE HANDLING THE INTERACTION
 8   WITH THE S.E.C.?
 9        A.  YES.
10        Q.  NOW, YOU MENTIONED A THIRD LAWYER.
11   FRIEDMAN?
12        A.  HE WORKS FOR THE FREEH GROUP, YES.
13        Q.  OH, THE FREEH GROUP.  OKAY.
14          AND WHAT IS THE FREEH GROUP?
15        A.  ATTORNEY.  MY ATTORNEYS.
```

Although the SEC was involved in the initial communication with Kenner (*June 24, 2009*) and multiple FBI-led proffers (*in 3500 materials*), the SEC also met with Kenner in 2011 on three (3) occasions to discuss the various investments.  Kenner and the Eufora plaintiffs' attorney, Michael Stolper, discussed the *excitement* ("*a welcomed thing*") of the Kenner investors with the SEC's renewed interest in the various investment matters, specifically related to Jowdy and Mexico.  It should be noted that Stolper's continual involvement with the Eufora plaintiffs (*separate from Kenner*) and Kenner (*related to the SEC inquiry, Diamante, and the pending litigation versus Lehman Brothers and the Hawai'i JV partner*) continued for over a year after Kenner had immediately disclosed the Constantine Home Depot recording (*August 2010*) to Stolper and his investigation team, where Constantine made outrageous claims about the FBI and the "*world caving in around him*".

Knowing that all of the allegations by Constantine were a farce and a typical Constantine tactic to threaten Kenner, Kenner immediately disclosed the recording to Stolper, Giuliani, Hatziemos, and former CIA Agent Libby for their investors.  Even two (2) months after Berard received the Home Depot recordings with the group including the salacious allegations (*See Point III @ 175*), Berard was waiting for Kenner to meet in NY with Stolper and Stolper's Rhode Island legal associate to go after Lehman Brothers and the Hawai'i JV partner for the documented $11 million in JV embezzlement frauds (*also ignored by Galioto after the June 24, 2009 Kenner proffer*).  If ANY of the Constantine nonsensical allegations had substance, all of these investors would have been defrauded, and their attorneys would have been made aware **BY KENNER HIMSELF**, *but it did not*.

Is the government's position that Stolper, Giuliani, Hatziemos, and former CIA Agent Libby were acting in complicity to protect Kenner (*considering only Stolper ever met Kenner*), so the Eufora investors [*their clients*] would be defrauded?

- It should be noted that in 2012, Gaarn recorded Kenner for nearly five (5) hours for the FBI.  During the recordings, Gaarn makes specific reference to the 2008-09 Standard Ventures [*Gaarn's 100% company – Tr.2570-2571*] private stock sales. Gaarn asked Kenner on several occasions on the surreptitious recordings how **he** (*not Kenner*) should handle **his tax payments** for the stock **he sold**.  At no time does Gaarn refer to the Eufora private stock sales as Kenner's stock, because Gaarn knew

that *IF* he had made that false insinuation to Kenner, Kenner would have replied "*WTF are you talking about?*"
- o *Thus, Gaarn never broached the subject of the government's future 2015 foundationless allegations.*

Prior to the frivolous Constantine Home Depot claims, Stolper and his team represented their same full knowledge of the identical issues (*as previously allege by Constantine's defense attorney*) on July 16, 2010 of the Constantine claims (*sales of Gaarn's private stock as some kind of fraud*) in the **signed off**, **multi-page disclosure letter** for all of the Eufora investors (*See Ex. 1*).  Stolper highlighted in a direct request to Constantine's attorney [Lee] in the full disclosure letter (*signed off by all his Eufora clients*) the following:

> Lee, you claim you have been "*informed*" about "*very disturbing facts relating to the actions of several different investors* [Kenner and Gaarn] *and managers* [Gaarn and Gentry] *in the Eufora saga*."  **We want to address these points as well**, not with finger-pointing and conjecture, but with real evidence (documents).  I invited Constantine to support his allegations but he has yet to provide a single piece of evidence or agree to meet with us.

Stolper represented the identical Constantine threats in the **signed-off** disclosure letter (*supra*) one (1) month before Constantine tried to threaten Kenner (*at Home Depot*) with the same frivolous conjecture.  These frivolous claims were echoed a 3rd time in front of Stolper, the Eufora investors and Kenner during Constantine's August 18, 2010 conference call, to which Stolper replied "***PREDICTABLE***" (*See R33 433*).   Kenner highlighted, again, the Constantine claims during the Eufora investors conference call via text to Stolper:

> *Kenner: Tommy has the Kenner gave Gaarn stock as an illegal transfer issue on the table.  He's threatening with law enforcement to go after us*

> **Stolper: Predictable**

> *Kenner: He just threatened law enforcement involvement to settle the issue with the Kenner/Gaarn transfer!*

> **Stolper: Hopefully recorded.**

Subsequently, Stolper and his legal partners continued working and representing Kenner as well.   After all of the Eufora investigations and disclosures, Stolper told the SEC (*See Ex. 62*):

[*August 2011 in front of the SEC on day 3 of the Kenner depositions*]:
> **Stolper**:   ...And I think that the conversations that I have been part of, without waiving privilege, and also my view is that my view of the SEC's involvement in this whole Diamante del Mar, et. al. is a welcome one and that we [*the investors who Stolper, Rudy Giuliani, Eric Hatziemos and Oliver Libby represented*] and Mr. Kenner are really looking to the SEC to enforce the securities laws against Mr. Jowdy and those who did wrong here.  And we see it as a welcome thing, as a positive thing.

> So the tenor of the conversations with Phil's friends, co-investors, clients, is that this is a welcome thing and maybe because we are having this direct communication

119

Jowdy laundered some of the Stumpel funds in 2005 thru another Mexico account

---

with the SEC and then subsequently with the US Attorney's Office, that maybe they will finally get some justice out of this.

And I know that I have said that off the record with you and I just wanted to clarify that in response to that line of questioning.

In spite of Stolper's statements to the SEC, nothing could reasonably explain to Stolper and Giuliani's team, *without undue influence* or *abuse of power* from "someone", why the basic act of Jowdy and Harvey <u>to *not transfer title*</u> of the Diamante del Mar properties after over $10 million of Kenner and Kenner investor's deposits were made to Jowdy's accounts (*See TIMELINE 021*) and multiple representations to secure the investments thru liens by Harvey and Jowdy were made (*See TIMELINE 020*), **these securities crimes were blatantly ignored by the SEC and US Attorneys offices**.

These crimes do not include the millions of embezzled funds by Jowdy's cabal documented by Kenner in *Kenner's Rule 6(e) Motion @ 21-40*.  Jowdy, Harvey, and Najam sold the proverbial "Brooklyn Bridge" to Kenner and Kenner investors and it went unchecked, multiple times.  *See TIMELINE REPORT @ 48-49*.

That simple and egregious scheme, *if addressed by the SEC as Kenner and Stolper disclosed in August 2011*, would have brought down Jowdy's well-protected *House of Cards*, now that he had admitted to the Nevada Court (*December 2010*) that the 2004 Hawai'i loan agreement was *authentic*, and the outstanding Hawai'i loans were *real* (*contradicting his fraudulent positions to the FBI, the Arizona Federal Courts, and the Federal Mexico courts thru December 2009*).

***The FBI and the SEC ignored the criminal misrepresentations by Jowdy and multiple Jowdy legal teams (in Mexico, California, Arizona and Nevada), all directed by Louis Freeh and Tom Harvey (Jowdy's co-conspirator since 2002).***
- It should be noted that pre-trial, someone indicated to the FBI &/or US Attorneys that the 2004 Hawai'i loan agreement was a forgery, considering the US Attorneys told the EDNY Court in 2014 they were going to prove it in their case in chief.   This representation confirms that "someone" lied to the FBI &/or US Attorneys office about the authenticity of the document, long after Jowdy and his attorneys lied to the FBI and Arizona Federal Courts in 2008-09 to fabricate a dismissal in the original "loan" case by Kenner and Kenner investors.  *So even after Jowdy authenticated it in December 2010 – the government was claiming it as fake – again?*

- This criminal misrepresentation is identical to the prosecutions pre-trial representations about the Kaiser-signed testimonial in Mexico being a forgery. Notwithstanding the pre-trial grand standing, Berard's own FBI recordings (*in Rule 16 evidence*) confirmed Kaiser (*or someone*) lied to the FBI &/or US Attorneys office about the authentication of the Kaiser signatures (**which Berard confirmed, while surreptitiously recording himself for the FBI**).
   - These two frauds went unchecked despite their clear fabrications to obstruct justice and frame Kenner as a *FORGER*.

(*Propiedades DDM [Mexico]*) controlled by himself and his Mexico attorney, Fernando Garcia (*who was responsible for coordinating Kenner's 2010 Mexico "gun trafficking" apprehension with FBI agent Galioto and near-death torture in the Mexico jail*), Jowdy repaid some of the Hawai'i loan to Ula Makika in 2005, continuing the Jowdy Ponzi scheme on Kenner and Kenner investors prior to the 2006 Lehman Brothers closing in Cabo.   The Jowdy "*repayment*" occurred two (2) weeks after Jowdy and Garcia laundered the Stumpel funds thru a different Mexico account controlled by them (*unrelated to Kenner*).   Jowdy diverted another $500,000 from Stumpel into his personal interest in another Mexico deal (*the Cabo san Lucas Airport*), while it was intended for the DCSL acquisition.   The Government documents Jowdy's diversion (*which was part of another scheme by Jowdy and attorney Garcia, which robbed Kenner, Norstrom and Stumpel of over $1 million*) on *Forf-36*.[78]

Second, Stumpel made another deposit thru a newly established account of Kenner's, Ula Makika at Northern Trust Bank (*May 2005*).  100% of the funds in the **newly opened** Ula Makika account belonged to Stumpel in May 2005 and were completely distributed to Jowdy, **as Stumpel and Kenner intended**.   Kenner opened the personal account and LLC to run a separate *Kenner-only* business but the deal failed to materialize, as scheduled. Since it was opened, Kenner ultimately used the account for the Hawai'i LLCs; but only **AFTER** the remaining $550,000 (***totaling over Stumpel's $1 million in Baja Ventures 2006***) was deposited directly to a Jowdy Mexico account on May 17, 2005 and May 18, 2005, as intended and **never co-mingled**.

---

[78] In 2009, Norstrom, Kenner, Gaudet and Stumpel were forced to hire subsequent Mexico counsel to file a criminal and civil suit versus Jowdy when Kenner discovered thru the Cabo Airport Owner/Manager that Jowdy had **AGAIN** defrauded Kenner and Kenner investors with the Cabo Airport offering.  Jowdy and his Mexico attorney, Fernando Garcia (*the author of the* **FORGED** *Kenner documents in 2005 – See PK39, PK40*) secured the Kenner, Norstrom and Stumpel investment funds in their own LOR Management SA de CV (*Mexico company – which also received Stumpel's $1.6 million deposit on May 23, 2005 per Forf-36*) without the documented, real equity investors of over $1 million to date receiving any interest in the project.  *See PK121*.

This is another known fraud Kenner expressed to Galioto in June 2009, left unchecked, resulting in more loss at Jowdy's protected hands, despite the government contrarian rhetoric of "*no Jowdy crimes*" from opening remarks (*Tr.31*) thru rebuttal summation (*Tr.5990, 5991*).

Ironically, the Government produced another previously undisclosed document *(BRADY issue)* in their forfeiture materials *(page 2 of FORF-36)*.   The allegedly signed version of this document, which was produced by the Government in Rule 16 (*but somehow under a different font*), documenting the $550,000 that went from Ula Makika to Jowdy's Mexico Company, Propiedades DDM (*Mexico*), ***just as Kenner and Stumpel expected***.   In addition, there was ***no*** co-mingling of the $1.6 million of Stumpel funds that went to LOR (*Mexico*) represented in the Baja Ventures 2006 capital account.   There was also no co-mingling of Stumpel's $550,000 that went thru the Kenner, Ula Makika account, and immediately to Jowdy's Propiedades DDM (*Mexico*) account.   In fact, according to the Government records, the deposits received by Jowdy's various Mexico accounts were then immediately sent to the seller of the Cabo san Lucas property.   The only fraudulent activity was Jowdy's embezzlements and diversions of a portion of the funds and the miscalculation of the Baja Ventures 2006 capital account, missing about $1.6 million of Stumpel's money.   Jowdy was subsequently sued for those funds in Mexico by Stumpel, to which, Kaiser (*after being hired by Jowdy*), claimed that his name was forged on his Courthouse testimonial.   Ironically, as previously exposed to the government after their 2014 forgery representation about that same, particular document to the EDNY Court (*i.e. more Kaiser false statements to the FBI and US Attorneys office about untrue forgeries – 18 U.S.C. 1001*), the FBI obtained recordings with both Kaiser and Berard admitting to the authentic Kaiser signatures.   Nonetheless, the government ignored their known and lying witness (*Kaiser*) regarding forgeries (*Jowdy-style*) and proceeded with his false trial testimony about two (2) of the three (3) Constantine agreements (*which, by the way, Kaiser and Manfredi each told the FBI [Galioto] they were aware of in separate proffers "under oath"...pre-trial*).

Kenner, thru his various counsels in front of the Court, has requested the production of the "***original ink***" signature versions of the Propiedades DDM (*Mexico*) agreements with Little Isle 4 and Ula Makika that purportedly bear Kenner's signature on them. *See PK40, PK39*.   In fact, in 2005, when Jowdy and his Mexico attorney, Fernando Garcia, were trying to document the Stumpel deposits (*including their forging of Kenner signatures*),

they confirm that the two fabricated documents are:

"*made due to the Private Promissory contractual relationship executed between YOU* [Kenner] *and Propiedades DDM…*[Jowdy]*"*.

Thus, even in fabricated 2005 dated documents, Jowdy and Garcia **CONFIRMED** the 2004 Hawai'i loan contract.  *See R33 002*.  *No other contract* has ever been signed between the parties (*Jowdy and Hawai'i LLCs*) that they could be referring to; and certainly not by 2005.  **No other referenced private promissory agreement has EVER been produced by Jowdy or the Government**.  This was further evidence of Jowdy and Garcia's Hawai'i loan agreement *knowledge* at the time they actually fabricated these documents dated 2005 (*produced by Garcia and Jowdy for the 2009 Nolan arbitration*).

The Government has repeatedly ignored the Courts requests to produce these documents from Jowdy.   The document that Jowdy and Nolan utilized in the 2009 arbitration was rejected by the court as inauthentic after Kenner demanded the original (*with ink signature*) and clearly demonstrated that the signature was a forgery *as-is*, produced by Jowdy, Nolan, and Nolan's attorney (*to support some unknown diversion during the arbitration*).  In the arbitration, when Jowdy was asked' "*Why did you forward it?* [*to Nolan's attorney -- the Stumpel transfer document with Kenner's alleged signature*]", Jowdy responded, "*I was giving him* [Nolan's attorney] *information that I had that had to do with money underlined invested by Mr. Kenner.*"  Jowdy did not say loaned in 2009.   Thus, the Stumpel investment (*thru the Ula Makika deposits*) is confirmed as *accurate* by Jowdy, even while trying to mislead the 2009 arbitration, with some version of double-talk.  Even though Jowdy and Nolan's attorneys attempt to submit a clearly forged document to the 2009 arbitration panel, Jowdy confirmed that the funds were *not his* and belonged to Kenner (*and ended up in the Baja Ventures 2006 capital account – as Kenner and Stumpel expected*).   This was one (1) of the first two (2) occasions that Jowdy, Nolan, and Nolan's arbitration attorney tried to pass off FORGED documents as authentic and were caught red-handed (*See PK105 [2009 Stumpel affidavit], PK126 [Stumpel 2017*

*affidavit]*).[79]

At the same time in 2009, Jowdy was a defendant in the 2008 Arizona lawsuit filed by Little Isle 4 and Ula Makika alleging over $5 million of unpaid, documented loans (*by Jowdy, his accountants and attorneys*), *fully transparent*.   Jowdy and his attorneys, who included Tom Harvey and former FBI Director Louis Freeh (*supra*), asserted that the 2004 Hawai'i loan agreement was a ***forgery*,** in order to delay the discovery in the case, seeking expedited discovery solely to prove the lack of authenticity of the loan agreement.   They hired an FBI forensic expert (*in Rule 16 discovery*) who had seventeen (17) years of Forensic Science Managerial Experience in the FBI, paid for with additionally diverted Cabo san Lucas funds (*in Rule 16 discovery*), but received an unfavorable report about the Jowdy allegations, *to their collective chagrin*.

At the same time, Jowdy and his Mexico counsel stole documents from the criminal courts in Mexico -- and **FORGED a Mexico NOTARY STAMP** -- and **FORGED a Mexico NOTARY SIGNATURE** on the documents when they filed them in the Arizona case, *knowing they were forged and fabricated (another unchecked criminal act by Jowdy*

---

[79] Attorneys (*including Michael Meeks*), who were working hand-in-hand with Jowdy and Harvey in 2008, convinced Stumpel, while he was living in Astana, Kazakhstan, and away from his daily contacts and records, that Kenner had FORGED documents with his name on them to: 1) open accounts, 2) open LOCs, and 3) steal $2.5 million from him.  After a face-to-face meeting with Kenner and two other Mexico and Hawai'i investors (*Khristich and Woolley*) in northern Russia (*Nitzny Novgorod*), Stumpel made the following statements in his 2009 affidavit:

> In 2008, Myrick [*Kenner's former assistant, fired for cause, and for stealing all Kenner corporate records and data servers prior to March 2007*], her former attorney, Jennifer McGrath, and her current attorney, Michael Meeks, contacted me about Phil Kenner....Myrick and her attorney **coerced** my wife and I to file suit against Phil Kenner and **convinced us that Phil had "forged" documents to set up an account at Northern Trust Bank** in Arizona.   Myrick further suggested that Kenner had transferred $2,500,000 from one of my other investment accounts into the Northern Trust account and that he had stolen the money from me...**I later learned that I had been completely deceived** by Myrick, Jennifer McGrath and Michael Meeks.   In fact, **I learned that I NEVER even had a bank account at Northern Trust Bank** and therefore the basis of their claim was without any merit whatsoever.   I confirmed this information independently after meeting with Kenner and have determined definitively that Phil Kenner has never stolen any of my money.

124

*and his attorneys),* used to perpetrate another documented threat towards adverse-Jowdy parties *(Little Isle 4 attorneys).   See TIMELINE 004.*  These Mexican documents include the Kenner ORIGINAL (*authentic case filings @1*) and Jowdy's FORGED and altered criminal case documents (*another federal crime in Mexico; nonetheless submitted thru Perkins Coie as <u>authentic</u> in the Jowdy Arizona defense case; and a crime in the USA*), where Kenner and Kenner investors sued Jowdy criminally for the $10 million plus that was unaccounted for in the Cabo san Lucas deal from the unpaid Hawai'i loans and others (*loans and investments*).    The FORGED version and REAL version were produced by the Government in Rule 16, and ignored, despite being utilized by Jowdy's Arizona counsel in 2009 to threaten Kenner and the Hawai'i investor's attorneys in the case (*the threat letter <u>still</u> alleging the Hawai'i loans as FAKE [four (4) months before the January 2010 Jowdy California deposition confessions that the loans were **NOW REAL**] – See TIMELINE 002*)[80].

After Kenner gave statements in the 2009 re-filed Mexico criminal case versus Jowdy for the $10 million plus Jowdy received and left undocumented (*because Jowdy's attorneys paid to physically throw out the original filing as a favor from the Mexico Governor – See pictures @ 95-96*), Jowdy's attorneys claimed the "*loans*" testimony in Mexico AND the "*loans*" lawsuit in Arizona were criminal frauds by Kenner, and somehow in criminal contradiction by Kenner creating a fraud: [*See TIMELINE 004*]

> "*As you know, we just obtained a copy of Mr. Kenner's Mexican Criminal Complaint, and we have filed it with the Court in this [Arizona] case…*"

Due to the fact Kenner called the money "*loans*" in Mexico, Jowdy's attorneys claim that Kenner's "*loans*" lawsuit in the USA created a criminal conundrum for Kenner in the two (2) cases.   As such, Jowdy's Arizona attorneys threatened the Arizona case attorneys, as follows:

> "*in light of these new facts* [loans in Mexico alleged as fake, again] *that have come to light, we do not see how your firm can in good faith continue to represent*

---

[80] Original Arizona Little Isle 4 and Kenner investors Plaintiff attorney, Jon Dessaules, explained to Kenner after the Lake threat letter in September 2009 that he **NEEDED** to be released from the case by Kenner, because Louis Freeh had contacted the AZ judge personally and Dessaules could not afford to lose his career as a result of the Freeh intervention.

*Mr. Kenner in this matter without becoming complicit in Mr. Kenner's ongoing
criminal conduct."*

Since the Arizona attorneys representing the Hawai'i investors and their "*loans*" to Jowdy
knew that Louis Freeh was behind the Perkins Coie ongoing threats about Kenner
pursuing their 2008-09 representations of "*fake loans*" [*in spite of Jowdy's confession
four (4) months later during his January 2010 California depo and two (2) months after
that to the FBI*], they were terrified of the opposing threats and withdrew from the case.
The final straw was lobbed as:

> "*If plaintiffs fail to fulfill all the conditions* [dismissal of the Arizona "loans"
> lawsuit versus Jowdy] *of the offer by that date* [midnight September 11, 2009],
> *then it will be withdrawn and we will pursue our case aggressively to its
> successful conclusion, and we will from that point forward seek sanctions against
> all the Plaintiffs and <u>also against you and your firm</u> (if you elect to continue your
> representation of Plaintiffs despite the proof of Mr. Kenner's fraud)."*

- **Kenner's alleged <u>FRAUD</u> was calling the $5 million Jowdy received from
  Hawai'i, "loans".** *(See Forf-44)*

Only three (3) weeks after the suspicious dismissal *WITH PREJUDICE* in the Arizona
case to Jowdy's favor, Jowdy confirmed in his January 5th and 6th, 2010 deposition that he
and his Mexico attorneys were filing criminal complaints versus Kenner in Mexico to
have Kenner arrested for claiming the funds were "*loans*" as a fraud versus Jowdy, in the
same deposition he now confessed to all of the loans (*@521 of Jowdy's California
deposition*) in complete and unceasing contradiction:

> *Q: And are you aware of any investigations against Philip Kenner…in Mexico?
> A [Jowdy]: I'm aware that Phil Kenner filed an action against me that is no
> longer active, and we are pursuing the fact that we believe he perjured himself in
> those accusations.*

To further the "*say anything under FBI protection, anywhere, at any time*" approach by
Jowdy and his attorneys, one (1) year after Jowdy and his attorneys <u>lied</u> to the FBI and
the Arizona Federal courts about the alleged FORGERY (*of the 2004 Hawai'i loan
agreement*), Jowdy and his attorney **admitted** the 2004 Hawai'i loan document as
**authentic** in December 2010 as Jowdy's primary defense exhibit (*thru document witness,*

*Robert Gaudet's testimony – See R33 011*).   The presentation of the **fake documents** (*from Mexico*) and the allegations of repeated **forgeries** were Jowdy's defense tactics to get the Arizona case dismissed and run from every known loan received from Kenner and Kenner investors (*both personally and from the Hawai'i investors*) once sued by the informed and collective group of Hawai'i and Mexico investors.[81]  As previously noted,

---

[81] In 2012 -- when Kenner (*Ranford, Lehtinen, Nash, Khristich, and Sydor in 2013 as Interveners brought in the case by Kenner*) sued Kaiser and Berard in Arizona [***cv2012-055576***] for the fraudulent conveyance of the AZ property title (*by Kaiser and Berard from Kenner*) and the refusal to repay the five (5) Promissory notes (*all signed by Kaiser*), Kaiser and Berard called the five (5) notes *forgeries – while sharing an attorney with Jowdy in Arizona*.  (*See R33 055e*) Kaiser and Berard lost their forgery defense in a 2015 contemporaneous Arizona trial once their *forgery* claims proven false by more empirical evidence Kenner provided to the Plaintiffs (*interveners*) attorney for trial, *specifically including* <u>Kaiser's own confirmation emails</u> (**verifying more Kaiser lies about forgeries**).

The same attorneys represented Kaiser and Berard that Jowdy and Harvey hired to discredit Kenner in Arizona with the 2008-09-loan case (*after falsely claiming forgeries as their defense tactic*).   In that same Arizona case, Berard and his best friend Lanie Donlan (*2015 "tracing" witness*) also tried to claim a *forgery* on the Arizona court but were caught as fraudsters in the judges ruling, even without Kenner's testimony and the most damning text messages confirming their authentic notarization and signatures.  *See Point I @ 27-28 (Berard's AZ deposition testimony), Point III @ 43-46.*

Once Kaiser and Berard were aligned with Jowdy, Harvey and Galioto, their *forgery* defenses developed as defendants in the 2012 AZ lawsuit, the 2013 Sag Harbor lawsuit (*documents again forged and fabricated by Kaiser and Berard*) and Kaiser's 2012-13 fraudulent Mexico testimonies alleging another *forgery* of his name to help dismiss another million-dollar Stumpel loan case versus Jowdy (*now, proven false by Berard's own FBI recordings*).

The alleged Mexico forgery was originally (*in 2014*) represented by the government to the EDNY Court as a *forgery*, which they intended to use at trial.

Once Kenner told his attorney (*Haley*) pre-trial about the Berard confessions on his own FBI recordings, Kenner's attorney informed the prosecution that they were going to impeach Berard and Kaiser with their own FBI recordings, **without saving it for the trial**.   The exposure of trial strategy from Kenner's attorney to the AUSA was one of the early Benedict Arnold issues (*amongst several significant defense strategy disclosures*) that caused great strife between Kenner and his trial counsel.   Nonetheless, Kaiser and Berard showed no limits to their *forgery* lies (*like Jowdy*), under Galioto's protection.  *See Point III @ 177-178 (Berard's recorded admissions of authenticity).*

Berard continued his *forgery* claims in the EDNY until he received vehement motioning from Komatireddy at the prosecutions table (*caught red-handed*) and quickly reversed his forgery claim (*related to the July 2006 Hawai'i JV disclosure letter*), as follows (*Tr.3231-3233*):

all of the Mexico and Hawai'i investors (*including Berard*) **participated** in the Arizona and California cases, seeking the repayment of the Hawai'i loans from Jowdy.  The Arizona Plaintiffs signed and initialed every page of their attorney, Tom Baker's 8-page, Little Isle 4 disclosure letter, *thus not only a single signature page*.  *See R33 A [New Evidence issue]*.  Jowdy and his counsel's lies to the FBI and the Arizona Federal courts have gone unchecked to the detriment of Kenner and Kenner investors, since the filing of the first litigation in 2008 (*in the USA and Mexico*), a year before the Constantine inception of the GSF.

Before the 2015 trial, the Government knew about the false Jowdy 2008-09 forgery claims (*in the Arizona case*), his lies to the FBI about the Hawai'i loan document (*in Arizona*), and Jowdy's reversed position one (1) year later in the December 2010 Nevada case (*after telling an FBI agent and the Arizona Federal court that the document was a forgery to get out of his Arizona case, as his defense*).   Jowdy lost a $1 million judgment in the Nevada case for another re-negged loan (*to Glen Murray*), which he tried to avoid paying and after being sued.  One (1) year after being sued, Jowdy and Harvey tried to blame the unpaid loan on Kenner, citing new knowledge in their 3rd party complaint versus Kenner.   Jowdy lost his 3rd party claim versus Kenner (*with Kenner in ProSe at the 2010, 4-day bench trial*) claiming, "**Kenner really got the money, not Jowdy**".  *See R33 015*.

These "**Kenner really got the money, not Jowdy**" claims echo the Government's pre-trial

---

*Q: ...Does it say that?*
**A: That says that, yes.   I already know I did not sign that document.**
*Q: Sorry?*
**A: I did not sign this document.**
*Q:  I thought you said that is your signature?*
*A:  Next to it, print name.  That's not my handwriting that says Bryan Berard.*
*Q:  My recollection of your testimony yesterday, I pointed that out to you, that you did not handwrite the Bryan Berard and Bryan Berard appears to be up here.   But this is your signature?*
**A:  That's my signature.  Yes, that's my signature.**

128

claims to the alleged victims and precede FBI Agent Galioto's same post conviction claims to the unknowing investors about the money Jowdy 100% received, *at all times*.

Post-trial, Kenner received a message stating from one (1) of the related investors' camps, "***They want to know where their fucking money is!***" confirming that the investors were told by Galioto that Kenner "*was convicted of stealing all of their Hawai'i funds that the investors thought went to Jowdy, and he* [Galioto] *and the FBI cannot find where the money is*".   Galioto and the Court know that Jowdy received all of the funds.

In the Court's ruling to the Kenner Rule 33 motion, the court confirmed its presumption that Jowdy received the Hawai'i funds thru a *bona fide* agreement (*specifically confirmed by Jowdy to the FBI [See R33 rebuttal 002 -- 3500-KJ-2 @ 12-14] and in Jowdy's January 2010, 2-day California deposition*), and has simply chosen not to repay any of the loans, thru his own, bold admission.   Not one of the investors (*other than those in communication with Kenner post-trial*) are aware of the truth (*that Jowdy **has** all of the funds from Hawai'i thru the 2004 loan agreement – See R33 002*) as Kenner relayed to Kristen Peca on her FBI recorded calls in 2012 when she confirmed that "***nothing***" she had heard from the FBI agents, Kaiser and Berard was true in 2012, which still resonates accurately today.   The only contradiction in information emanates from Kristen Peca's 2012 claim that she and her husband, Mike Peca, were specifically told by Galioto, Berard and Kaiser that a Kenner conviction at trial or plea deal would guarantee an immediate return their funds which Kenner claimed Jowdy received (*insinuating Jowdy didn't get them – wholly false and entirely documented in Rule 16 evidence*).   Kenner offered Kristen Peca the banking evidence on the phone call, plainly proving Jowdy received all of their funds (*and all others – with none to Kenner*), but she stated she was too confused to follow the bank statements with all of the evidence that would contradict the false narrative by Galioto, Kaiser and Berard, all intended to protect Jowdy's criminal activity for over a decade at that time.   Kristen Peca reiterated that she just wanted her money back that she learned about in 2008 "*while in Ohio*" (*not 2005 like she perjured herself in the 2015 trial testimony*).

It was Kenner who immediately exposed the Jowdy embezzlement plans in early 2007, as soon as it was fully discovered by Kenner and Gaudet (*in Mexico*).   It would have proven suicidal for Kenner to expose himself to all the Jowdy distributions from Hawai'i in 2007 and initiate the fully documented Arizona litigation (*in the Complaint*) in 2008 (*and California in 2009*) if Kenner was part of a scheme to illegally divert funds to Jowdy, without investor knowledge, regardless, ***clearly without any benefit to himself***.

The Court should note that Kenner's actions were duplicated in 2010, as soon as Stolper's investigation team (*hired by Gaarn – thus not Kenner's puppet*) notified Kenner 2-months into their secret investigation, that Constantine, Eufora and all of their transactions were under their investigation.    Again in 2010, Kenner led the disclosure efforts from that point forward to the entire investor group about each and every known Eufora activity; including the immediate disclosure of the August 2010 Home Depot recording with the salacious Constantine allegations (*since Kenner knew all of them to be untrue and simply another well-documented Constantine threat, perhaps learned from the years of fighting with Jowdy and Harvey*).[82]

---

[82] Constantine's veil threats were as varied to confuse the Eufora victims pursuing him as Jowdy used for "**loans**" – "**no loans**" – "**loans**" (*with Kenner under criminal investigation by Jowdy's people in Mexico for lying about the "**loans**" – prior to Jowdy's own FBI confessions in 2010 that they "**were loans**", just prior to Kenner's 2010 jailhouse beatings in Mexico*).

In concert with Constantine's false dissemination of claims regarding Kenner and the Gaarn 2008-09 private stock sales (*in Constantine's 2010 attorneys letter [represented and responded to by Stolper in his reply to the AZ Eufora Partners I investors and Constantine @ Ex. 1 -- Stolper letter to Eufora investors (July 16, 2010) (C37 at trial)]*), Constantine's false Home Depot claims, and Constantine's follow-up conference call misrepresentations [*See R33 433 @5-7*]), **Constantine changed his story again** (*with more outrageous and proven lies*) in his FBI recorded call with Nick Privitello in 2012.   Constantine claimed the $700,000 from the Gaarn sales ended up in Mexico for Kenner "*for G-d knows...what*".   Considering **none of the funds went to Mexico**.  Over $100,000 went to John Kaiser directly from Gaarn as personal loans (*unrelated to Kenner and documented by Kaiser-Gaarn texts – in Rule 16 evidence*).

Constantine's own texts proved he was in communication with Gaarn about the Gaarn sales and wanted to discuss his own friends' desires to buy the Gaarn stock instead of Kenner clients (*See R33 433*), **which Gaarn declined**.  Plus, Gaarn retained over $100,000 of the funds (*since they were his funds after the private sales*), and the balance that Kenner received is supported by a Promissory note between Kenner and Gaarn for any overage *after* Gaarn repaid Kenner the $150,000 plus (*including interest*) from the documented 2007-2008 loans

After all of the 2008-2010 flip-flopping of facts and allegations by Jowdy, Nolan, Juneau, Moreau and their collective attorneys to confuse the other Jowdy investors and allege Kenner had _all_ of the investment funds from Hawai'i that were deposited into 100% Jowdy controlled accounts (*specifically including Jowdy's Baja Development Corp – which the Government claimed during pre-trial belonged to Kenner [to assist in denying bail] and one time later belonging to Jowdy's brother [Taffy Jr.] – both of which they knew were false from Jowdy's January 2010 deposition and his March 2010 FBI proffer - - See R33 rebuttal 002 -- 3500-KJ-2 [page 2]*), it would be nearly impossible for a Court &/or the investors to parse out the truth; **notwithstanding the fact that the Government pre-trial had and IGNORED**:

---

(*which Gaarn confirmed at trial*).   Nonetheless, Constantine claimed on the FBI recording by Privitello –

   1) @2.36.40 -- Constantine claimed he was not in charge of the GSF and says Ronald Richards can confirm that to Privitello (*despite court stipulations by Constantine and Ronald Richards' contradicting testimony in 2015*).

   2) @22.50 – "*Kenner convinced the investors to re-buy the interest* [another false claim] *and $700,000 went to Tim Gaarn and $700,000 went to Mexico and G-d knows where and what for.*"   BUT -- **None went to Mexico.**

   3) @36.30 & @1.20.40 & @1.34.12 & @1.41.20 & @1.46.45 & @2.04.10 -- Constantine claimed the money received from Kenner ("*Grocery list loans*") were to pay him for the Hawai'i consulting [*another false claim – as paid in full in 2004-2006*] – with the Hawai'i banking records for Little Isle 4 and Ula Makika confirming the million plus Constantine received specifically according to his consulting agreements (*also confirmed by Kaiser in his October 2010 FBI proffer to Galioto*), separate and apart from the approximate $1.5 million Constantine received from Kenner's personal accounts ("*Grocery list loans*") when directly transferred to a desperate Constantine (*in 2007-2008 – with a multitude of confirmation texts in Rule 16 evidence – specifically in Kenner's 2013 adverse proceeding in Constantine Arizona bankruptcy filing – See 148 @ paragraph 16-17 @ 7-9*).

   Please note that Kaiser did not file an adverse proceeding, in spite of his perjurious claims in 2015 that Kenner allegedly told him the "*grocery list funds*" belonged to him "*worth millions*" and were forwarded to Constantine.   Kenner also hi-lighted the Constantine frauds on the bankruptcy court  (*and Kenner investor's 2008 private stock purchases from Constantine &/or Constantine Management Group*) related to the timing of his Eufora shares he tried to hide from Kenner with an implausible and unfeasible timeline transfer nearly ten (10) years _prior_ to another person. *See TIMELINE 037 @ 2-7 [paragraphs 6-15].*

131

- 100% of the records proving the **authenticity of the 2004 Hawai'i loan agreement** (*See R33 002*) between Jowdy and the Hawai'i LLCs (*December 2010 Nevada trial authentication and admission by Jowdy's attorneys -- See R33 011*),

- The 2009 Kaiser and Berard voluntary arbitration testimony that they were 100% **aware of the loans to Jowdy** and **agreed** with them (*See R33 556, R33 311*),

- The 2010 Kaiser FBI proffer confirming 5-6 meetings with Jowdy (***mostly before the initiation of the 2004 loans***) to discuss the merits of the Jowdy loan proposal (*See PK27* -- 3500-JK-1-r),

- The 2008-09 AZ lawsuit with 19 Little Isle 4 Hawai'i investors **signing** and **initialing** their 8-page, independent attorney's disclosure about the Complaint basis of the "*loans to Jowdy*" from the Hawai'i LLCs (*See R33 A @1*),

- The two (2) 2009 California lawsuits versus Jowdy for the Diamante del Mar and Diamante Cabo projects signed off thru independent plaintiffs' counsel, *specifically highlighting the $8,000,000 in unpaid loans to Jowdy from the Hawai'i LLCs* (*See TIMELINE 071 @7, TIMELINE 072 @7*),

- The July 2, 2009 Kenner EXTORTION lawsuit in California versus Tom Harvey and Jowdy (*TIMELINE 063*) for alleging Kenner would "*go to jail at the hands of the FBI*" **BECAUSE** Kenner claimed the millions Jowdy received from Hawai'i were "*loans*" (*TIMELINE 007*) unless Kenner turned over his Mexico properties,

- The 2009 Stumpel, 2009 Norstrom and 2009 Gonchar affidavits from the 2009 arbitration case confirming their knowledge of the Hawai'i loans and full project disclosures from Kenner (*See PK105 [2009 Stumpel affidavit], R33 035 [Norstrom], TIMELINE 036 [Gonchar]*),

- The 2010 Gonchar FBI proffer confirming that he knew about the Hawai'i loans to Jowdy from **BOTH** Kenner (*prior*) and Jowdy (*during*) independently (*See PK106 -- 3500-SG-2 @ 8-9*),

- The 2011 SDNY Grand Jury testimony from Mike Peca[83] (*See R33 419*) as Peca

---

[83] Please note that Kristen Peca gave testimony in the 2015 proceeding about her "vast" knowledge of the Peca family investments that they decided "*together*".  BUT -- Kristen Peca was **never** a client of Kenner or Kenner's firm; **never**.  *Only Mike Peca was Kenner's client.*

Kristen Peca surreptitiously recorded Kenner for the FBI for over four (4) hours in July 2012.  During those 2012 calls, Kristen Peca told Kenner that she was **NOT AWARE** that the Northern Trust LOC was even open by her husband until she was living in Ohio in 2008-09 (*four [4] years later*).  By this time, there were already multiple lawsuits in Arizona and Mexico versus Jowdy for the unpaid loans to Jowdy from the Hawai'i LLCs, *participated in by her husband*.  As a result, it would be logistically impossible for Kristen Peca to have given truthful testimony about her 2005 knowledge of the Hawai'i LOC loans to Jowdy, considering she was never part of the conversations she alleged about her "*baby*" in 2005 (*Tr. 697-698*).  In her own words, she was not aware of the LOC until about five (5) years later (*supra @ footnote 67*).  *See Point III @ 189-190*.

On the 2012 recorded phone call with Kenner -- Kristen Peca _also_ had **"no memory of LOC renewals signed by Mike Peca" –**

(@ About 2:11.40) – July 2012 recordings between Kristen Peca and Kenner –

> **_Kenner_** – What I can tell you is that you guys signed 5 or 6 annual renewals on that deal, and the only reason we are having this conversation, Kristen, the only reason, is because Ken Jowdy defrauded us and didn't pay us the money back.  And the guys from Lehman Brothers helped Alan Worden not pay us the $4mm (_MILESTONES_).  That's nine and a half million dollars (_$9.5mm_) that should have been paid back to the group in Hawai'i, which is far in excess…

> **_Kristen Peca_** – I understand that explanation.   I do.   But, if renewals had to be signed, **_which I don't remember signing them_**, **_maybe Michael did_**, **_maybe you did as Power of Attorney_**, obviously…

> **_Kenner -- Nope, I never did as Power of Attorney.   You guys signed them all_**.

> **_Kristen Peca_** – OK.   Well, if we had to sign them, _which I do not remember doing_, I'm not saying we didn't, we signed a ton of papers for you…

Even if Kristen Peca was told _something_ in 2005 about a "_6-month loan period_" by her husband _at that time_ (**but certainly not Kenner**) (_Tr.697_), she may have referenced the fact that in concert with the Stevenson and Sydor 2011 SDNY Grand Jury testimonies and the _2017 Jozef Stumpel affidavit (See PK126)_, the group took about six (6) months to decide in 2004 through a series of Hawai'i **conference calls** and **Kaiser's independent meetings with Jowdy** starting in 2003 in NYC (_See PK27_) to agree to begin lending funds to Jowdy from the Hawai'i LLCs.   The 2004 Hawai'i loan agreement (_See R33 002_) acknowledged the original verbal agreement with Jowdy at the beginning of July 2004 to consider the loan arrangement.   The first extension of funds (_$15,000_) to Jowdy occurred October 29, 2004 (_five [5] months later_).

> The 2004 Hawai'i loan agreement states, "**_Pursuant to the verbal agreement of July 9, 2004…_**"

Nevertheless, Kristen Peca told Kenner in July 2012 on the FBI recordings (_unknown to Kenner_) that she did not even know her husband signed LOC documents until 2008 at the earliest, stating, "**_the line of credit, that happened when we were in Ohio_**".   Thus, as Kenner proclaimed in the Rule 33 submission to the Court, Kristen Peca (_like all of the other wives and girlfriends, except Diana Nolan_) were never considered Kenner clients, nor were they included in regular meetings with Kenner and his clients away from their homes. Kristen Peca chose to fabricate her LOC story about her "_baby_" anyhow…What Kristen Peca knew about any investment was her husband's business to disclose (_if he wanted to_); **not Kenner's**.

Kristen Peca also confirmed on the 2012 calls that she learned about the LOC default from a "**_statement in the mail_**" (_See Point III @ 186-187_) and the account was "**_emptied out_**" which could not have been until after six (6) specific events (_neither of which fit the DEFAULT LETTER language_).   These events were:

133

1. ***After*** Mike Peca received the notification of the DEFAULT letter sent by Northern Trust in February 2009 (*See Point III @ 21, 49*) (*concealed by Mike Peca from his wife*),

2. ***After*** Mike Peca spoke on the phone with Northern Trust to APPROVE the seizure on April 1, 2009 (*See Point III @ 20*),

3. ***After*** Mike Peca signed off on the transfer of funds (*post seizure of collateral*) pursuant to his Northern Trust IMUS account agreement (*1-page document including signature, same as all Northern Trust LOC clients*) (*See Ex. Z35 -- Peca Northern Trust IMUS Agmt with fund transfer restrictions*),

4. ***After*** Mike Peca and Kenner communication May 1, 2009 via text confirmed the legal efforts to get Jowdy to repay the Hawai'i loans that comprised the **Peca Hawai'i capital account** (*See Point III @ 190-191*), just as Peca confirmed to the SDNY Grand Jury in 2011 (*See R33 419, R33 652*),

5. ***After*** the Mike Peca and Kenner communication via text that confirmed Kristen Peca was ***not aware*** of the default five (5) weeks after the 2 DEFAULT letters with Mike Peca confirming she would "**f'n loose it**" on 5-1-2009, **IF** she saw the email from Northern Trust with the loan paid off (*which he never told her about – nor did Mike Peca confront Kenner in March 2009 per Kristen Peca's testimony*), *See Point III @ 21, 26, 188,* and

6. ***After*** the GSF meeting in her Ohio living room -- considering the "*EMPTIED STATEMENT*" would not have been sent to them (@ *their Buffalo NY address, <u>not</u> Ohio address*) until after the end of April 2009, when the account was emptied via Mike Peca's multiple signature authorizations in April and May 2009, ***required*** by the bank (*See Ex. Z35 -- Peca Northern Trust IMUS Agmt with fund transfer restrictions*),

   a. Thus, Kristen Peca could <u>*not*</u> have been "***mad at him [Phil]***" (*Tr.716-717*) during the GSF meeting about the EMPTIED OUT ACCOUNT, which she professed in her own recorded words were from the statement that was "***EMPTIED OUT*** – <u>*NOT THE DEFAULT LETTERS. See Point III @ 186-187.*</u>

   b. In fact, Mike Peca confirmed to Kenner via text that the Northern Trust statements were in his Buffalo NY post office a few weeks after the GSF meeting in Ohio, after the Pecas got home to Buffalo for the summer (*See Point III @ 192*), ***further confirming and closing any rebuttal to Kristen Peca's grossly fabricated trial perjury***.

❖ This fabrication is commensurately contrived along with Kristen Peca's 2015 testimony that she somehow received a DEFAULT Letter, ***signed for it*** (*required by FedEx &/or certified USPO mail*), <u>*forgetting*</u> (*or more likely ignoring*) that she was living in Ohio with her husband in 2009 in Ohio, when the Northern Trust certified letter (*Tr. 887-888, 897*) was sent to Peca's summer home in Buffalo, NY, making her testimony also logistically impossible (*including the "SHOCK[ED]" incident she described "with tears" after allegedly signing for this <u>default letter</u> delivered to a <u>different city and state</u> than where she was living with her husband –Tr.709-711*). *See Point III @ 189*.

   o Aaron Mascarella testified at trial that a few of the documents were returned to Northern Trust undelivered. *Tr.898-900*.

confirmed "*the group*" made the loan to Jowdy by stating, "*We made a short-term loan until the lending* [Lehman Brothers] *came in.*" and when the lending was not repaid, Peca told the Grand Jury, "*That was kind of the whole sticking point as far as me and the other guys with Mr. Jowdy.*"  Peca acknowledged the **Hawai'i group's understanding** of the loan.   Peca went on to confirm, "*The capital account* [his $1.8 million Hawai'i investment] *was loaned to Ken Jowdy, our business partner, so there is no need at the time to be worried about anything.*"

- o Clearly, Peca is describing the loan to Jowdy in the ***present tense*** of exactly when the loan was occurring "***at the time***" and NOT, "*Uhh, when we found out about it years after the fact*" (*like he specifically contradicted with recently fabricated testimony four [4] years later to the EDNY Court (emphasis added)*).  Peca later verified to the SDNY Grand Jury his knowledge of **why** the money was loaned to Jowdy "*at the time*".

- Peca's confirmations to the SDNY Grand Jury, "*That money was loaned to Ken Jowdy to basically help some of the purchase of the Cabo property so we can get the funding.   And then it was supposed to be a short-term loan*".   Please note that the lending was almost all prior to June 2005 (*covering 7 months of lending – November 2004 thru June 2005*), considering Jowdy independently confirmed the

---

On June 28, 2009, Kenner sent an email to Kristen and Mike Peca to get them together with John Kaiser, the Managing Member of Na'alehu Ventures 2006. *See PK117 -- EDNY issues 110*.  This was 1-½ months after the Peca GSF meeting, where Kristen Peca falsely claimed she was aware of the LOC collateral loss and "*mad at Phil*".  (*Proven false -- supra*).

This would have been only three (3) months after the "*SHOCK[ED]*" incident where Kenner allegedly defrauded Kristen Peca out of her "*baby*" (*also proven logistically impossible – supra*).  With Kaiser as the Managing Member of Na'alehu Ventures 2006, he could have sued Kenner civilly or sought FBI intervention criminally, easily as a former NY Police officer, if Kaiser believed that Kenner defrauded them, or anyone (***after meeting with the Pecas face-to-face*** *– in Rule 16 evidence; which includes Kenner arranging the meeting and paying for Kaiser's plane ticket*).  Instead, Kaiser had given his full disclosure to the 2009 arbitration less than a month earlier (*May 30, 2009*), confirming:

> *Q: Has this ever been a secret that Mr. Kenner lent this money to Mr. Jowdy?*
>
> *A: **No.***
>
> *Q: Was this a transaction that, as you view as an investor was open and disclosed to everyone?*
>
> *A: **It was open.   There was no secret handshakes or nothing like that.***

135

**$6,500,000** Cabo deposit funds were the "*Amount paid to date*" [*10% of the original $65 million purchase agreement*]. *See TIMELINE 032*.  At no point during his 2011 testimony did Peca claim he learned at some later date about the loan to Jowdy.

    a.  In fact, the timing of the Jowdy loan distributions "*as Peca described to the SDNY Grand Jury*" (*supra*) versus the timing of the Peca LOC setup and inclusion in the Hawai'i LLCs leaves no time for Peca to not know about the loans, as he signed off on the entire use of his LOC within the same few months that the loan was sent to Jowdy as he specified to the SDNY Grand Jury (*supra*).

        i.  Jowdy (*supra*) confirmed to a prospective JV partner (*Boyd*) that the $6,500,000 full deposit was "*paid in full*" before his July 31, 2005 email to Boyd (*See TIMELINE 032*).

        ii.  Peca *signed* his LOC initiating **Letter of Authorization** for Little Isle 4 with Northern Trust for the use of his LOC on March 11, 2005 (*3 ½ months before the Jowdy email confirms full deposit, contemporaneous with Peca's testimony to the SDNY Grand Jury March 29, 2011*).[84]

---

[84] The **Letter of Authorization** *signed* by **Mike Peca and every other LOC client** of Northern Trust Bank fully "*authorized Philip A. Kenner to transfer funds to the Little Isle 4 account*".  Once the authorized funds were in the Little Isle 4 account, the Little Isle 4 By-Laws governed the use of funds (*See TIMELINE 046*).  There was no additional agreement between Kenner and Peca (*or any other Hawai'i partner*) that required *further individual authorization* to discuss the specific usage of the LOC funds or the timing of the withdrawals, once they were *transferred as authorized* to Little Isle 4's capital account (*exactly as Peca told the SDNY Grand Jury he expected*).

    •  Peca and Sydor like the other clients knew their funds would be used as the Little Isle 4 and Northern Trust documents mandated and authorized.  They knew their funds from the LOC belonged to their Little Isle 4 capital accounts, and not them (*See R33 467f, 419*) as they *specifically told the SDNY Grand Jury in 2011*.

All of the government questions and witness testimony about the "*specific transfers and use of funds*" knowledge was completely misleading, since the transfers to Little Isle 4 (*and the compliance and use of the resulting funds*) were uses in accordance with the purpose of the Little Isle 4 LLC, clearly outlined in the Little Isle 4 By-Laws (*supra*).  **Similarly, there were 100s of transactions that the individual Hawai'i investors could not have identified**. Kenner was the Managing Member and in charge of those decisions per the agreements.  In 2006, Peca received his resulting increase in equity from Na'alehu Ventures 2006 (*documented by Managing Member John Kaiser*) for his incremental contributions after the August 2006 Lehman Brothers JV closing.

The Little Isle 4 By-Laws specifically stated:

      **Article II. Purpose**

Little Isle 4 is an organized group of investors established to invest in a series of opportunities review by the Managing Member [Kenner] and deemed to be in the best interest of the partnership at all times.

At the sole discretion of the Managing Member, Little Isle 4, LLC, may participate as a lender if deemed by the Managing Member to be in the best interest of the LLC.

**Article VI. Qualifications of the Managing Member.**
*Section 2.* The Managing Member is responsible for the day-to-day administration of Little Isle 4, LLC.

*Section 3.* The responsibilities of the Managing Member shall include; addressing any issues that may arise in the LLC, settling any grievances of the members of the LLC...

*Section 5.* The Managing Member, at their sole discretion, can compensate any and all members and non-members for their role in the LLC, including but not exclusive to the Managing Member.

**Article VII. Projects**
...The Managing Member, at their sole discretion, can engage in outside ventures deemed to be in the best interest of the LLC, including but not limited to Private Equity Funds and Lending opportunities.

Kenner's actions to buy land, administer the companies day-to-day operations, and loan funds (*to Jowdy or anyone*), etcetera, were appropriate under the authorities granted in the Little Isle 4 By-Laws.  This included Kenner's efforts to settle the 2006 "*issues*" with Manfredi and Kaiser independently at the time of the proposed JV closing with Windwalker and Lehman Brothers; agreeing to pay Manfredi **$172,000** (*$180,000 minus $8,000 discovered in 2006 that he stole on the company credit cards – in Rule 16 evidence*).  It also allowed Kenner as Managing Member to forgive Manfredi's **$100,000** advance he received in July 2005.   It also included making the short-term (*11-day*) $395,000 loan to Kaiser for his Sag Harbor project (*funds originating from the Peca LOC **but belonging** at all times to Little Isle 4 per Peca's own SDNY Grand Jury testimony -- supra*).

As part of the deal with Kaiser to obtain his signature approval for the JV, Kaiser also received a FULL REPAYMENT of **$1.176 million** due at the time of the closing (*from his 2005 friends & family deposits*), in spite of the false Kaiser claims of "*other funds*" due to him for *back pay* (*with nothing filed with the IRS to prove it*) or *expenses* (*Tr.988*).  Kaiser defrauded his friends & family by withholding the repayment for personal use in other deals. *See PK50 -- R33 549*.  Kaiser was already receiving a $10,000 per month stipend at his request at that time (*pre-JV*), represented in the Hawai'i bank account records.  *Kaiser did not and could not produce even $10,000 worth of alleged expenses due to him at the time of the JV closing*.  Even **Chris Manfredi** told the FBI in 2010 in his proffer (*See R33 2006 @2*) that after Kaiser made a $1,000 deposit in 2002, he was *not sure* if Kaiser had any additional funds in the deal.  This -- **ALSO** --  fully contradicted Kaiser's alleged "**confrontation**" meeting in 2006 about the $1 million deposit in 2005 (*Tr.982-984*) going to Mexico unknown to Kaiser (*also grossly contradicting his own 2009 arbitration testimony – See R33 556*).   Clearly the $1 million friends & family deposit in 2005 was unknown to Manfredi (*thru his own October 2010 FBI proffer*), thus fully contradicting more Kaiser contrived testimony in 2015 to cover his own frauds (*like Berard and Jowdy*).

137

At the time of the JV closing in August 2006, Kenner left his entire capital account in the Hawai'i deal (*while entitled to over $200,000 commensurate with the approximate 42% capital account payoffs to every other investor under Na'alehu Ventures 2006*).

- *Please note that ONLY Kaiser received a benefit from the $395,000 short-term loan, since "Kenner's role in Sag Harbor [LedBetter] deal would be to raise money to build the property"; per the FBI proffer notes taken by IRS agent Wayne and Galioto, from LedBetter partner, Vincent Tesoriero (See R33 2005 @ paragraph 8).*

- *The confirmation that the $395,000 was solely for Kaiser's benefit (not Kenner's) came after Tesoriero also proffered that "Kaiser told Tesoriero that they needed to get Manfredi out of the Sag Harbor deal and that Phil Kenner and Bryan Berard were coming in the deal", further <u>contradicting</u> Kaiser's lies at trial about the removal of Manfredi, the transfer details to the new LedBetter LLC, and no alleged knowledge of Berard's involvement until much later.*

  - *Tesoriero, who proffered in 2014 after Kenner was indicted and arrested, was Kaiser's training officer at the NY Police academy over twenty (20) years prior and had no existing relationship with Kenner, further accentuating the weight of the Kaiser-adverse confirmations by Tesoriero to the FBI pre-trial, yet Kaiser's contradicting lies were allowed to stand uncorrected.*

  - *When Kaiser and Berard **FORGED** Kenner's girl-friend's name on the LedBetter operating agreement in April 2011 (See R33 308), replacing Kenner who managed the LLC (See R33 055d), Kaiser and Berard <u>sold</u> and <u>stole</u> the Sag Harbor property without Kenner's knowledge.   They kept 100% of the funds from Kenner; in spite of Kenner's equity contributions (in Rule 16 evidence @ BNK-MM-00215 et. al).   Kenner sued Kaiser and Berard in 2013 in an Arizona civil court [cv2013-052349] for the forgery and theft frauds.*

  - ***Their collective defense was that Kaiser and Berard had all of the funds in the deal; further documenting in their own words that the $395,000 loan was for Kaiser, and not Kenner.***
    - *Notes taken from Kenner's home (under search and seizure) represented the $395,000 transfer to LedBetter for Kaiser and Kenner's <u>lis pendens</u> on the Sag Harbor property until the loan was repaid to Na'alehu Ventures 2006; which it was 11-days later, as planned) (See PK107 -- FORF_EXH_134).*

Without either of these Hawai'i pre-JV signature deals (*with Kaiser and Manfredi*), and many others at the time of the JV, *approval signatures* for the buyout deal would not have been granted by Lehman Brothers, thus cancelling the entire JV for the group, resulting in the immediate loss of millions to the group (*from expiring land deposits*) in lieu of the negotiated $7 million payout from Lehman Brothers and the $4 million in MILESTONE payments (*due within 18 months of the August 2006 closing – although unpaid as part of the unpaid Lehman Brothers/Windwalker frauds after the conclusion of the JV – and subsequent non-actions by Kaiser once employed by Jowdy*).

138

Also, "Section 5" (*supra*) of the Little Isle 4 By-Laws further authorized Kenner to pay
outside consultants.  The Constantine agreements (*represented by Government agent
Petrellese @ Tr. 3934 as paid and totaling $1,000,900*), <u>was authorized</u>.   Constantine actually
delivered the $3.5 million Urban Expansion loan (*in October 2005*), when Manfredi, Kaiser
and Kenner were in a bind following the "*egregious*" final offer by Lehman Brothers in 2005,
forcing Manfredi, Kenner and Kaiser to walk away from Lehman Brothers' un-signable deal.

Manfredi independently confirmed that the Lehman Brothers 2005 deal was "*egregious*"
and <u>not</u> part of a scheme by Kenner.  *See R33 900*.   As proven at trial, Constantine produced
multiple loan options to Kenner, Manfredi and Kaiser thru 2006 (*despite Manfredi's amnesia
even when shown the emails he participated in*)*,* all of which were turned down by Manfredi,
Kenner and Kaiser's collective decisions*.   In spite of the future discoveries of Constantine's
frauds in the GSF and Eufora against Kenner and Kenner investors, <u>Constantine did deliver</u> on
his Hawai'i consulting agreements.*

- *It should be noted that Jowdy told the FBI on February 25, 2010, in independent FBI
  proffers, that **Kenner and Masood Bhatti were not getting along after Kenner
  (with Manfredi and Kaiser) turned down the 11th hour "egregious" Lehman
  Brothers deal in 2005**.  Jowdy told the FBI that –*

    *"**MB** [Masood Bhatti**] was not happy with PK** [Kenner]".*

  *Thus, it destroys the credibility of the government's theory that the Urban Expansion
  loan was a delay tactic, so Kenner could introduce Constantine into the deal after
  wastefully expending another $451,000 in non-attributable penalty fees from the 2005
  Lehman Brothers termination date thru the Urban Expansion closing (7-weks later).*

  *In fact Manfredi, who was handling 100% of the lender due diligence and working
  hand-in-hand with Constantine on other lenders during that specifically period of time,
  confirmed he felt with only weeks to go before losing the Waikapuna parcel
  (eventually funded by the Urban Expansion loan) that **the Hawai'i partners were
  going to lose the [Waikapuna] parcel** and one other (known as MoaUla, appraised
  at over $25 million with a $5 million purchase agreement negotiated by Kenner and
  Manfredi in 2005).  See Waikapuna loan efforts (excluding Lehman Brothers) FOLDER
  -- Aug-Oct 2005 -- Waikapuna loan efforts (34) -- KJ2375-2489.*

- On February 25, 2010, Jowdy further explained to FBI Agent Galioto and other DOJ
  members, (*with Louis Freeh at his side*) that he asked Masood Bhatti from Lehman
  Brothers to revisit the Hawai'i project with Kenner in April 2006, as noted –

    *"**KJ** [Jowdy] [Bhatti**] **asked MB** [Bhatti**] if he would revisit the Hawai'i project with PK**
    [Kenner].   MB said yes."*

  *By no fathomable theory could Kenner have been holding Lehman Brothers "**at bay**"
  for a year (as part of a conspiracy), nor could the government conceive that theory
  after hearing from Jowdy that Bhatti did not want to deal with Kenner; the ultimate
  basis for the Cabo closing corruption (diversion of equity and capital) by Bhatti and
  Jowdy against Kenner and Kenner investors.  See TIMELINE 031.*

139

Ultimately, after the "*egregious*" Lehman Brothers loan cancellation in 2005 (*confirmed independently by Hawai'i COO-Manfredi*), Kenner and Manfredi worked with over a dozen other potential lenders (*who all fell thru or demanded outrageous and similarly egregious terms*), independent from the Constantine efforts, before accepting the 11th hour deal from Urban Expansion (*Constantine and Grdina*), prior to potentially losing the $1 million deposit (*and the underlying $35 million oceanfront parcel*).  *See FOLDER -- Waikapuna loan efforts (excluding Lehman Brothers)*.

In spite of the fifty (50) plus emails about the lending needs and resulting lawsuits with fraudulent hard moneylenders, there is not a single existing email from Manfredi ever claiming that the Centrum funds were originally tagged to close the Waikapuna parcel (*notwithstanding the simple fact that the Centrum loan was not enough capital to close it, at a minimum*).

In fact, **Manfredi independently negotiated the $1.5 million short-term loan amount with Jowdy from the Centrum closing funds** (*See R33 2001*); <u>not Kenner</u>.

The lending of the Centrum funds were also authorized under the Big Isle 5 LLC operating agreement delivered to Centrum as part of the closing package by Manfredi, Najam, and the Hawai'i attorneys at Carlsmith Ball.  *See R33 2007 -- Big Isle 5 Operating Agreement (which was submitted by Nolan in the 2009 arbitration* – confirming that Nolan had full possession of another Hawai'i disclosure document, somehow without his knowledge*).*  This all occurred just before Manfredi's intense communication via email with Jowdy and Najam commenced to help find new Waikapuna closing funds. *See FOLDER -- Waikapuna loan efforts (excluding Lehman Brothers)*.

Manfredi, in fact, specifically expressed his angst on September 30, 2005, after dealing with so many hard moneylenders following the Hawai'i group's rejection of the ***egregious*** 2005 Lehman Brothers loan.   At no time during Manfredi's drawn out email rant to Kenner and expressed stress about the lending difficulties does Manfredi ever claim that the funds from the Centrum loan (*closed July 19, 2005*) should have been used for a Waikapuna closing, or anything else frankly (*See Aug-Oct 2005 -- Waikapuna loan efforts (34) -- KJ2375-2489*).

Manfredi's only concern was that the lending troubles made Manfredi,

> "*think the likelihood of losing Waikapuna AND MoaUla is very real*".

*This email also confirmed that the lenders would have received a $3 million fee (much <u>more</u> than Constantine) when their loan funded.*   The day before receiving the Centrum loan funds, Manfredi (*supra*) handled the negotiations with Jowdy (*See R33 2001*) about borrowing those specific funds from the Hawai'i partners for "*30-days*" as Jowdy and Najam represented to Kenner and Manfredi (*See PK109 -- Jowdy 30-day repay for Centrum loan email -- KJ1697-1830*).

While Jowdy and Najam were working hand-in-hand with the same Lehman Brothers lenders (*Bhatti and associates in NY*) in fall 2005, immediately after Manfredi, Kenner and Kaiser declined the "*egregious*" Lehman Brothers 2005 offer, Najam was checking on alternative financing for Kenner (*in Hawai'i*) [*See Aug-Oct 2005 -- Waikapuna loan efforts (21) -- KJ2375-2489*]:

[*September 5, 2005 – from Najam to Kenner*]
> ***Phil***
>
> ***Ken** [Jowdy] **tells me that things are moving along with Wynne** [another Waikapuna lender from Constantine].   **Chuck** [hard money lender working with Najam] **has another lending source.   <u>Let me know if you are closing this week</u> or want this potential lender pursued.   Chuck may arrange for a conference call tomorrow.   Are you available for a call?*
>
> ***Bill***

The next day (*September 6, 2005*), Manfredi confirmed to Kenner that he had sent the Waikapuna payoff information to a hard moneylender (*Wynne – Malinda assistant – introduced thru Constantine*) and told Kenner [*See Aug-Oct 2005 -- Waikapuna loan efforts (22) -- KJ2375-2489*]:

> *"We should hear today re closing date.  CM* [Chris Manfredi]*"*

None of these efforts could have coincided with some underlying scheme, as claimed thru the government's prosecution theories, that Kenner (*independently*) cancelled the "*sure thing*" 2005 loan with Lehman Brothers, so he could "*push off*" the Lehman Brothers' loan *for a year* while he got his alleged co-conspirator [*Constantine*] into the deal.  Dozens of Hawai'i partners, attorneys and consultants worked feverishly to save the $35,750,000 Waikapuna parcel (*See PK110*) that Lehman Brothers tried to "deal to steal" with their "*egregious*" lending terms, changed at the 11th hour, independently represented by Manfredi first-hand (*not Kenner*) as "*egregious*", at the time.

Constantine was one of the few people paid up front fees by Kenner and the Hawai'i partners who delivered "something" in terms of a loan. **Manfredi and Kaiser confirmed this during independent FBI proffer sessions to Galioto**.   In spite of the government's claims that the Lehman Brothers loan (*in August 2006*) was "*just waiting*", Constantine under the terms of his consulting deal, introduced another infrastructure lender to Manfredi and Kenner immediately following the Urban Expansion closing of Waikapuna.   With the closing pressure off the $35,750,000 oceanfront parcel, Manfredi was able to re-engage in the infrastructure loans with potential lenders, despite his amnesia in 2015.  *Tr. 3007-3008, 3014-3015*.

The Hawai'i partners and Kenner were forced to sue multiple hard moneylenders, who they paid like Constantine, *but failed to deliver as agreed*.   A Georgia lawsuit was filed versus Peachtree Commercial lenders in 2005 after a **$190,000** hard money payment and non-performance.   A Texas lawsuit [*kj2560*] was filed versus Mt. Zion Commercial lenders in 2005 after a **$270,000** hard money payment and non-performance.   A Minnesota lawsuit was filed versus Todd Burkhart (*hard money lender*) after a **$105,000** hard money payment (*personally advanced by Kenner*) and non-performance.

Separately (*yet under the same advanced-fee deals*), Jowdy had procured an England-based lender and utilized **$975,000** of the Hawai'i loans to him as a hard money fee.   This hard moneylender produced no results and defrauded Jowdy (*on behalf of the Mexico projects*

1. This critical document, *signed by Peca*, is a **one-page document** with his signature. (*See FOLDER Peca Northern Trust documents -- 2005 Letter of Auth for Little Isle 4 – Peca*).

iii. Peca *signed* his **2005 Extension of Credit** with Northern Trust increasing his LOC from $1.6 million to $1,775,000 on June 30, 2005 (*1 month before the Jowdy email confirms full deposit, contemporaneous with Peca's testimony to the SDNY Grand Jury March 29, 2011*).

1. This critical document, *signed by Peca*, is a **one-page document** with his signature. (*See FOLDER Peca Northern Trust documents -- 2005 Extension of Credit 1.775mm - Peca*).

---

*prior to the Lehman Brothers funding in March 2006*). After Kenner participated in several conversations with Jowdy and Tom Harvey about Jowdy &/or the DDM project suing the British lender "somewhere", Kenner no longer participated in future conversations. **It is possible that Jowdy and Harvey did sue and recover the $975,000 with Louis Freeh's help, and retained the funds (*unknown to Kenner*).** In 2004-2006, when these hard money loans were sought, the conventional banks (*like Bank of Hawai'i*) were not interested in infrastructure and development loans.

- **Hard moneylenders were the only alternative to begin the early phase developments.**

The Court should not set the dangerous precedent of deciding in hind-sight whether or not they concur with legitimate business decisions, authorized by the company By-Laws, to secure legal funding sources (*thru the only available means*), and later deem them as a fraud, specifically when the Constantine agreement, signed three (3) times by Kaiser (*and never backdated*), was consistent with dozens of other hard money lenders, (*mostly unsuccessful, yet fully disclosed to the Hawai'i management team, and at all times, 100% in the best interest of the investors, including Kenner*).

- Lehman Brothers even took hard money fees from Kenner and the Hawai'i partners (*two times; 2005 and 2006*).

On October 20, 2005, six (6) days after the closing of the Urban Expansion loan (*and still within the cancelation period according to the Hawai'i attorneys at Carlsmith Ball and Najam*), Kenner was expecting to be in Hawai'i with a different hard money lender and broker to sign a **replacement deal** for the Waikapuna funding (*without penalties*), **unknown to Constantine and Grdina**. Under Kenner's *critical state of mind (mens reus)*, how could Kenner have been part of an Urban Expansion conspiracy **IF** Kenner was waiting on another lender (*PFS Home Deals* and *Note Buyers of Texas*) to supersede and replace the Urban Expansion loan? *See Aug-Oct 2005 -- Waikapuna loan efforts (49) -- KJ2490-2600 (CRITICAL STATE OF MIND).*

- The fact that Kenner received ZERO personal benefit from any of the Constantine consulting payments should not be overlooked as inconsequential (*commensurate with the Jowdy loans*).

142

iv. Peca *signed* his **2005 Disbursement Request & Authorization** with Northern Trust confirming his LOC usage of $1.6 million and the extension of $175,000 more available funds up to $1,775,000 with a loan date of July 1, 2005 (*30-days before the Jowdy email confirms full deposit, contemporaneous with Peca's testimony to the SDNY Grand Jury March 29, 2011*).

    1. This critical document, *signed by Peca*, is a **one-page document** with his signature.  (*See FOLDER Peca Northern Trust documents -- 2005 Disbursement Request & Auth - Peca*).

v. Notwithstanding planned perjury or symptoms of **CTE**, Peca lied to the 2015 Court claiming **no knowledge** of the use of his funds for the Jowdy loan (*Tr.423*); fully contradicting his testimony *under oath* to the SDNY Grand Jury four (4) years earlier, &/or the timing of the LOC distribution (*Tr.429-430*); yet Mike Peca **signed the one-page acknowledgment** confirming the full $1.6 million was already distributed (*supra*) within four (4) months of opening the LOC. Peca proceeded to sign *annual* renewals of the LOC recognizing the "*used funds*" thru 2009 without his wife's knowledge (***until 2008** – per her 2012 recordings of Kenner*).

    1. In February 2006 (*only 10 months after the opening of the LOC*), Mike Peca received a **duplicate** loan statement at his home in Canada confirming a **$1,300,000 outstanding balance** on the LOC (*thus, full transparency without complaints*).  *See FOLDER Peca Northern Trust documents -- NT 2-17-2006 LOC Loan Stmt (Canada address) - Peca*

vi. Peca chose to reiterate his untruth on direct examination about his SDNY Grand Jury testimony (*Tr.422*), claiming he told the Grand Jury the money was "*just for Hawai'i*" (**coincidently, *it was, pursuant to his own 2011 Grand Jury testimony and participation in the 2008 AZ and two [2] 2009 California lawsuits to recover the Hawai'i funds from the Jowdy loans, pursuant to the supporting 2004 Hawai'i loan agreement [See R33 002]*).[85]

---

[85] The government had in its possession the April 30, 2005 email from Kenner to Jowdy to confirm the outstanding loan amounts to date (*BATE – PK_SEC_17642-17643*).  Jowdy turned over the email in the California case discovery (*KJ1345-KJ1346 – and delivered by Kenner to the SEC in 2010*), since Kenner no longer possessed it after his corporate server thefts by Attorney Meeks and Kristine Myrick (*who were working hand-in-hand with Jowdy and Harvey since 2009 adverse to Kenner and Kenner investors*).  **No reply came from Jowdy** denouncing the loans or questioning the funds:

    vii.  Mike Peca chose to corroborate his wife's recently fabricated Hawai'i testimony about funds being used for "*vertical development*" (*Tr.427*), while making **NO MENTION OF IT** to the SDNY Grand Jury when asked about the use of his LOC and Hawai'i investment funds. We should not disregard Kristen Peca's admitted (*2012 recordings*) lack of Hawai'i knowledge. Nor, should we ignore the underlying fact that nothing has ever been built there (*specifically even post-JV when the developer [Jowdy's friend, Alan Worden] robbed $11 million from the budget in 2-years, unchallenged by Lehman Brothers [Masood Bhatti's best friend – the Lehman Brothers lender], the FBI, &/or Kaiser as the Managing Member of the Hawai'i LLCs*), ***identical to the Bhatti-Lehman Brothers approved Jowdy-Cabo budget thefts*** (*in Rule 16 evidence – See Kenner Rule 6(e) Motion @ 34[Nolan theft by Jowdy], 35-38 [specifically Ex. 47, explained @ footnote 20]*).

        1.  It should be emphasized that discussions between Berard and Kenner (*and with Stolper's legal team*) about suing Lehman Brothers, the JV partner, and the 3rd party audit firm (*Trimont*) to protect the Hawai'i investors and recover the project in Hawai'i **ceased** the day Kaiser an Berard received jobs from Harvey and Jowdy, further protecting the Jowdy's acquaintances. *See Point III @ 175.*

   viii.  Mike Peca continued on direct (*Tr.457*) to claim he had no

---

**Kenner:** "*Let me know what you think about these numbers.  Tell me if you see any discrepancies.  pk*"

Attached spreadsheet (*with no adverse Jowdy response*):



| 11/1/2004 | Bruce Greenberg | $ | 11,000 |
| 11/1/2004 | Aero Lease of LB | $ | 26,469 |
| 10/29/2004 | Baja DevCo | $ | 15,000 |
| 11/2/2004 | Baja DevCo | $ | 250,000 |
| 11/3/2004 | Baja DevCo | $ | 52,469 |
| 11/30/2004 | Baja DevCo | $ | 100,000 |
| 1/12/2005 | Baja DevCo | $ | 20,000 |
| 1/18/2005 | Baja DevCo | $ | 100,000 |
| 4/11/2005 | Baja DevCo | $ | 240,000 |
| 11/24/2004 | Casa de Caza | $ | 14,500 |
| 12/22/2004 | Casa de Caza | $ | 15,500 |
| 1/18/2005 | Diamante | $ | 250,000 |
| 2/1/2005 | Diamante | $ | 20,000 |
| 2/7/2005 | Diamante | $ | 300,000 |
| 3/28/2005 | Diamante | $ | 50,000 |
| 1/7/2005 | Startime Mgmt | $ | 30,000 |
| 1/10/2005 | Startime Mgmt | $ | 30,000 |
| 1/7/2005 | Shepherd/Dalton | $ | 750,000 |
| 1/8/2005 | Shepherd/Dalton | $ | 125,000 |
| 2/25/2005 | Shepherd/Dalton | $ | 100,000 |
| 3/14/2005 | Diamante | $ | 100,000 |
| 3/15/2005 | Diamante | $ | 75,000 |

knowledge of Jowdy's involvement with Hawai'i.   This contradicted his involvement in the "*Hawai'i loan case in Arizona*" versus Jowdy (*prior to the GSF meeting*) and his SDNY Grand Jury, meticulously detailed 2011 testimony.   Peca's continuing testimony in 2015 and explanation of alleged "*no dissemination of information by Kenner*" about the whereabouts of his Hawai'i investment funds, is wholly unbelievable.   Yet Mike and Kristen Peca chose to contribute $250,000 for the GSF and additional Jowdy litigation, (*with his wife allegedly "mad at Phil"*).

1. At a minimum, Mike Peca did give the 2015 court the following *confirmation* of his *truthful 2011 testimony* regarding his knowledge of the Jowdy loans in advance of his participation in them with the Hawai'i partners (*Tr.499*), while systematically avoiding his 2011 Grand Jury underlying pro-Kenner (*and knowledge*) substance:

   *Q: Well, at that point in time, sir, when you testified in front of the Grand Jury in the Southern District of New York, the answer that you gave to that question was truthful, was it not?*
   **A: Yes it was.**

The Government also ignored:

- The Grand Jury testimony from Turner Stevenson (*See R33 651*) when Stevenson told the 2011 Grand Jury that the Hawai'i loan was done "*as a group*".   Stevenson further confirmed the group conference calls by testifying, "*...the group of us got together*".[86]

- Specifically, when Stevenson was asked directly about his *knowledge of the loan to Jowdy* (*@ Page 17-18*):

   *Q: When you put up the $100,000 for Hawai'i, did you have any understanding of whether the money could be used to pay for the Mexico project or was it just supposed to go to the Hawai'i project?*
   *A:  In the beginning it was supposed to go to Hawai'i.   Then I saw they needed, the group of us got together, we have this piece of land that's available for purchase in Mexico that we need to wait on or get funds on to transfer as a group like one big blanket to get money into Cabo and pay for that land to hold it until the loan came.*

---

[86] Please note that as soon as Kenner notified all of the Hawai'i and Mexico investors that Jowdy was further disrupting the investor group by suing them in California for malicious prosecution (*all dismissed under SLAPP orders*), Sydor immediately called for Kenner to arrange another "*conference call*" to discuss the issues "*as a group*".   *See PK115 -- Sydor UPSET-demands conference call-with new April 2010 Jowdy lawsuit v. investors.*

> *Q:  So you are saying you agreed to transfer some of the money from the Hawai'i project to the Cabo project?*
> *A:  **I would say that, YES.***
> *Q: Who made that decision?*
> *A: **I think all of us as a group**.*
> *Q: What do you mean "as a group", who is the group?*
> *A:  **All the guys who were invested in it**.*

The Government also ignored:

- The Grand Jury testimony from Darryl Sydor (*See R33 467f*) confirming his transparent, pre-loan knowledge of the Hawai'i agreement with Jowdy and their support.
  - When asked, "*Why did you borrow money?*", Sydor told replied to the SDNY Grand Jury that "*Just through talking with Phil Kenner to purchase some more, I believe, also help out the transaction in Cabo to start building there*".  (*@ Page 19*)
  - When asked, "*Was that* [the LOC and Hawai'i cash] *also for Little Isle 4 as far as you know?*".   Sydor replied, "*Yes, but then we put it towards a short-term loan for Mr. Jowdy until Lehman Brothers came up with the money that was supposed to be paid back.*" (*@ Page 25*)
  - When asked, "*Did you know in advance that it was going to be used, this Little Isle 4 money, to be used to salvage the Cabo investment?*".   Sydor replied, "*Yes.  It was to help with the short-term loan to keep funding the Cabo, but then it was supposed to be paid back, but that's --* " (*@ Page 25-26*)
  - When asked, "*Paid back to you or back to Little Isle 4?*".   Sydor replied, "*Paid back to Little Isle 4…Back to Hawai'i, not to me personally.*" (*@ Page 25-26*)
    - Sydor made it *clear (emphasis added)* that he knew the funds he contributed to his capital account with Little Isle 4 belonged to Little Isle 4, after he committed the funds via his LOC (*just like every other investor – See Peca supra*).
  - Sydor was asked about *risk* and *concerns*, "*You never told him* [Kenner] *you have any concerns?*" Sydor replied, "*We would always talk about, you have concerns when you make investments and they don't go the right way but it's a risk going in, but you know it's a risk going in.*" (*@ Page 29*)
  - Finally, Sydor was asked about *the multi-page Hawai'i JV disclosure* (*which he signed for the Hawai'i attorneys*), "*Let me show you one document and let me know if you may have gotten it or not…dated July 21, 2006…?*" Sydor replied, "*I remember getting something like this.  I*

*remember the thing here.  I didn't read through it all…but, I did not read through everything, every page.*" (*@ Page 30*).   Sydor signed the confirmation document for the Lehman Brothers closing.

- This <u>multi-page</u> 2006 disclosure letter was signed by every Hawai'i investor directly with the Hawai'i attorney, Larry Markowitz (*the documents author*), for the closing with Lehman Brothers and Alan Worden (developer).  *See PK111 -- Peca signed July 2006 LI4 disclosure letter (with Peca fax confirm)*.

- The RESPONSE FORM (*with signatures*) begins:

    *I acknowledge receipt of the letter of July 21, 2006 of Philip A. Kenner (the "Letter") to each of the members of Little Isle 4, LLC (the "Company")…[continuing]…I have signed and dated this RESPONSE FORM where indicated below to indicate that I consent to the transaction described in the **Letter** and to make the following representations and warranties to Mr. Kenner:*

    1.  *I have received, **carefully read and understood the Letter**, including the **copies of the proposed Limited Liability Company Agreement for Na'alehu Ventures 2006**, LLC ("Na'alehu") and the proposed **Liability Company Agreement for WWK Hawai'i Holdings**, LLC (the "Joint Venture").   I have relied on no representation or warranty by any party with respect to this transaction other than as set forth in the Letter.*

    2.  *I have been provided the opportunity to discuss any of my questions about the transactions, Na'alehu and the Joint Venture with Philip A. Kenner, as well as access to all information about them that I have requested.  I confirm that, in making my decision to consent to the Transactions, I have relied, as to legal, tax and all other matters, **on independent investigations** made by me and my advisors, if any, and that I have investigated the Transactions to the full extent I have deemed advisable.*

- CONTINUED…& **SIGNED** by all Little Isle 4 members…
    - ✓ <u>*Please note that nothing was concealed…*</u>

- Sydor turned over the 1800-page Hawai'i JV closing documents to the court during the 2015 trial, which were sent by the Hawai'i

147

attorneys to each and every partner, including Kaiser and Manfredi.

- ▪ The Court should note that even Mike Peca confirmed a multitude of Hawai'i documents when he sent via text to Kenner [*12-9-2009*]:

*"Cleaning up my files today…I have ashtload* [a shit load] *of Hawai'i documents…"*

Thus, the three (3) Mexico and Hawai'i investors who were cherry-picked by FBI agent Galioto for the 2011 Grand Jury testimony (*Peca, Sydor and Stevenson*) **ALL** confirmed their knowledge since the first 2004 conference calls about the loans to Jowdy.   The Jowdy loans were:

1) KNOWN at all times,
2) Further discussed "**as a group**" (*on conference calls*), and
3) Agreed upon – as they separately, ***under oath***, confirmed to the SDNY Grand Jury.

There is no equivocation about 100% of the prior "*under oath*" individual testimony, prior statements (*affidavits, depositions, testimony, email and texts*), the three (3) prior USA lawsuits and four (4) Mexico lawsuits to collect the <u>known loans</u>, yet still unpaid, despite *eventually* being admitted to by Jowdy (*and his attorneys*), all supporting FULL and UNFETTERED KNOWLEDGE of the Jowdy loans by the Hawai'i investors and the authenticity of the loans (*See Forf-44*).   In fact, Mike Peca slipped from his Government script under the duress of cross-examination and confirmed the Jowdy Hawai'i loan discussions during the GSF meeting in his Ohio home (*Tr. 540*).   On re-direct (*Tr.644*) *Michiewicz attempted to resuscitate the Peca "loan" faux pas from Peca's cross-examination*. Michiewicz did it knowingly and strategically, allowing Peca to retract his testimonial errors [*refuted by Peca's own empirical evidence – See R33 419*], but harmfully contradicting the foundationless Government theories.   Peca erred by claiming the "other things" (*like Eufora, Avalon, the Falcon, the Palms*) were only a "*small potion*" of the GSF meeting, thus adding credibility to the Jowdy-Hawai'i loan topic at the paramount GSF issue for the pending legal strategy to compliment the Arizona case that Peca was already an active participant in (*See R33 A, and Footnote 56*) thru multiple

148

independent counsel (*without his wife's knowledge*).

With the compliment of documents **signed** by all of the investors[87], every step of the legal processes from the set-up of the LOCs (*signed at all times by the LOC clients – and NEVER Kenner, as constantly insinuated thru the trial (i.e. Tr.2065-2066 [Nolan], Tr.139-140 [Juneau], Tr.4801 [Gonchar])*), the acknowledgement of the annual **one-page** "***use of funds***" (*signed on one-page acknowledgements directly with the bank – i.e. See 2005 Disbursement Request & Auth – Peca [supra]*), the **one-page** Extension of Credit signed directly with the bank – i.e. *See 2005 Extension of Credit 1.775mm - Peca* (*supra*), and the **one-page** authorizing letters – i.e. *See 2005 Letter of Auth for Little Isle 4 - Peca* (*supra*), was transparent (*and signed annually by EVERY Northern Trust LOC client*).[88]

During the 2009 arbitration, the "**one page**" theory started with Owen Nolan who later claimed he never read a single document in his FIFTEEN (15) years with Kenner, thus he would not know what he signed under his own defense theory of ignorance.   As a result,

---

[87] Please note that not a single **signed** document was presented to the Court during trial, which supported a scheme to conceal information from an undelivered portion of any document, ***utilizing only the signature pages***.   There are NONE in evidence that fit that "*one page*" description related to any element of the 2015 case, thus nothing was concealed (*as falsely proffered throughout the trial*) as a signature ONLY page.

The most critical of all the signed documents, are in fact, **ONE PAGE DOCUMENTS** (*supra – Rule 6(e) motion @ 111-122*).

The Northern Trust subpoena received in week SEVEN (7) of the trial (*and negligently used by defendants' trial counsel*) exposed all of the faulty claims by Nolan, Peca, Sydor, Rucchin and Berard that they were not delivered (*nor did they properly sign*) the proper documents from Northern Trust Bank &/or Kenner as part of a conspiracy against them. *All of the documents, confirming their perjury, were in the Northern Trust subpoena (unless CTE created their respective faulty memory, confusion and mistakes).*  Only their *faulty memory, confusion and mistakes* (***CTE or planned perjury***) can justify the complete lack of knowledge exhibited in 2015 (*up to TWELVE (12) years after the first signed documents – while specifically remembering exactly what "they were not told"*).

[88] In addition to Peca (*supra*), please see *signed* **one-page** Northern Trust documents for Berard [*Berard Northern Trust documents*], Nolan [*Nolan Northern Trust documents*], and Rucchin [*Rucchin Northern Trust documents*], turned over [*incomplete*] from the Northern Trust subpoena.

Kenner investor Jason Woolley voluntarily testified (*like Berard and Kaiser*) during the arbitration.   At that time, Woolley was asked the following about his experience of signing documents (*allegedly one-page signature page only*) (*Day 5 @ 496*):

> *Q: Did Mr. Kenner – you heard the judge talk to you about documentation.  Did you ever – was there ever a situation when you only received a signature page, or did you get the full package?*
>
> *A [**Woolley**]: I've got so many damn papers.  I didn't even want them after a while, to be honest.  Im digging stuff up to this day.  **But <u>no</u> to the answer.   I have no problems getting – I just didn't get the signature page**.*
>
> *Q: Did you feel you had access to information prior to making these investments?*
>
> *A [**Woolley**]: Absolutely.*
>
> *Q: Did you ever feel you did not have access to information?*
>
> *A [**Woolley**]: No.  Not for one second.*

In 2014 after Galioto, Harvey, Jowdy, Kaiser and Berard arranged for Kenner to be Indicted and arrested, Jowdy with Kaiser (*who was working for Jowdy at the time [2014]*) attempted to steal the Baja Ventures 2006 equity from Kenner with another FORGED document (*produced in the Delaware litigation versus Jowdy, which has been discussed in the EDNY courtroom post trial*).  The document (*with Kenner's signatures **forged**, <u>again</u>*) presented by Kaiser to Jowdy (*with Tom Harvey's help*) and followed by a letter Jowdy and Najam prepared for Kaiser, acknowledging their agreement to transfer Baja Ventures 2006 to Kaiser – *without any legal authority to do so*.  This *forgery*, and ongoing egregious theft, orchestrated by Jowdy, Kaiser, Najam and Harvey summarizes the underlying plan to extort &/or steal the majority of the Diamante Cabo san Lucas equity from Kenner's control, thru any means necessary under FBI protection, outlined in Harvey's original April 2009 extortion email to Kenner and Kenner's attorney, Paul Augustine.

> 1) It started with Jowdy's 2008-09 allegations of loan document forgeries (*all proven false by Jowdy's own words and subsequent legal actions*).
> 2) It continued with the 2008 media slander by Harvey's friends at the NY Daily News thru present (*having beat-writer, Michael O'Keefe present with Tom Harvey in the 2015 courtroom daily @ Tr.3246*), and

3) It included the 2010 "*gun trafficking*" allegations and filings (*by Jowdy's cabal and FBI agent Galioto*) versus Kenner in Mexico in 2010 (*after Jowdy confirmed the criminal case his attorneys initiated versus Kenner <u>in Mexico</u> for alleging that Jowdy received "loans"*).

The "no loans" criminal complaint in Mexico and the false "gun trafficking" charges led to Kenner's detainment and torture in Mexico for three days (***asserting Kenner could leave the jail and end the torture if Kenner signed over his Mexico project equities and Mexico home to Jowdy***).   Thankfully (*at the time*), Kenner's Mexico attorney, representing all of the Hawai'i investors in Mexico versus Jowdy in 2010, was able to receive an ***Amparo*** (*stay and release from a Mexico legal proceeding*) and have Kenner released from the jail after the third (3rd) day of no water, food and torture -- near death. *Kenner's attorney was murdered in Mexico shortly afterwards*.   At the time, the attorney was <u>*only*</u> working on the Kenner and Kenner investor's cases in Mexico versus Jowdy due to the enormity of the daily activity, fighting the Jowdy corruption and bribery schemes.[89]   The attorney had been partially paid from GSF proceeds.    Only the attorney's work on the amparo and Kenner's untimely release (*and saving Kenner's life*) alerted Jowdy's people and FBI Agent Galioto of the attorney's involvement, ultimately adverse to Jowdy for the Hawai'i and Mexico investors.

Despite the empirical evidence of the Baja Ventures 2006 funding source, Michiewicz falsely alleged that the Baja Ventures 2006 capital account contained funds that were "***borrowed***" and "***reborrowed***", all the while knowing that the source of the funds from Kenner's partners (*Stumpel and Lehtinen*) were well documented (*See Forf-36*). *Tr.4736*. During Komatireddy rebuttal summation, she lied to the jury about the same loaned funds by falsely claiming; "*Mr. Kenner told you that he used that money* [Hawai'i loans to Jowdy] *to get his piece in the Mexico investment with Ken Jowdy.   You know exactly what that's for.   That's in evidence.*".   Clearly, <u>Kenner never testified to that</u>, nor was it or has it ever been true; and certainly not "*in evidence*".   Notwithstanding, the jury was completely polluted with the defendant unable to respond after rebuttal summation.

---

[89] It should be noted that Kenner and the murdered attorney were pursuing legal activity, with Jowdy protected by the former Governor of Baja California Sur Mexico, in a country where 130 political related deaths occurred during this last election cycle, alone.

151

*Tr.5990*.   Komatireddy went on to further mislead the jury during rebuttal summation, specifically related to the Baja Ventures 2006 equity, when she claimed, "*He* [Kenner] *used it* [the Hawai'i loans to Jowdy] *for personal use to get an interest in that resort in Cabo.*".   Again, the Government was 100% aware of the source of the Baja Ventures 2006 capital account, thus further misleading the jury in an attempt to tie up their version of the foundationally flawed "*loans to Jowdy conspiracy*". *Tr.5996*.

This misrepresentation further discolored the jury's perspective, in spite of the Government's well-defined knowledge of the authenticated loans to Jowdy (*Jowdy's FBI proffer admissions and eventually Forf-44*) and the underlying agreement (*by Jowdy's own 2010 defense team's authentication in the Nevada trial – R33 011*), amongst a plethora of other clear and empirical evidentiary disclosures, by Jowdy himself, **including his own confession on 3-24-2010 to the FBI by Jowdy (*with Case Agent Galioto present*)** in *R33 rebuttal 002 -- 3500-KJ-2 – AND IGNORED.*   In early 2010, the newfound Jowdy clarity and FBI admissions occurred during Jowdy's 2-day California deposition confirming, now, that 100% of the money he received from the Hawai'i project pursuant to the 2004 loan agreement, and the other Kenner personal loans, were in fact **real (*specifically because he received a dismissal from his Arizona "no loans" defense three [3] weeks earlier*)**.

For the aforementioned reasons, the defendant requests that the Court rejects the Government's claims of forfeiture for the Baja Ventures 2006, LLC.

# PART II

## Government's Alleged Alternative Nexus To The Diamante Cabo Project

Considering the Government's faulty position that the funds from Stumpel and Lehtinen (*for Baja Ventures 2006*) are somehow tainted fails when faced with real, empirical evidence (*supra*), the Government has made an alternative claim theory of nexus based on their theory that the investors in the Hawai'i project were somehow unaware of the Hawai'i loans to Jowdy in Mexico.

### Kristen Peca and Mike Peca:

The Government received testimony from several Hawai'i and Mexico investors at trial related to "**the loans to Ken Jowdy**".   Kristen Peca, who was *never a Kenner client*, testified to a myriad of false claims (*supra*), fully discounting the veracity of her basic involvement in the LOC set-up (*2005 – thru her own FBI recordings and confessions in 2012 – See footnote 67*), and confirming her lack of knowledge of the resulting loans to Jowdy from the Hawai'i project (*2004-2006*), yet fully CONFIRMED by her husband in 2011 to the SDNY Grand Jury as within his full transparent knowledge at all times (*See R33 419*).

Mike Peca's own 2011 Grand Jury testimony fully impeaches his wife's illogical participation and timely knowledge of Mike Peca's Hawai'i LOC thru Northern Trust Bank, no less than three (3) years before she admitted on "her" FBI recorded calls that she knew about the underlying LOC (*sometime in 2008-09, while living in Ohio*). Notwithstanding and in concert with his wife's newly fabricated testimony, Mike Peca chose to perjure himself in 2015 by claiming "*no knowledge*" of the Jowdy loans (*Tr.496*), in spite of the excess of direct communication between himself, Kenner and his Arizona and California attorneys about the loans (*supra*).   Nevertheless, Mike Peca gave overwhelming testimony to a SDNY Grand Jury in 2011 (*consistent with 100% of the pre-trial empirical evidence*) to verify his perceptive and unwavering *knowledge of* and

153

*support for* the Hawai'i "**loans to Jowdy**".[90]   Mike Peca could not have described his

involvement in grander or more clairvoyant terms of the Jowdy loans from his Hawai'i

---

[90] Mike Peca was asked during his 2011 SDNY Grand Jury appearance about his 2007 Pledge Agreement with Northern Trust and his $1,775,000 LOC. Mike Peca confirmed signing the 15-page **Grand Jury exhibit 106.**  When asked if he knew he signed for the full collateral, "*putting up bonds to secure the collateral*"**,** he replied, "*Uh-huh, yes.  I was very well aware of that scenario*".   That confirmation was a follow-up to:

> *Q: Did you understand at the time that if you didn't pay back the line of credit the bank was going to take your bonds?*
>
> *A:* **Yes, and they did.**  *What they took was just under $2 million; I believe it was in 2008, maybe after a while.*  **We were just, when the loan, the short-term loan for Mr. Jowdy was not paid back, the line of credit time matured.**  *They had taken what was loaned, I guess, lent to me plus interest.*

Amazingly, in spite of Peca's crystal clear SDNY Grand Jury testimony, detailed with full knowledge of the Jowdy loan, his approval of it, his collateral understanding, his acknowledgement of the signed Northern Trust documents, confirmation of the **Letter of Authorization** he signed for his Little Isle 4 Capital Contribution, all Peca could confirm about the SDNY testimony in 2015 was that he was "*uncomfortable*" when he allegedly realized the questions were about Kenner.

No logic could support why answering questions with truthful answers (*under oath*) about anything or anyone having to do with his personal investments should have caused a problem for him.   In fact, and again contrary to the testimony of "*scared*", "*uncomfortable*", and other superlatives about their relationship with Kenner, Mike Peca was checking on vacationing with Kenner in Arizona and staying at his home with his family only a few months after the Grand Jury testimony, followed by potential New Years' plans with Kenner. *See Point III @ 118-119*.   It is illogical; especially considering Kristen Peca confirmed their vacation plans in Arizona two (2) years prior [*and shortly after the LOC collateral seizure*] with Kenner and his family, including a nice night out with Kenner's girl friend and "*kiddos*" on the Pecas.  *See Point III @ 132, R33 601.*

Peca was also in direct communication with the AZ Eufora Partners I Managing Member, Tim Gaarn, prior to the hiring of Giuliani's investigation group (*by Gaarn to represent Peca and the other Eufora shareholders, including private stock sales Gaarn recently documented for the Peca purchase from Constantine in 2008*).  On 10-28-2009, Kenner re-sent Peca's cell number to Gaarn via text for open communication.  This was independent of Peca's direct communication with his other two attorneys, Tom Baker and Ronald Richards at this time. Although Peca claimed in 2015 that he could not get an answer from Kenner as to why he was buying stock from Constantine (*Tr. 446, 452, 465-466, 506-507*), he had direct access to his Managing Member (*Gaarn*) and later Giuliani's team.  It is illogical that he could not get his answer.   This fabricated testimony ignores the salient fact that the Peca funds (*transferred from his Schwab account*) could not have been sent (*even under the Kenner Power of Attorney*) without a "verbal" approval of **amount** and **recipient** from Peca (*identical to every other Schwab client, Kenner's or not*).

capital account "*as a group*".   Alternatively, only the Government's Rule 33 defense of *faulty memory, confusion and mistakes* could amply define Peca's complete loss of memory in 2015, short of perjury (*whether suborned or not*), or **CTE**.

### Sergei Gonchar ["SG"]:

Gonchar gave 2015 testimony (*Tr.4847-4848*) claiming his lack of awareness to "**the Jowdy loans**" from Hawai'i, yet five (5) years prior (*See PK106 -- 3500-SG-2 @ 8-9*) he had already confirmed to the FBI that both Kenner and Jowdy, *independently*, discussed "**the Jowdy loans**" with him.

The FBI agents noted (*raw notes*) – "*SG – PK told SG $ in Hawai'i will be loaned to KJ [Jowdy]*".

Please note the "*future tense of the notes*" designating Gonchar's knowledge prior to the actual loans commencing in 2004.

Then, the FBI agents noted – "*SG heard from KJ that $ from Hawai'i loaned to KJ...*".

Both independent representations by Gonchar to the FBI on February 8, 2010 (*five [5] full years before trial*) clearly represented Gonchar's knowledge of the Hawai'i loans to Jowdy thru direct statements to the FBI.   In addition, Gonchar signed an affidavit May 30, 2009 for the 2009 Nolan Arbitration (*See TIMELINE 036*), approximately one (1) year prior to the FBI interview.  Gonchar sent the affidavit to the FBI during their pre-trial investigations (*received by the FBI as 3500-SG-4*).   In the 2009 affidavit (*six [6] full years before the 2015 trial and one [1] year prior to the FBI interview*), Gonchar confirmed under the paragraph header:

### HAWAI'I INVESTMENT GROUP:

"*I was aware that my funds would be used to make distributions for the company, including but not limited to; Land Acquisition, Travel & Entertainment expenses, Legal fees, Planning fees, Payroll, Permitting Fees, Loans to outside entities, and distributions to other members that would satisfy their monthly Line of Credit payments to Northern Trust Bank....Phil Kenner has always disclosed the*

*complete and detailed use of these funds with me from time to time and per my every request.*"

Gonchar continued in the affidavit to further confirm his Hawai'i loan knowledge specifically to Jowdy (*consistent with all three [3] lawsuits [in AZ and California] versus Jowdy for the unpaid loans, which he participated in*), under the paragraph header:

*DIAMANTE CABO SAN LUCAS:*

> *"I understand that approximately eighteen (18) months ago, Tommy Constantine negotiated a global settlement with Ken Jowdy, with the assistance of Jowdy's brother-in-law, William Najam, to a) relieve Ken Jowdy of the $10m + in personal debt, b) his management control of the project, and c) any additional personal financial obligations he had to our Hawaiian investment group, Glen Murray, Mattias Norstrom, Bob Gaudet, myself and others."*

Alternatively, only the Government's Rule 33 defense of *faulty memory, confusion and mistakes* could amply define Gonchar's complete loss of memory in 2015 (*of the Jowdy loans*), short of perjury, or **CTE**.

### Steve Rucchin:

Like Gonchar, Rucchin also gave 2015 testimony (*Tr. 2723-2724*) related to his lack of knowledge of the "**Hawai'i loans to Jowdy**".   Yet, Rucchin gave testimony that the events of 2004 "*...is still a little foggy*" related to his LOC.   This period of time is when Rucchin had suffered a series of severe concussions that led to him missing over one-and-a-half (1-½) years of his NHL hockey career diagnosed as post-concussion syndrome (*otherwise known as **CTE** today, whose main symptom is "loss of memory"*).

Notwithstanding, Rucchin also admitted at trial "*it's a long time ago*" and could not even recall if his own bonds (*collateral*) were being used to secure his LOC, stating – "*I can't really say. I'm sorry.*".   In fact, the Government knowingly asked Rucchin if the money was supposed to be "*used for the property in Mexico*".   The funds were a **loan to Ken Jowdy**, secured by his equity in the land in Mexico (*See R33 002*).   Once the Hawai'i LLC thru the 2004 loan agreement loaned the funds to Jowdy (*personally*), Kenner's only

control over the loaned funds was to suspend any further lending (*per the terms of the 2004 Hawai'i agreement*); never control or direct the actual use of funds by Jowdy (*despite the general understanding and premise for the loan*), thus, the agreement was with "**Kenneth Aboud Jowdy, individual ("Borrower")**", *not any other entity* as an additional borrower.  The actual accounting of funds (*that Jowdy stole &/or misappropriated*) was only known in totality after receiving the semi-complete accounting from the Government (*Forf-36*) during the forfeiture hearings for the Jowdy actual "*Source & Use*". The Government's question was misleading, *at a minimum to Rucchin*, who was "*foggy*" about the basic LOC (*perhaps thru faulty memory, confusion and mistakes – or **CTE***).   Rucchin could not have acknowledged understanding or legit memory of at least a dozen other Hawai'i related transactions; all <u>authorized</u> in the Little Isle 4 By-Laws, *at all times* (*emphasis added*).  *See TIMELINE 046*.   The best Rucchin could describe about the LOC was "*the interest was going to be paid off and that was somehow to be used with the Hawai'i venture*".   In fact, Rucchin told the 2015 court when asked:

> *Q: Did you ask specific questions of him [Kenner] about how the line of credit was going to be utilized with reference to the Hawai'i venture?*
>
> *A: I don't believe I did.   I just took – I just trusted Phil completely.   If he suggested it was a good idea, then to me that was – that was all that I needed from him.*

This refrain of "***trust in Kenner***" was repeated many times by the Mexico and Hawai'i investors throughout the trial.[91]   *None of the investors, Kenner, or even the former Fed*

---

[91] After Ranford made GSF and Eufora private stock purchase statements (*under clear duress*) on direct examination that were contradictory to the FBI Notes (*See Ex. 64*) from his July 2012 proffer, Ranford told the 2015 court in cross-examination, "*You are asking me to remember something that happened many years ago.  I am trying to respond to the best of my recollection*".   He continued under duress of his previous perjurious statements (*having been caught*), "*When Phil would come to me and present things to me, my understanding that Phil was representing me on my behalf so I <u>trusted</u> Phil if that's what he's doing.*"   Ranford continued, "*I <u>trusted</u> him.  He was looking out for my best interest*" (*Tr.2859-2862*).

In fact, the Ranford notes confirm that Ranford was aware of which account his funds were transferred out of, further confirming his underlying knowledge of all the transactions,

*which he could not remember three (3) years later under FBI duress.*   Ranford had to know his funds were transferred, because that was the mandatory protocol from his investment account (*just like every other Kenner client*).   Kenner **could NOT transfer** funds without independent individual client verifications.

- Tyson Nash echoed the same "*I trusted Phil Kenner*" refrain @ *Tr.1955*, while confirming Kenner was always available (*during the same period of time Kristen Peca claimed Kenner disappeared into a cave in Mexico and could not be reached*).   It should be noted that Nash also confirmed that his entire recollection of the Jowdy loans, the Hawai'i deal, etcetera were "*a little foggy*" (*Tr.1956*) over ten (10) years after the events.   *Nash, like the remainder of the Hawai'i investors still holds an equity interest in an LLC that has an uncollected $31 million plus loan from Ken Jowdy (in 2018).*

- Only the detention of Kenner since 2013, and the resistance of Jowdy employee John Kaiser as Na'alehu Ventures 2006 Managing Member to pursue the repayment (*in his Managing Member fiduciary capacity and Kenner's absence*), has restricted the Hawai'i investors from a substantial recovery, resulting in a massive profit for their Hawai'i investments.   Nash, like most of the 2015 testimony confirmed he would gladly accept the benefit of the loan to Jowdy (*regardless of his "foggy" recollections*), pursued by Kenner thru multiple, now-known (*and Jowdy self-proven*) litigation frauds (*lying to the FBI and Federal courts, including the EDNY District Court*) by Jowdy to dismiss the cases in the USA and Mexico.   *Tr.1955-1956.*

Considering Michael Stolper and his highly connected investigation team (*including Rudy Giuliani, Eric Hatziemos and former CIA Agent Libby*), representing the Eufora private stock investors independently (*See Ex. 1*), Giuliani's group wanted to participate (*as an agreed upon 6% equity partner*) in the future of Eufora – *after the well-documented 2008 and 2009 private stock sales by Constantine and Gaarn personally (not Kenner as insinuated throughout the trial, contradicting the empirical evidence in Rule 16).*
- *See PK130 (including the Eufora 2008 and 2009 tax returns documenting the 2008-09 private stock sale by Constantine and Gaarn), and*

- *See PK131* (*with Eufora CEO specifically confirming that - "Phil [Kenner] is not a member of Eufora or AZ Eufora Partners I LLC" [in August 2009 – so how could the government proffer or even believe 'Kenner was selling his shares?'"*).

Ranford and the other investors were properly guided thru the Eufora sales, known and investigated by their attorneys.   It should be noted that Kenner (*from the Michiewicz' named "grocery list" or "shopping list" loans by Kenner to Constantine*) was waiting at that exact time (*2008-09*) for a documented 20% equity transfer from Constantine as collateral for the well-documented advances from Kenner's personal funds (*in Rule 16 evidence*).

*None of these loan amounts belonged to Kaiser at any time* (*despite the fabricated story-line by Michiewicz and Kaiser, of a "grocery list" or "shopping list" of funds involving Kaiser*).
- As confirmation, Kenner's equity from Constantine was offered in August 2010 thru the Stolper-led settlement discussions in the new Eufora operating agreement sent by Constantine, while trying to resolve his liability and exposure to the investigative

*Reserve Chairman, Alan Greespan, could have or did predict the complete 2008-09 financial and real estate melt down in the USA.*   The real estate recession partially led to the Hawai'i JV's complete land loss in concert with the filing of the Lehman Brothers' September 2008 bankruptcy (*notwithstanding the $11 million embezzlements by Lehman Brothers lennder [Bhatti] and the JV partner, Alan Worden, which Kenner discussed with the FBI in June 2009). The JV partner's theft [by Worden and Bhatti] was systematically ignored, despite 100% of the empirical evidence in Rule 16 confirming it.*

Yet, as a result of the blind "**trust**" Rucchin (*Ranford, Berard and others claimed throughout the trial – referencing a "cult-like" following*) in Kenner, the Hawai'i LLCs (*Little Isle 4 and Na'alehu Ventures 2006*) (*separate and apart from the failed JV with Windwalker and Lehman Brothers*) <u>*has a collectible asset*</u>; **the authorized 2004 Hawai'i-Jowdy loan**.   It is supported by shockingly overwhelming empirical evidence (*supra*).   This is aside from the specific self-tendered Jowdy *confessions* to the FBI (*2010*), Jowdy's 2-day January 2010 California deposition *confessions*, and *PK100 -- Forf-44 (which the Government called <u>cumulative</u> in their Rule 33 reply, <u>despite</u> aggressively calling Kenner "lying" for claiming those funds as the true documented loan that they are).*

*Is the Government allowed to ignore empirical evidence during the trial, force the defense to produce it to refute fabricated theories based in contradiction to known evidence, then claim "new evidence" post trial which creates reformative issues to the entire trial as cumulative?*

---

team and the Eufora investors (*including Kenner's undocumented equity*).   *See R33 439 @ page 43 [Triple Diamond Black Trust – 12% equity].*

The 2010 text from McKee to Kenner confirmed the 6% after his personal discussions with Giuliani's team (***thus independently verifying real, perceived value in the Eufora assets***):



| 14797 | +17168034903 Jay McKee* | 7/15/2010 12:03:01 PM(UTC+0) | Read | Hopefully you're getting some sleep right now; I am planning on sending the letter this morning.. **Within our package or plan in taking the lender out, where is the 6% for Guilani partners comming from?** | |

*If the Government believes it is cumulative after trial, how did they ignore a 6-year pre-trial investigation to contrive now-false and proven foundationless allegations, which influenced the jury throughout the trial without reformative consequences?*

*The Government, like Jowdy, appears to have landed on whichever "defense tactic of the day" applied to their current evidentiary dilemma, despite its abusively contradicting nature, grossly confusing the jury, and wholly prejudicing the defendant.*

The unpaid Jowdy-Hawai'i loan (**worth over $31 million and uncollected today**) has not been pursued since the Kenner arrest in November 2013, with Jowdy's Teflon legal status (*thru Galioto's FBI protection*) and Kaiser's employment status (*working tax-free for Jowdy in Mexico and the Managing Member of Na'alehu Ventures 2006*).   Without Kenner on the street to renew the legal pursuit of the Jowdy loan on behalf of Little Isle 4 (*separate from Kaiser's Hawaiian control and fiduciary negligence managing Na'alehu Ventures 2006*), the investors, including Kenner himself, have no mechanism to seek the recovery of the well-past-due funds.

> These loaned funds – *which were never lost (restitution and money judgment issue) -- would make the entire Hawai'i investment profitable, specifically with a lien-able asset of Jowdy's available equity, including but not limited to his egregious monthly salary; verified by the prosecutors in Court in 2017 as over $200,000 per month for managing his ongoing criminal enterprise*.

Alternatively, only the Government's Rule 33 defense of *faulty memory, confusion and mistakes* could amply define Rucchin's complete loss of memory in 2015 (*of the Jowdy loans*) as a result of his "*foggy*" recollections, short of perjury, or **CTE**.

### Hawai'i LOAN RECOVERY:

A second deal[92] and confirmation to recover the funds had been secured in 2013, when Kenner received in-person confirmation from two (2) of the three (3) Supreme Court

---

[92] In 2012, Jowdy and his cabal rejected an earlier $20 million sale of the investor equity by Kenner and Kenner investors to a Jowdy-friendly 3rd party (*to punish Kenner as referred to*

*by a former Jowdy employee, later terminated and threatened by Harvey via letter with a USA lawsuit for passing information to Kenner from Jowdy's inner-war-room-circle*).

A Cabo resident and acquaintance of all parties brokered the deal.  The Kenner-agreed sale of the Cabo assets would have repaid every Mexico and Hawai'i investor **in full** (*in 2012 – after six [6] full years of chasing Jowdy, post discovery of his initial, yet incomplete list of frauds*).   Jowdy represented to the broker that the new investor could **NOT** see the existing books and records of the Diamante Cabo deal (*just like Jowdy's legal team fought Kenner in the Arizona and California lawsuits [2008-2010], the Delaware shareholder's action [2014-2017] and EDNY government actions [2015-2018], **knowing the tens of millions of embezzlements, racketeering, and illegal payoffs would be revealed***).

Jowdy revealed to the broker (*Mahoney*) that he did not need a partner who would present another and newer "*monkey wrench*" to his FBI and local Mexico protection schemes.   ***This was eerily similar to Najam's May 8, 2007 email comments to Jowdy days after Kenner rejected the FBI protection and Tennessee and Texas project bribes*** (*See PK101*), when Najam told Jowdy:

> "*I'm not so worried about the past failures* [of approximately $20 million by May 2008]…*The last thing you need is a conflict situation with another partner*".

Jowdy acknowledged to Mahoney and his insiders that a new partner, who echoed Kenner's long-standing allegations of criminal activities in the USA and Mexico, would specifically verify Jowdy's decade plus crimes, subject him to incarceration in the USA &/or Mexico, and not just a Kenner scheme to oust Jowdy for some unknown benefit.   Jowdy had already been six (6) years into his slander and defamation campaign of Kenner thru the FBI connections and the NY Daily News slander of neutralizing Kenner's representations of Jowdy frauds.   Jowdy and his attorneys did not want to implement another strategy if needed with new investors, since they had the Cabo project "*under control*" (*looting it without supervision and under FBI protection*) and the remainder of the Kenner and Kenner investors funds dismissed as "*never to be repaid*" as Jowdy brazenly proffered throughout his January 2010 California 2-day deposition.   **For Jowdy, the machine was well-oiled and not in need of fixing.**   It was perfect already and remains unscathed almost seven (7) years later; as planned.

This June 2012 deal was shared with FBI Agent Galioto.   Thus, even FBI Agent Galioto knew that a full recovery (*at a "pennies on the dollar" sale price, simply to facilitate it*) would have resolved the Jowdy thefts of eleven (11) years and counting at that point.   It would have thwarted their underlying plan to own all of Kenner's equity thru a Galioto-led criminal process (*albeit first thru Harvey's 2009 extortion attempt, second thru the 2010 Mexico jailhouse beating scheme, third thru a 2014 illegal transfer scheme with Kaiser [including more forged documents], and fourth thru a forfeiture-repurchase scheme*), all while not introducing new partners to disturb Jowdy's monthly, unchecked looting (*exposed by Kenner and acknowledged by the government in EDNY Court*).   *See PK120*.

- It would be valuable and clearly telling for an un-redacted view of the 2012 email (*PK120*) which outlined the basic plan to sell the DCSL equity to a third (3*rd*) party and relieve Kenner and Kenner investors forever from Jowdy's decade plus frauds.

- **Who was this email shared with and what was under further discussion when Jowdy vetoed the deal – to further punish Kenner and Kenner investors?**

Justices in Baja Sur California (*Mexico*) during face-to-face meetings, where the Diamante resort exists and Jowdy lives full time.  Another Diamante investor was present with Kenner in the Mexico Justice's meetings with our Mexico legal team to confirm the long-standing efforts, and no longer "*because only Kenner said so*" (*while the investors were constantly being represented by independent counsel in every matter*)(*emphasis added*) as echoed throughout the 2015 trial. The last remaining element for the recovery was Kenner's **REQUIRED** in-person testimony to the Supreme Court in December 2013.

Kenner's 2013 Mexico attorneys (*representing the entire Hawai'i-Mexico investor base – including those acting with Jowdy in opposition*), *after the 2010 murder of the investor's former counsel*, were several of the prosecuting attorney in former Governor Agundez arrest in May 2012, *supra*, thus access to the Supreme Court justices was granted, due to Jowdy's definitive connection to Agundez and his countless payoffs.    The new attorney's credibility was also intact as a result of their prior, adverse position to the former governor in front of the Supreme Court Justices.  The resolve as a result of the pending, monumental actions of the Supreme Court to end the eleven (11) years of Jowdy's criminal cabal was imminent and Galioto, Jowdy and Harvey discovered it; *and feared it*.   Kenner's testimony was scheduled just a few weeks after Kenner's fortuitous and timely Indictment and Arrest (*for the Jowdy criminal enterprise*), **solely via the Grand Jury testimony of FBI Agent Galioto**.

In an unbelievable coincidence (*after five [5] years of pre-arrest harassment*), Kenner was indicted only two (2) weeks after the Supreme Court confirmation in person to Kenner, to another Hawai'i and Mexico investor, and to the new Mexican legal team hired by Kenner for the Hawai'i and Mexico investors.   With Kenner in custody and unable to fulfill the *mandatory* in person testimony, Jowdy was able to extend his criminal enterprise another five (5) years and counting at this point; totaling over sixteen (16) years since his first documented theft in August 2002.  *See TIMELINE 012*.

**John Kaiser & Bryan Berard:**

Weeks after the confirmation in Mexico, Kenner was arrested and detained without bail (*fully thwarting four (4) years of grueling legal efforts in Mexico, persevering thru Jowdy's bribery scheme, graft, wrongful imprisonment, slander and defamation in the NY media, and physical threats towards all pro-Kenner investors*), prohibiting the final recovery and termination of the 11-year, well-documented, financial schemes of Jowdy and his cabal since 2002 on Kenner and Kenner investors (*See Kenner Rule 6(e) Motion @ 21-40*).[93]   Considering the initial FBI agent Galioto-led Grand Jury and investigation

---

[93] In June 2011, after McKee had become fully distraught by the ongoing Jowdy frauds and inability to get the FBI to assist our collective plight versus Jowdy, he wrote to Kenner via email:

> "*I will commend you 100% for your efforts versus Jowdy – you deserve a world of credit for your sacrifices.   There may not be another person out there that would have gone to the lengths you have.  I sincerely cannot thank you enough for what you have a are doing.*"

McKee's 2011 compliment echoed the 2009 Norstrom comments, continuing the Berard July 2010 texts of appreciation:

> "*I appreciate what u do. And I hope u know that. If I had the $ I'd give it to u in a second. BB".*

These comments were *ALL* related to Kenner's relentless efforts to fix the unpaid Jowdy-loan frauds (*as the primary basis for the Arizona, California and Mexico litigation efforts*):

| | | | | | |
|---|---|---|---|---|---|
| 104 80 | +46708874 363 Mattias Norstrom* | 10/26/2009 12:43:57 PM(UTC+0) | R e a d | **Hi Phil, Just wanna let you know how much I appreciate all the hard work you're puttin in.** One question: In case everything works out. is Cabo airport | |
| 104 81 | +46708874 363 Mattias Norstrom* | 10/26/2009 12:44:00 PM(UTC+0) | R e a d | and **Hawaii included in the make whole deal**? Matti | |

- Please note that, first, Norstrom was also robbed by Jowdy (*like Kenner and Stumpel*) in the Cabo Airport deal – *See PK121* -- where Norstrom was forced to file independent litigation versus Jowdy in Mexico in 2009.

- Second – Norstrom confirms his knowledge that the Hawai'i money is related to the Jowdy frauds, and asked Kenner to confirm again that he would recover the LOC funds pursuant to the GSF legal efforts versus Jowdy in Mexico and the USA.
    - *Norstrom was on all of the same conference calls as the other GSF contributors.*

of Kenner (*since July 2009 and over four [4] years old*), the fortuitous timing of the final efforts to save Jowdy from Mexico prosecution (*with conspiring members of his cabal*) and the investor's full recovery, **only a few weeks before the final event**, Jowdy received his final miracle.

The 2004 loan to Jowdy, which Jowdy has now confirmed to this EDNY Court thru *PK100 -- Forf-44* (*only post trial*), refuted the Government's persistent contentions during trial that Kenner "**made up**" the authenticity of the loans (*Tr.5064-5065*). Jowdy's *PK100 -- Forf-44* confirmations also confirmed Kaiser's specifically perjured testimony that he did not believe Jowdy stole the loaned funds (*Tr.1229*), in spite of his presence in the 2-day California depositions, which **Jowdy confessed** to all of the loans **in front of Kaiser, with no plans to repay them**.   It should be noted that Kaiser also initially refuted a recording played by Constantine of Kaiser calling Jowdy a "**thief**" (*related to the Hawai'i funds, the various Mexico related budgets, and personal loans*) during the trial proceedings.  *Tr.1229-1232*.   Kaiser's perjurious testimony followed his attempts to convince the Court and jury that he was present at the February 2010 mediation[94]

---

The McKee email was one (1) full year before McKee and the rest of the Hawai'i and Mexico partners received a July 2012 full disclosure update of the relentless issues of Jowdy non-payment and criminal thefts.  *See PK112 -- July 2012 Mexico update and FORTUNE response*

[94] The general amnesia (*or CTE*) exhibited by all Hawai'i investors ay have been best summed up by Mike Peca, after he signed off as a Jowdy loan Plaintiff in the 2008-09 Arizona lawsuit (*See R33 A – Peca letter*) and his signoff as a Plaintiff in both California cases versus Jowdy which specifically represent (*TIMELINE 071 @7 and TIMELINE 072 @7*):

> *"Mr. Najam was in charge of the corporate governance and while under Jowdy's direction and control, received over eight million dollars ($8,000,000) from a LLC in Hawai'i.  Mr. Najam failed to properly account for those funds and has placed the Jowdy investors in a vulnerable and compromised position."*

Nonetheless (*Tr.456-457*), Mike Peca claims that the three (3) major lawsuits versus Jowdy in the USA had nothing to do with the Hawai'i loans, stating:

> "*Zero.  I had never been told that he [Jowdy] had any connection to Hawai'i whatsoever*".

Only willful blindness could support the clearly misleading answers (*notwithstanding CTE*). If that testimony wasn't far-fetched enough, Mike Peca claimed he could not remember what the basis for his coast-to-coast, one-day trip to California in February 2010 was for during the 6-hour Jowdy mediation, claiming:

between the Kenner, the Kenner investors and Jowdy (*somehow invited to the private mediation in California*), *yet he was not there* in support of the Kenner group's efforts versus Jowdy, instead somehow independently there acting as a neutral party (*to whom and for what is bewildering?*).   It was more of the baffling Kaiser testimony, prefabricated to induce support for the Jowdy storyline of integrity (*under the Government's trial theory that Jowdy was also a victim of the Kenner claims of fraud and legally misdirected efforts [Tr.31]*).   Jowdy echoed the same frauds in his 2016 perjury-laden declaration, under oath, to the EDNY court (*See R33 Rebuttal 007 – PAGE 2*), claiming:

> *"I firmly believe, however, that the biggest challenge that I have had to overcome has been the nearly decade-long campaign orchestrated and promoted by the defendant, Philip Kenner and his clients and associates, to unfairly malign me, sue me, and wrongfully accuse me of improper conduct, ranging from mismanagement of the project to various unfounded criminal and civil complaints."*

Notwithstanding the Jowdy statement (*availing himself to the EDNY Court jurisdiction*) signed **under penalty of perjury** to the EDNY Court, executed December 13, 2016, the *Kenner Rule 6(e) Motion @ 21-40* by Kenner outlines dozens of instances of gross, premeditated embezzlements and flagrant criminal conduct by himself and his cabal (*well documented to include Tom Harvey, Bill Najam, Taffy Jowdy Sr., Fernando Garcia, etcetera*) that began *only* days after Kenner and Kenner investors first began wire transfer deposits to Jowdy's Baja Development Corp account in August 2002 (*See TIMELINE 012*) and escalated thru the following decade into tens of millions of criminal frauds in the USA and Mexico.   *Jowdy continues today to defraud Kenner and Kenner investors*.

Only a blind eye, or someone protecting Jowdy "*acting above the law*", could miss Jowdy's contemptible conduct, based in racketeering and deception. Only more obscene

---

"*I'm not sure, long time ago. I don't remember the conversation*".   (*Tr.511*).

BUT in 2015, Mike Peca was sure he never authorized the loans that he **authenticated**, **acknowledged** and **approved** vehemently during his 2011 SDNY Grand Jury testimony, only blaming Jowdy on the non-repayment.   **There is no explanation except perjury (suborned or otherwise – like his wife's *SHOCK[ED]* and "*baby*" fabrications in 2015)**.

than the now-16-years of Jowdy crimes is the unexplainable protection he receives (*along with the non-prosecuted, fabricated "under oath" claims of his henchmen, Kaiser and Berard in their various legal defenses and 2015 planned-perjury*), leaving both Kenner and the Kenner investors, never ending, yet well-documented victims.

Prior to the introduction of the Hawai'i loans, multiple **conference calls** were established to update the Hawai'i investors on the acquisition and permitting processes in 2003, 2004 and 2005.   Each Hawai'i investor was involved in the conference calls, as well as Manfredi and Kaiser to discuss their own respective on-site progress each of them were responsible for and managing in Hawai'i.   *See PK126 [@ paragraphs 9b and 14].*

> Hawai'i and Mexico investor, Jozef Stumpel confirmed:
>
> *"9.   ...As a group and individually, we began our efforts with Kenner to recover all of the funds I directly sent to Jowdy accounts* ***or we agreed as a group like Hawai'i to send to Jowdy for short-term loans****.   I was a participant in lawsuits for:*
>
> > *b. The $5 million plus Jowdy stole from me and the rest of our Hawai'i investors in unpaid loans since 2004 known to all of the Hawai'i investors I discussed it with since 2004 when* <u>*Kenner disclosed the idea to us as a group on a conference call*</u>*"*
>
> *"14. In 2007, Kenner explained to all of us* <u>*as a group on conference calls and individually*</u> *that he caught Jowdy stealing our funds and had no plans to return them.   This is the first time I saw Jowdy bank records from Kenner for both the airplane thefts and the original Diamanté del Mar investment thefts through Jowdy's Baja Development Corp."*

In spite of Kaiser's trial persona that he was barely involved in the Hawai'i project, *while receiving direct monthly stipends of $10,000 on average (coupled with his false allegations of receiving $195,000 of "back-pay" in August 2006 from the Lehman Brothers JV closing, despite not claiming the "income" on his IRS tax forms, ever)*, Kaiser claimed that he "*did not read*" financially critical documents and emails that were sent to him pre-closing (*Tr.1164*).

166

Yet, Kaiser still confirmed to the FBI (*October 19, 2010 – See PK27 -- 3500-JK-1-r*) that he personally met with Jowdy as early as 2003 (*@ page 2*) and several times in NYC to discuss the loans with Jowdy for Jowdy's Mexico projects.   Kaiser confirmed to the FBI that he met with Jowdy several times in Mexico "*prior*" to Jowdy borrowing the funds (*@ page 2*).  Kaiser confirmed to the FBI that after another independent meeting between himself and Jowdy about borrowing funds from Hawai'i, *he contacted Bryan Berard and Kenner to discuss the meeting* (*@ page 3*).[95]   In that noted meeting (*supra*) Kaiser confirmed to the FBI that he and Jowdy discussed the "**2004 loan agreement**" to borrow the money (*further authenticating Kaiser's independent knowledge of the agreement – and representations to Agent Galioto and Agent Romanowski*) (*@ page 3*).

As the raw notes further affirmed, Kaiser informed the FBI that Jowdy repeatedly confirmed to Kaiser – "*Don't worry all $ will come back; get repaid*".   In fact, Kaiser affirmed to the FBI that Kenner had produced multiple Hawai'i project updates (*which included the Jowdy loan issues, the land acquisition plans, the development timelines, permitting schedules, etcetera*), yet Kaiser thru Rule 16 produced *none* of these (*@ page 3*).   The original Hawai'i update messages produced by Kenner were part of the stolen documents and files by former assistant and Jowdy associate, Myrick, after her termination by Kenner in February 2007, for cause.[96]   In spite of Kaiser's revisionary

---

[95] Please note that it also creates an **independent** point in time (*2003-04*), **according to Kaiser**, that Berard would have discussed the Hawai'i loans to Jowdy, discrediting both of their claims in 2015 of "*no loan knowledge*".   Kaiser's FBI proffer also verified Berard's own 2009 arbitration testimony "*of full knowledge*" -- further impeaching Berard's 2015 credibility (*of lacking knowledge*).  *See R33 311*.

Other than the well-documented thefts by Kaiser and Berard from Kenner of the Arizona property (*Arizona lawsuit -- cv2012-055576*) and Sag Harbor (*Arizona lawsuit -- cv2013-052349*) property totaling millions of frauds against Kenner (*creating a clear ulterior motive for their proven perjury, and notwithstanding their high-paid Jowdy-Mexico employment and benefits*), Berard had no other involvement in the 2015 alleged schemes, except for the Hawai'i loans and Hawai'i project.   His own previous 2009 testimony and Kaiser's independent confirmations fully discredit Berard's veracity in 2015, or perhaps again, **CTE** affected him.

[96] Please note that all of the emails that have been used by the defendant post trial to refute all "***lack of knowledge***" perjury by the various government witnesses with real, empirical evidence were recovered by Kenner, *only as a result of* selective parsing by Myrick and

Jowdy's attorneys (*working together*) in the various lawsuits (*sued by Kenner and Kenner investors*), after 2008.

None of the **100,000 plus** "*full disclosure*" emails and subsequent email communications between Kenner and the alleged victims prior to February 2007 (*the exact and specific timing of the alleged concealment*) were available after Myrick stole the Kenner and Standard Advisors Company server and **refused** thru her attorney, Michael Meeks, (*who was working hand-in-hand with Tom Harvey and Jowdy*) to return it through litigation.   The emails that have been used by Kenner in defendant's post-trial motions were **only** those available as a result of Myrick and Jowdy's selective disclosures, after retaining or deleting the most blatantly devastating messages of "*full disclosure*", and destructive and contradicting evidence to their personal case defenses from the various Kenner litigation. During the 2008 *Kenner v. Myrick* litigation, Meeks and Myrick claimed during the settlement in front of the mediation judge that the server had been "***deleted***" by accident (*conveniently, just like the devastating "full disclosure" FBI recordings by Kristen Peca in 2012*).

Attorney Meeks was also used by Harvey as a threat (*or straw man*) to 2004 Hawai'i loan "witness" Robert Gaudet, in a veil attempt to scare Gaudet into backing off his 2009 confirmations of the loan agreement signed by Jowdy (*which Jowdy and his own attorneys admitted to 1 ½ years later in their December 2010 Nevada trial defense [See R33 011]*). After Gaudet confirmed his witness signature to Jowdy's attorneys, Gaudet's July 2, 2009 Arizona deposition testimony (*See R33 556a*) confirmed the complicity of Harvey and Meeks (*Nolan, Juneau, and Myrick's attorney*), and their *personal threats* for opposing Jowdy's legal interests, as follows:

[*Gaudet's July 2, 2009 Arizona deposition testimony*]
> *Q:  What about on Mr. Harvey's end?*
> *A:  Oh pardon me.   On one other call I got a phone call back.  Again, time frame I don't recall, but it was probably like the third or fourth communication.   Introduced himself, "Hey, Bob.  Tom Harvey here. Also John Behnke is with me."*
>
> *Q: Who is John Behnke?*
> *A:  John Behnke is I believe still an employee of Ken's, of Mr. Jowdy.   He is a former FBI Agent, assistant to the director – former assistant to the [FBI] director [Louis Freeh]. So I found it kind of unusual when he made that kind of announcement, that, hey, John Behnke's here.   I consider John to be a good friend.  We've built a good relationship over our time as employees of Diamante.  And John didn't say anything on that call or another call, but, you know, he says, "You obviously don't understand what the law means.  You obviously" – "The law in the United States is different than it is in Mexico."* **He referenced the name Michael Meeks**.  *He says, "Meeks"* – "**You have to be careful because Meeks is going to have somebody waiting for you**."
>
> *Q: Who is Meeks?*
> *A: As I find out, he is an attorney for – he's an attorney.  A California based attorney.  I think he represents a few people that have different lawsuits against – I believe against Kenner.*
>
> *Q: Okay.*

2015 trial testimony, he continued his confirmations to the FBI in 2010 that he knew Robert Gaudet and Tim Gaarn were being paid as consultants to source development partners and funding for the Hawai'i project (*@ page 5*), just like Constantine and many others (*See FOLDER -- Waikapuna loan efforts (excluding Lehman Brothers)*).   This is similar to Manfredi's confirmation of the same to the FBI agents (*See R33 2006*) that he was aware Constantine[97] (*Urban Expansion*) was one of the two "lenders" (*along with Centrum*) and Constantine was being paid in Hawai'i pursuant to an agreement (*@ page*

---

*A: But I was told that I have to be very careful when I travel; that Meeks is going to have someone waiting for me. **You know, this is a very serious issue**. You have to be careful with what you do.  Everybody in the – I believe he is aware that I have got two young children in Canada and I travel back often.  Any free moment I have I go back and spend time with my young children.  **And quite frankly, my next trip out of town was a little nerve-racking. And every one are because, you know, when you – when you get that held over your head, its intimidating, period.***

*Q: How many of these conversations were there?*
*A: I would say voice, four.   Four different phone – four or five different phone calls.*

[97] Komatireddy took outrageous liberties in her rebuttal summation to allege that the $200,000 that Gaarn was paid by Lehman Brothers for their introduction to a $125,000,000 loan was "*Crazy?  Yeah, a little.*" (*Tr.5995*).   Yet, the government turned a blind-eye to the **$650,000** Jowdy received for the introduction to Lehman Brothers for the neighboring deal in Cabo in August 2006 (*See PK118 [the same month Jowdy steals Nolan's $100,000 Cabo investment and makes 'hush payments' to Clemens' whistleblower, Brian McNamee]*)– after Jowdy defrauded Kenner and stole Kenner's personal $72,000 deposit on the $72,000,000 parcel (*next to Diamante*) – *admitted in Jowdy's January 2010 deposition confessions*.

The grand abuse by the Komatireddy statement in a financing world where multi-million dollar referral payments are the 'norm' in the business, not the 'outlier' (or "*Crazy*"), is that Jowdy and Bhatti split up a **$17,310,000** commission in March 2006 from the Cabo closing, while fabricating the story that the Hawai'i loans could not be paid at the closing as previously promised while they obtained the signoff signatures from Kenner and Kenner investors.  Their "*Plan B*" offering to Kenner and Kenner investors was they had to wait for their "*slush fund*" plan thru the future Phase I construction project sales, or decline to signoff on the Cabo deal and walk from the $125,000,000 funding.   That IS CRAZY!   *See TIMELINE 064 @ 11*.

Notwithstanding, Komatireddy makes the jury believe that the $200,000 to Gaarn or the Constantine consulting payments were "*Crazy*" (*ignoring the eight [8] other hard money lenders Kenner, Manfredi and Kaiser attempted to use from 2004 thru 2006*).   Please note that the Hawai'i partners actually sued three (3) of the hard moneylenders for non-performance, totaling about $500,000 in fees.   None of it was crazy – except the blind-eye given to Jowdy, again to the detriment of Kenner (*money and prison time as the Jowdy, FBI, and Harvey whistleblower*) and Kenner investors (*money*)?

169

*1*); *the* <u>three</u> *(3) consulting agreements signed by Kaiser.*   Kaiser made a final confirmation on October 19, 2010 to the FBI of the Jowdy loans that grew to about $5-6 million (*@ page 10*).   Then, Kaiser told the FBI he was aware of the Glen Murray loan (*See R33 015*) to Jowdy because of his relationship with Murray (*like many of the Hawai'i partners -- as testified by Kaiser in the 2009 arbitration – See R33 556 @ 5-6*).[98] Lastly, on that FBI proffer day, Kaiser confirmed to the FBI agents that he "*did see Hawai'i bank account statements*", thus, he was fully aware of all the expenditures of the Hawai'i LLCs from day 1 (*@ page 10*) to Constantine (*for hard money consulting fees*), other highly paid hard money lenders (*supra*) who grossly failed (*like Peachtree [$190,000 hard money fee, resulting in a Georgia lawsuit filed by Kenner for non-performance by the Hawai'i partners], Mt. Zion [$270,000 hard money fee, resulting in a Texas lawsuit filed by Kenner for non-performance by the Hawai'i partners]), Rodney Dalton [$975,000 hard money fee for Jowdy-Mexico, defrauded thru non-performance], and all other project creditors*).   Kaiser and Manfredi assisted Kenner with the filings of the two (2) lawsuits (*supra*) to recover hard-money fees in Georgia and Texas after non-performance. Ultimately, Kaiser confirmed to the 2009 arbitration panel "*under oath*":

> Q: Has this ever been a secret that Mr. Kenner lent this money to Mr. Jowdy?
> **A: No**
>
> Q: Was this a transaction that, as your view as an investor was open and disclosed to everyone?
> **A: It was open.   There was no secret handshakes or nothing like that.**
>
> Q: Even now, sitting here in May 2009, is there *anything* you've uncovered, as someone who obviously knows how to investigate, that Mr. Kenner has done anything inappropriate throughout these transactions?
> **A: No**
>
> Q: Not one complaint?
> **A: No**

---

[98] **Murray confirmed his knowledge of the Hawai'i loans in his own 2008 Nevada complaint versus Jowdy** (*supra*), further cross-referencing the "*group's knowledge*" that Jowdy was receiving multiple loans from his original DDM investors, and they were aware of them, *all of them.*

It should be noted that this testimony occurred four (4) years after Kaiser's *alleged* "*confrontation*" with Kenner by himself and Manfredi in Hawai'i (*April 2006*) about Kenner allegedly stealing and diverting his 2005 friends & family $1 million to Mexico from Hawai'i without his knowledge. *Tr.982-984*.  Ironically, Kaiser's best friend at the time, Chris Manfredi, made incurably contradicting statements to the FBI on October 12, 2010. (*See R33 2006 @ page 2*). In spite of Kaiser's 2015 claims about an April 2006 "*confrontation*" *led by Manfredi* with Kenner about Kaiser's $1 million investment, Manfredi clearly told the FBI that:

> 1) He and Kaiser made a "*$1,000*" deposit in Hawai'i when they first arrived in "**'02-'03**" (*before meeting Kenner*).
> 2) Manfredi confirmed he personally "*never increased investment*", and
> 3) Manfredi told the FBI that he was "*not sure if JK* [Kaiser] *did*".

It is not believable that Manfredi "*forgot*" about a heated $1 million confrontation meeting with Kenner, *specifically about Kaiser's money*, which "*he* [Manfredi] *pretty much stormed out of*" (*according to Kaiser's testimony – Tr.984*), especially if Manfredi was not aware four (4) years later if Kaiser had any more than his share of the original "*$1,000*" in the Hawai'i deal.    However, Kaiser told the 2015 court, "*No, the first time I learned of it [money going to Mexico from Hawai'i] was at that meeting [in April 2006]*". *It clearly never occurred.  The silence from the prosecution table was deafening in harmonizing support of Kaiser's recently fabricated testimony*.

Nonetheless, in addition to Kaiser's lack of complaints about Kenner during his *voluntary* 2009 testimony, Kaiser explained in detail to the arbitration panel that the reason he was agitated is that after "*he met with Jowdy a few times*" (*consistent with his FBI proffer in October 2010*), and "*personally received the guarantees from Jowdy*" for repayment, "*he personally went out and raised funds from his friends & family to contribute the $1 million to the 15% loans from Hawai'i to Jowdy*".

> • This was in gross contradiction to what Kaiser testified to in 2015, supporting what the Government knew to be his recently fabricated testimony, specifically

171

creating prior inconsistent statements, leaving them to stand uncorrected.  *See R33 556*.[99]

Notwithstanding Kaiser's trial claims that Kaiser participated in the "*confrontation*" meeting in the Spring 2006 with Manfredi and Kenner about Kenner allegedly deceiving

---

[99] Kaiser told the 2009 arbitration panel:

*Q: Tell us what your experience was with respect to that money right at the point there was a decision to start loaning money to Mr. – that Mr. Kenner had made a decision to start loaning some of that investor money to Mr. Jowdy?*

*A: ...So if we had some funds that were – that was stagnant and that warrant purchasing land, **we would utilize it for a loan**, so we actually made some money off if it.*

*Q: Was Mr. Jowdy at that time someone that appeared credible to you?*

*A: Well, the first thing, Mr. Kenner told me that he was, **and I met him a couple of times**.  He seemed – **a big thing it was 15 percent interest rate**, and I thought it was a good move.*

*Q: So at the time was there any representation about getting paid back this money when the Cabo deal closed?*

*A: **It was supposed to be a short-term loan**.   I thought it was three to six months, **because I had also raised some other funds from family and friends** that were getting a little antsy about it.*

*Q: At the time this money was lent to Mr. Jowdy...did anybody anticipate he wasn't going to pay you back when the Cabo deal closed, the Lehman Cabo deal?*

*A: **No.  Otherwise, I wouldn't have lent it.   I wouldn't want to go down that route.***

*Q: When you made the decision – or when you were made aware that some of this money was going to be lent, rather than sitting idle in an account, at 15 percent, did you know there were some risks?*

*A: At the 15 percent – actually, **the loans**, I didn't think they were going to be – to me it wasn't a risky loan...**but the loans -- even the investors I brought in – I said. Listen.   This guy – I gave him the whole story of Ken Jowdy back by land.   It's good.  Better than your money sitting somewhere.***

Kaiser with his friends & family money, Kaiser told the 2015 that he "*did not read*" the July 2006 deal document (*addressed to him, and signed and verified by him*) from the Hawai'i attorneys (*Markowitz and Najam*) and Lehman Brothers. The document was produced by the Hawai'i attorneys only a month or so after the alleged "*confrontation*" meeting. *Tr.1132-1134*.   It is inconceivable, especially as a former NYPD career officer, that after being alerted to the alleged $1 million of "diversions by Kenner to Mexico", Kaiser consciously chose not to read the deal documents before signing the acknowledgement.   It is more buffoonery overlooked as plausible, while mind-boggling, ultimately considering his 2009 voluntary testimony when asked:

> Q: Even now, sitting here in May 2009, is there *anything* you've uncovered, as someone who obviously knows how to investigate, that Mr. Kenner has done anything inappropriate throughout these transactions?

> **A [Kaiser]: No**

> Q: Not one complaint?

> **A [Kaiser]: No**

This "*no complaint*" attitude would have included being denied access to his 2007 California proceeds with Kenner as well.   Again, two (2) years after that event, Kaiser had "*no complaints*".[100]

---

[100] It should be noted that the accounting records from Rule 16 evidence of the California proceeds, post closing in November 2007, confirm that Kaiser received approximately $1.1 million in **OVER PAYMENTS** after receiving his full investment and profits were paid out. The over payments were loans Kaiser was obligated to repay to Kenner (*not counting Kaiser and Michiewicz' frauds with the alleged "grocery List"-Eufora funds and Kenner's Cabo house purchase*).   Kenner's arrest meant Kaiser would never be pursued for the funds he grossly borrowed from Kenner.

***Kaiser never make good on the OVER PAYMENT loans***, but instead:
    1) Kaiser stole the Arizona property (*with Berard*) [*TIMELINE 010 @ paragraph 57*],
    2) Kaiser stole the Sag Harbor property (*with Berard*) [*See R33 308*],
    3) Kaiser attempted to steal the Hawai'i "lots" [*See PK134*],
    4) Kaiser claimed he also owned Kenner's Cabo house (*at trial – Tr.1087*), and
    5) Kaiser and Michiewicz claimed Kaiser was due 100% of the Kenner loans to Constantine (*alleged by Kaiser as his Eufora investment "thru Kenner"*)(*Tr.1240*).

173

In the 2009 arbitration testimony, Kaiser confirmed that the _ONLY_ reason he raised the $1 million from his friends & family _was for the Jowdy 15% loan – not in spite of knowing about it_.  Kaiser told the arbitration panel that he told his friends & family "_the whole story of Ken Jowdy back_[ed] _by land_".  Kaiser raised the funds in 2005 specifically for the Jowdy loan, yet he proclaimed in 2015 that he was unaware until a year later (_2006_).   The contradictory statements are not reconcilable under any circumstance.

Ten (10) years later in the EDNY courtroom, Kaiser conveniently forgot; otherwise his truthful (**and previous**) testimony would have confirmed all of _his_ meetings with Jowdy prior to the initiation of the loan (_as proffered to the FBI on October 19, 2010 – See PK27_), his confirmations of the Hawai'i investor conference calls prior to the agreement for the Jowdy loan[101], and his repeated interaction with other Hawai'i investors (_specifically including Berard, as proffered to the FBI by Kaiser [See PK27 @ 3], and conveniently forgotten in 2015 – notwithstanding Berard's concurrent faulty memory, confusion and mistakes or **CTE**_).[102]

---

Now, despite full documented repayment of the California deal with Kenner (_in spite of 2015 trial amnesia [See R33 B -- $1.7mm REPAYMENT fraud...Kaiser CA funds] – which confirms that Counts 2, 3 and 4 are **NOT** due to Kaiser as "funds due to Kaiser"_), Kaiser also failed to disclose the profits of the California deal to the IRS (_just like his first three [3] years of earnings from Cabo/Jowdy – Jowdy-style, verified by Kaiser in his 2014 Arizona deposition_).

[101] Confirmed by Hawai'i, DDM, Diamante Air, and Cabo san Lucas investor (_and Baja Ventures 2006 partner_) Jozef Stumpel's 2017 **signed** and **initialed** affidavit for the EDNY court (_supra_).   _See PK126_

Confirmed by Hawai'i, DDM, Diamante Air, and Cabo san Lucas investor, Mattias Norstrom in his 2015 affidavit (_in lieu of the threats received from FBI Agent Galioto to "stay away" from anything to do with Kenner, the 2015 trial, or new litigation in Mexico versus Jowdy [supra]_).   _See PK123a and PK123b_. Norstrom affirmed:

> "_As a group, we agreed to lend him funds at a 15% interest rate.   Jowdy signed an official loan agreement with us in December of 2004._"

[102] Berard's May 2009 voluntary arbitration testimony to confirm his knowledge and agreement with the Jowdy loans was in spite of his 2015 perjured testimony to the contrary (_at a time Berard told the FBI [2013] – after receiving his job from Jowdy – that he thought Kenner was not legit_).   Yet, Berard confirmed his complete knowledge without a complaint in May 2009 when voluntarily testifying:

[*Berard May 2009 arbitration testimony – **only a month after Northern Trust seized his collateral**]*

> Q: Were you aware that Mr. Kenner got a credit line against some of the securities or investments you had?
>
> **A: Yes.**
>
> Q: And later on **were you aware that Mr. Kenner started lending this money to another principle in the Cabo project named Ken Jowdy**?
>
> **A: Yes.**
>
> Q: Were you aware that he had disclosed to you that he was going to lend this money at a rate of interest to benefit the investors?
>
> **A: Yes.**
>
> Q: Where did you think the money that Mr. Jowdy – were you told where the money was going to be used **that was given Mr. Jowdy** as far as the Mexican project? Was there anything that you were told about that?
>
> A: **Basically just loan him the money for the project**.

Berard's two (2) documented assaults (*NYC and Mexico*) in and around the time he began talking and working with Jowdy are *another early symptom of CTE*.  His aggravated behavior (*also documented with Constantine*) is a 3rd **CTE** symptom, in addition to the primary side-effect of "*loss of memory*".

**New York incident**:  [*BERARD texts to Kenner*] After Berard assaulted someone in NYC in his own restaurant.  Berard faced misdemeanor assault charges, as a result of the incident in NYC…one-and-a-half (1 ½) years after Berard later claimed (*in 2013*) to the FBI that he did not find Kenner to be legit – Berard acknowledged his assault:

| | | | | |
|---|---|---|---|---|
| 184 32 | +14015246 929 Bryan Berard* | 12/2/2010 11:39:17 PM(UTC+0) | Re ad | ***That fucker pressed assault 3 charge on me misdemaeanor. So going wth stolper to turn myself in tonite and get over wth. Ill b wth stolper for cpl hours so ill find out what's going on*** |
| 191 46 | +14015246 929 Bryan Berard* | 12/29/2010 9:24:16 PM(UTC+0) | Re ad | 42K lawyer bill today for eufora and **7500 for my lawyer on assult charge**. Ready to fuckn snap |

**Constantine incident (*only a few days prior to the NYC incident*)**:  [*BERARD texts to Kenner*] Berard looking for Constantine after litigation troubles in AZ…

175

Please note that the voluntary testimony by Berard in 2009 at the arbitration (*May 2009*) would have been less than two (2) months *after* Berard later reversed his position and claimed to the FBI (*on September 9, 2013 -- after employed by Jowdy*) that *he was now* (*in 2013 – four [4] years later*) unaware of the prior use of his LOC funds as noted by Galioto in FBI 302b notes (*in spite of his clear and voluntary, May 2009 arbitration testimony*) --

[*September 9, 2013 to the FBI (Galioto notes)*]

"*When Berard returned from Russia in March or April 2009* [when his LOC collateral was seized]*, he started to realize that Kenner was not legitimate.*"

Yet, Berard confirms to Kenner over a year later (*after his revisionary statements to the FBI claimed he allegedly had found Kenner to not be legit*) via text communication that Berard **ONLY** wants to continue investing with Kenner and a small group of "*4 or 5*"

| 18262 | +14015246929 Bryan Berard* | 11/27/2010 9:25:44 PM(UTC+0) | Read | That's the plan. Thanks. **What's TC** [Constantine] **complaint abt me and the meails** [emails]**?** |
|---|---|---|---|---|
| 18263 | +14015246929 **Bryan Berard*** | **11/27/2010 9:41:32 PM(UTC+0)** | Read | **Ha well if we don't win. Than stolper will have to represent me. Cause ill really fuckn hurt him and do by myself** |
| 18264 | +14015246929 Bryan Berard* | 11/27/2010 9:44:41 PM(UTC+0) | Read | **That's a promise** |

**Mexico incident (*Obstruction of Justice*):**  Berard physically assaulted Robert Gaudet because Gaudet would not turn on Kenner (*even with Jowdy and FBI pressure, and Kaiser and Berard recorded threats on FBI recordings in Mexico*), with Gaudet knowing the Jowdy frauds were real.   Gaudet was in contemporaneous Mexico litigation for years personally with Jowdy for more unpaid loan thefts and employment frauds costing Gaudet several millions of dollars.  Gaudet told FBI Agent Galioto and IRS Agent Josh Wayne:  (*See Ex.37 @ paragraph 9*)

*9. Gaudet recalled that he was out at a bar in Cabo san Lucas Mexico and he saw Bryan Berard.  Berard yelled at Gaudet for continuing to talk to Kenner.  Gaudet told Berard he was wrong.  **Berard put Gaudet in a choke hold and yelled he was going to kill Gaudet.***

after they collectively get rid of Jowdy and Constantine through the pending litigation in California, Nevada, Arizona and Mexico, stating (*in October 2010*):

> "*I wanna just get these guys there $ back and let's go do stuff wth small group*".

Three (3) months earlier (*July 2010),* Berard confirmed further confidence, texting:

> "*I appreciate what u do. And I hope u know that. If I had the $ I'd give it to u in a second*". [103]

Berard further confirmed in October 2010 (*over 1 1/2 years after he told the FBI [in 2013] that Kenner was not legit*):

> *"Uve put up wth enough bullshit over the years. Try get them there $ back and wash ur hands wth all these retards.   And I mean all of them"*

> *"hopefully this is the sign of the beginning of the end. 6 more months done all this shit Hopefully can go after Leaman Borthers soon too"*

> *"Any word when ur coming to NYC yet to meet wth Stolper and Lawyer from Rhode Island for the Hawai'i lawsuit"*

And again **four (4) months later** (*on February 16, 2011*), while Berard is still working hand-in-hand with Kenner on the Constantine and Jowdy cases:

> *"Don't know how uve done this for this long. I don't know how much longer I can."*

Berard's own text communication with Kenner refutes his 2015 perjury of "*lack of LOC knowledge*".  It refutes his belief that Kenner was not legitimate, including the timing and knowledge of the LOC collateral seizure (*a.k.a. lying to the FBI*), as follows:

Berard's perjury in 2015 supported the Kenner-adverse, Government theories that Berard was *not aware* of his LOC seizure (*Tr.3039-3040*) when he proclaimed:

> "*Honestly, I was playing in Russia.   I got back in 2009 and basically just kind of getting a phone call from Northern Trust that I lost close to a million dollars in my pledge account* [which was actually less than $650,000 at that time]."

---

[103] *See PK116 -- Berard Northern Trust LOC texts before seizure – full knowledge @ pages 6-8.*

177

Despite the following contradicting text communication **five (5) days prior** to the April 1, 2009 seizure, *this following confirmed Berard's fully unfettered knowledge – thus planned 2015 perjury*:

[**Berard in BLACK; <span style="color:red">Kenner REPLY in RED</span>**]:

| | | | | |
|---|---|---|---|---|
| 620 7 | +140152 46929 Bryan Berard* | **3/26/2009 6:53:59 PM(UTC+0)** | Rea d | **When u get chance can we look at _how much money will b freed up after payn off line of credit NT???_ Thanks** |
| <span style="color:red">728 0</span> | <span style="color:red">+140152 46929 Bryan Berard*</span> | <span style="color:red">**3/26/2009 7:00:51 PM(UTC+0)**</span> | <span style="color:red">Sen t</span> | <span style="color:red">**~300k**</span> |
| 620 8 | +140152 46929 Bryan Berard* | **3/26/2009 7:04:18 PM(UTC+0)** | Rea d | **Cool thanks!!! When will that b freed Gonna use 200 for a cool oppurtunity will show u and talk 2 u abt it later. Good for all of us n future.** |
| <span style="color:red">728 2</span> | <span style="color:red">+140152 46929 Bryan Berard*</span> | <span style="color:red">**3/26/2009 7:30:08 PM(UTC+0)**</span> | <span style="color:red">Sen t</span> | <span style="color:red">**Can't wait to hear!**</span> |

Berard's 2015 "*phone call claim*" also contradicted his September 12, 2013 FBI proffer (*after being employed by Jowdy in Mexico*) in which Agent Galioto noted:

> *"At some point, Berard received a Federal Express letter from Northern Trust explaining that his bond account was liquidated to pay off his LOC.   When Berard confronted Kenner, Kenner told him the Hawai'i project needed the money, but his value in Little Isle 4 increased by $1.1 million (the value of the bonds)."*

**No such letter was ever written by Northern Trust Bank.**

Obviously, Berard fabricated the entire claim to the FBI (*an ongoing criminal act*), refuted by his own March 2006 texts with Kenner _prior_ to the seizure.   In fact, the pledged Berard bond account was $650,000 (*clearly known to Northern Trust Bank and Berard, since Berard signed it on or about March 7, 2008*)[104]   Thus, Berard would have known immediately if Kenner claimed he acquired $1.1 million in additional equity &/or

---

[104] *See 2008 Berard Master Note with Pledge and Control Agreements $650k in FOLDER "Berard Northern Trust documents"*

178

Northern Trust's letter (*which was never written*) claimed he lost a million dollars as he fabricated to the FBI in the same September 2013 proffer, affirming:

> "*I got back in 2009 and basically just kind of getting a phone call from Northern Trust that I lost close to a million dollars in my pledge account.*"

**It was all false and fabricated to the FBI once working for Jowdy with Kaiser.**

Short of suborned perjury, the only explanation would be Berard's *faulty memory, confusion and mistakes* (or **CTE**).  It is the only plausible excuses (*thus wholly unreliable*) for his repeated fabrications, based on the paucity of empirical evidence to support even one of his *ex post facto* statements:

> 1) Repeatedly lying to the FBI,
> 2) Lying to the 2015 EDNY Court, and
> 3) Lying to the 2014-15 Arizona courts (*with Kaiser and Donlan's complicity*).

### Owen Nolan:

Nolan was a founding member of Little Isle 4, which Kaiser and Manfredi were members of (*in spite of their perjured testimony in 2015 and Michiewicz' insinuations with Kenner under his cross-examination*).  Otherwise, Kaiser and Manfredi would have had no legal ties to the property they discovered in 2001-02 (*before their introduction to Kenner*) and secured with their collective **$1,000 deposit** (*as Manfredi confirmed to the FBI in 2010 proffer, supra*). *See TIMELINE 046 (signed by Kaiser as a member).*

Manfredi signed the initial 258-acre purchase agreements for Little Isle 4 in December 2003 (*under the Big Isle IV purchase agreement*) as a member of Little Isle 4 with Kaiser.  *See R33 503.*   In fact, after the December 2003 purchase, Nolan received his copy of the 258-acre purchase agreement with Manfredi's signatures directly from Manfredi, as the Hawai'i COO (*full transparency*).   Nolan produced this document in the 2009 arbitration (*see Nolan's Arbitration BATE STAMP*), further compounding Nolan's

underlying knowledge thru full disclosure of involvement in the Hawai'i project from day 1.[105]

In fact, in direct contradiction to the Government's 2015 trial theories of "*no LOC knowledge*" and "*no Jowdy loan knowledge*", the Government (*as well as Nolan's 2009 attorneys*) ignored Northern Trust banker, Aaron Mascarella's March 24, 2009 deposition testimony (*only 1-week before all of the LOC collateral seizures – a 1 ½ months before the arbitration*) of direct communication with Owen Nolan between 2003 and 2006 when Nolan's LOC was open, used, and distributed to Little Isle 4 (*pursuant to the Little Isle 4 Letter of Authorization with Nolan – See FOLDER Nolan Northern Trust documents -- NT 2004 Letter of Auth for LI4 - Nolan-2*).   This was prior to the August 2006 Lehman Brothers' payoff and confirmed distributions to Nolan, ***thru documents Nolan possessed and personally signed***.   This leaves no equivocation whether or not Nolan had full Northern Trust LOC knowledge (*supra*), **thru third (3rd) party, independent verification**.   Yet, Nolan's attorneys allowed Nolan to commit known perjury in 2009 when asked and answered:

> *Q: **Did he [Kenner] discuss with you securing a line of credit for the Hawai'i investment?***
> *A: No* [106]

---

[105] Please note that this is the **same** Nolan BATE STAMPS that Nolan produced on his 2006 Little Isle 4 tax documents, **FULLY** confirming that **Nolan was aware of his $2.3 million Hawai'i capital account**.  *Nolan had the documents in his personal possession*, confirming he received a $761,000 payment in 2006 at the Lehman Brothers funding (*in spite of his alleged lack of knowledge*).  *See R33 495*.

It should be noted that Nolan immediately wired $500,000 out of his Northern Trust account as soon as the pledge amount cleared with the $761,000 distribution from the Lehman Brothers closing thru Na'alehu Ventures 2006, further identifying Nolan's personal knowledge of the timing of the Lehman Brothers payments, contradicting his later, planned selective amnesia.  *See R33 rebuttal 031*.

[106] *See R33 502* – 39-page fax cover sheet for Nolan to sign and return his December 2003 Little Isle 4 LOC documents directly to Northern Trust Bank using Kenner's FedEx account. The fully executed Little Isle 4 LOC with all of Nolan's signatures was recovered from Northern Trust Bank during the Arbitration by Nolan's attorneys, despite their fraudulent assertions and Nolan's perjury.

*See PK47* – Via text and phone in December 2007, Kenner and Nolan discuss Northern Trust LOC renewal package that Kenner sent via FedEx to Nolan after he ignored the renewal

Q: Did you ever have a conversation with Mr. Kenner in which you discussed granting him access to a line of credit to transfer to Little Isle 4?[107]
A: No

Q:  Do you know whether a line of credit was opened in your name in 2004 at the Northern Trust Bank?
A: I know there is now.

Q: Did you know at the time?
A: No

In the 2015 Northern Trust subpoena (*available to Nolan in 2009 pre-Arbitration but not disclosed to Kenner and Kenner's attorneys pre-arbitration by Nolan – partially Kenner trial exhibit 210*), Nolan and his attorneys ignored their clear knowledge of the following LOC documents **signed** personally by Nolan (*See FOLDER -- Nolan Northern Trust documents*):

1. 2004 Nolan Letter of Authorization for Little Isle 4

---

package for a month from Northern Trust bank (*directly*).   After a 7-day continuous text conversation (*in Rule 16 evidence*) between Nolan and Kenner specifically regarding the LOC **renewal** documents, Nolan AGAIN utilized Kenner's FedEx account and returned the entire package of **signed** documents to Northern Trust Bank.  Kenner's AMEX account documented the Nolan usage of the FedEx account (*in Rule 16 evidence @ BNK-AMEX-1640*) and Kenner's FedEx delivery confirmation from five (5) days earlier from Kenner to Nolan, in unison with the text conversation (*in Rule 16 evidence @ BNK-AMEX-1638). See R33 482.*

> Please note that Kenner's former assistant, Myrick (*who was terminated for cause*), worked with Jowdy's efforts (*against Kenner and Kenner investors*) since February 2007 (*immediately post-termination of Myrick*).   Prior to that, Myrick worked hand-in-hand with the various Northern Trust bankers to make sure the investors were signing their annual renewal packages.  This made the LOC usage further **transparent**, while coordinated by a future-adverse-party to Kenner, yet (*even post-termination*) she never gave testimony or provided supporting evidence that Kenner ever concealed the LOC information (*any portion of it*) from the various Kenner-Northern Trust clients.  *See PK122.*

*See PK113 -- FORF_EXH_212 - NT March 2007 DEFAULT Letter for LI4 - Nolan-2* – Default letter sent to Nolan by Northern Trust (*Aaron Mascarella*) regarding the Little Isle 4 LOC renewal that Nolan had ignored for 53-days since expiration.  This DEFAULT LETTER is consistent with the confirmations Mascarella made in his 2009 deposition about direct communication with Nolan (*without Kenner*), **years earlier**, between 2003 and 2006.

[107] *See NT 2004 Letter of Auth for LI4 - Nolan-2 in FOLDER "Nolan Northern Trust documents"*

181

      a.   ***One page document – signed by Nolan***,
    2.  2004 Nolan $2.2 million Extension of Credit for Little Isle 4
      a.   ***One page document – signed & dated by Nolan***,
    3.  2004 Nolan Disbursement Request & Authorization
      a.   ***One page document – signed by Nolan***,
    4.  2004 Nolan Control Agreement (***signed by Nolan***), and
    5.  2004 Nolan Master Note for $2.2 million (***signed by Nolan***).

They were all *personally signed* by Nolan and returned *independently* to Northern Trust bank before the end of 2004, all after both he and Joe Juneau signed their original Little Isle 4 LOC documents in December 2003.  They both utilized Kenner's FedEx account, and returned them independently to Northern Trust Bank.[108]

Notwithstanding, in 2005, Nolan re-signed all of the Little Isle 4 LOC renewal documents directly with Northern Trust, in addition to his new, personal LOC (*all subpoenaed by Nolan's attorneys prior to the arbitration confirming Nolan's knowledge*), including but not limited to:

    1.  2005 Nolan Disbursement Request & Authorization
      a.   ***One page document – confirmed $2.188 million used – independently signed by Nolan***,
    2.  2005 Nolan Pledge Agreement (***signed by Nolan***),
    3.  2005 Nolan Control Agreement (***signed by Nolan***), and
    4.  2005 Nolan Master Note for $2.2 million (***signed by Nolan***).

In 2015 (*Tr.2065-2066*), on direct examination by the Government and without correcting the known Nolan 2009 misrepresentations, the Government allowed Nolan to allege he was unaware of the LOC.   Only *faulty memory, confusion and mistakes* or **CTE** could have supported this unreliable testimony, *short of planned perjury*.

---

[108] Although Juneau and the government constructed 2015 testimony alleging Juneau had not seen LOC documents until sometime in 2006, *after he signed and retuned via FedEx his initial December 2003 LOC documents to Northern Trust Bank directly*, **Juneau signed renewal packages in 2004, 2005, and 2006** before Nolan bought out his 3+% interest in 2006 (*See R33 495*) and closed their Little Isle 4 LOC.

Complimenting and further confirming Nolan's personal knowledge of the LOC was the fact that Nolan's attorney (***Meeks, while working with Jowdy, Harvey, and Myrick in 2008-09***) deposed Northern Trust banker Aaron Mascarella on March 24, 2009 (*pre Arbitration*) and asked Mascarella if he and Nolan had ever spoken about Nolan's LOC between December 2003 and 2006, to which Mascarella replied:

[*Nolan attorney Meeks to Northern Trust banker, Aaron Mascarella*]
> Q.    During the time period from -- from the time you opened the Nolan account [December 2003] until the end of 2006, did you have conversations with Mr. Nolan concerning the line of credit?

 [*Aaron Mascarella*]
> A.    Conversations -- ***I spoke to Owen infrequently***.  I've only had brief conversations with him.  And my guess is that ***it was only relating to the payments, that the payments were being made or not being made***.  There was a few times when the payments were slow, that ***we sent out default letters***, which probably -- You know, ***I can't remember*** <u>***every***</u> ***conversation I had with him*** but I assume he might have <u>responded</u> to one of those default letters.

Nolan "***responded***" according to Mascarella's 2009 deposition testimony and heard by Nolan's own arbitration attorney, just weeks before the arbitration. Nolan's attorney ignored it and fraudulently fabricated the "*no knowledge*" testimony with Nolan for his arbitration case, defrauding the Arizona arbitration panel and Kenner.  Thus, ***Nolan independently made the <u>calls</u> to Mascarella***, further confirming the transparency of the LOC between Nolan and his personal Northern Trust banker, Mascarella.  Mascarella confirmed:

> "*I've only had brief conversations with him*".

**This independently confirmed multiple and direct communication; affirming 2015 perjury.**

In addition, after the August 2006 Hawai'i JV funded by Lehman Brothers, Mascarella sent a letter to every LOC client of his and Northern Trust Bank.   The letter confirmed the LOC "***paydown***" amount by the bank.   The letter confirmed that Kenner had requested that Mascarella directly communicate with the clients (*normal 2001 Patriot Act protocol*) and ask if they wanted to reduce their collateral.

183

Berard, Sydor and Nolan all signed new LOC documents with Mascarella as a result of Mascarella's direct and unobstructed communication. *See R33 659b2 -- Mascarella letter to Berard re- LOC reduction.*   By this point in time (*August 2006*), it would have been impossible for Mascarella to not establish direct and unhindered communication with his LOC clients.[109]   Not one response from Mascarella's LOC clients indicated they were unaware of the significant pay downs or the funds that had been used in their LOC thru that time.   Separately, Mascarella **confirmed his 2003 thru 2006 phone calls** with Nolan (*during his 2009 deposition to Nolan's attorneys, who consciously ignored Mascarella's statements of "direct communication" and allowed Nolan to claim "no knowledge" of the LOC only a month later in the May 2009 arbitration*).

Nolan received no repercussions from his false statements of obliviousness of his LOC (*per his 2009 and 2015 perjured testimony*) from the arbitration panel or the FBI. Immediately following the "***pay downs***" outlined in Mascarella's independent 2006 letter, Northern Trust issued new LOC documents to reduce collateral with Nolan, Berard, and Sydor; **signed independently by each of them** (*or the reduction of collateral would not have occurred without their independent signatures*).   Despite the Government's collective witness' *faulty memory, confusion and mistakes* in 2015 (*per the Government's main Rule 33 objection theme*), nothing was concealed from the LOC clients by their own Northern Trust banker acting independently of Kenner.   Mascarella verified under oath in

---

[109] The Mascarella letter specifically detailed:

- *As your relationship manager at Northern Trust,* **I was given instructions by Phil Kenner** *to make modifications to both your investment account and* **your personal line of credit***.*
- **As you are aware***, a recent paydown in the amount of $718,905 took place on 8/24/06.*
- *By setting a maximum line limit of $650,000 (***present balance $617,911***) on your* **personal line of credit***, we could lower the collateral requirement to $850,000…*
- *As a valued client of Northern Trust Bank,* **I wanted to take this opportunity to review recent account activity and confirm the changes to your account***.*

2015 (*Tr.912*) that LOC statements, under his watch, <u>were sent to his individual clients</u>, including the ones turned over by the Northern Trust subpoena[110] (*emphasis added*).

In addition, Nolan's 2009 attorneys, Nolan and the 2015 prosecution further ignored the evidence that repeated email communication between Nolan's wife, Nolan's private banker (*from Wells Fargo*), and Kenner's assistant (***transparent and independent from Kenner***), which <u>*existed*</u> (*in Rule 16 evidence*) to pay LOC fees that were due on the Nolan LOC to Northern Trust Bank thru 2006.[111]

The emails between Diana Nolan (*Owen's wife*) and Kenner's assistant, Myrick, (<u>*Diana Nolan's best friend*</u>) (*without Kenner cc'd*) included:

1.  [August 2, 2006 email] **SUBJECT: Conversation with Phil** [Kenner]

    *"You need to send about $190k to the LOC at Northern Trust."*

2.  [August 3, 2006 email] **SUBJECT: RE: Payment to LOC at Northern Trust**

    *"Below is the information for the payment that needs to be sent to your LOC at Northern Trust.  Please send $134,396…"*

    *[forwarded to Nolan's private banker at Wells Fargo <u>by Diana Nolan</u> for payment].*

3.  [August 9, 2006 email] **SUBJECT: Wires**

---

[110] See examples (*all under Mascarella's control at Northern Trust Bank since 2003*):
- In FOLDER Berard Northern Trust documents  -- NT 2-2009 LOC Loan Stmt - Berard-2
- In FOLDER Berard Northern Trust documents  -- NT 3-2009 LOC Loan Stmt - Berard-2
- **In FOLDER Peca Northern Trust documents  -- NT 2-17-2006 LOC Loan Stmt (*Canada address*) – Peca**
- In FOLDER Peca Northern Trust documents  -- NT 2-2009 LOC Loan Stmt (*Buffalo address*) - Peca-3
- In FOLDER Peca Northern Trust documents  -- NT 2-2009 LOC Loan Stmt (*Calgary address*) - Peca-3
- In FOLDER Sydor Northern Trust documents -- NT 3-2009 LOC Loan Stmt – Sydor
- In FOLDER Nolan Northern Trust documents -- NT 7-2008 LOC Loan Stmt - Nolan-2

[111] *See R33 468, R33 470, R33 471, R33 473, R33 475, and R33 476.*

185

*"I hope I am not bugging you the same way Phil has...I am receiving calls from both the tax guys in Canada and the LOC guys at Northern Trust. My main concern is that you are paying interest on 2 of them daily."*

Nolan's defiance and clear perjury in 2009 and 2015 about the underlying LOC knowledge prohibits him from any reasonable derivative testimony to knowledge of the loans to Jowdy (*or not*) from the Hawai'i project, since he could barely confirm his own involvement, thru perjury himself, **CTE**, or simply exhibiting *faulty memory, confusion and mistakes* about the deal since 2003, *thus wholly unreliable*.[112]

### Joe Juneau:

Joe Juneau testified in 2015 that he had been *returned* 100% of his investment funds from the Hawai'i project and Eufora when he made the extremely unusual request to Kenner about his Private Equity deals in 2006; ***to have his capital investments returned***.   *Juneau confirmed that he has no loss from the alleged schemes in the 2015 trial.*   Yet, Juneau provided more faulty testimony, in support of the Government's theories, when he

---

[112] Please note that Nolan told the 2009 arbitration panel that **he had not read a single document since before his initial NHL contract in 1991** (*18 years before the arbitration*).

[*Nolan 2009 Arbitration -- Day 1 @ 109-110*]

*Q:* **You've testified that you never read a document ever that you can think of sitting here today before you signed it.**   *At anytime in your lifetime has someone advised you to take the strategy of never reading a document when you sign it?*

*A: No.*

Nolan's willful blindness to the myriad of investment and financial documents he **signed** and his wife managed for him cannot create a reliable concealment argument from the various projects and deals he was involved with during his decade with Kenner.  One (1) of the arbitrators (*former AZ Federal Judge Meyerson*) and Nolan's attorney, Meeks (*who was working hand-in-hand with Jowdy and Harvey versus Kenner and the other Hawai'i and Mexico investors by then*), exchanged the following (*even after Northern Trust banker Mascarella confirmed in his 2009 pre-arbitration deposition, less than two (2) months earlier, about his specific, direct communication with Nolan -- supra*):

*Mr. Meeks: He* [Nolan] *admits that's his signature.  His testimony is he wasn't aware.*

*Arbitrator Meyerson:  So somebody signs a statement that says, Please grant Philip Kenner access to a line of credit for direct deposit into Little Isle 4.* **Doesn't somebody have to take responsibility for that?**

186

claimed he was not aware of the Little Isle 4 (*Hawai'i*) LOC with Northern Trust Bank until sometime in 2006 (*three [3] years after he personally signed the LOC documents to open the account, mailed them to Northern Trust with Kenner's FedEx account, all after he signed a completely separate set of documents to set up a new investment management account, and had transferred assets to Northern Trust in order to collateralize his LOC for his Hawai'i investment -- See R33 504a*).   Juneau, along with Nolan, **signed** as co-signors on the Little Isle 4 original LOC in December 2003. The process to transfer their respective collateral and open their underlying investment accounts began over a month earlier, also by FedEx, utilizing Kenner's account.  Both of them received the initial LOC packages via fax from Kenner (*See R33 502*) and returned their signed documents independently to Northern Trust Bank within days of the fax, *utilizing Kenner's FedEx account*.   Northern Trust funded the Little Isle 4 LOC, after receipt of their signed documents (*eight [8] days after Kenner's faxes to Nolan and Juneau*).[113]   The consecutive BATE STAMPS, produced by Northern Trust pursuant to subpoena, confirm their custody of the _complete_ LOC documents (*not just signature pages*), signed by Juneau and Nolan for Little Isle 4.    For further and initial Little Isle 4 transparency, Chris Manfredi (*Hawai'i COO, and Kaiser best friend*) signed the initial 258-acre purchase contract in Hawai'i for Little Isle 4 on December 23, 2003, only days after the funding by the Northern Trust LOCs and investor cash.  Manfredi mailed copies of the closing documents to Nolan, Juneau and other Little Isle 4 members after the recording of the deed in Hawai'i (*See R33 503*).   The documents in Rule 16 evidence confirm that Nolan had these documents in his possession, independent from Kenner, and were bate stamped by Nolan for the 2009 arbitration.

---

Nolan confirmed to the arbitration panel that he signed the 2003 Letter of Authorization for Kenner and Little Isle 4. *See NT 2004 Letter of Auth for LI4 - Nolan-2 -- in FOLDER Nolan Northern Trust documents*

[113] *See R33 506, 507, 508 (in FOLDER Juneau Northern Trust documents)* – **signed** by Juneau and sent via Kenner's FedEx account by Juneau to Northern Trust (*just like the signed 2003 Nolan documents -- supra*).

In spite of Juneau's **LOC lack of knowledge** testimony at trial "*until 2006*", Juneau and Kenner exchanged a series of emails (*in Rule 16 evidence and Juneau 3500 disclosures*) that confirmed that Juneau was 100% aware of his "loan" (*LOC*) investment in Hawai'i as Kenner confirmed to him without an adverse response.   Juneau confirmed his signature on LOC documents opening the account in December 2003 that he claimed he could not remember (*just like Nolan*).   *Tr.253-55*.   The May 2005 emails between Kenner and Juneau confirm Juneau's loan and make no mention of $100,000 investment to Hawai'i, which was NEVER made.   *Tr.167*.   Kenner's 2005 response clearly designates **Juneau's loan** with no adverse comments (*except the statements of investment* **in agreement with Kenner** *– infra*).   In fact, contrary to his 2015 faulty recollection, Juneau responded on May 18, 2005 (*ten [10] years earlier*):

> *"For Hawai'i, Id love to go and see that!   I'd also like to see how the #s work."*

At or about that time, Juneau was announcing his retirement from pro hockey and expressed to Kenner that he wanted "OUT" of his private deals (***with the specific exception of Hawai'i***).   **On May 18, 2005**, Juneau confirmed **in response** to a Kenner email that he was absolutely satisfied with Kenner's investment work and actually wanted Kenner to continue "*managing his bond account at Northern Trust Bank*" with the additional return of his requested Private Equity funds, if possible (*See R33 504a*) (*from Juneau to Kenner, on May 18, 2005 – one [1] year after his May 2004 retirement from the NHL*):

> *"Phil, like I told you a few times already.   I'm not confortable with this situation.   It's has nothing to do with you but everything to do with the way I am."* [114]

---

[114] Juneau's email asked Kenner to continue managing his $7 million in bonds at Northern Trust for him, contradicting his 2015 testimony.   In addition, this email was only five (5) months after Juneau confirmed that he and his fiancé spent their 2004 Christmas in Arizona "*visited the Kenners*".   *Tr.298-299*.

This full contact communication with Kenner (*and Juneau's 2015 amnesia about it*) echoes Kristen Peca's false claims that she and Mike, also, could not get a hold of Kenner in 2009-2010.   Kristen Peca's amnesia forgot:
    1) The **500+ text messages** between Kenner and her husband that year,
    2) The endless emails (*including confirmation of the Jowdy loans – See R33 319*),
    3) The meetings Kenner arranged for them to meet Kaiser (*the Hawai'i Managing Member*) face-to-face (*immediately after the LOC seizures*) in their NY home,
    4) The 2009 phone meetings with AZ Eufora Partners I Managing Member Gaarn,

Juneau made the clear statement in his 2005 email about his decision to be out of his private equity deals:

"*It has nothing to do with you…*"

And, to further his comfort with Kenner, Juneau continued in his May 18, 2005, same-day response to Kenner that he wanted his $7 million dollars <u>*under Kenner's management*</u> (*which clearly refutes Juneau's fabricated testimony in 2015 that by*

5) The face-to-face GSF meeting in Ohio,
6) The myriad of follow-up 2009 conference calls to update the GSF individuals about the legal status with Jowdy and the other "*bad apples*" [*as McKee confirmed independently (See McKee GSF report – in McKee GSF info)*],
7) The Jowdy lawsuit meetings in Los Angeles that her husband attended with Kenner and Ronald Richards,
8) The prior January 2010 invite to be with Kenner, Berard, Kaiser, Woolley and deVries for the 2-day Ronald Richards depositions of Jowdy,
9) The "plans" for Kristen Peca and her family to stay with Kenner at his Arizona home for their vacation in late 2009 (*See R33 601*).

*Notwithstanding the voluminous documented communication, all of this occurred while Kristen and Mike Peca were <u>allegedly</u> not able to communicate with Kenner?*

Kristen Peca said that she "*there were stretches [in 2009] where we didn't hear from him in months*".   Clearly her comments were unsubstantiated, or simply her husband concealed the overwhelming communication with Kenner (*like he concealed their Hawai'i LOC investment, exposed by Kristen Peca's own words in her 2012 FBI recording of Kenner*). Perhaps, in between all of that documented communication, Kenner was "*living in a cave*" (*Tr.712-713*).

All of this predated the one-week Kenner and Mike Peca spent together in Vancouver during the February 2010 Olympics (*See R33 600*).   At that point in time (*2009-2010*), Mike Peca was represented by Tom Baker in Arizona (*See R33 A -- Baker Little Isle 4 Disclosure letters [Peca letter]*) and Ronald Richards in California (*See R33 425*), in communication with AZ Eufora Partners I Managing Member Gaarn, thus, nothing Kenner was handling for Peca required instant communication with Kenner, *but he had it.*

This communication pattern was the same for every Hawai'i and Mexico investor, despite contrarian claims in 2015 by the various government witnesses.  In fact, starting in 2008, Juneau and Nolan had their own attorney working hand-in-hand with Jowdy against all of the investors, ultimately thwarting years of group legal efforts to recover the egregiously documented loans, which Jowdy eventually admitted to once legally beneficial.

➤ *Jowdy finally admitted, in total to the loans, in his January 2010 deposition and to FBI Agent Galioto in February and March 2010.*

189

*summer 2005 he could not get a hold of Kenner and wanted to terminate their work together – Tr.258*).  As Juneau emailed:

> **"This is roughly 7 millions CAD [Canadian] and I just want to have it invested in BONDS with Northern Trust and <u>under your management</u>**...*That also leaves me with a good % in real estate between my houses, Sotracom* [independent $2 million Juneau real estate investment in Canada]*, and whatever %s you'll get me in Mexico, **Hawai'i**, and Scottsdale* [Avalon investment with Constantine – yet sued for lacking knowledge of it four (4) years later]*."*

Kenner's disclosure email, in Rule 16 evidence (*See R33 504a -- page 2*), confirms that Kenner addressed Juneau regarding <u>*all*</u> of his investments on May 18, 2005 and had a plan for each of the private deals (*in spite of Juneau's unusual withdrawal requests*). Kenner specifically told Juneau:

> *"**Hawai'i.   <u>Your loan [LOC] is well</u>**.   The final % isn't known, but it should be about 1.25% of the investment LLC.   We haven't done a valuation of the project. We are too busy working on it every day."*

Juneau never invested cash into the Hawai'i deal (*only his LOC proceeds*), so there <u>*could not be any confusion*</u> as to the representation by Kenner in early 2005.   Juneau made no claims (*in his same-day response*) that the "*loan*" [*LOC*] comment confused him. Juneau responded to the contrary about his desire, to stay in the deal, to see the Hawai'i project first-hand, and to learn about the "*%s*" further.

In spite of the fact that Kenner's pre-trial subpoena (*See Document 154-6 @ 8-9*) to recover the Juneau LOC documents from Northern Trust was denied by the Court (*at the urging of the prosecution, claiming it was a "fishing expedition", and the request covering the dates of the allegations*), Juneau signed and re-signed the LOC annually (*2003, 2004, 2005, 2006*) and directly with Northern Trust Bank for the "*loan*" that the May 2005 email to Juneau confirmed.   Neither Juneau nor the Government produced any of those LOC renewal documents (*also signed by Nolan, like Juneau, annually thru 2007, until Nolan bought him out as reflected on Nolan's 2006 Little Isle 4 k-1*).  *See R33 495*.

With this Rule 16 evidence in hand, the Government allowed Juneau to represent that he had no idea about the Northern Trust LOC until some renewal a year after the email communication and confirmations between Kenner and Juneau (*supra*). In addition to the "*lack of LOC knowledge*", Juneau gave testimony on direct that he terminated the relationship with Kenner in summer 2005 because Kenner was non-responsive.   Juneau's 2015 testimony contradicts his own May 2005 email to Kenner stating again:

> *"This is roughly 7 millions CAD [Canadian] and I just want to have it invested in BONDS with Northern Trust and **under your management**."*

In no way does Juneau's own words to Kenner portray any concerns with Kenner, yet to the contrary in summer 2005, Juneau stated that it was all about his own personal mindset:

> *Phil, like I told you a few times already.   I'm not confortable with this situation. **It's has nothing to do with you but everything to do with the way I am.**

In the same CTE (or *faulty memory, confusion and mistakes*) response in 2015, Juneau gave false testimony (*Tr.138-140*) as follows:

> Q: Did there come a time that you – or do you recall that there was a line of credit through a bank known as Northern Trust that you had agreed to?
> **A: Something came up, I think it was sometime in 2006, around that time –**
>
> Q: Well –
> A: -- asking – yeah.
>
> Q: You are not sure?
> **A: Well, it was about that time and it was about signing for a renewal or whatever it was called for a line of credit.**
>
> Q: Do you remember when the original line of credit document was signed?
> **A:  No.**
> …
> Q: Was that about the time [December 18, 2003] that you recall first agreeing to open up a line of credit?
> **A: No.  Again, I don't, I don't recall opening a line of credit.  It's possible I did, but I do not remember that –**
>
> Q: okay.
> **A: Whatsoever.**

Juneau, like Nolan and several other LOC clients, could not recall the actual documents they signed (**at all**, *despite email and 3rd party confirmations*), the timeframes they were signed in, despite the empirical evidence that the LOCs were signed *by them*, independent of Kenner (**at all times**).

**Juneau actually confirmed that his "*lack of memory*" could have contributed in 2015 (*12 years later*) to not remembering the LOC.**

Juneau, like Rucchin (*supra*) appeared to be "*fuzzy*" on his knowledge in 2015 of the timing of the LOC, in fact stating [*about opening the LOC in 2003*]: "*It's possible I did, but I do not remember that – whatsoever.*"   Juneau told the 2015 Court that he also met in person with Kenner and Constantine in 2004 in Phoenix (*Tr.298-99*), but, true to form, could not recall a single element of the investment meeting discussions, which would have included the Avalon project status (*independently between Constantine and Juneau*), the Eufora investment (*later returned to Juneau per his May 2005 email request*), and the Hawai'i project status including the loans to Jowdy.  This meeting occurred part and parcel to Juneau's retirement preparation.  Yet, despite his unorthodox demand to "*get out*", he wanted to further get involved in his private investment deals thru Kenner that he "*stayed in*".

In fact, immediately after the December 2004 meeting in Phoenix with Constantine (*and another private deal Juneau executed* <u>*without Kenner*</u> *for $1,500,000 USD, also having nothing to do with Kenner, they travelled to Cabo to meet Jowdy.   It was* <u>*not*</u> *Kenner's responsibility as Juneau tried to engineer thru deceitful testimony in 2015 @ Tr.258-259*) that Kenner was responsible for Juneau's independent business dealings (*nor did Juneau pay Kenner for this responsibility*).  In December 2004, Juneau and Kenner travelled together to Cabo san Lucas, met with Jowdy face-to-face regarding a future development project in Cabo, and the lending of funds from Hawai'i to Jowdy.   After the Cabo meeting, Juneau decided not to further invest in the Cabo project, already exposed to Jowdy in the Hawai'i loans and the $500,000 Diamante del Mar deal (*again, directly with*

*Jowdy*).    This echoed the same pattern that Gonchar confirmed to the FBI in February 2010 (*See PK106 -- 3500-SG-2 [pages 8-9]*), but <u>*Juneau could not remember any of it*</u> *despite having $650,000 invested* <u>*directly*</u> *with Constantine, separate and apart from Kenner* (*Tr.298-99*).    Juneau's May 2005 email also confirmed another $2 million loss he suffered in "*Sotracom*" with some Canadian real estate deal, again, *having nothing to do with Kenner*.

It should be noted that Juneau suffered a series of severe concussions (*the precursor to* **CTE** *and/or post concussion syndrome, resulting in faulty memory, confusion and mistakes*) in concert with multiple broken jaws during his NHL career starting in 1993-94, leading to his early retirement in 2004.   This followed a series of known concussions during Juneau's college career from 1987-1991.

### *Steve Rucchin and Darryl Sydor (loss of collateral):*

Steve Rucchin and Darryl Sydor made similar but false 2015 claims that they were not aware of the loss of collateral until some time in 2015, and only discovered thru FBI agent Galioto's help.   It was previously noted that Rucchin suffered a series of severe concussions (*leading to* <u>*several years*</u> *away from hockey in the middle of his NHL career*).   Sydor, likewise, has struggled with post-concussion syndrome (*and severe memory recall issues as exhibited during his trial testimony*).

Regardless, neither claim could have been truthful, or **reliable**, for several provable reasons about the timing of learning of their LOC collateral loss.   First, each LOC client was *required* to speak with Northern Trust bankers [*Catherine Brill and Aaron Mascarella*] to confirm the release of their collateral by April 1, 2009, as Mike Peca confirmed via text.[115]   Sydor testified in 2015 he was not aware of the call about the

---

[115] Peca confirmed his LOC collateral call with Northern Trust with "*call already done*", thru a series of texts with Kenner (*See Point III @ 20*) on April 1, 2009 <u>*after*</u> Kenner notified Peca (*and the rest of the LOC clients, including Nolan who was in litigation with Kenner at the time*):

> "*A Northern trust person will call you to confirm your transfer to Schwab. Please acknowledge.*"

collateral seizure authorization.   Yet, on cross-examination, Sydor was shown his own text conversation with Kenner specifically **about the call <u>Sydor told Kenner</u> he received** from "**Erin** [*actually <u>Aaron</u> Mascarella*]" from Northern Trust.   **Sydor had no recollection of his own text to Kenner**. *Tr.2212*.[116] Kenner made the same notification to Rucchin, which also required his independent call to Catherine Brill and Aaron Mascarella at Northern Trust.[117]

---

This communication between Kenner and Mike Peca on April 1 is wholly inconsistent with Kristen Peca's testimony that Mike Peca (*in Ohio with his wife*) called Kenner "*and started laying into him*" after her fabricated story about receiving the default letter (*proven logistically impossible*). *Tr.710*.   Kristen Peca was not at their home (*in NY*) where the default was sent via FedEx. Further corroborating her fraudulent testimony was Kristen Peca's 2012 FBI recorded call with Kenner where she confirmed that she learned about the "*emptied out account*" from a "*statement*", not the default letter (**in her own words – and not defendable as anything but planned perjury**).

As an additional confirmation of her recent fabrication, Kristen Peca would not have received the "*emptied out statement*" until after the face-to-face GSF meeting in her Ohio living room (*per Mike Peca's own text to Kenner on May 22, 2009 about getting all their delayed and stored Buffalo, New York mail from his Buffalo post office*).   Thus, the claims about her anger with Kenner during the meeting were also unfounded and another parlor trick.

[116] BLACK is **Sydor** text; RED is Kenner reply.



- *CLEARLY -- Nothing was concealed from Sydor re: his LOC collateral seizures.*

[117] RED is Kenner text to **Rucchin**.



- *CLEARLY – Nothing was concealed from Rucchin re: his LOC collateral seizures.*

In fact, after **every LOC client** from Northern Trust spoke with Mascarella and Catherine Brill about their authorization for the LOC collateral seizures, each individual (*minus Nolan who independently chose to continue making LOC payments himself after his call*) were ***required to sign transfer paperwork*** directly with Northern Trust Bank for their residual funds to be wired to an outside account.   ***Kenner had no ability to independently do this***.   It is confirmed in each investors IMUS agreement document (*See Ex. Z35*).   The document specifically states under the **SPECIAL INSTRUCTIONS** paragraph (*the same page as their respective signature*):

> Only those instructions directing the wiring of funds to any account outside of Northern Trust Bank **must be signed by Client**.

The same page confirms specific mailing request of the client's documents:

> Client directs that copies of all account statements, including tax information letters, be sent to Standard Advisors Inc. **as well as to Client**.

Mascarella confirmed this in 2015 testimony:
> "*I know it doesn't help you today right now, but that a copy was also sent to each one of the borrowers*".

> ➢ *Please note that Mascarella was the Northern Trust person in charge of the statements, so he would be one of the critical people to confirm his own required Patriot Act actions.*

Thus, for each Northern Trust LOC client, they independently followed up with Northern Trust Bank and **signed multiple**, independent wire transfer requests to release their funds to their outside accounts.   Sydor's April 2009 Northern Trust statement (*mailed to his home at 110 Millview Drive, Pittsburgh PA 15238*) showed a balance of $5.80.   The April 2009 balance was after **Sydor signed** three (3) separate transfer requests (*all pursuant to Sydor's signed IMUS Agreement*), over a week after his telephone call with Mascarella and Brill, to execute:

1. [April 8, 2009] **Transfer** ten (10) bonds from his Northern Trust account to his Charles Schwab account, totaling **$476,332.86**,

2. [April 9, 2009] **Transfer $19,548.62** from his Northern Trust account to his Charles Schwab account via wire transfer, and

3. [April 30, 2009] **Transfer $19,921.37** from his Northern Trust account to his Charles Schwab account via wire transfer.

These transfers occurred after Sydor's March 2009 statement from Northern Trust confirmed that **$856,200.86** was "*Paid to Northern Trust for the benefit of Darryl Sydor represents pay-off of loan*".[118]   Sydor's February 2009 statement balance was $1,374,013.24.  His end of March statement balance was $515,881.48.   There was a CHANGE recognized of **MINUS (*$858,131.76*)**.   This statement was also sent to Sydor's Pittsburgh address.

Nothing was concealed about the account balances before or after the collateral seizures. Sydor knew he had approximate $1.3 million in the account in February 2009 (*per his statement*).  Sydor was aware that he transferred **$476,332.86** in bonds (*on 4-8-2009*) and **$39,542.82** in cash (*split between 4-9-2009 and 4-30-2009*) out of his account to bring the balance to $5.80 in March 2009.  Each of these three (3) transfers required independent signatures by Sydor (***not Kenner***) to disburse Sydor's assets.

Nothing was concealed from Sydor that could have led him to believe that his collateral was untouched &/or his account remained the same after his documented call (*per his own text to Kenner*) with Northern Trust bankers Mascarella and Brill, independently. Finally, after Sydor signed his final transfer request, Northern Trust Bank issued a check to close Sydor's account for $5.80 on May 8, 2009 (*also per his IMUS Agreement*).

[May 8, 2009] **Check paid** from his Northern Trust account to his Charles Schwab account, totaling **$5.80.**

---

[118] This loss corresponds to the text Sydor sent Kenner days earlier, confirming that he received and read the Northern Trust default letter with the nearly identical payment due as deducted after the independent phone call he had with "Erin" [*Aaron Mascarella*] (*all forgotten via amnesia, **CTE** or faulty memory, confusion and mistakes in 2015*).

Thus, Sydor was **100% aware**, yet *could not remember* to the government's concealment theory benefit, *again*.

| | | | | | |
|---|---|---|---|---|---|
| 6083 | +19725230505 Darryl Sydor* | 3/23/2009 1:59:36 AM(UTC+0) | R e a d | What funds ? And this thing says I owe **855,351.03** right now. | |

Sydor's May 2009 statement confirmed a zero dollar balance.   Notwithstanding all of the statements and Sydor's _requirement_ to sign off on the four (4) transfer requests independently, and the resulting monthly statements to confirm the underlying transactions (*all authorized and signed by Sydor*), in spite of the transactions with Northern Trust that specifically required Sydor's personal participation, **Sydor gave testimony in 2015 that he was not aware of any of it until just prior to the 2015 trial** (*over six [6] years later*).  *Tr.2191*.

Sydor also attempted to claim that he never received documents to sign from Northern Trust _directly_ (*Tr.2196*):

> *Q: ...There were instances where Northern Trust –*
> **A: -- Not directly.**

Yet, in the Rule 16 discovery, Sydor's IMUS agreement was sent from Northern Trust Bank (*per their own fax stamp*) directly to Sydor and returned to Northern Trust. Northern Trust produced it as a result of a prior subpoena.[119]   Somehow, Northern Trust failed to turn over any of the signed transfer documents by the LOC clients, that **their own client-agreements mandate <u>must be signed</u>** to trigger a transfer outside of the bank.

Apparently, Sydor's *faulty memory, confusion and mistakes* affected his truthful or **reliable** testimony again in 2015, but consistently to the detriment of the defendant, and in concert with the Government's concealment theories, like every other victim suffering from the same *faulty memory, confusion and mistakes*.

Not one government witness was able to remember a single element of:

> 1) Originally setting up their LOCs with Northern Trust (*with their own signatures*),
> 2) The authorized use of their LOCs by Little Isle 4 (*with their own signatures*),

---

[119] *See Sydor IMUS agmt -- NAAZ 0012123 to NAAZ 0012475 @ page 3 (in FOLDER Sydor Northern Trust documents).*

197

3) The Hawai'i conference calls and meetings to discuss the loans to Jowdy, or even
4) Their own participation in the multitude of USA and Mexico lawsuits to recover the Hawai'i funds from Jowdy.

This *faulty memory, confusion and mistakes* occurred despite the overwhelming FBI proffers, SDNY Grand Jury testimony, civil testimony, civil depositions, civil affidavits, prior legal disclosures with independent attorneys, and five (5) years of signed bank documents, amongst other empirical evidence in Rule 16, ***all previously confirming their real time knowledge of it, many years before the 2015 trial, yet with zero investors in prior contradiction***.  It is statistically impossible, if not merely irreconcilable.

In addition, Sydor claimed he was unaware of the use of his LOC in 2015.  This premise fails based on two specific pieces of evidence in the Government's hands pre-trial.

1) The Government had **Sydor's 2005 Disbursement Request & Authorization** from the previous Northern Trust subpoena.[120]   This **one-page, signed** document from Sydor to Northern Trust (*mailed to his Tampa, FL address for signature, in concert with his IMUS Agreement address -- supra*), confirmed that before the August 2006 Lehman Brothers JV closing that Sydor *authorized* and *acknowledged* the use of **$1,223,758.33** of his $1,225,000 open LOC.

2) After the Lehman Brothers distribution in August 2006, Sydor signed a brand new set of LOC documents to reduce his investment collateral exposure to $850,000[121].  It followed Sydor's receipt of the same letter that Mascarella independently sent to Berard[122], and all Mascarella's LOC clients, to reduce their

---

[120] *See Sydor 2005 Disbursement Request & Auth-NAAZ 0012123 to NAAZ 0012475  (in FOLDER Sydor Northern Trust documents)* (*from Kenner's home office and somehow **not** included in the 2015 incomplete Northern Trust subpoena*), **confirming additional and specific, responsive records are held by Northern Trust Bank that were not turned over via subpoena**.

[121] *See 2006 Sydor Master Note (after reduction) -- (in FOLDER Sydor Northern Trust documents)*

[122] *See R33 659b2* -- Berard Mascarella letter to reduce LOC collateral.  Please note that Berard signed the reduction per his new Master Note and reflected on his **one-page signed**

2006 LOC collateral amounts.   This **one-page** document was addressed and mailed to Sydor's Tampa Florida address on record at Northern Trust, **signed** and returned to Northern Trust by Sydor, independently.

When Sydor was asked about his communication with Kenner, he confirmed his "*trust*" with Kenner and Kenner decisions related to his Northern Trust LOC (*Tr.2200*):

> *Q: ...Give us some idea?   More than one conversation, more than ten?   Just some idea?*
>
> *A [Sydor]:* ***I can't recall****. I mean he was my financial advisor and* ***I trusted him with what he did****.  I can't recall** how many conversations we had specifically on that.*

Sydor's **trust of Kenner** echoes the Rucchin comments (*supra*), as well Berard, Ranford and others throughout the trial.   Again, the "*group decision*" according pre-trial statements from Berard, Kaiser, Peca, Sydor, Stevenson, Norstrom, Gonchar, Stumpel and others (*supra*) to lend Hawai'i money to Jowdy, still holds a fully confirmed loan valued at over $31,000,000 (*including interest and still accruing*) today for the Little Isle 4 investors (*with principle over $5,000,000*).

Despite this asset, Kenner is not able to pursue the recovery of it for Little Isle 4 and the investors, since Kaiser, Berard and Jowdy orchestrated the Kenner Indictment and arrest in 2013, saving Jowdy millions in *ex post facto* admitted loans (*and certainty of incarceration in Mexico and the USA along with Berard and Kaiser's co-conspiratorial efforts*).[123]   Many alleged victims who were cooperating with Jowdy and Tom Harvey at

---

2008 Disbursement Request & Authorization for $650,000 (*reduced from the original $900,000*).

- Please note that this is actually the Nolan pay down amount (*$718,905*), thus, further confirming that Nolan (*like all of the LOC clients*) received an identical letter to offer the "*reduction of collateral*" option to Mascarella's clients -- per Kenner's specific request to do so.  Nolan also signed and reduced his collateral after the Mascarella letter, directly with more Mascarella communication as the letter dictated (*leaving Kenner out of the document portion of the LOC restructuring*).
- Please note that no one -- specifically including Mascarella in 2009 or 2015 -- gave testimony that Mascarella received a phone call from a LOC client demanding -- "*WTF is this letter referring to?*" if any of them, including Nolan were somehow not aware as some 2015 testimony proclaimed.

the time immediately benefitted from the timely Kenner detainment, statements induced perhaps thru and with *ulterior motives*.[124]

---

[123] NY Daily News Article: "*Former NHL player Bryan Berard and ex-cop* [Kaiser] *help feds nail two Arizona men in massive fraud*", November 13, 2013, 1:33pm

[124] It should be noted that not only was the Hawai'i loan litigation (*& criminal Mexico corruption cases*) in Mexico halted by the 2013 Kenner arrest, but Jowdy's Mexico employees (**Kaiser** and **Berard**) were able to get two (2) Arizona civil cases dismissed as defendants to Kenner for several million dollars of proven frauds [*cv2013-052349 and cv2012-055576*].  In addition, **Mike Peca** and **Jay McKee** were able to avoid pending 2013 service in the Las Vegas Palms cases from Kenner for breaching their JV agreements, while retaining 100% of the unit revenues, and forbidding Kenner's access to the condo units, in spite of Kenner's documented $656,120 deposits in each unit since 2007-08 (*and $90,000 additional payments to the shared Peca unit, while Kristen Peca refused to share the monthly rental fees as agreed upon – See PK114 -- Peca Palms agreement, R33 436*).

McKee's GSF statements were *the only element of the Indictment McKee was involved in according to the prosecution (Tr.1846*) related to the lack of alleged disclosure from Kenner &/or Constantine (*Tr.1821-1824*).  This is specifically invalidated by:
  1) McKee's own texts (*See McKee GSF report @ 6-9 – in FOLDER McKee GSF info*) with Kenner the night of the GSF meeting with his wife and him in Buffalo NY,
  **2) The receipt of an independent follow-up email disclosure from Constantine (See PK67), and ultimately**
  3) A signed disclosure only a few hours after receiving the follow-up email confirms (*See GSF-McKee acknowledgment & approval-SMC-00000001 to SMC-00000045-GSF documents).  See McKee GSF report.*

[*McKee's text messages with Kenner refute any concealment on behalf of Kenner or Constantine during the dinner meeting or follow-up about McKee and his potential involvement in the GSF plan – conceived and explained in detail by Constantine*]:

***[McKee texts in BLACK -- Kenner responses in RED*]:**

| | | | | |
|---|---|---|---|---|
| 7032 | +17168034903 Jay McKee* | 5/9/2009 3:46:20 AM(UTC +0) | Read | Thx 4 making the trip bud.. **Took in alot from the talk tnite**.. Drive safe, be in touch.. |
| 8255 | +17168034903 Jay McKee* | 5/9/2009 3:55:39 AM(UTC +0) | Sent | Good stuff |

| | | | | |
|---|---|---|---|---|
| 7039 | +17168034903 Jay McKee* | 5/9/2009 12:36:25 PM(UTC +0) | Read | **Can u do me a favor.. Can u email me, so I can look at it on paper, everything my 25O turns into.. Nicole was speaking with Tommy when u explained to me all the areas where we are benefiting..** |



| 8265 | +17168034903 Jay McKee* | 5/9/2009 12:37:21 PM(UTC +0) | Sent | **I will have tommy do it so it's consistent with the discussion** |

| 7040 | +17168034903 Jay McKee* | 5/9/2009 12:37:42 PM(UTC+0) | Read | **Perfect, tks** |

| 7043 | +17168034903 Jay McKee* | 5/9/2009 2:12:22 PM(UTC+0) | Read | **Hey, also, could u email me what the 3 black sheep are getting in the end result, as well as Tommy bullet points they had 2 agree too.. Tks** |
| 8269 | +17168034903 Jay McKee* | 5/9/2009 2:32:11 PM(UTC+0) | Sent | **Tommy said you will get 1/10th of everything that is acquired of theirs which includes 20% (2% for you) of the airpark building, 1/10th of their 3.64% of their Eufora shares (.364% for you which puts you just over 1% in Eufora) and then a small piece of the jet which TC is still crunching numbers on but it will probably be 1% of it.** |
| 8270 | +17168034903 Jay McKee* | 5/9/2009 2:35:46 PM(UTC+0) | Sent | **TC will send you the bullets they agreed to but has to wait till it's actually signed. Should be a day or two. They have only agreed by email so far. He will also send you the media summary** but he wants you to convince the owner of Chef's to send him the tomato sauce Fed Ex. |

| 7044 | +17168034903 Jay McKee* | 5/9/2009 2:43:44 PM(UTC +0) | Read | Haha.. Consider it done.. I'll have Lou put some bottles together with the extra meat for the real flavor.. |
| 8271 | +17168034903 Jay McKee* | 5/9/2009 2:45:55 PM(UTC +0) | Sent | **Thx** |

| 7045 | +17168034903 Jay McKee* | 5/9/2009 3:36:47 PM(UTC +0) | Read | **Did TC say the jet was worth 25Om last night?** |
| 8273 | +17168034903 Jay McKee* | 5/9/2009 3:44:10 PM(UTC +0) | Sent | **The jet is worth 1.5m. He invested 250k to repair it** |

| 7046 | +17168034903 Jay McKee* | 5/9/2009 3:45:53 PM(UTC+0) | Read | Aha.. Thats where the 25O number came from.. |

| 7048 | +17168034903 Jay McKee* | 5/9/2009 3:53:08 PM(UTC+0) | Read | **In the deal, the 3 guys get their money back from their involvement with TC, but nothing back from their Mexico deals, correct..** |
| 8276 | +17168034903 Jay McKee* | 5/9/2009 3:54:14 PM(UTC+0) | Sent | **Correct!** |

| 7053 | +17168034903 Jay McKee* | 5/9/2009 5:43:22 PM(UTC+0) | Read | **If we get control of Jowdys Cabo equity and move to sell Cabo - we get our 5OO back from del mar, and what percent of Cabo do we end up with?** |
| 8282 | +17168034903 Jay McKee* | 5/9/2009 5:48:03 PM(UTC+0) | Sent | **Its impossible to say until we know everyone who's involved in getting Jowdy's 40%. For example, the new bank/investor may want half of it to do the deal. But...whatever it is, you will get 1/10 of it.** |

| 7060 | +17168034903 Jay McKee* | 5/9/2009 10:01:18 PM(UTC+0) | Read | **So is it correct to say we'd get our 5OO back from del mar, as well as a prob minumium 2% of Cabo? Sorry to keep asking - just trying to get it right..** |

If McKee did not lie on purpose to support the government's claims of conspiracy by concealment, then the inaccurate testimony by McKee certainly and wrongfully contributed to the ongoing collective amnesia by the GSF contributors to the government's favor while seeking a conviction of Kenner and Constantine – for alleged crimes that McKee – in particular – exhibited *faulty memory, confusion and clearly made a mistake*.

- *What is the government or McKee doing to make sure the court is alerted to the PLAIN ERROR?  To date – they are doing nothing to make sure innocent individuals are not convicted based on faulty memory, confusions and mistakes...*

*According to the government – this was the only relevant testimony to support the government conviction allegations thru McKee – and it is clearly FALSE...*

The confirmation email (@ *point 2*) above) is the identical follow-up email Mike Peca received (*See Peca GSF confirmation from Constantine – in FOLDER Peca GSF info*) before he (*See GSF-Peca SIGNED Acknowledgment & Approval-ED-00001979 to ED-00002616*) and

The Government has taken no action for the Jowdy premeditated frauds on the Kenner and Kenner investors in Hawai'i, even with the knowledge of Jowdy's past and ongoing frauds (*See Kenner Rule 6(e) Motion @ 21-40*), blatant lies to the FBI, and calculated lies to various Federal Courts, not limited to the EDNY (*in his 2016 declaration*).

Sydor's *faulty memory, confusion and mistakes* continued to the benefit of the Government's concealment theories when Sydor claimed he never saw the Northern Trust February 2009 and March 2009 default letters until the week before his 2015 appearance. *Tr. 2166-2167*.  Both letters were mailed to Sydor's address of record with Northern Trust bank.  *See TIMELINE 053, 054*.  In addition, after receiving the 2nd letter, Sydor confirmed it to Kenner via text (*clearly refuting his 2015 "memory" of it*). [125]

---

Kristen Peca (*See GSF-Kristen Peca acknowledgment & approval-SMC-00000001 to SMC-00000045-GSF docs*) independently returned the Acknowledgment emails to Constantine for the specific GSF "*use of funds*".

In fact, it further exposes Kristen Peca's erroneous claims that they did not want any more investments (*Tr.717-718*) with the GSF contribution, when she emailed Kenner May 18, 2009 with:

> "*Hey, before we sign off on an "approved" letter, can we please have the written documentation as to exactly how much (%) we obtained with our contribution?*"

Kristen Peca's demand compliments Mike Peca's similar text request for investment equity <u>confirmations</u> the day after the GSF meeting in Ohio, and further impeaches her credibility or *faulty memory, confusion and mistakes*, as follows:

[*Mike Peca to Kenner*]



| 7042 | +17163743234 Michael Peca* | 5/9/2009 2:04:59 PM(UTC+0) | Read | Make sure I get a statement of somekind to where my $250k is going. ***How much in ea of the two companies***. Thanks |
|---|---|---|---|---|

Clearly – both Mike Peca and his wife were aware and anxious to get the extra equity in the "other GSF deals" – despite their 2015 perjurious testimony to the opposite.

[125] [*From Sydor to Kenner*]



| 6079 | +19725230505 Darryl Sydor* | 3/23/2009 12:22:01 AM(UTC+0) | Read | ***What's this letter from northern trust all about*** |
|---|---|---|---|---|

Later that same evening, Sydor further confirmed his receipt of the DEFAULT letter, when he told Kenner via text:

"*K just leave me a message I am just worried about this <u>letter</u> from northern trust saying I owe 855,k right now cause I failed to pay it.*"[126]

Sydor's text on March 23, 2009 matched the default letter mailed to him from March 19, 2009 stating:

"*The amount now outstanding under the Note…as of today's date of $855,351.*"

After denying in 2015 his previously, self-confirmed receipt of the default letter, the Government pressed Sydor again, to which Sydor claimed:

"*If I saw this letter and it said Notice of Default and Intent to Sell Collateral, I would remember that, yes.*"   *Tr.2191.*

**Plainly, Sydor did not**.   The Government had the Sydor texts when they prepped him for 3-4 hours the week before he took the stand (*Tr.2188*) (*as Sydor confirmed at trial*). The Government had the Sydor Northern Trust LOC documents.  They had the Default Letter, yet, somehow, all of that resulted in Sydor's uncorrected testimony that he had no idea about any of it, with all of the refuting empirical evidence in the government's hands and withheld from the jury.

| | | | | |
|---|---|---|---|---|
| 6080 | +19725230505 Darryl Sydor* | 3/23/2009 12:25:25 AM(UTC+0) | R e a d | ***No I just got home but I had a fed ex letter*** *and also the one from steph.* |
| 6081 | +19725230505 Darryl Sydor* | 3/23/2009 12:26:39 AM(UTC+0) | R e a d | ***Yeah but what's the other one its cc'd to u also.*** |

[126] [*From Sydor to Kenner*]

| | | | | |
|---|---|---|---|---|
| 6126 | +19725230505 Darryl Sydor* | 3/24/2009 6:07:12 PM(UTC+0) | R e a d | ***K just leave me a message I am just worried about this letter from northern trust saying I owe 855,k right now cause I failed to pay it***. *Leave me a message. And I can call u after our game. Cause this is going to hurt my credit and I don't have 855 k.* |

Notwithstanding the fact that Sydor was "*foggy*" during his 2015 testimony, clearly contradicting empirical evidence in the Government's possession and ignored from Rule 16, Sydor had made it very clear to the SDNY Grand Jury in 2011 (*four [4] full years earlier – perhaps with fewer CTE symptoms*) that he knew his Little Isle 4 capital account funds were loaned to Jowdy (*from Hawai'i*) and the repayment of the loans would have resulted in Little Isle 4 receiving the money, *not him personally*. *See R33 467f*.

Sydor referred to the decision to lend to Jowdy as "**we**".  His 2011 testimony confirmed the transparency of his pre-loan knowledge of the Hawai'i agreement with Jowdy and his agreement.   Sydor confirmed in 2011 to the SDNY Grand Jury:

> Q: Was that also for Little Isle 4 as far as you know?
> A: Yes, but then **we put it towards Cabo for a short-term loan to Mr. Jowdy** until Lehman Brothers came up with the money that was supposed to be paid back.
>
> Q:  **Did you know in advance** that it was going to be used, this Little Isle 4 money, to be used to salvage the Cabo investment?
> A:  **Yes.  It was to help with the short-term loan to keep funding the Cabo**, then it was supposed to be paid back, but that's –
>
> Q:  Paid back to you or paid back to Little Isle 4?
> A:  **Paid back to Little Isle 4.**
>
> Q:  So –
> A:  **Back to Hawai'i, not to me personally**.
>
> Q: But that didn't happen?
> A:  That didn't happen.   And Lehman came up with $129 million loan.  **It was supposed to be back at closing.**

Steve Rucchin[127] followed the same Northern Trust protocol when his account closed in 2009.   Rucchin's March, April and May 2009 statements (*See FOLDER -- Rucchin*

---

[127] Just as Mike Peca, Bryan Berard, Sergei Gonchar, Glen Murray and Mattias Norstrom did, they received the Northern Trust default letters:
   1) They communicated <u>directly</u> by phone with Mascarella and Brill from Northern Trust (*after Kenner's text notifications*),
   2) They independently approved the seizure of their Northern Trust collateral,
   3) They independently signed multiple Northern Trust wire transfer requests,

*Northern Trust documents*) included all of the transfer dates and reduction of account principle after the approved seizures, yet Rucchin could not remember any of it.   He was "*foggy*".   *Tr.2722*.

> Rucchin's **February 2009** statement (*sent to his address of record*) showed an ending balance of <u>$1,453,364.46</u>.
>
> Rucchin's **March 2009** statement showed an ending balance of <u>$431,252.96</u>
>
> o   The March 2009 statement identified a **CHANGE AMOUNT of MINUS ($1,022111.50)** on the first page.

None of this was concealed from Rucchin, and certainly not by Kenner.    After Rucchin had signed three (3) different transfer documents for Northern Trust to:

1. **Transfer** his $288,252.97 of bonds on April 8, 2009 to his Charles Schwab account, then
2. **Wire** $123,656.24 on April 9, 2009, and then
3. **Wire** $19,944.01 on April 27, 2009 (*3 weeks later*),

…Rucchin sent Kenner an email on June 17, 2009 [*BATE STAMP: PK_SEC_005504*]. Rucchin asked Kenner for help close the Northern Trust account with the remaining $13 balance, while contemporaneously *confirming* he was receiving the statements (*supra*) that confirmed his $1 million pay off of the outstanding LOC.   Kenner instructed Rucchin to follow-up with Northern Trust and request the final check and account closing request documents.   Rucchin handled the process.

[*June 17, 2009 Rucchin email to Kenner*]:
> *"Hey Phil, it's Ruch. Know you have alot on the plate right now but I'm still getting statements from N. Trust because I have $13 and change in the account. Wonder if the account can somehow be closed. Let me know.   Thanks.   Ruch"*

---

4) They received all of their monthly Northern Trust bank statements, and
5) They independently closed their accounts.

*Nothing possibly could have been concealed – since Kenner had zero involvement in all of the steps, supra.*

Commensurate with the Sydor and Rucchin closing actions, the other six (6) Northern Trust LOC clients were required to personally sign for the release of the funds *after* their independent confirmation call with Mascarella and Brill.  Thus, each and every one of them were required to independently engage, multiple times with Northern Trust bankers in the month-long period surrounding their collateral seizures and residual account transfers, ***without Kenner***.

Only **willful neglect** in 2009 could have left any of the LOC clients at Northern Trust without the foundational understanding of the transaction they *independently* handled. The only other reasonable explanation for the 2015 testimony that contradicted all of the empirical evidence would be *faulty memory, confusion and mistakes, or CTE*, thus **unreliable**.

For the aforementioned reasons, the defendant requests that the Court rejects the Government's claims of forfeiture for the Baja Ventures 2006, LLC.

## PART III – Defendants Opposition To Government's Rehashing Of The Trial

### *Faulty memory, confusion and mistakes is an excuse –*
### <u>*Not*</u> *a prosecutorial foundation.*

The defendant respectfully submits the following PART III in response and <u>*only*</u> in response to the 69-page "Government's Memorandum Of Law In Support Of Entry Of An Order Of Forfeiture".   The defendant suggests that the majority of the Government submission is non-responsive to the purpose of the Baja Ventures 2006 forfeiture efforts by the Government &/or their alternative theory of nexus.   Under the circumstances, the defendant stands on the elements of PART I and PART II, which clearly identify the sources of the entire $2.5 million capital account in Baja Ventures 2006 (*in the Diamante Cabo san Lucas, LLC operating agreement – See TIMELINE 030*), and the vast underlying knowledge and independent transactions of the Little Isle 4 investors related to:

1.  The use of their LOCs for Little Isle 4,

2.  The subsequent loans to Ken Jowdy from the Hawai'i capital account funds, and

3.  Their comprehensive knowledge and support of the loans (*both thru empirical evidence [supra] from texts, emails, and personal testimony about the actual fact patterns ["**under oath"**]*).

In fact, as part of the 2006 thru present attempts by Kenner and his Baja Ventures 2006 partners to sue Jowdy in Mexico and the USA to fix the remainder of the Jowdy "*accounting errors*" for Baja Ventures 2006 and CSL Properties (*and eliminate Jowdy from the project for the overabundance of empirically PROVEN embezzlements [See Kenner's Rule 6(e) Motion @ 21-40]*), the efforts have been repeatedly thwarted by Jowdy, his attorneys in the USA and Mexico, and individuals including Berard and Kaiser who received bribes (*also known as high-paying jobs in Mexico after 2010*).   All of this interference has been spearheaded by FBI case agent Galioto every step of the way, starting with his canceling of the Kenner investors' FBI interviews immediately after Kenner June 24, 2009 proffer (*See PK119*) and the berating of Kenner in early 2010

208

for sending additional proof of the egregious **Jowdy confessions** to the thefts from Kenner and Kenner investors (***specifically the January 2010 Jowdy 2-day California confessional deposition***) (*See EDNY issues 018 and EDNY issues 019*).

Then, Galioto and AUSA Goldberg who were originally on the Jowdy/Najam case canceled the Kenner EDNY Grand Jury subpoena.  (*See R33 rebuttal 006*)   AUSA Goldberg was immediately replaced.   Nonetheless, as the Court recalls, AUSA Michiewicz claimed Kenner blew off the EDNY Grand Jury subpoena, inquiring thru known and misleading insinuation:

>*"Are you lying about even being summoned to the Grand Jury and then dropped like a hot potato?"*

And immediately followed-up with:

>*"Aren't you lying about being summoned to the Grand Jury and then the FBI deciding they were going to favor Mr. Jowdy in Mexico over you.  Aren't you lying about that?"*   *(Tr.5065).*

Upon calls to the EDNY offices in 2009, Kenner was told that AUSA Goldberg was no longer on the case and they could not inform Kenner or Ronald Richards who the new AUSA was or if there was even still an investigation regarding Jowdy and Najam. Kenner is unaware of any Mexico or Hawai'i related person who was ***ever*** requested to give Grand Jury testimony related to the documented thefts orchestrated by Jowdy, Harvey, Najam and supported/allowed by other Jowdy contemporaries, like Masood Bhatti at Lehman Brothers, Fernando Garcia, Kaiser, and Berard.   Shortly after the call by Kenner to AUSA Goldberg's office, Kenner received the heavy-handed call from Galioto informing Kenner that his "***days are numbered***" and to "***back off***".   Kenner's Mexico and US attorneys, in opposition to Jowdy since 2007, have received the same heavy-handed threats thru FBI Agent Galioto and Jowdy attorney Tom Harvey, in addition to the murder in 2010 of the Kenner and Kenner investors' Mexico attorney and the imprisonment of others.

For the aforementioned reasons, the defendant requests that the Court rejects the Government's claims of forfeiture for the Baja Ventures 2006, LLC.

# CONCLUSION

*Baja Ventures 2006*

The Government has failed to prove any nexus to **Baja Ventures 2006 LLC** thru their misleading allegations at trial &/or during their 2016 forfeiture hearing representations to the Court.    In fact, the Government's own accounting records confirm that the Baja Ventures 2006 capital account was 100% funded, as expected, by Kenner's partners; Lehtinen and Stumpel (*Forf-36*), and under-represented by Jowdy's capital account frauds by $1.6 million, *at a minimum*.

The Government has continued to change their theories since trial, now migrating the Jowdy role from an alleged victim of Kenner and Constantine's "*finger-pointing*" (*Tr.31*) to being a co-conspirator (*Document 401 @ 27*).   In their six (6) month-long-prepared "*Government Memorandum of Law in Support of Entry of an Order of Forfeiture*" to fit the lack of empirical facts in their case at trial, the Jowdy co-conspirator angle was a new and unsubstantiated ploy to distract the Kenner investors and the Court from the perjury-laden testimony that has clouded and disregarded the empirical evidence in this case, ignored throughout the trial and mocked at times when it failed to fit the vision of the anointed, wholly relying on *faulty memory, confusion and mistakes* as defended repeatedly by the Government, ***somehow as reliable?***

**The FBI has neglected Jowdy's well-documented frauds for over a decade** *(specifically agent Galioto)* **since the Kenner June 24, 2009 proffer**.

"*A little neglect may breed great mischief.*" – *Ben Franklin*

The government has failed to prove any intended loss from the alleged Hawai'i scheme, since their own post-trial introduction of *Forf-44* affirms the same documented  "*Jowdy loans*" that Kenner was belittled for, repeatedly at trial, and denigrated specifically while under verbally aggressive and emotional cross-examination attacks; concluding in both government summations.   **Now** (*post trial*)**, the funds Jowdy received <u>are loans</u> –**

because a "cumulative" explanation is the only defensible theory the government can provide to the "new evidence" (from Kenner's Rule 33 Motion) conundrum *(Forf-44)*, which they cannot explain otherwise?

This "*loans*" – "*no loans*" – "*loans*" – "*no loans*" back-and-forth representations synonymously matched the Jowdy pre-2008 (*loans*) – 2008-09 (*no loans*) – and 2010-present (*loans*) representations (*to various DOJ entities, in various Federal and State court rooms; including this one – **without concerns for perjury and prosecution?***).

However misleading, intended to confuse the 2015 jury in order to arrive at a conviction, the simple fact is that the "*Jowdy loan*" – **at all times** – *belonged* to the Little Isle 4 and Na'alehu Ventures 2006 partners.   It was *never* a loss, and certainly not an "intended loss".   **It was at all times an asset of the Hawai'i partners – and still is.**   Current accounting values the loan at over $31,000,000 (*to be verified by forensic accounting, currently underway*).   The collectability of the loan is not Kenner's responsibility (*certainly not the last five [5] years while incarcerated*) and thru the refusal of the government to even meet about the unpaid Jowdy loan matters.   The "*illiquid*" status of the loan cannot be considered any different than an "*illiquid*" real estate deal, properly titled in the investors' name – just like Jowdy's refusal to distribute DCSL funds &/or procure a total sale of the property to generate a profit after sixteen (16) years and counting of stealing the Kenner and Kenner investors' funds (*as Peca's letter to the EDNY complains – concurrent with Kenner's claims since 2007 [See Document 482]*); repeatedly proven thru empirical evidence in the government's possession and proffered *ad nauseum* by Kenner, and even argued in frustration by the government forfeiture attorneys, *yet Jowdy remains protected by "someone(s)"*.

Kenner's recent offers to the US Attorney's Office to assist in the collection of the Jowdy loans, supported by the underlying empirical evidence of Jowdy's multitude of unchecked criminal activity, **was recently denied twice (to the investors detriment – while the protection of Jowdy continues)**.   If the government has no interest in recovering the stolen funds from Jowdy, they cannot conversely transfer the blame to Kenner, when no

empirical evidence exists that deems the funds Jowdy received as anything but "*known*", "*approved*", "*authorized*" and at all times "*owned*" by the Little Isle 4 and Na'alehu Ventures 2006 partners, and only contradicted by *faulty memory, confusion and mistakes* (*a.k.a. unreliable testimony*), per the government's defense of the perjured and inconsistent testimony at trial.   In any account, Kenner never "**obtained**" the Hawai'i distributions.   **Only Jowdy did** as documented by the government and Jowdy himself. As highlighted by *Honeycutt, supra*, this transaction is not subject to joint and severable liability for money judgment, restitution or forfeiture, certainly not for funds received by a non-party to the defendants.


### Global Settlement Fund (GSF)

As pled, *supra*, the GSF funds were distributed according to the Constantine disclosures and under his sole direction and custodial controls (*as stipulated at trial*), and emails received by each of the contributors; in accordance with their independent "*acknowledgement and approval"* sign-offs (*See FOLDER "GSF-Acknowledged and Approved"*).   Again, *faulty memory, confusion and mistakes* do not excuse any contributor from what they signed off before Constantine distributed the funds (*regardless of the onset of amnesia or **CTE***) – whether Kenner and the remainder of the GSF contributors are pleased with it or not, civilly.   Perhaps, Jay McKee's *faulty memory, confusion and mistakes* (*or planned perjury*) exemplified the most egregious example of "*suborned perjury*" (*left uncorrected by the prosecutorial team*), considering the paper trail of empirical evidence in McKee's own two-day text communication with Kenner to confirm the exact details of the GSF meeting with Constantine and Kenner, which he vehemently claimed in 2015 that he "*never discussed the GSF details*". (*See McKee GSF report in FOLDER "McKee GSF information"*).   **Clearly – 100% of it <u>was</u> disclosed…again**.   In any account, Kenner never "**obtained**" the GSF distributions (*notwithstanding one [1] specific expense reimbursement*).   As highlighted by *Honeycutt*, this transaction is not subject to joint and severable liability for money judgment, restitution or forfeiture.


### Eufora

213

The Eufora investors in 2008-09 had their purchases and Eufora itself fully vetted by an experienced legal and investigation team, independent from Kenner and independently hired by two (2) Eufora Board Members (*Gaarn and Gentry, non-puppets*).   The allegations of impropriety were actually raised by Constantine related to the Gaarn (*not Kenner*) private stock sales (*as a distraction technique – learned from Jowdy – after he was informed of the NY investigation of his Eufora frauds against the company and complicity of several of his long-term employees*).   This further hi-lighted the failure of the government's future concealment allegations, while the highly qualified investigation team (*named, supra*) independently examined the Constantine false claims, while only representing the investors, not Kenner (*See Ex. 1*).   Any loss in value of the Eufora stock since the purchases that were independently validated in 2008-09 by a third (3rd) party Eufora lender (*Brent Nerguizian at Neptune Capital*), cannot be attributed to anything under Kenner's control.   The investors received market-value consideration for their purchases as a number of them affirmed at trial in 2015, as evidenced.   The others who claimed they "*could not remember*" specific details of their purchases were all previously under independent legal representation and made no civil claims.  No Honest Service Fraud was alleged at trial related to the allegedly unknown private stock sales.  Thus, with consideration granted and documented by Gaarn, Constantine and Eufora CEO Gentry in 2008-09 (*thru the aforementioned emails and revised operating agreements*), the investors were financially compensated with full-value consideration.  Over a year later after the private sales concluded, the independent NY legal and investigative team desired a 6% contingency fee for their services in lieu of legal payment (*while representing the same investors the government claimed at trial were victims of previous worthless private stock purchases*).  The two (2) independent valuations (*2008-09 and 2010*) and investigations (*2010*) further confirmed Eufora's intrinsic value, during and long after the 2008-09 sales were concluded, documented and signed-off by the Eufora Board.   No intended loss could be contributed to Kenner as the Supreme Court outlined in *Honeycutt*, referring to the intentions of Congress thru statute to only recover funds from the defendant who "*initially*" received the proceeds (*i.e. Gaarn private stock sales, and Constantine private stock sales*) (*See Footnote 25*). In any account, Kenner never "**obtained**" the Eufora private stock sales "**initially**" as required by *21 U.S.C. 853(p)(2)*

(*and only received repayment portions from previous and documented Gaarn and Constantine personal loans – fully adduced at trial*).  As highlighted by *Honeycutt*, this transaction is not subject to joint and severable liability for money judgment, restitution or forfeiture.

> *21 U.S.C. 853(p)(2) "...demonstrates that Congress contemplated situations where the tainted property itself would fall outside the Government reach. To remedy that situation, Congress <u>did not</u> authorize the Government to confiscate substitute property from other defendants or co-conspirator; it authorized the Government to confiscate assets only from the defendant who <u>initially acquired</u>[128] the property and who bears the responsibility for its disposition.*

- The government still faces the "defendant" hurdle of *21 U.S.C. 853(p)(2)*, because despite their rhetoric to Gaarn, in complete aggravation with his trial testimony that he "*did not conspire to commit a fraud*" (*Tr.2563-2564, 2608*), the government arbitrarily attacked him on re-direct, pronouncing that they can convict him when ever they wanted to, because they say so (*Tr.2682*).

It should be noted that although Gaarn's agreement stated he would assist the IRS in the "*ascertainment, computation and payment...for the year 2009 and 2010*", zero IRS action was brought on Kenner, if the government, working hand-in-hand with IRS agent Wayne thought Kenner was the actual seller of the Eufora private stock, which empirical evidence proved was owned at all times, since 2005, by Gaarn thru his LLC, Standard Ventures, and proffered to the FBI.  Nonetheless, the government repeatedly alleged to the government witnesses that Kenner was "*selling his shares*" thru pre-constructed questioning and misrepresented rebuttal summation proffers to seal their misdirection with the jury.

---

[128] The government faces another hurdle with the funds Gaarn ***initially*** received from selling ***his*** private Eufora stock [*fully documented from 2005 thru 2009 in the Eufora records; taxes, emails, operating agreements, etcetera –* **nothing in contradiction**], but in spite of the independent counsel investigations [*2010-2011*] on behalf of the AZ Eufora Partners I investors (*infra*), the government claimed the <u>*fully vetted*</u> private sales were still, somehow, part of a scheme.

**Gaarn <u>initially</u> received the sale proceeds** (<u>*since they were his*</u>, *and chose to utilize his personal proceeds to loan money to Kaiser [documented in Rule 16 text evidence] and repay Kenner for his $150,000 plus of unpaid loans [that kept Gaarn's kids in private schools and halted a pending home foreclosure for the Gaarn family], in addition to immediately paying over $100,000 of his own obligations*).

**LedBetter**

The alleged **LedBetter** scheme falls completely under the management control of the Na'alehu Ventures 2006 partners (*with Kaiser as Managing Member*).   Kaiser's books and records (*as requested by defendant Kenner thru subpoena to the Court in 2018 – and prior to the 2015 trial [denied]*) will verify the documented, incremental contribution of capital by Mike Peca (*post Hawai'i JV closing in August 2006*).   This transaction has been confirmed by Kaiser NYPD 20-year police partner and trainer (*Tesoriero*) to the FBI (*See R33 2005*), *supra*, to have been delivered exclusively for the benefit of John Kaiser, *at all times*, not Kenner, resulting in Kenner <u>neither</u> obtaining the funds initially or via indirect means thru Kaiser, thus not subject to money judgment or forfeiture.   In addition, Mike Peca has received his full agreed upon consideration thru the Kaiser documented transaction in Na'alehu Ventures 2006's tax records and most-certainly, eagerly awaits the same collection of the 2004 Hawai'i-Jowdy loan (*Forf-44 verification*), which will produce a financial windfall to all of the patient Little Isle 4 and Na'alehu Ventures 2006 investors, since Jowdy's repayment termination in March 2006; and subsequent reneging and refusal to repay.

**Falcon 10**

In spite of the fact that Kenner is the largest documented victim of the **Falcon 10** schemes from Jowdy (*beginning in 2004*) thru the Constantine titling and loan frauds (*in 2009 until present*), Kenner has ignored that portion of the forfeiture demands, as those issues would require a full hearing to understand the decade-plus of unresolved issues, including future, 3rd party claims on the asset.   All of the necessary documents are in Rule 16 evidence, but Kenner has chosen to avoid further distractions under the current circumstances, related to any Kenner future 3rd party claim on the Falcon airplane.

**Sugar Mill**

The forfeiture of the Sugar Mill property is also not argued by defendant Kenner.   Please *note that the Sugar Mill parcel has been held in a 501c3 Hawai'i company, originally at the strategic recommendation of Little Isle 4 and Na'alehu Ventures 2006's highly respected Hawai'i real estate attorney, Steve Lim, from Carlsmith Ball to work hand-in-hand with the local community as a proposed local landmark and museum.*   During cross examination of Kenner during the forfeiture hearing, the Government demanded of Kenner why he had not **SOLD** the Sugar Mill parcel and either disseminated the funds to the investors or used the potential sale proceeds for litigation versus Jowdy to recover the

216

post-trial, *now-stipulated Hawai'i loan funds*, like Kenner did with the "lots" left from the JV.   The Government's insinuation that 501c3 assets should be somehow used to fund a criminally illegal distribution (*almost a decade later*) to the Little Isle 4 and Na'alehu Ventures 2006 members &/or illegally fund a civil lawsuit.  This displayed the consistent attitude of the Government to simply ignore the facts or law when they did not support their means to a desired end.

For the aforementioned reasons, the defendant requests that the Court rejects the Government's claims of forfeiture for the Baja Ventures 2006, LLC.

For the aforementioned reasons, the defendant requests that the Court finds that the government lacks any necessary supporting evidence that Kenner "**obtained**" funds from the alleged Hawai'i scheme, the alleged GSF scheme, and the alleged Eufora scheme, in any criminally responsible manner.   As a result, the defendant requests the government's demand for money judgment is denied.   The defendant also requests that if money judgment funds under the forfeiture proceedings are deemed to have been obtained by Kenner, defendant Kenner requests that verifiable empirical evidence be provided to substantiate it prior to the Court's final judgment.   The government's victim impact statements have no supporting evidence and are completely fabricated with numbers unmatchable to the instant case, in practically all scenarios, as required by law.

The defendant reserves any necessary claims for oral arguments for the Falcon 10 and the Sugar Mill parcel, if required.

/s/

_____

Philip A. Kenner

Date: August 29, 2018