**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
                                                      |
**UNITED STATES OF AMERICA**                          |
                                                      |
   **against-**                         |
                                                      |        **Docket No. 13-cr-607 (JFB)**
                                                      |
**PHILLIP A. KENNER and**                             |
**TOMMY C. CONSTANTINE,**                             |
                                                      |
                                                      |
**Defendants.**                                       |
-------------------------------------------------------X

**Defendant, Kenner –**

**Motion for Release of Grand Jury Minutes**

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| TABLE OF AUTHORITIES | 03 |
| INTRODUCTION | 04 |
| PART I – Case Law | 08 |
| PART II – Concrete allegations of government misconduct... | 19 |
|     Part II (a) -- Jowdy loans | 21 |
|       *Initial Diamante del Mar fraud by Jowdy* | *24* |
|       *Jowdy loans confirmed (but only after trial)* | *25* |
|       *Jowdy known forgeries* | *25* |
|       *Diamante Air and "no loans" Jowdy frauds* | *30* |
|       *Jowdy 2-day California deposition confessions* | *34* |
|       *Jowdy robs Owen Nolan DCSL investment funds* | *34* |
|       *Jowdy and Harvey defraud DDM investors with fake liens* | *34* |
|       *Jowdy and Najam pilfer $3 million 2006, DDM loan* | *35* |
|       *False Jowdy declaration to the EDNY Court* | *35* |
|       *Jowdy DCSL Cabo villa thefts (racketeering)* | *37* |
|       *Jowdy's Diamante Air plane frauds* | *38* |
|       *Jowdy and father steal $500,000 thru mail fraud* | *39* |
|       *Jowdy's Cabo san Lucas Airport theft* | *39* |
|     Part II (b) – Baja Ventures 2006 bought with independent funds | 41 |
|     Part II (c) -- Other false government proffers | 47 |
|     Part II (d) – Alleged Unknown LOC usage and LOC payments | 64 |
|       • *Bryan Berard* | *65* |
|       • *Sergei Gonchar* | *69* |
|       • *Jozef Stumpel* | *71* |
|       • *Jere Lehtinen* | *76* |
|       • *Mattias Norstrom* | *78* |
|       • *Mike Peca and Kristen Peca* | *81* |
|       • *Darryl Sydor* | *88* |
|       • *Turner Stevenson* | *92* |
|       • *Rem Murray* | *94* |
|       *One-page documents* | *98* |
|       • *Direct 2007 renewal packages* | *105* |
|       • *The Northern Trust one-page documents* | *109* |
|       • *Extension of Credit* | *111* |
|       • *Disbursement Request & Authorization* | *113* |
|       • *Letter of authorization* | *120* |
|       • *IMUS Special handling instructions* | *122* |
|       • *Master Notes* | *124* |
| CONCLUSION | 127 |

## TABLE OF AUTHORITIES

### CASES

<u>Page</u>

*Douglas Oil Co. v. Petrol Stops Northwest* (1979)                    5

*United States v. Socony-Vacuum Oil Co.* (1940)                    7

*U.S. Industries, Inc. v United States District Court* (1965)        7

*Berger v. United States (1935)*                                    25

*Brady v. Maryland (1963)*                                        44, 62

*United States v. Sales Engineering, Inc.* (1983)                    8

*United States v. Leung*, 40 F.3d 577, 582 (2d. Cir. 1994)          8

*US v. Alaska Senator Ted Stevens*                                62

### STATUES

*Rule 6*                                                        8, 82

*18 U.S.C. 3500; Fed R. Criminal. P. 26.2(f)(3)*                    8

*Fed. R. Crim. P. 6(E)(3)(C)(i)*                                    8

*Fed. R. Crim. P. 6(E)(2)*                                        8

*18 USC 1001*                                                  12, 82

*28 USC 2255*                                                    5

## INTRODUCTION

As a result of the inconsistency of evidence, both empirical and hearsay that has been presented pre-trial thru the Government's Rule 33 response (*inclusive of other docketed submissions from all parties*), defendant Kenner respectfully forwards this request to the Court for release of the Grand Jury testimony of FBI Agent Galioto from the original Kenner EDNY Grand Jury (*2013*) and the superseding EDNY Grand Jury Indictment (*2015*).   The basis for multiple allegations of *concealment* throughout the trial and post-trial have grossly contradicted ***all*** (*emphasis added*) of the empirical evidence available to the FBI and the US Attorneys office (*in Rule 16*), allegedly used in the formulation of their prosecutorial theories, pre-trial.

Upon information and belief, the defendant supposes that only FBI agent Galioto gave testimony in front of the two (2) indicting Grand Juries in Central Islip, NY, thus insulating the second and third Grand Jury(s) of Kenner[1] from any of the alleged victims direct testimonial recollections, all which Galioto knew previously confirmed Kenner's full transparency.   Kenner was unable to confront his accusers of "*under oath*" testimony from either of the Grand Juries in the EDNY.   The sealed Grand Jury (*in both instances*) prohibited Kenner from making an appearance on his own behalf to provide contradicting testimony, supported by evidence the government possessed prior to convening either Grand Jury, specifically with Kenner in custody at the time of the 2nd EDNY Grand Jury, alleviating all flight risks.

---

[1] SDNY 2011 – On March 29, 2011, FBI Agent Galioto received testimony thru a SDNY Grand Jury, after personally handling the service of subpoenas to Kenner investors, Mike Peca, Darryl Sydor, and Turner Stevenson.   The three (3) Grand Jury witnesses were hand-picked by Galioto after multiple discussions with adverse investment partner, Ken Jowdy and his legal counsel, headed by Former FBI Director Louis Freeh and NY co-counsel, Tom Harvey (*a co-conspirator of Jowdy's embezzlements since 2002 – See TIMELINE 020*).

The investor-strong testimony in 2011 vindicated Kenner of any alleged *concealment* theories related to the Jowdy loans.  They acknowledged full knowledge of the Hawai'i to Jowdy documented transfers, verified full transparency of the group's angst with Jowdy for stopping communications in 2006 (*immediately after acquiring the $125 million Lehman Brothers loan and no longer needing the Kenner investors*), and the ultimate decision "***as a group***" (*thru a series of pre-loan conference calls*) to lend Jowdy the funds.

The Grand Jury testimonies of Galioto have reformative effects to the integrities of the Indictment process itself.   The defendant requires the testimonies for utilization in his Fatico hearings, his potential ineffective counsel filing (*28 USC 2255*), during sentencing arguments, and for application during direct appeal (*consistent with prosecutorial misconduct issues raised in defendant's ProSe Rule 33 submission, in additional to various selective prosecution issues*).

Parties seeking disclosure have the burden of showing that the requested material "*is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy...*".   *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 219, 60 L. Ed. 2d 156, 99 S. Ct. 1667 (1979).

As a matter of fact, the Galioto Grand Jury testimonies are now three (3) and five (5) years removed from any investigations by FBI agent Galioto and the respective Grand Juries, severely lowering the necessity of ongoing secrecy.   In fact, to further compliment the lack of need for secrecy, defendant recently proposed via two (2) separate offers (*via ECF letters*) to meet with the prosecutorial team and discuss the exact whereabouts of the allegedly misappropriated funds.  No portion of the defendant's offer/request to the prosecutorial team was to alleviate or circumvent the pending forfeiture proceeding already scheduled in front of this Court, but to merely aid the known whereabouts of the actual thieved funds, in a further attempt to recover them for the investors/lenders in the instant case.

The government, *thru ECF Document 554*, has declined, accentuating the defendant's belief that investigating officer Galioto has never had any "*concerns*" for the actual thieved funds, but merely needed Kenner "*out of the way*" for Jowdy and his accomplices to continue their on-going and lucrative enterprises.

The sole purpose of the meeting was to exploit the underlying frauds perpetrated on the Court and the alleged investor/victims by the investigative team, who at all times knew entirely where all of the Hawaiian loan funds resided, but selectively

5

chose to ignore the criminal thefts in lieu of a prosecutorial *concealment* theory, leaving the clearly on-going criminal activity of Ken Jowdy and his protected cabal unscathed and free from Constitutional resolve.   The fact that the government does not have any desire to meet, thru its investigative team or other, raises the specific issue as to whether of not the factually accurate distribution of evidence was properly disseminated to the two (2) indicting juries, considering it has been provably and falsely proffered by the government from opening remarks thru rebuttal summation, *solely to injure the defendant.*   Upon information and belief, the defendant supposes that *intentional misrepresentations* of prior, transparency testimony of virtually every alleged victim supporting Kenner pre-trial and the actual transactions resulting in the Jowdy criminal thefts were proffered misleadingly.   In Galioto's testimony, the defendant imagines there resides Galioto's altered-reality, contradicting all empirical evidence, via his testimony to Indict Kenner in 2013, perfectly timed to terminate Kenner's direct testimony in December 2013 to the Supreme Court in Baja California Sur, Mexico about Jowdy's twelve (12) year criminal enterprise by that time, *only one month later*. The Kenner testimony in Mexico would have effectively ended Jowdy's decade plus deceit on Kenner and Kenner investors, and secured full restitution plus profits for the Kenner investor/lenders in 2013.

The testimony will also show whether or not Galioto acted rogue in his false assertions or if there is deeper complicity in the prosecutorial team, resulting in a potentially grander malfeasance to the defendant, since none f the Indictment claims emanated from Rule 16 empirical evidence.

As the Supreme Court has previously stated, "*After a Grand Jury's functions are ended, disclosure is wholly proper where the ends of justice require it.*"   Several factors entered into their decisions that a district court would not be abusing its discretions.   *First*, by the time a district court's authorization of the disclosures, the Grand Jury has ceased its investigation.   Therefore, there is presently no need to protect against the accused escaping before he is indicted and arrested.   *Second*,

there is no risk of tampering with the witnesses. *Third*, there is no risk of inhibiting the Grand Jury's investigation and deliberation.  *In sum*, several of the reasons for Grand Jury secrecy are not operable here.  *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 234, 84 L. Ed. 1129, 60 S. Ct. 811 (1940).   See *U.S. Industries, Inc. v United States District Court*, 345, F.2d 18, 21-22 (9th Cir), *cert denied*. 382 U.S. 814, 15 L. Ed. 2d 62, 86 S. Ct. 32 (1965).

At stake is the public's faith and trust in their officials and the integrity of the judicial system.   In today's judicial climate, through the exposed corruption and prejudiced actions of the highest ranks of the FBI, DOJ and US Attorney's office, transparency of the "*means*" to arrive at the "*end*" should cause no pause for the Court to desire the same review, perhaps demanding it in the interest of justice with no discernable consequential risk.

To withhold Galioto's testimony under the circumstances surrounding this case, *infra*, and the prosecutorial team's lack of desire to address the actual thefts to the underlying alleged victims, could only discourage public respect for the law and the courts.  Congress has repeatedly noted, the interests of Grand Jury secrecy are reduced when the Grand Jury has ended its investigation.  After the Grand Jury's functions are ended, disclosure is wholly proper where the ends of justice require it.

## Part I
## CASE LAW

Rule 6 of the Federal Rules of Criminal Procedure permits disclosure of matters occurring before a Grand Jury.   Disclosure otherwise prohibited of matters occurring before the Grand Jury may be made when so directed by a court preliminarily to or in connection with a judicial proceeding.   *Fed. R. Crim. P. 6(E)(3)(C)(i)*.  The proper functioning of the Grand Jury system depends on the secrecy of Grand Jury proceedings.   *Fed. R. Crim. P. 6(E)(2)* codifies the traditional presumption that Grand Jury proceedings may not be disclosed.   The policy of secrecy surrounding Grand Jury proceedings, however, *is not absolute*.   It is designed to protect from disclosure <u>only the essence</u> of what takes place in the Grand Jury room, in order to preserve the freedom and integrity of the deliberative process.   As a result, Congress, thru its enactment of *Fed. R. Crim. P. 6(E)(3)(C)(i)* recognizes that in some situations justice may demand that Grand Jury proceedings may be made available for use in subsequent judicial proceedings.

A party seeking disclosure of Grand Jury minutes must make "*a strong showing of particularized need*."   *United States v. Sells Engineering, Inc.* 63 US 418, 425, 103 S. Ct. 3133, 77 L. Ed 2d 743 (1983).   A defendant has the absolute right to the Grand Jury testimony of any witness the government calls at trial.   *See 18 U.S.C. 3500; Fed. R. Crim. P. 26.2(f)(3)*.   Otherwise, a defendant is not entitled to disclosure of Grand Jury transcripts **<u>unless</u>** there are "**concrete allegations of government misconduct**" *United States v. Leung*, 40 F.3d 577, 582 (2d. Cir. 1994).

### *Hawai'i Loan knowledge and forgery claims*

As a result of the previous 2011 Grand Jury testimony of three (3) Kenner investors, two (2) of which gave testimony in the 2015 EDNY trial[2], *they all confirmed their*

---

[2] Note that in 2015, both Mike Peca and Darryl Sydor contradicted their prior "*under oath*" testimony from the March 2011 Grand Jury when they claimed they were unaware of all relevant prior claims of knowledge (*of the Jowdy loans and other critical issues, also*

*prior knowledge* of the loans to Jowdy and their decisions "*as a group*" on conference calls to make the loans.   The investor base lived all over the world, thus, the only medium to make "*group*" decisions with the Little Isle 4 (*Hawai'i*) capital account funds (*once independently signed off, authorized, and invested*) was via conference calls.  **Multiple investors have repeatedly confirmed this directly to Grand Jury proceedings, in civil testimony, directly in FBI proffers, and in sworn affidavits, amongst other mediums**.

Either based on *faulty memory, confusion and mistakes* or government theories in direct contradiction to the empirical evidence they possessed thru Rule 16, the only record of statements evaluated as factual by both the 2013 and 2015 Grand Jury's Indictment of Kenner, were made by Galioto.   Galioto was present for each and every pre-trial FBI proffer, the 2011 SDNY Grand Jury testimony, and possessed all other relevant statements from investor turncoats, Kaiser and Berard (*previously supporting Kenner's full transparency and the Hawai'i investor knowledge of the Jowdy loans without equivocation*)[3].   Agent Galioto had the Jowdy January 2010

---

*contradicted by empirical evidence possessed and ignored by the government pre-trial*).   The government replied to the clear and convincing perjury (**suborned or otherwise**) from Peca and Sydor (*in addition to all other witnesses*) in 2015 claiming that they suffered from *faulty memory, confusion and mistakes.*

The government's Rule 33 reply was the first time the government made representations that statements made by their witnesses might not be reliable based on amnesia-like symptoms, when their collective testimony contradicted CRITICAL testimony (*previously given under oath*) in the instant case.

[3] *See 3500-JK-1-r* when Kaiser confirms to Galioto and Agent Romanowski that he met with Jowdy on multiple occasions in multiple locations and independently discussed the meetings with Bryan Berard and Kenner, after the fact.   The 2010 proffer reiterated Kaiser's May 2009 arbitration testimony where he confirmed, not only his personal knowledge of the loans, but that he raised specific funds from friends & family to add to the Jowdy loans from Hawai'i.   He further finished the 2009 arbitration panel that there were "*no secret handshakes*" about the Jowdy lending deal and all Hawai'i investors that he had met (*thru his May 2009 arbitration testimony – as the Managing Member of the Hawai'i partners*) were "*aware of the Jowdy loans*".   When asked if Kaiser had seen "*anything inappropriate by Kenner*" (*thru May 2009*), Kaiser finished his symphony of pro-Kenner transparency by confirming to the 2009 arbitration panel, "*NO*".   He was then asked, Q: "Not one complaint?" – Kaiser replied singularly as – "*None*".   *See R33 556.*

deposition confessions of all the "*loans*" he received from the Hawai'i LLCs, Kenner and Kenner investors and his lack of plans to return any of them; *specifically while Hawai'i and Mexico investors Kaiser, deVries and Woolley witnessed the confessions first-hand.*   The January 2010 deposition echoed the Jowdy FBI proffers of February and March 2010 (*confirming he lied to the 2008-09 AZ court about the loans from Kenner and Kenner investors, specifically including the Hawai'i loan*).   Agent Galioto also had the December 2010 transcripts from the Glen Murray v. Jowdy case (*for another $791,000 stolen by Jowdy from Murray – See R33 015*).   In the 4-day Nevada bench trial, Jowdy was caught in irrefutable lies about the stolen money, once again. His own accounting records, his own attorney, his own accountant, and his own emails consistently discredited him.   In addition, shocking all present in the NV courtroom, Jowdy's attorneys (*paid for with diverted investor funds*) admitted the 2004 Hawai'i loan agreement as **authentic** in his case-in-chief defense.   This audacious, defense move raised a myriad of reformative issues, overlooked by the 2009 Jowdy Grand Jury case agent (*also Galioto*).   Jowdy had previously thru Louis

---

- It should be noted that Kaiser's transparent testimony in May 2009 would have taken place ***after the following, and in direct contradiction to his recently fabricated 2015, anti-Kenner claims*** *(thus making the 2015 claims wholly illogical – and known at all time to Galioto, at a minimum, most likely claimed at his two [2] Grand Jury testimonies)*:
    1. Kaiser's alleged "*confrontation*" meeting with Kenner, Manfredi and Kaiser about $1 million being stolen in 2005-06 by Kenner (*specifically refuted by Manfredi in his 2010 FBI proffer*) *Tr.983*,
    2. Kaiser's lack of repayment from the California renovation deal, claimed to only receive "*approximately $300,000*" of the millions he claimed he was due (*Michiewicz @ Tr.1020 and Tr.5745* – **confirming that Counts 2, 3 and 4 were fabricated on known lies ONLY to create venue in the EDNY**),
    3. The alleged unpaid 2005 friends & family loans from the Hawai'i-Jowdy loans (*despite full and documented repayment of $1.176 million – See August 2006 Na'alehu Ventures 2006 bank statements*), and
    4. Kaiser's alleged "*grocery list*" or "*shopping list*" representations of the falsely stated, unpaid California proceeds, *Tr.1405.*

    Yet, Kaiser told the 2009 arbitration panel -- **Q: "Not one complaint?"** – emphatically replied as – "***None***".   In any other universe, the 2009 Kaiser voluntary testimony would never have occurred if any of the 2015 fabrications are to be believed, in contradiction to all of the other supporting empirical evidence the government also ignored to frame the Kaiser perjury in 2015, as reliable and truthful.

Freeh and Perkins Coie (*paid for by diverted investor funds*), hired a FBI forensic signature analyst in March 2009 to determine the authenticity of the Jowdy signature (*also paid for with diverted investor funds*), which Jowdy proffered to the AZ court as a *forgery*.   The FBI analyst did <u>not</u> validate Jowdy's fraudulent claim, much to his defense's chagrin.   Nonetheless, after representing the 2004 loan agreement to the FBI, the NY US Attorney's office, and the AZ Federal Courts as a *forgery*, Jowdy's own defense **authenticated** the document (*after the signature witness on the document had authenticated it in two [2] other cases, and now in Jowdy's own Nevada defense*).   It should be noted that even after the Jowdy authentication, Kaiser further confirmed the agreement in his October 2010 FBI proffer to Galioto that – "*was agreement to borrow $ from Hawai'i*".   *See 3500-JK-1-r @ 3*.   Without question, by the time of the Jowdy 2010 authentication, no one was left to invalidate the document.   Yet, in 2014 pre-trial, the US Attorney (*Michiewicz*) announced to the Court that they were going to present *that* document as a forgery to the trial jury.   Who made this document inauthentic...again?   Who hypothesized this theory, in the face of all empirical evidence?   Who lied to the EDNY &/or US Attorney about its validity?   Then, perhaps to no one's surprise, Kaiser made two (2) bold and unsolicited claims that this authenticated agreement was a forgery during trial testimony, per some fabricated conversation with Kenner, completely stretching any permissible deceptive reality, thus, clearly pre-planned.   *Tr.1106-1008*.   The same misrepresentation about *forgery* was also flushed out when Kaiser lied to the US Attorney &/or FBI that his signature on a testimonial in Mexico was *forged*.   Defendant Kenner produced an FBI recording to his trial attorney (*from the government's own Rule 16 disclosures*) of Berard and Robert Gaudet (*another theft victim of Jowdy and Kaiser*), where Berard confirmed that Kaiser **DID SIGN** the Mexico document in question, while he and Gaudet were present at the Cabo courthouse.   Unauthorized by Kenner, Kenner's trial counsel released that "golden nugget" of impeaching evidence to the US Attorney, who promptly dropped that specific allegation of forgery for trial.   Clearly, Kaiser raised the Mexico *forgery*

claim (*again*) and was proven to be a liar by his co-conspirator, Berard's own FBI phone recording.[4] Neither the government nor the FBI have charged Kaiser with *18 USC 1001* for making false statements to the FBI (*or US Attorney*) related to the various nefarious forgery claims. FBI Agent Galioto's knowledge of Kaiser false proffers of forgeries extended into Galioto's unchecked interference in the 2012 Arizona civil case Kenner and five (5) interveners[5] filed against Kaiser and Berard

---

[4] It should be noted that Kaiser made this statement in the Mexico courts immediately after being hired by Jowdy in 2012. Kaiser's *forgery* claims allowed Jowdy to dismiss another $1.6 million lawsuit against him for unpaid loans (*from another Jowdy victim*), which Kaiser was now being materially used (*thru graft*) as the procedural pawn.

[5] The five (5) interveners Kenner introduced to the Arizona case in 2013 were Darryl Sydor, Bill Ranford, Tyson Nash, Dimitri Khristich, and Jere Lehtinen. They were all repeatedly contacted by FBI Agent Galioto in the AZ civil case and instructed to "*get out of the case versus Berard and Kaiser*", and in turn, "*sue Kenner*" instead. Ranford, Sydor and Nash confirmed this to Kenner on 2014 phone calls, after Kenner was detained in NY. Only Lehtinen fell prey to the pre-trial threats of deportation from the USA and dismissed his case under duress and fear of Galioto's extradition "*promises*". The others prevailed versus Kaiser and Berard in the contemporaneous 2015 AZ civil trial. **The Kaiser and Berard defense claimed the Promissory Notes that Kaiser signed with the respective interveners were <u>forged</u>.**

- *Specific empirical evidence which Kenner provided the Interveners and their counsel in 2014-15 from jail confirmed the Kaiser <u>email participation</u> in signing each and every Promissory Note personally. The AZ judge ruled against Kaiser and Berard in every alleged forgery instance.* *See R33 055e.*

In furtherance of their fraudulent "*forgery*" claims -- Berard and 2015 "*tracing*" witness (*Lanie Donlan – Berard's best friend*) also made AZ case claims under oath that their names were forged related to a notarized document. They failed to realize that Berard had exchanged a text communication with Kenner related to receiving the document in Massachusetts from Kenner, getting it signed, and notarized (*in MA with Donlan's witness help*) (*See R33 449*), and requested returning it to Kenner (*on the day of notary*) via Kenner's FedEx account (*to AZ*), to which Kenner replied, "*YES*". Galioto and IRS Agent Josh Wayne contacted Donlan about the forgery claims [*See 3500-LD-2*] but unexplainably never contacted the MA Notary William Medlin (*unless the agents failed to submit their raw notes after Medlin's devastating confirmation of Berard and Donlan lies*). Both agents would have been deftly aware of Medlin's Notary book with the Berard signature.

Berard in BLACK – <span style="color:red">Kenner in RED</span> 



| | | | | | |
|---|---|---|---|---|---|
| 463 | +14015246929 Bryan Berard* | 4/23/2008 9:14:25 PM(UTC+0) | Read | ***I get back 2 hboston 2nite so ill get papers 2 u 2morrow so ull have friday!!!*** Howd u guys do n tourney?? | |

for fraudulently conveying title (*a.k.a. stealing*) to a joint Kenner-Kaiser renovation project in AZ (*with Kaiser owing Kenner about $1 million from the project to Kenner, and documented – also refuting the wire transfers in Counts 2, 3 and 4 [as owed to Kaiser], contradicting Kaiser's trial fabrications*).   The interference from FBI agent Galioto began in the AZ case as soon as Kaiser and Berard received jobs from Jowdy and Tom Harvey in Mexico, and began working with FBI Agent Galioto versus Kenner (*and the Arizona interveners adverse to Kaiser and Berard*).

### *Eufora private stock sales:*

FBI Agent Galioto also had multiple conversations with Eufora investor attorney, Michael Stolper.  Stolper would have confirmed (*as the government's underlying empirical evidence confirmed*) that Stolper (*and his investigative team*)[6] was aware of the Gaarn and Constantine private stock sales in 2008 and 2009 to Stolper's clients. The discussions would have confirmed Stolper's group investigated and vetted the _validity_ of the private stock sales, thoroughly.   Stolper's group would have confirmed the documented acquisition of all the stock (*by AZ Eufora Partners I*),

| | | | | | | |
|---|---|---|---|---|---|---|
| 486 | +14015246929 Bryan Berard* | 4/24/2008 7:52:38 PM(UTC+0) | Read | *Ok 2 use ur fed x acct # 4 package??* | |
| 582 | +14015246929 Bryan Berard* | 4/24/2008 7:52:50 PM(UTC+0) | Sent | *Yes* | |
| 487 | +14015246929 Bryan Berard* | 4/24/2008 7:54:08 PM(UTC+0) | Read | *Thanks* | |

[6] Stolper's investigative team, hired by Eufora Board members, Tim Gaarn and CR Gentry (*unknown to Kenner and the Eufora investors for months, **contradicting repetitive puppet master refrains by the government***), included Rudy Giuliani's right-hand, Eric Hatziemos from their crisis management company, former CIA agent, Oliver Libby and Stolper.   None of these investigators had any previous ties or allegiances to Kenner, thus investigated Kenner under the same scornful eye as Constantine, Eufora and his management team in 2010-2011.

considering that Gaarn was the seller of half of the stock (*personally*)[7], and in charge of the AZ Eufora Partners I acquisition and documentation of it as Managing Member for all of the investors.  In fact, **Gaarn's FBI interview produced an unexplainable anomaly** related to the well-documented, Kenner to Gaarn stock transfer in 2005.   Although the Eufora tax documents, and every other corporate email from 2005 thru 2009 confirmed the 2005 transfer date by Kenner to Gaarn, the FBI notes were *unmistakably altered*[8] to cross out the initial 2005 response by Gaarn and replace or "*overwrite*" it with 2007 to correspond closer to the fabricated

---

[7] See *Kenner defense exhibit 80* (from trial – *R33 433f*) with Gaarn's response "***That is correct***" (*Tr.2571*) was exchanged after Gaarn had already signed the 2009 Eufora operating agreement (*R33 055a*), acknowledging:

1) **His personal sales** (*from his Standard Ventures LLC as told to the FBI, verified in proffer*),
2) **His knowledge of the buyers** (*members of AZ Eufora Partners I, which he was the Managing Member*), and
3) **The remaining 1.90% of Eufora stock owned by Gaarn** (*Standard Ventures LLC*) **after the $700,000 in Gaarn private stock sales**.

Upon information and belief, defendant supposes the "***Kenner stock sales***" misrepresentation emanated from the two (2) Galioto Grand Jury testimonies (*since Kenner was NOT selling his shares*) (*Tr. 5970, 5971, and 5974*), and no testimony from Kenner or any government witness suggested that during trial.  Only misleading questions insinuated that claim.  No foundation of Kenner sales was presented. The government had the Eufora 2009 operating agreement with fully documented shares owned by the 2008-09 buyers (*See R33 055a, signed by Gaarn personally and as Managing Member of AZ Eufora Partners I @ 35 and confirming Gaarn [thru Standard Ventures] and AZ Eufora Partners I "changed" share positions @ 37*).   When the 2009 signed Eufora operating agreement is compared (*which the government had years to do*) to the Eufora 2007 tax records, documenting the AZ Eufora Partners I share interest at 17.23% (*with Gaarn as Managing Member*), the *upward variance* is solely based on the 2008-09 Constantine and Gaarn private sales (*again confirmed by Gaarn and Eufora CEO Gentry in Kenner 80-R33 433f*), thus fully documented (*but ignored in summation to create a worthless, "pump-n-dump" falsity to the jury, leaving no choice but to convict*).   This repeated misrepresentation could only be described as misconduct.

See Eufora tax records from 2005, 2006, and 2007. (*R33 433h [@ 12, 35, 43 and 52], R33 433i[@ 9 and 22], R33 055b[@ 24 and 26]*).

- In *R33 433h @ 47* – 2005 Eufora tax paperwork confirms Kenner no longer owned shares of Eufora, despite repeated claims at trial thru misleading questions that Kenner was "*selling his shares*" to his clients, wholly untrue and without empirical evidence, but fabricated somewhere (*again perhaps in the multiple Grand Jury testimonies of Galioto*).

[8] *See R33 433d -- 3500-TG-1-r @ 2*

14

allegations of "*last minute*" transfers by Kenner to Gaarn (*misrepresented as December 2008 at trial, further ignoring their own doctored evidence*).  (*See R33 433d @ 2*).  The altering of FBI notes to frame someone is a crime, and without reasonable explanation, appears to have been "*recreated*" to corroborate a foundationless trial theory, making it the <u>*only*</u> contradicting piece of evidence to the empirically, real-time documented events by every other member of the Eufora Board over a four (4) year period of time.  Furthering any layman's suspicions of the altered document is the clear and convincing fact that Agent Romanowski originally wrote **2005**.  This cannot be a mere coincidence that the factually supported truth "*of the 2005 transfer*" was originally on the FBI 302 notes, but *only under great scrutiny* can it be noticed that 2005 was changed to support an unverifiable theory.[9]  In fact, Gaarn told the FBI during a subsequent proffer that he discussed the 2005 date in 2007 or 2008 with Eufora CEO Gentry, who replied (*per Gaarn's proffer notes*) – "*CR [Gentry] said can predate the doc when made a verbal agreement*".  This was not a conversation with Kenner, nor did Kenner testify to that during the 2015 trial as Komatireddy misled the jury during rebuttal summation.

---

[9] In a Constantine declaration (*in an unrelated case* – FL: *2:08-cv-08284-CBM-PJW*), Constantine stated – "*Mr. Kenner has not had ownership interest in any business of mine since 2005.  Prior to 2005, he has only owned one interest in one of my businesses, Eufora, LLC.*" This was confirmed by Eufora CEO Gentry (*See PK135*) in his November 2009 correspondence (*post all 2008-09 private sales – further documenting the proper buyer's shares from Gaarn and Constantine*) with the Eufora Board when he stated –

"*I have also attached the member registry I created for AZ Eufora Partners I, based on numerous conversations I had with Phil [Kenner] (for original transactions), with Tim [Gaarn] (for transactions since 2005).*"

Former Eufora CEO told the FBI in June 2012 that Gaarn was "***selling his shares***" and "***wanted $ wire out to him***".  Galioto systematically ignored this further corroborating evidence, yet his investigations led to trial claims (*believed to emanate from misleading Grand Jury testimony to indict Kenner*) that Kenner still owned Eufora stock thru 2008 and was "*selling his shares*".  The empirical evidence proves this to be untrue, yet the government trial theory advocates the contrarian and unsubstantiated position, without explanation.

As the Eufora tax records also confirmed, Kenner released his equity stake to Gaarn and replaced his equity position by becoming a documented lender (*in 2005 and 2006 – and repeated in 2008*) to Eufora (*totaling $386,000 in 2005 before Kenner was repaid by the end of the 2006 tax year, again all documented on the Eufora tax records in the government's possession, further refuting Urban Expansion conspiratorial issues*).  *See R33 433i (@ 9) and R33 433h (@ 10).*   Komatireddy continued by lying to the jury in rebuttal summation (*which the defendant believes emanated from the Galioto Grand Jury testimonies*) by fraudulently claiming – "**Kenner testified that he created a transfer document**, one more of those useless transfer documents, **and backdated it**" (*Tr.5983*).   Kenner <u>NEVER</u> testified to this salient issue.

Stolper confirmed his support of Kenner's actions re: Jowdy and Constantine (*along with his investigative team of former high-ranking government officials – unless the Giuliani team is also somehow complicit with Kenner*) to the SEC, 1 ½-years after his investigation began. The conversations with Stolper would have confirmed he was further enlightened[10] by Kenner's transparency of the Constantine fabricated

---

[10] Stolper responded to Constantine's original private stock sale fabrications of Gaarn (*as a distraction to his company embezzlements which were investigated by Stolper and his independent team, supra*) thru a letter correspondence that all of his investment/clients signed and returned confirming the full transparency of the false allegations (*made about Kenner in 2010*).   *See Ex. 1.*   A year later Stolper further confirmed the following to the SEC in August 2011 (*long after Berard and Kaiser later claimed to the FBI [after receiving high-paying jobs from Harvey and Jowdy in Mexico] that they found Kenner to be a fraud [as early as Spring 2010 – 1 ½ years earlier – even with Kenner staying at Berard's NYC apartment as his guest during the August 2011 testimony]*).  Stolper's participation and transparency with Kenner and Kenner investors related to Jowdy was clear and unambiguous, when he testified to the SEC (*SEC Tr. 683-685, **August 2011** (Ex. Z18)*):

> NY Attorney, Michael Stolper – *The only thing I would like to clarify was that I think in your line of questioning, which may not come through in the transcript, whether he [Kenner] disclosed that the SEC has sought enforcement of subpoenas to his clients.  I think that the suggestion in your question was that it was something negative that he should disclose to his clients as sort of a warning or red flag to his clients who are relying on him.*
>
> ***And I think that the conversations that I have been a part of***, *without waving privilege, **and also my own view** of SEC's involvement in this whole Diamanté del*

allegations (*only of Gaarn private sales frauds, not Constantine's own – See Ex. 1*) during Constantine's August 2010 company conference call.  Stolper called the Constantine claims "***predictable***".  *See R33 433 @ 5-7*. Lastly, Stolper would have confirmed to Galioto that immediately after Kenner recorded Constantine at Home Depot in August 2010 (*with Constantine making the same and previous claims of private stock sale fraud to Stolper's clients*), Kenner copied and forwarded to Stolper the salacious claims made by Constantine versus Kenner, for all his investor clients to hear (*full transparency*).   Although there were two (2) previously documented allegations by Constantine of the Gaarn private stock sales as frauds to Stolper and the investors, Kenner immediately released the repeated fraud claims (*3rd documented allegations*) for transparency to Stolper's investigative team.

No prior evidence would have led a reasonable investigative effort to believe that all of the Eufora investors (*or any of them, while collectively being represented by Stolper and his investigative group*) would have lacked full understanding of their transparent and documented acquisitions in 2008 and 2009.

How that theory came to fruition or how questions to claim its basis for prosecution had to be based somewhere other than thru empirical evidence.  Considering the government asked each Eufora witness about their prior knowledge of events while they all had full legal representation and thorough inspection thru independent counsel, **it is unexplainable within rational means that now (in 2015), none of them could remember**.

---

*Mar, et. al. is a welcome one and that we and Mr. Kenner, are really looking to the SEC to enforce the securities laws against Mr. Jowdy and those [Harvey, Freeh, and Najam] who did wrong here.   And we see it as a welcome thing, as a positive thing.*

*So the tenor of the conversations with Phil's friends, co-investors, clients is that this is a welcome thing and maybe because we are having this direct communication with the SEC, and then perhaps subsequently with the US Attorneys Office, that maybe they will finally get some justice out of this.*

*And I know I have said that off the record with you and I just wanted to clarify that in response to that line of questioning.   Just a point of information.*

These questions echoed the same Hawai'i loans (*to Jowdy*) questions and 2015 witness amnesia, contradicting 100% of the pre-trial empirical evidence, thus the defendant believes that the only other logical source for the theorization and origination of the *concealment* of the, 1) Hawai'i loans to Jowdy, and 2) Eufora private stock sales (*by Gaarn and Constantine*), would have emanated from the Galioto-only Grand Jury testimony.

**Part II**

**Concrete allegations of Government misconduct**

Defendant has represented extensively, *supra*, *infra*, and throughout his Rule 33 submissions the clear and convincing perjury by the government witnesses. Defendant has presented the synchronized perjured testimony by multiple government witnesses that defy logic, *notwithstanding suborned planning*.[11] Defendant has definitively reconstructed the absolute knowledge of the government witnesses' pre-trial evidence of their Hawai'i loans to Jowdy and Eufora private stock sale knowledge, including independent legal counsel who reviewed all relevant issues.

Yet, when the defendant presented the empirical evidence to the Court in his Rule 33 submissions, the government replied that the CRITICAL hearsay testimony by each and every one of their witnesses (*after hundreds of "I don't remember" claims under cross-examination*), the government promoted a single reply to the discrepancies related to every critical statement; *faulty memory, confusion and mistakes*.   The defendant reminds the Court that *faulty memory, confusion and mistakes* is synonymous with the Oxford Dictionary definition of ***unreliable***.   The

---

[11] The trial amnesia of Gaarn, Kaiser, Berard and Peca related to the attempted acquisition of the Eufora loan from Constantine acquaintance, Brent Nerguizian, was monumentally synchronized to perfection.   The government had dozens and dozens of text messages between those specific parties (*in 2010*), which included Kenner and their attorney (*Stolper*), confirming the months of daily activity and efforts to fund and purchase the Eufora debt out from under Constantine's control.  Former Eufora CEO Gentry also confirmed to FBI Agent Galioto that he worked with Gaarn, Stolper, Kenner, Berard, Kaiser and other Eufora investors to "*buy out*" the Eufora debt.

  •  Gentry told Galioto that for the first "*buy out*" meeting, "*Tim Gaarn and PK helped contact members*", "*get group together – all members of Eufora*", "*buy out notes BN* [Brent Nerguizian loan]", at the meeting Time Square with "*Eric Hat[ziemos], Rudy Giuliani's firm in NY through Michael Stolper*".

Nonetheless, none of them could remember any of it in 2015, perhaps afraid that their efforts would have validated an ***intrinsic value*** for Eufora (*in 2010*) under Stolper's lead and refute the government "*pump-and-dump*" theories of worthlessness.

newfound and foundationless government theories originated from somewhere, unsupported by empirical evidence in Rule 16.   Considering none of them are supported by Rule 16 evidence, the creation of the theories must have another, undocumented beginning.   The defendant believes without ambiguousness that FBI Agent Galioto contrived the *concealment* theories (*and pushed them on an unknowing prosecution staff – at least for some period of time)*, despite Galioto's presence during every pre-trial witness confirmation of transparency by Kenner.

The following is a non-comprehensive list of concrete allegations of prosecutorial misconduct, perhaps solely based in the efforts of FBI Agent Galioto to re-direct the attention from Jowdy, Najam and Harvey, and later his co-conspiratorial efforts with Berard and Kaiser (*once hired by Harvey and Jowdy in 2012*).

## Part II (a)

## Jowdy loans

Claims that the defendant stole the Hawai'i funds (*actually loaned to Jowdy*) have been refuted post-trial by government forfeiture exhibit *Forf-44.*   Nonetheless, the government themed their 2-month long prosecution on the basis that Kenner (*and Constantine*) had created a false narrative that "*Jowdy had stolen the various investor funds*" as a distraction scheme to re-direct attention away from the government and Galioto's shared belief that the Jowdy loans (*the Global Settlement Fund ["GSF"] efforts to recover them and straighten out other related issues, per the text, email and signed disclosures confirmed*)[12], and the Eufora private stock sales were concealed from the investors.

---

[12] *Fully available to the FBI and prosecution before trial* – and after Jay McKee and his wife met with Kenner and Constantine in Buffalo, New York on May 9, 2009, McKee and Kenner carried out a long and detailed text conversation that confirmed what was discussed at the dinner meeting.   In spite of the full disclosures in the text communication immediately after the dinner, McKee told the 2015 trial Court that he was not told any of the items (*Tr.1821-1824*) (*perhaps, faulty memory, confusion and mistakes or CTE*).   Notwithstanding ineffective counsel issues for being underprepared for the only items McKee was involved with in the trial allegations per the government sidebar proffer (*Tr.1846*), McKee and Kenner discussed as follows (*which was corroborated by a Constantine disclosure email [See PK67] the same day McKee signed an independent, full disclosure, granting permission for use of funds (See PK136) as utilized [minus the Constantine-Gonchar arrangements]*):

***McKee texts in BLACK -- Kenner responses in RED --***

| | | | | | |
|---|---|---|---|---|---|
| 7032 | +17168034903 Jay McKee* | 5/9/2009 3:46:20 AM(UTC+0) | Read | Thx 4 making the trip bud.. **Took in alot from the talk tnite**.. Drive safe, be in touch.. | |
| 8255 | +17168034903 Jay McKee* | 5/9/2009 3:55:39 AM(UTC+0) | Sent | Good stuff | |

| | | | | | |
|---|---|---|---|---|---|
| 7039 | +17168034903 Jay McKee* | 5/9/2009 12:36:25 PM(UTC+0) | Read | **Can u do me a favor.. Can u email me, so I can look at it on paper, everything my 25O turns into.. Nicole was speaking with Tommy when u explained to me all the areas where we are benefiting..** | |

| 8265 | +1716803490 3 Jay McKee* | 5/9/2009 12:37:21 PM(UTC+0) | Sent | **I will have tommy do it so it's consistent with the discussion** | |

| 7040 | +1716803490 3 Jay McKee* | 5/9/2009 12:37:42 PM(UTC+0) | Read | **Perfect, tks** | |

| 7043 | +17168034903 Jay McKee* | 5/9/2009 2:12:22 PM(UTC+0) | Read | **Hey, also, could u email me what the 3 black sheep are getting in the end result, as well as Tommy bullet points they had 2 agree too.. Tks** | |
| 8269 | +17168034903 Jay McKee* | 5/9/2009 2:32:11 PM(UTC+0) | Sent | **Tommy said you will get 1/10th of everything that is acquired of theirs which includes 20% (2% for you) of the airpark building, 1/10th of their 3.64% of their Eufora shares (.364% for you which puts you just over 1% in Eufora) and then a small piece of the jet which TC is still crunching numbers on but it will probably be 1% of it.** | |
| 8270 | +17168034903 Jay McKee* | 5/9/2009 2:35:46 PM(UTC+0) | Sent | **TC will send you the bullets they agreed to but has to wait till it's actually signed. Should be a day or two. They have only agreed by email so far.** He will also send you the **media summary** but he wants you to convince the owner of Chef's to send him the tomato sauce Fed Ex. | |

| 7044 | +17168034903 Jay McKee* | 5/9/2009 2:43:44 PM(UTC+0) | Read | Haha.. Consider it done.. I'll have Lou put some bottles together with the extra meat for the real flavor.. | |
| 8271 | +17168034903 Jay McKee* | 5/9/2009 2:45:55 PM(UTC+0) | Sent | Thx | |

| 7045 | +17168034903 Jay McKee* | 5/9/2009 3:36:47 PM(UTC+0) | Read | **Did TC say the jet was worth 25Om last night?** | |
| 8273 | +17168034903 Jay McKee* | 5/9/2009 3:44:10 PM(UTC+0) | Sent | **The jet is worth 1.5m. He invested 250k to repair it** | |

| 7046 | +17168034903 Jay McKee* | 5/9/2009 3:45:53 PM(UTC+0) | Read | **Aha.. Thats where the 25O number came from..** | |

The government theory started with opening remark statement (*Tr.31*) that – "*the defendants tell the investors that a guy in Mexico named Ken Jowdy stole their money and ran away with it*".   **Apparently, Jowdy did**.

| | | | | | |
|---|---|---|---|---|---|
| 7048 | +17168034903 Jay McKee* | 5/9/2009 3:53:08 PM(UTC+0) | Read | In the deal, the 3 guys get their money back from their involvement with TC, but nothing back from their Mexico deals, correct.. | |
| 8276 | +17168034903 Jay McKee* | 5/9/2009 3:54:14 PM(UTC+0) | Sent | **Correct!** | |

| | | | | | |
|---|---|---|---|---|---|
| 7053 | +17168034903 Jay McKee* | 5/9/2009 5:43:22 PM(UTC+0) | Read | If we get control of Jowdys Cabo equity and move to sell Cabo - we get our 5OO back from del mar, and what percent of Cabo do we end up with? | |
| 8282 | +17168034903 Jay McKee* | 5/9/2009 5:48:03 PM(UTC+0) | Sent | Its impossible to say until we know everyone who's involved in getting Jowdy's 40%. For example, the new bank/investor may want half of it to do the deal. But...whatever it is, you will get 1/10 of it. | |

| | | | | | |
|---|---|---|---|---|---|
| 7060 | +17168034903 Jay McKee* | 5/9/2009 10:01:18 PM(UTC+0) | Read | So is it correct to say we'd get our 5OO back from del mar, as well as a prob minumium 2% of Cabo? Sorry to keep asking - just trying to get it right.. | |

Ironically ignored by Galioto again, his accomplice, Berard, told Galioto in an FBI proffer (*9-12-2013*) one (1) month before the Kenner Indictment that the GSF (*according to his personal knowledge*) was for Jowdy litigation and to "buy out disgruntle [sic] players/investors, Ethan Moreau, Owen Nolan, and Joe Juneau."

- Please note that Jowdy and Harvey associate, Michael Meeks (*thus making them 100% collectively adverse to the remainder of the investment group*) represented all three (3) of the "**black sheep**".   In fact, Galioto ignored the further corroborating evidence of Berard's email to Kenner about his personal knowledge of the GSF in 2011.   *See PK144*.

Only Galioto's *willful blindness* could address the reason behind the falseness of the Komatireddy theory (*with a myriad of contrarian evidence available at all times*), thus permeating the jury's evaluation of the truths via false proffer and concealment, concluding with rebuttal summation, false affirmations.

This unfounded and slanderous claim, absolutely known as a falsity by the FBI agent (*at a minimum*) at the prosecutorial table, contradicts the following:

### Initial Diamante del Mar fraud by Jowdy:

The government chose, for some undocumented reason, to subpoena only the **Jowdy Baja Development Corp August 2002 bank statement** one week before trial.   This Jowdy bank statement was from the first (1st) month that Kenner, Woolley and Khristich transmitted funds to Jowdy for the original Diamante del Mar ("DDM") investment in Mexico.   [*See TIMELINE 012*].   Thus, the government was fully aware, immediately before the start of trial, that Jowdy did in fact steal significant funds from Kenner and Kenner investors.  Without further investigation into the following 15-years-plus of frauds and the transactions of Jowdy's Baja Development Corp account (*Jowdy's money laundering account*) and into the rest of Jowdy's criminal enterprise, on the face of the single statement, any layman can see **$417,000 of the first $804,000** (*from Kenner, Woolley and Khristich*) was embezzled by Jowdy and his NY attorney, Tom Harvey (*who ran mafia-like bully tactics for him*).   The balance of the $387,000 cannot be determined (*without further subpoenas*), but **51.8%** of the initial funds stolen by Jowdy are enough to know there is a premeditated criminal fraud occurring (*based on the most basic investigative skills*).    Nonetheless, they ignored it to the defendant's detriment, to smear Kenner in opening remarks based on known-false representations.   The government was aware, from other Jowdy bank records that he was embezzling funds from the Mexico project at DDM to payoff his father's various auto loans totaling over $27,000 (*check numbers 1038 and 1054*), re-pay Roger Clemens $17,000 for an unrelated investment in Atlanta GA (*cashier's check #30862768 on September 3, 2002 [less than a month after the initial investment]*), pay $25,000 hush money to Roger Clemens' lover (*Country star, Mindy McCready*), blow over $100,000 on his personal private jet travels thru his DDM account (*and about $100,000 more thru diverted funds to his mother's account [LMJ Management -- check numbers 1001, 1003, etcetera]*).   It was all undeniable fraud; ignored.

24

**Jowdy loans confirmed (but only after trial):**

The government had possession of the July 2007 confirmation email [*Ex. 48*]
between Jowdy and Constantine confirming the $8.5 million PLUS in debt owed by
Jowdy to Kenner and Kenner investors [*KJ6669-KJ6670*].

The Court and the government called *Forf-44* cumulative based on the government
rebuttal claims to defendant's Rule 33.   This cannot be possible under the
government's prosecutorial approach to call the loans to Jowdy "*BOGUS*" (*Tr.5708
(2x), 5709*), "*PHONY*" (*Tr.4597, 4598*) and "*SUPPOSED*" (*Tr.5707-5708*) throughout
the trial.   If *Forf-44* is cumulative, then the government must be condoning the
ignorance of empirical evidence to construct a false narrative for trial.  Otherwise,
the fairness and grave responsibility of the prosecution expressed by the Supreme
Court in *Berger* (1935) has been constitutionally ignored.

**Jowdy known forgeries:**

The government possessed the *Jowdy forgeries* from the investors $11 million
lawsuit in Mexico, altered by Jowdy and his attorneys, and used to threaten Kenner
and the Hawai'i (*Little Isle 4*) attorneys in the AZ case.  [*See TIMELINE 004*].  Jowdy's
attorneys claimed Kenner was lying to the Court and would face criminal
repercussions for calling all of the Hawai'i transfers (*in the lawsuit*) "**loans**".
Jowdy's attorneys further threatened that if the AZ attorneys stayed on the case,
they would receive the same sanctions (*i.e. criminal referral for being adverse to
Jowdy's cabal*).  [*See TIMELINE 002*].  These fabricated/forged Mexico documents
were presented to the AZ court by Jowdy (*criminally forged Mexico Notario
documents*) and used to threaten the Kenner investors and attorneys.[13]

---

[13] Please note that Hawai'i attorney Jon Dessaules immediately begged to withdraw from
the case after the September 2009 Perkins Coie threat letter and his recently acquired
knowledge that Louis Freeh had discussed the Jowdy defense case directly with the judge in
the case, in spite of not being a counsel of record for Jowdy in Arizona.

25

The government had possession of the November 23, 2007 Constantine, Jowdy and Najam disclosure email (*with the Lehman Brothers' Memorandum of Understanding, resulting in Jowdy departing as the DCSL Managing Member*) stating Lehman Brothers is aware of Jowdy's debt as the reason to eliminate Jowdy (*in 2007*) from the Diamante Cabo san Lucas ("DCSL") project (*See R33 909*). [*KJ6751-2*]

> *"..the Release of debt to Kenny [Jowdy] by Phil [Kenner].  These are the issues that Masood [Lehman Brothers] is aware of, understands why they exist and that they are a condition of the settlement between Phil and Kenny.  This is not being done for the sake of holding back information, as we all know that Masood is well aware of the situation.  Also, why is it necessary [in the agreement] for Lehman to be informed in writing that <u>Kenny owes Phil money?</u> If he is presented with questions as to why this is happening, he [Masood Bhatti] will have the answers because we have disclosed everything to him."*

The government is aware that Jowdy's longest tenured employee, Robert Burdick, [*See 3500-RB-1*] told the FBI during his proffer that Jowdy was not paying staff, was partying, and secretive once he got to Cabo in 2005 and thru the confrontations of 2007 with Kenner defending the investors from the Jowdy criminal acts.

> *"Jowdy stopped communications.  Jowdy only came down [to Cabo]...when [Louis] Freeh came down 4x's.  Came with family 3x...1-2 times alone".*

As noted specifically by Matt Galioto (*only five [5] days after the Kenner full-disclosure proffer of June 24, 2009*), Jowdy executive assistant, Shawn Hughes [*See 3500-SH-1-r*], told the FBI that she saw,

> 1. *"...lavish spending during her time as Jowdy's employee"*
> 2. *"He [Jowdy] tricked a lot of people"*
> 3. *"Jowdy was 'living the life' on other peoples' money"*
> 4. *"When investors asked for an update on the project, Jowdy would <u>always</u> brush it off and say he would get around to it."*

After the Hughes FBI proffer (*5 days after the Kenner June 24, 2009 FBI proffer to the $20 million plus of known Jowdy frauds*), Kenner arranged FBI interviews with eight (8) of the Hawai'i and DCSL investors and Agent Galioto.[14]

It should be noted emphatically that the Kenner proffer, the Hughes follow-up proffer (*both with FBI Agent Galioto*) and Kenner's efforts to get the Hawaii-Mexico investors to proffer directly with the FBI in June 2009, was less than three (3) months after the investors (*according to the government theory*) would have been furious with Kenner for deceiving them with their respective LOCs at Northern

---

[14] All texts were sent by Kenner to the Hawai'i and Mexico investors about arranging the FBI proffer thru their independent attorney, Ronald Richards.

| | | | | | |
|---|---|---|---|---|---|
| 9481 | +46708874363 Mattias Norstrom* | 6/30/2009 4:59:24 PM(UTC+0) | Sent | **Please call Ron Richards. He needs you for an interview.** | |
| 9482 | +17163743234 Michael Peca* | 6/30/2009 4:59:49 PM(UTC+0) | Sent | **Please call Ron Richards. He needs you for an interview.** | |
| 9483 | +17168034903 Jay McKee* | 6/30/2009 5:00:22 PM(UTC+0) | Sent | **Please call Ron Richards today. He needs you for an intervie.** | |
| 9484 | +19725230505 Darryl Sydor* | 6/30/2009 5:01:17 PM(UTC+0) | Sent | **Please call Ron Richards. He needs you for an interview. Thanks.** | |
| 9485 | +14254667663 Turner Stevenson* | 6/30/2009 5:01:36 PM(UTC+0) | Sent | **Please call Ron Richards. He needs you for an interview. Thanks.** | |
| 9486 | +13109947559 Glen Murray* | 6/30/2009 5:01:54 PM(UTC+0) | Sent | **Please call Ron Richards. He needs you for an interview. Thanks.** | |
| 9487 | +14802354193 pk* +14103532999 Sergei Gonchar* | 6/30/2009 5:02:08 PM(UTC+0) | Sent | **Please call Ron Richards. He needs you for an interview. Thanks.** | |
| 9488 | +14015246929 Bryan Berard* | 6/30/2009 5:02:17 PM(UTC+0) | Sent | **Please call Ron Richards. He needs you for an interview. Thanks.** | |
| 9493 | +19725230505 Darryl Sydor* | 6/30/2009 6:07:40 PM(UTC+0) | Sent | **Left you a message. Call Ron.** | |
| 9494 | +14254667663 Turner Stevenson* | 6/30/2009 6:08:26 PM(UTC+0) | Sent | **310.753.8777. Ron's cell** | |

Trust Bank and collateral losses.   If there was any concealment of the loans to Jowdy &/or the use of proceeds thru the Little Isle 4 capital account, it would have been a virtual suicide for Kenner if any of the investors had individual proffers with the investigating FBI Agent (*Galioto*).   Yet, despite that obvious problem (*if true*), Kenner was the person pursuing and arranging the independent FBI interviews for the investors with the FBI.   The genuineness of Kenner's actions, his obvious *mens rea* (*emphasis added*), and the timing of the potential FBI proffers would have been Kamikaze behavior, *thus clearly untrue*.

Only Galioto's decision to cancel the investor interviews and cancel Kenner's pending EDNY Grand Jury testimony about the $25 million in documented Jowdy crimes, deferred the resolution of the Kenner investor issues in 2009, nine (9) years ago.   No other law enforcement individual had their hands so deep into both the dismissed Jowdy investigations (*despite the clear and documented embezzlements from day one*), and the unexplainable and immediate re-direction to Kenner only a week after his June 24, 2009 proffer.

Two (2) years later, Mike Peca confirmed to the 2011 SDNY Grand Jury (*under subpoena from FBI Agent Galioto*) – [*See R33 419*]

> *"A short-term loan [was made] to Mr. Jowdy because at the time Cabo – we hadn't gotten the lending from Lehman Brothers yet.  **We** [emphasis added] made a short-term loan until the lending came in.  Once the lending came through they were to pay back the loan, I think in the neighborhood of five-and-a-half million dollars, on the closing.   It was never paid back.  And then communication basically seized [sic] at that point from him [Jowdy].  That was kind of the whole sticking point as far as me **and the other guys** [emphasis added] with Mr. Jowdy."*

At the same Grand Jury in 2011, Darryl Sydor confirmed the loan to Jowdy from Hawai'i and the underlying knowledge without hesitation. [*See R33 467f*].

> *Q:  Was that [the LOC at Northern Trust Bank] also for Little Isle 4 as far as you know?*
> *A [Sydor]: Yes, but then we put it towards a short-term loan to Mr. Jowdy until Lehman Brothers came up with the money that was supposed to be paid back."*

28

*Q: Did you know in advance that it was going to be used, this Little Isle 4 money, to be used to salvage the Cabo investment?*
**A [Sydor]: <u>Yes.  It was to help with the short-term loan to keep funding the Cabo, but then its supposed to be paid back</u>, but that's –**
*Q: Paid back to you or to Little Isle 4?*
**A [Sydor]: Paid back to Little Isle 4.**
*Q: So –*
**A [Sydor]: <u>Back to Hawai'i, not me personally</u>.**
*Q: Bu that didn't happen?*
**A [Sydor]: That didn't happen.   And Lehman came up with the $129 million loan. It was supposed to be back at closing.**

At no point did Sydor or Peca represent to the Grand Jury "*under oath*" that they were not aware of the loans to Jowdy *at all times*.   In fact, Sydor confirmed that he was clearly aware that the funds belonged to Little Isle 4 (*from his investment*) and no longer to him, personally.   Peca echoed the same refrain, actually expressing to the Grand Jury that he believed his entire $1.775 million LOC (*Hawai'i investment*) and his $100,000 cash (*from his capital account at Little Isle 4*) was being loaned to Jowdy, not just a small portion of it.   Peca's confirmed knowledge meant that the "subset" loan (*of $240,000 of his originating funds sent to Jowdy as part of the Hawai'i loans*) couldn't be a crime of concealment either; unless the government claims now that Kenner (*as Managing Member of Little Isle 4 and acting under the requirements and restrictions of the operating agreement – See TIMELINE 046*) did not send Jowdy enough of Peca's originating money?[15]   The defendant is convinced that Jowdy would have accepted it, since he is not held to the same legal standards under the law, and would merely have obtained another $1.5 million of "*free money*" and protection for it from "*someone*", to never repay it.

---

[15] The 2004 little Isle 4 By-laws (*which governed the Hawai'i project and the loans to Jowdy*) specifically expressed <u>*authority to lend*</u> in the beginning of the agreement:

*At the sole discretion of the Managing Member, Little Isle 4, <u>may participate as a lender</u> if deemed by the Managing Member to be in the best interest of the LLC.*

*The Managing Member, at their sole discretion, can engage in outside ventures deemed to be in the best interest of the LLC, <u>including but not limited to other Private Equity Funds and Lending Opportunities.</u>*

Finally, Turner Stevenson, at the 2011 Grand Jury, who was the 3rd handpicked witness (*by Agent Galioto*) (*See R33 651*), testified:

> *Q:  When you put up $100,000 for Hawai'i, did you have any understanding of whether the money could be used to pay for the Mexico project or was it just supposed to go to the Hawai'i project?*
> ***A [Stevenson]: In the beginning it was supposed to go to Hawai'i. Then I saw they needed, the group of us got together [emphasis added], we have this piece of land that's available for purchase in Mexico that we need to wait on or get funds on to transfer as a group like one big blanket to get money into Cabo and pay for that land to hold it until the loan came.***
> *Q: So are you saying that you agreed to transfer some of the money from the Hawai'i project to the Cabo project?*
> ***A [Stevenson]: I would say that, yes.***
> *Q:  Who made that decision?*
> ***A [Stevenson]: I think all of us as a group [emphasis added].***
> *Q: What do you mean as a "group", who is the group?*
> ***A [Stevenson]: All the guys who were invested in it.***

After the three (3) Grand Jury testimonies in 2011 (*and nothing in contradiction thru that date – seven [7] full years after the loans to Jowdy began*), there could be no question about the Jowdy loan knowledge "***as a group***", specifically considering two items.

First, FBI Agent Galioto cherry-picked the three (3) witnesses after consulting with several people adverse to Kenner in the Jowdy cabal, and second, each of the investors who confirmed the Kenner transparency to the SDNY Grand Jury regarding the Jowdy loans in 2011 were investors in the Cabo project.

- Peca and Sydor were also investors in the DDM project (*which Jowdy defrauded with Harvey and Najam*), and
- Sydor was an investor in the airplanes that Jowdy destroyed and robbed (*See R33 049, and exhibits R33 049a thru 049g*).

***Diamante Air and "no loans" Jowdy frauds:***

Next – the government had possession of Jowdy Diamante Air Balance Sheet
(*airplane company mis-managed by Jowdy and his accounting/childhood-friend, Mark
Thalmann*) [*See TIMELINE 015*].   It represented unpaid/defaulted loans to the
Hawai'i partners of $410,000, **on July 31, 2009**.   In addition, the government had
the DDM Balance sheet (*also constructed by Thalmann*) [*See R33 041*].   The Balance
Sheet accounted for Hawai'i unpaid/defaulted loans (*to Little Isle 4 and Ula Makika*)
of $845,000, **on December 3, 2009**.

Both Balance sheets were constructed (*and dated*) by Jowdy and Thalmann,
designating the unpaid loans to Kenner and Kenner investors (*Hawai'i*) **while
Jowdy maintained his "NO LOANS" defense in the 2008-09 Arizona "loans"
lawsuit**, where Jowdy defended his position for the same documented funds as "*not
loans*".   Based on Jowdy's now-proven false loan agreement forgery claims (*via his
own defense Nevada attorneys authentication in December 2010 – R33 011*), Kenner
and Kenner investors did not recover the Jowdy accounting until after the AZ case
was dismissed in Jowdy's favor as a result of his repeated threats to the attorneys
and falsehoods to the court (*including forgery claims and no loan claims – both, later
contradicted by Jowdy himself*).   No consequences from the FBI occurred as a result
of the Jowdy multi-jurisdiction frauds on the various courts, and Kenner and Kenner
investors.   Most harrowing was that the dates of the Diamante Air and DDM Balance
sheets were in 2009 (*representing the Hawai'i loans*).  This was while the Jowdy AZ
defense continued to lie to the AZ Court and defend the lawsuit by denying the loans
(*now on their own books*) to trigger a discovery stay (*and only expedited loan
agreement discovery related to authenticity, for over a year*).   During this time, the
continued their threats to Kenner's Hawai'i attorneys and loan witness Gaudet.
Gaudet gave testimony July 2, 2009 in the AZ case, where he confirmed the
signatures on the 2004 loan agreement multiple times (*argued falsely in
contradiction by the AUSA during Kenner's forfeiture testimony and government PSR
rebuttal for "obstruction of justice"*). Gaudet confirmed his discussions with Kaiser in
support of the investors versus Jowdy.  Gaudet testified to the threats made to him
by Tom Harvey (*See R33 566a*) related to the loan agreement.   During Gaudet's July

2, 2009 deposition[16], Gaudet confirms being **threatened** by Harvey during their communications about the <u>LOAN AGREEMENT</u>:

- On *PK_SEC_0651* – Jowdy's attorney tells Gaudet he could *"possibly face federal criminal charges for perjury.   Do you understand that?"*

    - *Please note that that seemed like a strange and "telling" disclosure pre-deposition...*

- On *PK_SEC_0657* – After Gaudet **CONFIRMS** his WITNESS signature, Jowdy's attorney says as follows: -

    *Q: All right.   I want you to take a minute to think about this question before you answer it and then provide your sworn testimony for the Court.   Did you sign this Document in December 2004?*

    *A [Gaudet]: YES.*

- On *PK_SEC_0673* – Gaudet testifies he was very uncomfortable with Harvey's comments.

- On *PK_SEC_0688* – Gaudet he **CONFIRMS** he also has an independent **criminal case in Mexico v. Jowdy (***in 2009 – and still pending nine [9] years later due to Jowdy delay and payoff tactics***)...**

- On *PK_SEC_0699* – Jowdy's attorney presents Gaudet with a "***surveillance***" photo of himself and Kenner at their criminal testimonies at the Cabo san Lucas courthouse in June 2009 versus Jowdy (***more THREATENING and INTIMIDATING behavior after being tailed in México to and from the courthouse***)...

    - **Gaudet was asked if he recognized who Jowdy's people had photographed in the photo, without Gaudet and Kenner's knowledge.**

- On *PK_SEC_0780* – Gaudet confirms that a lot of the Harvey statements about the *LOAN AGREEMENT* were "***threatening***"...

- On *PK_SEC_0787* – Gaudet states –

---

[16] It should be noted that July 2, 2009 was the same day Kenner filed a California lawsuit versus Jowdy and Harvey for EXTORTION (*See TIMELINE 007*), inclusive of FBI threats and Kenner's pending jail time (*according to Harvey*) for calling the money Jowdy received "**loans**". (*See FORF-44*)   Tom Harvey and Louis Freeh had also been notified by the EDNY that Jowdy and Najam were under Grand Jury investigation, Kenner had proffered to the FBI about the $25 million in Harvey, Jowdy and Najam thefts (*a week earlier*), and that Kenner was receiving a Grand Jury subpoena to give testimony in about a month (*See R33 rebuttal 005*).  After the notification, Kenner's appearance was subsequently terminated as soon as Freeh and Harvey engaged full-throttle versus Kenner and any party adverse to Jowdy (*See R33 rebuttal 006*).   The NY Daily News followed a month later with a story about FBI investigations into Kenner wrongdoings related to alleging his company [Hawai'i LLCs] was lending funds to Jowdy, ***from an unnamed source***.

> *"...It – with every subsequent call or communication it just became much more concerning to me.  Much more <u>threatening</u> to me, actually."*

- On *PK_SEC_0787* – Gaudet goes on to state –

> *"On one of the calls he [Harvey] was pressuring me to recognize <u>who</u> I was supporting and that I NEED TO MAKE SURE I UNDERSTAND WHAT THAT MEANS. And they have – I don't recall if he said former, but former FBI investigators, signature experts.  Starting cussing and stuff, saying the document is a fraud."[17]*

- On *PK_SEC_0788* – Gaudet states –

> *"I didn't say very much about the document because it was very quickly into a <u>threatening</u> conversation."*

- On *PK_SEC_0788* – Gaudet continues to state that Harvey called him with former FBI agent and Louis Freeh right-hand-man, John Behnke and stated –

> *"Hey, Bob.  Tom Harvey here.  Also John Behnke is with me."*

- On *PK_SEC_0789* – Gaudet states he was told –

> *"Bob, you really – you really have to realize...you obviously don't understand what the law means.  You obviously...the law in the United States is different than it is in Mexico"*

> *"<u>Meeks</u> (Nolan's attorney working with Jowdy and Harvey since 2008)...You have to be careful because <u>Meeks is going to have somebody waiting for you</u>...But I was told that I have to be careful when I travel; that Meeks is going to have someone waiting for me. You know, this is a very serious issue.  You have to be careful what you do...and quite frankly, my next trip out of town was a little nerve-racking. And every one are, because, you know, when you – when you get that held over your head, its <u>intimidating</u>, period."*

- On *PK_SEC_0795* – Gaudet states –

> *"I never told him that because, again, <u>he quickly went to a – more aggressive statements relating to the document</u>.*

And, further confirming the Jowdy criminality, Gaudet confirmed that the two (2) 2008 criminal cases (*Gaudet v. Jowdy, and Kenner and Kenner investors v. Jowdy*) in Mexico had to be re-filed due to the Jowdy payoffs:

---

[17] Please note that under Harvey's legal guidance in the December 2010 Nevada Murray v. Jowdy trial for another $791,000 unpaid loan (*which Jowdy lost after spending nearly $750,000 in legal fees, diverted from the investor's Cabo budget funds, confirmed by Jowdy during the trial*), Harvey and Jowdy's legal team **authenticated** this same loan document, *previously claimed as a forgery in the AZ case, to the FBI, and to the EDNY US Attorney's Office* (*in 2014*)– **now confirming their perjury and criminal representations** (*unchecked*). *See R33 011.*

*Q: Who paid off the government official?*

*A [Gaudet]: I don't know. Somebody paid off a government official, so the initial filing had to be redone.  So the two filings that I had said that I had done had to be redone.*

*Q: And you are now talking about the criminal complaint brought by Mr. Kenner and some other investors?*

*A [Gaudet]: I believe that's what it was, yes.*

### Jowdy 2-day California deposition confessions:

The government had possession of the Jowdy 2-day deposition in California when Jowdy first confessed (*after the AZ case dismissal*) that he actually lied to the AZ court – albeit only three (3) weeks after the AZ case dismissal, somehow "*with prejudice*", despite his newfound honesty about all of the "*loans*".   [*See TIMELINE 025, TIMELINE 026*].

### Jowdy robs Owen Nolan DCSL investment funds:

The government had possession of the Jowdy, Baja Development Corp bank records for August 2006 [*See Ex. 47h*] where Jowdy steals Owen Nolan's $100,000 investment in DCSL thru his money laundering account, Baja Development Corp.  The funds were partially used to pay HUSH MONEY to Roger Clemens' whistleblower, Brian McNamee, who just happened to be represented by Jowdy's attorney, Tom Harvey at the time of the payoff to McNamee, for his involvement in the Senator Mitchell Congressional hearings.

### Jowdy and Harvey defraud DDM investors with fake liens and title transfers:

The government has in its possession, the 2002 fraudulent lien letter from Tom Harvey (*on Jowdy's behalf*) to the early DDM investors [*See TIMELINE 020*].   This confirms that Jowdy and Harvey have been co-conspirators against Kenner and Kenner investors since August 2002.   The Harvey letter claimed that he was assigning liens to the DDM property in Mexico for Khristich, Woolley, Nolan and others (*for their $500,000 transfers to Jowdy's Baja Development Corp account*).  Then, Harvey confirmed he was arranging the transfer of title for the Mexico

34

property from Jowdy's previous Mexico entities to Baja Development Corporate (*to protect the investors*).   *Ironically*, the transfer never occurred, but if it had, it would have been <u>useless</u>.   Jowdy confirmed in his January 2010 California deposition that at all times, he has been the one and only member of Baja Development Corp.   Thus, even though Jowdy and Harvey never made the title transfer (*fully defrauding Kenner and his investors out of nearly $10 million in equity deposits*), it would have been made to another Jowdy-100%-owned LLC (*equaling the resulting criminal frauds*).

**Jowdy and Najam pilfer $3 million 2006, DDM loan:**

The February 21, 2006 loan collateralizing DDM's $68.9 million property[18] for Jowdy and Najam to pilfer over $1 million of the net $2.1 million loan[19], forced a undisclosed foreclosure on the DDM land in or about 2011.   Please note that Jowdy was diverting funds from the newly formed DCSL budgets in 2006 to make payments to the unknown DDM loan, also unknown to Kenner and Kenner investors, as soon as he and Najam fraudulently drained the proceeds from the $3 million loan.[20]

**False Jowdy declaration to the EDNY Court:**

The government is aware of Jowdy's post-trial perjured declaration in this Court (*See PK68*). It specifically misrepresents Jowdy acquisition of his $2.5 million equity on the Cabo project, as another blatantly unchecked fraud against Kenner and Kenner investors.   FBI Agent Galioto is aware of Kenner's proffer, which represented the theft of the KAJ Holdings assets (*Jowdy's DCSL equity LLC*).   Jowdy

---

[18] See *TIMELINE 018* for KPMG appraisal of the DDM property.

[19] See *Ex. 40* with Harvey-Jowdy title fraud and Jowdy-Najam KSI loan embezzlements.

[20] See *Ex. 47* for Jowdy's year one diversion frauds from the DCSL budget (**with actual FBI accounting notes on the documents**), opening the door for the ongoing conspiracy Jowdy and his cabal have continued unchecked over twelve (12) years later under Galioto's watchful eye and protection to Kenner and Kenner investor's sole detriment.

never transferred any equity to Kenner (*according to his false claims*) from DDM prior to the Cabo closing (*See TIMELINE 023*), since Jowdy's own email confirmed the full Kenner 10% equity *eight (8) months earlier*.[21]   There are several issues, aware to Galioto, that Jowdy's perjury overlooks.   One, if the forged Private Promissory Agreement documents (*presented by the government in a 2nd, never-before-seen format in Forf-36*) with Kenner were real and did not have Kenner's name forged on it by Jowdy and his Mexico attorney (*per previous Jowdy testimony in 2009*), then Jowdy would have already had $1.25 million of deposits in the DCSL deal, but since those documents were fabricated by Jowdy's cabal for the 2009 arbitration (*to disparage Kenner, yet somehow never determined exactly why*), why would a February 2006 deal with Kenner be needed?  Jowdy claimed Lehman Brothers demanded he have funds in the deal in February 2006 (*8-months after the email, which confirmed Kenner's full 10% position in June 2005*), well, to most Americans, $1.25 million would have been reasonably significant, but perhaps not to Jowdy and his criminal enterprise.

- ***Kenner reiterates his two previous requests for the Court and the government to secure the original signatures from Jowdy's attorney in Mexico, where Jowdy gave previous (2009) testimony that the originals reside.[22]***

The fabricated Jowdy agreements with Little Isle 4 and Ula Makika represent that these agreements (*PK39, PK40*) are based on a Private Promissory Contractual Agreement, otherwise known as the 2004 Hawai'i loan agreement that was called "*BOGUS*" by the government multiple times, even after the Jowdy authentication of the loan agreement in December 2010 in his defense case (*See R33 011*).   Even the forged and fabricated documents Jowdy's cabal created in 2009 for the arbitration

---

[21] If it were true – **which it is not** – Jowdy would have been selling Kenner the 5% equity in DDM at the same time (*and undisclosed*) that he had just (*within days*) fully leveraged the DDM property with Najam and KSI Capital, thus rendering the alleged transaction worthless to Kenner, yet another obvious fraud (*overlooked by Galioto*) on Kenner and Kenner investors.   Jowdy's own empirical evidence has once again foiled his revisionary history, yet ignored by the Federal investigation team.

[22] See *PK39* (*Little Isle 4 agreement*) and *PK40* (*Ula Makika agreement*).

_referenced_ the one (1) agreement that Jowdy claimed simultaneously was forged (_to defend his 2008-09 AZ case, yet later authenticated to defend his NV case [2010]_). Jowdy and his cabal said "_what ever_" they wanted "_whenever_" they wanted in any Court of Law (_US or Mexico_), because the consequences of their actions are not governed by the same Constitution that apparently governs the rest of America.  To the detriment of Kenner and Kenner investors, the on-going Jowdy frauds on the various courts fell under the same "_blind eye_" of its perpetual protection.   With the proof of these blatant oversights, it is more than reasonable to believe that the Grand Jury transcripts from the 2013 and 2015 proffers would misrepresent the Jowdy crimes as Kenner's wrongdoings.   The defendant believes in the interest of justice, he has the right to inspect them for the source of the misrepresentations, played out in the 2015 Courtroom.


**_Jowdy DCSL Cabo villa thefts (racketeering):_**
Next – the government and Galioto were fully aware that Jowdy diverted hundreds of thousands of dollars from the Cabo Villa deposit account (_intended for Lehman Brothers once Jowdy commenced construction – which never happened due to his gross mis-management of the project until after the Kenner exposé and the Lehman Brothers bankruptcy forced Jowdy into action over three [3] years after the initial funding and tens of millions of embezzled funds from the DCSL budget later_).   (_See Ex. 49_)


Jowdy received over $600,000 of funds from two (2) early investors in the Golf Villas (_homes on golf course number 1_).   Jowdy immediately began to withdraw tens of thousands monthly for his personal benefit, culminating in Jowdy establishing a new bank account for a subsequent project he personally funded with Lehman Brothers banker, Masood Bhatti.   Jowdy fraudulently diverted, embezzled, and utilized DCSL funds (_i.e. racketeering reference here_).   Jowdy transferred $232,000 to fully drain the DCSL Villa deposit account on May 14, 2007 to his money-

laundering account, Baja Development Corp.[23] Then, after cleaning the funds; Jowdy transferred the funds (*$225,000*) the next day (*May 15, 2007*) to his newly formed Laurel Cv Management LLC account.[24]   Then, once the funds were in a new, clean Jowdy account related to his new project (*in Tennessee*), Jowdy transferred the diverted $225,000 to the closing escrow account the same day (*May 15, 2007*) to conceal the source of the funds.   Jowdy's newly acquired 50% equity in the Lehman Brothers-funded Tennessee project was purchased with grossly laundered funds and represented on the closing statement [*See HHR_LBI_JOW_0000151 – designating Lehman Brothers and Jowdy*] (*also in Galioto's possession before the blasphemous statements about Kenner were delivered with precision during the opening and closing remarks, and carrying its synchronized theme throughout the 10-week ordeal*).   These racketeering embezzlements occurred within a week of Jowdy and Najam delivering their bribe to Kenner (*declined immediately by Kenner*) and Najam's warning e-mail to Jowdy.   *See PK146*.

### Jowdy's Diamante Air plane frauds:

There are a myriad of additional frauds Jowdy concealed and orchestrated with his cabal, including but not limited to Tom Harvey, Bill Najam, Masood Bhatti (*Lehman Brothers*), Mike Delvin (*Trimont Real Estate Advisors*), Alan Worden, Mark Thalmann, John Kaiser, Bryan Berard, etcetera which produced a litany of victims reaching far beyond Kenner and the Kenner investors.   These schemes include the Diamante Air fraudulent loans and underlying cash loan thefts (*guaranteed by Kenner and Gonchar*).   Jowdy was able to use a plane he did not own as collateral for another $475,000 loan (*all documented in the Rule 16 evidence*)[25] from an unknown person, which he then made monthly payments with more stolen funds from Kenner and Kenner investors to the fraudulent loan.

---

[23] Document possessed by Galioto as *DIAMANTE-000135*, confirming the Jowdy thefts.

[24] Possessed by Galioto as *BX19-SD-00001305*, confirming the Jowdy thefts..

[25] *See TIMELINE 035*.

**Jowdy and father steal $500,000 thru mail fraud:**

Jowdy and his father, Taffy Sr., stole $500,000 from Mattias Norstrom by borrowing the funds in 2004 "*for a very short time*".   As a guarantee, Taffy Sr. explained to Norstrom and Kenner that they would mail a $500,000 check from Baja Development Corp to Norstrom to secure the repayment.   They told Kenner and Norstrom that they needed to hold the check until the funds would be made good. A plethora of excuses followed and the check remained unopened and un-cashed when Galioto seized the envelope with the check in it November 13, 2013 at Kenner's AZ residence.   The envelope has been requested multiple times to be opened in front of the Court to confirm the Jowdy mail fraud, bank fraud, etcetera, but it has not been presented.  Jowdy confessed to this theft in January 2010.  *See TIMELINE 026 @ 7 [transcript page 411].*

- **Kenner reinstates his request to the government to produce the envelope and the original contents (the repayment check) from the November 13, 2013 search and seizure of Kenner residence.** *See PKHOME-0017314*

**Jowdy's Cabo san Lucas Airport theft:**

Jowdy defrauded Kenner, Norstrom and Stumpel by stealing over $1 million dollars and diverting it to a Mexico company owned by himself and his Mexico attorney, Fernando Garcia.   The company, *LOR Management*, has been the destination of millions of Jowdy's laundered funds for years in Mexico.   When Jowdy testified about the stolen funds in his January 2010 California confessional deposition, he claimed Kenner and Norstrom should get their money back, but he had no plans to do so.  *See TIMELINE 026 @ 67 [transcript page 654].*

If those previously listed frauds are not enough, Kenner is glad to address the remainder (*all supported with empirical evidence*) in open Court or by submission.

Nonetheless, only a purposeful and intentional blind-eye could produce an unknowing account of Jowdy's frauds, allowing for them to be misrepresented to the

39

2015 trial Court, and that the story about the Jowdy frauds were contrived to benefit Kenner, somehow.   For those reasons, Kenner believes that the origination of the lies about the money Jowdy has clearly stolen was somehow poached by Kenner (*and not Jowdy*).   The Grand Jury testimony of Agent Galioto ought to identify the misrepresentations, assuming the fabrication of the lies thru prosecutorial misconduct did not "*make them up on the fly*" at trial for the first time.

## Part II (b)

### Baja Ventures 2006 bought with independent, untainted funds

As completely disseminated during the 4-day forfeiture hearings, solely based on evidence that the government possessed prior to trial (*and for years*), the prosecution chose to make foundationless claims that Kenner stole the Hawai'i funds, transferred them to Mexico, and bought his equity in the DCSL project with the stolen funds.   Nothing new was discovered after the trial and before the forfeiture hearings (*or presented by the government as such*) that would have altered the government's perspective of the transactions from their Rule 16 discoveries.   Yet, when the government created *Forf-36* with the accounting of the funds utilized for the Cabo purchase, the entire capital contribution for **Baja Ventures 2006** (*Kenner, Stumpel and Lehtinen's equity LLC*) was accounted for with "*clean*" funds (*by the government's own work product*), untainted by any alleged misappropriations to Jowdy from the trial records.

In fact, the government had been long in possession of the two (2) subsequent agreements signed between Kenner-Stumpel and Kenner-Lehtinen.[26]   These agreements confirmed the debt-equity relationship between Kenner, Baja Ventures 2006, and each of them, respectfully.   The equity stake in the DCSL project by Lehtinen and Stumpel was further verified (*corroborating their debt-equity agreements*) when they participated in the *DCSL v. Jowdy* California lawsuit in 2009.   *See TIMELINE 072 @ 6.*   Both Kenner partners are listed as 5% owners of the LLC [*Baja Ventures 2006*].  Paragraph 7 of the Complaint states:

> *Specifically, two of the Plaintiffs (Jozef Stumpel and Jere Lehtinen) invested in Baja Ventures 2006, LLC, which owns 38% of Diamante Cabo san Lucas, LLC.*

The lawsuit also acknowledged for the fifteen (15) DCSL plaintiffs (*Tyson Nash, Vladimir Tsyplakov, Turner Stevenson, Mattias Norstrom, Greg deVries, Bryan Berard, Steve Rucchin, Brian Campbell, Darryl Sydor, Dimitri Khristich, Sergei Gonchar, Mike*

---

[26] *See R33 634* (*Stumpel agreement*) and *R33 633* (*Lehtinen agreement*).

*Peca, Jere Lehtinen, and Jozef Stumpel)* their knowledge of the $8 million in unpaid loans from Jowdy to the Hawai'i investors, as stated:

> *Mr. Najam was in charge of the corporate governance and while under Jowdy's direction and control, received over eight million dollars ($8,000,000) from a LLC in Hawai'i.  Mr. Najam failed to properly account for those funds and has placed the Jowdy investors in a vulnerable and compromised position.[27]*

---

[27] It should be noted that one (1) month before the filing of this litigation, both Jowdy and Najam had perjured themselves to the May 2009 arbitration (*See R33 647*), claiming that substantially ALL of the funds from the Hawai'i LLCs were "*investments*".

**Jowdy** (@ *Arbitration Tr.235-236*)– *"They were investments Phil was making. We never clarified as to what equity he would end up with, but they were investments that he was making to keep the projects going."*

    o   This false proffer was made to maintain Jowdy's simultaneous "**no loan**" defense in the Little Isle 4 lawsuit versus Jowdy in Arizona for the $5 million (*principle*) loans from Hawai'i, also affecting Nolan (*but concealed by his own attorney, Meeks, who was working with Jowdy and Harvey*).

**Najam** (@ *Arbitration Tr.376-377*)– *"I am familiar with the [lawsuit] allegations.  And substantially all of the money that came in came in as investments."*

    o   Najam previously testified in the 2009 arbitration that he was the CFO in charge of the DDM and DCSL accounts where funds' totaling about $6 million of the Hawai'i transfers to Jowdy were received.

    o   Despite both false testimonies of "*investments*" (*in May 2009*) by the two (2) controlling individuals of the Hawai'i money, **in January 2010**, Jowdy capitulated and claimed there were NO INVESTMENTS in his companies any more from the Hawai'i money, within three (3) weeks of the AZ case dismissal and his criminally deceitful "*no loans*" defense.   They were now – "***ALL LOANS...and Jowdy had no plans to repay them***".

    o   Jowdy's revisionary statements confirmed his and Najam's perjury in the 2009 arbitration, as well as the fraudulent defense in the Arizona "*loans*" case (**while lying to the FBI, the FBI signature forensic analyst, and the AZ Federal Court**)...but <u>no adverse actions occurred</u> due to the FBI protection to Jowdy &/or Najam.

       ▪   **In fact, their EDNY Grand Jury disappeared only two (2) months after the arbitration perjury.**

Thus, the two (2) California lawsuits (*TIMELINE 071 – DDM versus Jowdy, and TIMELINE 072 DCSL versus Jowdy*) properly claim the accounting issues [*at all times under Najam's control and Jowdy's direction*] as improper and leaving Kenner and Kenner investors "*at risk*".

Any representation at trial to the contrary (*infra*) must me construed as fabricated to serve a prosecutorial means to a specifically desired prosecutorial end.   The misrepresentation or ignorance of known facts in evidence (*thru the government's own Rule 16 production*) must be defined as "*known*", and "*at all times*".

Neither Stumpel or Lehtinen were considered alleged victims in either Indictment (*2013 or 2015*), thus no nexus exists based on the partnership.  Nonetheless, the government during rebuttal summation made several unchallenged (*ineffective counsel issues*) gross misrepresentations of evidence in their possession to create a missing air of corruption related to the Baja Ventures 2006 acquisition.   FBI agent Galioto had six (6) full years to construct his pre-trial theories, with millions of subpoenaed documents, unlimited resources, yet he chose to ignore all of them to present an ulterior perspective, related to Baja Ventures 2006 transactions that never took place.

The government submission of the loans to Jowdy on *Forf-44* confirm that all of the government attacks on Kenner's trial credibility were unfounded and strategically poison Kenner's credibility from Komatireddy's defamatory and knowingly untruthful opening remarks, such as:

> *"[GSF] This is the fraud where the defendants lie to the investors about who's stealing from them, and find a way to steal from them all over again.   The defendants tell the investors that a guy in México, named Ken Jowdy, stole their money and ran away with it..."*

A*pparently, Jowdy did, supra.*   Komatireddy continued thru her rebuttal summation slander,

> *"I thought the most important document in the case was the supposed loan to Ken Jowdy"*

---

Post-arbitration, on a series of conference calls, Kenner discussed the California litigation (*per the GSF conference calls*) and the underlying Jowdy perjury of the "*no loans*" claims in the Nolan arbitration and 2008-09 lawsuit defense.   Kenner continued open email communication with Mike Peca (*and others*) related to the transparent knowledge of the Jowdy loans **without contradiction**.   *See R33 319* (*Peca's knowledge of the Jowdy loans*).

And

> *"Mr. Kenner told you that he used that money to get his piece in the México investment with Ken Jowdy" (clearly another bald-faced lie).*

Second, it is difficult to believe that the government received the *Forf-44* document (*on August 3, 2015*) from Jowdy's attorneys (*only weeks after the completion of the 10-week trial and 6 years after the 2009 SDNY Grand Jury began with Jowdy's attorneys actively supporting the Indictment efforts versus Kenner as a side-show*), and specifically with no open issues pending.   It also disregards the fact that Jowdy's fraud-complicit attorney, Tom Harvey, was present in the EDNY courtroom for the most of the trial with his NY Daily News companion, Michael O'Keefe.   Harvey was actively working hand-in-hand with Michiewicz and Galioto at every break to evaluate evidence going specifically in front of Kenner during cross-examination.    It also raises separate concern for the December 18, 2014 Jowdy proffer session [*See 3500-KJ-8*] and in the EDNY (*which Jowdy traveled from Cabo san Lucas, México to attend with his attorneys*), which produced **NO PROFFER NOTES** or related substantive exculpatory disclosures to the defense of the discussions that day – as required by *Brady* (*whether memorialized or not*) [*See PK133a*]*.*   The notification of the meeting was not delivered with the original 3500 materials to the defense despite occurring about six (6) months earlier, clearly premeditated (*like forgetting to turn over the pre-trial Sydor meeting notes until Sydor unintentionally confirmed them while on the witness stand – another BRADY violation – not counting the unknown ones from additional witness pre-trial FBI and AUSA interviews*).   One question that needs to be answered by the government is,

> **"Was the August 3, 2015 receipt of Jowdy's confirmation (Forf-44) the first time they were aware that the funds from Kenner and Kenner investors to Jowdy thru the Hawai'i loans were REAL?"**

- **IF NO**, then the government has a real contradiction on their hands considering the abusive characteristics of Kenner's confirmation of the same,

as "***phony***", "***supposed***", "***fake***" and "***bogus***" and the resulting injustice to Kenner throughout the trial, and its consequential reference as *cumulative* in defense of defendant's Rule 33, "*new evidence*" claim.

- **IF YES**, then there are significant prosecutorial undertones that each knowing member of the investigative and prosecutorial team should be held accountable for by the court, as "*new evidence*" and somehow not explored (*as the most paramount element of proof*) thru the multiple Jowdy proffers. Its representative blindness would accept overlooking the full, unimpeded cooperation of Jowdy's attorneys to indict and convict Kenner from 2009 thru 2015, finally alleviating their proverbial legal "*thorn in their side*".

In either instance, a reformative action is necessary to correct an egregious contradiction at hand.   The defendant believes that some of the misrepresentations were originally constructed during Galioto's various Grand Jury testimonies, despite lacking foundational evidence, and should be released to the defendant.

Komatireddy didn't blink when falsely contradicting the government's evidence of Kenner's Cabo equity acquisition through his two partner's contributions, Lehtinen and Stumpel, neither of which participated in Galioto's ongoing EDNY threats to assist in his pro-Jowdy slander of Kenner, since they both knew the truths (*See R33 467d and R33 rebuttal 018*).  Galioto had been present at both Jowdy proffers (*3500-KJ-1 and 3500-KJ-3*) when Jowdy independently confirmed the Kenner Baja Ventures 2006 equity was exclusively from contributions via Stumpel and Lehtinen.   Jowdy also confirms the Stumpel funds (*$1.6 million*) that flowed directly from Stumpel's European account to Jowdy in México (*LOR Management*) was the basis for the Stumpel $1 million in Baja Ventures 2006.   The government's own post-trial spreadsheets corroborate the "*clean*" funds from both Lehtinen and Stumpel as the accounted for $2.5 million capital contribution in Baja Ventures 2006, in spite of their forfeiture claims to the contrary.   Despite the government's knowledge since 2010, Komatireddy chose to lie and agitate the jury again by claiming;

*"He [Kenner] used it [the Hawai'i money] for personal use to get an interest in*

*that resort in Cabo".*

Komatireddy attempts to close the door on her undocumented and known false claims that Kenner stole the Hawai'i funds to get his interest in Cabo (*clearly untrue and known to the government since 2010 – per Jowdy's own words*) by proffering (*Tr.5990*):

> *"Mr. Kenner told you that he used that money [Hawai'i] to get his piece in the México investment with Ken Jowdy.   You know exactly what that's for.   That's in evidence."*

Kenner clearly **NEVER** testified to anything resembling that outrageously ruinous rebuttal summation claim by Komatireddy.   The jury must assume pure and ethical representations by the government (*to not violate their Constitutional, legal and ethical duties*) while it imparts factually precise information to them at all times during trial.   When this is clearly breached for unjust desire, the system in its entirety loses its identity and integrity.

46

## Part II (c)

### Other false government proffers:

The witness' voluminous "**misstatements**" based on a "**lack of memory**" after clear and full pre-trial contradicting disclosures (*including affidavits, trial testimony, SDNY Grand Jury testimony, and 3500 FBI interview materials*) were 100% contradicted thru leading questions (*thus premeditated*) and resuscitating re-cross examinations by the government (*also premeditated*).   This coupled with the basis of the Kenner submissions and the Komatireddy rebuttal summation including deceitful statements that Kenner was: *(Tr.5982: 8-13)*

> *"Kenner is broke…That's why you can take a snapshot, because there is no other money coming in".*

The government knew Kenner earned over $250,000 in the following year solely thru his consulting practice (*with all deposits and bank records in Rule 16 evidence*). The government (*Komatireddy*) was deftly aware that the FBI had sent a subpoena to Wells Fargo Bank, and the bank closed the account as a result.   Komatireddy knew it had nothing to do with Kenner being "*broke*", and disregarded the hundreds of thousands of dollars Kenner had in his account at Wells Fargo just a month earlier, and similarly in his new accounts at Bank of America just a month later, &/or the hundreds of thousands Kenner had in his Mexico bank account (*all in Rule 16 discovery via government subpoena*).

Komatireddy continued with *(Tr.5996: 19-21)*:

> "*[Kenner] stole money for Cabo*"
>
> *"He [Kenner] used it [Centrum loan] for personal use to get an interest in that resort in Cabo".*

Komatireddy's recurring distorted statements made it categorically impossible for the jury to sort thru the glut of trial evidence with an impartial eye.   The government must maintain at least a minimum ethical standard while parsing thru

the evidence and statements prepared for prosecution as the Constitutional representative of justice.

Komatireddy lied to the jury in rebuttal summation about the circumstances of the client-confirmed seizures directly with the bank (*Tr.5998:20 to 5999:4*), calling Kenner and Kenner's representation of the collective decision prejudiciously "***insane***", _specifically when she knew it was 100% true_.   The defendant supposes that many of the misrepresentations were originally constructed during Galioto's various Grand Jury testimonies, despite lacking foundational evidence, and should be released to the defendant.

In separate claims, Komatireddy referred to Kenner as "***broke***" when Gaarn was selling his Eufora shares to repay Kenner about $200,000 in well-documented loans that had been outstanding for up to three (3) years.  Kenner had about $2 million in cash in his various bank accounts, *known to the government*, at that time (*via Rule 16 evidence*).   "*Broke*" is blatantly deceptive (*specifically when not true*), in concert with claims that "*desperation*" was the underlying theme to the alleged Eufora sales frauds (*and Counts 2, 3 and 4*).  In fact, Komatireddy was aware that Wells Fargo was closing Kenner's accounts within months of his $400,000 plus balances specifically due to FBI communication with the bank, alleging "*money laundering*" thru Kenner's Wells Fargo accounts.   The government knew exactly why Kenner's account had a $0 balance.  It had nothing to do with Kenner "***being broke***", and everything to do with the government (*FBI influence*) scripting the account closure (*See R33 653*).  The court is also deftly aware that no bank closes an account in a month or two (2) even with negative balances in them, without significant outside influence (*i.e. FBI money laundering allegations*).   It was more harmful and uncorroborated proffer.

Komatireddy's comments about the "***supposed***" loan agreement with Jowdy (*See R33 032*), further supported the known lies Michiewicz proffered about the same December 2010, Jowdy-authenticated loan agreement as "***fake***" and "***bogus***" during his summation, tying in the trial "*theme*" of the same meritless script.   Komatireddy

continued her inflammatory lies about the circumstance surrounding the client-confirmed seizures directly with the bank (*Tr.5998: 20 to 5999: 4*), calling Kenner and Kenner's representation of the collective decision prejudiciously "***insane***", specifically when she knew it was 100% true.

The defendant believes that many (*if not all*) of the misrepresentations were originally constructed during Galioto's various Grand Jury testimonies, despite lacking foundational evidence, and should be released to the defendant.

If the government relies on the context of the entire trial, now allegedly derived in the foundation of witness "*faulty memory, confusion and mistakes*" (*all detrimental to Kenner and the fundamental truth previously confirmed by virtually each of the government's witnesses now conflicting testimonies and prior empirical evidence*), the court must consider Michiewicz' repeated claims of Kenner being a "***liar***" (*See R33 400*) and insinuating the Hawai'i loan agreement being "***phony***" opening the door of misconduct to connect the prosecutorial themes with their resonating summation proffers.

It should be hi-lighted that Michiewicz specifically attacked the EDNY Grand Jury subpoena that *his own office* issued and rescinded within 10-days (*Tr.5048:14-5050:20, and See R33 rebuttal 005, 006*) once Jowdy hired his defense team (*led by Former FBI Director, Louis Freeh – who was present in Jowdy's initial and full confessional FBI proffers – See 3500-KJ-2 and 3500-KJ-3*).

In addition to the references of Northern Trust clients being unaware of the Hawai'i "*use of funds*" from day one, they made the misleading statements (*despite hundreds of bank authorization documents being signed by all of the LOC investors from 2003 thru 2009 fully acknowledging the "use of funds" at all times*).  The government has repeated quoted elements of the "*invited or fair response doctrine*" to explain away their lies, but nothing in that doctrine or anywhere else under Federal Rules, does

the doctrine "*open the door*" for rebuttal lies.

Komatireddy fraudulently continued her claims: (*Tr.5992)*

> "*You cannot tell from the notes when they were written, if they were written before the interview or after the interview*"

This claim is outrageous on the mere absurdity of the unchecked statement "*before the interview*", specifically calculated by Komatireddy to refute the obvious Kaiser perjury about not telling the FBI that he met with Jowdy 5-6 times to discuss the loans from Hawaiʻi (*See 3500-Kaiser-1-r*)).

Komatireddy's misstatements continue with (*Tr.5996):*

> "*Kenner takes out the whole value of parcel 2 (Honoʻapo), sucks the equity out and he is supposed to use that to buy Waikapuna but he doesn't.*".

It was patently false, since Honoʻapo was appraised for $30 million (*See PK137*) and the small development loan was $3 million, leaving considerable equity for the expected 30-day loan to Jowdy to be repaid per his own email (*See R33 636, R33 2001*) -- and future loan extensions available from Centrum once the pending permits were granted.  The government ridiculed the "*30-day loan expectation*" during forfeiture hearings during Kenner testimony.[28]  The Waikapuna purchase with the acquisition and early development planning loan of $5 million was being

---

[28] *Jowdy's email to his CFO (Bill Najam at Diamante) stated – "…and remember that this should be in place for less than 30 days…if we ever have to worry about a default on this loan [the loan from Hawaiʻi], then we will all have much bigger problems than this…".*  There is nothing Kenner believed about the 30-day repayment scheme Jowdy and his brother-in-law (*Najam*) proposed that would have disrupted the Hawaiʻi plans to begin infrastructure planning with those funds (*plus the accrued interest*) as soon as the planning director, Chris Yuen from Kaʻu, approved the plans that Kaiser and Manfredi had submitted thru Attorney Steve Lim at Carlsmith Ball (*the state largest law firm, specializing in Real Estate*), months earlier.

Nothing could have been concealed, **BECAUSE** Manfredi worked out the final loan amount directly with Jowdy, after Kenner told Jowdy the day before the Centrum loan funding – "*Leave a msg on the imvelocita [email service] address about what u work out*".  *See R33 2001.*  Transparently, Kaiser and Manfredi were 100% in the loop for the Jowdy loan, contrary to the government claims at trial and the Kaiser and Manfredi perjured testimony.

negotiated with Lehman Brothers at the same time in 2005 – and not the eventual $105 million loan that was consummated over a year after Kenner terminated the "*egregious*" 11th-hour loan terms *(See R33 900)*.   No logic or evidence supports the Hono'apo "*cross use*" of funds for Waikapuna with the 2005 Lehman Brothers deal pending *(before termination)*.

Komatireddy kept her unsubstantiated claims flowing with, (*Tr.5996*)

> "*He [Kenner] used it for a personal use to get an interest in that resort in Cabo*" [*which has been refuted repeatedly – supra*], "*but Kenner puts them [Lehman Brothers] off for another year and sets up the Urban Expansion loan, a loan that would not have been necessary if he used the Centrum as he was supposed to or let Lehman come in a year early.*"

The government knew this was dishonest as Manfredi confirmed to another hard moneylender *(See R33 900)* in Rule 16 evidence.   Centrum was a Hono'apo deal (*Big Isle V – See R33 2007*) unrelated to the 2005, $5mm Waikapuna acquisition and early permitting loan with Lehman Brothers.   The government knew that the 2005 Lehman Brothers deal was not the macro-development deal that was subsequently conceived after the April 2006 meeting *(following the closing of the $125 million Diamanté Cabo loan – 10-months later), but they misled the jury anyhow.*   The government knew it was originally only a $5 million acquisition and permitting deal, thus overlooking an enormous salient fact that emanated from "*somewhere*" other than empirical evidence.   Please note that after Kenner, Manfredi and Kaiser dismissed the "*egregious*" Lehman Brothers loan in August 2005 (*in Manfredi's words – See R33 900*), approximate one month *after* the closing of the July 2005 Centrum loan, making the government theory of "cross use" of the funds for a suggested Waikapuna closing logistically not possible and *out of chronological order*.[29]   The government cannot claim that Kenner should have taken the Lehman

---

[29] In fact, one (1) month after cancelling the "***egregious***" Lehman Brothers loan (*in August 2005*), Manfredi wrote to Kenner on September 30, 2005, after another lender that he, HIMSELF, was in Hawai'i to meet with and close, yet unexpectedly, failed to do so.  *See Aug-Oct 2005 -- Waikapuna loan efforts (34) -- KJ2375-2489 [in Waikapuna FOLDER].*

Brothers loan (*and didn't as part of a scheme*) if the Centrum loan (*under their trial theory*) was to close Waikapuna...but the Lehman Brothers loan was not planned to close on the Waikapuna for another month. Thus, it is illogical and logistically impossible to have happened the way the government proffered; ***systematically impossible*** (*emphasis added*). The evidence in the government's Rule 16 production confirms that their theory was 100% devoid of any empirical evidence (*and actually ignored*), hence completely contrived (*perhaps originating and as a result of misleading Grand Jury testimony by Galioto*). It was just another fabrication to fit their conspiratorial "*square peg into a round hole*". The jury had no chance to decipher the underlying timeline falsity thru the innumerable misrepresented claims. After the collective decision to terminate the 2005 Lehman Brothers deal, which otherwise would have guaranteed a 100% foreclosure, 24-months later on the Waikapuna parcel,[30] Kenner left Manfredi and Kaiser on the Big Island and flew to Maui *(per Kenner's FedEx records)* to negotiate the 8-week extension terms with the seller, Hawai'i Senator Avery Chumbley. The settlement terms cost the Hawai'i partners $451,080 in extension fees (*at $64,440 per week, per needed extension time, terminating in 8 weeks*) before securing the Urban Expansion loan seven (7) weeks later, and only one (1) week before the loss of the Waikapuna parcel (*and approximate $700,000 in hard deposits*). The government knew no logical *"pre-arranged deal"* with Constantine would have waited 7-weeks and exhausted hundreds of documented man hours and other expenses, just so the Hawai'i

---

Manfredi stated – "*I, like you, have been hearing the same old stories for so long, everyone can 'get it done' and no one does...I think the likelihood of losing Waikapuna and MoaUla is very real, which means I will have wasted a lot of time...I never thought I would be leaving this trip without funding...*".

This Commonwealth Financial deal was introduced by Constantine to Manfredi and handled between the two (2) of them without Kenner day-to-day. Therefore, this further refutes the outrageous government claims that the Urban Expansion deal was "*waiting in the wings*" after Kenner "*pushed off the Lehman deal for another year to get Constantine in*".

[30] Known as a typical "**deal-to-steal**" loan deal by Lehman Brothers in the commercial industry where they "*swap*" the terms on the deal at the 11th hour to "*strong-arm*" a borrower into untenable terms, an unextendable and definitive "*short-term*" repayment date, with no other options.

partners could pay $451,000 in penalty fees *(hard deposits and non-accruing to the Waikapuna purchase).*   It is completely illogical, but the theory originated somewhere other than in the empirical evidence.   Other hard moneylenders introduced thru Constantine per his consulting agreements, and signed by Kaiser*, (See R33 rebuttal 020 et. al.)* fell through during the 7-week process, despite industrious efforts by Manfredi, Kaiser and Kenner to close the other deals *(all in evidence)[31].*  Significant other hard moneylenders were in process of lending with Manfredi and the Hawai'i partners during this period of time (*between the Lehman Brothers cancellation and the Urban Expansion funding 7-weeks later*), as well as several lawsuits constructed for non-performance versus the same lenders.[32] Thus, the Urban Expansion loan was a last resort, completely contradicting all government proffers of conspiracy.[33]

---

[31] Please note that Manfredi's full management of the lending process produced the detailed information that Constantine's lenders required for consideration.  The fully disclosed consulting lists were shared by Manfredi with each and every hard moneylender that Manfredi produced due diligence for, verifying the authenticity of the deal and the non-permitted status (*or Parcel Consolidation and Re-subdivision status*) of the land.  Nothing was managed day-to-day, from the Centrum loan, Jowdy sub-loan, &/or the Waikapuna and MoaUla land loan efforts, without Manfredi's impressions on all of it as the full-time COO, living on-site in Hawai'i.   *See Wynne RFI 9_20_05 v 2 (3) -- authored by Manfredi for Kenner [in R33 rebuttal 020 FOLDER]*

- Manfredi's amnesia at trial related to *every* communication with Constantine, even portraying the persona of aloofness when confronted on cross-examination with emails he participated in.   Again, if Manfredi suffered from similar *faulty memory, confusion and mistakes,* then his testimony related to critical issues of *concealment* versus knowledge cannot be construed as reliable because of his selective amnesia symptoms.  **The empirical evidence confirms his real time knowledge that no hearsay could reasonably contest.**
    - *See in Waikapuna FOLDER –*
        - *Manfredi cannot remember -- Tucker $4 million parcel funding with Constantine (Tr.3013-3015), and*
        - *November 2005 $15 million funding meeting with Constantine and Manfredi (Tr.3007-3008)*

[32] *See FOLDER "Waikapuna loan efforts (excluding Lehman Brothers)".*

[33] Manfredi worked hand-in-hand with Kaiser (*as best friends*) on a daily basis thru the hard moneylender period (*2004-2006*) – specifically post 2005 Lehman termination and pre-Urban Expansion loan (*for the pending Waikapuna closing*).  On September 30, 2005, after multiple other hard moneylenders failed to close the Waikapuna and Moa Ula Makika parcels (*in evidence – See Aug-Oct 2005 -- Waikapuna loan efforts (34) -- KJ2375-2489 –*

According to Hawai'i attorney, Steve Lim from Carlsmith Ball (*for Little Isle 4, etcetera*) and within the cancelation period of the Urban Expansion loan, Little Isle 4 had the opportunity to terminate the Urban Expansion loan within a few days of the title company registering it, if Kenner could replace it with another loan.

- Kenner and his development team were trying to replace the Urban Expansion loan immediately, **unknown to Constantine and Grdina**, within days of the Urban Expansion funding, cutting out the alleged "*delay deal*" and as Komatireddy lied, "*puts them [Lehman Brothers] off for another year and he sets up the Urban Expansion loan*" (*Tr.5996*), like the government falsely proffered thru rebuttal summation.   The theory contradicts their own Rule 16 evidence once again to injure Kenner.

On October 20, 2005 (*three [3] days after Kenner wired the Urban Expansion funds to the closing [on October 17] – delayed three [3] days since Grdina made his $3,500,000 deposit [on October 14]*), Kenner was in Hawaii to sign a replacement deal with Premier Financial Solutions for a $15 million acquisition and development loan. Kenner sent Najam (*acting as an attorney for Little Isle 4*) an October 20, 2005 message stating  (*See in FOLDER Waikapuna loan efforts (excluding Lehman Brothers) "Aug-Oct 2005 -- Waikapuna loan efforts (49) -- KJ2490-2600 (CRITICAL STATE OF MIND)*":

---

*Waikapuna FOLDER*) with acquisition loans, Manfredi told Kenner – "*I think the likelihood of losing Waikapuna and MOA ULA [another parcel] is very real…I never thought I would be leaving this trip without funding*".

Manfredi had the highest level of communication with each and every hard moneylender, handling 100% of the due diligence packages with Kaiser (*not Kenner*).   Manfredi, as proven at trial despite his amnesia symptoms (*confirmed by email between Manfredi and Constantine*), worked with Constantine on several other lenders to close during the 7-week period before Constantine arranged the Urban Expansion loan to acquire Waikapuna at the 11th hour.

No "*delay Lehman Brothers*" theory could have been construed from the overabundance of empirical evidence (*and Manfredi's fingerprints all over it*) – specifically during the 7-week period of time, leading up to the Urban Expansion/Waikapuna closing, *unless Manfredi and Kaiser were fully complicit in this absurd conspiracy claim*.   Again -- "*someone*" had to create that foundationless theory, pre-trial, for the selective amnesia witnesses to *remember – forget – remember – forget* – etcetera....

*"Bill:  Can you please review this for me?  I have the lender and the broker flying to Hawai'i today [October 20] to sign docs (which I have not seen yet) tomorrow.  I think they will want this signed by me tonight to facilitate the deal.  Please let me know your thoughts ASAP.  I have not seen the final note docs either.  I think they operate as a last minute type of group.  They do NOT seem to be worried about this protocol.  They have asked to discuss our Mexico dealings after the signing.  Thanks in advance.  pk"*

Under the government's theory, had Kenner, Manfredi and Kaiser agreed to the original *"egregious"* **Lehman Brothers loan** and lost the property 2-years later in addition to a multi-million dollar loss to Kenner and Kenner investors, there would be no criminal issue, but the exercising of savvy business acumen created a criminal fraud?  Had Kenner, Manfredi and Kaiser refused the expensive **Urban Expansion loan** and allowed the Waikapuna Purchase and Sale Agreement to expire (*one week later*), the Hawai'i group would have lost approximately $1 million hard deposit funds, but there would be no criminal issue, so the exercising of savvy business acumen created a criminal fraud?   This standard is fundamentally unreasonable, and could not be rationally conceived without an ulterior motive by "*someone*".

Incrementally, all government references to a fraudulent loan to Jowdy from the Centrum funds systematically undermine the integrity of the fully documented loan *(See R33 002 – as authenticated by Jowdy's defense team in December 2010 – and See R33 011)*.  It contradicts and purposely ignores all of the previous investor acknowledgements *(in Rule 16 evidence)*.

Accretively, Lehman Brothers' confirmed plan and proposal to Kenner to repay the outstanding $7 million Hawai'i loan *(See TIMELINE 064 – page 11)*, Kenner's February 23, 2006 confirmation email to Najam and Jowdy *(PK127 -- Defendant's Exhibit F-29)*, where Kenner confirmed:

*"The Managing Member role for KJ [Jowdy] will be fine considering 'all funds will be paid'"*

This left no equivocation about Kenner's state of mind *(mens rea)* just days before

the February 2006 Cabo closing and expectations of 100% Hawai'i repayment.   The payment is further documented (*in Rule 16 evidence*) in concert with the Jowdy loan agreement and the original CM&D report from January 25, 2006 provided to Kenner. Both Mike Peca and Darryl Sydor confirmed this in their respective 2011 SDNY Grand Jury testimony.

With the independent Cabo "*use of funds*" report provided to Lehman Brothers by 3rd part consultant, CM&D, Bhatti and Jowdy confirmed to Kenner the pending $7 million Hawai'i payout.   In addition, the Big Isle V operating agreement confirmed to Centrum the pending use of funds as authorized (*See R33 2007*), for loans.  This Big Isle V operating agreement was produced by Nolan in the 2009 Arbitration confirming that it was 100% in Nolan's possession at all times.   Under the first section in the operating agreement, it stated under **Article II. Purpose**:

> "*At all times, the Company, through its Managing Member Philip A. Kenner, reserves the right to borrow, lend, or invest on behalf of the Company.*"

And again, under **Article X. Special Projects**:

> "*At the sole discretion of the Managing Member, Special Projects may be funded by current, new, or borrowed funds, including new debt of Big Isle V Ventures, LLC.*"

Considering this operating agreement and the remainder of the Hawai'i deals were in the possession of Nolan, produced in the 2009 arbitration and the Lehman Brothers 2006 loan agreement and Joint Venture documents were produced by Sydor during the 2015 trial, Kenner cannot be deemed to have concealed any of the inclusive information, based on the repeated theme of the government witnesses that they "*did not read*" what was put in front of them.   It is wholly improper for any person to be deemed restricted from knowledge or information if they chose by their own choice to consciously avoid the underlying material.   Nothing prohibited them, as testified throughout the trial by the government witnesses, from forwarding the materials from any of the Hawai'i or Eufora deals to independent attorneys, accountants, and etcetera.   In fact, related to the Hawai'i Joint Venture,

Hawai'i attorneys Larry Markowitz and Bill Najam produced a 7-page disclosure of the Joint Venture for each investor of Little Isle 4 to sign (*requirement of the deal leading to the negotiated short-term loan to Kaiser and Manfredi extortion-like payout and forgiveness of debt*).   The disclosure page confirms they all had the opportunity for independent review.   It should be noted that Kaiser, who apparently had just been notified thru the "*confrontation*" meeting initiated by Manfredi in Spring 2006 (*Tr.983*), claimed the following (*Tr.1132-1133*) related to the disclosure documents:

> *"Yes, it was a document like this [Kenner exhibit 28] that I received prior to the closing which would be around the time of July 2006.   **I didn't read through this document**."*

But again "*trust Kenner*" echoed hollowly...after an alleged $1 million diversion, discovered one (1) month earlier of his friends & family funds (*raising all levels of suspicion for suborned perjury and "idle and dirty hands" from the prosecutorial team*).   It is **inconceivable** for a former 15+ year NY Police Officer to react so nonchalant and cavalier, while dealing with $1 million of his friends & family money, concurrently discovered as "*stolen*".[34]

Komatireddy continued to mislead the jury in rebuttal summation with statements Kenner did not make when stating (*Tr.5998*):

> *"Mr. Kenner testified that he thought that lines of credit were cash that were sitting around."*

Although Kenner never said this at trial, Kaiser suggested to the 3-judge panel in the

---

[34] Again, it must be noted during Kaiser's voluntary 2009 arbitration testimony, he was asked and answered [*as a former 20-year NYPD and Suffolk County police officer*]:

> *Q: Even now, sitting here in May 2009, is there anything you've uncovered, as someone who obviously knows how to investigate, that Mr. Kenner has done anything inappropriate throughout these [Hawai'i] transactions?*
>
> **A [Kaiser]: NO**
>
> *Q:  Not one complaint?*
>
> **A [Kaiser]: None.**

2009 arbitration *(See R33 669)*:

> *"Better than your money sitting somewhere"*

Kaiser's 2009 arbitration testimony fully contradicted his 2015 testimony.

In one of the grossest, pre-planned perjuries, Komatireddy knew Kristen Peca was with her husband in Ohio when the second Northern Trust default letter arrived in Buffalo, New York "*signature required*" (*via FedEx and certified mail – See PK 138*), yet supplementing the Kristen Peca falsity, Komatireddy re-affirmed (*Tr.5999)*:

> *"Kristen Peca told you that when she got the default letter, she was in shock."*

This directly contradicted Kristen Peca's 2012-recorded FBI call with Kenner when she claimed she learned from a _statement_ that had been _emptied out_ *(See Point III at 187 – confirming Mike Peca concealment from his wife -- not Kenner)* forming a gross fabrication of the *"**shocked**"* story *(See R33 700).*  The events would have been at 2-months apart and certainly _after her fictitious comments_ about Kenner's demeanor during the May 8, 2009 GSF meeting in Ohio (*Tr.716:20-717:8).*   Her knowledge of the LOC seizure occurred after Mike Peca told Kenner he received his bank statements on May 22, 2009 *(See Point III at 192, and 186-187)*, weeks after the face-to-face Ohio GSF meeting when they returned home to Buffalo, NY.   Thus, the Kristen Peca story about signing for a FedEx *(or certified mail)* which Northern Trust mailed to her Buffalo home _could not have occurred_ while she was living in Ohio, thus confirming the witness perjury *(since she should not have been subject to CTE excuses of faulty memory, confusion and mistakes by the government).*

Mike Peca was informed of the first default letter via text and phone by Kenner *(See Point III at 49)* and spoke to Northern Trust before the premature seizure was approved by Mike Peca *(See Point III at 49)*, _with the actual due date for the loan several days after_ Peca's approval, thus authorization to seize collateral on April 1 clearly was granted by each LOC client *(just like all of the LOC clients – with Sydor*

*and Berard in evidence from the Northern Trust subpoena).[35]*   Defendant believes that Galioto made similar claims during each of his Grand Jury testimonies in order to set the stage for the uncorroborated trial theories, fully contradicting all of the investigation evidence Galioto had in his possession.   Galioto was aware of the texts between Kenner and Sydor and Rucchin[36], Mike Peca[37] and Berard (*See PK116*), which independently confirmed their approvals with Northern Trust to seize the collateral after receiving their respective default letters (*even if their **CTE**, like Sydor, could not remember receiving the letter*).[38]

---

[35] *See R33 rebuttal 021 [Peca], See TIMELINE 057 [Sydor], See R33 rebuttal 012 [Berard]*

[36]   BLACK is **Sydor** text; RED is Kenner reply.

| 6316 | +19725230505 Darryl Sydor* | 4/1/2009 8:48:29 PM(UTC+0) | Read | Hey someone from **northern trust** called with someone from schwabb. And want to do a conference call in a hour with **erin** someone |
|---|---|---|---|---|

| 7409 | +19725230505 Darryl Sydor* | 4/1/2009 10:04:40 PM(UTC+0) | Sent | Call me after u speak to them | |
|---|---|---|---|---|---|

- ***Thus -- NOTHING was concealed from Sydor about the LOC seizures.***

RED is Kenner text to **Rucchin**.

| 7464 | +19492330046 Steve Rucchin* | 4/3/2009 11:31:49 PM(UTC+0) | Sent | **Go ahead and call northern trust**. All good. Thx | |
|---|---|---|---|---|---|

- ***Thus -- NOTHING was concealed from Rucchin about the LOC seizures.***

[37] Peca confirmed his LOC collateral call with Northern Trust with "***call already done***", thru a series of texts with Kenner (*See Point III @ 20*) on April 1, 2009 *after* Kenner notified Peca (*and the rest of the LOC clients, including Nolan who was in litigation with Kenner at the time*): "*A Northern trust person will call you to confirm your transfer to Schwab. Please acknowledge.*"

[38] Please note that Sydor actually claimed during trial (*2015*) that he had not seen the 2009 default letter (*Tr.2166-2167*) until a few weeks before the 2015 trial.  Sydor tried to reiterate his lack of knowledge about the default and collateral seizure during cross-examination (*Tr.2190-2191*).   This perjury was refuted by the actual text messages that Sydor sent to Kenner the day he received the March 19, 2009 default letter demanding full payment of **$855,351.03**, expressly commenting on the specific dollar amount the letter stated was due from the LOC (*4 days later*). (*See trial exhibit Kenner 208*)

The DEFAULT letter(s) from Northern Trust open innumerable and concrete pro-Kenner evidentiary issues related to transparency of the LOCs at Northern Trust, the "*usage*" of the funds, the annual renewals signed by the respective LOC clients of the bank.   It compliments defendant's testimony at trial that each LOC client had independent access to the bank for all related issues or inquiries, whether they willfully chose to exercise that option or not.   This will be addressed, *infra*, all defended systematically post-trial trial, and blamed on *faulty memory, confusion and mistakes*.

Komatireddy went on to lie about Kenner, claiming he used the Hawai'i funds, as follows (*Tr.6007)*:

> "*LedBetter straight forward.  Kenner admitted to you he used the money for a non-Hawai'i purpose...*".

Kenner <u>never</u> called the short-term loan to Kaiser "*a non-Hawai'i purpose*".   It was a complete fabrication by Komatireddy.   The Little Isle 4 operating agreement authorized the short-term loan *(See R33 303)*.  It was used to secure the Kaiser signature on the Lehman Brothers required authorization *(after his partner Manfredi held Kenner hostage as well for a $180,000 payment at closing – minus $8,000 Kenner caught Manfredi stealing through the Hawai'i company credit cards [in Rule 16 evidence], and forgiveness of a July 27, 2005, $100,000 advance-loan to solve an IRS issue for Manfredi).*  As a result, not only did Kaiser demand the short-term loan to buy out two (2) of his previous Sag Harbor partners anonymously, including

| 6079 | +19725230505 Darryl Sydor* | 3/23/2009 12:22:01 AM(UTC+0) | Read | **What's this letter from northern trust all about** |
|------|----------------------------|------------------------------|------|-------------------------------------------------------|
| 6083 | +19725230505 Darryl Sydor* | 3/23/2009 1:59:36 AM(UTC+0) | Read | What funds ? **And this thing says I owe 855,351.03 right now.** |

> ➢ Clearly, Sydor had received the default letter regarding the **$855,351.03** and gave <u>unreliable</u> testimony – *again in the government's favor* – based on *faulty memory, confusion and mistakes* or **CTE**.

Manfredi, now that Kaiser was in conflict with Manfredi *(also in evidence -- as Vincent Tesoriero told the FBI on September 10, 2014 -- See R33 052b[39])*, he repaid it within 11-days *(fully authorized by the operating agreement)*.

At the time of the Hawai'i closing, Kenner was owed about $800,000 *(all documented deposits)* from Little Isle 4 and Na'alehu Ventures 2006.   Kenner had every right to withdraw funds and pay himself without repaying Little Isle 4 or Na'alehu Ventures 2006, <u>but Kenner did not</u>.   In hindsight, and under the government's misaligned and ridiculous theory *(which defendant believes was proffered during the two [2] Galioto Grand Jury testimonies)*, Kenner should have withdrawn the funds personally during the closing as a repayment of capital, eliminating the grasping theory of concealment, or otherwise.   The Hawai'i funds **were** loaned to Kaiser and repaid *(as Tesoriero also confirmed in September 2014 to Galioto in person; post Kenner detainment)*, <u>thus none of the funds from the loan, purchased any part of the LedBetter property, for Kenner</u>, expunging yet another fabricated government misrepresentation to the jury, purposely adverse to Kenner's real actions.   Thus, it was only "*straight forward*" if you do not challenge the government's foundationless claim with empirical evidence.   The defendant believes that many of the

---

[39] Tesoriero and Kenner had never met prior to the completion of the October 2006 LedBetter purchase of the Sag Harbor property, in fact, not until months later in Arizona (*on another project*).   All communications about LedBetter related to Tesoriero was derived from his communication solely with Kaiser.   Although Kaiser denied receiving the LedBetter operating agreement at the closing (*which Kenner attended in Long Island – with credit card confirmation records in Rule 16 evidence*), the FBI noted that Tesoriero told them – "*Tesoriero received the LedBetter agreement from only Kaiser*".   Tesoriero also confirmed (*only thru his direct communication with Kaiser*) that Kenner had no initial funds in the deal. The FBI agent (*Galioto*) noted from Tesoriero – "*Kenner's role in the Sag Harbor deal would be to raise money to build the property*" (*just like Kenner did for the subsequent California and Arizona deals*).   This refuted Kaiser's perjurious claims that he was not aware of the four (4) partners [*Kenner, Kaiser, Berard and Tesoriero*] at the closing, nor did he know Kenner was not fronting capital for the transaction, just the same as Kaiser was not (*other than Kaiser's requested anonymous short-term loan to kick Manfredi out, as a condition for his Hawai'i JV signature approval*).

- Please note that Kenner went as far as to place a lis pendens on the Sag Harbor property, as noted in Rule 16 evidence, for the Kaiser loan.  *See PK107*.

misrepresentations were originally constructed during Galioto's various Grand Jury testimonies, despite lacking foundational evidence, and should be released to the defendant.

In rebuttal summation, Komatireddy continued her cover-ups by supporting Kaiser in his denials of telling the FBI "***any***" of the statements about meeting with Jowdy at "***any time***" in the past about the Hawai'i loans and the multiple in-person meetings from 2003-2006[40] (*with Galioto again silent, despite his express knowledge to the contrary*).   Komatireddy's final fraud related to Kaiser on the Court (*and misleading the jury*) occurred when she claimed Kaiser's perjured October 19, 2010 FBI meeting testimony denying all of the statements to Galioto and Romanowski may never have occurred, stating (*See 3500-JK-1-r*):

> "*And it's just as plausible for Mr. Kaiser's testimony was consistent with those notes.   You can't conclude they were inconsistent.*"

In fact, similar Brady issues and overall misconduct, *specifically from the investigation team*, was hi-lighted and exposed with an overturned verdict (*and dismissal with prejudice by Former Attorney General Holder*) in the high-profile case, <u>*US v. Alaska Senator Ted Stevens*</u> (*only discovered as a result of an FBI agent whistleblower, confirming the difficulty in discovering the cover-ups*).   Thankfully in that case, Judge Sullivan held the individuals responsible for the prosecutorial misconduct liable for their misdeeds, even after the dismissal.  Judge Sullivan pointed out, "*the events and allegations in this case are too serious and too numerous to be left to an internal investigation that has no outside accountability.   The court has an independent obligation to ensure that any misconduct is fully investigated and addressed in a public forum*".   This instant case's analogously reverberated misconduct deserves the same attention under its wide-ranging external interests, "***above the law***" influences, and its associated culpabilities.   The defendant believes that many (*if not all*) of the misrepresentations were originally constructed during

---

[40] *See Tr.1110: 18-1112: 5, Tr.1120:09-1121:12, Tr.1191:25-1194:20, Tr.1407:4-1408:20 – and See 3500-JK-1-r*

Galioto's various Grand Jury testimonies, despite lacking foundational evidence, and should be released to the defendant.

**Part II (d)**

**Alleged Unknown LOC usage and LOC payments**

The government was fully aware that the various monthly LOC payments, opened since December 2003, were made by the Hawai'i company capital account.  Little Isle 4 made the payments thru the Little Isle 4 capital account funds and subsequently (*post Lehman Brothers JV in August 2006*) thru the Na'alehu Ventures 2006 account.   Yet, the government claimed in the Superseding Indictment that payments that were *supposed to be made* and *had been made* for five-and-a-half (*5 ½*) years, then, *became part of a concealment plan* (*Counts 7 and 8*).   Kenner's $267,000 of additional capital contributions to the Hawai'i partners (*evidenced in the Little Isle 4 capital accounts, just like every other Little Isle 4 contributions from the various investors*) were ongoing contributions and could not conceivably be part of a concealment.   This is further buoyed by the existence of overwhelming pre-trial empirical evidence that the government &/or investigators ignored to frame their theory.   It furthers slaps reality in the face to conceive that, had Kenner (*in agreement with the Little Isle 4 members*) allowed the seizure of the LOC collateral just six (6) months earlier, no overt acts would have been charged and Kenner would have retained $267,000 of his personal capital contributions.  The theory defies logic but emanated from "*someone*", thus the defendant seeks the two (2) Galioto Grand Jury transcripts to definitively identify the source of the foundationless representations, contradicting the following empirical evidence (*in the government's hands at the time of the theory fabrications*).[41]

---

[41] The original Grand Jury Indictment claimed that Kenner told various Hawai'i investors that he would make sure the payments for the LOCs were made, yet Kenner was charged with *making the payments* as a criminal act, for exactly what the government expected to happen.

- *Each year of the open LOCs, the LOC clients received a 1099-INT tax form directly from Northern Trust Bank at their address of record.   For this reason alone, it is not possible that any of the Northern Trust LOC clients could have been unaware of the use of their respective LOC funds any longer than thru the end of the calendar year, while their LOC was opened (by themselves – and not Kenner).   No evidence exists or was presented at trial that would substantiate that any LOC investor was confused or*

### Bryan Berard

Government witness Berard voluntarily supported Kenner in the 2009 arbitration with the following testimony.   It should be noted that after Berard received his high-paying (*bribery*) job from Tom Harvey and Ken Jowdy in Cabo san Lucas Mexico, he reversed his 2009 arbitration testimony and told the FBI his money was not supposed to be used, he was unaware of it, and he believed Kenner was "*not legit*" immediately after he returned from Russia in March or April 2009.   He falsely proffered to the FBI that he received a letter in the mail from Northern Trust stating that his collateral had been seized.   **That letter does not exist, anywhere**.   FBI agent Galioto knows that prominent fact.   In 2009, Berard's voluntary testimony would have been with one (1) month of receiving that "*ghost letter*" and believing Kenner was "*not legit*".   Berard's 2009 testimony was exclusively about the LOC, its usage, and its loan to Jowdy (*including his expectation – stated 2 times by Berard -- that the company [Little Isle 4] was paying for his LOC payments*).   Not once in 2009 did he claim any of the 2015 recent fabrications he "*remembered*", about knowing "*nothing*", after his newfound 2012 job in Mexico.   The 2013 proffer contradictions by Berard raised no concerns for the FBI agent. It only fueled his foundationless theories based on planned perjury.[42]   "*...In March or April 2009, he started to realize*

---

unaware of the completeness of their LOC investment in Little Isle 4 and the underlying collateral loans.

[42] In spite of Berard's 2015 perjury of (*Tr.3082*):
   "*Absolutely not.  My money was not supposed to be used in Mexico.*"

Berard's 2009 arbitration testimony affirmed:
   *Q: When you were – as far as the Hawai'i deal, were you made aware of any sort of transaction Mr. Kenner set up where you can give a commitment or pledge a credit line in lieu of putting all your money in initially?*
   *A [Berard]: Yes.*

   *Q: Can you tell the panel what was your understanding?*
   *A [Berard]: Basically the company – it was set up.  **The company would pay the payments.  I would pledge the money, obviously to get a loan for the property.  Again, the company would pay the payments, and I was not forfeiting all the amount of money for the piece of property.***

*that Kenner was not legitimate*", yet Berard clearly ignored his opportunity one (1) month later [*May 2009*] and confirmed his undeniable knowledge of the Jowdy loans and his full expectations of the use of his LOC-Capital Account for the loan.   He also confirmed the expectation that **Kenner and Little Isle 4 would make the LOC monthly payments**.   In fact, Berard told the FBI (*specifically Galioto*) on 9-12-2013 that -- "*The LOC would be used to pay the interest on the loans against the Hawai'i property*".   How does FBI agent Galioto Indict Kenner for payments (*Counts 7 and 8*) that Berard told him one month before the original Indictment were exactly what Kenner was supposed to do?   *See 3500-Berard-1-r*

**Nothing** could have convinced Galioto, prior to Berard working for Jowdy (*who was desperate by 2012 to get rid of Kenner's legal efforts in Mexico*), that Berard was not 100% aware of the Jowdy loans and 100% of the activity surrounding its use and collateral seizure.  *See PK116*

This was further confirmed when Berard explained to Kenner that he told the NY Daily News writer the truth about Jowdy (*May 2010*), when the writer was hunting

---

*Q: Were you aware that Mr. Kenner got a credit line against some securities or investments you had?*
*A [Berard]: Yes.*

*Q: And later on were you aware that Mr. Kenner started lending this money to another principal in the Cabo project named Ken Jowdy?*
*A [Berard]: Yes.*

*Q: Where did you think the money that Mr. Jowdy – were you told where the money was going to be used that was given Mr. Jowdy as far as the Mexican project?  Was there anything you were told about that?*
*A [Berard]: Basically just loan him the money for the project.*

*Q: And prior to signing any of these documents did you have access to your own attorney unconnected to Mr. Kenner to review this?*
*A [Berard]: Yes I did.   We have a family attorney back home where before I sign any documents basically – I went to his office, sat with him.   We reviewed them, and I signed them and basically FedEx'd them to Phil [Kenner].*

for another slander Kenner story (*at the directive of his friend, Tom Harvey*).   After the NY Daily News disparaged Kenner for the 3rd time related to Jowdy (*and a year plus after Berard allegedly found Kenner not to be legit – ONLY revised after getting his job from Harvey and Jowdy in 2012*), Berard notified Kenner that in May 2010, he spoke to the NY Daily News writer (*Michael O'Keefe*), as follows:

[Kenner in RED – Berard in **BLACK**]:

| | | | | | |
|---|---|---|---|---|---|
| 15177 | +14015246929 Bryan Berard* | 5/1/2010 12:06:48 AM(UTC +0) | Sent | **Good job with the reporter. Who was it?** | |
| 13185 | +14015246929 Bryan Berard* | 5/1/2010 12:11:12 AM(UTC +0) | Read | **The douchebag from daily news. Told him he's an idiot for printing these articles and he can quote me that I've been to both properties over a dozen times and Jowdy has not done his job.** | |
| 13186 | +14015246929 Bryan Berard* | 5/1/2010 12:11:34 AM(UTC +0) | Read | **He shut up right away and said sorry for bothern u. And hung up** | |

Please note that this was four (4) months after Kaiser sent the following text to Kenner <u>during</u> the Jowdy January 5th and 6th, 2010 depositions (*pre-employment with Jowdy and Harvey in Mexico*):

| | | | | | |
|---|---|---|---|---|---|
| 11474 | +16312350308 John Kaiser* | 1/5/2010 6:55:19 PM(UTC +0) | Read | Why didn't the masterplan include insferstruture to villas,homesite and hotel???? All was in masterplan ??? Why waste $$ millions on pulling insferstruture thru finished golf course?? **Gross mismanagement** | |

…And Kaiser went on to ask Kenner if we can just get the $50 MILLION that Jowdy spent (*mostly stole*) back…as follows:

| | | | | | |
|---|---|---|---|---|---|
| 11487 | +16312350308 John Kaiser* | 1/5/2010 8:14:05 PM(UTC+0) | Read | Your good , **can u get that 50 m in small bills?** | |

Please note that in the January 5, 2010 deposition, Jowdy could only confirm approximate $13 million in expenditures after $50 million had been drained from the Cabo budget:

> *Q: What did the desalination plant cost?*
> ***A [Jowdy]: 5 million dollars.***
> *Q: Okay.  And then – then after that, what was built next?*
> ***A [Jowdy]: Golf course.  Wait.  Things happened concurrently.  So the golf course is roughly 8 million dollars.[43]***

***Jowdy could not describe where any of the other $37 million had gone from the Cabo budget in 4 years (overlooked by the FBI investigation to Jowdy's favor, but authorized by Jowdy's co-conspirator, Masood Bhatti from Lehman Brothers).***

Kaiser immediately sent another exasperated text to Kenner at the attorney's table during the Jowdy confessional deposition, now boastfully confirming all of the Hawai'i transfers as "*loans*" (*with the AZ case dismissed 3-weeks prior*), stating:

| 11471 | +16312350308 John Kaiser* | 1/5/2010 6:32:34 PM(UTC+0) | Read | **Unbelieveable** ! | |
|---|---|---|---|---|---|

Before being offered jobs and conspiring with FBI agent Galioto (*against Kenner's relentless anti-Jowdy efforts*), Kaiser and Berard had a vastly different opinion of the truth related to the Jowdy loans, their personal underlying knowledge, and their personal disclosures and efforts to regain the money, *in concert with all of the other Hawai'i-Mexico investors*.   The 2012 Jowdy-Mexico jobs changed everything, including their brash, joint efforts to steal two (2) real estate projects from Kenner

---

[43] Please note that Jowdy reported to "Golf magazine", after Kaiser and Berard were hired, that he spent $15 million on the Davis Love III golf course, **double** the original Lehman Brothers budget.   This amount of costs, over budget by a developer on the main construction element of his project, would have shut Jowdy down for good.   Instead, the extra funds were pilfered and split with Lehman Brothers manager, Masood Bhatti, who blindly approved the gross overages as a co-conspirator.

- *This is the equivalent of having a custom home builder (considering the course budget was set up by experienced golf course design firm – Davis Love III Golf Course Design) budget your new mansion for $8 million and give you a final bill of $15 million, and you are expected not to have any concerns about the flagrant abuse of funds.*

(*in Sag Harbor NY and Paradise Valley AZ, thru documented fraudulent means – including one of them <u>forging</u> a signature on an official document, required for closing*).   Kenner sued on both cases but was forced to dismiss them versus Kaiser and Berard after being arrested at the hands of Galioto, Berard and Kaiser.[44]

It should be noted that Steve Rucchin confirmed to the trial Court that he also expected the LOC payments to be made by the Little Isle 4 Company, thru Kenner. (*Tr.2722*).

### *Sergei Gonchar*

For the same 2009 arbitration, Sergei Gonchar faxed a signed affidavit for Kenner's defense (*also less than two [2] months after the allegedly unknown LOC usage – per the government's theory*).   *See 3500-SG-4*.   One (1) month later, in June 2009, Gonchar asked Kenner to buy several tickets for his Russian friends for game 7 of the NHL Stanley Cup finals (*paid for out of Gonchar's GSF funds*).    Gonchar, clearly not upset with Kenner months after the collateral seizure, invited Kenner into the locker room to celebrate winning the Stanley Cup.   This is the most rare of privileges in Sports.   (*See Gonchar & CUP (June 2009).*   Hawai'i and Cabo investor Jason Woolley (*with son*) are also in the picture with Kenner, further rebuking the alleged disharmony amongst the Hawai'i and Mexico investors (*from the LOC seizures*).   In July 2009, Gonchar invited Kenner to his private Stanley Cup party (*only for his Russian friends & family*) in Miami, immediately after FBI Agent Galioto refused to interview Kenner for the EDNY Jowdy/Najam Grand Jury and terminated the Gonchar and other Hawai'i/Mexico investor FBI interviews set up by Kenner. *See Kenner and Gonchar drinking from the Stanley Cup -- July 2009.*

Gonchar's May 2009 arbitration affidavit [*3500-SG-4*] stated –

---

[44] NY Daily News Article: "*Former NHL player Bryan Berard and ex-cop* [Kaiser] *help feds nail two Arizona men in massive fraud*", November 13, 2013, 1:33pm

"*In addition to setting up a Line of Credit for the sole use and benefit of the Hawai'i investment Group, I wired $100,000 to Northern Trust Bank…**for the express purpose of making funds available to Phil Kenner, which were to be used at his discretion.  I was aware that my funds would be used to make distributions for the company, including but not limited to; Land acquisitions, Travel & Entertainment expenses, legal fees, Planning fees, Payroll, permitting fees, loans to outside entities and distributions to other members that would satisfy their monthly Line of Credit payments to Northern Trust Bank…**Phil has always disclosed the complete and detailed use of these funds with me from time to time at every request.*"

After the Jowdy January 2010 confessions (*R33 rebuttal 005 and R33 rebuttal 006*) about the loans he stole from Hawai'i, Kenner, Kenner investors, Gaudet and other non-Kenner clients, Gonchar asks Kenner to confirm sending the Jowdy confessions to the FBI, to which Kenner confirmed.  *See R33 597*.  This led to the Galioto February 2010 call to Kenner to "*warn*" him to <u>never</u> send information to the FBI or DOJ without his request, "*ever again*".   Galioto warned Kenner that this was his investigation and Kenner needed to "*back off if Kenner knew what was good for him*". Kenner was told that – "*you had your chance in 2007 from Jowdy, Harvey, and Freeh and things are 100% different now* [*in 2010*]".   This was the last Kenner/Galioto communication until November 13, 2013, notwithstanding Galioto's name on the 2010 Mexico-PGR arrest warrant months later when Kenner was jailed for over three (3) days and beaten (*starting the day Kenner was due to give criminal testimony versus Jowdy and his cabal in Cabo san Lucas*).   After Kenner's beating in the jail for the fabricated "*gun trafficking*" charges, signed by Galioto and Jowdy's local attorney, Fernando Garcia (*amongst others*), on the complaint, Kenner's Mexico attorney who freed him was **murdered**.


In February 2010, Gonchar further confirmed to the FBI agents (*specifically Galioto*) that he had been told by Kenner prior to the initial lending to Jowdy from the Hawai'i capital accounts, and independently by Jowdy.  *See 3500-SG-2 (page 8-9).*   It is incredible that the government could ask Gonchar if he was aware of the loans and sit silently thru Gonchar's amnesia.

**_Jozef Stumpel_**

Stumpel signed an affidavit in 2009 for the arbitration that made consistent claims to Gonchar about the Jowdy loans and the use of the Hawai'i funds.   Stumpel stated (*See PK105*):

> *"I wired $100,000 to Northern Trust Bank...**for the express purpose of making funds available to Phil Kenner, which were to be used at his discretion**.   I was aware that my funds would be used to make distributions for the company, including but not limited to; Land acquisitions, Travel & Entertainment expenses, legal fees, Planning fees, Payroll, permitting fees, **loans to outside entities** and distributions to other members that would satisfy their monthly Line of Credit payments to Northern Trust Bank...Phil Kenner has always disclosed the complete and detailed use of these funds with me from time to time at every request."*

In 2015, prior to defendant's trial in the EDNY, Stumpel and two (2) other investors continued their attempts to file litigation versus Jowdy in Mexico for the documented, stolen funds.   They were thwarted in April 2015 when another FBI Agent (*Michael Cassidy, assisting Galioto*) disrupted the plans of filing the anti-Jowdy cases and threatened the three (3) Jowdy investors to stop their actions versus Jowdy.   FBI Agent Cassidy arrested one (1) individual who was helping the three (3) disgruntled investors complete their Mexico City filings on obstruction of justice charges.   This protected Jowdy once again for the proven and documented frauds against Kenner and the Kenner investors.

Stumpel signed another affidavit for the new 2015 case versus Jowdy in Mexico City. In the affidavit, Stumpel stated:

> *"From the [Cabo] funding date [Lehman Brothers March 2006], in addition to the frauds not yet known to me about the prior deals, Jowdy began to distance himself from the group of investors and our main connection to him, Phil Kenner.[45]   Jowdy even tried to bribe[46] Kenner with a 20% stake in his new Texas*

---

[45] Mike Peca, in his 2011 SDNY Grand Jury, echoed this when he confirmed the communication with Jowdy ceased in 2006 from Kenner and the whole group.  *See R33 419*.

> *"Once the lending came through they [Jowdy and Lehman Brothers] were to pay back the loan, I think in the neighborhood of five-and-a-half million dollars, on the closing.*

*development.  **Kenner declined**...Kenner began [summer 2007] settlement negotiations with Jowdy to resolve the $8,000,000 plus in unpaid loans to me*

---

*It was never paid back.  **And then communication basically seized [sic] at that point from him [Jowdy].***

*__This was kind of the whole sticking point as far as me and the other guys with Mr. Jowdy.__"*

[46] After 6-8 weeks of chasing Jowdy around North America for a face-to-face meeting about his DCSL abandonment issues in 2006-07 (*and Jowdy's avoidance of Kenner -- as noted by the FBI in 3500-SH-1-r*), Kenner finally tracked Jowdy and Najam down in Cabo san Lucas in early May 2007.   Jowdy and Najam delivered their diktat to Kenner that they had "*FBI protection*" from Louis Freeh and John Behnke and "*all the money they would ever need*" from Masood Bhatti at Lehman Brothers, so if Kenner wanted to "*be taken care of*" he would need to "*stay quiet, and go along for the ride*".   Kenner was offered a 20% equity stake in each of the new, Lehman Brothers funded projects (*worth $100 million apiece [Texas and Tennessee], worth $20 million each to Kenner, plus high-paying management positions like Najam and Jowdy*) as part of the "*go along*" program.   Jowdy confirmed his 20% offers to Kenner in his January 2010 deposition, later shared with FBI agent Galioto, and ignored. **Kenner declined the offer to abandon his clients instantly.**

- Please note that the Texas project was procured using the DCSL staff (*as a massive budget diversion, a.k.a. theft*).   The Tennessee project's 50% equity interest was purchased by Jowdy utilizing funds he stole from the DCSL Villa deposit account (*See Ex. 49 – further exacerbating the opening remarks by Komatireddy (Tr.31) insinuating that Kenner falsely claimed Jowdy had stolen money from Kenner and Kenner investors*), at a minimum.
- The diversion of funds to Tennessee alone tied Jowdy's racketeering hands to two (2) separate projects [*DCSL and Tennessee*], accentuating the feigned ignorance of the investigating officers to Jowdy's protection and benefit.  *Considering Kenner was able to reconstruct the Jowdy criminal activity solely with evidence the government turned over to Kenner in Rule 16, how could Agent Galioto (and associates) with the forensic powers of the FBI, DOJ and US Attorney's Office not reconstruct the same Jowdy criminality for over a decade?* **A first year investigator could have done it**.

Thru Rule 16 evidence (*See TIMELINE 009*), Kenner discovered that Jowdy, Louis Freeh, Bhatti and Jowdy's father (*part of Jowdy's original con to Kenner in 2002 and the $500,000, Norstrom check fraud*), had just been together in Texas at the new, Jowdy-Bhatti project in early May. Kenner met with Najam and Jowdy at that exact time and received the bribe offers.

Najam memorialized the problem with Kenner to Jowdy via email (*declining to be part of the their protected, criminal enterprise to the detriment of the Kenner investors*) *after Kenner declined* to participate with them in their on-going criminal conspiracy, including Lehman Brothers and Freeh's FBI contacts.  *See PK146*.

Najam told Jowdy (*after Kenner declined their bribes*)-- May 8, 2007: "*The last thing you need is a conflict situation with another partner.*"

*and my friends as well as the embezzlement, mismanagement and other frauds that had gone unchecked since 2003 with Jowdy.   After two (2) months, Jowdy with the help of Bill Najam [the Diamante General Counsel and COO], Jowdy agreed to leave the project and reduce his equity position considerably in return for Kenner and the other investors/lenders forgiving the <u>outstanding loans</u> and other issues to Jowdy."*

In 2017 (*See PK126*), Stumpel signed an supplementary affidavit in further support of Kenner and the underlying knowledge of the loans to Jowdy and reverberating problems to collect, at all times since 2009, obstructed by the FBI case agent, Galioto.   Stumpel confirmed that he was a similar victim of *forgery* allegations made by Jowdy and his associates (*later like the Kaiser and Berard claims in NY and AZ in 2015*), also proven as frauds by them.  Stumpel stated:

*"I previously signed an affidavit in support of Phil Kenner in 2009 during his arbitration with Owen Nolan related to investments that I also have in common with Nolan but disagree completely with the assessment Nolan and his attorneys presented to the 2009 arbitration panel. (See PK105)*

*I was a short-term client of the same attorney in California, Michael Meeks. Both Mr. Meeks and his people, including Kenner's former assistant, Kristine Myrick, grossly misled me about documents in 2008 they <u>accused</u> Mr. Kenner of:*
   a.  <u>*Forging*</u> *in order to transfer funds from one of my investment accounts to Northern Trust Bank,*
   b.  <u>*Forging*</u> *my name on documents to establish a new investment account (unknown to me) at Northern Trust Bank,*
   c.  <u>*Forging*</u> *my name on new Line of Credit documents using my investment funds as collateral for a multi-million dollar loan at Northern Trust Bank, and*
   d.  *Ultimately stealing all of the line of credit funds for himself.*

*I was most bothered when I learned after filing a lawsuit versus Kenner that **NONE OF THE FORGERIES OR TRANSFERS WERE TRUE**.   I explained this in my 2009 affidavit to the arbitration panel.*

***Meeks, Myrick and Jowdy's attorneys lied to me about everything.  It was all a 100% lie."***

Related to the Hawai'i loans, unpaid by Jowdy, Stumpel affirmed:

*"As a group and individually, we began our efforts with Kenner to recover all of the funds I directly sent to Jowdy accounts or <u>we agreed as a group like Hawai'i to send to Jowdy for short-term loans</u>.  I was a participant in lawsuits for:*

73

a. The $1.6 million loan I loaned Jowdy in México from my account in Europe in 2005,

b. The $5 million plus Jowdy stole from me and the rest of our Hawai'i investors in unpaid loans since 2004 (known to all of the Hawai'i investors I discussed it with since 2004 when Kenner disclosed the idea to us as a group on a conference call)...

I have discussed all of the loans and scams by Jowdy on me and my former teammates and friends independently with Arizona attorney, Tom Baker, and California attorney Ronald Richards, both of which sued Jowdy for the various frauds against me and the other investors.

In 2009, after Jowdy terminated all of the settlement discussions with Tommy Constantine, on our behalf in 2008, our group of investors sued Jowdy in two major California lawsuits with Ronald Richards.   I was a Plaintiff in both lawsuits for the Diamanté del Mar and Diamanté Cabo san Lucas projects.   In both California lawsuits, we were all aware and claimed in the lawsuits that:

a. Jowdy had received approximately $8 million dollars from our Hawai'i partners and had not repaid the loans to us.
   i. I saw the January 2006 original closing documents that confirmed Lehman Brothers and Jowdy were expecting to pay our investors (Hawai'i loans) $7,000,000 at the closing (expected only days later), but that also changed as a fraud by the lender at Lehman Brothers and Jowdy.

b. Jowdy had mismanaged the two México resort projects for years while stealing funds from the budgets for his own personal uses.
   ii. Bryan Berard (in May 2010) and Jason Woolley (after the January 2010 Jowdy deposition) confirmed the mis-management to me personally after dealing with Jowdy in his CA depositions.
   iii. Kenner showed me and other investors the Jowdy bank records for Baja Development Corp and other Jowdy companies confirming that Jowdy began stealing funds from us within days of our first investment in August 2002 by Woolley, Khristich, and Kenner.

In 2007, Kenner also disclosed to me and our friends that Jowdy and his attorney, Tom Harvey, tried to bribe Kenner with millions in equity on future Jowdy-led projects that were funded by Lehman Brothers in Texas and Tennessee without us.

Kenner declined the bribes and fought Jowdy for the investors until he was arrested in 2013.   Jowdy confirmed the bribes to Kenner in his 2010 deposition with Ronald Richards.

74

*Kenner shared the 2-day depositions with me and all of the investors who read the Jowdy's confessions of stealing our money and having no plans to repay any of us, specifically including my $1.6 million loan.*

*All of the investors knew that Kenner and our attorney, Ronald Richards, sent copies of Jowdy's 2-day deposition to FBI Agent Matt Galioto who was supposed to be helping us get our money back from Jowdy in the various scams that Kenner explained to him in June 2009, on all of our behalf.*

*In 2007, Kenner explained to all of us as a group on conference calls and individually that he caught Jowdy stealing our funds and had no plans to return them.   This is the first time I saw Jowdy bank records from Kenner for both the airplane thefts and the original Diamanté del Mar investment thefts through Jowdy's Baja Development Corp.*

*In 2010, I was aware that Kenner was arrested and detained in México by the federal police after Jowdy's attorneys in the USA and México filed a complaint (with Nolan's attorney, Meeks).   I know that Kenner was physically beaten and told he had to sign transfer paperwork to Jowdy in México if he wanted to get out.   I know that a former attorney of ours, Palos, got Kenner released from jail and the torture after a few days.   I also know that our México attorney was murdered shortly after Kenner's release.   I know that it was not easy for Kenner to continue fighting for us in México for the next three years even with federal México protection on his trips to testify for us versus Jowdy in the various criminal lawsuits for me individually and others as a group."*

Stumpel went on to affirm that Galioto has continued to mislead him since the 2015 trial.

*"Since April 2015, I have heard from Agent Galioto on a few occasions to let me know that Kenner is a thief and Jowdy did nothing wrong.   **He is wrong**, because I have seen the paperwork and bank records.   **Jowdy stole from my friends and me**.   I personally know that he scammed Kenner and me.   Now, I have been instructed to sign paperwork giving up some of my rights to Jowdy for the money he has stolen from me for a small piece of the Cabo project (that Jowdy also stole from us).   It is incredible that Jowdy stole our money to buy his interest in the project, stole money for 10+ years from the project to pay for his protection and legal fees against the people he stole from, stole some of our equity in Cabo, and I am now being told that signing the deal with Jowdy to receive some of the stolen equity back is my best deal and I need to do it.   I do not understand why Agent Galioto of the FBI is working to protect Jowdy who stole all of our funds and against all of us."*

In light of the Stumpel verifications of group knowledge, echoing the Stevenson, Peca, and Sydor 2011 Grand Jury testimony, the Kaiser and Berard 2009 arbitration testimony, and the three (3) lawsuits [*one in Arizona and two in California*] versus Jowdy for the same Hawai'i loaned funds, it is improbable that any theory of concealment &/or lack of knowledge "***as a group***" could have transpired.   More specifically, it is not logical with 100% pro-transparency evidence pre-trial that the FBI agent &/or the US Attorneys office could have formulated a "*concealment*" theory in contradiction to 100% of their empirical evidence.   Upon information and belief, the defendant supposes that this erroneous theory was first presented at the 2013 Grand Jury in Central Islip and falsely reiterated in the 2015 Grand Jury proceedings related to the defendant's superseding Indictment.


### *Jere Lehtinen*

Kenner's Baja Ventures 2006 partner, Jere Lehtinen, has acknowledged his participation in the Baja Ventures 2006 LLC since its inception.   Lehtinen signed an affidavit in the 2009 arbitration stating:

> *"I have been an investor in the Hawaii Investment Group since about 2004.  I wired $100,000 of cash to the Hawaii Investment Group's account under Phil Kenner's control. I understood that I was making funds available to Phil Kenner for the sole purpose of being used at his discretion for my equity benefit in the Hawaii Investment Group.   I was aware that my funds would be used to make distributions for the company, including but not limited to; Land Acquisition, Travel & Entertainment expenses, Legal Fees, Planning Fees, Payroll, Permitting fees, **Loans to outside entities** and **distributions to other members that would satisfy their monthly Line of Credit payments to Northern Trust Bank**.  I have a capital account with the Hawaii Investment Group equal to my total investments in the group which includes my initial cash investment.   At the time of my investment, I also understood Phil was the sole signatory on the Little Isle IV, LLC bank account.   I have never had any reservations or issues regarding the use of these funds.   Phil Kenner has always disclosed the complete and detailed use of these funds with me from time to time and per my every request."*

Lehtinen went on to affirm about the Diamante Cabo san Lucas investment:

*"DIAMANTE CABO SAN LUCAS; I have been involved in a real estate investment project in Mexico since approximately 2006, specifically, Diamante Cabo San Lucas.   I was aware that Phil Kenner has had a significant ownership interest in the Cabo San Lucas project prior to making an investment into the project.* **I have invested $1,500,000 in the Diamante Cabo San Lucas through Phil Kenner's entity Baja Ventures 2006, LLC and have trusted Phil Kenner with respect to this investment.** *I am also aware that Phil Kenner and Tommy Constantine had been working diligently over the last two years to resolve certain partnership issues between Ken Jowdy and our investor group, which were related to our investment in Diamante Cabo San Lucas.* **I understand that approximately eighteen (18) months ago, Tommy Constantine negotiated a global settlement with Ken Jowdy, with the assistance of Jowdy's brother-in-law, William Najam, to a) relieve Ken Jowdy of the $10m+ in personal debt, b) his management control of the project, and c) any additional personal financial obligations he had to our Hawaiian Investment Group, Glen Murray, Mattias Norstrom, Bob Gaudet, myself and others.** *I was also aware that Ken Jowdy presented the settlement agreement to Masood Bhatti at Lehman Brothers in New York, who at that time was a Senior VP and was acting on behalf of the lender for the Cabo project. Subsequently, after Jowdy met with his brother in law William Najam and Masood Bhatti, Jowdy decided that he would not follow though with the agreement that he had made and elected to renig on the settlement that [Constantine] and Ken Jowdy had negotiated over a six (6) month period of daily negotiations.  Furthermore, in spite of being a significant investor and shareholder of Diamante Cabo San Lucas, per an email recently written by Jowdy and sent to Phil Kenner, I as well as other investors, have been prohibited from entering the property. Among other extravagant expenditures and instances of corporate waste, I am aware that Ken Jowdy has utilized various resources of the Diamante Cabo San Lucas project, including the use of personnel who were on the Cabo payroll and other financial resources to pay for several private jet flights around the country.   I am also aware that the individual in charge of the Lehman Brothers loan to Jowdy and Diamante Cabo San Lucas, Masood Bhatti, also acquired a secret equity interest in the Diamante Cabo San Lucas project through an entity owned by his Goddaughter named Somerset Properties, LLC. This was unknown to Phil Kenner or myself prior until recently.*

*I have always been made aware by Phil Kenner that I am able to request outside assistance from attorneys, accountants, or other professionals to audit the strategies that Phil Kenner has assisted in implementing.   I have always had direct access to third party advisors involved with the planning decisions for my family, whether I have included Phil Kenner or not in those conversations. Through conversations with other clients of Phil Kenner's over the years, I am aware that this is his common approach with his Family Office clients."*

At no point was Lehtinen listed as a victim in the defendant's Indictments.   Yet, during forfeiture proceedings, the government ignored the knowledge of the clean, and direct deposits Lehtinen himself acknowledges for the Baja Ventures 2006 LLC, in order to falsely construe a non-existent nexus.

Lehtinen and his attorneys received a copy of all the Lehtinen materials from Kenner in 2012 without any concerns raised.  *See PK140*.   Defendant believes that Galioto initiated the false claims of Kenner's acquisition in Mexico [*Baja Ventures 2006*] was from "*stolen*" Hawai'i funds during Galioto's Grand Jury testimony in 2013, since NO EVIDENCE exists in any Rule 16 materials that would lead a thorough investigative team to believe it occurred.

### Mattias Norstrom

Norstrom, who is not listed in the Superseding Indictment, signed an analogous affidavit for the 2009 arbitration (*See Ex. 62 – also provided to the FBI in 3500 materials from Norstrom directly*), also affirming his full awareness of the fabricated claims made by Owen Nolan, who's attorneys were working hand-in-hand with Jowdy attorneys (*whether Nolan was aware of it or not*) to slander Kenner and spread false rumors, in an organized effort to confuse the Kenner investors and create strife in the anti-Jowdy parties, who he has thoroughly robbed (*all in Rule 16 evidence*).

Norstrom affirmed:

> "*I wired $100,000 to Northern Trust Bank…**for the express purpose of making funds available to Phil Kenner, which were to be used at his discretion**.  I was aware that my funds would be used to make distributions for the company, including but not limited to; Land acquisitions, Travel & Entertainment expenses, legal fees, Planning fees, Payroll, permitting fees, **loans to outside entities** and distributions to other members that would satisfy their monthly Line of Credit payments to Northern Trust Bank…**Phil Kenner has always disclosed the complete and detailed use of these funds with me from time to time at every request.*"

In concert with the 2012 and 2013 efforts versus Jowdy in Mexico, Norstrom gave testimony in the Mexico courts to support the criminal allegations versus Jowdy.[47] Kenner met up with Norstrom after he was able to enter Mexico, give criminal testimony versus Jowdy, and return without harassment, unlike the flagrant abuse endured by Robert Gaudet, Rem Murray and Greg deVries in 2012 during similar testimony.   During the prior testimony efforts by Murray, deVries and Gaudet, they received deliberate and brazen threats from Attorney Tom Harvey and Bryan Berard (*Jowdy's new henchman since 2012*) about being sued in the USA by Jowdy if they gave criminal testimony in Mexico versus Jowdy.[48]   The original Harvey email

---

[47] Norstrom confirmed the Mexico testimonial trip for that week:

| 152 27 | +46708874 363 Mattias Norstrom* | 2/7/2013 4:01:48 AM(UT C+0) | Rea d | Hi Phil **You need me to make a trip to Cabo**? If you're available later tonight can I call? Long and costly trip! | |

Norstrom confirmed he spoke with deVries and Murray about their harassment during the 2012 testimonial trip by Jowdy, Harvey and Berard:

| 152 44 | +46708874 363 Mattias Norstrom* | 2/8/2013 2:15:55 AM(UT C+0) | Rea d | E mail me info and then let's talk when we can. **Talked to Devo [deVries] and Rem [Murray] last week**. | |

Norstrom confirmed he met with Kenner at the Phoenix airport – during his flight connection -- as he boarded the plane to fly back to Stockholm Sweden after his one-day testimonial trip to Cabo san Lucas Mexico (*thru Phoenix to meet Kenner*):

| 153 21 | +46708874 363 Mattias Norstrom* | 2/14/201 3 2:39:16 AM(UT C+0) | Rea d | On a cunthair!! Onboard, **good to see** you Talk soon | |

[48] Threats from Berard to Rem Murray and Greg deVries while they were in the Cabo san Lucas Courthouse giving testimony about the Jowdy frauds against the Hawai'i and Mexico investors:

| 150 49 | +15862123 454 Rem Murray* | 1/31/201 3 5:48:16 PM(UTC +0) | Rea d | FWD: **U 2 DUMB Bastards. At court house wth Bob Gaudet signing criminal papers against Jowdy?? You 2 will never get on property now and will be getting sued in** | |

threats scared Hawai'i and Mexico investor Steve Rucchin from making the testimonial trip with deVries, Murray and Gaudet in 2012; cancelling his flights the morning they received the Harvey, heavy-handed, and unabashed threats (*apparently legal when backed by FBI Agent's protection*).

Norstrom was part of the 2015 effort to file new litigation in Mexico versus Jowdy until Galioto's partner, FBI Agent Michael Cassidy, had their Mexico liaison arrested for obstruction of justice, effectively terminating another effort to recover the funds pilfered by Jowdy under FBI protection (*again*) and since 2007, when Kenner first exposed Jowdy's corruptions to the Hawai'i and Mexico investors.

During Norstrom's 2015 efforts in Mexico, Norstrom affirmed the following[49] to the Mexico government regarding the new 2015 efforts versus Jowdy, before the FBI stopped Norstrom and others from pursuing Jowdy, yet again.  Norstrom's 2015 affidavit confirmed his complete knowledge of the Hawai'i loans **with the group** to Jowdy and their unpaid status as follows:

> *"Hawai'i loan*
> *In late 2004, Jowdy approached my Business Manager [Kenner] and asked if a group of investors including me from Hawai'i would lend him some bridge funding personally until he could get either the current Diamante del Mar project funded in 2004 with development money and/or a project in Cabo san Lucas which several were pending at the time funded with a purchase and development loan.*
>
> *As a group, we agreed to lend him funds at a 15% interest rate.   Jowdy signed an official loan agreement with us in December of 2004.   Although, Jowdy received over $7,000,000 directly from us via wire transfer and repaid over $2,000,000 from December 2004 to April 2006, he later claimed that the funds*



| 15050 | +15862123454 Rem Murray* | 1/31/2013 5:48:46 PM(UTC +0) | Read | FWD: **the USA.. You have NO clue what your signing. yourjust as BAD as Kenner and Gaudet now. IDIOTS** |
|---|---|---|---|---|

---

[49] Norstrom 2015 affidavit – *See PK123a and PK123b*

> *were "not loans" but rather investments from our group of lenders after he was sued in the USA for not repaying the loans.   In 2010, Jowdy finally confessed that the funds he received from our lending group were actually loans and not the "investments" he declared as his defense in the case.  Jowdy's own NY attorney, Tom Harvey, actually threatened my Business Manager [Kenner] alleging that he [Kenner] stole the funds that Jowdy actually received.   Those funds remain unpaid of which about $1,700,000 in principle still outstanding is mine."*

Norstrom participated in all three (3) USA lawsuits [*Arizona and California*] versus Jowdy for the unpaid Hawai'i loans and the Mexico embezzlements and related frauds.  *See R33 A [Norstrom letter] and TIMELINE 071 and TIMELINE 072*.


No practical theory of "*concealment*" could have been derived from the Norstrom statements known at all times by FBI agent Galioto and continuing thru the NY Daily News media slander by Jowdy and Harvey's colleague (*Michael O'Keefe*).   The FBI back-story claiming Kenner frauds and the Berard and Harvey litigation threats of civil lawsuits being filed to deter testimony in criminal proceedings versus Jowdy could only be construed as lawful if protection from its motivating criminality is approved.   Yet, in contradiction to the known Norstrom verifications, some "*concealment*" of the Hawai'i loans to Jowdy still was pursued.   How many individuals "***as a group***" need to confirm their collective knowledge of the Jowdy loans before it is enough to refute the 2015 hearsay and foundationless testimony defended solely as *faulty memory, confusion and mistakes (i.e. unreliable)*?


### *Mike Peca and Kristen Peca*

In spite of Peca's 2015 amnesia thru *faulty memory, confusion and mistakes* or **CTE** symptoms, Mike Peca had clearly laid down his knowledge of the Jowdy loans and the underlying recollections to a 2011 SDNY Grand Jury while specifically "*under oath*".   Mike Peca was protected by the secrecy provisions of the Grand Jury proceeding, thus even though he was represented by counsel, he was alone in the Grand Jury room with the US Attorneys.   Peca knew that not even his attorney was entitled to the Grand Jury minutes.   Thus, anything that Peca had to say, pro-Kenner

or not, would receive the strictest of safeguard measures by the US government under Rule 6.   As such, even though Peca made unsubstantiated claims in 2015 that he was extremely bothered when he realized the 2011 SDNY Grand Jury questions were primarily related to Kenner and his Hawai'i loan knowledge to Jowdy, he was "*uncomfortable*".   Nevertheless, Peca was "*under oath*" and if the government wanted to ask him about "***the moon being made out of green cheese***", there is nothing that would have changed the truthful responses that were required by in lieu of *18 USC 1001* perjury charges.   How can Peca or the knowing prosecutorial team reconcile the fact that Peca was long-winded regarding his underlying knowledge "*as a group*" and the group's disdain for Jowdy once Jowdy "*seized [sic] communication*".

At all times, Peca affirmed that he was fully aware of the loans he signed for year after year with Northern Trust Bank.   Peca affirmed that he actually believed the entire $100,000 cash transfer and his entire $1.775 million LOC (*attributed to his personal capital account at Little Isle 4*) was being loaned to Jowdy.    The fact that only $240,000 of the total Peca originating deposits found their way thru the Little Isle 4 capital accounts into the Jowdy loans, could only be construed as less offensive than what Peca actually testified to in 2011, despite his revisionary perspective in 2015, amazingly supportive of "*concealment*".   This revisionary perspective was fabricated years after his 2008-09 AZ lawsuit participation (*See R33 A [Peca letter]*), his 2009 California litigation efforts as a Plaintiff versus Jowdy for the balance of the Hawai'i funds (*and Mexico embezzlements, etcetera*) (*See TIMELINE 071 and TIMELINE 072*), his wife's fully supportive letter of their attorney's [Ronald Richards] efforts versus Jowdy to recover their funds (*pursuant to the two [2] California complaints -- See R33 425*), when she stated:

> *"We are putting our trust in you [Ronald Richards], so we will do whatever you recommend is best for getting our money out.   Thanks, Michael and Kristen Peca"*

This direct communication by Mike Peca and Kristen Peca flies in the face of the false claims by Mike Peca in the 2015 trial, that when Mike Peca gave Ronald

Richards his GSF funds, he could not verify how his funds were spent.   Yet, he and his wife had unhindered access to their attorney but could not figure it out or verify it (*Tr.652-653*).   This is paralleled only by the willful blindness they claimed affected their falsified statements of the alleged concealment of their LOC.   It moreover flies in the face of the default letter language inviting Mike Peca and his wife to call Northern Trust if they wanted to see the back-up information for their LOC account (*although Mike Peca concealed the default from her – in Rule 16 evidence – despite her fabricated "shocked" incident that could not have occurred – Tr.709-713*).
The Northern Trust letter stated (*PK138*):

> *"You may request an accounting by calling us at 602-468-2537."*

Apparently, they were not so concerned to call.   And, when Kenner asked Mike Peca to sign a September 2009 release form to Northern Trust to receive the past statements (*6-months later*) for Mike Peca's LOC and banking accounts (*PK141*), the Pecas received copies from Northern Trust and failed to review them.   Access was supported by Kenner arranging the release of statements with Mike Peca's signature and fax to the bank.   O'er, the action was fully transparent.     Lastly, and finally confronting the alleged "*concealment*" issues head-on, Kenner told Kristen Peca on her surreptitiously recorded 2012 FBI calls with Kenner to "*Trace it – trace all of it*", when asked about what the LOC funds were used for.    The government portrayed Kenner's unguarded statement during their rebuttal summation as a form of *concealment*, but it echoed the merits of transparency; *nothing more, nothing less*. Unfortunately, as portrayed by Komatireddy's refrain, the jury would have believed they were "*bone-dry while standing unprotected in a monsoon rain*". (*Tr.5758*)


Only willful blindness could have supported the false 2015 claims by both Kristen Peca and Mike Peca related to the Northern Trust LOC and Jowdy loans (*of which Kristen Peca had nothing to do with*).


Kristen Peca actually told Kenner on the same FBI recordings in July 2012:
> [**@ *About 5.45 of the 1:34.50 call*]** –

> *Kristen Peca – Well, I was referencing the earlier stuff that you said, <u>I don't remember a large amount being distributed back to our account and the timing of the years of the loan</u>, **the line of credit, that happened when we were in OHIO** [2008 & 2009]. **I don't understand how it could have been open for 5 years before that?**  <u>Because we had a bond account going?   Do you mean the Hawai'i...you had a line of credit, but not for us?</u>*

> *Kenner – No, no, you guys had lines of credit for 5 years at Northern Trust.*

> *Kristen Peca – for 5 years?*

> *Kenner – for 5 years!   When you were in OHIO [2009], that's when the thing [LOC] closed.*

Per her own 2012 admission to Kenner; Kristen Peca was undoubtedly not part of the 2005 conversation between Kenner and Mike Peca about opening the LOC. Consequently, she fabricated the entire 2005 story about "*6-months*" and "*nothing would be touched*", yet contradicted by her own fabrications by stating the funds were supposed to be "*used for vertical construction*", in an clandestine attempt to create synchronicity with her husband's fabrications.  (*Tr.697*)

In spite of Mike Peca's perjured testimony in 2015 (*Tr.436*), when he claimed "*no knowledge*" of the defaults[50] and Kenner's lack of explanations, Mike Peca did <u>*NOT*</u> mention any of that to the 2011 SDNY Grand Jury, ***under oath***.   In fact, Mike Peca represented exactly the opposite with the following statements, when asked how much money he invested in Hawai'i (*thru Little Isle 4's capital account*).   Instead of stating $1.8 million and pausing his testimony, he offered a meticulous and eloquent narrative of the use of funds and his planned participation in the loans to Jowdy "*as a group*", as follows:

> *Q: How much did you put into Little Isle 4?*

> *A [**Mike Peca**]: "$100,000 cash investment that was going towards that.  Then we had lines of credit.  I had one out for $1.7 million that was going to be used at the time.  Here's where a lot of the cross starts to happen.   A short-term loan to Mr. Jowdy, because at the time Cabo – we hadn't gotten the lending from Lehman Brothers yet.  We made a short-term loan until the lending came in.*

---

[50] See **footnote 37**, supra, of Peca's text message confirmation to Kenner about talking to Northern Trust bank *prior* to his approved seizure, **on his own**.

*Once the lending came through they were to pay back the loan, I think in the neighborhood of five-and-a-half million dollars, on the closing. It was never paid back. And then communication basically seized at that point from him [Jowdy]. **That was kind of the whole sticking point as far as <u>me and the other guys</u> with Mr. Jowdy.***

*The 1.7 along with the $100,000 and **whatever else put in this a capital account**, Little Isle 4, I believe. The Capital account was loaned to Ken Jowdy, our business partner, so there is no need <u>at the time</u> to be worried about anything. The money was loaned to Ken Jowdy to basically help some of the purchase of the Cabo property so we can get the funding. And then it was supposed to [be] a short-term loan."*

Please note that Mike Peca told the 2011 Grand Jury that he expected 100% of his Hawai'i funds (**$1.8 million**) were supposed to be **in** Little Isle 4's capital account and **<u>loaned to Jowdy</u>**. Only $440,000 was initially loaned to Jowdy originating from the Peca capital account deposits. Jowdy repaid $200,000 of those advances after an 8-day period, leaving a net of $240,000 out of the $1.8 million Peca told the SDNY he "*approved and expected*" for the Jowdy loan, when he affirmed,

*"The Capital account was loaned to Ken Jowdy, our business partner, so there is no need <u>at the time</u> to be worried about anything."*

O'er, Peca affirmed:

*Q: When you signed those [loan] papers, where did you think that money was going?*

*A [**Mike Peca**]: "It was going to a Capital Account for Little Isle 4."*

Kenner was granted full permission to withdraw the LOC funds thru Peca's **one-page**, signed *Letter of Authorization* – which Mike Peca affirmed to the SDNY Grand Jury @39:

*"It was prepared for me, I read it, and signed it".*

Accordingly, Kenner could have foolishly withdrawn 100% of the LOC funds from Peca and the other LOCs all at once (*as authorized*), paid the higher monthly fees for the funds immediately withdrawn. Kenner could have co-mingled every dollar from the various LOCs. Nevertheless, <u>Kenner did not</u>. If Kenner had, he could have

been called 100% and completely incompetent by any reasonable investor, under review.   Instead, the government tried to wash this salient issue unnoticed throughout trial by insinuating that the LOC funds did not belong to the Little Isle 4 Capital Accounts (*re-writing capital contribution and centuries of economic theory in one flail floop, just like their misleading representations about the contents of the Joint Venture agreement*).   Peca and Sydor both convincingly told the Grand Jury that they *independently* granted access to Kenner and Little Isle 4, **rather** than the LOC funds remaining their own personal property.  It was exhaustively misrepresented by the government that future withdrawals would require incremental, individual approvals.   <u>This was never true</u>.   This government position ignored the fact that LOC investors already signed their <u>full permission</u>, <u>one-page</u> **Letter of Authorization** directly with Northern Trust Bank (*infra*), fully and legally satisfying this legally defined issue; *all in evidence, yet blatantly ignored*.

Mike Peca continued to the 2011 Grand Jury:

> *"The capital account was loaned to Ken Jowdy, our business partner, <u>so there is no need at the time to be worried about anything</u>.   That money was loaned to Ken Jowdy to basically help some of the purchase of the Cabo property[51] so we can get the funding.  And then it was supposed to be a short-term loan."[52]*

- Please note that this also contradicted Mike Peca (*Tr.419, 427*) and Kristen Peca (*Tr.697, 699*) claims that the funds were for "*vertical construction*"; suspiciously never mentioned by Mike Peca to the Grand Jury or by Kristen Peca in four (4) hours of 2012 FBI recordings.   This completely disregards

---

[51] Peca's statement to the SDNY Grand Jury confirms that the $350,000 that the government identified on *Forf-36* (*out of the $6.625 million purchase contribution*) that originated from any of the underlying LOC capital contributions was 100% expected.   The government chose to ignore this previous evidence to maliciously frame their position of *concealment*, as well.  The $350,000 out of $6.625 million was "*some*" – exactly as Mike Peca described in 2011, yet selectively forgot in 2015.   It raises more suspicions than it draws conclusions of the intention of the 2015 well-orchestrated testimony; *perhaps 'means' to a 'desired end'*?

[52] Specifically, in spite of this SDNY Grand Jury direct testimony four (4) years earlier, Mike Peca perjured himself in 2015, claiming the Hawai'i losses had nothing to do with Jowdy. (*Tr.455-457*).   After Mike Peca's SDNY Grand Jury testimony, his plaintiff status in the Arizona and two (2) California cases, without *faulty memory, confusion and mistakes* (**CTE**), it is impossible Mike Peca was unaware of the Jowdy loan relationship to the lawsuits from Hawai'i versus Jowdy.

the ***crucial fact*** that Kristen Peca told Kenner on her FBI recordings in 2012 that she was *not* aware of the LOC until sometime in 2008 at the earliest[53], confirming her multiple instances of planned perjury and fully discrediting her alleged participation in the 2005 LOC discussion and her emotional *"baby"* (*Tr.698*) testimony in 2015, constructed exclusively to elicit jury sympathy.

Mike Peca continued to the 2011 Grand Jury:

> *"I knew 100 percent it was going to Little Isle 4 initially.  Shortly after that the short-term loan was something that took place."*

Ultimately, when Mike Peca was faced with the most telling summary question to end the 2011 Grand Jury inquiry about his full and transparent knowledge, when asked if he is still in support of the loans to Jowdy seven (7) years after the loan started and five (5) years since Jowdy stopped payments, Peca did not have a single, terse word towards Kenner, as follows:

> *Q:  Did you know in advance of it being made?*
>
> ***A [Mike Peca]: I probably did***, *I mean at the time if I was told about it, I probably would say, okay, sounds good.   It was probably explained to me.  I cant tell you*

---

[53] (**@ *About 5.45 of the 1:34.50 call***) – In July 2012, Kristen Peca tells Kenner –

> ***Kristen Peca*** *– Well, I was referencing the earlier stuff that you said, I don't remember a large amount being distributed back to our account and the timing of the years of the loan,* **the line of credit, that happened when we were in OHIO** *[2008 & 2009].* **I don't understand how it could have been open for 5 years before that?**   Because we had a bond account going.   Do you mean the Hawai'i; you had a line of credit, but not for us*?*
>
> ***Kenner*** *– No, no, you guys had lines of credit for 5 years at Northern Trust.*
>
> ***Kristen Peca – for 5 years?***
>
> ***Kenner*** *– for 5 years!   When you were in OHIO [*2009*], that's when the thing [*LOC*] closed.*
>
> - *Kristen Peca cannot believe that she is finding out on the FBI phone call in 2012 that her husband, Kenner's client, had concealed that he had a LOC open for 5 years – even though she lied to the EDNY in 2015 that she and her husband waited months before deciding to participate with a 2005 LOC for their Hawai'i investment capital.*

*definitely right now that I know the day or time of the conversation.   <u>As it was happening I wasn't like what happened to that, I didn't know it would happen.   I kind of knew what we were doing.</u>*

*Q:  Let me paraphrase, you are not sure if you were told but you basically approved of it.   You wouldn't really have cared sounds like you're saying?*

*A [Mike Peca]: Correct.*

It is not credible under any standard that Mike Peca, four (4) years later in 2015, was sure he was never told.   The SDNY Grand Jury was the perfect place for someone, described by the government to have *faulty memory, confusion and mistakes*, **four (4) years later**, to have responded with what he knew, instead of "*forgetting that he remembered being told nothing (or vice versa)*" (*emphasis added, as wholly confusing*).   The 2015 testimony was specific regarding what he remembered exactly "*not being told*", although in 2011, when he confirmed "*what he knew*", he could not remember when the meeting took place, but now (*perhaps thru some influence*) he was able to remember every single occurrence of conversation with Kenner and that, as a result of now-perfect recollection, he remembered that he was never told.

*The defendant requests the Court reads the entire March 2011 SDNY Grand Jury testimony of Mike Peca for his mens rea.   There is not a single insinuation of confusion or ambiguity related to Peca's full and unabated knowledge of the LOCs, their full and expected usage for Little Isle 4, and the purposeful, and "no need at the time to be worried about anything" loans to Jowdy for the coordinated Mexico efforts.   See 3500-MP-5.*

- *Please note that Mike Peca, like 90% of the Hawai'i investors, were also DDM and/or DCSL investors, as well.*

**<u>Darryl Sydor</u>**

Darryl Sydor was one of the three (3) cherry-picked witnesses by Galioto after consulting with Jowdy's cabal and the attorneys for Nolan, Juneau, Moreau and

Myrick; all of who lost in their witch-hunt of Kenner through litigation.[54]

Collectively, Galioto and Jowdy's attorneys believed those three (3) investors would

---

[54] After the 2009 Nolan arbitration, which Nolan received a paper-victory to be bought out of his Hawai'i investment, not for fraud or evil mind (*as the arbitration proclaimed in their ruling*), but based on Nolan's <u>lack of recollection</u>, Juneau and Moreau dismissed their litigation since Kenner beat Nolan on every single identical issue they raised in their respective Complaints.   Despite the fact Juneau and Moreau had merely filed Complaints and subsequently stayed their collective proceedings under the same attorney as Nolan (*expecting, as told by their attorney, some form of <u>res judicata</u> [despite the underlying arbitration]*), Juneau and Moreau were each milked $250,000 in fees from the attorney. Nolan claimed to have paid over $500,000 in arbitration fees (*wholly unheard of*).   The attorney milked all three clients ruthlessly for over $1 million.   Separately, Jozef Stumpel, *supra*, who had been tortuously lied to about his bank accounts (*and false forgery claims*), was charged $43,000 for his 2008 Complaint to be filed, with no further actions, once he terminated the falsified Complaint and rejoined Kenner's efforts, adverse to Jowdy (*with the other 19 Hawai'i and Mexico investors*).   The Kenner witch-hunt by the Jowdy-related attorneys (*as a pure distraction technique, albeit successful*) milked the unknowing individuals in the grossest, unchecked manner possible.

Kenner subsequently received a settlement from the *Kenner v. Myrick* suit, 100% paid for by Myrick's insurance company at the time, and perhaps sheltered from her knowledge.   The same attorney (*Meeks, who was working hand-in-hand with Tom Harvey and Jowdy*) received another 6-figure litigation fee, this time milking the insurance company for his riches.

The Nolan "*lack of knowledge*" testimony flew in the face of the actual Northern Trust Banker's deposition (*Aaron Mascarella*) less than two (2) months before the arbitration, when he confirmed he had been speaking "*infrequently*" with Nolan when Nolan "*responded*" about his LOC at Northern Trust Bank.

> ***March 9, 2009 @23:***
> 13   Q.   Okay.  Now, with regard to the line of credit
> 14   account, who was authorized to make transfers out of that
> 15   line of credit?
> 16   A.   ***Owen and Phil.***
>
> 17   Q.   Was there any limitation on Mr. Kenner's
> 18   ability to transfer money out of the account?
> 19   A.   No.  It was -- Yes.  I'm sorry.  It was --
> 20   The proceeds were only to go to Little Isle Ventures,
> 21   Little Isle IV, I think, if I remember correctly.  He
> 22   signed -- ***Owen Nolan signed a bank authorization or an***
> 23   ***authorization letter to the bank authorizing Phil Kenner***
> 24   ***to transfer money from the line of credit into the Little***
> 25   ***Isle IV account***.

Mascarella confirmed that he personally dealt with Owen Nolan between 2003 and 2006 related to the LOC payments being late and DEFAULT letters on the LOC.

**March 9, 2009 @24:**

> 20    Q.   During the time period from -- From the time
> 21  you opened the Nolan account until the end of 2006, did
> 22  you have conversations with Mr. Nolan concerning the line
> 23  of credit?
> 24    A.   Conversations -- **I spoke to Owen**
> **25  infrequently**.  I've only had brief conversations with
> 1  him.  And my guess is that **it was only relating to the**
> **2  payments, that the payments were being made or not being**
> **3  made**.  There was a few times when the payments were slow,
> 4  that **we sent out default letters**, which probably -- You
> 5  know, I can't remember every conversation I had with him
> 6  but I assume he might have **_responded_** to one of those
> 7  default letters.

Nonetheless, the 2009 Nolan attorney, Meeks (*who was the same attorney in 2009 that Tom Harvey told Gaudet "would be waiting for him in the States" for verifying the Jowdy loan agreement in 2009 – supra, and PK_SEC_0789*) led Nolan to claim he was never aware during the arbitration, similar to his now-proven 2015 perjurious claims (*Tr.2065-2066*).  *See also PK47*.  Nolan had an extended text and phone conversation with Kenner in December 2007 when he re-signed his four (4) year old, four (4) times renewed, personal LOC.

Kenner notified Nolan about the pending LOC renewal documents:

| | | | | | |
|---|---|---|---|---|---|
| 37 | +141699 70110 Owen Nolan* | 12/23/2007 3:40:50 PM(UTC+0) | Sent | **I need to send you via FEDEX LOC docs from Northern Trust that MUST be signed and returned by the end of the year. Where are you the day after XMAS??** | |

Nolan replied:

| | | | | | |
|---|---|---|---|---|---|
| 41 | +14169970110 Owen Nolan* | 12/23/2007 6:40:59 PM(UTC+0) | Read | **What r the papers for** | |
| 42 | +14169970110 Owen Nolan* | 12/23/2007 6:41:26 PM(UTC+0) | Read | **And why the sudden rush** | |

Kenner replied:

| | | | | | |
|---|---|---|---|---|---|
| 38 | +14169 970110 Owen Nolan* | 12/23/2007 7:09:24 PM(UTC+0) | Sent | **The papers are for your Line of Credit at Northern Trust. The Bank sent them to me for the renewal of the LOC on friday and said they MUST be signed and returned by end of year. Its not just you. All of the guys have to do it. I don't make these rules. Where can I send them for next Wednesday or thurday fedex delivery?? Pk** | |

be adverse to Kenner in testimony, believing they had drank the same polluted Kool-Aid that Jowdy's people at the NY Daily News had maliciously spread and the Jowdy cabal had disseminated to those willing to believe (*like Nolan and his attorney, assisted by fired "for cause" Kenner employee, Myrick*).   Yet, despite their libelous tactics, and many years of difficult litigation due to the Jowdy payoffs, grafts and threats (*with the help of Harvey and his sycophants*), Sydor told the SDNY what

---

Nolan used Kenner FedEx after they spoke on the phone (*with the full text communication in Rule 16 evidence*) to return his signed paperwork to Northern Trust Bank.   This was over two (2) years before his first amnesia symptoms (**CTE**) occurred during the 2009 arbitration, *albeit known at all times as a fraud by his own attorney who deposed Mascarella.*

This conversation followed one (1) year *after* Nolan's wife made specific Northern Trust LOC payments independently with Kenner's assistant, in late 2006 (*after Nolan received a $5 million insurance settlement check*).   *See R33 471, R33 472, R33 473, R33 474, R33 475.* This left no question to Nolan's <u>independent</u> (*along with his wife, and Kenner's assistant, Myrick)* unrestricted, prior knowledge of the Northern Trust LOC and its full and timely usage.

Since Nolan refused to acknowledge his LOC (*in 2009, and tortuously repeated in 2015*), in the first instance, the subject of knowledge of the underlying loans to Jowdy from the LOC funds, in the second instance, cannot be broached for reliable testimony, as Nolan's position of total aloofness and "*not reading a single document*" between 1991 (*the year he was drafted in the NHL*) and 2009 (*the year of the arbitration*) provides nothing but undependable incoherence.

[Nolan May 2009 arbitration -- Day 1 @105]:
*Q:  Is there ever an agreement in your life that you've ever read that you can identify here today? Have you ever taken the time on your own to read?*

*A [Nolan]:  **I can't think of any offhand**.*

[Nolan arbitration May 2009 -- Day 1 @109-110]:
*Q: You've testified that you've never read a document <u>ever</u> that you can think of sitting here today before you signed it.   At any time in your lifetime has someone advised you to take the strategy of never reading a document when you sign it?*

*A [Nolan]:  **No**.*

[Nolan arbitration May 2009 -- Day 5 @1049] – Judge Meyerson & Nolan's attorney:
**Mr. Meeks**:  He [Nolan] admits that's his signature.  His testimony is he wasn't aware.

**Judge Meyerson**: So somebody signs a statement that says, **Please grant Philip A. Kenner access to a line of credit for direct deposit into Little Isle 4**.  *Doesn't somebody have to take responsibility for that?*

he knew to be the truth, synonymous with Mike Peca and Turner Stevenson (*the same day in March 2011*).

Sydor was faced with the identical question of "*Did you know in advance?*" identical to Mike Peca.   Sydor affirmed to the SDNY Grand Jury, "*Yes.  It was to help with the short-term loan to keep funding the Cabo, but then it was supposed to be paid back, but that's --* " (@ *Page 25-26 of the SDNY Grand Jury transcript*).  *See R33 467f.*

What credible influence supported Sydor's change of "memory" four (4) years later? Whichever the answer, it could not be indicia of reliable evidence.


### *Turner Stevenson*

As one of the three (3) cherry-picked individuals, the US Attorney proceeded with his third (3rd) session of questions about the Hawai'i loans to Jowdy.   After a short Q&A, Stevenson affirmed (*See R33 651*):

> *Q: When you put up the $100,000 for Hawai'i, did you have any understanding of whether the money could be used to pay for the Mexico project or was it just supposed to go to the Hawai'i project?*
>
> *A:  In the beginning it was supposed to go to Hawai'i.   Then **I saw** they needed, **the group of us got together**, we have this piece of land that's available for purchase in Mexico that we need to wait on or get funds on to **transfer as a group** like one big blanket to get money into Cabo and pay for that land to hold it until the loan came.*
>
> *Q:   So you are saying you agreed to transfer some of the money from the Hawai'i project to the Cabo project?*
>
> *A:  **I would say that, YES.***
>
> *Q: Who made that decision?*
>
> *A: **I think all of us as a group**.*
>
> *Q: What do you mean "as a group", who is the group?*
>
> *A:  **All the guys who were invested in it**.*

The SDNY Grand Jury questions ended almost immediately after Stevenson's "*group*" confirmation, echoing his investment partners Sydor and Mike Peca.   His unquestionable knowledge of the "*group decision*" could only have taken place on the repeated _conference calls_ that Kenner established for the Hawai'i project.   It should be noted that all of the Hawai'i and Mexico investors lived around the world, thus it was impossible for the "*group decision*", concurrently described by Mike Peca, Sydor and Stevenson to have occurred via any other reasonable medium.   This collective recognition of the Jowdy loans, after a "*group decision*" had to be malevolently ignored by Galioto and the prosecutorial team who drafted the Indictment and supported it with only Galioto's Grand Jury testimony.   No empirical evidence exists prior to the Galioto, well timed, 2013 Grand Jury to support the Indictment claims of concealment, thus his testimony can shed definite light on the creation of the first instance of deceptively hypothesized claims (*without foundational support*).

Stevenson had also participated in testimonials in the various Cabo san Lucas criminal cases versus Jowdy as early as February 2009 as a witness to the Jowdy crimes, when Kenner arranged for him to fly in one (1) day from Seattle to Cabo and back after meeting with our Mexico attorneys and Robert Gaudet to give his sworn testimonial for the Court.  His Mexico action predated his participation in the 2008-09 Arizona lawsuit, the 2009 GSF and two (2) 2009 California lawsuits for the same Jowdy diversions of Hawai'i and Mexico funds.   It was immediately after Stevenson signed the 2008-09 full disclosures for his attorney Tom Baker versus Jowdy for the $5 million unpaid loan case.  *See R33 A [Stevenson letter]*.

**Stevenson:**



| 5623 | +14254667663 Turner Stevenson* | 2/26/2009 12:36:42 AM(UTC+0) | Read | **FLIGHT INFO ?** | |
|---|---|---|---|---|---|

**Kenner reply In RED:**



| | | | | |
|---|---|---|---|---|
| 6624 | +14254667663 Turner Stevenson* | 2/26/2009 3:52:04 AM(UTC+0) | Sent | Alaska 7am #494 to San diego. Alaska #230 at 10:20 to **Cabo** (arrive 1:27pm). Return on Alaska #253 @ 5:10 to LA. Connect to Alaska #245 @ 8:30pm to SEA (arrive 11:10pm). Thx buddy. **Bobby will be waiting for you outside immigration. Call with questions. Bobby's cell is 702.480.7328** |

Stevenson reply:

| | | | | |
|---|---|---|---|---|
| 5632 | +14254667663 Turner Stevenson* | 2/26/2009 3:53:25 AM(UTC+0) | Read | **GOT IT THX BUD TALK FRI.** |

### *Rem Murray*

Rem Murray was never a Kenner investment client.   He was introduced to Jowdy by Ethan Moreau in 2005.   Separate from Kenner, Murray attempted to receive information about the DDM project and his $500,000 distribution to Jowdy in February 2006.   Jowdy stalled and blamed Kenner repeatedly to Murray for the lack of information that Jowdy controlled.   When Murray confronted Jowdy and Najam about his independence from Kenner, he was met with independent resistance, since the "blame Kenner" tactic fell on deaf ears.

Independently, Murray contacted Kenner in 2011 to offer his assistance to the group, since he was not part of the Kenner investor efforts at all times.[55]   In support of the group efforts to recover the Hawai'i and Mexico funds from Jowdy's fraudulent diversions, Mexico investor, Rem Murray, chose to work with two (2) other Mexico and Hawai'i investors and a 3rd party to file new-2015 litigation in Mexico City versus Jowdy.   As preparation for the new litigation, Murray prepared a declaration about his knowledge of the frauds for the Mexico Supreme Court and the PGR investigation.   Prior to the Galioto-led Indictment of Kenner, and after multiple calls to Murray from Galioto to dissuade him from further anti-Jowdy efforts,

---

[55] Notwithstanding, Rem Murray was a Plaintiff in the 2008-09 Arizona litigation v. Jowdy and the DDM v. Jowdy California case in 2009.

Murray assisted the "group" litigation efforts in Cabo san Lucas versus Jowdy.   In February 2015, Murray affirmed (*See PK124*):

*In 2013, I decided to travel to Cabo san Lucas with another Jowdy investor, Greg deVries, to testify in the criminal proceeding against Jowdy initiated by Phil Kenner.   Prior to leaving the United States, Greg and I (emailed to me) received a threatening email from Jowdy USA attorney, Tom Harvey.  The email stated that Harvey knew in advance that Greg and I were going to Mexico that day to testify against his client in the on-going CRIMINAL case.  Harvey threatened that he was planning to sue "anyone" on Jowdy's behalf immediately if they chose to testify against Jowdy in Mexico.   In fact, Harvey went so far to allege that he already had prepared the litigation in the USA and, perhaps, he would be filing it that day.*

*Over the years, since Kenner and I began the civil and criminal pursuit of Jowdy for the recovery of our investments and group's loans, we (as well as other members of our investment group) have collectively been met with on-going threats by Tom Harvey in the same vein.*

*Once Greg and I reached our destination in Cabo san Lucas, we were immediately met by the immigration officers and taken to secondary questioning, including but not limited to questions related to our purpose and expected testimony v. Jowdy while in the country.   The immigration people had our names taped to their screens while looking for us during arrival.   They released us about 30 minutes later.  We immediately changed our hotel for the night, which the immigration people asked us about.*

*During our 36 hours in Cabo, we were constantly harassed by Jowdy's security people, including former FBI agent John Behnke, who was identified by one of the members of my attorney's team.   Behnke parked in the lot of the District Attorney's Office during the testimony of Greg deVries and I.   Other Jowdy security team members were also identified as being present in the trailing vehicles.*

*During our time in the District Attorney's Office, I received text messages from another Jowdy co-conspirator, Bryan Berard, who used to be aligned with me and the other investors seeking retribution from Jowdy, until sometime in late 2011 when Berard actually took a job in Mexico working for Jowdy.*

*At that point, Berard began to fill the role as intimidator for Jowdy.[56]  Berard threatened me about being sued if I testified against Jowdy that day.  In spite of*

---

[56] During repeated interviews by FBI Agent Galioto and other FBI agents, Robert Gaudet (*previously confirmed being threatened by Tom Harvey related to the Hawai'i loan agreement authenticity – later confirmed in December 2010 in Nevada by the Harvey-led defense team*)

*all the threats and harassment by Jowdy's people, Greg and I completed our testimonials in the CRIMINAL case v. Jowdy and headed back to the airport.  At the airport, about an hour later, Greg and I were unable to catch the last flight of the day back to the USA, but we did cross paths with Jowdy's people who did not recognize us at the airport. We stayed at an unnamed hotel for the evening, discussing the day's activities with our attorneys and flew out the next day to the USA.*

Including Murray, it should be noted that not one (1) person who was interviewed by FBI agent Galioto claimed pre-trial that they were unaware that Kenner was making the LOC payments.   In addition, not one (1) individual told the pre-trial FBI they were not aware of the loans to Jowdy.   The "*as a group*" refrain (*related to the*

---

confirmed to the FBI on April 30, 2014 (*after Kenner was in custody*) that Berard (*perhaps as a violent symptom of* **CTE**) attacked Gaudet in Cabo san Lucas.   Agent Galioto noted:

> "*Gaudet recalled that he was out in a bar in Cabo san Lucas Mexico and he saw Bryan Berard.  Berard yelled at Gaudet for continuing to talk to Kenner.  Gaudet told Berard he was wrong.  Berard put Gaudet in a choke hold and yelled he was going to kill Gaudet.*"

These similar draconian tactics led Kenner to utilize both paid personal security from the USA (*former US Navy Seals*) and Mexico Federales (*in Rule 16 evidence*) and Gaudet to request protection from the investor's Mexico counsel as far back as January 29, 2009 [*See PK-000108063*]:

> "*I mentioned Jowdy's group has threatened us in the past...once possession is given to us does the federal ruling also come with federal protection?   We believe that Jowdy or Garcia [Jowdy's Mexico attorney] have staff that carry firearms [illegal in Mexico].*"

In addition, it should be noted that Gaudet was the signature witness on the Jowdy-Hawai'i loan agreement.  Gaudet gave testimony in three (3) different legal proceedings to confirm his signature and presence during the 2004 signing with Jowdy and Kenner.  Gaudet also filed multiple lawsuits in Mexico; independent of Kenner and Kenner investors, for millions Jowdy defrauded Gaudet thru unpaid loans (*again denied by Jowdy, as a pattern, like Berard and Kaiser in the 2012 AZ case after joining Jowdy in 2012*) and termination of an employment agreement and subsequent refusal to pay.

A Gaudet witness in one of his criminal Mexico cases versus Jowdy was threatened with criminal prosecution and deportation from Mexico (*just like Galioto did to Lehtinen to scare him from his 2013 Intervener case versus Berard and Kaiser in AZ [2012-cv-055576 – Maricopa County AZ]*).   In Jowdy's January 2010 deposition, he claimed that if he and his attorney made the deportation statements to the Gaudet witness (*if she didn't withdraw her testimonial for Gaudet*), he was not sure if that constituted a threat (*while protected and acting above the law, again*).

*Jowdy loan decisions and approvals*) could not be ignored as overwhelmingly transparent; <u>*not concealed*</u>.

**One-page documents:**

Throughout the 2015 trial, there was an unsubstantiated (*by empirical evidence*) theory represented by multiple government witnesses about *only signing one-page documents* related to their business dealings with Kenner.    It was purely contrived as subterfuge; for specific effect.   This fails on face value for numerous reasons, *infra*.  First and ironically, virtually every document in question, related to the Northern Trust LOC, **are** **one page documents** (*infra*).  In addition, when Northern Trust sent out their 2009 default letters to each of the LOC clients, the letters specifically named a series of **multi-page** documents that the individual clients signed directly with Northern Trust Bank to renew their LOCs in 2006 &/or 2007.   No testimony from Northern Trust witness, Aaron Mascarella, claimed that he received a call, text, email (*or other communication*) from his various LOC clients asking about "*what documents did I previously sign?*".    Each client would have signed two (2) or three (3) sets of *annual* renewals by the time they signed the documents listed in the 2009 default letters.   If any of them had called Northern Trust bank as a result of the 2009 default letters, which Kenner clearly notified the LOC clients of ahead of time, in spite of the fabricated Kristen Peca testimony (*Tr.711*)[57], the bank and the clients would clearly have reviewed the five (5) plus

---

[57] Mike Peca received the following text from Kenner before receiving the first (1st) default letter:

| | | | | | |
|---|---|---|---|---|---|
| 6350 | +17163743234 **Michael Peca\*** | 2/10/2009 8:13:58 PM(UTC+0) | Sent | **Northern Trust sent you a letter. Call me when you get it** | |
| 6352 | +17163743234 **Michael Peca\*** | 2/10/2009 10:31:42 PM(UTC+0) | Sent | **Call u shortly** | |

Then, prior to the March 2009 default letter being received by the LOC clients at their address of record, Kenner sent the following texts (*notwithstanding additional calls made and emails sent to the various investors, as well*):

years of documents with each client for authenticity and raised the issues with internal Northern Trust Bank compliance, law enforcement, &/or Kenner, at a minimum.   *None occurred.*

Each default letter, sent to each client's respective home addresses of record with Northern Trust Bank, specifically named:

1.  The **amount of the outstanding LOC** (*signed by the LOC client*)[58],

| | | | | | |
|---|---|---|---|---|---|
| 7133 | +17163167227 **Kristen Peca\*** | 3/20/2009 8:54:46 PM(UTC+0) | Sent | **Text me when you get the Northern Trust letter today.** | |
| 7134 | +19492330046 **Steve Rucchin\*** | 3/20/2009 9:04:02 PM(UTC+0) | Sent | **Text me when you get the letter from northern trust.** | |
| 7135 | +14015246929 **Bryan Berard\*** | 3/20/2009 9:04:37 PM(UTC+0) | Sent | **Text me when you get the letter from northern trust.** | |
| 7136 | +19725230505 **Darryl Sydor\*** | 3/20/2009 9:05:18 PM(UTC+0) | Sent | **Text me when you get the northern trust letter.** | |

[58] Notwithstanding the notification texts that Kenner sent to Berard and others, *supra*, and the subsequent text conversation, infra, between Berard and Kenner, Berard was 100% aware of the pending collateral issues, **but chose to lie to the FBI and EDNY Court**.

Although Berard told the FBI in September 2013 that he received a letter in the mail about his LOC collateral being taken – he clearly was in communication with Kenner about the LOC before the seizure, had no concerns, because he was **fully aware** of the use of LOC funds and Hawai'i/Jowdy issues:

After reviewing the letter Kenner notified him about, *supra*, Berard sent Kenner the following text – **five (5) full days before the seizure**:

| | | | | | |
|---|---|---|---|---|---|
| 6207 | +14015246929 Bryan Berard\* | 3/26/2009 6:53:59 PM(UTC+0) | Read | **When u get chance can we look at _how much money will b freed up after payn off line of credit NT???_ Thanks** | |

- This text is also five (5) days before Berard approved the seizure on the phone with Mascarella and Brill from Northern Trust (*just like the other seven [7] LOC clients*).  Similarly:
  - Sydor sent Kenner a text on April 1, 2009 to notify Kenner: "*Hey someone from Northern Trust called with someone from schwabb.  And want to do a conference call in a hour with erin [Mascarella] someone*".   *See R33 514.*
  - Mike Peca sent a text to Kenner on April 1, 2009 to confirm he independently already spoke to Northern Trust: "*Call already done*".  *See R33 514.*

**None of the LOC clients could have been concealed from their own transactions, notwithstanding complicity with Galioto's theories to surreptitiously convict Kenner, or *faulty memory, confusion and mistakes (thus wholly unreliable, but in "Rockets-like" unison).***

Kenner replied [**in RED**]:



Berard replied:



Kenner replied:



- Berard's statement would have contradicted the timing of his own reformative claims to the FBI in 2013 (*after getting his job from Jowdy*), that "*at this time of collateral seizure when he returned from Russia*", he found Kenner "*not to be legit*", yet his next investment with the residual funds was "*Good for all of us n future*".   It clearly does not jive, since Berard (*in Rule 16 evidence*) requested Kenner review the follow-up investment for him.

- The FBI proffer by Berard was clearly a fabricated statement to aggravate the pending Galioto arrest, bolster his foundationless theories, and save Jowdy, Berard, Kaiser, Behnke (*and others*) from the pending December 2013 arrest warrants and legally ordered removal from DCSL by the Baja California Sur Mexico Supreme Court after Kenner's scheduled, in-person

2. The **phone number to call to receive an accounting** of the LOC,
3. The **Master Note** (*and the most recently* <u>*signed*</u> *date*),
4. The **Change in Terms Agreement** (*and the most recently* <u>*signed*</u> *date*),
5. The **Pledge Agreement** (*and the most recently* <u>*signed*</u> *date*), and
6. The **Securities Account Control Agreement** (*and the most recently* <u>*signed*</u> *date*).

Nevertheless, no one called Northern Trust Bank &/or Mascarella.   Instead, as discussed "*as a group*" to let the collateral be seized and re-direct the $40,000 per month (*approximate*) that Kenner and Kenner investors had been paying (*totaling about $500,000 per year*) since Jowdy failed to repay the $5 million in loans plus interest since March 2006 (*three [3] years earlier*).   These non-payments were in addition to the funds the 2006 Hawai'i JV (*under Kaiser's on-going malfeasance*) failed to pay in pre-negotiated, post-closing milestones of $4 million.   As a result, the investors agreed that this was the ONLY form of recovery, by early 2009 (*six [6] to eight [8] months after Jowdy and Harvey terminated all mediations in June 2008 with Kenner and Kenner investors [thru Constantine] related to the then-known Jowdy*

---

testimony mid-December that **had to be stopped at all costs – <u>and fortuitously was</u>**.

Berard was specifically aware of his **$649,405.93** LOC from the real default letter (*See Berard March 2009 default letter in "Northern Trust default letter FOLDER"*) and not the $1 million he claimed he learned about (*fraudulently claimed unknowing and after the fact*) **via a phone call from Northern Trust, which never took place** (*Tr.3039-3040, 3041, 3042*), and perpetuated by the government's leading questions.

Berard's 2015 false testimony also contradicted what he told the FBI on September 12, 2013 (*two [2] months prior to the Kenner arrest, clearly an aggravating factor*) as noted by Galioto:  "*At some point Berard received a FedEx letter from Northern Trust explaining that his bond account was liquidated to pay off his LOC.*"   Second to the phone call that **never occurred**, the alleged letter about the liquidation **DOES NOT EXIST**; <u>two (2) validated lies</u>.

Perhaps the ulterior motive of having the two (2) fraudulent conveyance of title cases by Kenner versus Kaiser and Berard dismissed and the various Mexico criminal efforts versus his boss, Ken Jowdy, dismissed in Mexico by helping FBI case agent Galioto indict Kenner occurred; perhaps, if *faulty memory, confusion and mistakes* was the excuse for the clear misrepresentations (*a.k.a. Perjury*) to the 2015 Court and 2013 FBI proffer, *both known and unchecked criminal acts by Berard*.

*crimes with Harvey's complicity*).    This forced Kenner and Kenner investors to file more litigation, in more venues, versus Jowdy.[59]

---

[59] It should be **noted** that the Spring 2009 GSF, conceived by Constantine, was not the first (1st) efforts to sue Jowdy for the unpaid loans and other frauds, as the government portrayed in their opening remarks.  **It was the last**.   Considerable existing litigation (*pre-GSF*) versus Jowdy included:

1. The 2008 (*re-filed in 2009 after Jowdy payoffs and confirmed in the Gaudet July 2, 2009 deposition, supra*), full Hawai'i and Mexico investor groups lawsuit versus Jowdy [**Kenner v. Jowdy $11 million suit**], from which Jowdy *forged* Kenner's Mexico complaint to make unsubstantiated claims in the AZ case [*See TIMELINE 004*].   This litigation effort included, amongst other like Tyson Nash, Turner Stevenson's travel to Mexico in February 2009 to give a testimonial, as part of the existing 2008 criminal litigation versus Jowdy (*supra*),

2. The 2008 Arizona litigation, **Little Isle 4 v. Jowdy** for the $5 million in unpaid loans (*See R33 A*),

3. The 2008 **Glen Murray v. Jowdy** Nevada litigation for another unpaid Jowdy loan (*of $791,000 – which Jowdy lost in a 4-day bench trial in December 2010 to Kenner and Murray – See R33 015*),

4. The 2008 **Stumpel v. Jowdy** $1.6 million loan lawsuit in Mexico (*in which Kaiser defrauded the Mexico court by claiming his name was <u>forged</u> on a testimonial document, which Berard confirmed to Gaudet on a FBI recording, catching Jowdy, Berard and Kaiser in more false forgery claims*),

5. The 2008 **Norstrom v. Jowdy** litigation for the stolen Cabo san Lucas Airport investment with Kenner and Stumpel as additional victims to Jowdy, and

6. The 2010 **Kenner and Hawkins** breech of contract lawsuits **versus Jowdy and Diamante** in Mexico,

7. The two (2), 2008 **Robert Gaudet v. Jowdy** lawsuits for unpaid loans and breeched employment agreements, and

8. The two (2), 2008 **Phil Kenner v. Jowdy** lawsuits for unpaid loans and breeched employment agreements.

Clearly, the GSF was not conceived, as the government vehemently claimed, to begin suing Jowdy for his then-known criminality in the USA and Mexico.  Jowdy had been under legal duress for a year for his admitted wrongdoings (*See Ex. 48 [July 2007 when Kenner first exposed Jowdy] and Jowdy's January 2010 deposition confessions*).  The GSF, conceived by Constantine to "**fix**" the open issues with Jowdy and the "*3 Black Sheep*", was constantly mis-portrayed by the government.   *See PK143 [McKee GSF report – perjured testimony @ 5-6; contradictory empirical text evidence ignored @6-9]*.  This text communication with Kenner rendered the entire solicited McKee testimony in 2015 as FALSE, *yet systematically ignored by the prosecutorial team to frame their theories of concealment.*  Was McKee empowered by more than *faulty memory, confusion and mistakes*, or **CTE**?  By whom?

In spite of the government's knowledge of Kenner's transparency with McKee, Mike Peca and the remainder of the GSF contributors, they knowingly allowed McKee to feign ignorance of all underlying GSF purposes, despite his multi-day text communication with Kenner (*PK143 @6-9*), commencing immediately after the GSF meeting in Buffalo NY.   The government explained to the Court that the GSF was McKee's only relevant testimony as an

alleged victim (*Tr.1846*), thus McKee and the government cannot claim *faulty memory, confusion and mistakes* as the basis for refuting his own text communication, securing the full transparent knowledge before transferring his GSF contribution, yet now he is a victim? The prosecutorial team would have to ignore the additional email communication of transparency (*See PK67*) prior to McKee's signoff of full transparency (*See PK136*) from Constantine.

Kristen Peca bolstered the false theories with her perjured claim (*Tr.717-718*): "*And I quickly interjected and said we're not interested in any more investments or we're done with them.*"  On face value, you could believe a stand-alone statement had it not been followed by Kristen Peca's email to Kenner a few days later stating: "*Hey, before we sign off on an "approved" letter, can we please have the written documentation as to exactly how much (%) we obtained with our contribution?*"   Kristen Peca request was corroborated by several Mike Peca texts to Kenner about their %s in the "other" projects during the same days.

Not only does her own email conflict with her fabricated agitation and premeditated comment to the Court, but it was immediately followed by the Constantine full disclosure letter (*like all of the investors received [in Rule 16 evidence]*) further explaining the multi-pillars of the GSF strategy he devised for Kenner and Kenner investors after explaining them in-person.    *See PK145*.    Within days of the receipt of the explanation email from Constantine, Mike Peca and Kristen Peca independently returned the "*acknowledgement and acceptance*" email (*which also described the planned usages of the GSF contributions*). *See FOLDER "GSF-Acknowledged and Approved" [with Kristen Peca and Mike Peca sign-fraudulent letters].*

- Perhaps, the Court should note that although Kristen Peca professed that "*we're done*" with the investments, Mike Peca was a leader in the 2010 GSF loan buyout efforts, claiming there would be a "*lynching*" if **he** could not contribute more "*investment*" funds.   None of these statements reconcile Kristen Peca's falsities to the Court.

July 2010 texts to Kenner from Peca (*confirming Mike Peca's EDNY PERJURY re – his Eufora buyout knowledge*):

| | | | | |
|---|---|---|---|---|
| 147 27 | +171637 43234 Michael Peca* | 7/14/201 0 12:20:53 AM(UTC +0) | Rea d | **If not all willing members get a chance to be part of the loan buyout**, mean more % there may be a **lynching**. FYI |

Kenner responded *in the affirmative* to Mike Peca – as follows –

| | | | | |
|---|---|---|---|---|
| 169 13 | +171637 43234 Michael Peca* | 7/14/201 0 12:21:28 AM(UTC +0) | Sen t | **I don't disagree** |
| 169 14 | +171637 43234 Michael Peca* | 7/14/201 0 12:21:46 AM(UTC +0) | Sen t | **Why wouldn't they?** |

How could there _NOT_ have been any question for the Northern Trust bankers, if the default letter was truly as "*shocking*" (*Tr.710-713*) as the fabricated story by Kristen Peca?[60]

The Northern Trust default letter also invites each one of the LOC clients to receive a full accounting of their LOC, yet _unexplainably_, not a single call was made (*if the LOC, &/or any portion of its existence or usage were concealed, thus highly improbable*):

> *"You may request an accounting by calling us at 602-468-2537."*

So, when the government showboated on the unfounded claims that none of the LOC clients knew when their funds were used (*in spite of the annually signed – _one-page documents_, infra, _Disbursement Request & Authorizations_, fully acknowledging the amount of the respective LOC's _used_ and _unused_ portions, transparently*), they

---

And Mike Peca responded --

| 14728 | +17163743234 Michael Peca* | 7/14/2010 12:22:58 AM(UTC +0) | Read | **Has $ been collected already**? If not who's $ is sitting in escrow? |
|---|---|---|---|---|

**_CLEARLY Peca LIED to the EDNY about his knowledge of the loan buyout..._**

Continuing the pre-fabricated ruse on the EDNY jury and Court, and in spite of Berard's complimenting claims of "*no Eufora loan buyout knowledge*" during trial (*Tr.3106, 3110, 3111*), Berard was **managing** the buy out process with Eufora attorney Stolper and speaking with all of the Eufora investors on his own.   The following notification from Berard to Kenner ensued.

From Berard to Kenner re – McKee (*confirming Berard and McKee's EDNY PERJURY*):

| 148000 | +14015246929 Bryan Berard* | 7/15/2010 1:31:11 PM(UTC+0) | Read | **Call me now or at 1015am est. Michael [Peca] wants to talk to me u and jonny [Kaiser]... Mckee says before he signs he wants to help pay off loan too** |
|---|---|---|---|---|

**_CLEARLY Berard LIED to the EDNY about his knowledge of the loan buyout..._**

[60] Refuted by Kristen Peca's own statements in her 4-hour, surreptitious FBI recording of Kenner in 2012, *supra at Footnote 51*.

unjustifiably and grossly misled the jury, again.   The subsequent "*screen print*" (*Tr.884*) that Mascarella included for Kenner with all of the previous LOC and bank statements in fall 2009, to handle tax filings for the LOC clients (*as a direct result of the LOC clients sending a signed and notarized request directly to Northern Trust on their own*), was not the "*a-ha moment*", of anything, that the government insinuated thru their rebuttal summation, as verifiable concealment.  *See PK141 [Peca], PK142 [Berard].*   These documents were cumulative to everything else the LOC clients had in heir possession for years, and essentially useless.   Nobody had ever seen these "*screen prints*" until 6-months ***after*** the seizure of collateral (*October 19, 2009*), since they had <u>NEVER</u> been produced prior (*in 6+ years*) to anyone; *specifically not Kenner.*

### Direct 2007 renewal packages:

In December 2007, direct communication between Kenner and the LOC clients, not one LOC client who used Kenner's FedEx account to mail their LOC renewal documents "*directly*" to Northern Trust could have been a victim of *concealment*; including Owen Nolan, Glen Murray, Mattias Norstrom, Mike Peca, and Steve Rucchin [*See BNK-AMEX-1630 thru 1640 – all following similar conversations like with Kenner-Nolan – See PK47*]. The others LOC clients [*Berard, Gonchar and Sydor*] returned their signed renewal documents with their own postal carriers to Northern Trust, *independently*; specifically including Berard after review from his family attorney, per his 2009 arbitration testimony (*See R33 311 @3*).

Considering the independently signed, 2007 full renewal packages by each and every LOC client, **and** no documented complaints to Northern Trust, **and** the 2005 and 2006 and 2007 documents mentioned specifically in the Northern Trust default letters in March 2009, there are almost no other multi-page Northern Trust documents left which could have been referenced in the "*one-page*" tortious claims of impropriety.   Certainly, **the government identified none**, specifically after the Court in 2014 (*pre-trial*) gave specific instructions during a status conference to "*review all potential documents with their planned witnesses for forgeries*".   **The**

**government produced none**, but tried to employ a dirty, back-door approach to eliciting the "*one-page*" claims without evidence at trial, knowingly circumventing the Court's prior demand.

Upon information and belief, the defendant supposes the "**one-page**" theory (*or similar*) emanated from the Galioto Grand Jury testimonies, since it had never been previously proffered.   Not a single document has been produced separate and apart from the Northern Trust documents that would have held any value in the instant case applies to this unfounded theory.  It was thoroughly designed for a single, scandalous purpose; *mislead the jury related to concealment claims, a red herring (like the tequila bottle, repeatedly mentioned as a fraud without a scintilla of evidence to support it[61]*).

---

[61] Please note that even the Kaiser claims about receiving the tequila bottles from Kenner in NY is more provable perjury, since the dates of the shipping on Kaiser's email coincide with the specific texts to Robert Gaudet, who shipped the bottles (*without labels – also conflicting with the bottle the government provided after stealing it from Kenner's Mexico home*) to the Russian address in the Kaiser email (*See R33 804*):

- *Tequila -- Rojo bottles (no labels) shipped to Russia (per Kaiser's email) – NOT NYC (per the fabricated story-line and red herring.*

***Gaudet messages in BLACK; Kenner responses in RED***

| | | | | |
|---|---|---|---|---|
| 4170 | +526241515995 Bobby Gaudet | 10/22/2008 1:11:31 AM(UTC+0) | Sent | Santander statements?? Taking off for Europe now!! **Did you arrange for the tequila shipments per johnny's email??** |
| 3436 | +526241515995 Bobby Gaudet | 10/22/2008 3:28:44 AM(UTC+0) | Read | **Do we know what bottles/labels. Blanco ,rep, anj.** |
| 4173 | +526241515995 Bobby Gaudet | 10/22/2008 9:45:02 AM(UTC+0) | Sent | **No labels. Just DA [Don Abraham] bottles with 3 of each...blanco, repo, & anèjo. Pk** |
| 3438 | +526241515995 Bobby Gaudet | 10/22/2008 9:49:21 AM(UTC+0) | Read | **Bueno** |

The Hawai'i JV agreement (*of 8-pages with independent signoff*) was confirmed by multiple Hawai'i investors, none abstaining from affirming their receipt of the complete, 8-page document.   In fact, Berard (*Tr.3132*)[62], *under duress to carry-out the fabricated ruse*, and Kaiser (*Tr.1132-1133*)[63] affirmed they received the JV disclosure, signed it, **but decided not to read it**.   This willful negligence, echoed, *supra*, by Owen Nolan's 2009 arbitration testimony, cannot lead to any form of concealment by Kenner.

The government theory that Kenner concealed information from alleged victims who repeatedly claimed thru trial that they "*did not read*" documents routinely requiring their sign-off, but "*trusted Phil*" as their advisor, is a virtually impregnable contradiction in itself.

- How could a person have been a victim of concealment, when like Kaiser allegedly in 2006 "*discovered a $1 million diversion*" but testified, "*I didn't read through this document*"?  *Tr.1132-1133*.   The contemporaneous document was prepared by the Hawai'i attorneys (*Markowitz and Najam*) to cover the resulting funds from Kaiser's 2005 friends & family contribution? *See Kenner trial exhibit 28*.   Perhaps, its pure "insanity" was what Komatireddy referred to in her rebuttal summation and not the "*group decision*" to sue Jowdy and recover the unpaid loans.

Under the government's theory, the defendant could have produced "*any*" document with voluminous disclosures…and the Kenner investors would have blindly signed it.   Under identically repeated witness testimony, what would be necessary to conceal?   They all confirmed they "*trusted Kenner*" and "*did not read*" what they

---

[62] Berard affirmed (*Tr.3231-3232*): "*That's my signature, Yes. That's my signature*", but as the trial transcript reveals, Berard immediately denied his signature on cross-examination until Komatireddy motioned from the prosecutorial table for him to confirm it.

[63] Kaiser affirmed: "***I didn't read through this document***" immediately after authenticating his receipt of it.   Please note that this "***did not read***" event would have occurred contemporaneously with the FAKE "*confrontation*" meeting (*Tr.983-984*) he claimed with Manfredi, Kenner and himself (*which Manfredi's 2010 FBI proffer* <u>proved</u> *could not have occurred; known to Galioto at all times*).

signed.   Concealment by Kenner, as a result of the witness claims, would have been nothing short of pure idiocy, similar to Kenner disclosing the Constantine Home Depot falsehoods in his tirade to intimidate Kenner (*Harvey style*), if any of the contentions by Constantine held merit or were not cumulative to his previously disclosed fabrications to Eufora attorney Stolper (*a month earlier*).  *See Ex. 1*.

Mike Peca attempted the same provocative, "*signature only page*" testimony (*Tr.516.518*) vis-à-vis the July 21, 2006 JV disclosure letter, but upon further pressing, after confirming his signature, he affirmed that he wasn't sure if he saw the whole document or not, replying: "*I don't recall*".   Peca could not maintain his government prescribed story-line under the pressure of cross-examination questions, further exposing the suborned plot.

> It should also be noted that every one of the documents produced in the GSF acknowledgements and approvals were **one-page** docs, including the supplemental, **one-page** email summary by Constantine in mid-May 2009. The "***acknowledgement and approval***" emails returned by every one of the GSF contributors were also **one-page** in length.  *See "FOLDER GSF-Acknowledged and Approved"*

> During 2015 testimony, Darryl Sydor attempted to deny his GSF knowledge with underwhelming testimony, asserting that he only read the first line of the disclosure because of the size of his Blackberry phone.  (*Tr.2177-2178*). Yet, Sydor responded:
>> *"Yes I totally understand <u>everything</u>.   Thx Darryl"*

> How is that possible if "*everything*" is from the "*first little bit*"?  His statements contradict themselves, yet solicited and overlooked for effect. Although Sydor may have presented confusing testimony synonymous with the government's "*one-page theory*" of not seeing everything, willful blindness is not *concealment*.   Sydor tried to claim that his "*willful blindness*" was substantiated because:
>> *"…I never really wanted to purchase an airplane or invest in an airplane".*

On the surface, his statement could be taken at face value, notwithstanding the simple fact that Sydor had been an investor in the Diamante Air Falcon 10

since the inception in 2004 and evidenced on Jowdy's Balance Sheet. Perhaps, it should have been more obvious that another "*faulty memory, confusion and mistakes*" testimony was overlooked by a knowing prosecutorial team, specifically FBI agent Galioto.   (*See TIMELINE 015 @2*)[64]


### The Northern Trust one-page documents

The most critical documents ***signed*** by all of the Northern Trust LOC clients (*not Kenner*) established, authorized, and confirmed:

1. The **dollar amount** of their investment in Little Isle 4 (*Extension of Credit documents*),
2. The **annual "*used*" portion** (*and unused*) of their LOC (*Disbursement Request & Authorizations*), and
3. The **use of their LOC** for the Little Isle 4 investment (*Letters of Authorization*).


Nothing was left to support any *concealment* of the funds or the establishment of the LOCs, at all times, yet the defendant believes that the *one-page concealment* concept

---

[64] This is the same Diamante Air balance sheet – produced by Jowdy's accounting people – **dated May 2009** – that confirmed a **$410,000 loan from Ula Makika to Jowdy**.  This is contemporaneous to when Jowdy's fabricated "**no loans**" defense was in high gear in the Arizona, *Little Isle 4 v. Jowdy* loan case.   Jowdy stayed the discovery proceedings in Arizona by claiming the 2004 Hawai'i loan agreement was a *forgery*, and received an expedited discovery order from the Court in 2009.   Jowdy dragged the stay on Kenner and Little Isle 4's discovery until his "*timely*" dismissal in December 2009.   Notwithstanding the fact that Jowdy told the California court in January 2010 that all of the funds were "*now*" loans (*3-weeks after the AZ dismissal*) and reiterated it to the FBI (*Galioto specifically*) in February and March 2010.

Then, to further insult the integrity of any Court Jowdy's cabal interacted with (*while acting "**above the law**"*) Jowdy, Harvey and his Nevada legal team authenticated the loan agreement in his defense case-in-chief (*December 2010*).   This "*spit in the face of the Arizona Federal Court*" from their self-proven, 2009 **FAKE** forgery claim, and "*insulted*" the FBI signature expert in the AZ case (*all paid for by more embezzled funds*), while attempting to procure a false "*forgery*" declaration.

The Diamante Air Balance Sheet – ***in Jowdy's possession at all times thus verifying other premeditated lies to the AZ federal Court*** -- would have destroyed Jowdy's AZ case defense, thus they had to work overtime to threaten the Little Isle 4 and Kenner attorneys (*TIMELINE 002*) with jail time for supporting the "***loans***" case versus Jowdy, and push the Court for a dismissal while the Little Isle 4 defense attorneys were in flux.

was established during the Grand Jury testimony in 2013 and reiterated in 2015, since no pre-trial evidence was proffered that would have supported these deceptive claims.   The government sustained this evidence-less theory in rebuttal summation and thru their Rule 33 reply.

The Northern Trust documents received as a result of the delayed Northern Trust subpoena (*for 10-weeks, and thru week seven [7] of the trial*), plus several documents secured in the 2013 Kenner search and seizure, are only a subset of the total documents signed by all of the LOC clients at Northern Trust.  Yet, they leave no *wiggle-room* for the government theory or witness testimony that there was *concealment* of the LOC.  In addition, it was grossly improper for the government, knowing each and every client, signed each and every LOC document, to have made statements thru leading questions and summation that Kenner, not the actual signatories on the documents, established the LOCs (*Tr.139 [Juneau]*) (*Tr.2065-2066 [Nolan]*) (*Tr.4845-4846 [Gonchar]*), unknown to the LOC clients.

Komatireddy went so far to con the jury in rebuttal summation that Berard did not know or authorize his funds to be used at all, including in Hawai'i. (*Tr.5702*).  It was wholly unreasonable proffer, misleading and taunting the jury, with zero underlying testimony or evidence from the trial.  Yet, the rebuttal summation proffer contradicted the earliest known evidence in the government's possession from 2009 when Berard confirmed 100% knowledge of the LOC usage and loans to Jowdy from the capital account funds – with his permission.  *See R33 311.*

110

*Extension of Credit (<u>one-page documents</u>):[65]*

| Northern Trust Extension of Credit checklist | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **Berard** | **Peca** | **Nolan** | **Rucchin** | **Sydor** | **Norstrom** | **Gonchar** | **Murray** |
| 2003 | x | | | | | | | |
| 2004 | | | x | x | | | | |
| 2005 | x | x | | x | | | | |
| | *All YELLOW are missing Northern Trust documents (*from 2015 subpoena or Kenner search and seizure*) | | | | | | | |

In the possession of the Court are **Extension of Credit** documents signed by Nolan, Rucchin (*two [2] times*), Berard (*two [2] times*), and Mike Peca.   Multiple Extension of Credit documents are missing.

Despite the late arrival of the critical documents, defendant's attorney ignored the specific use of the documents for clear impeachment of the government witnesses, either thru recalling the witnesses for impeachment purpose or introducing the specific documents thru defendant Kenner.    The gross lack of use of the documents fully prejudiced Kenner and allowed the false and misleading government theories to go unchecked with fully refuting empirical evidence, available, albeit materially late and ineffectively applied (*under any reasonable standard [emphasis added]*).

> *NT 2003 Extension of Credit -* ***Berard*** *(signed 11-3-2003)*
> *"**350,000 Household purposes**" [converted in 2005, infra]*
>
> *NT 2004 Extension of Credit –* ***Nolan*** *(signed 10-29-2004)*
> *"**2,200,000 Investment in Little Isle 4 LLC**"*
>
> *NT 2004 Extension of Credit -* ***Rucchin*** *(signed 11-24-2004)*
> *"**480,000 Investment in Little Isle 4 LLC**"*
>
> *NT 2005 Extension of Credit -* ***Rucchin*** *(re-signed 1-3-2005)*
> *"**1,000,000 Investment in Little Isle 4 LLC**"*

---

[65] See FOLDER "*NT Extension of Credit documents*"

*NT 2005 Extension of Credit - **Peca** (signed 6-30-2005)*
**"1,775,000 Increase to existing loan used for speculative real estate investments"** *(plural)*[66]

*NT 2005 Extension of Credit - **Berard** (signed 3-7-2005)*
**"900,000 Investment in speculative real estate"**

Each investor clearly signed their respective Extension of Credit documents (*not Kenner*) and had full, unfettered access to Northern Trust Bankers before, during and after their initial LOC setup.   No complaints were filed or solicited by the prosecutorial team pre-trial or thru trial, *completely refuting any concealment theory*.

---

[66] Please note that that there is an **Extension of Credit** document for Mike Peca missing that would have represented his initial $1,600,000 Extension of Credit in 2005, thus signed two (2) times by Mike Peca within the first (1st) three (3) months.

Based on Kristen Peca's 2012 FBI recordings with Kenner, her own 2012 admissions confirmed she did not know anything about her husband's LOC in 2005.  Mike Peca signed LOC documents over twelve [12] times during the first [1st] year it was open.   Despite these irrefutable facts, Kristen Peca provided knowingly false testimony in 2015, contradicting her own, secret recordings of Kenner.  (*Tr.696-700*)

*Disbursement Request & Authorization (<u>one-page documents</u>):*[67]

| Northern Trust Disbursement Request & Authorization checklist | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Berard | Peca | Nolan | Rucchin | Sydor | Norstrom | Gonchar | Murray |
| 2003 | x | | | | | | | |
| 2004 | | | x | x(2) | | | | |
| 2005 | x | x | x | x | x | x | | x |
| 2006 | x | | x | x | | | | |
| 2007 | x | | x | | | | | |
| 2008 | x | | | | | | | |
| *All YELLOW are missing Northern Trust documents (*from 2015 subpoena or Kenner search and seizure*)* | | | | | | | | |

In the possession of the Court are **Disbursement Request & Authorization documents** signed by Nolan, Rucchin, Berard, Mike Peca, Murray, Sydor and Norstrom.   Multiple Disbursement Request & Authorization documents are missing; specifically documents from Sydor, but recovered from the Kenner, home office search and seizure (*yet, somehow, not part of the Northern Trust subpoena production*).   It confirms that the Northern Trust subpoena materials are "*somehow*" not complete.

Despite the late arrival of the critical documents, defendant's attorney ignored the specific use of the documents for clear impeachment of the government witnesses, either thru recalling the witnesses for impeachment purpose or introducing the specific documents thru defendant Kenner.   The gross lack of use of the documents fully prejudiced Kenner and allowed the false and misleading government theories to go unchecked with fully refuting empirical evidence, at trail.

As example, the government solicited Peca's claim that he was not aware of the use of funds (*Tr.429-430*)[68], but Peca <u>*signed*</u> the following ten (10) LOC documents (*at a*

---

[67] See FOLDER "*NT Disbursement Request and Authorizations*"

[68] Mike Peca falsely claimed:

*minimum*) in the first 12-months after opening his LOC (*but never questioned the usage?*):

> 2005 (July) Master Note 1.775mm – *Peca signed*
> 2005 (March) Master Note 1.6mm -- *Peca signed*
> 2005 (March) Pledge Agreement 1.6mm -- *Peca signed*
> **2005 Disbursement Request & Authorization – Peca signed \*\***
> 2005 Extension of Credit - *Peca signed*
> 2005 Letter of Authorization for LI4 - *Peca signed*
> 2005 Promissory Note 1.3mm -- *Peca signed*
> 2006 (March) Peg Balance 2.2mm -- Peca (*signed by Mascarella and Brill*)
> 2006 (November) Peg Balance 2.2mm -- Peca (*signed by Mascarella and Brill*)
> 2006 Change in Terms Agreement - *Peca signed*
> 2006 Master Note 1.775mm – *Peca signed*
> 2006 Pledge Agreement 1.775mm -- *Peca signed*
> 2006 Securities Account Control Agreement 1.775mm -- *Peca signed*

In the Mike Peca, March 2009 default letter, Northern Trust references four (4) **multi-page** documents Mike Peca *signed*:

> 2006 Master Note 1.775mm – Peca
> 2006 Pledge Agreement 1.775mm -- Peca
> 2006 Securities Account Control Agreement 1.775mm -- Peca

BUT -- missing from the 2015 Northern Trust subpoena (*referenced in their own default letter*):

> 2007 Change in Terms Agreement -- *dated November 5, 2007*

---

> *Q: During this period of time of October of '06 did you get any statement whether from the bank or Mr. Kenner or anybody, saying you have drawn down $1.6 million on your line of credit?*
>
> *A [Mike Peca]: No.*

**\*\* *Impeaches Peca's testimony @ Tr.429-30*.** *This Disbursement Request & Authorization was signed by Mike Peca only three (3) months after he opened the LOC (not Kenner), thus virtually no time passed before he was fully notified, signed the **ONE-PAGE, critical** authorization, thus conflicting with the government's theory and Peca's testimony, notwithstanding **CTE**.*

114

- This further confirms that Northern Trust only *partially* filled the 2015 subpoena (*after acknowledging additional documents in their own reference letters*) after "*holding*" the delivery to the Federal Court order for 10-weeks from service to delivery; *certainly an timely thru the end of the government's case and dismissal of their witnesses whose testimony the Northern Trust documents would have exhaustively impeached.*

The Mike Peca signatures, specifically including the **2005 Disbursement Request & Authorization,** confirmed the use of $1,600,000 and documented another $175,000 remaining as available (*See NT 2005 Disbursement Request & Auth – Peca*). The significance of this document is that it confirms that the prior 2005.  $1.6 million **Extension of Credit** signed by Mike Peca is also missing from the Northern Trust subpoena.  Peca signed this **Disbursement Request & Authorization** within three (3) months of his LOC opening.   Nothing could have been concealed after his observed signature on this substantially revealing, **one-page** document.

The following **one-page Disbursement Request & Authorizations** were also signed (*again, only a partially filled list by Northern Trust*) by the individual clients. These signatures all occurred during the existence of their LOCs, fully acknowledging the "*used*" and "*unused*" portions of their respective LOCs at every annual interval, required by Northern Trust.   Not a single solicited statement was produced at trial thru Northern Trust banker, Mascarella, or any LOC client (*government witness*) that suggested when they signed the **seventeen** (17) annual documents, *infra*, acknowledging the "*used*" funds, that they lodged a complaint to anyone.

***Bryan Berard:***

*NT 2003 Disbursement Request & Auth - **Berard** (signed 10-24-2003) for*
PURPOSE: "**350,000 personal cash flow**"
Undisbursed funds: $350,000
**Note principal: $350,000**

*NT 2005 Disbursement Request & Auth - **Berard** (signed 3-7-2005) for*
PURPOSE: "**900,000 investment in speculative real estate**"

Undisbursed funds: $900,000
**Note principal: $900,000**

*NT 2006 Disbursement Request & Auth - **Berard** (signed 3-7-2006) for*
PURPOSE: "**900,000 investment in speculative real estate**"
Undisbursed funds: $4,650
Amount paid to others on Borrower's behalf: $895,350
**Note principal: $900,000**

*NT 2007 Disbursement Request & Auth - **Berard** (signed 3-7-2007) for*
PURPOSE: "**900,000 investment in speculative real estate**"
Undisbursed funds: $282,088
Amount paid to others on Borrower's behalf: $617,911
**Note principal: $900,000[69]**

*NT 2008 Disbursement Request & Auth - **Berard** (signed 3-7-2008) for*
PURPOSE: "**Renew & decrease loan amount from $900M to $650M, originally used for investment in speculative real estate**"
Undisbursed funds: $32,088
Amount paid to others on Borrower's behalf: $617,911
**Note principal: $650,000** *(reduced after Mascarella communication)*

**Owen Nolan:**

*NT 2004 Disbursement Request & Auth – **Nolan** (signed 10-15-2004) for*
PURPOSE: "**Investment in Little Isle 4 LLC**"
Undisbursed funds: $2,200,000
**Note principal: $2,200,000**

*NT 2005 Disbursement Request & Auth - **Nolan** (signed 10-15-2005) for*

---

[69] Berard received a letter (*similar to all other LOC clients*) from Aaron Mascarella immediately following the August 2006 paydown of the LOCs.   Berard, Sydor and Nolan chose to reduce their LOC exposures by signing another new full set of LOC documents, while the remainder of the LOC clients chose to keep their entire LOC open for future access, under Na'alehu Ventures 2006 (*and represented in the tax records under Kaiser as the Managing Member of Na'alehu Ventures 2006*).   *See R33 659b2 and NT 2008 Disbursement Request & Auth - Berard*.   This letter (*to all of the LOC investors*) created further transparency from Kenner and direct access to the bank, ***refuting concealment, again***.   It specifically represented the clients "*used funds*" and the "*option*" to reduce their collateral. Clearly three (3) of the LOC did.

By this point in time (*August 2006*), there has been confirmed, direct communication between Mascarella and Nolan, Juneau, Berard, and Sydor (*with empirical evidence thru Rule 16 government production*).

PURPOSE: "**Renewal of line of credit originally used for Investment in Little Isle 4 LLC**"
>> Undisbursed funds: $11,352
>> Amount paid to others on Borrower's behalf: $2,188,637
>> **Note principal: $2,200,000**

*NT 2006 Disbursement Request & Auth - **Nolan** (signed 10-15-2006) for*
> PURPOSE: "**Renewal of line of credit originally used for Investment in Little Isle 4 LLC**"
>> Undisbursed funds: $823,693
>> Amount paid to others on Borrower's behalf: $1,376,307
>> **Note principal: $2,200,000**

*NT 2007 Disbursement Request & Auth - **Nolan** (signed 11-3-2007) for*
> PURPOSE: "**Renewal of line of credit originally used for Investment in Little Isle 4 LLC**"
>> Undisbursed funds: $10,203
>> Amount paid to others on Borrower's behalf: $2,189,796
>> **Note principal: $2,200,000**

**Steve Rucchin:**

*NT 2004 Disbursement Request & Auth – **Rucchin** (signed 11-3-2004) for*
> PURPOSE: "**Renewal of line of credit originally used for Investment in Little Isle 4 LLC**"
>> Undisbursed funds: $480,000
>> **Note principal: $480,000**

*NT 2004 Disbursement Request & Auth - **Rucchin** (signed 12-20-2004) for*
> PURPOSE: "**Increase to RLOC originally for Investment in Little Isle 4 LLC**"
>> Undisbursed funds: $1,000,000
>> **Note principal: $1,000,000**

*NT 2005 Disbursement Request & Auth - **Rucchin** (signed 11-3-2005) for*
> PURPOSE: "**Renewal of revolving line of credit originally used for Investment in Little Isle 4 LLC**"
>> Amount paid to others on Borrower's behalf: $1,000,000
>> **Note principal: $1,000,000**

*NT 2006 Disbursement Request & Auth - **Rucchin** (signed 10-15-2006) for*
> PURPOSE: "**Renew to extend the maturity date**"
>> Undisbursed funds: $313,400
>> Amount paid to others on Borrower's behalf: $686,599
>> **Note principal: $1,000,000**

***Mike Peca:***

> *NT 2005 Disbursement Request & Auth – **Peca** (signed 7-1-2005) for*
> PURPOSE: "**Renew to extend the maturity date**"
> > Undisbursed funds: $175,000
> > Amount paid to others on Borrower's behalf: $1,600,000
> > **Note principal: $1,775,000**

***The Disbursement Request & Authorization for Peca for 2006, and 2007 are <u>ALSO</u> missing from the Northern Trust subpoena.***

***Darryl Sydor:***

Please note that the following **Disbursement Request & Authorization** (*nor any other that would have been mandatory in the Northern Trust LOC annual renewal packages for **Sydor***) were included in the 2015 subpoena.   It clearly existed, as it was recovered from the Kenner search and seizure (*not the 2015 subpoena*).

> *NT 2005 Disbursement Request & Auth – **Sydor** (signed 10-29-2005) for*
> PURPOSE: "**Renewal of line of credit originally use [sic] in Little Isle LLC**"
> > Undisbursed funds: $1,241
> > Amount paid to others on Borrower's behalf: $1,223,758
> > **Note principal: $1,225,000**

***The Disbursement Request & Authorization for Sydor for 2006, and 2007 are <u>ALSO</u> missing from the Northern Trust subpoena.***

The following two (2) **Disbursement Request & Authorizations** were not part of the 2015 Northern Trust subpoena.   They were recovered in the Kenner search and seizure.

***Mattias Norstrom:***

> *NT 2005 Disbursement Request & Auth -- **Norstrom** (signed 11-3-2006) for*
> PURPOSE: "**Renewal of line of credit originally used for investment in Little Isle IV LLC**"
> > Amount paid to others on Borrower's behalf: $1,200,000
> **Note principal: $1,200,000**

***The Disbursement Request & Authorizations for Norstrom for 2006, 2007 and 2008 are <u>ALSO</u> missing.***

*Glen Murray:*

*NT 2005 Disbursement Request & Auth -* **Murray** *(signed 10-29-2005) for*
PURPOSE: "**Renewal of line of credit originally used for investment in Little Isle LLC**"
Amount paid to others on Borrower's behalf: $1,230,000
**Note principal: $1,230,000**

*The Disbursement Request & Authorizations for Murray for 2006, 2007 and 2008 are ALSO missing.*

*Sergei Gonchar:*

*None*

*The Disbursement Request & Authorizations for Gonchar for 2005, 2006, 2007 and 2008 are ALL missing.*

***Letter of authorization (<u>one-page documents</u>):*[70]**

In the possession of the Court and prosecutorial team at all times has been the **one-page** Letters of Authorization signed (*not by Kenner*) for the exclusive use by "*Philip A. Kenner and Little Isle 4*".    A specific **Letter of Authorization** <u>*exists in evidence*</u> for every single LOC client of Northern Trust Bank.

As Mike Peca and Sydor affirmed to the 2011 SDNY Grand Jury, once they signed for the LOC, the expected 100% of their funds to be contributed to the Little Isle 4 capital account.   They never testified that they had any expectation that the subsequent withdrawals from the LOC needed future communication or authorization, prior to its release.   Their expectations were that they did give the full authorization to Kenner and Little Isle 4.   *The government proffers that subsequent authorizations were required were gross fabrications and unethical representations to, again, knowingly mislead an overwhelmed jury trying to disseminate fact from unproven proffer.*

The government was deftly aware yet concealed that once the capital account funds were in Little Isle 4, the Little Isle 4 By-Laws (*See TIMELINE 046*) governed the use of the funds, which specifically included <u>lending</u>.   The loans to Jowdy were 100% authorized and all of the overwhelming pre-trial verifications, *supra*, affirmed to the FBI, the SDNY Grand Jury and the AUSA that they were aware and approved of the Jowdy loans *at all times*.   It was not until 2015, during trial, that the first contrarian, unsubstantiated and inverted testimony was solicited.

Thru suborned perjury or *faulty memory, confusion and mistakes* (*a.k.a.* ***CTE***), the government received testimony in full contradiction to their Rule 16 investigation evidence.   It certainly was fortuitous to support the unsubstantiated theory with zero pre-trial, corroborating statements.   The prosecutorial team ignored 100% of their pre-trial empirical evidence to pursue the concealment of the loan accusations.

---

[70] See FOLDER "*NT Letters of Authorization docs*"

Defendant believes that the first (1st) instance of the concealment (*of the Jowdy loans*) was presented in the two (2) Grand Jury testimonies of Galioto.

The government failed to produce a single LOC investor who claimed they were not aware of their fully authorizing Letter of Authorization.   The following Letters of Authorization were irrefutable relating to full transparency and authorization, addressed to Northern Trust, for Kenner and Little Isle 4, collectively stating:

> *"This letter is your authorization to allow Philip A. Kenner to access my above referenced line of credit for direct deposit to the Little Isle 4 account at Northern Trust Bank.  He is authorized to sign for the release of funds related to the line."*

Each client respectively signed the letter that Northern Trust prepared for them and were included in the Northern Trust subpoena.  *See FOLDER "NT Letters of Authorization documents"*.

> *NT 2004 Letter of Auth for LI4 - Nolan*
> *NT 2004 Letter of Auth for LI4 - Rucchin*
> *NT 2004 Letter of Auth for LI4 - Sydor*
> *NT 2005 Letter of Auth for LI4 - Berard*
> *NT 2005 Letter of Auth for LI4 -Peca*

Each of the following clients respectively signed the letter that Northern Trust prepared for them, they signed, but were ***NOT*** included in the Northern Trust subpoena.

> *Gonchar -- 2004 Letter of Authorization*
> *Murray -- 2004 Letter of Authorization*
> *Norstrom -- 2004 Letter of Authorization*

121

***IMUS Special handling instructions (sign on instructions page):[71]***

In furtherance of the total *transparency*, LOC clients closed their respective investment (IMUS) accounts after the seizure of collateral.  As part and parcel to their respective investment account documents (IMUS) with Northern Trust, they independently signed instructions that limited the release of funds from their Northern Trust accounts to accounts outside of the bank.   In order to make the multiple and final transfer(s) after the April 1, 2009 seizures, each LOC client had to sign *multiple* requests with the bank to close out their remaining funds, between two (2) and three (3) times each over the following 2-3 months.   Kenner had no authority to manage those transactions.    The language in the multi-page document stated:

> *"Only those instructions directing the wiring of funds to any account outside of Northern Trust Bank must be signed by Client."*

Please note that each client signed the IMUS account agreement on the same page as the restrictive directions, thus Kenner could not have closed, transferred or *concealed* any of the residual funds from their accounts.   Each LOC client (*post-seizure*) had to handle the remaining transactions directly with Northern Trust Bank and their personal investment banker, *without Kenner*.

The following IMUS signatures are in evidence.

> ***Norstrom*** *Northern Trust IMUS Agreement – signed 3-11-2004*
>
> ***Nolan*** *Northern Trust IMUS Agreement – signed 5-22-2004*
>
> ***Rucchin*** *Northern Trust IMUS Agreement – signed 10-15-2004*
>
> ***Gonchar*** *Northern Trust IMUS Agreement – signed 1-21-2005*
>
> ***Peca*** *Northern Trust IMUS Agreement – signed 3-21-2005*
>
> ***Berard*** *Northern Trust IMUS Agreement – signed 3-23-2005*

---

[71] See FOLDER "*NT IMUS special handling instrx*"

122

Please note that the IMUS agreements for Murray and Sydor were never produced, but the expectation is that they are identical to the other concurrently opened accounts.

***Master Notes (multi-page documents – but referenced in the 2009 default letters for further transparency):***

As part and parcel to the <u>annual</u> renewal forms (*requiring each investors personal signoffs on multiple one-page and multi-page documents*), the following Master Notes are either in the government's possession or missing, further creating an annual "*mass*" of documents that could not be perceived as part of a concealment plan.

### Northern Trust Master Note checklist

| | Berard | Peca | Nolan | Rucchin | Sydor | Juneau | Norstrom | Gonchar | Murray |
|---|---|---|---|---|---|---|---|---|---|
| 2003 | x | | x | | | x | | | |
| 2004 | | | x | x | x | | x | | x |
| 2005 | x | x | x | x | x | | x | x | x |
| 2006 | x | x | x | x | x | | | | x |
| 2007 | x | x | | | | | | | |
| 2008 | x | | | | | | | x | |

*All YELLOW are missing Northern Trust documents (*from 2015 subpoena or Kenner search and seizure*)

In addition, the annual **Credit applications** and **Control Agreements** (*denoted in the 2009 default letters*) are also missing in the subpoena of the annual documents. This further bolsters the defendant's plea that nothing could have been concealed from the LOC clients without full, willful blindness on their behalf or a complicit strategy for suborned perjury to injure Kenner at trial.

Otherwise, the fully contradicting testimony for each and every Northern Trust client (*in direct opposition to the empirical evidence from Northern Trust*) could not form the basis for any trier of fact to surmise that the information had been concealed by *anyone.*

With the mass of Northern Trust documents, mostly **one-page documents with signatures**, and in spite of the government's fabricated claims that the *one-page* documents were an issue, it is impossible that after five (5) years of directly handled

renewals between the LOC clients and Northern Trust Bank (*without Kenner's interactions*) that a single LOC client was concealed from any part of the process, unless the underlying theory is that a Federally Chartered Bank was somehow complicit in the on-going *concealment* plot.   Although complicity was insinuated thru government trial proffer and leading questions, Northern Trust has not been named in any sort of co-conspirator role.   The government merely left that ugly nugget to float un-confronted, bit insinuated.

In fact, as noted *supra*, Aaron Mascarella (*the Northern Trust LOC banker*) confirmed his direct and independent communication with Nolan about his LOC via phone and direct mailing.   Nolan made 2009 arbitration claims and 2015 EDNY claims thru testimony that he had not been aware of his LOC.   The independent confirmation by his own banker – *less than two (2) months before his false arbitration testimony* – is more disturbing than the fact that his complicit attorney (*Meeks – working with Jowdy and Harvey*) not just allowed it, but also went out of his way to solicit the perjury.

The 2015 prosecutorial team was fully aware of Nolan's 2009 perjury, yet they continued the artifice and solicited the same misstatements from Nolan (*Tr. 2065-2066*) with complete disrespect and contempt for the Court and the proceedings.

Incrementally, Juneau turned over email communication between himself and Mascarella, independent of Kenner, to check on the status of his LOC.   The email communication immediately followed Juneau's most unusual demand to be released from his multiple private equity deals, *because he wanted to*.   Juneau's 2015 testimony that he only became aware of the LOC in 2006 was refuted (*and known at all times by the government – thru Rule 16 evidence*) by emails between Kenner and Juneau in early 2005 where the two (2) parties discussed the Juneau "*loan*" as his investment vehicle for the Hawai'i project.   Kenner responded to him:

> "*Hawai'i.  your loan is well.*"

125

Juneau raised no issues in his responsive email, thus not surprised in the least.   To the contrary, and in the affirmative, Juneau replied:

> "*For Hawai'i.  id love to go and see that!  Id also like to see how the #s work.*"

Nonetheless, the government led him down another misrepresentation of alleged *concealment* and loss of trust with Kenner.    Yet, Juneau confessed in 2005, long before Nolan bought him out of the Hawai'i deal in 2007 (*See R33 504a*):

> "*Phil, like I told you a few times already.  I'm not very comfortable with this situation.  **It's** [sic] **has nothing to do with you but everything to do with the way I am**…I just want to have it [my investment funds] invested in BONDS with Northern Trust **under your management**.*"

Juneau is clearly aware of his Northern Trust LOC "*loan*" and perfectly happy with Kenner, requesting that Kenner continue to manage his BONDS at Northern Trust Bank as his sole investment, and add to them, when he can "*get out*" of his private equity deals, because he is "*not comfortable with the situation*" due to his pending retirement.

No other document, relevant to the instant case has been raised as a **one-page**, signature only deception by Kenner; **NONE**.

126

**Conclusion**

Statistically, it is not possible to know something (*in 2011 or earlier*), testify to it "*under oath*", and then forget it years later without symptoms of amnesia or **CTE** (*a.k.a. faulty memory, confusion and mistakes, ulterior motives[72], or undue influence*), specifically if that amnesia occurs contemporaneously with more than half-a-dozen other people who had given the same "*under oath*", contrarian and transparent testimony years prior to the 2015 EDNY trial.   Were their empirically supported prior statements all before they began suffering from **CTE**, as the government's *faulty memory, confusion and mistakes* defense tactic declared?

Alternatively, many witnesses have a *faulty memory*, but when shown materials (*emails, texts, photos, etcetera*) to "*refresh their recollection*", they remember what they could not recall, based on empirical evidence, but <u>not the other way around</u> (*without degenerative or scheming issues at hand*).

---

[72] Perhaps, the pending lawsuit versus Peca in Nevada for Peca knowingly breeching the Palms deal (*See PK29*) with Kenner (*in spite of his wife's never-ending lack of financial knowledge*) and subsequently banning Kenner from the property (*based on title control*), when Kenner had approximately $750,000 invested in the property side-by-side with Mike Peca, somewhat influenced Mike Peca's reformative recollections thru amnesia in 2015.

Due to the Kenner Indictment, the Kenner suit versus Peca could <u>not</u> be filed (*in early 2014*), relieving Peca from a *known* and *sure-losing legal situation*.   Problem solved for Peca, simply by supporting Galioto's frivolous theories, identical to the litigation relief garnered by McKee in Nevada (*same breech of contract issues with the Palms units*).

Kaiser and Berard's good fortunes in the multiple Arizona case defenses from Kenner's (*2012 and 2013*) legal filings for fraudulent title conveyances (*two [2] times in Arizona and Sag Harbor NY*) also benefitted from their newly developed memories, ironically concurring with the empirically evidence-absent Galioto prosecutorial theories.

These good fortunes are sometimes described as *ulterior motives*, and in these particular cases, they were worth millions to the collective, CTE-laden government witnesses, further injuring Kenner.

An uncountable number of amnesia-like symptoms occurred (*100% accruing to the government's benefit*), even when witnesses were shown and systematically could not remember:

- Emails they sent/received,
- Texts they sent/received,
- Bank records they signed,
- Disclosures they signed,
- Eufora loans they tried to buy (*with their own attorney*),
- Testimony about Jowdy loan knowledge they made "*as a group*"...etcetera

They could not remember any prior occurrences on cross-examination.   But, unmistakably, they were still able to remember, "*what they were not told*" (*over a decade earlier*), with unquestionable confidence. In the face of their prior empirical evidence, during resuscitative re-direct examination, and bolstered by deliberate government summations, the newfound theories were recently fabricated (*in 2015*), real-time.

The defendant deduces that many of the misrepresentations were originally fabricated during Galioto's various Grand Jury testimonies, despite lacking foundational evidence, and thus, Galioto's two (2) Grand Jury testimonies should be released to the defendant.   Upon information and belief, they will provide the evidence of the predicate for the **CTE** symptoms of *faulty memory, confusion and mistakes* in 2015 (*of all government witnesses*) to verify Galioto's allegations that were not just foundationless, but contrived in full contradiction to his solo, and entire 6-year investigation.

Perhaps, there is nothing worse in a criminal proceeding than the government presenting false evidence or manufacturing evidence thru recently fabricated testimony to suit the circumstance, in order to get the upper hand.   Justice in the life and conduct of the state is possible only as first it resides in the hearts and souls of the citizens and its representatives of justice.

Thus, as the prosecutorial anointed believe, they have repeatedly promoted the irrelevance of empirical evidence.   President John Adams addressed this exact issue in the context of truths, versus rhetoric, representing:

> *"Facts are a stubborn thing; and whatever may be our wishes, our inclinations, or our dictates of our passions, they cannot alter the state of facts and evidence…"*

As denoted by President Adams, objective evidence and logical arguments are often not merely lacking but ignored in many discussions by those with the vision of the anointed.  Much that is said by the anointed in the outward form of an argument turns out not to be substantiated arguments at all.   Often the logical structure of an argument is replaced by preemptive rhetoric [*media reports, threats, and suborned perjury*] or, where an argument is made, its validity remains unchecked against any evidence, even when such evidence is abundant.   Evidence is often particularly abundant when it comes to statements about history, yet the anointed have repeatedly been demonstrably wrong about the past as about the present or the future – and as supremely confident.   They remain often wrong, but never in doubt.

In concert with the horde of concrete allegations of wrongdoing and prosecutorial misconduct, whether it resides solely in the efforts of the FBI case agent (*or eventually thru the pollution of the prosecutorial team*), the Grand Jury testimonies of 2013 and 2015 will shed light on the origination of theories, derived in direct contradiction to the empirical evidence, thus fully infecting the judicial process thru trial, and paramount to the residual effects on the remaining judicial matters in this case, including direct appeal.

In order to fit the proverbial prosecutorial "*square peg into a resistant round hole*", with the prosecution's empirically lacking evidence, the defendant believes the same bullying tactics displayed versus White House Press Secretary (*Sarah Huckabee Smith*), Florida Attorney General (*Pam Bondi*), White House aid (*Sarah Sanders*) and

Cabinet Secretary Nielson, have been employed by Galioto, Harvey, and Berard (*only partially documented, supra*) as intimidation tactics to secure contrarian-laden hearsay versus Kenner, for alleged victims to avoid complicity charges, *or worse*. The "*threats*" against the previous pro-Kenner support, *supra*, was recently emulated by Deputy Attorney General Rod Rosenstein while being interviewed by a Congressional oversight committee.   He proclaimed that anyone who did not "*back off*" the investigation of DOJ wrongdoings "*could be"* subpoenaed for their own "*under oath*" testimony and complicity.   Rosenstein's statements to Federal Legislators certainly appeared to resonate from a playbook the defendant and his investors have endured, as well, thru Harvey, Berard and other Jowdy cabal members, *supra*.

For all of the foregoing issues, the defendant respectfully requests of the Court that the two (2) Grand Jury testimonies of FBI case agent Galioto be released to the defendant for review and application to the reformative issues which have been ultimately infected to date, and the remaining unaffected items, as of now.   If oral arguments on the matter are required, the defendant respectfully requests to be present.