TRULINCS  07480408 - KENNER, PHILLIP A - Unit: BRO-J-A

--------------------------------------------------------------------------------------------------------

FROM: 07480408
TO:
SUBJECT: Kenner 13-cr-607 (JFB)
DATE: 03/28/2019 06:03:57 PM

March 28, 2019

The Honorable Judge Bianco:

I have enclosed my ProSe submission to the government's PSR objections.

Second, I am not sure why the ProSe desk will not upload my two (2) letters from the March 6 disc to ECF.   I have no capacity to print in here (lacking electricity at times), as they instructed my paralegal for me to do.

I hope there is a reasonable solution that can allow the uploads to happen soon.

Sincerely,

Phil Kenner

#07480-408
Metropolitan Detention Center
PO Box 329002
Brooklyn, NY 11232

F I L E D
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★   APR 0 1 2019   ★
LONG ISLAND OFFICE

RECEIVED
APR 0 1 2019
EDNY PRO SE OFFICE

March 27, 2019

Judge Joseph Bianco
U.S. Federal Court House
Eastern District of NY
100 Federal Plaza
Central Islip, NY 11722

**RE: Kenner ProSe PSR objections**

Dear Judge Bianco:

By this letter, Kenner supplements the letters from Richard Haley, the Jeff Pittel, and
Jesse Siegel which sets forth comments and objections to the Presentence investigation
Report ("PSR") prepared in the above referenced matter.

Our comments and objections are as follows:

General Objections to the PSR presentation of the Offense Conduct + The
Defendant's Participation (¶¶ 4-54)

It is defendant Kenner's understanding that these paragraphs were either drafted by the
Government or are based upon information provided by the Government. As such, the
PSR should contain a disclaimer that these paragraphs represent the Government's
version of the offense. As the Probation Department is aware, Kenner testified at trial.
(This is noted in PSR ¶55). During his trial testimony, Kenner disputed the allegations
reported within these paragraphs. As such, it is self-evident that Kenner objects to the
portrayal of the offense conduct, and his participation, in the manner alleged in these
paragraphs. Kenner has provided irrefutable empirical evidence that the allegations are
baseless – and solely based on "failed memory tests" of witnesses who are now filing
federal lawsuits for Alzheimer's-type symptoms of "memory loss" and other cognitive
degenerative symptoms – due to **CTE** (or post concussion and sub-concussive hit brain
trauma)[1]. Accordingly, the PSR should contain a notation -- as evinced by Kenner's
testimony -- that many of the allegations in these paragraphs are disputed and Kenner
does not concur with allegations in these paragraphs. They are far too numerous to
individually address, in light of the actual empirical evidence that fully corroborates
every Kenner testimony, as fact.

The government claimed in their PSR recommendations that *"the defendants [trial]
behavior demonstrates his brazen attitude and belief that he could lie his way out of
trouble and escape accountability for his crimes"*.

---

[1] It should be noted that Kenner has submitted requests to the Court to address these issues with
the individual government trial witnesses.

1

- The government overlooks the simple fact that the alleged lies are all corroborated -- **in Kenner's favor** -- by each and every Kenner investors' pre-trial statements; not brazen Kenner hearsay.   It is the government's **CTE**-laden witness testimony that contradicts their own pre-trial and pro-Kenner statements "under oath".

- There is no standard that can apply this blatant PSR misrepresentation about Kenner's trial statements that should punish Kenner for decades of consistent statements "under oath" and underlying actions that Kenner advocates for still to this day (all supported by his investors own empirical evidence – and refuting the government's "hearsay" prosecutorial evidence from trial).

**Net loss and Amendment 616...**

Amendment 616 "net loss" has been the rule of the land since November 1, 2001.

The definition of "*loss*" under Amendment 616 has clearly reduced the circuit split issues (both the 2nd Circuit issues and the other Circuits) related to the calculation method that is most appropriate.

The amendment provides definition of loss application to offenses sentenced under 2B1.1, 2B1.3 and 2F1.1.   The definition resolves a number of conflicts, addresses a variety of application issues, and promotes consistency in application.

The loss rule retains the core rule that loss is the greater of actual and intended loss.   The Commission concluded that, for cases in which intended loss is greater than actual loss, the intended loss is a more appropriate initial measure of the culpability of the offender. Conversely, in cases, which the actual loss is greater, that amount is a more appropriate measure of the seriousness of the offense.

The amendment defines "actual loss" as the "reasonably foreseeable pecuniary harm" that resulted from the offense.   The amendment incorporates this causation standard that, at a minimum, requires factual Causation (often called "but for" causation) and provides a rule for legal causation (i.e. guidance to courts regarding how to draw the lines as to what losses should be included and excluded from the loss determination).

**Pecuniary harm...**

"Pecuniary harm" is defined in a manner that excludes emotional distress, harm to reputation, and other non-economic harm, in order to foreclose the laborious efforts sometimes necessary to quantify non-economic harms (as in some tort proceedings, for example).

"Reasonably foreseeable pecuniary harm" is defined to include pecuniary harm that the defendant knew or, under the circumstances, reasonable should have known, was a potential result of the offense.   The Commission determined that this standard better ensures the inclusion in loss of those harms that reflect the seriousness of the offense and

2

the culpability of the offender.

The loss definition also excludes from loss certain costs incurred by the government and victims in connection with criminal investigations and prosecution of the offense. Such losses are likely to occur in a broad range of cases, would present fact-finding burden in those cases, and would not contribute to the ability of loss to perform its essential function.

**"Time detection"…**

The loss definition also provides for the exclusion from loss of certain economic benefits transferred (or retained like the Jowdy-Hawaii loan and Eufora private stock) to victims, to be measured at the time of detection. This provision codifies the "net loss" approach that has developed in the case law, with some modifications made for policy reasons. This crediting approach is adopted because the seriousness of the offense and the culpability of a defendant is better determined by using a _net approach_. This approach recognizes that the offender who transfers something of value to the victim(s) generally is committing a _less serious offense_ than an offender who does not.

The amendment adopts "time of detection" as the most appropriate and least burdensome time for measuring the value of the transferred benefits. The Commission determined that valuing such benefits at the time of transfer would be especially problematic in cases, which the offender misrepresented the value of an item that is difficult to value. Although the time of detection standard will allow some fluctuation in value, which may inure to the defendant's benefit or detriment, the Commission determined.[2]

**Supplemental Objection to the Loss Calculation [USSG §2B1.1 (b)(2)]**

For the purposes of calculating the Guideline range, the loss is defined as "the greater of actual loss or intended loss". *United States v. Certified Envtl. Servs., Inc.*, 753 F.3d 72, 103 (2d Cir 2014)(quoting *U.S.S.G. §2B1.1 cmt 3(A)*). "Intended loss" means "the pecuniary harm that a defendant purposely sought to inflict." *U.S.S.G. §2B1.1 cmt. 3(A)(ii)*. The district court is "not required to calculate loss with 'absolute precision',"

---

[2] It should be noted that the government made several allegations in their various PSR submissions that Kenner received (at least in large part) $25,000,000 of fraud monies, but they were unable to determine which years Kenner received "any" of them. Regardless of the unsubstantiated statement by the government, Kenner received _none_ of the alleged "ill-gotten gains" (other than loan repayments and expenses that Kenner had already paid – and nothing more), thus there would never be a "tax evasion" issue. The allegations that they could not gain IRS cooperation (even with IRS Agent Wayne present since the departure of "non-FBI agent Romanowski" [*Tr.5992*]) in or about 2012 were more intent to mislead the Court and present another disingenuous narrative.
- The 2012 change of investigation agents also corresponds with John Kaiser and Bryan Berard receiving jobs in Mexico with Jowdy and the carrot to work with FBI agent Galioto and "*get rid of Kenner*".

3

See *United States v. Binday*, 804 F.3d at 595 (quoting *United States v. Coppola*, 671 F.3d 220, 250 (2d Cir 2012)), but it must "make a reasonable estimate of the loss" that is based in "available information" and supported by a preponderance of the evidence, *Id.* (quoting *U.S.S.G. §2B1.1 cmt. 3(C)*).

- Kenner objects to the enhancement as argued below.

**Hawai'i project...**

If the "*intended loss*" means "*the pecuniary harm that a defendant purposely sought to inflict*" then there cannot be an intended loss since the Hawai'i loans were:

- Always titled to Little Isle 4, LLC in the loan agreement (not Kenner),
- The 2008-09 Arizona lawsuit had Little Isle 4, LLC as a plaintiff to recover the loans (not Kenner), and
- The two (2) 2009 California lawsuits have the individual members of Little Isle 4 as plaintiffs to recover the known loans to Jowdy (not Kenner).

The loaned funds to Jowdy *never benefitted Kenner* – were always held in the name of Little Isle 4 – thus what "intended loss" could there be?   *ANSWER: NONE.*

The value of the Jowdy loan is real.   Jowdy, the FBI, and the government are obstructing the collection of the loan amount from all of the Hawai'i partners.

- It appears to be undisputed that Jowdy received loans from Kenner. In various litigations, Jowdy even attested to the existence of these loans. Nonetheless, the Government continues to advance the apparently false claim that these loans (to Jowdy) do not exist (*notwithstanding Jowdy's 2010 FBI confession of the loans* – *3500-KJ-2 at 12 et. al.*).

- Moreover, by advocating for this false claim, the Government is, in essence, seeking to deny many of the hockey players the opportunity to assert their right to collect the principal and interest owed on these loans &/or concealing its existence from them.

These loans (pending specific forensic analysis) are worth approximately **$33,840,000**.

| UNPAID PRINCIPAL + interest | |
|---|---|
| (at 15%) | **Balance Due** |
| March-06 (*Lehman Brothers closing*) | $5,500,000.00 |
| March-07 | $6,325,000.00 |
| March-08 | $7,273,750.00 |
| March-09 | $8,364,812.50 |
| March-10 | $9,619,534.38 |
| March-11 | $11,062,464.53 |

4

| | |
|---|---|
| March-12 | $12,721,834.21 |
| March-13 | $14,630,109.34 |
| March-14 | $16,824,625.74 |
| March-15 | $19,348,319.61 |
| March-16 | $22,250,567.55 |
| March-17 | $25,588,152.68 |
| March-18 | $29,426,375.58 |
| **March-19** | **$33,840,331.91** |

The government continues to grossly miscalculate the value of the Hawai'i investment (as it stands today) with no intrinsic loss attributable to this alleged fraud.

The Court *M&O at 9 (Document 501)* confirmed that Michael Peca *impeached* himself during trial testimony by confirming that he was aware of the loans to Jowdy "*as a group*", just as he told the SDNY Grand Jury in 2011 (*Tr.498*) -- after his "denial" during planned-direct examination testimony.

Thus, not only was Michael Peca not a victim of the Hawai'i project, reducing any claimed loss as a result of the "Jowdy loans", but the Court must ask, who else was part of this "*group*" of investors in Hawai'i that Michael Peca (Sydor and Stevenson) was referring to in their respective 2011 SDNY Grand Jury testimonies?

[2011 Peca SDNY Grand Jury at 30]:
> "*A short-term loan [was made] to Mr. Jowdy because at the time Cabo – we hadn't gotten the lending from Lehman Brothers yet. We* [emphasis added] *made a short-term loan until the lending came in. Once the lending came through they were to pay back the loan, I think in the neighborhood of five-and-a-half million dollars, on the closing. It was never paid back. And then communication basically seized [sic] at that point from him [Jowdy]. That was kind of the whole sticking point as far as me and the other guys* [emphasis added] *with Mr. Jowdy.*"

The expectation of the loan repayment is documented thru Lehman Brothers pre-closing due diligence in evidence. This is more empirical evidence the government has ignored since 2009 to frame their baseless theories; harming Kenner and Kenner investors, while protecting the Jowdy frauds.

We know that Superseding Indictment alleged victim, Darryl Sydor, also confirmed his knowledge (during his 2011 SDNY Grand Jury testimony) of the loans that were made to Jowdy. Sydor further confirmed that he was always under the belief that the funds he committed to the Little Isle 4 capital account thru his LOC and cash deposits were **at all times** the property of Little Isle 4's capital account, *not his personally*.

Hawai'i-Mexico investor Darryl Sydor confirmed the "Jowdy loan" from the Hawai'i partners and the underlying knowledge without hesitation.
[2011 Sydor SDNY Grand Jury at 25-26]:

5

*Q: Was that [the LOC at Northern Trust Bank] also for Little Isle 4 as far as you know?*

**A [Sydor]: Yes, but then <u>we</u> put it towards a short-term loan to Mr. Jowdy until Lehman Brothers came up with the money that was supposed to be paid back."**

*Q: Did you know in advance that it was going to be used, this Little Isle 4 money, to be used to salvage the Cabo investment?*

**A [Sydor]: <u>Yes.  It was to help with the short-term loan to keep funding the Cabo, but then its supposed to be paid back</u>, but that's –**

*Q: Paid back to you or to Little Isle 4?*

**A [Sydor]: Paid back to Little Isle 4.**

*Q: So –*

**A [Sydor]: <u>Back to Hawai'i, not me personally.</u>**

*Q: But that didn't happen?*

**A [Sydor]: That didn't happen.   And Lehman came up with the $129 million loan. It was supposed to be back at closing.**

Lastly, Hawai'i-Mexico investor Turner Stevenson validated Michael Peca and Darryl Sydor's "loan knowledge" confirmations *"as a group"*.
[2011 Stevenson SDNY Grand Jury at 17-18]:

*Q: When you put up the $100,000 for Hawai'i, did you have any understanding of whether the money could be used to pay for the Mexico project or was it just supposed to go to the Hawai'i project?*

*A [Stevenson]:  In the beginning it was supposed to go to Hawai'i.   Then __I saw__ they needed, __the group of us got together__, we have this piece of land that's available for purchase in Mexico that we need to wait on or get funds on to __transfer as a group__ like one big blanket to get money into Cabo and pay for that land to hold it until the loan came.*

*Q:   So you are saying you agreed to transfer some of the money from the Hawai'i project to the Cabo project?*

*A [Stevenson]:  I would say that, <u>YES.</u>*

*Q: Who made that decision?*

*A [Stevenson]: <u>I think all of us as a group</u>.*

6

*Q: What do you mean "as a group", who is the group?*

*A: **All the guys who were invested in it**.*

FBI agent Galioto **"cherry-picked"** the three (3) individuals who gave testimony to the 2011 SDNY Grand Jury (out of 20-some potential Hawai'i-Mexico investors).  **Galioto's theories of concealment were disproven 3-for-3 (years before the effects of CTE impinged on the investors "recall"**.    Thus, it cannot be assumed that **"only"** Peca, Sydor and Stevenson were part of the Hawai'i-Mexico investor *"group"* that were aware and approved the "Jowdy loans" since their inception.

**<u>Multiple Hawai'i investors confirmed "loan knowledge" pre-trial (notwithstanding CTE issues in 2015)…</u>**

As the Court knows, the following Hawai'i-Mexico investors have also previously made fully confirming statements **"under oath"** that they were at all times aware of the loans to Jowdy:

Alleged victims:
1. Bryan Berard – 2009 arbitration testimony,
2. John Kaiser (<u>non-investor</u> and thus <u>non-victim</u>) -- 2009 arbitration testimony, and

Non-victims (*not named in the Superseding Indictment as a victim*):
3. Glen Murray – 2008 Nevada Complaint (in *Murray v. Jowdy*),
4. Turner Stevenson – 2011 SDNY Grand Jury testimony,
5. Defendant Kenner – 2009 arbitration testimony,
6. Sergei Gonchar – 2009 arbitration affidavit,
7. Jozef Stumpel – 2009 arbitration affidavit,
8. Mattias Norstrom – 2009 arbitration affidavit,
9. Jere Lehtinen – 2009 arbitration affidavit,
10. Sergei Gonchar – 2010 FBI proffer,
11. Jozef Stumpel – 2014 Mexico affidavit
12. Mattias Norstrom – 2015 Mexico affidavit
13. Rem Murray – 2015 Mexico affidavit
14. Jozef Stumpel – 2017 EDNY affidavit

It should not be overlooked that nineteen (19) Hawai'i-Mexico investors sued Jowdy in Arizona (2008-09) and California (2009-2010) for the recovery of the Jowdy-Hawai'i loans, with independent counsel and without opposition to the "known" loans.

The Arizona disclosure – signed by all Little Isle 4 investors confirmed:

> "*the gist of the lawsuit is to recover certain monies loaned to Mr. Jowdy from Mr. Kenner, Little Isle 4 and Ula Makika LLC.   Mr. Kenner estimates the total amount of monies loaned to Mr. Jowdy which have not been repaid to be*

> *approximately $5,000,000. This is the estimated principal only, exclusive of accrued interest. In summary, Mr. Jowdy denies that the monies were loans but rather characterizes them as investments.*"

The two (2) California law suits versus Jowdy confirmed:

> "*Mr. Najam was in charge of the corporate governance while under Jowdy's direction and control received over eight million dollars ($8,000,000) from a LLC in Hawai'i. Mr. Najam failed to properly account for those funds and has placed the Jowdy investors in a vulnerable and compromised position.*"[3]

Kenner's repeated offer to assist the government and the FBI to recover the funds from Jowdy has been DENIED since Kenner's February 2018 ProSe admission.

In February 2019, former Jowdy co-conspirator, John Kaiser, confirmed that he was working with and protecting Jowdy's known crimes from the government and the investors for approximately five (5) years (2012-2017) -- *for pay*. After Kaiser's termination by Jowdy (after Jowdy used up his protective value), Kaiser now wants the Court to know that (*Document 628*):

> "*'the hockey guys will never see a dime' because they said he [Jowdy] was a crook*".

**Hawai'i partners Managing Member – John Kaiser – refused to assist in the recovery of the loans from his co-conspirator, boss Ken Jowdy while working for and protecting him from 2012-2017...**

These are the substantial Hawai'i loans that Kaiser, as the Managing Member (of Na'alehu Ventures 2006) of the Hawai'i partners since December 2007, has done nothing for "**his Hawai'i members**". In contrast, Jowdy's co-conspirator Kaiser has been *protecting Jowdy*, and preventing all efforts by Kenner and Kenner investors to recover the "known" loans (in the USA and Mexico) – including giving false testimony in Mexico (*Stumpel v. Jowdy -- $1.6 million loan case*) and the EDNY regarding Kaiser's Mexico testimonial (*signed in the same Stumpel v. Jowdy case*) (*i.e. 18 U.S.C. 1001 violations*).

---

[3] The two (2) California lawsuits were filed for fifteen (15) Diamante Cabo san Lucas plaintiffs (*Tyson Nash, Vladimir Tsyplakov, Turner Stevenson, Mattias Norstrom, Greg deVries, Bryan Berard, Steve Rucchin, Brian Campbell, Darryl Sydor, Dimitri Khristich, Sergei Gonchar, Mike Peca, Jere Lehtinen, and Jozef Stumpel),*

And the additional five (5) Diamante del Mar only plaintiffs (*Jay McKee, Chris Simon, Jason Woolley, Glen Murray and Raymond. Murray).*

**Northern Trust LOC investors received several "offsets"...**

Kenner's forfeiture reply confirmed that the Hawai'i investors also received several "offsets" to any possible calculation of loss (even though there is no crime in the "Jowdy loans" with Michael Peca's verified "*group*" knowledge).

The 2008 LOC interest payments totaled approximately $480,000.   Extrapolated over the 2003-2008 lives of the total LOCs, the interest benefit of the group would approximately $2.4 million.   Norstrom, Gonchar and Murray were not named Superseding Indictment victims – with their LOCs representing approximately 32% of the LOC investments.

Conversely, the named Superseding Indictment victims benefitted from their proportionate share of $1,632,000 of tax deductions.   Since they were all at the 39.6% marginal tax rate, throughout the life of their respective LOCs, their actual realized benefit would have been approximately **$646,272** (tax credit – dollar for dollar versus income).
- As such, this amount is a direct offset to any alleged loss amount; specifically for guideline calculations.

**Northern Trust Bank settlements** (as testified total: *over* **$1,400,000**)[4],
   **Nolan** – "*They gave us 500,000 for settlement, Northern Trust.*"  (*Tr.2074*),
   **Peca** – "*over*" $600,000 (*Tr.506*), and
   **Berard** – "*after lawyer fees and stuff*" -- $300,000 (*Tr.3042*).

- **Steve Rucchin** would not have settled thru litigation with Northern Trust at least according to his 2015 testimony, since he was unaware of the loss of the LOC collateral until 2015 when Agent Galioto showed him "how to read a bank statement" – despite his 4 year college degree at Western Ontario University before becoming a pro hockey player.
   - This foundationless logic would NEED to disregard Rucchin's 2009 texts to Kenner about the Northern Trust DEFAULT letters and his email confirmations with Kenner of his known collateral seizure.  In addition, Rucchin would have been required to give his *individual signed authorization* to transfer the remaining funds after a phone call with Northern Trust and the DEFAULT (all in evidence – and ignored).

---

[4] Kenner requests that the government and Court require the Superseding Indictment individuals to sign an affidavit of **"recovery amount"** from any Northern Trust settlement (specifically including: Juneau, Berard, Peca, Nolan, Rucchin, and Sydor).

Obviously, all non-Superseding Indictment victims with LOCs (Norstrom, Murray and Gonchar) have professed their non-victim status related to Kenner by refusing to participate in the 2015 EDNY trial; with the exception of Glen Murray (non-victim) who volunteered to appear, due to his American residence status without the need for a federal subpoena, under advice of counsel – and Sergei Gonchar (non-victim) assisting in the Constantine defense of the fully-disclosed GSF "side-deal"; thus expunging any GSF crimes from illegal distributions by Constantine – and relieving any criminal liability in the GSF alleged "object".

- **Darryl Sydor** would not have settled thru litigation with Northern Trust at least according to his 2015 testimony since he was unaware of the loss of the LOC collateral until 2015 when Agent Galioto showed him "how to read a bank statement".
  - o This foundationless logic would NEED to disregard Sydor's 2009 texts to Kenner about the Northern Trust DEFAULT letters and his email confirmations with Kenner of his known collateral seizure.  In addition, Sydor would have been required to give his *individual signed authorization* to transfer the remaining funds after his confirmed phone call with Northern Trust and the DEFAULT (all in evidence – and ignored).

**Northern Trust tax-free interest earned calculations** (total: **$1,601,572**),

> **Nolan** -- $592,878
> **Peca** -- $300,052
> **Berard** -- $129,314
> **Sydor** -- $249,215
> **Rucchin** -- $210,113
> **Juneau** – approximately $120,000 (but a non-victim with full buyout as requested)

- As such, this amount is a direct offset to any alleged loss amount; specifically for guideline calculations.

The individual investors signed *Letters of Authorization* for Kenner to access the LOCs for Little Isle 4 – resulting in **the funds belonged to Little Isle 4 (not the investors – as Sydor confirmed to the SDNY Grand Jury in 2011 -- Sydor SDNY Grand Jury at 25-26,** *supra***).**  As a result of the documented and approved investment transfers, Kenner's *duty* was "controlled" by the LLC and its 2004 operating agreement.

The government continues to try and place the burden on Kenner to communicate with the individual clients about each and every withdrawal, but Kenner clearly followed all of the investors' signed documents that exist and the transfer of funds thru the AUTHORIZED channels (LOC to Little Isle 4 capital account -- to "authorized expenses", pursuant to the Little Isle 4 operating agreement).

**NO WHERE** does it suggest Kenner has an additional obligation to any of the shareholders to inform them of the individual transfers...certainly not in the Northern Trust *Letters of Authorization* signed by each LOC note holder.   The absence of an additional notification requirement is the not the proof of wrongdoing; it is the opposite.

- ❖ If the investors had simply deposited cash into the investment (instead of opening the LOC's, per the recommendation of the Northern Trust Bank President, David Highmark) – they would be in the investment same position today (minus the 5

years of annual 4% tax-free bond interest they received from their underlying Northern Trust Bank accounts, *supra*).

*As an example, Michael Peca, from 2005 thru 2009 at Northern Trust Bank received 4% tax-free interest on his $1.775mm collateral that would have been spent as cash under a cash investment scenario thus forgoing approximately $71,000 tax free per year in 2005, 2006, 2007, 2008 and partial 2009 – or approximately $300,000 PLUS...over the life of the LOC.*

### Northern Trust LOC clients authorized full use of investment funds to Kenner and subsequently acknowledged Little Isle 4's use and control...

Each Northern Trust Bank LOC investor signed a 1-page *Extension of Credit* document directly with the Northern Trust Bank, prior to the approval of their LOC and release of funds pursuant to their 1-page, signed *Letters of Authorization*, which granted specific access to their LOC accounts for deposit into the Little Isle 4 account, part and parcel to their Hawai'i partners investment capital account contributions.

Berard's 1-page *Extension of Credit* verified -- signed and dated "*3-7-05*":
    *"$900,000 Investment in speculative real estate"*

Peca's 1-page *Extension of Credit* verified -- signed and dated "*6-30-05*":
    *"$1,775,000 increase to existing loan used for speculative real estate investments"*

- *Please note that the language of "investments" is plural – and Peca is signing a second (2nd) Extension of Credit with the original $1,600,000 document signed by Michael Peca just months earlier.*

Nolan's 1-page *Extension of Credit* verified -- signed and dated "*10-29-04*":
    *"$2,200,000 Investment in Little Isle IV"*

Nevertheless – Nolan contradicted his own signed documents and claimed (*Tr.2065-2066*):

> *Q There has been testimony in this case about lines of credit. <u>Did you ever have a line of credit associated with your investment in Hawaii?</u>*
>
> *A [Nolan]: No.*
>
> *Q Did you ever authorize Mr. Kenner to open up a line of credit in your name?*
>
> *A [Nolan]:  No.*

> *Q Did you ever authorize Mr. Kenner to open up a line of credit in a company called Little Isle IV?*
>
> *A [Nolan]: No.*
>
> *Q What about if there was a company called Little Isle IV and you and Mr. Joe Juneau and Mr. Kenner were somehow vouching for a line of credit in Little Isle IV, do you have any **memory** doing that?*
>
> *A [Nolan]: No.*
>
> *Q Did you intend to invest 2.2 million in Hawaii?*
>
> *A [Nolan]: No.*
>
> *Q At any time?*
>
> *A [Nolan]: No.*

- Nolan verified he signed the *Extension of Credit* document; just that he has no memory of it.   Nolan had over fifty (50) professional fights and countless more amateur bare-knuckle fights in his career.   He is a strong **CTE**-candidate simply by the nature of his physical career for nearly twenty (20) years.
  - o   Nolan's own 2007 text messages verify that Nolan independently was signing his Northern Trust Bank LOC renewal documents after full disclosures (text and phone calls) from Kenner; notwithstanding the explanation of the documents themselves while in Nolan's hands.

- Please note that the government rhetoric about "*Kenner opening a LOC for anyone*" is wholly misleading – since it never happened; certainly nothing is in evidence that would have allowed the government to formulate such a theory or prejudice the jury with the repeated and unsubstantiated remarks.

Nolan also (identical to all other LOC clients) signed off on the annual *Disbursement Request & Authorization* (1-page) documents verifying their knowledge of the total amount of their LOC distributed.   Nothing was concealed.

- In 2005, Nolan's *Disbursement Request & Authorization* (in evidence) confirmed $2,188,637.09 was distributed.

Rucchin's 1-page *Extension of Credit* verified -- signed and dated "*11-4-04*":
     "*$480,000 Investment in Little Isle IV*"

Rucchin's second (2nd) 1-page *Extension of Credit* verified -- signed and dated "*1-3-05*":
     "*$1,000,000 Investment in Little Isle IV*"

- Please note that each of these Extension of Credit documents are represented as *investments in Little Isle 4* &/or *investments in Speculative Real Estate* – not short term loans – and definitely not as accounts accessible with further disclosures to the note holders – or anything else ambiguous…

**Eufora private stock purchases…**

In 2009, independent hard moneylender, Neptune Capital, valued Eufora at $20,000,000 and delivered a $3,000,000 documented loan to the company at that value (with a 40% equity penalty provision – similar to all other onerous hard money lender terms in evidence).

All Constantine and Gaarn private stock sales occurred within months of the Neptune valuation and loan, and at that specific $20 million valuation.

Furthermore, in 2010 after extensive Eufora investigations by independent counsel for the AZ Eufora Partners I investors – Rudy Giuliani and his team wanted a 6% equity contingency fee of Eufora stock in lieu of actual legal fee payments, further valuing Eufora with some intrinsic value (at a minimum of $720,000 for the work completed – based on the 2008 Neptune valuation in real time).

Jay McKee confirmed Giuliani's groups' fee demand during text discussions with Kenner in 2010, prior to his face-to-face NYC meetings with "his" attorneys:

Kenner to McKee:



| 16999 | +17168034903 Jay McKee* | 7/15/2010 2:48:01 AM(UTC+0) | Sent | I heard you spoke with Stolper tonight. All good? Did you fax the letter to Bryan [Berard]? **Did you schedule to go to NYC Friday [for face-to-face meetings with Attorney Stolper]?** |

McKee reply to Kenner:



| 14797 | +17168034903 Jay McKee* | 7/15/2010 12:03:01 PM(UTC+0) | Read | Hopefully you're getting some sleep right now; I am planning on sending the letter this morning.. **Within our package or plan in <u>taking the lender out</u>, where is the 6% for Guilani partners comming from?** |

Any and all loss of Eufora value occurred *as a result of* FBI involvement in Eufora issues (including the vetting of the 2008-09 private stock sales) *after* the Giuliani team contingency demand was presented to the investors in 2010, and they were independently represented by counsel.

There was no loss of Eufora stock value that Gaarn and Constantine (not Kenner) owned and transferred to the investors/purchasers in 2008-09. Attorney Stolper, Giuliani and their investigative team represented them all. The attorneys/investigators had nothing to do with Kenner; as a non-party to Eufora.

13

## PSR Confirmations of loss...

The loss amount calculation contained in the Pre-Sentence Report ("PSR") was based on a series of loss claims for which there were no supporting evidence.

The *Victim Loss Statements* included multiple individuals who were not named in the Superseding Indictment, but moreover, they failed to include alleged victims: Juneau, Berard, Peca, and Sydor.

Pursuant to Rule 32(b)(4)(D), Federal Rules of Criminal Procedure, the probation officer's presentence investigation report *must* contain a victim impact statement. That report must contain information about the financial impact on the victim and the defendant's financial condition. This is clearly lacking. It is also so late in the PSR process (over three [3] years after their initial interview), controlled by government professionals, that the clearly negligence cannot by deemed an oversight and allowed to stand without issue and corroboration.

### Objection to Abuse of Trust - U.S.S.G. §3B1.3

The PSR (at ¶¶50,64) summarily indicates this 2-level enhancement applies to the calculation...

- Kenner objects to the enhancement as argued below.

For this enhancement to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offence (i.e. by making the detection of the offense or the defendant's responsibility for the offense more difficult. It cannot be merely conclusory.

Abuse of Trust cannot be related to any **GSF** transactions, because Constantine was in full control of the GSF proceeds and their distributions at all times. In addition, with the confirmation of the Constantine-Gonchar "side-deal" (*Tr.4826-4827*), any dispute over the personal spending by Constantine is nullified. Thus, there cannot be an enhancement for a conspiracy object when the object itself does not exist.

Abuse of Trust cannot be related to the **Eufora** private stock sales by Gaarn or Constantine. Because, the Eufora stock was transferred by Gaarn and Constantine, recorded on the corporate books and records of Eufora thru their 2009 Eufora Amended Operating agreement (in evidence), and ultimately, the valuation was cross-verified having intrinsic value, once thoroughly vetted by independent attorneys for the investors (who wanted equity in the Eufora Company as late as one [1] year after the completion of the Eufora private stock sales, *supra*). Kenner held no management role in Eufora since 2005 (in evidence), when it was transferred to Tim Gaarn along with the documentation of Kenner's stock (in all of the Eufora tax records and internal corporate correspondences – in evidence).

14

Abuse of Trust cannot be related to the **Hawai'i** project; because the majority of Little Isle 4 (Hawai'i partners) investors gave pre-trial and post-trial statements that they were aware of the loans to Jowdy.   The Court confirmed that Michael Peca was impeached thru his own testimonial confession; that his 2011 SDNY Grand Jury testimony was accurate (*See Document 501 at 9*).

Peca alleged during his direct examination that the "Jowdy loans" were "unknown to him".   <u>*Michael Peca's statement was proven false*</u>.

Peca's Grand Jury testimony also reverberated the same "*group knowledge*" refrain as Sydor, Stevenson (both from the same 2011 Grand Jury testimony, *supra*), Berard, Kaiser (both from their 2009 arbitration testimony – in evidence), Norstrom, Stumpel, Lehtinen, Peca (all from their 2009 arbitration affidavits – in evidence), Glen Murray's 2008 Nevada complaint (v. Jowdy – confirming the previous Jowdy-Hawai'i loan – in evidence), nineteen (19) Hawai'i-Mexico investors who filed litigation versus Jowdy to recover the "known" loans – *with none filing against Kenner for concealing anything from them*, etcetera (all in evidence).

- Michael Peca's confirmation during trial of his previous "*group*" decision to loan funds to Jowdy from the Hawai'i project must open the door to ask for confirmation of who else was part of the group?   The Court has a myriad of "*under oath*" confirmations, which cannot be disputed (*supra*); certainly not invalidated by asserting *faulty memory, confusion and mistakes* (as advocated by the government post-trial to explain all of the testimonial discrepancies) and the **"new evidence"** discovery of the witness **CTE** cases (for memory loss and cognitive degeneration – altogether affecting their trial memory and testimony).

████ Leadership Enhancement U.S.S.G. §3B1.1(a) ████

Defendant Kenner did <u>**not**</u> exercise sufficient control or organizational authority over co-conspirator (Constantine) to qualify for four-level "<u>**organizer**</u>" sentencing enhancement. <u>The government/probation recommendation alleges five (5) or more participants.</u>

- Kenner objects to the enhancement as argued below.

Beyond Constantine's co-defendant status, the government attempted to allege Gaarn was part of some conspiratorial act.   If true, that would place a Private Company (Eufora) Board Member under Kenner's wizardry, but Gaarn confirmed during trial that he had no intent, participation or otherwise with Kenner to carry on any conspiratorial or illegal act (*Tr.2503-2504, 2563-2564*).

After Gaarn's personal private stock sales, Gaarn hired a high-powered and well-connected New York based investigation group including Rudy Giuliani associates and a former CIA Agent (confirmed by the attorney's own letter to his clients – in evidence).

15

It is preposterous to believe that if Gaarn (in 2008-2010) believed he was part of any illegal act, he would introduce outside investigators and independent counsel to the investors he would have allegedly defrauded.  Second to that, Kenner assisted immediately upon request from the investigation team to turn over all information to them regarding Constantine and Eufora in 2010.  Clearly no obstruction between Kenner and the investigation occurred.

In fact, the August 2010 Home Depot recording corroborates that Kenner told Constantine he would *not* interfere with the investigation.  That inculpatory Home Depot recording was turned over by Kenner to the same people who would have been looking to sue &/or prosecute Kenner and Gaarn if they were involved in an illicit cover-up regarding their legal clients.  They did not.

No other individuals were alleged during trial to be part and parcel to a Kenner organized concealment plan or organization, thus the enhancement is not valid and should be denied.

Kenner's role (if any) is clearly similar with case law in argument with *United States v. Holden*, 2018 WL 3580122 -- United States Court of Appeals, **Ninth Circuit** (No. 16-30186 -- Argued and Submitted June 8, 2018—Portland, Oregon -- Filed July 26, 2018) where "Defendant [Holden] did not exercise sufficient control or organizational authority over co-conspirator to qualify for…"organizer" sentencing enhancement to his sentence for mail and wire fraud, conspiracy to commit mail and wire fraud, and money laundering, where co-conspirator was only other participant in conspiracy to defraud investors in refinery project, co-conspirators were co-equal conspirators [if at all in the instant case], joint venture agreement between defendant and co-conspirator specified that their companies would split profits from project evenly, and defendant's instructions to co-conspirator for sending investors' funds to defendant's accounts was more akin to facilitation than organization. *18 U.S.C. §§ 1341, 1343; U.S.S.G. §3B1.1(c).*

If the *Holden* standard is not adopted, it must be observed that Kenner *never* benefitted from the Hawai'i consulting payments to Constantine, nor the 2004-06 Hawai'i "Jowdy loans" (regardless of Kaiser's fabricated "forgery" claims[5], yet never alleging a Kenner

---

[5] The mere fact that the government produced the "*ink*" versions of the two (2) Kaiser-possessed Constantine-Hawai'i consulting agreements weeks before the trial, should give the Court pause; *grave pause*.  It is outrageous that Kaiser, with the government's support, could allege that two (2) documents – with original "*ink*" – could have been in Kaiser's possession for up to ten (10) years before the trial – BUT – someone else forged his name.

• Where is the original agreement(s) that Manfredi told the FBI existed during his October 2010 proffer with FBI agent Galioto present? (*3500-CM-2-r at 1*):

"*Agreement - PK or LLCs and Constantine*
*-> may have been w/ Constantine + another person*"

benefit).   Kenner played a smaller role than *Holden* – who was documented to "split" profits…yet, *Holden* was not deemed a leader for enhancements.

In *United States v. Rajrajratnam*, 2012 U.S. Dist. LEXIS 14961, the Second Circuit posited, "Prior to making a leadership enhancement under section *U.S.S.G. §3B1.1(a)*, a sentencing court must make 'specific findings that (i) the defendant was an organizer or leader, and (ii) the criminal activity involved five or more participants, or was otherwise extensive.'" *United States v. Si Lu Tian*, 339 F.3d 143, 156 (2d Cir 2003) (quoting *United States v. Escotto*, 121 F.3d 81, 85 (2d Cir 1997)).

As such in *Rajrajratnam*, the Second Circuit has held that persons cannot "be considered 'participants' within the above guidelines definition of that term where there is no indication in the record that they would be criminally liable." *United States v. Ware*, 577 F.3d at 453.   It follows from the definition of a participant as someone criminally liable that "[i]n assessing whether a criminal activity 'involved five or more participants,' *only knowing participant are included.*" *United States v. Paccione*, 202 F.3d 622, 625 (2d Cir 2000).

Under *Rajrajratnam*, the Court also held that leadership "factors the court should consider include…*the claimed right to a larger share of the fruits of the crime*".

- Kenner received *none* of the Hawai'i partners' proceeds from the Constantine consulting fees or the "Jowdy loans".
- Kenner received *none* of the GSF proceeds (although even Kenner's well-documented $22,425 expense reimbursement could have fallen under the Constantine-Gonchar "side-deal", if somehow the actual expenses Kenner paid for the GSF were deemed some repayment "fruit").
- And, Kenner received *none* of the Eufora private stock sales (except for the documented loan repayments from Constantine and Gaarn; and certainly not more than 55% of the "Gaarn sale proceeds" as government expert Petrellese explained to the Court (*Tr.3947*) – with 100% of the shares alleged as belonging to Kenner (under some cloud of mystery – contradicting all empirical evidence) (*Tr.5974-5975 [Rucchin], 5971 [Sydor], 6011[Court]*).

- The government alleged falsely that the Gaarn shares belonged to Kenner in the face of all pre-trial empirical evidence.   In addition, the fact that during four (4) plus hours of FBI planned recordings of Kenner with Gaarn's help, *never once* did

---

- If the Kaiser signed agreements are "fake" (somehow), then where are the real ones that Manfredi confirmed?   It is pure nonsense…

Furthermore, how does some "government expert" try to confirm the name was forged when he intentionally chose not to use the scientific approach to evaluate the document; fully knowing (unless concealed by the government) that Kaiser is a known liar about "forgeries" in the same EDNY Court, in Mexico, and in multiple Arizona civil cases.

Kenner possessed the photocopy versions of the same agreements in his Arizona home – recovered and BATES STAMPED during the November 13, 2013 search and seizure.

Gaarn allege that "his Eufora shares" were Kenner's or that he was selling them for Kenner. In fact the 2012 Gaarn-FBI recordings confirm that the money Gaarn sent Kenner was for loan repayments, leaving no equivocation on FBI recordings – in spite of the government's repeated trial allegations (contradicting their own evidence) thru rebuttal summation (*Tr.5971*) of the falsity.

The Second Circuit also referenced more activity by a potential leader from the court records, certainly more than Kenner exhibited, when the Court remarked: "So, again, I feel that it's a close question but I think that Mr. Osmanson was the *center of the fraud scheme*, that he *recruited other professional who acted in concert with him*, that *they were licensed professionals* who committed criminal or certainly unethical acts to *increase their joint profits*. I feel that they were joint conspirators with him. (*United States v. Osmanson*, 2014 U.S. Dist. LEXIS 156247, at 165:20- 166:1)

- Nevertheless, the Court opined it to be very a "[v]ery close" question, but elected *not* to impose the four-level enhancement. For Kenner, there were no recruited professionals (FINRA governed or otherwise), and nothing Kenner did "increased his profits" considering there were no accountable "ill-gotten gains"; only documented expense repayments [GSF] and loan repayments [Gaarn and Constantine Eufora private stock sales], contrary to the government's allegations of upwards of $80 million in frauds "*for Kenner's benefit*".

Ultimately, even with Constantine's involvement in some alleged secret scheme, the probation and government fail to explain that there was adequate evidence that Kenner exercised "control" over Constantine or was responsible for organizing Constantine in carrying out the crime.

**Objection to Adjustment for Obstruction of Justice USSG § 3C1.1**

The government claims that Kenner willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense.

- Kenner objects to the enhancement as argued below.

**In 2009 -- Kenner gave proffer and arranged for more exculpatory disclosures but the FBI stopped the damming Jowdy information that was pending...**

Kenner was the first (1st) whistleblower to the FBI, the US Attorneys' office and the SEC on June 24, 2009. Kenner exposed the decade of Ken Jowdy crimes that were "known" at that time (with only a partial Jowdy bank-record inventory). Kenner volunteered to come to the EDNY of New York and give Grand Jury testimony in August 2009. It was memorialized by a July 17, 2009 subpoena (*JAG-F.#2009R01218*). The subpoena was subsequently cancelled July 27, 2009 by FBI agent Galioto and US Attorney Jeff Goldberg ten (10) days later (*JAM:JAG-F.#2009R01218*) – even though Kenner was

assaulted about the truthfulness of the Kenner Grand Jury subpoena and termination of it during AUSA Michiewicz' passion-laden and partisan cross-examination (*Tr.5064-5065*), referring to Kenner as "*lying*" for testifying to the mere existence of the Jowdy subpoena and termination[6].

Please note that that the majority of the now-known Jowdy criminal embezzlements, racketeering crimes (RICO), and diversions have been fully substantiated by the actual evidence the government turned over to Kenner since his incarceration.   Thus, in order for Kenner to confirm 100% of the Jowdy criminal acts and the efforts to conceal them by the active FBI case agent (in concert with Jowdy's attorneys), it had to be confirmed with evidence the FBI case agent (and any other DOJ involved individuals) must *consciously and blatantly ignore*.

**Kenner organized FBI interviews for the investors...**

Only five (5) days after the Kenner 2009 proffer (June 30, 2009), Kenner contacted and organized the FBI interviews of Mexico-Hawai'i investors (in evidence):
1. Darryl Sydor (*Hawai'i LOC investor*),
2. Mattias Norstrom (*Hawai'i LOC investor*),
3. Michael Peca (*Hawai'i LOC investor*),
4. Glen Murray (*Hawai'i LOC investor*),
5. Bryan Berard (*Hawai'i LOC investor*)
6. Jay McKee, and
7. Turner Stevenson

Although it would have been a perfect time – *in real time* – for the FBI interviews to determine the Hawai'i LOC investors knowledge (with the collateral seizures occurring less than three [3] months earlier – for five [5] of the eight [8] LOC investors, *supra*) and the real "Jowdy loans" as Kenner proffered, it was FBI agent Galioto who cancelled the pending interviews, *obstructed justice* (to Kenner's eventual detriment) as soon as he communicated with Jowdy's attorneys (including Louis Freeh, Galioto's former boss).[7]

**Kenner instructed all Hawai'i-Mexico investors to contact their independent attorney, Ronald Richards, and ask him to arrange subpoena service...**

Five (5) LOC Hawai'i investors were included in the initial round of proposed interviews

---

[6] The actual EDNY Grand Jury subpoena and termination letters from US Attorney Jeff Goldberg were both issued in Michiewicz' EDNY office, thus further hi-lighting his breach of ethical responsibilities to promote a fair trial.   His actions were entirely prejudicial as planned to unfairly discredit Kenner as a witness, specifically related to the subpoena and cancellation that he knew to be true and issued, exactly as Kenner testified.

[7] In 2009 -- Jowdy and his attorneys were working hand-in-hand with Owen Nolan and Joe Juneau (two [2] of the three [3] other LOC Hawai'i investors) – so nothing, specifically including any Kenner actions, could have dissuaded them from testimony.  But, the FBI agent failed to interview them about the 2015 salient issues – as well.

by Kenner; allowing for full, unimpeded transparency, six (6) full years before their **CTE** affected every element of their *"failed memory tests"* at trial (defended as *faulty memory, confusion and mistakes* by the government) *nevertheless utterly unreliable*.

While Hawai'i-Mexico investor, Darryl Sydor, was sought for subpoena service by the FBI (or a US Marshall server), Sydor called Kenner to notify him (identical to Jay McKee, Sergei Gonchar, Michael Peca, and Turner Stevenson all before him).   Despite the fact Galioto knew they were all represented by counsel and ethical requirements are that Galioto contact the individuals' attorney before effectuating in-person service as an intimidation tactic, Kenner instructed all of the Hawai'i-Mexico investors to contact their attorney (Ronald Richards) and arrange service. Sydor was *not* hiding in his house from the US Marshalls and calling Kenner. *Kenner wanted 100% of the investors to give testimony* (in evidence).

As a result of the 2011 Grand Jury testimony, Sydor, Peca and Stevenson fully exonerated any Kenner "concealment" claims during their 2011 SDNY Grand Jury testimony regarding the "Jowdy loans" that were decided "*as a group*".   So, what would Kenner want to impede?   **The investors told the truth independently.**   They all confirmed the "*group*" decision surrounding the loans to Jowdy.   And, they all held Jowdy (never Kenner) responsible for the non-payment of the loaned funds (including John Kaiser during his October 2010 FBI proffer – *3500-JK-1-r at 3*).   Kaiser proffered (as Galioto's raw notes documented):
> *"never got $ back from KJ [Jowdy]/Mexico"*

**Kenner assisted Hawai'i-Mexico investors – at their request – to gather more evidence versus Jowdy and his Mexico cabal's criminal activities…**

In 2014-2015, several Mexico-Hawai'i investors (all non-victims in the Kenner 2015 Superseding Indictment) began new litigation efforts in Mexico (after Kenner's EDNY arrest) versus Jowdy for the decade-plus of *known* criminal activity.   The Jowdy-investor-victims contacted Kenner to assist in the preparation of evidence necessary to present to the Mexico government thru the District Federal Mexico Supreme Court. Kenner assisted his clients, as always.

100% of the evidence Kenner provided them was from the government's Rule 16 production; ultimately ignored to protect Jowdy and his co-conspirators in the USA (including Kaiser and Berard by then).

Nothing in the independent litigation efforts by multiple Kenner investors in Mexico (not Kenner) – separate and apart from the other investors' legal actions versus Jowdy in Delaware (which Kenner also provided evidence to support) – attempted to restrict Kaiser, Jowdy or anyone else from EDNY testimony.   Kaiser was never even a named defendant in any Mexico litigation.   In fact, Kenner welcomed the Kaiser 2015 perjurious testimony, hi-lighting his 2015-fabricated defense of Jowdy (in step with the government's false opening remarks – *Tr.31*) and both of their false victim statuses.

Kaiser's February 28, 2019 letter (*Document 628*) confirmed the Kaiser lies to protect his 2015-boss and re-write history included perjury (suborned or otherwise).   **Thru the government's July 18, 2016 addendum, they still referred to Jowdy as a victim.**

The government also claimed the 2014-2015 litigation in Mexico was related to the "Los Frailes project" in their PSR submissions.   This is wholly untrue.   In fact, Jowdy is a non-participant in that project, managed at all times by another individual (not Kenner), and not named in the EDNY instant case.

- In fact, Galioto and FBI Agent Michael Cassidy arrested the person who was independently helping the investors (Mattias Norstrom, Jozef Stumpel & Rem Murray – none of which were victims in the superseding EDNY Indictment) file their new, Mexico City Supreme Court action.
- Galioto and Cassidy provided more Jowdy protectionism; perhaps now exercising the lowest level of ethics.   During Kenner's pre-trial facility transfer, the "new" government officials involved in the 2015 arrest and detainment of the individual helping the anti-Jowdy investors told the Court that the "trial prosecution team" was *not* aware of the alleged independent obstruction investigation versus Kenner. This was not true either.
  - The investors confirmed to Kenner on the phone that FBI agent Galioto called them to announce "his" arrest of the person helping them versus Jowdy.   This obstruction by Galioto was improper but never clarified to the court as complicit; hiding it from the Court.

**The government still claims the "Jowdy loans" are a fraud in 2019, with Kenner's testimony contradicting their unsubstantiated claims constituting obstruction...**

Not only does the government have Jowdy's Nevada December 2010 defense trial transcripts (100% authenticating the 2004 Hawai'i-Jowdy loan agreement – in evidence), but Jowdy gave proffer to the FBI in March 2010 (*3500-KJ-1-r*) that all of the funds from Little Isle 4 and Ula Makika (the Hawai'i partners) are "loans".

Sergei Gonchar proffered to the FBI in February 2010 that Jowdy, independent from Kenner's disclosure, told Gonchar face-to-face about the loans (during their 2005 dinner in Cabo san Lucas) (*See 3500-SG-2 at 9*), noting:

> *"SG [Gonchar] heard from KJ [Jowdy] that $ loaned to KJ" – and*

> *"KJ only entity Hawaii loaned $ to."*

- **What could be clearer – or transparent?**

The government continued to promote their ruse on the Court; thru closing rebuttal statements during their recent March 1, 2019 forfeiture oral arguments.  Notwithstanding, the government authenticated *government forfeiture-44* during their 2016 forfeiture case. This document altogether verified the "Jowdy loans" *as documented by Jowdy and his attorneys*.   No evidence exists that the loans are anything but REAL, yet the government

continues to hang by a thread to their known falsity.

**The government hides from the Peca loan confirmations...**

*In addition to the Kaiser, Gonchar, Jowdy (et. al.) "Jowdy loan" confirmations (supra) to the FBI themselves*, the government hides from Michael Peca's trial reversal when he confirmed that his 2011 SDNY Grand Jury testimony was **accurate**, that *he knew about the Jowdy loans at all times*, and that *the loans were decided by the "group" of investors*; leaving no equivocation about multiple investors' involvement in the 2004 Hawai'i-Jowdy loans (all who have all given pre-trial testimony of their real time knowledge of the loans).

If acknowledged, the reversal of the "phony loans" prosecution theory in the eyes of the Court would leave revisionary items that could only be resolved by a new trial.   The government continues to fear that real possibility.   In fact, after their 2016 "error" in entering *government forfeiture-44* into evidence (trying to create a nexus for forfeiture that does not exist to the Kenner managed Baja Ventures 2006; for Kenner, Stumpel and Lehtinen), the government proclaimed that they viewed a website disclosing many of the trial witnesses "mis-representations".[8]

Unpardonably in the government's motion to terminate the website, the government claims they have concerns that their witnesses will not be able (after seeing the "real evidence" on the website) to maintain similar unreliably faulty testimony (regardless of the *faulty memory, confusion and mistakes* excuse) at a re-trial, now that their memories have been publically refreshed.

As suggested by the government's motion and as quoted, regarding the website's "***real evidence***":
> "*Its only purpose is to dissuade Victim Witnesses from testifying or speaking against Kenner in a manner* <u>*consistent*</u> *with their prior statements [from 2015], if they do, the Email intones, "**the real evidence**" will "**show your lies**"*.

- If the government witness testimony was factually inaccurate, as thoroughly exposed throughout the ample empirical evidence Kenner produced, shouldn't the witnesses be made aware, *specifically as the responsibility of the prosecutorial team?*

- Isn't the government concerned that the witnesses' inaccurate testimony in 2015 were based on ***perjury*** (*suborned or not*), ***lies*** &/or ***faulty memory, confusion and mistakes***?   Shouldn't they seek to rectify all of the inaccuracies in the name of justice?   Or, is the conviction the unspoken goal?

---

[8] The government referred to all of them as *faulty memory, confusion and mistakes*, which must be wholly unreliable for a "concealment" prosecution with alleged victims that repeatedly contradicted their own testimony, exhibiting full symptoms of **CTE** (degenerative memory loss) – another "new evidence" issue yet to be addressed by the Court; invalidating effectively 100% of the witness' claims that they "*do not remember*" anything.

> ➢ Was the government REALLY alleging that witness exposure to the "*real evidence*" would make it more difficult to elicit the same "*inaccurate testimony*" in a pending Kenner re-trial? The statement is utterly bewildering.

The government claimed that the identical "*documents filed on PACER are less publically available, in that one must have a user account and pay for access.*"

Is the government suggesting that with sign-up criteria for PACER and the fact someone would need to pay to download pages they want to review, that the government witness perjury from trial would prohibit the witnesses from viewing their own factually inaccurate testimony, confirming that their testimony at the 2015 trial was "*inconsistent*" with the "*real evidence*"?

- Why wouldn't the government want the factually inaccurate testimony to be cleared up for the Court through easily accessible information? Clearly, the government had not shared any of the contradicting evidence with the alleged victims.

**Government represents three (3) people who contradict Kenner's forfeiture hearing testimony – claiming they all "testified" at the forfeiture hearing in opposition to the existence of the 2004 Hawai'i loan agreement...**

None of the three (3) individuals testified[9]; and only John Kaiser gave testimony in the 2015 EDNY trial. It was utterly irresponsible that the addendum was submitted (supposedly written by the probation office) making those claims. No one could have read the transcripts which only IRS agent Wayne and defendant Kenner gave testimony and suggested three (3) additional people also did. The government *verified* (at 1):

> "*However, the testimony of the <u>victim witnesses, including Ken Jowdy himself</u>, as well as investors John Kaiser and Robert Gaudet, at the criminal forfeiture hearing, clearly contradicts this information, since all three individuals testified that the loan agreement did not, in fact, exist.*"

The underlying claims that their testimony (although never given) contradicted the 100% empirical evidence in the government's possession. The addendum contradicts the facts that the loan agreement has always been known (See Peca Grand Jury testimony and 2015 trial testimony), possessed by Kaiser for a decade (See Kaiser 2015 testimony), witnessed by Robert Gaudet (in three [3] separate civil cases – and interviewed by the FBI on multiple occasions), and authenticated by Jowdy in his 2010 defense case (in evidence).

---

[9] The government's July 18, 2016 addendum for "obstruction of justice" falsely verified to the court that Ken Jowdy, Robert Gaudet and John Kaiser testified at the 2016 forfeiture hearings.

- No evidence was ever presented that the 2004 Hawai'i loan agreement was inauthentic. The addendum, to invoke another enhancement, is disingenuous at a minimum.

To verify the Kenner claims of loan agreement authenticity (contradicting the government's fabrications), the court requested copies of the three (3) Robert Gaudet confirmations to his witness signature in three (3) different jurisdictions (*Forfeiture Tr.288-290*):

> *Q. Actually, what you said in that deposition transcript was that he remembered signing a document, but he could not identify the loan document; isn't that correct?*
>
> ***A [Kenner]: All I can recall from that July 2nd, 2009 deposition is Mr. Gaudet confirming on <u>approximately 10 different occasions</u> that he had signed and witnessed the loan agreement between Mr. Jowdy and myself.***
>
> *Q. Mr. Kenner, what Mr. Gaudet actually said was he did not recall that document. He recalled seeing something, but not that document; isn't that what he testified to?*
>
> ***A [Kenner]: I don't believe that to be accurate.***
>
> > *MR. CONWAY: Your Honor, if you'd like, I have the deposition downstairs. I can bring it back up and submit it to the Court in writing.*
> >
> > *MR. HALEY: Judge, if I may, it is our intention, I think the Court ought to have all the deposition exhibits and testimony that relates to what persons said about the legitimacy and authenticity of that loan document for the Court's consideration, so I have no objection.*
> >
> > *THE COURT: Yes, I'd like to read it. Okay.*
> >
> > *MS. LEONARDO: I'll do that in writing, your Honor.*

- The government never submitted a rebuttal in the face of the real evidence.

> > *MR. HALEY: Judge, in addition, of course, we'll be introducing the deposition -- well, deposition transcript from the AAA proceedings has already been introduced. I'm just reserving my right to introduce the testimony as adduced at trial that was referred to where Mr. Jowdy and his attorneys introduced that [2004 Hawai'i loan] document, actually identified as Exhibit 89-A as an authentic document.*
> >
> > *THE COURT: I'd like to see that, too, if you have it.*

24

As a result of this colloquy, all three (3) testimonies that confirmed the government's misrepresentations were delivered to the Court; altogether verifying the government was knowingly misrepresenting the actual evidence.

- There is no downward departure statute that promotes the dissemination of inaccurate information to the Court by the government, yet Kenner is repeatedly referenced as obstructing justice for re-verifying the loans and the underlying loan agreement that exists without equivocation.

In the simplest of the three (3) testimonies, document witness, Robert Gaudet confirmed thru Jowdy's attorneys' Q&A (further exploiting the government misrepresentations in desperation) during the December 2010 loan trial: *Murray v. Jowdy (v. Kenner)*[10]:

**Ms. Lee [Jowdy's lead trial counsel]** (*Nevada trial Tr.195-198*)**:**
   *Q:   Did you ever sign as a witness on Mr. Kenner's behalf for a revolving line of credit at any time?*

   **A [Gaudet]: Yes, I did.**

   *Q:   And when did you sign that agreement?*

   *A [Gaudet]: I don't recall but it was at a party, an event.*

   *Q:   If you could turn to exhibit A-89.  Are you there?*

   *A [Gaudet]: I am here, yes.*

   *Q:   Can you turn to the second page of that exhibit, please?*

   *A [Gaudet]: Yes.*

   *Q:   Is that your signature there as witness?*

   **A [Gaudet]: Yes, it is.**

   *Q:   Do you remember signing this?*

---

[10] Kenner as a third (3rd) party ProSe litigant in a 4-day Nevada bench trial defeated Jowdy's ridiculous claims that even though Jowdy *received*, then *stole* the Glen Murray 2005 loaned funds ($791,000) -- after a request from Kenner to refund all of the funds to Murray (with an email -- in evidence), that Kenner "*magically*" got the money anyhow.   The absurdity of the claim was defeated by Jowdy's own accounting records which tracked 100% of the funds to Jowdy distributions and embezzlements for his own benefit (in evidence); concealing his ongoing criminal acts as early as 2005 (still unknown to Kenner and Kenner investors).
   - *It should be hi-lighted that Murray's complaint in the 2008-filed Nevada case also **confirmed his previous authorization of the Hawai'i loans to Jowdy**, thru his independent Nevada counsel (in evidence).*

25

*A [Gaudet]: Yes, I do.*

*Q:  Is that your signature there as witness?*

*A [Gaudet]: Yes, it is.*

*Q:  And can you tell the Court what date this document is entered into?*

*A [Gaudet]: 12/7/2004.*

**Ms. Lee** *[Jowdy's lead trial attorney]:   Your honor, I'd like to move to admit this exhibit.  He's authenticated his signature on it.*

- The authenticated 2004 Hawai'i-Jowdy loan agreement was presented thru Gaudet[11] as Jowdy's main defense exhibit, to defend his defense theory that Jowdy had an alternative funding source to the Glen Murray money.

**The government ignores Jowdy's 2010 FBI proffer that he received loans from Little Isle 4 and Ula Makika – while confessing he used money for his personal expenses (a.k.a. embezzlement)…**

Jowdy confirmed to the FBI (as documented in their March 2010 raw notes) that he received loans from the Hawai'i entities: *Little Isle 4 and Ula Makika* – as follows:



- Despite both Jowdy and Gonchar's 2010 proffers confirming the Hawai'i loans – the government in 2015 (5 years later) pursued – in the criminal trial and thru the forfeiture hearings – a theory that Kenner made up the loans…

- Gonchar's 2009 affidavit (*3500-SG-4 – which was delivered to the FBI in 2010*) also verified Gonchar's knowledge of the use of his LOC to pay for monthly LOC expenses of others (amongst other Hawai'i partners expenses) and the loans to third parties like Jowdy.

---

[11] Robert Gaudet was Jowdy's director of golf when he signed the loan agreement as a witness in December 2004.

26

**The government continues their "forgery" ploy in light of overwhelming Kaiser perjury and the government's complicity...**

During the November 13, 2013 search and seizure at Kenner home, the FBI recovered photocopies of two (2) Constantine-Hawai'i consulting agreements.   They documented them with 100% of the seized documents that day as:

- 2004 agreement – *PKHOME00012892-12895*
- 2005 agreement – *PKHOME00012887-12890*

Yet 18-months later, and only weeks before the May 2015 trial began, the government announced that they had recovered the "*ink*" version of the two (2) agreements – **FROM KAISER, himself**.

- Further confirming that the "*ink*" versions were from Kaiser's home (after being held for approximately ten [10] years since Kaiser respectively signed the agreements), they were *not* BATES STAMPED from Kenner's home.  Instead they were "only" labeled for trial as:
    - 2004 agreement – *GX-7004*
    - 2005 agreement – *GX-7005*

It is suspicious, at a minimum (hint of falsely proffered evidence here), that Kaiser would possess the "*ink*" versions -- **at his home** -- if his name were forged by someone; unexplainable at best.   The gall of the government to continue with that forgery ruse at trial is commensurate with their ½ pregnant approach to all of the false predicates and revisionary trial testimony (too numerous to re-list).

Nevertheless, with all of the now-known Kaiser subterfuge surrounding all "other" Kaiser claims of his name being forged – *only after his 2012 employment by Jowdy* -- the government elicited the following from Osborne about the Kaiser signature (*Tr.3642*):

> *Q. ...did or did you not testify when asked about the signatures on this document, which the jurors were given by the government, so one can[t] have any mystery what we are talking about, <u>did or did you not testify we can conclude these signatures are non-genuine</u>, did you or did you not say that?*
>
> *A [Osborne]: During which portion of my testimony?*
>
> *Q During the portion of your testimony when you stood in front of the jury with these documents on that easel, wasn't that your testimony; yes or no?*
>
> *A [Osborne]: Yes.[12]*

---

[12] With all of the subterfuge surrounding Kaiser's integrity pre-trial with the uncovered <u>Mexico forgery fraud</u> by Kaiser and the discovery of the <u>"ink" versions at Kaiser's house</u> – the government did not request – or simply require – that their signature expert use the available methods of scientific analysis (*Tr.3643-3645*).

- As such (and for every reason *supra*), there is no condition represented by the government that properly substantiates any obstruction by Kenner and the request should be denied.

## Objection to USSG § 2B1.1(10)(C) Enhancement (Sophisticated Means)

In paragraph 61 of the PSR, it is alleged that the offense of conviction involved "sophisticated means" thus warranting a two-level enhancement under *Guideline §2B1.1(10)(C)*.

- Kenner objects to the enhancement as argued below.

If (c) of offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, then a 2-level enhancement is appropriate.

But -- the definition of sophisticated means is: for purpose of subsection (b)(1), "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. Conduct such as hiding assets or transactions, or both, thru the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicate sophisticated means.

**In the instant case, none of these elements exist.**
The alleged Constantine-Hawai'i consulting agreements with Kaiser forgeries are a fraud on the Court, the FBI and the US Attorneys office **by Kaiser** (with a complicit prosecution team) – *considering the government received the "ink" versions from Kaiser's home*! It is unexplainable that two (2) individual documents in Kaiser's possession for approximately ten (10) years, since he signed them, could have been forged when he has been the sole custodian of the documents. (Kenner's ineffective trial counsel shoulders tremendous blame for not demanding a *Daubert* hearing for the alleged expert, or attacking the veracity of the newly found documents, or how they were found, &/or the historical "*false forgery*" claims that Kaiser had already been found dishonest about in this same instant EDNY case, regarding his false Mexico forgery claims).[13]

- Plus, the **Hawai'i** consulting agreements have never been used to substantiate

---

*Q. And to avoid confusion on my part, in connection with the engagement by the Government in this case in connection with the signatures here, did you or did you not take advantage of the computerized program/software developed by this, sir? Yes or no?*

*A [Osborne]: No.*

[13] This will be further expounded upon in the pending *28 U.S.C. 2255* motion for defendant Kenner.

28

*anything* legally or otherwise, thus the mere existence of them was nothing more than typical corporate papering, like the numerous other signed consulting agreements in the Hawai'i partners files (and *cross-verified by both Kaiser and Manfredi during their FBI proffers*; **including the Constantine consulting deal by both of them**),

- The simple buyer-seller stock deals with the Gaarn and Constantine **Eufora** private stock sales (in 2008-09) were fully vetted by the investors' own well-seasoned attorneys and investigators (including a former CIA agent); finding nothing inappropriate about the fully disclosed private stock transactions (and specifically addressed in a July 16, 2010 letter to the Eufora stock purchasers and the rest of the Eufora investors – in evidence). **The full-disclosure letter by the investors' own attorney was signed and returned by each of them, acknowledging the vetting,** and

- The **GSF** was never misappropriated – fully pursuant to the Constantine-Gonchar "*side-deal*" that the government *ignored* in order to frame their prosecutorial theory; altogether wasting the Courts time with over ten (10) witnesses verifying transactions in and out of the Ronald Richards Trust account (the custodian for the Constantine-contrived and managed GSF).

## Limited Liability Corporations are not sophisticated...

The routine initiation of Limited Liability Corporations, established to hold the various land acquisitions in Hawai'i, were not just normal in any real estate transaction, but the absence of them would have subjected a Kenner decision to proceed in any other fashion **as negligent** (with Kenner not even sure what other option there would be).

Government witness Kaiser confirmed the specific validity of the LLC "protective" usages as follows (*Tr.1103-1104*):

> *Q Did you have an understanding, sir, that an LLC with reference to the creation -- excuse me, did you have an understanding or do you have an understanding that an LLC, limited liability corporation, with respect to investing and developing real property has a particularly useful legal significance?*
>
> *A [John Kaiser]: Yes.*
>
> *Q What is your understanding of that?*
>
> ***A [John Kaiser]: An LLC creates – I[t] won't state [sic - break] corporate veil, offers you some protection, liability protection, and also you can bring in different partners, different shareholders.***
>
> *Q It gives protection to the investors so that the only assets at risk are the assets of the LLC as opposed to the personal assets, correct?*

29

*A [John Kaiser]: That's correct.*

*Q And it also allows for further investors to come into the LLC, isn't that true?*

*A [John Kaiser]: Yes.*

*Q And it also allows for other investors to get out of the LLC through the operating agreement, isn't that true?*

*A [John Kaiser]: Yes.*

Not a single LLC was proven as utilized to "hide" anything.   In fact, when Kenner filed the first (1st) US litigation versus Jowdy in 2008 (the Arizona case) – after the eighteen (18) months of negotiations were terminated by Jowdy's attorneys – the lawsuit was titled "*Little Isle 4, Ula Makika and Phil Kenner v. Ken Jowdy*".   <u>Each</u> of the transactions from the Little Isle 4 and Ula Makika accounts were specifically listed in the lawsuit Complaint; subjecting the bank records to full discovery and transparency by Kenner.

Nothing was concealed for the main two (2) transaction accounts for the Hawai'i partners.
- Kaiser confirmed to the FBI in October 2010 that he saw <u>all</u> of the Hawai'i partners' bank statements (*3500-JK-1-r at 10*).

Every other Hawai'i-related LLC was utilized to hold the assets of land acquisitions or effectuate the payroll of the Hawai'i partners.

The government's PSR finishes with a conclusory statement that "*Since the offense involved sophisticated means, and the defendants intentionally engaged in or caused the conduct constituting sophisticated means, 2 levels are added...*"; but provided no evidence to support the representation.

**<u>All of the LLCs for the Hawai'i partners were registered in the state of Delaware (except one [1] 501c3 established by the Hawai'i attorneys at Carlsmith Ball, LLP)...</u>**

Delaware's government website currently boasts:

> "*More than <u>one million business entities</u> take advantage of Delaware's complete package of incorporation services, including modern and flexible corporate laws, our highly-respected Judiciary and legal community, a business-friendly government, and the customer-service-oriented staff of the Division of Corporations*".

In fact, one of the Hawai'i attorneys [William Najam] confirmed during his 2009 arbitration testimony that ten (10) law firms were involved in the closing of the 2006 Hawai'i transaction, and the specific disclosure letter was written by himself and Larry Markowitz (the other Hawai'i attorney for the Hawai'i partners), *not Kenner.*

Attorney Najam went on to explain that the disclosure letter explained exactly what the attorneys for the Joint venture partner (Windwalker) and the attorneys for Lehman Brothers <u>wanted</u> in the disclosure letter; not what the government alleged "should have been in the letter" (like Jowdy loans &/or land loans from Centrum financing and Urban Expansion).   The government and the Court know full-well that the Jowdy loans (as unrelated to the joint venture) would <u>*never*</u> be included in a joint venture disclosure letter (ever), but the government took advantage of an inexperienced jury to make that allegation as if it were an act of concealment.

At the 2009 arbitration, attorney Najam confirmed (*Arbitration Tr.359-361*):

> *Q. Now, between that May closing and the ultimate closing in August 2006, were there any -- was there any time in working with closing that you thought it wasn't going to close?*
>
> *A [Hawai'i partners' Attorney Najam]: No. I thought things were moving along pretty well for us getting to close it.*
>
> *Q. Were there any significant problems?*
>
> *A [Hawai'i partners' Attorney Najam]: Well, I mean, **<u>there were ten law firms involved</u>**. Other than the <u>complexity of the transaction</u> and some <u>fairly hard negotiations with Lehman and with the joint venture partner</u>, I wouldn't say there was anything that led me to believe that we were not going to be able to get it to close.*
>
> *Q. What was the name of the joint venture partner?*
>
> *A [Hawai'i partners' Attorney Najam]: Windwalker, <u>a [Delaware] company created specifically for this transaction</u>. The principal was Allen Warden.*
>
> *Q. <u>Did you have an understanding of why Windwalker was coming into the joint venture?</u>*
>
> *A [Hawai'i partners' Attorney Najam]: <u>To the best of my knowledge Lehman's principals reviewed the deal and were interested in financing. **They were not interested in working directly with Mr. Kenner**</u> and suggested that if they were going to finance the transaction, that <u>they would require that Mr. Kenner work out an arrangement with another joint venture partner that they had confidence in and they had worked with prior to this closing.</u>*

How could the government theory that Kenner "*also tells you that Lehman is interested. In 2005 Lehman is interested in investing in Hawaii but Kenner puts them off for another year and he sets up the Urban Expansion loan*" (*Tr.5996*), if the "fruit" of the deal – as speculated by the government -- would be for Kenner to:

- <u>Lose control</u> of the Hawai'i partners LLC (as Najam confirmed, *supra*),

- o Noting that Jowdy is paid $225,000 per month as the "developer" according to the government (and Kenner gave up any developer fee in Hawai'i to do a deal with Lehman Brothers *and receive nothing*),
- Receive none of the JV payout (minus documented pre-paid closing expenses),
- Lose his Hawai'i house in the JV deal at a financial loss as a requirement to consummate the deal, and
- Be stuck guaranteeing the Environmental Indemnity Agreement (with potential liability of tens of millions in the future – due to the known petroleum issue on one [1] of the project property sites)?
- Etcetera…

It is inconceivable that defendant Kenner could have prepped all of that with Lehman Brothers in 2005, knowing it would personally cost him close to a million dollars and the future loss of control of the project.  Who would "*put Lehman off*" if Lehman Brothers did not have confidence after Kenner cancelled the "*egregious*" 2005 deal[14] (which was for $5 million – not the $105,000,000 2006 deal – wholly different in scope and magnitude)?

[Najam continues in 2009 testimony]:
> *Q. If you could turn to Exhibit 47 [the 2006 joint venture disclosure letter for Little Isle 4 members, Kaiser and Manfredi]. Have you seen Exhibit Number 47 before?*
>
> *A [Hawai'i partners' Attorney Najam]: Yes, I have.*
>
> *Q. Did you participate in the drafting or review of this letter?*
>
> *A [Hawai'i partners' Attorney Najam]: I did.*

---

[14] Please note that Hawai'i partners COO Chris Manfredi explained to another hard moneylender on August 16, 2005 "*The deal with Lehman was cancelled by us as being too egregious.*"

Manfredi, Kaiser and Kenner ("*us*") made the joint decision the week of the signing based on the "*egregious*" change in terms, with Lehman Brothers believing they could "steal the deal" with their 11th hour-proposed, two-year, annual 26% bubble loan.

- **Had Kenner, Manfredi and Kaiser signed the 2005 Lehman Brothers deal for the Hawai'i partners, the *entire* project would have been forfeited after 24 months to Lehman Brothers** (due to the cross-collateralization requirements of the "*egregious*" deal), because no sales could be made until the County subdivision process was complete to repay the demand note.

- **It was a pathetic deal and un-sign-able.** The subdivision of the Hawai'i partners' land has still not been approved thirteen (13) years later, due to the complexity of local Hawaiian laws.

32

*Q. What was your participation?*

*A [Hawai'i partners' Attorney Najam]: **The letter was drafted by our attorney, Larry Markowitz, who drafted it at the request of both Lehman and Windwalker.** And the intention was there would be a letter sent to all of Phil's investors or clients <u>explaining the transaction</u> and <u>asking them to acknowledge that they had an opportunity to review the transaction with Phil and were comfortable with it</u>.*

*Q. And was there some intention of explaining to the clients what expenses were going to be incurred and what payout would occur at the time of closing?*

*A [Hawai'i partners' Attorney Najam]: Yes.*

*Q. And was the intent to disclose all the expenses so the investors would be aware of it?*

*A [Hawai'i partners' Attorney Najam]: Substantially all of the expenses. You know, they are summarized certainly.*

**Thus...**
- Kenner did not manage the process that ten (10) law firms vetted.
- Kenner did not handle the negotiations between Urban Expansion-Lehman Brothers or Centrum-Lehman Brothers.
- Kenner did not write the Lehman Brothers-Windwalker required 2006 joint venture disclosure letter, as described by attorney Najam, *supra*.

Instead -- Kenner followed "*advice of counsel*" who were aware of:
- The "Jowdy loans" (in evidence),
- The seventeen (17) paid consultants with Constantine being one of the seventeen (17) (in evidence), and
- Who approved the final JV payouts for the Hawai'i partners including the Kaiser payoff deals (in evidence).

A complex transaction, managed as appropriate by uncountable attorneys, cannot be the basis for a "sophisticated means" analysis and its subsequent enhancement.   *The lack of any of those steps would have been clear business negligence.*

**Objection to U.S.S.G. 2B1.1(b)(2)(A) Enhancement**
**More than ten victims**

In paragraph 60 of the PSR, it is alleged that the offense involved more than ten victims thus warranting a two-level enhancement under *Guideline 2B1.1(b)(2)(A)*.

The Commentary to *Guideline 2B1.1* defines **"victim"** as "(A)ny person who

sustained any part of ***actual loss***...or any person who sustained bodily injury as result of the offense".

- Kenner objects to the enhancement as argued below.

Berard (1), Sydor (2), Rucchin (3), Peca (4), Nolan (5), and Juneau (6) were the Hawai'i-LOC investors named in the Superseding Indictment. In addition, Jay McKee (7), Tyson Nash (8), William Ranford (9), John Kaiser (10), Ethel Kaiser (11), and Nick Privitello (12) were named as the remaining alleged victims in the Superseding Indictment (*Document 214 – filed 4/22/2015*).

Hawai'i LOC investors Mattias Norstrom, Glen Murray, and Sergei Gonchar are *not* named in the Superseding Indictment. **For the record, neither are Kenner's Baja Ventures 2006, LLC partners Jozef Stumpel and Jere Lehtinen**.
- In previous court filings (and the government's own *government forfeiture-36* accounting), it has been confirmed that non-victims, **Jozef Stumpel and Jere Lehtinen** (and Kenner partners) contributed $4.1 million to the Baja Ventures 2006 capital account.

- Yet, in another ignored Jowdy crime, Jowdy only documented a $2.5 million capital account for Baja Ventures 2006 (in evidence). The $1.6 million balance (stolen by Jowdy and left undocumented) was the subject of the *Stumpel v. Jowdy* litigation in Mexico for $1.6 million.[15] **This was the case that Kaiser gave signed testimony for Stumpel** – but later removed his testimonial and claimed his name was *forged in 2012*; once assisting Jowdy's defense of Stumpel's criminal case immediately after Kaiser and Berard received their high-paying jobs from Jowdy (as bribes to help protect Jowdy -- and work with the FBI case agent to destroy the legal efforts of Kenner and <u>any</u> Kenner investor versus Jowdy).

---

[15] Jowdy confessed to the theft from Stumpel at page 411 of his January 2010 2-day California deposition. Jowdy's confession was used in the *Stumpel v. Jowdy* Mexico criminal case, *until* Kaiser falsely claimed in 2012 (for his new boss) that his name was "forged" in the Stumpel case on a court testimonial.

The FBI's 2012 recordings of Bryan Berard confirmed that **Kaiser lied about the "forgery"**. Unfortunately for Kaiser's integrity (*specifically about forgeries*), one of the EDNY AUSAs had already informed the EDNY court that Kaiser confirmed his *forged signature* on the Mexico document (during a 2014 hearing).
- **The government hid that newfound knowledge about Kaiser-forgery integrity from the Court.**
- Kenner's trial attorney (Haley) refused to present it.

Kenner informed his trial attorney (Haley) about the Kaiser lie and FBI recording confession verification. Haley (unknowing to Kenner) breached confidence of attorney-client privilege and disclosed the exculpatory evidentiary issue to the government, who promptly stopped discussing the Mexico document; **after Kaiser lied to the Mexico court, the FBI and the AUSA about it.**

o The new scheme worked to Jowdy's advantage for seven (7) more years thru 2019 after the Kaiser and Berard hirings.   Nevertheless, Kaiser submitted a February 28, 2019 letter, now referring to his co-conspirator (Jowdy) as a thief, complementing Kaiser's own complicit criminal cover-up activities while being employed for five (5) years [2012-2017].

o The 2012 FBI recordings of Berard confirmed that Kaiser lied about the Stumpel testimonial *forgery* to the Mexico courts, the FBI, the US Attorney and this EDNY court – fully exposed; yet ignored.

**Ethel Kaiser...**

Based on Ethel Kaiser's trial testimony, Ms. Kaiser did not sustain an actual loss as a consequence of her investments in the Hawaii real estate deal.   She confirmed that her son [John Kaiser] repaid her (most likely when he was fully repaid in August 2006) as negotiated – and as the Na'alehu Ventures 2006 bank records confirm (*Tr.934*):

> *Q Were you eventually repaid by anybody?*
>
> *A [Ethel Kaiser]: Down the line, from my son [John Kaiser].[16]*

- **Ms. Kaiser is not a victim in the instant case.**

**John Kaiser...**

John received $816,000 in August 2006 from Na'alehu Ventures 2006 (in evidence).   At trial, the government and Kaiser tried to promote a scam on the Court and jury that Kaiser received those 2006 funds as "*back pay*" and "*expenses*".

**Renewed subpoena request...**
Defendant Kenner has made repeated requests to the Court for Kaiser's 2006 and 2007 IRS tax returns to be viewed "in camera" by the court to substantiate that Kaiser *did not* file taxes for any portion of the alleged "*back pay*".   The sure handed confirmation will prove another government-Kaiser planned perjury on the EDNY Court.

**Renewed subpoena request...**
Defendant Kenner has made repeated requests to the Court for Kaiser's 2005 and 2006 Hawai'i "*expenses*" to substantiate that Kaiser did not pre-pay any expenses in 2005 and 2006 that would substantiate *the balance* of the $816,000 (received) MINUS the "*back pay*" (from "in camera" review of his taxes); *if any at all*.   The sure handed confirmation will prove another government-Kaiser planned perjury on the Court.

---

[16] The bank records in evidence confirm that John Kaiser received $816,000 in wire distributions in August 2006 from Na'alehu Ventures 2006.   John Kaiser also signed an "Equity Transfer Agreement" with Kenner in July 2006 (accounting for another $360,000 of his capital account funds), thus totaling $1,176,000 in repayment for John Kaiser (as the straw-man for his 2005 friends & family loans to the Hawai'i project).

In fact, Kaiser received the following cash-wire transfers for actual "*pay*" in and around the JV deal paid towards his claimed $45,000 annual salary (*Tr.1414*):

- March 3, 2006 – received **$10,000** (BATES STAMP NAAZ00551),
- April 14, 2006 – received **$10,000** (BATES STAMP NAAZ00554),
- May 15, 2006 – received **$10,000** (BATES STAMP NAAZ00556),
- September 17, 2007 – received **$20,000** (BATES STAMP NAAZ00585).
  - o Kaiser claimed none of these transfers as taxable income (as Kenner personally reviewed Kaiser taxes years later while assisting Kaiser with a loan modification on his Long Island mansion).

**<u>Kaiser had no personal money in the Hawai'i deal...</u>**
- **Thus – Kaiser cannot be deemed a victim.**

Kaiser's best friend, Hawai'i partners COO Chris Manfredi, confirmed this to the FBI during his October 2010 proffer – *3500-CM-2-r at 2*).
- Kaiser had no money in any other venture, including having been fully repaid in his 2006-07 California real estate deal with Kenner (in evidence).   In spite of the proof of his full California repayment thru Kenner and Kaiser's bank statements in the government's possession, Kaiser's trial perjury about his California venture with Kenner was another planned-perjury on the Court – *and resulted in Counts 2, 3 and 4 (Tr.1020 – Michiewicz' false proffer to the Court)*.

- Kaiser's February 28, 2019 letter to the Court makes more fraudulent representations that now; he actually owns the Kenner Baja Ventures 2006 equity.   The agreements he references are *forgeries* of Kenner's name (just like the Kaiser and Berard forgeries of Kenner girl-friend's name – in evidence – for their theft of the Sag Harbor property from Kenner and Tesoriero).

  - Notwithstanding the forgeries of Kenner's name by Kaiser (referenced in the February 2019 letter) – the two (2) agreements would have been terminated as fully repaid based on the actual transactions (in evidence); making the Kaiser claims even more shameful to cover-up the millions (in evidence) he stole from his friends & family since the original 2005 Hawai'i loans (and got Jowdy to assist him with after receiving his 2012 Mexico job).[17]

  - **John Kaiser is not a victim in the instant case.   Kenner and the Court are victims of Kaiser.**

**<u>Nick Privitello...</u>**

---

[17] Please note that trial testimony also confirmed that Berard and Kaiser robbed Ethel Kaiser of $147,000 (*Tr.1160-1161*) (with $95,000 diverted to Berard) – unknown to Ethel Kaiser (*Tr.940-941*).

36

Privitello was involved in two (2) wire fraud counts (Counts 5 & 6) that Kenner was found "*not guilty*" of at trial; corroborated by the fact that the dozens of email interactions between Constantine, Kaiser and Privitello to consummate the Eufora transaction never include Kenner -- nor do the three (3) lawsuits that were filed by Privitello versus Constantine and Eufora (represented by independent counsel).

Privitello finally confessed that Kenner had nothing to do with his investment in Eufora; although, at that point in time, the government did not offer to withdraw Counts 5 & 6 versus Kenner with their witness' confession of Kenner's non-involvement.   They surely knew that before the Privitello trial charade attempted to implicate Kenner in the Kaiser and Constantine Eufora recruitment.

> *Q Is there anything <u>Mr. Kenner</u> and/or Mr. Kaiser said to you that convinced you to invest in Eufora before you spoke to Mr. Constantine?*

> *A [Privitello]:  No.*

- **Privitello is not a victim in the instant case to Kenner.**

**<u>Joe Juneau…</u>**

Juneau confirmed at trial that he was fully repaid from his Hawai'i LOC (after his request to leave all of his private equity deals because, as Juneau said in his May 18, 2005 email to Kenner (*DS-000004*):
> "*Phil, like I told you a few times already.   I'm not very comfortable with this situation.  <u>It has nothing to do with you but everything to do with the way I am</u>…I just want to have it [Juneau's money] invested in BONDS at Northern Trust <u>under your management</u>*".

Also, Juneau confirmed he was **fully repaid** from his Eufora investment during direct examination, <u>so why was the Juneau testimony even included</u>?

> *Q. And does that, do you recall getting a check from Eufora for $100,000?*

> *A [Juneau]:  I believe so, yeah.*

Juneau was not part and parcel to the Constantine-contrived GSF, thus not a contributor.

The government asked Juneau to represent other financial losses that he incurred **at the hands of a French Canadian investment advisor**, who he dealt with longer than Kenner.   The government selectively under-represented the transactions, leaving the Court and the jury to believe Kenner had "something" to do with the independent Juneau transactions.[18]

---

[18] As color, Juneau's French Canadian investment advisor (Mr. Turpin) accompanied Juneau to the EDNY courthouse in 2015 for his "non-victim" testimony, in spite of his millions in losses

- **Juneau is not a victim in the instant case.**

<u>**Government rebuttal summation included, "*Every John Doe*" …**</u>

During the government's rebuttal summation, the government confirmed that the jury and the court had heard from "*every John Doe*" (*Tr.5993*).

The court is aware that the defense has a right to be alerted who the alleged victims are, and "confront" them. According to the government's own closing statement, the defense did see and confront "*every John Doe*".  As such, with the non-victims, *supra*, the government is certainly below the numerical basis for the "more than ten" enhancement.

<u>**Other analysis, dismissing potential victims thru their own evidence…**</u>

<u>**Jay McKee…**</u>

This simple numerical analysis also ignores the clear *faulty memory, confusion and mistakes*, **CTE** – or planned perjury – of **Jay McKee** who testified that he was never told by Constantine or Kenner about the various uses of his GSF contribution.

The government (Komatireddy) confirmed at a side bar that McKee was only present at the trial as a potential victim of the GSF (*Tr.1846*).  As such, when McKee thru direct Q&A explained that he was never told about the specific GSF usages, he presented false evidence (*Tr.1821-1824*).  There was no equivocation about his testimony.  McKee emphatically confirmed he was "not told" in contrast to a loose recollection of "I don't

---

from an offshore investment scam his French advisor pulled on Juneau in the 1990s.  Juneau confirmed in 2009 (**13+ years after the Bahamian scam by his "French advisor"**):

> *Q. BY MR. RICHARDS: <u>Isn't it true that Mr. Turpin took you to the Bahamas with Mr. Kenner to look at a Bahamian bank that he recommended</u>?*
>
> *A [Juneau]: Yes. To look at different banks.*
>
> *Q. And you lost all your money in that investment, right?*
>
> *A [Juneau]: I don't know if I lost all my money.*
>
> *Q. <u>You don't know if you lost -- you don't remember how much you lost</u>?*
>
> *A [Juneau]: No.*
>
> *Q. <u>Have you received any money back from the Bahamian bank that Mr. Turpin recommended</u>?*
>
> *A [Juneau]: <u>No</u>.*

38

recall" or "I don't remember".   McKee was firm, but his own post-GSF meeting texts with Kenner confirm, *"nothing was concealed"*, as follows:

*McKee texts [read] in BLACK -- Kenner [sent] hi-lighted*.

| | | | | |
|---|---|---|---|---|
| 7032 | +171680349 03 Jay McKee* | 5/9/2009 3:46:20 AM(UTC+0) | Read | Thx 4 making the trip bud.. **Took in alot from the talk tnite.. Drive safe, be in touch..** |
| 8255 | +171680349 03 Jay McKee* | 5/9/2009 3:55:39 AM(UTC+0) | Sent | Good stuff |
| 7039 | +171680349 03 Jay McKee* | 5/9/2009 12:36:25 PM(UTC+0) | Read | Can u do me a favor.. Can u email me, so I can look at it on paper, everything my 25O turns into.. Nicole was speaking with Tommy when u explained to me all the areas where we are benefiting.. |
| 8265 | +171680349 03 Jay McKee* | 5/9/2009 12:37:21 PM(UTC+0) | Sent | I will have tommy do it so it's consistent with the discussion |
| 7040 | +171680349 03 Jay McKee* | 5/9/2009 12:37:42 PM(UTC+0) | Read | Perfect, tks |
| 7043 | +171680349 03 Jay McKee* | 5/9/2009 2:12:22 PM(UTC+0) | Read | Hey, also, could u email me what the 3 black sheep are getting in the end result, as well as Tommy bullet points they had 2 agree too.. Tks |
| 8269 | +171680349 03 Jay McKee* | 5/9/2009 2:32:11 PM(UTC+0) | Sent | Tommy said you will get 1/10th of everything that is acquired of theirs which includes 20% (2% for you) of the airpark building, 1/10th of their 3.64% of their Eufora shares (.364% for you which puts you just over 1% in Eufora) and then a small piece of the jet which TC is still crunching numbers on but it will probably be 1% of it. |
| 8270 | +171680349 03 Jay McKee* | 5/9/2009 2:35:46 PM(UTC+0) | Sent | TC will send you the bullets they agreed to but has to wait till it's actually signed. Should be a day or two. They have only agreed by email so far. He will also send you the media summary but he wants you to convince the owner of Chef's to send him the tomato sauce Fed Ex. |
| 7044 | +171680349 03 Jay McKee* | 5/9/2009 2:43:44 PM(UTC+0) | Read | Haha.. Consider it done.. I'll have Lou put some bottles together with the extra meat for the real flavor.. |
| 8271 | +171680349 03 Jay McKee* | 5/9/2009 2:45:55 PM(UTC+0) | Sent | Thx |
| 7045 | +171680349 03 Jay McKee* | 5/9/2009 3:36:47 PM(UTC+0) | Read | Did TC say the jet was worth 25Om last night? |

| 8273 | +171680349 03 Jay McKee* | 5/9/2009 3:44:10 PM(UTC+0) | Sent | The jet is worth 1.5m. He invested 250k to repair it |
| 7046 | +171680349 03 Jay McKee* | 5/9/2009 3:45:53 PM(UTC+0) | Read | Aha.. Thats where the 25O number came from.. |
| 7048 | +171680349 03 Jay McKee* | 5/9/2009 3:53:08 PM(UTC+0) | Read | In the deal, the 3 guys get their money back from their involvement with TC, but nothing back from their Mexico deals, correct.. |
| 8276 | +171680349 03 Jay McKee* | 5/9/2009 3:54:14 PM(UTC+0) | Sent | Correct! |
| 7053 | +171680349 03 Jay McKee* | 5/9/2009 5:43:22 PM(UTC+0) | Read | If we get control of Jowdys Cabo equity and move to sell Cabo - we get our 5OO back from del mar, and what percent of Cabo do we end up with? |
| 8282 | +171680349 03 Jay McKee* | 5/9/2009 5:48:03 PM(UTC+0) | Sent | Its impossible to say until we know everyone who's involved in getting Jowdy's 40%. For example, the new bank/investor may want half of it to do the deal. But...whatever it is, you will get 1/10 of it. |
| 7060 | +171680349 03 Jay McKee* | 5/9/2009 10:01:18 PM(UTC+0) | Read | So is it correct to say we'd get our 5OO back from del mar, as well as a prob minumium 2% of Cabo? Sorry to keep asking - just trying to get it right.. |

No trier of fact can be expected to weigh the evidence of McKee's own text communication with Kenner – *immediately after the face-to-face meeting that confirmed the REAL face-to-face communications* – versus McKee's *faulty memory, confusion and mistakes* (or otherwise) six (6) years later thru the haze of **CTE**.

If McKee did not lie on purpose to support the government's claims of conspiracy by concealment – then his inaccurate testimony contributed to the ongoing collective amnesia by the GSF contributors to the government's prosecutorial benefit, while seeking a conviction of Kenner and Constantine – for alleged criminal acts that McKee exhibited *faulty memory, confusion and clearly made a mistake.*
- 100% of the empirical evidence refutes the government's claims and the McKee testimony about what he knew in 2009 (and now forgot – in 2015).

What is the government or McKee doing to make sure the court is alerted to the testimonial ERROR and its effect on the verdict?   To date – the government is doing nothing but hiding behind the premise of *faulty memory, confusions and mistakes* making the unreliable testimony "sufficient" (again).

- According to the government – this was the only relevant testimony to support the government conviction allegations thru McKee; and it is clearly FALSE…

40

In addition, during trial, McKee confirmed that he spoke with another teammate before agreeing to the GSF (*Tr.1817*).   Michael Peca was McKee's only former teammate who was involved in the GSF.   With the detailed confirmation of information in the McKee texts, the Court must assume it was the factual basis for McKee's independent communication with Peca, *verifying the same information (in the texts messages)*.

Nevertheless, with the full disclosure confirmed by the McKee texts and the Constantine-Gonchar "*side-deal*", there are no misappropriated funds, no concealment from McKee &/or Peca; thus no criminal "scheme".

- **This leaves McKee as a non-victim in this instant case (…and adds the secondary disclosure to Peca as a sincere question of how Peca could have also been concealed from what the Court <u>NOW KNOWS</u> was fair game in the Peca-McKee conversation in May 2009 – before both committed to investing in Constantine's GSF).**

<u>Bryan Berard…</u>

In a similar analysis to McKee (and his non-victim status in the GSF – or the Superseding Indictment), Berard is only involved with the Hawai'i partners in the instant case.   Berard gave clear 2009 arbitration testimony – six (6) full years before his *faulty memory, confusion and mistakes* (or otherwise) clouded his "knowledge" (notwithstanding his 2012 Mexico-Jowdy employment).

**In 2009 -- Berard confirmed that he was fully aware of the "Jowdy loans".**   Berard also confirmed that he "**expected**" the Hawai'i partners (company) to make the payments on his LOC.   Berard's sharp testimony contradicted the fact that Kenner was charged (Counts 7 & 8 of the Superseding Indictment) with making personal contributions to the Hawai'i partners accounts in order to facilitate the loan payments that had been going on for 4-½ years prior to the six (6) consecutive Kenner contributions by Kenner totaling $267,000.

Kenner's payments occurred immediately after Jowdy and his attorneys cancelled the negotiations to repay the Hawai'i partners loans and leave the Diamante Cabo san Lucas project; in exchange for forgiveness for his known and unknown criminal acts related to Kenner and Kenner investors (including his entire cabal – with Attorney Tom Harvey, Bill Najam, and others in 2008).

Berard's 2009 arbitration testimony admitted (*Nolan arbitration Day 5 at 76*):
> *Q: When you were – as far as the Hawai'i deal, were you made aware of any sort of transaction Mr. Kenner set up where you can give a commitment or pledge a credit line in lieu of putting all your money in initially?*
>
> *A [Berard]: Yes.*
>
> *Q: Can you tell the panel what was your understanding?*

41

*A [Berard]: Basically the company – it was set up.  <u>The company would pay the</u>* <u>*payments*</u>*.  I would pledge the money, obviously to get a loan for the property.* <u>*Again, the company would pay the payments*</u>*, and I was not forfeiting all the amount of money for the piece of property.*[19]

*Q: Were you aware that Mr. Kenner got a credit line against some securities or investments you had?*

*A [Berard]: Yes.*

*Q: And later on were you aware that Mr. Kenner started lending this money to another principal in the Cabo project named Ken Jowdy?*

*A [Berard]: Yes.*

*Q: Where did you think the money that Mr. Jowdy – were you told where the money was going to be used that was given Mr. Jowdy as far as the Mexican project?  Was there anything you were told about that?*

*A [Berard]: Basically just loan him [Jowdy] the money for the project.*

*Q: And prior to signing any of these documents did you have access to your own attorney unconnected to Mr. Kenner to review this?*

*A [Berard]: Yes I did.  We have a family attorney back home where before I sign any documents basically – I went to his office, sat with him.  We reviewed them, and I signed them and basically FedEx'd them to Phil [Kenner].*

---

[19] In 2009 -- Berard was clearly able to articulate the investment strategy of collateralizing (a.k.a. – pledging) his securities portfolio at Northern Trust Bank – in lieu of cash – for his investment in the Hawai'i project, as the underlying investment strategy.  **There was nothing secret about it.**
  - ***Berard received his annual 1099-INT tax forms directly from Northern Trust Bank to receive the additional benefit for the pledged investment strategy.***

In fact – Berard's 2005, <u>1-page</u> **signed** Extension of Credit designated his original $900,000 as – "*Investment in speculative real estate*" (*in the Northern Trust trial subpoena*).

But, Berard had actually established his original Hawai'i LOC two (2) years earlier in 2003.   The Berard documents were delivered in the Northern Trust trial subpoena – thus his testimony at trial that his Hawai'i LOC was <u>established</u> to assure Lehman Brothers that there was collateral until Lehman Brothers funded the project, *was another farce* (Tr.3035-3036).

Lehman Brothers began their involvement in 2005 – not 2003.   The Northern Trust trial subpoena produced evidence that also disproved Berard's falsified claim that he never received monthly Hawai'i LOC statements. <u>*They were present in the 2015 subpoena*</u>*. (Tr.3036).*

42

In 2015, Berard clearly lied about his knowledge of the Hawai'i loans to Jowdy, as follows (despite the fact the loans were distributed to Jowdy *personally*, under "advice of counsel" for future collectability, and the terms of the signed 2004 Hawai'i loan agreement).   Berard's 2015 perjury of the Jowdy loans (*Tr.3082*), was as follows (whether based on **CTE** or planned perjury – it is unreliable):

> *Q When you testified on direct that you thought your line of credit was being utilized only for Hawaii, is it your testimony that at no point in time you became aware that your line of credit and/or others committed to the Hawaii project were being used to extend a loan to Ken Jowdy with a return of 15 percent interest on that loan?*
>
> *A [Berard]:   Absolutely not.   My money was not supposed to be used in Mexico.*

It should be noted that the John Kaiser February 28, 2019 letter indicts both himself and Berard's lack of evaluation skills related to Jowdy, because they both knew Jowdy robbed everyone before they accepted their jobs, becoming Jowdy's co-conspirators; whether they like their legal conspirator status or not.   Kaiser stated:

> *"I am submitting this letter today because I see Jowdy has once again started a campaign of wining and dining people who don't know all the facts to say what a great guy he is".*

- How did he wine and dine first?   Was it Berard and Kaiser when they previously knew he was a "thief"?

- Kaiser and Berard joined "Team Jowdy" after a "*wining and dining*" session in 2011 – turning their backs on Kenner and Kenner investors (in Hawai'i and Mexico) to personally benefit **as co-conspirators** thru the receipt of bribery jobs.   Kaiser's eventual fabricated "collateral agreements" -- after forging Kenner's name two (2) times -- received Jowdy's help to effectuate another fraudulent conveyance (in evidence) (like the Berard and Kaiser Sag Harbor [in evidence] and the Arizona renovation [in evidence] frauds – also after their "*wining and dining*" in 2011).

After Berard confirmed Jowdy's NY Daily News friend called him May 1, 2010, Berard told Kenner:

> *"The douchebag from daily news [called]. Told him he's an idiot for printing these articles and he can quote me that I've been to both properties over a dozen times and Jowdy has not done his job. He shut up right away and said sorry for bothern u. And hung up".*

- Berard took his job less than two (2) years later from Jowdy, who Berard had professed did not "do his job" after eight (8) years after independent review, *supra.*

43

Kaiser was caught during trial lying about his previous statements, calling Jowdy a *"thief"*, which he is now eloquently echoing again **after being fired by his co-conspirator**.

During Jowdy's January 2010 California deposition, Kaiser texted Kenner (from inside the California deposition room):

> [John Kaiser]: *"Why didn't the masterplan include inferstruture to villas,homesite and hotel???? All was in masterplan ??? Why waste $$ millions on pulling inferstruture thru finished golf course?? **Gross mismanagement'.**"*

And, minutes later when Jowdy could not explain how he spent $37 million of the expired $50 million of Diamante Cabo budget funds after four (4) years of pilfering the budgets (in evidence) [2006-2010], Kaiser commented on Jowdy's bumbling answer:

> *"Your good , can u get that 50 m in small bills?"*

- Kaiser took his job less than two (2) years later – notwithstanding Kaiser was the Managing Member of Na'alehu Ventures 2006 and responsible for the recovery of the Little Isle 4 loans to Jowdy, further protecting Jowdy thru graft and bribery.

- Based on Berard's sole Hawai'i investment participation and clear (pre-**CTE**) testimony, it is not possible that Berard could be deemed a victim in the instant case, notwithstanding his potential ulterior motive in 2015 of being employed by Jowdy, and getting two (2) cases against himself and Kaiser dismissed in Arizona – filed by Kenner for their real estate frauds (in evidence) – and several in Mexico dismissed against Jowdy by Kenner and Kenner investors.

Nevertheless, there are clearly less than ten (10) victims under any evidentiary analysis.

### Other Grounds for Departure

**First**, The Victim impact statements are insufficient to verify loss without backup and corroboration.

**Second**, the PSR (¶¶43,65) contends the calculation of Mr. Kenner's advisory Sentencing Guidelines should include a two level enhancement for obstruction of justice pursuant to *U.S.S.G. §3B1.1*. Among other purportedly obstructive conduct, the PSR reports Mr. Kenner is alleged to have committed perjury by providing false testimony regarding a loan agreement with Ken Jowdy[20] and seeking to commence litigation aimed at preventing Jowdy and Kaiser from testifying in this case.

---

[20] It should be noted that the Haley Letter objects to PSR ¶¶30-41, which includes "Relevant Conduct/Other Investment scheme" -- and the corresponding loss calculation (¶42) -- which were neither part of the trial nor offenses charged in the Indictment.

- However, Jowdy confirmed to the FBI that he received loans from Kenner. In various litigations, Jowdy even attested to the existence of these loans and authenticated the loan agreement (during a Nevada civil trial in his own defense). **Nonetheless, the Government continues to advance the apparently false claim that these loans (to Jowdy) do not exist.**

Moreover, by advocating for this false claim, the Government is, in essence, seeking to deny many of the hockey players the opportunity to assert their right to collect the principal and interest owed on these loans. Further, during the trial, the Government elicited testimony from witnesses, especially Kaiser, which was perjurious regarding the same.

**Third,** during pretrial proceedings, the Government moved to prevent Mr. Kenner for obtaining documents pursuant to the Northern Trust subpoena, resulting in only a small subset of the Northern Trust records ultimately produced. Nonetheless, although improperly admitted for the jury's consideration by Kenner trial counsel (another pending *28 U.S.C. 2255* issue), the limited documents fully confirmed significant **CTE** (memory loss) issues with the government witnesses and Kenner's full transparency.

**Ironically** -- by falsely claiming a loan agreement does not exist; attempting to deprive the hockey players their right to collect monies owed to them under a loan agreement; suborning perjury thru many (specifically, encouraging the known fabrication of multiple false claims thru Kristen Peca); and engaging in litigation tactics seeking to prevent evidence from being used by the defense at trial – the Government has engaged in the same type conduct which, according to the PSR, provides a basis for application of the enhancement for obstruction of justice upon Kenner.

Obviously, the Sentencing Guidelines do not have a comparable provision, which expressly provides for a guideline reduction based upon Governmental obstruction of justice (notwithstanding the arrest of an advocate for the Hawai'i-Mexico investors versus Jowdy (never Kaiser) in 2015, for further FBI-agent led cabal protectionism of known Jowdy criminal activity; (See Kaiser 2019 letter [*Document 628*]).

Thus, we contend this type of conduct (Governmental Obstruction of Justice) is one, which is not adequately taken into consideration by the Sentencing Guidelines. As such, it is a factor the Court may consider as a basis for downward departure under *U.S.S.G. §5K2.0(a)(2) & (3)*.

Sincerely,

*Phil Kenner*
Philip A. Kenner