June 1, 2019

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT F D.N.Y.

★   **JUN 17 2019**   ☆

LONG ISLAND OFFICE

The Honorable Judge Bianco
U.S. District Courthouse -- EDNY
100 Federal Plaza
Central Islip, New York 11722

The Honorable Judge Bianco:

Your Honor, the attached Rule 29 motion and Rule 33 Motion for reconsideration are being submitted on behalf of defendant Kenner, in case 13-cr-607 (JFB).

As the Court knows, defendant Kenner has been requesting for several years the documents related to his case available on the Court ECF docket.   Recently, defendant Kenner's paralegal (Mr. Fiske) delivered the first tranche of documents to Kenner, which included Docket 325 of July 29, 2015.   "325" was a letter to the Court announcing that defendant Kenner's trial counsel Haley was not going to submit a **Rule 29** or Rule 33 motion on behalf of defendant Kenner.

Kenner was unaware of this position.   In fact, Kenner was under the belief that Haley had submitted a Rule 29 motion for various issues Kenner discussed with Haley immediately after trial before Kenner's PSI at the Brooklyn Courthouse.   Kenner has been awaiting a ruling from the Court for the Kenner Rule 29 submission, subject to Haley's misrepresentations for over three (3) years until Kenner's recent review of Docket 325. I finally received for review a copy of the Kenner Superseding Indictment, for the first time. Mr. Fiske's delivery also included a printed version of the Court's Memorandum and Order (Document 501); received for the first time by Kenner, as well.

As the Court knows, Kenner worked on Rule 33 "notes" for Mr. Haley for nearly a year after trial, while Haley carried on the charade of Rule 29 and Rule 33 submissions for Kenner. Once complete, and after Haley refused to review the Rule 33 "notes" with Kenner or independently, Kenner was placed in the unenviable position of submitting his "raw notes". They were originally prepared to assist Haley's preparation of defendant Kenner's Rule 33; not a submission to the Court.   Haley refused and told Kenner (via email) that Kenner would need to fire Haley if he wanted a Rule 33 submitted to this Court.   Haley had not requested anything for the Kenner Rule 29, as he represented "had it handled", at all times.

In light of the recently acquired knowledge by defendant Kenner, Kenner respectfully submits his ProSe Rule 29 submission and Rule 33 Motion for reconsideration for the Court's review.   The documents have been completed at my earliest ability (after the conclusion of the *Faretta v. California* hearing), while working thru the well-documented morass at MDC, consistently creating an intimidating and restrictive environment to work consistency over the last 18+ months.

If Rule 29 or Rule 33 oral arguments are needed by the Court to determine the veracity of the raised issues, defendant Kenner will be prepared for the appearance at the Court's request.

I remain, respectfully yours,
*Phil Kenner*

**RECEIVED**

JUN 17 2019

**EDNY PRO SE OFFICE**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
|
**UNITED STATES OF AMERICA**　　　　　|
|
　against-　　　　　　　　　　　　　　　|
|　　　　　　　**Docket No. 13-cr-607 (JFB)**
|
**PHILLIP A. KENNER and**　　　　　　　|
**TOMMY C. CONSTANTINE,**　　　　　　|
|
|
**Defendants.**　　　　　　　　　　　　　|
-------------------------------------------------------X

**Defendant, Kenner –**

**Rule 29 Motion Reconsideration Motion**

**for Venue and Prejudicial Variance**

RECEIVED

JUN 1 7 2019

EDNY PRO SE OFFICE

1

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| TABLE OF AUTHORITIES | 3 |
| BACKGROUND | 4 |
| APPLICABLE LAW | 21 |
| Multiple venue conspiracy | 21 |
| Single Noncontinuing Act | 25 |
| Preparatory Acts | 26 |
| Constructive Amendment and Prejudicial Variance | 26 |
| NO NEXUS TO VENUE OCCURRED IN THE EDNY | 28 |
| EDNY individuals | 28 |
| Global Settlement Fund | 31 |
| Eufora private stock sales | 31 |
| • Prejudicial Variance | 36 |
| Hawai'i | 41 |
| None of the Overt Wire Fraud Counts give rise to venue in the EDNY | 43 |
| CONCLUSION | 53 |

**TABLE OF AUTHORITIES**

CASES

Page

| | |
|---|---|
| *United States v. Anderson* | 24,25 |
| *United States v. Beech-Nut Nutrition Corp.* | 21,24,26,32,38 |
| *United States v. Bithoney* | 25 |
| *United States v. Bozza* | 21,25,26 |
| *United States v. Busic* | 25 |
| *United States v. Cabrales* | 22 |
| *United States v. Chestnut* | 25 |
| *United States v. Davis* | 21,25,26 |
| *United States v. Delano* | 27 |
| *United States v. Fahra* | 36 |
| *United States v. Frank* | 27 |
| *United States v. Ganji* | 51 |
| *United States v. Geibel* | 21 |
| *United States v. Mollica* | 27 |
| *United States v. Panebianco* | 21 |
| *United States v. Potamitis* | 21 |
| *United States v. Reed* | 22,24 |
| *United States v. Rigas* | 26,27 |
| *United States v. Svoboda* | 39 |
| *United States v. Tzolov* | 22,39 |
| *United States v. Zingaro* | 27 |

STATUES

| | |
|---|---|
| 18 U.S.C. 3237(a) | 22,26 |
| Fed R. Crim. P. 18 | 21,23 |

## BACKGROUND

This instant case involves Phil Kenner, a long time business manager of over twenty (20) years in the sports and entertainment business.  Kenner managed the largest private client base in the industry thru 2003, when he sued his former publicly-traded firm for breach of contract and tortious interference of Kenner's business, resulting from the company's illegal management of their clients.  Kenner prevailed on behalf of his clients at an enormous monetary expense to Kenner.

In or about mid-2002, Kenner was introduced to Ken Jowdy, a person represented by former Kenner clients as a real estate developer and connected with a celebrity circle of people.  Until the introduction to Jowdy in 2002, thru Kenner's first ten (10) years in the investment business, Kenner and Kenner investors had never experienced a private equity deal so chock-full of fraud, certainly never to the magnitude that Jowdy and his attorneys had perpetrated from the first days. *See K29-40.*[1]

---

[1] Jowdy's initial Baja Development Corp bank statement in August 2002 confirms that Jowdy diverted and embezzled over $400,000 of the first $800,000 that investors, Kenner, Khristich and Woolley transferred to Jowdy for the Diamante del Mar ("DDM") project in Mexico in August 2002.  The government was aware of Jowdy's immediate frauds from the subpoena they issued to Jowdy's bank only weeks before the Kenner 2015 trial – specifically since they only subpoenaed the first (1st) statement from Jowdy's money laundering account; *Baja Development Corp.*

Jowdy documented his willingness to lie to every Court and Federal investigative entity during the 2009 arbitration between Kenner and Nolan when Jowdy produced a DDM summary stating – "*Phil Kenner arranged for several investors to forward investment capital to Baja Development Corp, and entity originally created by Ken Jowdy to develop the property [DDM]. The initial capital was transferred to DDM or used for the acquisition and development of the Property.*" *See K29-39.*  Baja Development Corp bank records in evidence confirm that Jowdy looted over $1 million of the initial $2 million of investor funds.  Jowdy's bank records are in the government's possession.

Jowdy's May 2009 arbitration disclosure was a fraud on Nolan and the arbitration panel – since Jowdy retracted all of it when he confessed to his thefts during his January 2010 California deposition.  He subsequently told the FBI in March 2010 [*3500-KJ-3*], as noted – "*Jowdy not sure if told PK [Kenner] what $ was to be used for*".  Jowdy's admission of the thefts did not seem to move the FBI criminally – approximately three (3) years after he confirmed his personal protection by the FBI during his May 2007 offer to Kenner – in exchange for Kenner's silence on the Jowdy thefts.

From 2002 thru 2006, Kenner and Kenner investors had invested approximately $10 million in Jowdy businesses and personally loaned Jowdy another $10 million plus, coupled with millions in personal guarantees that Jowdy robbed.   In March 2006, a start-up development deal in Cabo san Lucas, Mexico was financed thru Kenner, Kenner investors and loans to Jowdy for his personal stake in the development, from Kenner and Kenner investors.   March 26, 2006, Jowdy (who named himself as the Managing Member of the Cabo development vis-à-vis various misrepresentations to Kenner in evidence) received unfettered access to the financing from Lehman Brothers of $125 million.   From the March 26, 2006 closing with Lehman Brothers in Cabo san Lucas thru today (over thirteen [13] years later), Jowdy has refused to return another payment for the outstanding loans to Kenner and Kenner investors.   Approximately five million ($5,000,000) in principal capital accounts comes from the joint investments in a Hawai'i real estate project (managed by Kenner thru 2007) that Jowdy has failed to repay thru 2018.

In spring 2007, Kenner discovered Jowdy and his attorneys had diverted and embezzled the lion's share of the equity investments and, in addition, had no plans to repay the outstanding loans (verified by Jowdy during his January 2010 California deposition).   Kenner originally confronted Jowdy, and his COO and brother-in-law (Bill Najam – who was named as a co-conspirator in Jowdy's original SDNY Grand Jury in 2009) in Mexico after a 6-week effort by Kenner to meet face-to-face about the diversions, mismanagement and embezzlements.

On or about May 5, 2007 (in Cabo san Lucas Mexico), Jowdy and Najam informed Kenner that they had full protection from the FBI (thru Jowdy's head of security and former FBI agent, John Behnke – and Jowdy's new attorney, Former FBI Director, Louis Freeh; Behnke's best friend).   Then, Jowdy offered Kenner a 20% stake in his upcoming projects he was funding with Lehman Brothers (unknown to Kenner at the time) in Texas and Tennessee; worth tens of millions to Kenner (confirmed by Jowdy in his January 2010 California deposition).   During the 2007 meeting, Kenner

5

was offered management positions at the new projects by Jowdy and Najam, once funded (within a months' time), worth a half million in annual salaries plus bonus to Kenner, *along with Kenner's own FBI protection*.   In exchange, Kenner was told he had to "*go along with the Cabo transactions with his mouth closed*".

**Kenner declined immediately**.

Within days on May 8, 2007, Najam sent Jowdy an email message, warning him to be cautious with his new partners in Tennessee, *so they did not end up like Kenner* (*See K29-41*) – Najam stating –

> "*I'm not so worried about the past failures.   The last thing you need is a conflict situation with another partner [Kenner].*"[2]

Almost immediately after Kenner declined the bribery and FBI protection, roughly one (1) year of negotiation between Kenner and Jowdy began, attempting to relieve Jowdy of all of his known frauds and unpaid debt to Kenner and Kenner investors. A mutual acquaintance of Jowdy and Kenner's at the time was beckoned by both parties to try and mediate a settlement without litigation.   Tommy Constantine agreed to help.   Within a few weeks, Constantine and Jowdy had created the settlement framework to eliminate and forgive Jowdy's criminal exposure of embezzlements, diversions and unpaid debt -- "*in excess of $8.5M*".   *See K29-1.* Jowdy had agreed to leave the Diamante Cabo project for Kenner and Kenner investors to manage in exchange for non-prosecution of his known and unknown crimes and a severance payout for Jowdy and his staff.   Months later Jowdy and the lender from Lehman Brothers (Masood Bhatti) continued to drag their settlement signatures, while fabricating a series of false premises; such as Lehman Brothers needed an experienced developer like Jowdy at the helm (despite Jowdy having no development experience – notwithstanding his previous budget looting -- assisted

---

[2] Fully funded by Lehman Brothers in March 2006 -- Najam did not care about the previous thefts and frauds by he and Jowdy at 1) Diamante del Mar, 2) the $3 million KSI loan theft from DDM, 3) Diamante Air, and 4) **the unpaid loans from Kenner, Hawaii and the Kenner investors**.   Najam was singularly concerned that Kenner turned down the FBI protection and bribes to "*go along*" with them.

by Najam and Bhatti).   Bhatti was fully aware of the Jowdy debt problems as evidenced in communication between Constantine, Najam and Jowdy in late 2007 during negotiations.   Constantine stated (*See K29-44*) –

> "*the release of debt to Kenny by Phil [Kenner].  These are issues that Masood is aware of, understands why they exist and that they are a condition of the settlement between Phil and Kenny.*"

> "*This is not being done for the sake of holding back information, as we all know Masood is well aware of the situation.*"

> "*If he [Masood Bhatti] is presented with questions as to why this is happening, he will have the answers because we have disclosed everything to him.*"

***Hawai'i LOC investors independently sign off on litigation versus Jowdy to recover their Hawai'i loans – after Jowdy's refusal to repay – thwarting concealment claims in 2008 (and without a single adverse claim of lack of knowledge).***

In the summer of 2008, Jowdy and his NY based attorney, Tom Harvey (who has been complicit with Jowdy since 2002, defrauding Kenner and Kenner investors with ***fake*** "*lien letter guarantees*", Mexico title scams, and more -- *See K29-3*), terminated the negotiations.  Jowdy and Harvey were served with a series of litigation from Kenner and Kenner investors in Mexico, Nevada and Arizona in 2008 for the loan frauds, and follow-up litigation in 2009 in California and Mexico.  In each instance, all of the Kenner investors were involved in the litigation as plaintiffs versus Jowdy – fully disclosing the unpaid loans from the Hawai'i project to Jowdy in the various Complaints versus Jowdy.  *Nothing was concealed*.  The investors had direct and independent communication with their Arizona attorney, Tom Baker, (and subsequently with their California attorney versus Jowdy) who received fully

documented signoffs from the Hawai'i investors. *See K29-4³ and K29-49⁴*. The
signed disclosures pronounced in the first (1ˢᵗ) paragraph of the 7-page letter –

> "*the gist of the lawsuit is to recover certain monies loaned to Mr. Jowdy from
> Mr. Kenner, Little Isle 4 and Ula Makika LLC. Mr. Kenner estimates the total
> amount of monies loaned to Mr. Jowdy which have not been repaid to be
> approximately $5,000,000. This is the estimated principle only, exclusive of
> accrued interest. In summary, Mr. Jowdy denies that the monies were loans but
> rather characterizes them as investments.*"⁵

---

³ *Tr.457* and *Tr.644* -- Michael Peca lied to the 2015 trial Court (after signing onto two [2]
independent lawsuits to recover the Hawai'i loans made to Jowdy – and a July 26, 2006
signed Hawai'i disclosure letter discussing the Jowdy involvement) when he falsely claimed:
> "*Zero. I had never been told that he [Jowdy] had any connections to Hawai'i
> whatsoever.*"

⁴ Kristen Peca wrote to their independent California attorney (without Kenner's
involvement), while declining the open invitation to meet face-to-face with Jowdy in 2009
(again -- without Kenner's participation). This attorney communication was well after
Michael Peca has released his Hawai'i collateral and discussed via email (in evidence)
Jowdy's lack of desire to repay the Hawai'i loans. It is also after the date in May 2009 that
Michael Peca claimed at trial Kenner would not tell him where the Hawai'i money went
when deciding to contribute to the Constantine-led GSF plan (*Tr.506-7*). Kristen Peca wrote
to heir California attorney:
> "*We are putting our trust in you, so we will do whatever you recommend is best for
> getting our $$$ out. Thanks, Michael and Kristen Peca*"

⁵ Jowdy was able to get the Arizona case dismissed in mid-December 2009 thru a series of
unethical legal filings and documented threats to Kenner attorneys. Less than three (3)
weeks later – Jowdy confessed to all of the funds being loans -- contradicting his 1 ½ year
Arizona defense strategy -- during his 2-day California deposition in another case suing
Jowdy for the loans. The California cases stated in the two (2) court filings (*See K29-8 and
K29-9*)—
> "*Mr. Najam was in charge of the corporate governance while under Jowdy's direction
> and control received over eight million dollars ($8,000,000) from a LLC in Hawai'i.
> Mr. Najam failed to properly account for those funds and has placed the Jowdy
> investors in a vulnerable and compromised position.*"

Jowdy **personally** re-affirmed the loans in March 2010 [*3500-KJ-2*] – by confessing to FBI
Agent Galioto and other SEC officers (with Louis Freeh at his side) that he had received
100% of the Hawai'i funds and had no plans to repay any of them. The agents noted
Jowdy's full confession of his embezzlements in their *raw notes*, as follows:

>   @3 -- KJ [Jowdy] – "*all the funds were not used for DDM*"
>   @11 -- KJ [Jowdy] – "*if I was not allowed to use $ then it was a problem*"
>   @12 -- KJ [Jowdy] – "*thought I could use $*"
>   @12 -- KJ [Jowdy] – "*$ from -- $ from PK loans -- Little Isle 4 – Ula Makika*"
>   @12 -- KJ [Jowdy] – "*02-06 -- $ used from BD [Baja Development Corp] to pay
>   personal expenses→ booked as loans from BD*"

Attorney Baker's disclosure hi-lighted twelve (12) other litigations between associated parties in the signed-off disclosures (*K29-4 @4-5*) – fully revealing any conflicts amongst the parties.   All of the 2015 alleged trial victims signed-off and participated in the Arizona litigation versus Jowdy except for Nolan (who was working with Jowdy at the time).   ***None of these transactions for the Hawai'i investors occurred in the EDNY at any time.***

***Constantine's 2009 Global Settlement Fund ("GSF") plans initiated <u>additional</u> litigation versus Jowdy and Jowdy supporters; contradicting the government trial claims that the GSF was the start of the litigation versus Jowdy.***

In summer 2009, the Kenner investors filed a series of follow-up lawsuits versus Jowdy and Harvey in California (after Constantine conceptualized the GSF for Kenner and the Kenner investors).   Kenner and his investors agreed to the idea in concept and met face-to-face with Constantine beginning in May 2009.   Following the meetings with Constantine and Constantine's numerous conference call follow-up meetings, Kenner and many of Kenner's Hawai'i and Mexico investors signed on to the Constantine-led GSF plans; after signing off full disclosures (*See K29-47[Peca], K29-48[Sydor]*), following full email re-confirmations by Constantine to the GSF participants (*See K29-45[Peca], K29-46[McKee]*).   ***None of the GSF contributors or any of the GSF transactions touched the EDNY at any time.***

The California lawsuits alleged similar mismanagement to the 2008 Arizona and Mexico cases about the unpaid Hawai'i loans.   ***None of the Hawai'i investors who sued Jowdy had any ties to the EDNY at any time.   No other capital investors had ties to the EDNY, either.***   After the filing of the 2009 California litigation versus Jowdy and the media coverage, the FBI in multiple jurisdictions (of California and

---

All of the Hawai'i investors, who were alleged as victims in the 2015 trial of Kenner, participated as signed-off Plaintiffs versus Jowdy in the various Arizona and California cases.   ***None of these transactions occurred in the EDNY at any time.***

New York [EDNY and SDNY]) contacted the California attorney for the Plaintiffs and asked to interview the "person most knowledgeable" of the Jowdy allegations. Through the investors' California counsel, Kenner volunteered and gave proffer on June 24, 2009; fully disclosing the tens of millions Jowdy and his attorneys had been diverting and embezzling since August 2002 – including evidentiary verification in Kenner's possession at the time.   Kenner disclosed the various investments Jowdy controlled which pilfered the investors' funds.  Kenner directed the FBI and SEC agents to Jowdy's various banks and account names.  Kenner concluded with disclosures of the multiple loans made to Jowdy thru the Hawai'i entities and other investors in their individual capacities.   Kenner arranged for Jowdy's former assistant (Shawn Hughes) to interview with the FBI.   Days later, Ms. Hughes confirmed all of the Jowdy frauds and mismanagement (*See 3500-SH-1-r*), again. FBI Agent Galioto noted --

> @ 2 – "*Hughes saw lavish spending during her time as Jowdy's employee.*"
> @ 2 – "*He tricked a lot of people and did not deliver like he said he would.*"
> @ 2 – "*Jowdy was 'living the life' on other people's money.*"
> @ 2 – "*When investors would ask for an update on the project, Jowdy would always brush it off and say he would get around to it.*"

***Kenner set up Hawai'i LOC investor interviews with Galioto and the FBI immediately upon request by June 30, 2009 – but Galioto <u>cancelled</u> all of them once he discovered Jowdy was represented by the former FBI Director (his former boss).***

Upon request from FBI agent Galioto after the Hughes corroborating interview, Kenner set up direct investor interviews with the FBI. (*See K29-42*).[6]   Within days of the Kenner and Hughes interview – Galioto cancelled the investors' interviews and convened a Grand Jury on Kenner in the SDNY, immediately subpoenaing Kenner's

---

[6] These independent interviews would have occurred for the various Northern Trust Line of Credit clients – ***within months*** of releasing their Northern Trust collateral.  Kenner's willingness to set up the interviews could be nothing short of criminal suicide if each and every one of the Hawai'i-Line of Credit investors were not 100% sure of what happened with their money in 2009.  *It certainly could not be deemed as an act of concealment.*

credit card records (subpoena in EDNY evidence); taking the first (1st) step in destroying Kenner's access to credit.

*After Kenner's credit and banking facilities were destroyed by relentless FBI subpoenas from the time of the Kenner June 2009 proffer -- Kenner requested government witness, Tim Gaarn, to repay hundreds of thousands in documented personal loans thru the sale of Eufora private stock, which Gaarn acquired in 2005.*

During 2008 and 2009, Kenner funded the majority of the legal efforts versus Jowdy in the USA and Mexico, personally. As a result – Kenner asked his friend, Tim Gaarn, to repay a two-plus (2+) year-old outstanding loan from Kenner (confirmed at trial thru Gaarn's testimony and banking records). Kenner assisted Gaarn in selling some of his Eufora stock in Constantine's company -- Eufora. The sales were made to previous members of Gaarn's managed, AZ Eufora Partners I entity, fully documented by Gaarn for AZ Eufora Partners I and in Eufora's amended 2009 operating agreement. All Eufora Board Members signed the new Eufora operating agreement in February 2009 -- **including trial witnesses Tim Gaarn, Dan Kennedy, and Mark D'Ambrosio**. (*See K29-14*).

As a result of the documented sales, Gaarn was able to fully repay Kenner the hundreds of thousand dollars he owed Kenner. Gaarn, independent of Kenner, also used some of "his personal proceeds" to loan funds to John Kaiser. Their loan arrangement was made face-to-face between the two (2) of them during Gaarn's trip to Arizona in 2009 as part of his Board Member meetings for Eufora; independent of Kenner.

Gaarn had been the Managing Member of the investors LLC, AZ Eufora Partners I since 2005, when he took the responsibility over from Kenner. In addition, Gaarn received Kenner's Eufora equity in 2005 as compensation for his new role from Kenner. After the 2005 transfer of equity, Kenner was only a lender to Eufora; no

11

longer an equity investor.   The Eufora tax records, multiple signed operating agreements, and internal Eufora emails all confirm these 2005 facts without inconsistency.

***None of the Eufora private stock buyers from Constantine &/or Gaarn in 2008-09 had any ties to the EDNY.***

***Kaiser and Berard "go broke" and cut a backdoor deal to receive jobs from Jowdy in 2012 -- and turn on the Hawai'i and Mexico investors whom Jowdy had defrauded since 2002.***

In or about late 2011, after Berard and Kaiser had reached personal financial crisis mode (nearly insolvent), they flew to Mexico to cut a deal with Jowdy.   After the meeting with Jowdy and his attorney, Fernando Garcia, Kaiser and Berard received high-paying jobs from Jowdy in Mexico.  In turn, they began urgent work with FBI Agent Galioto to ruin the remaining investors' efforts led by Kenner to recover the equity and debt funds, which Jowdy had pilfered since 2002 and refused to return. These funds were in addition to the ongoing embezzlements occurring as a result of Jowdy's unfettered control in the Diamante Cabo project, thru today.   Threats were lobbied against every attorney in the USA and Mexico that worked with Kenner and the investors to "back off" the Jowdy legal efforts from Jowdy's attorneys (Tom Harvey and Fernando Garcia), the FBI case agent (Galioto), Berard and Kaiser; or else they would become complicit, &/or would be targeted and sued by Jowdy's attorneys.[7]

---

[7] Harvey made direct verbal threats to Chris Manfredi on the phone.   Manfredi relayed the information immediately to John Kaiser in July 2009.   Kaiser sent texts to Kenner to inform Kenner and the group adverse to Jowdy of the newfound threats against him as well. Kenner forwarded the information to Constantine immediately via email (*See K29-50*) – since Constantine was running the California legal efforts with the investors' independent attorney.

In 2013, Kenner and a new group of Mexico attorneys had secured court time in front of the Baja California Sur, Mexico State Supreme Court to put an end to the decade plus of Jowdy's protected crimes in Mexico against Kenner and Kenner investors by the end of 2013.

***Kenner was ironically arrested <u>only</u> weeks before his devastating in-person testimony was scheduled in Mexico in front of the State Supreme Court regarding Jowdy's decade plus of crimes and protection.***

Ironically, Kenner was arrested weeks before Kenner's scheduled testimony under an EDNY Indictment, where none of Kenner's investors had any contact throughout the life of the Hawai'i project, the Eufora private stock deals, &/or the GSF efforts versus Jowdy and his associates.   Nonetheless, ***Kenner was charged with a multiple count Indictment in a venue with no nexus to Kenner's actual business activities***.

Defendant Kenner has been a resident of Arizona since 1997 through the time of his arrest and detainment in November 2013.   During that time, defendant Kenner has resided in multiple other states, including Hawai'i, Nevada, California and Utah, and held residency in Nevada.   At no time did Kenner own or intend to own any residential or commercial property in the EDNY for purpose of residence or citizenship.   This has been known at all times to the investigating agencies involved in Kenner's Indictment.

---

During a Murray and deVries trip to Mexico to give testimony in a criminal case versus Jowdy – Tom Harvey emailed a threat to Murray – claiming Harvey was filing new litigation against them for participating in a criminal lawsuit versus Jowdy in Mexico. *In EVIDENCE.*

In Mexico – Berard (working as a Jowdy henchman) – sent texts to Murray telling him he would be sued for filing litigation against Jowdy and would never get on the Diamante property again. *See K29-51.*

13

In April 2009, after nearly eighteen (18) months of Kenner and his co-defendant Constantine negotiating on behalf of Kenner and Kenner investors with Ken Jowdy[8] to repay the tens of millions Jowdy had received (*See K29-1*)[9], embezzled and diverted for his own benefit and those in his direct cabal, Jowdy and his New York (Manhattan-based) attorney (Tom Harvey) terminated the negotiations with Kenner and Kenner investors in late 2008.  Instead of settling, they chose to threaten Kenner in April 2009 that he needed to back off Jowdy and relinquish all equity in any Jowdy-controlled entity in order to receive reprieve from multiple "bad elements" that were about to happen to Kenner for non-compliance with their commandment (*See K29-2*)[10].  In the extortion letter to Kenner's attorney, Harvey alleged there were ongoing FBI investigations related to Kenner in California and Arizona for the "loan claims versus Jowdy" in the USA and Mexico litigations.[11]  The Jowdy-Harvey threat-premise was that Kenner was alleging in USA civil, Mexico civil, and Mexico criminal litigation versus Jowdy at that time that Jowdy received *loans* from Kenner and Kenner investors, some specifically from Kenner's Hawai'i

[8] Jowdy is a supposed real estate developer, who resided in Nevada during the timeframe in the instant case.

[9] *K29-1* is a copy of Jowdy and Constantine's email negotiation in July 2007 when Jowdy agreed that his outstanding and unpaid debt was **in excess of $8.5 million** to Kenner and Kenner investors (and not counting over ten million in additional equity deposits Jowdy received).  The settlement would have included Jowdy's removal from the Diamante Cabo project *in exchange for* Kenner and Kenner investors *NOT* assisting the government in prosecuting him criminally in the USA.

[10] *K29-2* was an extortion-laden email sent from Jowdy's attorney, Tom Harvey, in April 2009 to threaten Kenner -- after Jowdy and his inner circle of legal advisors in the USA and Mexico believed they were properly prepared for each and every legal battle filed by Kenner and Kenner investors for the tens of millions Jowdy had already stolen with Attorney Tom Harvey's help (*See K29-3*), since 2002.  Kenner was forced to sue Tom Harvey and Ken Jowdy in California in July 2009 for extortion to place it firmly in the court records for Kenner and his investors as a result of the direct criminal threats to gain an advantage in the civil cases versus Jowdy at the time.  This was not their last threatening behavior of FBI-led prosecution for anyone in opposition to Jowdy.

[11] Tom Harvey is a private, Manhattan-based attorney who has held a co-counsel role with Former FBI Director, Louis Freeh, in various Jowdy defenses since in or about 2007 -- when Kenner first (1st) uncovered the Jowdy crimes.  In addition – Freeh's former right-hand-man (John Behnke) at the FBI for nine (9) years has been Jowdy's head of security since 2005.

14

real estate venture (Little Isle 4 and related entity, Ula Makika – *See 2008-09 Arizona case disclosures -- K29-4*) and failed to repay them as agreed upon in the 2004 Hawai'i-Jowdy loan agreement (*See K29-5*)[12].

These California and Arizona FBI investigations have never had any communication with any Kenner or Kenner investors, nor were any such materials present in the Jenks Act materials pre-trial, yet the alleged basis for the investigation was due to Jowdy alleging he never borrowed the "loaned" funds – at least thru the time of Harvey's extortion email to Kenner in April 2009.   In addition, Harvey predicted that the SEC would most likely be looking into Kenner; which they prophetically did almost two (2) years later with no actions taken versus Kenner after nearly twenty-four (24) hours of Kenner's recorded testimony in 2011.

***Harvey and Jowdy turned to the NY Daily News to slander Kenner regarding SDNY and SEC investigations that turned up nothing on Kenner.***

 Yet – Kenner was arrested in Arizona and mysteriously taken to New York without bail, based on the "*phony*", "*bogus*" and "*supposed*" loans to Jowdy (***reversed immediately** after trial by the government's forfeiture prosecution team working with Jowdy and Harvey – leaving wholly reformative issues and questions of ulterior motives in the entire Kenner prosecution*).

Harvey and Jowdy's documented threats claimed that Kenner needed to *give up all his assets in all Jowdy related endeavors* – which would then, *most likely* reduce the *criminal sentencing Kenner would face one day for lying about the loans* and minimize the potential of the pending news stories that Harvey and Jowdy believed would

---

[12] In spite of Jowdy's December 2010 authentication of the 2004 Hawai'i loan agreement in his Nevada civil case defense, and no other opposing views of the loan agreement's authenticity – without evidence in 2015, the government chose to describe the loan agreement with Jowdy as *"bogus" [Tr.5708-5709]*, *"phony" [Tr.4597-4598]*, and *"supposed" [Tr.5991]* – throughout the trial to prejudice Kenner.

15

*begin soon* in the NY Daily News.  Harvey and Jowdy's close friend, writer Michael

O'Keefe, ironically wrote them[13].    Harvey's extortion email was prophetic once

again with a series of Michael O'Keefe slander-based stories emanating almost

immediately from unnamed sources in the FBI about Kenner, immediately after

Kenner proffered about the Jowdy crimes in June 2009.[14]

---

[13] The Jowdy-Harvey slander support from the NY Daily News was confirmed when future
government witness, Bryan Berard, explained to Kenner that he told the NY Daily News
writer about his first-hand knowledge about Jowdy in May 2010, when the writer was
hunting for another Kenner-slander story (*at the directive of his friend, Tom Harvey*).

After the NY Daily News disparaged Kenner for the 3rd time related to Jowdy investments
threatening unnamed FBI sources conducting investigations of Kenner, Berard notified
Kenner that in May 2010, he spoke to the NY Daily News writer (*Michael O'Keefe*), as
follows:  [Kenner in RED (sent) – Berard in **BLACK (read)**]

Kenner:

| 151 77 | +140152 46929 Bryan Berard* | **5/1/2010** 12:06:48 AM(UTC +0) | Sent | **Good job with the reporter. Who was it?** | |
|---|---|---|---|---|---|

Berard:

| 131 85 | +140152 46929 Bryan Berard* | **5/1/2010** 12:11:12 AM(UTC +0) | Read | **The douchebag from daily news. Told him he's an idiot for printing these articles and he can quote me that I've been to both properties over a dozen times and Jowdy has not done his job.** | |
|---|---|---|---|---|---|
| 131 86 | +140152 46929 Bryan Berard* | **5/1/2010** 12:11:34 AM(UTC +0) | Read | **He shut up right away and said sorry for bothern u. And hung up** | |

- This communication occurred one-and-a-half years (1-½) *after the date Berard told
  the FBI in his 2013 FBI proffer that he allegedly found Kenner "not to be legit" – See
  3500--BB-1-r.*
- *Berard's revisionary perspective of Kenner and Jowdy was <u>ONLY</u> conveniently altered
  after Berard and John Kaiser received jobs from Harvey and Jowdy* at the Diamante
  Cabo resort property.

[14] Immediately preceding the initiation of the April 2009 Harvey threat email and
corresponding NY Daily News stories about Kenner, O'Keefe wrote a "tell-all" novel about
Harvey's client and Jowdy's best friend, Roger Clemens -- "*American Icon*".

16

Jowdy and Harvey's NY Daily News associate, O'Keefe, highlighted their desire to eliminate Kenner as a partner for causing them problems with the discoveries of ongoing theft when writing, June 30th, 2013 – NY Daily News –

> "Where all of the money went could affect who has equity in the new, world-class golf resort in Mexico..."

- This was similar echoing of Galioto, Berard, and Kaiser's pre-trial lies to the investors that "*Kenner has all of the money and Jowdy never received it.*"

From all deducible references, the FBI inquiries from California and Arizona (according to Harvey), the 2009 SDNY Grand Jury convened on Kenner (within days of Kenner's EDNY proffer about the Jowdy crimes and Harvey's help) were further intimidation tactics by Jowdy's thugs. The subsequent 2009-2011 SEC investigation of Kenner and the SDNY Grand Jury resulted in "no indictments" or "charges", in spite of their massively intended damage to Kenner and his reputation, fully buttressed by the NY Daily News stories (*perhaps sullying a future NY jury-base*).

***No Kenner ties to the EDNY.***

In 2013, after a decade plus of business transactions managed by Kenner in his role as a Business Manager and Project manager for Kenner's client-base, over 95% of Kenner's business-related transactions had direct ties to Arizona. Nevertheless, after four and a half (4 ½) years of "investigations of Kenner in every jurisdiction – including Jowdy's confirmed criminal pursuit of Kenner in Mexico for "*alleging that Jowdy received loans from Kenner and Kenner investors in Hawai'i and personally*" (in

---

- Jowdy and Harvey are central figures in the book, mentioned more than a dozen times in direct reference to their relationship with Clemens and their underlying interference in the government probe of Brian McNamee's role in Clemens' steroid usage and Federal perjury trial. Left out of the novel and the government inquiry was the fact that Jowdy had made a series of "hush payments" to McNamee from Kenner and Kenner investors' proceeds stolen from the Cabo san Lucas project and other Jowdy controlled projects (all evidence in the government's possession – *See K29-6*).

spite of its underlying truth, confirmed by the government during forfeiture proceedings – *See K29-7[15]*) – Kenner was arrested in Arizona in November 2013 and recommended for R.O.R. bail by the Arizona judge; after full analysis of Kenner's risk to the community and flight risk issues by the 9th Circuit District Court. The 2nd Circuit (EDNY) representatives argued in the Arizona Court that they were going to exercise their jurisdiction over Kenner and remand him to the EDNY for further bail hearings. Kenner's immediate detainment fully caused harm to Kenner in preparation of any and all realistic criminal defenses; in addition to forcing Kenner to relinquish multiple civil lawsuits versus Jowdy, Kaiser and Berard for millions of documented thefts from Kenner, personally.

### *Hawai'i and Mexico investors are lied to by the FBI case agent about who received all of the Hawai'i funds sent to Jowdy.*

Post arrest, Kenner investors were told directly by the FBI agent Galioto that Kenner was indicted, arrested and held without bail, because "*Kenner had been caught stealing all of the money from the Hawai'i project that was allegedly sent to Jowdy for the documented loans*" (*See K29-7*).[16]

---

[15] After the government's "*phony*", "*bogus*", and "*supposed*" attacks on Kenner veracity throughout trial about the documented-loaned funds – the government produced a spreadsheet *K29-7* (a.k.a. -- *Government Forf-44*) – prepared by Jowdy and his attorneys (*Forfeiture Tr.66-67*) – which confirmed that the loans to Jowdy were anything but "*phony*", "*bogus*", and "*supposed*" as Kenner testified to throughout his direct and cross-examinations.

Regardless – and without evidence to contradict Kenner – the government doubled-down during their two summations – referring to the loans as "*bogus*" (*Tr.5708-09*) and "*supposed*" (*Tr.5707, 5991*).

[16] A March 2015 article – pre-trial – was written online, alleging that Michael Peca was part of litigation versus Kenner for "*stealing about $25 million from him and other NHL players*".

This *false storyline* corroborates communication that investors Stumpel, Norstrom, Sydor, Ranford, deVries and Murray verified to Kenner after he was arrested. They confirmed that FBI case agent, Galioto, prior to the 2015 trial was trying to convince them Kenner stole the Hawai'i funds – despite its falseness. **According to the FBI case agent** -- "*stealing all of their Hawai'i money*" was the underlying charge to the 2013 Indictment, and not the actual loaning funds to Jowdy, while allegedly "*unknown to the investors*" or concealed (despite all

18

During trial, the government repeatedly alleged that the loans to Jowdy were "*bogus*" (*Tr.5708 (2x), 5709*), "*phony*" (*Tr.4597, 4598*) and "*supposed*" (*Tr.5707-5708*) – and simply a "*Kenner cover-up story*". Yet -- they produced *K29-7* (allegedly received only three [3] weeks after trial) fully contradicting their "*most significant*" trial allegations, now leaving yet unaddressed reformative effects on the jury's decision.

Apparently, "*bogus*", "*phony*", and "*supposed*" were not actually true, despite their successful-intended consequence of misrepresentations to the jury (and pre-trial to the investors the government prosecution was counting on for newly-remembered testimony).

In 2013, with Kenner in prohibitive custody and facing the false rhetoric of the FBI

---

prior testimony and under oath statements by the investors supporting full knowledge of the Jowdy loans and the underlying "*group decision*").

The investors were told that Jowdy *never* received the money Kenner said was sent from the Hawai'i accounts and multiple personal accounts to Jowdy over the years. The FBI statements to the investors ignored the fact that the subject of multiple lawsuits versus Jowdy by the Kenner investors to recover the unpaid loans were the "same" loans; thus known at all times.  *See K29-8 @7 – See K29-9 @7 -- See K29-4*.

The FBI agent further lied that the bank statements -- which the investors possessed contradicting these facts -- were "*forged and fabricated by Kenner over the years to cover-up the truth*" – "*Bernie Madoff-style*".  According to the FBI case agent – those forged bank statements were also the underlying reasons that Jowdy had committed *no crimes* – as he ultimately received none of the money.

Post-trial, Kenner received a message from one (1) of the investors' camps stating:

"*They want to know where their fucking money is!*"

This again confirmed that the investors were told by Galioto that, now –

"*Kenner was convicted of stealing all of their Hawai'i funds that you [the investors] thought went to Jowdy, and I [Galioto] -- and the FBI cannot find where the money is*".

Galioto and the Court know that Jowdy received all of the funds (*See K29-7*) – in contradiction to the misrepresentations to hide the true cover-up for Jowdy's crimes.

case agent, Kenner was severely restricted from defending the absurdity of the misrepresentations, in direct contra to 100% of the empirical evidence in the government's possession.  The untruthful distortions were allowed to marinate for eighteen (18) months until trial with investors who thought they knew the contrarian truths (in opposition to what Galioto, Harvey, Kaiser and Berard had been telling them in order to gain their pro-government testimony at trial).   The government sought and received 2015 trial testimony, which ***fully contradicted the investors' entire and prior***:

> (1) 2011 SDNY Grand Jury testimonies,
> (2) 2009 civil depositions,
> (3) 2009 arbitration testimony,
> (4) 2009 affidavits from prior legal proceedings,
> (5) 2014-15 affidavits from prior legal proceedings,
> (6) 2009 and 2010 FBI interview notes,
> (7) Jowdy's 2010 California depositions, **including Jowdy *confessions of <u>all</u> the loans*** – and
> (8) Most grandly -- **Jowdy's own February and March 2010 *confessions* to the FBI agent on Kenner's case; Matthew Galioto.**

Yet – Kenner was brought on charges in the EDNY.

**APPLICABLE LAW**

Venue must be proper with respect to each count.

Defendant Kenner argues that multiple counts in Kenner's conviction should be reversed because the government failed to prove nexus for venue related to Kenner's actions in the EDNY, in addition to prejudicial variance in the alleged Eufora conspiracy.

In *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181 (2d Cir App – 1988), the Court stated the Sixth Amendment to the Constitution provides that the accused in a criminal prosecution has the right to be tried in the "district wherein the crime shall have been committed".   See also Fed. R. Crim. P. 18.   The burden is on the government to prove that the crime was committed in the district in which the prosecution is brought, see *United States v. Potamitis*, 739 F.2d 784, 791 (2d Cir), *cert denied*, 469 U.S. 918, 105 S. Ct. 297, 83 L. Ed. 2d 232 (1984); *United States v. Panebianco*, 543 F.2d 447, 455 (2d Cir – 1976), *cert denied*, 429 U.S. 1103, 97 S. Ct. 1129, 51 L. Ed. 2d 553 (1977), and when a defendant is charged in more than one count, ***venue must be proper with respect to each count***, see, e.g., *United States v. Bozza*, 365 F.2d 206, 220-22 (2d Cir – 1966); *United States v. Davis*, 666 F.2d 195, 198 (5th Cir Unit B 1982).

The decision in *United States v. Geibel*, 369 F.3d 682, 697 (2d Cir – 2004) (finding venue improper where actions in the Southern District of New York were "anterior and remote" to the criminal conduct), also contradicts the government's venue position in Kenner's convictions.  See also *Bozza*.

A defendant in a criminal case has the right to be tried in the district where the crime was "committed".  U.S. Constitutional. Amend VI; *See also* Fed R. Crim. P. 18 ("Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed.").   "When a Federal

21

statute defining an offense does not specify how to determine where the crime was committed, '[t]he *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Tzolov*, 642 F.3d at 318 (2nd Cir) (quoting *United States v. Cabrales*, 524 U.S. 1, 6-7, 118 S. Ct. 1772, 141 L. Ed. 2d 1 (1998)).

### *Multiple venue conspiracy:*

Venue may lie in more than one place if "the acts constituting the crime and the nature of the crime charged implicate more than one location." *United States v. Reed*, 773 F.2d 477, 480 (2d Cir 1985). Venue is proper "in any district in which an offense was 'begun, continued or completed'". *Id.* at 483 n.4 (quoting 18 U.S.C. 3237(a))[17].

  o  The United States Court of Appeals for the Second Circuit has routinely supplemented its venue inquiry with a "*substantial contacts*" test that takes into account a number of factors including the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of the venue for accurate fact-finding. The Second Circuit has acknowledged that this is not a formal constitutional test, but has nevertheless found it to be a valuable safeguard for a defendant whose contacts with the district of prosecution are *minimal*.

This observation is particularly apt where the charged crime is a conspiracy, because any district in which an overt act "in furtherance" of the conspiracy was committed is properly designated as the "district where the offense was committed," so long as the act was performed:

  (1) by any conspirator, and
  (2) was undertaken for the purpose of accomplishing the objectives of the conspiracy.

---

[17] 18 U.S.C. 3237 – The underpinnings of defendant's argument is the Constitution, Article III, Section 2 which provides in part, "The trial of all crimes...shall be held in the State's where the said crimes shall have been committed..." U.S. Constitutional. Art III, 2, cl. 3. And the Sixth Amendment guarantees trial "by an impartial jury of the States and the district wherein the crime shall have been committed..." U.S. Constitutional. Amend VI.

Fed R. Crim. P. 18 also assists in the determination of *locus delicti*. Except as otherwise permitted by statute or these rules, the prosecution shall be had in the district in which the offense was committed. The Court shall fix the place of trial within the district with due regard to the convenience of the defendant and the witnesses and the prompt administration of justice.

Indeed, the old English common law rules of venue produced a doctrine that a crime could be prosecuted only in a venue which all of the acts necessary to establish the offense had occurred. See Note, *Criminal Venue in the Federal Courts: The Obstruction of Justice Puzzle*, 82 Mich. L. Rev. 90, 105 & n. 78 (1983). This search for the one perfect locus was chimeric and forced Parliament to define permissible venue or venues explicitly. The great criminal law scholar Stephen astutely noted, "the only general interest attaching to these exceptions is that they prove that the general principle which requires so many exceptions must be wrong." Stephen, *A History of the Criminal Law of England* 277 (1883).

In fact, proper venue in criminal proceedings was a matter of concern to the Nation's founders. Their complaints against the King of Britain, listed in the Declaration of Independence[18], included his transportation of the colonists "beyond Seas to be tried". The Constitution twice safeguards the defendant's venue right: Article III, 2, cl. 3, instructs, "trial of all crimes...shall be held in the State where the said Crimes shall have been committed"; the Sixth Amendment calls for trial "by an impartial jury of the State and district wherein the crime shall have been

---

[18] The Declaration recited among injuries and usurpations attributed to the King: "transporting us beyond Seas to be tried for pretend offenses." The Declaration of Independence, para. 21 (1776). A complaint of the same tenor appeared earlier, in the 1769 "Virginia Resolves". See Blume, The Place of Trial of Criminal Cases: Constitutional Vicinage and Venue, 43 Mich. L. Rev. 59, 64 (1944). Parliamentary History of England from the Earliest Period to Year 1803, pp 476-510 (T. Hansard ed. 1813). In response, the Virginia House of Burgesses unanimously passed a resolution condemning the practice of sending individuals "beyond the Sea, to be tried" as "highly derogatory of the Rights of British subjects." Journals of the House of Burgesses of Virginia, 1766-1769, p 214 (J. Kennedy ed. 1906).

committed." Rule 18 of the Federal Rules of Criminal Procedure, providing that "prosecution shall be had in a district in which the offense was committed," echoes the constitutional commands.

If the federal statute defining an offense does not indicate explicitly where Congress believes the criminal act is committed, "the *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it. *United States v. Anderson*, 328 U.S. at 703. "It is of course, necessary in order to decide where the crime is committed to ascertain what duty it was, the failure to perform which constitutes the crime, and also what act of the defendant constituted the violation." Id. at 705. Accordingly, the Court in *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1188 (2d Cir App – 1988), stated:

> The test [for constitutional venue] is best described as a substantial contacts rule that takes into account a number of factors – the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate fact-finding, see also *United States v. Reed*, 773 F.2d 477, 481 (2d Cir – 1985), and we have noted that it is helpful to examine the "key verbs" used by the statute in defining the offense, *United States v. Chesnut*, 533 F.2d 40, 46-47 (2d Cir), *cert denied*, 429 U.S. 829, 50 L. Ed. 2d 93, 97 S. Ct. 88 (1976).

In *Beech-Nut* at 1189, as the court summarized -- the government argues that the prosecution in the EDNY was permissible because...its brokers were located in the Eastern District, and defendant's subordinates,

(1) **telephoned** the brokers to place orders for the adulterated apple juice concentrate, and
(2) **mailed** confirmations for these concentrate orders into the Eastern District.

The Appellate Court stated, "*we disagree*", for these communications were not part of the offense of introducing the offending juice into commerce but were merely prior and preparatory to that offense. ***Whether the crime being continuing or noncontinuing, venue is not proper in a district in which the only acts performed by the defendant were preparatory to the offense and not part of the offense.***

24

See *United States v. Bozza*, 365 F.2d at 220-21 (noncontinuing crime of receipt of stolen goods); *United States v. Davis*, 666 F.2d at 200 (continuing crime of possession of drugs with intent to distribute).

### **_Single Noncontinuing Act:_**

When a crime consists of a single noncontinuing act, it is "committed" in the district where the act is performed.   See e.g., *United States v. Anderson*, 328 U.S. 699, 703, 90 L. Ed. 1529, 66 S. Ct. 1213 (1946); *United States v. Busic*, 549 F.2d 252, 259 (2d Cir – 1977).

*Bozza* involved a prosecution in the EDNY for; *inter alia*, the noncontinuing offense of receipt of stolen goods.   The only connection of the alleged receiver of the goods with that district was that he had gone there for an unspecified purpose and had made and received calls there to arrange a meeting and negotiate price with respect to the goods; he had then gone from the EDNY to the SDNY, where he actually received the stolen goods.   The Court concluded that the venue in the EDNY as to that count was improper.   They noted that:

> The cases draw a distinction between a continuing offense which is "held, for venue purposes, to have been committed wherever the wrongdoer roamed,"...and "a single act which occurs at one time and at one place in which only it may be tried, although preparation for its commission may take place elsewhere." 365 F.2d at 220 (citations omitted).

> The Court *rejected* the government's argument that "the making of a contract to receive was the 'beginning' of a receiving," *id.*, concluding instead that an act that was merely preparatory to the offense was not part of the offense. See also *United States v. Chestnut*, 533 F.2d at 47 (court must "decide 'when the defendant's actions have progressed to the point where the court can confidently conclude that [the offense in question] has been committed'")(quoting *United States v. Bithoney*, 472 F.2d 16, 23 (2d Cir), *cert denied*, 412 U.S. 938, 37 L. Ed. 397, 93 S. Ct. 2771 (1973)).

In *Bozza*, the court concluded that to such extent as the issue is doubtful, it is best to resolve the doubt in favor of construction which will ensure trial where witnesses to

the receiving are more likely to be present; otherwise the mere happenstance of a telephone call from a district, possibly remote, where a defendant chanced to be, could deprive him of the protection of the Sixth Amendment. *Bozza*, 365 F.2d at 221.

### *Preparatory Acts:*

Principle preparatory acts alone are insufficient to support venue applies also to continuing offenses. Though 18 U.S.C. 3237 traces an offense from inception to completion, its thrust is entirely forward-looking; it contains no retrospective provision establishing venue in a district which the defendant performed only acts that preceded the inception of the offense. In *United States v. Davis*, 666 F.2d 199-200, the defendants were prosecuted in the Middle District of Georgia for possession of narcotics with intent to distribute, a crime that may be a continuing offense within the meaning of 18 U.S.C. 3237. The [defendants] argued that venue on that count was improper because the narcotics had never physically entered the district. The government contended that venue was proper because the defendants had made arrangements while in that district for the acquisition of the drugs and had intended that the drugs be returned to the district for ultimate distribution at the street level. The Fifth Circuit rejected the government's contention and REVERSED for improper venue because the offense itself had not been committed in the district. Like the Fifth Circuit, *Beech-Nut*'s Court found no authorization in 18 U.S.C. 3237 for venue in a district whose sole connection with the offense in question is that it was a site of a preparation for the offense.

### *Constructive Amendment and Prejudicial Variance:*

To establish constructive amendment, defendants must show that the trial evidence or jury instructions "so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the Grand Jury's Indictment." *United States v. Rigas*, 490 F.3d 208, 227 (2nd Cir – 2007)(internal quotation marks omitted).

26

When a defendant has claimed that he was convicted of a crime other than the crime alleged in the Indictment, the Court has distinguished between a "constructive amendment" of an indictment – when the terms of the indictment were effectively modified by the presentation of evidence or by actions of the Court so that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the Indictment," *United States v. Delano*, 55 F.3d 720,729 (2nd Cir. – 1995)(quoting *United States v. Mollica*, 849 F.2d 723, 729 (2nd Cir – 1988))(internal quotations marks omitted) – and a "prejudicial variance" – "when the charging terms of the Indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the Indictment," *United States v. Frank*, 156 F.3d 332, 338 n.5 (2d Cir – 1997)(quoting *United States v. Zingaro*, 858 F.2d 94,98 (2d Cir – 1988).

A constructive amendment is a per se violation of the Grand Jury clause of the Constitution, which requires reversal.  See *Rigas* at 226.  By contrast, a variance "occurs when the charging terms of the Indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the Indictment." *Id.* (internal quotation omitted).

27

## NO NEXUS TO VENUE OCCURRED IN THE EDNY

### *EDNY individuals:*
Venue was artificially manufactured for specific intent by the government to create jurisdiction.

The only persons named in the 2015 Superseding Indictment who resided in the EDNY during the timeframe associated with the various investments in the Kenner Indictment were John Kaiser and Nick Privitello, with the government in full possession of evidence that John Kaiser:

1. He was fully repaid by Kenner in each joint venture (Hawai'i and California),
2. He had been systematically robbing his friends & family since their 2005 Hawai'i contributions were repaid in August 2006 (unrelated to Kenner),
3. He later robbed Kenner (with Berard's help – 2011-2013) in two (2) real estate projects (in Arizona and Sag Harbor, NY – and sued by Kenner for both as a result of the frauds) -- and
4. He submitted *forged* and *fabricated* documents in multiple jurisdictions (along with Berard) – all under the knowledge of the FBI case agent (Galioto); some of which were systematically withheld from the Rule 16 evidence to avoid Kaiser's cross-examination of the material forged documents during trial.

John Kaiser was never a victim of the 2013 or 2015 Indictments.

***The government gave false proffer about Ethel Kaiser and the Pecas living in the EDNY.***

The government falsely proffered that Ethel Kaiser resided in the EDNY, when they were fully aware that she resided full-time in "upstate New York" – the Northern District of New York.   *Tr.5638.*

They also falsely claimed without evidence that Michael Peca and Kristen Peca lived in Long Island during their Hawai'i investment.   Again, ***not true.***

28

The Pecas vacated their Long Island residence in or about April 2004 when the 2003-04 NHL season for the NY Islanders concluded. They moved full-time back to their main home in Buffalo, New York and remained there *full-time* until the end of the NHL lockout (work stoppage), which lasted from about September 2004 thru December 2005 (about 16 months), at which time, Michael Peca signed a contract to play in Edmonton, Alberta, Canada for the remainder of the shortened 2005-06 season.[19] No evidence of contact with Kenner occurred in Long Island (EDNY) with respect to Peca after his April 2004 departure from Long Island (or before). In fact, Michael Peca began his investment in the Hawai'i project no earlier than the day he signed his *2005 Letter of Authorization* (*See K29-11*).

- It authorized Northern Trust Bank to *release* his Line of Credit ("LOC") funds to the Little Isle 4 investment upon Kenner's request. Peca confirmed that salient fact during his 2011 SDNY Grand Jury testimony about Kenner. On the *Letter of Authorization* document **dated March 11, 2005**, Peca confirmed to the Grand Jury, @39 – "*It was prepared for me, I read it, and I signed it.*" Peca signed his authorization about one (1) year after Peca was no longer residing in Long Island, New York (EDNY).

In fact, the *2005 Master Note* that Michael Peca signed with Northern Trust Bank for his Hawai'i LOC was not signed until twenty (20) days after his *Letter of Authorization* – on March 31, 2005. The *Master Note* was addressed to his Getzville (Buffalo), New York home at: 46 Golden Pheasant Drive, in the *Western District of New York. See K29-12.*

- It is worth noting that even though this is an **11-page** document which Michael Peca signed, there is *no indication* by the bank – thru the subpoenaed bank documents delivered to the EDNY Court – that Michael Peca *only* signed

---

[19] Although the government falsely claimed throughout their openings and summations that none of the Hawai'i LOC clients at Northern Trust received Hawai'i LOC monthly statements – Kenner was so diligent with regards to the Hawai'i LOC investors and full "*Know Your Client* (KYC)" requirements of the **2001 Patriot Act** -- that Michael Peca's actual 2005-06 in-season Edmonton, Alberta CANADA address for Northern Trust Bank (when he commenced his Hawai'i investments) was immediately added to his Buffalo address (*See K29-10*) producing two (2) separate monthly verification copies **in 2006** – further confirming nothing was concealed while Michael Peca **& his wife** received his Hawai'i LOC monthly statements *showing usage* of Michael Peca's Hawai'i LOC (denied by both of them at trial – *Tr. 429-430, 433*).

a single, signature page (as the government attempted to allege throughout the trial – without submitting a single evidentiary back-up for these tortious and injurious claims thru summation).

Finally, the same holds true for Michael Peca's March 31, 2005 **signed** *Pledge Agreement* (18 pages – and counter-signed by Northern Trust Vice President, Edward Wilson) – addressed to Peca's Getzville, NY home in the *Western District of New York. See K29-13.*

- The government failed to produce any evidence that *only* a single-page (signature page) was received by Peca's banker at Northern Trust.

Peca confirmed to the SDNY Grand Jury in 2012 that he was fully aware of the Hawai'i loans to Jowdy – and he participated in them as part of a *"group decision"* (just as Hawai'i and Mexico investor -- Turner Stevenson -- confirmed to the same SDNY Grand Jury).   No equivocation about the Peca "group decision" and his underlying knowledge of the transactions could be mistaken after his independent, ***under penalty of perjury*** representations in 2012.  *See K29-43.*   Peca told the SDNY Grand Jury –

> *"That [Little Isle 4] capital account was loaned to Ken Jowdy, our business partner, so there is no need at the time to be worried about anything.   The money was loaned to Ken Jowdy to basically help some of the purchase of the Cabo property so we can get the funding.   And then it was supposed to be a short-term loan."*

- Ironically – Peca was only involved in the Jowdy loans from mid-2005 thru February 2006 (the last advance to Jowdy) – so his knowledge had to be in real time – as he described to the Grand Jury in 2012.

Nonetheless and wholly untrue, the government misinformed the 2015 trial court about Peca's residence and location – *Tr.5638:*

> *"In addition, Mr. Peca and Mrs. Peca also resided in Long Island during the years in which they were involved in the Hawai'i investments."*

The government affirmation of venue in EDNY went so far as to ignore the contradictory testimony from Kristen Peca, who confirmed they were in Edmonton, Alberta, Canada when they invested in the Hawai'i project. *Tr.700.*

> *Q: So this investment happened, do you remember approximately what time you invested the money in Hawai'i?*
> *A [Kristen Peca]: 2005, 2006.  We were in Edmonton[20]*

Nick Privitello had no involvement in the Hawai'i project, at all.


***As a result, the government failed to prove venue in the EDNY related to the Hawai'i allegations of conspiracy.***


**<u>Global Settlement Fund ("GSF"):</u>**

1. The government produced <u>*no evidence*</u> of any transaction occurring in the EDNY – and,
2. The government produced <u>*no alleged victim*</u> of the GSF transactions in the EDNY – during the time of the alleged scheme.

The government offered no evidence of it throughout trial.


***As a result, the government failed to prove venue in the EDNY related to the GSF allegations of conspiracy.***


**<u>Eufora private stock sales:</u>**

During the trial, the government produced <u>*only*</u> Nick Privitello as a potential Eufora investor in the EDNY, but solely thru his direct dealings with Kaiser and Constantine and two (2) overt wire acts – **not Kenner**.


One hundred percent (100%) of the pre-trial evidence produced by the government and the FBI confirmed that Kenner had *no involvement,* at any level, with the Privitello transaction.   In fact, Kenner was found "*NOT GUILTY*" of the two (2) wire fraud counts related to Privitello's transactions (Counts 5-6).[21]

---

[20] Please note that Kenner never had any business meeting with Peca &/or his wife in Edmonton, Alberta, Canada.   Kenner had one (1) visit to Edmonton during their 2005-2006 NHL season – and *only* during the Stanley Cup Finals in June 2006 – long after Michael Peca began his Hawai'i investment.

- During the same 2012 period that Privitello recorded roughly three (3) hours of surreptitious phone calls with Constantine – Privitello recorded Kenner during a series of phone calls.  After the third (3rd) call with Kenner in 2012 to discuss the Constantine lawsuits – Privitello informed Kenner that he had recorded all of their calls, to which Kenner requested copies.  Privitello refused.  Privitello's recordings – further exonerated Kenner's involvement thru Privitello's own recorded words, yet they have never been turned over by the US Attorneys' Office, in spite of Kenner's requests.

In addition, the hearsay, yet false, claims at trial about the Privitello transactions stated that Kenner's participation in an unsubstantiated "*$25,000 Las Vegas Cabana Party*"[22] was the reason Nick Privitello considered the Eufora investment "*a good idea*".  At a minimum, the alleged conversations with Kenner could only be deemed a "*preparatory act*", if it is found by the Court to have any influence over the decision by Privitello to invest independently with Constantine's company.  See *Beech-Nut*.

- If Kenner told Privitello about Metabank (as also alleged at trial), it would have been a ***preparatory act and not part of any proper venue argument***.[23]

---

[21] John Doe 11 -- Nick Privitello:

| FIVE | December 7, 2009 | $150,000 wire transfer from John Doe 11's account at Fidelity Investments in the Eastern District of New York to an account at 1st Century Bank in Los Angeles, California. |
| SIX | December 7, 2009 | $50,000 wire transfer from John Doe 11's account at Citizens Bank in the Eastern District of New York to an account at 1st Century Bank in Los Angeles, California. |

[22] Defendant Kenner has never attended any such "high-priced" Las Vegas Cabana party, nor is defendant Kenner aware if they even exist.  In fact, in order for Privitello to recount the alleged story, the AUSA had to ask a second time: "*Does a story about a cabana ring a bell?*" (*Tr.1429*), finally jarring his recently-fabricated memory.

[23] The government made several trial references to a text message -- "*I'll yell Metabank as I kick Nick in the balls*" from Kenner to Constantine. *Tr.5748*.  The government knew that the text was sent by Kenner during a California deposition with former Kenner employee – ***Nick James***; not Privitello.  The government knew the text had *nothing* to do with any alleged conversation between Kenner and Privitello – at any time.  Kenner texts related to the deposition and METABANK below, occurred during the Nick James deposition:

段

Although the government also claimed to the Court that Gaarn became "*the managing manager of Mr. Kenner's LLC that owns a substantial chunk of Eufora...*" – it was wholly untrue, again. *Nor was evidence presented at trial to confirm this occurred.*

At all times since 2005, all Eufora records and underlying email communication confirm that Gaarn was the sole owner of the stock Kenner had previously acquired in Eufora.   The Eufora tax records of 2004 *(K29-18)*, 2005 *(K29-19)*, 2006 *(K29-20)* and 2007 *(K29-21)* confirm the transfer of ownership from Kenner's LLC (GuideDog, LLC) to Gaarn's LLC (Standard Ventures) in 2005 – *not 2007*. [24]

**Gaarn FBI notes were altered.**

Ironically, the Gaarn FBI proffer notes were "***altered***" to change Gaarn's 2012 proffer to allege he received the transfer of Eufora stock from Kenner in 2007 instead of 2005 for taking over the Managing Member role at AZ Eufora Partners I (*See K29-15 @2*) in order to "somehow" better fit the government theories of "*Kenner selling his stock*", perhaps closer to the date of sales in December 2008 and early 2009.   The government theory is wholly refuted by all pre-trial empirical evidence.   In fact, and in evidence pre-trial, every other Eufora email (between the Eufora board members – *See K29-16[25]*) and subsequent operating agreements

---

[24] *3500-TG-1-r*



[25] *K29-16* – Before the independent 2010 investigations of Constantine and Eufora began on behalf of the AZ Eufora Partners I investors – **hired by Gaarn** and without Kenner – the Eufora CEO (CR Gentry) emailed the Board of Eufora while verifying the investor's equity positions for the operating agreement that the Board was going to re-sign (in February 2009 – *See K29-17 and K29-14 @35-37*).

confirmed that Kenner was _only_ a lender to Eufora after 2005[26] – when Gaarn acquired Kenner's stock and took control as Managing Member of AZ Eufora Partners I (the Kenner investors).   The government ignored all of their pre-trial evidence to frame their theory.

**_At best, the government ignored all of its pre-trial, Rule 16 evidence – and at worst, the government has a lot of serious questions to answer regarding their 6-year investigation._**

---

On August 14, 2009 -- Gentry told the Board—
> "_I created this [equity spreadsheet], after review of deposits from Mia [Eufora Secretary], discussions with Phil Kenner **for transactions thru 2005**, and Tim Gaarn for transactions **after 2005**._"

> "_Phil is not a member of Eufora or AZ Eufora Partners I._"

[26] The 2004 Eufora tax records (_See K29-18 @ 11_) confirm that Kenner had personally loaned **$106,971** to Eufora.

The 2005 Eufora tax records (_See K29-19 @ 10_) confirm that Kenner had **increased** his personal loan amount to **$386,971** for Eufora.

- _K29-19 @12_ – the 2005 Eufora tax records confirm that Gaarn (Standard Ventures) had acquired Kenner's (GuideDog LLC) entire Eufora stock position -- now totaling 5.77%.

- _K29-19 @21_ – the 2005 Eufora tax records confirm that Kenner's (GuideDog LLC) equity had been reduced to 0% in 2005.

- _K29-19 @35_ – the 2005 Eufora tax records confirm that Gaarn's (Standard Ventures) equity position had been increased from .1% to 5.77% after the 2005 acquisition of Kenner's (GuideDog LLC) equity.

- _K29-19 @35_ – the 2005 Eufora tax records confirm that Gaarn's home mailing in Closter, New Jersey is present on Gaarn's Eufora tax return – _K1 tax document_.

The 2006 Eufora tax records (_See K29-20 @9_) confirm that Kenner had been fully repaid for his personal loan to Eufora during the 2006 tax year.
- It should be noted that Constantine repaid the repayment of the $386,971 loan to Eufora from Kenner, personally.   Upon information and belief – Constantine utilized his personal funds and directly sent them to Kenner for repayment when Kenner forgave the Eufora debt.

***Prejudicial Variance (the Eufora conspiracy):***

The government created a prejudicial variance regarding the alleged conspiratorial acts between Gaarn and the defendants in the alleged Eufora conspiracy. The Superseding Indictment (*Docket 214 @5*) alleged that –

> "*The defendant Kenner directed co-conspirator 1 [Gaarn]...to divert certain money for unauthorized purposes...*".

At trial (*Tr.2503-2504*), the government asked Gaarn on direct –

> Q: "*For members of the jury, would you explain what does a nonprosecution agreement mean that you have with the government?*

> A [Gaarn]: *It means that I've not been accused of committing any crime.*"

This is clear prejudicial variance between the allegations of co-conspirator status in the Superseding Indictment and what the government directly elicited from Gaarn, ***their witness***, during his testimony. Gaarn further denied any co-conspirator role with Kenner thru *intent* or *actions* during his cross-examinations. *Tr.2563-2564, and 2599-2600.* The government thru Gaarn's testimony produced <u>*no*</u> solicitations of conspiratorial acts or during anyone else's related testimony. See *United States v. Fahra*, 2016 U.S. App. LEXIS 4174 (6th Cir App. – 2016), where the Sixth Circuit Court of Appeals **dismissed** multiple conspiracy charges, because the Indictment overreached the actual persons involved in what they proved at trial, creating the variance. ***For this reason alone, notwithstanding the venue hurdles, the Eufora conspiracy must be eliminated from consideration and dismissed for prejudicial variance.***

***Kaiser's dishonest testimony was offered by the government.***

At *Tr.1020, supra*, the government completed another fraud upon the Court by claiming that the transfers Kaiser received from Gaarn in February 2009 were allegedly a result of Kaiser still being owed funds from Kenner from their joint California real estate project, which completed in November 2007. This thoery, again, contradicted the Rule 16 evidence -- proving the transfers were actually loans

36

from Gaarn to Kaiser.

Notwithstanding, it was confirmed by the prosecution and Court that the California transaction was not part of any charged offense – *Tr.1024*. The government was fully aware that Kaiser was fully repaid by Kenner (all traceable to Kenner and Kaiser bank statements following the November 2007 California project closing – *See K29-22*). **Nonetheless, the government chose to fabricate the reason for the Gaarn transactions with Kaiser to the Court** (*Tr.1020*).

> Michiewicz: "*The reason some of those wire transfers go to Mr. Kaiser and some of these are the substantive wire fraud* **counts two, threee, four**, *the reason they go to Mr. Kaiser is because he has no money to complete a subsequent project.* **He's still owed money from this Hermosa Beach [California] project and, again, Mr. Kenner is controlling the funds.**"[27]

Furthering their misrepresentations that Kaiser was "somehow" still owed funds from Kenner after more than fully documented repayments, the Government's entire "*grocery list*" and "*shopping list*" claims (*Tr.1404-1406*) were related to funds loaned to Constantine **from Kenner**, allegedly on Kaiser's behalf (again

---

[27] This full fabrication is documented thru the Kenner and Kaiser bank records after their November 2007 closing in California. Kaiser received the 2009 funds from Gaarn as a personal loan in February 2009 – almost nine (9) months after Kaiser's final payments were sent to his newly escrowed project in Arizona (May 2008) – thus they could *not* have had anything to do with the California project – regardless of "*what Kaiser believed*" according to the government. *See K29-23*.

- It cannot be the defendant's responsibility to disprove an outrageous and known falsity put forth by the government with Kaiser's testimony – when the underlying empirical evidence is in the government's pre-trial possession, **known at all times**; and blatantly ignored.

With the government trial fabrications – in light of the bank record evidence they ignored with Kaiser – the Court could only assess at the time of the misrepresentations that –

> Judge Bianco:"...*he [Kaiser] was still owed money on Hermosa [CA] is basically the relevance and that's why the money was being wired to him by Mr. Kenner...Its just important whether the witness believed he was still owed money on Hermosa, correct?*" *Tr.1022-1023*.

Due to the fact that the underlying predicate is a fraud on the Court, knowingly perpetrated by the government and Kaiser, the actual transaction cannot be considered a crime in this foundationless situation.

misrepresented as outstanding and unpaid from the Hawai'i and California projects).   The joint caricature was falsely contrived and based on the Kenner list of documented funds, which Kenner had *previously loaned* to Constantine – *nothing to do with Kaiser – or this instant case.  See K29-24.*

***Kaiser's testimony was part of a jointly created fraud on the court*** -- and in direct contradiction to all of the pre-trial bank records in the government's possession, which confirmed Kaiser was fully repaid in both instances, without equivocation. The government had 100% of the bank documents from the California and Hawai'i projects thru Rule 16, full access to Kaiser at all times pre-trial (thru four [4] years of cooperation), and they knew that Kaiser was <u>*NOT*</u> owed any funds from either project in February or May 2009 (the dates of the Gaarn transactions with Kaiser), or anytime afterwards.     ***And yet, they fabricated the false specter of jurisdiction to create a false jurisdiction in the EDNY.   The entire story was fabricated.***

If the allegation was that Kenner "told" Gaarn to wire funds to Kaiser (Count 2), that is merely a *preparatory act* and not applicable to establish venue for the conspiracy; nor is it proper to establish venue for a single noncontinuing overt act.  See *Beech-Nut.*  Nonetheless, as far as conspiracy venue for Eufora, AUSA Michiewicz told the jury specifically that (*Tr.5744*) –

> "*Count 2 which is a wire transfer that occurs, this is a substantive charge, <u>not</u> part of the conspiracy*..."

The 2009 personal loan from Gaarn (a non-conspirator – in his own words) to Kaiser was not a criminal act.   There was no underlying evidence that the transaction somehow supported either "in furtherance" of a conspiracy or a criminal single noncontinuing overt action by Gaarn.

***Kaiser's own testimony at trial confirmed that Kenner had no intent for the Gaarn transfer.***   When the government asked Kaiser about Count 3 – Kaiser told the government that the wire was a "*mistake*" ***according to Kenner*** and should not have been sent to Kaiser.  *Tr.1048-1049.*

***The key to effect proper venue for any act is <u>intent</u>.***

As the Court is aware, venue cannot be established if the defendant has **no intent** for coming in contact with the district. Kaiser's own answer on direct-examination (as the government's long-term confidential informant [with Berard] and 2nd largest beneficiary of the Kenner arrest behind Jowdy) confirms that Kenner had "no intent" for the Gaarn transfer to arrive in the EDNY, even though it was also sent by a non-conspirator, Tim Gaarn (further destroying the venue argument for the government). The Second Circuit confirmed this in *Tzolov*, when addressing language in *Svoboda*.

> In *United States v. Tzolov*, 642 F.3d at 318 (2nd Cir), the government's reliance on *Svoboda* was misplaced. In *United States v. Svoboda*, 347 F.3d 471 (2d Cir – 2003), we stated that "venue is proper in a district where (1) the defendant <u>intentionally</u> or <u>knowingly</u> causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is <u>foreseeable</u> that such an act would occur in the district of venue [and it does]. 347 F.3d at 483.

Ultimately, with respect to Count 4, even if the Court deems the Eufora private stock sales by Gaarn were "somehow concealed" from *his* own AZ Eufora Partners I members (with Gaarn the Managing Member of that investment LLC) – the private stock sale transactions of 2008 (Constantine) and 2008-09 (Gaarn) were fully vetted by the Eufora investors' own investigators and attorneys (led by NY attorney -- Michael Stolper). Gaarn hired Stolper's team on behalf of the Eufora investors he represented as Managing Member of AZ Eufora Partners I (not as a *"puppet"* of Kenner – *Tr.2501-2502*).

Ultimately, the allegations of private stock sales (*See K29-25 @ 4 & 7*) was **fully disclosed** and **raised specifically** by at least seven (7) of the government witnesses thru their Eufora attorney -- and was "***signed off***" in said independent attorney's full disclosure letter (*See K29-25 @ 9-18*) – ***to which said witnesses are bound by admission and estoppel***. The wire transfer to Kaiser in May 2009 cannot be

39

***As a result, the government failed to prove venue <u>lies</u> in the EDNY, <u>particularly</u> in relation to the Eufora conspiracy &/or the Kaiser transfers.***

***<u>The Hawai'i project</u> – No venue lies in the EDNY with respect to the Hawai'i transactions.***

The government faces *even greater* hurdles on venue with respect to the Hawai'i project. ***There are no Hawai'i "investors" in the EDNY.*** The government misled

[Kenner] – "*I didn't ask...pk*"...
[Kaiser] – "*I know. Just tired of needing money. Gotta finish tje [sic] house so we can get our money out. U and me*"

Ironically – Kaiser and Berard claimed in 2012 – when sued by Kenner in Arizona for fraudulently conveying title to the Arizona project house to themselves as individuals and cutting Kenner out – they claimed all of the funds in the deal belonged to Kaiser – while he was perpetually "*broke*" by his own November 2008 admission.

Kenner had to dismiss the active Arizona case in 2014 – after Berard and Kaiser spearheaded the November 2013 Kenner arrest and detainment as the two (2) government informants – specifically referenced in the Kenner bail proceedings – and NY Daily News article of November 13, 2013 (prepared and ready for the arrest day by NY Daily News writer -- O'Keefe).

Kenner also had a second lawsuit for fraudulent conveyance of title versus Berard and Kaiser for their theft of their joint real estate project in Sag Harbor NY – which had to be dismissed in 2014, as well.

- Kaiser and Berard benefitted over $1 million in lawsuit defense losses that were imminent, fully documented, and owed to Kenner – up until the 2013 EDNY Indictment they led with FBI agent Galioto – and arrested Kenner.
  - *Several multi-million dollar lawsuits in Mexico by Kenner versus Jowdy (their new boss) also had to be dismissed without Kenner free to continue the legal actions in Mexico – after Kenner's 2013 detainment.*

In spite of the Kaiser and Berard 2013 informant status -- **Berard previously texted Kenner** on 4-28-2010 about Galioto's lack of knowledge regarding the Jowdy thefts:



| | | | | |
|---|---|---|---|---|
| 131 44 | +14015246 929 **Bryan Berard\*** | **4/28/2010** 8:54:28 PM(UTC +0) | Read | <u>**Tell [FBI] agent [Galioto] to shut the fuck up. Doesn't have a clue.**</u> |

the 2015 court affirming that Ethel Kaiser and the Pecas resided in the EDNY during the Hawai'i investment.   **Neither of which was true,** *supra.*

**As confirmed by at least seven (7) of the government trial witnesses, there are no Hawai'i investors in the EDNY.**

**No transactions related to the Jowdy loans "touched" the EDNY.**

**No transactions related to the Constantine consulting payments "touched" the EDNY.**

**Kaiser was fully repaid in August 2006 for his friends & family 2005 loans.**   The fact that Kaiser withheld repayment funds from them is a fraud the government chose to ignore and conceal from Kaiser's mother, Ethel amongst others – but separate and independent from any Kenner actions.

Hawai'i Chief Operating Officer, Chris Manfredi (and Kaiser best-friend) confirmed that in the Hawai'i project (as funded by Lehman Brothers – for $105,000,000 in August 2006), neither he nor Kaiser had any investment funds in the Hawai'i deal. Manfredi told the FBI in October 2010 (*See K29-26*) that he had no money in the Hawai'i project and that Kaiser had only made an initial $1,000 deposit, in 2002 (pre-Kenner involvement).   Kaiser was repaid in December 2003 when Kenner took over the management of the project, as the Hawai'i tax records confirmed. Manfredi further confirmed to the FBI in the same proffer that he "*never increased investment*" and he was "*not sure if Kaiser did*".   Manfredi would have been privy to all of the financials, since he confirmed to the FBI in 2010 that he was the "*COO and Project Manager during yrs with PK*".[30]   Manfredi's FBI proffer drives a hole thru

---

[30] Manfredi's 2010 FBI proffer also strikes what can be charitably described as an unbelievable gap in more of Kaiser's recently fabricated trial testimony, known at all times by the government, yet referenced in summation.  Manfredi clearly told the FBI in his 2010 proffer that he was not aware if Kaiser contributed any further funds to the Hawai'i project

after the initial $1,000 that was repaid by Kenner in 2003 (and confirmed by the Hawai'i tax records).

YET -- Kaiser told the 2015 trial court that "*Manfredi discovered*" that the $1,000,000 deposit in August 2005 was fraudulently transmitted to Ken Jowdy in Mexico.  Kaiser alleged that Manfredi *confronted* Kenner in Hawai'i by 2006.  Clearly – the recollection of the Manfredi confrontation was fabricated since the "eye-witness" and "instigator" of the alleged meeting [Manfredi] was not even aware of Kaiser's additional funds (*Tr.983*) – per Manfredi's FBI proffer five (5) years before trial (in 2010).

Neither Manfredi nor the government have alleged that Manfredi suffers from *faulty memory, confusion and mistakes* like the hockey player witnesses, nor did Manfredi testify to this fabricated "*confrontation*" at the time of trial; only Kaiser did.
- It should be noted that Kaiser actually testified to a 2009 arbitration panel (re – the Ken Jowdy loan agreement), where he gave voluntary testimony, as follows –
  > "*Any money that was allocated towards land for the Hawaiian Investment Group that wasn't being used – the due diligence in Hawai'i takes a long time...So if we had some funds that were – that was stagnant and that warrant purchasing land, <u>we would utilize it for a loan</u>, so we actually made some money off it.*"

- Kaiser later explained to the arbitration panel why he (not Kenner) raised funds from his friends & family to loan to the Hawai'i project -- specifically for the Jowdy 15% interest loan –
  > "*At 15 percent – actually, the loans, I didn't think they were going to be – to me it wasn't a risky loan.  But the loans – <u>even investors I brought in</u>, I said, Listen. This guy – I gave him the whole story of Ken Jowdy backed by land.  It's good. Better than your money sitting somewhere.*"

- Kaiser finished with the following statements in 2009 – at a date *after* Kenner would have allegedly defrauded him in the Hawai'i project, the California project – and according to EDNY testimony and Michiewicz' proffers – still owed Kaiser millions of dollars (although <u>*all*</u> untrue based on the actual bank statements) – thus Kaiser's factual 2009 testimony revealed --
  > *Q: Even now, sitting here in May 2009, is there anything you've uncovered, as someone who obviously knows how to investigate, that Mr. Kenner has done anything inappropriate throughout these transactions?*
  > *A [Kaiser]: No.*
  > *Q: Not one complaint?*
  > *A [Kaiser]: No.*

o   It should <u>not</u> be overlooked that Bryan Berard gave similar revealing testimony in the May 2009 arbitration to confirm his *personal knowledge and agreement* with the Hawai'i loans to Jowdy – *at a time in history* [May 2009] when his future 2013 FBI proffer claimed he "*no longer found Kenner to be legit*" – and only 1 ½ months after he allegedly lost his Hawai'i LOC collateral – "*as a surprise after receiving a letter from Northern Trust* [*that never existed*]".

Kaiser's false allegations of a 2006 "confrontation" meeting with Manfredi, Kaiser and Kenner (*Tr.983*) – considering Manfredi (in 2010) was not aware of any Kaiser funds from 2005. The investigating agent (Galioto) was present during the 2010 Manfredi proffer and failed to notify the Court of the known falsity or recently fabricated testimony by Kaiser (opening up another trial "issue" – fully prejudicing Kenner) – unless Galioto was involved in additional suborned perjury plans with one (1) of his "star witnesses".

---

o The latter 2013 FBI proffer by Berard does not comport with his 2009 supportive and *voluntary* testimony for Kenner – just like his best friend – John Kaiser (both volleying contradicting claims to harm Kenner immediately after acquiring jobs from Ken Jowdy and Tom Harvey in Mexico).

- Berard 2009 arbitration testimony (*See K29-35*):
  *Q: And later on were you aware that Mr. Kenner started lending this money to another principle in the Cabo project names Ken Jowdy?*
  *A[Berard]: Yes.*

  *Q: Where did you think the money that Mr. Jowdy – were you told where the money that was given Mr. Jowdy as far as the Mexican project? Was there anything you were told about that?*
  *A[Berard]: Basically just loan him the money for the project.*

Nonetheless, Manfredi's own *amnesia* with respect to the myriad of Constantine funding meetings, which Manfredi prepared and presented the Hawai'i project materials via phone calls and emails, was apparent when Manfredi even refused to acknowledge the empirical emails confirming his participation at trial – even after he was given the plethora of his emails for refreshing his recollection. *Tr.3009-3018.*

- It should be noted that although not a venue issue – neither Manfredi nor the government produced a single "due diligence" email from Manfredi (who was the only Hawai'i officer who managed the lending document process for dozens of hard-money and 3rd party lenders). Yet – the Constantine consulting payments are deemed as part of some conspiracy.
  o Constantine was one (1) of only two (2) hard-money lenders who were paid in advance by the Hawai'i project who delivered development funds as promised for pay.

  Constantine was the only consultant "*paid early*" (as Manfredi *confirmed* to the FBI for consulting payments in his same October 2010 FBI proffer) of the nine (9) that received prepayment fees -- and "delivered" a result. Yet – somehow the other eight (8) lenders were deemed **_NOT_** to be part of some conspiracy; only someone who actually delivered a result as expected.

44

No transactions related to the underlying conspiratorial allegations of *"lending funds unknown to Jowdy"* or *"paying consulting fees to Constantine"* emanated from the EDNY or *"touched"* the EDNY, thus *venue is clearly absent*.

### *None of the Overt Wire Fraud Counts give rise to venue in the EDNY*.

Counts 7 and 8 are Hawai'i Line of Credit ("LOC") payments for the Hawai'i LOC loans.[31]   *Neither of these transactions takes place in the EDNY*.   At all times, the Hawai'i LOC payments from 2003 thru 2009 (approximately 60 payments) were ordered by Kenner in Arizona, Hawai'i &/or Nevada to a bank located at all times in Arizona.   *The government presented no evidence to the contrary*.

In spite of Berard's clearly confused 2015 testimony (at direct odds with his prior 2009 arbitration admissions – *See footnote 30*), Berard had clear expectation and understanding that his Hawai'i LOC would be used on the Mexico project.   On direct examination – Berard tried to backpedal from his 2009 arbitration testimony confirmations that his clear and specific expectation *was the use of his Hawai'i LOC*. In 2015 -- on direct-examination, Berard's testimony was just the opposite (*Tr.3082*):

> *"Absolutely not.  My money was not supposed to be used in Mexico."*

Nonetheless -- fully ignored by the prosecutorial team, six (6) years earlier and before working for Ken Jowdy in Mexico, Bryan Berard *voluntarily* offered May 2009

---

[31]

| Count | Approximate Date of Wire Transmission | Description of Wire Transmission |
|---|---|---|
| SEVEN | November 20, 2008 | $43,000 wire transfer from KENNER's account at Wells Fargo Bank in Scottsdale, Arizona to the Ula Makika account at Northern Trust Bank in Scottsdale, Arizona. |
| EIGHT | December 31, 2008 | $35,000 wire transfer from KENNER's account at Wells Fargo Bank in Scottsdale, Arizona to the Little Isle IV account at Northern Trust Bank in Scottsdale, Arizona. |

arbitration testimony in support of Kenner, *supra*.   The testimony was specifically less than two (2) months after Berard knowingly forfeited his Hawai'i LOC collateral (in April 2009) after text communication with Kenner – and no signs of dissatisfaction or confusion with the transaction – *just the opposite*.[32]   Berard told

---

[32] After reviewing the February 2009 and March 2009 DEFAULT letters that Kenner notified him about, Berard sent Kenner the following text – **five (5) full days before Berard authorized the collateral seizure directly with Northern Trust employees (as required)**:

Berard:

| | | | | | |
|---|---|---|---|---|---|
| 620 7 | +140152 46929 Bryan Berard* | 3/26/2009 6:53:59 PM(UTC+0) | R e a d | **When u get chance can we look at *how much money will b freed up after payn off line of credit NT???* Thanks** | |

Kenner replied [**in RED**]:

| | | | | | |
|---|---|---|---|---|---|
| 728 0 | +140152 46929 Bryan Berard* | 3/26/2009 7:00:51 PM(UTC+0) | Sent | **~300k** | |

Berard replied:

| | | | | | |
|---|---|---|---|---|---|
| 620 8 | +140152 46929 Bryan Berard* | 3/26/2009 7:04:18 PM(UTC+0) | R e a d | **Cool thanks!!! When will that b freed Gonna use 200 for a cool oppurtunity will show u and talk 2 u abt it later. Good for all of us n future.** | |

Kenner replied [**in RED**]:

| | | | | | |
|---|---|---|---|---|---|
| 728 2 | +140152 46929 Bryan Berard* | 3/26/2009 7:30:08 PM(UTC+0) | Sent | **Can't wait to hear!** | |

- These text are also **five (5) days before** Berard approved his collateral seizure on the phone with Northern Trust Bankers, Mascarella and Brill from Northern Trust (*just like the other seven [7] Hawai'i LOC clients were REQUIRED to do – separate from Kenner*).

- Similarly (in evidence):
  - Darryl Sydor sent Kenner a text on **April 1, 2009** to notify Kenner: "*Hey someone from Northern Trust called with someone from schwabb.  And want to do a conference call in a hour with erin [Mascarella] someone*".   See K29-34.

46

the 2009 Arbitration panel that he also knew that the LLC (Little Isle 4 – and Kenner) *were expected to make the payments for the Hawai'i LOCs*, as follows:

Berard's 2009 arbitration testimony affirmed (*Nolan arbitration Day 5 @76*):

> Q: *When you were – as far as the Hawai'i deal, were you made aware of any sort of transaction Mr. Kenner set up where you can give a commitment or pledge a credit line in lieu of putting all your money in initially?*
> A [Berard]: *Yes.*
>
> Q: *Can you tell the panel what was your understanding?*
> A [Berard]: *Basically the company – it was set up.*  ***The company would pay the payments.***  *I would pledge the money, obviously to get a loan for the property.*  ***Again, the company would pay the payments****, and I was not forfeiting all the amount of money for the piece of property.*[33]

The actual Hawai'i LOC payments for all of the investors were paid continuously for approximately five (5) years (2003-2008) on behalf of the Hawai'i investors to Northern Trust Bank, *as expected*.

---

○  Mike Peca sent a text to Kenner on **April 1, 2009** to confirm he independently already spoke to Northern Trust: *"Call already done"*.  *See K29-34.*

None of the Hawai'i LOC clients could have been concealed from their own Hawai'i LOC transactions (specifically the collateral seizures), notwithstanding complicity for suborned perjury with FBI Agent Galioto's theories to convict Kenner, unless *faulty memory, confusion and mistakes* were the excuse (***thus CTE-based and wholly unreliable***).
•  Ironically – all of the *faulty memory, confusion and mistakes* were in perfect pro-government unison.

[33] In 2009 -- Berard was clearly able to articulate the investment strategy of collateralizing (a.k.a. – pledging) his securities portfolio at Northern Trust Bank – in lieu of cash – for his investment in the Hawai'i project.

In fact – his 2005, 1-page **signed** Extension of Credit designated his original $900,000 as – *"Investment in speculative real estate"* (*See K29-30*).  Berard had actually established his original Hawai'i LOC two (2) years earlier and designated as funds for *"personal investment"* (in 2003).  The Berard documents were delivered in the Northern Trust trial subpoena – thus his testimony at trial that his Hawai'i LOC was established to assure Lehman Brothers there was collateral until Lehman Brothers funded the project, *was another farce*, since Lehman Brothers began their involvement in 2005 – not 2003.  *Tr.3035-3036.*  The Northern Trust trial subpoena produced evidence that also disproved Berard's falsified claim that he never received monthly Hawai'i LOC statements. *They were present in the 2015 subpoena.  Tr.3036.*

***Again – neither Berard nor any other investor had any connection to the EDNY.***

In fact, the original Grand Jury Indictment claimed that Kenner had told various Hawai'i investors (***none of whom resided or reside in the EDNY***) that he would make sure the payments for the Hawai'i LOCs were made (*See Berard arbitration testimony, supra*), yet Kenner was charged with <u>making the payments</u> as a predicate criminal act, for <u>exactly</u> what the government and the investors agreed and expected to occur.

- *In addition, each year the investors had their Hawai'i LOCs open related to the Hawai'i investment; they received a 1099-INT-tax form directly from Northern Trust Bank at their address of record for the full interest payments made on behalf of their Hawai'i LOCs by Kenner and Little Isle 4 capital accounts.* ***NO 1099-int-tax forms show any address from the EDNY.***

- *Each investor utilized the deductibility of the Hawai'i LOC interest payments as deductions on their personal tax returns with the IRS (as a further benefit of investing thru their Hawai'i LOC in lieu of cash – and an offset if any losses were determined)[34].*

---

[34] Every Hawai'i LOC investor agreed to the loans; and all witnesses presented by the government had previously confirmed "*under oath*" their knowing, voluntary participation and acceptance to them.

It should be noted that as an entire group – the Northern Trust LOC investors earned over $2,000,000 tax-free income from their collateral as a result of the structured investment strategy (in lieu of cash – 2003-2009) – as Berard described to the 2009 arbitration panel. It is also an offset versus any perceived loss (which there actually are *none* – due to the existence of the Hawai'i-Jowdy loan, **valued at over $31,000,000 in 2018**).
- *See K29-38.* The 2004 Little Isle 4 By-Laws specifically allowed capital account funds to be "**loaned if deemed by the Managing Member to be in the best interest of the LLC**". Thus – there were no corporate violations either – considering virtually every Hawai'i investor pre-trial confirmed under oath their voluntary and knowledgeable participation in the loans to Jowdy.
  - o It was only 2015 trial testimony that produced any opposing statements from the investors – ironically in complete unison – after losing their complete historical memory.

- Multiple 2015 trial testimony claimed the investors "*trusted Phil*" – thus the Jowdy loan is the most significant and unresolved asset of the Hawai'i project – making all of the investors "more than whole" – yet the government will not assist thru

48

- *For this reason alone*, it is not possible that any of the Northern Trust LOC clients could have been unaware of the use of their respective Hawai'i LOC funds any longer than thru the end of the initial calendar year, while their Hawai'i LOC was opened (by themselves at all times – and not by Kenner) -- and certainly not concealed.
  - o *Additionally –* every Hawai'i LOC investor signed-off annually on their Northern Trust *Disbursement Request & Authorization* forms which documented (on a *one-page bank document*) the exact amount of funds spent and un-spent, remaining on their Hawai'i LOC account). *See K29-37.*

*Yet – the government failed to offer any proof that either count gave rise to venue in the EDNY.*

To further support the jury confusion and prejudice variance about the Hawai'i LOC payments (contradicting Indictment claims), Kenner was found NOT GUILTY on Count 7, but guilty on the subsequent count (Count 8), which would have represented the exact same *expected action* by Kenner on behalf of the Hawai'i investors and their Hawai'i LOCs; *making the monthly payments for the Hawai'i LOCs.*

*Yet – neither of them had venue in the EDNY.*

- Extending the support and knowledge of Kenner's ongoing efforts to make the monthly payments, during Kristen Peca's 2012 FBI recording of Kenner, she substantiated the fact she (after learning about the existence of the

---

multiple Kenner requests to recover the money from Jowdy who continues to loot the Cabo project on a monthly basis thru developers fees and side deals. *See Rucchin @ Tr.2719, 2752, 2756, 2758, 2799, 2800 – Ranford @ Tr.2861, 2862, 2885, 2887 -- Berard @ Tr.3042, 3053, 3158 – Sydor @ Tr.2200, 2222 – Nolan @ Tr.2062, 2065 – Peca @ Tr.517 – Kristen Peca @ Tr.699 – McKee @ Tr.1835 – Nash @ Tr.1955*

- The current uncollectable status of the Jowdy loan is a direct result of Na'alehu Ventures 2006 (Hawai'i) Managing Member, John Kaiser refusing to pursue Jowdy for the repayment (while Kaiser earns his living from Jowdy in Mexico) – and the government's repeated refusal to meet with Kenner post-trial to pursue the funds from Jowdy (*in the Court Docket*) – with full evidence and admission of Jowdy's receipt of the loaned funds (*See K29-7*) (notwithstanding the myriad of additional uncharged crimes perpetrated by Jowdy and Harvey versus Kenner and Kenner investors and covered-up since 2002).

Hawai'i LOC from her husband in or about 2008 [per her 2012 FBI recordings with Kenner[35]] – contradicting her made-up 2015 "*the bonds are my baby*" testimony -- and – her fabrication of attending a 2005 Hawai'i meeting with Kenner and her husband – *Tr.696-700*) -- *she believed that Kenner was making all of the Hawai'i LOC payments for them*.

At about 1:20.50 of Kristen Peca's July 2012 recording, in reference to Michael Peca's Northern Trust LOC, she told Kenner:

> "*You said that you would make all payments.*"

Conversely, this verified thru Kristen Peca's own words in 2012 that her husband also **expected** it.

**The government <u>excluded</u> satisfied investors of the Hawai'i project.  Multiple Hawai'i investors refused to allege they were victims during the trial &/or in the Superseding Indictment.**

Several Hawai'i investors who were not alleged as Hawai'i victims in the Kenner

---

[35] (**@ About 5.45 of the 1:34.50 call**) – In July 2012, Kristen Peca tells Kenner –

> **Kristen Peca –** *Well, I was referencing the earlier stuff that you said, I don't remember a large amount being distributed back to our account and the timing of the years of the loan, **the line of credit, that happened when we were in OHIO [2008 & 2009]. I don't understand how it could have been open for 5 years before that?  <u>Because we had a bond account going?  Do you mean the Hawai'i; you had a line of credit, but not for us?</u>**

> **Kenner –** *No, no, you guys had lines of credit for 5 years at Northern Trust.*

> **Kristen Peca – for 5 years?**

> **Kenner –** for 5 years!  When you were in OHIO [*2009*], that's when the thing [*Hawai'i LOC*] closed.

Kristen Peca cannot believe that she is finding out on the FBI phone call in 2012 that her husband, <u>Kenner's client</u>, had concealed that he had a Hawai'i LOC open for five (5) years at Northern Trust before her knowledge of it – even though she lied to the EDNY Court in 2015 when she testified that <u>she</u> and her husband waited a month after the 2005 Hawai'i meeting before deciding to participate with the Hawai'i LOC for their Hawai'i investment capital. *Tr.697.*

Superseding Indictment *signed* affidavits in 2009 during the *Nolan v. Kenner* arbitration.   Hawai'i investors Norstrom (*See K29-31 @3*), Gonchar (*See K29-32 @4-5*), and Stumpel (*See K29-33 @4-5*) re-confirmed Berard's 2009 testimony to the arbitration panel that they expected their funds to be used to pay the Hawai'i LOC fees (in addition to a myriad of other company expenses) via affidavit by affirming that:

> "*I was aware that my funds would be used to make distributions for the company, including but not limited to: ...loans to outside entities [Jowdy entities] and <u>distributions to other members that would satisfy their monthly line of credit payments to Northern Trust Bank</u>*"

> "*Phil Kenner has always disclosed the complete and detailed use of these funds to me from time to time and per my every request.*"

### *The government had full knowledge of these 2009 affidavits throughout their 6-year investigation and chose to ignore them.*

- These affidavits were signed by Hawai'i investors Norstrom, Gonchar and Stumpel only weeks after the various Hawai'i LOC collaterals were authorized to be released by the investors in April 2009 to Northern Trust thru direct and independent phone calls with the bank officials (Brill and Mascarella).

- The affidavits were also signed less than two (2) months before Kenner arranged for the Hawai'i LOC investors to speak directly with the FBI about the unpaid Jowdy loans from the Hawai'i loans and other personal loans, *supra*.

In *United States v. Ganji* 880 F.3d 760 (2018 – U.S. App. LEXIS 2279), the judges summarized that "a defendant could not be held liable for fraud as a result of activity that was legal".

Not only were the Hawai'i LOC payments and usage:
(1) **Authorized on the Little Isle 4 operating agreement,**
(2) **Expected** by the investors/government witnesses,
(3) **Consented to** by the investors/government witnesses,
(4) Not objected to at any time by the investors/government witnesses (until 10-

years after-the-fact – during contravening trial testimony for the first [1st] time),

(5) Annually represented on their independent *1099-int Northern Trust tax forms* directly from the Bank, and

(6) Signed off on their **one-page**, *Annual Disbursement Request & Authorization form* – BUT --

**The Hawai'i LOC transactions are wholly legal, legitimate, and authorized.**

***Thus, the government failed to prove venue in the EDNY related to Counts 7 and 8.***

**CONCLUSION**

For all of the aforementioned reasons, defendant Kenner requests that the Court reviews the arguments related to venue, *infra*, and dismiss the counts in the Superseding Indictment where statute dictates, and terminate the alleged conspiracies (for money laundering and wire fraud) where the claims have no venue in the EDNY.

Oral arguments are requested if elements of the Rule 29 request are left un-argued or with ambiguity.

/s/

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
Philip A. Kenner
Date: November 19, 2018

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
|
**UNITED STATES OF AMERICA**          |
|
    against-          |
|             **Docket No. 13-cr-607**
|
**PHILLIP A. KENNER and**          |
**TOMMY C. CONSTANTINE,**          |
|
|
**Defendants.**          |
----------------------------------------------------------X

**Defendant, Kenner –**

**Kenner Rule 33 Reconsideration motion**

████████████████████

███████████████████████████████████████████████████████████████ 03

███████████████████████████████████████████████████████████ 06

- Cumulative Prejudice
- Shocking New Evidence From The Government Star-Witness – John Kaiser
- ***Chronic Traumatic Encephalopathy*** ("Cte") Permeated The Entire "Memory Test" Prosecution
- Appendix[1]

███████████████████████████████████████████████████████████ 13

- Exculpatory Evidence Dump On The Eve Of Trial
- Materiality
- The Kenner Trial Evidence Was Thin -- At Best
- Brady Issues
- The Government's Constitutional Duty Of Disclosure
- Rule 16
- Tequila Bottle Fraud On The Court
- Northern Trust Bank LOC Fraud On The Court
- The Court Has Emphasized That Disclosure Of Critical Information On The Eve Of Trial Is Unsafe For The Prosecution
- Attorney Baker Disclosures Fraud On The Court
- Government-Forfeiture-44
  - o   If Cumulative...
  - o   If New Evidence...

███████████████████████████████████████████████████████████ 32

- The Jury Was Presented With Invalid Theories Of Conviction
- Agency Relationship
- "Conduct"

███████████████████████████████████████████████████████████ 40

███████████████████████████████████████████████████████████ 43

- The Use Of False Testimony

---

[1] All Appendix page numbers followed by * refer to a footnote on the corresponding Appendix page.

- Repeated False Proffers Contradicted Pre-Trial Investigations And Evidence

██████████████████████████████████████████████ 54

- Inflammatory Statements
- Summation And Rebuttal Summation
- Prosecutorial Misconduct
- Post Trial **"New Evidence"** Contradicted The Government's Summation That Kenner *"Stole"* From The Hawai'i Partners *"To Buy His Piece Of The Cabo Investment"*

██████████████████████████████████████████████ 66

- Prosecutorial Misconduct Infected Every Stage Of The Instant Trial
- The Materiality Standard For Use Of Perjury
- The Government's Awareness
- Automatic Reversal Of Conviction
- New Evidence
- Government Star Witness And Jowdy-Protector (A.K.A. Co-Conspirator) Goes Turncoat (Again)

██████████████████████████████████████████████ 81

3



*Annunziato v. Manson*............75

*Betaco, Inc. v. Cessna Aircraft Co*............41

*Brady v. Maryland*............13 et. al.

*Daubert v. Merrell Dow Pharms., Inc*............33

*Donnelly v. DeChristoforo*............68

*Giglio v United States*............23 et. al.

*Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A*............41

*In re Refco Capital Markets, Ltd. Brokerage Customer SEC. Litig*............39

*In Re United States (Coppa)*............22

*Kyles v. Whitley*............23, 78

*Leka v. Portuondo*............13, 26

*Levin v. Commissioner*............40

*Macomber v. Travelers Property. & Cas. Corp.* ............37

*Murray v. Jowdy*............35

*Napue v. Illinois*............43, 43*, 75

*Perkins v. LeFevre*............75

*Salinas v. United States*............34

*Saunders v. Sullivan*............75

*Schmidt v. United States*............40

*Shaw v. Autozone, Inc.* ............40

*Stoneridge Investment. Partners, LLC v. Scientific-Atlanta*............39

*Strickler v. Greene*............22

*United States v. Agurs*............75

*United States v. Alessi*............78

*United States v. Avellino*............13

*United States v. Bagley*............23, 78

*United States v. Ballard*............63

*United States v. Berger*............30, 54, 83

*United States v. Borello*............68

United *States v. Caracappa............61*

*United States v. Duncan............33*

*United States v. Dunnigan............64*

*United States v. Elias............66*

*United States v. Foley............34*

*United States v. Friedman............68*

*United States v. Gallego............43*

*United States v. Gil............13, 26*

*United States v. Hayman............40*

*United States v. Helmsley............66*

*United States v. Neresian............60, 62*

*United States v. Onumonu............33*

*United States v. Owen............78*

*United States v. Polisi............43*

*United States v. Rivera............63*

*United States v. Seijo............75*

*United States v. Stofsky............75*

*United States v. Universita............57*

*United States v. Wallach............43, 72, 74*

*United States v. Wexler............54*

*United States v. Wilkinson............62*

*United States v. Williams ............60*

*United States v. Wong............72*

*United States v. Young............60*

*United States v. Zagari............78*

*United States v. Zvi............34*

## *LEGAL ARGUMENTS*
### *(Case law)*

The defendant's Rule 33 reconsideration motion will address the following legal issues:

1. ***Shocking*** New Evidence
2. Late Discovery prejudice
3. Brady Materials
4. Expert Witnesses (FINRA) Prejudice
5. Failure to Read Prejudice
6. Inconsistent Prior Statements (a.k.a. PERJURY)
7. Prosecutorial Misconduct
8. **Cumulative Prejudice**

### Cumulative Prejudice:

Each of these items, *supra and discussed infra*, were issues of misconduct and irreversible prejudice to the defendant.   They violated his 6th Amendment and 14th Amendment rights to a fair trial.   Independently, each of these items deserves consideration for a new trial based on their independent injustice.   Yet, when reviewed in the context of the entire trial, the ***cumulative prejudice*** that ensued clouded the jury's perspectives that even a professional trier of fact would struggle to disseminate thru the morass of demonstrably false testimony.

### Shocking new evidence from the government star-witness – John Kaiser:

Since the end of trial, government star-witness John Kaiser ***shocked the conscious*** by submitting a co-conspirator confession letter about his 5-year working knowledge of Ken Jowdy's ongoing criminal activity in Mexico (*Document 628*).   It was exactly what the government **denied** during trial and alleged was "made-up" by Kenner to cover some alleged Hawai'i thefts (beginning at *Tr.31*). Yet, Kaiser's trial testimony occurred more than halfway thru his co-conspirator employment status with Jowdy (*Tr.1091*).   *The foundationless Hawai'i-Mexico and Jowdy-loan theft allegations levied repeatedly against Kenner were also proven to have never occurred (per government-forfeiture-44 – "new evidence" submitted post-trial).*

6

- Defendant Kenner requests an **evidentiary hearing** to collect the *"information"* that Kaiser claims to possess in his February 28, 2019 letter (*Document 628 at 4*), which shows Jowdy's irrefutable criminal activity – and

- Defendant Kenner requests the opportunity to elicit testimony from Kaiser, which is necessary to determine:
    - o <u>How</u> he learned first-hand of the Jowdy criminal activity,
    - o <u>When</u> he learned about it (and remained as a co-conspirator for pay),
    - o <u>How</u> his 2015 trial testimony about Jowdy's non-criminal actions changed since summer 2015 (fully prejudicing Kenner),
    - o <u>Why</u> he believes the FBI is not working with him versus Jowdy, and
    - o <u>Why</u> he waited until February 2019 to alert the court...

- Every Kaiser answer will provide a multitude of new trial issues based on his voluntary confession letter in February 2019 to the Court, including what Kaiser is <u>now</u> doing as the Managing Member of the Hawai'i partners (Na'alehu Ventures 2006, LLC since 2007) to recover the "Hawai'i-Jowdy loans" that Jowdy admitted and the government confirmed thru *government-forfeiture-44 <u>totaling a recoverable $31,000,000 plus asset for all of the Hawai'i partners investors; a virtual windfall for the 2004 loan they repeated acknowledged and approved</u>*.

- Kaiser's answers will unveil a new residual effect on the conviction, since the Baja Ventures 2006 investment funds [Kenner's Cabo investment LLC with partners; Jozef Stumpel and Jere Lehtinen (non-victims, yet)] are confirmed by the government's own post-trial evidence (*government-forfeiture-36)* to be "<u>not</u> stolen by Kenner to buy his piece of that Cabo project" – *Tr.5990, 5991, 5996*). Kaiser's answers will also have a resounding effect on sentencing matters -- specifically including money judgment, forfeiture and restitution.

*John Kaiser Was The Government's Star Witness (Presented In NY As A 9-11 Hero) Who Tied Together All Alleged Aspects Of The Government's Case – Tr.954-955)* -- including statements known as false by the government about Kaiser being robbed by Kenner, <u>*with the opposite actually in evidence – and ignored*</u>. Kaiser's statements about his alleged losses to Kenner contradict the actual bank records *in evidence*. These obviously false and harmful statements were left

7

uncorrected by the prosecutorial team, in their favor, prejudicing Kenner.  In fact, the government *vouched* for Kaiser's integrity during their summation (*Tr.5753*).

- Kaiser and Bryan Berard financially benefited along with their new-boss, Ken Jowdy in Mexico, surviving the termination of multiple lawsuits against all three (3) of them for millions and millions of dollars they stole collectively and in part from Kenner and Kenner investors during various criminal and civil frauds in the United States and Mexico; all *after* collectively assisting the FBI case agent in arranging Kenner's 2013 Indictment and arrest.
- Based on ulterior motives, a multitude of litigation was immediately terminated to all three (3) of their collective-financial benefits.

Nevertheless, after Kaiser was fired by his co-conspirator (Jowdy), Kaiser confirmed in his 2019 letter that Jowdy has been defrauding the Cabo project to the tune of $10 million plus and facilitating corrupt third-party deals with his friends & family. Kaiser verified non-arms-length third party deals with the same Lehman Brothers banker who collectively initiated and approved (on Lehman's behalf) all of the 2006-2008 criminal diversions (Masood Bhatti) (*Document 628 at 2*), and others. Yet while employed by Jowdy, Kaiser concluded his 2015 pro-Jowdy testimony under full government-known perjury (*Tr.1236*):

> Q: Mr. Kaiser. Would it be your testimony that the only reason you thought Mr. Jowdy had stolen or misappropriated money was because Mr. Kenner told you?
>
> A [John Kaiser]: Yes.

- **But** – Kaiser had attended the January 2010 two (2) day Jowdy California deposition in which ***Jowdy confessed*** to 100% of the money *he took* (a.k.a. stole) from Kenner and Kenner investors (2004-06) and *refused to repay* (**specifically including the $5 million plus of Hawai'i funds**) (in evidence).[2]

- **And -- Kaiser confirmed the same, approved "Jowdy loans" to the FBI on October 19, 2010** (*3500-JK-1-r- at 3*), **and that he and the Hawai'i partners:**

---

[2] The only funds Jowdy denied in his January 2010 depositions were the $791,000 he stole from Glen Murray -- which was adjudicated in Murray's favor ten (10) months later in Nevada [judgment submitted by Kenner March 6, 2019 to the docket] – *also finding Kenner not responsible for the Jowdy thefts* [as a 3rd party ProSe defendant to Jowdy] (*See Recon33-53*).

## *"never got $ back from KJ [Jowdy]/Mexico"*[3]

Kaiser confirmed in his February 2019 letter that Jowdy is telling the investors (and other associated people) that Kenner *stole* the $7 million Jowdy contributed to the down payment capital accounts in the Cabo project. *Government-forfeiture-36* **confirms none of that is true**; specifically that Kenner never stole any of it; nor received a specific benefit from it. The false "$7 million story" corresponds directly with, 1) the government's *main* prosecutorial theme during trial, 2) the story Kristen Peca confirmed the FBI agent told her during her 2012 FBI recorded calls with Kenner, and 3) the post-trial story from FBI agent Galioto to the investors and their attorney about why Kenner was convicted at trial.[4]

Without any evidence other than FBI case agent Galioto's reassurances and Jowdy's attorneys' supporting rhetoric, investor attorney Steve Main declared to the Hawai'i-Mexico investors, February 20, 2017:

> *"Finally for those of you who are convinced that Jowdy is guilty of some crime...*
> *I simply note that the circumstances surrounding the Diamante del Mar project*
> *and the Cabo project (and the relationship between Kenner and Jowdy) has*
> *been exhaustively investigated over several years by the FBI, SEC and the U.S.*
> *Attorney of the EDNY."*

It does not comport with all of Jowdy's banking records since 2002 in the government's possession, which hi-light the tens of millions of Jowdy's (and his cabal's) racketeering, diversions, and embezzlements from *every* project (including the Cabo project – *See Recon33-238 at 4-5*), and criminal frauds since 2002 (starting

---

[3] The FBI proffers occurred four [4] years after Jowdy ceased repaying the Hawai'i loans on March 24, 2006 – *two [2] days before Jowdy received the unchecked $125 million from the Lehman Brothers-Cabo loan* with Kaiser as the Hawai'i Managing Member for three [3] years by the time of the proffers. **Kaiser made no mention of any nefarious Kenner actions to the FBI regarding Hawai'i funds he claimed in the 2015 trial were never supposed to go to Jowdy as part of the Hawai'i-Jowdy loan agreement.** Please note that Kaiser verified the **"Agreement"** to the FBI during the same proffer in October 2010 (*See 3500-JK-1-r-at 3*).

[4] *See Appendix at 474*-475**

within two (2) days of the first investment deposit with Jowdy – *See Recon33-223 at 3-5*) &/or the **shocking Kaiser February 2019 letter** *(Document 628)*.

**Thus, Kenner and the Court (and the investors) are fully entitled to know <u>how</u>, <u>when</u>, <u>where</u> and <u>why</u> Kaiser (Jowdy's 2012-2017 co-conspirator) is now independently convinced Jowdy is a criminal.**

- **This is irrefutable "<u>new evidence</u>" based on Kaiser's February 2019 submission to the Court – and an evidentiary hearing is the only solution to ferret out the information Kaiser professes to have and its consequences on the verdict and ancillary proceedings.**

<u>**Government Now Considers Jowdy A Co-Conspirator?!?:**</u>

Thru government proffer on May 14, 2019, U.S. Attorney O'Conner explained to the Court that the reason for the government's broad forfeiture demand to seize 100% of the Cabo san Lucas resort property is because they "*now consider Jowdy to be an unindicted co-conspirator*". This is in stark contradiction to the government trial proffers (*starting at Tr.31*) and PSR affirmations thru 2016 that Jowdy was merely another alleged victim of Kenner. This "new evidence" affirmation creates additional reformative trial issues for Kenner that would have resulted in a 100% different trial – and certainly a trial with a different outcome (with Kenner absent of any benefit from the Jowdy transactions). The Court is entitled to learn (on behalf of itself and the defendants) what exactly changed the government's position with respect to Jowdy – gravely altering the prosecution theories – and "*<u>when</u>*" they believed this "new evidence" (or revelation), in the interest of a verdict of confidence.

- The government worked hand-in-hand with Jowdy and his counsel from July 2009 thru November 2013 to assist in the Kenner 2009 SDNY Grand Jury and the EDNY 2013 Indictment & incarceration.
- Jowdy's counsel (with several undocumented proffers with Jowdy himself) assisted in the 18-months of pre-trial preparations to prosecute Kenner.
- Jowdy's attorney (Tom Harvey) actively worked with AUSA Michiewicz throughout the trial in the courtroom; and specifically during the Kenner cross-examination to prepare their examination questions for Kenner.

10

**What "new evidence" did the government "discover" – and when -- that has led them to this new representation?**

**Chronic Traumatic Encephalopathy ("CTE") Permeated The Entire "*Memory Test*" Prosecution:**

Thru information and belief, the majority of the *faulty memory, confusion and mistakes*-laden witnesses have participated in litigations since the 2015 trial as Plaintiffs against the National Hockey League, claiming Chronic Traumatic Encephalopathy ("**CTE**") symptoms.   This disease is a result of repeated head trauma and produces the following recognizable symptoms:

- *CTE symptoms for the former hockey players listed in the current class action litigation efforts include faulty memory, confusion, amnesia, progressive dementia, and loss of memory, amongst other cognitive degenerative issues (See Appendix at 443-44).*

**As a result of new information and evidence** regarding the witnesses' *faulty memory, confusion and mistakes*, Kenner has previously requested to serve subpoenas on the individuals with specific Requests for Admissions ("RFA"); in lieu of depositions (**all under seal for privacy**).

These exculpatory **CTE** symptoms run concurrent with the "*excuses*" the government offered for their witnesses' synchronized testimony, which contradicted all pre-trial evidence in the government's possession.   As the Court is aware, the government solicited all of the "*first-time, contradicting statements*" from the alleged victims during direct examinations during trial.

- *Perhaps, instead of suborned perjury (as alleged by Kenner during his original Rule 33 submission), there is an actual medical disease which would deem the testimony at time of trial wholly unreliable (similar symptoms to Alzheimer's disease), and only raised by the government post-trial, in direct contradiction to all of the witnesses prior "under oath" statements were given by each of them, when more reliable.[5]*

---

[5] It should be noted that **only 4 of the 26 Hawai'i partners** (investors) gave testimony during trial that they were not aware of the "Jowdy loans", regardless of the fact that they

**Appendix**:

Defendant Kenner has attached an *Appendix* to this motion that addresses, *with specificity*, the statements by government witnesses and Kenner's defense case that the court deemed worthy of sustaining the current convictions, witness by witness, item by item; *specifically* identifying the critically raised statements in the Court's Memorandum and Order ("M&O") (*Document 501*).

Defendant Kenner presents the exact empirical evidence that the government possessed pre-trial, and repeatedly *ignored* in order to frame their testimony-only prosecution of Kenner at trial.   The *Appendix* leaves no wiggle room to evaluate:

> 1) What the government and the alleged victims *knew pre-trial*,
> 2) What they had to *systematically ignore together*, and
> 3) The *incalculable odds the government's case had to overcome* for each and every pre-trial statement to be *contradicted* by their prepared witness testimony, at trial and *in full synchronicity*.

Despite the government's droning about the overwhelming testimonial evidence that supported their claims, when presented with Kenner's original "perjury" analysis (*Document 416*), *not once did the government refute Kenner's claims of perjury* with affirmative support of their witnesses' truths.   Instead, they hid behind the guise of *faulty memory, confusion and mistakes* of *completely material items* as the foundation for their successful "concealment" prosecution.

---

were authorized by the Little Isle 4 By Laws at all times (*See Recon33-70*).   Twenty-two (22) Hawai'i partners (including Michael Peca's acknowledgement of the authorized Jowdy loans – *Tr.498-99*) investors are not counted in the grandiose "concealment" prosecutorial theories, in fact some of them – including Kenner's Baja Ventures 2006 LLC equity partners in Cabo – rejected any assistance to the government in the Kenner prosecution.   The "concealment" claims were based on four (4) investors who routinely "forgot" other empirical correspondence between themselves and Kenner from the same 2004-2009 time period; even failing to acknowledge the memory of their own emails and texts during trial.

**Late Discovery**
**(*Brady* materials & New Evidence)**

In *United States v. Gil*, 297 F.3d 93 (2d Cir 2002) ("the government wrongfully suppressed evidence favorable to the defendant [that was] exculpatory and impeaching information, seriously undermining confidence in [the] guilty verdict, and <u>was not disclosed timely enough for it to be useful to defendant</u>.   The production of the documents on the eve of trial did not provide defendant the opportunity to <u>read it</u>, <u>identify its usefulness</u>, and <u>use it</u>.")

In *Gil*, the district Court denied this motion, finding "no *Brady* violation because the Bradford memo [i] had been turned over to the defense prior to trial and was not "buried", [ii] was neither exculpatory nor favorable to the defense, and [iii] would not have altered the outcome of the trial."   **The Second Circuit Court disagreed**.

The Court opined, "To the extent that a prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation, grounded in the 14[th] Amendment, to disclose that evidence to the defendant.  Information coming within the scope of this principle includes not only evidence that it is exculpatory, i.e. going to the heart of the defendant's guilt or innocence, <u>but also evidence that is useful for impeachment</u>, i.e. having the potential to alter the jury's assessment of the credibility of a <u>significant</u> prosecution witness." *Leka v. Portuondo*, 257 F.3d 89, 98 (2d Cir 2001) (alterations in original) (quoting *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir 1998)).

Similar to *Gil*, although the Bradford memo was produced before trial [like the exculpatory Manfredi 302(b) proffers on the eve of trial, *infra*], the defense was not in a position to <u>read it</u>, <u>identify its usefulness</u>, and <u>use it</u>.  It was among five (5) reams of paper labeled "3500 material,…at a time presumably when a conscientious

13

defense lawyer would be preoccupied working on an opening statement and witness cross-examinations, and all else."

**First** – Months before trial and after the government claimed they closed their Rule 16 discovery production, defendant Kenner immediately requested to issue a subpoena to Northern Trust Bank for the time period covering the Indictment (2003-2013); including but not limited to all the LOC and bank records for the alleged victims in the case.   The government vehemently objected to the subpoena; calling it a "*fishing expedition*" by Kenner and "*burdensome*" on Northern Trust Bank. The Court concurred and suggested that a "reduced" version of the subpoena would better serve the Court's position of "what defendant Kenner needed" to fairly defend himself at trial from allegations of "concealment" spanning the requested years of the original subpoena, 2003-2013.

On the eve of trial, the government finally agreed to a paired down Northern Trust Bank subpoena with trial counsel; *not Kenner*.  Once the Court issued the subpoena, it took approximately ten (10) weeks for the Court's Federal subpoena to be returned thru repeated confusion and mis-communication with Northern Trust Bank (appearing as subterfuge) *(Tr.9)*.  This exculpatory information was crucial to the defense case of "*no concealment*", specifically in the light that the government presented alleged victims who claimed they were "*not aware*" of their own Northern Trust Bank lines of credit ("LOC") until "*after the fact*" or "*years later*" or the "use of funds"; all of which they personally signed off annually (on **one-page** documents)[6]. The subpoena – although delivered utterly incomplete – verified that each of the Northern Trust Bank LOC clients personally "**signed**" their own LOC bank documents to "open" their accounts (never Kenner – *Tr.20665-2066*); after the

---

[6] Northern Trust Disbursement Request & Authorization at *Appendix 41-2 and 42\* [all Disbursement Request & Authorization signed documents]*, 59-60, 70, 108 and 108\*, 116-117, 141, 166, 181-182, *270\* [Peca, Berard, Rucchin]*, *271 [Nolan]*, *279 [Sydor]*, 281, 291, *394 [Murray]*.

account documents were mailed to the individuals' home addresses of record, signed, and returned to Northern Trust Bank.

Nevertheless, for an unexplainable reason, the Northern Trust Bank subpoena arrived in the EDNY Courthouse no earlier than "*after week 7*" of the trial (and only partially filled); ironically after the government rested its case-in-chief and the government witnesses had returned home to all corners of the world (none remaining local). The government's deference to the initial subpoena request that spanned the *exact years* of the Indictment was improperly denied. Without the pre-trial arrival of the exculpatory defense materials, the defense was unable to prepare properly for the use of the documents for impeachment of the individual alleged victims on the witness stand allowing the trier of fact to assess their independent credibility of *faulty memory, confusion and mistakes* or "*memory loss*" face-to-face; and why the defendant was culpable for their "*memory loss*".

- The defense was subsequently unable to request a supplemental subpoena for the missing exculpatory information. In fact, the Northern Trust subpoena documents could not have amounted to "everything" that Northern Trust Bank needed to issue legit LOCs.
  - The document packages were so insufficient; Northern Trust Bank could not have lent money under any Federal-banking standard with the minimal documents they produced in the subpoena after week seven of the trial.

These incomplete banking documents were unavailable for impeachment cross-examination in any format; prejudicing the defendant. They were the underlying "signed" documents that *confirmed* the investors opened their own individual LOCs by their own signatures. **It confirmed that Kenner never opened their LOCs without their knowledge and sign offs**, as the government led multiple LOC investors to incorrectly testify (knowingly). These LOCs – *which they could not remember opening (in synchronicity)* – were "some" of the underlying funds that the same government witnesses claimed they did not know went to Jowdy.

- ***How could they remember the "Jowdy loans" – if they could not even recall their own "signed" underlying investment LOC? The foundationless***

***testimony cannot support "B" if they cannot even recall "A", <u>the necessary predicate act</u>.***

Impeaching all of the *faulty memory, confusion and mistakes* witnesses with their real documents <u>*would have spurred their recollection*</u>, like Michael Peca who confirmed under cross-examination pressures that he "now" (at time of trial) recalled giving 2011 SDNY Grand Jury testimony that confirmed <u>*he was at all times aware of the "Hawai'i-Jowdy loans" and approved them as part of a Hawai'i partners' "group" decision*</u> (*See M&O at 9*) (*Tr.498-499, 650*); contradicting the prosecutorial theories that "<u>*no one* was aware</u>" (*See Footnote 5, supra*).

It impeached Peca's own prepared-direct testimony (while following the government plot-line thru leading Q&As).[7]

- It should be clearly noted that only six (6) of the twenty (26) Hawai'i partners investors gave testimony about a "lack of knowledge" of the Jowdy loans – and of the six (6), plus Kaiser (a non-monetary member):

    o **Michael Peca <u>recanted</u>** -- and <u>*admitted his knowledge*</u> of the Jowdy loans (*M&O at 9*) (*Tr.498-499*).
    o **John Kaiser** had verified his six (6) independent meetings with Jowdy prior and during the 2004-06 loan period to the FBI in 2010 (*See 3500-JK-1-r at 2,3,10*) – and now in 2019 refers to Jowdy as a "crook" (*Document 628*).
    o **John Kaiser** gave irrefutable 2009 testimony that he raised additional money from his friends & family for the specific Jowdy loans (*See Appendix at 201*).
        ▪ Kaiser confirmed the loans to Jowdy, as: "*It was open.   There was no secret handshakes or nothing like that.*"

---

[7] The July 2012 FBI recordings of Kristen Peca and Kenner verified thru Kristen Peca's own words that FBI agent Galioto told her and Michael Peca that "**IF**" Kenner was convicted at a trial, then <u>*they would receive all of their investment money back*</u>, **because** <u>*Kenner kept all of the Hawai'i money and Jowdy never received any of it (proven untrue)*</u>.  There was a clear underlying and ulterior motive for Kristen Peca and Michael Peca to work hand-in-hand with the prosecutorial team to follow the leading Q&A straight to a Kenner conviction – regardless if it was contradicting all of the empirical evidence and Michael Peca's 2011 SDNY Grand Jury testimony fully exonerating Kenner from any alleged transparency issues; certainly not from him.

- o **Bryan Berard** gave crystal clear testimony in 2009, approving the Hawai'i-Jowdy loans: *"Basically just loan him [Jowdy] the money for the project."* (*See Appendix at 358-359*).
- o **Darryl Sydor** confirmed to the 2011 SDNY Grand Jury that he approved the Jowdy loans and knew they belonged to the Little Isle 4 capital accounts; *"not me [Sydor] personally"* (*See Appendix at 138-139*).
- o **Joe Juneau** had been fully repaid and had no traceable funds to the Jowdy loans (a non-victim) – and emails in evidence to prove it.
- o **Steve Rucchin** gave testimony that his LOC memory was *"foggy"*; noting that Rucchin missed 18-months of his NHL career from <u>severe</u> post-concussion symptoms, forcing his temporary retirement in or about the years of the initial Jowdy loans.
- o **Glen Murray** (non Superseding Indictment victim) confirmed that he possessed a copy of the 2004 Hawai'i-Jowdy loan agreement that he received from Kenner (like every Hawai'i partners member) (*See Appendix at 397-98*) (*Tr.3608*).
- o **And – Michael Peca, Darryl Sydor, Steve Rucchin, Bryan Berard, Tyson Nash <u>ALL</u>** participated as Plaintiffs in the 2008-09 Arizona lawsuit versus Jowdy -- and the two (2) California 2009-2010 lawsuits versus Jowdy to recover the same-loaned funds that Jowdy refused to repay (a.k.a. stole).
  - ▪ Please note that Nash, Berard and non-victims Mattias Norstrom, Turner Stevenson (who also verified to the 2011 SDNY Grand Jury his participation in the Hawai'i *"group"* lending decision (*See Appendix at 138, Recon33-35*), Rem Murray and Greg deVries all gave sworn testimony in Mexico to support the same criminal allegations versus Jowdy for non-payment of the known Hawai'i-Jowdy loans (a.k.a. stolen).
  - ▪ Kenner's Baja Ventures 2006, LLC partner, Jozef Stumpel, filed a $1.6 million lawsuit in Mexico versus Jowdy after Jowdy stole the funds and failed to account for them in Baja Ventures 2006's capital account (leaving it $1.6 million short of the expected $4.1 million total – or **61.88% of the total cash invested** in the Cabo project to acquire the Baja Ventures 2006 39% interest; and none *"stolen"*).[8]

---

[8] The "stolen" language emanates from the government's post-trial attempt to draw a nexus that *does not exist* between any funds that were used by Kenner and his two (2) partners to acquire the Baja Ventures 2006 equity in the Cabo san Lucas project.  100% of the Baja Ventures 2006 capital account funds are **"clean"** and are derived from Kenner's two (2)

17

All of the Northern Trust clients' individually "signed" documents would have produced the same "recollection refreshing" results (as Michael Peca, *supra*); supporting Kenner's full transparency defense – and *no concealment, leaving the trier of fact with no decision about any concealment scheme.*

- **Kenner was completely prejudiced as a result of the lack of exculpatory Northern Trust Bank materials while the government witnesses were present. The government strenuously objected to the Northern Trust Bank document subpoena months before trial -- and the Court sustained it.**

- **It fully delayed the defense's preparation of the crucial impeachment documents (received incomplete on the eve of Kenner's defense testimony) – and further critical considering the government's "memory test" prosecution strategy.**

**Second** -- The government dumped thousands of pages of Jenks Act 3500 and FBI 302(b) materials on the defendant on the eve of trial, with the defendant represented solely by a single practitioner; *and no paralegal, forensic accountant or investigator to assist disseminate the voluminous exculpatory materials.*  Defendant Kenner was assisting in his defense preparation with the lack of defense counsel staff available thru trial counsel's admissions.   And -- Kenner was limited to one (1) hour per day, Monday thru Friday (but not always), while incarcerated at Queens Private Detention Center ("QPDC") pre-trial.   Several weeks before trial, after a failed attempt to trap Kenner into "murder-for-hire" plot at QPDC, while being recorded by a jailhouse "snitch", the government had Kenner moved to Brooklyn MDC on or about April 22, 2015 citing security risks.   Kenner pre-trial preparations, with his computer[9] and all Rule 16 evidence, ceased on that day.

---

partners.  This is further verified by *government-forfeiture-36*; leaving "no nexus" to proceed again the LLC in forfeiture.

[9] Although the inability to access Kenner's laptop computer for additional pre-trial preparations was raised to the trial Court after the abrupt move to Brooklyn MDC ("MDC"), the communication between the U.S. Attorneys' Office and the MDC legal department alleged that Kenner was "*refusing*" to work on his case, after "*confirming it with officers*". This assertion fails on its merits – because there are no possible mechanisms for the legal department to check with "prior" officers and determine who was watching Kenner's

**Exculpatory Evidence Dump On The Eve Of Trial**:

The "*supposed*" **2004 Hawai'i-Jowdy loan Agreement** was a <u>*critical*</u> element of the government's case (*Tr.5707-5708*).   The government repeatedly alleged defendant Kenner "concealed" it from his Hawai'i partners; taunting the jury with, "*if the agreement was even authentic*".

The "dump" of materials on the eve of trial – coupled with the Kenner detention issues, *supra*, made preparations impossible for a prominent discovery, like Hawai'i partners' Chief Operating Officer, Chris Manfredi, **admitting** during his October 2010 FBI proffer that *he was aware* of the **"Agreement" between Kenner, the Hawaii LLCs and Constantine** (*See 3500-CM-2-r at 1*).   Yet -- the government ignored Manfredi's proffer to frame their Kaiser-forgery claims.   *What other document could Manfredi have been talking about with the FBI?*   No other "agreement" that Manfredi **confirmed** has been presented by the government.

Manfredi's proffer was 100% contradictory to the government's trial theory about the consulting deal and its concealment.   The proffer notes also contradicted Manfredi's 2015 "*faulty memory*" about the "Agreement" (5 years later during trial) (*Tr.2997-2999*).   It raised further questions about Kaiser's fabricated "forgery" testimony and his signature on the 2004 and 2005 Constantine-Hawai'i partners consulting agreements; now with his best-friend's confirmation known (*See 3500-CM-2-r at 1*), and the underlying loan agreements' existence (in addition to Kaiser's own FBI proffer admission [*See 3500-JK-1-r at 3*]).[10]   This malice was in spite of

---

housing unit.   Nevertheless, Kenner was **denied** necessary trial preparation time.   It ceased the day Kenner was moved (April 22, 2015).   It should be noted that Kenner was moved to MDC based on an allegation that would have received a phone sanction of 30 days *at the most* at QPDC (if any), nothing more.

[10] These agreements will be discussed, *infra*, solely based on their suspicious "late discovery" (**on the eve of trial**), <u>and the **stunning discovery**</u> of the original "*ink*" versions at <u>John Kaiser's home</u>; confirmed by AUSA Michiewicz while Kenner was reviewing them at the Central Islip courthouse immediately after their untimely "discovery", on the eve of trial.

Manfredi and Kaiser's October 2010 FBI proffers that *they were aware of the "Constantine Agreement"* (five years before trial).[11]

---

Kaiser claimed his named was forged on the "*ink*" documents that were in *his* personal possession for nearly ten (10) years.
- The photocopy versions were recovered November 13, 2013 during the search and seizure of FBI's FBI home (as would be consistent with reasonable expectations).

Kaiser had been working with the FBI case agent religiously for three (3) years to indict Kenner. The "forgery allegations" were an unreasonable prosecutorial theory to continue versus FBI once Kaiser produced the "*ink*" versions **from his home**; *specifically coupled with the Manfredi confession in October 2010 to the FBI* about his acknowledgement of the Constantine "**Agreement**".
- **Kaiser reiterated his personal knowledge of the Constantine agreement to the FBI one (1) week later on October 19, 2010**, as well (*See 3500-JK-1-r at 3*).

The mere fact that the government produced the "*ink*" versions of the two (2) Kaiser-possessed Constantine-Hawai'i consulting agreements on the eve of trial, should give the Court pause; *grave pause.* **It is outrageous** that Kaiser, with the government's support, could continue to allege that two (2) documents – with original "*ink*" – could have been in Kaiser's possession for up to ten (10) years before the trial – BUT – someone else forged his name?
- Where is the original agreement(s) that Manfredi told the FBI existed during his October 2010 proffer with FBI agent Galioto present? (*3500-CM-2-r at 1*):

  *"Agreement - PK or LLCs and Constantine*
  *-> may have been w/ Constantine + another person"*

- If the Kaiser signed agreements are "fake" (somehow thru witchcraft), **then where are the real ones that Manfredi confirmed?** *It is pure nonsense*...

Furthermore, how does some "government expert" try to confirm the name was forged when he intentionally chose *not* to use the scientific approach to evaluate the document (*Tr.3643-3646*); fully knowing by that time (unless concealed by the government) that *Kaiser is a known liar about "forgeries"* in this EDNY Court, in Mexico (on Jowdy's behalf), and in multiple Arizona civil cases (when sued with Bryan Berard for stealing money from Kenner investors: Sydor, Nash, Ranford, Lehtinen, and Khristich in 2013 as Kenner's Plaintiff interveners – wholly alongside Kenner versus Kaiser and Berard) (*See Recon33-61 and September 17, 2013 denial letter from Kaiser's attorney to the five victims he and Berard attempted to defraud with more false "forgery" claims*).

[11] John Kaiser, Glen Murray and Michael Peca all gave trial test that they were aware of the Jowdy loan agreement "*as a group*" – also **fully refuting any concealment, making the conviction evidence even more "thin"**. The Court must wonder "*who else was part of this group*", notwithstanding *faulty memory, confusion and mistakes* in 2015? **Or – who else was left that was not aware, even vaguely thru the haze of CTE symptoms?**

20

**Materiality**:

The suppression of exculpatory or impeaching evidence does not constitute a constitutional violation unless the evidence is "material".   A showing of materiality **does not require** demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal, whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant.   The touchstone of materiality is a reasonable probability of a different result, and the adjective is important.   The question is **not** whether the defendant would **more likely than not** have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.   A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome or trial.   The Court assesses materiality or prejudice in light of the trial evidence.   Where the evidence against the defendant is ample or overwhelming, the withheld *Brady* material is less likely to be material than if the evidence of guilt is thin.

**The Kenner Trial Evidence Was Thin -- At Best:**

**First --** the Superseding Indictment and trial allegations of theft by Constantine from the Global Settlement Fund ("GSF") were completely debunked by the Constantine-Gonchar "*side-deal*", allowing Constantine to spend freely the Gonchar contributions to the Ronald Richards' Trust account *per their personal arrangement* (*Tr.4826-4827*); unrelated to Kenner and Kenner investors.   As such – and in addition to the $124,982 Constantine personally deposited into Richards' account at the same time (on 9-8-2009) – no illegal diversions took place, **or underlying criminal act occurred**.   The government presented over a dozen (non-victim) witnesses during trial to substantiate "approved" GSF transactions that were part of the known Constantine-Gonchar "side-deal"; fully confusing the jury and the Court.   **This represented more than one-third (1/3rd) of the government's case witnesses**.

21

**Second** – the 2008-09 <u>Eufora Private stock sales</u> by Gaarn and Constantine were fully vetted by the investors' independent **attorneys** and *signed off by the investors* (*See Recon33-73 at 9-18*); **finding nothing untoward about the private sale transactions in real time – while the stock transactions were <u>also</u> fully documented in 2009 the Eufora operating agreement** (*See Recon33-2 at 37*).

**Third** – Kenner's alleged issues of "*phony*", "*bogus*" and "*supposed*" "***Jowdy loans***" from the <u>Hawai'i partners</u> have been fully debunked post trial by *government-forfeiture-44* – which is "**new evidence**"; and *non–cumulative, infra.*

- Michael Peca, one of the major Hawai'i partners' investors, confirmed to a 2011 SDNY Grand Jury and again to the 2015 trial court during cross-examination that he was part of a "*group decision*" to loan funds to Jowdy; absolving Kenner of any perceived "concealment issues" (*Tr.498.499*)(*See M&O at 9*).

- Nevertheless, the government tried to resuscitate Peca on re-direct examination asking him if the lawsuits in Arizona and California had anything to do with Jowdy (*Tr.644*):

  > *Q. By the way, what if anything did that litigation that Mr. LaRusso asked you about regarding Mexico have to do with the millions or $1.775 million in your line of credit that you authorized for the Hawaii investment? What if anything?*

  > *A [Michael Peca]: Nothing.[12]*

- And -- the **Constantine consulting** work and underlying "*Agreement*" was verified by Hawai'i partners COO Manfredi during his FBI proffer *five (5) years before trial* (*See 3500-CM-2-r at 1*) and witness Glen Murray during trial – and ignored by the government's prosecutorial team to frame another trial theory of "*concealment*"; in the face of actual presented evidence.

---

[12] Peca had already signed off on the 2008-09 Arizona lawsuit versus Jowdy to recover the Hawai'i-Jowdy loans (*See Recon33-14 [Peca letter] -- received during forfeiture hearings from the government also a "new evidence" issue*), as well as the two (2) 2009 California lawsuits versus Jowdy to recover the Hawai'i-Jowdy loans (*See Recon33-15, Recon33-16, Recon33-21*).
- **It was a fraudulent attempt to resuscitate Peca on re-direct -- and unethical.**

22

### ***Brady* issues**

To establish the *Brady* violation, "the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the state, either willfully or *inadvertently*; and *prejudice must have ensued*." *Strickler v. Greene*, 527 U.S. 263, 281-82, 144 L. Ed. 2d 286, 119 S. Ct. 1936 (1999); see also *In Re United States (Coppa)*, 267 F.3d 132, 139 (2d Cir 2001).

**The Government's Constitutional Duty Of Disclosure:**
In *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the Supreme Court held that the Due Process Clause requires the government to disclose upon request "evidence favorable to an accused" where the evidence is "material either to guilt or punishment." 373 U.S. at 87.  The Supreme Court later held that the government has a duty to disclose material favorable information *even in the nascence of a defense request*.  *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985); *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995).  **"Any evidence that would tend to call the government's case into doubt is favorable"** i.e. exculpatory.  *Giglio* extended the government's disclosure obligation to impeachment evidence.  *Giglio v United States*, 405 U.S. 150, 154-55, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972).  A witness' prior statements that are both material and inconsistent with anticipated trial testimony are *Brady* material.   Evidence impugning the testimony of a witness critical to the prosecution's case "is especially likely to be material" for *Brady* purposes.[13]

- In the instant case – the FBI &/or IRS agents selectively withheld evidence – both the exculpatory and fabricated Frailes agreement between Kaiser and Privitello (*See Recon33-127 FOLDER -- APP014 at 3-12*) – AND -- the Sconzo faxes (*Recon33-27 at 15-17*) – confirming *Kaiser stole his doctor-friends money*.

---

[13] ***Brady*** – See Sconzo fax (of Kaiser thefts) at *Appendix 35-40, 200, 235* – Frailes agreement (Kaiser and Privitello fabricated agreement and frauds on the FBI) at *Appendix 35, 239.*

- o There was a clear and conscious effort to "**hide**" selective exculpatory evidence from the defendant; not inadvertent, considering the materiality of the Kaiser fabrication and financial thefts from **his** friends & family, and the fact that the materials were originally part and parcel to other evidentiary submissions thru Privitello and Sconzo.

- The government systematically removed the "fabricated" (i.e. fake and fraudulent) Kaiser-Privitello Los Frailes document – *verifying Kaiser's propensity to fabricate documents* – **specifically when his integrity about potentially "forged" documents was paramount to the government's case**.

- The fabricated Kaiser-Privitello document would have led to additional discovery of *more* Kaiser fabrications with John Smith, Dr. Frank Sconzo and Dr. Willy Krueger (unknown until the post-trial exculpatory agreement was delivered to the defendant during forfeiture).
  - o The "signed" document also raised *18 U.S.C. 1001* issues for both Kaiser and Privitello in their pre-trial lies to the FBI and IRS agents during their October 2, 2014 joint-proffer ruse; fully affecting their trial credibility [*See 3500-JK-7 and 3500-NP-5*] – *i.e. lying to a federal officer*.

As a result of the selective removal of exculpatory evidence, one can look to the Law journal: *Scott E. Sundby, Fallen Superheroes and Constitutional Mirages: The Tale of Brady v. Maryland*, 33 McGeorge L. Rev. 643, 651 (2002) (prosecutor would have to think: "*This piece of evidence is so exculpatory in nature that it actually undermines my belief that a guilty verdict would be worthy of confidence...once I turn this evidence over...I can assume my zealous efforts to obtain a guilty verdict that I have just concluded will not be worthy of confidence.*").

**Rule 16**:

Rule 16 gives criminal defendants a limited right to discovery and requires the government to disclose, upon request, information within the government's possession, custody, or control that is material to preparing a defense. Fed. R. Crim. P. 16(a)(1)(E)(i).  Rule 16 requires disclosure of information that, *although not exculpatory or impeaching, may be relevant to developing a possible defense*.  Thus the rule imposes a broader disclosure obligations on the government that *Brady*.

24

The government's obligations under Rule 16 also impose a continuing duty to disclose evidence prior and during trial.[14]

**Tequila Bottle Fraud On The Court**:

The government produced a *phony* tequila bottle during Kenner's cross-examination *for the first (1st) time* – which allegedly came from their star-witness (John Kaiser in NY -- after years of joint efforts to indict Kenner).   The government is wholly aware that text messages *are* in Rule 16 evidence (from 10-22-2008), which confirm that it was not possible for Kaiser to have received the tequila bottles – shipped from Mexico as testified by Kaiser (*Tr.1084*) – in violation of Federal ATF laws from a well-established Mexico distributor who knows and operates within the ATF laws. Kaiser testified that he gave the "two bottles" to his Russian distributor friend, Fred (*Tr.1154*), but somehow over five (5) years later, Kaiser still had one (1) of the two (2) bottles in his possession; and empty?

The government perpetuated the tequila ruse on the Court; **lying** about the transfer of funds.   They lied to the judge – **BECAUSE** there were **NO FUNDS** distributed to any "tequila" account (as fraudulently alleged, first, in the government's opening statements – *Tr.33*) (*Tr.1075-1076*):

> THE COURT: I think the allegation is, it went to the tequila company. Right?
>
> **MR. MISKIEWICZ: Yes.**
>
> MR. HALEY: Is the government's proffer that the money was wired directly into the tequila company account?
>
> MR. MISKIEWICZ: Mr. Richards was handling all the disbursements out of the Ron Richards escrow account.
>
> THE COURT: *So it went from the Ron Richards account to another?*
>
> **MR. MISKIEWICZ: To the tequila company account.**

---

[14] See *Appendix at 23\* (footnote 13)*.

25

**Northern Trust Bank LOC Fraud On The Court**:

The government objected pre-trial to the Northern Trust bank records subpoena months before the trial, fully delaying the arrival of the defense-critical subpoena materials.   The government knew the actual voluminous Northern Trust Bank records would destroy their witnesses' "*I don't remember*" claims about the actual LOCs with their witnesses; further harming the believability of the "*I don't recall*" predicate acts to the Jowdy loans testimony.   The government knew the bank records would have proven their witnesses knew (at least by way of their own signatures, *discussed infra*):

1. They **signed off on** full authorizations to invest their funds thru a signed *Letter of Authorization* [**one-page** document] to access their LOC account funds (*See Recon33-28*),
2. They **signed** off on the amounts of their Hawai'i partners investment commitment thru signed *Extension of Credit* [**one-page** document] (*See Recon33-29*), and
3. They **signed off** *annual* acknowledgements of "**distributed funds**" from their LOCs thru signed *Disbursement Request & Authorizations* [**one-page** documents] (*See Recon33-30*).
   a. The government's "**signature page only**" slander would have been systematically "nipped in the bud", witness by witness, with this exculpatory and impeaching Northern Trust Bank evidence that "inadvertently" was withheld from the defendant until too late in the trial to have any effectiveness. *United States v. Gil*, 297 F.3d 93 (2d Cir 2002).
   b. And -- the government did not produce a single confirmed signature page only document at trial fitting their description, *only the slanderous testimony*.[15]

---

[15] The Court and government are aware that other than the independently verified:
   1. Multiple-page Hawai'i signed closing joint venture disclosure (*See Recon33-205*);
   2. Multi-page 2008-09 Attorney Baker Arizona lawsuit versus Jowdy disclosure (**new evidence**) (*See Recon33-14*);
   3. Multi-page 2010 California attorney Ronald Richards disclosure for the Jowdy loans litigation (*See Recon33-22*); and
   4. Multi-page Master Note and continuing Pledge Agreements documents -- annually signed -- returned directly with Northern Trust Bank for the underlying LOCs (*infra*)...

26

**The Court Has Emphasized That Disclosure Of Critical Information On The Eve Of Trial Is Unsafe For The Prosecution:**

*Brady* material must be disclosed in time for its effective use at trial. "Disclosure of critical information on the eve of trial is unsafe for the prosecution; when such a disclosure is first made on the eve of trial, **or when trial is underway** [like the Red Herring tequila bottle, the voluminous 3500 materials, and Northern Trust Bank records], *the opportunity to use it effectively may be impaired*. *The defense may be unable to divert resources from other initiatives and obligations that are or may seem more pressing. And the defense may be unable to assimilate the information into the case.* **The government runs a certain risk when it turns over so late documents sought by the defense for so long**". See *Leka*, 257 F.3d at 102.

**Attorney Baker Disclosures Fraud On The Court** (*See Recon33-14*):

The Baker disclosures[16] were delivered as part of the forfeiture production by the government (a.k.a. "new evidence"); delivered to Kenner by attorney Oliveras. Coupled with the Northern Trust Bank records, they would have demonstratively *refuted* all investor claims *while they were on the witness stand* that they were unaware of the annual "*use of funds*"[17] for the Hawai'i partners and the "*Jowdy loans*". Collectively, they would have confirmed each of the investors were part of

---

**There are no other documents that could even qualify as something a Kenner client signed on the signature only page; none!** *It was simply another Red Herring.*

[16] Baker disclosures at *Appendix 29, 31 and 31\*, 102, 117\*, 336, 446\*.*
- On page 1 of the Baker disclosure they signed off:

> "…*the gist of the lawsuit is to recover certain monies loaned to Mr. Jowdy from Mr. Kenner, Little Isle 4 and Ula Makika LLC. Mr. Kenner estimates the total amount of monies loaned to Mr. Jowdy which have not been repaid to be approximately $5,000,000. This is the estimated principle only, exclusive of accrued interest. In summary, Mr. Jowdy denies that the monies were loans but rather characterizes them as investments.*"

[17] Northern Trust Disbursement Request & Authorization at *Appendix 41-2 and **42\* [all Disbursement Request & Authorization signed documents]**, 59-60, 70, 108 and 108\*, 116-117, 141, 166, 181-182, **270\* [Peca, Berard, Rucchin]**, **271 [Nolan]**, **279 [Sydor]**, 281, 291, **394 [Murray]**.*

2008-09 Arizona litigation versus Jowdy (thru the Hawai'i partners' attorney) to recover the "*Jowdy loans*".

- Only *faulty memory, confusion and mistakes* could have explained their "memory loss"; fully discrediting their effectiveness as government *concealment* witnesses.

### *Government-forfeiture-44*:

There is an outstanding question about the single most revisionary piece of evidence in the instant case; ***Brady*** or **new evidence**?  The defendant has repeatedly requested that the Court inquire with the government about *when* they first (1ˢᵗ) discovered the information as documented by Ken Jowdy and his attorneys on *government-forfeiture-44*.   Defendant Kenner has requested that the government produce all *communication* evidence in their possession about the *initiation of the government's request and response* from Jowdy's attorneys to create the underlying document.

The government has taken the "side-show" position that they do not want to produce the "back-up" banking records for the Jowdy disclosure.  **That is not and has never been what defendant Kenner has requested.**  The government's résistance to disclosure of the conversations (electronic and raw notes) that support the initial request for the Jowdy information (resulting in *government-forfeiture-44*) and the delivery of the work-product to the government creates an air of suspicion of its own.  Kenner merely wants the "chain of custody" (with electronic backups for the *government-forfeiture-44* document – in addition to the emails, texts and other communications that initially requested the document).

  o  **It could not have been created in a vacuum.**

Either way -- this exculpatory document clearly *reverses* the government's trial contention from opening remarks (*Tr.31*), thru the vigorous and argumentative Kenner cross-examinations (*Tr.4598*), culminating in both government summations (*See Appendix at 479-505*) that the "Jowdy loans" and the underlying loan agreement

28

are "*bogus*" (*Tr.5708 (2x), 5709*), "*phony*" (*Tr.4597, 4598*) and "*supposed*" (*Tr.5707-5708*) – and simply a "*Kenner cover-up story*"; touting Kenner as a "liar".[18]

If the jury had been alerted to *government-forfeiture-44* during trial, there is a high probability that the verdict would have been different – specifically if the jury thought the "Jowdy loans" (as described by the prosecutorial team during rebuttal summation) were a Kenner "cover-up" when "*He [Kenner] used it for personal use to get an interest in that resort in Cabo.*" (*Tr.5996*).   **Clearly Kenner did not!**

**Obviously, the loans are real**, as introduced by the government itself during forfeiture hearings (*government-forfeiture-44*); **creating irreversible reformative effects on the jury deliberations and verdict.**

- The government ignored Ken Jowdy's own FBI proffer confessions, fully confirming the Hawai'i loans in 2010 (*See 3500-KJ-2 at 11-14*).

- It cannot be overlooked that government star-witness, Michael Peca, confirmed on cross-examination that he was aware at all times that the Hawai'i partners agreed to and forwarded loans to Ken Jowdy "*as a group*"; exactly as he testified to the 2011 SDNY Grand Jury, *under secrecy and privacy* (*Tr.498-499*) (*See M&O at 9*).

So – is the government charging Michael Peca with *18 U.S.C. 1001* (perjury) for *agreeing* with Kenner that the Hawai'i partners "*group*" made the decision to lend (authorized by the Hawai'i partners By-laws [*See Recon33-70*]) and actually lending pursuant to the "**Agreement**" that both John Kaiser and Chris Manfredi (thru their respective October 2010 302(b) notes – *See 3500-CM-2-r at 1 and 3500-JK-1-r at 3*) and Glen Murray (thru his trial testimony – *Tr.3608*) verified?

---

[18] John Kaiser, Glen Murray and Michael Peca all gave 2015 trial test that they were aware of the Jowdy loan agreement "*as a group*" – also **fully refuting any concealment, making the conviction evidence even more "thin"**.   The Court must wonder "*who else was part of this group*", notwithstanding *faulty memory, confusion and mistakes* in 2015?

- Perhaps, Glen Murray will be charged as well for agreeing with Kenner, Peca and the two (2) Hawai'i partners' management members (from the Manfredi and Kaiser FBI proffers, *supra*) and their authentication of the loan agreement -- in contradiction to the government's theory of concealment.

  o **The concealment theory is now debunked (by more than ½ of the government's witnesses).   The remainder gave full CTE-laden testimony, defended by the government post-trial as *faulty memory, confusion and mistakes*.**

- And, despite the government's desperate allegations of "*phony*", "*bogus*", and "*supposed*" during trial, there is not one piece of empirical evidence that supports this never-ending (Russia-collusion-like) perpetual fraud on the Court.

### *Government-forfeiture-44* alone raises a gross prosecutorial dilemma -- and demands a new trial to arrive at a verdict of confidence.

**If Cumulative**:

The government – and agreed upon by the Court in its initial Memorandum and Order (*Document 501*) – declared that the information was "*cumulative*" – thus not advantageous to the defendant's plea.   Yet, if it was indeed "cumulative" – what level of *prosecutorial misconduct* was present throughout the entire trial to **"ignore"** the **"cumulative"** evidence and proclaim Kenner as "*lying*" -- and the loans and loan document as "*phony*", "*bogus*", and "*supposed*"?   That would clearly violate all standards of *Berger*.   *It would have clearly prejudiced Kenner*.

**If New Evidence**:

On the other hand, if it is merely *new evidence* (delivered on August 3, 2015 – three [3] weeks after trial as a product of post-trial work by the government in concert with Jowdy's attorneys), *it creates egregious reformative issues not properly addressed by the trier of fact*.

30

## Expert testimony

## (FINRA)

The government established an *improper* "*standard of care*" between Kenner and his clients – because **_Kenner was never a stockbroker_**, thus never subject to any oversight by FINRA as a regulatory agency.   The Court allowed this "expert testimony" when Kenner was never subject to their authority, and only holding Series registrations thru spring 2004 (as part and parcel to prior litigation efforts filed to protect his clients from a previous investment company's documented frauds).   Only Juneau and Nolan's original December 2003 transaction were completed – fully signed off by each of them independently (in evidence) – during the time the unused FINRA licenses were even under registration.

- *The prejudice was obvious* when the jury asked for the "read back" of the FINRA expert and his "standard of care" testimony, **not applicable to Kenner**, as their first (1st) act during deliberations.

**Expert testimony**:

Although the expert FINRA testimony had little or no probative value, the Court allowed it.  **Its prejudice was solidified**.

During direct-examination, FINRA was immediately defined by its expert as (*Tr.2477-2478*):

> "*FINRA is a self-regulatory organization of the securities history. Its role is to govern the conduct of its members who are brokerage firms and the registered individuals who work at the firms. It does this by creating rules that its members need to adhere to and failure to do so can result in disciplinary action. FINRA also regulates trading on various trading markets, public markets like the NASDAQ or over the counter securities markets. And FINRA is also responsible for licensing and administering a number of licensing exams which allow individuals to buy and sell shares of stock on behalf of their clients and customers.*"

Kenner never did any of these regulated activities, nor was defendant Kenner ever at a firm that was capable of these activities during the Superseding Indictment

32

period.  The testimony produced substantial prejudice, asserting an improper "duty of care" standard that the government claimed as governing Kenner and his actions. Its presentation undermined the defendant's presumption of innocence by misrepresenting the standard by which his agreed upon relationship with his clients existed.

"[T]he decision of whether to admit expert testimony is left to the discretion of the trial judge and should not be set aside unless manifestly erroneous." *United States v. Duncan*, 42 F.3d 97, 101 (2nd Cir 1994) (internal quotation marks omitted).  An expert may not "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *Id.* (Internal quotations omitted).  "[A] Judge assessing a proffer of expert scientific testimony under Rule 702 should also be mindful of other applicable rules [under the Federal Rules of Evidence], "including Rule 403, which permits exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) (internal quotation marks and alteration omitted).

   o  **That is the case here.**

The Courts should also review evidentiary rulings for harmless error.  See *United States v. Onumonu*, 967 F.2d 782, 788 (2d Cir 1992).

Fed. R. Evid. 702 provide that an expert witness may testify as to "scientific, technical, or other specialized knowledge" where such testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue."

   o  **That is not the case here -- because *Kenner was never a stockbroker...***

**The Jury Was Presented With Invalid Theories Of Conviction:**
Because -- no fiduciary duty could exist between Kenner and the GSF contributors or the Hawai'i partners project as a matter of law in the absence of discretionary

authority.  Where a jury is presented with multiple theories of conviction, one of which is invalid, the jury's verdict must be overturned if it is impossible to tell which theory they formed the basis for conviction.  See *United States v. Foley*, 73 F.3d 484, 493 (2d Cir 1996) ("When…the jury has been presented with several bases for conviction, one of which is invalid as a matter of law, and it is impossible to tell which ground the jury selected, the conviction must be vacated."), abrogated on other grounds, *Salinas v. United States*, 522 U.S. 52, 139 L. Ed. 2d 352, 118 S. Ct. 469 (1997); see also *United States v. Zvi*, 168 F.3d 49, 55 (2d Cir 1999) ("[A] conspiracy conviction must be reversed where one or more objects is invalid and 'it is impossible to tell which ground the jury selected.'") (quoting *Foley*, 73 F.3d at 493).

- **First** -- Based on the **GSF** "*side-deal*" between Constantine and Gonchar (*Tr.4826-4827*), the government cannot claim any misappropriated funds by Constantine, thus there cannot be an underlying criminal act (conspiratorial or otherwise),
- **Second** – Each **GSF** contributor "signed off" (*See Recon33-37*) for the Constantine-use of the GSF deposits,[19]
- **Third** -- **Jowdy loans** were authenticated by nineteen (19) individual Hawai'i-Mexico investors thru pre-trial statements under oath and litigation they participated in.  Michael Peca confirmed his "Jowdy loans" knowledge and authorization during trial; confirmed at *M&O at 9* by the court, and
- **Fourth** -- The **Constantine consulting agreement(s)** was verified to exist by Hawai'i partners' management team Chris Manfredi (in his October 2010 FBI proffer – *3500-CM-2-r at 1*) and John Kaiser (in his October 2010 FBI proffer -- *3500-JK-1-r at 3*).   Government witness, Glen Murray, also verified his personal possession of a copy of the "*Jowdy loan agreement*" during trial (*Tr.3540, 3608*)[20].   For Murray, this was in addition to Murray's personal

---

[19] McKee texts with Kenner confirm full GSF disclosures – contradicting the government's allegations and McKee's CTE-laden testimony (*See Appendix at 47-53*) – further confirming transparency between Kenner and Peca (because McKee confirmed he and Peca spoke about the GSF funding before they signed off on their respective contributions -- *Tr.1817*).

[20] [Glen Murray confirms receiving the 2004 Hawai'i-Jowdy loan agreement]:
> *Q Now, when Mr. Miskiewicz asked you questions about the lawsuit you brought against Ken Jowdy, you confirmed that the loan agreement itself you had received through and from Phil Kenner, is that correct?*
>
> **A [Glen Murray]: Correct.**

verification in his 2008 Nevada Complaint in *Murray v. Jowdy* ($791,000 stolen by Jowdy) of his approval of "*the previous Hawai'i loans to Jowdy*" (in evidence).

**Agency relationship**:

Under an agency relationship, agency is defined as the fiduciary relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.

The three (3) elements necessary to an agency relationship are: (1) a manifestation by the principal [investor] that the agent [Kenner] will act for him; (2) acceptance by the agent of the undertaking; and (3) an *understanding between the parties that the principal will be in control of the undertaking*.   Where these elements are satisfied, an agent is a fiduciary with respect to matters within the scope of his agency.

- The 2004 Hawai'i partners' By-Laws "control" the management actions of the Managing Member [Kenner] at all times; *specifically allowing for lending* [like Jowdy, Kaiser, Manfredi and Nolan[21]] and *payments to outside entities*

---

> *Q But though you received the promissory note from Phil Kenner, it was a promissory note wherein Ken Jowdy agreed to pay you back the money that you were loaning, isn't that true?*
>
> > MR. MISKIEWICZ: Objection; hearsay.
> > THE COURT: Overruled based upon the redirect. Go ahead.
>
> **A [Glen Murray]: Correct.**

[21] Please note that even though Owen Nolan testified that he was not aware of his Northern Trust LOC (*Tr.2065-2066*), there is controverting evidence that:

1) His Northern Trust Banker Aaron Mascarella confirmed in a 2009 deposition that he spoke with Nolan between 2003 and 2006 about his LOC (*See Appendix at 170-171*),

2) Nolan and Kenner discussed by phone and text the signing of the Northern Trust LOC renewal documents in 2007 – with the documents in Nolan's personal possession (*See Appendix at 272-273*),

3) Nolan's own wife was in direct communication with Kenner and Kenner assistant via email about repaying the personal loans they took from their own Hawai'i-committed Northern Trust Bank LOC in August 2006 (*See Appendix at 273, Recon33-154, Recon33-155, Recon33-156, Recon33-157, Recon33-158*) and

who are performing tasks for the project [like Carlsmith Ball LLP, Constantine, 17 other hard money lenders -- including Lehman Brothers two [2] times, and 3rd party vendors] (*See Recon33-70*).

Two (2) of the duties owed by an agent [Kenner] to his principal [investor] are: an agent owes a duty of disclosure, specifically, a duty to use reasonable efforts to give his principal information which is relevant to affairs entrusted to him *and that the principal would desire to have*;[22] and an agent owes a duty to account for all profits arising out of the agent's employment that do not form part of his agreed-upon compensation [with none to Kenner at any time].   An agent who derives an undisclosed profit in connection with transactions conducted by him on behalf of his principal is under a duty to give such profit to the principal.

- **That never happened in this case – because Kenner never received any undisclosed fees.**

Such duties have their origin in the realization that, while the principal [investor] retains the right to control his agent's actions, the agent cannot be supervised at all times.   In short, the principal places trust or confidence in the agent to achieve the agency's objectives; in return, the law requires the agent to *keep the principal reasonably informed* about matters germane to the agency, both to forestall misconduct and to allow the principal to make informed decisions.

- In November 2009 – at the height of Kristen Peca lies that she could not get a hold of Kenner and feared for her money (*Tr.712-713*), she communicated openly with attorney Ronald Richards about the recovery of her funds from various Jowdy frauds, never mentioning a problem with Kenner.[23]

---

4) Nolan, himself, verified during his 2009 arbitration testimony that he signed his 2004 Letter of Authorization for Kenner to access his Northern Trust LOC (*See Appendix at 274-275*).

[22] The voluminous *"did not read"* testimony by literally all of the government witnesses about critical investment materials – *and signed nonetheless* – inherently contradicts any perception that some of the principles "*would desire to have*" materials – *notwithstanding they had them*!   Owen Nolan told a 2009 Arbitration panel that he had not read a document in nearly 20 years (*See Appendix at 274*).

[23] See *Appendix at 29, 117, 446*

36

- John Kaiser confirmed to the FBI on October 19, 2010 that Kenner distributed multiple Hawai'i updates to the investors [*See 3500-JK-1-r at 3*]:

  *"PK made these many times"*.

- Multiple alleged victims echoed the refrain I *"trusted PK"* when pressed about their "memory loss" on cross-examination.[24]
- As a result of the *"trust in Kenner"*, many of the witnesses claimed they *"did not read"* critical documents; diminishing the "*the principal would desire to have*" standard.[25]
- Stumpel, Lehtinen, Norstrom, Gonchar and Peca signed affidavits in the 2009 *Nolan v. Kenner* arbitration that confirmed they received *"full disclosure from Kenner when requested"* of the Hawai'i expenditures of their respective LOCs (in evidence).[26]

In the Second Circuit, "a failure to disclose can only be deceptive only if, in light of all the circumstances, there is a duty to disclose." *Macomber v. Travelers Property. & Cas. Corp.*, 261 Conn. 620, 635-36, 804 A.2d 180 (2002) (internal quotation marks and alterations omitted).

- All Northern Trust bank documents were individually signed by the LOC account holders; *never Kenner* (Northern Trust subpoena in evidence).[27]

---

[24] See *Appendix at 17-18, 447, Tr.2719 [Rucchin]*

[25] See *Appendix at 205, 447, 456*

[26] See *Appendix at 20, 32, 74, 357, and 446.*   The affidavits affirmed:

> "*In addition to setting up a Line of Credit for the sole use and benefit of the Hawai'i investment Group*, I wired $100.000 to Northern Trust Bank...*for the express purpose of making funds available to Phil Kenner, which were to be used at his discretion.* I was aware that my funds would be used to make distributions for the company, including but not limited to: Land acquisitions. Travel & Entertainment expenses, legal fees, Planning fees. Payroll, permitting fees, *loans to outside entities* and *distributions to other members that would satisfy their monthly Line of Credit payments to Northern Trust Bank...Phil has always disclosed the complete and detailed use of these funds with me from time to time at every request.*"

[27] See *Appendix at 40, 55, 59, 66-70, 76, 91-95, 103-163 [Peca], 165-183 [Northern Trust banker Mascarella], 263, 264-276 [Nolan], **270***, 277-292, 299-301 [Sydor], 358-365 [Berard], 390-391 [Rucchin], 393-396 [Murray], 467-468*

- The 2008-09 Eufora private sales were vetted by the investors' independent attorneys, afterwards demanding 6% equity stake in the Eufora deal, as a result of their due diligence and independent valuation of the company.[28]

For guidance on agency law, the Courts have looked to the Second Reinstatement of Agency ("Second Reinstatement").  Section 1 of that Reinstatement defines agency as "the fiduciary relationship, which results from manifestation of consent by one person [investors] to another [Kenner] that the other shall act on his behalf and subject to his [investor] control, and consent by the other so to act."  The three (3) elements necessary to an agency relationship are "(1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that **the principal will be in control of the undertaking**."

- At all times -- the investors "retained control"; "veto power" and "cancel power" for their Northern Trust *Letters of Authorization*.   **Juneau did it**.

- Others did *not* even after signing the annual *Disbursement Request & Authorization* that confirmed their annual, individually "*distributed funds*".

- No Standard Advisors client terminated Kenner's agreement or the Schwab Power of Attorney after the default letters.  *Instead – they transferred their remaining funds to Schwab under Kenner's management*.

The power to give interim instructions distinguishes principals in agency from those who contract to receive services provided by persons who are not agents [like Kenner as the Hawai'i partners' Managing Member].   In many agreements to provide services, the agreement between the service provider [Hawai'i Managing Member] and the recipient [investor] specifies terms and conditions creating contractual obligations [Little Isle 4 By-Laws – *See Recon33-70*] that, if enforceable,

---

[28] See *Appendix at 83-5, 134, 151, 197, 259, 299 & 317 ["predictable"] 319, 339, 348, 378, 425-29, 469, 471* -- Stolper letter et. al. to the Eufora investors confirming the knowledge of the private stock sales by Gaarn and Constantine and the "**loan buy out**" efforts, *conveniently forgotten by all government witnesses at the time of trial*.

38

prescribe or delimit the choices that the service provider has the right to make...The fact that such an agreement imposes constraints on the service provider does not mean that the service recipient has an interim right to give instructions to the provider.  Third Reinstatement § 1.01 cmt. F; see also id. cmt. G ("Performing a duty created by contract may well benefit the other party but the performance is that of an agent only if the elements of agency are present.").

**"Conduct"**:

"Conduct itself can be deceptive," and so liability under § 10(b) or Rule 10b-5 does not require "a specific oral or written statement." *Stoneridge Investment. Partners, LLC v. Scientific-Atlanta*, 128 S. Ct. 761, 769, 169 L. Ed. 2d 627 (2008).   Broad as the concept of "deception" may be, it irreducibly entails some act that gives the victim a false impression.  "Theft not accomplished by deception (e.g. physically taking and carrying away another's property) is not fraud absent a fiduciary duty."  *In re Refco Capital Markets, Ltd. Brokerage Customer SEC. Litig.*, 2007 US Dist. LEXIS 68082, 2007 WL 2694469, at *8 (SDNY September. 13, 2007)(Lynch, J.) (Internal citation omitted).

- Kenner is not a fiduciary; only an agent thru Agency rules.
- Kenner received none of the GSF or Hawai'i "proceeds".
- Only a portion of the documented and vetted Constantine and Gaarn private stock sales were received by Kenner – *as reimbursements for documented loans from Kenner* (verified by government accounting evidence – pre-trial).

In order to coherently allege deceptive conduct, the government must identify (1) the source of the understanding falsely created by defendant (that is, a fiduciary duty, prior representation, or some other reason why they believed defendants *would act otherwise than they did*), and (2) conduct that violated that fiduciary understanding.   These allegations were not corroborated by empirical evidence; only testimony derived from *faulty memory, confusion and mistakes*, and defended likewise.

39

## Failure To Read

Simply analyzed, the volume of "*did not read*" testimony throughout the trial was astonishing for alleged crimes that carry the weight of criminal conviction for information that was readily available; &/or would have motivated an interested party to demand answers to items that are now alleged as being "*crimes of concealment*".

It is an inappropriate standard to prosecute, based on "*did not read*", with witnesses whose testimony is defended by the government as *faulty memory, confusion and mistakes* (*See Document 440 at 16, 18*) -- and not "truthful".

- **Sydor** claimed at trial he never read the GSF authorization -- BUT he responded to it as, "*Yes, I totally understand everything.  Thx.*" (*Tr.2193*).
- **Berard**, at a date after he told the FBI he "*no longer found Kenner legit*", he testified that he "*did not read*" the California lawsuits versus Jowdy, because he "trusted Kenner" -- *Tr.3157*.
  - Berard also signed his Arizona lawsuit disclosure versus Jowdy for Attorney Tom Baker after the same "*legit*" date, as well (*See Recon33-14 FOLDER – Berard signed and initialed multi-page letter*).
- **Kaiser**, only weeks after allegedly being told that Kenner robbed $1 million from him (vis-à-vis a fake "*confrontation*" meeting testimony [*Tr.983*]), Kaiser claimed he "*did not read the Lehman Brothers closing documents*" – *Tr.1164*.
- **Nolan** gave testimony in his 2009 arbitration that he "*never read*" any document that he can remember since 1990 – *Appendix at 274-275*.

In general, individuals are charged with knowledge of the contents of documents they sign-that is, they have "constructive knowledge" of those contents.   In *United States v. Hayman*, for example, this Court held that one who asserts an innocent-spouse defense to tax evasion cannot claim ignorance of the contents of tax returns she signed: "Although *Hayman* claims to have *signed the returns without reading them*, **she nevertheless is charged with constructive knowledge of their contents.**" *Hayman*, 992 F.2d at 1262 (citing *Schmidt v. United States*, 5 Cl. Ct. 24, 27 (1984); *Levin v. Commissioner*, 1987 T.C. Memo 67, 52 TCM (CCH) 6, 8 (1987)); see also *Shaw v. Autozone, Inc.*, 180 F.3d 806 811 (7th Cir 1999) (charging a party with

constructive knowledge of a booklet she never read on the basis that her signature on a form stating that she had read the booklet) (citing *Betaco, Inc. v. Cessna Aircraft Co.*, 32 F.3d 1126, 1136 (7th Cir 1994) ("As a result of [the duty to read the contract] a person who signs a written contract is bound by its terms regardless of his or her **failure to read** and understand its terms." (Internal quotation marks and citation omitted))).

- In the 2008-09 Arizona lawsuit to recover the Jowdy loans, victims' attorney, Tom Baker had each Hawai'i partners' investor signoff (and initial each page) on a 7-page disclosure that confirmed Jowdy stole their Hawai'i partners' money and refused to return it.
- These documents were not turned over to Kenner until forfeiture disclosures (post-trial thru Attorney Oliveras) – wholly prejudicing any opportunity to confront the witnesses who "could not remember" the exact loans they were suing Jowdy for – in real time (a.k.a. "new evidence").[29]

In *Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A.*, 461 Fed. Appx. 61; 2012 U.S. App. LEXIS 3012, **the investor argued that the terms and conditions were _written in Portuguese_, which he did not understand, but the court of appeals found that the investor was charged with knowing and understanding the contents of the documents that he signed**.

Absent substantive unconscionability or fraud, parties are charged with knowing and understanding the contents of documents they knowingly sign. If the signer can read the instrument, not to have read it is gross negligence; if he cannot read it, not to procure it to be read is equally negligent; in either case the writing binds him. Parties are bound by documents expressly incorporated by reference into agreements to which they manifest their assent.

- Each investor independently signed off on:
    - A Joint Venture Hawai'i disclosure letter -- July 26, 2006 (*See Recon33-205*),
    - The Arizona Attorney Baker disclosures (*See Recon33-14 FOLDER*),

---

[29] See *Appendix at 28, 30, 101, and 335*

- o  The Ronald Richards' California lawsuit(s) versus Jowdy disclosures (*See Recon33-22, Recon33-15, Recon33-16*),
- o  The GSF disclosures for Constantine (*See Recon33-37*),
- o  Etcetera.

**Nothing was concealed from the investors whether they read the information available to them -- or not.**

**[The remainder of this page left intentionally blank]**

## Perjury

"If conviction is shown to be based even in part upon perjured testimony, the court will not inquire into precise effect of perjury, but will order a new trial if without perjury might not have convicted."  *United States v. Polisi*, 416 F.2d 573 (2d Cir 1969).   When false testimony is given by a government witness without the prosecution's knowledge, due process is violated only "if the testimony was material and 'the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.'"  *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir 1991) (quoting Sanders I, 863 F.2d at 226) (alteration in *Wallach*); see also *United States v. Gallego*, 191 F.3d 156, 162 (2d Cir 1999).

**The Use Of False Testimony**:

A *Napue*[30] violation occurs when the government induces false or misleading testimony *or allows it to go uncorrected*, even though the government knew or should have known that the testimony was false.   If a defendant makes that showing, a new trial is required only if there is any reasonable likelihood that the false testimony *could have affected the judgment of the jury*.

On that subject, the Court opined, "[t]he quantum or weight of evidence is crucial to determining whether prosecutorial misconduct was so prejudicial as to result in a denial of due process.   In that analysis, notably, an appellate court does not merely consider the sufficiency of the evidence.   It also takes into account whether the misconduct *shaped the development of the record* evidence or the trial strategy pursued by either party.   Where the defense that was raised involved witness credibility, an appellate court takes into account how the prosecutorial misconduct may have affected the jury's credibility determination."

---

[30] *Napue v. Illinois*, 360 U.S. 264, 269 (1959)

Several of the government's violations of uncorrected-known witness perjury are expressed, *supra*, out of the dozens and dozens that are laid out in detail in the attached *Appendix*; inconsistent statement by inconsistent statement, leaving no trier of fact with the ability to believe that any combination of these "missteps" did not mislead the jury and affect the credibility of the defendant and his defense.

- On direct examination, **Michael Peca** testified that he "*was not aware of the loans to Jowdy*".   This was consistent with the government's "concealment" theory of prosecution.   Yet, if true, the government would have needed to indict Ken Jowdy as a co-conspirator and the recipient of over $5,000,000 from the alleged "fake loans", referred to at trial as "*bogus*" (*Tr.5708 (2x), 5709*), "*phony*" (*Tr.4597, 4598*) and "*supposed*" (*Tr.5707-5708*) – and simply a "*Kenner cover-up story*" – **because Kenner received none of the funds as "ill-gotten gains" -- and none for his benefit.**

- Despite the government's grandstanding, Michael Peca **recanted** his direct-examination trial testimony and confirmed under the pressures of cross-examination that *he was aware* of the Jowdy loans at all times "*as a group*" (*Tr.498-499*), just as he confirmed testifying four (4) years earlier to a SDNY Grand Jury (*See M&O at 9*).

- Now, if the government's theory had any truths, how could Michael Peca possibly have confirmed that his previous knowledge was actually the truth?
    - Peca validated the "*group*" decision to loan funds to Jowdy – in concert with exactly what Kenner was convicted of concealing from Peca and others (in that same "*group*").

    - *The conviction cannot be based on "loan concealment" as a result.*

**Repeated False Proffers Contradicted Pre-Trial Investigations, Statements, And Evidence**:

Further harm and prejudice was developed as part of the government's prosecutorial record thru _known-false testimony_ and volumes of fully contradicting documents in their possession, all since pre-trial.   The government systematically ignored their-own investigative evidence to frame a prosecutorial theory that was solely based on fortuitous yet self-contradiction testimony.   The following critical witnesses enriched the government's false narrative, forcing defendant Kenner to "*prove his innocence*" with documents in the government's possession.   The government let every recently fabricated testimony stand uncorrected.

44

- **Hawai'i partners COO Chris Manfredi** testified at trial that he was not aware of the Constantine "agreement" (*Tr.2960*).
  - o BUT – Manfredi proffered to the FBI in October 2010 and confirmed there was an "*Agreement between Kenner, the LLCs and Constantine*" [*See 3500-CM2-r at 1*]. What other "agreement was he possibly talking about"?
  - o And – under cross-examination pressures, Manfredi told the trial court that he flew to Arizona and met with Constantine face-to-face *prior* to the initiation of Constantine's work on behalf of the Hawai'i partners. There is no other plausible reason Manfredi would have met with Constantine (an unknown person to him) "*prior to '05*" (*Tr.3004*), otherwise.

- **Kristen Peca** testified that she was "shocked" in 2009 about the Northern Trust default letter when she falsely claimed: "*basically what happened was one day I got mail that I had to sign for.*" (*Tr.709*).
  - o BUT – Kristen Peca was **in Ohio** with her husband and family when the default letters were mailed via FedEx to her husband's address **in New York State** (*See Recon33-82*); *rendering her story clearly fabricated -- and logistically impossible.*
  - o And – Kristen Peca recorded Kenner for the FBI in 2012, at which time she confirmed to Kenner that she learned about the loss of capital from a statement that was "*emptied out*" months after default letters.[31]

- Kristen Peca further fabricated "*he [Kenner] didn't have the decency to give us a heads-up and let us know we were about to get such a shocking notice in the mail.*" about the default letters, which again, was wholly refuted by the text messages between Michael Peca and Kristen Peca – and Kenner (in evidence).
  - o Because – Kenner sent texts to both Kristen Peca and Michael Peca prior to the delivery dates of the two (2) default letters from Northern Trust Bank.[32]

- The government used **Kristen Peca** – *a non-Kenner client at any time* -- as a pawn to ask her if she would have bought Eufora stock (purchase date of 4-7-2008) -- with the company patents actually pledged to the lender in early 2009 (*Tr.703*).

---

[31] See *Appendix at 67-68*.

[32] See Michael Peca communication at *Appendix 104, 263* -- and Kristen Peca communication at *Appendix 104, 360* from Kenner regarding the default letters.

- o And because – the misleading question referenced "pledged patents" which did not occur for eight (8) more months (until early 2009).
- o And -- the court referenced the false Q&A at *M&O at 11*; *also fooled by the government's ruse.*

- **Kristen Peca** testified that she had to think about the Hawai'i LOC proposal for a month before her husband agreed to it after the 2005 meeting.  She also alleged it was a 6-month investment, pursuant to the 2005 meeting (*Tr.697*).
  - o But – Kristen Peca recorded Kenner for the FBI in 2012 at which time she confessed to Kenner that she was not aware that her husband had an open LOC prior to her living in Ohio in 2008-09 – to which Kenner told her that was when the LOC closed.  *Kristen Peca clearly fabricated her testimony to the court, again to harm Kenner by government design.*[33]

- **John Kaiser** claimed he was unaware of the "*Jowdy loans*" from the Hawai'i partners (*Tr.976*) – and incredibly denied that he ever told the FBI agents what they documented in their *raw notes* about the "numerous" documented Kaiser meetings with Jowdy from 2003 thru 2006 (*Tr.1120-1122*) (some in his own testimonial words in 2009 during the *Nolan v. Kenner* arbitration (*See Appendix at 191-192*).
  - o But – Kaiser's October 19, 2010 FBI proffer (*3500-JK-1-r at 2, 3, 10*) to case agent Galioto confirmed that Kaiser met with Jowdy *at least six (6) times* to discuss the Hawai'i loans, beginning in 2003 – *before the first funds were transferred to Jowdy*.
  - o And – Kaiser's FBI proffer confirmed that there was an "**Agreement**" (*3500-JK-1-r at 3*) to loan the funds to Jowdy, so what document was Kaiser talking about if he was not part and parcel to the 2004 Hawai'i-Jowdy loan agreement that *he held in his personal custody since 2004*, effectively authenticating it (*Tr.1127*)?
  - o And lastly – Kaiser gave clear, voluntary testimony in May 2009 during the *Nolan v. Kenner* arbitration that confirmed *he solicited his friends & family* specifically to raise money to loan to Jowdy at 15% interest while expecting a 6-month turnaround; *fully contradicting his 2015 testimony.*[34]

---

[33] See *Appendix at 105-6, 112.*

[34] See *Appendix at 191-192.*   It should be noted that Jowdy had employed Kaiser since 2012 (3 years and counting) by the time Kaiser alleged at trial that *he did not think Jowdy received money from the Hawai'i partners; and certainly did not steal it (Tr.1230).*

46

- o *The government tried to resuscitate Kaiser* on re-direct-examination with known, false testimony (*Tr.1408*):

  > Q:  *Did you ever have a conversation with Ken Jowdy in which he asked you for money to be borrowed from the Hawaii project?*

  > **A [John Kaiser]:  No.**

  > Q Did somebody tell you that Kenneth Jowdy wanted to borrow money?

  > A [John Kaiser]:  Yes.

  > Q Who was that?

  > A [John Kaiser]:  Mr. Kenner.

  > Q Okay. Anybody else?

  > A [John Kaiser]:  No.

  > Q *Do you even know if that is true?*

  > **A [John Kaiser]:  I don't believe it's true.**

- o Kaiser was present for the January 5-6, 2010, two (2) day deposition in California with Jowdy (in evidence – which Kaiser also tried to refute), when *Jowdy confessed to the Hawai'i loans and millions more of un-repaid loans and diversions*.
  - ▪ The government was wholly prepared to present Kaiser's false testimony to resurrect his credibility, whenever necessary.

- o The "*I don't believe it's true*" statement (*supra*) specifically refers to the pre-trial (and continued post-trial) claims by FBI case agent Galioto that "*Kenner stole all of the money from Hawai'i and it never went to Jowdy*" (and referenced in Kaiser's February 2019 submission – *Document 628 at 1*), in order to "persuade" some of the investors [like Michael Peca, Darryl Sydor] to turn on Kenner and contradict their previous, under oath statements.

---

Now – and shocking the conscious again in his ever-changing testimony – Kaiser submitted *Document 628* to the Court on February 28, 2019 – confirming that he once again believes Jowdy is a thief (after being fired by Jowdy – once Jowdy used up Kaiser's value from coerced trial frauds against Kenner).   Kaiser makes direct representations that he knows Jowdy received the Hawai'i partners money.

- • **Surely, this was fully prejudicial to Kenner and his defense**.

- ▪ Each of the investors who were not cooperating with Jowdy in 2012 received a December 2012 demand by the Mexico courts to give in-person testimony that they had in fact contributed their investment and loan funds to Jowdy thru Kenner (*See Recon33-225*) – fully denied in the Mexico courts by Jowdy – with Jowdy's thefts corroborated by his own banking submission in 2010 to Danske Bank (alleging Jowdy had $8.4 million capital in the Cabo project [*See Recon33-224 at 2*] – when he had ZERO dollars; *another overlooked bank fraud by Jowdy under FBI protection*).

- o Kaiser's prior 2010 FBI proffer refuted his own trial testimony about the Hawai'i loans to Jowdy (and never Kenner).   Kaiser told the FBI investigators on October 19, 2010 (*3500-JK-1-r at 3*):

  *"never got $ back from KJ [Jowdy]/Mexico"*

- • **Ethel Kaiser** claimed that she met with Kenner at her granddaughter's christening in New York in 2005 and  *"discussed the 2005 loans for Hawai'i"*, falsely placing Kenner in a face-to-face solicitation role.   To further the fraud, the government had Ethel identify Kenner in a picture insinuating it was when they met in 2005 with her granddaughter in her christening outfit.
  - o But – It was actually at a **2006 event** [*the first time Kenner ever met Ethel Kaiser*] (*GX-942*) (*Tr.934*), a year after the 2005 loan and in or about when it was repaid to John Kaiser (August 2006).
  - o And -- *The government knew it* was one (1) year too early – because John Kaiser's first still-born baby died in summer 2005 as he testified during direct-examination (*Tr.976*); prejudicing Kenner again based on another *"failed memory test"* (or *undue influence* prior to testimony), using Ethel Kaiser to proffer the fake solicitation meeting with Kenner.

- • **William Ranford** testified that he never invested $300,000 in the Constantine-GSF fund (*Tr.2838*).[35]
  - o But – Ranford confirmed to the FBI, three (3) years earlier, on 9-7-2012 (in their *raw notes – 3500-WR-2-r at 2*):

  *"$300k gave to GSF July 2009"*

---

[35] See *Appendix 341-349.*

- And -- Ranford during his October 2014 Arizona deposition (*3500-WR-3 at 11, 12*) further confirmed his knowledge of the initial $100,000 that he wired to the GSF account, the $100,000 that was returned from the GSF account (days later), and the follow-up $300,000 that he wired to Ronald Richards' trust account in July 2009 – when asked the suspiciously unrelated questions by the Jowdy-Kaiser-Berard attorneys working hand-in-hand with FBI agent Galioto at that time. *Berard confessed to this collective effort with the FBI case agent during his own 2014 Arizona deposition.*
    - *Only undue influence could have changed Ranford's clear understanding of his GSF contributions thru two (2) well-documented proffers – just months later to the EDNY in 2015.*
  - And – Kenner's AMEX statements (in evidence) confirm that Kenner travelled to Los Angeles to meet with Ranford *the day before* Ranford made his $300,000 GSF deposit, confirming face-to-face communication in real time related to the second (2nd) GSF transfer.

- Next (perhaps under equal duress at the 2015 trial), **William Ranford** testified he "*did not*" make the three (3) independent investments in Eufora in July 2008 ($200,000), February 2009 ($100,000) and May 2009 ($100,000) (*Tr.2823-2824*).
  - But – Ranford confirmed those exact dates to the FBI, three (3) years earlier, in their *raw notes (See 3500-WR-2-r at 1, 2)*.
  - And – Ranford's Charles Schwab banking records and individual transaction confirmations verified the exact transactions that Ranford confirmed he received at his home address (*Tr.2854-55*) (*See Recon33-236, Recon33-236*).
  - **BEFORE ANY WIRE IS SENT FROM Schwab:**
    - Multiple confirmations occurred *by Ranford himself* -- AND –
    - His Investment Advisor [Greenberg Graham] received the fax copy *from Schwab* to independently verify the amount and the payee.
      - *Identical to every Schwab transaction requirement (See Appendix at 349 [critical]).*

- **Eufora loan buy out plans**: The government solicited synchronous testimony that none of the "key players" in the 2010 **Eufora loan buy out plan** were aware of anything to do with the "loan buy out plan". *This included Berard, Kaiser, Peca and Gaarn.* The complete "*lack of memory by all of them*" jolts ones' conscious

and cannot be randomly blamed on *faulty memory, confusion and mistakes – under the government's miracle of fully synchronized memory loss.*

- o Because – there are 100s of texts between Kenner, Peca, Berard, Kaiser and Gaarn in the summer of 2010, specifically outlining the frenzied efforts of them as the "key players" (*See Appendix at 368-379*) to:
  - 1) Buy the Eufora loan[36],
  - 2) Terminate Constantine's Eufora involvement for the perceived mis-management issues, and
  - 3) Continue to operate the valuable company under "new management" with Stolper and Giuliani's team becoming 6% shareholders.[37]
- o And – the Eufora investors' main attorney, Michael Stolper, wrote a July 16, 2010 full disclosure letter (one of many) to the investors describing:
  - 1) The paranoid Constantine claims of fraudulent **Gaarn private stock sales** (thus fully transparent and subsequently vetted by the investors' attorneys) (*See Recon33-73*) -- and
  - 2) **The loan buy out efforts of the group.**[38]
    - Twenty-nine (29) investors and related parties signed-off on the Stolper July 2010 letter for full transparency (in evidence); *not including Kenner (See Id. at 9-18).*

- **Michael Peca** testified on direct-examination that he had "*no Hawai'i-Jowdy loan knowledge*" (*Tr.422-424*).
  - o But – Peca testified to a 2011 SDNY Grand Jury regarding Kenner and confirmed 100% transparency about the loan (*See Recon33-33*). Peca affirmed this during his cross-examination (*Tr.498-499*).
    - The court acknowledged Peca's "*group*" knowledge as testified during the 2011 SDNY Grand Jury and re-confirmed by Peca in 2015 (*M&O at 9*).[39]

---

[36] See *Appendix at 51-52, 101, 134-135, 296-297, **368-375**, 427 and 455.*

[37] Eufora investor and buy out participant confirmed the 6% to Kenner via text in summer 2010:



| 147 97 | +1716803 4903 Jay McKee* | 7/15/2010 12:03:01 PM(UTC+ 0) | R e a d | Hopefully you're getting some sleep right now; I am planning on sending the letter this morning.. **Within our package or plan in taking the lender out, where is the 6% for Guilani partners comming from?** |

[38] See *Appendix at 83-85, 134, 151, 197, 259, 319, 339, 348, 378, 425-429, 469 and 471.*

- **Peca's recanted testimony** opens *Pandora's Box* about who else was part of the *"group"*, considering Darryl Sydor (*See Recon33-34*) and Turner Stevenson (*See Recon33-35*) *also* confirmed the identical *"group decision"* to loan funds to Jowdy during their respective 2011 SDNY Grand Jury testimonies from the Little Isle 4 capital account funded by their LOC contributions.
    - The Court knows that there are seventeen (17) [at least] under oath testimonies pre-trial by Hawai'i-Mexico members that they were part of the *"group decision"*, notwithstanding the Kaiser and Manfredi's independent FBI proffer confirmations in October 2010 of their full-time "Jowdy-loan" knowledge, *supra*.[40]

- **Jay McKee** testified during direct-examination that he had *"no knowledge"* of the possible uses of the GSF proceeds under Constantine (*Tr.1821-22, 1823-24*) – following the *"concealment"* prosecution of Constantine (& Kenner – although with Kenner never in control of anything to do with the GSF – or a beneficiary at any time).[41]
    - o But – the government knew that Jay McKee had carried on a several hour-long text communication (in evidence) with Kenner the night of the actual dinner meeting with McKee and his wife (*See Appendix at 49-52*).

    - o Thus, *the real time* empirical evidence *does hold* 100% of the weight of the truth; not McKee's failed *"memory test"* (or thru other undue influences) six (6) years later, *ironically* in concert with every other *"failed memory test"*.
        - During the text conversation, *McKee and Kenner discussed the exact expected uses of funds from the Constantine-GSF*, identical to the disclosure document McKee (or his wife) signed via email, days later (after receiving a third [3rd] confirmation email from Constantine).[42]

---

[39] See *Appendix at 31, 147-148, 152*.

[40] See *Appendix at 21,337, 363, and 411*.

[41] The government explained to the Court that McKee was "only" an alleged victim of the GSF, nothing else, when trying to limit questions that would be asked to McKee during cross-examination (*Tr.1846*):

   [Government]: *"We also objected because Mr. McKee is here as a witness with respect to the Global Settlement Fund."*

- o ***McKee cannot be a victim of anything based on his <u>confirmed</u> "memory loss" with his own real time texts.***

- **Darryl Sydor** suffered from the same amnesia-like symptoms during direct-examination when asked about his receipt of the March 2009 default letter (*Tr.2166-67*), claiming "*no knowledge*" of the default (and his underlying collateral loss) until the FBI case agent allegedly showed it to him weeks before Sydor's 2015 trial testimony (6-years after the fact).
  - o But – Sydor sent Kenner text messages *<u>in real time</u>* as soon as he received it in the mail at his home address (ironically where he *<u>also</u>* received his monthly LOC statements from Northern Trust Bank he *<u>also</u>* could not remember).
  - o The default amount of **$855,351.03** from Sydor's 2009 text to Kenner *<u>is identical</u>* to the random dollar amount that is on the one (1) and only default letter – thus the amount could not have come from anywhere else except for the default letter that Sydor "*could not remember*" (in evidence) (*See Appendix 284-286, GX-2119*).[43]

**As a result of the repeated (small subset) and proven "*failed memory tests*", *supra*, contradicting immense volumes of empirical evidence ignored by the government – <u>and the amazing odds against the synchronicity of the witness testimony</u> – the government continues to stand by their controversial testimony-only conviction and wants the court to ignore their reprehensible behavior in the instant matter.**

---

[42] See *Appendix at 250-252, 451-452, and 477*.

[43] Clearly – Sydor was informed directly by Northern Trust Bank and discussed it with Kenner – **leaving nothing concealed**, *at all*.



| 6083 | +19725230505<br>Darryl Sydor* | 3/23/2009<br>1:59:36<br>AM(UTC+0) | R e a d | What funds ? **And this thing says I owe <u>855,351.03</u> right now.** |
|---|---|---|---|---|

52

Under the perjury statute, all of the trial confirmations (*supra*) of clearly and known fabricated testimony by the government witnesses rises to the level of perjury; *and wholly prejudicial to the defendant at all times.*

"A witness commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from *confusion, mistake, or faulty memory*.  Simple inaccuracies in testimony do not rise to the level of perjury."  *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir 2001) (internal citation omitted).

- **Material misrepresentations do.**

**There is nothing reasonable that explains the ridiculous odds that the government overcame to extract identical and incredible faulty *memory, confusion and mistakes* testimony from concurrent "*failed memory tests*" – in synchronicity -- that could leave the Court with any confidence in the verdict – especially since it is based on alleged "*concealment*" from witnesses who exhibited nothing short of full Alzheimer's symptoms (or more likely CTE).[44]**

---

[44] *See Appendix at 4 (including footnote 1).*

- Defendant Kenner is waiting on a ruling from the Court since late 2018 to submit Requests for Admissions ("RFA") to the government witnesses who were Kenner's former clients, in addition to John Kaiser and Tim Gaarn -- both of which participated in violent sports for years prior to trial and exhibited similar **CTE** symptoms as the former Kenner clients (altogether forgetting everything they previously knew – **and in sync**).

## **Summations**

As this [Second Circuit] court has long recognized, "summations are not a detached exposition as would be appropriate in a lecture." *United States v. Wexler*, 79 F.2d 526, 530 (2d Cir 1935).

- A comprehensive listing of government summation frauds on the Court and defendant Kenner is attached.[45]

Because Ken Jowdy has been continuously pursued by various transparent "*group*" legal efforts in the United States and Mexico to recover the "Jowdy loans" since its first discovery in 2007 (of true Jowdy intentions to never repay) – it is *IMPOSSIBLE* that the government could rely 100% on the **CTE**-laden testimony, that "*no one could remember they agreed to loan money to Jowdy*"[46]; creating the greatest ethical breakdown possible under the well-settled guidance of *United States v. Berger*, 295 U.S. 78 (1935):

> *"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all, and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law. He may prosecute with earnestness and vigor – indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction, as it is to use every legitimate means to bring about a just one".*

In the context of *Berger*, "*faulty memory, confusion and mistakes*" are what the government choses to blame on all of the witnesses' inconsistent statements, contradicting every witness' pre-trial and pro-Kenner confirmations of full

---

[45] *See Appendix at 479-505 -- "AUSA Kom and Mich-Rebuttal Summation frauds"*

[46] The court *M&O at 9* confirmed that Michael Peca **recanted** his direct testimony and confirmed that his 2011 SDNY Grand Jury testimony was correct – that **he had full knowledge of the "*Jowdy loans*" and decided "*as a group*"**; echoed by every other Hawai'i-Mexico investor under oath – pre-trial – and forgotten &/or reversed at trial with incredible and unexplainable synchronicity – notwithstanding CTE symptoms &/or "wicked-good" guessing all together.

transparency, their own previous knowledge, and no allegations of any Kenner wrongdoings, *infra*.  These are the same individuals who formed the government's prejudicial basis for their conviction themes of concealment, non-disclosures, and "*finger pointing*" (*Tr.31*) (*further disputed by Kaiser's February 2019 letter – Document 628*).  They also contradicted several post-trial government disclosures (*government-forfeiture-36* and *government-forfeiture -44*) and newly announced revelations (Jowdy as a co-conspirator years after trial) to fabricate a false nexus for forfeiture.

- The government scoffed at Kenner's defense of the "Jowdy loans" relentlessly throughout trial, while referring to Kenner as "*lying*" (*Tr.32 [opening remarks], 4598, 5065, 5703*)[47] and Kenner's representations of the supportive loan documents as "*bogus*" (*Tr.5708 (2x), 5709*), "*phony*" (*Tr.4597, 4598*) and "*supposed*" (*Tr.5707-5708*)…

**But – the loans and the loan document are now irrefutably true!**

**Inflammatory Statements**:

The Second Circuit has addressed: "In considering the impact of what is said the court must be concerned with the great potential for jury persuasion which arises because the prosecutor's personal status and his [or her] role as a spokesperson for the government tend to give what he says the ring of authenticity.  The power and force of the government tend to impart an implicit stamp of believability to what the prosecutor says.  That same power and force allow him, with a minimum of words, to impress on the jury that the government's vast investigatory network, apart from the orderly machinery of the trial, knows that the accused is guilty or has non-judicially reached conclusions on relevant facts which tend to show he is guilty.  **For a prosecutor to convey, or to even permit, a false impression, invades the area of due process**.  It has been said that the more deliberate the intent [like verifying

---

[47] U.S. Attorney Michiewicz was not reprimanded in front of the jury – but only after the jury was dismissed from the courtroom – leaving the prejudicial effects of his reprimanded behavior to stand and influence the sponge-like jury who held the government "beyond reproach" (*Tr. 5076*).

the Kaiser denials of FBI notes as "*consistent*" during rebuttal summation – *Tr.5992*],
the greater the invasion."

- The government alleged **Kristen Peca** was not told about pledged Eufora
  patents before her husband (and never her) agreed to invest in 2008
  (*Tr.703*).
  - o But -- the Eufora patents were *not* pledged until eight (8) months after
    the Peca investment, fully known to the government and
    misrepresented for prejudicial effect.

- The government claimed during rebuttal summation that Kristen Peca was
  "*fed up*" with the Palms (Las Vegas) investment when she met in May 2009
  with Constantine and Kenner in Ohio (*Tr.6005*).
  - o But – in May 2009, Kristen Peca and her husband had already
    breached the 6-month-old agreement between themselves and
    Kenner (*See Recon33-81*), after Kenner made the first (1st) $90,000 of
    mortgage payments (for 6-months) -- and Kristen Peca *refused* to turn
    over the monthly revenue checks of the similar amount per the
    written agreement (defrauding Kenner of approximately $90,000).
  - o And thus -- *Kenner became a victim* of Michael Peca and Kristen Peca
    in the Las Vegas-Palms deal; *not the opposite* as prejudicially alleged
    by the government (wholly knowing as false with the agreement in
    evidence) (*See Appendix at 100-101, 133-136*).
    - ■ The Pecas knew their government support would terminate
      Kenner's pending 2013 litigation in Nevada to recover about
      $750,000 in losses as a result of the Peca-Palms breech. It was
      an enticing ulterior motive, at a minimum.[48]

---

[48] Michael Peca's confession *under cross-examination* that he was 100% aware of the loans
to Jowdy (*M&O at 9*) thru his 2011 SDNY Grand Jury testimony – impeached his direct-
planned-testimony of "*no knowledge of the loans*" and "*no connections to the Arizona and
California litigations*" (*Tr.457*).   This further confirmed that Peca was at all times aware of
each and every document he signed for the Hawai'i LOC investment and the intentions to
provide loans to Jowdy.   Michael Peca confirmed that he agreed to the Jowdy-loan as part of
a "*group*" decision.

- The Court must acknowledge that 15 of the 20 Hawai'i-Mexico investors gave pre-
  trial statements (synonymous with Peca) that they were also part of the "*group
  decision*" to loan money to Jowdy.
- How is it possible that Hawai'i investors **CTE** -- or severe and synchronized memory
  loss during trial -- could be the standard of conviction for "concealment"?  *See
  Appendix at 23\*, 73-74, 275-276, 357\*, 413, 445-446 and 446\*, 447\*, **448-450**.*

- During rebuttal summation, AUSA Komatireddy attempted to cover-up the perjury of **John Kaiser – again --** by claiming two (2) ridiculous items:
  1. Kaiser's statements (*Tr.1120-1122*) could have been "*consistent*" with the FBI agents' notes [*3500-JK-1-r at 2, 3, 10*], and
  2. Nobody can tell if the agents' *raw notes* that confirmed Kaiser's inconsistent prior statements "*if they were written before the interview*" or not (*Tr.5992*).

***"Before"...***

***How is that even possible with the 10 pages of detailed raw notes?***

**<u>Summation And Rebuttal Summation</u>**:

Due to the "inherent controversial nature of litigation" counsel has "substantial latitude" in making closing arguments.   However, in a criminal case the prosecutor "has a 'special duty not to mislead.'" *United States v. Universita*, 298 F.2d 365, 367 (2d Cir 1962)).   Nevertheless, in a final air of desperation to sway the jury with evidence that was neither truthful nor presented during the trial, the U.S. Attorneys vouched:

- The government asserted: "*<u>Kenner is broke</u>. He is entirely living off of his clients' money. He's entirely living off of his fraud. That's why you can take a snapshot, because there's no other money coming in.*" (*Tr.5982*).
  - But – the government had several Kenner bank accounts (in evidence) that confirmed Kenner had over a million dollars in cash at that exact time of 2008-09 stock sales; **never broke**.
  - And – Kenner's consulting company (a sole proprietor LLC) earned over $800,000 between 2008 and 2009; leaving Kenner anything but "*broke*" and "*living off his clients' money*".

- The government asserted: "*He [Kenner] used it [the Hawai'i money] for personal use to get an interest in that resort in Cabo.*" (*Tr.5982*).
  - But – the government has empirical evidence confirming that $4.1 million of "**clean money**" was invested by Kenner's two (2) Baja Ventures 2006 partners in mid-2005 (*government-forfeiture-36*) for their Cabo equity (documented on the Baja Ventures 2006 debt-equity signed agreements with Kenner's partners – *See Appendix at 412-413*).

- o Nevertheless, the government ignored the ongoing criminal activity of Jowdy (again) against Kenner and his Baja Ventures 2006 partners, with only $2.5 million documented by Jowdy and his cabal for the $4.1 million Baja Ventures 2006 capital account contributions on the final DCSL operating agreement (just like Jowdy's $300,000 downward accounting variance -- to his benefit -- with the CSL Properties, LLC investors capital account -- *$2.0 million v. $2.3 million actual*).

  - Kenner's partner, Jozef Stumpel had to sue Jowdy in Mexico for the $1.6 million balance (*unaccounted for by Jowdy in the Baja Ventures 2006 capital account, supra*).  During the initial court filing, **John Kaiser gave signed-testimony** in Mexico on Stumpel's behalf.
  - After Jowdy hired Kaiser (and Berard) in 2011-2012, Kaiser testified to the Mexico court that his signature was *now a forgery (See Appendix at 74\*, 188-189\*, 401\*)*.[49]

  - A 2012 Bryan Berard-FBI recording confirmed that Kaiser was *lying* to the Mexico court and subsequently to the U.S. Attorneys, the FBI, and the EDNY court about the Mexico forgery – when presented as "fake" by the U.S. Attorneys to the EDNY court in 2014 (pre-trial).  The *government did nothing* about the Kaiser fabrication about a **material** issue -- **forgeries**.

- o Jowdy's bank fraud permeated every bank filing Jowdy made to Lehman Brothers (never once Kenner) – including Jowdy's ridiculous 2009 presentation to the subsequent Cabo lending bank (Danske Bank – the current lender) alleging (*See Recon33-224 at 2*):

  "**Equity**: based on the summary information provided, Jowdy has invested approximately $8,400,000 in equity."

---

[49] Kaiser's Mexico forgery lie was also introduced to this EDNY Court by the U.S. Attorneys' proffer pre-trial (2014).  Thus – **Kaiser lied to the FBI and U.S. Attorney as the predicate act to the U.S. Attorneys' false proffer about the document Kaiser actually signed in the Mexico Courthouse** (as *verified by a 2012 FBI recording* – confirming Kaiser's known perjury habit about "alleged forgeries" – just like Jowdy and Berard -- also in evidence as fake "forgery" fraudsters).

- • The bank records in the government's possession confirm Jowdy had ZERO dollars invested thru 2009 in the Cabo project (and -- certainly not into the millions) – *only in excess of ten (10) million of documented thefts.*
- • **Notwithstanding Jowdy's declaration fraud on the EDNY Court (***Document 611-1 at Footnote 4 at 7 – attached to Attorney Souther's January 2019 court submission***) submitted December 2016 and January 2019 availing himself to ongoing criminal perjury to the FBI, the U.S. Attorneys Office and the EDNY Courts – Jowdy's actions were left unchecked *again* in his umpteenth jurisdiction while "protected".**

- • The government claimed Kenner (*Tr.5014-5015*) was *"lying"* about the 2009 Grand Jury subpoena to testify about Ken Jowdy and William Najam, and the cancellation of the same subpoena once the investigating agent (also Galioto) spoke with Jowdy's legal counsel (including Louis Freeh, Galioto's former boss).   The government slandered Kenner alleging Kenner ignored the federal subpoena and just left it *"hanging out there"* (*Tr.5048-5052, 5065*).

    i.   BUT -- The government knew there would have been a U.S. Marshall arrest warrant for Kenner if he left it *"hanging out there"*,

    ii.   AND -- The egregious fact that the subpoena and cancellation were orchestrated from the same EDNY office was another despicable fraud on the court – where AUSA Michiewicz worked (in evidence and ignored to frame another *"lying"* scenario, prejudicing Kenner) (*See Appendix at 9, 16*).

- • The government misrepresented the known truths of the "**Jowdy loans**" to slander Kenner without any empirical evidence suggesting they were not real (*Tr.5991*).   The government created another EDNY enigma (still unsolved by the Court as *"new evidence"*) by presenting *government-forfeiture-44* post-trial, fully validating Kenner's defense statements and rejecting the slanderous attacks on Kenner's credibility about the authenticity of the *"Jowdy loans"*.

    i.   The government *ignored* their own specific knowledge that Jowdy had already proffered to the FBI case agent (Galioto) in March 2010 that **"Jowdy received all of the money as loans from Kenner (personally), Little Isle 4 and Ula Makika [the Hawai'i partners]"**. [*3500-KJ-2 at 12, 13, and 14*].

59

ii.  The government *ignored* their-own specific knowledge that *Jowdy* had already *authenticated* the 2004 Hawai'i-Jowdy loan agreement in his December 2010 Nevada defense case (sued for another stolen loan -- of $791,000 from Glen Murray) (*See Appendix at 34, 57-58, 269*).

    a.  The government knew that Jowdy lost the 2010 Nevada, 4-day bench trial while declaring that thru "*magic*" Kenner received all of the money that Jowdy stole from Glen Murray, contradicting Jowdy's own accounting document in evidence as presented at trial.

        iii.  The seasoned Nevada Judge's Order of Law blasted Jowdy for his thefts and defiance to repay (in evidence) (*See Appendix at 34, 57, 193*).

    a.  Jowdy gave testimony in Nevada (2010) that he used hundreds of thousands of dollars from the Cabo budget in 2008-2010 to pay his defense attorneys – *because he confirmed he "stole $500,000 of the Murray money and sent it to Mexico" for his own use*, thus Jowdy was entitled to use Cabo project funds to defend his predicate theft.

- The "*supposed Jowdy loans*" were verified as "real" by Michael Peca (*Tr.498-499*) during trial, yet the government ignored their own witness' confession (recanting his planned, direct-examination testimony of "no knowledge") and continued on as if Michael Peca was now part of the Kenner cover-up.
  - i.  *The ridiculousness cannot go unregulated.*

- Was Peca's confirmation testimony at trial supporting Kenner's actual transparency actually *against the other investors*?   Because – Michael Peca explained to the SDNY Grand Jury and the EDNY (on cross-examination) that he decided as part of a "*group*" to loan money to Jowdy?
- Peca cannot be a victim.  (*See Appendix at 42, 45, 99, 104, 109-110, 111\*, 113-119, 128, 130-131, 139, 147\*, 152\*, 170, 330-331, 455, 473*).

**100% of these statements produced irreversible harm to defendant Kenner, regardless of the court's attempts (if any) to mitigate the prejudice caused by the government's recklessness – *especially during rebuttal summation*.**

## Prosecutorial Misconduct:

Prosecutorial misconduct must be viewed in the context of the entire trial to determine whether the "'behavior amounted to prejudicial error,'" that is, whether it

"cause[d] substantial prejudice to the defendant." *United States v. Neresian*, 824 F.2d 1294, 1327 (2d Cir 1987) (quoting *United States v. Young*, 470 U.S. 1, 11-12, 105 S. Ct. 1038, 1044-45, 84 L. Ed. 2d 1 (1985)).   The first step in the analysis is to determine if there was misconduct.  *United States v. Williams*, 343 F.3d 423, 437 (5th Cir 2003).   Next it must be determined if the behavior affected the defendant's substantial rights, by considering "(1) the magnitude of the prejudicial effect of the prosecutor's remarks, (2) the efficacy of any cautionary instructions by the judge, and (3) the strength of the evidence supporting the conviction."  Id. at 437-38; United *States v. Caracappa*, 614 F.3d 30, 41 (2d Cir), *cert denied*, 131 S. Ct. 675, 178 L. Ed. 2d 502 (2010).

**At all times**, the government was aware of their volume of misleading and false witness claims about:

1) The "Jowdy loans" (*Appendix at 4, 9, 29, 30\*, 31, 33\*, 73-74, 87, 96\*, 99, 102, 104, 108-109, 115, 126-7, 137-139, 151, 155, 179, 196, 201, 204, 275-6, 287, 330, 340, 356\*, 357-9, 411, 444-49, 473*),

2) Kristen Peca's "shocked" story (*Appendix at 66-71, 100\*, 103-06 and 105\*, 115, 144-46, 146\*, 163, 360 and 360\*, 444\**),

3) Kristen Peca "signing" for a default letter while in the wrong state (*Appendix at 67, 70-1, 106, 145-6, 163*),

4) Sydor's lack of default letter LOC knowledge (*Appendix at 285, 301, 395\**),

5) Nolan's entire lack of LOC knowledge (*Appendix at 171, 265-269*),

6) Rucchin's lack of default letter LOC knowledge (*Appendix at 331*),

7) Kaiser's 2006, $1 million "confrontation meeting" (*Appendix at 186-7, 193, 196, 203, 205-208, 209\*, 215, 292, 305\*, 355\*, 430*),

8) Manfredi's and Kaiser's perjured trial claims of "no Constantine agreement knowledge" (*Appendix at 7\*, 8, 11 and 11\*, 24, 40, 80, 186\*, 188, 206-7, 222, 306, 310, 352, 355\*, 384, 399, 416, 433, 464, 466*),

9) McKee's claims of "no GSF knowledge" (*Appendix at 18\*, 47-53, 123\*, 135\*, 158-161, 245\*, 249\*, 260\**),

61

10) Kaiser's claims of un-repaid 2007 California investment with Kenner [*the sole basis for Counts 2, 3 and 4*] (*Appendix at __191__, 200, 211\*, 213, 217, 223-4, 228, 236, 365\*, 418\**),

11) Berard's "no Eufora loan buyout knowledge" (*Appendix at 52, 101, 134 and 134\*, 197 and 197\*, 296 and 296\*, 366-375, 455 and 455-6\**),

12) Berard's "no Jowdy loan knowledge" (*Appendix at 18\*, 30\*, 73-4, __176-179__, 276, 356\*, 359, 445-450*),

13) The "key players" lack of Eufora loan buy out knowledge in 2010 (*Appendix at 296\*, 368-375, 457\**), and

14) The government fabricated the "*Kick Nick in the balls*" text message back-story and _revalidation_ during rebuttal summation (*Appendix at 236-241*).

15) *Etcetera...*


"A prosecutor's statements during summation, if improper, will result in a denial of the defendant's due process rights if the statements cause substantial prejudice to the defendant."  *Neresian*, 824 F.2d at 1327; see also *United States v. Wilkinson*, 754 F.2d 1427, 1435 (2d Cir) ("improprieties in prosecutor's summation warrant a new trial when they deprive the defendant of a fair trial"), *cert denied*, 472 U.S. 1019, 105 S. Ct. 3482, 87 L. Ed. 2d 617 (1985).   "In determining whether the defendant suffered substantial prejudice, we [the court] will view the allegedly improper statements in the context of the prosecutor's entire argument to the jury."   See *Wilkinson*, 754 F.2d at 1435 (alterations in original).


**Post trial evidence contradicted the government's summation that Kenner "stole" from the Hawai'i partners "*to buy his piece of the Cabo investment*":**


**_But_ -- _now untrue_**
**_(With the government's own admission)!_**


The government's post-trial admission of *government-forfeiture-44* (during forfeiture proceedings) confirmed severe and reformative mis-representations

62

throughout the trial, including attacking the defendant's integrity related to the "*phony Jowdy loans*" and the underlying "*supposed loan agreement*".   In addition, the "*stolen*" comments about defendant Kenner's DCSL equity capital was also refuted by the government's-own *government-forfeiture-36*; confirming that **$4.1 million was "cleanly invested" by Kenner's partners** (even though Jowdy robbed $1.6 million of it and left it unaccounted for) for their Baja Ventures 2006, LLC equity in the Cabo project.[50]

- **These verified truths leave <u>no nexus</u> for the government to seek forfeiture of the Baja Ventures 2006, LLC equity, but the government again ignored their <u>own</u> evidence and proceeded under prejudicial means.**

In *United States v. Ballard*, 2018 WL 1357392 (2d Cir), the court stated, they "consider errors together and found them...to be improper".   The court further noted that "vacating a conviction based on the substantially improper remarks when a defendant's guilt is established by overwhelming evidence is a high standard.   But that was not the case in *Ballard*, <u>given that the government evidence was the testimony of the alleged victims</u> [*like the Kenner prosecution*].   There were also several problems in their witnesses' credibility as there were several times where there were great contradictions."   In a close case like this instant case where the government has made improper summation arguments, thus, vacating the sentence is appropriate.

> Of course, even "substantially improper remark[s]" may not warrant vacatuer when a defendant's guilt is established by "overwhelming evidence" of the relevant crime.  *United States v. Rivera*, 971 F.2d at 885.

> "That, however, is not this case.   The government principally relied on the testimony of the [] victims, whose credibility was disputed, and whose

---

[50] It was the $1.6 million *Stumpel v. Jowdy* lawsuit in Mexico (for the Jowdy stolen capital account funds, *supra*) that led to the signed Kaiser testimonial, which he later lied to the Mexico courts – *after being hired by Jowdy.  Kaiser testified that his name was forged* (again) – and then *presented the document as a forgery to this EDNY Court, the FBI and the U.S. Attorneys Office in 2014* – furthering the "forgery" frauds on each and every court that Kaiser, Berard and Jowdy defended monies they stole (all documented from Kenner and Kenner investors).

testimony, as the government acknowledged, presented occasional irreconcilable differences on material matters." *Id.*

- ***"Faulty memory, confusion and mistakes"*** -- The government in their defense of the original Rule 33 "perjury allegations" by defendant Kenner – defended their position by asserting to the court that their witnesses *all* suffered from *faulty memory, confusion and mistakes*, see *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).

All circuits quote the governing standard from the Supreme Court decision in *Darden v. Wainwright*, that it would "engag[e] in a two step inquiry to determine whether the prosecutorial misconduct rises to the level of unconstitutionality. 'To satisfy the standard…, the conduct must be both improper and flagrant.'" It went on to evaluate the flagrancy step of that inquiry in light of four factors derived from its own precedent: '(1) the likelihood that the remarks…tended to <u>mislead</u> the jury or <u>prejudice the defendant;</u> (2) whether the remarks were <u>isolated</u> or <u>extensive;</u> (3) whether the remarks were <u>deliberately</u> or <u>accidentally made;</u> and (4) the total strength of the evidence against [defendant].'

- In the instant case, the government resorted to "banging" a fake tequila bottle in the courtroom to advance their unsupported allegation that Kenner diverted money from Constantine's GSF efforts to "*buy a tequila company*" (***which never happened***) (*Tr.1074-1075*).[51]

---

[51] U.S. Attorney Michiewicz lied to the court to allow the "tequila side-show" and allow more unsubstantiated and false proffers, **misleading the Court** and the jury, and prejudicing Kenner (*Tr.1074-75*):

> [MR. MISKIEWICZ]: "*Your Honor, Government Exhibit 304 is an email from Mr. Kenner to John Kaiser. The subject matter says MosquitoRojoTequila. It is dated August 6, 2008. There is a certificate from Mexico that represents that Mr. Kenner is the owner, or at least a representative, of this company. <u>And we are going to later on trace that he bought this company, it was a tequila company, using his funds from the global settlement fund.</u>*"

- o **FIRST -- No funds were ever traced, as proposed.**
- o SECOND -- The government's 2008 email evidence (*GX-304*) of the tequila company and alleged solicitation of Kaiser (*Tr.1074-1075*) took place almost a year before Constantine's 2009 initiation of the GSF – *thus creating another timeline that proves to be illogical* – but nevertheless used to create another hall-of-mirrors for their faulty prosecutorial means.

64

- Yet, without disclosing the tequila bottle during pre-trial, which was stolen from Kenner's Mexico home in 2014, the government presented it as another Red Herring (a.k.a. "smoking gun") of Kenner's guilt.   The tequila bottle back-story is wholly refuted by text communication (in evidence) surrounding the "actual" delivery of tequila to a Russian contact (in Russia) directly from a Mexico distiller and no nexus to case related funds, anywhere.

- And -- it was not shipped illegally, as testified, thru the United States by star-witness John Kaiser to his New York home (which would have broken ATF laws; amongst other criminal importation laws).
    - It was more proven fabricated testimony arranged between star-witness Kaiser and the prosecutorial team (in whole or in part).

The Red Herring was another *misleading* and *extremely prejudicial* element of the razor thin evidentiary prosecutorial efforts.

**[The remainder of this page left intentionally blank]**

65