## Cumulative Prejudice

The Second Circuit has opined, **"Whether any one error would, absent the others, have been harmless is irrelevant in light of the cumulative prejudice caused."**

This standard has been repeatedly observed by the Court as "cumulative prejudice caused by numerous errors and improprieties have a dramatic effect on the trier of fact, charged with the difficult task of disseminating the truths from the government's various proposed theories to support conviction.  These various errors carry different prejudice standards.   When reviewing claims of prosecutorial misconduct based on inappropriate remarks within the government's opening statement or summations, the Court will reverse" if the misconduct caused "substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Elias*, 285 F.3d 183, 190 (2d Cir 2002) (internal quotation marks omitted); see also *United States v. Helmsley*, 941 F.2d 71, 96 (2d Cir 1991).   "In assessing whether prosecutorial misconduct caused 'substantial' prejudice, 'this Court has adopted a three-part test," which considers "the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct." *Elias*, 285 F.3d at 190.

### *Prosecutorial Misconduct Infected Every Stage Of The Instant Trial*:

In the government's opening statement, the prosecutor made repeated improper comments, *supra*.  On direct examination of numerous key government witnesses, the prosecutor made repeated improper comments thru misleading Q&A, *supra*.  Improper evidence was introduced -- such as the "*ink*" versions of the alleged forgeries that were recovered on the eve of trial *from Kaiser's home* -- and, a fake tequila bottle (never turned over pre-trial, but allegedly received from Kaiser's possession -- per more government false claims), *supra*.  But, "*if true*", the bottle would have always been available pre-trial (and improperly withheld as evidence –

66

again until seven-plus weeks into the trial).  As a result, the "fake" bottle was produced under improper standards to prejudice the defendant despite no evidence of wrongdoing related to the improperly admitted "tequila" theory, *supra*. Prejudicially-misleading cross-examination Q&A by the government *contradicted* all pre-trial investigative discoveries, *supra*.  The defendant was attacked for authenticating evidence the government ignored that was in their possession and known as real (i.e. the Jowdy subpoena for Kenner's 2009 EDNY Grand Jury testimony – *Tr.5049-5050, 5051-5052, 5065*).   During the government's initial summation, the prosecutor made improper comments (*infra*).   And, during the government's rebuttal summation, the prosecutorial made still more improper comments – *further vouching for the original witness and their own improprieties*, *infra*.

All of the prejudicially foundationless and misleading statements permeated the proceedings here, such as (in part):

- Kenner was *never* "broke" (*Tr.5982*),
- Kristen Peca was *never* "fed up" with the Palms in 2009 (*Tr.6005*),
- Kenner *never* "stole" money "for personal use" and used it to buy a resort in Cabo (*Tr.5723, 5771, 5996, 5997*),
- Kaiser testimony was *never* "consistent" with FBI notes (*Tr.5992*),
- "*Bogus*" (*Tr.5708 (2x), 5709*), "*phony*" (*Tr.4597, 4598*) and "*supposed*" (*Tr.5707-5708*) – and simply a "*Kenner cover-up story*"; touting Kenner as a "liar" was *never true*,
- Kenner *was* – in fact -- "*dropped like a hot potato*" (*Tr.5065*),
- 18% v. 15% was *never correct* math for the Hawai'i partners arbitrage (*Tr.5721*), and
- The Hawai'i Joint Venture disclosure letter would *never* contain language about unrelated Constantine, Centrum and Jowdy loans, because it was not a corporate update letter (a "*state of the union*" letter) as Hawai'i partners'

attorney William Najam told a 2009 arbitration panel.   *"It was a JV disclosure letter"* (*Tr.5709, 5737, 5818*).

"Moreover, *<u>the improprieties were not insubstantial</u>.   The prosecutor's comments in the government's opening statement repeatedly bolstered the credibility of key government witnesses [specifically Jowdy as an innocent victim of the defendants (*Tr.31*), and a story about Kristen Peca who was <u>*never*</u> a Kenner-client].   Although a defense counsel fails to object, plainly improper bolstering continued through the government's case-in-chief and into the government's summation.   The Court should not lightly overlook such repeated violations of clearly announced rules."   See *United States v. Borello*, 766 F.2d at 58 ("For us to disapprove of the present procedure permitting the bolstering of the witness's testimony and then to declare it harmless error would make our remarks in the previous cases purely 'ceremonial.'")

- The Court ruled that the Arizona dismissal was **not** based on Jowdy's allegation of forgery (*Tr.4620*) (only presented thru Kaiser's planned-unsolicited testimony – *Tr.1106-1107*) – yet Michiewicz continued to proffer that Kenner was "*lying*" about the forgery and the Arizona dismissal (*Tr.4639*).

The Court recognizes that "summations, and particularly rebuttal summations, are not fully constructed in advance."   See *Donnelly v. DeChristoforo*, 416 U.S. 637, 646-47, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974).   But "[t]he improvisatory nature of a rebuttal summation is no license for improper vouching, referencing facts not in the record, or appealing to extraneous 'consequences' of a verdict."   *United States v. Friedman*, 909 F.2d 705, 710 (2d Cir 1990).

The improper bolstering such as:

1) John Kaiser's testimony is "*consistent*" with the 3500 FBI notes *(Tr.5992)*:
    *"And it's just as plausible for Mr. Kaiser's testimony was consistent with those notes. You can't conclude they were inconsistent."* -- and

2) Kenner was "*broke*" *(Tr.5982)*:

68

*"Kenner is broke. He is entirely living off of his clients' money. He's entirely living off of his fraud."* -- and

3) Kenner stole money from the Hawai'i partners to buy Kenner's interest in the Cabo resort project *(Tr.5996)*:

*"He used it for personal use to get an interest in that resort in Cabo."*

4) And -- More emphatically, the government claimed: "*Kenner told you*" he stole the money and used it for personal gain (*never for personal gain...nor did Kenner ever testify to that or stealing anything*) *(Tr.5990)*:

*"Mr. Kenner told you that he used that money to get his piece in the Mexico investment with Ken Jowdy. You know exactly what that's for. That's in evidence."*

**That is NOT in evidence.**   The government's gross misrepresentations continued thru the later stages of the trial without similarly "**emphatic**" curative steps.  These persuasive, yet unfounded rebuttal summation comments, had "consequences" on the jury's verdict and their ability to parse the voluminous contradictions of testimony throughout the trial.

As for the alleged certainty of conviction absent the errors, the government's case was based solely on testimony that contradicted their own witnesses' previous statements in civil and criminal proceedings, including Grand Jury testimony – and contradicted 100% of the pre-trial empirical evidence (emails, bank records, disclosure statements, texts, etcetera...).   The government's evidence contained no "smoking gun" and relied heavily on inconsistent and demonstrably false trial testimony from witnesses' *faulty memory*, some of which clearly perjured themselves about events they logistically could not have been present at, such as:

> ➢ **Kristen Peca falsely claiming she "signed" for the Northern Trust default letter while she was <u>in the wrong state</u>** (*Tr.709-710*) (*See Appendix at 67*) -- and

...Perjured themselves about meetings *they did not attend* based on their own FBI recordings, such as:

> **Kristen Peca's demonstratively false testimony that she was part of a 2005 Hawai'i LOC meeting with Kenner and claimed she needed a month to decide on the investment and it would only be six (6) months (*Tr.697*).**

> o **Yet – it is wholly contradicted by her 2012 FBI recordings of Kenner and her confessions of "no knowledge" of the LOC's existence until 2008-09 when "living in Ohio"** (*See Appendix at 70-71, 106 and 105-106\*, 109, 112\*, 125, **144-146**, 180\**).

The government, *ex post facto*, referred to all of them as *faulty memory, confusion and mistakes*.

> **Particularly concerning is that during a trial, based on a "concealment" prosecution, the Court must pause when defendant Kenner's position ran concurrent with _all_ the government witnesses' previous empirical evidence and all pre-trial statements – <u>and only in contradiction to the *faulty memory, confusion and mistakes*</u> proffered at trial.**

Yet, based on the testimonial-based prosecution, supported by only *faulty memory, confusion and mistakes*, the Court must bear a closer eye on the elements that construct **cumulative prejudice**. The *faulty memory*-based testimony along with the myriad of prior inconsistent statements and recently fabricated story-lines required the jury to judge their credibility and weigh it against the credibility of the defendant; whose testimony was consistent with the government witnesses' pre-trial statements and all empirical evidence, as a whole.

### The Materiality Standard For Use Of Perjury:

Defendant Kenner requests an evidentiary hearing to address the repeated occurrences of "prior inconsistent statements", and the government's knowledge of them.

Defendant Kenner argues that even if he cannot satisfy the *Brady* and *Giglio* materiality standard, his case satisfies the lower standard that applies in cases

where a conviction is obtained by the prosecutions' knowing use of perjured testimony and false evidence, such as:

- Kaiser's "*ink*" versions of the alleged "forged" consulting agreements:
  - **BUT** -- they were retrieved from Kaiser's own home on the *eve of trial,*
  - **AND** – **no BATES STAMPS** are on the Kaiser "*ink*" documents.

- Kristen Peca gave demonstrably false "*shocked*" testimony (*Tr.709-710*):
  - **BECAUSE** -- she was not in the same state (Ohio versus New York) to receive and "*sign*" for the Northern Trust default letter.

- Kristen Peca gave demonstrably false testimony that the Northern Trust Default letter verified she lost her money:
  - **BECAUSE** -- her own "*emptied out*" [on a bank statement] comments from her 2012 FBI recordings of Kenner *contradicted* her trial testimony (*See Appendix at 66-69, 70-71*).

- Kristen Peca gave demonstrably false testimony about her knowledge of the 2005 Hawai'i investment LOC meeting:
  - **BECAUSE** – she personally verified on her 2012 FBI recording of Kenner that she had no LOC knowledge until 2008-09 when living in Ohio (*See Appendix at 69-70*).

- John Kaiser gave demonstrably false testimony about never telling the FBI that he "*met Jowdy several times to discuss and approve the 2004-06 Hawai'i partners loans to Jowdy*":
  - **BECAUSE** – Kaiser told a 2009 arbitration panel that "*after meting Jowdy several times he raised money from his friends & family for the 15% loan*" (*See Appendix at 191-192, 200, 202*),
  - **AND BECAUSE** -- Kaiser verified he had the Hawai'i-Jowdy loan agreement in his possession to the FBI [*See 3500-JK-1-r at 3*], which he called a forgery at trial [*Tr.1106, 1007-08*],
  - **AND BECAUSE** -- Kaiser told the FBI on October 19, 2010 he met Jowdy on six [6] separate occasions and cross-verified one of the meetings with Berard and Kenner afterwards [*See 3500-JK-1-r at 2, 3, 10*].

- William Ranford gave demonstrably false testimony that his FBI proffer notes were "*not what he told the FBI*" about both his Eufora and GSF contributions:

- o **BECAUSE** – Ranford gave a 2014 Arizona deposition which confirmed his full knowledge of the **GSF** contributions and repayments by Constantine (*See Appendix at 342-348*) (*See 3500-WR-3 at 11, 12*),
- o **AND BECAUSE** -- Ranford also verified the exact **GSF** amount to the FBI during his September 7, 2012 proffers (*Tr.2906-2907*),
- o **AND BECAUSE** -- Ranford confirmed the exact dates and amounts of his three [3] independent **Eufora** purchases during the same 2012 FBI proffers [*See 3500-WR-2-r at 1-2*].

- Hawai'i partners COO Chris Manfredi gave demonstrably false testimony that he did not have any idea why Constantine would be getting paid by the Hawai'i partners (*Tr.2690, 2997-2999*):
  - o **BECAUSE** – Manfredi **verified** to the FBI in his October 2010 proffers that there was an "*agreement between Hawai'i partners and Constantine*" and "*Constantine was getting paid early*" [*See 3500-CM-2-r at 1*],
  - o **AND BECAUSE** – Manfredi later verified under cross-examination pressures that he met face-to-face with Constantine "*prior to '05*" when Kaiser signed the consulting agreements and Constantine began his fundraising efforts "**with Manfredi**" and the Hawai'i partners (*Tr.3004*).

In deciding whether a new trial is required due to prosecutor's knowing about the introduction of perjured testimony, the appropriate inquiry depends on the "materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury." *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir 1991).  This standard of materiality is less exacting than in the case of a prosecutor's failure to perform *Brady* or *Giglio* obligations.  If the prosecution knew of the perjury, then the conviction must be vacated "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  *Id.*; see also *United States v. Wong*, 78 F.3d 81-82 (2d Cir).

**The Government's Evidence Is Less Than Ample (If Existent At All):**
In the instant case, the government claimed three (3) objects to their conspiracy theories; (1) GSF, (2) the Hawai'i partners [Jowdy loans – and Constantine consulting payments], and (3) the Eufora private stock sales.

**First** -- The government was not able to prove that any **GSF** funds were misappropriated by Kenner's co-defendant (Constantine) pursuant to Constantine's "*side-deal*" with Sergei Gonchar (verified at trial by Gonchar – and known at all times by the government) (*Tr.4826-4827*).

**Second** – The government failed when their star-witness for the **Hawai'i partners**, Michael Peca, *impeached* his own direct-examination testimony of "*no Jowdy loan knowledge*" (*Tr.498-499*).   Michael Peca *recanted* his direct-examination testimony and **verified** that he knew at all times "*as a group*" during cross-examination (*See M&O at 9*) of the Jowdy-loans, consistent with his previous statements to the 2011 SDNY Grand Jury (as did nineteen [19] other Hawai'i-Mexico investors pre-trial; *none dissenting*) (*See Appendix at 29, 31, 73-75*).   And, as an *authorized function* of the Little Isle 4 By-Laws (*See Recon33-70*), Kenner paid independent consultant Constantine (1 of 17 that were paid similarly) to secure funding for the Hawai'i partners (*See Appendix at 75-76*).   Constantine succeeded, unlike fifteen (15) of the other paid hard moneylenders[52].

*Hawai'i partners COO Chris Manfredi confirmed to the FBI* (Galioto) in October 2010 that he was aware of the consulting "*agreement between Constantine and the Hawai'i partners*" (*See 3500-CM-1-r at 1*).

- Consistent with all of the government witnesses who confirmed they were prepped by the government, Hawai'i COO Chris Manfredi "*could not remember*" any Constantine involvement at trial (*Tr.2960*), while doubling-

---

[52] Immediately following the "*egregious*" 2005 Lehman Brothers 11th-hour offer that Manfredi, Kaiser and Kenner declined (*See Recon33-7*) – Jowdy, Manfredi, and other people assisting the Hawai'i partners close the various lending deals for acquisition and development continued at a frenzied pace (*See Recon33-8 FOLDER*).   Another paid consultant presented a September 2005 offer *prior to* the October 2005 Urban Expansion loan (*See Recon33-227*).   This further hi-lights that no one, specifically Kenner, "*pushed Lehman Brothers off for another year to get Constantine in the deal*".   It also disregards that plan – if true (which is was not) cost the Hawai'i partners another $451,080 in late penalties to save the 2016-acre oceanfront parcel (Waikapuna).   That cannot be presented as a reasonable plan.

down on his lack of knowledge during cross-examination when he was actually shown a myriad of emails between himself and Constantine; leaving all of his testimony subject to *faulty memory, confusion and mistakes* (a.k.a. unreliable) or based on "*other influences*" (*Tr.2997-3018*).

- Manfredi hi-lighted his catastrophic memory loss after failing to recognize years of his joint efforts with first-hand emails by stating (*Tr.3016*):

> "*I honestly do not recall communicating directly with Tommy Constantine.*"

**Third** – The **AZ Eufora Partners I** investors in Eufora (with Tim Gaarn as Managing Member) hired Rudy Giuliani's group to investigate "everything Eufora" (not arranged by Kenner).   Constantine's attorneys alerted the investors' attorney that they believed there were "illegal" private stock sales (notwithstanding Constantine's own 2008 transactions), but none of the Giuliani investigative team followed Constantine down that "rabbit hole" after verifying the underlying private stock knowledge with 27 of their "signed off" clients (not including Kenner) (*See Recon33-73*) (*See Appendix at 83-84, 85\*, 134\*, 151, 197\*, 259, 319, 339, 348, 378, 425-429 and 429\*, 469-471*).   Also, multiple Eufora investors during the same purchase period are considered non-victims of the same transactions (based on empirical evidence) [Gonchar, Norstrom, Murray and deVries].   And, government witness Tim Gaarn confirmed he was not part of any conspiracy with Kenner during his trial testimony (*Tr.2563-2564*).

> *[Tim Gaarn]: "My understanding is I've not been accused of doing anything wrong, I never was, and if I on the stand say something to incriminate myself with respect to this, that I will not be prosecuted."*

**The Government's Awareness**:

"[D]etermining that a new trial was necessary, because lies of his key witness [John Kaiser] who **'tied all the pieces together'** even as to matters affecting only his credibility, could have caused the jury to reject his entire testimony and eliminate the foundation for conviction."; *United States v. Wallach*, 935 F.2d 445, 457-8 (2d Cir 1991).

Whether the introduction of perjured testimony requires a new trial depends on the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury.   With respect to the latter inquiry, there are two discrete standards of review that are utilized.   Where the prosecution knew or should have known of the perjury, the conviction must be set aside "'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'"   *Perkins v. LeFevre*, 691 F.2d 616, 619 (2d Cir 1982) (quoting *United States v. Agurs*, 427 U.S. 97, 103, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976)); see also *Saunders v. Sullivan*, 863 F.2d 218, 225 (2d Cir 1988) (question is whether the jury's verdict "might" be altered); *Annunziato v. Manson*, 566 F.2d 410, 414 (2d Cir 1977). Indeed, if it is established that the government knowingly permitted the introduction of false testimony reversal is "**virtually automatic.**"   *United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir 1975) (citing *Napue v. Illinois*, 360 U.S. 264, 269, 3 L. Ed. 2d 1217, 79 S. Ct. 1173 (1959)), *cert denied*, 429 U.S. 819, 97 S. Ct. 65, 50 L. Ed. 2d 80 (1976).   Where the government was unaware of a witness' perjury, however, a new trial is warranted only if the testimony was material and "the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted."   *Sanders*, 863 F.2d at 226; see also *United States v. Seijo*, 514 F.2d 1357, 1364 (2d Cir 1975) (The test "'is whether there was a significant chance that this added item, **developed by skilled counsel**...*could have induced* a reasonable doubt in the minds of enough of the jurors to avoid a conviction.'") (Citations omitted).

**First** -- John Kaiser presented the two (2) "*ink*" versions of his alleged signature forgery – **recovered from his home on the eve of trial** -- although *they were in his possession for nearly ten (10) years pre-trial, shocking the conscious*.  Yet -- the government ignored the blasphemy and continued with their "forgery" ruse on Kenner and the Court.

**Second** -- Kaiser claimed he had "no knowledge" of the "Jowdy loans"; fully contradicting his October 2010 FBI proffers and previous 2009 Arizona arbitration testimony, when Kaiser fully confirmed his knowledge emphatically and without equivocation.

**Third** -- Kaiser claimed Kenner robbed $1 million from his 2005 Hawai'i friends & family loans for use as part of the Hawai'i-Jowdy loans, again contradicted by his own 2009 Arizona arbitration testimony and October 2010 FBI proffers.

- This perjury was the basis for Kaiser's trial perjury about a "confrontation meeting" led by Manfredi (*Tr.983*), who, by the way, had already told the FBI in October 2010 that he was not sure Kaiser had ever contributed more than the original $1,000 in 2002 to the Hawai'i project (*See 3500-CM-2-r at 2*).
  - o **That is a $999,999 difference.**

**Fourth** -- Kaiser tripled-down by claiming he had "no knowledge" of the 2010 Eufora loan buy out efforts, in contradiction to hundreds of text messages with Kenner and the investors' Eufora buy out attorney [Michael Stolper]; specifically identifying Kaiser and his massive efforts with the collective group (including Gaarn, Peca, and Berard – who also were miraculously absent of any recollection whatsoever during trial -- opening another Pandora's Box of known synchronized perjury).

**Fifth** – *And most disturbing* -- all of the Kaiser perjury received his own self-verification, while working as a now-admitted co-conspirator from 2012-2017 with Ken Jowdy in Mexico.   Kaiser confessed by submitting a *stunning* February 28, 2019 letter (*Document 628*) to the Court referring to "all things" Jowdy as a criminal actor.

- Kaiser further verified the ongoing criminal complicity of former Lehman Brothers' lender, Masood Bhatti, while only attempting to vilify Kenner (related to Jowdy's stolen $2.5 million capital account in the DCSL project) *with information that the Court and the government already know are false*; based on facts and emails in evidence, that Kaiser falsely espoused -- but is clearly not aware of.  *See Recon33-32 (prophesizing the Kaiser eventual downfall after he was USED UP by Jowdy).*

- Kaiser's letter also verified that Jowdy and the FBI are still telling the Kenner investors "*Kenner stole $7 million from them to buy his share of the Cabo project*".
  - o Thru *government-forfeiture-36* and *government-forfeiture-44* – the government confirmed that Kenner "did not steal" any Hawai'i investor money to "buy his share of the Cabo project" – **thus no nexus for forfeiture.**  This verifies the FBI case agent's complicit "cover-up" work with Jowdy and his cabal to continually lie to the investors about

76

Jowdy's documented thefts -- while transferring the "blame" to Kenner.

**Automatic Reversal Of Conviction**:

Defendant Kenner advances two (2) theories for "virtually automatic" reversal of conviction, arguing that the government knew or should have known that Kaiser's testimony was repeatedly false (amongst numerous other witnesses, *supra*), including the inclusion of the government signature expert with the Kaiser-possessed "*ink*" consulting documents (for ten [10] years) and its underlying ruse on the jury and court.  Alternatively, Kenner contends that **"red flags"** should have alerted the prosecutors and case agents (who were present at Kaiser's critical October 2010 FBI proffer) to Kaiser's obviously false testimony – and immediately raised the issues to the Court, before the prejudice to Kenner was irreversible.

Instead, in contradiction to their ethical responsibilities as officers of the court -- the government tried to resuscitate Kaiser's direct denials of what the FBI agent and SDNY criminal investigator noted in their raw notes (*See 3500-JK-1-r at 2, 3, 10*) during a two-plus hour interview at Kaiser's Long Island mansion during their rebuttal summation (*Tr.5992*).

> *"What is it? It's the notes of an investigator from another office, not the notes of an FBI agent, an investigator from another office. What is it not? It is not a transcript. It's not questions and answers. It's not direct quotes. You can't tell from the notes when they were written, if they were written <u>before</u> the interview or after the interview.*
>
> *Notes of a third party are just that, notes of a third party, nothing more, nothing less. And it's just as plausible for Mr. Kaiser's testimony was <u>consistent</u> with those notes. <u>You can't conclude they were inconsistent</u>. At the end of the day there is a reason why we don't run trials on notes."*

Sadly, the government also allowed Kaiser to claim he had no knowledge of the Hawai'i **"Agreement"** to loan money to Jowdy, even though the FBI case agent was

present in October 2010 when Kaiser confirmed his exact knowledge of the Jowdy loans and the actual "**Agreement**" (*See 3500-JK-1-r at 3*).

This mirrored the identical patently false testimony of Hawai'i partners COO Manfredi's who identically confirmed to the FBI about his unabated knowledge of the Jowdy loans and the Constantine consulting agreement; only one (1) week prior to Kaiser's confirmations in October 2010 (*See 3500-CM-2-r at 1*).

**New Evidence**:

Generally, Rule 33 relief is warranted only if the defendant demonstrates that "the evidence is so material and non-cumulative that its admission 'would probably lead to an acquittal.'" *United States v. Owen*, 500 F.3d 83, 2007 US App. LEXIS 21129, 2007 WL 2472019, at *4 (2d Cir 2007) (quoting *United States v. Alessi*, 638 F.2d 466, 479 (2d Cir 1980)); see also *United States v. Zagari*, 111 F.3d 307, 322 (2d Cir 1997). The standard differs, however, when the government has failed to disclose evidence favorable to the defense.   Constitutional error occurs "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433-34, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985)).   In such a case,

> [t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.   A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." *Id.* at 434 (quoting *Bagley*, 473 U.S. at 678).

**Government Star Witness And Jowdy-Protector (Co-Conspirator) Goes Turncoat (Again)**:

Government star-witness, and professed 9-11 hero (*Tr.954-956*) delivered a monumentally shocking letter to the Court (*Document 628*) in February 2019 – confirming Kenner's decade-plus statements of Jowdy criminal behavior and the

78

unchecked "pass" Jowdy receives from the FBI case agent (amongst others in the DOJ).[53]

**Kenner requests an evidentiary hearing to determine the extent of the evidence Kaiser claims in his shocking letter of February 2019 to posses.**   Kaiser's trial testimony supported the government's theory of Jowdy's victim status, fully denying he thought Jowdy stole any funds (fully fabricated based on his-own presence during the January 2010, 2-day California deposition of Jowdy – *which included Jowdy's confessions to all of the unpaid loans and stolen money from the various investors and projects*) (in evidence).

Now (as of February 2019), Kaiser claims Jowdy is the criminal Kenner has pursued for over twelve (12) years with and on behalf of the investors in Hawai'i and Mexico. All of Kaiser's 2015 trial testimony has demonstrably reformative effects under the presentation of the "new evidence" (as a subset):

1. The submission of *government-forfeiture-44*,
2. The submission of *government-forfeiture-36*,
3. The introduction of all the Little Isle 4 2008-09 Arizona lawsuit signed Attorney Baker disclosures,
4. The Kaiser-Privitello fabricated Frailes agreement,
5. The Kaiser-Sconzo faxes with Kaiser's documented thefts from Sconzo
6. The Kaiser February 2019 letter (*Document 628*).

- <u>What</u> ulterior motives encouraged Kaiser's testimony in 2015 in direct contradiction to all of his pre-trial testimony, FBI proffers, emails, signed disclosures and texts?

- <u>Why</u> can't Kaiser give his sought after testimony to the FBI agent who was on call to Kaiser and Berard 24-7 while they were working for/with Jowdy's cabal?

---

[53] After years of Kaiser boasting (with Bryan Berard) about their efforts culminating in the 2013 Kenner Indictment, arrest and 2015 conviction while working as Jowdy's co-conspirator in Mexico, Kaiser was fired by Jowdy based on Jowdy's paranoid schizophrenia related to Kaiser (like all previous people Jowdy and his cabal "used up" as a means to an end) (*See Document 628*).

- <u>Why</u> does Kaiser need the Court to hear his newfound desire for the Jowdy truths?

- <u>What</u> else is Kaiser aware of with respect to the full protectionism of Jowdy by the FBI case agent (Galioto) and at "who's direction"?

Dozens more exculpatory questions and evidence Kaiser is willing to offer to the Court are needed to fully expose the Kaiser's trial testimony (in support of the false government theories – contradicted by their own post-trial submissions) -- and uncover the reasons for it – *suborned or other ulterior motives*, or both.

**[The remainder of this page left intentionally blank]**

**<u>Conclusion</u>:**

The 2015 trial court was littered with known **perjury**, prophesized by opening remarks and supported by unsubstantiated summation comments (never in evidence or presented during trial).

Kaiser's **shocking "new evidence"** letter offering to the Court reveals unexplainable reformative problems for the government's prosecutorial theories. And -- the continuing story line by the government, the FBI and Jowdy's people that "Kenner stole $7 million to buy his Cabo interest" confirms their complicity – *since government-forfeiture-44 and government-forfeiture-36 confirm it never happened*.

It further hi-lights that the 2013, and two (2) 2015 Grand Jury testimonies of FBI Agent Galioto should be released as requested in *Kenner's 2018 Rule 6(e) Motion*, considering:

1. The **GSF** Constantine-Gonchar "*side-deal*" eliminates all GSF misappropriation allegations thru Constantine (known at all times by Galioto and the government),
2. The Peca trial confirmation that he knew "*as part of a group decision*" that the **Hawai'i partners** were lending Jowdy funds (in addition to nineteen [19] other pre-trial under oath confirmations reiterating the same "*group knowledge*"),
   a. The production of "new evidence" (*government-forfeiture-44*) cannot be viewed lightly since a "cumulative" explanation by the government – confirms they would have systematically <u>*ignored*</u> pre-trial evidence to frame their faulty prosecution (a.k.a. prosecutorial misconduct).
   b. It verified that Kenner "did not steal" the funds – and the FBI and government knew Jowdy had the money all along (in spite of their current $7 million claims – now re-verified in the Kaiser 2019 co-conspirator letter),
3. The Kaiser and Manfredi FBI raw notes from 2010 verified that Constantine was fully known to be engaged (for pay) thru "*agreements*" to secure funding for the **Hawai'i partners** <u>*as authorized by the Hawai'i partners operating agreement*</u>, and

81

4. The **Eufora** investors all had their 2008-09 private stock purchases fully vetted by their own well-connected attorneys (with no concerns).

• Defendant Kenner and the Court are entitled to discover the basis for the FBI agent Galioto-only testimony that secured the 2013 Indictment and two (2) different Superseding Indictments; in the interest of justice.

The **late production** of the 3500 materials, the "*ink*" Kaiser signatures (recovered from Kaiser's own home after ten [10] years in his possession), the Northern Trust subpoena, and the fake tequila bottle <u>were not disclosed timely enough for them to be useful to defendant</u>.   The production of the documents on the eve of trial (or during trial), in each case, did not provide defendant the opportunity to <u>read it</u>, <u>identify its usefulness</u>, and <u>use it</u>.

The *Brady* materials violations, including but not limited to the fabricated Kaiser-Privitello Mexico documents (verifying their collective proffer perjury to the FBI from October 2, 2014 – after the Kenner arrest date).   And -- the Kaiser thefts from his doctor-friend, Frank Sconzo, were systematically removed from the larger production of related materials sent to FBI case agent pre-trial (with fax date confirmations in evidence).  The unknown frauds by Kaiser and Privitello – related to believability and ulterior motive – could not be hi-lighted without the unknown document fabrication by Kaiser (if the government did not withhold the evidence until the forfeiture phase of the proceedings on purpose).   Additional exculpatory discovery could have been pursued by the defendant pre-trial with the new knowledge of the criminal acts (including document fabrications) between Kaiser and Privitello (related to other Kaiser cover-ups – assisted by FBI agent Galioto). Ultimately, Kaiser's February 2019 letter opens Pandora's Box again about another set of fabricated and forged documents by Jowdy and Kaiser to steal Kenner's Baja Ventures 2006 equity (under wholly unbelievable terms) after Kenner was arrested and detained.

82

The **FINRA expert** was a complete fraud to prejudice Kenner with ZERO actionable elements of the prosecution falling under their regulations.   The impact of the FINRA testimony was clearly evidenced when the jury immediately requested the read-back of the FINRA testimony upon commencement of their deliberations.

The Witnesses' "**failure to read**" significant-critical documents in their financial lives led to hundreds of "*I don't know*" and "*I don't remember*" responses during cross-examination, even with their own, real evidence in front of them.   Their "*failed memory tests*" cannot lead to a "**concealment**" prosecution with witnesses who exhibited full **CTE** (a.k.a. – "*memory loss*") symptoms throughout the trial.

- The defendant Kenner renews his 2018 request for the presentation of RFAs to each of the witnesses (under seal) who formerly played professional hockey, plus John Kaiser and Tim Gaarn (who independently participated in decades of full contact sports).
- Specifically with the government's *faulty memory, confusion and mistakes* defense to all Kenner allegations of perjury from the trial – in the interest of justice – the potentially Alzheimer's-like symptoms should be identified based on a conviction premised in "**failed memory tests**" – *in contradiction to 100% of the pre-trial evidence; leaving the testimony unreliable at best – and suborned at worst (to seek a conviction based on synchronized testimony).*

**Prosecutorial Misconduct** from the opening statements thru the summations permeated all ethical standards expected under *Berger*.   The government's planned ignorance to exculpatory materials they received – *per their own banking subpoenas* -- as late as weeks before the trial confirmed Jowdy's thefts since 2002 (*See Recon33-223*).   Nevertheless – they presented Jowdy as a victim of Kenner (& Constantine).

Amongst the dozens of startling claims and government induced proffers, the following are a selection of the hi-lights:

- The allegations of Kenner being "*broke*" contradicted all banking statements in evidence.

- The repeated allegations of the Jowdy loans being "*bogus*", "*phony*" and "*supposed*" and referring to Kenner as "*lying*" for confirming the "*group decision*" to loan money to Jowdy from the Hawai'i project were at all times false and misleading.  The government's own *government-forfeiture-44* (submitted for the forfeiture hearings) revalidates the government's statements were "dead wrong", improper, and fully prejudicial to Kenner.

- The government claims that Kenner "*stole*" his clients money and the Hawai'i partners funds to "*buy his piece of the Cabo project*" is contradicted by their own accounting (*government-forfeiture-36*).

- The government's attack on Kenner during cross-examination after Kenner verified that he was subpoenaed by the EDNY in July 2009 to give testimony to a Jowdy-Najam Grand Jury was fully prejudicial.   Specifically, the government issued and cancelled the Grand Jury subpoena for Kenner in the same office as the 2015 prosecutorial team, making the false attacks far less acceptable as a mistake.   The government possessed the actual U.S. Attorney's letters pre-trial and chose to ignore them to allege Kenner avoided the subpoena, refused to testimony, and was "*dropped like a hot potato*" (*Tr.50564-5065*), because Jowdy's attorney is the former director of the FBI.

- The government *used* John Kaiser to allege he never received his share of the California home project profits from Kenner (substance of Counts 2 -3 and 4).
    - But – this is 100% refuted by Kaiser and Kenner's own banking records in evidence.

- The government *used* Ethel Kaiser (a non-victim in the case) to claim that she met Kenner in 2005 "*prior*" to her decision to loan funds to her son (John Kaiser) for the Hawai'i project (to loan to Jowdy – as testified to by john Kaiser during his 2009 arbitration testimony without ambiguity).  The government knew their picture of Kenner, John Kaiser and Kaiser's daughter (*GX-942*) was taken 1-year after the 2005 date they falsely claimed Kenner solicited the funds from Ethel *in-person*.
    - In fact, John Kaiser claimed the entire "loan" discussion took place on the phone during trial; never in person.

- The government padded its Indictment with the two (2) Privitello charges (Counts 5 & 6), while their only witness, Privitello himself, told the trial court

that Kenner had "*nothing to do with his Eufora investment decision*".   Regardless of Privitello's damaging testimony to the government's theory and the connection to Kenner, they vouched for Privitello being a Kenner-victim again during summation (with no other allegations pending).

- The government *used* Kristen Peca to lie about a multitude of issues:

    - First, *Kristen Peca was never a client of Kenner's*, thus breaking all responsibilities between Kenner and Kristen Peca before they ever began. Yet, the government solicited planned testimony from Kristen Peca that she *signed* for a 2009 Northern Trust Bank LOC default letter *while living in Ohio*, stood in her kitchen in "*shock*" until her husband returned from his hockey practice in Columbus Ohio – **fully disregarding** that *the default notice was mailed* **FedEx, certified mail** *to their New York address*;
        - o   Making the entire series of events logistically impossible to have ever happened.

    - Next, the government *used* Kristen Peca to falsely claim she was part of a 2005 meeting with Kenner to decide if her husband (not her) would create a LOC at Northern Trust Bank to make an investment in the Hawai'i project. But, during Kristen Peca's 2012 FBI recordings with Kenner, *she confirmed that she had no knowledge of her husband's LOC until sometime when she lived in Ohio (2008-09)*.
        - o   Thus, her testimony was false and the government knew it.

    - The government also *used* Kristen Peca to claim that she and her husband could not get a hold of Kenner in 2009 thru early 2010 to discuss their Hawai'i and Mexico investments. Yet, Kenner and Michael Peca *exchanged over 500 text messages* during this exact period of time.   They *exchanged dozens and dozens of emails*.   They *met face-to-face* four (4) separate times; including January 2010 in Los Angeles California for the Jowdy mediation with ten (10) other Hawai'i partners for a Jowdy mediation with his own attorney – and for a week straight in February 2010 in Vancouver during the 2010 winter Olympics.   And -- Michael Peca turned down the January 2010 offer by Kenner and Michael Peca's own attorney to be present with other Hawai'i-Mexico investors in Los Angeles, California with Kenner for the 2-day Jowdy deposition (*attended by Jason Woolley and Greg deVries – who live-streamed the Jowdy deposition via computer to the entire Hawai'i-Mexico investor group*).

Nevertheless, the government *used* Kristen Peca to claim each of those outrageous items (and more – while *she was never a Kenner-client*), fully prejudicing Kenner at trial.

- And -- The government and John Kaiser claimed that he (on behalf of his friends & family) never received re-payment for their 2005 Hawai'i partners $1 million loan.   Yet, the August 2006 Na'alehu Ventures 2006 (Hawai'i partners) banking statements *confirm* Kaiser received $1,176,000 in repayments (including his signed side-deal with Kenner to become the Managing Member in Hawai'i).

  - The government allowed Kaiser to claim all of the August 2006 funds were for "*back pay*" and "*expenses*".   But, the government and Kaiser have *never* produced the 2006 or 2007 Kaiser IRS statements to confirm the "*income*" or any of the 2004-2006 "*expense receipts*" for the balance of the $816,000 of wire transfers Kaiser received from Na'alehu Ventures 2006 – as Kenner has repeatedly requested from the government and the Court.
    - o   *BECAUSE -- neither of them are true.*

  - In the hundreds of thousands of emails and text messages in evidence (with thousands between Kaiser and Kenner), there is *not one* message from Kaiser demanding the alleged millions he claimed thru leading government Q&A "*ruined his life*".
    - o   *BECAUSE – John Kaiser was fully repaid.*

  - Ultimately, Kaiser complied with the "protect Jowdy at all costs" FBI agent's strategy once he received his job from Jowdy in 2012.  The government completed the pro-Kaiser support for vouching several times that his testimony was "*consistent*" with his October 19, 2010 FBI proffer (while obviously wholly inconsistent at every turn) (*Tr.5992*) -- and reiterated that Kenner "*ruined his life*" (when the government knew: 1) Kaiser robbed his friends & family, 2) Kaiser robbed Kenner thru two independent fraudulent title conveyances, and 3) Kaiser robbed his mother [Ethel] with Bryan Berard [bank records in evidence]) (*Tr.5753*).

The **Cumulative Prejudice** of:

1) Significant and material perjury (*supra*),

2) The known misrepresentations by the government (i.e. "*Kenner is broke*" – and "*Kenner stole money to buy his Cabo piece*"),

3) The knowingly false attacks on Kenner and Kenner integrity (contradicting empirical evidence in the government's possession) (i.e. the EDNY Jowdy-Najam subpoena – and the "*bogus*", "*phony*" and "*supposed*" loans to Jowdy),

4) The introduction of Red Herring props (i.e. the Tequila bottle without prior notice) and no evidence of wrongdoings despite proffering the opposite,

5) The introduction of known false evidence (i.e. the "*ink*" Constantine consulting agreements recovered on the "eve of trial" *from Kaiser's home*),

6) The government obstruction to Kenner receiving the "full" Northern Trust Bank records for the timeframe of the Indictment years (2003-2013) before the start of trial,

7) The known introduction of false testimony (i.e. Kristen Peca's "*shock*" -- and 2005 LOC decision),

8) The allowance of Ranford, Kaiser and Manfredi's contradictions to the FBI raw notes (i.e. claiming they _never _ said what the notes clearly noted),

9) Attacking their own witness (Glen Murray) who _verified he did authorize the loans to Jowdy_ and received repayments from the 2006 Hawai'i partners' JV in August 2006,

10) Ignoring Michael Peca's confession that he did tell the SDNY Grand Jury in 2011 that he knew at all times about the Jowdy loans, decided to make the loans as part of a "*group*" decision, and blamed Jowdy for terminating communication with the group before the end of 2006 – while still vouching that "no one knew about the loans" in summations, *etcetera...*

As such, the defendant moves this Court to review the contents of this Rule 33 Motion for Reconsideration, the attached Rule 29 Motion for Reconsideration, the Appendix which addresses each of the previous Rule 33 elements detail-by-detail -- and determine that in the interest of justice, the defendant shall be entitled to a new trial to fairly adjudicate the charges levied against him by his accusers.

The Court should not hesitate to vacate and remand this case for a new trial based on any one, single error discussed in isolation, or perhaps even any one category of errors.   But considering the record as a whole, the Court should be compelled that a new trial is wholly warranted.


/s/

Philip A. Kenner (in Pro Se)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
                                                     |
UNITED STATES OF AMERICA                             |
                                                     |
   against-                           |
                                                     |          Docket No. 13-cr-607 (JFB)
                                                     |
PHILLIP A. KENNER and                                |
TOMMY C. CONSTANTINE,                                |
                                                     |
                                                     |
Defendants.                                          |
-----------------------------------------------------X


Defendant, Kenner –

Kenner Rule 29/33 Reconsideration motions

# APPENDIX

## TABLE OF CONTENTS

Table Of Authorities............................................03
Introduction.......................................................04
The government's case – per witness (**alleged victims** -- 2015 Superseding Indictment):
- **Joe Juneau**............89
- **Michael Peca**............99
- Kristen Peca............144
- Aaron Mascarella............165
- **Ethel Kaiser**............184
- **John Kaiser**............198
- Patrick Gonya............231
- **Nick Privitello**............232
- Allison Ressler............242
- Ricardo Bianciella............243
- Eric Edenholm............245
- Jeff Bailey............247
- John MacDonald............248
- **Jay McKee**............249
- **Tyson Nash**............258
- **Owen Nolan**............264
- **Darryl Sydor**............277
- James Grdina............302
- Tim Gaarn............314
- William Castro............323
- Bruce Berreth............324
- **Steve Rucchin**............330
- **William Ranford**............341
- Chris Manfredi............350
- **Bryan Berard**............356
- Lynne Legarde............381
- Lanie Donlan............382
- Glen Murray............389
- John Osborne............399
- Jackson Stewart............409
- Blake Rossner............410
- Ronald Richards............411
- Chris Petrellesse............416
- Joshua Wayne............421

Kenner case:
- Vincent Tesoriero............435
- Phil Kenner [defendant]............442

## TABLE OF AUTHORITIES
### (CASES)

*Alexander Realty Capital, Inc. v. Laurel Cove Development ("LCD"), LLC, 2009 US Dist. LEXIS 17907 (M.D. of Tennessee 2009)…………19*

*Diamante Cabo san Lucas v. Jowdy (California – 2009)…………412, 413*

*Ecoline, Inc. v. Local Union No. 12 of the Intl., AFL-CIO, 271 Fed. Appx. 72; 2008 U.S. Approximately. LEXIS 6390…………77, 111, 128, 275, 338*

*Faretta v. California…………423*

*Glen Murray v. Jowdy (Nevada – 2008)…………227, 397, 447, 461*

*Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A., 461 Fed. Appx. 61; 2012 U.S. App. LEXIS 3012……77,102, 110-11, 126, 128, 205, 250, 275, 338*

*Kenner v. Nick James (California -- 2009)…………237*

*Miller v. Pate, 386 US 1, 7 (1967)…………44, 72*

*Napue v. Illinois, 360 US 264, 269 (1959)…………44, 72*

*PaineWebber Incorporated v. Bybyk, 81 F.3d 1193; 1996 U.S. Appx. LEXIS 8728……77, 111, 128, 275, 338*

*United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181 (2d Cir App – 1988)……233*

*United States v. Berger, 295 U.S. 78 (1935)…………12, 32, 193, 397, 444-5*

*United States v. Contorinis, 692, F.3d 136, 148 (2d Cir 2012)…………322*

*United States v. Dunnigan, 507 U.S. 87, 94 [1993]…………11, 43, 397*

*United States v. Ganji 880 F.3d 760 (2018 – U.S. App. LEXIS 2279)…………276*

*United States v. Gil, 297 F.3d 93 (2d Cir 2002)…………8, 239, 264, 393*

*United States v. Svoboda, 347 F.3d 471 (2d Cir 2003)…………212*

*United States v. Tzolov, 642 F.3d at 318 (2d Cir)…………212*

*United States v. Wallach, 935 F.2d 445,473 (2d Cir. 1991)…………44, 72, 473*

## *INTRODUCTION*

The facts of the case are summarized by the Court in its Memorandum and Order ("M&O") dated October 13, 2017 (*Document 501*).

Defendant Kenner deserves a new trial because; the facts of the case as per the Court's M&O are contrary to the empirically evidence, _**all**_ previous witness statements "under oath", new evidence, *Brady* violations, and misconduct (whether prosecutorial induced or independently contrived by the witnesses' aligned contradictions – with ulterior motives or influences).   In totality, it provided unreliable testimony (in the form of repeated *"failed memory tests"* by the government witnesses) in contradiction to all previously known facts in the government's possession pre-trial, *fully prejudicing Kenner*.

A. <u>**New evidence**</u> of Chronic Traumatic Encephalopathy ("CTE") permeates every contradiction given by government witnesses (presented as a "memory test" by the government to frame their theories),

    a. Government witnesses were routinely unable to recall the basic facts regarding exculpatory emails and texts they individually exchanged with Kenner, conference calls they participated in with Constantine (re: Jowdy loans and GSF issues), documents they signed authorizing use of the Northern Trust Bank LOCs including annual knowledge of "use of funds", and private equity people they dealt with (i.e. – Manfredi emails confirming his voluminous lending work with Hawai'i paid consultant Constantine).

        i. Nevertheless, no reasonable business standard could expect disinterested minority investors to know the details of private equity deals; which they repeatedly *"refused to read"* the documents they signed.[1]

---

[1] The government asserted as a major portion of the "*conspiracy by concealment prosecution*" was that multiple investors were not aware of Constantine's consulting involvement in the Hawai'i deal.   Nevertheless, they would not have been able to identify any of the seventeen (17) consultants that were paid by the Hawai'i partners either.   The "lack of memory" or corporate details (not relevant to minority investors) cannot be the basis for criminal activity; specifically considering Constantine was one (1) of only two (2) paid consultants (including Centrum Financial) who actually delivered results, further abusing any standard of knowledge required for Kenner to avoid criminal prosecution.

- John Kaiser's February 28, 2019 whistleblower letter to the Court (*Document 628 at 2*) hi-lights the double-standard regarding the consulting payments by attesting that: "*Jowdy also cries to the Court that the government is interfering with his attempt to get Silverpeak Real Estate Partners to 'invest' in Diamante to help Kenner's victims recover their investments.   Jowdy did not tell the Court that Silverpeak is a company run by his close friend Masood Bhatti [former Lehman Brothers head lender who helped Jowdy*

*embezzle millions from the DCSL project before the Lehman Brothers 2008 bankruptcy],
or that Jowdy was paying Diamante funds to Silverpeak $150,000 to $200,000 every
month to find 'investors' or 'loans' for Diamante."*

- o Isn't this exactly what Constantine is being charged with receiving – with
  investors who allegedly were unaware?  Kenner is still a Diamante Cabo san
  Lucas investor/owner and had no idea about the "consulting" payments to Bhatti
  & Co. until the Kaiser February 2019 letter.   When is the FBI coming to discuss
  this matter with Kenner?

- Hawai'i partners COO Manfredi *"could not remember"* his own voluminous dealings
  with Constantine, even after the actual emails between them were shown to Manfredi on
  the witness stand (*Tr.2998, 3005-3008*),

- Manfredi testified that he actually travelled to Scottsdale, Arizona – paid for by the
  Hawai'i partners – specifically to meet face-to-face with Constantine before the
  consulting deals began (confirmed in testimony, *infra*) but later *"did not recall"* that they
  worked together for almost two (2) years on a myriad of funding options (2004-2006).   It
  is wholly unreasonable that anyone could remember if the Hawai'i partners COO could
  not. (*Tr.3004*).   Manfredi actually confirmed the 2004 face-to-face meeting in Scottsdale
  Arizona:
  > Q. Other than that one -- when was that? I should put a time frame on that, Mr.
  > Manfredi.
  >
  > **A [Manfredi]: I don't recall the exact year.  It was prior to '05.**

- And, Manfredi contradicted his 2010 FBI proffer by claiming at trial that he *"could not
  recall"* telling the FBI in 2010 that he was **"in charge"** of funding efforts for the Hawai'i
  partners (part of his paid COO responsibilities) (*Tr.2997*):
  > Q. Do you remember at any point in time speaking with the FBI back in 2010
  > and telling them that you, yourself, were responsible for securing funding for the
  > Hawaiian projects?
  >
  > **A [Manfredi]: No.**

- Chris Manfredi *"could not remember"* that he told the FBI agents five (5) years earlier (in
  2010) that he knew Constantine delivered *"more than $3 million"* in funding to the
  Hawai'i partners (*Tr.2999*):
  > Q. Well, again, look at the document. Down towards the lower third of that
  > document, my question is do you remember telling the agents back in 2010,
  > specifically October 12, 2010, in a telephone conversation that Constantine
  > brought in money to project Hawaii, more than $3 million? *Do you remember
  > telling the agents back in 2010 that it was Mr. Constantine who was responsible
  > for bringing that money in?*
  >
  > **A [Manfredi]: No.**

B. **New evidence of the John Kaiser letter of February 29, 2019 to the Court, reversing Kaiser's and the government's trial claims that Jowdy was simply a victim[2] of Kenner and Constantine false claims of Jowdy frauds.**

---

- And, in Michael Peca's SDNY Grand Jury testimony, he confirmed that another hard money lender, Louis Volpini's name meant nothing to him, <u>as expected</u> (*Grand Jury Tr.46*):

  > Q. Do you know who Lewis [sic] Volpini is??
  >
  > **A [Michael Peca]: Never heard the name before.**

  o  Michael Peca and the remainder of the Hawai'i partners could not have told the Court who the Hawai'i attorneys were. **Answer: Carlsmith Ball, LLP** -- and they were paid well over $1 million for their services, or the archeologists (paid over $100,000), etcetera.
  o  The vast majority of the investors *could not have identified* COO Chris Manfredi, or land manager, Christopher Hawkins, or local Hawai'i real estate coordinator, Brenda Moses-Iokepa, or any other Hawai'i employees, consultants, the Hawaiian law firm (Carlsmith Ball LLP), or any third (3rd) party payees...

If the Hawai'i partners COO [Manfredi] -- who was involved daily with dozens of lenders and every detail of the Hawai'i partners project – while living in Hawai'i full-time (and being paid for it) *"could not remember"* Constantine (even after refreshing his own recollection with his own emails), his joint funding efforts, or what he told the FBI about the REAL details, then what legal standard is it for a silent, minority investor to *"remember"* those details?  It is certainly an unreasonable prosecutorial standard.

Why should investors be able to identify the specific corporate details (thru a *"memory test"*) if the actions by Kenner and the Hawai'i partners management team (including Manfredi, Kaiser and Kenner) acted within the authorized scope and parameters of the Little Isle 4 By-Laws at all times?

---

[2] The probation officer continued the Jowdy "victim" charade on the Court during their **Obstruction of Justice** addendum. They falsified Jowdy's alleged victim status; contradicted as false by Kaiser's February 2019 letter.  And, falsified the outrageous claims that Jowdy, Robert Gaudet and John Kaiser gave testimony during the forfeiture hearings in 2016 that the 2004 Hawai'i-loan agreement was false.

- Clearly, the probation officer *did not write* this addendum, although consistent with similar fabrications in the initial PSR, because *none* of the three (3) of them gave testimony during the forfeiture hearing, and only Kaiser of the three (3) gave trial testimony (chocked full of proven lies).  Nothing in the forfeiture transcripts could have suggested Jowdy was a victim of anything; having carried on his FBI protected criminal activity since 2002 – and thru 2019 under the watchful eye of people acting "above the law" (*See Recon33-233 and Recon33-232*).
- Nothing, other than a fabricated addendum written by someone trying to desperately protect Jowdy, with Kenner unraveling the obvious trial misconduct, could be responsible for the grossly prejudicial statements; but held without consequence again, while seeking sentencing enhancements for crimes Jowdy committed (documented in evidence – *See government forfeiture-44*).

a. The government has ignored to Jowdy's un-prosecuted benefit of tens of millions of frauds (racketeering, embezzlement, diversions, tax evasion, etcetera), which have been proven ad nauseum by Kenner with the government's own evidence (including but not limited to Ken Jowdy's voluminous banking records) (*See Recon33-234 at 1-2*).

b. Now, John Kaiser submits a February 2019 letter to the EDNY Court confirming he was Jowdy's co-conspirator for five (5) years, only turning his "blind-eye" because he was receiving a paycheck, and

    i. Kaiser's letter begs the Court to interview him, so he can "rat" on Jowdy for the entire criminal acts that Kaiser participated in while employed, side-by-side with Jowdy (2012-2017).

    ii. **The Kaiser letter confirms that the FBI case agent (Matt Galioto) is in fact working to protect Jowdy**, because Kaiser was the "key" witness with respect to all of the pre-Indictment claims against Kenner (all now proven untrue with empirical evidence) and Galioto pursued Kenner's Indictment with vigor; ultimately saving Jowdy and his cabal from their December 2013 demise at the hands of the State Supreme Court in Baja Sur Mexico following Kenner's scheduled Supreme Court testimony.

    iii. It is *abundantly clear* that Galioto is protecting Jowdy, because under the "insider" revelations by Kaiser against Jowdy, coupled with the 15+ years of banking records Kenner has produced to the government, they will not talk to Kaiser or help "take down" Jowdy. The confirmation of the conspiratorial efforts to protect Jowdy are confirmed; and Former FBI Director Louis Freeh, who has represented Jowdy since Kenner's June 2009 whistleblowing proffer to the FBI, has succeeded in protecting the gross, criminal acts of Jowdy's since 2002.

C. **Prosecutorial misconduct** -- because the "*ink*" version of the alleged Kaiser forgeries were *__actually turned over by John Kaiser himself__* before trial to the government, fully discrediting any possible forgery claims and realistic belief that he wasn't aware that *he* signed the documents, while maintaining them for approximately a decade in his own custody.

    • *It is defies common sense.* Yet, the government proceeded with their own signature expert who used "*only an eyeball testimony*" and none of the available technology to analyze the Kaiser signatures.[3]

---

[3] In multiple other jurisdictions (Arizona civil and Mexico [the country] criminal court, and the EDNY criminal), Kaiser has been determined by the Courts and the underlying empirical evidence to have repeatedly ___LIED___ about his name being forged, in the face of concrete evidence.

- The government never refers back to the Chris Manfredi FBI proffer (*See 3500-CM-2-r*) (seven [7] days before the October 2010 Kaiser proffer) to realize that **Manfredi already confirmed that there was Agreement(s) with Constantine and the Hawai'i partners to raise money.**
    - o With the 11th hour "discovery" (*add a wink here*) by Kaiser of the "*ink*" versions at his New York residence (after being possessed for approximately ten [10] years by Kaiser), how could the government proceed with their forgery allegations; or leave any credibility in the second (2nd) forgery lie they discovered by Kaiser?

D. **The government obstructed justice** while fighting Kenner's subpoena request pre-trial to provide delivery time for the critical documents from Northern Trust Bank. As a result of the obstruction and delayed subpoena, they were not received until week seven (7) of the ten (10) week trial -- *suspiciously arriving ten [10] weeks after the Court subpoena* – and specifically after the government rested their case-in-chief. The government sent all of their alleged victims home without being confronted by five (5) years of signed bank documents they routinely *could not remember* signing or simply "recalled" (another **CTE** symptom); See *United States v. Gil*, 297 F.3d 93 (2d Cir 2002),

E. The government presented **new evidence** *government-forfeiture-44* during their forfeiture case to support their newfound theory that Mexico partner Ken Jowdy "***had received***" 100% of the funds transferred from the Hawai'i project to him as part and parcel to a documented, short-term loan – after referring to the Kenner loan representations as "*phony*", "*bogus*" and "*supposed*" throughout trial to

---

The "*ink*" versions of the 2004 (*GX-7004*) and 2005 (*GX-7005*) consulting agreements are not labeled with BATES STAMPS: *PKHOME ######* like all of the other documents that were seized from Kenner's home on November 13, 2013.

Nonetheless, the government persuaded the court that the documents were seized from Kenner's residence, yet they only found them weeks before trial (18 months after the Kenner search and seizure), when the photocopied versions of the agreements (found in Kenner's work files) were labeled with proper *PKHOME#####* BATES STAMPS.
- **Thus, the government's *ex post facto* revisionary claims are even more far-fetched.**
    - 2004 agreement – *PKHome 12892-12895*
    - 2005 agreement – PKHome 12887-12890
    - 2006 agreement (not claimed as a Kaiser forgery) – PKHome 12876-12882

destroy Kenner's credibility – creating egregious reformative issues not addressed by the trier of fact.[4]

- The Court addressed *Government-forfeiture-44* as *"cumulative"* in response to Kenner's *"new evidence"* claim, and deemed the evidence as not helpful to Kenner's defense, suggesting there was other evidence Kenner could have used at trial from the government's Rule 16 production.

- Yet – the government – thru rebuttal summation – alleged that the "loans to Jowdy" (as now represented on *Government-forfeiture-44*) were *"phony"*, *"bogus"* and *"supposed"* – and repeatedly asked Kenner if he was *"lying"* about the loans, insinuating a cover-up story to the Court and Jury; *fully prejudicing Kenner (and continued thru the PSR submission request for enhancements for verifying the loan agreement and the Jowdy loans as authentic).*

- The government cannot rely on *"cumulative"* in the face of their attack strategies on Kenner's integrity, if the evidence was *available* – and in the government's possession – to refute their prosecutorial theories.   It is utterly *improper and prejudicial*.

F. **Prosecutorial haranguing** (misconduct) of Kenner was unethical, interjecting personal emotions and partisanship (i.e. – calling Kenner a "liar" for disputing a Grand Jury subpoena that "was" in evidence and produced by the same EDNY office as the disbelieving and berating AUSA).  They further prejudiced Kenner thru misleading Q&A and grossly deceptive summation statements.   None of their Q&A or summation statements were based upon evidence produced at trial while attempting to frame Kenner for events that never happened.  And, it was in contradiction to full empirical evidence that confirmed the opposite of the government's egregious summation claims (i.e. – *"Kenner was broke"* and *"Kenner stole money to buy Cabo equity"*, etcetera).

---

[4] To add to the volleys of misrepresentations, almost four (4) years after trial, Jowdy's attorneys (*Document 611*) proffer to the Court that Jowdy *"has never borrowed money from Kenner and Kenner investors"*.   This unchallenged inaccuracy lies in direct contradiction to Jowdy's attorneys' *government-forfeiture-44* exhibit submission in 2016 **"confirming the loans Jowdy received"**.  It is in direct contradiction to Jowdy's January 2010 confessions of all the money he borrowed and has never paid back (over ten [10] years and counting).  And, it is in direct contradiction to Jowdy's own March 2010 FBI confessions of borrowing all of the money.
- Jowdy's attorneys' misrepresentations defy logic and their won evidence – but remains unchallenged by any government authority – in consistent *"protect Jowdy at-all-costs"* mode.

- None of those outrageous statements were supported by trial evidence or even true, thus out-of-bounds under any definition of "strong advocacy". The untrue statements created a non-recoverable prejudice to Kenner as applied by the government as a rebuttal summation, final "*kill shot*" by AUSA Komatireddy.

G. **The government failed in its *Brady* requirements** to turn over the Arizona Attorney Tom Baker signed disclosures, indicating that all Little Isle 4 (Hawai'i) investors had signed off on the $5 million-plus lawsuit versus Jowdy, with full knowledge[5].

  - The government turned these salacious exculpatory documents over to Kenner during their forfeiture production, confirming they systematically withheld the documents pre-trial; effecting Kenner's ability to "confront" each of the victims one-by-one with the documents *they signed, themselves*, not a third (3rd) party acknowledgment, based solely on Kenner testimonial "word".

H. **Crucial *Brady* materials were systematically and consciously withheld** from the defense to protect government witnesses (specifically Privitello and Kaiser) from their own criminal activity (fabricating documents and stealing friends & family investment funds) that government witnesses were alleging during trial of the defendants' actions (proven untrue).

After the removal of the perjured testimony (or unreliable **CTE**-laden statements) – there is no evidence left to meet the minimum requirements of conspiracy claims in any object of the alleged schemes.

The government deceived the defense and the Court, corrupted justice, and defied the Constitution. US Attorneys violated their legal and ethical obligations throughout the case to reached a desired destination, **guilty verdicts**; while systematically dismantling and maligning 100% of the empirical evidence that contradicted their theories.

- The government ethics have been governed by what they have been caught doing (or not). Their prosecutorial theory has been that if you do not get caught, then you have not violated any ethics. The defendant doubts that the US attorneys and

---

[5] Defendant Kenner had instructed his trial attorney, Richard Haley, to call attorney Tom Baker and request any/all disclosures he had signed from the 2008-09 litigation for Jowdy for the material issues at hand in the EDNY criminal case. Haley had repeatedly told Kenner that Baker claimed he had none of them. *Kenner's pre-trial letters with Haley confirm this unfulfilled request*. The government clearly obtained all of the disclosures from Attorney Tom Baker – because they turned them over post-trial as part and parcel to the forfeiture proceedings – **after choosing to withhold this critical exculpatory information.**

FBI case agent have spent any recent time reading the ethical guidelines from the American Bar Association.

The overwhelming misrepresentations (perjured – and most likely suborned) could not have allow a trier of fact to disseminate the empirical evidence from the amnesia-laden contradictory statements made years after the initial incidents that were previously verified by multiple "*under oath*" statements – *now contradicted in synchronicity* based on the government's defensive claims of *faulty memory, confusion and mistakes* (*Document 440 at 16*; even misrepresenting *United States v. Dunnigan*, 507 U.S. 87, 94 [1993]).

**The government's trial positions were frankly unbelievable and in contradiction to 100% of the pre-trial empirical evidence...yet, at trial:**
- If Kenner had claimed that (Mexico partner) Ken Jowdy received loaned funds without the signed "2004 Hawai'i-Jowdy loan agreement", the government would have presented the actual loan agreement in evidence (*See Recon33-1*), and
- If Kenner had claimed that the Eufora private shares Gaarn sold actually belonged to Kenner (like the government repeatedly did thru rebuttal summation), the government would have presented the 2010 Eufora operating agreement (*See Recon33-2 at 35, 37*), the 2004, 2005, 2006 and 2007 Eufora tax records (*See Recon33-3 FOLDER*), the Eufora corporate emails (corroborating the books and records of the company – and Gaarn's ownership) (*See Recon33-4*), and the Eufora internal sales tracking books and records (*See Recon33-5*) to prove Gaarn actually owned the private Eufora shares, and
- If Kenner claimed that Constantine was paid from the Hawai'i partners without a consulting agreement(s), the government would have produced the 2004, 2005, and 2006 actual "*ink*" consulting agreements[6] (*See Recon33-6 FOLDER*), the John Kaiser and Chris Manfredi FBI proffers confirming the known consulting payments to Constantine including Manfredi's specific involvement with Constantine (*See 3500-JK-1-r at 5, 3500-CM-2-r at 1*), and the actual emails between Constantine and Manfredi for the year-and-a-half (1 ½) of funding consulting work they performed together, independent of Kenner (*See Tr.3004,3018 and Defendant Constantine exhibits C-58, C-61, C-181, C-188*), and
- If Kenner claimed that Constantine was the only hard money lender to assist the Hawai'i funding efforts, the government would have produced the evidence of seventeen (17) other hard money lenders (and the chaos to find another lender in 2005 between the "*egregious*" (*See Recon33-7*) Lehman Brothers 11th hour, changed offer and the ultimate last-minute Urban Expansion loan (7 weeks later),

---

[6] Please note that the government and Kaiser did not claim that the 2006 Kaiser signed consulting agreement was a forgery.

that were paid like Constantine (including three [3] that were sued by Kenner and the Hawai'i partners for non-performance of the pre-paid fees agreements) (*See Recon33-8 FOLDER*), and

- If Kenner had claimed that he "*put off Lehman Brothers for another year*" (like Komatireddy's rebuttal summation claimed), the government would have produced Hawai'i partners COO Chris Manfredi's August 16, 2005 email to another hard moneylender that, "*The deal with Lehman was cancelled by us as being too egregious.*"
  - o Manfredi, Kaiser and Kenner ("*us*") made the joint decision the week of the signing based on the "*egregious*" change in terms, with Lehman Brothers believing they could "steal the deal" with their 11th hour-proposed, two-year, annual 26% bubble loan", **BUT**...

**Kenner did not claim any of those items at trial** -- because the evidence would have surely destroyed his defense strategy.

**Nevertheless, the government made all of those outrageous claims,** which would, at a minimum, caused Kenner to incur an "Obstruction of Justice" charge.  In direct contradiction and ignorance to all of the evidence, *supra*, the government forced Kenner to defend the decade plus of overly documented evidence in his favor (proving his innocence), while now being called a farce by the government to seek conviction at all costs.   Under *Berger*, it violates the sanctity of the Constitution.

### *CTE permeates the entire trial – defended as faulty memory, confusion and mistakes by the government; but only post-trial...*

"*Truth is about credible evidence – not strong opinions.*"   -- President John Adams

**CTE**-laden testimony was the conviction basis for the government's case – solely based on *faulty memory, confusion and mistakes* (as the government claimed in their initial Rule 33 defense).   The conviction was altogether based on a "*failed memory test*" from a hand-picked subset of individuals who had already presented themselves in multiple independent litigations as **knowing and knowledgeable** Plaintiffs (versus Mexico development partner, Ken Jowdy).   Yet, after Kenner exposed the synchronized testimony of exact contradiction to all pre-trial statements, the government claimed in their Rule 33 reply brief (*Document 440*) that their witnesses are now suffering from amnesia-like symptoms resulting in cognitive degeneration, known as **Chronic Traumatic Encephalopathy**.

Thus in concert, each and every one of the highly probable **CTE** sufferers "reversed" 100% of their pre-trial statements to fit perfectly into evidence-absent prosecutorial theories.

President John Adams addressed this exact issue in the context of truths, versus rhetoric, representing:

> "*Facts are a stubborn thing; and whatever may be our wishes, our inclinations, or our dictates of our passions, they cannot alter the state of facts and evidence…*"

As denoted by President Adams, objective evidence and logical arguments are often not merely lacking but ignored in many discussions by those with the vision of the anointed. Much that is said by the anointed in the outward form of an argument turns out not to be substantiated arguments at all.   Often the logical structure of an argument is replaced by preemptive rhetoric [*media reports, threats, and suborned perjury*] or, where an argument is made, its validity remains unchecked against any evidence, even when such evidence is abundant.   Evidence is often particularly abundant when it comes to statements about history, yet the anointed have repeatedly been demonstrably wrong about the past as they are about the present or the future – yet supremely confident. **They remain often wrong, but never in doubt.**

### *The Court's Memorandum and Order confirms no GSF frauds…*

The Court Memorandum and Order ("M&O") (*Document 501*) highlighted that the Global Settlement Fund ("GSF") resulted in Constantine's misuse of no more than $9,007 – assuming that all of Gonchar's "*side-deal*" with Constantine is not considered inclusive of their deal (*Tr.4826-4827*).

> *Q. So that deal was initially when you first had made the transfer to the Global Settlement Fund?*
>
> *A [Gonchar]: Yes.*
>
> *Q. And was that agreement also, did it cover the other monies that you* --
>
> **A [Gonchar]: Yes. As I said, like in my understanding it was like as long as he is going to pay it back, I don't mind him using the money I'm putting in.**
>
> *Q. That would include all of the monies that you had put into the Ron Richards' account?*
>
> **A [Gonchar]: Yes.**

*Q. Is that right?*

*A [Gonchar]: Yes.*

Regardless of Gonchar's initial statement that his $250,000 was the contribution he included in their "*side-deal*", he revised his statements during re-direct examination and confirmed to the Court that all of his $1,500,000 in contributions thru the Ronald Richards Trust fund was applied to the deal; in his mind (the only one that counts, with the use of "his" money being his prerogative -- and for no one else to judge).   It is Gonchar's money, so at any point in time, Gonchar is permitted to confirm it.

- Notwithstanding the Gonchar statements, the M&O failed to recognize the $15,000 and $125,000 contributions that Constantine personally deposited into the Ronald Richards Trust Fund at the same time; *fully eliminating any alleged misuse.*

Kenner and Kenner investors may not be pleased with the results from the Constantine-led efforts of the GSF in 2009, **but there is no criminally-based proverbial leg to stand on**.   Nonetheless, the government spent almost half of their prosecution time and witness testimony on GSF-related allegations, starting during their misleading opening remarks.[7] The government's simple application to the GSF distribution amounts by Constantine of the known Gonchar-Constantine "*side-deal*" would have eliminated weeks of the trial and further jury confusion, resulting in the prejudice of the defendants.

## The GSF produced no chargeable criminal actions...
Considering the non-criminal nature of the GSF funds Constantine administered – separate from his personal funds (administered with the authority of his "*side-deal*" with Gonchar), the government polluted the jury with ten (10) GSF-only witnesses (non-victims), corroborating expenses of non-criminal acts.   Patrick Gonya, Allison Ressler, Ricardo Bianciella, Eric Edenholm, Jeff Bailey, John MacDonald, William Castro, Lynne

---

[7] At *Tr. 31* -- "*[GSF] This is the fraud where the defendants lie to the investors about who's stealing from them, and find a way to steal from them all over again.   The defendants tell the investors that a guy in México, named Ken Jowdy, stole their money and ran away with it...*"

Kaiser's shocking February 28, 2019 letter to the Court re-confirmed that Jowdy was in fact stealing from Kenner and Kenner investors – and continues to do so, unchecked. The government's opening statement is false and misleading (although known to be at all times). The government's main witness and a former Jowdy insider [Kaiser] presented this **NEW EVIDENCE** to the Court.   The residual damage from the false Kaiser testimony at trial and the government's vouching for Jowdy, as a victim and not a thief are irreversible on the deliberations at this point and prejudicially unfair -- without a new trial to revisit the newfound truths...

Legarde, Jackson Stewart and Blake Rosser were all altogether unnecessary in light of the Gonchar-Constantine "*side-deal*".   The government knew long before trial from Gonchar about the "*side-deal*", yet they chose to ignore it and include the GSF expenses as 1/3rd of the conspiratorial objects at trial; prejudicing the defendants.

The government bogged down the trial testimony and extended its burden on the jury and the Court by several weeks with the introduction of these individuals.   These ten (10) witnesses confirmed nothing more than the fact that money Gonchar allowed Constantine to utilize personally was actually paid to them.   No criminal acts occurred, thus their entire presence and the magnitude of their days and days of testimony produced a purely prejudicial effect on the defendants; confusing the jury.

Considering more than twenty-five (25) percent of the government's witnesses were prejudicial [GSF-only witnesses] and thus useless, the element of confusion is enough for the Court to consider the prosecutorial intent of creating the misperception.   In concert with the volume of alleged "harmless" errors; from perjury, **CTE** or *faulty memory, confusion and mistakes*, the Court must begin to keep tabs on the barometer of when "harmless" is no longer cumulatively "harmless"

### *FBI Agent Galioto's Grand Jury minutes would have exposed the false GSF allegations and would lead the Court to the false claims of Kenner "stealing" funds to buy Mexico equity – contradicting all pre-trial evidence and proffers...*

In concert with the horde of concrete allegations of wrongdoing and prosecutorial misconduct, whether it resides solely in the efforts of the FBI case agent (*or eventually thru the pollution of the prosecutorial team*), the Grand Jury testimonies of 2013 and 2015 would shed light on the origination of government theories, derived in direct contradiction to their investigated empirical evidence.   Thus, they fully infected the judicial process thru trial, leaving paramount false evidentiary issues as documented residual effects on the remaining judicial matters in this case, including direct appeal.

Deep State and selective justice has permeated every element of this case – proving beyond a reasonable doubt that MEN not LAWS rule in this pay-for-play justice system.[8] During pre-trial investigations:

---

[8] It is not hyperbole to say that after watching two (2) years of the Robert Mueller investigation -- that any God-fearing American should be terrified that ONE investigator can ruin anyone's life – because they have the power of the US Government behind them.

NY Senator Charles Schumer told President Trump in 2017 – "*You better be careful because the FBI can convict you for anything they want, ten ways from Sunday.*"

- The FBI interviewed Ken Jowdy (always including FBI agent Galioto) on multiple occasions after Kenner presented his "whistleblowing" testimony to the FBI, SEC and US Attorney members on June 24, 2009.

- With former FBI Director, Louis Freeh at Jowdy's side throughout the 2010 FBI proffers – Jowdy confirmed that (*See 3500-KJ-2-r*) –
    - o He received the loaned funds from Kenner individually, Little Isle 4 and Ula Makika (the Hawai'i partners) (*at 11-14*),
    - o He used some of the original Kenner and Kenner investors' equity funds for personal expenses – unrelated to the investors understanding or permission – and never discussed the alternative usage with Kenner or any other investor (*at 2, 3, 11, 12, 14*),
    - o Yet -- Jowdy was never targeted once his 2009 EDNY Grand Jury was quashed in lieu of immediately pursuing Kenner in the SDNY – despite the $20 million plus in known and documented thefts by Jowdy and highlighted by Kenner, and
    - o Kenner had his EDNY (Jowdy and Bill Najam – Jowdy's brother-in-law and co-conspirator) Grand Jury subpoena issued (*See Recon33-9*) and cancelled (*See Recon33-10*) as soon as Louis Freeh made an appearance as Jowdy's counsel of record.

*Court's intro*

The *M&O at 1*: The Court names the three (3) conspiracy objects as (1) the Hawai'i land development project…, (2) Eufora LLC…; and (3) a multi-purpose fund for litigation against developer Ken Jowdy (the "Global Settlement Fund" or "GSF").

For (3), the name itself implies that it is not a legal fund ONLY (and is omnibus).   In addition, every investor signed a full-disclosure, which authorized the use of their funds for the specific distributions that Constantine transmitted them for; far outreaching "*a fund for litigation against developer Ken Jowdy*", as falsely proffered by the government thru summation, or concealed based on "*failed memory*" in 2015 (six [6] years later).[9]

---

[9] The following Kenner clients were fully aware of the outrageous efforts that Kenner went thru to protect the investors related to Jowdy.
[From **Mattias Norstrom**] – hi-light from Kenner:

| 104 80 | +46708874 363 Mattias Norstrom* | 10/26/20 09 12:43:57 PM(UTC +0) | Read | Hi Phil, *Just wanna let you know how much I appreciate all the hard work you're puttin in*. One question: In case everything works out. is Cabo airport |
| 104 81 | +46708874 363 Mattias Norstrom* | 10/26/20 09 12:44:00 PM(UTC +0) | Read | and Hawaii included in the make whole deal? Matti |
| 120 39 | +46708874 363 Mattias Norstrom* | 10/26/20 09 12:46:48 PM(UTC +0) | Sent | I would guess we stay in the airport. We want to once Jowdy is removed! The rest of the details will get more clear soon, but a lot of funds will pay out. I'm waiting for all the funds as well. Thx for the kind words! |

From **Tyson Nash** (*after Kenner went to México to give testimony versus Jowdy in one of the criminal cases*):

| 102 61 | +16232039 504 Tyson Nash* | 10/15/20 09 1:42:45 AM(UTC +0) | Read | Nice, well let's pray it all works out! **We all appreciate u protecting us buddy!** |

From **Nash's wife**:

| 117 71 | +16364481 170 Kathy Nash* | 1/15/201 0 3:04:05 PM(UTC +0) | Read | Ya I can see it is exhausting. I can appreciate it hasn't been easy. You need to make sure you take care of yourself…. |

From Michael Peca:

- Based on the Court's calculation of funds Constantine spent related to the Constantine-Gonchar "*side-deal*" plus the $140,000 that Constantine deposited in the Ronald Richards' Trust account at the same time in 2009, there is no conceivable misappropriation of funds from the contributors.

- Thus, each contributor who answered volumes of questions about approving Constantine's use of funds for non-GSF purposes were useless; and, entirely misleading, because it never happened, fully prejudicing the defendants.

- The government doubled-down with this "*non-approval*" language throughout their two (2) summations; further prejudicing the defendants (*Tr.5991, 6001-6006*).

| 129 27 | +17163743 234 Michael Peca* | 4/14/201 0 3:10:46 PM(UTC +0) | Read | *Thanks. I' not trying to push you to the brink here! I realize what you're doing and appreciate it. Just want to be up on all the info.* |
|---|---|---|---|---|

And **Bryan Berard** – over a year after he told the EDNY that he no longer trusted Kenner:

| 145 46 | +14015246 929 Bryan Berard* | 7/9/2010 10:11:35 PM(UTC +0) | Read | *I hear u buddy. I'm sorry for that. I appreciate what u do. And I hope u know that.. If I had the $ I'd give it to u in a second.* |
|---|---|---|---|---|
| 145 47 | +14015246 929 Bryan Berard* | 7/9/2010 10:11:47 PM(UTC +0) | Read | *Whatever u needed* |

And despite the pressures from Jay McKee's soon-to-be estranged wife about not selling the Las Vegas Penthouse deal when Kenner recommended it in 2009 – McKee told Kenner that he commended Kenner 100% for his efforts versus Jowdy; **knowing of the Mexico jailhouse beating**.

McKee told Kenner he deserves a:

"*world of credit for your sacrifices*"

McKee continued to tell Kenner:

"*There may not be another person out there who would have gone to the lengths you have.   I sincerely cannot thank you enough for what you have and are doing...*"

*The M&O at 2*: The Court states – "*…both defendants routinely diverted funds intended to finance the Hawai'i project, Eufora and the GSF to pay for undisclosed personal expenses*", while –

- **Hawaii** -- The government ignored the Constantine consulting deal – no different than the other seventeen (17) hard money deals (confirmed by Hawai'i COO, Chris Manfredi in his 2010 FBI proffer) (See *3500-CM-2-r*).
  - o **NONE TO KENNER**[10]

---

[10] See *Alexander Realty Capital, Inc. v. Laurel Cove Development ("LCD"), LLC*, 2009 US Dist. LEXIS 17907 (M.D. of Tennessee 2009), wherein Jowdy and Lehman Brothers scam developer, Tantara Partners out of project control and "stick" Tantara Partners owners with "hard money lender" fees after the closing.   **First** – it confirms that hard money lenders are a commonplace in the development business (identical to Constantine's role in the Hawai'i partners deal) – and **second, after Jowdy had developed nothing and bankrupted several development projects,** the racketeering plans between Jowdy and Masood Bhatti of Lehman Brothers was in full force when the Middle District of Tennessee court confirmed,

> **"On May 7, 2007 Lehman notified Jones [Tantara Partners] that, because of Jones' past bankruptcies and lawsuits against him [identical to Jowdy's problems] related to previous ventures, Lehman would be unable to make the loan to LCD with Tantara Partners as its owner.  Lehman wanted Kenneth Jowdy, a Las Vegas Businessman whom Lehman had done business with, to take over ownership of the Project from Tantara."**
> - o On May 8, Jowdy flies with Roger Clemens to Tennessee to show-off the new Tennessee fraud…

This hi-lighted two (2) major criminal acts related to Jowdy and Bhatti (from Lehman) days after Jowdy attempted to BRIBE Kenner in May 2007 to "go along with the various frauds – offering 20% interest in the new Lehman Brothers projects plus 'no show' management jobs".

- The flight records two (2) days earlier with Jowdy – Louis Freeh -- and Bhatti confirm the *suspicious* timing of their travel to Texas all-together – the site of the third (3rd) Jowdy-Lehman racketeering criminal acts.  (*See Recon33-11*).

**First** – Lehman did the identical bait-and-switch to Kenner in Hawai'i with Bhatti's lifelong friend, Alan Worden, claiming at the 11th hour of the deal (with the Hawai'i partners trapped) that they would not do a deal with Kenner because they needed an experienced developer (fabricated to oust Kenner's control of the Hawai'i partners).  *Bhatti approved $11 million in budget withdrawals the following 18 months in Hawai'i to Worden – with no development work being done (straight embezzlements and frauds)* -- and

**Second – Eight (8) days later** -- Jowdy and Bhatti arranged for Jowdy to embezzle and divert the entire closing capital of $225,000 from Kenner and Kenner investors from the Diamante Villa deposits (in evidence) to fund the Tennessee closing.  *See Recon33-12.*

Only one (1) day after robbing the management control of the Tennessee project with Bhatti from Tantara Partners, *supra*, **via a racketeering scam**, Diamante CFO and Jowdy brother-in-law, William Najam sent Jowdy a May 8, 2007 email warning him about another bad partner – since Kenner turned down their bribes only days earlier to keep his mouth shut and get the FBI protection (*See Recon33-13*):

- **GSF** -- The government ignored the known Sergei Gonchar *"side-deal"* with defendant Constantine – whether or not the court counts $250,000 or $1,500,000…with $9,077 Constantine expenditures as an overage and only with $250,000 contributed by Gonchar.
    - o This completely disregards that Constantine contributed $124,982.00 based on his September 8, 2009 deposit into the Ronald Richards trust account for the GSF.
    - o Thus – Constantine and Gonchar's most minimal contributions far exceed any conceivable or chargeable "misappropriations" by Constantine.

    - o **NONE TO Kenner** (except repayment of GSF expenses -- $22,425.52)[11] – also notwithstanding:
        - Kenner paid $20,000 to initiate defense litigation for Constantine directly to Ronald Richards in April 2009 (*in Rule 16 evidence*).
            - Kenner was denied repayment of that contribution by Constantine at a later date, reconfirming Constantine's control of the GSF funds at all times.

        - Kenner contributed $300,000 plus in equity payments to the Palms condos, which Constantine distributed as equity to the GSF contributors, per se (*in Rule 16 evidence*).

        - Kenner contributed his equity in the Falcon 10 (*airplane*) as the largest investor (*over $250,000*), which Constantine distributed as equity to the GSF contributors, per se (*in Rule 16 evidence*).

            - o Kenner remained a guarantor of the Falcon 10 after the GSF title-transfer *despite* Constantine removing Kenner as an owner from the final operating agreement (*unknown to Kenner -- once Kenner helped Rudy Giuliani's group investigate Constantine and Eufora in early 2010*) (*all in Rule 16 evidence*).

---

*"Ken…I'm not so worried about the past failures…The last thing you need is a conflict situation with another partner."*

*All of this occurred just*

[11] Michael Peca confirmed to the trial court that he expected GSF expenses to be paid as Kenner received (*Tr.558*):

> *Q. So it was okay for you because they disclosed the fact that there may be expenses from the Global Settlement Fund to do just that?*

**A. [Michael Peca]: Correct.**

- Kenner paid tens of thousands of dollars in additional, unreimbursed expenses for travel and hotel fees for Hawai'i-Mexico investors Jason Woolley, Greg deVries and Kenner and Kaiser to attend the January 2010 Jowdy depositions in the California litigation, *infra*.[12]   Kenner

---

[12] ***What*** possibly could be the reason that nineteen (19) Hawai'i-Mexico investors sued Jowdy in Arizona and in two (2) major California lawsuits (*with Michael Peca as a Plaintiff in both*) that were all over the media and invoked a EDNY Grand Jury investigation (*although quashed by FBI agent Galioto – its lead investigator – after Louis Freeh was hired by Jowdy to represent him in the ongoing investigations by the SEC and EDNY*) -- *IF* the lawsuits were not for the money Jowdy stole and refused to repay – as Jowdy testimony confirmed in his 2-day California deposition in January 2010; **in the same case**?

- The 2-day video depositions and transcripts were provided to Michael Peca (*and all of the Plaintiffs by Ronald Richards and Kenner by February 2010*).

Hawai'i-Mexico investor (and non-Superseding Indictment victim) Mattias Norstrom was part of the 2015 effort to file new litigation in Mexico versus Jowdy until Galioto's partner, FBI Agent Michael Cassidy, had their Mexico liaison arrested for obstruction of justice, effectively terminating another effort to recover the funds pilfered by Jowdy under FBI protection (*again*) and since 2007, when Kenner first exposed Jowdy's corruptions to the Hawai'i and Mexico investors.   The PSR charges Kenner with "obstruction" of r assisting his investors (Jowdy victims) file litigation for the investors to recover their money from the documented Jowdy frauds (further hi-lighted by the Kaiser February 2019 letter – *Document 628*).

During Hawai'i-Mexico investor, Mattias Norstrom's 2015 legal efforts in Mexico, Norstrom affirmed the following to the Mexico government regarding the new 2015 efforts versus Jowdy, before the FBI stopped Norstrom and others from legally pursuing Jowdy, yet again.  Norstrom's 2015 affidavit confirmed his complete knowledge of the Hawai'i loans ***with the group*** to Jowdy and their unpaid status as follows:

> *"Hawai'i loan*
> *In late 2004, Jowdy approached my Business Manager [Kenner] and asked if a group of investors including me from Hawai'i would lend him some bridge funding personally until he could get either the current Diamante del Mar project funded in 2004 with development money and/or a project in Cabo san Lucas which several were pending at the time funded with a purchase and development loan.*
>
> *As a group, we agreed to lend him funds at a 15% interest rate.  Jowdy signed an official loan agreement with us in December of 2004.  Although, Jowdy received over $7,000,000 directly from us via wire transfer and repaid over $2,000,000 from December 2004 to April 2006, he later claimed that the funds were "not loans" but rather investments from our group of lenders after he was sued in the USA for not repaying the loans.  In 2010, Jowdy finally confessed that the funds he received from our lending group were actually loans and not the "investments" he declared as his defense in the case. Jowdy's own NY attorney, Tom Harvey, actually threatened my Business Manager [Kenner] alleging that he [Kenner] stole the funds that Jowdy actually received.  Those funds remain unpaid of which about $1,700,000 in principle still outstanding is mine."*

Norstrom participated in all three (3) USA lawsuits [*Arizona and California*] versus Jowdy for the unpaid Hawai'i loans and the Mexico embezzlements and related frauds with eighteen (18) other co-investors. *See Recon33-14 [Norstrom letter] and Recon33-15 and Recon33-16.*

Norstrom also gave testimony in Mexico in the 2013 criminal case versus Jowdy to recover the loaned funds, as evidenced by his communication with Kenner post-testimony when he flew thru Phoenix and met with Kenner at the airport on his way back to Stockholm, Sweden. The entire two (2) day trip was made by Norstrom to Cabo san Lucas, Mexico exclusively to give known testimony about the repeated Jowdy frauds on himself and his "*group*" of investors.

Norstrom confirmed the Mexico testimonial trip for that week:

| 152 27 | +467088743 63 Mattias Norstrom* | 2/7/2013 4:01:48 AM(UTC +0) | Rea d | Hi Phil **You need me to make a trip to Cabo?** If you're available later tonight can I call? Long and costly trip! |
|---|---|---|---|---|

Norstrom confirmed that he spoke with Hawai'i-Mexico investors Greg deVries and Rem Murray about the harassment during their 2012 testimonial trip to Cabo san Lucas versus Jowdy, Harvey, Kaiser and Berard:

| 152 44 | +467088743 63 Mattias Norstrom* | 2/8/2013 2:15:55 AM(UTC +0) | Rea d | E mail me info and then let's talk when we can. **Talked to Devo [deVries] and Rem [Murray] last week.** |
|---|---|---|---|---|

Norstrom confirmed he met with Kenner at the Phoenix airport – during his flight connection -- as he boarded the plane to fly back to Stockholm, Sweden after his one-day testimonial trip to Cabo san Lucas Mexico (*thru Phoenix to meet Kenner*):

| 153 21 | +467088743 63 Mattias Norstrom* | 2/14/2013 2:39:16 AM(UTC +0) | Rea d | On a cunthair!! Onboard, **good to see** you Talk soon |
|---|---|---|---|---|

Norstrom "secret" testimony and safety were his concern after **threats from Jowdy-henchmen, Bryan Berard** to Rem Murray and Greg deVries while they were in the Cabo san Lucas Courthouse giving testimony about the Jowdy frauds against the Hawai'i and Mexico investors, just two (2) weeks earlier:

| 150 49 | +158621234 54 Rem Murray* | 1/31/2013 5:48:16 PM(UTC +0) | Rea d | **FWD: U 2 DUMB Bastards. At court house wth Bob Gaudet signing criminal papers against Jowdy?? You 2 will never get on property now and will be getting sued in** |
|---|---|---|---|---|
| 150 50 | +158621234 54 Rem Murray* | 1/31/2013 5:48:46 PM(UTC +0) | Rea d | FWD: the USA.. You have NO clue what your signing. yourjust as BAD as Kenner and Gaudet now. IDIOTS |

also paid for the court reporters (*Kelli Norden and Assoc.*) via Kenner AMEX (*in Rule 16 evidence*) for all the deposition days.

- Kenner incurred unreimbursed expenses for the February 2010 mediation with Jowdy in California for the ten (10) (*or so*) plaintiffs who attended.

- Kenner paid for the various litigation efforts related to Hawai'i-Little Isle 4 from the "*black sheep*" investors, as Constantine denied the litigation expenses (*in Rule 16 evidence*).

- Kenner paid hundreds of thousands of continuing legal expenses in Mexico for the legal efforts versus Jowdy (*related to the unpaid loans, etcetera*), once Constantine refused to send more than the two (2) small payments for the Mexico litigation to the group's Mexico attorneys, per Michael Peca's statements supra.

  o The government *fabricated prosecutorial claims about Kenner buying a tequila company that was <u>never</u> bought with the GSF funds – nor did the government produce evidence of such a transaction, simply more unfounded rhetoric]* (*in Rule 16 evidence*).[13]

---

The 2009 California lawsuit(s) also acknowledged for the fifteen (15) DCSL plaintiffs (**Tyson Nash**, *Vladimir Tsyplakov, Turner Stevenson, Mattias Norstrom, Greg deVries,* **Bryan Berard**, **Steve Rucchin**, *Brian Campbell,* **Darryl Sydor**, *Dimitri Khristich, Sergei Gonchar,* **Mike Peca**, *Jere Lehtinen, and Jozef Stumpel*) their knowledge of the $8 million in unpaid loans from Jowdy to the Hawai'i investors, as identified:

> "*Mr. Najam was in charge of the corporate governance and while under Jowdy's direction and control, received over eight million dollars ($8,000,000) from a LLC in Hawai'i. Mr. Najam failed to properly account for those funds and has placed the Jowdy investors in a vulnerable and compromised position.*"

[13] *Tr.539* – Peca confirmed that Kenner could not demand the GSF funds in 2009 for the Mexico litigation which Kenner, personally, had to fund for Kenner and Kenner investors thru 2013:

[Michael Peca]
> "*I do remember a conversation that I had with Phil regarding litigation in Mexico and he said he couldn't do it because he didn't have money and I remember calling Tommy to ask him why we couldn't use money from the global settlement for Phil and the answer [from Constantine] was Mexico was too much of a crap shot and unpredictable legally. So there's no money to go towards the Mexican part of it.*"

- Kenner spent hundreds of thousands to continue the Mexico criminal lawsuits for Kenner and Kenner investors from 2009-2013.

*The M&O at 2*, the Court states: "*…coupled with evidence that defendants attempted to conceal their fraud…*" – notwithstanding --

- The alleged Kaiser forgeries of the two (2) Constantine consulting agreements were the only evidence to support "concealment" presented at trial, *yet this incredible evidence was the "ink" versions of the alleged John Kaiser forgeries that were <u>recovered from John Kaiser's own home in Long Island NY</u> (GX-7004, GX-7005),*

- Hawai'i COO Manfredi told the FBI in October 2010 that (*See 3500-CM-2-r*):
  - o   He knew "*Constantine was paid early*" for his consulting work (*at 1*),
  - o   Manfredi "*did get 1 or 2 to lend[er] $*" – which was Urban Expansion [Constantine] and Centrum Financial (*at 1*),
  - o   He "*tried to get involved in raising $*" (*at 1*), and
  - o   "*Constantine brought in $ to project-Hawai'i*" (*at 1*).

What could Manfredi have known in 2010 -- and told the FBI, that he conveniently "*could not remember*" in 2015, until he was assisted by government preparation for his testimony?

The crown jewel was the fact Manfredi confirmed the consulting agreements when he told the FBI, *"Agreement – between (PK) or LLCs + Constantine"*

- ❖  Without influence from Kenner or anyone else, **Hawai'i COO Chris Manfredi explained to the FBI case agents that there was an agreement**!   There is no other plausible explanation for the use of the term -- "*Agreement*".
  - o   The government, and specifically the FBI case agent (Galioto), ignored the most exculpatory evidence that Manfredi confirmed the Constantine-Hawai'i consulting agreement(s) and parsed on with their foundationless theory – supported by Kaiser's frauds about the "forgery"…now unforgivably recognized as REAL and recovered from his own home!

- There are multiple Constantine-Manfredi emails regarding Constantine-led funding deals, selectively forgotten by Hawai'i COO Manfredi during trial, even after being presented with the actual emails in 2015 and his own FBI Proffer notes to refresh his recollection (*Tr.2997-2999, 3005-3018*)[14],

---

[14] After reviewing multiple emails regarding joint Manfredi-Constantine funding efforts for the Hawai'i project (<u>none of which Manfredi could recall</u> – even after seeing <u>his</u> actual emails to refresh his recollection) -- Manfredi completed his 2015 EDNY "*I remember nothing*" testimony (of nearly 13 transcript pages) by clearly answering the following:

❖ Shockingly, Manfredi told the EDNY court that the Urban Expansion loan took place *before* the Centrum loan, which meant that his follow-up representation that the government echoed thru rebuttal summation (*Tr.5996*) were false (prejudicial to the defendants); that "*the Centrum loan was supposed to help close the Waikapuna parcel*" (Urban Expansion parcel) (*Tr.2954*).

> *Q: Were you part of the decision-making to enter into this [Urban Expansion] loan?*
>
> *A [Manfredi]:  Well, no, I really didn't have -- really didn't have a choice. We had been through the gamut of trying to find these hard money lenders, and **this happened even before Centrum**, so I was working on it pretty much nonstop and not being able to close on Waikapuna, not having been successful to that point, you know, there wasn't a lot of choices left.*

BUT then – contradicting his own fabrication (*Tr.3017-3018*):

> *Q: Let me show you the last exhibit that was received in evidence, C 189. Again, this is an e-mail captioned Hawaii mortgage, March 19, 2006. Again from you to Mr. Constantine.*
>
> **Tommy [Constantine]:**
>
> **Please find mortgage attached for the Hawaiian property. I sent the updated title reports earlier. Let me know should you have any questions or need any additional information.**
>
> **Thank you,**
> **Chris [Manfredi].**
>
> *Then there are attachments down at the bottom, recorded mortgage. Do you see that?*

---

> *Q: Do you have a recollection now that we've been talking about that Mr. Constantine would be provided information by you so he could try to find a lender…*
>
> *A [Manfredi]: **I honestly do not remember communicating directly with tommy Constantine.***
>
> *Q: How about indirectly by email?  Do you have a recollection now?*
>
> *A [Manfredi]: **No sir.***

*A [Manfredi]: I see it.*

*Q: Did you have any recollection of communicating with Mr. Constantine regarding a Hawaii mortgage?*

**A [Manfredi]: I don't have a recollection of that, sir.**

*Q Do you have any recollection of any Hawaiian mortgages that this e-mail may be referring to?*

**A [Manfredi]: Yeah.**

*Q: What mortgage are we talking about and what piece of property?*

**A [Manfredi]: Well, <u>the only mortgage that existed at that would have been the Centrum loan.</u>**

*Q: As you think back is there any reason why you are sending this information back to Mr. Constantine?*

**A [Manfredi]: <u>I don't recall sending it to Mr. Constantine.</u>**

AUSA Komatireddy's final fabricated "Centrum dagger" was tossed as (*Tr.5996*):

*"So what does Kenner do? He takes out the Centrum loan. You remember the Centrum loan. The Centrum loan is the one where they take parcel 2, the land they just bought for $3.5 million, they take the players' money, 3.5 million goes to buy parcel 2, then they take 3.5 million out in the form of a mortgage. You see what is happening. They are laundering money through the land. <u>Kenner takes out the whole value of parcel 2, sucks the equity out and he is supposed to use that to buy Waika Puna but he doesn't.</u>"*

> ➢ Manfredi confirmed during his direct examination that the Urban Expansion loan happened *before* the Centrum loan – so even if Manfredi could remember the truths (or anything), how could the Centrum loan be used to "buy Waikapuna" -- *first, being approximately $2 million short to close it*…and *second, happening after Waikapuna was already closed* by the personal Kenner cash deposit and the Urban Expansion loan proceeds (which Kenner guaranteed personally)?

> *If the government's rebuttal summation cannot be reconciled with their own critical witness testimony, how can this summation statement be anything short of prejudicial and unethical.*

Based on this known lie during rebuttal summation by Komatireddy, she continued down another fabricated and prejudicially harmful path, knowing 100% it was false based on bank records (all Jowdy Mexico records), government accounting (*government forfeiture-36*) and emails in her possession [*See Recon33-17*]) (*Tr.5996*), and *nothing in contradiction*:

> *"He [Kenner] used it [the Centrum loan] for personal use to get an interest in that resort in Cabo".*
> > ➤ *100% untrue...*

- Kaiser told the FBI on October 19, 2010 that "*he saw the Northern Trust bank records*" – with Constantine's consulting distributions all over them from 2004-06, yet in 2015, Kaiser "*could not remember*" Constantine involvement – and defiantly challenged what the FBI wrote as notes on his 302(b) (See *3500-JK-1-r @10*),
  > ➤ AUSA Komatireddy also tried to "cover-up" any harm Kaiser did to their prosecutorial goal by outrageously claiming (*Tr.5992*):
  > *"What is it? It's the notes of an investigator from another office, not the notes of an FBI agent, an investigator from another office. What is it not? It is not a transcript. It's not questions and answers. It's not direct quotes. You can't tell from the notes when they were written, if they were **written before** the interview or after the interview."*

  - *"**Written before**" the interview?   Can they be serious?*

- Kenner's list regarding the funds Kenner loaned Constantine (*See Recon33-18*) has "*Ula + LI4 + NV2006*" written on the bottom right corner of the Kenner loan list for Constantine.  *Kaiser faxed them to himself on December 6, 2009.*
  - o These abbreviations do not mean much to anyone but Kenner – yet without Kenner assisting Kaiser in "copying" the "*Shopping list*" or "*Grocery List*" (*Tr.1404-1405*) – Kaiser juxtaposes the Kenner short-hand to "*Hawaii 2.65m*".

  > ➤ How could that be possible without Kaiser knowing exactly what the three (3) consulting payment amounts to Constantine were for or why they were even on Kenner's sheet that Kaiser copied to take to a meeting with

Constantine *without Kenner's knowledge*?   Text messages in evidence confirm that Kaiser did not tell Kenner about copying Kenner's list until six (6) days later (on December 12, 2009), when Kaiser texted:

| 11064 | +16312350308 John Kaiser* | 12/12/2009 4:43:29 PM(UTC+0) | Read | **I rewrote that list to show him** , is that ok??? |
|---|---|---|---|---|

> o   Second, if the "list" was money that was really Kaiser's as the government and Kaiser fabricated for trial, why would Kaiser need to ask Kenner "*is that ok???*"

> ➤ The consulting payment amounts were listed as "*1st K*", "*2nd K*" and "*NV2006*" by Kenner.   There is no reasonable explanation for Kaiser's suborned perjury.

*The M&O at 2*, the Court states – "*...none of the government's witnesses testified that they approved using the GSF for defendants' individual gain*" – notwithstanding –
- **None of it went to Kenner** (except the $22,425.52 GSF documented expense reimbursements),
- The GSF funds were at all times under Constantine's control (See Ronald Richards California Bar complaint reply – Recon33-19[15]), and
- Peca told the 2015 Court Kenner had "*no participation*" in the GSF (*Tr.540*)...

*The M&O at 2*, the Court states – "*statements show that Constantine's personal expenditures from the GSF exceeded the defense witness's (Gonchar) investments*" – notwithstanding the simple fact that testimony was given by defense witness Edenholm that the $125,000 that Constantine received from selling his BMW M6 race car was the accurate amount for the car (*Tr.1680-1681*) – which Constantine sent to the Ronald Richards Trust fund.
- This fully offset any alleged overage of either $17,077 or $9,077 based on the Gonchar contributions (for Constantine's personal use – wholly discounting Gonchar's statement of clarification that ALL of his funds ($1,500,000) could be used under his "*side-deal*" arrangement with Constantine (*Tr.4826-4827*).

*The M&O at 2*, the Court addresses Counts 2, 3 and 4.   Notwithstanding – the government's basis thru their own incorrect Courtroom admissions (*Tr.1020, 1036-1037*)

---

[15] Ronald Richards confirmed to the California Bar:

> "*I [Ronald Richards] provided evidence to the complainants that the funds were disbursed to various attorneys and entities at Constantine's direction.  There is no factual dispute from anyone that Constantine received all of the funds that were wired to him through my client trust account pursuant to the arrangements Constantine had made with the Complainants.*"

and Kaiser's testimony (*Tr.1042*) -- **Counts 2, 3 and 4 were based on known lies by Kaiser.** They collectively claimed thru government leading Q&A that Kaiser was owed funds from a California real estate project with Kenner in February 2009.

- **This is wholly untrue** and 100% of the bank records of Kenner and Kaiser are in the government's possession and have been long before trial to prove the Kaiser statements are known to be incorrect and disingenuous.

The February 2009 funds were transferred to Kaiser by Gaarn as a negotiated loan between Gaarn and Kaiser face-to-face in AZ and corroborated by texts in the government's possession. Kaiser – who routinely begged Kenner for money and expressed his "*broke*" status (*See Recon33-20*) -- was receiving funds he needed to borrow to keep his Ponzi scheme alive from the funds, we now know, Kaiser stole from his friends & family (also documented in bank records and **Kaiser's own FBI confession October 19, 2010** – *See 3500-JK-1-r*).

**Brady issues.**

*The M&O at 3*, the Court states – "*There was no violation of Kenner's due process rights under Brady...*" – yet the Arizona Attorney, Tom Baker disclosures that the government turned over during forfeiture for all of the Arizona Baker plaintiffs clearly demonstrated that each of the Hawai'i investors participated in the lawsuit versus Jowdy for the return of the Jowdy loans by *signing* off on a 7-page disclosure.

***The Baker 2008-09 Arizona case disclosures.***

The Hawai'i investors had direct and independent communication with their Arizona attorney, Tom Baker, (and subsequently with their California attorney – Ronald Richards -- versus Jowdy[16]) who received fully documented signoffs from the Hawai'i investors. *See Recon33-14[17] and Recon33-21[18].* The signed disclosures pronounced in the first (1st) paragraph of the 7-page letter –

---

[16] See *Recon33-22* – another multi-page document related to the instant case.

[17] Michael Peca lied to the 2015 trial Court (after signing as a Plaintiff in two [2] independent lawsuits to recover the Hawai'i loans made to Jowdy – and a July 26, 2006 signed Hawai'i disclosure letter discussing the Jowdy involvement) when he falsely claimed (*Tr.457* [direct examination] and again to recover at *Tr.644* [re-direct examination]):

> *Q Just based on your personal knowledge, what, if anything, did Mr. Jowdy have to do with your losses in Hawaii?*
>
> ***A [Michael Peca]: Zero. I had never been told that he had any connections to Hawaii whatsoever.***

*"the gist of the lawsuit is to recover certain monies loaned to Mr. Jowdy from Mr. Kenner, Little Isle 4 and Ula Makika LLC. Mr. Kenner estimates the total amount of monies loaned to Mr. Jowdy which have not been repaid to be approximately $5,000,000. This is the estimated principle only, exclusive of accrued interest. In summary, Mr. Jowdy denies that the monies were loans but rather characterizes them as investments."*[19]

---

*Q. By the way, what if anything did that litigation that Mr. LaRusso asked you about regarding Mexico have to do with the millions or $1.775 million in your line of credit that you authorized for the Hawaii investment? What if anything?*

*A [Michael Peca]: Nothing.*

[18] (*See Recon33-21)* -- Kristen Peca wrote to their independent California attorney (without Kenner's involvement), while declining the open invitation to meet face-to-face with Jowdy in 2009 (again -- without Kenner's participation). This attorney communication was well after Michael Peca had released his Hawai'i collateral and discussed via email (in evidence) Jowdy's lack of desire to repay the Hawai'i loans. It is also after the date in May 2009 that Michael Peca claimed at trial Kenner would not tell him where the Hawai'i money went when deciding to contribute to the Constantine-led GSF plan (*Tr.506-507*). Kristen Peca wrote to heir California attorney:

> *"We are putting our trust in you [attorney Ronald Richards], so we will do whatever you recommend is best for getting our SSS out. Thanks, Michael and Kristen Peca"*

[19] Jowdy was able to get the Arizona case dismissed in mid-December 2009 thru a series of unethical legal filings and documented threats to Kenner attorneys (*See Recon33-23*). Less than three (3) weeks later – Jowdy confessed to all of the funds being loans during his 2-day California deposition in another case suing Jowdy for the loans -- contradicting his 1 ½ year Arizona defense strategy of *"no loans"*. The California cases identified the Jowdy loans in both of the two (2) filed Complaints versus Jowdy (*See Recon33-15 and Recon33-16*) –

> *"Mr. Najam was in charge of the corporate governance while under Jowdy's direction and control received over eight million dollars ($8,000,000) from a LLC in Hawai'i. Mr. Najam failed to properly account for those funds and has placed the Jowdy investors in a vulnerable and compromised position."*

Jowdy **personally** re-affirmed the loans in March 2010 [*See 3500-KJ-2*] – by confessing to FBI Agent Galioto and other SEC officers (with his attorney, Louis Freeh at his side) that he had received 100% of the Hawai'i funds and had no plans to repay any of them. The agents noted Jowdy's full confession of his embezzlements in their *raw notes*, as follows:

> @3 -- KJ [Jowdy] – *"all the funds were not used for DDM"*
> @11 -- KJ [Jowdy] – *"if I was not allowed to use $ then it was a problem"*
> @12 -- KJ [Jowdy] – *"thought I could use $"*
> @12 -- KJ [Jowdy] – *"$ from -- $ from PK loans -- Little Isle 4 – Ula Makika"*
> @12 -- KJ [Jowdy] – *"02-06 -- $ used from BD [Baja Development Corp] to pay personal expenses → booked as loans from BD"*

The fact that Kenner possessed an Arizona Baker disclosure for a non-victim (Greg deVries) and introduced it does not mitigate the fact the government withheld the *Brady* material disclosures. The government, more likely than not, turned over the Baker disclosures during their forfeiture case, *as a mistake*, because new forfeiture prosecutors joined the case during the forfeiture phase and were not apprised of the previous, concealed evidence. The withholding of evidence in the government's possession related to this **critical issue** prejudicing Kenner inability to "**confront**" each of the individual witnesses' named in the Superseding Indictment (including Peca, Berard, Sydor, Rucchin and Nash) and their implicit knowledge of the 2008-09 Arizona Jowdy loan lawsuit.[20]

The first-hand witness reaction and responses would have been even more difficult to coordinate by the government if all of the Hawai'i investors who gave testimony had to stick to "another" fabricated story-line, or "*no knowledge*", or "*could not recall*" the basis for the Arizona lawsuit; specifically considering Mr. Baker had each of the Little Isle 4 investors *initial* the bottom of every page and *sign* the final page.

- The government investigators (most likely FBI agent Galioto) knew exactly what they were doing by withholding that exculpatory information from the defendants. See *Recon33-14*.

**More Brady issues when the government "also, perhaps by mistake" offered a new document that confirmed the "Jowdy loans"...**

The Court has received multiple requests from Kenner to subpoena the correspondences related to the "production" of the *Government-Forfeiture-44* exhibit – from the government and Jowdy's people; *emails and communication – not the back-up bank records*. This government exhibit confirmed that Kenner's trial testimony about the

---

- It should be highlighted that in 2019 (*Document 611 at 2*) – Jowdy's attorneys at **Freeh**, Sporkin and Sullivan LLP attempted to re-write history again related to the loans Jowdy has repeatedly confessed to by stating in contradiction that:

  > "*Mr. Jowdy never agreed to borrow any of the funds used to fund any portion of the down payment from Kenner or anyone else personally.*"

All of the Hawai'i investors, who were alleged as victims in the 2015 trial of Kenner, participated as signed-off Plaintiffs versus Jowdy in the various Arizona and California cases. ***None of these transactions occurred in the EDNY at any time***.

[20] *See Recon33-14*. Twelve (12) other Hawai'i investors signed the disclosures who were not named in the 2015 Superseding Indictment – including **Sergei Gonchar, Glen Murray, Mattias Norstrom**, Campbell, Khristich, deVries, Woolley, **Jere Lehtinen**, Glatt, R. Murray, **Turner Stevenson** (who verified the "*group decision*" to loan Jowdy the Hawai'i funds during his 2011 SDNY Grand Jury testimony, *infra*), and Tsyplakov.

Hawai'i loans to Jowdy was truthful. Nevertheless, Kenner was consistently assaulted by the government about Kenner veracity. During trial, the government repeatedly alleged that the loans to Jowdy were "*bogus*" (*Tr.5708 (2x), 5709*), "*phony*" (*Tr.4597, 4598*) and "*supposed*" (*Tr.5707-5708*) – and simply a "*Kenner cover-up story*".

- If *Government-Forfeiture-44* is <u>*cumulative*</u>, then the government and Court must be condoning the ignorance by the prosecutorial team of all the cumulative, empirical evidence it needed to reject in order to construct the government's false narrative for trial of "stolen by Kenner" (not Jowdy).

- Otherwise, the fairness and grave responsibility of the prosecution expressed by the Supreme Court in *Berger* (1935) has been constitutionally ignored – and significant revisionary issues are unresolved from an improperly pursued conviction "at all costs".

### *The government lies to the 2015 trial court about the source of the Baja Ventures 2006 – $2.5 million capital account in the DCSL investment*

The government claimed that after a 6-year investigation with Jowdy's people working hand-in-hand to indict and convict Kenner (as a cover-up for the Jowdy, Harvey, Najam criminal behavior and the cover-up efforts by Jowdy's attorney, the former director of the FBI, Louis Freeh) that they received this critical exculpatory document 3-weeks after trial when Kenner pressed them about the production of it post-forfeiture (*Government-Forfeiture-44*).

Not only did the government attack the veracity of the actual loans (now acknowledged post-trial as **authentic** and not "*bogus*", "*phony*" and "*supposed*") – but the government claimed that Kenner "*stole*" those funds from his Hawai'i partners to purchase his share of the Cabo san Lucas real estate project in Mexico (thru rebuttal summation – *Tr.5990, 5996*).

**The government's untrue and outrageous claim** were known at all times to be deceitful – with contradicting, empirical evidence in their possession pre-trial (*and government-forfeiture-36 own accounting to verify their lie*). Throughout the post-trial motions, Kenner has provided the Court with the government's Rule 16 documents <u>confirming 100% of the unconnected funds</u> from Kenner's Baja Ventures 2006[21] partners

---

[21] Jozef Stumpel and Jere Lehtinen funded the Baja Ventures 2006 LLC with **$4.1 million** (*despite Jowdy's crooked accounting of only $2.5 million – yet another unresolved issue with Jowdy*).

Baja Ventures 2006 is the LLC that the three (3) partners acquired their independent equity for the Diamante Cabo san Lucas project. **Neither of Kenner's Baja Ventures 2006 partners**

– yet they slandered and prejudiced Kenner thru the completion of AUSA Komatireddy's rebuttal summation, *supra*.

At no time during the guilt phase of the Government's case did they present any foundational evidence that funds from any alleged scheme were used to purchase Baja Ventures 2006 (*owned by Kenner, Stumpel and Lehtinen*). The Superseding Indictment (*Document 214*) makes no claims about the Kenner involvement in the Cabo san Lucas project, any conspiratorial issues with Jowdy, or allegations that the Cabo project is somehow related to the alleged criminal conduct. Kenner's **Baja Ventures 2006** funding partners (*Stumpel and Lehtinen*) are <u>not</u> named as alleged *Does*. Specifically, the Government relies on their fabricated claims (*prosecutorial misconduct*) during summations to cram in a false nexus:

> During rebuttal summation, AUSA Komatireddy lied to the jury about the same loaned funds by falsely claiming; "*Mr. Kenner told you that he used that money [Hawai'i loans to Jowdy] to get his piece in the Mexico investment with Ken Jowdy. You know exactly what that's for. That's in evidence.*" Clearly, <u>Kenner never testified to that</u>, nor was it or has it ever been true; and certainly **not** "*in evidence*". Notwithstanding, the jury was completely polluted with defendant Kenner unable to respond after rebuttal summation. *Tr.5990*.

> AUSA Komatireddy doubled-down while knowingly misleading the jury, specifically related to the Baja Ventures 2006 equity again, when she claimed, "*He [Kenner] used it [the Centrum loan] for personal use to get an interest in that resort in Cabo.*" Again, the Government was 100% aware of the source of the Baja Ventures 2006 capital account, thus further misleading the jury in an attempt to tie up their version of the foundationally flawed "*loans to Jowdy prosecutorial theory*". *Tr.5996*.

> This second misrepresentation further discolored the jury's perspectives. The summation statements by Komatireddy were in spite of the Government's well-defined knowledge of the authenticated loans to Jowdy (*which Jowdy confessed in his 2-day California deposition in January 2010*). In addition Jowdy's own 2010 defense team authenticated the actual 2004 Hawai'i loan agreement in the

---

**[Stumpel or Lehtinen] were alleged victims in the 2015 Superseding Indictment.** Stumpel provided affidavits in 2014 for an attempted Mexico prosecution of Jowdy for all of his known thefts, as well as a follow-up affidavit in 2017 further reiterating the "*group knowledge*" of the Jowdy crimes as outlined by Kenner and their independent attorneys in Mexico, Arizona and California since 2007. Mexico-Hawai'i investors Mattias Norstrom and Rem Murray provided similar affidavits in 2015 regarding all of the knowledge of the Jowdy loans and his underlying thefts of them – "*by the group of investors*".

December 2010 Nevada trial as his primary defense exhibit (*See Recon33-23*). Nevertheless, Michiewicz attacked Kenner about the authenticity of the loan agreement (*Tr.4597-4598*), insinuating Kenner's dishonesty about the loan agreement, he himself knew to be authentic:

> *Q: So you would agree with me Mr. Kenner, that if the loan document proves to this jury to be phony, everything you have said in your direct testimony about money going to Mexico and not being stolen is a lie?*

AUSA Michiewicz' assault on the known truths continued:

> *Q: And if that loan document proves to be phony, then you are lying? Correct?*

If AUSA Michiewicz' assaults thru well-devised and misleading questions were not enough to leave doubt on the minds of the jurors with no empirically contravening evidence to the document's authenticity (*See Recon33-23*), **thus real**, Michiewicz continued in summation with more affirmations of known falsities (*Tr.5707-5708*):

> *"...the signing of that <u>supposed</u> document?"*

AUSA Michiewicz continues with more affirmations of known falsities (*Tr.5708*):

> *"...the evidence, <u>I submit to you</u>, is that the loan agreement is <u>bogus</u>. <u>Never happened</u>. <u>Didn't exist</u>. Created as part of the hall of mirrors as part of the deception and lies to divert attention away from these two men."*

AUSA Michiewicz continues with more affirmations of known falsities (*Tr.5708-5709*):

> *"And that's all we got, th[is loan] document, this piece of paper saying: Oh, I hereby loan my clients' money to Ken Jowdy down in Mexico. But it is more than just that. The bogus nature of the loan agreement."*

## The entire prosecutorial team IGNORED Jowdy's own 2010 FBI confessions ...

To create their own "*hall of mirrors*", AUSA Michiewicz and the prosecutorial team, shut their eyes to the overabundance of supplementary clear and empirical evidentiary disclosures, *by Jowdy himself*.   They included Jowdy's own confessions on 3-24-2010 to the FBI by Jowdy (*with case agent Galioto present*) in *3500-KJ-2*.  The entire prosecutorial team IGNORED Jowdy's own 2010 confessions of the "loans", in a fabricated attempt to create a storyline and false nexus (*perhaps in forfeiture*

*forethought*).   All of this disregards that Jowdy disclosed the real truths once he dishonestly was able to dismiss his Arizona 2008-09 "*no loans*" defense case (*all documented including threats to the Little Isle 4 attorneys -- See Recon33-23*) of "severe consequences" to the Little Isle 4 (Hawai'i) attorneys if they continued to prosecute the money Kenner claimed that Jowdy received as "*loans*".

These threats contradicted Jowdy's own admissions three (3) weeks after the timely yet surprising dismissal in Arizona *with prejudice*.   None of the Government's false proffers relied on any empirical evidence (*in fact just the opposite*), fully misleading the jury, injuring the defendant, yet to their detriment, still leaving the forfeiture claims (*for Baja Ventures 2006*) without nexus or merit.

### *Brady materials withheld -- Frailes signed document with Kaiser-Privitello and Kaiser's Sconzo thefts.*

Kaiser and Privitello Frailes falsified statements to the FBI (Galioto) and IRS (Wayne) on October 2, 2014 – approximately one (1) year after the Kenner arrest.

The following two (2) 3500 notes from Kaiser and Privitello confirm their corroborated fraudulent statements around the Privitello investment in Los Frailes.

- Privitello – interviewed at 11:00am – **October 2, 2014** (by Galioto and Wayne) (See *3500-NP-5*).

- Kaiser – called the FBI at 1:50pm – **October 2, 2014** (by Galioto and Wayne) (See *3500-JK-7*)[22]

Please note that FBI Agent Galioto and IRS Agent Wayne were present on both calls – and received the following fraudulent story lines.

Privitello originally told the FBI, before the Kaiser follow-up, that –

> "*He [Privitello] was told by both Kenner and Kaiser that Privitello's money was going to be used to purchase land in Frailes [Mexico].   The seller of the of the Frailes property had clean title and they were buying the property.*"

---

[22] For the record – the John Kaiser 3500 notes arte *missing JK-4, JK-5 and JK-6.*   With the myriad of proven Kaiser lies to help the government's case and other Jowdy-related defenses – like his "**forgery**" lie in the Mexico case [*Stumpel v. Jowdy*] – it is curious at a minimum that so many Kaiser 3500 notes are "absent" the record.   The government should be asked – at a minimum – to look for the "missing" records.

This is correct.   Privitello was purchasing some of Kenner's Los Frailes equity interest at
$35m2.   Thus, it would make sense that Privitello sent the check for the purchase to
Kenner, individually (as evidenced in the government's forfeiture production – *not pre-
trial – a.k.a. another Brady violation*).

Then, Privitello went on to CONFIRM that the Frailes purchase was <u>from an existing
person</u> (*i.e. Kenner – since he wrote the check for the purchase to Kenner…or it would
have been written to someone else*).   The FBI notes confirmed –
> "*Privitello later recalled he was buying a part of Frailes that was **<u>already</u>**
> purchased by other investors.*"

This confirmed the purchase from Kenner in Privitello's own words.   The only
membership agreement that has ever been submitted into evidence arrived in the post-
trial forfeiture hearing exhibits that the government turned over.   **Clearly – this is
evidence the government had in their possession before the trial from Privitello &/or
Kaiser *and a BRADY violation*.**

The membership agreement reads as follows, time stamp on the agreement –
> *Nick Privitello=PP= 16H Membership Agreement, document
> 5/7/09 12:55 PM*

This fax transmission of the Frailes agreement in Privitello's possession is sixteen (16)
months AFTER the check that Privitello wrote to Kenner in January 2008.   Please note
that Kenner had Privitello and Jonathan Smith sign and notarize the identical document
that Kaiser signed & notarized on October 17th, 2008 (See *Recon33-24*).[23]

Kenner requested a copy of the notarized agreement back from Privitello in 2012 (*See
R33 100*) – but Privitello cut off communication after discussing it with the FBI and

---

[23] Kaiser signed and notarized this document in October 2008 after collecting $500,000 from his
friends & family in order to purchase some of Kenner's Frailes 16H investment in Mexico.
Notwithstanding – Kaiser lied to the FBI (See *3500-jk-1-r at 7*), explaining that he received
$550,000 from his handi-capped brother, police officer Robert Rizzi (a.k.a. Bobby), and his
doctor friends to invest in Las Vegas real estate with Constantine – specifically noted by the FBI
agents –

> "*PK [Kenner] was not involved in Palms R/E – as far as JK [Kaiser] remembers*"

- **First** -- it does not address what Kaiser did with the other $50,000 he pilfered from his
  friends & family, and
- **Second** – it does not explain why Kaiser and Berard claimed the same $500,000 as
  Kaiser's investment in their 2012 Arizona defense case (sued by Kenner) for fraudulent
  conveyance of title (a.k.a. criminal theft).
  - **Clearly** – it was more frauds on more courts by Kaiser and Berard while working
    hand-in-hand with FBI agent Galioto versus Kenner.

Kaiser, now knowing Kaiser had defrauded him.   Instead – they fabricated an agreement (a.k.a. – criminal fraud reference here) signed between Privitello and Kaiser (*See R33 103 – pages 3-12*).

Kaiser signed the fabricated agreement in May 2009 with Privitello with Kaiser as the **Managing Member of Pacific Properties SA de CV – 16H – including himself as the SELLER.**   This is not true and a total scam by Kaiser.

Now, after Privitello's call with the two (2) agents – *by non-random occurrence* – Kaiser happened to call the same two (2) agents on the same day at approximately 1:50pm (*according to the agent's notes*).

During the Kaiser call – Kaiser told the following to the agents –

1. *Nicholas Privitello and Jonathan Smith invested money in the Frailes property in Mexico.   Their money was to be used to purchase more of the Frailes property.*
2. *It was never Kaiser's understanding that Philip Kenner was selling his shares in the Frailes property to Privitello or Smith.*

This clearly contradicted Privitello's earlier comment as noted by Galioto –

*"Privitello later recalled that he was buying a part of Frailes that was already purchased by other investors."*

Now, after the 1:50pm call from Kaiser to the two (2) agents, apparently Privitello at approximately 2:50pm remembered more information that he needed to share with the agents, as follows –
*"9. Privitello's money that he invested in Frailes was supposed to go to purchase the rest of the parcels in Frailes and Privitello would get a percentage of all the Frailes properties.   Privitello's money was not supposed to go to Kenner so he (Kenner) can spend it on whatever he wanted."*

In order to further show the solidarity between Kaiser and Privitello's stories, Privitello needed to add the ***"knock out punch"*** that Kenner was not getting the paperwork Privitello needed from Kenner, so he asked Kaiser to step in and confirmed to the two (2) agents as follows –
*"10. When Privitello invested, he did not receive paperwork regarding his investment.   Kasier told Kenner "to stop draggin his feet" and get Privitello and a co-worker of Privitello's Jonathan Smith (another investor in Frailes) paperwork.   <u>That's when Privitello received the membership agreement for Frailes</u>."*

It should be noted that according to Privitello's 2015 EDNY testimony, in December 2009 when Privitello was worried about his wife staying home to raise their children and considering the future $200,000 investment in Eufora thru the recommendations of Kaiser and dozens of emails and concerns (*and not Kenner – per the not guilty verdicts*), Privitello is worried about his life savings, as a blue-collar, hard-working man (*Tr.1434*)…

### *BUT*

Apparently in January 2008, which was within weeks of Kenner and Privitello meeting for the first time at Kenner's home in AZ during a renovation project, Privitello sent a check for $250,000 to Kenner allegedly without paperwork?

*This is not believable – based on his 2015 testimony.* The paperwork (requested by Kenner as back-up in January 2012 – and not turned over by Privitello) is the same document[24] that Kaiser signed but has never been turned over by Privitello – because it would refute the truth of the sale from Kenner to Privitello.

Now – as a result of Kaiser (*on behalf of Privitello*) telling Kenner to "***stop dragging his feet***" – as follows – the only document that the government, Privitello &/or Kaiser produced is a May 2009 agreement that is signed between Kaiser and Privitello – ***not Kenner***.

If Kaiser was the person signing the agreement between himself and Privitello (and also Smith or Krueger or Sconzo – more Kaiser theft victims) – they were only presented in evidence during forfeiture "by mistake" [a.k.a. *Brady* violation], then – why did Kaiser have to tell Kenner to "***stop dragging his feet***".

### *Kenner had nothing to do with the paperwork.*

In May 2009, Privitello clearly knew he wrote a January 2008 check for $250,000 to Kenner for the purchase of a portion of Kenner's Frailes investment (*as declared in the first portion of his proffer on October 2nd, 2014 – before talking to Kaiser to get their stories revised*). So, why would Privitello accept the Kaiser paperwork?

Privitello told the two (2) agents "*he then received the paperwork for Frailes*"…

These may be additional questions for IRS Agent Wayne who documented the multiple Kaiser-Privitello fraudulent calls to try and implicate something with fabricated documents by Kaiser, again (See Arizona and Sag Harbor frauds by Kaiser and Berard).

---

[24] See *Recon33-25* -- email confirming FBI agent Galioto, AUSA Beckman, and IRS agent Wayne know of the Kaiser lies to the FBI about Frailes and the Arizona case – and – See *Recon33-24* (Kaiser's notarized Frailes document).

❖ This manufactured story about the Privitello land purchases at Los Frailes should create "***reasonable doubt***" that Privitello told the truth about the two (2) counts against Constantine (***Kenner not guilty***) and the authenticity of the Constantine 2004 & 2005 Hawai'i consulting deals (*refuted by Kaiser*) – with the clear propensity for fabricating "back stories".

The fact that Kaiser and Privitello both participated in a series of fabricated documents and cover-up stories, in 2014 after Kenner's arrest, to the Federal FBI and IRS agents, and the fact the government selectively chose to withhold the fabricated agreements from Kenner pre-trial (unknown to Kenner at all times – thus wholly impossible for Kenner to exercise reasonable due diligence to obtain them – plus the same agreements allegedly circulating for Smith, Sconzo and Kruger) should give the Court pause as to the authenticity of any assistance by Jowdy's employee, Kaiser, in the efforts to have Kenner arrested.[25]

The Court mentions in its October 13, 2017 Memorandum and Order **five (5)** times that "*based on the Kaiser allegations of forgery and the government's signature expert*" there is reason to believe that Kenner and Constantine attempted to conceal their consulting payments – notwithstanding the 15+ other hard moneylenders who received pre-paid funds like Constantine – and only one (1) other paid consultant who actually produced results, and the Manfredi and Kaiser confessions to the FBI, *supra*.

---

[25] The NY Daily News (*November 13, 2013*) touted Kaiser and Berard as "*heroes*" for their efforts with FBI Agent Galioto and featured them in an arrest-day article titled – "***Former NHL Player Bryan Berard and ex-cop help Feds nail two Arizona men in massive fraud***".

- The article claimed, "*...bringing to close a long and difficult investigation that relied largely on the determination and persistence of former Ranger and Islander Bryan Berard and former New York and Long Island police officer John Kaiser, along with New York-based FBI agent Matt Galioto.*"

The February 28, 2019 letter from John Kaiser to the Court, calling Jowdy a "thief" again (just like before he received the bribery job from him in Mexico), exposes Kaiser's own criminal co-conspirator status with Jowdy from 2012 thru 2017, and his willingness to say anything to cover his own proverbial behind.

- Finally, to close the premeditated and slander-ridden FORGERY loop with Berard, the article claimed, "*...said Berard, who estimates he lost at least $3 million and maybe as much as $6 million in forged lines of credit.*"

- It is clearly documented that at the time of the LOC collateral seizure, Berard's LOC was $650,000 (*of which he testified Northern Trust repaid him $300,000 of it – Tr.3042*), nowhere near the $3-6 million range *(See Recon33-26)*.

Kenner's defense counsel refused to do so, stating to Kenner that the Court would never allow the witnesses to be recalled.[26]

At a minimum, the introduction and execution of the documents' presentation at trial thru Kenner were so insufficient that it would have required the jury to physically parse thru hundreds of pages of records without any previous explanation of what they would have found &/or why they would have endeavored to do so.   Repeated arguments between Kenner and his trial counsel ensued, surrounded the inferior introduction and dismissal of value to prove each Northern Trust LOC investor (Nolan, Berard, Peca, Sydor, and Juneau) had signed so many documents -- supported by their own texts and emails with Kenner directly including FedEx receipts in evidence, that *they could not have claimed* that they had only "*one-page*" documents to sign &/or their signatures were not authentic.

Then, trial counsel Haley *refused* to present the documents thru Kenner.

The allegations from witnesses that they only signed "*one-page*" documents from time to time was supported by NO EMPIRICAL EVIDENCE of that occurring.   The Court in its M&O (*Document 501*) response mentioned the alleged "*signature only – one-page documents*" multiple times.

Nevertheless – there were significant documents that were in the Northern Trust package alone that were only *one-page* documents to sign annually such as:

1. **The Letters of Authorization** (*granting Kenner the authority to withdraw 100% of the LOC funds for the Hawai'i (Little Isle 4) project – without further or individual withdraw approvals*)[27]

---

[26] This was a clear *28 U.S.C. 2255* issue that will be addressed in Kenner's Ineffective Counsel motion.

The fact that the Berard and Kaiser depositions from their 2014 Arizona depositions were claimed as *BRADY* issues in Kenner's Rule 33 further supports Kenner's claim that his ineffective counsel also did not deliver the full government production pre-trial.

Kenner's pre-trial correspondences with his trial attorney (Rick Haley) outline the grave concerns Kenner expressed about the lack of readiness; thru non-receipt of the Northern Trust subpoena, the lack of witness prep (with 3500 and Rule 16 materials), the lack of pre-trial investigation by Haley for all corroborating professional – specifically considering the government's theme was "concealment" thus other professionals and involved people (like attorneys, accountants, executive assistants, other business partners and other investors) would have provided overwhelming supporting testimony that Kenner's investors were wholly aware of all their individual private investments -- as fully required under the law.

**Haley refused to call any of them in the Kenner defense.**

a. *When the government repeated their concealment Q&A themes with the five (5) Hawai'i investors – they insinuated that Kenner had some further obligation to disclose each and every advance made from the investors' LOC accounts (beyond the signed Letters of Authorization). This was false – and not pursuant to any additionally signed agreement between Kenner and the investors in Northern Trust's possession (or not),*

2. **The Extension of Credit**[28] (*authorizing the total investment amount in the Hawai'i project*), and

3. **The Annual Disbursement Request & Authorizations**[29] (confirming the exact amount of funds that were used annually from the individual LOCs).

Individually, Sydor and Peca confirmed to the 2011 SDNY Grand Jury that they signed a myriad of other "multiple-page" banking documents for Northern Trust Bank; *leaving no signed document in the 2015 EDNY case as* <u>*signed*</u> *and only* "<u>*one-page*</u>" *for the signature only -- and not the entire document.*

*The M&O at 3,* the Court states -- "*to the extent that he [Kenner] did not have those records, introducing them as evidence would not have led to an acquittal given the government's substantial proof of guilt*".

The salient fact that the Court repeats throughout its Memo and Order (*Document 501*) is that although the government theories, supported entirely by witness hearsay, was thoroughly *impeached* by cross-examination efforts of the two (2) defense teams. Yet, its analysis is repeated for each of the three (3) alleged objects [Hawai'i, GSF, Eufora Private stock sales] that even though the "current object under fire by the defense" was debunked during cross-examination thru witness confessions and empirical evidence, the other two (2) "objects" were supported by substantial evidence of guilt (also 100% hearsay). Thus, as Monte Hall used to say, "*Chose what you want from behind Door Number One, Door Number Two, or Door Number Three*".

The analysis fails when the proverbial "Door Number One" was a donkey, and we find out later (after the show per se) that the other two (2) doors also had donkeys behind them. The circular reference of support fails based on the lack of evidence (a.k.a. -- none) to override the impeached hearsay in each of the formulated schemes by the government. It should not be overlooked that the government theories also contradicted

---

[27] *See Recon33-28* FOLDER -- *NT Letters of Authorization docs*

[28] See *Recon33-29* FOLDER – *Northern Trust* <u>*Letter of Authorization*</u> and <u>*Extension of Credit*</u>

[29] *See Recon33-30* FOLDER -- "*NT Disbursement Request and Authorization documents*"

100% of their own pre-trial evidence, thus they had to receive a testimonial miracle when eight (8) out of eight (8) of their Kenner investors "reversed" all of their previous:

1. Grand Jury testimony,
2. Civil testimony,
3. 302(b) statements to the FBI (some through blatant and flat out denials they ever said it -- like Kaiser, Manfredi and Ranford),
4. Signed civil court affidavits,
5. Emails with Kenner,
6. Texts with Kenner,
7. Disclosure statements they signed for their independent attorneys,
8. Bank records they signed, and
9. Multiple lawsuits in Arizona, California, Nevada and (the country of) Mexico; all 100% acknowledging full disclosure of every single investment action they participated in for nearly fifteen (15) years before trial…

– And now – they instantly <i>"forgot"</i> in unison.

Shockingly, their collective amnesia-like symptoms (referred to by the government in their Rule 29/33 Reply as *faulty memory, confusion and mistakes* -- while mis-applying *United States v. Dunnigan*) worked in perfect synchronicity.   The simple idea that even a single "hand-picked" witness could have given clairvoyant and consistent testimony at trial to their previous "under oath" statements would have driven a spear thru the heart of the government's conspiracy claims.   Yet, they were all perfectly prepared; unless **CTE** is the sole cause, resulting in each of their respective "*failed memory tests*" (a.k.a. unreliable testimony).     The Court should remember that when the government discovered that all of the impeached testimony of the government witnesses and the underlying evidence was publically viewable on an Internet website, in addition to being fully and identically viewable on Pacer, they demanded the removal of the website to conceal some of the following items from their **CTE**-laden witnesses (not the public); constituting their own self-admission of wrongdoings.

### *The frauds the government Protective Order attempted to cover-up.*

The government's request for a protective order was well within their rights. Notwithstanding, the defendant represents to the Court that the request for the filing *UNDER SEAL* was an attempt to divert attention from the underlying issues and distract the Court and the government witnesses from the real evidence of the meaningful government witness' *PERJURY* at the trial that has now been exposed. The evidence of perjury or *faulty memory, confusion and mistakes* are on both Pacer (*confirmed by the government*) and the Internet.   Instead of addressing the specific perjury issues in the original Rule 33 reports, the government blamed all of the Kenner allegations of perjury

(suborned or not) on *faulty memory, confusion and mistakes* to cover-up their "***recently fabricated***" (*for trial*) witness testimony.

Thru the motion, the government sought to restrict the witnesses' access to view their own "***inaccurate testimony***" and compare it to "***real evidence***" of contradicting communication they previously had with Kenner as clearly laid out. This would also restrict the media from its ability to research the inefficiencies in the case that have been fabricated by a willing prosecution to "***win-at-all-costs***" and a desirous investigation team, who have blatantly ignored overwhelming evidence from day 1 (*since 2009*) to frame a conviction. This government ruse defies logic; harming both Kenner and Kenner investors.

- It is serious misconduct for a prosecutor to obtain a conviction through the knowing use of false evidence. See *United States v. Wallach*, 935 F.2d 445,473 (2d Cir. 1991) (Altimari, J. concurring) – knowing use of false testimony is "*perhaps the most grievous accusation that can be leveled against a prosecutor*". The use of false evidence is improper whether the prosecutor affirmatively elicits such evidence, See *Miller v. Pate*, 386 US 1, 7 (1967), or merely "***allows it to go uncorrected when it appears***", *Napue v. Illinois*, 360 US 264, 269 (1959) – (*prosecutor failed to correct witness's false testimony…*).

Inexcusably, the government's grand concern in the motion is they suggest that a notification email about the website to the Mexico and Hawai'i investors was deemed harassment, and not simply notification of inconsistent trial testimony, whether perjurious and intentional or unintentional thru government explained *faulty memory, confusion and mistakes* (dozens of times).

**Kenner outlines the Jowdy frauds to the group of Hawai'i-Mexico investors seven (7) years before Kaiser's shocking expose letter to the Court in February 2019…**

In fact, Kenner's ***pattern of disclosure was consistent*** throughout Kenner's decades of representation of the investors thru the time of Kenner's arrest. Bryan Berard confirmed it during trial (*Tr.3240*). In 2012, Kenner emailed disclosures about the criminal and civil legal updates versus Jowdy to the entire Mexico and Hawai'i investors, *including Berard (who responded to the July 2012 update)*, when Berard was working hand-in-hand with the Jowdy cabal. Berard, along with Kaiser, worked with Jowdy's attorneys to corrupt the legal process in two (2) countries and file scandalous media campaign stories until FBI Agent Galioto was able to complete his task of "*cutting the head off the snake*", and saving Jowdy from imminent prosecution in Mexico *(See Recon33-31 and Recon33-32)*.

*Exhibit Recon33-32 exposes everything about Jowdy that was discovered since 2007, protected by FBI agent Galioto since 2009; and Kaiser and Berard since 2012.   Kenner did not hide any of it from the investors (including Berard).   Not a single person replied to Kenner to confront anything that they were unaware of.*

- ***This email (Recon33-32) to the investors MUST BE READ by the Court to further understand the corruption by anyone Jowdy can pay (government officials or private).***

- *Kenner's prophetic email was 7-years before Kaiser's February 28, 2019 letter to the EDNY Court confirming EVERYTHING Kenner acknowledged in 2012, when Kaiser and Berard took jobs and screwed all of the investors from exactly what they already knew; **Jowdy is a thief**.   Jowdy will never pay anyone back.   And, Jowdy is protected by his FBI contacts.   **Kenner was NOT wrong**.*

## Galioto removes Jowdy's last adversary...

After almost five (5) full years of harassment of Kenner and Kenner's efforts to legally conclude the Jowdy documented thefts (*systematically ignored by Galioto*), Galioto finally without any witnesses and years of tortious slander towards Kenner was able to fabricate a Central Islip Indictment.   In 2018, Kenner submitted a Rule 6(e) motion to receive Galioto's various Grand Jury testimonies in order to uncover the false basis of the original Indictment and what empirical evidence it was derived from.   Considering the fact the government summation and rebuttal summation statements are littered with unsubstantiated lies and foundationless theories, contradicting their own empirical evidence, more than defendant Kenner should be "curious" for the release of Galioto's transcripts; specifically with the added pressure in late 2013 to "get Kenner off the streets" and prohibit Kenner's scheduled December 2013 Mexico Supreme Court testimony versus Jowdy and his cabal.

Galioto's 2013 Grand Jury testimony was two and a half (2 ½) years after he failed in the SDNY, with pro-Kenner Grand Jury testimony from Mike Peca (See *Recon33-33*), Darryl Sydor (See *Recon33-34*) and Turner Stevenson (*See Recon33-35*) (*which Galioto personally cherry-picked*).   Galioto was able to "persuade" Peca and Sydor to perjure themselves in 2015 in direct contradiction to their 2011 SDNY Grand Jury testimony, four (4) years later.

- Please note that Peca eventually confessed during cross examination that his 2011 SDNY Grand Jury testimony was *accurate*; that he knew at all times that the Hawai'i loans were made to Jowdy "*as a group*" (*See Document 501 at 9*).   The Court confirmed about Michael Peca: "*However, he [Peca] admitted that he had*

testified before the Grand Jury that he was aware of a short-term loan made to Jowdy using Little Isle IV's capital account." (See Recon33-232).

- If Michael Peca's direct examination can be attributed to nerves, **CTE** or *faulty memory, confusion and mistakes*, then sobeit, but the "*group*" acknowledgment during cross examination must make the Court pause to uncover who else (that was allegedly concealed from) was part of this "*group*" of knowledge?

The government motion in 2017 exposed their efforts to divert the witnesses' attention from the exposure of their *perjured* testimony and support the conviction with this motion.  Their motion confessions placed the government in a precarious position related to the strong potential for a re-trial, additionally based on its own post-trial production of *Government-forfeiture-44* (confirming all of the "loans" to Jowdy were truthful from Kenner and not – "*bogus*" (Tr.5708 (2x), 5709), "*phony*" (Tr.4597, 4598) and "*supposed*" (Tr.5707-5708) – as the government attacked throughout the trial).  The contents of *Government-forfeiture-44* and the circumstances surrounding its delivery to the government need to be thoroughly vetted as a highly probable *Brady* violation; hidden from the defendants for at least eight (8) months, **at a minimum**.  The revisionary evidence (*Government-forfeiture-44*), coupled with the voluminous *perjury* and *suborned perjury* issues, outlined in Kenner's original Rule 33 submission, were already available publically on Pacer; simply unknown to the Kenner investors.

Unpardonably in their motion, the government claims they have concerns that their witnesses will not be able (after seeing the "real evidence") to maintain similar unreliably faulty testimony (regardless of the excuse) at a re-trial, now that their memories have been publically refreshed.

- As suggested by the government and as quoted, regarding the website's "***real evidence***", "*Its only purpose is to dissuade Victim Witnesses from testifying or speaking against Kenner in a manner consistent with their prior statements [from 2015]. if they do, the Email intones, "**the real evidence**" will "**show your lies**".*

- If the government witness testimony was factually inaccurate, as thoroughly exposed throughout the ample Kenner submissions, available at the time to the alleged victims, shouldn't they be made aware, *specifically as the responsibility of the prosecutorial team to seek justice; not convictions*?

- Wasn't the government concerned that the witnesses' inaccurate testimony in 2015 is based on ***perjury*** (*suborned or not*), ***lies*** &/or ***faulty memory, confusion and mistakes***?  Shouldn't they seek to rectify all of the inaccuracies in the name of justice?

> Was the government REALLY alleging that witness exposure to the "***real evidence***" will make it more difficult to elicit the same "***inaccurate testimony***" in a pending Kenner re-trial?

The government claimed that the identical "*documents filed on PACER are less publically available, in that one must have a user account and pay for access.*"

Was the government suggesting that with sign-up criteria for PACER and the fact someone would need to pay to download pages they want to review, the government witness perjury from trial would keep the witnesses from viewing their own factually inaccurate testimony, as presented by the defendant, confirming that their testimony at trial in 2015 was "***inconsistent***" with the "***real evidence***"?

Why wouldn't the government want the factually inaccurate testimony to be cleared up for the Court through easily accessible information? Clearly, the government has not shared any of the real evidence with the witnesses and wanted them hidden from the rest of the public.

### *Specific government lies with Jay McKee were exposed regarding his Global Settlement Fund contributions and knowledge...*

The government claims, the February 13 email accuses one or more victim witnesses of testifying in a manner inconsistent with the "***real evidence***" and that documents would "*show your lies knowing or unknowing you were doing it*".

- There in no equivocation about the witness statements in 2015 and the contradicting "*real evidence*" in the government's possession prior to trial, as explicitly exposed (*as a single example*) during the critical testimony of Jay McKee, who the government explained to the Court was *only* involved in the Global Settlement Fund ("GSF") issues at trial – *See Tr.1846: 16-21*.

During the trial, the government asked very specific questions of McKee to support their ongoing theory of conspiracy by concealment (for the GSF). McKee followed the government script with deft awareness and flawless execution. During direct examination, McKee was asked if he was aware of the expected use of the GSF for ***Eufora***, the ***hangars*** (*Avalon*) and the ***Jet*** (*Falcon 10*). Despite the GSF Authorizations that McKee (*See Recon33-36*) and every other contributor signed before their funds were administered by Constantine pursuant to the authorization (*See Constantine stipulation at trial*), McKee brazenly denied knowledge; fully harming the defendants.

McKee was specifically asked (*Tr.1822*):

> *Q:   First of all, this <u>Airpark, the Falcon and the Palms condominium units, did Mr. Kenner or Mr. Constantine mention those things before you gave them money</u>?*
>
> **A: I don't recall those, no.  I don't recall those.**
>
> *Q:   In your conversations with them in the restaurant, did they mention those things?*
>
> **A:   Not that I recall.**

Now that the government got McKee lined up with their scripted theory of concealment in the <u>*only*</u> issue they had McKee present for, the government went in for the "*kill-shot*", related to the GSF Authorization (*See Recon33-36*) that McKee sent Kenner and Constantine.

> *Q:   In this email where it says you are going to get transfer of membership agreement for an interest in Eufora, did you <u>intend</u> for any of your money in the Global Settlement Fund to be used for <u>Eufora</u>?*
>
> **A:  No**
>
> *Q:   Would you have given any money to the Global Settlement Fund if you <u>had been told</u> that any portion of it would be used for Eufora?*
>
> **A:  No**
>
> *Q:   Did you <u>intend</u> for any of your money in the Global Settlement Fund Tommy Constantine used for a <u>Falcon 10</u> aircraft?*
>
> *Q:   Let me ask it again.   Did you <u>intend</u> for any of your money in the Global Settlement Fund to go to a Falcon 10 aircraft?*
>
> **A:  No**
>
> *Q:   Would you have given any money to the Global Settlement Fund if you <u>had been told</u> that any of it would go to a Falcon 10 aircraft?*
>
> **A:  No**
>
> *Q:   Would you have – did you intend for any of your money in the Global Settlement Fund to go to two <u>Palms Place</u> condominium units?*

*A: No*

*Q: Would you have given any money to the Global Settlement Fund if you knew that any portion of it would go to pay for two Palms Place condominium units?*

*A: No, I would not.*

*Q: This email says that you would be getting an interest in these things. Why would you be getting interest in these things?*

*A: I don't have an answer.*

*Q: Did they explain either Kenner or Constantine explain to you?*

*A: Not that I recall, no.*

If McKee were 100% truthful about these critical issues – which played a heavy role in the conspiracy conviction of concealment by Kenner and Constantine for the GSF (*producing related spill-over effect on the jury*) – it would be appropriate. The government adduced testimony would be all damming -- *if not for the following fully detailed and 100% contradicting text conversation between Kenner and McKee immediately after their May 8, 2009 dinner,* as follows:

McKee in BLACK (read) -- **Kenner responses hi-lighted (sent):**

| 7032 | +17168034903 **Jay McKee\*** | 5/9/2009 3:46:20 AM(UTC+0) | Read | Thx 4 making the trip bud.. **Took in alot from the talk tnite.. Drive safe, be in touch..** |
|---|---|---|---|---|
| 8255 | +17168034903 Jay McKee\* | 5/9/2009 3:55:39 AM(UTC+0) | Sent | Good stuff |

Then, McKee continued by re-engaging eight (8) hours later:

| 7039 | +17168034903 **Jay McKee\*** | 5/9/2009 12:36:25 PM(UTC+0) | Read | **Can u do me a favor.. Can u email me, so I can look at it on paper, everything my 25O turns into.. Nicole was speaking with Tommy when u explained to me all the areas where we are benefiting..** |
|---|---|---|---|---|
| 8265 | +17168034903 Jay McKee\* | 5/9/2009 12:37:21 PM(UTC+0) | Sent | **I will have tommy do it so it's consistent with the discussion** |
| 7040 | +17168034903 Jay McKee\* | 5/9/2009 12:37:42 PM(UTC+0) | Read | **Perfect, tks** |

Then, McKee continued by re-engaging one and a half (1-½) hours later:

| 7043 | +17168034903 Jay McKee* | 5/9/2009 2:12:22 PM(UTC+0) | Read | Hey, also, could u email me what the 3 black sheep are getting in the end result, as well as Tommy bullet points they had 2 agree too.. Tks |
|---|---|---|---|---|
| 8269 | +17168034903 Jay McKee* | 5/9/2009 2:32:11 PM(UTC+0) | Sent | Tommy said you will get 1/10th of everything that is acquired of theirs which includes 20% (2% for you) of the <u>airpark building</u>, 1/10th of their 3.64% of their Eufora shares (.364% for you which puts you just over 1% in <u>Eufora</u>) and then a small piece of the <u>jet</u> which TC is still crunching numbers on but it will probably be 1% of it. |
| 8270 | +17168034903 Jay McKee* | 5/9/2009 2:35:46 PM(UTC+0) | Sent | TC will send you the bullets they agreed to but has to wait till it's actually signed. Should be a day or two. They have only agreed by email so far. He will also send you the media summary but he wants you to convince the owner of Chef's to send him the tomato sauce Fed Ex. |

| 7044 | +17168034903 Jay McKee* | 5/9/2009 2:43:44 PM(UTC+0) | Read | Haha.. Consider it done.. I'll have Lou put some bottles together with the extra meat for the real flavor.. |
|---|---|---|---|---|
| 8271 | +17168034903 Jay McKee* | 5/9/2009 2:45:55 PM(UTC+0) | Sent | Thx |

Then, McKee continued by re-engaging forty-five (45) minutes later:

| 7045 | +17168034903 Jay McKee* | 5/9/2009 3:36:47 PM(UTC+0) | Read | Did TC say the jet was worth 25Om last night? |
|---|---|---|---|---|
| 8273 | +17168034903 Jay McKee* | 5/9/2009 3:44:10 PM(UTC+0) | Sent | The jet is worth 1.5m. He invested 250k to repair it |

| 7046 | +17168034903 Jay McKee* | 5/9/2009 3:45:53 PM(UTC+0) | Read | Aha.. Thats where the 25O number came from.. |
|---|---|---|---|---|

| 7048 | +17168034903 Jay McKee* | 5/9/2009 3:53:08 PM(UTC+0) | Read | In the deal, the 3 guys get their money back from their involvement with TC, but nothing back from their Mexico deals, correct.. |
|---|---|---|---|---|
| 8276 | +17168034903 Jay McKee* | 5/9/2009 3:54:14 PM(UTC+0) | Sent | Correct! |

Then, McKee continued by re-engaging two (2) hours later:

| 7053 | +17168034903 **Jay McKee*** | 5/9/2009 5:43:22 PM(UTC+0) | Read | **If we get control of Jowdys Cabo equity and move to sell Cabo - we get our 500 back from del mar, and what percent of Cabo do we end up with?** |
|---|---|---|---|---|
| 8282 | +17168034903 Jay McKee* | 5/9/2009 5:48:03 PM(UTC+0) | Sent | **Its impossible to say until we know everyone who's involved in getting Jowdy's 40%. For example, the new bank/investor may want half of it to do the deal. But...whatever it is, you will get 1/10 of it.** |

Then, McKee continued by re-engaging four (4) hours later:

| 7060 | +17168034903 **Jay McKee*** | 5/9/2009 10:01:18 PM(UTC+0) | Read | **So is it correct to say we'd get our 500 back from del mar, as well as a prob minumium 2% of Cabo? Sorry to keep asking - just trying to get it right..** |
|---|---|---|---|---|

If McKee did not lie (**on purpose**) to support the government's claims of conspiracy by concealment – then the inaccurate testimony by McKee certainly and wrongfully contributed to the ongoing collective amnesia by the GSF contributors "*in the government's favor*" while seeking a conviction of Kenner and Constantine – for alleged crimes that McKee – in particular – exhibited *faulty memory, confusion and clearly made a mistake* – **thus making the testimony <u>unreliable</u> at best – but thoroughly damaging to the defendant**.

- *What is the government or McKee doing to make sure the court is alerted to the PLAIN ERROR?   To date – they are doing nothing to make sure individuals are not convicted based on <u>faulty memory, confusions and mistakes</u> (the government's Rule 33 reply position was to uphold the verdict and deny a new trial in the interest of justices)...*

Jay McKee confirmed at trial that he also spoke with his wife and former teammate and friend – *Michael Peca* – after the presentation by Constantine and Kenner at dinner in Buffalo, N.Y. on May 8, 2009.  This further confirmed that Michael Peca and his wife were told about the various components of the overall GSF plan (*as clearly known to McKee from the text communication corroborating the dinner discussions, supra*).  Michael Peca and Kristen Peca conveniently claimed at trial during their respective direct examination that they were not told about the GSF details.  The Pecas' false testimony was notwithstanding they both returned the Constantine-GSF disclosure email (*See Recon33-37 FOLDER*).  But, they claimed to not understand the contents.   Kenner verified text communication between Michael Peca and Kenner discussing the various elements of the GSF plan (*specifically Eufora and the Avalon hangars*).   The Peca text

communication also contradicts Kristen Peca's false claims (*Tr.717-718*) that they wanted nothing to do with any more investments.   (*See Recon33-38*).

### Eufora loan buy out lies...

Shamefully, Michael Peca was one of the main potential investors in the Eufora loan buyout efforts one year later (*despite his consistent selective amnesia during trial*), fully contradicting his wife's fabricated 2015 trial statements of terminating all investments with Kenner allegedly one (1) year prior.   (*See Recon33-39*)

### *After the extensive text communication with Kenner, McKee discussed the GSF with Peca – and also spoke to his wife – before someone in his family returned the authorization email for the use of funds (Tr.1817: 5-15)...*

With reference to the GSF disclosure email that McKee (*&/or his wife – who participated in the dinner meeting*) signed off on, McKee confirmed that the government showed him the document to prepare him for his testimony the day before his appearance. Notwithstanding, the government also had the full text conversation in their possession since November 13, 2013, the day of Kenner's arrest and detainment, included on Kenner's iPhone.   The government cannot claim ignorance, since they still, to this date, have not returned Kenner's iPhone (*or his computer – in 2019*), which was last addressed by the court during trial and an unfulfilled briefing promise by the government why they continued to withhold the Kenner electronic possessions (*amongst other peripherals*) now six (6) years after their collective seizure (*Tr.2141: 16 to 2144: 9*).

*2015 McKee GSF signed disclosure testimony (Tr. 1860):*

> *Q:  -- Of this, when was the first time did you actually see this document?*
>
> *A:   Well, as I said, I don't recall if it was myself or my wife that opened it, so if it was me it would have been May 18th.   The next time I saw it was yesterday.*

As the government knows (*or they would have waived them like a Betsy Ross-original in the courtroom*), no follow-up email from any GSF contributor proceeded or followed the GSF authorizations claiming there was some new &/or undisclosed information on the authorization that needed further explanation.   Nor was there a single request for the funds to be returned.   In fact, as most of the GSF contributors were forced to reluctantly confirm on cross-examination that they participated in the GSF monthly update conference calls with Constantine where each and every detailed aspect of the GSF expenditures were given status updates (*from the disclosure authorization form and previous conversations*).

To finish the government's symphony of GSF conspiracy claims thru McKee, they asked McKee to confirm (in direct contradiction to his text message conversation -- at all times in the government's possession for 20 months pre-trial), that he expected his entire $250,000 to be spent on *only* Ronald Richards legal expenses versus Jowdy (*Tr. 1820: 25 thru 1821: 3*).

Apparently, Kenner was correct, as the notification email to the victim witnesses suggested (*per the McKee example and dozens more in the identical Kenner reports on Pacer – for public dissemination*) that they "*did testify inconsistent*" with "*the real evidence*" and the documents *would* "*show your lies (knowing or unknowing you were doing it).*"

- Doesn't the government want the myriad of inconsistencies to be straightened out for the Court?

### *After Jowdy-led assaults on Kenner's pre-trial integrity -- Darryl Sydor gave 2009 testimony that he had all of his investment paperwork from Kenner and had no concerns for his investments – only three (3) months after his LOC seizure*

Kenner immediately, upon hearing of the allegations of no investor paperwork (indirectly and in the NY Daily News slander), re-sent the full document packages to each and every one of the Kenner clients in 2008. Kenner retrieved the duplicate paperwork from the original 3rd party private equity companies, *which each individual could have done as well*. In fact, government witness Darryl Sydor gave testimony in July 2009 to confirm it. Sydor's deposition was raised in the 2015 trial (*Tr. 2240*).

- Please note that this testimony was given only three (3) months *after* the seizure of Sydor's Northern Trust collateral in April 2009.   Sydor failed to make a single adverse statement about Kenner and any of his investments at this most opportune moment, conversely only representing pro-Kenner sentiments and transparency at all times.  (*See Recon33-40*)

Sydor confirmed the following in July 2009:

> "*She [Myrick] goes, 'Don't worry. Phil Kenner is not stealing any of your money. Just get your paperwork.' And I had my paperwork in about six days.*"

Ultimately, Sydor confirmed the new slander stories in his deposition (*including alcohol, cocaine problems et. al. – but "not stealing" funds*).   Those rumors were created by Jowdy's attorney Tom Harvey, Attorney Meeks and former-fired Kenner employee (Myrick – for sexual misconduct and repeated drug issues).   They had been spread to

defame Kenner in 2008 when the Harvey-led NY Daily News slander and defamation stories began (*See Recon33-40*).

As the government knows from the same deposition in their possession, Sydor confirmed the **SEXUAL AFFAIRS** of Myrick (*as partial cause for her termination*) with Sydor's teammate Dan Boyle (*who played with him in Tampa*) and others.  Myrick was already on probation from Kenner and his company for previous affairs with Kenner clients (*also evidenced by affidavits of Berard and government "tracing" witness, Lanie Donlan*). (*See Recon33-40*)

- Attorney Meeks actually chose to depose Kenner's other assistant, Stephanie Dixon, in part, about Myrick's drug abuse and sex addict issues, which Dixon **confirmed** from first-hand knowledge, thus justifying the termination for cause. (*See Recon33-41*)

Finally, Sydor confirmed that all of the concerns raised by Myrick's slanderous statements were put to rest.   Sydor confirmed that he received all of the paperwork he requested (*again*) "*within six (6) days of the request*", despite all of it being stolen by Myrick and maintained by attorney Meeks and Harvey.  Kenner retrieved all of the private equity investment documents from the various 3rd party companies who controlled 100% of the funds for the investors, independent of Kenner (*See Recon33-40*).

### *The Government confirmed that the 2008 Nolan, Juneau and Moreau litigation with Kenner was for paperwork their own attorney (Meeks) and Myrick stole in concert with Jowdy's attorney, Tom Harvey*

The government confirmed that the faulty 2008-09 litigation that was brought by Nolan, Juneau and Moreau was brought "*seeking documentation and trying to recover their investments*".   **It was never for money they believed that Kenner had stolen,** misappropriated, or concealed.  Their own attorney, Michael Meeks (*who was working hand-in-hand with Jowdy's attorney Tom Harvey to create the smokescreen for Jowdy's discovered frauds*), *possessed* all of the documents thru the stolen corporate hard drives, confirmed in their possession by Myrick's attorney (*Meeks*) during the 2009 Myrick deposition.

The government references in their Rule 33 reply brief discussing the stolen records (*Tr.716*) is also erroneous and not discussed as asserted in the transcripts.  Despite the Nolan perjury in 2009 about "*no LOC knowledge*", his perjury is proven by:
1. Nolan's own "***real evidence***" communication with Kenner (*December 2007 text communication*) (*See Recon33-42*),

2. Evidence Nolan disclosed for the 2009 arbitration (*2003 closing documents for Hawai'i (See Recon33-43) & 2006 Hawai'i personal K-1 tax documents in his possession and delivered as evidence to the 2009 arbitration panel*) *(See Recon33-44)*, and

3. The 2009 deposition testimony of Northern Trust banker, Aaron Mascarella (*who appeared in the 2015 trial*) confirming his personal direct-phone communication with Nolan for years regarding Nolan's open LOC at the bank *(See Recon33-45)*.

Yet -- ***Nolan's attorney allowed the known perjury at the 2009 arbitration, as did the government and FBI in 2015.***

## *Nolan's wife handled all of his banking issues with Kenner former assistant – so Nolan's faulty memory (or lack of knowledge) cannot be from Kenner concealment...*

The government concealed from the court that Kenner former assistant (Myrick) and Nolan's wife, Diana, handled all of the Nolan family business (*as the one exception to the Kenner client rules*) and were dealing *specifically* with the Nolan Northern Trust LOC in August 2006.   This confirmed the additional Nolan family awareness of full and unrestricted comprehension of their LOC (*including Nolan's personal Private Banker at Wells Fargo, Kim Crane*).   *(See Recon33-46, Recon33-47, Recon33-48)*.

Ultimately, Myrick was in direct communication with all of the LOC clients, and as such, Kenner made sure she had the most recent updates of the used LOC amounts and "pledged amounts" in November 2005 from Northern Trust banker, Greg Cygan, to share with all of the LOC Hawai'i investors at her unfettered discretion. *(See Recon33-49)*.

Specifically, Myrick was in direct communication with Northern Trust Banker Aaron Mascarella on August 11, 2006 to retrieve LOC account statements for the Nolans prior to them personally making a $134,000 paydown on the LOC (without Kenner). *(See Recon33-50)*.

Clearly, the government's claim in *FOOTNOTE 4* (of their suppression motion) about Myrick being sued for claiming Kenner "***did not have paperwork***" was false and inflammatory, considering the evidence has shown that not only did Kenner produce the documents (*per Sydor deposition testimony*) *(See Recon33-40)*, but Myrick *possessed* all of it before and after her corporate hard drive thefts (with her attorneys). This was the basis for the deceptive claims by herself, Attorney Meeks, Jowdy and Harvey to the Kenner investors after 2007 to cause the first (1st) round of chaos and distractions from the Jowdy criminal acts.

- Jowdy's employee, Bryan Berard echoed these similar 6-year-old false claims that "*investments did not exist*" in the November 2013 NY Daily News article, as well,

confirming the contrived synchronous slander campaigns. No investment was phony, or failed to exist; certainly no evidence has been presented to support that Jowdy-led nonsense since its conception in 2007.

Immediately after the 2009 arbitration, attorney Meeks' other two (2) clients (Juneau and Moreau – aka "Bad Apples"), with cookie-cut Complaints versus Kenner, ***DROPPED*** their claims when Kenner notified them he was filing counter suits, in light of the Nolan arbitration victory (by Kenner). What happened to their desire to "seek documents" they realized thru the Nolan arbitration were already delivered to each and every investor, as represented by Darryl Sydor in his deposition, *supra*, and in their own attorneys' possession? Both Moreau and Juneau were charged approximately $250,000 apiece according to a former Moreau acquaintance by attorney Meeks for the filing and alleged investigation efforts (*before dropping the cases*). Attorney Meeks charged Nolan approximately $750,000 for his arbitration work.

- It should be noted that Kenner's Baja Ventures 2006 investment partner, Jozef Stumpel, had previously been tricked into filing a lawsuit by Meeks, Harvey, Jowdy and Myrick against Kenner under the false guise that Kenner had ***FORGED*** Stumpel's name on a series of bank documents for Northern Trust Bank amongst others and proceeded to claim that Kenner allegedly stole over $2 million from Stumpel. After Kenner and two (2) other NHL players (Mexico-Hawai'i investors, Dimitri Khristich and Jason Woolley) travelled to Northern Russia to meet with Stumpel face-to-face, Stumpel realized he was defrauded by Meeks, Harvey, Jowdy and Myrick and immediately dropped his 2008 litigation after being charged $43,000 to file the complaint (*and nothing else*). Stumpel memorialized this in his 2009 arbitration affidavit. *(See Recon33-51)*

In light of the government's knowledge of the Sydor and Stumpel statements and the real background to the issues with Myrick and her corrupt attorneys, it is puzzling at best that the government would introduce Myrick (during their post-trial suppression motion) – for the first (1st) time -- and her connection with the Jowdy cabal as more corroborating evidence attempting to support their unfounded position of harassment, since it has been Kenner as the recipient of the "harassment", slander and defamation actions since Myrick's termination in 2007 (at about the same time Kenner discovered the initial Jowdy frauds).

- Specifically, it is troubling that the false allegations to Stumpel, contrived by Meeks, Harvey, Jowdy and Myrick at that time, about the alleged FORGERIES confirm the originating source of the malicious and false ***FORGERY*** claims, *echoed by the government thru trial in 2015.*

***The government claims two (2) pre-trial documents as forgeries until they are wrongfully alerted by Kenner's defense counsel that the government possessed evidence that their "forgery" documents had been independently authenticated...***

The government perpetuated the false "forgery" claims starting with the 2014 pre-trial allegations to the Court of the 2004 Hawai'i RLOC loan agreement with Jowdy *(See Recon33-52)*, but -- dropped the specific issue when the government realized that Jowdy actually authenticated the document as his own defense exhibit in a December 2010 Nevada trial – *which Jowdy lost) (See Recon33-53)*. Regardless, the government chose to allege repeatedly at trial that he loan agreement was false, without trying to prove it (after they realized <u>Jowdy authenticated it</u>, and signature witness <u>Robert Gaudet had verified it</u> in three [3] different civil litigations) *(See Recon33-23)*.

This was the second (2nd) "forgery" lie that the government had to avoid.  The first (1st) was the Kaiser Mexico testimonial document (*alleged to be forged*) until the government realized that Berard and Kaiser had confirmed (***on several 2012 FBI recorded phone calls***) that Kaiser *actually* signed the document for their Mexico attorney while at the Cabo san Lucas courthouse.

- Despite the Kaiser and Berard recorded confirmations *(See Recon33-54)*, it should be noted that Kaiser gave sworn testimony in Mexico in support of Jowdy in the *Stumpel v. Jowdy ($1.6 million criminal loan)* case that his testimonial signature was a forgery (***DESPITE** being confirmed by Berard as REAL on the recorded FBI call*).   This was more Kaiser and Berard fabricated testimony (a.k.a. *PERJURY*) intended to harm Kenner and Kenner investors (and anyone adverse to Jowdy – their high-paying boss in Mexico).

- This was an additional planned perjury by someone in the Jowdy cabal, including Kaiser and Berard after 2012, and known at all times to FBI Agent Galioto -- but not disclosed to the Court.
    - *Once Kenner revealed the fraud to his trial attorney (Haley), he "leaked" Kenner's impeachment plans at trial to the prosecution (fully thwarting the Kaiser "perjury" setup.[30]*

- Who told the government in 2014 that the 2004 Hawai'i loan document was a forgery before they claimed it in open court (*for the NY Daily News to cover*), before the government realized Jowdy's defense authenticated it in 2010 as his

---

[30] This "*leak*" was one of many that Kenner conflicted with his ineffective trial counsel before, during and after trial – as evidenced by Kenner's pre-trial letter communication with attorney Haley about his unpreparedness and other preparation shortcomings; including nondisclosure of his announced FBI threats pre-trial; that seriously worried Haley's wife, according to Haley.

main defense exhibit (*while still losing a $1 million judgment to Glen Murray for another unpaid loan*)?   *(See Recon33-53)*

- Who told the government in 2014 that the Kaiser signed Mexico document was a forgery before they claimed it in open court (*for the NY Daily News to cover*), before the government realized that Berard and Kaiser authenticated it on their FBI recorded calls with Robert Gaudet -- while threatening Gaudet to be careful for suing Jowdy in Mexico? *(See Recon33-54)*

- Why wasn't the Court &/or the Defendant(s) notified that at least Kaiser had identified a document as a <u>forgery</u>, previously reported publically pre-trial to the EDNY Court, specifically one that Kaiser testified in a Mexico court was another alleged forgery; protecting Jowdy from criminal prosecution?  And, then why wasn't the Court notified that it was discovered <u>in his own words</u> (as well as those of Berard's) that the document was <u>authentic</u> and actually signed by Kaiser?  *Did the government forget to alert the Court about that credibility issue with Kaiser on purpose?*

  - The defendant(s) are sure that this false perjury claim was not cleared up in the Mexico criminal litigation for <u>Stumpel v. Jowdy</u> (and Jowdy's $1.6 million theft by Jowdy), either; since the criminal case versus Jowdy was dismissed as a result of the Kaiser perjured testimony.

  - This additional "false forgery claim" further highlighted the *Brady* issue of the fabricated Privitello document (Los Frailes), selectively withheld from the package of Privitello and Sconzo investigation materials turned over to FBI agent Galioto pre-trial.

### *Kaiser forgery lies presented at trial*

After the "leaks" that spoiled the grandiose impeachment chances in 2015, Kaiser and the government chose to represent two (2) documents as forgeries in the EDNY criminal trial, *supra*.  The government produced *only* photocopies of the alleged forgeries until just prior to trial.   Just prior to trial they announced to the Court that they had recovered the Kaiser forgery "*originals*" from Kaiser, **himself**.  It was another incredible revelation in the myriad of Kaiser-Berard-Jowdy-Harvey proven "forgery" lies.

- *How could Kaiser have been in possession of the two (2) original "ink" documents that had his name forged on them when Kenner only possessed the photocopied version?   It is unexplainable.*

### *Kaiser and Berard lie about more forgeries in a contemporaneous Arizona civil case – and get caught lying…*

It should *not* be overlooked that contemporaneously with the 2015 criminal trial, Kaiser and Berard were co-defendants in an Arizona civil trial (*originally filed by Kenner before he was arrested with their assistance. As a result, Kenner had to dismiss his Plaintiff case*. The 2012 Arizona Complaint surmised that Kaiser and Berard had not paid over $750,000 principle and interest due to Kenner clients (*Sydor, Ranford, Nash, Khristich and Lehtinen*) for Promissory loans – and over a million more to Kenner.  Kaiser and Berard's defense was that Kaiser's name (*again*) was allegedly forged (*5 more times*) on the Promissory notes.

In this case (*without Kenner present due to his detention in EDNY*), the Arizona judge ruled against Kaiser and Berard in each and every claim.   The judge ruled that Kaiser and Berard had stolen the Arizona home title from Kenner thru a ***fraudulent conveyance*** (*See Recon33-55 at ¶ 57*) (*just like the fraudulent theft of the Sag Harbor – LedBetter – property by Kaiser and Berard from Kenner thru <u>MORE</u> forged and fabricated documents*). (*See Recon33-56*).

- The fabricated and forged LedBetter operating agreement by Kaiser and Berard is in contradiction to the ***REAL*** operating agreement the government admitted in 2015 thru Sag Harbor closing attorney, Shimon Betesh.  (*Tr.672: 16 thru 673: 3*). Although Kaiser claimed erroneously to the 2015 Court that he never saw the REAL LedBetter operating agreement (*See Recon33-57*), Agents Wayne and Galioto sat silent at the prosecution table again knowing that Kaiser's former police partner, Vincent Tesoriero, informed them on September 10, 2014 (*after the Kenner arrest*) that <u>ONLY</u> Kaiser had given him the operating agreement for LedBetter and had also informed them that Kenner and Berard (*both unknown to Tesoriero at the time*) were "*coming in the deal*".  This FBI proffer to Agents Wayne and Galioto 100% contradicted the Kaiser 2015 testimony, but stood uncorrected again.  (*See 3500-VT-1-r*).

Please note that the NY Daily News (*November 13, 2013*) touted Kaiser and Berard as "<u>*heroes*</u>" for their efforts with FBI Agent Galioto and featured them in an arrest-day article titled – "***Former NHL Player Bryan Berard and ex-cop help Feds nail two Arizona men in massive fraud***".   Their collective work as heroes forced Kenner to drop two (2) Arizona civil cases versus Berard and Kaiser for millions in stolen assets thru fraudulent title conveyances, by forging documents themselves to accomplish their crimes.

- The article claimed, "...*bringing to close a long and difficult investigation that relied largely on the determination and persistence of former Ranger and Islander Bryan Berard and former New York and Long Island police officer John Kaiser, along with New York-based FBI agent Matt Galioto.*"

- Finally, to close the premeditated and slander-ridden forgery loop with Berard, the article claimed, "*...said Berard, who estimates he lost at least $3 million and maybe as much as $6 million in forged lines of credit.*" – another lie.

- It is clearly documented that at the time of the LOC collateral seizure (known to Berard – via full text communication with Kenner five [5] days prior to the seizure), Berard's LOC was $650,000 (*of which he testified Northern Trust repaid him $300,000 of it*), nowhere near the $3-6 million range *(See Recon33-26)*.
  - o In addition, not only were there no alleged forgeries by Berard in the entire 2015 trial, but the government made **ZERO** representations that *ANY* of the 100+ signed LOC documents with Northern Trust were forgeries, thus leaving each and every one was authentic and unchallenged.   As a result, at a minimum, each of the LOC clients at Northern Trust signed annual renewal documents (*Disbursement Request & Authorizations, infra*) specifically identifying the amount of funds withdrawn from their account at that time, year after year.
  - o No emails (*or communications*) have ever been produced claiming lack of knowledge while signing annual renewals directly with the bank.  *(See Recon33-58 FOLDER) – INCOMPLETE LIST (17 documents).*

### *Arizona judge rules against Berard, Kaiser and EDNY "tracing" witness, Lanie Donlan, claims of forgeries in contemporaneous 2015 civil case thefts by Kaiser and Berard*

In 2015, the seasoned Arizona judge saw thru the Kaiser and Berard defective forgery claims and ruled against them and their attempted $750,000 PLUS theft (of Kenner and Kenner clients). *(See Recon33-55)*.

Ironically related to the Arizona case, Berard and his best friend and "*tracing*" witness, Lanie Donlan, claimed their signatures were **FORGED** on *another* document in the Arizona case.   This document was actually *notarized* in Massachusetts where the two (2) of them resided at the time. *(See Recon33-59)*.   FBI Agent Galioto was aware of this "forgery" claim by Berard and Donlan (re-affirmed by Berard in his Berard October 2014 Arizona deposition).   Galioto contacted Donlan with Agent Wayne about the document, but amazingly, no follow-up 302(b) notes are available from Agent Galioto's interview with Massachusetts Notary William Medlin, *where Medlin would have CONFIRMED the authentic notary stamp and signatures*.

Berard lied during his 2014 Arizona deposition about another forgery, with "tracing" witness Lanie Donlan as the signature witness on the actual document; making them both complicit in the "forgery fraud":

Page 39:

*Kenner 13-cr-607 (JFB)*

**[By Mr. Baker]:**

> *Q: Let me show you what's been marked as Exhibit Number 3.   The first page is just the County Recorder's printout showing the document, the recording number, the date.   If you turn to page 2, it says <u>Power of Attorney, hyphen, Special</u>.   And on the second page, it states Bryan Berard and a signature.   Did you sign that document?*
>
> **A [Berard]: *I don't recall.   What was the date?***
>
> *Q: Of signature?*
>
> **A [Berard]: *Yeah.***
>
> *Q: The 24th of April.*
>
> **A [Berard]: *I don't recall.***
>
> *Q: If you turn to the next page, there's a notary.*
>
> **A [Berard]: <u>I did not sign this</u>.**

Then, on page 41, Berard continues his fraudulent claim about not signing the document and further claiming that the *notary stamp is a forgery*.

> *Q: So is it your testimony that you did not sign this Power of Attorney?*
>
> **A [Berard]: *Not that I recall, no.***
>
> *Q: <u>Well, we need to be clear on this.   Is it you could have, you don't recall</u> –*
>
> **A [Berard]: <u>No, I did not sign this</u>.**
>
> *Q: -- or no, I did not sign this?*
>
> **A [Berard]: <u>No, I did not sign this Power of Attorney</u>.**
>
> *Q: <u>So that notary of Mr. Medlin, your testimony would have to be that it is fictitious?</u>*
>
> **A [Berard]: *Yes.***

A routine follow-up investigation by Galioto and Wayne about the *false* Berard *notary-signature forgery claim* would have destroyed the false "forgery" claims by Berard and

Kaiser in their Arizona defense.  It would have highlighted Galioto's star witnesses' frauds on yet another court about this *critical* EDNY issue; **forgeries**.

Or, they would have had Kenner dead-to-rights with respect to 100%, now-proven forgery issues...yet, there are no 3500 materials for a routine follow-up call to Massachusetts notary, William Medlin.   How is that possible?

***FBI investigator, Galioto, fails to follow-up on simple forgery claim, knowing that it would have destroyed the Kaiser-Berard-Donlan credibility in the EDNY trial...***

Galioto refused to follow-up on the Medlin-notary confirmation, because he knew there was text communication between Berard and Kenner confirming Berard had the "Power of Attorney" document, *signed* and *notarized* it, before he used Kenner's FedEx account to return it to Kenner, as follows (*See Recon33-60*):

[Berard text to Kenner three (3) days before the document is notarized]:

| | | | | |
|---|---|---|---|---|
| 442 | +140152469 29 Bryan Berard* | 4/21/2008 2:00:09 AM(UTC+0) | Read | ***Boston is killn my liver!!!!!! Lol. U gotta come here worst is I'm even hangn in southie*** |

***Later that same day,*** Kenner texted Berard (*regarding the need for the notarized document which Berard falsely called a forgery for "PV" (Paradise Valley)*)–

| | | | | |
|---|---|---|---|---|
| 532 | +140152469 29 Bryan Berard* | 4/21/2008 6:19:35 PM(UTC+0) | Sent | ***Call me when free about PV[paradise valley renovation home]*** |

- Kenner sent the Power of Attorney document to Berard for a signature and NOTARY after they spoke on the phone.

- Berard sent the following text to Kenner to confirm Kenner would get Berard's Power of Attorney document signed on the 24th of April (*day of the signature, witness from Donlan and notarized stamp from William Medlin – See Recon33-59*):

| | | | | |
|---|---|---|---|---|
| 463 | +140152469 29 Bryan Berard* | 4/23/2008 9:14:25 PM(UTC+0) | Read | ***I get back 2 hboston 2nite so ill get papers 2 u 2morrow so ull have friday!!! Howd u guys do n tourney??*** |

- In fact --- Berard inquired about using Kenner's FedEx account to send Kenner the notarized document "*so ull have friday!!!*" which Berard called a **FORGERY** in the Arizona case:

[Berard (read) in BLACK; Kenner (sent) hi-lighted]

| 486 | +14015246929 Bryan Berard* | 4/24/2008 7:52:38 PM(UTC+0) | Read | *Ok 2 use ur fed x acct # 4 package??* |
|---|---|---|---|---|
| 582 | +14015246929 Bryan Berard* | 4/24/2008 7:52:50 PM(UTC+0) | Sent | *Yes* |
| 487 | +14015246929 Bryan Berard* | 4/24/2008 7:54:08 PM(UTC+0) | Read | *Thanks* |

Clearly, Berard and Donlan lied to the Arizona Court about another "forgery", *while being represented by the same Arizona attorneys as Jowdy* (who were engaging in the proven Jowdy "forgery fraud" at the same time).   The Arizona Court hi-0lighted the Berard fraud about his name being forged (in concert with Donlan's "witness" signature on the same document with the Massachusetts notary [William Medlin])

(*See Recon33-59*):

> *¶49. Berard testified that his signature on the Power of Attorney – Special (Arizona exhibit 25) and Deed of Trust (Arizona exhibit 26) were forged. However, Berard signed a number of recorded documents as a grantor, including the Quit Claim Deed transferring the property to John R. Kaiser, Trustee of the Shangri-La Trust 1999 (Arizona exhibit 27).*

Finally, the Arizona judge confirmed that Berard and Kaiser *stole* the Arizona property from Kenner via fraudulent conveyance, after they began to work hand-in-hand with FBI agent Galioto (just like the Sag Harbor theft and sale with fabricated documents and forging of Kenner's girl-friend's name) (*See Recon33-56 [FAKE], Recon33-57 [REAL]*):

> *¶57. The March 9, 2012, conveyance of the property by John R. Kaiser as Trustee of the Shangri-La Trust 1999 to "John R. Kaiser, a married man, as his sole and separate property and Bryan Berard, an unmarried man" (exhibit 29) was a fraudulent transfer. A.R.S. §44-1004(A).*

The notary [William Medlin] was never called in the Arizona case to confirm Kaiser and Berard's untrue defense positions, in addition to *another* claimed forged NOTARY STAMP by Kaiser.  (*See Recon33-61 at ¶9*)  Ironically, all of the forgery claims emanated from the original Jowdy, Harvey and Meeks ("*bad apples*"), and were never alleged by anyone else not directly associated with the Jowdy cabal (including Kaiser and Berard after their 2012 employment by Harvey and Jowdy in Mexico).

***Tom Harvey initiates NY Daily News slander stories to distract FBI and law enforcement from his own complicity with Jowdy frauds starting in 2002...***

- Tom Harvey was Louis Freeh's co-counsel for Jowdy for years, during the Harvey complicit criminal acts.   Jowdy confirmed their joint counsel status in his January 2010 California deposition (*at 26*):

  > *Q.  WHO'S BEEN DEALING WITH THEM?*
  >
  > *A [Jowdy]:* **MY ATTORNEY**.
  >
  > *Q.  AND WHO IS THAT?*
  >
  > *A [Jowdy]:* **LOUIS FREEH** *AND* **TOM HARVEY** *AND JOEL FRIEDMAN.*

It is obvious that after Tom Harvey initiated the NY Daily News assault on Kenner in 2008[31] (when his client Jowdy was under heavy pressure to resolve his tens of millions of thefts from Kenner and Kenner investors -- all confessed to in his 2-day January 2010 depositions – and ignored by Galioto and the government), Harvey was also protecting his own complicit liability and association that began when he falsely told Kenner and Kenner's original investors that "*liens*" were being placed on the first Mexico project, Diamante del Mar ("DDM").  *(See Recon33-62).*

- Although Kenner was present with Jowdy and Jowdy's Mexico attorney, Fernando Garcia, in Ensenada, Mexico in early 2003, when Jowdy signed the "*alleged*" protection liens referenced in the 2002 Harvey letter, they were apparently FAKE (*like the same liens Jowdy signed in early 2005 in the same Notario courthouse office with Garcia and Kenner for the 2004 Hawai'i RLOC loan*).

---

[31] Immediately preceding the initiation of the April 2009 Tom Harvey extortion-threat email to Kenner's attorney and corresponding NY Daily News stories about Kenner, O'Keefe wrote a "tell-all" novel about Harvey's client and Jowdy's best friend, Roger Clemens -- "*American Icon*".

- Jowdy and Harvey are central figures in the book, mentioned more than a dozen times in direct reference to their relationship with Clemens and their underlying interference in the government probe of Brian McNamee's role in Clemens' steroid usage and Federal perjury trial.

- Left out of the novel and the government inquiry was the fact that Jowdy had made a series of "hush payments" to McNamee from Kenner and Kenner investors' proceeds stolen from the Cabo san Lucas project and other Jowdy controlled projects (all evidence in the government's possession – *See Recon33-62*).

**_Kenner discovered the "fake liens" when uncovering the concealed February 2006, $3 million loan Jowdy-Najam acquired, eventually bankrupting the DDM project..._**

Kenner discovered that the "guarantee" liens were fake years later when he uncovered the concealed $3 million KSI Capital loan on the DDM property. The cash-out loan completed the fraud against Kenner and Kenner investors in the DDM project; while known and executed by Jowdy and Harvey. The KSI loan *could not have happened* if the two (2) sets of Jowdy liens were REAL, since KSI Capital would have been in third (3rd) position behind all of the individual investors, and the Hawai'i loans (*See government-forfeiture-44*). Neither Kenner (on behalf of the Hawai'i loan) nor the investors were ever asked to sign a subordination agreement for the KSI loan. Second, and in a greater fraud discovered years after the fact (*also ignored by Galioto in the government evidence*), Jowdy and Harvey **NEVER** transferred the title of the DDM Mexico property, *despite the $10 million PLUS from Kenner and Kenner investors PLUS Hawai'i loans*, into any LLC or company that was owned by anyone other than Jowdy. (*See Recon33-63 at 3*).

Clearly, Jowdy, Harvey, Meeks, Myrick and others (*later with Berard and Kaiser's assistance after receiving high-paying bribery jobs in Mexico*) were the "*bad apples*" working against Kenner and Kenner investors thru unscrupulous means – alleging FORGERIES as a themed defense at every turn – ultimately resulting in the government echoes thru Kaiser (*a known and proven forger and document fabricator*) in 2015.

- Why hasn't the government shared any of the "***real evidence***" with the investment victims (*who are actually together with Kenner in his recovery efforts and not adverse*)?

- Why has Agent Galioto (*and perhaps with an unknowing prosecution team, with specific information withheld only by Galioto*) not pursued the documented thefts by Jowdy and his cabal?

The admissions of the Jowdy crimes by the government would have certainly destroyed their Kenner conviction, similar to the government damaging *government-forfeiture-44* evidence. *Government-forfeiture-44* contradicted every one of the trial representations made by the prosecutorial team of "*bogus*" (*Tr.5708 (2x), 5709*), "*phony*" (*Tr.4597, 4598*) and "*supposed*" (*Tr.5707-5708*) -- and post-trial by FBI Agent Galioto to all of the alleged government victims since his efforts began to slander Kenner in 2009, protecting Jowdy's cabal.

- All government credibility would have been lost, similar to the problems the current government conviction would face if the alleged witness-victims realized their mis-representations in 2015, having the ability to plainly view evidence brought to their attention of what they have either *forgotten* (**CTE**) or *chose to*

*forget* (*aka. Perjury*) -- with or without the assistance of someone from the prosecutorial team's urging.

## *The government's Motion to terminate an Internet website attempted to shelter its unknowing witnesses from their previous evidence and testimony...*

In the context of the "*real evidence*", the government still claimed that the exposure to the "*real evidence*" in the Kenner reports, "*serves no legitimate purpose*". In the Peca report (*attached to the government Motion*), several blatant LIES are identified by government witness, Kristen Peca and highlighted below (*with Michael Peca concealment of the "real evidence" from his wife*).

## *Kristen Peca trial claims of receiving the Northern Trust Bank default letter and sharing it with her husband is false and wholly fabricated...*

In her grossest misrepresentations, Kristen Peca claimed being "*shocked*" the day she "*signed*" for the Northern Trust default letter (*Tr.709*) and had not been previously notified by Kenner. The text message from Kenner to Michael Peca in February 2009 alerted Michael Peca (*Kenner's client, which Kristen Peca was not*) that the first default letter was in the mail when Kenner texted:

> *[At 2/10/2009 8:13:58 PM(UTC+0)]:*
> *"Northern Trust sent you a letter. Call me when you get it."*

- In fact, in order for the Michael Peca Northern Trust account to be "*emptied out*" (according to Kristen Peca's 2012 recoding confessions) via wire transfers (*after the LOC collateral seizures*), Michael Peca (*like ALL of the LOC clients*) had to sign the actual transfer request **multiple times** for the bank pursuant to his Northern Trust IMUS Account agreement that identified (*See Recon33-64 FOLDER -- Peca*):

> "*Only those instructions directing the wiring of funds to any account outside of Northern Trust Bank must be signed by the Client*".

Clearly, for Kristen Peca to have received her "*emptied out statements*", Michael Peca had to initiate the transfers, *not Kenner*, and certainly not concealed by Kenner. *Michael Peca concealed* this information, like most of the other Peca family investments, from his wife (*at his sole discretion*).

- **Kenner held no fiduciary responsibility to Kristen Peca.**

**_Kristen Peca lies about receiving the Northern Trust default letter in her Ohio kitchen "in shock" in March 2009._**

Notwithstanding Michael Peca's chosen concealment from his wife, the default letters from Northern Trust were in February 2009 and March 2009 and delivered to Buffalo, New York (*certified mail*) when Michael Peca was living and playing in Columbus, Ohio with his family. *Michael Peca concealed* the first (*February 2009*) letter.

Nonetheless, it would have been logistically impossible for Kristen Peca to have "*signed for*" and received the second (2nd) Northern Trust Bank default letter and stood in her Columbus, Ohio kitchen "*in shock*" until Michael Peca returned from the hockey rink (*unless she was in Buffalo, NY for several months where the two [2] letters were addressed to -- while waiting for Michael to return*).

- Thus, it was logistically impossible for Kristen Peca's shocked incident to have occurred in any manner close to her 2015 dramatic trial-explanation (*and beyond a reasonable doubt, not at all*).

Specifically, Michael Peca sent Kenner a text over a month after the 2nd letter would have allegedly been signed for by Kristen Peca claiming Michael Peca was afraid his wife was about to discover the seizure and he did not know how to explain it to her. *(See Recon33-65)*.

[Peca (read in **BLACK**; Kenner (sent) hi-lighted]

| | | | | |
|---|---|---|---|---|
| ☆ 6851 | +17163743234 Michael Peca* | 5/1/2009 5:57:01 PM(UTC+0) | R e a d | Get in touch with Glen yet. **Also, NT sent an email to my wifes aol acct. Attached is the transfer info. She's going to f'n loose it when she sees loan paid** |
| 8042 | +17163743234 Michael Peca* | 5/1/2009 6:06:33 PM(UTC+0) | S e n t | Let's handle the NT discussion in person. I can make it all make sense. Trust me. |
| 6852 | +17163743234 Michael Peca* | 5/1/2009 6:07:06 PM(UTC+0) | R e a d | **Ok** |

- Incontrovertibly, Kristen Peca was not aware of the LOC payoff until months later (May 2009), based on Michael Peca's desire to keep the information from her. **Her alleged February 2009 "*shocked*" story was fabricated for the trial.**

**Between Michael Peca & Kenner one-month earlier on the day of the collateral seizure (April 1, 2009):**

[Peca (read) in **BLACK**; Kenner (sent) hi-lighted]

| 7415 | +17163743234 Michael Peca* | 4/1/2009 10:38:15 PM(UTC+0) | S e n t | *A NOrthern trust person will Call you to confirm your transfer to Schwab. Please acknowledge. Keep the call short. NT is the enemy* |
|---|---|---|---|---|
| 6325 | +17163743234 Michael Peca* | 4/1/2009 10:44:43 PM(UTC+0) | R e a d | **Got it. Call already done. Was this the plan b/c it makes sense to pay the line off or b/c the the loan defaulted? Honestly** |

### *Kristen Peca's own recordings IMPEACH her fabricated 2015 testimony...*

Kristen Peca recorded Kenner for approximately five (5) hours in 2012 and confessed to Kenner that she discovered the Northern Trust account *"emptied out from a statement"*. This is not consistent with her 2015 perjured testimony that the Northern Trust Bank default letter alerted her to the LOC seizure after she allegedly signed for it. *(See Recon33-66).*

[*At about 1:20.50*]:

> *Kristen Peca* – OK – So then help me answer up some questions.  Oh OK… With the Northern Trust loan.

> *Kenner* – OK tell me.  Go ahead and tell me what Berard has also told you, please.

> *Kristen Peca* – I will.  I will get to that in one second.  But with the line of credit from our Northern Trust bond account which was our safety net, you knew that I was against that all along, that was supposed to be a *6-month thing*[32], you guaranteed not a penny would ever go missing, and you know why I was so upset, *because we were never given any heads up by you or anyone that it was emptied out until we got a statement in the mail* and I thought I was going to have a heart attack when I saw that it was *emptied out*.  That you said that you would make all payments[33], and that it was a *6-month thing*, and that's it, it was just needed to quickly close, finish up loose ends in Hawai'i.

---

[32] This "*6-month thing*" corresponds to a Kristen Peca meeting note in February 2008 (*See 3500-MP-4 at 3,5,6,7*) – not 2005 – when Kenner explained to Kristen Peca and Michael Peca that Constantine's negotiations with Jowdy were progressing towards a finish line that would allow "our group" to sell an interest in the Cabo project and recoup the funds that Jowdy owed us from Hawai'i and some individuals personally (like Kenner, Gaudet, Norstrom, Stumpel, etcetera).

[33] Please note that Hawai'i COO Chris Manfredi told the FBI in 2010 (*See 3500-CM-1-r at 6*) that he expected Kenner to "*make the payments*".

Michael Peca had to sign three (3) separate transfer documents with Northern Trust Bank in order for the account to be *"emptied out"* – per his account IMUS agreement. (*See Recon33-64 FOLDER -- Peca*).   Thus – *Michael Peca concealed* the seizure and the transfer of the remaining balance back to their investment account at Charles Schwab from his wife.

Regardless of the facts in evidence, Kristen Peca claimed (*along with Michael Peca's 2015 perjury*) to the Court that she had only agreed to a 6-month use of the LOC in 2005. In her 2012-FBI-recorded call, she contradicted her 2015 testimony.   Kristen Peca stated:

[At approximately 5.45 of the 1:34.50 call] – Kristen Peca tells Kenner:

> **Kristen Peca** – Well, I was referencing the earlier stuff that you said, *I don't remember a large amount being distributed back to our account* and the timing of the years of the loan, the line of credit, *that happened when we were in Ohio [2008 & 2009]. I don't understand how it could have been open for 5 years before that?*   Because we had a bond account going.   <u>Do you mean the Hawai'i; you had a line of credit, but not for us?</u>

> **Kenner** – No, no, you guys had lines of credit for 5 years at Northern Trust.

---

Steve Rucchin also confirmed he expected Kenner and the Hawai'i partners to "make the payments" on his LOC (*Tr.2721*):

> *Q. And what was your understanding of what the line of credit was?*

> *A [Rucchin]: It was, that's still, that's the hard part for me...I took a line of credit out with a big financial institution, <u>so the interest was going to be paid off</u> and that was to be somehow used with the Hawaii venture.*

> *Q. When he [Kenner] proposed to go from a 500,000 line of credit to a million dollar line of credit were you eager to do that?*

> *A [Rucchin]: <u>I can't say I wasn't</u>. I don't know if eager is the right word, it's still money involved. But, and there was no risk involved. <u>It was a line of credit, there was going to be an interest that Mr. Kenner said would be taken care of, that's how it was.</u>*

The change in risk occurred when Lehman Brothers was brought to the deal.   That risk change was signed off by each of the Hawai'i partners.   The risk change was documented immediately in the disclosure letter as (*See Recon33-229*):

> *"I have the authority to commit the [Hawai'i] Company to the transactions described in this letter.   Nevertheless, I am asking for your acknowledgement of, and consent to, these transactions, as they will change your investment..."*

> *Kristen Peca – for 5 years?*
>
> *Kenner – for 5 years!*   When you were in OHIO. that's when the thing [LOC] closed.

- *Kristen Peca cannot believe that she is finding out on a phone call in 2012 that her husband, Kenner's client, had a LOC open for five (5) years without her knowledge.*

How could Kristen Peca have agreed to a 6-month LOC in 2005, when she did not claim to know about the LOC until 3-4 years later (*in 2008-09 when it was about to close*)?

Kristen Peca was also not aware that $555,571 was distributed back to Michael Peca's LOC in August 2006 (*from the Lehman Brothers closing*) in addition to $42,553 deposited into Michael Peca's Charles Schwab investment account (*also not in her joint name*) in 2006.

- Kristen Peca *confessed* on the FBI call that she did not know about the Hawai'i LOC investment until 2008-09. She even guessed that Kenner was mistaken because: "*Do you mean the Hawai'i; you had a line of credit, but not for us?*"

How could she know about the 2005 set-up or the 2006 distributions to their Northern Trust and Schwab accounts (documented in Rule 16 evidence?   **She could not!** Planned perjury is the only 2015 answer to her injurious claims.

**Michael Peca signed more LOC documents than any other LOC client in his first (1st) 365 days – further confirming his knowledge of the "use of funds"…**

Michael Peca originally signed four (4) times for the LOC in the first 365 days (in 2005-06), including his *2005 Disbursement Request & Authorization* acknowledgment that $1.6 million had *already* been withdrawn from the account within a few months of its opening?   *(See Recon33-67)*.   This was another government and Michael Peca fabricated and (*SUBORNED*) PERJURY. *(Tr.429:24 to 430:3).*

Lastly, and certainly not the end of the perjury issues raised originally in the Rule 33 *Peca Issues Report*, Kristen Peca claimed she learned about the loss in the Northern Trust account from an "*emptied out statement*".   That April 2009 statement would not have arrived in Buffalo, New York until the same time as the GSF meeting in their Ohio living room, which Kristen Peca claimed in 2015, they were "*mad at Kenner*" (*Tr. 716-717*) due to her recently fabricated and contrived "*shocked*" incident.

- Because -- the Northern Trust Bank statements were *all* delivered to Buffalo, New York and held in the Peca post office *(See Recon33-68)*, Kristen Peca could **NOT** have seen the *"statement"* before their GSF meeting on May 8, 2009.   Michael Peca confirmed it was still in their Buffalo, NY post office box until May 22, 2009, confirming the fabrication by his wife in 2015.  Michael Peca's text confirmed at 5/22/2009 5:46:27 PM(UTC+0), once he returned to his Buffalo New York home – post-season in Ohio --

  *"Just got all my mail at the [Buffalo] Post office. Had stuff that's been here for months.* Included was the Ins stuff for Palms. Explains a lot. Call me over the wk end."

### *Kristen Peca gave CTE-like testimony (without the precursor causation)*

It should be clearly recognized that Kristen Peca has never mentioned any concussion or sub-concussive issues resulting in cognitive degeneration to Kenner like all of the government witnesses exhibited during trial.   Nevertheless, Kristen Peca was able to recall a 2005 meting to discuss her husband's Hawai'i investment with Kenner.[34]   It was pure fraud on the Court and prejudicial to the defendants.

The government was in possession of Kristen Peca's 5- hours of surreptitious 2012 FBI recordings between her and Kenner, *supra*.   During those recordings – Kristen Peca fully admitted that she was not aware of the Hawai'i LOC investment until she was living in Ohio with her husband [2008-09].   Her own FBI recorded confessions fully prove that she was not part and parcel to any 2005 meting &/or discussions between Kenner and Michael Peca related to the Hawai'i project, Michael Peca's LOC or any of the related transactions.   Nonetheless, the government was fortuitously able to ignore their own clandestine recordings and pounce on Kristen Peca's false testimony related to *"my bonds are my baby"* and she only agreed because of Kenner's *"6-9 month promise [in 2005]"* and *"her bonds would never be touched"*.   Kristen Peca was able to add a beautiful and supporting soliloquy that her LOC investment funds (which she claimed would never to be touched) were only supposed to be used for *"vertical construction"* supporting the fabricated story of her husband – which directly contradicts her *"bonds would never be touched"* testimony.   It is wholly unbelievable.

### Kristen Peca's 2012 confessions ignored to frame Kenner...

---

[34] *Kristen Peca is not and has never been Kenner's client* – thus there is no fiduciary responsibility ever implied between Kenner and Kristen Peca (or any other Kenner client wife at any time – except as specifically documented with Owen Nolan's wife, Diana).

Since Kristen Peca confessed in 2012 to knowing "**nothing**" about her husband's LOC and thus clearly "**nothing**" about the underlying "use of the funds", **EVERYTHING** she said in reference to the 2005 meeting with Kenner was manufactured by someone, with someone, or created thru a miracle of harmonized testimony.

The *M&O at 4*, the Court concluded – "*a new trial is not warranted because there is no real possibility that an innocent person has been convicted*".

**FALSE** -- In the absence of the clearly fabricated testimony by Kristen Peca (in contradiction to her own 2012 FBI recordings – *supra*), Manfredi (in contradiction to his own emails and FBI proffers -- *infra*), and the alleged government witness victims (Berard, Kaiser, Nolan, Peca, Sydor, Ranford, McKee, Nash, and Rucchin – *infra and supra*) **CTE**-laden testimony, the sheer voluminous nature of the pre-trial empirical evidence and non-concealment (full transparency) confirmations *by all of the Kenner investors or previous knowledge confirmations*, cannot leave enough (or any) evidence for a trier of fact to evaluate thru the superfluous myriad of planned and slanderous US Attorney statements during Kenner's Q&A (exhibiting repeated personal contempt for Kenner thru emotional outbursts, crumbling of evidence, and ignorance of the Court's orders), and the two (2) government summations – repeatedly proven to be knowingly false, *supra*. It is serious misconduct for a prosecutor to obtain a conviction through the knowing use of false evidence.

- See *United States v. Wallach*, 935 F.2d 445,473 (2d Cir. 1991) (Altimari, J. concurring) – knowing use of false testimony is "perhaps the most grievous accusation that can be leveled against a prosecutor". The use of false evidence is improper whether the prosecutor affirmatively elicits such evidence, See *Miller v. Pate*, 386 US 1, 7 (1967), or merely "**allows it to go uncorrected when it appears**", *Napue v. Illinois*, 360 US 264, 269 (1959) – (prosecutor failed to correct witness's false testimony…).

### *The Court addressed the background of the case...*

The *M&O at 4*, the Court identified: "*Kenner subsequently diverted his clients' money – without their authorization to another property development in Mexico that involved Jowdy.*"

**FALSE** -- The following pre-trial statements were in the possession of the government and the FBI thru their 6-year investigation, all fully confirming the knowledge and approvals of the Hawai'i loans to Jowdy, *infra*.   The government subsequently overlooked the clear and convincing issue that the "Jowdy loan" was and has been at all times documented in the name of the Hawai'i partners (Little Isle 4) – thus never "**lost**" as an asset of the company (*and certainly not for any Kenner benefit*).    The government sought and received 2015 trial testimony, which *fully contradicted the investors' entire and prior*:

(1) 2011 SDNY Grand Jury testimonies [Peca, Sydor and Stevenson],
  a.   The Court's M&O confirmed Peca IMPEACHED himself about his critical knowledge of the Jowdy loans (*M&O at 8*).
(2) 2009 civil depositions [Gaudet, Mascarella],
(3) 2010 civil depositions [Sydor],
(4) 2009 arbitration testimony [Kaiser, Berard, Constantine],
(5) 2009 affidavits from prior legal proceedings [Gonchar, Stumpel, Norstrom, Lehtinen, Peca, Nash]
(6) 2014-15 affidavits from prior legal proceedings [Murray, Norstrom, Stumpel],
(7) 2009 and 2010 FBI interview notes [Gonchar, Hughes, Burdick, Boyden]
(8) Jowdy's 2010 California depositions, **including Jowdy** *confessions of all the loans* – and
(9) Most grandly -- **Jowdy's own February and March 2010** *confessions* **to the FBI agent on Kenner's case; Matthew Galioto.**

Only astronomical odds could support that probability that 100% newly contradicting testimony would be adduced; adverse to Kenner's proven, full time transparency.

### *Kenner Hawai'i-Mexico clients signed off as Plaintiffs in Arizona and California litigation versus Jowdy for the unpaid Jowdy loan – without a single adverse claim (or evidence) against Kenner...*

Kenner's investors independently asserted their roles as signed off Plaintiffs in a 2008-09 Arizona case versus Jowdy for the repayment of the 2004 Hawai'i loans.   During the pendency of the Arizona case, the same investor group extended its legal efforts (thru Constantine's GSF) to sue Jowdy in two (2) more cases in California for the same loans and other criminal acts (2009-2010).   These U.S. cases ran concurrent to multiple legal efforts filed by Kenner, Norstrom, Stumpel and Gaudet in Mexico as individuals and on behalf of the Hawai'i-Mexico investors.

In support of the Mexico litigation versus Jowdy, the following Hawai'i-Mexico related individuals gave sworn testimony in Mexico about the "Jowdy loans" and a myriad of criminal acts by Jowdy related to the documented embezzlements, including but not limited to:

1. John Kaiser[35],
2. Bryan Berard,
3. Tyson Nash,
4. Tuner Stevenson,
5. Rem Murray[36],

---

[35] After Kaiser was hired in late 2011 by Jowdy in Mexico – Kaiser claimed that his sworn and *signed* testimony in Cabo san Lucas Mexico was **"forged"**, now in support of a Jowdy, "motion to dismiss" in the criminal case, *Stumpel v. Jowdy* (for an additional $1.6 million unpaid loan to Jowdy). Jowdy bought his way out of the Stumpel lawsuit with the Kaiser planned perjury in front of another Court – by hiring Kaiser.

This is the sworn and signed statement that the EDNY U.S. Attorneys proffered to the court in 2014 that they were going to present as *another forgery* related to Kenner (somehow?) – until Kenner disclosed the Bryan Berard 2012 self-recorded admission on an FBI recording that he, Kaiser and one other former Jowdy employee (Dave Boyden – fired for supporting *Kenner v. Jowdy* in Mexico) all signed the documents on the same day in the Cabo san Lucas Courthouse. This represented just one (1) of many *false-forgery representations* by anyone related to Jowdy, his NY attorney (Tom Harvey) and others in the Jowdy protection cabal.

- *After Kenner's trial attorney "leaked" the enormous impeachment plans to the US Attorney, the government dropped that part of their "forgery" strategy – without another notice or disclosure to the Court of the potential credibility issue of their star witness; Kaiser.*

[36] Rem Murray and Greg deVries received threatening messages from Bryan Berard in 2013 during their scheduled appearance in the Cabo san Lucas Courthouse to give sworn testimony versus Jowdy and the unpaid Hawai'i loans and various other Mexico criminal actions versus Kenner and Kenner investors. **Berard threatened that giving testimony against Jowdy in the pending Mexico criminal cases would lead to them being sued by Louis Freeh and Tom Harvey in the USA** – as typical Jowdy-esque and Harvey-sanctioned intimidation tactics (or litigation and jail time for anyone adverse to Jowdy). The messages were forwarded from Murray to Kenner in real time (during their Mexico testimony on January 31, 2013).

| 150 49 | +1586212345 4 Rem Murray* | 1/31/2013 5:48:16 PM(UTC +0) | Rea d | FWD: U 2 DUMB Bastards. At court house wth Bob Gaudet <u>signing criminal papers against Jowdy</u>?? You 2 will never get on property now <u>and will be getting sued in</u> |
|---|---|---|---|---|
| 150 50 | +1586212345 4 Rem Murray* | 1/31/2013 5:48:46 PM(UTC +0) | Rea d | FWD: <u>the USA</u>.. You have NO clue what your signing. yourjust as BAD as Kenner and Gaudet now. IDIOTS |

- Berard's threats about Jowdy's credibility and the alleged false claims have an eerie tone to them after Berard co-conspirator, John Kaiser, submitted his February 28, 2019 Jowdy expose letter to the Court, verifying "Kenner was right" about Jowdy being a fraud since Kenner discovered and immediately exposed it in 2007.

*"You have NO clue what your signing. your just as BAD as Kenner and Gaudet now."*

     6.  Jozef Stumpel,

     7.  Mattias Norstrom,[37]

     8.  Greg deVries -- and others.

*The M&O at 4* – the Court identified: "*Constantine received money intended for the Hawai'i project.*"

**TRUE** – But, it is suggesting that somehow Kenner was allowed to hire any person on the planet to consult for the Hawai'i project – as authorized in the 2004 Little Isle 4 By-Laws (*See Recon33-69*); except Constantine (despite the fact that Kaiser confirmed to the FBI on October 19, 2010 that he knew Constantine was working to fund the Hawai'i project – *and did*.  If Kaiser knew – it would have been impossible for Manfredi to not know – because Manfredi controlled 100% of the Hawai'i project paperwork at the Hawai'i office – purchased and owned by Kenner[38]).

And, **Manfredi did know at all times**, because he confirmed it to the FBI during his October 2010 proffer.   The FBI raw notes confirmed (*See 3500-CM-2-r at 1*):

---

[37] Norstrom and Stumpel (two [2] non-victims in the 2015 Superseding Indictment) – along with Rem Murray (non-Victim -- as well) (after his 2013 Cabo san Lucas in-person testimony in the Jowdy criminal case, *supra*) – **signed new affidavits for the attempted 2015 criminal filings versus Jowdy in Mexico City**, *infra*.

- *The case was derailed when FBI agents Galioto and Michael Cassidy arrested the person assisting the investors file their new litigation thru his Mexico legal contacts,* the third (3rd) party was arrested for *obstruction of justice* in the USA.  Jowdy's "*pay-for-protection*" scheme – fully assisted by FBI personnel (perhaps in concert with influence from Louis Freeh and John Behnke) – worked better than a proverbial "Herradura de Mexico" (a Mexican horseshoe).

[38] If the government witnesses (other than Kaiser and Manfredi) were asked if the Hawai'i project even had an office – none of them would have been able to confirm or deny (other than potentially Berard – who was there on multiple occasions – notwithstanding **CTE**) – let alone asking the investors "*who owned the office?*".

There are levels of corporate detail (in any investment) that would be irrational for someone to know as a silent investor, who independently chose *not* to visit the project site (despite being in Hawai'i) at any time &/or meet with the management people in the project.   The same can be said for all of the Mexico investors who had *carte blanche* to visit Mexico (and specifically Cabo san Lucas) to meet Jowdy, see the project, meet the management team, etcetera -- *and did not*.

In fact – in 2006, Kenner produced a marketing event in Cabo san Lucas (ten [10] minutes from the Diamante-Cabo property) and during Owen Nolan and his wife's 4-day visit to Cabo – they declined to got to the Diamante office &/or the Diamante Cabo san Lucas resort property to view their substantial investment.

*"Constantine brought in $ to project-Hawai'i"*

*"more than $3m"*

*"Agreement – between PK or LLCs + Constantine -> may have been with Constantine and another person"*

- *What could possibly been deemed as concealed after both Kaiser and Manfredi confirmed the Constantine consulting "agreement" to the FBI?*

There is no plausible excuse to ignore the affirmations from the two (2) Hawai'i partners management members and indict Kenner &/or Constantine related to "concealment" of the consulting payments, that seventeen [17] other hard money lenders also received pursuant to the 2004 Hawai'i by-laws authorization, as well.

***The Little Isle 4 By-Laws*** *– (See Recon33-69)*
*Section 5.   The Managing Member [Kenner], at their sole discretion, can compensate any and all members and non-members for tier roles in the LLC, including but not exclusive to the Managing Member.*

- <u>Kenner had full authority</u> to pay Kaiser, Manfredi, Hawkins, Moses, Donlan, Myrick as employees – and Gaarn, Rae, Gaudet (confirmed by Kaiser to the FBI on October 19, 2010 – *See 3500-JK-1-r*), Burkhart, Peachtree, Mt. Zion, as paid consultants, etcetera – but the moment Constantine was paid (***and produced results***) – the government deemed his efforts to be a criminal act of conspiracy.
- It is wholly unreasonable and cannot realistically rise to anything more than a civil dispute of management duties – under "*business management rules*"; *not criminality.*

It cannot be overlooked that along the same line of misleading questions by the government to the investors, if they were asked about any of the other employees or consultants, they would consistently been "*without knowledge*" of:
>   1) **Who** they were,
>   3) **What** their specific involvement was,
>   2) **Where** their assigned tasks were, &/or
>   4) **Why** they were paid.

This is 100% expected, because they invested thru their LOCs at Northern Trust Bank in Little Isle 4 – and as such – Little Isle 4 was managing the project according to the 2004 By-Laws.

The repeated – "*I did not read*" and "*I trusted Phil*" refrains overwhelmed any potential belief that one (1) of the investors would have known, let alone cared about the finite details of the day-to-day efforts to manage the Hawai'i project and its inter-machinations, regardless of how many times they were told.   See *Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A.*, 461 Fed. Appx. 61; 2012 U.S. App. LEXIS 3012.[39]

- The Second Circuit Appeals Court has confirmed that "***Failure to read a contract that is signed by the victim***" is the <u>burden of the victim</u> and cannot create a fiduciary void or similar for activities of an individual tasked with presentation or management of the documents execution.

- *The Second Circuit Appeals Court clearly defines that absent substantive unconscionability or fraud, parties are charged with knowing and understanding the contents of documents they knowingly sign.   If the signer can read the instrument, <u>not to have read it is gross negligence</u>; if he cannot read it, <u>not to procure it to be read is equally negligent</u>; in either case the writing binds him. Parties are bound by documents expressly incorporated by reference into agreements to which they manifest their assent.*

Fully supporting this "lack of detailed knowledge" cannot be extended past the Hawai'i full-time and salaried Chief Operating Officers' [Chris Manfredi] amnesia (or *faulty memory, confusion and mistakes*), while "*not remembering*" any of the Constantine involvement in the multiple funding deals Constantine and Manfredi worked on together for the Hawai'i project[40].   If COO Manfredi could not remember the 10,000-foot details

---

[39] *See also PaineWebber Incorporated v. Bybyk, 81 F.3d 1193; 1996 U.S. Appx. LEXIS 8728.* ("…a party's ***failure to read*** a duly incorporated document will not excuse the obligation to be bound by its terms"); *See also Ecoline, Inc. v. Local Union No. 12 of the International Association of Heat and Frost Insulators and Asbestos Workers, AFL-CIO, 271 Fed. Appx. 72; 2008 U.S. Approximately. LEXIS 6390,* ("In general, individuals are charged with knowledge of the contents of documents they sign" and "a person who signs a written contract is bound by its terms regardless of his or her ***failure to read***  and understand its terms".)

[40] There are multiple Constantine-Manfredi emails regarding Constantine-led funding deals, selectively forgotten by Hawai'i COO Manfredi during trial, even after being presented with the actual emails in 2015 and his own FBI Proffer notes (*Tr.2997-2999. 3005-3018*).

After reviewing multiple emails on the witness stand regarding joint Manfredi-Constantine funding efforts for the Hawai'i project (none of which Manfredi could recall – even after seeing them to refresh his recollection) -- Manfredi completed his 2015 EDNY "*I remember nothing*" testimony (of nearly 13 transcript pages) by clearly answering the following:

> *Q: Do you have a recollection now that we've been talking about that Mr. Constantine would be provided information by you so he could try to find a lender…*

of Constantine's involvement in the funding efforts that Manfredi (himself) managed, despite his daily participation in, how could a silent investor know any of the random details?

- As a fact, none of the investors could have named the Hawai'i law firm (Carlsmith Ball LLP) who collected nearly $1,000,000 in fees from the Hawai'i partners during the same period of time under Kenner's Managing Member direction.

- Yet, that could not be considered an act of concealment, even though Carlsmith Ball worked hand-in-hand with Manfredi and Constantine to close the actual Urban Expansion loan (in 2005), while evaluating several other potential lenders instead of Lehman Brothers (thru early 2006).

The efforts between Constantine and Manfredi intensified after Manfredi told another independently paid hard moneylender that Lehman Brothers had tried to defraud the Hawai'i partners in 2005 with an "*egregious*" loan (*See Recon33-7*).   Manfredi stated this fact only days after Manfredi, Kaiser and Kenner collectively decided to walk away from the $5 million Lehman Brothers loan and its last minute, egregious 23% interest rate, and two (2) year bubble payment terms.

[August 16, 2005 – from Manfredi to another hard money lender – previously paid by the Hawai'i partners]:

> "*The deal with Lehman was cancelled by <u>us</u> as being too egregious.*"

It was not as the government claimed in rebuttal summation that "Kenner put off Lehman Brothers for a year", as clearly untrue and not based on evidence in the trial (*Tr.5996-5997*).

The government had full access to Jowdy's emails pre-trial that were turned over by Kenner to the SEC in 2011.  (*See Recon33-231*).   Immediately after the cancellation of the "*egregious*" Lehman deal – in lieu of the fabricated suggestion that "*Kenner puts them off for another year*" – and only weeks later – Jowdy introduced Kenner and Manfredi to a bank from his FBI-government connections [Beal Bank].

- **Jowdy was working with Lehman in September 2005 to close the Cabo deal - - so if there was a side-deal with Lehman to delay for a year -- this September 2005 deal Jowdy was setting up would have replaced the "future" Lehman**

---

*A [Manfredi]: **I honestly do not remember communicating directly with tommy Constantine.***

*Q: How about indirectly by email?  Do you have a recollection now?*

*A [Manfredi]: **No sir.***

**deal and also destroyed the Lehman-Cabo funding for undermining a "put off" deal...**

The Little Isle 4 By Laws also fully granted the Managing Member's [Kenner] authorization to lend funds to Jowdy -- the 2004 Little Isle 4 By-laws (*which governed the Hawai'i project and the loans to Jowdy*) specifically expressed *authority to lend* in the beginning of the agreement (*See Recon33-70*):

> *Little Isle IV, LLC is an organized group of investors established to invest in a series of opportunities review[ed] by the Managing Member [Kenner] and deemed in the best interest of the partnership at all times.*

> *At the sole discretion of the Managing Member, Little Isle 4, may participate as a lender if deemed by the Managing Member to be in the best interest of the LLC.*

> *The Managing Member, at their sole discretion, can engage in outside ventures deemed to be in the best interest of the LLC, including but not limited to other Private Equity Funds and Lending Opportunities.*

...But when Kenner hired Constantine – who was unknown to the Hawai'i investors in 2004-2006, Constantine fulfilled his contracted task while working hand-in-hand with Manfredi on all due diligence issues, it was a crime of concealment.  More than fifteen (15) other hired consultants failed to produce a loan for the Hawai'i project.  None of them are accused as participating in some covert act to defraud.  Kenner and his Hawai'i partners chose to sue three (3) of the hard moneylenders (Peachtree, Mt. Zion and Burkhart) for not producing an agreed upon loan (in evidence) -- **just the opposite of what Constantine produced.**

### *Kaiser confirmed to the FBI that there was a lending agreement with Jowdy*

Just like Manfredi seven (7) days earlier, Kaiser told the FBI in October 2010 that there was a lending agreement with Jowdy and the Hawai'i partners.  Kaiser confirmed his face-to-face meetings with Jowdy (after one [1] of the independent meetings with Jowdy, he told the FBI he called Berard and Kenner) (*See 3500-JK-1-r at 3*).  The FBI raw notes confirmed:

> *"was Agreement to borrow $ from Hawai'i"*

And *(at 10)*:

> *"KJ [Jowdy] might have repaid couple hundred thousand to Hawai'i"*

Kaiser told the FBI agents that he saw all of the Hawai'i bank statements *(at 10):*

*"JK [Kaiser] did see Hawai'i bank acct statements"*

Thus the myriad of wire transfers made to Constantine Management Group were never concealed from Kaiser, who became the Managing Member of the Hawai'i parent company (Na'alehu Ventures 2006) in December 2007; and raised no issues after his full control.

The Ula Makika account alone made thirty-one (31) wires to Constantine Management Group pursuant to the 2004, 2005 and 2006 agreements. Oddly enough, Kaiser and the government did not raise any issues with the 2006 signed agreement by Kaiser for fear of *faulty memory, confusion and mistakes* issues with Kaiser when he authenticated the 2006 document (*See Recon33-71*).

- This is the third (3rd) "*ink*" copy of a Constantine-Hawai'i consulting agreement found at Kaiser's home, which never had a PKHOME###### BATES STAMP on it (from the November 13, 2013 search and seizure of Kenner's Arizona residence).
- It is fully baffling how the government could, with a straight-face, present the 2004 and 2005 documents as forged when they recovered them from Kaiser himself (after possessing them for approximately ten [10] years), and Kenner possessing only the photocopy versions, as one might expect.

**Evidence of Eufora investor knowledge of the 2008 Constantine Eufora private stock purchases refutes government's concealment claims...**

**Eufora Private stock sales**
Non-victim, Mattias Norstrom (unnamed in the Superseding Indictment) exchanged the following real time texts with Kenner *before he signed-off* on his transfer to Constantine Management Group for the 2008 Eufora private stock purchases from Constantine.

[Texts from March 19, 2008]:
> *Norstrom: Got it! Account name; Constantine Management Group?*
> *Kenner: Yes. That is where the 1% is being transferred from...*
> *Norstrom: Sent the fax to WF [Wells Fargo].*
> *Kenner: I'll confirm. Thx...*

The 2008 communication with Norstrom is in direct contradiction to the government theories of concealment when the stock was purchased and purchased *only* as corporate or treasury stock.

**Independent investigation led by Rudy Giuliani and Michael Stolper's team reveal no Kenner-Gaarn-Constantine private stock sales frauds at Eufora...**

- It raised only "other" uncharged issues for Constantine and his Eufora management team, not addressed in the 2015 EDNY Superseding Indictment

In addition, the 2010 Rudy Giuliani and Michael Stolper-led investigations of "everything" Eufora exposed 100% of the items that they were concerned about on behalf of these identical investors.   At no time during the 2010 investigation did Kenner conceal information from the investigators or conduct his behavior in any way to deter the investigation from culminating in a full understanding of "everything".   Eufora employees were being accused of various wrongdoings by Eufora Board members; CEO Gentry and Gaarn). They were sued in a 2010 Arizona Eufora lawsuit by the investors. Constantine made rebuttal claims about Board Member wrongdoings.

The Constantine claims after his first (1st) discovery of the investigation into Eufora was that "*Gaarn had stolen Eufora stock from people who bought it before*" – and "*tried to resell it*" (as Constantine theorized on the Home Depot recording that Kenner turned over to Giuliani and Stolper immediately) (*At M&O at 66*)[41].   The false misdirection from Constantine was documented three (3) times.

- And, they were aware all three (3) times to the actual 2008-09 Eufora private stock purchasers and their collective 2010 investigation team.

Michael Peca confirmed this during his cross-examination by Attorney LaRusso (*Tr.608*), *infra*.   Thus, in real time, while Peca was represented by independent counsel (Stolper and the Giuliani investigative team), not one single issue was raised as reason for concern, not rising to an issue in the various civil lawsuits brought against Eufora members for alleged wrongdoings; and certainly not rising to the level of criminality, which Giuliani and Stolper would have been more than qualified to assess.

Peca confirmed from the conference call that Stolper received the recorded copies form Kenner, *infra*, following their full-disclosure text conversation:

> *Q. Did he ever discuss with you, Mr. Gaarn and Mr. Gentry and others, selling shares of stock for their own personal benefit to the detriment of the hockey 6 players?*
>
> *A [Michael Peca]: I do recall. Something along those lines, yes.*

---

[41] Constantine professed during his Home Depot recorded monologue to Kenner that he was **"saving the day again"**: "*I'm protecting you: I'm protecting Tim [Gaarn] too. I'm protecting everybody*".
- "*Everybody*"?   Thank G-d!!

*Q. And was that in a telephone call or in a face-to-face meeting with Mr.
Constantine?*

*A [Michael Peca]: I don't recall.*

*Q. And what you do remember is that Mr. Constantine was telling you that there
are a group of individuals, <u>including Mr. Gaarn and Mr. Gentry, that had
committed those crimes</u> and he was not going to have anything to do with that; is
that correct?*

***A [Michael Peca]: Yeah, I believe that may have been during a conference call
that was held with shareholders in July I think of 2010 or '11.***

During the aforementioned conference call available to all of the Eufora shareholders
(and specifically the 2008-09 private stock purchasers), Kenner immediately alerted the
investors' independent counsel that Constantine was raising allegations of criminal
activity (*See Recon33-72 at 5-7*), as follows:

There was NO SECRET about either the Gaarn (2008-2009) &/or the Constantine (2008)
Private Stock sales by Stolper &/or the Plaintiffs.  **Kenner personally alerted the
attorney for the investors – leaving no room for a "concealment" claim:**

| 18271 | 19176261175 Michael Stolper* | 8/18/2010 8:09:12 PM(UTC+0) | Sent | **Tommy has the Kenner gave Gaarn stock as an illegal transfer issue on the table. He's threatening with law enforcement to go after us** |
|---|---|---|---|---|

Reply from Stolper:

| 15750 | 19176261175 Michael Stolper* | 8/18/2010 8:10:45 PM(UTC+0) | Read | **Predictable** |
|---|---|---|---|---|

Then – Constantine makes another immediate and unfounded allegation about the private
stock sales.   Kenner passed the information along to the investors' attorney Stolper
again, as follows:

| 18272 | 19176261175 Michael Stolper* | 8/18/2010 8:10:37 PM(UTC+0) | Sent | **He just threatened law enforcement involvement to settle the issue with the Kenner/Gaarn transfer!** |
|---|---|---|---|---|

And Stolper again responded:

| 15751 | 19176261175 Michael Stolper* | 8/18/2010 8:12:24 PM(UTC+0) | Read | **Hopefully recorded.** |
|---|---|---|---|---|

**Stolper's July 2010 letter exposes the Constantine allegations of private stock sales – again -- as an issue for the shareholders (alleged EDNY victims) and demands Constantine present any unknown issues (after Stolper confirmed the investors' 2010 knowledge as his clients)...**

**One** (*See Recon33-73*), in response to Constantine's personal attorney's (Lee Weinberg at Weinberg Gosner LLP) claims that the Gaarn transactions were a fraud "somehow" – Attorney Stolper replied to Constantine's attorney, the Eufora corporate attorney (Karl Freeberg at Greenberg Traurig LLP), and copied the entire twenty-seven (27) person Eufora investment and investigative group (not including Kenner).   Stolper required that all twenty-seven (27) sign and return his letter and disclosure with Bryan Berard's help – separate from any Kenner concealment or restrictive actions.    All of the Eufora investors complied and signed off on the July 16, 2010 letter.

Stolper's letter exposed any perceived "concealment" by Kenner, as Stolper and Giuliani identified (*See Recon33-73*):

> @1: "...*to give him [Constantine] the opportunity to support his allegations against his co-managers at Eufora.*"

> @4: "*Lee, you claim to have been "informed" about "very disturbing facts relating to the actions of several investors and managers on the Eufora saga.*"

> "*We want to address these points as well, not with finger-pointing and conjecture, but real evidence (documents).   I invited Constantine to support his allegations but he has yet to provide a single piece of evidence or agree to meet with us.*"

> @7: "*Constantine made allegations against Gentry (Eufora CEO) and Phil Kenner, a money manager of the members of the company [AZ Eufora Partners I]:*"

> @7: "*Stolper repeatedly requested that Constantine come to New York to address the findings and support his allegations about Gentry, Kenner, Eufora financing and the defaulted loan.*"

> @7: "...*neither Constantine nor his counsel have provided the documents that Constantine said he was going to provide, and has otherwise not agreed to meet with Stolper and Hatzimemos [Giuliani's right-hand-man] to resolve the open issues:*"

**Two**, the government presented *no emails or texts* in Rule 16 evidence or at trial that claimed the Eufora investors who signed off on the full disclosure letter were unaware of their stock purchases or the private ownership origination – *five years earlier*.  The government simply applied the same **CTE** *(faulty memory, confusion and mistakes)* logic to their Q&A to create a failed "*memory test*" of items that were not and have not ever been in question, after Giuliani and Stolper's thorough investigation in 2010.   Five (5) years after the full disclosure investigations, the investors "*could not remember*" the basis for the Giuliani and Stolper investigations, let alone the details of their private stock purchases that were fully vetted by their own counsel; independent from Kenner.

In particular, Kenner was not part of the distribution list from Giuliani and Stolper on the July 16, 2010 disclosure letter (*See Recon33-73*); further distancing Kenner from any ability to conceal the private sales from the Eufora Board, the Eufora legal counsel, the Constantine counsel, the AZ Eufora Partners I investors &/or Stolper and Giuliani's team.

**Three**, weeks after the signed-off disclosure letter from Eufora investors' counsel [Stolper], Kenner unfortunately crossed paths with Constantine at a Home Depot in Scottsdale, Arizona.   Kenner and his 7-year-old son were present.  Kenner chose to record the expected Constantine ramblings after having separated from Constantine months earlier as soon as Kenner was notified of the investigation in or about March 2010; five (5) month earlier.

Kenner was right about Constantine's disingenuous rhetoric beginning with his typical "*save the world*" nonsensical ramblings.   The Constantine diatribe started as usual, with Kenner confirming his premeditated belief of what Constantine would say.   Kenner was right, as follows (*Docket 501 at 37*):

> *Constantine: "So, I know you are not going to believe anything I tell you, but I'm gonna to try anyways."*
>
> **Kenner:  "OK."**

The remainder of the Constantine rant (*M&O at 37*) is Constantine typically trying to convince Kenner to let him make everyone rich with the Eufora deals he has to sign and stop worrying about the Jowdy deals in Mexico because Jowdy is protected by the FBI and Louis Freeh.   Constantine tries to explain to Kenner that by letting the Giuliani investigation continue (although Kenner had no bearing on it one way or another as explained by Kenner, as self-described on the recording as a "*passenger*" in the investigation), ***Kenner was going to be the person responsible for the investigation team destroying Eufora***.

Constantine's plea was that if Kenner could shut down the investigation (*the opposite of Kenner's transparent actions of recording Constantine and turning it over to independent investigators – Giuliani and Stolper*), Constantine would make everyone rich, because no one would ever collect from the decade of known Jowdy frauds (for that, Constantine was prophetically correct, now nine [9] years later – *Document 628*).

Constantine's Home Depot double-talk is misleading, but the essence of every Constantine conversation from the inception of the Constantine-GSF to the alleged recruitment by Constantine for the Eufora investment money in 2009 (from Kaiser's friends & family) was that Constantine was "about to save the world".   John Kaiser noted this exact phrase in Kaiser's 2010 declaration that he and Stolper filed in the original 2010 Arizona case versus Constantine.

Constantine's typical defense was to present double-talk and falsified stories to anyone he could preach to in an effort to clear his documented wrongdoings.   The nonstop rhetoric was exemplified in his contradicting lies to Privitello in the 2012 Privitello-FBI recording of Constantine (regarding the Gaarn Eufora private stock sales):

[Constantine at 22.50]:
> "...*then the 700 grand went to Tim Gaarn and went to Mexico -- God knows where and what for and then Tim Gaarn and Phil and CR [Gentry] were the ones who convinced all you guys to do all this [investigate Eufora thru Giuliani and Stolper[42]]...you say that you are not surprised what Phil did but Phil is the one who did all of this...*"

- Please note that none of the funds went to Mexico – nor "*for God knows where and what...*".

**After thorough vetting by Giuliani and Stolper – AUSA Komatireddy lied to the jury in rebuttal summation about the Kenner involvement and Stolper as the attorney...**

In a final attempt to discredit the actual investigation of "all things Eufora" by Giuliani and Stolper's group, Komatireddy's rebuttal summation claimed "*different attorneys*"

---

[42] See *Recon33-73 at 6* where Stolper clearly explained to the AZ Eufora Partners I investors that **Tim Gaarn alone hired Giuliani and Hatzimemos and Stolper to investigate "everything" Eufora** – and they were granted access to all of the Eufora corporate records thru Board Members Gaarn and CEO Gentry.
- ***Kenner had no ability to conceal anything as a non-party to the investigation or Eufora for that matter.***

filed the 2014 EDNY claim versus Constantine. It was FALSE as easily verifiable in the EDNY docket. Komatireddy lied, as follows (*Tr.5960*):

> *"And his [Kenner's] argument is, well, if Kenner had something to do with Privitello, Privitello would have sued Kenner in some lawsuit that happened a year later <u>with a different lawyer</u> and a <u>different group of investors</u>."*

**FALSE** -- The Eufora Plaintiff claims were filed in 2014 in the EDNY (Central Islip) and were re-filings of the investors' complaint versus Constantine from Arizona in 2011. It is clear that these were filed after Kenner had been indicted in 2013 where the government falsely claimed that Kenner "somehow" was involved in the solicitation of the Privitello monies in late 2009; without any empirical evidence.

If any of the government claims were true, with Privitello a plaintiff in the 2014 re-filing, Privitello and Stolper (the original attorney on the 2011 Arizona Eufora case) would have added Kenner to the previous 2011 lawsuit. **Stolper and Privitello did not**, but Komatireddy lied to the jury that Stolper was not involved in the EDNY case in an attempt to separate the years of working knowledge of the Eufora Company, the 2008-09 private investments, and the underlying Constantine actions that were thoroughly investigated by Privitello's attorneys, Stolper and Giuliani.

### *The Court mis-references the Sag Harbor transaction details*

The Courts *M&O "footnote 3"* references Kenner illegally diverting funds to a real estate project in Sag Harbor as "overwhelming evidence" of Kenner guilt – at most falling under the "*Business judgment rules*".

The analysis fails on multiple grounds, as Kenner's task was to "secure" signatures from every member of the Hawai'i project in order to complete the $105,000,000 Lehman Brothers-Windwalker Hawai'i Joint Venture ("JV") transaction in August 2006. It was well articulated that after the extreme difficulties with Hawai'i COO Manfredi to gain agreement, Kaiser, Kenner and the Hawai'i attorneys agreed to pay Manfredi $180,000 (minus his documented $8,000 corporate credit card theft before the JV) in order to secure his signature. In addition, the attorneys offered to forgive the $100,000 advance in July 2005 made to Manfredi to clear his 2005 IRS tax problems (also as part of the Hawai'i partners' Managing Member's ability to "loan" money under the By-Laws, like the Jowdy loans) (*See Recon33-69*).

These two (2) group decisions were participated in by Kaiser, Kenner and the various attorneys representing the Hawai'i project; including Steve Lim – Carlsmith Ball LLP [Hawai'i] – Larry Markowitz [Baker Hostetler – engaged April 25, 2006 (*See PKHome-*

*17182 thru PKHome-17187)*] – and William Najam [Ken Jowdy's brother-in-law – at the specific request of Masood Bhatti from Lehman Brothers].

Following the 2006 terse negotiations with Manfredi, Kaiser then demanded to get rid of Manfredi in a separate deal, unrelated to Kenner, in Sag Harbor, NY.   One (1) of Kaiser's other partners (Vincent Tesoriero) confirmed to the FBI pre-trial that the October 2006 transaction that **Kaiser borrowed the $395,000 short-term funds** from the Hawai'i project to buy out Manfredi (*See Appendix at Recon33-230*) – in exchange for his signature on the deal (in addition to Kaiser's 2005 friends & family loan full payoff of $1,176,000).[43]

There was no difference in the two (2) transactions, as attorneys Najam and Markowitz approved them all before the post-JV distributions (*See Recon33-74*); including the Hawai'i-Jowdy loan discussions.   Multiple other Hawai'i employees were also compensated from the same corporate funds, as noted by the Markowitz emails, under the authority of Little Isle 4 By-Laws, and in concert with fully legal efforts to complete the JV with Lehman Brothers – resulting in a $7 million payout to the Hawai'i project partners.   None of the signatures would have been acquired without the necessary "horse-trading" under the attorneys' supervision at the 11th hour.

- It should be clearly noted that Kenner was due over $600,000 at the time of the Hawai'i JV closing and chose to leave his full capital account in the JV deal, in lieu of payments.   If there were any suggestion by any of the corporate attorneys involved with the deal that the post-JV use of funds (originating from the Peca LOC for his capital account, or otherwise from others) would trigger some criminal or conspiratorial act – Kenner would have simply paid himself out the

---

[43] The full $1,176,000 payoff for the 2005 friends & family loan Kaiser arranged was part and parcel to Kaiser's signature demands in August 2006.   Kaiser gave false testimony that his friends & family were not paid off in August 2006 (contrary to the Na'alehu Ventures 2006 bank statements).   Nevertheless, Kaiser explanation for the massive payments to him as a non-investor on the Hawai'i project were – "*back pay*" and "*expenses*" (*Tr.988*) – neither of which are true; simply more fabrication by Kaiser and the government to create the illusion that Kaiser did not blindly steal from his friends & family.

- Kenner has made post-trial "in-camera" requests for Kaiser's 2006 and 2007 IRS tax records to confirm that "*none of the August 2006 transfers to Kaiser*" were claimed as income – which a former NYPD cop would surely have done – *IF TRUE*.
  - Kaiser testified that the "*back pay*" was $195,000 (*Tr.988*).

- Second – Kaiser could *never* produce even $10,000 worth of receipts due to him from the Hawai'i project "at any moment in time", let alone in 2005-2006.   Kenner has made requests to the Court for that IMPEACHING evidence as well.
  - Based on Kaiser's "*back pay*" testimony – he should have had $621,000 in receipts to total the $816,000 that was distributed.   It was another fabrication and suborned representation.

$395,000 (or so) and disregarded the short-term loan idea to satisfy Kaiser's personal demands in exchange for his signature.   It is completely nonsensical.

## 9-11 First Responder – and Kaiser NYPD training partner – refutes all Kaiser LedBetter and Sag Harbor testimony thru 2014 FBI proffer...

Tesoriero's 2014 FBI proffer includes notes (*See 3500-VT-1-r*) from FBI case agent Galioto, as follows:

- *"Kaiser told Tesoriero that they needed to get Manfredi out of the Sag Harbor deal..."* -- and

- *"Kenner's role in the Sag Harbor deal would be to raise money to build the property"* [not invest money up front – a.k.a. the $395,000 short-term loan to Kaiser].

It should be clearly noted that Kenner sued Kaiser in 2013 in Arizona for **fabricating** a fake operating agreement, **forging** the name of Kenner's girl friend [Lauren Gilmore] with Berard's help in order to sell the Sag Harbor property on their own and collectively fleece Tesoriero and Kenner (under Galioto's knowledge) (*See Recon33-56*).
- Tesoriero also confirmed to the FBI (Galioto) that Kaiser defrauded him and his parents in the deal.

  o In Kaiser's REPLY brief in the 2013 lawsuit, Kaiser emphatically pronounced that *"Kenner had no money in the deal"*.  This was confirmed by both the 2014 Tesoriero FBI proffer and the specific fact that the $395,000 was for Kaiser (and repaid by Kaiser 11-days later); **never for Kenner**.

- *"Tesoriero received the LedBetter agreement only from Kaiser"*
  - This **impeached** Kaiser's 2015 claims he never received the operating agreement from Kenner or the closing attorney (*Tr.1144-1145*).

**Facts per witness**

**The Government's Case** (M&O at 5)

**Joe Juneau[44]**

**On direct-examination, Joe Juneau mis-remembered multiple facts that were already in evidence thru his own pre-trial production to the government (most likely due to his CTE symptoms).**
- **Juneau suffered multiple concussions and multiple broken jaws during his hockey-playing career.**

**Juneau:**
1. **Was not a client of Kenner's since 2003,**
2. **Is not a victim, and**
3. **Suffered no losses (having been fully repaid six (6) years before trial – from any of the named objects of the conspiracies).**

**Juneau gave repeated "*I don't remember*" testimony and answers during his cross examination that were in contradiction to all of the emails and texts between he and Kenner, and**

**Juneau emails requested Kenner to manage his assets (in evidence) at the exact time Juneau and the government claimed Juneau could not get in touch with Kenner.**

***Juneau Direct testimony***

**Juneau could not remember the basic facts of his management engagement details with Kenner on direct examination...**
- At no time did Kenner sign for any Juneau LOC account.

The Court's *M&O at 5* verified: "*Juneau introduced Kenner to Derek Sanderson, an NHL connection of his who worked at Boston Capital, a financial firm, and Kenner was hired to work at Boston Capital.*"

**FALSE** – Because neither Kenner nor Sanderson ever worked at Boston Capital.

---

[44] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 5-6.*

The Court's *M&O at 5* verified: "*Kenner then went on to work at other financial investment companies and eventually started his own company, Standard Advisors, in 2002.*"

**FALSE** – Because Kenner started Standard Advisors on April 1, 2003, and Juneau *never* became a client of Kenner's at his new firm.

Juneau's private equity investments and buyouts in the Hawai'i project and Eufora occurred independent of any Kenner fiduciary role, as Juneau dealt exclusively with the corporate people at Eufora and Northern Trust Bank.   Despite the Juneau testimony (and similar declarations by government witnesses), **Kenner was never a financial advisor**. Kenner has only worked as a marketing representative and later as a Business Manager.[45]

### The government presented misleading FINRA expert with Kenner not a FINRA regulated person...

The government's presentation of a FINRA "expert" created an erroneous "standard of care" issue that grossly misled the jury and prejudiced Kenner.   The testimony of the FINRA "expert" was the initial read-back by the jury during deliberations.   The testimony confirmed for the Court and jury, misrepresentations of the "agreement" between Kenner and the government witnesses and created a paradigm that held Kenner to a standard he never agreed to in his various roles or agreements with any client; and certainly not with Juneau.

### Government theory presents false "one-page" signature claims without evidence...

The Court's *M&O at 5* verified: "*Kenner often sent him faxes of investment-related documents to sign that only contained the signature page.*"

**FALSE** – as the Court highlighted Juneau testimony about "*signing one-page*" documents, which Kenner sent him, ***they produced no evidence*** of any document that it

---

[45] Kenner has never sold stocks or performed any other task regulated by *FINRA*, no different from a NASA representative giving useless testimony.  Nonetheless, the government's additional Red Herring provided presentation of a *FINRA* person and related regulations and standards; ***none of which applied to Kenner at all***.

Kenner's request to have a *Daubert* hearing before allowing the *FINRA* individual to give expert testimony was ignored by Kenner's trial counsel, further amplified by his negligence to simply state an objection to the *FINRA* testimony.  This prejudicial mistake received its ultimate hi-light when the jury asked for the *FINRA* testimony to be "*read back*" shortly after deliberations began.

allegedly ever happened or any documents that would have fit Juneau's false claims; causing any harm.   In fact, to the contrary, Juneau signed two (2) significant documents for his Northern Trust LOC (in this instant case).   First, he signed off on his *Extension of Credit* in 2003 (*See Recon33-74*) as part of the identical 39-page fax that Owen Nolan originally signed off (*See Recon33-75*).   Both packages (for Juneau and Nolan) are in evidence thru Northern Trust, as complete.[46]

At all times, Juneau's address with Northern Trust Bank was his Canadian home at 3989 Chemin Lac-September-Iles, St. Raymond Quebec G3L 255, Canada.   All of the Juneau guarantee documents for his LOC were addressed to Juneau's home address.

Juneau also signed a LOC renewal package for his Northern Trust LOC in June 2006. This was one full year after Juneau and Kenner discussed his Hawai'i "loan" via Juneau's initiated email (*See Recon33-76*).   Thus, Juneau's testimony (*Tr. 139*) that he was unaware of the Hawai'i LOC (a.k.a. – "loan") until "*Something came up. I think it was in sometime in 2006, around that time*" is clearly false (perhaps **CTE** related).   Unless Juneau's testimony was planned and disingenuous, his **CTE** was on full display from the only documents that the government needed to use to prepare Juneau's 2015 testimony. Juneau testified that (*Tr.140*):

> "*Again, I don't, I don't recall opening a line of credit.   Its possible I did, but I do not remember that –*".

---

[46] Juneau and Nolan have all three (3) of the following Northern Trust LOC documents signed and dated from their December 18, 2003 packages of documents before they independently sent them to Northern Trust via Kenner's International FedEx account:
1. *2003 Control Agreement* – dated December 18, 2003 (8-page document),
2. *2003 Little Isle 4 Pledge Agreement* (18-page document) (*GX-2152*), and
3. *2003 $500,000 Extension of Credit* (**1-page document**).

The 2003 Pledge Agreement states on page-one:
> *"In consideration of new party's secured extension of new financial accommodations or continuation of existing financial accommodations to Debtor or Little Isle, LLC a limited liability company organized under the law of the state of Delaware...whose obligations to Secured Party are being supported by Debtor..."*

- In the first (1st) paragraph of the *2003 Pledge Agreement*, "debtor" is defined as – *Joe Juneau on his own behalf, as debtor ("Debtor")*.

Juneau also re-signed the Northern Trust LOC documents in June 2006, about one (1) year after he communicated with Kenner about his Hawai'i investment "*loan*" – and had been in direct documented communication via his own emails with Northern Trust Banker, Aaron Mascarella about the status of his LOC (in evidence); lacking any possible concealment.

Corroborating Kenner's transparency dealings with Juneau at all times, even two (2) years after Juneau was no longer a Kenner Business Management client, Kenner replied immediately to Juneau's May 18, 2005 email about all of his private equity deals; *specifically including the Hawai'i project LOC*.   In fact, Juneau announced that he wanted to travel with Kenner to Hawai'i to view the project during his May 2005 email.

> *"For Hawai'i, I'd love to go and see that! Id like to also see how the #s work.".*
> *(See Recon33-76 and GX-728).*

- What could possibly have been concealed from Juneau who had "no cash" in the Hawai'i partners deal; only his LOC contribution?

The Court's *M&O at 5* verified: *"A May 2005 exchange between Kenner and Juneau indicated that Juneau had invested $100,000 in that enterprise."*

**FALSE** – Because the Court's *M&O* states that government exhibit *GX-728* identifies *"$100,000"* – **in Juneau's own words** is invested, under Juneau's heading: *"Hawai'i (loan)"*.   *It is wholly inaccurate*; with only the "loan" investment by Juneau mentioned in the May 2005 email communication between Kenner and Juneau.

**Juneau never transferred $100,000 to the Hawai'i investment – nor did Juneau ever sign a document designating a $100,000 loan-investment.**
- Juneau's designation in the May 2005 email to Kenner identifies the fact that Juneau knew he had a **loan** to the Hawai'i deal, thus leaving no other alternative to believe his investment money was anything but the Little Isle 4 LOC he signed for in 2003 and guaranteed.   **That's in evidence.**
- Juneau's 2007 email correspondence with Northern Trust Banker Aaron Mascarella confirmed that Juneau knew (a continuing action) that his entire investment in Hawai'i was based on the LOC loan he signed for multiple times from 2003-2007, which Mascarella confirmed was paid off by Nolan's acquisition of the Juneau equity – upon request. **That's in evidence.**

Kenner specifically replied to Juneau in May 2005 (on the same day as the lengthy Juneau request), as follows:

> *"Hawai'i.   Your loan is well. The final %s isn't known, but it should be about 1.25% of the investment LLC.   We haven't done a valuation of the project.   We R too busy working on it every day."*

- There is NO mention of a *"$100,000 investment"* anywhere in the email.   The remainder of the May 2005 email about the Kenner knowledge in Juneau's independent private equity deals exceeds any standard of *"sufficiency of transparency"*, especially with Kenner having no fiduciary roles in any of them.   Kenner was the Hawai'i Managing Member thru 2007; not Juneau's advisor.

In 2005 after confirming his knowledge of the Hawaii project (via his own email), his LOC investment, and desire to stay in the deal (pre-Lehman payoff), **Juneau still wants all of his money managed by Kenner.**

- In no way does this represent a person who found out about his LOC in 2006 for the first time or was disgruntled with Kenner.

**Juneau asks Kenner to manage all of his funds in 2005 at Northern Trust Bank – not the actions or requests of a person who Juneau claimed he could not get a hold of in 2005…**

In fact, Juneau closed his May 2005 email with "full praise" and "respect" for Kenner in spite of being a non-client for two (2) years; since March 2003 (when Kenner turned down Juneau's reduced fee offer for Kenner's services). Kenner refused to "cut a special deal" for any Standard Advisors client.

[From Juneau to Kenner – May 18, 2005]:
> "*Phil. Like I told you a few times already. I'm not very comfortable with this situation. It has nothing to do with you but everything to do with the way I am. …I just want to have it [Juneau's money] invested in BONDS with Northern Trust and under your management.*"

Notwithstanding Juneau's 2015 testimony (*Tr.170-71*) that he believed he had $100,000 "cash" invested in the Hawai'i project, Kenner clarified it completely to Juneau in Kenner's immediate June 2006 reply email stating:
> "*The $100k is the cash you were supposed to ALSO put in the [Hawai'i] deal, but you never did. I didn't bother you for it even though every other investor had to invest the cash in the deal even with the LOC signatures. The investment is 3% in Little Isle IV. The whole Hawai'i deal is worth (appraised land) ~$90m right now. pk*"

Clearly, Juneau had "*no problem*" with the Hawai'i project and Kenner's attempt to "*refresh his recollection*" nine (9) years before trial (in 2006), because *Juneau signed off on his*:
1. *2006 Extension of Credit* guarantee of $750,000
   a. **Dated by Juneau June 27th, 2006**
2. *2006 Securities Account Control Agreement*
   a. **Dated by Juneau June 27th, 2006 – and**
3. *2006 Pledge Agreement*
   a. **Dated by Juneau June 27th, *2007* (error dating by Juneau)**

In spite of Juneau's *faulty memory, confusion and mistakes* (a.k.a. **CTE**) in 2015, Juneau's actions ten (10) years earlier – *when the events were in real time* -- confirmed that

Juneau's communication with Kenner in 2005 and subsequently in 2006 were completely transparent and led to Juneau re-signing his Northern Trust LOC guarantees for his personal investment in the "*Hawai'i project*", while independently speaking with Northern Trust Banker, Aaron Mascarella (unimpeded by Kenner at any time).

Ultimately, Juneau received approximately **$120,000 PROFIT** in interest return from his pledged bond investment strategy during the five (5) years he was invested in the Hawai'i project.  In addition, Juneau received a 1099-tax form for the interest that was paid by Little Isle 4 on his behalf each year, further allowing Juneau to reap the benefits of the corporate (LLC) investment thru his pledged collateral.  It was Juneau's desire to "get out" of the Hawai'i project; *supra*

- **Juneau's desire to be "bought out" was unusually granted.**

### *Juneau Cross-examination*

The Court's *M&O at 6* verified: "*Juneau testified that he had lost money on other investments.*"

**TRUE (but wholly misleading)**, as the Court identified Juneau testimony that he had lost money on other investments, yet these were related to over $2 million Juneau placed with his Quebec stock broker (*Tr.232-3*), most of which was stolen as part of an offshore-Bahamian investment scheme by his Quebec "friend"; *nothing to do with Kenner*.

- That same investor accompanied Juneau to his 2015 EDNY testimony, despite being the known person to have robbed Juneau in the Bahamian scheme and his other failed investments.   Juneau confirmed his considerable Bahamian losses at the hands of his "French" investor during his 2009 arbitration testimony in *Nolan v. Kenner, 100% unrelated to Kenner*.

The Court's *M&O at 6* verified: "*he [Juneau] also testified that he had signed a form authorizing the line of credit.*"

**TRUE (and transparent)**, although Juneau repeatedly confirmed his signature to the EDNY trial court for Northern Trust LOC documents (based on documents discussed in the various email exchanges directly with Kenner identifying the said documents), Juneau's best recollection – *through his cloud of CTE symptoms* -- ten (10) to twelve (12) years after the documents he clearly signed was, as follows (*Tr.256-7*):

Q: *Do you recognize that [Northern Trust] document?*

A *[Juneau]: No.*

*Q: By that answer, you're not saying under oath, are you, that I never saw that document, are you?*

**A [Juneau]: I'm saying that <u>I don't remember</u>. That's what I'm saying, <u>I don't remember</u> seeing these documents.**

This Juneau testimony and those of his subsequent co-investors was presented as a "*memory test*" by the government, when the clear and underlying emails and texts, which corroborated the investors' authentic signatures and other transparency actions, *were repeatedly ignored by the government to frame their case-in-chief of concealment.*

The Court's *M&O at 6* verified: "*Juneau said that he terminated his relationship with Kenner in or around the summer of 2005 because Kenner was unresponsive to Juneau's attempts to communicate with him.*"

**FALSE** -- Because the Juneau email, *supra*, of May 2005 confirmed this was fabricated by Juneau's own 2005 retort (*See Recon33-76 and GX-728*):

"*Phil. Like I told you a few times already.  I'm not very comfortable with this situation.  <u>It has nothing to do with you but everything to do with the way I am</u>. ...<u>I just want to have it [Juneau's money] invested in BONDS with Northern Trust and under your management</u>.*"

- Juneau does not ask Kenner – "*Where the **** are you?*".  To the contrary, Juneau wants Kenner involved for the future with all of Juneau's investments "*under your management*".  This disregards that Kenner had not been Juneau's advisor since April 2003 (a two [2] plus year non-involvement with Juneau).

Further supporting Juneau's trust of Kenner in June 2006 and Kenner's Hawai'i management, Juneau signed the $750,000 LOC guarantee only days after his 2015 testimony claimed thru *faulty memory, confusion and mistakes* that Juneau could not remember his initial Hawai'i investment.  It is another misleading "*memory test*" failure that set the foundation for the government's concealment claims.

- How could the government have the actual evidence in hand that refuted their planned testimony and base the **CTE**-laden memory lapses on some false Kenner-concealment base for a conspiracy by concealment charge?
- **It is beyond a reasonable standard to hold any person to – notwithstanding CTE-laden individuals…and the government knew it!**

No other Juneau response refuted the full, transparent relationship.   The apparent "unresponsive" claims by Juneau in 2005 can only be attributed to his **CTE** symptoms,

because his own emails contradict it – and the government chose to ignore it to frame their case theories; *prejudicing Kenner*.

The Court's *M&O at 6* verified: "*Juneau admitted that Kenner never guaranteed any sort of financial return and that he understood the risks associated with investing. He further acknowledged that he received a communication dated July 21, 2006 that indicated that there were positive developments regarding his Hawaii Project investment.*"

**TRUE** -- Juneau made it clear that Kenner never guaranteed any of his private equity deals; including the two (2) that Juneau was bought of "at par" upon his unusual request, *supra*.

**The government claimed that Juneau's signature was "not his" on the 2006 Hawai'i joint venture closing disclosure letter from attorneys Markowitz and Najam for the Kenner investors...**
- The government knew the signature belonged to Hawai'i investor, Dimitri Khristich, who signed on the wrong line. But, they were setting their "forgery" misdirection game thru Juneau, who was a non-victim...

Although the government alleged that Juneau's signature was *forged* on the July 2006 Hawai'i JV disclosure letter written by attorneys Markowitz and Najam[47] – *when it was*

---

[47] Najam verified to the 2009 arbitration panel (*Nolan v. Kenner*) that he and Larry Markowitz had written the July 2006 JV disclosure that Lehman Brothers required for the closing.
- The pre-JV emails between Kenner, Markowitz and Najam confirmed that they were fully aware of the Jowdy loans, *supra*. They were also the two (2) attorneys who handled the Lehman Brothers closing in Cabo san Lucas for Jowdy in March 2006 – five (5) months earlier.
- The initial January 2006 Cabo funding deal document produced by CM&D for the Lehman-Diamanté closing listed the $7 million Jowdy was due to repay the Hawai'i project for his personal loan at the time of closing was noted on page 11 (*See Recon33-77 at 9.11.12*).
  - The $17 million sales commission (*See Recon33-77 at 11*) was also to be paid separately to Diamante for handling the deal internally. **It was supposed to be the basis for the remaining $10 million (+/-) due to Kenner and Kenner investors from Jowdy for his additional loans.**

*NONE of this was ever paid – simply stolen by Jowdy, Najam and Bhatti at the time of the closing (followed by a series of additional repayment plans and promises).*
- *After the receipt of the John Kaiser February 28, 2019 letter to the Court (Document 628), it should be hi-lighted that Masood Bhatti (who assisted in the 2006 Jowdy frauds and Hawai'i funding) is the person Jowdy is paying $150,000 to $200,000 monthly to "find investors and funding" just like Kenner paid Constantine – and was charged criminally for doing)...*
- *The double-standard is unexplainable.*

*actually Dimitri Khristich's signature on the wrong line* – **Juneau acknowledged receiving the July 2006 JV disclosure letter**.   The deal would not have closed if Juneau had not returned his actual signature to Larry Markowitz and the Lehman Brothers attorneys – **and the government knew that as well**.

The Court's *M&O at 6* verified: "*Juneau testified that he had met Constantine only once, in or around December 2004.   Juneau had an approximately hour-long lunch with Constantine and Kenner, but did not recall what they discussed.*"

Further highlighting the Juneau **CTE** (in 2015), he testified that he met with Kenner and Constantine face-to-face in Arizona in or around December 2004. Although the entire basis for that meeting would have been Juneau's independent investments in Constantine's Eufora and Avalon (airpark), Juneau could not remember what was discussed.

Juneau admitted he received full return of the investment funds related to Constantine (including $100,000 via check in July 2005), yet Juneau sued Constantine in 2008 for the non-return of his Eufora funds (more **CTE**?).

- Juneau and his attorneys were working with Jowdy and Tom Harvey (in 2008) and decided to sue Constantine/Eufora for the Eufora investment funds that had been repaid three (3) years earlier; anyhow.

This exhibited **more CTE symptoms – clearly present as early as 2008**.

**Juneau had been bought out of every investment dollar related to the 2015 EDNY Superseding Indictment six (6) full years before the trial – but was named as a Superseding Indictment victim nonetheless...**

Juneau was bought out of every investment he made with Constantine [Avalon and Eufora] at least six (6) years before the 2015 EDNY trial, *unrelated to Kenner*.

Juneau was bought out of the Hawai'i project upon his request (by Owen Nolan – who acquired Juneau's equity [in 2007]) – **documented on the Nolan 2006 K1 tax document** – *See Recon33-78*)[48].  Nolan produced the Little Isle 4 2006 K1 tax document during his

---

[48] *Recon33-78* -- The Nolan tax document confirmed that Nolan had $2.3 million invested in the project and had just received a distribution totaling **$761,458** in 2006 as a result of the Lehman Brothers JV.   The tax document also recognized the increase (to 17.6516%) in Hawai'i project equity Nolan owned since his signing of the July 21, 2006 Hawai'i-JV disclosure statement (from 13.44%) and the new Little Isle 4 operating agreement (*Recon33-79 @ 10.32*). See *Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A. (supra)*

2009 arbitration (*Nolan v. Kenner*) **confirming** that Nolan had received it from the Hawai'i project and Kenner; *never concealed*.

Nonetheless, the government produced Juneau – **a non-victim** – who lost $2 million at the hands of his current investment advisor from Quebec – **and none thru Kenner**.

This was the first (1ˢᵗ) failed "*memory test*" for a government witnesses; cleverly disguised as Kenner's concealment of investments.   The Juneau attempt failed under Juneau's own cross-examination admissions and the underlying empirical evidence the government misconstrued and ignored, on purpose, to create a false reality and confuse the jury.

*Juneau has no loss.*

*Juneau is a non-victim.*

- *It is irrefutable.*

---

- Only Nolan's complete willful blindness, **CTE**, or complete disregard for reading anything sent to him or signed by him could plausibly explain Nolan's complete ignorance.
- **Nolan gave testimony in the 2009 arbitration that he has not read a single document since "before" he signed his first (1ˢᵗ) NHL contract in 1991 – 18 years earlier.**

## Michael Peca[49]

**Michael Peca gave testimony to a SDNY Grand Jury in 2011.   Peca confirmed the use of his Northern Trust LOC.  He confirmed his expectation that 100% of it was committed to the Hawai'i partners capital account.  And -- he confirmed he expected use for the Hawai'i project and the underlying "Jowdy loans".**

**During Peca's 2011 SDNY Grand Jury testimony -- Michael Peca confirmed he made a decision "*as part of a group of Hawai'i investors*" to participate in lending money from the Hawai'i project to Ken Jowdy in order to assist in the acquisition of the Cabo san Lucas property and financing.**
- **Peca told the SDNY Grand Jury that <u>he thought his entire $1,875,000</u> capital account investment was being loaned to Jowdy; not just the $250,000 that Jowdy received (from Peca's traceable investment).**

**In 2015, Michael Peca exhibited heavy CTE symptoms throughout his direct testimony – fully contradicting his previous statements of Kenner's full transparency on the same, said material facts.**

**On cross-examination – Michael Peca was <u>impeached</u> repeatedly.   He "cracked" under the heavy pressures to remember his revised historical testimony and <u>confessed to his 2011 SDNY Grand Jury testimony as "honest"</u> in the end.**
- **Peca's confession that he knew of the "Jowdy loans" – per his previous SDNY Grand Jury testimony fully exonerates Kenner from having Peca as a victim of anything to do with loaning funds to Jowdy.**
- **Peca confirmed his "group" knowledge of the 2004 Hawai'i-Jowdy loan.**

**<u>At no time did Kenner sign for any Peca LOC account.</u>**

### Michael Peca Direct testimony

**<u>During the alleged erosion of a financial relationship between Peca and Kenner – Michael Peca invested millions of "additional" dollars in Kenner-controlled or other private equity deals introduced &/or vetted by Kenner contradicting any logic of "erosion"…</u>**

---

[49] Facts taken directly from the Court's Memorandum and Order of October 13, 2017 (*M&O at 7-10*).