The *M&O at 7* verified: "*Their business relationship ended in 2009 after eroding over the preceding two years*".

**FALSE** – Because the government did not allow Peca to verify that in those exact years of "*eroding*" and afterwards, Michael Peca decided to continue his vast private equity investments with Kenner, while concealing the information from his wife thru mid-2009 (a non-Kenner client at any point in time).[50]

- In late 2008 – Kristen Peca's meeting notes with Kenner describe detailed discussions about a multi-million dollar joint real estate project the Pecas began with Kenner in Desert Mountain Arizona (in evidence). Kenner paid nearly $100,000 to begin the process in Arizona in the same year Peca and Kenner commenced another joint venture in a Las Vegas condo project. Neither multi-million dollar joint venture exclusively with Kenner emulates any form of an "*eroding*" relationship; *in fact just the opposite*.

Oddly, that erosion included Kristen Peca offering to take Kenner and his family out to dinner during their planned vacation at Kenner's home in Arizona (with Kenner's family) in late 2009; six (6) months after the Northern Trust collateral seizure (*See Recon33-80 of September 16, 2009*). It should be highlighted that this is the period of time Kristen Peca said they could not get a hold of Kenner (2009) (*Tr. 718-719*).[51]

During the alleged "*erosion*" period, Peca made the following private investments with Kenner's assistance, vetting, and due diligence:

- $1mm in Robert Gaudet's Los Frailes (investment in 2007),
- $1.5mm FL home purchase (investment in 2008),
- $100,000 to purchase Constantine's private Eufora stock,
  - With "***no pledged patents***" as Komatireddy misled the jury thru deceptive Q&A while using Kristen Peca as a pawn, assuming it was not suborned (*Tr. 703*),

---

[50] There are various concealment charades by Peca from his wife (a non-Kenner client at any time). Most of the Kristen Peca gross-fabrications and lies will be directly addressed in the Kristen Peca section (*infra*) – but some will be highlighted part and parcel to the Michael Peca testimony misrepresentations – **yet corroborated by his wife under clearly impossible circumstances** (a.k.a. fabricated) – during years when her previous 2012 "FBI recorded" admissions confirm her specific absence from the said events; thus lack of knowledge.

[51] In the calendar year 2009 – Michael Peca and Kenner exchanged **over 500 text messages** – while Kenner had three (3) documented meetings with the Pecas face-to-face. In addition – Michael Peca had a face-to-face meeting with John Kaiser at their home in Buffalo, NY (arranged and paid for by Kenner) after Kaiser was the Managing Member of the Hawai'i project. If there was a genuine LOC question – or a Hawai'i "use of funds" concern shortly after the "shocking incident" Kristen Peca lied about in 2015 (*Tr. 709-715*) – their own Hawai'i Managing Member was in their living room – **yet nothing was discussed**.

- $330,000 in Las Vegas PALMS deal (investment in 2008) MINUS $90,000 Peca stole from Kenner thru Palms agreement BREACH (*See Recon33-81*), and
- $250,000 in Constantine's GSF (contribution in 2009)…

…In addition, Peca confirmed to Kenner that he wanted to be part of the $3 million buy-out effort of the Eufora loan in spite of his revisionary **CTE**-based amnesia in 2015 of "*not remembering*" (*Tr.604, 609*).

[July 2010 texts to Kenner *from Peca* (*confirming Mike Peca's EDNY PERJURY re – his Eufora buyout knowledge*)]:

| 147 27 | +171637 43234 Michael Peca* | 7/14/2010 12:20:53 AM(UTC +0) | Rea d | If not all willing members get a chance to be part of the loan buyout, mean more % there may be a lynching. FYI |
|---|---|---|---|---|

Kenner [highlighted] responded *in the affirmative* to Mike Peca, as follows:

| 16913 | +17163743234 Michael Peca* | 7/14/2010 12:21:28 AM(UTC+0) | Sent | I don't disagree |
|---|---|---|---|---|
| 16914 | +17163743234 Michael Peca* | 7/14/2010 12:21:46 AM(UTC+0) | Sent | Why wouldn't they? |

- Perhaps, the Court should note that although Kristen Peca falsely professed that "*we're done*" with the investments in May 2009 (*Tr.717*) (over one [1] year earlier), Mike Peca was a leader in the July 2010 GSF loan buyout efforts, claiming there would be a "*lynching*" if **he** could not contribute more "*investment*" funds.
  - o None of these statements reconcile Kristen Peca's falsities to the Court during trial or Michael Peca's amnesia symptoms (to the government's prosecutorial favor).

So, after Kenner's alleged "2005 Hawai'i 6-month misrepresentation" of the Hawai'i LOCs in 2005, Michael Peca felt comfortable investing *another $4 million*+ in private deals thru and with Kenner – none of which he or his wife considered their "*safety net*"…? (*Tr.385, 435 [Michael Peca], 698,710.734 [Kristen Peca]*).

- *Please note that from 2005 thru 2009 – the Michael Peca account at Northern Trust Bank produced approximately $320,000 in tax-free BOND interest as a result of the collateralized leverage deal Michael Peca signed off on – instead of using the cash directly in Hawai'i in 2005; further reducing any investment risk.*

September 16, 2009 email [Kristen Peca to Kenner], while she claimed they could not get a hold of Kenner for weeks or months (*Tr. 712-713*)[52]:

> "*We can take you, your girlfriend and kiddos out for a nice night there while we are there [staying at your home].*"

Kristen Peca's invite email was sent only two (2) hours before Kenner told the Pecas to get their Diamante K1s (tax records), because:

> "*Can you please look into your files and send me a copy of any Diamante K1s…We need them to show "conspiracy" and that Jowdy perjured himself in the Nolan trial when he <u>claimed that our "loans" to him from the Hawai'i group were investments</u>.*"

- Instead of asking, "*what loans?*", Kristen Peca sent Kenner the Michael Peca K-1s for our Hawai'i attorneys to continue the "loans" lawsuit in Arizona versus Jowdy.

No messages were received about the <u>*lack of knowledge*</u> or <u>*confusion*</u> about the Jowdy "loans" despite Michael Peca's trial testimony that he was unaware of the loans until some time in 2010 (*Tr. 424*).

- Please note that Michael Peca had already signed off on three (3) lawsuits as a Plaintiff versus Jowdy in 2008 (*See Recon33-14 – Baker/Peca letter*) and 2009 (*See Recon33-15 and Recon33-16*) in legal attempts to recover the Hawai'i-Jowdy loans, notwithstanding his participation in the contemporaneous Mexican criminal litigation.   *See Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A.*, 461 Fed. Appx. 61; 2012 U.S. App. LEXIS 3012.

Kenner and Peca exchanged (post-collateral seizure) texts one (1) month later about the Jowdy loans and the efforts to recover them, as follows:

[Peca in BLACK; Kenner hi-lighted]:

| 6843 | +17163743234 Michael Peca* | 5/1/2009 3:00:52 PM(UTC+0) | Read | *I'll be great when the Hawaii capital accts are paid back. Any news there?* |
|------|---------------|---------------|------|---------------------------------------------|
| 8037 | +17163743234 Michael Peca* | 5/1/2009 3:05:57 PM(UTC+0) | Sent | *I hear you clearly. Me too. Working on it with john kaiser.* |
| 6846 | +17163743234 Michael Peca* | 5/1/2009 3:37:28 PM(UTC+0) | Read | *Anything new on that* |
| 6847 | +17163743234 Michael Peca* | 5/1/2009 3:40:29 PM(UTC+0) | Read | *What's the timing look like* |

---

[52] Kristen Peca is certainly comfortable with a family vacation with Kenner – staying at his Arizona home – and treating his girlfriend and kids – when they were allegedly in a panic about not being able to get a hold of Kenner throughout the 2009 calendar year.

| 8040 | +1716374323 4 Michael Peca* | 5/1/2009 3:39:08 PM(UTC+0) | Sent | *Just slowly moving thru the process. We have to get all the other legal hammered out in the meantime. We are making great progress versus Jowdy. That will lead the rest of the deals like the Hawaii loans, etc* |
|------|------|------|------|------|

**These texts followed Michael Peca's notification to Kenner that his wife was not aware of the LOC collateral seizure – fully discrediting her 2015 fabricated testimony, as follows:**

[Peca in BLACK; Kenner hi-lighted]:

| 6851 | +1716374 3234 Michael Peca* | 5/1/2009 5:57:01 PM(UTC+0) | Read | Get in touch with Glen (accountant) yet. *Also, NT sent an email to my wifes aol acct. Attatched is the transfer info. She's going to f'n loose it when she sees loan paid* |
|------|------|------|------|------|
| 8042 | +1716374 3234 Michael Peca* | 5/1/2009 6:06:33 PM(UTC+0) | Sent | Let's handle the NT discussion in person. I can make it all make sense. Trust me. |

- *Peca had not told his wife about the collateral seizure he approved for Northern Trust Bank one month earlier*  (Text confirmation in evidence).
- Clearly, Michael Peca was going to introduce his LOC seizure and Jowdy loan issues to his wife with Kenner after the May 1, 2009 text exchange (months after her alleged "shocked" incident – *Tr. 709-711*).
  - o  Thus, Kristen Peca's fabricated trial testimony defies all ethical standards by herself and the complicit government who prepared her, as she testified at trail:

  *Q. Did you receive any information after 2008 about your investment in Hawaii?*

  *A [Kristen Peca]: Do you want me to get into the line of credit situation?*

**Michael Peca concealed all of his financial decisions from his wife; specifically the line of credit at Northern Trust Bank.**
- **Kristen Peca was never Kenner client.**

After Kristen Peca allegedly could not get answers from her husband in 2012 – *not Kenner*, when she initiated her four (4) hours plus of FBI recordings, as follows:

(At approximately 0:02.45 of 2:40.31) Kristen Peca starts her **July 22, 2012**, 5-hour conversation with Kenner by stating:

> **[Kristen Peca]** – *so…ummm… that's also why when I tried to get an explanation from him [Michael Peca] after talking to you, **I still felt confused because I felt like he didn't even understand what you were telling him**, when he was translating to me what you said, I said, I. **I didn't even understand what he was explaining to me about the Northern Trust loan and all that stuff**, which we can get into. Umm. so I said forget it, I am going to talk to him [Kenner] myself and get answers myself.*

**Conceivably, Michael Peca did not want his wife to understand the fact that he had been concealing all of his financial business decisions from her for over a decade,** *supra.*[53]   Michael Peca had no "lack of knowledge" of the Northern Trust loan and the Hawai'i issues, as he so eloquently described to the March 2011 SDNY Grand Jury – over one (1) year *before* the Kristen Peca calls; unless **CTE** was a contributing factor to what he revealed to his wife (then). If Michael Peca had shared with his wife the exact content of "*his own*" SDNY Grand Jury testimony, there could be no mis-representation about: 1) his "*use of funds*", 2) his knowledge of the "Jowdy loans", &/or 3) the three (3) litigations versus Jowdy for the Hawai'i loans that he signed onto as a Plaintiff in the USA and one (1) additional lawsuit in Mexico.

Michael Peca confirmed to the 2011 SDNY Grand Jury (*under subpoena from FBI Agent Galioto*) (*See Recon33-33*):

> "*A short-term loan [was made] to Mr. Jowdy because at the time Cabo – we hadn't gotten the lending from Lehman Brothers yet. **We** [emphasis added] made a short-term loan until the lending came in. Once the lending came through they were to pay back the loan. I think in the neighborhood of five-and-a-half million dollars, on the closing.  It was never paid back.  And then communication basically seized [sic] at that point from him [Jowdy]. That was kind of the whole sticking point as far as me **and the other guys** [emphasis added] with Mr. Jowdy.*"

**After Michael Peca's 2011 Grand Jury explanations, what could Kristen Peca not have understood – if Michael Peca had shared it with her at any time since 2005?**

This is paralleled only by their own *willful blindness* that affected their falsified statements of concealment regarding their LOC, in 2015-synchronicity (yet impeached by

---

[53] **Kristen Peca was not a Kenner client** – and as such – Kenner owed her no fiduciary duty.  If Michael Peca (Kenner's client) wanted his wife to be aware of anything Kenner and Michael Peca were doing – that was his sole prerogative; *never Kenner's responsibility.  Kristen Peca attended less that five (5) percent of all Kenner-Peca meetings in the fifteen (15) years before and after Kenner was Michael Peca's Business Manager*.

Michael Peca himself – outing his own wife's excuseless, fabricated testimony -- *Tr.499 [during cross examination]*). Moreover, it flies in the face of the Northern Trust default letter language *inviting* Mike Peca and his wife to call Northern Trust in 2009 if they wanted to see the back-up information for their LOC account (*although Mike Peca concealed the actual default from her[54] – in Rule 16 evidence – despite her fabricated*

---

[54] When Northern Trust mailed the first (February 2009) default letters to their LOC clients – *Kenner alerted Kristen Peca* despite her *faulty memory, confusion and mistakes*:

[Kenner to Kristen Peca]:

| 7133 | +171631 67227 **Kristen Peca*** | 3/20/2009 8:54:46 PM(UTC+0) | S e n t | **Text me when you get the Northern Trust letter today…** |
|------|------|------|------|------|

Yet – Kristen Peca felt comfortable to lie to the EDNY and testified (*Tr.711*):
> *"We didn't understand…how he didn't have the decency to give us a heads-up and let us know we were about to get such a shocking notice in the mail."*

- Kristen Peca and Michael Peca could have made the past due payments themselves as Owen Nolan chose to do after receiving the second (2nd) default notice.   No collateral would have been seized.   *That is not what Michael Peca chose to do.*

Michael Peca had already completed his *independent communication* with Northern Trust Banker Aaron Mascarella before Michael Peca approved the seizure of collateral, himself.   ***Nothing was concealed by Kenner or could have "shocked" Kristen Peca (if Michael Peca wasn't concealing "something" from her).***

Peca confirmed his LOC collateral call with Northern Trust with "***call already done***", thru a series of texts with Kenner (*See Point III at 20 of Kenner Rule 33*) on April 1, 2009 *after* Kenner notified Peca (*and the rest of the LOC clients, including Nolan who was in litigation with Kenner at the time*), as follows:
> *"A Northern trust person will call you to confirm your transfer to Schwab. Please acknowledge."*

[(***At approximately 5.45 of the 1:34.50 call***) – In July 2012 of the FBI recording, Kristen Peca tells Kenner]:
> ***Kristen Peca*** *– Well, I was referencing the earlier stuff that you said. I don't remember a large amount being distributed back to our account and the timing of the years of the loan,* ***the line of credit, that happened when we were in OHIO*** *[2008 & 2009].* ***I don't understand how it could have been open for 5 years before that?*** *Because we had a bond account going.   Do you mean the Hawai'i; you had a line of credit, but not for us?*

> ***Kenner*** *– No, no, you guys had lines of credit for 5 years at Northern Trust.*

> ***Kristen Peca*** *– for 5 years?*

*"shocked"* incident that could not have occurred based on Michael Peca's own texts to Kenner on May 1, 2009, *supra – Tr.709-713*).

**<u>Kristen Peca lied about "signing for" the Northern Trust default letter – because she was in Columbus, Ohio at the time (where her husband was paying hockey for the Columbus Blue Jackets in the NHL). The default letter was sent via FedEx and certified mail to their Getzville (Buffalo), New York address – making her entire story about receiving it in Ohio suborned perjury...</u>**

The default letter in March 2009 – *the one (1) Kristen Peca cried about "shocking" her –* was actually sent Certified Mail and FedEx (*See Recon33-82*) to their Getzville (Buffalo), New York home -- **while they were living in Ohio**.   It was *physically impossible* for Kristen Peca to have received the letter in the same state that her husband was working in

---

> *Kenner* – for 5 years!   When you were in OHIO [*2009*], that's when the thing [*LOC*] closed.

It should be noted that after the **REQUIRED**, independent phone calls made by each and every LOC client to Northern Trust Bank to confirm the release of their collateral, in lieu of individual on-going payments – **each Northern Trust Bank client had to sign** between two (2) and three (3) transfer statements for their residual funds to be transferred to a third (3rd) party bank (after their independent authorization of collateral seizure).   Thus – no one could have completed any portion of this process with Northern Trust Bank requiring multiple independent contacts (excluding Kenner) and been concealed from anything to do with their LOC, the seizure and the subsequent residual fund transfers.

- Each of the Northern Trust Bank LOC clients' April 2009 and May 2009 bank statements (in Rule 16 evidence) confirm these independent, hands-on transactions, *infra*.

Each of their IMUS (account management) agreements with Northern Trust Bank **REQUIRED** their independent sign-off, stating -- under the **SPECIAL INSTRUCTIONS** paragraph (*the same page as their signatures*) (*See Recon33-64).*

> *Only those instructions directing the wiring of funds to any account outside of Northern Trust Bank* ***must be signed by Client***.

The same page confirms specific mailing request of the client's documents:

> *Client directs that copies of all account statements, including tax information letters, be sent to Standard Advisors Inc.* ***as well as to Client***.

Northern Trust Banker, Aaron Mascarella confirmed this in testimony (*Tr.912*):
> *"I know it doesn't help you today right now, but that a copy was also sent to each one of the borrowers"*.

- ***Please note that Mascarella was the Northern Trust person in charge of the statements, so he would be one of the critical people to confirm his own Patriot Act actions.***

at the time (Ohio), considering the circumstances – ***thus clearly fabricated for trial effect***.

The Northern Trust default letter offered (*Recon33-82*):
> *"You may request an accounting by calling us at 602-468-2537."*

Apparently, the Pecas were not so concerned to call.   And, when Kenner asked Mike Peca to sign and notarize a September 2009 release form to Northern Trust to receive the past statements (*6-months later*) for Mike Peca's LOC and banking accounts (*Recon33-83*), the Pecas received copies from Northern Trust and Kenner -- **but failed to review them,** *infra*.   Kristen Peca confirmed this to the 2015 trial court (*Tr.770-771*):

> *Q: Is it your testimony on the witness stand under oath that at no point in time Phil Kenner ever sent you the Northern Trust documents that may have been in his possession?*

> *A [Kristen Peca]: **Not the kind we were looking for.***

> *Q: Well, to the best of your memory, what kind of Northern Trust documents did he send you?*

> *A [Kristen Peca]: **I can't recall.***

Access was supported by Kenner arranging the release of statements with Mike Peca's signature and fax to the bank.  O'er, **the action was fully transparent.**

### Kenner tells Kristen Peca on 2012 FBI recording to "*trace it all*" (Northern Trust LOC funds] – because Kenner had already discussed all of the details ad nauseum with her husband...

Lastly, and finally confronting the alleged "*concealment*" issues head-on, Kenner told Kristen Peca on her surreptitiously recorded 2012 FBI calls with Kenner to "*Trace it – trace all of it*", when she asked Kenner about what the LOC funds were used for.   The government portrayed Kenner's unguarded statement during their rebuttal summation as a form of *concealment*, but it echoed the merits of transparency; *nothing more, nothing less*.   Unfortunately, as portrayed by Komatireddy's refrain, the jury would have believed they were "*bone-dry while standing unprotected in a monsoon rain*". (*Tr.5758*)

As example, the government solicited Michael Peca's claim that he was not aware of the use of funds (*Tr.429-430*)[55], but Peca *signed* the following ten (10) LOC documents (*at a*

---

[55] Mike Peca falsely claimed:

*minimum*) in the first 12-months after opening his LOC (*but never questioned the usage?*):

> 2005 (July) Master Note 1.775mm – *Peca signed*
> 2005 (March) Master Note 1.6mm -- *Peca signed*
> 2005 (March) Pledge Agreement 1.6mm -- *Peca signed*
> **2005 Disbursement Request & Authorization – Peca signed \*\***
> 2005 Extension of Credit - *Peca signed*
> 2005 Letter of Authorization for Little Isle 4 - *Peca signed*
> 2005 Promissory Note 1.3mm -- *Peca signed*
> 2006 (March) Peg Balance 2.2mm -- Peca (*signed by Mascarella and Brill*)
> 2006 (November) Peg Balance 2.2mm -- Peca (*signed by Mascarella and Brill*)
> 2006 Change in Terms Agreement - *Peca signed*
> 2006 Master Note 1.775mm – *Peca signed*
> 2006 Pledge Agreement 1.775mm -- *Peca signed*
> 2006 Securities Account Control Agreement 1.775mm -- *Peca signed*

Only willful blindness could have supported the false 2015 claims by both Kristen Peca and Mike Peca related to the Northern Trust LOC and Jowdy loans (*of which Kristen Peca had nothing to do with*).

**<u>Kristen Peca admits on 2012 FBI recording that she had NO IDEA about her husband's Northern Trust LOC until years after it had been opened – thus confirming she LIED TO THE EDNY Court in 2015 about her 2005 involvement…</u>**

- The government allowed her known perjury to stand in contradiction to her own recorded "words"…

Kristen Peca actually told Kenner on the same FBI recordings in July 2012.
[@ *About 5.45 of the 1:34.50 call*]:

> **Kristen Peca** – *Well, I was referencing the earlier stuff that you said, <u>I don't remember</u> a large amount being distributed back to our account and the timing of*

---

> *Q: During this period of time of October of '06 did you get any statement whether from the bank or Mr. Kenner or anybody, saying you have drawn down $1.6 million on your line of credit?*
>
> *A [Mike Peca]: No.*

**\*\* <u>*Impeaches Peca's testimony @ Tr.429-30*</u>**. This <u>*Disbursement Request & Authorization*</u> was signed by Mike Peca only three (3) months after he opened the LOC (not Kenner), thus virtually no time passed before he was fully notified, signed the **ONE-PAGE**, critical authorization, thus conflicting with the government's theory and Peca's testimony, notwithstanding **CTE**.

*the years of the loan, **the line of credit, that happened when we were in OHIO [2008 & 2009]. I don't understand how it could have been open for 5 years before that?** Because we had a bond account going? Do you mean the Hawai'i…you had a line of credit, but not for us?*

**Kenner** *– No, no, you guys had lines of credit for 5 years at Northern Trust.*

**Kristen Peca** *– for 5 years?*

**Kenner** *– for 5 years!   When you were in OHIO [2009], that's when the thing [LOC] closed.*

**Per her own 2012 admission to Kenner; Kristen Peca was undoubtedly not part of the 2005 conversation between Kenner and Mike Peca about opening the LOC…**

Consequently, Kristen Peca fabricated the entire 2005 story about "*6-months*" and "*nothing would be touched*", yet contradicted by her own confusing fabrications when stating the funds were supposed to be "*used for vertical construction*", in an clandestine attempt to create synchronicity with her husband's fabrications (*Tr.697*).

**Michael Peca contradicted his detailed 2011 SDNY Grand Jury testimony and all his previous emails and texts with Kenner (pre-trial) to claim "*no knowledge of the Jowdy loans*" – in concert with the other government witness "*new testimony*"…**

In spite of Mike Peca's perjured testimony in 2015 (*Tr.436*), when he claimed "*no knowledge*"[56] of the defaults and Kenner's alleged lack of explanations, Mike Peca did *NOT* mention any of that to the 2011 SDNY Grand Jury, **under oath (four [4] years closer to the actual events)**.   In fact, Mike Peca represented exactly the opposite with the following statements, when asked how much money he invested in Hawai'i (*thru Little Isle 4's capital account*).   Instead of stating $1.8 million and pausing his testimony, he offered a meticulous and eloquent narrative of the use of funds and his planned participation in the loans to Jowdy "*as a group*", as follows:

*Q: How much did you put into Little Isle 4?*

*A [Mike Peca]: "$100,000 cash investment that was going towards that.  Then we had lines of credit.  I had one out for $1.7 million that was going to be used at the time.  Here's where a lot of the cross starts to happen.  A short-term loan to Mr. Jowdy, because at the time Cabo – we hadn't gotten the lending from Lehman Brothers yet.  We made a short-term loan until the lending came in.  Once the lending came through they were to pay back the loan, I think in the neighborhood*

---

[56] See footnote 54, *supra*, of Peca's text message confirmation to Kenner about talking to Northern Trust bank *prior* to his approved seizure, **on his own,** with: *"Call already done".*

> *of five-and-a-half million dollars, on the closing. It was never paid back. And then communication basically seized at that point from him [Jowdy].* **That was kind of the whole sticking point as far as** _me and the other guys_ **with Mr. Jowdy.**
>
> *The 1.7 along with the $100,000 and* **whatever else put in this a capital account**, *Little Isle 4, I believe. The Capital account was loaned to Ken Jowdy, our business partner, so there is no need* _at the time_ *to be worried about anything. The money was loaned to Ken Jowdy to basically help some of the purchase of the Cabo property so we can get the funding. And then it was supposed to [be] a short-term loan."*

Please note that Mike Peca told the 2011 Grand Jury that he expected 100% of his Hawai'i "capital account" funds (**$1.8 million**) were supposed to be **in** Little Isle 4's capital account and **loaned to Jowdy**. Only $440,000 was initially loaned to Jowdy originating from the Peca capital account deposits to Little Isle 4 as Peca authorization allowed (*See Recon33-84*). Jowdy repaid $200,000 of those advances after an 8-day period, leaving a net of $240,000 out of the $1.8 million Peca told the SDNY he "*approved and expected*" for the Jowdy loan, when he affirmed – **in present tense**,

> **"The Capital account was loaned to Ken Jowdy, our business partner, so there is no need** _at the time_ **to be worried about anything."**

O'er, Peca affirmed:

> *Q: When you signed those [loan] papers, where did you think that money was going?*
>
> *A [Mike Peca]: "It was going to a Capital Account for Little Isle 4."*

Kenner was granted full permission to withdraw the LOC funds thru Peca's **one-page**, signed *Letter of Authorization* – which Mike Peca affirmed to the 2011 SDNY Grand Jury *at 39*:

> *"It was prepared for me, I read it, and signed it".* [57]

Accordingly, Kenner could have foolishly withdrawn 100% of the LOC funds from Peca and the other LOCs all at once (*as authorized*), paid the higher monthly fees for the funds immediately withdrawn. Kenner could have co-mingled every dollar from the various LOCs in the Little Isle 4 capital account. Nevertheless, <u>Kenner did not</u>. If Kenner had, he could have been deemed completely incompetent by any reasonable investor, under

---

[57] See *Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A.* – confirming that once Peca signed the document (which he confirmed to the SDNY Grand Jury in 2011) – the related authorizations are his burden to understand; not subject to further and never-ending re-documentation or explanations.

review.  Instead, the government tried to wash this salient issue unnoticed throughout trial by insinuating that the LOC funds did not belong to the Little Isle 4 Capital Accounts (*re-writing capital contribution and centuries of economic theory in one flail floop, just like their misleading representations about the contents of the Joint Venture agreement*) – and Peca's own signed-authorization.[58]

**Thru signed ONE-PAGE *Letters of Authorization* from the LOC clients to Northern Trust Bank (directly) – they granted Kenner full access to transfer their LOC funds to the Little Isle 4 bank account – which Kenner legally did -- WITH FULL PERMISSION...**

Michael Peca and Darryl Sydor (*addressed infra*) both convincingly told the 2011 SDNY Grand Jury that they *independently* granted access to Kenner and Little Isle 4, **rather** than the LOC funds remaining their own personal property.  It was exhaustively *misrepresented* by the government that future withdrawals would require incremental, individual approvals.  This was never true.  This government position ignored the fact that LOC investors already signed their full permission, one-page **Letter of Authorization** directly with Northern Trust Bank (*infra*), fully and legally satisfying this legally defined issue; *all in evidence, yet blatantly ignored.*

**Peca confirmed to the 2011 Grand Jury that he EXPECTED all of his LOC funds [$1.7 million] to be deposited into the Little Isle 4 capital and loaned to Jowdy...**

Mike Peca continued his transparent testimony to the 2011 Grand Jury:

> *"The capital account was loaned to Ken Jowdy, our business partner, so there is no need at the time to be worried about anything.  That money was loaned to Ken Jowdy to basically help some of the purchase of the Cabo property*[59] *so we can*

---

[58] See *Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A. See also PaineWebber Incorporated v. Bybyk, 81 F.3d 1193; 1996 U.S. Appx. LEXIS 8728.* ("...a party's ***failure to read*** a duly incorporated document will not excuse the obligation to be bound by its terms"); *See also Ecoline, Inc. v. Local Union No. 12 of the International Association of Heat and Frost Insulators and Asbestos Workers, AFL-CIO, 271 Fed. Appx. 72; 2008 U.S. Approximately. LEXIS 6390,* ("In general, individuals are charged with knowledge of the contents of documents they sign" and "a person who signs a written contract is bound by its terms regardless of his or her ***failure to read*** and understand its terms".)

[59] Peca's statement to the SDNY Grand Jury confirms that the $350,000 that the government identified on *government-forfeiture-36* (*out of the $6.625 million purchase contribution*) that originated from any of the underlying LOC capital contributions was 100% expected.  The government chose to ignore this previous evidence to maliciously frame their position of *concealment*, as well.  The $350,000 out of $6.625 million was "*some*" – exactly as Mike Peca described in 2011, ***yet selectively forgot in 2015***.  It raises more suspicions than it draws

*get the funding. And then it was supposed to be a short-term loan."[60]*

- Please note that this also contradicted Mike Peca (*Tr.419, 427*) and Kristen Peca (*Tr.697, 699*) claims that the funds were for "*vertical construction*"; suspiciously never mentioned by Mike Peca to the Grand Jury or by Kristen Peca in four (4) plus hours of 2012 FBI recordings.  This completely disregards the ***crucial fact*** that Kristen Peca told Kenner on her FBI recordings in 2012 that she was *not* aware of the LOC until sometime in 2008 at the earliest[61], confirming her multiple instances of planned perjury and fully discrediting her alleged participation in the initial 2005 Hawai'i-LOC discussion and her emotional "*the bonds are my baby*" (*Tr.698*) testimony in 2015, constructed exclusively to elicit jury sympathy.

### Peca re-confirms his funds to the Little Isle 4 capital account and then to Jowdy for the loan...

Mike Peca continued to the 2011 Grand Jury:

"*I knew 100 percent it was going to Little Isle 4 initially.  Shortly after that the*

---

conclusions of the intention of the 2015 well-orchestrated testimony; *perhaps a corrupted 'means' to a 'desired end'?*

[60] Specifically, in spite of this 2011 SDNY Grand Jury direct testimony four (4) years earlier, Mike Peca perjured himself in 2015, claiming the Hawai'i losses had nothing to do with Jowdy. (*Tr.455-457*).  After Mike Peca's SDNY Grand Jury testimony, his plaintiff status in the Arizona and two (2) California cases, without *faulty memory, confusion and mistakes* (**CTE**), it is impossible Mike Peca was unaware of the Jowdy loan relationship to the lawsuits from Hawai'i versus Jowdy (*See Recon33-15 at 7, Recon33-16 at 7, and Recon33-14-Peca letter at 1*).

[61] (*At About 5.45 of the 1:34.50 call*) – In July 2012 of the FBI recording, Kristen Peca tells Kenner:

    **Kristen Peca** – *Well, I was referencing the earlier stuff that you said. I don't remember a large amount being distributed back to our account and the timing of the years of the loan, **the line of credit, that happened when we were in OHIO** [2008 & 2009]. **I don't understand how it could have been open for 5 years before that?  Because we had a bond account going.  Do you mean the Hawai'i; you had a line of credit, but not for us?***

    **Kenner** – *No, no, you guys had lines of credit for 5 years at Northern Trust.*

    **Kristen Peca** – *for 5 years?*

    **Kenner** – for 5 years!   When you were in OHIO [*2009*], that's when the thing [*LOC*] closed.

- *Kristen Peca cannot believe that she is finding out on the FBI phone call in 2012 that her husband, Kenner's client, had concealed that he had a LOC open for five (5) years – even though she lied to the EDNY in 2015 that she and her husband waited a month before deciding to participate with a 2005 LOC for their Hawai'i investment capital (Tr.697).*

*Kenner 13-cr-607 (JFB)*

*short-term loan was something that took place."*

**Peca reconfirms that he was 100% aware and agreed with the loans to Jowdy...**

Ultimately, when Mike Peca was faced with the most telling summary question to end the 2011 Grand Jury inquiry about his full and transparent knowledge, when asked if he is still in support of the loans to Jowdy seven (7) years after the loan started and five (5) years since Jowdy stopped payments, Peca did *not* have a single, terse word concerning Kenner, as follows:

> *Q: Did you know in advance of it being made?*

> *A [Mike Peca]: __I probably did__, I mean at the time if I was told about it, I probably would say, okay, sounds good.   It was probably explained to me.   I cant tell you definitely right now that I know the day or time of the conversation.   __As it was happening I wasn't like what happened to that__, I didn't know it would happen.   I kind of knew what we were doing.*

> *Q: Let me paraphrase, you are not sure if you were told but you basically approved of it.   You wouldn't really have cared sounds like you're saying?*

> *A [Mike Peca]: __Correct__.*

It is not credible under any standard that Mike Peca, four (4) years later in 2015, was sure he was never told.   The 2011 SDNY Grand Jury was the perfect place for someone, described by the government to have *faulty memory, confusion and mistakes*, **four (4) years later**, to have responded with what he knew, instead of "*forgetting that he remembered being told nothing (or vice versa)*" -- as wholly confusing.

Michael Peca's 2015 testimony was specific regarding what he remembered exactly "*not being told*", although in 2011, he confirmed, "*what he knew*" with articulateness and grace. But, in 2015 Michael Peca "*could not remember*" when the meeting took place, but (*perhaps thru some undue influence or promises*) he was able to remember every single occurrence of conversation with Kenner and that, as a result of now-perfect recollection, he remembered exactly what he was *never* told (?!?).

➢ *See Mike Peca 2011 SDNY Grand Jury testimony...*

> *The defendant requests the Court reads the entire March 2011 SDNY Grand Jury testimony of Mike Peca for his 2011 mens rea.   There is not a single insinuation of confusion or ambiguity related to Peca's full and unabated knowledge of the LOCs, their full and expected usage for Little Isle 4, and the purposeful, and "no need at the*

*time to be worried about anything" loans to Jowdy for the coordinated Mexico efforts (See 3500-MP-5).*

- *Please note that Mike Peca, like 90% of the Hawai'i investors, were also a DDM and/or DCSL investor, as well.*

- *All of Peca's "knowledge" statements were corroborated by Hawai'i-Mexico investors, Darryl Sydor and Turner Stevenson, the same day in 2011, in New York, and under oath.*

The Court at *M&O at 7*, represented that Michael Peca and Kenner began discussions "*about the Hawai'i project in or around 2003*", yet Peca was not involved in the Hawai'i project until he signed his *Northern Trust Letter of Authorization* on or after March 11, 2005; two (2) years later.   There is no representation that any conversation occurred in 2003 or even 2004 with Peca related to the Hawai'i project.   It is misconstrued testimony (*Tr.378-79*).

Michael Peca did confirm (*M&O at 7*) – consistent with his 2011 SDNY Grand Jury testimony that he "*invested $100,000 in cash and $1.775 million in funding obtained through a line of credit*".   (*Tr.381-82*).   As such, the 2004 Little Isle 4 By-Laws (*See Recon33-69*) "controlled" the use of funds from that point forward.   There was no document signed or testimony given by any investor that there was a subsequent agreement or requirement to "trace" the investor funds thru the Little Isle 4 capital account and give a specific Hawai'i use of funds report for their co-mingled investment funds.   **This government theory is more fantasy than even reasonable, yet accepted as commonplace to support a ridiculous theory of tracking funds.**

- If Jowdy is eventually forced to repay the documented, Jowdy-authenticated, Jowdy-confessed, and government verified (*See government-forfeiture-44*) loan he stole from Kenner and Kenner investors since his last payment of March 24, 2006 (of $90,000 just two [2] days before he gained access to the Lehman Brothers $125 million budget funds) – *with or without the government's help*...the defendant *knows* that each and every one of the Little Isle 4 capital account investors will step forward, hand-out to receive their commensurate share of the loan repayment funds of $31 million-plus (as of the end of 2018), based on their overall Little Isle 4 and Na'alehu Ventures 2006 ownership percentages.

- It is unfathomable under any non-contracted standard that the investors would expect a retrospective tracking of their initial investment – passed thru a myriad of kaleidoscope strainers to determine how much this co-mingled deal needs to be individualized.   It is wholly nonsensical when applying any accounting method that does not start with "*Based on accounting methods devised by Willy Wonka....*".

Peca confirmed to the 2011 SDNY Grand Jury that he expected all of those "investment" funds to be deposited in the Little Isle 4 capital account and *released* to Jowdy as part of the Hawai'i-Jowdy loans, *supra*. **There is no equivocation about that fact!**

When Michael Peca gave proffer to the FBI on July 17, 2009 [*3500-MP-2*] – just months after his LOC seizure and the "*shocking*" incident his wife fabricated in 2015, Peca did not declare his lack of knowledge of the LOC investment funds. At the same time – FBI Agent Galioto noted that:

> "*In the last few years, Peca started to get concerned for his money when the DEL MAR [Jowdy] project stalled.*"

- There was no more of a perfect time – *in real time with less **CTE** symptoms* – for Peca to disclose his LOC concerns, but none were forthcoming. Peca only declared his Mexico concerns for the documented Jowdy wrongdoings, he learned from his direct communication with his Arizona attorney (Tom Baker) and California attorney (Ronald Richards), at the time, *real time*.

Michael Peca was also immediately aware of the change of attorney in the Arizona case versus Jowdy after signing the 7-page waiver and disclosure for Tom Baker -- because he learned that Jowdy's attorneys threatened the previous Hawai'i attorneys; when they begged Kenner to let them out of the case (*See Recon33-85*). Kenner obliged.

[Kenner hi-lighted **(sent)** – Peca response in **BLACK (read)**]

| | | | | |
|---|---|---|---|---|
| 121 42 | +17163743 234 Michael Peca* | 10/28/200 9 3:10:08 PM(UTC +0) | Sent | Please fax the Attorney Tom Baker Waiver to me today. **I need them for Baker to take over the $5-10mm case versus Jowdy for us in AZ. Thx** |
| 105 70 | +17163743 234 Michael Peca* | 10/28/200 9 4:34:09 PM(UTC +0) | Read | **What is the waiver for? Why did other Attys withdraw? You can call me back if you need to explain with a lot of detail.** |

**Peca gave Kenner (like all of the Northern Trust LOC clients) full-signed authorization to access their LOC and transfer funds to the Little Isle 4 bank account without additionally required instructions...**

Peca also confirmed he signed the *Northern Trust Letter of Authorization* for Northern Trust Bank (*M&O at* 7) (*Tr.387-88 – GX-2142*). Nothing could be confused by the following blanket authorization Michael Peca granted:

> *"This letter is your authorization to <u>allow Philip A. Kenner</u> to access my above referenced line of credit for direct deposit to the Little Isle 4 account at Northern Trust. <u>He is authorized to sign for the release of funds related to the line.</u>"*

- Nothing in the authorization required additional or supplemental disclosure once the funds were transferred to the Little Isle 4 account.   At that point, the funds were governed 100% by the 2004 Little Isle 4 By-Laws (*See Recon33-70*).

- The remuneration of the Nolan investment in Hawai'i was Peca's first transaction under the *Letter of Authorization* he signed (*M&O at 7*).   Peca confirmed this to the SDNY Grand Jury as well thru Peca's **one-page**, signed ***Letter of Authorization*** – which Mike Peca affirmed to the SDNY Grand Jury *at 39*:

> *"It was prepared for me, I read it, and signed it"*.

### <u>The Northern Trust subpoena (although only partially filled – and never completed during or after trial) included monthly LOC statements that were sent to multiple Peca home addresses – leaving nothing concealed...</u>

The Court in the *M&O* represented that Peca did not receive LOC statements from Northern Trust Bank, yet the 2015 untimely subpoena produced multiple LOC statements Peca received in 2006 at both his Edmonton, Alberta, CANADA residence -- and his Getzville (Buffalo), New York home.

Thus -- ***nothing was concealed*** about the funds used at that point as directly mailed from Northern Trust to Michael Peca's multiple residences of record.   In addition – it cannot be overlooked that the Northern Trust subpoena also confirmed that Peca had signed his *2005 annual Disbursement Request & Authorization* form (*See Recon33-86*).   This **one-page** document signed by Peca confirmed that he was 100% aware that $1,600,000 of his extended $1,775,000 LOC was USED within four (4) months of his initial Letter of Authorization – **dated July 1, 2005**.   No emails or other communication was presented showing Peca's confusion regarding the matter.

Despite Peca signing the *2005 Disbursement Request & Authorization* (**one-page** document), Peca gave **CTE**-laden testimony despite his clear awareness (or based on *faulty memory, confusion and mistakes*) (*Tr.429-430*):

> *Q: ...did you get any statement whether from the bank or Mr. Kenner or anybody, saying that you have drawn down $1.6 million on your line of credit?*
>
> *A [Michael Peca]: No.*

Peca -- and all of the Northern Trust LOC clients -- signed *annual Disbursement Request & Authorization* forms in every year acknowledging the funds **DISBURSED** from their individual LOC accounts [2005, 2006, 2007, and 2008]. *No concealment was possible*.

The government's Q&A to multiple witnesses about the $395,000 short-term loan that Kaiser received for 11-days (in 2006) and repaid to the Hawai'i project (as required by Kaiser for his sign-off on the JV deal) also falls within the scope of the Little Isle 4 By-Laws (*See Recon33-70*); absolutely followed by Kenner.   **None of the Kaiser-loan proceeds benefitted Kenner at any time**; nor were they ever intended to (as confirmed by NYFD 9-11 first responder, Vincent Tesoriero to the FBI [Galioto] in 2014 – *See 3500-VT-1-r at 2*).

**Peca confirmed the 2004-05 "*group decisions*" to lend funds to Jowdy despite his 2015 LIES about "no knowledge" until 2010 – one [1] year after he and his wife confirmed they discussed the Jowdy-Hawai'i loans with Constantine and the GSF efforts...**

Notwithstanding Pecas' own 2011 SDNY Grand Jury testimony about his 2005-06 real time knowledge of the "*group decision*" to loan money to Jowdy to benefit the future Cabo project (that he was a member of) -- the Court represents (*M&O at 8*) that Michael Peca "*also said that he later learned from Kenner 'well after the fact,' in or around 2010, that a portion of that line of credit was used to loan money to Jowdy*".   The voluminous 2009 texts, 2009 emails, 2008 and 2009 lawsuits Peca was a Plaintiff [in Arizona, California, and Mexico], the 2008-09 disclosures he signed[62] – and his wife's own

_____

[62] *See Recon33-14 FOLDER -- Baker 2008-09 Arizona case disclosure signed by Peca (and 17 other Hawai'i-Mexico investors).*

The investors had direct and independent communication with their Arizona attorney, Tom Baker, (and subsequently with their California attorney versus Jowdy -- *See Recon33-14 and Recon33-21*) who received fully documented signoffs from the Hawai'i investors.  The signed disclosures pronounced in the first (1st) paragraph of the 7-page letter:

> "*...the gist of the lawsuit is to recover certain monies loaned to Mr. Jowdy from Mr. Kenner, Little Isle 4 and Ula Makika LLC.   Mr. Kenner estimates the total amount of monies loaned to Mr. Jowdy which have not been repaid to be approximately $5,000,000. This is the estimated principle only, exclusive of accrued interest.  In summary, Mr. Jowdy denies that the monies were loans but rather characterizes them as investments.*"

Jowdy was able to get the Arizona case dismissed in mid-December 2009 thru a series of unethical legal filings and documented threats to Kenner attorneys, *supra (See Recon33-23).* Less than three (3) weeks later – **Jowdy confessed to all of the funds being loans --** contradicting his 1-½ year Arizona defense strategy -- during his 2-day California deposition in another case suing Jowdy for the exact same loans.   The California cases identified in the two (2) Complaints (*See Recon33-15 at 7 -- and Recon33-16 at 7*):

testimony about the May 2009 discussions in their living room between Constantine and both of them about Jowdy not repaying the Hawai'i loans – all confirm that **CTE** or other extenuating factors relegated Peca's testimony to unreliable at best – *and fabricated as worst*.

**Peca's own text communication and phone calls with Northern Trust Bank confirmed he spoke directly to Northern Trust Bank about his LOC default…while he was engaged in Arizona litigation with Jowdy thru the Little Isle 4 (Hawai'i) partners over the non-payment by Jowdy…**

The Court *M&O at 8* identified – *"Peca testified that Northern Trust subsequently held his account in default"* after Kenner *"assured him not to worry"* and *"Kenner never explained to him what had caused the default"*.

**FALSE** – Because text communication between Kenner and Peca on April 1, 2009 confirmed Peca was in direct communication with Northern Trust and received his answers from Kenner about the default reasons that day.

Notwithstanding – Peca's own 2011 SDNY Grand Jury testimony refuted this as well:

[*2011 Peca SDNY Grand Jury at 30*]:
　　*"A short-term loan [was made] to Mr. Jowdy because at the time Cabo – we hadn't gotten the lending from Lehman Brothers yet.  **We** [emphasis added] made a short-term loan until the lending came in.  Once the lending came through they were to pay back the loan, I think in the neighborhood of five-and-a-half million*

---

　　*"Mr. Najam was in charge of the corporate governance while under Jowdy's direction and control received over eight million dollars ($8,000,000) from a LLC in Hawai'i.  Mr. Najam failed to properly account for those funds and has placed the Jowdy investors in a vulnerable and compromised position."*

Jowdy **personally** re-affirmed the Hawai'i loans in March 2010 [*3500-KJ-2*] – by *confessing* to FBI Agent Galioto and other SEC officers (with Louis Freeh at his side – noted in the raw notes *at 1*) that Jowdy had received 100% of the Hawai'i funds and had no plans to repay any of them. **The agents noted some of Jowdy's confession of his embezzlements** in their *raw notes*, as follows:
　　　　At 3 -- KJ [Jowdy] – *"all the funds were not used for DDM"*
　　　　At 11 -- KJ [Jowdy] – *"if I was not allowed to use $ then it was a problem"*
　　　　At 12 -- KJ [Jowdy] – *"thought I could use $"*
　　　　At 12 -- KJ [Jowdy] – *"$ from -- $ from PK loans -- Little Isle 4 – Ula Makika"*
　　　　At 12 -- KJ [Jowdy] – *"02-06 -- $ used from BD [Baja Development Corp] to pay personal expenses → booked as loans from BD"*

All of the Hawai'i investors, who were alleged as victims in the 2015 trial of Kenner, participated as signed-off Plaintiffs versus Jowdy in the various Arizona (2008-09) and California cases (2009-2010).  *None of these transactions occurred in the EDNY at any time.*

*dollars, on the closing.   It was never paid back.   And then communication basically seized [sic] at that point from him [Jowdy].   That was kind of the whole sticking point as far as me **and the other guys** [emphasis added] with Mr. Jowdy."*

[*2011 Peca SDNY Grand Jury at 39-40*]:
> *Q: Did you understand at the time if you didn't pay back the line <u>ever</u> credit the bank was going to take your bonds?*
>
> *A [Michael Peca]: Yes. And they did.   What they took was just under $2 million, I believe it was in 2008[63], maybe after a while.   We were just, when the loan, the short-term loan from Mr. Jowdy was not paid back, the line of credit time matured.   They had taken what was loaned, I guess, lent to me plus interest.*
>
> *Q:  Let me show you what is marked Grand Jury Exhibit 106, which is the pledge agreement dated November 5, 2007.   Kind of technical document, do you remember signing documents putting up the bonds to secure the line of credit?*
>
> *A [Michael Peca]: Uh-huh, yes.   **<u>I was very well aware of that scenario.</u>***

**<u>Peca explained via text that he already spoke with Northern Trust "on his own" after Kenner sent him a notification to call Northern Trust directly about the default...</u>**

On April 1, 2009 *<u>after</u>* Kenner notified Peca (*and the rest of the LOC clients, including Nolan who was in litigation with Kenner at the time*) via text, as follows:

> *"A Northern trust person will call you to confirm your transfer to Schwab. Please acknowledge."*

Peca immediately replied:



| 6325 | +17163 743234 Michael Peca* | 4/1/2009 10:44:43 PM(UTC +0) | Read | Got it. **Call already done.** Was this the plan b/c it makes sense to pay the line off or b/c the the loan defaulted? Honestly |

Kenner response (2 minutes later):



| 7420 | +17163743234 Michael Peca* | 4/1/2009 10:45:12 PM(UTC+0) | Sent | **100% better to pay off!** |

Peca replied:



| 6326 | +17163 | 4/1/2009 | Read | **Ok. Let's get this done soon.** Also, on top of the line |

---

[63] Small **CTE** memory issue – even during Peca's 2011 SDNY Grand Jury testimony.

| | 743234 Michael Peca* | 10:47:24 PM(UTC +0) | | I had towards Hawaii, I also had $200k cash in too. Correct. |
|---|---|---|---|---|

Kenner finally asks Peca to "*text when free*" to clear up any other Peca misconceptions or questions (during the year Kristen Peca alleged they could not get a hold of Kenner):

| 7423 | +17163743234 Michael Peca* | 4/1/2009 11:03:43 PM(UTC+0) | Sent | **Text me when free** |
|---|---|---|---|---|

Apparently – Michael Peca decided to NOT tell his wife -- again -- but rather conceal the investment decision to "pay off" the LOC in April 2009, in agreement & discussed with Kenner – and then finish pursuing Jowdy thru the open Arizona litigation (as mentioned by Peca, *supra*, with: "*Let's get this done soon*")…

Peca's "*Let's get this done soon*" was directly in reference to the January and February group conference calls that discussed the 2008-09 Arizona and Mexico legal fees that Kenner was personally paying (totaling hundreds of thousands of dollars) and the ~$40,000 per month in LOC fees, also being fronted by Kenner for the group (**Counts 7 & 8 of the Superseding Indictment**). Peca agreed with the group that the only way to recover the collateral funds was to "*continue suing Jowdy as a group*" in Arizona (legal fees fully paid for by Kenner) and recapture the "loaned" funds thru litigation. This strategy was in lieu of continuing to throw away an additional approximately $40,000 per month (of which Kenner had paid the last $267,000) – since the abrupt termination by Jowdy and his attorneys [Freeh and Harvey] to negotiate a settlement with Kenner and Kenner investors for the tens of millions the attorneys in Arizona and Mexico documented Jowdy stole, embezzled and diverted since August 2002.  **All of the corroborating documents are in Rule 16 evidence and ignored by the government to maintain a faulty conviction based on their "*failed memory test*" methodology.**

- Please note that even in April 2009, Michael Peca believed he had $200,000 of additional cash in the Hawai'i deal, not the actual $100,000 he invested – thus an early occurrence of **CTE**-laden, poor memory, *supra*, six (6) full years before his failed 2015 EDNY "*memory test*".

Peca was independently represented by counsel in Arizona and California versus Jowdy for the same loaned funds, *supra*, and failed to raise any documented issue (in Rule 16 evidence), nor any presented at trial, about a *now-remembered lack of knowledge*.

## Peca requests all Northern Trust documents sent to Kenner six (6) months after his collateral seizure…

The Court at *M&O at 8* identified that Peca *"asked Northern Trust to send all documents pertaining to his line of credit to Kenner"*.  Peca's 2009 request defies logic if he could not gain access to what he was looking for.  And, it is refuted by Kristen Peca's testimony, *supra*.  Even if, per se, Kenner's documents were "stolen"[64] (*Tr.439-440*), *nothing would have prohibited Peca from making a second (2nd) request to Northern Trust.*  **He did not.**

In fact the Kenner-Standard Advisors server was stolen in 2007 (with all of the company back-up records, including all emails pre-2007) – two and a half (2 ½) years before the Peca request to Northern Trust Bank for his full LOC records – for Kenner to handle tax related issues "as the Kenner communication suggests", *supra*.

In addition at trial -- Northern Trust banker Aaron Mascarella confirmed all clients of his received duplicate statements (*Tr.912*).  Kristen Peca said Kenner sent her Northern Trust documents, they did not contain whatever she was looking for, but *she could not remember what she received*.  The entire alleged concealment supporting scenario was wholly implausible at every juncture.

**Peca lies about his knowledge that the 2008 wire went to Constantine Management Group...**

Related to the Peca 2008 Eufora investment (*M&O at 8*), the Court identified that *"Kenner did not provide an explanation"* for the Constantine Management Group wire transfer (allegedly discovered by Michael Peca *"in or around 2011 or 2012"*) (*Tr.446-47, 452*).

- On Peca's confirmation from Schwab, mailed to his Getzville (Buffalo), New York home, it states in BOLD:

  **"Notice of Wire and Third Party Disbursement(s)"**

- It designates at the bottom of the same wire transfer confirmation:

  *"If you do not recognize this transaction or if you have any other questions regarding this transaction, please contact us immediately at the telephone above. [Questions: 800-515-2157]"*

**Without Peca's specific verbal authorization – to two (2) separate institutions – Peca's funds could never be transferred...**

---

[64] This is a mischaracterizing the 2007 documented server thefts – **2-1/2 years earlier** -- by Kenner's former employee, Myrick, who was sued in California for her theft of corporate materials after termination *for cause*.

It must be hi-lighted that in order for the funds to actually be transferred from Peca's Charles Schwab account to Constantine Management Group (or any third [3rd] party), **Michael Peca had to give two (2) verbal authorizations to confirm the amount and payee; directly to his investment advisor (Greenberg Graham Advisors) and his custodian (Charles Schwab).** Without those two (2) specific "calls" only by Peca (as the direct client of both third (3rd) party institutions, the wire could never be released.

- The fact that Kenner signed a Power of Attorney to initiate the transfer with the custodian (Schwab) had no bearing on Peca's individual responsibility to "**confirm**" the transactions; **twice.**

The Schwab Power of Attorney was so limited that even when Kenner needed duplicate statements for his clients Schwab accounts, the third (3rd) party "investment advisor from Greenberg Graham Associates" had to send the authorization for Kenner. It further hi-lights that is Kenner could not even trigger duplicate statements – how could Kenner trigger funds to be released "unknown" to the account holder? (*See Recon33-87*)

**Another "lack of knowledge" theory fails for multiple reasons...**
**First** -- the only communication between Kenner and Peca by mid-2011 thru 2012 was the five (5) hours of surreptitious recordings by Michael Peca and his wife of Kenner for the FBI. At no time during the 2012 recordings does Michael Peca address the Eufora-Constantine Management Group issue.

**Second** -- although Michael Peca refers to Ken Jowdy as Kenner's co-conspirator in his 2017 independent submission to the EDNY court (*Docket 482 at 2[Peca letter]*), it must be noted that Peca worked actively with Jowdy, Tom Harvey and Louis Freeh in 2012-13 to fight against the ongoing Kenner-led efforts in the USA and Mexico to recover "Pecas" funds from Jowdy for the documented Hawai'i loans and Mexico embezzlements. In 2012, Peca submitted a California Bar Complaint versus the Hawai'i group's attorney (Ronald Richards). It was drafted by Jowdy's attorney, Tom Harvey to further disrupt the efforts of anyone against his client; Ken Jowdy. Harvey's subterfuge with Peca was part and parcel to Jowdy's employees (Bryan Berard and John Kaiser) representing to the entire Hawai'i investment group that Jowdy *never* received any of the Hawai'i "loans" (as scripted by FBI agent Galioto and Jowdy's attorneys – and confirmed in the "**shocking**" new Kaiser February 2019 letter to the Court [*Document 628*]).

Thus, they claimed that Kenner stole all of the "loans" and attorney Ronald Richards helped Kenner conceal it. Clearly – and according to Jowdy's documentation, Jowdy's bank records, and the *government-forfeiture-44* admission post-trial – **Jowdy and only Jowdy received 100% of the Hawai'i funds** [in spite of "*bogus*" (*Tr.5708 (2x), 5709*),

"*phony*" (*Tr.4597, 4598*) and "*supposed*" (*Tr.5707-5708*) trial manifestations by the U.S. Attorneys, seeking conviction at all costs – and alleging a "*Kenner cover-up story*"].

After the frivolous 2012 Bar Complaint was swiftly dismissed following Ronald Richards' reply (*See Recon33-19*), Peca was left without options other than to follow the FBI fabrications at the 2015 trial (with Galioto's underlying promises that he would immediately receive 100% of his funds back from Kenner if found guilty).   **Kristen Peca admitted this FBI stratagem to Kenner on her 2012 FBI recordings.[65]**

➢ Because there was "no communication" between Kenner and Peca from late 2011 thru Kenner's November 2013 arrest, no conversation could have ever occurred to address or refuse to address the Constantine Management Group transfers in 2008 for Constantine's Eufora stock.
  o *It was another proven and fabricated trial lie for effect to prejudice Kenner.*

**Third** – and commensurate with the Ranford **CTE** symptoms (*infra*), Peca would have received his transfer confirmations from Charles Schwab related to the 2008 transfer. They would have included the destination account; Constantine Management Group.   If Peca had any questions about the veracity of the recipient – no time would have been better to demand an answer than in 2008; yet **Peca did not, according to his own testimony**.   Because, he gave verbal authorization – two (2) times to approve it (like every other investment client of Kenner's – at all times).

**Fourth** – in order for any transfer to occur from Michael Peca's Schwab account – or any other Schwab client whether or not they are related to Kenner – the actual client must give oral confirmation to Schwab *before* the funds were transferred.   This protocol includes the documents Kenner signed on behalf of Peca and others as their limited Power of Attorney.   This is wholly confirmed by the following text communication between Kenner and Peca – after his verbal approval with his independent Charles Schwab representative to release the funds:

Peca texts in BLACK (read); Kenner replies hi-lighted (Sent):



| 4 8 2 0 | +17163 743234 Michael Peca* | 1/12/2009 7:19:44 PM(UTC+0) | Read | Just got Shwab statement and saw the 600+k in and 1m+ out. **Please send wire request so I have it for my records** |

---

[65] Please note that Jay McKee was also hoodwinked by Kaiser and Berard to follow Jowdy and Tom Harvey's advice to sue their own attorney, Ronald Richards, thru a California Bar complaint regarding frivolous issues (*See Recon33-88*).   The Richards' letter to McKee clarified all of his unobstructed access to the GSF expenditures and Constantine's 100% control of the GSF at all times – per Ronald Richards's understanding from Constantine and the GSF contributors.

| 5 7 5 2 | +17163 743234 Michael Peca* | 1/12/2009 7:30:11 PM(UTC+0) | Sent | <u>You bet. I'm back in my office tonight.</u> Hope you are well. Happy New Year... |
| 4 8 2 1 | +17163 743234 Michael Peca* | 1/12/2009 7:31:23 PM(UTC+0) | Read | Thanks. |
| 5 7 5 3 | +17163 743234 Michael Peca* | 1/12/2009 7:33:56 PM(UTC+0) | Sent | Welcome buddy |

**Fifth** – as a **FINAL** AND **FAIL-SAFE** security issue for Peca and all other Kenner clients who had funds transferred from Schwab to Constantine Management Group (or anywhere), they also had to give a secondary confirmation by phone to their investment advisory firm (who frankly was under FINRA requirements – unlike Kenner); ***Greenberg Graham Advisors ("GGA")***.   Kenner's former assistant verified this salient fact to the FBI during her proffer (*See 3500-KM-1-r at 5*).   The FBI "raw notes" of 9-9-2010 confirmed, with FBI agent present, that:

> "*JG [Jim Graham of GGA] wanted access to clients accounts....**for wires JG would want access to clients directly**"*

Thus for the five (5) independent reason, *supra* – it was wholly impossible for Michael Peca (or anyone who transferred funds to Constantine Management Group or any other recipient) to not be aware of the fund movement (payee) *before* the funds left their respective personal accounts.

**<u>Peca LIES about the GSF "goal" – since the potential mediation solution he claimed was not proposed until a year later – and after two (2) independent lawsuits were filed by Peca and eighteen (18) other Plaintiffs versus Jowdy in California to recover, in part, the Hawai'i unpaid loans – thus could never be true...</u>**

**Peca's Global Settlement Fund ("GSF") issues.**

The Court at *M&O at 8* states that the "*Global Settlement Fund...was 'a legal fund was a legal fund designed for civil action against Ken Jowdy, with the end game being acquiring the northwestern parcel of beach front property in' a real estate development in Mexico*".

**FALSE** – Because, discussed *infra*, there are no equivocations that Kristen Peca and Michael Peca were deftly aware of the myriad of efforts Constantine planned for the contributors of the GSF (*See Recon33-89*).

**First** – Peca's claim that the "*northwestern parcel of beach front property*" was a portion of the plan was over one (1) year **too early (or out of order)**.   That "settlement proposal" by Jowdy and his attorneys in the California litigation occurred after the January 2010 mediation that Michael Peca attended with twelve (12) more of the Hawai'i-Mexico investors versus Jowdy (nine [9] months after the initial May 2009 GSF meeting with Constantine).   It could not be possible to believe that a 2010 mediation "solution" – far inferior to the demands of the Arizona and California litigations, themselves, versus Jowdy was the "solution" Peca understood from a meeting several months before the California litigation was even filed!?!

**Second** – Peca and his wife exchanged a series of emails and texts with Kenner immediately after the face-to-face meeting in their Ohio home in May 2009.   Kristen Peca bolstered the false theories with her perjured claim (*Tr.717-718*):

> "*And I quickly interjected and said we're not interested in any more investments or we're done with them.*"

On face value, you could believe her stand-alone statement had it not been followed by Kristen Peca's email to Kenner a few days after the GSF face-to-face meeting stating (*See Recon33-89 at 2*):

> "*Hey, before we sign off on an "approved" letter, can we please have the written documentation as to exactly how much (%) we obtained with our contribution?*"

Kristen Peca request was corroborated by Mike Peca's text to Kenner the day after the face-to-face meeting about their %s in the "other" projects:

| 7042 | +17163743234 Michael Peca* | 5/9/2009 2:04:59 PM(UTC +0) | Read | Make sure I get a statement of somekind to where my $250k is going. ***How much in ea of the two companies***. Thanks |
|---|---|---|---|---|

## If you "sign it" – "you own it"...

Not only does Kristen Peca's own email conflict with her fabricated agitation and premeditated comment to the Court during trial, but their individual communications with Kenner were immediately followed by the Constantine full disclosure letter (*like all of the investors received [in Rule 16 evidence]*) further explaining the multi-pillars of the GSF strategy Constantine devised for Kenner and Kenner investors after explaining it to them in-person (*See Recon33-89*).   Within days of the receipt of the explanation email

from Constantine, Mike Peca and Kristen Peca independently returned their *"acknowledgement and acceptance"* email (*which also described the planned usages of the GSF contributions*). *See Recon33-89 FOLDER [with Kristen Peca and Mike Peca sign-fraudulent letters]. See Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A., 461 Fed. Appx. 61; 2012 U.S. App. LEXIS 3012.*

### Peca LIED about his "return" from the Hawaii project after the 2006 joint venture agreement and Lehman Brothers funding efforts...

The Court at *M&O at 8* identified that ultimately, Michael Peca claimed, "*he had not received a return in the Hawai'i project*" (*Tr.453*).

**FALSE** -- This is wholly untrue – just like the government attacked their-own witness, Glen Murray when he confirmed his Hawai'i partners "return" in 2006.

**First** -- Peca received a wire transfer to his Charles Schwab account for $42,553 in August 2006 after he signed and acknowledged the 2006 Joint Venture with Lehman Brothers funding and Windwalker (Scout Capital and Alan Worden) as the new managing partner (in evidence).

**Second** -- Peca received a $555,571.12 transfer to his LOC at Northern Trust Bank on 8/25/2006 (just like non-victim Glen Murray confirmed during trial testimony). After the transfer, Michael Peca received a letter directly from Northern Trust Banker Aaron Mascarella (identical to all of the Northern Trust Bank LOC clients under Mascarella) inquiring whether or not Michael Peca wished to reduce his capital account collateral. Peca declined and left his extended credit available to the Na'alehu Ventures 2006 partners after the August 2006 closing. Not only was his testimony false, but also it was misleading with $598,124 advanced to Peca within sixteen (16) months of his initial investment in March 2005. Only *faulty memory, confusion and mistakes* or **CTE** could be attributed to the grossly misleading testimony – unless it was suborned.

### Peca lies about his knowledge that the Jowdy loans and the Hawai'i project were related...

The Court at *M&O at 8* identifies Peca's trial claim, "*Peca said at trial that Jowdy had no connection to Peca's losses in the Hawai'i Project*" (*Tr.455-57*).

> *Q: Just based on your personal knowledge, what, if anything, did Mr. Jowdy have to do with your losses in Hawaii?*
>
> *A [Michael Peca]: Zero. I had never been told that he had any connections to*

*Hawaii whatsoever.*

**FALSE** -- This is untrue again, notwithstanding *faulty memory, confusion and mistakes* (or **CTE**).   Michael Peca gave 2011 SDNY testimony that explained the following, while under the privacy of the Grand Jury proceedings (*See Recon33-33*):

> "*That [Little Isle 4] capital account was loaned to Ken Jowdy,* **our business partner***, so there is **no need at the time to be worried about anything**.   The money was loaned to Ken Jowdy to basically help some of the purchase of the Cabo property so we can get the funding.   And then it was supposed to be a short-term loan.*"

- Ironically – Peca was only involved in the Jowdy loans from mid-2005 thru February 2006 (the last advance to Jowdy), so his knowledge had to be in real time – as he described to the 2012 Grand Jury.

**Michael Peca was a Plaintiff in three (3) independent lawsuits versus Jowdy to recover the same Hawai'i loan funds in 2008-09...**

**The 2008-09 Arizona case:**
The disclosure Peca *signed* and *initialed* on **7-pages** for the 2008-09 Arizona case attorney (Tom Baker) explained:

> "*the gist of the lawsuit is to recover certain monies loaned to Mr. Jowdy from Mr. Kenner, Little Isle 4 and Ula Makika LLC.   Mr. Kenner estimates the total amount of monies loaned to Mr. Jowdy which have not been repaid to be approximately $5,000,000.   This is the estimated principal only, exclusive of accrued interest.   In summary, Mr. Jowdy denies that the monies were loans but rather characterizes them as investments.*"

**The 2009-10 California case(s):**
Michael Peca participated in two (2) subsequent California lawsuits versus Jowdy for, in part, the same unpaid Hawai'i loan funds (a by-product of Constantine's GSF efforts).   The lawsuits both identified the Hawai'i loans:

> "*Mr. Najam was in charge of the corporate governance while under Jowdy's direction and control received over eight million dollars ($8,000,000) from a LLC in Hawai'i.   Mr. Najam failed to properly account for those funds and has placed the Jowdy investors in a vulnerable and compromised position.*"

**Peca signed off as a Plaintiff with two (2) independent counsels for the Arizona and California cases...**

In addition to the Arizona full disclosure Plaintiff sign-off, Michael Peca signed an authorization for his independent California counsel, Ronald Richards, to file the lawsuits on his behalf as a named Plaintiff.   If Michael Peca "***did not read***" the lawsuits – as proffered by Bryan Berard during the 2015 trial (*Tr.3157*) – then it is Peca's fault, like Berard and others, and cannot lead to any concealment of issues with Kenner, specifically considering Peca's 2011 SDNY Grand Jury testimony, *supra*.      See *Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A., 461 Fed. Appx. 61; 2012 U.S. App. LEXIS 3012.*

- *The Second Circuit Appeals Court clearly defines that absent substantive unconscionability or fraud, parties are charged with knowing and understanding the contents of documents they knowingly sign.  If the signer can read the instrument, <u>not to have read it is gross negligence</u>; if he cannot read it, <u>not to procure it to be read is equally negligent</u>; in either case the writing binds him. Parties are bound by documents expressly incorporated by reference into agreements to which they manifest their assent.*

See also *PaineWebber Incorporated v. Bybyk, 81 F.3d 1193; 1996 U.S. Appx. LEXIS 8728.* ("…a party's ***failure to read*** a duly incorporated document will not excuse the obligation to be bound by its terms"); *See also Ecoline, Inc. v. Local Union No. 12 of the International Association of Heat and Frost Insulators and Asbestos Workers, AFL-CIO, 271 Fed. Appx. 72; 2008 U.S. Approximately. LEXIS 6390,* ("In general, individuals are charged with knowledge of the contents of documents they sign" and "a person who signs a written contract is bound by its terms regardless of his or her ***failure to read*** and understand its terms".)

***During alleged 2009-2010 "no contact" period with Kenner – the Pecas have direct and unfettered communication with their second (2nd) and third (3rd) independent counsel, Ronald Richards, Michael Stolper…amongst others…***

*In 2004 and beyond*, the Pecas had direct communication with Ken Jowdy and William Najam related to their Mexico investments (DDM and DCSL).
- This pre-dated Najam's attorney role in the 2006 Hawai'i joint venture closing with Lehman Brothers and Windwalker -- and the Pecas' direct communication with him.

*In 2007 and beyond* -- the Pecas had direct communication with John Kaiser – the Managing Member of Na'alehu Ventures 2006 (Hawai'i partners – after December 31, 2007 – per the Equity Transfer Agreement with Kenner).

*In 2008 and beyond* -- the Pecas had direct communication with their Arizona attorney, Tom Baker, related to the Hawai'i project and the recovery of loans to Jowdy.

*In 2009 and beyond* -- the Pecas had direct communication with Ronald Richards related to the two (2) California cases versus Ken Jowdy.

- Peca *declined* to visit with Ronald Richards in January 2010 (like Kaiser, Woolley and deVries did) for the two (2) Jowdy deposition days (January 5-6).

*In 2010 and beyond* – the Pecas had direct communication with NY attorneys Rudy Giuliani and Michael Stolper regarding their Eufora investments thru Constantine's company.

The Pecas independent legal representation highlights that the trial statements by Michael Peca (*Tr.539*) and Jay McKee (*Tr.1830*) about not suing Kenner for "fear" of never recovering their money is ridiculous and self-serving – because they were more than amply represented by independent counsel in the most important private equity deals in their personal portfolios; *Mexico (DDM and DCSL), Hawai'i and Eufora.*

The government relied on the prepared testimony of Kristen Peca to continue the coordinated fabrication, as follows (*Tr.713*):

> *"Everything was really scary at that point. And, you know, he even said to me at one point if I were to go down in a plane tomorrow, there would be no way to get your money. I'm the only one who knows where your money is. That is like having a string holding over you. It's a scary position to be in."*

Nothing about the "relationship" with Kenner or its "erosion" – *after the Pecas chose not to pay Kenner any longer for his services* – could have impaired their ability to recover their investments that were *not* managed by Kenner, *nor* were they under his control.

- It is more nonsensical rhetoric intended to confuse the Court and the sponge-like jury.

## Nevertheless, Kristen Peca puts her faith in Ronald Richards to recover her Hawai'i and Mexico funds from Jowdy; not Kenner…

Kristen Peca also refused to meet face-to-face with Jowdy; an independent person who has "control" of millions of their funds (*See Recon33-21*).   **It is simply unexplainable**.

Kristen Peca (on their mutual behalf) replied to an offer by their attorney to have a 2009 face-to-face meeting with Jowdy (absent Kenner) in order to address any specific issues or claims that Jowdy was mis-managing project funds, not repaying the specific Hawai'i loans that Peca has sued for three (3) times (in the USA alone), &/or embezzling funds from the various equity contributions to the DCSL Project, the DDM project, Diamante

Air planes, and the Cabo san Lucas Airport.   Kristen Peca wrote to their California attorney, **Ronald Richards**, confirming 100% transparency and independent advice from counsel (not Kenner only) *(See Recon33-21)*:

> *"We are putting our trust in you, so we will do whatever you recommend is best for getting our SSS out.   Thanks, Michael and Kristen Peca"*

Clearly, Michael Peca knew the Jowdy loan had "everything" to do with the Hawai'i project funds (a.k.a. Capital account) as he verified to the SDNY Grand Jury, *supra*.

- Although both Peca and McKee gave 2015 testimony that they were **afraid** without Kenner that they would not be able to recover their "investments", both Peca and McKee (who had independent legal counsel in Buffalo, New York) were also represented by Tom Baker (in the Arizona case), Ronald Richards (in the California cases), and Michael Stolper (in the Eufora cases).

- It should be noted that two (2) years later – in 2011 – Peca was confident enough in the 2009-2010 efforts of Ronald Richards in the Jowdy California cases that he hired Ronald Richards to represent him independently during his 2011 SDNY Grand Jury.

  o This further disturbs Peca's false statements that he could not verify what happened to the 2009 GSF contributions – specifically considering his direct and continuing interactions with **Ronald Richards, the custodian of the GSF funds and the creator of the spreadsheet** Peca allegedly could not verify.   It is unreasonable.

  o It is also in contradiction to his wife's trial testimony that Kenner and Constantine **explained** the "use of funds" to the Pecas via phone calls and emails.   *Kristen Peca impeached her own husband* (*Tr.720*).

    > *Q. Did either Mr. Constantine or Mr. Kenner follow-up with you by phone or e-mail about the use of the funds in the Global Settlement Fund?*
    >
    > *A [Kristen Peca]: Yes, by phone and e-mail.*

- Nevertheless with direct access to Ronald Richards, Constantine and Kenner, Michael Peca claimed at trial that he could not authenticate the GSF expenses (*Tr.652-653*) that his wife confirmed she was explained and verified "*by phone and e-mail*".

## Michael Peca GSF lies about GSF knowledge DESPITE direct access to Constantine and Ronald Richards ...

The Court at *M&O at 8* identified: "*Peca further testified that he did not know what happened to that [GSF] money...*" (*Tr.422, 460*).   At *Tr.422*, the Court improperly references the GSF funds.   The testimony from Peca at *Tr.422* reflects Peca's contradictory statements from what he told the SDNY Grand Jury (four [4] ears earlier):

*"Just for that purpose, for Hawai'i."*

Nonetheless, none of the Hawai'i funds were diverted for anything that was not for a Hawai'i purpose, approved by the Little Isle 4 By-Laws (*See Recon33-70*), and authorized repeatedly "*by the group*" – as Peca (himself), Turner Stevenson and Darryl Sydor, *infra*, told the 2011 SDNY Grand Jury.   And, multiple other Hawai'i-Mexico investors confirmed the same in arbitration testimony, deposition testimony, and thru affidavits -- **none dissenting pre-trial**.

Notwithstanding the Court's analysis, Michael Peca actually verified that he received the spreadsheet "*from a friend of mine who received it*" [government GSF witness -- Jay McKee].   McKee gave testimony that he received it from either Kenner or Ronald Richards (Peca and McKee's mutual attorney).   Because Peca received the GSF expenditure spreadsheet from McKee, he would have clearly known that McKee received it from Ronald Richards and it was Richards' accounting.   Peca knew that McKee did not make it.   Peca told Ronald Richards on November 4, 2009 via email that "*We are putting our trust in you, so we will do whatever you recommend is best for getting our SSS out.   Thanks, Michael and Kristen Peca*".      The email reply clearly confirmed that Peca had direct access to Ronald Richards at all times, thus verifying it was simple, if he was really concerned.   Nothing, specifically not Kenner, obstructed Peca from learning the details as known by Ronald Richards.   Peca chose not to learn – and rather decided to claim ignorance – or asking his wife who confirmed she was explained and verified the GSF expenditures "*by phone and e-mail*" (*Tr.720*).

### Despite Peca's CTE -- he could not understand what happened to the GSF funds in Ronald Richards' Trust Account – Peca hired Ronald Richards again in 2011...

In fact, Michael Peca hired Ronald Richards two (2) years later to advise him during his 2011 SDNY Grand Jury appearance.   There could have been no better time for Michael Peca to demand answers, while he paid $8,000 more to Ronald Richards for his retainer in the Grand Jury appearance issue.   Peca's willful negligence prevailed, again.

The Court *M&O at 9* reiterates: "*nor did he [Peca] receive an explanation from Kenner or Constantine as to how Peca's $250,000 was spent*" (*Tr.470-71*).

*[Michael Peca]: "I mean it was proposed that way. I mean the way it was for 250,000 there will be a legal fund and things were going to get settled and Juneau was settled, Moreau was settled, they never mentioned that this money would be used to settle these claims, that as an incentive we would acquire their percentages."*

**FALSE** – Because Michael Peca could have asked his wife who confirmed she was explained and verified the GSF expenditures "*by phone and e-mail*" (*Tr.720*).

The GSF spreadsheet received by Peca identified the following additions and withdrawals immediately "**after**" his $250,000 deposit on 5-8-2009:

| Date | Payee | Withdrawal | Addition | Note |
|---|---|---|---|---|
| 5/11/09 | SECURITY TITLE AGENCY | $(300,000.00) | | Avalon Closing |
| 5/12/09 | GILMARTIN, MAGRESS, ROSE CAREY, RODRIQUEZ, GREENBERG | ($45,000.00) | | Palms 31302&31304 units |
| 5/12/09 | | ($8,000.00) | | TC Miami attorneys (http://www.crgplaw.com/) |
| 5/12/09 | Sonnenshein | ($8,000.00) | | TC LA attorneys (http://www.sonnenschein.com/index.aspx) |
| 5/12/09 | Nussbaum & Gills, P.C. | ($500,000.00) | | Avalon BK attorneys (http://www.nussbaumgillis.com/) |
| 5/12/09 | SECURITY TITLE AGENCY | | $300,000.00 | Avalon Closing |
| 5/12/09 | SECURITY TITLE AGENCY | | $120,000.00 | Avalon Closing (NET $0) |
| 5/14/09 | Cabo Attorney | ($22,000.00) | | |
| 5/14/09 | Epstein Becker Green | ($25,000.00) | | |
| 5/14/09 | Ronald Richards & Associates | ($50,000.00) | | |
| 5/15/09 | MATTIAS NORDSTROM deposit | | $250,000.00 | |
| 5/18/09 | Earl, Curley, and Lagarde | ($10,000.00) | | TC AZ attorneys (http://www.ecclaw.com/pages/welcome.php) |
| 5/18/09 | Silver Law, PC | ($55,000.00) | | TC AZ attorneys (http://www.taxcontroversy.com/) |
| 5/18/09 | Glenn Murray deposit | | $250,000.00 | |
| 5/22/09 | Chase Bank | ($2,400.00) | | Dickenson Architects Inc. - Avalon |
| 5/22/09 | Gruber, Hurst, Johansen and Hail, LLP | ($6,127.50) | | SYDOR Attorney |
| 5/22/09 | Raymond Murray deposit | | $100,000.00 | |
| 5/26/09 | Steve Ruchin deposit | | $50,000 | |
| 5/26/09 | Ronald Richards & Associates | ($75,000.00) | | |
| 5/26/09 | Ronald Richards & Associates | ($20,000.00) | | |
| 5/26/09 | Sullivan and Cromwell | ($65,000.00) | | NY law firm (3rd largest lawfirm in the world) |

- Nothing on the Ronald Richards spreadsheet would have confused Peca (or other GSF contributors), certainly not restricting them from calling Ronald Richards or Constantine and asking them about the specifics of the transactions.

As Peca told the EDNY Court about Kenner's role in the GSF (*Tr.539-540*):

*"He [Kenner] didn't seem to have one."*

[Peca testimony confirmed]:
*Q. So from your perspective, who would you say was the one that was primarily responsible, if more than one, answer that as well.*

> *A [Michael Peca]: From my understanding Tommy was in charge of Global Settlement Fund.*
>
> *Q. And that came from whom?*
>
> *A [Michael Peca]: That came from both Phil Kenner and Ron Richards.*

**So then, why would Peca expect an explanation from Kenner?**  It is more double-talk or **CTE**-laden testimony.

The government skated over the fact that Kristen Peca gave testimony later in the trial to refute her husband's repeated claims that he [Michael Peca] did not know about the "use of funds" from the GSF, or did Kenner or Constantine ever let them know.   How could Kristen Peca know and not her husband?   Why would Kenner have been updating them after Michael Peca confirmed Kenner's role in the GSF as, *"He didn't seem to have one." (Tr.540).*

**Kristen Peca refutes the Court's analysis and her husband's "faulty" recollection of the GSF "use of funds"…**

Kristen Peca (*Tr.720*):
> *Q. Now, turning your attention to Government's Exhibit 754 in evidence. It's a wire transfer request. Does that reflect yours and Michael's investment in the Global Settlement Fund in May 2009?*
>
> *A [Kristen Peca]: Yes, it does.*
>
> *Q. Did either Mr. Constantine or Mr. Kenner follow-up with you by phone or e-mail about the use of the funds in the Global Settlement Fund?*
>
> *A [Kristen Peca]: Yes, by phone and e-mail.*
>
> - *Kristen Peca left "no wiggle room" for concealment or non-disclosure – in spite of her husband's CTE-laden faulty memory, confusion and mistakes.*

**Peca LIES about his state of desperation – while continuing to participate in additional private equity deals with Kenner – after the GSF contribution…**

The Court *M&O at 9* states: *"Peca said that he contributed to the Global Settlement Fund because of his "desperation" to recover his other investments."*

**FALSE** -- This again fails for a number of irrefutable reasons:

1. Michael Peca had just invested with Kenner, months earlier, in the Las Vegas Palms deal.   Kenner had made six (6) consecutive payments totaling approximately $90,000 towards the mortgage thru the date of the GSF meeting in their Ohio home.   At that time, Kristen Peca had refused (thru Michael Peca's words – **causing a contract breech**) to release the monthly rental payments to Kenner (of the equivalent amount) – per the terms of their email-agreement (*See Recon33-90*).

   - AUSA Komatireddy lied to the jury in rebuttal summation when she declared – "*Not for the Palms Condos which Kristin Peca told you they were never involved with.   They were fed up with the Palms Condos.*" (*Tr.6005*).

   - The Pecas were about $90,000 "in the black" as a result of Kristen Peca's refusal to release the monthly rental revenue checks (breach of contract) to Kenner (per the agreement), thus it was impossible that she was "*fed up*" with anything to do with the Palms.

   - The $5 million unit was also titled 100% in Michael Peca's name (including Kenner's $650,000 deposit funds and $90,000 mortgage deposits); granting Michael Peca full control to buy, sell or hold as he legally pleased.
     - Only Kenner had the right to be "*fed up*" at the time of the GSF meeting.

2. Months later, *supra*, Michael Peca and Kristen Peca declined to meet with Jowdy face-to-face with Ronald Richards.  Jowdy was the sole defendant in the Arizona case and California case(s).   If there were any independent questions they demanded or answers they sought, the invitation was absent Kenner's presence, thus nothing could have been deemed concealed or restricted  (*See Recon33-21*).

3. After the three (3) to four (4) month Eufora investigation in spring 2010 by Rudy Giuliani and Michael Stolper's investigation team of "everything Eufora", Michael Peca demanded to be part of the "*Eufora loan buyout effort*"[66] or, in his words:

---

[66] During trial – Peca exhibited more **CTE** (*faulty memory, confusion and mistakes*), as follows (*Tr.609*):

> *Q. Do you have a recollection, back around December of 2009, somewhere around October 2010, these same individuals, with your knowledge, being aware, secretly, without Mr. Constantine's awareness, try and contact Eufora's lenders to try and buy the loan before they publicly sought to do so?*

> ***A. [Michael Peca] I wasn't aware of that.***

To Kenner from Peca (*confirming Michael Peca's EDNY PERJURY*):

| 14727 | +17163743234 Michael Peca* | 7/14/2010 12:20:53 AM(UTC+0) | Read | **If not all willing members get a chance to be part of the loan buyout**, mean more % there may be a lynching. FYI |
|---|---|---|---|---|

Kenner [hi-lighted] responded in the affirmative to Michael Peca, as follows:

| 16913 | +17163743234 Michael Peca* | 7/14/2010 12:21:28 AM(UTC+0) | Sent | **I don't disagree** |
|---|---|---|---|---|
| 16914 | +17163743234 Michael Peca* | 7/14/2010 12:21:46 AM(UTC+0) | Sent | **Why wouldn't they?** |

During trial – it should be noted that **Bryan Berard also claimed he was unaware of the Eufora loan buyout plans** (all ignoring the fact that their attorney, Michael Stolper, discussed the "loan buyout plan" in depth in his various letters [*See Recon33-73*] to the investors and conference calls.)   Nevertheless – Berard confirmed his knowledge (one of about 50 confirming texts) that he had discussed the "buyout" with Jay McKee as well while coordinating the actual buyout efforts for the investor group with Kaiser, Gaarn, Kenner, Peca and others:

[Berard text to Kenner]:

| 14800 | +14015246929 Bryan Berard* | 7/15/2010 1:31:11 PM(UTC+0) | Read | Call me now or at 1015am est. Michael [Stolper] wants to talk to me u and jonny [Kaiser]... <u>**Mckee says before he signs he wants to help pay off loan too**</u> |
|---|---|---|---|---|

Berard either lied to the court or exhibited synchronizing **CTE** symptoms (*Tr.3106, 3111*):

> *Q: Was there also an effort underway not only to buy this loan but also to take the company over from Mr. Kaiser -- I'm sorry -- from Mr. Constantine?*

> *A [Berard]:  No.*

> *Q. Would it surprise you to learn it was with Eufora and not with Mr. Constantine?*

> *A [Berard]:  You say surprise? I didn't understand the loan in general.*

> *Q. Well, do you remember any discussions about going to talk to Brent to buy the loan?*

> *A [Berard]:  I do not, no.*

> *Q. Do you know if or did you come to learn that somebody in your group actually went to talk to Mr. Brent?*

> *A [Berard]:  Not to my knowledge, no.*

All of these efforts would have occurred **after** Kristen Peca claimed about the private equity investments, to the trial court (*Tr. 717*):

> [Kristen Peca]: ***"And I quickly interjected and said we're not interested in anymore investments or we're done with them."***

- Clearly her testimony was recently fabricated and untrue based on her husbands own actions.

**Peca LIES about the Little Isle 4 operating agreement – because he signed it!**
- **Perhaps – this is another CTE example...**

The Court *M&O at 9* states (re-Peca cross-examination): Peca "*also said that he never saw the [Little Isle 4] operating agreement or any books and records for Little Isle 4.*"

**FALSE** -- This assertion fails for multiple reasons again, *one of which is his wife's own contradictory testimony* (*Tr. 719-721*).

1. Michael Peca signed the Little Isle 4 operating agreement (*See Recon33-91 at 33*), which was introduced by the government during trial.   There is no equivocation about that fact – again highlighting potential **CTE** issues or perjury (a.k.a. *faulty memory, confusion and mistakes*), **but never reliable**, and

2. Kristen Peca claimed – according to the Court at *Tr. 719-21* (*See M&O at 12*):

> "*Mrs. Peca further testified that she received a packet of information from Kenner pertaining to Little Isle 4, but did not know what happened to those materials.*"

- The package received by Peca and all of the investors was as a result of the 2007 firing of Kenner's assistant, Myrick, and the theft of the Kenner-Standard Advisors backup server.

- The referenced Hawai'i package included:
  - The 2004 Little Isle 4 operating agreement,
  - The 2006 Little Isle 4 operating agreements (signed by Michael Peca),
  - The 2006 joint venture disclosure letter (signed by Michael Peca),
  - The 2006 joint venture agreements (about 1800 pages)
    - Confirmed as received by Michael Peca in his signed July 2006 disclosure letter,
  - The books and records of Little Isle 4,
  - The Little Isle 4 tax records; including their own 2006 Little Isle 4 k-1 (identical to the Little Isle 4 k-1 **produced by Nolan** during the 2009 Arizona arbitration – also confirming Nolan's full knowledge of his $2.3 million Hawai'i investment – despite his CTE testimony) (*See Recon33-78*).

**Peca lied that he was not aware that his LOC was the source of some of the Jowdy loans – despite his overwhelming 2011 SDNY Grand Jury testimony to the contrary and his participation in three (3) lawsuits versus Jowdy from the Hawai'i-Mexico investors to recover the Hawai'i loan funds...**

The Court *M&O at 9* states (re-Peca cross-examination): "*Peca further testified at trial that he was not aware that the line of credit he obtained to fund the Hawai'i project was the source of a loan to Jowdy for a development in Mexico [Tr.496].*"

**FALSE** – Because the Court confirmed that Peca *IMPEACHED* himself when verifying: "*However, he admitted that he had testified in front of the Grand Jury that he was aware of a short-term loan made to Jowdy using Little Isle 4's capital account.*" (Tr.499).

Pecas SDNY Grand Jury testimony confirmed:

> "*That [Little Isle 4] capital account was loaned to Ken Jowdy, our business partner, so there is no need at the time to be worried about anything.   The money was loaned to Ken Jowdy to basically help some of the purchase of the Cabo property so we can get the funding.   And then it was supposed to be a short-term loan.*"

This testimony followed Peca's explanation that his $1.7 million plus his $100,000 cash deposit were included in the Little Isle 4 capital, according to his understanding:

> *Q: How much did you put into Little Isle 4?*
>
> *A [**Mike Peca**]: "$100,000 cash investment that was going towards that.  Then we had lines of credit.  I had one out for $1.7 million that was going to be used at the time.  Here's where a lot of the cross starts to happen.  A short-term loan to Mr. Jowdy, because at the time Cabo – we hadn't gotten the lending from Lehman Brothers yet.  We made a short-term loan until the lending came in.  Once the lending came through they were to pay back the loan. I think in the neighborhood of five-and-a-half million dollars, on the closing.  It was never paid back.  And then communication basically seized at that point from him [Jowdy].  **That was kind of the whole sticking point as far as me and the other guys with Mr. Jowdy.**
>
> The 1.7 along with the $100,000 and **whatever else put in this a capital account, Little Isle 4,** I believe.  The Capital account was loaned to Ken Jowdy, our business partner, so there is no need at the time to be worried about anything.  The money was loaned to Ken Jowdy to basically help some of the purchase of the Cabo property so we can get the funding.  And then it was supposed to [be] a short-term loan."*

**Non-victim – Turner Stevenson – confirmed the same "group decision in 2004-05 to loan funds to Jowdy"…**

*Turner Stevenson* (a non-victim in the 2015 Superseding Indictment) confirmed Peca's Grand Jury affirmations.   As one of the three (3) cherry-picked individuals by FBI agent Galioto, the U.S. Attorney proceeded with his third (3rd) session of questions about the Hawai'i loans to Jowdy in 2011.   After a short Q&A, Stevenson affirmed (*See Recon33-35*):

> *Q: When you put up the $100,000 for Hawai'i, did you have any understanding of whether the money could be used to pay for the Mexico project or was it just supposed to go to the Hawai'i project?*
>
> *A [Stevenson]:  In the beginning it was supposed to go to Hawai'i.   Then **I saw** they needed, **the group of us got together**, we have this piece of land that's available for purchase in Mexico that we need to wait on or get funds on to **transfer as a group** like one big blanket to get money into Cabo and pay for that land to hold it until the loan came.*
>
> *Q:  So you are saying you agreed to transfer some of the money from the Hawai'i project to the Cabo project?*
>
> *A [Stevenson]:  **I would say that, YES.***
>
> *Q: Who made that decision?*
>
> *A [Stevenson]: **I think all of us as a group.***
>
> *Q: What do you mean "as a group", who is the group?*
>
> *A:  **All the guys who were invested in it.***

At the same Grand Jury in 2011, Darryl Sydor confirmed the loan to Jowdy from Hawai'i and the underlying knowledge without hesitation (*See Recon33-34*):

> *Q:  Was that [the LOC at Northern Trust Bank] also for Little Isle 4 as far as you know?*
>
> *A [Sydor]: Yes, but then we put it towards a short-term loan to Mr. Jowdy until Lehman Brothers came up with the money that was supposed to be paid back."*
>
> *Q: Did you know in advance that it was going to be used, this Little Isle 4 money, to be used to salvage the Cabo investment?*

*A [Sydor]:* <u>Yes.  It was to help with the short-term loan to keep funding the Cabo, but then its supposed to be paid back,</u> *but that's –*

*Q: Paid back to you or to Little Isle 4?*

*A [Sydor]: Paid back to Little Isle 4.*

*Q: So –*

*A [Sydor]:* <u>Back to Hawai'i, not me personally.</u>

*Q: But that didn't happen?*

*A [Sydor]: That didn't happen.   And Lehman came up with the $129 million loan. It was supposed to be back at closing.*

**<u>Not one investor claimed to the 2011 SDNY Grand Jury that they were not aware of the Jowdy loans – *just the opposite* – they confirmed them "*as a group*" decision using their own capital account contributions, specifically...</u>**

At no point did Sydor or Peca represent to the Grand Jury "*under oath*" that they were not aware of the loans to Jowdy *at all times*.

- *In fact, Sydor confirmed that he was clearly aware that the funds belonged to Little Isle 4 (from his investment) and no longer to him, personally.*

Peca echoed the same refrain, actually expressing to the Grand Jury that he believed his *entire* $1.775 million LOC (*Hawai'i investment*) and his $100,000 cash (*from his capital account at Little Isle 4*) was being loaned to Jowdy, not just a small portion of it.   Peca's confirmed knowledge meant that the "subset" loan (*of $240,000 of his originating funds sent to Jowdy as part of the Hawai'i loans*) couldn't be a crime of concealment either; unless the government claims now that Kenner (*as Managing Member of Little Isle 4 and acting under the requirements and restrictions of the operating agreement – See Recon33-70*) <u>did not send Jowdy enough of Peca's originating money?</u>[67]

---

[67] The 2004 little Isle 4 By-laws (*which governed the Hawai'i project and the loans to Jowdy*) specifically expressed <u>*authority to lend*</u> in the beginning of the agreement:

> *At the sole discretion of the Managing Member, Little Isle 4, <u>may participate as a lender</u> if deemed by the Managing Member to be in the best interest of the LLC.*

> *The Managing Member, at their sole discretion, can engage in outside ventures deemed to be in the best interest of the LLC, <u>including but not limited to other Private Equity Funds and Lending Opportunities.</u>*

- The defendant is convinced that Jowdy would have accepted it, since he is not held to the same legal standards under the law, and would merely have obtained another $1.5 million of "*free money*" and protection for it from "*someone*", to never repay it.

## Peca lied that he never requested LOC documents from Northern Trust Bank...

The Court *M&O at 9* states (re-Peca cross-examination): "*Peca also acknowledged that he <u>never</u> requested records from Northern Trust pertaining to his line of credit account…*"

**FALSE** – Because Michael Peca sent a fall 2009 notarized request to Northern Trust Bank to receive a copy of his line of credit information with a copy going to Kenner to handle tax issues for Peca.   These were more **CTE** symptoms exhibited by Peca, fully affecting the jury; notwithstanding the Court's analysis of "*concealed*" information based on repeated, "*failed memory tests*".

Each of the Northern Trust LOC clients sent the same notarized request in the fall 2009. This request from each of the Northern Trust clients[68] was the origination of the "loan

---

[68] Even Northern Trust Banker *<u>Aaron Mascarella could not remember</u>* his efforts to send all of the LOC backup documents to Kenner and the Northern Trust Bank LOC clients (*Tr.884*):

> *Q During that process did Mr. Kenner ever ask you for documentation regarding lines of credit?*
>
> *A [Mascarella]: No.*
>
> *Q Either by e-mail or by phone?*
>
> *A [Mascarella]: Not that I recall, no.*
>
> *Q I will hand you something that may <u>refresh your memory</u>. 5031 L, Government's Exhibit. Do you recognize that? Take your time.*
>
> *A [Mascarella]: Yes. Yeah, they are loan histories for each one of the individual lines of credit.*
>
> *Q And just can you describe for us the format of those loan histories?*
>
> *A [Mascarella]: These came from my personal computer.*
>
> *Q How do you know that?*

history" statements that Northern Trust Banker Aaron Mascarella confirmed were "screen prints" he added to the LOC production package, on his own for the first (1st) time ever.

**Northern Trust Banker Aaron Mascarella confirmed that he ONLY produced the "loan history screen shot" five (5) months after the LOC seizures (in or about September 2006) upon notarized request -- from the individual Northern Trust LOC clients; *not Kenner*...**

Northern Trust Bank *never* produced this fall 2009 "screen print" of the loan histories before that date for Kenner or Northern Trust Bank LOC clients.
- Thus – as mis-referenced during trial by the government to mislead the jury – the "*loan history*" statements could not have elucidated anyone about the "*use of funds*" until at least five (5) months after the seizure of the LOC collateral – that each LOC had to verbally authorize and did (with the exception of Nolan – who chose independently to continue making LOC payments to the bank).

Each LOC client signed annual *Disbursement Request & Authorization* (**1-page**) forms transparently *identifying the entire amount of LOC funds that had already been disbursed by Northern Trust bank* in accordance with their **signed**:
1. *Extension of Credit (**1-page** document),*
2. *Letter of Authorization (**1-page** document),*
3. *Master Notes* (annually signed),
4. *Pledge Agreement* (annually signed),
5. *Promissory Note* (annually signed), and
6. *Change in Terms Agreement* (annually signed and **1-page**).

**_The government falsely misled the jury about the proposed Sonnenblick deal..._**

The Court at *M&O at 9* identified, "*this deal with an individual named Robert Sonnenblick was never consummated*".

The government was 100% aware that after the deal was made public by Constantine to GSF participants, someone leaked the deal information to Jowdy and his attorneys.

**Jowdy and his attorneys immediately sued Sonnenblick...**

---

*A [Mascarella]: Because of the format. Monthly statements are generated by the bank using a third party company that takes the information, makes them into fancy looking bank statements. **These are literally the snapshots of the screen prints of my computer.**

*See Recon33-92* [Michael Peca] – and –
*See Recon33-93* – and --
*See Recon33-94*

Sonnenblick was a large California real estate developer who was funding $15 million "up-front" as part of his deal to buy out the Lehman Brothers loan and get rid of Jowdy. **The $15 million was not expected from Kenner and Kenner investors "as the government misled the jury"**, but rather, the funds were settlement funds to repay the Jowdy frauds to Kenner and Kenner investors.   The *Jowdy v. Sonnenblick* California lawsuit immediately stopped the 2010 Sonnenblick buy out efforts.

Even though the U.S. Attorneys office (specifically including Michiewicz who was working hand-in-hand with Jowdy's attorney, Tom Harvey throughout the trial in the courtroom) knew that Jowdy sued Sonnenblick to stop the potential buyout in 2009-2010 and recovery 100% of the stolen Jowdy funds for the Kenner investors, they proffered to the Court that Sonnenblick was some "phantom" (*Tr.532*):

[MR. MISKIEWICZ]:

> *"Generally, just we object on hearsay grounds. Even if the e-mail, itself, were admissible and I understand the court's ruling regarding a similar one yesterday, but even if that were to come in, what is attached, <u>this letter from potentially entirely fictitious character, Sonnenblick</u>, should not ever be admitted and this is total hearsay."*

The Court at *M&O at 10* identified on re-direct that Peca "*did not know whether he [Sonnenblick] actually exists*".   The government knew of the *Jowdy v. Sonnenblick* lawsuit – as did Peca – who told the Court, "*that Constantine kept him and the other investors apprised of developments with the Global Settlement Fund...*" (*M&O at 10*).

- It is clear that the government, again, took advantage of the fact that Peca's would "*not remember*" the details of the GSF deal, despite his underlying knowledge; in concert with "everything" the government wanted him to contradict from his own pre-trial evidence.

**The government tries to get Peca to LIE one last time about lacking knowledge of the GSF "use of funds"...**

The Court at *M&O at 10* again tried to "pound the drum" that Peca did not know how the GSF was spent indicating: "*he said that he never received an accounting of how the Global Settlement Fund legal fees were spent*" (*Tr.613-615*); despite his wife's own confirmation, *supra*.

As thoroughly exploited as false, *supra*, the government knew:

1. Peca received the GSF spreadsheet from Ronald Richards and his teammate, Jay McKee.
2. Peca had direct access to Ronald Richards for years after the GSF funding.

3. Peca had direct access to Constantine through the summer of 2010 – until he participated against Constantine in the Giuliani-led Eufora litigation.
4. At no time did Peca claim Kenner refused to tell him what the expenses were, and
5. Clearly damaging -- Peca's own wife confirmed that Constantine and Kenner "explained the use of funds" to them, *supra* – fully discrediting Michael Peca's repeated "no knowledge" (a.k.a. **CTE**) testimony.  (*Tr. 720*).

Peca's "*failed memory test*" or **CTE** appears to have infected the trial's integrity and the Court's M&O analysis of the real (non hearsay) evidence from trial – in full contradiction to the Rule 16 evidence in the government's hands, and again ignored to their prosecutorial benefits throughout trial.

### *Kristen Peca*[69]

It should be noted that, perhaps, the longest analysis of a single-witness testimony in the Court's M&O was related to Kristen Peca's testimony.

**BUT -- Kristen Peca was never Kenner's client.   Kenner never had any fiduciary responsibility to her.   The dissemination of Michael Peca's financial business was Michael Peca's issue --** *never Kenner's.*

**Nonetheless, Kristen Peca gave emotional testimony about "her bonds were her baby" and a heart-wrenching "shocked" incident during direct testimony.**
  - ***They were both fabricated for trial.***

**Both of these pre-planned "stories" are 100% disgraced by her own 2012 FBI recordings of Kenner – and the actual FedEx mailing address of the Northern Trust default letter she lied about "signing for" in 2009.**

**In contrast to the overwhelming trial evidence – the government led Kristen Peca to contradict that she had previous confirmed on the 2012 FBI recording, that:**

1. **She was not aware of her husband's Northern Trust LOC until no earlier than 2008 (while she was living in Ohio) [on her secret 2012 FBI recording of Kenner],**
   a. **Her admissions completely discredited her claimed 2005 participation with her husband's cash and LOC decisions to invest in the Little Isle 4 (Hawai'i) project – after meeting with Kenner. Thus, it was perjury – and the LOC was without her knowledge (*Tr.698-700*)...and**

2. **She opened her 5-hour FBI recording by telling Kenner that she could not understand anything her husband was explaining to her after his 2012-recorded call with Kenner (more concealment by Michael Peca from his wife)...**

**Next – Kristen Peca gave unforgivable testimony stating, "one day I got mail <u>that I had to sign for</u>" (*Tr.709-712*).   She claimed she received the Northern Trust Bank default letter and was in "shock" and stood in her kitchen until her husband came home (*See Recon33-82*).**

---

[69] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 10-13.*

1. **Kristen Peca <u>LIED</u>** – because the March 2009 default letter was sent via FedEx and certified mail to their Buffalo (Getzville), NY summer home address (*See Recon33-82*) while Michael Peca was living and playing in Columbus Ohio (where the May 2009, GSF meeting was held).
   a. Her blasphemous lies are clearly premeditated – because she could not have signed for a FedEx or Certified Mail letter at her Buffalo NY home and waited in her kitchen "for months" for her husband to "come home" to her while she remained in shock.

Much of the lies attributable to the Pecas (in general) were addressed in the Michael Peca issues, *supra*, but more flagrant and provable perjury is touched on *infra* related to the Court's analysis of the trial issues; exploiting the premeditation the government and Kristen Peca jointly contrived testimony to injure Kenner and place herself squarely in the middle of conversations, meetings and events that in real time, provably <u>she had nothing to do with</u>.

<em><u>Kristen Peca Direct testimony</u></em>

<u>**Kristen Peca lies to the EDNY court that she was part of the 2005 Hawai'i real estate discussions and Northern Trust LOC investment strategy...**</u>

The Court's *M&O at 10* identified, "*Kenner told her that he needed to get a line of credit from a bank that would be collateralized with a bond account that Mrs. Peca and her husband set up*".

**FALSE** – Because the account – as with every other Michael Peca account Kenner assisted – was *only* set up in Michael Peca name; as Kenner's client.
   • Kristen Peca told Kenner on their 2012 FBI recording that she was not aware of the LOC at Northern Trust Bank until 5 years after the LOC was set up by her (concealing) husband.

In July 2012, Kristen Peca tells Kenner -- @ *about 5.45 of the 1:34.50 call*:

> ***Kristen Peca*** *– Well, I was referencing the earlier stuff that you said, I don't remember a large amount being distributed back to our account and the timing of the years of the loan. the line of credit, that happened when we were in OHIO* [2008 & 2009]. *I don't understand how it could have been open for 5 years before that?* <u>*Because we had a bond account going.*</u>   <u>*Do you mean the Hawai'i; you had a line of credit, but not for us?*</u>

> ***Kenner*** *– No. no. you guys had lines of credit for 5 years at Northern Trust.*

*Kristen Peca – for 5 years?*

*Kenner* – for 5 years!   When you were in OHIO [*2009*], that's when the thing [*LOC*] closed.

Kristen Peca *cannot* believe that she is finding out on the FBI phone call in 2012 that her husband, Kenner's client, had concealed that he had an LOC open for five (5) years at Northern Trust *before her knowledge of it*.   It spite of her 2012 recorded statements, Kristen Peca *LIED* to the EDNY Court in 2015 when she testified that she and her husband waited a month after the 2005 Hawai'i meeting before deciding to participate with the Hawai'i LOC for their Hawai'i investment capital (*Tr.697*).

- It was planned perjury and facilitated thru leading questions from the government.

- **Clearly – <u>Kristen Peca was not part of the 2005 meeting</u>, thus, every other piece of testimony that the government salaciously solicited from Kristen Peca about the 2005 LOC, and its aftereffects, was known by both the government and Kristen Peca to be <u>fabricated</u> at all times and left to stand as a <u>fraud on the Court</u>.**

<u>**Kristen Peca delivers her second (2nd) huge LIE to the Court about "signing" for a document and "receiving" it at her home in Ohio (March 2009) – when the letter was actually mailed to her Buffalo (Getzville), New York home via FedEx and Certified Mail...**</u>

The Court's *M&O at 11* identified, "*Mrs. Peca said that, when she saw the letter from Northern Trust indicating that the line of credit was in default, she panicked*".[70]

**FALSE** – Because as identified, *supra*, the letter was sent to her Getzville, New York home – **and not their Ohio home where Michael Peca was living and playing hockey for the Columbus, Ohio, NHL team.**   Thus, the assertion that she received it at her Ohio home, "*signed for it*" -- and described her "*shock*" until her husband came home was 100% fabricated again for dramatic prosecutorial effect.

- Not only was her testimony proven as false – because **she was in the wrong state**.   Nevertheless (in truly rehearsed fashion), Kristen Peca asked the government immediately before describing the fake "*signed for it*" testimony (*Tr.709*):
      **"*Do you want me to get into the line of credit situation?*"**

<u>**Kristen Peca LIED to the court about Kenner-Michael Peca communication in 2009-2010...**</u>

---

[70] The Court identifies the transcript pages as *Tr.679-80* – but this is attorney Betesh's testimony; not Kristen Peca.   When Kristen Peca lied about her "shocked" incident (not "panicked"), it was at *Tr.709*.

The Court's *M&O at 11* identified, "*Mrs. Peca said that Kenner stopped returning her phone calls in or around 2009 and was slow in responding to other communication*".

**FALSE** – Because:
- **FIRST**– Kristen Peca was not Kenner's client.
- **SECOND** -- as identified in multiple previous filings, Kenner and Michael Peca exchanged over five hundred (500) text messages during 2009 – *all in Rule 16 evidence*.
- **THIRD** – Kenner and Constantine met face-to-face in Peca's Ohio home in May 2009.
- **FOURTH** – Peca participated in 6-8 independent conference calls with Kenner and Constantine about the GSF in the summertime 2009, alone.[71]

---

[71] Notwithstanding – in 2015 – Michael Peca could barely remember the conference call emails or conference calls that he participated in, claiming "*Its so long ago, I cant recall*".   BUT – the critical Jowdy loan discussions and Peca's confirmation to participate (per his own 2011 SDNY Grand Jury testimony) occurred five (5) years earlier than the actual GSF conference calls that he "*cannot remember*".   None of it comports as reasonable (*Tr.592-594, 596-597*).

> *Q. To stay on the subject of the Global Settlement Fund, if I could, during the period after your meeting with Mr. Constantine and Mr. Kenner, did Mr. Constantine arrange for conference calls for all of the investors in the Global Settlement Fund to participate in a group discussion regarding the status of the Global Settlement Fund, the issues that had to be dealt with?*
>
> *A [Michael Peca]:  I don't remember.*
>
> *Q. I'm going to show you collectively if I could try and save some time, four documents, and I'm trying to stay away from you as much as I can. C-33 for identification, C-34 for identification, C-35 and C-36. Could you take a look at those four documents for me, please.*
>                        *(Pause in proceedings.)*
> *A [Michael Peca]:  Okay.*
>
> *Q. Do you recognize these as group e-mails from Mr. Constantine to the participants of the Global Settlement Fund which includes you?*
>
> *A [Michael Peca]:  Yes, sir.*
>
> *Q. Do you remember, are these four notices of conference calls that took place during the period of time after you first agreed to participate in the settlement fund?*
>
> *A [Michael Peca]:  That's what they look like, yes.*

- **FIFTH** – in the fall 2009 – Kristen Peca exchanged messages with Kenner to spend a family vacation at Kenner's home in Arizona, telling Kenner, "*we can take you, your girlfriend and your kiddos out for a nice night while we are there*" (*See Recon33-80*).
- **SIXTH** -- Michael Peca participated in face-to-face mediation meetings with Kenner in Los Angeles in January 2010 regarding the California lawsuits to

---

*Q. Actually they reference a conference call 1, conference call 2, conference call 3, conference call 4; is that correct?*

**A [Michael Peca]:  They do.**

*Q. And then Defendant's Exhibit C-32, do you recognize that group e-mail?*

**A [Michael Peca]: *I don't recall that, no.***

*Q. Do you recognize it as an e-mail you received along with conference call e-mails discussing issues relative to the settlement fund referencing the names down at the bottom?*

**A [Michael Peca]: *It's so long ago I can't recall.***

*Q. Could that possibly be one of the ones you recall receiving?*

**A [Michael Peca]: *I guess it could be possible.***

*Q. And again instructions on how to participate. And then conference call 4, this is dated October 22, 2009. Actually this one starts off with a response from your e-mail address; is that correct?*

**A [Michael Peca]: Yes, it does.**

*Q. It says to Mr. Constantine, we understand?*

**A [Michael Peca]: Correct.**

*Q. Do you remember this one in particular?*

**A [Michael Peca]: *No.***

*Q. Do you have a recollection now of engaging in conversation so you participated in one of those conference calls?*

**A [Michael Peca]: *Yeah. It was a long time ago. I vaguely remember.***

recover the Hawai'i loans from Jowdy (in evidence).

- **SEVENTH** – Michael Peca and Kenner spent at least five (5) days together in Vancouver, Canada in February 2010 during the 2010 Winter Olympics, including several dinners and nights out together (in evidence), and

- **EIGHTH**, after all of those 2009-2010 contact points – *WHOLLY REFUTING* Kristen Peca's 2015 trial LIES – Michael Peca wanted to be part of the Eufora buyout in 2010 with Kenner – or as Peca told Kenner on July 14, 2010:

> [Michael Peca]: "*If not all willing members get a chance to be part of the loan buyout, mean more % there may be a lynching. FYI*"

This 2011 message was in direct contradiction to Kristen Peca's false claims to the 2015 EDNY that during her 2009 GSF meeting -- she told Constantine and Kenner:
> [Kristen Peca]: "*I quickly interjected and said we're not interested in anymore investments or we're done with them.*" (Tr. 717).

- o *Apparently – that was **not** true either!*

Notwithstanding – not one (1) email or text was presented at trial to substantiate her unanswered attempts to get a hold of Kenner in 2009 or 2010; *specifically when Kenner was **not** in charge of any of their investments.*

- *It should be noted that by the end of 2009 (with Peca retired), Kenner was no longer representing Michael Peca, thus, Kenner had no fiduciary role in Peca's life, whatsoever!   In addition, Kenner was not in charge of any Peca investments.*

**Kristen Peca LIES about being part of her husband's 2008 Eufora decision to invest in Eufora and buy private stock from Constantine…**

The Court's *M&O at 11* identified, "*Kenner told her that Eufora was about to 'explode' and needed extra funding to 'get us over the last little legal bit'* ".[72]

---

[72] The Court identifies the transcript page as *Tr. 672* – but this is attorney Betesh's testimony; not Kristen Peca.   When Kristen Peca testified about her Eufora conversation with Kenner that never happened, it was at *Tr. 702*.
- For extra flare – the government had Kristen Peca testify when she said, "*he [Kenner] didn't tell me about the commercial that had started airing*". (Tr. 702)

Kenner has *never* been aware of any Eufora commercials that aired – **so how could Kenner "not" tell her about them – as some kind of Kenner malfeasance?**  Nor was Kenner directly involved in Eufora since 2005 when he relinquished his equity and AZ Eufora Partners I Managing Member role to Tim Gaarn ( in evidence).

**FALSE** – Because Kenner was not "*anywhere*" with the Pecas to have that face-to-face conversation at the time of their April 2008 Eufora purchase from Constantine.   100% of the discussions were on the phone with Michael Peca -- absent his wife (and her revisionary lies).

> o   In addition – no money could be transferred from Michael Peca or any other Charles Schwab account to a third (3rd) party – per Charles Schwab and Greenberg Graham Assoc. ("GGA") (Peca's financial advisor) rules, *supra*.
>
> o   Michael Peca had to give verbal authorization (like all Kenner clients) to Schwab and GGA *before* the funds would have been transferred.
>
> o   Kenner's Power of Attorney only allowed Kenner to "start" the process with the necessary written information (payee, wire instructions, etcetera); *only*.
>
> o   Thus, it was impossible for any transfers to occur without:
>> i.   The account holder **knowing** exactly *who* and *where* the funds were getting wired –
>> ii.   **Verifying** it on two (2) separate calls to their independent advisor and custodian – and
>> iii.   **Approving** it.
>
> o   Kenner had no mechanism to divert the funds, unknown to the account holders, at any time.

### Kristen Peca LIED to the Court in complicity with the AUSA Komatireddy misleading question about the Eufora patents…

> •   *Apparently – this fooled the Court, as well.*

The Court's *M&O at 11* identified, "*She [Kristen Peca] also said that she would not have supported investing in Eufora if she knew the patents Constantine held were being used as collateral for the loan because that would indicate the company was in debt*". (*Tr.703*).[73]

**FALSE** – Because the irony about the Q&A between Komatireddy and Kristen Peca is that it would have validity if it were not for the SIMPLE FACT that the Eufora patents were *not pledged* until more that eight (8) months later – in January 2010.

> •   Thus, the well-planned falsity was added to the known fabrications that the government willingly admitted thru the morass of Kristen Peca's perjurious planned-rhetoric to harm Kenner.

### Kristen Peca claimed that she never received any official documents regarding her husband's 2008 Eufora purchase…but Michael Peca was represented by Attorney

---

[73] The Court identifies the transcript pages as *Tr.673* – but this is attorney Betesh's testimony; not Kristen Peca.   When AUSA Komatireddy and Kristen Peca introduced the known-false "patent" testimony timing to prejudice the defendants, it was at *Tr.703*.

**Michael Stolper and worked with AZ Eufora Partners I Managing Member Tim Gaarn…(*See Recon33-73*)…**

- *Kenner had no official role in Eufora or AZ Eufora Partners I as identified by CEO Gentry in several emails to the Eufora Board (See Recon33-95), as follows:*

[Eufora CEO Gentry – August 14, 2009 email]:

> *"Phil is not a member of Eufora or AZ Eufora Partners I LLC."*

The Court's *M&O at 11* identified, "*She also said that she never received any official documentation reflecting the ownership interest that she and her husband held in Eufora…*" (*Tr.703*).

**FALSE** – Because Attorney Stolper represented Michael Peca; never Kristen Peca.

- During the Michael Peca engagement of Michael Peca (*See Recon33-73*), Attorney Stolper and Managing Member Gaarn presented Eufora corporate records from Eufora CEO-Gentry including the ownership interests of all members in Eufora, with Tim Gaarn as the Managing Member of AZ Eufora Partners I (*See Recon33-95 – and Recon33-2*).

[Eufora CEO Gentry – August 14, 2009 email]:
> *"I have seen a copy of the operating agreement for AZ Eufora Partners I and I believe Phil and/or Tim would have that."*

- Kristen Peca was *never* a listed member or account holder on anything to do with Kenner (consistent with all Kenner clients – except Diana Nolan [Owen Nolan's wife] as a specially granted situation)…

**Kristen Peca verified that she and her husband knew about the loans to Jowdy based on their LOC contributions to the Hawai'i project…**

The Court's *M&O at 11* identified, "*Mrs. Peca said that Constantine explained that the line of credit was used to make loans to Jowdy and that filing a lawsuit against Jowdy would enable recovery of that money*".

- The Court designated approximately three (3) times in the Michael Peca section of *Document 501* that Michael Peca was not aware of the "link" between the Hawai'i LOC investment and the Jowdy loans (although he impeached himself as noted by the Court's *M&O at 8*); yet – Kristen Peca gives IMPEACHING testimony to her husband's perjury (or **CTE**).
  - o As the Court recalls, Michael Peca told the Court during direct examination (*Tr.457*):

    > *Q: Just based on your personal knowledge, what, if anything, did Mr. Jowdy have to do with your losses in Hawaii?*

> *A [Michael Peca]: Zero. I had never been told that he had any connections to Hawaii whatsoever.*

    o   As the Court recalls, Michael Peca also told the Court during direct examination (*Tr.644*):

> *Q: By the way, what if anything did that litigation that Mr. LaRusso asked you about regarding Mexico have to do with the millions or $1.775 million in your line of credit that you authorized for the Hawaii investment? What if anything?*

> *A [Michael Peca]: Nothing.*

- It is impossible to reconcile the Michael Peca lies – unless it must be based on *faulty memory, confusion and mistakes* (a.k.a. **CTE**); making it wholly <u>*unreliable testimony*</u> – certainly unreliable for a "concealment" prosecution.

- To further confuse the issue of whatever Michael Peca could *<u>not</u>* remember – *what his own wife verified*, Michael Peca was already a plaintiff in the 2008 Arizona case versus Jowdy for the same Hawai'i loan funds.   Michael Peca *signed* a disclosure of his Plaintiffs' attorney, Tom Baker, which the first (1st) paragraph of the 7-page letter read:

> "*the gist of the lawsuit is to recover certain monies loaned to Mr. Jowdy from Mr. Kenner, Little Isle 4 and Ula Makika LLC.   Mr. Kenner estimates the total amount of monies loaned to Mr. Jowdy which have not been repaid to be approximately $5,000,000.[74]   This is the estimated principle only, exclusive of accrued interest.  In summary, Mr. Jowdy denies that the monies were loans but rather characterizes them as investments.*"

    o   Michael Peca initialed every page of the 7-page disclosure for "his" attorney (Baker) and signed the last page, further verifying that all critical documents related to the Hawai'i project and Kenner prosecutorial were full-document packages when *signed*; *none presented to the contrary.*

---

[74] The $5,000,000 – in fact – is the same amount that Michael Peca told the SDNY Grand Jury in 2011 – further displaying his 2015 **CTE** symptoms or extreme perjury (whether suborned in sync with the other investors – or on his own) (*See Recon33-33*):

> "*A short-term loan [was made] to Mr. Jowdy because at the time Cabo – we hadn't gotten the lending from Lehman Brothers yet.  We* [emphasis added] *made a short-term loan until the lending came in.  Once the lending came through they were to pay back the loan, I think in the neighborhood of five-and-a-half million dollars, on the closing.  It was never paid back.  And then communication basically seized [sic] at that point from him [Jowdy].  That was kind of the whole sticking point as far as me and the other guys* [emphasis added] *with Mr. Jowdy.*"

**Kristen Peca contradicted her husband's testimony about the control of the GSF…**

The Court's *M&O at 11* identified, "*Constantine did not tell her that he would be in charge of the Global Settlement Fund*".

**FALSE** – Because based on the information disseminated by Constantine at the same May 2009 meeting, Michael Peca confirmed to the EDNY (*Tr.540*):

> *Q: Before the money went, before the money had been spent, before you were apprised of that, what was your belief as to who was in charge of the Global Settlement Fund?*
>
> ***A [Michael Peca]: Initially Ron Richards and, as it was ongoing, Tommy Constantine.***
>
> *Q: And what was Phil Kenner's participation in that, as you recall?*
>
> ***A [Michael Peca]: He didn't seem to have one.***

In the same line of questions, Michael Peca contradicted himself when he acknowledged that he was aware of the Jowdy loan – and the Constantine-GSF was being used for things other than just Jowdy litigation (in perfect consistency with the disclosure email – that both he and Kristen Peca returned to Constantine).  (*See Recon33-96 [Michael Peca] -- and Recon33-97 [Kristen Peca]*) (*Tr.540*).

> *Q: Just a few more questions on this. You also said that there was a portion of the conversation dealing with Eufora, is that correct?*
>
> ***A [Michael Peca]: Small portion, there was a small portion that dealt with things other than the loan and the Jowdy thing, all that stuff.***

**Kristen Peca gave testimony about Kenner" not receiving money" from the GSF…**

- *This statement by Kenner is true under any reasonable accounting standard, considering the $22,425.02 that was distributed to Kenner was a result of the $27,314.28 in actual expenses Kenner submitted (in evidence), while assisting the GSF (losing $4,889 in unreimbursed expenses at Constantine's discretion).*

- Michael Peca told the Court:

> *Q: And what was Phil Kenner's participation in that, as you recall?*
>
> ***A [Michael Peca]: He didn't seem to have one.***

The Court's *M&O at 11* identified Kenner told Kristen Peca that "*he [Kenner said] he did not receive any money from that [GSF] endeavor*".[75]

Michael Peca had received the GSF expense spreadsheet from both his independent attorney, Ronald Richards, and his teammate, Jay McKee, so how would the *Kenner expense reimbursement*, which was a line item (and not concealed) become an issue that she had to take Kenner's word for? Her husband (most likely concealed from her) had the expense spreadsheet, and she had direct email and phone communication with Ronald Richards. Ronald Richards expressed to Michael Peca via email:

[Ronald Richards to the Pecas – November 4, 2009] (*See Recon33-21*):
> *Hi Michael and Kristin,*
>
> *I have been effectively managing the litigation budget [set by Constantine] and not wasting money like most attorneys do. Jowdy has of course been stonewalling but he is running out of procedural barriers and I believe that he will soon be forced to deal with this case.*
>
> **Please email me anytime with any specifics and I am happy to have a conference call with you or your wife who I am aware is or was a practicing attorney.**
>
> *Thanks.*
> *RNR [Ronald Richards]*

So, with Michael Peca confirming that Kenner had no role in the GSF – who would believe that Kenner was "also", supposed to front travel expenses for the establishment of the GSF and subsequent expenses (as a gift)?

o *In addition to the $4,889, supra*, these additional **unreimbursed** expenses would include (totaling at least **$17,233** – before additional legal fee expenditures, *infra*):[76]

    i. *The un-reimbursed hotel ($2,270) and travel ($1,200-Woolley and deVries flights directly by Kenner via AMEX) and food ($638 – directly by Kenner via AMEX) expenses for the January 2010, 2-days of Jowdy depositions (for Kenner, deVries, Woolley, Berard, etcetera) --*

    ii. *The stenographer fee of $8,887.67 for the 2-day deposition [paid 1-5-2010 and 1-19-2010] –*

---

[75] The Court references *Tr.696* and *Tr.709*, neither of which make any reference to the Kenner expense reimbursements on behalf of the GSF.

[76] All of the expenses paid by Kenner are present on his personal AMEX statements in the government's possession at all times (in evidence).

     iii.    *The January 13, 2010 $1,650 Jowdy case closing fees (paid to the Law office of Ronald Richards directly by Kenner via AMEX),*

     iv.    *The January 21, 2010 $888 Jowdy case closing fees (paid to the Law office of Ronald Richards directly by Kenner via AMEX),*

     v.    *The January 27, 2010 $700 Jowdy case closing fees (paid to the Law office of Ronald Richards directly by Kenner via AMEX),*

     vi.    *The ongoing Mexico and Little Isle 4 litigation Constantine refused to advance (in contradiction to the GSF purpose) (Tr.539 – Michael Peca):*
[Michael Peca]:

> "*I remember calling Tommy to ask him why we couldn't use money from the global settlement for Phil and the answer was Mexico was too much of a crap shot and unpredictable legally. So there's no money to go towards the Mexican part of it.*"

• So, Kenner was forced to front almost 100% of the Mexico litigation expenses from 2009 thru his 2013 arrest (totaling nearly $1,000,000).

     vii.    *And, the January 2010 Los Angeles mediation expenses for over ten (10) Plaintiffs and associates to attend.*

     viii.    *Et. al.*[77]

Kenner documented the funds via expense spreadsheet and Constantine (because he was 100% in control of the GSF at all times) denied expenses that Constantine, himself, asked Kenner to pay for, including the initial meeting with Ronald Richards, Attorney Paul Augustine and Constantine in Los Angeles, over dinner (in Rule 16 evidence).

**Kristen Peca testified that she did not know what happened to the Hawai'i documents Kenner sent to Michael Peca and all the investors –** *but was sure it did not contain what she was looking for…*

• *What was Kristen Peca looking for?* Michael Peca received all of the Little Isle 4 By-Laws, copies of all *his signed* banking records, and updates on the Hawai'i project status, including Jowdy loans.[78] What else was there before he received the full joint venture package with Lehman Brothers and *signed* the July 2006

---

[77] *Kenner was not a plaintiff* in the ongoing litigation versus Jowdy – but fronted expenses routinely for the GSF efforts – despite Constantine refusing to repay the expenses on multiple occasions – after he had already "overspent" the GSF proceeds on his own.

[78] John Kaiser proffered to the FBI on October 19, 2010.   He confirmed to FBI Agent Galioto and others that he saw the Hawai'i project updates from Kenner the group of investors (*See 3500-JK-1-r at 3*).   From the Galioto–led investigation raw notes:
> "*Question to JK:*
> ***Update letter on Hawai'i project***
>     ***JK [reply] – yes, I recall letter***
>     ***PK made these -- many times***"

joint venture agreement – after confirming he received the "full document" (which is also represented on his *signed* and returned "acknowledgment"; a documented habit of Kenner's for full disclosures).

The Court's *M&O at 11* identified: "*Mrs. Peca further testified that she received a packet of information from Kenner pertaining to Little Isle 4, but did not know what happened to those materials.*" [79]

- The referenced Hawai'i package included:
  - The 2004 and 2006 Little Isle 4 operating agreements,
  - The 2006 joint venture disclosure letter (signed by Michael Peca),
  - The 2006 joint venture agreements (about 1800 pages),
  - The books and records of Little Isle 4,
  - The Little Isle 4 tax records; including their own 2006 Little Isle 4 k-1 (identical to the Little Isle 4 k-1 **produced by Nolan** during the 2009 Arizona arbitration – also confirming Nolan's full knowledge of his $2.3 million Hawai'i investment) (*See Recon33-78*).

The Court's *M&O at 11* identified – again: "*Mrs. Peca said that she thought she did receive some Northern Trust documents from Kenner, but they did not contain information the Pecas were looking for*".[80]

Again, Kristen Peca said she "*did not know what happened to those materials*", so how could this outrageous statement be cross-referenced any better that her nonsensical claim that Kenner told her "*he was living in a cave in Mexico*" – didn't believe him -- but continued to allow Kenner to manage their family business. It does not comport.

- The documents that Kenner produced, regardless of Kristen Peca "*not knowing where they are*", could not have been anything more or less from Northern Trust than what they produced to the 2015 trial Court via subpoena, so *what else* could she "*have been looking for*"…and from Kenner?

This ignores the obvious, which is that Michael Peca could have called Northern Trust any time in the five (5) years he had a relationship and millions of dollars at the bank and "**demanded**" that the bank turn over every document related to his accounts (IMUS investment account – and LOC), *but Michael Peca did not*. Northern Trust banker Aaron Mascarella told the 2015 Court that *Kenner received* "**duplicates**" of the client

---

[79] The Court references this communication at *Tr.719-21* but the testimony on that page has nothing to do with these comments from Kristen Peca.

[80] The Court references this communication at *Tr.752* but the testimony on that page has nothing to do with these comments from Kristen Peca.

records.  And, Northern Trust Banker Aaron Mascarella *never* violated the 2001 Patriot Act – which clearly means that while Mascarella was in charge of the individual LOC clients on behalf of Northern Trust Bank, Mascarella always was in compliance, making sure that the Kenner-related LOC clients received every legally mandated document that any other of the thousands of Northern Trust Bank clients would have received.  He confirmed to the Court that he did not "conceal" any information on Kenner's behalf or upon request from Kenner.  Mascarella, confirmed that he was not part of the lending relationship for years; and as such, the government failed to produce a single witness that actually verified the false prosecutorial theory that Kenner "somehow" demanded that Northern Trust conceal anything from their 2001 Patriot Act-governed lending clients, from the commencement of their relationship (for Kenner – a person they had no prior relationship with)?!?

[Northern Trust Banker Aaron Mascarella] *(Tr.912)*:
> *"So I was in charge of sending Little Isle IV checking account statements.* ***I wasn't part of the lending relationship. I had no control over where those loan statements went and who they went to.***"

- This leaves no equivocation as to the fully documented LOC statements that Michael Peca and all of the Northern Trust clients related to the instant case received (with many of them in the 2015 Northern Trust Bank subpoena).

Clearly, LOC statements were received in the 2015 Northern Trust Bank subpoena with the individual clients addresses on them.  How could they have received those statements and allowed the government to claim they never received them?  **Northern Trust Bank produced the statements directly to the Court**.  Michael Peca's LOC statements (assumedly under Northern Trust Banker Aaron Mascarella's control) were actually mailed to two (2) separate Michael Peca address, one (1) address in Edmonton, Alberta CANADA -- and the other to Michael Peca's New York address (the same place his February 2009 and March 2009 default letters were sent).

No *faulty memory, confusion and mistakes* or **CTE** by Peca (or recently fabricated testimony by Kristen Peca) should be considered "sufficient" based on their "*failed memory test*" of ten (10) year-old events in the face of the actual empirical banking records that refute their degenerative memory issues.   It is an unreasonable standard.

Ultimately, when Kristen Peca was asked what she did receive from Kenner related to their Northern Trust Bank information, she could not recall, despite being "sure" that it wasn't what she wanted *(Tr.770-771)*:

*Q. Is it your testimony on this witness stand under oath that at no point in time Phil Kenner ever sent you Northern Trust documents that may have been in his possession?*

*A [Kristen Peca]: Not the kind that we were looking for.*

*Q. Well, to the best of your memory, what kind of Northern Trust documents did he send to you?*

*A [Kristen Peca]: I can't recall.*

## Kristen Peca contradicts all "no knowledge" logic regarding the GSF...[81]

The Court's *M&O at 12* identified, "*Mrs. Peca admitted that, based on the [disclosure] email she understood the Global Settlement Fund had multiple objectives beyond litigation against Jowdy, including acquiring assets*".[82]

It must be highlighted that after the Pecas gave vehement testimony during their direct testimony for the government about "no knowledge" of the "other" GSF scopes, Kristen Peca clearly gives contradicting testimony, IMPEACHING herself thru her own admissions, and refuted direct testimony that her husband gave as a result of information disseminated by Constantine at the same meeting.   It cannot be reconciled.

Nonetheless, after Kristen Peca &/or Michael Peca received the information from Constantine via email (*See Recon33-98*) [*mentioned by the Court at M&O at 13*] and from Kenner for the necessary disclosure signoff (*See Recon33-99 FOLDER with all GSF approvals*), the Pecas *never* asked for their money back, nor did they question any of the alleged "additions" to the items discussed during the face-to-face meeting at their home.  To the contrary, they asked for the details of the equity they would receive from Constantine's presentation to them, as the email (*See Recon33-99*) lays out in precise detail.

## Michael Peca confirmed that he spoke with teammate, Jay McKee, the day after the GSF meeting – which included McKee's full text communication with Kenner, *infra* – further confirming full, transparent knowledge of the GSF "*use of funds*"...

---

[81] The Court references this communication at *Tr.777* but the information on that page (*no testimony at all*) has nothing to do with these comments from Kristen Peca.

[82] The Court identifies the transcript page as *Tr.672* – but this is attorney Betesh's testimony; not Kristen Peca.

Lastly, as Peca recalled during testimony, he spoke to his teammate, Jay McKee, immediately after McKee and Peca had individual meetings about the Constantine-GSF plan in May 2009.   As the Court recalls, Jay McKee was only present as a potential victim of GSF fraud per the government proffer (*Tr. 1846*).   McKee and Peca would have reconciled everything from the Constantine-GSF talk from the days before, thus fresh in their collective memories (in real time).

- Yet -- the government was blessed during the McKee testimony with more *faulty memory, confusion and mistakes* (or **CTE**) laden testimony.

- McKee was fortuitously able to compliment the GSF "*concealment*" government theories (of others' testimony) by emphatically announcing that neither Constantine nor Kenner disclosed anything about the "other" GSF objectives; **Falcon 10 airplane, Avalon** (airplane hangars), **Eufora** buyouts of the "*3 black sheep*" [Nolan, Juneau, and Moreau – three investors working hand-in-hand with Jowdy and Harvey]; and the **Las Vegas Palms units**. (*Tr. 1821-1824*).

- Notwithstanding, Kenner and McKee had a several hour-long text communication immediately after the face-to-face dinner to recap "**exactly**" what Constantine discussed at the GSF planning dinner.   The results were, as follows:

McKee in BLACK (read) -- Kenner responses hi-lighted (sent):

| | | | | |
|---|---|---|---|---|
| 7032 | +171680349 03 **Jay McKee*** | 5/9/2009 3:46:20 AM(UTC+0) | Read | Thx 4 making the trip bud.. **Took in alot from the talk tnite.. Drive safe, be in touch..** |
| 8255 | +171680349 03 Jay McKee* | 5/9/2009 3:55:39 AM(UTC+0) | Sent | Good stuff |

Then, McKee continued by re-engaging eight (8) hours later:

| | | | | |
|---|---|---|---|---|
| 7039 | +171680349 03 **Jay McKee*** | 5/9/2009 12:36:25 PM(UTC+0) | Read | **Can u do me a favor.. Can u email me, so I can look at it on paper, everything my 25O turns into.. Nicole was speaking with Tommy when u explained to me all the areas where we are benefiting..** |
| 8265 | +171680349 03 Jay McKee* | 5/9/2009 12:37:21 PM(UTC+0) | Sent | **I will have tommy do it so it's consistent with the discussion** |
| 7040 | +171680349 03 Jay McKee* | 5/9/2009 12:37:42 PM(UTC+0) | Read | **Perfect, tks** |

Then, McKee continued by re-engaging one and a half (1-½) hours later:

| 7043 | +17168034903 **Jay McKee*** | 5/9/2009 2:12:22 PM(UTC+0) | Read | **Hey, also, could u email me what the 3 black sheep are getting in the end result, as well as Tommy bullet points they had 2 agree too.. Tks** |
|------|------|------|------|------|
| 8269 | +17168034903 Jay McKee* | 5/9/2009 2:32:11 PM(UTC+0) | Sent | **Tommy said you will get 1/10th of everything that is acquired of theirs which includes 20% (2% for you) of the** <u>airpark building</u>**, 1/10th of their 3.64% of their Eufora shares (.364% for you which puts you just over 1% in** <u>Eufora</u>**) and then a small piece of the** <u>jet</u> **which TC is still crunching numbers on but it will probably be 1% of it.** |
| 8270 | +17168034903 **Jay McKee*** | 5/9/2009 2:35:46 PM(UTC+0) | Sent | **TC will send you the bullets they agreed to but has to wait till it's actually signed. Should be a day or two. They have only agreed by email so far. He will also send you the media summary** but he wants you to convince the owner of Chef's to send him the tomato sauce Fed Ex. |

| 7044 | +17168034903 **Jay McKee*** | 5/9/2009 2:43:44 PM(UTC+0) | Read | Haha.. Consider it done.. I'll have Lou put some bottles together with the extra meat for the real flavor.. |
|------|------|------|------|------|
| 8271 | +17168034903 Jay McKee* | 5/9/2009 2:45:55 PM(UTC+0) | Sent | Thx |

Then, McKee continued by re-engaging forty-five (45) minutes later:

| 7045 | +17168034903 **Jay McKee*** | 5/9/2009 3:36:47 PM(UTC+0) | Read | **Did TC say the jet was worth 25Om last night?** |
|------|------|------|------|------|
| 8273 | +17168034903 Jay McKee* | 5/9/2009 3:44:10 PM(UTC+0) | Sent | **The jet is worth 1.5m. He invested 250k to repair it** |

| 7046 | +17168034903 **Jay McKee*** | 5/9/2009 3:45:53 PM(UTC+0) | Read | **Aha.. Thats where the 25O number came from..** |
|------|------|------|------|------|

| 7048 | +17168034903 **Jay McKee*** | 5/9/2009 3:53:08 PM(UTC+0) | Read | **In the deal, the 3 guys get their money back from their involvement with TC, but nothing back from their Mexico deals, correct..** |
|------|------|------|------|------|
| 8276 | +17168034903 **Jay McKee*** | 5/9/2009 3:54:14 PM(UTC+0) | Sent | **Correct!** |

Then, McKee continued by re-engaging two (2) hours later:

| 7053 | +17168034903 Jay McKee* | 5/9/2009 5:43:22 PM(UTC+0) | Read | If we get control of Jowdys Cabo equity and move to sell Cabo - we get our 5OO back from del mar, and what percent of Cabo do we end up with? |
|---|---|---|---|---|
| 8282 | +17168034903 Jay McKee* | 5/9/2009 5:48:03 PM(UTC+0) | Sent | Its impossible to say until we know everyone who's involved in getting Jowdy's 40%. For example, the new bank/investor may want half of it to do the deal. But...whatever it is, you will get 1/10 of it. |

Then, McKee continued by re-engaging four (4) hours later:

| 7060 | +17168034903 Jay McKee* | 5/9/2009 10:01:18 PM(UTC+0) | Read | So is it correct to say we'd get our 5OO back from del mar, as well as a prob minumium 2% of Cabo? Sorry to keep asking - just trying to get it right.. |
|---|---|---|---|---|

If McKee did not lie -- **on purpose** -- to support the government's claims of conspiracy by concealment – then the inaccurate testimony by McKee certainly and wrongfully contributed to the ongoing collective amnesia by the GSF contributors "***in the government's favor***" while seeking a conviction of Kenner and Constantine – for alleged crimes that McKee *and now Michael Peca* – in particular – exhibited *faulty memory, confusion and clearly made a mistake – **thus making the testimony <u>unreliable</u> at best – but thoroughly damaging to the defendant(s).***

### Michael Peca acknowledged the "other GSF usages" in real time via text to Kenner...

The Court conceded in its *M&O at 12* that Michael Peca responded via text[83] to Kenner's disclosure and authorization email by asking "*how much equity they would receive*" in the various "other" elements of the GSF.   Kristen Peca also emailed Kenner to make an independent request before sending her own independent email "acknowledgement of the GSF "use of funds", *supra (See Recon33-89 at 2)*:

> [Kristen Peca]: "*Hey, before we sign off on an "approved" letter, can we please have the written documentation as to exactly how much (%) we obtained with our contribution?*"

---

[83] Michael Peca's GSF text to Kenner re – "other" equity...

| 7 0 4 2 | +171637 43234 Michael Peca* | 5/9/2009 2:04:59 PM(UTC +0) | R e a d | Make sure I get a statement of somekind to where my $250k is going. ***How much in ea of the two companies***. Thanks |
|---|---|---|---|---|

On face value, this would be a normal request by Kristen Peca, if it did not directly contradict her 2015 testimony of her alleged GSF meeting proffer (*Tr.717-718*):

> "*And I quickly interjected and said we're not interested in any more investments or we're done with them.*"

**The government attempts to resurrect the contradictory testimony of Kristen Peca – mainly refuting her own husband's *faulty memory, confusion and mistakes* (a.k.a. "failed memory test") addressing "personal projects"...**

- This statement was misleading since the government knew the Constantine-Gonchar "*side-deal*" covered all of the Constantine distributions from the GSF (Ronald Richards Trust) account (*Tr.4827*):

  *Q. And was that agreement also, did it cover the other monies that you --*

  *A [Gonchar]: Yes. As I said, like in my understanding it was like as long as he is going to pay it back, I don't mind him using the money I'm putting in.*

  *Q. That would include all of the monies that you had put into the Ron Richards' account?*

  *A [Gonchar]: Yes.*

  *Q. Is that right?*

  *A [Gonchar]: Yes.*

- Not counting the full "side-deal" funds, the Court designated a maximum $9,007 misused by Constantine from the GSF – by denying Gonchar's own right to confirm his additional $1,250,000 was covered by his deal with Constantine.

- The Court also ignores the contribution Constantine personally made to the GSF (Ronald Richards Trust) account during the same time period for $124,982 on 9-8-2009 – fully overpaying the $9,007 not covered under the Court's bare bones assessment of the Constantine-Gonchar "side-deal".

  o Either of these contributions under Constantine's control could also cover the **$22,425.02** Constantine authorized to reimburse Kenner for documented GSF expenses (that Constantine himself approved).

Nonetheless – the government closed the Kristen Peca testimony with another misleading and knowingly false allegation thru **insinuation** – since there were none (*Tr.819*):

> *Q: Would you have authorized your money to be used for Mr. Kenner or Mr. Constantine's personal projects?*

*A [Kristen Peca]: No. Absolutely not.*

The Court's *M&O at 13* highlighted this non-corroborated point, clearly suggesting that it had some impact on the jury's decision, despite being wholly false. The Court identified, *"she [Kristen Peca] said that she would never have authorized them to spend the Pecas' contribution on personal projects".*

- Defendant Kenner concurs -- because it was not.

The government defrauded the Court and the jury throughout the lengthy Q&A with Kristen Peca.

- The government knew at all times that Kristen Peca was not Kenner's client.
- The government knew from their own FBI 2012 recordings between Kristen Peca and Kenner that she was not part of the 2005 Hawai'i investment discussions (between Michael Peca and Kenner alone), and
- They knew that Kristen Peca was going to lie about receiving the 2009 Northern Trust Bank default letter (addressed to the Pecas' New York home) while she and her husband were living full-time in Ohio.

Nevertheless, the government knowingly chose to allow and promote the Kristen Peca perjury -- *more likely than not suborned.*

It is impossible, upon honest review and without pause, that the government received damaging testimony from Kristen Peca (without a reasonable claim of *faulty memory, confusion and mistakes*) that was consistent with so many other investors as a result of events that logistically could never have happened ("shocked") and meetings that she admitted thru FBI recordings she could never have been part of (2005 Hawai'i meeting).

How were any of Kristen Peca's testimony and the preceding Q&As prepared by the prosecutorial team?

- It certainly could not have been independent of one another (in a vacuum).

The Court must review the statements of Kristen Peca, the prodding of the government thru leading Q&A, and re-evaluate who promoted the obscene perjury from Kristen Peca. They must ask whether it rises to the level of prosecutorial misconduct on its own -- notwithstanding all of the other Kenner allegations of its prejudicial presence in the 2015 trial to elicit emotion from the jury and wrongly influence a verdict.

Kenner remains well-founded in his representation that, if the Kristen Peca testimony did not rise to *18 U.S.C. 1001* perjury &/or the government's complicity was not enough for clear prosecutorial misconduct on its own, the Court must ask how compounding the

"harmlessness" of the "win-at-all-costs" misrepresentations thru both of their respective participatory roles were on the verdict.

### Aaron Mascarella[84]

### Northern Trust Banker
### (Only late 2006 thru 2009 with Kenner LOC clients)

The government did not introduce any evidence or testimony from any Northern Trust Bank lender from inception (2003) of the LOC relationships thru Mascarella's late 2006 (in or around the time of the Lehman Brothers JV payments) that could verify any first-hand information.

- Nevertheless, the government tried to "back-door" Mascarella's testimony into the 2003-2006 timeframe when he had <u>ZERO</u> involvement with the LOCs and the underlying LOC clients of Northern Trust Bank.[85]

Northern Trust Bank is in the business of managing money for professional athletes and wanted to avoid publicity.  Clearly, the government did not think Northern Trust was involved in violating the 2001 Patriot Act; otherwise the bank would have been a sitting duck for major fines – *which is what the SEC and the FBI are in the business of collecting.*

Northern Trust Bank fired Aaron Mascarella after seventeen (17) years as a result of Northern Trust Bank's insurance company settling with several LOC investors.

After Mascarella was fired, he has spent years trying to "pay Kenner back" by spreading rumors in corroboration with Jowdy's attorneys.   His contradictory trial testimony corroborated (pro-Kenner) that Northern Trust Bank followed the 2001 Patriot Act rules of *"know your client"* and sent the legally required documents to all of the investors, at all times; as the SEC requires.

<u>Mascarella confirmed that at no time did he or any other Northern Trust Bank employee think Kenner signed documents on behalf of the Northern Trust LOC clients...</u>

---

[84] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 13-15.*

[85] In another disturbing *28 U.S.C. 2255* issue to be raised soon, trial counsel (Haley) not only refused to subpoena for trial testimony, each and every Northern Trust Banker who would have confirmed all of their transparency with their clients (including President Highmark who convinced Kenner in mid-2003 to establish the LOC investment concept) – while not breaking the law (2001 Patriot Act)...but attorney Haley *never* even called a single Northern Trust Banker for an interview to prepare for the trial "**based on concealment**".   It is a shocking lack of preparation – under any interpretation of the *Strickland* standard.

**Mascarella's own testimony confirms that he was NOT part of the first three and a half (3 1/2) years (2003, 2004, 2005 and ½ of 2006) and setup/management of the LOCs at Northern Trust Bank...**

- **Thus -- his testimony about anything prior to his late 2006 arrival is third party hearsay (and not admissible).**

The Court's *M&O at 13* confirmed that Mascarella "*was assigned to the banking division from 1997 thru 2005 and then transitioned to the lending division*" (*Tr.838*).

**FALSE** – Because Aaron Mascarella's own testimony on the same transcript pages actually confirmed that Mascarella was in the "lending division" in late 2006 (assisting in management of the Kenner client LOCs from 2007 thru 2011).

- *Kenner concurs with the latter*.   This highlights that Mascarella had "nothing" to do with the LOC clients from 2003 thru at least the end of 2006, the substance of the LOC activity.
- Mascarella began working under the lending division boss, Ed Wilson, late in 2006 with Kenner and Kenner clients. Mascarella's first recognizable task was to contact the LOC clients after the August 2006 Lehman Brothers joint venture at Kenner behest (*See Recon33-100*). [86]
  - o As a result of the 2006 Mascarella communication with each of the LOC investors, **no investor could claim**:
    - They were unaware of their LOC,
    - The LOC usage (because of years of their own previously *signed Disbursement Request & Authorization* **1-page** statements acknowledging exactly how much had been withdrawn from their LOC account for Little Isle 4 business use), and
    - Who to contact at Northern Trust Bank [*Aaron Mascarella @ 602-468-2537*] if they had a problem or question.

  - o No questions were raised by any of the LOC clients; *otherwise Mascarella would have grandstanded about it during his testimony*.

---

[86] The Mascarella letter to each of the LOC clients, specifically outlined (*See Recon33-100*):

- As your relationship manager at Northern Trust, "*I was given instructions by Phil Kenner*" to make modifications to both your investment account and **your personal line of credit**.
- **As you are aware**, a recent paydown in the amount of $718,905 took place on 8/24/06.
- By setting a maximum line limit of $650,000 (**present balance $617,911**) **on your personal line of credit**, we could lower the collateral requirement to $850,000...
- As a valued client of Northern Trust Bank, "*I wanted to take this opportunity to review recent account activity and confirm the changes to your account*".

*He did not…*

[Mascarella confirmed – *Tr.838*]:

> A [Mascarella]: I was in the banking division from 1994 to approximately 2005.
>
> Q: What division did you go to after that?
>
> A [Mascarella]: I transitioned into the lending division of Northern Trust.
>
> Q: Can you describe, in general, your duties and responsibility as part of the lending division?
>
> A [Mascarella]: Yes. I started off for the first couple years as a credit analyst. I was responsible analyzing tax returns and financial statements for borrowers in the bank. After being a credit analyst for a couple of years, I was promoted and become a lending officer.
>
> Q: *Approximately what years were you in the lending division?*
>
> **A [Mascarella]: Approximately 2007 to the end of my career, which ended in 2011.**

**Mascarella gives pro-government and false testimony that Kenner "opened" the clients' LOC – which NEVER happened (but insinuated as a prejudicial misnomer)…**

- *Mascarella was not involved during any year that a single LOC was opened!*

The Court's *M&O at 13* confirmed that Mascarella "*further testified that he was responsible for managing the lines of credit opened by Kenner with Northern Trust*". (*Tr.850-852*).

**FALSE** – Because as Mascarella's own testimony confirmed, he was not part of any LOC transactions until he joined the lending team in late 2006 (or 2007, *supra*).

o **None of the LOC accounts were set up under Mascarella.**
   - All of the LOCs were signed off by lending Vice President, Ed Wilson; *never Mascarella*.

o *Not one individual LOC account was ever established by Kenner.*
   - Every one of the LOC clients signed 100% of their documents – as presented in the 2015 Northern Trust Bank subpoena during trial – *none disagreeing*.

o Thus, each and every misleading reference by Mascarella, *supra*, &/or Q&A thru government witnesses that claimed "*Kenner set up the LOC accounts*" is wholly false, misleading, and planned as prejudicial.

- Not one LOC document was presented as a forgery, despite the fact the Court ordered the government during a 2014 hearing to "*check with all of your planned witnesses about other forgeries*".
- The government never opened that "treasure trove" as Berard and Kaiser lied to the NY Daily News in 2013 about documents they allegedly found from investments "*that never existed*" (also altogether untrue – otherwise the government would have raised it or charged Kenner – *and they did not*).

For the third (3rd) time in the Court's analysis of Mascarella, the Court's *M&O at 13* verified that Mascarella "*further testified that <u>Kenner opened</u> individual lines of credit for Peca, Nolan, Bryan Berard, Darryl Sydor, Steven Rucchin, Glenn Murray, Mattias Norstrom, and Sergei Gonchar" (Tr.853-854).*

**FALSE** – Because not one LOC account under the individuals' names were ever established by Kenner.   Every one of the LOC clients signed 100% of their documents – as presented in the 2015 Northern Trust Bank subpoena during trial.

- Thus, each and every misleading reference by Mascarella, *supra*, &/or Q&A thru government witnesses that claimed "Kenner set up the LOC accounts" is wholly false, misleading and **cumulatively prejudicial**.

**<u>Mascarella LIED to the Court about client communication issues that – *if true* – would have occurred before he was involved in the LOCs (2003-2006) – per his own testimony, *supra*...</u>**

The Court's *M&O at 14* represented that Mascarella identified, "*Kenner said that Northern Trust should only communicate with him regarding the lines of credit*" (Tr.859).

**FALSE** – Because the President of Northern Trust Bank, David Highmark, was the only person Kenner was introduced to at Northern Trust Bank when Kenner's clients began transferring funds to Northern Trust and opening the LOC accounts in 2003.

- President Highmark recommended the collateralized LOC strategy to lending for the Hawai'i project to Kenner in the initial 2003 meeting, because his bank [Northern Trust] would not offer an early-phase development loan for the project without a presence in Hawai'i for his bank.
- The Mascarella testimony would have placed Highmark and his subordinates in harm's way with the FDIC, the SEC and other banking regulatory agencies (including Homeland Security Agency – as a result of the newly implemented 2001 Patriot Act).

If this were true – Mascarella would have violated his own claims immediately in 2006, as follows:

**Joe Juneau confirmed that he spoke via email – at least – with Northern Trust Banker Aaron Mascarella...**(*Tr.251-252*):

> *Q:  Did Phillip Kenner, in either words or actions, ever prohibit you from communicating with the officials at the Northern Trust Bank?*
>
> **A [Juneau]: No. I can't say that, no.**
>
> *Q: As a matter of fact, there did come a point in time where you had a question about the status of your line of credit and you communicated directly with Mr. Mascarella with Northern Trust, isn't that true?*
>
> **A [Juneau]:I think I first asked Phil Kenner about it, and then went up to see the name of the Northern Trust person. And it was the first time I remember contacting someone at Northern Trust.**
>
> *Q: Does the name Aaron Mascarella, M-A-S-C-A-R-E-L-L-A, come to mind?*
>
> **A [Juneau]:  Yes.**
>
> *Q: Please take a look at this document marked Kenner Exhibit 3. In an effort to be complete, it is a 9-page document. Would you please take a look at this document, sir.*
> > *(Handing.) (Pause in proceeding.)*
>
> *Do you recognize that document, sir?*
>
> *A [Juneau]: Yes.*
>
> *Q: What is it, just so we know?*
>
> **A [Juneau]:It is e-mail exchanges, some between me and Phillip Kenner and the other one was Mascarella from Northern Trust.**

**Berard LOC reduction letter (2006):**

Mascarella immediately sent LOC reduction letters to all of the LOC clients as soon as he was involved in the Northern Trust lending division (in evidence). And, Lehman Brothers funding paid millions back to the LOC accounts in August 2006, *supra* (*See Recon33-100*).

**Peca LOC statements (2006):**

Michael Peca received LOC statements (present in the 2015 Northern Trust Bank subpoena) at his Edmonton, Alberta CANADA address (*See Recon33-101*) -- and his summer home, Buffalo (Getzville) New York address (*See Recon33-102*).    Thus even in

2006, Michael Peca would have had to collect those statements and conceal them from his wife (because Northern Trust Bank produced the LOC statements they mailed).

- Kristen Peca's 2012 FBI recordings confirmed that she was not aware of the Northern Trust LOC until she was living in Ohio (no earlier than 2008) – *five (5) years after her husband signed to open the account and concealed it from her.*

Michael Peca also confirmed his complete understanding of his LOC and its expected usages to the SDNY Grand Jury in 2011, *infra and supra*, leaving nothing to question related to:

- His full, transparent knowledge of the LOC,
- The usage of funds for contributions to the Little Isle 4 capital account, and
- The distributions to Jowdy for the 2004 Hawai'i loan.

**Mascarella communication confirmed with Kenner client, Nolan, during Mascarella's 2009 deposition -- *before he was terminated by Northern Trust Bank and blamed Kenner for his firing...***[87]

- The government presented **NO first-hand evidence** by the people who handled the Northern Trust LOC accounts in the first (1st) four (4) years...

[Mascarella deposition -- Page 23]:

> *Q.    Okay. Now, with regard to the line of credit account, who was authorized to make transfers out of that line of credit?*
>
> *A [Mascarella]: Owen **and Phil.***
>
> *Q.    Was there any limitation on Mr. Kenner's ability to transfer money out of the account?*
>
> *A [Mascarella]: No. It was -- Yes. I'm sorry. It was -- The proceeds were only to go to Little Isle Ventures, Little Isle IV, I think, if I remember correctly. He signed -- **Owen Nolan signed a bank authorization** or an authorization letter to the bank authorizing Phil Kenner to transfer money from the line of credit into the Little Isle IV account.*

- **Mascarella confirms that he dealt with Owen Nolan between 2003 and 2006 (as his private banker) related to the LOC payments being late and DEFAULT letters on the LOC...**

---

[87] In spite of the Mascarella 2009 deposition confirmation of communication directly with Nolan – Nolan gave 2009 arbitration testimony one (1) month later claiming he had *"no knowledge"* of the LOC account that Mascarella had just verified to Nolan's same attorney that they independently discussed Nolan's LOC without Kenner.  Nolan's attorney -- Meeks – was working hand-in-hand with Jowdy and Harvey in 2009 versus Kenner and Kenner investors...unknown to Nolan.

[Mascarella deposition -- Page 24]:

> Q:    *During the time period from -- From the time you opened the Nolan account until the end of 2006, did you have conversations with Mr. Nolan concerning the line of credit?*

> A [Mascarella]: *Conversations --* **I spoke to Owen infrequently.** *I've only had brief conversations with him. And my guess is that* **it was only relating to the payments, that the payments were being made or not being made.** *There was a few times when the payments were slow, that* **we sent out default letters,** *which probably -- You know, I can't remember every conversation I had with him but I assume he might have responded to one of those default letters.*

[Mascarella deposition -- Page 34]:

> Q.    *At some point, was a -- And I'm talking about the* **2004 to 2005 time frame. Was a line of credit opened up for Little Isle IV?**

> A [Mascarella]: *I believe so. That would -- It's my understanding the answer is yes.*

> Q.    *And do you recall who were signatories on that line of credit?*

> A [Mascarella]: **I wasn't involved at that time on the lending side, so I don't know.  I know that if it was set up in the business name -- I would only be speculating.  So I don't know.**

[Mascarella deposition -- Page 35]:

> A [Mascarella]: *We have a separate commercial lending department and a lender there [Ed Wilson] would have established the relationship on the lending side.*[88]

> Q.    *And* **during this time period, can you remember who would have been in that position?**

> A [Mascarella]: **I don't.** *It changed a couple of times during when their relationship was initially started.*

---

[88] Ed Wilson –the Head of the Northern Trust Bank Lending Department – signed all Northern Trust documents; *unknown to Mascarella.*

- **The government presented** *no first hand evidence* **presented by the people who handled the Northern Trust LOC accounts…**

**More ineffective counsel issues are raised considering Ed Wilson managed the seven (7) year LOC relationship for Northern Trust Bank -- and was never called for an interview by Kenner's trial counsel, let alone as a witness to confirm he never broke the law for Kenner.**

**Mascarella called Sydor to discuss his LOC – which Sydor confirmed to Kenner via text message...**

[Sydor text to Kenner]:

| 6 3 1 6 | +19725230505 Darryl Sydor* | 4/1/2009 8:48:29 PM(UTC +0) | R e a d | Hey someone from northern trust called with someone from schwabb. And want to do a conference call in a hour with erin [Aaron Mascarella] someone |
|---|---|---|---|---|

- How could Mascarella carry-on these communications if he was actively violating Kenner's request.   If the concealment were true – Mascarella would have been following the 2001 Patriot Act behind the back of his Northern Trust bosses and communicating with the clients – against everyone's alleged surreptitious plans. Mascarella would have started his mutiny four (4) years after the accounts started. The government chased these outrageous claims without a single signed authorization document to make the illegal demands for "no communication".
- It makes no sense.

**Mascarella's own testimony shows glaring inconsistencies in his memory of the timing of the LOC set ups – from the years before he was part of the lending division...**

In the government's efforts to "set up Kenner", Mascarella tries to convince the Court and the jury that Northern Trust Bank did not have "*know your client*" rules, which have been part of the banking industry since 2001.   *It is wholly unbelievable – considering Mascarella did not realize the 2001 Patriot Act came before the 2003 Kenner clients moved to Northern Trust Bank (in or about November 2003) (Tr.911).*

> *Q: Are you familiar with the concept, sir, given your training and background in the banking field, as you described in your direct, with the concept of 'know your client'?   What is your understanding of where that phrase originates?*
>
> *A [Mascarella]: We did not have 'know your client' procedures at the time this relationship started.*
>
> *Q: That doesn't originate, sir, from the 2001 Patriot Act?    Yes or no?*
>
> *A [Mascarella]: That's my recollection, yes.*

**Mascarella confirmed he did not work in the lending group until late 2006...**

The Court's *M&O at 14* represented that Kenner "*instructed Mascarella [in 2006] to send monthly statements for those accounts to Kenner's personal residence" (Tr.859).*

The earliest date on a LOC statement sent to Kenner's office is July 2006; *after* Mascarella became involved in the lending group.

It should be noted that the 2015 Northern Trust Bank subpoena showed a February 2006 LOC statement sent to Pecas' Edmonton Alberta Canada home (confirming someone gave Northern Trust the Peca "in-season" address – in addition to his Getzville (Buffalo) NY home address – ***further absolving any concealment claims as realistic...***

- Kenner did not have LOC statements for any dates that Mascarella only sent them to Kenner.  In fact, the LOC statements in the 2015 subpoena conclude that the investors received the statements on dates prior to Kenner receiving "copies" (per Mascarella's 2015 testimony).

[Northern Trust Banker Aaron Mascarella (*Tr.912*)]:

> *A [Mascarella]: So I was in charge of sending Little Isle IV checking account statements.  **I wasn't part of the lending relationship.**  I had no control over where those loan statements went and who they went to.*
>
> *Q. Sir, and I have to apologize. The mistake was mine. I thought you testified on direct that the monthly loan statements regarding lines of credit were sent by you exclusively to Phil Kenner pursuant to his request.*
>
> *A [Mascarella]: By the bank, not by me.*
>
> *Q. But you, I guess, had an understanding that the loan -- monthly loan statements regarding the use of the LOCs were being sent only to Phil Kenner. That was your understanding, correct?*
>
> *A [Mascarella]: **I knew a copy was going to Phil Kenner,** and I would have assumed, I know it doesn't help you today right now, but that **a copy was also sent to each one of the borrowers**.*

- The Northern Trust Bank subpoena confirmed this non-concealment issue.

*Mascarella did not testify* that once he was hired into the lending division that Kenner instructed him to send *ONLY* statements for the LOCs to Kenner, nor did anyone else.

Mascarella *ONLY* verified that Kenner requested copies once he became involved in the lending division in late 2006.   That is when the first statements arrive at Kenner's office.

- The government did not put any other Northern Trust lending Banker on the witness stand to claim that prior to the Mascarella late 2006 arrival, they were instructed by Kenner to conceal any LOC information &/or followed the request that would have risen to criminal activity (specifically related to the 2001 Patriot Act).

In fact – the 2015 Northern Trust subpoena produced multiple LOC statements that Northern Trust Bank had been sending out to the LOC clients before Mascarella's involvement in the lending department; full transparency to their LOC clients (in evidence).

The Court's *M&O at 14* stated Mascarella verified that, "*In addition, Mascarella testified that a senior lender at Northern Trust informed Kenner that the bank needed a full accounting of all advances that had been made on the lines of credit, as well as tax paperwork...*" (Tr.887).

**FALSE** – Because for several reasons, this is third (3ʳᵈ) party hearsay testimony.  Why would the bank require the accounting for the distributions when they controlled the bank accounts, which transferred 100% of the funds thru the Little Isle 4, and Ula Makika accounts?
- They already knew the distribution/accounting information, thus more complete non-sense.

In addition, what would the tax records of Little Isle 4 or Ula Makika have to do with the individual LOC accounts of the Northern Trust clients?
- The government induced pure clutter from Mascarella, yet it clearly made its mark.  The Court recognized it as holding some relevance to the verdict, although not to any reality in the banking world or the truth in this matter.

**<u>Mascarella raises another fruitless issue about Kenner not having a LOC at Northern Trust Bank – but the Court seemed impressed so as to mention it in its M&O...</u>**

The Court's *M&O at 15* represented that Mascarella identified, "*Finally, Mascarella said that Kenner never secured any line of credit with his own investment account*" (Tr.894).

This testimony, and recognition by the Court, is purely nonsensical, for several reasons:

**First** – Kenner's significant investment in the Hawai'i project was done thru direct contributions to the Hawai'i bank accounts, the direct purchase of the home/office for the project, and the carrying of monthly expenses, amongst others,

**SECOND** – Kenner never had an investment account at Northern Trust Bank, and

**THIRD** – There is no logical reason that Kenner, one of 20+ investors, would have some responsibility to have a LOC in lieu of any other equity or debt contribution to the

*Kenner 13-cr-607 (JFB)*

Hawai'i project, directly.   Over a dozen Hawai'i investors had no LOC account (or investment using a leveraged strategy *for higher potential returns*).

No evidence was submitted to the court to raise any "real" issue, notwithstanding the Court's recognition of the useless Mascarella testimony on that issue.

**Mascarella confirms that there is no banking reason that the capital account contributions from one (1) LOC could not be used by Little Isle 4 to make a monthly LOC payment on another LOC...**
- **Hawai'i LOC investors expected the Hawai'i partners to make the monthly payments for their LOCs.**

The Court's *M&O at 15* represented that Mascarella supported the "use of funds" method, verifying: "*Mascarella further testified that using one line of credit to pay off another was not in and of itself worrisome*" (Tr.901).

The initial Kenner Indictment explained that Kenner told the investors that Little Isle 4 would be responsible for making the LOC monthly payments.   How could Kenner be charged (Count 7 and Count 8)[89] for tasks the government – **and especially the investors** -- expected Kenner to do?

The government was fully aware that:
1. The various monthly LOC payments were made for five (5) plus years,
2. The LOCs were opened since December 2003,
3. The LOC payments were made by the Hawai'i company capital account, and
4. Little Isle 4 made the payments thru the Little Isle 4 capital account funds and subsequently (*post Lehman Brothers JV in August 2006*) thru the Na'alehu Ventures 2006 account.

---

[89] Counts 7 & 8

| Count | Approximate Date of Wire Transmission | Description of Wire Transmission Kenner NOT GUILTY... |
|-------|---------------------------------------|------------------------------------------------------|
| SEVEN | November 20, 2008 | $43,000 wire transfer from KENNER's account at Wells Fargo Bank in Scottsdale, Arizona to the Ula Makika account at Northern Trust Bank in Scottsdale, Arizona. |
| EIGHT | December 31, 2008 | $35,000 wire transfer from KENNER's account at Wells Fargo Bank in Scottsdale, Arizona to the Little Isle IV account at Northern Trust Bank in Scottsdale, Arizona. |

Yet, the government claimed in the Superseding Indictment that payments that were *supposed to be made* and *had been made* for four-and-a-half (4 ½) years, then, *became part of a concealment plan* (Counts 7 and 8).   Kenner's $267,000 of additional capital contributions to the Hawai'i partners (*evidenced in the Little Isle 4 capital accounts, just like every other Little Isle 4 contributions from the various investors*) were ongoing contributions and could not conceivably be part of a concealment.

■   This is further buoyed by the existence of overwhelming pre-trial empirical evidence that the investors *expected* that the monthly payments were the responsibility of the company.

■   The government &/or investigators ignored it to frame their theory.

It furthers slaps reality in the face to conceive that, had Kenner (*in agreement with the Little Isle 4 members in March 2009*) allowed the seizure of the LOC collateral just six (6) months earlier (in June 2008 – when Jowdy and Harvey terminated the loan repayment mediations), *no overt acts would have been charged* and Kenner would have retained the $267,000 of his personal capital contributions.

•   The theory defies logic but emanated from "*someone*".

### *Bryan Berard*

Government witness Berard voluntarily supported Kenner in the 2009 arbitration with the following testimony (*only weeks after his Northern Trust collateral seizure*):

[Berard's 2009 arbitration testimony affirmed]:

> *Q: When you were – as far as the Hawai'i deal, were you made aware of any sort of transaction Mr. Kenner set up where you can give a commitment or pledge a credit line in lieu of putting all your money in initially?*

> *A [Berard]: Yes.*

> *Q: Can you tell the panel what was your understanding?*

> *A [Berard]: Basically the company – it was set up.  __The company would pay the payments.__   I would pledge the money, obviously to get a loan for the property.  __Again, the company would pay the payments,__ and I was not forfeiting all the amount of money for the piece of property.*

> *Q: Were you aware that Mr. Kenner got a credit line against some securities or investments you had?*

> *A [Berard]: Yes.*

*Q: And later on were you aware that Mr. Kenner started lending this money to another principal in the Cabo project named Ken Jowdy?*

**A [Berard]: Yes.**

*Q: Where did you think the money that Mr. Jowdy – were you told where the money was going to be used that was given Mr. Jowdy as far as the Mexican project?  Was there anything you were told about that?*

**A [Berard]: Basically just loan him the money for the project.**

*Q: And prior to signing any of these documents did you have access to your own attorney unconnected to Mr. Kenner to review this?*

**A [Berard]: Yes I did.   We have a family attorney back home where before I sign any documents basically – I went to his office, sat with him.   We reviewed them, and I signed them and basically FedEx'd them to Phil [Kenner].**

It should be noted that after Berard received his high-paying (*bribery*) job from Tom Harvey and Ken Jowdy in Cabo san Lucas Mexico in late 2011, Berard reversed his 2009 arbitration testimony and told the FBI (and the 2015 trial Court) that:

- His money was not supposed to be used (*Tr.3035-3036*),
- He was unaware of it (*Tr.3082*), and
- He believed Kenner was "*not legit*" immediately after he returned from Russia in March or April 2009 (*See 3500-BB-1-r at 3*).

He *falsely* proffered to the FBI that he received a letter in the mail from Northern Trust stating that his collateral had been seized (*Tr.3039-3040*).

### That letter does not exist, anywhere.

**FBI agent Galioto knows that critical fact and help perpetrate the lie (by not correcting it).**   In 2009, Berard's voluntary arbitration testimony -- on Kenner's behalf -- would have been with one (1) month of receiving that "*ghost letter*" and believing Kenner was "*not legit*", *supra*.   Berard's 2009 testimony was exclusively about the LOC, its usage, and its loan to Jowdy -- *including his expectation – stated 2 times by Berard (supra) – that:*

"*The company would pay the payments*.   *I would pledge the money, obviously to get a loan for the property.   Again, the company would pay the payments*".

Not once during Berard's 2009 voluntary testimony did Berard claim any of the 2015 recent fabrications he – now -- "*remembered*", knowing "*nothing*" (perhaps in concert

with his newfound 2012 job in Mexico – just like Kaiser reversing his Mexico testimony in the *Stumpel v. Jowdy* case; also calling his signed and FBI-call-verified document – now – a *forgery*). [90]

Berard's 2013 FBI proffer contradictions (to his <u>*VOLUNTARY*</u>, pro-Kenner 2009 arbitration testimony) seemed to raise no concerns for the FBI agent when Berard changed his tune to: "*...In March or April 2009, he [Berard] started to realize that Kenner was not legitimate*", instead, it only fueled Galioto's foundationless theories of *concealment* based on the collectively-planned future fabrications at trial.

---

[90] *Berard admitted on the 2012 FBI recording with Gaudet that he and Kaiser signed "<u>BLANK DOCUMENTS</u>" in Mexico before they left the prosecutors office to fill in their testimonials.*

>    At 9:40 – Berard stated: *"We did not make testimonies, we waited outside forever, it took too long, we actually signed FAKE, not FAKE, uhh, <u>we signed BLANK PIECES OF PAPER, with our signatures</u>..."*

- *Kenner was not in Mexico when Kaiser and Berard were with Robert Gaudet at the prosecutor's office with their Mexico attorney, Javier Barreras, where they decided to sign the documents and give sworn-testimony after-the-fact with their own attorney.*
     - o Please note that Kaiser and Berard flew from the east coast of the USA to Cabo san Lucas (about a ten [10] hour travel day) *solely* to give testimony in the *Stumpel v. Jowdy* criminal case and returned to the USA the next day. **The sole purpose of their trip was to give signed-testimony.**
     - o Kenner paid for the flight travel on his AMEX credit card (in evidence).

- *Nonetheless* in 2014, the government presented the Kaiser Mexico document to the EDNY as a *forgery*...related to Kenner to slander Kenner pre-trial in front of the EDNY Court.

**How did Kaiser and Berard claim their signatures were FORGERIES if they both SIGNED BLANK DOCUMENTS (to add their verbal testimonials in the *Stumpel v. Jowdy Mexico criminal* case) <u>and admitted to it</u>?**

     - This is notwithstanding the fact that Kaiser testified in a Mexico court *under oath* that his (*Berard-acknowledged*) signature was a forgery – further delaying the 2012 criminal cases against Jowdy another 12 months (*until just before Galioto arrested Kenner*). All of these hostile efforts were initiated once, Jowdy in Mexico, employed Kaiser and Berard.

The alleged forgery in the Mexico Court was more of the calculated recklessness by Jowdy, Kaiser and Berard to disrupt Kenner and Kenner's investor's efforts in Mexico to seek justice from the multitude of Jowdy thefts (*with Kaiser and Berard acting as Jowdy co-conspirators for pay, verified by Kaiser's 2019 co-conspirator letter Document 628*).

In spite of Berard's 2015 perjury of (*Tr.3082*):
> "*Absolutely not. My [Hawai'i] money was not supposed to be used in Mexico.*"

Berard had clearly ignored his opportunity to malign Kenner in 2009, *one (1) month after the real-time collateral seizure event* [*May 2009*] where he confirmed his undeniable knowledge of the Jowdy loans and his full expectations of the use of his LOC-Capital Account for the loan.

Berard also confirmed his personal expectation that ***Kenner and Little Isle 4 would make the LOC monthly payments***.

In fact, Berard told the FBI (*specifically Galioto*) on 9-12-2013 that -- "*The LOC would be used to pay the interest on the loans against the Hawai'i property*".

- FBI Agent Galioto is the author of these notes, yet he endorsed charging Kenner for exactly what Berard told him (in the 2009 arbitration) and again face-to-face in 2013 what was expected by Berard.

- Regardless of Kenner acting how Berard verified he was expected to act, Kenner was charged for "making the payments" in his Superseding Indictment, *supra*.

How does FBI agent Galioto Indict Kenner for payments (*Counts 7 and 8*) that Berard told him one (1) month before the original Indictment were exactly what Kenner was supposed to do? *(See 3500-BB-1-r at 1).*

[Berard to the FBI on 9/12/2013 – just weeks before the Kenner Indictment charges that were in opposition to the Berard proffer statements]:

> [Berard]: *"The LOC would be used to pay the interest on the loans against the Hawai'i property."*

**Nothing** could have convinced Galioto, prior to Berard working for Jowdy (*who was desperate by 2012 to get rid of Kenner's legal efforts in Mexico*), that Berard was not 100% aware of the Jowdy loans and 100% of the activity surrounding its use and collateral seizure (*See Recon33-103*).

**Prior to the Berard 2013 FBI admissions -- Kristen Peca 2012 FBI recordings confirm monthly LOC payment expectations by Kenner and Little Isle 4...**

Extending the support and knowledge of Kenner's ongoing efforts to make the monthly payments, during Kristen Peca's 2012 FBI recording of Kenner, she substantiated the fact she (after learning about the existence of the Hawai'i LOC from her husband in or about

2008 [per her 2012 FBI recordings with Kenner[91]] – contradicting her made-up 2015 "*the bonds are my baby*" testimony -- and – her fabrication of attending a 2005 Hawai'i meeting with Kenner and her husband – *Tr.696-700*) -- <u>*she believed that Kenner was making all of the Hawai'i LOC payments for them*</u>.

At approximately 1:20.50 of Kristen Peca's July 2012 recording, in reference to Michael Peca's Northern Trust LOC, she told Kenner:

"*You said that you would make all payments.*"

- Correspondingly, this verified thru Kristen Peca's own words in 2012 that her husband also *expected* it.

**<u>No forgeries seen by Mascarella – and with Mascarella as the alleged Northern Trust "PMK"[92] – this would have been the perfect time to allege there were any Northern Trust beliefs that LOC documents were at any time inauthentic...</u>**

- Mascarella and the government did not...

The Court's *M&O at 15* represented that Mascarella "*never saw Kenner forge another person's signature*" *(Tr.916)*.

---

[91] (*At approximately 5.45 of the 1:34.50 call*) – In July 2012, Kristen Peca tells Kenner –

> **Kristen Peca** – Well, I was referencing the earlier stuff that you said. I don't remember a large amount being distributed back to our account and the timing of the years of the loan, **the line of credit, that happened when we were in OHIO [2008 & 2009]. I don't understand how it could have been open for 5 years before that?** <u>Because we had a bond account going?  Do you mean the Hawai'i; you had a line of credit, but not for us?</u>

> **Kenner** – No, no. you guys had lines of credit for 5 years at Northern Trust.

> **Kristen Peca** – for 5 years?

> **Kenner** – for 5 years!   When you were in OHIO [*2009*]. that's when the thing [*Hawai'i LOC*] closed.

Kristen Peca cannot believe that she is finding out on the FBI phone call in 2012 that her husband, <u>Kenner's client</u>, had concealed that he had a Hawai'i LOC open for five (5) years at Northern Trust before her knowledge of it – even though she lied to the EDNY Court in 2015 when she testified that <u>she</u> and her husband waited a month after the 2005 Hawai'i meeting before deciding to participate with the Hawai'i LOC for their Hawai'i investment capital (*Tr.697*).

[92] "*Person most knowledgeable*"

**Northern Trust in their partially filled 2015 subpoena presented no signature only documents...**

Mascarella and Northern Trust Bank would have raised "*red flags*" if the investors had ever retuned just "**1-page**" signature documents to the bank on behalf of the investors; in lieu of the entire packages.   They clearly had full-unabated access to their own clients.

The 2015 Northern Trust Bank subpoena delivered full document packages for each and every individual client signed LOC document; confirming Northern Trust had received the full packages, at all times, from their LOC clients.   In seven (7) years, Northern Trust Bank never raised a forgery issue, or any anomaly regarding the annual signing of the LOC packages.

- In fact, prior to Mascarella's involvement, in the Northern Trust Bank lending division, lending Vice President, Ed Wilson, continued open communication (requesting Kenner's assistance) in January 2006 with the annual renewal package updates that **Wilson had sent directly to <u>his</u> Northern Trust LOC clients**. Wilson emailed Kenner and Kenner's assistant, seeking help in prodding the LOC clients to return the remainder of their annual renewal packages to Northern Trust Bank.[93]

- The email from lending Vice President Wilson to Kenner also confirmed that, independently, Sydor, Rucchin, Murray (non-victim), and Norstrom (non-victim) returned their 2005-06 *Disbursement Request & Authorization* which confirmed the amount of funds that had been drawn on their accounts thru that day; unconcealed and signed-off on the **1-page** Bank disclosure document.

---

[93] Northern Trust Bank lending Vice President -- Ed Wilson to Kenner and Kenner assistant (Myrick): "*Phil. we have been receiving some of the financial documents on the players, so I thought I should update everything as of today*" (See Recon33-104).

- o   Kenner's assistant – Myrick – was the liaison between Kenner's clients and Northern Trust Bank (as exhibited in the email) to gather their signed-document-packages – thus – after she was terminated "for cause" in 2007 – if the government needed someone to allege that the clients were unaware of their documents – they could have utilized her – but again they did not...yet --

- o   Clearly – the Northern Trust Bank was in **direct communication with its clients**; *not* receiving the LOC paperwork from Kenner.   Thus -- ruling out the opportunity that Kenner was somehow involved in *concealing* information from Kenner's clients – or

- o   Clarifying any and all misrepresentation that Kenner had asked Northern Trust Bank not to communicate directly with his clients.

- The 2005 ***signed-one-page*** *Disbursement Request & Authorization* was noted on the email, in addition to the:
  - ○ 2005 *signed-multi-page* **Master Note**,
  - ○ 2005 *signed-multi-page* **Pledge Agreement**, and
  - ○ 2005 *signed-multi-page* **Control Agreement**.

The bottom line with Northern Trust Banker Aaron Mascarella is that his own, prejudiced testimony that Kenner instructed the bank to "*only deal with Kenner*" and not their 2001 Patriot Act regulated clients (considering all of them were foreign citizens; from Russia, Norway, Sweden, Canada, and Inuit – except Berard) was based on his own revenge plans after being fired.   Mascarella needed someone to blame.

Yet in contradiction, Mascarella confirmed that he was *not* part and parcel to the Northern Trust LOC until sometime in late 2006, four (4) years after the original initiation of *all* the LOCs (and four [4] years of signed renewals with Ed Wilson and his staff – before Mascarella's involvement).

The government failed to bring any of the Northern Trust employees that signed off on the first (1st) four (4) years of annual renewals; like Ed Wilson, or Northern Trust President, David Highmark to ask the simple questions:

> *Question 1*:  **Mr. Highmark**, *did you instruct* any members of Northern Trust Bank under your control to ignore the 2001 Patriot Act and conceal bank transactions from your own bank's clients on behalf of Phil Kenner?

> *Question 2*:  **Mr. Highmark**, *would you have instructed* any members of Northern Trust Bank under your control to ignore the 2001 Patriot Act and conceal bank transactions from your own bank's clients on behalf of Phil Kenner?

> *Question 3*:  **Mr. Wilson**, *did you instruct* any members of Northern Trust Bank under your control to ignore the 2001 Patriot Act and conceal bank transactions from your own bank's clients on behalf of Phil Kenner?

> *Question 4*:  **Mr. Wilson**, *would you have instructed* any members of Northern Trust Bank under your control to ignore the 2001 Patriot Act and conceal bank transactions from your own bank's clients on behalf of Phil Kenner?

The government did not bring Mr. Highmark, Mr. Wilson, or anyone else from Northern Trust Bank – *except for the jaded Mascarella* – to allege bankers were instructed by "someone" to criminally violate federal law and conceal transactions from Kenner's clients for almost seven (7) years, while facing federal prison time for those alleged actions.

- **That is heavy if it is true.**

## Ethel Kaiser[94]

### Mother of John Kaiser

**Ethel Kaiser was introduced to various investments in the instant case exclusively by her son, John Kaiser.**

- **Her trial claims that she met face-to-face with Kenner before her 2005 Hawai'i loan are fully debunked by her own son's testimony at trial making the meeting logistically impossible (perhaps reasonable amnesia for a 79-year old woman – *or solid pre-trial preparations*).**

**Evidence adduced at trial confirmed that although bank records prove that Ethel Kaiser (a non-EDNY person)[95] had contributed $700,000 to the 2005 short-term loan.   Ironically, whatever her son, John Kaiser, lied to her about at the time, she believed that she had only sent $390,000.**

- **She testified that she had been fully repaid, thus, she was not a victim.**

**A second (2nd) set of John Kaiser's banking records also proved that after John Kaiser and Bryan Berard "teamed up" and began their efforts with Jowdy and FBI Agent Galioto to "get rid of Kenner" and work for Jowdy, Berard and John Kaiser stole another $147,000 of Ethel's money; with $95,000 to Berard and the remainder to Kaiser -- unknown to Ethel.  (*See BK-MM-0000233*)[96]**

---

[94] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 15-16.*

[95] *JURISDICTION FRAUD* -- In order to misrepresent jurisdiction in the EDNY – the government falsely proffered that Ethel Kaiser resided in the EDNY, when they were fully aware that she resided full-time in "upstate New York" – the Northern District of New York (*Tr.5638*).

In addition – AUSA Komatireddy LIED about the Pecas living in the EDNY during any portion of Michael Peca's investments in the Hawai'i project (2005-present).   It was more government, "say what you want to create venue/conviction", and unchecked rhetoric…*ALL UNTRUE*.

> *Court: Assuming there was no Eufora conspiracy and assuming there was no GSF conspiracy, what is the venue with respect to the Hawaii conspiracy?*

> *Ms. Komatireddy: Yes, your Honor. So with respect to Hawaii, there are first of all several investors who are based in the Eastern District of New York including…Mrs. Ethel Kaiser. In addition Mr. Peca and Mrs. Peca also resided in Long Island during the years in which they were involved in the Hawai'i investments.*

[96] John Kaiser gave testimony at trial (*Tr.1160*) that he took the $147,000 funds from his Mother, further accentuating the need to cover-up the years of documented thefts from his friends &

**The testimony of Ethel Kaiser had a lot of evidence of fabrication or forgetfulness (for a 75+ year old woman) – but either way, it was clear that she learned 100% of the information from her son; never Kenner about anything that happened with her money.**

- **Ethel Kaiser went so far as to confirm that when she was allegedly pitched about Eufora at one point in time – assuming that even happened – she claimed that the phone call with her son, John Kaiser, and Constantine on the phone – AND -- her son did the majority of the talking "to pitch Constantine's company"!?!**
    - o **It clearly makes no sense…especially since John Kaiser was not a Eufora investor then – or at any time.**

**Ethel Kaiser claims she met Kenner in 2005 with John Kaiser to discuss her $390,000 loan – in lieu of the accurate $700,000 via two [2] separate transfers.** [97]

**Ethel would not have been able to lie (or forget that unusual amount) unless someone lied to her about it.**
- **Nonetheless – John Kaiser received $1,176,000 in payments from the Hawai'i project one (1) year later – in August 2006.**
- **Whatever Kaiser did with the repayment funds was his business and fraud on his Mother, friends & family; never Kenner's issue…** [98]

---

family – and blame it all on Kenner (while protecting Berard from the Ethel Kaiser fraud [collecting $95,000 of the stolen funds] and stealing title to two [2] individual real estate projects at the same time in Sag Harbor, NY [with fabricated and forged documents] and Paradise Valley, Arizona [thru a fraudulent title transfer – adjudicated *against* the Berard and Kaiser in a 2015 civil case (*See Recon33-55*) – even without Kenner and his evidence at trial]).

[97] *See Recon33-105* – Ka'u Holdings Corporate August 2005 Ethel Kaiser $700,000 deposits.

[98] John Kaiser made up a story at trial about the $816,000 that he actually received in August 2006 was for "*back pay*" and "*expenses*" (and not including the $360,000 more he received thru the signed, *Equity Transfer Agreement* with Kenner – *See Recon33-240*) (*Tr.988, 1414*).

- An 'in camera' review of the John Kaiser 2006 and 2007 IRS taxes will confirm that he never claimed anything for "*back pay*". As a NY Cop – Kaiser would clearly know that he had to pay taxes on income.
    - o *Defendant Kenner renews his request for the Court to demand an "in camera" review of Kaiser's 2006 and 2007 taxes to confirm the alleged "back pay" amount – in lieu of full loan repayments to Kaiser friends & family (considering the fact that none of the $1,000,000 belonged to Kaiser at any point in time).*

Ethel Kaiser told the 2015 Court that she was repaid for the $390,000 loan she believed she made. Thus, **Ethel Kaiser is not a victim in this instant case**; certainly not a monetary victim with any loss attributable to Kenner (*Tr.934*):

> *Q: Were you eventually repaid by anybody?*
>
> **A [Ethel Kaiser]: Down the line, from my son.**

The Court's *M&O at 15* confirmed that Ethel Kaiser "*In and around 2005, Kenner and [John] Kaiser asked Mrs. Kaiser to make a $390,000 loan to the Hawai'i project*" (*Tr.932-933*).

- ***Kenner never met Ethel Kaiser before the 2005 Hawai'i loan was made…***

To confirm the meeting in 2005, the government showed Mrs. Kaiser a picture of Kenner with John Kaiser and Kaiser's newborn baby (*See GX-942*) – alleging that it was at "**that event**" that she discussed the loan with her son and Kenner, *in person*. This event could not have occurred as the government solicited from Mrs. Kaiser in 2005 (before the date of the loan. It was actually a June 2006 "baby christening".

**Confrontation meeting fraud by Kaiser on the Court**:

There is another fraud that needs hi-lighting in regards to the actual June 2006 – not summer 2005 alleged "meeting" between Ethel Kaiser and Kenner.   Kaiser told the 2015 trial court that Manfredi and he had a "confrontation meeting" with Kenner about Kenner

---

- Second – Kaiser cannot produce expenses of any significant amount – especially considering he was distributed about $40,000 in the months few before the August 2006 joint venture agreement with Lehman Brothers and Windwalker.
  - *Defendant Kenner renews his request for Kaiser to provide the necessary credit card statements to validate the amount of "expenses" he was paid in August 2006 that offsets the difference between the $816,000 he was distributed – and the amount of "back pay" he claimed on his 2006 &/or 2007 IRS taxes.*

- Thus – without either "*back pay*" or "*expenses*" to invalidate his clear perjury in 2015 (*Tr.988, 1414*) – the **Kaiser testimony is perjured**.  Kaiser's "fake collateral agreements" presented in 2014 to the Delaware Chancery Court (assuming full acquisition of Kenner's Baja Ventures 2006 equity are evidence of another forgery and fabrication by Kaiser and people related to Jowdy's cabal) – now presented in the *Document 628* (Kaiser's February 2019 letter to the EDNY Court) – and

- It casts larger doubt on Kaiser's fake story about his name being forged on the 2004 and 2005 Constantine-Hawai'i consulting agreements.
  - **The Court *cannot* overlook the simple fact that Kaiser produced the two (2) "*ink*" versions of the underlined forged agreements to the FBI and AUSA.**
    - **It is an outrageous abuse of investigation responsibilities to not question that enigma…**

stealing $1,000,000 of his 2005 friends & family loan funds. This meeting would have needed to pre-date the now-proven June 2006 "baby christening". It is highly improbable that after Kenner was confronted by a former NYPD cop about stealing $1,000,0000 of his friends & family money (including police and NYFD money), that Kenner would be invited to attend the christening with all of the closest Kaiser friends & family that Kenner allegedly stole from.

- It is more nonsensical testimony that the government did not care about – while compiling testimony to support their eventual "*evidence reviewed in the light most favorable to the government*" standard for a Rule 33 challenge in the future.

John Kaiser gave testimony that Kenner called him at home to discuss the 2005 loan to the Hawai'i partners for the 15% Jowdy loan (made in August 2005) – because "*he just lost a baby*" **in June 2005** (*Tr.976, 994*):

> A [John Kaiser]: He was giving me an opportunity. *I was actually home at the time because in June [2005] my wife and I had lost a baby so I was home. He had called to say he was sorry for what happened,* but that he had an opportunity for me to make or -- you know, to make some good interest on a loan that was approximately 30 days.
>
> Q: And what was the total that you were asked to loan him?
>
> A [John Kaiser]: The total was $1 million.

On cross-examination Kaiser claimed he discussed the Hawai'i loan in 2006; but by that date, the loan period with Jowdy was over, fully thwarting Kaiser's timeline (*Tr.1104-1105*):

> Q Now, did there come a point in time where the Hawaii Project was still in existence and ongoing that you had discussions with Phil Kenner in terms of lending money specifically to Kenner [sic] Jowdy in return for a 15 percent return on that loan?
>
> MR. MISKIEWICZ: Objection as to the form. I request a time frame.
> MR. HALEY: I asked --
> THE COURT: Overruled. You can answer that.
>
> **A [Kaiser]: Yes, that was.**

*Q As a matter of fact, sir. you agreed during the course of the discussion with Phil Kenner that that type of financial arrangement with ~~Kenner~~ [sic] Jowdy, which involved a 15 percent return on investment, was a good idea, correct?*

*A [Kaiser]: Yes; that was in 2006.*

- Kaiser's FBI notes confirm he began speaking with Jowdy independently in NYC in 2003 about the potential loans to Jowdy from the Hawai'i project (*See 3500-Kaiser-1-r at 2*).

- *Thus – it is impossible that the picture the government showed the jury to confirm Kenner met with Mrs. Kaiser before the loan could have substantiated the meeting.*

- The "baby" in the picture was the newborn that Kaiser and his wife had over one (1) year after they lost their June 2005 baby during a previous delivery mishap.

This also creates another logistical anomaly that the government and Kaiser cannot reconcile having to do with Kaiser signing the 2004 Constantine-Hawai'i consulting agreement.   Kaiser told the 2015 Court – *and the government bolstered his claims* – that the 2004 Constantine-Hawai'i consulting agreement could not have been signed by Kaiser because he was not travelling as a result of his "recent loss [of the baby]".   The loss clearly occurred in or about June 2005 – per Kaiser's own 2015 testimony – thus the consulting "explanation" by Kaiser also failed in the face of real evidence, again.[99]

---

[99] Please note that Kaiser lying about forgeries is a pattern that has failed Kaiser on multiple occurrences -- and multiple jurisdictions – and was wholly ignored by the government to cling to their false theory.

- Kaiser produced the "*INK*" version of the alleged forgery from his own, personal records on the "eve of trial" – fully defying any and all logic that two (2) documents that he was allegedly "not aware of" were in his possession at all times – with Kenner only possessing the "photocopied versions" of the alleged frauds.

It is incomprehensible...

*Other occurrences of Kaiser and Berard lying about "forgery frauds":*
1. Kaiser and Berard forged and fabricated an operating agreement for LedBetter (Sag Harbor NY property) to steal the LLC from Kenner and sell it – keeping all of the proceeds for themselves.  *See Recon33-57 (ORIGINAL) and See Recon33-56 (FORGED and FABRICATED)*.
2. The government in 2014 claimed that Kaiser's name had been forged on a Mexico testimonial in support of *Jozef Stumpel v. Jowdy* and Jowdy's $1.6 million fraud (by not adding it to the Kenner-Stumpel Baja Ventures 2006 LLC capital account in the DCSL operating agreement) – yet Kaiser's co-conspirator Bryan Berard verified the

signature on a 2012 FBI recording – FULLY IMPLICATING Kaiser for lying to the EDNY Court thru the AUSA's 2014 representations.

    a. In addition – once Kaiser was employed by Jowdy in Mexico – Kaiser **LIED** to a Mexico Court by giving testimony that his name was forged – ultimately forcing the Stumpel $1.6 million case into dismissal. The case was not refiled after Kenner was arrested – saving Jowdy the $1.6 million criminal exposure in Mexico (thanks wholly to Kaiser's Mexico courtroom perjury).

3. Kaiser and Berard lost at their 2015 Arizona trial (*See Recon33-55*) after Kaiser and Berard lied in their 2013-filed (by Kenner) Arizona case defense – claiming that both of their names had been forged multiple times (again). Kaiser claimed the five (5) Promissory notes he signed (Nash, Sydor, Khristich, Ranford, and Lehtinen) were all forgeries. **Kaiser reversed his initial position and _confessed_ pre-trial that he signed the Nash document – and lost on the remainder at trial.**

    a. At the 2015 contemporaneous civil trial – Kaiser was IMPEACHED with the actual emails (with his signed Promissory notes attached – *See Recon33-106 [Ranford] and See Recon33-107 [Sydor]*) for the other lenders who sued him. The evidence was irrefutable that Kaiser **LIED** about his name being forged -- again.

    b. *An in camera review of this redacted section of Recon33-107 will show <u>FBI Agent Galioto received a copy of the REAL Promissory Note email (knowing Kaiser and Berard were lying about forgeries)</u> and the actual Promissory Note Kaiser signed from 2009 -- while he was assisting Berard and Kaiser in the Arizona case to threaten the witnesses. Galioto demanded the Intervening Plaintiffs, supra, to dismiss their cases versus Berard and Kaiser -- and in turn sue Kenner for the money (after they were brought into the case by Kenner in 2013 before he was arrested),*

    c. *Nash and Sydor confirmed this to Kenner in pre-trial on the phone, and*

    d. Bryan Berard gave a 2014 Arizona deposition (and reiterated his position at the 2015 Arizona civil trial) that his name was forged on a "notarized" document with his best friend, Lanie Donlan (EDNY tracing witness), also "forged" as the document witness -- even though irrefutable text messages between Kenner and Berard confirmed that he signed and notarized the document for Kenner (*See Recon33-59*).

| 532 | +14015246929<br>Bryan Berard* | 4/21/2008 6:19:35 PM(UTC+0) | Sent | *Call me when free about PV[Arizona home]* |
|---|---|---|---|---|

- Kenner sent the Power of Attorney document to Berard for a signature and NOTARY after they spoke on the phone.

- Berard sent the following text to Kenner to confirm Berard would get the Power of Attorney document signed on the 24th of April (*day of the signature, witness from Donlan, and notarized stamp from William Medlin - supra*):

| 463 | +140152469 29 Bryan Berard* | 4/23/2008 9:14:25 PM(UTC+0) | Read | *I get back 2 hboston 2nite so ill get papers 2 u 2morrow so ull have friday!!!* Howd u guys do n tourney?? |

- In fact --- Berard inquired about using Kenner's FedEx account to send him the notarized document *"so ull have friday!!!"* – which Berard called a **FORGERY** in the AZ case:

| 486 | +14015246929 Bryan Berard* | 4/24/2008 7:52:38 PM(UTC+0) | Read | *Ok 2 use ur fed x acct # 4 package??* |
| 582 | +14015246929 Bryan Berard* | 4/24/2008 7:52:50 PM(UTC+0) | Sent | *Yes* |
| 487 | +14015246929 Bryan Berard* | 4/24/2008 7:54:08 PM(UTC+0) | Read | *Thanks* |

- CLEARLY Berard PERJURED himself in the Arizona case – again echoing the same FORGERY claims that have been resonating falsely since the 2008-09 Jowdy, Meeks, and Harvey claims (*to disrupt the 2008-09 Jowdy UNPAID loans litigation and the 2009 Nolan arbitration*) and continuing thru Kaiser and Berard's Arizona defenses (*represented by the same Arizona attorney as Jowdy – working hand-in-hand with Tom Harvey*).

- The Judge in the Arizona case ruled against Berard (*infra*) – even without the Kenner text messages, *supra*, (*since Kenner was in EDNY detention and could not testify during the 2015 civil trial – costing Kenner about $1mm in losses*).

Berard lied to the FBI about the *"notarized"* document – as referenced by their follow-up with document witness, Lanie Donlan (*See 3500-LD-2*).
  e. Amazingly – FBI agent Galioto and IRS agent Wayne never followed-up with Massachusetts Notary, William Medlin, because they knew it would grossly impeach both Berard and Donlan – ruining their forgery fraud and discredit the fabricated *"tracing"* testimony by Donlan at the 2015 trial (*Tr.3438, 3454-3455*).
  f. Donlan did give surreal testimony that the "exculpatory" document that she allegedly helped Kenner produce with all of his clients *"traced"* names was *never* requested by the FBI agents, nor was the emails that confirmed she had that document and forwarded it for Kenner to "somewhere" (*Tr.3456-3457*).
      i. In the millions of documents produced at trial – there was not a single document "as described by Donlan" that is in evidence; **not one.**

What would have stopped Kaiser from signing the 2004 Constantine-Hawai'i agreement under the same fabricated explanation by the government and Kaiser one (1) year before the "*loss of the baby*"?

- It is another recently fabricated timeline – that left the Court, the jury and the defense the impossible task of unwinding the timeline untruths in real time (coupled with the volume of other government fabrications thru knowing or unknowing [**CTE**] witnesses).

John Kaiser further confirms he sold his "nursery" home to *repay* his friends & family *(Tr.980):*

> *A [John Kaiser]: Well, it wasn't coming back from him and at the time I decided to put my house -- I was living -- on the market because my wife and I we had built a nursery so it was best just to move on, so I put the house on the market. And somewhere in September I put house I was living in on the market.*
>
> *Q: Did you sell that house?*
>
> *A [John Kaiser]:It sold relatively quickly. Approximately within two weeks.*

- Again, clearly Kenner did not meet Ethel Kaiser prior to the 2005 loan advance of $390,000 (or whatever revisionary amount Kaiser stole from his mother at the time —per Ethel's 2015 testimony).

The Na'alehu Ventures 2006 bank records from August 2006 confirm that John Kaiser was fully repaid $1,176,000[100] for the $1,000,000 friends & family funds he raised "to participate in the Hawai'i 15% loans to Jowdy" (in his own 2009 arbitration words):

*Kaiser testified to the 2009 arbitration panel:*

> *Q: Tell us what your experience was with respect to that money right at the point there was a decision to start loaning money to Mr. – that Mr. Kenner had made a decision to start loaning some of that investor money to Mr. Jowdy?*
>
> *A [John Kaiser]: ...So if we had some funds that were – that was stagnant and that warrant purchasing land, we would utilize it for a loan, so we actually made some money off if it.*
>
> *Q: Was Mr. Jowdy at that time someone that appeared credible to you?*
>
> *A [John Kaiser]: Well, the first thing, Mr. Kenner told me that he was, and I met him a couple of times.   He seemed – a big thing it was 15 percent interest rate, and I thought it was a good move.*

---

[100] *See Recon33-108* -- Na'alehu Ventures 2006 August 2006 statement

*Q: So at the time was there any representation about getting paid back this money when the Cabo deal closed?*

*A [John Kaiser]: **It was supposed to be a short-term loan**.   I thought it was three to six months, **because I had also raised some other funds from family and friends** that were getting a little antsy about it.*

*Q: At the time this money was lent to Mr. Jowdy...did anybody anticipate he wasn't going to pay you back when the Cabo deal closed, the Lehman Cabo deal?*

*A [John Kaiser]: No.  Otherwise, **I wouldn't have lent it.   I wouldn't want to go down that route**.*

*Q: <u>When you made the decision</u> – or when you were made aware that some of this money was going to be lent, rather than sitting idle in an account, at 15 percent, did you know there were some risks?*

*A [John Kaiser]: At the 15 percent – actually, **the loans**, I didn't think they were going to be – to me it wasn't a risky loan...**but the loans -- even the investors I brought in – I said.   Listen.   This guy – I gave him the whole story of Ken Jowdy back by land.   It's good.   Better than your money sitting somewhere**.*

During trial, John Kaiser tried to un-explain his previous clear and convincing 2009 voluntary testimony with a virtual "**word vomit**" (*Tr.1107*) (*See M&O at 91*):

*Q: Well, you know, sir, for a fact, do you not, that ~~Kenner~~ [sic] Jowdy requested and received a loan that at some point reached approximately $5 million from Little Isle IV and Ula Makika where he was to repay that loan with 15 percent interest, correct?*

> *MR. MISKIEWICZ: Objection; time frame.*
> *MR. HALEY: At some point in time.*
> *THE COURT: Overruled. You can answer.*

*A [John Kaiser]: **When I testified at Owen Nolan, that's what I believed when I testified because as of 2006, Mr. Kenner had told me that when -- the same time he told me my money went to Mexico so post that I learned that**.*

Kaiser then claimed that Kenner told him the 2008-09 Arizona case was thrown out because the loan agreement was a forgery.  Clearly, Kenner never told Kaiser that

untruthful item.   In fact, Ken Jowdy authenticated the 2004 Hawai'i-loan document thru his Nevada counsel in December 2010 as his chief defense exhibit.[101]

The Court referenced Kaiser's "**word vomit**", *supra*, as an excuse for why Kaiser was not aware at the time of his 2009 arbitration testimony.  But, nothing Kaiser said in this 2015 testimony, *supra*, was comprehensible.

- In contrast -- there was nothing ambiguous about the voluntary Kaiser testimony in 2009, *supra*.
  a. **It was clear**.
  b. It corroborated the actual facts in evidence -- and
  c. It remains bulletproof – thus the incomprehensibility of Kaiser's failing 2015 attempt to "*un-ring the bell*" to support the government's concealment claims.

In fact, Kaiser made reference in the "**word vomit**" that Kenner told him about the funds going to Mexico (as if it were learned "after the fact").  But, Kaiser gave clearly fabricated testimony in 2015 claiming that his best friend and Hawai'i COO, Chris Manfredi, was the person who initiated a "*confrontation*" meeting with Kenner in 2006 about the 2005 funds going to Mexico (*Tr. 983*) – in direct opposition to what Kaiser's own clear and convincing 2009 arbitration testimony confirmed it was supposed to be.

It should be noted that $135,000 of the $1,000,000 Kaiser friends & family loan funds were transferred to the actual Jowdy loan -- *no more*.

Kaiser gave October 19, 2010 FBI proffer to FBI agent Galioto and SDNY Criminal Investigator, Scott Romanowski, that he met with Jowdy on multiple occasions (mostly without Kenner) and discussed the "potential" for the loans from Hawai'i to Jowdy – before they actually happened (*See 3500-JK-1-r*).

o   One of the FBI notes actually corroborates that "*after the Kaiser-Jowdy face-to-face meeting*"; **Kaiser called Kenner and Berard** to tell them about the meeting.
   ▪   *You cannot explain how the FBI agent could have made that up.*

o   Sadly during rebuttal summation, Komatireddy tried to cover-up for the Kaiser LIES and the "FBI NOTES" (*See 3500-JK-1-r*) of Kaiser's proffer admissions of October 19, 2010, by making a more improbable statement to the jury, disgorging all ethical responsibility to the Court under *Berger* to "*save*" her star witness, John Kaiser, by proffering (*Tr. 5992*):

---

[101] The December 2010 Nevada authentication occurred after the loan document witness (Robert Gaudet) verified the document two (2) previous times **under oath**.  In fact, there is deposition from Gaudet on July 2, 2009 that confirms that **Gaudet and John Kaiser met face-to-face in Arizona where he confirmed the authenticity of the loan agreement to Kaiser, himself**.  The unsolicited "forgery" claims were more premeditated frauds on the Court to prejudice Kenner.

*Q: How many times, to your knowledge, were you interviewed by the FBI prior to your appearance here today?*

*A [John Kaiser]: Probably over a dozen.*

*Q: During the course of the interviews by the FBI approximately a dozen times, they would ask you questions and you would answer their questions, true, sir?*

*A [John Kaiser]: Yes.*

*Q: And when you answered the questions of the FBI, did you observe them taking notes of the answers that you were giving to their questions?*

**A [John Kaiser]: No.**

The Court's *M&O at 15* confirmed "*her son eventually reimbursed her '[d]own the line*'" (*Tr.934*).

- If Mrs. Kaiser is satisfied with the deal she clearly established exclusively with John Kaiser – *and was fully reimbursed* – then she cannot be a victim of Kenner in the Hawai'i project.

### Mrs. Kaiser exhibited more signs of amnesia – or unreliable lack of knowledge...

The Court's *M&O at 15* claimed "*Mrs. Kaiser testified that she lost that [$70,000 in Eufora] entire investment and never received any explanation as to what happened to that money*" (*Tr.934*).

The false rebuttal summation by Komatireddy (*Tr.5960*) that claimed the 2012 EDNY case versus Constantine (by the Eufora investors) was "*if Kenner had something to do with Privitello, Privitello would have sued Kenner in some lawsuit that happened a year later with a different lawyer and a different group of investors.*"

**FALSE** – Because Ethel Kaiser was a Plaintiff in the 2012 EDNY lawsuit and was represented by the same attorney (Michael Stolper) that her son worked with for two (2) years (2010-2011) pursuant to the "**same**" Arizona and NY lawsuit versus Constantine and other Eufora members.

- Nothing Kenner did (as a non-party) to the Eufora lawsuits could have disturbed what Ethel "knew" or "did not know".   She had independent counsel -- Michael Stolper.

Clearly – amnesia could be to blame for the lack of knowledge – but regardless; *nothing to do with Kenner.*

The Court's *M&O at 16* identified that "*Mrs. Kaiser said that [John] Kaiser advised her that the Hawai'i project was a good investment, but she said that he [john Kaiser] did not originate the idea for that endeavor*" (*Tr.937-938*).

**FALSE** – Because John Kaiser confirmed that in 2002, over a year before he met Kenner, he and his best friend (Chris Manfredi) went to Hawai'i (*Tr.955-956, 960*). Manfredi confirmed in his 2010 FBI proffer (*See 3500-CM-2-r at 2*) that Kaiser placed a $1,000 deposit on the first (1st) parcel they found in Hawai'i (as the originators). Manfredi also confirmed that *Kaiser never invested another dollar in the Hawai'i project* – fully rejecting Kaiser's false claims that Manfredi told Kaiser in 2006 in the "*confrontation meeting with Kenner*" (*Tr.983*) that he knew Kenner had diverted Kaiser's entire $1,000,000 to the Mexico project.

- As previously noted, only $135,000 of the $1,000,000 was transferred pursuant to the Jowdy loan.   Kaiser's 2009 arbitration testimony, *supra*, confirmed that he and his friends & family *expected* it to be sent to Jowdy, *specifically*. Kaiser voluntarily explained the "**Jowdy loans**" as the reason he personally requested the funds:

  [Kaiser 2009 arbitration testimony]
  *Q: When you made the decision – or when you were made aware that some of this money was going to be lent, rather than sitting idle in an account, at 15 percent, did you know there were some risks?*

  *A [John Kaiser]: At the 15 percent – actually, the loans, I didn't think they were going to be – to me it wasn't a risky loan...but the loans -- even the investors I brought in – I said.   Listen.   This guy – I gave him the whole story of Ken Jowdy back by land.   It's good.   Better than your money sitting somewhere.*

The Court's *M&O at 16* identified that "*Mrs. Kaiser testified that Kenner did not discuss Eufora with her*" (*Tr.944*).

Kenner was not even aware of the Privitello or Ethel Kaiser investments in Eufora until after the fact when Kaiser told Kenner about it.   Kaiser was in a panic at that time (December 2009), because Kenner "cut off Constantine" after Kenner discovered Constantine had distributed all of the GSF funds; and was refusing to pay the Mexico attorneys.   Constantine's panicked texts that "Kenner was cutting off communication", confirm Constantine was desperately trying to communicate with Kenner at that time (in evidence).

The Court's *M&O at 16* identified that "*In addition, she said that her son would never be involved in an effort to take over Eufora from Constantine*" (*Tr.951-952*).

**FALSE** – Because Ms. Kaiser's knowledge of that may be genuine – but it is FALSE. Kaiser was the main person working with Attorney Stolper and Bryan Berard to raise money to buy out the Eufora loan from Neptune Capital.

- There are hundreds (100s) of texts between Kaiser, Berard, Gaarn, Peca, McKee, Kenner and others who worked diligently on behalf of the Eufora investors to raise the buy out money.[102]

---

[102] It should be noted that during the 2015 trial – Kaiser, Berard, Peca, and Gaarn – four [4] of the main "buy out" individuals assisting Attorney Stolper – all exhibited *faulty memory, confusion and mistakes* (a.k.a. **CTE**) and **not one of them** "could remember" anything to do with a Eufora loan buy out effort.

- **The odds of that synchronized memory loss approaches impossibilium**.

Ultimately – their own attorney (Stolper) – not representing Kenner in that matter – identified to all of his clients that they were negotiating with the lender (Neptune Capital) to buy out the loan and control Eufora (*See Recon33-73*).

Berard discussing his conversations with John Kaiser about the loan buy out:

| 1389 5 | +14015246 929 Bryan Berard* | 6/16/2010 4:34:37 PM(UTC+0) | Read | Talked to **Jonny** [*Kaiser*] just waiting on them to wrap up meeting. *I guess Brent [Neptune] is being difficult now* |
|---|---|---|---|---|

Berard confirms Kaiser gave him the update about the loan buy out:

| 1392 6 | +14015246 929 Bryan Berard* | 6/18/2010 5:01:08 AM(UTC+0) | Read | Yeah Ridiculous. **Jonny** [*Kaiser*] said was verbal agreement. **Lawyers** were goin thru every line? Did u hear that?? Keep me posted tomorrow. This sucks |
|---|---|---|---|---|

## John Kaiser[103]

**John Kaiser is a non-victim in the instant case.   Kaiser robbed Kenner and tried to rob a number of Kenner's clients in a 2012 Arizona case (adjudicated against Kaiser and Berard in a contemporaneous 2015 Arizona civil trial – *See Recon33-61*).**

- Kaiser and Berard tried to allege their names were *forged* on multiple promissory notes and other notarized transfer documents.   They were proven to have lied by the Arizona trial judge thru direct evidence of their participation in each and every signed document via corroborating emails and texts.

**The government's introduction to Kaiser represented his service to New York and its 9-11 crisis, as follows, creating a higher perceived level of integrity as a hero:**

*DIRECT EXAMINATION*
*BY MR. MISKIEWICZ:*

*Q Sir, what were you doing on 9/11?*

*A [Kaiser]: I was actually a police officer in Suffolk County, 2nd Precinct.*

*Q On that day, what did you do?*

*A [Kaiser]: After the call at the second tower, I started to escort doctors and nurses to the site.*

*Q Did you work in or around the Trade Center site in the weeks that followed?*

*A [Kaiser]: Yes; for approximately two months.*

*Q Did you do that as part of your duties as a Suffolk County police officer or on your own time?*

*A [Kaiser]: That was on my own time.*

**Kaiser's trial lies were clearly premeditated, yet the government continued to double-down on his ability to call Jowdy a victim (like himself) while working hand-in-hand in Mexico with Jowdy for over three (3) years by the time of his trial testimony.**

---

[103] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 16-19.*

- **Kaiser wrote a February 28, 2019 letter to the Court.**
  - o **The letter revealed outrageous Ken Jowdy fraud – now announced by Kaiser after Jowdy fired him (employed 2012-2017; inclusive of his 2015 EDNY perjury-laden testimony).**
  - o **John Kaiser was complicit with Jowdy's crimes for five (5) years.**
    - ▪ **On May 14, 2019, the government referred to Jowdy as an un-Indicted co-conspirator – reversing their entire trial and PSR theories.**

- **The revisionary issues from the Kaiser confessional letter demand a new trial based on "new evidence" alone; fully contradicting the government claims of Jowdy as a victim (*beginning at Tr.31*).**
  - o **The contradicting Kaiser trial statements were wholly prejudicial (and now recanted) – and upon re-review of the Kaiser pre-trial statements, confirms new conspiratorial issues to convict Kenner.**

**Since Kaiser's firing in Mexico (in or about 2017 per Kaiser's letter) – the FBI case agent (Galioto) has refused to cooperate with Kaiser now that he is "willing" to give real "insider" testimony - against Jowdy.**
- **This is in exact opposition to their fabricated claims "together" for years to dissuade Hawai'i-Mexico investors from supporting Kenner's efforts to pursue Jowdy and recover investment funds that Jowdy still refuses to address seven (7) years later.**

**Kaiser received $1,176,000 from Na'alehu Ventures 2006 and Kenner in August 2006 pursuant to the 2005 agreement between the parties.**
- **Kaiser confirmed it in detail to a 2009 arbitration; *Nolan v. Kenner* – as a voluntary witness.**
- **Nothing in Kaiser's 2009 testimony was ambiguous about his personal efforts to raise the funds from his friends & family; specifically to participate in the 15% loan to Jowdy.**
- **Only Kaiser's perjury – or CTE – could explain his complete inability to remember the events leading up to the loan and its full repayments.**

**John Kaiser gave testimony consistent with foundationless government theories.**
- **Tom Harvey and Ken Jowdy in Mexico had employed Kaiser since 2012.**
- **Once employed, Kaiser began contradicting all previous statements he had made under oath in multiple jurisdictions.**

**Kaiser and Berard's assistance with the Kenner Indictment and arrest fortuitously led to the dismissal of two (2) civil cases against them by Kenner – costing Kenner over $1 million in recovery from the two (2) fraudsters.**

- **The two (2) civil cases included multiple documents <u>forged &/or fabricated by Berard and Kaiser</u> to steal two (2) real estate projects from Kenner – thru fraudulent conveyance of title (adjudicated against Berard and Kaiser – *supra*) and multiple fabricated and forged documents (*See Recon33-56 and Recon33-60*).**

- **The dismissed case(s) with Kaiser and Berard's forged and fabricated documents further highlighted the suspicious and calculated removal of additional fabricated documents by the government from Rule 16 evidence.**

  - **The removed documents were only produced – *most likely in error* – by the government forfeiture attorneys; unknowing that the *Brady*, exculpatory documents were systematically withheld to cover Kaiser's fabrication and theft of money from more friends & family.**

**<u>Nevertheless – Kaiser has not lost any money and has never been a victim in the instant case; only an undisclosed predator to his mother, Ethel Kaiser, Nick Privitello, and other individuals alleged as victims -- but only post-trial – listed as Robert Rizzi, "Kaiser and others", Frank Sconzo, Jonathan Smith (*on forfeiture-1*) – unknown to them thru government concealment of the John Kaiser frauds...</u>**

The Court's *M&O at 16* confirmed that "*Kaiser said that he wired the funds to Ka'u Holding Company and that Kenner told him that, at the end of 30 days, he would receive $1.1 million in repayment with interest*" (*Tr.977-978*).

**FALSE** – Because Kaiser gave voluntary testimony, *supra*, in 2009 arbitration in contradiction to his 2015 testimony.  Kaiser's 2009 testimony would have occurred *after* he alleged (post Jowdy employment) that:

1. Kenner had not repaid him from the 2005 Hawai'i loan (untrue),
2. Kenner, Manfredi and himself had the 2006 *"confrontation"* meeting (fake),
3. Kenner had not repaid him from the 2007 California project (untrue), and
4. Kenner had defrauded him in the 2006 Sag Harbor (LedBetter) project (untrue).

In spite of the alleged multi-millions of *alleged frauds* that Kenner would have perpetrated on Kaiser *before* May 2009, Kaiser gave pro-Kenner testimony as follows:

- Please note that Kaiser was the Managing Member of Na'alehu Ventures 2006 (the Hawai'i partners) at the time of his 2009 arbitration testimony (in evidence).

**Kaiser confirms 6-month Jowdy loan (during his 2009 arbitration testimony) – not 30 days…**

> *Q.  So at the time was there any representation about getting paid back this money when the Cabo deal closed?*
>
> *A [Kaiser]: It was supposed to be a short-term loan.  __I thought it was three to six months__, because __I had also raised some other funds from family and friends that were getting a little antsy about it__.*
>
> *Q.  You'd been dealing with Mr. Kenner now for a couple of years?*
>
> *A [Kaiser]: Yes.*
>
> *Q.  __Have you ever seen him do anything inappropriate__?*
>
> *A [Kaiser]: No.*
>
> *Q.  __At the time this money was lent to Mr. Jowdy to be spent in the Mexican project, did anybody anticipate he wasn't going to pay you back when the Cabo deal closed, the Lehman's Cabo deal__?*
>
> *A [Kaiser]: No.  Otherwise I wouldn't have lent it.  I wouldn't want to go down that route.*
>
> *Q.  __Do you blame Mr. Kenner for him not paying the money back__?*
>
> *A [Kaiser]: No.*

**Kaiser confirms no secrets about the Jowdy loans from the Hawai'i investors…**

> *Q: __Has this ever been a secret that Mr. Kenner lent this money to Mr. Jowdy__?*
>
> *A [Kaiser]: No.*
>
> *Q: __Was this a transaction that, as your view as an investor was open and disclosed to everyone__?*
>
> *A [Kaiser]: It was open.   There was no secret handshakes or nothing like that.*

**In May 2009 – Kaiser has "NO COMPLAINTS" about Kenner…**

> *Q: Even now, sitting here in May 2009, __is there anything you've uncovered__, as someone who obviously knows how to investigate, __that Mr. Kenner has done anything inappropriate throughout these transactions__?*
>
> *A [Kaiser]: No.*

*Q: Not one complaint?*

*A [Kaiser]: No.*

Kaiser confirmed to the 2009 arbitration panel that *he met Jowdy a couple of times*; confirming the raw notes that the FBI noted in his October 19, 2010 proffer (*See 3500-JK-1-r at 2,3,10*). Kaiser *denied* telling the FBI about the meetings during his trial testimony.

[John Kaiser 2009 arbitration testimony]:

> *Q: Tell us what your experience was with respect to that money right at the point there was a decision to start loaning money to Mr. – that Mr. Kenner had made a decision to start loaning some of that investor money to Mr. Jowdy?*
>
> *A [John Kaiser]: ...So if we had some funds that were – that was stagnant and that warrant purchasing land, we would utilize it for a loan, so we actually made some money off if it.*
>
> *Q: Was Mr. Jowdy at that time someone that appeared credible to you?*
>
> *A [John Kaiser]: Well, the first thing, Mr. Kenner told me that he was, and I met him [Jowdy] a couple of times. He seemed – a big thing it was 15 percent interest rate, and I thought it was a good move.*
>
> *Q: So at the time was there any representation about getting paid back this money when the Cabo deal closed?*
>
> *A [John Kaiser]: It was supposed to be a short-term loan. I thought it was three to six months, because I had also raised some other funds from family and friends that were getting a little antsy about it.*
>
> *Q: At the time this money was lent to Mr. Jowdy...did anybody anticipate he wasn't going to pay you back when the Cabo deal closed, the Lehman Cabo deal?*
>
> *A [John Kaiser]: No. Otherwise, I wouldn't have lent it. I wouldn't want to go down that route.*
>
> *Q: When you made the decision – or when you were made aware that some of this money was going to be lent, rather than sitting idle in an account, at 15 percent, did you know there were some risks?*
>
> *A [John Kaiser]: At the 15 percent – actually, the loans, I didn't think they were going to be – to me it wasn't a risky loan...but the loans -- even the investors I*

*brought in – I said.   Listen.   This guy – I gave him the whole story of Ken Jowdy back[ed] by land.   It's good.   Better than your money sitting somewhere.*

- After multiple face-to-face meetings between Kaiser and Jowdy (without Kenner – per the raw notes – *See 3500-JK-1-r*), Kaiser was in possession of the 2004 Hawai'i loan agreement and confirmed with Jowdy that the "agreement" was real and thus, the collateral terms were "known" at all times by Kaiser (*at 3*).

The Court's *M&O at 16* confirmed that "*Kenner never re-paid any portion of that [Hawai'i] loan*" (*Tr.978-980*).

**FALSE** – Because the Na'alehu Ventures 2006 August 2006 bank record (*See Recon33-108*) confirms **Kaiser received $816,000 cash** in wire transfers and a mutually signed agreement (Kenner and Kaiser) to become the Managing Member of Na'alehu Ventures 2006 within a year (at Kaiser's discretion – *and he executed it*) and a $360,000 delayed payment from Kenner – which he fully received (as evidenced by Kenner's banking records in Rule 16 evidence).

- Defendant Kenner renews his request for the Court to demand an "in camera" review of Kaiser's 2006 and 2007 taxes to confirm the alleged "*back pay*" amount (*Tr.1413-1414*) – in lieu of full loan repayments to Kaiser friends & family (considering the fact that none of the $1,000,000 belonged to Kaiser at any point in time).
    o As a former NY Cop – Kaiser would clearly know that he had to pay taxes on income.

- Second – Kaiser cannot produce expenses of any significant amount – especially considering he was distributed about $40,000 via company wire transfer in the months few before the August 2006 joint venture agreement with Lehman Brothers and Windwalker (in evidence).
    o *Defendant Kenner renews his request for Kaiser to provide the necessary credit card statements to validate the amount of "expenses" he was paid in August 2006 that offsets the difference between the $816,000 he was distributed – and the amount of "back pay" he claimed on his 2006 &/or 2007 IRS taxes.*

**Kaiser makes fake "confrontation" claims that could never have occurred based on Manfredi's 2010 FBI proffer and future Kaiser actions with Kenner...**

The Court's *M&O at 16-17* confirmed that "*Kaiser further testified that, in or around April 2006, he and Manfredi met with Kenner to discuss the status of the Hawai'i project, and he learned from Kenner that the $1 million loan was used to fund a development project in Cabo san Lucas, Mexico rather than Hawai'i*" (*Tr.983*).

**FALSE** – Because this fabrication by Kaiser fails for a myriad of reasons as follows:

1. Kaiser actually claimed at trial that Manfredi confronted Kenner about the alleged diversion; *not a Kenner admission (Tr.983).*

   *Q: And tell the members of the jury what you -- what, if anything, occurred that led to your discovery of what happened to the $1 million?*

   *A [Kaiser]: At that meeting <u>Chris Manfredi actually confronted Phil Kenner</u> and he stated to him that the money that I sent, that was sent in '05, didn't go to Hawaii.*

   *Q: What else did he [Manfredi] say?*

   *A [Kaiser]: And then he stated that he went down to a development right in Cabo San Lucas in Mexico.*

   *Q: Was Mr. Kenner in the room then?*

   *A [Kaiser]: Yes, he was.*

   *Q: And what, if anything, did Mr. Kenner say when he was accused of sending the money to Mexico?*

   *A [Kaiser]: He said so what? What if it went down to Mexico. It's all in the same bucket.*

   - This is clearly refuted by Kaiser's own 2009 arbitration testimony, *supra.*

2. Only $135,000 of the $1 million of the funds Kaiser told the 2009 arbitration panel he personally "raised" from friends & family to be used as a loan specifically to Jowdy actually went to Mexico; the remainder was used directly for Hawai'i expenses (in evidence).
   - If Kenner was making a *confession*, as the Court M&O claims, Kenner would not have confirmed anything but the $135,000 went to the Jowdy loans (the truth of the issue).   It should be noted that Kaiser told the FBI he had at all times "*saw the Hawai'i bank statements*" (*See 3500-JK-1-r at 10*).

   - If Manfredi were "*confronting*" Kenner in or about April 2006, why would he have waited almost six (6) months, since Manfredi had access to all of the Hawai'i bank statements as the COO and manager of the hard money lending proposals?
     - Both Manfredi and Kaiser would have seen the instant distributions to Jowdy controlled accounts (*See 3500-JK-1-r at 10*) – as Kaiser's 2009 arbitration testimony expected, *supra* – on 8-26-2005 from the Ula Makika account [$25,000 to Propiedades DDM -- and $110,000 to

Baja Development Corp – **both wholly owned by Jowdy at all times**]
(*See Recon33-109*).

3. Kaiser's best friend, Chris Manfredi, told the FBI in 2010 (*See 3500-CM-2-r at 2*)
that he personally never contributed any funds to the Hawai'i project and Kaiser
contributed $1,000 initially and "*not sure if JK [Kaiser] did [contribute more]*".

   • How could Manfredi make this statement in October 2010 if he was the
   instigator of the Kaiser $1 million diversion "*confrontation*" meeting?

      ○ It is not reconcilable – because the "*confrontation*" *never occurred*.

   • There is a big difference between Manfredi telling the FBI in 2010 that he
   knew Kaiser contributed no more than $1,000 as opposed to the $999,999
   difference, which would have highlighted the 2006 Manfredi-led meeting.

4. Allegedly and immediately after the alleged "*confrontation*" meeting, Kaiser
decided *not to read* (*Tr.1164*) the most critical financial document in his life – the
July 2006 joint venture agreement (*See Recon33-239*) & the representations and
warranties email disclosing Constantine's previous dealings with Kenner (*See
Recon33-110*). *It is not believable behavior for a former Police Officer.*

[Kaiser 2015 testimony re – the Joint Venture disclosure document] (*Tr.1164*):
   "*Like I said, I did not read the Lehman closing docs related to Hawai'i*".[104]

---

[104] It should be highlighted that Kaiser and Manfredi received the "*Hawaii reps and warranties
disclosure*" email from Kenner prior to the 2006 closing – which clearly laid out that Kenner had
other dealings with both Centrum (original Hono'apo lender) and Constantine (Kenner's 2005-06,
$386,000 loans to Eufora – and Kenner's 2006 Miami real estate transaction still pending
completion) (*See Recon33-110 at 3*).

   • **The closing attorneys for Lehman Brothers, Windwalker, and the Hawai'i partners
   were involved in the drafting of the full-disclosure.**
   • These final representations and warranties were also part and parcel to the 1800-page
   closing documents constructed by nearly ten (10) law firms on behalf of all the parties (as
   attorney Najam confirmed in his 2009 arbitration testimony).
         See Recon33-111 – and
         See Recon33-112 – and
         See Recon33-113

Kaiser cannot claim, "*did not read*" status that results in himself being a victim. *See Horvath v.
Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A.*, 461 Fed. Appx. 61; 2012
U.S. App. LEXIS 3012.
   • The Second Circuit Appeals Court has confirmed that "***Failure to read a contract that is
   signed by the victim***" is the burden of the victim and cannot create a fiduciary void or
   similar for activities of an individual tasked with presentation or management of the
   documents execution.

a. Kaiser allegedly had just been robbed by Kenner of $1 million (per his fabricated confrontation testimony) – yet now – Kaiser was not interested in what was written in the disclosure document he signed for the rest of the $1 million (if he was really unaware) -- and the balance of the equity he and Manfredi would retain as a result of their work contributions – *with no investment capital.*

    i. Again – it is not reconcilable with any plausible behavior – let alone by a 20-year NYPD Police officer.

    ii. Kaiser would have had Kenner arrested immediately.

        A. Instead – *Kaiser did nothing.*

## Kaiser LIED about forgeries with documents recovered from Kaiser himself...
- **It is more baffling than most any other fabrication at trial...**

The Court's *M&O at 17* confirmed that "*Kaiser also reviewed two consulting agreements between Little Isle 4 and Constantine Management Group dated December 15, 2004 and June 1, 2005 that he purportedly signed, but he said his signatures on those documents were not authentic*" (*Tr.992-994*).

**FALSE** – Because notwithstanding all of the "other" proven Kaiser LIES about forgeries that have previously been raised (in concert with his cabal members; Jowdy and Berard [with "tracing' witness and Berard best friend Lanie Donlan included]) – **there is no reasonable explanation that can explain why Kaiser was personally "in possession" of the actual original signatures of both consulting agreements at his home – if they were "forged" – and not delivered until the *eve of trial.***

- *It is perhaps the most incredible of all fabrications &/or suborned perjuries at trial in 2015.*

The Court makes multiple references throughout its M&O regarding the alleged Kaiser forgeries and how they substantiate the "concealment" efforts of Constantine and Kenner.

---

- *The Second Circuit Appeals Court clearly defines that absent substantive unconscionability or fraud, parties are charged with knowing and understanding the contents of documents they knowingly sign. If the signer can read the instrument, not to have read it is gross negligence; if he cannot read it, not to procure it to be read is equally negligent; in either case the writing binds him. Parties are bound by documents expressly incorporated by reference into agreements to which they manifest their assent.*

- *Considering those agreements have never been recognized for any benefit before the false Kaiser allegations during the 2015 criminal proceedings, what conceivably would rationalize having a forged Kaiser signature on it.*

There are several other consulting agreements that Kaiser was not part and parcel to.  It was only after Kaiser learned thru Manfredi that he [Manfredi] had been signing multiple Hawai'i documents in 2003 and 2004 *"to be more involved"*[105] that Kaiser wanted to sign some of the Hawai'i documents; i.e. the 2004 and 2005 Constantine-Hawai'i consulting agreements (*See GX-7004, GX-7005*), the Environmental Indemnity Agreement (*See Recon33-114*), the 2006 Constantine-Hawai'i agreement (*See Recon33-115*), et. al.

- Kaiser did not need to meet Constantine during the signing period of the 2004 and 2005 agreements.   Kaiser signed the 2006 Constantine-Hawai'i consulting agreement, *supra*, before the 2007 date that testified he "met him" and did not claim that 2006 agreement was a forgery.

### *Agreements were not backdated…*
The agreements were also "not backdated".   Kenner **NEVER** gave testimony that they were.   Kenner clearly described that the 2004, 2005 and 2006 documents were all signed by Constantine on the dates they are "dated".   After the effective date (signed date) of the various agreements with Constantine, Kenner met with Kaiser in the near future and had Kaiser countersign the agreements with Kenner in Hawai'i.

Kaiser, in Hawai'i with Kenner, signed all three (3) of the Constantine-Hawai'i agreements in-person with Kenner during their respective meetings (*Tr.4303-4306*).
- There is no legal standard that creates a "bad document" or a "backdating" scenario as a result of a counter-signor(s) not being present on the "effective date" for the agreement.
  - It was a completely misrepresented standard and **prejudicial**, notwithstanding the fact that Kenner *never* claimed or gave testimony that he backdated the Hawai'i consulting documents – or any other document.[106]

---

[105] *See Recon33-116* -- the initial 258-acre Hawai'i partners closing document from December 2003 where *only* Manfredi signed (not Kenner) to close the first (1st) transaction in Hawai'i – **for greater transparency**.   The transaction was full transparency to all Hawai'i investors at the time.

In fact – in the *Nolan v. Kenner* arbitration in 2009 – **Nolan, himself, delivered the Manfredi-signed closing document to the arbitration proceeding** – not Kenner after his Standard Advisors corporate server was stolen by Nolan's new financial team member (Myrick) – working hand-in-hand with Jowdy and his attorneys since 2007.

- Only the government claimed during summation that the Kaiser signatures were backdated (*Tr. 5732*), **which was untrue**.

**Kaiser LIED about the entire Sag Harbor-LedBetter transaction – but was left unchecked by the government who knew Kaiser's lies at all times...**

The Court's *M&O at 17* confirmed that "*Kaiser also testified that he and others sold a 50 percent stake in the Sag Harbor property to Kenner and LedBetter in or around 2006 for $750,000*" (*Tr.998-1004*) (GX-1602).

**FALSE** – Because Kaiser's entire storyline fails for multiple reasons.

**FIRST** – This alleged "sale" to Kenner – giving Kenner full control thru LedBetter LLC – would have occurred within months of Kaiser's infamous "*confrontation*" meeting with Kenner, which Kenner allegedly stole $1 million from the Hawai'i project – and specifically the Kaiser friends & family loans (if true) -- for his own benefit.

The funds were clearly not "stolen" or diverted thru concealment as Kaiser confirmed during his 2009 arbitration testimony, *supra*.
- Clearly – if the Hawai'i confrontation story had any merit – that would have been the "last deal" Kaiser ever participated in with Kenner, *not the exact opposite – the next of many to follow*.

**SECOND** – At no time – or *never* in any LedBetter operating agreement did Kenner have a documented 50% interest in LedBetter (*See Recon33-57 [REAL LedBetter operating agreement]*).
- Kaiser claimed in 2015 that he never received the 2006 LedBetter operating agreement from the closing he attended, listing ownership as:
  - Kenner 25%
  - Kaiser 25%
  - Berard 25%
  - Tesoriero 25%

---

[106] Tim Gaarn's trial testimony that he was asked by Kenner to back date the Eufora transfer documents to 2005 is refuted by his own pre-trial FBI proffer when he clearly told the FBI – and they noted:

> "*TG [Gaarn] told CR [Eufora CEO C.R. Gentry] that doc was dated 2005. CR said can predate the doc when made the verbal agreement*".

- Gaarn did *not* tell the FBI in 2012 – according to their raw notes – that Kenner was the person asking him to sign any Eufora corporate documents. Kenner was not a member of Eufora or AZ Eufora Partners I since 2005 – as designated by each and every email, operating agreement, and tax record of the company; *none in contradiction*.

[Kaiser false testimony at *Tr.1105*]:

> *Q. Did you see this operating agreement at any point during the closing when you transferred the Sag Harbor property from your old company to Led Better?*
>
> **A [Kaiser]: No. I actually -- it was sold, so, no. I didn't see this document at that closing.**[107]

---

[107] Kaiser's NYPD partner, Vincent Tesoriero, was interviewed by the FBI in 2014 after Kenner's arrest and detainment. Tesoriero confirmed the following items about the LedBetter transaction that **prove** Kaiser gave more planned and perjured testimony during trial to injure Kenner.

From *3500-VT-1-r* with FBI agent Galioto and IRS agent Wayne present:

Please note that ONLY Kaiser received a benefit from the $395,000 short-term loan (from the Na'alehu Ventures 2006 Hawai'i partners closing), because according to Tesoriero:

*"Kenner's role in Sag Harbor [LedBetter] deal would be to raise money to **build** the property"*

- Per the FBI proffer notes taken by IRS agent Wayne and Galioto, from LedBetter partner, Vincent Tesoriero *(See 3500-VT-1-r at ¶ 8)*.

The confirmation that the $395,000 was solely for Kaiser's benefit (not Kenner's) came after Tesoriero also proffered:
> *"**Kaiser** told Tesoriero that they needed to get Manfredi out of the Sag Harbor deal and that Phil Kenner and Bryan Berard were coming in the deal".*

This further contradicted Kaiser's lies at trial about the removal of Manfredi and the transfer details to the new LedBetter LLC – and Kaiser's alleged "lack of knowledge" that Berard was initially part of the new LedBetter deal.
- The actual reason for removing Manfredi was documented by Hawai'i closing attorneys, Najam and Markowitz, as *"personal reasons"* after the Kaiser-Manfredi physical altercation in NYC when Manfredi said he would "blow up the deal" if he did not get paid $180,000 at the closing and have his previous $100,000 loan waived (from the Centrum loan funds – further discounting Manfredi's trial testimony that the Centrum funds were supposed to be for the closing of the Waikapuna parcel) *(See Recon33-117)*.
  - The Kaiser-Manfredi fight at Sabarro's Italian Restaurant in June 2006 was the only "confrontation" meeting that ever occurred – not Kaiser's revisionary claims of some unknown Kenner diversion to Mexico (refuted again by his own 2009 arbitration testimony, *supra*).

- Tesoriero, who proffered in 2014 after Kenner was indicted and arrested, was Kaiser's training officer at the NY Police academy over twenty (20) years prior and had no existing relationship with Kenner in 2006, further accentuating the weight of the Kaiser-adverse confirmations of Kaiser's trial perjury by Tesoriero to the FBI pre-trial, **yet allowed to stand uncorrected**, ad nauseum.
- When Kaiser and Berard **FORGED** Kenner's girl-friend's name on the LedBetter operating agreement in April 2011 *(See Recon33-56)*, replacing Kenner who managed the LLC *(See Recon33-57)*, Kaiser and Berard sold and stole the Sag Harbor property without Kenner's knowledge.

**THIRD** -- *GX-1602* is a copy of Kaiser's bank statement from November 2006 confirming that he was returning $380,000 to the Hawai'i project from his negotiated short-term loan – in exchange for his 2006 Hawai'i JV signature.

**FOURTH** – When the government turned over their Rule 16 evidence – *after the initial 2013 Kenner Indictment claimed Berard was supposed to have a 50% stake in the LedBetter project* – they produced the fabricated and forged agreement (*See Recon33-56*), **which contradicted their own fabrication.**

- Thus – it corroborated the **LIES** that the investigating agents along with Kaiser and Berard could not get straight in a rush to indict and arrest Kenner (November 13, 2013) just weeks before Kenner's damaging December 2013 testimony was already scheduled in front of the Mexico State Supreme Court about all of the Jowdy criminal frauds and his entire cabal (including Berard and Kaiser at that time). *They delivered the fabricated LedBetter operating agreement with Kaiser owning 50% after they stole the LLC from Kenner's control by forging Kenner's girl-friend's name on the fake operating agreement -- never Kenner.*

  - *It is an insult to the Court and the integrity of the system.*

- When Kaiser and Berard fabricated the **FAKE** LedBetter agreement (years later to steal the property), they named "Lauren Gilmore" the Managing Member despite

  - Berard and Kaiser kept 100% of the funds from Kenner; in spite of Kenner's capital contributions (in Rule 16 evidence at *BNK-MM-00215* et. al).   Kenner sued Kaiser and Berard in 2013 in an Arizona civil court [cv2013-052349] for the forgery and theft frauds *(See Recon33-118)*.
    - *Kaiser and Berard's collective defense was that "they" had all of the funds in the deal; further documenting [in their own words] that the $395,000 loan in 2006 from the Hawai'i partners capital account was for Kaiser, and not Kenner.*
  - Notes taken from Kenner's home (under search and seizure) represented the $395,000 transfer to LedBetter for Kaiser and Kenner's lis pendens on the Sag Harbor property until the loan was repaid to Na'alehu Ventures 2006; which it was 11-days later, as planned) *(See Recon33-119)(See GX-5103 at 4)*.
    - *The notes are unequivocal that the $395,000 transfer was for Kaiser.*

Without either of these Hawai'i pre-JV signature deals (with Kaiser and Manfredi – *See Recon33-239*), and many others at the time of the JV, *approval signatures* for the buyout deal would not have been granted by Lehman Brothers, thus cancelling the entire JV for the group, resulting in the immediate loss of millions to the group (from expiring land deposits) in lieu of the negotiated $7 million payout from Lehman Brothers and the $4 million in MILESTONE payments.  The MILESTONE payments were due within 18 months of the August 2006 closing – *but remain unpaid as part of the unpaid Lehman Brothers/Windwalker frauds following the conclusion of the JV – and subsequent non-actions by Kaiser once employed by Jowdy).*

the fact she had resigned from her position the day after the original transaction occurred in October 2006 (*See GX-703 – Article III*), as delivered by government witness, closing attorney Betesh (*Tr.672-673*).

- It was simply more unchecked frauds by **protected people** "related to" or "involved in" the Jowdy conspiracies.

- Kaiser and Berard also "*back-dated*" the fabricated and forged document with the operating agreement to the same date as the authentic LedBetter operating agreement that government witness, Attorney Shimone Betesh, told the 2015 Court he turned over to the government from his closing files.[108]

**The government and Kaiser claimed that Kenner – *who wired thousands of transfers for a living over twenty (20) years for his clients* – made two (2) separate erroneous transfers to Kaiser within two (2) weeks in February 2010 by giving Tim Gaarn instructions – but then claimed to Kaiser twice [not once] they were "mistakes".**
- **It is wholly unbelievable -- since no other wires from Gaarn to Kaiser ever occurred...**

The Court's *M&O at 17* confirmed that "*Kaiser said that on the same day, he sent $30,000 to Kenner because 'Kenner said it [the previous $30,000 wire from Gaarn to Kaiser] was a mistake, that he [Kenner] needed the money. It should have been sent to him [Kenner] directly*" (*Tr.1047-1048*).

**FALSE** – Because Kaiser's entire storyline fails for multiple reasons.

**FIRST** – In order for Kenner to make a "*mistake*" – Kenner would have needed to instruct Kaiser to send his wire instructions to Gaarn, and Gaarn would have needed to

---

[108] *See "Ledbetter Written Letters of Consent 2006" (Recon33-120)*. Clearly – Attorney Betesh had the *original* LedBetter operating agreement with Kenner and Gilmore as the co-Managing Members at the time of the closing -- because he required each of them sign *Written Letters of Consent*.
- **The FAKE agreement Kaiser and Berard produced to the government was clearly another criminal fraud by Berard and Kaiser -- unchecked again (*See Recon33-56*).**
- The government included the two (2) letters (from Gilmore and Kenner) in their initial 2014 discovery disc of items they were intending to use at trial [**BINDER 1-504**].
  - o The Indictment story changed shortly after Kenner explained to trial counsel Rick Haley that they would be able to dismiss the LedBetter issues and **IMPEACH** Berard and Kaiser with their collectively *forged* and *fabricated* LedBetter documents – while they were "criminally stealing" the investment.
  - o Haley, again, leaked this information to the government pre-trial and the issue was dropped, like the alleged Kaiser Mexico forgery document – which Berard confirmed on a 2012 FBI recordings.

This was CRITICAL information – because Kaiser and his false FORGERY claims (again) were paramount to the government allegations of concealment.

confirm it with Kenner before initiating the $30,000 transfer on or about February 8, 2009.

- *The truth* – and based on reality is that Kaiser – after meeting in February 2009 with Gaarn face-to-face in Arizona at Kenner's home (text messages in evidence) – was borrowing money from Gaarn because Kaiser was "**broke**"[109] and needed to contribute funds to the ongoing Kenner-Kaiser project in Arizona (despite the fact Berard and Kaiser eventually stole the title to the property thru a fraudulent conveyance from Kenner – and were sued for it).[110]

Although the government leans heavily on the two (2) transfers to Kaiser from Gaarn as VENUE arguments – Kaiser referred to the two (2) transfers as *"mistakes"*.   As the Court knows, **the key to effect proper venue for any act is intent**.

---

[109] *See Recon33-121* -- In November 2008, after Kaiser was fully repaid his California profits and the initial funds he borrowed to participate with Kenner on California project – Kaiser sent Kenner communicated via text in November 2008, as follows (*See Recon33-121*):

> [Kenner] – *"Sent the wire to you...pk"*
> [Kaiser] -- *"Needed it thx"*
> [Kenner] – *"Paid the guys again for the 8224 [Arizona] work...pk"*
> **[Kaiser] – *"Im broke cant help"*...**
> [Kenner] – *"I didn't ask...pk"*...
> [Kaiser] – *"I know. Just tired of needing money. Gotta finish tje [sic] house so we can get our money out. U and me"*

Ironically – Kaiser and Berard claimed in 2012 – when sued by Kenner in Arizona for fraudulently conveying title to the Arizona project house to themselves as individuals and cutting Kenner out – they claimed all of the funds in the deal belonged to Kaiser – while he was perpetually *"broke"* by his own November 2008 admission.

- *This "broke" admission is only a few months before Kaiser received the two (2) loan transfers from Gaarn and immediately sent them to Kenner to fulfill a small amount of the capital demands of the Arizona project that Kaiser could not afford.*

[110] While Kenner was incarcerated in the EDNY as a result of Kaiser and Berard efforts with FBI agent Galioto (*See NY Daily News Article: "Former NHL player Bryan Berard and ex-cop [Kaiser] help feds nail two Arizona men in massive fraud"*, November 13, 2013, 1:33pm) – a contemporaneous 2015 Arizona court ruled against Kaiser and Berard for their fraudulent conveyance (*See Recon33-55 at ¶57*)

> *57. The March 9, 2012, conveyance of the property by John R. Kaiser as Trustee of the Shangri-La Trust 1999 to "John R. Kaiser, a married man, as his sole and separate property and Bryan Berard, an unmarried man" (exhibit 29) was a fraudulent transfer. A.R.S. §44-1004(A).*

BUT -- Kenner had to previously dismiss his Plaintiff role in the case while incarcerated in the EDNY pre-trial -- costing Kenner approximately $1 million in investment losses at the hands of Berard and Kaiser; fully exposed by Kenner while Kaiser constantly espoused his *"broke"* status.

In *United States v. Tzolov*, 642 F.3d at 318 (2d Cir), the government's reliance on *Svoboda* was misplaced.   In *United States v. Svoboda*, 347 F.3d 471 (2d Cir 2003), we stated that "venue is proper in a district where (1) the defendant <u>intentionally</u> or <u>knowingly</u> causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is <u>foreseeable</u> that such an act would occur in the district of venue [and it does]. *Id* at 347 F.3d at 483.

**SECOND** – Considering that Kenner "*allegedly made a mistake*" with the first (1ˢᵗ) February 2010 wire instructions to Gaarn for the Kaiser funds, it is even more unlikely that Kenner made the same mistake weeks later (with Gaarn and Kaiser).

Furthering the improbability of the "mistakes" was that on the same day as the second (2ⁿᵈ) wire to Kaiser, Gaarn sent Kenner a separate wire to Kenner's Arizona bank account that was part and parcel to the ongoing Gaarn loan repayments to Kenner (fully documented thru bank statements in Rule 16 evidence).   How could Kenner make the same "mistake" twice to the same person within two (2) weeks – while Kenner was instructing Gaarn to send Kenner funds the same day?   Kaiser confirmed the alleged "mistake" again to the 2015 Court in the face of the real evidence (*Tr.1049-1050*).
- It certainly raises an issue to consider, which was **the truth** that Kaiser was borrowing the money from Gaarn $30,000 on February 8 and forwarding to Kenner four (4) days later (Count 2) and $40,300 on February 25ᵗʰ (Count 3).
- Kaiser and Gaarn had just been with face-to-face in Arizona (in evidence) – and
- Kaiser was using the "borrowed" Gaarn funds to continue his needed contributions to the Arizona project that Kenner had been forced to fully fund during Kaiser's self-professed "broke-ness", *supra at footnote 109*.

It should be noted that the government bank records confirm that Kaiser had been fully repaid by summer 2008 for his investment and profits in the 2006-07 California beach house (Hermosa Beach) project – but ignored them to allow Kaiser's harmful testimony.
- ***There is no dispute Kaiser was fully repaid by Kenner****, notwithstanding Kaiser's personal decision not to repay his friends & family or report "his profits" to the IRS.   Kaiser's IRS taxes from 2007 &/or 2008 will <u>not</u> reveal any taxes paid for the profits he incurred from the 2007 California sale and the funds Kenner fully disbursed to him by Kenner (post-sale) (See Recon33-128 with Recon33-127 back-up bank details).*

Thus – **it is not possible that Kaiser was receiving money from Gaarn – because Kenner owed Kaiser any funds by February 2010**.
- **This is an irrefutable fact,** supported with 100% empirical evidence at all times in the government's hands pre-trial – **and ignored** to fit their prosecutorial theories.

**The government claimed that the Eufora company was a pump-and-dump and that it is/was worthless – yet Kaiser called investors to talk them out of selling their stock at any price (just like Kaiser's "heroic" self-claims in the Cabo deal [*Document 628*]); not Constantine or Kenner…**

The Court's *M&O at 18* confirmed that *"Kaiser…advised them [the Eufora investors] not to sell their Eufora equity because Kaiser had seen documents indicating that the company was poised for financial success"* (*Tr.1065-1067*).

Kaiser's conversations took place before Kaiser raised more "friends & family" money, *without Kenner's knowledge in December 2009*, to invest with Constantine (Eufora) directly.   In spite of his "hero" status (self-proclaimed), **Kaiser's own advice to any and all of the Eufora members is another third (3rd) party who validated actual value in Eufora after the 2008-09 Constantine and Gaarn private stock sales occurred**.

Shortly thereafter, Kaiser began working with a New York based investigative team with Rudy Giuliani's people and Michael Stolper to investigate all of the Eufora corporate history.   As a result of the 2010 investigation fully participated in by Kaiser with Giuliani's team, Giuliani's partners wanted a six (6) percent equity stake in Eufora – acknowledging that the company, *after* the private stock sales, had full intrinsic value.

- **No person could be deemed as defrauded for receiving full value.**

Earlier Eufora investor, Jay McKee, confirmed the contingency fee requested by Giuliani and his partners to Kenner after speaking directly to his independent counsel:



| 147 97 | +1716803 4903 Jay McKee* | 7/15/2010 12:03:01 PM(UTC+ 0) | Rea d | Hopefully you're getting some sleep right now; I am planning on sending the letter this morning.. **Within our package or plan in taking the lender out, where is the 6% for Guilani partners comming from?** |
|---|---|---|---|---|

- McKee also confirms, *supra*, the loan buy out plans *"taking the lender out"* that Peca, Kaiser, Berard and Gaarn could not recall during trial despite their control of the attempted buyout.

Whatever happened to Eufora's value after the involvement of FBI agent Galioto has *nothing* to do with Kenner (who had nothing to do with the company in 2009-2010 or beyond).   Thus – all loss of value (real or perceived) is 100% the result of the FBI meddling in the Eufora dealings; *not any Kenner actions at any time.*

**Kaiser's "word vomit" and wholly confusing testimony continued as he addressed the funds he placed in the Hawai'i-Jowdy loan…**

The Court's *M&O at 18* confirmed that "*Kaiser said that he spoke with Kenner in or around 2006 about lending money to Jowdy with a 15 percent interest rate that was separate from the $1 million loan that Kaiser provided to Kenner and that Kenner subsequently gave to Jowdy*" (*Tr.1104-1105*).

**FALSE** – Because Kaiser told the FBI that he had met with Jowdy face-to-face in NYC and Mexico "several times" to discuss the loans to Jowdy from the Hawai'i partners.

Independently the FBI noted on one (1) occasion that *Kaiser told the FBI he actually called Berard and Kenner after his independent Jowdy meeting* to discuss the prospects of the fifteen percent (15%) loan.  There are five (5) separate meetings that Kaiser described to the FBI that took place before & during the 2004-06 lending period (*See 3500-JK-1-r*).

- Kaiser *denied* all of these meetings during trial – as well as denying that he ever told the FBI about them during his irreconcilable 2015 testimony (*Tr.1120-1122*).
- To complete the FBI meeting fraud by Kaiser – he claimed that during the 2-hour and 15 minute meeting – "*NO NOTES were taken*".   The detailed notes make that stand-alone statement nearly impossible to believe…

    [Kaiser denied notes were taken during the 2:15 hours of the meeting]:
    *Q: And when you answered the questions of the FBI, did you observe them taking notes of the answers that you were giving to their questions?*

    *A [Kaiser]: No.*

    *Q: You didn't observe them doing that?*

    *A [Kaiser]: No.*

Yet – in order to vouch for Kaiser's clear perjury -- AUSA Komatireddy claimed the FBI NOTES might have been taken **BEFORE** the Kaiser meeting during her unchallengeable rebuttal summation (*Tr.5992: 8-10*):

    [Komatireddy rebuttal summation]:
    "*What is it? It's the notes of an investigator from another office, not the notes of an FBI agent, an investigator from another office. What is it not? It is not a transcript. It's not questions and answers. It's not direct quotes. You can't tell from the notes when they were written. if they were written before the interview or after the interview.*"

It is not believable that Kaiser is claiming that separate and apart from his alleged "*confrontation*" meeting in spring 2006 with Kenner, that after Kaiser raised funds from his friends & family (without a single solicitation to any Kaiser friends & family member by Kenner), that Kenner was meeting with Kaiser to discuss loaning money to Jowdy in 2006 – *considering that in 2006 – the only funds that were distributed to Jowdy's personal loan agreement was $20,000 on February 3, 2006 (none other)*.

In contrast, Jowdy repaid the 2004 Hawai'i loan in 2006 as follows; stopping only two (2) days before he received the $125,000,0000 loan from Lehman Brothers and no longer needed Kenner and Kenner investors to sign-off on Jowdy's documented, lottery-style spending (*See Recon33-122 at 2,5*):

**[Jowdy Hawai'i loan repayments to the Hawai'i partners Ula Makika account]:**

| | | |
|---|---|---|
| 2-14-2006 | Baja Development Corp | $50,000 |
| 2-24-2006 | Baja Development Corp | $50,000 |
| 3-02-2006 | Baja Development Corp | $70,000 |
| 3-10-2006 | Baja Development Corp | $50,000 |
| 3-13-2006 | Baja Development Corp | $20,000 |
| 3-14-2006 | Baja Development Corp | $30,000 |
| 3-24-2006 | Baja Development Corp | $90,000 |

What type of additional loan could Kaiser have been discussing, unless it was more "word vomit" and double-talk from him to cover-up his nonstop perjury?

- Nevertheless – *none of the funds* were ever given to Kenner thru the loan agreement or otherwise – in spite of the government and the Court's representations that the loans from Kaiser's friends & family were to Kenner.

**Kaiser LIED that he was unaware of any other investors in the Hawai'i project other than Kenner before Lehman Brothers was involved in 2006…**

The Court's *M&O at 18* confirmed that "*Kaiser said that between 2003, when he first met Kenner, and August 2006 when Lehman Brothers lent money to the Hawai'i project, he was not aware of any individuals who contributed financing to the Hawai'i project other than Kenner*" (*Tr.1187-1188*).

**FALSE** – Because Kaiser gave 2009 arbitration testimony as follows:

> *Q.  You'd been dealing with Mr. Kenner now for a couple of years?*

> *A [Kaiser]: Yes.*

*Q. Have you ever seen him do anything inappropriate?*

*A [Kaiser]: No.*

Certainly not telling Kaiser about twenty-plus other investment partners <u>could be deemed inappropriate</u>, since he and Manfredi were handling 100% of the paperwork and due diligence for the Hawai'i project (*Tr.1198-1200*), including hosting investor Bryan Berard in late 2004 in Hawai'i for a week.

> *Q: And being in the course of the <u>years you've been over in Hawai'i</u> dealing with this, <u>have you met a lot of investors of Mr. Kenner</u>?*
>
> *A [Kaiser]: Yes.*
>
> *Q: Has this ever been a secret that Mr. Kenner lent this money to Mr. Jowdy?*
>
> *A [Kaiser]: No*
>
> *Q: Was this a transaction that, as your view as an investor was open and disclosed to everyone?*
>
> *A [Kaiser]: It was open.   There was no secret handshakes or nothing like that.*
>
> *Q: Even now, sitting here in May 2009, is there anything you've uncovered, as someone who obviously knows how to investigate, that Mr. Kenner has done anything inappropriate throughout these transactions?*
>
> *A [Kaiser]: No*
>
> *Q: Not one complaint?*
>
> *A [Kaiser]: No*

- Kaiser's 2009 arbitration testimony – again – refuted his revisionary *faulty memory, confusion and mistakes* throughout his 2015 testimony.   It is not reconcilable that he was unaware of the "other investors" – *but met a lot of them*.

Kaiser told the FBI in October 2010 that he met Constantine in 2007.  He validated that he learned about Eufora from "*players*"; *not Kenner* (*See 3500-JK-1-r at 4*).
- This confirmed that Kenner was not involved in any Kaiser solicitation efforts with Eufora – in addition to the two (2) not guilty counts that Kaiser and the government tried to fabricate against Kenner without any evidence; it was confirmed in Kenner's favor by Privitello during his cross examination (*Tr.1492-1493*).

- Also, since Kaiser had no "Hawai'i business" between the August 2006 Hawai'i closing and at any time in 2007 (the discovery period of Jowdy's cabal plans to NOT repay the Kenner and Kenner investors loans) – there is no possibility that after telling the FBI that he learned about Eufora from "players" that it could have happened any time after the Lehman Brothers August 2006 closing.   It had to be prior and in concurrence with Kaiser's 2009 arbitration testimony that "*he met a lot of the Hawai'i investors*" – **BEFORE 2006**…

Kaiser's voluntary 2009 arbitration testimony would have been given **AFTER**:

> 1) Kaiser allegedly was not repaid in Hawaii for his friends & family, 2005 loans,

> 2) Manfredi and Kaiser allegedly "*confronted*" Kenner about the $1 million theft of Kaiser's friends & family funds, and

> 3) Kaiser had not received his $1.9 million in proceeds since the December 2007 closing of their joint project in California.

**Thus -- MAKING NONE OF KAISER'S 2015 TESTIMONY -- BELIEVABLE ABOUT ALLEGED KENNER FRAUDS…**

- After the 2006 Lehman Brothers deal – the only Kenner investor Kaiser met with before the 2009 arbitration would have been Bryan Berard (in 2004 with Berard as a full investor by then) – thus there could not have been any post-2006 meetings that confused his answer other than "intent" to defraud the Court and Jury again.

- Berard – and his best friend Lanie Donlan -- were in Hawai'i with Kaiser and Manfredi for almost a week -- living at the same Kenner rental home.

**Kaiser confirmed that he was working hand-in-hand with Manfredi at all times to collect data to seek funding for the Hawai'i development project – but Manfredi and Kaiser testified that they were not aware of the Constantine involvement…**

The Court's *M&O at 18* confirmed that "*Kaiser testified that…Manfredi was involved in developing the Hawai'i project through collecting data necessary to obtain funding that he shared with Kenner*" (*Tr.1198-1200*).

Assuming that Kaiser was truthful (which takes some faith at this point in his testimony), Manfredi's testimony later in trial that Constantine was not part of any fund raising efforts that he was aware of, was in spite of the fact Manfredi was shown multiple emails at trial that confirm his direct communication with Constantine about multiple and various lenders and lending proposals.

- Kenner did not possess any of the necessary due diligence materials for any lender to begin their evaluation – thus, in order for Constantine's multiple third

(3rd) party lenders to receive due diligence packages – Manfredi and Kaiser (per their-own trial testimony) had to assemble the due diligence packages and participate in each process (dozens of them -- with and without Constantine).

- Thus, if Manfredi was in regular email communication with Constantine, then Kaiser had to know, *unless concealed by Manfredi*?

Kaiser confirmed to the 2015 court that Manfredi was the one person in charge of the due diligence portion of the Hawai'i company, **with him** (*Tr.973*):

> *Q Okay. Between 2003, I think when you said you met the defendant in Hawaii and 2006, what were you doing, either you personally or Mr. Manfredi, with respect to developing that property?*
>
> *A [John Kaiser]: Again, __we__ were still doing the due diligence. I believe we had closed on the first 258 acres and that was in Honuapo, and that was in 2003. Again we were still in the same due diligence period dealing with the governments or the townships, meetings, also laying out with GPS the home sites, the viability, what we were going to use, each particular subdivisions, whether it would be farming or land for homes.*

In fact, after the 2005 Lehman Brothers loan was declined by Kenner, Manfredi and Kaiser's *mutual decision* – Manfredi announced to another potential lender that the Lehman Brothers deal was "*egregious*" and *that was the reason* that the management group (Manfredi, Kaiser and Kenner) decided to "walk away" from the 2005 Lehman Brothers deal.   There was nothing in any email communication from Manfredi to Kenner or otherwise that could substantiate the AUSA Komatireddy's rebuttal summation claims that Kenner put off the Lehman Brothers deal for another year to get Constantine in the deal (*Tr.5996-5997*):

[Komatireddy rebuttal summation]"
> "*He [Kenner] also tells you that Lehman is interested. In 2005 Lehman is interested in investing in Hawaii but Kenner puts them off for another year and he sets up the Urban Expansion loan, a loan that would not have been necessary if he used the Centrum money as he was supposed to or let Lehman come in a year early.*"

Because (supporting Kenner transparency) – Manfredi's email states on August 16, 2005 (*See Recon33-123*):

> "*The deal with Lehman was cancelled by __us__ as being too egregious.*"

Manfredi has no other opinion at the time that is documented any other way about why the 2005 Lehman Brothers loan was turned down.   The Centrum loan (documented thru government witness, Bruce Berreth) produced the following documents, 100% adhered to by Kenner, and under the co-management of Manfredi and Kaiser.

While Manfredi and attorney Najam are managing (separate from Kenner) the Centrum loan acquisition for Hawai'i with the Hawai'i partners' attorneys at Carlsmith Ball LLP, Kenner tells Jowdy via email on July 13, 2005 (only days before the Centrum loan closed) that he needs to deal with Manfredi to agree to a short-term loan amount from the Centrum loan as follows (*See Recon33-7*):

> "*You [Jowdy] might want to follow-up with Chris [Manfredi].  Cell. 5165265010* <u>*Leave me a msg on the imvelocita [Kenner email]*</u> <u>*address about what u work*</u> <u>*out.*</u>"

On the same day (July 13, 2005), three (3) hours later, after Manfredi and Jowdy confirmed the loan amount from the pending Centrum funds to Jowdy, and per the loan agreement that Manfredi confirmed to the FBI about Constantine's efforts, "*Agreement – between PK or LLCs + Constantine -> may have been with Constantine and another person*" (*See 3500-CM-2-r at 1*), Jowdy affirms to attorney Najam and Kenner that the $1,500,000 should be outstanding to Jowdy for no more than "*30 days*" (*See Recon33-124*):

[Jowdy]: "*...and remember it should be in place for less than 30 days*"

Kenner cannot be part of any concealment efforts from Jowdy, Najam, Manfredi (and Kaiser's daily input), and the entire team of Hawai'i partners attorneys at Carlsmith Ball LLP that were part of the Centrum closing efforts with Manfredi and Najam (*See Recon33-124 at 1,2*).

As part and parcel to the lending package for Centrum, Najam, Manfredi and the Carlsmith Ball LLP attorneys had to submit the operating agreement for Big Isle 5, LLC (*See Recon33-125*).   The operating agreement states (*Article 2 – Section 1*), as follows:

> "*At all times, the Company, through it Managing Member Philip A Kenner, reserves the right to borrow,* <u>*lend*</u> *or invest on behalf of the Company*".

Centrum – and Bruce Berreth -- signed off on the Big Isle V operating agreement <u>*before*</u> the loan was completed, *supra.*

The Promissory Note for $3 million that Kenner personally guaranteed (*See Recon33-226*) also highlighted that Kenner utilized the loan as authorized (as written by Centrum and Berreth) – AND **never for his own benefit**:

> *"the proceeds of this note will be used exclusively for commercial and business purposes only"*.

- **It was used exactly as the Centrum agreement documented -- nothing else.**

Following Manfredi negotiating with Jowdy for the release of the $1.5 million loan advance (in accordance with the 2004 Hawai'i-Jowdy loan agreement), Manfredi received $100,000 personal loan from the Centrum proceeds – *approved by Kaiser* – on 7-27-2005; in accordance with the same Little Isle 4 By-Laws that authorized the loans to Jowdy (*See Recon33-70*).  *Please note that Kenner never received any such advance like both Kaiser and Manfredi did throughout the Hawai'i project.*

How could Manfredi have given testimony that the funds were "to be used" to close the Waikapuna parcel – while he was receiving a substantial loan from the proceeds?

In fact – *in real time 2005* – if Manfredi thought that the closing funds were supposed to be utilized for the pending Waikapuna closing (*Tr.2950-2951*), three (3) things are missing -- invalidating Manfredi's nonsensical testimony:

1. There are NO EMAILS from Manfredi or Kaiser to Kenner post-closing asking about the "alleged" misuse of the Centrum funds (a.k.a. "*a WTF message*"),
2. Why would Manfredi be negotiating with Lehman Brothers at the same time – and cancelling the Lehman Brothers Waikapuna only $5 million loan in July 2005 – if there was no need for the Lehman Brothers loan – *with the false caveat that the Centrum funds were supposed to close the property*?  -- and
3. How was Manfredi expecting to close the $4.2 million deal at Waikapuna with the $2,576,364.54 distribution from the Centrum loan?  (*See Recon33-126*).
   - The deal would have been over $1 million short to close.
   - None of it comports with any potential reality – thus fully confirming the fabrication by Manfredi at trial…

- *AND -- Kenner received none of the Centrum funds…*

**Kaiser LIED to the Court claiming he was not repaid for his friends & family $1 million loan – but he received "*back pay*" and "*expenses*" totaling about $816,000 in August 2006…**
- Neither of these is real nor can be substantiated by Kaiser.  It is another bald-faced lie – supported by the government to reach their intended verdict thru known and false means.