The Court's *M&O at 19* confirmed that "*he [Kaiser] said that, following the payout from the Lehman Brothers loan, he was still owed money from the original $1 million investment that he gave Kenner [actually he gave the Hawai'i partners; not Kenner]...*" (*Tr.1221-1223*).

FALSE – Because John Kaiser made up the testimony at trial about the $816,000 that he received in August 2006 (not including the $360,000 more he received thru the signed, "Equity Transfer Agreement" with Kenner – *See Recon33-240*).   Kaiser claimed it was all for "*back pay*" and "*expenses*" (*Tr.988, 1414*).

- An in camera review of the John Kaiser 2006 and 2007 IRS taxes will confirm that he never claimed anything for "*back pay*".  As a New York 20-year Police officer – Kaiser would clearly know that he had to pay taxes on income.
  - o  *Defendant Kenner renews his request for the Court to demand an "in camera" review of Kaiser's 2006 and 2007 taxes to confirm the alleged "back pay" amount – in lieu of full loan repayments to Kaiser friends & family (considering the fact that none of the $1,000,000 belonged to Kaiser at any point in time).*

- Second – Kaiser cannot produce expenses of any significant amount – especially considering he was distributed about $40,000 in the months few before the August 2006 joint venture agreement with Lehman Brothers and Windwalker.
  - o  *Defendant Kenner renews his request for Kaiser to provide the necessary credit card statements to validate the amount of "expenses" he was paid in August 2006 that offsets the difference between the $816,000 he was distributed – and the amount of "back pay" he claimed on his 2006 &/or 2007 IRS taxes.*

- Thus – without either "*back pay*" or "*expenses*" to substantiate his perjury in 2015 (*Tr.988, 1414*) – **Kaiser testimony is perjured**, his "fake collateral agreements" presented in 2014 to the Delaware Chancery Court (assuming full acquisition of Kenner's Baja Ventures 2006 equity are evidence of another forgery and fabrication by Kaiser and people related to Jowdy's cabal) (*mentioned in Document 628*) – and

- It casts definite doubt on Kaiser's fake story about his name being forged on the 2004 and 2005 Constantine-Hawai'i consulting agreements.
  - o  **The Court *cannot* overlook the simple fact that Kaiser produced the two (2) "*ink*" versions of the alleged forged agreements to the FBI and AUSA *on the eve of trial* – FROM HIS OWN HOME.**

**It is an outrageous abuse of investigation responsibilities to not question that paradox...**

**Kaiser continues his LIES about the funds he was paid from the California home sale...**

The Court's *M&O at 19* confirmed that "*he [Kaiser] said that, he invested approximately $1.7 million of his own money in Eufora that Kenner owed him from work on another development project*" (*Tr.1239-1241*).

**FALSE** – Because this contrived testimony is disproven by all of the banking records between Kenner and Kaiser – in the government's Rule 16 production – and ignored (*See Recon33-127 FOLDER and Recon33-128*).

**California renovation project payouts:**
Kaiser was due approximately **$1.9 million** (actually $1.896 million) after his $1.243 million in contributions (from his "friends & family" loans to him, personally) and the approximately $650,000 (actually $653,000) of his share in the 50-50 profits with Kenner.

The following $665,000 were distributed to Kaiser &/or for his uncontested behalf within weeks after the closing of the California real estate sale (*all APP### in Recon33-127 FOLDER*):

- Balance due to Kaiser approximately **$1.231 million** – *after* December 2007 transfers:
    - *See APP010 -- $665,000- 2007-08 Kenner transfers to Kaiser*
        - *See APP011 -- $665k in total transfers for Kaiser from Kenner post-CA closing*

- Balance due to Kaiser approximately **$731,750** – *after* December 2007 Los Frailes transfer:
    - *See APP012 -- $500,000 - Kaiser LOS FRAILES deposit*
        - *See APP013 -- $1mm wire to Gaudet (Frailes) with $500k for Kaiser (confirmed as part of government-forfeiture-1)*

- Balance due to Kaiser approximately **$151,750** – *after* December 2007 thru May 2008 deposit transfers for Arizona house project:
    - *See APP018 -- $580,000 - Kenner deposit transfers for AZ renovation down payment*
    - *See APP019 -- Kenner $25,000 deposit for PV -- BNK-WF-00000661*
    - *See APP020 -- Kenner check #1288 for $25,000 Opens PV (Arizona) escrow -- 15857-16152*
    - *See APP021 -- Jowdy subpoena in AZ case to harass Kenner -- 15857-16152*
    - *See APP022 -- Kenner $330,000 deposit to escrow for the PV (Arizona) house -- 15857-16152*

    o  *See APP023 -- Kenner $235,000 deposit to PV (Arizona) house escrow -- 2008-05-Schwab account Kenner*

- Kaiser OVERPAID approximately **$323,620 (OWING Kenner)**– *after* transfers and expenses paid by Kenner for Arizona house project:
  - *See APP024 -- about $140,000 - Phil Kenner – 8224 personal account checks*
  - *See APP025 -- $243,000 - Kenner wires to Kaiser AFTER AZ purchase*
  - *See APP026 -- Kenner post 2008 transfers to Kaiser*
  - *See APP027 -- $92,370 - Kenner wires to Kaiser AFTER AZ purchase*
  - *See APP028 -- Kenner checks for the AZ renovation project*

- Kaiser OVERPAID approximately **$1,165,620 (OWING Kenner)** – *after* transfers and expenses paid by Kenner for Arizona house project:
  - *See APP029 -- About 192,000 AMEX - 8224 expenses*
  - *See APP030 -- Kenner AMEX records for AZ renovation house*
  - *See APP031 -- About 85,000 Chase Bank credit card - 8224 expenses*
  - *See APP032 -- About 31,000 Citibank -- 8224 expenses*
  - *See APP033 -- $534,00 cash transfers to Kaiser during AZ renovation*

As the real evidence (in the government's possession at all times shows) -- Kaiser was fully repaid from the California project thru direct transfers (to him and on his recognized behalf) and investments in 2008-2012, Arizona project.   By end of 2008 – Kaiser began to "owe Kenner funds" from **OVERPAYMENT** to Kaiser thru the Arizona renovation project expenses advances.

None of the Kaiser California repayment amounts are involved in Kenner's Cabo san Lucas House purchase -- December 2007.   This was another **LIE** by Kaiser thru the government's leading questions (*Tr.1086-1087*):

    *(Discussion at sidebar was concluded.)*
    *(Continued on the following page.)*
    *(The following ensued in open court.)*

    *BY MR. MICHIEWICZ:*
    *Q. Mr. Kaiser, what if anything did Mr. Kenner tell you about the Pedregal [Cabo] house with respect to the other project, the Hermosa Beach?*

    **A [Kaiser]: Mr. Kenner stated that some of my funds from Hermosa Beach were actually used to purchase that house in Pedregal in Cabo San Lucas, Mexico.**

    *9 Q. Do you know when approximately that purchase took place?*

    *A [Kaiser]: I believe it was at the end of '07.*

- Clearly – none of the funds that Kenner used for his Mexico home purchase had anything to do with the independent **FULL** repayment amounts to Kaiser.  It should be noted that Kaiser wanted to buy more property with Kenner – and asked to be part of the Cabo home ownership.  Kenner agreed that if he could come up with half (1/2) of the $1.5 million deposit funds – he could be designated on the Mexico Trust that owned the house as a beneficiary.
    - o **Kaiser never raised the funds.**

In addition to Kaiser being **OVERPAID** -- *NO* portion of $1.5 million-plus of advances Kenner made to Constantine in 2007-2009 were in any way related to Kaiser.  (*See Recon33-18-- Kenner's list*).

- *Even for amusement* – if Kenner had used half of the Kaiser funds and owned the Cabo (Mexico) home with him, Kaiser would then have been OVERPAID by approximately **$1,915,620 (OWING Kenner)**.

Then -- **The government and Kaiser manufactured the "*Shopping List*" &/or "*Grocery List*" testimony at trial** (*Tr.1404-1405*).   The government asked Kaiser how much of the funds Kenner transferred to Constantine for his Eufora investment as a result of the funds Kenner allegedly still possessed from the California project (and unpaid to Kaiser).   It was a complete fraud on the Court and the Jury; with Kaiser and the government fully aware of the planned perjury:

> *Q: And Mr. Kenner told you you [sic] had how much invested, per this <u>shopping list</u>?*

> **A [Kaiser]: Approximately $2 million.**

> *Q: Mr. Constantine said what to you about this grocery list?*

> *A [Kaiser]:  He said he wasn't aware of it.*

- *Even for further amusement* – if Kenner had transferred the balance of the "alleged owed funds" to Constantine and Eufora for Kaiser, Kaiser would then have been OVERPAID by approximately **$3,915,620 (OWING Kenner)**.

- **At what point of absurdity does the government have an obligation to sort thru the known buffoonery -- and not defraud the Court, the Jury and prejudice the defendants?**

**<u>Kaiser and government proffer "Grocery List" fraud on the Court and Jury; prejudicing Kenner...</u>**

Now, when Kaiser testified he allegedly "received" the *"Grocery List"* from Kenner, he further defrauds the Court.  **Kaiser took the list from Kenner's home –** ***COPIED IT*** (and faxed it on December 6th) – and told Kenner about taking the list <u>six (6) days later</u> via text (on December 12th).

| 1106 4 | +16312350308 John Kaiser* | <u>**12/12/2009**</u> 4:43:29 PM(UTC+0) | Read | **I rewrote that list to show him [Constantine], is that ok???** |
|---|---|---|---|---|
| 1106 5 | +16312350308 John Kaiser* | **12/12/2009** 4:48:01 PM(UTC+0) | Read | Call me |

Kaiser's version of the list (which he copied himself six [6] days earlier – *See Recon33-129*) has a fax transfer date of <u>*December 6, 2009*</u>.  This is the same fax date that the Kenner list has on the top.   Thus, after Kaiser COPIED the list in Kenner's office (without telling Kenner), Kaiser faxed copies of the list somewhere – because the two (2) "lists" in evidence have the same fax transfer date on them.

- **This date is six (6) days before he told Kenner he even took it,** *supra.*

The Court's *M&O at 19* identified: "*he [Kaiser] further testified that Kenner gave him a list of the wire transfers pertaining to Kaiser's investments in Eufora and that Kaiser wrote those figures down on a sheet of paper*" (*Tr.1315-1316*).

**FALSE** – Because as noted *supra*, this is not the fact pattern based on the empirical evidence in the government's Rule 16 production – fully misinforming the Court and the Jury again – and *prejudicing Kenner.*

The other indisputable problem this raises for the government and Kaiser's testimony to the Court in 2015 is that Kaiser claimed he was never aware of the consulting payments to Constantine.   **This document clearly IMPEACHES Kaiser again.**

Kenner's list (*See Recon33-18*) has "*Ula + LI4 + NV2006*" written on the bottom right corner of the Kenner loan list for Constantine.   These abbreviations do not mean much to anyone but Kenner – yet <u>*without*</u> Kenner assisting Kaiser in "copying" the *"Grocery List"* – Kaiser juxtaposes the Kenner short-hand to "*Hawaii 2.65m*".

- How could that be possible without Kaiser knowing exactly what the three (3) consulting payment amounts to Constantine were for or why they were even on Kenner's sheet that Kaiser copied (without telling Kenner in advance) to take to a meeting with Constantine without Kenner's knowledge -- when listed as "*1st K*", "*2nd K*" and "*NV2006*" by Kenner?

**Ultimately Counts 2 and 3 are based on a known and false premise by the government and Kaiser to fabricate jurisdiction...**

In February 2009, when Tim Gaarn transferred his personal Eufora Private stock proceeds to Kaiser ($30,000 [Count 2] & $40,300 [Count 3]), the government's proffer and Q&As with Kaiser regarding "*funds still owed to Kaiser from the California project*" is disingenuous and prejudicial.    They should be held accountable for their perversions.

**The Court confirms that Kenner rightly alerted Kaiser that Jowdy had robbed Kenner and Kenner investors – thru the Hawai'i loan fraud and other embezzlements, diversions and unpaid loans...**

The government's opening remarks (*Tr.31*) by AUSA Komatireddy misled the Court and Jury from their opening premise, stating that:

> "*This is when the defendants think up their final fraud, the cover-up, they call it the Global Settlement Fund. This is the fraud where the defendants lie to the investors about who's stealing from them, and find a way to steal from them all over again. The defendants tell the investors that a guy in Mexico named Ken Jowdy, stole their money and ran away with it, and they tell investors that they are raising money for a legal defense fund to pay an attorney to go fight Jowdy.*"

Apparently, Kenner and Constantine were correct, *supra and infra*, about the morass of Jowdy's decade of criminality (by 2009 – and carried forward under FBI Agent Galioto's protection since the June 2009 Kenner FBI proffer).

- The government sat by silently when they absolutely knew of the tens of millions of Jowdy criminal activity, virtually spitting in the face of the Court and jury to claim Jowdy's "victim status".[111]

In fact, **the GSF efforts** (contrived and managed by Constantine) for Kenner and Kenner investors identified amnesia (a.k.a. **CTE**) from the contributors related to the use of funds by Constantine.   In spite of Kenner and Kenner investors' disappointment in the effectiveness of the GSF efforts under Constantine, the government-known "*side-deal*" between Constantine and Gonchar negates any wrongful use of funds by Constantine at any time.   Thus, regardless of the ten-plus witnesses the government "put on the witness stand" during trial to corroborate money Constantine wired to them (unrelated to the GSF

---

[111] It should be noted that the Probation office continued with the Jowdy "victim" ruse thru their 2016 addendum to the Court – when they had the temerity to claim Jowdy -- *as a victim* -- gave testimony at the 2016 forfeiture hearings – and in contradiction to Kenner; **both of which were 100% untrue.**

– but consistent with his Gonchar-side-deal), **the GSF cannot be deemed a fraud by Constantine, and certainly not a part of any conspiracy to defraud anyone.**

- The court should not overlook the fact that the misrepresentation by AUSA Komatireddy about Kenner and Constantine wanting to *start* suing Jowdy with the GSF is *ex post facto*.
- Kenner and Kenner investors had been suing Jowdy for a year in Arizona before the inception of the Constantine-led GSF; in addition to Nevada (by Glen Murray) for unpaid loans[112], and Mexico (the Country) for multiple criminal frauds.

## Kaiser re-direct testimony

**Kaiser LIES about receiving any information about his Eufora investments...**
- **This disregards the fact that Kaiser was represented by Giuliani and Stolper in a one-year effort to reclaim Eufora and deal with any irregularities in the Eufora books and records...**

The Court *M&O at 19* identified: "*he [Kaiser] further said that he had not received any information what had happened to his Eufora investment*" (*Tr.1404-1405*).

**FALSE** – Because **Kaiser was not a Eufora investor at any time**. In addition, independent counsel represented Kaiser. He had direct, daily access to learn about all of the Eufora transactions during the intensive 2010 investigation and litigation that he was instrumental in its daily activities. More importantly -- ***Kaiser did not invest any funds in Eufora*** (only his friends & family). Independent counsel for the AZ Eufora Partners I

---

[112] *See Recon33-130* – In Murray's Nevada complaint *Murray v. Jowdy* for his 2005, $791,000 loan that Jowdy refused to repay – Murray confirmed:

> "*Jowdy had sought and obtained several previous loans with the assistance of Kenner*", and

> "*Murray authorized Kenner to lend Jowdy monies.*"

Thus -- only the 2004 Hawai'i loans and the 2004 Mattias Norstrom loan to Jowdy for $500,000 would have fit this criterion, confirming Murray's full knowledge before 2005 of the Hawai'i loans to Jowdy. Murray hired independent counsel to file his Nevada complaint versus Jowdy in September 2005 – long before the inception of Constantine's GSF.
- The Jowdy 2-day California January 2010 deposition confession at *Recon33-131* – and envelope with $500,000 *un-cashable* repayment check at *Recon33-132* will confirm Jowdy's original $500,000 loan-theft from Norstrom further invalidating the government's opening remarks at *Tr.31* – insinuating Jowdy was an innocent third (3rd) party victim of Kenner and Constantine at any time.

investors – *unrelated to Kenner* – would have confirmed that Kaiser had no funds in Eufora, thru Kenner or thru Kaiser's December 2009 friends & family deposits.

- Thus, nothing about Kaiser's statement has integrity or validity; *certainly nothing that needed Kenner to explain as a non-party to the Kaiser–Eufora relationship.*

### Kaiser LIES confuse even the Court's M&O regarding his "alleged" money in Eufora thru Kenner; which never occurred, *supra...*

The Court *M&O at 19* identified: "*Kaiser said that Constantine agreed that Kaiser had millions of dollars invested in Eufora*" (*Tr.1406*).

**FALSE** – Because independently, two (2) paragraphs later, the Court M&O contradicts this statement by Kaiser by affirming factually (on re-cross-examination) that "*Kaiser acknowledged he received an email from Constantine disputing whether Kaiser had millions of dollars invested in or owned 20 percent of Eufora*" (*Tr.1425*).

As clearly laid out, *supra*, Kaiser's claims of Eufora ownership are **FALSE** based on Kaiser's allegations in 2015 that he had not been repaid by Kenner for the 2007 California real estate project. Kaiser's claims FAIL due to the fully documented repayment transactions in evidence to the contrary; known at all times by the government.

None of the transfers *from Kenner to Constantine* in 2007 and 2008 as "loans" (*See Recon33-18*) belonged to Kaiser at any time. Constantine presented Kenner (not Kaiser) his Las Vegas property deposits as collateral (*See Recon33-133* -- written by Constantine's attorneys at Quarles and Brady LLP).

Then, Constantine changed his mind in 2009 and exchanged the Vegas collateral for a 20% stake in Eufora (*for Kenner alone* – although by October 2010 – Constantine reduced *ex post facto* his offer to 12%, while under bankruptcy-fraud pressures and other uncovered side-deals Constantine tried to cover-up). The Eufora collateral for Kenner from Constantine in Eufora was from Constantine's Eufora equity (not a dilution of any other existing member shares – to Triple Black Diamond Trust) (*See Recon33-134 at 43*).

- **None of the "loan funds" or their residuals belonged to Kaiser at any point in time**, although he begged Kenner to "*be part of it*" just like the alleged "*partnership in Kenner's Cabo home*". Kaiser never paid Kenner for the funds to participate in any of these future endeavors; thus, he was never a Kenner partner.

### The Court confirms that Kaiser was told about Constantine's participation to raise funds for the Hawai'i project – despite Kaiser's best friend and Hawai'i COO

**(Manfredi) exhibiting full amnesia in 2015 -- in the face of Manfredi's own emails with Constantine...**

The Court M&O at 19 confirmed Kenner's transparency: "*With respect to the Hawai'i project, Kaiser testified that he was unaware whether Constantine ever attempted to raise money from others for that endeavor, but he said that Kenner told him that he was involved*" (*Tr.1409-1410*).

Kaiser fully contradicted his own revisionary testimony.  Furthermore, Kaiser's best friend (Hawai'i COO Manfredi) worked hand-in-hand for over a year with Constantine; as proven thru emails (in evidence).   In addition, Kaiser told the FBI in October 2010, that in addition to the paid funding efforts by Tim Gaarn and Robert Gaudet for the Hawai'i project (*See 3500-JK-1-r at 5*):

> "*TC [Constantine] trying to fund $ for Hawai'i...*"
> "*ultimately -> $ came from friend of TC -> $4m Waikapuna closing*"

Kaiser's *faulty memory, confusion and mistakes* (a.k.a. **CTE**) could be the only excuse for the unreliable testimony, yet again – fully assisting the government's concealment theories.

### Kaiser re-cross examination

**Kaiser LIES one last time to the Court about "*back pay*" and "*expenses*" – and introduced the potential of "another loan" (without a shred of evidence – and left to linger by the government who assisted with Kaiser's additional fabrication)...**

Ultimately, the Court's M&O suggested that: "*He [Kaiser] also said that approximately $800,000 that he received from the Lehman Brothers loan was for another loan, expenses, and back pay*" (*Tr.1414*).

**FALSE** – Because after Kaiser's time on the witness stand with repeated and bumbling "*word vomit*" answers to try and re-write his own overly documented testimony and proffers – all under the penalty of perjury in multiple jurisdictions, discussed *supra* -- Kaiser now attempted to claim (for the first [1st] time) there was "***another loan***" that was part and parcel to the August 2006 repayment amounts; not including his signed "*$360,000 Equity Transfer Agreement*" deal of July 2006 with Kenner, *supra*.

The only thing that ended Kaiser's lies to the Court and the jury -- that the knowing government let stand -- was the conclusion of his testimony in 2015.   Virtually none of his self-serving statements could be verified; *yet they remained salacious and prejudicial.*

## Patrick Gonya [113]

**Gonya testified: *"Kenner was not involved in any of Constantine's business"*
(Tr.1289-1295)...**

**Patrick Gonya was paid from funds that were traceable to the Constantine-Gonchar
*"side-deal"* and Constantine's $140,000 of personal contributions to the Ronald
Richards Trust account in 2009...**

As a result, the entire testimony of Gonya was irrelevant to the government's allegation of
the GSF being an object of the conspiracy, since no funds were diverted from the GSF,
pursuant to the full, signed off disclosures by each GSF contributor.

---

[113] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 20*.

*Kenner 13-cr-607 (JFB)*

## Nick Privitello [114]

**Nick Privitello is a non-victim of Kenner in the instant case.**

**Kenner was found <u>not guilty</u> of both charges related to Privitello.**
- **Kenner was entirely absent from dozens of emails and direct evidence of any and all transactions related to Privitello; in fact displaced by Kaiser's direct solicitation of Privitello...**
- **In addition – Privitello participated in two (2) civil lawsuits in 2010 (Arizona) and again in 2011 and re-filed 2014 (EDNY) – represented by independent counsel – versus Constantine and Eufora.**
  - **In spite of the criminal charges for the "exact same" transactions against Kenner – Privitello (nor any of his co-Plaintiffs) decided to sue Kenner in any of the three (3) filed lawsuits...**

<u>**Privitello recorded Kenner in 2012 – contemporaneous with his recordings of Constantine and Ronald Richards – but for another unexplainable reason – the Privitello-Kenner recordings have never been produced...**</u>

The Court's *M&O at 20* confirmed that "*Privitello said that Constantine told him that Eufora was close to signing deals with big banks and convinced him to invest $200,000 for a 1.5 percent stake in the company*" (*Tr.1432-1433*).

<u>**Kenner was clearly not a part of this testimony at trial – in spite of the government charging Kenner.**</u>
- <u>**Spillover prejudice occurred as a result of the unfounded Counts (#5 and #6).**</u>

After prodding by the government to refresh the pre-planned and fabricated story about a $25,000 cabana party in Las Vegas, Privitello and the government suggested (*Tr.1429-1430*):

> *Q. Did he tell you any stories or invite you to anything?*
>
> *A [Privitello]: Yeah, I'm sure he told me some stories, I'm not sure that I can recall them now, but stories.*

- The government knew there was a pre-planned nexus they wanted to draw to Kenner "somehow" – so the continued with their "*wink-wink*" refreshing of Privitello.

> *Q. Does a story about a cabana ring a bell?*

---

[114] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 20-22.*

> *A [Privitello]: Yes. Yeah. After working on his place one night, one of the guys with -- dinner and had some drinks and he mentioned I think in Vegas there is this club or something cost 25,000 to get in.*

>> *MR. HALEY: I'm going to object at this point. I'd ask for an offer of proof, Judge.*
>> *THE COURT: No. I'll allow it as background to how the relationship developed. Briefly. I assume it's not going to be too long. Go ahead.*

> *A [Privitello]: He mentioned it was worth every nickel, getting into this Vegas club, kind of like this crazy pool party and you have your own little cabana and he mentioned it's worth every nickel and to somebody like myself, it's just a long way, to me it could be worth every nickel because I don't have the money to spend on that. I figured he could be making it if he can drop 25 grand on party for the afternoon.*

In addition, the testimony -- yet false, claims at trial about the Privitello transactions stated that Kenner's participation in an unsubstantiated "*$25,000 Las Vegas Cabana Party*"[115] was the reason Nick Privitello considered the Eufora investment "*a good idea*". At a minimum, the alleged conversations with Kenner could only be deemed a "*preparatory act*", if it is found by the Court to have any validity &/or influence over the decision by Privitello to invest independently with Constantine's company **years later**. *See United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181 (2d Cir App – 1988).

**By the time Kenner met Privitello thru Kaiser, Kenner had no involvement in Eufora...**

- Since 2005 -- Kenner had rescinded all Eufora involvement after he transferred his 5.80 percent (%) equity in Eufora to Tim Gaarn who took over Kenner role in Eufora as the Managing Member of AZ Eufora Partners I (the LLC which contained all of the Kenner investor equity and capital accounts). (*See Recon33-3 FOLDER at 35, 21*).

- The only nexus between Kenner and Eufora after the documented 2005 transfers (with Eufora tax records and corporate emails[116] to corroborate the transfers and

---

[115] Defendant Kenner has never attended any such "high-priced" Las Vegas Cabana party, nor is defendant Kenner aware if they even exist. In fact, in order for Privitello to recount the alleged story, the AUSA had to ask a second time: "*Does a story about a cabana ring a bell?*" (*Tr.1429*), finally jarring his *recently fabricated* memory.

[116] *See Recon33-135* -- Eufora CEO C.R. Gentry wrote to the Eufora Board members [August 14, 2009 at 10:24am]:

underlying knowledge of it in real time – in the government's Rule 16 evidence production) was *Kenner role as a "lender"* to Eufora in 2004, 2005 and 2006.

- The 2005 Eufora tax documents confirm Kenner loaned **$106,971** to Eufora before 2005 and by the end of fiscal year 2005, it had been increased by Kenner to **$386,971** (*See Recon33-3 FOLDER at 10*).

- The 2006 Eufora tax documents confirm Kenner had a personal loan of **$386,971** to Eufora, which was **paid off** by the end of fiscal year 2006 (*See Recon33-3 FOLDER at 9*).
  - o Upon information and belief – the Kenner loans to Eufora were paid off thru contributions Constantine made to Eufora by wiring the funds to Kenner in fall 2006 and retiring the Kenner-Eufora debt.

The Court's *M&O at 20* suggested that "*he [Privitello] said that neither Kenner nor Constantine told him that the patents were being held as collateral for a loan*" (*Tr.1434-1435*).


**Kenner was clearly not a part of Eufora or the Privitello transaction...**
There is no reason that Kenner's name should have been mentioned as holding any responsibility to tell anything to Privitello, since Kenner had not had any day-to-day Eufora involvement for years prior to Kenner even meeting Privitello thru Kaiser.

Kaiser told the FBI that by 2007, he (*not thru Kenner*) had learned about Eufora from "*players*" (*See 3500-JK-1-r at 4*).   FBI notes confirmed:

---

*"Attached is the most up to date version of the Member registry for AZ Eufora Partners I LLC. I created this after the review of deposits from Mia, discussions with Phil Kenner for transactions through 2005 and Tim Gaarn for transactions after 2005".*

**"Phil [Kenner] is not a member of Eufora or AZ Eufora Partners I LLC."**

*See Recon33-4* -- Eufora CEO C.R. Gentry wrote to Constantine [February 4, 2010 at 8:54am]:
   "*I [Gentry] 'believe' the current equity stake based upon discussions with you and discussions with Tim Gaarn in the past*".
   - o Kenner is never mentioned in this capacity by the Eufora CEO.

Eufora CEO C.R. Gentry wrote to Constantine previously [November 6, 2009 at 4:02pm]:
   "*I have also attached the member registry I created for AZ Eufora Partners I, based upon numerous conversations with Phil for the original transactions and Tim [Gaarn] for transactions since 2005*".
   - o Kenner is never mentioned in any contradicting Eufora communication after his 2005 equity transfer to Gaarn – until late 2008 when Eufora was looking for additional documented short-term loans from Kenner -- of which Kenner granted anther $30,000 at the time to Eufora (in evidence).

*"JK [Kaiser] heard about Eufora through players/guys that Eufora – company will be big one day"*

**<u>Constantine confirms on an FBI recording with Privitello that Kaiser was directing Privitello's transaction so he could steal some of Privitello's equity from his $200,000 contribution (nothing to do with Kenner on either end)…</u>**

The Court's *M&O at 21* suggested *"Constantine also told Privitello that:*

> *…the reason that this – your money was directed to the lawyers office instead of us is because if we saw how much money was going directly to us, we'd know exactly where it came from and who, right?…But if it goes to Ronald Richards' office and them then we get one wire from Ronald Richards, then we have no idea who the money came from into Ronald Richards, then I can put it in whatever name he [Kaiser] wants without having to explain sh\*\*" (GX-503.3).*

- Every suggestion in the conversation between Kaiser and Privitello was that Kaiser, ***never Kenner***, was directing the fund transfers between Constantine and Privitello thru the Ronald Richards Trust account, so *Kaiser could rob* yet another "friends & family" deposit to anything he thought (by December 2009) he could get his hands on to repay the friends & family money he stole from the Hawai'i repayments in 2006 and the California repayments in 2007-08.

Kaiser was in deep sh\*\* and beginning to hear that he was getting sued by his friends & family.   Kaiser was desperate to create something to stem the tide of demands for repayment – **100% attributable to Kaiser's personal greed.**

After Kenner and Kaiser were no longer talking regularly in 2011 (as Kaiser began communicating with Jowdy about getting Hawai'i money repaid in his desperation to create any deal to save his proverbial behind), Kaiser admitted to Kenner that his doctor friends in Long Island NY (Frank Sconzo and Willy Krueger) were about to start suing him for money they gave him years before; and Kaiser kept to support his lifestyle expenses:

| 1997 5 | +16312350308 John Kaiser* | 2/17/2011 8:40:28 PM(UTC+0) | Read | **On the phone w / willy [Krueger] he is going to be suing me** |
|---|---|---|---|---|

- Through information and belief, Kenner knows that Krueger, Sconzo, Tesoriero and the balance of Kaiser's friends & family do not know that Kaiser kept the funds they originally gave him – once he received the deal repayments.   Kaiser has utilized the Kenner EDNY case to blame Kenner for allegedly keeping the un-

repaid funds. This is *despite the fact that Kaiser's own bank records confirm that he kept all of his friends & family money after Kenner properly and promptly repaid him, in real time.*

### Privitello cross-examination

### Privitello confirmed on cross-examination that Kenner was NOT involved in the December 2009 transaction…
- **Nonetheless – the government charged Kenner with those overt acts – creating full spillover prejudice.**

The Court's *M&O at 21* confirmed that *"On cross-examination, Privitello agreed that Kenner was not involved in the e-mail communication between Privitello and Constantine regarding Privitello's investment in Eufora…and Likewise, he [Privitello] said that Kenner never promised him a stake in Eufora in return for his investment"* (*Tr.1488-1492*).

- At no time did Kenner participate in &/or benefit from the Privitello transactions. Instead – Kenner gave testimony (commensurate with Tyson Nash's testimony at trial) that others involved in the 2010-2011 investigation of Constantine and all things Eufora instructed Privitello and the other December 2010 investors (friends & family of Kaiser) to "not" take their investment funds back from Constantine &/or Eufora, in order to keep more pressure on Constantine during the pending litigation efforts in Arizona and New York (2010-2011).

The Court needs to ask who concluded for the government that they should charge Kenner with those two (2) overt acts?   Privitello was the only witness (without Kaiser's "word vomit") who could confirm any Kenner involvement in the Privitello December 2009 investment – and he denied that Kenner was involved,
- **It is pure ethical neglect leading to prejudice spillover & jury confusion.**

Considering the not guilty verdicts for Kenner and the pure absence of any evidence (coupled with Privitello's trial statements of Kenner non-involvement) - the government *"used"* Privitello during their various Q&A tangents to claim that Kenner and Constantine were conspiring to "screw" Privitello out of his investments by exploiting a **100% unrelated** text from Kenner to Constantine on 11-13-2009, *hi-lighted infra.*

[Kenner rely to Constantine – hi-lighted]:



| 124 80 | +16023635676 Tommy Constantine* | 11/13/2009 8:25:27 PM(UTC+0) | Sent | I'll yell MetaBank as I kick nick in the balls. |
|---|---|---|---|---|

- This disregarded the fact that no communication between Constantine, Privitello and Kaiser was documented to occur until weeks later.

Now -- the Government grandstanded on the simple fact that "*this text*" was the "*smoking gun of corroboration*" that Kenner and Constantine were ready and willing to abuse Privitello and his Eufora investment money.

The government – thru AUSA Komatireddy – identified during rebuttal summation (fully knowing that the defense could not refute the wickedness of their false claim) (*Tr.5961*):

> "*Mr. Privitello testified that it was Kenner who told him about Metabank. Now, there is no reason to think that Mr. Privitello saw that text message that explicitly said Metabank. That is a text message between Kenner and Constantine. There is no reason to think that he was tailoring his testimony, **but his testimony is corroborated by that text message**.*

**Prosecutorial misconduct:**
The government was 100% aware of the fact that the text was sent by Kenner during a civil deposition of Nick James (California civil case: *Kenner v. Nick James* – a former Kenner employee who stole $50,000 from Kenner and refused to repay it).

During the Nick James deposition – Kenner joked with Constantine that after *Nick James* was sweating after getting caught in a series of infidelity lies and contradicting evidence, Kenner was going to celebrate in reference to a "*METABANK text*" that Constantine had sent Kenner less than one (1) minute earlier (which Kenner included in his *Kenner v. Constantine* Adverse Proceeding in the Constantine 2012 bankruptcy case – *See Recon33-136 at 7*).

**[Constantine text to Kenner at 8:24:30pm]:**



| 108 03 | +16023635 676 Tommy Constantine * | 11/13/20 09 8:24:30 PM(UTC +0) | Read | We just got MetaBank to do our deal. 28M total customers potentially paying us $5/mo. |
|---|---|---|---|---|

**[Kenner reply to Constantine *57 seconds* later – hi-lighted]:**



| 12480 | +16023635676 Tommy Constantine* | 11/13/2009 8:25:27 PM(UTC+0) | Sent | I'll yell MetaBank as I kick nick in the balls. |
|---|---|---|---|---|

- Clearly – and known at all times by the government – this text had **ZERO** to do with Nick Privitello.

- Perhaps – the emanation of the Privitello-METABANK story was fabricated to back itself into the "METABANK" text theory by the government.

Hours later – during the same Nick James California deposition, Kenner's girlfriend asked Kenner about Nick James' conduct during the known lies:



| 10808 | +18134516805 R******* | 11/13/2009 11:05:03 PM(UTC+0) | Read | **How is Nick [James] acting? Scared?** |
|---|---|---|---|---|

Kenner replied – hi-lighted:



| 1248 3 | +18134516 805 R******* | 11/13/2009 11:08:10 PM(UTC+0) | Sent | **Nervous.** I reprimanded him once on the record about scoffing at an answer. LOL |
|---|---|---|---|---|

Two (2) minutes later – Kenner sent the same message to Constantine about **Nick** James:

| 12485 | +16023635676 Tommy Constantine* | 11/13/2009 11:10:02 PM(UTC+0) | Sent | **Nervous nick** |
|---|---|---|---|---|

- Clearly the government tried to use the ***Nick*** James texts during his "*nervous*" deposition time with Kenner and twist it to have something to do with Nick Privitello.
  - o **FALSE, misleading, prejudicial -- and the government knew it.**

Nonetheless, AUSA Komatireddy tried to introduce this during Privitello's direct testimony, but they got their signals crossed.   The government decided to continue with the "*nervous Nick*" theme anyhow in Komatireddy's rebuttal summation.

Privitello direct testimony under examination from AUSA Komatireddy (*Tr.4743):*

> *Q. Ever heard the nickname **Nervous Nick**?*
>
> *A [Privitello]:  No, I have not.*
>
> *Q. Okay.*
>
> *A [Privitello]:  Should I have?*

Yet, the pre-scripted "*nervous Nick*" theme was replayed during Komatireddy's rebuttal summation (*Tr.5963):*

> *"And you can tell that **Nick Privitello, Nervous Nick**, is a little nervous about the investment because he told you that that the $200,000 was his life savings."*

**Brady violations**:

The rebuttal summation claims that the $200,000 that Privitello invested with Constantine and Eufora "*was his life savings*".   Yet – the government intentionally withheld exculpatory information from their Rule 16 production of Kaiser and Privitello fabricating fake purchase agreements for a $250,000 investment in another Mexico project (*See APP014 - Recon33-127 FOLDER -- at 3-12*) – solicited solely by Kaiser (only weeks after Kaiser's initial $500,000 investment in Frailes from his California project profits (*See APP011 - Recon33-127 FOLDER -- at 3*).   It appears that Privitello was a wealthy and successful individual regardless of his fabricated trial persona.

As the Court is aware, the *Brady* materials extend to "evidence that is useful for impeachment, i.e., having the potential to alter the jury's assessment of the credibility of a significant prosecution witness"; with both Privitello and Kaiser fulfilling that description with specificity.

"[*Brady*] Evidence is favorable to the accused if it either tends to show that the accused is not guilty or if it impeaches a government witness.   To the extent that a prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation, grounded in the 14[th] Amendment, to disclose that evidence to the defendant.  Information coming within the scope of this principle includes not only evidence that is exculpatory, i.e., going to the heart of the defendant's guilt or innocence, but also evidence that is useful for impeachment, i.e., having the potential to alter the jury's assessment of the credibility of a significant prosecution witness".   See *United States v. Gil*, 297 F.3d 93 (2d Cir 2002).

With both Counts 5 and 6 (Privitello wire frauds) and the underlying Kaiser-government "forgery" allegations, the withheld "fabricated" Frailes contracts (by Kaiser) and the Kaiser-Privitello fraud to the FBI in 2014 (*See 3500-JK-7 and 3500-NP-5 at 2*), substantiates the necessity that "the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the state, either willfully or inadvertently; and prejudice must have ensued." *Id*.   **All elements are met in this instance, harming the defendant**.

**Discovery misconduct**:
"The government is reasonably expected to have possession of evidence in the hands of investigators, who are part of the 'prosecution team'." *Id*.  FBI agent Galioto received the information from Nick Privitello, himself and *selectively* removed certain documents from the voluminous Privitello evidence, before disclosure to the defendants.

**The perfunctory "nervous Nick" and "METABANK" misrepresentations were a text-book "bait-and-switch" on the Court and the Jury...**

It was obviously pre-planned, based on the empirical evidence that had to be specifically misconstrued, and intended to cause prejudice and harm to the defendants; when known at all times as wholly untrue.

The other testimony the government wants the Court to ignore is the fact that in December 2009; Kaiser was dealing directly with Constantine and Privitello.  Kaiser apparently "saved" several investors from getting bought out of the Eufora deal (that the government now claims as worthless for money judgment and restitution issues).  Kaiser convinced investors not to take money ten (10) years ago; not Kenner.  Even though the government claimed the METABANK statements were the "hook" that got Privitello (notwithstanding Kenner was not involved with Privitello at that time), it was Kaiser's recognition of the METABANK deal with Constantine that convinced Kaiser to tell all of the investors to "not take the buyout deals".   Privitello's friend, John Kaiser, admitted it in 2015 (*Tr.1065-1066*):

> *Q Prior to getting on the phone, did you have a conversation with Mr. Constantine about the people that he was about to call?*
>
> *A [Kaiser]: Yes.*
>
> *Q What, if anything, did he say?*
>
> *A [Kaiser]: He was talking about getting rid of some of the hockey players from Eufora, that they were -- that the majority of them were broke and they were desperate for money.*
>
> *Q Did he say or mention who?*
>
> *A [Kaiser]: Yes.*
>
> *Q Who?*
>
> *A [Kaiser]: First was Bryan Berard. The second one was Greg DeVries. The third one was Jason Woolley.*
>
> *Q Had you met these gentlemen before?*
>
> *A [Kaiser]: Yes.*
>
> *Q When he said he wanted to get rid of them, what, if anything, did he say he was going to do to get rid of them?*

*A [Kaiser]: He said they were broke and he said he would buy them out for 50 cents on the dollar.*

*Q Did you observe whether or not he spoke to anybody on the phone?*

*A [Kaiser]: Well, first I said, Why the hell would you do that?*

*Q Why did you ask him that?*

*A [Kaiser]: Because I said the company's just about to make it. And he said, I have more investors, I need money.*

*Q What made you think that it just about to make it?*

**A [Kaiser]: Because I'd just seen all the documentation with the other bank for the deal, the pending deal with <u>Metabank</u>.**

The government cannot get straight who is promoting the METABANK deal.   It was clearly Kaiser, by his own testimonial admission; *never Kenner*.

### Allison Ressler [117]

Ms. Ressler was an attorney who Constantine paid with funds from the Ronald Richards Trust funds in 2009.

Those funds were part and parcel to the Constantine-Gonchar *"side-deal"* – thus nothing related to Ressler's testimony &/or her presence to corroborate the funds Constantine paid her – unrelated to the GSF – had anything to do with Kenner – any provable and underlying conspiratorial acts.[118]

---

[117] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 22.*

[118] With Constantine's 100% control of the GSF transactions at all times (*See Recon33-19*) – nothing could be attributed to Kenner as a beneficiary or a co-conspirator related to the Ressler funds.

### Ricardo Bianciella [119]

*Mr.* Bianciella's testimony was unrelated to Kenner.

Bianciella had previously handled litigation for Constantine in 2007-08.

Although unrelated to Kenner, Constantine made two (2) sales in 2008 of his Eufora private Stock to non-victims Sergei Gonchar on 2-29-2008 and Mattias Norstrom on 3-19-2008.

These funds are attributable to Constantine's April 2008 payments for his prior legal fees with Bianciella.

The Court should note that Rule 16 evidence possessed the Norstrom text communication between he and Kenner fully verifying Norstrom's implicit knowledge that he was buying his new Eufora equity from Constantine Management Group.

After the text communication between Kenner and Norstrom – Norstrom signed off on the 2008 transaction directly with Wells Fargo Bank to instruct them to send the funds (*See Recon33-228*), *infra*.[120]

**[The remainder of this page left intentionally blank]**

---

[119] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 22*.

[120] The Court must be aware that despite Kenner's Power of Attorney status at Charles Schwab (only for the Kenner clients) – Kenner was *only* allowed to send the wire instructions.   Each client had to fully verify the *amount of the loan* and the payee for the funds to be released.   No client could have found out at any time after the money was released -- *unless Kenner somehow transferred the clients' phones to his number and impersonated the client to both Jim Graham (clients financial advisor) and Charles Schwab (the clients' institutional custodian).*

• **Clearly – this never happened...**

Norstrom and Kenner text the day of the Eufora wire transaction (as always for client verification) – March 19, 2008:



### Eric Edenholm [121]

**Mr. Edenholm's testimony was not relevant to Kenner.**

**Edenholm sold an airplane that Constantine used thru the GSF to repay Joe Juneau[122] for his Avalon investment (airpark building – as mentioned to McKee in footnote below).  Tyson Nash also verified the GSF use for this purpose (*Tr.1919-1921*).  The transaction saved the GSF contributors $100,000 with the planned Juneau buyout from his original $550,000 Avalon investment.  Juneau signed a settlement agreement with Constantine for the transaction.**

---

[121] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 22.*

[122] Juneau was identified by Jay McKee in his May 9, 2009 texts with Kenner as one of the "3 black sheep" [with Nolan and Moreau] related to the overall GSF resolution efforts:

[McKee text in BLACK – Kenner responses in RED – hi-lighted]

| | | | | |
|---|---|---|---|---|
| 7043 | +17168034903 Jay McKee* | 5/9/2009 2:12:22 PM(UTC+0) | Read | Hey, also, could u email me what the 3 black sheep are getting in the end result, as well as Tommy bullet points they had 2 agree too.. Tks |
| 8269 | +17168034903 Jay McKee* | 5/9/2009 2:32:11 PM(UTC+0) | Sent | Tommy said you will get 1/10th of everything that is acquired of theirs which includes 20% (2% for you) of the airpark building, 1/10th of their 3.64% of their Eufora shares (.364% for you which puts you just over 1% in Eufora) and then a small piece of the jet which TC is still crunching numbers on but it will probably be 1% of it. |
| 8270 | +17168034903 Jay McKee* | 5/9/2009 2:35:46 PM(UTC+0) | Sent | TC will send you the bullets they agreed to but has to wait till it's actually signed. Should be a day or two. They have only agreed by email so far. He will also send you the media summary but he wants you to convince the owner of Chef's to send him the tomato sauce Fed Ex. |

- As the Court recalls the entire May 9, 2009 text conversation between Kenner and McKee was completely forgotten during his *faulty memory, confusion and mistakes* (a.k.a. – CTE) testimony (*Tr.1821-1824*).
- The government told the Court (*Tr.1846*) that McKee was only giving testimony related to his GSF involvement – thus, **McKee could not have been a victim in the instant case of concealment** – considering his extensive, real-time communication with Kenner discussing every detail **in recap** of the dinner that just concluded with McKee, his wife, Constantine and Kenner in Buffalo, NY.
  - o The entire communication is located in the McKee section of this Reconsideration motion (*beginning at 249*).

*Kenner 13-cr-607 (JFB)*

**The remainder of the funds transferred between the Ronald Richards Trust account and Edenholm are covered by the Constantine-Gonchar "*side-deal*" funds, thus have no relevancy to any alleged GSF conspiratorial actions.[123]**

**Kenner had no transactions with Edenholm.**

---

[123] With Constantine's 100% control of the GSF transactions at all times (*See Recon33-19*) – nothing could be attributed to Kenner as a beneficiary or a co-conspirator related to the Edneholm funds.

### Jeff Bailey[124]

**Mr. Bailey loaned Constantine mortgage funds for his acquisition in the Avalon (airpark) building – which Kenner was not a participant in.**

Each of the transactions between Constantine and Bailey were detailed in the McKee text communication (*supra*), the face-to-face meetings with Constantine, the pre-disclosure email language, and finally -- the signed off disclosure emails.   Thus, there is noting related to the transactions that constructed any portion of a conspiracy by concealment.[125]

---

[124] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 22-23*.

[125] With Constantine's 100% control of the GSF transactions at all times (*See Recon33-19*) – nothing could be attributed to Kenner as a beneficiary or a co-conspirator related to the Bailey funds.

## John MacDonald [126]

**Mr. MacDonald was the corporate comptroller at Playboy.**

**According to MacDonald, several of the 2008 transfers received by his office originated from Kenner.**

**If that were true, 100% of the funds from the 2008 "loan advancements" (to Constantine) paid directly to Constantine's creditor were part and parcel to the "grocery list" loans Kenner provided Constantine in 2007-2008.[127]**

**There is no charged conspiratorial behavior for Kenner's loans to Constantine &/or the payments made to Playboy or a myriad of additional Constantine third (3rd) party creditors.**

Kenner noted on the "grocery list" loans document in evidence:

> **PEII (Playboy Enterprises):**
>
> o  *9-12-2008*     *$56,919.78*
> o  *5-3-2008*      *$8,000*
> o  *6-18-2008*     *$27,819.05*
> o  *9-17-2008*     *$10,543.58*

These transactions **do not have** anything to do with Kenner investors, nor do they have any relation to anyone else but the documented loans to Constantine.

Kenner confirms the underlying loan amounts and the payee.

---

[126] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 23.*

[127] *See Recon33-18 –* Kenner *"grocery list"* loans to Constantine.

### Jay McKee [128]

During the 2015 trial, the government confirmed during a sidebar discussion that they alleged that *Jay McKee was only an alleged victim of the GSF scheme*.   The underlying issue with the alleged criminal scheme was that McKee – like others – were not aware of the various "*use of funds*" -- as solely distributed and managed by Constantine (never Kenner).

The government's confirmation of this took place as follows – *Sidebar discussion – Tr.1846:*

> THE COURT: *Everyone can be seated. Mr. McKee, you can take your lunch break, thank you.*
> *(Witness leaves the courtroom.)*
>
> THE COURT: *What's the objection?*
>
> MS. KOMATIREDDY: *Your Honor, we object based on relevance. We also objected because **Mr. McKee is here as a witness with respect to the Global Settlement Fund**. He's not alleged to be a victim of the Eufora fraud in this case.*

- **Jay McKee is not a member of the Hawai'i partners or the Cabo san Lucas investment thru Jowdy.**

**McKee discussed GSF with Peca – also spoke to his wife – before someone in his family returned the authorization email for the use of funds...**

Jay McKee confirmed to the government that he also spoke with his wife and former teammate and friend – Michael Peca[129] – after the GSF presentation by Constantine and Kenner at dinner in Buffalo, N.Y. on May 8, 2009 (*Tr.1817*):

> Q. *Did you ultimately decide to participate?*
>
> A [McKee]:  *I did.*
>
> **Q. Why?**

---

[128] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 23.*

[129] Michael Peca was the only teammate of McKee's that participated in Constantine's GSF, thus, Peca and McKee spoke directly after the full-text Kenner-McKee communication of May 9, 2009, **leaving nothing unknown to McKee, and conversely now to Peca based on McKee's first-hand testimony.**

*A [McKee]: I believed in what they said. I felt we would have had a chance to get some money back. I obviously wasn't happy with nothing being achieved in the property [Diamante del Mar] that I invested half a million dollars into. **So after talking to them my wife and I went home and talked about it, I talked to some other former teammates**, and thought that this would be the best course of action to recoup some money.*

After the alleged follow-up discussions, McKee authorized the wire transfer for the GSF contribution.   Immediately afterwards McKee (*or someone from his home – perhaps unknown to him as he testified*) returned the authorization form, which explained the use of funds -- as "***ACKNOWLEDGED and APPROVED…***" (*See Recon33-37 FOLDER*):

These specific terms of use for Constantine were, as follows:

*Per our conversation, please acknowledge your approval and authorization for me [Kenner] to have transferred $250,000 to Attorney Ronald Richards` Trust Account for your proportionate contribution to the Global Settlement Fund.   In addition to the fund paying for **various legal fees**, PR Agency Fees, as well as other protective advances and settlement costs, you will be receiving transfer of membership agreements from Tommy for acquisition of additional interest in <u>Eufora</u>, LLC as well as your new LLC and operating agreements reflecting your ownership interest in <u>Avalon Airpark</u> real estate Project, the <u>Falcon 10 Aircraft</u>, and the <u>two Palms Place condominium units</u>.   You may not remember Tommy or I mentioning the Palms units in our conversation.    In any case, because Moreau and Tommy settled that case as part of the Global Settlement, he has graciously elected to include you as a beneficiary in the significant equity that exists in those two units as part of this transaction.    As we discussed, instead of throwing money away only on legal fees, this strategy, which effectively acquires significant assets while providing a legal remedy, is by far our best solution.*

*Tommy has requested from all of us and will provide to us, written documentation of every element of this transaction.    Please respond, **ACKNOWLEDGED and APPROVED**, to this email accordingly ASAP.*

On May 18, 2009, Jay McKee responded, "*Acknowledged and approved…*".   McKee did not raise a single issue of confusion at that time. *See Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A.*, 461 Fed. Appx. 61; 2012 U.S. App. LEXIS 3012.

In fact, McKee received another full disclosure email from Constantine the same day (*See Recon33-137*):

*From: Tommy Constantine <tommy@eufora.com>*

*Sent: Monday, May 18, 2009 10:33 AM*
*To: nicjay74@aol.com*
*Cc: Phil Kenner*
*Subject: Global Settlement*
*Attachments: AZ Eufora Partners LLC McKee 5.4.09.xls*

*Nicole and Jay:*

*You will be receiving a Transfer of Membership Agreement for your increased interest in Eufora, LLC from our CEO (C.R. Gentry) later this week or next week at the latest. We just have to wait for the other side to sign the Transfer docs as part of the settlement, which is supposed to be in the next few days. In the meantime, this email shall serve as written confirmation that you will be receiving 1/10th of the interest that we acquire from Nolan, Juneau and Moreau with respect to Eufora. **Specifically, you will be receiving an additional .364% which is 1/10 of the 3.64% interest that they currently own or owned. The attached excel spread sheet shows your current ownership interest and the interest that we are acquiring from the three of them as part of the settlement.** The dollar amounts on the right are the current value of those interest at the $20M valuation (for the whole company). Again, your interest is 1/10 of that and will be added to the .70% you already own.*

*Additionally, Juneau and Nolan owned 10% each (20% total) of the Avalon Airpark project. We are buying out their 20%, so you will also receive 1/10th of this interest (2%). It is currently valued at $3.3M and the office space is currently being rented by Eufora. You will also be receiving an LLC and operating agreement reflecting your new proportionate share of ownership of this building.*

*Frankly, although this one is more of a luxury than an investment, you will also own 1/10th of 20% (2%) of the Falcon 10 airplane. It is worth approximately $1M but will be very difficult if not impossible to sell. In any case, this will not cost you guys anything going forward. Ultimately you guys should take advantage of the fact that we now all own an airplane together and when it's geographically feasible, you guys should use it to make owing a piece of it worthwhile. Just let me know whenever you want to use it. You just have to pay for the hourly costs for fuel and the daily costs for the pilots and landing fees.*

*Finally, as Phil and I stated, I also settled the Palms condo issue with Moreau as part of this global settlement transaction. Moreau had absolutely no right to sue me for the Palms units and I would have crushed him in that lawsuit because we had a signed agreement when he bought it. Nevertheless, since we got that issue resolved as part of the settlement as well, I have elected to share in the ownership of those units and the equity that exists in them with all of the great partners that have stepped up and helped us fix this problem with all these problem individuals. Specifically, these Palms units are a one bedroom and an adjacent studio on the 31st floor with a strip view. They are worth approximately $1.5M today and were*

> *worth $1.8-$2M some time ago. I believe they will recover in the future and be worth more than they are today. In any case, you will also be receiving an LLC and operating agreement reflecting your new proportionate ownership of these units. Although Juneau, Nolan and Moreau did not own any interest in these units, to keep things simple, I will just match what we are doing in the Avalon project so you will also receive 1/10th of a 20% interest in these (2%).*
>
> *Please do not hesitate to call me if you have any questions and please just to follow the program in terms of documentation.*
>
> *TC*
> *(602) 363-5676*

McKee actually told the trial court that he really did not even remember the "*ACKNOWLEDGED AND APPROVED*" authorization despite it clearly was sent to his email address, received, and responded to by someone with access to *his* email account.

- At a minimum – wouldn't that make someone related to McKee's email account responsible for the authorization, as detailed? (*Tr.1859-1860*).

No email to Kenner or Constantine ever followed from McKee or his wife – *or any other contributor to the GSF overall actions* -- after each and every person returned the **AUTHORIZATION** – *not one*.

Either **CTE** of *faulty memory, confusion and mistakes* was to blame for McKee's clearly erroneous testimony in contradiction to everything in the government's pre-trial possession. The government never stopped the 2015 proceedings to correct the known-false McKee testimony, or any of the overabundant mis-statements.

At the 2015 trial, McKee confirmed that based on his memory at the time that he thought the entire GSF was to ONLY sent funds to Ronald Richards to sue Jowdy – clearly contradicting his authorization email, *supra*, and not "***various legal fees***" (*Tr.1820-1821*):

> *Q. Did either Mr. Kenner or Mr. Constantine explain or tell you that any money from the Global Settlement Fund would be used to pay any lawyers other than Ron Richards?*
>
> *A [McKee]: No.*

Then, at least as planned by the government and expecting McKee's suborned perjury or lack of memory about the use of funds, the government led McKee thru a series of questions intended to **CONFIRM** the **CONCEALMENT** of the actual use of funds, per the government's prosecutorial theories.

**McKee claims no knowledge of the GSF use of funds as specifically outlined in the AUTHORIZATION email (*Tr.1821-1824*):**

*Q. In addition to the fund being for -- sorry. Let's go on the rest of that. You will be receiving transfer of membership agreements from Tommy for your acquisition of additional interest in Eufora, LLC, as well as your new LLC and operating agreements reflecting your ownership interest in the Avalon Airpark real estate project, the Falcon 10 aircraft and the 2 Palms Place condominium units. First of all, this Air Park, the Falcon and the Palms condominium units, did Mr. Kenner or Mr. Constantine mention those things before you gave them money?*

**A [McKee]:  I don't recall those, no. I don't recall those.**

*Q. In your conversation with them in the restaurant, did they mention those things?*

**A [McKee]:  Not that I recall.**

*Q. In this e-mail where it says you're going to get transfer of membership agreement for an interest in Eufora, did you intend for any of your money in the Global Settlement Fund to be used for Eufora?*

**A [McKee]: No.**

*Q. Would you have given any money to the Global Settlement Fund if you had been told that any portion of it would be used for Eufora?*

**A [McKee]:  No.**

*Q. Did you intend any of your money in the Global Settlement Fund Tommy Constantine used for a Falcon 10 aircraft?*

> *MR. HALEY: I would object again just leading nature.*
> *THE COURT: Again, you can't ask these questions that nonleading way so I'm going to allow it. There's no way to cover these items in a nonleading way.*
> *MR. HALEY: Thank you.*

*Kenner 13-cr-607 (JFB)*

Then, for further emphasis by the government once McKee failed to recall any of the authorized uses or his text conversation with Kenner, *infra*, the government asked McKee the same questions ***again*** *– this time –* receiving a more firm ***NO*** response for each of the approved uses.

McKee denied 100% of what was discussed at the GSF dinner meeting on May 8, 2009 (*Tr.1823-1824*):

> *Q. Let me ask it again. Did you intend for any of your money in the Global Settlement Fund to go to a <u>Falcon 10 aircraft</u>?*
>
> *A [McKee]:  No.*
>
> *Q. Would you have given money to the Global Settlement Fund if you had been told that any of it would go to a <u>Falcon 10 aircraft</u>?*
>
> *A [McKee]:  No.*
>
> *Q. Would you have -- did you intend any of your money in the Global Settlement Fund to go to <u>two Palms Place condominium units</u>?*
>
> *A [McKee]:  No.*
>
> *Q. Would you have given any money to the Global Settlement Fund if you knew that any portion of it would go to pay for <u>two Palms Place condominium units</u>?*
>
> *A [McKee]:  No, I would not.*
>
> *Q. This e-mail says that you would be getting an interest in these things. Why would you be getting interest in these things?*
>
> *A [McKee]:  I don't have an answer.*
>
> *Q. Did they explain either Kenner or Constantine explain to you?*
>
> *A [McKee]:  Not that I recall, no.*

If McKee were 100% truthful about these critical issues (or in turn did not "*fail his memory test*"), which played a heavy role in the conspiracy conviction of concealment by Kenner and Constantine – it would be appropriate -- ***if not for the following fully***

*detailed and 100% contradicting conversation between Kenner and McKee immediately after the May 8, 2009 dinner* (*infra*):

McKee testified (*Tr. 1815*):

> Q. And at the time that you were having this conversation and deciding to give money to the fund, what did Mr. Kenner and Mr. Constantine tell you about how the money would be used?

> **A [McKee]:** *I was under the impression that the money would be used to buy Ronald Richards for his expenses to again go after Ken Jowdy for the northern property in Mexico.*

**In spite of McKee's gross CTE symptoms in front of the Court (*or other undue influences*) -- McKee conducted a full text conversation with Kenner immediately after the May 9, 2009 dinner...**

- **At no time does McKee act aloof or concerned that he had not heard the "same" text details during the dinner meeting that had just completed only hours before...(prior to his acknowledged follow-up independent communication with Michael Peca about the GSF):**

McKee in BLACK (read) -- Kenner responses hi-lighted (sent):

| | | | | |
|---|---|---|---|---|
| 7032 | +17168034903 **Jay McKee\*** | 5/9/2009 3:46:20 AM(UTC+0) | Read | **Thx 4 making the trip bud.. Took in alot from the talk tnite.. Drive safe, be in touch..** |
| 8255 | +17168034903 Jay McKee\* | 5/9/2009 3:55:39 AM(UTC+0) | Sent | Good stuff |

Then, McKee continued by re-engaging eight (8) hours later:

| | | | | |
|---|---|---|---|---|
| 7039 | +17168034903 **Jay McKee\*** | 5/9/2009 12:36:25 PM(UTC+0) | Read | **Can u do me a favor.. Can u email me, so I can look at it on paper, everything my 25O turns into.. Nicole was speaking with Tommy when u explained to me all the areas where we are benefiting..** |
| 8265 | +17168034903 Jay McKee\* | 5/9/2009 12:37:21 PM(UTC+0) | Sent | **I will have tommy do it so it's consistent with the discussion** |
| 7040 | +17168034903 Jay McKee\* | 5/9/2009 12:37:42 PM(UTC+0) | Read | **Perfect, tks** |

Then, McKee continued by re-engaging one and a half (1-½) hours later:

| | | | | |
|---|---|---|---|---|
| 7043 | +17168034903 **Jay McKee*** | 5/9/2009 2:12:22 PM(UTC+0) | Read | **Hey, also, could u email me what the 3 black sheep are getting in the end result, as well as Tommy bullet points they had 2 agree too.. Tks** |
| 8269 | +17168034903 Jay McKee* | 5/9/2009 2:32:11 PM(UTC+0) | Sent | **Tommy said you will get 1/10th of everything that is acquired of theirs which includes 20% (2% for you) of the <u>airpark building</u>, 1/10th of their 3.64% of their Eufora shares (.364% for you which puts you just over 1% in <u>Eufora</u>) and then a small piece of the <u>jet</u> which TC is still crunching numbers on but it will probably be 1% of it.** |
| 8270 | +17168034903 **Jay McKee*** | 5/9/2009 2:35:46 PM(UTC+0) | Sent | **TC will send you the bullets they agreed to but has to wait till it's actually signed. Should be a day or two. They have only agreed by email so far. He will also send you the media summary but he wants you to convince the owner of Chef's to send him the tomato sauce Fed Ex.** |

| | | | | |
|---|---|---|---|---|
| 7044 | +17168034903 **Jay McKee*** | 5/9/2009 2:43:44 PM(UTC+0) | Read | Haha.. Consider it done.. I'll have Lou put some bottles together with the extra meat for the real flavor.. |
| 8271 | +17168034903 Jay McKee* | 5/9/2009 2:45:55 PM(UTC+0) | Sent | Thx |

Then, McKee continued by re-engaging forty-five (45) minutes later:

| | | | | |
|---|---|---|---|---|
| 7045 | +17168034903 **Jay McKee*** | 5/9/2009 3:36:47 PM(UTC+0) | Read | **Did TC say the jet was worth 25Om last night?** |
| 8273 | +17168034903 Jay McKee* | 5/9/2009 3:44:10 PM(UTC+0) | Sent | **The jet is worth 1.5m. He invested 250k to repair it** |

| | | | | |
|---|---|---|---|---|
| 7046 | +17168034903 **Jay McKee*** | 5/9/2009 3:45:53 PM(UTC+0) | Read | **Aha.. Thats where the 25O number came from..** |

| | | | | |
|---|---|---|---|---|
| 7048 | +17168034903 **Jay McKee*** | 5/9/2009 3:53:08 PM(UTC+0) | Read | **In the deal, the 3 guys get their money back from their involvement with TC, but nothing back from their Mexico deals, correct..** |
| 8276 | +17168034903 Jay McKee* | 5/9/2009 3:54:14 PM(UTC+0) | Sent | **Correct!** |

Then, McKee continued by re-engaging two (2) hours later:

| 7053 | +17168034903 Jay McKee* | 5/9/2009 5:43:22 PM(UTC+0) | Read | If we get control of Jowdys Cabo equity and move to sell Cabo - we get our 500 back from del mar, and what percent of Cabo do we end up with? |
| 8282 | +17168034903 Jay McKee* | 5/9/2009 5:48:03 PM(UTC+0) | Sent | Its impossible to say until we know everyone who's involved in getting Jowdy's 40%. For example, the new bank/investor may want half of it to do the deal. But...whatever it is, you will get 1/10 of it. |

Then, McKee continued by re-engaging four (4) hours later:

| 7060 | +17168034903 Jay McKee* | 5/9/2009 10:01:18 PM(UTC+0) | Read | So is it correct to say we'd get our 500 back from del mar, as well as a prob minumium 2% of Cabo? Sorry to keep asking - just trying to get it right.. |

If McKee did not lie on purpose in 2015 to support the government's claims of conspiracy by concealment, then the inaccurate and unreliable testimony by McKee, certainly and prejudiciously contributed to the ongoing collective amnesia (a.k.a. **CTE**) by the GSF contributors entirely in the government's favor while seeking a conviction of Kenner and Constantine – for alleged crimes that McKee – in particular – exhibited *faulty memory, confusion and clearly made a mistake*.

- **What is the government or McKee doing to make sure the court is alerted to the PLAIN ERROR?   To date – they are doing nothing about a conviction relying heavily based on *faulty memory, confusions and mistakes*...or a series of "*failed memory tests*".**

- **According to the government – this was the only relevant testimony to support the government conviction allegations thru McKee – and it is clearly FALSE...**

## Tyson Nash [130]

Nash confirmed during trial that the GSF, as presented to him by Constantine, the "purpose" of the GSF was "very broad" (*Tr.2003*).

Nash suggested at trial that he never authorized funds – from his deposit – to go to Mexico (notwithstanding the loan was to Jowdy, personally – as suggested by Diamante COO Najam for collectability; for whatever that was worth).
- Nonetheless – none of Nash's deposit funds went to the Jowdy loan; Mexico or not.

The government presented Nash's wire transfer to Constantine Management Group for Nash's 2008 Eufora share purchase (*GX-760*).
- This confirmed without a doubt that Nash and all of the individuals that transferred money to "anyone" had to go thru a three (3) step "fail-safe" process – thus neither Kenner nor anyone else were able to transfer their money from their Schwab investment account without their express knowledge and verbal confirmations of all the details.

Although none of Nash's funds went to Mexico &/or Jowdy – the Hawai'i operating agreement authorized it…but without question – when the US Government assists Kenner and Kenner investors in recovery of the known Jowdy thefts (from the Hawaii loans) – Nash will be lined up to collect his portion of the Hawai'i asset that is his sole remaining equity (along with all of the other Jowdy-victims)…

The Court's *M&O at 23* confirmed that "*[Nash] did not authorize those funds to go to Mexico*" (*Tr.1906-1908*).

Yet, *none* of Nash's funds went to the Jowdy, personal loan -- or to Mexico.   The government was aware of this before asking Nash the question at trial.  The government ignored at every turn that the Hawai'i partners' 2004 Little Isle 4 By-Laws authorized the use of capital account funds for loans (and other items) (*See Recon33-70*).

Nash invested in Eufora in 2008 after learning about the Eufora patents…

The Court's *M&O at 23* confirmed that "*Nash invested $100,000 in Eufora, on or around April 24, 2008, based on Kenner's representations that Constantine owned a valuable patent*" (*Tr.1912-1914*).   Yet, the Court claimed: "*he [Nash] was not told that his funds would be used to buy a stake in the company from Constantine*" (*Tr.1945*).

---

[130] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 23-24.*

Nash's investment is in Eufora.   It is documented in the Eufora tax records as applied by Eufora CEO Gentry and originally by AZ Eufora Partners I Managing Member, Tim Gaarn.

Nash was represented by independent counsel, Rudy Giuliani and Michael Stolper, who vetted all of the 2008-09 Eufora private stock sales by Constantine and Gaarn as appropriate and fully transparent, while investigating "*all things Eufora*" from 2002 (inception of the company) thru the date of the 2010 investigation.

- Nash and the other Eufora investors' attorneys raised no "*private stock sale issues*", in fact addressing it directly in a signed-off (multi-page) document by Nash (*at 10*) and all of the Eufora investors; *not including Kenner (See Recon33-73).*

- Private stock sales were used to repay previously documented loans from Kenner to Constantine (personally) -- and Tim Gaarn (personally).  They were fully vetted by independent attorneys Giuliani and Stolper, finding full disclosure and transparency.   Only the "*failed memory tests*" of the investors six (6) and seven (7) years later supports a concealment theory in direct contradiction to the empirical evidence prepared by their independent attorneys.

  - **As a result of the investors independent vetting, that knowledge of the private stock sales (from Constantine and Gaarn) cannot be an issue that a trier of fact needs to deliberate on.**

  - Actual, *signed-off*, independent acknowledgements versus a "*failed memory test*" (a.k.a. "*I don't remember*" testimony) is not a reliable or reasonable standard for conviction beyond a reasonable doubt, in any context – specifically not for a "concealment theory".

**Nash had to give verbal authorization for his funds to be released to any third (3rd) party regardless of the Kenner Power of Attorney transfer instructions...**

Nash, identical to all other Charles Schwab account holders, had to give verbal authorization for *his funds* to be released to any third (3rd) party (Constantine) *in real time*, pursuant to his Schwab account agreement.   Kenner had Power of Attorney to solely handle the "*signing*" of the request and provide the wire instructions for the destination account and payee.   Nevertheless, each and every Schwab account holder was *required* to give verbal authorization for the "*amount*" and "*payee*" *before* Schwab would release any funds.   Kenner's "Power of Attorney" facilitation role was solely based on the Kenner clients' irregular travel patterns and their inability to physically send fax paperwork easily while travelling with their NHL teams and schedule nearly nine (9) months out of the year.

- Thus, **without Nash's verbal approval to his independent financial advisors** at Greenberg Graham Associates ("GGA") and subsequently to Charles Schwab – both of which received copies of the Power of Attorney wire initiation from Kenner (as did the clients themselves) – **Nash's funds would not be transferred; without exception**.

The Nash fax (**CRITICAL** – *See GX-760*) – signed as Power of Attorney by Kenner tracks this exact pattern of transparency on the exact day that the $100,000 wire transfer to Constantine Management Group was approved by two (2) independent third (3rd) parties working for Nash – all *after* Kenner initiated the transaction with the signed-written instructions – and before Nash gave his two (2) independent verbal authorizations.

- This evidence leaves no question that at no time was any Kenner business management client relieved of their funds by any independent action of Kenner. There were three (3) different "fail-safes" of authorization built into the system to eliminate any potential theft by Kenner.

In fact, Nash did not have any "material" issue after describing his conversations with Kenner (*Tr.1915*):

> *Q. At the time that you invested money in Eufora, what did Mr. Kenner tell about how the money would be used?*
>
> *A [Nash]: Again we didn't really talk in great depth. I was guessing it was for those commercials that they wanted to shoot. Get those up and running. And **again I got a piece of a great, great company** or it was worth a lot of money.*

Nash was "*guessing*". His biggest concern, just like Gonchar repeated at trial was that Nash "*got a piece of a great, great company or it was worth a lot of money*".

- The value of the company thru the 2010 investigation by Giuliani's people confirmed that even the investigation team wanted a 6% contingency fee of equity from Eufora at that time (over 1 ½ years after the Nash purchase), as Jay McKee designated to Kenner via text.[131]

---

[131] McKee July 2010 text to Kenner:



| 147 97 | +1716803 4903 Jay McKee* | 7/15/2010 12:03:01 PM(UTC+ 0) | Rea d | Hopefully you're getting some sleep right now; I am planning on sending the letter this morning.. **Within our package or plan in** taking the lender out, **where is the 6% for Guilani partners comming from?** |
|---|---|---|---|---|

The problem with Nash's **CTE**-induced memory was that he claimed that he saw the commercials with Constantine when he made his investment in Eufora, yet the building he claimed as "*impressive*" (the Avalon Airpark Project) was not completed until almost one (1) year later.   This was another **CTE** issue that provided "unreliable" testimony, based on cognitive degeneration, which played into the government's "*failed memory test*" prosecutorial game plan (*Tr. 1916*):

> *Q. Now, when you met with Mr. Constantine in the Eufora offices, after your investment, what did he tell you about how your money was used?*
>
> *A [Nash]: We had sat down, he was excited to show me the commercials that were made, that were in production, and I was impressed, we had a good laugh, it was my first opportunity to sit down with Tommy, again a great guy, I was ecstatic to be part of this company, the building was impressive, the staffs great. I was again happy to be a part of it.*

Nash, who was one of the last GSF contributors, confirmed the entire "*use of funds*" scenario which many of the others **could not remember**, in spite of signing off on the same "**Acknowledgement and Approved**" disclosure (*See Recon33-37 FOLDER*) and receiving the identical, full disclosure email recap (*See Recon33-138 [McKee] and Recon33-98 [Peca]*), before any of their funds were spent.

Since Nash and Darryl Sydor were best friends, and all of the GSF contributors knew each other thru one means or another, it is highly improbable that Nash (the most vocal of the entire GSF contributors) would know about all of the details (and remember them in 2015) if the remainder of the GSF contributors had information about Constantine's planned "*use of funds*" and concealed it.
- This is the same group of individuals – true or not – who claimed they signed "signature only" documents from Kenner (although *none* were actually presented in evidence during trial).  Regardless – the investors all claimed they did not question them (the alleged one-page documents), because they "*trusted Kenner*".
- In addition, they often gave testimony that claimed they "*did not read*" the documents they signed for the same reason, *supra*.
    - Why would anything need to be concealed from people who "*did not read*", allegedly *signed "signature only" documents*, &/or blindly "*trusted Kenner*".  **It is nonsensical**.

Nash confirmed the following (*Tr. 1919-1921*), as if he could have offered the same terms as Constantine in 2009:

> *Q. What did Mr. Kenner and Constantine say during that conversation?*

.

*A [Nash]: We had talked a lot about the ongoing issues, Diamonte [sic] at length, Diamonte [sic] was a project in Mexico that is still up and running today. But it was a big one, Eufora was another big one. Tommy had talked a lot about Eufora and the success that he was having. The valuation of the company. Just a lot of good stuff, a lot of positive stuff. But the issue was money and we needed to put a fund together to pay for some things, pay for **some lawyers** to continue to fight in Cabo, to **get rid of some of the bad apples**, that we had some our group that were causing issues, Owen Nolan was a guy, Joe Juneau, I believe, Ethan Moreau, **Phil had an ongoing lawsuit that needed to get resolved**. There's, and in turn we were all going to get, whoever funded the Global Settlement Fund was going to **get a piece of those people that we bought out**. So Joe Juneau, Moreau, Nolan, we were going to buy their shares of Eufora and whatever else they had and in turn I gave $100,000 to the Global Settlement Fund and in turn I was going to get a small percentage of each one of those things.*

*Q. And then you also talked about some bad apples that Phil said needed to be gotten rid of, Moreau and you said Phil had a personal lawsuit against, what was that?*

*A [Nash]: He had a personal lawsuit with his secretary, Christie Myron.*

*Q. And he told you that he need funds to fund that lawsuit.*

*A [Nash]: Yes, he did.*

*Q. Just to be clear, what was your understanding of where you would be getting this percentage from in these other things?*

*A [Nash]: My understanding was that we would be buying those other guys out with cash from the Global Settlement Fund and getting whatever percentages they owned divvied up between the group that funded the Global Settlement Fund.*

*Q. And in terms of the things that those guys owned, would that include **hangar**, a **plane** and an **interest in Eufora**?*

*A [Nash]: And I believe a Palms unit as well.*

**The government asks Nash about payments to Constantine third (3ʳᵈ) parties that are covered by the Constantine-Gonchar "side-deal" to infect the jury and the Court…**

The Court's *M&O at 24* confirmed that *"Constantine never discussed with him [Nash] using that money for his [Constantine's] personal expenses, a lawsuit in Florida, race cars, or the purchase of Playboy"* (*Tr.2042*).

**MISLEADING** – Because the government knew full-well that there was no need for that conversation with Nash by Constantine or any of the GSF contributors – **because** 100% of the Constantine "expenses" unrelated to the GSF contributors was covered by his "*side-deal*" with Gonchar and the $140,000 that Constantine, himself, deposited into the Ronald Richards' Trust Account in 2009.

- The government, again, left the jury and the Court with an unreasonable standard of expectations, based on elements of Constantine's spending that were <u>not relevant</u> to any conspiratorial object outlined by the government theories; and entirely unsubstantiated by any documented theft (*notwithstanding Kenner and Kenner investors' disappointment in the Constantine-GSF results*).

<u>**Nash had already confirmed the entire expected use of funds for the GSF...**</u>

<u>**Nash Eufora purchase**</u>:
Nash's Schwab transfer for his Eufora shares, bought from Constantine Management Group in 2008 **directly and fully documented between the two (2) of them independently**, fully exonerated any concealment possibility by Kenner for any funds that were sent from client accounts to any third (3rd) party.

- In addition to the Schwab transfers to 3rd parties -- the Northern Trust IMUS accounts (of Peca, Berard, Rucchin, Nolan, Sydor in the Superseding Indictment, and Murray and Gonchar [non-victims of the Superseding Indictment]) also demanded third (3rd) party payees to have client signatures "*only*" as an identical fail-safe, stating in their agreements (*See Recon33-64 FOLDER*):

  [Northern Trust Bank]:  "*Only those instructions directing the wiring of funds to any account outside of Northern Trust Bank <u>must be signed by the client</u>*".

## Owen Nolan[132]

**Nolan exhibited the most severe CTE symptoms at trial...(or a close second to Darryl Sydor)...**

- **It is understandable considering Nolan had over 50 career heavy-weight NHL hockey fights during his 15+ years in the NHL (1991 thru 2008)...**

**The government and Nolan portrayed his Northern Trust LOC as another LOC that was allegedly learned about being opened *"after the fact"*...yet -- all of the evidence in the Northern Trust 2015 subpoena confirms that Nolan signed documents for over five (5) years before the April 2009 seizure event.** See *United States v. Gil*, 297 F.3d 93 (2d Cir 2002).

- **It should be carefully noted that Nolan's independent communication with Northern Trust allowed him to continue making monthly LOC payments – at the same time that all of the other Kenner clients chose (on their own) to allow the seizure of collateral...[133]**

---

[132] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 24*.

[133] It was a requirement of Northern Trust Bank to speak *one-on-one* with their LOC clients before they seized the collateral in April 2009. Kenner was *not authorized* to allow the seizure independent of the LOC clients. "Rule 16" evidence from multiple Northern Trust Bank LOC clients confirmed their independent discussions, as follows...

Peca and Kenner communication via text about the seizure (**on the day of the actual seizure**) – confirming that Peca had *already* spoken to Northern Trust on his own before receiving the Kenner text on the same day:

**Kenner notifies Peca** of the one-on-one Northern Trust Bank LOC call:

| 7415 | +17163743234 Michael Peca* | 4/1/2009 10:38:15 PM(UTC+0) | Sent | **A NOrthern trust person will Call you to confirm your transfer to Schwab. Please acknowledge.** |
|---|---|---|---|---|

**Michael Peca replies** that he has already handled the call to allow the seizure (even *before* the Kenner heads-up notification):

| 6325 | +17163743234 Michael Peca* | 4/1/2009 10:44:43 PM(UTC+0) | Read | **Got it. Call already done. Was this the plan b/c it makes sense to pay the line off or b/c the the loan defaulted? Honestly** |
|---|---|---|---|---|

- Michael Peca and Kenner communication via text about the seizure, *supra* – confirmed that Peca had *already* spoken to Northern Trust on his own *before* receiving the Kenner text on the same day...

**Nolan cannot recall anything to do with his LOC at Northern Trust in spite of volumes of empirical evidence – all signed by Nolan over a six (6) year period of time (in the late[r] delivery of the Northern Trust 2015 subpoena – withheld by the government, as well)…**

**Northern Trust Banker Aaron Mascarella gave independent confirmation of communication with Nolan weeks before Nolan's 2009 arbitration …**
- **Nolan's attorney (Meeks) – who was conducted the Mascarella deposition – allowed Nolan to give *"no knowledge"* perjured testimony during the 2009 arbitration…**

**At no time did Kenner sign for any Nolan LOC account.**

The Court's *M&O at 24* confirmed that *"He [Nolan] said that he never authorized Kenner to open a line of credit in his name at Northern Trust to fund the Hawai'i project, but later learned that Kenner opened a $2.2 million account with the bank"* (*Tr.2065-2066*).

**FALSE and MISLEADING** – Because Nolan signed over thirty (30) documents from Northern Trust Bank from December 2003 thru 2009.   A subset of all the Northern Trust LOC documents were in the 2015 Northern Trust Bank subpoena, which arrived after the government rested its case and Nolan was *far, far away* from the EDNY (where the government wanted him).

***There were no*** **Nolan documents alleged as "not signed by him".**
The Court's *M&O at 24* claimed: *"Nolan testified that a document purporting to contain his signature and extending a line of credit for a real estate investment does not in fact contain his authentic signature"* (*Tr.2067-2069*) (*GX-2154*).

**FALSE** – Because as Nolan's testimony (about a twelve [12] year old document) reads as follows, exactly to the contrary:

---

**Darryl Sydor notifies Kenner** of the *one-on-one* Northern Trust Bank LOC call from Erin [Aaron Mascarella]:

| 6316 | +1972523050 5 Darryl Sydor* | 4/1/2009 8:48:29 PM(UTC+0) | Read | *Hey someone from northern trust called with someone from schwabb. And want to do a conference call in a hour with erin someone* |
|---|---|---|---|---|

*Q. I'll show you what has been marked for identification as Government's Exhibit 2154. Showing you Government's Exhibit 2154. Do you recall ever seeing that document before?*

*A [Nolan]: No.*

***Q There's a signature on that document. Does that appear to be your signature?***

***A [Nolan]: It looks like it.***

**That is not a denial.**   In fact – the document was one (1) of three (3) that existed in the 2015 Northern Trust Bank subpoena from that same December 2003 signing by Nolan (and also by Joe Juneau at the same time).   Nolan was living in Toronto Canada in December 2003.   Nolan received a 39-page fax from Kenner with the entire package that Nolan needed to sign (inclusive of the Extension of Credit document, *supra*) and return via Kenner's FedEx account.[134]

The cover letter (of 39 pages) wrote the following to Nolan (*See Recon33-75*):

> *Owen: Please sign the three (3) documents where the signatures are required. These docs need to be sent VIA FedEx to: Nelson Lerner, c/o Northern Trust Bank, 2398 Camelback Road, Suite 400, Phoenix, AZ 85016.   Please send them via International FedEx (FedEx # 2699 9186 0).*
>
> *Let me know if you have any questions before you send them.  PK*

Nolan had to **sign** and **send** the documents to Northern Trust Bank via Kenner's International FedEx account immediately -- **because** Northern Trust Bank lending Vice President, Nelson Lerner (*supra* – from the fax cover letter) three (3) days later on 12/18/2003 countersigned the document (*See Recon33-29 FOLDER -- Nolan -- 2003 Little Isle 4 $500,000 Extension of Credit*).   The LOC funded on December 23, 2003 *after* receiving the Nolan and Juneau December 2003 signatures via International FedEx, independently.

- If the handwriting on the Northern Trust Bank document was an issue of merit, nothing stopped the government from contacting Nelson Lerner from Northern

---

[134] *See Recon33-75* – Nolan's 39-page fax cover sheet recovered from Kenner's home during the November 13, 2013 search and seizure.   The entire December 2003 package is in evidence from Northern Trust Bank.    There is no equivocation about Nolan (and Juneau) signing their-own full and initial December 2003 packages (**based solely on the 2015 Northern Trust subpoena**) – regardless of their-own failed "*memory test*" results in 2015.

Trust Bank to verify that he filled out the December 2003 documents for Nolan and Juneau -- after he received their signed copies.

At trial, Nolan gave **FALSE** testimony (perhaps based on his severe **CTE**-laden memory, akin to Juneau's **CTE**) that claimed he was not aware of his LOC at Northern Trust.

The 2015 prosecutorial team was fully aware of Nolan's 2009 arbitration perjury (refuted by Northern Trust Banker Mascarella's 2009 deposition, *infra*), yet they continued the artifice and solicited the same misstatements from Nolan with complete disrespect and contempt for the Court and the proceedings (*Tr.2065-2066*):

> *Q There has been testimony in this case about lines of credit. Did you ever have a line of credit associated with your investment in Hawaii?*
>
> *A [Nolan]: No.*
>
> *Q Did you ever authorize Mr. Kenner to open up a line of credit in your name?*
>
> *A [Nolan]: No.*
>
> *Q Did you ever authorize Mr. Kenner to open up a line of credit in a company called Little Isle IV?*
>
> *A [Nolan]: No.*
>
> *Q What about if there was a company called Little Isle IV and you and Mr. Joe Juneau and Mr. Kenner were somehow vouching for a line of credit in Little Isle IV, do you have any memory doing that?*
>
> *A [Nolan]: No.*

- The government manipulated the truth of the matter, again, as they *portrayed* Kenner as the person who "opened up the lines of credits".   The entire pre-trial evidence confirms that Kenner *did not ever* open up an individual LOC for any of the Hawai'i investors; *or anyone else, never*.

Nonetheless, that was the repeated catchphrase of questioning to individuals that the government knew would respond according to their 2015 prosecutorial theories – **BUT** -- in contradiction to 100% of the pre-trial empirical evidence.   The government repeatedly utilized the *"when did you stop beating your wife"* strategy of misleading insinuations.

## In addition, every one of the Northern Trust Bank records in the 2015 subpoena confirmed that Kenner "never" opened an individual LOC account -- for anyone.
- **It was entirely fabricated by the government for prejudicial effect...**

After the 2009 Nolan arbitration, which Nolan received a paper-victory to be bought out of his Hawai'i investment, not for fraud or evil mind (*as the arbitration proclaimed in their ruling*), but based on Nolan's <u>lack of recollection</u>, Joe Juneau and Ethan Moreau (the other two [2] '*bad apples*") dismissed their identical litigation with Kenner (when Kenner cross-claimed) -- **BECAUSE** Kenner beat Nolan on every single identical issue Juneau and Moreau raised in their respective Complaints.   Despite the fact Juneau and Moreau had merely filed Complaints and subsequently stayed their collective proceedings under the same attorney as Nolan (working with Jowdy and his attorneys) (*expecting, as told by their attorney, some form of <u>res judicata</u> [despite the underlying arbitration]*), Juneau and Moreau were each milked approximately $250,000 in fees from their attorney. Nolan claimed to have paid over $500,000 in arbitration fees (*wholly unheard of*). The attorney milked all three clients ruthlessly for over $1 million.

- Within months of the Kenner **victory** versus Nolan, Kenner subsequently received a settlement offer in the *Kenner v. Myrick* suit, 100% paid for by Myrick's insurance company, and perhaps sheltered from her knowledge. The same attorney (*Meeks, who was working hand-in-hand with Tom Harvey and Jowdy*) received another 6-figure litigation fee, this time milking the insurance company for his riches; now totaling well-over $1 million in fees – with some consulting fees paid back to Myrick (per Meeks' 2009 deposition confirmations).

The Nolan "*lack of knowledge*" testimony flew in the face of the actual Northern Trust Banker's deposition (*Aaron Mascarella*) less than two (2) months before the 2009 arbitration – by Nolan's attorney, when Mascarella confirmed he ***had been speaking*** "*<u>infrequently</u>*" with Nolan when Nolan "*<u>responded</u>*" about his LOC at Northern Trust Bank.

[Northern Trust Banker Aaron Mascarella deposition] -- ***March 9, 2009 at 23:***

    *Q.     Okay.  Now, with regard to the line of credit account, who was authorized to make transfers out of that line of credit?*

    *A [Nolan]: Owen **and Phil.***

    *Q.     Was there any limitation on Mr. Kenner's ability to transfer money out of the account?*

    *A [Nolan]: No.  It was -- Yes.  I'm sorry.  It was -- The proceeds were only to go to Little Isle Ventures, Little Isle IV, I think, if I remember correctly.  He signed -- **<u>Owen Nolan signed a bank authorization or an authorization letter to the bank authorizing Phil Kenner to transfer money from the line of credit into the Little Isle IV account</u>.***

Then, Northern Trust Banker Mascarella confirmed that he personally dealt with Owen Nolan between 2003 and 2006 related to the LOC payments being late and DEFAULT letters on Nolan's LOC, as his private banker.

[Northern Trust Banker Aaron Mascarella deposition] -- ***March 9, 2009 at 24:***

> *Q.     During the time period from -- From the time you opened the Nolan account until the end of 2006, did you have conversations with Mr. Nolan concerning the line of credit?*

> *A [Nolan]: Conversations -- **I spoke to Owen infrequently**. I've only had brief conversations with him.  And my guess is that **it was only relating to the payments, that the payments were being made or not being made**. There was a few times when the payments were slow, that **we sent out default letters**, which probably -- You know, **I can't remember every conversation I had with him** but I assume he might have responded to one of those default letters.*

> o   Mascarella clearly detailed he had multiple LOC conversations independently with Nolan between 2003-2006.

The 2009 Nolan attorney, Meeks (*who was the same attorney in 2009 that Tom Harvey told Gaudet "would be waiting for him in the States" for verifying the 2004 Hawai'i-Jowdy loan agreement in 2009*) allowed Nolan to claim he was never aware of his own LOC during the arbitration, *__contradicting__* Northern Trust Banker Mascarella's testimony.

It was similar to Nolan's now-proven 2015 perjurious claims (*Tr.2065-2066*), *supra*.
- Nolan's extended text and phone conversations with Kenner in December 2007 when he re-signed his four (4) year old, four (4) times renewed, personal LOC – *confirmed Nolan's innate knowledge*.

Nolan also falsely claimed in contradiction to the Northern Trust Bank records that he was not aware in 2007 that his funds had been drawn from his LOC (*Tr.2069-2070*).
- Nolan had signed four (4) independent *Annual Disbursement Request & Authorization* forms for Northern Trust Bank, *infra*, that confirmed the exact amounts that had been withdrawn by the date Nolan signed (all **one-page** documents – thus clearly nothing concealed from the "*use of funds*").

> o   2004 – *$0* disbursed --          *See Recon33-139*
> o   2005 – *$2,188,637* disbursed --      *See Recon33-140*
> o   2006 – *$1,376,307* disbursed --      *See Recon33-141*
> o   2007 – *$2,189,796* disbursed --      *See Recon33-142*

Notwithstanding Northern Trust Banker Mascarella's specific testimony pre-arbitration about independent communication with Nolan and Nolan's Hawai'i LOC, *supra*, Nolan signed dozens of documents (in addition to the annual *Disbursement Request &*

*Authorization* forms, *supra*) for Northern Trust Bank.   Nolan's correspondences verifying the specific "*use of funds*" in his Hawai'i LOC were addressed **at all times** to Nolan's home address in California.

Nolan signed the following **one-page disclosure documents**[135] annually, as follows:

---

[135] Each Northern Trust LOC client signed their annual *Disbursement Request & Authorization* documents and received *1099-Int Tax Documents* from Northern Trust's tax department (directly).

Each LOC client independently signed the following **one-page** annual acknowledgements for Northern Trust of "**FUNDS DISBURSED**" – leaving *no concealment* possible:

***Annual Disbursement Request & Authorization Forms (all one-page including signature) signed annually and present in the 2015 EDNY "delayed" subpoena.***

**Michael Peca** (*Disbursement Request & Authorization* – in evidence):
 *See Recon33-143 – 2005 Disbursement Request & Authorization* -- (**signed – identifying a $1,600,000 withdrawal** within the first [1st] three [3] months)

**Bryan Berard** (*Disbursement Request & Authorization* – in evidence):
 *See Recon33-144 – 2003 Disbursement Request & Authorization* -- (**signed two [2] years before Lehman Brothers' involvement in Hawai'i refuting 2015 testimony – *Tr.3035***)

 *See Recon33-145 – 2005 Disbursement Request & Authorization*
  •  *Verifying $0 used*

 *See Recon33-146 – 2006 Disbursement Request & Authorization*
  •  ***Verifying $895,350 used***

 *See Recon33-147 -- 2007 Disbursement Request & Authorization*
  •  ***Verifying $617,911 used (reduction after Lehman Brothers disbursement)***
   o  ***See Recon33-100 – Mascarella's LOC reduction letter to Berard.***

 *See Recon33-148 – 2008 Disbursement Request & Authorization*
  •  ***Verifying $617,911 used***

**Steve Rucchin** (*Disbursement Request & Authorization* – in evidence):
 *See Recon33-149 – 2004 Disbursement Request & Authorization*
  •  *Verifying $0 used (of initial $480,000 LOC)*

 *See Recon33-150 – 2004 Disbursement Request & Authorization (second signed during year one [1])*
  •  *Verifying $0 used (of follow-up $1,000,000 LOC)*

 *See Recon33-151 – 2005 Disbursement Request & Authorization*
  •  ***Verifying $1,000,000 used***

 *See Recon33-152 – 2006 Disbursement Request & Authorization*

***Owen Nolan Annual <u>one-page</u> Disbursement Request & Authorization documents (signed independently by Nolan):***

> *See Recon33-139 – 2004 Disbursement Request & Authorization*
> - *Verifying $2,200,000 undisbursed*

> *See Recon33-140 – 2005 Disbursement Request & Authorization*
> - *Verifying 11,362 undisbursed and*
> - ***2,188,637 (amount paid to others on Borrower's behalf)***

> *See Recon33-141 – 2006 Disbursement Request & Authorization*
> - *Verifying 823,693 undisbursed and*
> - ***1,376,307 (amount paid to others on Borrower's behalf)***

> *See Recon33-142 – 2007 Disbursement Request & Authorization*
> - *Verifying 10,203 undisbursed and*
> - ***2,189,796 (amount paid to others on Borrower's behalf)***

**Nolan's 2006 Little Isle 4 tax form fully disclosed the "exact amount" of his LOC plus cash investment and the amount of funds returned to him as a result of the 2006 Hawai'i joint venture agreement...**

Nolan received his **2006 tax K-1 from Little Isle 4** (and from Kenner) fully verifying the use of funds (as $2,300,000) and the repayment amount (as $761,458) after the 2006 Joint Venture and Lehman Brothers funding (in August 2006) (*See Recon33-153*).

The mere fact that Nolan produced the Little Isle 4 tax document– with the **NOLAN0005044 BATES STAMP** – for the 2009 arbitration (*Nolan v. Kenner*) – **fully confirmed** that Nolan, his independent accountants, and his independent attorneys (who assisted in the Nolan litigation) had the fully documented "*use of funds*" in their possession – **fully discrediting any realistic or believable claims that anything related to his Hawai'i LOC and use of funds were *concealed* from Nolan.**

Notwithstanding all of the previous confirmations of Nolan's intimate knowledge of his LOC, prior to signing his LOC renewal package for Northern Trust Bank – **for the 5th annual time** – Nolan and Kenner carried on a 5-day text conversation and at least two (2) phone calls (confirmed in the texts, *infra*) before Nolan used Kenner's FedEx account (in evidence) to independently mail his signed LOC documents in December 2007 to his Northern Trust Banker, Mascarella.   Nolan signed *Recon33-142* (2007 annual

---

> - ***Verifying $686,599 used (reduction after Lehman Brothers disbursement)***

Disbursement Request & Authorization) as part and parcel to the package – which clearly denoted **$2,189,796.02 as Amount paid on Borrower's behalf**.

**<u>December 2007 texts proving that it was wholly impossible for Nolan to be unaware of his Northern Trust Bank LOC &/or the paperwork he has signed for 4+ years to date…</u>**

From Kenner to Nolan (conversation Day 1):

| 37 | +14169970110 Owen Nolan* | 12/23/2007 3:40:50 PM(UTC+0) | Sent | *<u>I need to send you via FEDEX LOC docs from Northern Trust that MUST be signed and returned by the end of the year.</u>* Where are you the day after XMAS?? |
|----|--------------------------|------------------------------|------|------|

From Nolan to Kenner (conversation Day 1):

| 41 | +14169970110 Owen Nolan* | 12/23/2007 6:40:59 PM(UTC+0) | Read | What r the papers for |
|----|--------------------------|------------------------------|------|------|
| 42 | +14169970110 Owen Nolan* | 12/23/2007 6:41:26 PM(UTC+0) | Read | And why the sudden rush |

From Kenner to Nolan (conversation Day 1):

| 38 | +14169970110 Owen Nolan* | 12/23/2007 7:09:24 PM(UTC+0) | Sent | *<u>The papers are for your Line of Credit at Northern Trust. The Bank sent them to me for the renewal of the LOC</u>* on friday and said they MUST be signed and returned by end of year. *<u>Its not just you. All of the guys have to do it.</u>* I don't make these rules. Where can I send them for next Wednesday or thurday fedex delivery?? PK |
|----|--------------------------|------------------------------|------|------|
| 39 | +14169970110 Owen Nolan* | 12/23/2007 7:12:23 PM(UTC+0) | Sent | Can you also plz ask Diana for the ppwk I faxed a while ago for VortalOptics?? I need you to *sign and fax* them to me at 480.314.3795. Then, we can have your shares registered. *<u>Your ppwk is the last of the guys to get done.</u>* Happy Holidays. I hope the kids are well!! |

From Nolan to Kenner (conversation Day 3):

| 45 | +14169970110 Owen Nolan* | 12/26/2007 5:26:24 AM(UTC+0) | Read | Westin bayshore vancouver we leave tommorrow |
|----|--------------------------|------------------------------|------|------|

From Kenner to Nolan (conversation Day 3):

| 42 | +14169970110 Owen Nolan* | 12/26/2007 1:34:06 PM(UTC+0) | Sent | It already was sent to Calgary. It will be there when you return. Please just sign and return asap. Happy Holidays!! |
|----|--------------------------|------------------------------|------|------|

- As part of the government's Rule 16 production – they produced Kenner's FedEx records and AMEX account records.   It confirmed Kenner **sent** Nolan the 2007 renewal docs via FEDEX on 12-26-07 (***BNK-AMEX-1638***):

| 12/26/07 | FEDEX#831050944488 MEMPHIS      TN | 31.14 |
|---|---|---|
| | NO REFERENCE INFOT3H0Z7 | |
| | TO: OWEN NOLAN CA | |
| | FROM: PHIL KENNER 85259 | |
| | 001 FEDEX ENVELO 1LB AWB831050944488 | |
| | FedEx #1-800-622-1147 | |

From Nolan to Kenner (conversation Day 5):

| 46 | +14169970110 Owen Nolan* | 12/28/2007 6:04:48 PM(UTC+0) | Read | ***Where's the package that needs signed*** plus jp needs 200000 for toronto settlement **where r we getting that money since everything is tied up** |
| 47 | +14169970110 Owen Nolan* | 12/28/2007 6:06:04 PM(UTC+0) | Read | He said in order to write it off it needs to be paid this year |
| 48 | +14169970110 Owen Nolan* | 12/28/2007 6:07:04 PM(UTC+0) | Read | ***Call me need to discuss this*** |

- Kenner and Nolan spoke about the LOC paperwork on the phone at this point – per the following message the next day from Nolan to Kenner…

From Nolan to Kenner (conversation Day 6):

| 49 | +14169970110 Owen Nolan* | 12/29/2007 3:46:45 AM(UTC+0) | Read | ***Can u call me back I have a question about papers*** |

- As part of the government's Rule 16 production – they produced Kenner's FedEx records and AMEX account records.   It confirmed Nolan **returned his LOC documents** directly to Northern Trust Bank utilizing Kenner's FedEx account – ***AFTER his CONVERSATION with Kenner*** (***BNK-AMEX-1640***):

| | FedEx #1-800-622-1147 | | |
|---|---|---|---|
| 12/31/07 | FEDEX#831050944477 MEMPHIS      TN | 39.73 | |
| | NO REFERENCE INFO85016 | | |
| | TO: NORTHERN TRUST US | | |
| | FROM: OWEN NOLAN | | |
| | 001 FEDEX ENVELO 1LB AWB831050944477 | | |
| | FedEx #1-800-622-1147 | | |
| 01/01/08 | HMS HOST - SLC-AIRPQSALT LAKE CIT   UT | 26.57 | |
| | 8015752611 | | |

- Please note that Nolan's text on December 28, 2007 acknowledged:

> *"where r we getting that money [$200.000 for his agent's bill] since **everything is tied up**"*

- ***This is a clear confirmation that Nolan knew his $2mm PLUS BOND account at Northern Trust was pledged for the LOC.***

Nolan used Kenner's FedEx after they spoke on the phone (*supra*) to return his signed paperwork to Northern Trust Bank.   This was over two (2) years *before* his first amnesia symptoms (**CTE**) occurred during the 2009 arbitration, *albeit known at all times as a fraud by his own attorney who deposed Mascarella just prior to the arbitration.*

Kenner and Nolan's text conversation followed one (1) year *after* Nolan's wife made **specific 2006 Northern Trust LOC payments** independently with Kenner's assistant (Myrick), in late 2006 (*after Nolan received a $5 million insurance settlement check*) (*See Recon33-154, Recon33-155, Recon33-156. Recon33-157. Recon33-158*).

- This left no question about Nolan's independent (*along with his wife, and Kenner's assistant, Myrick*) unrestricted and prior knowledge of the Northern Trust LOC -- and its full and timely usage.

Since Nolan refused to acknowledge his LOC (*in 2009, and prejudiciously repeated in 2015*), in the first instance, the subject of knowledge of the underlying loans to Jowdy from the LOC funds, in the second instance, cannot be introduced for reliable testimony, as Nolan's position of total aloofness and "*not reading a single document*" between 1991 (*the year he was drafted in the NHL*) and 2009 (*the year of the arbitration*) provides nothing but unreliable incoherence.

[Nolan May 2009 arbitration -- Day 1 at 105]:
> *Q:  Is there ever an agreement in your life that you've ever read that you can identify here today? Have you ever taken the time on your own to read?*
>
> *A [Nolan]:  I can't think of any offhand.*

[Nolan arbitration May 2009 -- Day 1 at 109-110]:
> *Q: You've testified that you've never read a document ever that you can think of sitting here today before you signed it.   At any time in your lifetime has someone advised you to take the strategy of never reading a document when you sign it?*
>
> *A [Nolan]:  No.*

[Nolan arbitration May 2009 -- Day 5 at 1049] – Judge Meyerson & Nolan's attorney:

*Mr. Meeks*:  He [Nolan] admits that's his signature.[136]  His testimony is he wasn't aware.

*Judge Meyerson*:  So somebody signs a statement that says, **Please grant Philip A. Kenner access to a line of credit for direct deposit into Little Isle 4**.  Doesn't somebody have to take responsibility for that?[137]

### Other Hawai'i investors – non-victims in the instant case – confirmed via 2009 affidavit that they were fully aware of the "Jowdy loans", as part and parcel to a "*group*" decision (just like the 2011 Peca, Sydor and Stevenson SDNY Grand Jury affirmations)...

Hawai'i investors Mattias Norstrom (*See Recon33-160 at 3*), Sergei Gonchar (*See Recon33-161 at 4-5*), and Jozef Stumpel (*See Recon33-162 at 4-5*) also re-confirmed Berard's 2009 testimony[138] to the 2009 arbitration panel that they "*expected*" their funds to be used to pay the Hawai'i LOC fees (in addition to a myriad of other company expenses) via affidavit by affirming:

"*I was aware that my funds would be used to make distributions for the company, including but not limited to: ...loans to outside entities [Jowdy entities] and distributions to other members that would satisfy their monthly line of credit*

---

[136] Nolan *confirmed* signing his **one-page** *Letter of Authorization* to allow Kenner access to his LOC for the Little Isle 4 capital account in October 2004 (*See Recon33-159*).

[137] *See Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A. See also PaineWebber Incorporated v. Bybyk, 81 F.3d 1193; 1996 U.S. Appx. LEXIS 8728.* ("...a party's ***failure to read*** a duly incorporated document will not excuse the obligation to be bound by its terms"); *See also Ecoline, Inc. v. Local Union No. 12 of the International Association of Heat and Frost Insulators and Asbestos Workers, AFL-CIO, 271 Fed. Appx. 72; 2008 U.S. Approximately. LEXIS 6390*, ("In general, individuals are charged with knowledge of the contents of documents they sign" and "a person who signs a written contract is bound by its terms regardless of his or her ***failure to read*** and understand its terms".)

[138] Berard 2009 arbitration testimony (*See Recon33-163*):
> *Q: And later on were you aware that Mr. Kenner started lending this money to another principle in the Cabo project names Ken Jowdy?*
>
> *A [Berard]: **Yes**.*
>
> *Q: Where did you think the money that Mr. Jowdy – were you told where the money that was given Mr. Jowdy as far as the Mexican project?  Was there anything you were told about that?*
>
> *A [Berard]: **Basically just loan him the money for the project**.*

*payments to Northern Trust Bank*"

"*Phil Kenner has always disclosed the complete and detailed use of these funds to me from time to time and per my every request.*"

**The government had full knowledge of these 2009 affidavits throughout their 6-year investigation and chose to ignore them...**

- These affidavits were signed by Hawai'i investors Norstrom, Gonchar and Stumpel only weeks after the various Hawai'i LOC collaterals were authorized to be released by the respective LOC investors in April 2009 to Northern Trust thru direct and independent phone calls with the bank officials (Brill and Mascarella).

- The affidavits were also signed less than two (2) months before Kenner arranged for the Hawai'i LOC investors to speak directly with the FBI about the unpaid Jowdy loans from the Hawai'i loans and other personal loans, *supra.*

In *United States v. Ganji* 880 F.3d 760 (2018 – U.S. App. LEXIS 2279), the judges summarized that "a defendant could not be held liable for fraud as a result of activity that was legal".

Not only were the Hawai'i LOC payments and usage:
(1) **Authorized on the Little Isle 4 operating agreement,**
(2) **Expected** by the investors/government witnesses,
(3) **Consented to** by the investors/government witnesses,
(4) Not objected to at any time by the investors/government witnesses (until 10-years after-the-fact – during contravening trial testimony for the first [1st] time),
(5) Annually represented on their independent *1099-int Northern Trust tax forms* directly from the Bank, and
(6) Signed off on their **one-page,** *Annual Disbursement Request & Authorization form* – BUT --

**The Hawai'i LOC transactions are wholly legal, legitimate, and authorized.**

### Darryl Sydor [139]

**Sydor exhibited severe CTE symptoms at trial – clearly struggling to recall the most recent of events (including his FBI meeting the previous day)…**

- **Sydor suffered multiple severe concussions throughout his hockey career…**

**Sydor cannot recall the year or amount of his Northern Trust LOC – despite signing annual packages directly with Northern Trust Bank in 2004, 2005, 2006, 2007 and 2008…**

- **At no time did Kenner sign to open any Sydor LOC account…**

**In spite of the fact that Sydor "*could not remember*" anything about his "loans to Jowdy" in 2015 – he remembered all of it clearly in 2011 (4 years closer to the actual events in questions)…**
- **Yet – even during his 2011 SDNY Grand Jury testimony – Sydor struggled mightily to remember the names of many of his investments that he signed and transferred funds to…clearly exhibiting early signs of CTE within one (1) year of his retirement from professional hockey…**

Two (2) years after Sydor had his LOC collateral seized, he told the 2011 SDNY Grand Jury (*SDNY Grand Jury at 15*):

> *Q: Have you been satisfied with his services as a financial advisor [after fifteen years]?*
>
> *A [Sydor]: Yeah, yeah.*
>
> *Q: You have confidence that the [investment] returns will be coming some day?*
>
> *A [Sydor]: Oh, yeah, yeah.*

- By this point in 2011, Sydor was being represented by four (4) different attorneys related to his business affairs; independent from Kenner.

The government asked Sydor in the SDNY Grand Jury about his Northern Trust LOC. At no time – under the privacy of the Grand Jury proceeding -- did Sydor insinuate that he was unaware of the LOC, or the approximate $850,000 collateral seizure two (2) years earlier were either a surprise or unknown to him.  (*SDNY Grand Jury at 18-19*):

---

[139] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 24-25.*

*Q: Did you get documents on what any of these deals would be before you invested money?*

**A [Sydor]: Yes, I have all of the documentation.**

*Q: Did you get it before you invested?*

**A [Sydor]: Yes, like the portfolio, the binders, and all that…**

*Q: <u>Where did you get the line of credit</u>?*

**A [Sydor]: Actually, I think it was Northern Trust.**

*Q: <u>Why did you borrow money</u>?*

**A [Sydor]: Just through talking with Phil Kenner to purchase some more, I believe, <u>also help out the transaction in Cabo</u> to start building there.**

The Court's *M&O at 24* confirmed that "*He [Sydor] testified that…in or around 2003 he invested $500,000 in the Hawai'i project*" (*Tr.2163-2164*).

**FALSE** – Because Sydor made his initial investment in Little Isle 4 deposit in 2004 of $100,000 cash.   Ten (10) months later (October 2004), Sydor signed a full Northern Trust Bank package to open a $1,225,000 LOC with Northern Trust Bank.   <u>At no time did Kenner sign for any Sydor LOC account, or other</u> (*See Recon33-165*).

Sydor re-signed his *Master Note* again in 2005 along with the full pack of LOC documents (*See Recon33-166*).
- Please note that both the 2004 and 2005 *Master Notes* were directly <u>addressed to Sydor's Tampa Florida address</u>; separate and apart from his eventual Pennsylvania address and Texas address (also on record at Northern Trust Bank). They were all changed by someone at Northern Trust Bank to keep Sydor alerted to his LOC account activities at all times; independent of Kenner.

Thru the haze of **CTE** (or other undue influences since his 2011 Grand Jury testimony) -- in 2015, Sydor "*could not remember*" signing his LOC statements (*Tr.2167-2168*):

*Q Did Mr. Kenner ever tell you about a loan in your name from Northern Trust Bank of that amount?*

**A [Sydor]:  No.**

**Sydor signed an October "*2005 Disbursement Request & Authorization*" with Northern Trust Bank confirming his entire $1,225,000 was distributed…**

In spite of the 2015 Court issued subpoena, Northern Trust Bank did *not* produce a *Disbursement Request & Authorization* for Sydor related to any of his 2004, 2005, 2006, 2007 or 2008 signed-annual packages.

The documents that were produced by Northern Trust Bank for Sydor would have been an impossible *lack of a collection* of "lending documents" for the Northern Trust LOC under Sydor's name.

Clearly – the Northern Trust subpoena was not completely filled, **because** Kenner actually had a copy of a signed *Disbursement Request & Authorization* from Sydor from October 2005, which Sydor had signed and returned to Northern Trust Bank (*See Recon33-167*).

- This was not the only document that the government retrieved from Kenner's office (**copies** sent from Northern Trust Bank to Kenner after they received them signed by Northern Trust Bank's individual clients).

- This document was not delivered in 2015 in the Northern Trust Bank subpoena, leaving the door open to ask, "*what other documents were not included or were purposely excluded from the subpoena*"?

**_Sydor's 2005 Disbursement Request & Authorization is a "one-page" document with signature…_**

The *2005 Disbursement Request & Authorization* confirms that **$1,223,758.33 had been distributed** and *only* $1,241.67 was "undisbursed funds".

*Sydor signed this one-page document.*
- There is no equivocation or analysis needed to confirm that Sydor was 100% aware of the "*use of funds*" at the time **he signed the one-page document**, addressed to Sydor's home in Tampa Florida, in conjunction with the remainder of the his *2005 Master Note* package.

- The 2005 *Disbursement Request & Authorization* highlighted that the:

  *Purpose* was: "*Renewal of line of credit originally used to invest in Little Isle LLC*" – AND – "*$1,223,758.33 had been distributed*"

  o This document is corroborated by Sydor's testimony to the 2011 SDNY Grand Jury; fully acknowledging that when/if Jowdy had repaid the 2004

> Hawai'i-Jowdy loan amount, *Sydor was 100% clear that the funds belonged to the Little Isle 4 capital account*, **not him personally**.

Darryl Sydor confirmed the loan to Jowdy from Hawai'i and the underlying knowledge without hesitation during his 2011 SDNY Grand Jury (*See Recon33-34*):

> *Q:  Was that [the LOC at Northern Trust Bank] also for Little Isle 4 as far as you know?*
>
> ***A [Sydor]: Yes, but then we put it towards a short-term loan to Mr. Jowdy until Lehman Brothers came up with the money that was supposed to be paid back."***
>
> *Q: Did you know in advance that it was going to be used, this Little Isle 4 money, to be used to salvage the Cabo investment?*
>
> ***A [Sydor]: Yes.  It was to help with the short-term loan to keep funding the Cabo, but then its supposed to be paid back, but that's –***
>
> *Q: Paid back to you or to Little Isle 4?*
>
> ***A [Sydor]: Paid back to Little Isle 4.***
>
> *Q: So –*
>
> ***A [Sydor]: Back to Hawai'i, not me personally.***

In fact – after the 2006 Joint Venture payments from Lehman Brothers, Sydor chose independently to reduce his LOC contribution account from $1,225,000 to $850,000 as a result of receiving the same "reduction" letter that Mascarella mailed to all of the LOC investors[140], at Kenner's direction.   The Sydor letter identified:

- As your relationship manager at Northern Trust, "***I was given instructions by Phil Kenner***" to make modifications to both your investment account and **your personal line of credit,** and
- **As you are aware**, a recent paydown in the amount of $383,914.40 took place on 8/25/06, and
- By setting a maximum line limit of $850,000 (**present balance $841,043**) **on your personal line of credit**, we could lower the collateral requirement to $850,000, and
- As a valued client of Northern Trust Bank, "***I wanted to take this opportunity to review recent account activity and confirm the changes to your account***".

---

[140] *See Recon33-100* [2006 letter to Berard from Northern Trust Banker, Aaron Mascarella]

As a result of the independent Mascarella letter and follow-up communication with Sydor, Sydor *requested and received* another full LOC package and *reduced* his collateral exposure to $850,000 – similar to the Nolan, and Berard reductions, at their choosing in 2006.

**Sydor received two (2) separate payments (to his LOC account and to his Schwab investment account) after the closing of the August 2006 Hawai'i joint venture...**

- **Yet -- Sydor "*could not remember*" any of it in 2015 (*Tr.2238*):**

  *Q: Following Lehman closing, you testified to on direct you were aware there was going to be a Lehman closing as relates to the Hawaii land development, true?*

  *A [Sydor]: I believe, yes.*

  *Q: And following that closing, did you receive monies either directly or indirectly from Phil Kenner, yes or no?*

  *A [Sydor]: I don't recall.*

  *Q: Well, do you know if on or about August 25, 2006 you received the sum of $383,914.40?*

     *MS. KOMATIREDDY: Objection.*
     *THE COURT: Overruled. If he knows.*

  *A [Sydor]: I don't recall, no.*

  *BY MR. HALEY:*
  *Q: Do you recall, sir, receiving the sum of $42,500 some odd change, either directly or indirectly from Phil Kenner following the Lehman closing?*

  *A [Sydor]: I don't recall.*

- **Na'alehu Ventures 2006's statement for August 2006 identified a $40,000 transfer to "Darryl Sydor" on August 18, 2006** (*See Recon33-108 at 1*).

**Sydor's LOC history identified a deposit for $383,914.40 the same day that Sydor signed his 2006 Master Note package (with four [4] other signatures) to reduce his LOC collateral account to $850,000.**

- It was *not possible* that Sydor was unaware of either distribution to his own accounts in real time -- and his immediate signatures on the new LOC package directly from Mascarella per Mascarella's letter; including but not limited to:
  - *2006 Sydor Master Note (after reduction) (See Recon33-168).*

- *2006 Sydor Disbursement Request & Authorization (confirming DISTRIBUTED FUNDS TO DATE of $841,043.93),*
- *2006 Sydor Pledge Agreement (See Recon33-169), and*
- *2006 Sydor Securities Account Control Agreement (See Recon33-170).*

Nevertheless, perhaps due to Sydor's full-**CTE** symptoms in 2015, he was unable to recall that his 2003 investment for $500,000 was actually his Diamante del Mar capital contribution; *not his Hawai'i capital account.*

Sydor cannot remember any conversations about his LOC (*Tr.2200*):

> *Q: Could you give us some idea as to the conversations and communications you had with Phil, either over the phone or by way of e-mail exchanges or by way of let's say letters written for the period of time that your line of credit was in effect. Give us some idea? More than one conversation, more than 10? Just some idea?*
>
> *A [Sydor]: I can't recall. I mean he was my financial advisor and I trusted him with what he did. I can't recall how many conversations we had specifically on that.*

- Yet – in concert with the other revisionary statements in 2015 – *"Sydor could specifically remember what he was not told"* about the loans to Jowdy – in direct contradiction to his 2011 SDNY Grand Jury testimony and all other related documents that he personally signed – *none of which* were presented as signature only pages...

**Sydor *"could not remember"* in 2015 that he spoke directly with Northern Trust Banker Aaron Mascarella about his collateral seizure independent of Kenner...**
- Yet -- Sydor notified Kenner of the pending communication; fully acknowledging the independent contact.

The Court's *M&O at 25* confirmed that *"Kenner never told Sydor that $866,200.86 from Sydor's retirement account was used to pay off the Northern Trust line of credit on Sydor's name"* (*Tr.2168-2169*).

**FALSE** – Because Sydor sent Kenner the following text (in evidence) to confirm he spoke to Aaron Mascarella at Northern Trust Bank the day of the seizure to approve it (*See Kenner trial exhibit 65*).



| 6316 | +197252305 05 Darryl Sydor* | 4/1/2009 8:48:29 PM(UTC+0) | Read | *Hey someone from northern trust called with someone from schwabb. And want to do a conference call in a hour with erin someone* |
|---|---|---|---|---|

- Thus – Sydor's EDNY testimony was not possible that he only learned about the seizure in 2015 – six (6) years after the actual events he described in 2011 to the Grand Jury…

At trial, Sydor still *could not remember* the text communication or the call with Northern Trust Banker Aaron [Erin] Mascarella even after seeing the text communication between himself and Kenner, *supra*.

Sydor also alleged (thru his haze of **CTE**) that he never saw either of the 2009 default letters that were mailed to his Texas home (*See GX-2118 and GX-2119*) (*Tr.2166-2167*):

> *Q I will publish it to the jury, [GX]2118. These appear to be letters from Northern Trust Bank to you.*
>
> *A [Sydor]: Yes.*
>
> *Q Did you receive any of these letters in February or March of 2009?*
>
> ***A [Sydor]: No. I first saw these the other day.***
>
> *Q Turning to [GX]2119, the letter entitled Notice of Default and Intent to Sell Collateral. 2120, a letter entitled Notice of Exclusive Control. When you testified that you first saw them the other day, can you be specific? What other day?*
>
> ***A [Sydor]: About a week and a half ago when I came the first time to testify.*** *Something happened with someone's mom and I didn't stay.* ***But that's when I first saw the documents.***
>
> *Q I'm going to hand you what's in evidence as Government Exhibit 2135. (Handing.)   Did you have a chance to look at that before you came to court today?*
>
> ***A [Sydor]: <u>The same time I saw the other papers for the first time</u>.***

The contradiction the government did not want Sydor to address was the fact that after Sydor received the actual March 19, 2009 default letter directly from Northern Trust Bank at his Texas home (just like his monthly LOC statements in evidence), **Sydor sent Kenner a text with the <u>exact information</u> four (4) days later** (on March 23, 2009), *fully verifying* he saw the default letters *six (6) years* before the 2015 trial (or his **CTE** was fully in progress, identical to Rucchin's claims under identical circumstances, *infra*).

Sydor gave false 2015 testimony, as follows (*Tr.2191*):
> *Q Is it your testimony, sir, that for the first time, since 2009, you learned of the*

*sale of your bond and collateral to the line of credit when you met with the government back on May 17th through May 20th of this year?*

*A [Sydor]: Re-ask the question.*

*Q Sure. Is it your testimony, sir, that the first time you learned that there had been a default and the sale of your collateral as relates to the bond referenced to the line of credit in the amount of $850,000 as set forth on 2119, was only a few days ago when you saw those documents as presented to you by the prosecutor and the agent? Is that your testimony?*

*A [Sydor]: As I recall, yes. If I saw this letter and it said Notice of Default and Intent to Sell Collateral, **I would remember that, yes.***

*Q Sir, we're talking about -- if I may. For the past six years, throughout the pendency of this matter in terms of the investigation, you had no knowledge of the default and the sale of your bonds. Is that your testimony?*

*A [Sydor]: **That's what I'm saying, yes.***

- Clearly – this is not true based on Sydor's own 2009 text to Kenner – *and more prejudicial **CTE**-laden mis-representations…*

**Sydor's text to Kenner perfectly matches the March 19, 2009 default letter from Northern Trust Bank about his LOC.   At no time did Sydor ask Kenner why he has a LOC at Northern Trust Bank or why it was $850,000 (after effectuating his own collateral reduction two [2] years earlier…**

- **Only six (6) years later thru the haze of CTE – Sydor cannot remember any detail of his financial life, wholly prejudicing Kenner.**

[Sydor wrote to Kenner after receiving the letter he claimed in 2015 he never saw]:

| 6079 | +19725230505 Darryl Sydor* | 3/23/2009 12:22:01 AM(UTC+0) | Read | What's this letter from northern trust all about |
|---|---|---|---|---|

[Kenner replied (sent in RED – hi-lighted)]:

| 7150 | +19725230505 Darryl Sydor* | 3/23/2009 12:24:13 AM(UTC+0) | Sent | **Did you sign & send the docs for the NT transfer to jim graham?** |
|---|---|---|---|---|
| 7153 | +19725230505 Darryl Sydor* | 3/23/2009 1:40:50 AM(UTC+0) | Sent | Did you wire [your Bank of America] funds to jim graham and your Schwab account? |

- *Sydor had to sign a series of transfer documents* (just like all of the LOC clients) in order to transfer the remainder of his funds out of Northern Trust Bank and back to his personal Schwab accounts.  Thus, this was further evidence that nothing could have occurred without his specific knowledge and direct participation.
  - The government's "*failed memory test*" prosecutorial theme produced nothing but unreliable testimony (a.k.a. **CTE** or *faulty memory, confusion and mistakes*).

[Sydor confirmed the specific amount of money on the March 2009 default letter -- *after* receiving the letter he claimed in 2015 that he never saw]:

| 6083 | +19725230505 Darryl Sydor* | 3/23/2009 1:59:36 AM(UTC+0) | R e a d | What funds ? **And this thing says I owe 855,351.03 right now.** |
|------|------|------|------|------|

- Jim Graham was Sydor's independent investment advisor, thus, if there was a question in March 2009, Sydor had his independent financial advisor to discuss the concerns with.  *He did not…*

The next problem (of **CTE** or *faulty memory, confusion and mistakes*) that the government cannot reconcile is that Sydor's March 19, 2009 default letter also verifies Northern Trust LOC documents that **Sydor signed**, including:

- *The 2006 Sydor Master Note – dated November 3, 2006 (See Recon33-168)*
- *The 2006 Sydor Pledge Agreement – dated November 3, 2006 (See Recon33-169)*
- *The 2006 Sydor Securities Account Control Agreement – dated November 3, 2006 (See Recon33-170)*

The 2009 default letter also identifies the exact "*aggregate total as of today of $855,351.03*".  This amount perfectly lines up with the Sydor text communication to Kenner, *supra*, leaving no doubt that Sydor had seen the letter six (6) years *before* his prejudicial testimony at trial.
- **The government was aware of the untruthful testimony at all times; and they let it stand uncorrected.**

Both default letters (February 2009 and March 2009) to Sydor's Texas address also noted:

> "*You may request an accounting by calling us at 602 468-2537*".

Every default letter (both February 2009 and March 2009) from Northern Trust Bank directly *to all their LOC clients*' addresses of record included the same contact information, yet not a single LOC client called Northern Trust Bank, according to Northern Trust Banker Aaron Mascarella's testimony.

**It is impossible that not one of them called considering six (6) years later, Kenner is criminally charged with the investors "not knowing" about the LOC and the "use of funds" when they cannot even remember receiving documents that they clearly received, directly from their bank; not thru Kenner -- AND SIGNED...**

In addition -- each LOC default was **DUE** three (3) to four (4) days *after* the collective April 1, 2009 phone calls independently between each LOC client and Northern Trust Bankers Catherine Brill and Aaron Mascarella (per the Sydor, Peca, Rucchin, etcetera, texts confirming the action (*See Recon33-171*).

- If Northern Trust's clients did not make their-own independent *confirmation calls* on April 1, 2009 – Northern Trust Bank would <u>not</u> have seized their collateral on April 1, 2009, they would have seized it on the due date of April 3, 2009 (or later – *supra* [*See Recon33-171 to Sydor's Texas residence*]).
  - It is improbable that any bank would seize collateral *before the due date* – unless there was an agreement between the parties (which there clearly was; *independent of Kenner*).

**Sydor confirmed to the EDNY that he signed the *"Letter of Authorization"* for Northern Trust Bank and gave permission under the terms of the Authorization Letter to Kenner to withdraw funds and deposit them in the account for Little Isle 4 (the Hawai'i partners capital account)...**

- In 2011 -- *Sydor previously confirmed* to the SDNY Grand Jury that he signed the same *"Letter of Authorization"* for Kenner to have full access to his LOC funds for his Little Isle 4 capital account investment.
  - There were NO additional confirmations required for Kenner to access the entire LOC account; after Sydor gave the blanket authorization – like all of the LOC clients for Little Isle 4 (*Sydor SDNY Grand Jury at 20-21*)...

Following Sydor's confirmation to the 2011 SDNY Grand Jury that he signed the *Letter of Authorization* for Kenner and Northern Trust Bank, Sydor confirmed that he could not remember all of the details of the LOC; *early symptoms of* **CTE** (*SDNY Grand Jury at 22-23*):

> *Q: It [the $850,000 reduced Northern Trust LOC] would be the kind of thing you would recall if you knew about it?*
>
> *A [Sydor]: I think if it was $850,000 I would.   But I do know that I did that line of credit to Hawai'i.   I am not sure if that's what it was or not.*

> *Q: Let me show you what's been marked **Grand Jury exhibit 115**, its titled "**Pledge Agreement' dated November 3, 2006 [Recon33-169].**   Let me show you, start with the signature page, does that look like your signature to you?*
>
> *A [Sydor]: <u>I'd say most likely its mine.</u>*
>
> *Q: Why do you say it's most likely yours?*
>
> *A [Sydor]: <u>Sometimes it looks different, its not the exact same every time.</u>*

After the deposit from Sydor's LOC, Little Isle 4 **CONTROLLED** the investor's funds (inclusive of Little Isle 4 authorization to lend money), as identified (*See Recon33-69*):

## 2004 Little Isle 4 By-Laws:
### Article II: Purpose
"*At the sole discretion of the Managing Member, <u>Little Isle 4 may participate as a lender</u> if deemed by the Managing Member to be in the best interest of the LLC*".

### Article VII. Projects
"*The Managing Member of Little Isle 4 will be authorized to invest in any real estate project that are deemed appropriate by the Managing Member and in the best interest of the LLC. <u>The Managing Member, at their sole discretion, can engage in outside ventures deemed to be in the best interest of the LLC, including but not limited to other Private Equity Funds and Lending Opportunities.</u>*"

Sydor gave testimony to the 2011 SDNY Grand Jury four (4) years before trial.   During his 2011 testimony, he confirmed that he was *100% aware* of his LOC usage and the transfer of funds to Ken Jowdy as part and parcel to the 2004 Hawai'i –Jowdy loan agreement.

The Sydor testimony occurred on the same date that Michael Peca told the SDNY Grand Jury (*See Recon33-33*):

> [Michael Peca]: "*That [Little Isle 4] capital account was loaned to Ken Jowdy, our business partner, so there is no need at the time to be worried about anything. The money was loaned to Ken Jowdy to basically help some of the purchase of the Cabo property so we can get the funding.   And then it was supposed to be a short-term loan.*"

- Ironically – Michael Peca was only involved in the Hawai'i-Jowdy loans from mid-2005 thru February 2006 (the last advance to Jowdy) – so his knowledge had to be in real time – as he described to the Grand Jury in 2011.
    - Peca became involved in the Hawai'i project at the same time that Lehman Brothers began looking into financing the Cabo project, so the real time

knowledge of Lehman Brothers' involvement was different than other Hawai'i partners who were involved since the inception of the 2004 Hawai'i-Jowdy loan.

[Michael Peca]: *"A short-term loan [was made] to Mr. Jowdy because at the time Cabo – we hadn't gotten the lending from Lehman Brothers yet. We made a short-term loan until the lending came in. Once the lending came through they were to pay back the loan, I think in the neighborhood of five-and-a-half million dollars, on the closing. It was never paid back. And then communication basically seized [sic] at that point from him [Jowdy]. That was kind of the whole sticking point as far as me and the other guys with Mr. Jowdy."*

At the same Grand Jury in 2011, Darryl Sydor confirmed the loan to Jowdy from Hawai'i and the underlying knowledge without hesitation (*See Recon33-34*):

*Q: Was that [the LOC at Northern Trust Bank] also for Little Isle 4 as far as you know?*

*A [Sydor]: Yes, but then we put it towards a short-term loan to Mr. Jowdy until Lehman Brothers came up with the money that was supposed to be paid back."*

*Q: Did you know in advance that it was going to be used, this Little Isle 4 money, to be used to salvage the Cabo investment?*

*A [Sydor]: Yes. It was to help with the short-term loan to keep funding the Cabo, but then its supposed to be paid back, but that's –*

*Q: Paid back to you or to Little Isle 4?*

*A [Sydor]: Paid back to Little Isle 4.*

*Q: So –*

*A [Sydor]: Back to Hawai'i, not me personally.*

*Q: But that didn't happen?*

*A [Sydor]: That didn't happen. And Lehman came up with the $129 million loan. It was supposed to be back at closing.*

At no point did Sydor, Peca (or Turner Stevenson, *infra*) represent to the 2011 Grand Jury "*under oath*" that they were not aware of the loans to Jowdy *at all times*. In fact, Sydor confirmed that he was clearly aware that the funds belonged to Little Isle 4 (*from his LOC investment funds*) and no longer to him, personally.

Peca echoed the same refrain, actually expressing to the Grand Jury that he believed his entire $1.775 million LOC (*Hawai'i investment*) and his $100,000 cash (*from his capital account at Little Isle 4*) was being loaned to Jowdy, not just a small portion of it.   Peca's confirmed knowledge meant that the "subset" loan (*of $240,000 of his originating funds sent to Jowdy as part of the Hawai'i capital account loans*) couldn't be a crime of concealment either; unless the government claims now that Kenner (*as Managing Member of Little Isle 4 and acting under the requirements and restrictions of the operating agreement – See Recon33-69*) did not send Jowdy enough of Peca's originating money?[141]

- The defendant is convinced that Jowdy would have accepted it, since he is <u>not</u> held to the same legal standards under the law, and would merely have obtained another $1.5 million of "*free money*" and protection for it from "*someone*", to never repay it.


Finally, Turner Stevenson, at the 2011 Grand Jury, who was the 3rd handpicked witness (*by FBI Agent Galioto*) (*See Recon33-35*), testified:

> *Q:  When you put up $100,000 for Hawai'i, did you have any understanding of whether the money could be used to pay for the Mexico project or was it just supposed to go to the Hawai'i project?*
>
> **A [Stevenson]: In the beginning it was supposed to go to Hawai'i. Then I saw they needed, <u>the group of us got together</u> [emphasis added], we have this piece of land that's available for purchase in Mexico that we need to wait on or get funds on to transfer as a group like one big blanket to get money into Cabo and pay for that land to hold it until the loan came.**
>
> *Q: So are you saying that you agreed to transfer some of the money from the Hawai'i project to the Cabo project?*
>
> **A [Stevenson]: I would say that, <u>yes</u>.**
>
> *Q:  Who made that decision?*
>
> **A [Stevenson]: <u>I think all of us as a group</u> [emphasis added].**

---

[141] The 2004 little Isle 4 By-laws (*which governed the Hawai'i project and the loans to Jowdy*) specifically expressed <u>*authority to lend*</u> in the beginning of the agreement:

> *At the sole discretion of the Managing Member, Little Isle 4, <u>may participate as a lender</u> if deemed by the Managing Member to be in the best interest of the LLC.*
>
> *The Managing Member, at their sole discretion, can engage in outside ventures deemed to be in the best interest of the LLC, <u>including but not limited to other Private Equity Funds and Lending Opportunities</u>.*

*Q: What do you mean as a "group", who is the group?*

*A [Stevenson]: <u>All the guys who were invested in it</u>.*

After the three (3) Grand Jury testimonies in 2011 (*and no evidence in contradiction thru that date – seven [7] full years after the loans to Jowdy began*), there could be no question about the Jowdy loan knowledge "*as a group*", specifically considering two (2) items.

**First** -- FBI Agent Galioto cherry-picked the three (3) Grand Jury witnesses in 2011 after consulting with several people adverse to Kenner in the Jowdy cabal, and

**Second** -- Each of the investors who confirmed Kenner's transparency of the *loans to Jowdy* -- and decision "*as a group*" to the SDNY Grand Jury in 2011 were *also* investors in the Cabo (Mexico) project.

- In addition -- Peca and Sydor were investors in the DDM project (*which Jowdy defrauded with Harvey and Najam (See Recon33-62); documented as embezzlements since 2002 – See Recon33-223*), and

- Sydor was an investor in the airplane(s) that Jowdy destroyed and robbed (*See Recon33-172 FOLDER – and Government-forfeiture-44*).

**<u>Sydor gave full authorization to Northern Trust Bank to allow Kenner to access his LOC for deposit into his Little Isle 4 capital account (as Sydor confirmed to the SDNY, *supra*)...</u>**

Thus, as a result, there were *<u>no secondary requirements</u>* for Kenner to alert Sydor -- or any other Hawai'i partner of individual transactions.   100% of their LOC accounts were *immediately* committed for the Little Isle 4 capital account the moment they signed the *Letter of Authorization (See Recon33-173 – also Kenner Exhibit 64*).

Sydor confirmed his signature on his **one-page** *Letter of Authorization (Tr.2195)*:

*Q: As relates to what has been marked as Kenner Exhibit 64, was that one of the documents that was shown to you by the Government during the course of that meeting between May 17th and May 20th of this year?*

*A [Sydor]:  Yes, I've seen this.*

*Q: So you saw that document, I take it, before May 17th and May 20th of this year; is that correct?*

*A [Sydor]: I remember seeing this here, yes. I mean I don't remember everything but –*

*Kenner 13-cr-607 (JFB)*

*Q: Mr. Sydor, I don't expect you to remember everything. We're talking about matters that go back six, seven, eight, nine years, I'm not asking you, sir, to remember everything. You see typewritten Darryl Sydor?*

*A [Sydor]: Yes.*

***Q: Do you do you see what appears to be your signature on the photocopy?***

***A [Sydor]: That's my signature.***

> MR. HALEY: Your Honor, I offer this document as Kenner Exhibit 64.
> MS. KOMATIREDDY: No objection.
> MR. LARUSSO: No objection, your Honor.
> THE COURT: Kenner Exhibit 64 is admitted.
> (Whereupon, <u>Defendant's Exhibit 64</u> was received in evidence.)

*Q: Only because I'm not adapt using the screen, I'll read this document in evidence for purposes of the record. It's very short.*

> *November 3, 2014,*
>
> *Northern Trust Bank, 2398 East Camelback Road, Suite 400, Phoenix, AZ, 85016.*
>
> *Re: Darryl Sydor-LLC to Northern Trust.*
>
> *Please allow Phil Kenner to access this outstanding line of correct for direct deposit for Little Isle IV account at Northern Trust Bank. He's authorized to sign for the release of funds related to my line of credit.*
>
> *Thank you for your assistance in this matter,*
>
> */s/*
> *Darryl Sydor.*

It should be noted that from the November 13, 2013 Kenner search and seizure, we know Northern Trust Bank failed to produce the following documents (*which are also not a complete set of original Northern Trust documents*):

- *Sydor 2004 Master Note (See Recon33-165)*
- *Sydor 2005 Disbursement Request & Authorization (See Recon33-167)*
- *Sydor 2005 Master Note (See Recon33-166)*
- *Sydor 2006 Master Note (See Recon33-168)*
- *Sydor 2006 Pledge Agreement (See Recon33-169)*
- *Sydor 2006 Securities Acct Control Agreement (See Recon33-170)*
- *Sydor 2007 Change in Terms Agreement*

**Yet -- Sydor cannot remember text communication with Kenner regarding "his" collateral seizure from Mascarella that he sent to Kenner (*Tr.2211-2212*)...**

> *Q: Sir that's not my question. Is it not true that there were times when someone, whether it is those two individuals or someone else, contacted you from Northern Trust with reference to your account, correct?*
>
> *A [Sydor]: I don't recall, no.*
>
> *Q: Kindly take a look at a document marked Kenner Exhibit 65, and don't read it out loud. Just read the writing on this document to yourself.  Sir, does that refresh your recollection that on or about April 1, 2009, Aaron from Northern Trust contacted you and suggested a conference call take place between you, Phil Kenner and Aaron?*
>
> *A [Sydor]: <u>Yes. It says that, but I don't recall that. I don't remember it.</u>*

Nevertheless, the following text is in evidence – confirming Northern Trust Banker Mascarella communicated directly with Sydor – in 2009 – in real time:

| 6316 | +197252305 05 Darryl Sydor* | 4/1/2009 8:48:29 PM(UTC+0) | Read | *Hey someone from northern trust called with someone from schwabb. And want to do a conference call in a hour with erin someone* |
|---|---|---|---|---|

Ultimately, the SDNY Grand Jury wanted to make sure Sydor had received and signed off on the 2006 Hawai'i joint venture agreement.   Sydor echoed the same "*did not read*" response, like Kaiser and many others related to critical personal investment documents. (*See Sydor SDNY Grand Jury at 30*):

> *Q: Let me show you one document and see if you would have gotten it or not. 110A is the number on the document dated July 26, 2006.  I'll give you time to look through it.  Mr. Kenner is the author on the page six.  See if that looks like something you may have gotten one way or another?*
>
> *A [Sydor]: I remember getting something like this.  I remember this thing here. <u>I didn't read through it all.</u>*
>
> *Q: You are pointing at something that lists percentages?*
>
> *A [Sydor]: Percentages.  And I probably have this at home I remember seeing this Walker real estate, but <u>I did not read through everything, every page.</u>*

It should be noted that Kaiser, who apparently had just been notified thru the phony "*confrontation*" meeting initiated by Manfredi in Spring 2006 (*Tr.983*), claimed the following (*Tr.1132-1133*) related to the same joint venture disclosure documents:

> [John Kaiser]:   *"Yes, it was a document like this [Kenner exhibit 28 – same as Sydor Grand Jury 110A] that I received prior to the closing which would be around the time of July 2006.  **I didn't read through this document.**"*

But again *"trust Kenner"* echoed hollowly...after an alleged $1 million diversion, allegedly discovered one (1) month earlier of Kaiser's friends & family funds (*raising all levels of suspicion for suborned perjury and "idle and dirty hands" from the prosecutorial team*).

- It is **inconceivable** for a former 15+ year NY Police Officer to react so nonchalant and cavalier, while dealing with $1 million of his "friends & family" money -- concurrently discovered as "*stolen*".[142]

**Continuing Sydor's CTE theme that "he cannot remember reviewing the entire GSF disclosure", claiming he thinks he only read the first (1st) line on his Blackberry device – yet he responded, as follows (*Tr.2193*):**

> *Q: Well, let's go to this document, Government's Exhibit 6603, the e-mail introduced in evidence. Is says sent via BlackBerry via AT&T. Yes, I totally understand everything. Thx. With reference to that particular document, that was one of the documents you say that you saw for the first time sometime between May 17th and May 20th of this year, correct?*
>
> *A [Sydor]:  Yes, the whole document. Like I said it is on my BlackBerry <u>and I probably read through the first couple lines. It's small, probably didn't read through it all</u>.*

**Notwithstanding – Sydor cannot remember that he already was an owner in the Falcon 10 airplane thru his 2004 contribution to Jowdy's Diamante Air LLC (*Tr.2178*):**

> *Q: Now, at the time that you talked to Mr. Kenner, before you put money into the Global Settlement Fund, did he mention any of that money being used for any of those projects?*

---

[142] Again, it must be noted during Kaiser's voluntary 2009 arbitration testimony (three [3] years after the alleged 2006 confrontation), Kaiser was asked and answered [*as a former 20-year NYPD and Suffolk County police officer*]:

> *Q: Even now, sitting here in May 2009, is there anything you've uncovered, as someone who obviously knows how to investigate, that Mr. Kenner has done anything inappropriate throughout these [Hawai'i] transactions?*
>
> *A [Kaiser]: NO*
>
> *Q:  Not one complaint?*
>
> *A [Kaiser]: None.*

> *A [Sydor]: No. It was for the global settlement of the Mexico situation. As you can
> see, it's sent from my Blackberry. I probably read over the first little bit, the
> transfer to Ron Richards for the Global Settlement Fund. On the Blackberry, I
> probably didn't read this whole e-mail. I would have questioned, you know, the
> Palms, the **airplane**, the air park. I mean, I used private planes at the time, but I
> never really wanted to purchase a plane or invest in an airplane. And I know for a
> fact that I didn't want to be part of the Palms.*

Yet – on page 3 of the July 2005, Diamante Air operating agreement, Sydor is noted as a
10% owner of the Diamante Air LLC – after making a $250,000 contribution to the
Jowdy-controlled entity directly from his own Bank of America checking account (which
Kenner had no contact with at any time) (*See Recon33-174 at 3*).

## MORE CTE for Sydor...

- **Sydor cannot remember a single detail of the GSF phone calls...(*Tr.2257-
2258*):**
  *Q: Do you have any recollection of the particular nature of the discussions that
  took place during those [GSF] conference calls?*

  *A [Sydor]: The one I was sitting in Best Buy in my car listening, we were talking
  about the Global Settlement Fund and then for the situation in Mexico at the time.*

  *Q: Do you have a recollection of any other topics being discussed in the
  conference call? You do remember?*

  **A [Sydor]: I don't remember, no.**

  *Q: Let me just ask you to look at what has been in evidence and I'll not review all
  of these. This is C 33 in evidence, and at the header, do you see Syd@ as your e-
  mail address?*

  *A [Sydor]: Yes.*

  *Q: Do you have a recollection of receiving an invitation by Mr. Constantine on
  June 10, 2009, to participate in a conference call?*

  **A [Sydor]: I don't recall.**

  *Q: Let me show you what has been received in evidence as C 34, this is an e-mail
  that is in evidence June 25, 2009. This is C 34, June 25, 2009, and your e-mail is
  part of the group e-mail; is that correct (indicating)?*

  *A [Sydor]: Yes.*

  *Q: Do you recall receiving an invitation by Mr. Constantine on this date to
  participate in conference call number 2?*

*A [Sydor]: I don't remember, no. I don't recall.*

*Q: C 35 in evidence. This is conference call number 3, August 19, 2009. Your e-mail address is part of the group; is that correct?*

*A [Sydor]: Yes.*

*Q: Do you recall receiving an invitation on August 19, 2009, to participate?*

*A [Sydor]: I don't recall.*

(*Tr.2261*):

*Q: Do you have a recollection actually participating in this conference that occurred shortly after June 2009?*

*A [Sydor]: I mean I just don't recall.*

### Sydor CTE continues re -- Eufora private stock sales...
- **Sydor cannot remember if he ever met his own attorney, Michael Stolper:**

(*Tr.2285*):

*Q: Do you know a man by the name of Michael Stolper?*

*A [Sydor]: Yeah. He was a lawyer out of New York, I believe.*

*Q: Did there come a point in time that you actually met with Mr. Stolper?*

*A [Sydor]: Met with Mr. Stolper? I know he was on a conference call. **I'm not sure if I met him in person.***

(*Tr.2291*)

*Q: Do you remember attending a shareholder meeting, a Eufora Shareholder meeting either in person or over the telephone?*

*A [Sydor]: A shareholder meeting? I don't recall.*

During the call – Sydor's attorney (Michael Stolper) sent Kenner a text (in real time) to inquire who was on the Eufora conference call. Kenner replied [in RED (sent) –hi-lighted]:

| 15718 | +19176 261175 Michael Stolper* | 8/18/2010 7:17:17 PM(UTC +0) | R e a d | **You figure out who was on phone?** |
|---|---|---|---|---|
| 18239 | +19176 261175 | 8/18/2010 7:17:36 | S e | **Yes. I know all of them. Nash. Sydor. Peca. McKee.** |

| | Michael Stolper* | PM(UTC +0) | nt | Gonchar. Devries. Privitello and Rizzi. [CEO] CR [Gentry] was kicked off |
|---|---|---|---|---|

- Bryan Berard and Tyson Nash also participated in the meeting in person at the Eufora offices with Constantine.   Constantine refused to allow Kenner, the investors' attorney or John Kaiser into the building for the meeting; utilizing armed security as his deterrent.

It should be noted that Kenner and Attorney Stolper notified every shareholder about the conference call.   The notification received a terse response from Michael Peca, nevertheless acknowledging his participation and Kenner's transparency:

| 15503 | +17163743234 Michael Peca* | 8/13/2010 2:19:04 PM(UTC+0) | Read | Why the fuck is Tommy having a shareholders mtg? |
|---|---|---|---|---|

*(Tr.2292):*

> *Q: So in this particular conference call, do you have a recollection of what was discussed?*
>
> *A [Sydor]: I can't say that I remember exactly, no.*

After Berard managed the entire Eufora shareholders "buy out efforts" in spite of his 2015 amnesia about it (*Tr.3106, 3111*)[143], Berard went on a rant in August 2010 after he, Jay McKee and Peca (also exhibiting 2015 **CTE** regarding the Eufora loan buyout fought about the amount and participation in the collective buy out efforts (*Tr.604, 609*):[144]

---

[143] In 2015 testimony -- Berard exhibited full **CTE**-symptoms regarding his 2010 Eufora loan buyout efforts, in spite of his role as the manager of the effort with Attorney Stolper:

> *Q: Was there also an effort underway not only to buy this loan but also to take the company over from Mr. Kaiser -- I'm sorry -- from Mr. Constantine?*
>
> *A [Berard]: No.*
>
> *Q: Would it surprise you to learn it was with Eufora and not with Mr. Constantine?*
>
> *A [Berard]: You say surprise? I didn't understand the loan in general.*
>
> *Q: Well, do you remember any discussions about going to talk to Brent to buy the loan?*
>
> *A [Berard]: I do not, no.*
>
> *Q: Do you know if or did you come to learn that somebody in your group actually went to talk to Mr. Brent?*
>
> *A [Berard]: Not to my knowledge, no.*

[144] Peca cannot remember the Eufora buy out plans that he was emphatic about investing in, referring to it as a "lynching" if he and others could not be part of the buy out team (*Tr.609*):

Kenner 13-cr-607 (JFB)

| 1559 4 | +14015 246929 Bryan Berard* | 8/17/2010 3:17:47 AM(UTC +0) | R e a d | U asked mckee his other options? |
| 1559 5 | +14015 246929 Bryan Berard* | 8/17/2010 3:19:11 AM(UTC +0) | R e a d | I think u just tell him [McKee] get his own counsel and to have them call Stolper. Let him and Peca go fuck themselves and don't bother discussing with them any more |
| 1559 6 | +14015 246929 Bryan Berard* | 8/17/2010 3:19:46 AM(UTC +0) | R e a d | Him and peca say they r interested puttn $ in to it. But doesn't look like it. So fuck them. We can somehow do it ourselves.. |
| 1559 7 | +14015 246929 Bryan Berard* | 8/17/2010 3:21:12 AM(UTC +0) | R e a d | I'm tired of hearing abt it and I know u gotta b xhausted. U did What u cld and uve been trying and dealing wth it long enough. Time to go on our own and get things done. All good Karma. Uve done enough. Plus we got Lanie on our side so good stuff haha |

- The **8/17/2010 3:21:12** text from Berard to Kenner was also one and a half (1 ½) years after Berard claimed in his 2013 FBI proffer that he determined in April 2009 (even before his pro-Kenner, voluntary 2009 arbitration testimony) that "*Kenner was no longer legit*". Obviously Berard's own language in real time – and under frustration of the other investors' non-cooperation with "*his loan buy out plan*" was enough for Berard to commend Kenner and tell him to *only* work with Berard in the future; not Kenner's client base.

  o It should also be highlighted that 2015 EDNY tracing witness [Lanie Donlan] is mentioned by Berard as his loyal side-kick to **go along for the ride**. It further highlighted her unsupported and undocumented 2015 claims that Kenner was "tracing" signatures with Lanie Donlan's help onto bank documents (*Tr.3424*), that she neither turned over to the FBI, nor did they ask her to look for to place into evidence; **because** they do *not* exist!

- Please note that Kristen Peca recently fabricated testimony in 2015 that she told Kenner and Constantine in May 2009, her and Michael Peca wanted "*nothing to do with investments anymore*" (*Tr. 717*) – yet one (1) year later,

---

*Q. Do you have a recollection, back around December of 2009, somewhere around October 2010, these same individuals, with your knowledge, being aware, secretly, without Mr. Constantine's awareness, try and contact Eufora's lenders to try and buy the loan before they publicly sought to do so?*

*A [Michael Peca]: I wasn't aware of that.*

Michael Peca is negotiating with Stolper and Berard directly about more significant investments. ***It does not comport***.

**Regarding the Gaarn private stock sales in 2008-09, the government prejudicially alleged that Gaarn was selling "Kenner stock" in Eufora, thru misleading questions about facts that were never in evidence...**

The government used Sydor unknowingly to produce the false representations about "*Kenner selling his stock*"; because **Kenner was __not__ selling any stock -- ever** (*See Recon33-175 -- Kenner trail exhibit 80*).

- Gaarn and the FBI (Operating Pederpuck) recorded Kenner for over four (4) hours in 2012. Not once did they ask Gaarn to discuss with Kenner that he or they were doing anything conspiratorial or illegal related to Gaarn's stock sales (or anything at all)...
- The government and Gaarn knew Kenner would have vehemently DENIED any such false claims, thus in their entrapment plans, they never introduced that unwinnable allegation that they saved for trial to mis-direct the jury...

The government repeated their false claims during rebuttal summation (*Tr.5970-5971*):

[AUSA Komatireddy rebuttal summation – regarding the false Sydor Q&A]:
"*QUESTION: Now, at the time that you invested in Eufora, did the defendant say anything to you about your money being used to buy out other investors?*

*ANSWER: No.*

> *QUESTION: To buy out Tommy Constantine?*
> *ANSWER [Sydor]: No.*
> **QUESTION: To buy out Phil Kenner?**
> **ANSWER [Sydor]: No.**

*Now let's talk about the other Eufora fraud and what the defendants call "selling shares." They've told you that there is no impropriety in them getting money from the hockey players in 2008 and 2009. Because after all, they were just selling their shares in Eufora.*

- The government's theory was that after the 2008-09 sales were fully vetted by Giuliani and Stolper's investigative team, *supra*, and "*OK*" (a.k.a. "*predictable*" according to investors' attorney Stolper)[145] – the government was now going to criminalize the activity of the legal and vetted transactions...

---

[145] There was NO SECRET about either the Gaarn (*2009*) &/or the Tommy Constantine (*2008*) Private Stock sales to Stolper &/or the Plaintiffs. Kenner sent attorney Stolper the following text

**Finally – Sydor cannot remember if he ever saw the Northern Trust loan history report. (*Tr.2317*)…**

- This ignores the fact that Sydor had to request the documents directly from Northern Trust Bank in October 2009 with a signed and notarized request letter; independent from Kenner (and it was produced six [6] months after the collateral seizure):

*Q: You were asked on redirect a very specific question about, once again, the contents of the binder that you received from Phil Kenner. As I recall, you testified you do have a recollection that nowhere contained in that binder was the loan transaction history that the government showed you, is that correct?*

*A [Sydor]:  I don't believe that I was firm in that statement. I believe I said I don't believe it's in there.*

*Q: So by that answer, this loan transaction history, as best you know, may or may not have been in that binder?*

> *MS. KOMATIREDDY: Objection. Asked and answered.*

---

in real time during the Constantine-led Eufora shareholders conference call to hi-light the stock sales issues:

[Kenner (sent) in RED – hi-lighted]:

| 18271 | 19176261175 Michael Stolper* | 8/18/2010 8:09:12 PM(UTC+0) | Sent | **Tommy has the Kenner gave Gaarn stock as an illegal transfer issue on the table. He's threatening with law enforcement to go after us** |
|---|---|---|---|---|

Reply from Stolper:

| 15750 | 19176261175 Michael Stolper* | 8/18/2010 8:10:45 PM(UTC+0) | Read | **Predictable** |
|---|---|---|---|---|

Then – Constantine made another unfounded allegation during the investors' conference call. Again -- Kenner passed the information along to the investor's attorney (*Stolper*) immediately:

| 18272 | 19176261175 Michael Stolper* | 8/18/2010 8:10:37 PM(UTC+0) | Sent | **He just threatened law enforcement involvement to settle the issue with the Kenner/Gaarn transfer!** |
|---|---|---|---|---|

And Stolper again responded:

| 15751 | 19176261175 Michael Stolper* | 8/18/2010 8:12:24 PM(UTC+0) | Read | **Hopefully recorded.** |
|---|---|---|---|---|

*THE COURT: Overruled. He can answer.*

**A [Sydor]: Yes.**

Northern Trust Banker Aaron Mascarella confirmed at trial that the only time he produced the "*screen prints*" images of the loan history was six (6) months after the April 2009 seizure of collateral. Thus, as a result of the *ex post facto* information, the government's assertions that the "*screen prints*" document (requested individually by each Northern Trust LOC client) would have created some grander level of transparency for Northern Trust's clients.

- Nonetheless, this is not a document that Kenner produced – or in any way concealed from the Northern Trust clients who independently made the notarized request six (6) months after the collateral seizure to assist in their tax filings for the Hawai'i project, nothing more, nothing less (*See Recon33-92*):

[Mascarella] (*Tr.884-885*):
    *Q: And just can you describe for us the format of those loan histories?*

    ***A [Mascarella]: These came from my personal computer.***

    *Q: How do you know that?*

    *A [Mascarella]: Because of the format. <u>Monthly statements are generated by the bank using a third party company</u> that takes the information, makes them into fancy looking bank statements. These are literally the snapshots of the screen prints of my computer.*

    *Q: <u>What were the dates of those screens prints that were printed?</u>*

    ***A [Mascarella]:October 19, 2009.***

Mascarella's answer about the monthly statements also confirms that if the Northern Trust Bank LOC clients received even one (1) monthly statement for their LOC, then in order for the statements to not continue month-by-month, someone at Northern Trust Bank would have needed to input a manual "*cancelation order*" of the monthly LOC statements. **No one testified to that fraud from Northern Trust Bank. Mascarella confirms that it is an automatic process.**

- The government did not present evidence that someone at Northern Trust Bank chose to break the law, violate the 2001 Patriot Act (and a multitude of other federal banking laws), and <u>intermittently</u> CANCEL *some* of the monthly statements opposite the ones that arrived at the various LOC clients' addresses of record from the bank (in the 2015 Northern Trust Bank subpoena).

The theory that concealment of monthly LOC statements occurred at Kenner's direction fails based on the pure mechanisms of the federal banking system, as confirmed by Mascarella at trial – notwithstanding the pure lack of Kenner instructions to break the law.   This was more prejudicially unchecked clutter that the government polluted the jury and the Court throughout trial to defame Kenner.

<u>Sydor re-direct examination</u>

Lastly, after Sydor had confirmed his name without hesitation on multiple Northern Trust bank records during his initial cross-examination, the government needed to resuscitate its **CTE**-laden witness.   After a break (and likely additional preparations), Sydor was asked a series of questions related to these same "signed documents".

**But this time,** Sydor was immediately and without hesitation, 100% certain and emphatic that his name was forged by someone.  These are documents that the government had in their possession for years, but did not present to the Court ahead of the trial as instructed by the Judge in 2014.   This newfound confidence by Sydor was out-of-character, almost appearing "rehearsed" for his final show.

Yet, immediately after the series of signature denials, Sydor was back to his **CTE**-laden memory – BECAUSE it had not been rehearsed (*Tr.2296*):

> *Q: About those default letters. During that time period or at any time period, did you talk to Mr. Kenner on the phone about loaning your name going into default?*
>
> *A [Sydor]:I have no idea.*

The evidence, *supra*, confirms Kenner and Sydor spoke – including Sydor's text to Kenner the day he received the March 2009 default letter:



| 6083 | +19725230505 Darryl Sydor* | 3/23/2009 1:59:36 AM(UTC+0) | R e a d | What funds ? **And this thing says I owe** <u>855,351.03</u> **right now.** |

- Please note that the <u>855,351.03</u> perfectly matched the amount on the default letter (*See GX-2119*).

**There is no other explanation for the loss of memory, but <u>CTE</u>, because** *faulty memory, confusion and mistakes* **would be the same as altogether "defective testimony" and not sufficient (under the government's own claims of** *faulty memory, confusion and mistakes***) to sustain a conviction.**

### James Grdina [146]

Grdina was Constantine's financial partner in the Urban Expansion LLC that funded the Waikapuna purchase in 2005.  Grdina was unknown to Kenner and Kenner Hawai'i partners at the time of the loan and thru its completion.

The Urban Expansion loan was a result of a last minute effort to save approximately $1 million in hard money deposits on the $35 million appraised ocean-front Hawaiian parcel, known as **Waikapuna**.

In 2005, Hawai'i COO Chris Manfredi had expressed on two (2) occasions the difficult status of funding the Waikapuna parcel thru his own disappointments because of his hands-on funding work – prior to the Urban Expansion loan.

Manfredi stated on August 16, 2005, immediately after he chose (with Kenner and Kaiser) to cancel the 2005 Lehman Brothers loan agreement as (*See Recon33-123*):

> [Manfredi]: *"The deal with Lehman was cancelled by us as being too egregious"*

- Manfredi sent this message to another hard moneylender who he was trying to get involved in the project; independent from Kenner.

Following another failed effort to get the Waikapuna funding (prior to the Urban Expansion successful efforts), while never mentioning his 2015 allegations of mis-use of the Centrum loan or any other misappropriations (*Tr.2950-2951*), Manfredi stated clearly to Kenner on September 30, 2009 (*See Recon33-176*):

> "I, like you, have been hearing the same old stories for so long, everyone can "get it done" and nobody does…I think the likelihood of losing Waikapuna and Moa Ula Makika [another parcel under agreement] is very real.   I never thought I would be leaving this trip without funding.
>
> Chris Manfredi
> COO/Project Manager
> Big Isle Ventures, LLC
> 516-526-xxxx"

Clearly, Manfredi was intimately involved in the volume of lenders that he, Kaiser and Kenner attempted to secure to fund the Hawai'i project.   *None of it was apparently easy*

---

[146] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 25-26.*

*(thus the entire FOLDER Recon33-8) should be read to confirm the levels of despair that Manfredi was experiencing with Kenner's funding effort disappointments in Hawai'i.*

Never once in Manfredi's desperation email(s) – or any other medium – does Manfredi claim to Kenner that "*if we had just used the Centrum loan to close Waikapuna*", there would be no issues.   There were at least two (2) reasons that could never have been true:

**FIRST** – The Centrum funds were not enough money to close the Waikapuna parcel, and

**SECOND** – Manfredi (not Kenner) was still dealing day-to-day with the lenders from Lehman Brothers, so what would Lehman Brothers have been funding – considering their 2005 Lehman Brothers loan was only for the Waikapuna closing and no additional funds? Also – the Lehman Brothers lending parameters changed at the 11th hour to a two-year bubble loan with 23% annual interest, with no extensions allowed (thus -- a full loser – and absolutely "*egregious*").

- The Commonwealth Financial deal on the same Manfredi "distraught" email required a $3 million front end penalty on their loan (at page 2) – further confirming that none of the hard-money loans would get done without significant "penalty expenses" (*See Recon33-176*).

**Grdina confirmed at trial that he required Kenner to deposit another $100,000 -- personally -- in order for Grdina to sign off on the loan…**
- **Kenner did.**

The Court's *M&O at 26* verified: "*Grdina testified that Kenner contributed $100,000 of his own money to the purchase of the Waikapuna property…*" (*Tr.2408-2409*).

**Kenner was also forced to personally guaranty the entire $3.5 million Urban Expansion loan – identical to Kenner's personal Centrum guarantee…**
- **Kenner did.**

The Court's *M&O at 26* confirmed that "*He [Grdina] also said that he had no objection to the pre-payment penalty*" (*Tr.2445*).

Every one of the hard money financing agreements included high stakes pre-payment and back-end penalties for getting out of the deal at any time; *including the Centrum loan*.   It should be noted that **the 2006 Lehman Brothers' Cabo san Lucas deal included a 100% interest guarantee from day one of $125,000,000.**   The government's representation that the Urban Expansion loan "penalty" was some sort of an anomaly was knowingly false and premeditated to be prejudicial; which it was both.

**Grdina confirmed that Kenner had no financial interest in the Urban Expansion loan…**
- **This was 100% true.**

The Court's *M&O at 26* confirmed that "*He [Grdina] also said that Kenner had no financial interest in the Urban Expansion loan*" (*Tr.2472*).

**CORRECT** – In fact, the $669,000 that Constantine transferred to Kenner after the completion of the Lehman Brothers joint venture funding in August 2006 completed two (2) previous deals that were disclosed to Manfredi and Kaiser prior to the final JV agreement in the "*Representations and Warranties*" section email (*See Recon33-110 at 1,4*):

**FIRST** – *Eufora owed Kenner $386,000* from 2005 and 2006 personal loans to the Eufora Company (*See Recon33-3*).   These loans are documented on the Eufora tax filings.   Constantine repaid the loan to Eufora and retired the Kenner debt in 2006.

**SECOND** – *Constantine owed Kenner a $283,000 balance* (of an original $404,000 total payment) after buying Kenner's South Beach Miami penthouse from him in 2006 for $2,000,000 (*See Akoya closing document from the Florida website – Recon33-177*) (in evidence).

At trial, Kaiser denied seeing the ***Representations and Warranties*** email sent to himself and Manfredi, requiring their pre-closing sign-off in 2015.   **BECAUSE** -- Kaiser claimed *only* his name was in the "**To:**" line on the email, and not his full email address.

- **The most ridiculous part of Kaiser's direct denial was that the FBI had the email, which had Kaiser's name in "LARGE" letters at the top – which was a function of Kaiser forwarding the email to another party (the FBI – since it had an *ED-00003161 BATES STAMP* on it) (*Tr.1163-1164*):**

*Q To the best of your knowledge, sir, is that an e-mail sent to you by Phil Kenner on Wednesday, July 12th, 2006, at 3:06 p.m.?*

**A [Kaiser]: It's not my e-mail account.**

*Q I understand. It's to Chris Manfredi and John Kaiser. My question simply is, is that or is that not an e-mail sent to you on that date?*

**A [Kaiser]: My e-mail is not on here.**

*Q You can't –*

***A [Kaiser]: No, I can't. Not from this document.***

*Q Incidentally, the closing documents in connection with the Lehman closing did contain various representations and warranties in the body of the closing documents themselves, is that true?*

***A [Kaiser]: I didn't read the Lehman closing documents.***

*Q Did you have any interest, sir, before the closing, in knowing what representations and warranties were going to be made between the various business entities as relates to the closing?*

***A [Kaiser]: No. His attorney was working on it. Like I said, I did not read the Lehman closing docs related to Hawaii.***[147]

The **representations and warranties** email included the following language that was also in the 1800-page closing document – reviewed by ten (10) independent law firms who represented all of the parties (confirmed by Hawai'i partners attorney Najam in the 2009 *Nolan v. Kenner* arbitration, *supra*) – and received (& signed off) by all of the Hawai'i partners investors (as 100% required by Lehman Brothers).[148]

The **representations and warranties** email confirmed transparency, knowing Constantine was going to close the **Eufora** and **Akoya** deals with Kenner upon receipt of his Urban Expansion settlement. Either way, the funds were all documented as owed to Kenner for legitimate investment and lending deals Kenner had done *prior* to the Urban Expansion loan and Lehman Brothers' involvement in the August 2006 Hawai'i closing; yet disclosed, as follows:

> "*Windwalker acknowledges that JV Partner [Kenner] may be involved in business transactions unrelated to the Property with the holders of Parcel 2 debt ([Centrum] and Parcel 3 debt [Urban Expansion].*"

---

[147] This email would have been sent to Kaiser and Manfredi within a month or so of the fabricated "*confrontation*" meeting which Kaiser's friends & family were allegedly robbed $1 million from Kenner – but Kaiser chose "*not to read*" the closing documents with all of his friends & family money still involved.

- It is more irrational testimony; left to stand as the truth by the knowing government.

[148] The 100% compliance and sign-off of the 1800-page agreement thru the July 2006 individual sign-off disclosures are what led to the "horse trading" with Manfredi (about a $280,000 payout) and then Kaiser ($1.176 million for his friends & family loans -- and another $395,00 short-term loan for Kaiser to buy out two partners – including Manfredi for the chaos he caused during the 2006 Lehman Brothers closing [noted by Hawai'i closing attorney Najam to Markowitz - *See Recon33-117*] – AND fully confirmed by Kaiser's other Sag Harbor partner, Vincent the, during his 2014 FBI proffer, post Kenner arrest – *See 3500-VT-1-r*))...Final language *See Recon33-235.*

There is no evidence that there was anything unusual about the Urban Expansion loan. 100% of the settlement amounts and payouts were independently negotiated between Lehman Brothers attorneys, the JV partners' [Windwalker] attorneys and the Urban Expansion attorneys; *never including Kenner in the settlement*.   In fall 2005, the Urban Expansion loan was the only loan that Manfredi, Kenner, and Kaiser felt comfortable with closing before losing the Waikapuna parcel.

- **It was clear that the 2005 Lehman Brothers loan would have resulted in a total and catastrophic loss of the entire Hawai'i project**.   Lehman Brothers demanded that all of the Hawai'i land be cross-collateral for the Waikapuna $5 million acquisition loan.   Under all knowing circumstances, the subdivision of that parcel (and all other Hawai'i parcels originally under the Hawai'i partners control) has never been approved for subdivision approvals (still in 2019).   Thus, without the specific need to subdivide the land and sell parcels for home development, the entire project would have been consumed by the Lehman Brothers "*deal-to-steal*" that they presented (a.k.a. "*egregious*" per Manfredi in August 2005) at the 11th hour, expecting to have the Hawai'i partners in a proverbial "corner" -- and forced to sign.

Again (*See Recon33-123*) Manfredi confirmed this salient issue to another hard moneylender that he, Kaiser and Kenner were trying to collectively close before the Urban Expansion lenders were a even presented as a possibility over a month later:

[Manfredi]: *"The deal with Lehman was cancelled by us as being too egregious"*

Finally, Manfredi, who dealt directly with Constantine to close the 2005 Urban Expansion loan and attempted to close multiple prior and subsequent funding loans, ***could not remember*** a single incident of cooperation between the two (2) of them during his 2015 trial testimony.

The most incredible portion of Manfredi's testimony was his continued denials of the cooperation &/or memory of cooperation with Constantine even after being shown the emails that he and Constantine routinely exchanged to facilitate potential lenders (all pursuant to the 2004 and 2005 consulting agreements Constantine signed with Kenner and Kaiser in 2004 and 2005, respectively) (*Tr. 3014-3021*).[149]

---

[149] Manfredi 2015 testimony fully denied his recollection of the voluminous work with Constantine for lending deals before, during and after the Urban Expansion funding:

*Q I'll just read your response or your comment at this point:*

*Aloha Tommy, I'm forwarding this e-mail on behalf of Phil Kenner. Please contact me should you have any questions or need further information.* **Cheers, Christopher**.

*Below there is information regarding the Tucker parcel, dated January 15th, the day before, you state purchase price expected at 4-4.5 million. See attached appraisal and map on page 24 therein. Then there's a list of items TMK 25 acres and 16 acres, zoning. Finishing up with two attachments you see on the back.*

*Does this refresh your recollection that you were sending information regarding parcels that needed funding, both Mr. Kenner and in fact now telling Mr. Constantine that you would give him the information for his use.*

*A [Manfredi]: Can you show me page 2 of that again, please.*

*Q As soon as, if you can, focus, let me know when you had a chance to read that.*

*A [Manfredi]: No.*

*Q No. Meaning no, this doesn't help refresh your recollection that you are sending information to Mr. Tommy Constantine with regard to the need for funding?*

**A [Manfredi]: Yes.**

*Q Well, would you agree with me that the information at the bottom of the page starting with TMK, going through zoning, into the attachments, would be information you would normally send to a lender that was willing to do due diligence to the projects in Hawaii?*

**A [Manfredi]: Yes.**

*Q Tell us what all of those TMK zoning and attachments have to do with funding in layman's terms?*

*A [Manfredi]: TMK is a tax map key that refers to the property. In New York it would refer to section, block and lot. Zoning is relating to permitted land use.*

*Q And the zoning down here, the second zoning that appears?*

*A [Manfredi]: This particular document, it says RM 3 which is a multifamily with a maximum of one dwelling per 3,000 square feet. And CV-10 which is a commercial village, meaning 10,000 square feet per building site.*

*Q And I believe there is also references to appraisals and maps. This is all information a lender would need to do his due diligence; is that correct?*

*A [Manfredi]: Well, different lenders would require different information, so if you say it's all the information a lender would need, I can't say that with all certainty.*

*Q Let me refer to the Tucker parcel. What is the Tucker parcel?*

A [Manfredi]: Tucker was a seller of a parcel or the owner of a parcel of a potential seller of a parcel of land adjacent to Waikapuna.

Q Do you have a recollection, Mr. Manfredi, now that there were discussions with at least Mr. Kenner with regards to finding funding for the Tucker parcels?

A [Manfredi]: Yes.

Q Do you now have a recollection now that we've been talking about that Mr. Constantine would be provided information by you so he could try and find a lender to pay for the development of the Tucker properties?

**A [Manfredi]: _I honestly do not recall communicating directly with Tommy Constantine._**

Q How about indirectly by e-mail? Do you. Do you have a recollection now?

**A [Manfredi]: No, sir.**

Q By the way. this last one is January 16, 2006. That would be after the contract had been paid for on the Waikapuna property; is that correct?

A [Manfredi]: Can you repeat that.

Q I'll withdraw that. I'll move on.  I'll show you the next exhibit that is received in evidence. This is C 188. This is one captioned Title Records for Hawaii, and it is dated March 19, 2006. **It's an e-mail from you, Mr. Manfredi, to Tommy Constantine.**

> **Hi Tommy, the title reports for the Honu'apo property are attached. I'll fax you the mortgage shortly.   Thanks, Chris.**

Do you have a recollection of sending this to Mr. Constantine directly?

**A [Manfredi]: _No._**

Q By the way. the attachments that appear here, are you able to identify for us what these attachments are?

A [Manfredi]: No.

Q If you went back into your computer, you would be able to do this, correct?

A [Manfredi]: Yes.

**Q _Did the Government ever ask you to produce any of the e-mails and attachments that you sent to Tommy Constantine, if any?_**

**A [Manfredi]: _No._**

*Q Let me show you the last exhibit that was received in evidence, C 189. Again, **this is an e-mail captioned Hawaii mortgage, March 19, 2006. Again from you to Mr. Constantine**.*

**Tommy: Please find mortgage attached for the Hawaiian property. I sent the updated title reports earlier. Let me know should you have any questions or need any additional information.  Thank you, Chris.**

*Then there are attachments down at the bottom, recorded mortgage. Do you see that?*

*A [Manfredi]: I see it.*

*Q **Did you have any recollection of communicating with Mr. Constantine regarding a Hawaii mortgage?***

*A [Manfredi]: **I don't have a recollection of that, sir.***

*Q Do you have any recollection of any Hawaiian mortgages that this e-mail may be referring to?*

*A [Manfredi]: Yeah.*

*Q What mortgage are we talking about and what piece of property?*

*A [Manfredi]: Well, the only mortgage that existed at that would have been the Centrum loan.*

*Q **As you think back is there any reason why you are sending this information back to Mr. Constantine?***

*A [Manfredi]: **I don't recall sending it to Mr. Constantine.***

*Q I'll just show you one more document. I'll mark it separately with the Court's permission C-189 A. Mr. Manfredi, the last e-mail we talked about was C-189, okay. Is that correct?*

*A [Manfredi]: If you say so.*

*Q No, the one I last displayed. The Hawaiian mortgage dated March 19, 2006, with attached mortgage?   C 189, is that the attachment that goes with this e-mail? Take a look at that.*

*A [Manfredi]: I don't know. Without being able to open this PDF with that file name, I don't know if that points to this (indicating).*

*Q Take a look at the document. Have you ever seen the Big Aisle V Ventures mortgage from Centrum Financial Services before?*

*A [Manfredi]: Yes.*

- Ultimately – to lay the final joke on the Court in 2015, the alleged "forged" Kaiser names on the two (2) Constantine consulting agreements **were found by Kaiser at his home** on the "eve of trial"; *not in Kenner's possession.*

- And, **Manfredi did know at all times,** *because* he confirmed it to the FBI during his October 2010 proffer. The FBI raw notes confirmed (*See 3500-CM-2-r at 1*):

   *"Constantine brought in $ to project-Hawai'i"*

   *"more than $3m"*

   **"Agreement – between PK or LLCs + Constantine -> may have been with Constantine and another person"**

- ***What could possibly been deemed as concealed or forged – after <u>both Kaiser and Manfredi confirmed</u> the Constantine consulting "agreement" to the FBI in 2010 – five (5) years before their trial faulty memory, confusion and mistakes?***

It is fully confounding that anyone could allow Kaiser's testimony and the government signature expert to go forward at trial.   The dynamic of finding your name forged on original, "*ink*" documents that were at your-own house, when the photocopied documents that were originally represented in 2014 as forged examples were in Kenner's back-up office files, and the "**agreement**" being wholly verified by Kaiser's best friend (Manfredi), defies logic; *but rather, it became acceptable commonplace for the 2015 prosecutorial team.*

How could Manfredi have no recollection of the diligent months of work he did with Constantine – *independent of Kenner* – for the Hawai'i project funding and completely be without memory of it?

---

*Q Does this refresh your recollection that this is the mortgage that is being referred to in his e-mail?*

> *MS. KOMATIREDDY: Objection, asked and answered.*
> *THE COURT: He already said that. The only mortgage he had was with Centrum he said.*
> *MR. LARUSSO: Now that he looked at the pages --*
> *THE COURT: You asked him if it refreshed his recollection whether it refreshes --*
> *MR. LARUSSO: Your Honor, you are correct. I apologize. May I have one moment, your Honor? Your Honor, I have no further questions.*

How could the government &/or the FBI agents present Kaiser's alleged forged story when Kaiser himself delivered the "*ink*" versions of the two (2) agreements to the Government on the "eve of trial"? **Both scenarios defy all logic** – but apparently not at the clip the government and FBI passed these ridiculous anomalies off as apropos; with their integrity above reproach -- because they were consistent with the government's "*failed memory test*" prosecutorial theories.

The Court *M&O at 26* identified: "*Grdina testified that "Intrigue Investment Company received 70 percent of it. $4,855,000, and Constantine Management Group received 30 percent which was approximately $2,081,000*" (*Tr. 2379-80*). However, Grdina said that he later learned that Constantine never actually contributed $1.5 million to the Urban Expansion loan (*Tr. 2380*).

Regardless, Kenner and Grdina did not meet until years later.   Grdina was never listed as a victim in the 2015 Superseding Indictment.   Whatever deal Constantine constructed with Grdina was their deal.   **Kenner was a non-party to any of their dealings**.

Nonetheless, in order to further separate Kenner's investors from as much risk as possible, the Court *M&O at 26* confirmed, "*On cross-examination. Grdina testified that Kenner contributed $100,000 of his own money to the purchase of the Waikapuna property, in addition to the $3.5 million from Intrigue (Tr.2408-2409).  He also said that Kenner personally guaranteed the $3.5 million Intrigue loan via an amended security agreement*" (*Tr.2410, and Kenner Exhibit 78*).

Thus, Kenner not only guaranteed the loan personally, but also was required to deposit another $100,000 to the Hawai'i partners' capital account, pursuant to the Grdina lending requirement.

Finally, Grdina confirmed that, "*he had no objection to the pre-payment penalty*". (*Tr.2445*). And, "*Kenner had no financial interest in the Urban Expansion loan*". (*Id. at 2472; GX-3824.*)

There are no possible criminal acts associated with Kenner, yet the full lending deal with Urban Expansion benefitted 100% of the Hawai'i investors.   Without their last minute deal, arranged by Constantine and Manfredi, the Hawai'i partners would have defaulted on a $1 million hard money deposit with the seller.   In addition, the Lehman Brothers loan in 2006 required the ocean-front parcel.   Without it, there would not have been a subsequent deal.   No commercial banks were interested in the Hawai'i deal without oceanfront access.

<div align="center">

### Peter Melley [150]

</div>

**Peter Melley was presented as a FINRA representative.**

The Court *M&O at 26* identified: "*Peter Melley ("Melley") is an employee of the Financial Industry Regulatory Authority (Tr.2477). He testified that Kenner was a licensed stockbroker*" (*Tr.2480-85*).

**The presentation by the FINRA expert polluted the entire trial.**

- Nothing represented this prejudice more than the fact that the jury requested the Melley testimony to be read-back immediately when they began deliberations.

**Kenner was never a stockbroker;** because Kenner *never* sold stocks.   Kenner acquired licenses for education purposes only.   The licenses served no other purpose.   Kenner was never paid commissions; pursuant to stockbroker practices or FINRA standards. The government was 100% aware of this, but they presented the FINRA expert anyhow. Perhaps, they knew Kenner's trial counsel would not object or request a proper *Daubert* hearing.

Kenner's licenses lapsed, by design, in 2003.   As part and parcel to Kenner's 2003 litigation versus his former firm to force the release of his clients from the firm's illegal SEC practices (a.k.a. stealing from them), Kenner temporarily re-filed his licenses with a nominal Florida firm.   Kenner *never* did a single dollar of business with them.   The licenses lapsed a year after the registration was done for the 2003 lawsuit, *only*.

Nonetheless, the government elicited testimony about a "***standard of care***" that did not comport with Kenner's client agreements.   Thus, not only should the Kenner trial counsel have requested a *Daubert* hearing[151] to eliminate the misleading testimony regarding "standard of care", but also the FINRA presentation was wholly prejudicial to Kenner and misleading to the Court and Jury.

**Each of the Kenner clients had multiple investment advisors throughout the Kenner relationships between 2003 and 2013 (none of which were Kenner)...**

---

[150] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 26*.

[151] This trial counsel *error* proved to be enormous in the eyes of the jury – considering their request for an immediate read-back when they began deliberation.   The failure to request a *Daubert* hearing will be addressed during the pending ineffective counsel filing (*28 U.S.C. 2255*).

**Index Fund Advisors, Charles Schwab Institutional, Northern Trust Bank, Wells Fargo, Bank of America, and Greenberg Graham Associates managed the FINRA elements of the clients; *never Kenner*.**

Every transaction that transferred money from a client account had to be verbally approved by he individual client; *never Kenner* (*See GX-760 [Nash], supra*).

Kenner had limited Power of Attorney for the Charles Schwab accounts.   The Power of Attorney "only" allowed Kenner to initiate a wire transfer via the signed Power of Attorney paperwork.

In order for any funds to leave the respective client accounts, the clients **WERE REQUIRED** to speak with an institutional representative from Charles Schwab's custodial Bank -- and then speak to their financial advisor from Greenberg Graham Associates; **both independent from Kenner**.

Thus, any **CTE**-laden answers from individual clients that they were unaware of money being transferred out of their accounts without their explicit knowledge of "**Amount**" and "**Payee**" is INCORRECT.
- It could **NEVER** happen.

## Tim Gaarn[152]

**Tim Gaarn worked as an independent financial consultant in New York City for years before and after Kenner was introduced to Gaarn in or about 2002.**

**According to the Court,** *"Gaarn...testified on behalf of the government pursuant to a non-prosecution agreement".*

**Gaarn gave pre-trial proffers to the FBI.**

**Gaarn recorded Kenner in 2012 for approximately four (4) hours with the FBI under "*Operation Pederpuck*".   At no time during the four (4) hours of surreptitious recordings did Gaarn allege that Kenner and he were in a conspiracy related to "his" sales of "his" Eufora private stock in 2008-09.   They (thru Gaarn) never alleged that the Gaarn stock "really" belonged to Kenner.**

- **Gaarn and the FBI knew that if Gaarn had made such an untrue statement to Kenner on the phone, Kenner would have refuted it immediately and asked Gaarn "*what the f\*\*\* was going on*", because it would not have been true in the least – as both Kenner and Gaarn would have known.**

Years after the initial business introduction to Gaarn, Kenner asked Gaarn in 2005 to take over management of the investor LLC in Constantine's company, Eufora.   Gaarn accepted and confirmed this to the FBI, affirming that in 2005:
> *"PK asked TG [Gaarn] to take over Eufora LLC b/c cant handle it anymore. TG signed a document in 2007 that had a 2005 date on it."*

Amazingly, the FBI notes confirmed that Gaarn agreed in 2005 to do so, yet the notes were **altered**:



---

152 Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 26-27.*

Without question, the FBI note-taker originally wrote 2005 – and *someone* followed that by later altering the notes with a "7" over the "5".   It is not possible that the 2005 was the most random yet perfect representation of the actual date of the transfer of Kenner's Eufora stock to Gaarn which occurred in 2005…but it was a mistake worthy of changing to a date that does not correspond to any date related to the stock transfer or the Eufora CEO documenting the companies history in 2008.

- *Notwithstanding the rehearsed trial testimony claimed the transfer occurred three (3) years later in 2008 (never mentioned in the FBI proffer notes 3-½ years before trial) with either the 2005 (actual date of transfer and agreement) or the "altered" 2007 date.*

With Kenner no longer involved in the activities of Eufora since his 2005 transfer to Gaarn, Constantine hired a new CEO, CR Gentry.   Gentry's first (1st) task was to verify all previous Eufora transactions and verify Eufora's books and records.

Constantine – with new CEO Gentry's assistance (having nothing to do with Kenner), re-verified the entire set of books and records in order for Constantine and Gentry to search out lending opportunities for Eufora's ongoing growth.   This all occurred prior to the 2008 introduction to eventual Eufora lender, Neptune Capital.

Nevertheless, the government solicited testimony from Gaarn at trial claiming that he received the transfers in 2008 (*Tr.2493*).   This contradicts the FBI notes (both versions – legit and altered), all Eufora tax filing confirming the 2005 transfer, and 100% of the Eufora internal emails and records that Kenner had nothing to do with Eufora since 2005.

**Post 2005, the only Kenner involvement in Eufora was as a lender to the company…** The 2004 tax records confirm a $106,971 loan from Kenner to Eufora (*See Recon33-3 FOLDER Eufora Tax Return 2004 at 11*).   Kenner increased his personal loan to Eufora the following year (2005) to $386,971 (*See Recon33-3 FOLDER Eufora Tax Return 2005 at 10*).   In 2006, Constantine and Eufora offered to payoff their Kenner debt. As a result of the full repayment, Kenner's debt was retired.   The $386,000 was part and parcel to the **representations and warranties** disclosures that Kaiser and Manfredi signed off prior to the final Hawai'i JV in 2006 (*See Recon33-110 at 3*), which identified:

> *"Windwalker acknowledges that JV Partner [Kenner] may be involved in business transactions unrelated to the Property with the holders of Parcel 2 debt ([Centrum] and Parcel 3 debt [Urban Expansion]."*

Nothing to do with the Eufora repayment was concealed from Kaiser, Manfredi, the entire group of Hawai'i investors who also signed off on the entire package, or the ten (10) law firms that negotiated the $105,000,000 Lehman Brothers loan (*See Recon33-111 and Recon33-112 and Recon33-113*).

The Court *M&O at 26* identified, "*he [Gaarn] sought investors for Eufora based on representations about that company made by Constantine and Kenner*" (*Tr.2491-92*). Gaarn acted exactly how someone would as a Board Member for the company and while representing approximately 30% of the investors' equity thru AZ Eufora Partners I (with Gaarn as the Managing Member).   **Gaarn was a 5.67% owner of Eufora according to all of the Eufora tax records and internal books and records in evidence**.   To this day, Gaarn is still a member of Eufora (not Kenner) on the books and records, despite the government's repeated malfeasance that "*Kenner was selling his stock*" (thru Sydor and Rucchin misleading Q&A – *Tr.2173, 2732*).

[Sydor]:

> *Q Now, at the time that you invested in Eufora did the defendant say anything to you about your money being used to buy out other investors?*

> *A [Sydor]: No.*

> *Q To buy out Tommy Constantine?*

> *A [Sydor]: No.*

> *Q Or to <u>buy out Phil Kenner</u>?*

> *A [Sydor]: <u>No.</u>*

[Rucchin]:

> *Q. Did Mr. Kenner tell you anything about your money going to buy out either Mr. Constantine or <u>Mr. Kenner's shares in the company</u>?*

> *A [Rucchin]:  <u>No, he did not.</u>*

It was Gaarn's stock thru his company, Standard Advisors, at all times (*See Kenner trail exhibit 80*).  The government repeated their false claims during rebuttal summation (*Tr.5970-5971*).

[AUSA Komatireddy rebuttal summation – regarding the false Sydor Q&A]:

*"QUESTION: Now, at the time that you invested in Eufora, did the defendant say anything to you about your money being used to buy out other investors?*

*ANSWER: No.*

> *QUESTION: To buy out Tommy Constantine?*
> *ANSWER: No.*
> **QUESTION: To buy out Phil Kenner?**
> **ANSWER: No.**

*Now let's talk about the other Eufora fraud and what the defendants call "selling shares." They've told you that there is no impropriety in them getting money from the hockey players in 2008 and 2009. Because after all, they were just selling their shares in Eufora.*

The government's theory was that *even though* the 2008-09 sales were fully vetted by Giuliani and Stolper's investigative team, *supra*, and *"OK"* (a.k.a. *"predictable"* according to investors' attorney Stolper, *supra*)[153] – the government was now going to criminalize the activity of the legal and vetted transactions.

---

[153] There was NO SECRET or CONCEALMENT about either the Gaarn (*2009*) &/or the Constantine (*2008*) Private Stock sales by Stolper &/or the Plaintiffs.   During the Constantine-Eufora conference call with all of the investors on the call (who wanted to be) – **Kenner hilighted the Constantine allegations about "illegal" stock sales by Gaarn to the investors' attorney, Michael Stolper,** as follows:

| | | | | |
|---|---|---|---|---|
| 1827 1 | 19176261175 Michael Stolper* | 8/18/2010 8:09:12 PM(UTC+0) | S e n t | **Tommy has the Kenner gave Gaarn stock as an illegal transfer issue on the table. He's threatening with law enforcement to go after us** |

Reply from Stolper:

| | | | | |
|---|---|---|---|---|
| 1575 0 | 19176261175 Michael Stolper* | 8/18/2010 8:10:45 PM(UTC+0) | R e a d | **Predictable** |

Then – Constantine makes another unfounded allegation during the investors' conference call. Kenner passed the information along to the investor's attorney (*Stolper*) immediately:

| | | | | |
|---|---|---|---|---|
| 1827 2 | 19176261175 Michael Stolper* | 8/18/2010 8:10:37 PM(UTC+0) | S e n t | **He just threatened law enforcement involvement to settle the issue with the Kenner/Gaarn transfer!** |

And Stolper again responded:

The Court M&O at 26 identified: "*Moreover, Gaarn said that he became a managing member of AZ Eufora Partners ("AZ Eufora"), which owned a portion of Eufora, in or around 2008 or 2009 based on Kenner's request and as a favor to him because Kenner had previously lent Gaarn money*" (*Tr.2492-95; GX-TG-2*).

**FALSE** – Because this contradicted the FBI raw notes, *supra*, and all Eufora corporate records.  The FBI notes clearly wrote:
    "*PK asked TG to take over Eufora LLC b/c cant handle it anymore*".

The Court *M&O at 26-27* identified: "*He also said that he signed a transfer of membership interest agreement in around 2008 that Kenner backdated to indicate that it was signed on August 1, 2005*" (*Tr.2499-50; GX-TG-2*)

**FALSE** – Because Gaarn told the FBI that Gentry gave him the documents to sign; *not Kenner*.  Gaarn told the FBI on January 11, 2012 (*See 3500-TG-1-r*) that he took over the AZ Eufora Partners I Managing Member role in 2005 and signed the paperwork for Gentry (not Kenner) in 2007.   The government has a lot to answer for by allowing the misrepresentation at trial that Gaarn took over the deal from Kenner in 2008 (three [3] documented years after the fact), and considering 2008 was never mentioned in any of the transactions.

In addition, Gaarn's interactions with Gentry were independent from Kenner.  Gaarn was a Eufora Board Member, as was Gentry (and CEO).  Nothing about their documenting process to complete the books and records were illegal or criminal.   Yet, the government's proffers alleged that mis-representation to an unsophisticated jury on purpose.

The Court *M&O at 26-27* identified: "*he said that, in or around 2010, he and others sued Constantine because Constantine had said that he wanted to sell Eufora's patent, thereby devaluing the company*" (*Tr.2502, 2544-46*).

After Gaarn, *again not Kenner*, hired Rudy Giuliani's people to investigate "everything Eufora" in 2010, their three (3) month secret investigation revealed no issues with either the Gaarn or Constantine private stock sales from 2008-09.  Attorney Stolper's July 2010



| 1575 1 | 19176261175 Michael Stolper* | 8/18/2010 8:12:24 PM(UTC+0) | R e a d | Hopefully recorded. |
|---|---|---|---|---|

letter to his clients (Eufora investors) confirmed that Gaarn, alone, hired the high-powered investigation team; *not Kenner*. The hired investigators were in direct communication with all of the AZ Eufora Partners I investors under Managing Member Gaarn. Kenner had no interaction about the stock sales of Gaarn or Constantine with the investigators. Gaarn hired the investigators; but they did not represent him, Kenner or Constantine, so all three (3) were fair game if any illegal activity was discovered. Regardless, the lead investigator and attorney, Michael Stolper, sent a full disclosure letter to the AZ Eufora Partners I investors under Gaarn confirming the private stock sales (*See Recon33-73*).

- **No concerns were raised in response to the full disclosure letter – that each Eufora investor signed off**.

### The Home Depot recording by Kenner of Constantine...

Months later (August 2010), Kenner recorded an hour-long Constantine monologue revealing Constantine's schizophrenia about the Giuliani-led investigation and the underlying Louis Freeh interference in everything and everyone opposed to his client, Ken Jowdy, at the time (although a separate matter). Constantine alleged everyone in Eufora was involved in some "bad" behavior, regurgitating items that Constantine's attorneys had already disclosed to Stolper and the investors. ***The Home Depot recording was nothing new*** (*Court M&O at 37-38, 55, 57, and 66*). Nevertheless, Kenner immediately disclosed the **outrageous** Constantine allegations to Stolper and his team. If anything was revealing, criminally or otherwise, Stolper and Giuliani did nothing about the Constantine rant and never-ending allegations. Stolper referred to them as "*Predictable*" and "*Hopefully recorded*" when Constantine made them again a few weeks later to all of the investors on Constantine's conference call, *supra*.

Only five (5) years later (in 2015), and set up for "*failed memory tests*" under **CTE** standards and expectations, the investors were asked what they knew about the Gaarn and Constantine transfers. On cue, "*they knew nothing*", again.

To drive the spear in the misleading and knowingly false representations by the government to the jury about the Constantine and Gaarn sales, AUSA Komatireddy asked Kristen Peca if she would have invested in Eufora if she knew the **Eufora patents** were pledged in 2008 (although she again had nothing to do with any Michael Peca decisions in 15 years) (*Tr. 703*):

> *Q. Did he [Kenner] tell you at the time you invested those in Eufora whether those patents held were as collateral for a loan?*
>
> *A [Kristen Peca]: If they were held as collateral? No. No. Never.*
>
> *Q. Would that have been important to you in deciding whether to invest money?*

*A [Kristen Peca]: Yeah, of course.*

*Q. Why?*

*A [Kristen Peca]: They were being held as collateral that would show that the company is in some sort of debt or owe money and is not doing as well and isn't ready to explode as they said it was.*

- AUSA Komatireddy and the government knew the patents were not pledged until over eight (8) months later; *fully prejudicing the defendants and misleading the Court and jury.*

In spite of the Eufora records confirming all of the Gaarn private stock ownership, and not Kenner since 2005, Gaarn alleged he had no Eufora stock to sell (contradicting his own *Kenner exhibit 80* response), the Court *M&O at 27* identified: "*On cross-examination, Gaarn denied that the payment he sent from the Wachovia Account to Kenner constituted re-payment of the money that Kenner had previously loaned Gaarn*" (*Tr.2581*).

**FALSE** – Because:

**FIRST** -- Gaarn kept over $100,000 of *his own* private stock sales proceeds.

**SECOND** -- Gaarn confirmed to the FBI in 2012 that he owned Eufora stock.

**THIRD** -- Gaarn made a personal loan to Kaiser for approximately $70,000 after they spent several days face-to-face in Arizona together (in evidence), just days before the transaction; independent of Kenner. And,

**FOURTH** -- In the event Kenner died at any point since 2005 (thru present day), the stock that the government alleged as Kenner's, thru Gaarn's "*CTE-laden memory test*"[154], **did and still belongs to Gaarn** (in 2019); *not Kenner.*

Gaarn was not Kenner's co-defendant. During trial, Gaarn was asked specifically if he had any conspiratorial plans with Kenner. While testifying under a non-prosecution

---

[154] Tim Gaarn played college football at the prestigious University of Maryland; Division I. It fully subjected him to years of known concussions, the basis for the Boston University Neuroscience department **CTE** testing on retired football and hockey players who are suffering from neuro-degeneration; exhibiting symptoms of *faulty memory, confusion and mistakes.*
- This is no different than Kaiser (decades of mixed martial arts fighting) and the former NHL players who testified in direct contradiction to virtually all of their pre-trial statements in 2015 at the EDNY trial.

agreement, Gaarn was free to **"tell the truth"** as he and the government told the jury.   So – what did Gaarn tell the jury? (*Tr.2503-2504, 2563-2564*):

> *Q. For the members of the jury, would you explain what does a nonprosecution agreement mean that you have with the government?*
>
> *A [Gaarn]: It means that I've not been accused of committing any crime. As long as I come on to the stand and I tell the truth, I will have no issues. If I say something where when I'm on the stand that I could get in trouble for at the time, I could be prosecuted.*
>
> *Q Let me ask you this. As you sit here today, sir, to your knowledge, and your belief, you have not committed any crime, isn't that true?*
>
> *A [Gaarn]: True.*
>
> *Q In other words, you are not viewed in your mind as of, let's say, conspiring with Phil Kenner to commit a crime, and by that I mean the two of you form an objective to commit a criminal act. There was never any meeting of the minds between you and Kenner for that purpose, true?*
>
>> *MR. MISKIEWICZ: Objection.*
>> *THE COURT: I'll let him answer that. You can answer that.*
>
> *A [Gaarn]: Correct.*
>
> *Q As a matter of fact, sir, when you went to the FBI on two occasions to meet with the FBI, you didn't go with a lawyer, did you?*
>
> *A [Gaarn]: No.*
>
> *Q <u>And you didn't go with a lawyer because you knew in your own mind you had committed no criminal act, correct?</u>*
>
> *A [Gaarn]: <u>Correct.</u>*

If the government was certain that a conspiracy between Kenner and Gaarn occurred in order to sell stock that either Kenner, Constantine, Gaarn or *Santa Claus* owned, the government had every opportunity to bring another Indictment.   **They did not.**

In the *United States v. Contorinis*, 692, F.3d 136, 148 (2d Cir 2012), the Court "observed that neither the language of the criminal forfeiture statute nor Circuit case law supported the proposition that a defendant must forfeiture proceeds that 'go directly to an innocent third party and are never possessed by the defendant'" *Id.* at 147.

The government knew at all times that the Eufora private stock belonged to Gaarn. They knew the Eufora records proved it. They knew the high-powered attorneys Gaarn hired vetted the 20008 and 2009 stock sales. Yet, the government was expecting that if they allowed Gaarn to give his *CTE*-laden testimony about "*what he remembered*" (or not), there was another good opportunity to mislead the jury and confuse the actual empirical evidence in the government's possession.

## William Castro[155]

<u>William Castro</u> *gave testimony about a 2006 transaction with Constantine.*

*According to the Court, "He also said that he filmed a television promotional program for automobiles involving Constantine and his car (Tr.2696)".*

**Kenner had nothing to do with Constantine's racing business or William Castro.**

- A portion of the Kenner loans to Constantine in 2007-08 were sent to various Constantine 3rd-party vendors.   They were represented in the Kenner-Constantine loans (*See Recon33-18*).[156]

---

[155] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 27*.

[156] The "*grocery list*" or "*shopping list*" loans that Kaiser and AUSA Michiewicz fabricated during trial (*Tr.1404-1405*) had nothing to do with Kaiser at any time, *supra*, yet they were added by the US attorney and Kaiser to confuse the jury (again), considering Kaiser was not a victim or owed any money from Kenner, since his full payout from Hawai'i and California by early 2008 (as expected – and fully documented).

### Bruce Berreth [157]

Bruce Berreth was a lending officer from Centrum Financial Services.

Berreth confirmed that Kenner personally guaranteed the $3 million loan on behalf of the Hawai'i partners; with Kenner assuming all of the loan risk, individually.

Berreth gave <u>incorrect</u> testimony that the loan <u>had to be used</u> to develop land in Hawai'i; <u>contradicting the actual documents Kenner signed with Centrum</u>.

<u>The documents that Berreth and Centrum produced in addition to the required Hawai'i partners' documents clearly laid out the funds would be used "exclusively for business and commercial purposes"...</u>

- **They were.**

The Court's *M&O at 28* confirmed that *"Derreth [sic] testified that Kenner signed a document [as Managing Member of Big Isle V] certifying that the loan would be used to develop a 1,500-acre property on Hawai'i"* (*Tr.2703*).

**FALSE** – Because part and parcel to the operating agreement for Big Isle 5, which was required by Centrum, the operating agreement states (*See Recon33-125*):

> **In Article 2, Section 1:** *"At all times, the Company, through it Managing Member Philip A Kenner, reserves the right to <u>**borrow**</u>, <u>**lend**</u> or <u>**invest**</u> on behalf of the Company"*.

> - **In Article 2, Section 2:** *"Further, <u>based on the current market conditions of the project</u>, the Company shall continue to make decisions that are deemed in the best interest of the collective ownership".[158]*

> - **In Article 10, Section 2:** *"At the sole discretion of the Managing Member, Special Projects may be funded by current, new, or <u>borrowed funds, including new debt of Big Isle 5 Ventures, LLC"</u>*.

---

[157] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 28*.

[158] The Hawai'i partners were waiting for the County planning director, Chris Yuen, to approve the subdivision plans for the Hawai'i parcels. The funding efforts and due diligence had been incredibly difficult, thus, when Manfredi, Kaiser and Kenner were able to secure a lender, they secured the funds immediately and tried to utilize them "for a loan" as Kaiser told the 2009 arbitration panel, while Manfredi and Kaiser's efforts to receive subdivision approval was pending. Kenner did not manage that process; Kaiser and Manfredi were solely in charge of it.

Kaiser testified to the 2009 arbitration panel (regarding the Centrum loan funds – since they were the only loan funds):

> [John Kaiser]: *"Any money that was allocated towards land for the Hawaiian Investment Group that wasn't being used – <u>the due diligence takes a long time</u>. So if we had some funds that were – that was stagnant and that warrant purchasing land, we would utilize if for a loan, so we actually made some money off it"*.

**<u>Centrum – and Bruce Berreth -- signed off on the Big Isle 5 operating agreement before the loan was completed...</u>**
- There is no equivocation what the Big Isle 5 operating agreement allowed the Managing Member of Big Isle 5 to do with the funds.   Kaiser confirmed it to the 2009 arbitration panel.   Berreth and Centrum were never disadvantaged by the lending deal they struck with Big Isle 5, nor were the original Little Isle 4 and Hawai'i investors.

- **The 2004 Hawai'i-Jowdy loan is a documented and collectible asset** – merely being *obstructed* by the FBI case agent (since his discovery of it during Kenner's June 24, 2009 FBI proffer) and Kenner's ongoing detention.

  o It is part of the sole remaining asset of Little Isle 4.

Hawai'i COO, Chris Manfredi, and Hawai'i counsel William Najam *handled all of the Centrum document review* pre-closing with Hawai'i Real Estate counsel from Carlsmith Ball LLP (Jon Yamamura and Alan Okamoto) (*See Recon33-178*).

After the final review by multiple attorneys on July 13, 2005, Kenner sent a message to Jowdy to make sure Hawai'i counsel Najam saw the last messages before Kenner signed the Centrum loan documents.   Immediately (14 minutes later), Jowdy sent a message to Najam who was aware of the pending $1.5 million loan to Jowdy and the fact that Hawai'i COO Chris Manfredi and Jowdy (without Kenner involved -- for additional transparency) were determining the final loan amount from the Centrum funds to add to the 2004 Hawai'i-Jowdy loan agreement (*See Recon33-179*).

Manfredi and Jowdy determined the final amount on July 13, 2005; *not Kenner*.   Kenner sent the following message to Jowdy to initiate the final amount:

> [Kenner]: *"You might want to follow-up with Chris [Manfredi]. Cell. 5165265010 <u>Leave me a msg on the imvelocita [Kenner email] address **about what u work out**</u>."*

- Kenner was an uninvolved third (3rd) party to the negotiations of the extended loan to Jowdy -- for full transparency (again).

- Najam is also Jowdy's personal attorney as well as the General Counsel for all Diamante matters thru present (2019).

Jowdy's email to Najam (from Jowdy) – which were the same words and terms disseminated to Manfredi from Jowdy earlier in the July 13, 2005 evening – pre-empting Manfredi's $1.5 million sign-off and initiation of the Jowdy loan amount from the Centrum funds, identified:

> [Ken Jowdy to Najam]: "*...and remember that this [loan amount] should be in place for less than 30 days. If we ever have to worry about a default on this loan, we will all have much bigger problems than this...*"

Clearly – Jowdy is re-assuring Kenner and Najam that what he told Manfredi earlier in the evening to secure the $1.5 million personal advance thru the 2004 Hawai'i-Jowdy loan is the truth, as independently accepted by Manfredi.   Najam knew the parameters of the Centrum loan as the counsel of record for the Hawai'i partners.  Najam worked hand-in-hand with Manfredi and the Hawai'i attorneys (at Carlsmith Ball LLP); exclusive of Kenner.   **And, Najam instructed Kenner that the advance to Jowdy was permitted**.

**Kenner operated completely under "advice of counsel"** and full transparency on the deal (with Manfredi's involvement); while fully guaranteeing the Centrum $3 million loan personally – just like Kenner guaranteed the $3.5 million Urban Expansion loan months later – with no other Little Isle 4 member assuming any of that risk personally).

Najam and Jowdy warned Kenner (*See Recon33-180*) that the $3 million Centrum personal loan guarantee that Kenner was signing on behalf of the Hawai'i partners was very tough on Kenner if the loan defaults.   Jowdy reassured Kenner that it should not happen, as follows:

> [Ken Jowdy]: "*...he [Najam] said agreement is tough on how they can go after guarantee which better not be relevant*".

- This email, *supra*, was transmitted the day after Jowdy and Manfredi agreed on the $1.5 million advance.

Ultimately, Kenner demanded that Najam as counsel of record for the Centrum deal in Hawai'i review the July 18, 2005 documents that need to be signed related to the "*use of funds*" and confirm as "***OK***".   Under **"advice of counsel"**, Kenner followed thru on the deal Manfredi and Jowdy struck regarding the $1.5 million advance.

- It could not have been more transparent to all members of the Little Isle 4 partners; thru Manfredi and Hawai'i counsel. **Nothing was concealed** considering the loan documents, yet Berreth's incorrect testimony, and Manfredi's amnesia prevailed (*See Recon33-181*).

Kenner wrote to Najam:

> [Kenner to Hawai'i partners attorney William Najam]: "*Bill: Please review the STMT.doc letter regarding the use of funds and call me at the Cabo home ASAP. I need to discuss it with you **prior** to signing it. Thanks. pk*".

All documents signed by Kenner were in the capacity of Managing Member of Big Isle 5 Ventures, LLC.

There was a Big Isle 5 operating agreement included – *and required* – by Centrum as part and parcel to their lending package in order to determine the breadth and scope of Big Isle 5.
- Centrum received this operating agreement *before* they agreed to sign off on the Big Isle 5 loan package.

Please note that the hard money broker who introduced the Centrum loan deal to the Hawai'i partners was preparing a $20,000,000 loan to the Hawai'i partners in July 2005 (*See Recon33-182*).
- Considering the government charge of conspiracy -- because -- Constantine was paid to raise funds for the Hawai'i project (as some alleged illegal activity), the hard money broker (Tara Kelly) had already been pre-paid her fees for the Centrum loan (3% = $90,000) and was expecting more for the $20,000,000 loan (of 3% = $600,000).
- In addition to the Hawai'i partners having to *front another $50,000* for the lender who ended up *not* working out. The Hawai'i partners suffered another sunk cost that was repeated ad nauseum in the cut-throat hard money lending world.
  - **Constantine produced result for the Hawai'i partners** unlike 95% of the lenders who were paid during this same period of time; but was the only hard money lender charged with a conspiratorial crime.

The $20,000,000 loan *expectation* from a proven-source (Tara Kelly) in the difficult hard money world **refutes** all claims that the Lehman Brothers deal was a lock in July 2005 and that somehow Kenner "had it in the bag" and "pushed it off for another year to bring in Constantine". No common sense could believe the government rhetoric if they spent any time reviewing the myriad of support documents that confirm dozens of other deals were being sought by the Hawai'i partners at all times before, during, and after Manfredi

described on August 2005, "*canceling*" the July 2005 Lehman Brothers deal as being "*egregious*", thus unable to sign (*See Recon33-7*):

> [Chris Manfredi, August 16, 2005]: "*The deal with Lehman was cancelled by us as being too egregious*".

AUSA Komatireddy completed the false representations during her rebuttal summation – where the prejudicial falsity could not be undone with the defense silent from that moment forward (*Tr.5996*):

> [Komatireddy – rebuttal summation]: "*He [Najam] takes out the Centrum loan. You remember the Centrum loan. The Centrum loan is the one where <u>they</u> take parcel 2, the land they just bought for $3.5 million, <u>they</u> take the players' money. 3.5 million goes to buy parcel 2, then <u>they</u> take 3.5 million out in the form of a mortgage. You see what is happening. <u>They</u> are laundering money through the land.*"

- o **Constantine has nothing to do with the Centrum loan – so unless Najam, Jowdy, Kaiser &/or Manfredi are part of a money laundering conspiracy (which was never alleged) –** *the rebuttal statement from Komatireddy was wholly prejudicial.*

> [Komatireddy – rebuttal summation]: "*Kenner takes out the whole value of parcel 2, sucks the equity out and he is supposed to use that to buy Waika Puna but he doesn't.*"

- o "Parcel 2" is valued at $30 million (*See Recon33-183*); not the $3 million loan amount.   The remaining equity was under discussion with Centrum to be extended as the County Permits to develop the land were granted – which Centrum knew at the time were "pending".

- o Manfredi negotiated the $1.5 million advance to Jowdy under the terms of the 2004 Hawai'i-Jowdy loan agreement.   Nothing was concealed from Manfredi or Kaiser, who had their hands all over the deal; along with multiple attorneys representing the Hawai'i partners; *not Kenner individually.*

> [Komatireddy – rebuttal summation]: "*He [Kenner] sends that money to Mexico. He told you he sent it to Mexico. The bank records show he sent it to Mexico. Manfredi told you.*"

- o Of course Manfredi "told" the jury.   Manfredi negotiated the terms of the loan (*See Recon33-179*).

[Komatireddy – rebuttal summation]:  *"He [Kenner] told you at the time he sent it to Mexico instead of using that money on the Hawaii land project developing the project. He used it for personal use to get an interest in that resort in Cabo."*

o **100% FALSE** -- Because Kenner *never* used the Centrum funds (per any banking record – including but not limited to the *government-forfeiture-36's* accounting of the "Jowdy use of funds".
o It was *never* in Kenner's control – only Jowdy's control.
o No nexus can be proven – *let alone alleged* – that would substantiate Komatireddy's brazen and *grossly prejudicial statement*, which was left unchallenged in rebuttal summation.

   ▪ It was a gross abuse of discretion, *fully prejudicing Kenner*.

[Komatireddy – rebuttal summation]:  *"He also tells you that Lehman is interested. In 2005 Lehman is interested in investing in Hawaii but Kenner puts them off for another year…"*

o Manfredi, *not Kenner*, explained to a third (3rd) party in real time (August 2005) why the 2005 Lehman Brothers deal was **"cancelled"**.

o It was **"cancelled"** by the Hawai'i partners' managers (Manfredi, Kaiser, and Kenner) as being *"egregious"* – *no other documented reason*.

The government and Komatireddy used Berreth's testimony that did not follow his own loan documents *prejudicially*.  The government alleged financial transactions benefitting Kenner that their own accounting documents (*government-forfeiture-36*) refuted.

**Yet, without hesitation, Komatireddy misled the jury (again).**

## Steve Rucchin [159]

**Steve Rucchin suffered from multiple concussions throughout his hockey-playing career.**

**Rucchin's most severe concussions forced him to miss approximately one-and-a-half (1 ½) years to recover from post-concussion syndrome – the predicate for CTE.**

**When Rucchin was asked about the setup of his LOC, the most critical issue in the 2015 trial for him, he <u>could not remember</u> the basic establishment of his LOC (*Tr.2722*):**

> *Q. And just in terms of your understanding of that line of credit, did you have an understanding of whether that line of credit was going to be secured by bonds of any sort?*
>
> *A [Rucchin]: See, that is still a little foggy, but all I know is that it was a whole line of credit. You know, to go back and think about it how it was going to be secured, <u>I can't say for certain</u>. But I do know it was just a line of credit that was going to be under my name.*

The Court's *M&O at 28* confirmed that "*at the time Rucchin decided to invest in the Hawaii Project, he did not authorize that his investment be used to fund property in Mexico or to go to Constantine (Tr.2723-24)*".

**MISLEADING** – Because none of the funds went to fund the Mexico project.

**FIRST** -- the funds were a personal loan to Ken Jowdy (fully documented), who was Rucchin's partner in Cabo.   The "*group*" decision to loan Hawai'i funds to Ken Jowdy has been repeatedly documented.   Nevertheless, the government continued to claim the "funds went to Mexico"; when they know the loan "went to Jowdy".   Rucchin confirmed (thru his haze of CTE):"*that is still a little foggy*", when asked to describe how he set up the LOC.

Nevertheless, the Court should recognize that when Michael Peca was asked about the "Jowdy loans" during his 2011 SDNY Grand Jury, he testified:

[2011 Peca SDNY Grand Jury *at 30*]:

---

[159] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 28-29.*

> *"A short-term loan [was made] to Mr. Jowdy because at the time Cabo – we hadn't gotten the lending from Lehman Brothers yet. **We** made a short-term loan until the lending came in. Once the lending came through they were to pay back the loan, I think in the neighborhood of five-and-a-half million dollars, on the closing. It was never paid back. And then communication basically seized [sic] at that point from him [Jowdy]. That was kind of the whole sticking point as far as me **and the other guys** with Mr. Jowdy."*

**SECOND** -- Rucchin had no idea who Constantine was in 2004-06 along with any dozen more 3rd party people affiliated with the Hawai'i project at the time. Thus, it would be wholly improbable for Rucchin to even remember the details of a hard moneylender who was being paid (amongst the other 17 hard money lenders) from the Hawai'i project to find funding (*Tr.2724*), while being "*foggy*" about his own LOC information. In the same nonsensical line of reasoning, Rucchin did not authorize his money to go to architects, attorneys, hard money lenders, archeologists, engineers, a rock quarry, a nursery, a commercial property, the use for payroll, etcetera:

> *Q. At the time that you decided to invest in Hawaii, did you authorize any of that money to go to Tommy Constantine?*
>
> **A [Rucchin]: I did not, no.**
>
> *Q. At that time did you even know who Tommy Constantine was?*
>
> **A [Rucchin]: I did not, no.**

- **If Rucchin did not know who Constantine was, how could he remember thru his "foggy" recollection whether he approved the hard moneylender fees or not. It is an unreasonable standard.**

The Court's *M&O at 28* confirmed that "*in or around the fall of 2013, Rucchin learned that he had lost money as a result of that default (Tr.2730)*".

**FALSE (for several reasons)** – Because:

**FIRST** -- In order for Northern Trust Bank to seize any of the LOC collateral, they required a phone call with each LOC client. This is also corroborated by Peca, Sydor, and Berard texts directly with Kenner regarding the collateral seizures and their direct communication with Northern Trust Bank (*infra*).

Rucchin confirms to Kenner that he received the March 2009 default letter from Northern Trust Bank. He told Kenner that he received "*something*" (on the same day the other

LOC clients received the same DEFAULT letter). Rucchin sent the following text to Kenner:

| 6057 | +19492330046 Steve Rucchin* | 3/20/2009 9:10:27 PM(UTC+0) | R e a d | **K. In TO [Toronto] today but something may have came in** |
|---|---|---|---|---|

After Rucchin spoke with Northern Trust Bank (**which was required**), Rucchin had to sign off on the balance transfers with Northern Trust Bank and close his account.

| 6102 | +19492330046 Steve Rucchin* | 3/23/2009 8:36:22 PM(UTC +0) | R e a d | **Give me a shout when you get a chance. <u>Want to know what all these docs are I have to sign</u>** |
|---|---|---|---|---|

- Rucchin received the transfer documents in the mail at his home mailing address eight (8) days before his collateral was seized, thus, clearly before he spoke to Northern Trust Bankers Mascarella and Brill (as required), he knew of the transfer amounts minus the $1,010,645 collateral payoff.

And **SECOND** -- Rucchin's "**due date**" was 4/3/2009.   Northern Trust Bank accepted his payoff on 4/1/2009 – two (2) days before it was due.

- o **ONLY Rucchin could have approved the early collateral seizure – BEFORE THE DUE DATE, <u>proving he knew about it</u>.**

- o This is the same protocol for each of the LOC clients. Thus, not a single payoff could have occurred without their explicit approvals, individually.

  - ▪ They were obviously 100% known to the Northern Trust clients – and <u>not</u> as the government represented (**fully prejudicing Kenner**).

<u>**Rucchin in 2015 – along with Darryl Sydor's inability to recall his-own collateral seizure six (6) years after the event (*Tr.2166-2167*) – is 100% improbable…**</u>

Yet, the government continued with that presentation to the jury.   Although clearly false -- It was clearly accepted as true, because the Court included it in their first analysis of the alleged "unknown" seizures in its *M&O*.

Darryl Sydor confirmed the Northern Trust package on the same day:

| 6079 | +19725230505 Darryl Sydor* | 3/23/2009 12:22:01 AM(UTC +0) | R e a d | <u>**What's this letter from northern trust all about**</u> |
|---|---|---|---|---|
| 6080 | +19725230505 Darryl Sydor* | 3/23/2009 12:25:25 AM(UTC | R e a | <u>**No I just got home but I had a fed ex letter [from Northern Trust]**</u> **and also the one from** |



| | | +0) | d | steph. |

Kenner asked Darryl Sydor if he **signed** the same package *for his financial advisor*, Jim Graham for another third [3rd] party confirmation:

| 7150 | +19725230505 Darryl Sydor* | 3/23/2009 12:24:13 AM(UTC +0) | S e n t | **Did you sign & send the docs for the Northern Trust transfer to jim graham?** |

- Jim Graham was one of the financial advisors (regulated by FINRA – unlike Kenner) for many of the Kenner Business Management clients.

Michael Peca had to sign and send the same package (received a day later from Northern Trust Bank) – as Michael Peca confirmed to Kenner:

| 6122 | +17163743234 Michael Peca* | 3/24/2009 4:59:46 PM(UTC +0) | R e a d | **Sorry. Busy morning. We'll catch up this wk. I'll have those papers signed and sent out tomorrow.** |

- It should be noted that exactly during the period of time that Kristen Peca told the 2015 court that she and her husband could not get a hold of Kenner (in spite of over 500 texts between Kenner and Michael Peca in 2009), Michael Peca is telling Kenner he is too busy to speak on the phone; not the way Kristen Peca portrayed it at trial (*Tr.712-713 [with Kenner allegedly living in a cave], Tr.743-744, 746*).

After Rucchin signed all of his documents for the Northern Trust seizure prior to April 1, 2009 – 3 days *before* his LOC payment "**due date**", Rucchin asked Kenner to double-check that after he signed the transfer documents for the remaining funds to go back to his Schwab account, all other account issues were closed at Northern Trust Bank:



| 6664 | +19492330046 Steve Rucchin* | 4/21/2009 5:24:06 PM(UTC +0) | R e a d | **Give me a shout. Just want to make sure everything at N.Trust is cleared up and I'm not on the hook for any fees or anything** |

**THIRD --** Every one of the Northern Trust LOC clients had an IMUS (investment management) account at Northern Trust Bank with their collateral.   In order to transfer the money out of their Northern Trust IMUS accounts to any "**outside account**", they had to personally sign off.   Thus, it would be impossible for Rucchin to transfer his funds and not know that his $1,453,000 account was only $431,000 after the collateral seizure of April 1, 2009 (*See Recon33-64 FOLDER – Rucchin letter at 3*).   The signed IMUS agreement directed:

> "*Only those instructions directing the wiring of funds to any account outside of Northern Trust Bank must be signed by Client*".

**Kenner could not transfer the funds to complete the alleged "concealment"**.   Thus, it was impossible for Rucchin (or similarly Sydor) to "*not know*" that their collateral was

seized (following the one-on-one phone call with Northern Trust Bankers Brill and Mascarella – prior to the LOC collateral seizure) **AND** their "*requirement*" (per their own IMUS agreements) to independently sign off on all transfers for funds leaving their Northern Trust Bank IMUS account (which was multiple times for each client, *infra*).

**Rucchin's Northern Trust transfers:**
Rucchin's statements from his Northern Trust IMUS account confirmed the loss of principle (*See Recon33-184 FOLDER*).   Rucchin's statements were all mailed to his London, Ontario CANADA home (as he referenced as his "Toronto home", *supra via text*).

Rucchin signed off on the "delivery transfer" of bonds from his Northern Trust Bank account to Schwab as follows (pursuant to his IMUS account agreement):

**[Rucchin bond transfers "signed off" by Rucchin post collateral seizure]:**

> **April 8, 2009 for $30,849,**
> **April 8, 2009 for $27,368,**
> **April 8, 2009 for $28,834,**
> **April 8, 2009 for $26,347,**
> **April 8, 2009 for $25,413,**
> **April 8, 2009 for $21,074,**
> **April 8, 2009 for $25,599,**
> **April 8, 2009 for $26,748,**
> **April 8, 2009 for $20,892, and**
> **April 8, 2009 for $52,548.**

Then, to close the account with the cash balances, Rucchin signed for two (2) individual transfers in April 2009 from his Northern Trust account to his Schwab account:

**[Rucchin individual cash transfers "signed off" by Rucchin post collateral seizure]:**

> **April 9, 2009 for $123,656.24, and**
> **April 27, 2009 for $19,944.01.**

In May 2009, Rucchin's Northern Trust Bank statement showed a **$13 balance** (in evidence).   On June 17, 2009, Rucchin sent Kenner the following email to ask about getting the Northern Trust Bank IMUS account closed with Kenner's help.   Thus, nothing about the account loss being unknown after all of the Rucchin interaction could be attributable to anything but **CTE** in 2015 (*See Recon33-185*):

[Rucchin emailed Kenner June 17, 2009]:
> *"Hey Phil, Its Ruch.  Know you have a lot on the plate right now but im still getting statements from N. Trust because I still have $13 and change in the*

*account. Wonder if the account can somehow be closed. Let me know. Thanks. Ruch*"

**Nevertheless, after all of Rucchin's individual actions confirming full and independent knowledge in 2010, Rucchin falsely claimed in 2015 (or thru the haze of CTE) (*Tr.2729-2730*):**

> *Q. Did you think that you had lost any money?*
>
> *A [Rucchin]: No. I personally believed that the line of credit for a million dollar was just given back to Northern Trust.*
>
> *Q. Did you think that you had lost any money?*
>
> *A [Rucchin]: No. No. I thought that was going back to Northern Trust for that one million dollar line of credit.*
>
> *Q. Did Mr. Kenner tell you that you had lost any money in savings of your own?*
>
> *A [Rucchin]: No, he did not.*
>
> *Q. Did there come a time when you ultimately learned that?*
>
> *A [Rucchin]: I did, yes.*
>
> *Q. When was that?*
>
> *A [Rucchin]: That was I believe October, November of 2013 from the U.S. federal government.*
>
> *Q. When you say U.S. federal government, who do you mean?*
>
> *A [Rucchin]: FBI. Mr. Galioto. I saw the transactions coming in and out of the accounts and this one going, so I was, shocked to say the least, very, very upset and taken aback.*

- Only Rucchin's **CTE** could allow this representation to occur (unless the testimony was suborned – or unduly influenced).

The Court's *M&O at 28* claimed: "*With respect to the Global Settlement Fund, Rucchin testified that, in or around May 2009, he met with Kenner and Constantine at Kenner's request (Tr.2749-50). He said that he agreed to help fund litigation against Jowdy because he believed that Jowdy was misusing investment funds and that he contributed $50.000 on or about May 22, 2009*" (*Tr.2750-51; GX-1508*).

**FACT -- Jowdy was misusing Mexico investment funds.**

Jowdy's own bank records prove his criminal activity from August 2002 thru the date of the Constantine-led GSF efforts versus Jowdy and his supporters.

Kaiser's shocking February 28, 2019 letter (*Document 628*) re-affirmed the investors position ten (10) years after the investors sued Jowdy for the same allegations.

Shockingly, Kaiser (with turncoat investor, Bryan Berard) fought "on Jowdy's team" and *against* all of the investors until 2019 when Kaiser and Berard had both been fired by Jowdy, clearly after Jowdy used up their value to get rid of Kenner and spread his additional decade of false propaganda that "Kenner stole the money; not Jowdy".

In order for Kaiser and Berard to portray this false information on behalf of Jowdy and the FBI case agent (Galioto), they all had to ignore the Jowdy banking records that had been in the FBI's possession since 2009. **It was a fraud on the Court, the jury and the unknowing investors, who repeatedly were asked to accept the FBI case agent's representations as *"above reproach"*.** *The FBI case agent failed them all, purposely.*

Steve Rucchin agreed to participate in 2009 California litigation versus Jowdy after meeting face-to-face with Constantine in Arizona. This meeting was a year after Rucchin was already involved in the similar 2008 Hawai'i loans litigation v. Jowdy in Arizona with independent counsel Tom Baker; **not new as Komatireddy lied to the jury**.

The California litigation was one (1) year after the investors had direct and independent communication with their Arizona attorney in 2008, and subsequently versus Jowdy with their California attorney who received fully documented signoffs from the Hawai'i investors (in 2009) (*See Recon33-14 [Rucchin letter]*[160] *and Recon33-21*[161]). The signed

---

[160] Similarly -- Michael Peca lied to the 2015 trial Court (after signing onto two [2] independent lawsuits to recover the Hawai'i loans made to Jowdy – and a July 26, 2006 signed Hawai'i disclosure letter discussing the Jowdy involvement) when he falsely claimed (*Tr.457 and Tr.644*):
> [Michael Peca]: *"Zero. I had never been told that he [Jowdy] had any connections to Hawai'i whatsoever."*

[161] In addition -- Kristen Peca wrote to their independent California attorney (without Kenner's involvement), while declining the open invitation to meet face-to-face with Jowdy in 2009 (again -- without Kenner's participation). This attorney communication was well after Michael Peca has released his Hawai'i collateral and discussed via email (in evidence) Jowdy's lack of desire to repay the Hawai'i loans. It is also after the date in May 2009 that Michael Peca claimed at trial Kenner would not tell him where the Hawai'i money went when deciding to contribute to the Constantine-led GSF plan (*Tr.506-7*). Kristen Peca wrote to her California attorney:

---

disclosures by nineteen (19) Hawai'i-Mexico investors (including Rucchin's) announced in the first (1st) paragraph of the 7-page disclosure letter:

> "*the gist of the lawsuit is to recover certain monies loaned to Mr. Jowdy from Mr. Kenner, Little Isle 4 and Ula Makika LLC.   Mr. Kenner estimates the total amount of monies loaned to Mr. Jowdy which have not been repaid to be approximately $5,000,000.   This is the estimated principle only, exclusive of accrued interest.   In summary, Mr. Jowdy denies that the monies were loans but rather characterizes them as investments.*"[162]

The two (2) 2009 California lawsuits highlighted the reason for suing Jowdy.  It was specifically for the unpaid loans to Hawai'i (not the misuse of investment funds, only a subset of the Jowdy frauds).  The repayment of the Hawai'i loans (just like in the 2008 Arizona case) clearly benefitted Rucchin.  The California lawsuit announced, as follows, in the two (2) court filings (*See Recon33-15 and Recon33-16*):

> "*Mr. Najam was in charge of the corporate governance while under Jowdy's direction and control received over eight million dollars ($8,000,000) from a LLC in Hawai'i.   Mr. Najam failed to properly account for those funds and has placed the Jowdy investors in a vulnerable and compromised position.*"

The Court *M&O at 28-29* claimed: "*Rucchin testified that he did not authorize that his contribution be used to fund Eufora or anything else*" (*Tr.2751*).

---

> "*We are putting our trust in you, so we will do whatever you recommend is best for getting our $$$ out.   Thanks, Michael and Kristen Peca*"

[162] Jowdy was able to get the Arizona case dismissed in mid-December 2009 thru a series of unethical legal filings and documented threats to Kenner attorneys (*See Recon33-85*).

Less than three (3) weeks later – **Jowdy confessed to all of the Hawai'i funds being loans** during his 2-day California deposition in another case suing Jowdy for the loans -- *contradicting Jowdy's 1 ½ year Arizona defense strategy – and shocking all present*.

Jowdy **personally** re-affirmed the loans in March 2010 [*3500-KJ-2*] – by confessing to FBI Agent Galioto and other SEC officers (with Louis Freeh at his side) that he had received 100% of the Hawai'i funds and had no plans to repay any of them (just like the 2019 Kaiser letter suggests – *Document 628*).   The agents noted Jowdy's full confession of his embezzlements in their *raw notes*, as follows:

> At 3 -- KJ [Jowdy] – "*all the funds were not used for DDM*"
> At 11 -- KJ [Jowdy] – "*if I was not allowed to use $ then it was a problem*"
> At 12 -- KJ [Jowdy] – "*thought I could use $*"
> At 12 -- KJ [Jowdy] – "**$ from -- $ from PK loans -- Little Isle 4 – Ula Makika**"
> At 12 -- KJ [Jowdy] – "*02-06 -- $ used from BD [Baja Development Corp] to pay personal expenses→ booked as loans from BD*"

All of the Hawai'i investors, who were alleged as victims in the 2015 trial of Kenner, participated as signed-off Plaintiffs versus Jowdy in the various Arizona and California cases.   ***None of these transactions occurred in the EDNY at any time***.

**FALSE** – Because Rucchin signed the same GSF "acknowledgement and approved" letter as all of the GSF contributors under Constantine.   Rucchin cannot claim he "*did not read*"[163] the disclosure he signed off and approved.

<u>Rucchin cross-examination</u>

The Court *M&O at 29* claimed: "*Rucchin said that he anticipated acquiring a greater share of Eufora in return for his Global Settlement Fund contribution*" (*Tr.2783-84*).

**He did**. It was documented by his Managing Member, Tim Gaarn, thru AZ Eufora Partners I, the LLC that held Rucchin's Eufora investment with the majority of the other Eufora investors.  Nothing about that was concealed by Kenner.   Gaarn was his Managing Member.   *Kenner had zero responsibility to document it, ever.*

Yet – Rucchin's "expectation" of more Eufora shares obviously contradicted the Court's previous Rucchin assertion that:

> "*Rucchin testified that he did **not** authorize that his contribution be used to fund Eufora or anything else*" (*Tr.2751*).

- The government did not care about reconciling any real evidence, as obvious *supra*.   The government clearly wanted "anything" said by their various witnesses (ignoring the empirical evidence), so they could eventually rely on an "*evidence viewed in the light most favorable to the government*" standard to fight a Rule 33 new trial motion.
- When the government allowed Rucchin – and most other investors to confirm both sides of most stories (plus the occasional "*word vomit*" to allege it means anything they want it to mean in the future, they got their "*evidence most favorable*".[164]

---

[163] *See Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A. See also PaineWebber Incorporated v. Bybyk, 81 F.3d 1193; 1996 U.S. Appx. LEXIS 8728.* ("…a party's ***failure to read*** a duly incorporated document will not excuse the obligation to be bound by its terms"); *See also Ecoline, Inc. v. Local Union No. 12 of the International Association of Heat and Frost Insulators and Asbestos Workers, AFL-CIO, 271 Fed. Appx. 72; 2008 U.S. Approximately. LEXIS 6390*, ("In general, individuals are charged with knowledge of the contents of documents they sign" and "a person who signs a written contract is bound by its terms regardless of his or her ***failure to read*** and understand its terms".)

[164] During trial, John Kaiser tried to un-explain his previous clear and convincing 2009 voluntary testimony with a virtual "**word vomit**" (*Tr.1107*) (*See M&O at 91*):

In fact, Rucchin filed an adverse proceeding March 21, 2013 versus Constantine along with eleven (11) other Constantine creditors (nine [9] of which were filing to confirm their Eufora shares) in Arizona Bankruptcy Court (*See Recon33-186*):

- *2:13-Ap-00330-Ewh -- Kenner V. Constantine*
- *2:13-Ap-00331-Ewh – Darryl Sydor V. Constantine*
- *2:13-Ap-00332-Ewh – Greg Devries V. Constantine*
- ***2:13-Ap-00333-Ewh – Steve Rucchin V. Constantine***
- *2:13-Ap-00334-Ewh – William Ranford V. Constantine*
- *2:13-Ap-00335-Ewh – Mattias Norstrom V. Constantine*
- *2:13-Ap-00336-Ewh – Glen Murray V. Constantine*
- *2:13-Ap-00338-Ewh – Brain Campbell V. Constantine*
- *2:13-Ap-00339-Ewh – Raymond Murray V. Constantine*
- *2:13-Ap-00340-Ewh – Jozef Stumpel V. Constantine*

Even in 2013, Rucchin was clearly aware of his Eufora shares and how to confirm them. His ProSe Adverse Proceeding (in the Constantine bankruptcy) was filed after Rucchin was represented by Giuliani's NY-based investigation team versus Constantine and "all things Eufora".   Rucchin signed off on the Giuliani efforts (*See Recon33-73 at 14*).

**Rucchin "could not recall" any of the documented details of his business...**

Rucchin admitted his LOC memory was "*foggy*" (*Tr.2722*), and related to his business he identified, "*it's a long time ago*" (*Tr.2723*) – **but in real time**, when the actual events were happening five (5) to seven (7) years before trial:

1. Rucchin was represented by independent counsel in Arizona to recover his "Hawai'i Jowdy loans" in 2008-09,

---

*Q: Well, you know, sir, for a fact, do you not, that Kenner [sic] Jowdy requested and received a loan that at some point reached approximately $5 million from Little Isle IV and Ula Makika where he was to repay that loan with 15 percent interest, correct?*

> *MR. MISKIEWICZ: Objection; time frame.*
> *MR. HALEY: At some point in time.*
> *THE COURT: Overruled. You can answer.*

*A [John Kaiser]:* **When I testified at Owen Nolan, that's what I believed when I testified because as of 2006, Mr. Kenner had told me that when -- the same time he told me my money went to Mexico so post that I learned that.**

2. Rucchin signed off on the 7-page full disclosure letter with his independent Arizona attorney (*See Recon33-14 – Rucchin letter*),

3. Rucchin participated in the Constantine-led GSF efforts to recover the Hawai'i loans to Jowdy as a California Plaintiff in 2009-2010 (*See Recon33-187*),

4. Rucchin participated in January 2010 face-to-face mediation in Los Angeles with ten (10) plus other California Plaintiffs and his independent counsel, Ronald Richards, versus Jowdy, and

5. Rucchin was independently represented by NY counsel to investigate and sue "everything about Eufora".   Rucchin signed off on the full disclosure with twenty-plus Eufora investors (*See Recon33-73*).

**BUT** – years later, Rucchin cannot seem to recall much of it, exhibiting full **CTE** symptoms.

*His testimony contradicted each and every signed document, corroborating emails, and texts specifically signed by &/or sent by Rucchin, himself.*

## William Ranford[165]

**William Ranford was an NHL goaltender for over ten (10) years. He suffered from hundreds of concussive and sub-concussive hits to the face and head from 100 mph pucks; and the likes.**

**Ranford – like Kaiser – gave amazing trial testimony in 2015 that contradicted with the exact pro-Kenner proffer statements – and 100% clear knowledge -- that the investigation agents (including FBI case agent Galioto) documented in their independent interview –** *raw notes*. **Ranford confirmed he only spoke to Kenner after the FBI interview (***Tr.2906-2907***):**

> *Q When you had the conversation that you say that you had with Phil Kenner before you were interviewed by the FBI, did you take note of that conversation, so you knew what to tell the FBI based on what Phil Kenner was telling you?*
>
> ***A [Ranford]: I had no idea that the FBI was contacting me until they contacted me. I – Phil and I didn't discuss the FBI calling me.***
>
> *Q Oh, I thought you said that after you were contacted by the FBI and called up Phil –*
>
> *A [Ranford]: Afterwards.*
>
> *Q It's my problem. Afterwards. It is my fault. After you spoke to the FBI on September 2012 you told me you spoke to Phil Kenner, correct?*
>
> *A [Ranford]: Yes.*
>
> ***Q So it is not a fact that Phil Kenner in any way told you what to say in advance of September of 2012, correct?***
>
> ***A [Ranford]: That is correct.***

The Court M&O at 29 identified: "*he said that the bank records showed that $100,000 was wired from Ranford's account on February 6, 2009 to Eufora, but Ranford said that he did not authorize that transaction and that Kenner did not tell him about it (Tr.2823-2824; GX-1513). Likewise, Ranford testified that, although records show an additional*

---

[165] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 29.*

*$100,000 transfer from him to Eufora on May 4, 2009, he did not authorize that transaction" (Tr.2831-32; GX-1514 and GX-2216).*

**Ranford could not recall the statements he independently gave to the FBI in 2012...**
- Ranford's testimony was also contradicted by his 2014 civil deposition given just six (6) months before the EDNY trial (*3500-WR-3, Recon33-236, Recon33-237*).

Ranford had no trouble with Kenner – even after Kenner's Indictment and 1-½ years of EDNY detainment.   Ranford testified in the Arizona September 2014 deposition (*at 27*):

> *Q. Reading this paragraph in the Indictment, does that change your thinking about how your money was used, your hundred thousand dollars was used?*
>
> *A [Ranford]: No.*
>
> *Q. It doesn't make you concerned that it was perhaps used for something else by Phil Kenner?*
>
> *A [Ranford]: No.*

**Ranford confirmed in September 2014 that Kenner was still his business manager:**

> *Q. When did he [Kenner] become your financial advisor?*
>
> *A [Ranford]: It would have been probably the late '80s.*
>
> *Q. Did you know him before then?*
>
> *A [Ranford]:  No.*
>
> ***Q. Is he still your financial advisor?***
>
> ***A [Ranford]: Yes.***

- What complaints could Ranford have with Kenner considering Kenner was in federal custody – for allegedly stealing money and concealing it – as accused by the FBI and the EDNY – but Ranford still considered Kenner his financial advisor 1-½ years later?
- Only an undue influence in the eight (8) months between Ranford's September 2014 Arizona deposition testimony and the 2015 trial testimony could have aletered his perception of Kenner (like FBI case agent Galioto) – considering Ranford was openly communicating with Kenner in detention – alerting Kenner to the ongoing FBI lies to him and the other Hawai'i-Mexico investors.

**In 2014 -- Ranford also confirmed his $100,000 and $300,000 deposits to the GSF account (Ronald Richards' attorney Trust Account) – despite not remembering any of it eight (8) months later:**

*Q. And you never asked questions about how your money was being spent?*

*A [Ranford]:* **Yes, I did.** *I'm, I'm familiar with Eufora in this Global Settlement Fund.· I mean, I'm very familiar with the -- with Eufora, but –*

*Q. You just stated that the money was to be used for projects in Mexico?*

*A [Ranford]:  Well, that's what I thought it was, but I'm· incorrect. Now that I see the name Eufora, I· understand that that's what that was for, and I was familiar with the information on that, yes.*

*Q. So now it's your understanding the money was for Eufora?*

*A [Ranford]:  Yes. Correct.*

*Q. Okay. If you could turn to the third page,· please. And <u>do you see the entry on June 5th of 2009?</u> Is that your name there, William Ranford?*

*A [Ranford]:  Yes, it is.*

*Q. <u>And how much does it say was credited at that time?</u>*

*A [Ranford]:  100,000.*
  - **(See Recon33-188 and Recon33-189)**

*Q. And <u>do you see the entry on June 12th of 2009?</u>*

*A [Ranford]:  Yes.*

*Q. And is that also your name?*

*A [Ranford]:  Yes, it is.*

*Q. And how much does it say that you received?*

*A [Ranford]:  That I received?*

*Q. Yes. <u>Do you see the $100,000 debit there?</u>*

*A [Ranford]:  Yeah. Yes.*
  - **(See Recon33-190 at 6)**

*Q. Okay. And then if you could flip to the next page, please, at the top.· <u>Do you see the entry dated July 3rd -- or July 13th of 2009</u>?*

*A [Ranford]:  Yep.*

*Q. And is that your name as well?*

*A [Ranford]:  Correct.*

**Q. <u>And that's $300,000 that you deposited</u>?**

**A [Ranford]:  Yep.**
- *(See Recon33-191 and Recon33-192 and Recon33-193)*

- Ranford's September 2014 testimony exactly re-confirmed the statements he made to the FBI during his 9-7-2012 proffers (two [2] years earlier) – and confirmed by his own Schwab statements (with his home mailing address).

- Ranford's *faulty memory, confusion and mistakes* (or **CTE** – *ahem*...) forced him to amazingly forget all of this just eight (8) months later.

  o *How is that even possible?*

Again -- <u>Ranford confirmed he did not speak with Kenner before speaking to the FBI</u>, so clearly Ranford spoke from his own, unprepared knowledge at all times on September 7, 2012 (*Tr.2906-2907*):

*Q Did Phil Kenner tell you that you should related that information to the FBI? When you say you have a conversation with him, when you called him up to say, hey, the FBI told me this? Is that what you're thinking when you say that's what Phil Kenner told you to say?*

***A [Ranford]:*** *No, <u>that was my recollection at the time of the interview, how much I invested in Eufora</u>.*

*Q When you had the conversation that you say that you had with Phil Kenner before you were interviewed by the FBI, did you take note of that conversation, so you knew what to tell the FBI based on what Phil Kenner was telling you?*

***A [Ranford]: I had no idea that the FBI was contacting me until they contacted me. I -- Phil and I didn't discuss the FBI calling me.***

*Q Oh, I thought you said that after you were contacted by the FBI and called up Phil --*
***A [Ranford]: Afterwards.***

The effects of **CTE** can occur at any time, but Ranford claimed at trial that he "*did not*" tell the FBI the exact information that the FBI *raw notes* portrayed -- in specific detail (*See 3500-WR-2-r*):

- *At 1*, Ranford confirmed to the FBI that he sent "*S200k*" in "*7/2008*" from his Schwab account for Eufora.   Ranford even confirmed where the funds originated.

- *At 2*, Ranford confirmed to the FBI that he had: "*total = S400k in Eufora*"
  - The notes reveal that Ranford confirmed: "*several times to Eufora*".

- Ranford's raw notes further confirm: "*2009 - S100k – Feb*" and "*S100k – May*".

**No one told Ranford what to say to the FBI on 9/7/2012.   Ranford explained to the FBI, independently, exactly what he knew, and truthfully.**

It was diametrically the opposite of his **CTE**-laden 2015 testimony.   It is impossible – minus **CTE** symptoms (or undue influence) that any person (Ranford) could remember something exactly how it happened (and supported by the actual documented facts)…but then five (5) years later be adamant that he never said those things, asserting that the FBI investigators made up the notes ***in direct opposition*** to the prosecutorial desires in the matter.

So now, the FBI raw notes were now a mistake – **BECAUSE – it would have supported Ranford "remembering" that nothing was concealed, exonerating Kenner** – *and that was not acceptable to the FBI case agent*.

Ranford vehemently claimed in 2015 he did not make Eufora investments (*Tr.2823-2824*):

> *Q So you made a $200,000 investment as we saw in 1512 in July of 2008, and then you made another one for 100,000 in February of 2009; is that correct?*

> *A [Ranford]: **I did not**.*
>  - *(See "Ranford Feb 2006 Eufora 100k transfer")*

> *Q Did you know this was being transacted at the time that it purports to have occurred?*

> *A [Ranford]: **I did not**.*

> *Q Are you sure?*

*A [Ranford]:* <u>*I'm positive.*</u>

*Q How do you know?*

*A [Ranford]:* <u>*Because I knew I only made one investment in Eufora.*</u>

- The FBI *raw notes* directly contradict Ranford's testimony, but the knowing FBI and prosecutorial table knowingly left the testimony to stand unchallenged.

Ranford defiantly contradicted the 2012 FBI notes from his proffer – and his own Schwab confirmation statements that were mailed to his home address.

It raises a question on whether or not Ranford was "*threatened*" like he told Kenner on the phone in 2015 pre-trial, or his **CTE** symptoms (excusing suborned perjury) were specifically highlighted in 2015.

On cross-examination, Ranford did his best – like all of the government alleged victims to stick to the "planned" storylines, even in the face of their own, real evidence (*Tr.2858-2860*).

Ranford finally admitted under pressure of cross-examination (*Tr.2859*):

> *"You are asking me to remember something that happened many years ago. I'm trying to respond to the best of my recollection."*

**<u>Ranford LIED at trial about his $300,000 GSF transaction after he told the FBI he did it...</u>**

The Court *M&O at 29* identified: "*With respect to the Global Settlement Fund, Ranford said that he contributed $100,000 on June 15, 2009 based on Kenner's representations that the money was necessary to recoup Ranford's investment funds from Jowdy*" (*Tr.2834-35*).

**FALSE** – Because *Ranford was never invested with a Jowdy project.*   The government did a poor job prepping Ranford for this line of improper testimony, based on facts not in evidence, anywhere.

The Court *M&O at 29* identified: "*Ranford said that he did not authorize a subsequent $300,000 transfer on July 16, 2009 to Richards*" (*Tr.2837-38, 2841; GX-1507*).

**FALSE** – Because Ranford independently told the FBI and an Arizona civil court that he was fully aware on two (2) separate occasions. Nonetheless, the government elicited Ranford's misleading claims that he did not approve $300,000 to GSF (*Tr.2838*):

> *Q Did you authorize that $300,000?*
>
> *A [Ranford]: I did not.*
> • *See Recon33-191*
>
> *Q Did you know that it happened when it happened?*
>
> *A [Ranford]: I did not.*
> • *See Recon33-193 at 5*

Nevertheless -- Ranford told the FBI (*at 2*):

<p style="text-align:center">"*$300k gave to GSF July 2009*"</p>

This is exactly what happened according to Ranford's banking records and confirmations he received at his home, *supra*. Ranford had possession of the transaction record at his home for the $300,000 transaction (*See Recon33-192*). Ranford confirmed it on cross-examination, leaving his "lack of knowledge" 2015 claims, useless (*Tr.2854-2855*):

> *Q: And though the exhibit speaks for itself, sir, and will be available as an exhibit for ultimately the jury's consideration, for purposes of the record, we can agree that the document itself reflects a transfer of $300,000 on July 13, 2009, is the date of the Schwab letter, and that's also the date on Government's Exhibit 1505, correct?*
>
> *A [Ranford]: Correct.*

Ranford was trapped and had to agree he received the $300,000 July 2009 wire transfer confirmation at his home.

• It must be noted that the transfer could only occur thru his Schwab account AFTER Ranford confirmed it independently to his financial advisor, Jim Graham at Greenberg Graham Associates, and his custodian of record, Charles Schwab Institutional. **The multiple verbal authorizations were the fail-safe** for all of the Schwab investors thru Kenner. Thus, at no point in time, could Kenner transfer funds to anywhere without the actual client speaking with both parties, *supra*.

- The Schwab Power of Attorney was so limited that even when Kenner needed duplicate statements for his clients Schwab accounts, the third (3rd) party "investment advisor from Greenberg Graham Associates" had to send the authorization for Kenner.  It further hi-lights that is Kenner could not even trigger duplicate statements – how could Kenner trigger funds to be released "unknown" to the account holder?  (*See Recon33-87*)

- Each and every trial allegation that investors were not aware of their "Constantine Management Group" transfers, "Eufora" transfers, "GSF" transfers, etcetera, defied every fail-safe protocol that still exists today.
  - o Kenner was fully prejudiced by the government after asserting the concealment of any transfer, while fully knowing the truth.

The Court *M&O at 29* identified: *"On cross-examination, Ranford testified that his bank records show that his $100,000 contribution to the Global Settlement Fund was returned to his account on or about June 12, 2009, but he said that he had no recollection of that refund" (Tr. 2875-2876; Defendant's Exhibit C-180).*

**FALSE** – Because Ranford's mistake can only be premeditated (a.k.a. *faulty memory, confusion and mistakes*) or **CTE** induced.  Whichever sword the government wants to fall on, it makes the entire testimony **unreliable** and **fully prejudicial** to Kenner. Ranford's own Schwab statement for June 2009 – mailed to his home address – confirmed the funds wired out ($100,000) and wired back into ($100,000) of his account that month to the GSF (*See Recon33-190 at 6*).

**Ranford files ProSe adverse proceeding versus Constantine in Constantine's Arizona 2012 bankruptcy…**
In 2013, Kenner assisted Ranford in filing an adverse proceeding versus Constantine in Arizona (*See Recon33-186*).   Ranford could remember the filing (*2:13-ap-00334-EWH Ranford v. Constantine*) but not the reimbursement to Kenner for the filing fees, even after being shown the evidence of both (*Tr. 2861*).   Ranford echoed the familiar refrain that "*he trusted Kenner*".

- As the financial facts of the case have been exposed thru an arduous process against the government's desire to expose them, it clearly shows Kenner received "only" funds from Gaarn and Constantine for real loan repayments (documented on banking records) that Kenner actually sent to each of them independently.

Ranford received his Eufora shares, signed off, and participated in the Giuliani-led investigations of "everything Eufora" (*See Recon33-73 at 13*).   Thus, *"trusting Kenner"* seems to have worked out in his favor (assuming the government finally assists Kenner

and Kenner investors to recover the funds Jowdy stole – and Kaiser confirmed in his February 2019 revisionary letter to the trial court – *Document 628*).

Despite the pressures Ranford bore from the FBI case agent pre-trial to "alter" his story that was documented in FBI notes (2012) and an Arizona deposition (2014), revealing full, transparent knowledge of Ranford's Eufora investment and his GSF contribution -- Ranford apparently knew everything at one point in time (closer in time to the actual events), **and confirmed it** (all pro-Kenner transparency – again).

***But Ranford forgot just-in-time to the government's prosecutorial benefit once-again.***

It must be hi-lighted that the $300,000 wire transfer that Ranford CONFIRMED in his October 2014 Arizona deposition was recently forgotten by the time his testified in 2015 (eight [8] months later) (*See 3500-WR-3 at 12*):

> *Q. Okay. And then if you could flip to the next page, please, at the top. Do you see the entry dated July 3rd -- or July 13th of 2009?*
> *A [Ranford]: Yep.*
>
> *Q. And is that your name as well?*
> *A [Ranford]: Correct.*
>
> *Q. And that's $300,000 that you deposited?*
> *A [Ranford]: Yep.*

The Schwab evidentiary production confirmed that the following steps took place PRIOR to the $300,000 being released from Ranford's account (***just like every time a wire transfer occurs at Schwab***).

- BECAUSE of the protocol, *supra*, it is clearly impossible for any fund transfer to leave a Schwab account without multiple safeguards occurring first (**including the client's own verbal confirmation**)...as follows:

1. Kenner sends wire transfer with all applicable information to Schwab (*See Recon33-191 at 1*).
2. Schwab receives the signed request and faxes a copy to client's independent Investment Advisor (Greenberg Graham) for confirmation and authorization (*See Recon33-191 at 1 [fax confirm at top of page]*).
3. The client is contacted by Schwab to confirm the amount and payee on the wire transfer request (*See Recon33-191 at 2*).
4. **IF ALL IS INDEPENDENTLY VALIDATED: THE WIRE IS SENT**

## Chris Manfredi [166]

**Chris Manfredi <u>was</u> John Kaiser's best friend, discovered the Hawai'i property with Kaiser (in spite of Mrs. Kaiser's testimony to the contrary about her son)[167], and acted from 2003-2006 as the Hawai'i partners Chief Operating Officer ("COO").**

**Manfredi admitted that he handled, with John Kaiser, 100% of the necessary due diligence materials for all potential lenders during trial.**

- **As a result, there is no plausible explanation for Manfredi to testify that there was a lender, let alone one that funded the Hawai'i partners' project (Urban Expansion) that he was not intimately involved with.**

**Manfredi has carried extreme animus towards Kenner after Kenner exposed Manfredi stealing from the Hawai'i partners in 2006 with large, unauthorized personal purchases on the corporate credit cards.   This was one of the factors that ruined his relationship with John Kaiser in 2006 (*See Recon33-117*).**

**Manfredi's aloof testimony about not remembering his joint Constantine lending efforts was grossly inappropriate.  It was contradicted by a myriad of evidence in the government's possession pre-trial – <u>including his own FBI proffer of October 2010</u>, but left to stand to prejudicially injure the defendants (specifically Kenner) during Manfredi's testimony.**

**<u>Clearly, Manfredi and John Kaiser never informed Kaiser's mom before John asked her for 2005 money...</u>**

The Court *M&O at 29* identified: " *He testified that he first traveled to Hawaii in 2002 with Kaiser and that they entered into a contract to purchase a 258-acre property*" (*Tr.1910-12*).

---

[166] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 29-30.*

[167] *Tr.938*

> *Q Ma'am. are you aware that your son John was the one that actually originated the idea of investing in Hawaiian real estate? Are you aware of that?*
>
> *A [Ethel Kaiser]: No, he never did.*
>
> *Q He didn't originate that idea?*
>
> *A [Ethel Kaiser]: No.*

**Manfredi LIED about his work for over a year and a half with Constantine to search for funding for the Hawai'i partners...**

- Manfredi appeared to know the sophisticated details of everything else that promoted his "intelligence", "skills", and "value" during his testimony.

- BUT – Manfredi could not remember the main person who worked with him (Constantine) and actually funded one (1) of the two (2) hard money deals.

- It is more incredulous testimony that cannot be reconciled.

The Court at *M&O at 30* identified: "*He said that, to his knowledge [Manfredi], Constantine did not perform any work on the Hawaii Project that would have entitled him to such payment*" (*Tr.2962*).

**FALSE** – Because this is perhaps the "crown-jewel" of the government's "concealment" claims.   Constantine could not have closed the Urban Expansion loan, nor could any other lender (like Centrum, Lehman Brothers, or others), without Manfredi's (and most likely Kaiser's) fingerprint all over the deal.

- **Kenner did not handle any portion of the day-to-day due diligence work**. That is exactly what Kaiser and Manfredi were doing for their pay benefits and free equity in the deal.

The Centrum deal proved the full Manfredi fingerprints, *supra*; including the Manfredi negotiated $1.5 million loan to Jowdy from the Centrum proceeds (*See Recon33-171*).
- The Manfredi fingerprints with Centrum, attorney Najam and Jowdy, completely exonerated Kenner from any pre-planned concealment to divert funds.

Manfredi and the government falsely misled the Court, claiming they expected the Centrum proceeds to be used for either "*closing Waikapuna*" (with not enough funds to close), or "*in lieu of the Lehman Brothers $5 million Waikapuna loan*" that was pending. Both falsely premeditated testimonies expose the ridiculousness of the statements by Manfredi and the government's leading Q&A (*Tr.2954*):

> *Q: Were you part of the decision-making to enter into this [Urban Expansion] loan?*
>
> *A [Manfredi]: Well, no, I really didn't have -- really didn't have a choice.  **We had been through the gamut of trying to find these hard money lenders, and this happened even before Centrum**, so I was working on it pretty much nonstop and not being able to close on Waikapuna, not having been successful to that point, you know, there wasn't a lot of choices left.*

The Urban Expansion loan was *after* the Centrum loan (which would not have been enough funding to complete the Waikapuna purchase in the first instance – further exposing the prior Manfredi lie to the Court). **Manfredi could not keep his timeline lies straight**; *again the pure sign of a fabricated testimony that was created was to promote prejudice and harm to the defendants.*

Please note that that Manfredi was the Hawai'i management partner who called the Lehman Brothers 2005 loan "*egregious*" and told another hard money lender that it was the reason "*we*" cancelled the loan (*See Recon33-7*); not what he portrayed in 2015 (ten [10] years later – when he could not even remember working with Constantine).

> [Manfredi]: "*The deal with Lehman was cancelled by us as being too egregious.*"

**Manfredi's planned testimony was caught (IMPEACHED) when he was shown multiple emails related to his independent communication with Constantine for deals they worked on hand-in-hand to fund the Hawai'i project – specifically pursuant to Constantine's 2004 and 2005 Hawai'i consulting agreements...**

The Court *M&O at 30* identified: "*On cross-examination, Manfredi testified that he spoke with Constantine regarding the Hawaii Project, but he said that he did not recall exchanging several e-mails with Constantine introduced as evidence that indicated that Constantine was involved in obtaining financing for the Hawaii Project*" (*Tr.3004-3018; Defendants exhibits C-58, C-61, C-181, and C-181*).

Perhaps, even more telling for a guy who was expected by the government to give testimony that he and Constantine never worked together – to frame the government's fabricated conspiracy claims, Manfredi affirmed (like tracing witness Lanie Donlan) that the government never asked him to look for emails that would have clearly rebutted his own Constantine testimony.

- *How is that possible?*

Furthering Manfredi's "no Constantine contact nonsense" -- Manfredi confirmed that he met face-to-face in Scottsdale, Arizona with Constantine "*prior to '05*", exactly the time that he was working on Hawai'i funding with him (per the 2004 Hawai'i-Constantine consulting agreement -- Kaiser first signed) (*Tr.3004*):

> *Q. Well, did you speak to Mr. Constantine at any point in regards to the Hawaiian projects?*
>
> *A [Manfredi]: Yes.*

*Q. In person or by e-mail?*

**A [Manfredi]: I recall in person.**

*Q. How many times?*

*A [Manfredi]: One that I recall.*

*Q. And where was that?*

**A [Manfredi]: That was in Scottsdale, Arizona.**

*Q. Other than that one -- when was that?  should put a time frame on that, Mr. Manfredi.*

**A [Manfredi]: I don't recall the exact year.  It was prior to '05.**

There is no other business that Manfredi would have been in Scottsdale, Arizona to conduct in 2004, unless it was to specifically meet face-to-face with Constantine – and without Kenner present.  *The testimony is mystifying – specifically considering that the Hawai'i partners paid for his one-day travel to Scottsdale for the face-to-face meeting alone with Constantine (who he did not know personally before that meeting).*

**Manfredi lies about the loan details he managed with the attorneys at all times...**
Manfredi handled 100% of the paperwork with the various Hawai'i partners' attorneys prior to Kenner signing as the Managing Member for the loans (in evidence).   Manfredi had to review each document before the attorneys sent it to the lenders' attorneys for final sign-off, yet Manfredi claimed he was not aware of the Kenner guarantees on the Centrum or Urban Expansion loans (*Tr.2982*):

> *Q. As part of the financing of that property, were you aware that Phil Kenner personally guaranteed that loan?*

> *A [Manfredi]: No.*

Manfredi was included in the attorneys' final closing emails with Kenner (*See Recon33-194*) (*See Recon33-195*) (*See Recon33-196*).   Kenner emailed Jowdy July 13, 2005:

> *"Chris [Manfredi] is calling our guy Yamamura who is going to push their guy Okomoto to get Bill [Najam] & I docs tonight.   No phone call from Bill is necessary...**I'll keep you posted when I hear back from Chris [Manfredi] and the attorneys.  pk"***