**Finally, Manfredi is thoroughly impeached about "*not remembering anything*" to do with the Constantine work -- and the Urban Expansion loan (that he provided 100% of the due diligence)...**

Manfredi forgot even telling the FBI agents (including Galioto) in 2010 that Constantine provided the Urban Expansion loan, while he told the FBI that Manfredi knew he was being paid a consulting fee ahead of time – and based on an "agreement" (*See 3500-CM-2-r at 1*) (*Tr.2997-2999*):

> *Q. Do you remember at any point in time speaking with the FBI back in 2010 and telling them that you, yourself, were responsible for securing fundings for the Hawaiian projects?*
>
> *A [Manfredi]: <u>No</u>.*
>
> *Q. Would you take a look at that document that's to your immediate left. Yes, please. It's marked for identification as **3500 CM 2**. There is some highlighted portions, the top portions, probably the first third of that page. Just read it to yourself.*
>
> *(There was a pause in the proceedings.)*
>
> *A [Manfredi]: Okay.*
>
> *Q. Does it refresh your recollection that you may have told the agents back in 2010 who were investigating the case that you actually did get one or two lenders for the Hawaiian projects?*
>
> *A [Manfredi]: <u>No</u>.*
>
> *Q. That doesn't refresh your recollection?*
>
> *A [Manfredi]: <u>No</u>.*
>
> *Q. Well, you testified, I believe it was today, that Kenner, if I got it right, brought money into the Waikapuna project and then later testified that the money came from a company called Urban Expansion. Do you remember that?*
>
> *A [Manfredi]: Yes.*
>
> *Q. Isn't it a fact, Mr. Manfredi, that Mr. Constantine was the person responsible for bringing that money into the project, the Hawaiian project?*
>
> *A [Manfredi]: <u>I don't know</u>.*
>
> *<u>Q. Isn't it a fact that it was Mr. Constantine who was responsible for bringing the money that was able to secure the closing for the Waikapuna property?</u>*

> *A [Manfredi]: <u>I don't know that either</u>.*
>
> *<u>Q. Well, again, look at the document. Down towards the lower third of that document, my question is do you remember telling the agents back in 2010, specifically October 12, 2010, in a telephone conversation that Constantine brought in money to project Hawaii, more than $3 million? Do you remember telling the agents back in 2010 that it was Mr. Constantine who was responsible for bringing that money in?</u>*
>
> *A [Manfredi]: <u>No</u>.*

Manfredi and the government have "no excuses" as to why Manfredi was suffering from *faulty memory, confusion and mistakes*. His testimony was wholly unbelievable for the COO of the Hawai'i partners who managed and controlled 100% of the company due diligence materials. **He worked with all of the lenders**, because he (and Kaiser) handled all of the day-to-day work in Hawai'i that they were paid handsomely for (in equity, payroll, and advances).

**<u>The government knew the Manfredi testimony was recently fabricated, but they let it stand...</u>**
They could not afford to have Manfredi tell the court and jury that he worked hand-in-hand to find loans with Constantine after he personally travelled to Scottsdale, Arizona to meet face-to-face with Constantine *"prior to '05"* (*Tr.3004*). Manfredi could not corroborate that the face-to-face meeting that coincided with the signing of the 2004 Hawai'i consulting deal that Kaiser signed.[168] It would have ruined the government theories. Manfredi certainly could not corroborate all of the work he did with Constantine for years, that was totally documented. It would have been another prosecutorial disaster to unwind.

Nevertheless -- Manfredi was used religiously and **willingly** to mislead the jury and produce more slanderous prejudice with knowingly false testimony – contradicting empirical evidence and FBI proffer *raw notes* (again).

---

[168] It should be noted that the government – *with Kaiser's assistance* – tried to claim he could not have signed the 2004 consulting agreement with Constantine because of the death of his baby at the time. The baby died in 2005, thus the timing and story were a fraud on the Court, which prejudiced Kenner. Kaiser's own testimony confirmed that he was in his home in 2005 -- allegedly the date he "received" a call from Kenner asking about a $1 million loan to Hawai'i, because, according to Kaiser, that was "when" his baby died (and he was selling his home as a result) (*Tr.975-976*).

The government tried to use Ethel Kaiser, *supra*, to claim she met with Kenner in 2005 (*Tr.934*) – even showing her a picture [*GX-942*] (when it was really in late 2006 (a full year after the 2005 "friends & family loans") at the subsequent Kaiser baby christening, further misleading the Court and jury to Kenner's prejudice. Kenner's late 2006 presence with Kaiser's friends & family at his baby's christening further destroyed Kaiser's "confrontation" meeting lies with Manfredi and Kenner in middle 2006 (*Tr.983*); *inviting the fox to the henhouse?? Highly unlikely...*

## Bryan Berard[169]

### Bryan Berard suffers from CTE.

Berard received one (1) of many sever concussions during a severe eye injury in or about 2001.   He has suffered numerous recorded concussions and sub-concussive hits throughout his hockey-playing career, both before and after that injury; the basis for early onset Alzheimer's and CTE.

In a 2014 SDNY Courtroom [Case 1:14-cv-04174-AT], Berard was sued for legal fees after a failed attempt to re-recover insurance money from his disability insurance carrier (Standard Security Life Insurance Company of New York).

- Berard's original SDNY case was based on the fact that he claimed (again) that he *"did not read"* the settlement agreement with the insurance company when he chose to return to professional hockey and return the insurance settlement amount (in spite of being represented by counsel at all times -- and acknowledged in his original insurance paperwork).
  - Berard's *"did not read"* sentiment eerily echoed his 2015 trial testimony with respect to all of the Hawai'i documents he signed (*Tr.3157*). [170]

The Court *M&O at 30* identified: *"he [Berard] opened an approximately [sic] $700,000 line of credit with Northern Trust based on Kenner's advice with <u>the understanding that it would be used to make interest payments</u> on the Hawaii Property pending a loan from Lehman Brothers"* (*Tr.3035-37*).

**FALSE (yet raises more prosecution issues)** – Because Berard opened a $350,000 LOC on 10-24-2003 when he first wanted to get involved in the Hawai'i project (before the

---

[169] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 30*.

[170] In 2009, Berard gave voluntary testimony, which confirmed he had independent family attorneys that reviewed "**all**" documents before Berard signed them.   Berard's 2009 testimony also appears to run afoul of his claims in his 2014 SDNY case which Judge Torres ruled against him several times -- and his "**CTE**-style" *failed memory test* Berard claimed about everything he signed related to Kenner and Kenner disclosures (in the Hawai'i project) and independent litigation versus Jowdy to recover the "*Jowdy loans*" – and now another lawsuit unrelated to Kenner (*See 2009 arbitration – Day 5 at 916-917*):

> *Q: And prior to signing any of these documents did you have access to your own attorney unconnected to Mr. Kenner to review this?*

> *A [Berard]: Yes I did.   We have a family attorney back home where before I sign any documents basically – I went to his office, sat with him.   We reviewed them, and I signed them and basically FedEx'd them to Phil [Kenner].*

first property closing of December 2003) (*See Recon33-144*).

Then, on 3-7-2005 (seventeen [17] months later), Berard increased his LOC with Northern Trust Bank to $900,000 (*See Recon33-145*).

Only after Berard received a letter directly from Northern Trust Banker Aaron Mascarella in October 2006 (*See Recon33-100*), did Berard reduce his LOC to $650,000 after signing a complete, new LOC package for Northern Trust Bank (including a 2008 *Master Note* with *Pledge* and *Control Agreements for the reduced amount of $650,000*) (*See Recon33-198*).  Berard could not have participated in every step to create the LOC, increase it, and subsequently reduce it's collateral -- *and not been aware*; specifically considering his direct and unfettered communication with Northern Trust Banker Aaron Mascarella to initiate the LOC reduction began with the direct letter correspondence.

- Berard testified that he *"expected Kenner to make interest payments"* – yet Kenner was charged Counts 7 & 8 for *"making payments"*.
- This *cannot* reconcile a proper Indictment charging standard.

Berard – amongst others Hawai'i investors[171] – confirmed that they *"expected"* Kenner to make the payments (of which Kenner made approximately 60 of them before the *"group"* chose to default the LOCs and seek payback from Jowdy thru litigation – the only source of recovery remaining at the time).  **Kenner initial Indictment identified that investors expected the "payments" to be made**.  Nonetheless, Kenner was charged with making only payments #59 and #60.  It is illogical.

- *For five (5) years, the LOC investors received annual 1099-INT tax forms directly from Northern Trust Bank to deduct the interest that Little Isle 4 paid for their personal LOCs.*

- *Not one (1) complaint was presented at trial suggesting a Little Isle 4 LOC investor was unaware of their "use of funds" or the investment benefit they received from the Little Isle 4 paid-for interest payments.*

In 2009, Berard gave voluntary testimony in the *Nolan v. Kenner* arbitration.  Berard's testimony was one (1) month after he *ex post facto* claimed (in 2013 thru his own revisionary history) that he no longer found Kenner *"legit"* as a result of his Northern Trust Bank default.  Regardless of Berard's poor revisionary history, once employed by Jowdy, Berard had a free pass to lie to the FBI – if not in concert with.  In 2009, Berard travelled to Arizona at his own expense and gave the following testimony to *support*

---

[171] Stumpel, Norstrom, Gonchar, Lehtinen, and Peca signed 2009 affidavits (in evidence) confirming that they expected the LOC payments to be made by Little Isle 4, utilizing LOC accounts to fund the payments -- and the knowledge of loans to third (3rd) parties.

- **Nothing was concealed.**

*Kenner* and *confirm his knowledge* of the *Jowdy loans*.  He also confirmed his expectation that Kenner and Little Isle 4 were paying the interest payments on his LOC (contradicting Counts 7 & 8):

[Berard's 2009 arbitration testimony affirmed (*Nolan arbitration Day 5 at 76*)]:

> *Q: When you were – as far as the Hawai'i deal, were you made aware of any sort of transaction Mr. Kenner set up where you can give a commitment or pledge a credit line in lieu of putting all your money in initially?*
>
> *A [Berard]: Yes.*
>
> *Q: Can you tell the panel what was your understanding?*
>
> *A [Berard]: Basically the company – it was set up.  **The company would pay the payments.  I would pledge the money, obviously to get a loan for the property.  Again, the company would pay the payments,** and I was not forfeiting all the amount of money for the piece of property.*[172]
>
> *Q: Were you aware that Mr. Kenner got a credit line against some securities or investments you had?*
>
> *A [Berard]: Yes.*
>
> *Q: And later on were you aware that Mr. Kenner started lending this money to another principal in the Cabo project named Ken Jowdy?*

---

[172] In 2009 -- Berard was clearly able to articulate the investment strategy of collateralizing (a.k.a. – pledging) his securities portfolio at Northern Trust Bank – in lieu of cash – for his investment in the Hawai'i project, as the underlying investment strategy.  **There was nothing secret about it.**

*Berard received his annual 1099-INT tax forms directly from Northern Trust Bank's tax division to receive the additional investment strategy benefit.*

In fact – Berard's 2005, 1-page signed *Extension of Credit* designated his $900,000 as – "*Investment in speculative real estate*" (*See Recon33-199*).  Berard had actually established his original Hawai'i LOC two (2) years earlier (2003) and designated as funds for "*personal investment*".  The Berard documents were delivered in the Northern Trust trial subpoena -- **confirming Berard's lies.**

Thus Berard's testimony at trial that his Hawai'i LOC was established to assure Lehman Brothers that there was collateral until Lehman Brothers funded the project *was another uncorrected farce.*

Lehman Brothers began their involvement in 2005 – not 2003 (*Tr.3035-3036*).   The Northern Trust trial subpoena produced evidence that also disproved Berard's falsified claim that he never received monthly Hawai'i LOC statements. *They were present in the 2015 subpoena* (*Tr.3036*).

> *A [Berard]: Yes.*
>
> *Q: Where did you think the money that Mr. Jowdy – were you told where the money was going to be used that was given Mr. Jowdy as far as the Mexican project?  Was there anything you were told about that?*
>
> ***A [Berard]: Basically just loan him the money for the project.***
>
> *Q: And prior to signing any of these documents did you have access to your own attorney unconnected to Mr. Kenner to review this?*
>
> ***A [Berard]: Yes I did.   We have a family attorney back home where before I sign any documents basically – I went to his office, sat with him.   We reviewed them, and I signed them and basically FedEx'd them to Phil [Kenner].***

In 2015, Berard clearly lied about his knowledge of the Hawai'i-Jowdy loans, as follows (despite the fact the loans were distributed to Jowdy **personally**, *under advice of counsel for future collectability*, and designated as such in the terms of the signed 2004 Hawai'i loan agreement).

Berard's 2015 perjury and revised perspective of the *Jowdy loans, claimed* (*Tr.3082*):

> *"Absolutely not.  My money was not supposed to be used in Mexico."*

### Re – the LOC payments:

### Kristen Peca reiterated her (and conversely her husband's) expectation that Kenner would be paying the payments.   The fact that the company ran out of funds to make the payments is not a criminal act...

- Cash flow is part of everyday business; simply an unfortunate issue – at the hands of Jowdy's criminal intent to defraud the lenders (the Hawai'i partners), as he testified to in his January 2010 California deposition.

In 2012, Kristen Peca recorded Kenner for the FBI.   During her secret recordings, she also acknowledged that she expected Kenner to *"pay the interest payments for their LOC"*.

[At about 1:20.50 of Kristen Peca's July 2012 recording, in reference to Michael Peca's Northern Trust LOC, she told Kenner]:
> *"You said that you would make all payments."*

### So – how was Kenner charged with "making the payments" in Counts 7 & 8?   The

actual charges (guilty or innocent aside) created more jury confusion based on the government claiming a non-criminal act was criminal.   That is an unreasonable standard for a common citizen with no business experience to decipher accurately without a high margin for error.   Clearly it worked with a split verdict on the two (2) payment charges versus defendant Kenner.

**Berard was notified before receiving the default letters – like all of the Northern Trust LOC clients...**

It should be noted that Berard (like the others, *infra*) actually received text messages from Kenner to alert him about the March 2009 default letters, so no one could have been "*shocked*" (especially *including* Kristen Peca's fabricated testimony).[173]

**[Kenner texts to Michael Peca before the February 2009** default letter arrived – a month before Kristen Peca's fabricated "*shocked*" incident would have occurred]:

| 6350 | +17163743234 Michael Peca* | 2/10/2009 8:13:58 PM(UTC+0) | Sent | **Northern Trust sent you a letter. Call me when you get it** |
|---|---|---|---|---|
| 6352 | +17163743234 Michael Peca* | 2/10/2009 10:31:42 PM(UTC+0) | Sent | **Call u shortly** |

One (1) month later and prior to the **March 2009** default letters being received by the LOC clients at their addresses of record, Kenner sent the following texts (*notwithstanding additional calls made and emails sent to the various investors, as well*):

**[Kenner's notification texts to Kristen Peca, Darryl Sydor, Bryan Berard and Steve Rucchin** before the March 2009 letters arrived]:

| 7133 | +17163167227 **Kristen Peca*** | 3/20/2009 8:54:46 PM(UTC+0) | Sent | **Text me when you get the Northern Trust letter today.** |
|---|---|---|---|---|
| 7134 | +19492330046 **Steve Rucchin*** | 3/20/2009 9:04:02 PM(UTC+0) | Sent | **Text me when you get the letter from northern trust.** |

---

[173] Kristen Peca <u>lied</u> to the EDNY court claiming no knowledge of the default letter when both Michael Peca and her had received texts (*infra*), and with Michael Peca independently in communication with Northern Trust Bank before Kenner sent the text alerts (*Tr.711*):

[Kristen Peca]: "*We didn't understand, A, not only how this could happen, but <u>how he didn't have the decency to give us a heads-up and let us know we were about to get such a shocking notice in the mail</u>.*"

| 7135 | +1401524 6929 **Bryan Berard*** | 3/20/2009 9:04:37 PM(UTC+0) | Sent | **Text me when you get the letter from northern trust.** |
|---|---|---|---|---|
| 7136 | +1972523 0505 **Darryl Sydor*** | 3/20/2009 9:05:18 PM(UTC+0) | Sent | **Text me when you get the northern trust letter.** |

**<u>Berard lied about his communication with Kenner surrounding the March 2009 default letter, refuted by his own texts with Kenner (<i>supra</i>)...</u>**

The Court *M&O at 30* identified: "*Berard secured that line of credit with $1.1 million in bonds and stocks" (Tr.3038); and (5) "he contacted Kenner after receiving a notice of default from Northern Trust, and Kenner told him that the default meant that Berard had obtained a larger share of the Hawaii Project" (Tr.3040-41).*

**FALSE** – Because after reviewing the default letter that Kenner notified him about via text, *supra*, <u>Berard sent Kenner</u> the following text – **<u>five (5) full days before he approved the seizure on a mandatory call with Northern Trust Bankers (Mascarella and Brill)</u>**:

| 620 7 | +140152 46929 **Bryan Berard*** | 3/26/2009 6:53:59 PM(UTC+0) | R e a d | **When u get chance can we look at <i><u>how much money will b freed up after payn off line of credit NT???</u></i> Thanks** |
|---|---|---|---|---|

- This text is identical to the *<u>other seven [7] LOC clients</u>* (in evidence):

  o  Sydor sent Kenner a text on April 1, 2009 to notify Kenner: "*Hey someone from Northern Trust called with someone from schwabb. And want to do a conference call in a hour with erin [Mascarella] someone" (See Recon33-200 at 1).*

  o  Mike Peca sent a text to Kenner on April 1, 2009 to confirm he independently *already* spoke to Northern Trust: "*Call already done" (See Recon33-200 at 2).*

**None of the Northern Trust Bank LOC transactions could have been concealed from the clients. Only complicity with Galioto's false theories to convict Kenner could have been the basis for the "*memory loss*"; based on concealment, or <u>CTE</u> symptoms of *faulty memory, confusion and mistakes* (thus wholly unreliable, <i><u>but incidentally in perfect unison</u></i>).**

After Berard asked Kenner about his remaining Northern Trust account value *<u>five (5) days before</u>* the seizure of Berard's LOC collateral:



| 620 7 | +140152 46929 Bryan Berard* | 3/26/2009 6:53:59 PM(UTC+0) | R e a d | **When u get chance can we look at *how much money will b freed up after payn off line of credit NT???* Thanks** |

Kenner replied [(sent) – hi-lighted in **RED**]:



| 7280 | +14015246929 Bryan Berard* | 3/26/2009 7:00:51 PM(UTC+0) | Sent | **~300k** |

Berard replied:

| 620 8 | +140152 46929 Bryan Berard* | 3/26/2009 7:04:18 PM(UTC+0) | R e a d | **Cool thanks!!! When will that b freed Gonna use 200 for a cool oppurtunity will show u and talk 2 u abt it later. Good for all of us n future.** |

Kenner replied:

| 7282 | +14015246929 Bryan Berard* | 3/26/2009 7:30:08 PM(UTC+0) | Sent | **Can't wait to hear!** |

Berard's 2009 text statements contradict the timing of his own reformative claims to the FBI in 2013 (*after getting his job from Jowdy*), that "*at this time of collateral seizure when he returned from Russia*", he found Kenner "*not to be legit*".   Yet, Berard's next investment – in a real time 3-2009 text -- with his residual collateral funds was "*Good for all of us n future*".

- It clearly does not jive; since Berard (*in Rule 16 evidence*) requested Kenner review his follow-up investment for him.

The 2013 FBI proffer by Berard was clearly another fabricated statement to:
- Aggravate the pending Galioto arrest (November 2013),
- Bolster Galioto's foundationless theories contrived thru graft and threats, and
- Save Jowdy, Berard, Kaiser (and others) from the pending December 2013 Mexico arrest warrants and a legally ordered receivership to Kenner and Kenner investors by the Baja California Sur Mexico Supreme Court.

**Jowdy's cabal discovered Kenner was scheduled for in-person testimony mid-December. Galioto and Jowdy's people discovered it in October 2013; knowing their final demise was pending momentarily if irrational measures were not taken immediately.**

- Jowdy's cabal along with Galioto knew that Kenner's appearance ***had to be stopped at all costs – and it fortuitously was by his own Indictment (with no other Grand Jury witnesses)***.

- Only Galioto's self-serving, Jowdy protecting statements were given to the October 2013 EDNY Grand Jury, after his failed efforts with three (3) handpicked witnesses (Peca, Sydor and Stevenson) years earlier (all pro-Kenner -- and in evidence).

**Berard signed the July 2006 Little Isle 4 operating agreement as part of his joint venture sign off. The 2006 operating agreement identified his full LOC equity...**
- It was another mis-direction of information to confuse the Court and the jury.

The Court *M&O at 30* identified: *"and (6) Berard never received any documentation showing that he had a share in the Hawaii Project worth more than his original $100,000 investment"* (Tr.3041-42).

**FALSE** – Because Berard signed 2006 Little Isle 4 operating agreement with his full equity position identified – after his full contributions.   If there were any changes to Berard's equity positions in the Hawai'i partners (because of some event in 2009), his new-best-friend, John Kaiser was the Managing Member of the Hawai'i partners under Na'alehu Ventures 2006 since December 31, 2007.   Kenner would not have been making any capital account or equity adjustments to the books and records; **Kaiser would** (*See Recon33-79 at 12 [Berard]*).   *It was more double-talk to confuse the Jury.*

Berard's equity in the Hawai'i partners was listed as the seventh (7th) largest.   Thus it is inconceivable that nineteen (19) other investors had less equity than him (for a $100,000 investment), and Berard thought his entire LOC was not included in the 2006, $105,000,000 funding deal.  It is illogical (again).

Berard signed his *2005 Extension of Credit* on 3-5-2005 with Northern Trust Bank. Northern Trust delivered it to the EDNY court in 2015 as part of its "incomplete" subpoena.

Berard's *Extension of Credit* specifically identified: *"$900.000 investment in speculative real estate"* (*See Recon33-199*).
- Nothing in the language of the Northern Trust Bank document "**that Berard signed**" would lead Berard to believe he wasn't using the LOC funds &/or they were not fully committed to the Hawai'i partners capital account; *just like he explained to the 2009 arbitration panel – voluntarily.*

In spite of all the Berard hands-on activity in Hawai'i – including several visits to the

property in 2004 and 2005 with Kaiser, Kenner, Manfredi, Lanie Donlan[174] (employee at the time) and others – Berard claimed he had no knowledge of who was accessing his line of credit or running the Hawai'i project (*Tr.3099-3100*) – *perhaps due to CTE by 2015*?:

> *Q By the way, when you invest in Hawaii, you and Phil Kenner, or did Phil discuss with you how the investment would be organized from a corporate structure, something known an LLC?*
>
> *A [Berard]: No.*
>
> ***Q Well, did you have an understanding as to who would have the control, but also the responsibility for use of the line of credit funds when you invested?***
>
> ***A [Berard]: No.***
>
> *Q You had no understanding of that?*
>
> ***A [Berard]: No understanding, no.***
>
> *Q Was the name managing member ever mentioned to you -- withdrawn. Was the name "managing member" or the term "managing member," ever discussed between you and Phil in relation to your investment in the Hawaiian project?*
>
> ***A [Berard]: I don't recall.***

Please note that Berard signed his *2005 Letter of Authorization* with Northern Trust Bank, which identified (*See Recon33-201*):

> *March 11, 2005*
>
> *Northern Trust Bank of Arizona*

---

[174] Lanie Donlan has been Berard's best friend for over fifteen (15) years.   Berard made the introduction to Kenner in or about 2004.   Donlan travelled everywhere with Berard, thus, when Donlan gave her "*tracing*" testimony in 2015 with Berard and Kaiser fully employed by Jowdy (and working on his "protection" detail), it raised more than questions about the authenticity of her testimony; which included Kenner being present at her Boston MA office that Kenner has never been to…

The government *never* asked Donlan for the alleged "*tracing*" documents, but as she closed her testimony in a panic to stick to the premeditated script, she answered (*Tr.3457*):

> *Q. Well, as relates to what you just testified to, ma'am, is there some means by which we can obtain a copy of this document you say you saw Phil tracing signatures on? That is my question.*
>
> ***A [Donlan]: I don't know. I don't know. It's in '05. I don't have it. I have the memory of it. It's just something I really remembered.***

*2398 East Camelback Drive*
*Suite 300*
*Phoenix, AZ 85016*

*Re: Northern Trust Bank Line of Credit #252996/1542 in the name of Bryan Berard*

*Gentlemen:*

*This letter is your authorization to allow **Philip A. Kenner** to access my above referenced line of credit for direct deposit into the Little Isle IV account at Northern Trust. He is authorized to sign for the release of funds related to the line.*

*Thank you for your assistance in this manner*
*/s/*
*Bryan Berard*

**What possibly could Berard not understand?** Unless, Berard planned his fabricated testimony to injure Kenner, or he was suffering from **CTE** (memory loss) symptoms. Either way, the testimony is wholly *unreliable* and inconsistent with all of his empirical evidence prior to his hiring in 2012 by Kenner adversary, Ken Jowdy.

- John Kaiser's shocking letter of February 29, 2019 (*Document 628*) confirmed Kenner was accurate about "everything" Kenner exposed regarding Jowdy at trial and prior to the FBI and Kenner investors. Nevertheless, the government called Kenner a "*liar*" at trial; reinforcing the known fabricated testimony by its witnesses (*Tr.4597-4599*).

**Berard was only involved in the Hawaii investment...**[175]

---

[175] Please note that Berard and John Kaiser actually **robbed** Kenner and another friend of Kaiser's (Vincent Tesoriero) for hundreds of thousands of dollars in the LedBetter (Sag Harbor) investment. ***Berard and Kaiser created forged and fabricated documents*** (*See Recon33-56*), submitted them to an EDNY closing attorney, and retained the sale proceeds.

**FBI agent Galioto is 100% aware of their criminal acts and protected them.** Kaiser and Berard claimed that Kenner "had no money" in the LedBetter transaction when they were sued by Kenner in 2013, **further confirming that the 2006, short-term loan that Na'alehu Ventures 2006 and Little Isle 4 gave Kaiser, was in fact for Kaiser;** *never Kenner (as alleged in the 2015 trial)*.

- This evidence is in grave contradiction to the government trial theories that Kenner stole Hawai'i money (originating in the Peca LOC) and used it to buy his ownership in the Sag Harbor project. **Kaiser and Berard's Reply in the 2013 Arizona lawsuit confirmed that was not true. They confirmed that "all" of the money belonged to Kaiser.**
- The FBI interviewed Tesoriero in 2014 *after* the Kenner arrest in the EDNY criminal case. Tesoriero confirmed to FBI agent Galioto (*See 3500-VT-1-r at 2*) that "*Kenner's role in the Sag Harbor deal would be to raise money to build the property*".

- **Berard was not involved in the GSF.**
- **Berard was not involved in the 2008-09 Eufora private stock sales.**

Based on Berard's exculpatory testimony during his voluntary 2009 arbitration statements, the Court must draw a scorned eye on any and all revisionary statements Berard has made to the contrary after his employment with Ken Jowdy began in 2012 (just like John Kaiser).

- Kaiser and Berard's revisionary statements need to become a more scrutinized issue considering the delivery of John Kaiser's February 28, 2019 "**explosive**" letter to the Court (*Document 628*).

Kaiser verified all of the Jowdy frauds since his 2012 employment -- *objectively making Kaiser and Berard co-conspirators to Jowdy's cabal during their knowing period of employment – solely for financial gains.*

**The "conspiracy" is proven at this point to protect Jowdy at all costs...**
The Court must now reconcile Kaiser and Berard's pre-2012 statements.   Before they went on their barnstorming tour with FBI agent Galioto to slander Kenner, they, themselves, "*agreed*" with the language in the 2019 Kaiser letter.

After Jowdy hired Berard and Kaiser in 2012, they worked diligently with Galioto to convince investors to reverse every prior testimony by the Hawai'i-Mexico investors. Their repeated NY Daily News articles confirmed their trial lies – while working hand-in-hand with Galioto to frame Kenner.[176]

o Beginning in 2012, it was collectively 100% the artifice of Jowdy, Galioto, Harvey, Berard and Kaiser to extend the "protection" of Jowdy from Kaiser and Berard's 2012 hire date thru 2019 (*and beyond – considering FBI agent Galioto wants "nothing to do" with pursuing Jowdy and his decades of known frauds*).

o The FBI cover-up thru Galioto has now been exposed by Kenner (2007 discovery thru present) – and now Kaiser's insider verification (2012 thru present) – although

---

o Thus, the funds Kaiser received and repaid 11-days later were his; *never Kenner's*. It documented another known lie by the government to the Court and Jury intended to injure Kenner.

[176] The NY Daily News (*November 13, 2013*) touted Kaiser and Berard as "*heroes*" for their efforts with FBI Agent Galioto and featured them in an arrest-day article titled – "***Former NHL Player Bryan Berard and ex-cop help Feds nail two Arizona men in massive fraud***".

- The article claimed, "*...bringing to close a long and difficult investigation that relied largely on the determination and persistence of former Ranger and Islander Bryan Berard and former New York and Long Island police officer John Kaiser, along with New York-based FBI agent Matt Galioto.*"

Kaiser's paychecks kept him quiet until *fired* for five (5) years – when Kenner immediately turned down Jowdy's documented 2007 bribes to Kenner to "*stay quiet and receive FBI protection – like him*".

**Although Berard was "not" part of the 2015 Eufora case issues – the government used Berard to LIE when he was asked about the Eufora loans buy out in 2010 thru Plaintiff Attorney Stolper...**
- Berard controlled the buyout efforts with Kaiser.

Berard's texts confirm he was concealing information about Jowdy from his friend and ex-teammate Glen Murray ["Muzz"] – *after Constantine had exhausted the GSF funds*:

| | | | | |
|---|---|---|---|---|
| 141 37 | +14015246 929 **Bryan Berard*** | 6/26/2010 3:10:57 AM(UTC+ 0) | R e a d | Muzz [Glen Murray] is snappn a bit. So hopefully hell calm down when I talk to him |
| 141 38 | +14015246 929 **Bryan Berard*** | 6/26/2010 3:57:33 AM(UTC+ 0) | R e a d | Went ok. *Think I convinced him he's gotta do 35K. For Jowdys case.* Danced around a few things. <u>Telln him a little wthout telln him. He's on our side. Told him real close to finish line and trust us</u> |

**Berard worked hand-in-hand with Stolper and Giuliani's investigative group to discover "everything Eufora" in 2010 -- and find new funds for the Eufora buyout...**
- Berard had CTE-like amnesia during trial testimony (coinciding with Michael Peca, Tim Gaarn, John Kaiser, and others).

[Berard lies at trial thru a haze of CTE -- *Tr.3106, 3111*]:
*Q Was there also an effort underway not only to buy this loan but also to take the company over from Mr. Kaiser -- I'm sorry -- from Mr. Constantine?*

*A [Berard]: No.*

*Q. Would it surprise you to learn it [the loan] was with Eufora and not with Mr. Constantine?*

*A [Berard]: You say surprise? I didn't understand the loan in general.*

*Q. Well, do you remember any discussions about going to talk to Brent to buy the loan?*

*A [Berard]: I do not, no.*

*Q. Do you know if or did you come to learn that somebody in your group actually went to talk to Mr. Brent?*

*A [Berard]: Not to my knowledge, no.*

**Berard lied again to the Court regarding Eufora…**
- It was more egregious than most of his lies considering Berard was the "key person" who was gathering investor funds to buy out the loan from "Brent" [the Eufora lender] on behalf of the Rudy Giuliani-Michael Stolper Group and the AZ Eufora Partners I investors…
- The following texts (only a *very* small subset) are the clear proof that Berard (in addition to Kaiser, Peca, Gaarn, McKee, and others lied in 2015 about their loan buyout knowledge)…completely in sync (raising full suborning issues)…

**Sadly, the lies extended to an issue (the Eufora buy out) that had no perceived relevance to the criminal case…**
- But -- the government clearly prepped all for the witnesses to "*remember what to forget*" in unison (again).

With Giuliani-Stolper handling the negotiations with Berard and the lender [Brent Nerguizian at Neptune Capital], *Berard was soliciting 100% of the Eufora loan buy out funds to complete Stolper's deal with the lender* -- despite Berard's CTE-laden amnesia in 2015, supra.

Berard confirms four (4) different friends of his to Kenner that he (Berard) was talking to about soliciting Eufora buy out funds from.

**[Berard June 2, 2010 texts to Kenner regarding his Eufora buy out efforts]:**

| | | | | |
|---|---|---|---|---|
| 136 21 | +1401524 6929 Bryan Berard* | 6/2/2010 6:26:36 PM(UTC+ 0) | R e a d | I talked to **Lanie [Donlan]** and gave her the scoop. S[h]es calln u for the full run town and told her we both agreed if she can come up wth the 50 we want her to have the .5 percent. |
| 136 22 | +1401524 6929 Bryan Berard* | 6/2/2010 6:28:09 PM(UTC+ 0) | R e a d | If she can't come up wth it I have 2 other options. **Andy** or **kelly** but ull have to explain and probably want documents |
| 136 33 | +1401524 6929 Bryan Berard* | 6/2/2010 9:16:02 PM(UTC+ 0) | R e a d | Ok cool. Thanks. If **lanie [Donlan]** can't come up wth it got my brother **greg [Berard]** interested in it too. So we have some options for the 50k |

**[Berard June 3, 2010 texts to Kenner regarding his Eufora buy out efforts]:**

| | | | | |
|---|---|---|---|---|
| 136 63 | +1401524 6929 Bryan Berard* | 6/3/2010 8:49:19 PM(UTC+ 0) | R e a d | Sorry. The only one got left is **andy** and his **brother**. U wanna talk to him tonite?? B home abt 7??? |

| 136 64 | +1401524 6929 Bryan Berard* | 6/3/2010 8:52:49 PM(UTC+ 0) | R e a d | Maybe do the whole thing. Gotta chat wth **andy** again and u can xplain to him what we need and then **his brother**. Ill call u when on way home |

[Berard June 5, 2010 rants to Kenner regarding his Eufora buy out efforts and his **comparisons between Constantine and Jowdy known frauds**]:

| 137 08 | +1401524 6929 Bryan Berard* | 6/5/2010 9:29:08 PM(UTC+ 0) | R e a d | That's fosure. Hopefully this is light at end of tunnell.. Just makes me nervous wth Tommy. **Hopefully he [Constantine] just takes what they give him quietly and not end up wth another Jowdy** |
| 137 11 | +1401524 6929 Bryan Berard* | 6/5/2010 9:43:24 PM(UTC+ 0) | R e a d | I agree. **I don't give a fuck abt him [Constantine]. Just don't want him to fuck this up like Jowdy.** |

**[Kenner June 5, 2010 texts (hi-lighted) to Gaarn and Berard regarding their Eufora buy out efforts** -- and the need for Tim Gaarn to clarify the buy out deal for other investors that Berard is soliciting for the loan buy out]:

- Berard presents Eufora final questions for himself and his investment friends for Tim Gaarn and Team Stolper, which were needed to finish the necessary funding immediately; *NOT including Kenner*:

| 157 90 | +1201970 8712 Tim Gaarn* | 6/5/2010 10:55:05 PM(UTC+ 0) | S e n t | I have a long list of questions from Bryan [Berard] that need answers. When can you [Gaarn] look at them? |
| 157 91 | +1201970 8712 Tim Gaarn* | 6/5/2010 10:55:18 PM(UTC+ 0) | S e n t | Should I [Kenner] text it? |
| 157 92 | +1201970 8712 **Tim Gaarn*** | 6/5/2010 10:56:17 PM(UTC+ 0) | S e n t | From Bryan [Berard]..."We r sending u all the questions that I wld like answered b4 I agree to taking this personal loan. I trust u but this is a big chance for me. So me and andy worked on this email.. So please get back to me then we can talk tonite. Obviousiouly we gotta move fast so I can b whereeva to meet timmy in NY tomorrow or monday morning to see everything. Thanks" |
| 157 93 | +1201970 8712 **Tim Gaarn*** | 6/5/2010 10:56:54 PM(UTC+ 0) | S e n t | Hey, Before we secure a loan from either my brother or the other giy in DC, I have a few questions on the terms of the agreement to be completed Monday, the new entity going forward, the liscensing deals on the forward calendar, etc. I just want to make sure Bryan's [Berard] |

interests and ownership are protected, or if my brother is involved he would be making an investment on behalf of me. He doesn't need any money, so I'm cautious about what I go to him. Any info you have on the following questions would be helpful: - As you described, if the $250k is not paid, then the lender will foreclose on the note and take the whole company. Is that just exercising the convert on the note? So he would then own 40%?What other downside risk is there for shareholders? - What other consquences are there if this payment on the loan isn't funded? Does the company go bankrupt? What would the current owners be left with? I assume that the patents are worth a lot. - If the liscensing deals are in place what motivation does the lender have to agree to these terms and not exercise his option to convert the debt into equity? - What is the process to remove CEO? What potential pitfalls are there? Is there a successor in place? - How many shareholders are there currently? And does the makeup change after this deal closes? - Other than shareholders, who else is involved in the company (sales staff, support, etc). Who is in charge of handling the licensing agreements with the other prepaid card companies? - Is the company currently generating any revenue as a card issuer? I'm assuming the future liscensing deals will be the majority of the future revenue streams. - Has there been any revenue to date. When was inception? And what have the sources and uses been of the existing equity in company? - What documentation is there for this current agreement with the lender? The board has approved the exchange for equity? - If Bryan has the $ available Monday, where do those funds go? He should have these docs in place before he agrees to wire funds. - Is there any docs or proof of pending liscensing deal with NetSpend? - Are there any proforma statements? Revenue/growth projections? - After this deal closes and the company starts genersting revenue, when how often are distributions made to stakeholders? If the future of the company or at least a good chunk of equity is in jeopardy, this $250k is a lot more valuable than 2.5% under the circumstances. If Bryan [Berard] is going to front the $ for this loan, then not only is he personally assuming this, he is also exposing himself to a lender (my brother or the guy in DC). Bryan [Berard] and I spoke and we thought that 2 things were critical for him to agree to the terms assuming this situation: (1) Given how valuable this piece is, then the equity should be closer to 5% (without proforma numbers, it's hard to value this accurately). (2) the company should be responsible for his personal loan. He will likely pay 20-

| | | | | 30% on this note, and will be personally guaranteeing it. If the first $1.45mm is paid to the lender, and the board/shareholders have agreed that the next $250k, then it seems to me that they would agree to paying out $300k. Sorry for all the questions--I just want to make sure everything is in place before he agrees to fund this. We'll also want to have our lawyer take a look at the docs. |

Later that same night, after Gaarn and Berard's investment people discussed the final Eufora questions and issues, **Gaarn notified Kenner** that Berard's people were funding the Eufora buy out deal, as follows:

| | | | | |
|---|---|---|---|---|
| 136 97 | +1201970 8712 Tim Gaarn* | 6/5/2010 1:53:36 AM(UTC+ 0) | R e a d | Yes. We r done. I'll update u later tonight. How did u do ? |
| 136 99 | +1201970 8712 Tim Gaarn* | 6/5/2010 2:04:58 AM(UTC+ 0) | R e a d | Oh yes ! But we r going to need $300m then another $300m in 45 days. Hopefully the 2nd 300 will b easy cause we r so far along. |
| 137 00 | +1201970 8712 Tim Gaarn* | 6/5/2010 2:14:08 AM(UTC+ 0) | R e a d | It goes out over 6-7 months. |
| 137 01 | +1201970 8712 Tim Gaarn* | 6/5/2010 2:22:32 AM(UTC+ 0) | R e a d | Yes. Periodic payments over that time |

### Gaarn's CTE symptoms were exhibited at trial to the government's benefit...

At trial, Gaarn could not remember the buy out efforts (*Tr.2639-2640*) – in sync with Kaiser, Berard, and Peca, etcetera:

> *Q. Now, at this meeting was there ever an agreement reached or a consensus that either you, one of the other members of the group, would go and contact Mr. Nardidian [Nerguizian]?*
>
> *A [Gaarn]: No. I don't remember that.*
>
> *Q. Do you remember Mr. Gentry after this meeting or shortly after this meeting making contact with Mr. Nardidian [Nerguizian] on behalf of the group?*
>
> *A [Gaarn]:  I don't remember that.*

*Q. Well, this group that you were a part of, was there ever a discussion about raising money to be able to buy the loan and to secure the patents, do you remember that?*

**A [Gaarn]:** *No. I don't remember.*

*Q. At any point in time, whether it be this conversation or subsequently, do you remember any discussions about raising money to buy* --

**A [Gaarn]:** *No.*

*Q. -- the loan?*

**A [Gaarn]:** *No.*

- It is impossible to reconcile that none of the loan buy out participants could remember any of it, except Kenner in 2015; unless severe **CTE** also affects Tim Gaarn, a former Division I College Football player – *nevertheless unreliable to sustain a conviction.*

It is more than clear that Berard's June 5, 2010 text (in addition to the prior and subsequent texts) confirm that Berard was at least one (1) of the main solicitors (if not the primary one) for the Eufora buy out funds, while structuring the deal with attorney Stolper.

It is inconceivable that Berard, Gaarn, Peca, Kaiser, McKee and others were not aware of the loan buy out efforts five (5) years later during trial – *in unison* -- when they were the only "loan buy out" solicitors with Stolper in 2010.

- This corroborates more *organized* fraud on the 2015 Court that led the jury afield from the real facts in the case – **specifically the intrinsic value that everyone in 2010** (after the 2008-09 Constantine and Gaarn private stock sales) **believed in Eufora**; *wholly independent from Kenner at all times.*

**[Berard June 7, 2010 texts to Kenner regarding his Eufora buy out efforts** and how "*good*" Kenner is with Berard – a year after he claims (*ex post facto* in 2013) that Kenner was "*not legit*" since March 2009 when he received the Northern Trust Bank default letter]:



| 137 45 | +1401524 6929 Bryan Berard* | 6/7/2010 7:48:38 PM(UTC+ 0) | R e a d | **Ur good wth me buddy**. Just gotta keep between us now. **Tommy [Constantine] and Jowdy. Who wld of known. $ makes people greedy** |
|---|---|---|---|---|

| ID | Phone/Name | Date/Time | | Message |
|---|---|---|---|---|
| 13746 | +14015246929 Bryan Berard* | 6/7/2010 7:49:15 PM(UTC+0) | Read | I think [investor] guys will lose it if they find out tommys dirty too. So hoepfully have good news abt eufora. And no one needs to know abt tommy |
| 13747 | +14015246929 Bryan Berard* | 6/7/2010 7:50:44 PM(UTC+0) | Read | Honestly think while mexico and hawaii still going on. B best if he [Constantine] keeps his mouth shut and goes away quietly no one needs to know |
| 13748 | +14015246929 Bryan Berard* | 6/7/2010 7:58:54 PM(UTC+0) | Read | If does get out. And eufora hits ill go in front of all the guys and tell them what happpened. But this ones gotta wrk out for us. We r DO. |
| 13749 | +14015246929 Bryan Berard* | 6/7/2010 8:01:31 PM(UTC+0) | Read | Us there anything besides tommy that cld fuck this eufora deal up?? Sounds like u and jonny [Kaiser] r 99 percent sure this is the one?? |
| 13751 | +14015246929 Bryan Berard* | 6/7/2010 8:35:03 PM(UTC+0) | Read | Ok marty said guys lawyers r looking at now. He said they will get back to him in morning. Marty said not a matter if hell do. Just time frame. Martys pushn him and knows we need asap |
| 13752 | +14015246929 Bryan Berard* | 6/7/2010 8:51:59 PM(UTC+0) | Read | Got it thanks. Jonny [Kaiser] didnt think that it wld b a problem that company is responsible for the juice on the 250 loan?? If company needs this this bad. Y shld me and jonny cover the 50gs for juice?? |

[June 16, 2010 --- from Berard to Kenner – re – Eufora loan buy out]:

| ID | Phone/Name | Date/Time | | Message |
|---|---|---|---|---|
| 13895 | +14015246929 Bryan Berard* | 6/16/2010 4:34:37 PM(UTC+0) | Read | Talked to Jonny [Kaiser] just waiting on them to wrap up meeting. I guess Brent [Neptune] is being difficult now |
| 13903 | +14015246929 Bryan Berard* | 6/16/2010 9:54:35 PM(UTC+0) | Read | Still nothn wh Brent?? He and Tommy [Constantine] better not fuck this up? |
| 13904 | +14015246929 Bryan Berard* | 6/16/2010 10:07:57 PM(UTC+0) | Read | Jesus. What a pain n ass. Did Brent agree to sign tomorrow? Sorry to keep bother u on this. Just like the updates |
| 13905 | +14015246929 Bryan Berard* | 6/16/2010 10:09:07 PM(UTC+0) | Read | Does anybody think Brent is leaking out to Tommy? |
| 13906 | +14015246929 Bryan Berard* | 6/16/2010 10:12:48 | Read | That's good…. Well hopefully wrapped up tomorrow. U [Kenner] and Timmy [Gaarn] still |

| | Bryan Berard* | PM(UTC+0) | | *feel confident?* |
|---|---|---|---|---|

**[June 17, 2010 --- from Berard to Kenner]:**

| 13923 | +14015246 929 Bryan Berard* | 6/17/2010 10:34:44 PM(UTC+0) | Read | *And updates wth Brent*?? He still trying to squirm? |
|---|---|---|---|---|

**[June 18, 2010 --- from Berard to Kenner]:**

| 13925 | +14015246 929 Bryan Berard* | 6/18/2010 4:58:33 AM(UTC+0) | Read | They get this signed and completed yet?? Heard was a verbal agreement? |
|---|---|---|---|---|
| 13926 | +14015246 929 Bryan Berard* | 6/18/2010 5:01:08 AM(UTC+0) | Read | Yeah Ridiculous. **Jonny** [*Kaiser*] said was verbal agreement. **Lawyers** were goin thru every line? Did u hear that?? Keep me posted tomorrow. This sucks |
| 13927 | +14015246 929 Bryan Berard* | 6/18/2010 5:19:51 PM(UTC+0) | Read | You hear anything today yet?? Good. Bad. |

**[June 19, 2010 --- from Berard to Kenner]:**

| 13987 | +14015246929 Bryan Berard* | 6/19/2010 7:12:48 PM(UTC+0) | Read | *Heard we have the agreement **Lawyers** going over and supposely sign today???* |
|---|---|---|---|---|

**[June 23, 2010 --- from Berard to Kenner]:**

| 14061 | +14015246929 Bryan Berard* | 6/23/2010 7:09:29 PM(UTC+0) | Read | Any updates today from **Timmy** [Gaarn]?? And cld u call Scwab when u get a moment. Thanks. |
|---|---|---|---|---|
| 14062 | +14015246929 Bryan Berard* | 6/23/2010 7:17:02 PM(UTC+0) | Read | Yeah. What's up?? Good or bad? |
| 14063 | +14015246929 Bryan | 6/23/2010 7:18:45 PM(UTC+0) | Read | Not really. Ha. U coming in? Been trying get a update if we got **brent** [Nerguizian] signed and |

| | Berard* | ) | | now onto step 3. "Hop a long" [Constantine] |
|---|---|---|---|---|

**[July 2010 texts to Kenner** *from Peca* **confirming Mike Peca's EDNY PERJURY re – his Eufora buyout knowledge]:**

| 147 27 | +171637 43234 Michael Peca* | 7/14/2010 12:20:53 AM(UTC +0) | Rea d | If not all willing members get a chance to be part of the loan buyout, mean more % there may be a lynching. FYI |
|---|---|---|---|---|

Kenner responded (hi-lighted) *in the affirmative* to Mike Peca – as follows:

| 16913 | +17163743234 Michael Peca* | 7/14/2010 12:21:28 AM(UTC+0) | Sent | **I don't disagree** |
|---|---|---|---|---|
| 16914 | +17163743234 Michael Peca* | 7/14/2010 12:21:46 AM(UTC+0) | Sent | **Why wouldn't they?** |

Yet, in 2015, Peca lied in perfect sync with Gaarn, Berard and Kaiser (*Tr.1362*):

> *Q: Related to a little different fact pattern. Before the lawsuit was filed, were you part of a group who attempted to purchase a Eufora loan using Mr. Stober [Stolper]?*
>
> ***A [Michael Peca]: No.*** *We were attempting to get all the paperwork and documentation on it. I was in contact with Mr. Constantine with reference to the same.*

Perhaps, the Court should note that although Kristen Peca falsely professed that "*we're done*" with the investments during the May 2009 GSF meeting (*Tr.717*) (over one [1] year earlier, yet Mike Peca was a leader in the July 2010 GSF loan buyout efforts, claiming there would be a "*lynching*" if **he** could not contribute more "*investment*" funds.

- None of these statements reconcile Kristen Peca's untruths to the Court, either.

**Jay McKee** wants in on the Eufora buy out according to Berard (who remained oblivious in 2015 to the loan buy out efforts he organized):

| 14800 | +14015 246929 Bryan Berard* | 7/15/2010 1:31:11 PM(UTC+ 0) | R e a d | Call me now or at 1015am est. Michael [Stolper] wants to talk to me u and jonny [Kaiser]... Mckee says before he signs he wants to help pay off loan too |
|---|---|---|---|---|

Berard closed his 2010 efforts with – after the alleged date that he told the FBI he no longer found Kenner to be "*legit*" (another unchecked issue of lying to the FBI) with more contradiction, ***by wanting to deal only with Kenner in the future***:

| 16951 | +14015 246929 Bryan Berard* | 10/7/2010 11:29:07 PM(UTC+0) | R e a d | **Same wth mexico too. <u>Uve put up wth enough bullshit over the years. Try get them there $ back and wash ur hands wth all these retards.</u>** |
|---|---|---|---|---|
| 16952 | +14015 246929 Bryan Berard* | 10/7/2010 11:29:18 PM(UTC+0) | R e a d | **And I mean all of them** |

Still in February 2011 – six (6) months after Berard proffered to the FBI (*ex post facto* in 2013) that he had already cut ties with Kenner, Berard is empathizing with Kenner about all the acrimony (thus no conspiracy) but still anxious to do business with Kenner.

Right up until the time in July 2010, Berard told Kenner via text that he wished he had extra money to give Kenner (for legal efforts Kenner was personally funding versus Jowdy), again over a year after he claimed to the FBI (*ex post facto* in 2013) that he no longer trusted Kenner related to being notified in Spring 2009 about the loss of the Northern Trust LOC collateral (by a FedEx letter that never existed):

| 145 46 | +14015246 929 Bryan Berard* | 7/9/2010 10:11:35 PM(UTC +0) | Read | I hear u buddy. I'm sorry for that. **<u>I appreciate what u do. And I hope u know that.. If I had the $ I'd give it to u in a second</u>** |
|---|---|---|---|---|

And again three (3) months later (October 2010), Berard told Kenner via text that "they" only need a small group to work with in the future – **specifically with Kenner**:

| 169 49 | +14015246 929 Bryan Berard* | 10/7/2010 11:00:25 PM(UTC+0) | R e a d | **<u>I wanna just get these guys there $ back and let's go do stuff wth small group</u>** |
|---|---|---|---|---|
| 169 50 | +14015246 929 Bryan Berard* | 10/7/2010 11:03:41 PM(UTC+0) | R e a d | **Honestly. Fuck the rest.** |
| 169 51 | +14015246 929 Bryan Berard* | 10/7/2010 11:29:07 PM(UTC+0) | R e a d | Same wth mexico too. **<u>Uve put up wth enough bullshit over the years. Try get them there $ back and wash ur hands wth all these retards.</u>** |

*Kenner 13-cr-607 (JFB)*

| 169 52 | +14015246929 Bryan Berard* | 10/7/2010 11:29:18 PM(UTC+0) | Read | **And I mean all of them** |
|---|---|---|---|---|
| 169 53 | +14015246929 Bryan Berard* | 10/7/2010 11:40:16 PM(UTC+0) | Read | NO THANKS. Ha |
| 169 54 | +14015246929 Bryan Berard* | 10/7/2010 11:40:43 PM(UTC+0) | Read | If I did probably end up being just 5 of us |
| 169 55 | +14015246929 Bryan Berard* | 10/7/2010 11:40:48 PM(UTC+0) | Read | Maybe 4. Ha |
| 169 56 | +14015246929 Bryan Berard* | 10/7/2010 11:55:51 PM(UTC+0) | Read | hopefully this is the sign of the beginning of the end. 6 more months done all this shit |
| 169 57 | +14015246929 Bryan Berard* | 10/7/2010 11:56:06 PM(UTC+0) | Read | **Hopefully can go after Leaman Borthers soon too** |

- Berard was 100% aware that Kenner was working with Stolper and the NY legal team to prepare for litigation versus Lehman Brothers for the Hawai'i partners.
  - o It ended "before it began" when Kaiser and Berard "jumped ship" to work with Jowdy in Mexico (and the best friend of the Lehman Brothers lender – Masood Bhatti).
- Amazingly, in Kaiser's 2019 letter to the Court, Kaiser confirmed that Jowdy and the same crooked Lehman Brothers lender [Masood Bhatti] are still defrauding investors with their insider "Silverlake Property" deal they professed as a 3rd party deal to this EDNY Court in 2016 and critical for the Danske loan to survive – *Document 628.*
  - o It is simply, more fraud – as Kenner presented since 2007 to the Hawai'i-Mexico investors (the initial discovery of the Jowdy embezzlements).

One (1) week later -- Berard sent Kenner the following texts regarding help going after Jowdy and Worden (Windwalker Managing Member in Hawai'i):

| 1715 0 | +14015246929 Bryan Berard* | 10/15/2 010 1:27:47 AM(U TC+0) | Read | **Any word when ur coming to NYC yet to meet with Stolper and Lawyer from Rhode Island for the Hawai'i lawsuit** |
|---|---|---|---|---|

Spring 2011 and just before Kaiser and Berard flew to Mexico and met with Jowdy and his attorneys…AND RECEIVED JOBS (or bribes) – Berard foreshadowed his desperation:



| 199 66 | +14015246 929 Bryan Berard* | 2/16/2011 7:36:42 PM(UTC+0) | Read | I HEAR THAT. **Don't know how uve done this for this long. I don't know how much longer I can.** |
|---|---|---|---|---|

Approximately one (1) year later in August 2011, Kenner gave testimony in front of the SEC in NYC.   Although Berard told the EDNY in 2015 that he cut off Kenner no later than the fall of 2010 (contradicted by his own texts, *supra*), Berard invited Kenner to stay at Berard's NYC condo during his August 2011 SEC testimony (in evidence).
  * **Kenner STAYED with Berard.**

**During the SEC hearing, Attorney Stolper disclosed the collective beliefs of the investor group related to Kenner and Jowdy, etcetera…**

NY attorney for the Eufora investors (Michael Stolper) responded to Constantine's original "private stock sale" allegations of the 2008-09 Gaarn sales (*as a distraction to Constantine's company embezzlements which were investigated and discovered by Stolper and his independent team, supra*) thru a letter correspondence that all of his investors/clients signed and returned; confirming the full transparency of the false allegations of Kenner (*See Recon33-73*).
  * Stolper's letter exonerates Kenner.   No investors presented a contradicting or complaining email &/or text after their attorneys' exculpatory letter that rejected any Kenner wrongdoings against his clients in light of the full Eufora investigation in 2010.

One (1) year later Attorney Stolper further confirmed the following to the SEC in August 2011 (*long after the ex post facto dates Berard and Kaiser claimed to the FBI that they found Kenner to be a fraud -- after receiving high-paying jobs from Harvey and Jowdy in Mexico*).

In August 2011 -- Stolper's participation and transparency with Kenner and Kenner investors related to Jowdy was clear and unambiguous, when he affirmed to the SEC (*SEC Tr. 683-685, **August 2011** (Recon33-202)*):

[NY Attorney, Michael Stolper]:
   *The only thing I would like to clarify was that I think in your line of questioning, which may not come through in the transcript, whether he [Kenner] disclosed that*

*the SEC has sought enforcement of subpoenas to his clients.   I think that the suggestion in your question was that it was something negative that he should disclose to his clients as sort of a warning or red flag to his clients who are relying on him.*

***And I think that the conversations that I have been a part of****, without waving privilege, **and also my own view** of SEC's involvement in this whole Diamanté del Mar, et. al. is a welcome one and that **we** and Mr. Kenner, are really looking to the SEC to enforce the securities laws against Mr. Jowdy and those [Harvey, Freeh, and Najam] who did wrong here.   And we see it as a welcome thing, as a positive thing.*

*So the tenor of the conversations with Phil's friends, co-investors, clients is that this is a welcome thing and maybe because we are having this direct communication with the SEC, and then perhaps subsequently with the US Attorneys Office, that maybe they will finally get some justice out of this.*

*And I know I have said that off the record with you and I just wanted to clarify that in response to that line of questioning.   Just a point of information.*

With Kaiser and Berard working hand-in-hand with Stolper's investigative team for over eighteen (18) months by August 2011, Kaiser and Berard still accepted bribery jobs from Jowdy in early 2012 (because they were both independently broke – all in evidence). Clearly, their own attorney (Stolper) confirmed to the SEC the "*group*" understanding of the Jowdy frauds, yet Kaiser and Berard left the investor group to receive Jowdy paychecks (in conspiratorial acts – now confirmed by Kaiser's alarming February 2019 letter – *Document 628*).

Kaiser's 2019 letter, which would clearly echo Berard's identical sentiments from their Mexico work-time together under Jowdy's cabal (2012-??), has identified the crooked-handedness of the Kaiser and Berard decisions to abandon the investment group in 2012 (represented by Stolper, Ronald Richards and Tom Baker thru 2011) and join Jowdy, a well-known fraudster, as Berard exclaimed in his own texts, *supra*.

- June 5, 2010:  "*Hopefully he [Constantine] just takes what they give him quietly and not end up wth another Jowdy*" and "*I [Berard] don't give a fuck abt him [Constantine]. Just don't want him to fuck this up like Jowdy*".

- June 7, 2010:  "*Tommy [Constantine] and Jowdy. Who wld of known. $ makes people greedy*".

Only two (2) months earlier, Berard scorned Jowdy's friend at the NY Daily News for writing slander stories about Kenner, as follows: [Kenner (sent) in RED hi-lighted – Berard (reply) in **BLACK**]:

| 151 77 | +1401524 6929 Bryan Berard* | 5/1/2010 12:06:48 AM(UTC+ 0) | Sent | **Good job with the reporter. Who was it?** |
|---|---|---|---|---|
| 131 85 | +1401524 6929 Bryan Berard* | 5/1/2010 12:11:12 AM(UTC+ 0) | Read | **The douchebag from daily news. Told him he's an idiot for printing these articles and he can quote me that I've been to both properties over a dozen times and Jowdy has not done his job.** |
| 131 86 | +1401524 6929 Bryan Berard* | 5/1/2010 12:11:34 AM(UTC+ 0) | Read | **He shut up right away and said sorry for bothern u. And hung up** |

With Berard and Kaiser joined at the hip from 2010 until Kenner's 2015 trial, there was nothing they were apparently not aware of with Jowdy prior to taking their jobs and abandoning their responsibilities to the Hawai'i partners (with Kaiser as Managing Member) and Eufora co-investors (Kaiser and Berard – leading the litigation efforts with Giuliani's team).[177]

---

[177] The NY Daily News (*November 13, 2013*) touted Kaiser and Berard as "*heroes*" for their efforts with FBI Agent Galioto and featured them in an arrest-day article titled – "***Former NHL Player Bryan Berard and ex-cop help Feds nail two Arizona men in massive fraud***".

## Lynne Legarde [178]

**Lynne Legarde was an attorney for Constantine**

**Legarde received funds from Ronald Richards' Trust account pursuant to the Constantine-Gonchar *side-deal*.**

**Legarde had nothing to do with Kenner.**

Legarde was another government witness that gave *useless* testimony about funds that Constantine utilized as part and parcel to his "*side-deal*" with Gonchar that was known at all times by the government.

Nonetheless, the government introduced approximately ten (10) non-victim witnesses at trial (about 25% of the total trial witnesses), to drag out the prosecution related to GSF funds that were *never* misspent under Constantine's exclusive controls.

It created a prejudicial variance to the Indictment; or at a minimum, an irreconcilable diversion for the jury and Court to unfairly malign Kenner and Constantine.

---

[178] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 30.*

*Kenner 13-cr-607 (JFB)*

## Lanie Donlan[179]

**Lanie Donlan is Bryan Berard's best friend.**

**Donlan was introduced to Kenner in or about 2004 in Mexico.**

**Donlan was hired to work for the Hawai'i project, as a favor to Berard under a sales role almost immediately.**
- **Donlan travelled with Berard to Hawai'i on multiple occasions to work on the project during her Hawai'i employment.**

**Donlan gave perjured testimony about assisting Kenner to "*trace*" signatures onto a bank document in or about 2005.**
- **Donlan never produced the alleged document for the government.**
- **Stunningly -- Donlan testified that the government <u>never</u> asked her about the alleged criminal document.**

**Donlan's testimony was given to support a fabricated statement Berard made to the FBI during one of his FBI proffers.**

<u>**In perfect irony**</u> **-- Donlan and Berard were caught lying to an Arizona Court in 2015 about their names being forged on a notarized document** (*See Recon33-59*).
- The FBI agent and IRS case agent discussed the alleged forgery with Donlan (*See 3500-LD-2*) – but in the suspicious absence of incremental 3500 materials – they apparently failed their "investigation 101" class by not simply following up with the "notary" from Massachusetts who notarized the Berard-Donlan document to confirm the fraudulent allegations one way or another.
  - o *It is not a believable investigation blunder.*

<u>**Nonetheless, a text message conversation between Kenner and Berard exists that confirms Berard and Donlan signed the document -- got it notarized -- and returned it from Massachusetts (where they both lived at the time) to Kenner in Arizona using Kenner FedEx account...**</u>

The Court *M&O at 30* verified: "*Lani Dolan ("Dolan") is a real estate saleswoman (Tr. at 3419-20). She testified that she worked for Kenner on the Hawaii Project*" (*Tr.3420-21*).

**True**.   This further refuted Berard's testimony that he was not aware of who the Managing Member in Hawai'i was when he lied to the EDNY Court:

[Berard -- Donlan's best friend -- denies knowledge of Hawai'i Managing Member] (*Tr.3099-3100*):
> *Q By the way, when you invest in Hawaii, you and Phil Kenner, or did Phil*

---

[179] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 31*.

*discuss with you how the investment would be organized from a corporate structure, something known an LLC?*

*A [Berard]: No.*

**Q Well, _did you have an understanding as to who would have the control, but also the responsibility for use of the line of credit funds when you invested_?**

**A [Berard]: No.**

*Q You had no understanding of that?*

**A [Berard]: No understanding, no.**

*Q Was the name managing member ever mentioned to you -- withdrawn. Was the name "managing member" or the term "managing member," ever discussed between you and Phil in relation to your investment in the Hawaiian project?*

**A [Berard]: I don't recall.**

### Donlan lies about a document that she helped Kenner "*trace*" signatures...

The Court *M&O at 30* verified: "*Dolan [sic] said that, in or around 2005, she saw Kenner sign the names of his NHL clients on a document, stating: 'The guys that he was—advised for, the hockey guys. He had each one of their signatures on separate pages and he was doing them all on one page'*" (*Tr.3423*).

**FALSE** – Because Donlan claimed that Kenner travelled to Boston and visited her at a real estate office. Kenner has never been to a real estate office with Donlan in Boston (or anywhere). In the millions of documents presented to the Court during the Rule 16 production, there is not a single document that resembles the alleged document from the Donlan "*tracing*" story.

Furthering the lack of Donlan's believability, Donlan claimed that the FBI _never_ asked to retrieve a copy of the said "*tracing*" document.

### The government never asked Donlan for the "one sheet"...

The Court *M&O at 30* verified: "*She explained that Kenner "traced" his clients' signatures: 'Like Glen Murray's name. He would sign his name and I would photocopy that. Then he would take the next one, Brian Berard, and put it under and sign it onto the same sheet of paper so that all the guys were on one sheet'*" (*Tr.3424*).

There is no document in 2005 that would have required all of the Kenner clients to be listed (signatures) on the same document.   It is a further unsubstantiated scheme to support the now-known Kaiser-Berard lies about "forgeries".

**First** – It cannot be overlooked that after Berard and Kaiser took their 2012 jobs from Jowdy in Mexico, Kaiser *immediately* testified in Mexico that his name was forged on a testimonial supporting Jozef Stumpel's $1.6 million case versus Jowdy for the funds Jowdy stole and never documented in the Baja Ventures 2006 (Cabo) capital account.

- A 2012 FBI recording by Bryan Berard **confirmed** that Kaiser "***did sign***" that document, thus Kaiser's testimony to the Mexico Court to help his new boss (Jowdy), and his lies to the FBI, AUSA and subsequently the EDNY Court expose himself to perjury charges; notwithstanding being a liar about his name being forged in this same instant case – with irrefutable evidence against him (the recovery of the "*ink*" versions from his own home).

**Second** -- The Donlan "*tracing*" testimony was meant to bolster the Kaiser lies about his name being forged on a 2004 and 2005 Hawai'i consulting agreements with Constantine.

- During the November 13, 2013 search and seizure at Kenner home, the FBI recovered photocopies of the two (2) agreements.   The government documented them with BATES STAMPS along with 100% of the seized documents that day as follows:
  - 2004 agreement – *PKHOME00012892-12895*
  - 2005 agreement – *PKHOME12887-12890*

- Yet, on the "eve" of the May 2015 trial, the government announced that they had recovered the "*ink*" version of the two (2) agreements – **FROM KAISER, himself**.
  - Further confirming that the "*ink*" versions were from Kaiser's home (after being held for ten [10] years -- since he respectively signed the agreements), **they were *not* BATES STAMPED**.  Instead they were "only" labeled for trial as:
    - 2004 agreement – *GX-7004*
    - 2005 agreement – *GX-7005*

It is suspicious, *at a minimum*, that Kaiser would possess the "*ink*" versions if someone – *at his home*, forged his name.   The gall of the government to continue with that forgery ruse at trial was commensurate with their ½ pregnant approach to all of the false predicates and revisionary trial testimony.

**<u>2012-2015 Arizona case claims of forgery (again) by Kaiser and Berard…</u>**

Continuing the post-2012 "forgery" campaign by Kaiser, Berard and Donlan, Kaiser claimed his name was forged on five (5) separate Promissory notes he signed to Tyson Nash, Darryl Sydor, William Ranford, Dimitri Khristich, and Jere Lehtinen.

FBI Agent Galioto interceded with all five (5) of the 2012 Arizona case interveners versus Kaiser and Berard.   He demanded that each of the interveners who had the Kaiser signatures TERMINATE their litigation and sue Kenner, instead.   Nash, Sydor and Ranford confirmed this to Kenner via phone after Kenner was arrested in the EDNY (with Berard and Kaiser persistence and assistance to FBI Agent Galioto).

These three (3) declined to TERMINATE their lawsuits.   After a 2015 civil trial, the Arizona judge found Kaiser to not be legitimate in his "forgery" claims, primarily because Kenner provided the email traffic between Kenner, Kaiser and the Promissory note holders that 100% confirmed their authenticity.

At the same trial, Donlan and Berard claimed that their names – along with a Massachusetts notary [William Medlin] – had their signatures forged and the notary stamp fraudulently reproduced (*See Recon33-59*).

The FBI ***never*** followed-up with Medlin after calling Donlan about the allegations (*See 3500-LD-2*) on September 9, 2014 (after the Kenner arrest and detention).
- The FBI and IRS agents knew that if they could prove the Berard-Donlan document as a forgery – assuming it was Kenner who was guilty of it – they would have Kenner as a known forger.
- Yet, they never called Notary Medlin, unless they simply did not produce the exculpatory *Brady* materials that would have sunk the Donlan EDNY "*tracing*" testimony, and Berard's integrity -- and fowled up the 2015 Arizona case for Berard and Kaiser (Galioto's two [2] "heroes").
  - How could two (2) experienced government investigators (Galioto and Wayne) make such a routine blunder when they could have had the "smoking gun" in their hands – if it were true?[180]

---

[180] This negligence simulates the same investigation 101 blunder they repeatedly exhibited in multiple interviews with Robert Gaudet (even while travelling to Mexico to interview face-to-face with another FBI agent [Rosa]).
- They had the 2004 Hawai'i-Jowdy loan agreement "witness" face-to-face and never documented asking Gaudet about the authenticity of his signature and what he witnessed.
- They knew Gaudet had already authenticated the 2004 Hawai'i-Jowdy loan agreement in three (3) separate lawsuits with Jowdy – but needed to distance themselves from its truth in order to perpetrate the planned fraud on the 2015 EDNY Court -- claiming it was inauthentic – like the loans they called *"bogus"* (*Tr.5708 (2x), 5709*), *"phony"* (*Tr.4597, 4598*) and *"supposed"* (*Tr.5707-5708*) – and simply a *"Kenner cover-up story"*.

Furthermore, the following text conversation occurred between Kenner and Berard confirming that he was in Boston with Donlan -- and Berard was going to use Kenner's FedEx account to send the Arizona notarized document to Kenner on the same day it was signed and dated, fully discrediting Berard and Donlan's forgery claims – ***while showing their collective propensity to lie "as a team"***.

- The 2015 Arizona judge confirmed the false forgery claims in his ruling against Kaiser and Berard for all of the Kaiser Promissory notes, the Berard-Donlan notarized document, and several others the judge denied as being forgeries with corroborating evidence; none in agreement with Kaiser and Berard *(See Recon33-55 at ¶9, ¶20-21, ¶25-26, ¶32-33, ¶34 [money transfers Berard could not prove with bank records – another attempted fraud], ¶49[Berard-Donlan document], and ¶57 [confirmed fraudulent conveyance – like the identical Sag Harbor theft under Galioto's protection]).*

All of this was know to the Kenner FBI and IRS agents, yet they buried the exculpatory Medlin information to sustain their Kaiser false "forgery" claims that are now beyond believable in any scenario. Berard foreshadowed his Arizona perjury plan during his October 9, 2014 Arizona pre-trial deposition *(See Recon33-60).*

**When the most critical document to support the Donlan *"tracing"* allegations and bolster the Kaiser and Berard "forgery" theme, the government did not ask her to produce the said document (*Tr.3454-3457*)...**

- It is just not believable but the Donlan testimony was utilized to prejudice Kenner.

  *Q. The document that you say you saw Phil Kenner signed by way of tracing signatures, is it your testimony that all of those signatures were being traced onto one single page? Is that your testimony?*

  *A [Donlan]: Yes.*

  *Q. I assume, ma'am, that when this occurred in 2005, did you retain -- you -- any copies of the documents that you say you saw Phil signing and then I believe I said you copied them as well. Correct?*

  *A [Donlan]: I made copies of them as he was doing it.*

  *Q. And did you retain copies of these documents? Yes or no?*

---

Again – they knew the truths – and they knew it would contradict their needed prosecutorial theories.   It is shameful in its disrespect for the Court, at a minimum.

*A [Donlan]: Not that I know of. I thought I had someone, emailed but <u>I don't know</u>. I was trying to scan them to send to him so he could send them out.*

*Q. Did you retain your email going back to 2005?*

*A [Donlan]: No, I don't think so.*

*Q. When you said a moment ago I thought –*

*A [Donlan]: I said I saved a lot of stuff that had to do with Hawaii but it wasn't paperwork. I made him the copies. I sent them out. <u>I don't know. I don't know</u>.*

***Q. Well, <u>what you did retain in terms of these emails, did you provide those documents to the government</u>?***

***A [Donlan]: Not that I know of.***

*Q. Well, did the government ask you for the emails that you say were generated as relates to things Phil Kenner asked you to do and things of that nature?*

*A [Donlan]: I sent them emails I had between us, but I don't remember exactly which ones.*

- **Please note that the defendant is <u>*not*</u> aware of any Donlan provided emails in the government's discovery production.**

And when the most critical statements from Donlan were challenged on cross-examination, Donlan fell into the same "*I don't remember*" testimony as all of the other perjured statements.

***Q. Well, <u>did the government ever ask you if you have an email including the attachments reflecting this instance where you claim you saw Phil Kenner</u> --***

***A [Donlan]:  <u>I don't remember.</u>***

*Q. You don't remember whether they asked you for that?*

***A [Donlan]: Probably. <u>I don't remember</u>. I'm assuming they did. <u>I just don't remember.</u>***

*Q. Well, as relates to what you just testified to, <u>ma'am, is there some means by which we can obtain a copy of this document you say you saw Phil tracing signatures on</u>? That is my question.*

***A [Donlan]: <u>I don't know. I don't know</u>. It's in '05. <u>I don't have it. I have the memory of it. It's just something I really remembered.</u>***

*Kenner 13-cr-607 (JFB)*

**Coupled with the Kaiser fabricated forgery claims in Mexico, Arizona and the EDNY and Berard's fake investments and forgery claims to the NY Daily News ("*a treasure trove of fake investments*"), and the Arizona courts, all proven as LIES, it is no wonder Donlan replied "*I don't know*" in a panic five (5) times, and ultimately "*I don't remember*" three (3) times...**

**It left Donlan's closing retort as wholly irreconcilable:**

> *I have the memory of it. It's just something I really remembered.*

## Glen Murray[181]

Glen Murray is *not* a victim in the 2015 Superseding Indictment.

Glen Murray was working hand-in-hand with Kenner and the Mexico attorneys to recover the Hawai'i-Mexico funds from Jowdy thru the time of the 2015 Kenner trial.

Murray was not prepped by the US Government pre-trial.

Murray was the only Hawai'i-Mexico investor who gave accurate testimony by confirming his recollection that he received funds from the Hawai'i project.
- Ironically, Murray was badgered by US Attorney Michiewicz during re-direct to produce the banking records that corroborated the payments Murray testified he received.
  - The badgering exploited the agitation of the prosecutorial team when their tightly planned prosecution of "concealment" was exposed by Murray's honest statements (*Tr.3607-3608*).

- Murray verified his banking statements – after the defense was forced to rebut the US Attorneys attempted abuse of Murray's honesty by refreshing his honest recollection (*Tr.3514-3515*).

Murray has a multi-million dollar judgment versus Jowdy from a December 2010 Nevada trial (re-submitted as part of defendant's March 6, 2019 submission to the Court) (*See Recon33-53*).
- Jowdy borrowed (again) $791,000 from Murray on a short-term loan.

- When Jowdy received the funds back from the escrow bank in 2005, Jowdy chose to steal Murray's funds instead of return them pursuant to Kenner's email directions to Jowdy (*See Recon33-53 at Footnote 16*).

  *[Footnote 16 at 11]: "The email stated in bold: 'Please let me know when you send it. I need to speak with Glen, so the sooner the better.' [The judge stated] After this line, wire instructions were provided."*

- In 2009 – Jowdy and his Nevada attorneys amended the case to include Kenner as a 3rd party defendant.
  - Kenner defended himself in ProSe during the 4-day bench trial.

- Kenner and Murray won versus Jowdy and his $750,000 legal team in the $791,000 case.   Jowdy testified he used "more funds" from the Cabo san

---

[181] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 31-32.*

> **Lucas budget to pay his legal team, because $500,000 of the funds Jowdy stole, he sent to Mexico; so he justified having to defend his criminal use of funds with budget funds from the project he personally used the money for.**

- **The circular logic was more Jowdy brilliance – with FBI protection.**

## Glen Murray verified that his transfers to purchase Eufora private stock were authorized by him...

The Court *M&O at 31* verified: "*Murray said that he did not recall making additional investments in Eufora, notwithstanding that records showed a $100,000 transfer from his account to Eufora on December 29, 2008, although Murray said that he thought he likely authorized this transaction*" (*Tr. at 3493-95; GX-2211*).

**TRUE** (after Murray confirmed he was *not* prepped by the government)[182] – Because Murray's verification confirmed, unlike the other "prepped" witnesses, that Murray was able to recall a seven (7) year old transaction, with a normally faded recollection.

## Murray was able to also recall that Kenner could *not* transfer his money from any of his accounts without his verbal authorization to his independent financial advisors and custodians.

- Kenner was merely allowed to submit a Power of Attorney document to *begin* the process and identify the necessary "**accounts**", "**amounts**" and "**payees**".

## The government harassed Murray during re-direct...

- It was irrational for the government to ask Murray if he had his banking documents "with him" to prove that he received funds from the Hawai'i project, knowing Murray was their witness.

## Murray was forced to verify the multiple deposits during re-cross examination to re-gain his integrity from the government's unjustified attack on their own witness...

The Court *M&O at 31* verified: "*He [Murray] testified that...(2) he invested $100,000 in the Hawaii Project (Tr.3479); (3) he opened a line of credit with Northern Trust secured with $1 million transferred from his Charles Schwab investment account, although Murray could not recall if he agreed to this transaction*[183] (*Tr.3481-82*).

---

[182] Murray was the only government witness (who invested thru Kenner) who verified that they were not prepped by the government to "*remember what they were not told*" by Kenner.   Please note that Gonchar (another non-victim) was called by Constantine (in his defense case) – not the government.

[183] *See Recon33-203 -- "GLEN MURRAY transfer Auth for Schwab bonds to Northern Trust"*

Glen Murray actually signed for the transfer to begin (received by Northern Trust Bank on August 9, 2004), so Murray's eleven-year-old memory was as one would expect; absent of many details (notwithstanding a similar **CTE** potential problem as the other Kenner investors) (*See Recon33-203*).

The document Murray independently signed with his institutional custodian, Charles Schwab, confirmed that Murray agreed to the transaction and signed the transfer document himself (like every other investor who transferred bonds from Schwab to Northern Trust – including Nolan, Peca, Berard, Sydor, Rucchin, Juneau, Norstrom, and Gonchar).

- The government had the Murray transfer document in evidence, but ignored the Murray memory lapse to their "concealment benefit" yet again (*See Recon33-203*).

Although Murray claimed he did not remember authorizing the LOC (in spite of the years of signed LOC documents, *infra*), the government did not offer a single communication from Murray disputing the $385,000 payment or $42,553 payment he received from the Hawai'i investment in 2006 – or the years of signed renewals by Murray for his Northern Trust Bank LOC.

Murray acknowledged his recollection on cross-examination (*Tr.3514-3515*):

> *Q. There did come a point in time, did there not -- well, were you familiar, sir, do you have a recollection of an event in which Lehman Brothers, the lenders, became involved in the Hawaii project and by virtue of some money loaned by Lehman Brothers, you returned -- you received a return on some part of your investments in the Hawaii project? Do you have a memory of that?*
>
> *A [Glen Murray]: No, I don't.*

---

Rucchin signed a similar transfer document – *See Recon33-204 -- "Rucchin signs bond transfer stmt for Schwab to Northern Trust" – and*

Sydor signed a similar transfer document – *SeeRecon33-204 -- "Darryl Sydor transfer Auth for Schwab bonds to NT".*

- *All other bond transfer documents would be in possession of Charles Schwab as the institutional custodian of record.*

○ Please note that Murray signed the July 2006 JV disclosure letter – written by the Hawai'i partners' attorneys – in order to approve the JV transaction (*See Recon33-205 at 27*).

○ It should be noted that Kenner's former assistant, Myrick, sent the Murray signature page to the Hawai'i closing attorneys (her responsibility during the 2006 closing) after visiting with Murray face-to-face in California – with her fax transmission confirmation on the bottom of the page (like three [3] others).

○ During Myrick's FBI proffer (while working with Jowdy) – she told the FBI case agent (Galioto) that she was never told about the transaction – **further refuted by her own signature page** (*at 26* -- with her own signature fax transmission confirmation on the bottom of her signature page).

   ■ This was another "team Jowdy" person spreading misinformation to confuse the investors and corroborate falsities that Galioto needed for his fake concealment claims at trial.

[Murray continued]:

*Q. Well, if I were to suggest to you as relates to the $100,000 that you invested, you did get a return of -- you did receive a return of $5,000 [sic] -- you did receive a return in 2006 of $42,553 with reference to that $100,000 you had.*

***A [Glen Murray]: I might have.   Now it's sounding -- yes, I might have. I can't remember, but I might have, yeah.***

*Q. Mr. Murray, that's fine. Listen, this is a long time ago. This is not a quiz or a test. I'm just asking for your best recollection.*

*A [Glen Murray]: Okay.*

*Q. And, sir, do you also have a recollection that an additional $385,481.75 was also paid out to you in August of 2006 with reference to replenishment of a portion of your line of credit? Do you remember getting that check?*

*A [Glen Murray]: Do I remember getting a check for $300,000?*

*Q. Yes, sir, actually to be specific, $385,481.75?*

***A [Glen Murray]: That sounds familiar, yes.***

Zero Glen Murray documents were produced by the 2015 Northern Trust Bank subpoena, in spite of the defense requesting Murray's subpoena inclusion pre-trial. As the Court is aware, the government vehemently objected to the inclusion of Murray, Gonchar and Norstrom, stating that *"they were not victims in the 2015 Superseding Indictment"*, and the request "as a whole" by the defendant (Kenner) was unduly burdensome on Northern Trust Bank. This fully prejudiced Kenner's defense preparation and trial defense.

The initial denial by the court based on the government's aggressive advocacy to deny the request, forced a significantly late arrival of the Northern Trust subpoena documents. The Court is aware that it utterly prejudiced the thin defense team (only consisting of attorney Haley).[184]   The actual "incomplete" Northern Trust subpoena started arriving in week 7 of the trial – immediately after the government rested their case and multiple LOC alleged victims were dismissed after giving testimony inconsistent with their actual Northern Trust Bank LOC signed documents; including Juneau, Berard, Nolan, Peca, Rucchin and Sydor.   Attorney Haley was never able to use the voluminous exculpatory documents to cross-examine the various *"failed memory tests"* about:

- The mere existence of the LOCs (like Nolan et. al.),
- Who signed for them (with the government falsely insinuating that Kenner did, coupled with the *faulty memory, confusion and mistakes testimony "I don't recall"* testimony (thru Juneau, Gonchar, Sydor, Nolan et. al.),
- When they were aware of the release of funds (Peca et. al.),
- Etcetera…

**The Court agreed with the government pre-trial and denied the original timely subpoena request.**   Even without Murray's inclusion in the 2015 Northern Trust Bank subpoena, the government seized the following Northern Trust Bank LOC records from Kenner's home in 2013 (*See Recon33-206 FOLDER*); with many documents clearly missing from a full lending package:

**[Signed in 2004 by Murray]:**

---

[184] See *United States v. Gil*, 297 F.3d 93 (2d Cir 2002), 297, where a guilty verdict was vacated and remanded for "late discovery" of exculpatory information that *"was not disclosed timely enough for it to be useful to defendant"*.   In *Gil, supra*, the Court was disturbed that *"the production of the [exculpatory] document on the eve of trial did not provide defendant the opportunity to read it, identify its usefulness, and use it"*.

- In the instant case, defendant Kenner was in full custody during trial, so as never having the opportunity to properly review the Northern Trust subpoena, discuss it with his attorney (strategically demand to recall all of the LOC witnesses to impeach them properly), &/or admit the hundreds (100s) of signed documents thru proper means with Kenner on the witness stand.
- As the Court knows, the defendant's trial counsel barely skimmed the surface of proper admissions, fully harming his client – notwithstanding the *Gil* issue, at hand.

*Murray 2004 Master Note ($1,230,000) (See Recon33-208)*
*Murray 2004 Letter of Authorization (1-page document) (confirmed via testimony, infra) (See Recon33-207)*

- Murray confirmed that he invested $100,000 cash into the Hawai'i investment and authorized Kenner in October 2004 (*See Recon33-207*) to utilize his Northern Trust Bank LOC for the investment with the Hawai'i partners, leaving no question about Murray's recollection (albeit over ten [10] years old by that time) in the Hawai'i investment beginnings *(Tr.3512)*:

    *Q. We know, sir, that by your direct testimony you invested $100,000 in Hawaii, the project, correct?*

    *A [Glen Murray]: Correct.*

    *Q. And then we know, sir, <u>that you ultimately signed a document authorizing your line of credit to be accessed by Phil for purposes of the Hawaii project</u>. Isn't that correct?*

    ***A [Glen Murray]: Yes.***

**[Signed in 2006 by Murray]:**
   *Murray 2005 Master Note ($1,230,000) (See Recon33-209)*
   *<u>Murray 2005 Disbursement Request & Authorization</u> (1-page document)*
   - *This **one-page** signed document **confirmed $1,230,000 disbursed** within one (1) year of the opening of the Murray line of credit by Murray; <u>never Kenner</u> (See Recon33-210).*
   - *The document was addressed to Murray's home at: 30 Warwick Circle, Andover, MA 01810 – <u>not to Kenner</u>.*

**[Signed in 2006 by Murray]:**
   *Murray 2006 Change in Terms Agreement  (1-page document) (See Recon33-211)*
   *Murray 2006 Pledge Agreement (See Recon33-212)*
   *Murray 2006 Securities Acct Control Agreement (See Recon33-213)*

**[Signed in 2007 by Murray]:**
   *Murray 2007 Change in Terms Agreement (1-page document) (See Recon33-214)*

Clearly, based on empirical evidence, and not another "*failed memory test*", Murray was _aware_ of his initial transfer Northern Trust Bank and annual LOC renewals.

The Court *M&O at 31* verified: " *(4) he did not receive a default notice from Northern Trust*" (*Tr.3486*).

Whether Murray's memory failed him or not (like the other LOC clients – even when faced with the actual documents they previously acknowledged to Kenner thru texts – like the Sydor default letter he claimed to never receive [*Tr.2166-2167*][185]), Northern Trust Bank produced the February 2009 and March 2009 default letters they mailed to Murray.

The February 2009 and March 2009 default letters were addressed to Murray's California home address. Nothing prohibited Murray from receiving it; *certainly not Kenner*.

**Critical direct and independent communication between Murray and Northern Trust Bankers Brill and Mascarella:**
In order for Northern Trust Bank to seize Murray's collateral four (4) days before the due date, Murray had to give verbal authorization to do so to Northern Trust Bankers Mascarella and Brill, like the other LOC clients confirmed via text, *supra*.

**Murray had to sign off on his residual transfers from Northern Trust to his other accounts:**
Pursuant to Murray's IMUS agreement with Northern Trust Bank, he had to sign off on the multiple bond and cash transfers to his Schwab account after the April 1, 2009 collateral was seized. The IMUS agreement required:

> "*Only those instructions directing the wiring of funds to any account outside of Northern Trust Bank **must be signed by Client**.*"

---

[185] Text from Sydor to Kenner after Sydor received his March 2009 default letter.

Sydor claimed at trial that he never saw the default letter until a week or two (2) before the 2015 trial, **wholly untrue**. The default letter matched the $855,351.03 amount Sydor sent to Kenner just four (4) days after Northern Trust Bank mailed the letter.
- This was simply more **CTE** symptoms taken advantage of by the government to sustain a faulty conviction for concealment from potential Alzheimer's sufferers.



| 6083 | +19725230505 Darryl Sydor* | 3/23/2009 1:59:36 AM(UTC +0) | Read | What funds ? And this thing says I owe 855,351.03 right now. |
|---|---|---|---|---|

- As a result, only Murray could close and transfer his Northern Trust Bank account thru multiple signed documents directly with Northern Trust Bank.

Murray's March 2009 default letter also highlighted that, he previously had signed (*See Recon33-215*):

- *2005 Change in Terms Agreement (not in Kenner's possession),*
- *2006 Pledge Agreement, and*
- *2006 Securities Account Control Agreement*

And, Murray could call Northern Trust bank because "*You are entitled to an accounting by calling us at 602-468-2537*", signed by Aaron Mascarella (who ultimately spoke to Murray and all LOC clients before their collateral was seized, as a bank requirement), *supra*.

**The Court identified that Murray; unlike all of his "prepped" co-investors did recall that he received funds from the Hawai'i investment...**

The Court *M&O at 31* verified: "*On cross-examination, Murray testified that he may have received a return in 2006 of $42,533 on his $100,000 Hawaii Project investment, as well as a $385,481.75 payout on his line of credit that same year*" (*Tr.3514-15*).

- *Murray was the only witness to confirm he received the 2006 payouts.*

Even with Murray giving honest and sincere testimony about "what he remembered", he exhibited similar **CTE** symptoms to the other former athletes.

The **CTE** symptoms were the basis for an unacceptable "concealment" prosecutorial theory, considering the amnesia-laden "memory test" Q&A would have been tough for any normal person for events that occurred as many as thirteen (13) years before trial; notwithstanding any undue influence by the FBI case agent on the other witnesses pre-trial (to protect Jowdy and convict Kenner).

**Some of the grossest prosecutorial misconduct occurred when the government attacked their own witness' credibility with nonsensical demands...**

The Court *M&O at 31* verified: "*However, on re-direct, Murray said that he did not have any documentation of those payments*" (*Tr.3585-87*).

- **This exposed the government's gross misconduct to secure a conviction thru any means necessary.**

How could the government ask their own witness (Murray) to produce documents *while on the witness stand* to corroborate "what he remembered" – in grave contradiction to the "*memory test*" prosecution of concealment they pursued in the face of 100% of the disproving empirical evidence (all known pre-trial and ignored)?

The defense was forced to produce the evidence **from the government's-own records** for Murray to save-face with the Court and the Jury related to "*what Murray truly remembered*".

- The government attack on Murray defied all moral and ethical bounds.

The defense had to come to the government witness' rescue and produce the actual bank documents the government had (and ignored), while challenging Murray to personally produce them *while sitting on the witness stand*.   The government's behavior was wholly unethical, violating every boundary of *Berger's* advocacy standards.

The Court *M&O at 31* verified: "*On re-cross-examination, Murray testified that records showed a $42,533 transfer to his Charles Schwab account*" (*Tr.3604-3605: Defendant Exhibit Kenner-104*).

The machinations of the Murray pro-Kenner statements and the government's attack to humiliate their own witness were the epitome of the government's heavy-handed approach to seek conviction, *in lieu of the truth*.

- If the government were truly seeking the truth, they would have embraced (not embarrassed) the Murray testimony, suggesting to the Court that their other witnesses may have been suffering from *faulty memory, confusion and mistakes* (a.k.a. **CTE**) during trial – and not concealing that issue until they first (1st) raised it during their original Rule 33 reply (*Document 440 at 16, 18*).

The government only exposed their witnesses' **CTE** issues when they feebly defended the repeated and voluminous perjury at trial – *in synchronicity* – from each of their "prepped" witnesses during their original Rule 33 reply, also improperly citing their basis for defense under *United States v. Dunnigan*, 507 US 87, 94 (1993).

**Murray gave testimony that confirmed he knew Jowdy never repaid the Hawai'i loans that he personally identified in his own *Murray v. Jowdy* Nevada Complaint (in evidence) in 2008 (*Tr.3540*)…**

> *Q:  My question is, sir, do you have an understanding, based upon conversations you have had with individuals, that as relates the Hawaii investment, the Hawaii project, Ken Jowdy also, by virtue of a loan made to him for monies from the Hawaii project, has not paid that back?*
>
> *A [Glen Murray]: Correct. No, he hasn't.*

Murray left nothing for the Court or jury to guess about his "Jowdy loan" knowledge, identical to Michael Peca's admission during his cross-examination confession that his testimony during government direct-examination was incorrect (or planned) (*See M&O at 9*).

Murray independently verified his knowledge and previous approval of the Hawai'i loans to Jowdy in his 2008 Nevada Complaint versus Jowdy; separate and apart from his Nevada claims versus Jowdy of $791,000 stolen.

Murray confirmed (*See Recon33-130*):

> *"Jowdy had sought and obtained several previous loans with the assistance of Kenner"*, and
>
> *"Murray authorized Kenner to lend Jowdy monies."*

**Who is left to claim concealment of the Hawai'i-Jowdy loans?**

*If the court reconciles Glen Murray's "Jowdy loan" acknowledgement pre-trial and during trial in addition to Michael Peca's recanting (Tr.498-99) of "no knowledge" from his government direct-examination – the Court can only resolve that the four (4) Hawai'i investors – out of the twenty-six (26) in total are simply "not remembering" the Jowdy loans – as opposed to some grandiose underlying conspiracy to "dupe" only four (4) of them...and not the other twenty-two (22) who before, during and after trial verified their wholehearted knowledge – debunking the concealment prosecutorial theories.*

- *Please note that Darryl Sydor is one (1) of the remaining four (4) and gave non-ambiguous testimony four (4) years before trial to the SDNY Grand Jury that he fully was aware of the loans – that he could not remember during the 2015 trial...*
- *The remainder of the "memory loss" individuals participated in the 2008 Arizona and 2009 California lawsuits to specifically recover the loaned funds from Jowdy – and they signed off on the lawsuits as Plaintiffs.*

## John Osborne[186]

John Paul Osborn is a forensic document examiner, and the Court allowed him to testify as an expert witness (*Tr.3615, 3620-21*).

The Court at *M&O at 32* verified: "*He testified that he examined Kaiser's purported signatures on two consulting agreements dated December 15, 2004 and June 1, 2005 and determined them to be inauthentic after comparing them to genuine signatures*" (*Tr.3622-29; GX-5104 and GX-Osborn-1*).

- Too many unexplainable issues were allowed to occur in front of the jury regarding the government's knowledge of the alleged forged signatures of John Kaiser; and the known falsities of the documents before trial.
    - o The most blatant abuses will be addressed *infra*.

The defendants' attorneys failed to require a *Daubert* hearing to address the expert status of the witness and the source of the authenticity of the alleged documents prior to the jury hearing from Kaiser and the government expert.[187]

**<u>Outrageously, Kaiser produced the original "*ink*" versions of the documents with his signatures alleged forged on the "eve of trial" from "his own home"...</u>**

It is hard to grasp how the government even chose to go forward with the Kaiser "forgery" testimony at that point in time. The newly discovered exculpatory evidence **in Kaiser's possession** "*on the eve of trial*", wholly defied all logic that the "forged" documents could be in Kaiser's possession for ten (10) years – if his name was truly forged...

- *It was a straight fraud on the Court, the government ignored it – and alternatively chose to exploit it.*
- *Nevertheless, it was the second (2nd) gross anomaly related to Kaiser claiming forgeries in this instant case (Mexico document)*; and ignored with a blind-eye.

During the November 13, 2013 search and seizure at Kenner's home, the FBI recovered photocopies of the two (2) agreements in question. The government documented them

---

[186] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 32.*

[187] The *Daubert* issue will be addressed during defendant Kenner's pending ineffective counsel motion. Kenner's trial counsel refused to confront the government witness thru a *Daubert* hearing – and specifically his knowledge that John Kaiser was in possession of the alleged forgeries for approximately ten (10) years prior to turning them over to the government on the "eve of trial".

with 100% of the seized documents that day with BATE STAMP designations --
**PKHOME#######.**   The two (2) agreements were labeled:
- 2004 agreement – *PKHOME00012892-12895*
- 2005 agreement – *PKHOME00012887-12890*

With only photocopy versions recovered from Kenner's home, the government originally
declined to secure a "signature expert" to evaluate the Kaiser claims.

Yet, on the "eve" of the May 2015 trial (*once the "murder-for-hire attempted entrapment
plan to record Kenner in jail failed*), the government announced that they had *recovered*
the "*ink*" version of the two (2) agreements; **FROM KAISER, himself.**
- Further confirming that the "*ink*" versions were from Kaiser's home (after being
held for ten [10] years since he signed the agreements), they were *not* BATES
STAMPED.
- Instead -- they were "**only**" labeled for trial as:
  o 2004 agreement – *GX-7004*
  o 2005 agreement – *GX-7005*

- **Clearly, they were not from Kenner's home search and seizure – as no other
version of the "*ink*" documents exist.**

It is suspicious, *at a minimum*, that Kaiser would possess **at his home** the "*ink*" versions
of his signature that was allegedly forged by someone else.   The moxie of the
government to continue with the Kaiser forgery ruse at trial was commensurate with their
½ pregnant approach to all of the false predicates, impossibly constructed scenarios
(multiple times with Kristen Peca, alone), and revisionary trial testimony.
- This was the second (2nd) exposure of a Kaiser forgery **lie** issue revealed as
entirely improbable to the government pre-trial (and third [3rd] counting the
Jowdy 2004 Hawai'i loan agreement allegation).[188]

Osborne gave testimony claiming that although scientific methods were available to him
for his critical forgery analysis, he merely "eyeballed" the specimens based on his
training and experience; referring to his skills as a "*science*".   *Considering the additional
Kaiser forgery frauds, supra and infra, (along with his newly admitted co-conspirators;*

---

[188] After the government's announced plans to present the 2004 Hawai'i loan agreement as a
forgery, Kenner explained to his trial attorney, that **Jowdy's defense team had authenticated
the document in his December 2010 Nevada trial defense** (*See Recon33-23*).

- Kenner's trial counsel (Haley) leaked the information to the government.   As a result of
the "leak", the government immediately dropped the Jowdy forgery claims.

*Jowdy, Berard and Donlan – thanks to Kaiser's February 2019 submission to the EDNY Court), the government should have been obligated to utilize every scientific approach for the evaluation before placing Kenner's integrity in the hands of an "eyeball" test; with Kaiser as a known forgery liar (specifically in the EDNY Court itself)[189]* (Tr.3640-3645).

---

[189] **The government claimed a Kaiser-signed Mexico pre-trial document as a forgery in 2014 until they were alerted by Kenner's defense counsel (Haley) that the government-possessed evidence that Bryan Berard – fully impeaching Kaiser, had independently authenticated their alleged Mexico "forgery" document on an FBI recording...**

The Court may not be aware that the government perpetuated their false FORGERY claims starting with the 2014 pre-trial allegations to the Court of the 2004 Hawai'i loan agreement with Jowdy *(See Recon33-1)* (but -- dropped the issue when the government realized that Jowdy actually authenticated the document as his own defense exhibit in a December 2010 Nevada trial – *which Jowdy lost) (See Recon33-23)*.

This was the second (2nd) "forgery" lie that the government had to avoid.  The first (1st) was the Kaiser Mexico testimonial document (*alleged to be forged*) until the government realized that Berard and Kaiser had confirmed (*on FBI recorded phone calls*) that Kaiser *actually* signed the document for their Mexico attorney while at the Cabo san Lucas courthouse – **in person**.

- Despite the Kaiser and Berard recorded confirmations *(See Recon33-54)*, it should be noted that Kaiser gave sworn testimony in Mexico in 2012 in support of Jowdy in the *Stumpel v. Jowdy* (*$1.6 million criminal loan case*) that his testimonial signature was a forgery (**DESPITE** being **PROVEN A LIAR** by Berard on the 2012 recorded FBI call).

- This was more Kaiser and Berard fabricated testimony (a.k.a. *PERJURY*) intended to harm Kenner and Kenner investors in any jurisdiction (including anyone adverse to Jowdy – their high-paying boss in Mexico in 2012).
  - o   Kaiser's fabricated testimony terminated the $1.6 million case for *Stumpel v. Jowdy* in Mexico for Stumpel's additional capital account funds that *Jowdy stole* instead of contributing to the Baja Ventures 2006 capital account in the DCSL project; leaving the Baja Ventures 2006 capital account $1.6 million short.
  - o   Kaiser's testimony in Mexico protected his high-paying boss (Jowdy), immediately after being hired.

**Kaiser's fraud in Mexico was an additional planned perjury by someone in the Jowdy cabal, including Kaiser and Berard after 2012, and known at all times to FBI Agent Galioto.**
- **But – it was not disclosed to the Court.**

**Once Kenner revealed the FBI recording confirmations to his trial attorney, attorney Haley "*leaked*" the valuable IMPEACHMENT "forgery" evidence to the prosecution.**
- **It ruined Kenner's impeachment plans at trial – specifically related to a fabricated forgery claim.**

This "*leak*" was one of many issues that Kenner conflicted with his ineffective trial counsel before, during and after trial – as evidenced by Kenner's pre-trial letter communication with attorney Haley about his unpreparedness and other preparation shortcomings.  This issues

---

[Osborne testimony]:

*Q I will read it, sir. I'm just asking the following, if I read incorrectly, I know you will correct me: Findings, it is highly probable in the opinion of the undersigned that each of the two questioned signatures are non-genuine and the product of an attempted simulation of John Kaiser's signature. This finding is intended by the undersigned to express an opinion which meets and exceeds the threshold commonly described within the phrase within a reasonable degree of medical certainty. That's what that paragraphs says, is that correct?*

*A [Osborne]: No, it doesn't utilize the term "medical certainty."*

*Q Excuse me. It exposes my occasional medical malpractice defense work. I apologize.*

*A [Osborne]: It's okay.*

*Q Let me, for purposes of clarity of the record -- Judge, I do apologize -- the first sentence I read correctly, is that true?*

*A [Osborne]: Yes.*

*Q The second sentence, I will read: This finding, intended by the undersigned, is to express an opinion which meets and exceeds a threshold commonly described within the phrase, paren, within a reasonable degree of medical certainty, close paren.*

*A [Osborne]: Correct.*

*Q Now, the determination as to whether a signature is genuine or non-genuine involves certain tests and protocols you employ: is that correct?*

*A [Osborne]: Yes.*

*Q Fair to state, sir, what you do, I mean with a great deal of respect, is more of an art than science: is that true?*

---

included nondisclosure to the Court of Haley's announced FBI threats pre-trial; that seriously worried his wife, according to Haley.

*A [Osborne]: It is comparative analysis, which is accepted as scientific, including my -- the preeminent forensic science community, American Academy of Forensic Science, you can call it an art, but it is considered by scientists to be scientific.*

*Q We are not talking about the use of my limited -- not the use of computer simulations or commuter analysis, correct, of signatures, as known signatures. We are not talking about that; are we?*

*A [Osborne]: Well, I mean, in this particular case, commuter technology was only used to create illustrations for purposes of demonstrative, or demonstrate the evidence; however, examination of writing is possible to perform in initial examinations based on commuter analysis and comparison. CEDAR-FOX is one example of a commuter system capable of doing that. Secret Service has another system.*

*Q You utilized that commuter analysis in your analysis in this?*

*A [Osborne]: No. As I stated, the use of computers in this particular case was limited only to the production of illustrations.*

*Q I know that, sir. My question to you was: Is there or is there not a computer authorized software program that can be utilized for purposes of determining whether signatures are genuine or non-genuine; yes or no?*

*A [Osborne]: Yes.*

> *CROSS-EXAMINATION (Cont'd)*
> *BY MR. HALEY:*

*Q What is the name of that program?*

*A [Osborne]: I believe that the name is Cedar Fox, but I'm not sure. It was developed by Dr. Sirhari, S-i-r-h-a-r-i who is a professor in the SUNY system of schools, but that is one type of software that does an initial analysis and does examine things like visualization and different things. That type of software does exist. **It wasn't used here***.

*Q Let's back up, and I apologize. Dr. Sirhari?*

*A [Osborne]: Dr. Sirhari.*

*Q Is he well regarded in your field of study?*

*A [Osborne]: Yes, very much so.*

*Q So is it fair to state, sir, that the computer program he's developed by way of the software, given his reputation in the community, is regarded as having some value. Yes or no?*

*A [Osborne]: Yes.*

*Q And to avoid confusion on my part, in connection with the engagement by the Government in this case in connection with the signatures here, did you or did you not take advantage of the computerized program/software developed by this, sir? Yes or no?*

*A [Osborne]: No.*

With the **repeated** pre-trial known forgery lies by Kaiser (and Berard, Donlan and Jowdy) related to this instant case, it is irresponsible, *at a minimum*, to eliminate the scientific portion of the analysis to fit their "square peg into the corroborating round hole". It was absolutely prejudicial. The Court cannot overlook the presentation prejudice of a government expert as being well regarded by the jury as beyond reproach – and their residual harm – without the government taking every precaution before attacking the defendant.

### Kaiser, Berard and Donlan claim their names were forged in a contemporaneous 2015 Arizona trial – and were proven as liars...

Continuing the post-2012 (Jowdy hire date) "forgery" campaign by Kaiser, Berard and Donlan, Kaiser claimed his name was forged on five (5) Promissory notes he signed to:

- Tyson Nash,
- Darryl Sydor,
- William Ranford,
- Dimitri Khristich, and
- Jere Lehtinen.

FBI Agent Galioto interfered with all five (5) of the 2012 Arizona case interveners versus Kaiser and Berard. Galioto demanded that each of the interveners who had the Kaiser Promissory note signatures TERMINATE their litigation and sue Kenner instead. Nash, Sydor and Ranford confirmed this to Kenner via phone after Kenner was arrested in the

EDNY (contributed by Berard and Kaiser's persistence and assistance to FBI Agent Galioto).   They all declined to TERMINATE their lawsuits.   After a 2015 civil trial, the **Arizona judge found Kaiser to not be legitimate in his "forgery" claims**, primarily because Kenner provided the email traffic between Kenner, Kaiser and the Promissory note holders that confirmed their authenticity; *with Kaiser included on the emails in real time.*

## The FBI was also aware of Berard and Donlan's forgery lies before trial as well...

At the same 2015 Arizona trial, Donlan and Berard alleged that their names – along with a Massachusetts notary [William Medlin] had been forged and the notary stamp fraudulently reproduced (*See Recon33-59*).

The FBI *never* followed-up with Notary Medlin after calling Donlan about the allegations (*See 3500-LD-2*) on September 9, 2014.   The Donlan interview was one (1) year after Kenner's arrest and detention.

- The FBI and IRS agents knew that if they could prove the Berard-Donlan document as a forgery – *assuming it was Kenner who was guilty of it* – they would have Kenner dead-to-rights as a known forger.
- Yet, they *never* called Medlin.
  - o   Unless, Galioto and Wayne simply did not produce the exculpatory *Brady* materials that would have sunk the Donlan EDNY "tracing" testimony, the Berard integrity, and fowled up the concurrent 2015 Arizona case for Berard and Kaiser's thefts.
- Kaiser and Berard were found to be liars, repeatedly at the Arizona 2015 trial; specifically about forgeries (*See Recon33-55 at ¶ 9, 20, 21, 26*).[190]

---

[190] The Arizona ruling exposed more Kaiser, Berard and Donlan forgery lies:

> *9. Kaiser denies signing the Shangri-La Trust 1999 Revocable Trust Agreement, but the document was notarized by a local Maricopa County Notary Public (exhibit 38). Kaiser did not subpoena the notary or obtain his notary records. Kaiser admits that he subsequently executed documents as the trustee of the Shangri-La Trust 1999. In addition, he was aware of other documents that purportedly had been signed by him in that capacity. He did not object when he became aware of those documents, or say or do anything that suggested the documents were fraudulent or unauthorized.*

> *20. Kaiser denies signing the Sydor Promissory Note. However, Sydor provided an email dated November 23, 2009, from Kenner to Sydor with a copy sent to Kaiser (exhibit 61). Kaiser admitted that his email address was correctly shown on the email and he testified that Kenner would routinely forward emails to him (Kaiser deposition transcript read in court, exhibit 45, at page 112, lines 21-24: page 113, lines 5- page 114, line 1).*

> *21. Exhibit 61 states the following:*
> *Darryl [Sydor]:*
> *Please keep the attached note for your files during the sale of the Shangri-La home in AZ. Please note that the original note was signed on Oct 5, 2009, but the actual transaction occurred today, November 23, 2009. If you would like a new note to reflect that actual*

The 2015 Arizona judge **specifically** confirmed (based on Kaiser's defense of multiple forgeries):

> *26. The Court generally did not find Kaiser's testimony credible. Some of the reasons are stated elsewhere in these Findings. In addition, Kaiser's testimony in general was frequently self-contradictory and self-serving, his demeanor at times suggested a lack of veracity, and he had an obvious motive for denying responsibility for the loans.*

Berard's veracity was also exposed by the judge when he claimed he gave Kenner another $160,000 but had no paperwork, including no bank records for the transaction; *just his word*:

> *34. Berard testified that in the early part of 2010, Kenner made a second request for an additional $160,000.00 in order to continue with the renovations at the property. Berard could not provide a specific date for this second loan, nor did he provide any documentation.*

Furthermore, the following text conversation occurred between Kenner and Berard confirming that he was in Boston with Donlan ("*in southie*") and Berard was going to use Kenner's FedEx account to send the notarized document to Kenner on the same day it is signed, notarized, and dated; fully discrediting Berard and Donlan's forgery claims.

All of this was know to the FBI and IRS agents, yet they buried the exculpatory Medlin information to sustain Kaiser's false "forgery" claims that are now beyond believable under any scenario *(See Recon33-60)*.

Obviously, Berard and Donlan lied to the Arizona Court about another "forgery" – while being represented by the same Arizona attorneys as Jowdy. The Arizona Court exposed Berard again for other reasons regarding his fabricated statements of his name being forged (in concert with Donlan's "witness" signature on the same document with the Massachusetts notary [William Medlin]) *(See Recon33-59)*:

> *49. Berard testified that his signature on the Power of Attorney – Special (Arizona exhibit 25) and Deed of Trust (Arizona exhibit 26) were forged. However, Berard signed a number of recorded documents as a grantor, including the Quit Claim Deed transferring the property to John R. Kaiser, Trustee of the Shangri-La Trust 1999 (Arizona exhibit 27).*

Finally, the Arizona judge confirmed that Berard and Kaiser stole the Arizona property from Kenner via fraudulent conveyance – after they began to work hand-in-hand with

---

> *start date. I will get one from John. Otherwise, please accept this email as an acceptable change for the Promissory Note beginning date.*
> *Thanks. Phil*

FBI agent Galioto (just like the Sag Harbor theft and sale with fabricated documents and forging of Kenner's girl-friend's name) (*See Recon33-56 [FAKE], Recon33-57 [REAL]*):

> 57. *The March 9, 2012, conveyance of the property by John R. Kaiser as Trustee of the Shangri-La Trust 1999 to "John R. Kaiser, a married man, as his sole and separate property and Bryan Berard, an unmarried man" (exhibit 29)* <u>was a fraudulent transfer</u>. *A.R.S. §44-1004(A).*

### <u>When the most critical document to support the Donlan "tracing" allegations was described by Donlan -- and bolster the government's "forgery" theme, the government did not ask Donlan to produce the said document (*Tr.3454-3457*)...</u>

- It is just not believable -- but the "tracing" testimony was utilized to prejudice Kenner.

*Q. The document that you say you saw Phil Kenner signed by way of tracing signatures, is it your testimony that all of those signatures were being <u>traced onto one single page</u>? Is that your testimony?*

**A [Donlan]: Yes.**

*Q. I assume, ma'am, that when this occurred in 2005, did you retain -- you -- any copies of the documents that you say you saw Phil signing and then I believe I said you copied them as well. Correct?*

*A [Donlan]: I made copies of them as he was doing it.*

*Q. <u>And did you retain copies of these documents? Yes or no</u>?*

*A [Donlan]: **Not that I know of**. I thought I had someone, emailed but <u>I don't know</u>. I was trying to scan them to send to him so he could send them out.*

*Q. Did you retain your email going back to 2005?*

*A [Donlan]: No, I don't think so.*

*Q. When you said a moment ago I thought --*

*A [Donlan]: I said I saved a lot of stuff that had to do with Hawaii but it wasn't paperwork. I made him the copies. I sent them out. <u>I don't know. I don't know</u>.*

*Q. Well, what you did retain in terms of these emails, did you provide those documents to the government?*

**A [Donlan]: Not that I know of.**

*Q. Well, did the government ask you for the emails that you say were generated as*

*relates to things Phil Kenner asked you to do and things of that nature?*

*A [Donlan]: I sent them emails I had between us, but I don't remember exactly which ones.*

    ○  **Why wasn't Donlan sending "all of them" to the FBI?**

And when the most critical statements from Donlan were challenged on cross-examination, Donlan fell into the same "*I don't remember*" testimony to defend the recently fabricated testimony:

*Q. Well, did the government ever ask you if you have an email including the attachments reflecting this instance where you claim you saw Phil Kenner --*

*A [Donlan]: <u>I don't remember.</u>*

*Q. You don't remember whether they asked you for that?*

*A [Donlan]: Probably. <u>I don't remember.</u> I'm assuming they did. <u>I just don't remember.</u>*

*Q. Well, as relates to what you just testified to, ma'am, is there some means by which we can obtain a copy of this document you say you saw Phil tracing signatures on? That is my question.*

*A [Donlan]: <u>I don't know. I don't know.</u> It's in '05. <u>I don't have it. I have the memory of it. It's just something I really remembered.</u>*

**<u>Coupled with the Kaiser fabricated 2014 forgery claims in Mexico (the country), Arizona and the EDNY and Berard's forgery claims to the NY Daily News and Arizona courts -- all proven as lies -- it is no wonder Donlan replied "*I don't know*" in a panic five (5) times, and ultimately "*I don't remember*" three (3) times...</u>**

**<u>It left Donlan's closing retort as wholly irreconcilable:</u>**

    **<u>*I have the memory of it. It's just something I really remembered.*</u>**

**<u>With all of this false forgery claims for over seven (7) years and every person related to the Jowdy cabal, it was inexcusable that the government did not require that their expert utilize the CEDER-FOX computer modeling system (*Tr.3643*).</u>**

**<u>In addition, the mere existence of the "*ink*" versions having been recovered from Kaiser's home, is enough to make the entire government case ripe for a re-trial.</u>**

### Jackson Stewart[191]

**Jackson Stewart was racing associate of Constantine.**

**Stewart received funds from Ronald Richards' Trust account pursuant to the Constantine-Gonchar "*side deal*".**

- **Stewart had nothing to do with Kenner.**

Stewart was another government witness that gave useless testimony about funds that Constantine utilized as part and parcel to his "*side-deal*" with Gonchar that was known at all times by the government; wholly irrelevant to Constantine's activities within the GSF.

Nonetheless, the government introduced approximately ten (10) witnesses at trial, in addition to the alleged victim-witnesses (about 25% of their witnesses), to drag out the prosecution related to GSF funds that were *never* misspent under Constantine's exclusive controls.

It created a prejudicial variance to the Indictment; *or at a minimum*, an irreconcilable diversion for the jury and Court to unfairly malign Kenner and Constantine.

The Court at *M&O 32* verified: "*Stewart testified that Constantine told him that Constantine owned Eufora, and he said that Constantine introduced him to Kenner in or around 2007*" (*Tr.3665-66*).

**FALSE – *Because Kenner never met this person*.**   Yet -- it is wholly unknown why the government would ask Stewart to allege he met Kenner.

---

[191] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 32.*

### Blake Rosser[192]

**Blake Rosser was racing associate of Constantine.**

- **Rosser had nothing to do with Kenner.**

---

[192] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 32*.

## Ronald Richards[193]

**Ronald Richards represented the Mexico-Hawai'i investors versus Jowdy in two (2) independent lawsuits to recover the 2004 unpaid loans...**

The *Court M&O at 32* verified: "*Richards said that Kenner did not tell him where to send money once it was deposited into that account, but Constantine did provide him with such direction*". (*Tr.379*).

**TRUE** – Constantine was the only person handling the GSF.

> Michael Peca confirmed Kenner non-involvement in the GSF to the 2015 Court (*Tr.540*):
>> *Q. And what was Phil Kenner's participation in that [GSF], as you recall?*
>>
>> *A [Michael Peca]: He didn't seem to have one.*

**Although Ronald Richards was suing Jowdy in California on behalf of nineteen (19) Hawai'i-Mexico investors, to specifically recover the Hawai'i-Jowdy loans, the government alleged that the funds they were suing Jowdy for were actually stolen by Kenner to buy his Cabo san Lucas equity...**

As completely disseminated during the 4-day forfeiture hearings, solely based on evidence that the government possessed for years prior to trial (and ignored to fabricate their false theories), the prosecution chose to make foundationless claims that Kenner "*stole*" the Hawai'i funds.

The government claimed Kenner transferred "*stolen funds*" to Mexico and bought his equity in the DCSL project with the stolen funds.[194]  **This was 100% untrue.**

---

[193] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 32-33*.

[194] [*Tr.5990* – Komatireddy rebuttal summation]:
"*Mr. Kenner told you that he used that [Hawai'i] money to get his piece in the Mexico investment with Ken Jowdy. You know exactly what that's for. That's in evidence.*"

- **That is not in evidence.**   That was a prejudicial fraud on the jury and the Court during Komatireddy's rebuttal summation – knowing it can no longer be refuted.

[*Tr.5996* – Komatireddy rebuttal summation]:
"*He [Kenner] used it [the Hawai'i money] for personal use to get an interest in that resort in Cabo*".

Nothing new was discovered after the trial and before the forfeiture hearings (*or presented by the government as such*) that would have altered the government's perspective of the transactions from their Rule 16 discoveries.

Yet, when the government created *government-forfeiture-36* with the accounting of the funds utilized for the Cabo purchase, the entire capital contribution for **Baja Ventures 2006** (*Kenner, Stumpel and Lehtinen's equity LLC*) was accounted for with "*clean*" funds (*by the government's own work product*), untainted by any alleged misappropriations to Jowdy from the trial records or afterwards.

- In fact, **Kenner's partners (Stumpel and Lehtinen) contributed $4.1 million to the Baja Ventures 2006 capital account.** Jowdy fraudulently under-accounted for the Baja Ventures 2006 capital contributions -- and stole the other $1.6 million. Thus, Kenner "*did not steal*" any of the $2.5 million capital account in the Baja Ventures 2006 LLC records.
  - o The Baja Ventures 2006, LLC account is another victim of Ken Jowdy -- overlooked by the "pay-for-play" FBI case agent.

- This is the same fact pattern for the $2.3 million capital contributions by the CSL Property, LLC (*See Document 482 at ¶5*). Jowdy only accounted for $2.0 million and refused to "fix" it once discovered post-closing as a fraud Jowdy had perpetrated; specifically to harm Kenner and Kenner investors.
  - o There are millions of other additional funds that Jowdy never contributed as intended to the Cabo capital accounts during the closings, further harming Kenner and Kenner investors (*all in evidence – exposed by Kenner in his 2009 FBI proffer – and ignored to prosecute Kenner for known Jowdy criminal activity*).

**The government had been long in possession of the two (2) agreements signed between Kenner-Stumpel and Kenner-Lehtinen...**[195]

These agreements confirmed the debt-equity relationship between Kenner, Baja Ventures 2006, and each of them, respectfully. The equity stake in the DCSL project by Lehtinen and Stumpel was further verified (*corroborating their debt-equity agreements*) when they participated in the *DCSL v. Jowdy* California lawsuit in 2009 (*See Recon33-16 @ 6*).

Both of Kenner's partners are listed as 5% owners of the LLC [*Baja Ventures 2006*]. Paragraph 7 of the California Complaint versus Jowdy states:
> *Specifically, two of the Plaintiffs Jozef Stumpel and Jere Lehtinen invested in Baja Ventures 2006, LLC, which owns 38% of Diamante Cabo san Lucas, LLC.*

---

[195] *See Recon33-216 (Stumpel agreement)* and *Recon33-217 (Lehtinen agreement)*.

- Thus, the funds were not stolen by Kenner -- and Ronald Richards was suing Ken Jowdy for the appropriate frauds; the stolen and unpaid Hawai'i loans – despite the ongoing advocacy (in opposition of the documented truths) by Jowdy's attorneys (*See Document 664*).

The two (2) California lawsuits also acknowledged for the fifteen (15) DCSL plaintiffs (*Tyson Nash, Vladimir Tsyplakov, Turner Stevenson, Mattias Norstrom, Greg deVries, Bryan Berard, Steve Rucchin, Brian Campbell, Darryl Sydor, Dimitri Khristich, Sergei Gonchar, Mike Peca, Jere Lehtinen, and Jozef Stumpel*) their *Plaintiff knowledge of the $8 million in unpaid loans by Jowdy from the Hawai'i investors*, as plead:

> "*Mr. Najam was in charge of the corporate governance and while under Jowdy's direction and control. received over eight million dollars ($8,000,000) from a LLC in Hawai'i. Mr. Najam failed to properly account for those funds and has placed the Jowdy investors in a vulnerable and compromised position*".[196]

Ronald Richards verified that Constantine was the only control person for the GSF to the 2015 Court (*Tr.3805*):

> *Q. Now. if there are disbursements that represented funds that were sent under the authority of Mr. Constantine, again. for the record, who did you receive each and every one of those disbursements authorizations from?*
>
> *A [Ronald Richards]: Only Mr. Constantine.*

On direct examination by Michiewicz, Ronald Richards confirmed sixteen (16) times that only Constantine "*authorized*" the GSF transactions.

On cross-examination, Ronald Richards confirmed that the only funds Kenner received from the GSF (in spite of Kenner's multiple direct expense contributions to the GSF vendors that went unreimbursed, *supra*), Constantine authorized the "Kenner expenses" after refusing many of them (*Tr.3829-3830*):

> *Q Showing you, Mr. Richards, a page from Government's 1102, dated 7/31/09. and specifically there is a July 30th wire transfer out of the escrow account in the amount of $22,425.02.Who directed you to do that transfer?*
>
> *A [Ronald Richards]: Tommy Constantine.*

---

[196] The two (2) California lawsuits (*Recon33-15 [DDM versus Jowdy]. and Recon33-16 [DCSL versus Jowdy]*) properly plead the accounting issues [*at all times under Najam's control and Jowdy's direction*] as improper and leaving Kenner and Kenner investors "*at risk*".

*Q And who is that money being sent to?*

**A [Ronald Richards]: Phil Kenner.**

*Q Would this have been covered by one of your internal transfers from the general fund to represent Mr. Kenner?*

*A [Ronald Richards]: I don't understand the question.*

*Q In other words, was this money somehow related to litigation that you were retained for Mr. Kenner?*

*A [Ronald Richards]: No, I remember that transaction. **It was a cost reimbursement for Mr. Kenner.***

*Q What does a cost reimbursement mean?*

**A [Ronald Richards]: From my recollection, he [Kenner] had expenses that he needed reimbursed. And Tommy had allowed some of them and not allowed some of them, and that was what Tommy authorized after he reviewed the expenses. There were some he didn't allow.**

Kenner was a contributor to the GSF like the remainder of the Kenner clients.   Ronald Richards verified it to the EDNY Court.

### Constantine spent the GSF exactly how his disclosure email identified...[197]

Kenner, the government, and the Kenner investors may not be pleased with how Constantine executed the GSF plan.   But, nothing was improper based on the Gonchar "*side-deal*" (known at all times to the government before they created their improper GSF prosecutorial theory in 2013).

As a result, the entire GSF lines of questioning to the former Kenner clients and the ten (10) various vendors Constantine paid with the Gonchar "*side-deal*" funds (and Constantine's own $125,000 and $15,000 contributions), what was necessary to explain related to criminal acts that never took place?

---

[197] Ronald Richards confirmed Constantine's exclusive control of the GSF funds to the California Bar (*See Recon33-19*):

> "*I [Ronald Richards] provided evidence to the complainants that the funds were disbursed to <u>various attorneys</u> and entities <u>at Constantine's direction</u>.   There is no factual dispute from anyone that <u>Constantine received all of the funds</u> that were wired to him through my client trust account <u>pursuant to the arrangements Constantine had made with the Complainants</u>.*"

*Kenner 13-cr-607 (JFB)*

The entire GSF inclusion was a grossly prejudicial Red Herring, and the government knew it at all times to harm the defendants; including the Ronald Richards escrow accounting testimony.

### Chris Petrellese [198]

Christopher Petrellese is a forensic accountant for the FBI (*Tr.3909*).

The *Court M&O at 33* verified: "*Petrellese testified that, from December 2004 to September 2005, CMG received a net amount of $1,000,900 from Little Isle IV and Ula Makika. (Tr. 3934: GX-41-B).*

**TRUE** – Constantine was paid pursuant to his 2004 and 2005 Hawai'i consulting agreements; **countersigned by John Kaiser.** Constantine was one (1) of seventeen (17) hard moneylenders that were paid by the Hawai'i partners, *none of which benefitted Kenner at any time*.

Even though the government asked multiple witnesses if they were aware of the Constantine payments, none of them would have known Constantine's name (with one or two exceptions) in 2004 when he met face-to-face in Arizona with Manfredi to begin the consulting work (*Tr.3004*).[199]

- Why would the individual investors know Constantine's name or any of the other sixteen (16) hard money lenders that were paid; or any paid attorneys, contractors, engineers, architects, environmental engineers, etcetera?

  ANSWER: "*They would not have any reason to know their names.*"

---

[198] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 33-34*.

[199] [Hawai'i partners COO Chris Manfredi testimony about his initial 2004 meeting with Constantine – further verifying the concerted efforts by Constantine and the Hawai'i partners to raise development funds]:

> Q. Well, did you speak to Mr. Constantine at any point in regards to the Hawaiian projects?
>
> A [Manfredi]: Yes.
>
> Q. In person or by e-mail?
>
> A [Manfredi]: **I recall in person**.
>
> Q. And **where was that**?
>
> A [Manfredi]: **That was in Scottsdale, Arizona.**
>
> Q. Other than that one -- when was that? I should put a time frame on that, Mr. Manfredi.
>
> A [Manfredi]: I don't recall the exact year. **It was prior to '05**.

Two (2) of the seventeen (17) hard moneylenders were able to deliver "results" for the Hawai'i partners.   Centrum Financial loaned $3,000,000, with due diligence arranged by Chris Manfredi and Carlsmith Ball LLP on behalf of the Hawai'i partners.   After seven (7) extremely difficult weeks attempting to replace the "*egregious*" 2005 Lehman Brothers 11th hour Waikapuna funding (of only $5 million) (*See Recon33-7*), Constantine presented the Urban Expansion loan to Manfredi, Kenner, and Kaiser.   The deal was personally guaranteed by Kenner (just like the Centrum loan).   Urban Expansion funded the Waikapuna closing, including an additional $100,000 capital contribution from Kenner personally, specifically for the Waikapuna purchase.

After the Lehman Brothers 2005 loan was determined to be "too expensive" to sign by Manfredi, Kenner, and Kaiser, Hawai'i COO Manfredi notified another hard moneylender that the Hawai'i partners were looking for Waikapuna development money again (*See Recon33-123*).   Manfredi stated on August 16, 2005:

> [Manfredi]: "*The deal with Lehman was cancelled by us as being too egregious*".

- Manfredi handled the August 2005 correspondence independent of Kenner as part of his funding efforts with Constantine and a myriad of other hard moneylenders.

Weeks later -- and before the Urban Expansion funding was proposed, Manfredi explained to Kenner that he felt "*desperate*" after dealing with so many hard money lenders who all made unfulfilled promises. After cancelling the "*egregious*" Lehman Brothers loan (*in August 2005*), Manfredi wrote to Kenner on September 30, 2005, after another lender that he, HIMSELF, was in Hawai'i to meet with face-to-face and close financing for the Hawai'i partners, *yet unexpectedly*, failed to do so (*See Recon33-218*).

[Manfredi stated – September 30, 2005]:
"*I, like you, have been hearing the same old stories for so long, everyone can 'get it done' and no one does…I think the likelihood of losing Waikapuna and MoaUla is very real, which means I will have wasted a lot of time…I never thought I would be leaving this trip without funding…*".

- This Commonwealth Financial deal (in the same email, *supra*) was introduced by Constantine to Manfredi and handled between the two (2) of them without Kenner day-to-day.
  - **Commonwealth's deal that Manfredi wanted to close required a $3 million fee – up front.**

- Therefore, this further refutes the outrageous government claims that the Urban Expansion deal was "*waiting in the wings*" after Kenner "*pushed off the Lehman deal for another year to get Constantine in*" (*Tr.5996*).

The Court *M&O at 33* verified: "*He [Petrellese] further testified that the chart indicated that $381,127 was transferred from Wachovia account to Kenner's Wells Fargo accounts, accounting for roughly 55 percent of all outgoing transfers*" (*Tr.3947; GX-49-B*).

**TRUE** – This verification from Petrellese *contradicts* the government claims that Kenner was not being "*repaid*" for the previously documented loans to Gaarn.  It is irrational that the government theory is that Gaarn sold $700,000 of *his* documented private stock (*See Recon33-2 at 35,37; Recon33-175; See Recon33-3 FOLDER -- Eufora 2005 taxes at 11,21,35,43, Eufora 2006 taxes at 22*) -- and only forwarded $381,000 (*55 percent of the Gaarn private sales proceeds*).[200]

If the sale proceeds belonged to Kenner, Kenner surely would have received more than just his loan "repayment" funds from Gaarn.  It is another illogical prosecutorial theory; left without reasonable explanations – while fully contradicting 100% of the pre-trial empirical evidence.

**Gaarn failed to raise any conspiratorial issues on the four (4) hours of FBI recordings with Kenner...**
Furthermore, Gaarn and the FBI set up over four (4) hours of FBI recorded calls in 2012 (known as *Operation Pederpuck*) in order to secure statements from Kenner about the

---

[200] Please note that that the $381,00 according to the government expert, included the $70,300 that Gaarn loaned to Kaiser in 2009 -- when Kaiser was 100% "*broke*" per his own previous representations to Kenner.

*See Recon33-121* -- In November 2008, after Kaiser was fully repaid his California profits and the initial funds he borrowed to participate with Kenner on the 2006-2007 California project (documented in evidence) – Kaiser and Kenner communicated via text in November 2008 text about Kaiser's "*broke*" status:

[Kenner] – "*Sent the wire to you...pk*"

**[Kaiser] – "Needed it thx"**

[Kenner] – "*Paid the guys again for the 8224 [Arizona renovation] work...pk*"

**[Kaiser] – "*Im broke cant help*"**...

[Kenner] – "*I didn't ask...pk*"...

**[Kaiser] – "*I know. Just tired of needing money. Gotta finish tje [sic] house so we can get our money out. U and me*"**

Eufora transactions.   Yet, during the secretive FBI recording operation, Gaarn *never once* asked Kenner about *"selling Kenner's shares"* or insinuates anything similar like the government professed thru trial and during rebuttal summation (*Tr.5970-5971*).[201]

The FBI and Gaarn knew that if Gaarn made such a false claim on the phone, Kenner would have instantly rebuffed it, thus ruining any possible misuse of the Gaarn recordings at trial.   As such, the government only played Gaarn recordings that asked Kenner about tax help.   It was a backhanded way to allege that Gaarn and Kenner were "conspiring" about something; *when nothing existed.*   It was another Red Herring.

**Gaarn confirmed he was not part of any conspiracy with Kenner…**

At trial, Gaarn denied having been part of any conspiratorial acts related to selling his stock in 2008-09 (*Tr.2563-64*):

> *Q: Let me ask you this.   As you sit here today, sir, to your knowledge, and your belief, you have not committed any crime, isn't that true?*
>
> *A [Gaarn]: True.*
>
> *Q:  In other words, you are not viewed in your mind of, lets say, conspiring with Phil Kenner to commit a crime, and by that I mean the two of you form an objective to commit a criminal act.   There was never any meeting of the minds between you and Kenner for that purpose, true?*
>
> *A [Gaarn]: Correct.*

---

[201] [AUSA Komatireddy rebuttal summation – regarding the false Sydor Q&A]:

> *"QUESTION: Now, at the time that you invested in Eufora, did the defendant say anything to you about your money being used to buy out other investors?*
>
> *ANSWER: No.*
>
> > *QUESTION: To buy out Tommy Constantine?*
> > *ANSWER: No.*
> > *QUESTION: To buy out Phil Kenner?*
> > *[Sydor] ANSWER: No.*
>
> *Now let's talk about the other Eufora fraud and what the defendants call "selling shares."*
> *They've told you that there is no impropriety in them getting money from the hockey players in 2008 and 2009. Because after all, they were just selling their shares in Eufora.*

- Again, there was no evidence adduced at trial that any of the Eufora shares that Gaarn sold in 2008-09 belonged to Kenner at that time – or at all since the 2005 transfer that is documented in every Eufora tax record, the internal corporate emails, the books and records and the 2009 signed Eufora operating agreement.

> *Q:  As a matter of fact, sir, when you went to the FBI on two occasions to meet with the FBI, you didn't go with a lawyer, did you?*
>
> *A [Gaarn]: No.*
>
> *Q:  And you didn't go with a lawyer because you knew in your own mind you had committed no criminal act, correct?*
>
> *A [Gaarn]: Correct.*

Gaarn was crystal clear that he was not part of any criminal act, conspiratorial or otherwise, with Kenner with regards to Gaarn's personal stock that he sold in 2008-09 thru his company, Standard Ventures, LLC (***raising tremendous prejudicial variance issues with the Superseding Indictment***).

It was not Kenner's Eufora stock, nor did the government extract an admission from Gaarn (false or not) that it was Kenner's Eufora stock.  There was *no testimony* that Gaarn was acting as a "straw man" on the transactions, either.

### Joshua Wayne [202]

Joshua Wayne is a special agent with the Internal Revenue Service (*Tr.3985*).
- There are no IRS related issues in the instant case.

**Agent Wayne replaced Special Agent Scott Romanowski in or about the time the 2009 SDNY Grand Jury failed in 2011 following Michael Peca, Darryl Sydor, and Turner Stevenson's fully exculpatory, pro-Kenner transparency testimony (*supra*)...**

The replacement of Romanowski by Wayne was most likely warranted, because AUSA Komatireddy denigrated Romanowski's ability to take notes effectively ("unlike an FBI agent's specific abilities") (*Tr.5992*).
- The obnoxious statements were specifically related to discredit the notes from the 2010 Kaiser interview, which caught their star-witness, Kaiser in so many perjuries that the government could do nothing but denigrate a Federal investigator; claiming his incompetence.

- Was AUSA Komatireddy alleging that the incompetent investigator (Romanowski) they brought to interview Kaiser in 2010 -- and Kaiser's exculpatory statements of:
  - Kenner's full transparency,
  - No blame on Kenner for anything, and
  - Kaiser's intimate knowledge of the loans that were discussed ad nauseum between himself and Jowdy -- and approved by the group of Hawai'i partners...

  ...were not legitimate?

Nevertheless, the AUSA vouched for Kaiser's integrity as their key witness who was "*tying their whole case together*":

> "*And it's just as plausible for Mr. Kaiser's testimony was consistent with those notes. You can't conclude they were inconsistent.*"

As the Court is aware, John Kaiser gave utterly implausible testimony at trial, refuting every representation Special Agent Romanowski noted that Kaiser told the two (2) agents [Romanowski and Galioto] on October 19, 2010 at his Long Island multi-million dollar Estate (*Tr.1120-1122*).[203]

---

[202] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 34-35.*

[203] [Kaiser's fantastic testimony regarding his pre-Hawai'i loan meetings with Jowdy] (*See 3500-JK-1-r at 2,3.10*):

> *Q Mr. Kaiser, isn't it true that when you were interviewed by <u>Special Agent Scott Romanowski</u> and Special Agent Matt Galioto of the FBI on October 19, 2010, at 11:00 a.m., you told the agents that you met Jowdy twice in New York City and at the second meeting at a bar in New York City you discussed with him Hawaii and the lending of money from Hawaii to Mexico, isn't that true?*

**A [John Kaiser]: No.**

> *Q You did not tell the FBI agents what I just related?*

**A [John Kaiser]: That's correct.**

> *Q Isn't it true, Mr. Kaiser, during an interview with the FBI on October 19, 2010, 11:00 a.m. specifically Scott Romanowski and Matt Galioto, that you told them that you saw Kenner Jowdy in Mexico a couple of times and discussed that Kenner Jowdy wanted to borrow money from Hawaii to Mexico and would pay it back after the closing?*

**A [John Kaiser]: No.**

> *Q Isn't it true, sir, on October 19 at 11:00 a.m. in an interview conducted by Scott Romanowski and Matt Galioto of the Federal Bureau of Investigation you told them that Kenner Jowdy brought up money -- Kenner Jowdy brought up borrowing money from the Hawaii Project, borrowed millions, 5 to 6 million from Hawaii Project, that it was first going to be hundred thousands not millions and that Kenner Jowdy was not happy that the money amount started to grow to millions after money to Mexico?*

**A [John Kaiser]: No.**

> *Q How many times, to your knowledge, were you interviewed by the FBI prior to your appearance here today?*

*A [John Kaiser]: Probably over a dozen.*

> *Q During the course of the interviews by the FBI approximately a dozen times, they would ask you questions and you would answer their questions, true, sir?*

*A [John Kaiser]: Yes.*

> *Q And when you answered the questions of the FBI, did you observe them taking notes of the answers that you were giving to their questions?*

**A [John Kaiser]: No.**

> *Q You didn't observe them doing that?*

**A [John Kaiser]: No.**

After Kaiser's absurd defiance vis-à-vis his statements to Galioto present in 2010 (who refused to correct the known perjuries at trial in real time) and Romanowski, AUSA Komatireddy cleared up any misunderstandings during her rebuttal summation by further exacerbating the Kaiser **lies** as follows (*Tr.5992*):

> *"The very exhibit they showed you, Kenner 43, was stipulated into evidence by the government so you could see what it is and what it isn't. What is it? **It's the notes of an investigator from another office, not the notes of an FBI agent, an investigator from another office**. What is it not? It is not a transcript. It's not questions and answers. It's not direct quotes. You can't tell from the notes when they were written, if they were written **before** the interview or after the interview."*

> **"*before* the interview"??**

This was pure despondency to mislead the jury who was hearing the last statements before deliberations.

- After reviewing the FBI hand book regarding "note taking", there were no references to agents taking notes "*before*" a meeting of what the interviewee is going to say at "*some time in the future*".

This was one of the lowest displays of ethics, utilized dishonestly on the jury and the Court to resuscitate their star witness, John Kaiser, an alleged 9-11 hero, according to their opening Q&A with Kaiser (*Tr.954-955*).

If the unquestionable integrity of the FBI case agent was beyond reproach, it remains quizzical as to why the government did not present Galioto at trial or during forfeiture hearings.   The simple explanation is that they know that they cannot under any circumstances turn over his EDNY Grand Jury transcripts from 2013 or the Superseding Indictment 2015 transcripts.

- It should be noted that defendant Kenner submitted a Rule 6(e) motion in mid-2018 (after being admitted thru *Faretta v. California*) to represent himself.   The characteristics that must be satisfied were wholly proper in the Kenner submission, yet approximately twelve (12) months later, the Rule 6(e) submission remains unaddressed, subject to the government's objections.

- More likely than not, the Galioto statements to the two (2) Grand Juries will provide *more* reformative effects on the instant case, and as such, the government has vehemently opposed the release of the Grand Jury minutes.

As the Court knows -- any defendant's request for Grand Jury minutes must be weighed against the long tradition of protecting the secrecy of the Grand Jury process.   It is rooted in the need to protect the secrecy of the proceeding for specific reasons:

1) To prevent the escape of those whose Indictment may be contemplated;
2) To insure the utmost freedom to the Grand Jury in its deliberations, and to protect the persons subject to Indictment or their friends from importuning the Grand Jurors;
3) To prevent subornation of perjury or tampering with the witnesses who may testify before the Grand Jury and later appear at the trial of those indicted by it;
4) To encourage free and untrampled disclosures by persons who have information with respect to the commission of crimes; and
5) To protect the innocent accused who is exonerated from disclosure of the fact that they have been under investigation, and from the expense of standing trial where there was no probability of guilt.

Considering the Grand Jury minutes sought by the defendant are now four (4) and six (6) years old, all of the basic *"secrecy"* issues, *supra*, are long since ***moot***.

**Kenner was repaid $17,000 out of $25,000 from Constantine for funds Kenner wired to Constantine weeks earlier, as verified in multiple government accounting spreadsheets...**

Kenner *did not acquire* any funds that were not already loaned (identical to the Gaarn transfers – as documented by Petrellese, *supra*).

The Court *M&O at 33* verified: "*In addition, Wayne reviewed a text message conversation between Kenner and Constantine and testified as follows:*"

> *Q. I'm going to direct your attention to what is in evidence as government Exhibit 203A. Looking at this conversation, do you see on the right it says, I'm sending CMG 100K today. Please send the extra 25K back to me?*
>
> *A. Yes.*
>
> *Q. And on the left it says 25K question mark? I need 40K for lawyers and 40K for GT car. Is that Eufora money, question mark. Do you see that?*
>
> *A. Yes.*
>
> *Q. Yes on the right side?*
>
> *A. Yes.*

*Q. On the left side it says, <u>Are you cool if I just sent the 17K</u>? <u>I'm sorry to nickel and dime you</u>, but I have to lay out 80 straight away and I don't even have enough to afford a – I don't even have enough to get to the meeting in Cabo. Do you see that?*

*A. Yes.*

*Q. On the right it says, <u>No problem</u>?*

*A. Yes.*

- Kenner confirmed that Constantine could repay the $17,000 Constantine claimed to Kenner that he could afford at that time, leaving Kenner short of repayment funds, *not funds that were consummated to further enrich Kenner.*

If the underlying premise that Gaarn and Constantine sold their private stock is considered plausible, then the entire Eufora sales are non-prosecutable.

- **The government alleged-victims from the Superseding Indictment represent $700,000 in sales from the 2008-09 transactions with the balance purchased by non-victims.   It debunks their-own prosecutorial logic.**

Nevertheless, all of the stock purchasers were independently represented by counsel, Rudy Giuliani's investigative team; led by NY Corporate Attorney Michael Stolper.   The private purchases were fully vetted by the investors' independent counsel.  Nothing was concealed from the independent counsel; specifically including the immediate delivery by Kenner of the 2010 Home Depot recording of Constantine's diatribe to him.

There is no logic that could prevail suggesting that Kenner believed that anything Constantine said on the recording had merit with respect to "protecting Gaarn" or "Kenner receiving money" that would warrant Kenner turning over his recording to the investors attorneys.
- **Yet, Kenner immediately turned it over for full transparency.**

What did the Eufora investors' attorneys do with the Kenner recording?

**ANSWER: "Nothing".**

The investors' attorneys did nothing with the Constantine rhetoric, because they were fully aware of the foundationless statements by Constantine and wild allegations.

If Constantine claimed he was "covering for Tim Gaarn", then why did Constantine's attorney – previous to the Kenner Home Depot recording – broadcast the Constantine allegations of wrongdoings in a letter to Stolper – **weeks earlier**?   Constantine's "claims" (albeit 100% inaccurate) were specifically addressed by the Eufora investors' own attorney on July 16, 2010 – *weeks before the Home Depot recording*.

- For further confirmation that every investor was alerted to the private stock sales, each Eufora investor signed off on the disclosure letter from their-own attorney (*See Recon33-73 at 9-18*).

**July's July 2010 letter,** *supra***, exposes Constantine's false allegations of "private stock sales" as an issue -- and Stolper demands Constantine present any unknown issues (after Stolper confirmed the investors' 2010 knowledge as his clients)…**

**One** – in response to Constantine's personal attorney's (Lee Weinberg at Weinberg Gosner LLP) claims that the Gaarn transactions were a fraud "somehow", Stolper replied to Constantine's attorney, the Eufora corporate attorney (Karl Freeberg at Greenberg Traurig LLP), and copied the entire twenty-seven (27) person Eufora investment and investigative group.   **Stolper required that all twenty-seven (27) sign and return his letter** and disclosure *with Bryan Berard's help* – separate from any Kenner concealment or restrictive actions.   All of the Eufora investors complied and signed off on the July 16, 2010 letter.

Stolper's letter exposed any perceived "concealment" by Kenner, as Stolper and Giuliani confirmed (*See Recon33-73*):

> At 1: "*…to give him [Constantine] the opportunity to support his allegations against his co-managers at Eufora.*"

> At 4: "*Lee, you claim to have been "informed" about "very disturbing facts relating to the actions of several investors and managers on the Eufora saga.*"

> "*We want to address these points as well, not with finger-pointing and conjecture, but real evidence (documents).   I invited Constantine to support his allegations but he has yet to provide a single piece of evidence or agree to meet with us.*"

> At 7: "*Constantine made allegations against Gentry [Eufora CEO] and Phil Kenner, a money manager of the members of the company [AZ Eufora Partners I]:*"

> At 7: "*Stolper repeatedly requested that Constantine come to New York to address the findings and support his allegations about Gentry, Kenner, Eufora financing and the defaulted loan.*"

At 7: "*...neither Constantine nor his counsel have provided the documents that Constantine said he was going to provide, and has otherwise not agreed to meet with Stolper and Hatzimemos [Giuliani's right-hand-man] to resolve the open issues;*"

- Thus – nothing was concealed about the alleged "private sales by Gaarn" prior to Constantine's rant at Home Depot – that echoed the same, false sentiments.

**Two** -- the government presented *no emails or texts* in Rule 16 evidence or at trial that claimed the Eufora investors who signed off on the full disclosure letter were unaware of their stock purchases or the private ownership origination – *five (5) years earlier*.  The government simply applied the same **CTE** (*faulty memory, confusion and mistakes*) logic to their Q&A to create a "*memory test*" of items that were not and have not ever been in question, after Giuliani and Stolper's thorough investigation in 2010.

Five (5) years later, the investors *could not remember* the basis for the Giuliani and Stolper investigations (the "**loan buyouts**" – see Peca, Berard, Kaiser and Gaarn failed "*memory tests*", *supra*), let alone the details of their private stock purchases that were fully vetted by their own counsel; independent from Kenner and adverse to Constantine at all times.

The loan buyouts are also addressed in the July 16, 2010 letter, *supra*, that none of the Eufora investors could remember, further exploiting the "*failed memory tests*" issues versus some alleged "concealment" that cannot retain credibility in the face of the voluminous pre-trial empirical evidence.   Investors' Attorney Stolper stated clearly:

At 3: "*Why did Lee [Constantine's attorney] not address with Constantine, as I had requested, the possibility of doing a deal with the Lender [Nerguizian at Neptune] through insiders?   Unquestionably, a deal via insiders is financially and otherwise in the best interest of the members of Eufora.*"

- This further highlights the sever **CTE** issues of the investors (and the need for RFAs to explore the cognitive degeneration of the alleged "forgetful" government witnesses (as requested by Kenner to the trial court) – as a direct result of the government's position of full *faulty memory, confusion and mistakes.*

- On August 3, 2010, and only two (2) weeks after Stolper laid out the Kenner Private Stock sale allegations by Constantine to all of the investors in his July 16, 2010 letter, Kenner turned over the Home Depot tape to Stolper with the same foundationless allegations.
  - *Thus -- NO CONCEALMENT is possible for the 2008-09 Eufora private stock sales as identified by the Stolper letter -- and Kenner's follow-up transparency.*

    o   *The "failed memory tests" do not amount to investors being defrauded by Kenner -- <u>unless Giuliani, Stolper and their investigative team were complicit in the fully disclosed "cover-up".</u>*

In particular, Kenner was not part of the distribution list from Giuliani and Stolper on the July 16, 2010 disclosure letter (*See Recon33-73*); further distancing Kenner from any ability to conceal the private sales from the Eufora Board, the independent Eufora legal counsel, Constantine's independent counsel, the AZ Eufora Partners I investors &/or Stolper and Giuliani's team.

**Three** -- weeks after the signed-off disclosure letter from Eufora investors' counsel [Stolper], Kenner unfortunately crossed paths with Constantine at a Home Depot in Scottsdale, Arizona.   Kenner and his 7-year-old son were present.  Kenner chose to record the expected Constantine ramblings after having separated from Constantine once Kenner was notified of the investigation commencing in or about March 2010 – five (5) month earlier.  Kenner was right about the disingenuous rhetoric with Constantine beginning his nonsensical ramblings with (Court *M&O at 37*):

    *Constantine: "<u>So, I know you are not going to believe anything I tell you, but I'm gonna to try anyways.</u>"*

    ***Kenner: "OK."***

  •  **That was 100% prophetic – because Kenner <u>did not</u> and <u>does not</u> believe anything that Constantine has to say...**

The remainder of the Constantine rant (*M&O at 37*) is Constantine, in typical Constantine-style, trying to convince Kenner to let him make everyone rich with the Eufora deals he is ready to sign and stop worrying about the Jowdy deals in Mexico. **Constantine reiterated the inability to flush out Jowdy's frauds, because the FBI and Louis Freeh protected Jowdy.**

On the recording, Constantine tried to explain to Kenner that by letting the Giuliani investigation continue ***Kenner was going to be the person responsible for the investigation team destroying Eufora*** -- although Kenner had no bearing on it one way or another as explained by Kenner, self-described on the recording as a "*passenger*" in the investigation.

Constantine's Home Depot plea was that if Kenner could "*shut down*" the investigation (*the opposite of Kenner's actual transparent actions of recording Constantine and turning it over to independent investigators – Giuliani and Stolper*), Constantine would make everyone rich.   Because, Constantine reiterated that no one would ever collect

from the decade of known Jowdy frauds (**for that, Constantine was foretelling – now nine [9] years later**).

Constantine's Home Depot double-talk is misleading, but the essence of every Constantine conversation from the inception of the Constantine-GSF to the alleged recruitment by Constantine for the Eufora investment money in 2009 (from Kaiser's friends & family) was that Constantine was "*about to save the world*".   John Kaiser noted this in a declaration he and attorney Stolper filed in the original 2010 Arizona case versus Constantine (and several Eufora employees) supporting the documented allegations of Constantine business frauds – **having nothing to do with Kenner**.

It is documented that Constantine presented double-talk and falsified stories to anyone he could preach to in an effort to distract from his documented wrongdoings; being investigated by Giuliani and Stolper.   Constantine's nonstop rhetoric was typified in his contradicting lies to Privitello.   In 2012, Privitello and the FBI recorded Constantine – also contradicting Constantine's claims on the Home Depot recording (regarding the Gaarn Eufora private stock sales):

[Constantine to Privitello -- at 22.50]:
> "...*then the 700 grand went to Tim Gaarn and went to Mexico -- God knows where and what for and then Tim Gaarn and Phil and CR [Gentry] were the ones who convinced all you guys to do all this [investigate Eufora thru Giuliani and Stolper[204]]...you say that you are not surprised what Phil did but Phil is the one who did all of this...*"

- Please note that none of the funds went to Mexico – nor "*for God knows where and what...*".

Privitello was represented by Giuliani and Stolper and knew that Constantine lied to him about Gaarn's private stock sales' proceeds (*See Recon33-73 at 17*) – because Privitello was already disclosed this indisputable issue by Stolper and his team.

**The Court verifies several transactions that all are unquestionably valid and documented uses of Hawai'i partners' funds...**

---

[204] See *Recon33-73 at 6* where Stolper clearly explained to the AZ Eufora Partners I investors that Tim Gaarn *alone* hired Giuliani and Hatzimemos and Stolper to investigate "everything" Eufora – and they were granted access to all of the Eufora corporate records thru Board Members Gaarn and Eufora CEO CR Gentry.
- *Kenner had no ability to conceal anything as a non-party to the investigation and a non-party to Eufora since 2005-06 – and was certainly not the "puppet master" (Tr.6008).*

- **It is not easy to understand why the Court identifies these "clean" transactions as part and parcel to some illegal acts.**

The Court *M&O at 34* verified: "*In addition, Wayne testified as follows regarding other charts that he created*":

> *Q. Turning your attention to Chart 9. Is there additional money that you reviewed at the same time for Mr. Kaiser?*
>
> *A [Wayne]: That's correct.*
>
> *Q. Where does that money go?*
>
> *A [Wayne]: $380,000 on November 1, 2006 is transferred to Ula Makika. Money is then transferred over to CMG Tommy Constantine. Also from Ula Makika $200,000 is transferred to Phil Kenner.*

**First** – Kaiser negotiated to borrow a $395,000 short-term loan from the Hawai'i partners after the closing to rid "***his***" Sag Harbor project of his partner, Chris Manfredi (*See Recon33-117*). **Kaiser repaid $380,000 11-days later.** Kaiser kept the remaining $15,000 as pay. As Managing Member of Na'alehu Ventures 2006, Kaiser documented these payments on his books and records since 2007 as additional capital contributions, including Peca's LOC funds that were the source of the Kaiser deal.

As documented in Rule 16 evidence, Chris Manfredi caused great consternation during the 2006 Hawai'i partners closing with Lehman Brothers. As a result of Manfredi's detrimental actions (nearly destroying the final deal with Lehman Brothers), Kaiser required that the Hawai'i partners' closing lend him funds to orchestrate a buy out of Manfredi in his Sag Harbor deal (a $395,000 short-term loan) – in exchange for the Kaiser signature sign-off for Lehman Brothers.[205]

Kaiser's 2006 personal problems with Manfredi (at that time) -- and the need to get rid of him from Kaiser's Sag Harbor project -- was the predicate for the $395,000 loan to Kaiser. Kaiser confirmed that the $395,000 was his money in his 2013 Arizona lawsuit

---

[205] A June 8, 2006 email between Kenner and Hawai'i partners closing attorneys, Najam and Markowitz, confirmed the acrimony between Kaiser and Manfredi; following a physical altercation in Sabarro's restaurant in Manhattan, NY between Manfredi and Kaiser (*See Recon33-117*). The email confirms:
> "*Kaiser and Manfredi need to be separated for personal reasons from Moana View as 50/50 partners into Moana View (100% CM) and Maka Koa (100% JK)*".

defendant replies; leaving no equivocation of whether Kenner received any benefit from the 2006 short-term loan to Kaiser.   ***Kenner did not per Kaiser's own court filings.***

- Kaiser's 2006 Hawai'i partners' problem was with Manfredi.   Kaiser had no problem with Kenner in contradiction to Kaiser's fabricated *"confrontation"* meeting (*Tr.983*) testimony.   Otherwise, Kaiser would *never* have welcomed Kenner into the 2006 Sag Harbor deal, months after he discovered Kenner allegedly robbed $1 million (which never happened).

**Real 9-11 HERO** -- Vincent Tesoriero confirmed, *"Manfredi 'out' and Kenner and Berard 'in' the Sag Harbor deal"* in a 2014 FBI proffer, as follows (*See 3500-VT-1-r*):

[At ¶ 8, the agents noted – including agent Wayne]:

> "*Kaiser told Tesoriero that they needed to get Manfredi out of the Sag Harbor deal and that Phil Kenner and Bryan Berard were coming in the deal*".

- Amazingly, this Tesoriero FBI proffer also refutes Kaiser's 2015 trial testimony that he was not aware that Berard was *"coming in the Sag Harbor"* deal until he discovered it years later (more perjury), fully prodded along by the government.

*BY MR. MISKIEWICZ:*
*Q. Showing you page two of Government Exhibit 703 [the real LedBetter operating agreement]. At the time of the closing on the Sag Harbor Led Better property, did you see what I'm showing you here on the screen?*

*A [John Kaiser]: No, I did not.*

*Q. And how does that compare with what you understood the relative ownership interest would be in that property once it was sold to Led Better?*

*A [John Kaiser]: It was just Phil Kenner as 50 percent and myself and Vincent as 25 percent each.*

*Q. What about Mr. Berard?*

*A [John Kaiser]: He wasn't -- to my knowledge he wasn't involved in the property at that time.*

*Q. Did Mr. Kenner tell you that Mr. Berard was involved in the ownership of this Led Better house, talking about at the time of the closing?*

*A [John Kaiser]: No, not at the time of the closing.*[206]

---

[206] Tesoriero had *not* met Kenner or Berard at the time of the LedBetter deal closing in October 2006.   Yet, Tesoriero told the FBI that he received the LedBetter operating agreement "*only*" from Kaiser (*See 3500-VT-1-r at ¶9*).

In another unexplainable Kaiser moment (in concert with Galioto's Indictment), when Kaiser and Berard *fabricated* a LedBetter operating agreement in order to steal the Sag Harbor property (along with a *forged* signature of Kenner's girl-friend – *See Recon33-56*), Kaiser and Berard documented Kaiser with 50% equity in the deal and Berard only 25%; *fully undoing any common sense related to their frauds on Kenner and Tesoriero and the Superseding Indictment's misrepresentations.*

- **Galioto, Kaiser and Berard could not even get their own Sag Harbor equity frauds straightened out for the Kenner Indictment.**[207] *It is unforgivable.*

Furthermore, Kaiser's friend Tesoriero confirmed to the FBI after Kenner's arrest and detainment that Kenner was *only expected to acquire future construction funding* (*See ¶ 8*); all of which Tesoriero learned from Kaiser (with no relationship at all with Kenner at the time of the 2006 deal construction).

[Tesoriero's 2014 FBI proffers, *at ¶8*]:

> "*Kenner's role in the Sag Harbor deal would be to raise money to build the property*".

In spite of Tesoriero confirming to the FBI (after Kenner's arrest) that he received the 2006 LedBetter operating agreement "*only*" from Kaiser, Kaiser testified that he never saw the document (*Tr.1009*):

---

*At ¶9 of the Tesoriero 2014 FBI proffer*:

> "*Tesoriero was under the assumption from the start of the "LedBetter deal". Berard and Kenner were coming into the deal.   Tesoriero received the LedBetter operating agreement only from Kaiser*".

The real LedBetter operating agreement confirms Kaiser 25%, Tesoriero 25%, Kenner 25%, and Berard 25% as equity owners.

[207] [*See Document 214 at ¶25*]:
> "*It was a further part of the scheme to defraud that KENNER falsely represented to John Doe 1 [Berard] that John Doe 1 would be a 50% owner of the Sag Harbor Property and instructed John Doe 1 to wire approximately $375,000 to the LedBetter account at Wells Fargo Bank…*"

At no time does Kaiser represent in his 2015 trial testimony thru the faulty Superseding Indictment that he was supposed to own 50% of the LedBetter project – yet the fabricated LedBetter operating agreement (*See Recon33-56*) used by Berard and Kaiser to steal the property and sell it **granted Kaiser 50% equity**.
- It is another historically revised fraud -- from Team Galioto -- without any reasonable or logical explanation.

> *Q. Did you see this operating agreement at any point during the closing when you transferred the Sag Harbor property from your old company to Led Better?*

> ***A [John Kaiser]: No. I actually -- it was sold, so, no. I didn't see this document at that closing.***

**Second** – The $200,000 that was transferred to Kenner was part of a 2006 closing agreement, by which Kenner absorbed 100% of the Environmental Indemnity risk (potentially into the tens of millions), in lieu of any other Hawai'i partners' investor signing onto the risk for the Lehman Brothers deal (*See Recon33-114*).

- Kaiser co-signed and initialed the Environmental Indemnity agreement.
- The agreement still owes Kenner $300,000, unaddressed by Kaiser since becoming Managing Member of Na'alehu Ventures 2006 in 2007.

**Third** – Constantine received subsequent transfers from the Kaiser repayment funds pursuant to the third (3rd) consulting agreement that Kaiser signed with Constantine. Ironically, Kaiser does not allege that this document is "forged", although it is the only Constantine consulting agreement (of the three [3]) that Kaiser did not turn over the original "*ink*" version after possession of it for nearly ten (10) years since the time he signed them, or at least turn it over to the government on the "eve of trial" like the other two (2) documents; altogether mystifying any common sense (again) (*See Recon33-115*).

During Kaiser's October 19, 2010 FBI proffer, Kaiser confirmed that he saw the Hawai'i partners' bank statements (*See 3500-JK-1-r at 10*).   As a result of Kaiser's statements, confirmed by "*notes of an investigator from another office, not the notes of an FBI agent, an investigator from another office*" *(Tr.5992)*, he could not have become the Managing Member of Na'alehu Ventures 2006, LLC in 2007 and not had a major issue with the Constantine consulting payments from 2004-2006; **unless he was fully cognizant of them**.

### The Kenner "grocery list" fraud by the government on the jury and Court...
Ultimately, Kaiser's inherent knowledge of the Hawai'i consulting agreements with Constantine is verified by his own 2009 juxtaposing of the Kenner "loan" list to Constantine. Kaiser testified he was never aware of the consulting payments to Constantine.

- **Kaiser's own hand-written document IMPEACHES himself -- again**.

Kenner's list (*See Recon33-18*) has "*Ula + LI4 + NV2006*" written on the bottom right corner of the Kenner loan list for Constantine.   These abbreviations do not mean much to anyone but Kenner – yet without Kenner assisting Kaiser in "copying" the "*Grocery List*" – Kaiser juxtaposes the Kenner short-hand to "*Hawaii 2.65m*" (*See Recon33-129*).

- How could Kaiser's juxtapose be possible without Kaiser knowing exactly what the three (3) consulting payment amounts to Constantine were for or why they were even on Kenner's sheet?   Kaiser copied the Kenner list to take to a meeting with Constantine without Kenner's knowledge -- when listed as *"1st K"*, *"2nd K"* and *"NV2006"* by Kenner?

Kaiser confirmed to Kenner six (6) days later that he transposed and copied the Kenner list, further confirming that Kenner was not involved when Kaiser exhibited his inherent knowledge of the three (3) Constantine consulting deals from Hawai'i – *on his own*.

Now, when Kaiser allegedly "received" the "*Grocery List*" from Kenner, he further defrauds the Court.   Kaiser took the list from Kenner's home – ***COPIED IT*** – and told Kenner about taking the list six (6) days later via text:

[Kaiser texts to Kenner]:

| 11064 | +16312350308 John Kaiser* | 12/12/2009 4:43:29 PM(UTC+0) | Read | **I rewrote that list to show him [Constantine], is that ok???** |
|---|---|---|---|---|
| 11065 | +16312350308 John Kaiser* | 12/12/2009 4:48:01 PM(UTC+0) | Read | Call me |

Kaiser's version of the list (which he copied himself six [6] days earlier – *See Recon33-129*) has a fax transfer date of *December 6, 2009*.   This is the same fax date that the Kenner list has on the top.   Thus, after Kaiser COPIED the list in Kenner's office (on his own before seeking permission from Kenner), Kaiser faxed copies of the list somewhere – because the two (2) "lists" in evidence have the same fax transfer date on them.

- **This date is six (6) days before he told Kenner he even took it,** *supra.*

**Kenner case**

**Vincent Tesoriero[208]**

**Vincent Tesoriero was John Kaiser's training officer when Kaiser joined the NYPD.**

**Tesoriero met Kenner in late 2007 or early 2008 in Arizona.**
- **This was fourteen (14) months after the October 2006 closing of the Sag Harbor (2nd deal – LedBetter).**

**Tesoriero and Kenner had never met until over one (1) year after the October 2006 LedBetter deal occurred.**
- Tesoriero could not have gained any knowledge from Kenner or Berard about the transaction that terminated Chris Manfredi's involvement and the new LedBetter partners joined; Berard and Kenner.

The Court *M&O at 35* identified: *"Vincent Tesoriero testified that he served with Kaiser as a police officer in New York City and retired from the New York City Fire Department in 2004" (Tr.4106-07).*

There was tremendous angst between Kaiser and Manfredi during the closing months of the Lehman Brothers' 2006 JV funding in Hawai'i (*See Recon33-117*), which triggered John Kaiser (not Kenner) to buy out Chris Manfredi and another partner (Milana) from the original Sag Harbor deal -- introducing Kenner and Berard into the deal, *infra*.

Tesoriero verified to the FBI on September 10, 2014 and December 15, 2014 (both after the Kenner arrest and detainment) that Kaiser gave Tesoriero the "new" LedBetter operating agreement that included "new" Kenner 25% equity and "new" Berard 25% equity (replacing the Milana 25% and Manfredi 25% equity).  The agent's notes confirmed (*See 3500-VT-1-r*):

> "*Kaiser told Tesoriero that they needed to get Manfredi out of the Sag Harbor deal and that Phil Kenner and Bryan Berard were coming in the deal*".
>
> *Tesoriero was under the assumption from the start of the "LedBetter deal", Berard and Kenner were coming into the deal.*
>
> **Tesoriero received the LedBetter operating agreement *only from Kaiser*".**

**<u>Kaiser is caught lying -- again to the EDNY – IMPEACHED by his own NYPD training partner who has no relationship with Kenner or allegiance…</u>**

---

[208] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 35.*

Tesoriero's statements to the FBI contradicted Kaiser's 2015 trial testimony that he was not aware of the Kenner and Berard equity until years later.

Kaiser's trial lie included (*Tr.1008-1009*):

> BY MR. MISKIEWICZ:
> *Q. Showing you page two of Government Exhibit 703. At the time of the closing on the Sag Harbor Led Better property, did you see what I'm showing you here on the screen?*
>
> *A [John Kaiser]: No, I did not.*
>
> *Q. And how does that compare with what you understood the relative ownership interest would be in that property once it was sold to Led Better?*
>
> *A [John Kaiser]: It was just Phil Kenner as 50 percent and myself and Vincent as 25 percent each.*
>
> *Q. What about Mr. Berard?*
>
> **A [John Kaiser]: He wasn't -- to my knowledge he wasn't involved in the property at that time.**
>
> *Q. Did Mr. Kenner tell you that Mr. Berard was involved in the ownership of this Led Better house, talking about at the time of the closing?*
>
> **A [John Kaiser]: No, not at the time of the closing.**

The lie was clearly planned between Kaiser and the government; otherwise this line of questioning would not have taken place.   The FBI case agent was present at both Tesoriero proffers (as was IRS agent Wayne – according to the 302(b) notes).

- **Thus, Galioto clearly knew Kaiser was lying, and it was intentional to cause harm to defendant Kenner.**

The LedBetter closing attorney (Government witness, Shimone Betesh) confirmed the actual LedBetter operating agreement he received and utilized for the October 2006 closing included (*Tr.677*):

> MS. KOMATIREDDY:
> *Q. Who were the managing members of the LLC?*