> *A [Attorney Betesh]: **Philip Kenner and Lauren Gilmore**.*[209]
>
> *Q. There is a section called Equity Ownership and Dividends. Right?*
>
> *A [Attorney Betesh]: A. Yes.*
>
> *Q. The section on Equity Ownership and Dividends.   Can you read the last sentence there in the list.*
>
> *A [Attorney Betesh]: <u>Equity ownership rights as of the date herein as is (sic) follows.</u>*
>
> *Q. Go ahead.*
>
> *A [Attorney Betesh]: **Philip A Kenner, 25 percent.***
> *                             **Brian Berard, 25 percent.***
> *                             **John Kaiser, 25 percent.***
> *                             **Vincent J. Tosoriero [sic], 25 percent.***

Tesoriero told the FBI in 2014 (*See 3500-VT-1-r*):

> [¶ *8*]: "*Kenner's role in the Sag Harbor deal would be to raise money to build the property*".

Tesoriero had *not* met Kenner or Berard at the time of the LedBetter deal closing in October 2006, which Kaiser attended and received the closing package from closing Attorney Betesh (as Betesh confirmed at trial).   In fact, **Tesoriero told the FBI that he received the LedBetter operating agreement from Kaiser "<u>only</u>"**.

---

[209] It should be noted that the FABRICATED and FORGED LedBetter operating agreement (*See Recon33-56*) that Berard and Kaiser produced to the real estate attorneys when they stole and sold the property in 2012 *only included Gilmore's forged signature*; effectively removing Kenner's signature and Managing Member role illegally (or criminally -- if you are not working with Team Galioto-Jowdy).

The government produced the **forged** and **fabricated** operating agreement in their BINDER FOLDER pre-trial that was supposed to be the trial exhibits they originally told defense counsel they were going to use against Kenner at trial.

- Kenner explained the 2012 LedBetter *fabrication* and *forgery* by Berard and Kaiser to his trial counsel (Haley) – who in turn once again explained to the government that Kenner was going to IMPEACH Kaiser and Berard for the LedBetter "forgery" at trial with evidence the government possesses -- further thwarting the government's fabricated forgery claims by Kaiser at trial.   After Haley "leaked" the information, the government "dropped" the known LedBetter forgery by Kaiser and Berard; *never discussing the item again*.

[*At ¶9 of the Tesoriero 2014 FBI proffer, **the agents noted**]:

> *"Tesoriero was under the assumption from the start of the "LedBetter deal". Berard and Kenner were coming into the deal.   **Tesoriero received the LedBetter operating agreement only from Kaiser**".*

- Again – Tesoriero did not meet or even know Kenner or Berard until at least one (1) year later – thus in order for Tesoriero to know that *"Berard and Kenner were coming into the deal"* – Kaiser would have told him; *no one else*.
    - o  Kaiser is proven as a liar (again) to the EDNY Court – but the leading Q&A for Kaiser that led Kaiser to the perjury had to be established pre-testimony, because it was on direct examination that Kaiser and AUSA Michiewicz set up the LedBetter lie (*a.k.a. suborned perjury*).

[*At ¶8, the agents noted*]:

> *"<u>Kaiser told Tesoriero that they needed to get Manfredi out</u> of the Sag Harbor deal and that <u>Phil Kenner and Bryan Berard were coming in the deal</u>".*

- Amazingly, this Tesoriero FBI proffer also refutes Kaiser's planned 2015 testimony that he was not aware that Berard was *"coming in the Sag Harbor"* deal until he discovered it years later (more perjury), fully prodded along by the government on direct examination in the presence of Agents Galioto and Wayne who conducted both face-to-face interviews with Tesoriero in 2014.

**The court misconstrues the Tesoriero testimony about the LedBetter operating agreement...**

The Court at *M&O at 35* identified: *"Tesoriero further testified that Kaiser <u>never provided him</u> with documents in connection with the Sag Harbor Property operating agreement"* (*Tr. 4111*).

Tesoriero actually testified (*Tr. 4111*):

> *Q. When it was sold [in 2012], did you see a document that reflected what purported to be the ownership interest in that property <u>just before</u> it was sold?*
>
> *A [Tesoriero]: No. All documentation with regards to that was either lost or destroyed. I don't recall offhand what it said.*

- The government was referring to the fabricated and forged operating agreement that Kaiser and Berard fraudulently produced to close the deal and steal from Tesoriero, as well (*See Recon33-56*).

Even though Tesoriero was the first (1st) financial investor in the Sag Harbor deal in January 2005 (without Kenner and Berard) with $350,000, Tesoriero told the FBI in 2014, that he:

> *"took a loss because of the three closings and the tax on the property"*

- Kaiser and Berard sold the Sag Harbor property with the fabricated operating agreement in 2012 for $740,000 (*See Recon33-219*).
  - o *It must be noted that Kaiser and Berard stole and sold the property in 2012 from Kenner's LLC control immediately after receiving jobs from Jowdy and commencing their work with FBI agent Galioto.*

- *Even assuming a six percent (6%) real estate commission, the net payout would have been $695,600.*
  - o *Kaiser had invested net $30,000 – per the Tesoriero FBI proffer,*
  - o *Berard had invested net $375,000 – per the government bank statements, and*
  - o *Kenner had paid the $27,303 past due taxes on 8/24/2010 with a $28,5000 wire transfer to Kaiser on 5/25/2010 – which Kaiser wired to Suffolk County 5/27/2010 (See Recon33-220).*

- *Yet in 2012 – Kenner received ZERO repayment and Tesoriero "took a loss because of the three closings and the tax on the property".*

- *Tesoriero received $243,000 (per the FBI notes) – which confirms that even with a full real estate commission – Kaiser and Berard split $452,600 (their full amounts invested **PLUS** some money)...*

- *This verifies more FBI known thefts by anyone helping Jowdy (Kaiser and Berard in 2014) – and certainly anyone taking an opposing position to Kenner.*
  - o *No criminal investigation occurred even when a former 9-11 NYPD and NYFD officer (Tesoriero) was robbed by Kaiser and Berard.*

When the LedBetter closing occurred, Tesoriero testified at trial that he "*did not remember*" getting documents [in 2012] from Kaiser – in contradiction to his 2014 FBI proffer statements.   But – Tesoriero *never* said that he "did not receive the operating agreement".   He said he did not *recall* if he did or not (*Tr.4111*):

> *Q. Well, prior to the closing of the second deal, did John Kaiser provide you documents in connection with the operating agreement as relates to the Sag Harbor property? Do you recall receiving documents from him?*

> *A [Tesoriero]: No, I don't.*

In 2014 -- Tesoriero's FBI proffer confirmed:

[*At ¶9* of the Tesoriero 2014 FBI proffer, the agents noted]:

> "*Tesoriero was under the assumption from the start of the "LedBetter deal". Berard and Kenner were coming into the deal.*
>
> **Tesoriero received the LedBetter operating agreement *only from Kaiser*"**.

Tesoriero's 2014 FBI proffers and 2015 trial testimony confirmed (again) that Kaiser and the government had created a fabricated storyline related to the LedBetter deal.

Nevertheless, Kaiser confirmed in his 2013 Arizona case reply "*Kenner had no money in the LedBetter deal*". Kaiser is telling a 2013 Arizona Court – *under oath* – that he received 100% of the 2006 Hawai'i partners' short-term loan (and personally repaid it 11-days later). Otherwise, Kenner would have a 50% interest in the LedBetter deal (***notwithstanding the Kaiser and Berard FBI-sanctioned theft in 2012***) and a $395,000 capital account, subjecting Kenner to further criminal abuse by Kaiser and Berard (with Galioto's endorsing – for participating in Jowdy's cabal cover-up).

### Kaiser robs Tesoriero and his parents in the Hawai'i deal according to his 2014 proffers…

Additionally, Tesoriero told the two (2) agents that Kaiser took a loan from Tesoriero allegedly for the Hawai'i partners in summer 2006. Tesoriero confirmed that he only received $10,000 back from the $100,000 loan. *More Kaiser theft*.

The Na'alehu Ventures 2006 bank records confirm that Kaiser received $1,176,000 from the August 2006 closing – negotiated by Kaiser to fully repay the friends & family loans of 2005 and 2006. Yet, **Kaiser kept the money**. To this day, Kaiser's friends & family think Kenner somehow retains their funds. The empirical evidence confirms Kaiser robbed them all (just like Jowdy with the Kenner investors) – and *never Kenner*.

This cover-up is the basis for the Kaiser trial lies about not receiving loan repayments in August 2006 – rather calling the nearly $1.2 million he received as "*back pay*" and "*expenses*", both of which are another fabrication known by the government (*Tr.1413-1414*).

- Kenner has requested from the Court on multiple occasions to have an "in camera" review of Kaiser's 2006 and 2007 personal IRS taxes to prove he never paid taxes on any "*back pay*". Kenner has also requested from the Court that Kaiser produce **any** "*expenses*" for the Hawai'i project from 2005 and 2006 that total anywhere close to the balance of funds due.

If Kaiser was truthful (which defendant Kenner, the Court, and the government know he is not) – the $816,000 cash transfers from August 2006 should equal (=) Kaiser's alleged, "*back pay*" PLUS Kaiser's alleged, "*expenses*".

- **This will clearly fail any litmus test and the government knows it – further exposing their planned perjury – and Tesoriero's victim status at Berard and Kaiser's diabolical hands since 2006 – but "ok" with proper FBI-cover.**

In ¶*13* of the Tesoriero 2014 FBI proffers, Tesoriero also confirmed that Kaiser robbed $150,000 from Tesoriero's parents.  The agent's notes confirmed:

> "*On December 15th, 2014, Tesoriero further recalled that Tesoriero's parents gave Kaiser a check for $150,000.   Tesoriero stated that the money was a loan and Tesoriero's parents were supposed to receive 10% interest for 18 months*".

None of these thefts by Kaiser have ever been raised by the two (2) case agents – with a grander desire to implicate Kenner in the empirically proven thefts by Jowdy and Kaiser (never Kenner) – now, ultimately confirmed by the recent FBI case agent's "lack of actions" under the Kaiser February 2019 letter revelations (*Document 628*).

Nothing screams confirmation of conspiracy more than the apparent non-actions by both the FBI (specifically case agent Galioto) and the US Attorneys' office related to the gross Jowdy misconduct, exposed by his five (5) year co-conspirator (Kaiser); fully ratting Jowdy out now after being fired.

## Phil Kenner [defendant][210]

Kenner was a business manager for hundreds (100s) of high net wealth individuals from 1993 thru 2013.

At no time in Kenner's professional career was he a stockbroker, or did Kenner perform a business function that would have fallen under FINRA scrutiny.
- Nevertheless, the government produced a FINRA expert to discuss non-relevant "Duty of Care" standards – misleading the Court and Jury as to the contractually agreed upon relationship between Kenner and his clients.

The Indictment runs from the years 2003 thru 2014.   Kenner only maintained a security license (never used) in 2003 and the early months of 2004.  Thus, the FINRA standards are *not* relevant.   In fact, the only transactions that occurred during 2003 (non-FINRA regulated, at that) was Juneau and Nolan's participation in the initial Hawai'i land purchase; nothing more.
- Nevertheless, the jury requested the FINRA testimony as their initial read back during deliberations; fully confirming they were fooled by the government's ruse.[211]

Kenner challenged the veracity of many of the government witnesses' testimony during his direct examination.   The difference between the witness testimony and the Kenner rebuttal was that 100% of the Kenner rebuttal was supported by the witnesses' actual pre-trial empirical evidence; not Kenner "*he said – she said*".
- The proof of the government witnesses' inconsistent testimony was in the government's possession at all times prior to trial, yet they let it stand uncorrected and promoted it.

The government witnesses suffered from repeated "*memory loss*" (a.k.a. CTE).

During the government's initial Rule 33 rebuttal, the government specifically announced that the difference between the Kenner testimony, supported 100% of the time with their witnesses' pre-trial empirical evidence, and the government witnesses' trial testimony was...*faulty memory, confusion and mistakes; by their witnesses – not Kenner.*

---

[210] Facts taken directly from the Court's M&O of October 13, 2017 *M&O at 35-38.*

[211] The fact that Kenner trial counsel did not request a *Daubert* hearing prior to the introduction of the FINRA testimony is simply another ineffective counsel issue to be addressed in the pending *28 U.S.C. 2255* motion.

Post trial, defendant Kenner has learned that multiple government witnesses have participated in legal proceedings identifying themselves as victims suffering from CTE – Chronic Traumatic Encephalopathy.  The symptoms of CTE include:

> *Any post-concussion symptom including but not limited to memory loss, forgetfulness, light sensitivity, amnesia, faulty memory, disorientation, dementia, general cognitive problems, confusion, impaired judgment, mood swings, sleeplessness, &/or inability to concentrate.*

**Considering the simple fact that Kenner's defense is 100% corroborated by the witnesses'-own pre-trial empirical evidence – and opposed to their-own 100% provable false trial testimony -- including prior "*under oath*" testimony by the same government witnesses -- there is a reformative issue that must be addressed by the Court related to the new evidence of CTE admissions; coupled with the multitude of in-trial IMPEACHMENT, defined by the government post-trial as *faulty memory, confusion and mistakes.***

The government did not identify the *faulty memory, confusion and mistakes* (CTE issues) of their witnesses until *after trial*.   The CTE-symptoms by their witnesses were clearly present during many of the trial cross-examinations; responding "*I don't remember*" and "*I don't recall*" hundreds (100s) of times, compared to their pre-planned direct testimony, resulting in nearly zero (0) failures to recall or remember in line with the government's prosecutorial theories (in sync).

Kenner repeatedly pointed out at trial that witnesses were clearly unable to recall the 10,000-foot overview of 1) what they were invested in, 2) whom the other participants in the deals were, 3) their project related communication with Kenner (and Constantine for the GSF – and Manfredi with Constantine in the Hawai'i consulting role) -- and 4) the timeframes of the deals.

Yet, during direct examination from the government, they were specifically able to:
> "*Remember what they were never told…*"

The stand-alone statement by virtually every government witness was wholly baffling considering the government's prosecutorial theory is "*concealment*" – thru individuals who "*cannot remember*".

This requires the Court to intervene and resolve the absurdity – specifically because the government witness statements always contradicted:
- **Documents the witnesses signed,**
- **Disclosures the witnesses signed,**
- **Independent lawsuits the witnesses were Plaintiffs in (and signed-off),**

- **Three (3) independent counsels they freely communicated with,**
- **Conference calls the witnesses participated in,**
- **Emails and texts the witnesses exchanged with Kenner,**
- **Affidavits the witnesses submitted to Courts in various jurisdictions,**
- **FBI proffer notes[212] -- and**
- **Testimony the witnesses gave "*under oath*".**

**Repeatedly, either thru the haze of CTE[213] – or planned perjury – the government witnesses "could not identify" many of their own texts and emails that documented their "real time" knowledge of the events – from as many as ten (10) years before the trial – which the government prosecuted Kenner for "concealing" the same underlying information from the investors.**

- **It is not reconcilable – or even logical, yet the conviction stands thru the morass of known and proven falsities.**

**The Hawai'i project...**

As a result of the overwhelming *documented* "*group*" decisions to loan money to Jowdy and the "*group*" efforts thru a myriad of transparent litigation to recover the "Jowdy loans" – it is IMPOSSIBLE that the government could rely 100% on the **CTE**-laden trial testimony, that "*no one could remember they agreed to loan money to Jowdy*"; creating

---

[212] [Komatireddy rebuttal summation – *Tr.5992*]: Komatireddy claimed the FBI 302(b) notes are not reliable because they are "*notes of an investigator from another office, not the notes of an FBI agent, an investigator from another office*".

[213] The proven perjury and recently fabricated testimony by Kristen Peca (in perfect sync with her husband's **CTE**) is not an available excuse to her and the government, unless some record of repeated concussions and their predicate acts (sub-concussive trauma) can be established; either way, producing her utterly unreliable hearsay.

Kristen Peca's testimony still contradicted all empirical facts in evidence (yet ignored to frame the government "concealment theory" – including her "*shocked*" story while allegedly receiving a FedEx "*that she signed for*" -- **BUT** – while she was in the wrong state from where it was delivered...

And -- her alleged participation in the 2005 Hawai'i LOC discussions, when she admitted on a 2012 FBI recording that *she was not aware* of her husband's Northern Trust Bank LOC until at least four (4) years after it was opened -- and certainly after the 2005 meeting "she never attended".

- Kristen Peca's testimony was *premeditated perjury* and not subject to **CTE** excuses, like her husband and other government witnesses.   Nevertheless, the *faulty memory, confusion and mistakes* statements are *never* appropriate &/or reliable for a "concealment" prosecution from Alzheimer-symptom sufferers.

an irreconcilable ethical breakdown under the guidance of *United States v. Berger*, 295 U.S. 78 (1935):

> "*The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all, and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law. He may prosecute with earnestness and vigor – indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction, as it is to use every legitimate means to bring about a just one*".

In the context of *Berger*, "*faulty memory, confusion and mistakes*" are what the government choses to blame on all of the witnesses' statements, clearly contradicting every witness' pre-trial and pro-Kenner confirmations of full-transparent support, previous knowledge, and no wrongdoings, *infra*.   The same individuals, who formed the government's prejudicial basis for the conviction themes of concealment, non-disclosures, and "finger pointing" (*Tr.31*) (*contradicting Kaiser's February 2019 letter – Document 628*), also contradicted several of the post-trial government disclosures (*See government-forfeiture-44*) and revelations (Jowdy as a co-conspirator – *See May 14, 2019 hearing transcripts at 37*) – ***triggering wholly reformative trial claims and issues resulting in a verdict utterly lacking confidence***.

- The government scoffed at Kenner's defense insistently throughout trial, while referring to Kenner as "*lying*" (*Tr.4598, 5064-5065*) and Kenner's representations of supportive documents as "*bogus*" (*Tr.5708 (2x), 5709*), "*phony*" (*Tr.4597, 4598*) and "*supposed*" (*Tr.5707-5708*) -- **but are now irrefutably true!**

**Prior testimony confirmations...**

The following Hawai'i-Mexico investors gave testimony (including three [3] Grand Jury testimonies) that confirmed their knowledge of the "**Jowdy loans**" and the "**use of Hawai'i capital account funds**" – *specifically* including their own LOC accounts) in the years before they began suffering from **CTE** (or participatory perjury):

1) John Kaiser (2009 Arbitration testimony),
2) Bryan Berard  (2009 Arbitration testimony),
3) Jason Woolley (2009 Arbitration testimony),
4) Tommy Constantine (2009 arbitration testimony),
5) Kenner (2009 arbitration testimony),
6) **Michael Peca (2011 SDNY Grand Jury testimony),**
7) **Darryl Sydor (2011 SDNY Grand Jury testimony),**
8) **Turner Stevenson (2011 SDNY Grand Jury testimony), and**
9) Kenner (2011, 3-days of SEC testimony).

The following Hawai'i-Mexico investors signed affidavits that confirmed their knowledge of the "*Jowdy loans*" and the "*use of Hawai'i capital account funds*" – <u>*specifically*</u> including their own LOC accounts) in the years before they began suffering from **CTE**, including to "*pay LOC fees for other investors*":

1) Mattias Norstrom (2009 Arbitration affidavit),
2) Jozef Stumpel (2009 Arbitration affidavit),
3) Sergei Gonchar (2009 Arbitration affidavit),[214]
4) Jozef Stumpel (2014 affidavit for Mexico litigation),
5) Rem Murray (2014 affidavit for Mexico litigation),
6) Mattias Norstrom (2014 affidavit for Mexico litigation), and
7) Jozef Stumpel (2017 affidavit for EDNY instant case).

The following Hawai'i-Mexico investors participated in numerous USA litigations versus Ken Jowdy that confirmed their knowledge of the "**Jowdy loans**" in the years before they began suffering from **CTE**:

1) 17 signed-off Plaintiffs[215] (Little Isle 4 members) v. Jowdy in the 2008-09 Arizona case,

---

[214] **As an example, Sergei Gonchar's** <u>signed</u> **affidavit read** (*See 3500-SG-4 at 4-5 –* sent to the FBI via fax by Gonchar on 5-30-2009 – **six [6] years before trial**):

> "*In addition to setting up a Line of Credit for the sole use and benefit of the Hawai'i investment Group, I wired $100,000 to Northern Trust Bank...for the express purpose of making funds available to Phil Kenner, which were to be used at his discretion. I was aware that my funds would be used to make distributions for the company, including but not limited to; Land acquisitions, Travel & Entertainment expenses, legal fees, Planning fees, Payroll, permitting fees, loans to outside entities and distributions to other members that would satisfy their monthly Line of Credit payments to Northern Trust Bank...Phil has always disclosed the complete and detailed use of these funds with me from time to time at every request.*"

[215] 2008 Arizona plaintiffs versus Jowdy for the recovery of the "loans" included (5): **Michael Peca, Darryl Sydor, Bryan Berard, Steve Rucchin, Tyson Nash** -- as named in 2015 as victims in the Kenner Superseding Indictment.

The Hawai'i-Mexico investors had direct and independent communication with their Arizona attorney, Tom Baker, (and subsequently with their California attorney versus Jowdy) who received fully documented signoffs from each of the Hawai'i investors (*See Recon33-14 and Recon33-21*). The signed Arizona disclosures pronounced in the first (1st) paragraph of the 7-page disclosure letter (*See Recon33-14 – Peca letter*):

> "*the gist of the lawsuit is to recover certain monies loaned to Mr. Jowdy from Mr. Kenner, Little Isle 4 and Ula Makika LLC. Mr. Kenner estimates the total amount of monies loaned to Mr. Jowdy which have not been repaid to be approximately $5,000,000. This is the estimated principle only, exclusive of accrued interest. In summary, Mr. Jowdy denies that the monies were loans but rather characterizes them as investments.*"

2) 19 signed-off Plaintiffs[216] (Mexico and Little Isle 4 members) v. Jowdy in the 2009-10 California case(s), and

---

The Arizona lawsuit also included the following Hawai'i investors unnamed in the Indictment (12): Campbell, Khristich, Woolley, G. Murray, deVries, Lehtinen, Glatt, Norstrom, R. Murray, Gonchar, Stevenson, and Tsyplakov.

- A successful conclusion of the Arizona case would have benefitted even the Hawai'i investors who chose to support Jowdy after he paid them off with out-of-court settlements (*including Juneau, Moreau, Nolan – and others who were working in support of Jowdy once paid off by Jowdy and in direct opposition to the remainder of the investors Jowdy defrauded since 2002 – a.k.a. "bad apples"*).

[216] 2009 California plaintiffs versus Jowdy for the recovery of the "Hawai'i loans" included (5): **Bryan Berard, Steve Rucchin, Darryl Sydor, Tyson Nash, and Michael Peca** -- as named in 2015 as victims in the Kenner Superseding Indictment.

- The California lawsuit also included the following Hawai'i investors unnamed in the Indictment (14): Stumpel, Lehtinen, deVries, Woolley, Simon, Norstrom, Tsyplakov, R. Murray, Khristich, G. Murray, Gonchar, Campbell, and Stevenson.

The California lawsuit(s) highlighted the $8,000,000 that Jowdy received from the Hawai'i investors, only leaving a "*did not read*" claim to support any possible "lack of knowledge". Jowdy turncoat, Bryan Berard claimed at trial (during the time he was employed by Jowdy) that he never read the Ronald Richards-California lawsuits versus Jowdy, but signed off on them anyhow (*Tr.3157*) because he "*trusted*" Kenner.

The two (2) California lawsuits versus Jowdy announced the "Hawai'i loans" in their COMPLAINT(s), as follows:
> "*Mr. Najam was in charge of the corporate governance and while under Jowdy's direction and control, received over eight million dollars ($8,000,000) from a LLC in Hawai'i. Mr. Najam failed to properly account for those funds and has placed the Jowdy investors in a vulnerable and compromised position*".

Each Kenner client signed-off on the California lawsuits with emails identical to Jere Lehtinen, as follows:
> **From:** "Lehtinen, Jere" <jlehtinen@nhlpa.com>
> **Date:** Sat, 13 Jun 2009 12:27:39 -0400
> **To:** PHIL KENNER <kenner33@gmail.com>
>
> **I authorize the law firm of Ronald Richards & Associates, a professional corporation to initiate civil litigation on my behalf against Ken Jowdy and his related entities in any jurisdiction that is appropriate in the United States of America. If necessary, I authorize Ronald Richards & Associates to employ local counsel to assist them on my behalf or assist in any admission to a Court in the various jurisdictions to where an action could be brought.**
> **Sincerely, Jere Lehtinen**

The email "sign-off" was a result of the Constantine and Ronald Richards email request prior to commencing litigation in California versus Jowdy (*See Recon33-221*).

3) *Glen Murray v. Jowdy* (Nevada 2008 case – adjudicated in 2010[217]; Murray prevailed (as did Kenner as a 3rd-party cross-defendant in ProSe to Jowdy's fabricated claims that *magically* "*Kenner really got the Glen Murray money*", despite **Jowdy's-own** accounting records that *all* of Murray's money was diverted *only* to Jowdy, never for Kenner's benefit) (*See Recon33-53*).

The following Hawai'i-Mexico investors participated in various civil litigations in the USA versus Jowdy to recover the same loans they "*cannot remember*" as many as five (5) to seven (7) years later, during their respective 2015 trial testimony:

1) **Jozef Stumpel (Arizona and California) – Baja Ventures 2006 member,**
2) **Jere Lehtinen (Arizona and California)[218] – Baja Ventures 2006 member,**
3) *Tyson Nash* (Arizona and California),
4) *Vladimir Tsyplakov* (Arizona and California),
5) *Turner Stevenson* (Arizona and California),
6) *Mattias Norstrom* (Arizona and California),
7) *Greg deVries* (Delaware, Arizona and California),
8) *Chris Simon (California)*,
9) *Jason Woolley* (Arizona and California),
10) **Jay McKee** *(California)*,
11) *Glen Murray* (Nevada, Arizona and California),

---

[217] Murray confirmed in his 2008 Nevada Compliant with independent counsel that he had previously approved a loan to Jowdy; which prior to his August 2005 loan, there was only one (1) loan Murray would have known about – the 2004 Hawai'i loan.

• **In the Nevada trail Jowdy's defense attorneys' authenticated the 2004 Hawai'i loan agreement thru document "witness" and Jowdy employee, Robert Gaudet, as their chief defense exhibit (*See Recon33-23*).**

The government's trial attacks on Kenner that the 2004 Hawai'i loan agreement was "*bogus*" (*Tr.5708 (2x), 5709*), "*phony*" (*Tr.4597, 4598*) and "*supposed*" (*Tr.5707-5708*) – and simply a "*Kenner cover-up story*" were known at all times to be false, yet were presented to prejudice and harm Kenner.   Nevertheless – the government produced *government-forfeiture-44* (allegedly received only three [3] weeks after trial) fully contradicting their "*most significant*" trial allegations, now leaving yet unaddressed reformative effects on the jury's decision.

• **Apparently, "*bogus*", "*phony*", and "*supposed*" were not actually true**, despite their successful-intended consequence of *misrepresentations* to the jury (and pre-trial to the investors **the government prosecution was counting on for newly-remembered testimony**).

[218] Both Kenner Baja Ventures 2006 partners were listed as 5% owners of the LLC [*Baja Ventures 2006*].  In the California DCSL lawsuit Paragraph 7 of the Complaint states:

*Specifically, two of the Plaintiffs Jozef Stumpel and Jere Lehtinen invested in Baja Ventures 2006, LLC, which owns 38% of Diamante Cabo san Lucas, LLC.*

12) *Raymond Murray* (Delaware, Arizona and California),
13) **Bryan Berard** (Arizona and California),
14) **Steve Rucchin** (Arizona and California),
15) *Brian Campbell* (Arizona and California),
16) **Darryl Sydor** (Arizona and California),
17) *Dimitri Khristich* (Arizona and California),
18) *Sergei Gonchar* (Arizona and California), *and*
19) **Mike Peca** (Arizona and California).

The following individuals gave depositions in the multiple USA litigation against Ken Jowdy that confirmed their *real time* knowledge of the "**Jowdy loans**":

1) **Ken Jowdy – himself – (January 2010 California 2-day deposition)**
   a. With John Kaiser, Greg deVries, Jason Woolley, and Kenner present for both deposition days -- *and Jowdy's full confessions,* and
2) **Robert Gaudet (July 2009 Arizona deposition).**

The following individuals gave FBI proffers about Ken Jowdy that confirmed their knowledge of the "**Jowdy loans**" and "**criminal business**":

1) **Ken Jowdy (March 2010 proffer – to FBI agent Galioto).**
2) Shawn Hughes [Jowdy's assistant] (June 2009 – to agent Galioto),
3) Kenner (June 2009 – to agent Galioto),
4) Robert Burdick [a Jowdy project manager] (February 2010 – to agent Galioto)
5) David Boyden [a Jowdy golf architect] (February 2010 – to agent Galioto),
6) Sergei Gonchar (February 2010 proffer – to agent Galioto), and
7) John Kaiser (October 2010 proffer – to FBI agent Galioto).

**Not one (1):**
- **FBI proffer,**
- **Pre-trial Grand Jury testimony,**
- **Civil testimony,**
- **Civil deposition,**
- **Civil litigation,**
- **Civil affidavit, Emails/texts…**

**…Suggested pre-trial that a single person was unaware of the "Jowdy loans" since the inception of the 2004 loans from the Hawai'i partners.**

**Nevertheless, that is the government's theory – and a series of CTE-laden Alzheimer-symptom sufferers claimed, *"they cannot remember – what they previously all testified they knew"*…**

- **No legal standard supports maintaining a conviction under that wholly unreliable standard.**

### Glen Murray confirmed that he (as a Mexico-Hawai'i investor) had a copy of the 2004 Hawai'i-Jowdy loan agreement (*Tr.3540, 3608*) -- *contradicting the Court's M&O at 37...*

- *Kaiser distributed the 2004 Jowdy loan agreement to all the Little Isle 4 shareholders; not Kenner (as specifically asked at Tr.4599-4600)...*

Ultimately, non-victim Glen Murray testified to the Court that he had received a copy of the loan agreement related to the Hawai'i-Jowdy loans – contradicting the government's assertion that no one received it. *The government proffer also ignored the fact that the copy of the 2004 Hawai'i-Jowdy loan agreement actually came from Kaiser's possession to prepare the 2008 Arizona lawsuit versus Jowdy --in evidence) (Tr.3608)*:

> *Q Now, when Mr. Miskiewicz asked you questions about the lawsuit you brought against Ken Jowdy, you confirmed that the loan agreement itself you had received through and from Phil Kenner, is that correct?*
>
> *A [Glen Murray]: Correct.*

With Murray as a former teammate and friend of Norstrom, Stumpel, Berard, Ranford, Peca, Juneau (and others), it is highly improbable that Murray "*could recall*" receiving the 2004 Hawai'i-Jowdy loan agreement – but none of the other prepped government witnesses at trial could?   **How can that be reconciled?**

With Murray as a former teammate and friend of fellow-LOC Hawai'i investors Norstrom, Berard, Peca, Juneau (and others), it is highly improbable that Murray *also* "*could recall*" receiving payouts for the 2006 Hawai'i JV investments – but none of the other prepped government witnesses during trial could?   **How can that be reconciled?**

### Global Settlement Fund ("GSF")...

Constantine conceived a plan in early 2009 to assist Kenner and Kenner investors to attempt one (1) last collaborative effort to reign-in the decade of Jowdy known-criminal activity (at that point in time).

- Constantine and Kenner client, Sergei Gonchar, formulated a "*side-deal*" that allowed Constantine to utilize some or all of Gonchar's deposits into Ronald Richards' Trust account for his own benefit; *certainly having nothing to do with Kenner and Kenner investors' GSF efforts.*

As a result of the "*side-deal*" and the Constantine 2009 deposits of $124,982 (on 9-8-2009) and $15,000 into the Ronald Richards Trust Account, there is no use of funds "by Constantine" that violated each and every signed disclosure that Constantine sent to the GSF contributors.   Thus, **no crimes occurred with the Constantine-managed GSF**.

The "*signed*" disclosure from each contributor confirmed (*See Recon33-37 FOLDER -- "GSF-Acknowledged and Approved"*):

> *Per our conversation, please acknowledge your approval and authorization for me to wire transfer $250,000 to Ronald Richards Trust account for your proportionate contribution to the Global Settlement Fund.  In addition to the fund paying for <u>various legal fees, PR Agency Fees</u>, as well as other <u>protective advances</u> and <u>settlement costs</u>, you will be receiving transfer of membership agreements from tommy for your acquisition of additional interests in **Eufora**, LLC, as well as your new LLC and operating agreements reflecting your ownership interest in the **Avalon Airpark Real Estate Project**, the **Falcon 10 aircraft**, and the **two Palms Place Condominium units**. You may not recall tommy or I mentioning the Palms units in our conversation.   In any case, because Moreau and Tommy settled that case as part of the Global Settlement, he has graciously elected to include you as a beneficiary in the significant equity that exists in those two units as part of this transaction.  As we discussed, rather than throwing money away only on legal fees, this strategy which effectively acquires significant assets, while providing a legal remedy, is by far our best solution.*
>
> *Tommy has requested from all of us and will provide to us, written documentation of every element of this transaction.  **Please respond, ACKNOWLEDGED AND APPROVED**, to this email accordingly ASAP.*
>
> *Thanks.  Phil*

Following the distribution of disclosure emails (which were *signed* and *returned* by each and every GSF contributor), Constantine sent the following email to each of the contributors *for further disclosure*.   The government did not present a single contradictory email, text or otherwise that suggested any of the contributors were "confused" by the plans (in real time) or "concealed" by Constantine during his execution:

> *From: Tommy Constantine <tommy@eufora.com>*
> *Sent: Monday, May 18, 2009 10:33 AM*
> *To: nicjay74@aol.com [Jay McKee]*
> *Cc: Phil Kenner*
> *Subject: Global Settlement*
> *Attachments: AZ Eufora Partners LLC McKee 5.4.09.xls*
>
> *Nicole and Jay:*
>
> *You will be receiving a Transfer of Membership Agreement for your increased interest in Eufora, LLC from our CEO (C.R. Gentry) later this week or next week at the latest. We just have to wait for the other side to sign the Transfer docs as part of the settlement, which is supposed to be in the next few days. In the meantime, this email shall serve as*

*written confirmation that you will be receiving 1/10th of the interest that we acquire from Nolan, Juneau and Moreau with respect to <u>Eufora</u>. Specifically, you will be receiving an additional .364% which is 1/10 of the 3.64% interest that they currently own or owned. The attached excel spread sheet shows your current ownership interest and the interest that we are acquiring from the three of them as part of the settlement. The dollar amounts on the right are the current value of those interest at the $20M valuation (for the whole company). Again, your interest is 1/10 of that and will be added to the .70% you already own.*

*Additionally, Juneau and Nolan owned 10% each (20% total) of the <u>Avalon Airpark project</u>. We are buying out their 20%. so you will also receive 1/10th of this interest (2%). It is currently valued at $3.3M and the office space is currently being rented by Eufora. You will also be receiving an LLC and operating agreement reflecting your new proportionate share of ownership of this building.*

*Frankly, although this one is more of a luxury than an investment, you will also own 1/10th of 20% (2%) of the <u>Falcon 10 airplane</u>. It is worth approximately $1M but will be very difficult if not impossible to sell. In any case, this will not cost you guys anything going forward. Ultimately you guys should take advantage of the fact that we now all own an airplane together and when it's geographically feasible, you guys should use it to make owing a piece of it worthwhile. Just let me know whenever you want to use it. You just have to pay for the hourly costs for fuel and the daily costs for the pilots and landing fees.*

*Finally, as Phil and I stated, I also settled the <u>Palms condo</u> issue with Moreau as part of this global settlement transaction. Moreau had absolutely no right to sue me for the Palms units and I would have crushed him in that lawsuit because we had a signed agreement when he bought it. Nevertheless, since we got that issue resolved as part of the settlement as well, I have elected to share in the ownership of those units and the equity that exists in them with all of the great partners that have stepped up and helped us fix this problem with all these problem individuals. Specifically, these Palms units are a one bedroom and an adjacent studio on the 31st floor with a strip view. They are worth approximately $1.5M today and were worth $1.8-$2M some time ago. I believe they will recover in the future and be worth more than they are today. In any case, you will also be receiving an LLC and operating agreement reflecting your new proportionate ownership of these units. Although Juneau, Nolan and Moreau did not own any interest in these units, to keep things simple, I will just match what we are doing in the Avalon project so you will also receive 1/10th of a 20% interest in these (2%).*

*Please do not hesitate to call me if you have any questions and please just to follow the program in terms of documentation.*

*TC*
*(602) 363-5676*

### *"Concealment" was <u>not</u> possible.*

Constantine followed his prescribed "*use of funds*" without deviation (**considering his "*side-deal*" with Gonchar**).   Constantine held multiple conference calls that several

contributors confirmed during trial, despite including "*not remembering*" the emails and their own replies to them furthering the witnesses' **CTE** issues used to corroborate the government's "*concealment*" prosecutorial theory instead of the reality of the repeated "*failed memory tests*" (*Tr.592-597 – Michael Peca*):

> *Q. To stay on the subject of the Global Settlement Fund, if I could, during the period after your meeting with Mr. Constantine and Mr. Kenner, did Mr. Constantine arrange for conference calls for all of the investors in the Global Settlement Fund to participate in a group discussion regarding the status of the Global Settlement Fund, the issues that had to be dealt with?*
>
> **A [Michael Peca]: <u>I don't remember</u>.**
>
> *Q. I'm going to show you collectively if I could try and save some time, four documents, and I'm trying to stay away from you as much as I can, C-33 for identification, C-34 for identification, C-35 and C-36. Could you take a look at those four documents for me, please.*
> > *(Pause in proceedings.)*
>
> *A [Michael Peca]: Okay.*
>
> *Q. Do you recognize these as group e-mails from Mr. Constantine to the participants of the Global Settlement Fund which includes you?*
>
> *A [Michael Peca]: Yes, sir.*
>
> *Q. Do you remember, are these four notices of conference calls that took place during the period of time after you first agreed to participate in the settlement fund?*
>
> *A [Michael Peca]: That's what they look like, yes.*
>
> *Q. Actually they reference a conference call 1, conference call 2, conference call 3, conference call 4; is that correct?*
>
> *A [Michael Peca]: They do.*
>
> *Q. And then Defendant's Exhibit C-32, <u>do you recognize that group e-mail</u>?*
>
> **A [Michael Peca]: <u>I don't recall that, no</u>.**

*Q. Do you recognize it as an e-mail you received along with conference call e-mails discussing issues relative to the settlement fund referencing the names down at the bottom?*

**A [Michael Peca]: It's so long ago I can't recall.**

*Q. Could that possibly be one of the ones you recall receiving?*

**A [Michael Peca]: I guess it could be possible.**

- **What else "*could be possible*" to remember?**

In fact, Michael Peca "*could not remember*" his own responses, as follows (*Tr.596-597*):

*Q. C-35, this is conference call 3, and again from Mr. Constantine to the group who are part of the Global Settlement Fund, including yourself; is that right?*

*A [Michael Peca]: Correct.*

*Q. And it's dated August 19, 2009, correct?*

*A [Michael Peca]: Yes, sir.*

*Q. And again it reads similarly all, we have a call scheduled for tomorrow at 4 p.m. PST, Los Angeles time, to discuss the progress of all of the cases. Please try to make this call. We have a lot of progress to discuss, correct?*

*A [Michael Peca]: That's what it says, yes.*

*Q. And again instructions on how to participate. And then conference call 4, this is dated October 22, 2009. **Actually this one starts off with a response from your e-mail address; is that correct**?*

**A [Michael Peca]: Yes, it does.**

*Q. It says to Mr. Constantine, we understand?*

*A [Michael Peca]: Correct.*

*Q. Do you remember this one in particular?*

*A [Michael Peca]:* <u>No</u>.

*Q. But it follows an e-mail from Mr. Constantine to you. It states, on October 22nd, 2009, subject, conference call 4. I am just waiting for a few more guys to respond and I will let you know. If possible, I will move the call to accommodate your schedule. You can probably imagine what it's like rounding up 20 guys in multiple time zones globally. Keep you posted. Tommy Constantine. Do you see that?*

*A [Michael Peca]: Yes.*

*Q. <u>Do you have a recollection now of engaging in conversation so you participated in one of those conference calls</u>?*

**A [Michael Peca]: Yeah. <u>It was a long time ago. I vaguely remember.</u>**

**"<u>It was so long ago. I vaguely remember.</u>"**

The GSF conference calls occurred up to five (5) years after Peca and the other Hawai'i investors agreed "*as a group*" to loan money from the Hawai'i partners to Jowdy.   It highlights the pure frivolity of the government's case foundations; a "*memory test*" and wholly lacking any reliable empirical evidence – in real time.

**<u>Michael Peca cannot be considered a victim (notwithstanding the contribution of his wife's proven perjury)...</u>**

In particular, Michael Peca cannot remember his own GSF communication with Constantine – or the conference calls he participated in (as a result of his email communication), yet -- the government claims he is a victim of "*what he cannot remember*".
  - **Thus, Peca cannot be a victim of anything to do with the GSF.**

Michael Peca confessed during cross-examination that he did give truthful testimony in his 2011 SDNY Grand Jury, confirming that *he was aware of the loans to Jowdy at all times* (*Tr.498-99*).
  - **Thus, Peca cannot be a victim of anything to do with the Hawai'i partners.**

  - The Court *M&O at 9* verified: "*However, he [Michael Peca] admitted that he had testified before the grand jury that <u>he was aware of a short-term loan made to Jowdy using Little Isle IV's capital account</u>*" (*Tr.499*).

- Michael Peca also had his own independent personal attorneys. Peca participated in the Eufora loan buyout communication and efforts, managed in part by Bryan Berard (which Peca also could not remember) (*Tr.609*).[219]

---

[219] [Michael Peca "*no knowledge*" of Eufora loan buyout testimony]:

> *Q. Do you have a recollection, back around December of 2009, somewhere around October 2010, these same individuals, with your knowledge, being aware, secretly, without Mr. Constantine's awareness, try and* <u>*contact Eufora's lenders to try and buy the loan before they publicly sought to do so*</u>*?*
>
> **A [Michael Peca]: <u>I wasn't aware of that</u>.**

- Nevertheless, Michael Peca and Kenner exchanged the following texts regarding Peca's desire to participate in buying the Eufora loan – **in real time**.

This text to Kenner **from Peca** is two (2) days *before* Peca signed off on the Stolper disclosure letter – which identified two (2) critical issues (*See Recon33-73*):

1. It confirmed that <u>Constantine had **already** made allegations</u> about Board Member Gaarn and CEO Gentry making illegal stock transactions (a.k.a. Gaarn sales – and not Kenner's) -- thus not a concealed part of any conspiracy based on Constantine's "*verbal diarrhea at Home Depot*" **weeks later** – recorded by Kenner and immediately turned over to the investors' attorneys, and

2. The Stolper letter confirmed there was a group of Eufora investors actively trying to buy the Eufora loan -- but perhaps Peca "*did not read*" the letter he signed (*See Recon33-73 at 10*).

**Apparently Michael Peca's CTE interfered with his working knowledge of both independently documented items – again in the government's prosecutorial favor...**

**July 2010 texts to Kenner from Peca** (confirming Mike Peca's EDNY PERJURY re – his Eufora buyout knowledge):

| 147 27 | +171637 43234 Michael Peca* | 7/14/2010 12:20:53 AM(UTC +0) | Rea d | If not all willing members get a chance to be part of **the loan buyout**, mean more % there may be a **lynching. FYI** |
|---|---|---|---|---|

Kenner responded in the <u>affirmative</u> to Mike Peca, as follows:

| 16913 | +17163743234 Michael Peca* | 7/14/2010 12:21:28 AM(UTC+0) | Sent | **I don't disagree** |
|---|---|---|---|---|
| 16914 | +17163743234 Michael Peca* | 7/14/2010 12:21:46 AM(UTC+0) | Sent | **Why wouldn't they?** |

- Perhaps, the Court should note that although Kristen Peca falsely professed that "*we're done*" with the investments in May 2009 (according to her trial testimony), Mike Peca

## On cross-examination of Kenner

The Court *M&O at 36-37* identified: *"On cross-examination. Kenner was asked about the revolving line of credit loan agreement with Jowdy, and the following colloquy ensued:"*

> *Q. Well, there is no record, no document that shows any player knew anything about the Jowdy loan except for the one document you produced and offered into evidence during your direct. Correct?*
>
> *A [Kenner]: That in fact would be the loan agreement with Mr. Jowdy.*
>
> *Q. And if that loan document proves to be phony, then you are lying. Correct?*
>
> > *MR. HALEY: I object to the form.*
> > *THE COURT: Sustained as to form."*

Kenner confirmed that the Hawai'i investors knew about the loan agreement – **because of the actual loan agreement**.   No other document needed to explain that it was a loan agreement.   *Glen Murray confirmed that he as part of the Hawai'i investors "group" knew Jowdy never repaid the 2004-06 loans -- Tr.3540)*.[220]

---

was a leader in the July 2010 GSF loan buyout efforts, claiming there would be a "*lynching*" **if he could not** contribute more "*investment*" funds.

> o   None of these statements reconcile Kristen Peca's falsities to the Court, *infra*.

Kristen Peca testified about what she allegedly said to Constantine and Kenner in the May 2009 GSF meetings (*Tr.717*):

> [Kristen Peca]: *"And I quickly interjected and said we're not interested in anymore investments or we're done with them. That letter you were just showing that was up here, that was it for us. We were done with investments."*

• Apparently, by the time of the Berard-led Eufora buy out plans in 2010, **Michael Peca was concealing his investments from his wife again**; *never Kenner's issue – as Kristen Peca was never a Kenner client, only Michael Peca was.*

[220] Please note that prior to July 2007, there were no plausible methods to retain text messages (prior to the release of the Apple iPhone).   It is also well-documented that in or about February 2007, when Kenner terminated the employment of a former assistant, she stole the Standard Advisors server where 100% of the Kenner, pre-2007 emails resided.   The Standard Advisors emails were never recovered.   When Kenner sued for the recovery of the emails in California, her attorney [Michael Meeks] (who was working hand-in-hand with Tom Harvey and Ken Jowdy) declared in the deposition, "*they were all deleted by mistake*".

*Glen Murray confirmed receiving it* from Kenner, although it was actually mailed by Kaiser to all of the Little Isle 4 members after the 2004 signing (*Tr.3608*):

> *Q Now, when Mr. Miskiewicz asked you questions about the lawsuit you brought against Ken Jowdy, you confirmed that the loan agreement itself you had received through and from Phil Kenner, is that correct?*
>
> **A [Glen Murray]: Correct.**

In fact, the government knew – **at all times** -- that Jowdy's defense attorneys authenticated the 2004 Hawai'i loan agreement during his December 2010 defense case as his chief defense exhibit thru **Jowdy's-own** Cabo san Lucas Director of Golf, Robert Gaudet (*See Recon33-23*):

> *Q Did you ever sign as a witness on Mr. Kenner's behalf for a revolving line of credit at any time?*
>
> **A [Robert Gaudet]: Yes, I did.**
>
>     MR. RICHARDS: *Withdrawn.*
>
> **THE WITNESS: Yes, I did.**
>
> BY MS. LEE [Jowdy's lead attorney]: *Q And when did you sign that agreement?*
>
> A [Gaudet]: *I don't recall, but it was at a party, an event.*
>
> BY MS. LEE: *Q If you could turn to Exhibit A-89. Are you there?*
>
> A [Gaudet]: *I am here, yes.*
>
> *Q Can you turn to the second page of that exhibit, please?*
>
> A [Gaudet]: *Yes.*
>
> *Q Is that your signature there as witness?*
>
> **A [Gaudet]: Yes, it is.**
>
> *Q Do you recall signing this?*
>
> **A [Gaudet]: I do.**

*Q Can you look at the first pages of that document?*

*A [Gaudet]: Yes*

*Q And can you tell the Court what date this document was entered into?*

**A [Gaudet]: 12/7/2004.**

> **MS. LEE**: *Your Honor, I'd like to move to admit this exhibit. He's authenticated his signature on it.*
> *MR. RICHARDS: No objection.*
> **THE COURT: Okay. It's admitted.**
> *[Defendant's Exhibit A-89 Received]*

*BY MS. LEE: Q So this revolving line of credit -- and I'm not asking you to testify as to its contents. But that's your signature on this revolving line of credit, as a witness for Phil Kenner; is that right?*

**A [Gaudet]: I witnessed two signatures. And the person that I knew was Ken Jowdy. I was just asked to witness two signatures. So –**

*Q So Mr. Jowdy facilitated your signature on this document; is that what you're saying?*

*A [Gaudet]: I'm sorry?*

*Q Mr. Jowdy facilitated your signature on this personal line of credit? Is that --*

**A [Gaudet]: He requested for me to witness, yes.**

*Q Did you actually sit down and witness it? Did you sit there and look at Mr. Kenner while he was signing this document?*

**A [Gaudet]: I witnessed two signatures, correct.**

*Q But when you say witness, what does that mean to you?*

**A [Gaudet]: I watched two signatures.**

*Q So you watched Mr. Kenner sign this document?*

**A [Gaudet]: Correct.**

*Q And on the first page, that was back in December of 2004, correct?*

*A [Gaudet]: That is correct.*

What possibly could the government believe five (5) years later (in 2015) when they referred to the loan agreement as "*bogus*" (*Tr.5708 (2x), 5709*), "*phony*" (*Tr.4597, 4598*) and "*supposed*" (*Tr.5707-5708*) – and proffered that the loan agreement was a "*Kenner cover-up story*"? **The government knew at all times that their position was false**.

To create confusion for the jury and support another foundationless claim, the government used their willing henchman and then-Jowdy protector, John Kaiser, to claim twice (2x) that somehow Kenner told him the document was a forgery (with absolutely no basis for his statements – certainly not reality). In fact, <u>Kaiser was never asked if the document was a forgery</u>, he simply volunteered it without solicitation (solely premeditated for "*forgery effect*") (*Tr.1106-1108*):

*Q The question is did you ever -- was there ever a point where Kenner [sic] Jowdy paid back at 15 percent interest that loan that was given to him through Little Isle IV and Ula Makika?*

*A [Kaiser]: I believe what you are trying to say was brought out in a civil case and I believe it was due to a forgery of Kenner [sic] Jowdy's name.*

*Q Well, you know, sir, for a fact, do you not, that Kenner [sic] Jowdy requested and received a loan that at some point reached approximately $5 million from Little Isle IV and Ula Makika where he was to repay that loan with 15 percent interest, correct?*

> *MR. MISKIEWICZ: Objection; time frame.*
> *MR. HALEY: At some point in time.*
> *THE COURT: Overruled. You can answer.*

*A [Kaiser]: When I testified at Owen Nolan, that's what I believed when I testified because as of 2006, Mr. Kenner had told me that when -- the same time he told me my money went to Mexico so post that I learned that. <u>And then after this, I learned that the civil litigation against Kenner Jowdy got thrown out because of a forgery by Mr. Kenner.</u>*

*Q Who told you that sir, Kenner [sic] Jowdy?*

**A [Kaiser]: No, Mr. Kenner.**

*Q Is it your testimony that Mr. Kenner told you: The lawsuit I filed against Kenner [sic] Jowdy got thrown out because I forged his signature? Is that your testimony?*

*A [Kaiser]: They are saying that's what the judge was saying and that's why he didn't pursue it and he didn't have the original document.*

In fact, the Court ruled that the Arizona Court's ruling did not dismiss the case because of a forgery (in fact the reality of the situation), leaving more questions as to why Kaiser would make the un-solicited statement – that only agreed with another false and unsubstantiated government premise (*Tr. 4505-4506*); *forgery, forgery, forgery.*

- The timing of the Arizona case dismissal coupled with the leverage the Hawai'i-Mexico investors were gaining on Jowdy in the California cases were enough positive activity for the Hawai'i-Mexico investors.   **California attorney, Ronald Richards, had documented the Jowdy's lies (about the loans and the loan agreement) thru his 2-day California deposition confessions (January 2010).**

- In addition, the FBI (so the investors thought in January 2010) was supposed to be in full investigation mode regarding the criminal acts of Jowdy and his cabal.
  - o  As a result, all of the Hawai'i-Mexico investors were not concerned about the Arizona civil case dismissal -- with the other civil (California, Nevada and Mexico) and criminal (FBI, SEC and Mexico) cases pending in the USA and a myriad of criminal cases underway in Mexico; **all versus Jowdy.**

**The court finally halted the mis-representations by the government and Kaiser – demanding proof of the salacious statements...**

After the government berated the Court about believing the veracity of Kaiser's (false) statement that Kenner "*told him*" the Arizona case was thrown out because the loan agreement was a forgery (and yes, it is the same "Hawai'i-Jowdy loan agreement" that Jowdy's defense attorneys authenticated one [1] year later as their chief defense exhibit in *Murray v. Jowdy* [Nevada – exhibit A-89, *supra*] – while losing to Murray and Kenner, who was in ProSe for the 4-day bench trial (*See Recon33-53*) (*Tr. 4505-4506*).  The Court paused the ambush:

> THE COURT: Hold on.    It's 4:15. I have to read this order. I will tell you to move on to another area and we'll come back to this.

> MR. MISKIEWICZ: Okay.
> MR. HALEY: Thank you, Judge.
> *(Sidebar concluded.)*
>
> *(In open court.)*
>
> THE COURT: Members of the jury, I have to read this document. The government will move on to another area and I'll discuss it with them after.

The Court ruled (*Tr. 4619-4620*):

> THE COURT: Just to go back to 9080 C, to the extent the government is seeking to offer this order or portion of this order as a finding by the district court judge in Arizona that the document -- the promissory note was a forgery, that I'm not going to permit. As far as I can tell the only reference to any finding by the court is one sentence where the court says, plaintiff's failures to respond also lends credence to the claims of forgery and false claim to Nevada citizenship. But the whole rest of the order relates to essentially a failure by Mr. Kenner, or by Little Isle IV to respond to various discovery requests by Mr. Jowdy. So the whole document refers to basically failure to respond to discovery and that <u>line I do not read that as a finding by the court of forgery. I'm not going to permit that.</u>[221]

- **The Court <u>never</u> clarified this in the presence of the jury, opening the door for additional prosecutorial misconduct, *infra*.**

As such, AUSA Michiewicz repeated his misconduct and tried to insinuate the Arizona case was still thrown out because the 2004 Hawai'i loan agreement was a forgery of Jowdy's name, **entirely unethical**, still prejudicing Kenner and ignoring the Court's

---

[221] It should be noted that the December 2009 Arizona Court's ruling occurred after Jowdy's attorneys (knowingly led by Louis Freeh) threatened Little Isle 4 counsel that they would become criminally complicit with Kenner – "*if they continued to represent Kenner and Little Isle 4's claims that the money Jowdy received were for 'loans'*" (See Recon33-85). **They were loans!**

- *In 2015, Jowdy's attorneys submitted government-forfeiture-44, which confirmed their threats were for __intimidation only__ and falsely based…but religiously effective.*

Shockingly, not only did Jowdy's 2010 Nevada legal team admit to the loans and the loan agreement as authentic in his December 2010 defense case, *supra*…but only three (3) weeks after the Arizona case was dismissed (in December 2009) with the referenced order, *supra*, **Jowdy admitted** to all of the loans and the agreement in his January 2010 California deposition (in the cases filed via the GSF efforts). Two (2) months later, Jowdy also confessed the same admissions about the loans to the FBI (*See 3500-KJ-2 at 11-14*).

- How could the government take the ridiculous position they tried to cram down the Court's throat? It was wholly and knowingly unethical and irreversibly prejudicial.

previous ruling.  Despite the Court's attempted corrective measures – *the legal nuance was unrecognizable by the jury – regardless of the Court's attempted corrective measures* (*Tr.4639*):

> BY MR. MISKIEWICZ:
> Q. That was the lawsuit that was dismissed. Right?
>
> A [Kenner]: That was the Arizona lawsuit that was dismissed.
>
> Q. And it was dismissed because you were ordered by the court to provide discovery on an expedited fashion to substantiate the claim that that note that is now a Kenner Exhibit was true; not a *forgery*. Right?
>
>> MR. HALEY: I object.
>> THE COURT: Sustained.

## PSR Addendum highlights further prosecutorial misconduct...

In further acknowledgment of the government's desire to triple-down on the alleged forgery of Jowdy's name, the PSR Addendum asked for an "obstruction of justice" enhancement.   They claimed that John Kaiser, Robert Gaudet, and Ken Jowdy all gave forfeiture hearing testimony that the loan agreement was "not real".

This gross mis-representation clearly shows that the Probation Office never read the 4-day forfeiture hearing, and simply adopted another falsity given to them by the U.S. Attorney or the FBI case agent involved in the instant case at that time.

- None of the three (3) of them even gave testimony during the 4-day forfeiture hearings.   The Court is aware that only IRS Agent Wayne and defendant Kenner testified.   Thus, it is utterly impossible for the government or probation to defend their position that the three (3) individuals (Kaiser, Gaudet **and** Jowdy) testified about anything, and certainly not something that rises to "obstruction of justice".

  o   Unfortunately, there is no commensurate "downward departure" statute for the blatant mis-representations by the "probation office", in an attempt to harm Kenner – without foundation.

The Court *M&O at 37* verified: "*Kenner testified that a disclosure letter to the Hawai'i project investors did not mention Constantine's involvement in the endeavor*" (*Tr.4657: Defendant's Exhibit Kenner 93*).

**TRUE** – Because Constantine had nothing to do with the joint venture ("JV") <u>in the future.   The joint venture disclosure also does not mention</u>: [222]

- The Centrum loan – but included in the final 1800-page JV Agreement,
- The Kenner home deal,
- The project vehicles deal,
- The Home lots deals,
- The Environmental Indemnity Agreement (Kenner signed to protect his individual investors),
- Etcetera.

- **No joint venture disclosure agreement would mention Constantine or the other items; *ever*.   This was simply another "Business 101" nuance that the government knew they could overwhelm an uneducated jury...**

<u>**Lehman Brothers negotiated the final Urban Expansion (Constantine and Grdina) and Centrum (Berreth) settlement amounts with the two (2) lenders – *not Kenner*...**</u>

The decision by Lehman Brothers and Windwalker in 2006 to negotiate a full management buy out of Constantine and Grdina was an independent third (3rd) party transactions and decision of the entities controlling the joint venture funding; *never Kenner*.   That buyout was independent of the Urban Expansion loan agreement.

The fact that the government asked Kenner during cross-examination on multiple occasions about transactions related to the Hawai'i partners that had *nothing* to do with the consummation of the joint venture was wholly misleading; and the government knew it.   *The government deftly knew their audience.*

- Their audience was a jury who recognizably (thru jury selection voir dire) had "no experience" in any similar business transaction, let alone a $105,000,000 joint venture deal that required ten (10) separate law firms handling due diligence for the multiple parties – and 1800-page joint venture agreement -- and what should or should not be included.
  - **It was another perfectly planned misdirection.**

---

[222] Please note that Hawai'i partners' attorneys, Bill Najam and Larry Markowitz, wrote the JV disclosure letter for the investors to sign -- confirmed by Najam in *Nolan v. Kenner* (2009 arbitration -- *See Day 2 of Nolan at 362*) – pursuant to the specific demands of the Lehman Brothers and Windwalker attorneys.   **Kenner did not change a single element of the letter that all ten (10) of the "high-paid" attorneys approved and signed-off** (*See Day 2 of Nolan at 360*) – **prior to distribution for signatures with the 1800-pages of deal documents.**

**No dates were ever backdated for the Kaiser signatures on the 2004 or 2005 Hawai'i consulting agreements...**

The Court *M&O at 37* verified: "*Kenner also acknowledged that the dates on the consulting agreements were backdated*" (*Tr.4676-77*).

**FALSE** – Because the Kenner testimony confirmed that Kaiser dated the agreement based on the "*effective*" date of the two (2) respective agreements; *nothing to do with backdating the agreements*, certainly not under any surreptitious or criminal intent.

- It also raises another incredible faux pas by the government; attempting to allege that forged documents were backdated?   **What?   It is beyond reasonable!**

Nevertheless, Kaiser signed and dated them; *not Kenner*.[223]   In fact, *the government agreed with Kenner* when Kenner exposed the government's "underhanded" attempt to

_____

[223] **Outrageously, Kaiser produced the original "*ink*" versions of the documents with his signatures alleged forged...**

It is impossible to grasp how the government even chose to go forward with the Kaiser "forgery" testimony at that point in time.

The newly discovered exculpatory evidence in Kaiser's possession, wholly defied all logic that the "forged" documents could be in his possession – if his name was truly forged...
- *It was a straight fraud on the Court and the government chose to exploit it.*
- *Nevertheless, it was the second (2nd) gross anomaly related to Kaiser claiming forgeries in this instant case*; and ignored with a blind-eye.

During the November 13, 2013 search and seizure at Kenner's home, the FBI recovered photocopies of the two (2) agreements in question.  The government documented them with 100% of the seized documents that day with BATES STAMP designations: **PKHOME#######.**  The two (2) agreements were labeled:
- 2004 agreement – *PKHOME00012892-12895*
- 2005 agreement – *PKHOME00012887-12890*

With only photocopy versions recovered from Kenner's home in 2013, the government originally declined to secure a "signature expert" to evaluate the Kaiser claims.

Yet, on the "eve" of the May 2015 trial began, the government announced that they had *recovered* the "*ink*" version of the two (2) agreements – **FROM KAISER, himself.**
- Further confirming that the "*ink*" versions were from Kaiser's home (after being held for ten [10] years since he signed the agreements), they were *not* BATES STAMPED.  Instead they were "only" labeled for trial as:
  - 2004 agreement – *GX-7004*
  - 2005 agreement – *GX-7005*

- **Clearly, they were not from Kenner's home search and seizure.**

*Kenner Rule 29/33 Reconsideration motion – Appendix...*                              465

suggest that either of the two (2) Constantine consulting agreements were backdated. The Court, by documenting the "back dating" comment in its *M&O at 37*, fell for the government's "double" ruse, in spite of Kenner's clarification and the government's agreements, *infra*, once Kenner hoisted them by their-own petard:

> *Q. So even though it says, for instance, in the earlier of the two agreements in 5104, even though there it says next to John Kaiser's signature, 12-15-04, didn't happen, he didn't sign it according to you on that date? He signed it sometime when you were next out in Hawaii?*
>
> *A [Kenner]: I believe that's correct.*
>
> *Q. And where were you when you signed it in Hawaii?*
>
> *A [Kenner]: I don't recall.*
>
> *Q. Well, was it, you said on direct it was one of those due diligence trips where --*
>
> *A [Kenner]: The trip could have started in Honolulu, which is on the island of Oahu. While we were meeting either with bankers or some of our lawyers from Carlsmith Ball. Typically the trips would begin there for me. And then I would travel to the big island of Hawaii, which is a separate island. We may have been on a trip to Hilo with Carlsmith Ball lawyers or on the property site itself. We could have been at one of the rental homes that we utilized until I purchased a home for a home office for the project. Could have been in any one of those locations.*
>
> *Q. Was the rental home in Discovery Harbor?*
>
> *A [Kenner]: I don't believe -- from time to time I believe that they did -- Mr. Kaiser and Mr. Manfredi rented homes in Discovery Harbor as well.*
>
> *Q. My question is, where would you typically meet Mr. Kaiser during these due diligence trips?*

---

It is suspicious, at a minimum, and *18 U.S.C. 1001* perjury more likely than not (suborned by a desperate government) that Kaiser would possess **at his home** the "*ink*" versions of his name that was allegedly forged by someone else.   The moxie of the government to continue with the Kaiser forgery ruse at trial was commensurate with their ½ pregnant approach to all of the false predicates and revisionary trial testimony, *supra*.

- This was the second (2nd) confirmed exposure of a Kaiser forgery **lie** issue revealed as entirely improbable to the government pre-trial (and **third** [3rd] counting the Jowdy 2004 Hawai'i loan agreement allegation – and **fourth** [4th] if the LedBetter forgery by Berard and Kaiser are counted – and **fifth** [5th] if the *government-forfeiture-61* and *government-forfeiture-62* by Jowdy's attorneys are counted, etcetera).

*A [Kenner]: Could have been at any one of those locations that I spoke of.*

*Q. Okay. Then you said, I think you said similarly after the second agreement was signed 6/1/05, you went back out and you recall testifying, in sum and substance, that you had Mr. Kaiser sign it, **backdate it**, but sign it during another one of the due diligence trips, right?*

*A [Kenner]: I believe I testified that he signed it, then dated it pursuant to the date that was on the document just above the signature line.*

*[AUSA Michiewicz]  Q. That's all I meant by backdate.*

- **The government conceded that they did not allege "backdating" after Kenner caught them trying to do so thru "devious" and misleading Q&A.**

**The Home Depot tape was never concealed by Kenner from the attorneys for the Eufora investors...**

The Court *M&O at 37* verified: *"The recording of the August 2010 Home Depot conversation between Kenner and Constantine was played"* (*Tr.4773*).

Not only did the five (5) hours of 2012 Michael Peca and Kristen Peca recordings of Kenner not produce representations of criminal activity by Kenner, neither did the four (4) hours of 2012 Gaarn recordings.

Suspiciously, and despite repeated requests from Kenner to Privitello (pre-arrest) to turn over the FBI recordings he told Kenner he made between them in 2012, Privitello refused.   It surely was *not* going to help the case against Kenner's full time transparency (commensurate with the Peca and Gaarn recordings).

Kaiser and Berard recorded Kenner for multiple hours in summer 2012, at the height of their "record everybody" plans with FBI agent Galioto and Jowdy's cabal.   During these recordings, Kenner "called out" every fraud Berard and Kaiser were assisting Jowdy with at the time; fully exposed, in perfect sync with the recently discovered thefts by Berard and Kaiser of the Sag Harbor and Paradise Valley (Arizona) properties and Kaiser's friends & family.

- These would be deemed criminal acts *if Kenner were the perpetrator*; but never Kaiser and Berard while working under the Jowdy protectionism that Kaiser's February 2019 confirms.   **Those recordings never materialized**.

Yet, thru all of the Kenner recordings – only pro-Kenner, full transparency, evidence surfaced…that at all times contradicted the government's prosecutorial theories.

One (1) such transparent recording with Kristen Peca revealed Kenner telling her to *"trace it, trace all of it [the Northern Trust LOC funds]"* (*Komatireddy rebuttal summation Tr.5758*).

- The government decided to re-play the *"trace it"* recording for the jury. In spite of its obvious full transparency – attempting to conceal nothing – the government alleged that Kenner would not give documents to Kristen Peca three (3) years *after* Kenner was no longer Michael Peca's business manager, instead of respecting that Kenner told her to *"trace it all"*; **with nothing to conceal on Kenner's end (still – they should "trace it all" and "follow the money").**

Perhaps, Kenner would have been better off to tell Kristen Peca not to look into the bank records that her husband could request, again, from Northern Trust Bank, just like Michael Peca did in the fall of 2009 (referring to documents six [6] months after the Northern Trust Bank accounts closed -- and Michael Peca received copies of his request, confirmed by Northern Trust Banker Aaron Mascarella on multiple occasions) (*See Recon33-83*).

How could Kenner conceal bank records from Northern Trust Bank that Michael Peca could request on his own, and *Kenner could not request*?  It was simply another mis-direction by the government to claim to the unknowing jury that what it looks like is not what it really is…so just trust us, "it is bad", that is why we are highlighting it during our rebuttal summation (when the defense cannot rebut it).

**The Home Depot tape discloses "nothing new" that Eufora investors and their attorneys were not already aware of from Constantine's desire to "point fingers" at anyone -- and distract from his Eufora frauds (discovered by the investors' attorneys during their 2010 independent investigations)…**

Nevertheless, the Home Depot identifies *"out of control"* claims by Constantine, without Kenner participating in Constantine's nonsensical and falsely construed ramblings.

Constantine's grandest claim is that he is protecting "everyone" (like he always professed – other than *"saving the world"*)…*"especially Tim"* [Gaarn] (*M&O at 38*).

**Well, that could *not* be true on the August 2010 Home Depot recording…**

**BECAUSE** – Weeks earlier -- Constantine and his attorney had *already* broadcasted Constantine's identical allegations via letter to attorney Stolper that Gaarn and former

Eufora CEO Gentry were selling shares from Gaarn that they were not allowed to "according to Constantine's ethical standards".   Constantine's unsubstantiated claims were immediately addressed by the attorney (Stolper) for the Eufora investors following the three (3) plus month investigation (April thru June 2010) of "everything Eufora" in his July 16, 2010 letter – **prior to the Home Depot recording.**[224]   Every AZ Eufora Partners I investor signed off on attorney Stolper's July 2010 disclosure letter, which exposed the nonsensical allegations of illegal stock sales to Stolper's clients.   No follow-up complaints were logged; specifically not by attorney Stolper and his team.

Stolper's letter – prior to the Home Depot ramblings -- exposed any perceived "concealment" by Kenner (if there was any), as Team Giuliani confirmed (*See Recon33-73*):

> *At 1*: "*...to give him [Constantine] the opportunity to support his allegations against his co-managers at Eufora.*"

> *At 4*: "*Lee, you claim to have been "informed" about "very disturbing facts relating to the actions of several investors and managers on the Eufora saga."*

> *"We want to address these points as well, not with finger-pointing and conjecture, but real evidence (documents).   I invited Constantine to support his allegations but he has yet to provide a single piece of evidence or agree to meet with us.*"

> *At 7*: "*Constantine made allegations against Gentry [Eufora CEO] and Phil Kenner, a money manager of the members of the company [AZ Eufora Partners I]:*"

> *At 7*: "*Stolper repeatedly requested that Constantine come to New York to address the findings and support his allegations about Gentry, Kenner, Eufora financing and the defaulted loan.*"

> *At 7*: "*...neither Constantine nor his counsel have provided the documents that Constantine said he was going to provide, and has otherwise not agreed to meet*

---

[224] Kenner was not represented by the Giuliani team – thus if anything on the Home Depot recording or anything else they independently discovered during their 2010 Eufora investigation pointed its civil or criminal "finger" at Kenner, they were more than unobstructed to pursue Kenner on behalf of the AZ Eufora Partners I investors.   **They did not!**

When Stolper re-filed the Eufora case versus Constantine in 2014 (after the dismissal of the Constantine bankruptcy proceeding) – Stolper *did not* add Kenner to the defendants list in the Eufora case, **even after Kenner was in EDNY detention and charged with the identical Privitello transactions.**
> • *If Stolper's investigation thought Kenner had any wrongdoings, in 2014, Kenner was an easy target when they re-sued Constantine in the EDNY court.*   **They did not!**

*with Stolper and Hatzimemos [Giuliani's right-hand-man] to resolve the open issues;"*

- Thus – nothing was concealed about the alleged "private sales by Gaarn" weeks before Constantine's rant at Home Depot – *that echoed the same, false sentiments.*

Furthermore, at the same time as the sign-off letter – **and before the Home Depot recording** – Constantine held a conference call for all of the Eufora shareholders – while specifically excluding Kenner from the meeting in person by an armed police officer. One (1) of the other Eufora investors allowed Kenner to share a conference call line and listen to the Constantine "back story".

During the meeting – furthering Constantine's allegations (again without concealment for the Gaarn transactions – a.k.a. "*protecting Tim*") – Kenner and attorney Stolper exchanged more documented communication about the frauds alleged by Constantine in front of the entire Eufora shareholder base (*See Recon33-72*).

**In real time during the Eufora-Constantine conference call (weeks before the Home Depot immediate disclosure by Kenner) – there was more private stock sale transparency to everyone involved – AND DISMISSED AS "*PREDICTABLE*"...**

Kenner raised the specific issue about the Gaarn Private Stock sales to attorney Stolper (representing the alleged victims) as follows – THUS – *no concealment* of the transactions occurred. They were *already* threatened as an issue by Constantine's California attorney in a letter to Stolper -- and addressed by Stolper to the entire investor group weeks prior to the call, *supra.*

Clearly, there was NO SECRET about either the Gaarn (*2008-2009*) &/or the Constantine (*2008*) Private Stock sales from Stolper &/or the Plaintiffs:

Kenner text to Stolper (hi-lighted):



| 18271 | 19176261175 Michael Stolper* | 8/18/2010 8:09:12 PM(UTC+0) | S e n t | **Tommy has the Kenner gave Gaarn stock as an illegal transfer issue on the table. He's threatening with law enforcement to go after us** |
|---|---|---|---|---|

Reply text from the investors' attorney Stolper:

| 15750 | 19176261175 **Michael Stolper*** | 8/18/2010 8:10:45 PM(UTC+0) | R e a d | **Predictable** |
|---|---|---|---|---|

Then – Constantine made another unfounded allegation during the investors' conference call.   Kenner – again -- passed the information via text along to the investor's attorney (*Stolper*) immediately:

| 18272 | 19176261175 Michael Stolper* | 8/18/2010 8:10:37 PM(UTC+0) | S e n t | **He just threatened law enforcement involvement to settle the issue with the Kenner/Gaarn transfer!** |
|---|---|---|---|---|

And Stolper again responded to Kenner via text:

| 15751 | 19176261175 Michael Stolper* | 8/18/2010 8:12:24 PM(UTC+0) | R e a d | **Hopefully recorded.** |
|---|---|---|---|---|

- **There was no concealment** – certainly not by Kenner, acting in full transparency & raising the concerns of Constantine's nonsense in real time…

The government *cannot* answer what part of the Gaarn and Constantine private stock sales did Kenner participate in as a conspiracy to conceal information from anyone? Kenner has *only* provided transparency to the *exact* transactions thru empirical evidence, where the government's counter-case is again based on **CTE**-laden witnesses, who have repeatedly failed "*memory tests*" to allege "*they remember what did not know*" (?!?).

What during the Home Depot tape could Constantine realistically claim he was doing to "*protect Tim*"?   So far – and as predicate acts to Constantine's Home Depot rant/begging of Kenner to "*help stop the investigation against him*" (which Kenner refused – letting the legal process play out **transparently**) – Constantine had his attorney allege Tim's [Gaarn] frauds to the investor base via letter (which Stolper immediately addressed, *supra, Recon33-73*).   Constantine further made identical transparent allegations about involving law enforcement regarding Tim Gaarn's sales on the conference call – **never Kenner's stock!**

Frankly, no one needs, "Sammy the Bull"-like protection, as Constantine professed he was providing to Tim and others -- while in a complete panic to end the investigation and litigation against him.
- Kenner did nothing to interfere with the transparent investigation, thus taking the exact opposite actions of a conspirator who was attempting to conceal anything from anyone…similar to "*trace it, trace all of it*"…

**Constantine makes "slamming doors" comments (on the recording)…**

When Kenner cut off Constantine (from all communication) after discovering Constantine's exhausted spending of the GSF, Kenner told Constantine to stay away.

In December 2009, Kenner discovered that Constantine had drained the GSF funds and would not-could not fund any on-going Mexico litigation versus Jowdy. Kenner was forced to personally fund the Mexico litigation -- again -- by himself. Michael Peca confirmed to the EDNY court the same issue that ended Kenner's daily communication with Constantine (*Tr.539*):

[Michael Peca]:

> *"I do remember a conversation that I had with Phil regarding litigation in Mexico and he said he couldn't do it because he didn't have [GSF] money and I remember calling Tommy to ask him why we couldn't use money from the global settlement for Phil and the answer was Mexico was too much of a crap shot and unpredictable legally. So there's no money to go towards the Mexican part of it."*

- **Constantine had spent all of it** (*See Recon33-222*) – though not thru theft as alleged at trial.

**Berard explained in an email to Kenner and attorney Stolper about Constantine begging him for more GSF funds**...

***Berard confirmed that Kenner had nothing to do with the GSF*** -- nor the distribution of proceeds (*See Recon33-222*).

- Berard confirmed that the GSF was being utilized for litigation with Juneau, Moreau, Nolan and Myrick -- and were expected GSF distributions.

- Berard confirmed that the GSF was being utilized to buy out investments with Juneau, Moreau, Nolan and Myrick -- and were expected GSF distributions.

Kenner's response, on the Home Depot recording, to Constantine is not the action of someone who knew what Constantine did with any of the GSF funds &/or participated in a scheme to extract money to simply repay Kenner's expenses of $22,425 out of $100,000 plus Kenner paid.

- If that was Kenner's plan, Kenner cannot be considered a sophisticated individual; *just the opposite*.

A few months later when the Eufora investigation began, Kenner was already ignoring Constantine, while he was still telling the GSF individuals that he was "*saving the world*".

## CONCLUSION

Kenner's Appendix has again detailed the repeated prosecutorial misconduct that allowed their-own witnesses to repeatedly misrepresent the truth – in contradiction to what they, themselves, previously testified about "under oath" in various civil and criminal legal proceedings; in the USA and Mexico.

- *No evidence pre-trial alleged Kenner had concealed anything from his investors of nearly twenty (20) years.*

It cannot be overlooked that the most outrageous testimony (chocked full of lies) came from two (2) people who were employed by Ken Jowdy; John Kaiser and Bryan Berard (assisted by his best friend, Lanie Donlan).   The proven inconsistent statements from both of them has allowed for a complete injustice, posited under *United States v. Wallach*, 935 F.2d 445, 457-458 (2d Cir 1991) ("determining that a new trial was necessary because of lies of key witness[es] who '*tied all the pieces together*' even as to matters affecting only his credibility, could have caused the jury to reject the entire testimony and eliminate the foundation for conviction.").

The Court may not have awareness to the fact that both Michael Peca and Kristen Peca "joined" Jowdy and his attorney's (Harvey and Freeh) efforts in 2012 to fight against the Kenner-led recovery of the Hawai'i loans and Mexico criminal enterprise of Jowdy. Harvey convinced Peca to file a California Bar Complaint versus the investors' attorney (Ronald Richards) to further disrupt the remaining cohesive efforts versus Jowdy.

Nevertheless, the Bar Complaint failed miserably (in evidence), and after another lengthy delay for Jowdy, Michael Peca was left again (like Kaiser complains in his February 2019 letter – *Document 628*) looking to anyone for support to get his "previously approved" funds back from Jowdy and his cabal; who defiantly do not care (*See Kenner March 6, 2019 submissions to the Court via disc*) (*See M&O at 9* – confirming Michael Peca told the SDNY Grand Jury in 2011 that he authorized the Jowdy loans from Hawai'i as part of a "*group*" decision).

The government fought the revelation of real evidence showing the voluminous witness "inconsistent statements" with a suppression motion to further hide the empirical evidence from their-own witnesses in the event of the Court granting of a new trial. They stunned the defendant by claiming:

> "*Its [the website's] only purpose is to dissuade the Victim Witnesses from testifying or speaking against Kenner in a manner "*consistent*" with their prior statements [clearly referring to their 2015 inaccuracies]: if they do, the Email intones, "*the real evidence*" will "*show your lies*".*"

- Was the government sincerely concerned about alleged victims not being able to testify to the same inaccurate statements at a potential new trial, now-proven, as wholly inconsistent testimony?
- **That is admission of wrongdoing to their-own self-serving affirmations and protectionism.**

Under the extreme circumstances of well-documented inconsistent statements throughout the Kenner reports on Pacer and identically replicated on the Internet, supported by evidence in the hands of the government for years before the 2015 trial, all of their witnesses' "*inaccurate testimony*" and its contradictory real evidence was known to the government **at all times**, yet -- they let the known-inconsistent witness statements stand at *every occasion*.   In the interest of Constitutional justice -- the defendant had a First Amendment right for the alleged victims to be able to view the "***real evidence***" -- confirming their inaccurate testimony to the 2015 Court -- and be notified of the subsequent government ***SILENCE***.

In the event that one or more of the witnesses were unaware of their trial misrepresentations based on a "*failed memory test*", and they did not intentionally perjure themselves with the assistance &/or urging of the government, they should be aware in the interest of confidence.   *The inaccurate testimony, either way, is unreliable.*

To further the frauds against the defendant, the government claimed in their Rule 33 reply that all of the proven inaccurate statements were solely based on *faulty memory, confusion and mistakes;* and not due to perjury (suborned or otherwise).   Either way, considering the voluminous extent of the "*inaccuracies*", serious doubt must be cast on the veracity of the testimony (*and the underlying "spillover effect" of the nonstop contradictions to previous and "real evidence"*) on the verdict's confidence in totality.

The FBI case agent has continued to mislead the investors about Jowdy's crimes.  The investors' current Florida attorney, Steve Main, ***Jowdy was not found to have defrauded any investors – only Kenner.***[225]

---

[225] ***Despite Jowdy's own February and March 2010 confessions about stealing the Mexico and Hawai'i monies to the FBI (Galioto) during subsequent proffer sessions – from the first (1st) investor deposits in August 2002*** -- on February 20, 2017 – Hawai'i-Mexico investors' attorney, **Steve Main**, communicated via email with twenty (20) Hawai'i and Mexico investors about the status of *United States v. Kenner*. In the communication – Attorney Main *vouched* for the investigations of Jowdy by the US Attorneys' Office, the FBI and the SEC – and proclaimed that "*nothing*" was discovered about Jowdy criminal activity (thru 2017) – despite ***Jowdy's own confessions*** (in 2010) and the decade plus of ***documented*** bank records, *LIES* to US state and federal courts (as well as Mexico federal courts with documented bribes – *See David Boyden 3500 proffer notes 3500-DBP-1-r at 3*), forged documents by Jowdy and his attorneys, title frauds, bank frauds with forged and fabricated documents, RICO activity with Lehman Brothers

**Kenner has fully documented the tens of millions that Jowdy stole from Kenner and Kenner investors for the last two (2) decades, which are being preferentially ignored by the FBI (even more shocking with the AUSA O'Connell public affirmation)...**

The shocking Kaiser February 2019, turncoat, letter (*Document 628*) has verified the Jowdy protectionism for decades now – leaving the current lack of Jowdy prosecution of all the admitted and documented Jowdy frauds verification of the "double-standard" being applied to this case; considering Kenner received ZERO net benefit from any of the alleged schemes.   If any of the government (Galioto-led) allegations were true, it would make Kenner the least sophisticated white-collar criminal in the history of the Second Circuit.

---

(2006-2008) (and the use of physical threats [**Kenner 2010 Mexico prison beatings and subsequent murder of the investors' Mexico attorney**] – and documented litigation threats by Tom Harvey, Bryan Berard and others on behalf of Jowdy's protection team), and a myriad of other documented diversions and embezzlements (all in evidence – and in the government's possession at all times pre-trial).

Jowdy's right-hand-man in Mexico (Greg Carrafiello) explained to Boyden (as noted by Galioto on February 12, 2010):

> "*Carrafiello told Boyden that any bribes that were given to the Mexican Government were classified on the books as Consultant Fees.*"

Nonetheless without any foundation – investor attorney Steve Main declared February 20, 2017:

> "*Finally for those of you who are convinced that Jowdy is guilty of some crime... I simply note that the circumstances surrounding the Diamante del Mar project and the Cabo project (and the relationship between Kenner and Jowdy) has been exhaustively investigated over several years by the FBI, SEC and the U.S. Attorney of the EDNY.*"

- The only reasonable source for Main to mislead his legal clients would be information from the FBI case agent (Galioto) &/or Jowdy's legal team (led by Freeh and Harvey).   It is not possible that this salient fact was represented in "*good faith*" or with specific knowledge from any reliable source – since 100% of the documented facts since 2002 refute the mere representation; *more complicit frauds*.

- Two (2) years after the investors attorney's "misinformed" representations that led the unknowing investors to sign the pathetic 2017 settlement agreement with Jowdy (*See Peca objections – Documents 482 & 627*) – AUSA O'Connell explained to the Court (on May 14, 2019) (See hearing transcripts *at 37*):

    *The Court: Are you concerned with how the property is being managed at this point. I mean just in terms of maintaining status quo?*

    *AUSA O'Connell: Your Honor, the government does have certain concerns that its being run by Jowdy, who is someone that the government feels is an unindicted co-conspirator.*

To highlight the cover-up by the FBI and the original U.S. Attorneys (thru trial) for Jowdy and his criminal acts, the investors and the Court only need to look at the first Baja Development Corp bank statement from August 2002 (*as Kenner proffered to agent Galioto in June 2009*). The government subpoenaed that same Jowdy bank document and received it one (1) week before the 2015 trial commenced. It spite of the clearly documented proof that Jowdy robbed well-over $400,000 from his first (1st) investors within days of their first (1st) investments, the government immediately ignored the evidence and attacked the defendant during their opening remarks with a then-known falsity (*Tr.31*):

> [U.S. Attorney Komatireddy]: "*...Global Settlement Fund. This is the fraud where the defendants lie to the investors about who's stealing from them, and find a way to steal from them all over again. The defendants tell the investors that a guy in Mexico named Ken Jowdy, stole their money and ran away with it.*"

The May 2015 subpoenaed pre-trial Jowdy bank document *confirmed* over $417,000 of thefts and diversions by Jowdy to the immediate detriment of Kenner and Kenner investors (*Kenner, Woolley and Khristich only at that time*) of the first $804,000 deposited (*See Recon33-223*).

- *Apparently – Kenner was right.   Jowdy did steal it – <u>seventeen (17) years ago</u>...*

Notwithstanding the witness' inaccurate testimony in 2015, it is inexcusable that the government claimed any version of a cover-up by Kenner related to funds that were deposited into a Jowdy-controlled account (*under Jowdy's proven false pretenses*) – and verified post-trial by the government's-own admission of *government-forfeiture-44*.

- *All of the witnesses deserve to see the "real evidence" contradicting the myriad of testimonial inaccuracies in interest of justice, however the government &/or the Court chose to ultimately disclosed to them.*

**Fully knowing that several of the government's "*faulty memory*" witnesses defrauded Kenner pre-trial out of millions of dollars** -- the government also sought to enjoin Kenner from filing any civil litigation versus alleged government witness victims for a period of up to three (3) years (*a.k.a. -- to expire all statute of limitations to Kenner's detriment*). It should be noted to the Court that as a result of the Kaiser, Berard and Galioto-led Indictment in 2013:

- **First** -- Kenner was forced to drop civil litigation in Arizona versus Berard and Kaiser for the Arizona renovation project that Kaiser and Berard were found guilty of **FRAUDULENT CONVEYANCE** (*even without Kenner present for the trial*) *(See Recon33-55 at ¶57)*, costing Kenner six-figures of recoverable funds which Kenner had secured prior to his arrest thru the clouded title filing and lis pendens in the Arizona court.

- **Second** -- Kenner was forced to drop the litigation versus Berard and Kaiser for their theft of the LedBetter LLC (*thru forged and fabricated documents in the government's possession at all times – See Recon33-56*), costing Kenner his share of the $700,000 sale proceeds.

- **Third** -- Kenner was also forced to drop his multi-million dollar Mexico litigation versus Jowdy and Diamante Cabo san Lucas for labor violations.

- **In addition** -- Kenner was unable to file three (3) pending suits versus Kaiser as the Managing Member of Na'alehu Ventures 2006 and the million plus that was owed to Kenner due to Kaiser's fiduciary breeches, since becoming the Managing Member on December 31, 2007.
    - Kaiser has not produced a single tax document in twelve (12) years for Kenner and Kenner's Hawai'i investors.
    - In addition Hawai'i partners Managing Member Kaiser cancelled the pending 2011 litigation (*once hired by Jowdy*), with Berard's assistance, to recover the defrauded Hawai'i funds *versus*:
        - a) *Lehman Brothers*,
        - b) The JV partner (*Alan Worden and Windwalker*) who extracted $11 million in Hawai'i budget funds in two (2) years without a scintilla of relatable progress, and
        - c) The 3rd party audit firm who verified and approved the expense budget draws, as well as assisted Jowdy in three (3) other project frauds (*aka. Racketeering*) with the Lehman Brothers lender (Bhatti).
            - 1) Masood Bhatti is the ongoing Jowdy co-conspirator that John Kaiser identified in his February 2019 submission (*Document 628*) as continuing to pilfer the Cabo project with illegal non-3rd party arrangements to the detriment of Kenner and Kenner investors.

- Lastly, as known to Jay McKee and Michael Peca, Kenner was in the process of filing a clouded title action in Nevada versus each of them for the outstanding issues due to *their breach* of agreement(s) with Kenner in the Las Vegas Palms Penthouse deals *(See Recon33-81)*.

Under the circumstances, how can the government cloud the issue of loss and potential litigation, whether it would be commenced or not (*even considering the statute of limitations issues they creaded to protect their "failed memory" witnesses*)?

Kenner is supported by unchallengeable evidence that each and every investor in the Hawai'i partners (deemed a victim – and others who were not named in the Superseding Indictment) were fully disclosed – and participated in **"the decision"** to loan funds to Jowdy in 2004-06. After the never-ending "*did not read*" testimony because "*I trusted Kenner*" refrains, the Court must ask, if all of the transactions have bee proven as fully

transparent and vetted by multiple independent attorneys, what could Kenner have possibly concealed form anyone for over ten (10) years.  *Answer: nothing!*

> *"If I had asked the customers what they wanted, they would have told me – 'faster horses'."* – Henry Ford

There is no context the government can place the repeated witness statements throughout the trial that *"they trusted Kenner"*, and as such, they *"did not read"* documents that they were asked to sign for private deals in which they invested – but now *"cannot remember"*.

Now – in hindsight, and as a result of repayment promises from the FBI case agent *"if Kenner is convicted"*, the investors all exhibited *faulty memory, confusion and mistakes* (a.k.a. **CTE** symptoms) – in contradiction to their own evidence in the government's hands for years pre-trial – **but in indefensible synchronicity**.

There is no conceivable application that the wide-ranging conflict with prior inconsistent statements (or known by many other names) could be deemed the reliable testimony that convinced a jury that the decade and a half of empirical evidence and previous testimony by the same witnesses was "not valid" and the 2015 "revisionary statements" of not remember what or if Kenner told them about legal business deals that Kenner had the legal authority to transact.   The government case, based on conviction by *"failed memory tests"* is a standard that could and should make any American business-man shudder at doing business.

The Former Attorney General for the State of Utah identified while in public office:

███████████████████████████████████████████████

███████████

The verdict without confidence cannot be allowed to stand in this instant case, and the defendant requests as such that the Court order a new trial for each of the above outlined issues in this Appendix; *Brady* materials, new evidence, suborned perjury – or simply a *"failed memory test"* case based on witnesses who exhibited advanced symptoms of **CTE**, more often than not in contradiction to the actual evidence they participated in, during real time events (lawsuits, email, texts, bank records, disclosures) – **all signed by the witnesses themselves – and conveniently forgotten**.

**<u>Submitted by Philip A. Kenner in Pro Se</u>**

### *AUSA Michiewicz and AUSA Komatireddy grossly improper and prejudicial summation statements:*

These statements are listed in a relative order of **egregiousness**; although each and every one of them contradicts evidence in the government's possession since pre-trial; at times vouching for the recently fabricated hearsay of the government witness who could not recall anything except what they could remember on direct examination.[226]

### *The following summation statements were fabricated for prejudicial effect and not presented at trial with foundational evidence:*

*(Tr.5982) [Komatireddy]*
*"Mr. Haley said, you know, you can't just take a snapshot of someone's bank account and say it's fraud. Actually, with this one you can take a snapshot, and I'll tell you why. Special Agent Wayne and Forensic Accountant Petrellese told you why. Because when you look at that bank account, the balance is zero or negative before the investors' money comes in. Kenner is broke. He is entirely living off of his clients' money. He's entirely living off of his fraud. That's why you can take a snapshot, because there's no other money coming in."*

But -- this gross mis-representation defies logic.
- **Kenner has never been broke – certainly not while the US government is trying to forfeit a $100 million-plus LLC in Mexico!**
- The government *has* the Kenner bank records that show over $1 million between Kenner's other accounts (the ones that were not subpoenaed and closed by the FBI money laundering allegations four (4) years before the Kenner indictment).
- **The government "expert" did not tell you that Kenner was broke or that Kenner was entirely living off his clients money; ever!**
- The government knew that Kenner had to transfer the remaining balance from the Wells Fargo account to his Bank of America accounts (because of the FBI subpoena).
  - *That is why the account had a ZERO BALANCE.*
- The government knew that Kenner's consulting business grossed over $800,000 between 2008 and 2009 – so there was plenty of money coming in.
  - None of these government's statements were based in anything proven at trial.

*(Tr.5721) [Michiewicz]*
*"And what do you find out [about the Jowdy loan]? You find out, what did that 5 million or however much more or less that netted out to be, what did it buy Mr. Kenner? It bought him a 39 percent interest in Ken Jowdy's Cabo San Lucas. Didn't buy the players a 39 percent interest. Him. And if you read it, you will see that Ken Jowdy, himself, is only a 40 percent shareholder in the parent company. Can't get too much closer to being*

---

[226] All *Appendix* page numbers followed by an " *\** " refer to a footnote on the corresponding page. The Court's *M&O* refers to *Document 501* – the Court's Memorandum and Order.

*equal partners. To this day, right now, <u>he is a partner in that resort</u>. <u>That's where the money went</u>. <u>That's what it bought him. And on the backs, on the portfolios, of the hockey players</u>."*

- But – the government knew Kenner and his partners invested $4.1 million "clean" money (with **no nexus** to any charged Indictment objects) for the funding of Baja Ventures 2006 (owned by Stumpel, Lehtinen and Kenner).
  - o Thus – **the allegation was a fraud by the government and unsubstantiated by any facts in evidence.**
  - o Jowdy stole the additional $1.6 million from Stumpel and removed it from the Baja Ventures 2006 capital account.
- And – the government's own accounting confirmed the "**clean**" funds on *government-forfeiture-36* – **none benefitting Kenner**.
  - o In fact – Kenner and Kenner investors wired a minimum of $6.4 million of the closing $6,625,000 for the March 2006 closing.

  In addition:
  - o Jowdy robbed approximately $1 million from Kenner by that time (in evidence).
  - o Jowdy admitted to robbing $500,000 more from Glen Murray by that time –
    - ▪ And – Jowdy confirmed the theft in his December 2010 Nevada trial testimony –
    - ▪ And -- that Jowdy sent it to Mexico for the Cabo project.
    - ▪ Jowdy's own accounting presented in December 2010 (and in evidence) confirmed that Jowdy's own accountant documented the thefts.
  - o Jowdy confirmed he robbed $500,000 more from Mattias Norstrom (in his January 2010 deposition – with John Kaiser present).
  - o There were millions in additional lawsuits in Mexico versus Jowdy at the time of the Kenner arrest that had to be dismissed with Kenner in custody.

***Nothing from the "players portfolios" (or anywhere) bought Kenner "anything".***

***It was another unsubstantiated and incredible lie without any evidence.***

*(Tr.5722-5723) [Michiewicz]*
*"And if you look at the Centrum loan, <u>I can not think of a more perfect example of proof beyond a reasonable doubt</u> -- actions speak louder than words -- no reason to mortgage Honu'apo parcel. <u>No reason other than for Kenner to get his 39 percent</u>. Because remember, this is happening at the same time as, you know, some of the other transactions we have already talked about. <u>To get his piece of the pie, that resort in Cabo. No reason. Actions speak louder than words. And in this case the action is pure fraud</u>."*

- But – Kenner received nothing from the Hawai'i-Jowdy loans; nothing!!

- And – the government knew it at all times with 100% of the capital in Baja Ventures 2006 (Kenner's Cabo LLC) 100% accounted for from Kenner's partners; Stumpel and Lehtinen (actually totaling $4.1 million) (*See Appendix at 32\*, 412*).

### *The government vouching for the pure fraud, with a jury's expectation of integrity above reproach, cannot be deemed harmless.*

*(Tr.5744-5745) [Michiewicz]*
*"This is the point at which he's working on another project. Remember he [Kaiser] talked about Hermosa Beach, [Kaiser] talked about a million dollars that supposedly went to Hawaii, comes to find out it went somewhere else to Mexico. [Kaiser] doesn't get that money back. He works on the Hermosa Beach, California. At the closing he doesn't see anything but about $300,000 from the profit of that."*

- But – the government knew Kaiser had given 2009 arbitration testimony (before working for Jowdy) that he (not Kenner) solicited his friends & family specifically for the Jowdy loan at 15% (*See Appendix at 196, 201*).
- And – the government tried to get Ethel Kaiser to lie about meeting Kenner in 2005 before she gave her son the money – fraudulently vouching for the story by reinforcing it with a picture (*GX-942*) that the government knew was taken over a year later (*See Appendix at 186, 355\**) – because the 2005 baby died before birth.
- And – the government had all of Kenner and Kaiser's bank records confirming Kaiser was over paid by Kenner (owing Kenner money) by the time in February 2009 when Gaarn (not Kenner) loaned money to him (*See Appendix at 213, 226*).
- And – the government had all of the Na'alehu Ventures 2006 bank records plus the 2006 (Kaiser-Kenner signed) Equity Transfer Agreement (in evidence) that confirmed Kaiser had been fully repaid $1,176,000 for his friends & family loans (*See Appendix at **87\***, 128, 185\*, 221, 230*).
  - o Whatever Kaiser chose to do with the money (Jowdy-style) once he received it was not Kenner's issue – specifically because Kenner never dealt with the Kaiser friends & family.

### *Thus – with the government ignoring 100% of the bank records and evidence in their possession – they allowed Kaiser to lie about the money form the Hawai'i and Hermosa Beach, California deals – and utilized the known lies to fortify their summations.*

*(Tr.5983) [Komatireddy]*
*"Kenner testified that he created a transfer document, one more of those useless transfer documents, and backdated it."*

- But – Kenner never testified that he "*backdated*" anything (although repeated by the government several times).
- And – Gaarn testified he was not part of any conspiracy – even as a government cooperating witness.
- And – Gaarn told the FBI during proffer that Eufora CEO Gentry prepared the transfer records for Gaarn to sign; never Kenner (who was not part of Eufora

since 2005).

*(Tr.5988) [Komatireddy]*
*"There is no [Eufora] operating agreement."*

- But – the government had a copy of the 2009 Board-signed Eufora operating agreement that the investors' Managing Member (Tim Gaarn) signed for the Eufora Board (in evidence).
- And -- the Eufora operating agreement confirmed all of the 2008-09 sales from both Gaarn and Constantine.
- And -- Eufora CEO CR Gentry confirmed by email to Gaarn (Kenner exhibit 80 in trial) all the documented shares that had been sold and transferred by Gaarn to the LLC Gaarn managed for the investors.
    - It had nothing to do with Kenner, who Gentry's corporate emails confirmed *"Kenner has not been part of Eufora since 2005 [the date of the transfers to Gaarn]."*

*(Tr.5990) [Komatireddy]*
*"...you know what, <u>Baja Development Corporation</u>, on that chart, but there is some sort of misconduct; you don't know what the money was for. <u>You know exactly what the money was for.</u> In fact, Mr. LaRusso, when the first witness got on the stand, one of his first exhibits he entered into evidence was a record of the Baja Development Corporation. Those records are in evidence. <u>Mr. Kenner told you that he used that money to get his piece in the Mexico investment with Ken Jowdy. You know exactly what that's for. That's in evidence.</u>"*

- But -- Kenner **never** testified that he used the Baja Development Corp (or any) money from his investors to *"get his piece in the Mexico investment"*.
    - **That is <u>not</u> in evidence.**
    - <u>Those funds were documented by Jowdy's attorney post trial (as alleged by the government forfeiture attorneys) as "loans to Baja Development Corp [a.k.a. Jowdy]) (See *government-forfeiture-44*).</u>
- And – **Kenner has nothing to do with Baja Development Corp.**  It is Ken Jowdy's account only.
    - Yet – the government alleged during Kenner's bail hearings that Kenner owned the account and that is where he hid/stole all of the Hawai'i funds. It was a straight fraud that the government continued for years thru rebuttal summation.
- And -- The government was fully aware – thru Kenner's own pre-trial proffers that Jowdy used that account (**verified laundering activities by Jowdy in his 2010 FBI proffers** – *3500-KJ-2 at 2, 12, 13, 14*) to launder money from the various investments.

*(Tr.5991-92) [Komatireddy]*
*"He said the most important defense document in the case, Kenner 43, is a document reflecting notes of an interview with Mr. Kaiser. That's interesting. <u>I thought the most</u>*

*important document in the case for them was the **supposed** loan to Ken Jowdy. Let's take their word for it; notes of an interview with Mr. Kaiser.*

- But – **it was a loan to Ken Jowdy**.   The government never produced any evidence that it was not.   In fact – they produced *government-forfeiture-44* post trial to confirm Kenner truths.
  - o Nevertheless – when confronted with *government-forfeiture-44* as new evidence in Kenner's original Rule 33 – the government called the evidence "**cumulative**".
    - ▪ It cannot be "a Kenner lie" at trial – and "cumulative" post trial. This is a sword the government has to fall on (prosecutorial misconduct at trial – or significant new evidence post trial)…

*(Tr.5994) [Komatireddy]*
*"you will notice none of that [Northern Trust subpoena] paper shows you where the money went, none of it because only Kenner knows what he used the money for."*

- But – all of the bank records were in evidence showing everyone where 100% of the money went.
- And – the government knew the individual LOC annual statements would *never* describe those transactions.
  - o It was more known misdirection – taking advantage of jurists who the government knew would not understand corporate banking.
- And – Kaiser told the FBI during his October 2010 proffers that he "*saw all of the bank statements*" (*See 3500-JK-1-r at 10*) – and Kaiser "*saw the multiple updates to the investors*" (*See 3500-JK-1-r at 3*).
- And – Kaiser testified in 2009 that there were no secret handshakes about the Jowdy loans (*See Appendix at 201, 216*).
- And – Kaiser testified in 2009 that he met a number of the Hawai'i partners before 2006 (*See Appendix at 216*).
- And – Kaiser had been the Hawai'i partners Managing Member since 2007 – thus fully responsible for the entire Hawai'i partners deal – even "problems" if there were any with Kenner.
  - o Yet – Kaiser testified in 2009 that he did not have a single complaint with Kenner in all his years of dealing with him (*See Appendix at 201, 217, 293*) – until he went to work with Jowdy (but see *Document 628*) now!!

*(Tr.5998-5999) [Komatireddy]*
*"And most preposterous, the most preposterous suggestion from the defense, somehow the players all decided, got together and made a collective decision to allow those lines of credit to go into default and collateral to be seized. **Are you insane** [referring to Kenner's testimony]? Is the theory really that each hockey player volunteered to lose a million dollars so they could instead put another quarter million dollars into a lawsuit against a guy in Mexico? A collective decision? Not only implausible, it's contradicted by the evidence."*

- But – there is NO EVIDENCE that "contradicts" it.  **That is just a lie to the jury and the Court.**
  - o In fact – Nolan (who was not a Kenner client) called Northern Trust bank and chose to keep paying his LOC monthly payments at his discretion.
- **And -- the 2008-09 Arizona litigation and 2009-2010 California litigation versus Jowdy by this exact group (before and after the Constantine-GSF efforts) was exactly what they did to recover loans that are *not* "*bogus*" (*Tr.5708 (2x), 5709*), "*phony*" (*Tr.4597, 4598*) and "*supposed*" (*Tr.5707-5708*) – and simply a "*Kenner cover-up story*".**
  - o The fraud by the government is a false premise that there was some other means to recover the amount of the "Jowdy loans" except thru litigation –
  - o And – the government wants the Court and jury to believe that the better solution was to pay $500,000 in LOC annual fees (*like Kenner was doing from July true December 2008 – with no benefit to anyone – Counts 7 & 8*) and still pursue Jowdy legally to recover the "Jowdy loans" that the government admitted to after the trial (*See government-forfeiture-44*) – wholly defrauding Kenner and prejudicing his defense.
- And – Kenner and Michael Peca have a documented text conversation over several days during and after Michael Peca alerted Kenner that he "*already*" spoke to Northern Trust Bank and authorized the collateral seizure (*See Appendix at 68, 102-103, 105\*, 119, 264\*, 361*).
- And Darryl Sydor and Kenner have a detailed text conversation about Sydor speaking with Northern Trust Banker Mascarella about the default and seizures (*See Appendix at 172, 282, 361*).
- And – every seizure occurred days before the default dates  (*See Appendix at 53, 60, 66-69, 102-103, 105-6\*, 109\*, 141, 176, 264\*, 277, 282-283, 286 (Sydor LOC statement), 331-334, 361, 395-396*) –
  - o Thus – **the verbal confirmations had to occur --**
  - o And – the individual LOC clients had to sign-off of the residual fund transfers to their Schwab investment account – per their Northern Trust Bank investment management agreements (in evidence) (*See Appendix at 66, 332-335 [Rucchin]*).

***Nothing was insane except for the outrageous rebuttal summation comment.***

*"Kristin Peca told you when she got the default letter, she was in shock. You heard the tape between her and Mr. Kenner. She said: Phil, at least common decency, couldn't you have given us a heads-up? He didn't say: Kristin, you made a collective decision or Michael. He said: I apologize. All I can do is apologize for that."*

- But – Kristen Peca did not "*sign for*" the default letter (*Tr.709*).   That was a lie to the Court and facilitated by the government's leading Q&A.
  - o Kristen Peca was in Ohio when the March 2009 Northern Trust Bank default letters were mailed via FedEx to Michael Peca's Getzville (Buffalo) New York home.   Kristen Peca **could not have signed for the letter** and waited for her husband to come home and find her in "shock".

- o And – Kristen Peca's 2012 FBI recording of Kenner also proved she learned about the default and collateral (again – not Kenner's problem with her as a non-client) from an "*emptied out statement*" – not the default letter she lied about signing for and reading (*See Appendix at 66-71*).
- o And – Michael Peca's May 1, 2009 text to Kenner alerts Kenner that he is scared that his wife may have seen an email from Northern Trust Bank about the seizure and does not know what to tell her (*See Appendix at 67, 103*).
- o **100% fraud on Kenner and the Court and repeated by the AUSA during rebuttal summation.**

- And -- the text message evidence shows Kenner did alert Kristen Peca (even though she was not a Kenner client -- ever) – and after Kenner had alerted Michael Peca multiple times – confirmed by text and phone messages (*See Appendix at 66-71, 360*).
  - o Berard, Rucchin and Sydor were also notified by text at the same time as Kristen Peca from Kenner after failed phone call attempts (*See Appendix at 360*).
  - o Michael Peca was notified by phone and text (*See Appendix at 68, 119-120*).
- And thus – when Kristen Peca lied to Kenner about being notified – and Kenner knowing he sent her a text before the date the default letter could have been received – Kenner apologized "*that her husband never talked to her about it*".
  - o It had nothing to do with what Kenner did not do; because Kenner did alert her (in evidence).

*(Tr.6002-6003) [Komatireddy]*
*"Each of the other players came into this courtroom and told you in their words what they understood the Global Settlement Fund to be for. They told you what their understanding was, what they authorized, what they didn't authorize. They told you in no uncertain rules, Rucchin, Peca and all the rest, McKee, they told you that they did not authorize their money to be used for the defendants' pet projects or personal use."*

- But – **no funds were ever used for pet projects**; certainly not anything for Kenner – like the tequila fraudulent Red Herring alleged repeatedly by the government without any proof (including no hearsay) (*Tr.33, 726, 1076 [Michiewicz lie to the Court], summation at 5752*).
  > *[Michiewicz at Tr.1075]: "And we are going to later on trace that he bought this company, it was a tequila company, using his funds from the global settlement fund."*

  > *THE COURT: I think the allegation is, it went to the tequila company. Right?*

  > **MR. MISKIEWICZ: Yes.**

- The government *never* traced anything illicit – because no funds were ever "sent to a tequila company" -- but the government continued to "*bang*", "*sniff*", and present the tequila bottle as if there was something untoward they just did not want to say – but the truth of the alleged Red Herring fraud was there for the jury to "**just accept**".

- But – after not tracing any money to any alleged tequila company – AUSA Michiewicz claimed that the fake bottle (manufactured by another tequila company – Don Abraham) and having nothing to do with 6 bottles of tequila that were sent to Kenner's Mexico home for a tequila tasting – the government portrays money they never traced to a bottle that Kenner never manufactured or produced.   It was another Red Herring and straight fraud on the jury and the Court (*Tr.5752*):

    > "*Everything else, including Sergei Gonchar, 4 million, go basically to Kenner and Constantine expenses, including, you know, getting an interest in the Mosquito Rojo Tequila Company (indicating), and they find the agents testify they find a business card. Phil Kenner is the chairperson of this company, but no, no, no, I never possessed, it was never any manufacturing, there was never anything. Show him the e-mails that he sent to John Kaiser. Hey, here are the new Russian bottles, whatever that is. I don't know what to make of that testimony, photo shop? Finally, after I produced the bottle (indicating) and I don't know, I guess it's not a real bottle. You can have it. You can touch it. It's a real bottle.*"

    - **Clearly – the bottles in the picture were unlabeled -- and <u>not</u> the bottle they produced in Court – and <u>not</u> the bottles they alleged were the same from a preliminary website design.**
        - <u>**It was a straight deception.**</u>

**Constantine spent freely according to his "*side-deal*" with Gonchar – not affecting Kenner and Kenner investors – despite the general disappointment in the Constantine-led efforts for the group.   Our collective disappointment – with Constantine and the Gonchar "side deal" – does not make Constantine's atrocious business acumen an illegal act -- and it certainly does not rise to a conspiratorial act with Gonchar or Kenner.**

- And – the government was fully aware pre-trial of the Gonchar "*side-deal*" with Constantine – and Constantine's $140,000 additional personal deposits to the Ronald Richards' GSF Trust Account.
    - Thus – **nothing was spent on pet projects or anything not in the Constantine disclosure emails and authorizations.**
- Yet -- when the government produced the Superseding Indictment thru only FBI agent Galioto's fabricated testimony to the EDNY Grand Jury in 2015 – they continued with their GSF ruse – in the face of 100% of the evidence.
    - The government knew beforehand – and heard Gonchar's testimony at

trial – and because he was a hockey player who refused to be deemed a victim (like 20 others) but showed up in Constantine's defense – they attacked him.

*(Tr.6005) [Komatireddy]*
*"And remember what the Pecas told you; Tommy Constantine got on the phone in their living room and told them that he had someone who was going to go buy Cabo if they could get control. There was a seller within reach. That's why they put money into that Global Settlement Fund, <u>not for the plane which, by the way, has been resold at least four times</u>. You guys saw that. Not for the hangars; resold, long gone. Not for the Palms Condos which <u>Kristin Peca told you</u> they were never involved with. <u>They were fed up with the Palms Condos</u>. Not for any other reason. They put it in to get control of Cabo from Jowdy. The fraud was complete."*

- But – the Gonchar "side-deal" confirmed there was no financial fraud.
- And – the Constantine emails to all of the contributors confirmed they were wholly aware of the various uses of Constantine's GSF money.
- And – the signed disclosure emails confirmed (again) that the contributors were aware of the various uses of the Constantine GSF money.
- And – the emails presented at trial about the multiple Constantine-led conference calls (without Kenner) confirmed his open communication about his exact use of funds.
- And – attorney Ronald Richards confirmed Constantine, and only Constantine, authorized every single transaction (and further outlined that to the California Bar in May 2012 – in evidence)

- And – for the Palms – the AUSA (Komatireddy) lied when she claimed Kristen Peca was "*fed up*" in May 2009.
  - By May 2009 – Kristen Peca had breeched the Kenner-Peca Palms agreement (in evidence) by withholding 100% of the penthouse rental income instead of transferring it to Kenner.  Kenner effectuated $90,000 of mortgage payments for the unit after the time of the breech, and was in the process of suing Peca for fraud in Nevada when Kenner was arrested in 2013.
  - Kristen Peca and Michael Peca were $90,000 of mortgage payments ahead at that time and were in possession of approximately $90,000 of rental income.
  - ***They were anything but "fed up".   This was a cash cow for them thru the time of the GSF meeting in Ohio…***

    - FBI agent Galioto alerted Kristen Peca about Kenner's legal plans in Nevada -- as Kristen Peca admitted to Kenner during her 2012 FBI recordings.
  - **Kristen Peca also admitted that Galioto, Kaiser, and Berard confirmed that if they helped get Kenner indicted and convicted, <u>they would immediately receive their Hawai'i and Mexico money back</u>**

**from Kenner – BECAUSE – FBI agent Galioto told her that <u>Kenner never sent the money to Mexico or Jowdy for the loans.</u>   Instead, Galioto alleged (with Kaiser and Berard back-up stories) that <u>Kenner took all of it.</u>**

- And – **there was no proof offered that the Falcon 10 airplane was sold at least four times** – or that anything illegal had occurred with the plane or to Kenner's benefit.   It was another clearly deceptive statement from a desperate closing argument.

*(Tr.6006-6007) [Komatireddy]*
*"Constantine was the borrower and Kenner was the guarantor. Those two were in huge debt, not the players, except for Gonchar. They needed the money for their own projects."*

- But – <u>Kenner was never in huge debt – ever.</u>
- And – <u>no money was ever sent to a Kenner "pet project".</u>

   ***No proof of either was presented at trial.***

*(Tr.6006-6007) [Komatireddy]*
*"Led Better, straightforward. Kenner admitted to you he used the money for a non-Hawaii purpose"*

- But – <u>Kenner did not admit that anything was used for a non-Hawai'i purpose.</u>
    - In fact just the opposite – Kenner confirmed that the funds that were committed to the Little Isle 4 capital account (as Peca also confirmed to the 2011 SDNY Grand Jury -- and confessed to lying about on direct examination under cross-examination pressures [See M&O at 9]).
    - The funds were administered as described by every email in evidence and repaid as expected 11-days later by Kaiser (after Kenner initiated a *lis pendens* process on the Sag Harbor property – in evidence).
- And – it was well documented thru emails with Hawai'i partners attorneys (Najam and Markowitz) that there were huge issues with Kaiser and Manfredi during the closing period (summer 2006) – which required several side deals to be cut to secure their Lehman Brothers required signatures for the closing documents.
    - The side deals and expenditures were authorized by the attorneys for the Hawai'i partners (in evidence) – not at Kenner's sole discretion.

*(Tr.6007-6008) [Komatireddy]*
*"Rick Rozenboom came in here as a banker. It's his job; finance guy. He came in here and told you having reviewed all of the records, and he read the Bates numbers into the record, told you he had thousands of pages of records of exactly the money he was overseeing, what it was used for and why. <u>The victims didn't have those records. They have never had those records. That was part of the scheme.</u>"*

- But – Rozenboom and his First Source Bank records were in the possession of Kenner and Gonchar after they were sued due to the Jowdy and Harvey frauds with the airplane.   No reasonable person would ever expect the GSF contributors to receive copies of the First Source Bank litigation paperwork.
  - o But – nothing in the paperwork from First Source Bank described how Jowdy robbed over $430,000 from Kenner and Gonchar and screwed the Diamante Air (plane) investors.   Nothing.
  - o Komatireddy offered more false misdirection to an unsophisticated jury. It was again wholly unethical.

*(Tr.6008) [Komatireddy]*
*"When Jay McKee asked for records, he texted him back with just evasion and conspiracy."*

- But – there was nothing in the record that showed Kenner evading or creating a conspiracy regarding a McKee request to receive any records.   In fact – McKee confirmed that he received the only document in the 2015 trial that mattered to him from Kenner and attorney Ronald Richards.

*(Tr.5722-5723) [Michiewicz]*
*"And if you look at the Centrum loan. I can not think of a more perfect example of proof beyond a reasonable doubt -- actions speak louder than words -- no reason to mortgage Honu'apo parcel. No reason other than for Kenner to get his 39 percent. Because remember, this is happening at the same time as, you know, some of the other transactions we have already talked about. To get his piece of the pie, that resort in Cabo. No reason. Actions speak louder than words. And in this case the action is pure fraud."*

- But – the government's own accounting confirmed that Kenner's LLC (Baja Ventures 2006) was more than 100% funded solely by $4.1 million in contributions by his two partners; Jozef Stumpel and Jere Lehtinen.
- ***This summation statement by Michiewicz was a 100% fabrication prejudicing Kenner – followed during rebuttal summation with the same false rhetoric – closing the fraudulent noose about some theft that never occurred.***

*(Tr.5689-5690) [Michiewicz]*
*"by mid-2009...the hockey players are suddenly realizing they were indebted, in some cases over a million dollars. and started complaining and start sending desperate emails and phone calls to their financial advisor Mr. Kenner, the response was: We got a plan for you. We're going to go sue Ken Jowdy. But you will see that the evidence was that much of that money just disappeared and had nothing to do with Ken Jowdy's litigation."*

- But – the entire group of Hawai'i-Mexico investors was already suing Jowdy almost one (1) year before the Constantine GSF in Arizona and Mexico.
- And – not one (1) desperate email was sent to Kenner in evidence; *not one*.
- And – there was no proof that any desperate phone calls were made to Kenner.

- And – nearly 100% of the Hawai'i funds that were outstanding were in Ken Jowdy's possession.
  - o The government knew this and admitted to it as *government-forfeiture-44* allegedly receiving the confirmation document only three (3) weeks after the trial –
  - o But – they government called that exculpatory document **"cumulative"** when Kenner attacked it as **"new evidence"** in his original Rule 33.
- The government knew that Michael Peca, Darryl Sydor, and Turner Stevenson confirmed the Jowdy frauds and outstanding unpaid loan to the 2011 SDNY Grand Jury.
- The government knew John Kaiser and Bryan Berard (two of their star-witnesses) confirmed full knowledge of the Jowdy loans to a 2009 arbitration panel.
- The government knew that 19 Hawai'i-Mexico investors sued Jowdy in Arizona (2008-09 – before the GSF efforts), Mexico (2008-2013), and California (2009-2010) for the unpaid loans described in the Arizona suit as:

*"the gist of the lawsuit is to recover certain monies loaned to Mr. Jowdy from Mr. Kenner, Little Isle 4 and Ula Makika LLC. Mr. Kenner estimates the total amount of monies loaned to Mr. Jowdy which have not been repaid to be approximately $5,000,000. This is the estimated principle only, exclusive of accrued interest. In summary, Mr. Jowdy denies that the monies were loans but rather characterizes them as investments."*

And in the California suit(s) as:

*"Mr. Najam was in charge of the corporate governance while under Jowdy's direction and control received over eight million dollars ($8,000,000) from a LLC in Hawai'i. Mr. Najam failed to properly account for those funds and has placed the Jowdy investors in a vulnerable and compromised position."*

- And – the government knew that Jowdy confessed to the loans in his January 2010 California deposition (in evidence).
- And – the government knew Jowdy confessed to FBI agent Galioto during his March 2010 FBI proffers (with his attorney – Louis Freeh sitting at his sides during a myriad of Jowdy criminal confessions – overlooked as unimportant).

- The government cannot make the false statements they made at trial (about *"bogus, fake, phony, supposed"* – and calling Kenner a *"liar"* for documenting the loans thru empirical evidence and testimony – and then reverse course and claim that *government-forfeiture-44* is **"cumulative"**.

**The government loses for prosecutorial misconduct or new evidence.**

*(Tr.5703) [Michiewicz]*
*"And what does he [Kaiser] find out about where it goes? He is told it is going to be a short-term loan. 15 percent, 30 days, 60 days, 90 days, years go by. When does he finally*

*find out what happens to the money? Just before the Lehman closing, when he testified that Mr. Manfredi accused Kenner of basically lying to them. His partners in the Hawaii deal. And that is when he realizes, or he is told by Mr. Kenner, your money didn't go to Hawaii. It went to Mexico.*

- But – Manfredi claimed at trial he *never* saw the bank records – so if it were even true that Kaiser's money was not specifically for the Jowdy loan contributions as he told the 2009 arbitration panel – then how would Manfredi know?
- And – Manfredi gave October 2010 proffer to the FBI that he did not know if Kaiser contributed more that $1,000 at any time to the Hawai'i partners (*See 3500-CM-2-r at 2*).
  - o **That is only $999,999 short.**
  - o And – how could Manfredi forget both the "heated confrontation" meeting (*Tr.983*) and the additional $1 million that he discovered according to Kaiser's fabricated testimony?

- And – immediately after Kaiser allegedly learned about this mid-summer 2006, $1 million theft by Kenner (**which never happened**) – Kaiser chose *not to read* (?) the final Lehman Brothers closing documents (*Tr.1132-1134*).

- But – Kaiser confirmed to the 2009 arbitration panel that the 15% loan to Jowdy was the reason he solicited his friends & family for the $1 million (*See Appendix at 192, 200, 202*).
- And – Kaiser confirmed that he had never seen Kenner do anything illegal during his arbitration testimony (*See Appendix at 201, 217, 293\**).
- And – Kaiser confirmed that the Jowdy loans were not part of some secret handshake (*See Appendix at 201, 217*).

- But – somehow (whether from his 2012-2017 co-conspirator employment by Jowdy – *See Document 628*) or his **CTE** – Kaiser could not recall any of that in 2015.

- And – Kaiser could not recall being fully repaid $1,176,000 in August 2006 by Na'alehu Ventures 2006 (*See Appendix at 87\*, 185-186\*, 202-203, 221-222, 230, 440-441*).
  - o Instead – Kaiser claimed at trial that he received $816,000 for "*back pay*" and "*expenses*" – neither of which is true – nor could Kaiser provide proof of them.
  - o And – defendant Kenner has requested that the court demand proof from Kaiser – specifically now that Kaiser submitted another fabricated document (*Document 628*) to the Court in February 2019 – alleging that he is the true owner of Kenner Baja Ventures 2006 (Mexico) equity as part of some charade between him and Jowdy at the height of his Jowdy employment.

- These alleged agreements that convey Kenner's Cabo equity to Kaiser are

somehow part of Michiewicz (*Tr.5753*) and Kaiser's (*Tr.1089*) claims that Kenner ruined his life – **which $100 million would be a nice consolation prize IF TRUE**?!?

*(Tr.5707-5709) [Michiewicz]*
*"Does he, in all the texts all the emails, ever, ever contemporaneous with the signing of that **supposed** document?"*

- But – Glen Murray (the government non-victim witness) confirmed that he had received a copy of the 2004 Jowdy loan agreement from Kenner (*Tr.3608*) and knew about the Jowdy loans (*See Appendix at 397-398*).
  - And – Glen Murray identified the Hawai'i loans to Jowdy as *"another loan he authorized"* in his 2008 Nevada lawsuit complaint versus Jowdy for $791,000 that Jowdy stole from him (in evidence).
- And -- Michael Peca confirmed to the 2015 court that he was aware of the Jowdy loans and approved them as part of a group (*Tr.499*)(*See M&O at 9*).

*"And yes, I just used airports, because and I'm telling right now, the evidence, I submit to you, is that loan agreement is bogus. Never happened. Didn't exist. Created as part of the hall of mirrors as part of the deception and lies to divert attention away from these two men."*

- But – Ken Jowdy himself had the document authenticated during his December 2010 Nevada trial defense by signature witness, Robert Gaudet.
  - And -- the court has received from defendant Kenner the three (3) different verifications of signature and authenticity by witness Gaudet (*See Appendix at 57-58, 73, 193\*, 269, **385\***, **448\***, 449, **458-459**).
  - And – only the Kaiser nonsense of **unsolicited** "fake loan agreement" and "forgery" comments (*Tr.1106-1107*) introduce any opposing position to a document that has been authenticated by Jowdy, signature witness Gaudet, and Kenner (received by Kaiser, Murray and other Hawai'i partners), acknowledged by Kaiser (*See 3500-JK-1-r at 3*) and Manfredi (*See 3500-CM-2-r at 1*) to the FBI in their October 2010 proffers –
    - But – Kenner is chastised and accused of *"lying"* by the government only because they allege the document is *"phony"* because it does not comport with their trial theory (*Tr.4597*). It is more incredible and prejudicial proffer from the government.
- And – the 2004 Hawai'i-Jowdy loan document (authenticated by all involved parties) was signed in 2004 when Constantine was just beginning his consulting work for the Hawai'i partners – having nothing to do with Jowdy in Hawai'i.
- And – the government authenticated the loans by admitting *government-forfeiture-44* at the forfeiture hearing – when receiving the incredible exculpatory document *"only 3 weeks after trial"*.

*"No. No. Goes down, Ken Jowdy's house that he is renting. Doesn't keep an original. Apparently, Ken Jowdy is renting a house that has a copier machine. Does that sound*

*plausible to you? Reasonable? Logical? No. Bogus. And that's all we got, the document, this piece of paper saying: Oh, I hereby loan my clients' money to Ken Jowdy down in Mexico. But it is more than just that. <u>The bogus nature of the loan agreement</u>."*

- But – it has now been authenticated post-trial –
- And – called "cumulative" to fight against its true, "new evidence" status.
- And – the "house" that was being rented was also the office for Diamante as the government knew –
  - So – it is "reasonable" that it had a fax-copy-printer machine in 1894 – or was it in the modern age of 2004 – yes – 2004!!
    - **What business did not have a fax/copier in 2004?**

- **The government rhetoric was Bogus – but prejudiced Kenner.**

- **And – nothing in the government's trial evidence contradicted Kenner's testimony – except for the foundationless, nonstop government blustering.**

*(Tr.5961-2) [Komatireddy]*
*"Mr. Privitello testified that it was Kenner who told him about Metabank. Now, there is no reason to think that Mr. Privitello saw that text message that explicitly said Metabank. That is a text message between Kenner and Constantine. There is no reason to think that he was tailoring his testimony, <u>but his testimony is corroborated by that text message</u>. And you saw the text message. The text message that you saw is on screen again, Exhibit 7456, <u>where Kenner and Constantine tell you exactly how they are going to sell Privitello on the investment</u>. And it is all there. I'm not going to read it. That is not my style. You can read it. <u>And it tells you in vulgar terms that they are basically going to, well, they are going to defraud Mr. Privitello by selling him using this Metabank line</u>. And you can read it for yourself. That is 7456."*

- But – the text – as known by the government – was referring to the same day (November 13, 2009) deposition of Kenner former employee, **Nick James** – never Nick Privitello, especially after Privitello confirmed Kenner had nothing to do with his Eufora purchases, arranged by Privitello's friend, John Kaiser (per 100% of the empirical evidence) *(Tr.1488-1492)*.

*(Tr.5968) [Komatireddy]*
*"They were desperate for money. They had a lender on their back. And they went wherever they could for that money. Kenner and Constantine were in on it."*

- But – Kenner was never desperate for money, had nothing to do with the Privitello funds – per Privitello's own testimony – yet Komatireddy alleges Kenner was somehow desperate (whether Constantine was or not in 2009). The bank records confirm Kenner had over a million in his various bank accounts in cash, plus Kenner generated over $800,000 from his consulting business in 2008-2009; and continued as such thru 2010. Plus – Kenner had no lender on his back?

*(Tr.5994) [Komatireddy]*
*"The other thing you will notice in that big stack of bank documents, you will notice it in the box, government 770, the box Daryl Sydor sent back, you will notice none of that paper shows you where the money went, none of it because only Kenner knows what he used the money for. Only he could tell the players and he didn't tell the players."*

- But – the government misled the jury again knowing that the bank subpoena was not expected to have any money transactions.   The government authorized what Kenner was allowed to subpoena on the eve of trial.
- And – Kaiser told the FBI during his October 2010 proffers that he "*saw all of the bank statements*" (*See 3500-JK-1-r at 10*) – and Kaiser "*saw the multiple updates to the investors*" (*See 3500-JK-1-r at 3*).
- And – multiple Hawai'i-Mexico investors signed 2009 affidavits for the *Nolan v. Kenner* arbitration that confirmed (including but not limited to Gonchar, Norstrom, Stumpel, Peca, Murray, and Nash):
    > "*Phil Kenner has always the complete and detailed use of these [LOC] funds with me from time to time per my every request.*"
- And – nineteen (19) Hawai'i-Mexico investors sued Ken Jowdy in Arizona and California between 2008 and 2010 for the loans from the Hawai'i partners.
- And – John Kaiser and Bryan Berard gave voluntary testimony in 2009 at the *Nolan v. Kenner* arbitration that they were aware and approved the 2004-06 Hawai'i partners' "Jowdy loans" (in evidence) (*See Appendix at 176, 179, 191, 196, 200-201, 216, 275\*, 293\*, 325, 358, 445*).

*(Tr.5995) [Komatireddy]*
*"Mr. Constantine before the Urban Expansion loan did nothing for Hawaii but when you look at the exhibit, 41B shows you, it adds it all up, all the money Mr. Constantine gets from Hawaii before the Urban Expansion loan; over a million dollars. A million dollars for nothing.*

*And then you have the Urban Expansion. This, I would submit, is another essential example of the conspiracy. The Urban Expansion loan was completely unnecessary. It was completely unnecessary. Its sole purpose was so that Kenner and Constantine could steal money."*

- **But – Manfredi and Kaiser told the FBI in their respective October 2010 proffers that there was an "agreement" for Constantine to find funding for the Hawai'i partners** (*See 3500-JK-1-r at 5 – and 3500-CM-2-r at 1*).
- And – Manfredi called 2005 Lehman Brothers loan "*egregious*" (*See Appendix at 11-12, 78, 219, 302, 306, 328, 352 and 417*).
- And – no other lenders were available to close per Manfredi's desperate emails to Kenner after the "*egregious*" Lehman Brothers loan was terminated by Manfredi, Kaiser and Kenner (*See Appendix at 25, 302-303, 351, 354, 417*).  Manfredi told the 2015 trial court: (*Tr.2954*).

*Q: Were you part of the decision-making to enter into this [Urban Expansion] loan?*

*A [Manfredi]:  Well, no, <u>__I really didn't have -- really didn't have a choice__</u>. <u>__We had been through the gamut of trying to find these hard money__</u> <u>__lenders__</u>, and this happened even before Centrum, so <u>I was working on it</u> <u>pretty much nonstop and not being able to close on Waikapuna</u>, not having been successful to that point, you know, there wasn't a lot of choices left. "*

- And – Kenner did not receive any "benefit" from the Urban Expansion loan.
- Kenner was *repaid* (previously completed) documented transactions (Eufora loan and Akoya real estate closing) after the closing.
  - And – the Urban Expansion transaction that repaid some debts owed to Kenner were fully documented on the "*representations and warranties*" emailed to Kaiser and Manfredi pre-closing **for transparency** (*See Appendix at 205\*, 234, 304, 315*) -- and part and parcel to the Hawai'i closing packages received by every Hawai'i partners investor – as a result of their ***signed-off*** July 2006 disclosure letter that acknowledges the Hawai'i closing documents (all in evidence) (*See Appendix at 29, 205\*, 292, 336*).

*(Tr.5996) [Komatireddy]*
*"<u>He [Kenner] used it for personal use to get an interest in that resort in Cabo.</u> "*

- But – **the government's own accounting records confirm that Kenner never used it for personal use** (*government-forfeiture-36*).
  - It left the jury with a harmful and prejudicial view of Kenner – despite not one scintilla of evidence supporting the slander existed (in the trial record or not).

*"He also tells you that Lehman is interested. In 2005 Lehman is interested in investing in Hawaii but <u>Kenner puts them off for another year and he sets up the Urban Expansion loan</u>... "*

- But – Manfredi explained that the 2005 Lehman Brothers loan was "*egregious*" and "*cancelled by us*" [the Hawai'i partners management team].
- And – Manfredi explained that there were "*no other choices*".
- And – the Centrum loan – Manfredi said the Urban Expansion loan "*happened even before Centrum*" – but either way – it was not enough to close on the Waikapuna parcel – **so it fails on face value.**
  - **And – it is unexplainable why Kenner would "***put off Lehman Brothers for a year***" to lose control of the Hawai'i partners deal (and the future monthly developer's fee), lose his Hawai'i home for a loss to the deal, and not take any of his capital account out of the deal at**

**closing – with no benefits!**

*(Tr.5968-5969) [Komatireddy]*
*"Over those seven years, they've gotten money from all kinds of hockey players for all kind of reasons. Mr. Privitello is the last investor. They've done this before. They're doing it again with him. And they're doing it together. They're doing it because they need the money."*

- But – there is no proof that "they did this before" – whatever "this" is – and Kenner never needed the money.   Kenner was the sole person who was lending personal money (all documented in evidence) to Jowdy, Constantine, Kaiser, Berard, Gaarn, Sydor, Woolley, and Eufora, Diamante, Little Isle 4 etcetera. Kenner's loans to these individuals and companies cannot be deemed some predicate act to a crime to ask for repayment of the loans from these people and entities.

*(Tr.5977-8) [Komatireddy]*
*"They showed you this $100,000 going in from Michael Peca and another $100,000 going out to Mr. Kenner, but they didn't work their way up the bank record to show you that, actually, Mr. Kenner had put in $100,000 earlier. You have all the bank records, and they're all organized in the binders. You can look at them. I'll tell you what you find. When you look, work your way up the bank record, and you consider what Mr. Kenner told you, he told you he would advance Constantine some money to pay various expenses, sometimes for the hangars that they both were on the hook for, sometimes for Playboy that Mr. Constantine is on the hook for. Then when Mr. Constantine got this money from Eufora, he will pay Kenner back. Let's think about that for a moment. That's more evidence of fraud."*

- But – Kenner had nothing to do with the hangars – and was certainly not "*on the hook*" for it.
- And – when Giuliani's group vetted the entire Eufora transactions history from 2002 thru 2010 – they had no problem with the 2008-09 sales – or any other prior equity transfers in Eufora that *repaid Juneau* or other investors that asked to refund their investments.  In fact – *the Stolper July 2010 letter* (that every investor signed-off) *confirmed the Gaarn sales; without concealment*.
- Again – the government alleged that because Kenner was repaid for documented loans from Constantine's sales – Kenner was part of a crime that the investors' attorneys vetted *with Kenner assistance and transparency* (including immediate disclosure of the Home Depot recording).


***The following summation statements were fabricated* thru hearsay *for prejudicial effect and based* ONLY *on evidence that was fabricated for trial – and in direct contradiction to the evidence the government produced through their own Rule 16 productions – fully ignored to prejudice the defendant:***

*(Tr.5960)[Komatireddy]*
*"Mr. Kenner argues that he had nothing to do with Counts Five and Six. He argues that he had nothing to do with the Privitello investment from Eufora. And his argument is, well, if Kenner had some to do with Privitello, Privitello would have sued Kenner in some lawsuit that happened a year later with a different lawyer and a different group of investors."*

- But – Privitello gave testimony that Kenner had nothing to do with his Eufora purchases (*Tr.1488-1492*).
- In fact -- The *Court's M&O at 21* confirmed that "On cross-examination, Privitello agreed that Kenner was not involved in the e-mail communication between Privitello and Constantine regarding Privitello's investment in Eufora…and Likewise, he [Privitello] said that Kenner never promised him a stake in Eufora in return for his investment ".

*(Tr.5970) [Komatireddy]*
*"Now let's talk about the other Eufora fraud and what the defendants call "selling shares." They've told you that there is no impropriety in them getting money from the hockey players in 2008 and 2009. Because after all, they were just selling their shares in Eufora. What's wrong with that? Here's what's wrong with that. First of all, whether or not they are selling shares is entirely irrelevant because they didn't disclose it to the players. The fraud is complete when you lie to someone to get their money. That's fraud."*

- But – the government was fully aware that the investors own attorney, Rudy Giuliani's group – led by attorney Michael Stolper – fully vetted the purchases from Gaarn and Constantine (not Kenner) and found no legal issue worth litigating over – or even mentioning in Stolper's extensive – signed-off disclosure letter in July 2010 (*Recon33-73*).

*(Tr.5972) [Komatireddy]*
*"So Mr. LaRusso made some comment about how the hangar offices were under construction. But you saw the photos. These guys weren't working out of their homes. Before they moved into the offices in the hangar, they had another office building. And Mr. Nash remembers seeing the commercials."*

- But – the government was fully aware that Kenner worked out his home at all times – and certainly never in the Constantine office space.  **The government tried to cover-up from Nash's testimonial blunder** that he saw the Eufora commercials and was told everything by Constantine at the Avalon office space – except it was not completed until almost one (1) year later…

*(Tr.5973-4) [Komatireddy]*
*"Rucchin said the same thing [as Nash]. His understanding was the money was going to Eufora and into the company itself. He had no understanding he'd be buying out shares of any other investors. In fact, when asked, "Would that have been important to you? He said, "It would have been very important."*

*(Reading): "QUESTION: Why?*
*ANSWER: I wouldn't have done it."*

*I wouldn't have done it. Here's the thing. It's a natural response. The founder of the*
*company is selling his shares, your financial advisor is selling his shares."*

- But – the government was fully aware that <u>Kenner was not selling any shares</u>. Kenner did not own shares since 2005 per the Eufora tax records, the operating agreement, or the internal books & records.   Thus -- it was a clear misrepresentation thru Q&A and regurgitated as authentic even though it had no foundation in the trial.

*(Tr.5980) [Komatireddy]*
*"They say, "Listen, can you get me another 200K in the next few days? That's*
*Constantine to Kenner. Then Kenner goes out and pressures his clients [Sydor and*
*Ranford], pressures them to, quote, "invest in Eufora." He's actually taking that money*
*for himself and his criminal partner, Tommy Constantine."*

- But – Kenner did not receive any of the Sydor or Ranford money from Constantine.
- And – the pressure to invest was not only vetted by their attorney – but their attorneys requested a 6% equity stake in the same deal they just vetted as legit and full of intrinsic value.

*(Tr.5991-92) [Komatireddy]*
*And then they allege that the government sat silently by while Mr. Kaiser testified. That's*
*not true. The very exhibit they showed you, Kenner 43, was stipulated into evidence by*
*the government so you could see what it is and what it isn't. What is it? It's the notes of*
*an investigator from another office, not the notes of an FBI agent, an investigator from*
*another office. What is it not? It is not a transcript. It's not questions and answers. It's not*
*direct quotes. You can't tell from the notes when they were written, if they were written*
*before the interview or after the interview."*

- But -- AUSA Komatireddy disparaged a SDNY Criminal Investigator – insinuating that he could not take effective notes of the Kaiser October 2010, 2:15 interview at Kaiser's home – equivalent to the FBI agent (Galioto) who sat beside the unskilled SDNY "note taker" for the entire interview.

*"You can't tell from the notes when they were written, if they were written before the*
*interview or after the interview."*

- But -- AUSA Komatireddy **vouched** for the outrageous Kaiser trial testimony that he "*did not tell*" the FBI agents about the 6+ face-to-face meetings with Jowdy specifically regarding borrowing money from Hawai'i before the loans began in 2004.
- And – **Kaiser confirmed there was an agreement** to the FBI!

- And – to shock the conscience – *Komatireddy suggests that the notes were written* **before** *the 2:15 face-to-face meeting.*
  - **Before the meeting?**

*"And it's just as plausible for* <u>Mr. Kaiser's testimony was consistent with those notes</u>. *You can't conclude they were inconsistent."*

- But – **Komatireddy vouched again** – because there was not a single element of Kaiser testifying: "**I did not tell the FBI agents that**" which could qualify anywhere as a consistent statement.
- And -- Kaiser's testimony was 100% in contradiction to his independent verification to the FBI on October 19, 2010 (*See 3500-JK-1-r at 2, 3, 10*) of his multiple Jowdy meetings and calls to Kenner and Berard (before the date of the initial 2004 loans) to confirm his independent meetings (as a management person in the Hawai'i partners company).

*(Tr. 5997) [Komatireddy]*
*"<u>if they had just put that money toward the players' accounts</u> [instead of Lehman Brothers paying off the Centrum and Urban Expansion loans], the players would have lost nothing. The lines of credit would have been fully paid off. <u>The Pecas would still have a safety net</u>."*

- But – the government knew that was impossible – because the buyouts were part of the JV deal – *never negotiated by Kenner.*
- And -- the closing JV deal and $7 million post-closing distributions were authorized and approved by the attorneys for the Hawai'i partners (in evidence); *not Kenner (See Appendix at 96\*, 463-464\*).*
- And – ten (10) law firms (according to Hawai'i attorney Bill Najam – in his 2009 arbitration testimony – constructed the entire deal *(See Appendix at 205\*, 305, 316, 464).*
- And – Michael Peca confirmed to the 2011 SDNY Grand Jury that he was 100% aware of the risk he was taking and the exposure as a result of the un-repaid "Jowdy loans" *(See Appendix at 104-105, 110-112, 119).*

[*2011 Peca SDNY Grand Jury at 39-40*]:
> Q: <u>Did you understand at the time if you didn't pay back the line ever credit the bank was going to take your bonds?</u>
>
> A [Michael Peca]: <u>Yes. And they did.</u>   What they took was just under $2 million, I believe it was in 2008, maybe after a while.   We were just, <u>when the loan, the short-term loan from Mr. Jowdy was not paid back</u>, the line of credit time matured.   They had taken what was loaned, I guess, lent to me plus interest.
>
> Q: Let me show you what is marked Grand Jury Exhibit 106, which is the pledge agreement dated November 5, 2007.   Kind of technical document,

> *do you remember signing documents putting up the bonds to secure the*
> *line of credit?*
>
> **A [Michael Peca]: Uh-huh, yes.   I was very well aware of that scenario.**

*(Tr.5999-6000) [Komatireddy]*
*"Now, Mr. Kenner -- Mr. Haley said at the end of the day the players got approximately*
*40 percent of their money back both in their cash investments and in lines of credit.*
*That's just not true. You can look at the actual statements from Northern Trust. They are*
*in evidence: Government Exhibit 2162 through 2184. You will see that their lines of*
*credit were partially paid down in August of 2006, could have been fully paid down when*
*Lehman came in but as Mr. Haley said, for Peca, Rucchin, Murray and Nolan, Kenner*
*borrowed all the money back again."*

- But – **it is true**…they all got 40%+ back at the time of closing.
- And – Northern Trust Banker Aaron Mascarella sent every one of the LOC clients
  a letter offering – per Kenner's request – to reduce the collateral requirements by
  the 40%+ paydown amounts (in evidence) (*See Appendix at 166, and 166\*, 169,*
  *280\*, 357*).

*"The defendants took all that money again. And when those lines of credits went into*
*default, those guys got wiped out to the full extent of the loan. They didn't get 40 percent*
*back ever. That's a lie."*

- But – every investor (over 20 of them) got 40%+ back at the closing, and only a
  few LOC investors chose to remain in the Hawai'i deal; availing their remaining
  LOC assets to their Na'alehu Ventures 2006 capital account.
  - *Managing Member John Kaiser has been in charge of those Hawai'i*
    *partners tax records and accounting records since the 2007 tax filings –*
    *not Kenner.*
    - *And – Kaiser never raised an issue with Kenner or anyone about*
      *his members…*
- And -- the defendants did not take out the money again – Na'alehu Ventures 2006
  had capital accounts authorized by the individual investors and used for future
  corporate expenditures; *never authorized by Kenner – authorized by the "signed"*
  *Little Isle 4 operating agreement* (in evidence).
- And -- With Kaiser was in charge of Na'alehu Ventures 2006 and its obligations
  by the end of 2007. The company began to accrue LOC monthly expenses –
  - Since -- Jowdy did not pay back his loans as promised by Jowdy and
    Lehman Brothers banker (Masood Bhatti – disclosed by Kaiser in
    *Document 628* as still part of the Jowdy conspiracy) (*See Appendix at 96\**)
    –
  - And -- Kaiser refused to "*go after*" the Hawai'i JV partner &/or Lehman
    Brothers for the $4 million in MILESTONE payments agreed upon in the
    2006 JV agreement (a similar fraud to the Bhatti-Jowdy fraud in 2007-08
    in their Tennessee project [which was part of the basis for the bribe to

Kenner to "go along with them" in May 2007 when Kenner exposed their cabal] -- *See Appendix at 19-20 – footnote 10*).

*(Tr.5701-5702) [Michiewicz]*
*"But the Hawaii money? The Hawaii line of credit? Look at what <u>Brian Berard</u> says. <u>At that time I was already invested</u>. One was in the El Rosario property in Mexico. And then the other was in Cabo San Lucas. And my investments were 500,000 on El Rosario property and <u>200,000 on the Cabo San Lucas property</u>. And I submit to you that if you read the rest of his testimony, and we will come back to this later, <u>he had no idea nor was he advised by the defendant Kenner that his money would be spent, his line of credit would be spent, down in Hawaii</u>."*

- But – Berard testified that he expected his money to be spent for the Hawai'i partners interest payments [*what Kenner was charged with in counts 7 & 8*] (refuting his own follow-up testimony that he did not think it was to be used at all (*Tr.3035-3036*).
  - o This testimonial nonsense specifically contradicted five (5) years of Berard's signed Northern Trust Bank LOC documents (*See Appendix at 270\*, 280\**) and his 2009 voluntary arbitration testimony (only weeks after the seizure of the LOC) (*See Appendix at 275\**).
- And -- the government hid the fact that Berard testified in 2009 that he 100% knew of the Jowdy loans and approved them.   That clear testimony is irrefutable **– but the government ignored it like the Peca Grand Jury testimony** – until Peca "refreshed his recollection" and confessed on cross-examination that he did know about the Jowdy loans and approved them (*See M&O at 9*).
- And – Berard had *not* invested in the Cabo project until after Kenner and his two (2) partners secured the land purchase agreement with more than the first $4 million in the deal (carrying 100% of the risk).

Berard 2009 arbitration testimony (*See Appendix at 275\**):
> *Q: And later on were you aware that Mr. Kenner started lending this money to another principle in the Cabo project names Ken Jowdy?*

> *A [Berard]: **Yes**.*

> *Q: Where did you think the money that Mr. Jowdy – were you told where the money that was given Mr. Jowdy as far as the Mexican project?   Was there anything you were told about that?*

> *A [Berard]: Basically **just loan him the money for the project.***

**This is another clearly supporting element of needed discovery about the witnesses' incredible synchronized memory loss (known as CTE).**

*(Tr.5917) [Michiewicz]*
*"And then look at the settlement agreement. I'm not going to bore you with all of the*

*financial records. But there it is in black and white. This is the settlement statement when Lehman Brothers does come along. And there is the payment for Urban Expansion, $6,935,000 and change to Urban Expansion. <u>Out of that $2 million goes right to Tommy Constantine for no reason at all. $2 million that could have been used for Hawaii. $2 million that didn't have to be wasted, diverted, wasted for the players, diverted away from the players.</u>"*

- But – Kaiser and Manfredi confirmed to the FBI in October 2010 that Constantine was responsible for the Urban Expansion loan and voluminous efforts to secure additional funding for the Hawai'i partners.

- But – Manfredi emails in real time confirmed that he was **desperate** and **depressed** by the difficulty in securing lending for the land development in 2005 (*See Appendix at 302, 417*).
- And – Manfredi confirmed via email that he expected to lose two (2) of the three (3) major parcels in Hawai'i (65% of the land) – because the management group (Manfredi, Kaiser and Kenner) chose to walk away from the 2005 "*egregious*" loan change-offer from Lehman Brothers at the 11th hour (*See Appendix at 11-12, 78, 219, 302-303, 306, 328-329, 352, 417*).
- And – Lehman Brothers and the JV partner (Windwalker, LLC and Alan Worden) handled 100% of the final Lehman Brothers negotiations with Constantine and Grdina (never Kenner) – overseen by ten (10) law firms who were in the deal (verified by Hawai'i partners attorney William Najam during his 2009 arbitration testimony -- *See Appendix at 205, 316*).
- And -- $2 million was never wasted or diverted away from the players – because they had no rights to that extra money.
  - o The Lehman Brothers-Windwalker negotiations with the Hawai'i partners led to a deferment of $4 million that was reneged on – so what "magic wand" was available to anyone (including the ten [10] law firms) that could have diverted the $4 million or the Urban Expansion $2 million (buy out) – &/or the $3 million from the Centrum lenders – back to anyone in Hawai'i?

### *No one could –*

### *But the government misled the jury and the Court again with incredible insinuations.*

*(Tr.5721) [Michiewicz]*
*"And the deal makes no sense. They have to take a 12 percent loan from Centrum. The players are already paying six percent on their lines of credit. That's 18 percent. <u>There is no other way to characterize it on the same money.</u> They should just own Honu'apo. Instead they have this debt. Why? <u>So that Mr. Kenner can shovel more money to his partner Ken Jowdy in Mexico.</u>"*

- But –Chris Manfredi (as the Hawai'i partners COO) confirmed that finding development loans were next to impossible (*See Appendix at 302, 417*).

- And – Manfredi (not Kenner) negotiated the additional advance directly with Jowdy (*See Appendix at 27, 325-326*).
- And – Jowdy confirmed to Manfredi, Najam and Kenner that it should have been for 30-days and no more (*See Appendix at 220, 326*).
- And – Centrum had already agreed to extend the amount of the loan once the development subdivision approvals were given by the County in Hawai'i.
- And the Big Isle 5 operating agreement (provided in advance to Centrum) authorized the use of funds for "loans" (*See Recon33-125 at 1, 3*).

- And – *it does make sense* to loan funds at 15% because if the government knew anything about debt management (unlike the $22 trillion government deficit) – *they would have not lied to the jury*.
    - o The Hawai'i partners had a 6% sunk cost on an appreciating asset (the land worth $30 million in 2005 – not the $3 million the government claimed at trial) (*Tr.5996*).
    - o And – the 15% loan to Jowdy to a partner "*the group did not have to worry about*" according to Kaiser in his 2009 arbitration testimony (*See Appendix at 196, 201*) and Peca in his 2011 SDNY Grand Jury testimony (*See Appendix at 113, 118-119, 127, 137, 287*) (but somehow Jowdy's documented criminality is Kenner's fault) – even after Kaiser confessed in *Document 628* to being Jowdy five (5) year co-conspirator (just to be paid).

    - o The 15% interest was either:
        - ▪ A 3% arbitrage gain (15% minus 12%)…or at worst…
        - ▪ A 3% reduction in cost of capital (using the government's ridiculous math (6% plus 12% minus 15%).

*This is the foundation of Capitalism and the Global banking industry – even if the US attorneys were unfamiliar with modern economic theories.*

*Their collective ignorance cannot be allowed to prejudice the jury.*

[Peca 2011 Grand Jury]:
*"The Capital account was loaned to Ken Jowdy, our business partner, so there is no need at the time to be worried about anything.   The money was loaned to Ken Jowdy to basically help some of the purchase of the Cabo property so we can get the funding.   And then it was supposed to [be] a short-term loan."*

With Peca's 2011 SDNY Grand Jury testimony and his 2015 confirmation on cross-examination (*See M&O at 9*) – why didn't the government allege that Peca was Peca's co-conspirator after he refuted their ridiculous "*concealment*" prosecutorial theory – **now confirmed as transparent by Peca thru "refreshed recollection"?**

*The government's grandstanding was incredible, untruthful and prejudicial to an unsophisticated jury.*

*(Tr.5731) [Michiewicz]*
*"This document, through the expert testimony, through John Kaiser's testimony and through the circumstances under which it was purportedly signed, I submit to you prove beyond a reasonable doubt it's nothing but a forgery, a fraud."*

- But – the US Attorney fails to alert the court and the jury that they received the "*ink*" version of the two (2) alleged Kaiser forgeries on the eve of trial from Kaiser!! (*See Appendix at 7-8 and 7\*, 11, 24, 40, 58, 80, 186-188\*, 222, 310-311, 384, 399, 408, 433, 465\**)
- And – it was after Kaiser had been working hand-in-hand with the FBI since late 2011 (two full years) (*See Appendix at 39\*, 53-54, 59, 64 and 64\*, 168, 212\*, 366 and 366\*, 379-380 and 380\*, 388, 408*).
- And – both Kaiser and Manfredi had previously confirmed to the FBI in October 2010 that there was an agreement with Constantine to consult for the Hawai'i partners (*See 3500-JK-1-r at 5 – and 3500-CM-2-r at 1*).

***So – what agreement were they talking about if Kaiser's name is forged?***

- There are no other "**agreements**" –
  - Thus -- the government lied to the jury to effect full harm and prejudice after ignoring Kaiser being caught about claiming his name was forged in Mexico, and Arizona (in separate litigations to help himself, Jowdy and Berard avoid payment of millions of money they stole [in evidence] from Kenner and Kenner investors and Kaiser's friends & family) (*See Appendix at 35\*, 74\*, 57-58, 178\*, 211\*, 388, 400-401\*, 408*).

*(Tr.5748) [Michiewicz]*
*"This is November 13, 2009, just before the Privitello wire, right about the time that Eufora allegedly got some sort of terrific deal with MetaBank and it was going to be great. And what does Kenner say in response? I'll yell MetaBank as I kick Nick in the balls. Constantine says perfect. They knew about the discussion how to sell Nick Privitello."*

- But – Privitello confessed at trial Kenner had nothing to do with his Eufora investment (despite Kenner being charged for assisting in the Privitello Eufora investments without a scintilla of empirical evidence) – **only his friend Kaiser – again (with his dirty hands in everything)** (*See Appendix at 236-238 & the Court M&O at 21*).
- And – the government knew and lied about the "Metabank text" --
  - Because – they knew it came from a deposition date with former Kenner employee who stole approximately $50,000 – named "Nick James" (*See Appendix at 237-238*)
  - And – Kenner was in the deposition room when the texts were being sent back and forth about "*nervous Nick*" James (not Privitello) [**another false**

allegations by the government].

*Thus – the misleading Q&A, which had no foundation in the truth –*
*was perpetuated again thru the two (2) summations by the government –*
*confirming Kenner's "guilt" based on faulty evidence –*
*and they knew it at all times.*

(Tr.5753) [Michiewicz]
"*Remember of those litigation expenses, one case was dismissed and <u>John Kaiser</u>*
<u>*testified that he was told by the defendant himself, Mr. Kenner, that it was dismissed*</u>
<u>*because of a forgery*</u>."

- But – the government clearly knew the judge's dismissal order did not support the false premise of a forgery (*Tr.4602, 4606 [misstating the Jowdy December 2010 authentication]*) (*See Appendix at xx*) –
  - o And ruled on by the judge during trial (*Tr.4605-4607, 4619-4620 [ruling]*).
- Yet – the government repeatedly raised the "forgery" reference to the document they knew was real – even after the judge's ruling in the Court (*See Appendix at 460-461, 462-463*).
- And – the government knew Jowdy authenticated it in hid December 2010 Nevada defense case-in-chief (*See Appendix at 57-58, 73, 193\*, 269, 385\*, 448\*, 449, 458-459*).
  - o And – only the Kaiser nonsense of **unsolicited** "fake loan agreement" and "forgery" comments (*Tr.1106-1107*) introduce any opposing position to a document that has been:
    1. Authenticated by Jowdy,
    2. Authenticated by signature witness Gaudet, and
    3. Authenticated by Kenner,
    4. Received by Kaiser, Glen Murray and other Hawai'i partners, and
    5. Acknowledged by John Kaiser (*See 3500-JK-1-r at 3*) and
    6. Acknowledged by Chris Manfredi (*See 3500-CM-2-r at 1*) to the FBI in their October 2010 proffers –
       - ▪ But – Kenner is chastised and accused of "*lying*" by the government only because they allege the document is "*phony*" because it does not comport with their trial theory (*Tr.4597*).  It is more incredible and prejudicial proffer from the government.

- And – the signature witness (in evidence) for the 2004 Hawai'i-Jowdy loan document, Robert Gaudet, authenticated the document in three (3) different cases and jurisdictions (*See Appendix at 57-58, 73, 193\*, 269, 385\*, 448\*, 449, 458-459*).

*Thus – the Kaiser planted "forgery" claims – specifically that "Kenner told him" –*
*were so outrageous that the government had to double-down to vouch for the Kaiser*
*credibility as their "star-witness".*

13CR607

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   JUN 17 2019   ★

LONG ISLAND OFFICE

**Romedio Viola**

**Investigator---Paralegal**

**9 1 7 - 5 7 2 7 4 1 5**

romedio_viola@yahoo.com