1        UNITED STATES DISTRICT COURT   **FILED**
         EASTERN DISTRICT OF NEW YORK   **CLERK**
2
                                        **7/26/2019 8:40 am**
3    ------------------------------------X
                                    :    **U.S. DISTRICT COURT**
4    UNITED STATES OF AMERICA,      :    **EASTERN DISTRICT OF NEW YORK**
                                         **LONG ISLAND OFFICE**
5                                   : 13-CR-00607 (JFB)(AYS)
               v.                   :
6                                   : July 2, 2019
     PHILLIP S. KENNER, et al.,     : Central Islip, New York
7                                   :
               Defendants.          :
8    ------------------------------------X
9

10        TRANSCRIPT OF CRIMINAL CAUSE FOR STATUS CONFERENCE
              BEFORE THE HONORABLE JOSEPH F. BIANCO
11                 UNITED STATES DISTRICT JUDGE

12
     APPEARANCES:
13
     For the Plaintiff:        MADELINE O'CONNOR, ESQ.
14                             DIANE LEONARDO, ESQ.
                               United States Attorney's Office
15                             Eastern District Of New York
                               610 Federal Plaza
16                             Central Islip, New York 11722

17                             SARITHA KOMATIREDDY, ESQ.
                               MATTHEW HAGANS, ESQ.
18                             United States Attorney's Office
                               Eastern District Of New York
19                             271 Cadman Plaza East
                               Brooklyn, New York 11201
20
     For Defendant Thomas      SANFORD TALKIN, ESQ.
21   Constantine:              Talkin, Muccigrosso & Roberts LLP
                               40 Exchange Place, 18th Floor
22                             New York, New York 10005

23   Court Transcriber:        SHARI RIEMER, CET-805
                               TypeWrite Word Processing Service
24                             211 N. Milton Road
                               Saratoga Springs, New York 12866
25
                               (Appearances continued on next
                               page.)

     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service

APPEARANCES (CONTINUED):

For Defendant Phillip          PHILLIP KENNER, *Pro Se*
Kenner:                        No. 07480-408
                               MDC Brooklyn
                               Metropolitan Detention Center
                               P.O. Box 329001
                               Brooklyn, New York 11232

For Danske Bank:               GEORGE KOSTLAMPROS, ESQ.
                               Venable, LLC
                               600 Massachusetts Avenue, NW
                               Washington, DC 20001

For DCSL Properties:           THOMAS SOUTHER, ESQ.
                               Freeh Sporkin & Sullivan, LLP
                               350 5th Ave, Suite 6903
                               New York, New York 10118

3

1    (Proceedings began at 1:16 p.m.)

2              THE CLERK:  Calling  criminal case 13-CR-607, <u>United</u>

3    <u>States of America v. Phillip Kenner and Thomas Constantine</u>.

4              Counsel, please state your appearance for the

5    record.

6              THE COURT:  Good afternoon, Your Honor.  Saritha

7    Komatireddy for the United States.  I'm joined by AUSA Matt

8    Hagans, AUSA Madeline O'Connor, and AUSA Diane Leonardo as

9    well as our case agents, Special Agent Matt Galioto and

10   Special Agent Joshua Wayne.

11             THE COURT:  Okay.  Good afternoon.

12             MR. HAGANS:  Good afternoon, Your Honor.

13             MR. TALKIN:  Good afternoon, Your Honor.  Sam Talkin

14   for Tommy Constantine who's seated to my right.

15             THE COURT:  Yes, Good afternoon, Mr. Talkin and Mr.

16   Constantine is present.  Good afternoon, Mr. Constantine.

17             DEFENDANT CONSTANTINE:  Good afternoon, Your Honor.

18             DEFENDANT KENNER:  And good afternoon, Your Honor.

19   Phil Kenner, pro se defense.

20             THE COURT:  Okay.  Good afternoon, Mr. Kenner.  As

21   you know, I scheduled this as a status conference.  There are

22   a number of outstanding issues that I have on my agenda to

23   discuss and then I'll obviously address any other open issues

24   that anyone wants to raise.  Mr. Kenner has made a number of

25   filings since the last conference, so I wanted to go through

4

1    them.

2            But the first issues that I want to consider is the

3    forfeiture issue.  The Court has received obviously a number

4    of letters since our last conference.  I did try to have the

5    parties utilizes the services first of Judge Brown who then

6    had to recuse himself and then Judge Shields to try to address

7    the concerns that the Court had with respect to the scope of

8    the forfeiture.  And I read the transcript of Judge Shields'

9    proceeding.  I received the Government's proposed order and

10   then obviously the letters from the bank and the DCSL parties

11   including the letters from yesterday indicating their desire

12   to be heard today with respect to this issue.

13           But before I potentially hear from them, I do want

14   to just discuss my own views of what I've read.  And maybe I

15   wasn't as clear as I should have been when I sent it out to

16   the magistrate judge to try to see if the parties could work

17   it out.  I am concerned about the scope of the forfeiture in

18   this case.  My view based upon the numerous submissions that

19   I've had before me is that forfeiting an entire resort in

20   Mexico including one that has intricacies such as time shares,

21   thousands of people who've purchased time shares that to

22   utilize what the Government has suggested to this Court which

23   I understand obviously is the normal process of preliminary

24   order of forfeiture followed by an ancillary proceedings where

25   innocent third parties can, you know, raise their claims that

1    in this particular case under the unique facts of forfeiting a

2    Mexican resort with these types of investments could have the

3    practical effect of destroying the value of that resort,

4    hurting innocent third parties who had nothing to do with this

5    case, and potentially hurting the victims in this case who

6    continue to have investments in that property and would

7    obviously be impacted by a decision -- if a Court's decision

8    to preliminary -- enter a preliminary order of forfeiture were

9    to have the adverse economic impact that I am persuaded based

10   upon what I've read that it would have that it makes no sense

11   for the Court to do that.

12          I have seen nothing in the Government's letters,

13   nothing to persuade me that these issues that are being raised

14   are not valid issues.  The Government has not written a letter

15   to the Court that they're wrong, this couldn't possibly happen

16   or they're -- you know, just because there hasn't been any

17   adverse consequence in terms of being unable to sell

18   timeshares at this point, even though obviously the specter of

19   forfeiture has been in existence for years, does not mean that

20   once the Court enters if the Court were to enter an order of

21   forfeiture for the entire property and then require every

22   person who's purchased a timeshare -- would have to show the

23   Government the value of that, would have to get approval from

24   the Government, whatever process the Government thinks that

25   they would put in place to evaluate those claims to me is not

6

1   something that is going to be an insignificant thing where

2   people are going to continue to be able to transact business

3   with respect to these timeshares without any concerns.

4          I just think defies logic, and that's just one

5   issue.  I'm just pointing it out to be one issue.  I just

6   think there are multiple issues about forfeiting this entire

7   resort that I don't have answers to.  So I don't know if the

8   Government wants to respond now and explain to me what I'm

9   missing and why I should not be concerned about all these

10  things or why the Government is not concerned about all these

11  things.  But this has been an ongoing concern of the Court for

12  many months now.  So unless the Government explains to me why

13  they're still insisting on forfeiting the entire resort,

14  including having people who have timeshares go through some

15  process with the Government to try to be able to move forward

16  with respect to their property, I have to reevaluate the whole

17  situation and determine what discretion I have to depart from

18  the usual practice and come up with my own solution to this

19  situation because the Government is not proposing anything to

20  the Court.

21         So I don't know if the Government wants to address

22  that.

23         MS. LEONARDO:  Yes, Your Honor; we would.  Your

24  Honor, we have discussed with Danske Bank also an

25  interlocutory sale, which as Your Honor is correct, trying to

1    undertake selling the property in Mexico would be a huge task.
2    We had meetings with Danske Bank and DCSL back in I think it
3    was March with regard to an interlocutory sale.  To that end,
4    the Government hired a consultant who had worked with our
5    office previously with regard to a large-scale sale of Hotel
6    [indiscernible].
7            The consultant had indicated to us that the first
8    thing he would need to look at would be the trust agreement
9    because the resort is actually held in a Mexican trust.
10   Danske Bank had indicated to us back in March that they would
11   provide that to us.  They have not provided that to us yet.
12   That would be the first step to see the feasibility of that.
13   The consultant I don't believe met with Danske Bank's
14   approval.  We're not suggesting that we're limited to one
15   consultant or we wouldn't work with a consultant that the bank
16   has.
17           I know some of the submissions from Danske Bank
18   involved suggestions that an appraisal is done.  Of course,
19   yes, an appraisal needs to be done.  I don't know if Your
20   Honor recalls back in, oh gosh, the beginning of 2017, DCSL
21   and Danke had approached the Government about selling a
22   portion of the property.  We had a very limited appraisal
23   done.  I don't believe Your Honor would allow the marshals at
24   that point to go to the resort to actually do a full-blown
25   appraisal.  We had hired Cushman and Wakefield to do the

8

1   appraisal.  As I said, it's a very limited appraisal with

2   regard to about 12 acres of property.

3           So, we are not looking at this with blinders on in

4   terms of just thinking we can do this.  We have attempted to

5   work with the bank.  I believe we can still work with the

6   bank.  I think everyone's interest is to try to an

7   interlocutory sale.  That does not have to be put into a

8   preliminary order of forfeiture, though, and I think that's

9   where we kind of --

10          THE COURT:  I know, but what happens if I enter a

11  preliminary order of forfeiture of the entire property and

12  then for months, you're in negotiations over pursuing this

13  interlocutory sale?  What's going to happen to the property?

14  What's going to happen to the value of the property?  What's

15  going to happen to the people who own the timeshares?  If --

16  this is not something that's addressed in the preliminary

17  order.  I don't understand why these concerns that everyone is

18  raising are going to just -- everything's going to be frozen

19  while the Government tries to pursue an interlocutory sale.

20          MS. LEONARDO:  Your Honor, our suggestion in the

21  preliminary order at Paragraph 3 was that the status quo would

22  remain, that it would remain under the --

23          THE COURT:  But what does that mean the status quo

24  -- they're point in the status quo is that nobody's going to

25  want to buy these time -- nobody's going to be able to

9

1    transact on these timeshares.

2              MS. LEONARDO:  That would --

3              THE COURT:  That's not the status quo.

4              MS. LEONARDO:  I'm sorry, Your Honor.  That would

5    remain under the protective order that's been in effect since

6    2015.  We're not looking to forfeit interests of obviously

7    innocent third parties.

8              THE COURT:  So why are you even involving the third

9    parties?  Isn't there a way of forfeiting the interest that

10   the Government is focused on in the properties without even

11   having the third parties go through this whole process?  These

12   third parties obviously had nothing to do -- their money is

13   not involved in this case.  Why would you make them go through

14   this whole process of submitting documentation to the

15   Government when -- unless I'm missing something, it's clear

16   that they have nothing to do with this case, right?

17             MS. LEONARDO:  Well, Your Honor, at this point, we

18   don't know if the documentation is.  So, for example, if the

19   resort wanted to give us the documentation that they have, I

20   assume they have records of who the third parties are, I mean

21   that's something we could explore also without having to

22   involve people.  Or the Government has a contract with an

23   asset recovery firm that does this type of thing.

24             THE COURT:  But under what theory is the Government

25   even seeking to forfeit the property including the interest of

10

1  the time shares?  Under what -- why?  Why would you be doing

2  that other than to potentially I guess you can't do an

3  interlocutory sale unless the whole -- everything is

4  forfeited.  Is that essentially the reason?

5          MS. LEONARDO:  No, Your Honor.  I think we can do an

6  interlocutory sale like with the bank.  We can come to terms

7  on how it had to do an interlocutory sale.  I mean I think at

8  this juncture, it's really very premature in part because we

9  haven't gotten that far because we don't have a preliminary

10 order of forfeiture.  We have tried to talk to the bank.

11 We've not agreed --

12          THE COURT:  Okay.  What's going to happen if you're

13 wrong?  What's going to happen if you're wrong and I enter the

14 order that you're requesting tomorrow, okay, and then all

15 these things start happening with respect to the resort that

16 are negative consequences for everybody?  What's going to

17 happen?  What's the Government going to do with that money?

18 You can't agree on it's an interlocutory sale.  An appraisal

19 is going to take six months, a sale is going to take another

20 six months.  You know, who knows how long these things could

21 take.  And in the interim, nobody's able to dispose of their

22 timeshares because of the uncertainty surrounding the resort.

23 What's the Government going to do?

24          MS. LEONARDO:  Your Honor, I think one of the -- I

25 don't think this was on PACER, but I think one of the prior --

1    THE COURT:  Who is going to buy a timeshare in a

2  situation that you're describing?  Who is going to buy a

3  timeshare if there's a preliminary order of forfeiture for the

4  entire resort and the Government is pursuing a sale of the

5  property and is going to require people to submit all kinds of

6  documentation in the interim in order to engage in any

7  transactions with respect to the property?  Who is going to

8  decide this is a good time for me to purchase a timeshare in

9  that property?

10    MS. LEONARDO:  Your Honor, that's been in the

11  protective order for the past four years that the property is

12  subject to forfeiture.  That's been in existence for four

13  years.  It's on the internet.  It can be pulled up if you look

14  up Diamonte San Lucas.  You know, there's also been a lot of

15  movement in the resort.  There's been a Hard Rock Hotel that

16  has been built there and is now open.  There's a Nobu Hotel.

17  There's a Tiger Woods golf course.  There's a Davis  Love golf

18  course.  We're not --

19    THE COURT:  When was the last time the Government

20  obtained a forfeiture order of a business of this complexity

21  in the United States or outside the United States?  When was

22  the last time that has happened?

23    MS. LEONARDO:  Complexity-wise, I would --

24    THE COURT:  Complexity-wise  You have a resort --

25    MS. LEONARDO:  -- probably --

12

1          THE COURT:  -- an entire resort with banks, with

2    timeshares, and putting in -- well, let's put aside the fact

3    that it's in Mexico.  What would you equate -- what would you

4    point me to as an example where a court did what you're

5    suggesting and that it ran very smoothly?

6          MS. LEONARDO:  Probably Madoff, Your Honor, was huge

7    in terms of what was seized and there were -- there was

8    litigation.  I think there's still litigation going on with

9    regard to Madoff.

10          THE COURT:  Yeah, but weren't those -- those were --

11    that was money in bank accounts, though, right?  We're not

12    talking about a resort, there was a resort or something

13    that --

14          MS. LEONARDO:  I don't think there were resorts,

15    Your Honor, but there were numerous properties.  I mean I was

16    involved in a forfeiture here where we seized an oil company,

17    Mystic Oil, and we sold the company and we lost a deal with,

18    oh gosh, Hess Gas had parts of it.  There were --

19          THE COURT:  Okay.  When's the last time it involved

20    an overseas entity?

21          MS. LEONARDO:  Your Honor, I can't think of anything

22    from this jurisdiction with an overseas entity, but it's not -

23    -

24          THE COURT:  I think the Government's completely

25    underestimating -- completely underestimating the complexity

13

1   of this particular forfeiture and the potential of innocent
2   third parties being hurt by this Court doing what you're
3   requesting me to do.  I could be wrong.  Maybe I'm completely
4   misreading --
5              MS. LEONARDO:  Your Honor?
6              THE COURT:  -- the situation, but every instinct
7   that I have tells me that this is not a situation where that
8   just entering a preliminary order of forfeiture for the entire
9   property is not going to have any adverse consequences.
10  That's what my instincts are telling me.
11             MS. LEONARDO:  Your Honor, we have spoke with the
12  bank before.  We have talked to them.  We have -- as like I
13  said, back in March, we came up with the idea of an
14  interlocutory sale which would probably be the best way to do
15  this.  You know, we are in a very preliminary stage of it.  As
16  I indicated, we've hired a consultant.  If the bank wants to
17  hire a consultant, we're not certainly limited to one
18  consultant.  I imagine there are going to be at least one or
19  two appraisals.  Obviously, the Government would do one and
20  the bank would do one.
21             THE COURT:  I know, but I also -- I want to move
22  forward with the sentencing, obviously, so this process of an
23  interlocutory sale could take, you know, I don't know.  How
24  long could it take, months, years?  I don't know what period
25  of time you're even talking about, so --

1          MS. LEONARDO:  Well, Your Honor, the preliminary

2    order is final as to the defendant at sentencing.  It's not

3    final as to any third party until the ancillary process is

4    done.  So the sentencing doesn't have to wait until the

5    interlocutory sale.

6          THE COURT:  I understand that, but if my whole

7    concern is about the adverse consequences, what I'm telling

8    you is if I were to move forward with respect to the

9    defendants and their forfeiture, this open-ended interlocutory

10   sale issue could go on for a very long time and I'm not sure

11   what's going to happen to the value of the property and to the

12   innocent third parties in the interim.  That's the --

13         MS. LEONARDO:  Your Honor, we also have within DOJ,

14   we also have -- the marshals have an international asset

15   forfeiture division as does DOJ.  We've spoken with both those

16   entities and as opposed to this office, myself not having

17   international forfeiture experience, they do.  They have

18   contacts in Mexico.  There is a U.S. marshal who's

19   specifically assigned to Mexico and also one of the DOJ

20   attorneys.  So we have discussed it with them.  You know, it's

21   not our intention to have it go on for years, but as I said,

22   that doesn't have to be for the defendant to be sentenced.  We

23   can try to, you know, assuming the bank wants to sit down with

24   us and be cooperative, then we can try to make this go as

25   quick as possible.

15

1           But as I mentioned earlier, we had asked the bank

2    for the trust agreement back in March and we don't have that

3    yet.  And that was the first thing our consultant asked for

4    just to start looking at how to accomplish this.

5           THE COURT:  All right.  Let me hear from -- is the

6    bank's lawyer here?

7           MR. KOSTOLAMPROS:  Thank you, Your Honor.  George

8    Kostolampros of Venable representing Danske Bank.

9           THE COURT:  Yes.

10           MR. KOSTOLAMPROS:  Thank you for recognizing our

11    concerns.  And I'd like to add a couple of other things.

12    You've addressed one of the main concerns that we raised with

13    the Government after our initial discussions about an

14    interlocutory sale which is, number one, timing.  From our

15    consultant who has worked on the property for a number of

16    years, they've told us it would take at least a year for a

17    sale to occur.  And the issue is what happens in the meantime.

18    There's going to be concerns about what gets sold, what can be

19    sold, liquidity issues.  So that's number one.

20           The other issues that have come up in our initial

21    discussions were what is being sold ultimately.  The

22    Government's unwilling to recognize any third party sale that

23    has already occurred, so what possibly can be out there to

24    sell when there are going to be competing interests of that

25    particular property.  And the Government has this notion that,

16

1   look, let's just agree to an interlocutory sale and we'll

2   figure this all out later.  Well, the repercussions are going

3   to be happen within that year.  There's not going to be enough

4   value for anyone, frankly.

5              And ultimately, our suggestion was, number one, get

6   an appraisal so you can think to even show that there's any

7   value here that would go towards any victims here.  Our

8   appraisals show that there isn't even enough value here to pay

9   the bank back, and we've raised all these issues and

10  ultimately, what we get back is the same answer which is

11  ultimately we'll figure it out as we go and that's just not

12  going to work for us.  And ultimately, our client has decided,

13  look, an interlocutory sale would not solve the problem.

14             THE COURT:  I know, but you're not really proposing

15  any alternatives then.  What are you proposing as an

16  alternative?

17             MR. KOSTOLAMPROS:  We've raised it in our letter,

18  our last letter, which is, number one, is if the Government

19  believes there is equity value in this resort, ultimately then

20  there's equity owners in the U.S. where the Government can get

21  the shares of the particulate equity owners.  And, therefore,

22  you obviate the need for -- to bringing any sort of Mexican

23  law issues.

24             THE COURT:  I know, but to the extent that the

25  monies obviously that originated from the victims in this case

17

1    have flowed through U.S. entities into foreign entities, I

2    don't know why they would be bypassing that other money.  I

3    don't understand why that would be the line just to say we'll

4    just focus on the U.S. entities.

5         MR. KOSTOLAMPROS:  Well, the reason why is because

6    if there is equity value in the underlying entities themselves

7    that own the property, outside from they're a second

8    beneficiary to the bank that has the -- is the first

9    beneficiary of this trust.  If there's equity value there, if

10   you sale the equity shares, the U.S. equity interest, and if

11   there is according to the Government's there's equity value

12   there, then there will be equity -- there will be someone who

13   will purchase that equity value assuming that there is a

14   payday at some point and there's value in that equity.

15        And, again, I think if you do that and you start off

16   with, number one, an appraisal to see what you can sell, like

17   how much would it be work, that equity value?

18        THE COURT:  All right.  Does the Government want to

19   respond to that?

20        MS. LEONARDO:  Your Honor, with regard to the way

21   the entity is held, it's a little confusing I think on the

22   LLCs and what the shares are.  At one point, KAJ Holdings

23   conveyed interest to -- one percent interest to other people.

24   We don't know if there was any value to that or if there was

25   any value given for that.

1      One thing I just want to point out, Your Honor,

2  that, you know, with regard to this whole process if the

3  resort wanted to cooperate, they could provide us records

4  that, you know, we have sought -- we get some records.  We get

5  spreadsheets.  We get some of the -- well, some monthly

6  reports from the resort.  But if they can provide us with

7  records and a trust agreement, that would also expedite this

8  process.  I do agree that we do need to do an appraisal, but

9  that would also mean the marshals would want to go and do the

10  appraisal or be part of the appraisal and review books and

11  records to get that done to get an accurate valuation of the

12  resort.

13      THE COURT:  All right.  You want to -- their point

14  is that the Court obviously has been considering this

15  forfeiture issues for years and none of the things that you're

16  pointing to in terms of the adverse consequences have

17  happened, obviously other than just the issue regarding the

18  loans.  But do you want to address that more generally?

19      MR. KOSTOLAMPROS:  Your Honor, we've addressed it

20  before.  The bank has forbeared on its amounts due to it,

21  including -- right now it's owed $32 million that it's

22  forbeared on.  It's sort of its only going concern because the

23  bank has all of its loan.  Without the bank there, frankly,

24  the resort would not be a going concern at this point.

25      THE COURT:  All right.  Let me just see is the

1   lawyer for the DCSL properties want to --

2          MR. SOUTHER:  Thank you, Your Honor.  Thomas Souther

3   of Freeh Sporkin & Sullivan for the DCSL parties.  I won't

4   belabor the point.  You raised the point.  But to address the

5   last question that you just asked about, you know, the status

6   of the project now, as the bank pointed out, I mean we

7   currently owe the bank and it's past due $32 million in

8   principal payments.

9          At this point, the bank -- the project has only been

10  able to maintain enough sales to be able to meet its operating

11  expenses and pay its interest obligations.  It's not been able

12  to further advance the development because that's going to

13  require sales of parcels and large parcels for further

14  development, consistent with what as the Government pointed

15  out was done in the past.  Back in 2014, they were able to

16  sell a large parcel to Hard Rock Nobu developers who have

17  developed a hotel on that property.  That has taken years.  I

18  mean this isn't a function of like flipping a switch and

19  tomorrow everything will be fixed.

20         Just as an anecdotal illustration, there's a

21  condominium development that was projected to start in this

22  past January that we have not been able to finance.  The bank

23  -- you know, there's no financing available from the bank.

24  There's no other financing sources available given the

25  pendency of the forfeiture proceedings.  If we don't get that

1   project going by October, we're going to be in a position

2   where we're going to have to start repaying deposits to people

3   who put down deposits on that in anticipating of having a

4   condominium to move into.

5            So the notion that we maintain the status quo is

6   really just we've been treading water and trying to bail the

7   water out of the boat as we've been proceeding for the last

8   several years.  The day of reckoning is coming, and, you know,

9   we have -- our credit lines are exhausted.  And it puts the

10  resort in a desperate situation.

11           Our proposal to the Court in terms of the forfeiture

12  was forfeit the interest that the defendants have.

13           THE COURT:  But I don't -- again, I don't think that

14  adequately addresses it because the whole theory the

15  Government has here is that the proceeds with respect to the

16  fraud that occurred here have flowed through much beyond the

17  defendants' interests now including to your client, Mr. Jowdy

18  and his entities.  So I don't know why that would be the

19  dividing line would be their interests.  If the money flowed

20  through to your client and the entities that he formed, why

21  shouldn't that -- that would be a standard thing that would be

22  subject to forfeiture.  Put aside that people who own

23  timeshares who have nothing to do with this case, Mr. Jowdy

24  and his entities clearly were direct beneficiaries of Mr.

25  Kenner sending the money to them, right?  I don't understand

21

1   why would I ever exclude Mr. Jowdy and his entities from

2   forfeiture?

3           MR. SOUTHER:  No, Your Honor, I mean I'm just

4   proposing as an alternative --

5           THE COURT:  I know, but --

6           MR. SOUTHER:  -- because there was --

7           THE COURT:  -- that's not a viable alternative to

8   just forfeit the defendants' interests when, you know, Mr.

9   Kenner has been pointing out for years and it's obvious from

10  the trial that the money -- that money went to Mr. Jowdy and

11  his entities.  So why wouldn't that at a minimum also be

12  subject to forfeiture?

13          MR. SOUTHER:  Well, you know, Your Honor, and that's

14  ultimately would be the Court's decision to make is whether

15  that should be included.  But the idea of forfeiting the

16  entire resort, when you look at it and the amount of money of

17  criminal proceeds that arguably are traceable to having gone

18  into this compared to the hundreds of millions of dollars from

19  the bank, from investors that are purchasers of property, from

20  developers who develop the hotels along the waterfront,

21  hundreds of millions of dollars that clearly are untainted.

22  You know, our point is, you know, why does the Government have

23  to reach for the entire resort.

24          There's got to be an alternative, and the

25  alternative would be to reach for the equity interests which,

22

1  you know, we would suggest, unfortunately, right now there's

2  no value to those equity interests, but the equity interests

3  in the project itself which would not then trigger this

4  avalanche of timeshare owners, real property owners, hotel

5  developers to have to parade in here and demonstrate to the

6  Government that they are bona fide purchasers.  And it would

7  also allow the project going forward to be able to sell real

8  property, to be able to sell timeshares without that being

9  encumbered by, you know, the additional obligation of, oh and

10 by the way, we're just going to have to get the Government to

11 approve.

12         I mean as the Court probably knows, there's dozens

13 of developments down in Mexico and Cabo San Lucas.  The

14 competition down there is enormous, and all of it would take

15 it, you know, an additional order such as this forfeiting the

16 entire resort to add fuel to the fire down there that the

17 competition would be able to sort of wave that to their

18 potential purchasers.

19         THE COURT:  Okay.

20         MR. SOUTHER:  Thank you, Your Honor.

21         THE COURT:  And does the Government have anything

22 they want to add?

23         MS. O'CONNOR:  Your Honor, we just wanted to point

24 out in terms of the ownership interest and the equity

25 interests owned by the LLCs, we've considered that option;

23

however, the ownership structure has it that the trust has the
first place beneficiary being the bank and then the second
place beneficiary being the LLC, Mexican LLC, and then
underneath that the domestic LLCs.  And the problem being if
we only seek to forfeit the interest owned by the LLCs, the
bank is no longer subject to the forfeiture, and the project
itself as a whole could turn around and foreclose on the
property and there would be nothing left.  So that's a very
real concern.

          In terms of the timeshare interest, that seems to be
the greatest concern of the Court and the resort.  It may turn
out that these interests are contractual interests rather than
property interests that aren't even subject to forfeiture.  It
may be now --

          THE COURT:  But why wouldn't the Government just
carve that all out as part of the initial order of forfeiture,
this order of forfeiture will not impact the ability of
timeshare owners to transact business with respect to their
property?  The Government doesn't care -- we're not going to
get involved in the timeshares.  We're going to let them
proceed as if this property wasn't subject to forfeiture
because it's not productive for the Government to start
putting requirements on timeshare owners that could
potentially damage the value of the entire property?  I don't
even know why the Government is even concerned about that.

1           MS. O'CONNOR:  The Government has considered that,

2  although we don't -- again, we're not sure what these

3  contracts look like, how to even describe them in the

4  forfeiture order to carve them out.  If that's something the

5  Court would like us to do, we can carve out the timeshare

6  interest, although we do have concerns about some of these

7  individual lot owners and the timeshare interests.  The

8  Government's aware that Jowdy, for example, has obtained a

9  home, we believe, without any value given.  So those are the

10  kinds of interests that we would look to seek to forfeit.

11           THE COURT:  I don't have any problem with those --

12  you heard what I said.  I understand the relationship that Mr.

13  Jowdy and his entities to what happened here, so that's -- I'm

14  not concerned about limiting his ability or, you know, of

15  making sure whatever interest he has down there or has

16  received is potentially subject to forfeiture.  I don't have

17  any issues with that, but that also doesn't mean in order to

18  effectuate that -- I understand what you're saying about the

19  bank and its ability then to foreclose and, you know, move

20  ahead.

21           But there's got to be a solution in between where --

22  and, you know, I'm a judge.  I'm not a business person, so I

23  don't know all the intricacies of something like this.  So I'm

24  relying upon the Government's assessment of the way to do this

25  to protect what the Government is trying to accomplish here

25

1   without overreaching in a way that is going to hurt everybody.

2   And I don't think we're at that point.  If the Government just

3   continues to not really focus on this, I'm going to have to

4   try to figure out myself in terms of where I should draw the

5   line.  But I am not comfortable with what the Government is

6   proposing now, which is just to forfeit all the property,

7   we'll try to maybe pursue an interlocutory sale.  If we can't

8   do an interlocutory sale, we'll figure it out.  I'm not

9   comfortable with that.

10              So I'm suggesting to you without understanding all

11  the intricacies -- I understand you may need more cooperation

12  and more documentation to be in a place that you're

13  comfortable with.  What I want the Government to do is try to

14  obviously focus its attention on the core of this case which

15  is the entities that were controlled by the defendants and

16  those entities that the money was moved into and protect all

17  of that, make sure that that's protected in the context of a

18  forfeiture but allow to the extent you can allow the ongoing

19  business of the resort including the timeshares to be

20  completely unaffected by what the Court is doing.

21              If there are little instances where the timeshare

22  relates to Mr. Jowdy, obviously, the Government can deal with

23  that.  I'm talking about the thousands of people who have

24  purchased timeshares, people a year from now who may want to

25  sell their timeshares.  There should be something in the order

26

 1   once the Government gets efficient documentation to be
 2   concerned to eliminate any concerns to allow the ongoing
 3   development and business of the resort to continue regardless
 4   of whatever forfeiture order that the Court enters.  That's --
 5   I don't know how much more guidance I can give you, but that's
 6   what my concern is.
 7          MS. O'CONNOR:  So the Government thinks that it
 8   would be most helpful then if the Court would order Jowdy and
 9   the resort then to produce the contracts and the trust
10   agreement so that we can formulate a way to forfeit the
11   property to the best of our abilities and preserve the value
12   of the resort and perhaps carve out some of these interests
13   that the Court is concerned about.  But until we see these
14   records and have a way to do that, we're in an impossible
15   position as well.
16          THE COURT:  Where's Mr. Souther?
17          MR. SOUTHER:  Your Honor, the Government's never
18   asked for any of the records.  The records they've asked for
19   are the financial records which we, as we've discussed in past
20   appearances, we give them all the financial data that we give
21   to the bank.  You know, I'm not sure exactly what records that
22   she's looking for, whether she's looking for the 6,700
23   contracts that have been signed already with respect to the
24   timeshares and the 170-plus sales of real property that have
25   already been sold over the years.

27

1          I mean it's not clear to me, but they've never even

2     asked for this information.  So the idea that she's asking the

3     Court to order something as though, you know, she hasn't been

4     able to get it from us is a little frustrating, frankly.

5          THE COURT:  All right.  Well, let's not try to

6     resolve it today.

7          MR. SOUTHER:  Yeah.

8          THE COURT:  But I'm going to ask that you sit down

9     with the Government, make a request for whatever documentation

10    the Government wants, and if you can't agree to provide it, I

11    want you to come back right away to me and tell me what you --

12    what they agree to provide and what they won't provide.  But I

13    want you and your clients to understand my view is that the

14    Government in order to address the Court's concerns regarding

15    the scope of the forfeiture, she get access to these

16    materials.  This is all part of trying to figure out --

17         MR. SOUTHER:  Certainly.

18         THE COURT:  -- where I should draw the line and how

19    I should try to address these very complicated forfeiture

20    issues that are before the Court.  So before you come to me

21    with every little document, you should understand that it's

22    going to be my generally view of the situation, all right?

23         MR. SOUTHER:  No, I understand, Your Honor.

24    Absolutely.

25         THE COURT:  All right.  So I don't know, does the

28

1    Government want to report back to the Court two weeks, three

2    weeks?  I don't know what you think is a reasonable amount of

3    time.

4              MS. O'CONNOR:  Three weeks, Your Honor.

5              THE COURT:  Three weeks, okay.  So three weeks from

6    today I'll get a letter from the Government indicating what

7    documentation, if any, that Mr. Souther's clients will not

8    provide.  You know, you can just describe what your agreement

9    is generally.  I don't need to know every document, but just

10   tell me what generally you agreed up on and if there's any

11   area of disagreements, let me know and then we'll have a

12   conference immediately, okay?

13             MR. SOUTHER:  Thank you, Your Honor.

14             THE COURT:  All right.  Thank you.

15             MR. TALKIN:  Your Honor, there's one issue I'd like

16   to raise that I think you were starting to raise in your

17   comments and that's about the timing.  You know, our position

18   -- and well, I shouldn't speak for Mr. Constantine -- is that,

19   you know, our hope is that some of these victims will

20   ultimately, especially out of the Jowdy share get some money

21   back.  And if that happens, that's powerful 3553(a)

22   information for the Court to analyze when deciding what

23   sentence to deliver upon Mr. Constantine.

24             And that's why there's a real timing issue as to us

25   as well because if a victim of a crime gets paid back, I think

1   that the crime itself is viewed differently than a victim of a

2   crime that doesn't get paid back.  That's pretty fundamental

3   to sentencing.  And I think that -- I know that that is a

4   concern of ours.  So we although have no power and control

5   over what's happening here, we just want to let the Court know

6   our timing concern.  If there is an opportunity for victims to

7   get their money back and we're hoping there is, we would like

8   that to happen before we're sentenced because obviously that's

9   something the Court can consider in sentencing.

10              THE COURT:  Well, I guess I don't agree with the

11  fundamental idea that I should hold off sentencing until we

12  see ultimately how much victims recover.  I mean I just don't

13  -- you know, obviously restitution is set in a lot of cases,

14  and we don't put off sentences to see.  But I understand your

15  basic point, but I want you and your client to understand the

16  whole -- I mean I went through the trial here.  I understand

17  that not every dollar was, you know, dissipated and spent on

18  other things.  I understand that a significant amount of the

19  money went into Mexico.

20              So to the extent he's concerned that the Court will

21  not consider that because we don't know how much is actually

22  going to be recovered, I don't think that's fundamentally how

23  I'm looking at the sentencing.  I understand that issue and

24  we'll do the best that we can.  I'm going to go through with

25  you now what I anticipate in terms of the sentencing.  My goal

1    is to have the sentencings happen in September.  We can't --

2    you know, I've been a judge, you know, this is 13 years.  I've

3    never had a case where the sentencing has been delayed this

4    long and there's been reasons for it.  It's not like nothing

5    has been happening.  But there has to come an end, so we'll

6    see where things stand with this by September.  But we're not

7    going to wait, for example, for an interlocutory sale or

8    anything like that.  That's not happening, okay?

9              MR. TALKIN:  I understand that, Your Honor.

10             THE COURT:  All right.

11             MR. TALKIN:  I just wanted to raise that issue so

12   you understand what we're thinking about.

13             THE COURT:  Yeah.  I would also ask in the

14   discussions -- and obviously, the bank can participate in

15   these as well -- it's Mr. Souther, but it does make sense that

16   regardless of whether there can ever be an interlocutory sale,

17   that this appraisal process should go forward I think because

18   it would help everybody assess the whole situation.  So I'm

19   going to make that part of your discussion of making that move

20   forward, you know, whatever the Government needs in order to

21   be in a position to get an appraisal, that -- you know,

22   everybody's encouraged the Government to take a look at how

23   much the property's actually worth right now.  And that also

24   much be helpful to, you know, to the types of arguments that

25   Mr. Talkin and Mr. Kenner might want to make with respect to

31

1  sentencing, right?  If you know the value of the property, at

2  least that would give you something to work with.

3          MR. TALKIN:  Sure.

4          THE COURT:  Okay.

5          MR. TALKIN:  Absolutely.

6          THE COURT:  All right.

7          DEFENDANT KENNER:  And, Your Honor, if I could just

8  clarify one point, you know, the Government back in 2015, 2016

9  actually did their own accounting on the cash flow that

10  they're now talking about and they provided the Court during

11  the forfeiture hearings in early 2016 with both Government

12  Forfeiture Document 36 and Government Forfeiture Document 44.

13  Government 44 was the accounting records that Mr. Wayne had

14  produced for the Government through Jowdy's attorneys

15  confirming that a hundred percent of the money that flowed out

16  of Hawaii as loans to Jowdy were in facts loans to Jowdy in

17  spite of the Government's proffer during trial of being phony,

18  bogus, and supposed.

19          Second and probably more important to this

20  forfeiture issue, and the Government's trying to morph these

21  two accounting records together when they are two unique

22  issues.  And I addressed that on my last representations to

23  the Court.  I think it was in Docket 667.  But Forfeiture 36

24  was the Government's accounting to track the funds that went

25  to the purchase of the Cabo San Lucas property.  My two

1  partners -- and for the record, zero of the dollars flow

2  through any of my personal accounts.

3  My entity that the Government seeks to forfeit, Baja

4  Ventures 2006, was paid for in its entirety by my two

5  partners, Joseph Stumpel [Ph.] and [indiscernible], neither of

6  which were ever named in the superseding indictment.  The

7  Government through Forfeiture 36 traced $4.1 million to Mr.

8  Jowdy for the purchase, although he only docketed 2.5 million,

9  pilfering the other 1.6 that resulted in Mexican litigation as

10 I've written to the Court.

11 The other investors, which include Mr. Peka [Ph.]

12 who you've seen here and about nine other investors, totaled

13 2.3 million.  So in context, $6.4 million was directly sent to

14 Mr. Jowdy by my investors that are in the two equity LLCs.

15 Mr. Jowdy through his legal counsel only represented that

16 $6.25 million was given to the seller, so he's $150,000 short

17 on what we gave him for our two equity positions,

18 notwithstanding his accounting errors again in his favor.

19 THE COURT:  All right.  I don't want to go through

20 all the details.  I understand what you're saying, Mr. Kenner,

21 but the purpose today is really just to give general guidance

22 on what I'm trying to formulate with respect to the -- to

23 these individual issues.  Obviously, I have the briefing.  I'm

24 looking at them, but I don't want to get into all the details

25 of that.

33

1        DEFENDANT KENNER:   Okay.

2        THE COURT:   Okay?

3        DEFENDANT KENNER:   I just want to make sure the

4   Court was aware that they're morphing the Jowdy loan which was

5   a separate issue from the actual equity investments.   And the

6   Government's own accounting does that.   I didn't --

7        THE COURT:   Okay.

8        DEFENDANT KENNER:   -- I didn't provide that --

9        THE COURT:   All right.

10        DEFENDANT KENNER:   -- for the Court.   They did it

11   themselves, but now they want to ignore it and morph the two

12   issues together.

13        THE COURT:   All right.   Okay.   With respect to the

14   sentencing, obviously, we have the updated addendum for Mr.

15   Constantine.   I just want to make clear I think I've said this

16   before, but it is the Court's view and it's consistent with

17   the Government's letter to the Court, you know, two years ago

18   that we're not -- that the Government is not seeking to hold

19   the defendants accountable for any uncharged frauds.   The

20   scope of sentencing relates only to the frauds that were

21   proved at trial, and so I don't see any need for any type of

22   Fatico hearing.   Nobody has persuaded me based upon any of the

23   submissions that I should reopen the record with respect to

24   the frauds that were proven at trial for purposes of the

25   sentencing.   Both sides had a fair opportunity to litigate

1  that, and so I don't envision there'd be any Fatico hearings.

2         Obviously, I know the Constantine motion for a new

3  trial or for judgment of acquittal is still pending and I'm

4  going to plan on issuing an opinion obviously prior to the

5  sentencing on that.  But what I want to do is to -- to the

6  extent, you know, all the objections to the guidelines

7  calculations are in, I have those, I'll address them.  But to

8  the extent that the defendants and then if the Government

9  wants to respond and wants to put them in more general

10  sentencing submission, we should set a date for you to do

11  that, okay.  So, again, I'm trying to have the sentencing in

12  September, so you tell me what's a reasonable time for you to

13  put that in?

14         MR. TALKIN:  Late August.

15         THE COURT:  Okay.  This is for you as well, Mr.

16  Kenner.

17         DEFENDANT KENNER:  Yes, Your Honor.

18         THE COURT:  August 26th.  So this would include, Mr.

19  Kenner -- and I know you requested for me to give you another

20  standby counsel and I'll talk to you about that in a minute.

21  I don't -- if you want someone just to help you, I assume it's

22  just to try to help you formulate these types of things for

23  sentencing.  I just want to make sure just so you can

24  understand what you may or may not need standby counsel for.

25

1        And I want to make clear this is not going to affect

2   the deadlines.   I'll find an attorney that can help explain

3   certain things to you regarding the procedure, but we're not

4   going to have an attorney who's going to need six months, you

5   know, to get familiar with the record.   That's not in your

6   interest.   That's not in anybody's interest.

7            DEFENDANT KENNER:   I'm in concurrence with that.

8            THE COURT:   All right.

9            DEFENDANT KENNER:   The only person we're still

10  waiting on is the forensic accountant who has failed to come

11  see me through multiple, multiple promises.

12           THE COURT:   Yeah, I did see that.   But I'll ask Mr.

13  Talkin about that in a minute, but to the extent you're making

14  any additional requests other than I saw in your list of open

15  items, there was the document that I think the Government said

16  they would provide as long as you entered a protective order.

17  And we discussed that so long ago, I didn't even realize it

18  was still an open issue.   But this was the appraisal, right?

19           DEFENDANT KENNER:   Yes, sir.

20           THE COURT:   What --

21           MS. LEONARDO:   Your Honor, I have the

22  confidentiality agreement with me and the appraisal if you'd

23  like to sign it now.

24           THE COURT:   Okay.   All right.   So you can get that,

25  but other than that, Mr. Kenner, to the extent you're sending

36

1   me these request for admissions to any type of discovery

2   demands that you're requesting at this point are denied.

3   We're not -- as I just said, we're not -- there's going to be

4   no Fatico hearing.  I'm not reopening the forfeiture

5   proceeding for what you're calling new evidence.  I don't

6   believe there's any basis for doing that at this point.

7            So the only thing you're -- and I'm going to have

8   the Government respond to your motion for return of property

9   and your motion for reconsideration on the Rule 29 and 33

10  motion.  I'll have them put in a response to that.  But other

11  than them responding to that, the only additional thing you're

12  going to be submitting to the Court is your -- you know, your

13  sentencing submission, any letters from family or friends,

14  that type of thing.  That's where we're up to in this

15  proceeding.

16           And then the one last thing I wanted to talk about

17  was restitution, but -- so that submission, Mr. Kenner, is

18  August 26th.  Cant he Government respond by mid-September?

19                      [Pause in proceedings.]

20           MR. HAGANS:  I'm just looking at the calendar, Your

21  Honor.

22                      [Pause in proceedings.]

23           MS. KOMATIREDDY:  September 9th, Your Honor, should

24  be two weeks.

25           THE COURT:  Sure, September 9th.  And then I'll just

37

1    pull up the -- I think the week of the 23rd, September 23rd.

2                        [Pause in proceedings.]

3             THE COURT:  September 25th for sentencing.  I don't

4    know if the Jewish holidays -- are the Jewish holidays -- I

5    think they're later than that.  I think it's, right, the 30th

6    and the 1st?

7             MR. TALKIN:  If it's a problem, we'll deal with it.

8             THE COURT:  Okay.  All right.  So we'll say 11:00

9    a.m. September 25th for sentencing.  So, Mr. Kenner, in terms

10   of what I've described, do you still want standby counsel to

11   try to assist you in this additional submission that you're

12   going to be making?  Is that what you're requesting?

13            DEFENDANT KENNER:  Yes.  If someone would just come

14   to visit me once at MDC.

15            THE COURT:  Okay.

16            MR. TALKIN:  And, Your Honor, as far as the

17   accountant, I didn't know that there's been an issue recently.

18   I will --

19            THE COURT:  Yeah.

20            MR. TALKIN:  -- do the steps.  The only thing I ran

21   into is when it was a joint -- it was a co-counsel issue, I

22   could attest to get the -- I have to do an attestation to get

23   the non-attorney into the jail.  Since I'm not -- it's not for

24   me under these particular circumstances, it's a little more

25   difficult.  If --

38

```
1              THE COURT:  Okay.  If you need an order from the
2    Court --
3              MR. TALKIN:  That's what I was going to say.
4              THE COURT:  Yeah.
5              MR. TALKIN:  If it's okay, I'll contact -- MDC
6    Legal's been great with this, so I'll contact them.  And it
7    may take a court order, but I'll take the time to make that
8    happen as soon as possible.
9              THE COURT:  All right.  And so let me ask the
10   Government, Mr. Kenner did put in this return of property
11   motion.  I don't know if the Government saw that.
12             MR. HAGANS:  We did, Your Honor.
13             THE COURT:  Do you want to just respond to that in
14   writing as well?
15             MR. HAGANS:  I'd be happy to respond in writing.
16   There's one specific allegation I'd like to put on the record.
17             THE COURT:  Okay.
18             MR. HAGANS:  Mr. Kenner, I believe it's an associate
19   of his, filed an affidavit --
20             THE COURT:  Yes.
21             MR. HAGANS:  -- requesting return of some cash.
22             THE COURT:  Money, yes.  Twenty-five thousand
23   dollars, right?
24             MR. HAGANS:  Yes.  The Government obviously disputes
25   the circumstances set forth in that affidavit.  The Government
```

1  was executing a valid search warrant and executed it validly.

2  However, the Government did seize cash.  It wasn't $25,000.

3  It was $15,000, 150-$100 bills.  That seizure was disclosed to

4  Mr. Kenner via his counsel on March 24th, 2014.  I'd refer Mr.

5  Kenner to Docket 48 which had the return on the search warrant

6  which identified that seizure and identified the location from

7  which those funds were seized.

8       The Government is puzzled that it took six years for

9  this issue to be raised by Mr. Kenner's associate, puzzled

10  that it took a year for the affidavit to be filed, puzzled

11  that it's taken five years since the disclosure of that

12  seizure.  But if Mr. Kenner's disclaiming all claim to those

13  funds and if the associate is willing to complete any

14  necessary administrative paperwork that the FBI may require to

15  return those funds, the Government has no objection per se to

16  the return of that property.

17       THE COURT:  Okay.

18       DEFENDANT KENNER:  I think I understand what they

19  were saying, Your Honor.

20       THE COURT:  All right, that you need to disclaim any

21  interest and then I understand there's a dispute about the

22  amount.

23       DEFENDANT KENNER:  I believe I did disclaim that in

24  the last paragraph of my affidavit on my 41(g) motion, Your

25  Honor.

1          THE COURT:  All right.  Did the Government see that?

2     I didn't look at that particular issue, but if you think

3     something else is required beyond that?

4          MR. HAGANS:  I think with that and with his

5     statement now on the record --

6          THE COURT:  Okay.

7          MR. HAGANS:  -- should suffice, Your Honor.

8          THE COURT:  All right.

9          MR. HAGANS:  And with respect to the other items,

10    we'll be happy to respond in writing.

11         THE COURT:  All right.  Do you want to make that

12    maybe September 13th?

13         MR. HAGANS:  I'm sorry; just a moment, Your Honor.

14         THE COURT:  Or you want to do it sooner?  It's up to

15    you.

16         MR. HAGANS:  I don't think we need that much time,

17    Your Honor.

18         THE COURT:  How long do you need?

19         MR. HAGANS:  Three weeks, Your Honor.

20         THE COURT:  Okay.  July 23rd.  And then I also want

21    you to put in -- I know obviously the motion for

22    reconsideration rehashes a lot of the things that the

23    Government has already briefed, but -- and you can

24    reincorporate things you've already briefed, but I do want you

25    to put something in writing on that as well.  So do you want

41

1  to suggest a date for that?

2          MS. KOMATIREDDY:  The same is fine, Your Honor.

3          THE COURT:  Okay.  All right.  Mr. Kenner, I'll give

4  you -- you can have -- how long do you need to put in a reply

5  if you wanted any of those things, either of those things?

6          DEFENDANT KENNER:  I'll put a reply in as soon as I

7  get the paperwork from the Government.

8          THE COURT:  They're going to get it to you July

9  23rd, so two weeks, three weeks?

10          DEFENDANT KENNER:  Three weeks would be fine just to

11 make sure that it gets to me --

12          THE COURT:  All right.

13          DEFENDANT KENNER:  -- gets delivered to me.

14          THE COURT:  So your reply on either of those motions

15 is August 13th.  And I won't have argument on those unless I

16 think it's necessary.

17          MR. TALKIN:  Your Honor, as to that motion, to the

18 extent that we're going to join in and I don't know yet, I'm

19 still working my way through those motions, we'll follow the

20 same schedule.

21          THE COURT:  All right.

22          MR. TALKIN:  We'll let it be known before the 23rd

23 if there's any additional filing we have.  We'll file it in

24 that three-week period.

25          THE COURT:  All right.  And, Mr. Kenner, did -- we

42

1   docketed his motion but he submitted two disks with exhibits.

2           DEFENDANT KENNER:  Yes, sir; Your Honor.

3           THE COURT:  So --

4           MR. TALKIN:  I'll work out getting them.

5           THE COURT:  Yeah.  And we'll make copies and get it

6   to the Government, okay?

7           MS. KOMATIREDDY:  Yes, Your Honor.  That would be

8   great.  I'll coordinate with your chambers, Your Honor.

9           THE COURT:  All right.  Then the only other issue I

10  had is I was thinking about the restitution issue and I have a

11  concern.  It somewhat overlaps with the forfeiture issue as

12  how the Court would figure out how to set restitution in this

13  case.  I don't know if the Government's given thought to that.

14  In other words, you'd have to know the value of the resort,

15  you would have to know what the value of the interests are.

16  How would the Government -- how would the Court figure out

17  what restitution the amount should be given obviously that not

18  all the money is lost and is --

19          MS. KOMATIREDDY:  I'm sorry, Your Honor.

20          THE COURT:  -- at least in part invested.

21                    [Pause in proceedings.]

22          MS. KOMATIREDDY:  Yes, Your Honor.  So with respect

23  to the restitution, first of all, just as a first principle,

24  the restitution only applies to the counts of conviction, the

25  offenses for the counts of conviction.  So we would focus on

1    the loss related to the three frauds proved at trial and then

2    from there, we have loss affidavits from the victims

3    explaining their specific losses.

4            THE COURT:  I know, but -- look, I understand that,

5    but like the Hawaii loss, the money -- at least part of the

6    money obviously went to Mexico.  So to figure out what the

7    loss is, I would have to determine how much money is left in

8    Mexico, what its worth is.  I don't know given all these

9    issues we're talking about with respect to the forfeiture, I

10   don't know how I could do that, right, or am I missing

11   something?  How am I going to figure out how much of the money

12   that was from the Hawaii fraud that's now in Mexico what it

13   is, what's that amount?

14           MS. KOMATIREDDY:  I understand your question, Your

15   Honor.  But I think it proceeds in two steps.  First, we are

16   looking at just the present loss absent Mexico.  Mexico is if

17   forfeited and if it yields value is just a way to satisfy the

18   restitution.  The Court doesn't need to anticipate in advance

19   how much the victims will be compensated by proceeds from

20   Mexico in order to back-calculate restitution.  With the

21   restitution order, the proceeds from Mexico will be used to

22   satisfy the restitution order.

23           So all the Court has to do at sentencing and it also

24   has time after sentencing to do this under the statute is an

25   additional 60 or 90 days is just explain how much -- an

1  interim order indicating how much each victim is entitled from

2  any prospective forfeiture monies that come in.

3          THE COURT:  Well, you said a lot of different things

4  that I don't quite understand.  Maybe I missed it.  First of

5  all, if you're suggesting to me I just set the order of

6  restitution at what the victims gave to -- you know, their

7  affidavit of loss is going to say I gave X amount to Mr.

8  Kenner or Mr. Constantine, and I haven't gotten it back.  If

9  you're suggesting that that's the amount of the restitution, I

10  just disagree.  I don't think to the extent that they have

11  ongoing, you know, interests, I'm not sure that you just

12  ignore that for purpose of restitution.  So maybe I'm

13  misunderstanding what you're suggesting or maybe I don't

14  understand the law.  But I don't understand the law to be that

15  you ignore whatever may be the present value of whatever

16  interests remain in the most simple case.  This is obviously

17  -- if you add the securities case or so much money is taken,

18  but a certain amount is left in stocks or whatever it might

19  be.  You have to subtract that out, right?

20          MS. KOMATIREDDY:  Right.  I understand the concern,

21  Your Honor, and there are going to be -- the simple case in

22  this instance will be some of the victims were reimbursed for

23  example by another trust bank.  And we'll subtract that out.

24  But with respect to the property monies that went to Mexico,

25  some of those --

1          THE COURT:  I should just assume that's zero or --

2    and then you said something about forfeiture which is

3    inconsistent with my -- I thought the Government always tries

4    to keep the forfeiture separate from the restitution issue.  I

5    thought you said at the end that the money from the forfeiture

6    will be applied to -- that I will order that the money from

7    the forfeiture be applied to the restitution or maybe I

8    misunderstood that.

9          MS. KOMATIREDDY:  I'm sorry I was unclear.  The

10   issue with respect to the Court's order, yes, the forfeiture

11   and the restitution orders separately.  In practice, what ends

12   up happening is when money comes in, it is first used to make

13   the victims whole and then forfeited -- and the excess

14   forfeited by the Government.

15         THE COURT:  Okay.  But again, that's good to hear,

16   but I don't know that that then would affect the amount that I

17   set for purposes of restitution.

18         MS. KOMATIREDDY:  I understand what the Court's

19   concerns are.  We're happy to address that in our sentencing

20   submissions.  I think we can parse this out in a way that it

21   will be feasible.

22         THE COURT:  Okay.  Yeah, I think you should -- and

23   obviously the defendants can as well to the extent you have a

24   position on what the amount of the restitution should be.  And

25   I understand.  I'm not suggesting the whole restitution issue

1   is in that category, but the more I thought about the

2   forfeiture issue with regard to the money that's in Mexico, I

3   started thinking about how I'm going to be able to resolve

4   that, you know, for purposes -- you know, Mr. Kenner has made

5   a lot of requests to me about the value of that property and,

6   you know, again, I don't think it matters for purposes of the

7   sentencing in terms of what my sentence is going to be.  But

8   it could potentially be relevant on the restitution issue.

9            MS. KOMATIREDDY:  I understand, Your Honor.

10           THE COURT:  Okay.

11           MS. KOMATIREDDY:  We do have one more concern with

12  respect to the sentencing, and we appreciate the Court has

13  already moved those to a conclusion in September.  We do

14  expect the presence of multiple victims that were affected in

15  this case at trial and at sentencing, and we expect that they

16  will be flying in from great distance.  I know in the past in

17  this case it's not uncommon for an adjournment to be requested

18  close to the deadline for a submission.  So all we ask is if

19  defense counsel or the defendant pro se is going to request

20  any sort of adjournment that it be done sufficiently in

21  advance that we can avoid having an issue with respect to

22  people flying in for the sentencing.  So we would ask that the

23  Court direct --

24           THE COURT:  I'm actually thinking maybe we should

25  have a status conference in early September -- Mr.

47

1  Constantine, you can appear by phone for that -- and we'll

2  just see.  We'll make sure -- you know, all these issues.  We

3  have a lot of moving pieces.  We'll make sure that we're

4  staying on track.

5       I mean I did -- I saw how many objections there were

6  any how many guidelines issue there are.  I did think about

7  maybe bifurcating the sentencing and doing those issues on one

8  day and then having the actual sentencing like the following

9  day.  So if I decide to do it that way, I'd like to avoid

10 that.  But my thinking was we could probably get it all done

11 in one day, but given what you said, maybe I'll structure it

12 in a way to make sure that whoever's flying in will not have

13 to, you know, sit through an elaborate discussion of all the

14 guidelines issues, okay?

15      MS. KOMATIREDDY:  Thank you, Your Honor.

16      THE COURT:  All right.  So why don't we set a date

17 in early September for a status conference.  But, obviously, I

18 want to make sure that I'm clear on this forfeiture issue, I

19 don't necessarily need to wait until September to the extent

20 that there's no traction on getting a resolution of this.  I'm

21 around the whole summer, all right.  So how about like

22 September 5th?

23      MR. TALKIN:  In the afternoon is fine.

24      THE COURT:  Afternoon; is that okay with the

25 Government?

48

1          MR. HAGANS:  Yes, Your Honor.

2          THE COURT:  Say 1:30?

3          MR. TALKIN:  Perfect.

4          THE COURT:  All right.  Are there any other issues

5    from the Government for today

6                    [Pause in proceedings.]

7          MS. KOMATIREDDY:  No, Your Honor.  Nothing from the

8    Government.

9          MR. TALKIN:  Two brief issues, one I think you just

10   answered it.  So, in our sentencing memorandum on the

11   guidelines issue, it's my take that you want us to succinctly

12   crystalize the few disputed areas and that's appropriate to be

13   in the sentencing memorandum as opposed to --

14         THE COURT:  Yeah.

15         MR. TALKIN:  -- the objections that have already

16   been made?

17         THE COURT:  Yeah.  You don't have to repeat all the

18   objections already admitted.  I have those submissions.  If

19   you want to, as you point, crystalize them or repeat a few of

20   them or -- you can put those in as well, but you don't have to

21   repeat.  I have all those submissions and I'm going to be

22   looking, you know, at all of the submissions, not just this

23   last one, okay.

24         MR. TALKIN:  And, secondly, there's a small bail

25   issue to deal with.  There was a sureter by the name of Sue

49

1   Ellen Ferguson who unfortunately passed away.  Before that

2   happened, we -- the property that she posted, the equity of

3   that ended up in my escrow account and is still there.  I've

4   been contacted and so has the Government and Mr. Hagans has

5   been working with me on this, there are some issues about that

6   money because it's now no longer Ms. Ferguson's.

7           The good news is that some 360,000 of the 530- that

8   are in the account went to Kiki Constantine who's also a

9   sureter.  So I think that's easily resolved.  She understands

10  that that's no longer a liability of Ms. Ferguson, but that's

11  still posted as bail for Tommy Constantine's behalf, but it's

12  now her responsibility.  So that's easy.

13          There's another $170,000 that was passed to Mr.

14  Constantine's children in a trust.  I haven't released that,

15  nor would I.  What has happened though, fortunately, is that

16  Kiki Constantine, the mother's home that she's posted, since

17  she posted it has gone up in value much more than that

18  $170,000.  So I think one way to resolve it is it's actually

19  resolved because you have that surety there.

20          I don't think from my communications with the bank,

21  with the attorney dealing with the trust and the will in

22  Arizona, I don't think they're asking for that 170- to come

23  out.  I'm certain that they're not.  But I just want to flag

24  that for the judge because there is that issue there that this

25  doesn't belong to the same sureter, but I believe that we

50

1    still have the coverage that the Court has required of that

2    $170,000.  So I don't think it's an issue, and I can tell you

3    that 170- isn't going anywhere, but I just -- you can see --

4         THE COURT:  Okay.

5         MR. TALKIN:  -- the obvious issue that we can see --

6         THE COURT:  Yeah.  No, I'm --

7         MR. TALKIN:  -- worse case scenario arising.

8         THE COURT:  Okay.  If the worst case scenario, you

9    can have obviously raise it with me at that point given what

10   you've said about the other property.  But I don't think we

11   need to worry about that today.

12        MR. TALKIN:  And then, finally, I will put in

13   writing that Sue Ferguson -- basically what I just told Your

14   Honor, I'll put in writing so that we can release Sue Ferguson

15   legally so that they can move on in Arizona with whatever

16   other issues they have.

17        THE COURT:  Okay.  Thank you.

18        MR. TALKIN:  Thank you, Judge.

19        THE COURT:  All right.

20        MR. HAGANS:  I'm sorry, Your Honor, if I can just

21   add based on my understanding what the discussions with the

22   estate attorney in Arizona, it's the Government's

23   understanding that unless something changes, Mr. Constantine

24   is set up to become the trustee of those trusts to which

25   counsel referred which are in the names of I believe his minor

1  children.

2          It's been a while since I looked at the documents,

3  but it's a total of approximately $1.5 million across the I

4  believe it's three.  I believe that includes or is expected to

5  include the funds that are in that escrow account.  Seeing as

6  how nothing has as of now technically changed, that estate or

7  probate order has not been issued by the Arizona court.  The

8  Government has not had an application on this subject, but

9  suffice it to say the defendant having access even as a

10  trustee to that sum of money gives the Government great

11  concerns.

12          I've expressed those concerns with defense counsel,

13  and I believe he's agreed to try and work around it so that

14  the defendant is not a trustee of those assets.  But given

15  that the issue was raised, I wanted to express the

16  Government's concerns to the Court.

17          THE COURT:  All right.  So I don't know if you want

18  to respond to that.

19          MR. TALKIN:  Your Honor, yeah.  I mean he's right.

20  We've discussed it.  I mean, obviously, look, if he's a

21  trustee to that amount of money, there are obvious concerns

22  that would be raised with any defendant, but particularly to

23  Mr. Constantine, I think he's demonstrated that those concerns

24  are unfounded.

25          I've spoken to the attorney who told me basically

52

1  the way it breaks down is if he were to resign as the trustee,

2  his wife would become next.  And then the next individual is

3  one of the sureters, an individual Mr. Curry, but he has a

4  fiduciary duty to the trust because he's managing the money.

5  So he wouldn't be able to take it over.  And then finally,

6  there would be I think the [indiscernible] is a corporate

7  trustee, and that's where the issue lies.  So --

8            THE COURT:  Okay.

9            MR. TALKIN:  -- certainly there's no problem making

10  his wife the trustee, but falling further than that, there's

11  some issues.  Now we haven't gotten there yet, but --

12            THE COURT:  Well, let's see where -- I mean it's in

13  the probate court right now, right, so --

14            MR. HAGANS:  Correct, Your Honor.

15            THE COURT:  -- obviously, you know, when this

16  crystalizes, if you can't work it out, you can bring it to me.

17  But --

18            MR. TALKIN:  Okay.

19            THE COURT:  All right.

20            MR. TALKIN:  Thank you.

21            MR. HAGANS:  Thank you, Judge.

22            THE COURT:  I understand obviously the concern.

23            Okay.  Mr. Kenner?

24            DEFENDANT KENNER:  Yes, Your Honor.  I was just

25  going to clarify that because of my hearing, that Mr. Talkin

53

1  was going to arrange for the forensic accountant; is that

2  correct?

3          THE COURT:  Yes.  He's going to submit an order to

4  me so that he can visit you, okay, Mr. Talkin?

5          DEFENDANT KENNER:  Okay.

6          MR. TALKIN:  That's right, Judge.

7          THE COURT:  And then I will issue an order so that

8  you'll get a copy in the jail once we figure out -- we have to

9  call some attorneys who are on our list of CJA lawyers to see

10 who's available to fulfill this role.  And we'll issue an

11 order so you know the person's name, okay?

12         DEFENDANT KENNER:  That's fine.  And the forensic

13 accountant was also included in what Mr. Talkin was going to

14 make an arrangement for?

15         THE COURT:  I thought that's what we were just

16 talking about was the --

17         DEFENDANT KENNER:  Okay, not the standby counsel for

18 --

19         THE COURT:  No.  We're -- I'm talking about -- he

20 was talking about the forensic account.  He's going to submit

21 an order so the forensic accountant can come visit you, and

22 I'm going to issue an order that just indicates who your

23 standby counsel is, okay?

24         DEFENDANT KENNER:  Thank you, Your Honor.  And I'll

25 address those -- the calculations of restitution, et cetera,

54

1   as you discussed earlier.

2          THE COURT:  All right.  Thank you very much.  Have a

3   good day.

4          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

5          MR. HAGANS:  Thank you, Judge.

6          MS. KOMATIREDDY:  Thank you, Judge.

7   (Proceedings concluded at 2:22 p.m.)

8                         *  *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

55

1        I certify that the foregoing is a court transcript from

2   an electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5   _____

6                           Shari Riemer, CET-805

7   Dated:  July 15, 2019

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25