*Kenner -- ineffective counsel motion (Rule 33 supplement)*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                     |

UNITED STATES OF AMERICA      |

    against-                         |

                                   |   **Docket No. 13-cr-607 (JFB)**

PHILLIP A. KENNER and       |
TOMMY C. CONSTANTINE,   |
                                   |

Defendants.                   |
-------------------------------------------------------X

F I L E D
IN CLERK'S OFFICE
U.S. DISTRICT C?.     ?.N.Y.

★   JUL 02 2019   ★

LONG ISLAND OFFICE

Defendant, Kenner –

**MEMORANDUM IN SUPPORT OF
MOTION FOR A NEW TRIAL
*28 U.S.C. 2255*
INEFFECTIVE COUNSEL FOR DEFENDANT KENNER**



RECEIVED
JUL 02 2019
EDNY PRO SE OFFICE

1

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

## TABLE OF CONTENTS

Introduction...8

Governing Law...10

- The Second Circuit Will Review A 2255 Collateral Attack Post-Trial And Pre-Sentencing...11
- The *Strickland* Standard...12
- Reasonableness Of Trial Counsel's Performance...13
    o Presumption of Prejudice...13
- Trial Counsel Failed To Interview Obvious Pro-Defendant Witnesses And Prepare For Trial...16
- Errors Are Considered In The Aggregate, Or Cumulatively...17
- Failure To Investigate Can Alone Constitute Ineffectiveness...18

Basic Investigation Errors...21

- Vigorous Trial Advocacy Does Not Supplant Colossal Ineffective Matters...29
- Kenner Letters To Trial Counsel Pre-Trial Confirms Negligence In His Duty To Kenner And The Court...29
- Failure To File An Appropriate Motion To Suppress...34
- Failure To Request A *Daubert* Hearing (FINRA Expert)...38
- Failure To Request A *Daubert* Hearing (Signature Expert)...40
- Failure To Challenge Venue...40
- Failure To Meet With Defendant and properly prepare...48
- Trial Counsel Failed To Meet, Review Evidence, Or Discuss Strategy With The Defendant...49
- Failure To Investigate And Interview Witnesses...55
- Failure To Effectively Cross-Examination Government Witness – With Unused Impeachment Evidence Available In The Courtroom...73
- Multiple Exculpatory Documents Were Available Pre-Trial To Trial Counsel With Proper Investigations...76
- No Trial Counsel Assistance Requested From The Court...76
    o *Government forfeiture-44...77*
    o Trial Counsel Erred Not Investigating The Alleged "Stolen" Money -- *Government-Forfeiture-44* ...78
    o The Newly-Discovered Evidence Proved The Defendant Defense Was Truthful Based On Real Evidence...79
    o The Government's *Cumulative* Claim Post-Trial Was More Problematic Than Admitting They Knew Jowdy Stole The Money At All Times...80
    o The Government's Dilemma...*Because They Cannot Have It Both Ways......80*

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

- Kenner Requested A Trial-Start Delay To Complete Exculpatory Evidence Review ...82
- No Forensic Accountant Hired...84
  - *Government-forfeiture-36*...86
- Failure To Acquire Arizona Attorney Tom Baker Disclosures Re: Jowdy Loan Lawsuit...86
- Failure To Recover The Northern Trust Bank Subpoena Records -- *Or present a supplemental subpoena once discovered as incomplete*...88
- The FBI Had Copies Of The Requested Documents And Never Turned Them Over Pre-Trial...89
- Failure To Recall Any Of The Northern Trust LOC Clients -- *Or even request it*...96
  - Northern Trust Extensions of Credit documents...97
  - Northern Trust *Disbursement Request & Authorizations* documents...98
  - The *Letters of Authorization -- Signed by each Northern Trust LOC client...100*
- Weakly Supported Verdict...100
  - The Majority Of The Government's Case Was Based On Foundationless Testimony -- Contradicting Known Evidence...102
  - *Counts 2, 3 and 4*...102
  - *Counts 7 & 8*...103
- Failure To Share April 22, 2015, Superseding Indictment -- *Document 214*...105
- Failure To Submit Pre-Trial And Northern Trust Bank Follow-Up Subpoenas...107
- Failure To Allow A Co-Defendant Meeting...109
  - Lack Of Co-Defendant Meeting Proves Detrimental With Overwhelming And Direct Evidence Available To Impeach Witnesses...109
  - Co-Defendant Meeting Denied By Kenner's Trial Counsel...112
- Failure To Request A Delay In The Trial Start Date...113
- Failure To Allow The Defendant To Assist...116
  - Trial Counsel Refused To Give Kenner Trial Transcripts...117
  - Trial Counsel Failed To Take Direction From Kenner On Critical Exculpatory And Material Evidence...117

Trial Counsel's Errors Were Not Harmless...117
- Clearly Inadequate Representations By Trial Counsel...119
- Presumption of Prejudice...120

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

- Irreconcilable Differences Occurred Between Trial Counsel And Kenner Throughout Kenner's Direct-Testimony...123
- Witness Testimony Was Weak At Best And Wholly Inconsistent With 100% Of The Pre-Trial Empirical Evidence...125
- "*I can only remember specifically what I was not told*"...125
- The Government's Original Defense To The Gross "Inconsistent Statements" By Their Witnesses – Or Confabulation ...125
- *Faulty Memory, Confusion And Mistakes...*126
- How Does A Lack Of Contact To The "Involved" Professionals Constitute Any "Trial Strategy" In The Face Of A "Concealment" Prosecution?...127
- Spillover Prejudice...127
    - Spillover Prejudice Occurred Here...128
    - Privitello allegations with ZERO supporting evidence against Kenner -- *Counts 5 & 6...*129
    - More Spillover Based On Known-False Allegations -- *Counts 2, 3 and 4...*130

Rule 29 Opportunities Missed During Trial By Negligence...131
    - Lack Of Investigative Efforts Led To Full Prejudice And Harm Based On Ineffective Counsel's Unpreparedness...131
    - Trial Counsel's Forensic Accounting Failures Have Perpetuated Into The Fabricated Government Forfeiture Ruse...135
    - 100% Of The Banking Records Confirm That Kenner Stole ZERO Dollars...136
- FBI Agent Galioto's Ruse On The Court And Investors -- *Corroborated by Diamante investors...*137
- The Investors' Eufora Attorney Would Have Debunked All Concealment Claims And Rendered The Home Depot Recording As Transparent -- And Already Known By His Investigative Team...141
- Attorney Baker Signed Disclosures Debunk Any Kenner Concealment Claims By The Government...141
- Trial Prep Ended By Trial Counsel -- *After Jailhouse Recordings Pre-Trial...*142
- All "Contact" With Potential Witnesses Was A Lie By Trial Counsel...142
- Trial Counsel Failed To Call The Southern District Criminal Investigator Whose "Raw Notes" Were Denigrated By AUSA Komatireddy...144
- This Court Must Consider The Totality Of Errors On The Prosecution's Case Against The Defendant...145
- The Defendant Has Satisfied *Strickland's* Second Prong: Prejudice...146
- Trial Counsel Sat On His Hands And Allowed The Final Malfeasance During Both Summations -- *As trial counsel's final ineffective act...*149

4

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

## TABLE OF AUTHORITIES

*Bean v. Calderon,* 163 F.3d 1073, 1079 (9th Cir 1998)...14

*Bell v. Miller*, 500 F.3d 149 (2d Cir 2007) ......16, 34, 146

*Bellamy v Cogdell*, 974 F.2d 302, 308 (2d Cir 1992)...121

*Berger v. United States*, 295 U.S. 78 (1935) ......79, 80, 152

*Brady v. Maryland*, 373 U.S. 83 (1963) ......80

*Coles v. Peyton*, 389 F.2d 224 (4th Cir 1968) ......50

*Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 595, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)* ......39

*Espinal v. Bennett*, 588 F. Supp. 2d 388 (EDNY 2008) ......18, 19, 146, 147

*Eze v. Senkowski*, 321 F.3d 110 (2d Cir 2003) ......16, 23, 38, 40, 126

*Faretta v. California*...8, 105

*Gaines v. Hopper*, 575 F.2d 1147 (2d Cir 1978) ......50

*Garcia v. Portuondo*, 459 F. Supp. 2d 267, 287 (SDNY 2006) ......14

*Gersten v. Senkowski*, 426 F.3d 588 (2d Cir 2005) ......28, 127

*Green v. Lee*, 964 F. Supp. 237 (EDNY 2013) ......14, 18, 27, 29, 72

*Greiner v. Wells*, 417 F.3d 305 (2d Cir 2005) ......14, 18, 22

*Hemstreet v. Greiner*, 491 F.3d 84 (2d Cir 2007) ......146

*Henry v. Poole*, 409 F.3d 48 (2d Cir 2005) ......22, 147

*Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A.* ...101, 102

*Illinois v Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983) ......35, 36

*Jelinek v. Costello*, 247 F. Supp. 2d 212 (EDNY 2003) ......127

*Kimmelman v. Morrison*, 477 U.S. 365 (1986) ......15, 18, 22, 29, 72

*Kyles v. Whitley*, 514 U.S. 419 (1995) ......146

*Lefcourt v. United States*, 125 F.3d 79, 86 (2d Cir 1997) ......116

*Leka v. Portuondo*, 257 F.3d 89, 98 (2d Cir 2001) ......89

*Lindstadt v. Keane*, 239 F.3d 191 (2d Cir 2001) ......14 et. al.

*Lopez v. Miller* 915 F. Supp. 2d 373 (EDNY 2013) ...... 147

*Maddox v. Lord*, 818 F.2d 1058 (2d Cir 1987) ......27

*Moore v. Johnson*, 194 F.3d 586 (5th Cir 1999) ......14, 18

*Nathanson v. United States*,  290 U.S. 41, 44-47, 54 S. Ct. 11, 78 L. Ed. 159 (1933) ......36

*Pavel v. Hollins*, 261 F.3d 210 (2d Cir 2001) ......15, 26, 118

*Pena-Martinez v. Duncan*, 112 F App'x 113 (2d Cir 2004) ......19

*Porter v. McCollum*, 558 U.S. 30 (2009) ......146

*re Shargel*, 742 F.2d 61, 62-63 (2d Cir 1984) ......116

*Rodriguez v. Hoke*, 928 F.2d 534 (2d Cir 1991) ......16, 18

*Rompilla v. Beard*, 545 U.S. at 383......14, 22

*Rosario v. Ercole*, 601 F.3d 118 (2d Cir 2010) ......29, 72

5

*Schultz v. Marshall*, 528 F. Supp. 2d 77 (EDNY 2007) ......17, 19, 144, 146

*Sparman v. Edwards*, 26 F. Supp. 2d 450 (EDNY 1997) ......19

*Spinelli v. United States*, 393 U.S. 410, 418, 89 S. Ct. 584, 21 l. Ed. 2d 637 (1969) ......36

*Stouffer v. Reynolds*, 168 F.3d 1155 (10th Cir 1999) ......18

*Strickland v. Washington*, 466 U.S. 668 (1984) ......8 *and multiple*

*Texas v. Brown*, 460 U.S. 730, 742, 103 S. Ct. 2317, 76 L. Ed. 2d 502 (1983) ......35

*Trapnell v. United States,* 725 F.2d 149, 155 (2d Cir 1983) ......15

*United States v. Aguiar*, 737 F.3d 251 (2d Cir 2013) ......10

*United States v. Anderson*, 328 U.S. at 703...44, 45

*United States v. Avellino*, 136 F.3d 249, 255 (2d Cir 1998) ......89

*United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181 (2d Cir 1988) ......41, 44, 46

*United States v. Bithoney*, 472 F.2d 16, 23 (2d Cir) ......45

*United States v. Bozza*, 365 F.2d 206, 220-22 (2d Cir 1966) ......41, 42, 45, 46

*United States v. Brown*, 623 F.3d 104, 113 & n.5 (2d Cir 2010) ......11

*United States v. Busic*, 549 F.2d 252, 259 (2d Cir 1977) ......45

*United States v. Cabrales*, 524 U.S. 1, 6-7, 118 S. Ct. 1772, 141 L. Ed. 2d 1 (1998) ......42

*United States v. Chesnut*, 533 F.2d 40, 46-47 (2d Cir) ......44

*United States v. Cronic*, 466 U.S. 648, 662 (1984) ......13, 119

*United States v. Davis*, 666 F.2d at 200 ......41, 45, 46

*United States v. Delano*, 55 F.3d 720, 729 (2d Cir 1995) ......131

*United States v. Dominguez Benitez*, 542 U.S. 74 (2004) ......146

*United States v. Duncan, 42 F.3d 97, 101* (2nd Cir *1994)* ......39

*United States v. Dunnigan*, 507 U.S. 87, 94 (1993) ......90, 125

*United States v. Feliz*, 182 F.3d 82, 86 (1st Cir 1999) ......34, 35

*United States v. Ferguson*, 246 F.3d 129 (2d Cir 2001)...10

*United States v. Frank*, 156 F.3d 332, 338 n.5 (2d Cir 1997) ......131

*United States v. Ganias* (2d Cir) ......37, 38

*United States v. Garcia*, 406 F. Supp. 2d 304 (SDNY 2005) ......50

*United States v. Geibel*, 369 F.3d 682, 697 (2d Cir – 2004) ......41

*United States v. Gil*, 297 F.3d 93 (2d Cir 2002) ......88, 91, 117, 120

*United States v. Gray*, 878 F.2d 702, 782 (3d Cir 1989) ......14

*United States v. Jones*, 482 F.3d 60 (2d Cir 2006) ......126

*United States v. Kaminski, 1998 WL 275594 (NDNY 1998)* ......119

*United States v. Luciano,* 158 F.3d 655, 660 (2d Cir 1998) ......15

*United States v. McCourty*, 562 F.3d 458 (2d Cir 2009) ......10

*United States v. Mollica*, 849 F.2d 723, 729 (2d Cir 1988) ......131

*United States v. Morales*, 185 F.3d 74 (2d Cir 1999) ......126

*United States v. Murray*, 477 U.S. 478, 496 (1986) ......16

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

*United States v. Naimen*, 211 F.3d 40 (2d Cir 2000) ......127
*United States v. Panebianco*, 543 F.2d 447, 455 (2d Cir 1976) ......41
*United States v. Polouizzi*, 564 F.3d 142 (2d Cir 2009)...10
*United States v. Potamitis*, 739 F.2d 784, 791 (2d Cir) ......41
*United States v. Reed*, 773 F.2d 477, 480 (2d Cir 1985) ......42, 44
*United States v. Ribeiro*, 397 F.3d 43,48 (1st Cir – 2005) ......35
*United States v. Rigas,* 490 F.3d 208, 227 (2d Cir 2007) ......131
*United States v. Rooney,* 37 F.3d 847 (2d Cir 1994) ......127
*United States v. Sasso,* 59 F.3d 341 (2d Cir 1995) ......10
*United States v. Tucker*, 716 F.2d 576 (9th Cir 1983)...14, 19, 52, 53
*United States v. Tzolov*, 642 F.3d at 318 (2d Cir) ......42
*United States v. Velazquez,* 197 F. Supp 3d at 510 ......13
*United States v. Vigeant*, 176 F.3d 565, 569 (1st Cir – 1999) ......34, 36
*United States v. Wapnick*, 60, F.3d 948 (2d Cir 1995) ......127
*United States v. Wellington*, 417 F.3d 284, 289 (2d Cir 2005) ......116
*United States v. Zingaro*, 858 F.2d 94, 98 (2d Cir 1988) ......131
*Ward v. Jenkins*, 613 F.3d 692, 699 (7th Cir 2010) ......117
*Wilson v. Mazzuca*, 570 F.3d 490 (2d Cir 2009) ......118, 146
*Wynters v. Poole*, 464 F. Supp. 2d 167 (NDNY 2006) ......100

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

## Introduction

Defendant Philip A. Kenner moves for a new trial pursuant to Federal Rules of Criminal Procedure 33, with his pre-sentence supplement; thru *28 U.S.C. 2255*.   This motion is a supplemental submission following ProSe oral arguments for Rule 33 new trial on June 22, 2017, but prior to sentencing, and in ProSe (since the February 2018 *Faretta v. California* hearing).   During oral arguments, defendant requested the judge allow Kenner to submit an ineffective counsel motion to supplement the previous Rule 33 motion.   Under multiple premises, *infra*, defendant Kenner requests that the court accept the supplemental submission for consideration and grant it.

Kenner's attorney at trial ("trial counsel") was ineffective and his performance fell below any objective standard of reasonableness that is required as set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984).   Kenner's trial record is chock-full of instances where trial counsel failed to:

> 1) Sufficiently cross-examination witnesses,
> 2) Object to clearly unreasonable proffers and questions by the government,
> 3) Demonstrate a command and understanding of the germane facts in the case, and
> 4) Present or use readily available exculpatory evidence in the defense of his client – available in the courtroom.

- ***His ineffectiveness was a direct result of his unpreparedness, infra.***

Trial counsel failed in four (4) specific areas causing harm and prejudice to Kenner's Sixth Amendment right to adequate counsel; absolutely affecting the outcome of the trial, *infra*:

1. **Trial counsel failed to investigate/interview critical professionals** – as directed by defendant Kenner -- involved in all of the relevant transactions (in the Superseding Indictment – *Document 214*) to prepare as pro-Kenner trial witnesses,

8

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

2. **Trial counsel failed to investigate available evidence** -- as directed by defendant Kenner -- to secure for trial defense and cross-examination of government witnesses,

3. **Trial counsel failed to comprehend the basic white-collar case materials –** which resulted in complete trial incompetence – and inability to promote a succinct defense defined and reinforced with authentic and *available* empirical evidence (not testimony-only),

4. **Trial counsel failed to hire necessary staff to handle the critical elements of the "complex" case –** as designated by the court over a year before the start of trial – including decades of banking records and millions of exculpatory documents in the record.

**[*The remainder of this page left intentionally blank*]**

## Governing Law

Pursuant to Federal Rule of Criminal Procedure 33, "[t]he court on motion of a
defendant may grant a new trial to that defendant if required in the interest of
justice.  The defendant bears the burden of showing that a new trial is required.  *See
United States v. McCourty*, 562 F.3d 458, 475 (2d Cir 2009); *United States v. Sasso*, 59
F.3d 341, 350 (2nd Cir 1995).  This rule "confers broad discretion upon the trial
court to set aside a jury verdict and order a new trial to avert a perceived
miscarriage of justice."  *United States v. Polouizzi*, 564 F.3d 142, 158 (2d Cir 2009).
In deciding a Rule 33 motion, the Court "must examine the entire case, take into
account all the facts and circumstances, and make an objective evaluation."  *United
States v. Aguiar*, 737 F.3d 251, 264 (2d Cir 2013), quoting *United States v. Ferguson*,
246 F.3d 129, 134 (2d Cir 2001).  "[O]nly where exceptional circumstances can be
demonstrated" may the Court "intrude upon the jury function of credibility
assessment."

ProSe defendant had briefed and *submitted* three (3) elements of Rule 33 as "notes"
*after* the refusal of two (2) prior counsels (including trial counsel) to assist in
Kenner's post-trial submissions as:

1) Newly discovered evidence,
2) *BRADY* violations, and
3) Prosecutorial misconduct.

The Court received the government's objections to Kenner Rule 33 "notes" as
submitted[1], and primarily defended the motion claiming *faulty memory, confusion
and mistakes* regarding the voluminous inconsistent statements; in full

---

[1] The Kenner Rule 33 submission was written as "notes" for his trial counsel post-trial to
reference as part and parcel to the Rule 33 submission trial counsel espoused he was
preparing for Kenner.  Upon completion of the "notes" for Kenner's trial counsel, Kenner
learned that not only was trial counsel *not* willing to review the Kenner "notes" – but trial
counsel explained via CORRLINKS email to Kenner that if he had any interest in submitting
a Rule 33 motion, Kenner would have to "fire" trial counsel.  Kenner immediately tendered
a letter to the court to terminate the relationship that had been soured long before the start
of trial (and documented), extending specifically thru that moment.

contradiction to their-own-witnesses' exculpatory pre-trial evidence.   The Court replied with *Document 501* on 10-13-2017.   ***At all times*** – the witnesses' pre-trial evidence (specifically testimony) corroborates Kenner's trial defense and Kenner's testimony of full transparency thru documented communication (via texts and emails) and transactions (documented as disclosure sign-offs, corporate records, and their-own signed banking records).   All of the transactions were *transparently* evaluated -- *in real time* -- by the investors'-own third (3rd) party attorneys, who *vetted* and *verified* the authenticity of each and every transaction – thru *direct communication* with their clients at all times, *unobstructed by Kenner*.   There are no *exceptions*.   Parties who were deemed at fault for anything related to the investments by independent counsel were subsequently sued in multiple jurisdictions based on the attorneys' self-directed evaluation of the evidence.

### The Second Circuit Will Review A 2255 Collateral Attack Post-Trial And Pre-Sentencing...

Despite the general preference for considering ineffective claims on collateral review, in *United States v. Brown*, 623 F.3d 104, 113 & n.5 (2nd Cir. 2010), the Second Circuit reversed the lower court and held, in a case of first impression, that when an ineffective claim is raised after conviction but prior to sentencing, "the district court may, and at times should, consider the claim at that point in the proceeding" in the form of a new trial motion.

- The Court has yet to receive (or is currently receiving) the similar Constantine supplemental submission addressing ineffective counsel, thus, defendant's submission is not prejudicing the government or unnecessarily delaying the proceedings.

As the Court is aware, defendant Kenner has changed attorneys several times post-trial as a direct result of their *refusal* to submit paperwork on behalf of the defendant (starting with Kenner's Rule 33 "notes" submission), and specifically

including evidence requested by the Court (*FTr.206-208*)[2].  During the heightened difficulties between trial counsel and the first post-trial counsel, Kenner was unaware, and in fact, specifically told by both that Kenner could not brief an ineffective counsel motion until <u>*all*</u> other appeal remedies had been exhausted, post-sentencing.   It was only after accepting the CJA's desire to apply a pre-sentence "do-nothing and submit-nothing" strategy that defendant was able to learn that the two (2) attorney's claims were false and misleading, when Constantine's new CJA counsel announced in open court they were preparing a *28 U.S.C. 2255* motion.  (*See Document 325* – as another submission ruse hidden from Kenner by trial counsel).

This *28 U.S.C. 2255* motion is filed as a supplement to the prior Rule 33 filing to address ineffective counsel issues considered in concert with the previously addressed issues -- and the recently submitted Rule 29-33 Reconsideration motions (*Document 668*).

### The *Strickland* Standard...

To overturn a conviction on the ground of ineffective assistance of counsel, the defendant must demonstrate both:

(1) That counsel's performance was so unreasonable under prevailing professional norms that "counsel was not functioning as the 'counsel' guaranteed to the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984); and

(2) That counsel's ineffectiveness prejudiced the defendant such that "there is reasonable probability that, but not for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.   The two components are mixed questions of law and fact.  *Id*. at 698.

With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional

---

[2] *FTr*. identifies transcript pages from the 2016 forfeiture hearings, where *Tr*. identifies pages from the 2015 trial transcripts, throughout.

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

assistance. *Id*. at 689. "[Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689. (Citations omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise if reasonable professional judgment," *Id*. at 690. With respect to the prejudice prong of the *Strickland* test, the ultimate inquiry is "whether there is reasonable probability that, absent [counsel's] errors, the fact finder would have had a reasonable doubt respecting guilt." *Id*. at 695. That is, "there is a reasonable probability that, but for counsel's unprofessional errors, the result...would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

### Reasonableness Of Trial Counsel's Performance...
*(Presumption of Prejudice)*

Certain types of errors create a presumption of prejudice. See *United States v. Cronic*, 466 U.S. 648, 662 (1984) ("presumption of prejudice involving representation by ill-prepared, inexperienced attorney in complex white collar criminal case").

- ***This case epitomizes each element of Cronic to Kenner's detriment, infra.***

Under the *Strickland* analysis, courts are to grant significant deference to trial counsel's strategic decisions without the benefit of hindsight. *See Strickland*, 466 U.S. at 90. "However, strategic choices made *after less than complete investigation* are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *United States v. Velazquez,* 197 F. Supp. 3d at 510 (internal citations omitted).

- ***In the instant case, there was literally none (infra).***

"As the Second Circuit has held, a decision not to prepare an adequate defense because a defense lawyer thinks the prosecution's case is weak is not 'strategic.' *It is motivated by the desire to avoid work*, not to serve the best interest of the

13

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

defendant." *Garcia v. Portuondo*, 459 F. Supp. 2d 267, 287 (SDNY 2006) (internal citations omitted).

- ***In the instant case, trial counsel claimed the government's case was "weak" from the beginning (infra).***

Similarly, if an attorney has "no idea" why a decision was made, the court cannot label it "strategic." *Moore v. Johnson,* 194 F.3d 586, 610 (5th Cir 1999); *see also Bean v. Calderon,* 163 F.3d 1073, 1079 (9th Cir 1998) (noting that a decision cannot be characterized as "strategic" where it was a result only of "confusion").

- ***In the instant case, trial counsel claimed the "complex" nature of the case would benefit the defendant – but put no effort in to prepare for the same complexity -- nor did he request additional manpower from the court (infra).***

It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case." *Id.* at 2466 (citations omitted). *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (quoting 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp)). "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Lindstadt v. Keane*, 239 F.3d 191, 200 (2d Cir 2001) (quoting *Strickland*, 466 U.S. at 691).

- ***In the instant case, there were literally no investigations (infra).***

For example, an attorney's failure to interview readily available witnesses is ineffective, *infra*. *See United States v. Gray*, 878 F.2d 702, 782 (3d Cir 1989) ("under the circumstances, counsel's behavior was not colorably based on tactical considerations but merely upon lack of diligence.") "The duty to investigate is essential to the adversarial testing process '[b]ecause th[e] testing process generally will not function properly unless defense counsel has done some investigation into the People's case and into various defense strategies.'" *Green v. Lee*, 964 F. Supp. 2d 237, 256 (EDNY 2013) (quoting *Greiner v. Wells,* 417 F.3d 305, 320 (2d Cir 2005). "Pretrial investigation and preparation are the keys to effective representation of counsel." *United States v. Tucker*, 716 F.2d 576, 581 (9th Cir 1998).

14

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

- ***In the instant case, the delivery of government-forfeiture-36 and government-forfeiture-44 during the government's forfeiture case proved that significant exculpatory material was available but not researched by trial counsel, utterly effecting Kenner's defense (infra).***

During the trial preparation process, "Courts have repeatedly stressed the importance of adequate consultation between attorney and client, the interviewing of important witnesses and adequate investigation of potential witnesses." *Id.* A complete lack of pretrial preparation "puts at risk the defendant's right to an ample opportunity to meet the case of the prosecution." *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986).

- ***In the instant case, trial counsel was underprepared for literally every pre-trial meeting – altogether ineffective considering the "complex" nature of the case (infra).***

Putting on a defense is, of course, not required, but the Second Circuit has acknowledged that there are some situations when trial counsel's failure to call readily available witnesses to put forth a reasonable defense is ineffective:

> "Before explaining why, we pause briefly to note that [trial counsel's] decision not to call particular witnesses related to trial strategy, *see United States v. Luciano,* 158 F.3d 655, 660 (2d Cir 1998) ('[t]he decision to call a particular witness is typically a question of trial strategy'), and that we have been especially hesitant to disturb such 'strategic' decisions *See, e.g., Id; Trapnell v. United States,* 725 F.2d 149, 155 (2d Cir 1983). *See generally Strickland,* 466 U.S. at 690, 104 S. Ct. 2052 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable")"...Trial counsel's decision not to call the witness "was 'strategic' also in that it was taken by him to advance a particular goal. <u>That goal, however, was mainly avoiding work</u> – not, as it should have been, serving Pavel's interests by providing him with reasonably effective representation.  Therefore, although Meltzer's decision was 'strategic' in *some* sense of the word, it was not the sort of conscious, reasonably informed decision made by an attorney with an eye to benefitting his client that the federal courts have denominated 'strategic' and been especially reluctant to disturb." *Pavel v. Hollins*, 261 F.3d 210, 216-217 (2d Cir 2001).

15

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

"[T]he decision not to call a witness must be grounded in some strategy that advances the client's interests." *Eze v. Senkowski*, 321 F.3d at 129.   Where calling a witness "could have vastly increased the opportunity to cast doubt on...critical evidence", failure to do so is ineffective assistance of counsel.  *Bell v. Miller*, 500 F.3d 149, 156 (2d Cir 2007).  The right to effective assistance of counsel can be "violated by even an isolated error of counsel if that error is sufficiently egregious and prejudicial." *United States v. Murray*, 477 U.S. 478, 496 (1986).   However, where multiple instances of ineffective representation are alleged, courts must "look at the totality of the evidence before the judge or jury keeping in mind that some errors have a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture." *Lindstadt v. Keane*, 239 F.3d at 199 (internal quotations omitted).   Since a defendant's "claim of ineffective assistance of counsel can turn on the cumulative effect of all of counsel's actions, all [the] allegations of ineffective assistance should be reviewed together. *Rodriguez v. Hoke*, 929 F.2d 534, 538 92d Cir 2001). "We assess the impact of these errors in the aggregate" to determine whether counsel's services fell "outside the wide range of professionally competent assistance." *Lindstadt v. Keane*, 239 F.3d at 203.

- ***In the instant case, the main prosecutorial theme was "concealment" – thus there is no "cumulative" defense strategy that would support <u>not interviewing</u>, <u>not preparing</u> and <u>not calling</u> pro-defense witnesses who would have <u>confirmed</u> Kenner's full transparency during each and every transaction with his clients – <u>and their unfettered involvement</u>.***

### Trial Counsel Failed To Interview Obvious Pro-Defendant Witnesses And Prepare For Trial...

At a tactical minimum, after being repeatedly *<u>instructed</u>* by defendant to interview pro-defendant individuals before trial, trial counsel should have at least called the witnesses on Kenner's list for an interview.   **Trial counsel *<u>disregarded</u>* Kenner's specific requests**.   The heart of the government case unfurled into several specific issues:

- The *<u>authenticity</u>* of the Hawai'i loans to Jowdy,
- The *<u>knowledge</u>* of the Little Isle 4 investors of the loans,

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

- The *universal knowledge* of the Jowdy investors in the authentic nature of the core litigation issues versus Jowdy (the loans),
- The Hawai'i partners' *knowledge* of the Constantine consulting agreements,
- The *knowledge* of the Eufora private stock sales, and lastly,
- The complete *elements* of the Constantine-led Global Settlement Fund ("GSF").

Each of these items, *supra*, were decisively attacked by the prosecutorial team as conspiratorial frauds of "concealment" throughout trial, yet trial counsel was not just instructed to discover the real truths thru willing first-hand knowledge by bankers and attorneys transparently representing the investment throng independently as a whole, but trial counsel was directed by the defendant as to where each of these false allegations could be convincingly refuted thru exact individuals and unambiguous exculpatory evidence.

- ***Trial counsel failed to follow-up on even one of the defendant's directions; leaving the government's unraveled case in tact and without exculpatory challenges available to the defense at every turn.***

*Strickland* has determined unequivocally that because "*it was the government's burden, and they have not proven their case against you*", per the trial counsel's opinion, does not represent adequate representation under the Sixth Amendment as an acceptable trial strategy.

- ***Trial counsel reiterated this refrain to Kenner throughout trial while defending his lack of witness and evidentiary preparation for Kenner.***

### Errors Are Considered In The Aggregate, Or Cumulatively...

"[I]n determining whether one or more errors by trial counsel renders the representation constitutionally deficient under the first prong of *Strickland*, the Court 'need not decide whether one or another or less than all of these...errors would suffice', because *Strickland* directs us to look at the **'totality of the evidence before the judge or jury**.' Keeping in mind that 'some errors [] have...a pervasive effect on the inferences to be drawn from the evidence altering the entire evidentiary picture.'" *Schultz v. Marshall*, 528 F.Supp. 2d 77, 92 (EDNY 2007),

17

quoting *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir 2001).  This Court must asses "the impact of [defense counsel's] representation in the aggregate," to decide if that "ineffectiveness permeated all the evidence." *Schultz* at 92; *quoting Lindstadt*, at 203; *according to Rodriguez v. Hoke*, 928 F.2d 534, 538 (2d Cir 1991) (dismissing case for failure to exhaust claims, but noting, [s]ince Rodriguez' claim of ineffective assistance of counsel can turn on the cumulative effect of all of counsel's actions, all his allegations of ineffective assistance should be reviewed together.").  *See also Moore v. Johnson*, 194 F.3d 586, 619 (5th Cir 1999) (holding that court should examine cumulative effect of errors committed by counsel across both the trial and sentencing); *Stouffer v. Reynolds*, 168 f.3d 1155, 1163-64 (10th Cir 1999) ("Taken alone, no one instance establishes deficient representation.  However, cumulatively, each failure underscores a fundamental lack of formulation and direction in presenting a coherent defense.")

### Failure To Investigate Can Alone Constitute Ineffectiveness...

In preparing for trial, "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Lindstadt* v. Keane, supra, 239 F.3d at 200, quoting (*Strickland* at 691).  *See Espinal v. Bennett*, 588 F. Supp. 2d 388, 399 (EDNY 2008) ("It is axiomatic that sound trial strategy must be based on reasonable investigation by counsel.")  The duty to investigate is essential to the adversarial testing process '[b]ecause th[e] testing process generally will not function properly unless defense counsel has done some investigation into the [prosecution's] case and into various defense strategies.'" *Green v. Lee*, 964 F. Supp. 237 (EDNY 2013); *quoting Greiner v. Wells*, 417 F.3d 305, 320 (2d Cir 2005).  See also *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (faulting counsel for failing to request discovery materials from People); *Lindstadt*, 239 F.3d at 200 (faulting counsel for not obtaining information "available from a variety of sources").

- **In the instant case, trial counsel did <u>none of it as instructed</u> (infra).**

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

Though there may be unusual cases when an attorney can make a rational decision that investigation is unnecessary, as a general rule an attorney *must* investigate a case in order to provide minimally competent professional representation, none of the decisions can be based on the "*constraint of time*", *certainly not without a request for a pre-trial or trial delay from the defendant's attorney* (none of which were requested to further investigate the crucial elements of the defense).  *United States v. Tucker*, 716 F.2d 576, 581-83 & n. 16 & 18 (9th Cir 1983) (as corrected).

- ***In the instant case, trial counsel espoused that the "judge" would not allow a delay, thus the request would prejudice the defendant with the court (infra).***

The decision to forgo investigation may be based on reasonable judgment that such investigation would be fruitless, wasteful, or even counterproductive.  *Espina*, 588 F. Supp. 2d at 399, *citing Schultz v. Marshall*, 528 F. Supp. at 95-96.  However, "counsel's failure to investigate potentially exculpatory evidence, in the absence of a reasonable explanation, falls below the constitutional standard of effective representation required by *Strickland*."  *Espinal*, at 399, citing *Lindstadt*, 239 F.3d at 200; *Schultz*, 528 F. Supp. at 96; *Sparman v. Edwards*, 26 F. Supp. 2d 450, 452-53 (EDNY 1997).   Therefore, **an attorney's failure to present available exculpatory evidence is ordinarily deficient**, unless some cogent tactical or other consideration justified it.  *Pena-Martinez v. Duncan*, 112 F App'x 113, 114 (2d Cir 2004) ("[C]ounsel's failure to investigate alibi witnesses is particularly egregious.") (*emphasis supplied*).

- ***In the instant case, trial counsel did <u>not</u> investigate and present the information available from government-forfeiture-36 and government-forfeiture-44 that the government defended as "cumulative" to Kenner's Rule 33 "new evidence" arguments (infra).***

- ***Either the government's "cumulative" claim is in error and <u>there is</u> "new evidence" <u>worthy of a new trial</u> – or***

- ***Trial counsel's ineffectiveness failed to confront the prosecutorial theories of the** "bogus" (Tr.5708 (2x), 5709), "phony" (Tr.4597, 4598) **and** "supposed" (Tr.5707-5708) **<u>loans</u> and <u>loan agreement</u> with exculpatory***

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

*evidence the government <u>now</u> claims was available – or to defend the false claims that "Kenner stole the Hawai'i money to buy his piece in Cabo" – and "trial counsel's ineffectiveness" is <u>worthy of a new trial</u>.*

- *Shockingly – the prosecutorial attacks on Kenner's veracity during trial, infra and supra, were lies to the jury and court in lieu of now "cumulative" evidence they defend -- but contradicted while forming their prosecutorial theories.*

    o *It is indefensible...*

*They simply lied to the jury and Court -- are not held to any minimal ethical standard -- and an underprepared trial counsel sat "silent".*


*[The remainder of this page left intentionally blank]*

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

### **Basic investigation errors...**

Since the defendant's first meeting with trial counsel, the defendant begged trial counsel thru subpoenas and investigations to *recover*, *discuss* and *prepare* (*at a minimum*):

- The "Baker disclosures" (from the Hawai'i partners' attorney),
- The Jowdy loan confirmations (from Jowdy and counsel[3]),
- The Northern Trust Banker knowledge and communication with their LOC clients (thru interviews),
- The Eufora Private Stock sale investigation and resulting knowledge (thru interviews of investors' Attorney Stolper and his Eufora investigative team),
- The confirmation of the Eufora loan buyout efforts (led by Berard, Gaarn, Kaiser and Michael Peca, with the defendant) (thru Attorney Stolper team interviews),
- The Kaiser transactions from Hawai'i and California (with available bank records to support full repayment – *Counts 2, 3 and 4*) (thru forensic analysis),
- The Gaarn loans to Kaiser in 2009 (and not transactions dealing with Kenner – *Counts 2, 3 and 4*) (thru discovery review with Kenner),
- Etcetera, *supra*.

Nevertheless – thru trial counsel, *no* investigations occurred, fully jeopardizing Kenner's trial defense and undermining Kenner's Sixth Amendment rights.  As noted, *Strickland* recognizes that a defense counsel has a duty to make reasonable investigations; a decision not to investigate will be reasonable only "to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-691.

- *At a minimum* -- adequate investigations would have revealed the impeachment evidence necessary to dismiss the fabricated claims regarding Kaiser and his wire transfers from Tim Gaarn in 2009 from the sales of Gaarn's private Eufora stock (in text message evidence between Kenner, Gaarn and Kaiser immediately proceeding the Gaarn loans to Kaiser – in evidence) -- and impeachment evidence to confirm both Kaiser and Hawai'i

---

[3] This information was the basis for *government-forfeiture-36* and *government-forfeiture-44* – which proved that Kenner neither "stole anyone's money from Hawai'i or anywhere to 'buy his piece in Cabo'" nor used any "ill-gotten" gains or "tainted" funds to buy his Baja Ventures 2006 Cabo equity – *thus quashing any future forfeiture nexus arguments that simply do not exist – and reducing any sentencing guideline calculation for loss to nearly zero*.

21

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

partners COO Manfredi had already disclosed to the FBI five (5) years before trial that they were 100% aware of the Constantine consulting deal and payments (in Jenks material evidence – *3500-CM-2-r* and *3500-JK-1-r*).

- ***Trial counsel's negligence was a clear violation of the defendant's 6th Amendment right to adequate counsel.***

The Second Circuit has observed, "[i]n nearly every case that concludes that counsel conducted a constitutionally deficient investigation, the courts point to readily available evidence neglected by counsel." *Greiner*, 417 F.3d at 322; See also…

- *Rompilla v. Beard*, 545 U.S. at 383 (faulting defense counsel for not consulting a "readily available file" "sitting in the courthouse, open for the asking" and emphasizing that "[t]he unreasonableness of attempting no more than they did was heightened by the easily availability of the file at the trial courthouse"), *including but not limited to*:
  - ***Full Northern Trust subpoena***, *not limited to:*
    - ***Extension of Credit*** <u>*one-page*</u> *signed documents – See Ex. 7, Ex. 8, Ex. 10, Ex. 12-16, and*
    - ***Disbursement Request & Authorization*** <u>*one-page*</u> *signed documents – See Ex. 18-23, and*
    - ***Letters of Authorization*** <u>*one-page*</u> *signed documents – See Ex. 69-73.*
      - *Notwithstanding -- each LOC client's <u>one-page</u> signed "**Letter of Authorization**" for the defendant gave unfettered access to the LOC funds for Little Isle 4, and*
      - *There were no future disclosure requirements other than the Little Isle 4 By-Laws reporting requirements -- See Ex. 66 at Articles 2 and 7).*

- *Kimmelman, supra,* 477 U.S. at 386-387 (faulting counsel for failing to request discovery materials from People), *including but not limited to:*
  - ***Arizona Attorney Baker's*** *independent <u>Jowdy loan</u> disclosures,*
  - ***Northern Trust Bank records and Northern Trust banker verifications***, *and*
  - ***NY Attorney Michael Stolper*** *independent <u>Eufora private stock sale</u> disclosure;*

- *Henry v. Poole*, 409 F.3d at 64-65 (faulting counsel for failing to discover obvious discrepancies in dates), *including but not limited to:*

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

- ○ **Kristen Peca**'s <u>SHOCKING LIES</u> about her receipt of the Northern Trust default letter, <u>delivered to a home in a state that she was not physically in at the time</u>, **thus logistically impossible** (Tr.710-711),

- ○ **Kristen Peca**'s confessions on her 2012 FBI recordings that she did <u>not</u> know about her husband's Northern Trust Bank LOC until no earlier than 2008 – years after Michael Peca signed for it in 2005 – contradicting her participatory testimony (Tr.696-700),[4]

- ○ **Kristen Peca**'s representations that she was not aware of the Eufora patent pledges <u>at the time</u> of her husband's Eufora private stock purchase – thru AUSA Komatireddy's <u>misleading</u> Q&A, despite the purchase <u>occurring</u> about eight (8) months <u>prior</u> to the patent pledge by her husband and <u>not</u> her – thus not relevant (Tr.703);

- *Eze v. Senkowski*, 321 F.3d 110, 128-130 (2d Cir 2003) (faulting counsel for failing to consult available experts), *including but not limited to:*

---

[4] [At approximately 5.45 of the **FBI July 2012** 1:34.50 call] – Kristen Peca tells Kenner:

> **Kristen Peca** – Well, I was referencing the earlier stuff that you said, *I don't remember a large amount being distributed back to our account* and the timing of the years of the loan, the line of credit, *that happened when we were in Ohio [2008 & 2009].  I don't understand how it could have been open for 5 years before that?* Because we had a bond account going.  **Do you mean the Hawai'i; you had a line of credit, but not for us**?

> **Kenner** – <u>No</u>, no, you guys had lines of credit for 5 years at Northern Trust.

> **Kristen Peca** – *for 5 years?*

> **Kenner** – *for 5 years!*  <u>When you were in OHIO, that's when the thing closed</u>.

- ***Kristen Peca cannot believe that she is finding out on a phone call in 2012 that her husband, Kenner's client, had a LOC open for five (5) years without her knowledge.***

**How could Kristen Peca have agreed to a 6-month LOC in 2005** *(Tr.696-700)***, when she confessed that <u>she did not know</u> about the LOC until four (4) years later (***in 2008-09***) when it was about to close?**
- *It was a simple timeline fraud that the government and Kristen Peca constructed for trial – but unprepared trial counsel could not decipher the clear perjury and mount a proper or effective defense.*

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

- o **A signature expert** (or requesting a *Daubert* hearing at a minimum), considering John Kaiser's known and provable propensity for lying, *specifically related to forged documents **to the EDNY court**,*
  - ▪ Including the 2012 Mexico case information (*Stumpel $1.6 million v. Jowdy*) (*See Berard 2012 FBI recording*), [5]
  - ▪ Including the 2014 Arizona case information (*See Ex. 56 – paragraphs 9, 20 and 49*), both proven as perjurers (by Kaiser, Berard and Donlan [EDNY *"tracing"* witness of alleged Kenner banking documents that *do not exist anywhere* or *were ever asked for by the FBI*] – *Tr.3456-3457*).

- o **Not hiring a signature expert**, *at a minimum*, to compare the known claims of multiple false forgeries to the alleged EDNY claimed signatures was clear negligence &/or laziness, *with trial counsel stressing to defendant that defendant "would have to pay for it"* (also -- discovered as false post-trial thru independent counsel); [6]

---

[5] Berard admitted on the 2012 FBI recording with Gaudet that he and Kaiser signed "*BLANK DOCUMENTS*" in Mexico before they left the Cabo san Lucas prosecutor's office to fill in their testimonials.

[At 9:40 of the 2012 FBI recording – Berard stated to Robert Gaudet]:
   "*We did not make testimonies, we waited outside forever, it took too long, we actually signed FAKE, not FAKE, uhh, we signed BLANK PIECES OF PAPER, with our signatures..."*

- • *This does not constitute a forgery* – specifically considering Kenner was *not* in Mexico when Kaiser and Berard *signed* **in the presence of their own attorney and the District Attorney of Cabo san Lucas.**

[6] During the November 13, 2013 search and seizure at Kenner home (*ineffectively left unchallenged by trial counsel*), the FBI recovered photocopies of the two (2) Constantine consulting agreements.   The government documented them with BATES STAMPS along with 100% of the seized documents that day -- as follows:
   - o 2004 agreement – *PKHOME00012892-12895*
   - o 2005 agreement – *PKHOME00012887-12890*

Yet, on the "eve" of the May 2015 trial, the government announced that they had recovered the "*ink*" version of the two (2) agreements – **FROM KAISER, himself.**

Further confirming that the "*ink*" versions were from Kaiser's home (after being held for ten [10] years -- since he respectively signed the agreements), YET -- **they were *not* BATES STAMPED**.  Instead they were "only" labeled for trial as:

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

**The Court _cannot_ overlook the salient fact that Kaiser produced the two (2) "ink" versions of the alleged forged agreements to the FBI and AUSA _on the eve of trial_ – FROM HIS OWN HOME [_GX-7004 and GX-7005_].**

- **No forensic accountant was hired** – specifically considering the government portrayed Kenner as "*broke*" (*Tr. 5982*– although completely false with over $1 million in Kenner's cash bank accounts at the exact period of time they referenced to the jury [2008-09]) – and
    - The entire case was about "***tracing the money***" to confront people who alleged they did not know where the money went.   The government wrongly claimed thru rebuttal summation that Kenner "*stole*" it to buy his equity in Cabo (*Tr. 5722-5723, 5990, 5991-92, 5999-6000*),
        - This was proven untrue by *government-forfeiture-36* and *government-forfeiture-44* and
    - The government presented John Kaiser (for **Counts 2, 3 and 4** – at a minimum – *Tr.1020*) that he was not repaid funds from either his friends & family 2005 Hawai'i partners "loan" (somehow Kenner's responsibility -- or Kaiser was not repaid by Kenner after their joint [uncharged] California real estate project in 2007 [*See Ex. 5*] even though the government bank records in evidence confirm _Kaiser received all of it_ and "stole" it himself in 2006 – *See Ex. 6*)[7]– and

---

- 2004 agreement – *GX-7004*
- 2005 agreement – *GX-7005*

It is suspicious, *at a minimum*, that Kaiser would possess the "*ink*" versions of his own signature if someone – **at his home**, forged his name.   The gall of the government to continue with that forgery ruse at trial was commensurate with their ½ pregnant approach to all of the false predicates and revisionary trial testimony, *infra and supra*.
- ***Trial counsel's utter lack of any objections fortified the government's ruse on the jury and the court; fully harming Kenner -- with participating ineffective trial counsel***.

[7] **The government's "Grocery list" ruse was easily provable as false with any basic preparedness...**

Any due diligence by trial counsel would have also quashed the jointly fabricated ruse by the government and Kaiser, related to the defendant's $1.5 million plus personal loan to Constantine, referred to by Michiewicz as a "**shopping list**" (referring to Kenner's loan tracking document) &/or a "**grocery list**" of funds allegedly owed to Kaiser (*See Ex. 58*)

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

- It was **LIED** about thru AUSA Michiewicz' summation (*Tr.5744-5745*) – *further harming Kenner*.


- *Pavel v. Hollins*, 261 F.3d 210, 218, 221 (2d Cir 2001) (faulting counsel for not interviewing "readily available fact-witnesses"), *including but not limited to*:
    - **Arizona Attorney Baker** (the Hawai'i partners' *independent* attorney),
    - **NY Attorney Stolper** (the Eufora investors' *independent* attorney), and
    - **Mexico litigation attorneys Paul Donion and Karlos de la Puerta**,

    *...Who were all threatened by FBI Agent Galioto to "back off" any efforts adverse to Jowdy*);


- *Lindstadt, supra*, 239 F.3d at 200 (faulting counsel for not obtaining information "available from a variety of sources"), *including but not limited to*:
    - **Diana Nolan** (Owen's wife) and Owen Nolan's Northern Trust LOC, considering emails **in evidence** *confirm* her personal 2006 first-hand activity related to LOC payments and independent knowledge of her husband's LOC (*See Ex. 53, Ex. 54, Ex. 55*) – *in connection with Kenner's*

---

(*Tr.1404-1406*).   If the government deception about the "grocery list" to the Court were *true*, Kaiser would be millions "*more*" *in debt to Kenner*.
- ***The empirical evidence proves it is another fraud unchallenged by negligent trial counsel – and ignored by the government.***

Notwithstanding, Kaiser and Berard stole two (2) real estate projects from Kenner[7] with fraudulent conveyances (in Arizona – *See Ex. 56 – paragraph 57*) and with forged and fabricated operating agreements in Sag Harbor, NY (a.k.a. LedBetter) (*See Ex. 57*).
- Please note that both cases, defrauding the defendant, were forced into dismissal due to the Kenner's indictment and denial of bail with Kaiser and Berard acting as the government's two (2) Confidential Informants in their bail denial motion.  Please note that during the bond hearing the government made false allegations that Ken Jowdy's Baja Development Corp account (known as his primary money laundering account) was really Kenner's "get-a-way funds".
- ***Trial counsel sat "silent" during the lie.***

Neither the Arizona or Sag Harbor (NY) criminal thefts by Kaiser and Berard <u>from</u> Kenner are included in the 2014 Kaiser and Jowdy attempted theft of ***Baja Ventures 2006, LLC*** (*Document 628 at 1*) (the defendant's Diamante Cabo san Lucas equity, shared with defendant's partners, Lehtinen and Stumpel) and Kenner's responsive letter (*See Point III [prosecutorial misconduct of Kenner's original Rule 33 submission] at 38-39*).

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

<u>assistant and Diana Nolan's Wells Fargo private banker</u>, fully contradicting her husband's perjured 2009 arbitration and 2015 EDNY claims of "**no LOC knowledge**" (*Tr.2065-2066*);

- *Maddox v. Lord*, 818 F.2d 1058, 1061-1062 (2d Cir 1987) (faulting counsel for failing to interview available witnesses), *including but not limited to*:
  - **Ken Jowdy** (to confirm Jowdy received 100% of the Hawai'i loans as he proffered to FBI agent Galioto in 2010 (*See Ex. 2 [3500-KJ-2] at 11-14*) – and delivered as "new evidence" post trial in *government-forfeiture-44*,
  - **Robert Gaudet** [2004 Hawai'i loan agreement witness (*See R33 D*), a Jowdy adverse-individual who was robbed by Jowdy like Kenner and Kenner investors, and physically threatened by Jowdy's people (*See Ex. 37 [3500-RG-9] at ¶ 9*) -- in addition to receiving jail time threats as a Kenner co-conspirator if planning to testify in the EDNY trial],
  - **New York Attorney Michael Stolper** (for the Eufora attorney to confirm full transparency by Kenner about the 2008-09 Eufora private stock sales by Gaarn and Constantine – as Stolper's own letter to his investors confirms (*See Ex. 1 at 1, 4, 7*) –
    - **Which was signed off individually by the individual Eufora investors** – *See Ex. 1 at 9-18*), and
  - **Arizona Attorney Tom Baker** (for the Hawai'i partners – and subsequent Kaiser-Berard <u>*FBI protected*</u> 2012 thefts from Kenner, Nash, Sydor, Ranford, Khristich and Lehtinen)[8].

**In each of these cases, the reviewing court either granted habeas relief or remanded to the trial court for a hearing.** *Green*, at 257.

---

[8] The 2012 Arizona case (Maricopa County Arizona -- *cv2012-055576*) (represented by Attorney Baker) involving Tyson Nash, Darryl Sydor, William Ranford, Dimitri Khristich and Jere Lehtinen **versus** Kaiser and Berard for **fabricating** county recorder documents and **fraudulently conveying** a multi-million property title to themselves (while under the cover of FBI agent Galioto – *see Berard 2014 deposition confirmations*) -- while attempting to steal 100% of the stolen sale proceeds (approximately $1 million) from Kenner and Kenner investors by claiming "*Kaiser's name was forged on five [5] Promissory notes between Kaiser and the suing parties*" – despite 100% of the email confirmations between the parties in evidence) (*See Ex. 56 at ¶'s 20, 25, 26, 32, 33, 49 and 57*).
- *With FBI agent Galioto's assistance – Kaiser and Berard's civil trial defense was that "Kenner stole the investors' money and they knew nothing about the 'promissory notes' that Kaiser <u>actually</u> signed" – just like Ken Jowdy's fraudulent Arizona Hawai'i-loans defense in 2008-09 – sharing the same Arizona attorneys – yet reversing his lies to the California deposition (January 2010) and the FBI [Galioto] (March 2010).*

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

In this way, the instant case is similar to *Gersten v. Senkowski*, 426 F.3d 588 (2d Cir 2005), which stated:

> Thus, this is not a case where counsel made a reasonable decision to cease further investigation as a result of having "discovered...evidence...to suggest that" challenging the prosecution's...evidence "would have been counterproductive, or that further investigation would have been fruitless."
>
> Nor is this the case of "diligent counsel...draw[ing] a line when they have good reason to think further investigation would be a waste."
>
> Rather, counsel here never discovered any evidence to suggest one way or another whether such challenges would be counterproductive or such investigation fruitless, nor did counsel have any reasonable basis to conclude that such investigation would be wasteful.   This was because counsel settled on a defense theory and cut off further investigation of other **theories possible without having first conducted any investigation whatsoever** into the possibility of challenging the prosecution's...evidence.  Because counsel never investigated that alternative approach at all, counsel did not have reasoned basis to conclude that such an approach would be fruitless."

*Gersten*, at 609-610 (internal citations omitted) (*emphasis supplied*).   "Defense counsel may not fail to conduct an investigation and then rely on the resulting ignorance to excuse his failure to explore a strategy that would likely have yielded exculpatory evidence."  *Id.* at 610-611.

- *Government-forfeiture-36, government-forfeiture-44* and the Baker disclosures (*See R33 A*) fall squarely under this standard of neglect, *at a minimum...*

Here, there was no excuse for trial counsel to fail to conduct simple investigation ***requested by his client*** by following up on possible exculpatory evidence – by demanding crucial subpoena records from, *at a minimum*, from Northern Trust Bank, and contacting attorneys Baker and Stolper for interviews and pro-defendant witness testimony at trial.

- E*ach of which was continually demanded by the defendant thru trial – and ignored.*

28

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

### Vigorous Trial Advocacy Does Not Supplant Colossal Ineffective Matters...

In no particular order, nevertheless inexcusable in defense of the criminal allegations primarily based in "**concealment**" of material facts from Kenner's clients, the following items failed to meet any conceivable *Strickland* standard.

The fact that trial counsel vigorously cross-examined the government witnesses cannot compensate for other errors or omissions that fundamentally failed his client:

> It is axiomatic that, even if defense counsel had performed superbly throughout the bulk of the proceedings, they would still be found ineffective under the Sixth Amendment if deficient in a material way, albeit only for a moment and not deliberate, and the deficiency prejudiced the defendant.

*Green v. Lee*, *supra*, at 258; *quoting Rosario v. Ercole*, 601 F.3d 118, 138 (2d Cir 2010); see also *Kimmelman*, 477 U.S. at 386 (noting that while "[i]t will generally be appropriate...to assess counsel's overall performance throughout the case in order to determine whether the identified acts or omissions overcome the presumption that a counsel rendered reasonable professional assistance," a "failure to make reasonable investigations or to make a reasonable decision that makes a particular investigations unnecessary, **may be constitutionally deficient irrespective of trial performance.**" (Internal quotation marks omitted).

### Kenner Letters To Trial Counsel Pre-Trial Confirms Negligence In His Duty To Kenner And The Court...

**On or about March 22, 2015** (*See Ex. 3a*)...

Kenner requested the Bryan Berard and John Kaiser 2014 Arizona depositions (from trial counsel) – a case where Kaiser and Berard *stole* Kenner's Arizona project with a fraudulent conveyance of title (*See Ex. 56 at 12*).   The court noted in its ruling against Kaiser and Berard (in 2015):

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

*57. The March 9, 2012, conveyance of the property by John R. Kaiser as Trustee of the Shangri-La Trust 1999 to "John R. Kaiser, a married man, as his sole and separate property and Bryan Berard, an unmarried man" (exhibit 29)* **was a fraudulent transfer**. *A.R.S. §44-1004(A).*[9]

- Please note that Kenner raised these depositions as "new evidence" in his original Rule 33 motion inappropriately – ***BECAUSE*** trial counsel never delivered the requested depositions from attorney Ronald Richards or thru the government's 3500 disclosures to Kenner *ever*; further harming Kenner's defense preparation. *Trial counsel claimed they did not exist.*

- Berard and "*tracing witness*" Lanie Donlan (*Tr.3422-3425*) alleged more "forgeries" in the Arizona case – *and were proven to have lied (again) thru empirical evidence*. Specifically, Kenner-Berard direct text communications confirm Berard "signed" the *notarized document* and "mailed" it to Kenner using Kenner's FedEx account.
  - The FBI [Galioto] is absolutely aware of the Berard-Donlan "forgery" frauds (*See 3500-LD-2*) – yet they ignored another government star-witnesses getting caught lying about another "forgery" while working with Galioto and Jowdy's cabal to indict Kenner – and protect Jowdy.

Thru trial counsel -- Kenner requested the "*raw notes*" from the December 2014 Jowdy FBI proffer in Long Island, New York (*See 3500-KJ-8*). They were never delivered – and no record of trial counsel's request to the court or the government exists. This is most likely the meeting that Jowdy, his attorneys and the FBI discussed the contents of *government-forfeiture-44* and *government-forfeiture-36* - but never delivered the information to the defendants in accordance with the *Jenks Act* – destroying their "Kenner stole the money" prosecutorial theories – now wholly proven untrue by their own forfeiture submissions (supra) – while still not retroactively addressing the trial frauds and misrepresentations by the government prejudicing Kenner and the verdict.

---

[9] Please note that Kaiser and Berard **stole** the title to the second (2nd) joint project they had with Kenner after beginning their work with Ken Jowdy in Mexico and helping FBI agent Galioto prosecute Kenner. The first (1st) was the theft of the Sag Harbor-LedBetter project with a *fabricated and forged document* (*See Ex. 57*). Either of these actions would have been *criminal* if Kenner did it to them...but FBI agent Galioto looked the other way after *encouraging* his two (2) star-witnesses to fraudulently convey two multi-million properties "illegally" from Kenner. ***Membership has its privileges with Jowdy's cabal...***

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

**On or about March 26, 2015** (*See Ex. 3b*)...

Kenner requested the Berard and Kaiser Arizona depositions again.   There was no response from trial counsel.   *They were "material"* considering the "forgery" allegation pattern began immediately after Kaiser and Berard were hired by Jowdy's cabal in Mexico.   Trial counsel refused to raise this issue, notwithstanding trial counsel (and not Kenner) had copies of the two (2) depositions pre-trial according to the government's Rule 33 reply (*Document 440 at 6-7*).

Kenner confirmed that government trial witness preparation was neglected for the main individuals named in the indictment at that time; *including but not limited to Kaiser, Berard, Peca, Nolan and Jowdy* "...for starters...and then the remainder of the John & Jane Does immediately afterwards..." (*See Ex. 3b*).

- ***Less than limited evidentiary preparation meetings occurred between Kenner and trial counsel.***

Lastly, Kenner demanded to establish a co-defendant meeting.   Again, the Kenner trial demand fell on deaf ears...No request was ever made to Constantine's attorneys.   Attorney Oliveras confirmed to Kenner that no request was ever made by trial counsel prior to the trial proceedings.

**On or about April 12, 2015** (*See Ex. 3*)...

- *CRITICAL CONCERNS with trial counsel were raised by Kenner via letter and left unaddressed...*

*Kenner confronted trial counsel* about extremely serious FBI threats related to trial counsel's pending trial performance, echoing trial counsel's wife's *grave concerns*. Kenner demanded that trial counsel report this to the court.
- ***Trial counsel refused.***

**In this critical letter – only weeks before trial**...
*Kenner demanded* that the Northern Trust subpoena be *received* and *reviewed* "**before**" the start of trial, because of its exculpatory nature and "transparency" confirmations – the main government theme of the Kenner prosecution.

31

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

- ***Trial counsel refused.***

*Kenner demanded* that trial counsel call Arizona Hawai'i partners' attorney Tom Baker (again...if he had simply lied previously) to recover the Little Isle 4 (Hawai'i partners) disclosure letters for the 2008-09 lawsuit versus Jowdy by nineteen (19) signed-off Hawai'i partners (*See R33 A*). The lawsuit was filed *SPECIFICALLY* to recover the 2004-06 loans to Jowdy. Page one (1) of the 7-page Baker disclosure letter emphasizes:

> "***the gist of the lawsuit is to recover certain monies loaned to Mr. Jowdy from Mr. Kenner, Little Isle 4 and Ula Makika LLC****. Mr. Kenner estimates the total amount of monies loaned to Mr. Jowdy which have not been repaid to be **approximately $5,000,000**. This is the estimated principle only, exclusive of accrued interest. In summary, Mr. Jowdy denies that the monies were loans but rather characterizes them as investments.*"

Every page of the Baker disclosure was **initialed** and **signed by the Hawai'i partners -- and returned to Attorney Baker**. *No greater transparency could be possible.* Michael Peca's communication with Kenner about the Arizona lawsuit waiver Peca signed, is as follows:



| 10570 | +17163743234 Michael Peca* | 10/28/2009 4:34:09 PM(UTC+0) | Read | What is the waiver for? Why did other Attys withdraw? You can call me back if you need to explain with a lot of detail. |
|---|---|---|---|---|

Then -- *Kenner demanded* for trial counsel to return to the detention center to discuss the government witnesses that Kenner hi-lighted in this third (3rd) critical pre-trial letter "*on the eve of trial*", as Kenner declared that trial counsel is "*not prepared for the cross of them*". *Kenner listed the following potential defense witnesses that trial counsel had not even spoken to yet,* as follows:

1. Northern Trust Bank employees:
   a. Bank President -- **David Highmark**
   b. Vice President of Lending – **Ed Wilson**

32

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

     c.  Account Specialist – **Catherine Brill**[10]
2. **Owen Nolan's wife Diana** (handled 100% of Nolan's business),
3. **NY Attorney Michael Stolper** (Eufora investors' attorney),
4. **Arizona Attorney Tom Baker** (Hawai'i partners attorney),
5. **NY Attorney Tom Harvey** (for Jowdy),
6. **Ken Jowdy**,
7. **Stephanie Dixon** (Kenner's executive assistant),
8. **Shawn Hughes** (Jowdy's former executive assistant) (*See Ex. 38 [3500-SH-1]*),
9. **Robert Gaudet** (the 2004 Hawai'i-Jowdy loan agreement witness),
10. *And others.*

- *<u>**None were even contacted for interviews** – let alone prepared to be pro-Kenner defense witnesses at trial thru testimony and exculpatory evidence.</u>*

Lastly, <u>*Kenner demanded*</u> that trial counsel alert the Court that someone at the Queens Private Detention Facility was trying to get Kenner to hire him in a "*murder-for-hire*" plot against Jowdy.   The court and Kenner discovered on April 22, 2015

---

[10] Northern Trust Banker Catherine Brill spoke to each of the LOC clients *before* they agreed to allow Northern Trust to seize their collateral several days before the due date.   Darryl Sydor and Michael Peca confirmed the calls with Northern Trust Bankers Brill and Aaron Mascarella, as follows:

[Peca (read) in BLACK; Kenner (sent) hi-lighted]

| | | | | |
|---|---|---|---|---|
| 7415 | +17163743234 Michael Peca☆ | 4/1/2009 10:38:15 PM(UTC+0) | S e n t | *A NOrthern trust person will Call you to confirm your transfer to Schwab.* Please acknowledge. Keep the call short. NT is the enemy |
| 6325 | +17163743234 Michael Peca* | 4/1/2009 10:44:43 PM(UTC+0) | R e a d | Got it. Call already done. Was this the plan b/c it makes sense to pay the line off or b/c the the loan defaulted? Honestly |

Sydor message to Kenner about the seizure confirmation call:

| | | | | |
|---|---|---|---|---|
| 6316 | +19725230505 Darryl Sydor* | 4/1/2009 8:48:29 PM(UTC+0) | R e a d | *Hey someone from northern trust called with someone from schwabb. And want to do a conference call in a hour with erin someone* |

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

(about a week later) that the jailhouse "snitch" was recording Kenner; but to no avail. ***The "murder-for-hire-plot" sanctioned by FBI agent Galioto failed...***

- ***None of the Kenner pre-trial demands or requested notifications were followed by trial counsel.*** See *Bell v. Miller*, 500 F.3d 149, 156 (2d Cir 2007).

## Failure To File An Appropriate Motion To Suppress...

Failure to file a motion to suppress the clearly deficient Search Warrant executed on November 13, 2013 was another violation of Kenner's rights.

The Search Warrant was *deficient* in creating a nexus to any alleged crime.  It was *overbroad* in its search parameters *without providing any nexus* to the additional buildings at Kenner's alleged residence.  Lastly, the *staleness* of the tangible evidence presented to create a nexus by its Confidential Informant ("CI"), Jowdy's employee Bryan Berard, was a non-descript phone call four (4) years *before* the search warrant was even issued.

Under the Fourth Amendment – a law enforcement officer's application for a search warrant must "demonstrate probable cause to believe that...a crime has been committed," which is known as the "commission" element of the required probable cause showing.  *United States v. Feliz*, 182 F.3d 82, 86 (1st Cir – 1999); see also *United States v. Vigeant*, 176 F.3d 565, 569 (1st Cir – 1999).

In addition – the application must "demonstrate probable cause to believe that...enumerated evidence of the offense will be found at the place to be searched," which is known as the "nexus" element. *Feliz*, 182 F.3d at 86; See also *Vigeant*, 176 F.3d at 569 (where a search was suppressed only after six weeks of stale information).

- Only conclusory statements about the movement of money are referenced by the IRS agent who signed the search warrant.  There is not one (1) instance where a bank statement (or similar) is referenced by the IRS agent to explain that specific funds that were documented to go one place ended

34

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

up in another place – creating the suspicion of a crime or the probability that evidence would be present...

Here – **the defendant's challenge focuses on the nexus element**.  In determining whether the element is satisfied – "[t]he task of the issuing magistrate is...to make a practical, common-sense decision whether, given all of the circumstances set forth in the affidavit before him,...there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983).  With respect to how strong that showing must be – "the facts presented to the magistrate need only 'warrant a reasonable man to caution to believe that evidence of a crime will be found."  *Feliz*, 182 F.3d at 86 (quoting *Texas v. Brown*, 460 U.S. 730, 742, 103 S. Ct. 2317, 76 L. Ed. 2d 502 (1983) (plurality opinion)).  In conducting our review – moreover – "we gave significant deference to the magistrate judge's initial evaluation, reversing only if we see no 'substantial basis' for concluding that probable cause existed."  *United States v. Ribeiro*, 397 F.3d 43, 48 (1st Cir – 2005) (quoting *Feliz*, 182 F.3d at 86).

- The emails that the affidavit references related to any business elements of the alleged crimes are from (*wholly stale*):
    - June 18, 2006
    - July 26, 2006
    - May 18, 2009
    - April 19, 2011
    - July 12, 2012
    - December 10, 2012
- <u>Unrelated</u> business emails from Kenner's email addresses occur on:
    - March 25, 2013
- Text messages are referenced (*wholly stale*) on:
    - April 24, 2008
    - September 2012
    - January 2013
- <u>Unrelated</u> party texts with Kenner occur on:
    - August 2013

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

The affidavit -- in other words -- was *stale* and *conclusory* as to all the key points concerning nexus.  And such a *stale* and *conclusory* affidavit is plainly not sufficient to establish the necessary probable cause.  *Gates*, 462 U.S. at 239 (noting that issuing a warrant supported by "mere conclusory statement that gives the magistrate virtually no basis at all for making a judgment regarding probable cause" would be contrary to the rights secured by the Fourth Amendment); *Spinelli v. United States*, 393 U.S. 410, 418, 89 S. Ct. 584, 21 l. Ed. 2d 637 (1969) ("[A] simple assertion of police suspicion is not itself a sufficient basis for a magistrate's finding of probable cause."), *abrogated on other grounds by Gates*, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527; *Nathanson v. United States*,  290 U.S. 41, 44-47, 54 S. Ct. 11, 78 L. Ed. 159 (1933) (affiant's statement that "he has cause to suspect and does believe that "liquor illegally brought into the United States was located on certain premises was insufficient to support a finding of probable cause necessary for the issuance of warrant); *Vigeant*, 176 F.3d at 569 (warrant affidavit that contained "conclusory statements of the affiant that," though they "might otherwise have helped create probable cause," were "entirely without factual support" failed to support probable cause).

- In fact:
  - *No* element of any crime in any of the referenced emails or texts exists, and
  - *No* misleading statements or other artifice to disguise some element of any criminal activity exists.

1. The government even failed to produce a single **IP address** associated with any of the emails or texts creating a <u>mandatory element of "nexus"</u> to the Kenner residence – furthering the belief that the investigators actually checked them *after* confirming Kenner had internet access at his residence – *but* the results were *not favorable* to probable cause or "nexus" and left that critical nexus out of the affidavit – *hoping the magistrate would not notice*.
   - *They apparently knew their audience.*

2. Further ignoring the responsibility to provide a nexus to a crime – the only reference to Kenner "work" comes from the CI who claimed to be present in

36

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

May 2009 when "*Kenner received a telephone call from another unknown hockey player client*" and "*retrieved an external hard drive*".   Neither of these events refer to criminal activity or create an acceptable "nexus" – *and it is four-and-a-half (4 ½) old.*

    a.  No external hard drive was recovered from the Kenner premises four-and-a-half (4 ½) years after the CI "tip" – making any and all references to the Kenner premise ***stale and unreasonable***.

    b.  In addition – the government failed to draw any nexus to any other building on the Kenner premises. The only "work" reference was a loose, four-and-a-half (4 ½) year old "hard drive" reference from a CI who saw it *in Kenner's office* -- *assuming even that an external hard drive proves some underlying illegal behavior worthy of a valid search?*

       • As a result – there was *no probable cause* to search the other "detached" buildings -- **either**.

   o  The entirety of the paper documents the government removed from Kenner's residence were stored in the Kenner detached garage – ***not the Kenner office referenced by the FBI agent's site inspection pre-raid*** *(See 3500-JW-24 at 14-15).*

Any adequate attorney would have seen the total deficiencies in the Kenner search warrant – and submitted a suppression motion, specifically considering the government recovered hundreds of thousands of pages of documents from Kenner's *garage*; regardless if any of them represented any criminal activity (which they did not).

• ***Trial counsel failed to challenge the Search Warrant by affirming to Kenner that the government can get a warrant for anything they want.***

After further haranguing by Kenner about the search warrant's deficiencies (considering Kenner is not an attorney – like the seasoned white-collar defense attorney trial counsel *falsely* promoted himself to be), trial counsel filed a suppression motion and raised issues related to *United States v. Ganias* (2d Cir – *en banc*) to challenge what trial counsel knew would be a failed challenge; either thru

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

plain ignorance of Fourth Amendment law -- or already in lock-step with the initial FBI threats (which started the day trial counsel was assigned thru CJA – *See Ex. 3*).

- ***The instant case – and the search warrant – had nothing to do with the elements of the Ganias 2nd Circuit (en banc) review.***
  - o ***It was another deception by trial counsel to quell Kenner.***

### Failure to request a *Daubert* hearing…
*(FINRA expert)*

Failure to request a *Daubert* hearing to contest the relevance of the government's FINRA expert at trial *prejudiced Kenner* – **because** Kenner had never been a registered investment advisor in that capacity with any of the alleged victims.   In addition – Kenner had not held the licenses since around 2004 – and was under no FINRA standards or FINRA administrative organizations that had anything to do with Kenner's day-to-day business practices.

- ***As further proof that this failure caused harm on the defendant – during deliberations – the first item the jury demanded was a re-reading of the FINRA testimony – clearly influencing their decision process.***

- Trial counsel's failure to address and suppress the mere presentation of the FINRA testimony proved catastrophic by the actions of the jury during deliberations, *supra*.

The defendant prevailed in *Lindstadt*, 239 F.3d at 205, where trial counsel was both passive and inept, and in *Eze v Senkowski*, 321 F.3d 110, 128 (2d Cir 2003) – where counsel did not challenge the conclusions of the prosecution's expert and did not call a rebutting expert for the defense.

- After the FINRA expert testimony, which portrayed a false "standard of care"[11] between Kenner and his clients, it was obvious the entire testimony

---

[11] **Trial counsel failed to "object"**…

The government established an *improper* "*standard of care*" between Kenner and his clients – because ***Kenner was never a stockbroker***, thus never subject to any oversight by FINRA as a regulatory agency.   The Court allowed this "expert testimony" when Kenner was never subject to their authority, and only holding Series registrations thru spring 2004 (as part and parcel to prior litigation efforts filed to protect his clients from a previous investment

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

needed to be objected to and rebutted (by Kenner's own FINRA expert – if allowed, post-objection).   Minimally, trial counsel should have called a

_____

company's documented frauds).   Only Juneau and Nolan's original December 2003 transaction were completed – fully signed off by each of them independently (in evidence) – during the time the unused FINRA licenses were even under registration.
- *The prejudice was obvious* when the jury asked for the "read back" of the FINRA expert and his "standard of care" testimony as their first (1st) act during deliberations, **BUT not applicable to Kenner**.

**Expert testimony**:
Although the expert FINRA testimony had little or no probative value, the Court allowed it.
- **Its prejudice was solidified**.

During direct-examination, FINRA was immediately defined by its expert as (*Tr.2477-2478*):
> "*FINRA is a self-regulatory organization of the securities history. Its role is to govern the conduct of its members who are brokerage firms and the registered individuals who work at the firms. It does this by creating rules that its members need to adhere to and failure to do so can result in disciplinary action. FINRA also regulates trading on various trading markets, public markets like the NASDAQ or over the counter securities markets. And FINRA is also responsible for licensing and administering a number of licensing exams which allow individuals to buy and sell shares of stock on behalf of their clients and customers.*"

Kenner never did any of these regulated activities, nor was defendant Kenner ever an employee of a firm that was capable of these activities during the Superseding Indictment period.  The testimony produced substantial prejudice, asserting an improper "duty of care" standard that the government claimed as governing Kenner and his actions.  Its presentation undermined the defendant's presumption of innocence by misrepresenting the standard by which his agreed upon relationship with his clients existed.

"[T]he decision of whether to admit expert testimony is left to the discretion of the trial judge and should not be set aside unless manifestly erroneous." *United States v. Duncan*, 42 F.3d 97, 101 (2nd Cir 1994) (internal quotation marks omitted).  An expert may not "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *Id.* (Internal quotations omitted). "[A] Judge assessing a proffer of expert scientific testimony under Rule 702 should also be mindful of other applicable rules [under the Federal Rules of Evidence], "including Rule 403, which permits exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) (internal quotation marks and alteration omitted).
- o **That is the case here.**

Fed. R. Evid. 702 provide that an expert witness may testify as to "scientific, technical, or other specialized knowledge" where such testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue."
- o **That is not the case here** -- because ***Kenner was never a stockbroker...***

39

rebuttal expert to confirm Kenner had no FINRA regulated transactions during the indictment timeframe, nor had Kenner *ever* been subject to any regulated FINRA transactions during his financial career.

## Failure to request a *Daubert* hearing...
### (Signature expert)

Failure to request a *Daubert* hearing to evaluate the testimony of the government's signature expert &/or hire a defense signature expert to evaluate the known-inauthentic documents *prejudiced Kenner*.   At a minimum – defense counsel failed to challenge the expert testimony with known and factual "forgery" fabrications by Kaiser, Berard and Donlan in the instant case and other legal proceedings – along with their boss (Ken Jowdy's) identical false "forgery" claims in various legal proceedings – *including but not limited to* Jowdy lying to U.S. Attorneys and the FBI – claiming a "forgery" in his Arizona case defense (2008-09) – while admitting the same document as "authentic" in his Nevada defense case exactly one (1) year later (2010)...

- The defendant prevailed in *Eze v Senkowski*, 321 F.3d 110, 128 (2d Cir 2003) – *where counsel did not challenge the conclusions of the prosecution's expert and did not call a rebutting expert for the defense.*

  - Both the government's *signature expert & FINRA expert* caused colossal yet unnecessary prejudice to Kenner – and proceeded without a simple objection to the prejudice.

## Failure To Challenge Venue...

*No nexus occurred in the EDNY...*

**As the court knows, *venue* must be proper with respect to each count.**

Defendant Kenner argued with trial counsel about submitting a Rule 29 venue challenge after the government rested its case – **because** the government failed to prove nexus for venue related to Kenner's actions in the EDNY.

198 (5th Cir Unit B 1982).

The decision in *United States v. Geibel*, 369 F.3d 682, 697 (2d Cir – 2004) (finding venue improper where actions in the Southern District of New York were "anterior

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

rebuttal expert to confirm Kenner had no FINRA regulated transactions during the indictment timeframe, nor had Kenner _ever_ been subject to any regulated FINRA transactions during his financial career.

### Failure to request a _Daubert_ hearing...
### *(Signature expert)*

Failure to request a _Daubert_ hearing to evaluate the testimony of the government's signature expert &/or hire a defense signature expert to evaluate the known-inauthentic documents _prejudiced Kenner_.   At a minimum – defense counsel failed to challenge the expert testimony with known and factual "forgery" fabrications by Kaiser, Berard and Donlan in the instant case and other legal proceedings – along with their boss (Ken Jowdy's) identical false "forgery" claims in various legal proceedings – *including but not limited to* Jowdy lying to U.S. Attorneys and the FBI – claiming a "forgery" in his Arizona case defense (2008-09) – while admitting the same document as "authentic" in his Nevada defense case exactly one (1) year later (2010)...

- The defendant prevailed in *Eze v Senkowski*, 321 F.3d 110, 128 (2d Cir 2003) – *where counsel did not challenge the conclusions of the prosecution's expert and did not call a rebutting expert for the defense.*

    o Both the government's *signature expert & FINRA expert* caused colossal yet unnecessary prejudice to Kenner – and proceeded without a simple objection to the prejudice.

### Failure To Challenge Venue...

*No nexus occurred in the EDNY...*

***As the court knows, venue must be proper with respect to each count.***

Defendant Kenner argued with trial counsel about submitting a Rule 29 venue challenge after the government rested its case – **because** the government failed to prove nexus for venue related to Kenner's actions in the EDNY.

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

Prior to trial – Kenner discussed the venue argument.   Trial counsel agreed with
Kenner that the most opportune moment to challenge venue was after the
government rested its case at trial (more quelling) – instead of prior to trial where
the government would get a "second shot" at fixing their deficient jurisdiction
problem (which Kenner raised – not trial counsel).   *Nevertheless – at the close of the
government's case, trial counsel refused to file the Rule 29 venue challenge – at a
minimum…*

- ***Kenner provided trial counsel with the following venue arguments <u>prior</u>
  to trial.***
- BUT -- Trial counsel failed to review the information and present as a viable
  defense before deliberations – claiming he was too busy -- perhaps, again,
  his-own fault for not requesting the additional resources of a paralegal,
  investigator, forensic accountant, etcetera – all violating Kenner's
  constitutional right to adequate counsel.

*As the Court is aware – trial counsel refused to argue readily available pro-Kenner
case law, as follows:*

In *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181 (2d Cir App – 1988), the
Court stated the Sixth Amendment to the Constitution provides that the accused in a
criminal prosecution has the right to be tried in the "district wherein the crime shall
have been committed".  See also *Fed. R. Crim. P. 18*.   The burden is on the
government to prove that the crime was committed in the district in which the
prosecution is brought, see *United States v. Potamitis*, 739 F.2d 784, 791 (2d Cir),
*cert denied*, 469 U.S. 918, 105 S. Ct. 297, 83 L. Ed. 2d 232 (1984); *United States v.
Panebianco*, 543 F.2d 447, 455 (2d Cir – 1976), *cert denied*, 429 U.S. 1103, 97 S. Ct.
1129, 51 L. Ed. 2d 553 (1977), and when a defendant is charged in more than one
count, ***venue must be proper with respect to each count***, see, e.g., *United States v.
Bozza*, 365 F.2d 206, 220-22 (2d Cir – 1966); *United States v. Davis*, 666 F.2d 195,
198 (5th Cir Unit B 1982).

The decision in *United States v. Geibel*, 369 F.3d 682, 697 (2d Cir – 2004) (finding
venue improper where actions in the Southern District of New York were "anterior

41

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

and remote" to the criminal conduct), also contradicts the government's venue position in Kenner's convictions. *See also Bozza*.

A defendant in a criminal case has the right to be tried in the district where the crime was "committed". U.S. Constitutional. Amend VI; *See also Fed R. Crim. P. 18* ("Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed."). "When a Federal statute defining an offense does not specify how to determine where the crime was committed, '[t]he *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Tzolov*, 642 F.3d at 318 (2nd Cir) (quoting *United States v. Cabrales*, 524 U.S. 1, 6-7, 118 S. Ct. 1772, 141 L. Ed. 2d 1 (1998)).

### ***Multiple venue conspiracy:***
Venue may lie in more than one place if "the acts constituting the crime and the nature of the crime charged implicate more than one location." *United States v. Reed*, 773 F.2d 477, 480 (2d Cir 1985). Venue is proper "in any district in which an offense was 'begun, continued or completed'". *Id*. at 483 n.4 (quoting *18 U.S.C. 3237(a)*)[12].

- o The United States Court of Appeals for the Second Circuit has routinely supplemented its venue inquiry with a "*substantial contacts*" test that takes into account a number of factors including the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of the venue for accurate fact-finding. The Second Circuit has acknowledged that this is not a formal constitutional test, but has nevertheless found it to be a valuable safeguard for a defendant whose contacts with the district of prosecution are *minimal*.

---

[12] *18 U.S.C. 3237* – The underpinnings of defendant's argument is the Constitution, Article III, Section 2 which provides in part, "The trial of all crimes...shall be held in the State's where the said crimes shall have been committed..." U.S. Constitutional. Art III, 2, cl. 3. And the Sixth Amendment guarantees trial "by an impartial jury of the States and the district wherein the crime shall have been committed..." U.S. Constitutional. Amend VI.

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

This observation is particularly apt where the charged crime is a conspiracy, because any district in which an overt act "in furtherance" of the conspiracy was committed is properly designated as the "district where the offense was committed," *so long as the act was performed*:

- (1) by any conspirator, and
- (2) was undertaken for the purpose of accomplishing the objectives of the conspiracy.

*Fed R. Crim. P. 18* also assists in the determination of *locus delicti*.  Except as otherwise permitted by statute or these rules, the prosecution shall be had in the district in which the offense was committed.  The Court shall fix the place of trial within the district with due regard to the convenience of the defendant and the witnesses and the prompt administration of justice.

- Indeed, the old English common law rules of venue produced a doctrine that a crime could be prosecuted only in a venue which all of the acts necessary to establish the offense had occurred.  See Note, *Criminal Venue in the Federal Courts: The Obstruction of Justice Puzzle*, 82 Mich. L. Rev. 90, 105 & n. 78 (1983).  This search for the one perfect locus was chimeric and forced Parliament to define permissible venue or venues explicitly.  The great criminal law scholar Stephen astutely noted, "the only general interest attaching to these exceptions is that they prove that the general principle which requires so many exceptions must be wrong."  Stephen, *A History of the Criminal Law of England* 277 (1883).

- In fact, proper venue in criminal proceedings was a matter of concern to the Nation's founders.  Their complaints against the King of Britain, listed in the Declaration of Independence[13], included his transportation of the colonists

---

[13] The Declaration recited among injuries and usurpations attributed to the King: "transporting us beyond Seas to be tried for pretend offenses."  The Declaration of Independence, para. 21 (1776).  A complaint of the same tenor appeared earlier, in the 1769 "Virginia Resolves".  See Blume, The Place of Trial of Criminal Cases:  Constitutional Vicinage and Venue, 43 Mich. L. Rev. 59, 64 (1944).  Parliamentary History of England from the Earliest Period to Year 1803, pp 476-510 (T. Hansard ed. 1813).  In response, the Virginia House of Burgesses unanimously passed a resolution condemning the practice of sending individuals "beyond the Sea, to be tried" as "highly derogatory of the Rights of British subjects."  Journals of the House of Burgesses of Virginia, 1766-1769, p 214 (J. Kennedy ed. 1906).

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

> "**beyond Seas to be tried**".   The Constitution twice safeguards the defendant's venue right: Article III, 2, cl. 3, instructs, "trial of all crimes...shall be held in the State where the said Crimes shall have been committed"; the Sixth Amendment calls for trial "by an impartial jury of the State and district wherein the crime shall have been committed."   *Rule 18* of the Federal Rules of Criminal Procedure, providing that "prosecution shall be had in a district in which the offense was committed," echoes the constitutional commands.

If the federal statute defining an offense does not indicate explicitly where Congress believes the criminal act is committed, "the *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it. *United States v. Anderson*, 328 U.S. at 703.   "It is of course, necessary in order to decide where the crime is committed to ascertain what duty it was, the failure to perform which constitutes the crime, and also what act of the defendant constituted the violation." Id. at 705.   Accordingly, the Court in *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1188 (2d Cir 1988), stated:

> The test [for constitutional venue] is best described as a substantial contacts rule that takes into account a number of factors – the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate fact-finding, *see also United States v. Reed*, 773 F.2d 477, 481 (2d Cir 1985), and we have noted that it is helpful to examine the "key verbs" used by the statute in defining the offense, *United States v. Chesnut*, 533 F.2d 40, 46-47 (2d Cir), *cert denied*, 429 U.S. 829, 50 L. Ed. 2d 93, 97 S. Ct. 88 (1976).

In *Beech-Nut* at 1189, as the court summarized – "the government argues that the prosecution in the EDNY was permissible because...its brokers were located in the Eastern District, and defendant's subordinates,

- (1) **telephoned** the brokers to place orders for the adulterated apple juice concentrate, and
- (2) **mailed** confirmations for these concentrate orders into the Eastern District."

The Appellate Court stated, "***we disagree***", for these communications were not part of the offense of introducing the offending juice into commerce but were merely prior and preparatory to that offense. ***Whether the crime being continuing or***

44

***noncontinuing, venue is <u>not</u> proper in a district in which the only acts performed by the defendant were preparatory to the offense and not part of the offense***. *See United States v. Bozza*, 365 F.2d at 220-21 (noncontinuing crime of receipt of stolen goods); *United States v. Davis*, 666 F.2d at 200 (continuing crime of possession of drugs with intent to distribute).

- ***This clearly was the case in the instant case.***

### Single Noncontinuing Act:

When a crime consists of a single noncontinuing act, it is "committed" in the district where the act is performed.  *See e.g., United States v. Anderson*, 328 U.S. 699, 703, 90 L. Ed. 1529, 66 S. Ct. 1213 (1946); *United States v. Busic*, 549 F.2d 252, 259 (2d Cir – 1977).

*Bozza* involved a prosecution in the EDNY for; *inter alia*, the noncontinuing offense of receipt of stolen goods.   The only connection of the alleged receiver of the goods with that district was that he had gone there for an unspecified purpose and had made and received calls there to arrange a meeting and negotiate price with respect to the goods; he had then gone from the EDNY to the SDNY, where he actually received the stolen goods.   The Court concluded that the venue in the EDNY as to that count was improper.   They noted that:

> The cases draw a distinction between a continuing offense which is "held, for venue purposes, to have been committed wherever the wrongdoer roamed,"…and "a single act which occurs at one time and at one place in which only it may be tried, although preparation for its commission may take place elsewhere." *Bozza*, 365 F.2d at 220 (citations omitted).

> The Court *rejected* the government's argument that "the making of a contract to receive was the 'beginning' of a receiving," *id*., concluding instead that an act that was merely preparatory to the offense was not part of the offense. *See also United States v. Chestnut*, 533 F.2d at 47 (court must "decide 'when the defendant's actions have progressed to the point where the court can confidently conclude that [the offense in question] has been committed'") (quoting *United States v. Bithoney*, 472 F.2d 16, 23 (2d Cir), *cert denied*, 412 U.S. 938, 37 L. Ed. 397, 93 S. Ct. 2771 (1973)).

45

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

In *Bozza*, the court concluded that to such extent as the issue is doubtful, it is best to resolve the doubt in favor of construction which will ensure trial where witnesses to the receiving are more likely to be present; otherwise the mere happenstance of a telephone call from a district, possibly remote, where a defendant chanced to be, could deprive him of the protection of the Sixth Amendment. *Bozza*, 365 F.2d at 221.

- ***This clearly was the case in the instant case.***

**<u>Preparatory Acts:</u>**

Principle preparatory acts alone are insufficient to support venue applies also to continuing offenses.   Though *18 U.S.C. 3237* traces an offense from inception to completion, its thrust is entirely forward-looking; it contains no retrospective provision establishing venue in a district which the defendant performed only acts that preceded the inception of the offense.   In *United States v. Davis,* 666 F.2d 199-200, the defendants were prosecuted in the Middle District of Georgia for possession of narcotics with intent to distribute, a crime that may be a continuing offense within the meaning of *18 U.S.C. 3237*.   The [defendants] argued that venue on that count was improper because the narcotics had never physically entered the district.   The government contended that venue was proper because the defendants had made arrangements while in that district for the acquisition of the drugs and had intended that the drugs be returned to the district for ultimate distribution at the street level.   The Fifth Circuit rejected the government's contention and REVERSED for improper venue because the offense itself had not been committed in the district.   Like the Fifth Circuit, *Beech-Nut's* Court found no authorization in *18 U.S.C. 3237* for venue in a district whose sole connection with the offense in question is that it was a site of a preparation for the offense.

- ***This clearly was the case in the instant case.***

**<u>EDNY individuals:</u>**

- ***Venue was artificially manufactured for specific intent by the government to create jurisdiction.***

46

The only persons named in the 2015 Superseding Indictment who resided in the EDNY during the timeframe associated with the various investments in the Kenner indictment were John Kaiser and Nick Privitello.

The government is in full possession of evidence *dismissing* John Kaiser -- **BECAUSE:**

1. He was fully repaid by Kenner in each joint venture (Hawai'i and California) (in evidence),
2. He had been systematically robbing his friends & family since their 2005 Hawai'i contributions were repaid in August 2006 (unrelated to Kenner) (in evidence),
3. He and Bryan Berard had robbed Kaiser's mother (Ethel) – still unknown to her of $147,000 in 2010 (in evidence) (*Tr.940-941, 1160*),
4. He later robbed Kenner (with Berard's help – 2011-2013) in two (2) real estate projects (in Arizona and Sag Harbor, NY – and was sued by Kenner and Kenner investors for both projects as a result of the frauds) (in evidence) -- and
5. He submitted *forged* and *fabricated* documents in multiple jurisdictions (along with Berard) – all under the knowledge of the FBI case agent [Galioto]; some of which were systematically withheld from the Rule 16 evidence to avoid Kaiser's cross-examination of the material forged documents during trial (*See Ex. 86 at 1-3, Ex. 63 at 7*).

- **John Kaiser was never a victim of the 2013 or 2015 Indictments.**
    - **The evidence clearly proves it – yet ignored by trial counsel...**

*Kenner was found not guilty of both overt act charges related to Nick Privitello*...notwithstanding 100% of the government's empirical evidence *excluded* Kenner – *and implicated John Kaiser* in any acts (preparatory or otherwise) that induced Kaiser's close friend to invest in Constantine's Eufora.   Privitello's December 2009 investment was identical to his January 2008 Los Frailes investment into Robert Gaudet's company (not Kenner's) almost two (2) years earlier – *solely at Kaiser's solicitation*.

- It was the January 2008 Los Frailes transaction that FBI agent Galioto *also* withheld from evidence (*Brady* issue here) in order to hide the fact that Kaiser (*See 3500-JK-7*) and Privitello (*See 3500-NP-5*) **lied** to the FBI during

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

their independent October 2, 2014 proffers – **AND** –

- Kaiser fabricated an operating agreement (*See Ex. 94 at 1, 10*) for Privitello's Los Frailes investment – *confirming Kaiser's propensity for forgeries and fabricating documents.*

### *The government gave false proffer about Ethel Kaiser and the Pecas living in the EDNY.*

- The government falsely proffered that Ethel Kaiser resided in the EDNY, when they were fully aware that she resided full-time in "upstate New York" – the Northern District of New York (*Tr.5638*) – and

- The government falsely claimed *without evidence* that Michael Peca and Kristen Peca lived in Long Island during their Hawai'i investment.
  - Again, *not true*.

Nonetheless and wholly untrue, the government **lied** to inform the 2015 trial court about Peca's residence and location – *for venue* (*Tr.5638*):

> "*In addition, Mr. Peca and Mrs. Peca also resided in Long Island during the years in which they were involved in the Hawai'i investments.*"

- ***Trial counsel sat by "silent" -- prejudicing Kenner...***

The government affirmation of venue in the EDNY went so far as to ignore their-own contradictory testimony from Kristen Peca.   Kristen Peca confirmed they lived in Edmonton, Alberta, Canada when they invested in the Hawai'i project (*Tr.700*):

> *Q: So this investment happened, do you remember approximately what time you invested the money in Hawai'i?*

> *A [Kristen Peca]: 2005, 2006.  We were in Edmonton[14]*

### Failure To Meet With Defendant And Properly Prepare...

Trial counsel failed to prepare for Kenner's multi-day direct-examination or cross-examination testimony.   After the government's pre-trial ruse to "trap" Kenner in a

---

[14] Please note that Kenner *never* had any business meeting with Peca &/or his wife in Edmonton, Alberta, Canada.   Kenner had one (1) visit to Edmonton during their 2005-2006 NHL season – and *only* during the Stanley Cup Finals in June 2006 – well-over one (1) year after Michael Peca began his Hawai'i investment.

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

"murder-for-hire" plot and record him with a jailhouse "snitch", Kenner was moved to Brooklyn MDC "*on the eve of trial*".   Trial counsel told Kenner that day in the Central Islip courthouse that ("*preparation will end now*" because he was "*not going to waste his time going all the way to Brooklyn to meet with me when I could have stayed at GEO, if I had just kept my mouth shut*".   This non-participatory threat only coupled the fact that trial counsel was not holding constructive meetings with Kenner prior to Kenner's transfer, anyhow.

- *Trail Counsel Minimized The Defendant's Assistance In His Own Defense...*

### Trial Counsel Failed To Meet, Review Evidence, Or Discuss Strategy With The Defendant...

***Minimal Attorney Visits And Proper Trial Preparations occurred*** *(See Ex. 3, Ex. 3a and Ex. 3b).*

Although trial counsel made visits to Kenner's detention center (GEO – Queens) prior to the trial, the trial counsel meetings were *never* significant due to their characteristically short durations; lacking substantive information exchange.   Trial counsel was always in a rush due to personal demands for his time.   Trial counsel refused to discuss trial materials on the phone.  Thru the defendant's urging -- the majority of the pre-trial meetings (at GEO) concerned the topics of *potential defendant witnesses* and *critical information to subpoena* pre-trial.   In each and every occasion, trial counsel assuaged the defendant by claiming that he was evaluating the specific, potential witnesses (named by Kenner) and the underlying exculpatory documents (hi-lighted by Kenner), *although none were called and no evidence was subpoenaed* (except the Northern Trust documents, finally on second effort on the "*eve of trial*").

As the trial drew near, trial counsel had not conducted a single, reported interview or call with any of the myriad of pro-defendant witnesses (urged by the defendant – *See Ex. 3*), who could corroborate the defendant's trial defense of *full transparency* with all financial transactions, *including but not limited to*:

49

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

- The Jowdy loans,
- The Northern Trust "use of LOC funds",
- Northern Trust's *direct* communication with their LOC clients (specifically before the LOC seizure in April 2009),
- No Kenner request or complicity with Northern Trust Bankers or employees in concealing Patriot Act required materials from Northern Trust's own clients,
- The knowledge of Eufora private stock sales, and
- The litigation troubles with Jowdy (culminating in the fully briefed and disclosed GSF plans, despite *faulty memory, confusion and mistakes*) (*See Ex. 24, Ex. 25 and McKee texts, infra, at pages 106-108*).

### Defendants Have The Right To Participate In Their Own Defense...

Often, the defendants alone posses information that may be critical in refuting government's evidence, or in discrediting expected prosecution witnesses. *United States v. Garcia*, 406 F. Supp. 2d 304, 305-306 (SDNY 2005). Adequate consultation between counsel and client is essential to the competent representation of a criminal defendant. *See Gaines v. Hopper*, 575 F.2d 1147, 1149-1150 (2d Cir 1978) ("Informed evaluation of potential defenses to criminal charges and meaningful discussion with one's client of the realities of his case are cornerstones of effective assistance of counsel.") *See also Coles v. Peyton*, 389 F.2d 224, 226 (4th Cir 1968) ("Counsel must confer with his client without undue delay and as often as necessary, to advise him of his rights and elicit matters of defense or to ascertain that potential defenses are available.").

As the government's prosecutorial case *unraveled* (leaving the government evidence *thin at best*), the defense had ample opportunity to completely destroy the nonsense **– with real witnesses** – *that would have verified Kenner's transparency with empirical evidence*.

- o *Adequate trial counsel would have hi-lighted that the government ignored the same empirical evidence to frame their case.*
- o *Trial counsel failed again based on an utter lack of preparedness...*

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

If trial counsel had done an adequate job of preparation, no jury could have weighed the **real**, exculpatory evidence versus hundreds of "*I don't remember*" and "*I don't recall*" witnesses – and found "concealment" (from witnesses the government defends with *faulty memory, confusion and mistakes* – never the truth in the material matters).   **It is simply *not* a believable standard.**   The potential witnesses who possessed exculpatory information for the defendant's transparency included, *but were not limited to*:

- Eufora and Hawai'i plaintiffs attorney, **Michael Stolper**,
- Arizona -- Hawai'i lawsuit attorney **Tom Baker**,
- **Diana Nolan** (Owen Nolan's wife),
- SDNY Grand Jury witness -- **Turner Stevenson**,
- Northern Trust Bank President – **David Highmark**,
- Northern Trust Lending Vice President, **Edward Wilson**,
- Northern Trust loan banker, **Catherine Brill**,
- Mexico investor's attorneys, **Karlos de la Puerta** and **Paul Donion**,
- Kenner's former assistant, **Stephanie Dixon**,
- Hawai'i closing attorney, **Robert Madia**,
- Hawai'i property manager and Jowdy Diamante employee, **Christopher Hawkins**,
- Kenner's former clients **Woolley**[15], **Stumpel**[16], and **Norstrom**[17],

---

[15] Mexico and Hawai'i investor – **Jason Woolley** confirmed in the 2009 arbitration that he *never* received a "*one-page*" signature page document from Kenner, *since it was Jowdy and Nolan's attorneys from the 2009 arbitration who started that rumor.*

Woolley stated [*Day 5 at 945*]:
> "Q: Did Mr. Kenner – you heard the judge talk to you about documentation.  Did you ever – <u>was there ever a situation where you only received a signature page, or did you get the full documents</u>?
>
> A [Woolley]: I've got so many damn papers.  I didn't even want them after a while, to be honest.  I'm digging stuff up to this day.   **But no to the answer.**   I have no problems getting – **I just didn't get the signature page.**

[16] Mexico and Hawai'i investor --**Jozef Stumpel** signed a 2009 (*Ex. 60*), 2014 (*Ex. 60a*) and 2017 (*Ex. 60b*) affidavit in various cases – all supporting the full transparency of the Jowdy loans to the group by Kenner and the collective efforts to recapture the funds from Jowdy once it was discovered *by Kenner* and shared with the group that Jowdy had no plans to repay the Hawai'i loans &/or personal loans (*as Jowdy readily <u>confessed</u> to in his January 2010 California deposition and the FBI in 2010 – See Ex. 2 [3500-KJ-2] at 11-14*).

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

- Mexico investor **Rem Murray**[18]
- Jowdy's accountant -- and best friend, **Mark Thalmann**,
- **Federal Agent Scott Romanowski** (whose notes were challenged),

> ...Amongst other evidence later proven as pro-Kenner and true (with the *government-forfeiture-44* and *government-forfeiture-36* submissions – plus other *Brady* related documents withheld until the forfeiture hearings – post-trial, *infra and supra*).

The "lack of witness" facts here are similar to the case of *United States v. Tucker, infra.  Tucker* was a case of conspiracy to defraud the United States and filing false income tax returns in connection with a scheme to overcharge the Department of Navy.   At trial, two key witnesses directly implicated Tucker in the fraud.   The Ninth Circuit Court of Appeals found sufficient support on the record to conclude that trial counsel's incompetence had *prejudiced* Tucker's right to a fair trial.

- In the instant case, by no measure could the total lack of consultation between Kenner's trial attorney and Kenner about the case, and the competent absence of **any** discussion in the final, critical pre-trial strategy related to crucial pro-defendant witnesses and necessary subpoenaed materials, be deemed adequate for effective representation.

Further, the Court in *Tucker* found that trial counsel's lack of consultation with Tucker was accentuated by his failure to conduct an adequate pre-trial investigation.   Trial counsel did not interview nor attempt to interview, nor did he

---

[17] Mexico and Hawai'i investor –**Mattias Norstrom** signed a 2009 (*Ex. 78*) and 2015 (*Ex. 79a/79b*) affidavit in various cases – all supporting the full transparency *by Kenner* of the Jowdy loans to the group and the collective efforts to recapture the funds from Jowdy once it was discovered *by Kenner* and shared with the group that Jowdy had no plans to repay the Hawai'i loans &/or personal loans (*as Jowdy readily <u>confessed</u> to in his January 2010 California deposition*).

[18] Jowdy-only Mexico investor – **Rem Murray** signed a 2015 (*Ex. 80*) affidavit in a pending Jowdy case in Mexico -- ***and alleged as part of Kenner's new 2015 "obstruction of justice"*** – *<u>while all supporting the full transparency of the Jowdy loans to the group and the collective efforts to recapture the funds from Jowdy once it was discovered by Kenner</u>* and shared with the investment group that Jowdy had "no plans" to repay the Hawai'i loans &/or personal loans.
  - ***Jowdy readily <u>confessed</u> to the unpaid loans in his January 2010 California deposition.***

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

request anyone acting on his behalf to interview a single government witness prior to the trial because he felt "there was no need to." *Id*. at 582-583.  The *Tucker* court opined:

> "In this case, however, [Attorney] Keating *failed to prepare his client's defense* competently under the most tolerant standard of evaluation.  He *failed to obtain legally relevant facts* from his client; he failed to pursue *obvious* leads provided by his client, and *failed completely to garner corroborating evidence* for his client's testimony.  He failed to interview or attempt to interview *key witnesses*, and his *review of the trial exhibits* made available by the government was *inadequate*.  Under these circumstances, it can hardly be claimed that his preparation of Tucker's defense was adequate." *Id*. at 584.

- The same confluence of "**lack of communication**" and "**lack of investigation**" occurred in the instant case.  Trial counsel failed to conduct *any* discernable investigation.  Trial counsel systematically reverted back to his favorite refrain that "*the government has the burden, not the defense*", to combat Kenner's pleas before and during trial.

Further, the *Tucker* Court found that counsel's failure to seek proof to corroborate the defense theory "made it impossible for the jury to make an independent judgment as to whether there was a reasonable doubt regarding Tucker's guilt." *Tucker* at 583.  **"The most competent lawyer in the world can not [sic] render effective assistance in the defense of his client if his lack of preparation for trial results in the failure to learn of readily available facts which might have afforded his client a legitimate justifiable defense."** *Id*.

- In the instant case, trial counsel failed to 1) *obtain* legally relevant facts from his client, 2) *call* any of the witnesses the defendant demanded for pro-defendant testimony, 3) *pursue* obvious leads provided by his client, or 4) *review* with defendant the trial exhibits made available by the government (*See Ex. 3*).

Here, the Baker disclosures (*See R33 A*) were turned over by the government post-trial (a clear *Brady* violation – but available nonetheless), fully contradicting trial counsel's claims to the defendant about the availability of the disclosure letters from attorney Baker (*See Ex. 3*).  It plainly demonstrates how trial counsel's deficiencies

53

proved inadequate and ineffective.  If trial counsel would have regarded his client's requests and subpoenaed the very information provided by the government during the forfeiture proceedings, the jury would have had potent evidence corroborating Kenner's independent transparency for three (3) of the main issues at hand:

1. The 2004 Hawai'i loans to Jowdy were *real*, and
2. The Baker disclosures proved that each Little Isle 4 investment member had received *independent* information from their own attorney about the loans – *and signed off on them*, and
3. *No tainted funds* were used by Kenner to acquire Mexico equity (*Tr.5721, 5722-5723, 5990, 5991-92, 5707-5709, and 5996*).

***The Second Circuit has widely acknowledged that actual evidence far outweighs the any perception of self-serving testimony by a defendant at trial.***

The signed Baker disclosures (*See R33 A*) independently confirm each of the Little Isle 4 members' unobstructed knowledge.   It further confirms that with California attorney Ronald Richards (*See Ex. 90*) and NY attorney Michael Stolper (*See Ex. 1*) -- the defendant's investors had unabated access to multiple independent counsel related to all of the investment issues in the government's case – *independent from Kenner.*

- At no time, were the investors solely reliant on Kenner for any portion of their *Mexico*, *supra*, *Hawai'i*, *supra*, &/or *Eufora* **investment recovery**, contradicting Kristen Peca (*Tr.712-713*), Jay McKee (*Tr.1830*) and others alleged "*fearful dependency*" on Kenner for recovery.
  - *It was pre-fabricated nonsense...*

- Yet -- *in one sense they were correct* – since the FBI case agent has now: 1) extended the prosecution of Jowdy and his cabal thru his-own planned ignorance of the confessed and documented Jowdy crimes to over ten (10) years (hiding it from the investors), and 2) fully dismantled the investors' recovery efforts (while still trying to blame them on Kenner – despite John Kaiser's recent 2019 verification of the cover-up (*See Document 628 at 1*):

> "*Jowdy would like the court to think that Kenner stole $7 million from the hockey players and others...*"

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

In fact, the Hawai'i-Mexico investors were represented by ***Hawai'i*** ***independent*** ***counsel*** (since 2008) (*See R33 A*), ***Mexico independent counsel*** (since 2009) (*See Ex. 65, Ex. 90*), and ***Eufora*** ***independent counsel*** at all relevant times (since 2010) (*See Ex. 1*), rendering any lack of cooperation by Kenner irrelevant.   The *government ignored their own evidence that confirmed Kenner nevertheless spearheaded each of the legal efforts – with full transparency.*

- ***Trial counsel sat "silent" during the false testimony -- again -- to Kenner's prejudice.***

### Failure To Investigate And Interview Witnesses...

Failing to investigate and interview *crucial* defense witnesses and present their verifiable exculpatory evidence at trial was inexcusable, *infra and supra*.

In this "complex" case -- trial counsel failed to: 1) go over exculpatory evidence witness-investor by witness-investor, 2) prepare for individual government witnesses, 3) prepare Kenner's own witness testimony, or 4) discuss the details of the number of witnesses Kenner was told by trial counsel he was "allegedly" speaking with in order to refute the "concealment" of investment issue theories (Hawai'i and Eufora) during trial (*See Ex. 3, Ex. 3a, Ex. 3b*).

- Trial counsel cannot convince the defendant or any reasonable fact finder that not investigating the volume of "involved" professional individuals and their respective knowledge of all the investments -- &/or preparing them as a pro-defendant witnesses -- was a reasonable trial strategy, in the least; *certainly not ignoring all of them*.

***This is a case about concealment...***

Nevertheless, **trial counsel spoke to *none* of these defense witnesses demanded by Kenner**; *including but not limited to*:

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

- **David Highmark** – President of Northern Trust Bank[19]
  - **Highmark** would have *confirmed* *no* "Patriot Act violation plan" to withhold documents from the Northern Trust LOC clients.
  - **Highmark** would have *testified* that he had unrestricted access to Kenner's assistants and all of the banks' mutual LOC clients at all times.

- **Nelson Lerner** – Executive Vice President of lender at Northern Trust Bank
  - **Lerner** would have *confirmed* *no* "Patriot Act violation plan" to withhold documents from the Northern Trust LOC clients.
  - **Lerner** would have *confirmed* he co-signed multiple LOC packages after direct receipt from his LOC clients (not Kenner) (in the 2015 Northern Trust Bank subpoena).
  - **Lerner** would have *testified* that he had unrestricted access to Kenner's assistants and all of the banks' mutual LOC clients at all times.

- **Ed Wilson** – Executive Vice President of lending at Northern Trust Bank
  - **Wilson** would have *confirmed* *no* "Patriot Act violation plan" to withhold documents from the Northern Trust LOC clients.
  - **Wilson** would have *confirmed* he co-signed multiple LOC packages after direct receipt from his LOC clients (not Kenner) (in the 2015 Northern Trust Bank subpoena) (*See Ex. 7, Ex. 8, Ex. 10, Ex. 12, Ex. 13*).

---

[19] Trial counsel cannot convince the defendant or a reasonable fact finder that not investigating Northern Trust president, David Highmark's, knowledge and preparing Highmark as a defendant witness, was a reasonable trial strategy, considering he personally recommended the leveraged LOC investment approach for the LOC clients in Little Isle 4, and would have been the person to **CONFIRM** (*according to the government theories*) that Northern Trust Bank *agreed* to IGNORE the **2001 Patriot Act "Know Your Client"** rules and not communicate directly with their clients, including but not limited to delivering monthly disclosure statements for their investment and LOC accounts.

For one -- if the concealment of LOC information really occurred according to the government (which it did not), the Northern Trust *partially filed* subpoena contradicted it. It confirmed that the alleged victims ***were sent*** LOC statements (contradicting the government proffers) (*See Ex. 30, Ex. 31, Ex. 32, Ex. 34, Ex. 35, Ex. 36*). And second -- Northern Trust President, Highmark would have confirmed (*if really concealed*) that he would have had to instruct his bankers to violate Federal Law (2001 Patriot Act) to conceal information from Northern Trust's clients (specifically his Head of Lending, Edward Wilson) (*See Ex. 7, Ex. 8, Ex. 10, Ex. 12, Ex. 13*).

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

- o **Wilson** would have *testified* that he had unrestricted access to Kenner's assistants and all of the banks' mutual LOC clients at all times.

- **Catherine Brill** – Northern Trust Bank personal banker assisting the LOC/banking clients
  - o **Brill** would have *confirmed* *no* "Patriot Act violation plan" to withhold documents from the Northern Trust LOC clients – and
  - o **Brill** would have *confirmed* that she spoke "directly" with each LOC client in 2009 *before they gave permission* to seize their LOC collateral – and *before* the due dates of the loans (in evidence).
    - ▪ *In fact -- after **Brill** spoke with Nolan in March-April 2009, Nolan independently chose to continue his individual monthly payments – and did.*
  - o **Brill** would have *testified* that she had unrestricted access to Kenner's assistants and all of the banks' mutual LOC clients at all times.
  - o As a result of **Brill**'s testimony – AUSA Komatireddy could not have prejudiciously proffered during rebuttal summation that Kenner was "*insane*" when Kenner truthfully testified that the LOC investors chose to pursue Ken Jowdy thru litigation -- and terminate the LOC collateral after speaking independently with Northern Trust Bankers – while eliminating approximately $40,000 per month in LOC fees **-- that Kenner was ironically charged with paying** (*Counts 7 & 8*) (*Tr.5998*).
    - ▪ ***Brill** would have left no doubt of transparency and full disclosure to the investors.*

- **Attorney Michael Stolper** – New York attorney who filed the 2010 (AZ), 2011 (EDNY), 2014 (EDNY) litigation versus Constantine for his independently discovered Eufora corporate frauds
  - o **Stolper** would have confirmed that he *vetted* the 2008-09 Gaarn and Constantine private stock sales for the individual Eufora investors and *confirmed* full, transparent knowledge with his clients/Eufora investors (*dated July 16, 2010 – Ex. 1*).
  - o **Stolper** would have *confirmed* his Eufora investor clients "signed-off" on the vetted knowledge (*Ex. 1 at 9-18*).
  - o **Stolper** would have *verified* that the Home Depot recording and the Constantine rant provided no new information that he had not already been aware of – also with Kenner's transparency...

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

○ **Stolper** would have *verified* that he was part of the intimate Eufora loan-buyout discussions; fully contradicting Berard (*Tr.3106, 3111*), John Kaiser (*Tr.1348, 1362*), Michael Peca (*Tr.604*) and Gaarn (*Tr.2640*) perjury – ***all of which could not remember the Eufora loan buyout in perfect synchronicity during trial***.

○ **Stolper** would have <u>testified</u> that he was personally aware of the Jowdy loans -- and he was working with a group of Hawai'i-Mexico investors to sue Ken Jowdy and the Lehman Brothers "parties" who had defrauded the Hawai'i investors and the Mexico investors, collectively and in part – <u>*until*</u> John Kaiser and Bryan Berard received jobs from Jowdy, terminating all group efforts – just weeks after the Kenner-Stolper Day-3 appearance in front of the SEC (*See Kenner SEC testimony August 2011 at TR-SEC0000426*)[20].

○ **Turncoat – Bryan Berard** – confirmed Stolper's lawsuit plans for the Hawai'i-Mexico investors -- and his inherent knowledge of the Jowdy crimes -- via text to Kenner on October 7, 2010 and October 15, 2010 – just prior to Berard's employment by Jowdy in Mexico with Kaiser:

| 1 6 9 5 | +14015 246929 Bryan Berard* | 10/7/2010 11:56:06 PM(UTC+0) | R e a d | **Hopefully can go after Leaman Borthers soon too** |
|---|---|---|---|---|

---

[20] (*SEC Tr. 683-685, **August 2011***) -- [NY Attorney, Michael Stolper]:

*The only thing I would like to clarify was that I think in your line of questioning, which may not come through in the transcript, whether he [Kenner] disclosed that the SEC has sought enforcement of subpoenas to his clients.   I think that the suggestion in your question was that it was something negative that he should disclose to his clients as sort of a warning or red flag to his clients who are relying on him.*

***And I think that the conversations that I have been a part of***, *without waving privilege, **and also my own view** of SEC's involvement in this whole Diamanté del Mar, et. al. is a welcome one and that **we** and Mr. Kenner, are really looking to the SEC to enforce the securities laws against Mr. Jowdy and those [Harvey, Freeh, and Najam] who did wrong here.   And we see it as a welcome thing, as a positive thing.*

***So the tenor of the conversations with Phil's friends, co-investors, clients is that this is a welcome thing and maybe because we are having this direct communication with the SEC, and then perhaps subsequently with the U.S. Attorneys Office, that maybe they will finally get some justice out of this.***

*And I know I have said that off the record with you and I just wanted to clarify that in response to that line of questioning.   Just a point of information.*

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

| 7 | | | | |
|---|---|---|---|---|
| 1 7 1 5 0 | +14015 246929 Bryan Berard* | 10/15/2010 1:27:47 AM(UTC+ 0) | R e a d | **Any word when ur coming to NYC yet to meet wth <u>Stolper</u> and <u>Lawyer from Rhode Island</u> for the Hawai'i lawsuit** |

- **Attorney Tom Baker** (Arizona) – represented the Hawai'i partners (Little Isle 4) investors in their 2008-09 litigation versus Jowdy to recover the "loans"
    - o **Baker** would have *confirmed* nineteen (19) Hawai'i partners (Little Isle 4) members were 100% aware of the loans to Jowdy (*See R33 A*) -- and
    - o **Baker** would have *confirmed* that he received "no verbal or written objections" to the loan knowledge at any time.

- **Robert Gaudet**[21] – The "witness" who was interviewed multiple times by the FBI (in-person) – and signed the 2004 Hawai'i-Jowdy loan agreement with Jowdy

---

[21] **The Two Central Participants In The Signing Of The 2004 Hawai'i Loan Agreement Were Repeatedly Interviewed Pre-Trial And Not Presented By The Government To Support Their Allegations Of Fake Loans (*Robert Gaudet and Ken Jowdy*)...**

Throughout the trial, from opening remarks thru summations, trial counsel refused to object to the never-ending argument that the loans to Jowdy were "*bogus*" (*Tr.5708 (2x), 5709*), "*phony*" (*Tr.4597, 4598*) and "*supposed*" (*Tr.5707-5708*) -- during their attacks on Kenner's veracity.

The government *never* substantiated their false theories thru testimony or otherwise, with full, unabated access to both **Ken Jowdy** and **Robert Gaudet** (2004 Hawai'i loan agreement witness) as evidenced by their multiple FBI 302(b) meetings, always including FBI agent Galioto, at each occurrence.  Instead, trial counsel allowed John Kaiser to make several *false claims* about being told by Kenner that the 2004 Hawai'i loan agreement a forgery (by the defendant -- *Tr.1106-1108*), now unquestionably proven as authentic (specifically by Jowdy's-own Nevada trial attorneys in 2010).

In fact, in pre-trial, the government claimed that Kaiser's name was forged on a Mexico testimonial in the $1.6 million case (*Stumpel v. Jowdy*).  Please note that Jowdy brazenly confirmed the unpaid debt in January 2010, in Kaiser's presence (*See Ex. 42 – page 3*).  2012 FBI recordings proved the perjurious Kaiser claim of his name being forged in Mexico.  In 2012 Berard and Kaiser recorded Robert Gaudet in Mexico.  The multiple recordings occurred immediately after Kaiser and Berard received high-salaried jobs from Jowdy. Kaiser's first action for his new boss in Mexico was to testify that his name was "forged" in the Stumpel Mexico criminal case, *securing a case dismissal for Jowdy*.  Yet, when the government represented Kaiser's alleged forgery to the EDNY Court in 2014 (pre-trial), they

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

- o **Gaudet** would have *confirmed* his presence during the signing of the December 2004 Hawai'i-Jowdy loan agreement – just as he did in three (3) separate 2008-2010 litigations by the Hawai'i-Mexico investors to recover the various loans from Jowdy (*See R33 D*).
- o **Gaudet** would have *confirmed* he assisted about ten (10) Hawai'i-Mexico investors to file litigation versus Jowdy in Mexico for the same loan funds that Jowdy stole – in addition to lawsuits versus Jowdy for additional criminal thefts from Kenner, Stumpel, Norstrom, etcetera.

---

were in possession of the following Berard confession.  The recording confirmed Berard and Kaiser's affinity for lying to both the Mexico Federal Courts and the FBI/AUSA's, specifically regarding forgeries, **who then presented the document in the EDNY**.

During the recordings, after Gaudet told Berard that he has been followed in Mexico and intimidated:

> At 8:40 -- Berard told Gaudet -- TRACK 6 [23:08] – "*FORGERIES are very serious in Mexico...*"

Yet -- Berard immediately admitted to Gaudet that he and Kaiser signed "**BLANK DOCUMENTS**" in Mexico before they left the prosecutors office to fill in their testimonials in the presence of their own Mexico attorney, Francesco Duarte. Ultimately, their-own FBI recordings *refuted* another Berard-Kaiser-claimed forgery (just like repeated Jowdy defenses in every jurisdiction he was sued by Kenner and Kenner investors).  The FBI recording verified Kaiser's propensity for lying to both the Mexico and U.S. Justice systems, for their-own and Ken Jowdy's benefits.

> At 9:40 – Berard confirmed – "*We did not make testimonies, we waited outside forever, it took too long, we actually signed FAKE, not FAKE, uhh, we signed BLANK PIECES OF PAPER, with our signatures...*"

**Trial counsel "leaks" crucial impeachment information to government...**
Instead of alerting the Court to the Kaiser forgery lies – now extending out of Mexico to the EDNY (AUSA, FBI and IRS), trial counsel surreptitiously alerted the U.S. Attorney that, "*Kenner has an FBI recording that will impeach Kaiser*".
- Following Kenner's trial attorney "**leak**" of invaluable impeachment evidence, the U.S. Attorneys in the instant case no longer mentioned the Kaiser-Mexico forgery in front of the EDNY Court.

The identical scenario played out after the government claimed they were going to allege the 2004 Hawai'i-Jowdy agreement as a forgery – during a 2014 pre-trial hearing.  Kenner informed trial counsel that he possessed in government evidence in the Jowdy December 2010 Nevada trial transcripts where Jowdy's lead counsel authenticated the "loan agreement" as Jowdy's primary defense exhibit (*See R33 D*).  The government "dropped" that specific forgery claim after the subsequent trial counsel "**leak**".
- Instead, the prosecution chose to "back door" the false forgery claims into the case by having Kaiser allege "*Kenner told me they were forged*" – *unsolicited* (*Tr.1106-1108*)...

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

- o **Gaudet** would have *testified* that he was constantly threatened by Jowdy's "protection" to stop going after Jowdy; related to his own litigation -- and that of the Hawai'i-Mexico investors (as noted by FBI agent Galioto in *Ex. 37 – ¶ 9 [3500-RG-9]*).

- **Attorney Robert Madia** – The attorney who assisted the Hawai'i partners to complete the 2006 Joint Venture with Lehman Brothers
  - o **Madia** would have *confirmed* he participated in the 2004-06 conference calls with the Hawai'i partners to *discuss the Jowdy loans* and the various lending deals (*including Constantine* and other hard money lender efforts as paid consultants to raise money).
  - o **Madia** would have *confirmed* he participated as counsel to sue several hard moneylenders who did not fulfill their contracts with the Hawai'i partners (like Constantine did).

- **Christopher Hawkins** – Hawai'i project manager who assisted in the Hawai'i joint venture (2004-06) -- and subsequently worked for Jowdy in Mexico during the joint settlement timeframe (2006-09)
  - o **Hawkins** would have *testified* that he participated in the 2004-06 conference calls *about the Hawai'i-Jowdy loans* as well as the joint venture updates (*See Ex. 63 [3500-JK-1-r] at 3* – Kaiser confirming "Kenner updates").
  - o **Hawkins** would have *testified* that he worked in Cabo for Jowdy after the 2006 Hawai'i joint venture – in order to *"keep an eye on Jowdy" at John Kaiser and Kenner's request* (2006-09) – because of the "loans" Jowdy still owed the Hawai'i partners.

- **Stephanie Dixon** – Kenner's assistant who was in charge of the individual clients and involved in their participation in the Hawai'i partners investment deals
  - o **Dixon** would have *testified* that she was *never* told by Kenner to conceal a single element of the investors/clients finances from them during her ten (10) years working for Kenner – and s
  - o **Dixon** would have *testified* that during the entire Northern Trust Bank LOC lending relationship – she was instructed by Kenner to promote full, transparent communication between Northern Trust Bank and its clients.

- **Attorney Larry Markowitz** – Hawai'i closing attorney

61

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

- o **Markowitz** would have *testified* that he documented the Jowdy loan repayment issues via email throughout the 4-5 month Hawai'i closing in 2006 (in evidence).

- **Developer David Dewer** – Potential Hawai'i joint venture partner and long-term global developer – who Constantine presented as part of his consulting efforts
  - o **Dewer** would have *testified* that Constantine introduced the lending/development relationship as part of Constantine's consulting deal with the Hawai'i partners (in evidence).
  - o **Dewer** would have *testified* that before Lehman Brothers came back to Kenner thru Ken Jowdy's urging in March-April 2006 (post Diamante Cabo closing) to fund the Hawai'i partners development deal, he and his development partner had a tentative deal with the Hawai'i partners thru Kenner (in evidence).

- **Diana Nolan** – Owen Nolan's wife
  - o **Diana Nolan** would have *testified* that she handled *all* of the Northern Trust Bank transactions for her husband's LOC directly with Kenner's former assistant and her-own private banker at Wells Fargo (*See Ex. 53, Ex. 54, Ex. 55*).
  - o **Diana Nolan** would have *confirmed* that she knew her husband had a Northern Trust Bank LOC at all times and she managed the monthly management of the paperwork and payments Fargo (*See Ex. 53, Ex. 54, Ex. 55*).

- **Turner Stevenson** – Hawai'i-Mexico investor
  - o **Stevenson** would have *testified* that he gave truthful testimony to the 2011 SDNY Grand Jury on the same date as **Michael Peca** and **Darryl Sydor**.
  - o **Stevenson** would have *testified* that he *confirmed* to the SDNY Grand Jury – *four (4) years before the Kenner trial* – that he decided as part of a "**group**" to loan Hawai'i partners' funds to Jowdy (*See Ex. 95*).
    - ▪ This is identical to **Michael Peca**'s confirmation during the 2015 trial (*Tr.498-99*) – further accentuating that a "*group*" of Hawai'i partners agreed to participate in the Jowdy loans; *nothing concealed*.
    - ▪ Nearly all-26 Hawai'i partners (Little Isle 4) gave pre-trial proffer "under oath" that they approved the Jowdy loans.

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

- o **Stevenson** would have *confirmed* that nineteen (19) of the 26 Hawai'i partners participated in the 2008-09 Arizona lawsuit versus Jowdy (*See R33 A -- Stevenson*) – and the 2010-11 California lawsuit(s) versus Jowdy to recover the "loans".
  - ▪ *No evidence was presented at trial that refutes the unrestricted and transparent knowledge of the Jowdy loans at all times, since inception in 2004* (*See Ex. 95*).

- **Karlos de la Puerta and Paul Donion** -- Mexico investor's attorneys
  - o **They** both would have *confirmed* their transparent 2012-13 efforts with Kenner and the Hawai'i-Mexico investors to recover the loans from Jowdy and prosecute him criminally in Mexico.
  - o **They** both would have *testified* that they were constantly "threatened" and "harassed" by FBI agent Galioto and Jowdy attorney, Tom Harvey, to "*stop helping Kenner unless they wanted to be arrested with him*".
    - ▪ They would have testified that even after the Kenner arrest (November 2013), Jowdy's cabal had Kenner-investor attorneys arrested in Mexico to intimidate their recovery efforts and end Jowdy's criminal reign over the Mexico project thru FBI protectionism and graft in 2013-2014.
  - o They both would have *testified* that Kenner was scheduled with other Mexico investors to testify *in-person* to the Supreme Court in Baja California Sur, Mexico about the Jowdy criminal thefts of the loans and the well-documented embezzlements (*See Document 667 – The Jowdy Hoax*).

- **Federal Agent Scott Romanowski**
  - o **Romanowski** would have *testified* to the authenticity of the "raw notes" that he wrote during (not "*before*" – *Tr.5991-92*) the Kaiser October 19, 2010 FBI proffer (*3500-JK-1-r*) – and the Ranford September 7, 2012 FBI proffer (*3500-WR-2-r*).
  - o **Romanowski** would have *refuted* the witnesses claims that they "never told Romanowski (and Galioto)" what was written in the "raw notes".

- **Mark Thalmann** -- Jowdy's accountant and best friend
  - o **Thalmann** would have *testified* that *Jowdy did borrow* all of the funds from Kenner and the Hawai'i partners (as Thalmann personally testified to during the December 2010 Nevada trial).

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

- o **Thalmann** would have *verified* his own accounting records (admitted in the Nevada trial -- *BATES STAMP: PKHOME-001045 thru 1048*) that Jowdy did divert $791,000 from Glen Murray while trying to blame it on Kenner "*thru magic*" in his December 2010 Nevada trial defense (which Jowdy lost to Murray of the fraud and Kenner as a 3rd party ProSe defendant) (*BATES STAMP: PK_SEC_001727 thru 1753*).

- • **Shawn Hughes** – Jowdy's former Diamante executive assistant
  - o **Ms. Hughes** would have *testified* that she gave June 29, 2009 proffer to the FBI (including FBI agent Galioto – *Ex. 38* [*3500-SH-1-r*]) where she verified that Jowdy "*has been living the life off others money*" – corroborating Kenner's June 24, 2009 proffer (just 5 days earlier).
  - o **Ms. Hughes** would have *confirmed* Jowdy borrowed *all* of the money from Kenner and the Hawai'i partners – *and it was widely known*.

- • **Attorney William Najam** – Jowdy's personal attorney, inside counsel at Diamante, and Ken Jowdy's brother-in-law
  - o **Najam** would have *testified* that he (not Kenner – in evidence) wrote the July 2006 Hawai'i partners disclosure letter to the Hawai'i partners to identify the joint venture parameters; and nothing to do with the 3rd party loan to Jowdy (as he testified to during the 2009 Nolan arbitration – *Day 2 at 361-362*).
  - o **Najam** would have *verified* that he was at all times aware that Jowdy received millions from the Hawai'i partners (as he testified to during the 2009 Nolan arbitration – *Day 2 at 377-378*).
  - o **Najam** would have *verified* that he discussed the Jowdy loans with the Lehman Brothers lender (Masood Bhatti) before the 2006 Diamante Cabo closing -- and documented the loans in a February 6, 2006 2:55am email to Kenner, Jowdy, Mexico counsel (Fernando Garcia), and Jowdy Mexico comptroller (Greg Carifiello) related to the closing (*BATES STAMP: PKHOME-0005856*).
    - ▪ Please note that this February 2006 email pre-dates Najam's co-authorship of the July 2006 joint venture disclosure letter (with attorney Markowitz) – further verifying nothing was "concealed" from legal counsel for the Hawai'i partners or the Mexico project(s) regarding the Jowdy loans.

- • **Jack Larsen** – Eufora CPA
  - o Not interviewing Eufora accountant, **Jack Larsen** of Cleveland Estes Avellone, PLLC, was pure negligence.

64

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

- o Trial counsel failed to prepare **Larsen** as a trial defendant-witness to *introduce and confirm* the 2005-2006 Kenner personal loans to Eufora for $386,000 *after* transferring Kenner's previous Eufora shares to Tim Gaarn (Standard Ventures) *in 2005* (*Ex. 4 and See R33 433i – page 9 & 22*).

- o **Larsen** would have *testified* that the funds Constantine-Eufora paid Kenner from Constantine's 2006 Urban Expansion proceeds repaid Kenner's 2006 Eufora loan plus interest (in addition to one other real estate payment owed to Kenner – *See Ex. 84, Ex. 85*).
    - ▪ **Larson** would have *testified* that once repaid, the loan was not present on the Eufora 2007 taxes.

- o The previous deals between Kenner, Constantine and Centrum were fully disclosed in the 2006 Hawai'i closing documents and disclosed to Manfredi and Kaiser (for opinions pre-closing – *See Ex. 99*) -- despite Kaiser's trial claims of "*not reading*" the Hawai'i closing documents (*Tr.1164*) only months after Manfredi *allegedly* told Kaiser that Kenner had robbed his friends & family $1mm loan from 2005 (*Tr.983*).

- • Former Kenner clients **Jason Woolley**[22], **Jozef Stumpel**[23], **Mattias Norstrom**[24]

---

[22] Mexico and Hawai'i investor – Jason Woolley *confirmed* in the 2009 arbitration that he *never* received a "one-page" signature page document from Kenner, since it was Jowdy and Nolan's attorneys from the 2009 arbitration who started that rumor.

Woolley stated [*Day 5 at 945*]:
> "Q: Did Mr. Kenner – you heard the judge talk to you about documentation.  Did you ever – was there ever a situation where you only received a signature page, or did you get the full documents?
>
> A [Woolley]: I've got so many damn papers.  I didn't even want them after a while, to be honest.  I'm digging stuff up to this day.  **But no to the answer**.   I have no problems getting – **I just didn't get the signature page**.

**Woolley** would have *testified* that he was present in January 2010 when Jowdy confessed in his deposition testimony that he received 100% of the Hawai'i partners loans – in addition to loans form Norstrom, Kenner, Stumpel, Gaudet and others – and had "*no plans*" to return the money – "*because of what the investors said about him*"
- • Please note that John Kaiser hi-lighted Jowdy's never-ending defiance in his February 28, 2019 letter to the Court as (*Document 628 at 4*):

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

- o **Jozef Stumpel** would have *testified* that he contributed $2.4 million to the Baja Ventures 2006 capital account (with bank records in evidence) – and that he was aware that Jere Lehtinen contributed $1.5 million – totaling $4.1 million (*See government-forfeiture-36*).
  - ▪ **CRITICAL FORFEITURE ISSUE TESTIMONY**

- o **Stumpel** would have *testified* that Ken Jowdy stole $1.6 million of his Cabo funds and diverted them away from the Baja Ventures 2006 capital account (*See government-forfeiture-36*) and thus, Stumpel was forced to sue Jowdy in Mexico for the $1.6 million (*BATES STAMP: PK-00109539 thru 109542*).
  - ▪ ***Stumpel would have testified that John Kaiser lied about his signature being forged*** in the 2008 Mexico criminal case versus Jowdy to protect Jowdy after Kaiser received his job (in

---

*"'the hockey players will never see a dime' because they said he [Jowdy] was a crook"*

**Woolley** would have *testified* that he "live-streamed" the 2-day Jowdy California deposition on his computer for all of the Hawai'i partners and Mexico investors to watch in "real time" and witness the Jowdy confessions that the government denied throughout the Kenner trial (**as a well-executed fraud on the court**).

[23] Mexico and Hawai'i investor --**Jozef Stumpel** would have *testified* that he signed a 2009 (*Ex. 60*), 2014 (*Ex. 60a*) and 2017 (*Ex. 60b*) affidavit in various cases – all supporting the full transparency of the Jowdy loans to the "*group*" and the collective efforts to recapture the funds from Jowdy once it was discovered by Kenner and shared with the group that Jowdy had no plans to repay the Hawai'i loans &/or personal loans (*as Jowdy readily confessed to in his January 2010 California deposition*).

[24] Mexico and Hawai'i investor –Mattias Norstrom *signed* a 2009 (*Ex. 78*) and 2015 (*Ex. 79a/79b*) affidavit in various cases – all supporting the full transparency of the Jowdy loans to the group and the collective efforts to recapture the funds from Jowdy once it was discovered by Kenner and shared with the group that Jowdy had no plans to repay the Hawai'i loans &/or personal loans (*as Jowdy readily confessed to in his January 2010 California deposition*).

- • Norstrom would have *confirmed* that he testified in Mexico on February 14, 2013 versus Jowdy in the criminal case to recover the stolen Hawai'i partners loans -- in spite of the threats by the FBI and Jowdy's counsel to Mexico investors Greg deVries and Rem Murray about not testifying versus Jowdy "or else" (*See Kenner Rule 33 Reconsideration motion – Document 668 at 21*).

66

2012) – forcing the termination of Stumpel's Mexico criminal lawsuit versus Jowdy.

- **CRITICAL FORGERY ISSUE TESTIMONY**

- Mexico investor **Rem Murray**[25],

---

[25] Mexico investor –**Rem Murray** would have *testified* that he signed a 2015 (*Ex. 80*) affidavit in a pending criminal Jowdy case in Mexico – all supporting the full transparency of the Jowdy loans to the group and the collective efforts to recapture the funds from Jowdy once it was discovered by Kenner and shared with the group that Jowdy had no plans to repay the Hawai'i loans &/or personal loans (*as Jowdy readily confessed to in his January 2010 California deposition*).

**Murray** would have *testified* that Berard – on Jowdy and Harvey's behalf – threatened him with USA litigation if he gave 2013 testimony in the Mexico criminal case versus Jowdy (*See Kenner Rule 33 Reconsideration motion – Document 668 at 21*).

**[Kenner notifies Murray about criminal testimony schedule in Mexico versus Jowdy]:**

| 13137 | +15862123454 Rem Murray* | 1/23/2013 12:13:02 PM(UTC +0) | Sent | I just sent this to Rucchin "Our testimonial date with the courts has JUST been confirmed & scheduled for next Tuesday, January 29 in the morning. I believe that several of the guys are planning to fly to Phoenix the night before (Monday the 28th) to discuss any open issues & be prepared for the time in Cabo. Our attorneys in Mexico believe your action and participation in Cabo next week is one of the last critical steps necessary to finally seek the justice in Mexico after 5 years in the system. This final step cannot be completed without your participation. Call me immediately with any questions. Time is of the essence. Thanks, pk Cell: (480) 235-4193" |
|---|---|---|---|---|

**[Kenner notifies Rucchin about deVries and Murray's confirmed travel plans with him]:**

| 13141 | +19492330046 Steve Rucchin* | 1/23/2013 3:15:54 PM(UTC+0) | Sent | Check your email for a cabo update. Pk |
|---|---|---|---|---|
| 13190 | +19492330046 Steve Rucchin* | 1/24/2013 6:12:09 PM(UTC+0) | Sent | Devo & rem Detroit (DTW) to Phoenix (Sky Harbor Intl.) 01/27/13 11:15 AM - 1:40 PM US Airways 281 Phoenix (Sky Harbor Intl.) to San Jose del Cabo (SJD) 01/28/13 11:15 AM - 1:21 PM US Airways 334 San Jose del Cabo (SJD) to Phoenix (Sky Harbor Intl.) 01/30/13 4:12 PM - 6:17 PM US Airways 337 Phoenix (Sky Harbor Intl.) to Detroit (DTW) 01/30/13 7:40 PM - 1:27 AM +1 day US Airways 239 |
| 13192 | +19492330046 Steve Rucchin* | 1/24/2013 6:27:05 PM(UTC+0) | Sent | Rem is working on both of those places and a truck rental in Cabo so you guys can get around. I will keep you posted. |

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

- And ultimately, trial counsel *refused to even discuss* calling **Ken Jowdy**[26] or **FBI agent Matt Galioto** (with Kenner)...

---

**Murray** would have *testified* that Jowdy attorney, Tom Harvey, sent a threatening email to himself, Greg deVries and Steve Rucchin in 2013 the morning they were under FBI surveillance and Jowdy's cabal knew they were all flying to Mexico to give testimony versus Jowdy in the criminal case.

[Berard threat to Kenner for deVries, Murray and Rucchin, as well]:

| 149 22 | +140152469 29 Bryan Berard⁕ | 1/23/2013 10:06:52 PM(UTC+0) | Read | **Look fw to seeing u and the guys in cabo on the 29th!!! See u then** |
|---|---|---|---|---|

- **Murray** would have *testified* that the January 28, 2013 threats by Harvey and Jowdy's cabal caused Rucchin to terminate his 2013 Mexico travel and not give testimony versus Jowdy -- about the Hawai'i-Jowdy loans that Rucchin "somehow" could not remember in 2015 during his trial testimony (*2 years later* – **most likely based on his documented CTE symptoms**).

[Murray text to Kenner after Tom Harvey email threats]:

| 15014 | +15862123454 Rem Murray* | 1/28/2013 4:44:01 PM(UTC+0) | Read | **Rucchin is out** |
|---|---|---|---|---|

[26] With *simple investigation* and *consultation* with Kenner, trial counsel would have defeated the government's unsupported trial proffers by calling Ken Jowdy as a trial witness considering he had the following Jowdy crimes to present.

These documented crimes would have also highlighted the FBI blind-eye by FBI Agent Galioto &/or his criminal complicity with Jowdy; selective &/or vindictive prosecution towards Kenner -- and away from Jowdy (*Tr.5048* – and scoffed at by Michiewicz).
- It must be one or the other considering the overwhelming fraud Kenner described on June 24, 2009 by Jowdy, which was re-confirmed by Jowdy's personal assistant, Shaun Hughes, (*See Ex. 38*) to FBI agent Galioto only 5 days later (June 29, 2009).

**Documented and ignored Jowdy crimes** (despite *"finger pointing"* allegations by government – *Tr.31*):

**2002** – Jowdy steals at least $417,000 of initial $804,000 from initial DDM investors -- Kenner, Woolley and Khristich (*See Ex. 39*) – *and the government knows it...*

**2002 thru 2011** (DDM foreclosure) -- Jowdy NEVER transferred the Mexico DDM titles to Kenner and Kenner investors company (*DDM $10mm fraud*) – STRAIGHT THEFT by Jowdy and Harvey (*See Ex. 40 – page 2*) – *and the government knows it...*

**2002** -- Harvey FAKE LIEN letter -- Harvey was COMPLICIT with the Jowdy frauds since 2002 (*See Ex. 40 – page 4*) – *and the government knows it...*

68

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

- Jowdy lies to arbitration panel about NO LOAN @ DDM – 3 years after he received it (*See Ex. 41*) – *and the government knows it...*

➢ Please note that with Tom Harvey complicit in the tens of millions of thefts with Jowdy since his 2002 letter (*See Ex. 40 – page 4*), trial counsel *also* refused to call Harvey as a trial witness.  This unexplainable trial strategy morphed into a larger issue week-by-week thru the trial, as Tom Harvey was consistently present in the 2015 courtroom and working hand-in-hand with AUSA Michiewicz on trial materials and witness preparations at virtually every break; specifically Kenner's cross-examinations.  This unimpeded action was further highlighted prejudice to the defendant upon the post-trial receipt (allegedly 3 weeks after the trial conclusion) of *government-forfeiture-44* (refuting the government "<u>no loans</u>" claims for the prior three (3) months, thus, ***creating reformative effects on the crucial substance of the prosecutorial case***).

**2004-06** – Jowdy steals $5.5mm++ Hawai'i loans – *only confirmed by the government post-trial when their forfeiture team needed to create a "nexus" (See government-forfeiture-44) – and the government knows it...*

**2004** – Jowdy steals $500,000 Norstrom loan – *and the government knows it...*
- Jowdy loan confessions in Kaiser's presence (*See Ex. 42 – page 2*).
- Envelope with Norstrom 500,000 repayment check from Jowdy (*See Ex. 43*).

**2004-2006** – Jowdy steals initial Diamante Air $900,000 investment capital -- plus $430,000 from loan proceeds utilizing a forged and fabricated Diamante Air operating agreement (*See Ex. 44*) – *and the government knows it...*

**2005** – Jowdy stole $791,000 -- Glen Murray Nevada loan theft (*See Ex. 45*) – *and the government knows it...*

**2005** – Jowdy stole $1.6mm Stumpel Mexico loan theft *(See government-forfeiture-36) – and the government knows it...*
- Jowdy loan confessions in Kaiser's presence *(See Ex. 42 – page 3).*

**2005** – Jowdy stole $400,000 Mattias Norstrom México airport investment – *and the government knows it...*
- Jowdy loan confessions in Kaiser's presence (*See Ex. 42 – page 2*).

**2006** – Jowdy and Najam stole over $800,000 of concealed KSI loan (*See Ex. 40 – page 6-11) – and the government knows it...*

**2006** – Jowdy steals Diamante Cabo equity with misleading email that the REAL equity split (*40% Kenner investors, 40% Kenner (with Stumpel and Lehtinen) and 20% Jowdy*) would be reinstituted after Jowdy was allegedly told by Lehman Brothers what the DCSL equity needed to be "***for now***" (at the time of the closing), since Jowdy was usurping Kenner's co-manager status and apparently needed a larger equity position as the sole project manager (another pre-closing fraud orchestrated by Jowdy) (*See Ex. 50*) – *and the government knows it...*

69

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

    o  **Jowdy** and **Galioto** would have been forced (like Kaiser and Ranford, *supra*) to deny Jowdy's confessions of the Hawai'i partners' loans he received and has not repaid – despite Jowdy's in-person FBI confessions specifically to Galioto in March 2010 (*See Ex. 2 [3500-KJ-2] at 11, 12, 13*).

        ■  The government's fraud that Kenner either "*received*" or "*stole*" the funds "*To get his piece of the pie, that resort in Cabo. No reason. Actions speak louder than words. And in this case the action is pure fraud.*" (*Tr.5722-5723*) -- would have been destroyed before any necessary deliberations about the

---

    *clients and associates, to unfairly malign me, sue me, and wrongfully accuse me of improper conduct, ranging from mismanagement of the project to various unfounded criminal and civil complaints."*

Perhaps, trial counsel's ineffectiveness (prejudicing the defendant's Sixth amendment rights) coupled with Jowdy's newfound *faulty memory, confusion and mistakes* (**of his 15 plus years of documented and confessed, egregious and unconstrained thefts**) allowed Jowdy's ludicrous and *perjurious* 2016 declaratory statement to go unchallenged by the government due to the immediate attack by Jowdy attorney's threatening actions to sue the government after being referred to as a co-conspirator.   Nonetheless, the immediate and fervent backpedaling by the government to remove the "statement" ensued under Jowdy's highly "connected" legal pressure.

Even with a token amount of due diligence by trial counsel pre-trial, or at a minimum, during the trial after the government exposed their trial theory (*Tr.31*) that Kenner "*stole the funds*" (*Tr.5990, 5991, 5996, 5999*).

The loans to Jowdy were fully documented as Hawai'i loans (owned at all times by the Hawai'i partners – not Kenner individually) to Jowdy since 2004 (without any contrarian evidence presented other than nonstop and unsubstantiated government argument).   Trial counsel had nearly two (2) months available before the start of the defendant's defense case-in-chief to investigate the Jowdy crimes with the defendant, **considering the initial claims about "*finger pointing*" were delivered in the government's opening remarks** (*Tr.31*).

Without any reasonable efforts, trial counsel left the door open for the government to conclude their own self-proffered claims of Kenner actually stealing and benefitting from the **REAL Jowdy LOANS** (*See government-forfeiture-44*) in summation, finishing their foundationless arguments.  **This was disproven by the government themselves** during the forfeiture hearings, despite never substantiated during the 2015 trial.  Thus without challenge to the government false statements by trial counsel, it left the jury with no contradiction to consider when it was clearly and overwhelmingly *available* at all times to trial counsel to preemptively refute the government's false summation claims (*Tr.5982 "Kenner is broke", 5990, 5991, 5996, 5999*).

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

multiple summation lies ensued (*Tr.5722-5723, 5990, 5991-92, 5707-5709, 5996, et. al.*).

- **Aaron Mascarella** – Northern Trust Banker
  - o *Trial counsel failed* to re-call **Northern Trust Banker Mascarella** after Nolan claimed he had no direct knowledge of his LOC (*Tr.2065-2066*), supporting the government arguments for concealment.
  - o Yet, **Mascarella** was deposed March 9, 2009 by Nolan's attorneys in the 2009 arbitration case.   During the deposition, **Mascarella** *confirmed* that he had multiple conversations on the phone directly with Nolan, himself; to 1) discuss the status of Nolan's LOC, 2) discuss Nolan's early default letters that were sent out, and 3) discuss Nolan's LOC statements Nolan had independently received *at his residence*.
  - o Nolan's denial (*Tr.2065-2066*) echoed his 2009 perjury during his arbitration testimony (also known to the government thru Rule 16), which his 2009 arbitration attorney let stand (while working hand-in-hand with Jowdy and Harvey -- at that time).
    - ▪ The 2009 arbitration perjury by Nolan was only weeks after Mascarella's 2009 deposition disclosure of unabated communication and transparency with Nolan (*See Document 668 – Appendix at 170-172*) – *none of which Nolan could remember* "under oath" as far back as 2009.

- Nevertheless – **trial counsel called none of them** to inquire about their potential testimony -- *as their-own evidence would have supported*.

Trial counsel's lack of effort validated every subpar standard one needs to be branded lazy, unprepared, and wholly ineffective (*regardless of courtroom shenanigans and antics*).   *See Green v. Lee, supra*, at 258; *quoting Rosario v. Ercole*, 601 F.3d 118, 138 (2d Cir 2010); see also *Kimmelman*, 477 U.S. at 386 (noting that while "[i]t will generally be appropriate...to assess counsel's overall performance throughout the case in order to determine whether the identified acts or omissions overcome the presumption that a counsel rendered reasonable professional assistance," a "failure to make reasonable investigations or to make a reasonable decision that makes a particular investigations unnecessary, **may be**

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

**constitutionally deficient irrespective of trial performance.**" (Internal quotation marks omitted).

Trial based ineffectiveness claims – most of which involve questions of trial strategy and tactics – generally fail in the 2nd circuit even though counsel's strategy may have been "risky, unorthodox or down-right ill-advised".

But -- the New York Court vacated a conviction where trial counsel not only failed to call three (3) important witnesses – but trial counsel was *also* foolishly confidant that the case would be dismissed (and was won by the government after the government rested) – thus trial counsel decided to prepare a minimum defense in lieu of crucial and available witnesses (with proper trial preparations).

- *Trial counsel failed to confirm pro-Kenner exculpatory evidence available to the defense from nearly two-dozen available witnesses, supra.*

### Failure To Effectively Cross-Examination Government Witness – With Unused Impeachment Evidence Available In The Courtroom...

**Hawai'i partners COO Chris Manfredi** -- Trial counsel cannot convince the defendant or a reasonable fact finder that it was strategic in not presenting the seven (7) plus consulting agreements (other than Constantine's) that Kenner and Little Isle 4 obtained to assist in the legal acquisition of development loans after the failed attempts with every Hawaiian Bank and a multitude of mainland banks (in evidence).   Notwithstanding – defendants counsel allowed the Constantine consulting agreement to be represented thru government argument as "somehow unique" &/or "unusual" – if not an outright fraud.

- **Where is the original agreement(s) that Manfredi told the FBI existed during his October 2010 proffer with FBI agent Galioto present?**  *The FBI noted from Manfredi's proffers* (*3500-CM-2-r at 1*):

  > *"Agreement - PK or LLCs and Constantine*
  > *-> may have been w/ Constantine + another person"*

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

- If the Kaiser signed agreements are "fake" (somehow thru witchcraft – after he produced them from his own home on the "eve of trial"), **then where are the real one(s) that Manfredi confirmed to the FBI in 2010**?
  - o *It is pure nonsense*...

This obvious lack of argument by trial counsel also ignored that fact that Constantine produced the Urban Expansion $3.5 million loan to Little Isle 4 at a time when they were only one (1) week from losing $1 million in non-refundable deposits and the underlying $35,000,000 Hawaiian oceanfront development parcel. Trial counsel ignored the salient issue that Kenner initiated several civil lawsuits in Minnesota, Texas, and Georgia against other paid consultants for non-delivery of the promised loans (on behalf of Little Isle 4 – the Hawai'i partners) during that exact same period of time; *unlike Constantine's success*.

The Hawai'i partners' COO Chris Manfredi confirmed via email that after Manfredi, Kaiser and Kenner turned down Lehman Brothers' "*egregious*" loan in summer 2005 (*See Ex. 74*) together, and **Manfredi was distraught**:

Hawai'i COO Chris Manfredi stated his frustration with the funding problems to Kenner on September 30, 2009 (*See Ex. 81*):

> "I, like you, have been hearing the same old stories for so long, everyone can "get it done" and nobody does...I think the likelihood of losing Waikapuna and Moa Ula Makika [another parcel under agreement] is very real.   I never thought I would be leaving this trip without funding.
>
> Chris Manfredi
> COO/Project Manager
> Big Isle Ventures, LLC
> 516-526-xxxx"

Clearly, Hawai'i partners COO Chris Manfredi was intimately involved in the volume of lenders that he, Kaiser and Kenner attempted to secure to fund the Hawai'i project.  *None of it was apparently easy (thus the entire Waikapuna FOLDER -- Ex. 82)*

74

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

<u>should be read to confirm the levels of despair that Manfredi was experiencing with</u>
<u>Kenner's funding effort disappointments in Hawai'i.</u>

Never once in Manfredi's desperation email(s) – or any other medium – does Manfredi claim to Kenner that "*if we had just used the Centrum loan to close Waikapuna*", there would be no issues.  That prosecutorial theory was another fraud that prepared trial counsel could have easily debunked with empirical evidence – available in the courtroom (*See Ex. 82 – Waikapuna FOLDER*).  Trial counsel failed to present the empirical evidence thru a lack of preparedness.  There were at least two (2) reasons that Manfredi's trial testimony could never have been true when he testified that he expected the Centrum loan to be used for Waikapuna's purchase (*Tr.2950-2951*):

> **FIRST** – The Centrum funds were not enough money to close the Waikapuna parcel.  ***They were well over $1 million short***. -- And

> **SECOND –** Manfredi (not Kenner) was still dealing day-to-day with the lenders from Lehman Brothers in summer 2005, so what would Lehman Brothers have been funding – considering their 2005 Lehman Brothers loan was only for the Waikapuna closing and no additional funds?
> - Also – the Lehman Brothers lending parameters changed at the 11th hour to a two-year bubble loan with 23% annual interest, with no extensions allowed (thus -- a full loser – and absolutely "*egregious*" per Manfredi – *See Ex. 74*).

> - The Commonwealth Financial deal on the same Manfredi "distraught" email required a ***$3 million front-end fee*** on their loan (*Ex. 81 at 2*) – further confirming that none of the hard-money loans would get done without significant "penalty expenses".

**In fact, trial counsel ignored – with Manfredi on the witness stand – that Kenner and Manfredi were in Hawai'i less than six (6) days after the Constantine-Urban Expansion loan expecting to sign a different loan and terminate the Urban Expansion loan – under advice of counsel** (*See Ex. 83*). The replacement loan – substituting the Urban Expansion loan without penalty – never consummated in concert with more Manfredi despondency, *supra*.  Trial

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

counsel failed to present this exculpatory email for Manfredi's testimony – *wholly refuting some government fabricated conspiracy*.

- This email also confirmed that in October 2005 – there was no confirmed Lehman Brothers deal on the table in Hawai'i or Mexico – since the Urban Expansion replacement lenders were in communication with Jowdy and Najam about funding the Cabo property, as well...**further distancing some fabricated "***postpone Lehman Brothers a year***"** (*Tr.5996*) **theory by the government**...(*See Ex. 83*).

None of the items *supra* can be realistically considered "**trial strategy**" since each of the empirical emails had the pre-trial ability to undermine the heart of the government allegations in the superseding Indictment with adequate preparation, notwithstanding the government's ever-expanding, foundationless theoretical claims throughout trial.  The non-investigation by trial counsel, with any conclusion that it would be a more effective defense to avoid the presentation of pro-defendant evidence and testimony, is purely nonsensical, at best, *commensurate with a Washington Generals "winning game plan"*.

## Multiple Exculpatory Documents Were Available Pre-Trial To Trial Counsel With Proper Investigations...

**The government's "concealment" prosecution meant the more exculpatory evidence to present to the trial court  – the less likely a "concealment prosecutorial theory" would work...**

## No Trial Counsel Assistance Requested From The Court...

Defendant Kenner was in full detention and *relied entirely* on trial counsel for communication to third (3rd) parties and discovery issues for proper preparation of trial.   Trial counsel *refused* to request a **paralegal**, a **forensic accountant**, a **signature expert**, a **money-laundering expert**, &/or an **investigator** (*at a minimum*) to assist in the voluminous trial preparations, despite Kenner's demands, specifically after the court designated *United States v. Kenner* as a "complex case".

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

Trial counsel claimed defendant Kenner "*was not entitled to them or the judge would have already given them to our trial team*".

### Government forfeiture-44...

The government's post-trial admission of *government-forfeiture-44* confirms that its information could have been discovered thru diligent pre-trial investigations with Ken Jowdy and his counsel, considering its *alleged* submission to the government occurred within three (3) weeks of the end of trial.

- This information would have destroyed the government's opening remarks (*Tr.31*) that Jowdy was merely a victim of the Kenner "cover-up" scheme thru "finger-pointing" and innuendo about Jowdy criminality – and Kenner "stole" that specific money.  ***Clearly – Kenner did not steal any Hawai'i money***.
- It would have also demolished Kristen Peca's false testimony about "conspiracy theories" (*Tr.712-713*)– specifically because the Hawai'i money was *all* received by Jowdy as loans (*See government-forfeiture-44*).

- Apparently *government forfeiture-44* confirmed **Kenner was truthful** -- and **the government lied** starting with their opening remarks – and including Kristen Peca's fabrications to the court and jury.
   - *Government forfeiture-44* hi-lighted that when the government alleged the Jowdy-Hawai'i loan and its agreement were "*bogus*" (*Tr.5708 (2x), 5709*), "*phony*" (*Tr.4597, 4598*) and "*supposed*" (*Tr.5707-5708*) -- during the attacks on Kenner's veracity during trial, **they knew it was authentic – and lied to the jury and Court**.

- This exculpatory document refuted the government's repeated denigration of Kenner and their false theory that Kenner "*stole*" the investors Hawai'i money – and "*It bought him [Kenner] a 39 percent interest in Ken Jowdy's Cabo San Lucas*" (*Tr.5721 – Michiewicz summation*).

- And – "*Mr. Kenner told you that he used that money to get his piece in the Mexico investment with Ken Jowdy. You know exactly what that's for. That's in evidence.*" *(Tr.5990 – Komatireddy rebuttal summation).*

**Neither of these statements was proven at trial – nor were they ever true!**

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

- **Clearly – Ken Jowdy received 100% of the Hawai'i "loan" funds and the government was always aware of it…**

- **And – Kenner _never_ told anyone that he used the investors' money for anything!**

### **Trial Counsel Erred Not investigating the alleged "stolen" money**
_(Government-forfeiture-44 and the suspicious timing of its production)…_

Trial counsel – claiming the court would not approve it, hired no forensic accountant for the most exculpatory of charges; Kenner allegedly *"stealing money for his personal benefit in the Mexico project"*.

*Government-forfeiture-44* and *government-forfeiture-36* (*infra*) proved this crucially defamatory slander as 100% untrue -- **yet – it was left to stand by a _knowing_ government and an _ineffective_ trial counsel**.

[AUSA Michiewicz summation] (Tr.5721):
> "And what do you find out [about the Jowdy loan]? You find out, what did _that 5 million_ [of Hawai'i-loan money] or however much more or less that netted out to be, _what did it buy Mr. Kenner? It bought him a 39 percent interest in Ken Jowdy's Cabo San Lucas._ Didn't buy the players a 39 percent interest. _Him._ And if you read it, you will see that Ken Jowdy, himself, is only a 40 percent shareholder in the parent company. Can't get too much closer to being equal partners. To this day, right now, _he is a partner in that resort._ _That's where the money went._ _That's what it bought him. And on the backs, on the portfolios, of the hockey players._"

- ***This was a 100% fabrication by the government – and irreversible harm was done…***

- ***Unprepared trial counsel sat by "silent"…***

Clearly, the evidence could not be *cumulative*, otherwise the government would not have ignored *"what they knew"* to advocate for their prosecutorial theories unethically…or would they?   The government knows at all times that their position of **power** "*is [as] the representative not of an ordinary party to a controversy, but of a*

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

*sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all".*  See *Berger v. United States*, 295 U.S. 78, 55 S. Ct. 629, 79 L. Ed 2d 1314 (1935).

- *Berger's* standard places the prosecutorial team in a position, above reproach, further demanding that trial counsel be "on his game" to refute and "object" to items not in evidence and certainly not presented at trial.
  - o **Trial counsel failed completely.**

As a result, the government's malfeasance was accentuated by trial counsel's "**silence**"; utterly ineffective under any broad definition – almost in concert (after the pre-trial threats to back off his defense efforts for Kenner) (*See Ex. 3*).

If the evidence (and its contents) were delivered to the government three (3) weeks after the trial, then it was easily obtained by simple request to Jowdy and his attorneys thru subpoena by trial counsel, *before or during the trial*.  Moreover, the defendant had begged trial counsel to get the accounting of the Hawai'i-Jowdy loans thru Harvey, Najam, Jowdy or Mark Thalmann (Jowdy's personal accountant).  With the government's post-trial production of *government-forfeiture-44*, it would be hard to convince the Court that Jowdy would have reverted back to the "NO LOANS" fabrication from his 2009 Arizona case defense.   If Jowdy had done so, SDNY investigator Scott Romanowski could have been called to impeach Jowdy thru his March 2010 proffer notes (*See Ex. 2 at 11-14*).   Trial counsel failed to communicate, *at a minimum*, with SDNY Criminal Investigator Romanowski.

- **This is inexcusable neglect regarding matters at the heart of the case.**

<u>**The Newly-Discovered Evidence Proved The Defendant Defense Was Truthful Based On Real Evidence...**</u>

Simple investigation pre-trial by trial counsel would have discovered the Jowdy-government admissions that *Kenner did not steal anyone's money* (*See government-forfeiture-44* and *government-forfeiture-36, infra*) – **AND** -- the deafening theme presented thru trial about Kenner's "sure guilt" for stealing the Hawai'i money would have been debunked...

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

## The Government's *Cumulative* Claim Post-Trial Was More Problematic Than Admitting They Knew Jowdy Stole The Money At All Times...

- *They clearly needed to continue protecting Jowdy's Diamante Cabo interests...and blame the Jowdy thefts on someone else...*

The introduction of *government-forfeiture-44* by the government **PROVED IT unequivocally**.   Although required under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), its production appears to have been inadvertent (and regrettable by AUSA's forfeiture counsel), as the government now claims their "nexus" evidence is *cumulative* and non-essential (despite Jowdy's non-co-conspirator designation throughout trial).   The perplexing position argues dichotomous perspectives simultaneously, *neither to much avail.*

### The Government's Dilemma...
(*Because They Cannot Have It Both Ways*)

**In the first instance**, if the "new" evidence is truly *cumulative*, and not helpful to the defendant, then the government is readily admitting to the Court that they willingly and knowingly presented a prosecutorial theory in contradiction to "*their known evidence*", *knowingly prejudicing the defendant*.   If the defendant should have known of the evidence, *so should the government*.   It is their responsibility under *Berger v. United States*, 295 U.S. 78, 55 S. Ct 629, 79 L. Ed 2d 1314 (1935), as the Supreme Court noted in 1935:

> "*The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all, and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.   As such, he is in a peculiar and very definite sense the servant of the law. He may prosecute with earnestness and vigor – indeed, he should do so.   But, while he may strike hard blows, he is not at liberty to strike foul ones.   It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction, as it is to use every legitimate means to bring about a just one.*"

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

**Conversely**, if the evidence is *not cumulative*, then the defendant has ***new*** exculpatory evidence in hand which refutes the most crucial of prosecutorial assaults on the defendant, himself, for allegedly stealing the Hawai'i "loan funds" and acquiring Kenner's Diamante Cabo equity with "ill-gotten" gains.

Now, the government's own presentation of *government-forfeiture-44* clears up any ambiguous discrepancies left under-illuminated thru the defendant's testimony (*which are now substantiated by Jowdy's post-trial submission, as documented*).   **The funds are in fact loans to Jowdy**, as Jowdy and his complicit attorneys have documented, ***post trial***, leaving significant reformative effects on the grandest of *prosecutorial misconduct* at trial.   With the *new evidence*, it is improbable that the trier of fact – **with *government-forfeiture-44*** -- could have viewed the evidence, in totality, in the same light.

- Kenner's Baja Ventures 2006 funds are clearly "**untainted**" – yet the government continues its ruse on the court to seek forfeiture of the "**clean**" investment with Kenner and his two (2) partners...

Reformative issues become overwhelming in this case, as a result, with spillover issues apparent at every considerable turn.   As a matter of perspective, now, the defendant was correct in contradiction to the government when he espoused that the ten (10) lawsuits filed versus Jowdy in the USA and Mexico, ***before Constantine initiated the GSF***, were *not* a cover-up for alleged thefts of the Hawai'i partners' company funds, which were *legally* and *knowingly* loaned to Jowdy.

- As a result of the government theory of "stolen" Hawai'i funds – it is not acceptable under any defense strategy to not call Ken Jowdy, Tom Harvey, Bill Najam, and Mexico Attorney Fernando Garcia (who carries a U.S. passport) to clear up the fact that none of the funds Jowdy received were "stolen" by Kenner &/or applied to Kenner's Cabo san Lucas capital account (in Baja Ventures 2006).   This clear negligence left the government argument that the funds were "stolen" unchallenged – wholly allowing their summation and rebuttal summation statements to again substantiate the now-opposing position that *government-forfeiture-44* is *cumulative*.

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

Notwithstanding the new evidence (*government-forfeiture-44*) – Kenner's trial counsel still refused to submit any version of a Rule 29 (*See Document 325*) or Rule 33 to the Court.   In fact – the final straw in the legal relationship that had been confrontational even before trial counsel's "bombshell" acknowledgment in May 2015 that he was threatened, again, just prior to trial by the government agents and would not notify the Court (*See Ex. 3*).   Kenner was forced to file the "notes" that he prepared for trial counsel's reference as Kenner's actual Rule 33 submission, clearly not a traditional presentation of materials to the District Court.

### Kenner Requested A Trial-Start Delay To Complete Exculpatory Evidence Review And Receive And Review The Complete Northern Trust Subpoena...

- *The Kenner demands fell on deaf ears with trial counsel anxious to begin trial due to his own schedule conflicts...*

The **crucial** exculpatory Northern Trust documents arrived almost ten (10) weeks after the subpoena was issued and seven (7) weeks after the Court expected them (*Tr.9*).   They ultimately arrived only partially filled, further prejudicing the defendant.   Then -- trial counsel refused to request the trial delay &/or simply request another court subpoena to complete the insufficient, and overdue Northern Trust documents.   **Not only were the Northern Trust documents incomplete, but also they were never reviewed with the defendant**.   Trial counsel also erred by admitting them in agreement with the government's self-serving representation that the documents were mostly *duplicative* (*Tr.4209-4210*).   In fact, upon simple review (*never* done by trial counsel), the trial's most pro-defendant, non-duplicative, and exculpatory evidence was included in the Northern Trust documents, yet *never* seen by the defendant before that June 2015 date; much too late for any effective use without recalling the actual witnesses who "could not remember" their-own underlying LOC accounts at Northern Trust Bank thru *faulty memory, confusion and mistakes* or "*failed memory tests*" – both corroborating "concealment" from Alzheimer's like individuals.   *It is an outrageous prosecutorial standard.*

Again, trial counsel's refusal to uphold a bare minimum standard of investigation
and preparation prejudiced the defendant – extending thru trial, specifically in this
materially exculpatory matter.

The final straw related to the Northern Trust documents occurred when the
defendant was denied by trial counsel to request a brief adjournment for document
review (after subpoena receipt) and a request to recall alleged victims Nolan,
Berard, Sydor, Peca and Rucchin to cross-examine them with "***their fully
impeaching signed documents***" in the courtroom and available.   This exculpatory
impeachment evidence further confirmed their 100% knowledge of the capital
account "investments" (with their LOCs) (*See Ex. 7, Ex. 8, Ex. 10, Ex. 12, Ex. 13*) and
**their-own** annually signed acknowledgement of the "***use of funds***" (*See Ex. 14, Ex.
15, Ex. 16, Ex. 18, Ex. 19, Ex. 20, Ex. 21, Ex. 22, Ex. 23*).

- Trial counsel harangued the defendant after receipt of the Northern Trust
  documents, claiming that "*the judge would never allow it, so he would not
  embarrass himself to the judge to make such a 'useless' request on the record*".

Intensifying trial counsel's negligence, after the defendant was moved to MDC
Brooklyn ("MDC") on or about April 22, 2015 (just prior to trial under the guise of
an ***independent*** "obstruction of justice" investigation)[27], trial counsel *refused* to

---

[27] The FBI agent (Galioto) and another FBI agent (Michael Cassidy) used a jailhouse snitch
to record Kenner and attempt to secure a "murder-for-hire" conviction with surreptitiously
recorded information.   They failed – but they professed to the court that Kenner was
alternatively witness tampering – **despite no record of communication with any
Superseding Indictment individual**.

In fact – FBI agents Galioto and Cassidy arrested an individual who was helping documented
Jowdy investor-victims Jozef Stumpel, Rem Murray and Mattias Norstrom file new litigation
in Mexico City versus Ken Jowdy for the decade-plus racketeering crimes (*See Ex. 60a
[Stumpel], Ex. 60b [Stumpel], Ex. 79a [Norstrom], Ex. 79b [Norstrom], Ex. 80 [Murray]*) –
effectively terminating another lawsuit by defrauded investors versus Jowdy (who has
100% of their embezzled and diverted funds – per 100% government evidence – yet
ignored to protect Jowdy again – *See Document 667 – The Jowdy Hoax*).

*In July 2015 -- Kenner was informed by trial counsel that if he was acquitted of all charges –
the U.S. Marshalls were in the courtroom to arrest Kenner on a new indictment related to his
assistance with his investors and their Mexico case filings versus Jowdy in 2015.  Kenner was*

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

meet with Kenner at MDC Brooklyn to discuss the involvement of FBI Agent Galioto in the newest government ruse to disrupt the defendant's pretrial efforts, contradicting the "independent" claims made by the prosecution in the courtroom that day (on or about April 22, 2015).   The defendant had specific conversations with several pro-defendant witnesses who confirmed FBI Agent Galioto was working hand-in-hand with new FBI agent Michael Cassidy in the newly represented actions to prevent Jowdy's investors from filing new criminal cases in Mexico.   Trial counsel refused to request a trial delay to investigate the newest fraud perpetrated on the EDNY trial court, Kenner and Kenner investors, by the Jowdy-complicit case agent [Galioto] in the instant case.   In addition, trial counsel refused to follow-up on defendant's concerns that the government had tried to trap the defendant during the same recordings in the "murder-for-hire" plot in the months before the start of trial (*See Ex. 3*).

- ***The defendant's requests, again, fell on deaf ears.***

## No Forensic Accountant Hired...

Who better would have confirmed Kenner *only* received $22,425.52 of verified GSF expenses?...And the Gonchar "side-deal" covered 100% of the Constantine expenditures not in the email disclosures?

**Global Settlement Fund ("GSF"):**

In contradiction to the government's misleading opening remarks (*Tr.31*), *the 2009 GSF was not the beginning of suing Jowdy*; moreover, **it was supposed to be the end**. Second, the Constantine-conceived GSF fund (and its residually planned benefits for Kenner and Kenner investors) was formed on a truthful basis; ***Jowdy did STEAL the investor funds*** as outlined *supra*, with the specific assistance of his three (3) main

---

*told he would **not** be leaving jail -- and he should expect another 18-24 months in pre-trial for the new charges.   Trial counsel confirmed he was going to demand being excused from the new case.*

- *Kenner was told that his only reprieve would be to 1) relinquish all future efforts to expose Jowdy and his cabal – 2) sign over his Cabo san Lucas equity -- and 3) just leave them alone.*

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

attorneys; Tom Harvey, William Najam (brother-in-law, and co-defendant in the original 2009 EDNY Grand Jury *quashed thru Freeh's influence and Galioto actions*), and Mexico counsel, Fernando Garcia.

The six (6) years of misdirection by FBI Agent Galioto's investigation (2009-2015), claiming "*Kenner received the Cabo funds*" (not Jowdy; and replaced them with the stolen Hawai'i funds to conceal the $7 million which Galioto has vigorously reaffirmed to the misinformed investors post-trial along with Jowdy's cabal)[28] were 1) documented as delivered to Jowdy (thru every available bank record – and now *government-forfeiture-36 [infra]* and *government-forfeiture-44*), 2) confirmed by the 2004 loan agreement -- admitted as authentic by Jowdy's defense team in December 2010, as his main defense exhibit, and 3) not refuted by a single pre-trial piece of empirical evidence.

This coordinated misdirection effort allowed Jowdy and his legal cabal to avoid investigation and prosecution by any other investigative team in the Department of Justice.  Now, apparently Galioto's misdirection has played out as merely FALSE, yet with the evidence in hand, neither the prosecutorial trial team nor FBI Agent Galioto have relented on their now-disproven theory.

Nevertheless -- armed with the government-professed *cumulative* evidence, trial counsel failed to call Ken Jowdy or FBI agent Galioto to confirm Jowdy's January 2010 deposition confessions (of the Hawai'i loan thefts -- *See Ex. 42*) or Jowdy's specific confessions to FBI Agent Galioto during his March 2010 proffer (*See Ex. 2 – page 12*), five (5) full years before the false government theory was presented to the jury in opening remarks (*Tr.31*).

---

[28] See *Document 628* – John Kaiser's confirmation after five [5] years as Jowdy's co-conspirator (2012-2017) that:

> ""*Jowdy would like the court to think that Kenner stole $7 million from the hockey players and others...*"
> "

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

- ***Notwithstanding the government's overreach (at a minimum), trial counsel's ineffective assistance is inexcusable in the most crucial of defense moments.***

### Government-forfeiture-36...

The post-trial admission of *government-forfeiture-36* could have been created for the trial thru trial counsel's pre-trial investigations *with a forensic accountant*, considering the government created it with evidence in the government's possession at all times.

- This exculpatory document refuted the government's repeated denigration of Kenner and their false theory that Kenner "*stole*" the investors Hawai'i money – and "*It bought him [Kenner] a 39 percent interest in Ken Jowdy's Cabo San Lucas*" (*Tr.5721 – Michiewicz summation **LIES***).

- And – "*Mr. Kenner told you that he used that money to get his piece in the Mexico investment with Ken Jowdy. You know exactly what that's for. That's in evidence.*" (*Tr.5990 – Komatireddy rebuttal summation **LIES***).

**Neither of these statements were proven at trial – nor were they ever true!**
- **Clearly – Kenner's Cabo equity (Baja Ventures 2006) was purchased with 100% "untainted funds" -- provided exclusively by Kenner's two (2) equity-debt partners -- and fully documented...**

### Failure To Acquire Arizona Attorney Tom Baker Disclosures
### Re: Jowdy Loan Lawsuit...

In addition to other "newly discovered evidence" offered by the government during their forfeiture production (like fabricated operating agreements by John Kaiser to cover another fraud of his), the government-produced *Arizona Baker disclosures* were game changing and exculpatory (*See R33 A*).

- This evidence was produced by the government post-trial during forfeiture production, clearly confirms the government hid the signed disclosures. There is no *Brady* determination that would alleviate these critical documents' monumentally impeaching forces at trial.

86

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

- Attorney Oliveras delivered them to defendant Kenner with the remainder of the government's forfeiture exhibits.
    - ***Nothing arrived thru the government or trial counsel.***

Each of these signed *Tom Baker disclosures* for the 2008-09 Hawai'i partners (Little Isle 4 and Ula Makika) lawsuit versus Jowdy in Arizona highlighted that each of the Hawai'i partners' had 100% knowledge and signed-off as pronounced in the first (1st) paragraph of Baker's 7-page letter:

> "*the gist of the lawsuit is to recover certain monies loaned to Mr. Jowdy from Mr. Kenner, Little Isle 4 and Ula Makika LLC.   Mr. Kenner estimates the total amount of monies loaned to Mr. Jowdy which have not been repaid to be approximately $5,000,000.   This is the estimated principle only, exclusive of accrued interest.  In summary, Mr. Jowdy denies that the monies were loans but rather characterizes them as investments.*"

The hundreds of "*I don't know*" and "*I don't remember*" refrains at trial would have been destroyed with the exculpatory Baker materials.

- **The disclosure signed by seventeen (17) Little Isle 4 members** (*See R33 A*), confirmed the investors' full knowledge of the lawsuit with Jowdy was **because** of the unpaid $5 million plus loan from Little Isle 4, Ula Makika and Kenner (nothing else), and

- Jowdy's ongoing frauds to avoid repayment thru unscrupulous and bullying legal tactics, specifically threatening prior attorneys that they would be prosecuted "with Kenner" for "*falsely*" representing a Plaintiff (Kenner and the Hawai'i partners LLCs), *who claimed the "loans" to Jowdy were real*.
    - Jowdy's 2015 submission (*government-forfeiture-44*) confirmed Jowdy's attorney 2009 extortion threats to Kenner and the Hawai'i partners' attorneys were malicious, unsubstantiated, and a criminal fraud on the Arizona Court (*See Ex. 29*) *– yet – still unchecked*.

Kenner demanded that trial counsel speak with attorney Tom Baker pre-trial and request copies of the signed disclosures from each of the Little Isle 4 Hawai'i partners.   Trial counsel informed Kenner that Baker "told" him that there were no disclosures that he could provide.   Clearly that was a pre-trial lie, as evidenced by

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

the April 2015 letter from Kenner to trial counsel -- and the post-trial production by the government thru attorney Oliveras (*See Ex. 3*).

## **Failure To Recover The Northern Trust Bank Subpoena Records...**
*(Or present a supplemental subpoena once discovered as incomplete)*

**Trial counsel failed** to subpoena Northern Trust bank early enough pre-trial to gather the resulting *Northern Trust banking records* and make successive subpoena requests – *specifically considering the Northern Trust Bank records were clearly crucial -- yet deficient (once received)*.

In the first (1st) instances of the trial (*Tr.9*), the court engaged in conversation about the unavailability of the Northern Trust subpoena documents – and no request to *delay* the proceedings was placed on the record (denied or not).   Certainly – even if the exculpatory documents were received on the first (1st) day of trial, it would have been far too late for properly assimilate them into a constructive defense[29], after proper dissemination, evaluation – and the discovery that the subpoena was only partially filled (if the same documents arrived as they did after week seven [7] of the trial).

- *United States v. Gil*, 297 F.3d 93 (2d Cir 2002) ("the government wrongfully suppressed evidence favorable to the defendant [that was] exculpatory and impeaching information, seriously undermining confidence in [the] guilty verdict, and <u>was not disclosed timely enough for it to be useful to defendant</u>. The production of the documents on the eve of trial did not provide defendant the opportunity to <u>read it</u>, <u>identify its usefulness</u>, and <u>use it</u>.").

- The Court opined, "To the extent that a prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation, grounded in the 14th Amendment, to disclose that evidence to the defendant.  Information coming within the scope of this principle includes not only evidence that it is exculpatory, i.e.

---

[29] Please note that trial counsel *never* requested the assistance of a **paralegal**, an **investigator**, a **forensic accountant**, or others to assist in the voluminous evidence or the "complex case" as designated by the government and the EDNY court in 2014 – *approximately one (1) year before the start of trial.*

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

going to the heart of the defendant's guilt or innocence, <u>but also evidence that is useful for impeachment</u>, i.e. having the potential to alter the jury's assessment of the credibility of a <u>significant</u> prosecution witness."*Leka v. Portuodno*, 257 F.3d 89, 98 (2d Cir 2001) (alterations in original) (quoting *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir 1998)).

Although the Court has suggested that the "*memory*" of the individuals own actions and signatures to open their Line of Credit ("LOC") accounts thru Northern Trust Bank were not important, the government elicited false claims that the individual investors were not aware that or when their respective LOC accounts were opened. **The Northern Trust Bank evidence proves this to be untrue**.

### The FBI Had Copies Of The Requested Documents And Never Turned Them Over Pre-Trial...

Notwithstanding Kenner's request for the subpoena – and objections from the government as a "fishing expedition", clearly, the government knew what they were hiding from the defendant.

Michael Peca confirmed the FBI Northern Trust subpoena in 2009, as follows in a text to Kenner immediately after Peca requested copies of the records for himself and Kenner via notarized document (*See Ex. 96*):



| 10293 | +17163743234 Michael Peca* | 10/16/2009 1:42:01 PM(UTC+0) | Read | **Were you aware that a subpoena was issued for the NT acct? Just got a letter from NT today.** |

- ***The court <u>cannot</u> excuse this government <u>Brady</u> violation...***

<u>*The actual banking records would have impeached every one of them*</u> -- &/or severely set the stage for the investors obvious inability to "*remember*" critical items related to their own-approved – and **signed** -- investments thru Kenner – during a rigorous cross-examination...unlike a simple "*failed memory test*".

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

**Trial counsel failed by**:

- **Not delaying** the trial start date until the *crucial* Northern Trust subpoena was received.
- **Not reviewing** the subpoena materials (received in week seven [7] of the trial), and allowing ample time to review, to investigate and to assimilate into the defense, the *newly discovered documents* -- **signed-off** by 100% of the LOC investors.
- **Not discussing** strategy with Kenner related to the investor's full knowledge that their funds were *documented* by Northern Trust as "***Investment in Little Isle 4***" (*and nothing else, like a short-term loan that was not to be touched*).
- And -- **Not properly presenting** to the court and jury that all LOC investors **signed off** annually on their individual "***use of funds***" from their respective LOCs, further thwarting the government's prejudicially false claims that *none* of the LOC "investors" were aware of the annual use...
  - *Michael Peca testimony contradicts his own-signed Northern Trust LOC Disbursement Request & Authorization "use of funds" document (Tr.429-430) -- See Ex. 18.*

These actions, *at a minimum*, would have left no doubt of transparency between Kenner, the investors, and Northern Trust Bank, and full disclosure between the parties – *fully hi-lighting their memory loss issues* (a.k.a. **CTE**)[30].   As a simple

---

[30] **CTE** is Chronic Traumatic Encephalopathy.   The primary symptoms of **CTE** have been described neurological experts as:

*CTE, a catastrophic disease first associated with boxers long ago, results when a toxic protein, Tau, accumulates in the brain, kills brain cells, and leads to symptoms such as cognitive dysfunction, **memory loss**, sleeplessness, depression, diminished impulse control, episodes of anger, and dementia, among others. Until recently, CTE could only be confirmed through an autopsy. **Tau proteins are released whenever concussion occurs.***

- *See United States District Court of MN -- CASE 0:14-md-02551-SRN-BRT*

Since the conclusion of the 2015 trial -- Kenner has become aware, so far, of multiple litigations filed by former NHL players, including at least some of the alleged victims, for **CTE**.  At the same time, the government supports the witnesses' 2015 trial statements, fully contradicting all of their *own* pre-trial empirical evidence, as *faulty memory, confusion and mistakes* with reference to a Supreme Court case (*United States v. Dunnigan*, 507 U.S. 87, 94 [1993]), which is mis-referenced.
- Kenner has previously requested the Court submit each trial witness to Requests for Admissions to verify their prior-known concussion issues -- and any neurological

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

example -- for Owen Nolan -- the empirical evidence of his own signed bank acknowledgments (*See Ex. 14, Ex. 15, and Ex. 16*) contradicted Nolan's 2015 testimony (*Tr.2065-2066*) of *"remembering nothing"* from his <u>one-page</u>, **signed** documents.

Trial counsel's failure to subpoena crucial information early enough for effective trial use – or at all – draws a close-fitting comparable to the government's obligation to deliver the same exculpatory materials timely.   In *United States v. Gil*, 297 F.3d 93 (2d Cir 2002) ("the government wrongfully suppressed evidence favorable to the defendant [that was] exculpatory and impeaching information, seriously undermining confidence in [the] guilty verdict, and <u>was</u> <u>not disclosed timely enough</u> <u>for it to be</u> <u>useful to defendant</u>.   The production of the documents on the "eve of trial" did not provide defendant the opportunity to <u>read it</u>, <u>identify its usefulness</u>, and <u>use it</u>.")

- The effective and timely use of a pre-trial subpoena for *crucial* material items *directly related to charged counts and the indictment's timeframe* are **critical**.

- There is nothing superfluous about the witnesses' actual banking records confirming direct third (3rd) party contact – further minimizing any prosecutorial "concealment" theory.

**First** – Months before trial and after the government claimed they completed their Rule 16 discovery production, Kenner immediately requested to issue a subpoena to Northern Trust Bank for the time period covering the indictment (2003-2013); including but not limited to *all* the LOC and bank records for the alleged victims in the case.   **The government vehemently objected to the subpoena**; calling it a "*fishing expedition*" by Kenner and both "*burdensome*" and "*harassing*" to Northern Trust Bank.   The Court concurred and suggested that a "reduced" version of the

---

discussions with professionals; *related to <u>memory loss</u> issues.*  Kenner is waiting on a ruling from the Court to allow the service of the RFAs on the government witnesses whose "inconsistent statements" are defended by the government as "*faulty memory, confusion and mistakes*" when contradicting wholly material matters in the instant case.

subpoena would better serve the Court's belief of "what defendant Kenner needed" to fairly defend himself at trial from allegations of "concealment" spanning the same requested years of the original subpoena, 2003-2013.

- ### *Trial counsel acquiesced without argument…*

On the *eve of trial*, the government finally agreed to a paired down Northern Trust Bank subpoena with trial counsel; *not Kenner*.  Once the Court issued the subpoena, it took approximately ten (10) weeks for the Court's Federal subpoena to be returned thru repeated confusion and mis-communication with Northern Trust Bank (appearing as subterfuge) *(Tr.9)*.  This exculpatory information was crucial to the defense's case of "*no concealment*", specifically in the light that the government presented alleged victims who claimed they were "*not aware*" of their-own Northern Trust Bank lines of credit ("LOC") until "*after the fact*" or "*years later*" or the "*use of funds*"; all of which they personally **signed off** annually (on *one-page* documents)[31], *infra*.

The Northern Trust subpoena – although delivered downright incomplete – verified that each of the Northern Trust Bank LOC clients personally "**signed**" their own LOC bank documents to "open" their accounts (*never Kenner – Tr.2065-2066 [Nolan]*); after the account documents were independently by Northern Trust Bank:

1) <u>**Mailed**</u> **to the individuals' home addresses of record**,
2) <u>**Signed**</u> **by their LOC clients**, and
3) **Individually** <u>**returned**</u> **to Northern Trust Bank**.

Nevertheless, for an unexplainable reason, the Northern Trust Bank subpoena arrived in the EDNY Courthouse no earlier than "*after week 7*" of the trial (and only partially filled); ironically after the government rested its case-in-chief and the government witnesses had returned home to all corners of the world (none remaining local).   The government's deference to the initial subpoena request that

---

[31] See *Northern Trust Disbursement Request & Authorizations* (*Ex. 97*).

spanned the *exact years* of the Indictment was improperly denied (and certainly under-argued by trial counsel as *critical* to the main defense strategy); because according to Michael Peca, the government knew what would be in the subpoena materials having received all of them in 2009 from Northern Trust Bank, *supra.*

- **Clearly with the FBI knowledge of the 2009 identical subpoena documents, the government knew exactly what they needed to avoid allowing into the case – at least during their case-in-chief.**
  - *They succeeded.*

*Without the pre-trial arrival of the exculpatory defense materials*, the defense was unable to prepare properly for the use of the documents for impeachment of the individual alleged victims while on the witness stand – denying the defense's opportunity to enhance the trier of fact's ability to assess the independent credibility of *faulty memory, confusion and mistakes* or "*memory loss*" face-to-face during testimony *versus* empirical evidence from the bank subpoena; **and why the defendant would be criminally culpable for their "*memory loss*".**

- Subsequently – trial counsel failed to request a supplemental subpoena for the missing exculpatory information from Northern Trust.   In fact, the Northern Trust subpoena documents could not have amounted to "everything" that Northern Trust Bank needed to issue legit LOCs[32].
  - The document packages were so insufficient; Northern Trust Bank could not have lent money under any Federal-banking standard with the minimal documents they produced in the subpoena after week seven (7) of the trial.

These incomplete banking documents were unavailable for impeachment cross-examination in any format; *prejudicing the defendant*.   They were the underlying "signed" documents that *confirmed* the investors opened their own individual LOCs **by their own signatures**.  **It confirmed that Kenner *never* opened their LOCs -- with or without their knowledge and sign offs**, as the government led multiple

---

[32] Several Northern Trust LOC documents for Darryl Sydor et. al. – confirmed Sydor **signed** his-own *one-page* acknowledgement of the "*use of funds*" thru his 2005 *Disbursement Request & Authorization* forms that were recovered from Kenner's office and *not in the Northern Trust subpoena materials* (*See Ex. 98*).

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

LOC investors to incorrectly testify (knowingly).  These LOCs – *which they could not remember opening (in synchronicity)* – were "some" of the underlying funds that the same government witnesses claimed they did not know went to Jowdy.

- ***How could they remember the "Jowdy loans" – if they could not even recall their own "signed" underlying investment LOC?***

- ***The foundationless testimony cannot support "B" if they cannot even recall "A", <u>the necessary predicate act</u>.***

If properly prepared, trial counsel had all of the impeaching evidence to contradict the *faulty memory, confusion and mistakes* witnesses -- <u>*with*</u> their-own real documents.   It ***<u>would</u> have spurred their recollection***, like Michael Peca who confirmed under cross-examination pressures that he "now" (at time of trial) recalled giving 2011 SDNY Grand Jury testimony that confirmed *<u>he was at all times aware of the "Hawai'i-Jowdy loans" and approved them as part of a Hawai'i partners' "group" decision</u>* (*See M&O at 9*) (*Tr.498-499, 650*); contradicting the prosecutorial theories that "*<u>no one was aware</u>*".[33]

---

[33] **<u>Trial counsel had no computer skills to prepare exculpatory recording evidence…</u>**
- *Trial counsel did <u>not</u> request any "help" from computer experts, paralegals, investigators or others despite this evidence-heavy (determined as approximately 2 million documents) and "complex" status…*

In trial counsel's lack of preparation for Kristen Peca, he also failed to review the five (5) hours of recordings that Kristen Peca taped for the FBI in July 2012 – *with or without Kenner.*

**In those recordings, Kristen Peca <u>admitted</u> that she had <u>*no knowledge*</u> (for at least the first four [4] years) of her husband's LOC from Northern Trust Bank opened in March 2005.**

**Thus – Kristen Peca was clearly <u>unaware</u> that Michael Peca continued to sign full renewal document packages annually (in 2005, 2006, 2007, 2008 – *in Northern Trust Bank subpoena*).**
- Michael Peca concealed this information from his wife; *<u>not concealed by Kenner</u>* who had no fiduciary relationship with **Kristen Peca** at any time as a **non-client.**

Those documents specifically acknowledged Michael Peca's "***use of funds***" *<u>annually</u>* for his "*Increase to existing loan used for speculative real estate*" (per his 2005, $1.775mm **Extension of Credit** request with Northern Trust Bank -- *Ex. 8*).   The Peca **Extension of Credit** document was countersigned by Northern Trust Bank Vice President of lending – **Ed**

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

---

**Wilson**. Wilson **would have verified** his independent communication with Michael Peca during the annual signing of Peca's LOC documents...
- *If trial counsel has simply called him as a pro-Kenner witness*...

**Kristen Peca 2012 FBI recording confessions were utterly disregarded -- by the government -- to fabricate her trial testimony...**

During the impeaching portion of the 2012 FBI recording (*infra*), Kristen Peca claims she was *not aware* of the LOC until 2008 (after four [4] years of activity, *clearly concealed by her husband*, since **Kristen Peca was never Kenner's client**.

Trial counsel failed *grossly* in not pointing out that salacious fact to the jury, further discounting anything that Kristen Peca claimed that she was under-informed about related to the defendant's financial relationship **with her husband**.
- **Kenner had no fiduciary relationship with Kristen Peca, ever...**

The Northern Trust Bank subpoena evidence also highlights the fact that Michael Peca would have previously signed a *previous 2005 Extension of Credit* request for Northern Trust Bank for $1.6mm (prior to *Ex. 8*), which was *missing* from the incomplete Northern Trust subpoena.
- It was another CRUCIAL document missing and not recovered for trial use, again due to trial counsel's failure to request a delay to the start date of the trial until the Northern Trust subpoena was 1) received, 2) reviewed for completeness, and 3) final and proper investigation was complete.
  - *None of this occurred, fully prejudicing the defendant.*

**July 2012 (at about 5.45 of the 1:34.50 call recorded by Kristen Peca without defendant's knowledge) – Kristen Peca tells Kenner:**

> **Kristen Peca** – Well, I was referencing the earlier stuff that you said, I don't remember a large amount being distributed back to our account and the timing of the years of the loan, the line of credit, that happened when we were in OHIO (*2008 & 2009*). **I don't understand how it could have been open for 5 years before that?** Because we had a bond account going?  **Do you mean the Hawai'i; you had a line of credit, but not for us?**
>
> **Kenner** – No, no, you guys had lines of credit for 5 years at Northern Trust.
>
> **Kristen Peca** – **for 5 years?**
>
> **Kenner** – **for 5 years!**  When you were in OHIO, that's when the thing (*LOC*) closed.

Kristen Peca could not believe that she was finding out on a phone call in 2012 that her husband, Kenner's client, had a LOC open for five (5) years *without her knowledge*.

How could trial counsel allow Kristen Peca tell the 2015 trial court that she took a month to decide about opening the LOC (*Tr.697*) (*allegedly in 2005 – 4 full years before she even knew the LOC was opened*) and discussed her "baby" (a.k.a. -- Bond account at *Tr.698*)?

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

## **Failure To Recall Any Of The Northern Trust LOC Clients...**
### *(Or even request it...)*

With the government's concealment case based on the alleged unknown "***use of LOC funds***" – and their *subsequent* distribution as part of the Hawai'i-Jowdy loans, trial counsel's negligence allowed the foundationless government claims to go unchecked -- even with the Northern Trust subpoena evidence that arrived after the close of the government's case-in-chief.

- **Even when the subpoena documents arrived late -- there were no requests from trial counsel** to delay the trial temporarily to:
  1) Review the documents with the defendant,
  2) Strategize about the substantially ***crucial***, pro-defendant evidence now received by the Court,
  3) Request another subpoena to fill in the initial incomplete request (after 10 weeks of waiting),
  4) Specifically *recall* Nolan, Peca, Berard, Rucchin & Sydor (government witnesses) who allegedly were *not* aware of their "***Investments in Little Isle 4***",
  5) Address the "***use of funds***" from their respectively ***signed-off*** LOCs,
  6) Expose their knowledge of their ***Extensions of Credit***, or,
  7) Even, call the Northern Trust employee who filled the subpoena to explain to the Court the ten (10) weeks of delay in returning the initial and partially filled subpoena (*See Ex. 101*).
  - ○ ***BUT -- None of this happened...***

---

- Thus, her follow-up testimony that the 2005 LOC was only supposed to be open for 6-months, and specifically for vertical construction, ***has clearly been fabricated***.

**Only trial counsel's lack of preparation** for the trial would have allowed such adverse-defendant testimony to stand unchallenged with perfectly impeaching evidence available.

The impeachment by trial counsel of Kristen Peca, coupled with the Northern Trust subpoena documents, which Michael Peca signed for five (5) years thru 2009, would have proclaimed all of the Peca's joint testimony *false* in the eyes of the trier of fact and eliminated their victim status completely from the Hawai'i LOC investment and GSF knowledge complaints.   ***Trial counsel presented neither***.  Through blind negligence and failure to investigate, trial counsel deproved Kenner of his Sixth Amendment rights.

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

Instead of drawing specific attention to the *remarkable new evidence*, trial counsel chose to simply agree with the government that the documents were mainly *duplicative* **which they were not** (*Tr.4206*) -- and submit them as a group while never identifying any of them individually to the jury.

Instead, trial counsel chose to offer the crucial Northern Trust Bank LOC documents collectively to the jury during summation and suggest *they* (the jury) can sort thru the myriad of pro-defendant supportive documents *without guidance* (*Tr.5840*), *on their own without specific direction of what to look for in the exculpatory morass.* It is *unprecedented laziness* (not possible to be excused as trial strategy), and purely prejudicial ineffectiveness, *at a minimum*.

> Trial counsel's negligence is analogous to having out-of-country travel records confirming a bank robber was *not possibly present* for a robbery on the *exact day* that several crucial eyewitnesses identified him at the bank…and then **not presenting** it specifically as chief, exculpatory evidence in the defense case, merely suggesting in summation that the jury can peruse the travel records of the defendant, and draw their own conclusions.

### Northern Trust *Extensions of Credit* documents

Even in the "incomplete" subpoena -- the Northern Trust LOC information confirmed thru their-own **signed** Northern Trust "*Extension of Credit*" that:

- **Owen Nolan** signed-off -- "*$2,200,000*" "*Investment in Little Isle 4*" (*See Ex. 7*).

- **Michael Peca** signed-off -- "*$1,775,000*" "*increase to existing loan used for speculative real estate investments*" (*See Ex. 8*).
  - The grossly underutilized (under any analysis) subpoena evidence coupled with Peca's 2011 SDNY Grand Jury Michael Peca testimony (*See Ex. 9 at pages 27-40*) confirmed Peca's $1.775 million was signed for by himself to go into his-own Hawai'i **capital account --** *and then to Jowdy* for the Hawai'i loan – *with his full knowledge*, and

  - Michael Peca **confirmed this in detailed testimony to the 2011 Grand Jury** -- leaving nothing to debate about Michael Peca's 100% awareness of

his $1.775 million capital account "investment" – four (4) years before trial, *regardless of what he concealed from his wife for years* (*See Ex. 100*).

- **Bryan Berard** signed-off -- "*$900,000*" "*investment in speculative real estate*" (*See Ex. 10*).
  - o The subpoenaed evidence would have destroyed Berard's trial perjury – **because**, in conjunction, Berard's 2009 arbitration testimony confirmed his specific knowledge of the loans to Jowdy and agreement (*See Ex. 11*).

- **Steve Rucchin** signed-off -- "*$480,000*" "*investment in Little Isle 4*" in 2004 (*See Ex. 12*) -- and then...
  - o **Steve Rucchin** signed-off -- "*$1,000,000*" "*investment in Little Isle 4*" in 2005 (*See Ex. 13*).

### Northern Trust *Disbursement Request & Authorizations* documents

Then, and further ignored by trial counsel as part and parcel to his ineffective defense tactics, trial counsel refused to highlight (in any method) the individually **signed**, *annual* documents – *Disbursement Request & Authorization*.   Each document confirmed the "*use of funds*" by each of the Northern Trust LOC clients, annually -- *at a minimum*.   This **crucial** empirical evidence from Northern Trust would have proven *even more valuable* -- specifically after each witness with a LOC gave testimony that they were never made aware of its usage (*i.e. Peca – Tr.429-430, 433, 644*), *and infra*.   Had trial counsel reviewed the subpoenaed documents with Kenner and utilized them to cross-examine the government witnesses against their specific perjured statements (*after a critical request to the court to recall each of them*), it would have left no government theory defensible as to why any one of the LOC clients at any time after receiving the documents they independently *signed and returned* to Northern Trust, *did not complain* to anyone about an alleged "*unknown use of funds*".   The Northern Trust subpoena produced the crucial empirical evidence of the "*annual use of funds*" – and its underlying knowledge:

For **Owen Nolan**, he signed off in:
         2005 (*Ex. 14*) on **$2.188mm used funds**,
         2006 (*Ex. 15*) on **$1.376mm used funds**, and

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

2007 (*Ex. 16*) on **$2.189mm used funds**
- After Nolan's December 2007 text communication with Kenner – *See Ex.17*.

For **Michael Peca**, he signed off in:
2005 (*Ex. 18*) on **$1.6mm used funds**; despite his perjury to the 2015 Court that he had no knowledge of the used funds (*Tr.429-430*).

For **Bryan Berard**, he signed off in:
2006 (*Ex. 19*) on **$895,000 used funds**,
2007 (*Ex. 20*) on **$617,000 used funds**, and
2008 (*Ex. 21*), on **$617,000 used funds**
- Despite his perjury to the 2015 Court that he had no knowledge of the used funds (*Tr.3036*) – and
- Despite the fact he exchanged a 2006 letter *directly* with Northern Trust Banker Mascarella -- and as a result -- "*reduced*" his LOC collateral by **signing** an entire, new LOC package directly with Mascarella and Northern Trust Bank (*See Ex. 88*).

For **Steve Rucchin**, he signed off in:
2005 (*Ex. 22*) on **$1mm used funds**, and
2006 (*Ex. 23*) on **$686,000 used funds**.

**Trial counsel refused to request a Northern Trust supplemental subpoena** to complete the missing documents after receiving the mid-trial, incomplete Northern Trust subpoena – **despite Kenner's demands**.  The Northern Trust subpoena did *not* produce complete documents for Darryl Sydor, or any documents for Mattias Norstrom, Sergei Gonchar, and Glen Murray (three [3] non-victims); all of which would have *also confirmed* their independent annual sign-offs directly with Northern Trust Bank – and their undisputed knowledge of the annual "*use of funds*".

- None of this was raised or highlighted by trial counsel to the Court, leaving the defendant with a fully ineffective defense despite the exculpatory evidence *available* to trial counsel in the courtroom -- *and ignored* (or refused to subpoena again for completeness).

99

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

## The *Letters of Authorization...*
*(Signed by each Northern Trust LOC client)*

Each letter granted authority to Kenner to withdraw 100% of the LOC funds for the Hawai'i (Little Isle 4) project – *without further or individual withdrawal approvals.*[34]

Michael Peca's *Letter of Authorization* specified to Northern Trust Bank (*See Ex. 71*):

> "*This letter is your authorization to allow Philip A. Kenner to access my above referenced line of credit for direct deposit to the Little Isle 4 account at Northern Trust.    He is authorized to sign for the release of funds related to the line*."

When the government repeated their concealment Q&A themes with the five (5) Hawai'i LOC investors – they insinuated that Kenner had some further obligation to disclose each and every advance made from the investors' LOC accounts (beyond the **signed** *Letters of Authorization*).  **This was false** – and not pursuant to any additionally signed agreement between Kenner and the investors in Northern Trust's possession (or not).

- *A "silent" trial counsel refused to object...*

## Weakly Supported Verdict...

The Supreme Court has made clear that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696.  "[T]he determination of prejudice necessarily is affected by the quality and quantity of other evidence against the defendant." *Wynters v. Poole*, 464 F. Supp. 2d 167, 176 (NDNY 2006), *citing Strickland*, 466 U.S. at 695.   The government's evidence that trial counsel

---

[34] *See NT Letters of Authorization documents:*
- *Ex. 69 -- NT 2005 Letter of Authorization for LI4 - Berard*
- *Ex. 70 -- NT 2004 Letter of Authorization for LI4 - Nolan*
- *Ex. 71 -- NT 2005 Letter of Authorization for LI4 - Peca.pdf*
- *Ex. 72 -- NT 2004 Letter of Authorization for LI4 - Rucchin.pdf*
- *Ex. 73 -- NT 2004 Letter of Authorization for LI4 - Sydor.pdf*

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

chose to let the jury weigh – *unchallenged* -- was based on foundationless, government witness testimony that with simple due diligence, consultation with the defendant, and investigation would have produced irrefutable empirical, pro-defendant evidence.

1. The impeachment evidence "for each witness" was available to trial counsel in the courtroom.

2. First-hand testimony of the *professionals* involved in the original transactions was available at all times -- leaving nothing to decipher for any trier of fact.

3. In fact, the government witnesses repeatedly claimed they were not informed about their business dealings -- while echoing a similar refrain that they *"did not read"* the critical financial disclosure documents that were put in front of them, and continued to sign them blindly.

- See *Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A.*, ("**the investor argued that the terms and conditions were _written in Portuguese_, which he did not understand, but the court of appeals found that the investor was charged with knowing and understanding the contents of the documents _that he signed_**.") [35]

---

[35] In *Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A.*, 461 Fed. Appx. 61; 2012 U.S. App. LEXIS 3012

Absent substantive unconscionability or fraud, parties are charged with knowing and understanding the contents of documents they knowingly sign.  If the signer can read the instrument, not to have read it is gross negligence; if he cannot read it, not to procure it to be read is equally negligent; in either case the writing binds him.  Parties are bound by documents expressly incorporated by reference into agreements to which they manifest their assent.

- Each investor *independently signed off* on:
  - A Joint Venture Hawai'i disclosure letter -- July 26, 2006 (*See Ex. 89*),
  - The Arizona lawsuit Attorney Baker disclosures (*See R33 A FOLDER*),
  - The Ronald Richards' California lawsuit(s) versus Jowdy disclosures (*See Ex. 90, Ex. 91, Ex. 92*),
  - The GSF disclosures for Constantine (*See Ex. 93*) -- AND
  - **100% of their Northern Trust Bank LOC documents for 4-6 years...**

*Nothing was concealed from the investors --*
*whether they read the information available to them -- or not.*

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

Thus – the government-witnesses' own-signed empirical LOC evidence would have presented an irrefutable pro-defendant and incontrovertible transparency position for the jury to weigh (*barely needing to be deliberated for obvious reasons*) – specifically with respect to the eventual *faulty memory, confusion and mistakes* defense of the government.

- ***Trial counsel never raised the well-settled issues from <u>Horvath</u> that corroborated more Kenner transparency; not less.***

### <u>The Majority Of The Government's Case Was Based On Foundationless Testimony -- Contradicting Known Evidence...</u>

#### <u>*Counts 2, 3 and 4...*</u>

**Trial counsel refused** to present the Na'alehu Ventures 2006 bank statements (*See Ex. 6*), and the corroborating Kaiser bank statements (*See R33 B*) to refute the outrageous government proffer (*Tr.1036-37*) and Kaiser testimony that Kaiser had not been fully repaid from his 2007 California project with Kenner (*Tr.1042*).

With adequate preparation by trial counsel, substantive *Counts, 2, 3 and 4* would have failed on presentation, since Kaiser was <u>*not*</u> receiving funds from Kenner as a result of unpaid or overdue monies (*Tr.1020*).   Just the opposite, as the text message traffic in the government's possession showed, Kaiser was receiving those funds as "**loans**" from Tim Gaarn with Kaiser perpetually "*broke*" by 2009 (*See Ex. 87*). Kaiser independently chose to not repay his friends & family from the documented, California and Hawai'i project *<u>full repayments</u>* from 2006 thru 2008 – and eventually needed to blame his thefts on someone else. *Jowdy's Mexico job and the FBI [Galioto] help provided that medium.*   Kaiser's fraud on his friends & family allowed him to continue funding his portion of the ongoing Arizona renovation project with Kenner (while investing in other ventures using their money – *unknown to them*).   Kaiser confessed to Kenner that one of the Long Island doctors he fleeced was about to sue him (not Kenner) – just before Kaiser took his job in Mexico from Jowdy -- and

102

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

blamed all of the money he stole on Kenner (similar to his claims of Jowdy in February 2019 [*Document 628 at 1*]):[36]



| 1997 5 | +16312350308 **John Kaiser**\* | 2/17/2011 8:40:28 PM(UTC+0) | Read | **On the phone w / willy [Krueger] he is going to be suing me** |
|---|---|---|---|---|

The actual Kenner and Kaiser bank statements, 100% proving the false government theories (*for Counts 2, 3 and 4*) and the Kaiser perjury, would have carried far more weight than the defendant's testimonial representations of the facts (perhaps, received by the jury as merely unsubstantiated defense testimony).

### Counts 7 & 8...

- *The "expected" LOC monthly payments by Kenner conflict with the government's prosecution claims of "concealment" for the same payments...*

Trial counsel cannot convince the defendant or a reasonable fact finder that not addressing the fact that the LOC loans were open for five (5) years before Kenner made the series of payments on behalf of Little Isle 4 (totaling $267,000), and

---

[36] *Document 628 at 1* stated from Kaiser:

> *"Jowdy would like the court to think that Kenner stole $7 million from the hockey players and others..."*

This Jowdy lie (supported by FBI agent Galioto to the investors and their Florida attorney – Steve Main – *See Document 667 – The Jowdy Hoax*) echoed Kaiser's 2011-2012 claims to his friends & family – blaming Kenner for his thefts.

Nevertheless to protect Kaiser as their planned-star-witness at trial -- the government withheld exculpatory (*Brady*) materials specifically to keep the defense from seeing that Kaiser also robbed Willy Krueger's partner, Frank Sconzo (*See Ex. 86*) – **and they knew it**.

- These *Brady* discoveries occurred only after new AUSAs engaged post-trial to construct a "nexus" plan for money judgment, forfeiture, and restitution.  The documents were clearly "lifted" by a government discovery "manager" to avoid delivery pre-trial in the remainder of the Sconzo pre-trial disclosures – *just like the Arizona attorney Baker disclosures*.

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

Kristen Peca[37], Bryan Berard[38] and others have previously given public and "under oath" testimony that *they expected Kenner to be paying the monthly fees*.  **The defendant was being charged with what he was supposed to do, according to the alleged victims.**

- Thus – Kenner was convicted of one (1) count of doing exactly what the LOC investors of Little Isle 4 expected of Kenner as the Managing Member – in their own words.

The Northern Trust LOCs were open for approximately five (5) years, thus Kenner was charged with "making" payments #59 and #60.   It is illogical that Kenner, doing what he was supposed to be doing according to Bryan Berard, Kristen Peca -- **and**

---

[37] Kristen Peca's 2012 FBI recording of Kenner confirmed she knew Kenner was making LOC payments, and expected it (in concert with her husband's understanding and representations to her), until Kenner and the Hawai'i LLC ran out of funds and sought a legal remedy of recovery thru Jowdy (who controlled the loaned funds – *See Ex. 2 [3500-KJ-2 at 11-14]*).

[38] Berard gave voluntary testimony in 2009 in the *Nolan v. Kenner* arbitration, only a few weeks after his collateral was seized (*following his documented communication directly with Northern Trust banker, Catherine Brill, to authorize the release of collateral*).   Berard directly stated [*Day 5 at 916-918*]:
> "*Q:  When you were as far as the Hawai'i deal, were you made aware of any sort of transaction Mr. Kenner set up where you can give a commitment or pledge a line of credit in lieu of putting all of your money in initially?*
>
> *A [Berard]:  Yes.*
>
> *Q: Can you tell the panel what was your understanding?*
>
> *A [Berard]: Basically the company – it was set up.   The company would pay the payments.  **I would pledge the money**, obviously to get a loan for the property.  Again, the company would pay the payments, and **I wasn't forfeiting all of my money for the piece of property**.*
>
> *Q: And later on were you aware that Mr. Kenner started lending this money to another principle in the Cabo project named Ken Jowdy?*
>
> *A [Berard]:  Yes.*
>
> *Q: Where did you think the money that Mr. Jowdy – were you told where the money that was going to be used that was given to Mr. Jowdy as far as the Mexican project? Was there anything you were told about that?*
>
> *A [Berard]:  **Basically just loan him the money for the property**.*

104

**the Little Isle 4 operating agreement** – nevertheless was now committing some criminal action by continuing the LOC payments.

## Failure To Share April 22, 2015, Superseding Indictment...
*(Document 214)*

Trial counsel failed to share April 22, 2015, superseding Indictment, with Kenner pre-trial &/or request a reasonable delay to discuss and address the changes in the superseding indictment and resulting trial strategy adjustments.   Kenner only received the superseding indictment in mid-2018 (*as well as the other two [2] indictments of Kenner in the EDNY*).  All three (3) indictments were delivered by Kenner's paralegal *after* Kenner's ProSe admission of February 2018 (thru *Faretta v. California*).  It should be noted that Kenner never saw any of the indictments prior to trial.  Kenner's original attorney (Federal Defender service attorney) and trial counsel independently argued to Kenner that it was "*illegal*" for Kenner to posses a copy of his own indictment at his detention center.   Kenner's quarrels to the contrary fell on deaf ears.

- Trial counsel's only concern was that *he* had a busy schedule and could not "*just delay trial because Kenner wanted more preparation time*" with the superseding indictment that "*Kenner caused by talking to a jailhouse snitch*" (although unexplainable) -- and terminating the discussion with Kenner by repeatedly asserting, "*the judge is busy*" and "*won't let it happen*".

Trial counsel reiterated to Kenner in court on multiple occasions in the months leading up to the start of trial (after the move to MDC Brooklyn) that "*he had a whole law practice to handle and he was not going to 'give up' his entire practice to defend Kenner*".   Trial counsel became more belligerent about it especially after his adverse FBI communication (*See Ex. 3*).

As the government case-in-chief drew to a close, trial counsel refused to visit the defendant for any substantive trial prep (repeatedly promised to Kenner as the primary defense strategy – in lieu of recalling government witnesses – or other pro-defendant witnesses).

105

The strategic preparation became more critical considering the fact that trial counsel now planned to introduce all of the pro-defense claims – and witness perjury -- thru Kenner's testimony.   In lieu of the overwhelming evidence available to the defense -- which should have been admitted thru the actual authors of the evidence and the witnesses, ***trial counsel failed***.   Any minimal efforts by trial counsel would have eliminated any necessary judgment of the jury to determine the falseness of the government's case independent of the defendant's veracity on the witness stand.   Kenner's constant pleading during the defense case – with Kenner on the witness stand -- resulted in additional resentment from trial counsel towards the defendant.

After a truthful trial answer about Jowdy's legal counsel and former FBI Director Freeh's involvement in the various Jowdy defenses (*Tr.5013-5015*), at the next break, trial counsel threatened the defendant, claiming Kenner would now be watching trial counsel "*mail it in*" for the rest of the trial, leaving the defendant fully discouraged with several days remaining on the witness stand.

- *Kenner was told that trial counsel wanted nothing to do with Louis Freeh or any "blow back" from his name being tossed into the trial by Kenner.*

### Failure To Submit Pre-Trial And Northern Trust Bank Follow-Up Subpoenas...

Kenner prepared a myriad of subpoenas for trial counsel to present to the court. **Trial counsel refused**, only agreeing to request the submission of the original Northern Trust Bank subpoena -- months before trial.   However, when the government objected to the "timeframe" of the subpoena request – and called it a "*fishing expedition on the eve of trial to harass the bank*", trial counsel backed-off without argument.

- *It must be noted that timeframe of the subpoena request coincided "only" with the exact years of the charged indictment.*

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

How could that produce a discovery burden on anyone?   It cannot, but trial counsel refused to object.   Trial counsel's malfeasance allowed a long delay before the government suggested a "streamlined" subpoena would be "alright" on the "eve of trial" – and *after* filing their superseding indictment.   Then, Haley refused to object and demand the necessity of the "full subpoena" for the actual timeframe of the indictment -- and a delay to receive the documents in time to be *reviewed, determine their exculpatory value*, and *implement them into the defense's trial strategy* (for cross-examination of the *actual* witnesses who signed them independently).

**Northern Trust 1099-INT tax forms...**Trial counsel *also* failed to subpoena (or supplement the original insufficient subpoena) for the Northern Trust tax forms (1099-INT) of each LOC client from 2003-2009.  The LOC investors would have known (thru further transparent redundancy) that their LOC was receiving monthly payments, **because** their annual tax form – mailed to their homes of record and utilized on their annual IRS tax filings **-- was confirming it specifically**.

- To compliment the tax forms form Northern Trust Bank, simple trial counsel investigation would have produced the 2009 affidavits by Little Isle 4 members who also *confirmed* their awareness of the Little Isle 4 payments (thru contributions and LOC **Extensions of Credit**) (*See Ex. 60 at 4-5, Ex. 61 at 4-5*).

**Eufora investors' attorney confirms knowledge of Jowdy frauds to the SEC...**
Attorney Stolper also presented Kenner's Hawai'i-Mexico transparency to the SEC after three (3) full days of Kenner's testimony in 2011 (*See Ex. 62*).   With simple investigation, trial counsel could have also presented the Bryan Berard 2009 arbitration testimony confirming he expected Kenner to handle the monthly LOC payments (*See Ex. 11*), *thru the Hawai'i company*, which Kenner did *after* his own $267,000 additional capital contributions deposits (though not required to) from June 2008 thru December 2009.   Kenner's additional capital contributions commenced immediately after Jowdy, Freeh and Harvey terminated the Jowdy settlement talks (focused on primarily repaying the Hawai'i loans and millions more

107

due by Jowdy to Kenner and Kenner investors thru his 6 years -- by that time -- of
FBI-protected frauds, embezzlements and racketeering activities) (*See Ex. 59*).

### Failure To Allow A Co-Defendant Meeting...

Trial counsel failed to allow a co-defendant meeting at any time pre-trial or during
the trial proceedings led to trial friction and confusion.   With the myriad of
unsubstantiated allegations that empirical evidence was available to disprove, trial
counsel refused to allow a co-defendant meeting pre-trial.   Trial counsel's refusal
led to utter chaos in the incongruent defense strategies.   At a minimum, trial
counsel could have reduced the "*he said – she said*" issues *he personally created* by
openly attacking Kenner's co-defendant and antagonizing him, when that was the
job of the government, not trial counsel's responsibility (regardless of Constantine's
culpability for any misdeeds that did not involve Kenner – like the entire Global
Settlement Funds ["GSF"] control – as Constantine stipulated to at trial).

### Lack Of Co-Defendant Meeting Proves Detrimental With Overwhelming And Direct Evidence Available To Impeach Witnesses...

As an example, **Global Settlement Fund** (only) alleged victim, Jay McKee testified
on direct.  He declared that he was *not* aware of the "other benefits" of the Global
Settlement Fund ("GSF") as clearly outlined by both defendants during their dinner
meeting of May 9, 2009.

McKee was also adamant thru leading Q&A direct-examination that he ***would not
have contributed to the GSF*** if the defendants had made him aware of the Eufora,
Airpark, Palms and Falcon (airplane) elements of Constantine's GSF plan (*Tr.1821-1824*).

Nevertheless, due to a lack of pre-trial investigation and trial preparation with
Kenner, trial counsel ignored the following exculpatory materials, allowing the jury
to weigh the government and Jay McKee's perjury versus the singular produced

108

disclosure email (*See Government Exhibit 6602 – trial exhibit – Ex. 26*).   Immediately following the 2-3 hour face-to-face meeting on May 9, 2009 with the defendants, Jay McKee and his wife (Nicole), the following conversation took place via text over the following 12 hours (between Jay McKee and Kenner) confirming full disclosure and knowledge by Jay McKee (re-affirming the exact dinner conversation details[39]):

> **McKee** -- *Thx 4 making the trip bud.. Took in alot from the talk tnite.. Drive safe, be in touch..*

> **Kenner** -- *Good stuff*

> **McKee** --- *Can u do me a favor. Can u email me, so I can look at it on paper, everything my 250 turns into. Nicole was speaking with Tommy when u explained to me all the areas where we are benefiting.*

> **Kenner** -- *I will have tommy do it so it's consistent with the discussion*

> **McKee** -- *Perfect, tks... Hey, also, could u email me what the 3 black sheep are getting in the end result, as well as Tommy bullet points they had 2 agree too.. Tks*

> **Kenner** -- *Tommy said you will get 1/10th of everything that is acquired of theirs which includes 20% (2% for you) of the airpark building, 1/10th of their 3.64% of their Eufora shares (.364% for you which puts you just over 1% in Eufora) and then a small piece of the jet which TC is still crunching numbers on but it will probably be 1% of it. TC will send you the bullets they agreed to but has to wait till it's actually signed. Should be a day or two. They have only agreed by email so far. He will also send you the media summary but he wants you to convince the owner of Chef's to send him the tomato sauce Fed Ex.*

> **McKee** -- *Haha.. Consider it done.. I'll have Lou put some bottles together with the extra meat for the real flavor..*

---

[39] It must be clearly noted that *never once* in the 12-hour text communication does Jay McKee appear to be surprised by something Kenner and he discussed via text.  Only the passage of time (normal), **CTE**, or testimony under duress (or suborned) could have led to a complete mental failure to recall "anything"...yet -- again in perfect sync with every other government witness who "*could not remember*" their-own "real-time" empirical evidence.

email, sent by the defendant – *See Ex. 26, Ex. 27, Ex 28*).   Having received independent disclosures from both defendants (Kenner and Constantine), it was ignored by trial counsel.   Yet -- if presented at trial, the transparent text

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

disclosure email (*See Government Exhibit 6602 – trial exhibit – Ex. 26*).   Immediately following the 2-3 hour face-to-face meeting on May 9, 2009 with the defendants, Jay McKee and his wife (Nicole), the following conversation took place via text over the following 12 hours (between Jay McKee and Kenner) confirming full disclosure and knowledge by Jay McKee (re-affirming the exact dinner conversation details[39]):

> **_McKee_** *-- Thx 4 making the trip bud.. Took in alot from the talk tnite.. Drive safe, be in touch..*
>
> **_Kenner_** *-- Good stuff*
>
> **_McKee_** *--- Can u do me a favor. Can u email me, so I can look at it on paper, everything my 250 turns into. Nicole was speaking with Tommy when u explained to me all the areas where we are benefiting.*
>
> **_Kenner_** *-- I will have tommy do it so it's consistent with the discussion*
>
> **_McKee_** *-- Perfect, tks… Hey, also, could u email me what the 3 black sheep are getting in the end result, as well as Tommy bullet points they had 2 agree too.. Tks*
>
> **_Kenner_** *-- Tommy said you will get 1/10th of everything that is acquired of theirs which includes 20% (2% for you) of the airpark building, 1/10th of their 3.64% of their Eufora shares (.364% for you which puts you just over 1% in Eufora) and then a small piece of the jet which TC is still crunching numbers on but it will probably be 1% of it. TC will send you the bullets they agreed to but has to wait till it's actually signed. Should be a day or two. They have only agreed by email so far. He will also send you the media summary but he wants you to convince the owner of Chef's to send him the tomato sauce Fed Ex.*
>
> **_McKee_** *-- Haha.. Consider it done.. I'll have Lou put some bottles together with the extra meat for the real flavor..*

---

[39] It must be clearly noted that *never once* in the 12-hour text communication does Jay McKee appear to be surprised by something Kenner and he discussed via text.   Only the passage of time (normal), **CTE**, or testimony under duress (or suborned) could have led to a complete mental failure to recall "anything"…yet -- again in perfect sync with every other government witness who "*could not remember*" their-own "real-time" empirical evidence.

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

**_Kenner_** *– Thx*

**_McKee_** *-- Did TC say the jet was worth 250m last night?*

**_Kenner_** *-- The jet is worth 1.5m. He invested 250k to repair it*

**_McKee_** *-- Aha.. Thats where the 250 number came from.. In the deal, the 3 guys get their money back from their involvement with TC, but nothing back from their Mexico deals, correct..*

**_Kenner_** *-- Correct!*

**_McKee_** *-- If we get control of Jowdys Cabo equity and move to sell Cabo - we get our 500 back from del mar, and what percent of Cabo do we end up with?*

**_Kenner_** *-- Its impossible to say until we know everyone who's involved in getting Jowdy's 40%. For example, the new bank/investor may want half of it to do the deal. But...whatever it is, you will get 1/10 of it.*

**_McKee_** *-- So is it correct to say we'd get our 500 back from del mar, as well as a prob minumium 2% of Cabo? Sorry to keep asking - just trying to get it right..*

After the government confirmed to the 2015 Court that the only reason McKee was present was for his GSF issues (*Tr.1846*), no defense strategy would support **_not_** presenting the text communication to McKee and properly impeach his only valuable testimony in the proceeding; **_rendering him a non-victim_**. In fact, the McKee text conversation refutes virtually every testimonial recollection by McKee at trial of the GSF meeting and items he and his wife discussed with the defendants.

In addition, Jay McKee, Michael Peca and the remainder of the GSF contributors also received a full disclosure email from Constantine (*See Ex. 24, Ex. 25*) on or about May 18, 2009 (incremental to the GSF disclosure/"**_acknowledgement and acceptance_**" email, sent by the defendant – *See Ex. 26, Ex. 27, Ex 28*).   Having received independent disclosures from both defendants (Kenner and Constantine), it was ignored by trial counsel.   Yet -- if presented at trial, the transparent text

110

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

communication would have shut the proverbial door on Jay McKee, Kristen Peca, Michael Peca and the remainder of the GSF, allegedly "uninformed" contributors.

- Please note that McKee told the 2015 trial Court that he discussed the GSF idea with "*former teammates*" (*Tr.1817*).   <u>*Michael Peca was Jay McKee's only former teammate involved in the GSF*</u>.

The Pecas (Michael and Kristen) received the identical disclosure email (*See Ex. 25*) **before and separate** from the request to sign off on the "acknowledgement and acceptance" disclosure (*See Ex.27, Ex. 28*).   Had trial counsel been prepared for the GSF defense properly, no reasonable trier of fact could have believed that Jay McKee, Michael Peca, Kristen Peca and others (who received the same email) were "*under-informed*" about any of the expected uses by Constantine of the GSF, or *at a minimum*, had the full opportunity to request further information from the defendants.

- No believable or reasonable excuse (*as a coherent trial strategy*) could exist for the ineffectiveness of not using the known impeachment evidence by trial counsel, had trial counsel been properly prepared for Jay McKee, Michael Peca, Kristen Peca and others related to the GSF, through simple investigation and meetings with the defendant pre-trial (or *at a minimum*, during trial breaks &/or weekends, before establishing the defense's case).

### Co-Defendant Meeting Denied By Kenner's Trial Counsel...

Trial counsel refused communication with Constantine's counsel to arrange a pre-trial co-defendant meeting.   Trial counsel told the defendant that due to defendant's pre-trial incarceration and Constantine's bail release, a co-defendant meeting was <u>*not allowed*</u>.   This simple 'white lie' left the two (2) co-defendants at material odds on defense strategies, further muddling a complex case, which if communication between the defendant parties existed, could have been narrowed down to the four corners of the superseding indictment issues.   In fact, the simple recovery of the *Baker disclosures* post trial (unknown to Constantine at any time) would have been ferreted out, further emphasizing the ineffective counsel's issues.

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

### **Failure To Request A Delay In The Trial Start Date prejudiced the defendant…**
*(By further misleading the defendant about trial strategy)*

- *Without Northern Trust LOC documents (Tr.9)…*

Trial counsel failed to request a delay in the trial start date to receive the ***crucial*** Northern Trust subpoena documents which were endlessly and suspiciously delayed ten (10) weeks from the time of the court's subpoena order.   The lack of evidentiary review and strategic analysis deprived the defendant of ***critical*** cross-examination materials.   The subpoenaed materials did not arrive until after the government's case-in-chief had closed (in week seven [7] – ten [10] weeks after the issuance of the subpoena).  Without requesting a delay to obtain the crucial documents, it disadvantaged the defendant by removing (from available evidence) the documents the LOC investors all personally signed.   It would have hi-lighted the investors (government witnesses) *faulty memory* regarding the mere existence of their-own LOC (and never signed by Kenner as the government's mis-leading Q&A insinuated at every opportunity) (*Tr.2065-2066* et. al.).   Trial counsel confirmed this "ordeal" (after 7 weeks of trial) to receive the crucial Northern Trust documents further accentuating the trial mistake of failing to request the critical delay, as follows:

> MR. HALEY: *Your Honor, as the court will recall,* **it was somewhat of a process, from my perspective, an ordeal, obtaining the Northern Trust records from Northern Trust.** *As a matter of fact, I'm still awaiting the records as relates to Owen Nolan that I was told would be delivered to my office yesterday, they haven't yet -- I shouldn't say that -- they were received on disk.* **They did not provide me the password and the telephone number they gave me for the password is an incorrect telephone number.**

Trial counsel misled defendant Kenner by asserting that he would thoroughly admit any of the **crucial** documents thru Kenner's direct testimony and again during summation.   It should be noted that the subpoena included 4-5 inches of exculpatory Northern Trust LOC documents, fully exonerating any Kenner mischief related to the signing of the documents, the concealment of the monthly statements,

or the knowledge of the "*use of funds*" (which each investor individually **signed off** on *one-page* documents). This was another farce on Kenner by a lazy and ineffective trial counsel – who never met face-to-face with Kenner after the arrival of the *critical* Northern Trust subpoena documents. Trial counsel minimized his Kenner direct-examination questions related to the Northern Trust LOC subpoena, as follows (*Tr.4211*):

> *Q. Now, with reference, sir, to Kenner Exhibit 210, before you took the witness stand today did you have an opportunity to look at those documents?*
>
> *A [Kenner]. Yes, sir.*
>
> *Q. Specifically, did you have an opportunity to look at the signature that's contained on one or more of those documents?*
>
> *A [Kenner]. Yes, sir, I did.*
>
> *Q. As relates to those signatures, Mr. Kenner, did you forge any of those signatures?*
>
> *A [Kenner]. No, sir.*

Despite is uneventful and non-impacting Q&A (and wholly ineffective) – trial counsel asked Kenner about Owen Nolan's Northern Trust Bank LOC documents that were not even part of the subpoena materials. Trial counsel followed the misplaced and useless question by affirming to the court that he and Kenner did not even have the Nolan Northern Trust LOC documents at the time (further accentuating trial counsel's incompetence) (*Tr.4214*):

> *MR. HALEY: Your Honor, I'll reserve my rights in terms of offering this into evidence subject to connection in view of the fact that we are still waiting for records that were subpoenaed from Northern Trust.*
>
> *THE COURT: Okay.*
>
> *MR. HALEY: As relates to Owen Nolan, Judge.*

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

Trial counsel completely fumbled his closing – after confirming to Kenner he would produce the individually **signed**:

- *Extension of Credits*,
- *Disbursement Request & Authorizations* and
- *Letters of Authorization*

...For each and every LOC client named as a victim (Nolan, Peca, Berard, Sydor and Rucchin)...but instead trial counsel gagged as follows with the fully impeaching evidence by stating:

> *There is, ladies and gentlemen, offered in evidence, actually a defense exhibit, it's Kenner 210, it consists of a bank response to a subpoena with reference to this matter <u>and you will have an opportunity to review these documents</u>.*[40]

<u>*Even after*</u> the untimely arrival of the **incomplete** subpoena materials:

- Trial counsel refused to request a supplemental subpoena for the clearly incomplete and missing materials.

- Trial counsel failed to recall the Northern Trust LOC clients (*Nolan, Berard, Michael Peca, Sydor, and Rucchin*) for the defense case to address all of the gross contradicting testimony (perjury) from trial as a result of the newly received and overwhelming Northern Trust documents exonerating Kenner from any possible concealment – and the government witnesses' utter lack of LOC memory.

- Trial counsel failed to meet with defendant to discuss the **CRUCIAL** Northern Trust documents upon late arrival, or failure to request even a short trial delay to discuss strategy with the new and **CRUCIAL** exculpatory evidence.  With the clearly incomplete subpoena materials, trial counsel <u>*refused*</u> to request a supplemental subpoena for the clearly incomplete production from Northern Trust Bank (*10 weeks after the issuance of the original Court ordered subpoena*).

---

[40] Please note that trial counsel was <u>*more concerned*</u> at the start of his summation with the presence of his wife and neighbor to watch his closing argument than meeting with Kenner to confirm summation strategy – at a minimum...Trial counsel delayed the completion of his summation thru a weekend (at Kenner's demand) – thus trial counsel had the ability to visit Kenner for three (3) days at Brooklyn MDC prior to completing his summation.
- ***Trial counsel refused...***

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

Trial counsel claimed it would take ten (10) more weeks to receive the next subpoena, "*so what good will it do?*"[41]

### Failure To Allow The Defendant To Assist...

Trial counsel failed to allow the defendant to be fully informed or assist whatsoever in his own defense strategy falls below *Strickland* standards. Counsel's pre-trial meetings were sparse and lasted no longer than 30-45 minutes at Kenner's detention facility – full of personal early departure excuses like "*traffic*" and "*errands for his wife*". The meetings *never* included discussions of potential defense witnesses or the documents the defendant had prepared for the meeting or mailed to the trial counsel in advance of the meeting (*See Ex. 3b*). Trial counsel also carried on a ruse that he had been "in touch" with the Kenner defense witness list individuals and "they were ready when he would call during trial". Trial counsel refused to discuss his "alleged" discussions with the Kenner defense witnesses with Kenner in any pre-trial meeting. Specifically, trial counsel refused to include defense witnesses, *supra*, who would have personally confirmed 100% transparency of all related transactions alleged as "concealed" during trial.

- Trial counsel peppered Kenner just prior to the defense case commencement that the judge had just excoriated Constantine's counsel for "dragging out the trial". Kenner's trial counsel claimed he would not argue to extend the trial

---

[41] Please note that the government repeatedly claimed that the LOC monthly statements were "withheld" by Kenner from the LOC clients. There is no evidence of this, but the contradictory empirical evidence (in the subpoena) did not stop the government's prejudicial advocacy for their faulty prosecutorial theme.

- **Northern Trust Banker Mascarella confirmed that copies would have been given to Kenner -- AND -- his individual clients -- *and he was the person in charge of them* (***Tr.912***).**
  - *How could the government continue their ruse? But – they did...with no objections by an unprepared trial counsel...*

Nevertheless, the LOC investors' subpoena materials *did include* monthly LOC statements from Northern Trust Bank for the investors addressed to the home address on record (*BATES STAMP: TNTC0012, TNTC0010, TNTC0079, TNTC0247, TNTC0120, TNTC0119, TNTC0142*). Thus -- not only were the government proffers **false**, but **trial counsel failed** to present the real exculpatory evidence to the jury – *because he never reviewed the materials independently or with Kenner*.

115

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

and recall LOC witnesses with the subpoena records.   He would not add any out-of-town witnesses from Kenner's defense list.   He espoused it would be a burden on his time (and the rest of his one-man law practice).   He espoused it was a waste because it would be denied due to the court's expense and the U.S. Marshall's times to serve the subpoenaed witnesses (who may have been adverse – like Nolan's wife).   Kenner demanded that he simply "make a record" for the court.   ***Trail counsel refused***.

### Trial Counsel Refused To Give Kenner Trial Transcripts...
*(Declaring it was illegal for Kenner to posses at MDC -- and*
*He would not become complicit)*

Trial counsel refused to give Kenner trial transcripts during the proceedings, again claiming that it was "*illegal*" for Kenner to have a copy of them while in custody. After trial, Kenner finally received electronic versions of the transcripts for the first (1st) time from attorney Oliveras; *not Kenner's own trial counsel*.   Oliveras confirmed that trial counsel was lying.

The cumulative effect of these errors satisfies both prongs of *Strickland*.   Based on the totality of the evidence presented to the jury, there is a reasonable probability that but for the trial counsel's errors; the result of the trial would have been different.

### Trial Counsel Failed To Take Direction From Kenner
### On Critical Exculpatory And Material Evidence...

Because the attorney is only "a professional advisor and advocate", *Lefcourt v. United States*, 125 F.3d 79, 86 (2d Cir 1997) (quoting in *re Shargel*, 742 F.2d 61, 62-63 (2d Cir 1984)), and because the client maintains control over important aspects of the defense, there is no valid 6th Amendment claim where the "defendant instructed his counsel to pursue a course of action that defendant now complains of." *United States v. Wellington*, 417 F.3d 284, 289 (2d Cir 2005).

116

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

***On the other hand***, explicitly disregarding *specific instructions* from a client may amount to deficient performance; including but not limited to hiring experts, hiring a forensic accountant, interviewing and preparing "professionals" involved in the transactions that were alleged as "concealed", and failing to prepare exculpatory evidence with defendant pre-trial.

- The 7th Circuit – for example – found such deficient performance when an attorney ignored a direct instruction to move to withdraw a guilty plea.   See *Ward v. Jenkins*, 613 F.3d 692, 699 (7th Cir 2010).

## Trial Counsel's Errors Were Not Harmless...

Given the "newly-discovered evidence", specifically including *government-forfeiture-44*, the *Baker disclosures* (*See R33 A*), the Kaiser forgery/fabrication of a Frailes agreement with Privitello (*See Ex. 76* – with pages 3-12 specifically withheld with forgery/fabrication proof), Los Frailes funds stolen by Kaiser from Sconzo (*evidence turned over during forfeiture but received by Galioto on March 20, 2014 [selectively removed from Rule 16 evidence] over a year before trial – Ex. 77 at 15-17*), and the Northern Trust subpoena documents [*See United States v. Gil*, 297 F.3d 93 (2d Cir 2002)], **it was not harmless error** for the trial counsel ***not to*** **investigate**, *not to* delay the proceedings, and *not to* present this exculpatory evidence to the jury.

An objective view of the totality of the evidence (which would now include that newly-discovered evidence), makes it plain that in the absence of trial counsel's investigative and preparation errors -- *at a minimum* -- "there is a reasonable probability that, but for counsel's unprofessional errors, the result... would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, at 694.  "The level of prejudice the [Defendant] need demonstrate lies between prejudice that 'had some conceivable effect' and prejudice that 'more likely than not altered the outcome of the case." *Lindstadt*, 239 F.3d at 204, *quoting Strickland*, 466 U.S. at 693 (*emphasis supplied*). "[T]he reasonable probability standard is not the same as, and should not be confused with, a requirement that a defendant prove by a preponderance of the

117

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

evidence that but for the error things would have been different."   *Wilson v. Mazzuca*, 570 F.3d 490, 507 (2d Cir 2009).

Ultimately, during the trial, when the defendant asked trial counsel repeatedly to explain his failure to put on a defense with discoverable evidence and pro-defendant witnesses, trial counsel could only respond that "*it was the government's burden, and they have not proven their case against you*".   When pushed further by the defendant, considering the volume of provable perjury (pointed out in detail throughout the defendant's Rule 29-33 reconsideration submissions [*Document 668*], and *supra*), trial counsel responded aggressively on multiple occasions that "*you can fire me and put on your own defense, if you like*", effectively taunting the defendant (similar to the 2016 final irreconcilable conflict between the parties original submission of the defendant's Rule 33, after trial counsel was relieved by the court).   However, "a decision not to prepare an adequate defense because a defense lawyer thinks the prosecution's case is weak is not 'strategic'.  It is motivated by the desire to avoid work, not to serve the best interests of the defendant."   *Pavel*, 261 F.3d at 218.

### Clearly Inadequate Representations By Trial Counsel...

Throughout the 3-month trial in the instant case, trial counsel's representation was ineffective during a myriad of unexplainable occurrences.   Trial counsel:

- *Did not* adequately prepare for the trial,
- *Refused* to investigate witnesses favorable to the defense **even though defendant repeatedly requested such** with full contact information provided,
- *Did not* request *Daubert* hearings for the FINRA[42] or signature experts – with clearly insufficient &/or deceptive reasons for their trial appearances and testimony,

---

[42] "As to experts, however, the government must make more formal and complete disclosure pursuant to Fed.R.Crim.P. 16(a)(1)(E), which requires that the government provide "a written summary of testimony that the government intends to use under Rule 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

- *Failed* to challenge critical evidence even though he had the information to do so in the courtroom,
- *Was unable to comprehend* the business transactions at the heart of the fraud allegations,
- *Did not understand* and prepare a defense for the government's theory of prosecution,
- *Did not present* exculpatory evidence available to the defense for impeachment available in the courtroom,
- *Refused to call* witnesses favorable to the defense **even though defendant repeatedly requested such**, and
- Required defendant Kenner to prepare the cross-examination evidence – even though Kenner was full-time incarcerated at MDC Brooklyn throughout the trial (with no visitations by trial counsel on off days).

The collective volume of ineffective assistance of counsel issues pales to the Constitutional demand for the Sixth Amendment's guarantee to effective assistance of counsel.

### Presumption of Prejudice...

Certain types of errors create a presumption of prejudice.  See *United States v. Cronic*, 466 U.S. 648, 662 (1984) ("presumption of prejudice involving representation by ill-prepared, inexperienced attorney in complex white collar crime case[43]).  At a bare minimum:

---

trial...[including] the witnesses' opinions, the bases and reasons for those opinions, and the witnesses' qualifications." *United States v. Kaminski*, 1998 WL 275594 (NDNY 1998) (alterations in original).
- ***None of this was presented to the Court or the defendants.***
  - ***Trial counsel never requested it.***

- ***The government tried to convict Kenner on "negligence standard" instead of an "intentional standard".***

[43] After the court received Kenner's attorney termination letter in 2016 to terminate trial counsel's inadequate and abusive services -- for the first time – trial counsel proffered that he had plenty of white-collar experience – ***BECAUSE – he had negotiated a number of white collar plea deals during his legal career.***

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

- Trial counsel failed to delay trial (or at least request it) until the crucial Northern Trust Bank subpoena was received and reviewed properly with Kenner) (*Tr.9*).   See also *United States v. Gil*, 297 F.3d 93 (2d Cir 2002).

  - o Kenner had previously alerted trial counsel that the government had a Northern Trust subpoena from October 2009, and thus the government was 100% aware of the _crucial_ documents.  The government never turned them over pre-trial (a.k.a. *Brady* violation). Kenner confirmed it thru Michael Peca's text, as follows:



| 10293 | +17163743234 Michael Peca* | 10/16/2009 1:42:01 PM(UTC+0) | Read | **Were you aware that a subpoena was issued for the NT acct? Just got a letter from NT today.** |
|---|---|---|---|---|

- As the court is deftly aware – Northern Trust Bank would have sent a duplicate copy of the subpoena records to Michael Peca and all of the Northern Trust LOC clients as a result of the 2009 FBI subpoena.

- Thus – in October 2009, Michael Peca (and all the LOC clients) would have received another full copy of their LOC materials – directly from Northern Trust Bank.   Kristen Peca claimed she did not have access to them during trial – corroborating her 2012 FBI recording when Kenner told her to "*trace it, trace it all*".
  - Obviously Kristen Peca and the government fooled an underprepared trial counsel – who with adequate preparation would have debunked another government false theory – and addressed the 2009 FBI subpoena with evidence in hand.   ***Trial counsel failed again***.

---

- *Pre-trial, trial counsel had repeatedly boasted to Kenner that he was an experienced trial litigator in white-collar cases during his self-promoted illustrious career.   **It was clearly another lie…***

The court knows clearly that relatively zero experience, and practically no white-collar knowledge is necessary to negotiate a plea deal in the criminal justice system; under the "*take-it-or-leave-it*" demands of the U.S. Attorneys office offers.

Regardless – there is no plea deal negotiations that would mitigate the "inexperienced" title and replace it with "adequate" under any 6th amendment standard.

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

- o The government ruse extended to a breech of ethics with the court as well, again unchecked for their malfeasance – *but thoroughly providing harm to Kenner -- with ineffective counsel.*

- Trial counsel failed to interview Northern Trust Bankers pre-trial to confirm their direct contacts with their LOC clients – full transparency.

- Trial counsel failed to call Northern Trust Bankers as trial witnesses for the defense to confirm all of the documents in the Northern Trust subpoena and their unfettered communication with them – specifically the independent confirmations to seize the LOC collateral in April 2009 (days before the actual due dates).
  - o It would have debunked AUSA Komatireddy calling Kenner "*insane*" during her rebuttal summation (*Tr.5998*) about the individual investors' independent agreements to authorize the seizure of their LOC collateral.

- Trial counsel failed to call Eufora investor attorney Stolper to confirm his vetting of the private sales and knowledge per his July 2010 letter to his clients (*See Ex. 1*) -- *and confirming their unfettered access to independent counsel.*

- Trial counsel failed to call Arizona attorney Tom Baker to recover the Little Isle 4 disclosures signed and initialed by all of the Hawai'i partners (Little Isle 4 members) – *and confirm their unfettered access to independent counsel and knowledge of the Jowdy loans – without complaints* (*See Ex. 3*).

An attorney's health problems can affect the outcome of a trial and can be so varied in their effect that they "are best suited to the fact-specific prejudice inquiry mandated by *Strickland*." *Bellamy v. Cogdell*, 974 F.2d 302, 308 (2d Cir 1992) (en banc) ("refusing to enlarge list of situations where per se ineffectiveness will be found"). At a minimum:

- Trial counsel admitted during CORRLINKS email communication with Kenner during trial that he increased his nightly drinking during the trial to at least one (1) bottle of wine to cope with the trial stress. He confirmed via CORRLINKS email that his wife had noticed his difference in his drinking and behaviors during trial.

121

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

## Irreconcilable Differences Occurred Between Trial Counsel And Kenner Throughout Kenner's Direct-Testimony...

Trial counsel threatened Kenner that if he did not authenticate the Home Depot recording, he would withdraw from the case and then he could become a government witness – *just like Constantine's attorney was terrified of after authorizing his client to communicate with Kenner during trial.* Trial counsel threatened Kenner that he would assist the government with anything he needed to in order to convict Kenner.

- o *Trial counsel was adamant that "he promised" the U.S. Attorneys he would admit the Home depot tape during Kenner's defense case – and "he" was not going to get egg on his face.*

- o After Kenner's testimony (not in front of the jury) that he recalled portions of the conversation in different orders, trial counsel berated Kenner that if Kenner would not authenticate the 26 minutes audio, he would (again) "*mail it in*", referring to insufficient representation for the remainder of the trial.

- o Trial counsel claimed the government would put Kenner "*in jail for life*" if Kenner would not authenticate the Home Depot recording – and trial counsel would see to it.
  - o Trial counsel failed to argue at any point during trial or summation that "<u>nothing unknown to the investors and their attorneys was disclosed during the Constantine rant on Home Depot the recording</u>" that Constantine had not already conveyed to the investors' attorney (Stolper) prior to the Home Depot recording; by letter and conference call.[44]

---

[44] Kenner recorded the impromptu meeting between Kenner and Constantine – ***after*** Constantine's attorney had "outed" Gaarn for alleged "illegal stock sales" thru letter communication. Attorney Stolper responded to the Constantine allegations via letter to all of his Eufora clients (*See Ex. 1*). **Twenty-seven** (27) Eufora clients of Stolper's **signed off** on the exculpatory letter disclosure (*See Ex. 1 at 9-18*).

Weeks later and <u>*before*</u> the infamous Home Depot recording, Constantine held a conference call for the Eufora investors. Constantine reiterated his false allegations to the investors, Kenner **and their attorneys**.

Kenner hi-lighted the false Constantine allegations immediately from the conference call to **Attorney Stolper** as follows:

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

| 18271 | 1917626 1175 Michael Stolper* | 8/18/2010 8:09:12 PM(UTC+0) | S e n t | **Tommy has the Kenner gave Gaarn stock as an illegal transfer issue on the table. He's threatening with law enforcement to go after us** |
|---|---|---|---|---|

Reply from **Stolper**:

| 15750 | 1917626 1175 Michael Stolper* | 8/18/2010 8:10:45 PM(UTC+0) | R e a d | **Predictable** |
|---|---|---|---|---|

Then – Constantine made another immediate and unfounded allegation about the Gaarn private stock sales.   Kenner passed the information along to the investors' attorney Stolper again, as follows:

| 18272 | 1917626 1175 Michael Stolper* | 8/18/2010 8:10:37 PM(UTC+0) | S e n t | **He just threatened law enforcement involvement to settle the issue with the Kenner/Gaarn transfer!** |
|---|---|---|---|---|

And **Stolper** again responded:

| 15751 | 1917626 1175 Michael Stolper* | 8/18/2010 8:12:24 PM(UTC+0) | R e a d | **Hopefully recorded**. |
|---|---|---|---|---|

Kenner sent the following text to **Bryan Berard** who was in the conference call meeting face-to-face with Constantine about the private stock sale allegations – further hi-lighting the Constantine cover-up nonsense:

| 18273 | +14015246 929 Bryan Berard* | 8/18/20 10 8:11:23 PM(UT C+0) | S e n t | **Ask how Constantine thinks the Gaarn transfer affected the company...if at all?** |
|---|---|---|---|---|

**Michael Peca** even acknowledged the "*allegations*" to Kenner about the private stock sales as follows the next day:

| 15796 | +1716374 3234 Michael Peca* | 8/19/2010 2:40:01 PM(UTC +0) | R e a d | **I will later. Hopefully everyone can get together to put the allegations to rest. There are bad ones going both ways.** |
|---|---|---|---|---|

After the issues Constantine ranted about to Kenner on the Home Depot recording, Kenner immediately sent the recording to the attorney (Stolper) for the investors – ***concealing nothing***. *Transparency by Kenner cannot be challenged by any standard*.   Nevertheless, trial counsel abused Kenner and created an unreasonable ultimatum – going so far as to refuse

123

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

### Witness Testimony Was Weak At Best And Wholly Inconsistent With 100% Of The Pre-Trial Empirical Evidence...

#### *"I can only remember specifically what I was not told"*

Each of the government witnesses also suggested in the face of the empirical evidence, that they could "**only remember, not being told about specific events**".

But – they could not describe the date, time, duration, &/or content of the critical meetings they claimed remembering, which supported the government theories, when they "specifically remember they were *not* being told disclosure items by the defendant" that are actually in evidence and signed by them.

- The difficulty in comprehending the mind-twister is commensurate with the nonsense the government witnesses claimed – unknowingly supporting the fabricated prosecutorial "concealment" theories – not simply "*failed memory tests*".

### The Government's Original Defense To The Gross "Inconsistent Statements" By Their Witnesses – Or Confabulation[45] -- Was Never Defended As The Truth...
#### *(Only appearing as synchronized "failed memory tests")*

When Kenner exposed the gross, witness perjury in the defendant's original Rule 33 "notes" submission thru empirical evidence trial counsel *refused* to admit due to a lack of investigative effort and adequate preparations -- the government replied that

---

to visit Kenner (per Kenner's Thursday courthouse request) over the weekend at MDC Brooklyn.
- *Under any adequate effectiveness standard, trial counsel should have met with Kenner at MDC Brooklyn with Kenner actively giving testimony in his defense case.* ***Trial counsel refused under every auspice to meet an adequate measure of effective counsel.***

[45] It should be noted that **confabulation** occurs most often in patients with brain disorders (i.e. Alzheimer's and **CTE**).   The main attribute is that sufferers remember being and doing things when they *did not really happening*.   The patients need to convince themselves that they are really strong mentally to cope -- and this illusionary technique, which occurs from the mis-functioning brain, allows them to believe they are alright and healthy mentally – *when they are clearly not...*

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

the alleged perjury was merely based on ***faulty memory, confusion and mistakes***; also known as <u>unreliable hearsay</u>.   Yet, the government, with their weak evidence (now proven utterly false by the defendant – and significant post-trial "new evidence" submissions by the government during forfeiture hearings)[46] wants the Court to ignore the exposed "factual inaccuracies" in their prosecutorial proffers and theories and uphold a tainted verdict, lacking confidence.

### ***Faulty Memory, Confusion And Mistakes...***

As further demonstrated post-trial, the government's defense to the original Kenner Rule 33 allegations of perjury was *faulty memory, confusion and mistakes*; *United States v. Dunnigan*, 507 U.S. 87, 94 (1993); yet -- **never the truth**!   As a result, the prosecution theory of "concealment" would have failed before the Court – and the witness testimony would have been simply deemed a "*failed memory test*"...commensurate with the Court's Memorandum and Order representations.

---

[46] *Government-forfeiture-36* confirmed that 100% of the Kenner Baja Ventures 2006 capital account funding was derived exclusively from Kenner's two (2) partners **"untainted"** funds. In fact – *government-forfeiture-36* further exposed the FBI cover-up of the twenty (20) years of Ken Jowdy criminal thefts from Kenner and Kenner investors.   The government confirmed that Kenner's partners – *per the government's own accounting* – wired $4.1 million to Jowdy – and Jowdy only registered $2.5 million in the Baja Ventures 2006 capital account.

- *Jowdy was sued for the $1.6 million difference in Mexico – and <u>utilized John Kaiser's "forgery" perjury</u> to get the criminal case dismissed against him (once he hired Kaiser in 2012).*

*Government-forfeiture-44* confirmed that Jowdy **received** 100% of the funds Kenner testified to at trial came from the 2004 Hawai'i-Jowdy loan – *and documented them as "loans"*.   It contradicted the government's slander during trial that Kenner **"stole"** the *government-forfeiture-44* funds and used them surreptitiously to buy his equity in Cabo. The government called Kenner's "now-proven" truths "*bogus*" (*Tr.5708 (2x), 5709*), "*phony*" (*Tr.4597, 4598*) and "*supposed*" (*Tr.5707-5708*) -- during their attacks on Kenner's veracity during trial.

- <u>**At all times – the government knew the loans were authentic**</u> (based on Jowdy's own 2010 FBI proffer to FBI agent Galioto (*See Ex. 2 [3500-KJ-2] at 11-14*) – yet **they lied to the jury and Court anyhow to seek conviction thru unscrupulous means; *unless conviction was their goal, not justice*.**
  - o Both of these reformative "new evidence" issues have remained unanswered by the government and the Court to date.

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

- The government's main trial theme of defendant concealment from the Hawai'i investors would have been quashed before it began at trial; moreover -- *because there was no theft*.

### How Does A Lack Of Contact To The "Involved" Professionals Constitute Any "Trial Strategy" In The Face Of A "Concealment" Prosecution?...

In the instant case, trial counsel made numerous inexcusable errors; primarily in his lack of trial preparations related to a case deemed "complex" by the court long before trial -- and prosecuted based on the theory of "concealment" by the defendant. No realistic defense strategy could be based in good faith to "not contact the 'other' professionals" involved in the myriad of transactions alleged as "concealed" and criminal, when they were all readily accessible as public individuals.

> "Notwithstanding these [*Strickland*] obstacles, if certain omissions cannot be explained convincingly as resulting from a sound trial strategy, but instead arose from oversight, carelessness, ineptitude, or laziness, [the reviewing court] would find the quality of representation sufficiently deficient to grant the writ." *Eze v. Senkowski*, 321 F.3d 110, 112 (2d Cir 2003).

### Spillover Prejudice...

**Newly-discovered evidence**, *supra*, which may result in the reversal of a conviction of less than all of the counts of conviction, requires a reviewing court to consider whether the rest of the trial was sufficiently tainted to have prejudiced the jury as to the remaining counts. [A] court that overturns fewer than all criminal counts must consider the spillover effect on the remaining counts." *Lindstadt*, 239 F.3d at 205; *see also United States v. Morales*, 185 F.3d 74, 82 (2d Cir 1999). The Second Circuit has referred to the dismissal of some but not all of the offenses of conviction as "retroactive misjoinder". *United States v. Jones*, 482 F.3d 60, 78 (2d Cir 2006) ("retroactive misjoinder refers to circumstances in which the joinder of multiple counts was proper initially, but later developments – such as a district court's dismissal of some counts for lack of evidence or an appellate court's reversal of less than all convictions – render the initial joinder improper." (internal quotations

126

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

marks and brackets omitted).   A court must then determine whether the prejudicial spillover from evidence introduced in support of the dismissed or reversed counts requires the remaining convictions to be upset.  *Jelinek v. Costello*, 247 F. Supp. 2d 212, 276 (EDNY 2003), (*citing United States v. Rooney*, 37 F.3d 847, 855 (2d Cir 1994)).   In assessing the "spillover effect" on the remaining counts, reviewing courts consider "whether the **totality of the circumstances** requires reversal of some or all of the remaining counts."  *United States v. Wapnick*, 60, F.3d 948, 953 (2d Cir 1995) (quotations omitted) (*emphasis supplied*).

Three factors guide the inquiry on impermissible spillover:

1) Whether the evidence on the vacated counts was inflammatory and tended to incite or arouse the jury to convict the defendant on the remaining counts;

2) Whether the evidence on the vacated counts was similar to or distinct from that required to prove the remaining counts; and

3) The strength of the government's case on the remaining counts.

*United States v. Naimen*, 211 F.3d 40, 50 (2d Cir 2000); *Lindstadt*, 239 F.3d at 205; *Gersten v. Senkowski*, 426 F.3d at 614.

### **Spillover Prejudice Occurred Here...**

- *The GSF object of the charged conspiracy(s) proved to have no concealment or diversions from Constantine – per the Gonchar "side-deal" the government knew at all times prior to trial...*

The ten (10) plus government witnesses who painstakingly confirmed transactions from the Constantine-GSF proceeds to the Constantine-expenses (approved by Gonchar with Gonchar's own money – *Tr.4826-4827*) wore down an already beleaguered jury and court.  Weeks earlier – the court admonished the defense's cross-examination of a crucial government witness as (*Tr.1385*):

> *Your client is entitled to a fair trial. He's not entitled to an endless trial, okay. And that's what we're having right now, we're having an endless trial. He's*

127

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

*been on the stand for three days. This does not relate to any of the issues in this case. I can't let this go on endlessly.*

Clearly – both defense counsels were weary of more court reprimands – when it was clear that the government's misconduct led to the unnecessarily extended trial.

The government complimented the non-criminal expenditures in the GSF by asking each of the government witness contributors (to the Constantine-GSF) if they were aware of transactions "*that had nothing to do with them*".

- *A simple co-defendant meeting pre-trial* would have flushed out this nonsense and prepared trial counsel to object to all of the uninvolved witnesses.
- *Hiring a forensic accountant* would have created trial exhibits that proved only the Constantine-Gonchar "side deal" funds were used "legally" by Constantine to pay his personal bills (altogether unrelated to the GSF) – *regardless if the Kenner investors were aware of something irrelevant to them*.
- *The lack of preparedness* led to full spillover prejudice considering the GSF witnesses consumed far greater than 50% of the entire trial time.

### Privitello allegations with ZERO supporting evidence against Kenner…
*(Counts 5 and 6)*

- *Trial counsel refused to discuss a pre-trial submission to dismiss the charges for an utter lack of evidence (as the jury ultimately believed).*

The government theory that Kenner and Constantine conspired to defraud Privitello during his December 2009 Eufora purchases was absent of any participation by Kenner (in evidence) – or the three (3) civil trials filed against Constantine for the same issues (never Kenner).   To fabricate alleged conspiratorial evidence, with a clearly scared and underprepared (perhaps because of the FBI warnings pre-trial – *See Ex. 3*), trial counsel was unable to refute Kenner's November 2009 texts to Constantine about a deposition involving former Kenner employee, **Nick James** – while the government conflated the texts as the sole corroborating evidence that Kenner and Constantine were going to dupe Privitello – and hi-lighted during the government's summation.

128

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

[Kenner text reply to Constantine during a deposition involving **Nick James**– hi-lighted]:

| 124 80 | +16023635676 Tommy Constantine* | 11/13/2009 8:25:27 PM(UTC+0) | Sent | I'll yell MetaBank as I kick nick in the balls. |
|---|---|---|---|---|

- The government disregarded the fact that no communication between Constantine, Privitello and Kaiser was documented to occur *until weeks later (never including Kenner).*

Now -- the Government grandstanded on the simple fact that "*this text*" was the "*smoking gun of corroboration*" that Kenner and Constantine was ready and willing to allegedly abuse Privitello and his Eufora investment money.

AUSA Komatireddy identified it specifically during her rebuttal summation (fully knowing that the defense could not refute the wickedness of her calculated false claim) (*Tr.5961*):

> "*Mr. Privitello testified that it was Kenner who told him about Metabank. Now, there is no reason to think that Mr. Privitello saw that text message that explicitly said Metabank. That is a text message between Kenner and Constantine. There is no reason to think that he was tailoring his testimony, but his testimony is corroborated by that text message.*

**The jury acquitted the defendant Kenner** – but the egregious known falsities (un-objected by ineffective trial counsel) left the jury weary and beaten that "something" must be wrong after a three (3) month trial by a government beyond reproach (even if it was not the Privitello overt charges.

### More spillover based on known-false allegations...
*(Counts 2, 3 and 4)*

Michiewicz confirmed that Counts 2, 3 and 4 were based on the fact that John Kaiser alleged he was still owned millions of dollars from a joint project with the defendant in California, from two (2) years prior (*Tr.1020-1021*).

- *It was untrue based on Kenner and Kaiser's banking records (in evidence) – and the government knew it at all times.*

129

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

Again -- contradicting Michiewicz' proffer to the Court, Kaiser was fully repaid "both" from the 2007 California project (*See Ex. 6*) with Kenner -- and the 2005-06 Hawai'i investment/loan (despite Kaiser's perjury to the contradiction – *See Ex. 5*).

- The government had the banking records to disprove their charges – and Kaiser was their star-witness for years.  Thus -- **there is little question that they jointly fabricated the claims**.   Simple trial counsel discussions with Kenner pre-trial would have exposed the government-Kaiser frauds.
  - *No meeting of substance occurred despite Kenner's demands, specifically related to Kaiser* (*See Ex. 3b*).

Adequate investigation by the trial counsel – even without the use of a forensic accountant -- would have proven without doubt thru the production of John Kaiser's and Kenner's bank records -- and related project accounts to the jury -- that **Kaiser** was "more" than fully repaid by both projects.   The bank records would have proven that Kaiser actually **owed Kenner** substantial funds by 2009 (into the millions of dollars).

### Rule 29 Opportunities Missed During Trial Thru Trial Counsel Negligence...

- *With a full panoply of <u>available</u> pro-defense witnesses and pro-defense evidence (thru proper preparedness) – a myriad of insufficiency of evidence attacks were available.*

### Lack Of Investigative Efforts Led To Full Prejudice And Harm Based On Ineffective Counsel's Unpreparedness...

The presentation by trial counsel of 1) the underlying *government-forfeiture-44* information, 2) the underlying *government-forfeiture-36* information, 3) the *Baker disclosures*, 4) the Northern Trust subpoena materials, 5) the Kaiser fabrications and thefts (hidden thru *Brady* violations), 6) the testimony of NY Attorney Stolper to verify his knowledge of the Eufora 2008-09 private sales (and the underlying investigative non-issues)...amongst other issues discussed *supra*, would have thwarted any remaining belief in "concealment" by the defendant.  Thus, it would

130

have rendering the conspiracy charges insufficient (certainly clarifying Rule 29 claims of prejudicial variance &/or constructive amendment)[47].

Based on the prosecutorial strategy to grossly intertwine the entire superseding indictment claims, making each object theory inter-dependent on the others, the failure of one (1) prosecutorial pillar (specifically based on the non-production of pro-defendant witnesses and available evidence, with simple preparation and investigation by trial counsel) would have buckled the government's foundationless "house-of-cards".   The government's concealment claims of *fake Jowdy loans (as*

---

[47] **Trial counsel's lack of preparation lead to a failed Rule 29 submission opportunity after the government rested their case-in-chief...**

Not withstanding government witness Tim Gaarn's denial of involvement in a conspiracy with Kenner and the Eufora private stock sales (altering the co-conspirator charges in the Superseding indictment) (*Tr.2563-2564*), with the evidence, *supra* -- the defendants would have shown that the trial evidence or jury instructions "so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the Grand Jury's Indictment."   *United States v. Rigas*, 490 F.3d 208, 227 (2nd Cir – 2007) (internal quotation marks omitted).

As the Court knows, when a defendant has claimed that he was convicted of a crime other than the crime alleged in the Indictment, the Court has distinguished between a "constructive amendment" of an indictment – when the terms of the indictment were effectively modified by the presentation of evidence or by actions of the Court so that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the Indictment," *United States v. Delano*, 55 F.3d 720, 729 (2nd Cir. – 1995) (quoting *United States v. Mollica*, 849 F.2d 723, 729 (2nd Cir – 1988)) (internal quotations marks omitted) – and a "prejudicial variance" – "when the charging terms of the Indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the Indictment," *United States v. Frank*, 156 F.3d 332, 338 n.5 (2d Cir – 1997)(quoting *United States v. Zingaro*, 858 F.2d 94, 98 (2d Cir – 1988).

A constructive amendment is a per se violation of the Grand Jury clause of the Constitution, which requires reversal.  See *Rigas* at 226.  By contrast, a variance "occurs when the charging terms of the Indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the Indictment."  *Id*. (internal quotation omitted).
- *Trial counsel's utter lack of pre-trial investigations and presentation of evidence at trial fully prejudiced Kenner's defense on the merits of the empirical evidence -- and discriminated against plausible trial and appeal arguments afforded to the defense.*

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

*"bogus", "phony" and "supposed")*, has been disproven by the government's own production post-trial of *government-forfeiture-44.*

- Post trial – both the government and trial counsel "***remained silent***" with this outrageous "*new evidence*" presented thru the government's forfeiture attorneys – for the first time...

Simply summarized, the government's evidence overall would have been severely undermined and been drastically "thinner" with the introduction of *government-forfeiture-44* (or its underlying-confirming information) during trial, contradicting the basis for the prosecutorial allegations of "fake loans" and the years of alleged concealment that followed.   With the *government-forfeiture-44* confirmations of the Hawai'i Jowdy loan's veracity, the remainder of the conspiratorial theories would have failed.  The GSF conspiracy also failed on takeoff with the government-known Gonchar "side-deal".  Nevertheless – the government paraded of over a dozen useless witnesses to claim they received money from Constantine for unrelated personal expenses.  So what?   So stipulated – and confirmed as "legit" thru the Constantine-Gonchar "side deal".   Their independent business had nothing to do with Constantine's GSF distributions (100% under his control and stipulated during trial).  *The government needed the morass to overwhelm the jury once again.*

- ***Perhaps – they succeeded (without the presence of a crime) if that is what a confused and beleaguered jury based any part of their conspiratorial conviction...***

Then -- the government's concealment claims of *LOC clients unaware of their specific "use of funds"* would have been quashed with the Northern Trust Bank subpoena (*See full Northern Trust subpoena, including but not limited to Ex. 7, Ex. 8, Ex. 10, Ex. 12-16, and Ex. 18-23*).

Then -- the government's concealment claims of the *Eufora Private sales* would have been quashed by the simple production of alleged victim's attorney.  **Michael Stolper would have verified** the breadth of his 2010 Eufora investigation with Rudy Giuliani's partner, Eric Hatzimemos and ex-CIA Agent Oliver Libby.  **Stolper**

132

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

**would have verified** his open communication of the private stock sales vetting via letter (*See Ex. 1*) **with signed acknowledgments** (by the alleged victims).   **Stolper would have verified** his text communication with Kenner, *infra*, hi-lighting by Kenner the Constantine allegations with the private sale purchasers on a conference call (*See Kenner Rule 33 submission -- EDNY – Kaiser, Berard & Jowdy related issues at 175-180*).   **Stolper would have verified** Kenner's communication specifically related to hi-lighting the private sales for further transparency between Kenner and the Eufora plaintiffs attorney, Stolper, as follows:

*[August 18, 2010 – during the Constantine-led Eufora conference call]:*
> *Kenner* -- Tommy has the Kenner gave Gaarn stock as an illegal transfer issue on the table. He's threatening with law enforcement to go after us

> *Stolper* **-- Predictable**

> *Kenner* – He just threatened law enforcement involvement to settle the issue with the Kenner/Gaarn transfer!

> *Stolper* **-- Hopefully recorded.**

Then -- trial counsel would have been able to elicit from Eufora investors' attorney Stolper that he and his investigative team were able to excuse (after thorough discussions with **his** clients who purchased the 2008-09 private stock from Constantine and Gaarn) any wrongdoings (as alleged by the government in 2015). **Stolper would have verified** the government allegations were five (5) years after the conclusion of his specific investigations and stock sale vetting by his team for the government's now-alleged victims.

- Trial counsel complemented the error of not calling the Eufora investors' attorney (Stolper) by *not objecting* each time the government asked alleged victims if they knew they were buying private stock from the defendant (Kenner).   This was beyond prejudicial, since Kenner *did not own* any registered stock with Eufora in 2008-09, nor did Kenner sell it -- and the government blatantly overlooked "the facts" and misrepresented them to frame their conspiracies (*Tr.5971, 5974 – rebuttal summation regurgitating false and misleading direct questions of Sydor and Rucchin*).

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

### **Trial Counsel's Forensic Accounting Failures Have Perpetuated Into The Fabricated Government Forfeiture Ruse...**
*(Forfeiture without "nexus")*

- *Trial counsel's failure has allowed another false narrative to persist...*

After five (5) years as Ken Jowdy's Mexico co-conspirator (2012-2017), John Kaiser re-confirmed the false FBI (Galioto) narrative to this EDNY court (*Document 628 at 1*).   Jowdy's co-conspirator from 2012-2017 confirmed the FBI cover-up and hoax in his February 2019 submission stating (*Document 628 at 1*):

> *"Jowdy would like the Court to think that Kenner stole $7 million from the Hockey Players..."*

This perpetuated lie has further misled the Kenner investors (CSL Properties 2006, LLC) to protect Jowdy.   It disregards that the underreported truths that Ken Jowdy's cabal and the real money flow have been exposed by Kenner (*See Document 667*), all while under draconian work-conditions at MDC Brooklyn.

- Yet – while Kenner <u>has been able to verify</u> 100% of the cover-ups (by someone) -- and specific lies to the court and investors... **the FBI could not?...**

Trial counsel's own forensic accountant, *at a minimum*, would have been able to produce an identical accounting verification to *government-forfeiture-36* – which confirms that Kenner's investment partners (in Baja Ventures 2006) wired $4.1 million to Ken Jowdy for the Baja Ventures 2006 capital account and the Diamante Cabo san Lucas closing.

- ***If handled like adequate counsel should have – the government would not have been able to tell six (6) unchallenged LIES during summation that Kenner "stole" money from his investors to "buy his piece of that resort in Mexico".***
  - ***Trial counsel clearly failed and prejudiced Kenner...***

Each Hawai'i-Mexico investor could have been shown the contents of a readily prepared information equivalent to *government-forfeiture-36* during cross-

134

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

examination -- and realized first-hand in court with the jury present that "**Kenner did not steal any of the Hawai'i-Mexico money**" – *contradicting what they had been told by Galioto, Jowdy's attorneys, Kaiser and Berard for years and years* – *to turn support away from Kenner's collection efforts for the investors and towards supporting Jowdy by calculated artifice (See January 28, 2019 CSL Properties letter to the Court – Filed February 1, 2019).*

The witnesses' honest reactions would have proven priceless...but an underprepared trial counsel failed again.

- *100% of the Kenner-Baja Ventures 2006 funds were "untainted".*
  - o *The government is still trying to ignore their-own accounting, supra, and seize the clean – and untainted Baja Ventures 2006 property...*

Simple accounting in a white-collar theft and concealment case (although utterly obvious from the onset) would have prevented any post-trial nonsense and forfeiture demands by the AUSA forfeiture team that "somehow" the $4.1 million is from "ill-gotten" gains.[48]

- *Clearly it is not.*

## 100% Of The Banking Records Confirm That
## Kenner Stole ZERO Dollars...

But – the FBI case agent and Jowdy's cabal have perpetrated this *lie* since Kenner's June 2009 proffer *to all of Kenner's former investors* -- and any other party that is

---

[48] **Baja Ventures 2006, LLC** partners transferred to Jowdy $4.1 million documented "**clean and untainted**" investment funds in 2005.
- It *also* raises clear **Eighth Amendment Excessive Fines Clause issues** that the government cannot overcome.

The government's-own accounting (*government-forfeiture-36*) confirms the Baja Ventures 2006 capital account is 100% "**untainted funds**" of $4.1 million; notwithstanding what Jowdy did with the money after his, individual, receipt and sole control of the equity investment funds, *while Jowdy embezzled $1.6 million from the Baja Ventures 2006 capital accounts for his-own benefit* (in evidence).

135

involved in the Jowdy universe[49]; **when the truth is that Jowdy got it all -- and stole it**, *supra and infra.*

### FBI Agent Galioto's Ruse On The Court And Investors...
*(Corroborated by Diamante investors)*

Each of the investors were told by FBI agent Galioto, John Kaiser, Bryan Berard and Ken Jowdy attorneys pre-trial that the FBI had *traced* the alleged stolen funds *to Kenner*, and they would be returned to the investors upon a Kenner conviction from Kenner's accounts.   Kristen Peca confirmed this to Kenner during her 2012 FBI recordings[50].

---

[49] The head of the Diamante Cabo san Lucas home owners' association, Diamante Doce, LLC (Marc Wolinsky) verified on May 14, 2014 to the EDNY court that Jowdy's press release – agreed to by the unknowing Kenner investors (CSL Properties, LLC) – **WAS SUPPORTED BY THE FBI false narrative – and verified some "false-truths" (now all proven 100% false by Kenner's submissions to the court – and ignored by the government and FBI).**

It confirmed what this court knows as false...**and if not,** *See Document 667* with tens of millions of dollars of criminal activity by Jowdy and his well-documented cabal – with the exact same evidence the government and the FBI (Galioto) *ignored* to frame Kenner for the funds that Jowdy stole:

> [Wolinsky]: "...*if you Google the property like I did before I purchased, I would have seen that Mr. Kenner originally filed a lawsuit against Mr. Jowdy accusing him of fraud – that lawsuit was dismissed.  The government indicted Mr. Kenner, and* **Mr. Kenner turned out to have snuckered the hockey players into wrongly suing Mr. Jowdy.**"

The investors were not "*snuckered by Kenner*" based on Jowdy's-own well-hidden FBI confessions from the investors and the public at-large (*See Ex. 2 [3500-KJ-2] at 11-14*) and *Document 667.*

- FBI agent Galioto continues to mislead all interest parties including the court -- **because** the *real* government's evidence confirms that:

### Jowdy "*snuckered*" everyone!!

[50] **Trial counsel** had the following available for trial -- and again -- refused to impeach Kristen Peca – or set the record straight.   Trial counsel claimed he did not want to be seen as beating up the lies of a woman who seemed upset about her money in front of the jury.
- **It** *cannot* **be a reasonable trial strategy to let perjured statements from any government witness stand in the face of empirical evidence –** *under any strategy.*

[Kristen Peca and Kenner – at 40.45 of 2.40.31 recording]:

_____

*Kristen Peca – Why is Galioto in on it?*

*Kenner –Former FBI Director, Louis Freeh is Jowdy's attorney –*

*Kristen Peca – Oooooh!...*

*Kenner – I have the bank records that prove Jowdy stole all of the investment from us…*

[Kristen Peca & Kenner – at 1.32.30 of 1.34.50]:
*Kristen Peca – According to Bryan [Berard] -- Jowdy is paying our money back as soon as the problem with you is handled.*

[Kristen Peca & Kenner – at 2.11.40 of 2.40.31]:
*Kenner – What I can tell you is that you guys signed 5 or 6 annual renewals on that deal, and the only reason we are having this conversation, Kristen, the only reason, is because Ken Jowdy defrauded us and didn't pay us the money back.  And the guys from Lehman Brothers helped Alan Worden not pay us the $4mm (MILESTONES). That's nine and a half million dollars ($9.5mm) that should have been paid back to the group in Hawai'i, which is far in excess…*

*Kristen Peca – I understand that explanation.  I do.  But, if renewals had to be signed, **which I don't remember signing them**, **maybe Michael did**, **maybe you did as Power of Attorney**, obviously…*

*Kenner -- **Nope, I never did as Power of Attorney**.  **You guys signed them all**.*

*Kristen Peca – **OK.  Well, if we had to sign them, which I do not remember doing**, I'm not saying we didn't, we signed a ton of papers for you…*

[Kristen Peca & Kenner – at 13.16 of 22.50]:
*Kristen Peca – Matt told Michael and I that you stole all of the Hawai'i money and never gave it – the loan money -- to…uhhhh…Jowdy.*

*Kenner – Kristen – I have all of the bank records that prove the money went to Jowdy and his accounts at all times.  I told you that already. You told me that you saw the bank records after I sent them to Michael.  You know -- the attorneys who sued Jowdy for the money in Mexico and Arizona and California used them to confirm the loans before we sued?*

*Kristen Peca – but – I don't understand why he would say it.*

*Kenner – well – Kristen – do you know who represents Jowdy versus all of us?*

*Kristen Peca – you mean in the thing with Ron Richards?*

*Kenner – I mean everything…*

*Kristen Peca – no -- who?*

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

---

*Kenner* – Louis Freeh – the former director of the FBI – I already told you and Michael that also -- matt's prior boss – he was one of the 9 FBI directors in the history of America – the most powerful law enforcement officer in the United States...that's who...

*Kristen Peca* – well – why does Jowdy get him and he doesn't help us if he knows it is wrong.   The FBI is supposed to help us since we cant get our money back from Jowdy.

*Kenner* – who told you I got it?

*Kristen Peca* – matt -- the guy from the FBI.   Bryan and the cop guy –

*Kenner* -- John –

*Kristen Peca* – Yeah

*Kenner* – Kaiser?

*Kristen Peca* – yeah...yeah -- and he also told me at my house when they said you burned down some girls home in Hawai'i and what's it called...

*Kenner* – arson...?

*Kristen Peca* – yeah – and when you forged checks from her account and she caught you with the police...they said...

*Kenner* – then why am I not arrested for arson?

*Kristen Peca* – I never thought of that.

*Kenner* – Wait...wait – I never forged anyone's checks.   I did not hear that part from Greg [deVries].   And then why am I not arrested for just plainly stealing the funds from Hawai'i with them showing you my bank accounts – or her forged checks – or the arson bull shit?

*Kristen Peca* – that big hockey player – Greg you said -- was there at my house when Bryan and John said those things.   Matt said the investigation meant that they can't show us because it is something to do with the FBI rules...

*Kenner* – and I was...

*Kristen Peca* – and Michael and I should trust the FBI because they are helping us straighten out your lies about Jowdy.

*Kenner* – well – I was confused why they have the Jowdy company and personal bank records I told them about in 2009 with tens of millions of thefts by Jowdy and his people from us and they wont look at those?

138

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

*Kristen Peca* – I – uhhhh...I...

*Kenner* – ...why did Matt say he cancelled my Grand Jury appearance in 2009 when I would have told a Grand Jury all of this and then the courts – not matt – could have decided if there was a crime after Jowdy stole over ten million from us with his bank records to prove it and not my words?

*Kristen Peca* – matt said you didn't show up and that they could not find you.

*Kenner* – find me?  Matt also cancelled the FBI interviews with Michael and the other investors that I arranged with Ron [Richards].

*Kristen Peca* – find you to make you testify...he said that -- like you just blew them off.

*Kenner* – you know that the US Marshalls would have had an arrest warrant out for me immediately and I would have been arrested some time in the last 3 years?   I have not been hiding anywhere.

*Kristen Peca* – I don't know...I don't...uhhhh – they cant lie to me – because he is from the FBI...now I know – I don't know – I am confused by all of this.   We gave Jowdy money from whenever Michael told me about it and we want our money back for Hawai'i like we sued.   Didn't we...

*Kenner* – yes – yes we...

*Kristen Peca* – we sued Jowdy a few times in Mexico – a few times with Ron [Richards] and that other guy near you – what's his name that Michael signed the papers for??

*Kenner* – Tom Baker in Arizona?

*Kristen Peca* – I guess – I mean Michael was the one who did all of that stuff because I really do not understand it.  That is the business between you two — not me. If the bank accounts show Jowdy got the money from Hawai'i – well -- then why are the FBI guys saying you stole it all...I just don't understand...why would they lie if you did not take the money?

*Kenner* – to protect Jowdy maybe??

*Kristen Peca* – just because that director person you said is his attorney?

*Kenner* – Kristen – please – are you really asking me that after all of the lies you have heard from Bryan – and John – and that matt guy who refuses to meet with me and review the evidence?  Why would they have beaten me in Mexico in that jail if I had the money – and then killed our attorney?

*Kristen Peca* – this is too scary.   I told you that when we heard from – I don't remember who –

*Kenner* – I did not tell you...

139

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

- *It is another cover-up fraud that continues to be ignored and proven untrue.*

### The Investors' Eufora Attorney Would Have Debunked All Concealment Claims And Rendered The Home Depot Recording Transparent -- And Already Known By His Investigative Team...
#### *(Because of Kenner's transparency)*

NY Attorney Stolper's verification of his knowledge and his underlying knowledge of his plaintiffs in the 2010 Constantine matter -- **all through signed verification** (*See Ex. 1 at 9-18*) would have *dismissed* the government private sales concealment theories -- regardless of what their *faulty memory, confusion and mistakes* witnesses remembered during their "*failed memory tests*".


### Attorney Baker Signed Disclosures Debunk Any Kenner Concealment Claims By The Government...

Because -- the individual investor's *willful blindness* or *faulty memory, confusion and mistakes* cannot produce the necessary and reliable foundation for a "concealment" conviction.  Arizona Attorney Baker's disclosures (*See R33 A*) *and his verifying testimony* would have completed the dismantling of the prosecutorial concealment theories.  **Attorney Baker would have confirmed** the 2008-09 critical issue -- "*known Hawai'i loans to Jowdy*" -- in the Arizona lawsuit versus Jowdy, including Jowdy's fraudulent 2008-09 "*no loan*" defense claims, further highlighting the high probability that FBI Agent Galioto was complicit in the efforts to allow the Jowdy crimes to remain unchecked.

---

*Kristen Peca* – maybe that golf guy [Gaudet] told Michael about you being in jail and them hurting you – and...and the attorney guy getting killed.  Its too scary.  Michael and I cant thank you enough for keeping the fight going after the jail thing and the attorney but -- I just want this to be over no matter what it takes.  I know how mad Michael and the other guys are with Jowdy for not paying the loans back.  Who does that??

*Kenner* – a protected criminal – that's who.

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

## Trial Prep Ended By Trial Counsel...
### *(After Jailhouse Recordings Pre-Trial)*

All trial preparation ended (despite its feeble preparations while at the Queens Detention Center for approximately 18 months) once the defendant was ordered by the courts to be remanded to a maximum-security facility (Brooklyn MDC) on April 22, 2015.   Trial counsel berated Kenner afterwards at the Central Islip Courthouse. Trial counsel told Kenner that he would not be meeting with him any more, because "it was an inconvenience for him to travel to MDC".   Trial counsel claimed that *"you [Kenner] have really f\*\*\*ed things up now"*.

## All "Contact" With Potential Witnesses Was A Lie By Trial Counsel...

As a repetitive retort, trial counsel persistently referred to the fact that he tried to call Arizona attorney, Tom Baker, several times at the defendant's request to retrieve the 2009 Baker disclosure letters (*See R33 A*); claiming attorney Baker was "*not cooperative*", thus there was nothing he could do.   Kenner learned post-trial that trial counsel *never* contacted Baker -- *at any time*.   Kenner ultimately received the 2009 Baker disclosures from Constantine's attorney (Oliveras) thru the government's forfeiture disclosures (again *not produced* to Kenner by his own trial counsel).   This was another *Brady* issue that trial counsel refused to address post-trial with the court or government (perhaps out of fear of retaliation – *See Ex. 3*).

Kenner learned post-trial (thru Oliveras during a visit) that NY Attorney Stolper was also never contacted by trial counsel about any of the following critical defense issues:

- Becoming a defendant trial witness,
- Verifying his participation in open communication with Kenner's clients related to the uncollected "loans to Jowdy" and pending lawsuits (*See Ex. 62*),
- Verifying his knowledge of the Jowdy's Mexico embezzlements (*See Document 667*),

141

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

- Verifying the group efforts to "buy out" the Eufora loan led by Tim Gaarn (*Tr.2640*), Bryan Berard (*Tr.3106, 3111*), John Kaiser (*Tr.1363, 1400*), and Michael Peca (*Tr.604*), **fully impeaching each of them**, and
- Verifying the Eufora private stock sales knowledge by all members (*See Ex. 1 -- signed off at 9-18*).

### Stolper confirmed the Jowdy-loan knowledge to the SEC along – with full Kenner transparency...

...Stolper's participation and transparency with Kenner and Kenner investors related to Jowdy was clear and unambiguous, when he affirmed to the SEC (*SEC Tr.683-685 -- See Ex. 62*):

[NY Attorney, Michael Stolper – August 2011]:
> *The only thing I would like to clarify was that I think in your line of questioning, which may not come through in the transcript, whether he [Kenner] disclosed that the SEC has sought enforcement of subpoenas to his clients. I think that the suggestion in your question was that it was something negative that he should disclose to his clients as sort of a warning or red flag to his clients who are relying on him.*

> ***And I think that the conversations that I have been a part of,*** *without waving privilege,* ***and also*** <u>***my own view***</u> *of SEC's involvement in this whole Diamante del Mar, et. al. is a welcome one and that* ***we*** *and Mr. Kenner, are really looking to the SEC to enforce the securities laws against Mr. Jowdy and those [Harvey, Freeh, and Najam] who did wrong here. And we see it as a welcome thing, as a positive thing.*

> *So the tenor of the conversations with Phil's friends, co-investors, clients is that this is a welcome thing and maybe because we are having this direct communication with the SEC, and then perhaps subsequently with the US Attorneys Office, that maybe they will finally get some justice out of this.*

> *And I know I have said that off the record with you and I just wanted to clarify that in response to that line of questioning. Just a point of information.*

*As a result of Stolper's SEC confirmations – under oath -- there is no plausible trial strategy that could convince a reasonable trier of fact that* <u>*not*</u> *calling attorney Stolper*

142

*for his personal Eufora private stock sales vetting – and the Jowdy loan group knowledge -- was in Kenner best interest and part of a trial strategy…*

## Trial Counsel Failed To Call The Southern District Criminal Investigator Whose "Raw Notes" Were Denigrated By AUSA Komatireddy…

**AFTER** – both FBI Kaiser and William Ranford *denied* the exact and specific notes that Agent Romanowski documented from their private FBI proffers (during direct-examination) – any adequate trial counsel would have called the government official who "*wrote*" the "*raw notes*" (*See Ex. 63 [3500-JK-1-r]*) and *See Ex. 64 [3500-WR-2-r]*)…[51]

[AUSA Komatireddy rebuttal summation] (Tr.5991-92):
> "*And then they allege that the government sat silently by while Mr. Kaiser testified. That's not true. The very exhibit they showed you, Kenner 43, was stipulated into evidence by the government so you could see what it is and what it isn't. What is it? It's the notes of an investigator from another office, not the notes of an FBI agent, an investigator from another office. What is it not? It is not a transcript. It's not questions and answers. It's not direct quotes. You can't tell from the notes when they were written, if they were written before the interview or after the interview.*"

After both the conclusion of the Kaiser and Ranford trial testimonies, specifically related to their collective blunt denials of their previous pro-Kenner proffers to the FBI, trial counsel still refused to call any rebuttal witnesses.   Kaiser and Ranford fully contradicted the FBI's proffer notes (*See Ex. 63, Ex. 64*), allowing Komatireddy during rebuttal summation to unpardonably claim the agent's notes may have been written "*before*" the Kaiser proffer (*Tr.5992*), *supra*.

- o **It was some of the grossest "vouching" for the government's star-witness (John Kaiser) -- that went un-objected to…**

---

[51] Calling Agent Romanowski would have also allowed trial counsel to demand the previous undocumented interview materials from Romanowski's meeting(s) with Ken Jowdy in Mexico.   Jowdy confirmed this covert meeting during his January 2010 California deposition at *498 (January 6, 2010)*.

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

Finally -- trial counsel flatly refused to call SDNY Criminal Investigator Scott Romanowski to confirm his own "*raw*" proffer notes.   This simple testimony would have eliminated Ranford and Kaiser directly as credible witnesses – thru their "*failed memory test*" denials – <u>and hi-lighted the facts in the investigators "raw notes"</u>. **Trial counsel refused to close that defense door**.

No legitimate trial strategy could conform to the arbitrary, yet consistent desire by trial counsel to <u>*not*</u> put on pro-defendant witnesses or investigate known and available evidence.  Trial counsel's strongest argument to the defendant was that "*the government would not pay for the witnesses*" thru CJA.   He claimed, "*you* (the defendant) *would have to pay*".

### This Court Must Consider The Totality Of Errors On The Prosecution's Case Against The Defendant...

"[I]n determining whether one or more errors by trial counsel renders the representation constitutionally deficient under the first prong of *Strickland*, the Court 'need not decide one or another or less than all of these...errors would suffice, because *Strickland* directs us to look at the '**totality of the evidence before the judge or jury**,' keeping in mind that 'some errors [] have... a pervasive effect on the inferences to be drawn from the evidence altering the entire evidentiary picture,'" *Schultz v. Marshall*, 528 F. Supp. 2d 77, 92 (EDNY 2007) quoting *Lindstadt v. Keane*, 239 F.3d at 199.   This court must asses "the impact of [Trial counsel's] representation in the aggregate," to decide if that "ineffectiveness permeated all of the evidence." *Schultz* at 92; *quoting Lindstadt*, at 203.

In the instant case, trial counsel's errors compromised the adversarial process to such a degree that it undermines confidence in the outcome of the proceeding.   By *ignoring obvious* evidence, leads, failing to interview pro-defendant witnesses, not reviewing 3500 material with the defendant, and failing to review the superseding indictment with defendant -- *at a minimum*, trial counsel squandered the

144

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

opportunity to present available exculpatory evidence to the jury and a coherent defense 100% supported by empirical evidence -- *available in the courtroom during trial*.

As discussed *supra*, trial counsel could have dismantled *Counts 2, 3 and 4* with the investigation of simple evidence and a forensic accountant available at all times (utilizing the Kenner, Kaiser and Hawai'i bank records).

- ***Full transparency of each investment in the superseding indictment would have been proven with trial testimony, including known facts and real evidence, supra, by the "professionals" et. al. that Kenner demanded.***

**Nevertheless, trial counsel ignored Kenner**.   His utter lack of preparation proved 100% ineffective.   Trial counsel ignored the materials available to the defense, nor discovered the information due to no investigation.   Even with minimal efforts for the defendant, every element of potential *concealment* (affecting the two [2] conspiracy charges) would have created clear and obvious doubt with the trier of fact.

Trial counsel's ignorance was inexcusable and prejudicial -- considering the availability of Hawai'i attorney Baker, Eufora Attorney Stolper, and Northern Trust Bankers who handled regulated 2001 Patriot Act communication under the "*know your client*" laws and governed by their bank's federal charter, all discussed *supra*. *Count 8* would have simply disappeared due to a lack of evidence (and jurisdiction), with the destruction of the government concealment claims.

### The Defendant Has Satisfied *Strickland's* Second Prong: Prejudice...

Under the prejudice prong of *Strickland*, the defendant is required to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland*, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id*.  "The level of prejudice the [defendant] need demonstrate lies

between prejudice that 'had some conceivable effect' and prejudice that 'more likely than not altered the outcome in the case.'"   *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir 2001) (*quoting Strickland*, 4666 U.S. at 693) (*emphasis supplied*).   "[T]he reasonable probability standard is not the same as, and should not be confused with, a requirement that a defendant prove by a preponderance of the evidence that but not for error things would have been different."   *Wilson v. Mazzuca*, 570 F.3d at 507 (*quoting United States v. Dominguez Benitez*, 542 U.S. 74, 83 n. 9 (2004) (*citing Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).   "We do not require a defendant to show 'that counsel's deficient conduct more likely than not altered the outcome'...but rather that he established '**a probability sufficient to undermine the confidence in [that] outcome**.'"   *Porter v. McCollum*, 558 U.S. 30, 44 (2009) (*quoting Strickland*, 466 U.S. at 693-694) (*emphasis supplied*).   Moreover, "unlike the determination of trial counsel's performance under the first prong of Strickland, the determination of prejudice 'may be made with the benefit of hindsight.'"   *Hemstreet v. Greiner*, 491 F.3d 84, 91 (2d Cir 2007).   Further, in evaluating prejudice, the court must also consider the **cumulative effect** of all of counsel's unprofessional errors.   *Lindstadt*, 239 F.3d at 202.   *Strickland* further dictated, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."   *Strickland*, 466 U.S. at 696.   "Where the Second Circuit has found insufficient prejudice, the evidence against defendants was very strong, and counsel's error (or purported error) minor in comparison.   *Schultz v. Marshall*, 528 F. Supp. 77, 100 (citing multiple cases).

On the other hand, the Second Circuit has found sufficient prejudice to vacate a conviction where defense counsel *failed to conduct investigation* that "could have vastly increased the opportunity to cast doubt on...critical evidence."   *Id*., citing *Bell v. Miller*, 500 F.3d 149, 156 (2d Cir 2007); *Lindstadt*, 239 F.3d at 204 (finding prejudice where counsel failed to investigate witnesses that could have undermined the credibility of the prosecution's eyewitnesses.   Likewise, in *Espinal v. Bennet, supra,* the court found that trial counsel's failure to investigate pro-defendant evidence "undermine[d] confidence in the outcome," or "had some conceivable

effect." *Espinal v. Bennett*, 588 F. Supp at 401, citing *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir 2005) ("To satisfy the 'reasonable probability' test, however, 'a defendant need not show that counsel's deficient conduct more likely than not altered the outcome of the case.'"). In *Espinal*, as here, trial counsel failed to investigate or present available evidence that "could have" supported the defendant's trial claims of transparency. "There is a reasonable probability that a credible transparency defense, fully supported by this available evidence, could have placed reasonable doubt in the minds of the jury. Accordingly, [the defendant] has established that counsel's errors unacceptably prejudiced the outcome of this trial." *Id.* at 402. See also *Lopez v. Miller* 915 F. Supp. 2d 373 (EDNY 2013) (Habeas petition granted where defense counsel's failure to investigate or call available pro-defendant witnesses was a decision that had no basis in reasonable trial strategy and undermined confidence in the outcome of the proceedings.)

Of course here, in considering the totality of the prosecution's case against the defendant (Kenner), the evidence was hardly overwhelming, since it was substantially based on all of the alleged victims 2015 testimony (*Tr.5993*). It was 100% contradictory to their-own pre-trial, empirical evidence (emails, texts, signed disclosures, signed bank documents, signed engagement agreements, etcetera) and prior testimony (civil arbitrations, civil trials, Federal Grand Jury testimonies, etcetera) given by the same witnesses in prior years (and ignored by the government while in their possession).

Adequate (or perhaps *any*) investigation would have destroyed all of the "*I don't remember*" or "*I don't know*" or "*I was never told that*" -- or the absolute classic refrain, "*I remember, not being told*". Adequate representation would have replaced it with available, empirical material and indisputable evidence that no trier of fact would even need to weigh.

As a result of trial counsel's ineffective defense, the government argued that they stand by their witnesses' 2015 testimony, excusing all of the known contradictory

147

testimony and blatant perjury as ***faulty memory, confusion and mistakes***, <u>otherwise known as **unreliable**</u>.

At a minimum, the post-trial emergence of "new evidence" 1) *government-forfeiture-44*, 2) *government-forfeiture-36*, 3) the *Baker disclosures*, 4) the Northern Trust subpoena documents, 5) the Kaiser frauds on Sconzo, Privitello and Krueger (withheld by Galioto), etcetera, must be considered in conjunction with the other **strong evidence** that further, <u>*the defendant had not concealed any information*</u> or made up the "*fake loans*" as a "*cover-up*" story or "*finger-pointing*" scheme after "stealing" <u>*any*</u> funds, and blaming the unpaid Hawai'i funds erroneously on Jowdy (*Tr.31*).

- *The "new evidence" alone confirms that trial counsel failed to acquire some of the most material items available for Kenner's trial defense.*
- <u>*It also hi-lights that it was available*</u> *– if trial counsel had simply acquiesced to Kenner's trial preparation demands –* <u>*never*</u> *considering Kenner's freedom was at stake.*

*Government-forfeiture-44* now confirms the defendant's truthfulness about Jowdy receiving 100% of the loan money, although challenged at every instance throughout trial by the government as *bogus, phony, supposed and purported* thru prejudicial prosecutorial argument – and still post-trial.   These unchecked allegations *ignored* pro-defendant exculpatory evidence the government possessed for as many as five (5) years pre-trial (*See Ex. 2 at 11-14 amongst others*).

### <u>Trial Counsel Sat On His Hands And Allowed The Final Malfeasance During Both Summations...</u>
*(As trial counsel's final ineffective act)*

Trial counsel continued thru the conclusion of trial to underperform while failing to sound even one (1) single objection during the government's summation or rebuttal summation, when gross misrepresentations were made that had not been proven or even presented throughout the lengthy trial, as the government scraped the bottom of the ethical barrel of divisive tactics.

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

- o *As a result of trial counsel's "silence" – the government presented lie -- after lie -- after lie, leaving the un-objected rhetoric effectively verified by incompetent and inadequate trial counsel.*

Komatireddy referred to the defendant as "*Kenner is broke…living completely off his clients money*" (*Tr.5982*), during rebuttal summation, which could not be further from the factual truth and was never argued throughout trial.   With over $1,000,000 plus in cash in Kenner's bank accounts (in evidence) during the indictment period, it was a lie -- *yet trial counsel sat silent*.

In rebuttal summation, the government claimed "*…Kenner told you that he used that money* [Hawai'i] *to get his piece in the Mexico investment…that's in evidence*" (*Tr.5990*).   **It was not in evidence** -- *yet trial counsel sat silent*.

During rebuttal summation, Komatireddy continued to falsely represent the evidence by professing that "*He* [Kenner] *used it* [Centrum loan money] *for personal use to get an interest in that resort in Cabo*" (*Tr.5996*).  The trial facts did not support that malicious claim (***worthy of a conviction stand alone if actually true***, like the other misrepresentations without objection, *supra*).  The government evidence, during the forfeiture hearings further disproved that any of the defendant's capital account in Baja Ventures 2006 (Diamante Cabo san Lucas equity) came from any source other than the defendant's two (2) independent Baja Ventures 2006 partners (Lehtinen and Stumpel), as documented, and "**untainted**" -- not from any source of "*ill-gotten gains*".  Nevertheless -- *trial counsel sat silent*.

In each of the inflammatory and grossly false representations during summation towards the defendant – *and raised by the government for the first (1ˢᵗ) time during the proceeding* -- it was unfathomable that sitting idly by and allowing the defamatory slander to ensue was an explainable trial strategy.

- o ***It rises to the level of gross negligence.***

149

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

Unopposed, Komatireddy chose to draw another conclusive claim that she not only knew was false, but a claim that was in contradiction to every bit of evidence in the government's possession.   Trial counsel allowed the foundationless "kill strike" to go without objection, when Komatireddy proclaimed Kenner as "*insane*" (*Tr.5998*) for suggesting during testimony that "*...each hockey player volunteered to lose a million dollars so they could instead put another quarter million dollars into a lawsuit against a guy in Mexico? A collective decision? Not only implausible, it's contradicted by the evidence.*" (*Tr.5998-5999*).

  o **It was _not_ contradicted by evidence.**[52]

---

[52] The government possessed multiple text conversations between Kenner and the LOC clients regarding their pre-seizure communications with Northern Trust Bank.

Although Berard told the FBI that he received a letter in the mail from Northern Trust (during a 2013 FBI proffer about his LOC collateral being taken – *3500-BB-1-r at 2*), he contradicted that in his 2015 testimony (*Tr.3039-3040*) claiming he found out "*after the fact*" when he received a **phone call** from Northern Trust (*Tr.3039-3040*).
• **In reality (and evidence) – neither actually happened...**

***In total contradiction -- March 26, 2009* --** Four (4) days before the pay off of Berard's LOC -- Berard was clearly in communication with Kenner about the LOC and had no concerns – in addition to being fully aware of the use and Hawai'i/Jowdy issues:

| 6 2 0 7 | +14015 246929 Bryan Berard* | 3/26/2009 6:53:59 PM(UTC+0) | R e a d | **When u get chance can we look at *how much money will b freed up after payn off line of credit NT???* Thanks** |
|---|---|---|---|---|

Kenner replied seven (7) minutes later (hi-lighted):

| 7280 | +14015246929 Bryan Berard* | 3/26/2009 7:00:51 PM(UTC+0) | Sent | **~300k** |
|---|---|---|---|---|

Berard replied four (4) minutes later:

| 6 2 0 8 | +140152 46929 Bryan Berard* | 3/26/2009 7:04:18 PM(UTC+0) | R e a d | Cool thanks!!! When will that b freed **Gonna use 200 for a cool oppurtunity will show u and talk 2 u abt it later. Good for all of us n future.** |
|---|---|---|---|---|

Kenner replied (**hi-lighted**):

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

In a final plea to represent the defendant (Kenner) as *desperate*, at the same time the government knew Kenner:

> 1) Had millions of dollars in his various bank accounts (*in evidence*),
>
> 2) Had significant annual income thru multiple businesses (*in evidence*),
>
> 3) Had overwhelming equity in various real estate ventures (*in evidence*),
>
> 4) Was personally owed millions from the Hawai'i project (*in evidence*),
>
> 5) Was personally owed hundreds of thousands from the two (2) Mexico projects (in evidence) and Jowdy (personally) (*in evidence*), and
>
> 6) Was loaning hundreds of thousands of dollars to Constantine, Kaiser, Berard, and Gaarn at that particular moment in time (*all in evidence*)...

Komatireddy deceitfully claimed without challenge of objection that (*Tr.6006*):

> *"Those two [Constantine and Kenner] were in huge debt..."*

- ***Kenner clearly was not – *** *yet trial counsel sat silent...*



| 7282 | +14015246929 Bryan Berard* | 3/26/2009 7:30:08 PM(UTC+0) | S e n t | Can't wait to hear! |
|------|------|------|------|------|

***So – as soon as Berard discusses the LOC seizure "plan" with Kenner – Berard wants to get his remaining funds from Northern Trust (~300k) -- and wants Kenner involved in the next deal with him in addition to vetting his next deal for him...***

- ***Berard had 100% unfettered knowledge of the seizure – despite his 2015 perjury to the EDNY Court, supra.***

### *Trial counsel let it stand unchallenged...*

The government knew that for the seizures to occur, each Northern Trust client had to authorize their acceptance verbally to the bank -- and then sign two (2) sets of transfer documents in the following thirty (30) days to close their respective accounts.

> o ***That is in evidence*** *-- yet no objection.*

151

In an attempted *dismissive* moment, Komatireddy continued by contradicting the defendant's trial testimony claiming "*Kenner admitted he used the money* [short-term, approved loan to Kaiser] *for a non-Hawai'i purpose*" (*Tr.6007*) (*See Ex. 66*).

- o **_All use_ was authorized by the corporate By-Laws, repaid within 11-days (as agreed upon with Kaiser) and expressly for a Hawai'i purpose (to acquire John Kaiser's signature approval for the 2006 joint venture).**

Again, after this complete fabrication, trial counsel's deafening silence "**sounded**" like a positive affirmation to the government's misrepresentation, fully prejudicing the defendant.

- **The LIES were all immediately before deliberations, _not_ objected to -- and catastrophic to the defense**, specifically since the jury views the prosecutorial team (Government) under the guise of *Berger, supra*, as wielding a sword of moral and ethical purity seeking justice without malice or compromise.

For that reason alone, trial counsel requires at all times specific clarity in the representation of the defendant, for the mighty advantage of the prosecutorial efforts begins and ends with the benefit of perceived integrity, above reproach.

And now, *government-forfeiture-44* and *government-forfeiture-36*, delivered by the government during the forfeiture hearings, puts into question every unsubstantiated challenge by the government on the defendant's underlying veracity, since the alleged "fake loans" were the lynchpin of the "allegations of concealment". Adequate trial preparation would have revealed that over ten (10) lawsuits were filed versus Jowdy before the 2009 GSF and the alleged ongoing "cover-up" with the Constantine-led GSF efforts to finally draw the three (3) plus years of acrimony with Jowdy and his supporters to a rapid close – *not as the government proffered during opening remarks* (*Tr.31*).

Trial counsel's investigation of Jowdy, Harvey or Jowdy's accountant (Mark Thalmann) -- &/or calling them as part of the defense's case-in-chief would have

prevented the ongoing assaults on the defendant, specifically in cross-examination and government summations.

Thus, there is a strong likelihood that trial counsel's errors were disastrous, considering the Northern Trust subpoena in aggregate alone, was pivotal to the outcome of the trial, and affected all of the evidence.   See *Lindstadt*, 239 F.3d at 205. With the newly-discovered evidence (apparently available to trial counsel thru adequate efforts) and strong proof discrediting the government theory that the defendant "stole" any of the Hawai'i money for his benefit (*See government-forfeiture-36*) -- complimented by *government-forfeiture-44* confirming the *authenticity* of the Jowdy loans by Jowdy himself, it is now 100% confirmed that the *Kenner's truthfulness* with the facts the government had in their possession pre-trial exonerated the defendant.

- *Yet – they were ignored by the government and complimented by the trial counsel's minimal efforts (at best).*

The new evidence (clearly available with pre-trial investigative efforts) would have cast unchallengeable doubt as to the credibility of the government witnesses (*Tr.1229 – Kaiser denies Jowdy stole money – See Document 667 – "The Jowdy Hoax"*), and the quality of the evidence, substantially based in witness-testimony -- now defended as *faulty memory, confusion and mistakes* in lieu of Kenner exposing the voluminous perjury of the government witnesses thru his various submissions (*See Document 668*).

All of the reliable and newly discovered evidence (available with minimal pre-trial investigative efforts by trial counsel) is irrefutable.   They are *real* loan confirmations (*See government-forfeiture-44*), real Jowdy-loan knowledge confirmations (**signed** Baker disclosures – *See R33 A*), and *real*-known Northern Trust LOC "use of funds" knowledge (Northern Trust subpoena, *supra*).

- *In totality, they would have substantially undermined the jury's confidence in the prosecution's case.*

Moreover, the "evidentiary taint" on those witnesses' credibility, having given contradictory testimony, would have affected the jury's view of the other offenses, specifically, "no knowledge" of the Eufora private sales -- and "no knowledge" of the Eufora buy out efforts led by Kaiser, Berard, Gaarn and Peca (yet perjuriously refuted at trial in harmonizing symphony).

A finding of prejudice is further supported by the government's own emphasis upon the now-contested admission of "real loans" (*See government-forfeiture-44*), against the previous backdrop of a now-challenged thin case against the defendant. It is now solely supported by the government defense of *faulty memory, confusion and mistakes (**never once referring to the contradiction in testimony as "the truth"**)*. As noted *supra*, the government thru summations relied heavily on the argument that the defendant *stole* the Hawai'i money and used the allegations of Jowdy theft (non-repayment worthy of litigious recovery efforts) as a "finger-pointing" act of concealment.

Compounding the taint, *supra*, was the defense's lack of preparatory evidence to counter the prosecutorial arguments, due to trial counsel's failure to investigate and utilize the proof available in the courtroom.

This was especially so since the jury was willing to discredit the Kaiser and Privitello testimonies and **acquit** the defendant on their accusations (*Count 5 and Count 6*).   In this way, trial counsel's cumulative errors – specifically his failure to investigate, his failure to include the defendant in his defense in *any* meaningful way, and his failure to include the exculpatory and pro-defendant witness testimony – all "were outside the wide range of professionally competent assistance." *Strickland*, at 690.

As to the second prong, the defendant was prejudiced by his attorney's constitutionally deficient performance, in that, with that omitted evidence "there is a reasonable probability" the result of the proceeding would have been different," at

*Kenner -- ineffective counsel motion (Rule 33 supplement)*

least to the extent that it undermines confidence in the outcome of the trial. *Strickland*, at 694.

Indeed, the jury recognized there were problems with the government's witnesses and charges.   It acquitted the defendant on three (3) of nine (9) charges.   The impeachment of the government witnesses with the specific real evidence and not circumstantial and circumspect feigning during cross-examinations by trial counsel would have clarified to the jury that every government witness related to the Kenner claims, were "*over-informed*" (wholly transparent) by Kenner-himself through voluminous communication, real text messages, real email messages, real disclosure letters (they independently signed), and signed banking documents (they independently signed), ***at all times***.

Only the investors' _willful blindness_ could have left the government witnesses unaware of the details of their investments, unless truly based on unreliable testimony (otherwise referred to by the government as ***faulty memory, confusion and mistakes***).

For all of the reasons set forth within, the prejudice from ineffective assistance of counsel, for which exculpatory evidence was readily available, not investigated, or grossly ignored, tainted the entire case.   It supplements the defendant's previous and current Rule 29-33 submissions, and as such, the Court should grant the defendant's Motion for a New Trial based on his trial counsel's ineffective assistance.

Dated this 17th day of June 2019.

/s/

Philip A. Kenner.