August 13, 2019

(R-13-607)

**F I L E D**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   AUG 1 9 2019   ★

LONG ISLAND OFFICE

The Honorable Judge Bianco
U.S. District Courthouse – EDNY
100 Federal Plaza
Central Islip New York 11722

Judge Bianco:

Apparently the government posted a responsive letter, or letters, to Kenner's Rule 29-33 reconsideration motion (*Document 668*) and Kenner's July 3, 2019 *28 U.S.C. 2255* motion (*Document 675*).   Kenner has received neither from the government, which is troubling considering Kenner's ProSe defense position.   This has continued to be the pattern of disclosure, not the exception.

Kenner is aware of the basic contents of the letter and will respond accordingly, but with apologies in advance for any unaddressed issues based on third (3rd) party representations made to Kenner so Kenner can attempt to meet the August 13, 2019 reply deadline (at least for the Rule 29-33 motion, with no motion schedule set for the *28 U.S.C. 2255* submission – docketed July 3, 2019).

The government's sole position seems to be the pure avoidance of anything to do with the merits of Kenner's arguments to the court, in both instances.   They have continued to run from any empirical representation of the "real truths" post-trial, specifically when they have produced the post-trial evidence, *themselves*.[1]

---

[1] The government produced *government-forfeiture-36*, wholly proving that Kenner and his Baja Ventures 2006 two (2) partners (Jozef Stumpel and Jere Lehtinen, non-victims -- yet) contributed $4.1 million of "*untainted funds*" to the March 2006 Cabo san Lucas purchase. The government's evidence proves that *none* of those funds came from Kenner or alleged "*ill-gotten gains*".   **The $4.1 million represents 100% of the Baja Ventures 2006 equity contribution.**

- Nevertheless – the government wants the court to forfeit an asset *without nexus* to any criminal activity..."*just because*".   They continue to ignore the 8th Amendment "*excessive fines clause*" issues the forfeiture would surely violate – and their own exculpatory evidence, *infra*.

The government produced *government-forfeiture-44* confirming that all of the Hawai'i "loans" *went to Ken Jowdy (and never Kenner)* as government witness Michael Peca verified to the 2011 SDNY Grand Jury and the 2015 EDNY trial court.   Peca's testimony left no equivocation that he and 22 other Hawai'i partners (pre-trial) have given pro-Kenner transparency testimony of "full knowledge" of the LLC authorized transaction.   In

1

**Real justice has no time limit**; specifically when subjectivity can be applied to the decisions thru the application of the law.   New evidence &/or re-canted testimony and information can and should always be the basis for re-addressing known-perjurious or misrepresented facts used to create a verdict lacking confidence.  The government was aware of these misconduct issues, **because** they were part and parcel to the (1) FBI interviews (supporting Kenner transparency), (2) the 2012 surreptitious phone recordings of Kenner (supporting Kenner transparency), and (3) Grand Jury testimonies of the various "eye-witnesses" (supporting Kenner transparency).  After each pro-Kenner transparency testimony, the government witnesses contradicted their pre-trial "knowledge" -- to having "no knowledge" years later (during trial) of their-own previously proffered truths.

- This is *"memory loss"* (or **CTE**), or *not* reliable testimony; especially when defended as *faulty memory, confusion and mistakes* (*Document 440 at 16*) -- and never as the "**truth**".  Without hesitation, if the inconsistent testimony

---

contradiction to the empirical evidence in front of this court, the government wants to perpetuate their hoax based on the remaining four (4) Hawai'i partners, who also previously gave *"under oath"* testimony in concert with their 22 other partners; *__only__* **reversing their previous testimony in 2015** (in sync).

*Government-forfeiture-44* confirmed that Kenner's trial testimony about the loans to Jowdy being real was **truthful**, while consistently assaulted by the government as *"lying"* (*Tr.4598, 5064-5065*).  During trial, the government repeatedly alleged that the loans to Jowdy were *"bogus"* (*Tr.5708 (2x), 5709*), *"phony"* (*Tr.4597, 4598*) and *"supposed"* (*Tr.5707-5708*) – and simply a *"Kenner cover-up story"*.  But -- in the government's initial Rule 33 opposition, they called *government-forfeiture-36* and *government-forfeiture-44* "**cumulative**" (*Document 440 at 6*).

- If *Government Forf-44* is **cumulative** (*as defended*), then the government and Court must be allowing the government to ignore the "other" alleged *cumulative*, empirical evidence available (which they espouse) to construct the their-own false prosecutorial narrative for trial.
    - o  That would rise to clear "**prosecutorial misconduct**".

- Otherwise, the fairness and grave responsibility of the prosecution expressed by the Supreme Court in *Berger* (1935) has been constitutionally ignored – and significant revisionary issues are unresolved from an improperly pursued conviction "at all costs".
    - o  If it is not "**prosecutorial misconduct**" then it must trigger a "**new evidence**" issue worthy of a new trial – *because* the jury certainly should have been presented the *"new truth"* that *"Kenner did __not__ steal the money"* (*government-forfeiture-44*) and *"use it to purchase his Cabo san Lucas equity"* (*government-forfeiture-36*).

2

held any truths, the government would have beaten that drum.   *They did not...*

*It appears that justice is not the goal* – while lost in the morass of the government's post-trial behaviors at every turn.   Maintaining a conviction at all costs appears to be their primary -- and only target.

## Rule 29-33 Reconsideration motion...

### Untimely...

The government referred to Kenner's submission as "*untimely without excuse*".   It is disingenuous at a minimum.   They are certainly aware of the years of Kenner's submissions to the Court (as is the Court) that Kenner has been under severe work restrictions; heightened and documented by Kenner since before his February 2018 *Faretta* hearing to both the court and Kenner's counsel (*See Kenner communications of March 23, 2018[2], April 10, 2018, and September 30, 2018 – and letter to the Court [of January 1, 2019][3] -- at a minimum*).   Kenner also reported to the Court that

---

[2] Kenner's 3-23-2018, page-long submission to the Assistant Warden of Custody began as follows:

> "*To whom it may concern: I have tried for the last 3-4 months to address the complete ignorance by different members of the staff (thru the proper chain of command – unit team) of my need to follow the court order and be transported daily (upon request – in the morning) to the East VR from my unit to work on the remaining discovery items in my case. I understand that there are times when security issues in the building will take precedents, thus, I am patient with those representations when they arise.   Yet, in the last 3-4 months, after I was FORCE to write up CO M[...] for her part in the repeated denigration of me as a human being and disdain for my presence (in the VR) to fight for my freedom (especially considering the fact I represent myself in my case), I have been systematically REFUSED access to the East VR and my case work...*"

One week later (3-30-2018), Kenner received the following response:

> "*I will have the Captain and Legal look into this issue, to resolve this.*"

***Nothing happened.***   In fact, prior to Kenner's February 2018 *Faretta* hearing, previous counsel, Attorney Siegel, was unable to effectuate any change thru his alleged direct communication with MDC legal department since his 2017 appointment as CJA counsel, like Attorney Pittell before him, and Haley before him.

[3] The letter begins:
> January 1, 2019
>
> The Honorable Judge Bianco:

Kenner's work-time restrictions, in this clearly voluminous case, were further compounded by the loss of significant work product when Kenner's external hard drive was "taken" by MDC staff, _and never recovered (maintaining Kenner's original 2255 motion [pre-Constantine] and voluminous discovery materials)_.   100% of Kenner's back-up work product vanished, leaving Kenner to begin the re-creation of his letters and motions to the Court in ProSe and without his significant, completed work.   The Court should note that none of Kenner's CJA counsels produced a single post-trial motion to the court, over shadowed by the substantial work done to date by attorney Sam Talkin (as CJA for Constantine).

- **Please refer to the letter filed under seal (EX PARTE) on Kenner's behalf regarding the calculated work restrictions placed on Kenner at MDC, by design, regardless of "court order".**

**Missing discovery...**
- The court should note that the government's originally docketed letter of March 24, 2014 (_Document ## illegible_) claims that two (2) one-terabyte portable hard drives were delivered to Kenner's counsel (R. Chavis).   _Kenner received one, and only one hard drive_.   **What exculpatory materials were on the second hard drive? This is more newfound information to Kenner – and raises multiple discovery related issues too numerous to begin listing.**

- The court should also note that over three (3) months ago (on May 15, 2019) the U.S. Attorneys office promised the court that Kenner would receive another external hard drive "**_within a week_**" to replace the "flash drive" (_Document 191_) the government produced with exculpatory materials.   That "flash drive" landed Kenner in the SHU, furthering his work restrictions and facility denigration

---

_First, since the September 30th (2018) restriction placed on my work at MDC as instant retaliation for my reporting the repeated abusive behaviors towards me, I have not been able to go to the designated work area for more than fifteen (15) days of the last 90 of the 2018 calendar year.   The time restrictions are a further effort to retaliate against me.   My movement denial is attributed to daily representations of "security issues" in the building – although, 100s of people move throughout the rest of the two (2) building complex for food, medical, education, recreation, etcetera.   For some "other" reason, I am not permitted to move the ten (10) minute walk while escorted to the work space.   See the attached BP-10 document that had to be reported to the Regional Office to address the issues.   Multiple officers have warned me that I am under heavy "scrutiny" by those who originally abused me, while reiterating their apologies for the never-ending abuses._

Nothing changed at MDC after my notification of work restrictions (this or any time), thus removing Kenner's fault in any mitigation attempts Kenner made to be more "timely".

(*discussed in Kenner's pending sentencing memo*), yet no replacement has been issued to Kenner.  Kenner was *punished* for the government discovery until this court *ordered* a reluctant MDC to release Kenner weeks later.  If the government wants Kenner to play fair – but with two hands and half his brain tied behind his back and produce items "more timely", then their demands can only be deemed irrational; as willing participants in the restrictive behaviors.

**More intimidation...**
Kenner's entire discovery disc inventory disappeared after Kenner was returned to his work area, *post-SHU detainment (May 2019)*.   These were more intimidation tactics used by MDC staff to deter Kenner from working and bully him to stop requesting work time under "court order".

The government is wholly aware of the "timeliness" restrictions Kenner has been forced to confront for years at MDC, as they remain silent.   It strategically works to their benefit as in this instant issue.   O'er, the government would prefer that Kenner stay silent and ignore his unalienable rights granted by the Constitution, which are getting in their way.

Regarding timeliness, which is clearly out of Kenner's control as the only advocate for his freedom, the court should order the government to address the issues raised by Kenner on their merits and not hide from them or delay longer.   It is wholly unfortunate that the incarceration period has dragged on, but none of the government and Constantine's delays of years and years are from Kenner's doing.  No counsel changes have slowed any part of the defense process, as noted *supra* without a single advocating position (except Attorney Pittell's thoughtful PSR objections).[4]

The government also claims that Kenner's trial counsel had "*notice[d]*" Kenner that he would not file a Rule 29.   This is simply *not* the case.   The court is aware that Kenner's trial counsel failed to turn over pre-trial exculpatory evidence to Kenner (as Kenner claimed the items as "new evidence" in his Rule 33 "notes" submission to the Court; substantiating Kenner's lack of receipt of critical exculpatory items, let alone letter documents).   Trial counsel proffered that he was going to submit a Rule 29 motion during trial (*Tr.5633*) to address his "*understanding*" of the prosecutorial

---

[4] The court should note that Attorney Pittell was moreover unable to complete the required work product and commit the appropriate time to Kenner prior to change of counsel (at Kenner's detection).  Post dismissal, Kenner learned that Pittell was dealing with life-critical medical issues that would restrict any human being's time for anything but life-critical issues.

theories (*a wholly unbelievable comment on face-value after two-plus months of trial*):

[Trial counsel Haley]:

> *"And as relates to my understanding of the superseding indictment, I intend to address our Rule 29 application with what I hope is my correct understanding of the current theory of the prosecution."*

This statement followed his *deferment* to Constantine's counsel regarding the Rule 29 challenges.  At a minimum, Constantine's counsel specifically addressed the Hawaiian object venue of the conspiracies as follows (*Tr.5632*):

[Attorney Robert LaRusso]:

> *"More importantly, there is no venue for the Hawaiian conspiracy whatsoever."*

Kenner is not a trained attorney, and as such, his trial counsel's representation to Kenner at the time was that those two (2) actions *preserved* all potential Rule 29 issues for appeal in Rule 29 and its progeny.  Trial counsel's [mis]representations could not have been challenged by Kenner's inherent lack of legal knowledge or wherewithal.  *He was allegedly represented by adequate counsel.*

After Rule 29 motion schedule was docketed, Haley (unknown to Kenner) chose to submit a pedantic letter dismissing any Rule 29 claims by Kenner.  This unparalleled laziness cannot be deemed "*adequate representation*" under the 6th Amendment; considering an artless sentence like:

> *"Defendant Kenner challenges the venue on each and every count in the indictment."*

...would have preserved any appellate claims.  There is no apparent defect on the face of the superseding indictment, thus trial counsel's two (2) expressions during trial *do* satisfy the "preservation" requirement.

- The Court is aware that "The Constitutional underpinning and importance of proper venue dictate that waiver of objections to venue should *not* be readily inferred." *United States v. Price*, 447 F.2d 23, 27 (2d Cir 1971).  That being the case, this Court has found a waiver of the right to challenge venue in a criminal trial only under extraordinary circumstances.  One such circumstance is "when the indictment or statements by the prosecutor clearly reveal [a venue] defect but the defendant fails to object." *Id.*; see also *United States v. Khan*, 821 F.2d 90,

93 (2d Cir 1987) (finding waiver in light of a clear defect in venue apparent on the face of the indictment).

Defendant Kenner could not have any additional intrinsic knowledge that would supersede trial counsel's representations of "*what the law really means*".  Inasmuch, there is no proof that Kenner ever received *Document 325* from trial counsel, or would have sat silent (as the court is aware).  In fact, in multiple hearings, time after time, Kenner has notified this court that he has not received a multitude of letters allegedly produced by the government or legal counsel and mailed to Kenner at Brooklyn MDC.  That is clearly on the record for years -- and part of the hearing production Kenner requested since 2015 (on the record); still never received as ordered by the court in 2018.  This Court's clerk produced the Kenner docket to him in 2019, alerting Kenner to many unknown issues (this as one amongst the many).

**In the alternative...**
If the court is not moved by the previous argument to protect Kenner's venue rights, which go back to pre-Constitution times[5], then the court should couple Kenner's argument, *supra*, with trial counsel's failure to perform all of his 6th Amendment trial duties, *while under duress (infra),* making it a clear *28 U.S.C. 2255* issue (*infra*).

- Rule 12(f) provides an alternative for the Court to continue on the merits. "Failure by a party to raise defenses or objections or to make requests which must be made [] shall constitute waiver, thereof, but the Court for cause shown may grant relief." *United States v. Schwartz*, 535 F.2d 160, 163 (2nd Cir 1976); see also *United States v. Crowley*, 236 F.3d 104, 110 (2nd Cir 2000).

After another insignificant and underprepared pre-trial meeting at Queens Private Detention Center ("QPDC"), Kenner submitted the following letter to trial counsel, begging for him to alert the Court of the "out-of-bounds" behavior he personally

---

[5] The Declaration recited among injuries and usurpations attributed to the King: "transporting us beyond Seas to be tried for pretend offenses." The Declaration of Independence, para. 21 (1776). A complaint of the same tenor appeared earlier, in the 1769 "Virginia Resolves". See Blume, The Place of Trial of Criminal Cases: Constitutional Vicinage and Venue, 43 Mich. L. Rev. 59, 64 (1944). Parliamentary History of England from the Earliest Period to Year 1803, pp 476-510 (T. Hansard ed. 1813). In response, the Virginia House of Burgesses unanimously passed a resolution condemning the practice of sending individuals "beyond the Sea, to be tried" as "highly derogatory of the Rights of British subjects." Journals of the House of Burgesses of Virginia, 1766-1769, p 214 (J. Kennedy ed. 1906).

reported to Kenner (*See Document 675 [28 U.S.C. 2255] at 31-34, and Ex. 3 [the letter]*).  Part and parcel to the letter to trial counsel on April 12, 2015, Kenner wrote:

> "*I know that we just met to discuss the trial that is supposed to begin in a few weeks, but you have to tell the judge that the FBI agent has made threats to you again, as we discussed in the meeting.   It is not right they told you to back off the casework, because they really want me.   In addition, the fact that you told me your wife is scared for you and her as a result of the Galioto threats is even more worrisome. I know that he told you your practice would suffer if I were not found guilty at trial.   That is outrageous…You cannot stay silent in front of the judge with threats being made by Galioto to you…*"

- In the same letter, Kenner asked trial counsel to alert the court about someone at QPDC who was repeatedly asking Kenner to participate in a murder-for-hire plot, just prior to trial (resulting in FBI agent Galioto and others recording Kenner thru a jailhouse snitch on wire, *despite* claiming to this court on April 22, 2015 that it was an independent investigation and unknown to the prosecutorial team).[6]

- In the same letter (and others to counsel), Kenner begged trial counsel to communicate with Kenner's identified trial witnesses to confirm 100%, third (3rd) transparency with regards to each of the "objects" of the government prosecutorial theories.
  - *Trial counsel refused again – and interviewed* <u>*no*</u> *pre-trial witnesses.*

### Kenner's reconsideration motion…

The government quoted a WDNY 2013 case, *United States v. Larson* as:

---

[6] The Court should note that recently, Kenner discovered that not only was Paul LeRoux (the person who wore the jailhouse wire on Kenner at QPDC) a "significant government asset" and not just another run-of-the-mill inmate trying to raise Rule 35 or 5K1.1 issues -- but after Kenner was moved to MDC Brooklyn, the government had Kenner placed in a cell with one of Leroux' former "hit men" from his DEA case to try and resurrect and execute the "murder-for-hire" plot on Kenner, *one more time*.  It is not ironic or coincidence that Kenner was intentionally moved to live in a cell with Slawomir Soborsky (out of 1800 possible inmates), who attempted to discuss his "skills" with Kenner (reproducing the failed LeRoux scheme).

- *Either one of these contrived schemes were a violation of Kenner's civil rights, at a minimum.*

8

"the standard for granting...a motion [for reconsideration] is strict, and reconsideration will generally be denied _unless_ the moving party can point to controlling decisions _or_ data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."

In 2016, Judge Bianco exchanged the following colloquy with Kenner related to recently discovered evidence (*Forfeiture hearing, April 6, 2016, Tr.206-08*):

> *THE COURT: Are you saying you recently recovered documents? Are you saying since the trial you recently recovered documents?*
>
> *THE WITNESS [Kenner]: The term recently may have been misspoken. I apologize, your Honor. Out of my 89,000 text messages, I went back to corroborate some of what I believe were factual inaccuracies by some of the witnesses and based on some of the documents that were delivered to Mr. Haley in preparation for the forfeiture hearing, and I saw they were going to introduce Mr. Nolan's testimony that he was unaware of a line of credit, that he never signed a line of credit, nor had he ever given me authorization to open up a line of credit. So I went back into our text message traffic from December 2007 where he and I had about a five day interaction over text messaging, and I found a text message that I had sent to him in response to his question what are the papers for, and I clearly laid it out and I can provide that to the Court as well. So Mr. Nolan was clearly aware, in '07 in addition to '06, '05. '04 and '03 when he signed documents sent directly to him. And all of those documents, your Honor, were delivered to us as part of the Northern Trust subpoena box.*
>
> *THE COURT: If you have uncovered any documents since the trial that you believe suggest that there is something inaccurate about the testimony in the trial, Mr. Haley should definitely submit them to me.*
>
> **THE WITNESS [Kenner]: _Yes, sir. We will do so_. Thank you, your Honor.**

**Evidence such as the following has been documented post-trial, based on clear and egregious trial perjury (*more likely than not suborned*)...**

- *A prepared defense attorney – or even an adequate one (under _Strickland_ standards) – would have been prepared to impeach each and every one of the following perjurious statements with evidence that resided at all times within his reach in the EDNY courtroom.*

9

**Voluminous identical evidence has been revealed in the Rule 29-33 motion and the *28 U.S.C. 2255* motion.**

- *The evidence Kenner produced is inarguable.  <u>The government knows it and needs to run from it</u>.  Dealing with it on its merits would only destroy the lies that began in 2009 thru FBI case agent Galioto...and following true-to-form, the government representatives have been forced to "follow the leader", even when they are being led "off a bridge"...*

The following is a tiny subset of the egregious trial errors and data lost in the morass of government-fabricated testimony.   It cannot be deemed simply *faulty memory, confusion and mistakes* (*Document 440 at 16*).   <u>It was **known** at all times by a willing prosecutorial team and **ignored**</u>.

The court knows that the government already <u>*lied*</u> during summation and rebuttal summation about <u>*how*</u> Kenner acquired his Baja Ventures 2006 Cabo san Lucas equity with his two (2) partners (who are not part of the superseding indictment). But – the court may not be aware that Kenner was not "*broke*" at any time (per another government ruse), and specifically not when Komatireddy told the jury during rebuttal summation (*Tr.5982*):

> <u>"*Kenner is broke*</u>. *He is entirely living off of his clients' money. He's entirely living off of his fraud. That's why you can take a snapshot, because there's no other money coming in.*"

- This also is an unchecked government lie.   The government's evidence shows Kenner's bank accounts with over $1 million cash at the exact time of these transactions (none ill-gotten), and Kenner's consulting company grossed over $400,000 that year alone; not counting additional Kenner-held assets.
  - *Sadly, not a single objection came from Kenner's trial counsel.*

**Kristen Peca...**
Although <u>*Kristen Peca was never a Kenner client,*</u> the government "**used**" her willingness (like Ethel Kaiser, *infra*) to present emotional testimony and further their foundationless theories to the jury.   This testimony was recently fabricated and manufactured for specific intent.

- ***Northern Trust Bank Default letter...***

1. Kristen Peca gave heart-wrenching testimony about receiving the "unannounced" default letter for her husband's line of credit ("LOC") (*Tr.709-713*).   Although Kristen Peca was never Kenner's responsibility (or client), there are text messages (in evidence) between Kenner and Kristen Peca to look out for the default letter in the mail *after* Michael Peca told Kenner that he was nervous his wife would find out about his LOC and default decision (by mail when not home), in agreement with the rest of the Hawai'i partners.[7]

   a. Kristen Peca was living in Ohio with her husband when the March 2009 default letter was mailed via certified mail and FedEx to her New York residence.   ***It was logistically impossible for her to have received the letter and wait for her husband to come home, as she testified.***

   ▪ Ignoring the logistical impossibility, Kristen Peca testified (*Tr.710*):

   *"I think I stood there holding that letter and didn't really move much until Michael got home. I was pretty much in shock. When Michael got home, I just handed it to him and I started crying immediately."*

2. Kristen Peca recorded Kenner for the FBI in July 2012.   The recordings lasted approximately five (5) hours, following a one (1) hour-plus recording between Kenner and Michael Peca during the same July 2012 timeframe.    During the recordings, *Kristen Peca confessed* that she was *not* aware of her husband's LOC until she was living in Ohio in 2008-09.   The recording confirmed as follows:

   ***Kristen Peca*** *– Well, I was referencing the earlier stuff that you said, I don't remember a large amount being distributed back to our account and the timing of the years of the loan, the line of credit, that happened when we were in OHIO (2008 & 2009). I don't understand how it could have been open for 5 years before that?   Because we had a bond account going.   **Do you mean the Hawai'i; you had a line of credit, but not for us**?*

   ***Kenner*** *– No, no, you guys had lines of credit for 5 years at Northern Trust.*

---

[7] The court should note that although AUSA Komatireddy called Kenner "*insane*" (*Tr.5998*) for suggesting the default strategy to recover the funds from Jowdy thru litigation -- and stop wasting $40,000 per month to keep the underlying collateral afloat, Owen Nolan (who was working hand-in-hand with Ken Jowdy and his attorneys at the time) chose independently to continue making the payments on his own when the Hawai'i partners were without capital to continue; based on Jowdy non-payments and Lehman Brothers' refusal to pay the $4 million in agreed "milestone" payments post-closing (in evidence).

**Kristen Peca** – _for 5 years?_

**Kenner** – _for 5 years!_   When you were in OHIO, that's when the thing (LOC) closed.

a.   Kristen Peca cannot believe that she is finding out on this phone call in 2012 that her husband, Kenner's client, had a LOC open for five (5) years without her knowledge.

b.   How could Kristen Peca have agreed to a 6-month LOC in 2005, when she _confessed_ that she did not know about the LOC until 3-4 years later (_in 2008-09 when it was about to close_)?

c.   Kristen Peca confessed she not aware that $555,571 was distributed back to their LOC in August 2006 (_from the Lehman Brothers closing_) in addition to $42,553 deposited into Michael Peca's Charles Schwab investment account (_also not in her joint name_) in 2006.

d.   Kristen Peca _confessed_ on the FBI call that she did not know about the Hawai'i LOC investment until 2008-09.

- **Thus -- how could Kristen Peca participate in the 2005 meeting, know about the 2005 set-up, or the 2006 distributions to their Northern Trust and Schwab accounts (documented in Rule 16 evidence)?   She could not!**

3.   Kristen Peca lied about her participation in a 2005 meeting and her objections to transferring bonds (a.k.a. her _"baby"_) – both of which have been proven as fabricated by Kristen Peca (and perhaps in conjunction with the government) (_Tr.698-99_):

   Q: When Mr. Kenner first proposed to you to move the _safety net_ and _make it collateral for the line of credit_, were you able to do that?

   A [Kristen Peca]: _No. I said right away, no, no, no, no, no, not touching that, **that's my baby. I put that together**_. That's our safety net, I don't like that. And he reassured us over and over no, no, no, this not the money account, the line of credit, that's collateral, nothing is going to happen to it, not a penny will go missing, Kristin it's okay, this is only six months, he kept reassuring me, nothing will happen to it. The bank needs to hold on to it in order for us to get the money for the project.

*Q: Did you ultimately decide to invest and move your bond account?*

*A [Kristen Peca]: Yeah, we did.*

**The problem is that NO bond account was ever moved**!   Someone needs to hold the government and Kristen Peca accountable for their disreputable suborned perjury. Kristen Peca's "bonds" story was a 100% fabrication by her and the government who tried to elicit sympathy by lying to the court and jury.

**John Kaiser...**
- *Kaiser was a business partner with Kenner in Hawai'i (with no personal investment funds contributed, according to government evidence), and in two (2) subsequent real estate renovation projects (California and Arizona).   The government's evidence confirms that Kaiser was __fully repaid__ from all three (3) projects, and tried to perpetrate a "back pay" and "expenses" ruse on the court to cover-up the Hawai'i re-payments that Kaiser stole from his friends & family (Tr.1413-1414).*

    o As the court knows, Kenner has requested "*in camera*" review of the Kaiser 2006-07 IRS taxes and any proof of "any" Hawai'i expenses (totaling $816,000).   The court denied Kenner requests on July 2, 2019.

        ▪ The court knows that Kaiser's testimony was 100% perjury and neither "excuse" was true; or in the alternative, the Court can allow the government to obtain the Kaiser proof that even a scintilla of his "*back pay*" and "*expenses*" testimony was factually accurate.  It does not exist...

    o *The government also knew – along with Kaiser – that none of it was true...*

- *Kaiser and the government's complicit "forgery" ruse...*

    The alleged Kaiser forgeries of the two (2) Constantine consulting agreements were the government's critical evidence to support the alleged "*concealment*" presented at trial (*See Document 501 at 2*).

    **Yet this incredible evidence was the actual "*ink*" versions -- of the alleged John Kaiser forgeries -- that were __recovered from John Kaiser's own home in Long Island NY__** (*GX-7004, GX-7005*).

Hawai'i COO Chris Manfredi, and Kaiser best friend, told the FBI in October 2010 that (*See 3500-CM-2-r*), that:

- He knew "*Constantine was paid early*" for his consulting work (*at 1*),
- He "*did get 1 or 2 to lend[er] $*" --
    - Urban Expansion [Constantine] and
    - Centrum Financial [Berreth] (*at 1*),
- He "*tried to get involved in raising $*" (*at 1*), and
- "*Constantine brought in $ to project-Hawai'i*" (*at 1*).

The court must ask...in 2010 -- what could Manfredi have known about Constantine's funding efforts -- *and told the FBI during 2010 proffer*, that he conveniently "*could not remember*" in 2015, unless he was assisted by government preparation for his testimony – failing his "*memory test*" (*Tr.3016*) -- so the government could claim "*concealment*" from critical evidence Manfredi clearly knew (in real time) and proffered to the FBI five (5) years before trial?

The crown jewel was the fact Manfredi confirmed the Constantine consulting agreements when he told the FBI (*at 1*) –

### "*Agreement – between PK [Kenner] or LLCs + Constantine*"

The court should note that during the November 13, 2013 search and seizure at Kenner home, the FBI recovered *photocopies* of the two (2) Constantine-Kaiser agreements.   The government documented them with BATES STAMPS along with 100% of the hundreds of thousands of seized documents that day, as follows:
    - 2004 agreement – *PKHOME00012892-12895*
    - 2005 agreement – *PKHOME00012887-12890*

Yet, on the "eve" of the May 2015 trial, the government announced that they had recovered the "*ink*" version of the two (2) Constantine agreements – *from Kaiser himself*.
- Further confirming that the "*ink*" versions were from Kaiser's home (after being held for ten [10] years -- since Kaiser respectively signed the 2004 and 2005 agreements)...they were *not* BATES STAMPED, at all.

- Instead -- they were "only" labeled for trial as:
    - 2004 agreement – *GX-7004*
    - 2005 agreement – *GX-7005*

14

It is suspicious, *at a minimum*, that Kaiser would possess the "*ink*" versions *at his home* -- if someone *forged his name* (?).  *It is wholly unexplainable.*  If the defense had produced evidence under the same "protocol" – the government would have screamed wholly hell to the court…and called them *frauds – frauds – frauds*…

Second -- **what consulting agreements could Hawai'i partners COO Manfredi have been referring to during his October 2010 FBI proffer, if the only agreements that have ever been produced, by Kaiser, are now allegedly forged?**
- Only the unchecked gall of the government allowed them to continue with their forgery ruse at trial, even after Kenner exposed their other two (2) forgery lies pre-trial (*See Document 675 [Kenner 2255 submission] footnote 21 at 59-60*).
    - Thankfully for the government's respect for the court, they defended these unexplainable anomalies as *faulty memory, confusion and mistakes – and did not try to allege they were true!*

- *Kaiser denies FBI confessions (3500-JK-1-r)…*

    As if the "*ink*" fraud on the court is not substantial and indefensible misconduct enough (for a re-trial), Kaiser and the government chose to present testimony that he *never* discussed the Jowdy loans (from the Hawai'i partners) during the six (6) independent meetings that SDNY Criminal Investigator, Scott Romanowski, and FBI case agent, Matt Galioto, detailed in their raw notes on October 19, 2010 (*3500-JK-1-r*).
    - FBI agent Galioto and the AUSAs sat silent during Kaiser's planned and disgracefully fabricated testimony.

    In concert with his 2010 FBI proffer, Kaiser had given detailed testimony one (1) year earlier confirming his independent Jowdy meetings and his friends & family loans to Jowdy (after his solicitations; not Kenner's).

    *Kaiser's voluntary testimony to the 2009 arbitration panel:*

    *Q: Tell us what your experience was with respect to that money right at the point there was a decision to start loaning money to Mr. – that Mr. Kenner had made a decision to start loaning some of that investor money to Mr. Jowdy?*

    *A [John Kaiser]: …So if we had some funds that were – that was stagnant and that warrant purchasing land, **we would utilize it for a loan**, so we actually made some money off of it.*

15

*Q: Was Mr. Jowdy at that time someone that appeared credible to you?*

*A [John Kaiser]: Well, the first thing, Mr. Kenner told me that he was, **and I met him a couple of times**.  He seemed – **a big thing it was 15 percent interest rate**, and I thought it was a good move.*

*Q: So at the time was there any representation about getting paid back this money when the Cabo deal closed?*

*A [John Kaiser]: **It was supposed to be a short-term loan**.  I thought it was three to six months, **because I had also raised some other funds from family and friends** that were getting a little antsy about it.*

*Q: At the time this money was lent to Mr. Jowdy…did anybody anticipate he wasn't going to pay you back when the Cabo deal closed, the Lehman Cabo deal?*

*A [John Kaiser]: **No.  Otherwise, I wouldn't have lent it.   I wouldn't want to go down that route.***

*Q: When you made the decision – or when you were made aware that some of this money was going to be lent, rather than sitting idle in an account, at 15 percent, did you know there were some risks?*

*A [John Kaiser]: At the 15 percent – actually, **the loans**, I didn't think they were going to be – to me it wasn't a risky loan…**but the loans -- even the investors I brought in – I said.   Listen.   This guy – I gave him the whole story of Ken Jowdy back by land.   It's good.  Better than your money sitting somewhere.***

During trial – Kaiser tried to un-explain the clear and convincing 2009 testimony with a virtual **"word vomit"** (*Tr.1107*) (*See Document 501 at 91*):

*Q: Well, you know, sir, for a fact, do you not, that ~~Kenner~~ [sic] Jowdy requested and received a loan that at some point reached approximately $5 million from Little Isle IV and Ula Makika where he was to repay that loan with 15 percent interest, correct?*

> MR. MISKIEWICZ: Objection; time frame.
> MR. HALEY: At some point in time.
> THE COURT: Overruled. You can answer.

*A [John Kaiser]: **When I testified at Owen Nolan, that's what I believed when I testified because as of 2006, Mr. Kenner had told me that when --***

*the same time he told me my money went to Mexico so post that I learned that.*

The Court referenced Kaiser's "**word vomit**", *supra*, as an excuse for why Kaiser was not aware at the time of his 2009 arbitration testimony – but nothing about what Kaiser said in this 2015 testimony, *supra*, was comprehensible.

- To the contrary, there was nothing ambiguous about the voluntary Kaiser testimony in 2009.  It was clear.  It corroborated the actual facts in evidence, including Kaiser's subsequent 2010 FBI proffer.  And, it remains bulletproof – thus hi-lighting the incomprehensibility of Kaiser's failed 2015 attempt to "*un-ring the bell*" for the government's theories of "no knowledge".

**Ethel Kaiser...**
- *In 2005 -- John Kaiser solicited $1 million from his friends & family.  According to the government's evidence, Ethel contributed $850,000.  She gave testimony at trial that her son told her it was only $390,000 (Tr.933) and verified that she was fully repaid (thus not a victim – unless John Kaiser is now considered a co-conspirator to keep the government ruse alive – like the addition of Jowdy is considered a co-conspirator "now" [See May 14, 2019 transcript at 37 – further moving the goalposts to cover their ever-deteriorating theories]).*

*As a fabricated venue element,* the government "**used**" Ethel Kaiser (like Kristen Peca, *supra*) to <u>verify</u> an alleged 2005 "event" when she met Kenner to discuss the "*loans to Hawai'i*" with her son (<u>*never* loans to Kenner</u>) (*Tr.934*):

> *Q I'm showing you what has been marked for identification as **<u>Government 942</u>**. Do you recognize who is depicted in that photograph?*
>
> *A [Ethel Kaiser]: Yes; <u>Phil Kenner, my son John, and his baby</u>.*
>
> *Q Which baby is that?*
>
> *A [Ethel Kaiser]: A grandchild that John had just had.*

- The problem with the government "**cover story**" is that John Kaiser's previous baby boy died in 2005 (stillborn) and the baby girl pictured in the photo (*GX-942*) was not even born until the following year (2006) – *after* Ethel was repaid "*[d]own the line, from my son*" (*Tr.934*), as she told the EDNY.

17

- John Kaiser confirmed the fabrication of his mom's testimony about a face-to-face 2005 meeting to discuss the loan moments later (*Tr.976*):

  > Q And why was he [Kenner] asking you for a loan, if you know?
  >
  > A [John Kaiser]: Excuse me?
  >
  > Q Do you know?
  >
  > A [John Kaiser]: He was giving me an opportunity. I was actually home at the <u>time [2005] because in June my wife and I had lost a baby so I was home. He had called to say he was sorry for what happened, but that he had an opportunity for me</u> to make or -- you know, to make some good interest on a loan that was approximately 30 days.
  >
  > Q And what was the total that you were asked to loan him?
  >
  > A [John Kaiser]: The total was $1 million.

  Clearly the government and Ethel Kaiser were wrong; one (1) year off in the timing (2006 v. 2005) – *but wholly to their benefit*.   All of this disregarded the simple fact that Ethel Kaiser was not an EDNY resident; she resided full-time in the Northern District of New York.

- No trier of fact could have deciphered the timing of the events and believed that the government (above reproach) would "**use**" an old lady to further their fraud. *But – unequivocally – they did.*

  This was another outrageous fact pattern the government fabricated with willing participants to prejudice Kenner – contradicting themselves.   Ethel Kaiser met Kenner no earlier than 2006 at the baby christening she described to the EDNY court, *supra* (*GX-942*); <u>*clearly not in 2005 prior to the loan*</u>.   Nevertheless, any of the contacts would have been predicate acts, not sufficient to satisfy venue; and wholly left unchallenged by underprepared counsel.

**Jay McKee...**

During the 2015 trial, the government confirmed during a sidebar discussion that <u>*Jay McKee was **only** an alleged victim of the GSF scheme*</u> (*Tr.1846*).   The underlying issue with the alleged GSF criminal scheme was that McKee – like others – <u>***were not***</u>

*aware of the various "use of funds"* -- as solely distributed, managed and controlled by Constantine (as Constantine stipulated to during trial – and attorney Ronald Richards testified); *never Kenner.*

*In concert with the government's prosecutorial theories*, McKee claimed "*no knowledge*" of the GSF use of funds, contradicting what was specifically outlined in McKee's *authorization* email for the "exact use of funds" (*GX-6602*) (*Tr.1821-1824*).

Then, for further emphasis by the government once McKee "*failed to recall*" any of the uses he authorized on first (1st) impression -- or his text conversation with Kenner, *infra*, the government asked McKee the same questions *again* – *this time* – receiving a more *firm* "*No*" response for each of the *signed-off* and *approved* uses (again suborned or thru **CTE**-laden *faulty memory, confusion and mistakes*).   McKee followed the government script flawlessly by denying 100% of what was discussed at the GSF dinner meeting on May 8, 2009 – 6 years earlier (*Tr.1823-1824*).

If McKee were 100% truthful about these critical, 6-year-old issues (or in turn did not "*fail his memory test*"), which played a heavy role in the conspiracy conviction of concealment by Kenner – it could be deemed appropriate and damming testimony...

**But** – to reach that "*concealment*" conclusion – the government would have to ignore the fully detailed and 100% contradicting text communication between Kenner and McKee -- immediately *after* the May 8, 2009 dinner (*infra*):

McKee testified (*Tr.1815*):

> *Q. And at the time that you were having this conversation and deciding to give money to the fund, what did Mr. Kenner and Mr. Constantine tell you about how the money would be used?*
>
> *A [McKee]: I was under the impression that the money would be used to buy Ronald Richards for his expenses to again go after Ken Jowdy for the northern property in Mexico.*

- At no time (post-dinner) does McKee act aloof or concerned that he had not heard the "same" text details during the dinner meeting that had just completed *only hours before*...(all *prior* to his acknowledged follow-up independent communication with Michael Peca about the GSF) (*Tr.1817*):

McKee in BLACK (read) -- **Kenner responses hi-lighted (sent):**

19

| 7032 | +171680349 03 Jay McKee* | 5/9/2009 3:46:20 AM(UTC+0) | Read | Thx 4 making the trip bud.. **Took in alot from the talk tnite.. Drive safe, be in touch..** |
| 8255 | +171680349 03 Jay McKee* | 5/9/2009 3:55:39 AM(UTC+0) | Sent | Good stuff |

Then, McKee continued by re-engaging eight (8) hours later:

| 7039 | +171680349 03 Jay McKee* | 5/9/2009 12:36:25 PM(UTC+0) | Read | <u>Can u do me a favor.. Can u email me, so I can look at it on paper, everything my 2SO turns into.. Nicole was speaking with Tommy when u explained to me all the areas where we are benefiting..</u> |
| 8265 | +171680349 03 Jay McKee* | 5/9/2009 12:37:21 PM(UTC+0) | Sent | **I will have tommy do it so it's <u>consistent</u> with the discussion** |
| 7040 | +171680349 03 Jay McKee* | 5/9/2009 12:37:42 PM(UTC+0) | Read | **Perfect, tks** |

Then, McKee continued by re-engaging one and a half (1-½) hours later:

| 7043 | +17168034903 Jay McKee* | 5/9/2009 2:12:22 PM(UTC+0) | Read | Hey, also, could u email me what the 3 black sheep are getting in the end result, as well as Tommy bullet points they had 2 agree too.. Tks |
| 8269 | +17168034903 Jay McKee* | 5/9/2009 2:32:11 PM(UTC+0) | Sent | Tommy said you will get 1/10th of everything that is acquired of theirs which includes 20% (2% for you) of the <u>airpark building</u>, 1/10th of their 3.64% of their Eufora shares (.364% for you which puts you just over 1% in <u>Eufora</u>) and then a small piece of the <u>jet</u> which TC is still crunching numbers on but it will probably be 1% of it. |
| 8270 | +17168034903 Jay McKee* | 5/9/2009 2:35:46 PM(UTC+0) | Sent | TC will send you the bullets they agreed to but has to wait till it's actually signed. Should be a day or two. They have only agreed by email so far. He will also send you the media summary but he wants you to convince the owner of Chef's to send him the tomato sauce Fed Ex. |

| 7044 | +17168034903 Jay McKee* | 5/9/2009 2:43:44 PM(UTC+0) | Read | Haha.. Consider it done.. I'll have Lou put some bottles together with the extra |

20

| | | | | meat for the real flavor.. |
|---|---|---|---|---|
| 8271 | +17168034903 Jay McKee* | 5/9/2009 2:45:55 PM(UTC+0) | Sent | Thx |

Then, McKee continued by re-engaging forty-five (45) minutes later:

| | | | | |
|---|---|---|---|---|
| 7045 | +17168034903 Jay McKee* | 5/9/2009 3:36:47 PM(UTC+0) | Read | Did TC say the jet was worth 250m last night? |
| 8273 | +17168034903 Jay McKee* | 5/9/2009 3:44:10 PM(UTC+0) | Sent | The jet is worth 1.5m. He invested 250k to repair it |

| | | | | |
|---|---|---|---|---|
| 7046 | +17168034903 Jay McKee* | 5/9/2009 3:45:53 PM(UTC+0) | Read | Aha.. Thats where the 250 number came from.. |

| | | | | |
|---|---|---|---|---|
| 7048 | +17168034903 Jay McKee* | 5/9/2009 3:53:08 PM(UTC+0) | Read | In the deal, the 3 guys get their money back from their involvement with TC, but nothing back from their Mexico deals, correct.. |
| 8276 | +17168034903 Jay McKee* | 5/9/2009 3:54:14 PM(UTC+0) | Sent | Correct! |

Then, McKee continued by re-engaging two (2) hours later:

| | | | | |
|---|---|---|---|---|
| 7053 | +17168034903 Jay McKee* | 5/9/2009 5:43:22 PM(UTC+0) | Read | If we get control of Jowdys Cabo equity and move to sell Cabo - we get our 500 back from del mar, and what percent of Cabo do we end up with? |
| 8282 | +17168034903 Jay McKee* | 5/9/2009 5:48:03 PM(UTC+0) | Sent | Its impossible to say until we know everyone who's involved in getting Jowdy's 40%. For example, the new bank/investor may want half of it to do the deal. But...whatever it is, you will get 1/10 of it. |

Then, McKee continued by re-engaging four (4) hours later:

| | | | | |
|---|---|---|---|---|
| 7060 | +17168034903 Jay McKee* | 5/9/2009 10:01:18 PM(UTC+0) | Read | So is it correct to say we'd get our 500 back from del mar, as well as a prob minumium 2% of Cabo? Sorry to keep asking - just trying to get it right.. |

If McKee did not lie on purpose (or was persuaded) in 2015 to support the government's claims of *"conspiracy by concealment"*, then the inaccurate and unreliable testimony by McKee, certainly and prejudiciously contributed to the ongoing synchronized amnesia (a.k.a. **CTE**) by the GSF contributors.  The faulty and

21

inconsistent testimony was entirely in the government's favor (again) while seeking a conviction of Kenner – for alleged crimes that McKee – in particular – exhibited *faulty memory, confusion and <u>clearly</u> made a mistake*.

- What has the government or McKee done to make sure the court is alerted to this significant error?   To date – they are doing nothing about a conviction relying heavily based on *faulty memory, confusions and mistakes*...&/or a series of "*failed memory tests*".

- According to the government – this was the <u>*only*</u> relevant testimony to support the government conviction allegations thru McKee – and it is clearly FALSE...*leaving McKee as another non-victim.*

"*Truth is about credible evidence – not strong opinions.*"   -- President John Adams

The Kenner 29-33 Reconsideration motion hi-lights dozens of similar and substantially ignored pre-trial evidence patterns to allow a faulty memory, confusion and mistakes-laden stream of testimony.   There is no plausible objection to any of the Kenner-challenged issues in the voluminous motion, because the facts are the facts.

President John Adams addressed this exact issue in the context of truths, versus rhetoric, representing:

> "*<u>Facts are a stubborn thing</u>; and whatever may be our wishes, our inclinations, or our dictates of our passions, they cannot alter the state of facts and evidence...*"

As denoted by President Adams, objective evidence and logical arguments are often not merely lacking but ignored in many discussions by those with the vision of the anointed.  Much that is said by the anointed in the outward form of an argument turns out not to be substantiated arguments at all.  Often the logical structure of an argument is replaced by preemptive rhetoric [*media reports, threats, and suborned perjury*] or, where an argument is made, its validity remains unchecked against any evidence, even when such evidence is abundant.   Evidence is often particularly abundant when it comes to statements about history, yet the anointed have repeatedly been demonstrably wrong about the past, as they are about the present or the future – yet supremely confident.   **They remain often wrong, but never in doubt.**

**Kenner's _28 U.S.C. 2255_ submission...**

The government again relies on a timeliness argument, while they are deftly aware of Kenner's well-documented work restrictions at MDC (_infra_); 100% out of his control.  The instant case was deemed voluminous in 2014, and the workload is substantial (specifically in ProSe).   Kenner's best availability to produce work-product is minimal at best, while in detention regardless of the "court order".

The court is also aware that Kenner prepared a _28 U.S.C. 2255_ motion _before_ Constantine's 2017 submission (without the help of resisting counsel).   Post-trial counsel in 2017 informed Kenner that he would not assist in the submission of Kenner's motion.   Counsel "disappeared" for over a month while Kenner was pleading counsel to visit MDC and submit the prepared motion to the court.   Upon counsel's re-emergence, he claimed he was on vacation during that time, but counsel represented other defendants known to Kenner and held face-to-face meetings at MDC during the "vacation" period.   The avoidance, perhaps based on undue influence, was identical to that which Kenner experienced with his trial counsel and documented in pre-trial communication (_See Document 675 at 31-34, Ex. 3_).

Despite the general preference for considering ineffective claims on collateral review, in _United States v. Brown_, 623 F.3d 104, 113 & n.5 (2nd Cir. 2010), the Second Circuit reversed the lower court and held, in a case of first impression, that when an ineffective claim is raised after conviction but prior to sentencing, "the district court may, and at times should, consider the claim at that point in the proceeding" in the form of a new trial motion.

- In _Brown_, similar to the instant case, the government raises the issue that "review of a plea deal withheld by counsel" is not just subject for review, but reversible error.   Kenner's trial counsel never shared _Document 41_ with Kenner or even alerted him that an offer existed pre-trial.   As the court is aware, Kenner has previously requested a copy of _Document 41_ from the court and the U.S. Attorneys office, once discovered.   _Kenner has still not received either to-date._

| 03/11/2014 | 41 | Letter _from the government providing a proposed plea agreement_ as to Phillip A. Kenner (Capwell, Carrie) (Entered: 03/11/2014) |
|---|---|---|

- Since receiving the printed docket from the Court in 2019, Kenner has been made aware of multiple filings (or non-filings) related to the case; at all times inaccessible and unknown to Kenner.

23

**The government needs to run and hide from the facts...**

The government's case, as expressed pre-trial, denoted their entire "concealment" prosecutorial theories.

- Clearly, the individual Hawai'i partner investment funds were administered by Kenner at all times pursuant to their "signed off" authorizations with Northern Trust Bank (verified in the Northern Trust Bank subpoena delivered during trial) – and subsequently in accordance with the Hawai'i partners Little Isle 4, LLC By-Laws at all times; *never varying.*

- The Court and the government know that *no diversions* were made to Kenner thru these funds.   The government and the court also know that the "loans to Jowdy" and the "consulting payments" (made to 17 hard money lenders; including Constantine) were *authorized* activities of the LLC.

However, the government chose to prosecute under "concealment" (which is their choice), if there is even a legal position requiring someone to *re-double* authorizations from people who (1) signed off already, (2) "did not read" disclosures and reports provided them[8], and (3) refute the LLCs administrative actions (authorized in the corporate governing document).

This case, as Kenner has deftly papered with incontrovertible empirical evidence ignored by the government pre- and post-trial to form their theories, has independent and third (3rd) party professionals involved who interacted with the investors regularly – *and represented them independently* -- before, during, and after the transactions (in question).

---

[8] *See Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A.*, 461 Fed. Appx. 61; 2012 U.S. App. LEXIS 3012

- In *Horvath*, **the investor argued that the terms and conditions were *written in Portuguese*, which he did not understand, but the court of appeals found that the investor was charged with knowing and understanding the contents of the documents *that he signed*.**

- **If the signer can read the instrument, not to have read it is gross negligence; if he cannot read it, not to procure it to be read is equally negligent; in either case the writing binds him.  Parties are bound by documents expressly incorporated by reference into agreements to which they manifest their assent.**

24

The government opposition states Kenner's *"motion lacks any facial plausibility"*. Just to the contrary, over a dozen independent professionals were never contacted to prepare as defense witnesses, nor were they ever interviewed.   The court knows that failing to investigate is considered negligence under *Strickland* standards.  See *Strickland v. Washington*, 466 U.S. 668 (1984).

Certain types of errors create a presumption of prejudice.   See *United States v. Cronic*, 466 U.S. 648, 662 (1984) ("presumption of prejudice involving representation by ill-prepared, inexperienced attorney in complex white collar criminal case").
- ***This case epitomizes each element of Cronic to Kenner's detriment.***

Under the *Strickland* analysis, courts are to grant significant deference to trial counsel's strategic decisions without the benefit of hindsight. *See Strickland*, 466 U.S. at 90. "However, strategic choices made *after less than complete investigation* are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *United States v. Velazquez,* 197 F. Supp. 3d at 510 (internal citations omitted).
- ***In the instant case, there was literally none.***

"As the Second Circuit has held, a decision not to prepare an adequate defense because a defense lawyer thinks the prosecution's case is weak is not 'strategic.'  *It is motivated by the desire to avoid work*, not to serve the best interest of the defendant."  *Garcia v. Portuondo*, 459 F. Supp. 2d 267, 287 (SDNY 2006) (internal citations omitted).
- ***In the instant case, trial counsel claimed the government's case was "weak" from the beginning***.

Similarly, if an attorney has "no idea" why a decision was made, the court cannot label it "strategic." *Moore v. Johnson,* 194 F.3d 586, 610 (5th Cir 1999); *see also Bean v. Calderon,* 163 F.3d 1073, 1079 (9th Cir 1998) (noting that a decision cannot be characterized as "strategic" where it was a result only of "confusion").
- ***In the instant case, trial counsel claimed the "complex" nature of the case would benefit the defendant – but put no effort in to prepare for the same complexity (thru subpoena or witness interviews) -- nor did he request additional manpower from the court***.

It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case."  *Id*. at 2466 (citations omitted).   *Rompilla v. Beard*, 545 U.S. 374, 387 (2005)

25

(quoting 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp)).
"[C]ounsel has a duty to make reasonable investigations or to make a reasonable
decision that makes particular investigations unnecessary." *Lindstadt v. Keane*, 239
F.3d 191, 200 (2d Cir 2001) (quoting *Strickland*, 466 U.S. at 691).

- ***In the instant case, there were literally no investigations with over a
  dozen investors who knowingly had given pre-trial "under oath"
  confirmations of full Kenner transparency in each of the alleged
  conspiracy "objects".***
- ***None (of 22) were called at trial to verify transparency and independent
  knowledge as hi-lighted by Kenner.***

**For example, an attorney's failure to interview readily available witnesses is
ineffective.**  *See United States v. Gray*, 878 F.2d 702, 782 (3d Cir 1989) ("under the
circumstances, counsel's behavior was not colorably based on tactical
considerations but merely upon lack of diligence.")   "The duty to investigate is
essential to the adversarial testing process '[b]ecause th[e] testing process generally
will not function properly unless defense counsel has done some investigation into
the People's case and into various defense strategies.'" *Green v. Lee*, 964 F. Supp. 2d
237, 256 (EDNY 2013) (quoting *Greiner v. Wells,* 417 F.3d 305, 320 (2d Cir 2005).
"Pretrial investigation and preparation are the keys to effective representation of
counsel." *United States v. Tucker*, 716 F.2d 576, 581 (9th Cir 1998).

- ***In the instant case, the delivery of*** government-forfeiture-36 ***and***
  government-forfeiture-44 ***during the government's forfeiture case proved
  that significant exculpatory material was available (at a minimum) but
  not researched by trial counsel, nor prepared by forensic analysis, both
  prejudicing Kenner's defense***.

As the Court knows, Kenner alerted the court on the record during his June 2017
Rule 33 Oral Arguments that he was preparing a *28 U.S.C. 2255* motion for the court.
Only the issues at MDC Brooklyn hindered the process, never Kenner's lack of desire
to complete it for the court.   The court should note that all three (3) of Kenner's
attorneys refused to assist Kenner in the preparation of the *28 U.S.C. 2255* motion
(documented thru emails), leading in whole or in part to their termination.  On its
face, Kenner cannot be held responsible for any delay.   Additional issues are
discussed, *infra*, related to Kenner's detention issues and access to his designated
work area (previously raised in the courtroom) that delayed the production and
quality of Kenner's submissions.

In fact, the court should note that the government was aware of the *28 U.S.C. 2255*
submission on July 2, 2019.   They waited three (3) weeks to simply claim

26

Case 2:13-cr-00607-JFB-AYS   Document 700   Filed 08/19/19   Page 27 of 32 PageID #: 17069

untimeliness, failed to deliver notification to Kenner about their position, and now wait six (6) weeks later for Kenner's response.   Nothing restricted the government from beginning the inevitable task of opposing Kenner's motion (while clearly pleased with Kenner's ineffective trial counsel's lack of efforts).   Other than their own desire to restrict the Court from reviewing the merits of Kenner's arguments and ruling accordingly, the government skillfully manipulates their own delay tactics into play.

Kenner requests that the Court order the government to begin their responsive period immediately.   They had unrestricted access to Kenner's trial counsel when they needed "leaked" information (*See Document 675 [Kenner 2255 submission] footnote 21 at 59-60*) and felt it proper to "lean" on him pre-trial (*See Document 675, Ex. 3*), *infra*.   Kenner is sure he will avail himself accordingly, commensurate with his documented and previous pro-government assistance.

The government cites the "delays" related to Constantine's *28 U.S.C. 2255* submissions, glazing over the fact that Constantine is "out on bail" and typical of a non-detained defendant, has no immediate desires to hurry any part of the post-trial process.   That is not Kenner, in this instance or any other.

Lastly, in a similar delay issue (to other submissions, *supra*) the current restrictions on work at MDC may force a responsive delay in Kenner's sentencing memo and forensic accounting, *out of Kenner's control*.   And -- the court knows that Kenner has repeatedly asked for the forensic analysis to be complete for over a year and has only completed the initial meeting, shortly after the last status conference.[9]

**In summary...**

The government knows that each fabricated testimony has provable motive and has been suborned.   The government is aware that Kristen Peca admitted on her 2012 FBI recording of Kenner that FBI agent Matt Galioto told her and Michael Peca that "*Kenner stole your Hawai'i money and bought his piece of the Cabo resort with it*".

---

[9] The court should note that Kenner fully briefed the forensic accountant with the full-back-up records needed to complete his task (100% produced by the government) over a year ago.   In spite of Kenner's constant droning about completing his forensic work product, no response has come from the accountant to date.   He is the same accountant Constantine utilized a year ago.   In a July 2019 meeting (after a one year hiatus) Kenner explained the necessary timeline and court's schedule.

27

> *Kristen Peca* – *Matt [Galioto – FBI agent] told Michael and I that you stole all of the Hawai'i money and never gave it – the loan money -- to...uhhhh...Jowdy.*

> *Kenner – Kristen – I have all of the bank records that prove the money went to Jowdy and his accounts at all times.  I told you that already. You told me that you saw the bank records after I sent them to Michael.  You know -- the attorneys who sued Jowdy for the money in Mexico and Arizona and California used them to confirm the loans before we sued?*

> *Kristen Peca* – *but – I don't understand why he would say it.*[10]

John Kaiser confirmed that the government cover-up about Kenner (to protect Jowdy) – espoused by Kaiser, Berard and Galioto in 2011 to the Pecas (and others), *supra*, was *not true*...Kaiser told the EDNY court in his February 28, 2019 letter (*See Document 628 at 1*):

> *"Jowdy would like the court to think that Kenner stole $7 million from the hockey players and others..."*

**Obviously the court *now* knows that Kenner did *not* steal any of it.**

The government's own accounting (*government-forfeiture-36*) proves it...

- Now – the government's forfeiture attorneys (who did not work on the Kenner trial) are seeking disgorgement from Kenner and Kenner's two (2) Baja Ventures 2006 partners with $4.1 million in the Cabo project – ***over 65% of the initial capital***.   They do not care that *none of the funds are from tainted sources*.   The government confirmed it, themselves, thru their-own forensic accounting – post trial -- (*government-forfeiture-36*)...

---

[10] One (1) year after Michael Peca's 2011 SDNY Grand Jury *confirmation* of his *full knowledge* of (1) the use of funds of his Northern Trust Bank LOC, (2) his expectations that his *entire* $1.8 million was going to Jowdy as part of the Jowdy-loans, and (3) the "*group decision*" to loan the funds to Jowdy -- it begs the court to answer if Galioto's false dissemination of "*Kenner stole your money*" (supported by Jowdy employees, Kaiser and Berard's advocacy of the same storyline) *changed* their perception of Michael Peca's 2011 testified "truths" -- and persuaded both of them to fabricate a "no knowledge" storyline – simply to get their money back.

- Any rational person would chose to believe the perceived FBI morality and "go along" with their plan to recover funds they now (in 2012 – post SDNY Grand Jury testimony) believed Kenner actually "*stole*" from them (despite its lack of substantiation).

It is unexplainable why Jowdy's cabal and the two (2) decades of racketeering efforts are as obvious as a biblical locust plague (*See Document 667*) – yet the government is trying to force the court to forfeit items in violation of the 5th Amendment; affecting more people than Jowdy has already abused for nearly two (2) decades.

- At least since Kenner's *Document 667* submission, Jowdy's well-paid legal advocates have stopped promoting the hoax that Jowdy did not criminally abuse Kenner and Kenner investors – just as Kenner proffered to the FBI in June 2009 (although still ignored ten [10] years later; lacking indictment for his entire cabal thru Racketeering and other documented criminalities).

The government has no nexus to Baja Ventures 2006 – yet are trying to force the court to violate the 8th amendment's "excessive fines clause" (*See government-forfeiture-36* and *government-forfeiture-44*).

And – 22 of the 26 Hawai'i partners have given unchallenged "*under oath*" statements to various courts that they "approved" the Jowdy loans – and want the money back from Jowdy; *not Kenner*.  The government cannot explain how taking the "untainted" asset from Stumpel, Lehtinen and Kenner is going to replace the "memory loss" of four (4) Hawai'i investors out of 26 (with none other victims).

Even *former* FBI favorite – John Kaiser (when the FBI needed to get rid of Kenner to protect Jowdy in Mexico)[11] – cannot get FBI cooperation now (*See Document 628* pleading to the court to give adverse-Jowdy testimony now that he was fired by the man he discovered as a "thief" after acting as his co-conspirator from 2012-2017).

- Kaiser has had eight (8) years to "come clean" about the his truths, but was systematically used by Jowdy's cabal and Galioto to provide fabricated testimony at every turn at trial.   Kaiser's *shocking* letter to the Court in February 2019 should provide ample resolve that the verdict has been tainted.

Kaiser told this court in February 2019 that he wants to expose what Kenner had already exposed "in real time" when Kenner (1) discovered the Jowdy criminality (in 2007) – (2) sought to resolve thru negotiations and litigation involving Jowdy and the investors (in 2007-2010) – and (3) proffered as the *whistleblower* to the FBI

---

[11] It is an unexplainable turnabout after the NY Daily News (*November 13, 2013*) touted Kaiser and Berard as "*heroes*" for their efforts with FBI Agent Galioto and featured them in an arrest-day article titled – "***Former NHL Player Bryan Berard and ex-cop help Feds nail two Arizona men in massive fraud***".

– SEC – and EDNY U.S. Attorneys office (in 2009).   Kaiser and the court need to acknowledge that Kenner was attacked as "*lying*" at trial by the government for claiming the same criminal malfeasance by Jowdy at all times (*Tr.5064-65*).   This is the same "brazen" representation that probation has also recommended an "*obstruction of justice*" enhancement for Kenner; which would expose (if true) Kaiser to *18 U.S.C. 1001*, perjury charges (like the other government witnesses, *supra*).

The Kenner forensic detail of the cash flow confirms that all of the investors are in the *positive* from their investments.   That is not disputable.   The banking records in evidence confirm it – **but they are further ignored by a desperate government position** (to end this case, blame it on Kenner, and move on) – complicated by the egregious "*Kenner stole the money to buy his Mexico equity*" lie...

**"Trace the money, trace all of the money!!"**
(*Tr.4594*)

*(**Kenner: 2012 FBI recording with Kristen Peca...)*

It is inexcusable that the government wants to make Kenner's two (2) Baja Ventures 2006 partners the *newest* and *biggest* victims (by Jowdy and the complicit government) in the last twenty (20) years by forfeiting their 100% paid-for and *untainted* $4.1 million equity position – and turn it over to the government (or possibly their other Hawai'i partners) when there are *only* 4 Hawai'i partners of the total 26, who are alleged as victims of "*concealment*".   The prosecutorial basis for the four (4) of them was fully admitting to "*remembering what they were never told*" – although their own pre-2015-trial evidence confirms "*they already knew it*".

It is wholly confounding...

Out of frustration for the government's overbroad forfeiture attempts -- Judge Bianco told Jowdy's attorneys in court on July 2, 2009 (in sum and substance) –

> *"You think I am going to allow Mr. Jowdy to keep his stuff when Mr. Kenner has told this court for years that all of the money went to Jowdy and the government's records prove it?"*

How does that comport with??...

(*Tr.5721* – Michiewicz summation) --

> *"It bought him [Kenner] a 39 percent interest in Ken Jowdy's Cabo San Lucas".*

And (*Tr.5990* – Komatireddy rebuttal summation) –

> *"Mr. Kenner told you that he used that money to get his piece in the Mexico investment with Ken Jowdy. You know exactly what that's for. That's in evidence."*

### It does not because none of these statements were proven at trial –

### Nor were they ever true!

The government needs the court to ignore their documented pre-trial witness manipulation.

No reasonable person (specifically Peca, Nolan, McKee) would hear that gross lie about Kenner stealing the "Jowdy loan money" from the FBI and challenge it as meritless, so perhaps, the gross misrepresentation led in some calculable way to the willingness to: (1) fabricate meetings Kristen Peca was never in (by her own recorded admission), (2) received documents in *"shock"* (under logistically impossible circumstances), and (3) alleged to have transferred bonds (after pleading with Kenner not to transfer it (*Tr.697-700*) – corroborated by her husband's trial lie [*Tr.385*])...*when none of those things could logistically could have happened*.

At a minimum, the Peca manipulations and subsequent fabricated testimony (including Peca re-canting his "no knowledge" of Jowdy loans – *Document 501 at 9*) is more than enough prosecutorial misconduct to persuade a court that a new trial is warranted &/or the current reconsideration motion is necessary to review.   If it is not, there is no question that the under-preparedness of Kenner's trial counsel allowed these fabricated facts to go unchallenged from the "emotional" testimony of Kristen Peca, Ethel Kaiser &/or the other 100-ish issues raised by Kenner, clearly exposing a *"memory loss"* prosecution strategy for a tiny subset of investors who contradicted *all* of their-own pre-trial representations.[12]

---

[12] The court should recall that only four (4) of the 26 Hawai'i partners claimed they were not aware of the *authorized* acts Kenner performed as Managing Member of the Hawai'i partners (loans to Jowdy and consulting payments to seventeen [17] 3rd party individuals). The other 22 have *only* full-knowledge corroborating statements on the record supporting Kenner, their knowledge, and full transparency at all times.

Kenner is imploring the court to order the government to respond to the empirical claims by Kenner in the Rule 29-33 reconsideration motion and the *28 U.S.C. 2255* motion, plainly full of merit and in the true interest of justice, regardless of how long this ruse has carried on and by whom since Kenner's whistleblowing in 2006.

Sincerely,

Philip A. Kenner

---

In addition, the vetted Eufora private stock sales *only* claim five (5) of the eleven (11) investors were victims -- while the remainder were fully informed and represented by the same Giuliani investigative team, who found no wrongdoings in the 2008-09 private stock transactions with their own clients – when they sued Constantine and Eufora for other malfeasances in Arizona and the EDNY (and not by "*different lawyer*" as AUSA Komatireddy *lied* again to the court during her unchallenged, rebuttal summation – *Tr.5960*).