**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
|
**UNITED STATES OF AMERICA**                          |
|
    **against-**                                             |
|                                    **Docket No. 13-cr-607 (JFB)**
|
**PHILLIP A. KENNER and**                             |
**TOMMY C. CONSTANTINE,**                             |
|
|
**Defendants.**                                       |
-------------------------------------------------------X


**Sentencing Memorandum**

**On Behalf Of**

**Philip A. Kenner**

**TABLE OF CONTENTS**

*TABLE OF AUTHORITIES...6*

*Preliminary Statement.........10*
- *Kenner's Prose PSR Objections Object In Detail To The Government's Guideline Position.........14*
- *What Did Kenner's Clients Say In Real Time (Pre-CTE Symptoms And Outside Influence).........16*
- *Further verification of the government trial frauds to prejudice Kenner.........19*
- *Government-forfeiture-36.........12 et.al.*
- *Demand on the government?? .........21*
- *For the purposes of calculating the Guideline range.........22*
- *The 100% (+) Untainted Cabo Investments.........23*
- *Government-forfeiture-44.........12 et.al.*
- *Jowdy Loan Verification.........30*
- *The Government Produced No Contrarian Evidence.........36*
- *Pro-Jowdy Advocates Spread The "Kenner Stole Your Money" Rumor.........36*

*A Case of Contradictions.........41*
- *Former U.S. Attorney for the State of Utah, Brett Tolman, espoused the "power" of the position.........43*
- *So – What Has The Government Done To Malign Kenner, Lie To The Court, And Defraud The Investors – With Has Prejudiced Kenner And The Verdict?.........44*
- *John Kaiser exposed his co-conspirator, Ken Jowdy, and the FBI storyline of lies.........53*
- *Another U.S. Attorney In The 2nd Circuit Further Confirmed The Kaiser Mantra About Jowdy's Emboldened Truths.........54*
- *John Kaiser – Refused To Assist In The Recovery Of The Hawai'i Loans.........55*
- *The Fall-Out And Confusion From The Decade-Long Hoax.........56*
- *Jowdy's Cabal Initiated Their First Line Of Slander Attack Thru The Media (Substantiated By Unconventional FBI Procedures).........57*

*Kenner History.........59*
- *Kenner Met Jowdy Thru Existing Clients.........60*
- *Kenner Sues Billion-Dollar Company To Protect Clients (At Kenner's Career And Financial Risks).........60*
- *The U.S. Markets Falter.........60*
- *Kenner Clients' Private Investments Represent A Minute Subset Of Their*

*Wealth.........61*
- *Discovery Of Jowdy Criminality In 2006.........6*
- *The Threats Began.........63*
- <u>*New evidence*</u> *of Chronic Traumatic Encephalopathy ("CTE").........66*
- *Kenner Unresolved Issues With Trial Counsel Wholly Affected The Presentation Of An Adequate Defense (While Under Duress)............71*
- *Jowdy's Racketeering Crimes Further Harm Kenner And Kenner Investors (And Are Covered-Up By The FBI Case Agent).........73*
- *Jowdy's Attorney Made One Last Threat/Bribe Attempt On Kenner (Recorded).........73*
- *Kenner And Kenner Investors Begin U.S. Litigation To Recover Jowdy-Loans Immediately After Jowdy-Harvey Terminate Settlement Discussion (One Year Before The Initiation Of The GSF).........80*
- *Conspiracy By Concealment.........81*
- *The Dichotomy Of Reality.........82*
- *In 2006.........82*
- *Kenner Received Loan Repayments.........88*
- *Other government-witnesses had ulterior motives for Kenner's conviction – in addition to Jowdy's protectorate (for the last 12 years, and counting).........90*
  - *Michael Peca.........90*
  - *Jay McKee.........92*
  - *John Kaiser and Bryan Berard.........92*
  - *John Kaiser And Ken Jowdy's Baja Ventures 2006 Theft.........95*
  - *Ken Jowdy and Tom Harvey.........97*
- *Government Hides Another Kaiser Forgery Lie From The Court.........98*

*Individualized Assessment Of Philip A. Kenner.........103*
- *Sentencing Kenner For The Boondoggle That The Government Has Created.........103*
- *Kenner's Friends & Family Have Offered Letters In Support Of Kenner To The Court Describing Kenner In A Capacity Unaddressed During Kenner's Six (6) Years In The EDNY Custody; Regarding Background, Community And Selflessness.........106*
  - *Dr. Steve Locnikar.........106*
  - *Christopher Hawkins.........106*
  - *Kenner's fiancée Marlene Grissom.........107*
  - *Blake Kenner.........111*
  - *Haley Kenner.........112*
  - *Kim Garret.........113*

- o *Kathy Martin………113*
  - o *Timothy Dundon………115*
  - o *Eric Aaronson………116*
- *Kenner's Friends And Companies In Dire Straits………117*
- *Kenner's Contributions To Fellow Inmates During His Incarceration At MDC………117*
- *Basic Timeline Of Events As Kenner Continues To Defend His Investors Despite Jowdy's Team Threats To Stop………118*
- *The Nature and Circumstances of the Offense Conduct………123*
- *Hawai'i Partners Investor Gains (Realized And Unrealized)………124*
- *Kristen Peca Fraudulently Assists In The Conspiracy Theory Attack On Kenner With Incremental False Testimony………125*

*ANALYSIS – 3553(a) factors………127*
- *The Law Permits A Below Guideline Sentence………127*
- *Probation's Pre-Sentence Report Contains The Following Guidelines Analysis………130*
- *The Court's Discretion to Vary from the Advisory Guidelines Is Well Established………132*
- *The Supreme Court Has Since Re-Emphasized That The Guidelines Are Both Advisory And Not To Be Presumed Reasonable………133*
- *Downward Departure Available And Necessary In The Instant Case………134*
- *Harsh Conditions During Incarceration Time At MDC………134*
  - o *Issues With The Court Order To Work On Discovery………136*
  - o *The Urination Incident (3rd Time)………136*
  - o *External Hard Drive Stolen (And Files Discarded)………137*
  - o *Kenner Refused Bathroom Access………138*
  - o *The 2019 Flash-Drive SHU Incident………138*
- *Other Unusual Issues That Have Occurred Since Kenner's November 13, 2013 Incarceration………140*
  - o *November 2013 – CCA Prison………140*
  - o *November 2013 – Oklahoma City Transit Jail………141*
    *Pre-Trial Private Detention Facility………141*
  - o *During Trial………142*
- *Harsh Work Area Conditions And Intimidating Retaliation From Staff………143*
- *Inhumane MDC Living Conditions………146*
  - o *PREA Issues………149*
  - o *AFTER May 2019 SHU Release Issues………151*
- *First Time Offenders Qualify For Downward Departure Considerations………152*

- *The Factors Set Forth In 18 U.S.C. § 3553 As Applied In This Case Do Not Require Any Additional Incarceration………155*
- *Second Occurrence Of "Third World" Condition Issues At MDC Exposed By Civilian Protest And Federal Defenders Litigation In The SDNY………155*
  - *2019 Lawsuit Versus MDC For Inhumane Conditions………156*
- *Post-Release Issues………158*
- *Health Conditions As A Factor………158*
- *Kenner Has Lived Six (6) Years Without Access To The Sun………159*
- *Chronic Traumatic Encephalopathy ("CTE")………159*
- *Defendants Age And Physical Health Is A Factor Worthy Of Consideration………160*
- *Life span of older inmates………160*
- *Kenner's Character and Background Mitigate Against Any Additional Incarceration………161*
- *Other Mitigating Factors………162*
  - *Consideration Of Kenner's Family Circumstances Is Warranted………165*
- *Neither Specific Nor General Deterrence Will Be Served By Any Additional Incarceration………167*
- *A Sentence Of Any Additional Incarceration Will Not Further The Goals Of Specific Deterrence Or The Need To Protect The Community………168*
- *A Sentence of Any Additional Incarceration Will Not Further General Deterrence………168*
- *A Sentence Of Any Additional Incarceration Would Result In Unwarranted Sentencing Disparity………172*
- *No Loss Is Calculable After Forensic Review Of The Various "Objects" ………173*
- *High(er) Profile Cases………174*
  - *Jowdy's Cabal Initiated All NY Daily News Media Coverage Since 2007 (When Kenner Refused The Bribes…)………175*
  - *Case Disparity Issues………176*

*Conclusion………179*

# TABLE OF AUTHORITIES

## CASES

*Agudelo v. United States, 724 F. Supp. 1110, 1111 (E.D.N.Y. 1989).........40, 50, 123*

*Alexander Realty Capital, Inc. v. Laurel Cove Development ("LCD"), LLC, 2009 US Dist. .........70*

*Dura Pharmaceuticals, Inc. v. Broudo, 161 L. Ed. 2d 577, 544 U.S. 336, 125 S. Ct. 1627, 1631-32 (2005) .........22*

*Gall v. United States, 552 U.S. 38, 50 & n.6, 128 S. Ct. 586, 596 & n.6, 597 (2007) .........105, et.al.*

*Greenberg v. Crossroads Systems, Inc., 364 F.3d 657 (5th Cir 2004) .........22*

*Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A., 461 Fed. Appx. 61; 2012 U.S. App. LEXIS 3012.........19*

*Kimbrough v. United States, 552 U.S. 85, 90, 128 S. Ct. 558, 564 (2007) .........132, 133*

*Koon v. United States, 518 U.S. 81, 113, 116 S. Ct. 2035, 2053 (1996) LEXIS 17907 (M.D. of Tennessee 2009) .........162*

*Napue v. Illinois, 360 U.S. 264, 269 (1959) .........26, 37, 38, 67, 68, 81*

*Nelson v. United States, 555 U.S. 350, 352, 129 S. Ct. 890, 892 (2009) .........132, 133*

*Pepper v. United States, 131 S. Ct 1229, 1240 (2011) .........181*

*Peugh v. United States, 133 S. Ct. 2072, 2080 (2013) .........133, 154*

*Spears v. United States, 555 U.S. 261, 263-64, 129 S. Ct. 840, 842 (2009) .........154*

*United States v. Adelson, 441 F. Supp. 2d 506, 509 (2006) .........131, 132, 162, 169, 177*

*United States v. Algahaim, 2016 BL 399171, 2d Cir, No. 15-2069.........130*

*United States v. Ali, 508 F.3d 136, 150 & n.19 (3d Cir 2007) .........163*

*United States v. Binday, 804 F.3d at 595 .........22*

*United States v. Booker, 543 U.S. 220, 226-46 (2005) .........132, 133, 134, 162*

*United States v. Cavera, 550 F.3d 180, 191 (2d Cir. 2008) .........170*

*United States v. Certified Envtl. Servs., Inc., 753 F.3d 72, 103 (2d Cir 2014) .........22*

*United States v. Contorinis, 692, F.3d 136, 148 (2d Cir 2012) .........27*

*United States v. Cooper, 394 F.3d 172, 177, 178 (3d Cir. 2005) .........163, 164*

*United States v. Coppola, 671 F.3d 220, 250 (2d Cir 2012) .........22*

*United States v. Corsey, 723 F.3d 366, 381 (2d Cir. 2013) .........170*

*United States v. Ebbers, 458 F.3d 110 (2d Cir 2006) .........23*

*United States v. Edwards, 595 F. 3d 1004 (9th Cir. 2010) .........170*

*United States v. Emmenegger, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) .........131*

*United States v. Faibish, No. 12-CR-265, 2015 WL 4637013, at *2 (E.D.N.Y. Aug. 3, 2015) .........132*

*United States v. Faria, 161 F.3d 761,762 (2d Cir 1998) .........167*

*United States v. Fernandez, 443 F.3d 19,32 (2d Cir 2006) .........153*

*United States v. Fishman*, 631 F. Supp 2d 399, 404-405 (SDNY 2009) .........163, 164

*United States v. Frias*, 521 F.3d 229, 236 (2d Cir 2008) .........153

*United States v. Galante*, 111 F.3d 1029 (2d Cir 1997) .........166

*United States v. Grabske*, 260 f. Supp. 2d 866, 869-71 (N. Dist. Cal. 2002) .........22

*United States v. Greene*, 249 F. Supp. 2d 262 (SDNY 2003) .........163, 164, 166

*United States v. Gupta*, 904 F. Supp. 2d 349, 350 (2012) .........131

*United States v. Jimenez*, 212 F. Supp.2d 214 (SDNY 2002) .........160

*United States v. Jones*, 531 F.3d 163, 182 (2d Cir. 2008) .........153

*United States v. Merritt*, 988 F.2d 1298, 1307 (2d Cir. 1993) .........161

*United States v. Milikowsky*, 65 F.3d 4, 9 (2d Cir. 1995) .........104

*United States v. Monaco*, 23 F.3d 793, 801 (3d Cir 1994) .........166

*United States v. Nesbeth*, 188 F. Supp. 3d 179, 180 (E.D.N.Y. 2016) .........168

*United States v. Rioux*, 95 F.3d 648 (2d Cir 1996) .........160, 163, 164

*United States v. Rita*, 551 U.S. 338, 351, 127 S. Ct. 2456, 2465 (2007) .........134, 154, 162

*United States v. Roberts*, 2005 WL 1153757 at *5 (SDNY 2005) .........167

*United States v. Roth*, 1995 WL 35676, at *1.........160

*United States v. Rutkoske*, 506 F.3d 170 (2d Cir 2007) .........23

*United States v. Serafini*, 233 F.3d 758, 773, 774 (3d Cir. 2000) .........162, 164

*United States v. Smith*, 445 F.3d 1, 5 (1st Cir. 2006) .........153

*United States v. Sprei*, 145 F.3d 528, 535 (2d Cir 1998) .........167

*United States v. Springer*, 684 F. App'x 37, 40 (2d Cir. 2017) .........158

*United States v. Thurston*, 544 F.3d 22, 26 (1st Cir. 2008) .........163

*United States v. Tomko*, 562 F.3d 558, 572 (3d Cir. 2009) .........163, 169

*United States v. Wallach*, 935 F.2d 445,473 (2d Cir. 1991) .........37, 96

*United States v. Warner*, 792 F.3d 847, 860-61 (7th Cir. 2015) .........170

*United States v. West Coast Aluminum Heat Treating Co.*, 265 F.3d 986, 991 (9th Cir 2001) .........22

*United States v. Wills*, 322 F. Supp. 2d 76, 83 (D. Mass 2004) .........161

*United States v. Wills*, 476 F.3d 103, 109 (2d Cir 2007) .........154

*United States v. Woods*, 159 F.3d 1132, 1136 (8th Cir. 1998) .........163

*United States v. Yeaman*, 248 F.3d 223, 238 (3d Cir. 2001) .........169

*United States v. Zimmerman*, No. 10-CR-598 JG, 2012 WL 3779387, at *6 (E.D.N.Y. June 19, 2012) .........158

## STATUES

U.S.S.G. § 5B1.3.........*158*

U.S.S.G. § 6A1.3(a) .........*53*

U.S.S.G. §1B1.4.........*162*

*U.S.S.G. §2B1.1* .........*22, 127, 173, 174*

U.S.S.G. 2F1.1.........*23*

U.S.S.G. 5H1.6.........*166*


*18 U.S.C. 1001*.........*55*

*28 U.S.C. 2255*.........*71, 72, 90, 92, 120, 134, 136, 159*

18 U.S.C. § 3553(a) .........*127 et.al.*

18 U.S.C. § 3563.........*158*

18 U.S.C. § 3661.........*162*


Fed. R. Evid. 1101(d)(3) .........*53*


**Other references**

- Amy Baron-Evans, Sentencing by the Statute, at 7 (Apr. 27, 2009), available at Deterrence?, 100 J. Crim. L. & Criminology 765, 817 (2010) Eastern District of New York, Table 7 at p. 10 .........*170*
- http://www.fd.org/docs/select-topics---sentencing/Sentencing_by_the_Statute.pdf.........*170*
- http://www.nydailynews.com/newyork/brooklyn/judge-refuses-send-women-horrifying-brooklyn-jail-article-1.2820551 (last visited February 22, 2018) .........*155*
- https://en.wikipedia.org/wiki/Paul_Le_Roux.........*72*
- https://isb.ussc.gov/content/pentahocdf/RenderXCDF?solution=Suorcebook&path=&action=table_xx.xcdf&template=mantle&table_num=Table13.........*173*
- https://isb.ussc.gov/content/pentahocdf/RenderXCDF?solution=Suorcebook&path=&action=table_xx.xcdf&template=mantle&table_num=Table13G.........*173*
- https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-ppublications/2004/200405_Recidivism_First_Offender.pdf.........*153*
- https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-ppublications/2004/200405_Recidivism_Criminal_History.pdf.........*153*

- M. Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006) .........*169, 170*
- Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, Exhibit 9 (United States Sentencing Commission, May 2004) .........*153*
- Mirko Bagaric, A Rational Theory of Mitigation and Aggravation in Sentencing: Why Less Is More When It Comes to Punishing Criminals, 62 Buff. L. Rev. 1159, 1203 (2014) .........*169*
- N.Y.C Bar Association Communication. On Proffer'l Ethics, Op. 2018-2, 4/13/18.........*43*
- New York Rule of Professional Conduct 3.8(c) .........*43*
- *Private Securities Litigation Reform Act, 15 U.S.C. 78u-4(b)* .........*22*
- Raymond Paternoster, How Much Do We Really Know About Criminal Recidivism and the First Offender, Exhibit 6 (United States Sentencing Commission, May 2004) .........*153*
- Robert Weisberg, Reality-Challenged Philosophies of Punishment, 95 Marq. L. Rev. 1203, 1248 (2012) .........*169*
- *The Dose-Response of Time Served in Prison on Mortality:  New York State*, 1989-2003, Am. J. Pub. Health 103:3 (March 2013) .........*160*
- *The High Cost of Low Risk: The Crisis of America's Aging Prison Population,*" The Osborne Association (2014) .........*161*
- United States Sentencing Commission, Statistical Information Packet Fiscal Year 2016,United States Sentencing Commission, Statistical Information Packet Fiscal Year 2016, Second Circuit, Table 7 at p. 10 .........*178*
- United States Sentencing Commission, Statistical Information Packet Fiscal Year 2016, New York State, Table 7 at p. 10. .........*178*
- Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) .........*169*

**Preliminary Statement**

Defendant Philip A. Kenner, in ProSe, respectfully submits this Sentencing Memorandum to assist the Court in determining an appropriate sentence in this case following a trial in which Kenner was acquitted of three counts of the Indictment and convicted of six; including two (2) conspiracy counts of concealment, not requiring a money loss element of the offenses.

The forensic accounting in this case reveals that there are _no monetary losses_ to any of the alleged victims in the Kenner case (*See Kenner supplemental submission*).

The gross and documented instances, *infra*, of witness perjury (more likely than not suborned by the government based on empirical evidence ignored to frame the prosecutorial themes), hi-lights that "sometimes" the government has lost its moral bearings.   There is no other excuse.

During the July 2, 2019 hearing, Judge Bianco denied any *Fatico* hearing, while verifying that he was only considering charged conduct in his guideline calculations and other rulings (*Tr.33*):

> *[Judge Bianco]: "I just want to make clear that I think I've said this before, but it is in the court's view and its consistent with the government's letter to the court, you know, two years ago that we're not – that the government is not seeking to hold the defendants accountable for any uncharged frauds.   The scope of sentencing relates only to the frauds that were proved at trial..."*

As such, the Kenner supplemental sentencing memo, specifically addresses the funds related to the _charged conduct_, from the _named alleged victims_ (*"every John Doe" – Tr.5993*) in the superseding indictment.   The government grossly misrepresented their case to the 2015 trial Court, and more specifically post-trial, by attempting to include dozens of individuals after-the-fact who _refused_ to be named as victims, nevertheless used to calculate a fraudulent forfeiture, money judgment, and restitution amount.

   o   The Court should note that the lack of cooperation by the lion's share (over 20 pro-Kenner versus only 5 cooperating investors) of Kenner investors was despite years of badgering and false representations by (1) FBI agent Galioto, (2) Jowdy's attorneys, and (3) in a final push, by John Kaiser and Bryan Berard -- once hired by Jowdy starting in or about the end of 2011 thru the date of trial.

10

As the Court is clearly aware -- the rallying-cry of fraud by Galioto and his progeny pre-trial was that "*Kenner stole all of your money from Hawai'i and used it to buy his piece of the Cabo investment*".

- **The Court knows this is 100% false – but was left uncorrected in front of the jury, fully prejudicing Kenner**.
- **The Court knows that the government echoed the same false claims throughout the trial, seeking a conviction _not_ based on the truths**…

President John Adams addressed this exact issue in the context of truths, versus rhetoric, representing:

> "*Facts are a stubborn thing; and whatever may be our wishes, our inclinations, or our dictates of our passions, they cannot alter the state of facts and evidence…*"

As denoted by President Adams, objective evidence and logical arguments are often not merely lacking but ignored in many discussions by those with the vision of the anointed; prosecutorial team.  Much that is said by the anointed in the outward form of an argument turns out not to be substantiated arguments at all.   Often the logical structure of an argument is replaced by preemptive rhetoric (of *media reports, threats, and suborned perjury*) or, where an argument is made, its validity remains unchecked against any evidence, even when such evidence is abundant.   Evidence is often particularly abundant when it comes to statements about history, yet the anointed have repeatedly been demonstrably wrong about the past as they are about the present or the future – yet supremely confident.   They remain often wrong, but never in doubt.

First -- The Court knows that the government lied, *infra*, about "Kenner thefts" while falsely denigrating Kenner from opening remarks (*Tr.27-33 et.al.*) thru rebuttal summation; including Kenner's contentious cross-examination with the government, accusing Kenner of "*lying about everything*" (*Tr.5064-65*).[1]  Only post-

---

[1] Kenner cross-examination testimony (*Tr.5064-65*)

> *Q. Aren't you just making all of this up as you sit there?*
>
> *A [Kenner]: No, sir.*
>
> *Q. **Aren't you lying about these documents**, your interactions with the people who relied upon you to take care of their money? **Aren't you just lying about everything**?*
>
> *A [Kenner]: No, sir.*

trial, did the Court learn thru the government's evidence production (*government-forfeiture-36* and *government-forfeiture-44*) that all of the government theory was a lie; and <u>*Kenner told the truth*</u>.   That may have been the first reveal that the foundation of their prosecutorial case was based on the grossest of pre-trial misrepresentations to influence witnesses "memory", yet no one has been held accountable for a trial full of malfeasance and prejudice.

Second -- The Court knows that Kristen Peca confirmed the same government lie to her, *infra*, during her July 2012 FBI surreptitious recordings with Kenner, slandering Kenner, and *perhaps the tipping point to persuade* the Pecas to fabricate testimony, *infra*, based on their newfound belief that Kenner actually <u>*stole*</u> their Hawai'i money.

- *Who could argue with the perceived integrity of the FBI*?   Well, it certainly let the Pecas down (and this Court).

Nevertheless, the details of the actual investment funds, who authorized them, who administered them based on corporate document mandate, and the tracing of the original "owners" is <u>*shocking*</u> – specifically relative and in contradiction to what the government espoused thru a 10-week ordeal in 2015.  Almost none of it actually originates with the alleged victims in the case.   The government continues to hide this critical fact from the Court.  The government abused their duty to do the proper accounting before they made their salacious allegations (during the original indictment or at trial); destroying Kenner's 20-year career (without incidences) and life (and reputation) forever.  And the government doubled-down on their salacious allegations during summation and rebuttal summation, *infra*, to secure their verdict, lacking confidence -- once the true source of funds was revealed indisputably by *government-forfeiture-36* and *government-forfeiture-44*.   It shocks the senses – even six (6) years into this egregious cover-up to protect Jowdy's criminality after:

> (1) Kenner <u>*immediately*</u> exposed the Jowdy frauds in late 2006 to his investors (once discovered),
> (2) Kenner <u>*explained*</u> Jowdy's ten-plus million fraud in detail in June 2009 to the FBI, SEC and U.S. Attorneys office (as a whistleblower),
> (3) The government <u>*verified*</u> their malfeasance post-trial (attempting to <u>*vary*</u> the prosecution -- when faced with unsolvable nexus issues to recoup the expenses of their 10-year debacle thru forfeiture and money judgment), and
> (4) The government <u>*lies*</u> about Kenner were stunningly re-verified by John

---

The Court admonished the government outside the earshot of the jury about starting questions, "*Aren't you lying…*" – but the damage was done...as calculated (*Tr.5076*).

Kaiser (Jowdy co-conspirator from 2012-2017 – *See Document 628*)[2] after being fired...

Kenner's client and investment partner, Jozef Stumpel (former NHL player who was a teammate of dozens of Kenner clients since 1995), wrote to the Court in 2017.   He explained his experience with Kenner and the ever-changing lies told by the FBI and Jowdy's cabal members (pre- and post-trial) to him and any investor adverse to Jowdy's criminality.   Stumpel clearly hi-lighted the confusion and challenges the Kenner investors faced while being berated by the false claims that "*Kenner stole all of your money*":

*Dear Judge Bianco:*

*I am writing because I read the Mike Peca letter.  I have more problems with Ken Jowdy and what he done to us for over 15 years.  I am glad Mike Peca wrote a letter to you to say exactly what Phil Kenner said in his report to us. Jowdy stole our money from 2002.   Jowdy stole our first project money and loan.  Jowdy's attorneys helped hide the project DDM from us.  Jowdy stole our airplane money.  Jowdy stole money from the second project Cabo.  Jowdy stole our Hawaii money.   Jowdy stole money from my loan and Phil's loan and my friends loans and more.  **What Mike Peca forget to say for you is that only Phil told us about all of it over ten years ago.   We all know.  Phil told us together**.*

*I am Phil's partner in Baja Ventures in Cabo.   When Jowdy tried to steal that money from me and our other partner Phil protected me and him in Phil's company.*

*Phil and another guy Jowdy stole from helped me sue Jowdy in Mexico to get back over 1 million more of my money from 2005.   **What Mike Peca did not tell is that Jon Kaiser lied to a court in Mexico to help Jowdy and hurt me. Kaiser told the Mexico court he never signed a testimony affidavit for me versus Jowdy.   He lied.   Kaiser told me himself that he signed it to help me before he got the job from Jowdy like Berard.***

*The only peoples Jowdy is co-conspirator with is Kaiser and Berard and Galioto and Jowdy lawyers.   They have been stopping Phil from helping us get our money back.   That is why they made up stories to get people mad at Phil and stop him helping by arresting him.   Phils report to all of us explain it.   Phil never lied to us.  Phil never hid stuff about our investments from us.   Why cant the FBI people or the court see it.   Why cant you have someone talk to Phil for*

---

[2] All *Document ##* refer to Kenner Docket entry numbers.

13

*us.   He already showed when all the money went to Jowdy.*   **These are the same people who had Phil arrested in 2010 in Mexico to scare him bad to stop fighting for us**.   *I am glad for my family Phil never stop.*

**All of us know from over 10 years ago that we gave money to Jowdy from our Hawaii company as a group.   We all talked about it with conference calls before we agreed to do it.   Mike Peca and Jon Kaiser an Bryan Berard was talking on the same calls that I was talking on.**   *All of us got mad after 2006 when Jowdy did not pay us back.   All the rest of our money that Jowdy got for Mexico we sent our self not by Phil.   Mike Peca is wrong about that.   Phil helped me sue Jowdy in Mexico to get that money.   Kaiser and Jowdy lawyer lies stopped my lawsuits.   I cant start again without Phil.   In 2015 before Phil's trial we tried.*   **But some FBI people arrested the person helping us**.   *I don't know why the FBI is helping Jowdy, Kaiser and Berard keep all of our money so hard*.

*Phil told us right after the deal from Jowdy came that it was never going to be paid.   He is right after 15 years of Jowdy lies but the FBI people told us to sign it.   The FBI said it is good.   I know it is not good but only Phil was trying to help fix it and tell us and no one else.*

*I remember Phil telling us about the extra money for the investor money Jowdy didn't count.   Phil showed us that Jowdy stole over ten millions from us and his owner piece for Cabo.   Phil explained we would fix the extra money and owner piece when Jowdy was gone.   Since there were over 10 big problems to fix of Jowdy and we would do them all at once.   We all agreed to sue Jowdy and do it Phils way.   This included Mike Peca and Kaiser and Berard.*

*Everyone wants some money back.   I do to.   But anyone who is broke is from their spending to much and not just from one or two investments.   We all made a lot of money.   We made the Mexico investments to help us after hockey but Jowdy stole them.   No one else did it to us.*

**Since they arrest Phil the FBI people and Berard and Kaiser have called me to lie to me about him.   We all know the truth of who has our money and how he got it.  And who robbed our projects.  And Berard and Kaiser are helping to protect Jowdy after they got jobs from him.**

*Please help us get someone to talk to Phil so they can get the truth and evidence I saw.   Thank you for helping us and reading my letter.*

## Kenner's Prose PSR Objections Object In Detail To The Government's Guideline Position…

Kenner's final March 27, 2019 PSR objections also scrutinizes the falsities and

foundationless attempts to further malign Kenner with enhancements that cannot exist; numerically or logistically.  *Kenner's arguments are not rehashed herein*. Probation went so far as to call Kenner's trial testimony about the Jowdy loans "*brazen*" and worthy of an obstruction of justice enhancement (echoing the extortion threats from Jowdy's cabal attorney, Tom Harvey, via email in April 2009 – *Bates stamp: ED-0003068-69*) [*Ex.1*]; further demanded by Probation because of "alleged" conflicting testimony during the forfeiture hearing.[3]

- o ***It was all proven as 100% false, yet maligning to Kenner, and still uncorrected***.
- o *Kenner lived under years of duress since Tom Harvey's first 2009 extortion threat of FBI-led jail time "*because the Jowdy loans were fake*".*
  - o *Harvey's own 2016 government-forfeiture-44 production exposes how horrifying his FBI-jail-time threats were to Kenner.*
  - o *No normal American could live without fear and duress after such veil threats were volleyed.*

In spite of the slander and defamation campaigns waged versus Kenner and the duress Kenner lived under, Kenner's clients continued to offer incredible support despite the FBI lies about "*Kenner stealing their Hawai'i funds*" and Jowdy's cabal back-ups of the same lies.

- The government attempted to use Michael Peca's testimony at trial to allege his unsubstantiated belief that Kenner used the Hawai'i funds to "*buy his Cabo equity*".   Since it was never true (*See government-forfeiture-36*), the fact

---

[3] The Probation representation was contrived, because none of the three (3) individuals they mention (Jowdy, Gaudet or Kaiser) gave testimony during the forfeiture hearings.  It begs the question, "*How does an independent arm of the sentencing process make up names of people who never testified?*"   It is alarming at a minimum, and evidence of prosecutorial coercion at its worst.  ***It is inexcusable***…

In fact, the Court must note that John Kaiser confirmed to the FBI on October 19, 2010 (*3500-JK-1-r at 3*), that there "*was agreement to borrow money from Hawai'i*" during the documentation of an independent meeting between Jowdy and Kaiser (excluding Kenner).

- FBI agent Galioto was present during this meeting, thus, the "agreement" was clearly **known by the government's prosecutorial team in 2010 – five (5) years before trial** -- and ignored to prejudice Kenner and solicit fabricated testimony in 2015.

- They noted in their raw notes: "*KJ [Jowdy] to → JK [Kaiser] don't worry all $ will come back; get repaid*"

What else could Kaiser have possibly verified to the FBI – five (5) years prior to trial -- that the government was confused about -- unless they needed to un-ring the bell in order to fabricate their "concealment" strategy?

that Peca asked the question hi-lights the fraud.   The answer would have stopped that nonsense in its tracks by anyone involved; inapposite of the testimony Michael Peca gave in 2015 (*Tr.424-425*) to perpetuate the government ruse.

**What Did Kenner's Clients Say In Real Time (Pre-CTE Symptoms And Outside Influence)...**

In real time -- what did Kenner's friends and investors say, all after (1) the exposure of the Jowdy frauds of tens of millions of documented crimes (*See Document 667*), (2) the Mexico jailhouse beatings of Kenner to "dissuade" future criminal legal actions versus Jowdy and his cabal in Mexico, (3) the murder of the investors Mexico attorney who freed Kenner from the Mexico jail, (4) the known seizure of collateral from their Northern Trust LOC accounts[4], (5) the initiation of the Constantine-led GSF efforts, and subsequently (6) the exposure by Kenner and the Eufora board of alleged Constantine wrongdoings...

All of Kenner clients were fully aware of the outrageous efforts that Kenner went thru to protect the Hawai'i-Mexico investors related to Ken Jowdy's FBI protection (*as well as participating in one Arizona, two California, one Nevada, and multiple Mexico lawsuits personally and as witnesses*).

[From **Mattias Norstrom**] – <mark>hi-light reply from Kenner</mark>:

| | | | | |
|---|---|---|---|---|
| 104 80 | +46708874 363 Mattias Norstrom* | 10/26/20 09 12:43:57 PM(UTC +0) | Read | Hi Phil, ***Just wanna let you know how much I appreciate all the hard work you're puttin in***. One question: In case everything works out. is Cabo airport |
| 104 81 | +46708874 363 Mattias Norstrom* | 10/26/20 09 12:44:00 PM(UTC +0) | Read | and Hawaii included in the make whole deal? Matti |
| 120 39 | +46708874 363 Mattias Norstrom* | 10/26/20 09 12:46:48 PM(UTC +0) | Sent | I would guess we stay in the airport. We want to once Jowdy is removed! The rest of the details will get more clear soon, but a lot of funds will pay out. I'm waiting for all the funds as well. Thx for the kind words! |

---

[4] The Court should note that at all times, the Northern Trust clients' accounts were addressed to their respective homes and all accounts were titled as **PLEDGED**.

- *Nothing was concealed about the LOC collateral at any time.*

From **Tyson Nash** (*after Kenner went to Mexico to give testimony versus Jowdy in one of the criminal cases – under Mexico federal protection*):

| 102 61 | +16232039 504 Tyson Nash* | 10/15/20 09 1:42:45 AM(UTC +0) | Read | Nice, well let's pray it all works out! **We all appreciate u protecting us buddy!** |
|---|---|---|---|---|

From **Nash's wife**:

| 117 71 | +16364481 170 Kathy Nash* | 1/15/201 0 3:04:05 PM(UTC +0) | Read | **Ya I can see it is exhausting. I can appreciate it hasn't been easy. You need to make sure you take care of yourself....** |
|---|---|---|---|---|

From **Michael Peca**:

| 129 27 | +17163743 234 Michael Peca* | 4/14/201 0 3:10:46 PM(UTC +0) | Read | ***Thanks. I' not trying to push you to the brink here! I realize what you're doing and appreciate it. Just want to be up on all the info.*** |
|---|---|---|---|---|

- This colloquy occurred months after Kenner and Peca spent one (1) week together in Vancouver, Canada during the February 2010 Olympics.   Kristen Peca told the Court that she could not get a hold of Kenner and it scared her – while her husband and Kenner met over four (4) times face-to-face that year (in addition to the week in Vancouver) -- and <u>exchanged *over 500 text messages*</u> (*Tr.712-713*).[5]

---

[5] Kristen Peca explained that she could not find Kenner, while she was represented by independent counsel, Tom Baker (in Arizona), Ronald Richards (in California), and Michael Stolper (from the Giuliani group in NY)...wholly fabricated, as the government knew it...

*Q: Around this time in 2009, what was your communication with Mr. Kenner like?*

*A [Kristen Peca]: It had changed dramatically.   He was no longer answering our calls. He also no longer got back to us that same day.* **In fact, it often took weeks and there were stretches where we didn't hear from him in months.** *He was not responding to e-mails in a timely manner. It was very, very difficult to track him down. It leaves you with a sense of desperation when you're financial advisor is avoiding you like that. And I vividly remember him telling me when I was questioning why I can't get a hold at him, at one point he said he was hiding in a cave in Mexico because someone was trying to kill him. It was just scary hearing all these stories he had and the finger pointing, blaming others, all these elaborate conspiracies. Everything was really scary at that point. And, you know, he even said to me at one point if I were to go down in a plane tomorrow, there would be no way to get your money. I'm the only one who knows where your money is. That is like having a string holding over you. It's a scary position to be in.*

The Court should note that there is not a single stretch in 2009-2010 when Kenner and Michael Peca went more than a week without constant communication (with over 500

And **Bryan Berard** – over a year after he told the EDNY and the FBI (in 2013 proffer) that he no longer trusted Kenner:

| 145 46 | +14015246 929 Bryan Berard* | 7/9/2010 10:11:35 PM(UTC +0) | Read | *I hear u buddy. I'm sorry for that. I appreciate what u do. And I hope u know that.. If I had the $ I'd give it to u in a second.* |
|---|---|---|---|---|
| 145 47 | +14015246 929 Bryan Berard* | 7/9/2010 10:11:47 PM(UTC +0) | Read | *Whatever u needed* |

And despite the pressures from Jay McKee's soon-to-be estranged wife about not selling the Las Vegas Penthouse deal when Kenner recommended it in 2009 _at a million dollar plus profit_ – McKee told Kenner that he commended Kenner 100% for his efforts versus Jowdy; <mark>**after hearing about Kenner's Mexico jailhouse beating from Peca and his wife**</mark>.

Jay McKee told Kenner he deserves a:

"*world of credit for your sacrifices*"

Jay McKee continued to tell Kenner:

*"There may not be another person out there who would have gone to the lengths you have.   I sincerely cannot thank you enough for what you have and are doing…"*

Not one (1) of the Kenner investors levied allegations towards Kenner about "fault" for the documented thefts by Ken Jowdy (*government-forfeiture-44* and *government-forfeiture-36),* which have not changed today; in spite of the "*Kenner stole your money to buy his piece in Cabo*" prosecutorial rhetoric (still all untrue…).

Even Ethan Moreau (one of the "bad apples") sent Kenner the following before his own "broke-ness" forced him into litigation to try and get some private equity deals liquidated or cancelled [like his PalmsPlace deal, *infra*] thru hollow litigation threats.   The same "team Jowdy" attorneys represented Moreau, Nolan, Juneau, and Myrick; and subsequently Kaiser and Berard (once they received their Mexico jobs).

---

texts); including 100s of emails (in evidence) and more than four (4) face-to-face meetings (excluding the week straight in Vancouver, February 2010).   In fact, the Pecas (thru Kristen Peca emails) made arrangements to have their 2009 fall vacation in Arizona with Kenner – fully exposing her trial LIES…(*Bates stamp: PK_SEC_005477*) [Ex.46].   This email occurred two (2) hours before Michael Peca and Kenner were discussing strategy about the _Jowdy loan recovery_ (September 16, 2009) in the same email string [Ex.47].

[Moreau text to Kenner]:



| 290 | +178026 66118 Ethan Moreau* | 3/28/2008 3:24:40 PM(UTC +0) | R e a d | **It was great 2 c u and thnx 4 the tour of the palmsplace, it looks amazing! Let's get 2 gether soon 2 talk more about organizing my assets and exit strategies.** |

> ➤ Moreau and Juneau dropped their identical litigation complaints versus Kenner in 2009 after the Kenner victory versus Nolan in arbitration.[6]

## Further Verification Of The Government Trial Frauds To Prejudice Kenner...

The government completed a myriad of forensic accounting documents for the 2016 forfeiture hearings; including *government-forfeiture-36* and *government-forfeiture-44*, in particular.

- The government *also* presented known-forged documents of Kenner's name by Jowdy cabal members to the Court to support their nexus case -- *but refused to provide the originals despite the Court's multiple orders to do so*, once Kenner exposed this subsequent forgery fraud by the government on the Court (*government-forfeiture-61* and *government-forfeiture-62*); attempting to further injure Kenner.

The government's post-trial accounting documents contradicted their-own prosecutorial theories at trial -- yet stand uncorrected today.  Since the first instance Kenner confronted the government about the prejudicial contradictions, the government has run from the details of their-own accounting, *desperately hoping* the Court will *not* notice their prosecutorial mishap and simply grab a "loss number" out

---

[6] Via arbitration, Kenner was ordered to buy Nolan out of his Hawai'i investment.  The arbitration panel did not find wrongdoings, but rather, they opined that Nolan "*could not remember*" anything that he had approved, signed, &/or authorized thru *faulty memory, confusion and mistakes* (A.k.a. **CTE**).  See *Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A.*, 461 Fed. Appx. 61; 2012 U.S. App. LEXIS 3012

Nolan's own Northern Trust Banker, Aaron Mascarella, verified Nolan's independent communication with Mascarella [Ex.48] regarding his LOC that Nolan could not remember in 2009, let alone 2015 (*Tr.2065-66*).  Moreau and Joe Juneau knew they could not pursue the "fraud" claims like Nolan, since the arbitration panel already ruled *against* every element of the *identical* Nolan allegations.  They dropped their cases as soon as Kenner was forced to counter-sued them, post arbitration.

- *They were each bilked approximately $250,000 in legal fees from attorneys associated with Jowdy and Tom Harvey.   Nolan was bilked over $500,000 by the same attorneys.*
  - No *res judicata* was available to them...

of thin air to create a guideline loss, which *does not exist*…

***Government-forfeiture-36***…

The government told the Court and 2015 jury, "*Kenner stole the Hawai'i money and used it to buy his piece of the Cabo investment*".   It is 100% false – and they knew it at all times.

[*Tr.5721* – Michiewicz summation]:
> *"And what do you find out [about the Jowdy loan]? You find out, what did that 5 million or however much more or less that netted out to be, what did it buy Mr. Kenner? It bought him a 39 percent interest in Ken Jowdy's Cabo San Lucas. Didn't buy the players a 39 percent interest. Him. To this day, right now, he is a partner in that resort. That's where the money went. That's what it bought him. And on the backs, on the portfolios, of the hockey players."*

[*Tr.5722-5723* – Michiewicz summation]:
> *"And if you look at the Centrum loan, I can not think of a more perfect example of proof beyond a reasonable doubt -- actions speak louder than words -- no reason to mortgage Honu'apo parcel. No reason other than for Kenner to get his 39 percent. To get his piece of the pie, that resort in Cabo. No reason. Actions speak louder than words. And in this case the action is pure fraud."*

And – [*Tr.5990* – Komatireddy rebuttal summation]:
> *"…you know what, Baja Development Corporation, on that chart, but there is some sort of misconduct; you don't know what the money was for. You know exactly what the money was for. In fact, Mr. LaRusso, when the first witness got on the stand, one of his first exhibits he entered into evidence was a record of the Baja Development Corporation. Those records are in evidence. Mr. Kenner told you that he used that money to get his piece in the Mexico investment with Ken Jowdy. You know exactly what that's for. That's in evidence."*

And – [*Tr.5996* – Komatireddy rebuttal summation]:
> *"He [Kenner] used it for personal use to get an interest in that resort in Cabo."*

In the Kenner Appendix (to the Rule 29-33 Reconsideration Motion) -- AUSA Michiewicz and AUSA Komatireddy grossly improper and prejudicial summation statements are listed in a relative order of **egregiousness** in more totality (*See Appendix at 479-506*).

Each and every one of the summation claims contradicts evidence that was in the government's possession since pre-trial; at times vouching for the recently fabricated testimony of the government witness who could not recall anything except what they could remember on direct examination thru extensive trial preparations.

- ==The Court and the government know that these abusive statements, amongst multiple others, were *false*, but fully prejudicial against Kenner – and left uncorrected, absolutely affecting the jury's deliberations.==

*Government-forfeiture-36* proves their trial proffers were 100% false, *supra*.   The government knew it.

*Government-forfeiture-36* also proves that there are "*no tainted funds*" (from anywhere) that contribute to Kenner and his Baja Ventures 2006 partners $4.1 million of capital contributions; *with ZERO dollars traceable to Kenner at all*.   Thus, there cannot be "*ill-gotten gains*" used to purchase the Kenner asset, the necessary pre-cursor to forfeiture.

- The government prays that the court overlooks this issue, and remains confused by their morass of forfeiture bluster that they must "get" forfeiture from Kenner and anyone else involved in the Cabo project…"*just because…*"

**Demand on the government??**

Perhaps, *at a minimum*, the Court can request that the government explain:

(1) How they calculated a $36 million forfeiture money judgment (*See Document 693, See Kenner August 25, 2019 submission to the Court*), with less than $9 million involved in the instant case (before redemptions and unrealized assets),

(2) How they drew their forfeiture conclusion -- with no nexus per their-own accounting – *government-forfeiture-36* and *government-forfeiture-44*,

(3) How they prejudiced Kenner at trial with the gross misrepresentation of "*theft*"; left uncorrected to this day,

(4) How they debunked their conviction theories with their-own forensic accounting (allegedly not completed in the 6-year pre-trial investigation), but

(5) How they now want their conviction to stand based on *faulty memory, confusion and mistakes; never defended as the truth* of witness inconsistent statements (*See Document 440 at 16*) – and

(4a) How they demand forfeiture for an asset with no nexus[7]…while _investors have no loss attributable to Kenner_; only the government's own ongoing obstructionist actions, delaying unrealized gain collections.

**For the purposes of calculating the Guideline range**…

The loss is defined as "the greater of actual loss or intended loss".  _United States v. Certified Envtl. Servs., Inc._, 753 F.3d 72, 103 (2d Cir 2014) (quoting _U.S.S.G. §2B1.1 cmt 3(A)_).  "Intended loss" means "the pecuniary harm that a defendant _purposely sought_ to inflict." _U.S.S.G. §2B1.1 cmt. 3(A)(ii)_.  The district Court is "not required to calculate loss with 'absolute precision'," See _United States v. Binday_, 804 F.3d at 595 (quoting _United States v. Coppola_, 671 F.3d 220, 250 (2d Cir 2012)), but it must "make a reasonable estimate of the loss" that is _based in "available information" and supported by a preponderance of the evidence_, _Id_. (quoting _U.S.S.G. §2B1.1 cmt. 3(C)_).

The guidelines measure criminal culpability in theft and economic crimes according to their pecuniary impact on the victims.

**Actual loss** – which is at issue here – "_means the reasonable foreseeable pecuniary harm that resulted from the offense._"

Contrary to the government's arguments – to date – District Courts must take a "realistic, economic approach to determine what losses the defendant truly caused or intended to cause." _United States v. West Coast Aluminum Heat Treating Co._, 265 F.3d 986, 991 (9th Cir 2001).

In civil cases – the principle of loss causation is well established.   See _Dura Pharmaceuticals, Inc. v. Broudo_, 161 L. Ed. 2d 577, 544 U.S. 336, 125 S. Ct. 1627, 1631-32 (2005); see generally _Greenberg v. Crossroads Systems, Inc._, 364 F.3d 657 (5th Cir 2004); _Private Securities Litigation Reform Act, 15 U.S.C. 78u-4(b)_.

- "Where the value of the security [Eufora private stock] declines for other reasons – however – such decline – or component of the decline – is '_not a loss_' attributable to the misrepresentation [of private stock versus treasury stock]." See also _United States v. Grabske_, 260 f. Supp. 2d 866, 869-71 (N. Dist. Cal. 2002).

---

[7] The Court should note that a forfeiture of the _no nexus_ Baja Ventures 2006 asset to the government would make Kenner's two (2) partners, Jozef Stumpel and Jere Lehtinen, the two (2) largest victims of the ten (10) year Galioto cover-up of the actual Jowdy crimes that _government-forfeiture-36_ and _government-forfeiture-44_ document; **totaling $4.1 million real money** (notwithstanding their additional losses at Jowdy's-sole criminality – _See Document 667_).

**The FBI investigations of Eufora – 100% after the Giuliani-group 2010 investigations concluded – are wholly responsible for any loss of value.**

- Neptune Capital independently determined Eufora value at $20 million in 2008-09 and re-verified by the investors'-own attorneys in Giuliani's investigation team in 2010-2011…

During rebuttal summation – AUSA Komatireddy lied to the jury again claiming there was no Eufora operating agreement.  Not only was this false – but it was signed by all of the Eufora Board Members – and documented the 2008-09 transactions [Ex.49 at 33-37].   Nevertheless, Komatireddy *lied* (*Tr.5988*):

> *"There is no [Eufora] operating agreement."*

Furthermore in *United States v. Rutkoske*, 506 F.3d 170 (2d Cir 2007) – the Second Circuit opined – "a key component of the guidelines calculation is the amount of loss caused by the wrongful conduct."  See *U.S.S.G. 2F1.1(b)(1)*.

- The Hawai'i loan to Jowdy has been *verified* by 25 of the 26 Hawai'i partners, while the unrealized return of the Hawai'i partners' asset (the loan repayment) is solely based on Ken Jowdy's criminality and the FBI agent's protection, since Kenner's June 24, 2009 FBI proffer (over ten [10] years ago).
  - The loan is also authorized by the corporate By-Laws [Ex.2].

- The government has also repeatedly (post-trial) refused Kenner's assistance in recovering the funds that resulted from the egregious Jowdy frauds (*See Document 653*).

The Second Circuit also opined that as a result of the complexities in *United States v. Ebbers*, 458 F.3d 110 (2d Cir 2006) – "'**[t]he loss must be the result of the fraud**." *Id*. at 128.   "**[l]osses from causes other than the fraud must be excluded from the loss calculation**."  *Id*.

The guidelines state that "[t]he court need only make a reasonable estimate of the loss, given the **available** information."  See U.S.S.G. 2F1.1 cmt. N.9.

**The 100% (+) untainted Cabo investments…**

The government continues to lie to the Court thru forfeiture in the face of their-own accounting.   The government is aware that Jowdy has made "under oath" statements that Kenner was responsible for the Cabo down payment.   Well,

23

*government-forfeiture-36* confirms that Kenner and Kenner investors provided $6.4 million to Jowdy specifically for the ($6,250,000) Cabo down payment (obviously too much). Those funds are _unique_ and not related to the 2004-06 Hawai'i loans to Jowdy. _The government's accounting confirmed that_.

- What *government-forfeiture-36* also confirms is that:
  1. Jowdy stole the approximate $5 million in remaining unpaid loans from the Hawai'i partners (Little Isle 4) (as sued by the Hawai'i partners in every possible jurisdiction), and
  2. Even if Jowdy thought the money belonged to Kenner (and not Kenner investors as he has testified in various jurisdictions), the government knows that Jowdy, then intended to "rob just Kenner" and not the entire Kenner and Kenner investors group; _somehow making it all right_.

Neither scenario implicates Kenner in any of the "Jowdy loan" wrongdoings. As the Court knows, 22 (or 23 with Peca's 2015 re-canting at *Tr.499*) of the 26 Hawai'i partners have given _only_ under oath affirmations of the Jowdy loans (concurring with the operating agreement's authorizations to "loan money"). Only three (3) Hawai'i partners "*cannot remember*" (in 2015); which includes Darryl Sydor who explicitly told the 2011 SDNY Grand Jury that he authorized the decision to loan funds to Jowdy as part of the same "*group*" of investors that Michael Peca and Turner Stevenson verified in 2011 (to the same SDNY Grand Jury). Berard and Rucchin are also in the (25 of 26) "under oath" group. Both Berard and Rucchin signed-off and participated in a multitude of lawsuits as plaintiffs versus Jowdy in Arizona, California and Mexico to specifically recover the "loaned funds". The Court knows that Berard previously verified his knowledge and approval for the Jowdy loans in a voluntary 2009 arbitration testimony (*See Kenner 29-33 Reconsideration Motion APPENDIX at 176-177*).

This leaves other Kenner investors who sued Ken Jowdy in Mexico and the USA for similar unpaid loan, as _Jowdy-only victims_ (also confessed to by Jowdy in his January 5-6, 2010 California deposition; and known to FBI agent Galioto):

- **Mattias Norstrom** [$500,000 2004 loan, and $300,000 Cabo airport fraud by Jowdy)
  o Mexico lawsuit _dismissed_ with the Kenner 2013 arrest,

- **Glen Murray** [$791,000 2005 loan adjudicated in Nevada, after a 4-day December 2010 bench trial – which Jowdy tried to blame Kenner for the thefts "thru magic" (Murray and Kenner [ProSe] beat Jowdy)],

- **Jozef Stumpel** [$1.6 million 2005 investment stolen by Jowdy from Baja Ventures 2006 capital account, sued in Mexico, but case terminated by John Kaiser forgery testimony (proven-false on FBI recordings – and hidden from the Court by the government)]
  - o Mexico lawsuit *dismissed* with the Kenner 2013 arrest,

- **Robert Gaudet** [multi-million labor and criminal lawsuits versus Jowdy]
  - o Mexico lawsuit *dismissed* with the Kenner 2013 arrest,

- **Phil Kenner** [multi-million labor and criminal lawsuits versus Jowdy]
  - o Mexico lawsuit *dismissed* with the Kenner 2013 arrest,

- **Hawai'i partners** [$11 million criminal lawsuit versus Jowdy for business frauds; thwarted by Kenner's untimely November 2013 arrest, stopping Kenner's Mexico State Supreme Court testimony[8]]
  - o Mexico lawsuit *dismissed* with the Kenner 2013 arrest.

FBI agent Galioto has obstructed all Hawai'i partners group efforts to recover the various criminally obtained funds from Jowdy, including but not limited to arresting a 3rd party in 2015, who was assisting in additional litigation filings versus Jowdy and his cabal in Mexico City, Mexico. The obstruction has found no boundaries to

---

[8] First -- The Court should note that Kenner and a 3rd party in Mexico had acquired a $20 million, 2012 buyout of the Kenner investors, to a Jowdy friendly party (*Bates stamp: ED-0002144-45*). The deal would have bought all Jowdy related deals "out" and left all investors with a profit in their Jowdy dealings. **Jowdy terminated the deal**, requiring his signature as Managing Member, to "hide" the Diamante corporate books from future member/owners; the same books the government cannot get from Jowdy today (or the CSL Property investors could not get from Jowdy in their Delaware Chancery filings post-Kenner arrest).

Second – the Court should note that the new, 2013 Mexico attorneys (replacing the previous murdered Mexico counsel), representing the Hawai'i-Mexico investors had a Mexico private hedge fund under agreement for a $20 million management buyout, once Kenner completed his December 2013 testimony in front of the State Supreme Court regarding Jowdy and his cabal (after a 2-year criminal proceeding) -- and Kenner was granted receivership of the property. Again, **all Jowdy investors would have been made whole (not just the 4 [or 3, or 2, or 1] Hawai'i partners who cannot remember "anything...about anything")**.

- ***Kenner was arrested 6 weeks before his scheduled Mexico Supreme Court testimony and the deal was completed. FBI agent was aware of the critical protectionist timing (after four (4) years of nothing but intimidation to deter Kenner and Kenner investors).***

protect Jowdy's well-connected cabal.   No argument could support…"*in seeking justice*".

### *Government-forfeiture-44*…

If the government's malfeasance related to *government-forfeiture-36* and false proffers are not enough to trigger a retrial (or further investigative scrutiny), the government called everything to do with the "Hawai'i loans to Jowdy" "*bogus*" (*Tr.5708 (2x), 5709*), "*phony*" (*Tr.4597, 4598*) and "*supposed*" (*Tr.5707-5708*).   They referred to Kenner directly as "*lying about everything*" (*Tr.4598, 5064-65*).   But – the truth was that the government <u>*knowingly*</u> lied to the Court during the trial and the forfeiture hearings claiming the loan agreement was a fraud, yet when confronted by the three (3) prior testimonies of the loan agreement witness, Robert Gaudet, the government did not refute the truths, nor did they respond to their exposed lies as they told the Court they would in writing (*Forfeiture Tr.288-291*).

- Further exposing the government's planned malfeasance was the fact that during the Gaudet July 2, 2009 deposition, Jowdy's attorneys asked Gaudet what Kaiser's involvement was in the loan agreement (*Bates stamp: PK_SEC_00669-670*) (*Tr.23*) [Ex.18 at 3]:

  *Q [Jowdy's attorney]: <u>Did he [John Kaiser] mention that he had any involvement with the **creation** of this loan agreement document?</u>*

  *A [Gaudet]: <u>**Yes**</u>.*

  *Q: What did he tell you?*

  *A [Gaudet]: **He [John Kaiser] told me it was a document <u>he</u> needed for – it was a document he had for the Hawai'i entity, for the Hawai'i company**.*

- Several questions later, Gaudet confirmed that he authenticated his own "witness" signature on the document to Kaiser.   Gaudet confirmed that Kaiser was in possession of the loan agreement in his personal files.

After the irrefutable confirmation by Gaudet (authenticating his witness signature) and the Kaiser "construction" verification, how did the government allow Kaiser to perjure himself thru two (2) non-responsive answers, referring to the loan agreement as a forgery (*Tr.1106-1108*) and not correct it?   *Napue v. Illinois*, 360 U.S. 264, 269 (1959) – (*prosecutor failed to correct witness's false testimony…*)

*Government-forfeiture-44* clearly refuted the months-long "fake loans" prosecutorial

theory.   The government's-own theory was debunked by (1) Jowdy's own exculpatory evidence (produced in concert with IRS Agent Wayne), (2) the signature witness' confirmation (from three [3] different jurisdictions when the Hawai'i partners sued Jowdy to recover the loans), and (3) verified to the Court by the government (obviously too late for the jury to consider) that Kenner "*did not steal anyone's money*"…**PERIOD**!

Nevertheless, the prosecutorial damage was done, and the Court is aware that after claiming, "*Kenner stole the funds and used it to buy his equity in Mexico*" from start-to-finish at trial, no reasonable juror could refute the vigorous presentation with conviction by the prosecutorial team.

During the July 2, 2019 hearing, Judge Bianco echoed some of the government's fraudulent misdirection – after years of being misled by the government's fraudulent portrayal of the Hawai'i loans to Jowdy (*Tr.29*):

> *[Judge Bianco]: "I understand that not every dollar was, you know, dissipated and spent on other things.   I understand that a significant amount of the money went to Mexico."*

It did not.   As part of the Jowdy loans – and verified by *government-forfeiture-36* – only $350,000 originally went to Mexico *solely for Jowdy's benefit*, *no more*.[9]   The

---

[9] During the Mexico State Supreme Court criminal case versus Jowdy (brought by Kenner and Kenner investors – in 2012-13), it was *verified* to the Supreme Court that Jowdy's Mexico attorney, Fernando Garcia, forced the seller of the Cabo property to wire transfer $750,000 from the purchase proceeds (including the original $350,000) to an offshore account shared by Garcia and Jowdy (a portion of the Supreme Court criminal proceedings versus Jowdy and his cabal).

> ➤ None of the cash purchase proceeds (of the $6,250,000 deposit) -- originating from either Kenner managed LLC [Baja Ventures 2006 or CSL Properties] -- comes from the Hawai'i loans; *leaving no forfeiture nexus*, and certainly nothing acquired by "*ill-gotten*" gains or funds traceable to the instant case (*See Contorinis, infra*).   This mis-direction is the critical ruse the government wants the Court to be blinded by – so they can capture thru forfeiture, portions of the Cabo deal even though they cannot trace a single dollar to anyone in the instant case.

In the *United States v. Contorinis*, 692, F.3d 136, 148 (2d Cir 2012), the Court "observed that neither the language of the criminal forfeiture statute nor Circuit case law supported the proposition that a defendant must forfeiture proceeds that 'go directly to an innocent third party and are never possessed by the defendant'" *Id.* at 147.

government produced the real Jowdy-Hawai'i loan agreement (*3500-KJ-2 at 24-25*). That agreement verified, as did Michael Peca to the 2011 SDNY Grand Jury (*Peca SDNY Grand Jury Tr.30-33*) and 2015 trial Court (*Tr.499* and *Document 501 at 9*), corroborating Darryl Sydor's SDNY Grand Jury testimony (*Sydor SDNY Grand Jury Tr.25-26*) – ***Jowdy was supposed to receive the funds***.

In the same July 2, 2019 hearing, Judge Bianco defined exactly what he wanted (unfortunately confused by the government's 6-year misrepresentations -- *Tr.25*):

> *[Judge Bianco]: "What I want the government to do is try to obviously focus its attention on the core of the case which is the entities that were controlled by the defendants and those entities that the money was moved into and protect all of that…"*

*None* of the "*entities*" involved in the Cabo san Lucas project, originally controlled by Kenner, *have ever had Hawai'i funds traceable to them*.   *Government-forfeiture-36* confirms it – **but the government does not want the Court to know it**, because their nexus will fail.   100% of the funds in Baja Ventures 2006 and CSL properties 2006 are "*clean*", "*untainted*" and "*traceable*" to the various Kenner investors.

o   *None of the Hawai'i funds are traceable to those accounts*.

The government lies about it -- and repeats it – **but their-own evidence debunks their nexus**.   When will the government be forced to admit their lies to this to the Court – and the investors -- that FBI Agent Galioto, Kaiser, Berard and the Jowdy cabal continue to falsely claim -- "*Kenner stole all of your money to buy his piece of the Cabo project*"?   The truth is surely revisionary to the entire case -- and the

---

• **Jowdy was never charged in the instant case, *by the government's premeditated choice*.**   And – Jowdy was referred to as a victim thru the Probation offices July 18, 2016 addendum to their PSR submissions.

• This also applies to the **Tim Gaarn** private Eufora stock sales, other than Gaarn's $187,500 of loan repayments to Kenner with Gaarn's stock sale proceeds (for government documented loans Kenner provided to Gaarn years earlier).
   o   The Court should note that although the stock belonged to Tim Gaarn (documented by Eufora's own tax records since 2005), the government asked the witnesses if they knew they were buying stock from Kenner; clearly a fraud on the witnesses, the jury and the Court (*Tr.2173, 2732, 5970-1, 5974, 6011 [the Court misled by the government]*).   Kenner did not own Eufora stock that could have been sold per the government misrepresentations; *and they knew it all along*.

government is running from it at light-speed, _pushing for sentencing_ (before fully exposed) to complete their 10-year ruse on Kenner (his freedom) and Kenner investors (for the Jowdy hoax – _Document 667_).

John Kaiser's "alarming" February 2019 letter this Court confirms the fraud is still being "sold" (_Document 628 at 1_) in 2019 by those desirous of protecting Jowdy:

> "_Jowdy would like the court to think that Kenner stole $7 million from the hockey players and others..._"

- o   Obviously the Court _now_ knows that _Kenner did not steal any of it_.

- o   The government's own accounting (_government-forfeiture-36_) proves it...so the government cannot argue it otherwise...

Further disintegrating the constitutional process is that when the Court (and Judge Bianco) are looking to the government for guidance (a.k.a. ethics), the government failed everyone (_Tr.24):_

> _[Judge Bianco]: "I'm a judge.  I'm not a business person, so I don't know all of the intricacies of something like this.   So I'm relying on the government's assessment of the way to do this to protect what the government is trying to accomplish here without overreaching in a way that is going to hurt everybody."_

==At no point since the _government-forfeiture-36_ and _government-forfeiture-44_ revelations has the government alerted the Court that not only was Kenner "not responsible" for the unpaid and wholly authorized Jowdy loans from the Hawai'i partners (per the corporate By-Laws), but Kenner never used any "_ill-gotten gains_" to purchase anything the government is seeking thru forfeiture proceedings.==

The government simply hopes the Court will get lost in the morass and order forfeiture because three (3) [which would not include Michael Peca _after_ his re-canted confessions], and only three (3) of the 26 Hawai'i partners "_cannot remember_" (as of 2015) that they were involved in multiple conference calls and decisions to loan money to Jowdy; that the other 23 Hawai'i partners have remembered and confirmed "under oath".   The Court at the government's urging to

"finish the sentencing" has left the giant elephant of **CTE**[10] unaddressed by the Court.

Further defining the government's mis-direction to the Court and jury, the actions by Kenner as the Managing Member of the Hawai'i partners and Little Isle 4 had 100% authority to "loan funds" (transparent or not), and carry on dozens of other legal actions on behalf of the LLC (whether or not the LLC members "could identify them").   The government is attempting to take advantage of the Court, when that same Court is depending on the government's direction, *supra*.   The government needs to be checked for their attempted malfeasance with the Court relying on their integrity.

Hawai'i partners' 2006 closing attorney for the Cabo (March 2006) and Hawai'i (August 2006) verified to this Court [Attorney Robert Madia, Esq.]:

> *"There were a lot of moving parts on the two closings.   They were very intertwined with all of the loans and similar partner groups.  The Cabo closing occurred on March 2006.   There were a lot of monies due to the Hawai'i investment partners from Ken Jowdy's loans at that time.    I participated in several conference calls with Phil Kenner and his investors leading up to the March 2006 closing as one of the attorneys.    There were two main topics outstanding on the conference calls.    The first was the Jowdy loans that would be paid back to the investors from Hawai'i when the Cabo deal closed.*
>
> *The multiple investor conference calls in January and February 2006 disclosed the original repayment plans at the Cabo closing per the terms of the Hawai'i loan agreement.   The March 2006 conference call announced that there was a delay to repayment of the Hawai'i loans when we had to collect signatures from*

---

[10] **CTE** -- *Chronic Traumatic Encephalopathy* is defined by the Boston University neurological center (for brain trauma research) as *any post-concussion symptom* including but not limited to **memory loss**, **forgetfulness**, light sensitivity, **amnesia**, **faulty memory**, disorientation, **dementia**, **general cognitive problems**, **confusion**, impaired judgment, mood swings, sleeplessness, &/or **inability to concentrate.**

- In a 2012 lawsuit by 300+ NHL players versus the NHL for **CTE** – the lawsuit defined the symptoms as **memory loss, dementia, depression, CTE, and related symptoms**. The lawsuit alleged that players continue to suffer on a daily basis from headaches, *loss of train of thought*, depression, anxiety, *memory loss*, *confusion*, aggression, paranoia, irritability, impulse control problems, *inability to concentrate*, light sensitivity, *concentration difficulties*, sleep disorder and *cognitive deficit*.

> *the investors.   Ken Jowdy and Bill Najam told us that the Lehman Brothers partners would facilitate a post-closing repayment plan.   Nobody was alarmed because those payments were pending in the following 6-9 months.   The 15% interest on the Hawai'i loan was accruing to the benefit of the Hawai'i investment partners."*

**Jowdy Loan Verification…**

This Jowdy loan has now been verified to the Court by the government itself (*only* post-trial, leaving its prejudice on the verdict unaddressed).   The actual loan *is* an asset of the Hawai'i partners and Little Isle 4 (*3500-KJ-2 at 24-25*; in the government's possession for five [5] years before trial -- and *specifically* ignored).

- The loan is today -- and it has always been (since 2004) an asset of the LLC.

The Court pointed out to the Government on July 2, 2019 during the hearing (*Tr.21*):

> *THE COURT: "…you know, Mr. Kenner has been pointing out for years and its obvious from the trial that the money – that money went to Mr. Jowdy and his entities."*

The Court continued (*Tr.29*):

> *THE COURT: "I understand that not every dollar was, you know, dissipated and spent on other things.   I understand that a significant amount of the money went into Mexico."*

**The Court is partially correct.**

One -- Kenner *never* dissipated any of the Hawai'i partners' funds that Jowdy received; *independently verified by 25 of the 26 Hawai'i partners, Kaiser (to the FBI), Kenner, Jowdy (to the FBI) and the signature witness (Gaudet) in three (3) independent jurisdictions.*

And…Two -- *none* of the Hawai'i partners' funds that paid Constantine his $1,000,900 of consulting fees (as documented by FBI forensic expert, Petrellese, during trial -- *Tr.3934*) originated from any superseding indictment victim deposits.

- None of these funds went to Kenner from this Hawai'i partners LLC By-Laws authorized transactions…***NONE**!*

31

**All of the 2004-06 Hawai'i loans went to Ken Jowdy <u>personally</u>** (and only $1,315,000 from the Hawai'i investors contributions named in the superseding indictment -- if traced prior to their capital account contribution). The "*group*" intention, as **Michael Peca**, **Darryl Sydor**, and Turner Stevenson testified the 2011 SDNY Grand Jury was that the money would "*help with the acquisition of the Cabo san Lucas project*" for the same "*group*" of investors (thru Jowdy). The $1,315,000 includes Sydor ($200,000) and Peca ($240,000) and their 2011 and 2015 confessions of "full knowledge", further *<u>removing them as victims</u>* from transactions they "approved" and "acknowledged" in real time -- and years later.

- Michael Peca's 2011 SDNY Grand Jury testimony confirmed that he expected *<u>all</u>* of his $1.8 million to be loaned to Ken Jowdy (*See Peca SDNY Grand Jury Tr.30-32*).

- Thus, the actual $1,315,000 is *<u>less than</u>* the amount Michael Peca directly confirmed in 2011 and re-confirmed on cross-examination to the 2015 trial Court.  This leaves no unexpected funds, with fully supporting testimony, sent to Ken Jowdy for the 2004-06 Hawai'i partners' loans – *<u>assuming thru fungible money, all of it is attributed to Peca's specific testimonial expectations.</u>*

**Under advice of counsel**, the Hawai'i partners constructed the loan agreement "personally" with Jowdy in order to further protect the long-term collectability of the loaned funds (*3500-KJ-2 at 24-25*).  As a result of following counsel's advice, the "Jowdy loan" *is still* an asset of the Hawai'i partners (Little Isle 4 and Na'alehu Ventures 2006) – and collectible if not for the government's specific obstructionist actions.

- Otherwise, Jowdy would have been able to bankrupt another worthless LLC that he used for laundering Kenner and Kenner investors' money since August 2002 (*See Jowdy's August 2002 Baja Development Corp account statement subpoenaed in April 2015 by the government, just weeks before the start of the 2015 trial – which confirmed his immediate -- FBI unchecked and overlooked -- embezzlements)* [Ex.3].

- The April 2015 Jowdy subpoena on the eve of trial hi-lighted the government's explicit knowledge of the Jowdy criminal activities *<u>within days</u>* of the first August 2002 Kenner and Kenner investors' investments thru Jowdy – and *<u>blatantly ignored</u>* at trial to falsely blame the funds Jowdy stole on Kenner at trial days later (*Tr.27, 29-30, 31, 33*).

Prior to the documented Jowdy-Galioto manipulation efforts of the Hawai'i partners investors (beginning in 2009):

1. **John Kaiser voluntarily verified** to the 2009 arbitration panel that he raised money from his friends & family for the 15% loans to Jowdy (*Day 5 at 922-929)* [Ex.4].
   a. Kaiser re-verified the Jowdy loans to the FBI on October 19, 2010 during a 2:15 FBI proffer, and his six (6) pre-cursor meetings with Jowdy (*3500-JK-1-r at 2-3, 9*),
2. **Bryan Berard voluntarily verified** to the 2009 arbitration panel that he authorized the Hawai'i partners loans to Jowdy; without equivocation (*Day 5 at 915-918*) [Ex.5],
3. **Jozef Stumpel voluntarily verified** the Jowdy loan to the 2009 arbitration panel via affidavit  [Ex.6],
4. **Jere Lehtinen voluntarily verified** the Jowdy loan to the 2009 arbitration panel via affidavit (in EDNY evidence),
5. **Mattias Norstrom voluntarily verified** the Jowdy loan to the 2009 arbitration panel via affidavit  (*3500-MN-2*),
6. **Sergei Gonchar voluntarily verified** the Jowdy loan to the 2009 arbitration panel via affidavit (*3500-SG-4*).
   a. Gonchar re-verified his loan knowledge – directly from Jowdy and Kenner independently to the FBI in February 2010 (*3500-SG-1 at 8-9*),
7. **Tyson Nash voluntarily verified** the Jowdy loan to the 2009 arbitration panel via affidavit (in EDNY evidence),
8. **Michael Peca verified** the Jowdy loan to a 2011 SDNY Grand Jury and specifically confirmed his approval and knowledge of the Jowdy loans "*as a group*" (*Peca SDNY Tr.30-32*).[11]

---

[11] Michael Peca *SDNY Tr.30-31 [3500-MP-5]:*
*Q: How much did you put into Little Isle 4?*

*A [**Mike Peca**]: "$100,000 cash investment that was going towards that.  Then we had lines of credit.  I had one out for $1.7 million that was going to be used at the time.  Here's where a lot of the cross starts to happen.  **A short-term loan to Mr. Jowdy, because at the time Cabo – we hadn't gotten the lending from Lehman Brothers yet.  We** made a short-term loan until the lending came in.  Once the lending came through they were to pay back the loan, I think in the neighborhood of five-and-a-half million dollars, on the closing.  It was never paid back.  And then communication basically seized at that point from him [Jowdy].  **That was kind of the whole sticking point as far as me and the other guys with Mr. Jowdy.**

a. Michael Peca *re-canted* inconsistent direct-examination testimony and *re-confirmed* to the 2015 EDNY Court (*Tr.499*) that he was *always aware* of the loans to Jowdy (making him a non-victim of any loan concealment allegations)[12],

---

*The 1.7 along with the $100,000 and* **whatever else put in this a capital account**, *Little Isle 4, I believe.* **The Capital account was loaned to Ken Jowdy**, *our business partner, so there is no need* *at the time* *to be worried about anything.* **The money was loaned to Ken Jowdy to basically help some of the purchase of the Cabo property so we can get the funding**. *And then it was supposed to [be] a short-term loan.*"

- Please note that Mike Peca told the 2011 SDNY Grand Jury that he expected 100% of his Hawai'i "capital account" funds (over **$1.8 million**) were supposed to be **in** Little Isle 4's capital account and **loaned to Jowdy**.

[12] Michael Peca *cannot* be a victim of the Jowdy loans that he confirmed he approved to the 2011 SDNY Grand Jury and the 2015 EDNY trial Court. *Michael Peca told the SDNY he expected his entire $1.8 million to be part of the Jowdy loan*. The Court should note that only $1,315,000 originated from the six (6) individuals in the superseding indictment who are Hawai'i partners; *no more*. Michael Peca's verified expectations cover the entire amount of the traceable loans, *and more*. Peca's SDNY testimony (re-verified in 2015) confirmed it was a "*group*" decision to lend the money to Jowdy – so it begs the question...

> QUESTION: "Is Michael Peca part of a conspiracy with Kenner to conceal the Jowdy loans from the three (3) other Hawai'i partners (Nolan, Sydor and Rucchin) who cannot seem to remember (in 2015) the details of the multiple conference calls they were part of? Is Peca and the other 22 Hawai'i partners part of an uncharged conspiracy – for something the corporate By-Laws also authorized?"

- Darryl Sydor is one (1) of the three (3) other Hawai'i partners, *supra*. Sydor gave the identical testimony to Michael Peca in the 2011 SDNY Grand Jury but "*could not remember*" *anything* to do with his Hawai'i investment (like Owen Nolan) in 2015.

> QUESTION: "Is Sydor another part of the concealment conspiracy [based on his 2011 Grand Jury testimony]"?

- Bryan Berard voluntarily gave "full Jowdy loan knowledge testimony" to the 2009 arbitration (*Nolan v. Kenner*) and confirmed 100% knowledge and approvals with the "*group*".

> QUESTION: "Is Berard another part of the concealment conspiracy [based on his 2009 voluntary arbitration testimony]"?

- Only Steve Rucchin (who was "*foggy*" about the Hawai'i details – *Tr.2722*) and Owen Nolan (who "*could not remember anything*" to do with his 5-year LOC – *Tr.2065-66*) are alleged remaining victims (out of the 26 Hawai'i partners).

9. **Darryl Sydor verified** to a 2011 SDNY Grand Jury and specifically confirmed his approval and knowledge of the Jowdy loans "*as a group*" (*3500-DS-2 -- Sydor SDNY Tr.25-26)*,

    a. Please note that Sydor could not recall seeing his 2009 default letter (*Tr.2166-67, 2191*), and presented more self-inflicted confusion when cross-examination revealed Sydor sent Kenner a text on March 23, 2009 (*Kenner trial Exhibit 209*) to confirm his receipt of the March 19, 2009 letter (*Tr.4199*).   Sydor could not remember speaking with the Northern Trust bankers before closing his LOC, but debunked by his own text to Kenner in real time (*Tr.2211-12*).   The government had the evidence and ignored it to allow the Sydor "*memory loss*" testimony, alleging "*concealment*".

10. **Turner Stevenson verified** to a 2011 SDNY Grand Jury and specifically confirmed his approval and knowledge of the Jowdy loans "*as a group*" (*3500-TS-1 -- Stevenson SDNY Tr.17-18)*,

11. **Glen Murray verified** in his 2008 Nevada complaint versus Jowdy (for another $791,000 Jowdy stole from Murray) that he previously approved the Hawai'i partners Jowdy loans [Ex.34],

12. **Seventeen (17) Hawai'i partners sued Jowdy** for the Hawai'i loans in Arizona (2008-09) and signed specific loan acknowledgment disclosures for their independent attorney, Tom Baker (withheld by the government until post-trial production; an unresolved *Brady* issue),[13]

13. **Nineteen (19) Hawai'i partners sued Jowdy** for the Hawai'i loans in

---

    o   The Court should note that Rucchin signed-off and participated as a plaintiff in the Arizona (2008-09) and two California (2009-2010) lawsuits versus Jowdy to recover the Hawai'i partners loans from Jowdy.

- The Court should note that in 2008 – **Owen Nolan received a full-recovery of investment funds from Ken Jowdy in a negotiated settlement**, _never_ naming Kenner as a party to the Jowdy thefts…
  - ➤ The Court should also note that Nolan and Rucchin collectively recorded dozens of severe concussions during their amateur and NHL playing careers, resulting in severe _memory loss_ and _cognitive degenerative symptoms_; **fully documented in their NHL medical records**.

[13] 2008 Arizona plaintiffs versus Jowdy for the recovery of the "loans" included (5): **Michael Peca, Darryl Sydor, Bryan Berard, Steve Rucchin, Tyson Nash --** as named in 2015 as victims in the Kenner Superseding Indictment.

- The Arizona lawsuit also included the following Hawai'i investors unnamed in the Indictment (12): Campbell, Khristich, Woolley, G. Murray, deVries, Lehtinen, Glatt, Norstrom, R. Murray, Gonchar, Stevenson, and Tsyplakov.

California (2009-10) and signed specific lawsuit acknowledgment disclosures for their independent attorney, Ronald Richards,[14]

**The Government Produced No Contrarian Evidence...**

The Court should note that not a single piece of exculpatory evidence was produced in the millions of pre-trial documents – or during trial – or post-trial -- that represented any adverse belief by the investors or their attorneys that the Jowdy loans were concealed, ever.   Only two (2) Hawai'i partners [Nolan and Rucchin] who claimed they were "*foggy*" about the details [Rucchin], or "*could not remember*" any specifics over ten (10) years after the original conference calls and "*group*" decisions [Nolan and Rucchin]; or Rucchin's signed-off plaintiff status in the multiple lawsuits versus Jowdy for the recovery of the Hawai'i loans.

**Pro-Jowdy Advocates Spread The "*Kenner Stole Your Money*" Rumor...**

The Court knows that FBI agent Galioto (with the 2011-2017 help of Jowdy employees, Berard and Kaiser) spread the malicious rumors, "*Kenner stole all of the money from the Hawai'i partners and <u>never</u> gave it to Jowdy*".

- Kristen Peca <u>*confirmed*</u> this during her 2012 FBI recordings of Kenner, *infra*.

During trial, *supra*, the prosecutorial team doubled-down on that falsity in front of the sponge-like jury from opening remarks (*Tr.27-33, et.al.*) thru rebuttal summation.

Post-trial, not only have Kenner investors like Jozef Stumpel confirmed the continuation of the lies (despite the government's introduction of *government-forfeiture-44*) by FBI agent Galioto, Berard, Kaiser and Jowdy attorneys to the investors, but...

John Kaiser verified that the FBI and "Jowdy" were still spreading this prejudicial and false story (as a cover-up to the truths for Jowdy), when Kaiser "*shocked*" the Court and submitted his February 28, 2019 letter to the Court (*Document 628 at 1*),

---

[14] 2009 California plaintiffs versus Jowdy for the recovery of the "loans" included (5): **Bryan Berard, Steve Rucchin, Darryl Sydor, Tyson Nash, and Michael Peca** -- as named in 2015 as victims in the Kenner Superseding Indictment.

- The California lawsuit also included the following Hawai'i investors unnamed in the Indictment (14): Stumpel, Lehtinen, deVries, Woolley, Simon, Norstrom, Tsyplakov, R. Murray, Khristich, G. Murray, Gonchar, Campbell, and Stevenson.

stating:

> "*Jowdy would like the court to think that Kenner stole $7 million from the hockey players and others...*"

Again -- the Court knows that Kenner did <u>*not*</u> steal any of it.

The government's own accounting (*government-forfeiture-36*) proves it...and there is no wiggle-room for the government to ignore it.

- Could the Galioto – Kaiser -- and Berard manipulation of Kristen Peca and Michael Peca in 2011 (and others -- to protect the Jowdy criminality) have led to Michael Peca's **CTE** (*faulty memory, confusion and mistakes*) symptoms during trial??
- They certainly did not help Michael Peca recall the real events and empirical evidence that he previously participated in (lawsuits in Mexico – Arizona – and California) and testified (to the 2011 SDNY Grand Jury) about personally, *supra*.

*See United States v. Wallach*, 935 F.2d 445,473 (2d Cir. 1991) (Altimari, J. concurring) – knowing use of false testimony is "*perhaps the most grievous accusation that can be leveled against a prosecutor*".   The use of false evidence is improper whether the prosecutor affirmatively elicits such evidence, See *Miller v. Pate*, 386 U.S. 1, 7 (1967), or merely "***allows it to go uncorrected when it appears***", *Napue v. Illinois*, 360 U.S. 264, 269 (1959) – (*prosecutor failed to correct witness's false testimony...*).

- <mark>Conviction obtained thru use of false testimony, known to be such by representatives of the State, is a denial of due process.   There is also a denial of due process, when the State, though not soliciting false evidence, <u>allows it to go uncorrected when it appears</u>.</mark>[15]

---

[15] In either instance, these ugly issues were raised thru the following (as a minor subset in *Kenner's Rule 29-33 reconsideration motion and Appendix*):

1) **Michael Peca**'s false "no Jowdy loan knowledge" testimony on direct-examination (*Tr.381*) – or use of LOC (*Id. at 108 footnote, 118-119*) and his specific re-canting of that testimony during cross-examination (*3500-MP-5 at 38-40*) (*Tr.499*) (in concert with his 2011 SDNY Grand Jury testimony – *3500-MP-5 at 29-35*) – and confirming texts with Kenner (*Id. at 102-103*),

2) **Kristen Peca**'s false proffer about her participation in the 2005 Hawai'i transaction (*Tr.697-98*) and the underlying issues (despite her 2012 FBI recordings confirming her 2015 trial fabrications to harm Kenner) (*Id. 145-146*),

3) **Kristen Peca**'s transfer of her "bonds" in 2005 (*Tr.697-700*), that Kenner promised her would be safe – when "**no bonds were ever transferred**" (*Ex.7 at 7*] and the

government was 100% aware (*Id. at 104, 105-109*),

4) **Kristen Peca**'s testimony that "*there were stretches where we didn't hear from him in months*" after the LOC default (*Tr.712*) was completely fabricated, **because** the government had Kenner's emails and text messages with Michael Peca.   The evidence confirms that in the 12 months following the April 1, 2009 LOC collateral seizure that Michael Peca authorized (in evidence) with Northern Trust Bank, Kenner and Michael Peca exchanged over 550 text messages and met face-to-face over four (4) times, including a week-long visit in Vancouver Canada during the 2010 Winter Olympics.  Kristen Peca also arranged a family vacation in Scottsdale Arizona to stay at Kenner's home in the fall of 2009.   The fabrication was surreal.

5) **John Kaiser**'s testimony about his "forged" name (*Id. 206-208*) (*Tr.991*) while he possessed the "*ink*" versions of the actual documents until the "*eve of trial*" (also caught lying about his name being forged in multiple other instances in the EDNY, Arizona, and Mexico Courts contemporaneously – and hidden from the Court by the government) (*Id. at 7-8 footnote*),

6) **John Kaiser**'s false testimony about receiving "*back pay*" and "*expenses*" repaid in August 2006 – in lieu of the repayment of his 2005 friends & family loans.   Please note that the government objected to subpoenas of Kaiser to the IRS for his 2006-07 taxes (to verify the Kaiser lie of "*back pay*" income) or a subpoena to secure the balance of the $816,000 payments as "expense reimbursements" as Kaiser and the government falsely alleged (*Tr.1413-14*).   The IRS agent on the case has full access to verify the Kaiser perjury and the government's knowledge, yet it remains unexplainable.

7) **Bryan Berard**'s inconsistent "loans" testimony (while employed by Ken Jowdy – the beneficiary of non-collection, contradicting his 2009 arbitration testimonial explicit knowledge and approvals) [*Ex.5*] (*Tr.3035-36*),

8) **Darryl Sydor**'s complete memory loss about his own Northern Trust LOC (*Tr.2166-67*) (in the face of his own, personal texts with Kenner) (*Id. 301, 395 footnote*),

9) **Owen Nolan** complete lack of knowledge of his Northern Trust LOC (*Tr.2065-66*) (despite his own banker's 2009 deposition confirming years of direct communication with Nolan [*Id.170-71*] and the 2007 Kenner text communication specifically documenting Nolan's inherent knowledge [*Id.271-74]*),

10) Hawai'i partners COO **Chris Manfredi**'s complete amnesia regarding "securing lenders with Constantine" (despite his direct email communication with Constantine – in real time -- and FBI proffer confirmations in 2010 – all forgotten by 2015) [*3500-CM-2-r at 1*] (*Id.350-55*),

11) **Jay McKee**'s [**non-victim**] lack of GSF "*memory*" (*Tr.1821-24*) (despite his 2-day text communication with Kenner on the evening of his dinner with Constantine – confirming each and every detail of use as discussed by Constantine at dinner) (*Id. at 47-52*),

12) **Joe Juneau**'s complete "*loss of memory*" about his LOC (despite being fully bought out [**non-victim**] and his years of emails directly with Kenner about his LOC and underlying Hawai'i investments, contradicting his testimony), and

13) **William Ranford**'s "*memory loss*" for his GSF and Eufora transactions (*Tr.2823-24, 2838*) (despite confirming the specific transactional details to the FBI in 2012 [*3500-WR-2-r*] and lying at trial to cover-up like John Kaiser (*Tr.2860*) -- and 2014 Arizona deposition confirmations of the exact transactions [a 2nd time] [*3500-WR-3 at 11-12, 27*]),

14) **Ethel Kaiser**'s false testimony that she met Kenner in 2005 (*Tr.934*) – before her

At all times prior to trial, the government had the empirical evidence to alert them that each and every one of these testimonies was false.   The government let them stand uncorrected, *again and again (to their prosecutorial benefit)*.   It should never have been Kenner's responsibility to the Court, the jury &/or in defense of his Constitutional freedom to "prove his innocence" with the government's evidence.

In the same context of malfeasance, the government continues the hoax on the Court thru sentencing requests that (1) elevates the number of people (alleged) in Kenner's conspiracy – seeking four enhancement levels, (2) elevates the number of victims – seeking two enhancement levels, and (3) elevates the money involved in the basic transactions (to four times the money even involved) to grossly enhance the guideline levels.   None of it should be Kenner's responsibility to defend, as the probation department has a 3rd party, arms-length responsibility to the Court, the government and ultimately to Kenner to independently evaluate the case on its merits.   As examples

- The funds involved in Count 2 *do not originate* thru any alleged victim in the instant case.   Tim Gaarn, the seller of the documented stock, is not a co-defendant or co-conspirator in the instant case.   The Count is plainly erroneous.

- The funds involved in the Constantine consulting payments of $1,000,900 (*Petrellese Tr.3934*) *do not originate* thru any victim in the instant case.   The

---

Hawai'i loan transaction…with the government presenting *GX-942* to confirm her 2005 meeting at her granddaughter's christening.   The fraud is that the granddaughter wasn't born until 2006!   Neither the government nor Ethel Kaiser [**non-victim**] cared about the perjury -- since Kenner never met Ethel Kaiser until after the loan was repaid to John Kaiser in August 2006.

15) Lanie Donlan's "tracing" testimony about Kenner visiting her in Boston to allegedly defraud a bank with "traced" signatures (*Tr.3424-25*).   The testimony fails for several provable reasons.   First – Kenner did not spend a single night in Boston in 2005 (as there was an NHL lockout, limiting Kenner's travel).   Second – the "alleged" document does not exist anywhere in the two (2) million documents the government produced pre-trial (*Tr.3454-3457*).   Third – Donlan and Berard were caught in the contemporaneous 2015 Arizona case lying about another "forgery" of a document [Ex.28] that was actually notarized [Ex.39 at 11 ¶49].   FBI agent Galioto failed to contact the notary after Donlan refused to "go along" with the "forgery ruse" once addressed by the FBI (*See 3500-LD-2*).   John Kaiser, as Berard's co-defendant, was caught by the same Arizona judge lying about "forgeries" over five (5) more times [Ex.39].

16) **etcetera, etcetera, etcetera**…

- <mark>*The government needs to explain to the alleged victims, the Court and the defendant <u>how many provable lies</u> (**fully contradicting evidence in the government's possession pre-trial**) they are allowed to present to the jury to continue the hoax on the Court, the investors and Kenner – before their misconduct becomes prejudicial to the entire legal proceeding.*</mark>   *See Napue v. Illinois*, 360 U.S. 264, 269 (1959).

charged portion of the conspiracy has no nexus to any victim and is plainly erroneous.

- Etcetera…and as such, a Fatico hearing is required to force the government to substantiate the alleged victims and alleged losses in their case that are requesting an advisory guideline range of <mark>324-405</mark> months (<mark>27 to 33.75</mark> years) imprisonment.[16]

At no time does probation's deferment to the government information provide an independent review.   As such, it all is tainted.

---

[16] See *Agudelo v. United States*, 724 F. Supp. 1110, 1111 (E.D.N.Y. 1989) ("A federal probation officer is an arm of the court and not an agent of the government qua prosecutor. The probation officer's role in the sentencing process is not an adversarial one. Rather, he acts as a neutral gatherer of information from many sources to be used by the judge in imposing sentence.").

## A Case of Contradictions...

Kenner believes in idealism, the Constitution, and the rule of law; and has followed each without hesitation or diversion since the inception of the instant case issues. All of it let him and his investors down.   Kenner deserves equal considerations and justice, as do those anointed people of privilege; while they all need to be held to the same standard.   The 2-tier justice system has reared its ugly head in this case as a gross divergence of the truths as documented by empirical evidence for nearly two (2) decades, and ignored.

This case is a study of almost unimaginable paradoxes.   Kenner has been the whistleblower, not just to the issues related to fraudulent developer, Ken Jowdy and his cabal and their tens of millions of criminal thefts from Kenner and his investors (in 2006), but versus a billion-dollar publicly traded firm (in 2003), and his co-defendant (in 2010)[17] at the earliest discoveries of perceived wrongdoings.  This is Kenner's historical character, as noted by Kenner's mother in her letter to the Court, *infra*.   None of Kenner's actions and subsequent self-exposure to financial and physical harm equates to anything resembling "concealment"...*of anything*.

How is it, for example, that Kenner ignored specific threats and potential harm with Jowdy's cabal and placed himself in the middle of a 2-decade-long battle to protect his clients with an apparently insurmountable opposition (including the Former Director of the FBI and his progeny) – yet Kenner has lost his freedom for "concealing" everything that his own actions empirically exposed, time after time?

Several months *after* former Kenner clients Michael Peca, Darryl Sydor, and Turner Stevenson gave 2011 SDNY Grand Jury testimony, New York based attorney Michael Stolper's represented his participation and transparency with Kenner and the same Kenner investors *related to Jowdy* as clear and unambiguous, when he affirmed to the SEC (*SEC Tr. 683-685*):

[NY Attorney, Michael Stolper – August 2011] [Ex.17]:

---

[17] Former California Sherriff, Kim Garrett, wrote to this Court:

> *"...when he [Kenner] started noticing some issues with some of his previous business partners, he asked me to contact some of my LEO and legal contacts to look into some of the issues from here in CA.   I also accompanied Phil to the AZ Attorney Generals office to report the crimes he suspected with his co-defendant in the current matter for two separate business problems.   My contacts allowed us to get to the right people without many hurdles."*

*The only thing I would like to clarify was that I think in your line of questioning, which may not come through in the transcript, whether he [Kenner] disclosed that the SEC has sought enforcement of subpoenas to his clients.   I think that the suggestion in your question was that it was something negative that he should disclose to his clients as sort of a warning or red flag to his clients who are relying on him.*

***And I think that the conversations that I have been a part of,*** *without waving privilege,* ***and also my own view*** *of SEC's involvement in this whole Diamante del Mar, et. al. is a welcome one and that* ***we*** *and Mr. Kenner, are really looking to the SEC to enforce the securities laws against Mr. Jowdy and those [Jowdy's cabal] who did wrong here.   And we see it as a welcome thing, as a positive thing.*

*So the tenor of the conversations with Phil's friends, co-investors, clients is that this is a welcome thing and maybe because we are having this direct communication with the SEC, and then perhaps subsequently with the US Attorneys Office, that maybe they will finally get some justice out of this.*

*And I know I have said that off the record with you and I just wanted to clarify that in response to that line of questioning.   Just a point of information.*

- Please note that Kenner's trial counsel never discussed this transparency of Eufora and Hawai'i information via interview with Attorney Stolper, despite constant haranguing by Kenner to prepare Stolper as a defense witness for Kenner.

At the time of Stolper's proffer to the SEC -- he represented nearly 30 Kenner investors and associates related to one object (Eufora) in the instant case for years prior to this pro-Kenner transparency proffer – and…

In 2010, Attorney Stolper was organizing the legal efforts versus Jowdy, Lehman Brothers and their associates for the frauds perpetrated by Jowdy's cabal, as Stolper confirmed to the SEC, *supra*.

- The Stolper-led litigation efforts ceased once Kaiser (the Hawai'i Managing Member since 2007) and Bryan Berard received jobs from Jowdy to help FBI agent Galioto spread the "*Kenner stole all of your money to buy his piece of the Cabo project*" rumor.
    - This *lie* – repeated ad nauseum thru trial by the U.S. Attorneys – was debunked by the government's own post-trial accounting (*See*

*government-forfeiture-44* and *government-forfeiture-36*)[18] – but never highlighted to the Court as grossly contradicting their trial theories, leaving unanswered reformative issues affecting the confidence in the verdict.[19]

**Former U.S. Attorney for the State of Utah, Brett Tolman, espoused the "power" of the position...**

When he was U.S. attorney for Utah, Brett Tolman would deliver the same line in front of business leaders over and over again:

*"Give me the executives of any company and I could prosecute them for a federal crime"*

_____

[18] **Prosecutors can't ignore post-conviction evidence -- NY Panel**: A prosecutor's duty of competence includes an obligation to investigate credible exculpatory evidence that is revealed after a defendant is convicted, the New York City's bar ethics committee said in a April 13, 2018 opinion.   New York Rule of Professional Conduct 3.8(c) sets forth a prosecutor's obligation when the prosecutor knows of new evidence that a defendant may have been wrongly convicted.  "Knows" under the ethics rules include actual knowledge, but also may include "[c]onscious avoidance" of fact.  While a prosecutor's failure to uncover new, exculpatory evidence due to negligence may not result in a violation of rule 3.8(c), it may still be a competence violation, the committee said.   The opinion is N.Y.C Bar Association Communication. On Proffer'l Ethics, Op. 2018-2, 4/13/18.

Regardless of "how" the new exculpatory information "arrived"...The Court must ask:

- Why after the post-trial production of *government-forfeiture-36* and *government-forfeiture-44*, the government has not obliged their inherent responsibilities to the Court (if not Kenner) and explore why Kenner was alleged to have stolen the Hawai'i partners funds (when *government-forfeiture-44* proves he did not) and why the forfeiture U.S. Attorney team is seeking Baja Ventures 2006, LLC from Kenner and his partners (when *government-forfeiture-36* proves it was purchased with 100% "untainted" funds, having no nexus to the instant case, totaling $4.1 million)

- ***These critical post-trial revelations should not be Kenner's sole responsibility to notify the Court; and scream until heard.***

[19] Based on the jury's multi-object enigma, it is wholly possible that in their conspiracy "guilty" verdicts, several members of the jury convicted based on the "Hawai'i object", while others convicted based on the "GSF object", while others convicted on the "Eufora private sales object".  Neither the government nor the Court levied instructions during jury charge that ordered the jury to determine one (1) of the "objects" unanimously, at a minimum.

- The nature of the gross misrepresentation of "*Kenner stealing the money*" is *not* a harmless error under the government's prosecutorial theories; now debunked by their-own forensic accounting.

At the time, it was said with the intention of telling business leaders to shape up, stay complaint with the law, don't dodge the IRS.   But now, after nearly eight (8) years removed from that office, he sees things differently, and stated:

*"I look back at that speech and I realize how absolutely horrifying that is.   That I could prosecute any individual because that's how broad I felt the law was and how powerful I felt my position was?  It's pretty haunting now."*

He still stands by that notion that a federal prosecutor could likely charge anyone with a crime – but he is hoping to change that.

The Economist, on October 14, 2014, wrote "*A plea for change, American prosecutors have too much power.  Hand some of it to the judges*".   The identify:

"*Over the past generation, two things have given prosecutors more muscle.  One is the proliferation of incomprehensible laws [like subjective "concealment" versus "memory loss"], which mean that in complex white-collar cases a prosecutor can usually find some technical rule his target has broken…*"

The Economist, on October 14, 2014, wrote "*The Kings of the Courtroom*".   The identify:

"*The prosecutor has more control over life, liberty and reputation than any other person in America," said Robert Jackson, the attorney-general in 1940.*

*Another change that empowers prosecutors is the proliferation of incomprehensible new laws.   This gives prosecutors more room for interpretation and encourages them to overcharge defendants in order to bully them into plea deals…Since the financial crisis, says Judge Alex Kozinski, prosecutors have been more tempted to pore over statutes looking for ways to stretch them so that this or that activity can be construed as illegal.   "That's not how criminal law is supposed to work.   It should be clear what is illegal", Judge Kozinski, says.*

### So – What Has The Government Done To Malign Kenner, Lie To The Court, And Defraud The Investors – With Has Prejudiced Kenner And The Verdict?

First – Jowdy's cabal (including FBI agent Galioto, Attorney Tom Harvey, John Kaiser and Bryan Berard, amongst others) began spreading rumors pre-trial that "*Kenner stole all of your money to buy his piece of the Cabo project*".   This rumor declared that

the $6.4 million that Baja Ventures 2006, LLC (Kenner, Stumpel and Lehtinen capital account -- $4.1 million) and CSL Properties, LLC (Kenner investors capital account -- $2.3 million) sent to Ken Jowdy (*See government-forfeiture-36*) for the Cabo san Lucas closing was "*stolen*" by Kenner and *never went to Jowdy*.

Baja Ventures 2006 $2.6 million investor Jozef Stumpel (*of the $4.1 million untainted funds in Baja Ventures 2006 capital account*) wrote to the Court (*Document 652*):

> *The Judge Bianco:*
>
> *I am writing to you about the Phil Kenner case. I am Phils friend and partner in Baja ventures in Cabo. I read the letter that Jon Kaiser sent to you. It shocked me totally that he finally said the truth like Phil always says to us. Kaiser worked for years with Bryan Berard to convince all of us investors with the FBI agent that Phil stole our money and Jowdy didn't. We all know Phil did not get our money. Phil gave us the bank records that prove it right when they said the lies. They kept telling us the wrong stuff to help Ken jowdy. Jowdy has our money. we all know it.*
>
> *I have more problems with Jowdy and what he done to us for over 15 years. i am glad Jon Kaiser says Jowdy is a crook after firing him. But why not before? Jowdy stole our money from 2002. Jowdy stole our first del mar project money and loan. Jowdy's attorneys helped hide the project del mar from us. Jowdy stole our airplane money. Jowdy stole money from the second project of Cabo. Jowdy stole our Hawaii money. Jowdy stole money from my loan and Phil's loan and my friends loans and more. Jowdy's lawyers lie to us about all of it. What Kaiser forget to say for you is that only Phil told us about all of it over ten years ago. All the investors know. Phil told us together on calls so we decide together. We are all mad from when Jowdy did not pay us back when he got cabo Lehman money. no money paid to us for hawaii and me and the guys other money from loans. We had to sue him everywhere.*
>
> *I am Phils partner in Baja Ventures company in Cabo. When Jowdy tried to steal that money from me and our other partner Phil protected me and him in our company. Why wont someone talk to Phil so we can get our money back? Kaiser lied to the Mexico court for Jowdy help to say he did not help me in my case for 1,600,000 against Jowdy. He lied about a forgery of his name to help Jowdy and ruin my case in Mexico. I sue Jowdy for the 1,600,000 of my money Jowdy never put in my Cabo investment with Phil. I sue Jowdy with a new Mexico lawyer because he would not talk to us after he got the money of Lehman.*
>
> *I put 2,600,000 into the Cabo deal with Phil and another friend put 1,500,000. We are supposed to have 4,100,000 in Baja Ventures but Jowdy stole my extra*

*1,600,000 and then got Jon Kaiser to lie and screw up my lawsuit just because he got a job like Berard. Right a way. Now I know Jowdy only says we have 2,500,000 in Baja venture. He is a robber and Kaiser and Berard know it before they took the job and helped screw Phil with the FBI. And help Jowdy.*

*Phil and another guy Jowdy stole from Gaudet helped me sue Jowdy in Mexico to get back over 1 million more of my money from 2005. Jon Kaiser lied to a court in Mexico to help Jowdy and hurt me. Kaiser told the Mexico court he never signed a testimony affidavit for me against Jowdy. Kaiser lied for Jowdy his boss. Jon Kaiser told me himself that he signed it to help me. then he got the job from Jowdy like Berard and said it was fake.*

*The only peoples Jowdy is conspirator with is Kaiser and Berard and Galioto and Jowdy lawyers. But not Kaiser now because hes fired? They have stopped Phil from helping us get our money back. That is why they made up storys to get people mad at Phil and stop him helping by arresting him. Phils report to all of us explain it always. Phil never lied to us. Phil never hid stuff about our investments from us. Why cant the FBI people or the court people see it? Why cant you have someone talk to Phil for us? phil already showed when all the money went to Jowdy from Hawaii money and other money. we always know from group calls to decide together. These are the same people who got Phil arrested in 2010 in Mexico to hurt him and to scare him bad to stop fighting for us. I am glad for my family Phil never stop.*

*All of us know from more than 10 years that we gave money to Jowdy from our Hawaii company as a group. We all talked about it with conference calls before we agreed together. Mike Peca an Jon Kaiser an Bryan Berard was talking on all the same calls that I was talking on. All of us got mad after 2006 when Jowdy did not pay us back. All the rest of our money that Jowdy got for Mexico we sent our self not by Phil. Phil cant send our money. we have to tell the bank after Phil did send the papers for us. Phil cannot take money without us telling the bank people to authorize ok it. Before Phils trial we tried with Phils help to get our money again in Mexico. But some FBI people arrested the person helping us. I don't know why the FBI is helping Jowdy an Kaiser an Berard keep all of our money so hard.*

*How can Jon Kaiser tell you now that Jowdy is bad? All of us knew it and thats why we were helping Phil with the Mexico lawyers and cases to get it back so long. Jowdy paid Kaiser to help get rid of me and all of us because only Phil was fighting for us. the FBI guy does not want to hear anything about Jowdy just Phil.*

*Please dont take our Baja ventures company from me and Phil and jere. All of our money is from our hockey and investment earnings. Jowdy stole all of our Hawaii money and other money from Glen Murray and Phil and Bob Gaudet and Mattias Norstrom. Because the FBI wont help us and lies about Phil we*

*are scared that no one wants to help us.   why is the government trying to take our company?  Phil told us everything always. And me an jere are with Phil's company.  Only Jowdy people and FBI guy lie to us.   Lie is what Kaiser did to us after his new job only.   I guess that is gone and he need us again.*

*The FBI even arrested a person from 2015 who was helping us file new cases against Jowdy in Mexico City.   FBI people was happy to tell us that he stopped us again.   I am so confused because Phil sent us the info we needed to get the cases filed.   Why doesnt the money Jowdy stole matter to the FBI?   Phil did not take any of our money.   we just want the money back our Hawaii group gave Jowdy after we decided with phil.   Anyone who says they dont know are lying. We all did it together because we were all with Jowdy in del mar Mexico and then waiting to do Cabo.   It was the big plan.   We all chose it together.*

*Phil told us right after the deal from Jowdy to settle came two years ago that it was never going to be paid.   He is right after 15 years of Jowdy lies like Kaiser now says in his letter.   But the FBI people told us to sign the new Jowdy deal. The FBI said it is good to our lawyer.   I know it is not good but only Phil was trying to help fix it and tell us and no one else.   I see Peca is not with the new deal in his letter.   Because the deal is not good.  But only Phil try to help us still today.*

*Since there were over 10 big problems to fix of Jowdy after the Lehman money came to Mexico.   We decide we should do them all to fix at one time.   Our group agreed to sue Jowdy and do it Phils way all on calls together.   This includes Peca an Kaiser an Berard an alot more of our invetor guys.*

*Everyone wants some money back.   I do to.  I hear some guys is broke is from their spending to much and not just from one or two investments. But not from phil.  We all made a lot of money.   We made the Mexico investments to help us after hockey but Jowdy stole them.   No one else did it to us.*

*Since they arrest Phil the FBI people and Berard and Kaiser have called me to lie to me about phil.   We all know the truth of jowdy has our money and how he got it.  And Jowdy who robbed our projects all of them I said in this letter.  And Berard an Kaiser are helping to protect Jowdy after they got jobs from him.    it is crazy now Kaiser has no job and is on Phils side to help like Phil always told us.*

*Please help us get someone good to talk to Phil so they can get the truth and evidence I saw.   Thank You for helping us. Thank You for reading.*

*Thank You,*
*Jozef Stumpel*

Kristen Peca confessed the cover-up in her 2012 FBI recordings to Kenner, *infra*, confirming the spreading of the fictitious "*theft*" information to specifically malign Kenner and break down Kenner's integrity and cohesive support versus Jowdy to those who trusted Kenner.

Next, during trial, the government claimed "*Kenner stole all of the investors' money to buy his piece of the Cabo project*" (*transcript references, infra*) – also proven untrue post-trial by *government-forfeiture-36* and *government-forfeiture-44* (produced solely by the government).  Hitherto, the government was relentless from opening remarks (*Tr.27-33, et.al.*) thru rebuttal summation that *the convictable fraud* was that Kenner "*Kenner stole all of the investors' money to buy his piece of the Cabo project*".

The government went so far to denigrate and attack Kenner on the witness stand for Kenner's corroboration of the exact information verified by *government-forfeiture-36* and *government-forfeiture-44* (and produced by the government *only* post-trial).  Even though it is these government forensic documents, *which the forfeiture team for the U.S. Attorneys office are using to try and create a nexus for forfeiture that does not exist*, they are begging with crossed-fingers behind their backs for the Court to not notice their fraud of calling Kenner's loan story "*bogus*" (*Tr.5708 (2x), 5709*), "*phony*" (*Tr.4597, 4598*) and "*supposed*" (*Tr.5707-5708*).

Clearly – now and *only* post-trial, the government agrees with Kenner that "*Kenner did not steal any of the funds*".   The timing was perfect for the government admission, *because the trial damage was done*.   No reasonable juror could have heard the zealous government advocacy for the Kenner "thefts" (that were false) and disseminated the tens of thousands of banking records in opposition to the government's prosecutorial theory and surmised, "*not guilty*".   If Kenner were on the jury, with the "*above reproach*" belief in the red-white-and-blue, Kenner would have advocated during deliberations for a guilty verdict, alongside them.

- *The government ignored* Jowdy's *verification* of the 2004 Hawai'i loan agreement, during his 2010 Nevada trial defense for stealing more money from Kenner and Kenner investors (*Nevada trial Tr.195-199*), to frame the unsubstantiated prosecutorial attacks on Kenner during trial.[20]

---

[20] Jowdy lost a Nevada, 4-day bench trial to Glen Murray for $791,000 he "borrowed" from Murray in 2005 and refused to return (a.k.a. stole), even after Kenner's email demanded it be returned when the deal Jowdy borrowed it for (short-term) fell thru.  Kenner's email is in evidence, yet Jowdy's defense in the Nevada case was to sue Kenner as a third (3rd) party defendant in the case and claim Kenner actually received the money "*thru magic*" since

Now lastly, and post-trial, the government thru FBI agent Galioto has continued to advance the "*Kenner stole all of your money to buy his piece of the Cabo project*" hoax – away from the courtroom – to the investors and their current attorney, Steve Main (who managed the 2017 settlement agreement with Jowdy and his attorneys – at Galioto's urging).  As a result of the Galioto reinforcement of the Kenner "theft" ruse (still post-trial), Steve Main declared via email to the Hawai'i-Mexico investors, on February 20, 2017:

> "*Finally for those of you who are convinced that Jowdy is guilty of some crime… I simply note that the circumstances surrounding the Diamante del Mar project and the Cabo project (and the relationship between Kenner and Jowdy)* <u>*has been exhaustively investigated over several years by the FBI, SEC and the U.S. Attorney of the EDNY.*</u>"

- Clearly from the bowels of Brooklyn MDC detention, Kenner was able to reconstruct tens of millions of dollars of Jowdy's 2-decade of crimes, wholly assisted by Tom Harvey and other participating cabal members from time to time "for pay" (*Document 667*).
  - *How is it possible that the FBI investigating agent and the U.S. Attorneys office could not find the indictable crimes…or moreover espoused such falsities to the Hawai'i-investors' attorney, continuing the hoax post-trial?*

These are the investors Kenner led thru years of litigation in Arizona (2008-09), Nevada (2008-2010), California (2009-2010) and Mexico (2008-2013) to recover the same funds the government claimed "*Kenner stole*" – when their-own evidence (*government-forfeiture-36* and *government-forfeiture-44*) now confirms Jowdy, <u>*and only Jowdy*</u>, stole with Kenner as the whistleblower.

- *How is that concealment of anything as the government advocated for throughout trial?   Kenner and his other investors continue to ask…*

---

Kenner never "actually" received any portion of it directly or indirectly.   Kenner defended himself in ProSe in the 2010 Nevada proceeding (*Bates stamp: PK_SEC_0001727-0001753 at 11, including footnote 16*) [Ex.50 at 11].

Jowdy gave December 2010 Nevada testimony that he "diverted" $500,000 of the Murray proceeds (traceable in Jowdy bank records in the government's possession) to the Cabo san Lucas project for his-own benefit (and ignored by the investigation efforts since June 24, 2009 when Kenner proffered it to the FBI case agent and others).

Kenner's offer (*Document 553*) to recover the funds now documented in Jowdy's sole possession -- and the government's refusal to meet with Kenner &/or even discuss the possible recovery of funds from Jowdy for the investors (*Document 554*) are blatant disregards for the truths; and the government is avoiding its obligation to "*trace the money*" (*Tr.4594*).   They simply want to sentence Kenner for money they alleged at trial "*Kenner stole*" while their post-trial evidence (and accounting records they had in their possession since 2009) *proved Kenner stole none of it*, for anything (*See government-forfeiture-36* and *government-forfeiture-44*).

Even after the government admitted their accounting, that corroborated Kenner's transparency, truths and innocence, the government's (probation department) July 18, 2016 addendum for "obstruction of justice" falsely verified to the Court that Ken Jowdy, Robert Gaudet and John Kaiser testified at the 2016 forfeiture hearings against Kenner as the reason for the proposed enhancement.  None of them testified, so it begs the question, "*who fed Probation the information?*" especially if they are conducting an independent evaluation?[21]

Nonetheless, Jowdy has been verified by the government as having received the Hawai'i loans (all of them -- as documented), and refusing to re-pay them (exactly as Jowdy testified to in his January 2010 California depositions), and admitted to the government in his March 2010 FBI proffer (*3500-KJ-2 at 11-14*), making Jowdy the criminal that the government espoused Kenner was **for the exact same funds**. Even armed with the 2015, post-trial forensic proof of Jowdy's criminality and Kenner's innocence, the government thru probation claimed in 2016 (*at PSR addendum 1*):

> *"However, the testimony of the victim witnesses, including Ken Jowdy himself, as well as investors John Kaiser and Robert Gaudet, at the criminal forfeiture*

---

[21] Kenner is somewhat dismayed that Probation in this case has chosen to simply defer to the prosecution instead of fulfilling its role as a "neutral gatherer of information."

- See *Agudelo v. United States*, 724 F. Supp. 1110, 1111 (E.D.N.Y. 1989) ("A federal probation officer is an arm of the court and not an agent of the government qua prosecutor. The probation officer's role in the sentencing process is not an adversarial one. Rather, he acts as a neutral gatherer of information from many sources to be used by the judge in imposing sentence.").  Despite the fact that Probation did not consider Kenner's information, Kenner still relies on these specific objections which he submitted to the Court and will not revisit the objections herein.

*hearing, clearly contradicts this information, since all three individuals testified that the loan agreement did not, in fact, exist."[22]*

---

[22] The underlying claims that their testimony (although never given) contradicted the 100% empirical evidence in the government's possession.  The addendum contradicts the facts that the loan agreement has always been known (*See Peca Grand Jury testimony and 2015 trial testimony*), possessed by Kaiser for a decade (*See Kaiser 2015 testimony*) – and Glen Murray (*Tr.3540, 3608*), witnessed by Robert Gaudet (*in three [3] separate civil cases – and interviewed by the FBI on multiple occasions – and delivered as unequivocal proof post-forfeiture-hearing – Forfeiture Tr.288-291*), and authenticated by Jowdy in his 2010 defense case (*supra*).

- No evidence was ever presented that the 2004 Hawai'i loan agreement was inauthentic -- *anywhere*.  The addendum, to invoke another enhancement, was disingenuous at a minimum – and a deceitful towards the Court.

To verify the Kenner claims of loan agreement authenticity (contradicting the government's fabrications), the Court requested copies of the three (3) Robert Gaudet confirmations to his witness signature in three (3) different jurisdictions (*Forfeiture Tr.288-290*):

*Q. Actually, what you said in that deposition transcript was that he remembered signing a document, but he could not identify the loan document; isn't that correct?*

**A [Kenner]: All I can recall from that July 2nd, 2009 deposition is Mr. Gaudet confirming on <u>approximately 10 different occasions</u> that he had signed and witnessed the loan agreement between Mr. Jowdy and myself.**

*Q. Mr. Kenner, what Mr. Gaudet actually said was he did not recall that document. He recalled seeing something, but not that document; isn't that what he testified to?*

**A [Kenner]: I don't believe that to be accurate.**

> *MR. CONWAY: Your Honor, if you'd like, I have the deposition downstairs. I can bring it back up and submit it to the Court in writing.*
>
> *MR. HALEY: Judge, if I may, it is our intention, I think the Court ought to have all the deposition exhibits and testimony that relates to what persons said about the legitimacy and authenticity of that loan document for the Court's consideration, so I have no objection.*
>
> *THE COURT: Yes, I'd like to read it. Okay.*
>
> **MS. LEONARDO: I'll do that in writing, your Honor.**

- The government *never* submitted a rebuttal in the face of the real evidence.

> *MR. HALEY: Judge, in addition, of course, we'll be introducing the deposition -- well, deposition transcript from the AAA proceedings has already been introduced. I'm just reserving my right to introduce the testimony as adduced at trial that was referred to where Mr. Jowdy and his attorneys introduced that*

*[2004 Hawai'i loan] document, actually identified as Exhibit 89-A as an authentic document.*

*THE COURT: I'd like to see that, too, if you have it.*

As a result of this colloquy, all three (3) testimonies that confirmed the government's misrepresentations were delivered to the Court (directly by Kenner himself – after trial counsel, Haley, refused to follow-up); <mark>altogether verifying the government was knowingly misrepresenting the actual evidence to the Court as they did to the jury during trial</mark>.

- There is no downward departure statute that promotes the dissemination of inaccurate information to the Court and jury by the government, yet Kenner is repeatedly referenced as obstructing justice for re-verifying the loans and the underlying loan agreement that exists without equivocation.

In the simplest of the three (3) testimonies, document witness, Robert Gaudet confirmed thru Jowdy's attorneys' Q&A (further exploiting the government misrepresentations in desperation) during the December 2010 loan trial: *Murray v. Jowdy (v. Kenner)*:

**Ms. Lee [Jowdy's lead Nevada trial counsel]** (*Nevada trial Tr.195-198*):

> *Q:  <mark>Did you ever sign as a witness</mark> on Mr. Kenner's behalf for a revolving line of credit at any time?*
>
> *A [Gaudet]: Yes, I did.*
>
> *Q:  And when did you sign that agreement?*
>
> *A [Gaudet]: I don't recall but it was at a party, an event.*
>
> *Q:  If you could turn to exhibit A-89.  Are you there?*
>
> *A [Gaudet]: I am here, yes.*
>
> *Q:  Can you turn to the second page of that exhibit, please?*
>
> *A [Gaudet]: Yes.*
>
> *Q:  <mark>Is that your signature there as witness?</mark>*
>
> *A [Gaudet]: Yes, it is.*
>
> *Q:  <mark>Do you remember signing this?</mark>*
>
> *A [Gaudet]: Yes, I do.*
>
> *Q:  <mark>Is that your signature there as witness?</mark>*
>
> *A [Gaudet]: Yes, it is.*
>
> *Q:  <mark>And can you tell the Court what date this document is entered into?</mark>*

- How could the Probation department assert that Jowdy was a victim in 2016? They have the government's *government-forfeiture-36* and *government-forfeiture-44*, which were presented at the same hearing Probation claims Jowdy, Kaiser and Gaudet gave testimony?!?   They could not have read any of it and formulated these conclusions "independently".   *It is indefensible…*

     - *However, Kenner is tasked with defending more lies, post-trial, for money the government indisputably knows Kenner never stole…*

**John Kaiser Exposed His Co-Conspirator, Ken Jowdy, And The FBI Storyline Of Lies…**

- As the Court knows, the Rules of Evidence do not apply to sentencing proceedings.  Fed. R. Evid. 1101(d)(3).  The district Court is permitted to consider relevant information, even if it would be inadmissible at trial, "provided that information has sufficient indicia of reliability to support its probable accuracy."  U.S.S.G. § 6A1.3(a).

Jowdy's 5-year co-conspirator (John Kaiser – 2012-2017) exposed the complicated dual-existence of the prosecutorial hoax – assisting Jowdy on one hand, while the government seeks a Jowdy forfeiture with no standing on the other, knowing it would be tied up in court for years, if granted, until Jowdy and his complicit banking partners can drain the last nugget out of the property (per their espoused 20-year plan to this Court) and leave Kenner and Kenner investors with the center of the donut (a.k.a. worthlessness).   Kaiser re-confirms the divergence in truths and storylines to persuade the Court to forfeit property with no nexus to any "*ill-gotten gains*" by Kenner in the instant case – and at the same time with contradicting evidence (with all of the money in Jowdy's criminal hands) – keep the investors under false promotions and ruse that "*Kenner stole all of your money to buy his piece in the Cabo project*"…

---

*A [Gaudet]: 12/7/2004.*

*Ms. Lee [Jowdy's lead trial attorney]: **Your honor, I'd like to move to admit this exhibit. He's authenticated his signature on it.***

- The authenticated 2004 Hawai'i-Jowdy loan agreement was presented thru Gaudet as Jowdy's main defense exhibit, to defend his defense theory that Jowdy had an alternative funding source to the Glen Murray money.

In February 2019, Jowdy co-conspirator, John Kaiser, confirmed that he was working with and protecting Jowdy's known crimes from the government and the investors for approximately five (5) years (2012-2017) -- *for pay*.   After Kaiser's termination by Jowdy (after Jowdy used up his protective value), Kaiser now wants the Court to know that (*Document 628 at 4*):

*"'the hockey guys will never see a dime' because they said he [Jowdy] was a crook".*



**-- END REDACT --**

The government's fear of Jowdy's cabal was never more evident than when the forfeiture U.S. Attorney's requested the Court remove Jowdy's name as a co-conspirator in their initial forfeiture brief *after* Jowdy's attorneys berated them publicly (*requested in Document 408 at 2*).

**John Kaiser[23] – Refused To Assist In The Recovery Of The Hawai'i Loans From His Co-Conspirator, Boss Ken Jowdy While Working For And Protecting Him From 2012-2017...**

Kaiser has done nothing for "**his Hawai'i members**" to recover this significant Hawai'i partners asset from Jowdy (admitted in *government-forfeiture-44*).  While working for Jowdy in 2015 – Kaiser claimed he did not think Jowdy stole the "loan money" (*Tr.1229*):

> *Q. Mr. Kaiser, were you there [at the February 2010 California mediation] because you felt that Mr. Kaiser had stolen money?*

> *A [John Kaiser]: I didn't steal money.*

> **Q. I'm sorry. Mr. Jowdy had stolen money?**

> **A [John Kaiser]: No.**

- Jowdy's theft was was the *only* reason Kaiser was present as the Managing Member of the Hawai'i partners for three (3) years by then to recover the unpaid Jowdy loans...

In contrast, Jowdy's co-conspirator, Kaiser, has been *protecting Jowdy*, and preventing all efforts by Kenner and Kenner investors to recover the "known" loans (in the USA and Mexico) – including giving false testimony in Mexico (*Stumpel v. Jowdy -- $1.6 million loan case*) and the EDNY regarding Kaiser's Mexico testimonial (*signed in the same Stumpel v. Jowdy case*) (*i.e. 18 U.S.C. 1001 violations*).

How could any reasonable investor follow the complicity of this hoax as (1) created

---

[23] John Kaiser has been the Managing Member of the Hawai'i partners since 2007 and has refused to do anything to assist in the collection of the Jowdy loans.  To the abusive contrary – Kaiser and his co-conspirator, Bryan Berard, received jobs from Jowdy in Mexico to forgo any legal pursuits of Jowdy for his Hawai'i partners, and spearhead the "*Kenner stole your money*" lies with FBI agent Galioto since 2011 – all *for pay*.  Seven (7) years later – it clearly worked...

by Jowdy and his cabal, (2) perpetuated by FBI case agent Galioto, and (3) presented thru graft and ruse to worn-out investors who are tasked with evaluating who to believe?  **ANSWER**:  "*They cant!*"

A former law enforcement officer ("LEO"), and charity fundraising partner of Kenner's wrote to the Court:

> *"In the time I have known Phil, he has been nothing but professional with me and my family and, I'm a very skeptical and private individual.   So in order to get into my inner circle you have to prove yourself as a caring and above board individual and Phil was able to do that in a very brief period of time.   Even so much so that when he started noticing some issues with some of his previous business partners [Jowdy and Constantine], he asked me to contact some of my LEO and legal contacts to look into some of the issues from here in CA.   I also accompanied Phil to the AZ Attorney Generals office to report the crimes he suspected with his co-defendant [Constantine] in the current matter for two separate business problems.   My contacts allowed us to get to the right people without many hurdles."*

**The Fall-Out And Confusion From The Decade-Long Hoax...**
First, Kenner has been subject to rumor and innuendo about stealing money since <u>*before*</u> his June 24, 2009 FBI proffer about the well-documented tens of millions of Jowdy's criminal activity.   Jowdy and Attorney Tom Harvey's close friend, NY Daily News writer, Michael O'Keefe, managed the public slander campaign of Kenner from that moment on.   Harvey identified the planned defamation on Kenner in his April 2009 extortion email to Kenner and his attorney about pending FBI-led jail time, pending SEC investigations, and pending NY Daily News articles that "*will have legs*" (*Bates stamp: ED-003068-3069*) [Ex.1].   Second, Kenner was alleged to participate in stealing money [with Constantine], in business transactions that Kenner received no benefit.

- *The government ignores that Kenner was the whistleblower in both of their cases to the investors*.

Kenner's transparency has been the complete antithesis of a person who was charged for "concealment" crimes.   The prosecutorial logic is baffling at best, and solely based on the investors' **CTE**-laden testimony (defended as *faulty memory, confusion and mistakes* by the government for their witnesses' voluminous inconsistent testimony versus their-own prior "under oath" statements – *Document 440 at 16*).   At worst, the theories behind conviction are irreconcilable with all of the empirical evidence although most likely induced thru intimidation, graft or the

continued hoax that "*Kenner stole your money*", *infra*.

- Even in the face of the government's own forensic accounting post-trial, the government wants the Court to forfeit property that is "untainted", *just because*...(*See government-forfeiture-36*).

- And -- <u>the alleged victims have no calculable losses</u>.   In fact, they have been shielded from the truth that their Cabo partner [Ken Jowdy], who they now espouse loyalty and faith in, is actually the person who stole their funds, just as Kenner exposed in 2007; despite the government's trial lies to the Court and jury – thru rebuttal summation – *Tr.5996, 5721, 5722-23, 5744-45, 5990, 5991-92, 5707-5709*.  It is now equivocally proven that Kenner *never* stole it; diffusing the ten-plus-year fabrication to slander and defame Kenner to all of the investors – <u>unfortunately only after trial</u>.

The government cannot reconcile any valid evidence that would have allowed them to tell the Court and the jury in 2015, "*Kenner stole the money*" – especially since their post-trial accounting proves they <u>lied</u> to the jury and Kenner was truthful (despite the nonstop attacks on his veracity)...

Yet – the truth is left unaddressed to aid in their attempted follow-up fraud on Kenner and the Court by demanding forfeiture with no nexus from an "untainted" source; making Kenner's partners (Stumpel and Lehtinen new, $4.1 million victims of the government cover-up ruse – per the government's-own accounting – if Baja Ventures 2006 is forfeited) (*See Document 652*).

**Jowdy's Cabal Initiated Their First Line Of Slander Attack Thru The Media (Substantiated By Unconventional FBI Procedures)...**
Kenner had been forced to live under the guise of illegality and misdeeds as a result of the NY Daily News slander campaign and the highly unusual techniques of the investigating FBI case agent, since Kenner's whistleblowing proffer to him in June 2009.   As an example, with the investors all represented by counsel, and known to the government as such, FBI agent Galioto showed up at Madison Square Garden in 2010 to hand-deliver FBI subpoenas to Sergei Gonchar and Jay McKee (without ever contacting counsel); fully knowing the rumors of the subpoenas would permeate the NHL and the Kenner client base within days (as planned), initiating and substantiating back-stories and rumors which the government's accounting has proven nine (9) plus years later as <u>still untrue</u>.

[Jay McKee text to Kenner about the FBI presence]:



| 11884 | +17168034903 Jay McKee* | 1/25/2010 5:06:49 PM(UTC +0) | Read | **Just giving u a heads up.. The FBI is waiting downstairs at MSG here in NY after our pregame skate to subpoena Sergei and I for the court case.. Wanted to inform u guys..** |
|---|---|---|---|---|

- The same FBI agent who cancelled Kenner's Grand Jury appearance months earlier – cancelled the follow-up FBI interviews with at least eight (8) Kenner investors in June 2009, *organized by Kenner himself only a few months after **six (6) of them** released their LOC collateral in April 2009 (in evidence)*; including but not limited to: (1) Mattias **Norstrom**, (2) Michael **Peca**, (3) Darryl **Sydor**, (4) Bryan **Berard**, (5), Sergei **Gonchar**, (6) Glen **Murray**, (7) Jay McKee, and (8) Turner Stevenson.

As U.S. Attorney Jim Michiewicz told the Court while badgering Kenner on cross-examination (*Tr.5051*):

> *"Q. And your testimony is that the FBI, the U.S. Attorney's Office in Manhattan did <u>not</u> want you under oath in a deposition essentially or transcript which might at some point prove valuable, <u>like right here</u>. Is that your testimony?"*

Michiewicz was right about Kenner and the Kenner investors (specifically the Hawai'i LOC clients) – *but* it was his FBI case agent that cancelled all of them; not Kenner...

- **And yes** -- the 2009 testimony would have been a great value in 2015!

**Kenner History…**

- ***Who was Kenner before the FBI/Jowdy efforts to destroy his reputation and career?…***
- ***And how did we get here?***

From 1992 thru 2001 -- Kenner personally and solely built one of the most significant sports and entertainment practices in the world from *scratch* (as recognized by Money Magazine in August 2001, cover story – *Bates stamp: ED-0003004*) [Ex.8].  The story references Kenner's business (not FINRA regulated)[24], "*As Director of the Private Client Group, he oversees over $200 million for more than 100 clients*".

- Under that $200 million management portfolio, Kenner had legitimate access to over $5 million in mutual fund billings per year of commissions for himself (referral fees), *if he wanted to*.   Kenner *never* managed his clients' enormous portfolio for his-own benefit, *nor* ever received a dime of the potential $5 million available, *annually*.
- This further hi-lights the ethical position Kenner maintained over a twenty-year career, always placing the best interests of his clients ahead of his own.
  - In addition and comparably, in 2018, the government proffered that Ken Jowdy receives $**220,000** in developer fees **PER MONTH** from the Diamante Cabo project despite draining nearly $50 million from its budgets for his friends & family since 2006, while never repaying a dime to Kenner and Kenner investors in seventeen (17) plus years (*See Document 628*)…and counting.
    - Kenner and Kenner investors have invested **over $20 million** in equity and loans in Jowdy's various criminal schemes (*See Document 667*).
  - In the four (4) years before the 2006 Lehman Brothers joint venture funding in Hawai'i[25], Kenner had authorization to pay himself a developer

---

[24] Ineffective trial counsel allowed the government to present a FINRA regulations person who presented a "duty of care" standard that does NOT and has never regulated Kenner or any of his "family office" agreements with his clients.   It was wholly prejudicial, as evidenced by the fact the jury asked for the FINRA rep testimony to be read back immediately when deliberations began.   The application of "apples" to "oranges" was clear, prejudicial to Kenner and his contractually bound relationships, although *never* under FINRA (*Tr.2477*).

[25] The Court should note that every Hawai'i partners (Little Isle 4 member plus Kaiser and Manfredi) signed a July 2006 disclosure that identified in paragraph one [Ex.51]:

fee (in the Little Isle 4 corporate By-Laws).   Assuming the $220,000 fee is a legit 3rd party, arms-length transaction (approved by Lehman Brothers and subsequently Danske Bank), ==the Court should note *Kenner received ZERO developer fees*==.

o   None of that comports with the "*brazen*", schemer the government represents Kenner to be; noting that Kenner received less than $300,000 of loan repayments from alleged victim private stock investments – thru legal 3rd party sales for value -- in the instant case; *and nothing more*.

▪   This is clearly not the $80-100 million scheme the NY Daily News reported thru Berard and Kaiser slander and defamation -- and FBI agent Galioto promoted to Kenner investors for years pre-trial – all in exchange for Kenner risking his FREEDOM, prodigious career, and successes (*under the alleged Grassley-Graham protection of being the Jowdy and Constantine whistleblower for his clients*).


**Kenner Met Jowdy Thru Existing Clients...**

In 2002 (ten years into Kenner's practice, representing over 100 clients in all sports, music, and entertainment fields), Kenner was introduced to Ken Jowdy; presented as a real estate developer and restaurateur by Kenner's introducing clients – who are not involved in the instant case.


**Kenner Sues Billion-Dollar Company To Protect Clients (At Kenner's Career And Financial Risks)...**

In 2003, Kenner sued and prevailed versus his former publicly traded firm in California after Kenner exposed their illegal business practices; specifically towards the Kenner clients.   Kenner walked away from a significant financial stake in the company in order to complete the litigation/mediation in 2003.   Kenner's clients were protected from the unscrupulous financial conditions by Kenner's selfless and monetary-sacrificing actions.


**The U.S. Markets Falter...**

In the years that followed, the U.S. stock markets and private equity markets suffered the largest recession in decades, wholly affecting anyone in its path. Nevertheless, if it were not for the corruption of Kenner and Kenner investors' partner [Ken Jowdy] in several private equity investments and related loans, the

---

*"I have the authority to commit the [Hawai'i] Company to the transactions described in this letter.   Nevertheless, I am asking for your acknowledgement of, and consent to, these transactions, **as they will change your investment**…"*

security of their overall investment exposure in the private equity world would have clearly survived the years of market turmoil.   Clearly, Jowdy and his participating cabal have been able to bilk the same investments for tens of millions of dollars while Kenner and Kenner investors have received "none".   It is a fact that the Cabo san Lucas project (thru its budget funds) has paid a multitude more money to attorneys personally representing Jowdy (and continuing in the current courtroom) than Kenner and his investors have ever received.

**Kenner Clients' Private Investments Represent A Minute Subset Of Their Wealth...**
Kenner's former clients involved in the superseding indictment earned approximately $180 million during their professional sports careers[26].   The value of their private equity exposures were _minimal_ relative to their individual earnings, and at the time of inception, represented a tiny subset of their overall macro investment diversification.

The instant case superseding indictment individuals have approximately $8.675 million in total initial investments in the various private deals in the instant case. This hi-lights that _over $90 million_ of _after-tax_ earnings were dissipated by the alleged victims thru lifestyle expenditures; unrelated to Kenner's control at any time.   Kenner, in no way, can be considered the source for any financial "suffering" by his former investors who lived grossly above their means for years; if they are having current financial troubles.   Any claim to the contrary is without merit.

- Kenner's forensic supplemental submission addresses the net value of each of the investments; object-by-object, and investor-by-investor, _resulting in no loss_ (intended or otherwise).

- There are simply uncollected assets (and unrealized gains) that the government has obstructed the investors from collecting and receiving net profits (not just getting their investment funds returned) (_See Document 654_).

**Discovery Of Jowdy Criminality In 2006 (_Document 667_)...**
Out of Kenner's control – yet exposed by him upon first detection, Kenner and Kenner investors began a mediated process to solve the discovered issues of embezzlements, diversions and criminal activity thru 3rd parties and independent counsels (wholly documented in the government's possession – _See Document 667_).

---

[26] These totals are detailed in the forensic accounting supplemental submission.

Kenner investor, Michael Peca told a 2011 SDNY Grand Jury (*3500-MP-5 at 30-31*):

> *"A short-term loan [was made] to Mr. Jowdy because at the time Cabo – we hadn't gotten the lending from Lehman Brothers yet.  **We** made a short-term loan until the lending came in.  Once the lending came through they were to pay back the loan, I think in the neighborhood of five-and-a-half million dollars, on the closing.   It was never paid back.   And then communication basically seized [sic] at that point from him [Jowdy].   That was kind of the whole sticking point as far as me **and the other guys** with Mr. Jowdy."*

Michael Peca and the rest of the "**we**" investors were clearly aware of the newfound communication issues with Jowdy by late 2006 (thru Kenner) – immediately after Kenner discovered Jowdy's diabolical plans for Kenner and Kenner investors (still unchecked thru the well-documented FBI agent protectionism today).

Kenner exposed Jowdy's criminal activity immediately to all of the Hawai'i-Mexico related investors.   It still exists thirteen (13) years later according to Jowdy's 2012-2017 co-conspirator, John Kaiser (*See Document 628*).

Michael Peca testified to a 2011 SDNY Grand Jury along with investors Darryl Sydor and Turner Stevenson, who espoused their identical _knowledge_ and _concerns_ for the Jowdy loan problems; never accusing Kenner of any wrongdoings during their secret testimony.   They independently confirmed to the 2011 SDNY Grand Jury that the Jowdy-loans were _known at all times_ and _decided by the "group"_ of investors; _with none opposing_.

Despite the FBI case agent's presence during the SDNY Grand Jury, he and the government allowed (or perhaps encouraged) Michael Peca to change his testimony during direct-examination to "*no knowledge*" (four [4] years later -- in 2015) (*Tr.381, 386*).

- Cross-examination pressures forced Michael Peca into **re-canting** his recently fabricated "*no knowledge*" claims in 2015.   Peca then re-affirmed his intrinsic "Jowdy loan" knowledge to the EDNY Court – confirming the truths of his statements, which he detailed to the 2011 SDNY Grand Jury four (4) years earlier.   This Court recognized the Peca re-cant in *Document 501 memorandum and order filed 10-13-2017, at 9* (two years ago).
- In spite of the Court's acknowledgement of Pecas 2015 confession, the government still attempts to deem Peca a Hawai'i "object" victim, which is wholly confounding.   _He confessed to his knowledge (a.k.a. no concealment)_!

After a year-plus negotiation with Jowdy and his attorneys (2007-08), the discussions broke down when the arrogance (associated with Teflon protectionism) overwhelmed the logical solutions needed to resolve the well-documented criminal frauds by Jowdy on Kenner and Kenner investors.

**The Threats Began...**
The overwhelming threats towards Kenner and any Jowdy-adverse party commenced with vigor, fully attempting to dissuade anyone from pursuing civil or criminal remedies versus Jowdy, Harvey, and the remainder of their cabal.   Despite the threats, Kenner triggered Jowdy's criminal exposure (*See Document 667*) and alerted the investor base in 2006 (per Peca, *supra*).  At no time (thru today) did Kenner walk away from his investors, even after the 2010 near-death beatings of Kenner in a Mexican jail to deter Kenner's criminal testimony versus Ken Jowdy (&/or the subsequent murder of Kenner's Mexico attorney, representing the investor group and Kenner).

Even after the entire investor base (totaling at least 19 of the 26 Hawai'i partners) continued in sync to pursue Jowdy legally in multiple jurisdictions thru Kenner's lead and presentation of empirical evidence, the Jowdy protectionism began to wear down many of the investors thru lies and graft, year after year.

It proved true that no normal person could handle the contradicting stories of "*Kenner stole all of your Hawai'i money to buy his piece of that resort in Mexico*" from FBI agent Galioto (proven untrue by the government's own accounting [*government-forfeiture-36* and *government-forfeiture-44*] – yet only exposed by the government post-trial, leaving the resulting harm and prejudice in front of the unknowing Court and jury in tact).

- As the Court recalls -- the government attacked Kenner's evidence-based representations during trial.   The government *only* acknowledged Kenner's testimony as truthful post-trial when they sought to create a forfeiture nexus, which *still does not exist*.

One client's wife (not herself a Kenner-client) told Kenner on a 2012 FBI recorded call *years before trial -- and before Kenner was indicted*:

> *Kristen Peca – Matt [Galioto – FBI agent] told Michael and I that you stole all of the Hawai'i money and never gave it – the loan money -- to...uhhhh...Jowdy.*

> *Kenner – Kristen – I have all of the bank records that prove the money went to Jowdy and his accounts at all times.  I told you that already. You told me that*

> *you saw the bank records after I sent them to Michael.  You know -- the attorneys who sued Jowdy for the money in Mexico and Arizona and California used them to confirm the loans before we sued?*
>
> *Kristen Peca – but – I don't understand why he would say it.*[27]

How could Kenner compete with the integrity of the FBI?   It is *not* possible and the Court should recognize it – because, the government ***disproved*** their *pre-trial* hoax, their *trial* persistence, and their *post-trial* insistence that "somehow" Kenner got the money – by the production of their-own accounting records (*government-forfeiture-36* and *government-forfeiture-44*).  *It defies logic*...but when Kenner attempted to inform the investors of the ongoing cover-up post-trial – and the fact that "*Kenner did not steal any of their Hawai'i money*" (per the government's own forensic accounting, *supra*), the government submitted a motion to quash the real evidence.

Unpardonably in their motion, the government claimed they had concerns that their witnesses would be able, after seeing the "real evidence" thru Kenner, to maintain similar unreliably *faulty testimony* (regardless of the excuse) at a re-trial, now that their memories have been publicly refreshed.   The government defended the unreliable testimony as *faulty memory, confusion and mistakes*; **not the truth**.[28]

*That statement is not a mistake, just bewildering*.   As suggested by the government to the Court and as quoted, regarding the website's "***real evidence***":

> "*Its only purpose is to dissuade Victim Witnesses from testifying or speaking against Kenner in a manner consistent with their prior statements [from 2015], if they do, the Email intones, "**the real evidence***" *will "**show your lies**".

---

[27] After Michael Peca's 2011 SDNY Grand Jury testimony of full knowledge of (1) the use of funds from his Northern Trust Bank LOC, (2) his expectations of the entire $1.8 million going to Jowdy as part of the Jowdy-loans, and (3) the "*group decision*" to loan the funds to Jowdy, it begs the Court to answer if Galioto's false dissemination of "*Kenner stole your money*" (supported by Jowdy employees, Kaiser and Berard's advocacy of the same storyline) *changed* their perception of Peca's 2011 testified "truths" -- and persuaded them to fabricate a "no knowledge" storyline – simply to get their money back.

•  Any rational person could choose to believe the perceived FBI morality and "go along" with their plan to recover funds they now (in 2012 – post SDNY Grand Jury testimony) believed Kenner actually "*stole*" from them...

[28] *See Document 440 at 16. See United States v. Dunnigan, 507 U.S. 87, 94 (1993)*

==If the government witness testimony was factually inaccurate (as they defend), and thoroughly exposed throughout the ample Kenner submissions, shouldn't the investors be made aware, *specifically as the responsibility of the prosecutorial team to seek justice; not convictions*?==

Wasn't the government concerned that the witnesses' inaccurate testimony in 2015 is based on **perjury** (*suborned or not*), **lies** &/or **faulty memory, confusion and mistakes**?   Shouldn't they seek to rectify all of the inaccuracies in the name of justice?

Was the government REALLY alleging that witness exposure to the "**real evidence**" will make it more difficult to elicit the same "**inaccurate testimony**" in a pending Kenner re-trial?

- Based on the entire inconsistent prior testimony and the government's-own post-trial exposure of their prosecutorial frauds ("*Kenner is broke*" and "*Kenner stole all the Hawai'i money to buy his Cabo equity*" and "*Kenner was selling his Eufora shares*") – there would be no foundational basis to re-try Kenner.

- As such – the Court should consider the government's malfeasance that the jury was prohibited from knowing and the real, case critical, documented truths.  It should weigh heavy on this Court – the prosecutorial quandary (of nothing to re-try) in its evaluation of adequate sentencing &/or the proper next judicial step to correct the verdict clearly lacking confidence.

- The government would have an insurmountable task of recreating another trial with the same prosecutorial themes, now that they have <u>all</u> been grossly exposed thru known perjury and reformative evidence (only post-trial).

  - That cannot be an acceptable standard of justice – because "if once guilty" the defendant should "always be guilty".

Or -- was Chronic Traumatic Encephalopathy (or **CTE**) at fault…and if so, was Kenner convicted of "concealment" by <u>a small subset of people</u> who "*could not remember*" investment details (not expected to be recalled by any normal investor)?

### 1.  None of it supports a verdict of confidence.[29]

---

[29] An internet site posted the following in response to the government's motion to conceal the truths from its trial witnesses:

**New evidence** of Chronic Traumatic Encephalopathy ("CTE") permeates every contradiction given by government witnesses presented as a "*memory test*" by the government to frame their theories.

- As the Court knows, the government witnesses were consistently unable to recall the basic facts regarding exculpatory emails and texts they individually exchanged with Kenner, conference calls they participated in with Constantine (re: Jowdy loans and GSF issues), documents *they signed* authorizing use of the Northern Trust Bank LOCs including annual knowledge of "use of funds", and independent private equity people they dealt with.

---

*Government seeks to HIDE TRUTH from their own witnesses by censoring website about their suborned perjury!*

*In a stunning Motion filed by the US government in April 2017, the government has sought the court's assistance in shutting down the TRUTH-TELLING website –* **SavePhilKenner.com** *– because according to their Motion, they are concerned that if their witnesses who have been proven through* **real evidence** *(and not just hearsay) to have provided* **perjured** *testimony to convict Kenner, see the website, they will be concerned about providing "consistent" (aka. more perjury) testimony in a future trial, assuming one is granted by the savvy EDNY judge who has now seen 3+ years of government rhetoric and the subsequent* **real evidence** *fully contradicting the government trial theories, including damning Brady violations produced immediately after the end of the trial.*

*Why, in light of the overabundance of* **real evidence***, is the prosecutorial team refusing to address the* **truths** *that have been exposed confirming the innocence of Kenner at every turn? Are they that desperate to maintain a faulty conviction?*

*Why is the FBI case agent, perhaps behind the prosecutorial team's back, assisting known con-man, Ken Jowdy, and his efforts to continue un-indicted after 15 years of proven frauds, physical beatings and wrongful imprisonment of Kenner in Mexico, extortion activities, and RICO acts (all supported by his legal cabal, led by some of the highest people in law enforcement in the USA)?   What has Jowdy done to receive this level of government protection for his tens of millions of ongoing frauds?   Who else, in addition to his high-paid legal team (all with embezzled funds for over a decade) are receiving kick-backs and under the table deals to forgo the inevitable Indictment, if the Department of Justice would simply open their "blind eyes" for just a moment?   Ultimately, what have the government witnesses been promised in exchange for the* **known perjured** *testimony?*

*The Jowdy back-story will lead you to a decade plus of corruption with ties to the Roger Clemens, major league baseball steroid scandal (including documented payoffs ignored by the government), unprosecuted thefts with the assistance of former Lehman Brothers associates, and questions with rhetorical answers about who is behind ALL of it!*

- Yet amazingly – the "*faulty memory*" extended to Hawai'i partners COO Chris Manfredi's inability to recall *critical* exculpatory emails that confirmed his voluminous lending work with Hawai'i paid consultant Constantine).

==This was *after*…Manfredi *verified* the Constantine consulting agreements five (5) years before trial to the FBI in October 2010 (*See 3500-CM-2-r at 1*).==

- The use of false evidence is improper whether the prosecutor affirmatively elicits such evidence, See *Miller v. Pate*, 386 U.S. 1, 7 (1967), or merely "**allows it to go uncorrected when it appears**", *Napue v. Illinois*, 360 U.S. 264, 269 (1959) – (*prosecutor failed to correct witness's false testimony…*).

Nevertheless, no reasonable business standard could expect *disinterested* minority investors (and only 2 of the 26 Hawai'i partners – with the other 24 maintaining full knowledge) to know the details of private equity deals; where they repeatedly "*refused to read*" the documents they signed.[30]

---

[30] The government asserted as a major portion of the "*conspiracy by concealment prosecution*" was that multiple investors were not aware of Constantine's consulting involvement in the Hawai'i deal. *Constantine was a complete stranger to most of them before their 2008 purchases of Eufora stock (just another government misdirection).* Nevertheless, the investors would not have been able to identify any of the seventeen (17) consultants that were paid by the Hawai'i partners either. The "lack of memory" or corporate details (not relevant to minority investors) cannot be the basis for criminal activity (when authorized by the company By-Laws); specifically considering Constantine was one (1) of only two (2) paid consultants (including Centrum Financial) who actually delivered results as paid, further abusing any standard of knowledge required for Kenner to avoid criminal prosecution.

- ==The government knows that none of the Hawai'i partners' funds that paid Constantine his $1,000,900 originated from any superseding indictment alleged victims (and forensically accounted for by the government – *Tr.3935*).==

- John Kaiser's February 28, 2019 whistleblower letter to the Court (*Document 628 at 2*) hi-lights the double-standard regarding the consulting payments by attesting that:

  "*Jowdy also cries to the Court that the government is interfering with his attempt to get Silverpeak Real Estate Partners to 'invest' in Diamante to help Kenner's victims recover their investments. Jowdy did not tell the Court that Silverpeak is a company run by his close friend Masood Bhatti* [former Lehman Brothers head lender who helped Jowdy embezzle millions from the DCSL project before the Lehman Brothers 2008 bankruptcy], *or that Jowdy was paying Diamante funds to Silverpeak $150,000 to $200,000 every month to find 'investors' or 'loans' for Diamante.*"

- Wasn't the consulting money exactly what Constantine is being charged with receiving – with investors who allegedly were unaware (despite authorized by the corporate By-Laws – and not originating from the alleged victims)?

- Kenner is still a Diamante Cabo san Lucas investor/owner and had no idea about the "consulting" payments to Bhatti & Co. until the Kaiser February 2019 letter.

    - When is the FBI planning to discuss this Jowdy-criminal matter with Kenner as a victim – or at a minimum alerting the other investors who have been misled as to Jowdy's honor and integrity (*See attorney Steve Main email of 2017, supra*)?

**Hawai'i partners COO Chris Manfredi** "*could not remember*" his own voluminous dealings with Constantine, even after the actual emails between them were shown to Manfredi on the witness stand (*Tr.2998, 3005-3008*).  *See Napue v. Illinois, supra*.

Yet -- Manfredi testified that he actually travelled to Scottsdale, Arizona – paid for by the Hawai'i partners – specifically to meet face-to-face with Constantine *before* the consulting deals began (confirmed in testimony, *infra*) but later "*did not recall*" that they worked together for almost two (2) years on a myriad of funding opportunities (2004-2006).

It is wholly unreasonable that anyone could remember, if the Hawai'i partners COO could not – &/or the government let that testimony stand in opposition of their-own FBI proffer. Manfredi confirmed the 2004 face-to-face meeting in Scottsdale Arizona to the 2015 trial Court (*Tr.3004*):

> *Q: Well, did you speak to Mr. Constantine at any point in regards to the Hawaiian projects?*

> *A [Manfredi]: Yes.*

> *Q: In person or by e-mail?*

> **A [Manfredi]: I recall in person.**

> *Q. How many times?*

> *A [Manfredi]: One that I recall.*

> *Q: And where was that?*

> **A [Manfredi]: That was in Scottsdale, Arizona.**

> *Q. Other than that one -- when was that? I should put a time frame on that, Mr. Manfredi.*

> **A [Manfredi]: I don't recall the exact year.  It was prior to '05.**

In 2004, Kaiser signed the first (1st) Constantine consulting deal *after* the Manfredi face-to-face meeting – which Manfredi verified to the Court, *supra*.
- The Kaiser 2004 signing also corresponded with Kaiser's October 2010 proffer in which

the agent's notes verified that Kaiser knew Constantine was raising money for the Hawai'i partners (*3500-JK-1-r at 5*).

Manfredi also verified the consulting deal to the FBI in October 2010 (*See 3500-CM-2-r at 1*), leaving the Kaiser claims that *his* "*ink*" versions of the same consulting deals recovered from Kaiser's home on the eve of trial were somehow forged and *not* the consulting agreements that Manfredi previously verified to the FBI – five (5) years before trial.

- **If they are not the same ones – then where are the "other" ones that Hawai'i partners COO Chris Manfredi was 100% aware of?**

And, Manfredi contradicted his 2010 FBI proffer by claiming at trial that he "*could not recall*" telling the FBI in 2010 that he was "**in charge**" of funding efforts for the Hawai'i partners (the lion's share of his paid COO responsibilities) (*Tr.2997*):

> *Q. Do you remember at any point in time speaking with the FBI back in 2010 and telling them that you, yourself, were responsible for securing funding for the Hawaiian projects?*
>
> *A [Manfredi]: No.*

Chris Manfredi "*could not remember*" that he told the FBI agents five (5) years earlier (in 2010) that he knew Constantine delivered "*more than $3 million*" in funding to the Hawai'i partners (*Tr.2999*):

> *Q. Well, again, look at the document. Down towards the lower third of that document, my question is do you remember telling the agents back in 2010, specifically October 12, 2010, in a telephone conversation that Constantine brought in money to project Hawaii, more than $3 million? Do you remember telling the agents back in 2010 that it was Mr. Constantine who was responsible for bringing that money in?*
>
> *A [Manfredi]: No.*

During Michael Peca's SDNY Grand Jury testimony, he confirmed that another hard money lender, Louis Volpini's name meant nothing to him, <u>as expected</u> (*3500-MP-5 at Tr.46*):

> *Q. Do you know who Lewis [sic] Volpini is??*
>
> *A [Michael Peca]: Never heard the name before.*

Michael Peca and the remainder of the Hawai'i partners could not have told the Court who the Hawai'i attorneys were.  **Answer: Carlsmith Ball, LLP** -- and they were paid well over $1 million for their services, or the archeologists (paid over $100,000), engineers, real estate agents, etcetera.
- The vast majority of the investors *could not have identified* COO Chris Manfredi, or land manager, Christopher Hawkins, or local Hawai'i real estate coordinator, Brenda Moses-Iokepa, or any other Hawai'i employees, consultants, the Hawaiian law firm (Carlsmith Ball LLP), or any third (3rd) party payees...

- *That would be normal…not some criminal activity of concealment…*

Michael Peca confirmed this to the SDNY Grand Jury (*3500-MP-5 at Tr.18*):

> *"On all of them, through all the times, I made the final decision.   I may not have done as much due diligence as some may have done.   It's not like I had to say yes or forced. I made the decision to say, yeah, I want to do that.   Based on the money I was making at the time it didn't bother me to invest those kinds of dollars."*

If the Hawai'i partners COO [Manfredi] -- who was involved daily with dozens of lenders and every detail of the Hawai'i partners project – while living in Hawai'i full-time (and being paid for it) "*could not remember*" Constantine (even after refreshing his own recollection with *his own* emails), his joint funding efforts, or what he told the FBI about the REAL details five (5) years earlier and closer to the real-time events, then what legal standard is it for a silent, minority investor to "*remember*" those details?

- *It is certainly an unreasonable prosecutorial standard.*

Why should investors be able to identify the specific corporate details (thru a "*memory test*") if the actions by Kenner and the Hawai'i partners management team (including Manfredi, Kaiser and Kenner) acted within the specific and authorized scope and parameters of the Little Isle 4 By-Laws at all times [Ex.2]?

See *Alexander Realty Capital, Inc. v. Laurel Cove Development ("LCD"), LLC*, 2009 US Dist. LEXIS 17907 (M.D. of Tennessee 2009), wherein Jowdy and Lehman Brothers scam developer, Tantara Partners out of project control and "stick" Tantara Partners owners with "hard money lender" fees after the closing.

First – it confirms that *hard money lenders are a commonplace* in the development business (identical to Constantine's role in the Hawai'i partners deal).  And second, after Jowdy had developed nothing to date and bankrupted several previous development projects, the racketeering plans between Jowdy and Masood Bhatti of Lehman Brothers was in full force when the Middle District of Tennessee Judge confirmed:

> *"On May 7, 2007 Lehman notified Jones [Tantara Partners] that, because of Jones' past bankruptcies and lawsuits against him [identical to Jowdy's problems] related to previous ventures, Lehman would be unable to make the loan to LCD with Tantara Partners as its owner. Lehman wanted Kenneth Jowdy, a Las Vegas Businessman whom Lehman had done business with, to take over ownership of the Project from Tantara."*

**On May 8, Jowdy flew with Roger Clemens to Tennessee to show-off the new Tennessee fraud…**

This hi-lighted two (2) major criminal acts (all covered-up by FBI agent Galioto) related to Jowdy and Bhatti (from Lehman) days after Jowdy attempted to *BRIBE* Kenner in May 2007 to "go along with the various frauds – offering 20% interest in the new Lehman Brothers projects plus 'no show' management jobs".

- The flight records two (2) days earlier with Jowdy – Louis Freeh -- and Bhatti confirm

**Kenner Unresolved Issues With Trial Counsel Wholly Affected The Presentation Of An Adequate Defense (While Under Duress)…**

Pre-trial and after several "leaks" from Kenner's trial counsel to the government about critical impeachment evidence regarding Kaiser and Berard lying about forgeries and their-own FBI recordings proving they lied – Kenner's trial counsel was subject to continued FBI threats.   He shared them with Kenner pre-trial on several occasions, *infra*.

Kenner was already in conflict with the trial counsel because of the "leaks".  In addition, Kenner's trial counsel refused to administer the basic trial preparation needs.   The negligence was as simple as "failing to investigate" potential professionals who would be pro-Kenner witnesses who routinely interacted with the Kenner-investors independently and transparently (*See Kenner 28 U.S.C. 2255 –*

---

the uncanny timing of their travel to Texas all-together – the site of the third (3rd) Jowdy-Lehman racketeering criminal acts. (*Bates stamp: 6988-6989 [from the Jowdy production]*) [Ex.9 at 21-22].

First – Lehman did the identical bait-and-switch to Kenner in Hawai'i with Bhatti's lifelong friend, Alan Worden, claiming at the 11th hour of the deal (with the Hawai'i partners financially trapped) that they would *not* do a deal with Kenner because they needed an experienced developer (fabricated to oust Kenner's control of the Hawai'i partners).  *Bhatti approved $11 million in budget withdrawals the following 18 months in Hawai'i to Worden – with no development work being done* (straight embezzlements and frauds) – and

Second – Eight (8) days later (May 15, 2007) -- Jowdy and Bhatti arranged for Jowdy to embezzle and divert the entire closing capital of $225,000 *from Kenner and Kenner investors* from the Diamante Villa deposits (*Bates stamp: BX-TD-0002592 and BX19-SD-0001432, DIAMANTE-000135*) [Ex.10 at 8-13] to fund the Jowdy-Lehman Brothers-Bhatti Tennessee closing (*See Recon33-12 in Kenner Appendix -- Rule 29-33 Reconsideration motion*) [Ex.10].

Only one (1) day after robbing the management control of the Tennessee project with Bhatti from Tantara Partners, *supra*, via a racketeering scam, Diamante CFO and Jowdy brother-in-law, William Najam sent Jowdy a May 8, 2007 email warning him about another *bad partner* – since Kenner turned down their bribes *only days earlier* to keep his mouth shut and get the FBI protection (*Bates stamp: 27888 [from Jowdy production]*) [Ex.11]:

> *"Ken…I'm not so worried about the past failures [Diamante del Mar, Diamante Air, Diamante Cabo, etcetera]…The last thing you need is a conflict situation with another partner."*

- *Kenner was the victim of an attempted bribe* – documented by Jowdy in his January 2010 California deposition – BUT chose to protect his clients/investors again from the criminal acts of Jowdy's cabal once discovered – *despite facing an insurmountable opponent fortified with the backing of former top U.S. government officials in the USA.*

*Document 675 filed July 3, 2019*).

Kenner's trial counsel knew the government's prosecutorial theories were "concealment" based and as such, it was 100% irresponsible and grossly negligent that he would not interview and prepare the other professionals who would have verified full Kenner transparency in the specific "concealment" matters in question – and their independent relationships.

Their independent empirical evidence is in the government's Rule 16 evidentiary production, thus the Kenner defense would not have required "*memory test*" supporting testimony.   The refreshing documents were available in the courtroom at all times.

Nevertheless, after trial counsel confessed to Kenner about the demonstrative personal threats that went so far as to worry trial counsel's wife on the eve of trial, Kenner demanded trial counsel alert the Court about the threats and several other critical trial matters.   *Trial counsel refused* and left a taint over the entire trial process.  Kenner's correspondence with trial counsel is noticed (*See Document 675 [2255] at 31-34, and Ex. 3 [the letter]*).  Part and parcel to the letter to trial counsel on April 12, 2015, Kenner wrote:

> "*I know that we just met to discuss the trial that is supposed to begin in a few weeks, but you have to tell the judge that the FBI agent has made threats to you again, as we discussed in the meeting.   It is not right they told you to back off the casework, because they really want me.   In addition, the fact that you told me your wife is scared for you and her as a result of the Galioto threats is even more worrisome. I know that he told you your practice would suffer if I were not found guilty at trial.   That is outrageous…You cannot stay silent in front of the judge with threats being made by Galioto to you…*"

Kenner also asked trial counsel to alert the Court about someone at Queens Private Detention Center who was repeatedly asking Kenner to participate in a murder-for-hire plot, just prior to trial.   *Trial counsel refused again*.[31]

---

[31] The Court should note that recently, Kenner discovered that not only was Paul LeRoux (the person who wore the jailhouse wire on Kenner at QPDC for FBI agent Galioto) a "*significant government asset*" and not just another run-of-the-mill inmate trying to raise Rule 35 or 5K1.1 issues (*See* https://en.wikipedia.org/wiki/Paul_Le_Roux) -- but after Kenner was moved to MDC Brooklyn, the government had Kenner placed in a cell with one of Leroux' former "hit men" from his DEA case to try and resurrect and execute the "murder-for-hire" plot on Kenner, *one more time post-trial*.   It is not ironic or coincidence

**Jowdy's Racketeering Crimes Further Harm Kenner And Kenner Investors (And Are Covered-Up By The FBI Case Agent)...**

Ken Jowdy, William Najam [Jowdy's brother-in-law and Diamante general counsel] and the Lehman Brothers lender [Masood Bhatti] were extending their racketeering efforts to projects in Texas and Tennessee by the spring 2007.   Once Kenner discovered their embezzlements and exposed them and their racketeering activities (*See Document 667 at 15-16*), Kenner could have accepted Jowdy's bribes in 2007. Kenner *immediately declined and protected his clients.*  Jowdy's General Counsel and Mexico COO William Najam told Jowdy on May 8, 2007 (only days after Kenner's Mexico confrontation with Jowdy and Najam to fix "everything" – and declining their money and protection bribes) [*Bates stamp: 27888*] [Ex.11]:

> "*The last thing you need is a conflict situation with another partner*".

Kenner Baja Ventures 2006 investment partner, Jozef Stumpel, identified for the Court the Jowdy bribes as known to the group of investors [Ex.12]:

> *"In 2007, Kenner also disclosed to me and our friends that Jowdy and his attorney, Tom Harvey, tried to bribe Kenner with millions in equity in future Jowdy projects that were funded by Lehman Brothers in Tennessee and Texas without us.  Kenner declined the bribes and fought Jowdy for the investors until he was arrested in 2013.  Jowdy confirmed the bribes to Kenner in his 2010 deposition with Ronald Richards."*

**Jowdy's Attorney Made One Last Threat/Bribe Attempt On Kenner (Recorded)...**

In 2007, Tom Harvey invited Kenner to NYC under the guise that he needed assistance with one of his high net worth legal clients (Dick Wolf's ex-wife).   After dinner with the alleged client, Harvey told Kenner that his money and protection offer that night would be Kenner's last chance to avoid FBI prosecution and go to jail – and as such – Kenner was instructed to "*think long and hard*" about his choice to fight versus Jowdy's people and connections.   *Kenner immediately declined* and had

---

that Kenner was intentionally moved to live in a cell with Slawomir Soborsky (out of 1800 possible inmates), who attempted to discuss his "skills" with Kenner (reproducing the failed LeRoux scheme).

- *Either one of these contrived schemes were a violation of Kenner's civil rights, at a minimum.*

limited to no communication with Harvey after that threatening day.

At the time Kenner declined the multiple bribes, he had former Hawai'i land
manager, Christopher Hawkins, working in Mexico.   Because Jowdy and his
management team were almost never in Mexico while looting the budgets during
the first three (3) years (2006-2008) (*See Document 667*), Hawkins was unnoticed
by Jowdy's cabal during regular conference calls with management staff.

Hawkins noted to this Court:

> *"I worked in Cabo from 2006 to 2008 after we got the project funds from
> Lehman.   John Kaiser asked me to go work there in 2006 so I could watch my
> new boss Ken Jowdy...*
>
> *John needed me to relay information to him about the Cabo business because
> Ken owed us over 7 million dollars by then.   I worked in Cabo until Kens people
> threatened me.  I was caught telling Pk [Kenner] about Kens team plans to hurt
> Pk physically.  There was another guy named Matt who was telling Pk other
> bad stuff Ken was doing to hurt the investors from other meetings I was not in.
> They fired and threatened him with lawsuits later too. Ken said constantly that
> the FBI was protecting him and the Lehman people I knew would give him any
> money he asked for.  They wanted to set Pk up on Mexico drug and gun crimes.
> I know they did bad things to Pk in the jail after I was gone from the fake gun
> charges in Cabo...*
>
> *Ken said they would not have to repay our Hawaii group if they could blame Pk
> after getting him arrested in Mexico.   That was their plan.   Kens lawyer said
> they could take Pks ownership piece then without a fight.*
>
> *Ken and Fernando [Jowdy's Mexico attorney] and Bill Najm [Jowdy's brother-
> in-law and Diamante general counsel] talked about not paying the loans to PK
> on those calls.  I told John and Pk all of this each time.   They talked about
> spreading rumors about Pk being a gun dealer and a drug dealer.  They said
> they would put a bad drug deal on Pk if they needed something to go very bad
> in Mexico for him.   I passed all of this information on to John and Pk also until
> 2008 when Ken found out that I was telling Pk about their plans.  I dont know
> how they found out. I have known Pk my whole life.   I have never heard from
> anyone or personally seen Pk be around drugs or tolerate them.  He definitely
> did not use them.   These stories were so crazy that they said people would
> think Pk had a secret life.   From the back story in Mexico it would let them*

*claim Pk stole all of the investment money and that none of it got to Ken.   It was too crazy.*

*Kens people began to threaten me like Fernando.   Pk called me one morning and told me that I needed to pack all of my stuff without telling anyone.   Pk bought me a ticket on the next flight out of Cabo to Phoenix.   When I landed in Arizona, Pk told to me he spoke to a cousin of Kens local muscle.   They told Pk they were going to kill me in Mexico and blame it on a Pk drug deal at Pks house where I was living sometime."*

Kenner's fiance wrote to the Court:

*"Phil's last trip to Mexico to testify to the Supreme Court Justices in Baja California South was in the fall 2013, just before Galioto arrested him.   Phil travelled with paid federal officers from Mexico for his safety.   This was not the only time I remember Phil paying for hired protection in the US and Mexico from these people.   When Phil returned to San Diego after I had several sleepless nights, I met with him and his new Mexican attorneys.   The new Mexican attorneys told me that Jowdy corruption and payoffs for protection in Mexico was finally over.   The Supreme Court Justices they met with would not allow another payoff or bribe for Jowdy or his FBI people because it would be their ruling in December 2013.  Phil was required to testify in their presence.   That would be Phil's next trip to Mexico, and as promised by the attorneys and the Supreme Court Justices, the nightmare for Phil and his clients would finally be over.   The Mexico attorneys told me that they already had a significant investment fund in Mexico that would be buying a major interest in the project and take over the daily management.   Every one of the defrauded Jowdy investors would be fully repaid and make significant money immediately.   Phil called a few of the investors after the meeting while we drove back to Phoenix to relay the amazing news.   Instead they had Phil arrested by Galioto after an indictment that came only a few weeks after the Mexican meetings.   We knew they were tapping Phil's phone but figured the great news could not be undone.   They did it by arresting Phil after 6 years of threatening to do so.   The timing was not believable.   The attorneys and the investors I know were shocked at this new turn of events.   Everyone deserved to receive the funds from the Mexican sale after 10 years, arranged by Phil and Phil's new Mexican attorneys, so the investors could go on with their lives and put this nightmare with Jowdy to rest.   In December 2013, Phil's attorneys went without him to carry out the court orders without Phil's testimony making the charges severely diminished.   Phil was the main witness.   Phil's attorneys told me they were met by a militia*

*of 50 heavily armed men and a former FBI agent who told them they would never win. Because the FBI was protecting them.   Phil's attorneys were arrested in Mexico shortly after that day.*

*I have spoken to many of Phil's friends and attorneys since Phil's arrest who told me they were constantly being threatened by Galioto and Jowdy's attorneys Tom Harvey in NY and Fernando Garcia in Mexico.   They were instructed to stop communicating with Phil and me or they would be brought into the case with Phil.*

*Around the same time, I spoke with another person in Mexico named Bobby Gaudet.  Jowdy and Kaiser also robbed Bobby, separately.   Bobby tried to file lawsuits against Jowdy in Mexico.  His witnesses were <u>threatened</u> in Mexico and forced to drop the cases.   Bobby lost several million due to Jowdy personally. Bobby told me that <u>Berard physically attacked him</u> in Mexico and <u>threatened to kill him if he continued to sue Jowdy</u>.  Bobby told Galioto about the death threat and physical attacks by Berard and the witness tampering and threats by Jowdy's people.   <u>Bobby told me that Galioto laughed at him.   Bobby told me that Jowdy's attorneys had Kaiser and Berard lying in the Mexican courts about their own witness testimony they had signed in front of the court and Bobby's attorneys to support Stumpel, Norstrom, Phil's and Bobby's criminal cases versus Jowdy.</u>   Now they were calling them forgeries after they received jobs from Jowdy.   I was disgusted to hear all of it and told Bobby.*

*There were a few of Phil's investor friends that I spoke to in 2015 who were trying to file a new criminal case versus Jowdy in Mexico for the millions he stole from them personally.   Galioto and another FBI person arrested the man who was helping Phil's friends.   <u>The investors told me that Galioto said they would also be arrested for obstruction of justice charges if they tried to sue Jowdy again in Mexico or testify for Phil in your courtroom.</u>   <u>**Each of those people stopped returning my calls after they received the threats before Phil's trial**</u>.  Galioto's threats saved Jowdy another federal lawsuit in Mexico City.*

Threats to Manfredi and Kaiser were some of the follow-up issues for any adverse party to Jowdy's cabal to deal with.   This threat towards Kenner, Kaiser and Manfredi came from Jowdy's New York Attorney, Tom Harvey (the Former FBI Director's co-counsel for Jowdy).   Kaiser relayed the message to Kenner, who documented it for Constantine.   Constantine was working hand-in-hand with Hawai'i-Mexico investors' attorney, Ronald Richards versus Jowdy in 2009-2010

(vis-à-vis the GSF efforts).

On 7-23-2009, John Kaiser sent a text to Kenner:

> "*I spoke with SF [Manfredi].  Jk*"

John Kaiser followed the text on the same day to Kenner:

> "*He spoke with that attorney [Harvey] again.*"

Kenner memorialized the follow-up phone conversation with John Kaiser and the Harvey threats to Constantine via text (*Bates Stamp: DS-000510 and HARV P-000020*), as follows [on 7-23-2009] [Ex.13]:

> "*Harvey spoke with Manfredi today.  Threatened jail time for everyone against Jowdy, including Kaiser.*"

Jowdy's cabal, including Harvey, who had serous criminal exposure for his fraudulent lien letters (*Bates Stamp: BN-P-000109-110*) [Ex.14] to the various Jowdy investors as guarantees and subsequent cover-up actions (*See Document 667*), needed to intimidate Kenner and Kenner investors with their FBI connections and jail time threats.   Harvey threatened Kenner in April 2009 thru email correspondence with the Kenner and Kenner investors' attorney, Paul Augustine. Harvey again represented FBI-led jail time because "*Kenner says the money Jowdy received were loans*" [Ex.1].    Well – according to Harvey's own 2015 submission to the FBI and U.S. Attorney's office (*government-forfeiture-44*), *the money were loans (and the government's trial mis-representations were never explained to the jury before conviction)*.

- It is clear that Harvey and "his FBI connections" triggered an investigation and destruction of Kenner's business well-before early 2009 – solely based on his contention that "*Kenner stole the Hawai'i money and bought his piece of the Cabo project with the money*" (the origination of the government's false trial allegations).   Kenner was forced to file 2009 California litigation versus Harvey and Jowdy to temporarily stop the extortion, slander and defamation [Ex.15].

- *Government-forfeiture-36* and *government-forfeiture-44* prove the slander was *not true* in 2004-06, *not true* in 2009 (when Kenner was receiving threats of FBI intervention – which happened), *not true* when alleged in 2015 to the Court and jury, and still *not true* today…but the government has

==carried the Harvey-torch and will not relent regardless of the proven lie…==

John Kaiser re-affirmed this in February 2019 (*Document 628 at 1*)…

> "*Jowdy would like the court to think that Kenner stole $7 million from the hockey players and others…*"

The "fake loans" story remained as the government's theory of Kenner "*cover-up*"; although now proven by the government as 100% untrue.  It was overtly espoused from opening remarks (*Tr.27-33, et.al.*) thru rebuttal summation, leaving harmful prejudice on the tainted Kenner verdict.[32]

One of the attorneys for the Hawai'i partners' transactions with Jowdy and the Lehman Brothers closings of Cabo san Lucas and Hawai'i wrote the Court:

[Attorney Robert Madia, Esq.]:
> *"There were a lot of moving parts on the two closings.   They were very intertwined with all of the loans and similar partner groups.   The Cabo closing occurred on March 2006.   There was a lot of monies due to the Hawai'i investment partners from Ken Jowdy's loans at that time.   I participated in several conference calls with Phil Kenner and his investors leading up to the March 2006 closing as one of the attorneys.   There were two main topics outstanding on the conference calls.   The first was the Jowdy loans that would be paid back to the investors from Hawai'i when the Cabo deal closed.*
>
> *The multiple investor conference calls in January and February 2006 disclosed the original repayment plans at the Cabo closing per the terms of the Hawai'i loan agreement.   The March 2006 conference call announced that there was a delay to repayment of the Hawai'i loans when we had to collect signatures from the investors.   Ken Jowdy and Bill Najam told us that the Lehman Brothers partners would facilitate a post-closing repayment plan.  Nobody was alarmed*

---

[32] [*Tr.5721* – Michiewicz summation]:
> "*It bought him [Kenner] a 39 percent interest in Ken Jowdy's Cabo San Lucas*".

And – [*Tr.5990* – Komatireddy rebuttal summation]:
> "*Mr. Kenner told you that he used that money to get his piece in the Mexico investment with Ken Jowdy. You know exactly what that's for. That's in evidence.*"

• Clearly – *government-forfeiture-36* proved the government **lied** at trial thru rebuttal summation and *prejudiced Kenner* to the Court and jury, et.al, *infra*.

> *because those payments were pending in the following 6-9 months.  The 15% interest on the Hawai'i loan was accruing to the benefit of the Hawai'i investment partners.*

Attorney Madia continued:

> *I know that Phil has worked harder in the last 10 years to recover the money that his investors were defrauded than in the prior ten years when he constructed those long-term deals for his investors.  Several bad people got in the way, tried to bribe Phil, but he would have none of it.  I admire that.  Tough times can fall on good people.   They have on Phil because he stood up for his friends and investors...I know that nothing happened without everyone's knowledge.  It could not have.   I was there.*

Attorney Madia continued:

> *I think it has been over a decade of abuses laid on Phil since then by powerful people who had a lot to gain with Jowdy free and not criminally pursued as Phil did against him in the States and in Mexico, at his near life-ending risk."*

Nevertheless, Jowdy's people had a Mexico criminal investigation opened on Kenner to stop Kenner from travelling to Mexico without being arrested and thrown in jail. Jowdy confirmed the Mexico criminal pursuit of Kenner, again, because "*Kenner says the money he [Jowdy] received were loans*".  Jowdy confirmed placing the Mexico criminal actions on Kenner's head during his January 2010 deposition (*January 6, 2010 at 522*) [Ex.13 at 71].

During his extortion threat via email [*Bates stamp: ED-003068-3069*] [Ex.1], Attorney Tom Harvey confirmed his knowledge that the FBI and the SEC were investigating Kenner well _before _ Kenner's June 24, 2009 FBI proffer, which was a lot of knowledge for a private attorney in New York; *unless he knew someone "big" from the FBI, like his Jowdy co-counsel, Louis Freeh.*

Harvey was also able to prophesize that the NY Daily News would begin to run a series of slander stories against Kenner because Kenner was adverse to Ken Jowdy.

- Harvey was correct about the NY Daily News, with beat writer Michael O'Keefe a close friend of both Jowdy and Harvey.   Harvey and Jowdy are mentioned and quoted by O'Keefe over a dozen times in the O'Keefe 2008 novel; "Roger Clemens – American Icon..." – ironically when the NY Daily News slander stories began versus Kenner.   The Court should note that Kenner had no connections to NY then...*or now*!

Harvey was correct about the SEC who interviewed Kenner for 24 hours under oath in 2011 and discontinued their interests.   Attorney Michael Stolper concluded the 2011 3-days of Kenner SEC testimony in August 2011 by confirming the Hawai'i-Mexico investor group's feelings about the Jowdy cabal to the SEC, *supra* [Ex.17].

Nevertheless, the Harvey threats were real and provided imposing cover for the Jowdy cabal, which threats of any FBI-led jail time would do; specifically, with the underlying involvement of Louis Freeh and his best friend, John Behnke (who was Jowdy's head of security in Mexico since 2005).

**Kenner And Kenner Investors Begin U.S. Litigation To Recover Jowdy-Loans Immediately After Jowdy-Harvey Terminate Settlement Discussion (*One Year Before The Initiation Of The GSF*)**…

After Kenner and Kenner investors began litigation in Arizona (2008) versus Jowdy to recover the Hawai'i loans – Harvey began his threats against former Jowdy employee Robert Gaudet.   The threats were to intimidate Gaudet as the witness to the 2004 Hawai'i-Jowdy loan agreement (*3500-KJ-2 at 24-25*).   The threats were about his personal safety – *and more*.

During a July 2, 2009 Arizona deposition of Robert "Bob" Gaudet by Jowdy's attorneys (including Harvey), Gaudet testified *[Bates stamp: PK_SEC_000789]* [Ex.19 at 145-146]:

> [Gaudet]:  *"It might have been on that call or another call [with Harvey], but, you know, he says, "Bob, you really – you really have to realize" – he says. "You obviously don't know what the law means. You obviously" – "the law in the United States is different than it is in Mexico".  He referenced the name Michael Meeks.  He says, "Meeks" – "You have to be careful because Meeks is going to have someone waiting for you." [33]*

- *Gaudet confirmed in his July 2, 2009 deposition multiple aggressive threats from Tom Harvey about "knowing whom you are supporting" and "making the right decision for yourself" and "FBI is all over this thing" (in evidence and delivered to the Court after the Forfeiture hearing colloquy –* Forfeiture Tr.288-291*).*

---

[33] Attorney Michael Meeks was the attorney working with Tom Harvey and Ken Jowdy – and representing Nolan, Juneau, Moreau and Myrick in 2008 thru present (a.k.a. "Bad apples").

- *Gaudet also confirmed that Kaiser confessed that he had a hand in the creation of the Hawai'i-Jowdy loan agreement* [Ex.18 at 3].

  - o *Kaiser's confession to Gaudet clearly hi-lights Kaiser's desire to lie during his 2015 testimony that he was <u>not</u> aware of the loan agreement – although he later testified that he possessed a copy of it at his home (just like the alleged "forged" consulting agreements which he had possession of the "ink" versions.   This leaves both critical issues of Kaiser's testimony a fraud – fully prejudicing Kenner intentionally.*

  - o *The Court should note that Kaiser also DENIED his personal Jowdy meetings (Tr.1120-22), which the FBI noted in their raw notes (3500-JK-1-r at 2, 3, 10).*

Please note that despite the threats of incarceration or worse to Robert Gaudet in Mexico from Jowdy's cabal -- Jowdy, Harvey and his Nevada attorneys authenticated the same 2004 loan agreement with Gaudet as the "witness" as his chief defense evidence thru Gaudet in December 2010.   <u>*The government was aware of the Jowdy authentication for five (5) years before trial*</u> *– and completely ignored it (Nevada December 2010 trial Day One at Tr.197-198)* [Ex.20].

Nevertheless, they attacked Kenner and the veracity of the authenticated loan agreement in front of the Court and jury; **calling Kenner a liar**, repeatedly (*Tr.4598, 5064-65*).   It was wholly unethical and they knew it.
- Unless the Constitutional parameters have changed and Kenner was forced to disprove every government theory with the evidence that the government possessed and ignored to frame their nonsense, *it must again be deemed an unreasonable standard and unethical practice.*   Trial counsel, Haley, told Kenner it was allowed by the government…*See Napue v. People of State of Ill.*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959).

**Conspiracy By Concealment…**
Almost three (3) months of trial in 2015 produced several guilty verdicts based on "conspiracy by concealment" supported only by witness testimony (with demonstrated **CTE** symptoms) who were asked to remember, "*what they were never told and testify about it*".[34]

---

[34] Following the government's lead, Kristen Peca actually testified about "commercials" that she was never told about, after not being asked about them, leaving a wholly confounding "head scratcher" as to where did she learn about it to give that specific testimony…

That simple contradiction cannot be a basis of confidence for a verdict, with zero empirical evidence to support the 2015 testimony that survived in contradiction to:

> (1) 100% of their previous testimony (some in front of a 2011 SDNY Grand Jury),
> (2) Previously signed banking records (supporting full transparency),
> (3) Tax documents in the witnesses' possession (supporting full transparency),
> (4) Disclosures signed for their respective capital contributions (supporting full transparency),
> (5) Emails (supporting full transparency) and
> (6) Texts further corroborating fully disclosed participation by the investors (supporting full transparency)...

Yet, none of that was "*remembered*" during trial, indistinguishable from asking eyewitness testimony from a blind person.

**The Dichotomy Of Reality...**

From the moment of the Kenner's 2006 discovery of Jowdy's criminal activity and intentions, Kenner openly arranged for group conference calls, group mediations, independent legal counsel (in Mexico, Nevada, Arizona and California) to represent the Hawai'i partners versus Jowdy and recover the unpaid loans – and address the additionally discovered diversions and embezzlements (as known at that time...with many more discovered thru the government's Rule 16 production of evidence).

Although it was proffered during trial that Kenner was the "lynchpin" to recovering the investors' assets, this could not have been further from the truth.[35]

---

*Q. And when you invested the second time [in Eufora], what were the circumstances in which you invested then?*

*A [Kristen Peca]: Phil came back to us and he explained that this is about to explode, they finally started marketing, **he didn't tell me about the commercial that had started airing**...*

[35] Kristen Peca and Jay McKee (*Tr.1830-1831*) gave testimony that they never sued Kenner because they feared that without him, they would never recover their various investment funds.   Independent counsel has represented the investors at all times and in each relevant private equity investment.

**In 2006…**

Upon discovery of the various frauds against Kenner's investors, Kenner hired independent counsel; *concealing nothing* – including the items alleged in the superseding indictment as "concealed" by the whistleblower himself.   *It defies logic*.

Each investor in the various private equity deals (and loans to Jowdy) was independently represented and retained direct, unfettered access to their attorneys; independent of Kenner.   Kenner was not the lynchpin to anything.

Kristen Peca confirmed this thru direct communication in November 2009 with her husband's attorney, Ronald Richards:

[Attorney Ronald Richards wrote to the Pecas – November 4, 2009] [Ex.21]:

> *Hi Michael and Kristin,*
>
> *I have been effectively managing the litigation budget [set by Constantine] and not wasting money like most attorneys do.  Jowdy has of course been stonewalling but he is running out of procedural barriers and I believe that he will soon be forced to deal with this case.*
>
> ***Please email me anytime with any specifics and I am happy to have a conference call with you or your wife who I am aware is or was a practicing attorney****.*
>
> *Thanks,*
> *RNR [Ronald Richards]*

Kristen Peca replied (the same day), while not refuting the erroneous "attorney" representation:

> "*We are putting our trust in you, so we will do whatever you recommend is best for getting our $$$ out.*
>
> *Thanks, Michael and Kristen Peca*"

Although the government withheld (*Brady* issue) the investors' 7-page signed and initialed disclosure statements with their independent Arizona counsel, Tom Baker, the documents were recovered post trial during the forfeiture proceedings.   The investor signed Baker disclosure started out [Ex.22 and Ex.23]:

"*the gist of the lawsuit is to recover certain monies loaned to Mr. Jowdy from Mr. Kenner, Little Isle 4 and Ula Makika LLC.* **Mr. Kenner estimates** *the total amount of monies loaned to Mr. Jowdy which have not been repaid to be approximately $5,000,000. This is the estimated principle only, exclusive of accrued interest. In summary, Mr. Jowdy denies that the monies were loans but rather characterizes them as investments.*"

Jowdy attempted to lie to the FBI in 2010 – but reversed his "investment" claims when challenged for the equity paperwork.   The FBI raw notes of Southern District Criminal Investigator, Scott Romanowski, and FBI case agent Matt Galioto, confirmed (*3500-KJ-2 at 13*):

*"Little Isle $ to DDM [Jowdy's Diamante del Mar bank account]*

*$ is treated as loan or converted to equity → never converted to equity"*

The signed disclosures identified Jowdy's fraudulent position about the loans (*alleged as fake*), while attempting to defend his thefts in 2008-09 (Arizona case only).  Yet – Jowdy obviously confessed to the FBI in March 2010 (*3500-KJ-2 at 11-14*) – contradicted his 2-year Arizona defense and associated perjury issues in Arizona (as Attorney Baker revealed, *supra*) -- and *ignored by the government* pre-trial to frame Kenner for "*stealing the loans*" the Court now knows Jowdy received (and not Kenner).

- To date, the Court has not ruled on Kenner's 2018 Rule 6(e) submission. Kenner and the government are adroitly aware that FBI Galioto (the only indictment witness) confirmed to the multiple Grand Juries -- "*Kenner stole all of the Hawai'i money to buy his piece of the Cabo project*"...amongst other lies perpetuated at trial – and proven untrue (again) post-trial...

- Galioto's Grand Jury testimony was "leaked" in sum and substance to the NY Daily News to further hi-light the purported "secret" investigation of Kenner; hi-lighted by O'Keefe in multiple articles slandering Kenner.

The government continues to ignore the "loan" truth – now that they have been publicly disclosed by the government and Jowdy (*government-forfeiture-44*); but only post-trial.  *The government continues to ask the Court to do the same*, so they can effectuate a faulty forfeiture; harming more Kenner investors (Jozef Stumpel and Jere Lehtinen – both unnamed in the superseding indictment – *government-*

*forfeiture-36*).

Jozef Stumpel wrote to the Court:

> *"Phil even travelled to Vancouver during the 2010 Olympics when we were all suing Jowdy [in Mexico and California] to discuss the frauds Jowdy was doing with the different lawsuits and changing his stories to keep defrauding us about the money.  Jowdy had paid people to have my personal case against him in Mexico thrown out several times according to my Mexican attorney.   Phil and my Mexican attorneys kept fighting for me with new cases until Phil was arrested in 2013.*
>
> *I never heard a single complaint about Phil from anyone until Phil and I had to sue Ken Jowdy in 2008 for millions of dollars that we loaned or invested with him.   I have heard a few wrong things about Phil from Bryan Berard and the FBI law people since we went after him in 2008. None of them have been true with me.*
>
> *I have been called a few times by the FBI about Phil.  Each time they left messages or told me stories about things I knew were not true.*
>
> *I am an investor in the Hawai'i project that also loaned money to Jowdy.   We all decided to do it as a group.  I talked to Phil and a couple other friends about it when we agreed. I know that me and all of the other Hawai'i investor people knew always that we sent money to Jowdy as loans.   Everyone I ever talked to about it was mad at Jowdy for not paying our money back when he was supposed to even though we had a contract with him for Hawai'i.   I talked to other investors who Jowdy told he was thanking us for the loan money to get through the tough times before the big loan.  We all expected this money to be paid back to us when we got the big bank loan just like my own money in 2006. It has been too long for this.*
>
> *Phil is the only person that has always helped me and my wife with the money and the fighting with Jowdy.  I know the FBI person who calls me does not like Phil and blames the money Jowdy stole on Phil.   I do not understand how since Phil did not have any of our money and only Jowdy.   Phil, me and my friends who gave him money and not this bad deal that I got screwed.*
>
> ==*Please let Phil go so he can continue to fight for me and my friends.  Maybe you can have some law people help Phil fight for me.   No one else is fighting for me*==

*and my money."*

Kristen Peca's 2012 FBI recording verified the same lies from the FBI case agent:

> *Kristen Peca* – *Matt [Galioto] told Michael and I that you stole all of the Hawai'i money and never gave it -- the loan money -- to...uhhhh...Jowdy.*

> *Kenner* – *Kristen – I have all of the bank records that prove the money went to Jowdy and his accounts at all times.  I told you that already. You told me that you saw the bank records after I sent them to Michael.  You know -- the attorneys who sued Jowdy for the money in Mexico and Arizona and California used them to confirm the loans before we sued?*

> *Kristen Peca* – *but – I don't understand why he would say it.*

There is not a shred of credible evidence in this case, nor did the jury find, that Kenner was motivated by greed or by causing financial injury to his investors in connection with the counts of conviction.  Indeed, the convicted charges do *not* have as an element of intent by the perpetrator to realize financial gain or to cause any victim financial loss.   Consequently, the common thread in the jury's verdict, which we accept for purposes of sentencing, is that the jury found that Kenner did not do anything to injure his investors, simply two (2) of the 26 Hawai'i partners "*cannot remember*" (prosecution of concealment) what the other 24 Hawai'i partners have verified "under oath" that they all agreed to (the Jowdy loans) "*as a group*".

Non-victim and Hawai'i-Mexico investor Turner Stevenson testified the following to the 2011 SDNY Grand Jury (*3500-TS-1 at Tr.17-18*):

> *Q: When you put up the $100,000 for Hawai'i, did you have any understanding of whether the money could be used to pay for the Mexico project or was it just supposed to go to the Hawai'i project?*

> *A [Stevenson]:  In the beginning it was supposed to go to Hawai'i.   Then **I saw** they needed, **the group of us got together**, we have this piece of land that's available for purchase in Mexico that we need to wait on or get funds on to **transfer as a group** like one big blanket to get money into Cabo and pay for that land to hold it until the loan came.*

> *Q:   So you are saying you agreed to transfer some of the money from the Hawai'i project to the Cabo project?*

> *A [Stevenson]:  I would say that, **YES**.*

86

> Q: Who made that decision?
>
> A [Stevenson]: **I think all of us as a group**.
>
> Q: What do you mean "as a group", who is the group?
>
> A: **All the guys who were invested in it**.

At the same Grand Jury in 2011, Darryl Sydor confirmed the loan to Jowdy from the Hawai'i partners -- and the underlying knowledge without hesitation (*3500-DS-2 at Tr.25-26*):

> Q:  Was that [the LOC at Northern Trust Bank] also for Little Isle 4 as far as you know?
>
> **A [Sydor]: Yes, but then we put it towards a short-term loan to Mr. Jowdy until Lehman Brothers came up with the money that was supposed to be paid back."**
>
> Q: Did you know in advance that it was going to be used, this Little Isle 4 money, to be used to salvage the Cabo investment?
>
> **A [Sydor]: Yes.  It was to help with the short-term loan to keep funding the Cabo, but then its supposed to be paid back, but that's –**
>
> Q: Paid back to you or to Little Isle 4?
>
> **A [Sydor]: Paid back to Little Isle 4.**
>
> Q: So –
>
> **A [Sydor]: Back to Hawai'i, not me personally.**
>
> Q: Bu that didn't happen?
>
> **A [Sydor]: That didn't happen.   And Lehman came up with the $129 million loan. It was supposed to be back at closing.**

Not one investor claimed to the 2011 SDNY Grand Jury that they were unaware of the Jowdy loans – *just the opposite* – they confirmed them "*as a group*" decision using their own capital account contributions, specifically…

At no point did Sydor or Peca represent to the Grand Jury "*under oath*" that they were not aware of the loans to Jowdy *at all times*.

- **In fact, Sydor confirmed that he was clearly aware that the funds belonged to Little Isle 4 (from his investment) and no longer to him, personally.**

Peca echoed the same refrain, actually expressing to the Grand Jury that he believed his *entire* $1.775 million LOC (*Hawai'i investment*) and his $100,000 cash (*from his capital account at Little Isle 4*) was being loaned to Jowdy, not just a small portion of it.

Peca's confirmed knowledge meant that the "subset" loan (*of $240,000 of his originating funds sent to Jowdy as part of the Hawai'i loans*) couldn't be a crime of concealment either; unless the government claims now that Kenner (*as Managing Member of Little Isle 4 and acting under the requirements and restrictions of the operating agreement*) did not send Jowdy enough of Peca's originating money?[36]

- The defendant is convinced that Jowdy would have accepted it, since he is not held to the same legal standards under the law, and would merely have obtained another $1.5 million of "*free money*" and protection for it from "*someone*", to never repay it.

The trial conviction was completely based on alleged "concealment" and verified thru testimony supported by hundreds of "*I don't know*" and "*I don't remember*" "*memory loss*" responses during cross-examination and *faulty memory, confusion and mistakes* as the government defended (*Document 440 at 16*).

It cannot be stressed enough that at no point after Kenner challenged the voluminous "inconsistent testimony" did the government defend any of it as the truth...*because it is not – and they confirmed most of it themselves, post-trial.*

---

[36] The 2004 little Isle 4 By-laws (*which governed the Hawai'i project and the loans to Jowdy*) specifically expressed *authority to lend* in the beginning of the agreement [Ex.2]:

> *At the sole discretion of the Managing Member, Little Isle 4, may participate as a lender if deemed by the Managing Member to be in the best interest of the LLC.*

> *The Managing Member, at their sole discretion, can engage in outside ventures deemed to be in the best interest of the LLC, including but not limited to other Private Equity Funds and Lending Opportunities.*

**Kenner Received Loan Repayments…**

As Kenner has documented to the Court, Kenner received funds from the Constantine 2008 and Gaarn 2008-09 Eufora private equity sales proceeds to repay loans from Kenner to each of them, respectively.   The government verified the repayment of the verified loans, but deemed their private proceeds "ill-gotten". Constantine re-paid Kenner $**117,000** from his private stock sale proceeds.   Gaarn paid Kenner approximately $381,000, as verified by government accounting expert, Petrellese (*Tr.3947*):

> *Q: And when you look at the entries for Phillip Kenner Bank of America and Wells Fargo bank, what are the shares of money that went out to those two accounts from this Gaarn account?*
>
> *A [Petrellese]: To the Bank of America account, **approximately 300,000**, which accounts for almost 43 percent during this time period, and then **$81,127** to the Wells Fargo bank account which accounts for approximately 12 percent total on this account.*

Petrellese verified that no more than 55% of the Gaarn private sales – *repaying Kenner's documented previous loans to him* – were distributed to Kenner, not a penny more.   The Court should note that only $==**162,500**==[37] ==was distributed by Gaarn to Kenner from alleged victims in the superseding indictment==.   The remainders of the Gaarn private stock sales were made to non-victims, uncharged transactions. Gaarn was a government witness and non-co-conspirator in the instant case by his own testimony (*Tr.2503-2504, 2563-2564*).

- ==The Court should also note that Count 2 and Count 4 also are based on Gaarn private stock sales to non-victims of the superseding indictment, *thus there is absolutely no nexus to this case* – and more sloppy, overlooked government zealousness.==

As the Court knows, Eufora investors' attorneys and investigators (the Giuliani Group led by attorney Michael Stolper) vetted the Constantine and Gaarn sales in 2010-11 and found "no issues" to pursue while suing Constantine and Eufora for multiple indiscretions in Arizona and subsequently in EDNY (in 2010-2011 and again in 2014 [after the dismissal of the 2012 Constantine bankruptcy proceeding]).

---

[37] Gaarn distributed ($==**162,500**==):
> *2-19-2009 -- **$30,000** from the Rucchin transaction thru Gaarn to Kenner,*
> *4-17-2009 -- **$47,500** from the Rucchin transaction thru Gaarn to Kenner, and*
> *5-04-2009 -- **$85,000** from the Ranford transaction thru Gaarn to Kenner…*

Each of the 29 related Eufora parties associated with the Giuliani Group's investigation signed off on (1) their private stock sale knowledge, (2) the group's efforts to buy out the Eufora loan, and (3) the people involved on both sides of the dispute [Ex.24].

Nevertheless, in sync (again), the Eufora investors "*could not remember*" their (1) July 16, 2010 signed off disclosure document (*referenced as Ex. 1 in Kenner's 28 U.S.C. 2255 submission – Document 675*), (2) the group efforts to buy out the Eufora loan, &/or (3) the conference calls to discuss the investigation and legal process of "everything Eufora" – *independent of Kenner*.   Full amnesia was the government-witness theme of "*no knowledge*" again for (1), (2), and (3), even going so far to disregard the disclosures of another 3rd party, independent attorney for the Eufora investors as 100% proof of transparency (similar to Attorney Baker in Arizona and Attorney Richards in California).

**Other government-witnesses had ulterior motives for Kenner's conviction – in addition to Jowdy's protectorate (for the last 12 years, and counting)...**

**Michael Peca...**
Government witness **Michael Peca** had breached his 2008 agreement with Kenner in a separate real estate project in Las Vegas (*Bates stamp: PK_SEC_005398*) [Ex.25]. Peca was in 100% control of Kenner's $650,000 plus deposit funds since 2008. Peca had text message communication with Kenner (in evidence) denying Kenner's access to the Las Vegas property and any decision-making contributions after 2010.

Michael Peca was alerted by Kenner in 2013 that Kenner was planning to file litigation in Nevada and subsequently add a lis pendens to the property's title; effectively securing Kenner's $650,000-plus in accountable funds to the real estate partnership.

- Kenner's incarceration saved Peca the defendant's chair in the pending and empirically documented Nevada litigation.
- Michael Peca's well-documented "re-canting" of the Jowdy-loan knowledge denial (identified by the Court at *Document 501 at 9*), confirms that Peca attempted to defraud the Court and assist in the concealment prosecution of Kenner but failed to go thru with his scripted plan with the government (*Tr.498-99*), and
- Overwhelming evidence, including 2012 FBI recordings, confirmed that **Kristen Peca** (never a Kenner client) attempted to assist in the recently fabricated storylines of concealment by:

- o Giving testimony that she received a bank default letter (unannounced – while the Kenner text message to her predated the letter date) (*See Kenner's Rule 29-33 Reconsideration Motion at 105-106 footnote*),

- o Alleging she received a FedEx and certified mail document in Ohio in 2009 while the Northern Trust Bank default letters were sent to a New York address (making it logistically impossible – yet overlooked) (*Tr.709-713*),

- o Alleging she was part of a meeting/decision in 2005 to invest (or not) in the Hawai'i project with her husband (while her 2012 FBI recording confirmed she did *not* know about the investment funds until almost 5 years later making it logistically impossible– yet overlooked again) (*See Kenner's Rule 29-33 Reconsideration Motion at 105-106 footnote*),

- o And giving emotional testimony about her dire requests to not transfer her husband's bonds (*Tr.696-700*)[38] to use as loan collateral but reluctantly agreed to it *only* after Kenner's repeated promises of

---

[38] Kristen Peca lied about her participation in a 2005 meeting and her objections to transferring bonds – both of which have been proven as fabricated by Kristen Peca (and perhaps in conjunction with the government) (*Tr.698-99*):

> *Q: When Mr. Kenner first proposed to you to move the safety net and make it collateral for the line of credit, were you able to do that?*

> *A [Kristen Peca]: No. I said right away, no, no, no, no, no, not touching that, **that's my baby. I put that together**. That's my safety net, I don't like that. And he reassured us over and over no, no, no, this not the money account, the line of credit, that's collateral, nothing is going to happen to it, not a penny will go missing, Kristin it's okay, this is only six months, he kept reassuring me, nothing will happen to it. The bank needs to hold on to it in order for us to get the money for the project.*

> *Q: Did you ultimately decide to invest and move your bond account?*

> *A [Kristen Peca]: Yeah, we did.*

- **No bond account was ever moved**!  Someone needs to hold the government and Kristen Peca accountable for their disreputable suborned perjury.  Kristen Peca's "bonds" story was a 100% fabrication by her and the government who tried to elicit sympathy by lying to the Court and jury.
  - o *Apparently the lies worked...*

safety, ***while the empirical bank statements prove that no bonds were ever transferred*** (*Bates stamp: NAAZ009796-9805 - Peca's Northern Trust Bank statement -- March 2005*) [Ex.7 at 7].   Michael Peca followed the government lie as well (*Tr.383*).

- These outrageous frauds contributed in some calculable way to the Kenner conviction – but moreover allowed Peca to avoid his pending and announced 2013 Nevada litigation defense.

**Jay McKee...**
Government witness Jay McKee had breached his 2008 agreement with Kenner in a separate real estate project in Las Vegas (identical to the Peca agreement, *supra*). McKee was in 100% control of Kenner's $650,000 plus deposit funds (similar to the Peca deal).   McKee had text message communication with Kenner (in evidence) denying Kenner's access to the Las Vegas property and any decision-making contributions after 2010.

McKee was alerted by Kenner in 2013 that Kenner was planning to file litigation in Nevada and subsequently add a lis pendens to the property's title; effectively securing the $650,000-plus in accountable funds to the real estate partnership.
- Kenner's incarceration saved McKee the defendant's chair in the pending and empirically documented Nevada litigation.
- The government presented McKee as a Global Settlement Fund victim who "*could not remember anything*" that Constantine spent the GSF money on (*Tr.1820-24*), as proposed (and authorized by McKee – *GX-6602*).
    - Nevertheless, the government had to ignore the most obvious text communication between Kenner and McKee (the night of the initial GSF meeting) that clearly laid out "exactly" what Constantine (and Kenner) discussed in detail with McKee and his wife.   There can be no contradiction to the empirical evidence that McKee knew "everything" and "at all times" and "in real time" (*See Document 675 at 109-110 – Kenner's 28 U.S.C. 2255*).
    - The government never re-canted the McKee fabrications or attempted to inform the Court about the "mistaken" testimony – during trial or afterwards.

- These outrageous frauds contributed in some calculable way to the Kenner conviction – but moreover allowed McKee to avoid his pending and announced 2013 Nevada litigation defense.

**John Kaiser and Bryan Berard…**

Almost immediately after Ken Jowdy and Tom Harvey hired Kaiser and Berard, a number of Jowdy-like events occurred (with protection).   Kaiser and Berard forged and fabricated an operating agreement to steal the Sag Harbor (LedBetter) project from Kenner's LLC control (*Bates stamp: BINDER-450 and 452*) [Ex.26].   They submitted the forged and fabricated document to Suffolk County New York to facilitate a 3rd party sale.   They stole the residual funds from Kenner and another partner in the LedBetter deal (*3500-VT-1-r*).

- Kenner sued Kaiser and Berard in 2013 – once the criminal theft was discovered thru Suffolk County tax records, and long after they completed their criminal activity.

Second, and in the same manner, Kaiser and Berard signed a fraudulent quitclaim in Arizona and stole another real estate project from Kenner.   Kenner discovered the post-Jowdy-hire theft in 2012 and sued immediately.   Kenner placed a lis pendens on the property to secure the investment for him and five (5) other investors.   After the Court-ordered sale of the property and the escrow of funds, the five (5) other investors filed with Kenner as interveners versus Kaiser and Berard (as defendants). The interveners wanted to be repaid by Kaiser in accordance with five (5) Promissory notes that Kaiser signed with them.   Kaiser and Berard defended the litigation by claiming Kaiser's name was **forged** on all of the Promissory notes.

- They shared Arizona counsel with Ken Jowdy once hired in Mexico by Jowdy and Tom Harvey.

Kaiser and Berard lost to the five (5) interveners at trial in 2015.   The judge found their "forgery" defenses to have no merit, complimented with first-hand emails that Kaiser was "copied" on sending and receiving his signed Promissory notes in real time (*Bates stamp: BINDER-453*) [Ex.27].   **The judge ruled that Kaiser and Berard has "fraudulently conveyed" the title away from Kenner**.   <mark>Due to Kenner EDNY incarceration, Kenner was unable to continue the 2012 Arizona case and was forced to drop his million-dollar-plus claims, which the fraudulent conveyance would have granted victory (with the money held in escrow).   Instead, Kaiser and Berard captured Kenner's money.</mark>

- The Court should note that Berard and Kaiser dragged EDNY "tracing" witness, Lanie Donlan (*Tr.3424, 3438*), into another alleged "forgery" claim in the 2012 Arizona case (*Bates stamp: PKHome-0013158-13160*) [Ex.28], which was ½-investigated by the FBI case agent (*3500-LD-2*) and never followed-up after receiving the Donlan response, *harmful to Galioto's fabricated "forgery" theories*.   The alleged Arizona "forgery" including Donlan was proven as

another fraud on the courts by Berard's own text messages with Kenner on the days of the actual notarized signing in Massachusetts, by Berard, Donlan and a registered notary (*See Kenner's Rule 29-33 Reconsideration Motion at 62-63*).

Kaiser and Berard were the only two (2) individuals who assisted FBI agent Galioto in his fabrications and slander of Kenner. The NY Daily News article on arrest day memorialized their "heroic" assistance. The Daily News writer (who slandered Kenner since Kenner's first confrontation of Jowdy in 2007) is a best friend with Ken Jowdy and Attorney Tom Harvey.[39]

- Kaiser and Berard were able to avoid the completion of two (2) sure-loser defenses in the 2012 and 2013 cases filed by Kenner. The 2015 adjudication (on the interveners' 2012 case) proved as such. ==Kaiser and Berard made off with over $1 million of Kenner's money as a result==.
  - Kaiser admitted to stealing $550,000 from his mother, handi-capped brother, and a few Long Island Doctors to the FBI on October 19, 2010 (*3500-JK-1-r at 7*).
  - Kaiser admitted in the EDNY trial to stealing $147,000 from his mother, Ethel Kaiser (and sharing $95,000 of it with Berard) (*Tr.1160-1161*).
  - Ethel Kaiser verified that the 2005 loan she agreed to with John Kaiser was for $390,000 (not the $850,000 she actually deposited – *Bates stamp: NTC012759-12761*) [Ex.29 at 2] (*Tr.933*).
  - Kaiser verified to Kenner (just prior to his Mexico-Jowdy employment) that several Long Island doctors were suing him (never blaming Kenner).

  [From John Kaiser – February 17, 2011]:

| 19975 | +16312350308 John Kaiser* | 2/17/2011 8:40:28 PM(UTC+0) | Rea | **On the phone w / willy [Dr. Krueger] he is going to be suing me** |
|---|---|---|---|---|

---

[39] The NY Daily News (*November 13, 2013*) touted Kaiser and Berard as "*heroes*" for their efforts with FBI Agent Galioto and featured them in an arrest-day article titled – "***Former NHL Player Bryan Berard and ex-cop help Feds nail two Arizona men in massive fraud***".

- The article claimed, "*...bringing to close a long and difficult investigation that relied largely on the determination and persistence of former Ranger and Islander Bryan Berard and former New York and Long Island police officer John Kaiser, along with New York-based FBI agent Matt Galioto.*"

o   And – Kenner verified the frauds again to Kaiser's brother once it was discovered that Kaiser (and Berard) were employed in Mexico and had stolen another $50,000 of power tools from Kenner's home in Arizona:

[From Phil Kenner to Richard Kaiser – December 9, 2012] [Ex.30]:

*"You disappeared 27 days ago when you said you were sending my tools back. Let me know how you want to handle this. No more screwing around. Your brother [John] is in a lot of trouble. You need to decide what side you're on. I was your friend and host at my home for many years...not your brother!*

*I hear your brother tells anyone that'll listen I screwed guys...well, we will see what happens when the legal process plays out.*

*He tried to STEAL the PV [Arizona] house from me when I have over $1.5mm into the home and he has ZERO! I cannot wait to drag him through that one in court.*

*He will pay for the Long Island [Sag Harbor – LedBetter] theft as well. It is COMING SOON! How does Vinny [Tesoriero] feel about being fucked by him!*

*Remember, John took all your mom's $$ [Ethel] and Keith's $$ [handi-capped brother], not me! That's fucked up!! Now he is Jowdy's right hand guy!"*

➢   Kaiser's former NYPD training officer and friend, Vincent Tesoriero, gave proffer to the FBI in 2014 (*3500-VT-1-r*).  Tesoriero *verified* to the FBI that Kenner was not the recipient of the $395,000 loan in 2006 from the Hawai'i partners; it was John Kaiser who needed to buy out several LedBetter partners (*3500-VT-1-r at ¶8-9*).  In opposition to Kaiser's 2015 testimony (*Tr.1008-09*), **Tesoriero *verified* to the FBI pre-trial that he knew from Kaiser that Kenner and Berard were part of the 2006 LedBetter deal; again nothing concealed**.

•   Kaiser has been able to blame all of *his* documented and confessed thefts from his friends & family (since the 2005 Hawai'i loans) on Kenner, with Kenner in EDNY custody; in opposition to the empirical bank records.  His criminal actions (of stealing two [2] real estate properties with Berard) would land most people in jail, but when protected like Jowdy, it is washed under the rug, *creating more*

*victims via the cover-up*.

- o *To this day, <u>none</u> of the Kaiser victims know John Kaiser robbed their funds (and <u>not</u> Kenner).   Kaiser's friends & family are still disillusioned and attend various Kenner court hearings with Kaiser.*

**John Kaiser And Ken Jowdy's Baja Ventures 2006 Theft...**
With Kaiser employed by Jowdy and Harvey, they have attempted in this EDNY courtroom to fraudulently steal Kenner's Baja Ventures 2006 LLC from Kenner and his two (2) partners (Stumpel and Lehtinen – who paid $4.1 million to the Cabo closing accounts, per Jowdy's transfer instructions; with none from Kenner "ill-gotten" or otherwise – See *government-forfeiture-36*).

Kaiser made representations – along with more fabricated and forged documents (*Bates Stamp: DCSL000066-73: Delaware Chancery Court case, Diamante investors versus Jowdy*) – that Kenner owes his Baja Ventures 2006 LLC as collateral for his 2005 friends & family loans.   Amazingly for the naivety of Kaiser (with Jowdy and Najam's help – after being hired), even if the agreements were real (which they are clearly not), Kaiser would have already received 100% of his 2005 friends & family Hawai'i loans back, per the real banking evidence in the government's possession.   There fraudulent position is again bewildering; failing two (2) separate ways.

This is a second (2nd) reason the government and Kaiser argued to <u>*not*</u> turn over Kaiser's 2006 and 2007 IRS taxes "in camera".

One – it would have refuted Kaiser's fabricated "*back pay*" testimony.

And two -- the demand for Kaiser to produce any "*expenses*" that he testified about in 2015 would have failed – with no possible evidence to produce (*Tr.1413-1414*).

- Either piece of requested evidence would again confirm incremental Kaiser fabrications to this Court with the government's intrinsic knowledge (and related to his production of two [2] more *forged* documents by someone in the Jowdy cabal).  *See United States v. Wallach*, 935 F.2d 445,473 (2d Cir. 1991) (Altimari, J. concurring).

- The fraudulent transfer via letter – without legal authority (produced in the Delaware Chancery Court case versus Jowdy by Kaiser and Jowdy and discussed in the EDNY courtroom) – was another fraud on Kenner, criminally perpetrated

by members of Jowdy's cabal for "*not going along*"...apparently like Kaiser and Berard agreed to do "for pay" in 2012 (*Bates Stamp: DCSL000066-73*) [Ex.31] and fraudulent conveyance of Baja Ventures 2006 equity in 2014.[40]

- Jowdy and Najam documented the fraudulent transfer to Kaiser "by letter" once:

    (1) Kaiser had completed helping FBI agent Galioto in apprehending Kenner (in 2013 to stop Kenner's criminal testimony about Jowdy in front of the state Supreme Court in Baja Sur Mexico versus Jowdy, himself and others) -- and

    (2) Kaiser had "delivered" to Jowdy the necessary lies in front of the Mexico court *to claim Kaiser's name was forged* in the *Stumpel v. Jowdy* ($1.6 million criminal case versus Jowdy – for money Jowdy stole from Stumpel's Baja Ventures 2006 capital contribution and documented by *government-forfeiture-36*).

It was more than ironic that these fabricated transfer documents were not produced before Kaiser, for Jowdy, completed those two (2) tasks.[41]

### Ken Jowdy and Tom Harvey...

Jowdy, Tom Harvey, and Diamante Cabo san Lucas were relieved from Kenner's personal 2013 litigation in Mexico for millions of dollars of Jowdy thefts and employment frauds (with Kenner and Kenner investors as victims in the various civil and criminal cases).   Jowdy and his cabal avoided the pending Kenner-led

---

[40] The Court should note that Kaiser, Jowdy and Najam completed their fraudulent transfer paperwork for Baja Ventures 2006 *after* Kaiser gave false testimony in Mexico – claiming another document he signed in the *Stumpel ($1.6 million) v. Jowdy* case was a "forgery" (although refuted by Bryan Berard's 2012 FBI recording) – and *after* Berard and Kaiser assisted Galioto have Kenner indicted and arrested (and held without bail as the two [2] government C.I.s in 2013).

[41] The Court should note that 2012 FBI recordings by Bryan Berard confirmed that Berard, himself, and John Kaiser signed the actual documents in the Cabo san Lucas courthouse that they later alleged were *forged* in Mexico (as a favor to the Jowdy defense case for stealing $1.6 million from Stumpel and the Baja Ventures 2006 capital account).

The Court should note that the U.S. Attorneys in the instant case presented the same documents in 2014 to the EDNY Court as forged (a.k.a. -- another fraud on this Court about forgeries).
- The U.S. Attorneys never notified the Court of the Kaiser fraud after Kenner's trial counsel "leaked" the impeachment evidence to them pre-trial.

investors' criminal litigation and Kenner's State Supreme Court testimony in the criminal case – *scheduled only weeks after Kenner's timely arrest and detention* (December 2013).

- The timing was catastrophic to the victims in the criminal cases versus Jowdy -- and a "*miracle of timing*" for Jowdy's cabal...including Harvey, Berard and Kaiser at the time.

**Government Hides Another Kaiser Forgery Lie From The Court...**

As the Court knows, the U.S. attorney and FBI case agent in the instant matter presented a Mexico document to the Court as another "forgery" of Kaiser's name in 2014.   It was related to the *Jozef Stumpel v. Jowdy* $1.6 million lawsuit in Mexico – where Jowdy stole the money intended for the Baja Ventures 2006 capital account (*See government-forfeiture-36*).   The Court is aware that after the 2014 pre-trial hearing about the alleged Mexico "forgery", the government ceased all discussions about "that" proffered evidence.

Kenner's trial counsel "leaked" to the FBI and U.S. Attorney that there was a 2012 FBI recording by Bryan Berard where he admitted that he and John Kaiser signed testimonial documents in the Mexico courthouse for the Stumpel case with their independent Mexico counsel.   That impeachment evidence would have been critical, considering the plethora of Kaiser, Berard and Jowdy "forgery" lies they have been caught in.

- Nevertheless, trial counsel foiled the critical exculpatory impeachment opportunity -- *by disclosing it to the government*.

As the Court is aware, immediately following Kaiser's (and Berard's) hiring in Mexico under Jowdy, his first action for Jowdy was to give testimony in the Mexico case, *supra*, alleging his name was "forged" on the "testigo".[42]   As a result of the perjured Kaiser testimony – *proven as a fraud by the Berard FBI recording* – the $1.6 million case was thrown out.

- Kenner's Baja Ventures 2006 partner is still without his $1.6 million as a result of the Kaiser fraud for Jowdy (for pay), and as Stumpel has referred to this Court, if a Baja Ventures 2006 forfeiture occurs (with no "criminal proceeds" or "ill-gotten gains" traceable to Baja Ventures 2006 as a nexus to the $4.1 million capital account – *See government-forfeiture-36*), then Stumpel will become the largest victim in the instant case, with his equity "taken" as a result of only two (2) of his 26 Hawai'i partners failed "*memory*

---

[42] A "**testigo**" is a Mexican witness testimonial document required as part of the litigation filing process to attest to knowledge of events related to the instant case.

*tests*".

Stumpel has told this Court by way of letter submission:

*"I have discussed all of the loans and scams by Jowdy on me and my former teammates and friends independently with Arizona attorney, Tom Baker, and California attorney Ronald Richards, both of which sued Jowdy for the various frauds against me and the other investors.   I have also discussed all of the Jowdy scams with the other investors, since we began suing Jowdy in 2008. Kenner made sure that everyone was 100% aware of all the funds that Jowdy received through actual Jowdy bank records and what Jowdy did with them, so no one was in the dark about it.*

*In 2007, Kenner also disclosed to me and our friends that Jowdy and his attorney, Tom Harvey, tried to bribe Kenner with millions in equity on future Jowdy-led projects that were funded by Lehman Brothers in Texas and Tennessee without us.*

*Kenner declined the bribes and fought Jowdy for the investors until he was arrested in 2013.   Jowdy confirmed the bribes to Kenner in his 2010 deposition with Ronald Richards.*

*Kenner shared the 2-day [Jowdy California] depositions with me and all of the investors who read the Jowdy's confessions of stealing our money and having no plans to repay any of us, specifically including my $1.6 million loan.*

*All of the investors knew that Kenner and our attorney, Ronald Richards, sent copies of Jowdy's 2-day deposition to FBI Agent Matt Galioto who was supposed to be helping us get our money back from Jowdy in the various scams that Kenner explained to him in June 2009, on all of our behalf.*

*In 2007, Kenner explained to all of us as a group on conference calls and individually that he caught Jowdy stealing our funds and had no plans to return them.   This is the first time I saw Jowdy bank records from Kenner for both the airplane thefts and the original Diamante del Mar investment thefts through Jowdy's Baja Development Corp.*

*In 2010, I was aware that Kenner was arrested and detained in Mexico by the federal police after Jowdy's attorneys in the USA and Mexico filed a complaint with Nolan's attorney, Meeks.   I know that Kenner was physically beaten and*

_told he had to sign transfer paperwork to Jowdy in Mexico if he wanted to get out_.   I know that a former attorney of ours, Palos, got Kenner released from jail and the torture after a few days.   _I also know that our Mexico attorney was murdered shortly after Kenner's release_.   **I know that it was not easy for Kenner to continue fighting for us in Mexico for the next three years even with federal Mexico protection on his trips to testify for us versus Jowdy in the various criminal lawsuits for me individually and others as a group.**

In 2014, I spoke with Kenner while he was in jail and a few other investors who Jowdy scammed about going to Mexico and filing new criminal actions in Mexico City.   I was relieved that I was able to file another lawsuit against Jowdy to finally recover the money he stole from my family and me since 2003.

The week before I was supposed to fly to Mexico City in April 2015 with two other investors (Mattias Norstrom and Rem Murray), I learned that our contact who was arranging the filings and related testimonies in front of the Mexico City Supreme Court judges, the Office of the Ministerial Publico and the PGR, was arrested by FBI Agent Galioto and FBI Agent Mike Cassidy for Obstruction of Justice in the USA to protect Jowdy.   I am not from the USA but do not understand how this can happen.   He was helping us with real thefts, which we have the paperwork for.

Since April 2015, I have heard from Agent Galioto on a few occasions to let me know that Kenner is a thief and Jowdy did nothing wrong.   He is wrong, because I have seen the paperwork and bank records.   Jowdy stole from my friends and me.   I personally know that he scammed Kenner and me.

_Phil Kenner has worked to protect my family and I for years against Jowdy and his people who have stolen from us.   I have received all of the bank records to prove where my funds have gone and the Jowdy depositions that confirmed he received them.   Without Kenner, no one has ever tried to help me recover the money that is so important to me._

Bryan Berard, John Kaiser and other people working for Jowdy, since Kenner arrest in November 2013, have lied to me about information I already know is not true.   Berard and Kaiser have been working hard to protect Jowdy since 2011, because they are employed by him in Mexico and working with FBI Agent Galioto against Kenner's efforts to help us recover our funds from Jowdy.

One of John Kaiser's family friends [James Fellman] wrote to the Court about Kenner, Kaiser and his knowledge of the related issues:

"*I am originally from Long Island and grew up across the street from John Kaiser and his family....I met Phil Kenner in Arizona in 2009...After my job in Arizona [for Kenner and Kaiser] was done, I did not speak with Phil for quite a while.  It was probably in 2012 before I called him to let him know some disturbing stuff I learned.*

*I explained to Phil that a few months earlier John had paid for me to fly out to Arizona.   I thought I was going to work on something with Phil again.   When I arrived in Arizona, I was told by John's brother Richey that we were there to steal about $50,000 of construction tools from Phil's home and steal Phil's old corvette from his house.    I immediately said I would have nothing to do with it and left on my own.   I know John's brother Richey and another friend of his stole the tools from Phil but were not able to get the old car out of Phil's garage without Phil or his girlfriend noticing it during the trip.*

*When I returned home I learned from his other family members that John owed his Mom and a lot of other people in NY lots of money in millions.   He was trying to blame it on Phil so the people would not sue him.*

*I ended up calling Phil to let him know all this after John called me to say that he was going to go to work in Mexico.   I asked him how he could do that because the guy he was going to work for was the person who stole the money that he complained about every night I was in Arizona with them.   John told me it was the only way he could protect himself against the people who wanted to sue him.   John offered me a new job to work construction for him in Mexico and said that he was going to have Phil arrested by the FBI that was friends with the guy in Mexico.*

*He begged me to come work for him.   I did not because this was getting too crazy and we all knew Phil did nothing wrong.   I heard that from John's own mouth.   That is exactly what I heard from John for years until he went to Mexico to work.*

*I do not know Phil that well but I do know that everything I heard from John Kaiser for years was that Phil was fighting so hard for John and his other investors and the guy in Mexico stole everyone's money.   John was frustrated that they could not get the money back because some very powerful FBI people*

*protected him.   I do not understand all of the reasons for it but I know that John never thought Phil did anything wrong for all of the years I was around him.*"

**Individualized Assessment Of Philip A. Kenner...**

<mark>**Sentencing Kenner For The Boondoggle That The Government Has Created...**</mark>

- *The dilemma of FBI protection and accepting bribes -- or protecting his investors...*

Kenner could have walked away after the 2007 threats by Jowdy's cabal. Had he done that, he would not have been in the same position today.  According to Hawai'i and Mexico employee, Christopher Hawkins, *Kenner would have been killed as planned* (*supra*).

However, had he stopped trying to recoup his investment partners' money, he would have been something worse than a felon, at least in his mind. He would have been a failure to his friends, and he could not let that happen.

After receiving a small glimpse into Kenner's true business history in the instant case and his characteristics, this Court is now faced with the question of what is an appropriate sentence in this case. As will be argued more fully below, we believe that a sentence of *time served* (with 72+ months of incarceration already completed by September 2019), followed by Court-mandated *one-year of supervised release*, [43]

---

[43] Specifically, we propose that supervised release be approved to be performed at a non-profit organization like Kenner did for years before incarceration; creating the programs that raised millions for brain cancer research (focusing on children's brain cancer treatments).   Kenner's incarceration has forced a void in the fundraising efforts so desperately needed to find a cure for the children Kenner was fighting to assist thru fundraising.   Kenner's partner (and former law enforcement officer, "LEO") acknowledged this to the Court:

> *"Let me start your Honor by introducing myself.   My name is Kim Garrett.   I'm a retired Sheriff's sergeant with twenty plus years in Law Enforcement and security.*
>
> *I was introduced to and met Phil Kenner approximately eight years ago, during a charity event held at his home.   Phil and I became fast friends since we had the same ideas and goals on how to help those suffering from brain and lung cancer, since I had a LEO partner who was and still is a brain cancer survivor with 14 years under his belt.*
>
> *Phil and I, along with a host of other individuals in Law Enforcement as well as the entertainment industry were on a path to help a lot of people suffering from brain and lung cancer through charity events we had planned in both CA and AZ.   I'm looking forward to resuming this great partnership that has gone stale the past four [now six] years while Phil addressed this situation, we have lost lots of momentum, money and even some instrumental people to cancer during the past four [now six] years.   All of which, would have helped a number of those surviving and suffering from these terrible killers.   **Millions of dollars and thousands of survivor mentors have been***

is "sufficient, but not greater than necessary" to accomplish the goals of sentencing for the following reasons:

1) The Guidelines range in this case as argued by the government significantly overstates Kenner's criminal conduct (and catastrophically depleted by the government's own post-trial submission – contradicting their prosecutorial theories – after the initial PSR was written);

2) While Kenner has been convicted of "concealing" investments from his investors, there is no dispute that he worked tirelessly to make sure that they ultimately received positive returns on their investment – and spearheaded the lawsuits to recover the same monies they were allegedly unaware of;

3) **Unlike the usual fraud case, there is no evidence that Kenner used any of the investors' money to fund a lavish lifestyle**;

4) Kenner has already served over 72 months (with over 54 of them at the MDC -- a maximum security facility) -- where he has endured months of time in multiple lockdowns as a result of terrifying acts of violence, MDC power outages (during the coldest period of time in the last 20 years in NYC, causing near death, sub-zero conditions), improperly restrained in the SHU for weeks "without cause" and solely at MDC's fault, gang rapes by other inmates (not involving Kenner), amongst other disturbing items, discussed *infra* (under MDC Conditions);

5) _And, Kenner and his family have serious and well-documented safety concerns about living in the United States long-term under the constant harassment and threats by those who facilitated Kenner's initial indictment and arrest; as well as orchestrated Kenner's Mexican near-death beatings and attorney's murder_.

Kenner is not a danger to community and does not require specific deterrence. As the Second Circuit has noted, "the Sentencing Guidelines 'do not require a judge to leave compassion and common sense at the door to the courtroom.'" *United States v. Milikowsky*, 65 F.3d 4, 9 (2d Cir. 1995). We respectfully ask this Court to use its compassion and common sense when sentencing Kenner.

In determining the appropriate sentence for a defendant, a sentencing Court must

---

**lost**. *However, once Phil is released and is able to rejoin the team with me I'm sure we can make up for lost time knowing his character."*

"make an individualized assessment based on the facts presented," which includes "a broad command to consider 'the nature and circumstances of the offense and the history and characteristics of the defendant.'" *Gall v. United States*, 552 U.S. 38, 50 & n.6, 128 S. Ct. 586, 596 & n.6, 597 (2007) (emphasis added).

In this case, both the circumstances of the offense and the history and characteristics of this very unique defendant urge a sentence of *time served* (with over 72 months of incarceration completed by September 2019)[44], followed by Court-mandated *one (1) year of supervised release*.

The Court in the best position to fashion a sentence that is fair to society and to Kenner, who we all hope will move beyond the realm of the fabricated NY Daily News articles by Jowdy's people and return to his full-time devotion to being a man of significance and moral strength for the charities he supported and the children he

---

[44] The Court should recognize that with the FIRST STEP ACT **good time calculation**, Kenner has completed the equivalent of 86 months of incarceration (7 years – 2 months).   In that vein, Kenner would also be eligible for 6 months of halfway house time (or home confinement) – increasing the "completed" sentence time to 92 months (allowing Kenner to leave immediately).   There is potentially another 6 months (totaling 12 months of home confinement), based on the December 2018 FIRST STEP ACT parameters, further increasing the "completed" incarcerated time to 98 months (8 years – 2 months).

As such, even before the additional FIRST STEP ACT calculations, Kenner's time of incarceration in the maximum-security facility (notwithstanding its extra-ordinary circumstances) has completed nearly double the "sentenced" time (*infra*) that virtually any other similar 2nd circuit case with similar "alleged" circumstances, *infra*.

- Those similar times would have been completed at the lowest security "camp" environment; in dire contrast to the violent and harsh MDC living conditions.

- Several MDC staff have confidentially confirmed that less than 12 inmates currently at MDC (out of approximately 1800 inmates) have resided longer than Kenner, and each of them are government cooperators on significant gang-related &/or drug related cases involving dozens of co-defendants and countless victims of violence.

Although Kenner is the first to espouse remorse for any hardship endured by his former friends and investors, the Court should note that thru Kenner's submissions to the District Court, Kenner maintains that his investors were at all times aware of every investment element in this case (*See Stumpel letter to the Court*) – and only 2 of 26 investors were presented by the government as failing their "*memory tests*" of private equity knowledge.

Kenner has presented the empirical evidence that each and every investor *could not remember* **signing**, *could not remember* **texting**, *could not remember* **emailing**, or *could not remember* **participating in**; commensurate with full-blown Alzheimer's sufferers (or exemplary **CTE** symptoms of *faulty memory, confusion and mistakes*) (*See Document 440 at 16*)…

volunteered and helped.

**Kenner's Friends & Family Have Offered Letters In Support Of Kenner To The Court Describing Kenner In A Capacity Unaddressed During Kenner's Six (6) Years In The EDNY Custody; Regarding Background, Community And Selflessness (Excerpts, *infra*).**

- In spite of threats against anyone supporting Kenner, including his former Rabbi who moved to Israel in 2014 to avoid the constant haranguing, several of Kenner friends & family provided the following about Kenner's history...

**Dr. Steve Locnikar letter...**
- *Dr. Locnikar's book has been an inspiration to tens of thousands of people about recovery and life's harshest lessons.*

  *"I am a well respected member of the medical community and assist people recover[ing] from drug addition and alcohol dependency every day.*

  *Ironically, I was in a similar situation about ten years ago and lost my medical license and ability to practice medicine and surgery.   I found myself in a very difficult situation and essentially at the crossroads of my life.  As fate would have it, I was fortunate to meet Phil Kenner at that time.  He was well aware of my circumstances and out of kindness offered me a job on his construction crew despite my lack of skills.  This random act of kindness set into motion the chain of events that have helped save so many people.   Phil Kenner helped me at a time in my life that was critical.   He was generous, kind and always honest.  It is my opinion that he is a good man and is need of a helping hand at this point in his life.   I believe that given the opportunity he will once again return to his family and become a productive member of society.  I will be waiting to offer him my help in any way once he returns."*


**Christopher Hawkins letter...**
- *Hawkins was a former land manager at the Hawai'i project, later working in Cabo under Ken Jowdy for several years.*

  *"Pk called me one morning and told me that I needed to pack all of my stuff without telling anyone.  Pk bought me a ticket on the next flight out of Cabo to Phoenix.  When I landed in Arizona, Pk told to me he spoke to a cousin of Kens local muscle.   They told Pk they were going to kill me in Mexico and blame it on*

*a Pk drug deal at Pks house where I was living sometime.   I was safe and never went back there thanks to Pk… I got back to the U.S. safe thanks to Pk in 2008.*

*I witnessed a lot of terrible things that happened related because of Ken and the Mexico projects.   I do not know any person who did so much in my whole life to help me and my friends and his friends like pk. I met lots of these people in Hawaii and Cabo and Arizona and Las Vegas.   I know that Pk is someone who will never stop fighting.   He will never let people steal from his friends.   I hope you have seen all the good stuff in Pk and not just the lies about him from the NY Daily News friends of Kens.   I know the guys like John and Bryan knew everything about Ken and how he screwed us when I was with them in 2003 to 2009 a long long time.*

*I offered to testify for Pk at trial.  Pk said no.   He would not let me get harassed by the FBI who was working so hard to protect Kens people.  I experienced it myself for years.  Pk is like that to protect people he cares about.   Please be good to Pk.  Pk does not and has never cheated anyone.   I have been around his whole life since kids.    I know he wants to get out so he can fight to get the money back like he fought every day for me and his friends."*

## Kenner's fiancée Marlene Grissom…

*"This is probably the hardest thing that I have ever had to do.   The love of my life, my soul mate, and the man who has protected me and his children for as long as I have known him, was wrongfully taken away.   I apologize for how long this letter is, but you have one of the most amazing humans in front of you. His selfless character is 100% what any parent, lover, family or friend would beg to have in their life for one day.   So many have lost that, including me, in our lives every day.*

*Prior to that day, I lived with Phil for years and helped raise his children.  They are both without an amazing father who gave everything to them and never missed a single moment of their lives.   All children deserve a father who has their priorities straight like Phil.   Other kids wish they only got half as much from their dads.  During those years, I spent almost 24 hours a day with Phil while he worked on 3 things that consumed our lives other than the kids.   He was raising millions of dollars for brain cancer research, coaching three youth hockey teams and working to recover all of the money that Jowdy, Constantine, Kaiser and Berard stole from him and his clients.*

*With the fundraising, in addition to the millions I already helped him raise worldwide, just prior to his arrest, he signed a deal with Major League Baseball that would guarantee raising over 1 million dollars per month through their joint efforts.   That was more money than the top 3 brain cancer charities in the USA raise combined.   The 2 main brain cancer research facilities in Phoenix, AZ where we did so many visits to the kids suffering from terminal brain cancer, and the facility in San Francisco, CA would have received more funding in 2014 alone than ever before in the history of brain cancer research funding.   Not even the USA government funds more for the research.   All of that stopped the day that Galioto arrested Phil.  It disgusts me every time I think about the tens of thousands of children who have died since that day who could have received the benefits of Phil's amazing and relentless efforts.   That is over $40 million gone since he was arrested.*

*With the coaching, Phil's reputation amongst the kids he coached and their parents was priceless.   He was everyone's favorite "Coach PK".   Phil used to also coach free lessons for kids a few days a week from 5 in the morning until 7 before school.   He used to pay for the ice time for the kids whose parents could not afford the extra expenses.   I cannot tell you how many of the kids told me they wished Coach PK could be their dad.   It used to bring happy tears to my eyes every time.   I have not had one day of happy tears since he was taken from the people who need him.   I have only had the other kind.   The same compliments came from basically every parent. When we were in AZ, Phil hosted "Camp Kenner" for all of the kids to come to his house, train off-ice for a day of fun, and sleep over about once per month.   According to the parents, each time was the best memory of the year for their kids.   Even though dozens of kids sleeping over was overwhelming to me, the kids always acted like angels and followed every word from Phil.   Since his arrest, dozens of kids and parents have asked when "Coach PK" is coming back to coach again.  Before I left AZ, it made me sad every time to realize how much the kids who love "Coach PK" have lost.*

*Lastly, and certainly what defines Phil has a one-of-a-kind person, is his relentless pursuit of justice for his friends, clients, and especially former clients, who were misinformed and threatened by Galioto, Jowdy's attorneys, Kaiser and Berard for years.  I personally begged Phil to let them fight for themselves, especially after being scared for my own life in 2012 in Mexico with Phil.   I experienced the threatening world Phil has lived in for taking a stand against Galioto and Jowdy first hand to fight for his clients.   We were in Mexico for Phil*

*to meet with his attorneys and testify in the criminal cases for him, his Mexico investors, the Hawaii companies who loaned Jowdy millions and millions, his friends Jozef Stumpel and Mattias Norstrom, and others who were not repaid by Jowdy, either.   We also met with the former Mayor of Cabo who Jowdy tried to put in a Mexico jail to threaten him to give up his ownership in the Cabo airport, which Jowdy also stole from Phil and Jozef.   Jowdy's people wanted to put the former Mayor in jail and threaten or beat him like they did to Phil for over 3 days in 2010.  I saw the 2010 arrest document for Phil and Gun Trafficking charges filed by Galioto and Jowdy's attorneys in Mexico and the one for the former Mayor during the meeting.  I do not know how Phil survived that or cared to help anyone after that incident.   After our secret meetings in Cabo, we went to Phil's house, which he had not seen in two years since a different attempt to capture Phil when they beat his housekeeper badly.   Phil thought that Jowdy's people would have paid surveillance on his house in case he tried to return.   Phil was right.   We went to the security gate for Phil's compound, checked in and proceeded thru the gate towards the house.   We did not go to the house.  We passed right by it.     Instead, we drove to a point on a neighboring mountain in the subdivision and watched the house.  Less than 30 minutes passed when 3 big trucks entered the main gate of the subdivision and drove to Phil's house.   About 8-9 guys got out of the trucks in front of Phil's house and proceeded to jump the security wall of the house and climb up the 4 flights of stairs to the main living level where we could easily see them.   We watched them for about 15 minutes go all through the house, in and out of the different levels and rooms, and finally leave.   We immediately left the subdivision through the back exit in Phil's truck.   While leaving town, the local police spotted Phil's truck and pulled us over.   I was driving the truck and Phil climbed into the back seat and under the Mexican blankets in the truck and hid. The police approached the truck and demanded that I tell them where Phil was. They told me that they knew Phil was in Cabo.   They threatened me saying I should pray that I am not with Phil "when they capture him".   They said, "You will get what Phil is going to get".   They let me go about 10 minutes later.   I was shaking terribly.   It was near impossible to drive while crying so hard. They followed me to the attorney's office.   We were both scared to death.   They finally left me in the attorney's parking lot and Phil was able to go into the office.   After the last meetings with the attorney to testify that day, we took off and drove about 30 hours out of the country through the mountains.   I was never as scared as that trip in my whole life.  I begged Phil again to stop fighting these people for his friends and investors.     He told me that if he did not fight for them, Jowdy and Galioto would never let anyone recover the tens of millions that Phil proved to his clients that Jowdy stole with all of the Jowdy*

*company bank records.   Phil said that Jowdy would continue to steal from the projects until they had no assets left.   I guess Phil is still right about that.   The fact that Phil continued to fight for the same people who had long-since lost their appreciation is one of the things I love about him.   They tried to kill Phil 2 times in Mexico and hurt him badly in the Mexican jail beating him in solitary confinement for days without food or water.   Then they murdered Phil's attorney who saved him from the jail.   Who else would keep fighting for justice under these circumstances?   No one else I know, not even the people who Jowdy has stolen from.*

*Please consider all of the amazing qualities Phil has and that the world is a far better place with his heart and soul contributing to it out here with us.  I am sure that you have found out that he is a relentless fighter.  He is amazing.   He does not put up with injustices.   He just never quits.    That is an unique quality I hope he never loses even after this experience.  No one who has done so much selflessly for others should suffer as he has, forever ruining his reputation just because he refused to heed to the endless threats by Galioto and the Jowdy people since turning down their huge bribes since 2007 to stay safe and quiet.  Even today I know Phil would not go back and change his mind.   I love him for that.*

*Please have mercy on him for who he really is!  Even in the days when Phil was under the most duress from the Jowdy attorneys trying to arrest him from fraudulent court filings that Phil had dismissed and Berard threatening to have Phil killed, Phil gave everything he could physically to the kids at hockey, me, our charity efforts and his children.   As Jowdy, Berard, Kaiser and the FBI agent spread horrible rumors through the newspapers and directly to Phil's investors, whom he fought for, Phil only got stronger and fought harder for them.   I cannot fathom even today how he managed to do it.   Anyone less than a saint would have caved in years earlier to their calculated and evil ways.  Phil is needed out here by more than just me and his children.   He has been away from us for too long.  The world is less of a place without him in it.  Actually today I know that Jowdy has continued to rob all of the same people Phil began protecting and fighting for over a decade ago, just like when Phil began to fight against Jowdy when the FBI people and Jowdy tried to bribe Phil to stay quiet or suffer.*

*Your Honor, I hope that I am alive after all of this to thank you in person one day for seeing the real truths behind all of this.  I know one day in the future you will read about Phil and what he has done for the world to make it a better*

110

*place.   I know it will make you smile and realize what a beautiful and one-of-a kind person he really is.   There are not many ever or anywhere like him."*

**Blake Kenner's letter...**

- *Phil's son was 11-years-old when Kenner was arrested.*

*"My father, Phil Kenner is the best father in the world.   Although every good son would say that, I truly mean it.  He is one of the best role models, most intelligent, and best respected among his peers of anyone I have met in my 14 years on this planet.  The man I am speaking of is a beloved family member, friend, business partner, coach and mentor to hundreds of people, especially kids.  All of these people have had a gaping hole in their life, yet to be filled, since the day that person was taken away from us.*

*I remember the day when I was 7 years old when my sister and I received a call from him in Mexico.  He said he was sorry for not calling for a few days, telling us that the people who stole from us and his clients put him in a Mexico jail.  When he came home a few days later, my sister and I begged him to stop fighting these people in case the next thing they did was worse.   He promised us he would be more careful, but he could not just let people steal from us, his clients, and others that he cared about.  That was over 6 years ago. He never stopped until the day he was arrested in 2013.  Now that I am much older and can understand who and why he was fighting, I have nothing but admiration towards him, knowing what his enemies did to stop him from protecting the people he cared about.*

*Before my dad was arrested, he coached multiple youth hockey teams as far back as I can remember.   All of the kids always flocked to him as their favorite coach, almost wishing they could do a dad trade with me.*

*Can you imagine being taken away from your family and the ones you love for not giving up your possessions to the people who threaten you?  Imagine being robbed of your freedoms, rights, peace, privacy and possessions; everything you have worked hard for your whole life, taken away from you in the blink of an eye.   It not only wastes his time here on earth, but holds back everything he was doing for pediatric cancer research funding.*

*I know that if he could do it all over again, he would still not take their bribes and go along with them.   This is one of the main reasons I am proud to be his son and aspire to follow in his footsteps.  On top of all this, while dealing with*

111

*hundreds of people, my dad was working every day to raise money for charities, volunteering to coach kids sports, being a good role model, and spending as much time with my sister and I to always feel like a priority to him.  This is the life of a very important man who has been in front of you.  He is a valued member of society that did great things for others every day without seeking praise for his actions.*

*I am a young boy who not only needs his dad back, but our community needs the void he left behind years ago filled again.  I am blessed to have a dad I respect and aspire to be like when I grow up.  Please see all of my father's efforts to protect the people around him and fight for what is right instead of taking the easy path.  I cannot imagine many other people who would have fought this ten year fight.  Your Honor, I just want you to return him to me."*

**Haley Kenner's letter...**

- *Phil's daughter was 14-years-old when Kenner was arrested.*

*"My dad is the most important person in my life, and there is no question in my voice when I say that.  He is the reason I am who I am today; the reason I fight for what I believe is right; the reason I do not give up on the truth; the reason I do not do wrong even though it may be the easier path.  My dad taught me my whole life to do good and be good and continues to inspire me every day to be an even better and stronger person than I was yesterday.   He is the reason I believe everything will be okay one day.   He is the reason I fight for what is right every day no matter how hard it may be.   Even having lost his freedom...he continues to inspire me and be my whole world from 2500 miles away.*

*It takes a certain type of person to be able to endure the poor conditions he is forced to live in and still go about every day with honesty and integrity, even though if he had just given those up, he could possibly be here with me right now.   The only worse than how much I miss him is how much he misses me.*

*It is not fair to me and my little brother to have these most important moments in our lives stolen from us simply because our father is a good man and refused to work with corrupt people or admit he did something he didn't do and really would not and could not ever do because of who he is.*

*I will reiterate again to you again that my father is my entire world, and I*

112

*actually need him to be in my world.   My father will continue to fight until the truth prevails, but I don't have his strength.   My brother and I have lost a father, his fiancée has lost the love of her life, my grandma has lost her son, many have lost a friend, colleague, the greatest hockey coach they ever had, but most of all we have all lost an inspiration, and where there once was is a hole in all of our hearts.  The impact he has had on everyone in his life and continues to have on me every day is more than he will ever know and I hope that somewhere in this letter you have gotten even a little glimpse of the man I am forever proud to call my father."*

**Kim Garret's letter...**

- *Kim is a former 20-year law enforcement officer who worked intimately with Kenner on multiple cancer fundraising efforts for years before the Kenner arrest...*

  *"In closing, I would just like to state that Phil Kenner is someone I would not hesitate to partner with on any charity or business project and I am looking forward to working with him again in the very near future.   As a member of Law Enforcement I can and, have seen how things get interpreted or mis interpreted by individuals who have their own agendas for what ever reason.  And I believe this to be the case in Phil Kenner's matter."*

**Kathy Martin's letter...**

- *Kenner's mother...*

  *"Phil has been a wonderful son since the first time I experienced his personality and individualism.  He has always been an independent person.  When other kids his age were out playing, he was working 7 days a week at the local golf course, taking lawn mowing jobs in the summer and snowblowing and shoveling jobs in the winter, apart from school, to make money and pay for things he needed as a teenager.  I have always been proud of his work ambition and desire to take care of others, actually in lieu of his better interests some of the time, unselfishly.*

  *Through his adult life, I always think of how proud I have remained of his unselfishness for friends, family and clients.   He has faced some unbelievable obstacles in his working career, while building the largest Sports and Entertainment management business in the world by the time he was 33.   I could not have been more proud.*

  *Below are some of the memories that truly stand out for me.*

113

*In 2002, Phil had become one of the top business managers in the world according to Money Magazine.  He worked for a giant, publically traded company out of California.   He called me, after his father died at the age of 51, to inform me that he was going to file a lawsuit in California against his firm for stealing money from his clients and other managers in his firm.  No one else at the firm would stand up to protect his clients, but he did.  He endured over one year of stressful litigation spending over $1 million in legal fees, versus a billion dollar, public firm who tried to destroy him and his career through a series of unscrupulous legal maneuvers.  Ultimately, after walking away from over $3 million in bonuses due to him and fighting for what was right, he prevailed and protected his clients.*

*I am proud of my son who chose to loan millions of dollars of his own money, due to his amazing work ethic and subsequent business successes, when he was financially capable of doing so.   Some of these people he helped substantially are people who testified against hi in his trial...One of these people caused me personal financial loss because of his unethical business dealings.*

*The millions Phil spent on litigation in Mexico and the USA to go after people who stole from him and his clients were a financial burden he did not need to take on everyone's behalf, but he did.  That is the kind of selfless person he is and I am proud of him for that.  I am sure some people see selflessness as a fault of personality.   I am proud of who he is and his moral compass, even in the face of issues he went through to protect his clients and investors.  He was thrown in a Mexican prison to deter him from pursuing proper justice in that country.  These are characteristics you hope for when you raise a child.  Phil has them.  I will forever love him as a mother, but I believe it may be a rarity to also admire someone so close to you as a parent.*

*Phil has spent his life echoing the values that I, as a parent, instilled in him since he was young.  I know that he chose to fight again in 2007 against his partner in Mexico who had stolen millions from him personally and his clients.  It is in his nature to fight and protect the people around him at any cost.  If this fight is the toughest of his life, I know in my heart, that he will always be on the side of good.  For this, I will always be a proud mother.*

*Please have mercy on my son.   There is so much more to the story of Phil's life and what he has done, including spending the majority of his time the last few years before he was arrested raising money for brain cancer research as his*

114

*main day-to-day volunteer work.  The world is a better place with him in it…"*

**Timothy Dundon's letter…**

- *Tim is another long-term friend of Kenner's.*

  *"I am a friend of Phil Kenner's for my whole life.  We grew up in Buffalo.  We have been through a lot together.   We lost our best friend when we were young in a car accident.   I do not think PK or I ever recovered from this.*

  *There are a lot of things that I know about PK.   The one thing I know for sure is that he would never cheat anyone.  He is exactly the opposite.  He is the type of person that if you left him with a million dollars in cash he would have it when you got back no matter how long or ever until you returned.   There is no way he would ever steal or defraud people.   He does not have it in him.   But I will tell you that he does have fight in him like no one I ever saw before.*

  *PK used to spend a lot of time with me before he was arrested.   Whenever I needed any kind of help he was there for me.   He helped me save my business when I was in big trouble once.   Being your own boss is good and bad.   When things are bad because business is slow it can be really bad.   PK sent me a lot of money to make sure I never missed a beat.  I didn't thanks to him.    I heard from many of our friends that he did the same for them since we were kids.*

  *I cannot wait for him to get out of that situation and forget about the people who did this to him and back to the people who love him and really know him like me.   I will be waiting to do anything I can to help him get started again without the other people in his life.   I know that fighting with them and everyone hearing wrong FBI claims about him and his character in the New York papers wore PK out.   Near the end in 2013 when he said things were finally going to be good again because the Mexico courts were arresting the FBI people and other people who robbed him and his friends he looked relieved.  He deserved it especially after getting beaten in a Mexican jail for fighting against the real thieves.  He is lucky he did not die.   I can't imagine if he did for just fighting for what's right like I told you.  I was so happy for him then because I know he would feel the same way for me.   He always did.  They had to stop him like they did.  It was the only way and it wasn't right.  You cannot take the Great Spirit and soul away from him.   He is one of a kind.   I hope he gets back to helping kids soon.   He is awesome at hockey since we were kids and better at teaching little kids about the greatest sport in the world.   Everyone where we*

*grew up knew him from hockey but he was never a jerk to anyone.   Other people who received the notoriety he did turned into bad people towards others.   PK seemed to become a better friend and person from it.   I hope he writes a book about all of this one day.   People will be amazed at the kind of person he really is and how he fights.   Maybe hockey taught him that.   I asked him to several times and said I would help but he is still too humble to do it.*

*I am proud to be called one of his friends.   Anyone would be.   One of our childhood friends worked in Hawai'i and Mexico with PK and the people who stole from him and lied about it.   I have heard all of the real stories from him also.   I am disgusted about it all.*

*I ask if you can think about all of the things PK did for me, other friends of ours, kids, and people he hardly knew raising tons of money for brain cancer research, when you think about sentencing him.   He belongs here with me, his fiance, his kids who have been away from him for years, and our community. We need and want him back where he should be."*

**Fellow inmate Eric Aaronson's letter…**

*"I have had serious bouts with depression.  I have had times where I could not see any light at the end of the tunnel for myself.   One day, not knowing Mr. Kenner, he came over to me and asked if everything was alright.  I was at what I considered my rock bottom and for some reason, Phil took the time to take me to his cell, and spent over 3 hours with me…All of my problems were miniscule in comparison to what Philip has had to deal with and made me realize where I am in life.  I feel if it were not for his intervention, I do not know where I would be today.  He has given me the opportunity to see the light at the end of the tunnel and realize it is not a freight train headed my way.  I can only say that this man has changed my life for the positive and has given me hope.*

*I could only ask Your Honor to take into consideration leniency on Mr. Kenner since I have had the chance to meet a person who has inspired me to go on…He has had a tremendous impact on my life in a positive way.  The longer he stays incarcerated the less time he has making an impact on others in the way he has on me; showing others hope and life can be great no matter how bad it may be at the moment.  He is someone I will always have respect for since I will now be here for my family [be]cause of him."*

116

**Kenner's Friends And Companies In Dire Straits...**

When Kenner's friends/clients [Gaarn, Kaiser, Constantine, Berard, Kaiser, Sydor, Moreau, Nolan, etcetera] were running out of money – they came to Kenner for personal loans.  Kenner never turned down any of them (in evidence).

When the corporate investments were short of money (Eufora, Hawai'i partners, GSF, TDA, etcetera) Kenner was the person they asked for personal loans to bail them out – and again Kenner never turned them down (in evidence).

When "issues" were discovered in the various investments – Kenner bore the massive and initial financial burden(s) to hire attorneys and pursue mediated solutions for years (Jowdy, Lehman Brothers, Eufora, Impact, Los Frailes, etcetera) – never turning them down (in evidence).

**Kenner's Contributions To Fellow Inmates During His Incarceration At MDC...**

Although the facility pays inmates to teach others, Kenner created several teaching curriculums at MDC for betterment of his fellow inmates as a volunteer.

**Introduction to Finance...**
Kenner taught "Introduction to Finance" classes, which started as an institutional class to dozens of inmates.   As intimidation towards Kenner, one (1) of the staff officers removed all of Kenner's teaching materials (given to him by the education facility staff) from his cell.   Kenner was forced to complete that particular teaching session with materials replaced by Kenner alone, after other staff backed-up the officer who destroyed the teaching materials intended for the inmate program. Kenner taught two (2) more years of classes (8 classes in all) to the inmates in transit thru MDC.

**Spanish GED...**
Kenner voluntarily taught three (3) sessions of GED preparation to 14 Spanish inmates.   They could not get a class sanctioned by the facility, so Kenner received the materials from the facility library and conducted the 6-week preparation courses for the Spanish-only inmates.   Each of the inmates were planning to take their GED exams when they arrived at their designated prisons after leaving MDC.

**English GED...**
Kenner voluntarily taught four (4) sessions of GED preparation to 18 English

inmates.   They could not get a class sanctioned by the facility, so Kenner received the materials from the facility library and conducted the 6-week preparation courses for the English-only inmates.   Each of the inmates were planning to take their GED exams when they arrived at their designated prisons after leaving MDC.

**Yoga instructor…**

Kenner has taught four (4) years of yoga classes to over 100 inmates during his time at MDC.   He studied yoga for nearly a decade prior to his incarceration at MDC.   As a result of the high-stress and violent conditions at MDC, there were never enough spaces in the classes for all of the desired applicants.   Kenner ran the yoga sessions 3-4 days per week.   They were interrupted by staff who threatened to place Kenner in the SHU for "organizing gang activity".   The yoga sessions were temporarily interrupted until the offending officers were changed to other "safety" posts for the institution.

- At Kenner's prior private detention center, Kenner initiated a daily (Monday thru Friday) yoga program for the inmates.  Kenner's program ran in concert with the head health administrator at the facility for nearly a year before Kenner's departure from the facility.

**Workout trainer…**

Kenner has taught four (4) years of fitness classes to over 150 inmates during his time at MDC.   He has provided individual classes on fitness and nutrition as well as 6 day per week group training.   The "group" training have been interrupted by staff who threatened to place Kenner in the SHU for "organizing gang activity".   Immediately following each "incident", the group training sessions were temporarily interrupted until the offending officers were changed to other "safety" posts for the institution.

**Basic Timeline Of Events As Kenner Continues To Defend His Investors Despite Jowdy's Team Threats To Stop…**

**2006**
- Kenner discovers Jowdy's intentions to steal or continue stealing from every project involving Kenner and Kenner investors.
- Kenner alerts his investors and begins moderated negotiations.

**2007**
- Kenner turns down FBI protections and Lehman Brothers money bribe from Jowdy and Najam in Cabo san Lucas meeting at Kenner's home.

118

**2008**
- Kenner slandered and denigrated by NY Daily News – thru Harvey and Jowdy's friend/writer, Michael O'Keefe.
- Kenner sued by Jowdy friendly investors for money "Jowdy stole" (with Harvey's coercion as co-counsel for the "bad apples").

**2009**
- Kenner placed under SDNY Grand Jury one (1) week after Kenner's June 24, 2009 FBI, SEC and AUSA proffer about the Jowdy criminal discoveries.
- Kenner accounts and 20-year business relationships subpoenaed repeatedly by the FBI case agent who Kenner proffered to – terminating all relationships and weakening Kenner's efforts versus Jowdy's cabal.
- Kenner systematically abused in the legal process by Jowdy's attorneys, threatening FBI led jail time thru documented extortions (since April 2009 – *Bates stamp: ED-0003068-69*) [*Ex.32*].
  - The main extortion claim was that Kenner was "lying" about the Jowdy loans – which Harvey himself submitted and verified to the AUSA/FBI allegedly three (3) weeks after the Kenner 2015 verdict (*government-forfeiture-44*).
  - *Kenner lived under constant stress since the 2009 Jowdy threats.*

**2010**
- Kenner placed on Mexico top-10 "most wanted" list for gun trafficking and money laundering – signed off by FBI agents and attested to by "bad apples" attorney.
- <mark>Kenner bagged and beaten in a Mexico jail while demanded to sign and relinquish all Jowdy-related holdings</mark>, *for 3 ½ days near death.*
- Kenner forced to deal with newfound banking restrictions because Jowdy and his attorneys tell the FBI (*See 3500-KJ-2 at 22*) that Kenner's 2007 California beach house project was "fraudulent" – with Jowdy having zero connection or knowledge about it.
  - This lie to the FBI terminated Kenner's banking relationships of two (2) decades with Wells Fargo institutional lending.
- Kenner travels under Mexico federal protection to pursue criminal lawsuits for investors versus Jowdy in Mexico.
- <mark>Kenner and investors' attorney murdered in Mexico.</mark>
- Kenner suffers long-term cognitive degeneration from Mexico jailhouse beatings (a.k.a. **CTE**).

- Kenner placed on USA banking restriction lists – unable to wire transfer money from USA to Mexico to pay for Mexico litigation – due to FBI intervention.
- Kenner forced to carry cash to Mexico to pay attorneys – and enter Mexico on foot to avoid Jowdy's paid-off people detecting Kenner's entry into the country (for safety).

**2012**
- Kenner forced to deal with FBI – Kaiser and Berard frauds that Kenner was caught forging checks and burning down the house of his then-Hawaiian girlfriend – neither of which was true (*See Kenner's 28 U.S.C. 2255 at 137-139; Document 675*).
- Kaiser and Berard fraudulently convey title to Kenner's Arizona renovation project – a.k.a. stealing – but not when protected by the FBI and Jowdy's cabal.
- Kenner prohibited from Western Union to pay Mexico attorneys – due to FBI intervention.
- Kenner told by Kaiser and Berard to sign over all joint real estate projects to them or Kenner would go to jail by Jowdy – now with their help.

**2013**
- Kenner sets up Baja California Sur Supreme Court testimony for Kenner and Kenner investors in October 2013 (for December 2013 testimony) thru new Mexico and USA attorneys.
- Government vehicles and helicopters follow Kenner consistently for years leading up to Kenner's arrest (November 2013).

**2014-15**
- Kenner assists Hawai'i-Mexico investors with 2015 litigation in Mexico City Federal Courts versus Jowdy to recover investments and loans.
- Kenner acquaintance arrested by FBI case agent and one (1) other FBI agent to stop Mexico legal efforts versus Jowdy.
- Kenner recorded in 2015 "murder-for-hire" attempt while in federal custody just prior to trial.
  - *Kenner's trial attorney refuses to alert the Court about the suspicious inmate*.
- Kenner trial counsel threatened by the FBI to "back off" the Kenner defense work several times prior to trial.
- Kenner begs trial attorney to raise the issues with the Court – or recuse himself.
  - *Trial counsel refuses*.

**Post-trial (2015 to present)**

- Kenner proves 100% of the money – as asserted to the FBI on June 24, 2009 – was stolen by Jowdy thru government possessed banking records and corroborated by the government's own forensic accounting (*government-forfeiture-36 and government-forfeiture-44*).

- Kenner investors confirm to Kenner that the FBI case agent continues his ruse that "*Kenner stole all of your money*" and "*that is what he was found guilty of*"…

- Kenner investors' attorney (Steve Main in Florida) distributes from FBI confirmations that "*Jowdy is not a guilty person*" after thorough investigations from the SEC, FBI and U.S. attorneys office – with no connections to the case other than FBI case agent Galioto.
  - Attorney Main's statement contradicts thousands of pages of real evidence in the government's possession -- and in front of the Court at this time (*See Document 667*).   Nevertheless, the 2017 positive confirmation by the attorney has significant ramifications on the trial verdict confidence, and the subsequent settlement arrangement that many of the investors signed off with Jowdy after the February 20, 2017 mis-informed declaration:

    [Attorney Steve Main]:  "*Finally for those of you who are convinced that Jowdy is guilty of some crime… I simply note that the circumstances surrounding the Diamante del Mar project and the Cabo project (and the relationship between Kenner and Jowdy) has been exhaustively investigated over several years by the FBI, SEC and the U.S. Attorney of the EDNY.*"

As the Court is aware, AUSA O'Connell wholeheartedly refuted this misleading pronouncement to the investors during open court on May 14, 2019 during Q&A (*See May 14, 2019 hearing transcripts at 37*):

> **The Court***: Are you concerned with how the property is being managed at this point, I mean just in terms of maintaining status quo?*
>
> **AUSA O'Connell:**  *Your Honor, the government does have certain concerns that its being run by* ==**_Jowdy, who is someone that the government feels is an unindicted co-conspirator_**==*.*

- The Jowdy thefts (disconnected from Kenner) were corroborated by the government post-trial after viciously attacking Kenner throughout trial calling Kenner a liar "*about everything*" – *government-forfeiture-44.*

- The government has attempted to re-create a "fake nexus" post trial to forfeiture Kenner's Mexico investment LLC – with no "ill gotten gains" or "tainted" funds traceable to the LLC.  *Government-forfeiture-36* proves it...

  - The government continues to ignore their-own submission – to the financial detriment of the courts and the 6000 other Mexico investors.

- Kenner is told thru U.S. Attorney back channels that Jowdy is untouchable (a.k.a. "hands off" and "powerful") and the U.S. attorneys are afraid of his "connections".

- The government continues their ruse on the Court with no nexus to anything Kenner related to the desired forfeiture.

- Jowdy is proven as a criminal by Kenner – with government evidence (*See Document 667*).   That is indisputable – but instead – the government is trying to force the Court to ignore the Constitution and create a forfeiture of Mexico property to cover for their 25 million of prosecutorial expenses since 2007 of Kenner.

- Jowdy called a co-conspirator post-trial by the government (contradicting the Probation Office's 2016 "Jowdy victim" language – without being charged -- after being referred to as a Kenner victim thru trial).
  - Jowdy 2016 declaration (*Document 611-1*) claims that Kenner has tortured Jowdy emotionally and business-wise – according to Jowdy -- due to the unsubstantiated claims of Jowdy's criminal activity.

  [Ken Jowdy]: "*I firmly believe, however, the biggest challenge that I have had to overcome has been the nearly decade-long campaign orchestrated by the defendant, Philip Kenner and his clients and associates, to unfairly malign me, sue me, and wrongfully accuse me of improper conduct, ranging from mismanagement of the project to various unfounded criminal and civil complaints.*"

- Kenner submitted *Document 667* – "**The Jowdy Hoax**" – to quell all Jowdy attorney advocacies and anyone living in a fairy tale world...

- It should be a must read for any investor who followed Attorney Steve Main's blind-lead from the misinformation campaign perpetuated by FBI Agent Galioto...

**Today...**

Kenner lives at MDC under constant stress from government threats.  Forensic accounting proves there is no money missing.   There is 100% provable suborned perjury by willing government witnesses, some who were working for Jowdy at the time &/or being paid by him (Kaiser, Berard, Nolan, Juneau).   Or – lastly, Galioto and the Jowdy cabal, thus misinformed investors who don't know the truths, under the assumption that "*Kenner stole your Hawai'i money and never gave it to Jowdy*" (*See Kristen Peca 2012 FBI recordings, supra*)...

==**The Nature and Circumstances of the Offense Conduct...**==

Certain issues that are, in our judgment, relevant for sentencing are hi-lighted in Kenner's final PSR objections to this Court, dated March 27, 2019.[45]

At this point, Kenner seeks to focus the Court on important mitigating factors that separate this case from nearly all other fraud cases, namely that Kenner worked tirelessly, at near-death personal risk, to ensure his investors profited from their investment -- and that he did _not_ use investor funds to support his personal lifestyle.

Kenner's inclusive forensic analysis of the three (3) "objects" of the conspiracy and their resulting assets confirm to this Court with empirical evidence produced by the government, itself, that there is _no loss_; merely uncollected assets of the various companies (completely out of Kenner's control).

---

[45] Kenner submitted lengthy objections to the various Presentence Investigation Report and addendums and filed his submissions stating his position on Forfeiture and Loss.

Probation chose not to consider these objections—opting instead to defer to the government regarding any objections to factual information, as the government informed Kenner that the PSR is accurate, and was either proven beyond a reasonable doubt at trial or can be proven by a preponderance of evidence.
  o   Kenner is somewhat dismayed that Probation in this case has chosen to simply defer to the prosecution instead of fulfilling its role as a "neutral gatherer of information."

See *Agudelo v. United States*, 724 F. Supp. 1110, 1111 (E.D.N.Y. 1989) ("A federal probation officer is an arm of the court and not an agent of the government qua prosecutor. The probation officer's role in the sentencing process is not an adversarial one. Rather, he acts as a neutral gatherer of information from many sources to be used by the judge in imposing sentence.").  Despite the fact that Probation did not consider Kenner's information, Kenner still rely on these specific objections which he also submitted to the Court and will not revisit these objections herein.

The record is replete with confirmations that thru the date of trial that Kenner continued to assist his investors recover "stolen" funds from Jowdy in Mexico (until the FBI arrested another person for obstruction of justice – while helping the Kenner investors).

In a contemporaneous case in Arizona (*Bates stamp: BINDER-000462-471*) [Ex.39], Kenner continued to assist five (5) of his investors [Ranford, Sydor, Nash, Khristich and Lehtinen] recover funds stolen by Bryan Berard and John Kaiser in a 2012 Arizona title fraud case.   The Court should note that FBI agent Galioto is noted in the Berard 2014 Arizona deposition to be assisting and directing Berard's testimony in the concurrent, yet unrelated matter.  In an EDNY matter (Sag Harbor), Kenner was also assisting 9-11 first-responder, Vincent Tesoriero, attempt thru 2013 Arizona litigation, recover more funds that John Kaiser and Bryan Berard "stole" from Tesoriero and Kenner in the Long Island real estate project, by filing *forged* and *fabricated* documents in the EDNY (*Bates stamp: BINDER-0000450-452*) [Ex.26]. Unfortunately for Tesoriero and Kenner (*3500-VT-1-r*), the case was forced into dismissal by Kenner's detention at the cooperative hands of the two (2) perpetrators, under Galioto's guidance.

==Hawai'i Partners Investor Gains (Realized And Unrealized)...==

- *Net value of Little Isle 4 investment:*

| Hawai'i | Equity % of Little Isle 4 | Hawai'i LOC Investment | Approximate Value (incl. Jowdy loan) | Bond interest earned | 2015 Testified recovery amount | Net value of Little Isle 4 investment |
|---|---|---|---|---|---|---|
| Nolan | 18.102[46] | 2,198,910 | 3,502,651 | 592,878 | 500,000 | 4,595,529 |
| Peca | 10.37 | 1,794,392 | 2,560,386 | 300,052 | 600,000 | 3,460,438 |
| Berard | 6.36 | *649,405* | 1,119,195 | 129,314 | 300,000 | 1,548,509 |
| Sydor | 7.85 | 856,200 | 1,436,051 | 249,215 | ? | 1,685,266 |
| Rucchin | 6.82 | 1,010,645 | 1,514,413 | 210,113 | ? | 1,724,526 |
| Juneau [47] | 0 | 0 | 0 | 120,000 | | 120,000 earned |

---

[46] Nolan increased his Little Isle 4 ownership from 13.44% to 18.102% after his buyout of Joe Juneau's Little Isle 4 equity [*Bates stamp: NOLAN00005044 -- produced by Nolan in his 2009 arbitration*].

| Hawai'i | Equity % of Little Isle 4 | Hawai'i LOC Investment | Approximate Value (incl. Jowdy loan) | Bond interest earned | 2015 Testified recovery amount | Net value of Little Isle 4 investment |
|---|---|---|---|---|---|---|
| Totals: | | 6,809,552 | 10,132,696 | 1,601,572 | 1,400,000 | 13,134,268 |

These realized and unrealized gains cannot be overlooked when considering the "no loss" element of the Hawai'i partners' investments.   The Court cannot overlook that Kenner, at tremendous personal safety risks, had been scheduled to complete his State Supreme Court testimony in Mexico (December 2013) only weeks after the fortuitous arrest by the FBI in November 2013.

As the record shows, Kenner and Mexico counsel had secured a Mexico private equity firm in 2013 to acquire a $20 million stake in the Cabo san Lucas property once Kenner was granted control of the property by the Supreme Court.   Another Kenner Hawai'i-Mexico investor was present during the initial meetings with the Supreme Court justices (in chambers) and was on the schedule to corroborate the decade-plus of frauds against himself, Kenner and the other Kenner investors by Ken Jowdy and his cabal; _including at the time, John Kaiser and Bryan Berard_.

The Court should note that, while under federal protection in Mexico, Kenner was able to secure the _full return_ of the investors' investment funds from the various Jowdy criminal schemes (_See Document 667_).   Yet, all of this came to another crashing halt when Jowdy, Kaiser and Berard assisted FBI agent Galioto in securing the timely Kenner detainment in November 2013.

**Kristen Peca Fraudulently Assists In The Conspiracy Theory Attack On Kenner With Incremental False Testimony...**

The Court should note that Kristen Peca fabricated a story about Kenner "_hiding in a cave_" in Mexico (_Tr.712-713_); wholly conflating Kenner's jailhouse beatings (admitted to on her 2012 FBI recordings of Kenner, _infra_) and Kenner's repeated Mexico testimonial appearances under Mexico federal protection versus Jowdy to recover the tens of millions his cabal pilfered.   Kristen Peca surreptitious 2012 FBI recordings of Kenner:

---

[47] Juneau was completely bought out of his Hawai'i investment in 2007 by Owen Nolan at Juneau's request [_Bates stamp: NOLAN00005044 -- produced by Nolan in his 2009 arbitration_] – _without loss or consequence_ – with Juneau receiving an approximate $**120,000 tax-free interest profit** during the period of time he maintained a Northern Trust bond account as collateral for his LOC investment.

*Kristen Peca – I guess – I mean Michael was the one who agreed to all of that [investment] stuff because I really do not understand it.  That is the business between you two — not me.   If the bank accounts show Jowdy got the money from Hawai'i – well -- then why are the FBI guys saying you stole it all...I just don't understand...why would they lie if you did not take the money?*

*Kenner – to protect Jowdy maybe??*

*Kristen Peca – just because that director person you said is his attorney?*

*Kenner – Kristen – please – are you really asking me that after all of the lies you have heard from Bryan – John – and that matt guy who refuses to meet with me and review the evidence?   Why would they have beaten me in Mexico in that jail if I had the money?*

*Kristen Peca – this is too scary.   I told you that when we heard from – I don't remember who –*

*Kenner – I did not tell you...*

*Kristen Peca – maybe that golf guy [Gaudet] told Michael about you being in jail and them hurting you and the attorney getting killed.  It is too scary.  Michael and I cant thank you enough for keeping the fight going after the jail thing and the attorney but -- I just want this to be over no matter what it takes.  I know how mad Michael and the other guys are with Jowdy for not paying the loans back.   Who does that??*

*Kenner – a protected criminal – that's who.*

How does the government assist in the fabrication of the "*hiding in a cave in Mexico*" testimony and let it stand?   Perhaps, it plays into the grander cover-up of the outrageous Jowdy cabal protectionism, and the "crazier" Kenner appears to the jury, the less the jury would believe that Kenner was being truthful about the real Jowdy loans (*government-forfeiture-44*) and the "untainted" acquisition of the Cabo san Lucas equity (thru Baja Ventures 2006) (*government-forfeiture-36*).

But – the government proved Kenner's case and is not re-tracing their dishonest prosecutorial themes for the Court post-trial.

126

## ANALYSIS – 3553(a) factors

### The Law Permits A Below Guideline Sentence…

- *For a myriad of reasons discussed infra, Kenner is requesting the Court consider a downward departure from its determined guideline range to time-served with one (1) year supervised release.*

The Court is aware that Kenner has submitted a thorough objection to the PSR's analysis of monetary loss and enhancements.   The government has not put forth any reasonable argument to support the PSR's request for any of the 12-enhancement points (merely conclusory allegations) or the 22-point monetary enhancement (the majority of which are unrelated to the alleged superseding indictment victims and their "*memory loss*" issues); in contradiction to any real loss or proven intended loss (with all remaining assets, *real*, and titled in the investors' names and control at all times; never dissipated by Kenner for his benefit or "ill-gotten-gains").

The Pre-sentence Investigation Report calculates an advisory guideline range of 324-405 months (27 to 33.75 years) imprisonment, based on a total offense level of 41 and a Criminal History Category of I.   This extremely high sentence range is largely a result of the enhancement under § 2B1.1 corresponding to the purported "gain resulting from the offense" (over $25 million).   In this case, the PSR has failed to substantiate by any standard that Kenner obtained, received or even benefitted from the alleged conspiratorial transactions; short of Kenner's repayment of less than $300,000 of real, loan repayments from co-defendant Constantine ($117,000) and a non-defendant (and non co-conspirator) Tim Gaarn of $162,500; totaling $**279,500**.   Twenty-two (22) enhancement points are added to Kenner's 7-point base level offense.   This gain calculation is deeply flawed because, as set forth *in Kenner's PSR objections of March 27, 2019*, it relies on an estimation of losses for people who were *never* alleged as victims in the superseding indictment; specifically several active partners of Kenner's in opposition to the government's 10-year case versus Kenner.

- As an example, the funds involved in the 2004-05 Constantine consulting payments of $1,000,900 (*Petrellese Tr.3934*) *do not originate* thru any victim in the instant case.   The charged portion of the conspiracy has no nexus to any victim and is plainly erroneous.   The government continues to ignore this critical issue, *hoping the Court will miss it in their-own calculations*.

Kenner's Baja Ventures 2006 partner, Jozef Stumpel wrote to this Court:

*"I have been called many times by the FBI about Phil.   Each time they left messages or told me stories about things I knew were not true.   Bryan Berard makes the same crazy calls about Phil to me.   I know he works for Jowdy so I don't expect anything else from Berard.   I have all of the paperwork I ever requested from Phil showing me that Jowdy directly received all the money I decided to invest or loan with him.  It is what I always knew.   The only thing I do not have is the money I invested or loaned to Jowdy just like Phil and several of my other former teammates and friends."*

*"I signed paperwork in Mexico for my Mexico attorney to sue Jowdy for the 1.6 million he stole from me. I signed paperwork for the Arizona attorney to sue Jowdy for the Hawaii loans.   I signed paperwork for the California attorney to sue Jowdy for the loans and other money he stole from all of us.   I know all of this but the FBI law people have not helped us.   They only protect Jowdy from paying us the money."*

*"I am an investor in the Hawaii project that also loaned money to Jowdy.  We all decided to do it as a group.   I talked to Phil and other friends about it when we agreed on conference calls.   I signed an affidavit in 2009 for Phil confirming everything I knew about my investments when he was in a lawsuit with Owen Nolan."*

The specific 12-enhancement points are addressed at length in *Kenner's March 27, 2019 PSR objections*.  <u>Kenner will not rehash the arguments herein</u>.   The government has failed to document where Kenner is responsible to any of the extra enhancements (other than more conclusory allegations).  Perhaps it is simply unsubstantiated malice for Kenner's desire to defend his Constitutional rights and not just give up as he was instructed to do by counsel on several occasions.

At the time of Kenner's sentencing memo submission, the Court has yet to address the specific issues raised by Kenner in the PSR objections.   Kenner and several of Kenner's legal advocates have opined that the excessive enhancement requests and the monetary enhancement (with virtually all of the funds being delivered to a non-party in the instant case [Ken Jowdy])[48] are simply egregious punishment for

---

[48] The Court should also note that the Eufora "object" of the conspiracy included stock sold by a non-party to the instant case, Tim Gaarn (*Tr.2563-64*).   His private stock, proven at trial to belong to Gaarn, not Kenner (*Kenner trial exhibit 80*) – in contradiction to the government's false proffers and lies by the government that the Eufora stock belonged to Kenner (*Tr.2173, 5970, 5973-74*) – and only represents $250,000 in sales; not Gaarn's $700,000 in total <u>with $450,000 sold by Gaarn to non-victims of the superseding indictment</u>.

Kenner because of:
1) Kenner refusing to kowtow to Jowdy's cabal and accept the FBI protection in 2007 when Kenner first whistle-blew on the Jowdy crimes to the investors,
2) Kenner's full disclosure proffer to the current FBI case agent on June 24, 2009 about all of the same Jowdy crimes the government documented -- but only post-trial -- to maintain their "*Kenner stole all of your money to buy his piece of the Cabo project*" theme thru jury deliberations –
   a. Now empirically disproven by themselves...the government *ignores* the exculpatory evidence order to keep their conviction, despite lacking confidence – and
3) Kenner not going away quietly after the 2010 Mexico jailhouse beatings, the murder of his Mexico investors' attorney, and the 2015 trial conviction...

---

- The Eufora operating agreement and multi-year tax records also confirm Gaarn's ownership since 2005, *not Kenner*.

Gaarn told the 2015 trial Court (*Tr.2503-04*): *"I've not been accused of committing any crime. As long as I come on to the stand and I tell the truth, I will have no issues. If I say something where when I'm on the stand that I could get in trouble for at the time, I could be prosecuted."*
- Post trial – Gaarn was not prosecuted.

Gaarn continued (*Tr.2563-64*):
> *Q Let me ask you this. As you sit here today, sir, to your knowledge, and your belief, you have not committed any crime, isn't that true?*
>
> **A [Gaarn]: True.**
>
> *Q In other words, you are not viewed in your mind as of, let's say, conspiring with Phil Kenner to commit a crime, and by that I mean the two of you form an objective to commit a criminal act.* **There was never any meeting of the minds between you and Kenner** *for that purpose, true?*
>
> > *MR. MISKIEWICZ: Objection.*
> > *THE COURT: I'll let him answer that. You can answer that.*
>
> **A [Gaarn]: Correct.**
> *Q As a matter of fact, sir, when you went to the FBI on two occasions to meet with the FBI, you didn't go with a lawyer, did you?*
>
> *A [Gaarn]: No.*
>
> *Q And you didn't go with a lawyer because you knew in your own mind you had committed no criminal act, correct?*
>
> **A [Gaarn]: Correct.**

129

❖ Kenner has been told that Jowdy's cabal and his "pay-for-play" protection fear that once Kenner is released from detention, the cover-ups and secrets they have kept from the investors, the DOJ, and the public (about Jowdy's RICO activities of over a decade) will be fully exposed and the criminal "cover-ups" may be exposed higher up than Jowdy himself...

**Probation's Pre-Sentence Report Contains The Following Guidelines Analysis...**

Kenner has no prior criminal history; therefore his criminal history level for purposes of the Sentencing Guidelines is a Category I. The advisory Guidelines range associated with an adjusted offense level of 41 for an individual with a criminal history Category I is 324-405 months of imprisonment.   Kenner objects to this Guidelines analysis and has filed formal objections with the Probation and this Court (*See Kenner's supplemental objections of March 27, 2019*).    Although we will not cite these objections in this Sentencing Memorandum, we incorporate the objections by reference.

• The Second Circuit Appellate Court ruled on December 1, 2016 (*United States v. Algahaim*, 2016 BL 399171, 2d Cir, No. 15-2069) that enterprising white-collar defendants should apply the ruling and argue for leniency in fraud prosecutions where the client's guideline ranges were significantly increased by the loss enhancement.   "Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that circumstances entitles a sentencing judge to consider a non-guideline sentence". Judges Jose A. Cabranes and Ralph K. Winter joined the opinion.

**The Sentence Guidelines in This Case Do Not Properly Reflect the Degree of Kenner's Culpability...**

The Guidelines analysis in this case, even if legally correct, demonstrates an oft-criticized aspect of the Sentencing Guidelines:

> Imposing a sentence on a fellow human being is a formidable responsibility. It requires a Court to consider, with great care and sensitivity, a large complex of facts and factors. The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding up of a small set of numbers artificially assigned to a few arbitrarily-selected variables with common sense. Whereas apples and oranges may have but a few salient

qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results.

*United States v. Gupta*, 904 F. Supp. 2d 349, 350 (2012) (Rakoff, J.) (emphasis added); see also *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (2006) (Rakoff, J.) ("As many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as the weight of drugs in narcotics cases or the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors."). This is particularly true when addressing the Guidelines' loss enhancements, which are "a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (Lynch, J.).

These insights into the Guidelines are remarkably relevant in this case where, although Kenner may have stumbled and sometimes failed in vetting the never-ending stream of potential business partners introduced to him by former clients, he never turned his back on his investors when things went badly; specifically with the Jowdy cabal. Why else would Kenner have not walked away after the "take FBI protection or else" threats from Jowdy's connected cabal, or the 2010 Mexico near-death jailhouse beating, or the death of the investors' Mexico attorney? Why else would Kenner have worked night and day and lived under Mexico Federal protection (not "*in a cave*" – *Tr.712*) to give testimony after the beatings in 2010, knowing only worse was possible when Kenner was giving testimony in the Jowdy criminal cases in Mexico?

Kenner certainly could have done things differently, but that does not mean that he should bear the brunt of a 22-level increase for Probation's loss amount (without any foundation), especially considering that all of his investors were made whole several times over (and *only* government obstruction has interfered with unrealized collection). Yet, under the cold, calculated Guidelines, Kenner is treated the same as a defendant who takes all his investors' money to spend on himself without even trying to provide for his investors. While the profit of Kenner's investors may not help with the overly-technical Guidelines calculation, it should matter when this Court considers the degree of his criminal culpability in determining sentence.

We anticipate that the government will seek a Guidelines sentence in this case and will not join the defense in asking this Court for a significant variance. That defies logic because, while a Guidelines range in a usual case is not presumed reasonable

131

(*Nelson v. United States*, 555 U.S. 350, 352 (2009)), the Guidelines range in this case– 324-405 months (27 to 33.75 years) – is entirely unreasonable to the point that it cannot honestly serve as a real starting point of the Court's sentencing considerations, otherwise, this could be the epitome of "the harm that guideline calculations can visit on human beings if not cabined by common sense." *Adelson*, 441 F. Supp. 2d at 512; see also *United States v. Faibish*, No. 12-CR-265, 2015 WL 4637013, at *2 (E.D.N.Y. Aug. 3, 2015) (Vitaliano, J.) (refusing to "peg [the defendant's] fate to a guidelines computed loss amount" where, using "common sense," the Court found that "a strict application of the existing guidelines derived from the existing loss table in this case would unfairly balloon [the defendant's] sentencing range beyond any reasonable proportion to his crimes").

- The Court must consider that the government produced *government-forfeiture-36* and *government-forfeiture-44* post-trial confirming that their attacks on Kenner's veracity about "stealing" money and "misusing it" were wholly unfounded.

- The jury never got to hear that critical misstep, but the Court can intervene.

Kenner understands that this Court may, as a technical matter, be required to look to the Guidelines calculation as a "starting point." Kenner prays, however, that Your Honor will agree that a level 41 is draconian and offensive under the facts of this case as to this defendant and, accordingly, when deciding on the degree of variance to impose, will temper justice with mercy and impose a sentence not greater than necessary to meet the ends of justice.

## The Court's Discretion to Vary from the Advisory Guidelines Is Well Established…

In *United States v. Booker*, 543 U.S. 220, 226-46 (2005), the Supreme Court held that the then-mandatory Sentencing Guidelines system violated the Sixth Amendment. As a result, the Booker Court rendered the Sentencing Guidelines merely "advisory." *Booker*, 543 U.S. at 245, 125 S. Ct. at 756-57.  Later, the Court further clarified its position, holding that, in addition to being advisory, the Guidelines "now serve as one factor among several Courts must consider in determining an appropriate sentence." *Kimbrough v. United States*, 552 U.S. 85, 90, 128 S. Ct. 558, 564 (2007).

To be sure, while a sentencing Court must begin the process of determining an appropriate sentence for a criminal defendant by calculating the applicable Guidelines range, it "should then consider all of the § 3553(a) factors to determine

whether they support the sentence requested by a party." *Gall v. United States*, 552 U.S. 38, 49-50, 128 S. Ct. 586, 596 (2007); see also *Peugh v. United States*, 133 S. Ct. 2072, 2080 (2013) ("Under the resulting scheme, a District Court is still required to consult the Guidelines. But the Guidelines are no longer binding, and the District Court must consider all of the factors set forth in § 3553(a) to guide its discretion at sentencing." (citations omitted)).

**The Supreme Court Has Since Re-Emphasized That The Guidelines Are Both Advisory And Not To Be Presumed Reasonable…**

> Our cases do not allow a sentencing Court to presume that a sentence within the applicable Guidelines range is reasonable. In *Rita* we said as much, in fairly explicit terms: "We repeat that the presumption before us is an appellate court presumption. . . . [T]he sentencing Court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." And in [*Gall*] we reiterated that district judges, in considering how the various statutory sentencing factors apply to an individual defendant, "may not presume that the Guidelines range is reasonable."

. . . . The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable.  *Nelson v. United States*, 555 U.S. 350, 352, 129 S. Ct. 890, 892 (2009) (citations omitted). Section 3553(a), "as modified by *Booker*, contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Kimbrough*, 552 U.S. at 101, 128 S. Ct. at 570 (citing the sentencing goals set forth at 18 U.S.C. § 3553(a)(2)(A)-(D)). The § 3553(a) factors include the following:

> (1) The nature and circumstances of the offense and the history and characteristics of the defendant;

> (2) The need for the sentence imposed:
>> (A) To reflect the seriousness of the offense, to promote respect for the law[49], and to provide just punishment for the offense;

---

[49] Kenner's father was killed in 1996 while working undercover for the federal government. Kenner grew up under the auspice of law enforcement – and as a result felt more than comfortable to expose Jowdy as a whistleblower in 2007 (and thru 2009 FBI proffer) the crimes of someone who was known to be associated with the Former Director of the FBI.

(B) To afford adequate deterrence to criminal conduct;

(C) To protect the public from further crimes of the defendant; and

(D) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) The kinds of sentences available;

(4) The advisory guideline range;

(5) Any pertinent policy statements issued by the Sentencing Commission;

(6) The need to avoid unwarranted sentence disparities; and

(7) The need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a)(l)-(7); see also *Booker*, 543 U.S. at 224, 125 S. Ct. at 744.

## Downward Departure Available And Necessary In The Instant Case...

While a court may impose a Guideline-authorized downward departure in an appropriate case, such downward departure is no longer required in order to justify a below-guidelines sentence.   After *Booker*, a sentencing Court need not find that a particular § 3553(a) factor is "extraordinary" or sufficient to take a case out of the "heartland" in order to justify a below guidelines sentence. See *Gall*, 552 U.S. at 47, 128 S. Ct. at 595; *United States v. Rita*, 551 U.S. 338, 351, 127 S. Ct. 2456, 2465 (2007).

## Harsh Conditions During Incarceration Time At MDC...

- The defendant Kenner is making a specific request for downward departure consideration by the Court upon review of the egregious conditions Kenner has been forced to endure, *infra*, literally unlike any of the other 20,000-plus inmates who have passed thru MDC while Kenner has remained in their custody.

    o The Court should note that in 2017, MDC staff *stole* and *discarded* Kenner's external hard drive (provided by the government pre-trial). That back-up drive stored Kenner's 2017 *28 U.S.C. 2255* submission, amongst Gigabytes of exculpatory evidence (lost and the 2255 never

---

- That proffer and forethought of future repercussions did not come lightly, but in the context of exposing the frauds and protecting his investors, Kenner has still not wavered under the stress and duress of the current situation, discussed *infra.*

submitted by counsel – but with emails proving its completion and in possession of attorney Siegel).
- MDC refused to allow a 2nd back-up hard drive.

- In 2019, while in Pro Se, Kenner was *wrongly* designated to the MDC SHU for possessing a government flash-drive, *submitted by the U.S. Marshalls to MDC on April 22, 2015 (Document 191).*
  - Although the government *promised* the Court during the May 15, 2019 hearing to release Kenner from the wrongful SHU confinement, they were providing Kenner an external hard-drive to replace the flash-drive, inclusive of the 100,000-plus emails and evidence.  It was more government double-talk, because 3 ½ months later (at the time of this submission), the government has not provided it.
    - Kenner has sent three (3) letters to the U.S. Attorneys office to remind them, to no available.
  - It should be noted that only 1-½ years earlier, MDC legal and the U.S. Attorneys explained to this Court that external hard-drives were *illegal*…but now they are not??   More double-talk…

- In late May 2019, after Kenner was allowed to work on his casework again (post SHU containment), Kenner discovered that MDC staff had *stolen* and *discarded* the various 200-ish discovery discs that were in Kenner's legal possession – in addition to thousands of pages of paper discovery that was taken from Kenner's cell.

- It is hard to fathom that this is the typical treatment for a pre-sentence detainee, under Court order, to effectively be allowed to defend him or herself.

- In addition, the Court should recognize that under any normally adjusted timeline of trial thru sentencing, Kenner would have served the majority of the last 1500+ days (since trial) in the lowest security facility, *close to his family*, and not under the draconian maximum-security conditions of Brooklyn MDC.

  - *Kenner has not been able to see his teenage kids in six (6) years while in New York – 3000 miles from his Arizona home.*

Kenner has logged years of daily issues related to the simple efforts to work on his defense case, without the advocacy of counsel (whether CJA was assigned or not). Several of the most outrageous intimidating, inhumane, and denigration issues are

hi-lighted, *infra* [Ex.33, 35, 36, 37, 42, 43, 44 (another murder-for-hire attempt), 45].

**Issues With The Court Order To Work On Discovery…**

Kenner has been in the unenviable position of representing himself (in ProSe) while incarcerated at MDC Brooklyn since February 2018.   As discussed in Kenner's *28 U.S.C. 2255* motion to this Court (*Document 675*) (*and supra*), Kenner has been subject to negligible legal assistance prior to his ProSe admission by the Court following Kenner's *Faretta* hearing.

MDC's standard policy is that inmates cannot receive more than one (1) hour of law library time weekly to review discovery and prepare legal materials while in a mass, group environment.   In Kenner's case, the Court had issued an "order" to have Kenner granted additional time for "discovery work".   This "order" as issued by the District Court judge is one of the least prioritized items in the daily routine at MDC. Kenner has repeatedly been denigrated by staff who laugh at Kenner's daily requests to "work" in accordance with the Court's "order".

The "working" policy of the MDC legal department is to dissuade the daily "order" as well, by making up their "rules of the day" in support of inhumane conditions granted to Kenner during the _less than 20% time allotments_ in contrast to the Court's "order".   Other cooperating officers have received "group shaming" from other officers for trying to uphold the Court's "order" and transport Kenner to the "work area".    Staff peers have called them "*motherfuckers*" and "*inmate lovers*" for helping Kenner.   The resentment is that Kenner is one (1) of 1800 inmates who requests to work on his case daily under Court order.  It requires a lazy staff member (who would be without any responsibilities otherwise for their work day) to remain in the "work area" with Kenner.   Although it is not Kenner's issue, there are 2-3 other inmates who have Court orders, but they have been thoroughly discouraged to work pursuant to their respective "orders" and have given up to avoid intimidation tactics.

**The Urination Incident (3ʳᵈ Time)…**

After Kenner "wrote-up" and reported an officer for locking Kenner in a workroom until he urinated on himself (as intimidation and punishment to deter Kenner from working), Kenner was further retaliated against.    Kenner's discovery privileges were revoked (under new MDC policy) while in ProSe.   Kenner was no longer allowed to use his case materials (legal paperwork) in the same room as Kenner's discovery computer, as a new safety protocol at MDC.   This determent action required the EDNY District Court to intervene and expose the ridiculousness of the "new rule" – only applied to Kenner.   After the 33 lock-out was "resolved" with new

136

policy, it was discovered on the first (1st) day returning to the "work area" that another inmate had continued his identical activities to Kenner's restrictions throughout that exact period of time.   When Kenner raised the issue with a Lieutenant, Kenner was told, "*Mind your own business and stop getting in trouble*".

- During Kenner's MDC-imposed hiatus, other officers were told Kenner was caught masturbating in the discovery rooms (untrue – and simply another degenerating slander technique).[50]   Kenner requested the "camera recordings" of the alleged masturbating incident but was told they were erased by accident. This same excuse occurred after Kenner demanded the "camera recordings" after the officer locked Kenner in the workroom without bathroom access until he urinated on himself.

Again while in ProSe, "masturbating" was the institution "rumor" explained to any officer who addressed the Kenner work restriction to help Kenner.   This particular rumor has continued to deter officers from allowing Kenner access to the work area per Court order.

**External Hard Drive Stolen (And Files Discarded)…**
After one (1) of the MDC staff were reprimanded for not counting Kenner on a Sunday "out count" during an institutional regular "count" with Kenner working in the discovery work area, the staff member was mad at Kenner (having nothing to do with Kenner actions).   The next workday (a Monday), Kenner realized that his external hard drive issued by the government was "missing" along with about ½ of the legal case files in Kenner's work area materials.   Kenner immediately reported it to staff (CO Burner).   He called the prior staff member who belligerently expressed disdain for Kenner's presence during the weekend and said "*Kenner deserves what he gets and should not have been working on the weekend*."   Kenner reported this to the Court.

The device and folders were never recovered at MDC.   Upon specific request to the Court to receive another external hard drive to replace the "missing" one, the legal department explained to the Court via letter, "*BOP policy does not allow external hard drives*".   This "new" policy (only affecting Kenner at MDC) ignored that Kenner had the government hard drive that the government delivered to MDC on April 22, 2015 thru the date the officer "discarded" the hard drive.   As the Court knows, this,

---

[50] The Court should note that if the masturbating story had any veracity, Kenner would have been sanctioned by the facility and immediately placed in the SHU.  Kenner could have been subject to new sex-offender charges.  None of that occurred, but the rumors worked as a sadistic deterrent for several officers to discontinue helping Kenner.

amongst other surreal policies, *infra*, are solely created and concocted in relationship to Kenner, not in conjunction with BOP policies.

**Kenner Refused Bathroom Access…**
Kenner was told by staff (and corroborated by calls to the MDC legal department in Kenner's presence) that Kenner's Court order did not allow him to "use the bathroom" while working for up to 10 hours (per Court order).

o  The next workday that Kenner was allowed to move to the work area (over a week later), Kenner was told by staff to use the bathroom *before* he left the housing unit – *because* Kenner would have to wait until he returned to use it again (4-5 hours later).

o  Kenner sent multiple requests to the medical department for diapers (as an attempted mediated solution) -- but was *declined* each time.

Subsequently, Kenner was told by staff (and corroborated by calls to the MDC legal department in Kenner's presence) that Kenner's Court order did not allow him to "drink water" while working for up to 10 hours.

• Kenner alerted the Court and had asked for a more specific Court order to allow bathroom use and water.   The Court laughed (as would Kenner if faced with the same lunacy) at the request for specificity.  The Court asked why that would be needed in lieu of commonsense.

• Nevertheless, MDC took a tangential approach to Kenner's exposure to the Court of their mistreatments (and Kenner refusing to kowtow to their intimidation tactics) by claiming that Kenner was requiring the use of a "cup" to drink water out of the sink in lieu of "slurping" like a dog as Kenner was instructed to do if thirsty. *It is true and in the MDC letter to the Court*.
   o  MDC determined that the "cup" (Styrofoam at that) presented a security risk to the staff.   This was additional retaliation after Kenner "wrote-up" staff who told Kenner "*if he wanted to drink water, then he would have to drink out of the toilet bowl like a dog*".

**The 2019 Flash-Drive SHU Incident…**
After Kenner was finally allowed to resume 1-2 day per week (3-4 hours per day) of work in the "work area" after repeated pleas to the Court to assist in the application of the Court's previous work order, Kenner was cuffed and placed in the SHU at MDC.

It should be noted, the government promised the Court and Kenner on May 15, 2019 that Kenner would receive the discovery materials from the government issued "illegal flash drive" on a new external hard drive within a week.   Kenner has sent two (2) separate letters to the U.S. Attorneys office and has not received a response regarding the underlying tens of thousands of emails that resided on the device, et. al.   Over three (3) months have passed and Kenner is nowhere closer to receiving the discovery items.[51]

- This is a simple, but regular, delay and diversion technique the government has used with the overburdened Court to avoid allowing Kenner (1) hearing transcripts [requested since 2014], (2) the production of Court ordered briefings (*Tr.2141-2144*) to return Kenner's computer, iPhone and peripherals, (3) the production of documents *forged* by Jowdy and produced by the government as part of the forfeiture case (*government-forfeiture-61* and *government-forfeiture-62*), (4) discovery requests of simple exculpatory evidence in opposition to some of the government witnesses' most severe perjury during trial, (5) etcetera…

Although the "flash drive" was found in Kenner's discovery property, exactly where it was placed by MDC upon arrival April 22, 2015 (pre-trial), the package with the government's password on it ["Kenner2015!"]  and the contents of the flash drive were not reviewed prior to detaining Kenner.   Kenner was told he would spend 90 days before seeing the DHO (Disciplinary Hearing Officer) -- and the incident would receive other facility sanctions; such as loss of "discovery privileges", loss of email, and loss of phone.   The complicit staff refused to review the "contraband" with Kenner.

While in the SHU, several staff members visited Kenner and explained that several officers orchestrated the incident to "*stop Kenner from working*" (as further intimidation).   Those same officers inquired with Kenner as to the contents of the flash drive in question.   Kenner explained it was "privileged attorney-client

---

[51] Kenner is not a typical defendant, not just regarding his ProSe status.   Kenner's access to the Court ordered work area has been restricted to minimal and insufficient time since 2015, before trial.   Although Kenner has "made due" with what he could get from MDC, the government complained that Kenner has delayed submissions and produced "untimely" motions to this Court.  Kenner can only produce work product as constrained by the facilities allowance of access.

- If necessary, Kenner can provide the Court with the names of several officers who would corroborate the Kenner "work restrictive actions of MDC" and coordinated abuses; assuming the Court would grant them "sealed testimony status" in order to avoid their-own future retaliatory issues from MDC, denigrated by co-workers as "*inmate lovers*".

communication" provided by the government and listed on Kenner's Court docket (*See Document 191*).

When those officers attempted to assist Kenner in "clearing up" the "misunderstanding" (per se), they were told to "*butt out and let Kenner get what he deserves*".   They conveyed to Kenner that they were told that the flash drive he was caught with contained "gay porn" that he was selling in the institution.   It was fantastical fodder, further denigrating Kenner throughout the facility.   The "gay porn" story had arrived at Kenner's general population unit before Kenner's return causing several incidences of attempted extortion of Kenner.   The originators of the "story" knew exactly what they were doing to Kenner, effectuating peer violence and the expectation of jailhouse-justice.

Kenner is still waiting for the return of contents from the flash drive as promised by the U.S. Attorneys office to the Court on May 15, 2019, the day Judge Bianco ordered Kenner to be immediately released from the SHU.

- Upon Kenner's return to general population, he was told 4-5 days later that his discovery privileges were reinstated.   No apologies from the complicit staff followed.

- When Kenner received his discovery materials the first (1st) day in the "work area", all of the 150-ish discovery discs were removed from Kenner's property – and missing.  They were never returned.

- Several days later, Kenner was returned his other "property" in the housing unit. Nearly all of the current Kenner case materials were missing.

**Other Unusual Issues That Have Occurred Since Kenner's November 13, 2013 Incarceration...**

- Kenner has kept a complete log of the "incidences" since his incarceration in Phoenix Arizona on November 13, 2013 – available upon request from the Court.

**November 2013 – CCA Prison –** The first (1st) day that Kenner was taken to the courthouse from the CCA jail in Phoenix, Kenner was singled out at 7 AM in the line of detainees waiting to load the bus.   One of the main officers yelled into the holding area – "*Who is Kenner?*"  When Kenner identified himself, the guard stared Kenner down.   Clearly, the guard was not aware of who Kenner was before asking the group question, despite the fact Kenner was the *only* white person in a room full of five (5)

foot tall Mexicans.  After the rest of the bus was loaded, Kenner remained in the holding area.  The same officer, with another guard, entered the room and approached Kenner.  After they pushed Kenner into the corner of the room while in full body irons, they kneed Kenner in the groin and kicked Kenner in the side of the head when Kenner fell over.  When Kenner was on the floor, they kicked Kenner a few times in the stomach.  Kenner was picked up and placed on his feet.  They both laughed at Kenner and asked – "*Do you understand what's going on here?*"  Kenner did not reply.  They stared at Kenner a little longer and then pushed Kenner along, out the door, and towards the bus to be loaded.

**November 2013 – Oklahoma City Transit Jail –** Upon entry into the holding unit, Kenner was assigned to a cell with a 6'6" 300 pound African American (seemingly more unusual with maximum-security facilities uber-conscious of not rooming interracial detainees together).  As soon as Kenner placed his items in the room, the inmate followed Kenner into the room and began to aggressively attempt to push Kenner around and suggest he was going to rape Kenner at night.  Kenner managed to get himself out of the cell and approached the unit officer.  Kenner explained the brief yet intimate encounter with the individual in the cell he assigned for Kenner. Kenner explained specifically that he told Kenner he wanted to _rape_ Kenner when they locked in.  The officer asked Kenner directly – "*Do you think you got that assignment by accident?*" and finished with – "*good luck! Do you think this is a PREA complaint office?*" and laughed as Kenner left.  Kenner stayed out of the cell until the nighttime lockdown.  After the 10pm count, the cell mate got off his lower bed and told Kenner, "*Now is the time for you, son.*"  Kenner told him to "*fuck off*".  He tried to pull Kenner off the top bunk and to the floor.  During the scuffle, Kenner kicked him in the throat.  He dropped to the floor and gagged for air.  For the remainder of the night, Kenner was forced to sit up on the top bunk and wait until the morning officer unlocked the room eight (8) hours later.  In the morning, that inmate was taken from the unit and never returned.

**Pre-Trial Private Detention Facility...**
While at Queens Private Detention Center for seventeen (17) months, Kenner experienced minimal restrictive actions by staff, other than law library time accessibility.  Kenner's time restrictions were unsolvable during the workweek for no apparent reason, considering the facility was 99% designated for cooperators, minimizing any legitimate law library needs.  Kenner was fortunate to have weekend staff open the law library, inapposite of policy, to allow Kenner 2-3 extra hours both days.  Kenner's law library time was restricted in the face of the Court's order for additional time.  Kenner's trial counsel did not want to "make waves" with the facility or the Court and raise the time restriction issue pre-trial.

141

**During Trial** – Kenner was moved to Brooklyn MDC on April 22, 2015, weeks before trial after another inmate recorded Kenner in an attempt to set up a murder-for-hire plot versus Kenner.   The FBI plot versus Kenner failed, but the government alleged Kenner was witness tampering and needed to be moved to a maximum-security facility.[52]

Kenner was not granted access to his discovery at MDC until his trial began May 4, 2015.   Kenner's trial counsel would not alert the Court, because he again did not want to "make waves".   Once trial began, Kenner could _only_ see his discovery on the weekends, and _only_ when granted access to the work area; which no officer had ever heard of.   According to the staff, Kenner was breaking new ground at MDC.

Once trial began…Kenner was forced to move cells in his unit, five (5) times in the first 30-days _after_ Kenner returned from trial Court at or about 9PM at night. Kenner was told that if he did not move before the lock-in (_30-45 minutes later_) to the newly designated cell – Kenner would be taken to the SHU.   All of the cell moves occurred on days that Kenner had trial the following day and had to leave at 5AM as well as prepare after lock-in for the next day.

During Kenner's 6-days of trial testimony (_on the stand_) in late May 2015 – Kenner was awakened at midnight and told to pack all of Kenner's possessions for departure from the prison.   Kenner argued with the CO about Kenner being in trial and they were making a mistake.   Kenner was instructed to discuss that issue after packing all of Kenner's possession (_voluminous_) and move the five (5) full garbage bags of paperwork downstairs to R&D for departure to a prison.   Kenner was downstairs for four (4) hours dealing with the erroneous transfer notice and returned to his unit at 5AM in time to shower for the day.   While in R&D, the MDC Officer threw away all of the Kenner personal possessions that would not fit in two

---

[52] The Court should note that recently, Kenner discovered that not only was Paul LeRoux (the person who wore the jailhouse wire on Kenner at QPDC) a "significant government asset" and not just another run-of-the-mill inmate trying to raise Rule 35 or 5K1.1 issues -- but after Kenner was moved to MDC Brooklyn, the government had Kenner placed in a cell with one of Leroux' former "hit men" from his DEA case to try and resurrect and execute the "murder-for-hire" plot on Kenner, _one more time_.   It is not ironic or coincidence that Kenner was intentionally moved to live in a cell with Slawomir Soborsky (out of 1800 possible inmates), who attempted to discuss his "skills" with Kenner (reproducing the failed LeRoux scheme).

- _Either one of these contrived schemes were a violation of Kenner's civil rights, at a minimum._

==small packing boxes, thus, Kenner lost a few hundred dollars of commissary clothes and food in addition to a night's worth of sleep during the critical defense testimony.==

- Trial counsel refused to raise the issue to the Court, claiming that Kenner was "in court now" and the judge would not allow a delay despite Kenner's frazzled demeanor and critical trial testimony that day about the Home Depot recordings, etcetera.

==**Harsh Work Area Conditions And Intimidating Retaliation From Staff...**==

- ==*A complete list is available upon request from the Court but has been currently withheld to protect the officers who have both "done wrong" and "done right" (in protection of Kenner) throughout his Brooklyn detainment.*==

- ==*Under seal filing will avoid triggering future BOP issues that would result in incremental retaliation versus Kenner.*==



==*END REDACT...*==

**August 2016** – Kenner collapsed in the East VR – due to ongoing harsh conditions of being locked in an 80+ degree room with no ventilation and lack of water access -- if Kenner wanted to work.   The three (3) officers in the VR refused to call medical to assist Kenner after he collapsed on the floor.   Finally 20 minutes later, the 4th officer N[...], called for medical assistance for Kenner after arguing with the other three (3) officers.

**October 10, 2017** – It had been 20 days since Kenner saw CO M[...] in the VR due to her prior refusals to allow access to the VR for Kenner.   CO M[...] greeted Kenner by claiming Kenner should not be working in the VR since we did not call her first. Kenner has no access to call her.   She simply does not want to work at her post. Then – M[...] referred to Kenner as a "***mother fucker***" in front of CO F[...] for coming over to work.

Kenner asked immediately to get some water to drink while working in the VR and was refused.   M.[...] told Kenner that if he was going to "***play those games***" (drinking water) – Kenner would be thrown out and returned to his unit immediately.   Kenner asked when he could get water.   M.[...]asked, "***are you fucking deaf***" (which Kenner legally is since birth...and M.[...]has been informed on multiple occasions by Kenner).   Kenner replied, "***Yes I am***", to which M.[...]screamed, "***go sit the fuck down...NOW!!***"

- **Kenner was forced to urinate in his clothes since M.[...] refused to allow him access to the bathroom later that day**.   This was reported to the Medical staff (who received permission for Kenner to drink water and go to the bathroom during his extended work hours).   Kenner also informed the custody staff.

**After Kenner admitted as ProSe litigant...**

**Saturday March 10, 2018** – Kenner was working in the tiny work cell – fully enclosed with glass.   The room had an average temperature of 80+ degrees.   After 5 hours of sweating in the room – with Kenner lifting his pants legs from mid-calf to knee height – Officer M[...] came to tell Kenner that he was violating dress code policy.   Then – M[...] called Kenner in front of the other detainees and officers to demand again that Kenner "dress properly" in the VR.   All of it was another effort by M[...] to denigrate and intimidate Kenner in front of the other inmates and officers.

**March 11, 2018** -- Kenner had been DENIED access from March 11 thru March 16 (except for Monday the 12th – court date), and the majority of the prior three (3) weeks.   Two separate lieutenants asked Kenner – "*well what do you expect me to do?*"   *After* Kenner inquired about the problem (which by Saturday March 17th had become 17 out of 20 days of denials) – Kenner's cell was torn apart by the day watch officer (while no other inmate had a problem).   Kenner's legal documents (numbering about 20,000 in the room) were strewn all over and dumped out of every file folder – walked all over – destroyed -- and some were taken...the response

144

to Kenner was that they were looking for a weapon in the interest of security (from a tip).

**Friday, September 14, 2018** – After a 4-day lock down in the MDC building – Kenner returned to the East VR for casework.   Upon arrival – Officer R[…] informed Kenner that he was no longer allowed to drink out of a cup – echoing the identical rhetoric of every older female black officer that has harassed Kenner in the past – including his recent issue with Officer G[…].   Kenner explained that his vertigo and nausea symptoms were the reason Kenner needed water continuously (and was authorized by medical) – and not ice cold water (furthering the nausea issues). R[…] told Kenner she does not listen to medical and did not care what they say. R[…] made a call and informed Kenner that an "un-named Lieutenant" confirmed that Kenner is not allowed to drink water in a cup – and said it was her job to keep the jail safe (from Kenner drinking from a cup – another act of intimidation)…

Shortly thereafter, Kenner requested to go to the bathroom.   R[…] told Kenner she had to leave the unit and needed to lock Kenner in the work area.   Kenner told her he needed the bathroom soon.   R[…] left Kenner locked in the room for over 45 minutes until Kenner urinated on himself again (3rd time under the harsh conditions).   When R[…] finally came to unlock the door – she told Kenner to pack up because he was leaving the VR for demanding to go to the bathroom.

Kenner showed CO B[…] the urine-flavored uniform after the incident.   B[…] apologized to Kenner as an older man – and said Kenner should write her up – because they cannot treat another person like that.

After Kenner discussed the incident with two (2) lieutenants on the weekend, they told Kenner to write R[…] up stating…"*do what you need to do*".

After Kenner wrote up the incident – immediate retaliation began to Kenner – including denial of work time for weeks without work access…further delaying any work that Kenner was preparing for the Court.

*November 2, 2018* – After 32 days of restrictions by MDC to carry Kenner's legal paperwork to and from the East VR (work area) (addressed to the Court on October 1, 2018) – Kenner was allowed to bring a smaller manila folder with legal supplies. As Kenner and Clark (other inmate with legal privileges) waited in transit to be taken to the East VR – 3rd inmate (BIG BLACK GUY) who had been working with Kenner in the East VR prior to the "legal paperwork" issues – tried to come on the elevator.   For the first time – the 3rd inmate was told that he could not bring a large

folder with legal paperwork and discs (33-days after Kenner had been restricted from access).   Clearly – the BLACK INMATE was not prohibited during the same 33-day period from legal paperwork during his legal work as Kenner was – as retaliation for the "pissing" incident and subsequent write-up (BP-8 and BP-9).

- *About 2pm – CO Robinson entered Kenner's workspace to tell him that his day was "over" because he had to return with the other inmates to the West Building.   Kenner said he was not done – to which Robinson retorted – "You think this battle with me is over – you are writing-up the wrong person – it is too bad you were not in Pittsburgh last week and this would be over now".*
  - *The anti-Semitic reference to the violent assassination of 11 Jews in a Pittsburgh Synagogue was so beyond any acceptable thing to say to another person – whether or not they are a federal detainee…*

**August 21, 2019** – While Kenner was in the changing area (post-work), Officer D[…] asked Kenner why he does not cut his hair so the black ladies will stop being jealous and mad at him for his long, curly and thick hair.   Kenner explained that he was about to cut 14" off for the 4th time since incarceration (with more than 12" necessary) to forward to Cancer Kids Wigs charities – so free wigs can be given to some of the kids Kenner used to raise Brain Cancer Research funding dollars for before being incarcerated.   *Officer D[…] began to cry*.   The officer explained to Kenner that his daughter died from childhood cancer and utilized a wig like the one Kenner provided during her chemotherapy before dying.   He told Kenner, "*F*** those jealous ladies and keep doing what you are doing.   They don't deserve your attention*".

- A more complete list is available upon request from the Court.

**Inhumane MDC Living Conditions…**
- See Ex.41

**Summer 2016** – for a six (6) week period of time during the 90+ degree and 90% humidity of the summer, MDC had no A/C in the unit or the cells.   They did not even have airflow from the vents.   Everyone suffered greatly.   The violence became a daily event in the harsh conditions.   Nighttime temperatures reached over 100 degrees and full humidity in the cells; causing the walls to sweat all night.   Sleeping conditions were impossible.

**On April 28, 2017** – Kenner was startled in his cell at night for the umpteenth time by a mouse entering his cell after night lock down and trying to steal food from

Kenner's food trays.   Kenner's cellmate was also startled by similar events on multiple occasions in the middle of the night while going to the bathroom.

**From April 28 to May 3, 2017** – as a result of a fight in the unit – Kenner was locked down for six (6) days.   During that time – Kenner and his cellmate were forced to use the bathroom in the tiny cell in front of one another with no airflow-ventilation daily.   Kenner and the other inmates were all denied showers during the entire lockdown.

> ➢ During the extended lockdown – Kenner was using the toilet (#2) and the COs came thru the unit to count the inmates.   The two female COs demanded that Kenner (during #2) stand up so they could count him (while wearing no pants).   As they walked away – they laughed at what they ordered Kenner do…

The kitchen staff – who had not showered during that period of lockdown – was serving food in an unsanitary method to all.   Complaints about the conditions fell on deaf ears with the COs and Lieutenants.   On the evening of May 2nd – Kenner was forced to skip his Kosher dinner meal as the unit staged a "food strike" due to the draconian conditions enforced on the unit *after* the fight participants had been removed and the investigation interviews of the entire 100+ inmates were individually interviewed over 24 hours earlier (*4 days into the sequestering*). Inmates like Kenner who attempted to walk from their cells to the kitchen to pick up their needed rations were screamed at by other inmates claiming they were going to be beaten and killed once the unit was unlocked.   The Lieutenants and the COs did nothing to quell the intimidation of the other inmates.   Kenner was forced to forgo food that evening and suffer the extreme hunger for 20+ hours from lunch service at 11am on the 2nd until the unit was finally unlocked the next morning about 9am.

**May 17-18, 2017** – for the 2nd straight day – there was been no air conditioning or air blowing in the cells (or the unit).   The temperatures at night (after lock down) reached about 90+ degrees in the cells.   The windows and walls were covered in sweat.   The sleeping conditions were 100% unbearable and inhumane.

**May 18, 2017** – The East VR had no air conditioning.   CO J[…] commented to Kenner that he hopes they do NOT pull the same sh*t as the previous summer when they keep the AC units off in the common areas and on ONLY in the staff office areas. The temperature was about 90+ degrees and humid.

> ➢ In the evening of May 18 – Kenner collapsed in his cell after the evening lockdown.   Kenner experienced VERTIGO and severe dehydration from the effects of the exhaustive heat in the unit during the day and no AC in the cells at night.   Kenner has continued to exhibit dizziness and VERTIGO symptoms thru May 29, 2017.   Kenner has fallen in his cell at night on multiple occasions from the VERTIGO.   Kenner submitted a medical request to

immediately address the symptoms.   No doctor call has been administered despite the ongoing failing health issues...

**On Saturday June 24, 2017** – While Kenner was walking thru the unit – Kenner noticed one of the inmates was lying in his bed having a seizure and mini-stroke. Kenner immediately approached the CO and demanded they call medical.   Medical arrived about 20 minutes later and refused to help the person from the 2nd floor in the unit to the first floor and out of the unit with the person having seizures. Kenner had to carry the inmate from his 2nd floor cell to the front door while he was covered in urine, spitting up and shaking from a seizure.   The medical staff remained at the front door and refused to handle any portion of the transport for Inmate McCreary.   The inmate would surely have died without Kenner's intervention and demands to the staff to get him to medical ASAP...

- **On Thursday June 29th, 2017** – in the housing unit – the medical staff and housing team called repeatedly for inmate McCreary to report to medical. He had been taken out of the unit five (5) days earlier while having a stroke and seizure.   Neither medical nor the facility knew where he was...

**November 2017 thru January 2018** – Kenner's unit had no ice machine for the inmates.

**June 2017 thru present** – there has been no microwave in the unit to cook food. There is no other means to cook commissary foods.

**December 2017 thru January 2018** (7 weeks) – There was no light in Kenner's cell – despite CO R[...], the AW Operations, and two (2) other COs knowledge and constant badgering of Kenner about not having a light (out of Kenner's control).
- From June 2017 thru January 2018, there has been only brown water from the sinks hot water after 9pm each night.   There is no access to hot/warm water after the lock down otherwise.

  ➢ **Shower** – Black mold inundates the shower areas – except when the unit team has them repainted -- over the mold.   The mold returns in 2-3 days. Summer water is scorching and burns the skin and the winter water is 60 degrees making the showers untenable.   There are 100s of black fleas in the shower areas at all times.   They have bitten Kenner repeatedly.   On a few occasions – Kenner has had to remove them from his ears after the showers when they flew in.   On several occasions – Kenner has swallowed the black fleas after flying directly into his mouth.   It is a 3rd world condition.

**In October 2017** – The medical staff G[...] was worried about the length of the Kenner stay in the temporary MDC detention center and the adverse effects on Kenner's psych levels.   G[...] ordered the psychiatric staff to evaluate Kenner for the migraines, vertigo, stress, and sleep deprivation issues.   After a brief meeting with

Dr. M[...] – who met in the front foyer of the unit with other inmates around – discussing the private Kenner information – Kenner received a sleep study two (2) weeks later and charts to document the sleep issues and other variables.   Kenner completed the 30-day paperwork and documentation and returned it to the staff in December.   Dr. M[...] did not return to visit Kenner and discuss the documentation or any other follow-up protocols.   Kenner's sleep, migraines, and vertigo continued. In a chance encounter in the hallway – Dr. M[...] briefly asked Kenner how he was doing.   Kenner replied – "*terrible and when are you coming to discuss the sleep paperwork I sent you a month earlier?*".   Dr. M[...] said – "*what paperwork?*" and left the common area.   Dr. M[...] has not returned to address Kenner since.









**<mark>First Time Offenders Qualify For Downward Departure Considerations</mark>**…

Even those factors that would not necessarily result in the granting of a downward departure-or that were expressly prohibited or deemed irrelevant by the Sentencing Guidelines-must now be considered under the mandate of § 3553(a). See *United*

*States v. Jones*, 531 F.3d 163, 182 (2d Cir. 2008) ("[J]ust as we may not bar a district Court from considering facts simply because they were also considered by the Commission, the district court 'may not presume' the reasonableness of the Commission's Guidelines sentencing ranges.")

Studies conducted by the Unites States Sentencing Commission demonstrate that true first time offenders like the Defendant are extremely unlikely to re-offend. The re-arrest rate for all first offenders is only 6.8%, and the reconviction rate is even lower, at 2.5%. See Recidivism and the First Offender, Exhibit 6 (United States Sentencing Commission, May 2004).[53]

Moreover, there is also proven correlation between age and recidivism, with the likelihood of a re-offense dropping dramatically where the defendant is over 50 (which Kenner is). See Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, Exhibit 9 (United States Sentencing Commission, May 2004).[54]

The Second Circuit has also recognized that "*[r]arely, if ever do the pertinent facts dictate one and only one appropriate sentence but rather experienced district court judges may reasonably differ.*" *Id.* at 173. Rather, in every case, the district court 'must make an individualized assessment' of the appropriate sentence 'based on the facts presented' and the factors detailed in §3553(a)." (citations omitted)); *United States v. Smith*, 445 F.3d 1, 5 (1st Cir. 2006) ("That a factor is discouraged or forbidden under the guidelines does not automatically make it irrelevant when a court is weighing the statutory factors apart from the guidelines. The guidelines-being advisory are no longer decisive as to factors any more than as to results.").

In order to avoid unwarranted sentence disparities of similar situated defendants – it would be incumbent upon the court to consider the sentencing trends for these types of cases on both a district and national level. The Second Circuit has held that 18 USC 3553(a)(6) "*requires a district court to consider nationwide sentence disparities.*" *United States v. Frias*, 521 F.3d 229, 236 (2d Cir 2008). The intent of the Sentencing Reform Act of 1984 – was "*to reduce the wide disparity in sentences imposed by different federal courts for similar criminal conduct by similar offenders.*" *United States v. Fernandez*, 443 F.3d 19,32 (2d Cir 2006) (*internal citations omitted*);

---

[53] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-ppublications/2004/200405_Recidivism_First_Offender.pdf

[54] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-ppublications/2004/200405_Recidivism_Criminal_History.pdf

See also *United States v. Wills*, 476 F.3d 103, 109 (2d Cir 2007) (the primary purpose of the provision was to reduce unwarranted sentence disparities nationwide).

As the Court is well aware – it is often times difficult to quantify an appropriate sentence on the basis of monetary loss.   While the PSR and the government have sought monetary damage levels of over $43 million in one calculation (*government-forfeiture-1*), over $25 million in another calculation (PSR), the Court's own July 2, 2019 statement to the U.S. Attorneys was that "only charged" conduct would be considered (*Tr.33*).

As a consequence in part, we respectfully submit that in Kenner's case – a non-guideline sentence of *time-served* would meet the goals of sentencing as enumerated in *18 USC 3553(a)*.   As stated above – in terms of punishment and general deterrence -- a sentence below the applicable guideline range of *time-served* (with 72+ months already served in a maximum-security environment to date) would still be in *above* the general sentencing trends in similar cases on both the National and District level.   Therefore – a sentence below Kenner's guideline range would nonetheless promote respect for the law and provide just punishment – as it sends a message to the general public that such offenses will be sentenced accordingly (and equally).

A non-Guidelines sentence is also warranted where a sentencing judge finds that a particular Guideline or Guideline range fails to properly reflect § 3553(a) considerations, reflects "unsound judgment" or when "the case warrants a different sentence regardless." *Rita*, 551 U.S. at 351, 357, 127 S. Ct. at 2465, 2468. The Supreme Court clarified this point:

> "Even when a particular defendant . . . presents no special mitigating circumstances, such as no outstanding service to country or community, no unusually disadvantaged childhood, no overstated criminal history score, no post offense rehabilitation, a sentencing court may vary downward from the advisory guideline range. . . . The only fact necessary to justify such a variance is the sentencing court's disagreement with the guidelines . . . ."

*Spears v. United States*, 555 U.S. 261, 263-64, 129 S. Ct. 840, 842 (2009) (per curiam) (quoting *United States v. Spears*, 533 F.3d 715, 719 (2008) (Colloton, J., dissenting), rev'd *Spears*, 555 U.S. at 261-68, 129 S. Ct. at 841-46); see also *Peugh*, 133 S. Ct. at 2080 ("The district court 'may not presume that the Guidelines range is reasonable,' and it 'may in appropriate cases impose a non-Guidelines sentence based on disagreement with the [Sentencing] Commission's views.'" (citation omitted)).

**The Factors Set Forth In 18 U.S.C. § 3553 As Applied In This Case Do Not Require Any Additional Incarceration**...

No Additional Incarceration Is Required to Reflect the Seriousness of the Offense, to Promote Respect for the Law, or to Provide Just Punishment for the Offense...

In fashioning an appropriate sentence, one consideration for this Court is whether the imposed sentence is sufficient "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). There are several reasons why these concerns are met in this case with a sentence of *time-served*, followed by Court-mandated one (1) year of supervised release.

First, Kenner has already served **72+** months of his sentence under the harsh conditions of the MDC, which Judge Cheryl Pollak of this District described in 2016 as a "Third World Country" prison based on its unconscionable conditions.[55]

- See http://www.nydailynews.com/newyork/brooklyn/judge-refuses-send-women-horrifying-brooklyn-jail-article-1.2820551 (last visited February 22, 2018).

**Second Occurrence Of "Third World" Condition Issues At MDC Exposed By Civilian Protest And Federal Defenders Litigation In The SDNY**...

In addition to the rugged conditions typically found at MDC, the Court is aware that in January-February 2019, MDC suffered a catastrophic power outage during the harshest winter cold-spell in NYC in over a decade; leaving the inmates to live in sub-zero temperatures, *without electricity*, without hot water, without hot food (when and if served) and minimal resources (even refusing to distribute the blankets provided by the City of New York to the prison until days after their arrival in the building – revealed by the prison guards).

- The seriousness of the offense and resulting conditions led to the MDC Warden's replacement; after catastrophic breakdowns and failing to maintain remotely humane living conditions for Kenner and the other inmates over the twelve (12)

---

[55] While Judge Pollack's comments referred specifically to MDC's female housing section, many of the same severe conditions exist next door at the men's housing facility.

coldest days in NY in nearly a decade, *without power, heat, communication, lights, hot water, etcetera*.

**2019 Lawsuit Versus MDC For Inhumane Conditions...**

In February 2019, The Federal Defenders of New York filed an "inhumane conditions" lawsuit versus the Federal Bureau of Prisons and Warden Quay (*Case 1:19-cv-00660-MKB-SMG*).  Judge Torres visited the facility after the resumption of power to meet-and-greet the inmates and document their grievances by stenographer.  The conditions, which led many to beg for heat or death (including Kenner) before freezing to death included as referenced in the litigation:

1. "The visitation revealed that the defendant' response to the fire has caused significant and serious deprivations of the constitutional rights of the MDC detainees." (*at 2*)
2. "Following the fire, MDC inmates reported to attorneys at the Federal Defenders that there was little or no heating, no hot water, minimal access to electricity, and near total lack of medical services, telephones, televisions, computers, laundry, or commissary.  Inmates also reported they smelled noxious fumes; some reported seeing BOP officers wearing masks.  No masks were supplied to inmates." (*at 4*)
3. "On February 3, however, less than four hours after legal visiting resumed, visiting attorneys began to smell a strong chemical scent, and started coughing, when pepper spray was dispersed in a visiting room.  Public reports indicate that BOP officials pepper sprayed individuals that had assembled in the lobby of the MDC [protesting the inhumane conditions]." (*at 4*)
4. "...the people housed at MDC were prevented from meeting with attorneys" (*at 4*)
5. "BOP officials were largely non-responsive.  They refused to provide detailed or accurate information..." (*at 5*)
6. "[BOP] offered explanations that were inconsistent with the conditions that had been described by the MDC inmates." (*at 5*)
7. "BOP attorney represented to Federal Defenders attorney on two separate occasions that he was "informed that the power outage did not impact the heating in the institutions" and that "the heat is operational".   ...however, the power outage following the fire had a significant impact on the MDC's heating system." (*at 5*)

The BOP has since reassigned Warden Quay following the catastrophic event.  Warden Quay falsely reported to the media and the U.S. District Court, in

contradiction to the first-hand experiences of the Federal Defenders who visited the building and spoke with inmates during the ordeal:

> "*Inmates have not been confined to their cells and are still allowed leisure/recreational activities.   There is currently no TV/Internet.   Inmates still have access to Public Defender Phones which are working.   Heat has never been impacted and is monitored regularly due to the cold weather.   Heat is in the high 60s and low 70s.   Hot water has not been impacted as it is on the same system as the heat.   There is no problem with medical, medications are still delivered twice daily.   The only issue related to medication is that the computers are not working so you cannot request medical through the computers.   Medical can still be requested through their units and also during the twice daily medical runs.  The visiting room is without power which is why there is no visitations.   The staff has temporary wiring in place and should have attorney visiting up today.*" (*at 6*)

"…much of what Warden Quay told the Southern District was materially false &/or misleading.   For example, the attorney at Federal Defenders witnessed the following:

    a. the facility was very cold (including one unit in which cold air was blowing from facility vents), such that BOP officers were wearing multiple layers and scarves around their heads, yet many inmates were wearing only short-sleeves shirts and light cotton pants;

    b. the lights were not functioning in the individual cells, leaving the cells in total darkness;

    c. inmates widely reported that they had been unable to fill medical prescriptions…

    d. inmates had not received clean clothing or bedding since the fire…

    e. large fluctuations in water temperature [ice cold or freezing cold only] and potability [brown tap water]…

    f. …inmates had not been allowed out of their cells since the date of the fire [totaling 8 days]

    g. received only cold food [with no food service on February 2]…"

The visiting Federal Defenders attorneys opined that the first two representations of Warden Quay (heat issues and medical issues) were patently false.   They confirmed to the U.S. District Court that their *personal observations* were in stark contrast to the representations by Warden Quay on behalf of the institution.

- This lawsuit and the "power outage issues" underscored the typical "spin" that

each and every day at MDC includes if Kenner or any inmate request items, activities, or compliance with Court orders, that the institution "does not care" about.   _This inhumane torture was inappropriate, yet the cover-up lies were abysmal and unforgivable_.


**Post-Release Issues...**

Second, even after Kenner is discharged from prison, his restricted liberty will continue when he is placed on supervised release.   As noted by former Judge John Gleeson from this District:

> Imprisonment is not the only way we punish. Supervised release brings with it a series of significant restrictions on a defendant's liberty. Offenders on supervised release, like the probationer in _Gall_, "may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the Court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking."

Imprisonment is concededly a more onerous from of punishment, and different in kind from supervision, but Zimmerman is being punished. _United States v. Zimmerman_, No. 10-CR-598 JG, 2012 WL 3779387, at *6 (E.D.N.Y. June 19, 2012) (citing and quoting _Gall v. United States_, 552 U.S. 38, 48-49 (2007); see also _United States v. Springer_, 684 F. App'x 37, 40 (2d Cir. 2017) (referring to Supervised Release as "conditional liberty").[56]

Third, in addition to losing his liberty, Kenner may also be required to pay a significant forfeiture amount for his alleged misconduct even though none of his investors actually lost money.


**Health Conditions As A Factor...**

As the Probation reported noted, thru Kenner's ex-wife, Kenner has a degenerative heart condition, which has no appreciable or available treatments in the BOP. Kenner has been legally deaf since childhood, a genetic trait in his family (shared by his daughter since birth), and has been systematically refused hearing aids during his incarceration (in spite of multiple ENT observations at local hospitals and

---

[56] For a list of mandatory and discretionary conditions of probation, see 18 U.S.C. § 3563 and U.S.S.G. § 5B1.3.

specialists recommendations).   Not only has Kenner's hearing loss affected his daily routine in the violent MDC environment (heightening his personal risk levels considerably), but it severely affects his courtroom presence and recognition of critical case issues (since pre-trial).   These hearing deficiencies have been exacerbated by ineffective counsel issues hi-lighted in Kenner's *28 U.S.C. 2255* submission to the Court (*Document 675*).

**Kenner Has Lived Six (6) Years Without Access To The Sun**; further harming his health and access to appropriate Vitamin D levels as recommended by the AHA (of 5,000 I.U.s per day).   This Court opined in July 2019 that it couldn't recall another case in its courtroom, which has dragged as long pre-sentence as the instant case.   If the Court deems additional incarceration time is necessary, under the unique conditions of this case, it certainly will be served in a minimum security facility with 12+ hours of sun available daily, unfortunately never correcting the inhumane lack of sun already unduly suffered by Kenner, and other conditions.

- Pre-arrest, Kenner was on a medical dose of Krill oil with phosphititel choline to save Kenner's remaining brain functions.
- Studies at University of Central Michigan and Boston University Neurological Centers have proven the efficacy.

<mark>The Bureau of Prisons will not provide the necessary medical relief.</mark>

**Chronic Traumatic Encephalopathy ("CTE")...**
**CTE** has been hi-lighted by the government's *faulty memory, confusion and mistakes* defense of 100s of their witnesses' inconsistent testimony at trial (*Document 440 at 16*) – fully contradicting their witnesses' own pre-trial FBI proffers, Grand Jury testimonies, civil testimonies, affidavits, emails, texts, signed disclosures, and civil complaints versus Ken Jowdy (filed in Arizona, California, Nevada and Mexico).

At issue is that Kenner suffers from the same **CTE** symptoms that led to the death of Kenner's childhood friend (Ex-NHL player, Richard Martin), who has been prevalent in the NHL players' litigation efforts versus the NHL for **CTE** damage, identical to the NFL's highly-publicized **CTE** litigation.

- Through information and belief, multiple superseding indictment individuals have participated since the 2015 trial in the litigation as **CTE**-sufferers, creating wholly reformative issues in the event of a re-trial.

After a lifetime of concussions and sub-concussive hits playing hockey, Kenner was highly susceptible to the Tau protein buildups in his brain tissue like many of the case witnesses.   The vicious 2010 jailhouse beating in Mexico, leaving Kenner near

death before his Mexico attorney found him and had him removed under Mexico Federal orders from Mexico City District Federal, have continued to specifically deteriorate Kenner's short-term memory.   Most daily memories for Kenner are vacant until days or weeks pass and some recollection returns.   Kenner is forced to write down where he is every night, so in the morning he can be reminded of his present location.   This is an unfortunate habit that Kenner had to do for years before his November 13, 2013 incarceration.   Fortunately, at the moment, the majority of Kenner's longer-term memory functions are still in tact.

- The BOP has no treatments available, nor will they treat Kenner's constant and resulting migraines with anything but Tylenol (which unfortunately has resulted in anal bleeding issues based on the daily prescription dose).   This side-effect is not welcomed anywhere, but in a maximum-security federal detention facility, it is critically dangerous (for many "urban" reasons).

Kenner's additional side-effect of concussion-induced severe vertigo has only increased while Kenner has been incarcerated without proper medical treatments. MDC has offered Kenner a "breathing" program to deal with the medical vertigo issues.   It is not acceptable or a reasonable solution.   As a result of Kenner's vertigo, the facility has tested Kenner at outside hospitals for brain tumors with magnetic resonance CT-scans on several occasions because of his inability to stand up at times, yet offer no medical assistance or follow-up.

**Defendants Age And Physical Health Is A Factor Worthy Of Consideration...**
The Second Circuit has routinely opined that age and physical illnesses have been a factor considered by sentencing courts.   See *United States v. Jimenez*, 212 F. Supp.2d 214 (SDNY 2002) (Since the time the crime was committed – the defendant suffered a brain aneurism.   The sentencing judge found that this injury left Jimenez physically and mentally weaker and less likely to recidivate and concluded that a long imprisonment would not be necessary to protect the public and would be "*wasteful and unnecessary*". *Id* at 219); *United States v. Rioux*, 95 F.3d 648 (2d Cir 1996) (upheld a downward departure in consideration of defendants kidney disease); *United States v. Roth*, 1995 WL 35676, at *1 (held downward departure for 63 year old defendant with neuro-muscular was warranted).

**Life span of older inmates...**
Further – **recent studies have shown that incarceration reduces the average person's lifespan by up to two years per each year in prison**.   *The Dose-Response of Time Served in Prison on Mortality:  New York State*, 1989-2003, Am. J. Pub. Health 103:3 (March 2013).

160

> "*Incarceration not only compounds existing health issues and heightens the risk of future health problems – but – most alarmingly – has deteriorating effect on the bodies of incarcerated people – causing them to physically age at a much faster rate than the public at large.*" *The High Cost of Low Risk: The Crisis of America's Aging Prison Population*," The Osborne Association (2014).

Any additional period of incarceration will adversely affect Kenner's health. Kenner's combined age and physical health presents a separate problem that is not presented by a younger defendant who has committed the same alleged offense. The same sentence applied to a younger offender "*may be uniquely disproportionate to the elderly offender; elderly criminals will lose a greater percentage of their lives than younger criminals and may suffer from the same sentence.*" *United States v. Wills*, 322 F. Supp. 2d 76, 83 (D. Mass 2004).

Furthermore – "*[t]he physical and mental capacity to engage in criminal activity plainly lessens as the offender gets older.*" *Id.* Kenner submits that he has a zero likelihood of committing future crimes. Therefore – Kenner respectfully request that the Court consider Kenner's health and age at sentencing.

Considering the severe nature of these punishments, Kenner's proposed *time-served* sentence is sufficient to satisfy the factors in 18 U.S.C. § 3553(a)(2)(A) listed above.

## Kenner's Character and Background Mitigate Against Any Additional Incarceration...

Section 3553(a) allows a sentencing court to consider a defendant in all of his unique humanity. It is long been recognized that a defendant's character is always "a central consideration in the fashioning of a just sentence." *United States v. Merritt*, 988 F.2d 1298, 1307 (2d Cir. 1993).

As Judge Jed S. Rakoff of the Southern District of New York so eloquently explained:

> [S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

161

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006); accord *Gall v. United States*, 552 U.S. 38, 52, 128 S. Ct. 586, 598 (2007) ("'It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue'" (quoting *Koon v. United States*, 518 U.S. 81, 113, 116 S. Ct. 2035, 2053 (1996))); see also 18 U.S.C. § 3661; U.S.S.G. §1B1.4 (sentencing court not limited with respect to the information concerning a defendant's background, character and conduct that it may consider for the purpose of imposing an appropriate sentence).

**Other Mitigating Factors...**
The letters submitted on behalf of Kenner demonstrate his characteristic good deeds and charitable works. Post-*Booker*, a defendant's history of charitable activities can be considered as one of the factors appropriate in imposing a sentence under the advisory guidelines. See *Rita*, 127 S. Ct. at 2473 (Stevens, J., concurring) ("Matters such as . . . charitable, or public service are not ordinarily considered under the Guidelines [but are] matters that § 3553(a) authorizes the sentencing judge to consider.")

Notably, several courts have granted a defendant a variance or downward departure based on the defendant's "exceptional" good works. For example, in *United States v. Serafini*, 233 F.3d 758, 773, 774 (3d Cir. 2000), the Third Circuit upheld the district court's downward departure where many of the letters supporting Serafini, an elected official, "contain[ed] substantive descriptions of Serafini's generosity with his time as well as his money." *Serafini*, 233 F.3d at 773.   Indeed, "several constituents and friends described situations in which Serafini extended himself to them in unique and meaningful ways during times of serious need." *Id*. at 773. The Third Circuit specifically noted three letters describing Serafini's good works:

> (1) a letter from a friend who sought and received from Serafini a $300,000 guarantee to secure treatment for a family member's brain tumor;
> (2) a letter from Serafini's constituent who, having sustained serious injury in an accident that rendered him incapacitated, was hired by Serafini and who credits Serafini with "turning his life around"; and
> (3) a letter from a widow who approached Serafini because she was about to lose her home and to whom Serafini gave a check for $750 with no expectation of repayment. Id. at 773-74.

Finding that Serafini was "an exceptionally giving person," the Third Circuit upheld the District Court's downward departure for community and charitable activities. Id.

at 774, 775.

As Serafini and other cases make clear, whether it is categorized as a downward departure or the basis for a non-guidelines variance owing to the criteria delineated in 18 U.S.C. § 3553(a), a life of extraordinary good works towards others remains a vital factor for a sentencing court to consider. See, e.g., *United States v. Tomko*, 562 F.3d 558, 572 (3d Cir. 2009) (affirming variance to a sentence of probation due largely to the defendants "exceptional" charitable acts and good works); *United States v. Thurston*, 544 F.3d 22, 26 (1st Cir. 2008) (affirming a sentence of three months incarceration and 24 months supervised release from a recommended guideline sentence of 60 months imprisonment based in part on the defendant's "charitable work, community service, generosity with time, and spiritual support and assistance to others"); *United States v. Ali*, 508 F.3d 136, 150 & n.19 (3d Cir 2007) (upholding downward departure where the defendant, inter alia, "helped organize fundraising banquets for the [school where she worked], contributed her 'personal assistance from leading to scrubbing floors,' spent several hours 'counseling and comforting' a student's parent who was struggling to overcome drug-addiction, and became the 'legal guardian' to two nieces to ensure that they attended better schools." (record citation omitted)); *United States v. Cooper*, 394 F.3d 172, 177, 178 (3d Cir. 2005) (noting that "[d]ownward departures for good works . . . are permissible when the works are exceptional," and upholding the departure where the defendant's good works included  "hands-on personal sacrifices, which have had a dramatic and positive impact on the lives of others"); *United States v. Woods*, 159 F.3d 1132, 1136 (8th Cir. 1998) (upholding defendant's downward departure for charitable activities, which included bringing two troubled young women into her home and paying for them to attend a private high school, as well as helping to care for an elderly friend").  *See United States v. Rioux*, 97 F.3d 648, 663 (2d Cir 1996) (affirming downward departure based upon charitable fundraising and other factors), *United States v. Greene*, 249 F. Supp. 2d 262 (SDNY 2003) (seven level departure based upon charitable good works and extraordinary family circumstances); *United States v. Cooper*, 394 F.3d 172 (3rd Cir 2005) (four level departure for exception good works).  *United States v. Fishman*, 631 F. Supp 2d 399, 404-405 (SDNY 2009) (granting a variance for the laudable good deeds of the defendant attorney).

Tellingly, many of the courts that have addressed a defendant's good works have recognized that the defendant's contribution of his time and energy is more valuable than simply his monetary contributions. See, e.g., *Tomko*, 562 F.3d at 572 (describing how the defendant's "charitable acts that involved not only money, but also his personal time."); *Cooper*, 394 F.3d at 177 (noting that personal sacrifices

163

"are qualitatively different from the detached donation of money"); *Serafini*, 233 F.3d at 775 (noting that Serafini's contributions "weren't acts of just giving money, they were acts of giving time, of giving one's self").

Here, Kenner's history of contributions to youth sports and charitable works are truly remarkable.   He has selflessly helped others in need – more often than not spending his own funds to help them; in addition to his charitable time.   Kenner spends seemingly the majority of his free time helping near strangers navigate terrifying medical diagnoses of brain cancer – specifically children.   Kenner had shown his commitment to charity by contributing to medical research thru much needed research funding and volunteer time visiting the children who suffer their horrible fates in life.   Kenner is ultimately a compassionate man perhaps pursuing success with a bold and, at times, confident style, but always shares the fruits of his success -- whether financial fruits distributed to investors, scientific fruits dispensed in the form of charitable efforts, or support and hope for those whose health has been devastated.

These charitable activities, along with his sentence already served, demonstrate Kenner's commitment to his community and further support the conclusion that no additional incarceration is either appropriate or necessary.   *See United States v. Rioux*, 97 F.3d 648, 663 (2d Cir 1996) (affirming downward departure based upon charitable fundraising and other factors), *United States v. Greene*, 249 F. Supp. 2d 262 (SDNY 2003) (seven level departure based upon charitable good works and extraordinary family circumstances); *United States v. Cooper*, 394 F.3d 172 (3rd Cir 2005) (four level departure for exception good works).   *United States v. Fishman*, 631 F. Supp 2d 399, 404-405 (SDNY 2009) (granting a variance for the laudable good deeds of the defendant attorney), see also, *United States v. Cooper*, 394 F.3d 172, 177 (3d Cir 2005) (departure affirmed where good deeds were far beyond the realm of that traditionally seen).

Kenner's fiance noted to this Court:

> *"With the fundraising, in addition to the millions I already helped him raise worldwide, just prior to his arrest, he signed a deal with Major League Baseball that would guarantee raising over 1 million dollars per month through their joint efforts.   That was more money than the top 3 brain cancer charities in the USA raise combined.   The 2 main brain cancer research facilities in Phoenix, AZ where we did so many visits to the kids suffering from terminal brain cancer, and the facility in San Francisco, CA would have received more funding in 2014 alone than ever before in the history of brain cancer research funding.   Not*

*even the USA government funds more for the research.   All of that stopped the day that Galioto arrested Phil.  It disgusts me every time I think about the tens of thousands of children who have died since that day who could have received the benefits of Phil's amazing and relentless efforts.   That is over $40 million gone since he was arrested.*

*Please have mercy on him for who he really is!  Even in the days when Phil was under the most duress from the Jowdy attorneys trying to arrest him from fraudulent court filings that Phil had dismissed and Berard threatening to have Phil killed, Phil gave everything he could physically to the kids at hockey, me, our charity efforts and his children.   As Jowdy, Berard, Kaiser and the FBI agent spread horrible rumors through the newspapers and directly to Phil's investors, whom he fought for, Phil only got stronger and fought harder for them.   I cannot fathom even today how he managed to do it.   Anyone less than a saint would have caved in years earlier to their calculated and evil ways. Phil is needed out here by more than just me and his children.   He has been away from us for too long.  The world is less of a place without him in it."*

**Consideration Of Kenner's Family Circumstances Is Warranted...**
We respectfully submit that Kenner's family circumstances – which encompass pending life-critical medical treatments – be considered at sentencing.

Kenner's fiancée wrote to the Court in her Rule 41(g) submission (at ¶14):

*"I am currently awaiting medical approvals for a liver transplant and have been without my emergency funds for almost five years to expedite and facilitate the pre-approval process.   As a result, I live under constant anxiety of dying from my medical conditions, which I cannot be addressed without my emergency funds."*

She noted to the Court:

*"At the height of my medical collapse in 2016, I received a summons to court or get arrested by the US Marshalls.   I could not even walk after a month in intensive care in the hospital, but I was forced to appear or go to jail.   When I arrived, a very aggressive prosecutor told me that I needed to be booked and would face up to 6 years in jail for my charges.  I told him that I was not aware of any charges.  He said it related to the noise incident at my house a year earlier. I told the prosecutor that the charge was dismissed by the judge a year earlier and was actually against someone else who rented my home the prior*

*year.  I actually called the police to report the loud behavior.   The prosecutor laughed at me and said that this case was going to be fun for him.  It would be my turn to really pay.   I told him I nearly died this month and need severe medical attention 24/7.   I had to walk with a walker.   He told me that I had messed with the wrong people and would pay for it.   I nearly collapsed on the spot.   The realized the noise complaint was being re-opened a year after it was dismissed against someone else, it was changed to me, and 2 new charges for criminal nuisance-premises for unlawful conduct (a class 3 misdemeanor) and disorderly conduct-disruptive behavior or fighting (a class 1 misdemeanor) were being added to me.   There were no fights.   The prosecutor told me I should be prepared to spend some serious jail time after I was booked and photographed and finger printed.   After months of appearances travelling to and from the in-patient clinic, the new judge dismissed the charges and fined me a few hundred dollars for the noise complaint.   The stress almost killed me again.  The prosecutor told me afterwards that I better think twice about whom I am dealing with, because this would not be the end of it.   I know who really did this to hurt Phil and me.   I have since moved away from AZ to two different friends homes to have a place to live until Phil comes back to protect me and care for me.   I am feverishly working to get accepted onto a liver transplant list.   I do not know if I will make it before I die.   Every day is a horrible challenge.   I try to put on a good face, and enjoy each day under this duress.   It is taking its toll on me."*

Kenner has been unable to provide financially for his fiancée during his extended absence, leaving her in dire need of appropriate medical attention but left alone to provide for herself in an unsafe environment, risking her wavering health and life daily.

Although "*family ties and responsibilities are not normally relevant,*" to a sentencing decision – U.S.S.G. 5H1.6 Policy Statement – "*'[n]ot ordinarily relevant' is not synonymous with 'never relevant' or 'not relevant'.*"   *United States v. Monaco*, 23 F.3d 793, 801 (3d Cir 1994).   It is well settled that the federal courts have imposed non-incarceration sentences on individuals whose imprisonment would create exceptional and devastating consequences for their families.   *United States v. Galante*, 111 F.3d 1029 (2d Cir 1997).

The Second Circuit has recognized that – "***[t]he intended beneficiary of a family circumstances departure is not the defendant but his dependents***."   *United States v. Greene*, 249 F. Supp 2d 262, 266 (SDNY 2003) (quoting *United States v. Johnson*, 964 F.2d 124, 129 (2d Cir 1992)).   Thus – "*[s]entencing courts must...focus on the*

166

*vulnerability of these dependents, assessing the hardships that a sentence of incarceration would impose on them."* Id. (referencing *United States v. Faria*, 161 F.3d 761,762 (2d Cir 1998)) ("*[W]e have upheld downward departures based on family circumstances 'where the family was uniquely dependent on the defendants ability to maintain existing financial and emotional commitments.'"*) (quoting *United States v. Sprei*, 145 F.3d 528, 535 (2d Cir 1998).   Furthermore – "*a defendant's family circumstances are part of [his] history and characteristics.*"   *United States v. Roberts*, 2005 WL 1153757 at *5 (SDNY 2005) (granted time served in consideration of defendant's role as the sole caretaker for his chronically ill and disabled life partner).

We submit that Kenner's fiancée's circumstances warrant consideration at sentencing.

## <mark>Neither Specific Nor General Deterrence Will Be Served By Any Additional Incarceration…</mark>

Congress has instructed that, in fashioning an appropriate sentence, the Court should take into account the need for deterrence, and to protect the public from the potential that the defendant will commit additional crimes in the future. Under this prong of § 3553(a), courts assess whether a sentence will sufficiently deter the defendant from committing further crimes, and the public at large from committing similar offenses.

In the instant case – the Court is faced with the interesting dilemma of determining how only four (4) of the 26 **Hawai'i-Mexico** partners were allegedly *unaware* of the "Jowdy loans" as authorized by their signed By-Laws…and how that constitutes a crime when no assets of the investors -- or the company -- are missing.

In addition, the forensic accounting confirms there were no "misspent" **GSF** funds (when considering the Constantine-Gonchar side-deal, known at all times pre-trial by the government and ignored – and the significant financial deposits by Constantine to the GSF efforts).

Lastly, the investors-own attorneys vetted the enigma about concealment in the Eufora private stock sales "object".   They found no issues with the fully documented and transparent transactions, in real time.   In addition, the government alleged that only six (6) of the eleven (11) 2008-09 private stock purchasers had information concealed from them – while all represented by the same investigative attorneys.

- None of it conforms to a typical criminal "routine" or profile.  Nor does it reveal a pattern where the Court should find concern about recidivism.

**A Sentence Of Any Additional Incarceration Will Not Further The Goals Of Specific Deterrence Or The Need To Protect The Community**...

Specific deterrence is achieved by sending a clear message to the defendant. Kenner has received this message, through the machinations of this ordeal since Kenner's 2006 whistleblowing efforts.   Since 2013, Kenner has been indicted and charged by the U.S. government.   Due to the nature of his indictment, his 20-year unblemished career in sports and entertainment is over.   His Google-resume will be forever destroyed by the Internet-spinning by the NY Daily News to keep their stories (although 100% false) at the top of Kenner's search page.   He has also suffered by sitting through a ten-week trial, which ended in convictions on two (2) conspiracies by concealment counts.   During that process, Kenner went through a very public jury selection -- with names that unnamed Jowdy advocates called Kenner and smeared across the news media day after day (by Michael O'Keefe of the NY Daily News).

In addition, Kenner has spent the last 72+ months in maximum-security facilities, which has included numerous locks downs and power outages during the winter, *supra*.   Given the punishment that Kenner has already received, and the punishment he will continue to receive as a convicted felon, there is no basis to believe that he would commit any crimes in the future.   See *United States v. Nesbeth*, 188 F. Supp. 3d 179, 180 (E.D.N.Y. 2016) (urging sentencing courts to consider the collateral consequences facing a convicted felon).

Moreover, given the public nature of this prosecution, it is extremely unlikely that Kenner would or could ever commit a fraud crime.   As such, there is no need for any additional incarceration to further the goal of specific deterrence.

**A Sentence of Any Additional Incarceration Will Not Further General Deterrence**...

General deterrence has also been achieved here, given the public nature of this prosecution and Kenner's already 72-month-plus long incarceration (mostly at the MDC).   Imposing a sentence of any additional incarceration will not serve the general deterrence purposes under § 3553(a).   Indeed, research has consistently shown that, while the certainty of being caught and punished has a deterrent effect,

> "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." M. Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006);

See also *United States v. Yeaman*, 248 F.3d 223, 238 (3d Cir. 2001) (Nygaard, J., dissenting) ("It is widely recognized that the duration of incarceration provides little or no general deterrence for white collar crimes.").

> "Three National Academy of Science panels . . .reached that conclusion, as has every major survey of the evidence." *Id*.; see also Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

Moreover, a short sentence can also send a strong message to potential white-collar offenders. See *Adelson*, 441 F. Supp. 2d at 514 (describing the "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders"); *United States v. Tomko*, 562 F.3d 558, 573 (3d Cir. 2009) (declining to adopt government's argument that district court's probation-only sentence in complex securities fraud case, which government described as a "100% variance," would harm general deterrence; see also *Gabbay*, *supra*, at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").[57]

- "[E]mpirical research shows no relationship between sentence length and

---

[57] See generally Raymond Paternoster, How Much Do We Really Know About Criminal Deterrence?, 100 J. Crim. L. & Criminology 765, 817 (2010) (summarizing empirical studies of deterrence and concluding there is no apparent deterrent effect from more severe punishments, a modest deterrent effect for the perceived certainty of legal punishment, and "an even stronger effect for the certainty of non-legal or informal sanctions"); Mirko Bagaric, A Rational Theory of Mitigation and Aggravation in Sentencing: Why Less Is More When It Comes to Punishing Criminals, 62 Buff. L. Rev. 1159, 1203 (2014) ("[S]tudies repeatedly show that awareness of potentially severe sanctions does not produce less crime."); Robert Weisberg, Reality-Challenged Philosophies of Punishment, 95 Marq. L. Rev. 1203, 1248 (2012) (summarizing empirical research on general deterrence which concludes that "although the general deterrent effect may operate at some base rate to reduce crime, changes in penal policy or enforcement play little role in sending a message that crime does not pay").

deterrence."[58]

With respect to the question of whether there is any "particular quantum of punishment that results in increased deterrence and thus decreased crime": Here the findings are uniformly negative: there is no evidence that increases in sentence length reduces crime through deterrence. Current empirical research on general deterrence shows that while certainty of punishment has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects . . . ."[59]

Furthermore, "general deterrence" alone cannot support the weight of a sentence sending an individual to prison. See *United States v. Corsey*, 723 F.3d 366, 381 (2d Cir. 2013) (Underhill, J., concurring) (where the district court's § 3553 analysis relied "almost exclusively on one word – 'deterrence,'" that factor simply could not "'bear the weight assigned it under the totality of circumstances in the case,'" (quoting *United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008))). Several courts have recognized the over-emphasis on "general deterrence" as a basis for imposing prison sentences. For example, in *United States v. Edwards*, 595 F. 3d 1004 (9th Cir. 2010), the defendant, who was convicted of bankruptcy fraud and bank fraud, was sentenced to a five-year period of probation with house arrest in lieu of the recommended guideline sentence of 27-33 months. 595 F. 3d 1004.

During sentencing, the district court first noted that the defendant was unlikely to re-offend because of his post-offense rehabilitation. Then, the district court explained that "general deterrence" was not a significant factor in the case. *Id*. at 1011. The district court reasoned that the conditions of probation and restitution constituted sufficient "specific deterrence" to prevent Edwards from engaging in similar conduct in the future. *Id*. In upholding the district court's sentence, the Ninth Circuit held that § 3553(a) "does not require the goal of general deterrence be met though a period of incarceration." *Id*. at 1016; see also *United States v. Warner*, 792 F.3d 847, 860-61 (7th Cir. 2015) (finding the message sent by probationary sentence in tax evasion case sufficient to satisfy general deterrence under § 3553(a)).

A sentence substantially below-PSR-Guidelines of *time-served* would still reflect the

---

[58] Amy Baron-Evans, Sentencing by the Statute, at 7 (Apr. 27, 2009), available at http://www.fd.org/docs/select-topics---sentencing/Sentencing_by_the_Statute.pdf.

[59] Id. (quoting Michael Tonry, Purposes and Functions of Sentencing, 34 Crime and Justice: A Review of Research, at 28-29 (2006) (emphasis in original)).

need for general deterrence of the criminal activity as alleged.  The deterrent effect is particularly strong in this case, where Kenner's trial, conviction, and time already confined to a maximum-security prison facility have been widely reported in the news.

During the May 14, 2019 hearing, a third (3rd) party to the instant case noted that *Jowdy was sued for exactly those thefts and misappropriations.*[60]

Nevertheless – the slander-ridden press release (promoted by the NY Daily News) as part of the Jowdy settlement terms and conditions with the investors has left another deceitful and falsified scar on those related to the DCSL project, as evidenced by Diamante Doce Managing Member, Attorney Marc Wolinsky's open Court proffer on May 14, 2019 that:

> [Wolinsky]: "*...if you Google the property like I did before I purchased, I would have seen that Mr. Kenner originally filed a lawsuit against Mr. Jowdy accusing him of fraud – that lawsuit was dismissed.  The government indicted Mr. Kenner, and* **Mr. Kenner turned out to have snuckered the hockey players into wrongly suing Mr. Jowdy.**"

- This is clearly <u>not correct</u> based on Jowdy's-own well-hidden confessions to the same FBI agent who hides in the EDNY courtroom at every hearing -- from the investors and the public at-large – and the government's post-trial evidence they continue to run from (*government-forfeiture-36 and government-forfeiture-44*), except when they need to berate the Court about a nexus that does not exist (simply to cover their-own malfeasance of over a decade at this point in time).

### It is clear and confessed that...

### Jowdy "*snuckered*" <u>everyone</u>!!

Kenner will never be able to undue the false press (for the remainder of his life) – as spread by Jowdy's cabal – and intended to cover-up more of the two (2) decades of Jowdy crimes thru diversions of the truths...and sadly still <u>not</u> known by the

---

[60] <u>Jowdy verified</u> his own thefts during his January 2010 California deposition (in evidence) -- <u>and re-verified</u> them to the FBI during his February and March 2010 proffers (*3500-KJ-2 at 11-14*).  There is no equivocation about each and every theft and misappropriation that Jowdy's investor group, between 2007 and 2014, sued Jowdy to recover -- <u>and his respective confessions</u>.

investors who have taken the proverbial "bait" from FBI agent Galioto and Jowdy's cabal (formerly including Berard and Kaiser).   Kenner can either live with the lies (allowing them to be taken as truths) or spend the next decade of his life suing the NY Daily News &/or the individuals who have allowed and promoted the dissemination of the lies.

- Neither option appears to be an enviable task as Kenner is released to his community and forced to rebuild his life for his family under the already unbearable weight of a felony conviction (notwithstanding potential appeal and retrial issues that the government continues to project to this Court as inevitable – based on their trial misconduct).

Moreover, because deterrence is only one (1) factor to be considered under § 3553(a), in assessing the deterrent value of any aspect of a sentence, this Court can and should assume that people learning of the sentence will also be aware of all the facts the Court considered, including Kenner's determination and hard work, set forth above, rather than just the limited and mostly inaccurate details described in the press (orchestrated by Jowdy's cabal) and spread thru the Sports and Entertainment world by FBI agent Galioto, John Kaiser and Bryan Berard (while employed by Jowdy to do so: *See Document 628*).

**A Sentence Of Any Additional Incarceration Would Result In Unwarranted Sentencing Disparity**...

Another factor that a sentencing court must consider before imposing sentence is the need to avoid unwarranted sentence disparities. See 18 U.S.C. § 3553(a)(6). As stated throughout this submission, Kenner's case is significantly different from most other fraud cases because his investors made money from their investment(s) &/or have significant retained value (**only obstructed by an uncooperative U.S. Government and FBI case agent**).

This Court should also consider that, unlike most fraud cases, Kenner's alleged criminal conduct did not lead his investors to any financial hardship.

- As previously noted, in the Kenner forensic analysis, Kenner's superseding indictment investors earned approximately $180 million during their professional hockey careers, not counting off-ice income and post-career earnings.   No more than $9 million is traceable to the actual "objects" of the charged conspiracies as initial investments; *notwithstanding* the millions they each received as a result of their investments thru specific payments,

distributions, and retained equity; *resulting in a positive return*.

- As the Court knows, if the government would stop their obstructionist actions (and confess to the investors and the public that "*Jowdy received and still has 100% of their Hawai'i-Mexico funds*"…then the recovery process could proceed accordingly, unencumbered) (*See government-forfeiture-36* and *government-forfeiture-44*).

**No Loss Is Calculable After Forensic Review Of The Various "Objects"…**
As the Kenner forensic analysis has verified (and unchallenged by the government thru six (6) years of incarceration) is that the superseding indictment victims had *$8.675 million* "involved" in the various objects conspiracies – ***before*** their 2015 courtroom confessions, empirical evidence ignored by the government, repayments of capital, settlements from 3rd parties unrelated to Kenner-client activity, and residual value from assets received by bonafide purchasers for value (fully documented); leaving the objects' residual values (in total return), a positive return – *resulting in no loss, merely uncollectable assets based on the government's-own obstructive behaviors*…

None of this is Kenner's doing at any point in time (intended or otherwise) with all real assets titled, at all times, to the investors and their respective corporate entities [Little Isle 4, Na'alehu Ventures 2006 or AZ Eufora Partners I – if not personally from Constantine GSF Eufora additional equity] – and never diluted by Kenner for personal benefit or "*ill-gotten-gains*".

As a result – a sentence within the guideline range based on the monetary loss would result in an unwarranted and gross sentencing disparity in comparison to other defendants.

Even though the national sentencing averages are trending down, on a national level – out of the 6,517 fraud cases in federal court for the 2016 year – the mean imprisonment was 25 months – with a median term of 13 months – according to statistics published by the United States Sentencing Commission.[61]   Out of the 7,104 cases sentenced under 2B1.1 – the mean term of imprisonment was 22 months and the median was 12.[62]

---

[61] https://isb.ussc.gov/content/pentahocdf/RenderXCDF?solution=Suorcebook&path=&action=table_xx.xcdf&template=mantle&table_num=Table13

[62] https://isb.ussc.gov/content/pentahocdf/RenderXCDF?solution=Suorcebook&path=&action=table_xx.xcdf&template=mantle&table_num=Table13G

**When calculated more specifically – in the Second Circuit the average length was 27 months with a corresponding average loss amount of $2,654,452 – and in this District the average sentence length was 27 months with a corresponding average loss amount of $2,439,213**.  The below chart illustrates the sentencing trends for fraud cases and corresponding losses in both the Southern District and Second Circuit – as well as the National level – for both 2016.

| Jurisdiction | Year | Mean | Median | # of Sentence |
|---|---|---|---|---|
| **National Total** | 2016 | 32 | 24 | 4,705 |
| **National CHC I** | 2016 | 30 | 21 | 2,900 |
| **National Loss** | 2016 | $1,801,472 | $137,828 | 5,647 |
| **2nd Circuit Total** | 2016 | 29 | 18 | 348 |
| **2nd Circuit CHC I** | 2016 | 27 | 16 | 242 |
| **2nd Circuit Loss** | 2016 | $2,654,452 | $227,125 | 473 |
| **SDNY Total** | 2016 | 27 | 18 | 174 |
| **SDNY CHC I** | 2016 | 27 | 16 | 116 |
| **SDNY Loss** | 2016 | $2,439,213 | $291,313 | 215 |

Therefore – a sentence within the guideline range of 324-405 months (27 to 33.75 years) imprisonment – or the reduced 20-year recommendation -- would create unwarranted sentencing disparity between Kenner and defendants sentenced under U.S.S.G 2B1.1 with a C.H.C. I (and Higher Criminal History categories) nationally – in the Second Circuit and in the District.   Based on the data compiled by the Commission – a sentence well below the guideline range would prevent unwarranted sentencing disparities among similarly situated defendants.

**High(er) Profile Cases…**

As the Court is aware, several high-profile cases were sentenced in the SDNY in or about 2018.

- For one, Festival promoter, Billy McFarland, plead guilty to wire fraud charges after selling "fake tickets" and putting thousands of people's lives at risk in a foreign country when they arrived to watch a music festival.   McFarland was also accused of defrauding the investors in his company.   The court alleged a

$24 million loss as a result of McFarland's criminality.   **He was sentenced to 6 years (72 months in prison**).

- Second, former "*Pharma-Bro*" and "*Most hated man in America*", Martin Shkreli was found guilty after trial of approximately $10.1 million of investment misconduct and **sentenced to 7 years (84 months)** in prison.

- Third, Billy Walters (16 CR 338[PKC]), former professional gambler was convicted of all charges at trial in his insider-trading scheme.   The sentencing judge opined, "*the amounts of profits and losses avoided were well over $25 million.   The government asserts they were approximately $45 million...*" (*Id. at 31*).   Identical to Kenner (who received no benefit of the alleged conspiratorial activities -- other than two (2) documented loan repayment amounts totaling less than $300,000, with full consideration given by the 3rd private stock sellers), Walters' judge opined, "*These crimes were not about enhancing a life of comfort or luxury.  He already had that.*"  **Judge Castell sentenced Walters to 60 months imprisonment and one (1) year supervised release** with a $10 million fine plus restitution (determined after sentencing by the court).

**Jowdy's Cabal Initiated All NY Daily News Media Coverage Since 2007 (When Kenner Refused The Bribes...)...**

Although Kenner's media coverage was part and parcel to Jowdy's cabal cover-up plan since the initial 2008 slander and defamation stories (thru their personal relationship with NY Daily News writer, Michael O'Keefe), it was wholly contrived in a region of the country that Kenner had zero contact with for nearly a decade.

- o This further exposed the "planted", "pay-for-play" stories by Jowdy's attorneys to soil Kenner before any potential jurors in the future (as their 2008 extortion email of Kenner laid out).   The Court should note the first (1st) media stories reflected Harvey and Jowdy's defense position in 2008 that "*Jowdy never received loans from Kenner and the Hawai'i partners*" and that was why the FBI would eventually arrest Kenner.[63]

---

[63] As part and parcel to Kenner's transparency and the investors independent representation by counsel, the Hawai'i-Mexico investors signed a 7-page disclosure about the litigation versus Jowdy to *recover the "Hawai'i loans"* (received post-trial from the government production, raising another *Brady* issue before this Court):

"*the gist of the lawsuit is to recover certain monies loaned to Mr. Jowdy from Mr. Kenner, Little Isle 4 and Ula Makika LLC.   **Mr. Kenner estimates** the total amount of monies loaned to Mr. Jowdy which have not been repaid to be approximately*

- As the Court knows, this same sham that was perpetrated on several federal courts by Jowdy and his attorneys was *debunked* by Jowdy's own January 2010 California deposition confessions, his March 2010 FBI confessions (*3500-KJ-2 at 11-14*), and again post-trial in the government's submission of *government-forfeiture-44* and *government-forfeiture-36*.

- The Court must ask how the government's prosecutorial theory was that the "loans" were not real &/or how the NY Daily News wrote slander stories about Kenner specific to the fake "loans" – and they all got it wrong, while collectively destroying Kenner's reputation for years…and none of them have any accountability?   Is it because Jowdy's frauds supported the government's debunked trial themes?

  - The Court must remember that Kristen Peca confessed to the fraudulent back-story by FBI agent Galioto to her and Michael Peca in her 2012 surreptitious FBI recordings of Kenner.

**Case Disparity Issues…**

Because of these factors, we respectfully submit that a sentence of any additional incarceration would create unwarranted sentencing disparities with cases where the actual fraud was larger, the conduct more egregious, and where the defendant was required to pay restitution because the fraud victims actually lost money.[64]

A non-exhaustive list of such cases is detailed in the below:

---

> *$5,000,000.   This is the estimated principle only, exclusive of accrued interest.  In summary, Mr. Jowdy denies that the monies were loans but rather characterizes them as investments.*"

[64] ***No loss of value has ever occurred***.   The Little Isle 4 assets have merely faced insurmountable defiance and hurdles to collect (specifically with Kenner in detention) and Hawai'i partners Managing Member John Kaiser working for Jowdy (2012-2017), when Jowdy was the person Kaiser had a fiduciary responsibility to pursue thru litigation to recover the unclaimed asset (the Jowdy loan) of Little Isle 4 and Baja Ventures 2006.

The *Mandatory Victims Restitution Act* ("MVRA") statutes also do not allow for a restitution judgment to provide a windfall of money by double collecting at any time in the future, especially for an asset that was "**never lost**" to Little Isle 4 and its investors.   As such, if the funds were never lost, just merely *illiquid* based on the government's non-efforts, *discussed supra*, then the same non-loss cannot be a contributing factor to sentencing guidelines, either…

| CASE | NATURE OF OFFENSE | GUIDELINE RANGE | SENTENCE |
|---|---|---|---|
| U.S. v. Block[29] (SDNY) 16 Cr. 595 (JPO) | Conspiracy to Commit Securities Fraud;  Securities Fraud; False Statements in Filings with SEC | Life | 18 months $100,000 fine (after trial) |

| | | | |
|---|---|---|---|
| U.S. v. Adelson[30] (SDNY) 05 Cr. 325 (JSR) | Securities Fraud | Life | 42 months $50 m restitution $1.2.m forfeiture (after trial) |
| U.S. v Caspersen[31] (SDNY) 16 Cr. 414 (JSR) | Securities Fraud; Wire Fraud | 151-188 months | 48 months $47m forfeiture $36m restitution (plea) |
| U.S. v. Lamm[32] (EDNY) 15 Cr. 43 (FB) | Securities Fraud | 78-97 months | 36 months $15m restitution (plea) |
| U.S. v. Lumiere[33] (SDNY) 16 Cr. 483 (JSR) | Conspiracy to Commit Securities Fraud | 135-168 months | 18 months $1,000,000 fine (after trial) |
| U.S. v. Hochfeld[34] (SDNY) 13 Cr. 21 (PAC) | Securities Fraud; Wire Fraud | 78-97 months | 24 months $2.1m forfeiture (plea) |
| U.S. v. Sekaran[35] (SDNY) 12 Cr. 821 (RPP) | Securities Fraud; Mail Fraud | 41- 51 months | 30 months $2.2m restitution (plea) |

Table references:

[29] Block was the former CFO of a real estate investment trust that manipulated financial results of the trust in various SEC filings. The government argued the loss in the case to be **$315 million** based on the market drop following disclosure of the fraud.

[30] Adelson was Chief Operating Officer and President of Impath, Inc. who conspired with others to materially overstate Impath's financial results, thereby artificially inflating the price of its stock. Adelson enriched himself by increasing salary and exercising stock options at the artificially increased share price. The government alleged a loss amount of **more than $200 million**.

[31] Caspersen defrauded friends, family and college classmates in a Ponzi scheme, using their money to make payments on a house and an apartment. Caspersen

**never used the investor funds to make the secured loans as he had promised his investors**.

32 Lamm was the "operational expert" of multiple, overlapping fraud schemes in which individual **investors lost life savings** and retirement funds.

33 Lumiere's offense involved fraudulently inflated performance results and **misleading investors about performance results**.

34 As general manager of an investment fund, Hochfeld **misappropriated over $2 million from the fund for use on personal vacations and antiques**.

35 Sekaran made numerous misrepresentations to family and friend investors, including false statements to prevent redemptions. In total, **more than ten investors lost approximately $2.3 million** while **Sekaran personally took more than $500,000 for himself**.

| U.S. v. Trebitsch[56] (SDNY) 15 Cr. 450 (VSB) | Securities Fraud | 51-63 months | 24 months $5.9m restitution (plea) |
|---|---|---|---|

36 During a seven-year scheme, Trebitsch promised outsized returns, failed to adhere to his purported investment strategies, stole or lost his investors' money and lied to his investors about their returns.

These sentences in the chart above are consistent with the statistics compiled by the United States Sentencing Commissions for 2016 regarding sentences in all fraud cases showing that the average fraud sentences nationally, in the Second Circuit, in all New York Federal Courts and in the Eastern District of New York as follows: [65]

---

[65] United States Sentencing Commission, Statistical Information Packet Fiscal Year 2016, Eastern District of New York, Table 7 at p. 10; United States Sentencing Commission, Statistical Information Packet Fiscal Year 2016, Second Circuit, Table 7 at p. 10; United States Sentencing Commission, Statistical Information Packet Fiscal Year 2016, New York State, Table 7 at p. 10.

178

| JURISDICTION | MEAN | MEDIAN |
|---|---|---|
| Nationwide | 34 months | 24 months |
| Second Circuit | 30 months | 18 months |
| NY Federal Court | 29 months | 18 months |
| EDNY | 33 months | 24 months |

Considering these sentences, and sentencing averages, a sentence of any additional incarceration in this case would create unwarranted sentencing disparities.


**CONCLUSION**…

The Court is now faced with determining an appropriate sentence for a unique individual with enormous potential that has done and can do a lot of good if his intellect is allowed to be channeled appropriately.   From helping local youths learn the greatest game in the world thru free lessons (paid for by Kenner), his volunteer coaching time, his relentless charitable efforts, to helping educate prisoners so they have a chance at a better life upon release, these letters are replete with personal vignettes demonstrating that Kenner is comprised of more than his alleged criminal conduct: specifically, he is a kind, caring and generous person who uses his time, money and effort to help those in need.

If not warehoused in prison, Kenner could literally save lives as demonstrated thru his charitable acts for brain and lung cancer sufferers.   We also ask this Court to consider that, although Kenner was convicted of fraud, there was no evidence that he was looking to hurt or damage his investors like many other fraudsters.

A former Kenner client gave 2014 pre-trial and independent testimony truly demonstrating the "trust" Kenner earned despite the pre-arrest media slander and defamation campaigns -- and fifteen (15) months of post-incarceration rumor-mill and slanderous perpetuation by the FBI case agent.

179

Kenner's former client, William Ranford, espoused the strongest "testimonial" of Kenner's trustworthiness when he testified only seven (7) months before the EDNY trial, as follows [*3500-WR-3*]:

> *Q: How do you know Phil Kenner?*
>
> *A [Ranford]: He was my financial advisor.*
>
> *Q: When did he become your financial advisor?*
>
> *A [Ranford]: It would have been probably the late '80s.*
>
> *Q: Did you know him before then?*
>
> *A [Ranford]: No.*
>
> **Q. Is he still your financial advisor?**
>
> *A [Ranford]:* **Yes.**

Then, Jowdy, Berard and Kaiser's attorneys badgered Ranford with the 2013 EDNY indictment:

> *Q: Reading this paragraph in the [Kenner] Indictment, does that change your thinking about how your money was used, your hundred thousand dollars was used?*
>
> *A [Ranford]: No.*
>
> *Q:  It doesn't make you concerned that it was perhaps used for something else by Phil Kenner?*
>
> *A [Ranford]: No.*

What else could tell someone pre-trail that Kenner was a trusted person in spite of nearly eight (8) years of calculated slander at that point in time?  Nothing was more a testament to Kenner's integrity and why multiple investors espoused, "*trust in Kenner*" to this Court, while wholly misled that "*Kenner stole your money to buy his piece of that Cabo resort*".

- There is nothing short of a re-trial that the Court can do to undo the damage that the false, slander did to the underlying integrity of the entire legal proceeding, from Kenner's June 24, 2009 FBI proffer until present.

Kenner's former LEO partner who raised lung and brain cancer money with Kenner for years offered to the Court:

> *In closing, I would just like to state that Phil Kenner is someone I would not hesitate to partner with on any charity or business project and I am looking forward to working with him again in the very near future.   As a member of Law Enforcement I can and, have seen how things get interpreted or mis interpreted by individuals who have their own agendas for what ever reason. And I believe this to be the case in Phil Kenner's matter.*
>
> *Respectfully written,*
>
> *Mr. Kim Garrett VCSD SGT. RET.*

In sum, after weighing all of those factors in 18 U.S.C. 3553(a), we respectfully submit that any additional period of incarceration would be inimical to the ends of justice because "the punishment should fit the offender and not merely the crime", *Pepper v. United States*, 131 S. Ct 1229, 1240 (2011).

A sentence of <u>*time-served*</u>, followed by one (1) year of supervised release (similar to the Walters's case), is "sufficient, but not greater than necessary" to accomplish the goals of sentencing and consistent with the interests of justice.


Dated:   September 2, 2019
Brooklyn, New York

Respectfully submitted,

/s/
Philip A. Kenner