```
                          Day5.txt
19                      BRYAN BERARD,
20   having been first duly sworn, was examined and testified as
21   follows:
22
23                     DIRECT EXAMINATION
24   BY MR. RICHARDS:
25       Q.   Do you know who the first pick of the 1994 NHL
                                                                    914


 1   draft was?
 2       A.   Yes.
 3       Q.   Who's that?
 4       A.   '94, Jovanovski.
 5       Q.   What about '95?
 6       A.   Myself.
 7       Q.   Now, do you see anybody in the room that you
 8   know?
 9       A.   Yes.
10       Q.   And can you point out to someone that's currently
11   your business manager?
12       A.   Yes, Phil Kenner.
13       Q.   Are you an investor in some real estate deals in
14   Hawaii and Cabo San Lucas?
15       A.   Yes.
16       Q.   And prior to investing in those transactions can
17   you just tell the panel what type of diligence or things
18   you did before you made the investment?
19       A.   Sure.  I knew Phil was involved with a few land
20   deals that to me sounded pretty interesting.  I kind of
21   called Phil.  We had a discussion about the properties.  I
22   got on the plane.  I met Phil.
23            I think it was Mexico -- the North Baja property
```

Page 75

Day5.txt

24   I saw first.  I loved it.  I got involved in that.  I
25   invested $500,000 of my money into that, and I believe Cabo

                                                                915

1    was next.  I took a plane and went down and saw Cabo.  It
2    looked like a great piece of property.  I was interested in
3    it.  I obviously invested money, $200,000.
4        Q.   You don't need to tell us the amount.  That's
5    your personal business.
6        A.   Again, in Hawaii, I was definitely interested.  I
7    got on a plane and went and saw Hawaii.  Again, I thought
8    it was a great deal, and I got involved.
9        Q.   When you were -- as far as the Hawaii deal, were
10   you made aware of any sort of transaction Mr. Kenner set up
11   where you can give a commitment or pledge a credit line in
12   lieu of putting all your money in initially?
13       A.   Yes.
14       Q.   Can you tell the panel what was your
15   understanding?
16       A.   Basically the company -- it was set up.  The
17   company would pay the payments.  I would pledge the money,
18   obviously to get the loan for the property.  Again, the
19   company would pay the payments, and I wasn't forfeiting all
20   the amount of money for the piece of property.
21       Q.   Were you aware that Mr. Kenner got a credit line
22   against some securities or investments you had?
23       A.   Yes.
24       Q.   And later on were you aware that Mr. Kenner
25   starting lending this money to another principal in the

                                                                916

1    Cabo project named Ken Jowdy?
2        A.   Yes.

Day5.txt

3    Q.   Were you aware that he had disclosed to you that
4  he was going to lend this money at a rate of interest to
5  benefit the investors?
6    A.   Yes.
7    Q.   And with respect to the --
8        MR. MEEKS:  Objection.  Leading.
9        ARBITRATOR MEYERSON:  I'm sorry?
10       MR. MEEKS:  I just want to point out that we're
11 leading this witness quite a bit.
12       ARBITRATOR MEYERSON:  Sustained.
13   Q.   BY MR. RICHARDS:  Where did you think the money
14 that Mr. Jowdy -- were you told where the money was going
15 to be used that was given Mr. Jowdy as far as the Mexican
16 project?  Was there anything you were told about that?
17   A.   Basically just loan him the money for the
18 property.
19   Q.   What about bank statements; did you have any
20 problem getting any of your bank statements from Mr. Kenner
21 at any time?
22   A.   Not at all.
23   Q.   And prior to signing any of these documents did
24 you have access to your own attorney unconnected to
25 Mr. Kenner to review this?
                                                           917

1    A.   Yes, I did.  We have a family attorney back home
2  where before I sign any documents basically -- I went to
3  his office, sat with him.  We reviewed them, and I signed
4  them and basically FedEx'd them to Phil.
5    Q.   At any time did Phil ever recommend or push these
6  investments on you?

Page 77

Day5.txt

7   A.   Not at all.  It was something I wanted to be
8   involved in.
9   Q.   At any time did Phil pressure you to sign any
10  documents let's say on property or anything?
11  A.   Not at all.
12  Q.   Was everything very transparent and relaxed?
13  A.   Something I wanted to do.  I saw the properties
14  in person, and I was very interested.
15  Q.   At any time did Mr. Kenner or the people that
16  were showing you the properties, like Mr. Jowdy, promise
17  you some sort of return on your investment?
18  A.   Not at all.
19  Q.   At any time did someone tell you that you would
20  be able to get this money back at a specific date?
21  A.   Not at all.
22  Q.   Did you understand that investing in a
23  transaction like this, that your money could be tied up for
24  a while?
25  A.   Yes, I understand how that works.

918

1        MR. RICHARDS:  I have no further questions.
2        ARBITRATOR MEYERSON:  Thank you.
3
4                    CROSS-EXAMINATION
5   BY MR. MEEKS:
6   Q.   Good morning.  Thank you for coming.  Did you and
7   Mr. Kenner own a property here in Scottsdale together?
8   A.   Own a property?
9   Q.   Yes.
10  A.   I don't think I own --
11  Q.   You did not own a property together?