0387
1          SUPERIOR COURT OF THE STATE OF CALIFORNIA
2            COUNTY OF LOS ANGELES, CENTRAL DISTRICT
3
4
5   GREG DEVRIES, JASON          )
    WOOLLEY, CHRIS SIMON,        )
6   MATTIAS NORSTROM, VLADIMIR   )
    TSYPLAKOV, JAY MCKEE,        )
7   RAYMOND MURRAY, GLEN MURRAY, )
    BRYAN BERARD, DARRYL SYDOR,  )
8   DIMITRI KHRISTICH, SERGEI    )
    GONCHAR, MICHAEL PECA AND    )
9   JOZEF STUMPEL, TYSON NASH,   )
    BRIAN CAMPBELL, STEVE        )
10  RUCCHIN, TURNER STEVENSON,   )
                                 )
11              PLAINTIFFS,      )
                                 )
12      VS.                      ) CASE NO. BC416081
                                 )
13  KENNETH A. JOWDY, AN         )
    INDIVIDUAL; AND DOES 1       )
14  THROUGH 100, INCLUSIVE,      )
                                 )
15              DEFENDANTS.      )
    _____)
16
17                    VOLUME II
18
19          DEPOSITION OF KENNETH JOWDY, TAKEN
20          ON BEHALF OF THE PLAINTIFFS, AT 9255
21          DOHENY ROAD, SUITE 602, WEST HOLLYWOOD,
22          CALIFORNIA, COMMENCING AT 10:11 A.M.,
23          WEDNESDAY, JANUARY 6, 2010, BEFORE
24          ALEJANDRIA E. KATE, CSR NUMBER 11897.
25
0388
1   APPEARANCES OF COUNSEL:
2
3   FOR THE PLAINTIFFS:
4           RONALD RICHARDS & ASSOCIATES, A.P.C.
            BY:  RONALD RICHARDS, ESQ.
5           9255 DOHENY DRIVE
            SUITE 602
6           WEST HOLLYWOOD, CALIFORNIA  90069
            310.556.1001
7           RON@RONALDRICHARDS.COM
8
9

```
10   FOR THE DEFENDANT KENNETH A. JOWDY:
11           CALDWELL LESLIE & PROCTOR, P.C.
             BY:  ROBYN C. CROWTHER, ESQ.
12           1000 WILSHIRE BOULEVARD
             SUITE 600
13           LOS ANGELES, CALIFORNIA  90017-2463
             213.629.9040
14           CROWTHER@CALDWELL-LESLIE.COM
15
16
17   ALSO PRESENT:
18           GREG DEVRIES
19           JASON WOOLLEY
20           PHIL KENNER
21           JOHN KAISER
22           TIM BARKER, LEGAL VIDEO SERVICES
23
24
25
0389
 1                    I N D E X
 2
 3   DEPONENT:           EXAMINED BY:          PAGE:
 4   KENNETH JOWDY        MR. RICHARDS          391
 5                    (AFTERNOON SESSION)       516
 6
 7
 8
 9           EXHIBITS FOR IDENTIFICATION:
10                    (NONE)
11
12
13
14        QUESTIONS UNANSWERED BY THE DEPONENT:
15                  PAGE:   LINE:
16                  409     13
                    410     2
17                  410     7
                    410     15
18                  422     15
                    426     11
19                  427     9
                    428     19
20                  431     16
                    442     12
21                  485     10
                    559     14
22                  681     20

23
```

```
24
25
0390
 1              WEST HOLLYWOOD, CALIFORNIA, WEDNESDAY
 2                     JANUARY 6, 2010
 3                       10:11 A.M.
 4
 5                  THE VIDEOGRAPHER:  AND GOOD
 6    MORNING.  WE'RE ON THE VIDEOTAPE RECORD, BEGINNING
 7    TAPE NUMBER 1 OF VOLUME NUMBER II, 10:11 A.M.
 8                  COUNSEL, PLEASE MAKE VERBAL
 9    INTRODUCTIONS FOR THE RECORD.
10                  MR. RICHARDS:  RONALD RICHARDS, FOR
11    THE PLAINTIFFS.
12                  MS. CROWTHER:  ROBYN CROWTHER, FOR
13    KEN JOWDY.
14                  THE VIDEOGRAPHER:  VERY GOOD.
15                  WILL THE COURT REPORTER PLEASE
16    ADMINISTER THE OATH.
17
18                      KENNETH JOWDY,
19       CALLED AS A DEPONENT AND DULY SWORN IN BY
20         THE DEPOSITION OFFICER, WAS EXAMINED
21               AND TESTIFIED AS FOLLOWS:
22
23    ///
24    ///
25    ///
0391
 1                  DEPOSITION OFFICER:  PLEASE RAISE
 2    YOUR RIGHT HAND.
 3             DO YOU AFFIRM, UNDER PENALTY OF
 4    PERJURY THAT THE TESTIMONY YOU ARE ABOUT TO GIVE
 5    IN THE FOLLOWING DEPOSITION PROCEEDING SHALL BE
 6    THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT
 7    THE TRUTH?
 8                  THE DEPONENT:  YES.
 9                  DEPOSITION OFFICER:  THANK YOU.
10
11                      EXAMINATION
12    BY MR. RICHARDS:
13         Q.   OKAY.  GOOD MORNING, AGAIN,
14    MR. JOWDY.
15         A.   MORNING.
16         Q.   HOW ARE YOU?
17         A.   GOOD.  HOW ARE YOU?
18         Q.   REMEMBER THE ADMONITIONS I GAVE YOU
19    YESTERDAY, THE VERY SHORT ONES, RELATED TO YOUR
20    MENTAL HEALTH AND IF THERE WAS ANYTHING -- HAS
21    ANYTHING CHANGED AS TO WHERE YOU WOULDN'T BE ABLE
```

```
22   TO GIVE THE SAME COMPETENT, TRUTHFUL TESTIMONY
23   FROM YESTERDAY?
24            A.   NO.
25            Q.   OKAY.  ALL RIGHT.  IN YOUR EARLIER
0392
 1   TESTIMONY, YOU STATED THAT TOMMY CONSTANTINE WAS
 2   SUPPOSED TO TAKE OVER AND START PAYING FOR THE
 3   FALCON AND DIDN'T; IS THAT CORRECT?
 4            A.   THROUGH AN E-MAIL THROUGH PHIL,
 5   THAT WAS THE ARRANGEMENT THAT I UNDERSTOOD, YES.
 6            Q.   DID TOMMY CONSTANTINE ASK YOU OR
 7   MARK THALMANN FOR A BILL OF SALE OR PURCHASE
 8   AGREEMENT FOR THE FALCON BEFORE HE WOULD START
 9   CONTRIBUTING FINANCIALLY TOWARDS THE PURCHASE OR
10   REFURBISHMENT OF THE AIRPLANE?
11            A.   HE ASKED FOR A BILL OF SALE, YES.
12            Q.   OKAY.  AND DID YOU PROVIDE ONE?
13            A.   I DIDN'T THINK I COULD WITHOUT
14   SELLING HIM THE PLANE.
15            Q.   AND WOULD YOU -- WHAT WOULD BE YOUR
16   EXPECTATION FOR HIM TO START PAYING FINANCIALLY
17   TOWARDS THE PURCHASE OR REFURBISHMENT WITHOUT A
18   BILL OF SALE?
19            A.   I'M NOT A LAWYER, BUT I DON'T -- I
20   CONSULTED WITH ONE.  I WASN'T SURE HOW DO I GIVE
21   HIM A BILL OF SALE WITHOUT HIM BUYING --
22   PURCHASING THE PLANE.
23            Q.   DID YOU OWE ANY MONEY AT THE TIME
24   TO THE MAINTENANCE FACILITY THAT WAS WORKING ON
25   THE FALCON DURING THE TIME PERIOD WHERE
0393
 1   MR. CONSTANTINE WAS CONTEMPLATING BUYING THE
 2   AIRPLANE?
 3            A.   DID I?
 4            Q.   DID THE DIAMANTE AIR?
 5            A.   WHAT MAINTENANCE FACILITY?
 6            Q.   WHERE THE PLANE WAS KEPT.
 7            A.   WHERE IS THAT?
 8            Q.   WELL, WASN'T THE PLANE GROUNDED AT
 9   THE TIME WHEN YOU WERE -- STOPPED MAKING PAYMENTS?
10            A.   IT WASN'T GROUNDED WHEN
11   TOMMY CONSTANTINE TOOK CONTROL OF THE PLANE.
12            WHERE HE TOOK IT, I -- I WASN'T A
13   PART OF THAT.  SO IF YOU CAN TELL ME WHAT
14   MAINTENANCE FACILITY HE TOOK IT TO -- ALTHOUGH I
15   WASN'T RESPONSIBLE -- OR DIAMANTE AIR, I DON'T
16   THINK, SHOULD HAVE BEEN RESPONSIBLE FOR ANYTHING
17   THAT TOMMY CONSTANTINE DID AT THE TIME.
18            BUT HE -- WHEN HE TOOK CONTROL OF
19   THE PLANE, IT WAS AIRWORTHY.
```

```
20              Q.   WAS THERE ANY BALANCE OWED TO THE
21   MAINTENANCE -- ANY MAINTENANCE FACILITIES AT THE
22   TIME HE TOOK CONTROL OF THE PLANE THAT YOU'RE
23   AWARE OF?
24              A.   NOT THAT I KNOW OF, NO.
25              Q.   AND ARE YOU AWARE THAT THE SALE OF
0394
 1   THE 421 CESSNA WENT TOWARDS PAYMENTS OF PAST DUE
 2   MAINTENANCE FACILITIES?
 3              A.   NO.
 4              Q.   I'M GOING TO -- YOU MENTIONED
 5   YESTERDAY, YOU TESTIFIED ABOUT THAT THIS LAWSUIT
 6   SORT OF HAD SOME NEGATIVE RAMIFICATIONS FOR YOU.
 7              DID YOU -- DID YOU PERSONALLY
 8   INSTIGATE OR GENERATE ANY NEGATIVE MEDIA ARTICLES
 9   IN THE NEW YORK POST OR DAILY NEWS REGARDING
10   MR. KENNER OR MR. CONSTANTINE?
11              A.   NO.
12              Q.   DID YOU DIRECT ANYBODY AT YOUR
13   BEHALF?
14              A.   NO.
15              Q.   DID YOU EVER COMMUNICATE WITH
16   TERRI THOMPSON OF THE NEW YORK DAILY NEWS?
17              A.   YES.
18              Q.   OR RICHARD JOHNSON, PRIOR TO THE
19   ARTICLES BEING PUBLISHED?
20              A.   NO.  WAIT.  PRIOR TO WHAT ARTICLES?
21   I NEVER COMMUNICATED WITH RICHARD JOHNSON.
22              Q.   DID YOU TALK TO -- DID YOU TALK TO
23   TERRI THOMPSON PRIOR TO THE NEW YORK DAILY NEWS
24   ARTICLE BEING PUBLISHED?
25              A.   NO, I DON'T BELIEVE SO.
0395
 1              Q.   WHEN DID YOU TALK TO HER?
 2              A.   AFTER THE NEW YORK POST ARTICLE WAS
 3   WRITTEN ABOUT THIS LAWSUIT.
 4              Q.   OKAY.  DID -- DO YOU KNOW IF
 5   TOM HARVEY SPOKE WITH ANY OF THEM?
 6              A.   I DON'T KNOW.
 7              Q.   DO YOU KNOW WHO ADRIENNE MOORE IS?
 8              A.   YES.
 9              Q.   WHO IS SHE?
10              A.   SHE WORKED FOR DIAMANTE CABO SAN
11   LUCAS.
12              Q.   AND WHERE DID YOU MEET HER?
13              A.   IN LAS VEGAS.
14              Q.   AND WHY DID YOU HIRE HER?
15              A.   I NEEDED SOMEONE JUST TO BE IN THE
16   OFFICE, AN ASSISTANT, JUST TO DO EXPENSES, TRAVEL
17   ARRANGEMENTS, ET CETERA.
```

```
18            Q.   DID YOU -- DID SHE PROVIDE A
19    RESUME?
20            A.   YES.
21            Q.   AND YOU INTERVIEWED HER PERSONALLY?
22            A.   I BELIEVE SO.
23            Q.   DID YOU HIRE HER -- HOW LONG AFTER
24    YOU MET HER DID YOU HIRE HER?
25            A.   I DON'T KNOW.
0396
1             Q.   WASN'T IT THE NIGHT -- THE NIGHT
2     YOU MET HER, YOU HIRED HER THE NEXT DAY?
3             A.   I DON'T THINK SO, NO.
4             Q.   HOW MUCH DID YOU PAY HER?
5             A.   I BELIEVE 25,000 DOLLARS A YEAR.
6             Q.   AND DID YOU -- IF YOU KNOW, DID SHE
7     HAVE A SEXUAL RELATIONSHIP WITH ROGER CLEMENS?
8             A.   I DON'T KNOW.
9             Q.   DID SHE -- DOES HE STILL WORK FOR
10    YOU?
11            A.   NO.
12            Q.   WHO'S SHAWN HUGHES?
13            A.   SHE WORKED FOR, I BELIEVE -- I'M
14    NOT SURE WHAT ENTITY SHE WORKED.  BUT SHE WAS PAID
15    THROUGH DIAMANTE DEL MAR, I BELIEVE.
16            Q.   DID YOU EVER INVITE THE PORN STAR
17    ABBY ROSE TO ONE OF YOUR GOLF -- GOLF OUTINGS OR
18    PARTIES?
19            A.   NO.
20            Q.   DID SHE EVER ATTEND?
21            A.   NOT THAT I KNOW OF.
22            Q.   AT THE TIME LEHMAN CLOSED, WHO
23    OWNED THE SOMERSET ENTITY THAT OWNS AN INTEREST IN
24    THE CABO PROJECT?
25                 MS. CROWTHER:  I THINK THAT'S ASKED
0397
1     AND ANSWERED YESTERDAY.
2                  THE DEPONENT:  YEAH.  I DIDN'T
3     RECALL HIS LAST NAME.  THAT I KNOW OF, I DIDN'T
4     RECALL HIS LAST NAME.
5     BY MR. RICHARDS:
6             Q.   OKAY.  YEAH, WAS THAT -- THAT
7     WAS -- THE QUESTIONS I HAD WERE RELATED TO MASOOD
8     BHATTI, B-H-A-T-T-I.
9                  SO YOU DON'T KNOW WHO THE
10    PRINCIPALS OF THAT ENTITY ARE?
11            A.   I SAID I DIDN'T RECALL HIS LAST
12    NAME.
13            Q.   SINCE YESTERDAY, DID YOU -- WERE
14    YOU ABLE TO RECALL IT?
15            A.   I DIDN'T.
```

```
16              Q.   IS THE PRINCIPAL'S DAUGHTER
17  CONNECTED TO MASOOD BHATTI IN ANY WAY, IF YOU
18  KNOW?
19              MS. CROWTHER:  OBJECTION.  HE
20  DOESN'T KNOW WHO THE PRINCIPAL IS.
21  BY MR. RICHARDS:
22              Q.   YOU DON'T -- YOU ONLY KNOW --
23              (SPEAKING SIMULTANEOUSLY.)
24              THE DEPONENT:  I DO.  I DON'T -- I
25  DON'T -- WHAT DO YOU MEAN, "CONNECTED"?
0398
1   BY MR. RICHARDS:
2               Q.   IS THE PRINCIPAL RELATED TO HIS
3   DAUGHTER IN ANY WAY?
4               DO YOU KNOW WHO THE PRINCIPAL IS AS
5   A PERSON OR --
6               A.   YES.
7               Q.   DID THEY HAVE ANY RELATIONSHIP TO
8   ANY FAMILY MEMBER OF MASOOD BHATTI?
9               A.   NO.
10              Q.   DO YOU KNOW IF THEY HAVE ANY --
11              A.   NOT THAT I KNOW OF.
12              Q.   OKAY.  WAS -- WAS MASOOD BHATTI
13  INSTRUMENTAL IN YOUR RECEIVING THE 650,000 DOLLAR
14  COMMISSION FROM LEHMANS?
15              MS. CROWTHER:  OBJECTION.
16              (SPEAKING SIMULTANEOUSLY.)
17              THE DEPONENT:  I HAVE NO IDEA.
18              MS. CROWTHER:  IT'S ALSO VAGUE AS
19  TO THE TERM "YOU."
20  BY MR. RICHARDS:
21              Q.   WELL, BAJA -- SORRY.  BAJA
22  DEVELOPMENT.
23              DID -- WHO ARRANGED FOR THE
24  COMMISSION, THEN, IF YOU KNOW?
25              A.   I DON'T KNOW.
0399
1               Q.   YOU DON'T KNOW WHO GAVE YOU A
2   650,000 DOLLAR REFERRAL FEE?
3               A.   LEHMAN BROTHERS.
4               Q.   BUT, I MEAN, WHO WAS THEIR PERSON
5   THAT --
6               (SPEAKING SIMULTANEOUSLY.)
7               THE DEPONENT:  THERE'S SEVERAL
8   PEOPLE THAT I DEALT WITH THERE.
9   BY MR. RICHARDS:
10              Q.   JUST FOCUS ON THE COMMISSION,
11  THOUGH.
12              WHO AUTHORIZED THE COMMISSION?
13              A.   I DON'T KNOW.
```

```
14              Q.   WHO -- HOW DID YOU COME TO THE TERM
15    OF THE COMMISSION?
16              A.   WELL, IT'S -- IT WAS A 1 PERCENT
17    COMMISSION.  I DON'T KNOW WHO AUTHORIZED IT.  I
18    DON'T KNOW.
19                   I'VE TALKED TO SEVERAL PEOPLE
20    THERE.  I DON'T KNOW WHO SIGNED OFF ON IT.  I
21    DON'T KNOW WHAT THE PROCESS IS.
22              Q.   WELL, WHO DID YOU NEGOTIATE WITH?
23              A.   I DON'T BELIEVE I NEGOTIATED WITH
24    ANYONE.  LIKE I SAID, I DEALT WITH SEVERAL PEOPLE
25    THERE.  I DON'T KNOW.
0400
1               Q.   WELL, CAN YOU TELL ME WHO THOSE
2     PEOPLE WERE THAT YOU REMEMBER?
3               A.   THE NAME OF PEOPLE I KNOW AT LEHMAN
4     BROTHERS?
5               Q.   NO.  JUST THAT WERE INVOLVED WITH
6     THE COMMISSION.
7               A.   THE PEOPLE I KNOW AT LEHMAN
8     BROTHERS.
9               Q.   WHO IS THAT?
10              A.   MASOOD BHATTI, LOIS BRAMLEY,
11    KEN COHEN, TOM NOLAN.
12              Q.   ANYBODY ELSE?
13              A.   I'M TRYING TO THINK OF THAT TIME
14    FRAME.  I DON'T --
15              Q.   ALL RIGHT.  TAKE YOUR TIME.
16              A.   I DON'T KNOW.
17              Q.   AFTER -- DID YOU WORK WITH ANYBODY
18    ELSE AT LEHMAN TO FACILITATE THE LEHMAN DEAL?
19              MS. CROWTHER:  OBJECTION.  VAGUE AS
20    TO "THE LEHMAN DEAL."
21                   ARE YOU TALKING ABOUT THE
22    COMMISSION DEAL OR HIS -- OR THE LOAN TO DIAMANTE
23    CABO SAN LUCAS?
24              MR. RICHARDS:  THE LOAN TO DIAMANTE
25    CABO SAN LUCAS.
0401
1                    THE DEPONENT:  YES.  ANYONE ELSE
2     OTHER THAN WHO, THE PEOPLE I JUST MENTIONED?
3     BY MR. RICHARDS:
4               Q.   YEAH.
5               A.   THE SEVERAL PEOPLE I JUST
6     MENTIONED?
7               Q.   YES.
8               A.   ANTHONY BARSANTE MAYBE.
9               Q.   AFTER LEHMAN WENT BANKRUPT, DID YOU
10    HIRE MASOOD BHATTI IN ANY CAPACITY?
11              A.   NO.
```

```
12              Q.   ANY OF YOUR ENTITIES?
13              A.   NO.
14              Q.   BY THE WAY, JUST FOR THE -- SO WE
15   GET THIS CLEARED UP.
16              WHEN I SAY "YOU," I MEAN YOU OR ANY
17   ENTITY YOU HAVE AN OWNERSHIP INTEREST, A
18   MANAGERIAL POSITION OR CONTROL, EITHER LEGALLY OR
19   EQUITABLY.  IS THAT --
20              MS. CROWTHER:  OBJECTION.  THAT'S
21   NOT ACCEPTABLE.  IT'S COMPLETELY COMPOUND.
22              YOU CAN ASK HIM ABOUT HIS ENTITIES
23   OR HIM PERSONALLY, BUT YOU HAVE TO MAKE EACH
24   QUESTION CLEAR.  THAT'S ABOUT 15 DIFFERENT
25   ENTITIES THERE.
0402
1               MR. RICHARDS:  WELL, DO YOU WANT ME
2    TO BREAK IT UP EACH TIME?
3               MS. CROWTHER:  I DO.
4               MR. RICHARDS:  ALL RIGHT.
5    BY MR. RICHARDS:
6               Q.   SO DID YOU HIRE MASOOD BHATTI
7    PERSONALLY?
8               A.   NO.
9               Q.   DID ANY OF THE ENTITIES THAT YOU
10   HAVE OWNERSHIP INTEREST HIRE HIM?
11              A.   NO.
12              Q.   HAS MASOOD EVER BEEN COMPENSATED BY
13   YOU OR ANY OF THE ENTITIES YOU CONTROL FOR ANY
14   REASON?
15              A.   NO.
16              Q.   DID MR. KENNER INTRODUCE YOU TO
17   LEHMAN THROUGH HIS CONTACTS?
18              A.   THROUGH A MAN NAMED JEFF KESWIN
19   (PHONETICALLY).
20              Q.   WITHOUT MR. KENNER'S HELP, DO YOU
21   THINK YOU WOULD HAVE EVER HAD ACCESS TO LEHMAN AT
22   THAT LEVEL?
23              A.   I DON'T KNOW.
24              Q.   PRIOR TO MR. KENNER'S INTRODUCTION,
25   DID YOU EVER HAVE ACCESS TO LEHMAN?
0403
1               A.   I'M SURE THERE WAS ACCESS.  I
2    DIDN'T KNOW ANYBODY AT LEHMAN.  I DON'T KNOW WHAT
3    YOU MEAN BY "HAVE ACCESS."
4               Q.   SO PRIOR TO THAT, YOU DIDN'T HAVE
5    ANY RELATIONSHIP WITH LEHMAN?
6               A.   NO.
7               Q.   ISN'T IT TRUE THAT MR. KENNER AND
8    HIS CLIENTS PROVIDED THE SEED MONEY NECESSARY FOR
9    LEHMAN TO WRITE THE MONEY FOR CABO?
```

```
10                MS. CROWTHER:  OBJECTION.  CALLS
11   FOR SPECULATION.  LACKS FOUNDATION.
12                THE DEPONENT:  EXPLAIN WHAT YOU
13   MEAN.
14   BY MR. RICHARDS:
15        Q.   IF MR. KENNER DIDN'T BRING YOU HIS
16   CLIENTS TO -- TO GIVE YOU THAT INITIAL MONEY,
17   ISN'T IT TRUE THAT YOU WOULD -- THAT YOUR COMPANY
18   WOULD HAVE NEVER BEEN ABLE TO HAVE ENOUGH CAPITAL
19   TO HAVE SOMETHING TO SELL TO LEHMAN TO GIVE
20   THEM -- GIVE THE COMPANIES THE LOAN?
21                MS. CROWTHER:  OBJECTION.
22   INCOMPLETE HYPOTHETICAL AND CALLS FOR SPECULATION.
23                THE DEPONENT:  SHOULD I ANSWER?  I
24   DON'T HAVE A PROBLEM ANSWERING.
25                MS. CROWTHER:  YOU CAN ANSWER IT,
0404
 1   YES.  I'M JUST STATING MY OBJECTIONS.
 2                THE DEPONENT:  I COMPLETELY DON'T
 3   UNDERSTAND THE QUESTION.  IT'S LIKE ME SAYING IF I
 4   DIDN'T BRING THE KNOWLEDGE OF THE PROPERTY OR
 5   CONSTRUCT THE DEAL THAT I DEALT WITH PHIL, WOULD
 6   THE DEAL HAVE GOTTEN DONE.
 7                THERE'S TWO PARTS TO THE DEAL.  I
 8   BROUGHT ONE PART.  PHIL BROUGHT ANOTHER PART.  SO
 9   WITHOUT EITHER PART -- IF YOU WANT ME TO SAY NO --
10   YES.  I DON'T KNOW.  WITHOUT EITHER PART, IT
11   DOESN'T HAPPEN, SO ...
12   BY MR. RICHARDS:
13        Q.   ALL RIGHT.  SO PHIL WAS AN INTEGRAL
14   PART OBVIOUSLY?
15        A.   YES.  AND ...
16        Q.   ALL RIGHT.  DID -- WAS THERE A --
17   WAS THERE A PARCEL NEXT TO THE CABO PROPERTY THAT
18   YOU CONSIDERED BUYING?
19        A.   YES.
20        Q.   AND DID MR. KENNER AND HIS CLIENTS
21   PROVIDE THE DEPOSIT MONEY FOR THE OPTION TO
22   PURCHASE THE LAND NEXT TO THE CABO PROPERTY?
23        A.   I BELIEVE SO.
24        Q.   WAS IT ABOUT 72,000?
25        A.   I BELIEVE SO.  I DON'T REMEMBER.
0405
 1        Q.   AND DID YOU PURCHASE THE LAND NEXT
 2   TO THE CABO PROJECT?
 3        A.   NO.
 4        Q.   WHY DIDN'T YOU PURCHASE IT?
 5        A.   AT THE TIME WE HAD NOT CLOSED ON
 6   THE EXISTING PARCEL, SO -- AND IT WAS -- WOULD
 7   HAVE BEEN PURCHASED UNDER THE SAME ARRANGEMENTS
```

```
 8   WITH MR. KENNER.
 9              AND HE WAS HAVING DIFFICULTIES THE
10   FIRST TIME BRINGING THE SEED MONEY.  AND WE HADN'T
11   CLOSED ON IT YET, SO IT WOULDN'T HAVE BEEN WISE AT
12   THE TIME, WE FELT, TO GO FORWARD.
13        Q.   AND DO YOU KNOW WHAT HAPPENED TO
14   THE 72,000 DOLLAR DEPOSIT?
15        A.   I DON'T.
16        Q.   SO THIS -- WHEN YOU USED THE LEHMAN
17   CONTACTS THAT WERE PROVIDED TO YOU BY MR. KENNER
18   AND THE FUNDS THAT WERE PROVIDED TO YOU BY
19   MR. KENNER TO FACILITATE THIS RELATIONSHIP WITH
20   LEHMAN WHICH RESULTED IN THE REFERRAL FEE OF
21   650,000 DOLLARS, YOU DIDN'T SHARE ANY OF THAT WITH
22   HIS -- KENNER AND HIS CLIENTS?
23              MS. CROWTHER:  OBJECTION.  THAT
24   MISSTATES TESTIMONY AND IS COMPOUND AND
25   ARGUMENTATIVE.
0406
 1              THE DEPONENT:  I'D HAVE TO GO SEE
 2   WHERE IT WAS SPENT.  I'M SURE A LOT OF IT WAS
 3   SPENT ON DIAMANTE DEL MAR AND OTHER THINGS THAT
 4   NEEDED FUNDS, BUT I DON'T KNOW WHERE IT WAS SPENT.
 5   BY MR. RICHARDS:
 6        Q.   WELL, YOU DIDN'T -- ISN'T IT TRUE,
 7   THOUGH, YOU DIDN'T DISCLOSE THAT YOU RECEIVED THIS
 8   MONEY UNTIL AFTER YOUR RELATIONSHIP WITH
 9   MR. KENNER HAD SEPARATED?
10        A.   THAT'S NOT TRUE.
11        Q.   WHEN DID YOU DISCLOSE THAT --
12        A.   I TOLD PHIL.  I DON'T KNOW WHEN,
13   BUT I TOLD PHIL AT THE TIME.
14        Q.   AND YOU DIDN'T -- AND YOU DIDN'T
15   FEEL YOU HAD AN OBLIGATION TO SHARE ANY OF THAT
16   INCOME WITH KENNER AND HIS CLIENTS?
17        A.   LIKE I SAID, I DON'T KNOW HOW THE
18   MONEY WAS SPENT, BUT --
19        Q.   ALL RIGHT.  YESTERDAY YOU TESTIFIED
20   THAT YOU'D BEEN MAKING ABOUT 240,000 DOLLARS A
21   YEAR.
22              DO YOU REMEMBER THAT TESTIMONY?
23        A.   YES.
24        Q.   AND THAT YOU HAD BEEN PAYING -- OR
25   THAT -- YOU SAID SOMEBODY, YOU OR YOUR ENTITIES,
0407
 1   WAS PAYING 40,000 PER MONTH ON THE K.S.I. LOAN.
 2              REMEMBER THAT?
 3        A.   YES.
 4        Q.   AND THEN YOU HAD BEEN PAYING 15,000
 5   A MONTH ON THE AIRPLANE LOANS AND ABOUT 8,000 A
```

```
 6    MONTH FOR THIS MORTGAGE IN VEGAS.
 7              AND WHAT I'M --
 8         A.   I NEVER SAID THOSE THINGS.
 9         Q.   WELL, HOW MUCH WERE YOU PAYING --
10         A.   WELL, FIRST OF ALL, THAT WASN'T MY
11    TESTIMONY.  I NEVER SAID ANYTHING ABOUT 15,000.  I
12    NEVER SAID ANYTHING ABOUT 8,000.
13              SO WHEREVER YOU GOT THAT WASN'T
14    FROM MY TESTIMONY, I DON'T BELIEVE.  I'D HAVE TO
15    LOOK AT THE RECORD --
16         Q.   WELL, HOW MUCH --
17         A.   -- AND EVERYTHING WE TALKED ABOUT.
18         Q.   OKAY.  HOW MUCH WERE YOU PAYING ON
19    THE AIRPLANE MAINTENANCE?
20              MS. CROWTHER:  OBJECTION.  VAGUE AS
21    TO TIME.
22    BY MR. RICHARDS:
23         Q.   DURING THE TIME THAT DIAMANTE AIR
24    HAD THE PLANE.
25         A.   I DON'T RECALL.
0408
 1              MS. CROWTHER:  WHICH PLANE?
 2              MR. RICHARDS:  THERE ARE TWO PLANES
 3    THAT HE TESTIFIED TO.
 4              MS. CROWTHER:  RIGHT.  BUT YOU JUST
 5    SAID "PLANE."  DURING THE TIME THAT DIAMANTE AIR
 6    HAD THE PLANE, WHICH PLANE?
 7    BY MR. RICHARDS:
 8         Q.   THE AIRPLANE LOANS.  LET ME JUST
 9    FOCUS ON THE LOANS.
10         A.   I DON'T RECALL.
11         Q.   WAS THE MONEY COMING FROM VARIOUS
12    ENTITIES THAT YOU OWNED TO PAY FOR THE K.S.I. LOAN
13    OR FROM ONE ENTITY?
14         A.   I DON'T RECALL.
15         Q.   BUT YOU WERE -- WHEN YOU SAY YOU
16    WERE PAYING FOR THESE LOANS -- YOU KNOW HOW YOU
17    SAID YOU WERE MAKING THE AIR -- YOU MADE THE
18    AIRPLANE PAYMENTS FOR A YEAR AND A HALF AFTER --
19         A.   I SAID IT WAS THROUGH ENTITIES.  I
20    BELIEVE IT WAS COMING FROM LEGACY PROPERTIES.
21         Q.   AND LEGACY PROPERTIES WAS GETTING
22    MONEY FROM -- FROM VARIOUS -- WAS LEGACY
23    PROPERTIES -- THAT'S THE PROPERTY COMPANY THAT
24    GETS THE -- THAT WAS GETTING A DRAW FROM THOSE TWO
25    OUT-OF-STATE PROJECTS AND GETTING MONEY FROM
0409
 1    LEHMANS?
 2         A.   A DEVELOPMENT FEE.
 3         Q.   A DEVELOPMENT FEE.
```

```
 4                 SO BASICALLY YOU WERE TAKING MONEY
 5   FROM OTHER COMPANIES THAT YOU OWN AND JUST TRYING
 6   TO SERVICE SOME OF THIS DEBT; IS THAT FAIR TO SAY?
 7             A.   BASICALLY.
 8             Q.   OKAY.  HAVE YOU PERSONALLY EVER --
 9   HAVE YOU OR ANYBODY AT YOUR DIRECTION EVER FILED
10   ANY COMPLAINTS AGAINST PHIL KENNER WITH ANY
11   FEDERAL AGENCIES?
12             A.   I DON'T BELIEVE SO.
13             Q.   HAVE -- HAS -- HAVE YOU EVER
14   DIRECTED TOM HARVEY TO HAVE ANY COMMUNICATIONS ON
15   YOUR BEHALF?
16                 MS. CROWTHER:  OBJECTION.
17   ATTORNEY-CLIENT.
18                 MR. RICHARDS:  NO.  JUST "YES" OR
19   "NO."
20                 MS. CROWTHER:  NO.  IT'S AN
21   ATTORNEY-CLIENT COMMUNICATION.
22                 YOU ASKED HIM A SUBSTANTIVE
23   QUESTION.
24                 DON'T ANSWER THAT QUESTION.
25   ///
0410
 1   BY MR. RICHARDS:
 2             Q.   HAVE YOU EVER -- HAVE YOU EVER
 3   ASKED TOM HARVEY TO FILE A COMPLAINT?
 4                 MS. CROWTHER:  SAME OBJECTION.
 5   SAME INSTRUCTION.
 6   BY MR. RICHARDS:
 7             Q.   WHAT ABOUT LOUIS FREEH?
 8                 MS. CROWTHER:  SAME OBJECTION.
 9   SAME INSTRUCTION.
10   BY MR. RICHARDS:
11             Q.   IS LOUIS FREEH REPRESENTING YOU IN
12   ANY CAPACITY AT THIS POINT IN ANY LITIGATION
13   ANYWHERE?
14             A.   HE'S REPRESENTING ME, YES.
15             Q.   WHAT SPECIFICALLY IS HE
16   REPRESENTING YOU IN?
17                 MS. CROWTHER:  OBJECTION.  CALLS
18   FOR ATTORNEY-CLIENT COMMUNICATIONS AND WORK
19   PRODUCT.
20                 I INSTRUCT YOU NOT TO ANSWER.
21                 MR. RICHARDS:  I JUST WANT TO KNOW
22   WHAT HE'S REPRESENTING.
23                 MS. CROWTHER:  HE TESTIFIED TO THAT
24   YESTERDAY.  HE TESTIFIED THAT IT WAS AS TO THE
25   GRAND JURY INVESTIGATION AND THE S.E.C.
0411
 1   INVESTIGATION.
```

2                    MR. RICHARDS:  OKAY.
3   BY MR. RICHARDS:
4          Q.   I ASKED YOU IF YOU WERE AWARE OF
5   ANY LAWSUITS FILED OR PENDING YESTERDAY, AND
6   YOU -- YOU PROVIDED SOME TESTIMONY.
7                    ARE -- ARE YOU AWARE THAT THERE'S A
8   CLAIM FROM JOZEF STUMPEL FOR A 1.6 MILLION DOLLAR
9   LOAN TO PROPIEDADES D.D.M.?
10         A.   NO.
11         Q.   DID THEY BORROW MONEY FROM
12  JOZEF STUMPEL?
13         A.   I DON'T BELIEVE SO.
14         Q.   WHAT -- HOW -- DO YOU KNOW IF
15  JOZEF STUMPEL EVER GAVE ONE OF YOUR ENTITIES 1.6
16  MILLION DOLLARS?
17         A.   HE DID.
18         Q.   AND WAS THAT PAID BACK?
19         A.   NO.
20         Q.   AND WHEN IS IT GOING TO BE PAID
21  BACK?
22         A.   I DON'T KNOW.
23         Q.   WHAT ABOUT MATTIAS NORSTROM, DID HE
24  GIVE 400,000 DOLLARS TO LOR MANAGEMENT FOR THE
25  C.S.L. AIRPORT IN MEXICO?
0412
1          A.   I THINK SO.
2          Q.   HAS THAT BEEN PAID BACK?
3          A.   NO.
4          Q.   DID MATTIAS NORSTROM GIVE -- WAS
5   THERE -- THERE WAS A -- YOU TESTIFIED YESTERDAY
6   THAT THERE WAS A 500,000 DOLLAR CHECK FROM BAJA
7   DEVELOPMENT CORP. THAT WAS ISSUED TO
8   MATTIAS NORSTROM BUT NEVER CASHED.
9                    DO YOU REMEMBER THAT?
10         A.   YES.
11         Q.   IS THAT GOING TO -- IS THAT CHECK
12  GOING TO BE MADE GOOD AT ANY TIME THAT YOU'RE
13  AWARE OF?
14         A.   I DON'T KNOW.
15         Q.   GLEN -- GLEN MURRAY SPENT 800,000
16  DOLLARS FOR THE PALM UNITS THAT -- THAT -- THAT
17  THERE'S -- THAT THERE'S LITIGATION WITH YOU.
18                    ARE YOU AWARE OF THAT LITIGATION?
19         A.   YES.
20         Q.   AND THEN THERE WAS A -- THERE WAS A
21  LAWSUIT THAT WE FOUND WITH SOME OF THESE HAWAIIAN
22  ENTITIES IN FEDERAL COURT IN ARIZONA FOR 5.5
23  MILLION DOLLARS.
24                    ARE YOU AWARE OF THAT LAWSUIT?
25         A.   WHAT LAWSUIT IS THAT?

```
0413
 1            Q.   A LAWSUIT IN PHOENIX.
 2            A.   WHO -- WHO'S --
 3            Q.   SOME OF THOSE HAWAIIAN ENTITIES,
 4  LIKE ULA MAKIKA AND LITTLE ISLE 4, AND I THINK
 5  PHIL KENNER.  I THINK MAYBE JUST THOSE.
 6                 ARE YOU FAMILIAR WITH THAT
 7  LITIGATION AT ALL?
 8            A.   ARE YOU STAYING THAT'S A PENDING
 9  LITIGATION?
10            Q.   NO.  JUST WAS THERE A LAWSUIT
11  RELATED --
12            A.   THERE WAS, YES.
13            Q.   AND WHAT HAPPENED TO THAT LAWSUIT?
14            A.   IT'S BEEN DISMISSED.
15            Q.   YOU KNOW WHY IT WAS DISMISSED?
16            A.   I KNOW IT'S BEEN DISMISSED.
17            Q.   I'M JUST ASKING YOU BECAUSE,
18  BELIEVE IT OR NOT, I DON'T FOLLOW EVERY SINGLE
19  THING.
20            A.   THAT'S FINE.
21            Q.   I MEAN --
22            A.   I HAVE NO PROBLEM.
23            Q.   YEAH.  I JUST WANT -- I FEEL
24  THAT -- I JUST WANT YOU TO KNOW THAT YOUR -- YOUR
25  FORMER COLLEAGUE HERE, THEY LIVE THIS STUFF EVERY
0414
 1  DAY.  I DON'T.  I GOT PLENTY OF CASES.
 2                 SO THAT'S WHY I JUST WANT TO MAKE
 3  SURE I COVER THIS.  SO IF IT SOUNDS -- DON'T
 4  ASSUME I KNOW THE ANSWER BECAUSE I DON'T.
 5            A.   NO PROBLEM.
 6            Q.   ALL RIGHT.  I'M JUST -- I'M JUST
 7  LETTING YOU KNOW.  I'M NOT TRYING TO BADGER YOU
 8  ABOUT IT.
 9                 NOW, WAS THERE EVER A CLAIM FROM --
10  DO YOU KNOW IF THERE'S A DISPUTE OVER SOME OF
11  THESE AIRPLANES THAT DIAMANTE AIR OWNED AND THEN
12  LOST, IF THERE'S ANY CLAIM FOR DAMAGES AS A RESULT
13  OF THOSE?
14            A.   I DON'T KNOW.
15            Q.   DO YOU -- WHAT TRIPS DID YOU TAKE
16  THAT YOU'RE AWARE OF WITH THE INTENTION OF
17  ACQUIRING ADDITIONAL LAND OR PROJECTS FROM 2003 TO
18  2007 THAT WEREN'T RELATED TO THE CABO PROJECTS?
19            A.   ALL TRIPS.
20                 MR. RICHARDS:  CAN YOU GUYS GET
21  MR. JOWDY A PAPER TOWEL, PLEASE?
22                 NO, NO.  YOU DON'T NEED TO USE YOUR
23  HAND.  JUST AS -- YOU'RE ANSWERING ALL THE
```

```
24    QUESTIONS.  YOU JUST HAVE A DRY MOUTH.
25               THE DEPONENT:  CAN I HAVE A BOTTLE
0415
1     OF WATER?
2               MS. CROWTHER:  YEAH.
3               MR. RICHARDS:  YEAH.  I WANT YOU TO
4     BE COMFORTABLE, BECAUSE, REALLY --
5               THE DEPONENT:  OKAY.  NO PROBLEM.
6               MR. RICHARDS:  -- YOU'RE DEALING
7     WITH TWO PROFESSIONAL ATTORNEYS.  WE JUST WANT
8     TO -- WE JUST WANT TO GET THROUGH THE DAY.
9               THE DEPONENT:  THANKS.
10              MR. RICHARDS:  AND IF YOU SEE
11    SOMEONE ON MY SIDE HAVING A FROTHING ISSUE, ROBYN,
12    PLEASE ALERT ME.
13              MS. CROWTHER:  OBJECTION TO THE USE
14    OF THE TERM "FROTHING."
15              MR. RICHARDS:  I'M KIDDING.  IT WAS
16    A JOKE.  THE RECORD WILL REFLECT IT WAS LEVITY.
17              THE DEPONENT:  THE QUESTION IS IF I
18    TOOK ANY TRIPS TO SEE ANY PROPERTIES?
19    BY MR. RICHARDS:
20         Q.   YEAH.  THAT WEREN'T RELATED TO THE
21    CABO PROJECT.
22         A.   JUST PROPERTIES YOU WANT TO KNOW
23    ABOUT?
24         Q.   PROPERTIES OR PROJECTS.
25              MS. CROWTHER:  HE JUST WANTS TO
0416
1     KNOW IF YOU TOOK ANY TRIPS BETWEEN 2003 AND 2007.
2               THE DEPONENT:  OKAY.  YES.
3     BY MR. RICHARDS:
4          Q.   WHAT WERE THOSE THAT YOU REMEMBER?
5          A.   I REMEMBER A TRIP TO COSTA RICA.  I
6     REMEMBER A TRIP TO TEXAS.  A TRIP TO TENNESSEE.
7               I'M SURE I LOOKED AT PROPERTY IN
8     AND AROUND SOMEWHERE IN BAJA CALIFORNIA.
9               NOT -- THIS IS -- THIS IS STUFF
10    EITHER TO POSSIBLY PURCHASE OR JUST TO GET A
11    PERSPECTIVE AS TO WHAT WE HAVE; CORRECT?
12         Q.   YEAH.
13         A.   NOT ALWAYS JUST TO PURCHASE.  JUST
14    TO KIND OF UNDERSTAND OTHER PROPERTIES.
15         Q.   CORRECT.
16         A.   OKAY.
17         Q.   AND DID YOU FLY ON THE FALCON OR
18    OTHER DIAMANTE AIRPLANES WHEN YOU DID THESE
19    VISITS?
20         A.   FOR SOME OF THEM I DID, YES.
21         Q.   AND WHO PAID FOR THESE TRIPS?
```

22          A.   IT DEPENDS WHAT -- IF IT WAS
23   OUTSIDE OF WHAT THIS WAS, THEN EITHER -- MOSTLY
24   LEGACY PROPERTIES, IF I TOOK THE FALCON AND IT WAS
25   OUTSIDE OF THE SCOPE OF WHAT THIS BUSINESS IS.
0417
 1          Q.   AND WERE YOU GOING TO HAVE THE
 2   ORIGINAL DIAMANTE MEMBERS AS PARTNERS EVER IN ANY
 3   OF THESE OTHER NON-CABO PROPERTIES?
 4          MS. CROWTHER:  OBJECTION.  I DON'T
 5   THINK THERE WERE ANY PARTNERS.
 6   BY MR. RICHARDS:
 7          Q.   WELL, JUST THE ORIGINAL DIAMANTE
 8   MEMBERS, WERE YOU GOING TO INVOLVE THEM, GIVE
 9   THEM, LIKE, A RIGHT OF FIRST REFUSAL IN THESE
10   OTHER PROPERTIES?
11          A.   WELL, I'M -- I KNOW I TALKED TO
12   MR. KENNER ABOUT A TRIP TO COSTA RICA.  I THINK I
13   EVEN ASKED HIM IF HE WANTED TO GO.  HE SAID HE
14   DIDN'T.
15          AND WHEN THE BOOT RANCH DEAL CAME
16   UP, I THINK I OFFERED 20 PERCENT TO MR. KENNER OF
17   THAT DEAL.
18          Q.   WHAT WAS THE PLAN WITH QUERENCIA IN
19   CABO?
20          A.   QUERENCIA?
21          Q.   QUERENCIA, YEAH.
22          A.   WE LOOKED AT PROPERTY ALL OVER
23   CABO, SO THAT WAS ONE OF THE PLACES THAT WE LOOKED
24   AT.
25          Q.   DO YOU KNOW WHY YOU DIDN'T PURCHASE
0418
 1   IT?
 2          A.   THERE WERE, I THINK, A FEW REASONS.
 3   AND ONE WAS I DON'T THINK WE CAN PUT IT TOGETHER
 4   IN TIME.
 5          AND THE MEMBERS HAD A GROUP
 6   TOGETHER THAT WANTED TO PURCHASE IT, AND THEN THEY
 7   KIND OF WENT TO ANOTHER GUY THAT WAS, I THINK,
 8   FRIENDLY TO -- WITH THE BROKERS OF THE DEAL.
 9          Q.   WHAT WAS THE PLAN WITH THE TWIN
10   DOLPHIN SITE IN CABO?
11          A.   AGAIN, IT'S ANOTHER PROPERTY THAT
12   WE LOOKED AT.
13          Q.   AND DO YOU KNOW WHY THAT WASN'T
14   PURCHASED?
15          A.   I DON'T.
16          Q.   IN 2005/2006, DO YOU REMEMBER
17   TAKING A TEN-DAY TRIP TO ACAPULCO?
18          A.   NO.
19          Q.   DID YOU EVER REMEMBER GOING TO

```
20    ACAPULCO?
21              A.   YES.
22              Q.   AND WHEN DID YOU GO TO ACAPULCO?
23              A.   I'M NOT SURE.
24              Q.   DID YOU USE THE FALCON 10 TO VISIT
25    THE AIRPORT IN ACAPULCO?
0419
1               A.   I MAY HAVE.
2               Q.   WHO OWNED THE AIRPORT IN ACAPULCO?
3               A.   I DON'T RECALL.
4               Q.   DO YOU REMEMBER WHAT THE PURPOSE OF
5     THE TRIP WAS?
6               A.   I DON'T RECALL.
7               Q.   AND WHO PAID FOR THE FLIGHTS?
8               A.   I DON'T RECALL.
9               Q.   DO YOU KNOW WHO PAID FOR THE
10    EXPENSES?
11              A.   I DON'T KNOW.
12              Q.   WHEN WAS LEGACY PROPERTIES CREATED?
13              A.   I'M NOT SURE.
14              Q.   WASN'T IT AFTER THE ACAPULCO TRIP?
15              A.   I DON'T KNOW.
16              Q.   WHEN YOU WENT TO THE COSTA RICA
17    TRIP, DID YOU FLY IN THE FALCON 10?
18              A.   I BELIEVE SO.
19              Q.   DO YOU KNOW WHO PAID FOR THAT
20    FLIGHT?
21              A.   I DON'T KNOW.
22              Q.   WHAT ABOUT THE EXPENSES?
23              A.   I DON'T RECALL.
24              Q.   DO YOU KNOW ABOUT THE BLACK -- THE
25    BLACK BART?
0420
1               A.   I DON'T KNOW WHAT THAT IS.
2               Q.   WERE YOU -- WERE YOU TRYING TO
3     FACILITATE A HARD MONEY LOAN FROM A GENTLEMAN
4     REFERRED TO AS "BLACK BART"?
5               A.   I DON'T BELIEVE I KNOW WHO THAT IS.
6               Q.   DO YOU KNOW WHO GIGI FERNANDEZ IS?
7               A.   GIGI FERNANDEZ.  CAN YOU GIVE ME
8     SOME REFERENCE?
9               Q.   SHE WAS A -- NO.  BECAUSE IF YOU
10    DON'T KNOW WHO SHE IS, I CAN TRY LATER.  I'LL TRY
11    TO GET SOME --
12              A.   I KNOW OF ONE GIRL NAMED GIGI.  SHE
13    LIVES IN MEXICO.  SHE'S A FRIEND OF BOB GAUDET'S.
14    I DON'T KNOW.
15              Q.   YEAH.  THAT'S THE RIGHT PERSON.
16              A.   I DON'T KNOW.
17              Q.   DID SHE -- DO YOU KNOW IF
```

18    TOM HARVEY TRIED TO COMMUNICATE WITH GIGI ABOUT
19    TWO CRIMINAL CASES IN MEXICO?
20            A.   I DON'T KNOW.
21            Q.   IS -- ARE YOU AWARE THAT
22    FERNANDO GARCIA APPROACHED GIGI IN PERSON IN CABO
23    SAN LUCAS TO DISCUSS HER INVOLVEMENT?
24            A.   I KNOW THAT HE SAW HER BECAUSE I
25    WAS WITH HER WHEN HE SAW HER.  BUT I DON'T KNOW
0421
1     WHAT THEY DISCUSSED.
2             Q.   ARE YOU AWARE THAT -- THAT GARCIA
3     THREATENED HER, THAT IF SHE REMAINED INVOLVED IN
4     THE CASES IN MEXICO, THAT SHE'D BE SUBJECT TO
5     CRIMINAL PROSECUTION?
6             A.   I DON'T KNOW IF HE SAID THAT OR
7     NOT.  I DON'T KNOW IF THAT'S A THREAT OR NOT.
8             Q.   I DON'T KNOW.  I'M JUST ASKING IF
9     YOU'RE AWARE HE SAID IT.
10            A.   I DON'T KNOW IF HE SAID THAT.
11            Q.   ARE YOU AWARE THAT TOM HARVEY SENT
12    THREATENING E-MAILS TO PHIL KENNER?
13            A.   NO.
14            Q.   ARE YOU AWARE THAT HE SENT THEM TO
15    ONE OF KENNER'S -- AN ATTORNEY IN IDAHO NAMED
16    PAUL AUGUSTINE?
17                 MS. CROWTHER:  OBJECTION.  THIS IS
18    A CASE THAT'S BEEN DISMISSED.
19                 MR. RICHARDS:  I KNOW.  I'M JUST
20    ASKING HIM IF HE'S AWARE OF IT.
21                 MS. CROWTHER:  BUT YOU'RE CALLING
22    THEM THREATENING E-MAILS, AND THEY'RE NOT.
23                 MR. RICHARDS:  NO.  THEY --
24                 MS. CROWTHER:  THAT'S SETTLEMENT
25    COMMUNICATIONS, AND THAT'S WHY THE JUDGE DISMISSED
0422
1     THE CASE.
2     BY MR. RICHARDS:
3             Q.   OKAY.  I'LL JUST SAY:  ARE YOU --
4     ARE YOU -- ARE YOU AWARE THAT E-MAILS WERE SENT
5     TO -- WELL, THEY WERE DISMISSED ON CONSTITUTIONAL
6     GROUNDS.  WE CAN GET INTO THAT DISCUSSION LATER.
7                 THE -- THEY -- THEY -- BECAUSE I
8     GUESS TOM HARVEY PRACTICES OUT HERE NOW.
9                 ARE YOU -- ARE YOU -- ARE YOU AWARE
10    THAT TOM HARVEY SENT AN E-MAIL TO PAUL AUGUSTINE
11    RELATED TO TRYING TO SETTLE THIS CASE WITH YOU FOR
12    YOU?
13            A.   I'M AWARE HE -- I AM AWARE HE SENT
14    E-MAILS TO PAUL AUGUSTINE, YES.
15            Q.   DID YOU APPROVE THEM BEFORE HE SENT

16    THEM?
17              MS. CROWTHER:  OBJECTION.  DON'T
18    ANSWER.  ATTORNEY-CLIENT COMMUNICATIONS AND WORK
19    PRODUCT.
20              COME ON.
21    BY MR. RICHARDS:
22         Q.   WHY DOES JOWDY -- WHY DID -- WHY
23    DID YOU -- WHY DO YOU THINK THAT IF PHIL KENNER
24    RELINQUISHES HIS INTEREST IN DIAMANTE DEL MAR, IN
25    THE DIAMANTE CABO SAN LUCAS, THAT THE MEDIA WILL
0423
1     LEAVE KENNER ALONE?
2          A.   WHY ARE YOU SAYING I -- I DON'T --
3     ARE YOU ASKING --
4          Q.   THESE WERE IN E-MAILS.  I JUST WAS
5     WONDERING -- DID YOU EVER READ THE E-MAILS?
6          A.   THAT I WROTE?
7          Q.   NO.
8               MS. CROWTHER:  OBJECTION.
9     BY MR. RICHARDS:
10         Q.   NO.  THAT TOM HARVEY WROTE.
11              (WHEREUPON, A DISCUSSION WAS HELD
12              OFF THE RECORD.)
13    BY MR. RICHARDS:
14         Q.   DID YOU EVER READ THE E-MAILS?
15              MS. CROWTHER:  AND LET ME JUST
16    OBJECT.  TO THE EXTENT THAT YOU READ THEM AT THE
17    DIRECTION OF COUNSEL OR IN COMMUNICATION WITH
18    COUNSEL, YOU SHOULD NOT DISCLOSE THAT.
19              IF YOU READ THEM SOME OTHER TIME,
20    THEN THAT'S FINE.
21              THE DEPONENT:  I CAN'T DISCLOSE.
22    BY MR. RICHARDS:
23         Q.   ALL RIGHT.  WHO -- WHO OWNS THE
24    JOWDY INTEREST IN THE C.S.L. AIRPORT?
25         A.   THERE IS NO JOWDY INTEREST IN THE
0424
1     C.S.L. AIRPORT NOW.
2          Q.   SO NONE OF YOUR COMPANIES OWN ANY
3     PORTION OF THAT AIRPORT?
4          A.   NO.
5          Q.   ALL RIGHT.  IS THERE A LAWSUIT
6     RIGHT NOW WITH YOU AND THE CURRENT AIRPORT
7     MANAGEMENT?
8          A.   THERE'S LITIGATION, YES.
9          Q.   AND WHAT -- WHO'S THE PARTIES OF
10    THAT LITIGATION, TO THE BEST OF YOUR KNOWLEDGE?
11         A.   I DON'T KNOW.
12         Q.   AND HOW DO YOU KNOW THERE'S
13    LITIGATION?

```
14              A.    I BELIEVE THERE IS.
15              Q.    BASED ON WHAT?
16              A.    BASED ON COMMUNICATIONS WITH MY
17    ATTORNEY.
18              Q.    ALL RIGHT.  DIAMANTE AIR --
19    YESTERDAY YOU TESTIFIED THAT YOU AND PHIL KENNER
20    WERE THE MANAGING MEMBERS AT -- IT WAS UNCLEAR AS
21    TO WHO WAS MANAGING MEMBER WHEN.
22                    BUT WEREN'T YOU -- WEREN'T -- DON'T
23    THE CORPORATE RECORDS SHOW THAT YOU AND THALMANN
24    ARE THE MANAGING MEMBERS?
25              A.    I DON'T BELIEVE SO.
0425
1               Q.    WHO CONTROLLED THE DAY-TO-DAY
2     DECISIONS OF DIAMANTE AIR?
3                     MS. CROWTHER:  OBJECTION.  VAGUE AS
4     TO TIME.
5     BY MR. RICHARDS:
6               Q.    DURING THE TIME -- AT ANY -- DURING
7     THE TIME PERIOD UNTIL YOU RELINQUISHED CONTROL --
8     UNTIL DIAMANTE RELINQUISHED CONTROL OF ALL OF
9     THEIR PLANES, PRIOR TO THAT TIME?
10              A.    I DON'T KNOW.
11              Q.    WASN'T MR. THALMANN IN CONTROL OF
12    DAY-TO-DAY OPERATIONS?
13              A.    I DON'T BELIEVE SO.
14              Q.    WHO MANAGED THE BANK ACCOUNTS FOR
15    THE COMPANY?
16              A.    MARK THALMANN.
17              Q.    WHAT BANK WERE THE ACCOUNTS AT?
18              A.    I DON'T REMEMBER.
19              Q.    ARE THERE ANY FUNDS IN THE ACCOUNTS
20    NOW?
21              A.    I DON'T KNOW.
22              Q.    HAS THE COMPANY CLOSED?
23              A.    I DON'T KNOW.
24              Q.    DO YOU KNOW WHO SIGNED FOR THE LOAN
25    ON THE FALCON?
0426
1               A.    I DON'T KNOW.
2               Q.    DO YOU KNOW WHY THE LOAN WAS NEVER
3     PAID DOWN DURING THE YEARS THAT YOU USED IT?
4               A.    I DON'T BELIEVE THAT TO BE TRUE.
5               Q.    DO YOU BELIEVE IT WAS PAID DOWN?
6               A.    DEFINE "PAID DOWN."
7               Q.    YOU KNOW, THE PRINCIPAL LOWERED.
8               A.    YES, IT WAS.
9               Q.    IT WAS?
10              A.    I BELIEVE SO.
11              Q.    ALL RIGHT.  AND JUST SO WE'RE
```

12    CLEAR, DID YOU DIRECT TOM HARVEY TO SPEAK WITH
13    RICK ROSENBOOM AT 1ST SOURCE BANK TO TRY TO BUY
14    THE PLANE?
15              MS. CROWTHER:  OBJECTION.
16    ATTORNEY-CLIENT COMMUNICATIONS.
17              I INSTRUCT YOU NOT TO ANSWER.
18    BY MR. RICHARDS:
19         Q.   DID YOU HAVE ANYBODY TRY TO BUY THE
20    BANK FROM 1ST SOURCE BANK?
21              MS. CROWTHER:  OBJECTION.  IF THAT
22    INVOLVES A COMMUNICATION TO AN ATTORNEY, YOU
23    SHOULD NOT DISCLOSE IT.  BUT IF THERE ARE
24    COMMUNICATIONS WITH NONATTORNEYS, YOU MAY.
25              THE DEPONENT:  NO, I DON'T BELIEVE
0427
1     SO.
2     BY MR. RICHARDS:
3          Q.   DID YOU TRY TO HIRE A C.E.O. OF
4     DIAMANTE DEL MAR NAMED HOMI, H-O-M-I?
5          A.   I DON'T UNDERSTAND THE QUESTION.
6          Q.   HAVE YOU EVER TRIED TO HIRE A
7     C.E.O. FOR DIAMANTE DEL MAR OTHER THAN YOURSELF?
8          A.   NO.
9          Q.   DIRECTING YOUR ATTENTION TO THE
10    QUESTIONS ON THE TEXAS BOOT RANCH.
11              WHY DID YOU PURSUE THAT PROJECT?
12              MS. CROWTHER:  OBJECTION.  IT'S
13    BEYOND THE SCOPE OF THE COMPLAINT.  IT'S NOT
14    RELEVANT.
15              AND I INSTRUCT YOU NOT TO ANSWER.
16              MR. RICHARDS:  YOU KNOW, IT IS
17    RELEVANT BECAUSE HE'S TESTIFIED TO IT.  IT'S ALL
18    OVER THE DOCUMENTS YOU PROVIDED US.
19              MS. CROWTHER:  JUST BECAUSE THERE
20    ARE DOCUMENTS THAT MIGHT MENTION IT DOESN'T MEAN
21    THAT IT'S RELEVANT.  AND I'M NOT GOING TO LET YOU
22    ASK HIM QUESTIONS ABOUT IT.
23              MR. RICHARDS:  YOU KNOW, IT'S
24    SUPPOSED TO LEAD TO THE DISCOVERY OF ADMISSIBLE
25    EVIDENCE.
0428
1              MS. CROWTHER:  IT WON'T.
2              MR. RICHARDS:  WELL, HOW DO YOU
3     KNOW?
4              MS. CROWTHER:  BECAUSE I KNOW.  IT
5     DOESN'T HAVE ANYTHING TO DO WITH ANY OF THE
6     PLAINTIFFS IN THE COMPLAINT.  IT DOESN'T HAVE
7     ANYTHING TO DO WITH THE MEXICAN PROJECTS.
8              MR. RICHARDS:  I KNOW.  BUT WE'RE
9     ALLEGING THAT HIS INTERESTS WERE DIVERTED.  AND I

```
10        JUST WANT TO KNOW WHY HE WENT TO PURCHASE -- WHY
11        DID HE PURSUE THE PROJECT.  IT'S A SIMPLE
12        QUESTION.
13                    MS. CROWTHER:  IT IS A SIMPLE
14        QUESTION.  IT'S ALSO IRRELEVANT.
15                    YOU CAN ASK HIM ABOUT HIS TIME AND
16        WHAT HE SPENT HIS TIME DOING, AND HE'S TESTIFIED
17        TO THAT.  SO THAT'S ASKED AND ANSWERED.
18        BY MR. RICHARDS:
19             Q.   DID YOU -- WELL, HOW MUCH DID YOU
20        INVEST IN THAT PROJECT?
21                    MS. CROWTHER:  OBJECTION.  I
22        INSTRUCT YOU NOT TO ANSWER.
23                    MR. RICHARDS:  WE'RE TRYING --
24        WE'RE TRYING TO RECOVER FUNDS.  WE'RE ENTITLED TO
25        KNOW IF HE INVESTED ANY MONEY IN IT.
0429
 1                    MS. CROWTHER:  NO, YOU'RE NOT.
 2                    MR. RICHARDS:  IF IT'S -- IF IT
 3        CAME FROM THE ENTITIES THAT MY CLIENTS HAVE
 4        OWNERSHIP INTEREST, IT IS.
 5                    MS. CROWTHER:  YOU CAN ASK HIM THAT
 6        QUESTION.
 7                    MR. RICHARDS:  OKAY.
 8        BY MR. RICHARDS:
 9             Q.   DID YOU -- DID ANY OF THE MONEYS
10        INVESTED IN THE TEXAS BOOT RANCH PROJECT COME FROM
11        ANY OF THE ENTITIES THAT HAVE BEEN TESTIFIED TO IN
12        THIS LITIGATION?
13                    MS. CROWTHER:  OBJECTION.  THAT'S
14        NOT WHAT I SAID HE COULD ANSWER.
15                    HE CAN ANSWER WHETHER ANY OF THE
16        ENTITIES IN WHICH THE PLAINTIFFS HAVE INTEREST
17        SENT MONEY TO THAT PROJECT.
18                    MR. RICHARDS:  WELL, THE
19        PLAINTIFFS -- WELL, NO, BECAUSE HE -- THAT MONEY
20        HAS BEEN DIVERTED TO OTHER ENTITIES IN THIS CASE,
21        SO THAT -- THAT WOULD BE TOO LIMITING.
22                    MS. CROWTHER:  NO, IT'S NOT.
23                    MR. RICHARDS:  WELL, ANY OF THE
24        ENTITIES THAT ARE INVOLVED IN MEXICO WOULD BE THE
25        ACCURATE QUESTION.
0430
 1                    MS. CROWTHER:  NO, IT'S NOT.
 2                    YOUR CLIENTS HAVE INTEREST IN
 3        PARTICULAR ENTITIES, AND YOU CAN ASK ABOUT WHERE
 4        THAT MONEY WENT.  YOU CAN'T ASK ABOUT WHERE OTHER
 5        ENTITIES SENT THEIR MONEY.
 6                    MR. RICHARDS:  BUT HE NEVER
 7        PROVIDED A TRACING OF WHERE THE MONEY WENT.
```

```
 8                  MS. CROWTHER:  YOU CAN ASK HIM
 9   ABOUT WHERE THE MONEY WENT FROM THE ENTITIES IN
10   WHICH THOSE PEOPLE HAVE INTEREST.
11                  MR. RICHARDS:  BUT THAT MONEY WAS
12   THEN TRANSFERRED INTO OTHER ENTITIES.
13                  MS. CROWTHER:  WELL, YOU CAN ASK
14   HIM IF THAT HAPPENED.  YOU HAVEN'T LAID ANY
15   FOUNDATION THAT THAT HAPPENED.
16   BY MR. RICHARDS:
17           Q.   WELL, WHEN -- WHEN YOU -- WHEN YOU
18   TOOK DRAWS FROM LEHMAN BROTHERS OVER THE COURSE OF
19   THE LOAN, WHAT ENTITY DID YOU DEPOSIT THE FUNDS
20   IN?
21           A.   WHICH LOAN?
22           Q.   THE CABO SAN LUCAS LOAN.
23           A.   DIAMANTE CABO SAN LUCAS.
24           Q.   AND DIAMANTE CABO SAN LUCAS PAID
25   FEES TO LEGACY PROPERTIES; CORRECT?
0431
 1           A.   I BELIEVE SO.
 2           Q.   OKAY.  AND THEY PAID FEES TO BAJA
 3   DEVELOPMENT?
 4           A.   NO.
 5           Q.   ONLY LEGACY PROPERTIES?
 6           A.   I DON'T KNOW IF IT'S ONLY LEGACY
 7   PROPERTIES, BUT NOT BAJA DEVELOPMENT.
 8           Q.   OKAY.  CAN YOU JUST TELL ME WHAT
 9   OTHER ENTITIES THAT YOU OWN OR CONTROL RECEIVE
10   PROCEEDS FROM THE LOAN DRAWS FROM LEHMANS BESIDES
11   CABO SAN LUCAS?
12           A.   INITIALLY, THE EMPLOYEES WERE IN
13   DIAMANTE MANAGEMENT, SO THAT WOULD GET MONEY FROM
14   DIAMANTE CABO SAN LUCAS TO PAY THE EMPLOYEES.  WE
15   DON'T USE DIAMANTE MANAGEMENT ANYMORE.
16           Q.   DID LEGACY PROPERTIES INVEST IN
17   TEXAS BOOT RANCH?
18                  MS. CROWTHER:  OBJECTION.
19   IRRELEVANT.  EXCEEDS THE SCOPE OF THE COMPLAINT.
20                  INSTRUCT YOU NOT TO ANSWER.
21                  MR. RICHARDS:  BUT HE SAID THEY GOT
22   MONEY FROM THE LOAN --
23                  MS. CROWTHER:  SO WHAT.  YOU DON'T
24   NEED TO KNOW WHAT HE DID WITH IT.
25                  YOU CAN ARGUE THAT IT WAS IMPROPER
0432
 1   FOR THEM TO GET THE MONEY, BUT YOU DON'T GET TO
 2   KNOW WHAT THEY DID WITH IT.  IT'S NOT RELEVANT.
 3                  MR. RICHARDS:  WELL, IT'S RELEVANT
 4   IF IT'S CONCEALED.
 5                  MS. CROWTHER:  NO, IT'S NOT.
```

```
 6                    IF IT PAID IT TO LEGACY PROPERTIES
 7     AS A DEVELOPMENT FEE, YOU CAN ARGUE THAT'S
 8     IMPROPER.  THAT'S IT.
 9                    YOU DON'T GET AN ACCOUNTING OF
10     EVERY PLACE THAT THE MONEY WENT BEYOND THAT.  YOU
11     GET TO KNOW WHAT THOSE ENTITIES DID WITH THE
12     MONEY.  THAT'S IT.
13                    MR. RICHARDS:  HE'S DEPRIVING THE
14     OTHER -- THE OTHER INDIVIDUALS OF CORPORATE
15     OPPORTUNITY.
16                    MS. CROWTHER:  NO, HE'S NOT.
17                    AND THAT'S A LEGAL ARGUMENT.  YOU
18     WANT TO MAKE THAT ARGUMENT TO THE JUDGE AND ARGUE
19     YOU GET TO GO GET ASSETS FROM SOMEONE ELSE?
20     THAT'S SO FAR DOWN THE ROAD.  THAT'S NOT WHAT THIS
21     DISCOVERY IS ABOUT.
22                    MR. RICHARDS:  WELL, HE'S SUED FOR
23     AN ACCOUNTING.  IF MONEY WAS DIVERTED TO LEGACY
24     PROPERTIES IN THE FORM OF A DEVELOPMENT FEE, THEN
25     I'D BE ENTITLED TO KNOW WHAT HE DID WITH THE MONEY
0433
 1     IN THE TEXAS PROJECT.
 2                    MS. CROWTHER:  NO.  YOU GET TO KNOW
 3     THAT LEGACY GOT A DEVELOPMENT FEE.  AFTER THAT
 4     IT'S NOT RELEVANT.  THOSE PLAINTIFFS DON'T HAVE AN
 5     INTEREST IN LEGACY.
 6                    YOU CAN ARGUE THAT IT WAS
 7     INAPPROPRIATE.  THAT'S THE END OF THE ARGUMENT.
 8                    MR. RICHARDS:  WELL, YOU'RE JUST --
 9     YOU KNOW, YOU'RE -- THESE ARE -- THESE ARE
10     QUESTIONS THAT PROBABLY ARE SIMPLE ANSWERS.
11     YOU'RE JUST INVITING MORE MOTIONS ON THIS.
12                    MS. CROWTHER:  MORE MOTIONS THAT
13     YOU'LL LOSE.
14                    I'M NOT GOING TO LET YOU DO A
15     FISHING EXPEDITION TO EVERYTHING KEN JOWDY'S EVER
16     SPENT MONEY ON.  IT'S JUST A WASTE OF TIME.
17                    MR. RICHARDS:  WELL, IF IT'S -- IF
18     IT'S MONEY THAT HE -- IF IT'S MONEY THAT WAS
19     RECEIVED FROM THE -- FROM THIS PARTICULAR PROPERTY
20     THAT MY CLIENTS OWN, THAT -- IT'S -- THAT EQUITY
21     WAS ENCUMBERED.
22                    AND THAT'S WHY WE'RE TRYING TO GET
23     THAT -- I DON'T -- ARE WE ON THE SAME PAGE HERE?
24                    HE GOT A -- HE GOT A CREDIT LINE.
25     THEY DIDN'T GIVE HIM ALL THE MONEY AT ONCE.  SO
0434
 1     HE -- THE CREDIT LINE WAS SECURED BY THE PROPERTY
 2     THAT MY CLIENTS OWN.
 3                    MS. CROWTHER:  FIRST OF ALL, HE
```

```
 4    DIDN'T GET A CREDIT LINE.  DIAMANTE CABO SAN LUCAS
 5    DID.
 6                    AND SECOND OF ALL, IT MADE
 7    PAYMENTS.  AND THAT'S WHAT THIS LITIGATION IS
 8    ABOUT.
 9                    BUT US DEBATING THIS IS JUST
10    WASTING MORE TIME.  I'M NOT GOING TO LET YOU ASK
11    QUESTIONS ABOUT WHAT LEGACY PROPERTIES SPENT MONEY
12    ON.
13                    MR. RICHARDS:  WELL, I WAS MERELY
14    JUST ATTEMPTING TO MEET AND CONFER OR MAKE A
15    RECORD OF THIS SO IT WOULDN'T BE IN A TOTAL VACUUM
16    IF I HAVE TO SHOW THE COURT.  THAT'S ALL.
17                    IT WASN'T -- AND WHEN YOU SAY IT'S
18    A WASTE OF TIME, IT REALLY ISN'T.  ONLY TO THE
19    EXTENT THAT IT'S A BROAD STANDARD IN A DEPOSITION.
20                    IT'S ANYTHING THAT CAN LEAD ME TO
21    THE DISCOVERY OF ADMISSIBLE EVIDENCE, AS YOU KNOW,
22    AND IT'S NOT A VERY NARROW STANDARD.  AND I'M JUST
23    TRYING TO FOLLOW WHERE THIS MONEY WAS SPENT.
24                    MS. CROWTHER:  AND I THINK WHAT I'M
25    SAYING IS I'VE MADE MY POSITION CLEAR ABOUT WHY I
0435
 1    DON'T THINK THAT'S RELEVANT, AND I DON'T WANT TO
 2    WASTE MORE OF YOUR TIME DEPOSING MR. JOWDY MAKING
 3    MY POSITION CLEAR.
 4                    MR. RICHARDS:  ALL RIGHT.
 5    BY MR. RICHARDS:
 6            Q.   DID ANY -- DID LEGACY PROPERTIES OR
 7    DID -- WAS -- DID YOU DIVERT ANY MONEY FROM
 8    DIAMANTE CABO SAN LUCAS TO INVEST IN THE LAUREL
 9    COVE DEVELOPMENT?
10            A.   NO.
11            Q.   DID YOU -- DID YOU -- DID YOU,
12    ACTING ON BEHALF OF BAJA DEVELOPMENT CORP. OR
13    DIAMANTE CABO SAN LUCAS OR LEGACY PROPERTIES,
14    RECEIVE ANY MONEY FROM YOUR COUSIN, EDDIE ESSA?
15                    MS. CROWTHER:  OBJECTION AS TO
16    LEGACY PROPERTIES.
17                    THE DEPONENT:  DID --
18    BY MR. RICHARDS:
19            Q.   DID EDDIE ESSA GIVE YOU ANY
20    MONEY -- YOU, AS A PERSON, HAND YOU ANY MONEY?
21            A.   NO.
22                    MS. CROWTHER:  OBJECTION.  NOT
23    RELEVANT.
24    BY MR. RICHARDS:
25            Q.   ISN'T IT TRUE THAT HE GAVE YOU OVER
0436
 1    A MILLION DOLLARS?
```

```
2              A.   NO.
3              Q.   IS HE AN OWNER OF ANY OF THESE
4    PROPERTIES IN CABO SAN LUCAS?
5              A.   NO.
6              Q.   SO WHAT'S YOUR RELATIONSHIP WITH
7    EDDIE ESSA?
8              A.   HE'S MY COUSIN.
9              Q.   DO YOU HAVE A BUSINESS RELATIONSHIP
10   WITH HIM?
11             A.   NOT RIGHT NOW, NO.
12             Q.   NO.  AT THE TIME.
13             MS. CROWTHER:  OBJECTION.  IT'S NOW
14   NOT RELEVANT BECAUSE HE'S GOT NO INTEREST IN THESE
15   PROPERTY, SO HIS RELATIONSHIP WITH LOTS OF PEOPLE
16   IS NOT RELEVANT.
17             THE DEPONENT:  HE HAS AN INTEREST,
18   I BELIEVE, IN BAJA MANAGEMENT.
19   BY MR. RICHARDS:
20             Q.   OH, HE DOES.  OKAY.
21             SO WHAT'S -- HOW DID HE ACQUIRE
22   INTEREST IN BAJA MANAGEMENT?
23             A.   HE MADE AN INVESTMENT, I BELIEVE.
24   I DON'T KNOW WHAT IT WAS.
25             Q.   WAS IT A MILLION DOLLARS?
0437
1              A.   NO.
2              Q.   HALF A MILLION DOLLARS?
3              A.   NO.
4              Q.   WHAT -- WHAT COMPANY DID THE
5    3 MILLION DOLLAR LOAN PROCEEDS FROM K.S.I. GET
6    DEPOSITED IN?
7              A.   DIAMANTE -- DIAMANTE DEL MAR.
8    SORRY.
9              Q.   AND WHAT WERE THOSE FUNDS USED FOR?
10             A.   TO PAY EXISTING EXPENSES.
11             Q.   AND HOW DID THAT LOAN BENEFIT THE
12   PROJECT?
13             A.   WE HAD EXISTING EXPENSES THAT
14   NEEDED TO BE PAID.
15             Q.   HAVE ANY OF THE -- HAVE ANY OF THE
16   INVESTORS EVER BEEN NOTIFIED IN WRITING ABOUT THE
17   3 MILLION DOLLAR LOAN OR THE STATUS?
18             A.   I DON'T KNOW.
19             Q.   HAS THE LOAN EVER BEEN PAID?
20             A.   NO.
21             Q.   FOR DIAMANTE CABO SAN LUCAS, WHO'S
22   IN CHARGE OF THE BUDGETS?  WHO CONTROLS THE
23   BUDGETS, I MEAN.
24             A.   IT DEPENDS WHICH BUDGET YOU'RE
25   TALKING ABOUT.
```

0438
1              Q.   I GUESS THE BUDGET -- WELL, THE
2    ONLY SOURCE OF MONEY IS THIS -- THE REMAINING
3    CREDIT LINE THAT'S NOW OWNED BY DANSKE; RIGHT?
4              (NO AUDIBLE RESPONSE BY DEPONENT.)
5    BY MR. RICHARDS:
6              Q.   IS THAT A "YES"?
7              (NO AUDIBLE RESPONSE BY DEPONENT.)
8    BY MR. RICHARDS:
9              Q.   YOU'VE GOT TO JUST SAY "YES."
10             A.   YES.
11             Q.   SHE CAN'T TAKE DOWN "UH-HUHS."
12                  THE -- SO WHO SIGNS OFF ON THE
13   BUDGET EVERY MONTH?
14             A.   THE BUDGET IS PUT TOGETHER BY A
15   GROUP OF PEOPLE THAT, I GUESS AS THE MANAGING
16   MEMBER, I HAVE TO SIGN OFF ON.
17             Q.   YESTERDAY YOU SAID IT WOULD BE EASY
18   TO GET YOUR BUDGET REQUESTS E-MAILED OVER.
19                  DID YOU -- SINCE YESTERDAY, DID YOU
20   EVER MAKE AN ATTEMPT TO DO THAT?
21             A.   I DID NOT.
22             Q.   OKAY.  DID -- SO IT'S NOT THAT
23   EASY, OR DID YOU NOT MAKE AN ATTEMPT?
24             A.   I NEED TO BE TOLD IF THAT'S WHAT I
25   NEED TO DO.
0439
1              Q.   I SEE.
2                  MR. RICHARDS:  AND, ROBYN, YOU SAID
3    YOU WOULD TRY TO DO IT, BUT YOU WERE UNABLE TO?
4                  MS. CROWTHER:  NO, I DID NOT GET
5    HOME IN TIME LAST NIGHT TO DO IT.
6                  MR. RICHARDS:  NO PROBLEM.
7    BY MR. RICHARDS:
8              Q.   WHO -- ARE YOU THE ONE, THOUGH,
9    THAT SIGNS OFF ON THE REQUEST TO DANSKE BANK?
10             A.   I HAVE TO SAY, AS A MANAGING
11   MEMBER, I'M RESPONSIBLE FOR IT.
12             Q.   OKAY.  WHO'S FORREST METZ?
13             A.   I BELIEVE HE HAD A PROPERTY IN
14   NORTHERN BAJA.
15             Q.   AND DID YOU FLY THE FALCON 10 TO
16   THAT SITE?
17             A.   I BELIEVE SO.
18             Q.   AND WHO WAS GOING TO FUND THAT
19   DEAL?
20             A.   I DON'T KNOW.
21             Q.   DID -- LET ME DIRECT YOUR ATTENTION
22   TO BOB GAUDET.
23                  DID BOB GAUDET EVER LEND YOU

24    125,000 DOLLARS?
25              A.   NO.
0440
 1              Q.   DID HE LEND YOU ANY MONEY AT ALL?
 2              A.   NO.
 3              Q.   DID BOB GAUDET EVER PERSONALLY PAY
 4    FOR DIAMANTE OR -- PAY DIAMANTE EXPENSES OR YOUR
 5    EXPENSES?
 6                   MS. CROWTHER:  VAGUE AS TO THE TERM
 7    "DIAMANTE."  WHICH ONE?
 8    BY MR. RICHARDS:
 9              Q.   ANY OF THEM.
10              A.   HE PAID SOME HOME EXPENSES, HOUSE
11    EXPENSES, YES.
12              Q.   DID YOU EVER ATTEMPT TO REPAY HIM?
13              A.   NO.
14              Q.   HOW COME?
15              A.   BECAUSE HE WAS GIVEN AN INTEREST IN
16    DIAMANTE CABO SAN LUCAS.
17              Q.   WHO'S MARK PETERSON?
18              A.   HE WORKED FOR THREE PALMS
19    INTERNATIONAL.
20              Q.   AND DID YOU TELL HIM TO HALT SALES
21    IN 2007?
22              A.   NO.
23              Q.   AT ANY TIME?
24              A.   NO.
25              Q.   DO YOU KNOW WHO BRIAN MCNAMEE IS?
0441
 1              A.   YES.
 2              Q.   WHO'S THAT?
 3              A.   HE'S A TRAINER.
 4              Q.   AND WHO DID HE TRAIN OTHER THAN
 5    ROGER CLEMENS AND YOU?
 6                   MS. CROWTHER:  OBJECTION.  NOT
 7    RELEVANT.  LACKS FOUNDATION.
 8                   THE DEPONENT:  I DON'T KNOW.
 9    BY MR. RICHARDS:
10              Q.   DID HE TRAIN YOU?
11              A.   I WORKED OUT WITH HIM, YES.
12              Q.   AND DID HE TRAIN ROGER CLEMENS?
13              A.   YES.
14              Q.   AND DID YOU EVER ASSIST HIM IN
15    PROVIDING ANY TYPE OF DRUGS TO ROGER CLEMENS?
16                   MS. CROWTHER:  OBJECTION.  NOT
17    RELEVANT.
18                   DON'T ANSWER THAT QUESTION.
19                   MR. RICHARDS:  ARE YOU HAVING HIM
20    ASSERT THE FIFTH?
21                   MS. CROWTHER:  NO.

```
22                    HOW IS THAT RELEVANT?
23                    THE DEPONENT:  I'LL BE HAPPY TO
24   ANSWER.
25                    NO.
0442
 1   BY MR. RICHARDS:
 2             Q.   OKAY.  AND ARE YOU AWARE OF AN
 3   E-MAIL THAT ROGER CLEMENS' SISTER SENT TO YOU
 4   ABOUT RUINING THE CLEMENS FAMILY?
 5                    MS. CROWTHER:  OBJECTION.  NOT
 6   RELEVANT.
 7                    THE DEPONENT:  SHE SENT TO WHO?  TO
 8   ME?
 9   BY MR. RICHARDS:
10             Q.   YES.
11             A.   YES.
12             Q.   AND WHAT WAS THE E-MAIL?
13                    MS. CROWTHER:  AGAIN, OBJECTION.
14                    I REALIZE YOU DON'T HAVE ANY
15   PROBLEM TALKING ABOUT THIS STUFF, BUT I DON'T WANT
16   YOU TO SPEND YOUR DAY TALKING ABOUT THIS.
17                    IT'S NOT RELEVANT TO THIS
18   LITIGATION, UNLESS IT HAS SOMETHING TO DO WITH
19   THIS LITIGATION.  IF IT DOES, YOU CAN TALK ABOUT
20   IT.  IF IT DOES NOT, I INSTRUCT YOU NOT TO ANSWER.
21                    MR. RICHARDS:  WELL, RELEVANCY IS
22   AN IMPROPER OBJECTION IN A DEPOSITION.  IT REALLY
23   IS.
24                    MS. CROWTHER:  IT'S TOTALLY
25   IMPROPER WHEN YOU ARE SO FAR AFIELD OF ANYTHING.
0443
 1                    MR. RICHARDS:  WELL, IF I HAVE AN
 2   E-MAIL THAT -- THAT SAYS THAT HE'S RUINING THE
 3   CLEMENS FAMILY, IT'S RELEVANT.  HE'S THE DIRECTOR
 4   OF A GUY THAT IS -- THAT IS HOLDING ALL MY
 5   CLIENTS' MONEY.
 6                    MS. CROWTHER:  YOU REPRESENT
 7   ROGER CLEMENS?
 8                    MR. RICHARDS:  NO.  I SAID IF I
 9   HAVE AN E-MAIL FROM HIS SISTER.
10                    MS. CROWTHER:  ABOUT WHAT?
11                    MR. RICHARDS:  HE KNOWS ABOUT THE
12   E-MAIL.  I'M ASKING HIM ABOUT IT.
13                    MS. CROWTHER:  HE KNOWS ABOUT A LOT
14   OF THINGS.  THAT DOESN'T MEAN THAT THEY ARE
15   RELEVANT.
16                    MR. RICHARDS:  YOU'RE BEING AN
17   OBSTRUCTIONIST.  I'M JUST ASKING HIM ABOUT IT.
18                    MS. CROWTHER:  NO.  YOU'RE GOING SO
19   FAR -- I KNOW YOU'RE JUST ASKING, BUT A DEPOSITION
```

```
20    ISN'T A TIME TO SIT DOWN AND ASK ANY QUESTION YOU
21    WANT TO ASK.
22                    MR. RICHARDS:  SURE IT IS.
23                    MS. CROWTHER:  NO, IT ISN'T.
24                    MR. RICHARDS:  SURE IT IS.
25                    MS. CROWTHER:  NO, IT ISN'T.  IT
0444
 1    HAS TO BE AT LEAST REASONABLY CALCULATED TO LEAD
 2    TO THE DISCOVERY OF ADMISSIBLE EVIDENCE.
 3                    MR. RICHARDS:  IF ROGER CLEMENS'
 4    SISTER IS SENDING HIM AN E-MAIL ABOUT RUINING THE
 5    CLEMENS FAMILY, I WANT TO KNOW WHAT SHE'S TALKING
 6    ABOUT.
 7                    MS. CROWTHER:  I REALIZE YOU WANT
 8    TO KNOW.  THAT DOESN'T MAKE IT RELEVANT.
 9                    MR. RICHARDS:  IT COULD BE -- IT
10    COULD LEAD TO THE DISCOVERY OF ADMISSIBLE EVIDENCE
11    THAT RELATED TO HIS QUALIFICATIONS OR CAPACITY AS
12    THE MANAGER.
13                    THE DEPONENT:  CAN I ANSWER THAT
14    ONE QUESTION?
15                    MS. CROWTHER:  YES, YOU MAY ANSWER
16    THE QUESTION ABOUT WHETHER IT HAS ANYTHING TO DO
17    WITH YOUR QUALIFICATION --
18                    MR. RICHARDS:  WELL, YOU CAN'T
19    COACH HIM.  THAT WASN'T MY --
20            (SPEAKING SIMULTANEOUSLY.)
21                    THE DEPONENT:  I CAN ANSWER THE
22    QUESTION.  AND I DON'T -- I DON'T REALLY WANT TO
23    GO FURTHER.
24                    IF YOU WANT TO KNOW WHAT'S
25    RELEVANT, THAT E-MAIL CAME THE DAY AFTER THE NEW
0445
 1    YORK POST ARTICLE, AND IT'S GOING TO GO TOWARDS
 2    THE DAMAGES THAT YOU'VE CAUSED ME BECAUSE IT WAS
 3    BASED ON THE LIES THAT WERE IN THAT FIRST
 4    COMPLAINT THAT WAS IN THE NEW YORK POST ARTICLE.
 5                    SO THAT GOES TO THE DAMAGES THAT
 6    I'VE SUFFERED BECAUSE -- SHE SAYS THAT BECAUSE HER
 7    BROTHER WAS MENTIONED IN THAT ARTICLE, AND I WAS.
 8    BY MR. RICHARDS:
 9            Q.   OKAY.  SO IS THAT --
10                    MS. CROWTHER:  IT WAS IRRELEVANT.
11                    MR. RICHARDS:  NOT REALLY.  BECAUSE
12    HE CLAIMS -- HE'S BEEN CLAIMING THAT THE
13    LITIGATION HAS CAUSED HIM DAMAGES, AND THAT'S
14    RELEVANT.
15                    MS. CROWTHER:  IT'S NOT YET.
16                    WHEN WE FILE THAT LAWSUIT, IT WILL
17    BE.  IT'S NOT TODAY.
```

```
18    BY MR. RICHARDS:
19            Q.   OKAY.  NOW, WAS -- WAS MCNAMEE ON
20    THE CABO PAYROLL?
21            A.   NO.
22            Q.   AND LEGACY PROPERTIES, IS THAT --
23    THAT'S OWNED 100 PERCENT BY YOU?
24            A.   YES.
25            Q.   AND IS THERE A REASON WHY, ON THIS
0446
1     VEGAS PROPERTY, THAT YOU'VE NOT TRANSFERRED TITLE
2     TO PHIL KENNER?
3             A.   THERE WAS AT THE TIME, I BELIEVE.
4     I DON'T KNOW WHAT IT WAS.  HE JUST DIDN'T WANT TO
5     HAVE TITLE IN HIS NAME.
6             Q.   WOULD YOU TRANSFER IT NOW?
7             A.   IF HE WANTED TO HAVE A THIRD OF IT,
8     YES.
9             Q.   OKAY.  WHO HAS THE DOCUMENTS
10    RELATED TO THIS LOAN MODIFICATION THAT YOU
11    TESTIFIED TO YESTERDAY?
12            MS. CROWTHER:  THERE'S A BUNCH OF
13    THEM.  YOU MEAN THE CURRENT --
14            MR. RICHARDS:  YEAH.  THE CURRENT
15    ONE.
16            MS. CROWTHER:  -- FOR DANSKE BANK.
17            MR. RICHARDS:  YEAH, THE CURRENT
18    ONE.
19            THE DEPONENT:  ATTORNEYS, I
20    BELIEVE.
21    BY MR. RICHARDS:
22            Q.   WHICH ATTORNEYS?
23            A.   LARRY MARKOWITZ.
24            Q.   AND DO YOU HAVE HIS PHONE NUMBER?
25            A.   NO.
0447
1             Q.   WHERE IS HE LOCATED?
2             A.   NEW YORK.
3             Q.   IS HE A NEW YORK-LICENSED ATTORNEY?
4             A.   I HOPE SO.
5             Q.   I MEAN, YOU MAKE ATTORNEYS HAPPY IN
6     EVERY STATE OF THE COUNTRY.
7             A.   UNFORTUNATELY.
8             MR. RICHARDS:  ALL RIGHT.  NOW --
9     WELL, HE HAS A LOT.  DELAWARE.  NEW YORK.
10    MASSACHUSETTS.  CALIFORNIA.  IT'S TRUE.
11    BY MR. RICHARDS:
12            Q.   OKAY.  DO YOU -- DID YOU EVER
13    GET -- DID YOU EVER NOTIFY ANY OF THE INVESTORS IN
14    DIAMANTE CABO SAN LUCAS THAT YOU WERE GOING TO
15    HAVE THEM PAY FOR YOUR LEGAL FEES AS A RESULT OF
```

16    THIS LITIGATION?
17              A.   NO.
18              Q.   WHY DIDN'T YOU SPEND MONEY ON THE
19    MASTER PLANNING INFRASTRUCTURE WHILE THE GOLF WAS
20    BEING BUILT?  THE GOLF COURSE.
21              MS. CROWTHER:  WHICH PROPERTY?
22              MR. RICHARDS:  WELL, HE DIDN'T
23    BUILD ONE IN DIAMANTE DEL MAR, SO --
24              THE DEPONENT:  WHAT ARE YOU TALKING
25    ABOUT?  WHAT'S THE QUESTION?
0448
1     BY MR. RICHARDS:
2               Q.   WHY DIDN'T YOU SPEND MONEY ON THE
3     ENGINEERING, SEWAGE AND WATER TO THE HOMESITES
4     WHILE YOU WERE BUILDING THE GOLF COURSE?
5               A.   WHY DIDN'T I?
6               Q.   WHY DIDN'T YOU.
7               A.   YOU'RE SAYING THAT WE DIDN'T?
8               Q.   YEAH.  I'M SAYING THAT YOU -- THAT
9     YOU TESTIFIED YESTERDAY THAT THESE HOMESITES DON'T
10    HAVE ANY, YOU KNOW, INFRASTRUCTURE YET.
11              A.   WELL, YOU HAVE -- YOU WORK WITHIN A
12    BUDGET.  THERE'S INFRASTRUCTURE THAT WE DID DO.
13    AND WE DID EVERYTHING THAT WE WERE SUPPOSED TO DO
14    BASED ON THE FUNDING THAT WE HAD.
15              SO I DON'T UNDERSTAND THE QUESTION
16    AS TO WHY DIDN'T WE DO SOMETHING THAT WE WEREN'T
17    FUNDED TO DO.
18              Q.   YOU WEREN'T FUNDED TO BUILD
19    INFRASTRUCTURE TO THE HOMESITES?
20              A.   NO.  WE DID EVERYTHING WE WERE
21    FUNDED TO DO.
22              Q.   YOU'RE SAYING -- SO YOU'RE SAYING
23    THE LEHMAN LOAN DIDN'T COVER -- IT ONLY COVERED
24    THE GOLF COURSE?
25              A.   IT COVERED WHAT WE DID AND WHAT
0449
1     INFRASTRUCTURE THAT WE DID.  THAT WAS ALL
2     PREAPPROVED AND ALL DONE ON THE BASIS OF WHAT THE
3     PURPOSE OF THE FUNDING IS.
4               Q.   DID IT GO OVER BUDGET?
5               A.   DID WHAT GO OVER BUDGET?
6               Q.   THE BUILDING OF THE GOLF COURSE.
7               A.   NO.
8               Q.   WHAT WAS THE BUDGET FOR THE GOLF
9     COURSE?
10              A.   I BELIEVE IT WAS 8 MILLION DOLLARS,
11    I BELIEVE.  I'M NOT SURE.
12              Q.   AND HOW MUCH HAVE YOU -- HOW MUCH
13    DID YOU SPEND BUILDING THE GOLF COURSE?

14           A.   ROUGHLY WHAT THE BUDGET CALLED FOR.
15  I'M NOT SURE EXACTLY WHAT THE NUMBERS WERE.
16           Q.   BECAUSE YOU TESTIFIED YESTERDAY
17  THAT 125 MILLION DOLLARS HAD BEEN SPENT BASICALLY
18  FROM THE DRAWDOWNS OF THE LOANS.
19           A.   YES.
20           Q.   AND WHAT I COULDN'T UNDERSTAND WHEN
21  I WAS GOING OVER MY LEGAL ADDITION YESTERDAY --
22  AND LAWYERS AREN'T VERY GOOD AT MATH -- IS IF THE
23  GOLF COURSE WAS 8 MILLION DOLLARS, HOW DID THE
24  OTHER 142 MILLION -- OR NOT 142, BUT HOW DID THE
25  117 MILLION GET SPENT?
0450
1            A.   IS THAT A QUESTION?
2            Q.   YEAH.
3            A.   DESALINATION PLANT, INFRASTRUCTURE,
4   PERMITTING, PLANNING, ENGINEERING, CONSTRUCTION.
5            Q.   BUT IF THE GOLF COURSE IS
6   8 MILLION, WHAT IS THE -- WHAT IS THE -- WHAT I
7   DON'T UNDERSTAND IS IF THE -- IF THE GOLF COURSE
8   IS 8 MILLION DOLLARS AND THE DESALINATION PLANT,
9   HOW DO WE GET UP TO THAT -- HOW DO WE SPEND
10  125 MILLION DOLLARS?  IS THERE ANY WAY TO BREAK
11  IT DOWN?
12           A.   I'M SURE I COULD.  AND AFTER LUNCH,
13  I'LL COME WITH A BREAKDOWN FOR YOU, JUST IN
14  GENERAL.
15           Q.   BUT YESTERDAY --
16           A.   I DID.  I UNDERSTAND.
17           Q.   -- YOU SAID YOU WERE GOING TO BRING
18  SOMETHING AFTER LUNCH.  WE DIDN'T GET IT.
19           MS. CROWTHER:  YEAH.  WHEN HE
20  OFFERS STUFF, HE --
21           (SPEAKING SIMULTANEOUSLY.)
22           THE DEPONENT:  I'LL GIVE YOU A
23  GENERAL BREAKDOWN.  I DON'T KNOW.  I'LL DO
24  WHATEVER I'M SUPPOSED TO DO.
25           MS. CROWTHER:  HE CAN TESTIFY ABOUT
0451
1   IT.
2            THE DEPONENT:  IF YOU UNDERSTAND
3   THE PROCESS OF WHAT IT IS, BECAUSE WHEN YOU SAID
4   MONEY WENT MISSING, AND WHEN YOU MAKE THESE CLAIMS
5   ON NATIONAL T.V. THAT MONEY WENT MISSING, IF YOU
6   UNDERSTAND THE CONCEPT OF WHAT HAS TO HAPPEN ON A
7   DAILY BASIS AND A MONTHLY BASIS, THERE'S THREE
8   SETS OF CHECKS AND BALANCES AS TO HOW THE MONEY IS
9   SPENT.
10           AND IT'S VERY DIFFICULT FOR THIS
11  MONEY TO GO MISSING, SO TO SPEAK.

```
12   BY MR. RICHARDS:
13           Q.   BY THE WAY, DID YOU PROVIDE A
14   HUMMER FOR MCNAMEE WHEN HE WAS ON PROPERTY?
15           A.   NO.
16           Q.   WHAT I DON'T -- WHAT I DON'T
17   UNDERSTAND IS -- WELL, WHAT I'M TRYING TO
18   UNDERSTAND IS YOU GET 125 MILLION DOLLARS, AND
19   WE'RE NOW FIVE YEARS LATER.
20                WHEN DID -- WHEN IS YOUR
21   RECOLLECTION OF WHEN YOU FIRST HAD ACCESS TO THE
22   125 MILLION DOLLARS?
23           A.   MARCH OF '06.
24           Q.   OKAY.  SO IN MARCH OF '06, YOU GET
25   ACCESS TO 125 MILLION DOLLARS.  AND NOW WE'RE IN
0452
 1   JANUARY OF 2010, AND THE GOLF COURSE IS FINALLY
 2   OPEN.
 3                YOU'RE OUT OF -- THE LOAN HAS BEEN
 4   COMPLETELY EXHAUSTED, AND WE STILL HAVE ANOTHER
 5   100 TO 200 MILLION DOLLARS' WORTH OF
 6   INFRASTRUCTURE THAT'S GOING TO NEED TO BE BUILT TO
 7   BUILD ALL OF THESE HOUSES AND ALL OF THESE
 8   HOMESITES.
 9                AND IT SEEMS TO ME LIKE -- I DON'T
10   UNDERSTAND HOW THE 125,000 WAS SPENT.  SO
11   THAT'S -- THAT'S --
12           A.   SO THIS IS A MANAGEMENT ISSUE?  IS
13   THIS A -- I'M TRYING TO EXPLAIN TO YOU THAT IT WAS
14   SPENT ON INFRASTRUCTURE, CONSTRUCTION, GOLF
15   COURSE, DESALINATION PLANT.
16                MS. CROWTHER:  KEN, DON'T LEAVE OUT
17   THE PURCHASE OF THE PROPERTY.
18                THE DEPONENT:  PURCHASE OF THE
19   PROPERTY.  YOU KNOW, I THINK AT THE CLOSING --
20                MR. RICHARDS:  DO YOU WANT TO
21   TESTIFY?
22                THE DEPONENT:  -- IT WAS 80 MILLION
23   DOLLARS.
24           (SPEAKING SIMULTANEOUSLY.)
25                THE DEPONENT:  BUT HE KNOWS THAT.
0453
 1   IT MAY NOT -- YOU KNOW, SO --
 2   BY MR. RICHARDS:
 3           Q.   SO THE PURCHASE OF THE PROPERTY --
 4           A.   -- I THINK AT THE END OF THE DAY,
 5   WHEN WE PAY THE FEES AND EVERYTHING ELSE, I THINK
 6   THE CLOSING IT WAS CLOSE TO 80 MILLION DOLLARS.
 7           Q.   OKAY.  THAT'S FINE.
 8                I GUESS OUR POSITION IS -- SO WE'RE
 9   NOT HIDING THE BALL, IS THAT IF YOU TAKE THE
```

```
10    8 MILLION FOR THE GOLF AND THE 5 MILLION FOR THE
11    DESALINATION PLANT, YOU'VE SPENT 50 MILLION
12    DOLLARS SINCE THE CLOSING.
13              AND THERE'S 37 MILLION DOLLARS THAT
14    WE CAN'T FIGURE OUT WHERE IT WENT.  SO I'M TRYING
15    TO FIGURE OUT WHAT ELSE -- WHERE ELSE DOES THAT
16    MONEY GO TO IF IT'S NOT DESALINATION OR GOLF, IF
17    YOU KNOW?
18         A.   ROAD CONSTRUCTION.  MAINTENANCE.
19    BUILDING CONSTRUCTION.  VILLA CONSTRUCTION.
20         Q.   THERE'S ONLY ONE VILLA.
21         A.   WELL, IT'S A MILLION DOLLARS.  YOU
22    WANT TO KNOW WHERE IT WENT.  I'M JUST TRYING --
23         Q.   ALL RIGHT.
24         A.   AND, AGAIN, ALL THIS IS ITEMIZED
25    AND IN THE BUDGET.  AND IF THIS IS GOING TOWARD
0454
1     WHAT I'VE BEEN DEALING WITH AS FAR AS
2     MISMANAGEMENT, I'M HAPPY TO HAVE THAT FIGHT IN ITS
3     PROPER VENUE.  BECAUSE I'VE BEEN DEALING WITH THIS
4     FOR TWO YEARS.
5          Q.   BELIEVE IT OR NOT, I'D LIKE TO END
6     IT.  BECAUSE AFTER LISTENING TO THE TESTIMONY
7     YESTERDAY, I BECAME QUITE CONCERNED THAT IF THE
8     BANK DOESN'T WANT TO KEEP FINANCING THIS, THAT
9     THIS LAWSUIT IS NOT HELPING THE SITUATION.
10         A.   THIS LAWSUIT HAS HURT TREMENDOUSLY.
11              THIS LAWSUIT --
12         Q.   I MEAN -- YEAH.
13         A.   THIS LAWSUIT -- WELL, YOU KNOW,
14    WE'LL GO TO THAT WHEN WE GET TO DAMAGES.
15              BUT, YOU KNOW, I WAS HOPING, AS I
16    SAID YESTERDAY, WHEN I TALKED ABOUT WANTING TO SIT
17    IN FRONT OF THIS PEOPLE AND WANTING TO SIT IN
18    FRONT OF PEOPLE LIKE JASON WOOLLEY, WHO I THOUGHT
19    WAS A GOOD GUY, IF HE KNOWS THE FACTS AND HE STILL
20    WANTS TO PURSUE THIS, HE'LL UNDERSTAND HOW MUCH
21    THIS LAWSUIT HAS HURT.
22              IT HASN'T HELPED PEOPLE GET CLOSER
23    TO THEIR MONEY.  IT'S HURT.  IT'S HURT ME
24    PERSONALLY.  IT'S HURT THE PROJECTS.  IT'S HURT
25    THEIR INVESTMENTS.
0455
1          Q.   WE -- BUT IN ALL FAIRNESS, YOU'VE
2     MADE -- YOU'RE THE ONLY GUY THAT'S MADE MONEY SO
3     FAR.
4          A.   THAT'S NOT TRUE.
5          Q.   HAVE MY CLIENTS MADE ANY MONEY?
6          A.   THEY MADE -- THEY HAVEN'T WORKED
7     THEY MADE INVESTMENTS.
```

```
 8                  PHIL KENNER, WHEN HE WAS WORKING,
 9    HE WAS MAKING 240,000 DOLLARS A YEAR THERE.  SO IF
10    YOU SAY GETTING A SALARY FOR YOUR WORK IS MAKING
11    MONEY, THEN, FINE.
12              Q.   BUT YOU ALSO GOT THE 650,000 DOLLAR
13    REFERRAL FEE.
14              A.   NOTHING TO DO WITH IT.
15              Q.   IT WAS PART OF, THOUGH, THIS WHOLE
16    PROCESS.  IF YOU DIDN'T DO THE BIG LOAN WITH
17    LEHMAN, YOU WOULDN'T HAVE HAD THE REFERRAL LOAN.
18                  MS. CROWTHER:  OBJECTION.
19    ARGUMENTATIVE.  CONCLUSORY.  CALLS FOR
20    SPECULATION.  LACKS FOUNDATION.
21                  MR. RICHARDS:  BUT, I MEAN,
22    REALISTICALLY, IF YOU'RE -- IF YOU'RE -- AND I'M
23    NOT BEING ARGUMENTATIVE WHEN I'M ASKING THIS
24    QUESTION -- THIS NEXT QUESTION.  I JUST WANT TO
25    ESTABLISH IF HE'S ANALYZED THIS.
0456
 1    BY MR. RICHARDS:
 2              Q.   DO YOU BELIEVE IT'S REALISTIC THAT
 3    YOU CAN REMAIN THE MANAGER OF THIS PROJECT, WHERE
 4    IF YOU GOOGLE YOUR NAME, IT'S AFFILIATED WITH ALL
 5    SORTS OF PROBLEMS, WHETHER THEY'RE TRUE OR NOT
 6    TRUE?
 7              A.   SO YOU'RE SAYING YOU CAN MAKE THESE
 8    OUTRAGEOUS CLAIMS AGAINST ME AND THEN USE THAT TO
 9    GET ME OUT BASED ON -- YOU KNOW IT'S -- THEY'RE
10    ALL FALSE.
11                  AND YOU CAN MAKE ALL THESE FALSE
12    CLAIMS AND THEN HAVE -- HAVE ME HAVE TO DEAL WITH
13    THIS ON A DAILY BASIS.
14                  I DEAL WITH IT ON A DAILY BASIS,
15    THESE LAWSUITS THAT YOU'VE PUT AGAINST ME, THAT
16    ARE NOT TRUE.  AND I THINK THAT YOU KNOW THEY'RE
17    NOT TRUE.  PERSONALLY.  YOU.
18                  AND I DEAL WITH IT EVERY DAY.
19                  SO BASED ON THAT, YOU WANT ME TO
20    STEP ASIDE BASED ON THE FACT THAT YOU MADE THESE
21    OUTRAGEOUS CLAIMS AGAINST ME.  NOW I NEED TO STEP
22    ASIDE BECAUSE OF THEM.
23              Q.   WELL, NO.  WE'RE -- THAT'S
24    INTERESTING THAT YOU HAVE THIS MYOPIC VIEW OF THE
25    SITUATION.
0457
 1                  THE -- THE FACT IS IS THAT YOU WERE
 2    FIRST GIVEN -- BECAUSE THESE CASES ARE
 3    CONSOLIDATED NOW.
 4                  YOU UNDERSTAND THAT?
 5              A.   YES.
```

```
 6              Q.   YOU HAD A FIRST GROUP OF CLIENTS
 7    THAT GAVE YOU MILLIONS OF DOLLARS, AND THAT WAS A
 8    PROJECT THAT YOU WERE GOING TO BUILD A VERY LARGE
 9    DEVELOPMENT IN.
10              AND, GRANTED, YOU HAD NO
11    EXPERIENCE, AND THAT PROJECT WAS PRETTY MUCH DEAD.
12    THERE'S NO PLANS TO DO ANYTHING RIGHT NOW WITH
13    THAT PROJECT.  I MEAN, BECAUSE NOW YOU'RE FOCUSED
14    ON CABO SAN LUCAS.
15              SO THEN WE GET TO CABO SAN LUCAS,
16    AND YOU GOT MILLIONS OF DOLLARS OF LOANS WITHOUT
17    ANY DOCUMENTATION, BECAUSE PHIL SENT THEM TO YOU
18    AND YOU WERE HAVING A GOOD RELATIONSHIP WITH PHIL
19    AT THE TIME.
20              AND THAT PROJECT HAS TAKEN YEARS TO
21    GET TO THE POINT OF WHERE WE'RE AT NOW, WHERE ALL
22    WE HAVE IS A GOLF COURSE WHERE 30 GOLFERS A DAY
23    ARE GOING THERE.  THAT'S WHAT I'M LOOKING AT.  AND
24    I'M LOOKING AT --
25              A.   IF THAT'S WHAT YOU WANT TO SAY,
0458
 1    THAT'S FINE.  THAT'S YOUR OPINION.
 2              AND IF YOU WANT TO TAKE THAT UP IN
 3    ANOTHER VENUE WHERE YOU'RE SUPPOSED TO, ACCORDING
 4    TO WHAT -- THE OPERATING AGREEMENTS, I'LL -- I'LL
 5    TAKE EVERYTHING WE'VE DONE AND THE POSITION THAT
 6    WE'RE IN, AND I'LL -- I'LL -- I'LL PUT IT IN ANY
 7    VENUE THAT'S APPROPRIATE AND ARGUE MY CASE.
 8              Q.   WELL, WE'RE IN THIS VENUE, AND ALL
 9    WE'VE GOTTEN IN THIS VENUE IS THE MOST AGGRESSIVE
10    ATTEMPTS POSSIBLE NOT TO BE IN THIS VENUE.
11              AND I'VE HAD TO SPEND OVER 100
12    GRAND JUST TO GET 7,000 PAGES OF DISCOVERY.
13              MS. CROWTHER:  OKAY.  THIS IS SO
14    ARGUMENTATIVE.  LET'S TAKE A BREAK.
15              MR. RICHARDS:  I'M NOT ARGUING.
16              MS. CROWTHER:  YEAH, YOU ARE.
17    YOU'RE ARGUING.
18              MR. RICHARDS:  I'LL JUST GO ON.
19              MS. CROWTHER:  LET'S TAKE A BREAK.
20              MR. RICHARDS:  LET'S JUST GO ON.
21              MS. CROWTHER:  I NEED A BREAK.
22              MR. RICHARDS:  YOU DO?
23              MS. CROWTHER:  YES.
24              MR. RICHARDS:  WHY ARE YOU
25    GETTING -- YOU DON'T HAVE TO GET EXCITED.
0459
 1              MS. CROWTHER:  I'M NOT EXCITED.  I
 2    NEED A BREAK.
 3              MR. RICHARDS:  OKAY.  NO PROBLEM.
```

```
 4                    THE VIDEOGRAPHER:  OFF THE RECORD,
 5      COUNSEL?
 6                    MR. RICHARDS:  YEAH.
 7                    THE VIDEOGRAPHER:  WE'LL GO OFF THE
 8      VIDEOTAPE RECORD AT 11:08.
 9                 (WHEREUPON, A RECESS WAS HELD
10                 FROM 11:08 A.M. TO 11:22 P.M.)
11                    THE VIDEOGRAPHER:  AND WE'RE BACK
12      ON VIDEOTAPE RECORD AT 11:22 A.M.
13                    MR. RICHARDS:  ALL RIGHT.  CAN
14      YOU -- DO YOU HAVE THE DOCUMENT ON YOUR SCREEN
15      THERE?
16                    MS. CROWTHER:  OUR SCREEN IS DARK.
17                    MR. RICHARDS:  OH, IT IS?
18                    MS. CROWTHER:  YEAH.  LET ME SEE.
19      NO.  LOOKS LIKE MAYBE IT'S NOT PLUGGED IN.
20                    MR. RICHARDS:  DID IT GET
21      UNPLUGGED?  OH, WAIT.  THERE WE GO.
22                    MS. CROWTHER:  IT STILL LOOKS LIKE
23      WE'RE NOT GETTING POWER.
24                    THE VIDEOGRAPHER:  SHALL WE GO OFF
25      THE RECORD MOMENTARILY?
0460
 1                    MR. RICHARDS:  THERE SHOULD BE
 2      POWER.
 3                    MS. CROWTHER:  THERE WE GO.
 4                    MR. RICHARDS:  YOU GOT IT.
 5      BY MR. RICHARDS:
 6           Q.   ALL RIGHT.  I'M SHOWING YOU, WHICH
 7      IS KJ 274, A E-MAIL THAT YOU SENT ON JUNE 19TH,
 8      2005.
 9                    DO YOU KNOW WHAT THIS E-MAIL IS?
10           A.   NO.
11           Q.   YOU SAID THAT -- THAT THERE WAS A
12      MISTAKE ON THE BAJA OWNERSHIP, AND THEN THE -- IT
13      LISTS THESE PARTIES AS THE BREAKDOWN OF THE
14      OWNERS.
15                    IS THIS AN ACCURATE BREAKDOWN?
16                    MS. CROWTHER:  WE'RE ON KJ 275 NOW?
17                    MR. RICHARDS:  YEAH.
18                    THE DEPONENT:  I DON'T KNOW.
19      BY MR. RICHARDS:
20           Q.   WHAT ABOUT THIS?
21                    MS. CROWTHER:  WHAT DO YOU MEAN,
22      "THIS"?
23                    THE DEPONENT:  I DON'T KNOW.
24      BY MR. RICHARDS:
25           Q.   OF D.D. -- OH, SORRY.  OF D.D.M.
0461
 1           A.   I DON'T KNOW.
```

```
2              Q.   I'M SHOWING YOU WHICH IS NOW KJ
3       309.  THIS IS AN E-MAIL YOU SENT ON JULY 6TH,
4       2005.  IT SAYS -- IT'S AN E-MAIL THAT WAS
5       INITIALLY RECEIVED FROM CHARLES WESLEY.
6                   DO YOU KNOW WHO THAT IS?
7              A.   NO.
8              Q.   AND THEN YOU SEND -- YOU SEND AN
9       E-MAIL, WHICH IS KJ 310.  YOU SEND AN E-MAIL:
10                  "TO BE HONEST, RIGHT NOW WOULD
11             BE A GREAT TIME TO GO TO FT.
12             LAUDERDALE AND TO SWITZERLAND."
13                  WHAT DO YOU MEAN BY THAT?
14             A.   I DON'T KNOW.
15             Q.   THEN YOU SAY:
16                  "CAN'T DO MUCH HERE WITHOUT
17             MONEY."  THEN YOU SAY, "I CAN ONLY DO
18             THE CORK TRICK SO MANY TIMES BEFORE
19             THEY START TO KNOW."
20                  WHAT DO YOU MEAN BY THE CORK TRICK?
21             A.   IF I'M LOOKING AT THAT POINT OF
22      REFERENCE, AT THAT TIME, IN JULY OF '07, WE WERE
23      SUPPOSED TO HAVE HAD --
24             Q.   THAT WAS JULY OF '05.
25             A.   JULY 7TH OF '05.
0462
1              Q.   YEAH.
2              A.   WE WERE SUPPOSED TO HAVE HAD THE
3       HARD MONEY OR THE -- THE DEPOSIT, THE HARD
4       DEPOSIT, ON THE CABO PROPERTY BY APRIL.
5                   AND MONEY DIDN'T START GOING THERE
6       UNTIL MAY.  AND IT WAS, AS WE DISCUSSED MANY
7       TIMES, PHIL'S RESPONSIBILITY TO BRING THE MONEY
8       IN.  HE WAS OBVIOUSLY HAVING DIFFICULTY DOING IT.
9                   AND IT WAS -- MY JOB AT THAT POINT
10      WAS TO KEEP THE SELLER ENGAGED, SO HE DIDN'T JUST
11      TAKE WHATEVER MONEY THAT WAS DEPOSITED AT THAT
12      TIME AND CANCEL THE CONTRACT.
13             Q.   BUT WHAT'S A CORK TRICK?
14             A.   I DON'T REMEMBER.  IT WAS A LITTLE
15      THING WITH WINE CORKS.  IT WAS A JOKE.
16             Q.   DO YOU WANT ME TO GET SOME WINE
17      CORKS FOR YOU TO SHOW US?
18             A.   I'M SURE I PROBABLY COULDN'T DO IT.
19             Q.   ALL RIGHT.  THIS IS KJ 312.
20                  YOU STATE THAT:
21                  "YOU WANT ME TO MAKE AN EARLY
22             MORNING CALL TO RODNEY.  HE WAS DUE
23             TO SIGN THE PAPERS.  AND THEN I WILL
24             GET OFF TO MASOOD AS EARLY AS I CAN.
25             I SAW MOST OF THE AIRPORT" --
```

0463
1              "AIRPORT DEALS."
2                   WHAT ARE YOU REFERRING TO IN THIS
3    E-MAIL?
4              A.   FOR RODNEY, YOU MEAN?
5              Q.   YEAH.  WHO'S RODNEY?
6              A.   HE -- I BELIEVE THAT WOULD BE
7    RODNEY DALTON, A GENTLEMAN INTRODUCED BY PHIL, WHO
8    HAD SOME TYPE OF SCHEME, WHICH OBVIOUSLY TURNED
9    OUT TO BE A SCAM, IN LONDON.  AND THAT'S WHO I
10   BELIEVE I'M REFERRING TO.
11             Q.   ALL RIGHT.  ON THIS E-MAIL, WHICH
12   IS 315, YOU STATE:
13             "LYNN IS WORKING ON IT THIS
14             MORNING.  AL HEARD FROM NOBLE GUY
15             (PHONETICALLY), WHO GAVE HIM A
16             CONTACT."
17                  WHO'S AL?
18             A.   PROBABLY REFERRING TO AL GUTIERREZ.
19             Q.   AND THEN YOU SAID:
20             "I DON'T MEAN TO OFFEND DONNY BY
21             PUTTING HIM IN THE SAME SENTENCE WITH
22             TARA (PHONETICALLY)."
23                  WHAT DO YOU MEAN BY THAT?
24             A.   AGAIN, AT THIS TIME, IT WAS A
25   DIFFICULT TIME.  AND THAT MONEY WAS IN DEPOSIT
0464
1    WITH THE SELLER IN CABO.  PHIL WAS TRYING
2    DESPERATELY TO COME UP WITH THE REST OF THE MONEY.
3    WE WERE TALKING TO -- HE WAS TALKING AS WAS I
4    OTHER LENDERS.  TARA WAS SOMEONE WHO WAS
5    BROKERING, I BELIEVE, SOME HARD MONEY DEALS FOR
6    PHIL.
7                   AND DONNY WAS A FRIEND OF PHIL'S,
8    WHO WAS ALSO TRYING TO PUT IN TOUCH WITH HARD
9    MONEY GUYS.  AND WE DIDN'T HAVE THE HIGHEST
10   OPINION AT THE TIME, OF TARA.  AND I WAS TRYING TO
11   BE NICE TO PHIL'S FRIEND.
12             Q.   ON 316 YOU STATE THAT -- OH, BY THE
13   WAY, IF YOU -- WHY WERE YOU TALKING TO LENDERS IF
14   PHIL WAS SUPPOSED TO BE IN CHARGE OF FUNDING?
15             A.   I WAS HELPING IN ANY WAY I COULD.
16             Q.   ON 316 HERE, YOU STATE THAT YOU
17   "HAVE BENITO DRIVING THE LEAD CAR AND BOB G.
18   FOLLOWING BEHIND ME," AND THAT YOU "HAD A
19   CONVERSATION WITH YOUR F.B.I. BUDDY, WHO IS
20   SERIOUS ABOUT HELPING US OUT."
21                  IS THAT BECAUSE YOU HAVE THE F.B.I.
22   HELP YOU OUT -- OR FORMER F.B.I. AGENTS?  IS THAT
23   WHAT YOU MEANT?

```
24              A.   NO.
25              Q.   BUT YOU HAVE A BUDDY THAT'S IN THE
0465
 1    F.B.I.?
 2              A.   HE WAS.
 3              Q.   AND WHO'S THAT?
 4              A.   JOHN BEHNKE.
 5              Q.   AND THEN IT SAYS:
 6                   "I AM SENDING HIM ALL THE PLANS
 7              AS I GET THEM TODAY."
 8                   YOU SAID HE WAS THE RIGHT-HAND MAN
 9    OF LOUIS FREEH IN THE E-MAIL; IS THAT CORRECT?
10              A.   YES.
11              Q.   SO DO YOU HAVE SOME SORT OF
12    INFLUENCE OVER THE F.B.I.?
13              A.   NO.
14              Q.   WAS JOHN BEHNKE EMPLOYED BY THE
15    F.B.I. AT THE TIME IN THIS E-MAIL?
16              A.   YES.
17              Q.   SO YOU -- AT THE TIME OF THIS
18    E-MAIL, YOU HAD A BUDDY IN THE F.B.I.?
19              A.   YES.
20              Q.   AND EXPLAIN TO ME HOW YOU HAD A
21    BUDDY IN THE F.B.I.
22              A.   WHERE I MET HIM?
23              Q.   YEAH.
24              A.   WE BOTH WORKED AT A CAMP FOR KIDS
25    WITH CANCER ABOUT 20 YEARS AGO, AND WE BOTH WENT
0466
 1    TO THAT CAMP EVERY YEAR, AS COUNSELORS, AND WE
 2    BECAME FRIENDS.
 3              Q.   AND ARE YOU -- ARE YOU AWARE THAT
 4    THE -- THAT THE F.B.I. IS THE INVESTIGATIVE AGENCY
 5    ON THE GRAND JURY THAT YOU WERE REFERRING TO
 6    YESTERDAY?
 7              A.   YES.
 8              Q.   AND HAVE YOU ASKED JOHN BEHNKE TO
 9    ASSIST YOU IN THAT INVESTIGATION?
10              A.   NO.
11              Q.   HAVE YOU MENTIONED THAT HIS FORMER
12    AGENCY IS INVESTIGATING YOU?
13              A.   HE'S AWARE OF IT, YES.
14              Q.   AND WHAT HAS HE DONE, IF ANYTHING,
15    TO HELP YOU?
16                   MS. CROWTHER:  OBJECTION.  LACKS
17    FOUNDATION.
18                   THE DEPONENT:  NOTHING.
19    BY MR. RICHARDS:
20              Q.   YOU DIDN'T ASK HIM TO -- FOR ANY --
21              A.   ABSOLUTELY NOT.
```

```
22              Q.   WHY NOT?
23              A.   I HIRED ATTORNEYS TO HELP ME.  I
24    DON'T THINK IT'S PROPER TO HAVE -- TO DO IT ANY
25    OTHER WAY.
0467
 1              Q.   DID YOU HIRE JOHN BEHNKE TO
 2    PROVIDE -- WHAT'S F.B.O. AT C.S.O.?  WHAT DOES
 3    THAT MEAN?  THE NEW F.B.O. AT CABO SAN LUCAS,
 4    RIGHT HERE (INDICATING)?
 5              A.   WELL, WHEN WE WERE INTERESTED IN
 6    THE AIRPORT, WE FELT THAT, HAVING INVOLVEMENT IN
 7    THE AIRPORT, SECURITY AT THE AIRPORT WAS
 8    IMPORTANT.
 9              Q.   THE AIRPORT WHERE?
10              A.   IN CABO SAN LUCAS.
11              Q.   YOU WERE GOING TO HAVE YOUR OWN
12    AIRPORT?
13              A.   NO.  WHEN WE WERE INTERESTED IN --
14    HAD AN INTEREST IN THE AIRPORT.
15              Q.   OH.  AND SO DID YOU HIRE HIM TO
16    PROVIDE ANYTHING?
17              A.   WE EVENTUALLY HIRED HIM FOR THE
18    DIAMANTE DEL MAR PROJECT AFTER WE GOT FUNDED, YES.
19              Q.   AND WHAT DOES HE DO FOR THE
20    PROJECT?
21              A.   HE'S DIRECTOR OF SECURITY.
22              Q.   NOW?
23              A.   YES.
24              Q.   SO HE LIVES DOWN THERE?
25              A.   SPENDS MOST OF HIS TIME DOWN THERE,
0468
 1    YES.
 2              Q.   AND WHAT DOES HE GET PAID?
 3              A.   I DON'T KNOW EXACTLY.
 4              Q.   APPROXIMATELY.
 5              A.   200,000.
 6              Q.   AND IS THERE A LOT OF SECURITY
 7    ISSUES ON THE PROPERTY PRESENTLY?
 8              A.   THERE'S ALWAYS -- THERE ARE ALWAYS
 9    ISSUES DEALING WITH SECURITY, YES.
10              Q.   LIKE WHAT?
11              A.   IN GENERAL IN CABO OR --
12              Q.   YEAH, IN GENERAL.
13              A.   WELL, I MEAN, THE REASON THAT WE
14    HIRED HIM IS BECAUSE WE HAVE TO SELL A LOT OF REAL
15    ESTATE, AND WE WANTED TO GIVE PEOPLE THE COMFORT
16    LEVEL THAT WE HAD A VERY SERIOUS PERSON THAT WAS
17    IN CHARGE OF SECURITY IN GENERAL.
18              IT'S PEOPLE TRYING TO GET ACCESS TO
19    THE PROPERTY.  WE HAVE TO -- WE HAVE OBVIOUSLY A
```

20  LARGE INVESTMENT THAT WE HAVE TO PROTECT.  SO
21  THERE ARE ISSUES THAT WE NEED TO DEAL WITH.
22          Q.   YOU SAID THAT YOU HAVE BENITO
23  DRIVING THE LEAD CAR.  WHAT DOES THAT MEAN, "THE
24  LEAD CAR"?
25          A.   THIS WAS ALL A -- THAT WAS A JOKE.
0469
1               AT THE SAME TIME WAS WHEN WE WERE
2  SCRAMBLING AND DOING EVERYTHING WE COULD TO KEEP
3  THIS PROJECT ALIVE.  AND I WAS DOING THE BEST I
4  COULD, AND THAT'S IN JEST.
5               BENITO WAS A HANDYMAN THAT WORKS AT
6  PHIL'S HOUSE NOW.  I DON'T THINK HE HAS A LICENSE.
7          Q.   OKAY.  BECAUSE YOU SAID:
8               "I DON'T WANT TO GET SHOT BY
9          SENOR BULNES' GUYS IN THE CROSSFIRE
10         LOOKING FOR YOU."
11         A.   THAT'S ACTUALLY PHIL KIND OF SAYING
12  THAT.
13         Q.   YEAH.  TO YOU.
14              WELL, WHO'S SENOR BULNES --
15         A.   I DIDN'T SAY THAT.
16         Q.   AND WHO'S SENOR BULNES?
17         A.   HE'S A PROPERTY OWNER IN CABO.
18         Q.   DID YOU HAVE A DISPUTE WITH HIM?
19         A.   NO.
20         Q.   SO IS THAT A JOKE, TOO?
21         A.   I DIDN'T WRITE THAT.
22         Q.   I KNOW.  BUT DID YOU INTERPRET IT
23  AS A JOKE?
24         A.   YES.
25         Q.   IT SAYS -- YOU WRITE TO HIM:
0470
1               "BILL IS ON IT AND WILL BE
2          WORKING WITH BOTH OF THEM ALL DAY.  I
3          WILL LET YOU KNOW AS SOON AS I GET
4          BACK."
5               WHO'S BILL?
6               MS. CROWTHER:  YOU'VE JUST MOVED TO
7  A NEW E-MAIL?
8               MR. RICHARDS:  YES.  317.  SORRY.
9  BY MR. RICHARDS:
10         Q.   BILL NAJAM?
11         A.   I ASSUME SO.
12         Q.   WHY WAS HE REVIEWING DOCUMENTS FOR
13  HAWAII?
14         A.   PHIL WOULD ALWAYS SEND HIM
15  DOCUMENTS, TO HELP HIM.
16         Q.   DID YOU EVER DO A DEAL WITH
17  JORGE DIAZ?

```
18              A.   I DON'T BELIEVE SO, NO.
19              Q.   OKAY.  I'M LOOKING AT 319.  NO.
20      I'M LOOKING NOW AT 327.
21                   YOU WROTE PHIL AN E-MAIL SAYING
22      THAT YOU "HAVE THE DOCS THAT YOU DOWNLOADED FROM
23      THE COMPUTER.  I WILL BILL FAX THE L.L.C. DOCS.
24      GRACIAS, AMIGO.
25                   AND JOSHUA BLUMAN IS ASKING YOU TO
0471
 1      FAX BACK THE L.L.C. DOCS.
 2                   WHAT L.L.C. IS HE TALKING ABOUT?
 3              A.   I DON'T KNOW.
 4              Q.   AND THEN IT SAYS -- YOU WRITE --
 5      YOU TELL HIM THAT MARK THALMANN ALSO WORKS FOR
 6      BAJA MANAGEMENT, L.L.C., AND DIAMANTE DEL MAR,
 7      L.L.C., AND YOU LIVE THERE FROM NINE YEARS.
 8                   AND YOU SAY YOU'LL "GET THE L.L.C.
 9      PAPERWORK TO YOU AS SOON AS POSSIBLE."
10                   WHAT PAPERWORK ARE YOU REFERRING
11      TO?
12              A.   I DON'T KNOW.
13              Q.   THEN YOU TELL JOSH, "I'M
14      SELF-EMPLOYED."
15                   WHY DID YOU SAY YOU WERE
16      SELF-EMPLOYED?
17              A.   I DON'T KNOW.
18              Q.   THIS IS ON 327.
19                   MS. CROWTHER:  IT'S ACTUALLY 328.
20                   MR. RICHARDS:  328.  SORRY.
21      BY MR. RICHARDS:
22              Q.   "I'M TRYING TO GET THE APPRAISAL
23              TO YOU.  WE SHOULD GET IT TODAY.  PHIL
24              WANTED ME TO TELL YOU THAT IF YOU WANT
25              TO USE THE HOUSE IN LAS VEGAS, WE NEED
0472
 1              TO CLOSE NEXT WEEK.  SOMEHOW I AM SURE
 2              WE ALREADY GOT IN THAT POINT TO YOU."
 3                   WERE YOU TRYING TO ENCUMBER YOUR
 4      PROPERTY IN VEGAS FOR SOMETHING RELATED TO
 5      DIAMANTE AND BAJA?
 6              A.   NO.  WE HADN'T PURCHASED IT YET.
 7              Q.   SO WAS THIS FOR THE LOAN ON THE
 8      PROPERTY?
 9              A.   YES.  PHIL WAS HELPING -- JOSH
10      BLUMAN WAS A CONTACT OF PHIL'S WHO WAS A MORTGAGE
11      BROKER, I BELIEVE.
12              Q.   THIS -- THIS IS ON 331.  IT SAYS:
13              "THIS" -- "THIS IS PART OF WHAT
14              IS GOING TO MASOOD THIS MORNING.  LET
15              ME KNOW WHAT YOU THINK.
```

```
16                 THAT'S FROM YOU.  IT SAYS,
17      "CLUB" -- "CABO CLUB EXECUTIVE SUMMARY."
18                 WHY WERE YOU SENDING MASOOD CABO
19      CLUB EXECUTIVE SUMMARY?
20            A.   WHAT'S THE DATE THERE?
21            Q.   OH, JULY 5TH, 2005.
22                 MS. CROWTHER:  15TH, ACTUALLY.
23                 MR. RICHARDS:  15TH.  SORRY.
24                 THE DEPONENT:  I'M SURE TO KEEP HIM
25      ABREAST OF -- AS TO WHAT WE WERE DOING, SO WE CAN
0473
1       EVENTUALLY, WHEN THE TIME CAME, BE IN POSITION TO
2       GET FUNDING.
3       BY MR. RICHARDS:
4             Q.   OKAY.  I'M SHOWING YOU AN INVOICE
5       FROM FIVE STAR PRODUCTIONS, FROM DEL REY BEACH,
6       DATED MARCH 1ST -- MARCH 9TH OF '01.  AND IT HAS
7       SCOTT WOOLLEY'S NAME ON IT.  AND IT'S KJ 3 --
8       3224.  AND IT'S SIGNED.
9                  WHO SIGNED THIS?
10            A.   I BELIEVE ME.
11            Q.   AND THAT'S 2-14-03?
12            A.   OKAY.
13            Q.   RIGHT.  AND THIS IS FOR -- IT SAYS
14      HERE THAT BEFORE PRINTING THE BROCHURE, YOU HAVE
15      TO PAY 40 PERCENT OF THE BALANCE.
16                 DO YOU SEE THAT?
17            A.   OKAY.
18            Q.   AND IT'S CIRCLED, AND THAT -- AND
19      THAT HAS A CHECK NUMBER:
20                 "PAID DIAMANTE DEL MAR, CHECK
21                 NUMBER 1076, 3-5-03."
22                 DOES THAT MAKE SENSE?
23            A.   YES.
24            Q.   OKAY.  AND THEN INITIALLY, TO BEGIN
25      PRODUCTION, YOU HAD TO PAY 56,400 FOR DIAMANTE DEL
0474
1       MAR, CHECK NUMBER 1065.
2                  DO YOU SEE THAT?
3             A.   YES.
4             Q.   AND THAT'S 2-15-03.
5                  DOES THAT LOOK LIKE THOSE ARE NOTES
6       THAT YOU WROTE TO -- REFLECTING THE CHECKS THAT
7       YOU AUTHORIZED TO BE CUT?
8             A.   THAT'S NOT MY HANDWRITING THERE.
9             Q.   BUT DO YOU RECOGNIZE IT AS --
10            A.   YES.
11            Q.   WHO'S HANDWRITING IS IT?
12            A.   I DON'T KNOW.
13            Q.   BUT IT LOOKS LIKE SOMETHING YOU
```

```
14    GUYS WOULD DO?
15              MS. CROWTHER:  LACKS FOUNDATION.
16    BY MR. RICHARDS:
17         Q.   OKAY.  THIS IS AN INVOICE TO
18    DIAMANTE DEL MAR THAT -- THAT YOU PROVIDED.  IT'S
19    KJ 3225.  THAT THERE WAS A FEE OF 100 -- THE
20    INVOICE IS DATED 2-17-03, AND THAT THEY WERE
21    CHARGING YOU 112,000 DOLLARS TO PRINT UP THESE
22    PACKAGES AND THEN DO THE BROCHURE AND THEN THE WEB
23    SITE DESIGN.
24              AND THAT IT REFLECTS 56,400 WAS
25    PAID ON 2-20-03 AND 45,120 WAS PAID ON 3-6-03.
0475
1               DO YOU HAVE ANY REASON TO BELIEVE
2     THAT THOSE -- THAT THE PAYMENTS REFLECTED ARE
3     INACCURATE?
4          A.   NO.
5          Q.   OKAY.  NOW, I'M SHOWING YOU INVOICE
6     3-24-03, WHICH IS A SHIPPING FEE INVOICE TO -- FOR
7     VARIOUS FEDERAL EXPRESSES.
8               AND ONE OF THE -- AND THIS IS ON
9     JOWDY 3226.  ONE OF THE PLACES THESE PACKAGES WERE
10    SENT, IT'S A PLACE IN FLORIDA.
11              DO YOU KNOW HOW TO PRONOUNCE THAT
12    NAME?
13         A.   LOOKS LIKE ZEPHYRHILLS.
14         Q.   ZEPHYRHILLS.
15              AND THAT WAS APPARENTLY SHIPPED
16    PRIOR TO THE DATE OF THIS INVOICE, 3-24-03.
17              DID -- WHY DID YOU HAVE STUFF SENT
18    TO ZEPHYRHILLS?
19         A.   I DON'T KNOW.
20         Q.   ISN'T THAT TRUE THAT THAT'S WHERE
21    ROGER CLEMENS' TRAINING CAMP WAS, AND THAT'S WHY
22    YOU WANTED IT THERE, SO HE COULD HAND OUT THESE
23    MATERIALS THERE?
24         A.   I HAVE NO IDEA.
25         Q.   WELL, DO YOU KNOW WHERE HIS
0476
1     TRAINING CAMP IS?
2          A.   I DON'T BELIEVE IT WAS EVER IN
3     ZEPHYRHILLS, SO ...
4          Q.   DO YOU REMEMBER RECEIVING THE
5     PACKAGES PRIOR TO THIS INVOICE BEING SENT, IN
6     THESE VARIOUS LOCATIONS:  NEW YORK, CONNECTICUT?
7               IF YOU LOOK -- IF YOU TAKE A LOOK
8     WHERE MY ARROW IS --
9          A.   UH-HUH.
10         Q.   -- THERE WAS A PACKAGE TO CT, WHICH
11    IS CONNECTICUT, LOS ANGELES, ZEPHYRHILLS,
```

12    NEW YORK.
13                    DO YOU REMEMBER RECEIVING THE
14    PRINTING AROUND THAT TIME?
15            A.    WHAT TIME?
16            Q.    MARCH -- MARCH OF '03.
17            A.    I DON'T REMEMBER, NO.
18            Q.    WELL, DO YOU KNOW WHEN YOU RECEIVED
19    THE BROCHURES?  I MEAN, DOES THAT -- DOES THAT --
20    DOES THIS INVOICE REFRESH YOUR MEMORY AS TO WHEN
21    YOU WOULD HAVE RECEIVED THEM?
22            A.    IF IT SAYS THEY WERE SHIPPED OUT IN
23    MARCH 24TH OF '03, I'M SURE I RECEIVED THEM
24    SHORTLY THEREAFTER.
25            Q.    WELL, THAT'S WHEN YOU WERE BILLED.
0477
1                     LET ME GO BACK OVER THE AGREEMENT
2     THAT YOU SIGNED.
3                     IT SEEMS TO ME THAT -- THAT THEY --
4     BEFORE THEY PRINT THEIR BROCHURE, YOU HAD TO PAY
5     40 PERCENT.  AND THEN THE FINAL 10 PERCENT IS UPON
6     DELIVERY OF WEB SITE AND PACKAGING.
7                     SO I'M ASSUMING THAT -- THAT --
8     THAT THIS INVOICE WAS DATED 2-17-03, AND YOU PAID
9     THESE PRIOR TWO PAYMENTS, THAT YOU DON'T HAVE ANY
10    REASON TO BELIEVE YOU DIDN'T PAY THEM.
11                    THAT AT THAT POINT, AFTER 2-17-03,
12    THE WORK WAS SHIPPED TO YOU.  I MEAN -- RIGHT?
13    THAT'S WHAT -- THESE ARE YOUR RECORDS, SO I'M
14    JUST --
15            A.    THAT WOULD BE IMPOSSIBLE.
16            Q.    WHAT WOULD BE IMPOSSIBLE?
17            A.    WELL, GO TO THE FIRST ONE.
18            Q.    YEAH.  NO PROBLEM.
19            A.    I BELIEVE I SAW A QUOTE FROM A
20    PROPOSAL DATED SOMETIME IN FEBRUARY, SO I DON'T
21    THINK THAT WE COULD HAVE HAD IT DONE.  EVEN --
22    THIS WORK PRODUCT HERE, FOR THAT PROPOSAL, IS -- I
23    MEAN GO UP A LITTLE BIT.
24            Q.    SURE.
25            A.    GO UP MORE.  MARCH 9TH.  OKAY.
0478
1                   (DOCUMENT REVIEWED BY THE DEPONENT.)
2                     THE DEPONENT:  GO DOWN.
3     BY MR. RICHARDS:
4             Q.    HERE, I CAN -- I CAN --
5             A.    SO -- NO.  SO THAT'S -- THIS IS
6     MARCH 9TH.  SO IF YOU'RE SAYING THAT I GOT -- THIS
7     IS MARCH 9TH.  AND IT SAYS I HAVE TO MAKE THE
8     FIRST TWO PAYMENTS; CORRECT?
9             Q.    WHICH DATE ARE YOU LOOKING AT, THIS

```
10    DATE (INDICATING)?
11              A.   YES.
12              Q.   THAT'S MARCH 9TH OF '01.  I'M
13    SAYING THAT --
14              A.   THAT'S THE WRONG -- THAT'S THE
15    WRONG DATE.
16              Q.   YEAH.  AND YOU MADE A PAYMENT WITH
17    THIS CHECK NUMBER, 1065.  THIS IS ON -- THIS IS
18    YOUR WRITING.
19              NOT YOU PERSONALLY, BUT SOMEONE AT
20    YOUR DIRECTION --
21              A.   OKAY.
22              Q.   -- ACKNOWLEDGED THE CHECK NUMBER
23    THAT WAS PAID.
24              YOU HAVE NO REASON TO BELIEVE
25    THAT'S INACCURATE?
0479
1               A.   OKAY.
2               Q.   AND THEN ON 3-5-03, THERE WAS --
3     THERE WAS THIS SECOND PAYMENT.  THAT'S WHY IT'S
4     CIRCLED.  AND THEN THAT'S WHEN THEY WERE SUPPOSED
5     TO SHIP IT.
6               SO I'M JUST TRYING TO FIGURE OUT,
7     HOW DID -- HOW WOULD WE FIGURE OUT WHEN YOU
8     ACTUALLY RECEIVED IT IF NOT FOR THE PRINTER'S
9     RECORDS?
10              A.   WELL, GO AHEAD.  SO WHAT ARE YOU --
11    WHEN ARE YOU SAYING THAT WE RECEIVED IT?
12              Q.   I'M -- I'M SAYING THAT YOU RECEIVED
13    THEM ON OR AROUND -- I'M SAYING YOU RECEIVED THEM
14    BETWEEN MARCH -- FEBRUARY 17TH, 2003, AND
15    MARCH 24TH, 2003, BECAUSE THEY'RE BILLING YOU
16    ALREADY BY THAT TIME FOR STUFF THAT WAS ALREADY
17    SHIPPED.
18              SO I DON'T KNOW THE EXACT DATE.
19    I'M BEING OBJECTIVE THAT YOU -- YOU PAID -- THAT
20    YOU GOT AN INVOICE FOR JUST THE BALANCE, THE
21    10 PERCENT.  THAT'S -- BUT THEY SAID THEY WOULD
22    SHIP IT.
23              YOU'D ONLY HAVE TO PAY UNTIL AFTER
24    THEY SHIPPED.  AND THIS INVOICE WAS GENERATED ON
25    THE 17TH OF -- OF FEBRUARY.
0480
1               SO I'M -- SO -- IT'S -- IT SEEMS TO
2     ME THAT -- THAT THEY SHIPPED IT AFTER THAT DATE.
3     THAT'S WHY THEY'RE ASKING FOR THE FINAL BALANCE,
4     PURSUANT TO THE CONTRACT.
5               A.   I DON'T KNOW IF THEY SHIPPED IT IN
6     MARCH.  I WOULD SAY THAT --
7               Q.   WELL, I THINK THEY SHIPPED IT IN
```

```
 8   FEBRUARY, BUT I'M SAYING WHETHER --
 9            (SPEAKING SIMULTANEOUSLY.)
10                 THE DEPONENT:  I DON'T KNOW WHAT
11   THE POINT IS, SO --
12   BY MR. RICHARDS:
13            Q.   WELL, MY POINT IS:  DO YOU THINK --
14   DO YOU -- BASED ON REVIEWING YOUR PAYMENTS, IS IT
15   FAIR TO SAY THAT YOU RECEIVED THESE BROCHURES
16   EITHER IN FEBRUARY OR MARCH OF 2003?
17            A.   I THINK THE EARLIEST WE RECEIVED
18   THEM IS MARCH.
19                 BUT I STILL DON'T UNDERSTAND WHAT
20   THE DIFFERENCE IS, SO YOU CAN EXPLAIN IT TO ME.
21            Q.   WELL, THERE'S NO -- THERE'S --
22   THERE'S NO REAL DIFFERENCE BETWEEN MARCH OR
23   FEBRUARY.  I'M JUST TRYING TO CORROBORATE THE
24   DATE.  THAT'S IT.  IF IN MARCH -- SO YOU --
25            A.   I WOULD SAY IT WOULD HAVE TO BE
0481
 1   LATE IN MARCH, SO MAYBE ON THAT 24TH DATE.
 2                 BUT I DON'T -- I DON'T KNOW.
 3            Q.   OKAY.  WHY WOULD YOU SAY IT WOULD
 4   HAVE TO BE LATE MARCH?  WAS THERE ANY OTHER FACTS
 5   THAT WOULD HELP --
 6            (SPEAKING SIMULTANEOUSLY.)
 7                 THE DEPONENT:  I THOUGHT THAT WE --
 8   WE JUST HAD A PROPOSAL FOR THEM IN FEBRUARY.  AND
 9   SO I THOUGHT I SAW A PROPOSAL FOR THEM IN
10   FEBRUARY.
11                 SO IF WE HAD A PROPOSAL FOR THEM IN
12   FEBRUARY THAT WAS -- THAT WAS -- IT WOULD BE
13   IMPOSSIBLE TO GET DELIVERY OF THEM IN FEBRUARY.
14                 AND I KNOW IT TOOK --
15            (SPEAKING SIMULTANEOUSLY.)
16   BY MR. RICHARDS:
17            Q.   RIGHT.  YOU PAID -- YOU PAID THE
18   FIRST PAYMENT, 56,400, THE NEXT DAY AFTER YOU
19   SIGNED THIS -- THIS CONTRACT, PURSUANT TO YOUR
20   RECORDS.
21            A.   AND THAT'S -- THAT'S WHEN THEY
22   START.  THEY DON'T -- THEY DON'T BEGIN UNTIL
23   THEY -- UNTIL THAT.
24            Q.   WE'RE ON THE SAME PAGE SO FAR.
25            A.   OKAY.
0482
 1            Q.   THEN ON MARCH 5TH, YOU MADE THE
 2   SECOND PAYMENT.  THAT'S WHAT I'M TRYING TO TELL
 3   YOU.
 4            A.   NO.  I UNDERSTAND.
 5                 SO ALL I'M SAYING IS IT MAKES MORE
```

```
 6    SENSE FOR IT TO BE LATE MARCH, BECAUSE THE FIRST
 7    PAYMENT IS WHEN THEY -- THEY DON'T START UNTIL YOU
 8    MAKE THE FIRST PAYMENT.
 9                  SO IF YOU DO THAT ON THE 15TH, IT
10    WOULD BE IMPOSSIBLE.  IT WOULD BE VERY DIFFICULT
11    TO GET DELIVERY ANY TIME IN FEBRUARY.
12                  SO WE MAKE THE SECOND PAYMENT,
13    WHICH IS A PROGRESS PAYMENT, ON MARCH 5TH.  AND WE
14    MAKE THE FINAL PAYMENT WHEN THEY'RE DONE, WHICH
15    WOULD BE LATER MARCH.  THAT'S ALL I'M SAYING.  AND
16    I --
17          Q.   RIGHT.  AND THEY -- WELL, THEY SAID
18    IN THE AGREEMENT THAT THEIR TARGET DATE IS
19    MARCH 10TH.
20          A.   OKAY.
21          Q.   SO SITTING HERE TODAY, DO YOU HAVE
22    ANY RECOLLECTION THAT THEY BREACHED THE TARGET
23    DATE?
24          A.   I REMEMBER IT TAKING LONGER, BUT
25    I DON'T -- YOU COULD SAY MARCH 10TH, AND I'M NOT
0483
 1    GOING TO -- IT DOESN'T MATTER TO ME.
 2          Q.   DO YOU REMEMBER HOW MUCH LONGER?
 3          A.   I DON'T KNOW.
 4          Q.   LIKE A WEEK LONGER?
 5          A.   I DON'T KNOW.
 6          Q.   OKAY.  BUT IT WOULDN'T BE, LIKE --
 7    LIKE -- WOULD IT BE OVER A WEEK?  OVER TWO WEEKS?
 8          A.   I DON'T KNOW.  I DON'T KNOW.
 9          Q.   WOULDN'T YOU BE UPSET, THOUGH, IF
10    YOU PAID 56,000 -- 45,000 DOLLARS ON MARCH AND IT
11    WASN'T DELIVERED ON TIME?
12                  MS. CROWTHER:  OBJECTION.  CALLS
13    FOR SPECULATION.
14                  THE DEPONENT:  UNFORTUNATELY, THESE
15    THINGS TEND TO TAKE LONGER THAN ORIGINALLY
16    ANTICIPATED.
17    BY MR. RICHARDS:
18          Q.   ALL RIGHT.  BUT YOU DON'T HAVE ANY
19    REASON TO BELIEVE THAT YOU DIDN'T RECEIVE THE FED
20    EX'S AS THEY BILLED YOU FOR AND YOU PAID PRIOR --
21    AROUND MARCH 24TH, AT THE LATEST, OF '03?  YOU
22    DON'T HAVE ANY REASON TO BELIEVE YOU DIDN'T
23    RECEIVE THEM AT THAT TIME?
24          A.   NO.
25          Q.   OKAY.  LET ME GO OVER SOME OTHER
0484
 1    DOCUMENTS WITH YOU.
 2                  DID I LEAVE -- LET ME GET MY FILES.
 3                  OKAY.  I'M GOING TO SHOW YOU 3 --
```

```
 4    336, KJ 336.
 5                KEN -- PHIL KENNER SENT YOU AN
 6    E-MAIL SAYING:
 7                "GOOD.  I DO NOT WANT ONE OF THE
 8            TRIPLETS TO RIDE YOUR ASS OR MINE
 9            ABOUT IT."
10                WHO'S ONE OF THE TRIPLETS?
11        A.   I HAVE NO IDEA.
12        Q.   YOU HAVE NO IDEA WHAT THAT MEANS?
13        A.   NO.
14        Q.   OH.  ALL RIGHT.
15                OKAY.  ALL RIGHT.  I'M SHOWING YOU
16    AN ADVANTAGE CREDIT REPORT TO KENNY JOWDY THAT WAS
17    PROVIDED FOR YOU, WITH A F.I.C.A. SCORE OF 713.
18                DOES THAT LOOK LIKE A COPY OF YOUR
19    CREDIT REPORT?
20                MS. CROWTHER:  BATES NUMBER,
21    PLEASE.
22                MR. RICHARDS:  OH, SORRY.  344.
23                THE DEPONENT:  ACTUALLY, IT'S NOT.
24    BY MR. RICHARDS:
25        Q.   IT'S NOT YOUR CREDIT REPORT?
0485
 1        A.   NO.
 2        Q.   WHAT IS IT?
 3        A.   I DON'T KNOW.  I DON'T KNOW HOW
 4    THAT WAS MIXED UP.  AND I SAID AT THE TIME, AND
 5    IT'S GOT -- IT DOESN'T HAVE MY SOCIAL SECURITY
 6    NUMBER ON IT.
 7        Q.   BUT THIS IS NOT YOUR SOCIAL
 8    SECURITY NUMBER?
 9        A.   NO.
10        Q.   WHAT IS YOUR SOCIAL SECURITY
11    NUMBER?
12                MS. CROWTHER:  OBJECTION.
13    RELEVANCE.
14                MR. RICHARDS:  WELL, HE SAID --
15                MS. CROWTHER:  YEAH.  HE SAID IT'S
16    NOT.
17                MR. RICHARDS:  WELL, I DON'T HAVE
18    TO TAKE HIS WORD FOR IT.
19                MS. CROWTHER:  HE DOESN'T HAVE TO
20    GIVE YOU HIS SOCIAL SECURITY NUMBER.  THAT'S
21    PRIVATE.
22                MR. RICHARDS:  SO YOU'RE GOING TO
23    INSTRUCT HIM NOT TO ANSWER?
24                MS. CROWTHER:  I AM.
25                IF YOU CAN TELL ME WHY YOU NEED HIS
0486
 1    SOCIAL SECURITY NUMBER, THAT'S FINE.
```

2                MR. RICHARDS:  TO VERIFY –– WELL,
3    THIS IS A CREDIT REPORT THAT WAS SUBMITTED TO A
4    LENDER AND RELATED TO THIS CASE, AND HE'S CLAIMING
5    IT'S NOT HIS.
6                IF HE HAS MORE THAN ONE SOCIAL, I
7    JUST WANT TO VERIFY THE SOCIAL.  IF YOU WANT TO
8    STIPULATE TO A PROTECTIVE ORDER ON THE SOCIAL, I
9    WILL.
10               MS. CROWTHER:  NO.  I DON'T THINK
11   YOU'VE LAID ANY FOUNDATION THAT THIS WAS SUBMITTED
12   TO ANYONE –– AND I DON'T THINK THAT YOU –– DO YOU
13   HAVE MORE THAN ONE SOCIAL SECURITY NUMBER, KEN?
14               THE DEPONENT:  NO.
15   BY MR. RICHARDS:
16          Q.   OKAY.  THERE'S A DEROGATORY
17   ACCOUNTING HERE FOR WOLF MANAGEMENT LEASING FOR
18   129,000 DOLLARS.
19               DO YOU KNOW WHAT THAT'S ABOUT?
20          A.   NO.
21          Q.   DO YOU KNOW WHO WOLF MANAGEMENT
22   LEASING IS?
23          A.   I DON'T RECALL.
24          Q.   OKAY.  THIS IS BATES 349.  YOU
25   STATE, "MY CREDIT REPORT," AND THEN YOU –– YOU
0487
1    PROVIDE –– YOU PROVIDE THE CREDIT REPORT.
2                AND THEN ROB BURDICK SENDS YOU AN
3    E–MAIL SAYING THAT HE'S RESERVED A ROOM FOR YOU
4    WITH TWO KING–SIZED BEDS.
5                WHAT IS THIS FOR?
6                MS. CROWTHER:  YOU KNOW, IT'S HARD
7    BECAUSE YOU HAVE THEM ON THE SCREEN.  I CAN'T TELL
8    IF THIS IS ACTUALLY ATTACHED TO THE CREDIT REPORT
9    WE JUST SAW OR NOT.
10               MR. RICHARDS:  NO.  IT'S A NEW
11   E–MAIL.
12               MS. CROWTHER:  OKAY.  SO THOSE
13   QUESTIONS YOU WERE ASKING ABOUT THE CREDIT REPORT
14   BEFOREHAND, THEY DON'T HAVE ANYTHING TO DO WITH
15   THE ROB BURDICK E–MAIL?
16               MR. RICHARDS:  CORRECT.
17               MS. CROWTHER:  OKAY.  SO ARE YOU
18   ASKING ABOUT THE ROB BURDICK E–MAIL OR THE CREDIT
19   REPORT?
20               MR. RICHARDS:  THE ROB BURDICK
21   E–MAIL.
22               MS. CROWTHER:  AND THAT'S BATES
23   NUMBER?
24               MR. RICHARDS:  350.
25               MS. CROWTHER:  OKAY.

```
0488
 1                    THE DEPONENT:  SOUNDS LIKE HE'S
 2    TALKING ABOUT A FESTIVAL IN EL ROSARIO.
 3    BY MR. RICHARDS:
 4            Q.   DID IT EVER TAKE PLACE?
 5            A.   I BELIEVE SO.
 6            Q.   OKAY.  NOW, I'M ASKING ABOUT THE
 7    CREDIT REPORTS, 352.
 8                 YOU SAY:
 9                 "IT PRETTY MUCH TELLS YOU HOW
10            MANY DAYS I WAS LATE FOR SCHOOL MY
11            SENIOR YEAR.  ANYWAY, THE ONLY SCORE
12            IT HAD ON THERE WAS FROM EXPERIAN.
13            HOW THEY GOT IT, I DON'T KNOW.  CAN
14            THEY PULL UP MARK'S?"
15                 WHY DID YOU WANT THEM TO PULL UP
16    MARK'S?
17            A.   MARK ENDED UP BEING THE ONE -- I
18    WASN'T ON THE -- I'M NOT ON THE LOAN.  I ENDED UP
19    NOT BEING ON THE LOAN.  MARK ENDED UP BEING ON THE
20    LOAN FOR THE HOUSE IN LAS VEGAS.
21            Q.   DID YOU HAVE -- WHY?  DO YOU HAVE
22    BAD CREDIT?
23            A.   I DON'T KNOW -- I DON'T KNOW WHAT
24    MY CREDIT WAS.  IT WASN'T GOOD ENOUGH TO BE ON THE
25    LOAN AT THAT TIME.
0489
 1            Q.   IS IT BETTER NOW?
 2            A.   I DON'T KNOW.
 3            Q.   BATES 353.  YOU SENT A LETTER TO --
 4    AN E-MAIL TO PHIL KENNER.
 5                 "DO WE TAKE CARE OF EVERYTHING
 6            SO THE FUNDING CAN HAPPEN MONDAY
 7            MORNING?"
 8                 WHAT ARE YOU REFERRING TO, WHICH
 9    FUNDING?
10            A.   I'M SURE AT THAT TIME -- AGAIN,
11    IT'S JULY OF '05.  IT WAS A SCRAMBLE TO KEEP THE
12    CABO DEAL GOING.
13                 PHIL HAD A LOT OF MONEY THAT WAS
14    IN -- THAT WAS HARD MONEY.  AND ALL I WAS TRYING
15    TO DO WITH THE SELLER, WHO WAS 89 YEARS OLD AT THE
16    TIME, WAS TO KEEP HIM ENGAGED SO THAT WE CAN GET
17    TO CLOSING AND THE MONEY WOULDN'T BE LOST.
18            Q.   OKAY.  ON 354, THERE'S -- THERE'S
19    E-MAILS THAT YOU PROVIDED FROM A WJIN 1434.
20                 DO YOU KNOW WHO THAT IS?
21            A.   BILL NAJAM.
22            Q.   OKAY.  AND IT SAYS:
23                 "GUYS, PLEASE FILL OUT THE 1003
```

```
24                  RESIDENTIAL APPLICATION FORM.  IT'S
25                  THE FORM MOST LENDERS ARE FAMILIAR
0490
 1                  WITH."
 2                        WHAT IS THAT REFERRING TO?
 3                  A.   I ASSUME IT'S A FORM FOR A LENDER.
 4                  Q.   WELL, WERE YOU TRYING TO BUY A
 5       DIFFERENT RESIDENTIAL PROPERTY?
 6                  A.   NO.  AT THIS TIME, WHEN WE WERE
 7       STILL TRYING TO WORK -- GET FUNDING FOR THE
 8       EL ROSARIO PROJECT, OR PHIL WAS TRYING TO GET
 9       FUNDING FOR THE HAWAII PROJECT.
10                  Q.   ON BATES 356, YOU SENT AN E-MAIL TO
11       PHIL KENNER STATING THAT YOU LOOKED AT THE REPORT.
12       IT HAS YOUR NAME AND ALL OF YOUR INFO, BUT MARK'S
13       SOCIAL SECURITY NUMBER AND HIS BIRTHDAY.
14                        AND DO -- DID YOU AND MARK EVER
15       SWITCH SOCIAL SECURITY NUMBERS?
16                  A.   NO.
17                  Q.   SO ULTIMATELY ON THAT PROPERTY,
18       ONLY MARK IS ON THE -- HE'S THE ONLY GUY ON THE
19       LOAN?
20                  A.   I BELIEVE SO, YES.
21                  Q.   AND WHO OWNS THE PROPERTY?
22                  MS. CROWTHER:  WE DID THIS
23       YESTERDAY.  ASKED AND ANSWERED.
24                  MR. RICHARDS:  HE DIDN'T STATE THE
25       NAME OF WHO OWNS THE PROPERTY.
0491
 1                  MS. CROWTHER:  YES, HE DID.  HE
 2       SAID IT WAS ONE-THIRD HIM, ONE-THIRD MARK, ONE --
 3                  MR. RICHARDS:  NOW I'M ASKING THE
 4       TITLE, WHO'S THE TITLE.  THAT'S WHAT I MEANT.
 5                  MS. CROWTHER:  HE SAID THAT
 6       YESTERDAY, TOO.  HE SAID IT'S HIM AND
 7       MARK THALMANN.
 8                  MR. RICHARDS:  OH, ALL RIGHT.
 9       BY MR. RICHARDS:
10                  Q.   OKAY.  I'M GOING TO SHOW YOU NEXT,
11       IT'S GOING TO BE KJ 430.
12                        YOU STATE THAT -- THIS IS AN E-MAIL
13       TO FERNANDO GARCIA.  IF YOU CAN TAKE A LOOK AT
14       THAT.
15                        IS THAT RELATED TO THE MORTGAGE
16       THAT YOU'RE TRYING TO CLOSE?
17                  A.   NO.  IT'S RELATED TO THE CABO
18       PROPERTY.
19                  Q.   ALL RIGHT.  NOW I'M SHOWING YOU
20       431.  IT'S A CLOSING STATEMENT TO BIG ISLE 4
21       VENTURES, L.L.C., FOR 3 MILLION DOLLARS.
```

22                    DO YOU KNOW WHAT THAT'S ABOUT?
23          A.   I BELIEVE THAT WAS A HARD MONEY
24   LOAN THAT PHIL TOOK OUT ON A PIECE OF PROPERTY
25   THAT HE OWNED IN HAWAII.
0492
1           Q.   AND DO YOU KNOW WHY -- WHY HE'S
2    PROVIDING YOU THAT CLOSING STATEMENT?
3           A.   AT THAT TIME, I DO.
4           Q.   OKAY.  TELL ME WHY.
5           A.   AGAIN, AS I SAID, WE WERE UNDER A
6    LOT OF PRESSURE TO GET THE HARD MONEY DEPOSIT TO
7    WHERE IT WAS SUPPOSED TO BE, WITH THE SELLER, IN
8    CABO.
9                IT TOOK -- THERE WERE A LOT OF
10   PROMISES THAT WERE NOT REALIZED, AND HE WAS LOSING
11   CONFIDENCE IN OUR ABILITY TO AT LEAST GET THAT
12   PORTION OF THE DEAL DONE.
13               SO WHEN I NEEDED TO GET MORE TIME,
14   BECAUSE PHIL WASN'T ABLE TO GET THE MONEY AS
15   PROMISED, HE SENT ME THIS AS SOME EVIDENCE THAT IT
16   WAS GOING TO GET DONE SO I CAN AT LEAST SHOW THE
17   SELLER SOMETHING.
18          Q.   OKAY.  I'M GOING TO SHOW YOU NEXT
19   492.  THIS IS AN E-MAIL DATED JULY 21ST, 2005,
20   AT -- FROM 5:15 IN THE MORNING.
21               DO YOU NORMALLY GET UP THAT EARLY?
22          A.   UNFORTUNATELY.
23          Q.   IT SAYS:
24               "NOT HAPPENING YET.  I AM
25          WAITING FOR FUNDING SOLUTIONS TO GET
0493
1           ME THE LIST OF WHAT THEY NEED AND
2           THEN CAN GO FROM THERE."
3                IS THIS --
4                MS. CROWTHER:  THAT'S NOT ALL.  IT
5    SAYS, "THEN WE CAN GO TO WORK."
6    BY MR. RICHARDS:
7           Q.   YEAH.  THEN WE -- THEN WE CAN GO
8    TO -- MY QUESTION IS:  IS THIS DEALING WITH THE
9    RODNEY DALTON DEAL STILL?
10          A.   IT SOUNDS LIKE -- LOOKS LIKE I
11   TALKED TO RODNEY.
12          Q.   YEAH.
13          A.   SO SOME OF THAT WAS.  AND IT WAS
14   DEALING WITH THREE OR FOUR THINGS.
15          Q.   OKAY.  AND WHAT ABOUT -- THIS IS
16   493.
17               ISN'T IT TRUE THAT, BY THE WAY,
18   RODNEY COULD ONLY FUND DEALS OUTSIDE OF THE UNITED
19   STATES?

```
20              A.   THAT'S WHAT I WAS TOLD.
21              Q.   ALL RIGHT.  THE -- WHO'S
22   JOHN PLUNKETT?
23              A.   I BELIEVE HE WORKED FOR ANOTHER
24   LENDER.
25              Q.   OKAY.  ON 494, IT STATES THAT:
0494
 1                   "KENNY IS PAYING THE TICKETS.
 2              IT COSTS 5,000.  BE THERE SUNDAY
 3              NIGHT.  WANTS TO MEET WITH PHIL
 4              MONDAY MORNING.  HE SAID HE WOULD PAY
 5              FOR THE ATTORNEY OUT OF THE 15 YOU
 6              NEED TO PAY HIM.  HE MAY NOT BE ABLE
 7              TO MEET WITH PHIL'S LOCAL ATTORNEY."
 8                   WHAT DEAL WAS THIS FOR?
 9              A.   I DON'T KNOW.
10              Q.   OKAY.  THIS IS 495.
11                   APPARENTLY YOU THREATENED SOMEONE
12   WITH A LAWSUIT, AND THEY TOLD YOU THEY WEREN'T
13   AFRAID OF YOU THREATENING THEM.
14                   WHAT IS THIS REFERRING TO?
15                   MS. CROWTHER:  CAN YOU SCROLL DOWN
16   SO THAT WE CAN SEE THE E-MAIL THAT PRECEDES IT ON
17   THE SAME PAGE?
18                   MR. RICHARDS:  SURE.
19                   THE DEPONENT:  I BELIEVE PHIL HAD
20   SEVERAL HUNDRED THOUSAND DOLLARS OF HIS MONEY WITH
21   THIS HARD MONEY LENDER AS A COMMITMENT FEE,
22   QUOTE/UNQUOTE, MOSTLY FOR THE HAWAII PROJECT, BUT
23   I THINK WE DID -- WE DID ATTEMPT TO DO SOMETHING
24   IN MEXICO ALSO.
25                   AND WHEN HE DIDN'T COME THROUGH
0495
 1   WHEN HE WAS SUPPOSED TO, HE WAS GOING TO KEEP THE
 2   FEES THAT PHIL HAD INVESTED WITH HIM.
 3                   AND IT LOOKS LIKE I WAS EITHER
 4   TRYING TO MAKE THE THING GO FORWARD OR HAVE PHIL'S
 5   MONEY SENT BACK TO HIM.
 6   BY MR. RICHARDS:
 7              Q.   DID KEN MICKENS INTRODUCE YOU TO
 8   THE K.S.I. PEOPLE?
 9              A.   YES.
10              Q.   AND WHO'S KEN MICKENS?
11              A.   HE'S A BROKER.
12              Q.   NOW, YOU MENTIONED -- YOU MENTIONED
13   THAT -- YOU TESTIFIED EARLIER THAT YOU HAVE TO
14   SPEND EVERY DAY DEALING WITH THIS LAWSUIT.
15                   DO YOU REMEMBER THAT TESTIMONY?
16              A.   WHEN I'M IN CABO, IT COMES UP
17   DAILY.
```

18          Q.   OKAY.  CAN YOU ELABORATE ON WHAT
19   YOU MEAN BY THAT?
20          A.   EITHER PEOPLE DIRECTLY ASK ME,
21   PEOPLE THAT ARE INTERESTED IN A PROPERTY -- IT
22   SEEMS THAT EVERYBODY KNOWS ABOUT WHAT THIS LAWSUIT
23   IS.
24              UNFORTUNATELY, THEY DON'T KNOW THE
25   TRUTH, SO THAT'S WHAT I NEED TO TALK TO THEM
0496
1    ABOUT.
2              BUT THEY HAVE A QUESTION AS TO WHAT
3    THE VALIDITY OF THE LAWSUIT IS AND WHAT THE STATUS
4    IS AND WHEN I THINK IT'S GOING TO BE RESOLVED
5    BECAUSE IT AFFECTS PEOPLE'S DECISIONS, I BELIEVE,
6    ON WHETHER OR NOT THEY WANT TO PURCHASE.
7          Q.   WELL, JUST SO YOU'RE CLEAR, WE
8    HAPPEN TO BELIEVE THE GENERAL ALLEGATIONS OF THIS
9    LAWSUIT ARE TRUE.
10              BUT NOTWITHSTANDING THAT, AND
11   NOTWITHSTANDING YOUR JUST GENERAL DENIAL WITHOUT
12   ANY EVIDENCE SO FAR, WHAT -- CAN YOU TELL ME
13   SPECIFICALLY --
14          A.   IF I CAN MAKE A COMMENT.
15          Q.   YEAH.  COMMENT.
16          A.   IF YOU WENT FROM YOUR -- IF YOU --
17   IF YOU STARTED WITH YOUR LAST -- WHAT YOU PUT IN
18   YOUR SECOND AMENDED COMPLAINT, IT WOULDN'T HAVE
19   BEEN NEWSWORTHY AND WE COULD HAVE -- WE COULD HAVE
20   HAD A LEGAL INTERACTION, I WOULD SUPPOSE.
21              WHETHER YOU THINK THEY'RE TRUE OR
22   NOT, I THINK I WENT THROUGH ENOUGH AND SHOWED YOU
23   HOW THEY'RE NOT TRUE.  AND I'LL GO THROUGH AGAIN
24   AND SHOW YOU HOW EACH STIPULATION OR EACH
25   PARAGRAPH IN THAT IS NOT TRUE OR, FOR THE MOST
0497
1    PART, IS NOT TRUE.
2              BUT WHEN YOU STARTED WITH SUCH A
3    SENSATIONAL, COMPLETELY FALSE, ACCUSATIONS AGAINST
4    ME, THAT'S WHAT THEY TALK ABOUT.
5              IT'S HARD FOR ME TO GET INTO DETAIL
6    AND SAY, "WELL, THOSE TWO CASES HAVE BEEN THROWN
7    OUT.  NOW I'M DEALING WITH A THIRD ONE."
8              I NEED THEM ALL TO BE EXTINGUISHED.
9    AND I NEED TO DO WHATEVER I NEED TO DO TO GET THAT
10   REMOVED FROM MY NAME AND NOT ASSOCIATED WITH ME.
11         Q.   CAN YOU NAME ONE DEAL THAT YOU'VE
12   LOST AS A RESULT OF THE LAWSUIT?
13         A.   TO PROVE A NEGATIVE?
14         Q.   I'M JUST ASKING YOU IF SOMEONE --
15   IF SOMEONE TOLD YOU -- CAN YOU NAME ANYBODY THAT'S

```
16    TOLD YOU, "I'M NOT GOING TO INVEST WITH YOU
17    BECAUSE WE READ YOU WERE BEING SUED"?
18              A.   I JUST HAD A CONVERSATION, AND
19    I'LL -- ON SATURDAY, WITH SOMEONE WHO SAID --
20              Q.   WELL, NO.  WHO?  I CAN'T GET AN
21    ANONYMOUS PERSON.
22              A.   I THINK THE LAST NAME WAS
23    ROMANOVSKY.
24              Q.   WHERE DO THEY LIVE?
25              A.   IN CABO SAN LUCAS.
0498
1               Q.   OKAY.  I BET YOU DON'T HAVE HIS
2     PHONE NUMBER, DO YOU?
3               A.   I DON'T.
4               Q.   OKAY.  SO THIS WAS JUST LIKE A
5     CASUAL, LIKE AT THE -- AT THE MERMAIDS?
6                    I'M JUST SAYING, YOU SAID -- DID
7     YOU LOSE A BUSINESS DEAL AS A RESULT OF THIS
8     LAWSUIT?
9               A.   ARE YOU SERIOUS?
10              Q.   ABOUT WHAT?
11              A.   SERIOUSLY.
12              Q.   WHAT DO YOU MEAN, AM I SERIOUS?
13              A.   ARE WE GOING TO HAVE AN INTELLIGENT
14    CONVERSATION --
15              Q.   YEAH.  BUT YOU'RE SAYING --
16              A.   -- BETWEEN A -- PROFESSIONAL?
17              Q.   YEAH.
18              A.   OKAY.  LET'S HAVE IT, THEN.
19              Q.   OKAY.  GO AHEAD.
20              A.   SO WHAT'S YOUR QUESTION?
21              Q.   WHAT DID ROMANOVSKY SAY TO YOU?
22              A.   HE SAID THAT HE WAS INTERESTED.
23    HE'S CONCERNED ABOUT THE LAWSUIT.  AND HE WOULD
24    PREFER TO WAIT UNTIL IT'S SETTLED.
25              Q.   AND WHERE DID THIS CONVERSATION
0499
1     TAKE PLACE?
2               A.   AT DIAMANTE CABO SAN LUCAS.
3               Q.   AND YOU DON'T HAVE A CONTACT NUMBER
4     FOR ROMANOVSKY?
5               A.   PERSONALLY, NO, I DON'T HAVE IT.
6               Q.   I MEAN, WHAT ABOUT AT THE FACILITY?
7               A.   I'M SURE THE SALESPERSON -- YOU
8     WANT TO KNOW HOW IT ACTUALLY HAPPENED?
9               Q.   YES.
10              A.   HE'S BEEN TO THE COURSE A COUPLE OF
11    TIMES.  THIS IS HOW IT USUALLY HAPPENS.
12                   THERE'S INTEREST IN THE PROPERTY.
13    THEY'RE TALKING TO A SALESPERSON.
```

14                  THE SALESPERSON CALLS ME AND SAYS,
15     "LISTEN, YOU NEED TO TALK TO THESE PEOPLE.
16     THEY'RE INTERESTED, BUT THEY WANT TO TALK TO YOU
17     DIRECTLY ABOUT THE LAWSUIT."
18                  SO I MET HIM.  SAT DOWN.  SPENT 30
19     MINUTES TALKING TO THEM, AND RESOLUTION IS WAIT
20     UNTIL IT'S SETTLED.
21           Q.    BESIDES ROMANOVSKY, IS THERE
22     ANYBODY ELSE THAT YOU CAN NAME THAT WANTED TO NOT
23     PURCHASE A -- WHEN YOU SAY -- IS THIS -- WAS THIS
24     SOMEONE PURCHASING A HOMESITE?
25           A.    YES.  I MEAN YOU CAN TALK TO --
0500
1      WELL PROBABLY CHRIS SNELL IS PROBABLY THE BIGGEST
2      BROKER IN CABO.
3            Q.    CHRIS SNELL?
4            A.    CHRIS SNELL IS PROBABLY THE BIGGEST
5      BROKER IN CABO.
6                  WON'T EVEN ALLOW HIS BROKERS TO
7      PARTICIPATE IN A BROKER GOLF EVENT BECAUSE OF THE
8      CLOUD HANGING OVER THIS PROJECT AND DOESN'T WANT
9      TO INTRODUCE HIS CLIENTS TO THIS PROJECT BECAUSE
10     OF THE CLOUD HANGING OVER THIS PROJECT.
11                 THAT'S WHAT I WAS TOLD.  AND HIS
12     BROKERS DID NOT COME TO OUR EVENT.
13           Q.    DO YOU THINK THAT ONE OF THE
14     REASONS WHY IT COULD BE DIFFICULT TO INVEST IN
15     THIS PROJECT IS BECAUSE YOU DON'T HAVE A
16     GUARANTEED SOURCE OF ADDITIONAL FINANCING TO
17     SERVICE THE 400,000-DOLLAR-PER-MONTH EXPENSES TO
18     KEEP THE RESORT OPEN?
19           A.    I THINK THERE ARE A NUMBER OF
20     CHALLENGES THAT EVERYBODY FACES TODAY.
21                 AND I THINK THAT WE CAN OVERCOME
22     ALL OF THEM, INCLUDING THIS LAWSUIT.  IT JUST
23     MAKES IT MORE DIFFICULT.
24                 SO THERE ARE A NUMBER OF FACTORS,
25     ALL OF WHICH WE NEED TO OVERCOME AND ALL OF WHICH
0501
1      I THINK WE CAN OVERCOME.  AGAIN, INCLUDING THIS.
2            Q.    DO YOU -- DO YOU THINK THAT -- DO
3      YOU THINK THAT YOUR POSITION WITH RESPECT TO THE
4      PLAYERS' INVESTMENT HAS BEEN REASONABLE WITH
5      RESPECT TO THE AMOUNT OF TIME IT'S TAKEN TO RETURN
6      ANY OF THE PROCEEDS?
7            A.    I DON'T UNDERSTAND THE QUESTION.
8            Q.    WELL, YOU -- SOME OF THESE
9      INVESTMENTS HAVE BEEN GOING ON FOR OVER SIX YEARS.
10           A.    UH-HUH.
11           Q.    AND -- AND THERE'S BEEN A LOT OF

```
12    MONEY THAT'S BEEN SPENT TO FUND THIS PROJECT, BUT
13    NOBODY EXCEPT PEOPLE THAT YOU'VE -- THAT YOU'RE
14    FRIENDLY WITH STILL HAVE MADE ANY MONEY OFF THIS
15    PROJECT, EITHER THROUGH WORKING OR FROM REFERRALS.
16              SO I'M JUST -- I'M JUST ASKING:
17    WHAT IS -- WHAT IS -- WHAT IS THE REASONABLE
18    AMOUNT OF TIME PEOPLE SHOULD WAIT TO GET A RETURN
19    OF THEIR INVESTMENT IN THIS DEAL?
20              MS. CROWTHER:  OBJECTION.  THAT'S
21    COMPLETELY VAGUE AND CONCLUSORY.  IT ALSO -- YOUR
22    PREAMBLE TO THAT MISSTATED THE FACTS.
23              AND I -- IF YOU CAN ANSWER THE
24    QUESTION, GO AHEAD.  BUT IT CALLS FOR A LEGAL
25    CONCLUSION, AMONG OTHER THINGS.
0502
 1              THE DEPONENT:  WELL, I THINK IT'S A
 2    RIDICULOUS QUESTION, TO BE HONEST.
 3              THEY INVESTED IN A REAL ESTATE
 4    DEAL.  THE REAL ESTATE IS ONGOING.  THE ECONOMY
 5    HASN'T BEEN THE BEST.  THEIR INVESTMENT IS STILL
 6    THERE.
 7              THEY STILL HAVE AN OPPORTUNITY TO
 8    RECOUP THEIR INVESTMENT.  THEY STILL HAVE AN
 9    OPPORTUNITY TO TURN A PROFIT.
10              THEY'VE MADE IT CONSIDERABLY MORE
11    DIFFICULT FOR THAT TO HAPPEN WITH THEIR ACTIONS,
12    BUT IT'S A REAL ESTATE INVESTMENT, AND THE
13    INVESTMENT IS STILL ONGOING.
14    BY MR. RICHARDS:
15         Q.   WHERE -- WHERE ARE THE RECORDS KEPT
16    FOR YOUR MONTHLY -- FOR ALL THE DETAIL FROM THE
17    DRAWS THAT YOU MADE FROM THE LEHMAN LOAN?
18         A.   DANBURY, CONNECTICUT.
19         Q.   DO YOU THINK IT'S -- IT'S --
20    IT'S -- DO YOU THINK THAT IT'S -- THAT PROVIDES
21    EASY ACCESS FOR PEOPLE THAT YOU KNOW DON'T LIVE IN
22    DANBURY, CONNECTICUT, TO GET COPIES OF THE
23    RECORDS?
24              LET ME REPHRASE THE QUESTION.  LET
25    ME WITHDRAW THAT QUESTION.
0503
 1              DO YOU -- ARE YOU EVER WILLING TO
 2    PROVIDE A DIGITAL COPY OF THE DIAMANTE CABO SAN
 3    LUCAS RECORDS THAT CAN BE SHIPPED TO YOUR VARIOUS
 4    INVESTORS?
 5         A.   I WOULD HAVE NO IDEA.  I MEAN, THE
 6    ACTUAL RECORDS, WHICH WE DID MAKE AVAILABLE TO
 7    MR. KENNER, WE PUT HIM IN A ROOM FULL -- THIS
 8    SIZE, FULL OF DOCUMENTS.
 9              HE SPENT TWO HOURS THERE, WHICH
```

```
10    COULD HAVE TAKEN FIVE DAYS TO LOOK THROUGH.  HE
11    SPENT TWO HOURS THERE AND LEFT.
12                  THERE ARE THOUSANDS AND THOUSANDS
13    AND THOUSANDS OF PAGES OF DOCUMENTS, ALL OF WHICH
14    PEOPLE THAT ARE ENTITLED TO GO SEE ARE WELCOME TO
15    GO SEE.
16              Q.   HAS ANYBODY EVER MADE AN INSPECTION
17    REQUEST IN THE LAST SIX YEARS, BESIDES THE S.E.C.
18    OR THE SOUTHERN DISTRICT OF NEW YORK OR
19    PHIL KENNER, TO GO TO THE DANBURY, CONNECTICUT,
20    OFFICE THAT YOU'RE AWARE OF?
21              A.   THAT THEY REQUESTED TO GO TO THE
22    DANBURY OFFICE?
23              Q.   YEAH.  HAS ANYBODY EVER BEEN THERE,
24    TO THE DANBURY OFFICE, BESIDES PHIL KENNER?
25              A.   I DON'T KNOW.
0504
 1              Q.   OKAY.  ISN'T IT TRUE THAT YOU
 2    DIDN'T MAKE THE S.E.C. GO TO THE DANBURY,
 3    CONNECTICUT, OFFICE AND LOOK THROUGH PAPER BOXES
 4    OF RECORDS?
 5              A.   WE'VE COMPLIED WITH WHAT THEY ASKED
 6    FOR.
 7              Q.   BUT ISN'T IT TRUE THAT YOU PROVIDED
 8    THEM A COPY OF THE RECORDS IN RESPONSE --
 9              (SPEAKING SIMULTANEOUSLY.)
10              THE DEPONENT:  I DON'T KNOW EXACTLY
11    WHAT WE PROVIDED THEM, NO.
12    BY MR. RICHARDS:
13              Q.   I'M SURE YOU -- ARE YOU SURE -- DO
14    YOU HAVE ANY KNOWLEDGE AS TO WHETHER OR NOT YOU
15    JUST SIMPLY TOLD THE S.E.C., "GO TO MY OFFICE IN
16    DANBURY, CONNECTICUT, AND GO GET THE RECORDS
17    THERE"?
18              A.   I DON'T KNOW WHAT WAS TOLD TO THEM.
19              Q.   WHO'S -- WHAT KIND OF OFFICE IS IN
20    DANBURY, CONNECTICUT?
21              A.   A BUSINESS OFFICE.
22              Q.   I MEAN, WHO'S OFFICE IS IT?
23              A.   BILL NAJAM.  PATTY FORMISANO.
24    ANOTHER BOOKKEEPER.  THAT'S IT THAT'S THERE EVERY
25    DAY.
0505
 1              Q.   AND ARE YOU -- ARE YOU TESTIFYING
 2    THAT YOUR RECORDS AREN'T KEPT ON A COMPUTER
 3    SOMEWHERE?
 4              A.   NO.
 5              Q.   OKAY.  WHERE ARE -- WHAT COMPUTER
 6    HOUSES THE RECORDS OF CABO SAN LUCAS?
 7              A.   I DON'T KNOW.
```

```
 8                 Q.   WHERE IS IT LOCATED?
 9                 A.   IN DANBURY, CONNECTICUT, I WOULD
10     ASSUME.
11                 Q.   OKAY.  WELL -- BUT IF YOU NEED TO
12     PAY A BILL IN CABO SAN LUCAS, YOU DON'T CALL
13     DANBURY, CONNECTICUT, DO YOU?
14                 A.   WHAT BILL ARE YOU TALKING ABOUT?
15                 Q.   LIKE YOUR -- THE BILLS TO RUN THE
16     CURRENT OPERATION.
17                      WHERE DO YOU GET THE CHECKS FOR
18     THOSE BILLS?
19                 A.   SOME FROM DANBURY, CONNECTICUT.
20     SOME ARE IN CABO.
21                 Q.   WELL, WHAT'S IN CABO.  LIKE,
22     SPECIFICALLY, WHAT'S IN CABO?
23                 A.   I DON'T UNDERSTAND THE QUESTION.
24                 Q.   LET'S SAY YOU NEED SOME MONEY TO
25     PAY THE GREENSKEEPERS AT THE GOLF COURSE.
0506
 1                 A.   OKAY.
 2                 Q.   WHERE WOULD YOU GET THE MONEY FROM?
 3     LIKE, WHERE DO YOU GET THE CHECKS?  WHO DOES THE
 4     PAYROLL CHECKS?
 5                 A.   THERE'S AN OFFICE IN CABO.
 6                 Q.   OKAY.  AND IS THERE A BOOKKEEPER
 7     THERE?
 8                 A.   YES.
 9                 Q.   AND WHAT'S THAT PERSON'S NAME?
10                 A.   WELL, THERE IS -- THERE ARE --
11     GREG CARRAFIELLO IS RESPONSIBLE FOR SIGNING THE
12     CHECKS.
13                 Q.   GREG CARRAFIELLO?
14                 A.   YES.
15                 Q.   AND WHAT'S HIS BACKGROUND?
16                 A.   PERMITTING.  PLANNING.  HE DOESN'T
17     DO THE BOOKS THERE.  HE SIGNS -- HIM -- HE AND
18     FERNANDO GARCIA SIGN THE CHECKS.
19                 Q.   A LAWYER IS IN CHARGE OF YOUR --
20                 A.   NO, I DIDN'T SAY HE'S IN CHARGE.  I
21     SAID THEY SIGN THE CHECKS.
22                 Q.   I SEE.  OKAY.  YOU'RE NOT A SIGNER?
23                 A.   ON SOME OF THE ACCOUNTS.  NOT ON
24     ALL OF THE ACCOUNTS.
25                 Q.   WHAT ACCOUNT IS THIS THAT SIGNS
0507
 1     THESE CHECKS FOR --
 2                 A.   I DON'T KNOW.
 3                 Q.   WHAT BANK IS IT AT?
 4                 A.   I DON'T KNOW.
 5                 Q.   YOU'RE SAYING THAT YOU'RE THE
```

```
 6    MANAGER OF CABO SAN LUCAS DIAMANTE, AND YOU DON'T
 7    KNOW WHERE YOUR BANK IS?
 8             A.   I DON'T KNOW WHICH BANK IT IS, NO.
 9             Q.   DO YOU KNOW WHICH BANKS YOU USE IN
10    CABO SAN LUCAS FOR YOUR COMPANY?
11             A.   THERE'S A COUPLE, BUT I DON'T KNOW
12    THEM ALL, NO.
13             Q.   SO DO YOU REALIZE HOW HARD IT IS TO
14    GET RECORDS FROM YOUR INVESTORS IF WE DON'T EVEN
15    KNOW WHERE YOU BANK?
16             A.   NO.  THEY'RE ALL IN ONE SPOT THAT
17    YOU'RE WELCOME TO GO TO.  AND IT SAYS -- IF YOU
18    LOOK AT THE OPERATING AGREEMENTS, IF YOU LOOK AT
19    THE OFFERING MEMORANDUMS, IT PROVIDES FOR THAT.
20             Q.   BUT THERE IS NO OFFERING
21    MEMORANDUMS FOR CABO SAN LUCAS.
22             A.   AN OPERATING AGREEMENT.
23             Q.   AND SO IS IT YOUR -- IS IT YOUR
24    POSITION -- I JUST WANT TO MAKE IT CLEAR FOR THE
25    RECORD THAT YOU WON'T PROVIDE A COPY ON A C.D,
0508
 1    LIKE YOU DID IN THIS CASE, OF ALL THE RECORDS THAT
 2    SHOW HOW THE MONEY'S BEEN SPENT THE LAST FOUR
 3    YEARS?
 4                 MS. CROWTHER:  PROVIDE TO WHOM?
 5                 MR. RICHARDS:  TO ME.
 6                 MS. CROWTHER:  THAT IS FOR ME TO
 7    DECIDE.
 8                 MR. RICHARDS:  TO PROVIDE TO YOUR
 9    INVESTORS.
10                 MS. CROWTHER:  THE INVESTORS --
11    WHICH INVESTORS?  FOR WHICH COMPANY?
12                 BECAUSE YOU REALIZE THE INVESTORS
13    IN DIAMANTE CABO SAN LUCAS ARE NOT ANY OF THE
14    NAMED PLAINTIFFS; THAT THOSE PEOPLE INVESTED IN
15    C.S.L. PROPERTIES, MR. KENNER'S COMPANIES.
16    BY MR. RICHARDS:
17             Q.   C.S.L. PROPERTIES IS A -- IS A --
18    IS AN OWNER OF -- OF -- IS A PARTNER IN THIS
19    DEVELOPMENT; IS THAT CORRECT?
20                 MS. CROWTHER:  OBJECTION TO THE
21    TERM "PARTNER."
22    BY MR. RICHARDS:
23             Q.   THEY HAVE AN OWNERSHIP INTEREST
24    WITH YOU?
25             A.   YES.
0509
 1             Q.   AND YOU'RE AWARE THAT MR. KENNER
 2    REPRESENTS SOME OF THE PEOPLE THAT INVESTED -- OR
 3    YOU'RE AWARE NOW, OR YOU BECAME AWARE THAT THEIR
```

```
 4    MONEY, AS YOU -- AS YOU MENTIONED WHEN YOU
 5    TESTIFIED YESTERDAY, WAS USED TO ASSIST IN -- WAS
 6    THE CAPITAL THAT MADE UP THE INITIAL INVESTMENT
 7    PRIOR TO THE LEHMAN BROTHERS LOAN; CORRECT?
 8            A.   SOME OF IT.
 9            Q.   AND?
10            THE VIDEOGRAPHER:  PARDON ME,
11    COUNSEL.  I'M SORRY.  WE HAVE APPROXIMATELY FIVE
12    MINUTE LEFT ON THIS PARTICULAR TAPE.
13            MR. RICHARDS:  ALL RIGHT.  AND -- I
14    WANT YOU TO GET LONGER TAPES NEXT TIME.
15    BY MR. RICHARDS:
16            Q.   THE -- THE -- IS THERE -- WHAT IS
17    THE DIFFICULTY IN PROVIDING C.S.L. PROPERTIES A
18    DIGITAL OR SCANNED COPY OF YOUR RECORDS?
19            A.   I'M SURE WE PROVIDE WHATEVER EACH
20    MEMBER IS ENTITLED TO ACCORDING TO THE DOCUMENTS.
21            AND I'M NOT ENTITLED TO SAY WHAT
22    THAT IS OR ISN'T, BUT I'M SURE WE WILL.
23            Q.   BUT LET'S SAY THE DOCUMENTS HAVE A
24    PROVISION IN THERE THAT IN 2010 IT'S SIMPLY
25    UNREASONABLE TO HAVE PEOPLE FLY TO DANBURY,
0510
 1    CONNECTICUT, AND SIT IN THE OFFICE FOR FIVE DAYS
 2    AND GO THROUGH PAPER RECORDS.
 3            LET'S JUST SAY THEY DON'T WANT TO
 4    DO THAT MUCH WORK.  AND THEY JUST WANT A COPY OF
 5    HOW THEIR MONEY HAS BEEN SPENT ON A COMPANY THAT
 6    THEY OWN A PART OF THROUGH ONE GLOBAL ENTITY.
 7            IS THERE A REASON WHY YOU JUST
 8    WON'T PROVIDE DIGITAL RECORDS?
 9            A.   THERE'S A REASON WHY I WANT TO
10    STICK TO WHAT THE DOCUMENTS SAY I NEED TO DO, YES.
11            Q.   AND WHAT'S THE REASON?
12            A.   BECAUSE I DON'T THINK ANY
13    PURPOSE -- THAT THAT GENTLEMAN THERE OVER THE LAST
14    YEAR AND A HALF HAS DONE ANYTHING WITH ANY
15    INFORMATION AND TWISTED IT IN ANY WAY HE CAN TO
16    HURT ME PERSONALLY AND THE COMPANY ITSELF.
17            AND HE CAN TAKE COMPLETELY
18    LEGITIMATE BOOKS AND RECORDS AND TWIST THEM ANY
19    WAY HE CAN TO HIS BENEFIT.
20            AND IF I'M LEGALLY SUPPOSED TO GIVE
21    HIM ACCESS TO THAT, WHICH WE WERE, WE WILL.
22            BUT TO GIVE HIM OTHER INFORMATION,
23    IT'S THE SAME AS ME GIVING SOMEONE'S PHONE NUMBER,
24    WHICH I WILL IF I HAVE IT.  AND IF I DON'T, I
25    WON'T.
0511
 1            AND I'D RATHER NOT GIVE IT EITHER
```

2   WAY BECAUSE I DON'T KNOW IF HE'S GOING TO CALL HIM
3   AND SAY SOMETHING TERRIBLE ABOUT ME.
4                   AND I'M SORRY IF IT'S GOTTEN TO
5   THAT POINT, BUT THAT'S WHERE WE'RE AT.
6                   SO IF THE DOCUMENTS SAY I NEED TO
7   DO IT, THEN I'LL DO IT.
8           Q.   WELL, THE -- IF YOUR RECORDS --
9   WHAT I'M JUST TRYING TO FIND OUT, IF YOUR RECORDS
10  ARE ORIGINALLY KEPT ON ELECTRONIC FORMAT AND THEN
11  THESE DOCUMENTS ARE PRINTED OUT TO JUST KEEP IN A
12  BOX, WE'RE ENTITLED NOW UNDER THE LAW TO GET THEM
13  IN ELECTRONIC FORMAT.
14                  MS. CROWTHER:  OBJECTION.  YOU'RE
15  MISCHARACTERIZING THE LAW.
16                  AND I TOLD YOU BEFORE, THAT IF YOU
17  WANT TO TALK ABOUT DISCOVERY ISSUES, YOU TALK WITH
18  ME.
19                  IF YOU WANT TO TALK ABOUT WHAT
20  HE'LL PROVIDE AS A MANAGING MEMBER, YOU TALK WITH
21  HIM.
22  BY MR. RICHARDS:
23          Q.   WELL, WHEN YOU GO TO THE DANBURY,
24  CONNECTICUT, OFFICE, ARE THE -- WOULD YOU PROVIDE
25  RECORDS ALREADY -- THAT ARE ON THE COMPUTERS THAT
0512
1   THEY'RE STORED IN?
2           A.   I HAVE NO IDEA WHAT'S ON THE
3   COMPUTER AND WHAT'S NOT ON THE COMPUTER.
4           Q.   WHO WOULD KNOW WHAT'S ON THE
5   COMPUTER AND WHAT'S NOT ON THE COMPUTER?  WHO
6   WOULD BE THE PERSON THAT IS THE CUSTODIAN OF THOSE
7   RECORDS?
8           A.   I WOULD SAY PATTY FORMISANO.
9           Q.   AND WHERE IS SHE LOCATED?
10          A.   IN DANBURY.
11          Q.   AND WHAT'S HER TITLE WITH THE
12  COMPANY?
13          A.   CONTROLLER.
14          Q.   AND DOES SHE GET PAID A SALARY
15  EVERY YEAR FROM DIAMANTE CABO SAN LUCAS?
16          A.   SHE GETS -- YES.
17          Q.   AND HOW DO YOU SPELL FORMISANO?
18          A.   F-O-R-M-I-S-A-N-O.
19          Q.   AND HOW LONG HAS SHE WORKED FOR YOU
20  FOR?
21          A.   I DON'T KNOW.  APPROXIMATELY THREE
22  YEARS.
23          Q.   DID SHE EVER HAVE A RELATIONSHIP
24  WITH MASOOD BHATTI PRIOR TO WORKING WITH YOU?
25          A.   I DON'T KNOW.  THEY'RE FRIENDS.

```
0513
 1              Q.   DO YOU KNOW IF THEY DATED?
 2              A.   I DON'T KNOW.
 3              Q.   HAVE YOU EVER MADE STATEMENTS TO
 4      INDIVIDUALS THAT MR. KENNER STOLE HIS CLIENTS'
 5      MONEY AND BOUGHT A BEACH HOUSE IN CALIFORNIA?
 6              A.   NO.
 7              Q.   HAVE YOU EVER TOLD ANYONE THAT
 8      MR. KENNER STOLE HIS CLIENTS' MONEY?
 9              A.   I DON'T KNOW.
10              Q.   YOU DON'T KNOW?
11              A.   I DON'T BELIEVE SO.  I DON'T KNOW.
12              Q.   DO YOU -- DO YOU HAVE ANY EVIDENCE
13      AT ALL THAT MR. KENNER STOLE HIS CLIENTS' MONEY?
14              A.   I HAVE MY BELIEFS, BUT I DON'T --
15              Q.   I MEAN ANY -- ANY --
16              (SPEAKING SIMULTANEOUSLY.)
17                   THE DEPONENT:  I DON'T KNOW.
18      BY MR. RICHARDS:
19              Q.   BESIDES SPECULATION, DO YOU HAVE
20      ANY EVIDENCE?
21              A.   I DON'T KNOW.
22              Q.   BY INVESTING -- BY MR. KENNER --
23              A.   I CAN SAY THERE WAS A JUDGMENT
24      AGAINST HIM FOR TWO -- OVER TWO AND A HALF MILLION
25      DOLLARS.
0514
 1                   I DON'T KNOW WHAT'S -- IF THAT'S
 2      EVIDENCE OR NOT OF ANYTHING.  BUT HE DOES HAVE A
 3      JUDGMENT AGAINST HIM.
 4              Q.   DO YOU KNOW WHAT THE BASIS OF WHY
 5      THE JUDGMENT WAS ENTERED?
 6              A.   I DON'T KNOW.
 7              Q.   YOU TESTIFIED IN THAT ARBITRATION?
 8              A.   YES.
 9              Q.   WERE YOU UNDER SUBPOENA, OR DID YOU
10      VOLUNTARILY TESTIFY?
11              A.   VOLUNTARILY, I BELIEVE.
12              Q.   AND WHY DID YOU VOLUNTARILY
13      TESTIFY?
14              A.   BECAUSE I WAS ASKED.
15              Q.   BY WHO?
16              A.   MR. MEEKS.
17              Q.   AND WHAT DID MR. MEEKS TELL YOU?
18              A.   NOTHING.  I DON'T KNOW.
19              Q.   DID MR. MEEKS PROMISE YOU THAT IF
20      YOU TESTIFIED IN THAT ARBITRATION, THAT HE WOULD
21      DROP HIS LAWSUIT AGAINST YOU IN FEDERAL COURT IN
22      LOS ANGELES?
23              A.   ABSOLUTELY NOT.
```

24          Q.   ONE THING HAD NOTHING TO DO WITH
25   THE OTHER?
0515
 1          A.   NO.
 2          Q.   SO YOU JUST TESTIFIED -- YOU FLEW
 3   ALL THE WAY FROM CABO SAN LUCAS TO ARIZONA JUST
 4   BECAUSE YOU'RE A -- YOU'RE -- YOU DO THAT FOR
 5   PEOPLE?
 6               MS. CROWTHER:  OBJECTION.
 7   ARGUMENTATIVE.
 8   BY MR. RICHARDS:
 9          Q.   WHAT WAS YOUR MOTIVE, THOUGH, FOR
10   FLYING OUT TO ARIZONA FROM CABO SAN LUCAS?
11          A.   I WAS ASKED TO BE THERE.  AND HE
12   FELT THAT INFORMATION, WHETHER IT'S HELPFUL OR --
13   WHETHER IT HELPED OR HURT, I WASN'T THERE ON
14   BEHALF OF ANYONE OTHER THAN TO TELL THE TRUTH.
15   AND THAT'S WHAT I DID.
16               THE VIDEOGRAPHER:  COUNSEL, I NEED
17   TO CHANGE TAPES.
18               MR. RICHARDS:  OKAY.
19               THE VIDEOGRAPHER:  AND WE'LL GO OFF
20   VIDEOTAPE RECORD AT 12:21 P.M.  CONCLUDING TAPE
21   NUMBER 1 OF VOLUME NUMBER II.
22
23               (WHEREUPON, A LUNCHEON RECESS WAS
24               HELD FROM 12:21 P.M. TO 1:49 P.M.)
25   ///
0516
 1          WEST HOLLYWOOD, CALIFORNIA WEDNESDAY
 2                  JANUARY 6, 2010
 3                     1:49 P.M.
 4
 5               THE VIDEOGRAPHER:  AND GOOD
 6   AFTERNOON.  WE'RE BACK ON THE VIDEOTAPE RECORD,
 7   BEGINNING TAPE NUMBER 2 OF VOLUME NUMBER II AT
 8   1:49 P.M.
 9
10               EXAMINATION (CONTINUED)
11   BY MR. RICHARDS:
12          Q.   ALL RIGHT.  I'M GOING TO SHOW YOU
13   THE OFFERING MEMORANDUM.
14               NOW, WAS IT -- I ACTUALLY HAVE A
15   COPY HERE THAT'S EASIER FOR YOU TO LOOK AT.
16               MS. CROWTHER:  AND WHERE DID --
17   THIS HAS A JOWDY 001 BATES NUMBER.
18               MR. RICHARDS:  YEAH.
19               MS. CROWTHER:  I DON'T THINK THAT'S
20   MINE.
21               MR. RICHARDS:  THIS IS MINE.  I

22    SCANNED IT AND PUT A COPY OF THE C.D. THAT I'M
23    MAKING FOR YOU.
24                 MS. CROWTHER:  OKAY.  SO THIS IS
25    THE -- THIS IS YOUR COPY OF THE DOCUMENT?
0517
 1                 MR. RICHARDS:  YEAH.  YOU'RE GOING
 2    TO GET A C.D. WITH ALL YOUR DISCOVERY, PLUS THE
 3    VIDEO, PLUS THIS DOCUMENT.
 4                 MS. CROWTHER:  I JUST WANT TO KNOW
 5    WHERE IT CAME FROM.
 6                 MR. RICHARDS:  I SCANNED IT FROM --
 7    FROM THIS BOOKLET RIGHT HERE.  FROM -- THAT WAS --
 8    JUST FROM ONE OF THE BOOKLETS PROVIDED TO
 9    JAY MCKEE.  I JUST SCANNED IT FROM THERE.
10    BY MR. RICHARDS:
11          Q.    OKAY.  NOW, INITIALLY, WHAT WERE
12    YOU TRYING TO RAISE FROM THIS -- THIS OFFERING, DO
13    YOU REMEMBER?  LIKE HOW MUCH MONEY?
14          A.    I BELIEVE -- UP TO 10 MILLION
15    DOLLARS, I BELIEVE.
16          Q.    AND HAD YOU ALREADY ACQUIRED THE
17    LAND THAT YOU WERE -- IN THE EL ROSARIO?
18          A.    THE COMPANY HAS ACQUIRED SOME OF
19    IT, YES.  I'M NOT SURE WHAT PORTION OF IT OR ALL
20    OF IT AT THAT POINT.
21          Q.    OKAY.  AND DID YOU -- DID YOU --
22    HOW MUCH MORE OF THE LAND WERE YOU -- WERE YOU
23    SUPPOSED TO ACQUIRE PRIOR TO THIS OFFERING?  LIKE
24    HOW MUCH -- WHAT WAS THE BALANCE DUE ON THIS -- ON
25    THIS LAND?
0518
 1                 (TELEPHONIC INTERRUPTION.)
 2                 MR. RICHARDS:  SORRY.
 3    BY MR. RICHARDS:
 4          Q.    GO AHEAD.
 5          A.    I DON'T KNOW.  AT THIS TIME I DON'T
 6    KNOW.
 7          Q.    HOW MUCH DID THE COMPANY ULTIMATELY
 8    RAISE?
 9          A.    THROUGH THIS OFFERING?
10          Q.    YEAH.
11          A.    I BELIEVE IN THE NEIGHBORHOOD OF
12    7 MILLION DOLLARS, I BELIEVE.  SOMEWHERE IN THAT
13    NEIGHBORHOOD.  I DON'T KNOW FOR SURE.
14          Q.    WHAT WAS THE TOTAL -- THE TOTAL
15    PRICE OF THE LAND?
16          A.    IF YOU ADD UP -- LIKE I SAID, THERE
17    WAS SEVERAL CONTRACTS, SEVERAL PEOPLE WHO HAD
18    PROPERTY THERE THAT WE NEEDED TO BUY OUT.
19                 IF YOU ADD IT ALL UP, I BELIEVE,

20    I'M NOT SURE, IN THE NEIGHBORHOOD OF 4 MILLION
21    DOLLARS.
22               Q.    THAT WAS THE TOTAL PRICE OF THE
23    LAND?
24               A.    I BELIEVE SO.
25               Q.    OKAY.
0519
1                A.    I'M NOT SURE.
2                Q.    AND WERE YOU AWARE OR NOT WHETHER,
3     WHEN PEOPLE WERE MAKING THE INVESTMENTS IN THIS
4     ENTITY, THAT THEY WERE -- WHETHER OR NOT THEY WERE
5     UNDER THE IMPRESSION THAT YOU'D ALREADY OWNED THE
6     LAND, AND THERE WAS NO MORE REQUIREMENT NECESSARY
7     FOR LAND PURCHASES?
8                A.    I DON'T KNOW.
9                Q.    WHAT WERE YOU -- WHAT WERE YOU
10    SUPPOSED TO DO WITH THE FUNDS THAT YOU RAISED --
11    LET ME POINT YOU DOWN HERE TO PAGE 7, BATES STAMP
12    7, IF YOU COULD LOOK AT HERE.
13               IT SAYS THAT YOU WERE GOING TO
14    BE -- YOU WERE GOING TO CONTRIBUTE 150,000 IN
15    CASH TO THE COMPANY, PLUS 2 MILLION 750 IN THE
16    AGGREGATE PRINCIPAL AMOUNTS OF PROMISSORY
17    NOTES.
18               DID YOU EVER -- DO YOU HAVE ANY
19    EVIDENCE THAT YOU EVER CONTRIBUTED THE 150,000
20    DOLLARS IN CASH?
21               A.    I DON'T KNOW.  I BELIEVE SO.  I
22    DON'T KNOW.
23               Q.    DO YOU -- DO YOU HAVE ANY
24    RECOLLECTION THAT YOU EVER DID?
25               A.    I BELIEVE I DID.  I BELIEVE I
0520
1     CONFORMED TO WHAT THE DOCUMENTS SAY.  I'M LOOKING
2     AT IT, SO I ASSUME I DID.
3                Q.    NOW, AT SOME POINT LATER ON, DID
4     YOU REMEMBER HAVING TO SPEND ADDITIONAL MONEY TO
5     BUY MORE PARCELS TO COMPLETE THIS DEVELOPMENT THAT
6     CAUSED YOU TO GO OVER THE -- THAT CAUSED YOU TO GO
7     OVER THE AMOUNTS REPRESENTED IN THE PRIVATE
8     PLACEMENT MEMORANDUM?
9                A.    WHAT AMOUNTS ARE YOU TALKING ABOUT
10    IN THE PRIVATE PLACEMENT MEMORANDUM?
11               Q.    WELL, FOR THE TERM TO GO TO
12    4 MILLION DOLLARS?
13               A.    FOR THE --
14               Q.    FOR THE PURCHASE OF THE LAND.
15               A.    I SAID THAT WAS AN APPROXIMATE.
16    I'M NOT SURE EXACTLY WHAT IT WAS, AND I DON'T
17    BELIEVE WE SPENT MORE THAN WE WERE SUPPOSED TO, IF

```
18    THAT'S THE QUESTION.
19              Q.   YEAH.  SO WAS 4 MILLION WHAT YOU
20    INTENDED TO PAY FOR THE LAND?
21              A.   I DON'T RECALL.  I JUST DON'T THINK
22    IT WAS MORE THAN WHAT WE -- WHATEVER IT WAS THAT
23    WE REPRESENTED.  I DON'T KNOW.
24              Q.   ALL RIGHT.  DO YOU REMEMBER
25    TRANSFERRING 4 MILLION DOLLARS TO LOR MANAGEMENT?
0521
 1              A.   I DON'T RECALL, NO.
 2              Q.   AND ARE YOU AWARE OF ANY
 3    INVESTIGATIONS PRESENTLY AGAINST PHILLIP KENNER?
 4              A.   IN THE UNITED STATES?
 5              Q.   YES.
 6              A.   AS IN A FEDERAL INVESTIGATION?
 7              Q.   ANY INVESTIGATION.
 8              A.   I'M NOT AWARE, NO.
 9              Q.   WHAT ABOUT IN MEXICO?
10              A.   I'M AWARE THAT PHIL KENNER FILED AN
11    ACTION AGAINST ME THAT IS NO LONGER ACTIVE.  AND
12    WE ARE PURSUING THE FACT THAT WE BELIEVE HE
13    PERJURED HIMSELF IN THOSE ACCUSATIONS.
14              Q.   YOU MEAN UNDER, LIKE, MEXICAN LAW,
15    PERJURY?
16              A.   WELL, HE PROVIDED FALSE TESTIMONY.
17              Q.   WHERE?
18              A.   IN MEXICO.
19              Q.   OKAY.  AND DID YOU EVER -- DID YOU
20    EVER REPRESENT TO ANY OF THE PLAINTIFFS IN THIS
21    ACTION THAT YOU HAD ALREADY OWNED THE LAND IN
22    EL ROSARIO BEFORE THEY INVESTED MONEY?
23              A.   I DON'T KNOW -- NAME ME A
24    PLAINTIFF, AND I'LL TELL YOU IF I'VE EVER EVEN MET
25    THE PERSON FIRST.  AND THEN I CAN SAY WHAT I
0522
 1    POSSIBLY COULD HAVE OR COULD NOT HAVE SAID TO HIM.
 2              Q.   WELL, ANY OF -- YOU TESTIFIED
 3    YESTERDAY THAT YOU MET VARIOUS PLAINTIFFS -- OR TO
 4    MR. KENNER.
 5              DID YOU EVER -- DID YOU EVER
 6    REPRESENT TO ANY OF THE PLAINTIFFS THAT -- THE
 7    PARTIES OF THIS ACTION THAT YOU OWNED THE LAND IN
 8    EL ROSARIO PRIOR TO THEM INVESTING?
 9              A.   AGAIN, BE SPECIFIC WITH THE
10    PLAINTIFF, AND I CAN TELL YOU FIRST WHETHER I'VE
11    EVEN TALKED WITH THAT PERSON AND, SECONDLY, WHAT I
12    MAY OR MAY NOT HAVE REPRESENTED TO THEM.
13              Q.   OKAY.  WHAT ABOUT JASON WOOLLEY?
14              A.   I NEVER TALKED TO JASON WOOLLEY
15    BEFORE HE INVESTED HIS MONEY.
```

```
16            Q.   WELL, IF I GIVE YOU THE LIST OF THE
17   PLAINTIFFS, WHY DON'T YOU TELL ME WHICH ONES YOU
18   THINK YOU SPOKE TO, RATHER THAN ME GOING THROUGH
19   EACH ONE.
20            A.   POSSIBLY GLEN MURRAY.
21   RAYMOND MURRAY.  POSSIBLY DIMITRI KHRISTICH, BUT I
22   DON'T RECALL.  POSSIBLY BRYAN BERARD.
23            Q.   DID YOU --
24            A.   AND THAT WOULD BE IT.
25            Q.   OKAY.  DID YOU HOLD YOURSELF OUT AS
0523
 1   THE OWNER OF THE PROPERTY WHEN YOU MET THOSE
 2   INDIVIDUALS?
 3            A.   IT DEPENDS WHEN I MET THOSE
 4   INDIVIDUALS.  THEN I -- IF WE HAD LEGALLY OWNED
 5   THE PROPERTY, THEN I PROBABLY SAID WE DID, THE
 6   COMPANY DID.
 7                 AND IF THE COMPANY DIDN'T, I'M SURE
 8   I DIDN'T SAY THAT THEY DID.
 9            Q.   IF THE COMPANY -- IF THE COMPANY --
10   SO YOU'RE SAYING A DIFFERENT -- WHEN DID THE
11   COMPANY FINALLY ACQUIRE ALL OF THE PROPERTY?
12            A.   THERE WERE SEVERAL -- THERE WERE
13   SEVERAL CONTRACTS, AND I BELIEVE FROM SEPTEMBER --
14   AND I DON'T KNOW THE ACTUAL DATES.  THAT'S WHY I
15   DON'T WANT TO SAY ONE WAY OR THE OTHER.
16                 BECAUSE FROM SEPTEMBER, I WOULD
17   THINK, UNTIL DECEMBER, IT WENT FROM LEASEHOLD
18   INTEREST TO FEE SIMPLE TITLE.  AND I'M GUESSING AS
19   TO WHAT THOSE DATES ARE.
20                 THEREFORE, I'D BE GUESSING AS TO
21   WHETHER OR NOT I WOULD HAVE REPRESENTED TO THE
22   THREE OR FOUR PEOPLE THAT I MENTIONED, WHO I MAY
23   HAVE TALKED TO BEFORE THEY INVESTED, AT WHAT TIME
24   THEY INVESTED WOULD MEAN WHETHER I SAID THAT WE
25   DID OR WE DIDN'T.
0524
 1            Q.   ALL RIGHT.  I'M GOING TO SHOW YOU
 2   PAGE -- THIS IS MARKED JOWDY 61.  THIS IS A COPY
 3   OF YOUR ARTICLES OF YOUR LIMITED LIABILITY
 4   AGREEMENT.
 5                 ON PAGE -- PARAGRAPH 601 ON
 6   PAGE 61, TAKE A LOOK AT THAT, WHERE IT SAYS,
 7   "GENERAL FIDUCIARY DUTY."
 8            A.   UH-HUH.
 9            Q.   IT SAYS THAT:
10                 "THE MANAGING MEMBERS SHALL BE
11                 UNDER A FIDUCIARY DUTY TO CONDUCT THE
12                 AFFAIRS OF THE COMPANY IN THE BEST
13                 INTEREST OF THE COMPANY AND OF THE
```

```
14              CLASS A MEMBERS, INCLUDING
15              SAFEKEEPING AND USE OF ALL COMPANY
16              FUNDS AND ASSETS, WHETHER OR NOT IN
17              THEIR POSSESSION OR CONTROL.
18                 "AND THE MANAGING MEMBERS SHALL
19              NOT EMPLOY OR PERMIT ANOTHER PARTY TO
20              EMPLOY SUCH FUNDS AND ASSETS IN ANY
21              MANNER EXCEPT FOR THE EXCLUSIVE
22              BENEFIT OF THE COMPANY."
23                 YOU -- DO YOU UNDERSTAND THE
24      CONCEPT OF A FIDUCIARY DUTY?
25              A.   I BELIEVE SO.
0525
1               Q.   AND AT ANY TIME DO YOU -- DID YOU
2       OR AT ALL TIMES SINCE YOU'VE BEEN THE MANAGER OF
3       DIAMANTE DEL MAR, YOU HAVE SAFE -- HAVE YOU
4       TRANSFERRED ANY OF THE ASSETS OUT OF THAT COMPANY?
5               A.   I DON'T BELIEVE SO.  I DON'T -- IF
6       YOU HAVE AN EXAMPLE, YOU CAN GIVE ME AN EXAMPLE.
7               Q.   WELL, HAVE YOU EVER -- IT SAYS, THE
8       LAST SENTENCE:
9                  "THE MANAGING MEMBER AND ITS
10              AFFILIATES SHALL NOT RECEIVE ANY
11              REMUNERATION FOR ANY SERVICES THEY
12              MAY PERFORM FOR THE COMPANY OTHER
13              THAN AS PERMITTED UNDER THIS
14              AGREEMENT."
15                 HAVE YOU EVER RECEIVED ANY PAYMENTS
16      FROM ANY OF YOUR OTHER ENTITIES THAT YOU OWN OR
17      CONTROL THAT ARE FOR SERVICES THAT AREN'T
18      PERMITTED IN THIS AGREEMENT?
19              A.   I DON'T BELIEVE SO.
20              Q.   HAVE YOU -- WITH RESPECT TO THE
21      SAFEGUARDING OF THE ASSETS OF THE COMPANY, HAVE
22      YOU EVER ENCUMBERED ANY OF THE ASSETS OF DIAMANTE
23      DEL MAR?
24              A.   IT HAS A LOAN ON IT, YES.
25              Q.   AND WHERE DID THE PROCEEDS FOR THAT
0526
1       LOAN GO?
2               A.   TO DIAMANTE DEL MAR.
3               Q.   AND WAS THAT -- WAS THAT A LOAN
4       THAT OCCURRED -- THAT'S A LOAN THAT OCCURRED
5       AFTER -- AFTER THE INITIAL PURCHASE; IS THAT
6       CORRECT?
7               A.   YES.
8               Q.   DID YOU -- WHAT BANK ACCOUNT DID
9       THE FUNDS GO INTO FOR THAT LOAN?
10              A.   DIAMANTE DEL MAR'S.
11              Q.   AND HOW DO YOU KNOW THAT?
```

```
12              A.   I DON'T -- I'M PRETTY CERTAIN IT
13     DID.  I KNOW.
14              Q.   NOW, IF YOU TURN TO PAGE 60, WHERE
15     IT SAYS, "BOOKS AND RECORDS," IT SAYS -- IT SAYS:
16              "THE BOOKS AND RECORDS OF
17              THE" -- IT SAYS, "THE BOOKS AND" --
18              IT SAYS, "THE MANAGING MEMBER SHALL
19              MAINTAIN COMPLETE AND ACCURATE BOOKS
20              AND RECORDS OF ALL MATTERS RELATED TO
21              THE COMPANY, INCLUDING, WITHOUT
22              LIMITATION, COPIES OF THE COMPANY'S
23              CERTIFICATE OF FORMATION, THIS
24              AGREEMENT, ALL AMENDMENTS TO EACH,
25              AND THE COMPANY'S STATE AND FEDERAL
0527
1               INCOME TAX RETURNS."
2                    AND THEN IT SAYS THAT UPON TEN
3      BUSINESS DAYS' NOTICE, THEY CAN HAVE ACCESS TO THE
4      BOOKS AND RECORDS AT ANY TIME.
5                    SO WHERE -- SINCE YOU'RE THE --
6      YOU'RE THE ONLY MANAGING MEMBER OF THIS COMPANY;
7      RIGHT?
8               A.   YES.
9               Q.   AND THEN I'LL REPRESENT TO YOU,
10     WHICH I'LL SHOW YOU, THAT IF YOU LOOK ON THE
11     SCREEN, YOU HAVE THE IDENTICAL -- THE IDENTICAL
12     CLAUSE.  AND THIS IS -- THIS IS THE IDENTICAL
13     CLAUSE FOR THE CABO SAN LUCAS AGREEMENT.
14              MS. CROWTHER:  WHAT WE SEE ON THE
15     SCREEN IS THE SAME -- OH, YOU'RE CHANGING.  OKAY.
16              MR. RICHARDS:  OH, NO.  THAT'S
17     DIAMANTE DEL MAR.  SORRY.
18              LET ME PULL THE -- ACTUALLY, THAT'S
19     THE SAME -- I'M SHOWING YOU THE SAME DOCUMENT.
20     BY MR. RICHARDS:
21              Q.   DO YOU -- WHERE -- WHERE IN THE
22     AGREEMENT DOES -- WHERE IN THE AGREEMENT DOES IT
23     REQUIRE PEOPLE TO GO TO DANBURY, CONNECTICUT, TO
24     LOOK AT THE BOOKS AND RECORDS?
25              MS. CROWTHER:  OBJECTION.  THE
0528
1      DOCUMENT SPEAKS FOR ITSELF.  CALLS FOR A LEGAL
2      CONCLUSION.
3      BY MR. RICHARDS:
4               Q.   OKAY.  WHERE DO YOU MAINTAIN -- YOU
5      DON'T HAVE AN OFFICE IN DANBURY, CONNECTICUT, DO
6      YOU?
7               A.   I HAVE A DESK THERE, YES.
8               Q.   AND HOW OFTEN HAVE YOU BEEN THERE
9      IN 2009, DID YOU GO TO DANBURY, CONNECTICUT?
```

```
10              A.   WELL, I'VE BEEN -- I DON'T KNOW HOW
11   MANY DAYS.
12              Q.   THAT MANY?  I MEAN WHY WOULD
13   ANYBODY GO TO DANBURY, CONNECTICUT, THAT MANY
14   TIMES?
15              A.   IT'S A BEAUTIFUL PLACE.
16              Q.   IS THAT WHERE YOU'RE FROM?
17              A.   YES, SIR.
18              Q.   SO IF YOU -- IF YOU HAD TO DO A
19   PERCENTAGE, HOW MUCH OF YOUR TIME DO YOU SPEND IN
20   DANBURY, CONNECTICUT?
21              A.   NOT VERY MUCH.
22              Q.   AND SO ARE YOU -- ARE YOU
23   TESTIFYING THAT COPIES OF BOOKS AND RECORDS ARE
24   NOT -- YOU DON'T HAVE ACCESS TO THEM IN CABO SAN
25   LUCAS IF YOU WANT TO SEE WHAT NUMBERS YOU'RE
0529
 1   DOING?
 2              A.   FOR WHAT PROJECT?
 3              Q.   FOR THE -- FOR THE CABO SAN LUCAS
 4   PROJECT.
 5              A.   A FULL SET OF RECORDS I BELIEVE IS
 6   IN DANBURY, CONNECTICUT.
 7              Q.   OKAY.  SO IF YOU WANTED TO ACCESS
 8   ALL OF YOUR BOOKS AND RECORDS, HOW WOULD YOU --
 9   HOW WOULD YOU PERSONALLY DO THAT?
10              LIKE, IF YOU -- LET'S SAY YOU, AS
11   THE MANAGER OF THE COMPANY, SAID, "LOOK, I WANT TO
12   SEE EXACTLY WHAT OUR EXPENSES WERE IN CABO SAN
13   LUCAS FOR 2009," WHAT WOULD YOU DO?
14              A.   I'D LOOK AT SEVERAL DIFFERENT
15   SPREADSHEETS, I BELIEVE.  IF I WANTED TO SEE WHAT
16   WE ACTUALLY SPENT, I'D LOOK AT A DRAW REQUEST.
17              Q.   AND WHERE WOULD YOU GET THE
18   SPREADSHEETS FROM?
19              A.   I'D CALL THE OFFICE IN CONNECTICUT
20   AND HAVE THEM E-MAIL IT TO ME OR -- THAT'S
21   BASICALLY WHAT I WOULD DO.
22              Q.   AND WHAT -- WHAT SOFTWARE WOULD THE
23   E-MAIL COME IN FOR YOU TO LOOK AT?  LIKE MICROSOFT
24   EXCEL?
25              A.   IF IT WAS A SPREADSHEET, YES.
0530
 1              Q.   OKAY.  SO THERE'S SOME -- SO IF
 2   SOMEONE MADE A REQUEST TO LOOK AT THE SPREADSHEET
 3   OF THE EXPENSES, THAT WOULD BE FAIRLY EASY FOR YOU
 4   TO ACCOMMODATE?
 5              A.   YES.
 6              Q.   HAS -- IN PREPARING THE DISCOVERY
 7   RESPONSES IN THIS CASE, HAS ANYBODY ASKED YOU TO
```

```
 8    PREPARE ANY ELECTRONIC RECORDS, LIKE IN THE FORM
 9    OF A SPREADSHEET?
10                 MS. CROWTHER:  OBJECTION.  AND I
11    INSTRUCT YOU NOT TO ANSWER TO THE EXTENT THAT
12    INSTRUCTION CAME FROM COUNSEL.
13                 IF SOMEBODY ELSE ASKED YOU TO DO
14    IT, YOU CAN GO AHEAD.
15    BY MR. RICHARDS:
16          Q.    IS THAT THE ONLY ONE THAT ASKED YOU
17    TO DO IT?
18                 MS. CROWTHER:  WELL, HE'S NOT
19    SUPPOSED TO DISCLOSE WHETHER I DID OR DIDN'T.  SO
20    IF THERE'S SOMEONE OTHER THAN COUNSEL, HE CAN GIVE
21    YOU THAT INFORMATION.
22    BY MR. RICHARDS:
23          Q.    OKAY.  WHERE -- ARE YOU AWARE OR
24    ARE NOT AWARE OF WHETHER OR NOT YOU MAINTAIN YOUR
25    BOOKS AND RECORDS IN ELECTRONIC FORMAT?  DO YOU
0531
 1    KNOW THE ANSWER TO THAT?
 2          A.    BY "ELECTRONIC FORMAT," DO YOU
 3    MEAN --
 4          Q.    LIKE IN MICROSOFT EXCEL OR
 5    QUICKBOOKS.
 6          A.    YES.
 7          Q.    YOU DO MAINTAIN THEM IN ELECTRONIC
 8    FORMAT?
 9          A.    YES.
10          Q.    OKAY.  YOU'RE FAMILIAR WITH HOW
11    THEY'RE MAINTAINED OR WHAT TYPE OF ELECTRONIC
12    FORMAT?
13          A.    I BELIEVE QUICKBOOKS.
14          Q.    OKAY.  AND DO YOU KNOW WHERE THAT
15    DATA -- THE DATA THAT IS USED TO BE PUT INTO THE
16    QUICKBOOKS PROGRAM, WHERE -- WHAT COMPUTER IS THAT
17    ENTERED INTO, IF YOU KNOW?  LIKE WHAT LOCATION?
18          A.    I BELIEVE IN CONNECTICUT.
19          Q.    OKAY.  ALL RIGHT.  I'M GOING TO --
20    I'M GOING TO SHOW YOU A BALANCE SHEET FOR DIAMANTE
21    DEL MAR.
22                 LET ME PUT THIS ON THE SCREEN.
23          (BRIEF PAUSE IN THE PROCEEDINGS.)
24    BY MR. RICHARDS:
25          Q.    ALL RIGHT.  THIS IS A BALANCE SHEET
0532
 1    THAT'S DATED -- THAT WAS PRINTED OUT ON 12-3-09,
 2    IN THE UPPER LEFT-HAND CORNER, AND IT'S JOWDY
 3    4896.
 4                 AND IF YOU GO DOWN TO THE BALANCE
 5    SHEET, THERE'S SOME NOTES -- THERE'S 4 MILLION
```

```
 6    DOLLARS IN PAYABLES OUTSTANDING, AND THERE'S ONE
 7    OF THEM THAT SAYS, "REMAINING PARCELS 1,350,000
 8    DOLLARS."
 9              DO YOU SEE THAT?
10         A.   YES.
11         Q.   OKAY.  WHY IS THERE STILL A BALANCE
12    OF -- FOR REMAINING PARCELS?
13         A.   AGAIN, AT THAT TIME, I TOLD YOU WE
14    HAD DIFFERENT CONTRACTS THAT WERE TO BE PURCHASED
15    AT DIFFERENT TIMES.  THERE'S STILL ONE PARCEL THAT
16    WE HAVEN'T YET PURCHASED.
17              SO WHEN YOU TALK ABOUT THE
18    PROPERTY, YOU HAVE TO SAY WHICH PART OF THE
19    PROPERTY.
20              IF I REPRESENTED THAT EVERYTHING --
21    AND EVEN BY SAYING "EVERYTHING," YOU HAVE TO
22    DEFINE WHAT "EVERYTHING" IS.
23              THERE'S STILL CONTRACTS THAT WE
24    HAVE THAT HAVEN'T BEEN COMPLETE.  SO I DON'T KNOW
25    WHAT THE TOTAL IS RIGHT NOW.  BUT THE DATE AND
0533
 1    TIME, DIFFERENT PROPERTIES WERE TAKEN FROM LEASE
 2    TO PURCHASE.
 3         Q.   ON YOUR BALANCE SHEET, AS OF THE
 4    THIRD QUARTER OF 2009, IT SAYS YOU OWE ONE MILLION
 5    THREE FIFTY?
 6         A.   CORRECT.
 7         Q.   WHAT'S THAT FOR?
 8         A.   PARCELS, I BELIEVE, THAT WE HAVE
 9    NOT TAKEN FROM LEASE TO PURCHASE AS OF THIS DATE.
10         Q.   SO -- SO THOSE PARCELS ARE -- WHAT
11    TYPE OF LEASE ARE THEY ON?
12         A.   BASICALLY, A 90-YEAR LEASE.
13         Q.   AND THEN YOU HAVE, "B DEVELOPMENT."
14              WHO'S THAT?
15         A.   BAJA DEVELOPMENT.
16         Q.   THAT'S YOU?  THEY OWE YOU 198,000?
17    OR D.D.M. OWES YOU 198,000?
18              MS. CROWTHER:  OBJECTION TO THE
19    TERM "YOU."
20    BY MR. RICHARDS:
21         Q.   OWES BAJA DEVELOPMENT 198,000?
22         A.   IF THAT'S WHAT IT SAYS.
23         Q.   AND THEN SAYS BAJA MANAGEMENT IS
24    OWED 662,000?
25         A.   OKAY.
0534
 1         Q.   WELL, DO YOU KNOW -- AND THEN
 2    THERE'S LEGAL TITLE.
 3              DO YOU KNOW WHAT THAT IS?
```

```
 4              A.   AGAIN, THAT'S, MOST LIKELY, ANOTHER
 5   PARCEL THAT NEEDS TO BE PURCHASED.  I DON'T KNOW
 6   FOR SURE.
 7              Q.   WHAT'S T.L.J. PAYABLES?
 8              A.   T.L.J. IS ANOTHER CORPORATION.
 9              Q.   AND WHO OWNS THAT?
10              A.   I DO.
11              Q.   AND WHY DID -- IS THAT TAFFY L.
12   JOWDY?
13              A.   NO.  IT'S MY FATHER'S NAME AND MY
14   MOTHER'S NAME.
15              Q.   AND WHAT IS THAT -- WHY ARE THEY
16   OWED 358,000?
17              A.   I'D HAVE TO LOOK AT THE BOOKS AND
18   RECORDS.  BUT OBVIOUSLY THEY HAD EXPENSES ON
19   BEHALF OF DIAMANTE DEL MAR.
20              Q.   DID YOU -- ARE THOSE EXPENSES
21   DOCUMENTED ANYWHERE?
22              A.   I'M SURE THEY ARE.
23              Q.   SO WHY DID THE 3 MILLION DOLLAR
24   K.S.I. LOAN AND THE 10 MILLION DOLLARS THAT KENNER
25   BROUGHT YOU DID YOU ACQUIRE FEES TITLE?
0535
 1              A.   KENNER BROUGHT ME -- EXPLAIN TO ME
 2   THE 10 MILLION DOLLARS THAT KENNER BROUGHT ME.
 3              Q.   WELL, BETWEEN THE WIRES FROM THE
 4   HAWAII COMPANIES AND THE -- AND THE -- THE MONEY
 5   THAT HE RAISED IN THE INITIAL INVESTMENT.
 6              A.   WHAT DID HE GIVE ME 10 MILLION
 7   DOLLARS FOR?
 8              Q.   I DON'T KNOW.  FOR YOU.
 9              A.   WELL, JUST DEFINE THE 10 MILLION
10   DOLLARS, AND I'LL TELL YOU SPECIFICALLY WHAT EACH
11   DOLLAR AMOUNT WENT FOR, WHETHER IT WAS A LOAN,
12   WHETHER IT WAS AN INVESTMENT, WHAT TIME IT CAME
13   AND WHAT IT WAS FOR.
14              Q.   WELL, WE CAN'T -- WE WANTED YOU TO
15   DEFINE IT.  YOU SAID THEY WERE MOSTLY LOANS WITH
16   NO REPAYMENT DATE WAS THE TESTIMONY.  SO I DON'T
17   KNOW.
18                   THERE'S NO RECORD.  YOU DON'T HAVE
19   THE LEDGER AS TO WHAT -- HOW YOU ALLOCATED IT.
20              A.   IF HE GAVE BAJA DEVELOPMENT A LOAN,
21   THEN BAJA DEVELOPMENT DIDN'T HAVE AN OBLIGATION TO
22   BUY ANYTHING, APPARENTLY.
23              Q.   I'M JUST -- WHAT WAS THE TOTAL --
24   YOUR -- YOU -- WHAT IS YOUR UNDERSTANDING OF HOW
25   MUCH YOU RAISED WITH -- BETWEEN -- WHEN THIS
0536
 1   INITIAL -- FROM THE INITIAL ROUND?
```

```
 2              A.   I BELIEVE THAT IT WAS APPROXIMATELY
 3    7 MILLION DOLLARS.
 4              Q.   AND YOU'RE SAYING IT WAS 7 MILLION.
 5    EVEN TODAY, THERE'S STILL 2 MILLION DOLLARS OF FEE
 6    TITLE THAT STILL NEEDS TO BE PAID?
 7              A.   YES.
 8              Q.   AND HOW COME BAJA DEVELOPMENT CORP.
 9    DIDN'T PAY SOMETHING OUT OF THE 2.75 MILLION THEY
10    RECEIVED?
11              A.   I HAVE NO IDEA WHAT YOU'RE TALKING
12    ABOUT.
13              Q.   HOW MUCH DID BAJA DEVELOPMENT CORP.
14    RECEIVE OUT OF THAT MONEY?
15              A.   I DON'T KNOW.
16              Q.   DO YOU HAVE ANY IDEA?
17              A.   OUT OF WHAT MONEY?
18              MS. CROWTHER:  YEAH.
19    BY MR. RICHARDS:
20              Q.   OUT OF THE INITIAL MONEY THAT
21    D.B.M. RAISED.
22              A.   NOTHING.
23              Q.   WHAT ABOUT THE MONEY IT RECEIVED
24    FROM KENNER ENTITIES?
25              A.   OKAY.
0537
 1              Q.   WHAT DID IT DO WITH THAT MONEY?
 2              MS. CROWTHER:  OBJECTION.
 3    COMPOUND.
 4    BY MR. RICHARDS:
 5              Q.   OR DID IT SPEND ANY OF THAT MONEY
 6    ON DIAMANTE DEL MAR?
 7              A.   I DON'T KNOW.
 8              Q.   SO NOW, IT SHOWS THAT IN THE BANK
 9    PRESENTLY IS 22 DOLLARS AND 36 CENTS.
10              IS THAT ACCURATE?
11              A.   I DON'T KNOW.
12              Q.   WELL, WHAT ASSETS DOES DIAMANTE DEL
13    MAR HAVE BESIDES THE LAND, IF YOU KNOW?
14              A.   BASICALLY, THE LAND.
15              Q.   AND IT SHOWS THAT -- THAT THERE'S A
16    LOAN FROM BAJA DEVELOPMENT CORP. FOR 2,189,000.
17              DO YOU SEE THAT?  A PAYABLE.
18              A.   YES.
19              Q.   AND WHY DID BAJA DEVELOPMENT
20    LOAN -- OR ISN'T IT TRUE THAT BAJA DEVELOPMENT
21    GAVE DIAMANTE DEL MAR SOME OF THE MONEY THAT THE
22    HAWAII ENTITIES SENT TO BAJA DEVELOPMENT CORP.,
23    AND THAT'S WHY THERE'S A LOAN PAYABLE ON THE
24    BALANCE SHEET OF D.D.M.?
25              A.   I WOULD SAY A MAJORITY OF THAT
```

0538
1    MONEY WAS THE INITIAL MONEY THAT WAS RAISED
2    THROUGH BAJA MANAGEMENT AND BAJA DEVELOPMENT.
3                   IF YOU LOOK AT 2002, WHEN MOST OF
4    THAT MONEY CAME IN, THAT'S -- MORE THAN HALF OF
5    THAT MONEY WAS IN 2002, WHICH WOULD HAVE BEEN --
6    PREDATED THE -- ANY MONEY FROM LITTLE ISLE 4 AND
7    ULA MAKIKA.
8              Q.   AND THEN IT SAYS MONEY IS OWED --
9    1.1 MILLION IS OWED TO LEGACY PROPERTIES.
10             A.   OKAY.
11             Q.   SO -- AND IN 2000 -- IT SAYS LEGACY
12   PROPERTIES SPENT CLOSE TO A MILLION DOLLARS OR
13   GAVE CLOSE TO A MILLION DOLLARS TO D.D.M. IN 2008
14   AND 2009?
15             A.   OKAY.
16             Q.   SO WHERE DID LEGACY PROPERTIES GET
17   THE MONEY FROM?
18             A.   FEES FROM -- DEVELOPER FEES FROM
19   PROJECTS THAT IT WAS INVOLVED IN.
20             Q.   THESE WERE -- THESE WERE PROJECTS
21   THAT WERE NOT THE MEXICAN PROJECTS?
22             A.   NO.
23             Q.   THESE ARE OTHER PROJECTS?
24             A.   YES.
25             Q.   SO HOW DID LEGACY PROPERTIES
0539
1    DETERMINE THAT IT NEEDED TO PROVIDE LOANS TO
2    DIAMANTE DEL MAR?
3              A.   I'M THE MANAGING MEMBER OF LEGACY
4    PROPERTIES.
5              Q.   WHAT ARE -- IF YOU LOOK AT THE
6    BALANCE SHEET, IT HAS A LOAN PAYABLE OF 795,000 TO
7    LITTLE ISLE.
8              A.   YES.
9              Q.   OKAY.  SO DO YOU AGREE THAT YOU AT
10   LEAST RECEIVED 800,000 DOLLARS FROM LITTLE ISLE?
11             A.   700 -- THAT SAYS 795,000.
12             Q.   YEAH.  SO WAS THERE ANY INTEREST
13   ACCRUING?
14             A.   NOT THAT I KNOW OF.
15             Q.   WHAT ABOUT ON THE LEGACY PROPERTIES
16   LOANS PAYABLE, WHAT'S THE INTEREST RATE OF THAT?
17             A.   THERE'S NO SET INTEREST RATE.
18             Q.   SO YOU'RE -- SO DIAMANTE DEL MAR
19   WAS ABLE TO BORROW MONEY FOR FREE, IS THAT WHAT
20   YOUR TESTIMONY IS?
21             A.   I'M SAYING THERE'S NO SET INTEREST
22   RATE.
23             Q.   WELL, WHAT IS THE INTEREST RATE IF

24    IT'S NOT SET?
25            A.    THERE'S NO SET INTEREST RATE.
0540
 1            Q.    ALL RIGHT.  YOU -- IF YOU TAKE --
 2    WHEN DID THE 3 MILLION DOLLAR K.S.I. LOAN CLOSE?
 3            A.    I BELIEVE FEBRUARY OF '06.
 4            Q.    AND IS IT YOUR TESTIMONY THAT BY
 5    FEBRUARY OF '06 -- WHERE ON THE -- WELL, LET ME
 6    STRIKE THAT.
 7                  WHERE ON THE -- DO YOU DOCUMENT ON
 8    D.D.M.'S BOOKS HOW THE MONEY WAS SPENT?
 9            A.    I DON'T KNOW.
10            Q.    ARE YOU AWARE THAT YOUR BANK
11    RECORDS FOR FEBRUARY '06 THAT YOU PROVIDED ONLY
12    SHOW 500,000 DOLLARS IN THE BANK AND DON'T SHOW AN
13    INCOMING WIRE FOR 3 MILLION DOLLARS?
14            A.    IT WOULDN'T BE A WIRE FOR 3 MILLION
15    DOLLARS, BUT I KNOW IT WENT INTO THAT ACCOUNT.
16                  I DIDN'T SEE WHICH ACCOUNT IT WENT
17    INTO.  I BELIEVE -- I BELIEVE -- I KNOW IT WENT
18    INTO THE DIAMANTE DEL MAR ACCOUNT, SO I CAN FIND
19    OUT WHAT YOU HAVE.
20            Q.    I HAVE BANK STATEMENTS FROM HUDSON,
21    UNITED BANK AND TD BANK OF NORTH -- TD BANK.
22            A.    I'M SURE IT WENT TO A DIAMANTE -- A
23    DIAMANTE DEL MAR ACCOUNT.
24            Q.    DO YOU THINK -- DO YOU BELIEVE THAT
25    IN YOUR EXECUTIVE SUMMARY OR IN YOUR OFFERING
0541
 1    MEMORANDUM, IT IMPLIES IN ANY WAY THAT AFTER YOU
 2    RECEIVED 7,150,000 DOLLARS IN CAPITAL, THAT THE
 3    ENTITY IS NOT GOING TO HAVE FEE SIMPLE TO ALL THE
 4    LAND REPRESENTED IN THE PLACEMENT?
 5                  MS. CROWTHER:  OBJECTION.  THE
 6    DOCUMENT SPEAKS FOR THEMSELVES.  AND IT CALLS FOR
 7    SPECULATION.
 8                  THE DEPONENT:  I BELIEVE IF WE WENT
 9    THROUGH THE DOCUMENT, IT WOULD PROVIDE FOR THAT,
10    YES.
11    BY MR. RICHARDS:
12            Q.    I'M GOING TO SWITCH OVER TO THE
13    GENERAL LEDGER.
14                  ALL RIGHT.  I'M GOING TO SHOW YOU
15    THE GENERAL LEDGER.  OKAY.  THIS IS THE GENERAL
16    LEDGER.  I'M GOING TO -- THIS IS YOUR GENERAL
17    LEDGER.
18                  AND IF WE -- IF WE SCROLL DOWN
19    TO -- IF WE SCROLL DOWN TO FEBRUARY OF '02, IT
20    SHOULD HAVE -- IT SHOULD HAVE A -- YOUR GENERAL
21    LEDGER STOPS -- WHEN DID YOU SAY YOU GOT THE LOAN,

```
22   IN FEBRUARY OF '03?
23             A.   '06.
24             Q.   FEBRUARY '06.  OKAY.  SO HOLD ON.
25   SORRY.
0542
 1                 OKAY.  SO IF WE GO DOWN TO FEBRUARY
 2   OF '06, WE SHOULD SEE A 3 MILLION DOLLAR CREDIT
 3   SOMEWHERE.  SO THIS MUST BE THE MORTGAGE
 4   PROCEEDS --
 5             A.   THAT'S THE BALANCE.
 6             Q.   WHAT -- WHAT -- TELL ME WHAT WAS
 7   THE -- WHAT WAS THE -- THIS IS FROM WEITZ,
 8   GOLDMAN & LOEHMAN?
 9             A.   YES.
10             Q.   OKAY.  NOW, TELL ME -- EXPLAIN TO
11   ME --
12                 MS. CROWTHER:  FOR THE RECORD, CAN
13   YOU SAY WHICH BATES PAGE.
14                 MR. RICHARDS:  YEAH.  4953.
15   BY MR. RICHARDS:
16             Q.   WHY, IF YOU GOT A 3 MILLION DOLLAR
17   LOAN, DID YOU PAY 850,000 IN POINTS?
18             A.   IT WAS TWO HUNDRED -- 2 MILLION
19   8-5, I BELIEVE.  I BELIEVE THERE WAS A
20   RESERVE FOR POSSIBLY DOING SOMETHING IN THE
21   FUTURE.  SO IT WASN'T TECHNICALLY 3 MILLION.
22                 IT'S NOT TECHNICALLY 3 MILLION.
23   THAT'S THE PRINCIPAL.  SO THAT WAS LESS.
24                 THERE WERE POINTS.  I DON'T KNOW
25   WHAT THE POINTS WERE.  AND THERE WERE, I BELIEVE,
0543
 1   EITHER SIX OR NINE MONTHS OF PREPAID INTEREST.
 2   BALANCE BEING WHAT YOU SEE THERE.
 3             Q.   OKAY.  AND THEN WHEN THAT LOAN CAME
 4   IN, THERE WAS -- THERE'S A PAYMENT TO T.L.J. FOR
 5   25,000 DOLLARS.
 6             A.   OKAY.
 7             Q.   NOW, IT SAYS, FOR MANAGEMENT."
 8   WHAT EXACTLY IS THAT FEE FOR?
 9             A.   WELL, AS YOU SAW ON THE BALANCE
10   SHEET, T.L.J. HAD INCURRED EXPENSES.  AND THAT WAS
11   A PARTIAL REPAYMENT.
12             Q.   THAT'S A COMPANY OWNED BY YOU?
13             A.   YES.
14             Q.   AND THEN IT SAYS -- IF YOU GO --
15   LET ME JUST STAY HERE.  I DON'T THINK I NEED
16   THESE.
17                 THERE'S -- IF WE GO DOWN -- IF I GO
18   DOWN THE LIST -- I'LL ENLARGE IT IN A MINUTE.
19   IT'S JUST EASIER TO READ HERE.
```

20            YOU -- YOU HAVE A -- YOU HAVE A
21    25,000 DOLLAR CREDIT TO T.L.J. MANAGEMENT, AND
22    THEN YOU TRANSFERRED 500,000 DOLLARS TO -- IS
23    THIS -- IS THIS -- IS THIS ANOTHER DIAMANTE
24    ACCOUNT?
25            A.   IT'S A DIAMANTE DEL MAR MONEY
0544
1    MARKET ACCOUNT, I BELIEVE.
2            Q.   OKAY.  AND THEN YOU -- THE BALANCE
3    SHEET STARTS TO -- YOU GO DOWN THE -- YOU GO DOWN
4    THE BALANCE SHEET, AND YOU SPEND 48,000 DOLLARS TO
5    EDWARD ESSA.
6            AND IT SAYS:
7            "EXPENSES JULY '06 TO DECEMBER
8            AND THEN NOVEMBER 4TH TO D.C.L.'S
9            CLOSE."
10            WHY -- WHY IS -- WHY IS HE GETTING
11    PAID 48,000 DOLLARS?
12            A.   IT SAYS HE INCURRED EXPENSES, SO WE
13    WERE OBVIOUSLY REIMBURSING HIM FOR EXPENSES.
14            Q.   BUT FOR -- FOR -- FOR WHAT?
15            A.   I DON'T KNOW.
16            Q.   RELATED TO THIS -- IT SEEMS LIKE
17    IT'S RELATED TO CABO SAN LUCAS.
18            A.   NO.
19            Q.   WHAT'S IT -- DO YOU KNOW WHAT THE
20    EXPENSES ARE?
21            A.   I DON'T NOW WHAT THE EXPENSES ARE.
22            Q.   ALL RIGHT.  AND THEN IT SAYS, "BAJA
23    DEVELOPMENT PAYABLE."
24            IS THAT -- THAT'S -- WHO -- WHERE
25    DOES THAT MONEY GO TO?
0545
1            A.   APPARENTLY BAJA DEVELOPMENT.
2            Q.   THEN LOR MANAGEMENT -- NOW, REMIND
3    YOU, WE'RE IN '06 -- GETS PAID 457,000 DOLLARS FOR
4    LAND.
5            WHAT LAND IS LOR MANAGEMENT BUYING?
6            A.   NO.  LOR MANAGEMENT IS THE ONE THAT
7    HAS THE LEASEHOLD, SO IT WOULDN'T MAKE SENSE THAT
8    THAT IT COULD HAVE BEEN FOR A PURCHASE.  BUT I
9    BELIEVE THAT WAS FOR THE AIRSTRIP CONTRACTOR.
10            Q.   SO BY THIS TIME HE STILL HADN'T
11    BEEN PAID?
12            A.   NOT IN ITS -- NOT IN ENTIRETY.
13    HE'D BEEN MAKING -- HE'D BEEN MAKING PAYMENTS THAT
14    FINISHED IT.
15            Q.   ALL RIGHT.  SO WITHIN -- WITHIN ONE
16    MONTH OF -- OF RECEIVING THE 2 MILLION DOLLARS,
17    THE GENERAL LEDGER ON THIS ACCOUNT GOES TO -- GOES

```
18   TO ABOUT 22,000 DOLLARS.
19           A.   OKAY.
20           Q.   AND SO AT WHAT POINT -- AT WHAT
21   POINT WERE YOU GOING TO DISCLOSE TO THE INVESTORS
22   IN THIS COMPANY THAT YOU WERE OUT OF MONEY?
23           A.   PHIL KENNER WAS AWARE OF THE
24   SITUATION.
25           Q.   AND WHAT DO YOU BASE THAT ON?
0546
1            A.   CONVERSATIONS WITH PHIL KENNER.
2            Q.   WHY IS THE COMPANY, WHEN IT'S
3    RUNNING OUT OF MONEY, PAYING BAJA DEVELOPMENT
4    CORP. -- AND IF YOU GO BACK TO ADD THESE UP --
5    OVER 300,000 DOLLARS TOWARDS THEIR LOANS?  AFTER
6    IT GETS MORE BORROWED MONEY, WHY IS IT PAYING BAJA
7    DEVELOPMENT CORP.?
8            A.   I BELIEVE THAT IT WAS ENTITLED TO
9    DO THAT.  AND BAJA DEVELOPMENT DID EVERYTHING IT
10   COULD TO KEEP THE COMPANY RUNNING.
11               AND I BELIEVE THAT WHATEVER ACTIONS
12   ARE ON HERE ARE -- ARE ACCOUNTED FOR IN THE
13   OFFERING MEMORANDUM AND THE OPERATING AGREEMENTS.
14           Q.   WELL, DID IT EVER OCCUR TO YOU --
15   WELL, WHO -- WHO OWNS THE -- WHO DOES THE -- WHO'S
16   THE -- WHO'S THE PERCENTAGE OWNERS OF BAJA
17   DEVELOPMENT CORP.?
18               MS. CROWTHER:  OKAY.  HOW MANY
19   TIMES ARE YOU GOING TO ASK?
20   BY MR. RICHARDS:
21           Q.   OKAY.  WHO BENEFITED THE MOST FOR
22   PAYING THE LOANS PAYABLE FOR BAJA DEVELOPMENT
23   CORP.?
24               MS. CROWTHER:  OBJECTION.
25   ARGUMENTATIVE AND CALLS FOR A CONCLUSION.
0547
1    BY MR. RICHARDS:
2            Q.   WELL, DID YOU EVER CONSIDER NOT
3    MAKING A PREFERENTIAL PAYMENT TO BAJA DEVELOPMENT
4    CORP. TO TAKE THE CASH OUT OF THE COMPANY?
5                MS. CROWTHER:  OBJECTION TO THE
6    TERM "PREFERENTIAL."
7                THE DEPONENT:  I BELIEVE IF WE WENT
8    THROUGH THE DOCUMENTS, IT WOULD TELL YOU WHAT I
9    COULD AND COULDN'T DO.
10   BY MR. RICHARDS:
11           Q.   BUT YOU HAVE A -- YOU AGREE THAT
12   YOU HAVE A FIDUCIARY DUTY TO THE INVESTORS --
13               MS. CROWTHER:  OBJECTION.  CALLS
14   FOR A LEGAL CONCLUSION.
15   BY MR. RICHARDS:
```

16          Q.   -- IN THIS -- IN THIS COMPANY.
17               SO I'M JUST -- WHY DIDN'T IT OCCUR
18   TO YOU NOT TO PAY A COMPANY THAT YOU OWNED
19   THESE -- THESE -- THESE LOANS PAYABLE AND PAY
20   OTHER EXPENSES OF THE -- OF THE COMPANY IN ORDER
21   TO PREVENT THE COMPANY FROM RUNNING OUT OF MONEY?
22          A.   I BELIEVE I ACTED RESPONSIBLY
23   ACCORDING TO WHAT THE DOCUMENTS SHOW.
24          Q.   WELL, I'M NOT ASKING YOU IF YOU
25   ACTED ACCORDING TO THE LETTER OF THE DOCUMENTS.
0548
1                BUT I'M JUST ASKING:  DO YOU THINK
2    THAT YOU ACTED IN THE BEST INTEREST OF THE COMPANY
3    BY PAYING BAJA DEVELOPMENT BEFORE YOU PAID THE
4    EXPENSES OF THE COMPANY?
5                THAT'S MY QUESTION.
6          A.   I BELIEVE I'VE ACTED IN THE BEST
7    INTEREST OF THE COMPANY.
8          Q.   BY PAYING BAJA DEVELOPMENT?
9          A.   YOU ASKED ME IF I BELIEVE I'VE
10   ACTED IN THE BEST INTEREST OF THE COMPANY.
11         Q.   WELL, HOW DID -- HOW DID DIAMANTE
12   DEL MAR BENEFIT BY YOU TRANSFERRING 400,000
13   DOLLARS TO BAJA DEVELOPMENT TO PAY THEIR LOAN
14   NOTES PAYABLE?
15         A.   SAME WAY IT BENEFITED WHEN THE
16   MONEY WENT TO DIAMANTE DEL MAR.
17         Q.   DO YOU THINK THAT THE COMPANY WOULD
18   BENEFIT IF THAT MONEY WAS RETURNED IN ORDER TO
19   SERVICE THE EXISTING DEFAULT SO THE COMPANY
20   DOESN'T LOSE THE LAND ENTIRELY?
21         A.   WHAT DO YOU MEAN, "RETURNED"?
22         Q.   WELL, IF BAJA DEVELOPMENT CORP. DID
23   NOT HAVE -- DID NOT RECEIVE PAYMENTS ON ITS -- ON
24   ITS LOANS PAYABLE, IT WOULD BE ABLE TO SERVICE
25   THIS DEBT FOR A LOT MORE -- A LOT LONGER BECAUSE
0549
1    IT WOULD THEN HAVE CASH IN THE BANK.
2                MS. CROWTHER:  OBJECTION.  CALLS
3    FOR SPECULATION.
4                THE DEPONENT:  WHAT DO YOU WANT ME
5    TO SAY?
6    BY MR. RICHARDS:
7          Q.   WELL, WHAT -- I'M ASKING YOU.  IT
8    JUST SEEMS TO ME THAT YOU BORROWED -- YOU BORROWED
9    MONEY -- I MEAN, YOU CAN'T -- YOU'RE A PRETTY
10   SMART GUY, SO LET'S NOT, LIKE, BEAT AROUND THE
11   BUSH.
12               YOU BORROWED MONEY FROM A COMPANY
13   WHICH ENCUMBERED LAND WHICH WAS FREE AND CLEAR;

```
14    TRUE OR FALSE?
15              A.   TRUE.
16              Q.   AND THEN WHEN THE MONEY CAME IN,
17    INSTEAD OF KEEPING IT IN THE COMPANY TO SERVICE
18    THE DEBT, YOU SIMPLY PAID YOUR OTHER COMPANY THE
19    MONEY THAT WAS BORROWED USING THE ASSET OF
20    DIAMANTE DEL MAR.
21              IS THAT TRUE OR FALSE?
22              A.   I WAS REPAYING A LOAN.  THAT'S
23    TRUE.
24              Q.   SO IS THAT -- IS THAT -- IS THAT
25    BETTER THAT THE COMPANY THAT YOU OWN -- IS IT
0550
 1    BETTER FOR DIAMANTE DEL MAR -- I'M JUST ASKING YOU
 2    A SIMPLE QUESTION.  IT'S A VERY SIMPLE QUESTION.
 3              IS IT BETTER FOR DIAMANTE DEL MAR
 4    TO HAVE THAT MONEY THAT WENT TO BAJA DEVELOPMENT
 5    IN THEIR BANK ACCOUNT OR BAJA DEVELOPMENT'S BANK
 6    ACCOUNT?
 7              MS. CROWTHER:  OBJECTION.  CALLS
 8    FOR AN OPINION.  ARGUMENTATIVE.
 9              THE DEPONENT:  IT'S NOT A SIMPLE
10    QUESTION.
11    BY MR. RICHARDS:
12              Q.   OKAY.  WELL, IT'S A SIMPLE -- THEN
13    GIVE ME A COMPLICATED ANSWER.
14              A.   DEPENDING IF IT -- IF -- UNDER THE
15    CIRCUMSTANCES OF WHICH BAJA DEVELOPMENT LOANED THE
16    MONEY AND NEEDED THE MONEY, IT'S NOT A "YES" OR
17    "NO" ANSWER.
18              BUT I DID WHAT I WAS ALLOWED TO DO.
19              Q.   BUT YOU ALSO HAD -- CLEARLY, YOU
20    HAD KENNER ON THERE -- YOU HAD KENNER'S COMPANIES
21    ON THERE AS A 795,000 DOLLAR NOTE PAYABLE; ISN'T
22    THAT TRUE?
23              A.   YES.
24              Q.   SO WHY DIDN'T KENNER'S COMPANY GET
25    PAID BEFORE BAJA DEVELOPMENT?
0551
 1              A.   HE WAS STILL THE ONE THAT WAS
 2    ACTUALLY FUNDING THE PROJECTS.  HE WAS HELPING
 3    FUND THE PROJECTS AT THE TIME.  HE WAS CONTINUING
 4    TO HELP FUND THE PROJECTS.  WHEN THAT -- WHEN THAT
 5    MONEY CAME IN IS NOT CLEAR TO ME.
 6              Q.   WHEN WHAT MONEY CAME IN?
 7              A.   WHEN THE LITTLE ISLE MONEY CAME IN.
 8              PHIL WAS HELPING TO FUND THE
 9    PROJECTS.
10              Q.   WELL, WE SEE -- OKAY.
11              WHEN THE LITTLE ISLE MONEY CAME IN
```

```
12    IS EASY TO DETERMINE IF YOUR GENERAL LEDGER IS
13    ACCURATE.  THE -- IT WOULD COME IN AS A DEBIT
14    BECAUSE NOT A LOT OF MONEY COMES IN AFTER THAT --
15    AFTER THAT LOAN.
16                   WELL, YOU HAD -- THAT MONEY CAME IN
17    IN NOVEMBER OF '04.  LET ME ...
18                   YEAH, I KNOW.
19                   ALL RIGHT.  LET'S SEE HERE.  OKAY.
20    HERE IT IS.
21                   MONEY CAME IN RIGHT HERE, IF YOU
22    CAN SEE.  THERE'S JUST -- FOR EXAMPLE, ON 1-18-05,
23    250,000 DOLLARS.
24            A.   OKAY.
25            Q.   SO THAT -- WHAT I'M TRYING TO
0552
 1    FIGURE OUT IS WHY DID YOU PAY YOURSELF BEFORE YOU
 2    PAID YOUR OTHER LENDERS?
 3            A.   I DON'T KNOW WHAT THE CIRCUMSTANCES
 4    WERE.  I KNOW THAT I WAS ALLOWED TO.
 5            Q.   YOU SAID THAT PROBABLY 20 TIMES,
 6    BUT I'M ASKING:  IS THERE A REASON WHY YOU PAID
 7    YOURSELF BEFORE EVERYBODY ELSE?
 8            A.   I SAID I DON'T KNOW WHAT THE
 9    CIRCUMSTANCES WERE.
10            Q.   DO YOU THINK THAT THAT WAS IN THE
11    BEST BUSINESS JUDGMENT OF DIAMANTE DEL MAR, TO PAY
12    ANY LENDER, NOT YOU OR MR. KENNER, PRIOR TO
13    KEEPING THE EXISTING OPERATIONS OPEN?
14            A.   APPARENTLY AT THE TIME I DID.
15            Q.   AND WHAT WAS YOUR THINKING AT THE
16    TIME YOU DRAINED THE CASH OUT OF THE COMPANY?
17            A.   I DON'T KNOW.
18            Q.   HAS ANYBODY TOLD YOU IN THE PAST
19    THAT TAKING ALL THE MONEY OUT OF THE CORPORATE
20    BANK ACCOUNT IS A GOOD THING FOR THE COMPANY?
21                   MS. CROWTHER:  OBJECTION.
22                   MR. RICHARDS:  I'LL WITHDRAW THE
23    QUESTION.
24    BY MR. RICHARDS:
25            Q.   DID YOU RELY ON ANY ADVICE TO PAY
0553
 1    YOURSELF BEFORE YOU PAID MR. KENNER?
 2            A.   I DIDN'T PAY MYSELF.  I PAID BAJA
 3    DEVELOPMENT.  AND, NO.
 4            Q.   BUT IT'S A COMPANY THAT YOU CONTROL
 5    AND OWN EXCLUSIVELY.
 6                   MS. CROWTHER:  WE'VE BEEN THROUGH
 7    THIS SO MANY TIMES.
 8                   (SPEAKING SIMULTANEOUSLY.)
 9    BY MR. RICHARDS:
```

```
10              Q.   ON -- YOU -- RAYMOND MURRAY PAID
11    YOU 500 AND -- 400 -- 500,000 DOLLARS -- THAT'S
12    THE WIRE -- ON 3-29-05.
13              WHAT WAS THAT FOR?
14              A.   I BELIEVE HE SIGNED THE
15    SUBSCRIPTION AGREEMENT.
16              Q.   NOW, IF WE TAKE A LOOK -- IF YOU GO
17    BACK AND TAKE A LOOK AT THE SUBSCRIPTION
18    AGREEMENT -- I MEAN THE OPERATING AGREEMENT -- I
19    THINK I GAVE YOU A COPY IN FRONT OF YOU.
20              WOULD YOU TAKE A LOOK AT SECTION
21    205.
22              A.   WHAT PAGE?
23              Q.   47.  ACTUALLY -- ACTUALLY, LET'S --
24    LET'S -- ACTUALLY 207, COMPANY EXPENSES.
25              DO YOU BELIEVE YOU COMPLIED WITH
0554
 1    SECTION 207?
 2              (DOCUMENT REVIEWED BY THE DEPONENT.)
 3    BY MR. RICHARDS:
 4              Q.   HERE.  LET ME -- LET ME HELP YOU
 5    OUT.
 6              YOUR DUTIES ARE DEFINED, IF YOU
 7    TAKE A LOOK AT PAGE 57 --
 8              A.   47?
 9              Q.   57.  PARAGRAPH J IN SECTION 401.
10    IT SAYS THAT AS PART OF YOUR MANAGEMENT, YOU CAN
11    INCUR REASONABLE EXPENDITURES FOR THE CONDUCT OF
12    THE COMPANY'S BUSINESS AND PAY ALL EXPENSES, DEBTS
13    AND OBLIGATIONS OF THE COMPANY.
14              AND THEN 402 SAYS THAT -- SECTION
15    402, THE NEXT PAGE.
16              NOW, LET ME -- LET ME JUST ASK YOU
17    THIS.  OKAY.  BECAUSE THIS IS A VERY IMPORTANT
18    QUESTION.
19              SECTION 402, SUBSECTION E.
20              DO YOU SEE WHERE I'M AT?
21              A.   UH-HUH.
22              Q.   OKAY.  IT SAYS YOU NEED A
23    MAJORITY -- YOU NEED A -- YOU NEED A CONSENT OF
24    THE MAJORITY IN INTEREST OF THE CLASS A MEMBERS TO
25    DO -- PARAGRAPH E:
0555
 1              "TO DO ANY ACT WHICH MAKES IT
 2              IMPOSSIBLE TO CARRY OUT THE ORDINARY
 3              BUSINESS OF THE COMPANY."
 4              NOW, PRIOR TO YOU TAKING THE REST
 5    OF THE MONEY OUT OF THE D.D.M. OPERATING ACCOUNT
 6    TO PAY YOURSELF, HOW DID YOU THINK THAT THAT
 7    WOULDN'T MAKE IT IMPOSSIBLE -- LET ME STRIKE THAT.
```

```
 8                    PRIOR TO YOU TRANSFERRING THE MONEY
 9    TO BAJA DEVELOPMENT CORPORATION, WHICH BROUGHT THE
10    ACCOUNT TO ZERO, DID YOU -- DID YOU CONSIDER
11    PARAGRAPH E OF SECTION 402?
12              MS. CROWTHER:  OBJECTION.
13    MISSTATES THE EVIDENCE.
14              (DOCUMENT REVIEWED BY THE DEPONENT.)
15              THE DEPONENT:  DID I CONSIDER THAT
16    EXACT -- I DON'T THINK I MADE IT IMPOSSIBLE TO
17    CARRY OUT THE ORDINARY BUSINESS THAT THE COMPANY
18    WAS DOING AT THE TIME.
19    BY MR. RICHARDS:
20         Q.   AND WHY IS THAT?
21         A.   IT'S STILL DOING THE SAME THING
22    TODAY.
23         Q.   WHICH IS NOTHING?
24         A.   WHICH IS PAYING CERTAIN PEOPLE
25    THERE AND BASICALLY TRYING TO BE IN A POSITION TO
0556
 1    FURTHER THE DEVELOPMENT AT SOME TIME IN THE
 2    FUTURE.
 3         Q.   BUT TODAY YOU -- THE COMPANY YOU
 4    SAID TODAY, YOU TESTIFIED -- YOU SAID IT'S IN
 5    ARREAR -- DO YOU KNOW MUCH -- HOW MANY MONTHS
 6    ARREARAGES IT IS IS ON THAT NOTE?
 7         A.   NOT EXACTLY, NO.
 8         Q.   IS IT -- IS IT CONCERNING TO YOU
 9    THAT AS THE MANAGING MEMBER OF THE COMPANY, YOU
10    DON'T KNOW HOW MANY MONTHS YOU'RE IN DEFAULT?
11         A.   I BELIEVE IT'S THREE TO FOUR
12    MONTHS.
13         Q.   AND DO YOU -- DO YOU KNOW IF
14    THEY'RE GOING TO -- WHAT THE LAWS ARE IN MEXICO
15    RELATED TO HOW LONG IT TAKES THEM TO -- TO
16    FORECLOSE ON TITLE?
17         A.   WE'RE NEGOTIATING WITH THEM.
18         Q.   AND DO YOU KNOW WHEN THEY'RE --
19    WHEN -- WHEN THE DEADLINE IS FOR THEM TO ELECT TO
20    FORECLOSE IF THEY WANT?
21         A.   THERE'S NO DEADLINE RIGHT NOW.
22         Q.   AND HOW DO YOU KNOW THAT?
23         A.   THROUGH THE NEGOTIATIONS.  I DON'T
24    BELIEVE THERE IS.  I'M NOT A LAWYER.
25         Q.   RIGHT.  WELL, I KNOW.  BUT YOU --
0557
 1    MOST PEOPLE KNOW WHEN AND IF THEY COULD LOSE, YOU
 2    KNOW, MILLIONS OF DOLLARS' WORTH OF LAND.  SO I'M
 3    JUST TRYING TO FIGURE OUT --
 4         A.   WELL, YOU ASKED ME -- YOU ASKED
 5    ME -- I SAID THERE'S NO DEADLINE.  YOU ASKED ME
```

```
 6    HOW DO I KNOW THAT, AND I SAID THAT'S WHAT I'M
 7    TOLD.  I'M NOT A LAWYER.
 8              Q.   NOW, PARAGRAPH 402C SAYS YOU CAN'T
 9    MAKE ANY LOANS OR GUARANTEE THE INDEBTEDNESS OF
10    ANY PARTY OTHER THAN A SUBSIDIARY OR CONTRACTOR OR
11    SERVICE MATERIALS PROVIDER ENGAGED BY THE COMPANY
12    OR ANY -- OR ANY SUBSIDIARY, YET BAJA DEVELOPMENT
13    CORP. IS NOT A SUBSIDIARY OF THIS COMPANY, IS IT?
14              A.   NO.  IT DIDN'T MAKE A LOAN.
15              Q.   WELL, THEN WHY DOES IT HAVE NOTES
16    PAYABLE?
17              A.   IT SAYS, "MAKE A LOAN," NOT RECEIVE
18    A LOAN.
19              Q.   SO WHEN YOU -- WHEN YOU -- WELL,
20    THE BAJA -- BAJA DEVELOPMENT CORPORATION, DID IT
21    ACTUALLY PUT CASH INTO THE COMPANY AT SOME POINT?
22              A.   I BELIEVE SO.
23              Q.   AND WHERE -- WHERE ON THE LEDGER
24    DOES IT SHOW THAT IT PUT CASH INTO THE COMPANY?
25              MS. CROWTHER:  OBJECTION.  THE
0558
 1    DOCUMENT SPEAKS FOR ITSELF.
 2              LET HIM SEE IT.
 3    BY MR. RICHARDS:
 4              Q.   ALL RIGHT.  DO YOU HAVE ANY IDEA
 5    WHEN, IF AT ALL, BAJA DEVELOPMENT CORP. MADE ANY
 6    LOANS?
 7              A.   I DON'T HAVE THE -- I KNOW IT'S PUT
 8    MONEY INTO THE COMPANY, MORE MONEY THAN IT'S TAKEN
 9    OUT.  QUITE A BIT MORE.
10              Q.   AND HOW -- AND WHAT ARE YOU BASING
11    THAT ON?
12              A.   WELL, THERE'S A PAYABLE TO BAJA
13    DEVELOPMENT CORP.
14              Q.   UH-HUH.
15              WHAT TYPE OF CRITERION DID YOU
16    EMPLOY TO DETERMINE WHICH CREDITORS GOT PAID BACK
17    FIRST FROM THE LOAN PROCEEDS OF THE K.S.I. LOAN?
18              A.   I DON'T KNOW.
19              Q.   IS BAJA DEVELOPMENT CORP. WILLING
20    TO RETURN THE LOAN PROCEEDS OR THE -- OR THE
21    PAYMENTS IT RECEIVED FROM DIAMANTE DEL MAR IN
22    ORDER TO KEEP THE COMPANY OPERATIONAL?
23              A.   NO.
24              Q.   AND WHY NOT?
25              A.   LEGACY PROPERTIES HAS DONE THE BEST
0559
 1    THAT IT COULD.  AND I'VE DONE THE BEST THAT I
 2    COULD -- CAN, AND STILL AM DOING, TO KEEP THE
 3    COMPANY OPERATIONAL.
```

```
 4              Q.   WHAT DOES -- WHAT DOES LEGACY
 5   PROPERTIES HAVE TO DO WITH BAJA DEVELOPMENT CORP.?
 6              A.   NOTHING.  YOU ASKED ME IF BAJA
 7   DEVELOPMENT CORP.  THE ANSWER IS NO, SO I WON'T --
 8   I WON'T EXPOUND UPON THAT.
 9              Q.   NO.  I'M ASKING WHY WON'T BAJA
10   DEVELOPMENT CORP. --
11              A.   IT'S NOT CAPABLE.
12              (SPEAKING SIMULTANEOUSLY.)
13   BY MR. RICHARDS:
14              Q.   AND HAS LEGACY PROPERTIES -- WHY
15   ISN'T IT CAPABLE?  WHAT HAPPENED -- I MEAN, WHAT
16   HAPPENED TO THE MONEY THAT BAJA DEVELOPMENT CORP.
17   RECEIVED ONCE IT WAS GIVEN FROM DIAMANTE DEL MAR?
18              A.   I DON'T KNOW.
19              MS. CROWTHER:  OBJECTION.  INSTRUCT
20   YOU NOT TO ANSWER.  NOT RELEVANT.
21              DEPOSITION OFFICER:  I'M SORRY.
22   THERE WAS AN ANSWER.
23              MS. CROWTHER:  I INSTRUCT YOU NOT
24   TO ANSWER.  NOT RELEVANT.
25              DEPOSITION OFFICER:  NO.  I SAID HE
0560
 1   DID ANSWER.
 2              MS. CROWTHER:  OKAY.
 3              DEPOSITION OFFICER:  SO IT'S ON THE
 4   RECORD.  I JUST WANT TO LET YOU KNOW.
 5              MS. CROWTHER:  MOVE TO STRIKE.
 6              AND SLOW DOWN.
 7              MR. RICHARDS:  ROBYN, I DON'T KNOW
 8   WHY YOU THINK THAT IF BAJA DEVELOPMENT CORP. --
 9   HOW YOU COULD POSSIBLY THINK THAT IF HE'S WRITING
10   A CHECK TO HIMSELF, THAT IT'S NOT RELEVANT AS
11   TO -- AS TO WHERE THAT MONEY WENT.
12              MS. CROWTHER:  WELL, I DISAGREE
13   WITH ALMOST EVERYTHING YOU JUST SAID.
14              AND WE SPENT A WHOLE BUNCH OF TIME
15   TALKING ABOUT THIS THIS MORNING.
16              WHEN BAJA DEVELOPMENT GETS REPAID,
17   YOU CAN ARGUE THAT IT WAS INAPPROPRIATE FOR IT TO
18   BE REPAID.
19              YOU ARE NOT ENTITLED TO KNOW WHAT
20   IT DOES WITH THE MONEY.
21              WE'RE NOT HERE ABOUT BAJA
22   DEVELOPMENT CORP., SO I'M NOT GOING TO LET YOU
23   SPEND A LOT OF TIME ASKING HIM TO DO AN ORAL
24   ACCOUNTING OF A COMPANY THAT NOBODY HERE BUT HIM
25   HAS ANY INTEREST IN.
0561
 1              MR. RICHARDS:  BUT THEY'RE A
```

```
 2   DEFENDANT.
 3              MS. CROWTHER:  AS OF YESTERDAY.
 4   AND MAYBE.  I DON'T KNOW THAT YOU FILED THOSE.  I
 5   DON'T THINK THE SERVICE WAS -- WAS VALID.
 6              MR. RICHARDS:  WHY NOT?
 7              MS. CROWTHER:  WELL, I'M NOT GOING
 8   TO GET INTO THAT EITHER.
 9              MR. RICHARDS:  OKAY.  WELL, WE DID
10   FILE THEM.  OF COURSE WE FILED THEM.
11              MS. CROWTHER:  I HAVE NO IDEA IF
12   YOU FILED THEM.
13              MR. RICHARDS:  THEY WERE CONFORMED
14   COPIES.
15              MS. CROWTHER:  I DON'T KNOW IF
16   THEY'VE BEEN FILED.  THIS IS WHAT I'M TELLING YOU.
17              MR. RICHARDS:  ALL RIGHT.  WELL,
18   I'M JUST TRYING TO -- I JUST DON'T SEE, IF WE'RE
19   ENTITLED TO AN ACCOUNTING, WHY THE ACCOUNTING
20   STOPS AT WHERE HE TRANSFERS THE MONEY.
21              MS. CROWTHER:  YOU AREN'T ENTITLED
22   TO AN ACCOUNTING FROM BAJA DEVELOPMENT CORP.  YOU
23   AREN'T.
24   BY MR. RICHARDS:
25        Q.   IT SAYS, IN YOUR GENERAL LEDGER --
0562
 1   OR NOT IN YOUR GENERAL LEDGER, IN YOUR BALANCE
 2   SHEET, THAT YOU SPENT APPROXIMATELY 989,000
 3   DOLLARS IN MARKETING EXPENSES.
 4              DID YOU -- BUT THERE'S NO BREAKDOWN
 5   OF THAT.
 6              CAN YOU BREAK THAT DOWN AT ALL?
 7        A.   NO.  I DON'T KNOW.
 8        Q.   SO YOU DON'T KNOW HOW YOU SPENT A
 9   MILLION DOLLARS?
10        A.   WELL, YOU CAN SEE 100,000 DOLLARS
11   WAS ON THAT INVOICE FOR BROCHURES.
12        Q.   RIGHT.  BESIDES THAT, DO YOU HAVE
13   ANY KNOWLEDGE AS TO WHERE ELSE THAT MONEY WENT?
14        A.   I'M SURE SOME OF IT WENT ON
15   SALARIES.  I'M SURE SOME OF IT WENT ON FLIGHTS TO
16   AND FROM THE PROPERTY.  I DON'T HAVE A SPECIFIC
17   BREAKDOWN.
18        Q.   OKAY.  I MEAN, YOU DON'T HAVE A
19   GENERAL IDEA WHAT YOU SPENT THE MONEY ON?
20        A.   SALARIES, WEB SITE, BROCHURES,
21   FLIGHTS, OTHER MARKETING, HOTELS.
22        Q.   IF THE COMPANY WANTED TO -- IF THE
23   COMPANY WANTED TO SHOW THE PROPERTY FOR -- TO
24   EXISTING -- ANY PROSPECTIVE PURCHASERS, HOW WOULD
25   THE COMPANY GET MONEY AT THIS POINT TO GET YOU
```

```
0563
 1    FROM POINT A TO POINT B TO MARKET THE PROPERTY?
 2              A.   I WOULD HAVE TO DO IT RIGHT NOW.
 3              Q.   AND SO WHERE WOULD YOU GET THE
 4    MONEY FROM?
 5              A.   WHATEVER INCOME THAT I HAVE.
 6              Q.   WHATEVER INCOME THAT -- THAT YOU
 7    HAVE FROM JUST YOUR OTHER -- YOU ONLY HAVE INCOME
 8    FROM ONE SOURCE AT THIS POINT; RIGHT?
 9              A.   RIGHT NOW, YES.
10              Q.   YEAH.  AND HOW IS THE -- ON THIS
11    RESTRUCTURING THAT YOU'RE DOING WITH K.S.I., HOW
12    IS K.S.I. GOING TO -- HOW ARE YOU GOING TO SERVICE
13    THAT DEBT IF THE COMPANY HAS NO ASSETS AND NO
14    INCOME?
15              MS. CROWTHER:  OBJECTION.
16    MISSTATES THE EVIDENCE.
17              MR. RICHARDS:  IT DOES?
18              MS. CROWTHER:  YES.
19    BY MR. RICHARDS:
20              Q.   OKAY.  HOW -- DOES THE COMPANY HAVE
21    ANY INCOME?
22              A.   NO.
23              Q.   OKAY.  SO HOW IS THE COMPANY GOING
24    TO SERVICE THE DEBT THAT IT RESTRUCTURES WITH
25    K.S.I.?
0564
 1              A.   WE'RE ATTEMPTING TO BRING IN A
 2    JOINT VENTURE PARTNER AND BUY OUT THE LOAN.
 3              Q.   TO BUY OUT THE LOAN.
 4              AND THEN WOULD YOU HAVE TO PAY THE
 5    JOINT VENTURE PARTNER?
 6              A.   NO.  THE JOINT VENTURE PARTNER
 7    WOULD INVEST IN THE PROPERTY.
 8              Q.   IF -- WHAT DO YOU -- DO YOU HAVE
 9    ANY IDEA IF THE PROPERTY IS WORTH MORE THAN THE
10    DEBT AT THIS POINT?
11              A.   I BELIEVE IT IS.
12              Q.   BUT YOU DON'T -- YOU DON'T HAVE ANY
13    IDEA -- YOU DON'T HAVE ANY -- HOW MUCH LONGER ARE
14    YOU GOING TO TRY TO -- IF THE JOINT VENTURE
15    PARTNER DOESN'T WORK OUT -- WHEN WILL YOU KNOW
16    WHEN THE JOINT VENTURE PARTNER IS GOING TO WORK
17    OUT OR NOT?
18              A.   I DON'T KNOW.
19              Q.   YOU DON'T KNOW?
20              WELL, IS THERE -- I MEAN, NO ONE IS
21    GIVING YOU ANY PARAMETERS -- YOU'RE NOT WORKING
22    UNDER ANY TIMETABLE WITH THIS LENDER?  THEY SEEM
23    VERY EASYGOING.
```

```
24              A.   WELL, WE'RE TRYING TO GET THEM
25      PAID, AND THEY'RE, SO FAR, BEING COOPERATIVE WITH
0565
 1      US IN OUR EFFORTS.  AGAIN, MADE MORE DIFFICULT BY
 2      THIS SITUATION, BUT THAT'S OKAY.
 3              Q.   DOES THE -- HOW COME -- HAVE YOU
 4      MADE ANY ATTEMPTS JUST TO SELL THE PROPERTY SO
 5      THE -- SO THAT THE LENDER CAN GET PAID AND THE
 6      INVESTORS CAN GET PAID?
 7              MS. CROWTHER:  OBJECTION.  ASKED
 8      AND ANSWERED.  WE DID THIS YESTERDAY.
 9      BY MR. RICHARDS:
10              Q.   BESIDES THE JOINT VENTURE, DO YOU
11      HAVE ANY OTHER -- OTHER -- BESIDES THE JOINT
12      VENTURE, DO YOU HAVE ANY OTHER OPTIONS THAT
13      YOU'RE -- THAT YOU'RE CURRENTLY AWARE OF?
14              A.   NO.  OTHER THAN PUTTING THE
15      PROPERTY UP FOR SALE.
16              Q.   HAVE YOU MADE AN OFFER TO THE OTHER
17      INVESTORS -- HAVE YOU CONSIDERED MAKING AN OFFER
18      TO THE OTHER INVESTORS TO JUST BUY WHATEVER YOUR
19      INTEREST IS LEFT AND TAKE OVER THE SERVICING OF
20      THE DEBT?
21              A.   HAVE I CONSIDERED WHAT?
22              Q.   MAKING AN OFFER TO THE OTHER OWNERS
23      TO JUST TAKE YOUR POSITION AND CONTINUE SERVICING
24      THE DEBT SO IT'S NOT LOST?
25              A.   NO.
0566
 1              Q.   WOULD YOU CONSIDER DOING THAT?
 2              A.   NO.
 3              Q.   WHY NOT?
 4              A.   TO THE PLAINTIFFS?  I THINK THE
 5      PLAINTIFFS HAVE A LOT TO DO WITH ME BEING IN THIS
 6      POSITION.
 7              Q.   WELL, IF IT COMES TO THE POINT
 8      WHERE YOU CAN'T FIND A JOINT VENTURE PARTNER, ARE
 9      YOU JUST GOING TO LET THE PROPERTY GO IN
10      FORECLOSURE, OR ARE YOU GOING TO AT LEAST MAKE
11      THAT OFFER?
12              MS. CROWTHER:  OBJECTION.  CALLS
13      FOR SPECULATION.
14              THE DEPONENT:  I'M GOING TO DO
15      EVERYTHING I CAN.  BUT IF IT GETS TO THAT POINT, A
16      GOOD REASON -- A BIG REASON WILL BE BECAUSE OF
17      THIS LITIGATION AND BECAUSE OF WHAT THEY STARTED
18      WITH ME.
19      BY MR. RICHARDS:
20              Q.   SO IT -- SO IT'S YOUR POSITION -- I
21      JUST WANT TO MAKE SURE I UNDERSTAND YOUR POSITION.
```

```
22                    IF YOU CAN'T WORK OUT AN
23   ARRANGEMENT WITH THE LENDER BY BRINGING IN SOMEONE
24   ELSE TO BUY OUT THE LOAN, ARE YOU GOING TO LOSE
25   THE PROPERTY BEFORE YOU SEEK ASSISTANCE FROM THE
0567
 1   OTHER INVESTORS OF THIS COMPANY?
 2                    MS. CROWTHER:  OBJECTION.  CALLS
 3   FOR SPECULATION.
 4                    THE DEPONENT:  I DON'T KNOW WHAT MY
 5   OPTIONS ARE.  I'LL WEIGH MY OPTIONS WHEN THAT TIME
 6   COMES.
 7   BY MR. RICHARDS:
 8           Q.   OKAY.  WHAT ABOUT WITH THE CABO SAN
 9   LUCAS PROPERTY?  WHAT'S THE TIMETABLE ON WHEN
10   YOU'RE GOING TO FIND OUT WHETHER OR NOT THEY'VE
11   AGREED TO GIVE YOU AN ADDITIONAL 4 MILLION
12   DOLLARS?
13           A.   I TOLD YOU THAT'S BEEN APPROVED,
14   AND WE'RE JUST IN LOAN MODIFICATIONS.  SO IT'S
15   JUST GETTING THE DOCUMENTS DONE.
16           Q.   AND IS THE ONLY RESPONSIBLE PARTY
17   ON THAT LOAN GOING TO BE DIAMANTE CABO SAN LUCAS?
18                    MS. CROWTHER:  OBJECTION.  CALLS
19   FOR A LEGAL CONCLUSION.
20                    THE DEPONENT:  I DON'T KNOW.
21   BY MR. RICHARDS:
22           Q.   WELL, DO YOU KNOW WHO ELSE IS GOING
23   TO BE OBLIGATED ON THE LOAN?
24                    MS. CROWTHER:  OBJECTION.  SAME
25   QUESTION.  AND CALLS FOR A LEGAL CONCLUSION.
0568
 1                    THE DEPONENT:  I DON'T KNOW.
 2   BY MR. RICHARDS:
 3           Q.   AND WITH RESPECT TO THE 4 MILLION
 4   DOLLARS, DO YOU KNOW WHAT YOU'RE GOING TO DO WITH
 5   THAT MONEY?
 6           A.   WE HAVE A BUDGET FOR THAT MONEY,
 7   YES.
 8           Q.   OKAY.  ARE YOU GOING TO BE PAYING
 9   YOURSELF BACK ANY LOAN PAYABLES OUT OF THAT MONEY?
10           A.   NO.
11           Q.   IS ANY OF THAT MONEY GOING TO GO TO
12   ANY COMPANY THAT YOU OWN OR CONTROL FROM THE
13   4 MILLION DOLLARS?
14           A.   OTHER THAN TO PAY PAYROLL, NO.
15           Q.   SO IT'S JUST GOING TO PAY PAYROLL
16   AND OPERATING EXPENSES?
17           A.   YES.
18           Q.   AND YOUR SALARY?
19           A.   YES.
```

```
20              Q.    AND MR. NAJAM'S SALARY?
21              A.    PAYROLL.
22              Q.    HAVE YOU EVER THOUGHT OF
23   TERMINATING MR. NAJAM TO SAVE MONEY?
24              A.    NO.
25              Q.    HAVE YOU EVER THOUGHT OF NOT TAKING
0569
 1   A SALARY IN ORDER TO TRY TO SAVE THE PROJECT?
 2              A.    I HAVE.  AND I'VE DONE THAT IN
 3   DIAMANTE DEL MAR.  AND I DID THAT WITHIN THE FIRST
 4   YEAR OF DIAMANTE DEL MAR.  AND WHAT I COULD HAVE
 5   TAKEN AND WHAT I DIDN'T TAKE.
 6                    SO I'VE SHOWN IN THE PAST THAT I'D
 7   BE WILLING TO DO THAT.
 8              Q.    IS THERE A REASON WHY -- IS THERE A
 9   REASON WHY WE DON'T HAVE ANY OF THE BOOKS AND
10   RECORDS OF DIAMANTE CABO SAN LUCAS?
11              A.    I'M SURE THERE'S A GOOD REASON.
12                    MR. RICHARDS:  BECAUSE, ROBYN, THAT
13   WAS ALSO ON MY PRODUCTION REQUEST.
14                    MS. CROWTHER:  I DON'T KNOW WHAT --
15   I DON'T KNOW WHAT YOU'RE TALKING ABOUT, AND I'D
16   HAVE TO CHECK.
17                    MR. RICHARDS:  I MEAN, BECAUSE THE
18   ONLY RECORDS WE GOT WERE -- WERE -- WERE BAJA
19   DEVELOPMENT.
20                    MS. CROWTHER:  I HAVE TO CHECK.
21                    MR. RICHARDS:  NOT BAJA
22   DEVELOPMENT.  DIAMANTE DEL MAR.
23                    THE DEPONENT:  WELL, WHY WOULD YOU
24   GET -- WHY WOULD YOU GET DIAMANTE CABO SAN LUCAS?
25   THE PLAINTIFFS AREN'T -- YOU GAVE THEM RECORDS FOR
0570
 1   WHAT THEY WERE -- HAD AN INTEREST IN.
 2                    MS. CROWTHER:  I HAVE TO CHECK AND
 3   SEE WHAT I AGREED -- WHAT WE AGREED TO PRODUCE AND
 4   WHAT WE DID PRODUCE.  I DON'T KNOW OFF THE TOP OF
 5   MY HEAD.  WE'LL TALK ABOUT IT OFF THE RECORD.  I'M
 6   NOT GOING TO ANSWER.
 7   BY MR. RICHARDS:
 8              Q.    ARE YOU GOING TO USE SOME OF THE
 9   4 MILLION DOLLARS TO PAY LEGAL FEES?
10              A.    UNFORTUNATELY, I WILL, YES.
11              Q.    OKAY.  AND HOW MUCH OF THE BUDGET
12   WAS APPROVED TO PAY LEGAL FEES?
13              A.    I DON'T KNOW.
14              Q.    YOU DON'T KNOW?  WELL, WAS THERE --
15   IS THERE A PORTION OF THE BUDGET TO PAY LEGAL
16   FEES?
17              A.    YES.
```

```
18              Q.   SO IF THAT -- IF THE CASE SETTLED,
19   THEN WOULD THAT MONEY BE PUT BACK INTO THE ACCOUNT
20   OF DIAMANTE DEL MAR IF IT WASN'T USED FOR LEGAL
21   FEES?
22              A.   DIAMANTE CABO SAN LUCAS.
23              Q.   YEAH.  DIAMANTE CABO SAN LUCAS.
24              A.   IT WOULD BE REAPPROPRIATED IN THE
25   BUDGET, YES.
0571
1               Q.   AND WHY ON YOUR BALANCE SHEET DID
2    LOR MANAGEMENT GET WIRES EVERY MONTH FROM DIAMANTE
3    DEL MAR?
4               A.   THERE'S A PAYROLL.
5               Q.   IS THAT WHO -- IS THAT WHO MAKES
6    THE PAYROLL?
7               A.   YES.
8               Q.   AND DOES LOR MANAGEMENT CHARGE A
9    FEE TO DIAMANTE DEL MAR FOR MAKING THE PAYROLL,
10   FOR HANDLING THE MANAGEMENT OF THE PROPERTY?
11              A.   NO.
12              Q.   SO THEY DO IT FOR FREE?
13              A.   IT'S A SUBSIDIARY, I BELIEVE.
14   THERE'S NO FEE INVOLVED.
15              Q.   SO -- DOES THE COMPANY PAY YOU A
16   SALARY, LOR MANAGEMENT?
17              A.   NO.
18              Q.   SO IT'S JUST A -- IT'S JUST LIKE A
19   HOLDING COMPANY FOR PAYROLL?
20              A.   WELL, WE CAN'T PAY THE MEXICAN
21   PAYROLL FROM THE UNITED STATES.
22              Q.   WHY IS THAT?
23              A.   I DON'T KNOW THE LAWS.
24              Q.   OKAY.  SO YOU JUST HAVEN'T SET
25   UP -- IT'S LIKE A PASS-THROUGH COMPANY?
0572
1                    MS. CROWTHER:  OBJECTION.  CALLS
2    FOR AN OPINION --
3    BY MR. RICHARDS:
4               Q.   OR YOU JUST HAVE IT SET UP JUST TO
5    DO PAYROLL ONLY?
6               A.   NO.
7               Q.   WHAT ELSE IS IT SET UP FOR TO DO?
8               A.   IT HELD THE LEASEHOLD INTEREST IN
9    THE PROPERTIES.  IT STILL DOES IN ONE OR TWO OF
10   THEM, I BELIEVE.
11              Q.   OKAY.  THERE WAS AN E-MAIL YOU
12   SENT.  IT'S 503, BUT IT'S JUST A SHORT ONE.  IT
13   SAYS:
14                   "CALL ME ON MY CELL.  I JUST HAD
15              MY FIRST JOSEPH BAKER EXPERIENCE.
```

```
16              KEN."
17                   WHO'S JOSEPH BAKER?
18              A.   HE WAS SOMEONE THAT PHIL HAD PAID A
19   LARGE AMOUNT OF MONEY AS A COMMITMENT FEE.  HE WAS
20   SUPPOSED TO LEND MONEY TO THE HAWAII PROJECT.
21              Q.   DOES LOR OWN THE REMAINING
22   LEASEHOLD INTERESTS IN THE DIAMANTE DEL MAR LOTS?
23              A.   IN THE PARCELS?
24              Q.   IN THE PARCELS.
25              A.   I BELIEVE SO.
0573
 1              Q.   IF IN JUNE -- BY THE TIME IN
 2   JUNE -- IF CABO SAN LUCAS IS STILL NOT ABLE TO
 3   FINANCE ITS EXISTING 400,000 DOLLAR MONTHLY
 4   EXPENSES WITH -- BY SELLING LOTS, WHAT IS THE NEXT
 5   COURSE OF DIRECTION?
 6              A.   AT THAT POINT, IF WE HAVE TO GO AND
 7   GET ANOTHER LOAN MODIFICATION FROM DANSKE BANK,
 8   WE'LL HAVE TO MAKE A CASE TO DO THAT.
 9              Q.   DID DANSKE BANK INDICATE THEY WILL
10   CONTINUALLY GIVE YOU LOAN MODIFICATIONS?
11              A.   THEY CAN'T MAKE THAT REPRESENTATION
12   NOW.  BUT DEPENDING ON THE PROGRESS AND THE
13   PROCESS, I'M SURE WHEN IT'S APRIL, AND WE HAVE TO
14   MAKE THE ASSESSMENT, WE CAN SEE WHAT THE PROGRESS
15   IS.
16                   BUT I BELIEVE THEY'RE COMMITTED TO
17   THE PROJECT.
18              Q.   DO YOU THINK IT'S REALISTIC, BASED
19   ON YOUR EXPERIENCE IN CABO THE LAST FEW YEARS
20   PRESENTLY, THAT YOU'LL BE ABLE TO SELL ENOUGH
21   PARCELS TO COVER THE EXISTING EXPENSES OF THE
22   PROJECT AND SERVICE THE DEBT THAT WOULD BE AT
23   129 MILLION DOLLARS BY JUNE?
24              A.   I BELIEVE IT'S REASONABLE, YES.
25              Q.   AND WHAT DO YOU BASE THAT OPINION
0574
 1   ON?
 2              A.   I BASE IT ON BEING THERE EVERY DAY.
 3   KNOWING THE TRAFFIC THAT WE HAVE COME THROUGH.
 4   HOPEFULLY GETTING THIS RESOLVED.
 5                   AND I BELIEVE THAT IT'S, YOU KNOW,
 6   VERY REASONABLE THAT BY THE TIME JUNE COMES, WE
 7   WILL HAVE SHOWN ENOUGH PROGRESS AND ENOUGH SALES
 8   TO NOT ONLY KEEP THE OPERATIONS GOING, BUT TO
 9   CONTINUE WITH INFRASTRUCTURE AND DEVELOPMENT.
10              Q.   YOU MENTIONED THAT YOU BELIEVED
11   THAT THE PLAINTIFFS IN THIS CASE HAVE BEEN GIVEN
12   ERRONEOUS INFORMATION ABOUT WHAT YOU DID WITH
13   THEIR INVESTMENT.  YOU MADE THAT STATEMENT A
```

```
14    COUPLE TIMES.
15              THAT IF YOU HAD A CHANCE TO TALK TO
16    THEM, YOU WOULD BE ABLE TO EXPLAIN THAT YOU'VE
17    DONE NOTHING IMPROPER.
18              DO YOU REMEMBER THAT GENERAL
19    TESTIMONY?
20         A.   I DIDN'T SAY THAT -- THAT THEY
21    WOULD -- GIVEN WHAT I'VE DONE WITH THEIR
22    INVESTMENT.
23              I SAID WHAT THEY'VE DONE IN THE
24    COMPLAINT IS COMPLETELY FALSE.  I THINK THAT'S
25    WHAT I SAID.  AND I'D LOVE TO HAVE A CHANCE TO
0575
1    TALK TO EACH ONE INDIVIDUALLY.
2         Q.   WELL -- AND WE WENT THROUGH, YOU
3    KNOW A LARGE PORTION OF THE COMPLAINT YESTERDAY.
4    AND I'LL LET YOU FINISH THE LAST COUPLE PAGES SO
5    WE HAVE A COMPLETE RECORD.
6              BUT NOTWITHSTANDING THE COMPLAINT,
7    WHAT WOULD BE -- WHAT WOULD YOU TELL EACH OF
8    THE -- WHAT WOULD YOU TELL THE PLAINTIFFS AS TO
9    HOW THEY'RE GOING TO RECOVER THEIR INVESTMENT IN
10   THE VARIOUS -- IN THE TWO DEVELOPMENTS THAT
11   THEY'VE GIVEN YOU MONEY FOR?
12              MS. CROWTHER:  OBJECTION AS TO THE
13   TERM "YOU."
14   BY MR. RICHARDS:
15        Q.   OH.  THAT THEY'VE GIVEN THE
16   ENTITIES THAT YOU'RE THE MANAGING MEMBER OF, THAT
17   YOU HAVE A FIDUCIARY DUTY TO.
18              MS. CROWTHER:  OBJECTION.  VAGUE
19   AND COMPOUND.
20              THE DEPONENT:  WHAT WOULD I TELL
21   THEM?
22   BY MR. RICHARDS:
23        Q.   YEAH.
24        A.   THE THIRST THING I'D TELL THEM IS
25   THEY DID A LOT OF DAMAGE TO THEM GETTING THEIR
0576
1    MONEY BACK, TO ME PERSONALLY AND TO THE PROJECTS.
2              AND THE FACT THAT THEY DID THAT TO
3    ME WITH SUCH MALICIOUS INTENT IS HURTFUL.
4              AND NOTWITHSTANDING THAT, I BELIEVE
5    THE WAY TO CORRECT THAT IS TO HAVE THEM COME OUT
6    AND TELL THE TRUTH.
7              UNDERSTAND THAT THERE IS MONEY --
8    THERE IS MONEY TO BE MADE, BUT IN THE SITUATION
9    THAT IT IS CURRENTLY, THEY'VE DAMAGED THE
10   PROJECTS.
11              WITH THAT SAID WE'RE STILL MOVING
```

12    FORWARD.  WE OPENED UP A GREAT GOLF COURSE IN CABO
13    SAN LUCAS.  WE HAVE TRAFFIC THERE EVERY DAY.
14              I BELIEVE THAT WE'RE GOING TO SELL.
15    I BELIEVE THAT WE'RE GOING TO BE SUCCESSFUL.
16    THEY'VE MADE IT MUCH MORE DIFFICULT, BUT I'D LIKE
17    TO GO THROUGH EACH POINT WITH THEM AND WHAT
18    THEY'VE SAID AND LET THEM UNDERSTAND THAT I DON'T
19    THINK THAT IN OUR COUNTRY YOU CAN JUST MAKE SUCH
20    ALLEGATIONS AND SUCH MALICIOUS ALLEGATIONS AND NOT
21    HAVE SOME ACCOUNTABILITY FOR THEM.
22         Q.   WELL, PRIOR TO THE LITIGATION
23    ENSUING, THERE WAS NOT ONE SINGLE SALE; ISN'T THAT
24    TRUE?
25         A.   YES.
0577
1          Q.   SO WHAT -- WHY DO -- IS THERE
2     SOMETHING THAT -- DO -- HOW LONG DO YOU THINK THE
3     PLAINTIFFS SHOULD HAVE WAITED BEFORE THEY DID
4     SOMETHING AFFIRMATIVE TO COLLECT THEIR MONEY?
5               MS. CROWTHER:  OBJECTION.
6     ARGUMENTATIVE.  LACKS FOUNDATION.  CALLS FOR
7     SPECULATION.
8               THE DEPONENT:  WELL, IF --
9               SHOULD I ANSWER OR NOT?
10              MS. CROWTHER:  IF YOU WANT TO.  IF
11    YOU CAN.
12              THE DEPONENT:  WELL, I MEAN, I
13    THINK THAT IF THEY HAD A PROBLEM, THEY COULD GO
14    BACK TWO YEARS.
15              AND UP UNTIL -- UP UNTIL MAY OF
16    '08, PHIL KENNER WAS THE DIRECTOR OF SALES.  AND
17    THERE WAS ALL SORTS OF ISSUES AND PROBLEMS WITH
18    THAT THAT NEEDED TO BEEN CONTENDED WITH.
19              IN SEPTEMBER OF '08 THERE WAS THE
20    LEHMAN BANKRUPTCY.  THE ECONOMY HAS OBVIOUSLY BEEN
21    DAMAGED.
22              AND IN MARCH OF '09, WE WERE
23    RESTRUCTURED UNDER DANSKE BANK.
24              IN JUNE, THIS LAWSUIT CAME OUT.
25              I THINK THAT THE FACT THAT THEY'RE
0578
1     IN A REAL ESTATE DEAL IN CABO SAN LUCAS, AND IT
2     HAS -- STILL HAS A HIGH POTENTIAL OF SUCCESS IS
3     SOMETHING THAT THEY SHOULD BE HAPPY WITH.
4     BY MR. RICHARDS:
5          Q.   IS IT TRUE OR UNTRUE THAT THERE'S
6     NO SINGLE PERSON THAT HAS BROUGHT MORE CAPITAL TO
7     YOUR -- TO DEVELOPMENTS SINCE 2003 THAN
8     PHILLIP KENNER?
9          A.   TRUE.

```
10            Q.   SO WHY IS -- WHAT IS THE -- WHAT IS
11   THE SOURCE OF -- OF YOUR INABILITY TO SPEAK WITH
12   MR. KENNER ABOUT -- IF MR. KENNER'S BEEN THE
13   SINGLE BIGGEST SOURCE OF CAPITAL CONTRIBUTION,
14   THROUGH HIM OR HIS CLIENTS, SINCE 2003, WHAT IS
15   THE REASON WHY YOU CAN'T OPERATE THE CABO SAN
16   LUCAS PROJECT WITH MR. KENNER?
17            A.   ARE YOU SERIOUS?
18            Q.   YEAH.  I MEAN, YOU COULD -- YOU
19   TERMINATED HIM, SO I'M JUST -- I'M TALKING ABOUT
20   WHAT WAS THE REASON?
21            A.   THAT'S A SERIOUS QUESTION?
22            Q.   YEAH.
23            A.   OKAY.  WELL, WE CLOSED THIS DEAL IN
24   MARCH OF '06.  BY OCTOBER OF '06, HE WAS VOICING
25   HIS DISPLEASURE WITH ME IN A SERIES OF E-MAILS.
0579
 1            BY APRIL OF '07, WITHIN A YEAR, HE
 2   WAS SAYING THAT I WAS MISMANAGING THE PROJECT.
 3            BY MAY OF '07, HE WAS CANCELLING
 4   ALL SALES CALLS.  BY JUNE AND JULY OF '07, HE HAD
 5   TOMMY CONSTANTINE WORKING WITH HIM, THREATENING
 6   ME, THREATENING TO DO ALL THE THINGS THAT HE DID.
 7            ALL THE ACCUSATIONS THAT HE'S MADE,
 8   THAT HE ENDED UP DOING, HE DID THAT.
 9            SO WITHIN A YEAR, BASICALLY, HE HAD
10   DETERMINED THAT I MISMANAGED THIS PROJECT.  AND
11   THERE ARE WAYS LEGALLY -- AND IF HE HAS THAT --
12   THAT WAS HIS OPINION, THERE ARE WAYS THAT ARE
13   PROVIDED FOR IN THE OPERATING AGREEMENTS, THERE
14   ARE THINGS THAT YOU CAN DO THAT ARE PROVIDED FOR
15   THAT WE COULD HAVE DONE AND THAT SHOULD HAVE BEEN
16   DONE.
17            AND IF HE WANTS TO DO THAT, IT'S
18   WITHIN HIS RIGHT TO DO THAT.
19            BUT TO GO ABOUT IT THE WAY HE HAS,
20   AS MALICIOUSLY AS HE HAS -- AND FOR YOU TO ASK ME
21   RIGHT NOW WHY I DON'T THINK I CAN WORK WITH HIM I
22   THINK IS A PRETTY SILLY QUESTION.
23            Q.   WELL, IT'S -- IT'S -- IT'S
24   INTERESTING THAT A GUY THAT HAS BASICALLY PUT UP
25   ALL THE MONEY TO ACQUIRE THESE PROPERTIES -- WELL
0580
 1   LET ME STRIKE THAT.
 2            ISN'T IT TRUE THAT HIS CONCERN WAS
 3   THAT -- THAT YOUR DISPUTE WITH HIM OR HIS CONCERNS
 4   WITH YOU AROSE WHEN YOU STARTED GOING TO TEXAS,
 5   AND THAT'S WHAT HE WAS UPSET ABOUT?
 6            MS. CROWTHER:  LACKS FOUNDATION.
 7            THE DEPONENT:  I DON'T KNOW.  BUT
```

8    THERE WERE REMEDIES.
9                    IF HE HAD A PROBLEM, THERE ARE
10   REMEDIES IN THE OPERATING AGREEMENT.  NOT TO DO
11   WHAT HE DID, THREATEN ME FOR A YEAR, AND THEN COME
12   THROUGH ON THE THREATS.
13                    WHAT HE DID IN JUNE WITH THE FIRST
14   LAWSUIT I DON'T THINK PUT HIM OR HIS PLAYERS IN
15   ANY BETTER A POSITION TO -- TO GET THEIR MONEY
16   BACK.
17                    IT MAY HAVE -- IN SOME SICK WAY, IT
18   MAY HAVE BEEN HIS WAY OF THINKING HE CAN GET
19   CONTROL OF THE PROPERTY, I DON'T KNOW.
20                    THERE WAS A STATEMENT IN THERE THAT
21   SAID I WAS UNDER -- THERE WAS A WARRANT OUT FOR MY
22   ARREST.
23                    DO YOU BELIEVE THERE WAS A WARRANT
24   OUT FOR MY ARREST IN MEXICO?  YOU PUT IT IN THERE.
25   DO YOU BELIEVE THAT?
0581
1            Q.   I BELIEVE EVERYTHING I PUT IN THE
2    COMPLAINT.
3            A.   WELL, YOU'RE WRONG.  THAT'S A LIE.
4    AND IT WAS IN EVERY PAPER IN THE COUNTRY.
5                    DID YOU DO ANYTHING -- DID YOU DO
6    ANYTHING -- SINCE YOU BELIEVE IT, DID YOU DO
7    ANYTHING TO INVESTIGATE WHETHER THERE WAS A LIEN
8    ON THE PROPERTY WHICH YOU SAID, WHETHER THERE WAS
9    A WARRANT FOR MY ARREST?  DID YOU DO ANYTHING?
10           Q.   YOU KNOW, MR. JOWDY, IF YOU WANT TO
11   SUE ME, YOU CAN TAKE MY DEPOSITION.
12           A.   I WOULD LOVE TO.
13           Q.   THAT'S FINE WITH ME.  I'LL FILE MY
14   OWN SLAPP MOTION.
15           A.   OKAY.
16           Q.   IT'S NOT A PROBLEM.
17           A.   YOU HEARD THEY WORK, I GUESS, HUH?
18           Q.   THERE'S SOMETHING CALLED THE
19   LITIGATION PRIVILEGE.  YOUR LAWYER IS VERY SKILLED
20   IN IT.
21                    SO THE -- THE ISSUE IS, THOUGH, I'M
22   NOT THE GUY THAT ACQUIRED ALL THIS MONEY -- THIS
23   IS THE DIFFERENCE HERE, IS I'M NOT THE GUY THAT
24   GOT 50 MILLION DOLLARS AFTER THIS PROPERTY WAS
25   PURCHASED AND HASN'T PROVIDED ANY ACCOUNTING ON
0582
1    HOW 37 MILLION WAS SPENT.  THAT'S -- THAT'S WHY
2    WE'RE IN A LAWSUIT.
3            A.   PROVIDED AN ACCOUNTING TO WHO?
4            Q.   TO MR. KENNER, THE MEMBERS OF HIS
5    COMPANY.

6              A.   MR. KENNER ASKED FOR AN ACCOUNTING.
7    HE ASKED TO LOOK AT THE BOOKS AND RECORDS.  AND HE
8    WAS GIVEN THAT OPPORTUNITY.
9              HE WENT TO CONNECTICUT.  HE SHOULD
10   HAVE SPENT FIVE DAYS LOOKING AT THIS MATERIAL.  HE
11   SPENT TWO HOURS.  HE LABEL A FEW THINGS FOR
12   COPIES, AND WE GAVE THEM TO HIM.
13             IF HE WANTS TO GO BACK, HE HAS A
14   RIGHT TO DO THAT.
15             Q.   AND LISTEN TO WHAT YOU'RE SAYING.
16   YOU KEEP SAYING "THE RIGHT TO GO BACK."
17             YOU TESTIFIED THAT YOU HAVE THESE
18   RECORDS IN ELECTRONIC FORMAT, WHICH EVERYBODY USES
19   IN 2010.  WE'RE NOT IN THE 1800S.
20             AND WHEN MR. KENNER SHOWED UP, YOU
21   TESTIFIED YOU PUT -- LET THE RECORD REFLECT MY
22   OFFICE HERE IS ABOUT -- THIS ROOM IS ABOUT 800
23   SQUARE FEET.
24             YOU SAID WE CAN FILL UP A ROOM FULL
25   OF BOXES WITH OUR PAPER RECORDS.  SO IT'S NOT
0583
1    REASONABLE FOR SOMEONE TO FLY TO CONNECTICUT AND
2    LOOK THROUGH PAPER RECORDS WHEN YOU HAVE IT ALL ON
3    ELECTRONIC FORMAT.
4              MS. CROWTHER:  OBJECTION.  THAT
5    MISSTATES THE EVIDENCE.
6              AND, KEN, I'M GOING TO INSTRUCT YOU
7    NOT TO ANSWER ANY MORE QUESTIONS ABOUT THE
8    DOCUMENTS YOU WILL OR WILL NOT MAKE AVAILABLE.
9              THE DEPONENT:  OKAY.
10             MS. CROWTHER:  THE RECORD IS
11   EXHAUSTED ON THAT.
12             THE DEPONENT:  OKAY.
13   BY MR. RICHARDS:
14             Q.   HAVE YOU -- DO YOU HAVE THE ABILITY
15   TO BUY -- DO YOU HAVE THE ABILITY TO SIMPLY GET
16   DANSKE BANK TO BUY OUT THE DISILLUSIONED
17   INVESTORS?
18             MS. CROWTHER:  OBJECTION.
19   ARGUMENTATIVE.
20             THE DEPONENT:  I -- I DON'T HAVE
21   THAT ABILITY, NO.
22   BY MR. RICHARDS:
23             Q.   NO.  DO YOU THINK THAT -- THAT IT'S
24   A REALISTIC, LONG-TERM VIABILITY TO HAVE
25   47 PERCENT OF THE ENTITY AT ODDS WITH THE OTHER
0584
1    53 PERCENT?
2              A.   IT'S NOT -- IT'S NOT HEALTHY.
3              Q.   SO I KNOW THAT YOUR LAWYER DID NOT

```
 4    WANT YOU TO TESTIFY AS TO SETTLEMENT OFFERS.  I'M
 5    NOT ASKING YOU TO DO THAT.
 6                    BUT I'M -- WHAT I AM TRYING TO
 7    FIGURE OUT IS IN THE ENTIRE TIME I'VE BEEN ON THIS
 8    CASE, WHICH IS, YOU KNOW, NOT MY ONLY FILE -- I
 9    HAVE 140 CASES -- NOT ONCE HAVE ANY OF MY CLIENTS
10    RECEIVED A COMMUNICATION FROM YOU SAYING, HEY,
11    THIS IS MY SOLUTION TO EITHER BREAK UP THIS
12    MARRIAGE OR SOLVE THIS PROBLEM.
13                    AND I JUST WANT TO ASK YOU:  IS
14    THERE A REASON YOU HAVEN'T CONTACTED MY CLIENTS
15    DIRECTLY AS THE PARTY TO TRY AND RESOLVE THIS
16    ISSUE THAT'S OBVIOUSLY, ACCORDING TO YOU, CAUSING
17    A LOT OF PROBLEMS?
18                    MS. CROWTHER:  I WILL INSTRUCT YOU
19    NOT TO ANSWER TO THE EXTENT YOU MADE A DECISION
20    BASED ON COMMUNICATIONS WITH COUNSEL.  IF THERE
21    ARE OTHER REASONS THAT YOU CAN DISCLOSE, GO AHEAD.
22                    THE DEPONENT:  I ACTUALLY SENT AN
23    E-MAIL RECENTLY TO TURNER STEVENSON TO CALL, AND
24    HE DIDN'T CALL.
25                    I WOULD LOVE TO TALK TO EACH ONE.
0585
 1    I DON'T KNOW HOW TO GET AHOLD OF THE PLAINTIFFS.
 2    IF I THOUGHT THAT THEY WOULD TALK TO ME, I WOULD
 3    LOVE TO TALK TO THEM.  INDIVIDUALLY.  ONE-ON-ONE.
 4    NO ONE ELSE IN THE ROOM.  JUST ME AND THE OTHER
 5    PERSON.
 6                    BUT TO KNOW THAT ANY SETTLEMENT
 7    NEEDS TO BE A COMPLETE SETTLEMENT.
 8    BY MR. RICHARDS:
 9             Q.    OF COURSE.
10             A.    IT'S VERY DIFFICULT AT THIS POINT.
11                    AND THE THINGS NEED TO BE TAKEN
12    INTO ACCOUNT AS TO THE POSITION THAT WE'RE IN AND
13    THE POSITION CAUSED.
14                    LOOK, WE CAN KEEP GOING BACK AND
15    FORTH.  BUT PERSONALLY, IF THEIR INTEREST WAS
16    SOLELY TO SEE A RETURN ON THEIR INVESTMENT, I
17    THINK THEY TOOK A BAD ROUTE.
18                    A CALL TO ME BEFORE THIS ACTION,
19    BECAUSE I DIDN'T KNOW THIS ACTION WAS GOING TO
20    HAPPEN, A CALL -- ONE PHONE CALL TO ME WOULD HAVE
21    PROBABLY GONE A LONG WAY TO NONE OF THIS EVER
22    HAPPENING AND DAMAGE BEING IRREPARABLE ON MY SIDE,
23    PROBABLY.
24                    I DON'T KNOW.  I DON'T KNOW IF --
25    FIVE YEARS FROM NOW, IF CABO SAN LUCAS IS A
0586
 1    SUCCESSFUL PROJECT, IF I EVER LOSE THE STIGMA OF
```

2    WHAT HAPPENED TO ME OVER THE LAST SIX MONTHS.  I
3    DON'T KNOW.
4                    BUT I THINK A CALL BEFORE IT, WHEN
5    ALL THAT INFORMATION, INCLUDING A LOT -- OR
6    90 PERCENT OF IT FALSE INFORMATION WAS PUT OUT ON
7    ME, WOULD HAVE BEEN PRETTY HELPFUL.
8              Q.    WELL, YOU -- PRIOR TO -- PRIOR
9    TO -- THE ONLY PRIOR DEVELOPMENT BEFORE CABO SAN
10   LUCAS WAS DIAMANTE DEL MAR.  WE CERTAINLY AREN'T
11   GOING TO SAY THAT'S A SUCCESS YET.
12                    SO THE ONLY -- THERE'S NO, REALLY,
13   OTHER BASIS TO -- WHEN YOU SAY HURTFUL TO YOU, YOU
14   DON'T HAVE A TRACK RECORD AS A SUCCESSFUL
15   DEVELOPER.
16                    SO THE ONLY ISSUE IS HOW -- WHAT IS
17   YOUR IDEA FROM A BUSINESS STANDPOINT TO TRY TO
18   REPAIR SOME OF THE MARKETING PROBLEMS THAT HAVE
19   OCCURRED AS A RESULT OF THIS LITIGATION?
20                    MS. CROWTHER:  LET ME JUST OBJECT
21   BECAUSE THE PREAMBLE TO THAT QUESTION WAS
22   CONFUSING AND VAGUE.
23                    CAN YOU ASK -- I THINK YOU HAVE ONE
24   SIMPLE QUESTION AT THE END THERE.
25                    CAN YOU ASK HIM WHAT THE QUESTION
0587
1    IS?
2                    MR. RICHARDS:  WHY DON'T YOU ASK IT
3    SINCE YOU SEEM TO HAVE IT ON YOUR BUFFER.
4                    MS. CROWTHER:  CAN YOU READ THE
5    LAST SENTENCE THAT MR. RICHARDS SAID BEFORE I
6    OBJECTED.
7              (THE RECORD WAS READ AS FOLLOWS:
8              Q.    SO THE ONLY ISSUE IS HOW --
9              WHAT IS YOUR IDEA FROM A BUSINESS
10             STANDPOINT TO TRY TO REPAIR SOME
11             OF THE MARKETING PROBLEMS THAT
12             HAVE OCCURRED AS A RESULT OF THIS
13             LITIGATION?)
14                    MS. CROWTHER:  THAT'S THE QUESTION
15   YOU CAN ANSWER.
16                    THE DEPONENT:  FIRST IS FOR IT TO
17   BE DISMISSED AND FOR THE PEOPLE THAT WERE INVOLVED
18   TO SAY THAT THEY HAD NO KNOWLEDGE OF ANYTHING THAT
19   THEY ACCUSED ME OF.  THAT WOULD BE NUMBER ONE, I
20   THINK.
21                    AND THEN AFTER THAT, WE CAN WORK
22   TOWARD GETTING A RESOLUTION.
23   BY MR. RICHARDS:
24             Q.    SO YOU WANT THEM TO DISMISS THE
25   LAWSUIT FIRST WITHOUT ANYTHING?

0588
```
 1              A.   NO.  I WANT THEM TO TELL THE TRUTH.
 2    I WANT THEM TO TELL THE TRUTH.
 3              IF THEY WANT TO GET UP IN FRONT OF
 4    EVERYBODY AND SAY THAT THEY HAD PERSONAL KNOWLEDGE
 5    OF EVERYTHING THEY SAID ABOUT ME, THEN THEY CAN
 6    SAY THAT.  BUT I WANT THEM TO TELL THE TRUTH.
 7              Q.   WHAT IF THEY JUST SAY, "I GAVE
 8    KEN JOWDY A HALF A MILLION BUCKS, AND IT'S SEVEN
 9    YEARS LATER AND I HAVEN'T RECEIVED ANYTHING YET"?
10              MS. CROWTHER:  OBJECTION.
11              THE DEPONENT:  THEY -- THEY CAN SAY
12    THEY INVESTED ACCORDING TO A DOCUMENT, AND IT
13    HASN'T WORKED OUT AS PLANNED.
14              IF THEY WANT TO SAY THAT, THAT'S A
15    TRUE STATEMENT.  THEY SHOULD HAVE SAID THAT FROM
16    DAY ONE.  IF THEY WENT ON RECORD ON DAY ONE AND
17    SAID THE TRUE STATEMENT, THAT'S ALL I WANT.  SAY
18    THE TRUTH.
19    BY MR. RICHARDS:
20              Q.   I MEAN, EVEN -- EVEN IF THE LAWSUIT
21    WAS -- WAS LIMITED TO ALL THE DEVELOPMENT PROBLEMS
22    ON THE PROJECT AND ALL THE ISSUES THAT WERE
23    RELATED TO THIS PROJECT IT STILL WOULD HAVE THE
24    SAME DAMAGING EFFECT?
25              MS. CROWTHER:  OBJECTION.  THAT
```
0589
```
 1    CALLS FOR SPECULATION.
 2              THE DEPONENT:  WELL, I WOULDN'T BE
 3    ON THE FRONT PAGE OF THE NEW YORK POST.  I
 4    WOULDN'T BE IN EVERY NEWSPAPER.
 5              THIS WOULD BE A LEGAL MATTER.  IT
 6    WOULD BE -- I'M SURE YOU HAVE A LOT OF -- YOU'RE A
 7    HIGH-PROFILE LAWYER AND PROBABLY HAVE A LOT OF
 8    HIGH-PROFILE CASES.
 9              I'M SURE, ROBYN, YOU HAVE A LOT OF
10    CASES THAT AREN'T IN THE NEWSPAPERS.  THEY'RE NOT
11    IN THE NEWSPAPERS EVERY DAY.
12              AND WHEN I PICK UP A PHONE FROM
13    SOMEBODY THAT HASN'T TALKED TO ME IN SIX MONTHS,
14    I'M PRETTY CERTAIN THEY DON'T KNOW THAT THERE WAS
15    A LAWSUIT IN ARIZONA, BUT I'M ALSO PRETTY CERTAIN
16    THAT THEY KNOW ABOUT THIS CASE.  AND THERE'S
17    REASON FOR THAT.
18              AND I THINK THAT YOU DID THAT FOR A
19    REASON.
20              BUT IF -- TO ANSWER YOUR QUESTION,
21    I THINK THAT IN ORDER TO MOVE ON, THE PLAINTIFFS
22    JUST NEED TO TELL THE TRUTH.  HOWEVER YOU WANT TO
23    PHRASE IT, HOWEVER YOU WANT TO TERM IT, THEY NEED
```

24    TO TELL THE TRUTH.
25    ///
0590
1     BY MR. RICHARDS:
2            Q.   OKAY.  AND WHAT -- I'M TALKING
3     ABOUT, THOUGH, HOW DO -- IS YOUR BUSINESS STRATEGY
4     TO KEEP THE PLAINTIFFS AS YOUR INVESTORS IN THIS
5     DEAL?
6            A.   MY BUSINESS STRATEGY WOULD BE TO --
7     AS WE SAID, IF -- IN THIS SITUATION IT'S VERY
8     UNHEALTHY.
9            MY BUSINESS STRATEGY IS IF THEY
10    TOLD THE TRUTH, AND EVERYONE KNEW THE TRUTH, THEN
11    I'D BE IN A MUCH BETTER POSITION TO RECOUP THEIR
12    INVESTMENT.
13           Q.   SO BASICALLY -- BASICALLY, YOU HAVE
14    NO BUSINESS PLAN TO CHANGE THE MANAGEMENT OF THE
15    COMPANY?  YOU WANT TO STILL MAINTAIN THE
16    RESPONSIBILITY OF KEEPING -- OF TRYING TO RETURN
17    THEIR INVESTMENT?
18           A.   YES.
19           Q.   AND WHY DO YOU WANT TO DO THAT?
20           A.   I THINK I'M ENTITLED TO DO THAT.
21           Q.   BECAUSE SOME OF THE FUNDS FROM
22    DIAMANTE DEL MAR WERE TRANSFERRED TO ENTITIES THAT
23    YOU OWN OR CONTROL THAT WERE THEN USED TO
24    FACILITATE THE PURCHASE OF THE CABO SAN LUCAS
25    DEAL, WOULD YOU BE WILLING, ALONG WITH MR. KENNER,
0591
1     IF IT WAS EQUAL, TO GIVE UP SOME OF YOUR POINTS IN
2     CABO SAN LUCAS IF IT WAS, YOU KNOW, EQUAL TO BOTH
3     SIDES, SINCE YOU GUYS ARE THE MAJORITY OWNERS, IN
4     ORDER FOR THE INVESTORS THAT INVESTED IN DIAMANTE
5     DEL MAR TO HAVE SOME POSSIBILITY OF RECOVERING
6     THEIR INVESTMENT?
7            A.   JUST TO BE CLEAR --
8            Q.   YEAH.
9            A.   -- WHEN WE WERE HAVING THESE
10    PROBLEMS WITH PHIL -- WHEN I WAS HAVING THESE
11    PROBLEMS WITH PHIL KENNER, I WROTE A LONG E-MAIL.
12           AND IN THAT E-MAIL I SUGGESTED THAT
13    HE GIVE UP 10 PERCENT, I GIVE UP 10 PERCENT AND WE
14    MAKE A DECISION TO NOT TAKE ANY PROFITS OUT OF
15    EITHER PLACE UNTIL ALL THE INVESTORS ARE REPAID.
16           I NEVER GOT A RESPONSE FROM THAT
17    E-MAIL.  THAT WAS WHEN ALL OF THIS WAS GOING SOUTH
18    IN JUNE -- MAY AND JUNE OF 2007.
19           Q.   DID YOU PROVIDE THAT E-MAIL AS PART
20    OF THE DISCOVERY RESPONSES?  BECAUSE I WOULD LOVE
21    TO SEE THAT E-MAIL.

22          A.   I HOPE SO.
23          Q.   OKAY.  THERE WAS -- THERE WAS A
24   TREMENDOUS -- THERE'S A TREMENDOUS AMOUNT OF --
25   THERE WAS A -- THERE WAS A TREMENDOUS AMOUNT OF
0592
1    E-MAILS BETWEEN YOU AND TOMMY CONSTANTINE,
2    ATTEMPTING TO SETTLE THIS MATTER.
3               AND ALL THE E-MAILS SEEMED VERY
4    CORDIAL AND COURTEOUS BETWEEN YOU.
5               IS THAT A FAIR CHARACTERIZATION?
6          A.   WHAT'S A FAIR CHARACTERIZATION IS
7    THAT I'M OBVIOUSLY VERY NAIVE.
8          Q.   WHY?
9          A.   BECAUSE I TRUSTED TOMMY CONSTANTINE
10   WAS WORKING FOR BOTH PHIL KENNER AND MYSELF, AND I
11   TRUSTED WHAT HE SAID.  AND WHEN HE ACTED AS MY
12   FRIEND, I BELIEVED HIM.
13         Q.   AND WHAT DID HE DO THAT MADE YOU
14   BELIEVE THAT HE WASN'T ACTING AS YOUR FRIEND?
15         A.   WELL, I'VE LEARNED THAT HE'S MADE
16   VERY BAD COMMENTS ABOUT ME SINCE THE LEHMAN
17   BANKRUPTCY, SO I'M SURE BEFORE THAT, TO LEHMAN
18   BROTHERS AND TO DANSKE BANK, AMONG OTHER PEOPLE.
19         Q.   IS THAT AFTER THE SETTLEMENT
20   NEGOTIATIONS BROKE DOWN?
21         A.   YES.
22         Q.   AND DO YOU KNOW WHETHER OR NOT --
23   DO YOU KNOW WHETHER OR NOT TOMMY CONSTANTINE WAS
24   UPSET THAT THE -- THAT AFTER WORKING ON THIS WITH
25   YOU FOR 18 MONTHS, THIS THING DIDN'T SETTLE?
0593
1          A.   I -- I REALLY DON'T KNOW BECAUSE IT
2    WASN'T OUR FAULT THAT IT DIDN'T SETTLE.  PHIL
3    DIDN'T SIGN IT.
4               SO AT THIS POINT I DON'T KNOW IF IT
5    WAS ALL JUST A PLAN TO STALL THE PROJECT.  I DON'T
6    KNOW.
7          Q.   WHY WOULD BE THE -- DO YOU HAVE ANY
8    EVIDENCE THAT SOMEONE WANTED TO STALL THE PROJECT?
9          A.   WELL, THEY MADE THESE CLAIMS FOR ME
10   TO MISMANAGE, AND THEY PUT ME IN A VERY DIFFICULT
11   POSITION TO MANAGE.
12              SO I LOOK BACK NOW, AFTER BEING, I
13   THINK, NAIVE IN MY RELATIONSHIP WITH TOMMY
14   CONSTANTINE, TO THINK THAT MAYBE THIS WAS JUST A
15   STALL TO MAKE ME LOOK BAD.
16         Q.   WHAT DID KENNER SPECIFICALLY SAY
17   THAT WAS BAD ABOUT THE PROJECT?
18         A.   I DIDN'T SAY KENNER.  I SAID
19   CONSTANTINE.

20          Q.   YEAH.  WHAT -- OH, BUT WHAT DID
21   CONSTANTINE SPECIFICALLY SAY BAD ABOUT THE
22   PROJECT?
23          A.   HE JUST MADE COMMENTS THAT I
24   MISMANAGED THE PROJECT.  I WASN'T IN THE
25   CONVERSATION.  I JUST HEARD IT WAS VERY NEGATIVE
0594
1    TOWARDS ME.
2           Q.   ISN'T IT TRUE THAT YOU WENT TO THE
3    NEW YORK POST BEFORE PHIL KENNER OR
4    MR. CONSTANTINE OR ANYBODY ELSE?
5           A.   NO.
6           Q.   NO?
7           A.   NO.
8           Q.   DIDN'T YOU RUN A STORY IN THE
9    NEW YORK POST ABOUT TOMMY -- TOMMY CONSTANTINE?
10          A.   NO.
11          Q.   SO YOU DON'T KNOW ANYTHING -- JUST
12   SO WE'RE VERY CLEAR ON THE RECORD, YOU DIDN'T TAKE
13   PART IN ANY SORT OF PROVIDING ANY INFORMATION --
14   YOU OR ANYONE ACTING ON YOUR BEHALF, TO PROVIDE
15   INFORMATION TO THE NEW YORK POST REGARDING
16   TOMMY CONSTANTINE?
17          A.   NO.
18          Q.   SO WHEN THE STORY CAME OUT ABOUT
19   TOMMY CONSTANTINE, IT WAS A COMPLETE SURPRISE TO
20   YOU?
21          A.   I DIDN'T DO IT.
22          Q.   I KNOW.  I'M SAYING BUT YOU OR
23   ANYBODY THAT YOU HAVE A PROFESSIONAL RELATIONSHIP
24   WITH.
25          A.   I CAN ONLY SPEAK FOR MYSELF.
0595
1           Q.   WELL, I KNOW.  BUT YOU'RE SPLITTING
2    HAIRS.
3           A.   I SAID I DON'T KNOW.  I DIDN'T DO
4    IT, AND I DON'T KNOW.  HOW IS THAT?
5           Q.   THAT'S FINE.
6                SO PRIOR TO THE STORY COMING OUT,
7    YOU WEREN'T A PARTY TO ANY SORT OF E-MAILS OR
8    ANYTHING THAT SUGGESTED THAT -- THAT WAS PROVIDING
9    INFORMATION FOR A STORY ON TOMMY CONSTANTINE?
10          A.   I DON'T BELIEVE SO.
11          Q.   NOW, DID YOU ASSIST KRISTIE MYRICK
12   IN -- IN ANY LITIGATION WITH PHIL KENNER?
13               MS. CROWTHER:  OBJECTION.
14   RELEVANCE.
15               MR. RICHARDS:  RELEVANCE?
16               MS. CROWTHER:  YEAH.  RELEVANCE.
17   KENNER IS NOT A PARTY.  MYRICK DOESN'T INVEST IN

18    ANY OF THE MEXICAN PROPERTIES.
19                    MR. RICHARDS:  WELL, SHE'S ALL OVER
20    THESE E-MAILS.
21                    MS. CROWTHER:  I DON'T CARE THAT
22    SHE'S ALL OVER THE E-MAILS.  I AGREED TO GIVE YOU
23    ALL OF THE COMMUNICATIONS BETWEEN PHIL AND KEN.
24    THAT DOESN'T MAKE IT RELEVANT.
25                    MR. RICHARDS:  BUT RELEVANCE IS NOT
0596
1    A PROPER OBJECTION.  IT MAY LEAD ME TO SHOW -- IT
2    WILL GO BACK -- IT'S ONE QUESTION.  COME ON.  IT'S
3    NOT A LOT OF --
4                    MS. CROWTHER:  IT'S ONE QUESTION
5    NOW.  OKAY.  AND I'M TELLING YOU THAT I'M LIMITING
6    THE SCOPE OF THIS DEPOSITION TO WHAT IS BROADLY
7    DEFINED AS RELEVANT.
8                    MR. RICHARDS:  WELL, IT'S NOT ONLY
9    RELEVANCE.  IT MAY BE IRRELEVANT, BUT IT COULD
10    LEAD TO THE DISCOVERY OF ADMISSIBLE EVIDENCE.
11                    MS. CROWTHER:  I THINK THE
12    DEFINITION OF "RELEVANCE" IS ADMISSIBLE IN
13    EVIDENCE OR LIKELY TO LEAD TO THE DISCOVERY OF
14    ADMISSIBLE EVIDENCE.
15                    QUESTIONS ABOUT KRISTIE MYRICK AND
16    HER LAWSUIT AGAINST PHIL KENNER IS NOT LIKELY TO
17    LEAD TO THE DISCOVERY OF ADMISSIBLE EVIDENCE AS TO
18    THESE PLAINTIFFS AND THEIR INVESTMENTS IN MEXICAN
19    PROPERTIES.
20                    MR. RICHARDS:  BUT PHIL KENNER IS
21    THE MANAGING MEMBER OF THE 47 PERCENT OWNER.  SO
22    IF HE'S -- I'M JUST -- THE REASON WHY I BROUGHT IT
23    UP IS BECAUSE HE WAS SAYING, WELL, HE DOESN'T KNOW
24    WHY HE WAS ATTACKED.
25                    AND WE BELIEVE THAT HE WAS
0597
1    ASSISTING KRISTIE MYRICK IN HER LITIGATION WITH
2    PHIL KENNER.
3                    MS. CROWTHER:  ALL THAT DOES IS
4    SHOW THAT YOU HAD MOTIVE TO MALICIOUSLY ATTACK
5    KEN JOWDY.  IT HAS NOTHING TO DO WITH WHETHER HE
6    DEFRAUDED THESE PLAYERS.
7                    AND I'M NOT GOING TO LET YOU --
8            (SPEAKING SIMULTANEOUSLY.)
9                    MR. RICHARDS:  NO.  I'M USING IT IN
10    RESPONSE TO THE CONTENTION THAT -- THAT KEN JOWDY
11    IS SOME SORT OF INNOCENT BYSTANDER AND -- AND --
12    AND THAT HE WAS DOING EXACTLY WHAT HE WAS
13    COMPLAINING OF.
14                    MS. CROWTHER:  NO.  YOUR LAWSUIT IS
15    THAT HE MADE MISREPRESENTATIONS TO PARTICULAR

```
16      INDIVIDUALS ABOUT INVESTMENTS THAT THEY MADE.
17                    AND THIS MUD THAT YOU'RE TRYING TO
18      THROW AT KEN HAS NOTHING TO DO WITH ANYTHING.
19                    AND IF YOU WANT TO USE IT TO ADMIT
20      THAT YOU HAD ULTERIOR MOTIVES FOR WHY YOU WENT
21      AFTER HIM, THAT'S YOUR DECISION.
22                    BUT IT IS NOT RELEVANT TO THIS
23      LAWSUIT.
24                    MR. RICHARDS:  I'M NOT TRYING TO
25      THROW ANY MUD.  I JUST ASKED HIM IF HE ASSISTED
0598
1       KRISTIE MYRICK.
2                     LET ME ASK.  I'LL ASK A DIFFERENT
3       QUESTION.
4                     MS. CROWTHER:  NO.
5       BY MR. RICHARDS:
6            Q.   WHO IS KRISTIE MYRICK?
7            A.   FORMER ASSISTANT TO PHIL, I
8       BELIEVE.
9            Q.   AND HOW DO YOU KNOW?
10           A.   BECAUSE I KNOW WHEN PHIL WAS ––
11      WHEN SHE WAS WORKING PHIL.
12           Q.   AND HAVE YOU EVER SPOKEN TO HER
13      AFTER SHE STOPPED WORKING FOR PHIL?
14           A.   YES.
15           Q.   WHEN WAS THAT?
16           A.   SEVERAL TIMES.
17           Q.   AND WHAT DID SHE TELL YOU?
18                MS. CROWTHER:  OBJECTION.  THERE'S
19      NO FOUNDATION THAT THIS HAS ANYTHING TO DO WITH
20      THE LAWSUIT.
21                IF YOU LAY THAT FOUNDATION, YOU CAN
22      ASK THE QUESTION.  BUT THERE ISN'T ANY.
23      BY MR. RICHARDS:
24           Q.   HAVE YOU EVER PAID KRISTIE MYRICK
25      ANY MONEY?
0599
1                 MS. CROWTHER:  OBJECTION.
2                 THE DEPONENT:  NO.
3                 MR. RICHARDS:  NO?  THAT'S
4       OBJECTIONABLE?
5                 MS. CROWTHER:  YES.
6       BY MR. RICHARDS:
7            Q.   DID –– DID KRISTIE MYRICK EVER TELL
8       YOU SHE WOULD ASSIST YOU IN HELPING YOU DEFEND MY
9       LAWSUIT, THE ONE I FILED?
10           A.   WHICH ONE?
11           Q.   THE ONE –– THE ONE ––
12           A.   THIS ONE HERE?
13           Q.   YEAH.
```

14            A.   DID SHE EVER TELL ME SHE'D HELP ME?
15            Q.   WELL, DID YOU EVER -- DID YOU EVER
16   CALL HER TO SEEK ASSISTANCE AFTER THIS LAWSUIT WAS
17   FILED?
18            A.   I CALLED HER TO SEE IF I CAN GET
19   THE -- SOME NAMES AND ADDRESSES OF PEOPLE.  AND
20   SHE SAID SHE WOULD TRY TO HELP ME.
21            Q.   AND DID SHE EVER TRY TO HELP YOU?
22            A.   SHE GAVE ME THE NAME AND ADDRESS OF
23   TWO PEOPLE.
24            Q.   WHO IS THAT?
25            A.   WELL, MR. LITMAN IS NOT IN THIS
0600
1    CASE ANYMORE; RIGHT?
2            Q.   NO.
3            A.   AND JOZEF STUMPEL.
4            Q.   AND DID YOU CONTACT MR. STUMPEL?
5            A.   I HAVEN'T YET.
6            Q.   ISN'T THE REASON WHY YOU TESTIFIED
7    IN THE NOLAN ARBITRATION IS BECAUSE YOU HAD AN
8    INFORMATION-SHARING AGREEMENT WITH KRISTIE MYRICK
9    AND MICHAEL MEEKS?
10            MS. CROWTHER:  OBJECTION.  ASKED
11   AND ANSWERED.
12            THE DEPONENT:  NO.
13            MR. RICHARDS:  DO YOU WANT TO TAKE
14   OUR BREAK NOW?  IT'S, LIKE, 3:30.
15            MS. CROWTHER:  UP TO YOU.
16            MR. RICHARDS:  YEAH, I CAN TAKE A
17   FIVE-MINUTE BREAK.
18            THE VIDEOGRAPHER:  ALL RIGHT.  OFF
19   THE RECORD.  WE'LL GO OFF VIDEOTAPE RECORD AT
20   3:26 P.M.  THAT WILL CONCLUDE TAPE NUMBER 2 OF
21   VOLUME NUMBER II.
22            (WHEREUPON, A RECESS WAS HELD
23            FROM 3:26 P.M. TO 3:50 P.M.)
24            THE VIDEOGRAPHER:  AND WE'RE BACK
25   ON THE VIDEOTAPE RECORD, BEGINNING TAPE NUMBER 3
0601
1    OF VOLUME NUMBER II, AT 3:50 P.M.
2    BY MR. RICHARDS:
3            Q.   ON -- JUST ONE MORE QUESTION HERE
4    ABOUT THE GENERAL LEDGER, AND THEN WE'LL GET OFF
5    OF THIS SUBJECT.
6            I'M SHOWING YOU, FROM THE GENERAL
7    LEDGER, WHICH IS ON PAGE 4990 -- THESE ARE ALL
8    THESE AMEX CHARGES, WHICH GO ONTO THE NEXT PAGE,
9    AND THEY -- AND THEY KEEP GOING UNTIL THERE'S A
10   TOTAL OF 467,000 DOLLARS IN PAYMENTS TO AMEX, EVEN
11   SOME AS RECENTLY AS, I GUESS, JANUARY 1ST OF 2009.

```
12                    AND WHAT I'D LIKE TO KNOW IS WHERE
13      DO I GET THE ACTUAL AMEX STATEMENTS TO SHOW WHAT
14      THE AMEX CHARGES WERE?
15              A.   I ASSUME THEY'RE IN THE OFFICE IN
16      CONNECTICUT.
17              Q.   DO YOU KNOW WHAT TYPE OF THINGS
18      WERE CHARGED ON AN AMEX TO THE TUNE OF HALF A
19      MILLION DOLLARS?  YOU MUST HAVE A PLATINUM CARD BY
20      NOW RIGHT -- A BLACK CARD, I MEAN.
21              A.   I DON'T.  IT WOULD BE VARIOUS
22      THINGS, FROM FLIGHTS TO EQUIPMENT TO HOTELS.
23              Q.   WELL, LET ME JUST ASK YOU:  WHOSE
24      CARD IS IT?
25              A.   I BELIEVE BILL NAJAM HAS A CARD AND
0602
 1      I HAVE A CARD.
 2              Q.   AND THE CARD IS TO YOU GUYS AS
 3      INDIVIDUALS?
 4              A.   I BELIEVE SO.
 5              Q.   SO THIS IS JUST WHAT YOUR -- YOUR
 6      AMEX -- LIKE THIS IS YOUR -- SO IT'S A CARD WITH
 7      YOU GUYS -- WHO'S THE PRIMARY ACCOUNT HOLDER ON
 8      THE CARD?
 9              A.   BILL NAJAM.
10              Q.   AND THEN YOU'RE THE SECONDARY CARD?
11              A.   I BELIEVE SO.
12              Q.   AND THIS JUST PAYS THE AMEX
13      CHARGES?
14              A.   YES.
15              Q.   ALL RIGHT.  DO YOU -- DO YOU
16      PRESENTLY, WHEN YOU HAVE AN AMEX CHARGE, DO YOU
17      SUBMIT IT TO -- DO YOU SUBMIT YOUR BILL, OR DO
18      JUST YOUR BILLS GO TO CONNECTICUT, AND THEN
19      THEY'RE JUST PAID PRESENTLY FOR CABO SAN LUCAS?
20              A.   IT DEPENDS.  I SUBMIT EXPENSE
21      REPORTS.
22              Q.   OKAY.  I'M GOING TO SHOW YOU NEXT,
23      THIS IS JOWDY 653.
24                   THIS IS A -- THIS IS AN E-MAIL THAT
25      WAS SENT TO YOU.  IT SAYS:
0603
 1                   "ROB CALLED TO TELL ME HE WAS
 2                   OUT OF LINE.  DUDE WAS
 3                   MISUNDERSTANDING OF THE DOCS AND THE
 4                   PLAYERS INVOLVED.  HE SENDS HIS
 5                   SINCEREST APOLOGIES."
 6                   AND THEN YOU MENTIONED THAT THEY
 7      ASKED FOR 18,000 A MONTH.
 8                   DO YOU KNOW WHAT YOU'RE REFERRING
 9      TO?
```

```
10              A.    WELL, THAT'S AN E-MAIL FROM PHIL
11   I'M NOT SURE WHAT HE'S REFERRING.
12              Q.    WHAT ARE YOU REFERRING?
13              A.    SYNTHESIS WAS A SALES AND MARKETING
14   COMPANY.  THEY MUST HAVE GIVEN US A PROPOSAL,
15   WHERE THEY ASKED FOR 18,000 PER MONTH.
16              Q.    NOW, WHEN YOU SAY YOU'RE NOT
17   REFERRED -- YOU DON'T KNOW WHAT HE'S REFERRING TO,
18   DO YOU THINK YOU KNEW AT THE TIME WHAT HE WAS
19   REFERRING TO?
20              MS. CROWTHER:  CALLS FOR
21   SPECULATION.  YOU CAN ALSO LET HIM SEE THE WHOLE
22   E-MAIL.
23              THE DEPONENT:  YEAH.  MAYBE IF YOU
24   GIVE ME ...
25   ///
0604
1    BY MR. RICHARDS:
2               Q.    ALL RIGHT.  LET'S START AT THE
3    BOTTOM.
4               A.    OKAY.  NO, NO, NO.  NOW I KNOW.  IF
5    I CAN GET TO IT.
6               THAT'S ROB MADIA, WHO WAS AN
7    ATTORNEY FOR PHIL KENNER.  AND IT LOOKS LIKE WE
8    ASKED HIM TO GIVE AN OPINION LETTER.
9               AND BASED ON THAT, LOOKS LIKE HE
10   THINKS FERNANDO WAS GETTING 2 1/2 PERCENT OF REAL
11   ESTATE SALES.  AND FERNANDO WAS A LAWYER, SO IT
12   LOOKS LIKE ROB WAS THINKING THAT HE WOULD GET THAT
13   SOMEHOW.
14              I REMEMBER HE HAD SOME
15   MISCONCEPTION OF WHAT HIS FEE SHOULD BE AND
16   THOUGHT IT SHOULD BE IN LIGHT OF WHAT FERNANDO WAS
17   GETTING, BUT I THINK HE MADE A MISTAKE.  IT WASN'T
18   OUR ATTORNEY.  IT WAS SYNTHESIS MARKETING.  AT
19   LEAST THAT'S WHAT I'M ...
20              Q.    THIS IS ON THE OFFERING MEMORANDUM
21   FROM WHICH -- WHICH COMPANY?
22              A.    I DON'T THINK THERE'S AN
23   OFFERING -- I DON'T BELIEVE THAT THEY'RE OFFERING
24   DOCUMENTS THAT WE'RE TALKING ABOUT HERE.
25              Q.    WHAT DOCUMENTS ARE THESE?
0605
1               A.    I DON'T KNOW.  I JUST THINK HE'S --
2               Q.    DIFFERENT DOCUMENTS?
3               A.    -- MADE A MISTAKE.
4               Q.    ALL RIGHT.  ON JOWDY 655, IT STATES
5    THAT:
6               "WITH RESPECT TO CAREY
7               (PHONETICALLY) AND CHRIS, MANY THANKS
```

```
 8              FOR THE PRESENTATIONS.  WE'LL BE
 9              PLEASED AND ABLE TO ASSIST IN
10              PROVIDING INSURANCE CAPACITY TO
11              PROTECT THESE PROJECTS."
12                   WHAT'S THIS ABOUT?
13         A.   APPARENTLY ABOUT INSURANCE.  I'M
14   NOT SURE IF IT'S -- IT SAYS, "HAWAII PROJECT,"
15   SO --
16         Q.   THAT PROJECT, DID THAT EVER COME TO
17   FRUITION?
18         A.   THE HAWAII PROJECT?
19         Q.   YEAH.
20         A.   WELL, IT'S -- PHIL KENNER WAS --
21   IT'S HIS PROJECT, BUT I --
22         Q.   WERE YOU GOING TO BE A PARTY TO
23   THAT IN SOME WAY?
24         A.   I AM A SMALL PARTY TO THAT, YES.
25         Q.   WHAT PART OF IT?
0606
 1         A.   I BELIEVE THERE IS A COMPANY CALLED
 2   J & N DEVELOPMENT OR J & N THAT HAS 5 PERCENT, I
 3   BELIEVE, OF NAHALAHU (PHONETICALLY) VENTURES.
 4         Q.   OKAY.  THIS IS A SPREADSHEET,
 5   DIAMANTE PHASE 1 CASH FLOW PROJECTION SUMMARY
 6   SHEET.
 7                   DO YOU KNOW WHAT THIS IS?
 8         A.   LOOKS LIKE A PROJECTED -- SOME CASH
 9   FLOW.
10         Q.   DID YOU DO -- DID YOU DO STUFF LIKE
11   THIS REGULARLY?
12         A.   WE DID A LOT OF THINGS LIKE THIS,
13   YES.
14         Q.   SO IF CASH FLOW WAS SOMETHING THAT
15   WAS IMPORTANT TO YOU, DID YOU -- DID YOU HAVE
16   ANY -- DID YOU DO ANY CASH FLOW PROJECTION -- IF
17   YOU REMEMBER, DID YOU DO ANY CASH FLOW PROJECTIONS
18   AT THE TIME AFTER THE LOAN CAME IN FOR K.S.I.?
19         A.   AFTER?
20         Q.   OR RIGHT BEFORE, YOU KNOW, ON THAT
21   LOAN.
22         A.   I'M NOT SURE.
23         Q.   DO YOU KNOW WHO MADE THESE CASH
24   FLOW PROJECTIONS?
25         A.   I'M SURE IT WAS A GROUP EFFORT.
0607
 1         Q.   WHAT TYPE OF INSURANCE -- I'M
 2   SHOWING THIS ON 6668.
 3                   WHAT TYPE OF INSURANCE ARE WE
 4   REFERRING -- IS THIS FOR HAWAII OR MEXICO, THIS
 5   E-MAIL, DOES IT REFER TO AS FAR AS INSURANCE?
```

```
 6              A.   THE SUBJECT IS HAWAII PROJECT, SO I
 7   ASSUME IT'S HAWAII.
 8              Q.   ON 670, YOU SENT AN E-MAIL TO PHIL
 9   SAYING:
10              "ANY NEW NEWS?  DID YOU EVER
11         TALK TO JEFF LITNER AGAIN?"
12              WHAT'S THAT?  AGAIN, AT 5:15 IN THE
13   MORNING, SHOWING YOUR LONG WORK HOURS.
14              A.   I DON'T KNOW.
15              Q.   YOU DON'T KNOW WHO JOE LITNER IS?
16              A.   HE MAY HAVE BEEN A POSSIBLE FUNDING
17   SOURCE OR CAPITAL GUY.  I DON'T KNOW.
18              Q.   OKAY.  ON 672, IT'S -- IS THIS --
19   THIS IS AN E-MAIL FROM AL GUTIERREZ TO YOU.
20   WHAT'S HE WRITING ABOUT WITH RESPECT TO THIS
21   INVESTMENT?
22              A.   LOOKS LIKE HE HAS A GROUP INTEREST
23   IN HAWAII.  AL WAS SOMEBODY I KNEW FROM NEW YORK.
24              AND HE WAS ACTING AS A BROKER, AND
25   I WAS KIND OF THE MIDDLEMAN, HELPING PHIL TRY TO
0608
 1   GET FUNDING IN HAWAII.  SO AL IS ACTING AS BROKER,
 2   I BELIEVE, AND I WAS JUST TRYING TO HELP OUT.
 3              Q.   WHY DID YOU SPEND SO MUCH TIME ON
 4   THIS HAWAII DEAL?
 5              A.   WELL, I MEAN, PHIL WAS TRYING TO
 6   GET THIS FUNDED AT THE SAME TIME.  HE HAD A LOT
 7   GOING ON AT THIS TIME.
 8              WE ARE TRYING TO GET THE EL ROSARIO
 9   PROJECT FUNDED.  WE WERE TRYING TO GET THE DOWN
10   PAYMENT DONE FOR -- FOR CABO.  AND WE'D HELP HIM
11   IN ANY WAY THAT WE COULD.  I THOUGHT IT WOULD BE
12   BENEFICIAL IF HE WAS SUCCESSFUL.
13              Q.   HE SAYS, ON 673:
14              "KJ, PLEASE FOLLOW UP WITH ALAN
15         STANDON TO GET SOMETHING DONE WITH
16         THESE GUYS.  IT WOULD BE A HUGE
17         RELIEF TO CHRIS, ME AND US."
18              WHO'S AL?
19              A.   SAME AL AS IN THE OTHER E-MAILS.
20              Q.   SO THIS IS ALL -- THESE E-MAILS ARE
21   ALL JUST BASICALLY E-MAILS DOCUMENTING THAT YOU
22   AND PHIL WORKED HAND IN HAND ON TRYING TO GET
23   CAPITAL FOR THE HAWAII PROJECT?
24              MS. CROWTHER:  OBJECTION.  VAGUE AS
25   TO THE TERM "THESE E-MAILS."
0609
 1   BY MR. RICHARDS:
 2              Q.   THE LAST FEW E-MAILS I'M SHOWING
 3   YOU.
```

```
 4                    IT SEEMS TO ME THAT YOU AND PHIL
 5     ONLY DIDN'T WORK ON MEXICAN PROJECTS, YOU ALSO
 6     WERE TRYING -- YOU WORKED TOGETHER ON A LOT OF
 7     PROJECTS.
 8          A.   WELL, AT THIS TIME PHIL WAS TRYING
 9     TO GET A HARD MONEY LOAN IN HAWAII.  AND I BELIEVE
10     THAT'S HOW HE WAS GOING TO FUND WHAT HE WAS
11     SUPPOSED TO FUND IN CABO.
12                    SO LOOKING AT THIS, OBVIOUSLY IT
13     WOULD BE IN MY BEST INTEREST TO HELP HIM WITH
14     WHATEVER DOCUMENTATION HE NEEDED TO DO THAT.
15          Q.   FROM -- FROM 2002 TO THE TIME THAT
16     YOU -- THAT PHIL GOT TERMINATED AS THE DIRECTOR OF
17     MARKETING -- WELL, YOU TESTIFIED YESTERDAY THAT
18     YOU FIRST HAD LIKE A PROBLEM IN -- WAS IT '06 OR
19     '07?
20          A.   I BELIEVE THAT THE FIRST ISSUES OR
21     MAJOR ISSUES WERE IN '06, AT THE END OF '06.
22     OCTOBER OF '06.
23          Q.   OKAY.  SO PRIOR TO OCTOBER '06, DID
24     YOU HAVE ANY PROBLEMS WORKING WITH PHIL KENNER?
25          A.   NOT REALLY.
0610
 1          Q.   AND DID YOU -- IT SEEMS TO ME THAT
 2     DURING THAT TIME, YOU WERE SUCCESSFUL IN THAT PHIL
 3     WAS SUCCESSFUL IN INTRODUCING LEHMANS TO THE CABO
 4     PROJECT AND ALSO GOT THEM TO FUND THIS HAWAII
 5     PROJECT EVENTUALLY.
 6                    ISN'T THAT CORRECT?
 7          A.   WELL, I THINK THAT HE WAS
 8     SUCCESSFUL IN INTRODUCING ME TO A PERSON WHO
 9     INTRODUCED ME TO LEHMAN.
10                    UNFORTUNATELY, HE HAD A BAD
11     EXPERIENCE WITH LEHMAN SOMEWHERE IN, I BELIEVE
12     2005.
13                    I DEVELOPED THE RELATIONSHIP WITH
14     LEHMAN.  WHEN IT CAME TIME TO DO THE CABO PROJECT,
15     THEY GOT IT FUNDED.  THEY STILL DID NOT WANT TO
16     WORK WITH PHIL.
17                    WHEN THE CABO PROJECT DID GET
18     FUNDED ABOUT A WEEK LATER, I ASKED FOR THEM TO
19     TALK TO PHIL AND TO SEE IF THEY COULD PUT ASIDE
20     THEIR DIFFERENCES AND FUND THE HAWAII PROJECT FOR
21     PHIL, AND THEY ENDED UP DOING THAT.  I THINK THEY
22     CLOSED THAT IN AUGUST.
23          Q.   PRIOR TO 2003, HAD YOU BEEN
24     INVOLVED IN ANY LAWSUITS PREVIOUSLY?
25          A.   I DON'T REMEMBER.
0611
 1          Q.   DID KENNER HAVE A LOT OF SALES
```

2    READY TO GO IN DECEMBER OF 2006?
3              A.   I DON'T KNOW.
4              Q.   WAS THERE A PROBLEM WITH YOU BEING
5    ABLE TO PROVIDE SALES PACKAGES TO KENNER TO MAKE
6    SALES IN 2006, YOU AND NAJAM?
7              A.   WHAT'S A SALES PACKAGE?  WE NEVER
8    WORKED -- WE WORKED ON GETTING HIM WHAT HE NEEDED.
9                   I KNOW THAT WE GOT HIM
10   DOCUMENTATION THAT -- I BELIEVE WE GOT HIM THE
11   DOCUMENTATION THAT HE NEEDED.
12             Q.   DO YOU KNOW ANYBODY FROM AMERICAN
13   FUNDING GROUP?
14             A.   I'M NOT SURE.  I DON'T -- I DON'T
15   KNOW.
16             Q.   THERE'S A LETTER THAT'S AT 686 THAT
17   WAS GOING TO GIVE YOU A CREDIT FACILITY FOR
18   230 MILLION DOLLARS.
19                  HOW DID YOU COME INTO CONTACT WITH
20   AMERICAN FUNDING GROUP?
21             A.   I DON'T KNOW.
22             Q.   ON JUNE 1ST, 2005, THERE WAS A
23   SUMMARY APPRAISAL REPORT.  AND THAT'S AT PAGES 693
24   OF THE PRODUCTION.
25                  AND IN THE REPORT, THERE'S A LETTER
0612
1    TO YOU THAT OUTLINES THAT THE PROPERTY IS WORTH
2    92 MILLION DOLLARS.
3                   I'LL SHOW YOU THE PAGE.  IT'S ON
4    PAGE 695.  AND THAT'S IN JUNE 1ST OF '05.
5                   MS. CROWTHER:  WHICH PROPERTY?
6                   MR. RICHARDS:  THE CABO -- CABO SAN
7    LUCAS PROPERTY.
8    BY MR. RICHARDS:
9              Q.   IS THAT -- DO YOU REMEMBER GETTING
10   THAT REPORT?
11             A.   YES.
12             Q.   AND DID YOU AGREE WITH THAT REPORT?
13             A.   GENERALLY, YES.
14             Q.   AND ARE YOU AWARE AS TO, IN THAT
15   REPORT, IF IT MADE ANY RECOMMENDATIONS, IS -- IF
16   IT MADE ANY RECOMMENDATIONS AS TO WHEN IT THOUGHT
17   YOU WOULD NEED TO GET THE LAND DEVELOPED?
18             A.   I'D HAVE TO READ THE REPORT.
19             Q.   WHAT -- WHEN THIS REPORT WAS
20   CREATED IN JUNE OF '05, WHAT'S CHANGED ON THE
21   PARCELS SINCE THIS REPORT WAS CREATED?  NOT IN THE
22   PARCEL.  I MEAN IN THE DEVELOPMENT.  WHAT'S BEEN
23   IMPROVED SINCE THIS REPORT WAS CREATED?
24             A.   WE HAVE ENTITLEMENTS ON THE
25   PROPERTY.  WE HAVE INFRASTRUCTURE.  WE HAVE A GOLF

0613
1    COURSE.  DESALINATION PLANT.  STRUCTURES.
2              Q.   HAVE YOU GOTTEN ANY ESTIMATES OF
3    WHAT IT WOULD COST TO BRING INFRASTRUCTURE TO THE
4    100 -- HOW MANY TOTAL SITES ARE THERE?  135?  136?
5    APPROXIMATELY.
6              A.   YEAH.  7 -- 66 AND 70.
7              Q.   66 AND 70.  SO 136.
8              (NO AUDIBLE RESPONSE BY DEPONENT.)
9    BY MR. RICHARDS:
10             Q.   HOW MANY -- HOW MANY -- DO YOU KNOW
11   HOW MUCH IT WILL COST TO BRING INFRASTRUCTURE TO
12   THOSE SITES?
13             A.   I BELIEVE TO THE FIRST 66, A LITTLE
14   BIT LESS THAN 2 MILLION DOLLARS.  AND TO THE OTHER
15   78, I BELIEVE 3 1/2 TO 4 MILLION DOLLARS, BUT I'M
16   NOT SURE EXACTLY.
17             WE'RE JUST IN THE PROCESS OF
18   GETTING SOME OTHER ESTIMATES.
19             Q.   OKAY.  I'M GOING TO SHOW YOU
20   PAGE 755.  THIS IS A LETTER FROM THE PALMS CASINO
21   TO YOU THAT SAYS THAT THEY'RE GIVING YOU TITLE
22   DOCUMENTS TO BUY UNITS IN THE PALMS CASINO.
23             DO YOU REMEMBER THAT TRANSACTION?
24             A.   I REMEMBER WHAT HAPPENED, YES.
25             Q.   OKAY.  WELL, WHERE DID YOU GET THE
0614
1    MONEY TO BUY THOSE UNITS?
2              A.   I DIDN'T BUY THE UNITS.
3              Q.   DO YOU KNOW WHY THEY'RE SENDING
4    TITLE DOCUMENTS TO YOU?
5              A.   BECAUSE I HAD A CONTRACT TO BUY THE
6    UNITS.
7              Q.   OKAY.  BUT YOU DIDN'T HAVE TO PUT
8    UP ANY MONEY?
9              A.   I DID.
10             Q.   HOW MUCH DID YOU PUT UP?
11             A.   I'M NOT SURE THE TOTAL AMOUNT.
12             Q.   WELL, I THINK THEY LIST THEM ON
13   HERE.
14             WAS THAT -- IS THAT -- IS THAT THE
15   DEPOSIT?
16             A.   THE FIRST DEPOSIT CAME FROM
17   PHIL KENNER, AND THE SECOND DEPOSIT CAME FROM
18   GLEN MURRAY THROUGH PHIL KENNER.
19             Q.   OKAY.  AND IS THERE -- THERE'S ONLY
20   TWO DEPOSITS?
21             A.   TWO.  ONE WAS A CERTAIN AMOUNT AND
22   THE OTHER DEPOSIT WAS A CERTAIN AMOUNT.
23             Q.   DIDN'T THE FIRST 150,000 COME FROM

```
24    T.L.J. MANAGEMENT?
25              A.   IT WAS A CHECK FROM T.L.J.
0615
 1    MANAGEMENT, YES.
 2              Q.   SO ARE YOU SUGGESTING THAT A CHECK
 3    FROM T.L.J. MANAGEMENT IS SOMEBODY ELSE'S MONEY?
 4              A.   T.L.J. MANAGEMENT WROTE THE CHECK,
 5    YES.
 6              Q.   AND -- AND PALM SENT THE MONEY TO
 7    THE PRINCIPAL AT T.L.J. MANAGEMENT; RIGHT?  I MEAN
 8    SENT THE TITLE DOCUMENTS.
 9              A.   SENT IT TO ME, YES.
10              Q.   AND WHAT -- WERE YOU SUPPOSED TO
11    GET TITLE IN THE PROPERTY?
12              A.   IF I PURCHASED THE PROPERTY, I
13    BELIEVE SO.
14              Q.   AND WHAT -- WHAT ENDED UP
15    HAPPENING?
16              A.   THE -- CAN I TELL THE WHOLE STORY?
17              Q.   I WANT YOU TO, YEAH.  THAT'S WHY
18    I'M ASKING YOU.  I DON'T KNOW THE STORY.
19              (SPEAKING SIMULTANEOUSLY.)
20              THE DEPONENT:  ARE YOU ASKING ME A
21    QUESTION, SO THERE'S A LONG STORY.  AND THERE'S A
22    LONG LITIGATION THAT HAS TO DO WITH THIS
23    TRANSACTION.
24              SO IF I -- YOU WANT ME TO TELL --
25    YOU'RE ASKING QUESTIONS ABOUT IT, SO IT'S UNDER
0616
 1    EXISTING LITIGATION IN LAS VEGAS.  SO THERE'S A
 2    WHOLE DOCUMENTED STORY.
 3              I CAN SEND YOU THE TRANSCRIPTS AT
 4    THE SAME TIME.
 5    BY MR. RICHARDS:
 6              Q.   NO, NO.  I JUST WANT YOU TO TELL ME
 7    THE STORY.
 8              A.   PHIL KENNER HAD, I BELIEVE, SEVERAL
 9    PALMS UNITS UNDER CONTRACT.  HE CAME TO ME IN --
10    I'M NOT SURE IF IT WAS FEBRUARY OR MARCH OR APRIL
11    OF '05 SAID THAT HE HAD THREE UNITS UNDER
12    CONTRACT.  HE COULDN'T GET ANY MORE.
13              THAT IT WAS A GREAT DEAL.  HE
14    THOUGHT I SHOULD GO UNDER CONTRACT FOR THREE
15    UNITS.
16              I TOLD HIM I DIDN'T HAVE THE MONEY.
17    HE SAID NOT TO WORRY ABOUT THE MONEY.  HE WOULD
18    PUT THE MONEY UP.  I JUST HAD TO PUT IT IN MY
19    NAME.
20              I SAID, "OKAY."
21              PUT THE FIRST INITIAL DEPOSIT UP OF
```

```
22   150,000 DOLLARS.  THEN IT CAME TIME IN AUGUST FOR
23   THE REMAINING DEPOSIT TO BE PUT UP.  IT WAS AT THE
24   SAME TIME THAT, AS YOU SAW, ALL OF THE OTHER
25   THINGS THAT WERE HAPPENING AS FAR AS THE PRESSURE
0617
1    OF THE HAWAII PROPERTY, THE PRESSURE OF THE CABO
2    CLOSING, SO PHIL DIDN'T HAVE THE FUNDS TO DO THAT.
3                   HE BORROWED THE FUNDS FROM
4    GLEN MURRAY.  WE DIDN'T GET THEM IN TIME.
5                   SO INSTEAD OF HAVING THE FUNDS SENT
6    BACK TO GLEN MURRAY, HE HAD THE FUNDS SENT TO BAJA
7    DEVELOPMENT.
8                   BAJA DEVELOPMENT SPENT -- SENT
9    500,000 DOLLARS TO PROPIEDADES D.D.M. AND THE
10   OTHER 400,000 DOLLARS WAS PUT AS A DOWN PAYMENT ON
11   THE LAS VEGAS HOUSE.
12           Q.   DID THE FUNDS EVER -- IS THAT THE
13   RETURN OF THE DEPOSIT, YOU SAY?
14           A.   YES.
15           Q.   DID THOSE FUNDS EVER GO BACK TO
16   PHIL KENNER?
17           A.   EVENTUALLY SOME OF THEM DID, YES.
18           Q.   AND HOW -- TELL ME SPECIFICALLY HOW
19   THEY WENT BACK TO PHIL KENNER.
20           A.   PHIL KENNER ARRANGED FOR A
21   REFINANCING OF THE HOUSE IN LAS VEGAS AND MONEY
22   WAS SENT TO HIM.
23           Q.   HOW MUCH WAS SENT TO HIM --
24           A.   I DON'T KNOW.
25           (SPEAKING SIMULTANEOUSLY.)
0618
1    BY MR. RICHARDS:
2            Q.   YOU DON'T KNOW HOW MUCH?
3            A.   I DON'T KNOW EXACTLY, NO.
4            Q.   WAS KENNER ON THE NEW MORTGAGE
5    AFTER THE REFINANCE?
6            A.   NO.
7            Q.   AND WHY -- AND TELL ME WHY -- WHY
8    IS THERE LITIGATION OVER THAT TRANSACTION?
9            A.   GLEN MURRAY ORIGINALLY SUED ME,
10   EVEN THOUGH I NEVER TALKED TO GLEN MURRAY.  HE
11   SAID THAT HE WAS TRYING TO GET THE MONEY BACK FOR
12   FOUR YEARS.
13                   PHIL KENNER NEVER ALLOWED HIM TO
14   TALK TO ME.  I NEVER HAD ONE CONVERSATION WITH HIM
15   ABOUT THIS UNTIL THE LAWSUIT.
16                   WE HAVE NAMED PHIL AS A
17   CO-DEFENDANT, I BELIEVE.  I DON'T KNOW WHAT
18   EXACTLY THE PROCESS OF THAT IS OR WHERE IT IS
19   RIGHT NOW, WHERE IT SITS, BUT IT'S STILL IN
```

20    LITIGATION.
21              Q.    WHAT IS GLEN MURRAY -- WHAT DOES
22    GLEN MURRAY WANT FROM YOU?
23              A.    GLEN MURRAY HAS -- HE WANTS --
24    WELL, HE'S SUING ME FOR 791,000 DOLLARS, I
25    BELIEVE.
0619
1               Q.    791,000?
2               A.    YES.
3               Q.    AND WHY DID GLEN MURRAY LOSE
4     791,000?
5               MS. CROWTHER:  OBJECTION.  ASSUMES
6     FACTS.
7     BY MR. RICHARDS:
8               Q.    OKAY.  DO YOU KNOW WHY GLEN MURRAY
9     IS CLAIMING YOU OWE HIM 791,000?
10              A.    BECAUSE HE'S THE PERSON THAT PHIL
11    BORROWED THE MONEY FROM.
12              Q.    IF -- IF PHIL GOT MONEY OUT OF THE
13    REFINANCE, WHY WOULDN'T HE BE ON THE LOAN OR ON
14    TITLE?
15              A.    HE ARRANGED FOR THE REFINANCING.
16    THE FIRST REFINANCE HE DID, THERE WAS A CHECK
17    WRITTEN TO HIM BEFORE THE MONEY HIT
18    MARK THALMANN'S BANK.  AND MARK THALMANN IS THE
19    ONLY ONE THAT'S ON THE LOAN.  AND MARK THALMANN
20    AND I WERE ON THE TITLE.
21              Q.    WERE YOU AWARE THAT THIS WAS
22    OCCURRING?
23              A.    YES.
24              Q.    AND WHY DIDN'T YOU OBJECT TO IT?
25              A.    THERE'S NO REASON TO OBJECT TO IT.
0620
1               Q.    IS THAT BECAUSE IT WAS HIS MONEY
2     THAT INITIALLY WAS FOR THE DEPOSIT THAT WAS
3     REFUNDED FROM THE PALMS?
4               A.    PARTIALLY, YES, THAT WAS THE
5     REASON.
6               Q.    WAS THERE ANY OTHER REASON?
7               A.    I DON'T KNOW.
8               Q.    DID -- HOW COME T.L.J. MANAGEMENT
9     DIDN'T ASK FOR A RETURN OF ITS 150,000?
10              A.    I DON'T KNOW.
11              Q.    WAS THAT BECAUSE IT WASN'T OWED THE
12    150,000?
13              A.    I'D HAVE TO LOOK AT ALL THE
14    CIRCUMSTANCES, THE RECORDS AT THE TIME.
15              Q.    DIDN'T GLEN MURRAY LOAN YOU SOME
16    MONEY, AND THAT'S WHAT HE WAS SUING YOU FOR?
17              A.    I NEVER ASKED GLEN MURRAY TO LOAN

18   ME MONEY.  GLEN MURRAY DEPOSITED MONEY IN AN
19   ESCROW, AS PER PHIL'S INSTRUCTIONS.
20          Q.   FOR PROPERTY THAT WAS -- I'M JUST
21   TRYING TO UNDERSTAND.
22               HOW DID GLEN MURRAY LOSE MONEY?  I
23   MISSED THAT.
24          A.   HE DEPOSITED MONEY, AS PER PHIL'S
25   INSTRUCTIONS.
0621
1          Q.   YEAH.  INTO AN ACCOUNT?
2          A.   INTO AN ESCROW ACCOUNT.
3          Q.   THAT WAS ENTITLED IN YOUR NAME?
4          A.   YES.
5          Q.   I GOT YOU.
6               AND THEN -- AND THEN THE MONEY CAME
7   BACK TO YOU?
8          A.   CAME BACK TO BAJA DEVELOPMENT,
9   UNDER PHIL'S DIRECTION AND 500,000 WENT TO
10  PROPIEDADES D.D.M. BECAUSE WE WERE UNDER SEVERE
11  PRESSURE.
12               PHIL WAS SUPPOSED TO RAISE THE
13  MONEY FOR THE CABO PROJECT.  I WASN'T SUPPOSED TO
14  RAISE ANY OF THE MONEY FOR THE CABO PROJECT.  I
15  THINK THAT'S BEEN ESTABLISHED.
16         Q.   YES.
17         A.   OKAY.  SO WHEN 500,000 WENT TO BAJA
18  DEVELOPMENT TO PROPIEDADES D.D.M, THEN DIRECTLY TO
19  THE SELLER, WHO WAS UNDER THE DIRECTION OF PHIL
20  KENNER, BECAUSE HE WAS HAVING DIFFICULTY RAISING
21  THIS MONEY.
22               AND THERE WAS A PROBLEM WHERE WE
23  WERE ABOUT AT THE END OF THE ROPE WITH THE SELLER,
24  AND HE COULD HAVE, AT ANY TIME, TAKEN THE FULL
25  DEPOSIT.
0622
1          Q.   I KNOW.
2          A.   SO --
3          Q.   THAT WAS WHEN YOU SAID EVERY
4   PAYMENT WAS HARD MONEY COMING IN?
5          A.   CONTACTUALLY.
6          Q.   RIGHT.  I GOT YOU.  BUT WHY DID --
7   WHAT -- I'M NOT UNDERSTANDING WHAT GLEN MURRAY IS
8   CLAIMING WENT WRONG.
9               IS HE SAYING THAT YOU SHOULD HAVE
10  REFUNDED THE DEPOSIT TO HIM BECAUSE HE'S THE GUY
11  THAT PAID YOU?
12         A.   I'M NOT SURE WHAT PHIL SAID TO
13  GLEN MURRAY.
14         Q.   RIGHT.
15         A.   BUT IT'S GLEN MURRAY'S BELIEF, AND

16    HE SUED ME, BECAUSE HE THINKS THAT I OWE THE
17    MONEY.  AND WE'RE IN LITIGATION NOW BECAUSE I SAID
18    I DON'T OWE THE MONEY.
19             Q.   OKAY.  AND WHO'S PAYING THOSE LEGAL
20    FEES?
21             A.   FOR ME?
22             Q.   YEAH.
23             A.   I BELIEVE -- I'M NOT SURE.  I
24    BELIEVE I AM.  I DON'T KNOW.
25             Q.   YOU DON'T KNOW WHO'S PAYING YOUR
0623
1     LAWYER?
2              A.   UNFORTUNATELY, I HAVE A LOT OF
3     LAWYERS AND A LOT OF LEGAL FEES.
4              Q.   WELL, ARE -- IS CABO SAN LUCAS
5     PAYING YOUR FEES?
6              A.   MOST LIKELY, THEY'RE PAYING SOME OF
7     IT, YES.
8              Q.   AND WHAT DOES THAT HAVE TO DO
9     WITH -- WHAT DOES THAT LAWSUIT, THIS REAL PROPERTY
10    TRANSACTION IN NEVADA, HAVE TO DO WITH THE
11    OPERATION OF CABO SAN LUCAS?
12             A.   500,000 DOLLARS WENT TO THE
13    PURCHASE OF THE PROPERTY.
14             Q.   FROM WHERE?
15             A.   FROM PROPIEDADES D.D.M. TO THE
16    PURCHASE OF THE PROPERTY.  THE MONEY THAT HE'S
17    SUING ME FOR, 500,000 DOLLARS OF IT WENT TO THE
18    PURCHASE OF THE PROPERTY.
19             Q.   NO, NO, NO.  I UNDERSTAND THAT
20    THAT -- THAT GLEN MURRAY WIRED IN 780, AND THEN
21    500 WENT TO PROPIEDADES AND 280 TO BAJA
22    DEVELOPMENT; IS THAT RIGHT?
23             A.   NO.
24             Q.   500 WENT TO PROPIEDADES.  AND WHERE
25    DID THE BALANCE GO?
0624
1              A.   THE WHOLE THING WENT TO BAJA
2     DEVELOPMENT.  500 TO PROPIEDADES D.D.M. AND THEN
3     TO THE SELLER.
4              Q.   WAS ALL -- THEN -- TO QUOTE THE
5     GREAT ROBYN CROWTHER, ONCE THE MONEY GOES TO BAJA
6     DEVELOPMENT, IT DOESN'T REALLY MATTER HOW THEY
7     SPENT IT.
8              ALL -- ALL MR. MURRAY KNOWS IS THAT
9     HE WIRED MONEY INTO AN ESCROW, AND THEN THE MONEY
10    WENT TO YOUR COMPANY?
11             A.   BUT ALL I KNOW IS PHIL WAS SUPPOSED
12    TO PUT UP ALL THE MONEY FOR THE CABO PROJECT.  SO
13    IF I'M HAVING TO INCUR EXPENSES FOR 500,000 THAT

```
14   WENT INTO THE DIAMANTE CABO SAN LUCAS, I THINK
15   IT'S LEGITIMATE THAT -- I THINK IT'S FAIR THAT THE
16   CABO PROJECT IS PAID SOME OF THOSE EXPENSES.
17           Q.   SO YOU'RE SAYING THAT -- THAT --
18   THAT AS A MANAGER, YOU MADE THE DECISION TO HAVE
19   THIS LITIGATION PAID FOR BY THE COMPANY BECAUSE
20   THIS MONEY THAT'S THE SUBJECT OF LITIGATION WAS
21   ULTIMATELY USED TO PURCHASE THE CABO PROPERTY?  IS
22   THAT THE RATIONALE?
23           A.   YES.
24           Q.   ALL RIGHT.  THIS IS MONEY THAT
25   WENT -- THAT NEVER TOUCHED -- THIS IS MONEY THAT
0625
 1   NEVER TOUCHED PHIL KENNER'S HANDS; IS THAT
 2   CORRECT?
 3           A.   YES.
 4           Q.   ALL RIGHT.  I GOT IT NOW.  I JUST
 5   WANT TO UNDERSTAND THE POSITION.
 6           A.   NEVER TOUCHED HIS ACCOUNT.
 7           Q.   RIGHT.  YEAH.  THIS IS MONEY THAT
 8   MURRAY WIRED --
 9           A.   EVENTUALLY, IT DID.  LET ME BE
10   CLEAR.  SO EVENTUALLY WE SAID WE PAID BACK A
11   PORTION OF IT, SO JUST TO BE CLEAR.
12           Q.   YOU MEAN OUT OF THE REFINANCE?
13           A.   YES.
14           Q.   BUT YOU DON'T KNOW HOW MUCH?
15           A.   I DON'T KNOW EXACTLY.
16                MR. RICHARDS:  OKAY.  WHAT WAS THE
17   LAST NUMBER THAT I GAVE THAT I WAS ON?
18                MS. CROWTHER:  755.
19                MR. RICHARDS:  OH, THANKS.
20   BY MR. RICHARDS:
21           Q.   WHO'S REX VANCE?
22           A.   I DON'T KNOW.
23           Q.   DO YOU KNOW WHO RESULTS FUNDING IS?
24           A.   NO.
25           Q.   IT'S -- LET ME JUST SHOW YOU 762
0626
 1   REAL QUICK.
 2                IT'S -- IT'S -- WAS PHIL KENNER
 3   PROVIDING YOU ALL OF THESE LENDING OPPORTUNITIES?
 4                MS. CROWTHER:  OBJECTION.  VAGUE AS
 5   TO "THESE."
 6   BY MR. RICHARDS:
 7           Q.   THE ONES DEALING WITH DIAMANTE DEL
 8   MAR.  LIKE ALL THESE -- LIKE THIS LETTER THAT WAS
 9   GIVEN TO YOU, FOR 20 MILLION IN THREE YEARS, 8,000
10   ACRES, ET CETERA?
11                MS. CROWTHER:  TAKE A MOMENT TO
```

```
12    REVIEW THE DOCUMENT.
13               AND HE CAN ANSWER AS TO THIS
14    SPECIFIC OPPORTUNITY, BUT I'M STILL UNCLEAR AS TO
15    WHAT YOU MEAN BY "ALL OF THESE."
16               MR. RICHARDS:  CAN WE JUST THEN
17    LIMIT IT TO THIS SPECIFIC OPPORTUNITY?
18               MS. CROWTHER:  YES.
19               MR. RICHARDS:  OKAY.  GREAT.
20               THE DEPONENT:  I DON'T KNOW.  DOES
21    IT SAY IT CAME FROM PHIL KENNER?
22    BY MR. RICHARDS:
23          Q.   WELL, BEFORE THEN, THERE'S AN
24    E-MAIL, KEN, PHIL AND DONNY.  BUT WHAT I'M -- WHY
25    DID ALL THESE LENDING OPPORTUNITIES SEEM TO FALL
0627
 1    THROUGH?  BECAUSE I PROBABLY COUNTED 20 THAT HAD
 2    BEEN SENT TO YOU.
 3               WHAT WAS -- IT SEEMED TO ME LIKE
 4    THERE WAS ACTION TO LEND MONEY, AND THEN ON THIS
 5    EL ROSARIO, THE ONLY THING THAT YOU ENDED UP
 6    GETTING WAS A 3 MILLION DOLLAR LOAN.
 7               I'M TRYING TO FIGURE OUT WHAT WAS
 8    GOING -- AT THIS TIME WE WERE STILL IN THE
 9    EUPHORIA OF NO MONEY DOWN, 120 PERCENT L.T.V.
10    FINANCING.  SO WHAT -- WHAT HAPPENED?
11          A.   WE JUST WEREN'T ABLE TO DEAL WITH
12    THE RIGHT PEOPLE.  GET THE -- I MEAN, IF YOU HAVE
13    A CHANCE -- OFF THE RECORD, YOU CAN HAVE A NICE
14    CONVERSATION WITH PHIL ABOUT THIS.
15               BECAUSE WE WERE BOTH GOING THROUGH
16    IT TOGETHER AT THE SAME TIME, DEALING WITH HARD
17    MONEY LENDERS AND JUST PROBABLY DEALING WITH
18    PEOPLE THAT -- SOME OF THE PEOPLE THAT WOULD BE
19    VERY QUICK TO GIVE YOU A COMMITMENT, THEN ASK FOR
20    A COMMITMENT FEE.
21               AND PHIL'S GOT A LOT OF EXPERIENCE
22    WITH THAT, UNFORTUNATELY.
23               AND WE JUST HAD A PROBLEM GETTING
24    TO -- GETTING THESE LOANS TO THE FINISH LINE.
25          Q.   DO YOU THINK THEIR BUSINESS MODEL
0628
 1    WAS TO ASK FOR THE FEE AND THEN THEY NEVER DO THE
 2    LOAN?
 3          A.   UNFORTUNATELY, SOME OF THEM.  AS I
 4    SAID, THERE'S EXPERIENCE AT THIS TABLE WITH THAT,
 5    YES.
 6          Q.   NOW, ON -- SO HOW MANY -- CAN YOU
 7    ESTIMATE HOW MANY DIFFERENT -- OH, STRIKE THAT.
 8               HOW DID YOU GO TO -- WHY WERE YOU
 9    GOING TO HARD MONEY LENDERS?  WHY DIDN'T YOU JUST
```

```
10   GO INTO, LIKE, WELLS FARGO?
11           A.   BECAUSE THERE DIDN'T SEEM TO BE AN
12   INTEREST FROM A BANK AT THAT TIME -- FROM BANKS AT
13   THAT TIME.
14           I BELIEVE WE DISCUSSED -- I'M NOT
15   SURE WHICH ONES, BUT, IN GENERAL, WE -- I TALKED
16   TO BANKS.  AND IT SEEMED LIKE, TO GET IT OFF THE
17   GROUND, IT NEEDED TO BE IN THIS MANNER.
18           Q.   DID -- DID KENNER -- WAS KENNER
19   EVER UPSET WITH YOU THAT THE 5 MILLION DOLLARS'
20   WORTH OF LOANS FROM THE HAWAII ENTITIES DIDN'T GET
21   REPAID?
22           A.   WHICH LOANS?
23           Q.   THE MONEYS THAT WERE -- THAT YOU
24   TESTIFIED TO YESTERDAY.  I SHOWED YOU AT LEAST
25   THERE WAS 3.8 -- 3,840,000 DOLLARS TO -- YOU HAD
0629
1    WIRE RECEIPTS FOR.  I THINK THERE WAS SOME OTHER
2    LOANS.
3            DID THAT EVER CAUSE -- WELL, DID
4    YOU EVER WITNESS PHIL BEING CONCERNED OR WORRIED
5    THAT THOSE -- THAT MONEY WASN'T BEING REPAID?
6            A.   IF YOU'RE TALKING ABOUT THE LAWSUIT
7    HE FILED, THEN HE FILED A LAWSUIT IN ARIZONA.
8            Q.   YEAH.  BUT THAT WASN'T UNTIL LAST
9    YEAR, I BELIEVE; RIGHT?
10           A.   CORRECT.
11           Q.   YOU MENTIONED BEFORE THAT --
12   BEFORE -- THAT WAS -- WHILE YOUR RELATIONSHIP WAS
13   STILL GOOD, DID PHIL EVER EXPRESS TO YOU THAT HE
14   WAS CONCERNED THAT HE NEEDED THIS MONEY TO BE PAID
15   BACK SOONER THAN LATER?
16           A.   NO.
17           Q.   DID -- DID PHIL EVER TELL YOU THAT
18   HE NEEDED SOME OF IT TO BE PAID BACK?
19           A.   I DON'T KNOW WHAT YOU MEAN.
20           Q.   AS FAR AS SOME OF THIS MONEY THAT
21   WAS GIVEN TO YOUR COMPANIES, DID HE EVER TELL YOU
22   THAT IT WAS CAUSING HIM PROBLEMS NOT TO GET THE
23   MONEY PUT BACK ON THE -- REPAID?
24           A.   WELL, HE WOULD ASK, YOU KNOW, IF
25   THERE WAS MONEY, HE WOULD SAY AT TIMES THAT HE
0630
1    NEEDED MONEY, BUT NEVER TO REPAY.  THERE WAS NEVER
2    A LOAN AGREEMENT.  THERE WAS NEVER A DOCUMENT.
3    THERE WAS NEVER AN AGREED LOAN AMOUNT.
4            Q.   I KNOW.  YOU'RE VERY BIG ON
5    AGREEMENTS WHEN THEY'RE -- YOU KNOW, WHAT I'M
6    TRYING TO -- I'M NOT TALKING ABOUT, LIKE, AN
7    AGREEMENT.  I'M NOT TRYING TO PIN YOU DOWN OR
```

```
 8    TRICK YOU.
 9              I'M JUST SAYING, YOU GUYS WERE --
10    YOU GUYS DID A LOT OF TRANSACTIONS TOGETHER; ISN'T
11    THAT FAIR TO SAY?
12         A.   YES.
13         Q.   I MEAN, IT SEEMS TO ME IF YOU GUYS
14    WERE DATING, PHIL PROBABLY SPENT MORE TIME WITH
15    YOU THAN ANYBODY ELSE IN HIS LIFE FROM 2003 TO
16    2006.
17              IS THAT A FAIR STATEMENT?
18         A.   PROBABLY NOT, BUT THAT'S OKAY.
19         Q.   YOU SPENT A LOT OF TIME TOGETHER?
20         A.   PROBABLY NOT, BUT THAT'S OKAY.  I
21    MEAN, ACTUALLY, TOGETHER, PROBABLY NOT.  BUT WE
22    COMMUNICATED QUITE A BIT.
23         Q.   IF YOU HAD TO TELL ME WHO YOU
24    COMMUNICATED WITH MORE BETWEEN 2003 AND 2006 THAN
25    PHIL KENNER, TELL ME THAT PERSON.
0631
 1         A.   NO.  I SAID WE COMMUNICATED.  IT'S
 2    DIFFERENT THAN SPENDING TIME WITH THAT PERSON.
 3    I'M NOT TRYING TO SPLIT HAIRS, BUT WE WEREN'T
 4    ALWAYS IN THE SAME ROOM.  WE COMMUNICATED QUITE A
 5    BIT, YES.
 6         Q.   OKAY.  I MEAN, BECAUSE -- WAS THERE
 7    ANY SINGLE INDIVIDUAL IN THE WORLD THAT YOU WERE
 8    DOING A GREATER AMOUNT OF TRANSACTIONS OR BUSINESS
 9    WITH THAN PHIL KENNER BETWEEN TO 2003 AND 2006?
10         A.   PROBABLY NOT.
11         Q.   AND DURING THAT -- DURING THAT
12    TIME, DID YOU -- DID YOU EVER CONSIDER THAT IF HE
13    DIDN'T GET ANY OF THIS MONEY REPAID TO SOME OF
14    THESE HAWAIIAN ENTITIES, THAT IT WOULD -- IT COULD
15    CAUSE HIM SOME FINANCIAL STRESS?
16         A.   AS FAR AS?
17         Q.   WELL, JUST THAT -- BECAUSE YOU GOT
18    THE MONEY FROM OTHER PEOPLE AND HE COULDN'T PAY IT
19    BACK, IT WOULD CAUSE HIM FINANCIAL STRESS.
20              MS. CROWTHER:  OBJECTION.  LACKS
21    FOUNDATION.
22              THE DEPONENT:  I'M NOT SURE.  YOU'D
23    HAVE TO GO THROUGH EACH TRANSACTION BECAUSE WHEN
24    YOU SAY 5 MILLION DOLLARS, I DON'T -- I DON'T SAY
25    THAT 5 MILLION DOLLARS IS OWED.
0632
 1              SO WE'D HAVE TO GO THROUGH AND JUST
 2    SAY WHATEVER.  IT COULD BE A DOLLAR, IF YOU WANT
 3    TO SAY IT THAT WAY.
 4    BY MR. RICHARDS:
 5         Q.   WELL, EVEN ON D.D.M.'S BOOKS,
```

```
 6    THERE'S 800,000 -- OR 795 FROM LITTLE ISLE 4.
 7              WHY DON'T YOU START WITH THAT --
 8         A.   RIGHT.
 9         Q.   -- BECAUSE THAT'S MORE MONEY THAN
10    ROBYN AND I HAVE IN OUR POCKET.
11              WHAT -- WHAT -- DO YOU THINK THAT
12    WOULD CAUSE HIM STRESS, THAT HE WOULDN'T BE ABLE
13    TO GET THAT MONEY REPAID?
14         A.   YOU'D HAVE TO ASK HIM.
15         Q.   NO.  I'M ASKING YOU.
16              DID HE EVER TELL YOU THAT "THIS IS
17    CAUSING ME SOME PROBLEMS"?
18         A.   DID HE EVER SAY THAT "THE MONEY I
19    LOANED TO D.D.M. AND I HAVEN'T BEEN REPAID IS
20    CAUSING ME PROBLEMS"?
21         Q.   DID HE?
22         A.   NO.  NOT THAT I KNOW OF.
23         Q.   SO I'M ASSUMING THAT YOU WERE AWARE
24    THAT -- OR YOU HAD PAID YOURSELF BACK BECAUSE YOU
25    WERE -- YOU HAD FELT IT WAS LONG ENOUGH THAT THAT
0633
 1    MONEY WAS OUTSTANDING; IS THAT FAIR TO SAY?
 2         A.   I'M NOT SURE WHAT THE REASONS WERE.
 3         Q.   YOU DON'T KNOW WHY YOU PAID
 4    YOURSELF BACK?
 5         A.   I DON'T KNOW WHAT THE REASONS WERE
 6    OR THE CIRCUMSTANCES AT THE TIME.
 7         Q.   DO YOU HAVE ANY CORPORATE MINUTES
 8    AS TO WHY YOU PAID YOURSELF BACK?
 9         A.   NO.
10         Q.   DO YOU HAVE ANY -- DO YOU HAVE ANY
11    COMMUNICATION WITH PHIL, WHO'S -- IT'S FAIR TO SAY
12    AT THE TIME YOU PAID YOURSELF BACK, YOU GUYS WERE,
13    YOU KNOW, INVOLVED -- YOU GUYS WERE INVOLVED IN A
14    MULTIPLICITY OF DEALS TOGETHER.
15              AND IT WOULD BE FAIR TO SAY THAT
16    YOU HAD -- YOU HAD A GOOD LINE OF COMMUNICATION
17    WITH ONE ANOTHER.  ISN'T THAT FAIR TO SAY?
18         A.   YES.
19         Q.   AND THEN DID YOU CONSIDER THE FACT
20    WHEN YOU WOULD -- WHEN YOU PAID YOURSELF BACK ALL
21    YOUR OUTSTANDING LOANS AFTER -- AFTER THAT FUNDING
22    CAME IN FROM L.S.I., BUT PHIL DIDN'T GET ANY OF
23    HIS LOANS PAID, THAT THAT WOULD CAUSE A PROBLEM?
24              MS. CROWTHER:  OBJECTION.
25    MISSTATES THE EVIDENCE.
0634
 1              THE DEPONENT:  I DIDN'T PAY BACK
 2    ALL MY LOANS.
 3    BY MR. RICHARDS:
```

```
 4              Q.   WELL, SOME OF YOUR LOANS.
 5              A.   AND I THINK YOU'LL SEE SOME
 6   PAYMENTS MADE TO PHIL KENNER PERSONALLY FROM THOSE
 7   PROCEEDS ALSO.
 8              Q.   I'M GOING TO SHOW YOU -- STRIKE
 9   THAT.
10              SO DO YOU -- DO YOU -- AS YOU'RE
11   SITTING HERE TESTIFYING TRUTHFULLY, DO YOU BELIEVE
12   THAT YOUR INABILITY TO REPAY ANY OF THAT MONEY
13   THAT GENERATED FROM THE HAWAII ENTITIES IS -- IS
14   THE CAUSE OF SOME OF THE BREAKDOWN BETWEEN YOU AND
15   PHIL KENNER?
16              A.   I DON'T KNOW.
17              Q.   WELL, DO YOU THINK THAT PHIL KENNER
18   WAS HAPPY THAT HE DIDN'T GET ANY OF THAT MONEY
19   REPAID?
20              MS. CROWTHER:  OBJECTION.  LACKS
21   FOUNDATION.  CALLS FOR SPECULATION.
22   BY MR. RICHARDS:
23              Q.   OKAY.  DID YOU EVER HAVE ANY
24   CONVERSATION WITH PHIL KENNER ABOUT WHEN THAT
25   MONEY WAS GOING TO BE REPAID?
0635
 1              A.   NO.
 2              Q.   SO YOU'RE TELLING ME THAT HE JUST
 3   GAVE YOU THIS MONEY AND THEN YOU NEVER DISCUSSED
 4   IT AGAIN?
 5              A.   YES.
 6              Q.   AND THEN THE FIRST TIME YOU EVER
 7   HEARD THAT PHIL WAS UPSET ABOUT IT WAS WHEN YOU
 8   RECEIVED A LAWSUIT ABOUT IT?
 9              A.   YES.  AND THE FIRST TIME I HEARD
10   THAT THERE WAS AN ACTUAL DOCUMENT.  SO MAYBE THAT
11   MEMORIALIZES THESE SO-CALLED LOANS.
12              Q.   FORGET ABOUT THE DOCUMENT.
13              YOU KNEW YOU RECEIVED MONEY FROM
14   SOMEBODY AND DIDN'T GIVE ANYTHING FOR IT.  IS THAT
15   FAIR TO SAY?
16              A.   WELL, THE ENTITY RECEIVED MONEY.
17              Q.   THE ENTITY THAT YOU CONTROLLED.
18              A.   GIVEN BY PHIL, YES.
19              Q.   RIGHT.  AND SO YOU'RE -- YOU
20   WERE -- YOU WERE BORN IN '64, YOU SAID?
21              A.   YES.
22              Q.   OKAY.  SO YOU'RE ABOUT 45 YEARS
23   OLD?
24              (NO AUDIBLE RESPONSE BY DEPONENT.)
25   ///
0636
 1   BY MR. RICHARDS:
```

```
2              Q.   RIGHT.  YOU KNOW THAT IF SOMEONE
3    GIVES YOU SOMETHING THAT'S NOT YOUR, YOU KNOW,
4    SPOUSE OR YOUR MOM, IT'S PROBABLY -- THEY EXPECT
5    SOMETHING IN RETURN; RIGHT?
6              A.   YES.
7              Q.   SO WHAT DID PHIL KENNER OR THOSE
8    ENTITIES GET IN RETURN THAT YOU'RE AWARE OF, THAT
9    YOU CAN TESTIFY TO, FOR -- FOR THAT OVER 3.8
10   MILLION DOLLARS THAT WAS GIVEN TO YOUR ENTITIES?
11   IF ANYTHING, DID THEY TAKE ANYTHING IN RETURN?
12              MS. CROWTHER:  OBJECTION.
13   COMPOUND.
14              THE DEPONENT:  I THINK HE'S GOT
15   39 PERCENT OF THE CABO SAN LUCAS.
16   BY MR. RICHARDS:
17              Q.   DIDN'T HE GET THAT BEFORE THE
18   LOANS?
19              MS. CROWTHER:  OBJECTION.
20   COMPOUND.
21              THE DEPONENT:  NO.  NO.
22   BY MR. RICHARDS:
23              Q.   NO.  BUT DIDN'T -- DIDN'T KENNER
24   PAY 2.5 MILLION FOR THE 39 PERCENT?
25              A.   HE WAS SUPPOSED TO PUT UP ALL THE
0637
1    MONEY.  HE WAS SUPPOSED TO SUPPLY ALL THE FUNDING
2    FOR THE PROJECT.
3              Q.   I UNDERSTAND THAT.
4              A.   NO.  HE DIDN'T PUT UP ANY MONEY.
5    HE BORROWED THAT MONEY.  HE DOESN'T HAVE ANY MONEY
6    INVESTED IN IT.
7              Q.   WHETHER HE BORROWED IT OR WHETHER
8    HE STOLE IT OR WHETHER IT WAS GIFTED TO HIM, AT
9    THE TIME OF YOUR INVESTMENT ON YOUR BOOKS AND
10   RECORDS, IT CREDITS HIM PAYING IN YOUR CAPITAL
11   ACCOUNT 2.5 MILLION; ISN'T THAT CORRECT?
12              A.   YES.
13              Q.   I MEAN, YOU DIDN'T PUT UP ANY MONEY
14   EITHER, SO LET'S NOT GO THERE.
15              A.   OKAY.
16              Q.   THE -- WITH RESPECT TO -- WITH
17   RESPECT TO THE -- THE PROCEEDS, DID YOU EVER --
18   WERE YOU EVER CONCERNED AS THIS MONEY WAS COMING
19   IN THAT YOU SHOULD HAVE SOME SORT OF REPAYMENT
20   DATE?
21              MS. CROWTHER:  OBJECTION.  VAGUE.
22   PROCEEDS OF WHAT?
23              MR. RICHARDS:  THE PROCEEDS FROM
24   THE HAWAII ENTITIES, ULA MAKIKA AND LITTLE ISLE 4.
25              THE DEPONENT:  NO.
```

```
0638
 1    BY MR. RICHARDS:
 2              Q.   I DON'T KNOW WHY THEY PICKED THOSE
 3    NAMES, DO YOU?
 4              A.   NO.
 5              Q.   IT DRIVES ME CRAZY.  THE
 6    ARBITRATION DROVE ME CRAZY, HAVING TO KEEP
 7    REPEATING THOSE NAMES ALL THE TIME.
 8                   ALL RIGHT.  WHY DO YOU GUYS HAVE
 9    COMPLICATED NAMES FOR ALL THESE ENTITIES?
10              A.   THE MEXICAN ONES ARE A LITTLE
11    COMPLICATED.
12              Q.   YEAH.  IS THERE A REASON FOR IT?
13              A.   I DON'T KNOW.
14              Q.   WHY CAN'T -- I MEAN, WHY CAN'T -- I
15    MEAN TO -- ALL RIGHT.
16                   NOW, LET'S TAKE A LOOK AT -- THIS
17    IS A -- THIS IS GREG HOLST, OF 1ST SOURCE BANK,
18    FOR --
19                   DEPOSITION OFFICER:  I'M SORRY,
20    COUNSEL.
21                   MR. RICHARDS:  GREG HOLST,
22    H-O-L-S-T.
23    BY MR. RICHARDS:
24              Q.   767.  MR. HOLST -- THIS IS A LOAN
25    GUY THAT FINALLY CAME THROUGH; RIGHT?
0639
 1              A.   FOR THE 1ST SOURCE, YES.
 2              Q.   RIGHT.  AND WHAT WAS THE STORY WITH
 3    THIS LOAN, IF YOU KNOW?
 4              A.   IT WAS FOR THE FALCON AND THE
 5    METRO.
 6              Q.   AND WHAT -- IS THAT TO PURCHASE, OR
 7    WERE THEY ALREADY PURCHASED?
 8              A.   TO PURCHASE.
 9              Q.   AND WHO DID YOU PURCHASE THEM FROM?
10              A.   I PURCHASED THE FALCON FROM
11    JERRY CONRAD.
12              Q.   WASN'T THE FALCON ALREADY OWNED,
13    AND THIS WAS LIKE A REFI OR SOMETHING?
14              A.   NO.
15              Q.   SO THIS WAS TO BUY IT; RIGHT?
16              A.   YES.
17              Q.   AND DID -- WHY DID YOU WANT TO
18    PURCHASE -- WHAT WAS THE POINT OF PURCHASING THESE
19    JETS?
20              A.   TO BRING PEOPLE TO THE PROPERTY.
21              Q.   WHY NOT CHARTER FOR NETJET?
22              A.   IF WE'RE DOING IT AT THE PACE THAT
23    WE'RE SUPPOSED TO BE DOING IT, IT'S TOO EXPENSIVE.
```

```
24              Q.   WHAT IS THE COST PER HOUR ONCE YOU
25   PURCHASE A JET?
0640
 1              A.   IT COULD BE 1500 DOLLARS AN HOUR.
 2   I'M GUESSING.
 3              Q.   AND HOW MUCH IS THE -- ISN'T THE
 4   DEBT SERVICE EXPENSIVE ON THE JET?
 5              A.   IT CAN BE, YES.
 6              Q.   DO YOU REMEMBER WHAT YOUR DEBT
 7   SERVICE WAS ON THESE JETS?
 8              A.   I DON'T KNOW.
 9              Q.   IT WASN'T 40K A MONTH?
10              A.   NO.
11              Q.   A LOT LESS?
12              A.   I BELIEVE SO.
13              Q.   I DON'T KNOW.  I THINK BUYING THESE
14   JETS IS --
15              A.   IN HINDSIGHT, YOU'RE CORRECT.
16              Q.   YEAH.  I MEAN, I NEVER -- I LIKE
17   CHARTERING.  YOU DON'T HAVE TO MAKE PAYMENTS.
18              A.   IN HINDSIGHT, YOU'RE CORRECT.
19              Q.   DID YOU EVER SEEK THE OPINION OF --
20   DID YOU EVER GET AN OPINION FROM ANYBODY AS TO
21   WHETHER OR NOT YOU SHOULD PURCHASE JETS?
22              A.   I DON'T KNOW.
23              Q.   WHAT -- IF -- IF -- DO YOU KNOW WHY
24   SERGEI GONCHAR AND PHIL KENNER GOT TO BE PERSONAL
25   GUARANTORS ON THE -- ON THE LOANS FOR THOSE JETS?
0641
 1              A.   I DON'T RECALL.
 2              Q.   ISN'T IT TRUE THAT THEY WOULDN'T
 3   HAVE ISSUED THE LOANS FOR THE JETS IF THERE WASN'T
 4   PEOPLE WITH SUBSTANTIAL FINANCIAL CREDIT AND NET
 5   WORTH, AND THAT'S WHY THEY COULDN'T USE -- THEY
 6   NEEDED TO USE PHIL AND SERGEI?
 7              A.   MOST LIKELY.
 8              MS. CROWTHER:  OBJECTION.  LACKS
 9   FOUNDATION.
10              GIVE IT A SHOT.
11              (SPEAKING SIMULTANEOUSLY.)
12   BY MR. RICHARDS:
13              Q.   WHY DIDN'T YOU SIGN THE GUARANTEE?
14              A.   I'M SURE I PROBABLY WOULDN'T HAVE
15   QUALIFIED AT THAT TIME.
16              Q.   DO YOU THINK YOU QUALIFY NOW?
17              A.   NO IDEA.
18              Q.   WHY DIDN'T YOU PROVIDE -- WHY
19   DIDN'T YOU PROVIDE THEM YOUR FINANCIAL STATEMENT
20   WHICH SAID YOU HAD A 51 MILLION DOLLAR NET
21   WORTH -- OR 56 MILLION?  SORRY.
```

22          A.   BECAUSE IT WOULDN'T HAVE SHOWN THE
23     INCOME PROBABLY NECESSARY.
24          Q.   ALL RIGHT.  WHOSE IDEA WAS IT TO
25     PURCHASE THE JETS?
0642
1               MS. CROWTHER:  I THINK WE DID THIS
2      YESTERDAY.  I'LL LET YOU ANSWER.
3               MR. RICHARDS:  I DIDN'T ASK --
4               (SPEAKING SIMULTANEOUSLY.)
5               MS. CROWTHER:  I'M PRETTY SURE YOU
6      DID, BUT I'LL LET HIM ANSWER AGAIN.
7               THE DEPONENT:  I'M SURE IT WAS A
8      COMBINATION OF PHIL AND MYSELF.
9      BY MR. RICHARDS:
10          Q.   ALL RIGHT.  BELIEVE ME, I'M NOT
11     GOING TO SPEND THAT MUCH TIME ON THESE JETS.
12              MS. CROWTHER:  THAT STATEMENT IS
13     ALREADY CATEGORICALLY FALSE.
14              MR. RICHARDS:  I DIDN'T SPEND THAT
15     MUCH TIME ON THE JETS.
16              MS. CROWTHER:  YES, YOU DID.  WE
17     CAN DISAGREE AS TO "THAT MUCH," BUT, YES, YOU DID.
18              MR. RICHARDS:  I'M KIND OF INSULTED
19     THAT YOU'D SAY THAT.  I JUST WANT TO CLARIFY.
20     BECAUSE THERE'S SO MANY DIAMANTES, IT'S LIKE HE
21     DID IT INTENTIONALLY TO CONFUSE EVERYBODY LATER
22     ON.  THAT'S WHY THERE'S ...
23     BY MR. RICHARDS:
24          Q.   I MEAN, DOES DIAMANTE, LIKE, HAVE
25     A -- A TRADEMARK?
0643
1           A.   THE LOGO IS TRADEMARKED, YES.
2           Q.   WHAT IS DIAMANTE?  WHAT IS THAT?
3           A.   IT JUST MEANS "DIAMOND" IN SPANISH.
4           Q.   AND WHO CAME UP WITH THE NAME
5      DIAMANTE?
6           A.   I KNOW WE NAMED THE NAME DIAMOND,
7      AND WE USED THE ENGLISH NAME WHEN WE WERE
8      INTERESTED IN PROPERTY NEAR ENSENADA THAT WAS
9      SHAPED LIKE A DIAMOND.
10              AND SO WHEN WE NAMED THE PROJECT --
11     I'M NOT SURE EXACTLY WHO DID.
12          Q.   ALL RIGHT.  I MEAN, LOOK AT -- THIS
13     IS -- OKAY.
14              I'M GOING TO SHOW YOU PAGE 779.
15     OKAY.  THIS IS FROM YOU TO PHIL.
16              "PHIL, I WOULD GET ON THIS
17              A.S.A.P. AS CONTACT INFO IS AT THE
18              BOTTOM OF THIS E-MAIL."
19              IS THIS YOU SENDING PHIL A -- LIKE

```
20   A REFERRAL FOR A -- MORE FUNDING FOR HAWAII?
21            A.   YEAH, IT LOOKS LIKE IT.
22            Q.   IT SAYS -- NOW, IT SAYS HERE YOU'RE
23   SENDING A LETTER.  I JUST WANT TO MAKE SURE I'M
24   READING THIS CORRECT.  THAT SAYS:
25                 THE PERSON WHO OWNS THESE DEALS
0644
 1                 IS PHIL KENNER, WHO'S ALSO A PARTNER
 2                 OF MINE IN MEXICO."
 3                 WHAT -- WHAT -- WHAT PARTNER WERE
 4   YOU REFERRING TO?
 5            A.   WELL, HE WAS A PARTNER IN DIAMANTE
 6   DEL MAR AT THE TIME.
 7            Q.   AND SO THEN PHIL KENNER HAS THAT'S
 8   ACREAGE FROM WAIKAPUNA, MOAULA AND HONU'APO.
 9   THESE DRIVES ME NUTS, THESE HAWAII NAMES.
10                 W-A-I-K-A-P-U-N-A AND M-O-A-U-L-A
11   AND H-O-N-U, APOSTROPHE.
12                 BY THE WAY, IF I WANT TO HAVE ANY
13   OF THE PLAYERS CALL YOU, WHAT IS THE BEST NUMBER
14   FOR THEM TO CALL YOU AT?
15            A.   702-821-5495.
16            Q.   AND IS THAT THE SAME NUMBER YOU'VE
17   HAD FOR A LONG TIME?
18            (NO AUDIBLE RESPONSE BY DEPONENT.)
19   BY MR. RICHARDS:
20            Q.   OKAY.
21            A.   AND IF THERE'S ANY WAY I CAN
22   CONTACT THEM, IF THAT'S OKAY, I WOULD LOVE TO HAVE
23   THEIR CONTACT INFORMATION.
24            Q.   DO YOU WANT ME TO SET UP A
25   CONFERENCE CALL, LIKE YOU CAN CALL IN TO --
0645
 1            A.   I'D LIKE TO BE ABLE TO SET UP A
 2   MEETING WITH THEM, TO BE HONEST, TO MEET WITH
 3   THEM.
 4            Q.   AND WHAT ABOUT THE ONES THAT ARE
 5   OVERSEAS?  DO THEY HAVE TO FLY HERE?
 6            A.   NO.
 7            Q.   WHAT ABOUT THE ONES THAT ARE ON THE
 8   EAST COAST?
 9            A.   I'M ON THE EAST COAST ENOUGH THAT I
10   CAN -- OBVIOUSLY IT'S IMPORTANT.
11            Q.   OKAY.  GREAT.  I'M GOING TO WORK ON
12   THAT FOR YOU, TOO.
13                 ALL RIGHT.  THE -- IS BEAL BANK
14   DEALING WITH THE HAWAII DEAL?
15            MS. CROWTHER:  BATES NUMBER,
16   PLEASE.
17            MR. RICHARDS:  OH, SORRY.  IT'S
```

18    783.
19                   THE DEPONENT:  I DON'T KNOW.
20    BY MR. RICHARDS:
21              Q.   DO YOU KNOW WHO RON DUNKEL IS?
22              A.   YES.  I BELIEVE I MET HIM ONCE, AND
23    THAT'S WHERE I SET UP THE CONTACT FOR PHIL.
24              Q.   OKAY.  ON BATES 787, YOU STATE
25    THAT:
0646
1                   "JERRY, THERE'S NO QUESTION ON
2                   OUR SIDE THAT THIS IS GOING TO
3                   HAPPEN.  PHIL JUST NEEDS TO TALK TO
4                   GREG SO HE CAN BE CERTAIN THAT THE
5                   FINANCING IS NOT GOING TO BE A
6                   PROBLEM."
7                   WHAT FINANCING IS HE REFERRING TO?
8              A.   I'M ASSUMING IT'S ON THE FALCON.
9              Q.   WHAT IS THE PAULARINO GATE?
10             A.   YOU MAY BE BUTCHERING THE
11    PRONUNCIATION, BUT I DON'T KNOW.
12             Q.   P-A-U-L-A-R-I-N-O.
13             A.   THERE'S NO E-MAIL UP HERE, SO
14    IT'S --
15             Q.   I KNOW.  I DIDN'T PUT AN E-MAIL UP
16    THERE.
17             A.   I DON'T KNOW.
18             Q.   IS -- THERE WAS AN E-MAIL YOU SENT
19    ON OCTOBER 4, 2005, THAT SAID:
20                   "CALL ME AT THE CABO HOUSE FOR
21                   AN UPDATE.  310-656-6537."
22                   DO YOU GET L.A. NUMBERS IN CABO, OR
23    IS THERE A CABO HOUSE IN L.A.?
24             A.   IT'S A VONAGE PHONE LINE.  YOU CAN
25    HAVE A U.S. NUMBER THERE.
0647
1              Q.   I SEE.  AND THAT JUST RINGS TO YOUR
2    COMPUTER OR SOMETHING?
3              A.   NO.  WELL, IT RINGS THROUGH THE
4    COMPUTER INTO THE HOUSE.
5              Q.   IS THAT THE SAME NUMBER?
6              A.   THAT'S PHIL'S HOUSE NOW.
7              Q.   DID YOU EVER PURSUE A PURCHASE OR
8    PROPERTY AT THE PEDREGAL IN LOS CABOS?
9              A.   THAT'S THE HOUSE THAT WE HAD LEASED
10    THAT PHIL CURRENTLY OWN, I BELIEVE.  IF THAT'S
11    WHAT YOU'RE TALKING ABOUT.
12             Q.   WELL, I'M SHOWING YOU -- AGAIN,
13    THIS IS IN YOUR NAME, AND IT'S ON 799, SILVER GATE
14    BANK, FOR 1.1 MILLION, SIX-MONTH LIBOR PLUS 450.
15                   GOD, YOU GUYS GET BAD LOANS DOWN

```
16    THERE.
17                 WHAT IS THAT -- DID YOU EVER
18    PURCHASE THIS HOUSE?
19         A.   NO.
20         Q.   WHY WERE YOU TRYING TO PURCHASE IT?
21         A.   I BELIEVE I WAS JUST GATHERING
22    INFORMATION.
23         Q.   OH.  WAS THIS A HOUSE THAT YOU GUYS
24    USED FOR -- TO ENTERTAIN CLIENTS AND CUSTOMERS IN?
25         A.   YES.
0648
1                 THAT'S IMPORTANT, ABOUT THE
2     SIGNATURES ON THE OPERATING AGREEMENT.
3          Q.   LET'S GO BACK, THEN.
4                 I MADE TWO VERSIONS, ONLY ONE WITH
5     ONE SIGNATURE LINE.  AND THEN --
6                 MS. CROWTHER:  BATES NUMBER,
7     PLEASE.
8     BY MR. RICHARDS:
9          Q.   808.
10                THIS IS -- WHAT -- THIS IS ON 809.
11                WHAT IS THE MANAGING MEMBER -- WHAT
12    IS THIS -- WHAT DOES THIS MAKEUP?
13         A.   DIAMANTE AIR.
14         Q.   SO INITIALLY IT SHOWS, IN 1045, THE
15    MANAGING MEMBERS ARE PHIL KENNER AND
16    MARK THALMANN?
17         A.   YES.
18         Q.   AND THEN OBVIOUSLY SOMEHOW THAT
19    CHANGED BECAUSE YOU BECAME THE MANAGER MEMBER?
20         A.   A MANAGER MEMBER, YES.
21         Q.   THIS E-MAIL IS PRE-INCORPORATION --
22    THIS PEDREGAL HOUSE, WAS THIS -- DID ROGER CLEMENS
23    STAY AT THE PEDREGAL HOUSES?
24         A.   I BELIEVE HE HAS, YES.
25         Q.   AND THIS -- THIS -- DO -- DO YOU
0649
1     KNOW WHO HAS THE INCORPORATION DOCUMENTS TO SEE
2     WHO WAS ACTUALLY INCORPORATED AS THE MANAGING
3     MEMBER?
4          A.   I BELIEVE IT MAY BE IN LAS VEGAS,
5     BUT I COULD FIND OUT.
6          Q.   DOES MARK HAVE THEM?
7          A.   HE SHOULD.
8          Q.   AND WHAT HAPPENED WITH C.S.L.
9     INTERNATIONAL, THE 5 MILLION DOLLAR OFFERING?  DID
10    THAT EVER GO THROUGH?
11         A.   WE NEVER FINISHED IT, NO.
12         Q.   WHERE DID -- WHERE ARE -- ALL THESE
13    DOCUMENTS YOU PROVIDED WITH ALL THESE OFFERINGS,
```

14    WHERE DID YOU GET THEM FROM?
15              A.   EVERY HANDHELD, EVER COMPUTER THAT
16    I HAD, I BELIEVE I JUST -- WHATEVER I HAD, I JUST
17    GAVE TO THEM AND SAID EXTRACT WHAT YOU NEED.
18              Q.   YEAH.  BUT YOU REALIZE THAT I CAN'T
19    TELL IF THEY'RE IMPORTANT OR NOT BECAUSE I DON'T
20    KNOW WHICH DEALS YOU -- YOU KNOW, THAT YOU WENT
21    THROUGH -- WHICH ONES WENT THROUGH OR WHICH ONES
22    DIDN'T?
23              MS. CROWTHER:  OBJECTION.
24    RELEVANCE.
25              THE DEPONENT:  I'D BE HAPPY TO --
0650
1     IF THE DIRECTIVE WAS TO TAKE THE ONES I THOUGHT
2     WERE IMPORTANT, I WOULD HAVE PROBABLY MADE IT
3     EASIER.  BUT IT WAS JUST TO SEND ALL.
4     BY MR. RICHARDS:
5              Q.   NO.  I THINK SEND ALL IS BETTER.
6     THAT'S WHY I'M JUST ASKING.  I JUST WANT YOU TO
7     KNOW WHY I DON'T HAVE ANY ABILITY TO TELL WHICH
8     ONES WERE FUNDED AND WHICH ONES WEREN'T.  I JUST
9     WANT YOU TO KNOW.
10             NOW, THIS IS BATES 867.  THERE'S A
11    SERIES OF E-MAILS STARTING AT THE BOTTOM, WHICH
12    SAYS THAT YOU SENT OUT -- AND YOU SAY NOT -- THIS
13    IS FROM DONNIE RAE.
14             "NOT SURE IF HE'S IN THE PSYCHO
15             WARD OR JAIL.  ALSO WHY REMEMBER.
16             I'LL BE ON THE PHONE WITH OUR TWO
17             MONEY GUYS SOON."
18             AND THEN HE SAID -- YOU SAY:
19             "THIS MAY TAKE IT ALL TO A NEW
20             LOW.  AT LEAST WE KNOW IT'S ENDING."
21             WHAT ARE WE REFERRING TO HERE?
22             A.   I BELIEVE THAT'S TODD BURKHARDT.
23    HE HAD OWED PHIL MONEY.  I THINK WE TALKED A
24    LITTLE BIT ABOUT IT YESTERDAY.  HE'S VERY HARD TO
25    PIN DOWN.  ALWAYS CAME UP WITH ONE EXCUSE AFTER
0651
1     ANOTHER.
2              AND HOWEVER THIS EXCUSE WAS -- FROM
3     PHIL'S E-MAIL, TOOK IT TO A NEW LOW.  AND I
4     CONCURRED, I GUESS.
5              Q.   YOU MEAN THIS GUY'S E-MAIL?  TODD'S
6     E-MAIL?
7              A.   YEAH.  WELL, DON -- TODD TO DONNIE.
8              Q.   WHAT IS THIS ABOUT, THOUGH?  LIKE
9     WHAT --
10             A.   HE WAS -- HE HAD OWED PHIL MONEY.
11    PHIL HAD LENT HIM MONEY.  HE HAD PUT PHIL, AND

```
12   SUBSEQUENTLY ME, IN TOUCH WITH THIS RODNEY DALTON.
13              AND HE MADE UP EVERY EXCUSE AND DID
14   NOT PAY PHIL HIS MONEY BACK.  SO IT WAS ALWAYS ONE
15   THING AFTER ANOTHER.
16              I GUESS HE SAYS:
17              "IF I HAVE GOOD BEHAVIOR OVER
18         THE WEEKEND, THAT'S NOT GOOD."
19              SO DONNIE SAYS HE'S NOT SURE IF
20   HE'S IN A PSYCH WARD OR JAIL AND TOOK IT TO A NEW
21   LOW.
22         Q.   GOT YOU.
23              THERE WAS A DOCUMENT FOR C.S.L.
24   AIRPORT.  IT WAS AN OFFERING MEMORANDUM, OFFERING
25   ADDENDUM AND OFFERING GRAPHICS SENT TO YOU BY
0652
1    BOB GAUDET TO PHIL KENNER, YOU AND KEN.
2              WAS THAT FOR YOU GUYS TO BUY PART
3    OF THE AIRPORT?
4         A.   WE WERE NEGOTIATING TO BUY A PIECE
5    OF THE AIRPORT.  AND THEN WE WERE ASSISTING IN
6    PUTTING TOGETHER AN INFORMATION PACKAGE, YES.
7         Q.   AND WHAT WERE YOU -- WHAT WAS YOUR
8    ROLE IN THAT SUPPOSED TO BE?
9         A.   I WAS DEALING WITH THE SELLER AT
10   THE TIME.
11        Q.   DID THEY EVER BUILD A NEW AIRPORT
12   THERE?
13        A.   THERE IS AN AIRPORT THERE, YES.
14        Q.   BUT HAS THERE BEEN A NEW ONE SINCE
15   2005?
16        A.   WELL, THAT IS THE ONE WE'RE TALKING
17   ABOUT.
18        Q.   OH, THEY ACTUALLY BUILT IT?
19        A.   YEAH.  IT WAS BUILT AT THE TIME.
20        Q.   SO WHAT WAS -- WHY DID THEY NEED
21   ADDITIONAL MONEY, THEN?
22        A.   THEY WANTED TO BUILD AN F.B.O. AND
23   EXTEND THE RUNWAY, WHICH THEY ENDED UP DOING SOME
24   OF THAT.
25        Q.   YEAH.  IT'S NOT THE BEST AIRPORT.
0653
1         A.   ANOTHER ONE DOWNTOWN?
2         Q.   NO.  THE ONE WHERE YOU FLY INTO
3    CABO.  BEFORE THEY BUILT THE TOLL ROAD, IT WAS
4    HORRIBLE.  THEN THE TOLL ROAD IS A LITTLE FASTER.
5    BUT --
6         A.   THE OTHER ONE IS STILL -- THE ONLY
7    PLACE TO LAND COMMERCIALLY IS SAN JOSE.  IT'S THE
8    ONLY COMMERCIAL FLIGHT.
9         Q.   OH, THIS IS FOR A PRIVATE AIRPORT?
```

```
10              A.   THIS IS PRIVATE.  I SHOULDN'T SAY
11   THAT.  THERE'S SOME INTER -- AEROCALAFIA FLIES TO
12   MAZATLAN AND -- FROM THERE, BUT ...
13              Q.   OH, SO IF YOU GO PRIVATE, YOU GET
14   TO GO TO THE CLOSER AIRPORT?
15              A.   IT'S NOT BETTER.  IT'S JUST CLOSER
16   TO DOWNTOWN.
17              Q.   RIGHT.
18              A.   MOST PRIVATE PLANES STILL GO INTO
19   SAN JOSE.
20              Q.   OH, THEY DO?
21              YOU DON'T -- YOU OR YOUR ENTITIES
22   ENDED UP NEVER PUTTING ANY MONEY IN THAT; CORRECT?
23              A.   I DON'T KNOW IF THAT'S COMPLETELY
24   TRUE, BUT --
25              Q.   WELL, DO YOU GET -- DO YOU HAVE ANY
0654
1    OWNERSHIP INTEREST IN THE AIRPORT?
2              A.   NOT RIGHT NOW.
3              Q.   YOU OR YOUR ENTITIES?
4              A.   NO.
5              Q.   DID YOU AT ONE TIME?
6              A.   WE WERE NEGOTIATING TO.
7              Q.   WELL, YOU SAID NOT --
8              A.   IT'S STILL IN LITIGATION.
9              Q.   I'M CONFUSED.  YOU'RE IN LITIGATION
10   OVER THE AIRPORT?
11              A.   WITH THE AIRPORT.  YES.
12              Q.   WHY?
13              A.   BECAUSE MONEY WAS INVESTED IN THE
14   AIRPORT, AND WE DIDN'T GET WHAT WE WERE SUPPOSED
15   TO GET IN RETURN.
16              Q.   HOW MUCH MONEY?
17              A.   I BELIEVE 1,070,000.
18              Q.   AND WHO'S FILING -- WHO'S THE
19   PLAINTIFF IN THE LAWSUIT?
20              A.   I BELIEVE IT'S LOR MANAGEMENT.
21              Q.   BUT ISN'T THAT THE MILLION DOLLARS
22   THAT KENNER OR NORSTROM GAVE YOU?
23              A.   I DIDN'T SAY IT SHOULDN'T BE
24   RETURNED TO THEM WHEN IT GETS RESOLVED.
25              Q.   AND WHO'S PAYING THE LEGAL FEES FOR
0655
1    THAT?
2              A.   THERE AREN'T ANY RIGHT NOW.  WE DID
3    IT -- I BELIEVE IT'S BEING HANDLED ON A
4    CONTINGENCY.
5              Q.   BY A MEXICAN ATTORNEY?
6              A.   YES.
7              Q.   WELL, WHAT WOULD BE THE MOTIVE FOR
```

```
 8    LOR MANAGEMENT TO FILE A LAWSUIT AGAINST THE
 9    AIRPORT IF THE MONEY IS GOING TO BE RETURNED TO
10    KENNER OR NORSTROM?
11                   MS. CROWTHER:  OBJECTION.  CALLS
12    FOR SPECULATION.  LACKS FOUNDATION.
13    BY MR. RICHARDS:
14         Q.   WELL, I'M ASKING.  WHAT WAS THE
15    MOTIVE FOR YOU TO FILE THE LAWSUIT?
16         A.   WELL, I THINK THE MOTIVE IS THAT
17    THE MONEY IS THERE AND IT NEEDS TO BE -- EITHER
18    THE INVESTMENT NEEDS TO GO FORWARD OR THE MONEY
19    NEEDS TO BE PAID BACK.
20                   THE INTENTION IS TO -- IS TO
21    CONTINUE WITH THE INVESTMENT.
22         Q.   YOU MEAN TO GET A PIECE OF THE
23    AIRPORT?
24         A.   YES.
25         Q.   WHY DO YOU THINK THEY'RE TAKING --
0656
 1    WHY DO YOU THINK THEY'RE TAKING ADVANTAGE OF YOU
 2    ON THAT MILLION DOLLAR INVESTMENT?
 3         A.   WHAT DO YOU MEAN?
 4         Q.   WHY DO YOU THINK THE AIRPORTS NOT
 5    RECOGNIZING YOUR -- YOU'RE BASICALLY SAYING THE
 6    AIRPORT TOOK YOUR MILLION --
 7         A.   NO.  THEY RECOGNIZE THAT THE
 8    MONEY -- BECAUSE WE'RE IN A LITIGATION TO EITHER
 9    HAVE THE MONEY RETURNED OR TO CONTINUE WITH THE
10    INVESTMENT.
11         Q.   IF KENNER COULD GET THE APPROVAL OF
12    THE OWNER TO TRANSFER THE INTEREST FROM LOR TO
13    KENNER OR NORSTROM, WOULD YOU DO THAT?
14         A.   I'D HAVE TO SEE WHAT HE'S GOING TO
15    DO.
16                   OUR INTENTION IS STILL TO CONTINUE
17    WITH THE INVESTMENT.  SO THE INTENTION WOULD BE TO
18    BE ABLE TO PURCHASE THE AIRPORT AS DESIRED AND
19    TO -- IF KENNER OR NORSTROM DIDN'T WANT THEIR
20    PIECE, OR WHOEVER'S INVESTED, THEY'D WANT THEIR
21    PIECE AT OUR PRO RATA BASIS, THEN THEY WOULD BE
22    BOUGHT OUT.
23         Q.   WELL, WHAT IS THE -- WHAT IS THE
24    STRUCTURE -- SINCE YOU DON'T HAVE ANY OF YOUR OWN
25    MONEY IN THE DEAL, I'M ASSUMING; CORRECT?
0657
 1         A.   I BELIEVE I DO.  I DON'T
 2    KNOW EXACTLY HOW MUCH.  I DON'T KNOW -- I DON'T
 3    KNOW WHAT THE AMOUNT IS.
 4         Q.   OKAY.
 5         A.   BUT NOT A SIGNIFICANT AMOUNT
```

```
 6      COMPARED TO THOSE.
 7              Q.   SO THEN WHAT'S -- WHAT'S THE --
 8      WHAT'S THE -- WHAT'S -- HOW -- HOW MUCH PERCENTAGE
 9      DOES KENNER OWN IN THAT DEAL?
10              A.   THERE'S NO OWNERSHIP RIGHT NOW.  HE
11      WAS GOING -- IT WAS THE SAME DEAL STRUCTURE.  I
12      WAS GOING TO DO THE DEAL.  HE WAS GOING TO BRING
13      THE MONEY.  IT WAS GOING TO BE 50/50.
14              Q.   I SEE.
15                   SO THAT'S WHY YOU FEEL YOU HAVE AN
16      OBLIGATION TO TRY TO GET THE MONEY BACK BECAUSE
17      SOMETHING WENT WRONG, AND YOU WERE RESPONSIBLE FOR
18      THE -- PAPERING THE DEAL, BASICALLY?
19                   MS. CROWTHER:  ASKED AND ANSWERED.
20      AND IT'S NOT WHAT HE SAID.
21      BY MR. RICHARDS:
22              Q.   HOW DID KENNER OR NORSTROM KNOW IF
23      THEY WERE THE OWNERS OR THEY HAVE AN INTEREST IN
24      THERE?  WHAT -- WHAT DOCUMENTATION DID THEY GET TO
25      SHOW THAT THEY HAVE --
0658
 1              A.   THEY DON'T HAVE ANY.  I'VE SAID
 2      THAT.
 3              Q.   JUST BASICALLY JUST YOUR
 4      REPRESENTATION THAT THEY OWN HALF THE DEAL?
 5              A.   IF IT GOT TO COMPLETION, AND WE
 6      WERE ABLE TO COMPLETE THE DEAL, IT WAS A
 7      6.6 MILLION DOLLAR DEAL.
 8                   IF HE PUT ALL THE MONEY IN LIKE HE
 9      WAS -- HE WAS SUPPOSED TO, AND THE DEAL WENT
10      ACCORDING TO PLAN, THEY WOULD HAVE -- PHIL WOULD
11      HAVE 50 PERCENT.
12              Q.   WHAT IF THE OWNER JUST RETURNS THE
13      MILLION DOLLARS, JUST GIVES PHIL BACK HIS MONEY
14      WITH NORSTROM, IS THAT ACCEPTABLE TO YOU?
15              A.   THAT'S -- WOULD BE ACCEPTABLE.
16      THAT'S PART OF THE LITIGATION.  IF YOU WANT TO
17      HAVE CONVERSATIONS WITH THE ATTORNEY IN -- IN --
18      IN CABO, YOU CAN DO THAT.
19              Q.   WHO'S THAT?
20              A.   FERNANDO GARCIA.
21              Q.   OH, YOU'RE OWN ATTORNEY IS HANDLING
22      IT FOR YOU?
23              A.   YES.  AND THERE'S ANOTHER ATTORNEY
24      ALSO.
25              Q.   DID THEY EVER GET TO TRIAL IN CABO,
0659
 1      DO YOU KNOW?
 2              A.   NOT YET, NO.
 3              Q.   I MEAN, IS THERE A TRIAL DATE?
```

```
 4              A.   NO.
 5              Q.   DID THE OWNER OFFER JUST TO RETURN
 6     THE MONEY?
 7              A.   NO.
 8              Q.   WHAT IS THE OWNER'S POSITION?
 9                   MS. CROWTHER:  OKAY.  COME ON.
10                   MR. RICHARDS:  WELL, MY -- THIS IS
11     A -- THERE'S A MILLION DOLLARS AT STAKE HERE.
12                   MS. CROWTHER:  BUT NOT IN THIS
13     LAWSUIT.  YOU HAVEN'T SUED ABOUT THAT.
14                   MR. RICHARDS:  DO YOU WANT ME TO?
15                   MS. CROWTHER:  IF YOU WANT TO, THEN
16     YOU CAN TAKE A DEPOSITION ABOUT IT.  IT WILL BE A
17     LOT SHORTER.
18                   MR. RICHARDS:  ALL RIGHT.  WELL,
19     I'M JUST -- I'M JUST TRYING TO -- YOU KNOW, THERE
20     JUST SEEMS -- THERE'S SO MANY --
21                   MS. CROWTHER:  OKAY.  YOUR
22     EDITORIALIZING DOESN'T HELP ANYTHING.
23                   MR. RICHARDS:  SORRY.
24     BY MR. RICHARDS:
25              Q.   ALL RIGHT.  THERE -- ON PAGE 942 --
0660
 1     IT'S RIGHT HERE.
 2                   ON PAGE 942, THERE WAS A -- THIS
 3     WAS A MEMORANDUM THAT -- THAT WAS PREPARED UP TO
 4     AUGUST 21ST, 2009.
 5                   AND IT STATES OVER HERE THAT:
 6                   "AS OF THE DATE OF SAID TERM
 7              SHEET, THREE PARCELS ARE HELD IN A
 8              FEE SIMPLE IN MARCH.  TITLE -- OF
 9              2005.  TITLE TO THESE PARCELS HAVE
10              BEEN TRANSFERRED."
11                   IF YOU COULD READ THAT.
12              (DOCUMENT REVIEWED BY THE DEPONENT.)
13     BY MR. RICHARDS:
14              Q.   IS THAT ALL TRUE IN THESE
15     PARAGRAPHS?
16              A.   I BELIEVE SO.
17              Q.   AND HOW COULD -- IS THERE -- IS
18     THIS A TYPO?  IT SAYS, "THIS INFORMATION AS OF
19     AUGUST 21ST, 2009."
20                   BECAUSE DO YOU -- IS THIS -- IS
21     THIS STILL -- BECAUSE IT SAYS THAT THE PROPERTY IS
22     STILL WORTH LIKE -- SOMETHING LIKE 68 MILLION
23     DOLLARS?
24              A.   NO.  I BELIEVE THAT IF YOU OPEN
25     THAT, AND WHATEVER THE LAST TIME THAT WAS OPENED,
0661
 1     IT MAY AUTOMATICALLY CHANGE THE DATE.
```

```
 2            Q.   THAT'S WHAT I'M SAYING.  SO IT'S A
 3   TYPO.
 4            A.   YEAH.  RIGHT.
 5            Q.   SO IT HASN'T BEEN OPENED IN A
 6   WHILE.
 7                 OKAY.  ON 956, IT SAYS -- HE'S
 8   ASKING:
 9                 "HAVE YOU HEARD ABOUT THE CASA
10            OR THE 10?  LET ME KNOW."
11                 WHAT IS -- AND IT SAID:
12                 "THE 10 WAS SUPPOSED TO BE FLOWN
13            TO GARRETT AT L.A.X., AT LEAST TO DO
14            THE CRITICAL TEST THAT WE NEED TO
15            PASS."
16                 WHAT 10?
17            A.   I ASSUME THE FALCON 10.
18            Q.   OH, THE FALCON 10.
19                 AND THEN WHAT WAS GARRETT SUPPOSED
20   TO DO?
21            A.   I BELIEVE THERE WAS A -- PROBABLY
22   AN AIR FRAME TEST -- I'M GUESSING AIR FRAME TEST
23   THAT WOULD NEED TO BE DONE TO SATISFY THE BANK.
24            Q.   I SEE.  OKAY.  SO THAT WAS JUST
25   STILL PART OF THE SAME REFINANCING?
0662
 1            A.   IT WAS THE FINANCING, YES.
 2            Q.   YEAH.  THE FINANCING.  ALL RIGHT.
 3                 YOU -- YOU TESTIFIED THAT YOU DON'T
 4   HAVE A -- WHAT KIND OF AN AMEX DO YOU HAVE?  IT'S
 5   NOT A BLACK CARD.  WHAT IS IT?
 6            A.   THE DELTA SKY MILES, I BELIEVE IS
 7   THE ONE THAT YOU'RE REFERRING TO.
 8            Q.   ALL RIGHT.  AND IT SAYS HERE ON
 9   BATES 964 -- ON BATES 964 THAT:
10                 "WE MAY NEED TO USE YOUR LITTLE
11            BLACK FRIEND FOR THIS.  GRACIAS."
12                 IS THAT ON A BLACK CARD?
13            A.   IT'S NOT A RACIAL SLUR, NO.  YEAH,
14   IT'S PHIL'S CREDIT CARD, I'M SURE.
15            Q.   DOES HE HAVE A BLACK CARD?
16            A.   I THINK HE DID, YES.
17            Q.   OH.  ALL RIGHT.
18                 AND THEN ON OCTOBER 28TH, 2005,
19   THAT'S AT 968, YOU HAD A GOLF TOURNAMENT FOR
20   EL ROSARIO?
21            A.   YES.
22            Q.   AND WHAT WAS ROBERT GAUDET DOING
23   FOR YOUR COMPANY AT THE TIME?
24            A.   HE WAS HELPING US WITH THE DUE
25   DILIGENCE, AND WE WERE TRYING TO GET THE LEHMAN
```

0663
1    LOAN CLOSED.
2                    WE WERE MOVING FORWARD WITH THE
3    FUNDING OF THE LEHMAN LOAN.  HE WAS HELPING US
4    WORK TOWARDS GETTING THAT FUNDING AND WOULD
5    CONTINUE ON WORKING FOR DIAMANTE CABO SAN LUCAS.
6            Q.   ALL RIGHT.  SO DID THAT -- DID THAT
7    SHERIDAN -- DID THAT SHERIDAN EVER -- DID THAT
8    SHERIDAN THING EVER GO THROUGH?
9            A.   I DON'T -- I BELIEVE SO.
10           Q.   ON 978, PHIL SENT YOU AN E-MAIL
11   SAYING:
12                "KJ, I HAVE 50,000 ON ITS WAY TO
13                HUDSON BANK.  PLEASE HAVE LYNN SEND
14                IT TO AMEX AND FOLLOW UP TODAY TO
15                MAKE SURE THE BLACK CARD IS CLEAN FOR
16                CABO EVENTS."
17                WHAT DOES THAT MEAN?
18           A.   I MEAN IT APPARENTLY MEANS THAT HE
19   WANTS THE -- TO PAY DOWN HIS AMEX SO HE CAN USE IT
20   AGAIN.
21           Q.   AND THEN IS THIS K.S.I. CAPITAL, IS
22   THIS THE LOAN THAT I HAD ALL THE QUESTIONS ABOUT
23   WITH RESPECT TO -- IS THIS THE ACTUAL LOAN?
24           A.   YES.
25                CAN I SEE THE TOP OF THAT?
0664
1            Q.   YEAH.
2            A.   JUST THE TOP OF THE E-MAIL.  CAN
3    YOU GO FURTHER?
4            Q.   YEAH.
5            (DOCUMENT REVIEWED BY THE DEPONENT.)
6                THE DEPONENT:  HOLD ON.
7                MR. RICHARDS:  THAT'S 979 FOR THE
8    RECORD.
9            (DOCUMENT REVIEWED BY THE DEPONENT.)
10               THE DEPONENT:  OKAY.
11   BY MR. RICHARDS:
12           Q.   IS THAT ALL RIGHT?
13           A.   UH-HUH.
14           Q.   SO THIS IS THE SAME K.S.I. THAT
15   YOU'RE NEGOTIATING WITH NOW?
16           A.   YES.
17           Q.   ARE YOU STILL DEALING WITH
18   DANIEL HASKEL?
19           A.   I'VE BEEN DEALING WITH
20   HENRY HASKEL.
21           Q.   IS IT LIKE A FATHER-AND-SON DEAL?
22           A.   HE MAY BE HIS SON, I BELIEVE, YES.
23           Q.   DO ALL YOU GUYS ON THE EAST COAST

24    WORK WITH DAD?
25            A.   APPARENTLY.
0665
 1            Q.   ALL RIGHT.  OKAY.  SO DID THIS LOAN
 2    EVER GET FUNDED AT THREE -- AT THESE TERMS, DO YOU
 3    KNOW?
 4            A.   I BELIEVE SO.
 5            Q.   WHO REFERRED YOU TO K.S.I. CAPITAL?
 6            A.   I BELIEVE KEN MICKENS.
 7            Q.   SO THIS IS SORT OF ACCURATE WHEN IT
 8    SAYS -- SO THE LOAN WAS FOR TWO-FIVE.  THEN THERE
 9    WAS A 10 PERCENT -- 10 POINTS.
10            AND THEN BENNETT & BENNETT, WHO ARE
11    THEY?
12            A.   I BELIEVE -- I BELIEVE THAT'S KEN
13    MICKENS'S COMPANY.
14            Q.   GOT YOU.
15            SO THE LOAN -- IT'S GOVERNED
16    PURSUANT TO NEW JERSEY LAW.
17            ARE YOU NEGOTIATING WITH THEM IN
18    NEW JERSEY OR IN -- OR IN MEXICO?
19            A.   I AM NEGOTIATING WITH THEM OVER THE
20    PHONE.
21            Q.   OKAY.  OVER THE PHONE.
22            ALL RIGHT.  THIS IS 993, ON
23    HALLOWEEN.
24            YOU -- PHIL -- THIS IS -- PHIL
25    SENDS YOU, "OLD LAUNDRY" -- "OLD DIRTY LAUNDRY,
0666
 1    WHOOPS."
 2            AND THEN YOU SAID:
 3            "THAT IS PRETTY SAD.  WE ARE
 4            STILL DEALING WITH THE SAME PROBLEMS
 5            ONE YEAR LATER.  WAIT UNTIL WE ARE
 6            FLUSH WITH MONEY BEFORE YOU DECIDE TO
 7            RESEND ME THAT AGAIN.  THEN MAYBE IT
 8            WILL PUT A SMILE ON YOUR FACE.  NOW
 9            IT'S PRETTY DAMN DEPRESSING."
10            WHAT ARE YOU TALKING ABOUT?
11            A.   I REALLY DON'T KNOW.
12            MS. CROWTHER:  READ THE WHOLE
13    E-MAIL STRING IF YOU'D LIKE.
14            MR. RICHARDS:  ALL RIGHT.  NO
15    PROBLEM.  THIS ONE -- SAME PAGE.
16            (DOCUMENT REVIEWED BY THE DEPONENT.)
17            THE DEPONENT:  I CAN GUESS.  I
18    MEAN, IT'S --
19            MS. CROWTHER:  IF YOU DON'T
20    REMEMBER OTHER THAN WHAT'S WRITTEN THERE, DON'T
21    GUESS.

22                    THE DEPONENT:  IT'S NOTHING BAD.  I
23  WOULD GUESS THAT WE WOULD BE HOPING AT THAT POINT
24  TO BE A LITTLE FURTHER ALONG.
25  ///
0667
 1  BY MR. RICHARDS:
 2            Q.   WHAT MOTIVATED YOU TO TRY TO
 3  DEVELOP PROPERTY IN BAJA CALIFORNIA?  WHAT DREW
 4  YOUR ATTENTION TO THIS TO BEGIN WITH?
 5            A.   HOW I GOT TO THE PROPERTY IN THE
 6  FIRST PLACE?
 7            Q.   YEAH.
 8            A.   THE SAME —— THE SAME CAMP THAT I
 9  MENTIONED EARLIER, CAMP SUNSHINE, WAS A CAMP FOR
10  KIDS WITH CANCER.
11                 ONE OF THE CAMPERS WHO I DEVELOPED
12  A CLOSE RELATIONSHIP, HE BECAME LIKE MY LITTLE
13  BROTHER.
14                 YEARS LATER, AFTER HE BECAME AN
15  ADULT, HE TOLD ME THAT HIS AUNT AND UNCLE HAD
16  BUILT A HOUSE ON THIS PROPERTY IN EL ROSARIO, AND
17  HE FELT THAT THEY THOUGHT THAT MARRIOTT HOTELS WAS
18  GOING TO BE PURCHASING AROUND IT.  AND HE THOUGHT
19  THAT I MIGHT WANT TO GO TAKE A LOOK.
20                 AND THAT WAS IN 1998.
21            Q.   AND DO YOU FEEL THAT —— THAT THEY
22  TOOK ADVANTAGE OF YOU AT ALL?
23            A.   NO.
24            Q.   SO IN HINDSIGHT, YOU WOULD HAVE
25  STILL BOUGHT THIS PROPERTY?
0668
 1            A.   I WOULD HAVE DONE THE THINGS ——
 2  SOME THINGS DIFFERENTLY.  I THINK WE CAN ALL SAY
 3  THAT IN HINDSIGHT.  BUT I ——
 4            Q.   WHAT WOULD YOU HAVE DONE
 5  DIFFERENTLY?
 6            A.   I DON'T KNOW.  I WOULD HAVE
 7  OBVIOUSLY TRIED TO DO THINGS A LITTLE DIFFERENTLY.
 8            Q.   DID YOUR EVER DO A DEAL WITH
 9  MT. ZION COMMERCIAL SERVICES?
10            A.   NO.
11            Q.   WAS THERE A LAWSUIT AS A RESULT OF
12  MT. ZION COMMERCIAL SERVICES?
13            A.   PHIL HAD A LAWSUIT WITH THEM, YES.
14            Q.   AND WHAT WAS HE TRYING TO RECOVER?
15                 MS. CROWTHER:  OBJECTION.  LACKS
16  FOUNDATION?
17  BY MR. RICHARDS:
18            Q.   DO YOU KNOW WHAT THE ISSUES WERE?
19            A.   I BELIEVE COMMITMENT FEES.

```
20              Q.   ALL RIGHT.  WHO -- DO YOU KNOW WHO
21   THE METROLINER AIRPLANE WAS EVER -- WHO IT WAS
22   EVER ENTITLED TO?
23              A.   I'M NOT SURE OF THE QUESTION.
24   THE -- THE --
25              Q.   THE PLANE.  THE METROLINER
0669
 1   AIRPLANE, WHO'S NAME IT WAS TITLED TO?
 2              A.   WHEN WE BOUGHT IT?
 3              Q.   YEAH.
 4              A.   BEFORE DIAMANTE AIR?
 5              Q.   YEAH.
 6              A.   I BELIEVE IT WAS METRO JET, BUT I'M
 7   NOT SURE.
 8              Q.   OKAY.  NOW, TAFFY JOWDY JR., WHO'S
 9   THAT?
10              A.   MY BROTHER.
11              Q.   OKAY.  I'M SHOWING YOU 1070.  IT
12   SAYS -- THIS IS AN E-MAIL DATED OCTOBER 7, 2003.
13              WHAT -- DID HE -- WHAT'S THIS
14   E-MAIL REGARDING?  IS THIS JUST PRINTED -- I'M
15   CONFUSED.
16              A.   YES.  AGAIN, HE WAS JUST COMPILING
17   THE E-MAIL.  SO HE -- IT HAS NOTHING TO DO WITH
18   HIM.
19              Q.   SO THESE E-MAILS THAT WERE
20   PROVIDED, WERE THEY STORED ON -- WHERE WERE
21   THEY -- WHERE WAS, LIKE, THIS E-MAIL STORED?
22   BECAUSE OBVIOUSLY YOU PRINTED THIS OUT ON A PIECE
23   OF PAPER.
24              A.   RIGHT.  I DON'T KNOW WHERE THESE
25   INDIVIDUAL E-MAILS WERE STORED.
0670
 1              AGAIN, I GAVE WHATEVER COMPUTERS
 2   I'VE HAD, AND I'VE HAD TO GO THROUGH E-MAILS, YOU
 3   KNOW, QUITE A BIT OVER THE LAST SEVERAL MONTHS,
 4   SO ...
 5              Q.   I SEE.  SO YOU BASICALLY HAD
 6   EVERYBODY YOU KNOW -- ARE YOU COMPUTER LITERATE?
 7              A.   NO.  I MEAN, I USE THE COMPUTER ALL
 8   THE TIME, BUT I WOULDN'T CALL MYSELF VERY COMPUTER
 9   LITERATE.
10              SO I HAD FORWARDED A BUNCH OF
11   E-MAILS TO HAVE PRINTED OUT.  AND WHOEVER ELSE HAD
12   E-MAILS STORED, JUST SAID, "JUST FORWARD THEM
13   TO" -- YOU KNOW.  SO SOME, I GUESS, WENT TO TAFFY
14   TO PRINT.
15              Q.   I SEE.  SO YOU BASICALLY -- WHEN
16   YOU GOT THE CALL FROM CALDWELL LESLIE SAYING, "WE
17   NEED THESE E-MAILS NOW, TIME IS UP," YOU JUST
```

18   STARTED CALLING PEOPLE AND SAYING, "WE NEED TO GET
19   ALL THESE E-MAILS"?
20                    MS. CROWTHER:  OBJECTION.
21   BY MR. RICHARDS:
22            Q.   WHEN DID YOU START COLLECTING THESE
23   E-MAILS?
24            A.   I'VE BEEN DOING IT FOR A WHILE.
25            Q.   WHEN IS -- HAS TAFFY JOWDY EVER
0671
1   BEEN PAID BY YOU OR ANY OF YOUR ENTITIES FOR
2   ANYTHING?
3            A.   YES.
4            Q.   FOR WHAT?
5            A.   HELPING WITH THIS PROCESS HERE.
6            Q.   THIS PARTICULAR PROCESS?
7            A.   THIS WHOLE PROCESS.
8            Q.   HOW MUCH IS HE BEING PAID?
9            A.   I DON'T KNOW EXACTLY.  I THINK
10   5,000 DOLLARS A MONTH.
11            Q.   FOR -- FOR LITIGATION SUPPORT?
12            A.   BASICALLY.
13            Q.   DOES HE HAVE ANY BACK -- LEGAL
14   TRAINING BACKGROUND?
15            A.   HE'S A LAWYER.
16            Q.   OH, HE'S --
17            A.   HE NEVER PRACTICED.  HE PASSED THE
18   BAR IN CONNECTICUT AND NEVER PRACTICED.
19            Q.   YOU DO KNOW MORE LAWYERS THAN ANY
20   GUY I'VE EVER MET AS FAR AS DIFFERENT STATES.
21   IT'S INCREDIBLE.  BILL'S A -- HE'S A MASSACHUSETTS
22   LAWYER.
23                    DO YOU LIKE CALIFORNIA LAWYERS THE
24   BEST SO FAR?
25            A.   SO FAR, YES.
0672
1            Q.   THAT'S WHAT I THOUGHT.
2            A.   OBVIOUSLY.
3            Q.   ALL RIGHT.  SO -- BECAUSE THESE
4   E-MAILS, THE WAY YOU HAVE THEM ON THE -- THE WAY
5   YOU HAVE THEM ON THE -- THE WAY YOU HAVE THESE
6   E-MAILS ON THE ROSTER HERE, THERE'S NO -- WHAT
7   HAPPENS IS BECAUSE THEY'RE PRINTED OUT FROM
8   DIFFERENT COMPUTERS, THEY'RE NOT IN CHRONOLOGICAL
9   ORDER.
10                    SO -- SO WHAT I'M TRYING TO DO IS
11   IF I CAN'T DEMISE WHAT -- WHAT THE E-MAIL'S
12   REFERRING TO OR IF IT'S CUMULATIVE, I'M NOT ASKING
13   YOU ABOUT IT.
14                    BUT I CAN'T TELL BECAUSE THEY
15   ALWAYS GO BACK TO THAT '03, THEN THEY GO TO THE

16    PRESENT.  SO THAT'S WHY THERE'S A LITTLE
17    CONFUSION.  I JUST WANT -- JUST SO YOU UNDERSTAND,
18    THEY'RE -- I WAS GIVEN THIS INDEX?
19              A.   OKAY.
20              Q.   AND SO IT'S CONFUSING TO -- I HAVE
21    TO READ THE SAME PERIOD OF YOUR LIFE FIVE
22    DIFFERENT TIMES BECAUSE THEY'RE FROM FIVE
23    DIFFERENT COMPUTERS.
24              SO I'M EXPLAINING WHY IT'S
25    COMPLICATED BECAUSE I'M TRYING TO MENTALLY AVOID
0673
1     HAVING TO REPEAT THE SAME SUBJECT MATTER, BUT
2     SOME -- NOT ALL OF IT I CAN FIGURE OUT.  SO THAT'S
3     JUST WHAT I'M -- WHAT I'M DOING.
4               I STAYED UP VERY LATE LAST NIGHT
5     TRYING TO SIPHON OFF SOME OF THESE THINGS, BUT
6     IT'S JUST TOO MANY PAGES TO PULL OUT OF -- LIKE I
7     GOT A GROUP OF, LIKE, 300 P.D.F.S, AND IT'S TOO
8     MANY PAGES TO KEEP PULLING OUT JUST THE PAGE I
9     THINK MAY BE RELEVANT.  I'D HAVE, LIKE 2900
10    SUBDIRECTORIES.
11              SO THAT'S WHY I'M -- IT'S JUST
12    EASIER TO QUICKLY SCAN THROUGH THEM, AND THEN WHEN
13    I GET TO AN AREA THAT I -- NOW, THIS RAISES
14    ANOTHER QUESTION HERE.
15              LET ME -- I'M GOING TO SHOW YOU
16    BATES 1108.  AND I'LL PUT THAT BACK ON THE BIG
17    SCREEN.
18              AND THAT IS -- THERE'S AN E-MAIL
19    FROM TORONTO, BRIAN MCBRIDE HAS BEEN DECERTIFIED
20    AS A PLAYER.
21              AND THEN THERE'S AN E-MAIL WITH
22    PHIL KENNER TO YOU.
23              DO YOU KNOW WHAT THIS HAD TO DO
24    WITH YOUR BUSINESS AT ALL?
25              A.   HE WAS SOMEBODY THAT PHIL KNEW AND
0674
1     I KNEW.  AND PHIL DIDN'T HAVE A VERY GOOD
2     RELATIONSHIP WITH HIM.
3               AND WHEN THAT CAME OUT, PHIL
4     OBVIOUSLY FORWARDED THAT TO ME.
5               Q.   I SEE.  SO WHEN HE SAYS, "WHAT A
6     SHAME, I KNOW IT COULD HAVE NOT BEEN HIS FAULT,"
7     HE WAS BEING SARCASTIC?
8               A.   I BELIEVE SO.
9               Q.   OKAY.  AND WHEN -- GOING BACK TO
10    YOUR TESTIMONY EARLIER, WHEN YOU WERE TALKING
11    ABOUT THE NEWSPAPERS, THERE WAS THE CONTENTION
12    THAT -- THAT YOU HAD -- THAT THIS NEWSPAPER --
13    THAT THIS LAWSUIT SOMEHOW GOT PICKED UP BY THE

```
14    NEW YORK POST.
15                   DO YOU REMEMBER THAT TESTIMONY?
16           A.    IT WAS PICKED UP BY A LOT OF
17    THINGS, YES.
18           Q.    OKAY.  ARE YOU -- ARE YOU AWARE
19    THAT IT WAS THE STORY OF TOMMY CONSTANTINE AND THE
20    LAWSUIT AGAINST PHIL KENNER BY OWEN NOLAN THAT
21    BROUGHT THIS ENTIRE DIAMANTE INVESTMENT TO SOME
22    SORT OF FOCUS BY THE MEDIA?  ARE YOU AWARE OF
23    THAT?
24                   MS. CROWTHER:  OBJECTION.  LACKS
25    FOUNDATION.  CALLS FOR SPECULATION.
0675
1                   THE DEPONENT:  I DON'T KNOW.
2     BY MR. RICHARDS:
3            Q.    OKAY.  DO YOU REMEMBER THE STORY
4     COMING OUT BY THE DAILY NEWS, LONG BEFORE YOU WERE
5     INVOLVED IN THIS, THAT THERE WAS A STORY THAT CAME
6     OUT ON THIS INVESTMENT IN CABO SAN LUCAS THAT WAS
7     RECOMMENDED BY PHIL KENNER TO OWEN NOLAN,
8     JOE JUNEAU -- AND JOE JUNEAU.
9                   DO YOU -- DO YOU REMEMBER THAT
10    STORY?
11           A.    I DON'T REMEMBER IT PERTAINING TO
12    DIAMANTE CABO SAN LUCAS.
13           Q.    YOU DON'T?
14           A.    IF YOU SAY IT WAS MENTIONED IN
15    THERE.  I READ AN ARTICLE IN THE DAILY NEWS.
16           Q.    YEAH.  DO YOU REMEMBER -- DO YOU
17    REMEMBER -- BECAUSE -- I JUST WANTED TO CLEAR THIS
18    UP WITH YOU.
19                   YOU -- YOU WERE UNDER THE BELIEF
20    THAT -- THAT -- THAT THESE PLAYERS PUBLISHED THIS
21    STORY IN THE NEW YORK DAILY NEWS BECAUSE -- THE
22    CONTENT WAS INTERESTING, AND I WAS TRYING TO LET
23    YOU KNOW THAT THE CONTENT BECAME INTERESTING
24    BECAUSE OWEN NOLAN SUED PHIL KENNER AND JOE JUNEAU
25    SUED PHIL KENNER IN FEDERAL COURT AND THEN SUED
0676
1     TOMMY CONSTANTINE IN FEDERAL COURT.
2                   AND THEN THE DAILY NEWS DID A STORY
3     ON THESE INVESTMENTS THAT THESE PLAYERS MADE
4     RELATED TO CABO SAN LUCAS.
5                   I JUST -- THAT'S WHAT BROUGHT SORT
6     OF THE SPOTLIGHT ON IT.  AND I WAS CONCERNED --
7     AND I, YOU KNOW, HAD SOME TIME TO REFLECT AT THE
8     BREAK, BECAUSE I WAS WONDERING, YEAH, WHY DID THIS
9     STORY GET ANY COVERAGE?
10                   AND THEN I REALIZED IT'S BECAUSE
11    YOU DON'T -- YOU WEREN'T -- MAYBE YOU WEREN'T
```

```
12    PUTTING TWO AND TWO TOGETHER.  BUT I JUST -- I
13    JUST WANT TO --
14              A.  I CAN DISAGREE; CORRECT?
15              Q.  YEAH, YOU CAN DISAGREE.
16              A.  I WOULD DISAGREE IN THAT IF THIS
17    COMPLAINT THAT YOU HAVE NOW, WHICH IS STILL, I
18    WOULD SAY, 90 PERCENT FALSE -- AND WE CAN CONTINUE
19    TO GO THROUGH IT IF YOU'D LIKE -- IF THIS IS WHAT
20    YOU FILED AGAINST ME THE FIRST TIME, IT WOULDN'T
21    HAVE GOTTEN -- IT WOULDN'T HAVE PUT ME IN THE
22    POSITION THAT IT PUT ME.
23              NO ONE -- NO ONE WAS INTERESTED IN
24    A LAND DEAL IN -- IN THIS THE WAY THEY WERE
25    INTERESTED IN WHAT YOU MENTIONED IN THE FIRST
0677
 1    COMPLAINT.
 2              SO I -- YOU KNOW, I DON'T THINK WE
 3    NEED TO GO THROUGH IT.  I THINK THAT THERE'S --
 4    AGAIN, WHERE WE'RE AT.  BUT I THINK THAT THE FACT
 5    THAT YOU PUT ALL OF THOSE ALLEGATIONS IN THERE PUT
 6    US IN A POSITION THAT WE'RE IN.
 7              Q.  ALL RIGHT.  WELL, YESTERDAY WE
 8    WERE -- WE WERE -- WE WENT ALL THE WAY TO -- WE
 9    WENT ALL THE WAY TO THE FIRST -- THE FIRST CAUSE
10    OF ACTION --
11              MS. CROWTHER:  IF YOU'RE GOING TO
12    CHANGE GEARS, CAN WE TAKE A RESTROOM BREAK,
13    PLEASE?
14              MR. RICHARDS:  YEAH, WE CAN.
15              THE VIDEOGRAPHER:  WE'LL GO OFF THE
16    VIDEOTAPE RECORD AT THE TIME OF 5:16 P.M.
17              (WHEREUPON, A RECESS WAS HELD
18              FROM 5:16 P.M. TO 5:33 P.M.)
19              THE VIDEOGRAPHER:  WE'RE BACK ON
20    THE VIDEOTAPE RECORD, BEGINNING TAPE NUMBER 4 IN
21    VOLUME NUMBER 2 AT 5:33 P.M.
22    BY MR. RICHARDS:
23              Q.  OKAY.  I'M GOING TO SHOW YOU JOWDY
24    1200.  THIS IS AN E-MAIL FROM PHIL TO YOU STATING:
25              "I SPOKE WITH HER YESTERDAY, AND
0678
 1              SHE SAID SHE WOULD HAVE COME IF SHE
 2              HAD LONGER ADVANCED NOTICE.  SHE
 3              WANTS ROGER TO CALL WITH HIS NEW 713
 4              NUMBER FOR HER.  BY THE WAY SHE
 5              SOUNDED REALLY HOT."
 6              THAT'S WHAT YOU CALL A GOTCHA.
 7              A.  YEAH.  I DON'T KNOW.
 8              Q.  ROGER DID HAVE A 713 NUMBER; RIGHT?
 9              A.  ROGER?
```

```
10                Q.   CLEMENS.
11                A.   HE DOES HAVE A 713 NUMBER.
12                Q.   OKAY.  SO WAS THIS LIKE A GIRL THAT
13   WAS GOING TO VISIT HIM?
14                A.   I HAVE NO IDEA.
15                Q.   BY THE WAY, DID ADRIENNE MOORE
16   (PHONETICALLY) STAY AT THE HOUSE EVER?
17                A.   WHICH HOUSE?
18                Q.   WHAT'S IT CALLED?
19                A.   PEDREGAL?
20                Q.   YEAH.
21                A.   YES.
22                Q.   OKAY.  ALL RIGHT.
23                     SO WAS -- WOULD -- WHY WOULD
24   PHIL -- DO YOU KNOW -- DO YOU REMEMBER THAT E-MAIL
25   WITH PHIL OR NO?
0679
1                 A.   NO.
2                 Q.   IS THIS -- LIKE YOU GUYS WOULD SEND
3    E-MAILS LIKE THAT SOMETIMES?
4                 A.   WE COMMUNICATED A LOT.
5                 Q.   PHIL SENT YOU AN E-MAIL ON
6    JANUARY 31ST, 2005, SAYING:
7                     "I'M WEARING THE WHITE SHIRT
8                 TONIGHT."
9                     WHAT'S THAT?
10                A.   I HAVE NO IDEA.
11                Q.   YOU GUYS HAD TOO MUCH FUN DOWN
12   THERE.
13                     THEN THERE WAS AN E-MAIL HE SENT
14   YOU THAT SAID, "ROCKS DOC."
15                     DO YOU KNOW WHAT THAT'S ABOUT?
16                A.   NO.
17                Q.   OKAY.  JUST SO TOMMY CONSTANTINE
18   DOESN'T FEEL WE LEFT HIM OUT OF THIS DEPO, THERE'S
19   A KENNER -- I MEAN AT JOWDY 1207:
20                     "I NEED THE CABO HOUSE FOR TOMMY
21                 AND A FEW RACECAR DRIVERS."
22                     WHAT HOUSE IS HE REFERRING TO?
23                A.   I ASSUME THE HOUSE IN PEDREGAL.
24                Q.   ALL RIGHT.  AND THEN HE ASKS YOU IN
25   AN E-MAIL:
0680
1                     "ARE YOU ON THE SHUTTLE TO OCENA
2                 CLUB?"
3                     O-C-E-N-A.
4                 A.   I HAVE NO IDEA.
5                 Q.   IS THAT -- IS THAT OCEANA CLUB?
6                 A.   IT'S NOT UP HERE, SO I DON'T
7    (INDICATING) --
```

```
 8              Q.   NO.  I KNOW.  I'LL SHOW YOU THE
 9    SPELLING.
10                   THAT'S 1208.
11              A.   I DON'T KNOW.
12              Q.   IT'S PROBABLY OCEAN CLUB.
13                   DID YOU GO TO OCEAN CLUB IN
14    PHOENIX?
15              A.   I DON'T KNOW.
16              Q.   BECAUSE TOMMY CONSTANTINE EATS
17    THERE EVERY NIGHT, SO I WAS WONDERING.
18              A.   I DON'T KNOW.
19              Q.   OKAY.  WHEN PHIL SENT YOU, ON 1210,
20    BATES 1210, IT SAYS:
21                   "THE 20K HAS LEFT THE BUILDING."
22                   WHAT'S HE REFERRING TO?
23              A.   I ASSUME HE SENT 20,000 DOLLARS
24    SOMEWHERE.
25              Q.   WHAT'S THE COZUMEL DOCS?
0681
 1              A.   I BELIEVE HE HAD A FRIEND WHO HAD
 2    SOMETHING GOING ON IN COZUMEL.
 3              Q.   IS CASA DE CABO STILL THE SAME
 4    HOUSE?
 5                   MS. CROWTHER:  CAN YOU PLEASE REFER
 6    TO BATES NUMBERS WHEN YOU'RE ASKING HIM ABOUT AN
 7    E-MAIL?
 8                   MR. RICHARDS:  1222.
 9                   THE DEPONENT:  CASA -- WELL IT'S
10    CASA DE CAZA, BUT CASA DE CABO, I WOULD ASSUME, IS
11    STILL THE SAME PEDREGAL HOUSE.
12    BY MR. RICHARDS:
13              Q.   WHAT PAPERWORK WAS FERNANDO -- IT'S
14    1227 -- TRYING TO PREPARE FOR YOU?  YOU DON'T
15    KNOW?
16              A.   IT LOOKS LIKE THAT SAME PROJECT
17    THAT PHIL IS LOOKING AT IN COZUMEL.  HE MAY HAVE
18    WANTED FERNANDO TO -- TO LOOK AT THE PAPERWORK
19    APPARENTLY.
20              Q.   DID YOU EVER -- THIS IS JUST A
21    "YES" OR "NO" QUESTION.
22                   HAVE YOU EVER HAD LOUIS FREEH
23    INTERACT WITH DANSKE BANK?
24                   MS. CROWTHER:  OBJECTION.
25                   MR. RICHARDS:  JUST "YES" OR "NO."
0682
 1                   MS. CROWTHER:  NO.  YOU'RE ASKING
 2    HIM SUBSTANTIVELY IF HE DIRECTED AN ATTORNEY TO DO
 3    SOMETHING.  YOU DON'T GET TO ASK THAT.
 4                   MR. RICHARDS:  OF COURSE YOU DO.
 5                   MS. CROWTHER:  I'LL INSTRUCT HIM
```

```
 6    NOT TO ANSWER.
 7    BY MR. RICHARDS:
 8          Q.   WELL, HAS LOUIS FREEH EVER
 9    REPRESENTED YOU WITH DANSKE BANK?
10          A.   I DON'T BELIEVE SO.
11          Q.   DO YOU KNOW WHY THERE'S ALL THESE,
12    LIKE, ONE-LINE E-MAILS?  IS THIS ON LIKE AN
13    INSTANT MESSAGE OR SOMETHING?
14          A.   I WOULD ASSUME IT'S ON A -- ONE OF
15    THOSE OLDER -- I MEAN I FORGET WHAT THE DATE IS.
16    IT WAS A TWO-WAY PAGER THING.
17          Q.   LIKE A NEXTEL?
18          A.   NO.  I DON'T KNOW WHAT YOU CALL IT.
19               IT WAS ONE OF THOSE THINGS THAT
20    LOOKED LIKE A PAGER.  IT HAD A -- THE PRECURSOR TO
21    THE BLACKBERRY, I BELIEVE.
22          Q.   ALL RIGHT.  WHAT'S
23    EXCLUSIVERESORTS.COM?
24               MS. CROWTHER:  BATES NUMBER,
25    PLEASE.
0683
 1               MR. RICHARDS:  1257.
 2               THE DEPONENT:  THEY ARE A VACATION
 3    CLUB.
 4    BY MR. RICHARDS:
 5          Q.   ON BATES 1260, YOU STATED:
 6               "I WILL PUT THE SCREWS TO TOAD
 7               (PHONETICALLY).  NO MERMAIDS UNTIL WE
 8               GET THE MONEY.  GRACIAS, AMIGO."
 9               WHAT DOES THAT MEAN?
10               MS. CROWTHER:  OBJECTION.  ASKED
11    AND ANSWERED.  WE LOOKED AT THIS YESTERDAY.
12               MR. RICHARDS:  THIS SAME E-MAIL?
13               MS. CROWTHER:  YEP.
14               MR. RICHARDS:  WELL, I'M LETTING
15    YOU KNOW HE'S PRODUCED IT TWICE, THEN.
16               MS. CROWTHER:  THAT'S BECAUSE THERE
17    ARE TWO DIFFERENT VERSIONS, AND WE PRODUCED ALL OF
18    OUR DOCUMENTS.
19               MR. RICHARDS:  WHY IS THERE TWO
20    DIFFERENT VERSIONS, IF YOU KNOW?
21               MS. CROWTHER:  BECAUSE THERE'S A
22    SENT AND THERE'S A RECEIVED.
23               MR. RICHARDS:  OH, OKAY.
24               MS. CROWTHER:  YOU ASKED FOR ALL
25    E-MAILS BETWEEN KEN AND PHIL.
0684
 1               MR. RICHARDS:  SO I GUESS YOU THINK
 2    THAT HE'S USING LIKE -- HE'S JUST PRINTING OUT THE
 3    SENT FOLDER OF HIS OUTLOOK?  BECAUSE I CAN'T TELL
```

```
 4    THIS IS TAFFY JOWDY.  THE OTHER ONE WAS SOME GUY
 5    NAMED BEN.
 6              MS. CROWTHER:  I DON'T KNOW EXACTLY
 7    HOW THAT HAPPENED BECAUSE I DON'T KNOW WHAT THEY
 8    DID TO COLLECT DOCUMENTS.
 9              BUT WHAT I CAN TELL YOU IS THAT
10    I'VE SEEN SEVERAL TIMES THAT WE HAVE ONE -- THAT
11    IT APPEARS TO BE A COLLECTION OF THE KEN JOWDY
12    E-MAILS WITH PHIL KENNER, AND THEY DON'T HAVE
13    PHIL'S RESPONSES.
14              AND THEN WE HAVE THE OTHER SIDE,
15    WHERE IT'S PHIL'S COMMUNICATIONS.  AND SOMETIMES
16    WE HAVE KEN'S RESPONSES.  SOMETIMES WE DON'T.
17              MR. RICHARDS:  I SEE.  OKAY.
18              MS. CROWTHER:  AND SOME OF IT MAY
19    RELATE TO THE SYSTEM PAGER, WHERE YOU SAY SOME OF
20    THEM IS PHIL'S AND SOME OF THEM IS KEN'S.
21    BY MR. RICHARDS:
22         Q.   ON BATES 1308, IT SAID THAT:
23              "HE SAID 2 MILLION WILL GET TO
24              DIAMANTE DEL MAR ACCOUNT TOMORROW
25              REGARDING TODD."
0685
 1              WHAT WAS THAT ABOUT?
 2         A.   I -- I'M GUESSING, BUT IT MAY HAVE
 3    HAD SOMETHING TO DO WITH RODNEY AND -- AND HIS
 4    SUPPOSED DELIVERY OF FUNDS, WHICH NEVER HAPPENED.
 5         Q.   WHEN WAS THE LAST TIME YOU HAD ANY
 6    DIRECT COMMUNICATION WITH PHIL KENNER?
 7         A.   WE'VE ACTUALLY -- WE'VE BEEN IN THE
 8    SAME ROOM.  WE HAVEN'T SAID A WHOLE LOT OF WORDS
 9    TO EACH OTHER.  I'M TRYING TO THINK OF THE LAST
10    TIME WE ACTUALLY HAD A DISCUSSION.
11         Q.   DID -- OKAY.  GO AHEAD.
12         A.   I DON'T REMEMBER.
13         Q.   DID YOU MEET HIM IN LAS VEGAS?
14         A.   YES.
15         Q.   DID YOU WEAR A WIRE?
16         A.   NO.
17         Q.   DID -- DID -- DID YOU EVER TELL --
18    HAVE YOU EVER TOLD ANYBODY THAT YOU THOUGHT THAT
19    PHIL KENNER WAS GOING TO END UP IN JAIL IN 2010?
20         A.   I DON'T BELIEVE SO.  I DON'T KNOW.
21         Q.   DO YOU HAVE ANY REASON TO -- DO YOU
22    HAVE ANY FACTS THAT WOULD -- THAT YOU'RE AWARE OF
23    THAT WOULD -- AS TO -- AS TO WHY PHIL KENNER WOULD
24    WANT TO RUIN THE DIAMANTE PROJECT?
25         A.   I DON'T KNOW.
0686
 1              Q.   DO YOU KNOW -- DO YOU HAVE ANY
```

2    FACTS AS TO WHY -- AS TO WHY PHIL KENNER FILED A
3    LAWSUIT AGAINST YOU IN ARIZONA AS FAR AS WHAT HIS
4    MOTIVATIONS WERE?
5                    MS. CROWTHER:  OBJECTION.  LACKS
6    FOUNDATION.
7                    MR. RICHARDS:  I'M ASKING IF HE
8    KNOWS.
9                    THE DEPONENT:  I DON'T KNOW.
10                   MS. CROWTHER:  HE COULDN'T KNOW.
11                   MR. RICHARDS:  WHY?  PHIL COULD
12   HAVE TOLD HIM OR SOMEBODY ELSE COULD HAVE TOLD
13   HIM.  I'M GOING TO FOLLOW-UP ON THAT.
14   BY MR. RICHARDS:
15           Q.  ISN'T IT TRUE THAT IN THE 18 MONTHS
16   YOU WERE DEALING WITH TOMMY CONSTANTINE, THAT HE
17   TOLD YOU REPEATEDLY THAT PHIL KENNER WAS VERY
18   UPSET THAT HE WASN'T GETTING ANY OF THE HAWAII
19   MONEY BACK?
20           A.  NO.
21           Q.  DID TOMMY CONSTANTINE -- DID YOU
22   EVER HAVE A DISCUSSION WITH --
23                   MR. RICHARDS:  OH, JUST -- YOU
24   DON'T HAVE TO TYPE THIS.
25   ///
0687
1                    (WHEREUPON, A DISCUSSION WAS HELD
2                    OFF THE RECORD.)
3    BY MR. RICHARDS:
4            Q.  DID YOU EVER HAVE ANY DISCUSSION
5    WITH TOMMY CONSTANTINE AS TO WHY PHIL KENNER WAS
6    UPSET?
7            A.  I HAD A LOT OF DISCUSSIONS WITH
8    TOMMY CONSTANTINE.
9            Q.  WELL, DO YOU REMEMBER ANYTHING
10   ABOUT -- WITH TOMMY CONSTANTINE ABOUT WHY
11   PHIL KENNER WAS UPSET?
12           A.  HE -- HE WOULD SAY HE FELT THE
13   PROJECT WAS BEING MISMANAGED.  I'M SURE HE WAS --
14   I DON'T KNOW.  I DON'T KNOW WHAT WAS IN PHIL'S
15   HEAD.
16               I KNOW THAT TOMMY CONSTANTINE WOULD
17   REPEATEDLY SAY THAT HE THOUGHT PHIL WAS BEING
18   UNREASONABLE, TO ME.
19               AND, AGAIN, I WAS NAIVE.  I DON'T
20   KNOW IF TOMMY CONSTANTINE ACTUALLY BELIEVED THAT,
21   OTHER THAN WHAT HE WAS SAYING TO ME.
22           Q.  DO YOU HAVE ANY EVIDENCE THAT
23   TOMMY CONSTANTINE EVER SAID ANYTHING DISPARAGING
24   ABOUT YOU PRIOR TO THE SETTLEMENT NEGOTIATIONS
25   BEING TERMINATED BY YOU?

0688
1              A.   I DON'T KNOW.
2              Q.   SO IN OTHER WORDS, YOU DON'T HAVE
3    ANY EVIDENCE THAT HE'S EVER --
4              A.   THE SETTLEMENT -- JUST TO BE CLEAR,
5    THE SETTLEMENT NEGOTIATIONS WERE SUPPOSED TO -- WE
6    WERE SUPPOSED TO HAVE A SETTLEMENT AGREEMENT
7    PROBABLY IN MARCH.
8              WE DIDN'T.  ENDED UP SENDING A
9    LETTER TERMINATING THAT UNTIL MAY JUST BECAUSE WE
10   COULDN'T JUST LEAVE IT HANGING.  WE JUST WANTED TO
11   MOVE ON AT THAT POINT.
12             Q.   DO YOU HAVE ANY SPECIFIC EVIDENCE
13   THAT YOU'RE AWARE OF THAT WOULD CAUSE PHIL KENNER
14   TO GO TO JAIL?
15             MS. CROWTHER:  OBJECTION.  CALLS
16   FOR A LEGAL CONCLUSION.  I DON'T KNOW HOW HE WOULD
17   KNOW THAT.
18             THE DEPONENT:  WELL, I DIDN'T.
19   BY MR. RICHARDS:
20             Q.   WELL, YOUR LAY OPINION.
21             MS. CROWTHER:  NO.  DON'T
22   SPECULATE.
23             MR. RICHARDS:  WELL, HE SAID HE
24   COMMITTED PERJURY.
25             THE DEPONENT:  I KNOW HE DID THAT.
0689
1    BY MR. RICHARDS:
2              Q.   OKAY.  WELL, HOW DID HE DO THAT?
3              A.   HE LIED UNDER OATH.
4              Q.   WHERE?
5              A.   IN -- EVERY TIME HE'S BEEN UNDER
6    OATH.
7              Q.   WELL, WHEN -- WHEN HE -- YOU SAID
8    HE LIED IN MEXICO, THAT IS WHAT YOU SAID.
9              A.   WELL, HE'S LIED IN THE UNITED
10   STATES ALSO.
11             Q.   AND WHAT DID HE LIE ABOUT?
12             A.   HOW MANY EXAMPLES WOULD YOU LIKE ME
13   TO GIVE YOU?
14             Q.   WELL, I MEAN, IT'S -- WHEN YOU SAY
15   SOMEONE'S COMMITTED PERJURY, I THINK IT'S
16   REASONABLE TO KNOW WHAT THEY DID.
17             A.   HE'S BEEN UNDER OATH QUITE A BIT,
18   AND HE'S LIED EVERY TIME HE'S BEEN UNDER OATH.
19             Q.   WELL, LET'S FACE IT, YOU'RE A LOT
20   HARDER TO GET UNDER OATH THAN HE IS.
21             A.   I TELL THE TRUTH.
22             Q.   DO YOU WANT TO GIVE ME ANY EXAMPLES
23   OF WHERE PHIL KENNER HAS COMMITTED PERJURY IN YOUR

```
24    OPINION?
25            A.   OKAY.  WHEN HE TRIED TO DESCRIBE --
0690
 1    I BELIEVE IT WAS THE NOLAN -- OWEN NOLAN
 2    ARBITRATION, WHEN HE TRIED TO DESCRIBE THE EQUITY
 3    SPLIT IN CABO.
 4                 AND HE SAID THAT IT WAS THREE DAYS
 5    BEFORE THE DEAL WAS SUPPOSED TO CLOSE, THAT WE
 6    SCAMMED HIM.  AND THAT'S WHY HE HAS 39 PERCENT AND
 7    HIS PLAYERS HAVE 8 AND I HAVE 40 PERCENT.
 8                 THAT IF HE DIDN'T CAPITULATE -- AND
 9    I'M PARAPHRASING.  I DON'T HAVE THE EXACT
10    DOCUMENTS OR THE EXACT TRANSCRIPT.
11                 BUT IF HE DIDN'T CAPITULATE AT THAT
12    TIME, HE WOULD HAVE LOST THE ENTIRE INVESTMENT.
13    THAT IS JUST A LIE.
14            Q.   WHY IS THAT A LIE?
15            A.   WELL, THERE'S AN E-MAIL IN FEBRUARY
16    OF '06, WHICH IS THREE WEEKS EARLIER, WHERE PHIL
17    OUTLINES WHAT THE EQUITY SPLIT IS.
18            Q.   DID YOU PRODUCE THAT E-MAIL?
19            A.   I'M SURE I DID.
20            Q.   ALL RIGHT.  AND THEN WHAT ELSE HAS
21    HE COMMITTED PERJURY ABOUT?
22            A.   WELL, IN THE GLEN MURRAY CASE, HE
23    SAYS THAT HE'S NEVER HAD ANY INTEREST IN ANY PALMS
24    UNITS.  HE'S NEVER LENT ANY MONEY FOR ANY PALMS
25    UNITS.  HE'S NEVER CONTRIBUTED ANY MONEY TO ANY
0691
 1    PALMS UNITS.  HE SAYS THAT UNDER OATH.
 2                 ON HIS FINANCIAL STATEMENTS, HE
 3    SAYS HE HAS INTEREST IN FOUR PALMS UNITS.  AND HE
 4    ALSO HAS -- WE HAVE PAYMENTS THAT I'VE SEEN THAT
 5    HAVE GONE FROM HIS ACCOUNT TO THE CLOSING
 6    ATTORNEYS FOR THE PALMS UNIT.
 7                 SO WHETHER HE SAYS HE BOUGHT THEM,
 8    LENT MONEY OR WHATEVER HE DID, HE DID HAVE SOME
 9    INTEREST IN THE PALMS UNITS.
10            Q.   DID -- DID TOMMY CONSTANTINE NOT
11    TELL YOU THAT PHIL AND HIS CLIENTS WERE GOING TO
12    SUE YOU IF THESE ISSUES DIDN'T GET RESOLVED, AND
13    THEN YOU RESPONDED THAT YOU'RE NOT WORRIED BECAUSE
14    IT'S A PROCESS?
15            A.   NO.  I SAID THE LAWSUITS ARE A
16    PROCESS, AS WE'VE LEARNED.
17                 TOMMY CONSTANTINE WOULD SAY THAT
18    THEY'RE GOING TO STORM INTO LEHMAN'S OFFICES AND
19    SAY EVERYTHING DISPARAGING AGAINST ME, WHICH IS A
20    CONCERN OF MINE.
21                 A LAWSUIT IS A PROCESS.  A
```

22    LAWSUIT -- IF YOU WANT TO SUE ME, YOU HAVE TO GO
23    THROUGH A PROCESS.
24                    AND IF IT DOESN'T GET THE
25    SENSATIONAL ATTENTION THAT THIS ONE DID, WE CAN GO
0692
1    THROUGH THE PROCESS, AND HOPEFULLY THE TRUTH AND
2    THE RIGHT SIDE WINS.  SO THAT'S THE PROCESS I
3    TALKED ABOUT.
4                    SO IF THEY WANTED TO SAY YOU WANT
5    TO SUE ME FOR MISMANAGEMENT, THEN THAT'S A
6    PROCESS, THAT YOU HAVE TO -- THAT YOU HAVE TO
7    PROVE THAT THERE WAS MISMANAGEMENT.
8                    THAT'S DIFFERENT THAN WALKING INTO
9    THE CHAIRMAN OR THE C.E.O. OF LEHMAN AND SAYING --
10   BASICALLY SAYING LIES ABOUT A PERSON.  THAT'S A
11   DIFFERENT PROCESS.
12           Q.   WHY WOULD -- WHAT WOULD BE THE
13   MOTIVATION -- OR WERE YOU EVER TOLD ANY MOTIVATION
14   WHY PHIL OR HIS CLIENTS -- WELL, LET'S JUST DEAL
15   WITH PHIL BECAUSE THAT SEEMS TO BE THE PERSON
16   YOU'RE DEALING WITH -- WHY PHIL WOULD HAVE THE
17   MOTIVATION TO LIE ABOUT YOU TO LEHMAN?
18           A.   BECAUSE HE WANTED -- AT THE TIME I
19   BELIEVE HE THOUGHT SOMEHOW HE WAS GOING TO BE ABLE
20   TO GET CONTROL OF THE PROJECT.
21                    AND HE FELT BY SAYING THESE THINGS
22   TO ME, ABOUT ME, WOULD DAMAGE ME ENOUGH WHERE I'D
23   EITHER HAVE TO TURN THE -- MAKE HIM A MANAGING
24   MEMBER OR MAKE TOMMY A CO-MANAGING MEMBER OR MAKE
25   TOMMY A MANAGING MEMBER.
0693
1                    BUT I DON'T KNOW WHAT HIS -- WHAT
2    HE ACTUALLY THOUGHT WAS GOING TO HAPPEN BY WALKING
3    IN THERE OTHER THAN CREATING A HUGE MESS, WHICH IS
4    EXACTLY WHAT THIS LAWSUIT IN JUNE HAS DONE.
5                    IT HAD THE SAME EFFECT AS WALKING
6    INTO THE C.E.O. OF LEHMAN A YEAR AND A HALF AGO.
7            Q.   WELL, DID -- DID PHIL TELL YOU,
8    EVER, HE WANTED TO BE A MANAGING MEMBER?
9            A.   HAS HE TOLD THAT?
10           Q.   YEAH.  EVER.
11           A.   WELL, HE KNEW THAT HE WASN'T GOING
12   TO BE ABLE TO BE THE MANAGING MEMBER.
13           Q.   WELL, OF COURSE.  YOUR AGREEMENT
14   MAKES YOU THE MANAGING MEMBER.
15           A.   NO.  HE KNEW LEHMAN WOULD NEVER
16   ALLOW HIM TO BE A MANAGING MEMBER.
17           Q.   SO THEN -- SO THE OTHER ANSWER IS:
18   NO, PHIL NEVER TOLD YOU HE WANTED TO BE MANAGING
19   MEMBER?

```
20              A.   HE WANTED TOMMY TO BE CO-MANAGING
21     MEMBER.  HE WANTED TOMMY TO BE MANAGING MEMBER.
22     AND THEN WHEN THAT WASN'T GOING TO HAPPEN, HE
23     WANTED TO BE CO-MANAGING MEMBER.
24              Q.   WHO TOLD YOU THAT SPECIFICALLY?
25              A.   TOMMY.
0694
 1              Q.   DID PHIL EVER TELL YOU THAT?
 2              A.   I WASN'T TALKING TO PHIL AT THAT
 3     TIME.
 4              Q.   OKAY.  SO THE ANSWER IS:  NO, PHIL
 5     NEVER TOLD YOU?
 6                   I WANT TO MAKE SURE WE'RE CLEAR FOR
 7     THE RECORD.
 8                   DID PHIL KENNER EVER TELL YOU AT
 9     ANY TIME HE WANTED TO BE MANAGING MEMBER?
10              A.   THAT HE WANTED TO BE?
11              Q.   YEAH.  PHIL.
12              A.   NO.
13              Q.   NO, NO.  OKAY.
14              A.   WHICH IS ALSO PART OF THAT WHOLE
15     PERJURY, WHEN HE SAYS IN ONE OF HIS TESTIMONIES
16     THAT HE WAS SUPPOSED TO BE A MANAGING MEMBER WITH
17     ME, AND THEN THAT WAS TAKEN AWAY FROM HIM, TOO.
18     THAT'S ANOTHER LIE.
19              Q.   WELL, DOES --
20              A.   AND ALSO -- I MEAN, IF YOU WANT ME
21     TO GO BACK, I CAN -- I'LL START TO THINK OF ALL
22     THE THINGS HE'S LIED ABOUT.  IF YOU'D LIKE ME TO
23     CONTINUE TO SAY THEM, THERE'S QUITE A FEW.
24              Q.   I WOULD BE VERY GRATEFUL IF YOU'D
25     DO THAT.
0695
 1              A.   OKAY.  ALL RIGHT.  YOU WANT ME TO
 2     NOW?
 3              Q.   YES.
 4              A.   THE DOCUMENT IN THE ARIZONA CASE,
 5     THE FORGED DOCUMENT.  HE HAS AN ENTIRE TESTIMONY
 6     BASED ON A LIE.
 7                   IT'S A FORGERY.  I NEVER SIGNED THE
 8     DOCUMENT.  I'VE NEVER -- I NEVER SAW THE DOCUMENT
 9     UNTIL HE PRODUCED IT.  THAT'S AN -- THAT'S AN
10     ENTIRE TESTIMONY THAT HE'S PUT IN FRONT OF FEDERAL
11     COURT.
12                   HE PRODUCED A DOCUMENT IN FRONT OF
13     FEDERAL COURT AND SAID JOHN KAISER WAS THE ONE WHO
14     HAD THE ORIGINAL.  THAT WAS HIS FIRST STORY.  AND
15     HE CHANGED THAT STORY.
16                   HE SAID HE DID IT ON A COMPUTER,
17     THAT WE LATER FOUND OUT THAT HE DIDN'T EVEN OWN AT
```

18    THE TIME THIS THING WAS DONE.  AND HE CHANGED THAT
19    STORY.
20                   I BELIEVE THAT THERE'S ENOUGH
21    EVIDENCE TO SHOW THAT HE LIED -- HE -- HE -- HE
22    PUT UP FORGED DOCUMENTS IN FRONT OF THE FEDERAL
23    COURT.
24                   I BELIEVE THAT IF THAT CASE WASN'T
25    DISMISSED, THEN IT WOULD HAVE SHOWN FOR THAT TO BE
0696
1     A FORGERY AND FOR PHIL TO HAVE PERJURED HIMSELF IN
2     A WHOLE DAY'S WORTH OF TESTIMONY.
3              Q.   WELL -- ANYTHING ELSE?
4              A.   OH, THERE'S A LOT.
5              Q.   I'M ENTITLED TO GET ALL OF THE
6     INFORMATION THAT YOU HAVE, SO IT DOESN'T COME OUT
7     LATER.
8              A.   I'LL PREPARE A DOCUMENT FOR YOU SO
9     I CAN HAVE THE ACTUAL TRANSCRIPTS.  SO I CAN -- IF
10    I READ THE TRANSCRIPT, I CAN GO THROUGH, ONE AFTER
11    ANOTHER.  IF THAT'S WHAT YOU'D LIKE, I'D BE HAPPY
12    TO DO THAT.
13             Q.   DID YOU HIRE AN EXPERT IN THAT CASE
14    TO CONFIRM WHETHER OR NOT IT WAS A FORGERY?
15                  MS. CROWTHER:  I'LL JUST OBJECT TO
16    THE EXTENT THAT AN EXPERT WAS ENGAGED BY COUNSEL.
17    AND ANY DECISIONS WE'VE MADE ABOUT AN EXPERT
18    WAS -- THE DISCUSSION OF COUNSEL.
19                  IF THERE'S A PUBLIC RECORD OF IT,
20    YOU CAN GO AHEAD AND DISCLOSE IT.  BUT DON'T
21    DISCLOSE COMMUNICATIONS WITH COUNSEL.
22                  THE DEPONENT:  IT WAS ENGAGED BY
23    COUNSEL.
24                  MR. RICHARDS:  NO.  BUT THERE WAS A
25    PUBLIC RECORD OF IT.
0697
1                   MS. CROWTHER:  I SAID IF THERE'S A
2     PUBLIC RECORD, HE CAN DISCLOSE IT.
3                   MR. RICHARDS:  YEAH.
4                   THE DEPONENT:  HE SAID IT HAD
5     CHARACTERISTICS OF A FORGERY, BUT HE NEEDED THE
6     ORIGINAL.
7     BY MR. RICHARDS:
8              Q.   SO IT WAS INCONCLUSIVE?
9              A.   HE NEEDED THE ORIGINAL, WHICH PHIL
10    SAID JOHN KAISER HAD.  AND HE'S SINCE CHANGED THAT
11    STORY.  I DON'T KNOW WHO HE SAYS HAS THE ORIGINAL
12    NOW.
13             Q.   ALL RIGHT.  DID TOMMY CONSTANTINE
14    EVER TELL YOU HE WANTED TO BE MANAGER?
15             A.   YES.

```
16              Q.   AND DID HE TELL YOU WHY HE WANTED
17   TO BE MANAGER?
18              A.   BECAUSE HE THOUGHT I WAS
19   MISMANAGING THE PROPERTY.
20              Q.   WHEN DID HE TELL YOU THAT?
21              A.   MOSTLY THROUGHOUT 2007.
22              Q.   WELL, ON --
23              A.   WELL, LET ME -- SORRY.
24              I'D HAVE TO THINK AT WHAT POINT
25   TOMMY WOULD -- HE WAS CAREFUL TO REMAIN FRIENDLY
0698
1    WITH ME.
2                   SO WHEN HE WOULD SAY THINGS, HE
3    WOULD SAY THEM AS IF THEY'RE COMING FROM
4    PHIL KENNER.  SO I DON'T KNOW EXACTLY WHEN HE
5    WOULD SAY THAT HE TAUGHT I WAS MISMANAGING THE
6    PROPERTY.  SO --
7              Q.   DO YOU -- DO YOU HAVE ANY E-MAIL
8    FROM TOMMY CONSTANTINE STATING THAT YOU MISMANAGED
9    THE PROPERTY?
10             A.   I DON'T KNOW.
11             Q.   CAN YOU RECALL ANY SPECIFIC
12   CONVERSATION WITH TOMMY CONSTANTINE WHERE HE TOLD
13   YOU THAT -- FROM HIM THAT YOU WERE MISMANAGING THE
14   PROPERTY?
15             A.   I DON'T KNOW.
16             Q.   DIDN'T YOU -- DIDN'T
17   TOMMY CONSTANTINE KNOW FROM THE BEGINNING, FROM
18   HIS DISCUSSIONS WITH YOU, THAT LEHMAN INDICATED
19   PHIL COULDN'T BE THE MANAGER OF THE PROPERTY?
20   WASN'T THAT A FACT WELL KNOWN FROM THE VERY
21   BEGINNING?
22             A.   I BELIEVE SO.
23             Q.   SO DIDN'T -- DID TOMMY CONSTANTINE
24   SUGGEST THAT HE BE A CO-MANAGER AS A SUBSTITUTE
25   FOR PHIL SO THE PLAYERS WOULD HAVE SOMEBODY THEY
0699
1    FELT WAS LOOKING OUT FOR THEIR INTERESTS?  WAS
2    THAT SORT OF THE RATIONALE?
3              A.   PART OF IT, YES.
4              Q.   DID -- ON THE -- ON THE SETTLEMENT
5    AGREEMENT THAT YOU CLAIM THAT YOU AGREED UPON,
6    WHAT -- DID IT CALL FOR YOU AND TOMMY CONSTANTINE
7    TO BE CO-MANAGERS?
8              A.   YES.
9              Q.   SO AT LEAST IN THEORY, THAT -- THAT
10   DIDN'T SOUND LIKE A PROBLEM TO YOU AT THAT POINT;
11   RIGHT?
12             A.   IT WAS A BIG PROBLEM TO ME, BUT I
13   WAS UNDER A HUGE -- I WAS UNDER A THREAT THAT
```

```
14     ENTIRE YEAR.  IF THERE WAS NO THREAT OF HIM --
15     PHIL DOING EXACTLY WHAT HE'S DONE, THEN I WOULD
16     NEVER HAVE CONSIDERED IT.
17          Q.   WELL, ARE YOU SAYING THAT IT WAS
18     YOU THAT DECIDED AT THE END NOT TO DO THE
19     SETTLEMENT, OR IT WAS PHIL THAT DECIDED TO DO
20     THE -- WHO REJECTED THE LAST SETTLEMENT?
21          A.   WELL, THERE WAS AN E-MAIL THAT SAID
22     IT WAS GOING TO HAVE PHIL'S SIGNATURE.  THEY ONLY
23     NEEDED TO LOOK AT TWO SMALL SECTIONS.  AND WE
24     NEVER GOT PAST THAT.
25               WE HAD AGREED TO EVERYTHING.  PHIL
0700
1      WAS LOOKING AT TWO LAST SECTIONS IN AN E-MAIL FROM
2      TOMMY CONSTANTINE.  IT NEVER CAME -- IT NEVER WENT
3      PAST THAT.
4           Q.   NOW -- BUT -- NOW, LEHMAN
5      DOESN'T -- I MEAN DANSKE BANK DOESN'T HAVE THE
6      SAME RESTRICTIONS THAT LEHMAN -- ARE YOU SAYING
7      THAT IN THE DOCUMENTS IT SAID PHIL KENNER COULDN'T
8      BE A MANAGER?
9           A.   NO.
10          Q.   THEN WHY COULDN'T PHIL KENNER JUST
11     BE A CO-MANAGER, LIKE YOU WERE IN OTHER DEALS?
12          A.   AS I SAID, LEHMAN HAD A BAD
13     EXPERIENCE WITH PHIL IN 2005 AND DIDN'T WANT TO
14     HAVE TO DEAL WITH IT.
15          Q.   I SEE.
16               WHO REJECTED THE FIRST SETTLEMENT
17     THAT WENT TO LEHMAN?
18          A.   I DON'T KNOW.
19          Q.   WHAT WAS THE -- DO YOU REMEMBER
20     GENERALLY WHAT THE TERMS OF THIS AGREED-UPON
21     SETTLEMENT THAT YOU AGREED TO?
22          A.   I BELIEVE IT WAS A REDUCTION IN MY
23     EQUITY IN EXCHANGE FOR A CASH PAYMENT.  I'M NOT
24     SURE WHAT THE FINAL -- THE FINAL NUMBER WAS.
25     INDEMNIFICATION FROM EVERYONE THAT PHIL'S
0701
1      ASSOCIATED WITH.  AND TOMMY BEING CO-MANAGER.
2           Q.   WAS IT -- WAS THERE ANYBODY BESIDES
3      MASOOD BHATTI THAT HAD A PROBLEM WITH PHIL?
4               MS. CROWTHER:  OBJECTION.  LACKS
5      FOUNDATION.
6      BY MR. RICHARDS:
7           Q.   FROM LEHMAN?
8           A.   I DON'T KNOW.
9           Q.   WELL, DO YOU KNOW WHICH PERSON AT
10     LEHMAN DIDN'T LIKE PHIL?
11          A.   I DON'T KNOW.
```

12          Q.   WELL, FOR WHATEVER IT'S WORTH, I
13  THINK YOU'RE WRONG ABOUT TOMMY IN HIS FEELINGS
14  ABOUT YOU.  FOR WHATEVER IT'S WORTH.
15          I DON'T -- SPECIFICALLY, HAVE YOU
16  EVER SPOKEN TO TOMMY CONSTANTINE, WHERE HE SAID
17  SOMETHING INSULTING TO YOU?
18          A.   NO.  BUT I'VE SPOKEN TO PEOPLE WITH
19  DANSKE BANK AND PEOPLE AT LEHMAN BROTHERS WHO'VE
20  SAID THAT HE WAS EXTREMELY INSULTING TOWARD ME.
21          AND I DON'T THINK THEY WOULD HAVE
22  REASON TO MAKE THAT UP.
23          Q.   WELL, DOES -- DID -- DO YOU KNOW
24  SPECIFICALLY WHO TOLD YOU THIS AT LEHMANS OR
25  DANSKE BANK?
0702
1           A.   YES.
2           Q.   WHO'S THAT?
3           A.   I BELIEVE THE PERSON AT LEHMAN WAS
4   CHAD DIMARTINO.
5           Q.   AND WHAT DID MR. DIMARTINO SAY?
6           A.   I DON'T REMEMBER SPECIFICALLY.  AND
7   HE DIDN'T WANT TO GET INTO THE DETAILS.
8           Q.   OKAY.  SO HE DIDN'T TELL YOU, LIKE,
9   A SPECIFIC STATEMENT.  HE JUST SAID,
10  "TOMMY CONSTANTINE DIDN'T SPEAK HIGHLY OF YOU";
11  RIGHT?
12          A.   NO.  HE SAID, "TOMMY CONSTANTINE
13  BASICALLY" -- IT WAS STRONGER THAN "DIDN'T SPEAK
14  HIGHLY OF YOU."  LET'S PUT IT THAT WAY.  HE
15  WOULDN'T GET INTO THE DETAILS.
16          Q.   BUT YOU DON'T KNOW WHAT HE SAID?
17          A.   NO.  I'D LIKE TO GET A RECORD OF
18  WHAT HE SAID.  I WOULD IMAGINE THAT WOULD BE
19  HELPFUL.
20          Q.   WELL, DO YOU THINK THAT
21  TOMMY CONSTANTINE WAS FRUSTRATED THAT THE
22  SETTLEMENT DIDN'T GO THROUGH, AND THEN YOU -- YOU
23  HIRED THAT ESMERALD MARKETING COMPANY?
24          IN THE TERMINATION LETTER YOU
25  MENTION THAT YOU --
0703
1           A.   GREENWICH GROUP.
2           Q.   GREENWICH GROUP.
3           ARE THEY FROM CONNECTICUT?
4           A.   NO.  FROM NEW YORK.
5           Q.   OKAY.  WHY DOES ALL THIS BUSINESS
6   GO TO EAST COASTERS?  JUST OUT OF CURIOSITY.
7           MS. CROWTHER:  OBJECTION.  VAGUE AS
8   TO "THIS BUSINESS."
9   BY MR. RICHARDS:

```
10              Q.   LIKE, JUST BUSINESS WITH DIAMANTE.
11    EVERYTHING SEEMS TO BE ON THE EAST COAST.
12              A.   LIKE WHAT?
13              Q.   THE ACCOUNTING, THE LAWYERS, THE
14    PEOPLE THAT DRAFTED ALL THESE AGREEMENTS, THE
15    MARKETING.
16              A.   THE FUNDING.
17              Q.   YEAH.
18              A.   WELL, THAT'S WHERE WE WERE BASED.
19              Q.   ALL RIGHT.  IT'S NOT THAT YOU HAVE
20    SOMETHING AGAINST WEST COASTERS; RIGHT?
21              A.   NO.
22              Q.   ALL RIGHT.
23              A.   NOT ALL OF THEM.
24              Q.   NOW, HAVE YOU -- DID YOU EVER
25    CONTACT TOMMY CONSTANTINE AFTER YOU HEARD THESE
0704
 1    STATEMENTS AND ASK HIM IF HE SAID SOMETHING
 2    NEGATIVE ABOUT YOU TO EITHER BANK?
 3              A.   NO.
 4              Q.   SO IS THERE A REASON WHY YOU DIDN'T
 5    CALL TOMMY CONSTANTINE TO CLARIFY WHETHER OR
 6    NOT -- WELL, YOU -- WAIT.  LET ME STRIKE THAT.
 7                   YOU SAID THAT YOU THOUGHT
 8    TOMMY CONSTANTINE AND YOU WERE FRIENDS.  AFTER
 9    THESE 18 MONTHS EVOLVED, YOU GUYS BECAME FRIENDS;
10    RIGHT?
11              A.   I THOUGHT THAT HE WAS LOOKING OUT
12    FOR THE BEST INTERESTS OF BOTH PHIL AND I, YES.
13              Q.   OKAY.  AND DID -- AFTER THE
14    SETTLEMENT AGREEMENT BROKE DOWN, DID YOU -- WHAT
15    WAS THE REASON WHY YOU DIDN'T WANT TO CALL
16    TOMMY CONSTANTINE AND SAY, "HEY, WHAT'S" --
17    "YOU'RE BAD-MOUTHING ME NOW TO THE BANK?  YOU
18    KNOW, I THOUGHT WE WERE LOOKING INTO THE BEST
19    INTEREST OF THE -- OF EVERYBODY"?
20                   WHY DIDN'T YOU AT LEAST GIVE THEM
21    SOME -- CLEAR IT UP?  WAS THERE A REASON?
22              A.   THERE WAS NO REASON TO DO THAT.  I
23    HAD -- I BEGAN TO HAVE SUSPICIONS ABOUT TOMMY,
24    AFTER A WHILE, ANYWAY.
25                   AND I JUST THOUGHT THAT IF I TALKED
0705
 1    TO HIM, HE WOULD GIVE ME A 30-MINUTE SPIEL.  HE'S
 2    VERY GOOD AT MAKING EXPLANATIONS AND -- AND --
 3              Q.   YOU'VE GOT TO CUT HIM OFF.
 4              A.   WELL, IT'S JUST THERE WAS -- THERE
 5    WAS NO POINT AT THAT TIME.  TOMMY AND I HAD TALKED
 6    ENOUGH.
 7              Q.   I SEE.
```

```
 8                    WHAT WAS THE REASON WHY LEHMAN
 9   REFUSED TO ALLOW YOU TO SIGN THE FIRST DEAL THAT
10   YOU GUYS HAD ACTUALLY AGREED TO, YOU AND KENNER?
11              A.   I DON'T KNOW.
12              Q.   WELL, DON'T YOU -- YOU DO REMEMBER
13   AT ONE POINT YOU HAD WHAT WE CALL AN ACCORD -- AN
14   ACCORD WITH ONE ANOTHER.  YOU ACTUALLY CAME TO A
15   DEAL THAT WAS THEN SUBMITTED TO LEHMANS, AND THEN
16   THEY REJECTED IT?
17              A.   I DON'T KNOW.
18              Q.   ARE YOU -- YOU DON'T REMEMBER
19   THAT --
20              A.   THERE WAS SEVERAL ITERATIONS OF A
21   SETTLEMENT AGREEMENT.  WE HAD AGREED TO THE LAST
22   ONE.  WHY LEHMAN WOULD AGREE OR NOT AGREE IS -- I
23   WOULD HAVE NO IDEA.
24              Q.   DID YOU EVER -- DID YOU EVER --
25   ONCE LEHMAN WENT BANKRUPT, AND THEN THERE WAS THIS
0706
 1   KIND OF HOLDING PATTERN, DID YOU EVER THINK OF
 2   REAPPROACHING DANSKE OR WHOEVER BOUGHT THE LOAN?
 3              A.   I DON'T UNDERSTAND THE QUESTION.
 4              Q.   LET ME BACK UP.
 5                    HOW DID YOU FIRST FIND OUT THAT
 6   DANSKE BANK PURCHASED THE LOAN FROM LEHMAN
 7   BROTHERS?
 8              A.   THROUGH SOMEONE AT LEHMAN.  I
 9   DON'T -- I'M NOT SURE WHO.
10              Q.   DO YOU KNOW -- WHERE DID THEY
11   PURCHASE IT?  OUT OF THE BANKRUPTCY?
12              A.   I BELIEVE IT WAS PART OF COLLATERAL
13   THAT THEY HELD, SO IT WAS -- THEY BASICALLY
14   REPOSSESSED THE LOAN.
15              Q.   AND THEN WHO -- WHO REPOSSESSED IT?
16              A.   WELL, IT WAS USED -- IT WAS PART OF
17   COLLATERAL THAT DANSKE BANK HELD.  THIS ASSET WAS
18   COLLATERAL THAT DANSKE BANK HELD.  SO WHEN LEHMAN
19   WENT BANKRUPT, IT WAS -- IT BECAME THEIR PROPERTY.
20              Q.   AND THEN WHAT DID YOU -- LEHMAN
21   TOLD YOU NOW THE BANK'S GOING TO BE DEALING WITH
22   YOU?
23              A.   THEY TOLD US THAT NOW WE HAVE TO
24   DEAL WITH DANSKE BANK, YES.
25              Q.   OKAY.  AND THEN -- SO YOU HAD TO --
0707
 1   DO YOU THINK DANSKE BANK -- DO YOU THINK
 2   DANSKE BANK IS HAPPY WITH YOU RIGHT NOW?  HAVE
 3   THEY EXPRESSED AN OPINION AS FAR AS YOUR STATUS
 4   THERE?
 5              A.   I THINK THEY'RE VERY HAPPY WITH US,
```

6    YES.
7                Q.    TELL ME WHY.  WHAT ARE YOU BASING
8    THAT ON?
9                A.    BASING IT ON WE GAVE THEM A BUDGET
10   IN MARCH AND AGGRESSIVE AS TO WHAT WE NEEDED TO
11   DO.  AND THEY FEEL THAT WE'VE ACCOMPLISHED
12   EVERYTHING THAT WE WERE SUPPOSED TO ACCOMPLISH ON
13   TIME AND ON BUDGET.
14               Q.    DID -- DID DANSKE BANK INDICATE HOW
15   LONG -- DID THEY INDICATE HOW LONG THAT THEY WANT
16   TO -- INDICATE HOW LONG THEY WOULD WANT TO BE
17   INVOLVED AS A LENDER ON THIS PROJECT?
18               A.    NO.
19               Q.    DO YOU KNOW WHO PETER HUGHES'S BOSS
20   IS?
21               A.    NO.
22               Q.    YOU'VE NEVER MET ANYBODY ABOVE
23   PETER HUGHES?
24               A.    I DON'T KNOW THE HIERARCHY.  I'VE
25   MET OTHER PEOPLE THAT WORK AT DANSKE BANK.  I
0708
1    DON'T KNOW.
2                Q.    WHERE IS DANSKE BANK'S OFFICES?
3    HAVE YOU EVER BEEN THERE?
4                A.    YES.
5                Q.    WHERE ARE THEY LOCATED?
6                A.    THE BANK -- THE OFFICE THAT WE DEAL
7    WITH IS IN LONDON.
8                Q.    SO DO YOU FLY TO LONDON TO MEET
9    THEM?
10               A.    I HAVE.
11               Q.    AND WHY DID YOU FLY TO LONDON?
12               A.    BECAUSE, FOR WHATEVER REASON, A
13   FACE-TO-FACE MEETING WAS NECESSARY.
14               Q.    DID THEY -- DID THEY -- SO THEY
15   TOLD YOU THAT YOU HAD TO HAVE A FACE-TO-FACE
16   MEETING?
17               A.    I'M NOT SURE IF THEY DEMANDED A
18   FACE-TO-FACE MEETING.  BUT FOR WHATEVER REASON, IT
19   WAS DETERMINED THAT A FACE-TO-FACE MEETING WOULD
20   BE THE MOST PRODUCTIVE THING TO DO.
21               Q.    WHO ELSE HAVE YOU SPOKEN WITH AT
22   THE BANK BESIDES PETER HUGHES?
23               A.    DAVID DANIEL.
24               Q.    ANYONE ELSE?
25               A.    I DON'T REMEMBER NAMES.
0709
1                Q.    DOES DANSKE BANK HAVE ITS EXECS
2    COME DOWN AND PLAY GOLF AT THE GOLF COURSE?
3                A.    THEY HAVE NOT.

```
 4              Q.   WHAT, NOBODY'S BEEN DOWN THERE FROM
 5    DANSKE BANK AND SEEN IT?
 6              A.   THEY HAVE BEEN DOWN TO SEE IT, YES.
 7              Q.   WHO?  PETER HUGHES AND DAVID?
 8              A.   YES.
 9              Q.   ANYBODY ELSE?
10              A.   NOT THE GOLF COURSE, NO.  THERE'S
11    TWO OTHER GENTLEMAN -- I DON'T REMEMBER NAMES --
12    THAT CAME DOWN THE FIRST TIME.
13              Q.   AND DOES DANSKE BANK -- DID
14    DANSKE BANK REQUIRE ANY -- DID THEY ASK YOU ABOUT
15    THIS LAWSUIT?
16              A.   YES.
17              Q.   AND WHEN WAS THAT?
18              A.   WELL, THEY ASKED ME ABOUT THE
19    ARIZONA LAWSUIT, WHEN THAT HAPPENED, BECAUSE AT
20    THAT TIME WE HADN'T RESTRUCTURED THE LOAN.  SO
21    THAT WAS A MAJOR ISSUE THAT WE NEEDED TO GET BY.
22              AND THEN WHEN THIS -- WHEN I WAS
23    MADE AWARE THAT THIS WAS COMING OUT, I BASICALLY
24    SENT THEM AN E-MAIL TO TRY TO BRACE THEM FOR THE
25    NEW YORK POST ARTICLE.
0710
 1              AND LUCKILY WE -- THEY'VE BEEN
 2    SUPPORTIVE.  UNFORTUNATELY, I BELIEVE THAT THEY
 3    WERE ISSUED A SUBPOENA BY THE S.E.C. ALSO FOR ALL
 4    THEIR RECORDS.
 5              AND, UNFORTUNATELY, I THINK WE JUST
 6    GOT A BILL FOR CLOSE TO 100,000 DOLLARS FOR THEIR
 7    LEGAL TO JUST TAKE CARE OF THE SUBPOENA.
 8              Q.   OH, REALLY?
 9              A.   YES.
10              Q.   WHO REFERRED YOU TO ROBYN CROWTHER?
11              A.   MY ATTORNEY.
12              Q.   IS THAT -- I JUST WANTED TO SEE IF
13    DANSKE REFERRED YOU.
14              A.   NO.
15              Q.   WHICH ATTORNEY?
16              A.   TOM HARVEY.
17              Q.   DID -- SO DO YOU HAVE TO NOW PAY
18    DANSKE BANK OUT OF THE MONTHLY DRAW THAT YOU -- IS
19    THAT PART OF THE BUDGET THAT YOU'RE BORROWING?
20              A.   YES.
21              Q.   WHO'S THE ATTORNEY THAT YOU HAVE
22    WITH -- THAT'S REPRESENTING YOU WITH THE S.E.C.?
23              MS. CROWTHER:  OBJECTION.  ASKED
24    AND ANSWERED.
25              MR. RICHARDS:  OH, THAT WAS --
0711
 1    YOU'RE RIGHT.  SORRY.
```

```
 2    BY MR. RICHARDS:
 3           Q.   IS THERE ANYTHING THAT'S PREVENTING
 4    ANY OF THE PARTNERS OR THEIR MEMBERS IN THIS
 5    PROJECT FROM COMING TO VISIT THE SITE?
 6           A.   NO.
 7           Q.   SO IF -- IF ANY OF MY CLIENTS OR
 8    PHIL KENNER WANTED TO COME LOOK AT THE PROJECT,
 9    WOULD THEY BE ALLOWED IN?
10           A.   PHIL KENNER WOULD BE ALLOWED IN BY
11    HIMSELF, BUT I'D BE WANTING TO KNOW WHO HE WAS
12    BRINGING IN AND WHAT HIS -- WHAT HIS REASONS WERE.
13           HE'S HAD -- HE'S HAD MOTIVES THAT I
14    DON'T CONSIDER BENEFICIAL TO THE PROPERTY IN THE
15    LAST YEAR AND A HALF OR SO.  I'M SURE YOU CAN
16    UNDERSTAND.
17           Q.   SO HE CAN COME BY HIMSELF AND LOOK
18    AROUND?
19           A.   IF HE WANTED TO CALL ME AND SAY HE
20    WANTED TO COME BY AND HE WANTED TO COME IN, I'M
21    SURE THAT WE COULD HAVE HIM IN AND SHOW HIM WHAT
22    WE WERE DOING.
23           Q.   COULD HE BRING JUST, LIKE, A --
24    LIKE A HELPER SO HE DOESN'T END, YOU KNOW, UP IN A
25    SAND DUNE?
0712
 1           A.   I'LL HAVE SOMEBODY -- WE'LL HAVE
 2    SOMEBODY HELP HIM.
 3           Q.   NO.  I MEANT LIKE SOMEONE THAT
 4    DOESN'T WORK FOR YOU.
 5           A.   DEPENDS WHO IT IS.
 6           Q.   IF WE PRECLEARED IT, LIKE A
 7    SECURITY PERSON?
 8           A.   I DON'T WANT TO SOUND -- YOU HAVE
 9    TO UNDERSTAND WHAT WE DEALT WITH.
10           Q.   YEAH.
11           A.   AND HE SAID A LOT OF THINGS TO A
12    LOT OF PEOPLE THAT HAVE BEEN HURTFUL.  HE'S DONE
13    DAMAGE TO THE PROJECT.
14           SO PLEASE DON'T MAKE IT SEEM LIKE I
15    WANT TO BE EXCLUDING ANYONE FROM WHAT THEY SHOULD
16    RIGHTFULLY BE ABLE TO DO.  I JUST THINK THAT WE
17    NEED TO BE CAREFUL AS TO WHAT HE DOES ON THE
18    PROPERTY.
19           Q.   WELL, HE -- HE OWNS 47 PERCENT OF
20    IT, SO HE -- HE CERTAINLY HAS A STAKE IN IT; ISN'T
21    THAT FAIR TO SAY?
22           A.   YOU WOULD -- YOU WOULD THINK THAT
23    HE WOULD ACT IN THE BEST INTERESTS OF THE PROJECT
24    AT ALL TIMES BECAUSE HE DOES.
25           BUT IT'S BEEN MY OPINION, ALONG
```

0713
1    WITH, I'M SURE, MANY PEOPLE'S OPINION, THAT HE HAS
2    NOT ACTED IN THAT MANNER.
3                 SO, UNFORTUNATELY, WE HAVE TO MAKE
4    MEASURES THAT WE WOULDN'T NORMALLY HAVE TO DO.
5                 Q.   ARE ANY OF MY CLIENTS, THE
6    PLAINTIFFS IN THIS CASE, ALLOWED TO COME TO THE
7    PROPERTY WITH THEIR SPOUSES OR SIGNIFICANT OTHERS?
8                 A.   I WOULD LOVE THAT.
9                 Q.   SO I CAN EXTEND THAT INVITATION?
10                A.   ABSOLUTELY.
11                Q.   CAN THEY PLAY GOLF THERE FOR FREE?
12                A.   THAT WOULD BE GREAT.  I'D LIKE TO
13   REACH A SETTLEMENT WITH THEM, AND I'D LIKE TO HAVE
14   THIS MATTER RESOLVED.
15                AND I'D LIKE TO KNOW THAT WE'RE ALL
16   IN THE SAME -- WORKING FOR THE SAME GOAL.  I DON'T
17   BELIEVE THAT WE HAVE BEEN.
18                Q.   WOULD -- WOULD YOU CONSIDER THAT
19   CONSISTENT WITH YOUR BUSINESS PHILOSOPHY, IF MY
20   CLIENTS WANTED TO MEET WITH YOU MONTHLY TO DISCUSS
21   THE ISSUES DOWN AT THE PROJECT?
22                A.   I THINK THAT WOULD BE GREAT.
23                AGAIN, AS LONG AS WE HAVE A
24   RESOLUTION AND I FEEL THAT WE'RE ALL ON THE SAME
25   TEAM, WORKING FOR THE SAME GOAL.  I HAVE NOT HAD
0714
1    THAT IMPRESSION.
2                 Q.   WHAT ABOUT THE IDEA OF HAVING
3    SOMEONE THAT WOULD -- THAT YOU COULD AGREE ON
4    CONCEPTUALLY THAT WOULD HAVE ACCESS TO THE SAME
5    SORT OF DATA AND INFORMATION THAT YOU HAVE, SO IF
6    THERE WAS SOMETHING THAT WAS OBJECTIONABLE, YOU
7    COULD AT LEAST GET THE FEEDBACK FROM YOUR
8    47 PERCENT PARTNERS?
9                 A.   IF THEY CAME DOWN ON A MONTHLY
10   BASIS, AND SOMEONE WANTED TO LOOK AT EVERYTHING IN
11   A SPOT, I'M SURE THAT WE COULD.
12                IT'S GOING TO TAKE -- YOU'RE ASKING
13   SOMETHING THAT'S ASSUMING THAT WE'RE GOING TO HAVE
14   AN AMICABLE RESOLUTION.
15                THIS HAS BEEN EXTREMELY CONTENTIOUS
16   AND EXTREMELY HURTFUL ON MY SIDE, AT LEAST FOR ME
17   PERSONALLY.
18                SO YOU'RE ACTING -- YOU'RE ACTING
19   AS IF THAT'S ALL DONE AND GONE, AND IT'S JUST A --
20   KIND OF A DO-OVER.  SO IT DOESN'T -- I DON'T KNOW
21   WHAT THE -- WHAT THE RESOLUTION IS GOING TO BE.
22                IT'S MY HOPE THAT WE CAN GET THIS
23   RESOLVED, AND WE CAN ALL MOVE ON WITH OUR LIVES.

```
24    BUT YOU'RE ASKING ME TO ASSUME THAT.  AND I -- AND
25    UNTIL WE GET TO THAT POINT, IT'S VERY HARD FOR ME
0715
 1    TO TRUST ANYBODY THAT'S -- THAT'S DONE THIS TO ME.
 2          Q.   WELL, MR. JOWDY, I JUST -- YOU
 3    SHOULD BE AWARE THAT -- THAT MY FIRM ESPECIALLY
 4    DOESN'T HAVE A POLICY OF JUST LITIGATING CASES SO
 5    WE MAKE MONEY.
 6                LIKE I SAID, I HAVE A LOT OF FILES,
 7    AND THIS IS NOT PROVIDING A BUSINESS SOLUTION FOR
 8    MY CLIENTS.
 9                SO IT TOOK LITERALLY A VERY LONG
10    TIME BECAUSE OF AGGRESSIVE LEGAL POSITIONS JUST TO
11    GET YOUR DEPOSITION.  SO I COULDN'T TALK TO YOU
12    BECAUSE YOU'RE REPRESENTED BY COUNSEL.
13                BUT I CAN ASSURE YOU THAT IF THINGS
14    WOULD HAVE BEEN DIFFERENT ON YOUR END, WE WOULD
15    HAVE MET A LOT SOONER, WENT TO MEDIATION A LOT
16    SOONER.
17                BUT YOU -- YOUR LAWYERS DID A VERY
18    GOOD JOB OF FILING A LOT OF DIFFERENT MOTIONS,
19    INCLUDING TO DISQUALIFY ME FROM THE CASE, THAT
20    JUST DELAYED THINGS.  SO I WANT YOU TO KNOW, IT'S
21    NOT AS MYOPIC AS YOU THINK.
22                MS. CROWTHER:  OBJECTION.  THAT
23    CHARACTERIZATION IS SO FAR OUT OF LINE.
24                MR. RICHARDS:  WHAT PART WAS OUT OF
25    LINE?
0716
 1                MS. CROWTHER:  ALL OF IT.
 2                MR. RICHARDS:  OH, COME ON.
 3    ROBYN --
 4                MS. CROWTHER:  YOU NOTICED HIS
 5    DEPOSITION IN JULY, AND YOU DIDN'T ASK ME FOR
 6    ANOTHER DATE UNTIL NOVEMBER, AND YOU NEVER ISSUED
 7    ANOTHER NOTICE.
 8                MR. RICHARDS:  YOU SAID YOU REFUSED
 9    TO PRODUCE HIM UNTIL --
10                MS. CROWTHER:  NO, I DIDN'T.
11                MR. RICHARDS:  I CAN SHOW YOU AN
12    E-MAIL.  YOU SAID YOU DON'T HAVE TO PRODUCE HIM
13    WHILE THERE'S A DEMURER PENDING.
14                MS. CROWTHER:  NO, I NEVER SAID
15    THAT.  THAT IS FALSE.
16                MR. RICHARDS:  WE HAD TO GO TO
17    COURT WHEN YOU -- WE HAD TO GO TO COURT AND GET AN
18    ORDER COMPELLING HIS DEPO.
19                MS. CROWTHER:  YOU HAD TO GET AN
20    ORDER COMPELLING HIM TO HAPPENED TODAY AND
21    YESTERDAY, WHICH I OFFERED TO MAKE AVAILABLE TO
```

22    YOU.
23              SO DON'T BE MISREPRESENTING TO MY
24    CLIENT THAT THIS IS MY FAULT.
25              MR. RICHARDS:  I'M GOING TO -- WHAT
0717
1    I'M GOING TO DO IS I'M GOING TO SEND THE WHOLE
2    E-MAIL STRING TO MY CLIENTS AND TELL THEM TO START
3    E-MAILING JOWDY, AND THEY CAN LOOK AT IT.
4              MS. CROWTHER:  YOU CAN SEND IT
5    DIRECTLY TO MY CLIENT.  AND YOU'RE ASSUMING HE
6    NEVER SAW IT BEFORE.  GO AHEAD.
7              MR. RICHARDS:  I CAN?  I CAN SEND
8    IT DIRECTLY?
9              MS. CROWTHER:  YES.  YOU GO AHEAD.
10              MR. RICHARDS:  I WILL.
11              THE DEPONENT:  MR. RICHARDS, IF I
12    CAN MAKE A COMMENT.
13    BY MR. RICHARDS:
14         Q.   YEAH.
15         A.   I BELIEVE THAT -- I'M HAPPY YOU'VE
16    GOTTEN TO THE POINT WHERE YOU THINK THAT A
17    RESOLUTION IS BEST FOR ALL.  I THINK THAT --
18         Q.   I'M HORRIFIED LISTENING TO THIS.
19    REALLY, THIS IS HORRIFYING.  I'VE GOT THIS WHOLE
20    TESTIMONY -- WHAT I'VE SEEN WITH THESE FOUR YEARS
21    IS ABSOLUTELY -- THIS OCCURRED LONG BEFORE ROBYN
22    AND I GOT INVOLVED, BUT THERE -- IT'S AMAZING THE
23    SCHISM THAT HAS BEEN CREATED.
24         A.   I AGREE.
25         Q.   AND IT'S TOTALLY SENSELESS.  IT'S
0718
1    LIKE THE ARABS AND THE ISRAELIS.
2         A.   I AGREE.  I AGREE 100 PERCENT.
3              BUT YOU'VE GOTTEN TO THIS POSITION.
4    UNFORTUNATELY, YOU'VE -- I'M NOT SAYING YOU, BUT A
5    BOMB WAS DROPPED, AND THE NUCLEAR BOMB WENT OFF,
6    AND NOW WHEN THE ASHES KIND OF SETTLE, YOU WANT TO
7    TALK.
8              IT'S DIFFICULT FOR ME TO DO THAT AT
9    THAT POINT.  I WISH THAT WE HAD THIS DISCUSSION.
10    I WISH WE GOT TO THIS POINT BEFORE THAT HAPPENED.
11              SO I APOLOGIZE IF SOMETIMES I GET
12    IRRITATED OR DISGUSTED OR DON'T SEEM LIKE I GIVE
13    THE RIGHT WEIGHT TO THE PEOPLE THAT HELPED GET THE
14    PROJECT TO THIS POINT.  I DO.  BUT A LOT OF THINGS
15    HAVE HAPPENED TO JADE MY OUTLOOK ON THAT AND ON
16    THOSE PEOPLE.
17              AND IF WE CAN GET PAST THAT, WHICH
18    I HOPE THAT WE CAN, AND JUST SAY, "LOOK, WE NEED
19    TO MOVE FORWARD," I'D LIKE TO GET -- I'D LIKE TO

20    DO THAT.  BUT THAT'S WHY I WANT TO JUST MAKE SURE
21    THAT I'M CLEAR WITH YOU ON THAT.
22              Q.   AND WITH RESPECT TO THAT, AT THE
23    ARBITRATION, WHEN I GAVE MR. NAJAM A SUBPOENA TO
24    PRODUCE THE RECORDS, HE SAID HE WOULD COMPLY AND
25    PRODUCE THEM.  AND THIS IS LONG BEFORE THE
0719
1     LAWSUIT.
2              AND I'M NOT -- AT THIS POINT I
3     AGREE, IT'S WAY PAST FINGER-POINTING.  BUT I'M
4     LETTING YOU KNOW, FOR WHATEVER REASON, MAYBE IT
5     WAS BECAUSE OF WHAT HAPPENED PRIOR TO ME GETTING
6     INVOLVED, THERE WAS A TREMENDOUS AMOUNT OF
7     RESISTANCE JUST TO GET BASIC ACCESS TO
8     INFORMATION.
9              SO IT'S UNFORTUNATE THAT THIS
10    OCCURRED, BUT I THINK THAT, REALISTICALLY, YOU
11    KNOW, MY CLIENTS WILL TELL YOU THEMSELVES AT THE
12    MEDIATION IS THAT THEY WANT TO SEE THE MOST RETURN
13    ON THEIR INVESTMENT, AND THEY DON'T WANT THE
14    PROPERTY TO BE LOST IN SOME SORT OF FORECLOSURE.
15             BECAUSE YOU MAY BE FRIENDLY WITH
16    DANSKE NOW, BUT THEY'RE NOT GOING TO BE YOUR
17    FRIENDS IF THEY JUST WANT TO JUST TAKE THE
18    PROPERTY BACK.  YOU KNOW, YOU'RE REALLY AT THEIR
19    MERCY.
20             SO THIS DISTRACTION IS NOT HELPING
21    ANYBODY.  LIKE, I DON'T CARE WHO'S RIGHT OR WRONG
22    ANYMORE IN THIS ARGUMENT BECAUSE I'M TELLING YOU
23    UNEQUIVOCALLY, I'M GENERATING E-MAILS AND LETTERS
24    TO MY CLIENTS THAT THEY HAVE TO SETTLE THIS CASE.
25             SO, YOU KNOW, WHATEVER YOU NEED TO
0720
1     DO TO GET EVERYBODY ON BOARD, YOU HAVE -- YOU KNOW
2     WHAT I WAS GOING TO TELL YOU ON A SEPARATE NOTE,
3     YOU HAVE THESE HOCKEY PLAYERS THAT INVESTED IN THE
4     FIRST DEAL.
5              AND RATHER THAN LEAVING THEM
6     WITHOUT SOME SORT OF EQUITY, I THINK THAT IF WE
7     INCORPORATE THEM INTO THE CABO DEAL, THEY WOULD BE
8     VERY GOOD ENDORSERS OF THE PROJECT.
9              THEY HAVE A VERY GOOD BRAND
10    RECOGNITION, AND THEY WOULD BE -- YOU KNOW, YOU'D
11    GET A LOT OF FREE MILEAGE WITH THE MARKETING
12    BUDGET THAT YOU DON'T REALLY HAVE NOW.
13             SO I THINK THAT -- YOU KNOW, I
14    DIDN'T GO TO BUSINESS SCHOOL AS WELL AS LAW SCHOOL
15    NOT TO COME UP WITH SOLUTIONS, BUT IN THIS CASE, I
16    THINK THAT, YOU KNOW, IT SADDENS ME THAT THIS HAS
17    COME TO THIS POINT.

```
18                SO I'M VERY SERIOUS WHEN I TELL YOU
19   THAT I'M IN CONTROL MYSELF, AND THAT UNEQUIVOCALLY
20   WE ARE GOING TO TRY VERY HARD TO SETTLE THIS CASE
21   WHEN WE HAVE THIS MEDIATION.
22                BUT I THINK YOU NEED TO START
23   THINKING OF A LOT OF DIFFERENT POSSIBILITIES
24   BECAUSE YOU HAVE A LOT OF DIFFERENT PERSONALITIES.
25                BY THE WAY, IF TOMMY CONSTANTINE
0721
1    WANTS TO VISIT THE PROPERTY BY HIMSELF, IS HE
2    ALLOWED TO VISIT THE PROPERTY?
3           A.   I WOULD RATHER HE DIDN'T.
4           Q.   SO IT'S NOT OPEN TO THE PUBLIC, THE
5    GOLF COURSE?
6           A.   IT'S OPEN TO THE PUBLIC.
7                I WOULD LIKE TO -- IF
8    TOMMY CONSTANTINE WANTED TO SIT DOWN WITH ME AT
9    SOME POINT AND GIVE ME A CALL AND WANTED TO TALK
10   TO ME, THEN I WOULD SAY, "LET'S HAVE A
11   CONVERSATION AND LET'S GET IT ALL OUT."
12          Q.   YEAH.  I CAN TELL YOU, JUST AS
13   SOMEONE THAT DOESN'T REALLY KNOW ANY OF YOU THAT
14   WELL, YOU GUYS NEED TO ALL SIT DOWN AND TALK
15   CALMLY.
16                BECAUSE THIS IS -- YOU GUYS HAVE SO
17   MUCH INVESTED IN THIS DEAL, THAT IT'S -- THAT TWO
18   LAWYERS FROM L.A. ARE NOT GOING TO BE ABLE TO
19   RESOLVE THESE ISSUES IN MEXICO.  I'M JUST TELLING
20   YOU THAT IT'S A JOKE.
21          A.   I UNDERSTAND THAT.  I'M TALKING
22   VERY CALMLY TO YOU, AND I JUST DON'T WANT YOU TO
23   UNDERESTIMATE WHAT THE MAN SITTING NEXT TO YOU HAS
24   DONE.
25                I MEAN -- AND I GIVE ALL THE
0722
1    CREDIT, AND I DON'T WANT TO SOUND LIKE I DON'T
2    HAVE THAT IN ME TO BE APPRECIATIVE FOR WHAT HAD
3    TRANSPIRED.  BUT, UNFORTUNATELY, OVER THE LAST
4    COUPLE OF YEARS, IT'S HARD FOR ME TO THINK OF HIM
5    IN A GOOD LIGHT.
6           Q.   WELL -- AND I THINK AT THIS POINT
7    IT'S NOT REALLY CRITICAL TO RESOLVING THIS MATTER.
8                WHAT'S CRITICAL IS THAT YOU HAVE 19
9    OTHER INNOCENT PEOPLE THAT DIDN'T DO ANYTHING BUT
10   INVESTED MONEY IN YOUR PLACES AND WOULD LIKE TO
11   GET THEIR MONEY BACK OR SEE SOME SORT OF EXIT
12   STRATEGY.
13          A.   AND IF THEY HAD THAT CONVERSATION
14   WITH ME ON JUNE 15TH, I WOULD SAY, "YES, THEY
15   DIDN'T DO ANYTHING."
```

```
16                   BUT THOSE 19 PEOPLE DID DO
17  SOMETHING TO ME PERSONALLY AND TO THE PROJECT.
18  THEY DID.
19                   AND WHOEVER WAS A PART OF IT, THAT
20  HAPPENED.  AND THERE WERE MANY THINGS THAT WERE
21  WRITTEN IN THAT LAWSUIT THAT WERE COMPLETELY
22  UNTRUE.
23                   AND I KNOW THEY DON'T HAVE ANY
24  PERSONAL KNOWLEDGE OF IT.  AND I KNOW IF I TALK TO
25  EACH ONE, THEY MAY NOT EVEN HAVE KNOWN THAT IT WAS
0723
 1  THERE.  I DON'T KNOW IF THEY ALL PUT THEIR NAME ON
 2  EACH AND THEY KNOW EVERY STATEMENT IN THERE.
 3                   BUT I KNOW THEY DON'T KNOW THEM TO
 4  BE TRUE.  AND THAT'S HURTFUL.  WHEN SOMEONE SAYS
 5  SOMETHING ABOUT YOU, AND THEY KNOW IT'S NOT TRUE,
 6  OR AT LEAST THEY KNOW THEY HAVE NO PERSONAL
 7  KNOWLEDGE, AND THEY CREATE A FEDERAL DOCUMENT,
 8  THAT'S PUT MY LIFE --
 9           Q.   FEDERAL DOCUMENT?
10           A.   WELL, A DOCUMENT THAT'S WITH THE
11  COURT.
12           Q.   RIGHT.  OKAY.
13           A.   SORRY.  BUT NOW IT'S CAUSED A
14  FEDERAL INVESTIGATION THAT'S PUT MY LIFE IN
15  TURMOIL, THAT I DON'T KNOW IF I CAN RECOVER FROM.
16  I REALLY DON'T.
17                   AND I WISH THAT THEY HAD SOME
18  RESPONSIBILITY BEFORE THEY DID THAT, BEFORE THEY
19  PUT THOSE THINGS IN THAT DOCUMENT THAT ARE NOT
20  TRUE.
21                   I WISH THAT YOU -- I WISH THAT YOU
22  INVESTIGATED WHETHER THESE THINGS WERE TRUE.  VERY
23  SIMPLE THINGS WERE TRUE.  I WISH THAT YOU DID
24  THAT.
25                   BUT IT DIDN'T HAPPEN.  BUT, AGAIN,
0724
 1  WE HAVE TO LOOK FORWARD.  AND I -- I THINK THAT
 2  THERE'S A WAY TO RESOLVE THIS.  EVERYONE NEEDS TO
 3  BE REASONABLE, INCLUDING MYSELF.
 4                   I'LL DO THE BEST I CAN AND --
 5           Q.   WELL, I CAN TELL YOU THE FASTEST
 6  WAY TO CLOSE OUT THESE INVESTIGATIONS THAT YOU
 7  TESTIFIED TO IS TO ELIMINATE ANYBODY CONTENDING
 8  THAT THEY'RE A VICTIM OF ANYTHING.
 9                   I CAN TELL YOU THAT'S THE FASTEST
10  WAY TO CLOSE THEM OUT.  BECAUSE YOU HAVE NOBODY
11  CLAIMING A LOSS.  SO THAT'S -- THERE'S NO --
12  NOTHING TO INVESTIGATE ANYMORE.
13           A.   I AGREE WITH YOU.
```

14              Q.   SO -- SO I THINK THAT -- THAT, YOU
15    KNOW, A LOT OF MONEY IS -- ONE THING I CAN TELL
16    YOU THAT IS MISSING IS I STILL -- AND I'VE BEEN
17    HERE WITH YOU FOR TWO DAYS -- I DON'T KNOW WHAT
18    HAPPENED TO 37 MILLION DOLLARS.
19                   IT'S LIKE IN A DIVORCE.  YOU DON'T
20    LIKE WHEN YOUR EX-WIFE AND HER LAWYERS GO THROUGH
21    ALL YOUR ASSETS TO FIGURE OUT WHERE YOU SPENT THE
22    MONEY.
23                   AND YOU MAY BE THE MOST HONEST
24    SPOUSE IN THE WORLD, BUT THEY'RE ENTITLED TO
25    VERIFY EVERYTHING.
0725
1                    AND SO IN THIS CASE IT HAS BEEN
2     DIFFICULT JUST TO GET SOME CLARITY AS TO HOW THIS
3     37 MILLION WAS SPENT.
4                    AND I THINK THAT IF WE CAN COME UP
5     WITH THE -- SOME TRANSPARENCY, YOU'RE NOT GOING TO
6     BE -- YOU'RE NOT GOING TO HAVE TO GO BACK AND
7     FORTH ANYMORE.
8                    I MEAN, I REALLY THINK THAT
9     SOMETIMES WHEN PEOPLE HAVE A WAR OR A FIGHT, YOU
10    REALLY CAN'T LOOK AT WHO THREW THE FIRST STONE OR
11    WHAT WENT WRONG, BUT YOU HAVE RATIONAL DETACHED
12    PEOPLE.
13                   MY LAWYER AND YOUR LAWYER ARE NOT
14    PART OF THIS LAWSUIT.  WE DON'T HAVE A VESTED
15    INTEREST.  I'M NOT ON A CONTINGENCY.  I DON'T CARE
16    IF YOU SETTLE TOMORROW.  IT'S NOT GOING TO AFFECT
17    MY LIFE.
18                   YOU KNOW, I ONLY WANT WHAT'S IN THE
19    BEST INTEREST OF MY CLIENTS.  AND THEY ALL KNOW MY
20    POSITION.  SETTLE THIS LAWSUIT WITH YOU.
21    THAT'S -- THAT'S MY OPEN ADVICE.
22                   SO I HAVE NO INTEREST IN SPENDING
23    ANOTHER DOLLAR ON LITIGATION.
24                   BUT WHAT I DO HAVE AN INTEREST IN
25    IS MAKING SURE THEY'RE COMFORTABLE THAT WHEN THEY
0726
1     WANT TO GET ACCESS TO THE BUDGETS, TO HOW THIS
2     MONEY IS BEING SPENT, THAT THEY GET ACCESS TO IT
3     EITHER ON THE WEB SITE WITH A PASSWORD OR SOME WAY
4     THEY CAN SEE WHAT'S GOING ON.
5                    OR YOU JUST MAIL STATEMENTS.
6     WHATEVER IS NORMAL CORPORATE PROTOCOL.  AND THEY
7     FEEL LIKE THEY'RE NOT -- THEY DON'T HAVE ANY
8     CONTROL OVER THEIR INVESTMENT, YOU KNOW.
9                    AND I THINK THAT THAT WOULD BE THE
10    BEST WAY TO -- YOU KNOW, TO RESOLVE -- TO RESOLVE
11    THIS.  I'M JUST GIVING YOU SOME IDEAS BEFORE I --

```
12    SINCE I WON'T GET TO SPEAK TO YOU UNTIL THE
13    MEDIATION.
14              BUT I CAN TELL YOU, THERE'S NOBODY
15    ON THIS SIDE OF THE TABLE FROM THE LEGAL SIDE THAT
16    IS TRYING TO PROLONG THIS LITIGATION.  WE ONLY
17    WANT TO SETTLEMENT.
18              I CAN SHOW YOU E-MAILS, SINCE I'M
19    ALLOWED TO SEND THEM ALL TO YOU.  I'VE SENT
20    MS. CROWTHER E-MAILS VERY EARLY ON.  WE NEED TO
21    GET THESE PEOPLE IN A ROOM.
22              I KNOW THERE WAS THIS ISSUE ABOUT
23    THE PLAYERS.  AND JUST SO YOU'RE NOT THINKING
24    THERE'S SOMETHING BEING HIDDEN, JUST SOME OF THESE
25    PLAYERS ARE OUT OF MONEY.  THEY JUST CAN'T FLY
0727
 1    HERE FOR EVERY SORT OF THING.
 2              YOU KNOW, AND IT'S NOT LIKE THEY
 3    DON'T WANT TO SETTLE, BUT I THINK LIKE IF A
 4    MAJORITY OR -- ARE IN AGREEMENT, THEY'RE WILLING
 5    TO GO ALONG WITH IT.
 6              I'LL GET DOCUMENTS, YOU KNOW, TO
 7    SUGGEST -- THAT WILL SUPPORT THAT REPRESENTATION
 8    BECAUSE I TALKED TO THEM ALL.  BUT THEY'RE LIKE,
 9    "LOOK, I DON'T HAVE ENOUGH MONEY TO FLY HERE.  IF
10    THE OTHER GUYS ARE GOOD WITH IT, I'M GOOD WITH IT,
11    BECAUSE WE'RE ALL WORKING TOGETHER."
12              I WOULDN'T HAVE TAKEN THE CASE IF I
13    WAS GOING TO HAVE 19 OPINIONS.  SO, YOU KNOW, WE
14    HAVE SORT OF A STRUCTURE LIKE THAT.  AND SO THAT'S
15    WHY I AGREE WITH YOU.
16              AND I THINK IT'S A VERY GOOD IDEA
17    THAT YOU BELIEVE THAT WE SHOULD ALL SETTLE WITH
18    EVERYBODY BECAUSE THAT'S WHAT WE WANT TO DO, IS
19    SETTLE ALL THESE LAWSUITS, YOU KNOW, AND -- THAT'S
20    RIGHT.
21              AND YOU'VE GOTTEN YOUR NICKS IN
22    THERE, TOO.  IT WASN'T HELPFUL WHEN YOU TESTIFIED
23    IN KENNER'S ARBITRATION.  AND THE 2 MILLION DOLLAR
24    JUDGMENT THAT YOU REFER TO, THAT REALLY IS FOR ONE
25    TRANSACTION, IRONICALLY, THAT THE MONEY WAS WIRED
0728
 1    TO YOU.  THAT'S THE IRONY OF THE WHOLE THING.
 2              YOU GUYS ARE STILL JOINED AT THE
 3    HIP, JUST IN A LEGAL SENSE.  BUT EVERYTHING ELSE,
 4    KENNER WAS FOUND NOT LIABLE ON.  THESE WERE ISSUES
 5    WHETHER HE SHOULD HAVE MADE THESE INVESTMENTS.
 6              SO THAT ONE TRANSACTION TO YOU IS
 7    HIS BALLYHOO.
 8         A.   I UNDERSTAND THAT.  I DIDN'T -- I
 9    DIDN'T GO THERE TO BE HELPFUL OR NOT HELPFUL.  I
```

10    WENT THERE TO TELL THE TRUTH.  AND TO BE HONEST,
11    YOU WERE -- YOU -- YOUR CROSS-EXAMINATION, YOU
12    COULDN'T HAVE DONE A BETTER JOB IF YOU WERE MY
13    LAWYER.  THAT'S WHAT WAS SURPRISING -- WHEN
14    THIS -- WHEN YOU FILED THIS CASE AGAINST ME.
15              Q.   WELL, DIFFERENT -- THERE'S
16    DIFFERENT HEARINGS, DIFFERENT INTERESTS.
17              A.   WELL, YOU DID A GOOD JOB.  I
18    APPRECIATE IT.
19              Q.   I DID DO A GOOD JOB BECAUSE THE
20    ARBITRATION PANEL, THREE JUDGES FOUND THAT HE
21    WASN'T LIABLE FOR THAT INVESTMENT, YOU KNOW, FOR
22    RECOMMENDING THAT INVESTMENT.
23              A.   I SAID YOU DID A GOOD JOB.
24              Q.   YEAH.  I MEAN, THEY WERE ASKING FOR
25    A LOT MORE THAN WHAT THEY GOT, AND THAT HAS NOT
0729
 1    BEEN CONFIRMED YET.
 2              JUST -- I KNOW YOU SAID IT WAS A
 3    JUDGMENT.  RIGHT NOW IT'S JUST AN AWARD.  THERE'S
 4    SOME LEGAL PROBLEMS WITH THAT JUDGMENT THAT HAVE
 5    ARISEN DUE TO THE ATTORNEY THAT WAS INVOLVED IN
 6    THE CASE.
 7              BUT, ANYWAY, I HAVE TO COPY --
 8    WHICH I HAVE IN MY THING, TO COPY THE EXHIBITS.
 9    SO I'M JUST GOING TO COPY THEM NOW.  BECAUSE I
10    KNOW YOU LIKE TO GET OUT OF HERE RIGHT ON TIME.  I
11    WANT TO SAVE THREE MINUTES FOR THE COPYING OF THE
12    EXHIBITS.
13              MS. CROWTHER:  WELL, YOU DON'T HAVE
14    TO TAKE THAT OUT OF YOUR TIME ON THE DEPO.  BUT
15    YOU HAVE THREE MINUTES BEFORE WE'RE GOING OFF THE
16    RECORD.
17              THE DEPONENT:  HE WAS GOING OFF THE
18    RECORD.
19              MR. RICHARDS:  OH, OKAY.  I --
20              THE DEPONENT:  CAN I SAY SOMETHING
21    WHILE WE'RE ON THE RECORD?
22              MR. RICHARDS:  YEAH.
23              THE DEPONENT:  AND SINCE YOU
24    BROUGHT UP THE -- THE NOLAN ARBITRATION, I WANT TO
25    CORRECT THE MISTAKE THAT I MADE THERE.
0730
 1    BY MR. RICHARDS:
 2              Q.   OKAY.
 3              A.   WHEN YOU HAD ASKED ME ABOUT CAPITAL
 4    ACCOUNTS, I WAS -- BECAUSE I WENT BACK AND READ
 5    THAT TESTIMONY.
 6              I SAID THAT THE CAPITAL ACCOUNTS
 7    WERE ZERO, AND THEY'RE NOT ZERO.  THEY'RE WHAT

```
 8    THEIR INVESTMENT IS.  I JUST WANT TO BE CLEAR AND
 9    ON THE RECORD FOR THAT.
10              Q.   IS THAT DIAMANTE DEL MAR?
11              A.   YES.
12              Q.   OKAY.  THAT RECORD IS OVER WITH,
13    BUT, YEAH --
14              A.   NO.  I WANT TO BE -- SO YOU
15    DON'T -- SO YOU DON'T THINK THAT I THINK THAT.
16                   AND I JUST DON'T KNOW IF -- YOU
17    KNOW, TO ME, WHEN I -- WHEN I HAD MADE THAT
18    MISTAKE AND THIS HAPPENED, I'M THINKING, WELL,
19    MAYBE THAT WAS THE -- ONE OF THE REASONS.  I
20    DIDN'T KNOW.
21                   SO WHEN -- IT DIDN'T COME UP TODAY,
22    SO I JUST WANTED TO CLEAR IT SO YOU KNOW.
23              Q.   WELL, IT'S INTERESTING THAT YOU SAY
24    THAT BECAUSE WHEN YOU SAID THEIR CAPITAL ACCOUNTS
25    WERE ZERO, THAT WAS WHEN I BELIEVED THAT SOMEHOW A
0731
 1    FRAUD WAS BEING PERPETRATED.
 2                   BECAUSE YOU TESTIFIED THAT THEIR
 3    CAPITAL ACCOUNTS WENT TO ZERO, SO MY ADVICE WAS
 4    ALL YOUR MONEY HAS BEEN TAKEN BECAUSE THE MANAGER
 5    TESTIFIED -- SURE.
 6                   IT WOULD HAVE BEEN HELPFUL IF YOU
 7    WOULD HAVE WRITTEN ME A LETTER AFTER THE
 8    DEPOSITION AND SAID -- OR NOT AFTER THE -- AFTER
 9    YOUR TESTIMONY AND SAID, "YOU KNOW, I MADE A GRAVE
10    MISTAKE.  I ERRONEOUSLY WIPED OUT MILLIONS OF
11    DOLLARS OF CAPITAL ACCOUNTS IN MY TESTIMONY, AND
12    THAT WAS A MISTAKE."
13                   THAT REALLY WOULD HAVE BEEN HELPFUL
14    TO ME BECAUSE THEN I MAY HAVE ANALYZED THEIR
15    POSITION DIFFERENTLY.
16              A.   OKAY.
17              Q.   SO -- I MEAN -- AND, AGAIN, IT'S
18    NOT A PERFECT PROCESS, BUT I THINK AT THIS POINT
19    WE'RE IN A GRAVE SITUATION WITH THIS LOAN BEING
20    EXTENDED, BECAUSE I DON'T THINK 4 MILLION IS GOING
21    TO CUT IT, REALLY, ON THIS PROJECT.  ESPECIALLY
22    UNDER A CLOUD OF LITIGATION.
23                   I THINK -- I THINK THAT EVEN A
24    MONTH MORE OF THIS IS TOO MUCH.  YOU KNOW.  AND
25    THEN -- SO IT'S -- WHAT I'D LIKE TO DO IS --
0732
 1    THAT'S WHY I'D LIKE TO REALLY GET -- REALLY GET
 2    THAT ORGANIZED.
 3                   BUT I'M GLAD YOU CLARIFIED THAT.
 4    THEY'LL BE -- MY CLIENTS WILL BE RELIEVED TO KNOW
 5    THAT THEY STILL HAVE CAPITAL ACCOUNTS SOMEWHERE.
```

```
 6                    IS THERE STILL -- IS THE DIAMANTE
 7     DEL MAR PROPERTY OPEN FOR VISITATION BY ANYBODY?
 8              A.   YES.
 9              Q.   DO YOU NEED TO GET PERMISSION TO GO
10     THERE FIRST?
11              A.   NO.  I MEAN, IF YOU'RE GOING TO FLY
12     THERE, YOU NEED TO JUST ALERT -- IT WOULD BE
13     HELPFUL TO TELL ME.
14              Q.   IS THE -- DO YOU HAVE TO GO THROUGH
15     CUSTOMS WHEN YOU LAND THERE?
16              A.   YOU GO THROUGH CUSTOMS IN ENSENADA
17     OR SAN FELIPE.
18              Q.   OH, SO YOU LAND THERE FIRST AND
19     THEN GET OUT ON A FLIGHT -- YOU CAN'T FLY DIRECTLY
20     IN?
21              A.   NO.
22                   MS. CROWTHER:  IT'S NOW 6:30.
23                   MR. RICHARDS:  OKAY.  I'M GOING TO
24     START COPYING.
25                   DEPOSITION OFFICER:  I NEED A
0733
 1     STIPULATION.
 2                   MR. RICHARDS:  ROBYN, WHY DON'T YOU
 3     TAKE A STAB AT THE STIPULATION WHILE I'M DOING
 4     THIS.
 5                   MS. CROWTHER:  I'M WILLING TO
 6     STIPULATE THAT THE COURT REPORTER WILL BE RELIEVED
 7     OF HER DUTY UNDER THE CODE OF CIVIL PROCEDURE TO
 8     MAINTAIN THE ORIGINAL OF THE TRANSCRIPT;
 9                   THAT THE ORIGINAL WILL BE SENT TO
10     ME, AND I WILL PROVIDE IT TO MR. JOWDY, FOR HIS
11     REVIEW;
12                   THAT HE WILL HAVE 30 DAYS TO MAKE
13     ANY CHANGES.  AND I WILL NOTIFY MR. RICHARDS OF
14     ANY SUCH CHANGES.
15                   IF I HAVE NOT NOTIFIED HIM OF ANY
16     CHANGES WITHIN 30 DAYS, IT WILL BE ASSUMED THAT
17     THERE ARE NONE;
18                   THAT MR. JOWDY CAN SIGN HIS
19     TRANSCRIPT UNDER PENALTY OF PERJURY.
20                   I WILL MAINTAIN THE ORIGINAL AND
21     MAKE IT AVAILABLE UPON REQUEST.  AND THAT IF THE
22     ORIGINAL IS LOST OR DESTROYED FOR ANY REASON, A
23     CERTIFIED COPY MAY BE USED IN ITS PLACE.
24                   MR. RICHARDS:  OKAY.  JUST -- THAT
25     WAS VERY GOOD, ROBYN.
0734
 1                   A COUPLE MORE THINGS FOR THE
 2     RECORD.
 3                   MS. CROWTHER:  DO YOU AGREE TO
```

```
 4   THAT?  ARE WE SO STIPULATED AS TO THAT?
 5                 MR. RICHARDS:  YEAH, BUT I JUST --
 6   BEFORE I AGREE TO IT, I JUST WANT TO CLARIFY WHERE
 7   I BELIEVE WE'RE AT JUST SO WE'RE ON THE SAME PAGE.
 8                 MS. CROWTHER:  WELL -- OKAY.
 9                 MR. RICHARDS:  AND THEN I'LL AGREE
10   TO IT.
11                 MS. CROWTHER:  BUT I MIGHT NOT
12   AGREE TO WHAT YOU'RE ABOUT TO SAY.  SO IF WE CAN
13   AGREE FOR THE COURT REPORTER'S BENEFIT AND THEN --
14                 MR. RICHARDS:  WELL, I'M NOT
15   RELIEVING THE COURT REPORTER YET.  BUT I JUST WANT
16   TO MAKE SURE.
17                 MS. CROWTHER:  SORRY.
18                 MR. RICHARDS:  OKAY.  I DON'T WANT
19   TO FALL INTO THAT PROCEDURAL TRAP.  THE -- THE --
20   AS YOU'RE -- AS AWARE, THERE'S JUST A COUPLE
21   THINGS.  SOME HOUSEKEEPING ISSUES.
22                 WE HAVE A DISPUTE RELATED TO THE
23   DISCOVERY PRODUCTION IN THIS CASE.  AND I'M NOT
24   GOING TO LITIGATE IT ON THE RECORD, BUT I'M GIVING
25   YOU SOME -- I'M GIVING YOU SOME MOTIONS THAT WE
0735
 1   FILED RELATED TO THE DISCOVERY PURSUIT.
 2                 AND I'M GIVING YOU A SUBPOENA FROM
 3   CASE NUMBER YC 058700.  THAT'S TO KEN JOWDY.
 4            (DOCUMENT HANDED TO THE DEPONENT.)
 5                 MR. RICHARDS:  THE -- THE
 6   DEPOSITION -- I'VE COVERED MOST OF THE DOCUMENTS
 7   THAT YOU PRODUCED IN THIS CASE, EXCEPT FOR, I'D
 8   SAY, ANOTHER 800 E-MAILS THAT WERE PROVIDED.
 9                 SOME OF THEM MAY BE DUPLICATES, SO
10   I'M NOT GOING TO ASK HIM ABOUT THOSE AGAIN, BUT I
11   NEED TO FINISH GOING THROUGH THEM.
12                 AND YOU REPRESENTED TO MY OFFICE
13   THAT WE HAVE ADDITIONAL DISCOVERY AND THERE'S
14   DOCUMENTS ON CABO SAN LUCAS DEALING WITH HOW THE
15   37 MILLION DOLLARS WAS SPENT.
16                 ALL THOSE DOCUMENTS, WE DON'T HAVE.
17   AND WE DON'T HAVE -- WE DON'T HAVE ANY OF THOSE
18   DOCUMENTS.  AND SO WE NEED TO GET THOSE DOCUMENTS,
19   AS WELL AS THE DETAIL OR BACKUP ON THE FINANCIALS
20   THAT HE PROVIDED, LIKE THE AMERICAN EXPRESS BILLS
21   AND STUFF.
22                 AND I'D LIKE TO TRY TO GET THOSE
23   BEFORE WE HAVE ANY FURTHER DEPOSITION DAYS JUST SO
24   I CAN FINISH THE DEPOSITIONS.
25                 IF -- WE WERE SUCCESSFUL LAST TIME
0736
 1   IN MEETING AND CONFERRING, BUT WE DO HAVE THIS
```

2   ISSUE ABOUT NONE OF THE DOCUMENTS MR. JOWDY'S
3   PROVIDED US ARE UNDER OATH, SO -- AS FAR AS
4   THEY'RE NOT VERIFIED.
5              SO HE CAN LITERALLY SAY, "THOSE
6   DOCUMENTS HAVE NOTHING TO DO WITH ME" BECAUSE HE'S
7   NEVER -- THERE'S BEEN NOBODY FROM THE DEFENDANTS
8   THAT HAVE VERIFIED IT.  SO THAT'S WHAT I -- THAT'S
9   WHAT I WANTED TO TELL YOU.
10             AND SO BASICALLY I'M -- THE DEPO --
11  HIS DEPOSITION IS NOT ADJOURNED.  IT'S MERELY --
12  IT'S ADJOURNED, BUT IT'S NOT CONCLUDED UNTIL I
13  HAVE THE OPPORTUNITY TO HAVE THOSE OTHER DOCUMENTS
14  PRODUCED.
15             I STILL HAVE -- I WAS ESTIMATING,
16  WITH THE 7,000 DOCUMENTS YOU PROVIDED AND WHATEVER
17  ELSE YOU'RE GOING TO BE GIVING ME SHORTLY, I
18  PROBABLY HAVE ANOTHER DAY OR TWO DEALING WITH --
19  WITH WHAT YOU'VE ALREADY PROVIDED.  SO --
20             MS. CROWTHER:  WELL, I DON'T THINK
21  YOU'RE ENTITLED TO ANY MORE TIME.
22             I DIDN'T REPRESENT TO YOUR OFFICE
23  THAT I HAD MORE DOCUMENTS TO PRODUCE.
24             WHAT I REPRESENTED TO YOUR OFFICE
25  WAS THAT I HAD A C.D. THAT I HAD TO REVIEW IN
0737
1   ORDER TO DETERMINE WHETHER THERE WERE ANY
2   DOCUMENTS TO PRODUCE AMONG OTHER THINGS.
3              THAT HASN'T BEEN PRODUCED FOR
4   PRIVILEGE OR DUPLICATES.  SO THEY MIGHT BE
5   DUPLICATIVE.
6              MR. RICHARDS:  RIGHT.
7              MS. CROWTHER:  I DON'T THINK YOU'RE
8   ENTITLED TO ANY MORE TIME ON THE DOCUMENTS WE
9   PRODUCED ON DECEMBER 7TH.
10             AND SO WE CAN MEET AND CONFER ABOUT
11  A FURTHER DEPOSITION AT THE APPROPRIATE TIME, BUT
12  I DON'T AGREE THAT IT'S REMAINING OPEN.
13             MR. RICHARDS:  WELL, THE DATE --
14  THE ORDER SAYS DAY-TO-DAY.
15             MS. CROWTHER:  WE'VE HAD OUR
16  DISCUSSIONS ABOUT THAT, AND WE BOTH READ THE
17  TRANSCRIPT.
18             MR. RICHARDS:  WE NEVER CHANGED IT.
19             MS. CROWTHER:  WE BOTH READ THE
20  TRANSCRIPT, RON.
21             MR. RICHARDS:  ALL RIGHT.  WELL,
22  THE E-MAIL, THOUGH -- I WAS ONLY -- I'M NOT SAYING
23  HE'S ORDERED TO BE HERE AFTER TODAY, BUT I'M
24  SAYING THE -- THE -- THE E-MAIL THAT YOU SENT ME
25  SAID THAT WE WILL AGREE ON ANOTHER DAY.

```
0738
 1                    I NEVER SAID I ONLY WAS GOING TO
 2    NEED HIM FOR TWO DAYS.
 3                    MS. CROWTHER:  WELL, I SAID I WOULD
 4    MEET AND CONFER WITH YOU AFTER THE TWO DAYS, AND I
 5    WILL.
 6                    MR. RICHARDS:  OKAY.
 7                    MS. CROWTHER:  IN ADDITION, THERE
 8    WAS SOMETHING ELSE THAT WAS PROBLEMATIC IN WHAT --
 9    IN WHAT YOU JUST REPRESENTED.
10                    MR. RICHARDS:  ALL RIGHT.  WELL,
11    THINK ABOUT IT.  TAKE YOUR TIME.
12                    MS. CROWTHER:  AND -- OH, IT WAS
13    THAT THE DOCUMENTS WEREN'T UNDER OATH.
14                    I BELIEVE THAT WE DID PROVIDE A
15    VERIFICATION FOR OUR WRITTEN RESPONSES, ALTHOUGH
16    THEY MAY HAVE ONLY BEEN OBJECTIONS, IN WHICH CASE
17    WE WOULDN'T HAVE.
18                    BUT WE'VE AGREED TO GIVE YOU
19    SUPPLEMENTAL RESPONSES THAT WILL BE VERIFIED.
20                    OH, I KNOW WHAT IT WAS.
21                    YOU'VE COMPLAINED THAT THERE AREN'T
22    ANY DOCUMENTS RELATING TO DIAMANTE CABO SAN LUCAS.
23                    IF YOU LOOK AT MY NOVEMBER 5TH
24    E-MAIL, AS I EXPLAINED, YOU DIDN'T CLAIM THAT YOUR
25    CLIENTS HAD AN EQUITY INTEREST IN THAT AND,
0739
 1    THEREFORE, WE DIDN'T PRODUCE THEM.  AND SO UNDER
 2    THE MEET AND CONFER, I DIDN'T AGREE.
 3                    NOW, I SUSPECT THAT IN CONNECTION
 4    WITH THE MEDIATION, WE'RE GOING TO BE WILLING TO
 5    MAKE AVAILABLE INFORMATION TO YOUR CLIENTS.
 6                    SO IT MAY BE A DISTINCTION WITHOUT
 7    A DIFFERENCE, BUT WE DID NOT AGREE TO MAKE THOSE
 8    DOCUMENTS AVAILABLE.
 9                    MR. RICHARDS:  YOU AGREE TO MAKE
10    DOCUMENTS AVAILABLE TO ANY ENTITY THAT RECEIVED
11    MONEY FROM MY CLIENT.
12                    MS. CROWTHER:  OH, NO, I DID NOT.
13                    READ MY NOVEMBER 5TH E-MAIL AND
14    READ THE MEET AND CONFER.
15                    I SAID I WOULD MAKE BOOKS AND
16    RECORDS AVAILABLE FOR ANY ENTITY IN WHICH YOU
17    CLAIMED YOUR CLIENTS HAD AN EQUITY INTEREST THAT
18    MR. JOWDY CONTROLLED.
19                    AND YOU ONLY IDENTIFIED TWO IN THE
20    COMPLAINT:  BAJA MANAGEMENT AND DIAMANTE DEL MAR.
21    AND I PRODUCED THOSE RECORDS.
22                    YOU'VE NEVER ALLEGED THAT YOUR
23    CLIENTS HAVE AN EQUITY INTEREST IN DIAMANTE CABO
```

```
24    SAN LUCAS, AND THEY DON'T.
25                SO, AGAIN, THAT'S WHY THEY HAVEN'T
0740
 1    BEEN PRODUCED, AND I'M SURE IN CONNECTION WITH THE
 2    MEDIATION, THAT WE'RE GOING GIVE YOU SOME OF THAT
 3    INFORMATION.
 4                MR. RICHARDS:  ALL RIGHT.  WELL,
 5    I -- I THINK THEY DO HAVE AN EQUITY INTEREST
 6    THROUGH THE L.L.C. THAT MR. JOWDY'S TESTIFIED TO.
 7                MS. CROWTHER:  THEY HAVE AN
 8    INTEREST IN AN L.C.C.  THAT L.L.C. IS NOT A
 9    PLAINTIFF.
10                IF YOU WANT TO MAKE IT A PLAINTIFF,
11    WE MIGHT BE IN A DIFFERENT POSITION.
12                BUT EVEN SO, IT'S NOT WHAT I AGREED
13    TO.  AND I DOCUMENTED WHAT I AGREED TO, AND YOU
14    DIDN'T OBJECT.  SO THAT'S THE PROBLEM.  THAT'S WHY
15    THERE AREN'T ANY RECORDS YET.
16                MR. RICHARDS:  ALL RIGHT.  WELL, I
17    THINK THAT -- I THINK YOU'RE SPLITTING HAIRS.
18                I THINK THAT HE'S -- REGARDLESS OF
19    WHETHER WE REQUESTED HIM -- HE'S -- HE IS REQUIRED
20    TO PRODUCE THEM SIMPLY FOR THE FACT THAT -- THAT
21    THEY'RE BEING REQUESTED BY PHIL KENNER ON BEHALF
22    OF MY CLIENTS BECAUSE THE TESTIMONY IS
23    OVERWHELMING THAT HE HAS 47 PERCENT OF THIS
24    OPERATION.
25                MS. CROWTHER:  AND HE'S -- HE'S
0741
 1    COMPLIED WITH HIS OBLIGATIONS TO MR. KENNER.  I
 2    DON'T WANT TO ARGUE ABOUT THAT ANYMORE NOW THAT
 3    WE'RE TEN MINUTES PAST THE DEPOSITION TIME.
 4                MR. RICHARDS:  OKAY.  AND -- THAT'S
 5    FINE.
 6                I MEAN, THE RECORDS IN THIS CASE
 7    ARE NOT ENOUGH.  THEY ALSO NEED TO HAVE SOME LEVEL
 8    OF CONTROL THERE.  THAT'S -- THAT'S THE OTHER
 9    ISSUE.
10                MS. CROWTHER:  "LEVEL OF" I DON'T
11    UNDERSTAND.
12                MR. RICHARDS:  CONTROL AT -- IN --
13    IN HAVING -- IN DECISION-MAKING OF THIS OPERATION.
14                MS. CROWTHER:  WHO NEEDS TO HAVE
15    THAT?
16                MR. RICHARDS:  MY CLIENTS.
17                MS. CROWTHER:  WELL, I -- WELL, YOU
18    CAN MAKE THAT ARGUMENT BASED ON WHATEVER LAW OR
19    DOCTRINE YOU WANT TO.  I THINK YOU'RE JUST WRONG.
20                MR. RICHARDS:  ALL RIGHT.
21                WELL, I MEAN, IT -- IF I HAVE TO --
```

22  IF I HAVE TO GET AN ASSIGNMENT, WHICH IS VERY -- I
23  MEAN, THIS IS -- THIS IS WHY WE'RE REALLY PLAYING
24  PROCEDURAL.
25              IF I CAN JUST GET AN ASSIGNMENT
0742
1  FROM THE L.L.C. TO THE CURRENT PLAINTIFFS AND THEN
2  THEY'LL HAVE STANDING, IF THAT'S THE ISSUE.
3              MS. CROWTHER:  YOU CAN'T DO THAT
4  WITHOUT MR. JOWDY'S CONSENT UNDER THE VARIOUS
5  OPERATING AGREEMENTS.
6              MR. RICHARDS:  NO.  ASSIGNMENT OF
7  THIS CLAIM.  I DON'T NEED HIS CONSENT TO --
8              MS. CROWTHER:  IT DOESN'T HAVE TO
9  DO WITH STANDING.  LOOK, THIS IS -- THIS IS TWO
10  LITIGATORS JUST SPOUTING OFF AT THIS POINT.
11              MR. RICHARDS:  ALL RIGHT.  LET ME
12  GET TO THE C.D. HERE.
13              MS. CROWTHER:  CAN WE GO OFF THE
14  RECORD, THEN?
15              MR. RICHARDS:  YEAH.
16              WELL, DO YOU WANT TO DO THE
17  STIPULATION, OR IS THE STIPULATION YOU SAID OKAY?
18              MS. CROWTHER:  THE STIPULATION I
19  SAID IS FINE WITH ME.
20              I UNDERSTAND THAT YOU BELIEVE THAT
21  YOU HAVE GROUNDS TO DEPOSE MR. JOWDY FURTHER.  I
22  DISAGREE WITH YOU.
23              BUT WE'LL MEET AND CONFER ABOUT
24  THAT.  AND ESPECIALLY SINCE WE'RE MEDIATING, IT
25  DOESN'T SEEM LIKE WE HAVE TO RESOLVE IT NOW OR
0743
1  THAT IT SHOULD INTERFERE WITH THE COURT REPORTER'S
2  OBLIGATIONS.
3              MR. RICHARDS:  NO.  THAT'S FINE.
4              DEPOSITION OFFICER:  SO STIPULATED?
5              MR. RICHARDS:  SO STIPULATED.
6              THE VIDEOGRAPHER:  VERY GOOD.
7  WE'LL GO OFF VIDEOTAPE RECORD AT 6:38 P.M.
8  CONCLUDING TAPE NUMBER 4 OF VOLUME NUMBER II.
9
10              (WHEREUPON, AT THE HOUR OF
11              6:38 P.M., THE PROCEEDINGS
12                WERE CONCLUDED.)
13                    -O0O-
14
15
16
17
18
19

```
20
21
22
23
24
25
0744
 1   STATE OF CALIFORNIA      )
                              )  SS.
 2   COUNTY OF LOS ANGELES    )
 3
 4
 5
 6                    DEPONENT'S DECLARATION
 7
 8
 9
10         I CERTIFY UNDER PENALTY OF PERJURY THAT
11   THE FOREGOING IS TRUE AND CORRECT.
12
13
14
15
16   EXECUTED AT _____ ON _____.
17
18
19
20                        _____
                                (SIGNATURE OF DEPONENT)
21
22
23
24
25
0745
 1   STATE OF CALIFORNIA      )
                              )  SS.
 2   COUNTY OF LOS ANGELES    )
 3
 4       I, ALEJANDRIA E. KATE, CERTIFIED SHORTHAND
 5   REPORTER, CERTIFICATE NUMBER 11897, FOR THE STATE
 6   OF CALIFORNIA, HEREBY CERTIFY:
 7       THE FOREGOING PROCEEDINGS WERE TAKEN BEFORE ME
 8   AT THE TIME AND PLACE THEREIN SET FORTH, AT WHICH
 9   TIME THE DEPONENT WAS PLACED UNDER OATH BY ME;
10       THE TESTIMONY OF THE DEPONENT AND ALL
11   OBJECTIONS MADE AT THE TIME OF THE EXAMINATION
12   WERE RECORDED STENOGRAPHICALLY BY ME AND WERE
13   THEREAFTER TRANSCRIBED;
14       THE FOREGOING TRANSCRIPT IS A TRUE AND CORRECT
```

```
15    TRANSCRIPT OF MY SHORTHAND NOTES SO TAKEN;
16        I FURTHER CERTIFY THAT I AM NEITHER COUNSEL
17    FOR NOR RELATED TO ANY PARTY TO SAID ACTION, NOR
18    IN ANY WAY INTERESTED IN THE OUTCOME THEREOF.
19        IN WITNESS WHEREOF, I HAVE HEREUNTO SUBSCRIBED
20    MY NAME THIS 13TH DAY OF JANUARY, 2010.
21
22    _____
              ALEJANDRIA E. KATE
23
24
25
```