UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Little Isle IV, LLC, a          )NO. CV-09-142-PHX-SRB

 Delaware Limited Liability     )
Company; Ula Makika, LLC, a   )

 Delaware Limited Liability     )
Company; and Philip Kenner,   )

                              )
   Plaintiffs,            )

                              )
vs.                        )

                              )
Kenneth A. Jowdy, et al.,    )

                              )
   Defendant.            )

                              )

VIDEOTAPED DEPOSITION OF ROBERT GAUDET

Phoenix, Arizona
July 2, 2009

9:05 a.m.

**CONFIDENTIAL TREATMENT REQUESTED**

**PK_SEC_000645**

Prepared by:

Jill Marnell, RPR

Arizona Certified Reporter

No. 50021

2

1                    INDEX

2  WITNESS                          PAGE

3  ROBERT GAUDET

4      Examination by Mr. Lake            5

5      Examination by Mr. Harper          124

6

7                 INDEX TO EXHIBITS

8
   No.     Description               Page

9
   1      Document titled "Revolving Line of      9

10          Credit Loans 2-7-2004"

11  2      Color laser photograph          48

12  3      Calendar for November and December 2004    57

13  4       Agenda for the 2nd Annual Diamante Cup    59
        2004

14

**CONFIDENTIAL TREATMENT REQUESTED**

5       Hand-drawn diagram by the witness        73

15

6       Hand-drawn diagram by the witness        73

16

17

INSTRUCTIONS TO WITNESS NOT TO ANSWER

18

Page    Line

19

32      11

20

38      3

57      7

21

109     23

111     13

22

114     5

116     18

23

117     2

24

25

3

1       VIDEOTAPED DEPOSITION OF ROBERT GAUDET

2

3       The videotaped deposition of ROBERT GAUDET was

4   taken on July 2, 2009, commencing at 9:05 a.m., at the law

5   offices of Perkins Coie Brown & Bain, 2901 North Central,

6   20th Floor, Phoenix, Arizona, before JILL MARNELL, a

7   Certified Reporter, Certificate No. 50021, for the State

CONFIDENTIAL TREATMENT REQUESTED

8    of Arizona.

9         The plaintiffs were represented by their

10   attorney, Harper Law, by Mr. Kevin R. Harper.

11        The defendant was represented by his attorneys,

12   Perkins Coie Brown & Bain, by Mr. Brian C. Lake.

13        The witness was represented by his attorneys,

14   Augustine & McKenzie, by Mr. Paul J. Augustine.

15        Also present was Richard Borgmann, videographer,

16   and Kenneth Jowdy.

17

18

19        The following proceedings were had:

20

21

22

23

24

25

4

1         THE VIDEOGRAPHER:  We're going on the record

2    at 9:05.

3         This is the videotape deposition of Robert

4    Gaudet, taken by the defendant, in the matter of Little

**CONFIDENTIAL TREATMENT REQUESTED**

5  Isle IV, et al., versus Kenneth Jowdy, et al., in the

6  U.S. District Court for the District of Arizona.  The

7  case number is CV-09-142.

8          This deposition is being held in the offices

9  of Perkins Coie Brown & Bain, 2901 North Central Avenue,

10  Suite 2000, Phoenix, Arizona, on Thursday, July 2nd, 2009.

11         The court reporter is Jill Marnell from the

12  firm of Glennie Reporting Services, Phoenix, Arizona.  The

13  certified legal video specialist is Richard Borgmann in

14  association with Forensic Video Deposition Services,

15  Phoenix, Arizona.

16         Will the attorneys introduce themselves,

17  please; defendants first.

18         MR. LAKE:  Brian Lake with Perkins Coie

19  Brown & Bain, representing Defendant Ken Jowdy.

20         MR. AUGUSTINE:  Paul Augustine of

21  Augustine & McKenzie, representing the deponent, Bobby

22  Gaudet.

23         MR. HARPER:  Kevin Harper of Harper Law,

24  PLC, representing the plaintiffs.

25         THE VIDEOGRAPHER:  Will the court reporter

5

1  please swear in the witness.

CONFIDENTIAL TREATMENT REQUESTED

PK_SEC_000649

2

3              ROBERT GAUDET,

4   having been duly sworn by the Certified Reporter to

5   testify to the whole truth and nothing but the truth,

6   testified as follows:

7

8                  EXAMINATION

9   BY MR. LAKE:

10   Q.  Good morning, Mr. Gaudet.

11   A.  Good morning.

12   Q.  Can you please state your name and current

13   address for the record.

14   A.  Robert Gaudet of --

15        How complete do you want the address?  Of

16   Cabo San Lucas, Mexico.

17        THE COURT REPORTER:  Say it again.

18        THE WITNESS:  Cabo San Lucas.

19        THE COURT REPORTER:  Oh.

20        THE WITNESS:  Actually, San Jose del Cabo,

21   technically.  San Jose del Cabo, Mexico.

22   Q.  BY MR. LAKE:  Okay.  And is Mr. Augustine

23   representing you for purposes of your deposition today?

24   A.  Correct, yes.

25      Q.   Have you ever participated in a deposition

6

1    before?

2      A.   I have not.

3      Q.   All right.  Have you ever testified in court

4    before?

5      A.   No.

6      Q.   Well, this -- this will be a little new, so I'm

7    going to go through a couple of preliminary instructions

8    here.

9      A.   Thank you.

10      Q.   The deposition is taken under oath.  Which, for

11    your purposes, has the same force and effect as if you

12    were actually testifying as a witness in federal court.

13    And your testimony here today, including the video record,

14    may be offered as evidence in court.

15           Do you understand that?

16      A.   Yes.

17      Q.   If you provide knowingly false testimony during

18    this deposition, you can be subject to sanctions by the

19    Court and also possibly federal criminal charges for

20    perjury.

21           Do you understand that?

CONFIDENTIAL TREATMENT REQUESTED

22     A.   Yes.

23     Q.   I will be asking you a series of questions and

24   you'll be giving me answers to those questions as best

25   you're able.

7

1          I'll try to ask questions that are clear and

2   easy to understand.  But if I do ask a question that you

3   don't understand, please let me know and I'll do my best

4   to rephrase it and make my answer -- or my question more

5   clear.

6          Given that, if you do answer a question, I

7   will assume that you understand it.

8          Okay?

9     A.   Very good.

10     Q.   Also, as you can see, the deposition is being

11   recorded by a court reporter.  And she has difficulty

12   getting things down correctly if we both talk at the same

13   time.  So I will try to wait until you finish your answers

14   before I ask the next question.  And I'll ask you to try

15   to wait until my question is complete before you give your

16   answer, even if you kind of know what it is that I'm

17   asking, because it makes for a cleaner record that way.

18          Okay?

19   A.   Excellent.

20   Q.   Also, the court reporter can't take down nods or

21   shrugs or nonverbal responses, so you need to speak the

22   answers clearly for the record.

23          At certain points during the deposition your

24   attorney may say objection or objection to form.  This is

25   something attorneys do to preserve an objection on the

8

1   record.  But you can go ahead and answer the question

2   unless your attorney instructs you not to answer the

3   question.

4          And finally, if at any time you need to take

5   a break for a restroom or for any other reason, just let

6   me know and we can -- we can do that.  The only thing I

7   would ask is that we take a break after an answer to a

8   question, not while there's a question still pending.

9          Is that okay?

10   A.   Yes.

11   Q.   All right.  Are you using any medication today

12   that could affect your testimony?

13   A.   No.

14   Q.   Is there anything else that would prevent you

15   from providing truthful and reliable testimony today?

CONFIDENTIAL TREATMENT REQUESTED

16    A.  No.

17    Q.  Okay.  You mentioned earlier that Mr. Augustine

18  is representing you today for this deposition; is that

19  right?

20    A.  Yes.

21    Q.  Do you know whether Mr. Augustine also represents

22  Philip Kenner in matters involving Mr. Jowdy?

23    A.  I do not.

24    Q.  You mean you don't know?

25    A.  I don't know if he's representing.

9

1    Q.  Okay.  Do you know whether Mr. Augustine has ever

2  represented Mr. Kenner?

3    A.  I don't understand that question.

4    Q.  Do you know whether Mr. Augustine has ever worked

5  as Mr. Kenner's attorney?

6    A.  I don't know, no.

7    Q.  Okay.  How did you first learn that your

8  deposition had been requested in this action?

9    A.  Could you repeat that, please?

10    Q.  Sure.

11        How did you first learn that your deposition

12  had been requested in this lawsuit?

CONFIDENTIAL TREATMENT REQUESTED

PK_SEC_000654

13      A.  I don't recall.  I don't recall specifically.

14      Q.  Okay.  Do you remember whether someone gave you a

15   phone call or sent you a letter or an e-mail or --

16      A.  Hmm.  It may -- If you can ask that question

17   again, as we go forward I'll continue to try and recall.

18   I just don't recall my initial awareness.

19          MR. LAKE:  Okay.  Can you mark this as

20   Exhibit 1, please.

21          (Deposition Exhibit No. 1 was marked for

22   identification by the court reporter.)

23      Q.  BY MR. LAKE:  Mr. Gaudet, I'm showing you what's

24   been marked as Exhibit 1.

25      A.  Okay.


                                  10
1       Q.  By the way, how do you pronounce your last name?

2       A.  Gaudet is good.

3       Q.  Gaudet?

4       A.  Yes.

5       Q.  Kind of like the Australian good day, sir?

6       A.  Usually brings a smile to my face.

7       Q.  Okay.  This document that's marked as Exhibit 1

8    is titled at the top:  Revolving Line of Credit Loans,

9    12/7/04.

CONFIDENTIAL TREATMENT REQUESTED                    PK_SEC_000655

10          Have you ever seen this document before?

11    A.  Before?

12    Q.  Before now.

13    A.  Before now, yes.

14    Q.  Okay.  I'm going to -- this obviously is the --

15  Do you understand this to be the document whose

16  authenticity has been requested in this lawsuit?

17    A.  Who?  Or --

18    Q.  Do you understand that this document is one of

19  the documents that is central to the lawsuit involving

20  Mr. Jowdy and Mr. Kenner?

21    A.  Yes.

22    Q.  Okay.  I'm going to refer to this as the loan

23  agreement document or the contract or the written

24  contract.  So if I say any of those terms, will you

25  understand that to mean this document?

                         11

1    A.  Yes.

2    Q.  Okay.  What is the first time that you -- Well,

3  let me have you take a look at the second page of the

4  document.  Does that appear to be your signature there

5  under the line that says "Witness"?

6    A.  Yes.

PK_SEC_000656

7      Q.   All right.  I want you to take a minute to think

8   about this question before you answer it and then provide

9   your sworn testimony for the Court.

10           Did you sign this document in December 2004?

11     A.   Yes.

12     Q.   Do you have a clear recollection of having done

13   that?

14     A.   I have a fairly clear recollection, yes.

15     Q.   Did you see Ken Jowdy sign this document in 2004?

16     A.   I recall a document with his name on it and a

17   line, and I recall a document with a line that I was

18   requested to witness.

19     Q.   So do you mean to say that you don't know whether

20   it was this same document that you saw him sign?

21     A.   I assume.

22     Q.   You assume -- I'm not sure I understand what you

23   mean.

24     A.   I assume it was the same document, yes.

25     Q.   Well, what is that assumption based on?

                              12

1      A.   The line that I'm looking at, the signature that

2   I'm looking at.

3      Q.   Okay.  But what you're saying, then, I think, if

CONFIDENTIAL TREATMENT REQUESTED

4   I understand you correctly, is you remember seeing --

5   witnessing Ken Jowdy sign a document in December of 2004.

6       A.   Yes.

7       Q.   And you countersigned as a witness to that same

8   document?

9       A.   Yes.

10      Q.   But you're not sure whether it was this same

11  document that we're looking at now as Exhibit 1?

12      A.   Yes.

13      Q.   What do you remember about that document that you

14  remember seeing him sign in 2004?

15      A.   Hmm.  Just a little bit more specific.  What do

16  I --

17      Q.   Well, you said you remembered seeing a document

18  with a line for his name.  Do you remember anything else

19  about that document that -- that he signed?

20      A.   I don't, no.

21      Q.   Do you remember how many pages it was?

22      A.   No.

23      Q.   Have you done anything to prepare for your

24  deposition today?

25      A.   Could you repeat that?  Sorry.  I was just

CONFIDENTIAL TREATMENT REQUESTED

13

1   reading the document.

2   Q.  Sure.

3        Have you done anything to prepare for your

4   deposition today?

5   A.  Yes.

6   Q.  And what was that?

7   A.  Just conversations related.

8   Q.  Conversations with whom?

9   A.  With my representation.

10   Q.  Okay.  And I don't want to -- I don't want to ask

11   you what you discussed with your attorney.

12   A.  No, that's fine.

13   Q.  Did you have conversations with anyone other than

14   Mr. Augustine about your deposition?

15   A.  Not about the deposition.

16   Q.  Did you have conversations with anyone other than

17   Mr. Augustine about this lawsuit?

18   A.  Yes.

19   Q.  Who was that?

20        MR. HARPER:  I'll object.  I think that goes

21   beyond the scope of this deposition.

22        MR. LAKE:  You can go ahead and answer.

23        THE WITNESS:  Repeat the question for me.

**CONFIDENTIAL TREATMENT REQUESTED**

24     Q.   BY MR. LAKE:  Well, just you had mentioned that

25   you had conversations with someone else about this

                                        14

1   litigation, and I was asking who.

2     A.   About this litigation.

3     Q.   The litigation between Mr. Kenner and Little

4   Isle IV and Ula Makika and Mr. Jowdy.

5     A.   So with that --

6          Other than --

7     Q.   Other than your conversations with Mr. Augustine.

8     A.   -- Mr. Augustine?

9          There has been some conversation with Phil

10   Kenner.

11     Q.   Have you spoken to Phil Kenner about this

12   litigation during 2009?

13     A.   2009?  2009, yes.

14     Q.   When was that?

15     A.   I didn't catalog the day, but definitely 2009.

16     Q.   Okay.  Can you recall with any more specificity

17   than that?  Was it early in the year?

18     A.   I don't recall specifically.

19     Q.   How many conversations did you have with

20   Mr. Kenner about this lawsuit?

PK_SEC_000660

21     A.   Maybe three.

22     Q.   Do you remember what you discussed in those

23   conversations?

24     A.   No.

25     Q.   Was anyone else present during those

                                    15

1   conversations?

2     A.   No.

3     Q.   Were these conversations by telephone or in

4   person?

5     A.   Telephone.

6     Q.   All of -- all three?

7     A.   Telephone.   And I didn't catalog anything, so --

8          Specifically to the case.   Telephone.

9     Q.   And during those three conversations did you

10   discuss at all the existence of this loan agreement

11   document that's Exhibit 1?

12     A.   Repeat that, please.

13     Q.   During these conversations you had with

14   Mr. Kenner about the lawsuit, during any of those

15   conversations did you discuss this -- this loan agreement

16   document --

17     A.   Yes.

CONFIDENTIAL TREATMENT REQUESTED                    PK_SEC_000661

18   Q.   -- that's marked as Exhibit 1?

19        Did you discuss it during all three of those

20   conversations?

21   A.   No.

22   Q.   What did you discuss about the document?

23   A.   He just asked me to recall.

24   Q.   To recall what you remembered about it?

25   A.   Correct.

                              16

1   Q.   And what did you tell him?

2   A.   I first attempted to get back to the time frame.

3   And he asked me just to recall things related to the time

4   frame.

5   Q.   What did you recall or what did you tell him that

6   you recalled?

7   A.   What did I tell him.  I remember many things that

8   were upcoming in December.  I remember I got invited to an

9   event.  I know I had many conversations with Mr. Jowdy

10   previous to the event regarding my employment with the

11   company.  I remember it was an important event.  I

12   remember the event was in Cabo San Lucas.  That's about

13   all.

14   Q.   Have you ever spoken to Mr. Kenner's lawyers

15   about this lawsuit?

16      A.   To Mr. Kenner -- I don't know who Mr. Kenner's

17   lawyers are.

18      Q.   Okay.  Mr. Harper, for example?

19      A.   Yes.

20      Q.   Have you spoken with him about this lawsuit?

21      A.   Yes.

22      Q.   Okay.  And do you understand that that's

23   Mr. Kenner's attorney?

24      A.   If that's what the record is, yes.

25      Q.   Okay.  How many times have you spoken with

17

1   Mr. Harper about this lawsuit?

2      A.   Again, two or three times.

3      Q.   Do you remember when?

4      A.   I can't be certain, but I believe they were all

5   in 2009.

6      Q.   Were those conversations you had by telephone?

7      A.   No.

8      Q.   In person?

9      A.   Yes.

10      Q.   Was anyone else present during those

11   conversations?

CONFIDENTIAL TREATMENT REQUESTED

12   A.  Yes.

13   Q.  Who else was present?

14   A.  Phil Kenner.

15   Q.  Okay.  Was this --

16   A.  Which -- which now lets me recall that one of my

17   other conversations must have been with -- I'm not sure if

18   Phil was in all three, but I believe.  Possibly.

19          Again, I wasn't clear if all the

20   conversations were telephone or -- or in person.  But

21   thank you, I recall that I did have visits with

22   Mr. Harper.

23   Q.  Okay.  Did those visits occur here in Phoenix?

24   A.  Yes.

25   Q.  In Mr. Harper's office?

18

1   A.  Yes.

2   Q.  Were they within the last month?

3   A.  One may have.

4   Q.  Okay.  Can you remember at all when these

5   conversations took place?

6   A.  One within the last month is -- is very probable.

7   Q.  Uh-huh.  What did you discuss with Mr. Harper

8   during these meetings?

9     A.   Just, again, anything that I could recall related

10   to my signature.

11     Q.   When is the first time that you spoke with

12   Mr. Harper?

13     A.   Hmm.  I don't recall.

14     Q.   Do you believe it was in 2009?

15     A.   I do believe.

16     Q.   Have you spoken with John Kaiser or his attorneys

17   about this litigation?

18     A.   John Kaiser, yes.  Attorneys, I don't know if

19   he's -- who his attorneys are.

20     Q.   Okay.  When did you speak with John Kaiser about

21   this litigation?

22     A.   Couple months ago.

23     Q.   Were those conversations in person or on the

24   telephone?

25     A.   One was in person.

19

1     Q.   Where did that take place?

2     A.   That was here in Arizona.

3     Q.   Was that in Mr. Harper's office also?

4     A.   No.

5     Q.   Where was it?

6    A.  I think it was at a restaurant somewhere in the

7    Scottsdale area.

8    Q.  Was anyone else present during that conversation?

9    A.  I believe it was just myself and John Kaiser.

10    Q.  How did you come to meet with John Kaiser at that

11    time?

12    A.  I would assume he was here on business.  I'm not

13    sure.  We didn't discuss.

14    Q.  Well, how did you first get in contact with him?

15    Did you call him?

16    A.  No.  There was no formal communication or contact

17    to set up a meeting.

18    Q.  Okay.  I just -- I'm trying to figure out how you

19    ended up at the same restaurant at the same table.  It's

20    not a trick question.  It's just a --

21    A.  Yeah.  No, it was a social -- by chance he was in

22    town and I was.

23    Q.  Okay.  Did he contact you and ask you to have

24    dinner or --

25    A.  It was -- it was nothing specific.  We just had

20

1    free time at the same time.

2    Q.  Okay.  I'm just trying to find out who -- who

3   started the contact, who initiated the contact between the

4   two of you.

5       A.   I don't know.

6       Q.   Was the purpose of this meeting to discuss the

7   lawsuit?

8       A.   No.

9       Q.   What was purpose of the meeting?

10       A.   It was just social.

11       Q.    And did you discuss the lawsuit at the meeting?

12       A.    We discussed nothing regarding the lawsuit

13   because I don't know if a lawsuit existed at the time.

14   But just many things general related to himself.

15       Q.   When did you -- when did you believe that this

16   meeting occurred?

17       A.   Could have been a month or two ago.  I'm not

18   certain.

19       Q.   Are you and Mr. Kaiser friends?

20       A.   We have a friendship, yes.

21       Q.   How often do you see him?

22       A.   Not often.

23       Q.   When was the last time you saw him prior to this

24   meeting a few months ago?

25       A.   I don't know.

CONFIDENTIAL TREATMENT REQUESTED                                                   PK_SEC_000667

21

1    Q.   Did Mr. Kenner ask you or John Kaiser to -- to

2    speak with each other --

3    A.   No.

4    Q.   -- about the litigation?

5        During this meeting with Mr. Kaiser, did

6    you -- did you discuss at all the loan -- this loan

7    agreement document, Exhibit 1?

8    A.   He asked me if I could recall anything, yes.

9    Q.   Why did he bring up that topic?

10       MR. HARPER:  Object to form.

11       MR. AUGUSTINE:  Object to form.

12       If you know.

13   Q.   BY MR. LAKE:  If you know.  Did he say?

14   A.   Repeat the question.

15   Q.   Do you know why Mr. Kaiser brought up this topic

16   of the loan agreement document while you were having

17   dinner?

18   A.   No.

19   Q.   What did he ask you?

20   A.   What did he ask me.  I just recall things being

21   very general.  Nothing very -- nothing pointed, nothing

22   specific.

**CONFIDENTIAL TREATMENT REQUESTED**

23    Q.   Tell me everything you remember about what you

24   said in this discussion about the loan agreement document.

25    A.   With John Kaiser?

                                22

1    Q.   With John Kaiser, right.

2    A.   I don't recall.

3    Q.   The only thing you recall is that he mentioned

4   the existence of this document?

5    A.   Yes.

6    Q.   Did he ask you if you remembered signing it?

7    A.   Yes.

8    Q.   And what did you tell him?

9    A.   I told him what I mentioned to you earlier, that

10   I recall signing as a witness to a document.

11    Q.   Did you tell him that you didn't remember exactly

12   what the -- which document it was or what the document

13   was?

14    A.   Yes, correct.

15    Q.   Did he mention that he had any involvement with

16   the creation of this loan agreement document?

17    A.   Yes.

18    Q.   What did he tell you?

19    A.   He told me it was a document that he needed

20  for -- it was a document he had for the Hawaii entity, for

21  the Hawaii company.

22      Q.   Did he have a copy of the document there at the

23  dinner?

24      A.   No.

25      Q.   Did you know what document he was talking about?

                                23

1      A.   He had referred to it as a loan document.

2           Could you repeat that question so I can just

3  be accurate for you?

4      Q.   Yeah.  I just -- I just wanted to know if you

5  knew what he -- what document he was talking about in the

6  conversation.

7      A.   Yes.

8      Q.   What document did you understand him to be

9  talking about?

10     A.   I got this document or I received this document

11  through two different persons.  One was Tom Harvey and one

12  was Fernando Garcia.

13     Q.   When you say this document, you mean this

14  Exhibit 1?

15     A.   Exhibit 1, yes.

16     Q.   Okay.  And you believe you received it before

PK_SEC_000670

17  this meeting with -- with Mr. Kaiser?

18      A.  I had an electronic copy --

19      Q.  Uh-huh.

20      A.  -- again, forwarded to me from Fernando and

21  Mr. Harvey.

22      Q.  By electronic copy, do you mean like a PDF scan?

23      A.  A PDF scan, yes.

24      Q.  When did you receive a PDF scan of Exhibit 1 from

25  Mr. Harvey and Mr. --

                              24

1           What's his last --

2       A.  Garcia.

3       Q.  -- Garcia?

4       A.  Maybe four months ago.  I'd have to check my

5  computer to be certain, but I'd guess at four.

6       Q.  Would you have -- Was it sent to you in an

7  e-mail?

8       A.  Yes.

9       Q.  Where -- did Mr. Harvey and Mr. Garcia send you

10  two separate e-mails that each had this document attached?

11      A.  Yes.

12      Q.  Were they sent around the same time?

13      A.  Yes.

CONFIDENTIAL TREATMENT REQUESTED

14     Q.   Do you keep an electronic calendar or anything

15   that would -- or any kind of diary that might show the

16   date on which you had this dinner with Mr. Kaiser?

17     A.   No, to a calendar.  I don't keep a

18   calendar/diary.

19     Q.   Do you think there are any documents in your

20   possession that might show when this dinner with

21   Mr. Kaiser took place?

22     A.   Again, it wasn't a dinner specifically.  But I'd

23   be happy to look through my -- my computer to see if

24   there's anything that would --

25     Q.   Okay.


25

1     A.   -- date it.

2     Q.   But you believe it was after you had received a

3   copy of this document from Mr. Harvey and Mr. Garcia?

4     A.   Yes.

5     Q.   Did you bring a copy of the document with you to

6   the dinner with Mr. Kaiser?

7          I keep saying dinner.  Was it a dinner or a

8   lunch?

9     A.   It -- it was neither.

10     Q.   Or --

CONFIDENTIAL TREATMENT REQUESTED

11    A.   It was just a social gathering.

12    Q.   Okay.  Was it at a restaurant?

13    A.   Restaurant.

14    Q.   I thought you said restaurant.  I might have --

15    A.   Yeah, sure, yes.

16    Q.   -- misheard, but --

17    A.   Yes.

18    Q.   Okay.  So I forgot if you answered.  Did you

19  bring a copy of the document with you to the meeting?

20    A.   No.

21    Q.   Did you ask to meet with Mr. Kaiser to discuss

22  the document?

23    A.   No.

24    Q.   Did he ask to meet with you?

25    A.   Again, there was nothing specific regarding the

26

1  document, but we did discuss it.

2        I was sent the file from Garcia and Harvey

3  and I felt very unconvertible with some of the commentary

4  that came out of -- or after the e-mails.  And that

5  compelled me to be, you know, happy to speak with John.

6    Q.   Who was it -- Was there anyone else present at

7  this meeting other than you and Mr. Kaiser?

CONFIDENTIAL TREATMENT REQUESTED

PK_SEC_000673

8    A.  No.

9    Q.  Who first brought up the topic of the loan

10  document during this meeting?

11    A.  John.

12    Q.   And he asked your recollection, I think you said,

13  about the circumstances of the document.

14          Was there any other discussion about the

15  document?

16    A.  Hmm.  Other than anything that I could recall

17  related, I believe that was the extent of it.

18    Q.   When Mr. Harvey and Mr. Garcia e-mailed you this

19  document, is that the first time you had seen it since --

20  I mean, is that the first time you had seen it since --

21  If it was the same document that was signed in 2004, would

22  that have been the first time you had seen it since then?

23    A.  Yes.

24    Q.  Was there any other discussion that you had with

25  Mr. Kaiser during that meeting about the lawsuit that you

                              27

1  can remember?

2    A.  Again, I don't know if there was a lawsuit in

3  place.

4    Q.  Uh-huh.

CONFIDENTIAL TREATMENT REQUESTED

5    A.  That I can't make comment to.

6    Q.  Did Mr. Kaiser indicate that he had been involved

7  in the creation or the preparation of this document?

8    A.  I don't recall.

9    Q.  Did he say that he had been -- that he had kept

10  the document in his possession or in his files?

11    A.  Yes.

12    Q.  What do you remember him saying about that?

13    A.  He said he wished he would have brought a copy

14  with him.  And I said not to worry, because I've got a

15  copy which I received, again, from Harvey and -- and

16  Garcia, and that all I know is my signature is on it.

17  That's my signature.

18    Q.  Have you ever spoken with Tim Gaarn about this

19  document or about this lawsuit?

20    A.  No.

21    Q.  Do you know who Tim Gaarn is?

22    A.  I've heard the name before, yes.

23    Q.  Have you ever met him?

24    A.  I have not met him.

25    Q.  Have you ever spoken to him?

28

1    A.  I have spoken to him.

2    Q.   On the phone?

3    A.   Yes.

4    Q.   When was that?

5    A.   Maybe seven months ago, eight months ago, nine.

6    Q.   Did that have anything to do with this loan

7  agreement document or the lawsuit?

8    A.  No.

9    Q.   Have you spoken with Philip Kenner about this

10  loan agreement document, Exhibit 1?

11    A.   Yes.

12    Q.   I think you mentioned the three meetings that you

13  had.  Were there any other times when you spoke with him

14  about this document?

15    A.   There may have been.  I've never recognized the

16  significance of it until conversations with Harvey.

17    Q.   With Tom Harvey?

18    A.   Correct.

19    Q.   When was your first discussion with him about

20  this document?

21    A.   You know, I've said about four months ago.  And I

22  think -- you know, as I continue to try and recall, I

23  think that's still accurate.

24    Q.   Have you ever exchanged any written

CONFIDENTIAL TREATMENT REQUESTED

25   communications with anyone relating to this loan agreement

29

1   document:  e-mails, letters, anything like that?

2   A.  No.

3   Q.  Do you have in your possession any documents or

4   e-mails that refer to this loan agreement document?

5   A.  Just the ones I mentioned, from Harvey and

6   Garcia.

7   Q.  Do you know Ken Jowdy?

8   A.  Yes.

9   Q.  When did you first meet Ken Jowdy?

10   A.  Would have been either late 2003 or early 2004.

11   Q.  What were the circumstances under which you first

12   met him?

13   A.  It was an introduction -- telephone introduction

14   first off -- from a golf-industry person.

15   Q.  Have you ever been employed by or paid to provide

16   services for Mr. Jowdy or any of the companies he owns or

17   manages?

18   A.  Yes.

19   Q.  Which companies have you been -- have you been

20   employed by or provided services to that are owned by or

21   managed by Mr. Jowdy?

22    A.   There's many that exist, so specifically I think

23   it would be just Diamante Cabo San Lucas.

24    Q.   Is that a -- is that a corporation?

25    A.   I believe so.

30

1   Q.   Do you know?

2         Have you ever worked for a company called

3   Diamante Management?

4    A.   I did mention that there's several entities.  And

5   I couldn't qualify which one I was specifically with other

6   than Diamante Cabo San Lucas.

7         I'm familiar with the namesake Diamante

8   Management, yes.

9    Q.   So when you say Diamante Cabo San Lucas, that you

10  worked for Diamante Cabo San Lucas, are you referring

11  generally to that project rather than a specific --

12   A.   Yes.

13    Q.   -- legal entity?

14         Was the company you worked for a U.S.- or a

15  Mexico-based company?  Do you know?

16    A.   I believe it was a Mexico-based company.

17    Q.   What's that belief based on?

18    A.   Because I was a resident of Mexico, and the

CONFIDENTIAL TREATMENT REQUESTED

19   company existed in Mexico -- or the project, pardon me,

20   existed in Mexico.

21      Q.   Okay.  But you don't know whether the actual

22   entity that employed you and that paid your salary, you

23   don't know which actual entity that was; right?

24      A.   Again, I believe I was employed by a Mexican

25   company.

31

1      Q.   Were you paid in dollars or pesos?

2      A.   Dollars.

3      Q.   Who paid you?

4      A.   I don't know specifically the entity that paid

5   me, but I worked for Diamante Cabo San Lucas.

6      Q.   Were you paid by check or by cash?

7      A.   Initially check.

8      Q.   And then later cash?

9      A.   No, wire deposit.

10      Q.   Okay.  When you were paid by check, what

11   company's name was on the check, the paycheck?

12      A.   I remember an address of Danbury.

13      Q.   Danbury, Connecticut?

14      A.   Yes.

15      Q.   If you were paid in dollars rather than pesos,

PK_SEC_000679

16    why did you assume that it was a Mexican company that was

17    paying you?

18        A.   It's a very common practice to be paid in

19    dollars.

20        Q.   For Mexican companies to pay their employees with

21    dollars rather than pesos?

22        A.   Correct.

23        Q.   But other than your general belief that since you

24    were working in Mexico, you know, that you assumed it was

25    a Mexican company, did you have any basis for actually

32

1    knowing which entity employed you?

2        A.   I spent a lot of time with the human resource

3    manager in Cabo San Lucas.

4        Q.   Who was that?

5        A.   Her name was Luly Ruiz.  R-U-I-Z, I believe.

6            THE COURT REPORTER:  How about Louie?

7            THE WITNESS:  Luly.  L-U-L-Y.

8        Q.   BY MR. LAKE:  How much were you paid?

9            MR. AUGUSTINE:  I'll start objecting to

10    these questions.  It's beyond the scope of the deposition

11    as represented to me by Mr. Lake.  So I'll instruct my

12    client not to answer.

13    Q.   BY MR. LAKE:  Well, can you -- can you just give

14  me a general description of what you did for Mr. Jowdy's

15  company?

16    A.   I was involved in sales and marketing, promotion;

17  and director of golf operations.

18    Q.   Did you perform services in -- in -- right in

19  Cabo or somewhere else?

20    A.   In Cabo.

21    Q.   Was it in -- were you in an office every day or

22  what was the -- what did the job entail?

23    A.   Yes, in an office most days; on the site many

24  days.

25    Q.   In Cabo --

                                    33

1    A.   In Cabo, yes.

2    Q.   -- in both cases?

3         Who hired you for this job?

4         Well, let me back up a little.  Were you an

5  employee or a consultant of the company?

6    A.   An employee.

7    Q.   What is that understanding based on?

8    A.   That I spent considerable time in the office in

9  Cabo San Lucas.  That I interviewed potential employees

10   for the project in Cabo San Lucas.  That I participated in

11   any staff meetings that only employees were invited to.

12   That my --

13          Generally, that's -- that's my --

14   Q.   Okay.

15   A.   -- my assumption.

16   Q.   Did you have an employment contract?

17   A.   I had an employment agreement with Mr. Jowdy.

18   Q.   Was that a written agreement?

19   A.   Was not.  Wanted it to be, but never happened.

20   Q.   Were taxes withheld from your check?

21   A.   I believe so.

22   Q.   When did you start work for Mr. Jowdy's company?

23   A.   Early 2005.

24   Q.   And how long did you work for him?

25   A.   Through 2008.

                              34

1   Q.   Who hired you?

2   A.   Ken Jowdy.

3   Q.   Did you work for or get paid by -- by someone --

4   by anyone else during this same time period?

5   A.   I don't understand the question.

6   Q.   During the time period that you worked for

7  Mr. Jowdy, were you also getting -- were you also working

8  for or getting paid by another company or by someone else?

9      A.   My employment started in I believe March of '05.

10  And I received my first payment from the company

11  approximately one year later.  So during the time period

12  that was delinquent, that I didn't receive any payment

13  from the company, yes, I would have received other.

14      Q.   From -- from what source?

15      A.   I own a real estate company in Cabo as well.

16      Q.   Was there -- were there any other companies or

17  entities that you worked for during the time period that

18  you worked for Mr. Jowdy or that you were paid by?

19      A.   Just my own entity.

20      Q.   During the time that you worked for Mr. Jowdy's

21  company up through February of 2008, were you ever paid or

22  employed by Mr. Kenner?

23      A.   Repeat the time frame for me.

24      Q.   The same time frame that you were working for

25  Mr. Jowdy's company.  During that entire time period,

35

1  which I think you said ended in 2008.

2          Is that right?

3      A.   2008, yes.

4    Q.   During that time period, were you ever paid by or

5   employed by any company owned or managed be Mr. Kenner?

6    A.   Yes.

7    Q.   What company was that?

8    A.   It was a Hawaiian-based company.

9    Q.   Do you remember what it was called?

10    A.   I do not.

11    Q.   When was that?

12    A.   Would have been -- I don't recall specifically,

13   but -- but I was -- I was definitely forced to look at

14   alternate income sources.

15          You know, maybe 2005.

16    Q.   How long did you work for Mr. Kenner's company?

17    A.   For that specific deal, it would have lapsed --

18   it would have lapsed -- maybe a start and finish of a

19   total of two months.

20    Q.   Around what -- when was that?

21    A.   I don't recall.

22    Q.   Do you think it might have been around June of

23   2006?

24    A.   Yes, it may have been.

25    Q.   How much did Mr. Kenner pay you for your

36

1   two-month employment with his company?

2       A.   Again, I'm not certain on if it was exactly two

3   months.

4       Q.   Okay.  Or however long it was.

5       A.   Right.  Just a little bit more than 100,000.

6       Q.   And you believe it was for a few months?

7            I mean, I know you don't know exactly.  But

8   does that sound like the right ballpark?

9       A.   What was the ballpark?  What was the question?

10      Q.   How long -- about how long were you employed by

11  Mr. Kenner's company?

12      A.   Hard to put a time frame to it because it didn't

13  have a start and a finish day.

14      Q.   What do you mean by that, that it didn't --

15      A.   I wasn't -- it wasn't a scheduled start on

16  Monday, finish on Friday, start on Monday, finish on

17  Friday equals -- it wasn't that arrangement.

18      Q.   What services were you providing for Mr. Kenner's

19  company?

20      A.   Services related to finance.

21      Q.   Relating to a project in Hawaii?

22      A.   Yes.

23      Q.   What does that mean, services related to finance?

                    PK_SEC_000685

24          MR. AUGUSTINE:  Well, I'm going to -- again,

25   I let -- I can understand why you need to get witness

                              37

1   bias, I'll start to --

2          THE COURT REPORTER:  Witness bias?

3          MR. AUGUSTINE:  Bias.

4          I'll start to -- I'll start to object on

5   this on the grounds that it's beyond the scope of the

6   deposition and what the Court ordered, as far as going

7   down this road.  So I'll make those objections.

8     Q.   BY MR. LAKE:  Well, were you employed by

9   Mr. Kenner full-time, your employment with -- I'm sorry,

10   with Mr. Jowdy?  Was your employment with Mr. Jowdy a

11   full-time job?

12     A.   It wasn't defined as that.

13     Q.   Did you consider it to be a full-time employment,

14   a full-time job?

15     A.   Yes.  But, again, because it took a year to get

16   paid from the company, I had to seek alternate income

17   sources.  And -- Yes.

18     Q.   Did Mr. Jowdy know that you were working for

19   Mr. Kenner at the same time you were working for him?

20          MR. HARPER:  Object to form.

**CONFIDENTIAL TREATMENT REQUESTED**                    **PK_SEC_000686**

21          MR. AUGUSTINE:  I'll object to the form.

22          MR. HARPER:  And I'll join in

23   Mr. Augustine's objection.

24          MR. AUGUSTINE:  Yeah.  And I'll --

25          MR. HARPER:  The bias you're looking for is

                              38
1   established.  Let's move on to something related to the

2   scope of this deposition.

3          MR. AUGUSTINE:  Absolutely.  And I'll

4   instruct the witness not to answer.

5          You can notice his deposition for another

6   purpose if you'd like to later, but you're probably going

7   to have to subpoena him for that.

8          MR. LAKE:  Okay.

9    Q.  BY MR. LAKE:  Do you have any personal animosity

10   towards Mr. Jowdy?

11    A.  I have a couple lawsuits that I've been forced to

12   move forward with.

13    Q.  Okay.  I'll ask you about that in a minute.

14          But would you say that you have personal

15   animosity towards him?

16    A.  No.

17    Q.  Tell me about the lawsuits that you've -- that

18   you have against Mr. Jowdy.

19      A.   I have a labor lawsuit for wrongful termination

20   and I have a criminal complaint that's filed for moneys

21   not returned to me.

22      Q.   Where are those actions pending?

23      A.   In Mexico.  My place of residence.

24      Q.   When were those actions commenced?

25           Let's start with the labor -- the labor one.

                                39

1   That's a civil action?

2      A.   I don't know.  I'm not a lawyer, so I don't know

3   if it's civil or --

4      Q.   Okay.

5      A.   It would be in '08 for the labor.

6      Q.   And when was the criminal action commenced?

7      A.   The criminal had to get filed twice, due to the

8   first time I was told that the -- the complaint was

9   tampered with.

10     Q.   What does that mean?

11     A.   It was an incomplete file, so I had to file it

12   twice.  So I'm having a hard time coming up with the date

13   that it was filed.

14     Q.   Was it within the last year, do you think?

15    A.   Yes.  Well, the last 12-month period, sure.

16    Q.   Are we talking about the civil -- I mean, the

17  labor case or the criminal?

18    A.   The criminal.

19    Q.   Do you believe it was within the last few months?

20    A.   It's an ongoing process.  I think it was much,

21  much before that.

22    Q.   Do you believe it was filed in 2008?

23    A.   The labor.

24    Q.   The labor one.  What about the criminal one?  Do

25  you believe that was in 2008 or 2009?

40

1    A.   Again, I believe within the last 12 months.

2    Q.   Did Mr. Kenner provide any testimony or affidavit

3  in support of your labor lawsuit against Mr. Jowdy?

4    A.   Yes.

5    Q.   What did he provide in support of your lawsuit?

6    A.   Awareness of my employment; awareness of my

7  agreement with Mr. Jowdy.

8    Q.   Was this like a written declaration or an

9  affidavit that he submitted or was it like a testimony,

10  sworn testimony?

11    A.   I'm not certain.  I know the lawyer that handled

12   the case contacted him.  So whether it's specifically an

13   affidavit or --

14       Q.   Okay.

15       A.   I'm not --

16       Q.   You just don't know?

17       A.   I don't know.

18       Q.   What about the criminal action; did Mr. Kenner

19   submit an affidavit or testimony in support of your

20   criminal action against Mr. Jowdy?

21       A.   I don't recall on that one.  I know by law I

22   was -- I was required to provide a couple people to

23   testify, and I don't recall if in that case he's on it.  I

24   don't recall.

25       Q.   What are the allegations of the criminal action

                                41

1   against Mr. Jowdy?

2       A.   In 2005 I had accumulated some expense

3   reimbursables with the company that have not been paid

4   back.

5       Q.   What's the amount at issue in the criminal

6   action?

7       A.   Criminal is I believe 300,000.

8       Q.   And these were for expenses incurred while you

9    were an employee of his company?

10      A.   These are expenses while I had an agreement with

11   Ken Jowdy, pending payment as an employee with Mr. Jowdy.

12           Because, again, I believe my first payment

13   from the company was in 2006.  But my agreement started in

14   2005, approximately April 2005.

15      Q.   The -- I guess I'm confused.  In the criminal

16   action did you say it was for reimbursement of expenses?

17      A.   Company-related expenses --

18      Q.   Okay.

19      A.   -- yes.

20      Q.   In the labor -- in the labor lawsuit, how much is

21   at issue in that lawsuit?

22      A.   I'm sorry?

23      Q.   In the labor action that you filed, how much is

24   at issue in that action?

25      A.   How much?  I don't understand the question.

                              42
1     Q.   How much money is involved in -- in your claim in

2    that case?

3     A.   The exact amount of our -- my agreement with

4    Mr. Jowdy.

5     Q.   Do you remember in the ballpark of how much it

**CONFIDENTIAL TREATMENT REQUESTED**

6   is?

7      A.   It was a multiyear agreement, and $2 million.

8      Q.   Did you receive payment as a commission based on

9   the purchase of the Diamante Cabo San Lucas property?

10     A.   Repeat that for me.

11     Q.   Did you receive any compensation as a commission

12   based on the purchase of the Cabo San Lucas property?

13     A.   My real estate company did, yes.

14     Q.   How much was that?

15     A.   I don't recall.  In the neighborhood of 200,000.

16   I don't recall the number exactly.

17     Q.   Okay.  Are you aware of anyone having filed or

18   attempting to instigate a criminal action against

19   Mr. Jowdy in the U.S. or Mexico other than the one that

20   you instigated?

21     A.   Mine is in Mexico.  And you're asking in the

22   U.S.?

23     Q.   The U.S. or Mexico.

24     A.   In the U.S., just -- I'm aware of the -- the --

25   pardon me, how do you say it?  How did you say it?  The

43

1   lawsuits?  Did you say lawsuits?

2      Q.   I'm asking about a criminal action.

3    A.   I'm aware of criminal action in the U.S., yes.

4    Q.   What action is that?

5    A.   I don't know the specifics of it other than what

6  I read on the Internet.

7    Q.   Against Mr. Jowdy?

8    A.   Some friends of mine gave me links to some news

9  releases.  And I don't know if I read them close enough to

10  identify if Mr. Jowdy was listed.  I assume so, because

11  that's the name that was given to me.

12    Q.   And these were criminal actions?

13    A.   Again, I'm not a lawyer.  I don't know criminal

14  versus other.  But I know there was a lot of news articles

15  related to issues in the U.S.

16    Q.   Okay.  Are you aware of any -- other than the

17  actions you filed, are you aware of any other criminal

18  actions that have been filed or instituted against

19  Mr. Jowdy in Mexico?

20    A.   Yes.

21    Q.   What's -- what are you aware of?

22    A.   I'm not sure if I understand what am I aware of.

23    Q.   Well, what -- You said you are aware of a

24  criminal action filed against Mr. Jowdy in Mexico; is that

25  right?

CONFIDENTIAL TREATMENT REQUESTED

44

1    A.   Yes.

2    Q.   Which action is that?

3    A.   I'm not sure how the action is described.  But

4  I'm aware that there is a group of investors that have an

5  issue.  I don't know if there's actually a lawsuit in

6  place or if it's pending.

7    Q.   How do you know about this criminal action?

8    A.   The lawyer that is working on the action has

9  asked me some questions regarding.

10   Q.   What -- what lawyer is that?

11   A.   It's a Mexican attorney.  His name is

12  Francisco -- I can't pronounce the last name correctly,

13  but I believe it's B-A-R-R-A-S.

14   Q.   Do you have any involvement -- is this

15  Mr. Barras, or whatever -- however you pronounce it --

16   A.   That's fine.

17   Q.   -- is he also your attorney?

18   A.   He's representing me on my criminal case, yes.

19   Q.   Who brought this -- this other criminal case that

20  you're referring to?

21        You said it was some investors.  Do you know

22  their names?

23     A.   There's several of them.  I wouldn't be able to

24   repeat the names.

25     Q.   Do you know any of their names?

45

1     A.   If you had something that showed their names, I

2   could probably say yes or no.

3     Q.   Okay.  But can you right -- sitting now, can you

4   remember any of the names of the people who brought this

5   action?

6     A.   No.

7     Q.   Have you provided any -- have you had any

8   involvement in this criminal action?

9     A.   I was asked by the lawyer to give a -- again, I

10   don't know if you call it a testimony or a statement, yes.

11     Q.   And did you -- did you give a statement?

12     A.   Yes.

13     Q.   Was it a statement under oath?  Like a sworn

14   statement?

15     A.   I don't recall.

16     Q.   Are you aware of Mr. Kenner having instituted a

17   criminal action against Mr. Jowdy in Mexico?

18     A.   I'm not sure if it's Mr. Kenner or, as I

19   mentioned earlier, investors.

20     Q.   Do you -- in -- you're -- you're talking about

21   this same criminal action we've been discussing?

22     A.   I don't know the status of that criminal action;

23   if it's actually in place, pending to be in place.  But I

24   was asked to give a statement, yes.

25     Q.   And you don't know whether Mr. Kenner is one of

46

1   the people who brought this criminal action or not?

2     A.   Repeat that.

3     Q.   Is Mr. Kenner one of the individuals who brought

4   this criminal action?

5     A.   Yes.

6     Q.   When did you provide this statement or sworn

7   testimony?

8     A.   Maybe eight months ago, nine months ago.

9     Q.   Did you provide only a single -- was it only a

10   single instance where you provided sworn testimony or

11   whatever this -- whatever we call this witnessing?

12     A.   I may have done it more than once.

13     Q.   When was the other -- do you remember any other

14   time when you did that?

15     A.   There was an initial request for me to give

16   testimony, which I gave, approximately -- I think it was

17  about nine months ago.

18    Q.  Okay.

19    A.   And then I was requested by the same lawyer to do

20  it again several months ago.

21        MR. HARPER:  Brian, I'm going to ask again

22  that we get to something pertaining to the agreement.

23        MR. LAKE:  All right.

24        MR. HARPER:  This line of questioning was

25  way off base.

                              47

1    Q.  BY MR. LAKE:  Was Mr. Kenner present when you

2  gave that statement?  Either of the two statements you're

3  referring to?

4    A.   Present?  Define present for me.

5    Q.  Was he there with you?

6    A.   Not sitting with me when I did my testimony, no.

7    Q.  You mean, he wasn't in the room with you?

8    A.   Yes, correct.

9    Q.  Well, was he in the building?  Or in the --

10    A.   While I was giving testimony?

11    Q.   -- area?

12    A.   Yeah.

13    Q.   I mean, was he there with you?

14    A.  He wasn't with me.  He was -- Where was he?  On

15  the second testimony, he was not with me, but I believe he

16  was -- How did you say it?  Not in the building, but

17  somewheres?

18    Q.  Around.

19    A.  Yeah.

20    Q.  Are those the only two times that you provided

21  testimony for this action, was the eight months ago and

22  then the second time a few months ago?

23    A.  Yes.

24    Q.  Did Mr. Kenner ask you to provide testimony on

25  those two occasions?

                                48
1    A.  The lawyer that was working the case and --

2  again, for the investors, had asked me to.

3    Q.  Was that the lawyer who was representing

4  Mr. Kenner also?

5    A.  I believe so.  I'm not certain how the structure

6  is, but, yes.

7          MR. LAKE:  All right.  Can you mark this,

8  please.

9          (Deposition Exhibit No. 2 was marked for

10  identification by the court reporter.)

11    Q.   BY MR. LAKE:  Mr. Gaudet, I'm showing you a

12    photograph that was taken on June 15th of this year, a few

13    weeks ago.

14    A.   Uh-huh.

15    Q.   Do you recognize any of the people in this photo?

16    A.   Kind of a blurry image.

17    Q.   It is.

18         Well, I'll represent to you that this is a

19    photograph taken of you and Mr. Kenner outside the

20    Attorney General's Office in Los Cabos on June 15th.

21         Does that refresh your recollection, that

22    you in fact were swearing -- or giving sworn testimony in

23    support of Mr. Kenner's criminal action just a few weeks

24    ago?

25    A.   We were -- I gave my testimony, as I mentioned

49

1    earlier, one about nine months ago and one about four

2    months ago.  And I was requested by the attorney to come

3    back to the office to do -- again, I don't think it was a

4    brand-new testimony, but it was --

5         The -- the attorney had mentioned to me that

6    someone had paid off -- what do you call it -- a

7    government official, so they had to do the filing again.

8    Q.   Who paid off a government official?

9    A.   I don't know.  Somebody paid off a government

10   official, so the initial filing had to be redone.  So the

11   two filings that I said I had done had to be redone.

12   Q.   And you're talking now about the criminal

13   complaint brought by Mr. Kenner and some other investors?

14   A.   I believe that's what it was, yes.

15   Q.   And that someone had paid off a government

16   official in connection with the filing of that criminal

17   action?

18   A.   That's what I was told, yes.

19   Q.   Who told you that?

20   A.   My attorney.

21   Q.   Did Mr. Kenner discuss that with you?

22   A.   Yes.

23   Q.   What did he tell you?

24   A.   He told me he didn't understand how something

25   like that could happen.

50

1    Q.   Did he tell you who paid off this government

2    official?

3    A.   No.

4    Q.   Did he -- does -- do you -- did he mention that

5   he knew who paid off the government official?

6   A.   Who's -- who's -- who mentioned?

7   Q.   Mr. Kenner.

8   A.   No.

9   Q.   Did any of the -- did anyone there mention who is

10   alleged to have paid off this government official?

11   A.   They had just mentioned -- let's see, my attorney

12   mentioned --

13       MR. AUGUSTINE:  I'll caution you not to

14   testify to anything that your attorney in Mexico told you.

15   That's attorney/client privilege.

16       THE WITNESS:  Thank you.

17       MR. AUGUSTINE:  So if you got the

18   information from some other source, you can testify to it.

19   But if it came from your attorney, I would instruct you

20   not to answer -- caution you not to answer.

21       THE WITNESS:  Thank you.  It came from my

22   attorney.

23   Q.   BY MR. LAKE:  Did anyone explain to you why they

24   had to refile or -- is that what you said, they had to

25   refile the action?

51

1   A.   In legal terms, I don't know what they called it.

2  But they had to -- to reenter the file.

3      Q.   So were you in fact, then, in Cabo a few weeks

4  ago, on June 15th?

5      A.   I believe so.  I'm a resident of --

6      Q.   Okay.

7      A.   -- Cabo.

8      Q.   Do you know what the status of that criminal

9  action is now?

10      A.   No.

11      Q.   Do you know whether the government is bringing

12  any charges against anyone as a result of this claim that

13  someone paid off a government official?

14      A.   The attorney is working on determining what's the

15  next step.

16          MR. LAKE:  Do you want to take a break or do

17  you want to keep going?

18          THE WITNESS:  I would like a -- a water

19  would be great.

20          MR. LAKE:  All right.

21          THE WITNESS:  So, yeah.

22          MR. LAKE:  Why don't we take a break.

23          THE VIDEOGRAPHER:  We're off the record at

24  10:18.

**CONFIDENTIAL TREATMENT REQUESTED**                           **PK_SEC_000702**

25          (Recess.)

52

1          THE VIDEOGRAPHER:  We're back on the record

2   at 10:28.

3       Q.   BY MR. LAKE:  Mr. Gaudet, you mentioned this

4   employment you had with Mr. Kenner's company for the

5   couple of months.  Other than that -- which we've already

6   discussed -- have you ever received any other payments

7   from Little Isle IV or Ula Makika?

8       A.   The agreement that I had with Mr. Jowdy was to

9   include any related income.  So he encouraged me to

10   receive income from other sources.

11      Q.   Which agreement are you talking about?

12      A.   My labor agreement with the company, Diamante.

13      Q.   This was an oral agreement, you said?

14      A.   Correct.

15      Q.   Okay.  And what was -- what was the term of the

16   oral agreement you just referred to?

17      A.   One of the terms --

18      Q.   Okay.

19      A.   -- was that Mr. Jowdy wanted it to include income

20   from -- income from related sources, related sources or

21   other -- other sources.

22    Q.  I'm not sure I know what you mean by that.  He

23   wanted it to include income from other sources?

24    A.  He wanted our agreement to include moneys from

25   other sources.

                                53

1         Vague, yes, I agree.

2         THE COURT REPORTER:  I'm sorry, say that

3   again.  They, I guess?  Or vague?

4         THE WITNESS:  Vague.

5         THE COURT REPORTER:  Vague, I guess?  Okay.

6         THE WITNESS:  Vague.

7    Q.  BY MR. LAKE:  Do you mean to say that he

8   encouraged you to work for other people at the same time

9   he was working for you?

10        MR. AUGUSTINE:  Objection.  I think --

11        THE WITNESS:  Yeah.

12        MR. AUGUSTINE:  -- you misspoke on that

13   question.  You said working for you, rather --

14        MR. LAKE:  Yeah, okay.

15        MR. AUGUSTINE:  -- than working for

16   Mr. Jowdy.

17    Q.  BY MR. LAKE:  I'm trying to understand your

18   previous answer.  Do you mean to say that Mr. Jowdy was

PK_SEC_000704

19   encouraging you to work for other companies at the same

20   time you were working for his company?

21       A.   Not that specific.  Other sources.  He wanted it

22   to be other sources.  And I think he felt the pressure to

23   fulfill the agreement.

24       Q.   Okay.  So when you say that -- when you said that

25   the agreement was to include income from other sources,

54

1   what you mean is that he told you that he didn't mean to

2   prevent you from getting income from other sources?

3       A.   Again, he wanted our agreement -- my agreement

4   with Diamante and himself -- to not be limited to income

5   received from Diamante, but to include other sources.

6       Q.   Do you mean that he would pay you income from

7   other sources?

8            By that I mean Mr. Jowdy?

9       A.   Yeah.  No, not limited to, but, yeah, possible.

10   Other sources being a big --

11       Q.   I'm struggling to understand what it is you're

12   trying to express.

13       A.   Okay, I'll repeat.

14            My agreement with Mr. Jowdy was expressed by

15   him that he wanted moneys that I made from other sources

16  to be included in the -- in the agreement.

17          And it was after some time, because I

18  believe he was feeling that it might be difficult to

19  fulfill the agreement.

20      Q.  So when you say included in the agreement, does

21  that mean that income you earn from other sources would

22  count against the money he was obligated to pay you under

23  the agreement?

24      A.  I have to make an assumption on that as well, or

25  during that time frame.  My eyes looked the same as yours,

55

1  confused, because it was -- it was a very --

2          He requested it to be a broad agreement,

3  that I would receive moneys from other sources.  I

4  assumed, and I don't know if he assumed that, but sources

5  related to what he's dealing with.  Or company --

6  company-related sources, I suppose, would be fair.

7      Q.  Okay.

8      A.  Again, it didn't formally get done in writing.

9  It was a verbal agreement and I agreed to the terms.

10      Q.  Do you mean -- I mean, did you understand him to

11  mean that it was okay for you to get money from other

12  sources?  Is that what you mean by that?

CONFIDENTIAL TREATMENT REQUESTED

13          I'm trying to understand what you -- what

14  you thought he was agreeing to do.  Was he saying, it's

15  okay for you to go get money from other sources at the

16  same time you are working for me?  Or was he saying, if

17  you do get money from other sources while you're working

18  for me, that counts against the money I am obligated to

19  pay you?

20    A.   Say that again.  That was -- I think that was

21  well said, but say it again for me, please.  Repeat that.

22          MR. AUGUSTINE:  Why don't you read it back.

23          THE WITNESS:  Yeah, read it back.  That was

24  a --

25          MR. LAKE:  Why don't you go ahead and read

                                    56

1  it back.  I don't know if I can say it again.

2          (The requested portion of the record was

3  read back by the court reporter.)

4          MR. HARPER:  I'll object to the form of that

5  question.

6          MR. LAKE:  Let me try this another way.

7          THE WITNESS:  Yeah, thank you.

8    Q.   BY MR. LAKE:  How much did he promise to pay you

9  in this agreement?

CONFIDENTIAL TREATMENT REQUESTED          PK_SEC_000707

10          MR. HARPER:  Object to form.

11          THE WITNESS:  Four years, two million.

12     Q.   BY MR. LAKE:  Okay.  Was he saying that if, while

13   you're working for me, you go and earn $500,000 from

14   another source, that means I only have to pay you

15   $1.5 million?

16          MR. HARPER:  I'm going to object.  We're not

17   here about an employment dispute between Mr. Gaudet and

18   Mr. Jowdy.  Let's move on.

19          MR. LAKE:  I'm just trying to understand

20   the -- what he's -- what he's testifying.

21          MR. HARPER:  Well, you can understand it if

22   you represent Mr. Jowdy in an employment dispute between

23   Mr. Gaudet and Mr. Jowdy.

24          THE WITNESS:  Put on the record, again, I

25   felt that he -- he was becoming very concerned that he was

57

1   going to fulfill our agreement.  So I think he was looking

2   for many ways to say here's ways that we can make our

3   agreement be fulfilled.

4     Q.   BY MR. LAKE:  Okay.  Did Mr. Jowdy know you had

5   this other agreement with Mr. Kenner?

6          MR. HARPER:  Object to form.

CONFIDENTIAL TREATMENT REQUESTED

7            MR. AUGUSTINE:  I'll object, too.  I'll

8    instruct the wit -- my client not to answer because

9    it's -- If you can tie his employment to this document,

10   then I'll -- I'll let him answer the questions.  But he's

11   already testified that his employment postdated this

12   document.  So --

13           MR. HARPER:  The scope of the deposition is

14   the authenticity of the document.  So far, I don't know if

15   you've asked a single question about the authenticity of

16   the document.

17           MR. AUGUSTINE:  Right.  I'll be happy to on

18   cross-examination.

19           MR. LAKE:  Let's mark this next exhibit.

20   Q.  BY MR. LAKE:  You lived in Cabo in December 2004;

21   is that right?

22   A.   December 2004, correct.

23           MR. LAKE:  Okay.  Mark that.

24           (Deposition Exhibit No. 3 was marked for

25   identification by the court reporter.)

                           58
1            MR. LAKE:  What number is this?

2            THE COURT REPORTER:  3.

3    Q.  BY MR. LAKE:  Okay.  I've marked -- we've marked

4    as Exhibit 3, it's just a blank calendar that shows the

5    months of November 2004 and December 2004.  I just think

6    this might be helpful as we go through the time frame and

7    talk about the -- what happened during this critical

8    weekend.

9        A.   Yes.

10       Q.   So we can just kind of have that here.

11            Tell me what you remember about this event

12   that took place in early December of 2004.

13       A.   At the time I was employed by a company named

14   Querencia, which is the location of where I met -- first

15   met Mr. Jowdy.

16       Q.   Querencia is a place?

17       A.   Is a golf/real estate project in Cabo San Lucas.

18            We had spent several -- or much time

19   together from our initial meeting.  And at some time in

20   probably October or November Mr. Jowdy invited me to

21   attend a golf function in Cabo.  The golf function was to

22   be a promotion for a project that he is an owner of in

23   northern Baja, Mexico, and a project that he was hopeful

24   to be an owner of in Cabo.

25            The event was primarily a golf event in a

PK_SEC_000710

59

1   very social-like atmosphere.  In other words, it was a

2   fun-natured golf event that had related social.

3         So I was invited to attend this event in

4   December, which was labeled Diamante Cup.  The event was

5   to take place the first weekend of December.  First

6   weekend, last week of, plus or minus.

7         I recall, because I was shared itineraries

8   and schedules, that there was several people to arrive to

9   the area, Cabo, I believe sometime in the first week of

10  December, and golf was to -- Well, it was going to start

11  off with a welcome reception and golf to follow,

12  et cetera.

13    Q.   Okay.  Were you employed by either Mr. Kenner or

14  Mr. Jowdy at that time?

15    A.   I was not.

16         MR. LAKE:  Okay.  Let's mark this.

17         (Deposition Exhibit No. 4 was marked for

18  identification by the court reporter.)

19         MR. LAKE:  This is 4?

20         THE COURT REPORTER:  Yes.

21    Q.   BY MR. LAKE:  Okay.  Mr. Gaudet, I'm handing you

22  Exhibit 4, which is a sort of agenda for something called

23  the Annual Diamante Cup 2004, Diamante Del Mar.  And I

**CONFIDENTIAL TREATMENT REQUESTED**

24   think this is the same event that you were just

25   describing.

60

1          Is that right?

2      A.   I believe I recognize that, yes.

3      Q.   Okay.  Do you recall having seen this -- this

4   agenda before?  Or one like it?

5      A.   Yes, one like it.

6      Q.   Okay.  Go ahead and take a look and scan through

7   it here and see if you think that this refreshes your

8   recollection or if this looks like it was -- may have been

9   an accurate description of what happened that weekend.

10     A.   Yes.

11     Q.   Were you invited to -- to this weekend -- I don't

12   know if guest is the right word.  But you were sort of

13   invited as a guest rather than as an employee that was

14   tasked with performing some specific services?

15     A.   I guess, yes.  As an employee soon to be.

16     Q.   An employee of?

17     A.   Employee of Diamante soon to be.

18     Q.   Okay.  Did -- had Mr. Jowdy indicated to you that

19   you were soon to be an employee of Diamante?  Is that what

20   you meant?

21    A.  We had discussed several times of when the right

22  opportunity would be for me to be a formal employee of

23  Diamante.

24    Q.  A form -- did you say former?

25    A.  Former.  Not former.  I said formal.

61

1    Q.  Oh, formal.  Okay.

2    A.  Yes, to be an employee of.

3    Q.  So were you asked to do anything during this

4  weekend or were you just kind of there to enjoy the -- the

5  celebration?

6    A.  I wasn't given a task list specifically, but I

7  was more of a -- I would have been represented as more of

8  an employee than a guest, although everything that I was

9  participating in was more guest oriented.

10    Q.  Uh-huh.  So you would kind of mingle with the

11  guests and talk -- talk up the project and things like

12  that?

13    A.  Golf is my background, so, you know, I had a very

14  easy opportunity to speak to many of the guests.

15    Q.  Okay.  And Diamante Del Mar, is that the project

16  in northern Baja that you were referring to?

17    A.  I never referred to any project, so I don't

18   understand the question.

19   Q.   Or the -- I think you mentioned there was a golf

20   course in northern Baja.

21   A.   Ah, yes.

22   Q.   Okay.  Is that Diamante Del Mar?

23   A.   Yes.

24   Q.   Okay.

25   A.   Ken had taken me up there to visit that site,

62

1   that project.  So, yes, that's Diamante Del Mar in

2   northern Baja, Mexico, yes.

3   Q.   Okay.  So it was the -- would it be fair to say

4   that sort of the primary goal of this weekend was to

5   promote that project because the Cabo project wasn't

6   really --

7   A.   In my belief it was double-edged for sure.

8   Because there was a couple sites being considered in Cabo

9   to be the future Diamante Cabo San Lucas.

10   Q.   Had a specific site been selected already -- or

11   purchased in Cabo at that time?

12   A.   Let me try and recollect.  Ken had pursued

13   ownership in the project that I was formerly with,

14   Querencia.  That pursuit went on for several months before

15   this particular event.

16          Subsequently, the deal did not happen and

17   another property was being looked at and negotiated on in

18   the region.

19          So I recall that in December of 2004 that

20   the excitement was not only related to Diamante Del Mar in

21   northern Baja, excuse me, but also a hopeful Diamante

22   project in Cabo.

23   Q.   In December 2004 Mr. Kenner and Mr. Jowdy did not

24   live in Cabo; is that right?

25   A.   They had a house.  I don't know who the owner of

                                    63

1   the house was, but they had a house.  There was a house.

2   Q.   Okay.  Did you understand that they were flying

3   in to Mexico for the purposes of this weekend from the

4   U.S. or --

5   A.   Who is they?

6   Q.   I'm sorry, Mr. Kenner and Mr. Jowdy.

7   A.   For certain Ken, yes.

8   Q.   Okay.  But for Mr. Jowdy, did you really know at

9   all the --

10   A.   For Ken Jowdy.

11   Q.   Oh, for Ken Jowdy?

12    A.   For -- Yes.

13    Q.   And for Mr. Kenner, did you know anything about

14   his travel plans?

15    A.   No.

16    Q.   Did you know specifically when Ken Jowdy would be

17   arriving and departing?  I mean, did you actually have a

18   copy of his itinerary?

19    A.   No.

20    Q.   Do you know when Mr. Kenner arrived in Mexico for

21   this weekend?

22    A.   No.

23    Q.   During the events on this agenda --

24        Well, let me ask this.  When is the first

25   time during this weekend that you remember seeing

                                64

1   Mr. Kenner?

2    A.   Hmm.  Is it difficult for everybody to go back

3   five years?

4    Q.   It is.  It is.

5    A.   Okay.  Just checking.

6    Q.   And if you can't remember, that's fine.  I just

7   wanted to know if you could remember.

8    A.   I don't recall.  But if I do, I'll certainly put

**CONFIDENTIAL TREATMENT REQUESTED**

**PK_SEC_000716**

9   that out there.

10   Q.   Okay.  Do you remember the first time during this

11   weekend when you saw Mr. Jowdy?

12   A.   You know, I was in and out so often because,

13   again, I was still employed by Querencia.  So when I had

14   free time, I -- I -- I recall visiting the golf course.

15        So if I go back to the schedule -- I can't

16   confirm if I had seen Mr. Jowdy on the Wednesday per the

17   schedule, but I recall -- I recall visiting the golf

18   course that they played at on more than one occasion.  So

19   I think, again, by virtue of the schedule, probably

20   Thursday.  But more than likely, because of how my

21   invitation was, I was probably at the --

22        Tomatoes restaurant, outside terrace.  I'm

23   just -- I'm just looking at the location of the event the

24   first night.  Outside terrace near Tomatoes.

25        I may have been at the evening social on

65

1   Wednesday, but I don't recall that.  I was definitely at

2   the golf course the next day.  I did make a visit to the

3   golf course.  I'm good friends with all the people that

4   run the -- the golf facilities down in the region.  Well,

5   in particular the -- where the golf course -- where the

6    golf event was held.  So I definitely had gone to the golf

7    course.  That would have been the first time.

8        Q.   Okay.  We're going to talk a minute about the

9    Friday evening get-together at the house.

10       A.   Okay.

11       Q.   But first I want to ask you, do you remember --

12   prior to that Friday-evening gathering at the house, do

13   you remember seeing Mr. Jowdy and Mr. Kenner together

14   prior to that time?

15       A.   No.

16       Q.   Okay.  This get-together on Friday night, on the

17   agenda it shows -- looks like 7:00 p.m. dinner at Casa de

18   Diamante.  What is Casa de Diamante?

19       A.   Casa Diamante would be the house that -- at the

20   time I didn't know whose house it was, whether it was

21   Mr. Jowdy's, the company.  So it was -- I was -- I was

22   assuming that it was Ken's house --

23       Q.   Okay.

24       A.   -- in Cabo.

25       Q.   The people who were coming down for this event,

                              66

1    were they staying at this house or were they staying at a

2    hotel?

3    A.  I believe both.

4    Q.  Okay.

5    A.  The house is --

6    Q.  There were a lot of people, I guess.

7    A.  The house is a large house.

8    Q.  Uh-huh.

9    A.  Has seven bedrooms.  And I believe that the house

10   was full, so -- And there were also guests staying at the

11   Sheraton hotel.  So both.

12      Q.  Okay.  Were there guests staying at any other

13   hotel that you knew of?

14      A.  I assume so, yes.

15      Q.  Did you know where Mr. Kenner was staying?

16   Whether he was staying at the house or at a hotel?

17      A.  No.

18      Q.  Did you know where Mr. Jowdy was staying?

19      A.  I assume at the house.

20      Q.  Okay.  But you didn't know for sure?

21      A.  I was -- I believe the house was Mr. Jowdy's, so

22   I believe he had a room in the house.

23         Actually, I know which room it was.

24      Q.  All right.  Describe for me the scene or what was

25   going on at the house that evening, on Friday,

CONFIDENTIAL TREATMENT REQUESTED

67

1  December 3rd.

2      A.   Friday.

3      Q.   Were you there at the house that evening?

4      A.   Yes, I did get to the house.

5      Q.   When did you get there, if you remember?

6      A.   Hmm.  It would have been sometime in the early

7  evening.

8      Q.   Was it still light when you arrived?

9      A.   Still light out.  I don't recall if it was light

10  when I arrived.

11      Q.   Describe for me the scene of what was going on at

12  the house when you arrived.

13      A.   It was definitely a social atmosphere.  Several

14  people around preparing for a dinner.  I'm trying to

15  remember if there was caterers and stuff.  I don't recall

16  some of those specifics.  Social atmosphere.

17           You know, seven-bedroom house, so there was

18  at least that many people.  I believe there was many more

19  than that at the time.

20      Q.   How many levels are in this -- this house?

21      A.   Five, five levels.

22      Q.   Okay.  Is -- is there one level that is kind of

23   like the main level where there's kind of an open area

24   where most of the people were mingling in?

25       A.   There is a main floor, yes.

68

1    Q.   Okay.  Now we get to play art student.  And I

2    want you to sort of draw a little sketch of the floor plan

3    of the -- of the main floor of the house --

4        A.   Whoa.

5        Q.   -- if you can.  You can use my pen if you want.

6        A.   I'd be more than happy to.

7        Q.   I just kind of want to get a sense of what the

8    house is shaped like and where the rooms are.

9        A.   Hope you have good visual imagination.

10           Obviously we're expecting this to be pretty

11   raw, right?

12       Q.   Oh, of course.

13           Okay.  This is -- this is helpful.  I

14   think --

15       A.   Is that close?

16       Q.   -- you had indicated --

17           Where were you when you signed the document?

18       A.   I was -- I never put the stairwell in here, but

19   this -- I'll call it the main --

20    Q.   Kind of the main level?

21    A.   Yeah.

22    Q.   Okay.

23    A.   Does that kind of make sense?

24    Q.   Yeah.

25         What I would actually like is to have kind

                                    69

1    of a top view of what the floor plan looked like on that

2    main level, where the -- I don't know, the dining room,

3    the kitchen, whatever.

4    A.   Okay.

5    Q.   That's kind of what I was --

6    A.   Okay.

7    Q.   -- hoping for.

8    A.   Let me do that.  Do you mind if I save paper and

9    use the other side?

10    Q.   Well, that would be fine.

11         Actually, you know what, let's do a separate

12    page.

13    A.   Separate?

14    Q.   Just a --

15    A.   Okay.  Can I borrow your pen again?

16    Q.   Sure.

CONFIDENTIAL TREATMENT REQUESTED                                    PK_SEC_000722

17    A.   Floor plan.

18    Q.   And, again, this is just -- can be rough.

19    A.   Yeah.

20    Q.   It's just what you recall.

21    A.   Yeah, I'm just -- I don't think it's changed in a

22   lot of years, so --

23    Q.   Just kind of want to get a sense of where things

24   are.

25    A.   Great.

                                    70
1         I actually might be good at this.

2         Well, without overdoing it, can you confirm

3   that this is space-oriented enough?

4    Q.   Yeah.  That's good.

5         So it was essentially one large, open room?

6    A.   Yes.

7    Q.   And --

8    A.   This is -- this is to the outside.

9    Q.   Oh, okay.  Is that a window or --

10    A.   Yes, a window.

11    Q.   Okay.

12    A.   Here is the door to the outside.  And this is a

13   door to another building.

**CONFIDENTIAL TREATMENT REQUESTED**

14    Q.   Okay.  This, where I'm putting the letter A, is

15  that a wall?

16    A.   That's a -- what would you call it?  A nook

17  counter.  Countertop.

18    Q.   Okay.

19    A.   Kitchen countertop.

20    Q.   So you can see over the top of it?

21    A.   Yes.

22    Q.   And what is this where I'm putting the letter B?

23    A.   That's a sofa couch.

24    Q.   So would it be correct that, if you're in this

25  room you can pretty much see what's going on anywhere in

71

1  the room?

2    A.   Yeah, if you're -- if you're facing the right

3  direction, sure.

4    Q.   Okay.  Okay.  And this, where I put the letter C,

5  what is that?

6    A.   That's a large table, dining table.

7    Q.   Okay.  And right here where I put the letter D --

8    A.   Yes.

9    Q.   -- what is that?

10    A.   That's a window.

**CONFIDENTIAL TREATMENT REQUESTED**

11   Q.   Okay.  Where is the front door or the --

12   A.   This is a big sliding glass, so it's wide open.

13          The front door is down multiple levels.

14   Q.   Okay.  So if someone were to enter the house,

15   where would they come in?

16   A.   Can I borrow that?

17   Q.   Sure.

18   A.   This is the other building.  Let's see.  This is

19   probably bigger, like this.  Kind of plus or minus like

20   this.  There's stairs somewhere in this proximity.

21   Q.   Uh-huh.

22   A.   And then your natural walking path is like this

23   to this or this to this.  There's also, I think, another

24   stairwell somewheres over here.

25   Q.   Okay.  That's good.

72

1    A.   But this would be kind of like a -- There's an

2    elevator right here.  So this is --

3    Q.   So if someone was to arrive from the street, this

4    is where they would come in?

5    A.   Yes.

6    Q.   Okay.  I'll put a letter E here so we'll know

7    where we're talking about.

**CONFIDENTIAL TREATMENT REQUESTED**

**PK_SEC_000725**

8      A.   Entry, okay.

9      Q.   Okay, good.

10          Prior to the time that you first saw

11   Mr. Kenner on the evening of Friday, December 3rd --

12      A.   Uh-huh.

13      Q.   -- had you spoken to Mr. Jowdy?  Here at the

14   house, I mean.

15      A.   Yeah.  If I was at the house, we definitely would

16   have spoken, sure.

17      Q.   Okay.  Do you actually remember having spoken to

18   him or --

19      A.   Yeah.  I believe he introduced me to a few of the

20   guests, yes.

21      Q.   Okay.  When did Mr. Kenner arrive at the house on

22   December 3rd?

23      A.   I wouldn't -- I don't wear a watch, so I don't

24   know the time specifically.

25      Q.   It's the Cabo lifestyle; right?

                              73

1      A.   You know, I'm just not a --

2      Q.   Okay.  Well, do you remember if it was still

3   light or dark outside?

4      A.   Boy.  I don't recall the -- whether it was light

5   or bright out, don't recall.

6           MR. LAKE:  Okay.  The video guy says we need

7   to change the tape.

8           THE WITNESS:  Okay.

9           THE VIDEOGRAPHER:  This marks the end of

10  Tape 1.  We're off the record at 11:02.

11           (A recess was taken and Deposition Exhibit

12  Nos. 5 and 6 were marked for identification by the court

13  reporter.)

14           THE VIDEOGRAPHER:  This is Tape 2 in the

15  videotape deposition of Robert Gaudet.  We're back on the

16  record at 11:09.

17    Q.   BY MR. LAKE:  Okay.  Mr. Gaudet, we're continuing

18  to talk about the get-together at the 33 Pedregal house on

19  the evening of December 3rd.

20           At the time Mr. Kenner arrived at the house,

21  about how many people were there at the house, would you

22  say?

23    A.   Hmm.  Maybe 15 to 20.  I have nothing to base

24  that on other than what my memory is kind of telling me.

25  15 to 20.

74
1    Q.   And you don't really remember what time in the

2   evening it was?

3      A.  Late afternoon, early evening.

4      Q.  Was the plan that all of the people who were

5   invited for the weekend were going to come to this dinner

6   at the house that evening?

7      A.  Yes.  I believe that was the plan.

8      Q.  Had they set up tables or -- What did the scene

9   in the house look like?

10         Let me start by asking you, about how many

11   people were invited on this -- to this golf weekend?

12     A.  There would have been --

13         MR. AUGUSTINE:  Let me let me object on the

14   grounds of speculation.  Invited, my client didn't invite

15   anybody.  Maybe --

16         MR. LAKE:  Okay.  Well --

17         MR. AUGUSTINE:  Maybe better is who -- how

18   many people attended.

19         MR. LAKE:  That's fine.

20     Q.  BY MR. LAKE:  How many -- to your knowledge,

21   about how many people attended that golf weekend?

22     A.  I had seen an invite list, actually.  I don't

23   know how many total were invited, but I believe there was

24   40 golf players in the event, plus or minus.  And to the

25  social events, probably in that number, 40.  Maybe more,

75

1  because I think there might have been some female

2  companions as well; girlfriends, et cetera.

3     Q.   So if everybody from the weekend was getting

4  together for a dinner together, which I think this was,

5  about how many people were we talking about?

6         I mean, was it maybe 80 people or 70 or --

7     A.   Yeah, yes, I would agree with you.  Probably

8  70-ish.

9     Q.   Had they set up tables at the house for the

10  people to sit at when they ate dinner?

11    A.   Yes.

12    Q.   Okay.  Look at your -- Let's look at your little

13  floor plan you drew which we've marked as Exhibit 6.

14    A.   Okay.

15    Q.   Can you show me where the table -- where they had

16  placed tables for the dinner?

17    A.   This is a path.

18    Q.   Uh-huh.

19    A.   This is the pool.  And if I extended this map,

20  there's a pretty significant amount of deck space over

21  here.  That would be the location of all of the extra

**CONFIDENTIAL TREATMENT REQUESTED**

22  tables and chairs.

23      Q.   Okay.  So it would be on the -- on the other

24  side -- the other side of the pool, further away from the

25  house?

                                76

1      A.   Yes.

2      Q.   Were there tables set up there at the time

3  Mr. Kenner arrived?

4      A.   I believe, yes.

5      Q.   Were they like folding tables or --

6      A.   I didn't look at the structure, but I would

7  assume some type of portable table.

8      Q.   And do you remember whether the dinner was

9  catered?

10      A.   I believe it was catered.

11      Q.   Do you know where the food was being prepared?

12      A.   On that particular case, no.

13           In my own experience, a lot of times food is

14  prepared off-site and then brought in and put in a buffet

15  style with heat trays and all that sort.

16           And I'm just trying to recall, and I believe

17  that it was actually similarly set up, in a typical

18  larger-group format, which is, you know, a table with a

19   buffet style.  And I think -- You know, now it's blending

20   a little bit.

21          There was two kitchens in the home.  So

22   quite possibly one of the kitchens was utilized for some

23   type of preparation.

24   Q.  Uh-huh.  At the time Mr. Kenner arrived that

25   evening, was the -- was the food already being set up:

77

1   the buffet, the heating trays and that -- that sort of

2   thing?

3   A.  Was it already set up?

4   Q.  Was it already set up -- being set up or --

5          I keep ending my sentences with the word

6   "or."  I have to stop doing that.  Sorry.

7          I'm just trying to get a picture of --

8   A.  Yeah.

9   Q.  -- what it looked like when Mr. Kenner showed up.

10   A.  Yeah.  You know, I didn't walk the path that he

11   walked.  I don't know what it looked like for him, but --

12   Q.  Well, I mean --

13   A.  -- I will try and give you a reference to the

14   whole environment.

15          6.

16          I'm sure it was a fairly -- a fair amount of

17   the setup was probably complete at that time.

18      Q.   Do you know where they set up the buffet?

19      A.   You know, when it comes to those specifics,

20   again, I wasn't directly involved.  So I don't recall

21   necessarily where everything was stationed.  You know,

22   it's easier for me to speak of where I was as opposed to

23   what was where.

24      Q.   Okay.  Do you remember where you were when

25   Mr. Kenner arrived?

                                    78
1      A.   I would have been somewheres in this area right

2   here.

3      Q.   Between the house and the pool?

4      A.   Yes.

5      Q.   Pointing to there?

6          Was there anything on -- when Mr. Kenner

7   arrived, was there anything on this table that has the

8   letter C on it?

9      A.   Three -- three Diet Cokes, two -- No, I'm

10   kidding.  I was hoping I was going to be funny at some

11   point.

12      Q.   With lemon?

CONFIDENTIAL TREATMENT REQUESTED

13    A.   With lemon.  Sorry.

14         It's surrounded by chairs.  It was

15    surrounded by chairs.  I recall seeing something that was

16    referencing this logo.

17    Q.   On the top of the Exhibit 4 there?

18    A.   I'm not saying it was a document.  There was like

19    promotional posters or visual posters.

20    Q.   Okay.

21    A.   I'm trying to remember if they were on the table

22    at the time.

23         I believe the table was clear.

24    Q.   Did you see Mr. Kenner arrive?

25    A.   I seen him at the home.  I would not be able to

                              79

1    confirm anything related to his arrival.

2    Q.   Okay.  So you just sort of remembered all of a

3    sudden he was there?  You don't know when -- you didn't

4    see him walk in the house?

5    A.   Correct.

6    Q.   When you first saw Mr. Kenner, do you know where

7    in the house you were standing or sitting?

8    A.   Yeah.  I believe I was standing in this area --

9    Q.   Okay.

10    A.   -- as I just mentioned.

11    Q.   Okay.  Between the pool and the house?

12    A.   Yeah, somewheres in that front entryway.  Which

13  is a comfortable spot to stand.

14    Q.   Where was Mr. Kenner when you first saw him?

15    A.   I can't confirm specifically where I seen him

16  other than I know I spent a lot of time in this area that

17  I pointed out.  And the first time I -- I was able to

18  identify him being at the house would have been mixed with

19  people.  Nothing monumental, just in the population.

20    Q.   Right.  About how much time passed between the

21  time when you first saw Mr. Kenner and the time when the

22  document was executed?

23    A.   When I first seen him -- Not very much.  Not very

24  much.

25    Q.   Does that mean like ten minutes or 30 seconds?  I

80

1  just want to understand what you -- what you remember.

2    A.   It just seemed like a short time.  Not an hour.

3  Less than an hour.

4    Q.   Okay.  Do you think it was more than a half hour?

5    A.   The question again was, more than a half hour?

6    Q.   Was it more than a half hour, do you think?

**CONFIDENTIAL TREATMENT REQUESTED**

7    A.   It may have been, but it didn't feel like that

8    from the first time I was able to say --

9    Q.   Uh-huh.

10   A.   -- there he is.

11   Q.   So if you had to give your best estimate of how

12   long you think -- how long a period passed between when

13   you first saw him and when the document was signed, what

14   would be your best guess?

15   A.   Less than a half an hour.

16   Q.   Okay.  Prior to this -- prior to this

17   December 4th had you heard anything about a loan agreement

18   between Mr. Kenner and Mr. Jowdy?

19   A.   No.

20   Q.   So you're there at the party and there's people

21   milling around.  About how many people were there at that

22   time?  Did you say?

23   A.   It was a moving target.  You know, when I

24   initially got there there might have been 15 to 20.  And,

25   you know, we agreed that maybe up to 70.  So it was a

                                    81

1    moving target.  I never did a head count.

2    Q.   About how much time passed between the time when

3    you arrived at the house and the document was signed?

CONFIDENTIAL TREATMENT REQUESTED

4   Just a rough estimate.

5          Had you been there an hour or two hours?

6   A.   I'd say I was there for at least an hour.

7   Q.   All right.  So at some point did -- how did the

8   topic of the loan agreement first come up?

9          You're there -- everyone's there at the

10  party.

11  A.   I wasn't -- I wasn't told anything --

12  Q.   Okay.

13  A.   -- specific or related to a loan document.

14  Q.   Okay.  What happened?  I mean, just -- I just

15  want to know what -- how it sort of developed after that.

16  A.   You know, again, I'm in this little area here and

17  I was called over.

18  Q.   Okay.  Who called -- who called you over?

19  A.   Mr. Jowdy.

20  Q.   Where was he standing?

21  A.   Somewhere in this area.

22  Q.   Okay.  I'll put --

23  A.   Just opposite of C.

24  Q.   I'll put a letter F there so we know where we're

25  talking about.

82

1    A.   Okay.

2    Q.   Over near the table?

3    A.   Uh-huh.

4    Q.   Was anyone else standing there with him?

5    A.   I recall -- whether you call it with or nearby,

6  there was a couple people nearby, yes.

7    Q.   Okay.  Do you -- do you know who those people

8  were?

9    A.   One was -- one was Phil.

10    Q.   Phil Kenner?

11    A.   And the others, I don't know if I could identify.

12    Q.   Okay.

13    A.   But there was people around.

14    Q.   Did you mean Phil Kenner?

15    A.   Yes.

16    Q.   All right.  Were the other people who were

17  standing there -- I mean, were they just kind of standing

18  nearby and kind of not paying attention or were they

19  involved in what was going on with the document?

20    A.   No, it was -- You know, nothing about the

21  document was known at that moment.  So if we say

22  chronological order of happenings, it's irrelevant.  But

23  it was -- there was people in the -- that area that you

24  identified as F --

25    Q.  Uh-huh.

83

1    A.   -- those people were in a very social

2  environment.  You know, some drinking and just

3  socializing, talking.  So conversation, music in the

4  background.  You know, it wasn't -- it wasn't a calm

5  environment.  There was a lot of things going on.

6    Q.  Okay.  So Mr. Jowdy called you over, I think you

7  said.

8    A.  Yes.

9    Q.  Did he just call you by name and ask you to come

10  over?

11    A.  Yes.

12    Q.  Okay.  At that point did he -- did he say what he

13  wanted you for?

14    A.  Yeah.  He said he just wanted me to take a look

15  at something.

16    Q.  Okay.  And so then you walked over to the table?

17    A.  Yes.

18    Q.  All right.  What happened next?

19    A.  What happened next was I seen a document that

20  looked just like this.

CONFIDENTIAL TREATMENT REQUESTED

21    Q.   You are pointing to the second page of Exhibit 1?

22    A.   The second page.  I recall there only being one

23  piece of paper.  Had no idea what it was other than, here,

24  please sign there.

25    Q.   It was a single piece of paper?

84

1    A.   Single piece of paper.

2    Q.   Okay.

3    A.   There might have been a briefcase nearby or bag.

4  There was other stuff around, but all I'm aware of or all

5  of I seen -- all I seen was a single piece of paper, just

6  like that.

7    Q.   Okay.  Did it -- do you actually remember there

8  being a briefcase or are you not sure about that?

9    A.   I recall a briefcase or a bag or --

10    Q.   Was it sitting on the table?

11    A.   I -- I don't think there was anything sitting on

12  the table.  There was nothing sitting on the table.

13    Q.   Was the whole table --

14    A.   I just remember when I leaned over to the

15  table -- to the table, which was a large table --

16    Q.   Uh-huh.

17    A.   -- not as large as this, but a large wooden

18   table, I just remember -- I don't know why I can remember

19   this, but I just remember kicking something out of the way

20   as I approached the table.  Kicking or stepping on

21   something.

22      Q.   Something that was on the floor?

23      A.   Yes.

24      Q.   Okay.  And that's what you think was a bag or the

25   briefcase?

85

1      A.   Yes.

2      Q.   Okay.  So was there anything at all on the

3   surface of the table other than this single piece of

4   paper?

5      A.   I don't recall anything else.

6      Q.   All right.  So when you were called over, did

7   someone speak to you after that or --

8           I mean, they --

9      A.   When I was --

10      Q.   -- called you over to the table.  I just want to

11   know what happened next.

12      A.   I was called over.  Nothing specific other than,

13   you know, "You know Phil."

14      Q.   Was this Mr. Jowdy speaking?

15    A.  Yes.

16    Q.  Okay.

17    A.  Again, you know, you try your best to recall

18  specific pieces of conversation, but --

19    Q.  Uh-huh.

20    A.  -- "You know Phil."  "I just need you to quickly

21  witness this for me."  And that was -- I don't think there

22  was much more conversation than that.

23    Q.  Did Mr. Kenner say anything?

24    A.  Not to me.

25    Q.  Did he say anything to Mr. Jowdy while you were

86

1  standing there?

2    A.  I don't recall.  I don't think so.  I really

3  don't recall.

4    Q.  Did Mr. Jowdy tell you what it was that -- what

5  the document was?

6    A.  A lot of our conversation -- myself and

7  Mr. Jowdy -- was relating to my hopeful employment with

8  the company.  So there was a lot of excitement about many

9  things going on --

10    Q.  Uh-huh.

11    A.  -- the event, financing coming up, you know.

CONFIDENTIAL TREATMENT REQUESTED

12 Hopeful to -- to -- you know, I referenced earlier that

13 there was a property that they were hoping to be a

14 Diamante Cabo property. So there was just a lot of

15 excitement in the air about things moving forward.

16   Q.  Did he tell you what the -- what that document

17 was that you were signing?

18   A.  No, no.

19   Q.  At that point did you know Mr. Kenner?

20   A.  Not very well.  I had met him a few times.

21   Q.  Uh-huh.

22   A.  I knew he was associated to the Diamante

23 companies -- company/companies.

24   Q.  And would you say that you knew Mr. Jowdy at that

25 point?

87

1   A.  We had spent quite a bit of time together, yes.

2 Again, we had spent, you know, time talking about my

3 employment and very specific strategies about me resigning

4 from my former place of employment to join him with

5 Diamante.

6   Q.  You had mentioned that the single piece of paper

7 that was on the table looked like this second page of

8 Exhibit 1.

9    A.   Yes.

10    Q.   When you say that it looked like it, did you mean

11  that -- I mean, do you recognize -- did it have, for

12  example, the number six at the top?  Do you remember that?

13  Or do you just remember that it was a sheet that had some

14  signature lines on it?

15    A.   I remember the bottom half of the sheet.  I don't

16  recall the top half.  I don't recall if there was a six on

17  it.  I remember very specific, though, there was -- yeah,

18  I remember very specifically it was an interesting

19  document because I recognized, you know, Little Isle,

20  which looked confusing, different.  And that's all.  I

21  recognized there was names on it and I recognized these

22  names were on it.  And I recognized the line for a

23  witness.

24    Q.   Do you remember whether there was text above the

25  signature line on the page?

88

1    A.   There was definitely text on the top of that

2  signature, yes.

3    Q.   But do you remember anything about what that text

4  said?

5    A.   I didn't read it, no.

6    Q.   Did you read any of that text?

7    A.   Did not.

8    Q.   At the time that you walked over and first saw

9    this sheet of paper, had it already been signed by anyone?

10    A.   There was -- The bottom half was already

11    completed.

12    Q.   What do you mean by the bottom -- you mean --

13    what do you mean by the bottom half?

14    A.   The bottom half -- the two signatures and the

15    date was already on there.

16    Q.   You mean, the two signatures under "Lenders"?

17    A.   Under "Lenders," yes.

18    Q.   Okay.  Do you remember whether the document that

19    you saw had a line that said the word "Lenders"?  Do you

20    remember that specifically?

21    A.   I'm just going through my photogenic memory --

22    Q.   Okay.

23    A.   -- and I think I found it, yes.

24       Yes, I do recall.

25    Q.   That it had the word "Lenders" on it?

                                89
1    A.   (No verbal response.)

2       THE COURT REPORTER:  I didn't hear your

PK_SEC_000744

3   answer.

4         THE WITNESS:  Yes.

5     Q.   BY MR. LAKE:  Do you remember that the -- The two

6   signatures that were already on the bottom of the page,

7   did you recognize whose signature that was when you saw it

8   that evening?

9     A.   I -- I just assumed that it was Phil's because

10   his name is above the signature.

11    Q.   Okay.  Was the bottom line where it says -- did

12   it have a date filled in by hand?

13    A.   It was complete.  Because I'm used to putting a

14   date next to something that I sign, and I didn't.  And

15   when I scanned the document I seen a date.  And that was

16   it.

17    Q.   Did you notice what date was on the document in

18   the -- the handwritten date on that page?

19    A.   I seen a date, but I didn't relate to what that

20   meant.

21    Q.   Did you notice whether the date was correct or

22   not?

23    A.   Did I ask myself if it was correct?  I'm sure I

24   just assumed that the date was correct.

25    Q.   Did it --

CONFIDENTIAL TREATMENT REQUESTED                    PK_SEC_000745

90

1    A.  Because I didn't have any specific tasks relating

2  to anything on any particular day, so --

3    Q.  Uh-huh.  Did it seem odd to you that the date was

4  already filled out?

5    A.  No.

6    Q.  So at the time that you signed the document, the

7  only two signatures that were already on the document were

8  the two on the bottom two lines; is that right?

9    A.  Yeah.

10      I don't know when that happened.  When I

11  approached the table that was already done.

12   Q.  Okay.  Do you remember what color the ink of the

13  signature was on those bottom two signatures?

14   A.  I don't specifically, but, you know, it's always

15  blue or black, so -- I don't know.

16   Q.  Okay.  You just don't remember?

17   A.  Yeah.

18   Q.  Do you remember what color ink the handwritten

19  date was?

20   A.  No.  The same as -- same as the other ink that I

21  seen.  I don't recall it being black or blue, but in that

22  kind of recollection -- You know, it was black or blue.

**CONFIDENTIAL TREATMENT REQUESTED**

23   Q.   Okay.

24   A.   Yeah.

25   Q.   Do you remember whether the date, the handwritten

91

1   date, was the same color as the bottom two signatures?

2   A.   Same color.  I would have to say, yes, because I

3   think I would have had a mental note or a flash if there

4   was a color difference.  So I have to say the colors were

5   the same.

6   Q.   Okay.  Do you actually remember that they were

7   the same or do you just --

8   A.   I don't remember anything.

9   Q.   -- suspect that you would have remembered if they

10   weren't the same?

11   A.   Correct.

12   Q.   Were the bottom two signatures on the document

13   the same signature?  Repeated twice?

14   A.   Just as I see it here in front of me now.

15   Q.   Okay.  When you walked over, Mr. Jowdy asked you

16   to -- he said, "Will you witness this?"  Is that --

17   something to that effect?

18   A.   Something to that effect.

19   Q.   Did he have a pen that he handed you?  Or what --

CONFIDENTIAL TREATMENT REQUESTED

20  what did you use to sign the document?

21    A.   I believe I just recall picking one off the

22  table.

23    Q.   There was a pen sitting on the table?

24    A.   Yes.

25    Q.   Was there more than one pen on the table?

92

1    A.   More than one pen.  I don't recall.  I don't

2  believe so.

3    Q.   Was there a tablecloth or a place mat or anything

4  on the table or was it just the -- the plain hardwood

5  table?

6    A.   Just -- I don't know if you would call it a

7  hardwood table.  It's definitely softer than hard.  But

8  just the table.

9    Q.   Okay.  Just a flat wood table?

10    A.   Flat wood table.

11    Q.   When did Mr. Jowdy sign the document?

12         Did you see him sign the document?

13    A.   Yes.

14    Q.   When did he sign it?

15    A.   I was called over.  Just after I approached the

16  table he would have put a signature on it, and I followed.

CONFIDENTIAL TREATMENT REQUESTED

17    Q.   So he signed the document before you did?

18    A.   Yes.

19    Q.   Okay.  I thought you said a minute ago that there

20   was only the two signatures on the bottom of the document.

21    A.   When I approached the table --

22    Q.   Okay.  So --

23    A.   -- and was shown the single document, there was

24   already ink on the paper.

25    Q.   So when you walked over, when you --

93

1          Were you standing there when Mr. Jowdy

2   signed the document?

3    A.   Yes.

4    Q.   Did you sign the document with the same pen that

5   he used to sign the document?

6    A.   Same pen.  I recall there only being one pen.

7    Q.   Okay.  Did you see Mr. Kenner give the

8   document -- Well, when you walked over to the table, I

9   think you said there were some other people there.

10    A.   There was definite -- there was definitely people

11   in the vicinity, yes.

12    Q.   Okay.  Were any of those people like talking to

13   Mr. Jowdy or Mr. Kenner or were they just sort of standing

CONFIDENTIAL TREATMENT REQUESTED

14  nearby?

15      A.  I would say standing nearby.

16      Q.  What happened after you signed the document?

17          Well, were you the last person to sign --

18      A.  Yes.

19      Q.  -- the page?

20      A.  Yes.

21      Q.  Okay.  What happened next?

22      A.  I was called back to my location by Corona.

23      Q.  Pardon me?

24      A.  Someone was offering me a beer.

25      Q.  Oh.

                                94

1      A.  It was nothing formal, so it wasn't -- you know,

2  it wasn't like I needed to excuse myself or anything.  So

3  I said that's it and walked away.

4      Q.  So when you left was the paper still sitting on

5  the table?

6      A.  Yes.

7      Q.  When you left were Mr. Jowdy and Mr. Kenner still

8  standing there by the table?

9      A.  I left before both of them, yes.

10      Q.  Okay.  Did you ever see Mr. Jowdy read the

11  document?

12      A.  There was only the single page when I was at the

13  table.

14      Q.  Okay.

15      A.  Did I see him read it?  I seen him sign it.  I

16  didn't see anybody reading anything.

17      Q.  Okay.  Did you see what happened -- what happened

18  to the document after you walked away from the table?

19      A.  No, did not.

20      Q.  Did you see anything that Mr. Kenner did after

21  you walked away from the table?

22      A.  I walked away and engaged in conversation with

23  others.  No, I did not.

24      Q.  Did you see anything that Mr. Jowdy did after you

25  walked away from the table?

                                95

1           MR. HARPER:  Object to form.

2           THE WITNESS:  No.  I left immediately after

3  signing.  I went to another location and wasn't paying

4  attention to anything associated.

5      Q.  BY MR. LAKE:  Okay.  Do you remember where you

6  walked to after you left the table?

7      A.  It would have been outside.  It would have

8   been --

9      Q.  Did you ever see this document again after that

10  moment but before the time that Mr. Harvey e-mailed you a

11  copy?

12    A.  No.

13    Q.  Did Mr. Kenner or Mr. Jowdy ever explain to you

14  what this document was that you signed?

15    A.  No, other than what I mentioned earlier.  And the

16  air of excitement was -- was that, that there's a lot of

17  things that are positive; look forward to you being an

18  employee.

19    Q.  So --

20    A.  And it was nothing at any particular time, it was

21  just -- how do you say -- the atmosphere.  Lots going on,

22  lots of positive things happening.  And Mr. Jowdy was

23  hopeful that I would be an employee very soon.

24    Q.  Have you ever been involved in any other

25  situation where you were executing a document with

96

1   Mr. Kenner, like a contract or something?

2     A.  In 2004?

3     Q.  Any time.

4     A.  I don't understand the question, then.

**CONFIDENTIAL TREATMENT REQUESTED**

5   Q.  Where -- was there ever another situation, other

6   than this one, where you and Mr. Kenner were both signing

7   a contract together?

8   A.  Yeah.  I signed an agreement with him much later,

9   yes.

10   Q.  Okay.  And in that instance did he sign the

11   document there in front of you or did he bring it to you

12   already signed by him?

13   A.  That was a document more important to me.  I

14   recall him giving me the document, which was an agreement,

15   and him saying, "Here is the document.  I've signed it.  I

16   want you to just look at it for a couple days and confirm

17   that everything's good with you," plus or minus.

18   Q.  Had he already signed the document?

19   A.  The document -- I remember him saying, "I've

20   already signed it.  Take it home; look at it.  Make sure

21   you agree with everything."

22   Q.  Okay.  So you didn't actually see him sign the

23   document.  It was already signed when he handed it to you?

24   A.  He just handed it to me.

25   Q.  Okay.

97

1   A.  I'm trying to recall for you where this happened

2   and I haven't found the spot yet.

3      Q.   Okay.  When you signed this document on

4   December 4th, do you remember what kind of pen you used?

5   Like was it a ballpoint pen or a felt-tip pen or --

6      A.   Hmm.  You know, I don't have a real good

7   signature, as you can see by this document.

8           Was it ballpoint?  Your question was, was it

9   ballpoint or felt?

10     Q.   Yeah.

11     A.   Definitely wasn't a pencil.  I don't recall,

12   but -- You said please make an answer.  I don't --

13     Q.   Well --

14     A.   -- really recall.  I'd say ballpoint.

15     Q.   -- you don't need to guess.

16     A.   I'd say it'd be a ballpoint.

17          MR. AUGUSTINE:  Don't guess.

18          MR. LAKE:  Yeah, don't guess if you don't

19   know.

20          THE WITNESS:  I don't know.

21          MR. LAKE:  Because it's -- you know, it's

22   not a test or anything.  I just want to know if you do

23   remember.  And if you don't, that's fine.

24          THE WITNESS:  I don't remember.  But one

25   thing that happens when I write with a felt is typically,

98

1   because I write reverse, it will smudge.  And I don't

2   remember smudging anything.  But again, I don't -- I don't

3   know.

4       Q.   BY MR. LAKE:  What do you mean you write reverse?

5       A.   I write like a lefty.  I'm right-handed.

6       Q.   Oh.

7       A.   I tilt to the left.  My signature does not go

8   from left to right.  It goes the other way, like a

9   left-hander.

10      Q.   I don't understand what you're saying.

11      A.   Can I borrow your pen?

12      Q.   Sure.

13      A.   If I do something (indicating) because I write

14   this way (indicating) a lot of times when it's a felt --

15      Q.   Oh, because your hand drags across the --

16      A.   Exactly.  It goes over my signature.

17      Q.   -- the ink?

18           I see.

19      A.   And typically I recognize afterwards, and I don't

20   recall that.

21      Q.   So if it's a felt-tip pen, it would tend to

CONFIDENTIAL TREATMENT REQUESTED

22   smudge?

23      A.  So for that I believe it was a ballpoint.

24      Q.  Okay.  Or at least not a felt tip?

25      A.  At least not a felt tip, because typically I --

99

1   You always remember when you sign something and you've got

2   a mess on your hand.

3      Q.  Right.  So it could have been something like this

4   or some other kind of pen?

5      A.  Could have been, yeah.

6      Q.  All right.

7      A.  I guess that still means I don't know.

8      Q.  You said you're right-handed; right?

9      A.  Uh-huh.

10          MR. AUGUSTINE:  Is that a yes?

11          THE WITNESS:  Yes, I am right-handed.

12      Q.  BY MR. LAKE:  Do you know whether Mr. Kenner is

13   right- or left-handed?

14      A.  In what regard?  His signature?

15      Q.  Yeah --

16      A.  In sports?

17      Q.  -- signature.

18      A.  Pretty certain he's right-handed.

CONFIDENTIAL TREATMENT REQUESTED

19   Q.   Do you know what happened to the original page

20   that you signed that day?

21   A.   I do not.  Again, I walked away after I --

22   Q.   Do you know -- did you see Mr. Kenner again that

23   evening at the party after -- after the document was

24   signed?

25   A.   No, no.

                                    100

1   Q.   About how long after the document was signed did

2   everyone sit down and have dinner?

3   A.   I don't recall it being a formal sit-down, so

4   hard to identify or answer that question.  It was kind of

5   more of a --

6   Q.   People just go through?

7   A.   -- when you're hungry, go to the thing and --

8   Q.   Okay.  Do you remember how long it was between

9   the time you signed the document and the time that they

10   started serving food?  Maybe I should put it that way.

11   A.   I'd almost think that it had already started --

12   Q.   People had already --

13   A.   -- the food serving.

14   Q.   -- started eating?

15   A.   Yeah.  I believe.  Which would mean, you know, if

16   the schedule's accurate, saying dinner at 7:00.  You know,

17   time frame is -- in those kind of areas when, you know --

18   nobody is trying to catch an airplane that night, so time

19   is kind of irrelevant other than the caterers maybe

20   getting upset.  And I don't recall that happening either,

21   so --

22      Q.  Do you know whether Mr. Kenner ate dinner at the

23   house that night?

24      A.  I don't remember seeing him after I left the

25   table.  I got back into the social atmosphere.  I went

101

1   back to the social -- I don't recall seeing him

2   afterwards.

3      Q.  Do you recall him -- do you recall seeing him

4   eating before he signed the document?

5      A.  I don't recall him eating at all.

6      Q.  Okay.  How familiar were you with that house?

7   Did you know what was in the different rooms of the house

8   back in December 2004?

9      A.  I had been at the house several times previous

10   for other social issues and, I guess, business-related

11   meetings.  So I had been in the house previous, yes.

12      Q.  Was there a device in the house that could make

CONFIDENTIAL TREATMENT REQUESTED

13  photocopies?

14        MR. HARPER:  Object to form.

15        MR. LAKE:  If you knew.

16        THE WITNESS:  Yeah, whew.  There may have

17  been, I'm not sure, at that time.

18    Q.   BY MR. LAKE:  Did you see Mr. Kenner at any time

19  that weekend after that evening?

20        I mean, did you see him -- I know you said

21  you didn't see him at any time later that evening.  Did

22  you see him the next day or the day after?

23    A.  I don't -- I don't recall seeing him.

24    Q.  Do you know whether -- whether he left Cabo or

25  whether he stayed beyond that evening?

                          102

1   A.  I do not.

2   Q.  How were the people -- how were the guests who

3   were staying at the hotel getting from the hotel to the

4   house for the dinner?

5        Did they all come by taxi or by some other

6   method?

7   A.  I recall seeing taxies coming and going.  I

8   recall seeing taxies coming and going.  I can't say that,

9   if there was 40, 60 or 70 people at the house, that they

CONFIDENTIAL TREATMENT REQUESTED

PK_SEC_000759

10   all came by taxi.

11      Q.   Okay.

12      A.   But I do recall seeing taxies.

13      Q.   Was there any other method that was being used to

14   shuttle the people from the hotel over to the dinner that

15   you were aware of?

16      A.   I would assume that there was some private

17   vehicles or rental vehicles.  I don't --

18      Q.   You just don't remember?

19      A.   I don't remember that.

20      Q.   Okay.  At the time that you signed the document

21   on the table, about how many other people were in the room

22   with you --

23      A.   In that room?

24      Q.   -- if you had to estimate?

25      A.   Yeah.  You know, again, I mentioned earlier that

103

1   it was kind of a moving target.  It just kept on growing

2   and thinning.

3      Q.   Right.

4      A.   In that room -- One thing that's kind of unique

5   about the house is that the doors open up.  Like if this

6   is the width of the room, the sliding doors open the

7   entire width.  So you get this perspective that there's,

8   you know, a lot of people in one space.

9     Q.   Uh-huh.

10    A.   In the interior, probably 20, 30, 40.  Again,

11  never took a population matrix.

12    Q.   Right.

13    A.   Yeah.

14    Q.   Can you remember the identity of any of those

15  individuals?

16    A.   You know, there was I guess what you would call

17  many well-known baseball players and hockey players that

18  were at the event.

19    Q.   Can you name some of them who were in the room at

20  the same time?

21    A.   Hmm.  I remember a couple hockey players.  Rem

22  Murray, which -- Raymond Murray.  I remember seeing -- You

23  know, there was a lot of significant names and very

24  familiar faces, but name specific -- There was several

25  hockey players, several baseball players.  Most of them

104

1   active.

2        If you have a list of the guests, I can tell

3   you if I seen them at the house.  That would be helpful.

**CONFIDENTIAL TREATMENT REQUESTED**

4    Q.   Okay.  And you said you think the food had

5   already -- they had already started serving the food at

6   this point?

7    A.   As I mentioned earlier, I believe it was just one

8   of those --

9    Q.   Right.

10    A.   -- circulating --

11    Q.   Go get it when you're hungry?

12    A.   Yeah.  And then people standing.  I don't

13   remember it being a real formal, formal deal.

14    Q.   Uh-huh.

15    A.   Or pardon me.  I do remember it not being a

16   formal deal.

17    Q.   After the document was signed, when was the next

18   time that you saw Mr. Kenner?

19    A.   Sometime in '05, I believe.

20    Q.   You -- When we were talking earlier about your

21   meeting with Mr. Kaiser, at the restaurant --

22    A.   Uh-huh.

23    Q.   -- during that conversation did Mr. Kaiser tell

24   you that he had maintained a copy of the loan agreement

25   document?

**CONFIDENTIAL TREATMENT REQUESTED**

**PK_SEC_000762**

105

1      A.   He had referenced -- and I think I said it

2   earlier.  He had referenced that he had a copy and wished

3   he had brought it because he wanted to discuss it with me.

4      Q.   And he told you that it had to do with the Hawaii

5   project?

6      A.   What did he tell me?  I don't recall him saying

7   anything that it was related to the Hawaii project.  It

8   just became such a -- such an important document because

9   of the conversations that I had had with Mr. Harvey.  So

10   everybody became very aware of the document.

11      Q.   Did he tell you during that conversation that he

12   had been the one who at -- who told Mr. Kenner that he

13   should put that agreement in writing?

14      A.   Repeat that for me, please.

15      Q.   During that conversation with Mr. Kaiser, did he

16   tell you anything about that he was the one who told

17   Mr. Kenner that he should put the agreement in writing?

18      A.   Repeat that one for me again.

19      Q.   I just want to know if you remember him saying

20   anything about the fact that he told Mr. Kenner that

21   Mr. Kenner should put the agreement in writing.

22           Did he ever mention that to you?

23      A.   Not in those words.  But he did mention something

24  that -- he did mention something to that effect.

25      Q.   Did Mr. Kaiser tell you about any conversations

106

1  he had had with Mr. Kenner about the loan agreement

2  document?

3      A.   No.

4      Q.   When was the first time you became aware of an

5  entity called Diamante Cabo San Lucas?

6      A.   In 2004, when Mr. Jowdy and others were pursuing

7  Querencia, we had many discussions regarding -- I was an

8  employee of Querencia.  We had many discussions regarding

9  the name of Querencia should they be the successful buyers

10  of that project.  I recall, should we keep it Diamante?

11  Should we call it Dia -- or pardon me.  Let me say that

12  over.  Should we keep it Querencia?  Should we rename it

13  Diamante Del Mar?  Should we name it Diamante San Jose?

14  Should we name it Diamante Cabo?  Should we name it

15  Diamante Cabo San Lucas?  You know, what name was

16  significant for that property.

17          I had suggested that it would be most

18  appropriate to rename it because it had some -- Querencia

19  had some perceived problems.  So my comment was a new name

20  for that project would be good.

CONFIDENTIAL TREATMENT REQUESTED

21        So there was many conversations regarding

22   some type of name.  Specifically, we went from Querencia

23   to another property called -- When the Querencia pursuit

24   didn't happen, another property became a potential

25   candidate to become the Cabo -- the Cabo Diamante.  And

107

1    that property's name was -- well, for location's sake,

2    Twin Dolphin.  The Twin Dolphin Hotel property.

3        So there was -- I'm leaving some voids.

4    There was a time frame that was spent on the Querencia

5    property, to be the owners.  And there was a lot of

6    discussion about names intimately with myself because I

7    was in charge of the property, the project operations.  So

8    my opinion, I believe, was very valued by Mr. Jowdy as far

9    as what do we think the name should be.

10       And then we -- That pursuit didn't happen,

11   and I helped him, you know, look in the market and

12   introduced to some of my friends in the area (sic).  And

13   the Twin Dolphin property came up, and that was -- that

14   was, again, potentially going to be a Diamante property.

15   And there was conversations about it.  What should the

16   name be?  Should it be named -- you know, that whole

17   region is -- is based on it being Cabo San Lucas.  So

CONFIDENTIAL TREATMENT REQUESTED

18  anytime you talk about, you know, business or other, the

19  name sake, where are you going?  I'm going to Cabo San

20  Lucas.  So that's -- I don't know what about the name.

21       I might ask you to repeat the question

22  because I'm -- I'm thought-provoking as far as -- there

23  was many discussions about the naming of a potential

24  Diamante project.

25    Q.  Okay.  Let me try to simplify maybe a little like

108

1  this.  As best you recall, when did -- when was it

2  actually settled that the name would be Diamante Cabo San

3  Lucas?

4    A.  Hmm.

5    Q.  When was that decision actually made?

6    A.  You know, I remember seeing many different

7  documents that had different names on it related to the

8  project.  I remember seeing Diamante Del Mar.  I remember

9  seeing Diamante South.  I remember seeing -- South.  I

10  remember seeing -- on various documents, I remember seeing

11  Diamante Cabo San Lucas.

12       I'm not narrowing down the time frame for

13  you, but just globally there was a lot of discussions

14  about, you know, can't wait and we know we need -- the

CONFIDENTIAL TREATMENT REQUESTED

PK_SEC_000766

15   development company needs a property in Cabo San Lucas --

16     Q.   Uh-huh.

17     A.   -- to help make the property in the north more

18   known, more aware, more viable.

19         So Cabo San Lucas, as an address, became a

20   very important target.

21     Q.   Okay.  But you don't know -- you don't remember

22   when the name was actually settled on?

23     A.   No, no.

24     Q.   Okay.  Have you ever seen any e-mail or any other

25   document that refers to the existence of this loan

109

1   agreement document other than those e-mails you got from

2   Mr. Harvey and Mr. --

3     A.   Garcia.

4     Q.   -- Garcia?

5     A.   Just the first half of that question.

6     Q.   Have you ever seen any other -- any e-mail or

7   document or anything in writing that refers to the

8   existence of this loan agreement document other than those

9   two e-mails you got?

10     A.   No.

11     Q.   Are you aware of whether this note, this loan

CONFIDENTIAL TREATMENT REQUESTED

PK_SEC_000767

12  agreement, ever came due?

13      A.  No.  I don't know any specifics relating to the

14  document.

15      Q.  Do you know whether any of the plaintiffs in this

16  case ever sent a demand for payment to Mr. Jowdy?

17          MR. HARPER:  I'm going to object.  It's

18  beyond the scope of the deposition.

19          Don't answer it.

20          MR. AUGUSTINE:  Lack of foundation as well.

21          MR. HARPER:  Again, I'm asking the witness

22  not to answer the question.

23          MR. AUGUSTINE:  And I'll instruct him not to

24  answer that question because it doesn't have anything to

25  do with the authenticity of the document.

                            110

1           MR. LAKE:  Whether a demand for payment was

2   ever made I think is relevant to whether an agreement ever

3   existed.

4           I'm asking him whether he knows -- if he

5   knows --

6           THE WITNESS:  I do not know.

7           MR. LAKE:  I think that answers the

8   question.

CONFIDENTIAL TREATMENT REQUESTED                                    PK_SEC_000768

9    Q.   BY MR. LAKE:  Were you ever asked by Mr. Kenner

10   or anyone else to help locate a copy of this loan

11   agreement document?

12   A.   I was asked by Mr. Harvey.  I was asked -- I was

13   not asked by Ken -- by Phil, no.

14        MR. LAKE:  Let's go off the record for a

15   minute.

16        I've got maybe 45 minutes left.

17        MR. AUGUSTINE:  Let's just go through.

18        THE VIDEOGRAPHER:  We're off the record at

19   12:06.

20        (Recess.)

21        THE VIDEOGRAPHER:  We're back on the record

22   at 12:14.

23   Q.   BY MR. LAKE:  I just wanted to circle back on a

24   couple of things.  You mentioned the job you had with

25   Mr. Kenner's company related to the Hawaii property.  Have

111

1    you ever seen the Hawaii property?

2    A.   Yes.  I've been to the Big Island, to Kona, a

3    couple times.

4    Q.   When was that?

5        MR. AUGUSTINE:  Well, let me -- let me just

CONFIDENTIAL TREATMENT REQUESTED

6   object on the grounds that it's not the subject matter of

7   the deposition.  It doesn't relate to the authenticity of

8   the document.

9        So you can ask questions related to that,

10  and that's perfectly fine.

11       MR. LAKE:  You objected to him answering the

12  question?

13       MR. AUGUSTINE:  Yes, I am.

14  Q.  BY MR. LAKE:  All right.  Do you know who is

15  paying Mr. Augustine's legal fees?

16  A.  For?

17  Q.  Your attorney's, for this --

18  A.  My attorney?

19  Q.  -- for your representation.

20  A.  I am obligated.

21  Q.  You're the one who is paying him?

22  A.  Correct.

23  Q.  Have you seen the complaint in this lawsuit, that

24  was filed in this lawsuit?

25  A.  I believe I have.  If it's the same one that is

112

1   on -- in the Internet on the public -- public site.  I

2   guess you would call it a public site.

CONFIDENTIAL TREATMENT REQUESTED

3    Q.   Uh-huh.  When did you -- when did you read the --

4   Well, did you actually read the complaint or did you just

5   kind of look at it?

6    A.   I just kind of looked at it.  Looked at several

7   parts of it, yes.

8    Q.   Okay.  When was that?

9    A.   Boy, the last Google search.  Days ago.  Not very

10   long ago.

11    Q.   Had you looked -- had you seen the complaint

12   before then?

13    A.   Just on the public domain or whatever you call

14   it.

15    Q.   Okay.  That's what I'm trying to find out, is

16   when you looked at it on the website or whatever it was.

17    A.   Yeah, days ago.

18    Q.   And had you seen it before that time?

19    A.   Had not.

20    Q.   Are there any other documents that you have

21   signed that are in the possession of Phil Kenner,

22   contracts and things like that, that have your signature

23   on them?

24       MR. HARPER:  Object to form.

25       THE WITNESS:  Could you repeat the question?

CONFIDENTIAL TREATMENT REQUESTED

113

1    Q.  BY MR. LAKE:  Yeah.  I'm just --

2         Do you know, are there -- other than this

3   Exhibit 1, are there any other documents in Phil Kenner's

4   possession that you know of that have your signature on

5   them?

6    A.  Currently?

7    Q.  Yeah.

8    A.  I would say it's quite possible.

9    Q.  Are you involved in any other business ventures

10  with Mr. Kenner other than the ones we've already

11  discussed?

12   A.  Am I involved in any other business ventures with

13  Mr. Kenner?  Currently, no.

14   Q.  Are you involved with business ventures with any

15  companies owned or managed by Mr. Kenner other than the

16  ones we've already discussed?

17   A.  Owned or managed.  I don't know the list of

18  companies that he owns or manages, but I do not have any

19  business relationships with him.

20   Q.  Okay.  Do you have business relationships with

21  any of Mr. Kenner's clients?

22        MR. HARPER:  Object to form.

**CONFIDENTIAL TREATMENT REQUESTED**

23   Q.  BY MR. LAKE:  I'm sorry, did you say something?

24   A.  No, I didn't.

25        Could you repeat that?

                              114

1   Q.  Sure.

2        Do you have any business relationships with

3   any of Mr. Kenner's clients?

4        MR. AUGUSTINE:  I'll make the same

5   objection; instruct him not to answer.

6        If it relates to the authenticity of the

7   document, then I'll allow him to answer it.  But you have

8   to convince me that that question does.

9        THE WITNESS:  Thank you.

10       MR. LAKE:  Well, I think if it goes to his

11   connection with -- with Mr. Kenner, then it goes to

12   possible bias and to --

13       MR. AUGUSTINE:  Well, what about to

14   Mr. Kenner's clients?  I don't see how that has a

15   connection with Mr. Kenner.

16   Q.  BY MR. LAKE:  Did Mr. Kenner or Mr. Kenner's

17   attorneys ask you to review or comment on the complaint in

18   this action before it was filed?

19   A.  No.

CONFIDENTIAL TREATMENT REQUESTED

20    Q.   Did Mr. Kenner or his attorneys ask for your --

21  ask for any information from you before they filed the

22  complaint in this action?

23    A.   I don't know when the complaint was filed.  Do

24  you have record of that for me?

25    Q.   It would be -- I think it was November --

                                115

1  October 2008.

2    A.   October 2008.  October 2008.  The filing that I

3  was referring to that I Google searched was actually a

4  more recent one.  So not this particular one.

5          Pardon me for not understanding your

6  question previously.

7          So the case that was filed in October of

8  2008 is what you're asking me?

9    Q.   Yeah.  I mean, maybe part of the confusion is

10  that there's been an amended complaint filed in this

11  action.

12    A.   Okay.

13    Q.   What I'm trying to figure out is, when Mr. Kenner

14  was first preparing his complaint to file in this lawsuit,

15  did he have any communications with you or ask -- ask you

16  for any information to help him in preparing his

17  complaint?

18      A.  I actually spent more time talking with

19  Mr. Harvey about the relevant issues of the complaint than

20  Phil Kenner.

21      Q.  Okay.  But -- but did you have conversations with

22  Mr. Kenner about his lawsuit against Mr. Jowdy before he

23  filed it?  That's what I'm trying to find out.

24      A.  October 2008.  I'd have to look at what the

25  complaint actually is.  Because at this moment, as I said,

                            116

1  I don't know what that is.

2      Q.  Who is John Kaiser?

3      A.  Who is John Kaiser.  I believe he is a business

4  partner of Phil Kenner's.

5      Q.  How long have you known him?

6      A.  I believe the first time I met him would have

7  been -- The calendar only has two months.  First time I

8  ever met him --

9      Q.  A rough estimate is fine.

10     A.  Yeah.

11         MR. AUGUSTINE:  If you don't recall, you

12  don't recall.

13         THE WITNESS:  Yeah, more than a year ago.

CONFIDENTIAL TREATMENT REQUESTED                    PK_SEC_000775

14   Three years ago?  I don't recall.

15      Q.   BY MR. LAKE:  All right.  Do you have any

16   business relationship with Mr. Kaiser?

17           MR. AUGUSTINE:  I'll state the same

18   objection and instruct you not to answer because it's --

19   it's irrelevant to the authenticity of the document.

20           MR. LAKE:  Well, he's another witness to --

21   he's another witness to the document with relevant

22   information.  I just want to know whether the witnesses

23   know each other.

24           THE WITNESS:  We do know each other.

25           MR. AUGUSTINE:  That's not the question you

                              117

1   asked.  You asked if they knew each other.  We've already

2   established that.  So I'll instruct him not to answer.

3           MR. LAKE:  I think it's relevant to know

4   whether they have business relationships with each other.

5           But you're instructing him not to answer

6   that?

7           MR. AUGUSTINE:  Counsel, I don't see

8   Mr. Kaiser's name anywhere on this document.

9           MR. LAKE:  Well, the -- the plaintiff in

10   this case has identified Mr. Kaiser as the person who can

11   testify as to the whereabouts of the original copy of this

12   loan -- of this document after it was created.  Actually,

13   I think the only copy that is in existence was purportedly

14   in his possession.

15          So he's clearly a relevant witness.

16          MR. AUGUSTINE:  Right.

17          MR. LAKE:  And I'm asking whether the two

18   witnesses who have relevant information to the existence

19   of this disputed document have business relationships with

20   each other.

21          MR. AUGUSTINE:  Okay.

22          THE WITNESS:  No, we do not.

23    Q.   BY MR. LAKE:  Let me ask it maybe a little more

24   broadly to make sure that I understand.

25          Do you have any business -- do you or any

                                118

1   businesses that you run have any business relationships

2   with Mr. Kaiser or any businesses that he runs?

3    A.   As it relates to Diamante, yes.

4    Q.   And what is that?

5    A.   I'm assuming that he's involved in Diamante.

6    Q.   Is he?

7    A.   I'm hoping you can tell me, and then I'll

**CONFIDENTIAL TREATMENT REQUESTED**

8  confirm --

9    Q.  I don't know.

10    A.   -- if he's an associate.

11        There's many people that are involved in

12  Diamante that I'm not aware of, in the Diamante entity.

13  And he could quite possibly be.  And that's what took me

14  so long to try and recollect and find out.

15    Q.   Well, do you know whether he is or not?

16    A.  I can't confirm that, no.

17    Q.   All right.  Other than Diamante, are there any

18  other business relationships that you or -- or your

19  businesses have with him and his businesses?

20    A.  No.

21    Q.   To your knowledge, have Mr. Kenner or any of the

22  plaintiffs in this case -- meaning Little Isle or Ula

23  Makika -- ever made any payments to John Kaiser or

24  companies owned or managed by John Kaiser?

25        MR. HARPER:  Object --

                              119
1        MR. AUGUSTINE:  If you know.

2        MR. HARPER:  -- to form.

3        THE WITNESS:  I don't know.

4    Q.  BY MR. LAKE:  Okay.  Do you know whether

CONFIDENTIAL TREATMENT REQUESTED

5   Mr. Kenner, Little Isle or Ula Makika have ever

6   transferred any property to John Kaiser or companies owned

7   or managed by John Kaiser, if you know?

8       A.   I don't know.

9       Q.   Do you know whether any of -- whether Mr. Kenner

10  or any of the businesses owned or managed by Mr. Kenner

11  have any business relationships with Mr. Kaiser?

12      A.   I believe so, yes.

13      Q.   What do you know about that?

14      A.   I know they are partners in the Hawaii deal.  And

15  that's what I was thought-provoking, because obviously

16  Hawaii is involved with the Diamante project.  So there's

17  the association of business.

18      Q.   How are those two projects connected?  Or

19  associated, as you say?

20      A.   I'm not familiar with how they are associated.

21      Q.   Do you believe that they are associated?

22      A.   Can you just describe who who is again for me?

23      Q.   Well, I don't know.  You said a minute ago

24  that -- I think you said that those two projects were

25  associated.  And I was wondering what led you to that

120

1   conclusion.

**CONFIDENTIAL TREATMENT REQUESTED**

2    A.   Just the circulation of the -- the loan document

3    makes me believe that.

4    Q.   The circulation --

5    A.   The circulation and the conversations related to

6    the loan document.

7    Q.   Which -- which conversations are you referring

8    to?

9    A.   Mr. Harvey disclosed a lot of things to me.

10   Q.   Did Mr. Harvey indicate to you that -- that

11   the -- that the loan document had something to do with the

12   Hawaii projects?

13   A.   The loan document originated from the Hawaii

14   project.

15   Q.   Mr. Harvey told you that?

16   A.   He put a lot of statements forward to me, and it

17   makes it very difficult to recall.  I'll keep on thinking,

18   but a lot of them were threatening.  So let me -- ask me

19   the question again and I'll keep it isolated for you.

20   Q.   Okay.  I'm just trying to figure out if

21   Mr. Harvey said something that led you to believe that the

22   loan document was connected to the Hawaii projects.

23   A.   Yes.

24   Q.   Do you remember what he said about that?

25    A.  Not specifically.

                              121

1    Q.  Do you know whether Mr. Kaiser was ever the

2  managing member of the Hawaii project?

3    A.  I believe he is.

4    Q.  Today?

5    A.  Today.  I don't know the structure of the

6  business.

7    Q.  Do you know whether Mr. Kaiser was ever a member

8  of Little Isle IV or Ula Makika?

9        MR. AUGUSTINE:  Only if you know.

10       THE WITNESS:  I don't know.

11   Q.  BY MR. LAKE:  Do you know who Tim Gaarn is?

12       MR. HARPER:  Object to form.

13       THE WITNESS:  We referenced him earlier.  I

14  said I do know him and have had limited conversations

15  with.

16   Q.  BY MR. LAKE:  Do you know what his occupation is?

17   A.  I do not.

18   Q.  Do you know anything about his education or

19  experience?

20   A.  No.

21   Q.  Forgive me if I asked this before, but have you

22  ever spoken to Mr. Gaarn?

23    A.  Yes.

24    Q.  When was that?

25        MR. AUGUSTINE:  I'll object; asked and

122

1  answered, because you already asked him and he answered.

2        MR. LAKE:  You're instructing him not to

3  answer?

4        MR. AUGUSTINE:  You can ask him about the

5  conversation, but he's already asked -- he's asked and

6  answered that question.

7    Q.  BY MR. LAKE:  Well, tell me -- tell me what you

8  can about that conversation.

9    A.  The last conversation I had with him -- I don't

10  recall when it was, but --

11        What do I recall?  I don't recall what our

12  conversation was.

13    Q.  Have you ever had a conversation with him about

14  the loan agreement document?

15    A.  No.

16    Q.  Have you had a conversation with Mr. Gaarn about

17  this litigation?

18    A.  No.

**CONFIDENTIAL TREATMENT REQUESTED**

**PK_SEC_000782**

19    Q.  To your knowledge, have Mr. Kenner, Little Isle

20  or Ula Makika ever made any payments to Tim Gaarn or

21  companies that he owns or manages?

22    A.  Repeat that, please.

23    Q.  To your knowledge, have Mr. Kenner, Little Isle

24  or Ula Makika ever made any payments to Tim Gaarn or to

25  companies that he owns or manages?

123

1    A.  I believe, yes.

2    Q.  What payments are those?

3    A.  I don't know.  I'm not sure.

4    Q.  Well, what is the basis for your belief that --

5  that such payments were made?

6    A.  Just various conversations unrelated to anything.

7        He had an association or a -- I just recall

8  conversations, not really specific, that he -- he knew of

9  a Hawaiian company.  I don't know much more than that

10  specifically.

11    Q.  You mean conversations you had with Mr. Kenner?

12  Is that what you're talking about?

13    A.  Right.

14    Q.  In those conversations was there any -- did you

15  learn any information about the amount of the payments?

16    A.  No.

17    Q.  To your knowledge, have Kenner, Little Isle IV or

18    Ula Makika ever transferred any property to Tim Gaarn or

19    to companies that he owns or manages?

20    A.  I don't know that.

21        MR. LAKE:  Okay.  I think that's it.

22        Do you have some questions?

23        MR. HARPER:  Yeah.

24

25        (Next page, please.)

124

1                  EXAMINATION

2    BY MR. HARPER:

3    Q.  When did Tom Harvey contact you about this

4    agreement?

5    A.  Several occasions initially, by telephone.  I

6    don't recall the first time it would have been.  I don't

7    recall the first occasion.

8    Q.  Had you communicated with Tom Harvey before?

9    A.  Before?

10    Q.  Before he contacted you about this agreement.

11    A.  Specifically about the agreement?

12    Q.  No, on other occasions.

CONFIDENTIAL TREATMENT REQUESTED

13    A.   Yeah, we have talked before.

14    Q.   Okay.  Who is Tom Harvey?

15    A.   Tom Harvey I believe is Mr. Jowdy's counsel from

16  New York.

17    Q.   He's a lawyer?

18    A.   Yes.

19    Q.   And for what purposes had you communicated with

20  Mr. Harvey in the past?

21    A.   We had talked just in a social capacity once

22  previous just relating to the Diamante project.

23  Undescript (sic).

24    Q.   Was he -- when he contacted you about this loan

25  agreement, did he represent himself as Mr. Jowdy's

                                 125

1  representative?

2            MR. LAKE:  Objection.

3            MR. AUGUSTINE:  You can answer.

4            THE WITNESS:  On that call, I don't recall

5  him representing he being, but I knew that he was.

6    Q.  BY MR. HARPER:  How did he first contact you

7  about the loan agreement?

8    A.  By telephone.

9    Q.  And what was -- what was the substance of that

10    conversation?

11         Well, first of all, was anybody else on the

12    line?

13    A.  Not that I'm aware of.

14    Q.  Okay.  And what was that conversation about?

15    A.  It was specifically regarding -- specifically

16    regarding the loan agreement.

17         He had announced that there was a loan

18    agreement in question, and then proceeded to ask if I

19    recall anything.  It appears that there's your signature

20    on the document and, again, do I recall anything?  If I

21    could recall, please contact him.

22         First occasion.

23    Q.  Was this a voicemail?  I just asked because of

24    the last comment, please contact him.

25    A.  Yeah.  No, I think our conversation -- it was in

                              126
1     person; it was not a voicemail.  But it was please contact

2     me should you recall anything related, because it appears

3     that your signature is on this document.

4     Q.  Okay.  And did you -- did you convey any

5     information to him at that point about recalling the

6     document?

7      A.   That was the first time that I had had a

8   conversation with anybody regarding the document since

9   2004.

10     Q.   And earlier you mentioned some of the -- that

11   some of Mr. Harvey's comments were threatening.  Were they

12   threatening in that conversation?

13     A.   No.  The first conversation was more of an

14   information -- you know, there's a dispute.  You're on it,

15   your signature's on it.  What do you know about it?

16          So the first one was pretty simple.  But he

17   definitely requested me to get back to him.

18     Q.   Okay.  And did you get back to him?

19     A.   I never, but he called me a few days later and

20   asked a few more questions related.

21          It -- with every subsequent call or

22   communication it just became much more concerning to me.

23   Much more threatening to me, actually.

24     Q.   And why was that?  Why -- why would you call

25   those conversations threatening?

                                    127

1     A.   On one of the calls he was pressuring me to

2   recognize who I was supporting and that I need to make

3   sure I understand what that means.  And that they have --

CONFIDENTIAL TREATMENT REQUESTED

4    I don't recall if he said former, but former FBI

5    investigators, signature experts.  Started cussing and

6    stuff, saying that the document's a fraud.

7           And so a lot of pressure just to -- to get

8    back to the time frame and recognize anything that I could

9    to help him understand what this document -- about this

10   document, I should say.

11       Q.  Did you tell him that you recalled signing the

12   document?

13       A.  I didn't say very much about the document because

14   it was very quickly into a threatening conversation.

15       Q.  Was anybody else participating in the phone

16   calls?

17       A.  Not on my end.

18       Q.  What about on Mr. Harvey's end?

19       A.  Oh, pardon me.  On one other call I got a phone

20   call back.  Again, time frame I don't recall, but it was

21   probably like the third or fourth communication.

22   Introduced himself, "Hey, Bob.  Tom Harvey here.  Also

23   John Behnke is with me."

24       Q.  Who is John Behnke?

25       A.  John Behnke is I believe still an employee of

CONFIDENTIAL TREATMENT REQUESTED

128

1   Ken's, of Mr. Jowdy.  He is a former FBI agent, assistant

2   to the director -- former assistant to the director.

3           So I found it kind of unusual when he made

4   that announcement, that, hey, John Behnke's here.  I

5   consider John to be a good friend.  We've built a good

6   friendship over our time as employees of Diamante.

7           And John didn't say anything on that call,

8   but it was announced to me that he was there, listening

9   in.

10          With that -- it might have been on that call

11  or another call, but, you know, he says, "Bob, you

12  really -- you really have to realize" -- he says, "You

13  obviously don't understand what the law means.  You

14  obviously" -- "The law in the United States is different

15  than it is in Mexico."

16          He referenced the name Michael Meeks.  He

17  says, "Meeks" -- "You have to be careful because Meeks is

18  going to have somebody waiting for you."

19      Q.   Who is Meeks?

20      A.   As I find out, he's an attorney for -- he's an

21  attorney.  A California-based attorney.  I think he

22  represents a few people that have different lawsuits

23  against -- I believe against Kenner.

24   Q.   Okay.

25   A.   But I was told that I have to be very careful

129

1   when I travel; that Meeks is going to have someone waiting

2   for me.  You know, this is a very serious issue.  You have

3   to be careful with what you do.

4            Everybody in the -- I believe he's aware --

5   I know Mr. Jowdy is aware that I have got two young

6   children that live in Canada and I travel back often.  Any

7   free moment that I have I go back to spend time with my

8   young children.  And quite frankly, my next trip out of

9   town was a little nerve-racking.  And every one are

10   because, you know, when you -- when you get that held over

11   your head, it's intimidating, period.

12   Q.   How many of these conversations were there?

13   A.   I would say voice, four.  Four different phone --

14   four or five different phone calls.

15   Q.   Were there other communications?

16   A.   One or two e-mails.

17   Q.   Did you ever discuss with Mr. Harvey your

18   recollection of the execution of the agreement?

19   A.   I did, but not thoroughly.  I didn't -- I didn't

20   explain details of the occurrence.

**CONFIDENTIAL TREATMENT REQUESTED**

21   Q.   Did he ever ask you about the execution of the

22   agreement?

23          Let me rephrase.

24   A.   Yeah.

25   Q.   Did he ask you whether you signed the agreement?

                                    130

1   A.   He did ask, but I -- I didn't say anything.  I

2   just said, "I" -- you know, "I know what I know and I'm

3   not sure what you're asking me to talk about."

4   Q.   Did he ever encourage you to tell the truth?

5   A.   That wasn't part of our conversation.

6   Q.   In December of 2004 did you witness more than one

7   agreement or more than one document?

8   A.   More than one document at the time that I --

9   Q.   In the time period when this agreement was

10   signed, the loan agreement was signed by yourself, any

11   time during that time period did you perform a similar

12   function with regard to any other document?

13   A.   Nothing surrounding that event in December, no.

14   Q.   Okay.  And you referred earlier to the table

15   where the document was signed as the wood being soft.

16   A.   Yes.

17   Q.   Describe that table for me in a little more

18  detail.

19     A.   It's a large table, rectangular in shape.  It's

20  soft because -- If you were to look at it, you can see a

21  lot of markings on it; whether it be pen markings or just

22  (indicating).  It just -- How do you say it?  It dents or

23  makes marks very easily.  It's soft wood.

24     Q.   It's fair to say it's not smooth like the table

25  in front of us today?

131

1     A.   No, no.

2     Q.   At the time in December of 2004, Diamante Del Mar

3  already existed; correct?

4     A.   I -- Yes.

5     Q.   Okay.  And the Diamante entity or one or more

6  Diamante entities were looking to procure a property in

7  Cabo San Lucas; correct?

8     A.   Yes.

9        MR. LAKE:  Objection.

10     Q.   BY MR. HARPER:  One of those was Querencia?

11     A.   That was the -- to the best of my knowledge, that

12  was the first property that the group was pursuing for

13  ownership.

14     Q.   There were other properties as well?

15    A.   Subsequent to the Querencia one, yes.

16    Q.   It was understood that those would be a Diamante

17  property?

18    A.   Yes.

19    Q.   Whatever was acquired?

20    A.   Yes.

21    Q.   And it would be located in Cabo San Lucas?

22    A.   That was the desire, yes.

23    Q.   And one of the names discussed was Diamante Cabo

24  San Lucas?

25    A.   I had heard Diamante, and I had heard many times

                                  132

1  Cabo San Lucas.

2           MR. HARPER:  Okay.  I don't have any other

3  questions.

4           MR. LAKE:  Just a little bit on redirect.

5

6                FURTHER EXAMINATION

7  BY MR. LAKE:

8    Q.   Is Querencia located in Cabo?

9    A.   Querencia is located in Baja, California South,

10  the state, and in the -- It's located in Los Cabos.

11           There's a lot of different identifiers to

PK_SEC_000793

12   Querencia.

13      Q.   How far is that from Cabo San Lucas?

14      A.   Well, it's -- from downtown Cabo San Lucas, about

15   eight miles.

16          One thing to consider is the airport in

17   San Jose or the airport in Cabo or the airport in Los

18   Cabos -- which is all the same area -- Let me just

19   rephrase that.

20          The airport in the region, the commercial

21   airport -- the commercial airport in the region, which is

22   in San Jose or Los Cabos, is called Cabo San Lucas

23   airport.  CSL is the registration of that airport, Cabo

24   San Lucas.

25          Or it's SJD, actually, yeah.  But it's -- In

                                133
1   some websites, actually, when I search for my flights,

2   most often I've got to find Cabo San Lucas.

3      Q.   So is Querencia, then, in Cabo San Lucas?

4      A.   Depends who you ask.

5      Q.   Well, if you looked at a map, what would it say?

6      A.   Where is it?  It's -- If I looked at it or if you

7   looked at it?

8          If you looked at it, you wouldn't know if it

9   was Cabo San Lucas, San Jose or Los Cabos.  If I looked at

10  it, I would know it was San Jose.

11      Q.   Okay.  Well, what's the address?  How about that?

12      A.   The address -- the address is San Jose.

13      Q.   Did you ever tell -- Just to be clear on this --

14      A.   Uh-huh.

15      Q.   -- did you ever tell Tom Harvey that you signed

16  the document, the loan agreement document, in 2004?

17      A.   I never told him that because, again, he quickly

18  went to a -- to more aggressive statements relating to the

19  document.

20          So it wasn't really comfortable to discuss

21  the document with him.

22      Q.   That's how you perceived them, his comments, as

23  more aggressive?

24      A.   I felt them to be.

25      Q.   The table that Mr. Harper was just asking you

                                    134

1   about, the table that the document was signed on, you were

2   sort of indicating what looked like --

3           Did the table have little holes or pockmarks

4   in it?

5       A.   It's not smooth like this surface.

CONFIDENTIAL TREATMENT REQUESTED                    PK_SEC_000795

6    Q.  Uh-huh.

7    A.  Holes, pockmarks?  It just dents very easily.  If

8  I did that (indicating), it would actually have a little

9  dent in the table from that little movement.

10    Q.  The wood is that soft?

11    A.  It's pretty soft.

12    Q.  That if you dropped a --

13    A.  Maybe it would have to be this, the cap, a little

14  harder surface.

15    Q.  It would leave a mark?

16    A.  It would leave a mark, yes.

17    Q.  Okay.  So what you meant to indicate, then, was,

18  that if it had pressure on it it could leave a mark, but

19  not that it already had pockmarks or holes naturally in

20  the wood?

21    A.  Because it could leave marks, I'm going to say

22  that it probably had a lot of marks on the table.

23    Q.  Okay.  But it wasn't one of these where the wood

24  naturally has little holes or pockmarks in it?

25    A.  No, it's not a holey table.  It's a -- you know,

135

1  I don't know if you could roll an object on it and it

2  would continue to roll.  It's --

3    Q.   So it's a pretty rough-hewn surface?

4          I'm just trying to get an --

5    A.   Yeah, yeah.  I'm just probably overthinking

6  because -- I never took wood shop in class, in school.

7    Q.   I took it, but I failed.

8    A.   It's just a soft surface and there's markings on

9  it.

10         MR. LAKE:  Okay.  I think that's it.  Thanks

11  for your time.

12         THE WITNESS:  Thank you.

13         MR. AUGUSTINE:  Thank you.

14         THE VIDEOGRAPHER:  This marks the end of the

15  videotape deposition of Robert Gaudet.  We're off the

16  record at 12:52.

17

18

19

20

21

22

23

24

25

**CONFIDENTIAL TREATMENT REQUESTED**

136

1  STATE OF ARIZONA    )

2              : ss.

3  COUNTY OF YAVAPAI   )

4

5        I, JILL MARNELL, a Certified Reporter,

6  Certificate No. 50021, in the State of Arizona, do hereby

7  certify that the foregoing witness was duly sworn to tell

8  the whole truth; that the foregoing pages constitute a

9  full, true, and accurate transcript of all proceedings had

10  in the foregoing matter, all done to the best of my skill

11  and ability.  Deposition review and signature was not

12  requested.

13        I FURTHER CERTIFY that I am not related to nor

14  employed by any of the parties hereto and have no interest

15  in the outcome thereof.

16

17        WITNESS my hand this      day of

18            , 2009.

19

20

21            JILL MARNELL
           Certified Reporter #50021

CONFIDENTIAL TREATMENT REQUESTED

22          Registered Professional Reporter

23

24

25

**CONFIDENTIAL TREATMENT REQUESTED**                                    **PK_SEC_000799**