telephonic

Scott R
Matt C.
Chris M

Chris Manfredi = 3:30PM = 10/12/10

Question to (CM):

?? ⇒ raising $ in Hawaii
(CM) — tried to get involved in raising $
      — send out maps + development plans to potential lenders

The 2 lenders were Centrum and Urban Expansion -- CLEAR...

(CM) = did get 1 or 2 + lender $
       (CM) — one lender — $3M

Manfredi confirms his involvement in all of the Hawaii fundraising...although he attempted to deny it at the EDNY trial...

Gaarn — (CM) doesn't recall name
Gaudet — (CM) doesn't recall name
Donny Rae — (CM) doesn't recall name — sounds familiar
            ⇒ may have put in touch w/ potential lender

≡ most lender contacts came through (PK)
  — then (CM) send out package
                              — pro forma
                              — maps
                              — plans

Manfredi confirms that Constantine was paid early by the Hawaii partners for his fundraising -- thus -- Galioto was aware of this confirmation since 2010...

Constantine
  ≡ brought in $ to project - Hawaii
  ≡ more than $3M -
  ≡ Agreement - between (PK) or LLCs + Constantine

Urban Expansion loan...

      loan w/ pre-payment penalty

may have been w/ Constantine + another person

Lehman came in

+ paid ≡   Constantine — (PK) paid (TC) early +
            (TC) made a lot of $ from penalty



1st
— Hawaii
party = Kaiser + (CM) = w/ went to Hawaii in 2002-2003
*02-'03

(CM) → ① closed w/ (JK)
+
(JK)

(CM) - never increased investment
     - not sure if (JK) did

(CM) → title COO + Project Mngr = during yrs
     - partner in LLC's              w/ (JK)

2006 - when Lehman came in w/ new development
                                          partner

(JK) - was a partner in LLC's

(JK) - retired w/ back injury from Suffolk Cty Police

END

②

**Annotation boxes (red):**

Far less than the $1mm Kaiser claimed Manfredi confronted Kenner about in 2006...

[pointing to] $1,000 deposit

How could Manfredi and Kaiser have confronted Kenner in 2006 about a $1mm investment (*sent to Mexico -- from the Kaiser August 2005 funds*) IF Manfredi told the FBI in 2010 **"not sure if Kaiser did"**...???

Government Exhibit

3500 - DS   - 2

13-CR-607(JFB)

ORIGINAL

1

2   UNITED STATES GRAND JURY

3   SOUTHERN DISTRICT OF NEW YORK

4   - - - - - - - - - - - - - - - - - - - x

5   UNITED STATES OF AMERICA

6   -v-                                    August 2009
                                          :Special
7   PHILLIP KENNER                         :

8   - - - - - - - - - - - - - - - - - - - x

9

Sydor confirms knowledge of loans to Jowdy from Hawaii investment group -- pages 19, 24 and 25...

                    UNITED STATES COURTHOUSE
                    500 Pearl Street
                    New York, New York 10007

                    March 29, 2011
                    11:46 a.m.

14

15   APPEARANCES:

16             ARLO DEVLIN-BROWN, ESQ.

17             Assistant United States Attorney

18

19

20             Rivka Teich, R.P.R., C.S.R.
               Acting Grand Jury Reporter

21

22

23

24                                    GRAND JURY
                                      EXHIBIT
25                                    10/22/13
26

Stevenson was the second person to give testimony -- so if Peca was REALLY concerned about the Kenner GJ -- any FALSE preparations would have been alerted by Peca to Sydor and Stevenson

2

D. Sydor    03/29/11

(Colloquy Precedes.)

(Witness Enters Room.)

(Time Noted: 11:46 a.m.)

DARRYL SYDOR, called as a witness, having been

6      first duly sworn by the Foreperson of the

7      Grand Jury, was examined and testified as

8      follows:

9   BY MR. DEVLIN-BROWN:

10      Q    My name is Arlo Devlin-Brown.  I'm an Assistant

11   United States Attorney.  You've been called today to

12   this Grand Jury pursuant to a subpoena, correct?

13      A    Yes.

14      Q    This Grand Jury is investigating various

15   offenses of securities fraud, bank fraud, wire fraud,

16   things of that nature.  You've been called as a witness

17   in that investigation, meaning you're not a subject of

18   the Grand Jury's inquiry, you're not a target of this

19   inquiry, but you're called because you have potentially

20   some information.

21      Would you state your name and spell it for the

22   for the record?

23      A    Darryl Sydor, D-A-R-R-Y-L, M., S-Y-D-O-R.

24      Q    I'm going to advise you of certain rights that

25   you and every witness has, just to make sure you

26   understand them.  Okay?

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor, New York, N.Y. 10018  (212) 869-1500

```
                            D. Sydor    03/29/11                    3
```

1

2      A    Okay.

3      Q    For one thing, you have the right not to

4   incriminate yourself, meaning you have the right not to

5   answer a question if the truthful answer would tend to

6   incriminate you.  Do you understand that?

7      A    Okay.

8      Q    Do you understand that what you're saying today

9   is taken down by the court reporter and that you're

10  under oath?

11     A    Yes.

12     Q    Do you understand that you have the right to

13  consult with an attorney during your testimony even if

14  that attorney can't be in this room?

15     A    Yes.

16     Q    Who is your attorney?

17     A    Ronald Richards.

18     Q    Does he represent other people connected to

19  this investigation or the subject matters?

20     A    Just the two others that are here, yes.

21     Q    If you need to consult with your attorney on

22  something just let us know or if you need a break for

23  some other reason.

24          Do you understand that because you're under

25  oath you're required to give truthful, non-misleading

26  answers to the Grand Jury?

D. Sydor    03/29/11                                    4

1

2     A    Yes.

3     Q    Do you understand that if you make false

4  statements or give misleading testimony you could be

5  prosecuted even though you're not a subject of this

6  investigation?

7     A    Yes.

8     Q    These are crimes that you could be prosecuted

9  for perjury or obstruction of justice, making false

10 declarations to a Grand Jury?

11    A    Yes.

12    Q    Do you understand that these offenses include

13 not just -- let me give you an example, if you remember

14 something and you say "I don't remember," that falls

15 within the federal perjury laws.

16    A    Okay.

17    Q    Do you understand everything I've told you so

18 far?

19    A    Yes.

20    Q    Are you prepared then to proceed?

21    A    Yes.

22    Q    Let me start by getting a little background

23 about where are you from?

24    A    Alberta, Canada.

25    Q    Are you a Canadian citizen?

26    A    Dual, American too.

```
                                                                 5
1                    D. Sydor    03/29/11

2        Q    Where do you live today?

3        A    Houston, Texas.

4        Q    What do you do for a living today?

5        A    Retired hockey player, now an assistant coach

6   with the Houston Arrows.

7        Q    How long were you a hockey player?

8        A    Eighteen seasons.

9        Q    All with the NHL?

10        A    Yes.

11        Q    What teams did you play for?

12        A    Los Angeles, went to Dallas, went to Columbus,

13   went to Tampa Bay, back to Dallas, went to St. Louis

14   back to Dallas.

15        Q    When did you retire?

16        A    Just this season here, so 2010.

17        Q    Let me ask you about an individual Phil Kenner,

18   do you know him?

19        A    Yes.

20        Q    When did you first meet Mr. Kenner?

21        A    Would have met him in 1996, I played for Los

22   Angeles.

23        Q    How did you end up meeting him?

24        A    Just through other teammates that had him as a

25   business manager.

26        Q    Did you select him to be your business manager
```

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor, New York, N.Y. 10018  (212) 869-1500

The FINRA witness for the government was a classic mis-direction...

D. Sydor    03/29/11                                 6

2    as well?

3        A    Yes.

4        Q    What did that mean?  What was he going to do

5    for you?

6        A    Look over just financial investments, just be

7    my business manager, getting different investments and

8    different securities.

9        Q    When did you select him to be your business

10   manager?

11       A    Exact date I don't know.

12       Q    Best to your recollection?

13       A    1996, 1997 season.

14       Q    Is he still your business manager today?

15       A    Yes.

16       Q    Did you come to some kind of agreement with him

17   as to how he was going to be paid for managing your

18   investments?

19       A    Yes.  His normal pay of, you know, every two

20   months I believe, a percentage.

21       Q    A percentage of the total amount of money he

22   was managing?

23       A    Whatever I put into the investments, not the

24   investments, of what he was managing, yes.

25       Q    What type of investments did he manage on your

26   behalf?

D. Sydor   03/29/11                                    7

2    A    He managed a lot.  He managed, you know, sales

3    of our houses that I bought throughout the years.  He

4    would help me with that, put me in contact with

5    different mortgage people.  Different investments like

6    Code Fire, TechNeck, properties that we're invested in

7    in today.

8        Q    Stocks and bonds as well?

9        A    He put me in touch with people, yes.

10       Q    Let's start with specific companies that he put

11   you in, not big publicly-traded companies.  Do you

12   remember some of those companies?

13       A    I remember some of them, yes.

14       Q    I have some names here.  I'll ask you if you

15   remember some of them, Impact Protective Equipment?

16       A    Yes.

17       Q    Who presented that investment to you?

18       A    That actually got presented by Richard Salgado,

19   also knew through Phil Kenner and other people he was an

20   exfootball player who retired at the time and got into a

21   shoulder pad company.

22       Q    How much did you invest?

23       A    I can't exactly remember.

24       Q    Around $100,000?

25       A    I'd say around $100,000.

26       Q    Was that in 2003?

D. Sydor   03/29/11                                    8

2    A    Yeah.  I would have say around there, that's

3    when I started to make my earnings, that's probably when

4    I did that.

5    Q    Just so it's clear, I'm not sure you're not

6    going to remember exact dates or often exact amounts,

7    that's fine.  Just let the Grand Jury know it's your

8    best estimate or if it sounds right.

9    A    Okay.

10   Q    Did you get any of that money back?

11   A    No.

12   Q    Midland Celtic Title, does that name mean

13   anything to you?

14   A    No.

15   Q    A company Cleveland, Ohio?

16   A    What is the name of it?

17   Q    Midland Celtic Title?

18   A    No, that doesn't ring a bell.

19   Q    If you were investing -- if there was a

20   particular company for you to make a potential

21   investment in, who had authority to decide if you would

22   make that investment or not?

23   A    Myself.

24   Q    Could Mr. Kenner just make an investment

25   without asking you about it?

26   A    No.

D. Sydor   03/29/11                                        9

2    Q   Let me show you what we'll mark as Grand Jury
3  Exhibit 120.  I'm going to show you some documents on
4  the screen.  This signature on the bottom of the
5  document, does that look like your signature?
6    A   Yes.

7    Q   A wire request of August 28, 2003, signed by
8  you to wire $250,000 to Midland Celtic Title, does that
9  ring bells for you?

10    A   It doesn't ring bells, no, but that's my
11  signature.

12    Q   You don't have any specific recollection of
13  what, signing this or what that company was?

14    A   What date was that?

15    Q   It says here August 28, 2003.

16    A   No.

17    Q   That's fine.  Let me ask you about Prime Sports
18  One, does that name mean anything to you?

19    A   No.

20    Q   Do you remember investing in a company around
21  $70,000 in 2003?

22    A   Do you know what it is, like, what kind of
23  company?

24    Q   I don't think I do.  I'll show you a document
25  maybe it will help you, I don't know if it will.

26    A   Okay.

```
 1                    D. Sydor   03/29/11              10
 2          Q   121, "Please mail check to Prime Sports One,"
 3    it's for $70,000.  Is that your signature?
 4          A   That might have been payment to like Richie
 5    Salgado.  Maybe that was his company's name.  I can't
 6    remember.
 7          Q   Why would you be paying Salgado?
 8          A   Rich did my life insurance too.
 9          Q   You think, you're not sure?
10          A   I'm not sure.  I can't say yes or no.
11          Q   That's fine.  Exclusive Imports of Scottsdale,
12    does that ring any bells for you, a company in
13    Scottsdale, Arizona?
14          A   I'm thinking vehicles, but -- is there a total
15    on there?
16          Q   85,400.
17          A   I don't recall.
18          Q   It was in December 2003.
19          A   2003, 2004 was I was in Arizona at the time.
20          Q   Ice Luck Inc.?
21          A   That's my agent fees, my hockey agent.
22          Q   TechNeck Digital Arts Inc.?
23          A   I do.
24          Q   What is that?
25          A   If I recall right I want to say a gaming
26    company, like a new video game type thing, supposed to
```

D. Sydor    03/29/11                                    11

2    come out.

3         Q    Do you remember how much you invested, around

4    100,000 sound right?

5         A    Probably.

6         Q    Did that work out?

7         A    I haven't seen anything from it.

8         Q    You haven't seen any?

9         A    Any profit, that's what I meant.

10        Q    Or even getting your money back?

11        A    Or getting my money back.

12        Q    Integrated Telecommunications Inc.?

13        A    Integrated Telecommunications Inc., I'm not

14   sure.

15        Q    That one doesn't mean anything to you?

16        A    I'm sure there are a few that I have just

17   forgotten.

18        Q    I'll give you some specifics if it helps, might

19   have been something around June 2004, a company in

20   Syosset, New York?

21        A    I don't know.

22        Q    Let me put on the screen Exhibit 122, is that

23   your signature?

24        A    Yes.

25        Q    You hesitated for a moment.

26        A    You know, the "D" looks a little different.

12

D. Sydor   03/29/11

1

2      Q    What about the rest of it, what about the "S"

3   for Sydor?

4      A    Looks fine to me.

5      Q    $100,000 to North Fork Bank for Integrated

6   Telecommunications Inc. doesn't ring any bells though?

7      A    If I -- the names, I not sure.  If I had more

8   on what it was the company it probably would ring bells.

9      Q    That's fine.  What you're saying is you

10  understood what some of the companies did and you may

11  have forgotten the names?

12     A    Right.

13     Q    What about Tech Connect Corp.?

14     A    TechNec, yes.

15     Q    What did it do -- not TechNec, Tech Connect?

16     A    I believe it was, maybe that was the video

17  gaming.

18     Q    Rather than TechNec, you think Tech Connect was

19  the gaming?

20     A    You asked me what the Digital --

21     Q    Technique Digital Arts is what I said earlier,

22  now Tech Connect Corp.?

23     A    I do remember these names, I don't know which

24  one is which.

25     Q    One was a video game, what was the other one?

26     A    That's what I'm saying.  This one may be the

D. Sydor   03/29/11                          13

2  video gaming thing.  I know that I invested in Tech

3  Connect.

4        Q   Have you gotten any money back from that one?

5        A   No.

6        Q   Are there other companies that you remember,

7  whether you remember the name or whether you remember

8  what the company did that you invested in that had been

9  brought to your attention by Phil Kenner?

10       A   Can you repeat that?

11       Q   Are there any other companies that you remember

12  investing in that were bought to your attention by Phil

13  Kenner?

14       A   Have you mentioned Code Fire?

15       Q   I don't think I did, what is that?

16       A   I believe it was a credit card thing.

17       Q   Who was the person who ran Code Fire?

18       A   Who ran Code Fire, I don't know who owned it.

19       Q   Tommy Constantine, does that mean anything to

20  you?

21       A   That's Euphoria, that's a prepaid credit card

22  company too that I'm in.

23       Q   Did you invest in that?

24       A   Yes.

25       Q   How much did you invest in that?

26       A   Around $200,000.

```
 1                    D. Sydor   03/29/11              14

 2        Q    Do you know what happened to that investment?

 3        A    Right now it's going through, not litigation, I

 4   don't know the exact words.  But there are problems with

 5   it not, with the company, but there is some

 6   arguing inside I guess.

 7        Q    What about the Code Share investment, how much

 8   did you invest in that, what happened to that?

 9        A    In what?

10        Q    Did you say --

11        A    Code Fire.

12        Q    Code Fire.

13        A    I want to say around 100,000.

14        Q    What was that company?

15        A    I can't remember what it was.

16        Q    Did you get that money back or do you know what

17   happened?

18        A    I believe they are all still invested, still

19   going.  I don't, I guess I'm gullible in that way.  I

20   haven't watched them every month to see where they are.

21        Q    No one is saying you're gullible.

22        A    I'm just saying I'm not one to always be on top

23   of things.

24        Q    Are there any investments that you've made

25   through Mr. Kenner that have paid off that you can think

26   of, other than stocks or bonds, any of these companies
```

```
1                    D. Sydor    03/29/11              15

2    that he put you into or land where you had gotten the

3    money back or made a profit?

4         A   I can't remember which company it was but I did

5    get one some money back.

6         Q   You're not sure which one?

7         A   I'm not sure.

8         Q   Have you been satisfied with his services as a

9    financial adviser?

10        A   Yeah, yeah.

11        Q   Why?

12        A   He's helped me on a lot of things not just the

13   investments, but I think we did a lot of good things and

14   still waiting for return.

15        Q   You have confidence that the return will be

16   coming some day?

17        A   Oh, yeah, yeah.

18        Q   Except in the companies that had gone bust,

19   right?

20        A   I believe the shoulder pad company is gone

21   bust, yeah.

22        Q   But you think some of the others might turn

23   around?

24        A   Yes.

25        Q   Let's talk about land deals.  Did you invest in

26   real estate projects with Mr. Kenner?
```

*Two years after Sydor LOC collateral was seized -- March 31, 2009*

D. Sydor   03/29/11                                    16

1

2      A   I didn't invest with him.

3      Q   He brought to your attention?

4      A   Yes.

5      Q   What are the projects did you invest in?

6      A   Cabo San Lucas, Delmar, Baha, so El Rosario in

7   Mexico.

8      Q   That's two projects, the one El Rosario then

9   San Lucas?

10     A   Yes, and Hawaii.

11     Q   That would be the Little Isle IV?

12     A   Yes.

13     Q   How much did you put into each of these

14   investments?

15     A   First one El Rosario was $500,000.

16     Q   Do you remember when you invested in that?

17     A   2004, or five, I'm not sure.  If you have

18   documents you can -- so El Rosario was first, then

19   Hawaii then Cabo.

20     Q   How much did you invest in Hawaii?

21     A   500,000, and 200 in Cabo.

22     Q   Have you been to the El Rosario development.

23     A   No, I've seen the portfolio, that's it.  The

24   plan, I guess.

25     Q   What happened to that investment?

26     A   That was, first we were supposedly putting in

1                          D. Sydor    03/29/11                    17

2       an airport to get everything down there.  And then we

3       put that on hold and everything started picking up

4       around Cabo, so we put in Cabo.

5            Q    And you put in 250 in Cabo?

6            A    Yes, to purchase the land, yes.

7            Q    To help purchase the land?

8            A    Yes.

9            Q    Was the land purchased?

10           A    Purchased by us?

11           Q    Yes.

12           A    I believe so.

13           Q    Do you know what the status of that development

14      is at that point?

15           A    That's why we're here now, I think, because

16      it's supposedly built.  I found out two days ago the

17      golf course is built, there is no infrastructure in

18      buildings.  But we haven't seen anything back from that.

19           Q    Who did you find that out from two days agent?

20           A    When I was talking to my attorney, Ron

21      Richards.

22           Q    He's the source of the information that the

23      golf course has been built?

24           A    Not the source.

25           Q    But he's the one that one that told you?

26           A    He mentioned it to me.

Sydor is receiving info from his personal attorney about his investments -- not just Kenner...

```
1                    D. Sydor    03/29/11              18

2        Q   You put in some money into Little Isle IV as

3   well, correct?

4        A   Yes.

5        Q   You said before that was 500,000 am, I right?

6        A   Yes.

7        Q   What was that for?

8        A   That was for land.  I believe it's a sugar cane

9   farm or something, supposedly to develop.

10       Q   Did you get documents on what any of these

11  deals would be before you invested money?

12       A   Yes, I have all the documentation.

13       Q   Did you get it before you invested?

14       A   Yes, like the portfolio, the binders, and all

15  that, whatever the, I can't tell you exactly what

16  percentage I own of it.

17       Q   Where do you do your investment banking?  Do

18  you have accounts in certain banks?

19       A   Yes, Charles Schwab.  My personal bank is Bank

20  of America.

21       Q   In addition to the money you put into Little

22  Isle IV did you borrow more money to put into that

23  project?

24       A   Did I put more money into Hawaii?

25       Q   You said you put in $500,000?

26       A   Yes.
```

1                      D. Sydor     03/29/11                    19

2        Q    Did you take out a loan to put in more money?

3        A    I believe $100,000 line of credit.

4        Q    $100,000 line of credit?

5        A    I believe so.

6        Q    Where did you get the line of credit?

7        A    Actually I think it was Northern Trust.

8        Q    Why did you borrow money?

9        A    Just through talking with Phil Kenner to

10   purchase some more, I believe, also help out the

11   transaction in Cabo to start building there.

12       Q    You think it was for about $100,000?

13       A    I think so.

14       Q    Let me show you a few more documents, Grand

15   Jury Exhibit 111, which is on the top it says "Northern

16   Trust Bank investment management account agreement."  Is

17   that handwriting yours on the top, "Owner Darryl Sydor"?

18       A    No, not my printing, no.

19       Q    What about this page of the document, numbered

20   657 on the bottom, is that your signature here?

21       A    Yes.

22       Q    Do you recall signing forms that gave Phil

23   Kenner power of attorney to trade in your account as he

24   saw fit?

25       A    Not as he saw fit.

26       Q    What conditions were put on the power of

*Sydor claims the reason for the LOC at NT Bank was to help the Cabo project (loans to Jowdy)*

1                    D. Sydor    03/29/11                    20

2    attorney?

3         A    I would have to authorize any transactions, but

4    he did have power of attorney to do that if I was

5    playing hockey somewhere I couldn't get there; he had

6    the power of attorney to make trades.

7         Q    If I understand, you're saying from your own

8    relationship with him he had to go to you to ask; but,

9    from the bank's perspective he had the power to execute

10   transactions in the account as if he was on the account,

11   right, or are you not aware of that?

12        A    He had to come through me first.  I would have

13   to he -- would have to come to me, I have to say yes

14   then, he can make the transaction.

15        Q    Let me show you Grand Jury Exhibit 113, is that

16   your signature down there?

17        A    Yes.

18        Q    This is dated November 3, 2004, "Please allow

19   Phillip A. Kenner to access the outstanding LOC for

20   direct deposit into the Little Isle IV account at

21   Northern Trust Bank.  He is authorized to sign for the

22   release of funds related to my LOC."  Do you know what

23   the LOC means there?

24        A    Line of credit.

25        Q    Do you remember signing this document?

26        A    I signed it.  I don't remember where and when I

Sydor confirmed he signed the Letter of Authorization for Kenner to access his LOC funds for Little Isle 4

```
1                        D. Sydor     03/29/11              21

2    signed it.

3         Q    Are you saying that because you see your

4    signature there or do you have a memory of signing this

5    document?

6         A    I do have a memory of signing a document like

7    that.

8         Q    Okay.  You thought your line of credit was for

9    about $100,000; is that right?

10        A    I thought, yes.

11        Q    Would it surprise you to learn that it was

12   actually up to $850,000?

13        A    That would surprise me, but I don't think my

14   memory is that bad.

15        Q    Let me show you what we'll mark Grand Jury

16   Exhibit 114.  Is that your signature down here?

17        A    It looks different than the other ones, but I

18   think they all look a little different.  But if that's

19   the way I sign it, yeah.

20        Q    I don't want you to say it's your signature

21   just because there is a signature above your name.  Does

22   it look to be your signature or not?

23        A    I'd have to say not sure, no.

24        Q    The document, the title, is "Change in terms

25   agreement," showing a loan $850,000, you as the borrower

26   and address care of Phil Kenner, interest rate of
```

1                    D. Sydor    03/29/11                    22

2    seven-and-a-half percent, agreement dated November 3,

3    2007.  Do you remember being informed that there was a

4    loan taken out in this amount?

5          A    Is this for the Little Isle V?

6          Q    It's your memory.  I'm asking, do you remember

7    any loan authorizing him to take out a loan in your name

8    for that kind of money?

9          A    I can't recall.

10         Q    It would be the kind of thing you would recall

11   if you knew about?

12         A    I think if it was $850,000 I would.  But I do

13   know I did that line of credit to Hawaii.  I'm not sure

14   if that's what it was or not.

15         Q    Do you recall, for the line of credit that

16   you're talking, about the one to Hawaii, if you had to

17   put up something in order to get the line of credit?

18         A    If I have to put something up?

19         Q    Do you know if that was part of the deal you

20   had to --

21         A    I don't recall having to do that.

22         Q    You're familiar with what I'm talking about,

23   like if you had to put up stocks or bonds?

24         A    Some kind of liquid.

25         Q    Collateral.  With a mortgage the bank can get

26   your house if you don't pay.  You're not familiar with

D. Sydor   03/29/11                                     23

1
2    whether -- you don't think you had to put up anything
3    for the line of credit?
4         A   No.
5         Q   Let me show you what's been marked Grand Jury
6    Exhibit 115, it's titled "Pledge Agreement" dated
7    November 3, 2006.  Let me show you, start with the
8    signature page, does that look like your signature to
9    you?
10        A   It's a little loopy, not as sharp.
11        Q   So?
12        A   I don't think so, I mean, I sign it different,
13   not different, but sometimes it could look different.
14        Q   But it doesn't look familiar to you; is that
15   what you're saying?
16        A   It looks familiar, but.
17        Q   No one here can second guess you on this one.
18   In your judgment, is this your signature most likely or
19   most likely not?
20        A   I'd say most likely it's mine.
21        Q   Why do you say it's most likely yours?
22        A   Sometimes it looks different, it's not the
23   exact same every time.
24        Q   Without -- you're welcome to look through this
25   document as much as you want -- but I'll represent to
26   you that this document is an agreement to pledge

```
 1                    D. Sydor   03/29/11              24

 2   collateral for the loan in the amount of the loan, which

 3   was $850,000 putting up stocks and bonds.  You don't

 4   remember signing anything like that or agreeing to

 5   anything like that?

 6        A   No.

 7        Q   Did you have an account with stocks and bonds

 8   somewhere?

 9        A   Yes.

10        Q   Where?

11        A   I believe it was Jim Graham, he's with Charles

12   Schwab.

13        Q   Jim Graham was the account holder?

14        A   Yes.

15        Q   As far as you know, you still have stocks and

16   bonds in that account?

17        A   Some of them, but some I've sold or cashed in

18   or whatever you want to say.

19        Q   Do you receive the statements from your Charles

20   Schwab account?

21        A   Yes.

22        Q   What about Northern Trust, do you get

23   statements from that account?

24        A   I don't believe I get any more from Northern

25   Trust.

26        Q   Do you recall losing roughly $850,000 of bonds
```

D. Sydor    03/29/11                                    25

1
2  in March 2009 to pay off that line of credit?
3       A   No, I don't.
4       Q   Because you're not aware that you had a line of
5  credit in that amount?
6       A   I guess so, yes.
7       Q   How often do you communicate with Mr. Kenner
8  about your investments?
9       A   I don't really communicate with him about, I
10  mean, about the, right now just been communicating about
11  the land deals.
12       Q   Back to the land deals, you put in, as far as
13  you remember, about 500,000 to Little Isle IV?
14       A   Uh-huh.
15       Q   You thought it was about $100,000 line of
16  credit?
17       A   Yes.
18       Q   Was that also for Little Isle IV as far as you
19  know?
20       A   Yes, but then we put it towards Cabo for a
21  short-term loan for Mr. Jowdy until Lehman Brothers came
22  up with the money that was supposed to be paid back.
23       Q   Did you know in advance that it was going to be
24  used, this Little Isle IV money, to be used to salvage
25  the Cabo investment?
26       A   Yes.  It was to help with the short-term loan

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor, New York, N.Y. 10018  (212) 869-1500

Sydor confirms knowledge of loans to Jowdy and knowledge of them from Kenner "in advance"...

Sydor confirms that the LOC funds were committed to his Hawaii capital account and no longer his personally...

D. Sydor    03/29/11                              26

2  to keep funding the Cabo, then it was supposed to be

3  paid back, but that's --

4       Q    Paid back to you or back to Little Isle IV?

5       A    Paid back to Little Isle IV.

6       Q    So --

7       A    Back to Hawaii, not to me personally.

8       Q    But that didn't happen?

9       A    That didn't happen.  And Lehman came up with

10  $129 million loan.  It was supposed to be back at

11  closing.

12       Q    Did there ever come a point in time that you

13  started having concerns about your investments that

14  Mr. Kenner was managing?

15       A    No.  Just now that I'm retired I was concerned,

16  when you're playing the game of hockey you're making

17  good money you don't -- like I said, a little gullible.

18       Q    Was there a time when someone in his office

19  told you you should be careful?

20       A    Yes, I know who you're talking about, Christy

21  Myrick.

22       Q    What happened?  Just tell the Grand Jury what

23  happened?

24       A    She actually approached me, I think via phone

25  call.  She was a secretary at the time for Phil.  And

26  she actually said, "You make sure you check into your

*Sydor confirms conversation with Kenner's FIRED assistant who alleges no money frauds*

                              D. Sydor    03/29/11                    27

1
2    investments, all the investments".  But I asked why, she
3    said, "Make sure you have all the documentations, all
4    that," which I did get all the documentation.  So I did
5    inquire, I said, "What is going on?  Why are you saying
6    that."  She goes, "Well, I'm going to be leaving.  I'm
7    in an argument with Phil Kenner."  She actually started
8    sleeping around with some hockey players that Phil was
9    the business manager with, so that's why she got fired.
10        Q   How do you know that she was sleeping around
11   with the hockey players?
12        A   I played with one of them so I saw it.
13        Q   He told you?
14        A   Yes.  But I did ask her, I said, "Is there any
15   concern about my money?"  She said, "It's nothing about
16   that.  I'm not saying Phil is stealing your money or
17   doing anything, just make sure you get all your
18   documentation or paper work for your investment," which
19   is I did.
20        Q   What did you understand that to mean?  I mean,
21   on the one hand you better get your documentation and
22   paper work; on the other hand, she says, supposedly,
23   he's not stealing your money?
24        A   She was upset with him.  She could have said
25   make sure, watch, because he is stealing it.  She told
26   me he wasn't.  You don't have to be concerned with that,

D. Sydor   03/29/11                                    28

1

2     just be concerned with getting your documentation.  I

3     did a deposition with her and I believe that case got

4     thrown out, her case against Mr. Kenner.

5          Q    You were deposed in that case?

6          A    Yes, in Los Angeles.

7          Q    Are there any other cases that you've been a

8     party to relating to the land deals or Mr. Kenner?

9          A    Just this case here.

10         Q    Were you a plaintiff in a lawsuit in California

11    against Mr. Jowdy?

12         A    I don't believe I was.

13         Q    Did anyone ask you to be in one?

14         A    No.

15         Q    Here's one, have you heard of a company

16    Na'Alehu Ventures or Na'Feu Ventures?

17         A    Can you show me?

18         Q    I don't have a document.

19         A    Doesn't ring a bell.

20         Q    Do you remember getting about $40,000 from some

21    company back in August 2006?

22         A    That could have been where I mentioned earlier

23    about getting repaid or getting back, I'm not sure what

24    that is though.

25         Q    Did there ever come a point where you mentioned

26    you had concerns about your investments with Mr. Kenner?

Sydor acknowledges RISK for all investments

```
 1                    D. Sydor    03/29/11              29
 2         A    No.
 3         Q    You've never told him you have any concerns?
 4         A    We would always talk about, you have concerns
 5    when you make investments and they don't go the right
 6    way but it's a risk going in, but you know it's a risk
 7    going in.
 8              MR. DEVLIN-BROWN:  I'm going to propose we
 9         excuse the witness.
10              If you don't mind, sir, to wait out in the
11         hall.  We may be done with you completely.  It's
12         possible we will be done with you today or we may
13         have questions for you.
14              May I ask the witness be excused.
15              THE FOREPERSON:  Yes.
16         (Witness Excused.)
17         (Time Noted:  12:26 p.m.)
18         (Colloquy Follows.)
19
20
21
22
23
24
25
26
```

```
1                    D. Sydor    03/29/11              30

2           (Colloquy Precedes.)

3           (Witness Enters Room.)

4           (Time Noted: 12:30 p.m.)

5           THE FOREPERSON:  I remind you, you are still

6       under oath.

7    BY MR. DEVLIN-BROWN:

8       Q   Do you recall on the Little Isle IV project

9    getting updates in writing from Mr. Kenner about the

10   status of the project, how it was going?

11      A   In writing?  I'd have to go home and check if

12   it's all there.  I know verbally he gave me updates.

13      Q   Let me show you one document and see if you

14   might have gotten it or not.  110A is the number on the

15   document dated July 21, 2006, I'll give you time to look

16   through it.

17          Mr. Kenner is the author on the page six.  See

18   if that looks like anything you might have gotten one

19   way or another?

20      A   I remember getting something like this.  I

21   remember the thing here.  I didn't read through it all.

22      Q   You're pointing to something that lists

23   percentages?

24      A   Percentages.  And I probably have this at home

25   I remember this seeing the Walker real estate, but I did

26   not read through everything, every page.
```

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor, New York, N.Y. 10018  (212) 869-1500

Sydor received Hawaii Joint Venture disclosure -- signed it -- but did not read it...

1                    D. Sydor    03/29/11                    31

2         MR. DEVLIN-BROWN:  Understood.

3         I have no further questions for you, sir.

4    You're excused.

5         (Witness Excused.)

6         (Time Noted: 12:30 p.m.).

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

32

C E R T I F I C A T E

STATE OF NEW YORK    )

                     )

COUNTY OF NEW YORK   )


                    I, RIVKA TEICH, hereby certify that

          the foregoing is a true and accurate transcript,

          to the best of my skill and ability, from my

          stenographic notes of this proceeding.


                    Rivka Teich, R.P.R., C.S.R.

                    Acting Grand Jury Reporter



2:15 meeting that Kaiser claimed NO NOTES were taken -- Komaterdity claimed NOTES may have been taken **BEFORE** the meeting during Rebuttal Summation!?!? -- **Tr.5992:lines 8-10**

Government Exhibit

3500 - JK -1
13-CR-607(JFB)

Scott R
Matt G - FBI
John Kaiser

Oct. 19, 2010                    11AM

2002    ≡ vacation - Hawaii - after 9/11/01  ≡ Main Island
    -saw property = cheap  w/ Chris Manfredi
    $700K purchase price        ≡ $10K downpmt
    ≡ JK - tries to raise $       ≡ JK's pmt $
    ≡ had property's in NY to sell
            ≡ couple homes -

    (PK) had friend ≡ James Milana -≡ lives on Long Island
    Phil Kenner ≡ knew
    intro'd to (PK)
    ≡ had hockey clients/investors ≡ to start purchasing
                        property in Hawaii

starting
closing
2005    ≡ Closed on some more parcels
    ≡ 6,000 acres total ≡ kept adding/buying more adjacent
                            properties
    ≡ Lehman - comes in    ≡ Windwalker - developer
                    Scott   Lehman brought in

    JK's investment ≡ $1.1M - JK
    amt.        ≡ family members $
    JK  $1.2m = sold house in NY
    took $1.1M to pay family off

                            (1)

≡ Masood Bhatti — Lehman Bros.
— got a piece of Hawaii deal

▨ 260 acres — 1st piece of Hawaii investment
just kept buying/expanding ⟹ 6,000 acres total

≡ Alan Warden ≡ Windwalker ≡ Accountant/contact

(JE) met Jowdy = 2x in NYC
① in NYC = Trust (2003) = Jowdy restaurant
times                              discuss:
                        = discuss pojet in Hawaii
there (PR)
@ (KJ) — with a girl        = funding in Mexico

② another time @ a bar ≡ in NYC = bar
time  — discussed Hawaii                    (KJ)
      — lending $ from Hawaii to Mexico      (JE)

(JE) — not sure how (KJ) & (PC) met

(JE) ≡ saw (KJ) in Mexico couple times
again | (KJ) wanted to borrow $ from Hawaii to Mexico
discussed  — would pay back after closing        ②

(KJ) - brought up borrowing $ from Hawaii Project

borrowed millions from Hawaii project → $5M-$6M
- 1st was going to be $100sk = not millions
- (JK) not happy $ amt started
to grow to millions of $
to Mexico

discussed = Brian Berard
(JK)

**2004 Hawaii loan agreement**

= was Agreement to borrow $ from Hawaii -

(KJ) → to → (JK)  (KJ) - don't worry all $ will come
(JK) back, get repaid
- in NYC
discussed $ from Hawaii to Mexico
= just to be used for Mexico
↳ no other project

Question to (JK):
2006 = update letter on Hawaii project -

- (JK) - yes, I recall letter
(JK) - made these, many times

**Many update letters from Kenner to the investors per Kaiser proffer...**

(JK) - never got $ back from (KJ) / Mexico

(JK) -

**Kaiser does NOT say that this is money that he was unaware of at the time of the loans -- notwithstanding the fact that Kaiser would still (according to his EDNY testimony) have been missing millions from the CA closing almost 2 years prior and Hawaii 4 years prior -- *if actually TRUE!***

③

Eufora

2007 = (JK) met Tommy Constantine in AZ @ (JK)'s house

(TC) = intrid as self made millionaire to (JK)

(JK) = heard about Eufora thru players / guys that
Eufora - company will be big one day

in
beginning = nerd couple hundred thousand @ first

(JK) (\$2.2M) - over 3yr period invested

(JK) borrowed from family - majority of $
  - Mother
  - brothers - both

(JP) =
  includes (JK)'s friends $ -
    - (JK) got 4 friends to invest

Donny Rae → ex-hockey player - lives in AZ
  - bringing investors in Hawaii

(JK) = met (DR) - 1yr ago = heard of him prior
  - when put house for sale in AZ - (JK)'s house
  - Brian Berard + (JK) own - 2½ yrs ago bought
  - (JK) - raised $ from friends to buy house in AZ

④

- Tim Gaarn - used to work in banking industry
  - 1st intro to Lehman from (TG)

- not invested in Hawaii

- (TC) - trying to ~~raise~~ fund $ for Hawaii w/ own funds
  - suppose to use own $ to fund Hawaii

- Ultimately $ came from friend of (TC)
  - $4M - Waikapuna closing

Robert Gaudet
(JK) met (RG) - ≡ golf pro
                ≡ knows people in Mexico

≡ tried to get $ for Hawaii                    (JK)

Kaiser confirms consulting deals for Gaudet and Gaarn from Hawaii

- believe above indiv. getting paid for getting $
  ≡ (RG)    ≡
  ≡ (TG)

RG -- Robert Gaudet and TG -- Tim Gaarn

1st heard
2005 ≡ heard of Enfora from (JK) or players

(TC) ≡ showed (JK) Agreements w/ banks & credit card companies
     ≡ wanted increase ownership in Enfora → (TC)'s own shares in
     → appeared to be great company → (JK)

⑤

and Mark Ambrosio

= Dish Zero — (TC) running ₿ from Eufora
  Taser    = accounts to these investments

Sergei Gonchar ₿ going to

all (JK) investment ₿ to (TC) went from
(JK) = TD Bank accts

//

(JK) - rec'd couple hundred thousand back
from (PK)
(JK) from fronted ₿ for renovation (PK)
house in AZ

(PK) ← (JK) - gave (PK) ₿ from his house sale in
needed      Smithtown, NY
for Myrick     (PK) never repaid
lawsuit

(6)



**$500,000 of these funds were immediately transferred to Kenner by Kaiser for the documented Kaiser (individual) purchase of land from Kenner in Mexico (los Fraíles) -- also unknown to Kenner, Kaiser's friends and family -- See PK19 and PK50**

**Kaiser took money form his handicapped brother, his DEA friend Bobby Rizzi, and his doctor friend $conzo (whom he later robbed for another $200,000 admitted by the Gov't in their forfeiture brief)...**

**Clearly -- no closing "with Kaiser" EVER occurred...**

- ☰ (PK) - living in Vegas - Condos
  - house in AZ ☰ is wife's from divorce

- (JK) ☰ Palms Condos
  ☰

- (TC) - new Maloof in Vegas
  - invested - (JK) friends 13
  ① keith Kaiser - brother
  ② Bobby ☰ police officer $150K together
  ③ a doctor friend of (JK) } for penthouse @ Palms

- ☰ Jay Mckee ☰
  ☰ Mike Peca ☰ } on Note ☰ 2 separate units { got 15% from #
    - promised by (TC)

- ☰ closing went through (TC)
  went into it to buy & sell quickly

- ☰ (PK) - was not involved in Palms R/E
  - as far as (JK) remembers

- ⭐ • Global Settlement Fund • set-up by (TC) ☰ w/ (KD) ☲ (PK)
  - pay Ethan Morreau back - from Palms
  - Eufora - ☒
  - Mexico - } players $

- ☒ used to straighten ☒ investment mess which happened throughout years.

- Eufora ☰ (TC) instructed Ronald Richard to send $ to Eufora acct so he can distribute to players ☰ GS Fund $
- Palms (TC) instructed (JK) friends - investment $ - to go to Ronald Richards - not Eufora

⑦

(TC) involved w/ → renovated — (JK)'s brothers did work
≡ Hermosa beach — house . (PK) - owned - the the sold
   - (PK) - owes $ from house construction / renovate

   - (JK) - brothers worked on house ≡ took 4 months

   (JK) - raised funds to buy house from:
            ≡ (PK) - mother
               - brothers
               - friends
   (JK) - not rec'd $ from (PK) on house yet
   (PK) - will get $ from Hermosa Beach house when
       AZ house sells
            ≡ on market now

            (JK) - met (NJ) in Hawaii
 Nick James -
            ≡ did stuff for flag racing + (TC)

 (NJ)  called (TC) to get married
       $ 20k-80k - asked $ from (PK) ≡ (PK) - said no
            borrowed from (PK)

 (NJ) did not work or invest in Hermosa Beach house

            (8)

Los Frailes - investment

— JK + has friends invested in

~2008    ~$1M

JK - included in the $1M

① purchase property + develop

$1M used to purchase property ≡ sell parcels to get $ back from 1st investment

→ Bobby Goudet — told JK about investment

JK - not involved in Los Frailes

↓ does have clients involved / hockey players

JK - went down thru w/ friends to see

JK - 6 mos. ago in Cabo ≡ Towdy project

≡ golf course - done

≡ suppose to put up condos

≡ never went to North property

DDM

⑨



(KJ) = $5M-6M — (KJ) borrowed / rec'd / loaned

(KJ) — borrowed from Hawaii project → To Mexico

(KJ) — borrowed from Glen Murray too for Mexico

(KJ) = might have repaid couple hundred thousand To Hawaii

(JK) — did see Hawaii bank acct statements

— accountant for Hawaii project

(JK) not rec'd K-1's ever

(JK) will get name of accountant before Lehman came in.

(JK) = never rec'd K-1's from Hawaii

= took two yrs to st from Allan Warden

will receive K-1's soon

Kaiser confirms seeing all of the Hawaii bank statements -- so there could be no questions where the $1mm from his friends and family went after deposits in the NEW KAU HOLDINGS ACCOUNT -- See PK26

Agent wrote END TIME -- even though Kaiser disputes seeing agents taking notes during a 2 hour and 15 minute meeting at Kaiser's home during EDNY testimony...*Tr.1120-1122*

END 1:15 PM

(10)



**Government Exhibit**
3500 - KJ  - 2
13-CR-607(JFB)

Ken Jowdy
3/24/10 @ 10:15AM

— continue of Letter Agreement
   dated 3/25/10

Tom Harvey
Louis Freeh
Joel Friedman
Mike McCall
Ken Jowdy

Ken Joseph  } SEC
Chris Castano

Julian Moore
Scott Romanowski
Matt Galioto

How does Castano and Joseph not look at the DDM title docs and the KSI loan docs to show Jowdy and Harvey stole the investor money and never transfered title to an investor entity...?? (*TIMELINE 020*)

Harvey complicit in Jowdy frauds from September 2002 letter to Nolan and other initial investors until present...

KJ = PGR officials in Mexico = Books ago     happened on Monday, 3/22/10
took pictures of garbage + vehicles
   — came to his property looking for Someone
   — KJ thinks it was him they were looking for
   — said looking for drug dealer, child molester....
   — may be rogue operation
   — LF — spoke to Gov't officials — state no investigation ensuing w/ KJ in Mexico

? JA — have discussions w/ PK re: PK clients = to KJ
answer — PK = always a phone call away from his PB clients —
from KJ
   — KJ — had discussions w/ PK early on in relationship —
   — KJ — had very little contact w/ PB clients = Jason Woolley — saw once w/ PB
                                                  turner stevenson — saw w/ PB
   — KJ — docs provided by TH re: subpoena — Bernard Kristich
   started 2/24/10 agt — Thelmann + KJ — reconstructed docs — receipts + invoices
         — Baja Mnsmt
         — TLJ Mnsmt

(KJ) - (PE) did not generate any paperwork on his own
re: DDM + DCSL investments/projects

=(KJ) = spoke early on of (PE) re: other investments
                                    outside Baja Develop.
Bates 13088 - states "funds be used fund other projects of
                Developer"

PPM's

3/7/03 - Baja Mngmt, LLC
            - for original investors prior to PPM being drafted
                → from Promisory Notes from investors
                                                (initial)
                        $ going into Baja Development acct
might have been             initially.
drafted by 8/9/02     - suppose to be delivered to investors by (PE)
                                            + return signed

Bates # 13228 =
                1st paragraph =
    (KJ) - $ to be in Diamante
                    → Diamante Del Mar
                        (KJ) Managing Member

─ BD Corp =
    Baja Development - owned by (KJ)
        → used before offering - El Rosario project +
                other things

②

- initial investment given w/ a written agreement
- Promisory Notes issued
    - $ to Diamante

= 3rd paragraph -
    $110k to be invested by (KJ)

= $ From Baja Development Corp.
    $ - from initial 6 investors = (KJ)

- then to Baja Mngmt - Diamante Del Mar
    (KJ) - b/c PPM said that (KD) needed to contribute $

Bates # 13231 -
    = Source of $110k from BD Corp - from initial investors $

Bates # 13232 -
    (KJ) - all the funds were NOT used for DDM

Bates # 13233 -
    (KJ) founding offering not consumated

Bates # 13234
    - (KJ) - $350 k -
        $200k - to (KJ)
        $150k - to (BN)

- Consult fee's = (PK) - marketing consulting
    - don't recall how much paid (PK)

- compaste Suzanne Tabour                                    ③

- financial reports = re: PPM
  - (KJ) - did not receive these exact reports

(KJ) r (PE) - did create memos of project
  which thinks (PE) shared w/ investors
  - Project Information Memos =
      included = cash flow projections
                = Sales projections
              y (KJ) worked w/ sales people,
                    consultants to get
                    #'s for projections

= (KJ) - does not thinks this satisfies PPM required docs
  to investors.

= (KJ) = does not know reason he did not supply docs
  required by PPM

= (KJ) does not recall role he played in creating PPM
  (KJ) he read PPM - yes

(KJ) - PPM - given to (PE) - D given to clients

(KJ) - (PE) handling communications w/ clients/investors

Bates 13236 - overview of DDM

(KJ) - came up w/ idea of 2 courses < Fazio
                                      Love
  - showed property to Davis Love = had previous relationship
                                    w/ (DL) - met
(KJ) - doesn't recall - how met Tom Fazio        through friend

(4)

- (TF) - sent down his reps to look

(KJ) ① Love course - conceptual design → to set price for cours

② Fazio course more invulved → to construction drawings
    -irrigation      } studies
    - erosion control }

- had 4-5 biddin, on construction for course

(KJ) - wid be exclusive Fazio + Love courses

(KJ) ⟩ Dennis Wise → architect for Fazio
dealt  ⟩ Tom Fazio → worked w/ Fazio company
w/
(DM) ⟩ limited dealings
dealt
   ⟩ Dave Boyden - landscape architect = Would have been on-site
   ⟩ (KJ) = hired for DCSL              rep for Fazio
2006 ─────         after left Fazio
              = not dealings w/ DDM

  ⟩ not sure if there term limits on contract w/
    Fazio
       ⟩ couple hundred thousand $'s - paid by (KJ)
       $2M - contract Total        ⟩ $ from DDM acct

(KJ) - could not call Fazio design + need t- make
    material changes to course if sever contract
    before construction.

⑤

dated — Bates →
11/1/02 → DDM offering —
—specifically for DDM
not through any other entity/agreement

≡ Suppose to be delivered to investors (15 investors)
by (PK)
— told by (PK) - delivered to investors

KJ
investors:  — Stumpf
            — Mckee
            — Bevard
            — U. Tsydlicou
            — DeVries
            — Scott Ericson - outside of (PK) - friend of (KJ) - baseball player
            —              SFR  KJ delivered PPM
            — Nolan
            — Morreau
            — Murray
            —

Bates# 13336 = (KJ) CORSA - Mexican comp held leases

(KJ) only other profits out of after intial member drive or
property sale

Bates  13339 -

Bates 13339 -

(KJ) = Promisory Notes w/ Baja Mngmt - $2.75M

↓ $ came in summer to fall of 2002

dates = Securities attny retained in Sept 02 -
of ??  dealt w/ PPM then DD PPMs
PPM ?

Bates 13341 = (KJ) never raised ATOM in dive

- Mngmt Fees - (KJ)
(BN)

Expenses:
- Suezanne J. - never compensated for
- (PK) - consult fee's + expenso
- $14K per month - initially = 4-5 mos.
stopped salary - then paid expenses & other salary if brought
based upon (in investors)
lack of funds
in company

Bates 13349
- Mngmt Compensation
(KJ) - never made $150K contribution to comp

- $2.75M = from investors /initial
- $110K (KJ) contributed from this $

⑦

12/1/03    DDM Club = PPM

(KJ) - not equity in DDM - just part of Club

- Founding Member                    ≡ right to lot + villa
(KJ) - carry project forward

- would go to (PK) → to potential founding members

- there is a dividend / pmt - outlined in PPM    / not share in DDM
                                                    / profits

provided - (KJ)    Joseph Essa    } 3 relatives    } $30k each
PPM                Cindy Essa                       }
to                 Joe Thompkinson  } friends       } ↓
in 03-04           Suzanne Desmond  }               into DDM acct.
         - (PK) brought in 3 others

$210k    - '03-'04 - airstrip SFR            $210k total
total             to operating expenses of DDM

Bates #13899

⊗ 4th paragraph -
(KJ) never hit #'s to be given certificate

⑧

Bates #13913

(KJ) - $210k collected from Funding members
    - used for expenses for DDM

= (KJ) - wasn't Trust set up initially - not sure (KJ)

= Founder Member offering
    ↓
(KJ) never closed

Break — 12PM

Start 1:10PM

                    asked (KJ)
(JF) - attny - advice - for IPM
    (KJ) - was my idea to so to attny for IPM

(KJ) - regularly consulted w/ attny

Nirjam - attny also. - (KJ) consulted w/ (BN) also

(BN) - went w/ (KJ) attny's also

(9)

≡ Promissory Notes - (KJ) executed shortly after funds
      were rec'd

Carl Essa - 2/11/04 (KJ) for investment made around that
                      time = late '03 - early '04
(KJ) don't know why separate subscription agreement

(KJ) Baja Management - each investor signed offering +
                      subscription agreement
    (KJ) - doesn't know whis idea it was

    (KJ) - provided MM to one player ⟹ Erickson
              - 2 relatives - Essa's
              - 2 friends.

≡ Byron Defoe ≈ $ in late 2002 - 8% BD Corp
      - (KJ) doesn't think his writing on front page
(KJ) - yes signature on back page

Dmitri Kristich ≈ August 2002 - rec'd $

Jason Allison ≈ late 2002 - funds rec'd
    - Agreement signed in 4/03
    -

⑩

Joe Juneau ≈ Sept. '02 - funds rec'd
   Agreement ≡ 3/03

~~~~~~~~~~~~~~~~~~~~~~~~~

⊘   Jason Wooley ≈
         Note
      Agreement
~~~~~~~~~~~~~~~~~~~~~~~~~

Owen Nolan
   note
   Agreement
~~~~~~~~~~~~~~~~~~~~~~~~~

Bank Accts
—————————

- 2002 - First Union & Wachovia - (KJ) personal accts

- now Capital One + TD Bank Wirth
     ↳ last 3 yrs opened

This is a lie (**See R33 rebuttal 003**) with Jowdy laundering funds with Najam's help to create the illusion of a $100,000 Jowdy investment...

- DDM - $ from (EJ)

- '02 - (KJ) - $ used as downpayment from investor $

personal → rent + car - $ used from BD Corp acct
             - not part of DDM

(KJ) - if I wasn't allowed to use it then it was a problem                                              (17)

- (KJ) - thought I could use $

- Moye + Barbara Wicks -
    - pmts to them for
- negotiated deal w/ (MW) + (BW) = to give up home + lease in Rosario
    - bought them a house in Alabama

(KJ) $200k salary took from beginning
only to $150k over 3 pmts - 02-03

DDM → BM → (KJ)

$ | B Devolp = $100k Salary for 2 yrs = 03-04
$ from - $ from (PF) loans

02-06 - $ used from BD
to pay personal exp.

- Little Isle IV
- Ula Makika

- (KJ) - not using $ now to pay personal expenses

→ 06 - salary from DCSC

$ booked as loans from BD

8/02 | $250k from Q thristich → BD → Eufora → Eufora SFR
1yr later - $ came back from 2 → she had employees for (E Eufora

*Another lowdy lie based on the fact the 2007 Baja Management taxes show Khristich with a full $500,000 capital account -- **See R33 rebuttal 025...***

- Khristich was never repaid for the 8/02 A2s2lc $ that went to Eufora

- (KJ) - believed Eufora part of a developer project

- TLJ Management - (KJ) owns
  - CA corp
formed for = lease house in CSL + airplane - falcon 10

$ came from BD - that came from (PK) and/or its entities ←

*More acknowledged loaned funds from Kenner (cash and wires personally) and Hawaii LLCs*

- Defoe
Allison   3 were (PK) clients a time of investment
          but no longer

Little Isle IV = Lehman financed = Masood Bhatti
                                  = brought in a developer-sai

2006  - (PK) gave 5% of 50% To (KJ) + (BN)
       ↘ N Alabu Ventu

*Jowdy admits to the FBI that he took money from Hawaii as loans -- despite his contrarian defense positions in Mexico and AZ cases (2008-09) -- now with the FBI aware of the frauds on the courts...*

= Little Isle $ to DDM
(KJ) - Little Isle is (PK) company
(KJ) DDM needed $
     $ is treated as loan or converted to equity
       ↘ never converted to equity

TLJ Mgmt
Arizona case ✓
Mexico case ✓
⑬

Jowdy paid to dissuade from testifying in Federal Case v. Roger Clemens -- *See Baja Development Corp (Jowdy) August 2006 bank records* et.al.

- Brian McNamee — he's a trainer
- 1999 = (KJ) - met thr�ugh Roger Clemens

= has not had contact since 2007

- worked out w/ (BM)
- brought to CSL - several times - up 2007
  ⇨ 2003-2007
- @ time use (BM) to put together fitness program

- paying (BM) - $25k/month
  - to train & work w/ (KJ)'s relative = Ed Essa

Money from PK (personally) and players

DDM- owed BD over $2M = from players $ /(PK)
= # to BD → time paid to DDM vs paid expenses DDM - so payable to BD
(KJ) - Pledging of Promissory Notes = to      BD  6 investors → BM PPM
  = Baja Management (owns 92% of DDM)  $2,75M

Met Mindy McCready through Roger Clemens

$25k

Jowdy STOLE DDM funds to pay off Roger Clemens mistress before she died

= Roger Clemens ask (KJ) to write check — possibly to make a record

= rec'd $ back from (RC) in pmts

Since the 2015 conviction -- Galioto has used every opportunity to tell the Kenner investors that Kenner has NO MONEY in any investment -- despite the Jowdy confessions (within) and the millions documented in the numerous bank records for Hawaii, Mexico, all renovation projects, "Grocery list loans", Gaarn loans, Kaiser loans, etcetera -- creating fully slanderous prejudice from all remaining supporters -- culminating in the Jowdy settlement discussions -- with no faith in the real Kenner documented truths...

= Adrienne Moore
  DCSL

2006- (KJ) met her out w/ (RC) @ a bar - Vegas
2007

AM = wanted a job

KJ - had her fill out application

left company after Lehman Bankruptcy

KJ - paid through DCSL acct
& also KJ paid weekly/monthly from personal
acct for her expenses

KSI Capital - hard $ lender
loan for DDM - 2006 =
$3M total
$21JK holdback

- used $ for expenses on DDM project = $38k to $41k monthly

- $ from Legacy Properties
pmts for KSI interest; security/guard

Jowdy, Najam and Essa looted over $800k of the loan funds personally and drained the entire loan amount within 2 months -- UNKNOWN to ALL of the investors

(15)

— (KJ) - did fly people down to CSL
       - wives
       - friends
       -

— Shawn Hughes would bring friends ≡ 6-8 friends

(KJ) Shown e-mail - 1/24/05
     - Palm Springs - Bob Hope Tournament
       - did not pay them ; (KJ) may be strippers
   pay - maybe flight = use Credit Card
           (KJ) - not sure where it came from to pay
              for flights

- e-mail ≡ 1/26/05
     - not sure

- email =
     "quality" ≡ (KJ) : fun, outgoing, girls

     - just paid for flights ; stayed @ house in CSL

(KJ) - doesn't know of anyone paying for Sex

Bates # 1967 - 79

(KJ) - doesn't recall exact email
   - Players Clolc's
     - (KJ) doesn't know how set up

(16)

— @ time of CSL closing

(PK) - Pressure w/ Hawaii

Bates 19674-75

— don't know what (PK) talking about ✓

— (PK) needs to make pmts ←

Jowdy lies to the FBI after previously disclosing to the FBI (above) that the money from Hawaii and Kenner were loans (*see R33 rebuttal 008*)

(KJ) - not involved w/ player c/olc

Bates # 19714

Bates # 19672

email ≡ 1-2dy after lunch w/ (MB) - in NYC

≡ asked (PK) to break down $

Bates # 19663

— (KJ) - did send $ out

— (KJ) - thought (PK) put $ already for Peca, so this $ was back to (PK)   (7)

≠ Peca was investing in DCSL CCC
    no 11M provided

2007 - (Pk) puts $ up ⎱ 50%
       (KJ) does work ⎰   ｜   Spl. t
                          50%

4/2007 - 10% dwnpmt due
         (Pk) didn't have b

5/05 = $ started coming in
       $ coming from (Pk)

9/05 - $ from players coming in — doesn't know what was
                                   said between (PE) & players
       (KJ) thinks $ coming in from loan from (Pk)

$ treated as loan in begining; then changed to
  equity

Bates # 19621
- 10 days before closing - (Pk) had already given
                                              breakdown to
    19607 ⟶                                    (KJ)

(18)

Bates 19607 - "double up option"
 - We already had $ in

Bates 19578

 - trying to get an idea of players $ for
   operating agreements

Bates # 19348

 - talking about house in Vegas

Bates 19297

 - $ from J. Stumpel
 -

Bates # 198499

 - talking about Ruby scam
 - Rodney Dalton - from England ⟶ KJ met in London once
                                  KJ 2nd time met in D.C.
 2004  Todd Burkhart - (PE) - met in MN
       (PE) - lent $200k - $215k -
          - Burkhart said waiting for $3M from an investment
            ⟶ investment w/ Rodney Dalton

 (KJ) Told this by (PE)
   - used $ from DPPA SFR Little Isle

(9)

- (PK) - said $1/M from Little Isle

(PK) — profits from investment had to go to an outside U.S.
told (EJ) development = which would be DDM
↳ help investment out w/ profits

(KS) - don't know what - "start a clean record"

- (KJ) - didn't sign anything

Bates - 18456

- ∅ from Jere Lehtinen
  - ∅ for CSL

- "0% risk"
  - (EJ) - thought (PK) was near closing in Hawaii
  - thought (PK) believed it - no.
(KJ) never spoken to Jere Lehtinen
(EJ) never told (PK) that there was risk associated; nor
had anyone else
from (EJ) company

Bates - 19534

(KJ) if everything fell through w/ CSL
then have to sell El Rosario

How could this be true --
since as history revealed
Jowdy's $3mm KSI loan in
Feb 2006 that Najam and he
looted and then left for
foreclosure -- with ZERO
loss to Jowdy and Najam
since they had diverted
millions from 2002 thru 2006
already...

(KJ) don't recall letter
(KS) - I would not have prepared it | 19506

Bates 19506

- for Operating Agreements
- not for financials

Bates 198547

- doesn't recall email
- (KP) - got docs to (PK) for D Air

Bates 19561

(PK) - Operating Agreements
(KT) that's all we have

Tim Gaarn - friend of (PK)
(KT) Met once

oct/08 - went w/ (PK) to inspect (KT) books

- doesn't know if accountant or in finance industry
- in NJ

BD Call
- (KT) did wire $25k to Tim Gaarn
(KT) doesn't know what for        Wintroed to Kevin
                                   → Lehman     ②

- Mount Zion ⟶ Joseph Gate
  - hard $ lender - (PK) talked to
- (PK) engaged Hawaii deal
  - Paid $ commitment fee
  also talked about DDM

//

= Mark Peterson
  3 Palms
  marketing firm

in pictures from (RD)

= Lannie Doulon - w/ (PK) friends w/ krystie Myric
  in MA -
  (RD) hired her for (PK) as assistant - both on payroll for 1 Vegas

Nick James - worked w/ (PK)  - pending lawsuit
  ⟵ falling out w/ (PK)  in CA

- (PK) suing (NJ)
  counter sue

> Gov't aware of "Nick" lawsuit when they falsely claimed "Kick Nick in the balls was Nick Privitello on the day of the Nick James deposition...

Hermosa Beach, CA = d... w/ Some house - Sold for $8.5M
  Wells Fargo - loan

= Something like $4M profit - fraudulent (?)

> Jowdy and Harvey spread this false claim in 2008 to all Kenner investors -- and others in the sports industry -- to disrupt the cohesive efforts versus Jowdy..

62

(1) $IDM used for:    2002 - 2004

- airstrip                              2006 - & still owed KSI loan
- land                                          - paid
- Engineering
- Studies
- hydrology
- roadway Systems
- water
- electric
- design gdf course
- marketing
- sales
- Some salaries
-
- no gdf courses on IDM

4:30PM
END

(23)

Revolving line of Credit Loans
12-7-2004

Pursuant to the verbal agreement of July 9, 2004 to secure a revolving Line of Credit for Kenneth Aboud Jowdy to use at his sole discretion, this Revolving Line of Credit will be executed by all related parties *December, 7*, 2004.

For VALUE RECEIVED, the undersigned, Kenneth Aboud Jowdy, individual ("Borrower") promises to pay to the order of Philip A. Kenner ("Kenner"), individual and Little Isle IV, LLC a Delaware LLC ("LI4"), ("Lenders"), and any other related individual or entity involved in the future by Kenner to facilitate the ongoing Revolving Line of Credit to Borrower. Lenders have a principle place of business located at 10705 East Cactus Road, Scottsdale, AZ 85259 or at such other place that the Lenders hereof may from time to time designate in writing. Borrower promises to pay Lenders, the aggregate unpaid principle balance of each advance made by Lenders to Borrower hereunder at an interest thereon at the rate of fifteen percent (15%) per annum. Subject to the other terms and conditions hereof, Borrower may borrow, repay and reborrow hereunder until the principle balance and all interest sums payable hereunder are paid in full as follows in lawful money of the United States of America. Lenders have no obligation to refinance or extend the terms of this agreement with Borrower.

1) The note shall mature and the entire principle balance hereof is due upon completion of any transaction whereas Borrower facilitates funding for the Real Estate Development known as Diamante Del Mar ("DDM") located in El Rosario, Baja Mexico, of which the Borrower is the Managing Member. The note will be due in full including interest if the Borrower on behalf of DDM receives benefit equal to or in excess of the total outstanding loan amount including interest due from proceeds of the loan thru the funding date to Lenders.

2) In the event Borrower fails to pay the entire principle indebtedness evidenced by this Note, or any portion thereof as described by events described above in paragraph 1, the note may be demanded for full payment including all accrued interest.

3) In the event the total funding amount for DDM is not sufficient to cover the outstanding funds due to the Lenders, at least 50% of the funds raised will be paid towards the outstanding Principle balance and the interest on the Revolving Line of Credit will continue to accrue until the entire note, principle plus full interest are paid to the Lenders.

4) The note shall mature and the entire principle balance hereof is due upon completion of any transaction whereas Borrower facilitates funding for the Real Estate Development known as Diamante Cabo San Lucas ("DCSL") located in Cabo San Lucas, Baja Mexico, of which the Borrower is expected to be the Managing Member. The funding for DCSL is expected to occur per the Borrower on or before December 31, 2005. The note will be due in full including interest if the Borrower on behalf of DCSL receives benefit equal to or in excess of the total outstanding loan amount including interest due from proceeds of the loan thru the funding date to Lenders.

5) In the event Borrower fails to pay the entire principle indebtedness evidenced by this Note, or any portion thereof as described by events described above in paragraph 4, the note may be demanded for full payment including all accrued interest.

6) Borrower pledges his individual interest in DDM, DCSL and any related entity controlled by Borrower as additional consideration for the loan presented by Lenders.

Borrower agrees that:

    a) Borrower will pay all costs and expenses of collection of this Note if the note matures and is unpaid within 30 days of maturity upon demand by Lenders.

    b) The entire principle balance of the Note shall bear interest after maturity at the standard interest rate on the entire unpaid balance as described above until paid in full.

Borrower may pay this Note at any time, in whole or in part, without penalty or premium.

Failure of the Lenders hereunder to exercise any option hereunder shall not constitute a waiver of the right to exercise the same in the event of any subsequent default or in the event of continuance of an existing default for strict performance hereof.

Borrower waves any exemption rights affecting full collection of this Note, and waives presentment, diligence, notice of dishonor and protest.

This Note shall be governed by the State of Arizona.

Witness:

Borrower:

Kenneth Aboud Jowdy, Individual

By:

LENDERS:

Philip A. Kenner, Little Isle IV, LLC a Delaware LLC

By:

Philip A. Kenner, Individual

By:

Philip A. Kenner, Managing Member, Little Isle IV, LLC a Delaware LLC

Dated: 7 - Dec - 2004

# Exhibit 1

1                              **NOT FOR PUBLICATION**

2

3

4

5

6                IN THE UNITED STATES DISTRICT COURT

7                  FOR THE DISTRICT OF ARIZONA

8

| | |
|---|---|
| 9  Little Isle IV, LLC, et al., | )  No. CV09-0142-PHX-SRB |
| 10         Plaintiffs, | )  **ORDER** |
| 11  vs. | ) |
| 12 | ) |
| 13  Kenneth A. Jowdy, | ) |
| 14        Defendant. | ) |

15

16

17       Plaintiffs filed their complaint in state court on October 29, 2008.  Among the

18 allegations in the complaint were that the Plaintiff Philip Kenner was a resident of the State

19 of Arizona and that the corporate defendants were Delaware corporations authorized to do

20 business in Arizona.  After Defendant waived service of process in late December 2008, he

21 filed a Notice of Removal to this Court claiming diversity jurisdiction pursuant to 28 U.S.C.

22 § 1332 because he is a citizen of Nevada and the amount in controversy exceeds $75,000.00.

23 Defendant also filed a Motion to Dismiss.

24       The first of several unusual events then occurred.  When Plaintiffs responded to the

25 Motion to Dismiss they attached a document purporting to be a promissory note which, as

26 the Court noted in its order granting the Motion to Dismiss, had terms inconsistent with the

27 terms alleged in the Complaint for the alleged loans that were the subject of the suit.

28 Defendant alleged that the note was a forgery and sought expedited discovery concerning the

1  document. The Court granted the motion for this limited discovery. Plaintiffs also attempted

2  to save their complaint from dismissal by improperly alleging numerous additional facts in

3  their response to the Motion to Dismiss.  Plaintiffs also claimed that they did not have

4  possession of the original note asserting that Defendant was the holder of the original note.

5         The second unusual event occurred when Plaintiffs filed their First Amended

6  Complaint on May 22, 2009.  In the Amended Complaint, Plaintiffs alleged for the first time

7  that Plaintiff Kenner was a citizen, not of Arizona, but of Nevada. Plaintiffs also filed a

8  Motion for Remand to state court arguing that the original complaint did not identify

9  Kenner's citizenship and Defendant, in his original Notice of Removal, wrongly assumed

10 that Kenner's state of residency and state of citizenship were the same.  Also asserted as a

11 basis for remand was that Defendant did not meet his burden of establishing that the

12 members of the corporate Plaintiffs, as listed in Plaintiffs' Corporate Disclosure Statement,

13 were citizens of states other than Nevada. Plaintiff ignores the fact that Defendant could not

14 have made that allegation at the time of the removal because Plaintiffs did not file their

15 corporate disclosure statement as required. On January 26, 2009, a Notice of Deficiency was

16 issued to the corporate plaintiffs advising them of the requirement to file a Corporate

17 Disclosure Statement. They were given 15 days to file it. No Corporate Disclosure Statement

18 was filed.   The Court then issued an Order to Show Cause on March 31, 2009, advising

19 Plaintiffs that if they failed to file their Corporate Disclosure Statement within 10 business

20 days that sanctions would be imposed.  It was only after this Court Order threatening

21 sanctions that the Corporate Disclosure Statement was filed.  Shortly thereafter Defendant

22 amended his Notice of Removal to allege the diversity of the members of each corporate

23 defendant.

24        Because of Plaintiff Kenner's new assertion that he was a citizen of Nevada rather

25 than of Arizona a question arose concerning this Court's subject matter jurisdiction. In

26 response to the Motion for Remand, Defendant challenged the assertion that Kenner was a

27 Nevada citizen and accused Kenner of making this false claim solely to defeat diversity

28 jurisdiction. Defendant requested discovery from Plaintiffs about Kenner's citizenship.

- 2 -

1    On July 15, 2009, the Court granted Defendant's request for discovery on the
2  jurisdictional question arising from Kenner's claim of Nevada citizenship. The Court
3  included in its order that jurisdictional discovery could include a request for production of
4  documents of Plaintiff Kenner, Kenner's deposition and the depositions of Tracy Kenner and
5  Rebekah Baumgardner.  Defendant was ordered to advise the Court in writing concerning
6  the completion of the jurisdictional discovery so that the Court could determine whether an
7  evidentiary hearing was needed and when it could rule on the Motion to Remand. Defendant
8  promptly attempted to complete the authorized discovery.

9    On October 16, 2009, Defendant filed a Status Report concerning jurisdictional
10  discovery advising the Court that jurisdictional discovery was not yet complete because
11  Kenner had refused to provide a date for the rescheduling of his deposition and had refused
12  to respond to Defendant's inquiries regarding deficiencies in his responses to the Request for
13  Production of Documents.  Around the same time Plaintiffs' counsel sought leave to
14  withdraw.  In the report to the Court, Defendant advised that Kenner's deposition was
15  originally scheduled for June 15, 2009. On the morning of the deposition Plaintiffs' counsel
16  advised Defendant that Kenner was out of town and would not be attending. Kenner failed to
17  provide any alternate dates for his deposition. It was then noticed by Defendant for July 14,
18  2009.

19    Kenner appeared on July 14, 2009, but left before the deposition could be completed
20  claiming he needed to catch a flight.  As of October 16, 2009, Kenner had not provided any
21  date to complete his deposition. Defendant re-noticed Kenner's deposition for December 4,
22  2009 at which time Kenner appeared.

23    Plaintiffs' counsel's Motion to Withdraw was granted on October 23, 2009.  On
24  November 3, 2009, the Court issued an order advising Plaintiffs that there was a pending
25  Motion to Remand filed May 22, 2009 and that the Court had entered an order permitting
26  limited discovery that Defendant could take in connection with that motion. The order
27  summarized the difficulties in completing discovery outlined in the October 16, 2009 report.
28  The Court also noted that Plaintiffs were presently without counsel and advised Plaintiffs that

- 3 -

1    Philip Kenner could represent himself but the corporate plaintiffs would be required to be
2    represented by counsel. The Court ordered that Little Isle IV and Ula Makika, LLC's claims
3    would be dismissed if counsel did not make an appearance on their behalf within 30 days of
4    November 2, 2009. The Court also ordered Kenner to advise the Court in writing within 30
5    days of November 2, 2009, whether he intended to proceed with his case *pro se* and to
6    respond to the allegations made about his failure to make himself available for deposition.
7    Kenner was advised that the case[1] would be dismissed without further notice if Kenner failed
8    to comply with the Court's order.

9        While a Notice of Appearance was filed by a lawyer on behalf of Philip Kenner, Little
10    Isle IV and Ula Makika on December 3, 2009, no written response to the Court's order was
11    ever filed. On December 15, 2009, the Court dismissed the case in accordance with its
12    November 2, 2009 order for Plaintiffs' failure to comply with that order. Approximately four
13    weeks later, and only after Defendant had noticed the lodging of a form of judgment,
14    Plaintiffs filed the pending motion entitled "Plaintiffs' Motion for New Trial and/or to
15    Alter/Vacate Order Dated December 16, 2009." This Court's December 16, 2009 order was
16    noticed electronically to Plaintiffs' counsel on December 16, 2009 at 10:53 a.m.

17        Plaintiffs' new counsel argues that the Court should vacate its order of dismissal
18    because Plaintiffs obtained new counsel who filed an appearance within the time specified in
19    the Court's November 2, 2009 order and because Plaintiff Kenner appeared for the
20    continuance of his deposition on December 4, 2009. Counsel then attempts to convince the
21    Court that he acted diligently, by initiating discovery, by noticing Defendant's deposition and
22    by serving a first request for production of documents. Apparently Plaintiffs' counsel has not
23    reviewed the file in this case to note that discovery, except for the limited discovery
24    previously authorized by the Court on the citizenship of Kenner and on the alleged forged
25    note, is not yet authorized to proceed. Plaintiffs' counsel argues that because he has done
26    _____

27    [1]Kenner is the managing member of both corporate plaintiffs and the sole member of
     Ula Makika, LLC. Kenner's failures to cooperate with discovery and comply with court
28    orders therefore are also failures of the companies he controls.

- 4 -

1    more to prosecute Plaintiffs' case within the two weeks prior to the Court's order of dismissal

2    than Plaintiffs' prior attorneys did that dismissal would result in manifest injustice. It is not

3    clear to this Court that Plaintiffs' counsel has any idea that Plaintiffs have challenged this

4    Court's jurisdiction. Counsel also attaches a deposition of over 400 pages taken of Defendant

5    in an unrelated case arguing that if the Court were to review this deposition it would find that

6    Defendant has taken a different position with respect to the money at issue in this case in that

7    unrelated case and that this testimony somehow warrant's reversal of the Court's order of

8    dismissal. The Court has not reviewed the 400 pages deposition and finds it irrelevant to the

9    pending motion.

10          In response to Plaintiffs' motion, Defendant raises numerous unanswered questions.

11   For example, Plaintiffs' motion states that it is brought under Rule 59 allegedly because Rule

12   59 is the only Rule that would permit this motion to be timely. Rule 59 motions can be filed

13   28 days after the entry of the order or judgment from which a new trial is sought. Defendant

14   argues that Plaintiffs' motion is one for reconsideration. A Motion for Reconsideration must

15   be filed 14 days after the order from which reconsideration is sought. Citing the standards for

16   a Motion for Reconsideration, Defendant argues that Plaintiffs have not shown that the

17   Court's order dismissing the action amounted to a clear error of law because the five factors

18   justifying dismissal weigh in Defendant's favor. Defendant's response also notes the

19   unexplained failure of Plaintiff to file any timely Motion for Reconsideration despite receipt

20   of the Court's order until after Defendant lodged a proposed form of judgment 20 days after

21   the order of dismissal was entered. Defendant's response also remarks on the failure of

22   Plaintiffs' motion to address the additional six day delay between the notice of the lodging

23   of the proposed form of judgment and the filing of Plaintiffs' motion.

24          Despite the fact that Plaintiffs' motion still fails to explain Kenner's past failures to

25   appear at his deposition and comply with document requests, and despite the new and

26   disturbing assertion about Plaintiff's failure to attend his June 15, 2009 deposition Plaintiffs

27   failed to file a reply. The explanation given by Plaintiffs' attorney in a June 15, 2009 e-mail

28   was, "Mr. Kenner is traveling and missed his flight to Phoenix last night and will not be able

- 5 -

1  to appear for his deposition scheduled this morning." Defendant provides evidence that this

2  assertion was false and that Kenner had intentionally travel to Mexico where he gave sworn

3  testimony on June 15 in support of a criminal complaint against Defendant. Robert Gaudet,

4  the witness on the alleged forgery was to be deposed on June 16, 2009.  Instead he

5  accompanied Kenner to Mexico and gave sworn testimony on June 16 cancelling his

6  deposition by Defendant.  Plaintiff has provided no response to these allegations either in a

7  reply or in response to the Court's November 3 order.

8       Plaintiffs brought this lawsuit 17 months ago.  Four months after removal Kenner

9  suddenly realized that he was not a citizen of Arizona but of Nevada and moved to remand.

10 This case has been pending in this Court for over one year and the jurisdictional issue has not

11 been resolved because of Plaintiffs' obstruction of discovery.  Moreover, despite the

12 suspicious facts and circumstances that have been continuously raised by Defendant with

13 respect to this case Plaintiffs have failed to respond.  Even with counsel now presently

14 representing Plaintiffs, the motion filed to set aside the December order contains no

15 explanation as required in this Court's November 2, 2009 order only counsel's assertion that,

16 "Mr. Kenner never meant to fail to comply with this Court's order dated November 2, 2009,

17 and believed that by retaining new counsel and appearing for his deposition as scheduled, he

18 would be in compliance with this Court's order of November 2, 2009." This explanation is

19 not credible. The Court has been told of an alleged forgery and a false claim of Nevada

20 citizenship.  The Court ordered expedited discovery many months ago and Plaintiffs have

21 delayed and obstructed it.  In the light of the assertions in Defendant's response, this Court

22 draws the inference that no reply has been filed and no excuse has been offered for Plaintiffs'

23 delay and failures to comply with discovery because the facts asserted surrounding the

24 cancellation of the deposition are true. Plaintiffs' failures to respond also lend credence to the

25 claims of forgery and false claim to Nevada citizenship.

26      The Court finds that no Rule 59 motion can appropriately be filed from this Court's

27 December 16, 2009 order because Rule 59(a)(1) states that the ground for new trial are to be

28 asserted after a jury trial or a non-jury trial. Altering or amending a judgment under Rule

- 6 -

1    59(e) is not the same as vacating a judgment. Plaintiffs' motion is either an untimely Motion

2    for Reconsideration or a Rule 60 Motion for Relief From Judgment or Order. In either case,

3    Plaintiffs have not satisfied the requirements for relief under either Rule 60 or LRCiv 7.2(g).

4        For the reasons outlined in Defendant's Response in Opposition to Plaintiffs' Motion,

5    which have not been controverted either legally or factually in a reply,

6        IT IS ORDERED denying Plaintiffs' Motion for New Trial and/or to Alter/Vacate

7    Order Dated December 16, 2009. (Doc. 88).

8        IT IS FURTHER ORDERED overruling the objections to the proposed form of

9    judgment and ordering that the proposed form of judgment (doc. 87) be entered by the Clerk.

11       DATED this 12th day of March, 2010.

                         *Susan R. Bolton*

                         Susan R. Bolton
                 United States District Judge

> Two weeks later -- Jowdy *confessed* to all of the loans in his 2-day California deposition -- contradicting every underlying reason for the "*expedited discovery*" -- and then one year later (Dec 2010), admitted the actual loan document (*claimed as a forgery in the AZ case*) as authentic in his Nevada trial defense as the key evidence to support his defense theory (*which he lost resoundingly*)...

<center>**AGREEMENT**</center>

AGREEMENT, dated as of March     , 2003, among BAJA
DEVELOPMENT CORPORATION, a Delaware corporation ("Developer"), BAJA
MANAGEMENT, LLC, a New York limited liability company (the "Managing
Member"), each of which has its principal offices at 2 Dogwood Drive, Danbury,
Connecticut 06811 and the person whose name and address are set forth at the end of this
Agreement ("Lender").

<center>W̲I̲T̲N̲E̲S̲S̲E̲T̲H̲:</center>

WHEREAS, an affiliate of Developer, LOR Management, S.A. de C.V., a
Mexican corporation, has acquired the rights to a leasehold interest in and an option to
purchase approximately 8,000 acres of undeveloped land, including nearly three miles of
direct ocean frontage on the Pacific Ocean, in El Rosario, Baja California, Mexico (the
"Property");

WHEREAS, the Managing Member has organized Diamante del Mar,
LLC, a Delaware limited liability company (the "Company");

WHEREAS, the Company plans to develop a portion of the Property into
*Diamante del Mar*, an exclusive, private golf community and resort with as many as three
golf courses, tennis courts and other recreational facilities, a golf club, fitness center, spa,
lodge with apartments, recreational lake, marina and residential villas (the "Resort");

WHEREAS, the Managing Member has prepared an Offering
Memorandum for use in raising $7,500,000 to $10,000,000 to finance the pre-
development activities of the Managing Member's current development plan for the
Resort (the "Offering"), and has provided a copy of such Offering Memorandum to
Lender;

WHEREAS, Developer has required funds to finance certain land
acquisition costs, consultant studies, tests, preliminary golf course designs and master site
plan expenses prior to the first closing of the Offering referred to above, as well as to
fund certain other projects of the Developer;

WHEREAS, Lender has loaned $500,000 to Developer to finance a
portion of such expenses (the "Loan"), and Lender wishes to participate in the
development of the Resort and the Property on the terms and conditions set forth below;
and

WHEREAS, Developer has executed and delivered to Lender a five-year
promissory note payable to the order of Lender in the principal amount of the Loan,
bearing interest at the rate of 3.75% per annum, with principal and interest payable in full
on maturity (the "Note", a copy of which is attached to this Agreement);

NOW, THEREFORE, the parties agree as follows:

NEWYORK 4185363

1.     At the Managing Member's request, Lender shall assign the Note to, and contribute the Note to the capital of, the Managing Member in consideration of Lender's admission to the Managing Member as a Class A member and the issuance to Lender of a Class A membership interest in the Managing Member. The Lender's initial capital account in the Managing Member shall be equal to the principal amount of the Note. The Lender shall thereupon execute the Operating Agreement of the Managing Member (the "Operating Agreement"). The Managing Member will then assign the Note to, and contribute the Note to the capital of, the Company.

2.     If the development of the Resort is successful, it is expected that the Company will make cash distributions from time to time to its members, including the Managing Member. The Managing Member, in turn, will distribute any such cash received from the Company, net of expenses and reasonable reserves for expenses, to its members, including Lender, as provided in the Operating Agreement.

3.     On the fifth anniversary date of the Note, Developer shall pay to Lender an amount equal to the original principal amount of the Note, plus all accrued interest thereon, less the amount of all cash distributions made to Lender by the Managing Member prior to such date and the amount of any interest paid by the Company on account of any Private Residence Club Certificate or Home Site Certificate distributed to Lender by the Managing Member. Developer shall not be obligated to make any payments with respect to the Note prior to such fifth anniversary.

4.     This Agreement sets forth the entire understanding of the parties with respect to its subject matter and merges and supersedes all prior agreement, instruments and understandings (including any prior promissory notes) of the parties with respect to its subject matter. No provision of this Agreement may be waived or modified, in whole or in part, except by a writing signed by each of the parties. Failure of any party to enforce any provision of this Agreement shall not be construed as a waiver of its rights under such or any other provision. No waiver of any provision of this Agreement in any instance shall be deemed to be a waiver of the same or any other provision in any other instance.

NEWYORK.4185363

13089

5.      This Agreement shall in all respects be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and fully to be performed in such state, without giving effect to conflicts of law principles.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

BAJA DEVELOPMENT CORPORATION

By_____
    Kenneth A. Jowdy, President

BAJA MANAGEMENT COMPANY, LLC

By_____
    Kenneth A. Jowdy, President

Lender:

_____
        Signature

DIMITRI KHRISTICH
        Print Name

_____
        Address

_____

NEWYORK 418536.3

13090