

# DEPARTMENT OF THE TREASURY
## Internal Revenue Service
## Criminal Investigation

## Memorandum of Interview



Government Exhibit

3500 - LD   - 2
13-CR-607(JFB)

| | | | |
|---|---|---|---|
| **Investigation #:** | 1000259846 | **Location:** | **Phone Call** |
| **Investigation Name:** | Phillip Kenner | | |
| **Date:** | September 9, 2014 | | |
| **Time:** | Approx. 4:05PM | | |
| **Participant(s):** | Lanie Donlan, Witness | | |
| | Joshua Wayne, Special Agent, IRS | | |
| | Matthew Galito, Special Agent, FBI | | |

On the above date and time Special Agents Wayne and Galioto spoke with Lanie Donlan by phone. Donlan provided the following:

1. Donlan was asked about a Power of Attorney dated May 5th, 2008 that granted PHILLIP KENNER lawful attorney for Bryan Berard regarding a property in Arizona. Donlan was listed as the witness for this document.

2. Donlan had in her possession and was reviewing the Power of Attorney in question.  Donlan said it looks like her signature but does not recall the document. She further stated that she did not know the public notary, William Patrick Medlin, whom had verified the signatures on the Power of Attorney.

I prepared this memorandum on September 12th, 2014, after refreshing my memory from notes made during and immediately after the interview with Lanie Donlan.


*Joshua R. Wayne* E
Joshua R Wayne
Special Agent

Known and in the government's possession for years before the trial...

Government Exhibit

3500 - MN - 2
13-CR-607(JFB)

## AMERICAN ARBITRATION ASSOCIATION

DIANA NOLAN, an individual, and
OWEN NOLAN, an individual,

                Claimants,

    vs.

PHIL KENNER, and individual;
STANDARD ADVISORS, INC., a
Delaware Corporation and STANDARD
ADVISORS, LLC, a Delaware Limited
Liability Company,

                Respondents.

NO. 76 148 Y 00223 08 DEAR

**AFFIDAVIT OF
Mattias Norstrom**

I, Mattias Norstrom, being duly sworn upon oath, depose and say:

1.    I am over the age of 18 and otherwise competent to execute this affidavit.

2.    The contents of this affidavit are based upon my own personal knowledge.

3.    I have information in the above-captioned matter and have personal knowledge of the statements contained in this declaration.

4.    I have been a professional hockey player for over 15 years. I either personally know, or know of, the following individuals; Owen Nolan, Ethan Moreau, Joe Juneau, Dan Boyle and Brad Lukowich. All of these individuals are also professional hockey players.

5.    My home is in Sweden. I have known Phil Kenner for over 10 years. I met him while he was representing other friends of mine who were being assisted by him. At that time, Kenner was acting as a family advisor and these friends had expressed their high level of satisfaction with his service and commitment to their families. I subsequently worked with Kenner in a similar capacity and have experienced the same

high levels of satisfaction with his service and commitments to my family. On many occasions, Phil has flown all over the world to visit me on short notice upon my request.

6.    In 2003, I decided to join Phil Kenner at his new Family Office practice at Standard Advisors after he had left his former employer, Assante Global Advisors. I was aware that Phil actually sued Assante Global Advisors in California Federal Court shortly after his departure. I was aware of Phil's status as a licensed advisor when he established Standard Advisors in 2003 and I was also aware that approximately one year later, Phil Kenner gave up his licensed status. I neither had any concerns about this issue then, nor do I feel that it this issue has negatively impacted his ability to act as my Family Advisor now.

7.    I am aware that Owen Nolan is suing Phil Kenner and his company, Standard Advisors, in Arizona and is alleging several improprieties by Phil Kenner related to certain investments that I am part of, such as; the Hawaii Investment Group, Diamante Del Mar (managed by Ken Jowdy), Diamante Cabo San Lucas (managed by Ken Jowdy), Eufora, LLC (managed by Tommy Constantine) and the Avalon Airpark Project (managed by Tommy Constantine). I believe that Phil Kenner holds my investments in his companies with the highest level of integrity. Phil Kenner has always made himself available to my family and I and has always addressed any and all of my inquires. As a professional hockey player, not a full time businessman, it is important to me and my family to have access, often face-to-face, with the people who are directly and indirectly involved in my business affairs. To date, I have never seen any indications of any improprieties or wrongdoings by Phil Kenner, his company Standard Advisors, and/or his advice for my family's best interest.

8.    **DIAMANTE AIR, LLC;** I am currently at odds with Ken Jowdy as a result of his gross mismanagement of an investment that I have made in his airplane company, Diamante Air, LLC. Ken Jowdy and Mark Thalmann, his childhood friend, acting as the Managers of this company, operated a Falcon 10 airplane and a Metroliner

III. In the fall of 2008, Ken Jowdy and Mark Thalmann stopped making the monthly loan payments on the two (2) airplane loans under Diamante Air, LLC that they had been making since 2005. Phil Kenner notified me that Jowdy and Thalmann had failed to properly manage and maintain the business and had allowed our investment to become virtually worthless. As a result, this left Phil and one of our other partners, Sergei Gonchar, with over $1,000,000 in personally guaranteed debt with the lender for these airplanes. Phil, as well as all of our other partners and I were led to believe by Jowdy, and Thalmann, that the loans for these planes were being paid down aggressively based on the representation that Jowdy's extensive usage of the planes, was generating charter revenue for the business. In fact, Jowdy and Thalmann did not reduce the loan obligation as represented in spite of their extensive use of the airplanes. After numerous requests, neither Phil, our attorney, Paul Augustine, or myself have been able to obtain the bank records, financial reports or tax records from Jowdy or Thalmann to review the status of our investment and where it all went wrong.

9. **HAWAII INVESTMENT GROUP;** I have been an investor in the Hawaii Investment Group since about 2004. I wired $100,000 to Northern Trust Bank for my equity stake in the Hawaii Investment Group through Little Isle IV, LLC and for the express purpose of making funds available to Phil Kenner, which were to be used at his discretion. I was aware that my funds would be used to make distributions for the company, including but not limited to; Land Acquisition, Travel & Entertainment expenses, Legal Fees, Planning Fees, Payroll, Permitting fees, Loans to outside entities and **distributions to other members that would satisfy their monthly Line of Credit payments to Northern Trust Bank**. I also understood Phil was the sole signatory on the Little Isle IV, LLC bank account. I have never had any reservations or issues regarding the use of these funds. Phil Kenner has always disclosed the complete and detailed use of these funds with me from time to time and per my every request. We discussed in detail the risks associated with the Hawaii Investment Group and I elected to invest

THUS -- no ponzi issues -- as represented by the government during the EDNY trial...

accordingly. Phil also discussed in detail, the merits of the Joint Venture agreement with WWK Hawaii Holdings, LLC prior to me personally signing the Acknowledgement and Acceptance letter Phil provided to me through our attorneys, Larry Markowitz and William Najam in July of 2006, which was prior to my agreement of the Joint Venture. I understand the global markets have caused many issues with the Joint Venture's ability to sell or liquidate the land holdings, but I am confident that the ~$100,000,000 of land that Phil Kenner was instrumental in acquiring on behalf of the Joint Venture, is more that sufficient to ensure a positive investment result as originally contemplated prior to my involvement. From day one, I have also been made aware of Phil Kenner's significant interest in the Hawaii Investment Group in consideration of his ongoing capital contributions, day-to-day management, personal loan guarantees (including securing the Waikapuna loan with his Arizona residence at the time), his environmental guarantee on behalf of the Joint Venture (so none of the other members would be liable), as well as other contributions.

10. **DIAMANTE CABO SAN LUCAS;** I have been involved in real estate investment projects in Mexico since approximately 2003, specifically, Diamante Del Mar and Diamante Cabo San Lucas. I was aware that Phil Kenner has had an ownership interest in the two Mexico projects operated by Ken Jowdy prior to my making an investment into each respective project. I am aware that Phil Kenner and Tommy Constantine had been working diligently over the last two years to resolve certain partnership issues between Ken Jowdy and our investor group, which were related to our investment in Diamante Cabo San Lucas. I understand that approximately eighteen (18) months ago, Tommy Constantine negotiated a global settlement with Ken Jowdy, with the assistance of Jowdy's brother-in-law, William Najam, to a) relieve Ken Jowdy of the $10m+ in personal debt, b) his management control of the project, and c) any additional personal financial obligations he had to our Hawaiian Investment Group, Glen Murray, Bob Gaudet, myself and others. I was also aware that Ken Jowdy presented the

settlement agreement to Masood Bhatti at Lehman Brothers in New York, who at that time was a Senior VP and was acting on behalf of the lender for the Cabo project. Subsequently, after Jowdy met with his brother in law William Najam and Masood Bhatti, Jowdy decided that he would not follow though with the agreement that he had made and elected to renig on the settlement that Tommy Constantine and Ken Jowdy had negotiated over a six (6) month period of daily negotiations. Furthermore, in spite of being a significant investor and shareholder of Diamante Cabo San Lucas, per an email recently written by Jowdy and sent to Phil Kenner, I as well as other investors, have been prohibited from entering the property. Among other extravagant expenditures and instances of corporate waste, I am aware that Ken Jowdy has utilized various resources of the Diamante Cabo San Lucas project, including the use of personnel who were on the Cabo payroll and other financial resources to pay for several private jet flights around the country. I am also aware that the individual in charge of the Lehman Brothers loan to Jowdy and Diamante Cabo San Lucas, Masood Bhatti, also acquired a secret equity interest in the Diamante Cabo San Lucas project through an entity owned by his Goddaughter named Somerset Properties, LLC. This was unknown to Phil Kenner or myself prior until recently.

11. **DIAMANTE DEL MAR;** I am an investor in Diamante Del Mar (DDM), in El Rosario, Mexico, which Ken Jowdy also acts as the sole Managing Member. I invested $500,000 in the project and have not received a single communication in several years, from Ken Jowdy, William Najam or others representing the project regarding the status or development of the project. I also hold a $250,000 Promissory Note from Ken Jowdy and Diamante Del Mar that has not been paid by Ken Jowdy even though the note matured several months ago. I am aware that the project has not been proceeding with any development in the last three (3) plus years. This is primarily due to the fact that Ken Jowdy has focused his efforts on two unrelated projects, which Phil Kenner and the rest of our investors in Diamante Del Mar and Diamante Cabo San Lucas are not involved.

12.    **EUFORA, LLC**: I have been an investor in a few LLCs that have a direct investment in Eufora's Pre-paid card business.    From day one, I have been aware of the risks associated with a start up company in the payment card industry.    I understood that at the time of my first investment in the LLC which held our interest in Tommy Constantine's Eufora, LLC, Phil Kenner was a shareholder in the company.    Phil Kenner disclosed his investment in Eufora, LLC prior to my making my investment.

13.    I have always been made aware by Phil Kenner that I am able to request outside assistance from attorneys, accountants, or other professionals to audit the strategies that Phil Kenner has assisted in implementing.    I have always had direct access to third party advisors involved with the planning decisions for my family, whether I have included Phil Kenner or not in those conversations. Through conversations with other clients of Phil Kenner's over the years, I am aware that this is his common approach with his Family Office clients.

Further Affiant Sayeth Not.

Executed on this 30th day of May, 2009.

_____

Mattias Norstrom

Government Exhibit

Pierce Printers NJ #69

3500 - MP - 5
13-CR-607(JFB)

ORIGINAL

1  UNITED STATES GRAND JURY

2  SOUTHERN DISTRICT OF NEW YORK

3  - - - - - - - - - - - - - - - - - - x

4  UNITED STATES OF AMERICA

5  -v-

August 2009
:Special

6  PHILLIP KENNER                    :

7  - - - - - - - - - - - - - - - - - - x

Peca confirms knowledge of loans to Jowdy from Hawaii investors "as a group" -- Pages 30-33, 35, 40, 42, and 45...

                    UNITED STATES COURTHOUSE
                    500 Pearl Street
                    New York, New York 10007

                    March 29, 2011
                    10:20 a.m.

15  APPEARANCES:

16            ARLO DEVLIN-BROWN, ESQ.

17              Assistant United States Attorney

18

19

20            Rivka Teich, R.P.R., C.S.R.
21            Acting Grand Jury Reporter

22

23

24

25

26

GRAND JURY
EXHIBIT
2
10-23-13

M. Peca    03/29/11                                    2

1

2          (Colloquy Precedes.)

3          (Witness Enters Room.)

4          (Time Noted: 10:20 a.m.)

5    MICHAEL PECA, called as a witness, having been

6          first duly sworn by the Foreperson of the

7          Grand Jury, was examined and testified as

8          follows:

9    BY MR. DEVLIN-BROWN:

10       Q    Please state an spell your full name for the

11   record.

12       A    Michael, M-I-C-H-A-E-L, Anthony, A-N-T-H-O-N-Y,

13   Peca, P-E-C-A.

14       Q    Mr. Peca, I'm an Assistant United States

15   Attorney -- my name is Arlo Devlin-Brown -- that just

16   means I'm a federal prosecutor.

17            You've been subpoenaed to testify to this Grand

18   Jury about potential violations of federal law,

19   including laws relating to securities fraud, bank fraud,

20   other types of fraud offenses.

21            If this Grand Jury uncovers evidence of

22   criminal activity it can return indictments on those

23   charges or any other charges of federal law that it

24   finds evidence of.

25            I want to advise, you first of all, I'm sure

26   you know this, you're not a target or subject of this

M. Peca    03/29/11                    3

1

2    Grand Jury inquiry.  You've been subpoenaed solely

3    because we believe you may have information relevant to

4    it as a witness.  I wanted to give you some piece of

5    mind there and explain that to you.

6            You did receive, I guess, from your lawyer a

7    subpoena for today; is that correct, Mr. Peca?

8        A    Did I get it from him?

9        Q    Yes.

10       A    No, to my home in Buffalo.

11       Q    Okay.  We're going to get started in a few

12   minutes.  I'll give you an overview of things I'll talk

13   about, I'll ask you questions about your background,

14   then we're going to ask you questions about various

15   financial investments that you've made, some of the

16   people you've entrusted with money, and go over some

17   documents as well.  Okay?

18       A    Okay.

19       Q    Before I do that I want to advise you of rights

20   and responsibilities you have before the Grand Jury,

21   just so you understand how it works.  I'm sure you may

22   have gone over some of these things with your attorney,

23   but it's a good idea to do it on the record as well.

24   Okay?

25       A    Okay.

26       Q    So, first of all I'm sure you understand you

                              M. Peca   03/29/11                        4

1    have a right not to incriminate yourself.  Do you

2    understand that?

3         A    I do.

4         Q    So if you believe that a truthful answer to a

5    question would incriminate you, you have the right to

6    refuse to answer that question.  Do you understand?

7         A    I do.

8         Q    Do you understand that your testimony is taken

9    down here by a court reporter?

10        A    I do.

11        Q    You're not recording this yourself in any way?

12        A    No, they took everything I had at the front

13   door.

14        Q    They do it to the Grand Jurors too.

15             So you understand then that the testimony taken

16   down can be used in any kind of proceeding?

17        A    Yes.

18        Q    Do you have an attorney representing you in

19   this matter?

20        A    Yes.

21        Q    Who is your attorney?

22        A    Ronald Richards.

23        Q    Does he represent anyone else connected to

24   these issues?

25        A    The other two gentlemen here today, Turner

```
1                    M. Peca    03/29/11                5

2      Stevenson and Darryl Sydor.

3          Q    Do you know if he now or previously represented

4      anyone else connected to this Grand Jury's inquiry?

5          A    Not that I'm aware of.

6          Q    Do you know, for example, if he's represented

7      Phillip Kenner?

8          A    I believe he has.

9          Q    Do you have any understanding as to whether he

10     continues to represent him?

11         A    That I'm not sure.

12         Q    As you probably were told, your attorney is not

13     allowed inside of the Grand Jury room.  But I want to

14     advise you that if you want to talk to him at any point,

15     whether because there is a particular question or if you

16     need to go to the bathroom -- you don't to talk to him

17     for that -- let us know and let the Foreperson know and

18     she'll give you a break.

19         A    Great.

20         Q    Do you understand that you're required to give

21     truthful, non-misleading testimony to this Grand Jury?

22         A    Yes.

23         Q    Do you understand that if you make any false

24     statements or give misleading testimony under oath, you

25     could be prosecuted for perjury or making false

26     declarations to a Grand Jury?
```

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor, New York, N.Y. 10018  (212) 869-1500

```
 1                    M. Peca    03/29/11                    6
 2        A   Yes, I do.
 3        Q   Do you understand everything that I've asked
 4   you so far?
 5        A   I have.
 6        Q   Let me advise you of one other thing before we
 7   start.  The Grand Jury proceedings are secret.  No one
 8   in this room, with the exception of you, is allowed to
 9   reveal what you've said, here absent a court authorizing
10   it.  So your testimony is secret.  You can share it with
11   whoever you want, but no one else will know what your
12   testimony is unless you do so or a court orders it.
13        A   If I tell my wife, it's not a big deal?
14        Q   It's up to you.
15        .   Who knows that you're testifying here today?
16        A   Who else knows, just my wife and the guys that
17   are in the other room.
18        Q   Does Phil Kenner know?
19        A   I believe he does, yes.
20        Q   Why do you believe he knows?
21        A   I think he was scheduled to come and speak to
22   somebody and it was postponed because of this proceeding
23   today.
24        Q   Let's go over -- start with a little background
25   about yourself.  Where are were you born?
26        A   I was important in suburb of Toronto, Ontario,
```

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor, New York, N.Y. 10018  (212) 869-1500

Peca does not say "BECAUSE Kenner prepped me last night on the phone for this testimony" -- like he misled the EDNY court 4 years later (*2015*)...

1              M. Peca    03/29/11                    7

2    Canada.

3         Q   You're a Canadian then?

4         A   Dual citizen, I live in Buffalo, New York and a

5    U.S. citizen as well.

6         Q   You've had a long career in hockey?

7         A   Played 15 years.

8         Q   Where did you start your hockey career?

9         A   I started in Vancouver, British Colombia, then

10   spent time in Buffalo, New York, New York Islanders,

11   Edmonton, Toronto and Columbus.

12        Q   Have you played in the NHL at some point?

13        A   That was the 15 years, yes.

14        Q   All 15 was in NHL?

15        A   Yes.

16        Q   What are you doing presently?

17        A   Presently I do some on-air analysis work up in

18   Toronto for NHL.  I sit on various charitable boards,

19   and coach youth hockey.

20        Q   Where do you coach youth hockey?

21        A   In Buffalo.

22        Q   Let's start off with Phil Kenner, when did you

23   first meet Mr. Kenner?

24        A   I first met Phil Kenner from my first agent I

25   had when I turned professional, Anton Thun, either in

26   '95 or '96, my first year in Buffalo.  I believe there

8

1   was a meeting at my house.  I had started making a lot

2   of money at that point and wanted to get into a program

3   where I was budgeting myself and responsible with my

4   money.  So I was introduced to him; I think several of

5   Anton Thun's clients were.  And then we started working

6   a relationship from that point on.

7       Q    Did you come to any agreement with him at that

8   meeting or shortly after with Mr. Kenner about what

9   services he performed for you?

10      A    I'm sure I did, yes, I don't recall the exact

11  transaction but I started working with him.  I'm sure

12  that took place before.

13      Q    What was it in general that he started doing

14  for you.

15      A    Just helping me manage money, budget myself,

16  and trying help me secure a future.

17      Q    Does that mean he would sort of have access to

18  your bank accounts and would tell you, give you the

19  money to use and say you need to spend more or less?

20      A    Not my savings or checking account.  But it was

21  a case where I believe at the time it might have been

22  Wells Fargo was the bank that held, whether it was

23  investing in Pepsi Cola or whatever it was.  And my

24  paychecks would go there and I would get wired to my

25  account from those paychecks whatever I needed to pay

M. Peca    03/29/11                              9

utilities and daily expenses, things of that nature.  I

didn't have an abundance of money in my checking account

that would force me to want to spend it.

    Q   You would have in your checking and savings

account your day-to-day living expenses.  Then stuff you

were putting away for the long-term in some other

account?

    A   Correct.

    Q   This other account was one that Phil Kenner

managed?

    A   Yes.

    Q   Did he have any kind of company when he

started?

    A   At the time I believe he was working with State

Street Capital out of Boston.  I think that was the

house.  There was a gentleman I dealt with there, I

can't remember his name though, it was State Street

Capital in Boston.

    Q   Would you get statements on what the investment

account was in?

    A   Every month.

    Q   What kind of authority did -- let's start at

the beginning -- did Phil Kenner have authority in terms

of how he could invest that money in that account?

    A   I won't say a full autonomy, but he had power

M. Peca    03/29/11                                    10

1
2      of attorney to help me.  If I needed to send money, he
3      could to it on my behalf.
4          Q    What if he had an investment idea?  To take
5      your example, buy Pepsi Cola, was that something he
6      needed to check with you first to see if you wanted to
7      do it, or did he have authority to just make investment
8      decisions on your behalf?
9          A    I think when it comes to that level of
10     investing, whether money to goes to Pepsi or Disney, I
11     didn't need to know the details.  I didn't have
12     experience in that area.
13         Q    Do you still use Phil Kenner as an investment
14     adviser?
15         A    I don't.  I've been retired for two years and
16     Greenberg Gram out in California handles that stuff.
17         Q    How long has Greenberg Gram been handling --
18         A    They've managed my account for quite a few
19     years now.
20         Q    How did Mr. Kenner, to your knowledge, earn
21     money for performing these services for you?  What was
22     your arrangement?
23         A    There was a percent, I can't remember the exact
24     amount, about $50,000 a year.  The reason I stopped
25     using him, because I was done I had started handling my
26     own insurance issues, mortgage issues.  When I was

M. Peca   03/29/11                              11

1
2    playing I didn't have the time or the ability to do a
3    lot of that myself.  He was able to do a lot of that for
4    me.  It just got to the point where my wife and I were
5    able to do that stuff.  We didn't require the services
6    so we ceased the relationship.
7        Q    When was that?
8        A    Two, three years ago.
9        Q    Was it a flat fee or?
10       A    Percentage-based, it worked out to about 12,500
11   a quarter.
12       Q    Was it a percentage of the money that he had,
13   that he was managing for you?
14       A    Correct.
15       Q    Did he get any additional money, as far as you
16   know?  If he made transactions with the money would he
17   get a percentage?
18       A    No, not that I'm aware of.
19       Q    Do you know if he ever put your money into
20   projects where he had a personal interest?
21       A    No.  More than -- other personal interest as
22   far as him getting a kickback-type scenario?
23       Q    I mean him investing your money into say a
24   company he owned or that he had some kind of ownership
25   in?
26       A    No.

M. Peca    03/29/11                    12

1
2      Q    You're not aware of any situation?

3      A    No.

4      Q    What about what you were talking about,

5   kickback scenario?

6      A    Not that I'm aware of.

7      Q    Some of your money just going to just stocks

8   and bonds?

9      A    Primarily.

10     Q    What about other types of investments that

11  Mr. Kenner made for you?

12     A    I didn't start getting into outside the stock

13  market and bonds until it was about 2002, 2003.

14     Q    What happened in 2002, 2003?

15     A    I made my first investment in a company

16  TechNeck.  The president at the time was Bob Thompson.

17  And it was a telecommunications company that basically

18  put cable lines into schools for educational purposes.

19  That was my first venture outside of the stock market.

20     Q    Who recommended Tech Connect to you?

21     A    Phil Kenner brought the idea to me.

22     Q    How much money did you invest into it?

23     A    $250,000.

24     Q    Are you aware of whether the investment made

25  money or not?

26     A    It was promising at the start.  Unfortunately,

M. Peca    03/29/11                    13

1    the war took place and Federal funding dried up for

2    educational funding.  The company was acquired by Dime

3    Tech.

4        Q    What happened to your investment, did you get

5    any of it back?

6        A    No, we did not.

7        Q    What is the next sort of company that you

8    invested in?

9        A    In chronological order --

10       Q    If you can't do chronological.

11       A    I can't recall now.

12       Q    Forget the next one, what are some of the other

13   ones that you invested in?

14       A    Impact was a protective equipment company based

15   out of New Jersey.  Then we started getting into some

16   real estate ventures.

17       Q    Let's talk about Impact a little bit.  Who

18   recommended that to you?

19       A    A gentleman by the name of Tim Garn, who I met

20   in New York.

21       Q    How did you meet Tim Garn?

22       A    Acquaintance of mine, guys that played football

23   at University of Maryland knew the guy, Mark Monica, who

24   is, I think he worked for Rye Dell Protective Equipment.

25   He's an engineer who came up with a product, thinner,

M. Peca   03/29/11                                    14

more stream-lined equipment.  And, again, the concept

seemed pretty good, quite a demand for it.  Something I

was interested in getting involved with.

Q    Protective equipment, what are you talking

about?

A    Football shoulder pads.

Q    Did Phil Kenner have anything to do with that

investment?

A    I don't know to what level, no.  I know he

was -- I would talk to him about it because he was my

adviser at the time.

Q    Did you bring him the company as an idea or did

he bring it to you?

A    He had a relationship with Tim Garn at the time

or got to know him at that point.

Q    How much did you invest in Impact?

A    $100,000 at the time.

Q    Did you invest more later?

A    I believe I put in another $100,000 a year or

two later.

Q    What time of year?

A    That was early after the TechNeck investment,

so maybe 2003-ish.  I was still in Long Island, New York

at the time.

Q    What happened to that investment?

M. Peca   03/29/11                     15

1

2    A    I just got a notice probably four months ago

3    that they weren't paying the rent and the doors were

4    locked shut on them.

5    Q    Before we get to real estate, any other

6    companies that you remember investing in through Phil

7    Kenner?

8    A    No, not at the time.

9    Q    You invested in real estate deals as well?

10   A    I did.

11   Q    Before we get into them in detail, just go over

12   each one so I know what we're talking about.  What are

13   the real estate deals?

14   A    In chronological order there was El Rosario in

15   Baha, Mexico.

16   Q    Did that have any other names?

17   A    Demonte Delmar.

18   Q    That was the first one?

19   A    Correct.

20   Q    What was the next one?

21   A    Next one was in Hawaii.

22   Q    What about Cabo San Lucas?

23   A    That was after that, yes.

24   Q    Next one is that Hawaii?

25   A    Correct, Demonte Cabo San Lucas.

26   Q    San Lucas is not Hawaii?

```
                        M. Peca    03/29/11                    16
1
2      A    No, that's not Hawaii; the other Mexico one.
3      Q    Hawaii is which one?
4      A    Little Isle.
5      Q    Was it Little Isle IV?
6      A    Yes.
7      Q    Any others in Hawaii?
8      A    No.
9      Q    Any other real estate projects?
10     A    Not that I can recall.
11     Q    Any other investments at all that you can
12   recall through Phil Kenner other than the two companies
13   you mentioned, the three real estate deals, and of
14   course just buying stock and bonds things of that
15   nature?
16     A    This would be a good time to speak to my lawyer
17   to help me refresh.  I know there is a couple, I don't
18   want to miss them.
19         MR. DEVLIN-BROWN:  That's fine.
20         THE FOREPERSON:  You're excused.
21         (Witness Temporarily Excused.)
22         (Time Noted: 10:43 a.m.)
23
24
25
26
```

M. Peca    03/29/11                                    17

1

2        (Colloquy Precedes.)

3        (Witness Enters Room.)

4        (Time Noted: 10:43 a.m.)

5        THE FOREPERSON:  I remind you, you are still

6     under oath.

7   BY MR. DEVLIN-BROWN:

8        Q   Mr. Peca, you said you needed to speak with

9   your attorney to see if it prompted your memory on any

10  companies?

11       A   Yes.  Two other ones, one at that time was

12  small investment in a kind of technology company but

13  more of a gaming company.  It was Code Fire to start

14  then Technique Digital Arts.  As well as -- I think that

15  was it.

16       Q   One other company was Technique Digital Arts?

17       A   Yes

18       Q   Who brought that to your attention?

19       A   It was presented to me by Phil.

20       Q   How much money did you invest?

21       A   $116,000, something like that.

22       Q   What happened to that investment?

23       A   It didn't work out.

24       Q   When did you make that investment?

25       A   It round the same time, 2004, 2005.  I want to

26  say they were my very much -- they were presented to me.

M. Peca    03/29/11                    18

1

2   On all of them, through all the times, I made the final
3   decision.  I may have not done as much due diligence
4   that some may have done.  It's not like I had to say yes
5   or forced.  I made the decision to say, yeah, I want to
6   do that.  Based on the money I was making at the time it
7   didn't bother me to invest those kinds of dollars.

8       Q   For any of these three companies you mentioned
9   did, since you were making the investment decision
10  yourself, did you receive materials from the companies
11  how your investment would be used?  What the plans were
12  for?

13      A   I would get updates on the plans.  To say -- I
14  mean, it was a long time ago.  I can't remember if I got
15  all the documents for all the companies, but I was
16  getting, I would get updated from time to time, sure.

17      Q   That's after you made the investment?

18      A   Correct.

19      Q   Before you made the investment did you receive
20  any materials from the companies, memos, brochures,
21  anything that would guide you in making your investment
22  decision?

23      A   Some I did, some I didn't.

24      Q   Do you remember any you did?

25      A   I remember getting Impact, getting information
26  background on the founder of the product, Mark Monica,

M. Peca    03/29/11                          19

1
2   who developed the product.  That one in particular
3   allowed me to make a decision that I was comfortable
4   with.
5       Q    Were you buying stock in the companies or do
6   you know?
7       A    We were making investment in getting a share in
8   the company.
9       Q    Let's talk about the real estate -- before we
10  do that.  Your investment account or accounts what banks
11  have you had those funds out over the years?
12      A    I believe just the two -- I'm not sure.  State
13  Street back in the time if it was Wells Fargo.  Then it
14  was Wells Fargo a long time.  Now it's at Schwab.
15      Q    That holds what kind of money at Schwab?
16      A    Just all my investment accounts, stuff like
17  that, stocks, bonds.
18      Q    Cash?
19      A    Yes.  There is a cash portion to it, yes.
20      Q    That money used to be at State Street and/or
21  Wells Fargo?
22      A    State Street was the manager of the account,
23  and whether it was State Street bank, it might have
24  been, I can't remember.  It was a long time ago.
25      Q    Then it got moved to Schwab?
26      A    Correct.

1                    M. Peca    03/29/11                    20

2        Q    When?

3        A    The people managing the account were leaving

4   State Street, so then I started using a company Asante.

5   Phil, who is my adviser, moved over to Asante Global.  I

6   think at the time formed a relationship based out of

7   Winnipeg.  Any ways, the accounts came together and a

8   company was Asante.  I think that's when it went into

9   the Wells Fargo account.

10       Q    You mean it went into the Schwab account?

11       A    No, the Wells Fargo.  After State Street it was

12  Wells Fargo then Schwab.  It's in Schwab currently.

13       Q    When did it go to Schwab?

14       A    I don't know.

15       Q    Do you know why it went to Schwab?

16       A    Maybe just because it was a different manager

17  of the account, maybe their accounts were in a different

18  bank.  I'm into the sure.

19       Q    Let's talk about some of the real estate.  The

20  first one El Rosario, as you refer to it?

21       A    Demonte Delmar it's more known as.

22       Q    Let's call it Delmar, which just means by the

23  ocean?

24       A    "Diamond by the sea."

25       Q    Who brought the "Diamond by the sea" to your

26  attention?

M. Peca   03/29/11                              21

1

2      A   It was presented to me in conversation briefly

3  by Phil.  I have a passion for golf and for development

4  at the time.  At the time he brought it to me I signed a

5  five-year, 25 million-dollar contract.  I grew up in a

6  family with no money so now was an opportunity to do

7  some of the things I thought would be fun and

8  adventurous.  He told me how he was introduced to a

9  gentleman Ken Jowdy, who owned land in El Rosario and

10  was looking for charter members.  And we made an

11  investment as a charter member for that particular

12  development.

13      Q   What was El Rosario?

14      A   El Rosario was the town in Baha.

15      Q   In Baha, California?

16      A   Correct, north Baha.

17      Q   Tell the Grand Jurors where that is?

18      A   About an hour south of San Diego I think.

19      Q   Only an hour?

20      A   I think so.

21      Q   By car?

22      A   I flew in on a small plane.  I'm not sure the

23  how long the car ride is.  The roads are not that easy

24  in that part of town.

25      Q   Did you fly in to make the investment or after?

26      A   After.

Peca confirmed that he knew of the KPMG appraisal (68.9mm) on the DDM property -- thus felt comfortable with Jowdy and DDM...

M. Peca    03/29/11                                          22

2      Q    What was the status of the development at the

3    time you made the investment?

4      A    Piece of property that was in good shape and it

5    was appraised by KPMG at a good value.  And if anything,

6    it was potential.  It was a beautiful piece of property

7    on the Pacific Ocean.

8      Q    How much did you invest in it?

9      A    The charter member initiate was $500,000.

10     Q    Did you receive documents when you made the

11   investment stating what you would be getting in return?

12     A    Yes.

13     Q    What did it say you would get in return?

14     A    It was broken down in different ways.  It was

15   $300,000 portion was for a lot that the charter member

16   had the ability to sell back to the development and get

17   $300,000 back.  A time-share portion of villas going to

18   be built, things to that nature.

19     Q    What did you -- when did you put in the

20   $500,000?

21     A    It was early 2003 or late 2002.

22     Q    How did you do it actually, did you wire money

23   somewhere?

24     A    I wired money.

25     Q    From which account?

26     A    I think at the time it was the Wells Fargo

M. Peca    03/29/11                    23

1
2       account.
3           Q    When you say you wired, did other people have
4       access to the account?
5           A    They did, but I had to approve everything that
6       what went out of the account; nobody could make
7       transactions without my approval.
8           Q    You said you visited the property, how many
9       times have you visited?
10          A    Just the one time.
11          Q    When was that in relation to when you made the
12      investment?
13          A    Trying to think of the year, I was at the
14      National Hockey League Players in San Diego and flew in
15      from there, I think June 2005.
16          Q    What prompted the trip?
17          A    I was just down there and wanted to set up an
18      opportunity to go down and see it.
19          Q    Who did you go there with?
20          A    With Phil, Phil Kenner.
21          Q    How did you get there?
22          A    The development itself had a plane out of San
23      Diego and a pilot that would fly perspective buyers or
24      investors down there.
25          Q    Was there an airport?
26          A    Airport strip built on the property.  One of

M. Peca    03/29/11                        24

1

2     the first things done there.  It's on top of the Mesa,

3     which sits about 600 feet above sea level.

4          Q   So you went on the developer's plane, went on

5     the developer's air strip, what else was going on at the

6     development?

7          A   There was stakes in the ground where potential

8     holes and tee boxes may be.  There were a couple of

9     homes by the water inhabited by squatters, who were

10    moved out.  And employees for the project that were down

11    there basically take perspective buyers or investors

12    down there and showing them the property.  We hopped on

13    the four-wheelers and looked over the property.

14         Q   Did you spend the night there?

15         A   I did not.

16         Q   Was there anywhere to spend the night?

17         A   There were homes in the area if we wanted to,

18    but I flew back.  My wife and son were in the hotel in

19    San Diego.

20         Q   Were the homes built by the developer?

21         A   Pre-existing homes.

22         Q   Meant to be torn down eventually?

23         A   Correct.

24         Q   Had anything actually built --

25         A   No.

26         Q   -- by the developer?

M. Peca    03/29/11                                25

2    A    No.

3    Q    Do you know if that's changed to this day?

4    A    Nothing has changed.  Having said that, I know

5  that when you invest in real estate development there is

6  no quick return.  It could be a lengthy process.

7    Q    To your knowledge what is the status of the

8  project today?

9    A    As far as the status of that project today,

10  it's on hold.  I don't want to jump ahead, I'm sure

11  you're going to ask about Cabo San Lucas, but that

12  portion of the project put the northern project on hold

13  because Cabo got hot and that was able to used to

14  cross-market the northern property.  So the focus was

15  shifted from north to the south.  Delmonte Delmar and El

16  Rosario in north Baha would shift to Cabo in south Baha.

17    Q    Let's talk about the San Lucas project.  When

18  did you invest in that one?

19    A    I can't remember the exact year, it was later

20  on in 2000s, mid to late 2000s.

21    Q    Who brought that to your attention?

22    A    Phil, always the same group of guys, same

23  investment group from the other one.

24    Q    What was the pitch as to why it was a good

25  investment?

26    A    Cabo was hot.  Cabo San Lucas is a much more

M. Peca    03/29/11                                    26

1   desired destination than a town El Rosario which there

2   is no easy access.  The thought was, it was an easier

3   way to get a development going.  And maybe, I guess, the

4   thought process they did at time is they did fly them to

5   the north to show them the Demonte brand up north.

6       Q    I see.  Was it your understanding that the San

7   Lucas project was starting in part because the other one

8   wasn't going anywhere?

9       A    That wasn't my impression of that.  It was

10  more, things aren't going as quickly as they would have

11  liked up north.  The real estate market is slowly

12  starting to cool.  They figured the sales would be

13  hotter in a destination in the south so they focused

14  there.

15      Q    I'm not sure I understand the cross marketing.

16  If the south is a more desirable location, you got

17  people looking at south how does that help sell the

18  place up north?

19      A    In these destinations -- it's a unique buyer.

20  I don't think -- some people might like a lot of the

21  action like in Cabo and those people would be attracted

22  to that.  But they are down there and got to see north,

23  maybe there are people who are little more private and

24  reserved.  It's a quite location, then it would appeal

25  to them.  It was just a personality-based thing.

M. Peca    03/29/11    27

1
2    Q    How much money did you put into San Lucas?
3    A    200,000.
4    Q    We're talking about 2004 somewhere around
5    there?
6    A    Maybe a little later that 2004.
7    Q    2005?
8    A    Maybe five or six.
9    Q    What were you going to get in return?
10    A    It was the -- we were still business partners
11    with Mr. Jowdy, the managing partner of the projects.
12    It was kind of the same thing we got in.  The difference
13    is in the northern property we were told he owned the
14    land, we were becoming charter members for the
15    investment.  In the south our money was going, money was
16    going to purchasing the property.  So the investments
17    were a little different, both places had the same idea.
18    Q    Did you get any documents on that property as
19    to what your investment was?
20    A    No.  At the time we're all business partners,
21    so we'll get it in due time.
22    Q    What happened with of that investment?
23    A    That investment, what went on there is probably
24    why we're here today.  I've never gotten any clear
25    understanding of what was going on.  After we purchased
26    the property --

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor, New York, N.Y. 10018 (212) 869-1500

Still 5 years after 2006 acquisition and Lehman funding -- Peca, Kenner and the other investors cannot get any info from Jowdy...

Still 5 years after 2006 acquisition and Lehman funding -- Peca, Kenner and the other investors cannot get any info from Jowdy...

```
                    M. Peca    03/29/11                    28

 1

 2     Q    You say "we" who do you mean by we?

 3     A    Our investment group, everybody involved in it.

 4   I'm not sure who everybody is.

 5     Q    Did it have a name your investment group?

 6     A    It does, I can't remember it now.  But

 7   basically we closed on the land negotiations immediately

 8   started with Lehman Brothers to fund the real estate

 9   loan for the project.

10     Q    And did you get the loan?

11     A    Yes, $129 million loan to develop the property.

12     Q    What happened then?

13     A    That's the question were looking to get from

14   Mr. Jowdy, where the $129 million went.  To only get a

15   golf course with $129 million real estate loan, where

16   was that money spent, if know only a golf course exists

17   on the property.

18     Q    Have you gone down and visited the property?

19     A    I have not gone down to Cabo.

20     Q    Where is your source of information?

21     A    Other lawsuits that are going on, I get updated

22   on information.  I mean as of now there -- I guess the

23   golf course is a nice one.  They are getting greens fees

24   that's subsidizing the property on a daily basis.

25     Q    Your understanding is still there is just a

26   golf course at this point and some lawsuits?
```

Peca info coming from attorneys representing him in various litigation -- not just Kenner...

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor, New York, N.Y. 10018  (212) 869-1500

```
                          M. Peca    03/29/11                    29

 1
 2        A    No vertical development as all.

 3        Q    Let's talk about Little Isle IV.  What was that

 4   investment?

 5        A    That again was a land acquisition deal.  An old

 6   sugar cane farm, I think southwest or east of the big

 7   island.

 8        Q    In Hawaii?

 9        A    Correct.

10        Q    Who brought that to your attention?

11        A    That was Phil Kenner who brought me that one.

12        Q    What was supposed to happen with this project?

13        A    It was a same thing where Lehman Brothers were

14   involved in a potential loan.  We were going to buy some

15   land and we were going to start some development fairly

16   quickly.

17        Q    When you say "we", is this the same we in the

18   San Lucas property?

19        A    I don't know if all the same people were

20   involved in that or not.  I never cared to know who was

21   involved.  If I knew -- I wanted to get involved, I

22   wasn't concerned about the others.

23        Q    Who put together the group?

24        A    Phil Ken.

25        Q    Was Jowdy involved in the Hawaii property as

26   well?
```

1                    M. Peca    03/29/11                    30

2         A    I don't believe he was.

3         Q    Do you know who the developer was in Hawaii?

4         A    I can't remember the name.  I know there is a

5    managing partner, Allan Warden, was Dan supposed to be

6    involved.

7         Q    How much money did you put in Little Isle IV?

8         A    $100,000 cash investment that was going to go

9    towards that.  Then we had lines of credit.  I had one

10   out for $1.7 million that was going to be used at the

11   time.  Here's where a lot of the cross starts to happen.

12         A short-term loan to Mr. Jowdy, because at the

13   time Cabo -- we hadn't gotten the lending from Lehman

14   Brothers yet.  We made a short-term loan until the

15   lending came in.  Once the lending came through they

16   were to pay back the loan, I think in the neighborhood

17   of five-and-a-half million dollars, on the closing.  It

18   was never paid back.  And then communication basically

19   seized at that point from him.

20         That was kind of the whole sticking point as

21   far as me and the other guys with Mr. Jowdy.

22         Q    I think we'll need to slow down and walk

23   through that in more detail, because I'm a little

24   confused.

25         This $1.7 million line of credit that was for

26   the Mexican project or Little Isle IV?

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor, New York, N.Y. 10018  (212) 869-1500

Peca verifies his 1.7mm LOC and use as well as LOANS to Jowdy from the Hawaii investor group...

Peca confirms loan to PARTNER, Jowdy, and NOTHING to be worried about at the time...

1.7mm and 100k cash were both in his Capital Account

```
 1              M. Peca    03/29/11                    31
 2        A   It was for -- you're right, we're ahead.
 3        The 1.7 along with the $100,000 and whatever
 4   else put in this a Capital account, Little Isle IV I
 5   believe.  That Capital account was loaned to Ken Jowdy,
 6   our business partner, so there is no need at the time to
 7   be worried about anything.  That money was loaned to Ken
 8   Jowdy to basically help some of the purchase of the Cabo
 9   property so we can get the funding.  And then it was
10   supposed to a short-term loan.
11        Q   When you first took out the $1.7 million loan
12   was the idea first that that was going to go towards
13   Little Isle IV at the very beginning -- let me finish --
14   so at the very beginning did you understand, I'm taking
15   out this loan even though it's going first to Little
16   Isle, it's going to quickly go to be a short-term loan
17   for the Mexico stuff?
18        A   I knew 100 percent it was going to Little Isle
19   IV initially.  Shortly after that the short-term loan
20   was something that took place.
21        Q   So when you -- did you sign papers to take out
22   a loan in that amount?
23        A   Yes.
24        Q   When you signed those papers, where did you
25   think that money was going?
26        A   It was going to a Capital account for Little
```

FINK & CARNEY
RVICES
Y. 10018 (212) 869-1500

Peca confirms that he KNEW that the LOC funds were going to his Little Isle 4 Capital Account -- THUS Kenner (per the signed Peca Letter of Authorization) had the authority to access the entire LOC immediately -- if necessary...

M. Peca     03/29/11                    32

Isle IV.

Q   At the time you signed the papers, did you
think that Little Isle IV Capital Account for Hawaii was
used to lend money to Jowdy for the Mexico stuff, or
only later where that was a decision that was made?

A   I can't remember exactly what the time frame
was on those two things.

Q   Were you consulted an advance about whether to
use the money in the Little Isle IV Capital account to
loan money to the Mexico project?

A   I knew the short-term loan was made to
Mr. Jowdy.

Q   Did you know in advance of it being made?

A   I probably did, I mean at the time if I was
told about it, I probably would say, okay, sounds good.
It was probably explained to me.  I can't tell you
definitely right now that I know the day or time of the
conversation.  As it was happening I wasn't like what
happened to that, I didn't know it would happen.  I kind
of knew what we were doing.

Q   Let me paraphrase, you're not sure if you were
told but you basically approved of it.  You wouldn't
really have cared sounds like you're saying?

A   Correct.

Q   Then, you were getting into this before, so

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor, New York, N.Y. 10018 (212) 869-1500

Peca NEVER states (like in the 2015 EDNY testimony) that he learned about the loans to Jowdy the night before his very detailed GJ testimony

Peca confirms that the loaned funds to Jowdy NEVER came back...

1                              M. Peca    03/29/11                    33

2    that money was loaned to Ken Jowdy because they were

3    waiting for some kind of financing to come in?

4         A    Correct.

5         Q    And then it never came back?

6         A    Correct.

7         Q    So that money went back to the Little Isle IV?

8         A    It did not.

9         Q    What about the $100,000 cash, did that go to

10   Little Isle IV?

11        A    It did.

12        Q    What is the status of Little Isle IV?

13        A    We're part of a joint venture that still owns

14   the property.

15        Q    What is the status of the investment there?

16        A    We've been busy with a lot of this stuff.  I

17   haven't cared to look at it yet.  As far as I know it's

18   land and it hasn't been developed yet.

19        Q    As far as you know your 1.7 million was that go

20   to Little Isle IV at some point so they could use it?

21        A    It was all part of the land acquisition, yes.

22        Q    Obviously that 1.7 couldn't go there because it

23   got tied up in Mexico project.

24        A    Correct.

25        Q    I want to make sure I understand it right.  Was

26   the idea you took out this big loan, $1.7 million, was

Peca NEVER tells the GJ that the money was a "6 month thing" like he and his wife told the EDNY in 2015

M. Peca   03/29/11                                    34

1
2    the idea that after the Mexico project solved its
3    short-term problem, the money comes back to you and pays
4    off the loan.  Or was it that after the Mexico people
5    solve their problem it goes to Hawaii and funds your
6    investment out there?
7              THE WITNESS:  Can I step out for a second?  I
8         want to understand it so you get the answer that
9         you need.
10             THE FOREPERSON:  Yes.
11             (Witness Temporarily Excused.)
12             (Time Noted:  11:04 a.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25
26

M. Peca   '03/29/11                        35

1

2          (Colloquy Precedes.)

3          (Witness Enters Room.)

4          (Time Noted: 11:10 a.m.)

5          THE FOREPERSON:  I remind you, you are still

6     under oath.

7     BY MR. DEVLIN-BROWN:

8          Q    About five minutes or so ago you stepped out,

9     you wanted to consult with your attorney to try to

10    refresh your recollection on certain facts?

11         A    The recollection is the two things were

12    happening almost simultaneously.  The loan by Lehman

13    Brothers was held up, and the short-term loan was to

14    make sure that loan was to come through.  The loan to

15    Mr. Jowdy was on a short-term basis.  We had a real

16    asset in Cabo, it pays different terms for us.  We were

17    able to make sure the land was acquired and we did get

18    the loan from Lehman Brothers.

19         Q    When did you make the investment in Little Isle

20    IV, to the best of your knowledge?

21         A    2004, 2005 maybe.

22         Q    I want to show you some documents, some of them

23    I'll show you on the screen others I'll walk over to

24    you.

25              Let me just ask you first, Northern Trust Bank?

26         A    That's where the line was credit was out on for

Peca again confirmed the loan to Jowdy...

1
2      the Hawaii investment.

3          Q    I'm showing you what's been marked as Grand

4      Jury Exhibit 101, which says, "Investment management

5      account agreement," with your name here, Michael Peca.

6      I mostly want to ask you if it's your handwriting on

7      here.  Is that your signature?

8          A    Yes.

9          Q    March 21, 2005, does that seem like the time

10     you would have taken out the loan?

11         A    Sounds like it.

12         Q    Do you remember signing these documents?

13         A    Yes.

14         Q    Did you authorize anyone to make, to have

15     access to your Northern Trust loan account so they could

16     make decisions as to how it could be used?

17         A    Phil Kenner was power of attorney on the

18     account, but nobody had the ability to make a decision

19     on my account but me.

20         Q    When you say that no one --

21         A    His power of attorney privileges were limited

22     to, "I need this wire, can you do it for me."  Often

23     times I'm traveling and didn't have the ability to do

24     it.

25         Q    Do you know if that was the instructions the

26     bank had or was the bank told he could access the lines

M. Peca    03/29/11                                37

1
2      as he wished?

3          A    No idea.

4          Q    Let me show you this document, marked 102, Greg

5      Cygan, do you know who that is?

6          A    I don't know that person, no.

7          Q    June 3, 2005, "The following is a list of

8      standard adviser employees that are permitted to

9      instruct Northern Trust with regard to client accounts,"

10     signed by Phil Kenner and Christine -- how do you say

11     the last name?

12         A    Heirick.  I believe she was an employee of

13     Mr. Kenner's.

14         Q    Had you met here?

15         A    The only time I met her the time is when I flew

16     from San Diego to El Rosario.

17         Q    There is a Grand Jury Exhibit 103, which is a

18     credit application.  Is this your writing on the top?

19         A    I didn't write that, no.

20         Q    The same real estate investments, the amount

21     1.775 million.  Did you write that?

22         A    I did not write that.

23         Q    What about --

24         A    That's all my writing there.

25         Q    Just so the record is clear, I'm pointing to

26     the "information about me" section.  What about this

M. Peca    03/29/11                    38

1   signature dated December 26, 2007, is that your

2   signature?

3        A    That is my signature.

4        Q    Do you recall completing any kind of financial

5   statement in order to obtain the line of credit?

6        A    I remember them doing some due diligence.  I

7   don't remember exactly what was required at the time.

8        Q    I'm going to show you 104, personal financial

9   statement.  The first blank where it has your name and

10  information, is that your handwriting?

11       A    It is.

12       Q    Then numbers written down on the page that says

13  income statement, is that your writing?

14       A    That is not my writing.

15       Q    Let me show you Grand Jury Exhibit 107,

16  starting with the signature.  Is that your signature?

17       A    It is.

18       Q    This letter is dated March 11, 2005,

19  "Gentlemen, this letter is your authorization to allow

20  Phillip A. Kenner to access my above-referenced line of

21  credit."  it says, "For line of credit, for direct

22  deposit to the Little Isle IV account at Northern Trust,

23  he is authorized to sign for the release of funds

24  related to the line."  Do you remember signing this?

25       A    I do.

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor, New York, N.Y. 10018  (212) 869-1500

Peca confirmed that he signed the *Letter of Authorization* for Kenner to access his LOC at NT Bank

Confirmed his signature after receiving the document...

1          M. Peca    03/29/11                    39

2          Q     Did you write this or was it written and given

3     to you?

4          A     It was prepared for me, I read it, and signed

5     it.

6          Q     Who prepared it for you?

7          A     I'm not sure.

8          Q     Who gave you it to?

9          A     Phil.

Peca confirms all LOC funds were part of his Capital Account

10          Q     It references direct deposit to the Little Isle

11     IV account.   Is that what you were calling the Capital

12     account?

13          A     Correct.

14          Q     Do you know what kind of interest you were

15     paying on the line of credit?

16          A     Can't remember.

17          Q     To get this kind of line of credit, even though

18     you were a professional hockey player, did you have to

19     put up collateral?

20          A     The collateral, at the time I moved my bond

21     account over to Northern Trust, which I think was just

22     in excess of $2 million or just under, to kind of use as

23     collateral for the line of credit.

24          Q     Did you understand at the time if you didn't

25     pay back the line ever credit the bank was going to take

26     your bonds?

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor, New York, N.Y. 10018  (212) 869-1500

*Peca confirmed FULL KNOWLEDGE to the consequence of the LOC funds and the fact that the non-repayment of the Jowdy loan was a factor in the seizure...*

M. Peca    03/29/11                40

```
 1
 2      A    Yes, and they did.  What they took was just
 3   under $2 million, I believe it was 2008, maybe after a
 4   while.  We were just, when the loan, the short-term loan
 5   from Mr. Jowdy was not paid back, the line of credit
 6   time matured.  They had taken what was loaned, I guess,
 7   lent to me plus interest.
 8      Q    Let me show you what is marked Grand Jury
 9   Exhibit 106, which is the pledge agreement dated
10   November 5, 2007.  Kind of a technical document, do you
11   remember signing documents putting up the bonds to
12   secure the line of credit?
13      A    Uh-huh, yes.  I was very well aware of that
14   scenario.
15      Q    Is this your signature?
16      A    That is, yes.
17      Q    You say to do this you transferred the bonds
18   from your Schwab account; is that right?
19      A    If it was Schwab, I think it was Schwab at that
20   time, whatever it was in.
21      Q    Do you recall ever getting updates from
22   Mr. Kenner in sort of written form, a little formal,
23   about what was going on with the Little Isle IV project?
24      A    It was pretty informal.
25      Q    Do you recall getting letters or anything like
26   that?
```

*Peca claims VERY WELL AWARE of the collateral he secured the LOC with to NT Bank...*

**Peca does NOT recall the July 2006 disclosure doc he signed for the Hawaii deal -- although Peca's signature was faxed from his home fax machine...*See Peca signed July 20067 LI4 disclosure letter (with Peca fax confirm)***

M. Peca    03/29/11                                    41

A    No.

Q    Let me show you one letter and see if you
recognize it.  I'm going to mark this as Grand Jury
Exhibit 110A.  Take a look through that.  On the last
page it's signed by Phil Kenner.

6

7        A    Do you want me to read what is highlighted?

8        Q    Not necessarily, just look at it and see if it

9    refreshes whether you got this or any similar update,

10   it's dated 2006, about what was going on with the

11   project.

12              (Witness reviewing document.)

13        A    No, I don't recall this document.

14        Q    Let's talk a little about some of the various

15   litigation.  You mentioned there was all kinds of

16   litigation; is that right?

17        A    Yes.

18        Q    Are you party to some litigation?

19        A    Not currently.  We did have a suit against

20   Mr. Jowdy that was filed in State of California.

21        Q    Who you were a plaintiff in the lawsuit?

22        A    Correct.

23        Q    Who were the other plaintiffs generally?

24        A    I believe Mr. Stevenson was one, there was

25   maybe 15 to 20 guys, I think.  You want me to go through

26   all the names that I can?  Rob.

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor, New York, N.Y. 10018  (212) 869-1500

M. Peca   03/29/11                     42

1
2      Q    Were they all hockey players?

3      A    The majority.

4      Q    What happened in the lawsuit?

5      A    The case was dismissed without prejudice, so we

6   have the ability to go back and file the suit, there was

7   just a thing we were -- at the end of the day we're

8   trying to get the accounting for the Lehman $129 million

9   loan and how that was used.  We've yet to receive that

10  information.  That's been the frustration on our side

11  all along.

12     Q    Do you know why the case was dismissed?

13     A    The lawyer can answer that better than I could.

14     Q    Same lawyer, Mr. Richards, represented you

15  there?

16     A    Correct.

17     Q    Did he represent the other plaintiffs as well?

18     A    Yes, he did.

19     Q    Was Mr. Kenner one of the plaintiffs?

20     A    He was not.

21     Q    Were you deposed in that case?

22     A    I -- not for that case.  The last time I was

23  asked any questions was informally maybe year-and-a-half

24  ago over-the-phone with, I think several district

25  attorneys from this area, somebody from the SEC, nothing

26  from that case.

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor, New York, N.Y. 10018  (212) 869-1500

M. Peca    03/29/11                    43

1

2          Q    In that case you were not deposed?

3          A    I was not.

4          Q    Did someone seek to depose you or did you get a

5    notice of deposition?

6          A    I did not.

7          Q    Do you know if the case was dismissed because

8    certain plaintiffs were not appearing for their

9    depositions, does that ring any bells for you?

10         A    That's not -- I know there was a question of,

11   you know, Mr. Jowdy's side wanted to depose players that

12   were in the Olympic.  It was an inconvenience.  They

13   were playing in the Olympics, to take time to be

14   deposed.

15         Q    That was not an issue for you?

16         A    I was retired at the time.

17         Q    Any other lawsuits that you're a party to?

18         A    Currently no that I can recall.

19         Q    Any former lawsuits to these things?

20         A    To these things, no.

21         Q    Who paid the attorneys fees in that lawsuit out

22   in California?

23         A    We all took part in paying Mr. Richards.

24         Q    What about your fee for his representation of

25   you in the Grand Jury, are you paying that or is someone

26   else?

M. Peca    03/29/11                          44

1
2    A    I am paying it, reluctantly.
3         MR. DEVLIN-BROWN:  I propose excusing the
4    witness for the moment.  I'm going to ask the
5    Grand Jurors if they have other questions.  This
6    might be it for you.
7         THE WITNESS:  Okay.
8         MR. DEVLIN-BROWN:  We'll call you back in if
9    you we need you, otherwise you're excused.
10        You should know, however, that the Grand Jury's
11   investigation is continuing so although -- I'm
12   sure you hope this is not the case -- they may
13   request that your testimony continue on a later
14   date.  We're excusing you pursuant to potentially
15   coming back on a later date if there are more
16   questions.
17        THE WITNESS:  Okay.
18        MR. DEVLIN-BROWN:  May I ask the witness be
19   excused.
20        THE FOREPERSON:  Yes.
21   (Witness Excused.)
22   (Time Noted: 11:24 a.m.)
23   (Colloquy Follows.)
24
25
26

```
 1                    M. Peca   03/29/11              45

 2            (Colloquy Precedes.)

 3            (Witness Enters Room.)

 4            (Time Noted: 11:28 a.m.)

 5            THE FOREPERSON:  I remind you, you are still

 6       under oath.

 7   BY MR. DEVLIN-BROWN:

 8       Q    Just a few more questions for you.  Do you know

 9   a hockey player Mr. Nolan?

10       A    He was my roommate at the Olympics.

11       Q    Do you know if he invested in Little Isle IV as

12   well?

13       A    I believe he did.  I think.  I don't have any

14   evidence that he did, but I think he did.

15       Q    Do you know if his line of credit -- if he took

16   out a line of credit as well?

17       A    I believe he did.  He filed suit against

18   Mr. Kenner, that was part of his complaint.

19       Q    Do you know if his line of credit got paid off?

20       A    I have no idea.

21       Q    Would you have authorized your line of credit

22   to be transferred to pay his line of credit off?

23       A    I think, I don't think they came in separately

24   to that extent.  It was all in one account.  If the

25   money is in the account and something paid something, I

26   don't know.  I don't know how that process would work.
```

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor, New York, N.Y. 10018  (212) 869-1500

Peca confirms the
(Capital Account
process) money all
went to the Little Isle 4
account where he was
aware bills were paid...

M. Peca    03/29/11                          46

1

2      Q    Have you heard that that happened?

3      A    No.  I got a document from Northern Trust at

4    the time that said my line of credit expired and my

5    money, and they were taking the money from that bond

6    account.

7      Q    Do you know who Lewis Volpini is?

8      A    Never heard the name before.

9      Q    Do you know who Led Betterville is?

10     A    No idea.

11     Q    Do you know who Shaman Manbetzi is?

12     A    I do not.

13     Q    Do you know why any of those people would be

14   getting money from the Little Isle IV capital account

15   funded by your line and credit and other lines of

16   credits?

17     A    I don't.

18          MR. DEVLIN-BROWN:  No other questions.

19          May I ask the witness be excused.

20          THE FOREPERSON:  Yes.

21          (Witness Excused.)

22          (Time Noted: 11:30 a.m.)

23

24

25

26

47

C E R T I F I C A T E

STATE OF NEW YORK    )

                     )

COUNTY OF NEW YORK   )


             I, RIVKA TEICH, hereby certify that

the foregoing is a true and accurate transcript,

to the best of my skill and ability, from my

stenographic notes of this proceeding.




_____

         Rivka Teich, R.P.R., C.S.R.

         Acting Grand Jury Reporter

St. Andrew's Plaza, = 5th Floor

J. Moore
C. Castano = SEC

02/8/10 - @ 9:30AM

Sergei Gonchar
Ron Richards = Atty

(JM) - went over Proffer Agreement

Scott Romanowski
Matt Galiotto = FBI

(RR) - agreed - (SG) signed

(310)-753-8777
Ron Richards on
telephone = cell

Born in Russia    =   until 18 y.o.
drafted by Washington Capitals  = 10 yrs playing w/ Capt.
     Signed @ 20 y.o.
                                        Boston - lock-out
                                                    Russia
                              Pittsburg
                              Penguins

- met (PK) through Team mates - Washington Capitals
      12 years ago                = Joe Juneau (already
                                       = Chris Simon) w/
- 1st time investing in U.S.        Aydin college w/ (PK)

- 1st year or so - learning / talking about investing
      with (PK) = had dinners w/ (PK)

- Juneau & Simon - Came to rink w/ (PK)
                          in Washington

Government
Exhibit

3500 - SG   - 2
13-CR-607(JFB)

(SG) ≡ (PK) was afiliated w/ Assante @ that time
 — offered help investing $$
(PK) — mortgages — would help (SG) with

1st/year → did not pay (PK) @ that time — just advice

≡ (SG) — signed contract w/ Assante — (PK)
 — made some $$ — things going well
(SG) — putting $$ in little by little = each pay check  SFR
                                 monthly - check to Assante

— (SG) — recid monthly statements from Assante

invested — Stock Market + Bonds
(SG) — (PK) — would explain strategy — Assante (PK) — would invest per strategy
(SG) — not sure how (PK) was paid
(PK) — left Assante ≡ 5-6 years ago
 → went to work on his own Business

(PK) — working w/ 20-30 other NHL players  Jay McKee
                                           Norstrom
                                           Syder
                                           Campbell
(SG) — relationship w/ (PK) good           Symor — Berard
 = comes to house ; (PK) know family ; dinner —Woolley
                                                —Chotnir
 ≡ "friends" w/ (PK)                             — Pmitrik

after/Assante ≡ (PK) — started own company = not sure name
(SG) — left Assante = b/c his company — wanted to focus
        on indiv. — make it easier

(SG) — signed Contract w/ new company
(SG) — % of $ invested went to pay (PK)

(Charles Schwab) → (PK) - helped set-up
& suggested

(SG) send @ to his Trust acct. from his checking acct.
- (SG) + (PK) - would discuss investments              ( Mellon)

- Charles Schwab - send statement

(PK) - set-up - Wells-Fargo Acct for (SG)

≡ no other accts open / opened - Schwab
                                          Mellon
                                          Fargo
                                          Russian acct
                                          (set-up (SG) father)

2003
(PK) - told (SG) about RLE investment in Mexico + Ken Jowdy
(PK) - RD - was developer; found land; supervise project    - Northern Baja
(PK) - should make @ on it            did not see
(PK) - was suppose to represent NHL interest ≡ 12 players
- year later - told (SG) about CSL project
(PK) - in tourist location; develop 1st shelter opportunity ≡ flew to see w/ wife
                                                                    + daughter
(PK) Phil Mickelson - will be involved in golf course
                                                          Met (PK)
                                                          in NY
(SG) - invested in Northern Baja                          through friends
(SG) rec'd business plan

(PK) - told (SG) not doing anything on Baja project

2003- — Northern Baja - project -
2004
(SG)- $500K invested - told to buy land + develop - by (PK)
(SG) = never told it was to be used for anything else

2004- — CSL project -                    Spoke to (KJ) once
2005-   (SG)- $250K invested                      later on

✓ had business plan before invested
- provided by (PK)

- (PK) + (KJ) - partners in project #1

= $500K - from Schwab acct.                    #
    - acct info to be wired provided by (PK)

= A+ frame SFR

= (PK) - Schwab acct - may have had access to acct = short
              - call before - buy + sell stocks only        time

- would give authorization for wires

CSL = $250K - invested - buy land + develop
                                        flew on plane
- went to see property after investment - charter
same { - met Ken Jowdy there @ house in CSL = not on property
day  { - had dinner that night → spoke about buying another
      -        = architect @ dinner too. (KJ) plane; travel to Russia
              = (KJ)
              = (PK)
              - (SG) + wife

Diamante Air — Falcon

(PK) = to bring investors to CSL and/or Northern Baja

(PK) = (EJ) - supervise plane / charter / make the pmts on

investors ⎰ investors - (PK) ⎱ → $250k    (approx.    (EJ) - no $ in Air
(PK) ⎰        (SG) ⎱ Guarantee ($1M loan)    (SG) - do not believe
⎱        → $250k invested    (EJ) put $ in any
(SG) ⎰                    ≡ to buy plane              investment
only ⎱ (PK) - told (SG) that he is putting $250k of his own $$

(PK) ⎰ CSL - (PK) invested own $ } over $1/M
told ⎱ Rosario
(SG)

before

(SG)
invested

≡ (EJ) - found plane to buy - (SG) investment
(SG) - doesn't know who owned prior

(SG) - rec'd letter → from Bank 2 yrs later pmts not being
made by (EJ)
4-5 yrs ago ~ - also found additional plane - (SG) not aware of
(PK)                                              this plane
intr'od ≡ Tommy Constantine - talking to Bank for (SG) + (EJ)
(SG) (SG) invested $ - Eufora - debit card company ≡ $250k + $200k + $250k
                                                          SG invested
(PK) told (SG) ≡ (EJ) - trying to buy plane for half price (EJ) calling Bank

(SG) met (personally) in 11/09 ≡

(SG) ≡ did not know about (TC) past problems until article
in Post

(PK) - told (SG) - spending $35M on golf course

2007 - bought golf course in Houston - & left CSL & Baja
(CT) projects doing nothing

(TC) & (PK) in November @ (SG) house - Pittsburg

(PK) - meets during season w/ hockey players
to discuss situation

(SG) - not surprised
- knew problems w/ (ET) & (PK) before

NY Post Article - July/August 2009

(PK) - called & told (SG) article
(SG) friends called & told him & other players
- teammates

(SG) called (PK) that day & (TC)
(PK) - not surprised - re: investments
(TC) - said he made a mistake when he was young
- agreed to meet to talk later

fall 2005

- (PK) + (TC) + (SG) + wife @ (SG) house in Pittsburg
  - investments
  - how go after (KT)
  - where @ w/ lawyers
  - blamed (KT) - it's his fault
  - going to hire lawyer - Ron Richards
  - move forward + go after (KT)

(PK) - said b/c of article - that SFR

≡ (PK) told (SG) - Gov't has interest from article

(PK) - (SG) - invested in another company rubber recycling
  2000°

- (SG) - invested in Hawaii - land purchased
  2003
  (PK)                        (PK) - found developer
                                      to develop land
- (TC) invested own $$
invertors ≡ 6 other hockey players - Owen Nolan; Kristich;
- (PK) - approached (SG) + explained how to work
         ≡ good opportunity buying land - NOT RISKY
         ≡

≡ HJM - (SG) - invested ≡ in beginning $100k - $150k -
              in Hawaii        rest Guarantee in Bonds
                               transfer to Northern Trust
                               - Bond Portfolio - Northern
✱ project on hold now                              trust
         b/c of economy       (TC) - setup acct.  managing
✱ (SG) recd no $ back

(SG) = has not seen land in Hawaii
- own land b/c (PK) said so; doesn't know otherwise

= investments - (PK) to (SG)
(PK) - since own land; have asset then - not risky
(PK) Northern - 5-7 yrs to develop; then switch focus to CSL

(SG) put in $400k in CSL - for villa's

> These funds were subsequently stolen by Jowdy and diverted to his new Tennessee project -- ignored by Galioto...*Ex. 49*

rec'd back 840ok - # 2 yrs ago
- pulled $ back b/c nothing being done - (PK) told (SG)
- ask for $ back

Jason Woolley - was traveling w/ (PK)
- spending time in CSL; bringing in clients
- saw nothing being done there too

(PK) - took care of getting $ back
- went to Schwab acct. - (SG)

> From the Stanley Cup photo

- Woolley = spoke to about (KJ)
- Sydor = - not doing what he is suppose too.

Northern - property

> Confirmed to the Galioto led 2011 SDNY Grand Jury

(SG) - (PK) - told (SG) $ in Hawaii will be loaned to (KJ)

> *"future tense"*

from KJ

SG = heard that $ from Hawaii loaned to KJ once.
= doesn't recall how much $ loaned to KJ
= KJ - only entity Hawaii loaned $ to.

SG - has docs from Hawaii investments

Schwab - Jim Graham - SG = ref. from Schwab

Contacted by Galioto in 2010 and told to disassociate with Kenner of he would become complicit in the Indictment.   This further eroded Kenner's ability to financially fight Jowdy, as planned by Galioto, Harvey and Freeh.