

May 30. 2009  4:27PM

Government
Exhibit

3500 - SG - 4
13-CR-607(JFB)

facsimile

date 5/30

to Phil

**Faxed to Kenner attorney, Tom Baker by Gonchar during the May 2009 arbitration...**

company

fax number 046-827-0832   phone number

**Gonchar handwriting**

subject

from Sergei

fax number   phone number

number of pages, including cover sheet

comments

The information contained herein is privileged and confidential and is intended solely for use by the person(s) to whom it has been addressed. If you receive a copy of this memorandum in error, please notify the sender immediately and destroy all copies in your possession.

the westin book cadillac detroit
1114 washington blvd  detroit, michigan 48226
phone 313.442.1600  fax 313.442.1645
westin.com/bookcadillac



WESTIN
HOTELS & RESORTS

May. 30. 2009  4:27PM                                                                No. 4657   P. 2

## AMERICAN ARBITRATION ASSOCIATION

DIANA NOLAN, an individual, and
OWEN NOLAN, an individual,

                  Claimants,

vs.

PHIL KENNER, and individual;
STANDARD ADVISORS, INC., a
Delaware Corporation and STANDARD
ADVISORS, LLC, a Delaware Limited
Liability Company,

                  Respondents.

**NO.  76 148 Y 00223 08 DEAR**

**AFFIDAVIT OF
Sergei Gonchar**

I, Sergei Gonchar, being duly sworn upon oath, depose and say:

1.    I am over the age of 18 and otherwise competent to execute this affidavit.

2.    The contents of this affidavit are based upon my own personal knowledge.

3.    I have information in the above-captioned matter and have personal knowledge of the statements contained in this declaration.

4.    I have been a professional hockey player for over 15 years.   I either personally know, or know of, the following individuals; Owen Nolan, Ethan Moreau, Joe Juneau, Dan Boyle and Brad Lukowich.   All of these individuals are also professional hockey players.

5.    My home state is Florida although I reside part of the year in Russia.  The State of Florida has been my primary residence for the last four years.

6.    I have known Phil Kenner for over 10 years. I met him while he was representing other friends of mine who were being assisted by him. At that time, Kenner was acting as a family advisor and these friends had expressed their high level of

satisfaction with his service and commitment to their families. I subsequently worked with Kenner in a similar capacity and have experienced the same high levels of satisfaction with his service and commitments to my family. On many occasions, Phil has flown all over the world to visit me on short notice upon my request.

7.      In 2003, I decided to join Phil Kenner at his new Family Office practice at Standard Advisors after he had left his former employer, Assante Global Advisors. I was aware that Phil actually sued Assante Global Advisors in California Federal Court shortly after his departure. I was aware of Phil's status as a licensed advisor when he established Standard Advisors in 2003 and I was also aware that approximately one year later, Phil Kenner gave up his licensed status. I neither had any concerns about this issue then, nor do I feel that it this issue has negatively impacted his ability to act as my Family Advisor now.

8.      I am aware that Owen Nolan is suing Phil Kenner and his company, Standard Advisors, in Arizona and is alleging several improprieties by Phil Kenner related to certain investments that I am part of, such as; the Hawaii Investment Group, Diamante Del Mar (managed by Ken Jowdy), Diamante Cabo San Lucas (managed by Ken Jowdy), Eufora, LLC (managed by Tommy Constantine) and the Avalon Airpark Project (managed by Tommy Constantine). I have met with Tommy Constantine personally. After discussions about the Avalon project and Eufora's current business activities, I found Constantine to be an honorable individual who, like Phil Kenner, holds my investments in his companies with the highest level of integrity. Phil Kenner has always made himself available to my family and I and has always addressed any and all of my inquires. As a professional hockey player, not a full time businessman, it is important to me and my family to have access, often face-to-face, with the people who are directly and indirectly involved in my business affairs. To date, I have never seen any indications of any improprieties or wrongdoings by Phil Kenner, his company Standard Advisors, and/or his advice for my family's best interest.

9.    In 2008, Kristine Myrick, her former attorney, Jennifer McGrath, and her current attorney, Michael Meeks, in California, contacted me about Phil Kenner and his alleged acts of impropriety and negligence with respect to all of my investments.

10.    **DIAMANTE AIR, LLC;** I am currently at odds with Ken Jowdy as a result of his gross mismanagement of an investment that I have made in his airplane company, Diamante Air, LLC.   Ken Jowdy and Mark Thalmann, his childhood friend, acting as the Managers of this company, operated a Falcon 10 airplane and a Metroliner III.   In the fall of 2008, Ken Jowdy and Mark Thalmann stopped making the monthly loan payments on the two (2) airplane loans under Diamante Air, LLC that they had been making since 2005.   Phil Kenner notified me that Jowdy and Thalmann had failed to properly manage and maintain the business and had allowed our investment to become virtually worthless. As a result, this left Phil and I, Sergei Gonchar, with over $1,000,000 in personally guaranteed debt with the lender for these airplanes.   Phil, as well as all of our other partners and I were led to believe by Jowdy, and Thalmann, that the loans for these planes were being paid down aggressively based on the representation that Jowdy's extensive usage of the planes, was generating charter revenue for the business. In fact, Jowdy and Thalmann did not reduce the loan obligation as represented in spite of their extensive use of the airplanes. After numerous requests, neither Phil, our attorney, Paul Augustine, or myself have been able to obtain the bank records, financial reports or tax records from Jowdy or Thalmann to review the status of our investment and where it all went wrong.

11.    **HAWAII INVESTMENT GROUP;** I have been an investor in the Hawaii Investment Group since about 2004.   In addition to setting up a Line of Credit for the sole use and benefit of the Hawaii Investment Group, I wired $100,000 to Northern Trust Bank for my equity stake in the Hawaii Investment Group through Little Isle IV, LLC and for the express purpose of making funds available to Phil Kenner, which were to be used at his discretion.   I was aware that my funds would be used to make

distributions for the company, including but not limited to; Land Acquisition, Travel & Entertainment expenses, Legal Fees, Planning Fees, Payroll, Permitting fees, Loans to outside entities and **distributions to other members that would satisfy their monthly Line of Credit payments to Northern Trust Bank.** I also understood Phil was the sole signatory on the Little Isle IV, LLC bank account. I have never had any reservations or issues regarding the use of these funds. Phil Kenner has always disclosed the complete and detailed use of these funds with me from time to time and per my every request. We discussed in detail the risks associated with the Hawaii Investment Group and I elected to invest accordingly. Phil also discussed in detail, the merits of the Joint Venture agreement with WWK Hawaii Holdings, LLC prior to me personally signing the Acknowledgement and Acceptance letter Phil provided to me through our attorneys, Larry Markowitz and William Najam in July of 2006, which was prior to my agreement of the Joint Venture. I understand the global markets have caused many issues with the Joint Venture's ability to sell or liquidate the land holdings, but I am confident that the ~$100,000,000 of land that Phil Kenner was instrumental in acquiring on behalf of the Joint Venture, is more that sufficient to ensure a positive investment result as originally contemplated prior to my involvement. From day one, I have also been made aware of Phil Kenner's significant interest in the Hawaii Investment Group in consideration of his ongoing capital contributions, day-to-day management, personal loan guarantees (including securing the Waikapuna loan with his Arizona residence at the time), his environmental guarantee on behalf of the Joint Venture (so none of the other members would be liable), as well as other contributions.

12.     **DIAMANTE CABO SAN LUCAS;** I have been involved in real estate investment projects in Mexico since approximately 2003, specifically, Diamante Del Mar and Diamante Cabo San Lucas. I was aware that Phil Kenner has had an ownership interest in the two Mexico projects operated by Ken Jowdy prior to my making an investment into each respective project. I am also aware that Phil Kenner and Tommy

May. 30. 2009  4:26PM                                                No. 4657   P. 6

Constantine had been working diligently over the last two years to resolve certain partnership issues between Ken Jowdy and our investor group, which were related to our investment in Diamante Cabo San Lucas.   I understand that approximately eighteen (18) months ago, Tommy Constantine negotiated a global settlement with Ken Jowdy, with the assistance of Jowdy's brother-in-law, William Najam, to a) relieve Ken Jowdy of the $10m+ in personal debt, b) his management control of the project, and c) any additional personal financial obligations he had to our Hawaiian Investment Group, Glen Murray, Mattias Norstrom, Bob Gaudet, myself and others.   I was also aware that Ken Jowdy presented the settlement agreement to Masood Bhatti at Lehman Brothers in New York, who at that time was a Senior VP and was acting on behalf of the lender for the Cabo project. Subsequently, after Jowdy met with his brother in law William Najam and Masood Bhatti, Jowdy decided that he would not follow though with the agreement that he had made and elected to renig on the settlement that Tommy Constantine and Ken Jowdy had negotiated over a six (6) month period of daily negotiations.  Furthermore, in spite of being a significant investor and shareholder of Diamante Cabo San Lucas, per an email recently written by Jowdy and sent to Phil Kenner, I as well as other investors, have been prohibited from entering the property. Among other extravagant expenditures and instances of corporate waste, I am aware that Ken Jowdy has utilized various resources of the Diamante Cabo San Lucas project, including the use of personnel who were on the Cabo payroll and other financial resources to pay for several private jet flights around the country.   I am also aware that the individual in charge of the Lehman Brothers loan to Jowdy and Diamante Cabo San Lucas, Masood Bhatti, also acquired a secret equity interest in the Diamante Cabo San Lucas project through an entity owned by his Goddaughter named Somerset Properties, LLC. This was unknown to Phil Kenner or myself prior until recently.

13.   **DIAMANTE DEL MAR;** I am an investor in Diamante Del Mar (DDM), in El Rosario, Mexico, which Ken Jowdy also acts as the sole Managing Member.   I

invested $500,000 in the project and have not received a single communication in several years, from Ken Jowdy, William Najam or others representing the project regarding the status or development of the project. I also hold a $250,000 Promissory Note from Ken Jowdy and Diamante Del Mar that has not been paid by Ken Jowdy even though the note matured several months ago. I am aware that the project has not been proceeding with any development in the last three (3) plus years. This is primarily due to the fact that Ken Jowdy has focused his efforts on two unrelated projects, which Phil Kenner and the rest of our investors in Diamante Del Mar and Diamante Cabo San Lucas are not involved.

14.    **EUFORA, LLC**; I have been an investor in a few LLCs that have a direct investment in Eufora's Pre-paid card business. I have visited with Tommy Constantine to discuss the merits of the actual business. From day one, I have been aware of the risks associated with a start up company in the payment card industry. I understood that at the time of my first investment in the LLC which held our interest in Tommy Constantine's Eufora, LLC, Phil Kenner was a shareholder in the company. Phil Kenner disclosed his investment in Eufora, LLC prior to my making my investment.

15.    I have always been made aware by Phil Kenner that I am able to request outside assistance from attorneys, accountants, or other professionals to audit the strategies that Phil Kenner has assisted in implementing. I have always had direct access to third party advisors involved with the planning decisions for my family, whether I have included Phil Kenner or not in those conversations. Through conversations with other clients of Phil Kenner's over the years, I am aware that this is his common approach with his Family Office clients.

Further Affiant Sayeth Not.

Executed on this _____ day of May, 2009.

_____
Sergei Gonchar

See pages 17 & 18 for Hawaii investment decision CONFIRMED "as a group" by Stevenson...

ORIGINAL                                    1.

UNITED STATES GRAND JURY

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x

Government
Exhibit

3500 - TS  -1
13-CR-607(JFB)

UNITED STATES OF AMERICA        :
                                    August 2009
    -v-                         :Special

PHILLIP KENNER                  :

- - - - - - - - - - - - - - - - - - x


                    UNITED STATES COURTHOUSE
                    500 Pearl Street
                    New York, New York 10007

                    March 29, 2011
                    12:33 a.m.



APPEARANCES:

            ARLO DEVLIN-BROWN, ESQ.

            Assistant United States Attorney




                    Rivka Teich, R.P.R., C.S.R.
                    Acting Grand Jury Reporter




GRAND JURY
EXHIBIT

```
                                                                  2
 1                 T. Stevenson    03/29/11

 2            (Colloquy Precedes.)

 3            (Witness Enters Room.)

 4            (Time Noted: 12:33 p.m.)

 5   TURNER STEVENSON, called as a witness, having been

 6            first duly sworn by the Foreperson of the

 7            Grand Jury, was examined and testified as

 8            follows:

 9   BY MR. DEVLIN-BROWN:

10       Q    Please state your name and spell it for the

11   record?

12       A    Turner Stevenson, T-U-R-N-E-R,

13   S-T-E-V-E-N-S-O-N.

14       Q    Good afternoon.  I'm Arlo Devlin-Brown.  I'm an

15   Assistant United States Attorney.  You've been

16   subpoenaed to testify to this Grand Jury, which is

17   investigating various offenses involving securities

18   fraud, bank fraud, other fraud offenses.  I want to

19   advise you that you're not a target or subject of the

20   Grand Jury's inquiry, just subpoenaed as a witness.

21            Before we get started I make it a practice to

22   advise you of certain rights that you and all witnesses

23   have before the Grand Jury.

24       A    Okay.

25       Q    First of all, you have the right not to

26   incriminate yourself, meaning if a truthful answer to a
```

T. Stevenson     03/29/11                3

1

2  question would tend to incriminate you you have the

3  right to refuse to answer that question.  Do you

4  understand that?

5       A   Yes.

6       Q   You do have a right to an attorney to represent

7  you.  That attorney cannot be in the Grand Jury room.

8  Do you have an attorney?

9       A   Yes, outside.

10      Q   What is his name?

11      A   Ronald Richards.

12      Q   If you need to consult him to answer or to get

13 advice on a question you can feel free to take a break

14 and ask to consult him, okay?

15      A   Okay.

16      Q   Do you understand that you're required to give

17 truthful, non-misleading information to the Grand Jury?

18      A   Yes.

19      Q   Do you understand that if you give false or

20 misleading information intentionally you could be

21 prosecuted for obstruction of justice, perjury or false

22 declaration to a Grand Jury?

23      A   Yes.

24      Q   Do you understand everything I've told you so

25 far.

26      A   Yes.

4

                    T. Stevenson    03/29/11

1

2       Q    We'll proceed.

3            Let's start with a little background about you.

4  Where you were born?

5       A    I was born in Port Alborne, British Columbia,

6  May 18, 1972.

7       Q    What country is that?

8       A    Canada, sorry.

9       Q    What country are you citizen of?

10      A    Just Canada.  I reside in the United States, I

11  have my greencard here.

12      Q    What is your current job here?

13      A    I'm an assistant hockey coach for the Seattle

14  Thunderbirds.

15      Q    Is that NHL?

16      A    Minor league team for players that are drafted

17  out of there to go to the NHL.

18      Q    Before you took this coaching position were you

19  a professional hockey player yourself?

20      A    For 13 years I was.

21      Q    Played on the NHL?

22      A    Yes.  I played Montreal Canadians for seven

23  years.  I played in New Jersey for four years.  And my

24  last year was for the Fliers.

25      Q    Do you know someone Phil Kenner?

26      A    I do, yes.

```
 1                  T. Stevenson    03/29/11                5

 2        Q    When did you first meet Mr. Kenner?

 3        A    Probably first time when I got traded to New

 4   Jersey, the season of 2001, 2002, 2001, when I was

 5   playing for the Devils.

 6        Q    How did you meet him?

 7        A    Just through players that I played with, Mark

 8   Recky, who I played with, knew, and trusted very well.

 9   I had to change my financial stuff because you can't

10   have that in Canada.  I was moving.  He recommended Phil

11   Kenner.  I went out at different times in Phoenix out

12   there, for the first time dinners before feeling

13   comfortable to go with him.

14        Q    When you say "go with him" what did you have

15   him do with you?

16        A    Financial, get my, take care of my kids' stuff,

17   college education, budget, stuff where my wife and I

18   could put our money away, live a proper life, a proper

19   life.  We were making good money, you make good money as

20   an athlete.  We wanted to do things to make it long-term

21   and not live an extravagant lifestyle.  We don't live

22   beyond our means.  We don't own fancy cars, things like

23   that.

24        Q    You hired him to do this work?

25        A    Yes.

26        Q    What kind of compensation did you have with
```

```
                        T. Stevenson    03/29/11                    6

 1

 2   him?

 3        A    He gets just depending on what the portfolio

 4   would do, good or bad, anything he invested in or that

 5   he would oversee.  It would basically be around 35, four

 6   different quarters.

 7        Q    Thirty-five?

 8        A    $3,500 per quarter, stuff like that.

 9        Q    Based on the amount that he was managing for

10   you?

11        A    How it is set now, that's basically what it is

12   right now, a set amount that he takes for working for

13   us.

14        Q    When you first signed on with him what year

15   would this have been, 2001?

16        A    I would say '01, '02.

17        Q    Where had your money been banked before you

18   signed on?

19        A    Most of it was, we just had it in the bank in

20   Nova-scotia in Montreal or CBC Bank in Montreal, Canada.

21        Q    When he started managing, what accounts did you

22   set up?

23        A    Personal bank accounts.  Then we had Schwab

24   where we have cash market accounts.  The rest of the

25   stuff is in different stocks.

26        Q    Which personal bank accounts, what banks did
```

```
 1                    T. Stevenson    03/29/11              7

 2    you use for that at first?

 3        A   Our main one here -- in New Jersey when I was

 4    here, I can't remember the name of the bank here.  The

 5    main one we use is Bank of America, is what we kept in

 6    Edmonton.  In the summer I've been back there since '95;

 7    96.  My wife and I lived there at various points; when

 8    the season is over we go back there.

 9        Q   Aside from stocks and bonds did Mr. Kenner

10    recommend any -- in your history with him -- purchases

11    of particular companies, stakes in particular companies,

12    and/or real estate ventures?

13        A   Real estate, yes; companies, no.  I'm not

14    invested in companies.

15        Q   Did he recommend some to you from time to time?

16        A   Yes, he did.  He would ask me if I'm interested

17    in an equipment company, I think.  I would have been a

18    later arrival than some players that have heard into

19    companies, but nothing that I've agreed on to, just

20    land.

21        Q   Like Impact, have you heard of that company?

22        A   No.

23        Q   Did you consider potentially investing in some

24    of the companies he was suggesting and conclude it was

25    not for you, or you were not interested in doing that?

26        A   A little of both at the time.  I guess it was
```

T. Stevenson    03/29/11                    8

1
2  different on feeling what percentage of what pay scale I
3  was making at the time as playing a professional
4  athlete.  There are different amount of money, whether
5  when at that time I felt this amount of money, I had
6  made enough money in my career savings for playing from
7  '94, '95 the dollar amounts of hockey never took off
8  until later 90s when all players -- when I wasn't on the
9  upper-end of the pay scale of a player.  So that might
10 have been something to do with it.  I didn't have enough
11 money at the time or feel comfortable giving away that
12 money to do something like that.

13      Q    Understood.  What about the real estate, how
14 many real estate ventures did you invest in that Phil
15 Kenner had recommended?

16      A    The one, the first one, would have been Hawaii,
17 that I put $100,000 into.  Then the other one would have
18 been Cabo San Lucas.

19      Q    Do you remember the order of those investments?

20      A    Order meaning?

21      Q    Which one first?

22      A    Hawaii.

23      Q    When did you put the money into Hawaii?

24      A    Probably not long after that, I would say, I
25 would say after 2002, 2003 in there.

26      Q    You think that early?

1                     T. Stevenson    03/29/11                    9

2        A    I think, yeah.

3        Q    What kind of material did you receive, if any,

4   before you decided to make that investment?

5        A    Material meaning?

6        Q    Documents, prospectuses, something describing

7   the project, how the money would be used?

8        A    Never saw anything how the money would be used.

9   I've seen pictures, land, what we were going to do, what

10  they are purchasing, what it's going to look like.  Then

11  I agreed on to it, that was my decision.

12            Cabo was a little different.  I've been there.

13  So I was there a few times to see actually what it is

14  and what it can be.

15       Q    We'll stick with Hawaii for now.  You put in

16  $100,000?

17       A    Yes.

18       Q    What made you think it would be a good

19  investment since you didn't review materials?  Is it

20  things Kenner told you about?

21       A    I don't think, it's not that, no.  When I got

22  into land I think you -- look back now, it's different,

23  different world real estate.  I had enough money.  I

24  don't think that, I don't say enough money, it was,

25  $100,000 at that time was a small percentage, something

26  I believed in that could do well and make a lot of money

```
1                    T. Stevenson    03/29/11                    10

2       in a great place like Hawaii.  It wasn't learned in any

3       way or so, that was just my own personal opinion of what

4       I saw.

5            Q    What were they supposed to do with this project

6       in Hawaii?

7            A    Get title of the land and turn it into some

8       sort of development, hotels, something along those

9       lines.

10           Q    What was your $100,000 buying you?

11           A    Probably a small percentage.

12           Q    In addition to the Hawaii projects mentioned

13      San Lucas, tell us about that investment.

14           A    That was one I decided -- I wasn't in the other

15      ones -- that I went down there.  I saw the property.  I

16      saw before the purchase was made.  I want to say I was

17      in there, I saw the pictures maybe '04, '05 I went in

18      there to see it.

19           When I retired my last year was 2005/2006 in

20      Philadelphia I went down there.  When there was a golf

21      tournament I saw the course and the possibility, which

22      of course, there is there.  That this could be very

23      good.  Because I've been to Cabo San Lucas before and

24      saw the potential of what that investment could be.

25      That to me 200,000, much like the 100,000, was a small

26      percentage of my wealth.  That I wasn't concerned about
```

                    T. Stevenson    03/29/11                    11

1
2   the risk.  Obviously there is a risk of buying land in
3   another country, I understand that.  I saw what this can
4   be and still can be today.  I think it's great piece of
5   property in a very popular place in the world.
6        Q    What was the $200,000 supposed to go for?
7        A    Same percentages, we had up to $200,000 to make
8   the property work until there was a bank loan that was
9   coming.   Lehman Brothers came in eventually and we
10  waited for that loan to buy the property, to buy the
11  project, a small percentage.
12       Q    Did you understand whether or not Phil Kenner
13  had any interest in the project; in other words, he was
14  like one of the owners or he would profit from your
15  investment at all?
16       A    I didn't, not at the time.  I didn't -- are you
17  asking if that is a factor of why I got into it?
18       Q    I'm asking whether you understood he had any
19  interest in it at the time?
20       A    No, at the time I didn't.
21       Q    Did you learn he had an interest at some point?
22       A    Yeah, I would say that, yes.
23       Q    How did you learn he had an interest?
24       A    Probably from him, talking with Phil.  But also
25  talking with Mr. Jowdy as well.  Ken Jowdy more so
26  because I've had dealings with him, I've dealt with him

T. Stevenson    03/29/11                    12

2  on a personal level with different issues that the other

3  guys haven't, that I've had contact with him.

4       Q    Mr. Jowdy?

5       A    Yes.

6       Q    How many times have you been down to San Lucas

7  to see the property?

8       A    Two times, once when I went there for the golf

9  tournament.   Another time when I went with, I brought my

10  family, my wife and kids, to see the place.

11       Q    The property is being developed as condominiums

12  or timeshares?

13       A    At the time the original was to build a golf

14  course, and there is a golf course there.   And then

15  build homes, different condos, stuff like that, vacation

16  resort kind of place.

17       Q    Has the resort only been built or only the golf

18  course?

19       A    Only the golf course.

20       Q    What is the status of the project?

21       A    Sitting there.   The players haven't, we, the

22  loan is still there, as far as I know from Donza Bank,

23  who took over the Lehman loan.   That's the order it goes

24  in.   Not much is going on there.

25       Q    At the time you invested in the San Lucas

26  project, did you learn anything, did you know anything

T.  Stevenson    03/29/11                    13

1   about an earlier project that Mr. Jowdy had been

2   managing elsewhere in the Baha?

3        A    I knew they, I wouldn't say I knew at the exact

4   time that I invested the 200,000, I wouldn't say of the

5   north project I learned, but I wasn't invested in that.

6        Q    You learned after the fact?

7        A    Yes.

8        Q    Have you learned after the fact that they were

9   having major problems with the north project?

10        A    Yes.  After they had done that, I think they

11   learned that, my thought was, we kind of get everyone

12   into Cabo.  I didn't pay that much attention in it.  I

13   wasn't invested in it at the time; still ain't.

14        Q    Same guy running both projects, Jowdy?

15        A    Yes.

16        Q    Would have you liked to have known at the time

17   you were making the decision about whether to put money

18   in San Lucas that the Jowdy project in the north of

19   Mexico had gone no where?

20        A    I may have known, like, I don't, at the exact

21   time I don't remember knowing the north project was not

22   bad.  I probably if you would told me it that was bad at

23   the time I still would have made, from what I've seen,

24   even though he was managing, from what I saw at the land

25   I still think I still probably would have made that

1                     T. Stevenson    03/29/11

2   decision.

3       Q    Are you saying even if you had known the

4   manager who you were entrusting the $200,000 was not

5   doing much on the project to the north, you still would

6   have that, it wouldn't have been relevant to you as an

7   investment?

8       A    It would have been relevant, but I've also,

9   like I said at the beginning, I don't believe the

10  percentage I was putting in of 200,000 -- I think that's

11  a fair question when I look back now.  But at the time

12  when I've seen, I still believe today that the property

13  is going to be, it's going to be phenomenal whatever the

14  end result is.  That's going to be a beautiful place,

15  because Cabo is just such a popular place to go.  I

16  still think it's going to be a great investment.  I

17  still think that even everything we've gone through.

18      Q    Do you have any accounts at Northern Trust

19  Bank?

20      A    No.

21      Q    Do you have a line of credit there as far as

22  you know?

23      A    No.

24      Q    Did anyone ever ask you to open a line of

25  credit?

26      A    No.

T. Stevenson   03/29/11                    15

1

2     Q    Did anyone suggest to you to increase your

3  investment?

4     A    No.

5     Q    Do you know other players who have lines of

6  credit that were used to fund any of these real estate

7  deals?

8     A    No, not that I'm aware of.

9     Q    Are you party to any litigation or lawsuit

10  involving any of these projects?

11     A    We had one involving Ken Jowdy dismissed

12  without prejudice.

13     Q    Do you know why it was dismissed?

14     A    No.

15     Q    Were you deposed in that lawsuit?

16     A    No.

17     Q    Were they seeking to depose you, as far as

18  you're aware of?

19     A    Not that I've aware of.

20        MR. DEVLIN-BROWN:  I propose excusing the

21        witness for a moment.  If you won't mind waiting

22        in the hall.  We may have more questions for you,

23        we may not.  In any event, it's possible at some

24        future date the Grand Jury will wish to continue

25        your Grand Jury testimony.  We'll advise your

26        attorney.

16

1              T. Stevenson     03/29/11

2         May I ask the witness be excused.

3          THE FOREPERSON:   Yes.

4         (Witness Excused.)

5         (Time Noted: 12:52 p.m.)

6         (Colloquy Follows.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor, New York, N.Y. 10018  (212) 869-1500

```
 1                    T. Stevenson   03/29/11              17
 2              (Colloquy Precedes.)
 3              (Witness Enters Room.)
 4              (Time Noted: 12:57 p.m.)
 5              THE FOREPERSON:  I remind you, you are still
 6          under oath.
 7     BY MR. DEVLIN-BROWN:
 8          Q    The Hawaii project is called Little Isle IV; is
 9     that right?
10          A    If that's the name they use, I just call it
11     Hawaii.
12          Q    When you put up the $100,000 for Hawaii, did
13     you have any understanding of whether the money could be
14     used to pay for the Mexico project or was it just
15     supposed to go to the Hawaii project?
16          A    In the beginning it was supposed to go to
17     Hawaii.  Then I saw they needed, the group of us got
18     together, we have this piece of land that's available
19     for purchase in Mexico that we need too wait on or get
20     funds on to transfer as a group like one big blanket to
21     get money into Cabo and pay for that land to hold it
22     until the loan came.
23          Q    So are you saying you agreed to transfer some
24     of the money from the Hawaii project to the Cabo
25     project?
26          A    I would say that, yes.
```

1           T. Stevenson    03/29/11                    18

2       Q   Who made that decision?

3       A   I think all of us as a group.

> After Kenner conference calls in 2004...

4       Q   What do you mean "as a group", who is the

5   group?

6       A   All the guys who were invested in it.

7       Q   All the guys who were invested through

8   Mr. Kenner, his clients?

9       A   If all of them, yeah, and other guys that were

10   invested in this; Mr. Jowdy I'm not sure.

11       Q   Let me show you what's been marked 110A.

12   Before I do, do you remember getting reports or anything

13   from Mr. Kenner about the status of Little Isle IV the

14   Hawaii project?

15       A   No.

16       Q   Take a look at this and see if you remember

17   ever getting anything like this.

18           (Witness reviewing document.)

19       A   I think I remember seeing that.

20       Q   How do you remember getting it?

21       A   Through a fax maybe.  Seeing these actual

22   numbers that looks familiar to me.

23       Q   Okay.  Is he still your financial adviser?

24       A   He is.

25       Q   Roughly how much money is he managing for you?

26       A   Probably five, 600,000.

1                   T. Stevenson    03/29/11          19

2         Q    Does that include the money tied up in these

3    real estate ventures like 300,000?

4         A    No, that would be more than 900,000.

5              MR. DEVLIN-BROWN:   May I ask the witness be

6       excused.

7              THE FOREPERSON:   Yes.

8         (Witness Excused.)

9         (Time Noted: 1:00 p.m.)

10        (Colloquy Follows.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

20

CERTIFICATE

STATE OF NEW YORK     )

                      )

COUNTY OF NEW YORK    )


          I, RIVKA TEICH, hereby certify that

the foregoing is a true and accurate transcript,

to the best of my skill and ability, from my

stenographic notes of this proceeding.




                    _____

                    Rivka Teich, R.P.R., C.S.R.

                    Acting Grand Jury Reporter



# DEPARTMENT OF THE TREASURY
## Internal Revenue Service
## Criminal Investigation



Government
Exhibit

3500 - VT - 1
13-CR-607(JFB)

## Memorandum of Interview

| | | | |
|---|---|---|---|
| **Investigation #:** | 1000259846 | **Location:** | **FBI Office** |
| **Investigation Name:** | Phillip Kenner | | 135 Pinelawn Rd. |
| | | | Melville, NY 11747 |
| **Date:** | September 10th, 2014 | | |
| | December 15, 2014 | | *After the Kenenr indictment* |
| **Time:** | Approx. 10:50 AM | | |
| **Participant(s):** | Vincent Tesoriero, Witness | | |
| | Joshua R Wayne, Special Agent, IRS | | |
| | Matthew Galioto, Special Agent, FBI | | |

On the above date and time Special Agents Wayne and Galioto met with Vincent Tesoriero (Tesoriero). Agents met with Tesoriero on two separate occasions.   Unless otherwise noted, all statements were stated to the Agents on September 10th 2014.

1. Tesoriero resides at _____. His date of birth is _____. His cell phone number is _____ and his home phone number is _____.

2. Tesoriero met John Kaiser when they worked together as housing police officers in New York.  Kaiser went on to be a Suffolk County Policeman and Tesoriero went to work for the Fire Department in New York (FDNY).

3. Tesoriero retired from the FDNY in May of 2004.  Tesoriero received a lump sum payment of $700,000 from Victim's Compensation's Fund regarding the September 11th, 2001 attacks on the World Trade Center.

## SAG HARBOR DEAL

4. Kaiser mentioned to Tesoriero about an investment property in Sag Harbor, New York.  Kaiser had a $70,000 retainer on the property.  Chris Manfredi, Tom Milana, John Kaiser and Tesoriero met to discuss the property.  The purchase price of the property was $700,000.  Tesoriero and Milana each put $350,000 for a total of $700,000 for the purchase of the Sag Harbor property.

   This is the first time Tesoriero invested with John Kaiser (Stated on 12/15/2014).

5. Kaiser used $30,000 of the retainer money for the closing costs of the Sag Harbor Property.  Kaiser withdrew the remaining $40,000 from the original retainer. Tesoriero knows this because it was in the closing documents.

6. Manfredi and Kaiser were going to fund the build for the Sag Harbor property. Kaiser's brothers and Tesoriero were going to build the property.

**[handwritten note, top]** Tesoriero was not aware that Berard was involved in the Ledbetter deal -- only Kenner...

7. Kaiser gave Tesoriero $50,000 back out of the $350,000 originally put in the Sag Harbor deal. The $50,000 was paid back by one $25,000 check given to Tesoriero and Kaiser paid $25,000 to build a retaining wall at Tesoriero's home.

8. Kaiser told Tesoriero that they needed to get Manfredi out of the Sag Harbor deal and that PHIL KENNER and Bryan Berard were coming in the deal. In November, 2006 Ledbetter is created (Ledbetter would own Sag Harbor) The Sag Harbor deal was closed on with KENNER, Berard, Kaiser and Tesoriero. Tesoriero stated he was not at the closing. Tesoriero found out some time after the closing that Berard came up with the money for the closing and KENNER never put money in the deal. KENNER's role in the Sag Harbor deal would be to raise money to build the property. At the time of the closing Tesoriero did not know where money came from. Thomas Milana was bought out of the Sag Harbor deal. Tesoriero signed documents that stated he was 25% owner in the Sag Harbor deal.

**[handwritten note, right]** Kenner had not met Tesoriero at the time of the October 2006 deal...

9. Tesoriero stated that he has never spoken to Berard. Tesoriero was under the assumption from the start of the "Ledbetter deal", Berard and KENNER were coming into the deal. Tesoriero received the Ledbetter agreement from only Kaiser.

**[handwritten note, left]** Kaiser and Berard fully recovered their investment after the fraudulent sale by Kaiser and Berard...

10. Kaiser told Tesoriero that by the time they sell, Tesoriero would make $300,000 to $400,000 on the Sag Harbor deal. Nothing ever happened with the Sag Harbor property. Kaiser told Tesoriero that he had a buyer and that Berard and himself (Kaiser) wanted to sell.

11. The Sag Harbor property was sold for $740,000. For the sale of the property Tesoriero got $150,000 check and a $93,000 check. Tesoriero took a loss because of the 3 closings and the tax on the property.

**HAWAII PROJECT**

12. In the summer of 2006, Kaiser asked Tesoriero for a loan from Tesoriero. Tesoriero believed the loaned money would be used to buy property in Hawaii. Tesoriero wired $100,000 from his account to an account he believed was in the name Big Isle Ventures. Tesoriero was not aware of who had control of the account. Tesoriero has no documentation of this other than the wire. For the loan, Tesoriero would get 10% interest. Tesoriero believes he got $10,000 from Kaiser in either cash or check.

On December 15th, 2015, Tesoriero's recollection was refreshed when he was shown a wire transfer on 8/8/2006 for $150,000 from Tesoriero's account at Sovereign Bank to an account called Kau Holdings at Northern Trust. The investment was for a Hawaii project. The money was to be used to purchase land and develop property in Hawaii. Tesoriero's friend Jim Cody also invested in the Hawaii project.

**[handwritten note, bottom]** Kenner was also not repaid for his $28,500 tax payment in 2010 and/or the 25% equity Kaiser and Berard fraudulently stole from Kenner in 2011 with a forged signature on a fabricated document...all in EDNY evidence and turned over early and specifically in BINDER-### from the government as evidence they planned early to use against Kenner until they realized that their two STAR witnesses had been part of multiple real estate frauds against Kenner and many others...since they began their Mexico employment...

13. Tesoriero's parents invested $150,000 with Kaiser to build properties.  $150,000 for an 18 month investment.  Tesoriero's parents got back $5,000.   Tesoriero gave his parents $150,000 because he told his parents to invest with Kaiser.  The $150,000 Tesoriero paid back to his parents came from money from the sale of the Sag Harbor property.

On December 15th, 2014, Tesoriero further recalled that Tesoriero's parents gave Kaiser a check for $150,000.  Tesoriero stated that the money was a loan and Tesoriero's parents were to receive 10% interest for 18 months.  (On the memo line of the check it states "investment")

14. Kaiser told Tesoriero, instead of Kaiser giving Tesoriero his $100,000 back for the loan, Kaiser would sell Tesoriero ▮▮▮▮▮▮▮▮▮▮▮▮▮▮to Tesoriero and Kaiser would take $100,000 off the purchase price.  Prior to purchasing the property, Tesoriero lived at ▮▮▮▮▮▮ and was paying Kaiser's mortgage on the property.  In around October of 2008, Tesoriero bought the property from Kaiser for $300,000.  The original sale price of the property was $400,000.  Kaiser took $100,000 off the purchase price for repayment of the loan.  Tesoriero took a $300,000 mortgage from Wells Fargo for the purchase of ▮▮▮▮▮▮

15. Kaiser saw KENNER at Kaiser's 40th birthday party.  He also saw KENNER at Hermoso Beach, and stayed at KENNER's house when Tesoriero did work on the Paradise Valley house (an investment property for Kaiser).  Tesoriero did not invest in the Paradise Valley house.

16. On December 15th, 2014, Tesoriero stated that he was never asked to invest in the Palms Condos in Las Vegas, NV.


I began preparing this memorandum on December 15th 2014, after refreshing my memory from notes made during and immediately after the interview with Vincent Tesoriero.




*Joshua R. Wayne*

Joshua R Wayne
Special Agent



Government Exhibit
3500-WR-2
13-CR-607(JFB)

(BR) Bill Ranford — William E. Ranford

telephonic

Scott R.
Matt G.

Bill R.

★7/25/12
left mss
for (BR)

DOB =

SSN =

CA Kings
last 7yrs

New Westminster, B.C.
///

call to 7/30/12 — no answer; didn't leave mss
ill to 8/2/12 — left mss for (BR)

At EDNY -- Ranford claimed to not know about the following transfers

See Kenner 2008 text requests to Constantine and Gaarn re -- paperwork

09/7/12 — telephonic

Eufora — investment — Phil Kenner told (BR) about

(BR) from Schwab — 
7/2008 = $200k

— credit card co.
— out of Mexico (JFB)
— good investment
— bunch of (PK) client NHL players in

accts
to
Eufora
★ get Eufora up + running
distribute credit cards
★ # just used for Eufora

(PK) never met Tommy Constantine

(BR) — asked for paperwork many times throughout yrs from (TC) via emails

(TC) — held out on paperwork for Eufora

(PK) — then Q'd (TC) — never produced paperwork

Evidence altered from truth --
DB story just like Gaarn Eufora
transfer date change from 2005
(original) to 2007 (see 3500-TG-1-r
-- altered)

total ≈ $300k in Eufora - several times to Eufora

- 2009 - Block - Feb.

Block - May

≡ any $ from (BR) accts to be used for Eufora

≡ never told (BR) $ used to buy-out other investors
I could never do that → (BR)

$300,000 corroborate the truth,
yet Ranford refuted it vehemently
during the trial -- claiming the
notes were WRONG.

GSF

explained: Jowdy issues in Mexico
- stuck financially with legal bills
Need help financially

(BR)
never
invest'd
in
Mexico

(BR) - $300k gave to GSF
July 2009

(BR) - suppose
to get a
piece of
Mexico, Northern
for putting $
in GSF

# to GSF
in exchange for
the $300k

(BR) - gets updates from (PO)
re: Jowdy issues / Mexico

(BR) - knew (TC) involved in GSF - not sure what role

≡ (TC) now on side w/ Jowdy

(BR) - did not get emails stating (TC) stole $ + how GSF
$ spent

? - if knew $ spent on other expenses - not Towdy issues
(BR) - would not put $ in GSF         i.e,
                                     houseos in AZ
                                     airplanes
                                     Qufora

(BR) - never went to Mexico properties

(BR) Speaks To (PE) currently ; still his financial advisor

(PE) spoke to briefly
       Pryan Brevard

END

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA


PHILLIP A. KENNER, TRUST       )  NO. CV2012-055576
BENEFICIARY, THE SHANGRI-LA    )
TRUST 1999,                    )
                               )
        Plaintiff,             )
vs.                            )
                               )
JOHN KAISER, TRUSTEE, THE      )        at 11-12 and 27
SHANGRI-LA TRUST 1999;         )
JOHN KAISER, a married man;    )
ELIZABETH KAISER, a married    )
woman; JOHN AND JANE DOES I-VII, )
                               )
        Defendants.            )
JOHN R. KAISER, a married man as )
his sole and separate property; )
BRYAN BERARD, an unmarried man, )
                               )
        Counterclaimants.      )
vs.                            )
                               )
PHILIP A. KENNER, a single man, )
                               )
        Counterdefendant.      )
TYSON and KATHY NASH, husband  )
and wife; DARRYL SYDOR; JERE   )
LEHTINEN; DIMITRI KHRISTICH;   )
WILLIAM RANFORD,               )
                               )
        Interveners.           )


DEPOSITION OF WILLIAM RANFORD

Phoenix, Arizona
September 17, 2014
8:37 a.m.


Prepared for:          BARTLOWE REPORTING SERVICES
                       357 North Fourth Avenue
                       Suite B
                       Phoenix, Arizona 85003
(Copy)                 (602) 254-9116


BY:  CRYSTAL BARTLOWE, RPR
Arizona Certified Reporter #50198

Kenner vs. Kaiser September 17, 2014
Deposition of William Ranford

```
                                                          Page 2
 1                      I N D E X

 2

 3   W I T N E S S:                             Page

 4   WILLIAM RANFORD

 5       Examination by Ms. Lavonier               4

 6

 7                    E X H I B I T S

 8

 9   Deposition
     Exhibit      Description                    Page
10
     1   March 14, 2011 letter to Ronald Richards   9
11       from Robert L. Lane, 5 pages

12   2   Charles Schwab Institutional Statement    23
         for William Ranford, Statement Period
13       May 1-31, 2010, page 5 of 9

14   3   United States District Court Indictment   26
         against Phillip A. Kenner and Tommy C.
15       Constantine, 29 pages

16

17

18

19

20

21

22

23

24

25
```

Kenner vs. Kaiser September 17, 2014
Deposition of William Ranford

Page 3

1          THE DEPOSITION OF WILLIAM RANFORD,

2   witness herein, was taken pursuant to Notice and the

3   Arizona Rules of Court before Crystal Bartlowe,

4   Arizona Certified Court Reporter No. 50198, at the

5   Law Offices of THE TRAVIS LAW FIRM, PLC, 10621

6   South 51st Street, Suite 103, Phoenix, Arizona, on

7   September 17, 2014, commencing at 8:37 a.m.

8                    *   *   *   *

9   APPEARANCES:

10

11        ON BEHALF OF DEFENDANTS/COUNTERCLAIMANTS:

12             THE TRAVIS LAW FIRM, PLC
               10621 South 51st Street, Suite 103
13             Phoenix, Arizona 85044
               BY:  Melissa S. Lavonier, Esq.
14                  (480) 219-3633

15

          ON BEHALF OF INTERVENERS:
16
               BAKER & BAKER
17             5050 North 8th Place, #10
               Phoenix, Arizona 85014
18             BY:  Thomas M. Baker, Esq.
                    (602) 279-1644

19

20        ALSO PRESENT:

21             Tyson Nash

22

23

24

25

Kenner vs. Kaiser September 17, 2014
Deposition of William Ranford

```
                                              Page 4
 1                          Phoenix, Arizona
                            September 17, 2014
 2                          8:37 a.m.

 3

 4                     WILLIAM RANFORD,

 5    called as a witness herein, having been first duly

 6    sworn by the court reporter, was examined and

 7    testified as follows:

 8

 9                     EXAMINATION

10    BY MS. LAVONIER:

11        Q.    Could you please state your name for the

12    record.

13        A.    William Ranford.

14        Q.    Have you ever been deposed before?

15        A.    Never.

16        Q.    I'm gonna ask you some questions today.  If

17    you answer those questions, I'm gonna assume that you

18    understand the question that's been asked.  Is that

19    fair?

20        A.    That's fair.

21        Q.    Please answer these questions with audible

22    statements, as our court reporter here can't

23    understand shrugs or nods.  Is that fair?

24        A.    Yes.

25        Q.    If you need a break, I'd just ask that you
```

Kenner vs. Kaiser September 17, 2014
Deposition of William Ranford

Page 5

1  answer the question that I'm asking, that's pending,

2  and then we'll take the break.  Is that fair?

3      A.    Yes.

4      Q.    How old are you?

5      A.    47.

6      Q.    What's your profession?

7      A.    Professional hockey coach.

8      Q.    Are you married?

9      A.    Yes.

10     Q.    Do you have any children?

11     A.    Yes.

12     Q.    How many children do you have?

13     A.    Two.

14     Q.    Where do you currently live?

15     A.    Los Angeles.

16     Q.    And what's your address?

17     A.    13714 Judah Avenue, Hawthorne, California,

18  90250.

19     Q.    And how long have you lived there?

20     A.    I rent.

21     Q.    About how long have you lived there?

22     A.    One year.

23     Q.    In 2009 what's the name of the financial

24  institutions where you were banking, where you had

25  money located?

Case 2:13-cr-00607-JFB-AYS   Document 708-3   Filed 09/04/19   Page 40 of 68 PageID #: 18527

Page 6

1      A.     Schwab.

2      Q.     Did you have money at any other

3  institutions in 2009?

4      A.     Yes.

5      Q.     And what were the names of those

6  institutions?

7      A.     It would have been TD Canada Trust.

8      Q.     And anywhere else?

9      A.     I believe Asante.

10     Q.     And any other locations?

11     A.     Not that I can think of right now.

12     Q.     And in 2010, what financial institutions

13  did you have money?

14     A.     The same.

15     Q.     And in 2011?

16     A.     The same.

17     Q.     And nothing different in 2010 or 2011?

18     A.     Not to my recollection.

19     Q.     How do you know John Kaiser?

20     A.     Just that he's involved in real estate that

21  I invested in.

22     Q.     How long have you known him?

23     A.     I've never met him.

24     Q.     You've never met him.  So you've never

25  spoken with him?

Kenner vs. Kaiser September 17, 2014
Deposition of William Ranford

Page 7

1    A.    No.

2    Q.    Do you know Bryan Berard?

3    A.    I know who he is, yes.

4    Q.    But you've never met him?

5    A.    Technically, no.

6    Q.    Could you explain that answer, please.

7    A.    I play hockey against him, so -- he was

8  never on my -- he was never a teammate.

9    Q.    So you never had any conversations with him

10 off the hockey rink?

11   A.    No.

12   Q.    How do you know Phil Kenner?

13   A.    He was my financial advisor.

14   Q.    When did he become your financial advisor?

15   A.    It would have been probably the late '80s.

16   Q.    Did you know him before then?

17   A.    No.

18   Q.    Is he still your financial advisor?

19   A.    Yes.

20   Q.    How did you meet Phil Kenner?

21   A.    Through Derek Sanderson when I played for

22 the Boston Bruins.

23   Q.    So he provided you with financial advice?

24   A.    Correct.

25   Q.    Are you aware of the Global Settlement

Kenner vs. Kaiser September 17, 2014
Deposition of William Ranford

Page 8

1  Fund?

2       A.    Yes.

3       Q.    What's your understanding of the purpose of

4  the Global Settlement Fund?

5       A.    It was -- my understanding is it was for

6  money invested in Mexico.

7       Q.    You were investing money in Mexico through

8  this Global Settlement Fund?  Is that what you're

9  saying?

10      A.    Yes.

11      Q.    So the money that was going into the Global

12  Settlement Fund was to be distributed to Mexico?

13      A.    Correct.

14      Q.    Did you contribute money to this Global

15  Settlement Fund?

16      A.    Yes, I did.

17      Q.    When did you contribute money?

18      A.    I can't recollect the actual date.

19      Q.    Do you remember how much you gave to the

20  Global Settlement Fund?

21      A.    I don't recollect, no.

22      Q.    Do you know from which financial accounts

23  you would have sent money to this Global Settlement

24  Fund?

25      A.    I believe that would have been -- it would

Kenner vs. Kaiser September 17, 2014
Deposition of William Ranford

Page 9

1  have either been Northern Trust or Schwab at that

2  time.

3      Q.    Do you know who was controlling the Global

4  Settlement Fund?

5      A.    Who was controlling it?

6      Q.    Yes.

7      A.    Not exactly.

8            (Deposition Exhibit No. 1 was marked for

9  identification.)

10      Q.    BY MS. LAVONIER:  Have you seen this

11  document before?

12            MR. BAKER:  Was this disclosed prior to

13  today?

14            MS. LAVONIER:  I don't believe so.

15            MR. BAKER:  Okay.  Is there a reason we're

16  going into the Global Settlement Fund?

17            MS. LAVONIER:  There is.

18            MR. BAKER:  Relevant to this case?

19            MS. LAVONIER:  Yes, there is.

20            MR. BAKER:  Okay.  We'll see how you tie it

21  together.

22      Q.    BY MS. LAVONIER:  Have you seen this

23  document before?

24      A.    I don't recollect seeing this document

25  before.

Kenner vs. Kaiser September 17, 2014
Deposition of William Ranford

Page 10

1      Q.     What's the date on this document?

2      A.     March 14th, 2011.

3      Q.     And who is the letter to?

4      A.     Mr. Richards.

5      Q.     And who is the letter from?  If you would

6  read the name at the top, please.

7      A.     Robert Lane.

8      Q.     Thank you.

9             Have you ever received an accounting of how

10  the money in the Global Settlement Fund was used,

11  similar to the accounting in this document?

12     A.     I have not.

13     Q.     Weren't you a little bit curious about how

14  your money was being spent?

15     A.     Yes.

16     Q.     And you never asked questions about how

17  your money was being spent?

18     A.     Yes, I did.  I'm, I'm familiar with Eufora

19  in this Global Settlement Fund.  I mean, I'm very

20  familiar with the -- with Eufora, but --

21     Q.     You just stated that the money was to be

22  used for projects in Mexico?

23     A.     Well, that's what I thought it was, but I'm

24  incorrect.  Now that I see the name Eufora, I

25  understand that that's what that was for, and I was

Kenner vs. Kaiser September 17, 2014
Deposition of William Ranford

Page 11

1   familiar with the information on that, yes.

2       Q.    So now it's your understanding the money

3   was for Eufora?

4       A.    Yes.  Correct.

5       Q.    Okay.  If you could turn to the third page,

6   please.  And do you see the entry on June 5th of 2009?

7   Is that your name there, William Ranford?

8       A.    Yes, it is.

9       Q.    And how much does it say was credited at

10  that time?

11      A.    100,000.

12      Q.    And do you see the entry on June 12th of

13  2009?

14      A.    Yes.

15      Q.    And is that also your name?

16      A.    Yes, it is.

17      Q.    And how much does it say that you received?

18      A.    That I received?

19      Q.    Yes.  Do you see the $100,000 debit there?

20      A.    Yeah.  Yes.

21      Q.    Okay.  And then if you could flip to the

22  next page, please, at the top.  Do you see the entry

23  dated July 3rd -- or July 13th of 2009?

24      A.    Yep.

25      Q.    And is that your name as well?

Kenner vs. Kaiser September 17, 2014
Deposition of William Ranford

Page 12

1    A.    Correct.

2    Q.    And that's $300,000 that you deposited?

3    A.    Yep.

4    Q.    Okay.  And if you could go back to the

5  other page, please.  There's an entry on June 23rd of

6  2009.  Could you read that name next to that for me,

7  please.

8    A.    June 23rd?

9    Q.    Yes.  Thomas Baker?

10   A.    Yeah, Thomas Baker.

11   Q.    Is it your understanding it's the same

12 person as is your attorney in this case?

13   A.    Yes.

14   Q.    So you spoke with Phil Kenner about what

15 was occurring in the Global Settlement Fund?

16   A.    Yes.

17   Q.    And what did he tell you?

18   A.    Regarding the fund?  The funds were going

19 to this Eufora project.

20   Q.    And you never received a final accounting?

21   A.    I did not, no.

22   Q.    When did you speak with Phil Kenner about

23 this money?

24   A.    The last time I would have spoke to him

25 about the Eufora would have been probably 2013, I

Kenner vs. Kaiser September 17, 2014
Deposition of William Ranford

Page 13

1  believe.

2        Q.    Do you have an understanding what his role

3  was in this Global Settlement Fund?

4        A.    What his role was?

5        Q.    What Phil Kenner's role was in the Global

6  Settlement Fund?

7        A.    I don't know exactly what his role was in

8  the -- in the Global Settlement Fund, no.

9        Q.    When did you first learn about this house

10  on Golf Drive in Paradise Valley, Arizona?

11        A.    When Phil Kenner approached me about the

12  property to see if I was interested in helping out

13  with some funding as they were unable to finish the

14  project.

15        Q.    And do you remember what date that was?

16        A.    I believe it was in 2010.  I don't remember

17  the exact date.

18        Q.    And it was Phil Kenner that approached you?

19        A.    Yes, it was.

20        Q.    When did you learn that the property was

21  sold?

22        A.    I learned the property was sold when --

23  when I was contacted that we were having issues

24  getting our money after it was sold.

25        Q.    And who contacted you?

Kenner vs. Kaiser September 17, 2014
Deposition of William Ranford

Page 14

1      A.     I believe it was Phil Kenner who contacted
2  me.
3      Q.     And do you remember the time frame of when
4  he contacted you?
5      A.     Not exactly, no.
6      Q.     You don't remember what year that might
7  have been?
8      A.     No.
9      Q.     And how did he contact you?  Did he talk to
10  you in person?
11      A.     By phone.
12      Q.     He called you on the phone or did you call
13  him?
14      A.     I probably called him -- I -- not probably.
15  I called him, and it was just on an update to see how
16  things were going.
17      Q.     And did you talk to him more than once
18  about the sale of the house?
19      A.     No.  Just the one time.
20      Q.     And what did he tell you during that time,
21  during that phone call?
22      A.     He informed me that there was some issues
23  with the funds being released and that Tom Baker would
24  be handling the proceedings with trying to acquire my
25  funds back.

Kenner vs. Kaiser September 17, 2014
Deposition of William Ranford

Page 15

1      Q.      Did he explain what the problem was with
2  getting your funds out of the house?
3      A.      Not in great detail.  Just that -- my
4  understanding was that when the promissory note was
5  signed by John Kaiser, that seven days after the house
6  was sold, that I would be receiving my funds, and
7  obviously, I didn't, so --
8      Q.      So it occurred sometime after the house
9  sold --
10     A.      Yeah.
11     Q.      -- that he called you?
12     A.      I had called him about -- probably about
13  another matter, and he was just updating me.
14     Q.      So you didn't specifically call to ask him
15  where your money was?
16     A.      Not specifically, no.
17     Q.      And did he explain anything else to you
18  about the money and the house?
19     A.      No.
20     Q.      He just told you that there was an issue
21  with it?
22     A.      Correct.
23     Q.      And you weren't curious about what these
24  issues were?
25     A.      Well, obviously, I was curious, yes.

Kenner vs. Kaiser September 17, 2014
Deposition of William Ranford

Page 16

1    Q.    So did you ask him any questions?

2    A.    I asked him where my money was.

3    Q.    And his response was?

4    A.    That it was -- it was tied up due to legal

5    issues.

6    Q.    Did he explain what those legal issues

7    were?

8    A.    He probably went into some detail.  I just

9    don't recollect that.

10    Q.    So you signed the note -- or you have this

11    note from sometime in 2010, and the first time that

12    you followed up to find out where the money was, was

13    in 2013; is that fair?

14    A.    Yes.

15    Q.    So you didn't wonder, in the meantime,

16    where that money was?

17    A.    No, I mean, I'd had conversations

18    throughout the -- you know, they were trying to sell

19    the house and it hadn't sold.  You know, there was

20    obviously the market crash here in Phoenix, so they

21    were trying to get the most for the house that they

22    could and I was getting updated on that periodically.

23    Q.    And who gave you those updates?

24    A.    Phil Kenner.

25    Q.    Who approached you about the promissory

Kenner vs. Kaiser September 17, 2014
Deposition of William Ranford

Page 17

1   note on the house?  Who had approached you about the

2   promissory note that you signed -- or that John Kaiser

3   signed?

4       A.    Who approached me to -- I don't understand.

5       Q.    Let me rephrase that.

6       A.    Yes.  Please.

7       Q.    Did you ask for a promissory note before

8   you sent money --

9       A.    Yes.

10      Q.    -- for this property?

11      A.    Yes.

12      Q.    And who did you ask for that promissory

13  note?  Did you ask Bryan Berard for a promissory note?

14      A.    No.  John Kaiser.

15      Q.    So you personally asked John Kaiser for the

16  promissory note?

17      A.    Yeah.

18      Q.    A few minutes ago you said you'd never

19  spoken to him.

20      A.    Oh.  Sorry.  Not personally.  It was

21  through Phil Kenner.

22      Q.    So you asked Phil Kenner for a promissory

23  note or did Phil Kenner offer it to you?

24      A.    He offered it to me.

25      Q.    So you did not ask for it?

Kenner vs. Kaiser September 17, 2014
Deposition of William Ranford

Page 18

1      A.      Not from John Kaiser directly, no.  But I,

2   I -- when he approached me about the funds, to cover

3   myself personally, he suggested that a promissory note

4   be written up, and I received the promissory note from

5   John Kaiser, and that's when I signed it and sent it

6   back.

7      Q.      When you say, "he" approached you to lend

8   money, could you explain what you mean by "he"?

9      A.      Phil Kenner.

10     Q.      So Phil Kenner approached you and suggested

11  that a promissory note would protect your interests?

12     A.      Yes.

13     Q.      Did you ever personally witness John Kaiser

14  sign the promissory note?

15     A.      No.

16     Q.      Who provided you a signed copy of that

17  promissory note?

18     A.      Phil Kenner.

19     Q.      Do you remember when he provided that to

20  you?

21     A.      I don't recollect, no.

22     Q.      Do you remember whether he would have given

23  it to you in person?

24     A.      I believe it was electronically sent to me,

25  but I don't -- I couldn't find the copy of it, and he

Kenner vs. Kaiser September 17, 2014
Deposition of William Ranford

Page 19

1   had it on file, so I received it later on from him

2   electronically.

3        Q.    When you say, "electronically," do you mean

4   by email or fax?

5        A.    I believe it was by fax.

6        Q.    Did you ever speak with Bryan Berard about

7   loaning any money for repairs or renovations on the

8   property?

9        A.    I never ever talked to Bryan Berard.

10       Q.    Did you ever speak with John Kaiser

11  about --

12       A.    No.

13       Q.    -- loaning any money?

14       A.    I've never spoken with John Kaiser.

15       Q.    So you said you spoke with Phil Kenner --

16       A.    Correct.

17       Q.    -- exclusively about this issue?

18       A.    About this project, yes.

19       Q.    And you don't remember the time that you

20  spoke with him?

21       A.    The exact time, no.

22       Q.    Do you have an idea of what year you spoke

23  with him?

24       A.    Well, it was the year that the project

25  obviously had been done, after 2010.

Kenner vs. Kaiser September 17, 2014
Deposition of William Ranford

Page 20

1    Q.    And so you spoke with him after 2010?

2    A.    Yes.

3    Q.    About loaning money?

4    A.    Yes.

5    Q.    Did he speak with you in person about

6  loaning money?

7    A.    Yes.

8    Q.    Did you exchange text messages with Phil

9  Kenner about loaning money?

10   A.    On this particular project?

11   Q.    Yes.

12   A.    Not that I can recollect, no.

13   Q.    Did --

14   A.    Most of the dealings were by phone with

15  Phil or in person.

16   Q.    So did you ever receive emails from Phil

17  Kenner about this project other than the promissory

18  note?

19   A.    Not that I can recollect, no.

20   Q.    And you don't remember when you spoke with

21  him in person?

22   A.    Not the exact date, no.

23   Q.    Do you remember where you were, which state

24  you were in?

25   A.    Nope.

Kenner vs. Kaiser September 17, 2014
Deposition of William Ranford

Page 21

1    Q.    And do you remember what Phil Kenner said

2  to you about this money?

3    A.    Just that they had a house that they ran

4  out of money in order to finish the project and the,

5  the proposed plan was to finish the project and resell

6  the house.

7    Q.    Was there anyone else present when he spoke

8  to you about loaning some money?

9    A.    Nope.

10    Q.    And did you ever discuss what occurred in

11  your conversation with Phil Kenner with anyone else?

12    A.    I think I might have talked to my wife

13  briefly, but I don't remember if I did or not.

14    Q.    So before Phil Kenner called you -- before

15  you called Phil Kenner to discuss these other matters

16  and he brought up the issues with getting your money

17  back, you haven't had another discussion with an

18  individual about loaning money?

19    A.    No.

20    Q.    So did you actually loan money for the

21  repairs and renovations of this property?

22    A.    Yes.

23    Q.    Do you know how much you lent?

24    A.    130,000.

25    Q.    All right.  When did you send the money?

Kenner vs. Kaiser September 17, 2014
Deposition of William Ranford

Page 22

1      A.     I don't remember the exact date.  I know I
2 have it.  Obviously, I have it in my records.
3      Q.     Do you know who you sent the money to?
4      A.     Phil Kenner.
5      Q.     Do you remember which bank account you used
6 to send the money?
7      A.     I believe it was my Schwab account.
8      Q.     And do you remember where -- to which of
9 Phil Kenner's bank accounts you sent the money?
10      A.     I do not recollect, no.
11      Q.     Did you ever speak with Bryan Berard?
12      A.     I have never spoken to Bryan Berard or John
13 Kaiser.  I've said that many times already.
14      Q.     Did you speak with Phil Kenner after you
15 sent the money?
16      A.     No.
17      Q.     And you said you never received an
18 accounting of how your hundred thousand dollars was
19 used for this property?
20      A.     No.
21      Q.     And you never asked for an accounting?
22      A.     No.
23      Q.     So you weren't curious about how they were
24 spending your money?
25      A.     Well, he told me he was spending the money

Kenner vs. Kaiser September 17, 2014
Deposition of William Ranford

Page 23

1  towards upgrading the house.  That's why I gave him

2  the money.

3      Q.    And you never checked on that to make sure

4  that's what it was being used for?

5      A.    No.  I was a hockey player.  I focused on

6  my hockey and Phil was my financial advisor.

7            (Deposition Exhibit No. 2 was marked for

8  identification.)

9      Q.    BY MS. LAVONIER:  If you could please

10  identify this document for me.

11      A.    Yep.

12      Q.    Could you read the top of the document,

13  please.

14      A.    It's a Charles Schwab International

15  document, Schwab account of William Ranford.

16      Q.    Could you read the account number for me?

17      A.    285.

18      Q.    And what's that statement period?

19      A.    May 1st to the 31st, 2010.

20      Q.    Did you black out this information on the

21  document?

22      A.    Did I personally black it out?  No.

23      Q.    Do you know who did that?

24      A.    No, I don't.

25      Q.    There's two disbursements at the bottom.

Kenner vs. Kaiser September 17, 2014
Deposition of William Ranford

Page 24

1  Could you tell me the dates and the amounts of those

2  disbursements?

3      A.     May 19th for 100,000 and May 19th for

4  30,000.

5      Q.     And did you authorize these disbursements

6  from your Charles Schwab account?

7      A.     Yes, I did.

8      Q.     And how did you authorize these

9  disbursements?  Did you call somebody by phone?

10      A.     I contacted Phil Kenner, and then he had

11  the power of attorney to contact Charles Schwab to

12  have the funds released.  So I did -- I believe, if I

13  remember correctly, it would have been by a faxed

14  document that I would have had to send -- sign and

15  send to Charles Schwab to have the funds released.

16      Q.     So you would have faxed something and not

17  Phil Kenner?

18      A.     I would have faxed something myself, yeah.

19      Q.     Even though he had the power of attorney?

20      A.     Yeah.  If I remember correctly at that

21  time, that was the process that I had to go through

22  with Charles Schwab, is it had to be a faxed document

23  in order for them to release the funds.

24      Q.     And just a minute ago you said that he --

25  Phil Kenner didn't approach you until after 2010 about

Kenner vs. Kaiser September 17, 2014
Deposition of William Ranford

Page 25

1   loaning money for this project?

2          MR. BAKER:  Objection.  Misstates the

3   evidence.  He said 2010, not after.

4          THE WITNESS:  Correct.

5      Q.    BY MS. LAVONIER:  And so sometime in 2010,

6   he approached you --

7      A.    Correct.

8      Q.    -- about loaning money?

9      A.    Yes.

10     Q.    And then you disbursed this money?

11     A.    Correct.

12     Q.    And into Phil Kenner's account?

13     A.    Correct.

14     Q.    And you would have sent the authorization

15  for this disbursement?

16     A.    Correct.

17     Q.    Are you aware that Phil Kenner's been

18  indicted on charges in the Eastern District of

19  New York?

20     A.    Yes.

21     Q.    Alleging that he's been -- he's forged

22  signatures and improperly used money that was given to

23  him for other projects?

24     A.    I do not know what he's indicted for.  It's

25  just I knew he was.

Page 26

1        (Deposition Exhibit No. 3 was marked for

2   identification.)

3        Q.    BY MS. LAVONIER:  If you could please go to

4   page 7.  Could you read paragraph 21, please.

5        A.     In or about and between August 2002 and

6   April 2013, the defendants Phil Kenner and Tommy

7   Constantine, also known as --

8             THE COURT REPORTER:  Slow down a little

9   bit, please.

10            THE WITNESS:  Sorry.

11            Defendants Phil A. Kenner and Tommy C.

12   Constantine, also known as Tommy C. Hormovitis,

13   devised, implemented, supervised and executed a scheme

14   to fraudulently induce the investors, including

15   John Doe 1 through 15 and Jane Doe 1, to invest money

16   with entities and deposit money into accounts that

17   Kenner and Constantine controlled by falsely stating

18   that funds would be invested in real estate, small,

19   privately-held companies and a legal defense fund for

20   the benefit of the investors when, in truth and

21   in fact, as Kenner and Constantine then and there well

22   knew and believed, that a substantial portion of the

23   money would be improperly diverted to bank accounts

24   controlled by Kenner and Constantine and used for

25   their personal benefit, for unrelated business

Kenner vs. Kaiser September 17, 2014
Deposition of William Ranford

Page 27

1  ventures and to conceal their scheme to defraud.

2      Q.    Reading this paragraph in the Indictment,
3  does that change your thinking about how your money
4  was used, your hundred thousand dollars was used?
5      A.    No.
6      Q.    It doesn't make you concerned that it was
7  perhaps used for something else by Phil Kenner?
8      A.    No.

9      Q.    And you've -- okay.

10          And you testified a few minutes ago that
11  the Global Settlement Fund was to be used for the
12  Eufora project; is that correct?

13      A.    Yes.

14      Q.    Could you go to page 15, please, and read
15  paragraph 34.

16      A.    It was a further part of the scheme to
17  defraud that between May 2009 and February 2010, the
18  defendants Phil A. Kenner and Tommy C. Constantine,
19  also known as Tommy C. Hormovitis, solicited many of
20  the investors to invest in what Kenner and Constantine
21  represented to be a legal defense fund known as the
22  Global Settlement Fund, hereinafter GSF.  According to
23  Kenner and Constantine, the GSF would be used
24  primarily to litigate civil claims in connection with
25  the investors' real estate development investments in

Kenner vs. Kaiser September 17, 2014
Deposition of William Ranford

Page 28

1   Mexico, which had failed.

2       Q.    So Phil Kenner never told you that the

3   money was to be used in connection with litigation

4   involving the Mexico project?

5       A.    He -- to my understanding, the funds were

6   for Eufora, and I think later on, he talked to me

7   about funds in, in -- towards the civil action with,

8   with the Mexico property.

9           MS. LAVONIER:  I don't have any other

10  questions at this time.

11          MR. BAKER:  Okay.  We'll read and sign.

12          THE COURT REPORTER:  Thomas, did you need a

13  copy?

14          MR. BAKER:  Yeah.  We'll take the condensed

15  with word index, a CD, and the electronic.

16          (Whereupon the deposition proceedings

17  concluded at 9:03 a.m.)

18

19

20

21

22

23

24

25

Case 2:13-cr-00607-JFB-AYS  Document 708-3  Filed 09/04/19  Page 63 of 68 PageID #: 18550

Page 29

1

2

3

4                    SIGNATURE OF WITNESS

5

6      I, WILLIAM RANFORD, the undersigned, say that I

7  have read the foregoing transcript of testimony taken

8  on September 17, 2014, and I declare, under penalty of

9  perjury, that the foregoing transcript is a true and

10  correct record of my testimony, with such corrections

11  and changes, if necessary, attached.

12

13      EXECUTED this      day of            , 2014.

14

15

16
                           William Ranford
17

18

19

20

21

22

23

24

25

Case 2:13-cr-00607-JFB-AYS Document 708-3 Filed 09/04/19 Page 64 of 68 PageID #: 18551

Kenner vs. Kaiser September 17, 2014
Deposition of William Ranford

Page 30

1  STATE OF ARIZONA      )
                         )  ss.
2  COUNTY OF MARICOPA    )

3      BE IT KNOWN that the foregoing proceedings were
taken before me; CRYSTAL BARTLOWE, Certified Reporter
4  No. 50198, in and for the State of Arizona; that the
witness before testifying was duly sworn by me to
5  testify to the whole truth; that the questions
propounded to the witness and the answers of the
6  witness thereto were taken down by me in shorthand and
thereafter reduced to print under my direction; that
7  the foregoing pages are a full, true, and accurate
record of the proceedings, all done to the best of my
8  skill and ability.

9      I CERTIFY that I am in no way related to any of
the parties hereto nor am I in any way interested in
10 the outcome hereof.

11     [X]    Review and signature was requested.
           [ ]    Review and signature was waived.
12         [ ]    Review and signature not required.

13     I CERTIFY that I have complied with the ethical
obligations set forth in ACJA 7-206(F)(3) and
14 ACJA 7-206 J(1)(g)(1) and (2). Dated at Phoenix,
Arizona, this 29th day of September 2014.

15

16         _____
               Crystal Bartlowe, RPR
17              Certified Reporter
               Arizona CR No. 50198

18

19         *       *       *       *       *

20

           I CERTIFY that Bartlowe Reporting Services has
21 complied with the ethical obligations set forth in
ACJA 7-206 (J)(1)(g)(1) through (6).

22

23         _____
               Bartlowe Reporting Services
24             Registered Reporting Firm
               Arizona RRF No. R1063

25

Bartlowe Reporting Service  -  (602) 254-9116
357 North Fourth Avenue, Suite B, Phoenix, Arizona 85003

Kenner vs. Kaiser September 17, 2014
Deposition of William Ranford

**$**

**$100,000** 11:19
**$300,000** 12:2

**1**

**1** 9:8 26:15
**100,000** 11:11 24:3
**12th** 11:12
**130,000** 21:24
**13714** 5:17
**13th** 11:23
**14th** 10:2
**15** 26:15 27:14
**17** 4:1
**19th** 24:3
**1st** 23:19

**2**

**2** 23:7
**2002** 26:5
**2009** 5:23 6:3 11:6,13,23 12:6 27:17
**2010** 6:12,17 13:16 16:11 19:25 20:1 23:19 24:25 25:3,5 27:17
**2011** 6:15,17 10:2
**2013** 12:25 16:13 26:6
**2014** 4:1
**21** 26:4
**23rd** 12:5,8
**285** 23:17

**3**

**3** 26:1
**30,000** 24:4
**31st** 23:19
**34** 27:15
**3rd** 11:23

**4**

**47** 5:5

**5**

**5th** 11:6

**7**

**7** 26:4

**8**

**80s** 7:15
**8:37** 4:2

**9**

**90250** 5:18
**9:03** 28:17

**A**

**a.m.** 4:2 28:17
**account** 22:5,7 23:15,16 24:6 25:12
**accounting** 10:9, 11 12:20 22:18,21
**accounts** 8:22 22:9 26:16,23
**acquire** 14:24

**action** 28:7
**actual** 8:18
**address** 5:16
**advice** 7:23
**advisor** 7:13,14, 18 23:6
**Alleging** 25:21
**amounts** 24:1
**Angeles** 5:15
**approach** 24:25
**approached** 13:11,18 16:25 17:1,4 18:2,7,10 25:6
**April** 26:6
**Arizona** 4:1 13:10
**Asante** 6:9
**assume** 4:17
**attorney** 12:12 24:11,19
**audible** 4:21
**August** 26:5
**authorization** 25:14
**authorize** 24:5,8
**Avenue** 5:17
**aware** 7:25 25:17

**B**

**back** 12:4 14:25 18:6 21:17
**Baker** 9:12,15,18, 20 12:9,10 14:23 25:2 28:11,14
**bank** 22:5,9 26:23
**banking** 5:24
**believed** 26:22

**benefit** 26:20,25
**Berard** 7:2 17:13 19:6,9 22:11,12
**bit** 10:13 26:9
**black** 23:20,22
**Boston** 7:22
**bottom** 23:25
**break** 4:25 5:2
**briefly** 21:13
**brought** 21:16
**Bruins** 7:22
**Bryan** 7:2 17:13 19:6,9 22:11,12
**business** 26:25

**C**

**California** 5:17
**call** 14:12,21 15:14 24:9
**called** 4:5 14:12, 14,15 15:11,12 21:14,15
**Canada** 6:7
**case** 9:18 12:12
**CD** 28:15
**change** 27:3
**charges** 25:18
**Charles** 23:14 24:6,11,15,22
**checked** 23:3
**children** 5:10,12
**civil** 27:24 28:7
**claims** 27:24
**coach** 5:7
**companies** 26:19
**conceal** 27:1

**concerned** 27:6
**concluded** 28:17
**condensed** 28:14
**connection** 27:24 28:3
**Constantine** 26:7,12,17,21,24 27:18,20,23
**contact** 14:9 24:11
**contacted** 13:23, 25 14:1,4 24:10
**contribute** 8:14, 17
**controlled** 26:17, 24
**controlling** 9:3,5
**conversation** 21:11
**conversations** 7:9 16:17
**copy** 18:16,25 28:13
**correct** 7:24 8:13 11:4 12:1 15:22 19:16 25:4,7,11, 13,16 27:12
**correctly** 24:13, 20
**court** 4:6,22 26:8 28:12
**cover** 18:2
**crash** 16:20
**credited** 11:9
**curious** 10:13 15:23,25 22:23

**D**

**date** 8:18 10:1 13:15,17 20:22 22:1

Kenner vs. Kaiser September 17, 2014
Deposition of William Ranford

dated 11:23

dates 24:1

days 15:5

dealings 20:14

debit 11:19

defendants 26:6, 11 27:18

defense 26:19 27:21

defraud 27:1,17

deposed 4:14

deposit 26:16

deposited 12:2

deposition 9:8 23:7 26:1 28:16

Derek 7:21

detail 15:3 16:8

development 27:25

devised 26:13

directly 18:1

disbursed 25:10

disbursement 25:15

disbursements 23:25 24:2,5,9

disclosed 9:12

discuss 21:10,15

discussion 21:17

distributed 8:12

District 25:18

diverted 26:23

document 9:11, 23,24 10:1,11 23:10,12,15,21 24:14,22

Doe 26:15

dollars 22:18 27:4

Drive 13:10

due 16:4

duly 4:5

E

Eastern 25:18

electronic 28:15

electronically 18:24 19:2,3

email 19:4

emails 20:16

entities 26:16

entry 11:6,12,22 12:5

estate 6:20 26:18 27:25

Eufora 10:18,20, 24 11:3 12:19,25 27:12 28:6

evidence 25:3

exact 13:17 19:21 20:22 22:1

EXAMINATION 4:9

examined 4:6

exchange 20:8

exclusively 19:17

executed 26:13

Exhibit 9:8 23:7 26:1

explain 7:6 15:1, 17 16:6 18:8

F

fact 26:21

failed 28:1

fair 4:19,20,23 5:2 16:13

falsely 26:17

familiar 10:18,20 11:1

fax 19:4,5

faxed 24:13,16, 18,22

February 27:17

file 19:1

final 12:20

financial 5:23 6:12 7:13,14,18, 23 8:22 23:6

find 16:12 18:25

finish 13:13 21:4, 5

flip 11:21

focused 23:5

forged 25:21

frame 14:3

fraudulently 26:14

fund 8:1,4,8,12, 15,20,24 9:4,16 10:10,19 12:15,18 13:3,6,8 26:19 27:11,21,22

funding 13:13

funds 12:18 14:23,25 15:2,6 18:2 24:12,15,23 26:18 28:5,7

G

gave 8:19 16:23 23:1

Global 7:25 8:4,8, 11,14,20,23 9:3, 16 10:10,19 12:15

13:3,5,8 27:11,22

Golf 13:10

great 15:3

GSF 27:22,23

H

handling 14:24

Hawthorne 5:17

helping 13:12

hereinafter 27:22

hockey 7:7,10 23:5,6

Hormovitis 26:12 27:19

house 13:9 14:18 15:2,5,8,18 16:19, 21 17:1 21:3,6 23:1

hundred 22:18 27:4

I

idea 19:22

identification 9:9 23:8 26:2

identify 23:10

implemented 26:13

improperly 25:22 26:23

including 26:14

incorrect 10:24

index 28:15

indicted 25:18,24

Indictment 27:2

individual 21:18

induce 26:14

information 11:1 23:20

informed 14:22

institutions 5:24 6:3,6,12

interested 13:12

interests 18:11

International 23:14

invest 26:15 27:20

invested 6:21 8:6 26:18

investing 8:7

investments 27:25

investors 26:14, 27:20

investors' 27:25

involved 6:20

involving 28:4

issue 15:20 19:17

issues 13:23 14:22 15:24 16:5, 6 21:16

J

Jane 26:15

John 6:19 15:5 17:2,14,15 18:1,5, 13 19:10,14 22:12 26:15

Judah 5:17

July 11:23

June 11:6,12 12:5,8

K

Kaiser 6:19 15:5 17:2,14,15 18:1,5,

Kenner vs. Kaiser September 17, 2014
Deposition of William Ranford

13 19:10,14 22:13

**Kenner** 7:12,20
12:14,22 13:11,18
14:1 16:24 17:21,
22,23 18:9,10,18
19:15 20:9,17
21:1,11,14,15
22:4,14 24:10,17,
25 26:6,11,17,21,
24 27:7,18,20,23
28:2

**Kenner's** 13:5
22:9 25:12,17

**knew** 25:25 26:22

---

**L**

**Lane** 10:7

**late** 7:15

**LAVONIER** 9:10,
14,17,19,22 23:9
25:5 26:3 28:9

**learn** 13:9,20

**learned** 13:22

**legal** 16:4,6 26:19
27:21

**lend** 18:7

**lent** 21:23

**letter** 10:3,5

**litigate** 27:24

**litigation** 28:3

**live** 5:14

**lived** 5:19,21

**loan** 21:20

**loaning** 19:7,13
20:3,6,9 21:8,18
25:1,8

**located** 5:25

**locations** 6:10

**long** 5:19,21 6:22

**Los** 5:15

---

**M**

**make** 23:3 27:6

**March** 10:2

**marked** 9:8 23:7
26:1

**market** 16:20

**married** 5:8

**matter** 15:13

**matters** 21:15

**meantime** 16:15

**meet** 7:20

**messages** 20:8

**met** 6:23,24 7:4

**Mexico** 8:6,7,12
10:22 28:1,4,8

**minute** 24:24

**minutes** 17:18
27:10

**Misstates** 25:2

**money** 5:25 6:2,
13 8:6,7,11,14,17,
23 10:10,14,17,21
11:2 12:23 13:24
15:15,18 16:2,12,
16 18:8 19:7,13
20:3,6,9 21:2,4,8,
16,18,20,25 22:3,
6,9,15,24,25 23:2
25:1,8,10,22
26:15,16,23 28:3

---

**N**

**names** 6:5

**nods** 4:23

**Northern** 9:1

**note** 15:4 16:10,
11 17:1,2,7,13,16,
23 18:3,4,11,14,
17 20:18

**number** 23:16

---

**O**

**Objection** 25:2

**occurred** 15:8
21:10

**occurring** 12:15

**offer** 17:23

**offered** 17:24

**order** 21:4 24:23

---

**P**

**Paradise** 13:10

**paragraph** 26:4
27:2,15

**part** 27:16

**pending** 5:1

**period** 23:18

**periodically**
16:22

**person** 12:12
14:10 18:23 20:5,
15,21

**personal** 26:25

**personally**
17:15,20 18:3,13
23:22

**Phil** 7:12,20
12:14,22 13:5,11,
18 14:1 16:24
17:21,22,23 18:9,
10,18 19:15 20:8,
15,16 21:1,11,14,
15 22:4,9,14 23:6
24:10,17,25
25:12,17 26:6,11
27:7,18 28:2

**Phoenix** 4:1
16:20

**phone** 14:11,12,
21 20:14 24:9

**plan** 21:5

**play** 7:7

**played** 7:21

**player** 23:5

**portion** 26:22

**power** 24:11,19

**present** 21:7

**primarily** 27:24

**prior** 9:12

**privately-held**
26:19

**problem** 15:1

**proceedings**
14:24 28:16

**process** 24:21

**profession** 5:6

**Professional** 5:7

**project** 12:19
13:14 19:18,24
20:10,17 21:4,5
25:1 27:12 28:4

**projects** 10:22
25:23

**promissory** 15:4
16:25 17:2,7,12,
13,16,22 18:3,4,
11,14, 20:17

**property** 13:12,
20,22 17:10 19:8
21:21 22:19 28:8

**proposed** 21:5

**protect** 18:11

**provided** 7:23
18:16,19

**purpose** 8:3

---

**Q**

**question** 4:18
5:1

**questions** 4:16,
17,21 10:16 16:1
28:10

---

**R**

**ran** 21:3

**Ranford** 4:4,13
11:7 23:15

**read** 12:6 23:12,
16 26:4 27:14
28:11

**Reading** 27:2

**real** 6:20 26:18
27:25

**reason** 9:15

**receive** 20:16

**received** 10:9
11:17,18 12:20
18:4 19:1 22:17

**receiving** 15:6

**recollect** 8:18,21
9:24 16:9 18:21
20:12,19 22:10

**recollection** 6:18

**record** 4:12

**records** 22:2

**release** 24:23

**released** 14:23
24:12,15

**Relevant** 9:18

**remember** 8:19
13:15,16 14:3,6
18:19,22 19:19
20:20,23 21:1,13
22:1,5,8 24:13,20

**renovations**
19:7 21:21

**rent** 5:20

**repairs** 19:7
21:21

**rephrase** 17:5

Kenner vs. Kaiser September 17, 2014
Deposition of William Ranford

**reporter** 4:6,22 26:8 28:12

**represented** 27:21

**resell** 21:5

**response** 16:3

**Richards** 10:4

**rink** 7:10

**Robert** 10:7

**role** 13:2,4,5,7

---

**S**

**sale** 14:18

**Sanderson** 7:21

**scheme** 26:13 27:1,16

**Schwab** 9:1 22:7 23:14,15 24:6,11, 15,22

**sell** 16:18

**send** 21:25 22:6 24:14,15

**September** 4:1

**Settlement** 7:25 8:4,8,12,15,20,23 9:4,16 10:10,19 12:15 13:3,6,8 27:11,22

**shrugs** 4:23

**sign** 24:14 28:11

**signatures** 25:22

**signed** 15:5 16:10 17:2,3 18:5, 16

**similar** 10:11

**Slow** 26:8

**small** 26:18

**sold** 13:21,22,24 15:6,9 16:19

**solicited** 27:19

**speak** 12:22 19:6, 10 20:5 22:11,14

**specifically** 15:14,16

**spending** 22:24, 25

**spent** 10:14,17

**spoke** 12:14,24 19:15,20,22 20:1, 20 21:7

**spoken** 6:25 17:19 19:14 22:12

**state** 4:11 20:23

**stated** 10:21

**statement** 23:18

**statements** 4:22

**stating** 26:17

**substantial** 26:22

**suggested** 18:3, 10

**supervised** 26:13

**sworn** 4:6

---

**T**

**talk** 14:9,17

**talked** 19:9 21:12 28:6

**TD** 6:7

**teammate** 7:8

**Technically** 7:5

**testified** 4:7 27:10

**text** 20:8

**things** 14:16

**thinking** 27:3

**Thomas** 12:9,10

28:12

**thought** 10:23

**thousand** 22:18 27:4

**tie** 9:20

**tied** 16:4

**time** 9:2 11:10 12:24 14:3,19,20 16:11 19:19, 24:21 28:10

**times** 22:13

**today** 4:16 9:13

**told** 15:20 22:25 28:2

**Tom** 14:23

**Tommy** 26:6,11, 12 27:18,19

**top** 10:6 11:22 23:12

**Trust** 6:7 9:1

**truth** 26:20

**turn** 11:5

---

**U**

**unable** 13:13

**understand** 4:18,23 10:25 17:4

**understanding** 8:3,5 11:2 12:11 13:2 15:4 28:5

**unrelated** 26:25

**update** 14:15

**updated** 16:22

**updates** 16:23

**updating** 15:13

**upgrading** 23:1

---

**V**

**Valley** 13:10

**ventures** 27:1

---

**W**

**wife** 21:12

**William** 4:4,13 11:7 23:15

**word** 28:15

**written** 18:4

---

**Y**

**year** 5:22 14:6 19:22,24

**York** 25:19