September 30, 2019

The Honorable Judge Bianco
U.S. District Court – EDNY
100 Federal Plaza
Central Islip, NY 11722

Your Honor,

In lieu of the government's reluctance to support their position of loss beyond, "*just because…*" thru summary submissions, there are several significant cases that lend precedent to the calculation of loss and the resulting effects on restitution, forfeiture and sentencing for *equity investors*.

*United States v. Rutkoske*, 506 F.3d 170 (2d Cir 2007), and

*United States v. Evans*, 744 F.3d 1192; 2014 U.S. App. LEXIS 4490 (10th Cir 2014) (*referencing Turk*) (*Evans I – with Justice Gorsuch on appellate counsel*)…and
  - *2nd appeal for improper calculation (again) -- United States v. Evans*, 677 Fed. Appx. 469; 2017 U.S. App. LEXIS 1942 (10th Cir 2017) (*Evans II*).

Both cases, on appeal, confirmed critical issues related to the current case. *Rutkoske* affirmed, "a key component of the guidelines calculation is the amount of loss caused by the wrongful conduct."   Non-fraud elements of an investment are not considered as part of loss calculation.   And *Evans*, after two appeals was released "time served" due to repeated miscalculation of loss, because there was no fraud in the inducement of the investments, and the district courts should have inquired into what loss, if any, the investors would have suffered if defendant had "come clean" regarding the status of the investments.   The district courts should have considered the effect and foreseeability of non-fraud factors in determining loss in an *equity investment*, where the shareholders/investors assume the risk of their investment.

  - In the instant case, Kenner is focusing on the Hawai'i investment "object" by the government; except where the same calculation theories obviously apply to other aspects of the instant case.

*Jowdy loan…*
The Hawai'i loan to Jowdy has been *verified* by 25 of the 26 Hawai'i equity partners, while the unrealized return of the Hawai'i partners' asset (the Jowdy loan repayment) is solely based on Ken Jowdy's criminality, his desire to never repay

anyone (Kaiser's shocking February 2019 revelation to the court – *ECF No. 628 at 4*) and the FBI agent's protection, since Kenner's June 24, 2009 FBI proffer (over ten [10] years ago).

Kaiser explained to this court in February 2019 (*ECF No. 628 at 4*):

> *"'the hockey guys will never see a dime' because they said he [Jowdy] was a crook".*

*The loan is duly authorized by the corporate By-Laws...*

**The Little Isle 4 By-Laws:**

*Article II. Purpose*

> *Little Isle IV, LLC is an organized group of investors established to <u>invest in a</u> <u>**series of opportunities**</u> review[ed] by the Managing Member [Kenner] and deemed in the best interest of the partnership at all times.*

> *At the sole discretion of the Managing Member, Little Isle 4, **may participate** **as a lender** if deemed by the Managing Member to be in the best interest of the LLC.*

> *The Managing Member, <u>at their sole discretion</u>, can engage in outside ventures deemed to be in the best interest of the LLC, <u>including but not limited to other</u> <u>Private Equity Funds and</u> **Lending Opportunities**.*

*Constantine consulting payments...*
Regarding (1) the consulting agreements (with Constantine and 16 other hard moneylenders) – (2) hiring employees – (3) hiring 3rd party vendors [for legal, architecture, engineering, planning] etcetera – the Little Isle 4 By-Laws also expressly granted those rights to the Managing Member (Kenner at the time).

> *Section 5.   The Managing Member [Kenner], at their sole discretion, **can** **compensate any and all members and non-members for their roles in the** **LLC**, including but not exclusive to the Managing Member.*

- The government has also repeatedly (post-trial) refused Kenner's assistance in recovering the funds that resulted from the egregious Jowdy frauds (*ECF No. 653, 654*).   Although there is a component of risk associated with the duly authorized activities of the LLC (per its By Laws – and the July 2006 Joint Venture letter

authorization), the available collection of the Jowdy loans (*government-forfeiture-44*) has been disadvantaged and obstructed solely by the government's non-participatory actions (still unknown to the underlying investors).

In support of *Rutkoske*, the Second Circuit also opined that as a result of the complexities in *United States v. Ebbers*, 458 F.3d 110 (2d Cir 2006) – "'**[t]he loss must be the result of the fraud**.**"** *Id.* at 128.   "**[l]osses from causes other than the fraud must be excluded from the loss calculation**."   *Id.*

At the time of the initial equity investment by Hawai'i partners, Nolan (in 2003), Rucchin, and Sydor (in 2004), they were all involved in the land acquisition phase of the project *before* the Jowdy loans commenced (authorized, known, or not).   The other two alleged Hawai'i victims (Berard and Peca) joined the Hawai'i partners in 2005, while the Jowdy loans were in progress.  All six Hawai'i investors were also members in the Jowdy-Mexico projects contemporaneously.   Ironically, both Peca (2011 SDNY Grand Jury) and Berard (2009 voluntary arbitration testimony) specifically confirmed that they were involved in the authorization of the Jowdy loans.   Michael Peca explained to the 2011 SDNY Grand Jury (*SDNY Tr.30-31 -- 3500-MP-5*):

> *"**The [Little Isle 4] Capital account was loaned to Ken Jowdy**, our business partner, so there is no need <u>at the time</u> to be worried about anything.  **The money was loaned to Ken Jowdy to basically help some of the purchase of the Cabo property so we can get the funding**.  <u>And then it was supposed to [be] a short-term loan.</u>"*

In the 2009 *Nolan v. Kenner* arbitration[1], Bryan Berard specifically confirmed (1) his knowledge of the Jowdy loan, (2) its 15% interest rate, and (3) that the <u>Hawai'i partners company would pay the monthly LOC payments</u> (although Kenner was charged in Counts 7 & 8 with exactly what Berard and Kristen Peca testified they expected Kenner to do) (*ECF No. 668 at 357*).   Berard re-affirmed his belief that the Hawai'i partners were paying the Line of Credit ("LOC") interest payments to the FBI (*3500-BB-1-r at 1*):

> "*Kenner had to pay interest on the Hawai'i property until the Lehman Brothers' funding came through.   The LOC would be used to pay the interest on the loans against the property*."

---

[1] It should be noted that Berard's voluntary 2009 testimony took place only two months

*2011 SDNY Grand Jury...*

In 2011, FBI agent Galioto subpoenaed Michael Peca (along with Hawai'i partners Turner Stevenson [*ECF No. 668 at 137*] and Darryl Sydor [*ECF No. 668 at 137-38*]) to give testimony in a SDNY Grand Jury -- *versus Kenner*.   At the time of Peca's 2011 Grand Jury testimony, two years had passed since Kristen Peca allegedly received the Northern Trust Bank default letter via FedEx (when she had "*to sign for it*") while in Ohio, the predicate to her fabricated "*shocked*" testimony in 2015 (*Tr.710-711*).   Her fabrication was a logistical impossibility, *because* the default letter was actually mailed and addressed to the Peca summer home in Getzville (Buffalo), New York (*GX-2115, GX-2116*), via FedEx and certified mail (no forwarding address). Thus, if Michael Peca were actually duped by Kenner and two more years had passed with no Kenner communication "*in months*" per Kristen Peca (*Tr.712*) with Kenner "*hiding in a cave*" (*Tr.712*), Michael Peca clearly explained the Kenner transparency of the Jowdy loans to the Grand Jury when he joined the Hawai'i partners and acknowledged the Jowdy loans during "secret" testimony (*ECF No. 668 at 108-109, 118*).   Michael Peca never alleged any fault to Kenner.   Four years later, Michael Peca failed to maintain his "*I don't remember anything*" testimony about the Jowdy loans during his 2015 cross-examination, when he confessed to his inherent knowledge of the loans (*Tr.498-99*) and his accurate 2011 testimony; recognized by the court for his re-canting (*ECF No. 501 at 9*); removing Peca as a victim of anything to do with the loans he approved as part of the "*group*".

The government's problem in the instant case is that all of the *equity* investors were part of the conference calls (*ECF No. 707 at 30-31*) that approved the loan agreement that *John Kaiser confirmed* to the FBI on October 19, 2010.  Kaiser proffered that he personally had five meetings with Jowdy to confirm and re-confirm Jowdy's intentions with the loan agreement (*3500-JK-1-r at 2, 3, 10*).   The first meeting between them was documented by the FBI raw notes as taking place in 2003 (*Id. at 2*), at least a year *before* the loans began.   This is the same agreement that Bryan Berard and Michael Peca gave unambiguous testimony about years before their attempted revisionary statements to the 2015 EDNY court.

In addition, the "foreseeable" harm aspect is troubling for the government, because the 2004 Little Isle 4 By-Laws (the corporate governing documents) authorized "lending" (*ECF No. 668 at 78*) and normal business operations, such as paying employees and non-employees for services rendered (*ECF No. 668 at 75*).   In fact, incrementally, the operating agreement for Big Isle 5, the borrower of the 2005 Centrum loan funds, was turned over by Owen Nolan as *Arbitration Exhibit No. 82* during his 2009 arbitration with Kenner -- thus, Nolan had possession, like all of the

4

Hawai'i partners, of the corporate transactional documents.   The Big Isle 5 operating agreement was signed off by Centrum as part of their 2005 lending protocols.   That operating agreement also authorized the use of corporate funds for "lending" (*ECF No. 668 at 323*).

- Why would archeology-consulting payments be authorized and non-conspiratorial if hard money lending consulting payments were part of a conspiracy to defraud?  The double-standard is not defensible by the government.

*Non-victim John Kaiser...*

John Kaiser is *not* a victim of anything in the instant case.  But -- Kaiser gave voluntary 2009 arbitration testimony to confirm the loans to Jowdy and his personal solicitation of his friends & family funds in 2005 (of which he was fully repaid $1,176,000 for the $1,100,000 of loans as part of the August 2006 joint venture distributions – fully documented in the Kenner forensic submission) (*ECF No. 668 at 190-91, 324*).[2]  *Kaiser even confessed* to his previous lies about "*no knowledge*" of the Jowdy loans during cross-examination (*ECF No. 668 at 187-88*); *impeaching himself.*   In addition, Kaiser confirmed to the FBI during his October 19, 2010 proffer that there was, in fact, an "*agreement*" with Jowdy to borrow the money (*ECF No. 668 at 78-79*) (*3500-JK-1-r at 3*) (in spite of the government's grandstanding throughout trial that the loan and agreement were "*bogus*" (*Tr.5708 (2x), 5709*), "*phony*" (*Tr.4597, 4598*) and "*supposed*" (*Tr.5707-5708*) and a Kenner cover story to "*steal the Hawai'i money and buy his piece of the Cabo project*".[3]

Kaiser could not remember what he was supposed to forget to protect Jowdy and assist in the prosecutorial theme versus Kenner.

- Why should non-active, passive-equity investors be able to identify any specific corporate details (thru a "memory test") if the actions by Kenner and the Hawai'i partners management team (including Manfredi, Kaiser and Kenner) acted

---

[2] Kaiser's 2009 voluntary testimony verified Kenner's veracity and transparency to him and the other Hawai'i equity investors at all times – specifically about the Jowdy loans.  The testimony was *after* Kaiser would have been duped by Kenner repeatedly (*Tr.983, 1001-04, 1020-21, 1413-14*); making Kaiser's 2015 fabrications even more apparent, notwithstanding his 2011-2017 employment by Jowdy to protect him –followed by his "*shocking*" and revisionary letter about Jowdy to the Court *after Jowdy fired him*, all washed-up for value to the Jowdy cabal and Galioto (*ECF No. 628*).

[3] The court is aware that the government *debunked* their own lies about Kenner's alleged thefts when they offered *government-forfeiture-36* and *government-forfeiture-44* during the forfeiture phase of the Kenner case.

within the authorized scope and parameters of the Little Isle 4 By-Laws at all times?  And – if the assets of the Jowdy loan have been titled to the Little Isle 4 partners since inception (never diverted for ulterior means) (*3500-KJ-2 at 24-25*), what was the underlying fraud that caused pecuniary harm?

*Reasonably foreseeable pecuniary harm …*
Under U.S. Sentencing Guidelines Manual § 2B1.1 (b)(1) application n. 3(A)(i), the "actual" loss for which a defendant is liable is the reasonably foreseeable pecuniary harm that resulted from the offense (alleged as the concealment of the Jowdy loans). Furthermore, a defendant may receive a credit against the loss for which he is responsible in the amount the victim has recovered at the time of sentencing from disposition of the collateral (*ECF No. 653, 654*), or, if the collateral has not been disposed of by that time, *the fair market value of the collateral at the time of sentencing (emphasis added)*. § 2B1.1 (b)(1) application n. 3(E)(ii).

*Nolan and Juneau are non-victims…*
The court must note that Nolan and Juneau signed 2008 settlement agreements with Jowdy.  Jowdy transferred 1% of his Cabo equity to Nolan and Juneau (*Tr.354*) in exchange for a release of any and all wrongdoings related to Jowdy.  This clearly includes any damage that could be deemed "inappropriate" for the 2004-06 Hawai'i partners' loans to Jowdy.  Both Nolan and Juneau have been fully recompensed and cannot be deemed victims of anything related to the Hawaii project "object". Furthermore, Juneau was fully bought out of the Hawai'i deal in 2007, further releasing him from harm (or victim status).  Neither Juneau nor Nolan are involved in any other "object" allegations in the superseding indictment (*ECF No. 214*), thus are non-victims and *cannot* contribute to loss, restitution or forfeiture calculations; under *Evans* and *Rutkoske*.

- The plain language of U.S. Sentencing Guidelines Manual § 2B1.1 (b)(1) application n. 3 states clearly that the credit against loss is the actual amount recovered or recoverable at sentencing (*ECF No. 653, 654, 667*), without reference to the foreseeability analysis.
- The government has repeatedly referenced in court Jowdy's $220,000 monthly developer fee from Danske Bank -- and his Mexico home as immediately recoverable assets against the increasing loan value for the Hawai'i equity partners – thus the "borrower" (*3500-KJ-2 at 24-25*) is not insolvent.
- *Government-forfeiture-44* confirmed the actual Hawai'i-Jowdy loans by Jowdy's attorneys and IRS Agent Wayne (*Forfeiture Tr.66-67*), regardless of the government's disgust and ignorance with their own forensic accounting *completely vindicating Kenner from stealing the Hawai'i funds*, post-trial

(regardless of their obtuse summation lies to unfairly influence the jury -- *Tr. 5996, 5721, 5722-23, 5744-45, 5990, 5991-92, 5707-5709*).

- o *Their own forensic work confirmed their trial lies*.  And apparently, "Kenner did *not* steal the Hawai'i loan money to buy his Cabo san Lucas equity".  It was just one of the voluminous frauds on the Court and jury; *left uncorrected*.

*United States v. Turk*, 626 F.3d 743; 2010 U.S. Ap. LEXIS 24427 (2d Cir 2010)... Many courts reference *Turk* related to loan cases, but that is not the case here.   All of the investors are equity partners (wholly relating to *Rutkoske* and *Evans*).

*Clear Jowdy cabal and Tom Harvey criminality overlooked...*
The *Turk* Court referenced lies that *Turk* had represented to his investors, such as "*telling the investors that they held recorded first mortgages*".  Ironically, this is the exact criminal cover-up that Jowdy and his attorney, Tom Harvey, perpetrated on Kenner and Kenner investors since 2002; *exactly* (*ECF No. 667 at 23-24*).   Kenner has delineated this Jowdy cabal crime and cover-up for years.   It has received the blind-eye of the government and FBI for "unknown" reasons; specifically considering it was the beginning of their 20 years of RICO activity -- and proffered specifically in Kenner June 24, 2009 FBI interview.

*The underlying knowledge of the Jowdy loans...*
Only four of the Hawai'i equity partners (Nolan, Rucchin, Berard and Sydor) maintained thru testimony in 2015 that they were not aware of the Jowdy loans. This was simply inconsistent with their-own specific, prior statements; *ironically all forgotten in harmony*.   The prior knowledge was confirmed by: (1) Berard's 2009 arbitration testimony, *supra*; (2) Sydor's 2011 SDNY Grand Jury testimony, *supra*; and (3) the fact that Sydor, Rucchin and Berard all signed off on their litigation participation versus Jowdy in both the 2008-09 Arizona litigation to recover their Jowdy loan funds (*ECF No. 668 at 28-29*) and 2009-2010 California litigation to recover the same (*ECF No. 668 at 29-30, footnote 18-19*) -- *thru independent counsel*.

Only Owen Nolan is unique in his previous accounts.   Nolan had given 2009 arbitration testimony that he could not recall ever reading a document, thus his-own willful ignorance cannot be weaponized as "concealment".[4]

---

[4] [Nolan May 2009 arbitration -- *Day 1 at 105*]:
> *Q:  Is there ever an agreement in your life that you've ever read that you can identify here today? Have you ever taken the time on your own to read?*
>
> *A [Nolan]:  I can't think of any offhand.*

*Rutkoske* and *Ebbers* do confirm that extrinsic factors can also, and many times have, causal effects on the underlying values of the investments (like the non-fraud allegations in the instant case).   The Hawai'i partners suffered a total real estate property loss when Lehman Brothers filed for bankruptcy in September 2008 and the real estate markets were decimated within that same year from the global real estate recession.

- Was the global real estate recession or the Lehman Brothers bankruptcy Kenner's doing?

In fact, it points out that the last, remaining asset of the Hawai'i partners **is** the Jowdy loans (*government-forfeiture-44*).   Both *Rutkoske* and *Ebbers* defeat the

---

[Nolan arbitration May 2009 -- *Day 1 at 109-110*]:

> *Q: You've testified that you've never read a document <u>ever</u> that you can think of sitting here today before you signed it.   At any time in your lifetime has someone advised you to take the strategy of never reading a document when you sign it?*
>
> ***A [Nolan]:  No.***

[Nolan arbitration May 2009 -- *Day 5 at 1049*]:

Judge Meyerson & Nolan's attorney (Meeks):

> ***Mr. Meeks [Nolan's attorney]****:  He [Nolan] admits that's his signature. † His testimony is he wasn't aware.*
>
> ***Judge Meyerson****:  So somebody signs a statement that says, **Please grant Philip A. Kenner access to a line of credit for direct deposit into Little Isle 4**.   Doesn't somebody have to take responsibility for that?*

† Nolan <u>confirmed</u> signing his **one-page** *Letter of Authorization* with Northern Trust Bank to allow Kenner access to his LOC for the Little Isle 4 capital account in October 2004 (*See Bates Stamp -- TNTC000048*).

*See Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A. See also PaineWebber Incorporated v. Bybyk,* 81 F.3d 1193; 1996 U.S. App. LEXIS 8728. ("...a party's ***failure to read*** a duly incorporated document ***will not excuse the obligation to be bound by its terms***"); *See also Ecoline, Inc. v. Local Union No. 12 of the International Association of Heat and Frost Insulators and Asbestos Workers, AFL-CIO,* 271 Fed. Appx. 72; 2008 U.S. App. LEXIS 6390, ("In general, individuals are charged with knowledge of the contents of documents they sign" and "a person who signs a written contract is bound by its terms regardless of his or her ***failure to read*** and understand its terms".)

government claims of total loss and Kenner's responsibility for any of the real estate losses -- with the residual Jowdy loans still collectible, simply obstructed to the government's potential guidelines, forfeiture and restitution benefits – *ECF No. 654*.

The court should note that at the time of the Hawai'i loans, Michael Peca confirmed to the 2011 SDNY Grand Jury that he and the remainder of the Hawai'i partners had no concerns (*ECF No. 668 at 108-09*):

> *Q: How much did you put into Little Isle 4?*
>
> *A [**Michael Peca**]: "$100,000 cash investment that was going towards that. Then we had lines of credit. I had one out for $1.7 million that was going to be used at the time. Here's where a lot of the cross starts to happen. A short-term loan to I. I, because at the time I – we hadn't gotten the lending from I Brothers yet. We made a short-term loan until the lending came in. Once the lending came through they were to pay back the loan, I think in the neighborhood of five-and-a-half million dollars, on the closing. It was never paid back. And then communication basically seized at that point from him [I]. That was kind of the whole sticking point as far as me and the other guys with I. I.*
>
> *The 1.7 along with the $100,000 and whatever else put in this a capital account, Little Isle 4, I believe. <u>The Capital account was loaned to I I, our business partner, so there is no need at the time to be worried about anything. The money was loaned to I I to basically help some of the purchase of the I property so we can get the funding. And then it was supposed to [be] a short-term loan</u>."*

*Evans I...*

In *Evans I* (under the appellate review of Judges <u>Gorsuch</u>, Kelly, and Holmes), the Court recognized that the district court relied on *United States v. Turk*, 626 F.3d 743 (2d Cir 2010), in stating that even if extrinsic factors were partially responsible for the eventual bankruptcies of the properties, the only loss that needed to be foreseeable to Mr. Evans was the loss of the "unpaid principal."  I R 90.  The court found irrelevant the fact that there was no fraud in the inducement of the investments.  IV R. 112-13.   Mr. Evans argued that the district court erred in calculating loss because there was no fraud in the inducement of the investments. *Aplt Br. 34-38.   <u>The Appellate Court agreed</u>.*   In the instant case, the court should have to account for the fact that it has never been alleged that there was fraud with respect to the business model to acquire and develop land (irrespective of the contentions towards the broad authorizations in the Hawai'i partners By Laws

authorizing "lending" and "payments to 3rd party vendors" from the government on behalf of four Hawai'i equity investors who routinely "*did not read*" the critical documents presented to them by Kenner for their investments) (*Tr.3157-Berard, 1164-Kaiser, Sydor 2011 SDNY Grand Jury at 30*).

In *Evans I*, the district court should have inquired into what loss, if any, the investors would have suffered if Mr. Evans had come clean regarding the status of the securities [or Jowdy loans, assuming they were concealed, yet authorized]…".  This requires a determination of the value of the securities at the time the fraud began, which is the correct starting point for loss calculation in this case.   The *Evans I* Court opined, "**In making that calculation, the fact that the securities had lost value due to poor or unsustainable business model would not be chargeable to Mr. Evans**."

- In the instant case, (1) the "*group*" decision to lend the money to Jowdy, (2) the Lehman Brothers 2008 bankruptcy, (3) the JV partner-Lehman Brothers documented budget thefts, and (4) the global real estate recession in 2009 are *not* Kenner's fault and cannot be chargeable offenses.

Next, Mr. Evans argues that the district court should have considered the effect and foreseeability of *non-fraud factors* in determining loss.  *Aplt Br. 38-41*.  The Court opined, "*Again, he is correct*".   The Court continued that the district court relied on *Turk* in stating that the receiver's actions and market conditions were irrelevant to determining actual loss.   The Court opined, "*that reliance was misplaced*".   Because -- *Turk* is related to lenders, and the *Evans* case involved equity investors -- *indistinguishable from the instant case*.

*John Kaiser assumes Managing Member role in 2007 (via written agreement)…*
In the instant case, John Kaiser assumed the Managing Member role in the Hawai'i partners (Na'alehu Ventures 2006, LLC) in 2007 thru a documented and signed transfer; not 2008 as Kaiser testified to (*Tr.1164*).   Comparable to Evans, the Court opined that "on remand, the district court must determine whether Mr. Evans fraud was a 'but for' cause of the investors' loss, and whether is was the legal cause" [with the Jowdy loans fully authorized by the corporate By Laws and verified by 22 of the 26 Hawai'i partners *independently* and *prior* to the 2015 testimony].

In considering the latter (legal cause), the court must account for the effect and foreseeability of the non-fraud factors including actions of the receiver [akin to Kaiser's 2007 Managing Member role initiation] to prolong the investments and the effect of the housing market on the value of the securities and the underlying properties [or in the instant case, the collectability efforts ignored by Kaiser after

securing a job for himself and Berard and abandoning his Managing Member role and responsibilities to the Hawai'i equity partners].  The Court should also note that the August 2006 Hawai'i joint venture removed Kenner from the active Managing Member role, replacing him with the best-friend of the Lehman Brothers lender, Alan Worden of Windwalker.[5]   Neither of these factors, and their resulting issues, can be attributed to Kenner.   The district court should determine in the first instance the proper assignment of the burden of production regarding these non-fraud factors.  See *United States v. Gordon*, 710 F.3d 1124, 1163 n.40 (10th Cir 2013).

After the Managing Member change in 2007 from Kenner to John Kaiser, Kaiser held the destiny of the Hawai'i partners' assets and Jowdy loan collections in his hands. Kaiser's years of non-action (2007-2011) and his 2011-2017 employment by Jowdy (as a pay-for-play deterrent for collection actions) must be considered in contrast to Kenner's culpability of an authorized action (without *any* legal ability to continue versus Jowdy on behalf of the investors Kaiser wholeheartedly has [mis]represented for twelve years and counting) (*ECF No. 628*).

- Now, after being terminated by Jowdy in 2017, when Kaiser's anti-Kenner value had expired, Kaiser cannot get an audience with the same FBI and U.S. Attorney's office he fabricated testimony for at trial as their star-trial-witness; specifically including the astonishing denial of details in the FBI raw notes form his October 19, 2010 proffer – to protect Jowdy (*Tr.1120-22*).

The court should note that the Appellate Court noted that *Evans* for the identical loss arguments (to Kenner), restitution and forfeiture arguments, and resulting guidelines calculations, was being remanded with instructions to vacate the sentence and resentence consistent with their opinion.

The district court, on remand, failed to adhere to the appellate review.   Again, in *Evans II*, the Court opined, "the district court erred in applying the number-of-victims enhancement [although Kenner has *not more than 10* and is *not* subject to the enhancement, in contradiction to the erroneous PSR calculation; U.S.S.G. § 2B1.1(b)(2)(A)], because the government failed to prove an actual loss.  The *Evans II* court opined, "[w]ithout an actual loss, there could be no victims".  As such, the *Evans II* Court remanded Evans for the district court to vacate defendant's sentence, resentence defendant without any loss or victim enhancement (reducing the

---

[5] The post-closing Na'alehu Ventures 2006 management team (Kenner, Kaiser and Manfredi) discovered in the first year-and-a-half post-JV that Lehman Brothers had distributed over $11 million to Alan Worden (including almost $2 million in developer fees) – when the project produced *nothing but budget looting*; identical to the Lehman Brothers-Jowdy-Cabo debacle Kenner confronted for his investors, once discovered.

guidelines to 4-10 months, effectuating a "time served" re-sentence), and vacate the restitution order.

*Unconventional fund tracking (because the government will not do any of it)...*
The total amount of equity funds that (if forensically traced from the Jowdy loans "in reverse" thru the Little Isle 4 capital accounts to the original source of the investments)[6] Jowdy received from the alleged victims in the superseding indictment (*ECF No. 216*) is **$1,315,000**.   Thus, the loss can never be more than that amount, prior to the court's determination of what Peca, Berard, Sydor[7], Rucchin and Nolan knew (or agreed to, remembered, and forgot by 2015 thru the haze of CTE, "memory loss", or undue influence to forget what they previously knew and testified to); notwithstanding their equity ownership and associated risks, per *Evans*.

Peca's re-canting about "no knowledge" (*Tr.422-424*) and affirmation of his "*truthful*" (*Tr.498*), previous 2011 SDNY Grand Jury testimony deflates the government prognosis that "Kenner concealed the Jowdy loans" from all of his investors (when the court knows only four of the 26 Hawai'i partners corroborated that they "*no longer remember*" what they previously testified about).   The forensic analysis of what the aforementioned Hawai'i partners invested and traced to the Jowdy loans is represented object-by-object and investor-by investor in Kenner's pending forensic submission (awaiting forensic verification of the underlying calculations).

- Nevertheless, *Evans II* confirms that as *equity* members of the Hawai'i partners, the investors assumed all of the equity risk of the LLC, because the actions managed by Kenner were at all times under the authorization of the Corporate By Laws; simply "*misremembered*" by four of the 26 investors in 2015 (11-12 years after the conference call decisions were made "as a group") (*ECF No. No. 668 at 287-290*), and not chargeable to Kenner for loss purposes (and the resulting guidelines, restitution and forfeiture).

---

[6] This reverse-forensic accounting method is highly unusual considering all testimony possessed by the government pre-trial confirmed the investors were always under the belief that their investments belonged to Little Isle 4' capital account, and not them personally once conferred (*ECF No. 668 at 108-09 [Peca], Id. at 136-83 [Sydor], Id. at 136-38 [Stevenson]*).

[7] The court should note that Sydor actually gave testimony that he thought he had $500,000 cash in the Hawai'i project and a $100,000 LOC; when it was effectively the opposite further reducing the efficacy of Sydor's CTE-laden memory failures (*Tr.2216*).

*Joint venture disclosures…*

Further exonerating Kenner thru documented transparency; Kenner and the Hawai'i partners closing attorneys disclosed the other business interests between Kenner and the Centrum lenders/Urban Expansion lenders in the Representations and Warranties email to Hawai'i partners' management team (Kaiser and Manfredi) (*Tr.1163-64*).   The identical disclosures were represented in the final joint venture agreements with Lehman Brothers and Windwalker and given to each of the investors (and signed off) as part of their July 2006 JV disclosure letter (*Tr.4317-18*) (i.e. *Tr.297 [Juneau]*).   Nothing was concealed from any investor or the ten law firms that Attorney Najam confirmed to the 2009 arbitration court were involved in the 2006 Lehman Brothers-Hawai'i closing. [8]

*Constantine consulting payments were fully authorized by the corporate By Laws…*

The Constantine consulting payments that were *authorized* under the Little Isle 4 By Laws in Article IV, Section 5 (*supra*) have *no nexus* to the Hawai'i partners named in the superseding indictment.

FBI expert Petrellese confirmed $1,000,900 in consulting payments to Constantine (*Tr.3934*).   The court should note that Hawai'i partners COO, Chris Manfredi, told the FBI in October 2010 (*3500-CM-2-r at 1*) that he knew there was an agreement between the Hawai'i partners and Constantine. [9]   If the Constantine funds are

---

[8] It should be highlighted that Kaiser and Manfredi received the "Hawaii reps and warranties disclosure" email from Kenner on July 12, 2006, over one month before the August 2006 closing – which clearly laid out that Kenner had other dealings with both Centrum (original Hono'apo lender) and Constantine (Kenner's 2005-06, $386,000 loans to Eufora – and Kenner's 2006 Miami real estate transaction still pending completion) (*See "Kenner July 12, 2006 Hawaii reps and warranties disclosure email to Kaiser- Manfredi" at 3 – Bates stamp: ED-0003161-3165*).

- The closing attorneys for Lehman Brothers, Windwalker, and the Hawai'i partners were involved in the drafting of the full-disclosure.

- These final *representations and warranties* were also part and parcel to the 1800-page closing documents constructed by nearly ten (10) law firms on behalf of all the parties (as attorney Najam confirmed in his 2009 arbitration testimony – *Nolan arbitration -- Day 2 at Tr.359-61*) (*See Kenner final PSR Objections dated March 27, 2019 at 31-32*).
  *See "WW-00000001-Hawaii closing papers.pdf" – and
  See "WW-00000172-hawaii loan docs2.pdf" – and
  See "WW-00000542-hawaii loan docs.pdf"*

[9] The court should note that it again begs the *incredible* question that if Hawai'i COO Manfredi was aware of the consulting agreements with Constantine (in real time after his

forensically traced from the Jowdy loans "back" thru the Little Isle 4 capital accounts to the original source of the investments (like the Jowdy loans, *supra*), it does *not* originate with any Peca, Berard, Sydor, Nolan, or Rucchin funds (the named alleged victims).   Thus, another alleged fraud by the government fails under nexus and *Evans II*, since Kenner could have told every investor *except the five*, *supra* (in addition to the By Laws authorization) on a video recorded conference call, and the government would not and could not tie the allegations of Constantine's consulting payments to a victim in the instant case.   Some of the funds originate from Kenner, himself.   The government had 6-years pre-trial to formulate their forensic back up and convince their victims of choice.   They did not.

*Ultimately the loss calculation must be proper...*
In *Evans II*, the appellate court opined for the second time that "even if the government's interpretation were correct, the district court's "loss of equity" theory did not reasonably measure loss caused by the fraud [a.k.a. alleged concealment]." The government acknowledged that at least some of the liens [Hawai'i project activities, in the instant case] "appear to have resulted from activities outside the scope of [Mr.] Evans' fraud."  R. vol. 2 at 1724-25.   And the government has not identified evidence demonstrating that the liens resulted from fraud, as opposed to a defective business model.   See *Evans I*, 744 F.3d at 1197 (stating that a loss in value "due to poor or unsustainable business model would not be chargeable to Mr. Evans").   The government has not presented any reason to believe that the [Evans] liens would have been avoided if Mr. Evans had disclosed the cash-flow problems.

---

2004 face-to-face meeting with Constantine in Arizona – *Tr.3004*), **where are they**, since the government's star witness (John Kaiser) told the government, the FBI and the 2015 trial court that his name was *forged* on the same agreements his best-friend, Manfredi, verified in 2010 (*Tr.990-991*).

**So – where are the Constantine consulting agreements Manfredi verified?   Are there other ones?**

And – ultimately – why didn't the government admit the original "*blue ink*" versions of the alleged Kaiser-name-forgeries at trial (*GX-7004, GX-7005*), in lieu of the photocopies they recovered from Kenner's home-office (as would be expected of corporate documents) (*GX-5104*)?

Was the government terrified that if/when they told the Court and the jury that they recovered the "*original ink*" versions on the eve of trial *from Kaiser's home* (four years into Kaiser's help with the FBI and Jowdy to put Kenner in jail), the court and the jury would have laughed them out of the courtroom for recently fabricated testimony – and held someone accountable for their malfeasance criminally?  It is the only excuse...they needed "that lie" in front of the jury – but they, themselves, did not want to go to jail!!  That makes sense...

Equally, if Kenner had video recorded an August 2006 meeting (post JV closing) with the Hawai'i partners for authenticity) and vehemently expressed that the Jowdy loans were never going to be repaid, the only augmentation to the current financial dilemma would be that the Hawai'i partners, in total, could have save some LOC interest payments (of which Kenner contributed $267,000 personally and was charged [Counts 7 & 8] for making the payments that Berard and Kristen Peca told the courts and the FBI they expected Kenner to make...exactly as Kenner did). Apparently, fulfilling that corporate "expectation" was criminal and releasing the LOC collateral over a year earlier would have been "kosher".

- Peca contributed $161,345 of joint LOC payments post-JV-closing ($27,632.86 to his own LOC)...[10]
    - Kristen Peca told Kenner on her 2012 FBI seereptitious phone recordings that she expected Kenner to make the LOC payments (somehow culminating in a chargeable crime [Counts 7 & 8] – when Kenner contributed $267,000 to the LOC payments that benefitted Peca and the other Little Isle 4 members thru tax deductions in 2008).
- Berard contributed $34,000 of joint LOC payments post-JV-closing ($2,802.06 to his own LOC)...
- Nolan contributed $10,000 of joint LOC payments post-JV-closing ($10,112.60 to his own LOC)...
- Sydor contributed $0 of joint LOC payments post-JV-closing...
- Rucchin contributed $0 of joint LOC payments post-JV-closing...

Nevertheless, there is no proof, supporting or objecting, that the eventual LOC payment distributions would have been altered while assessing the best remedy for recovering the Jowdy loans (once Jowdy's attorneys and Jowdy terminated the pre-GSF settlement negotiations on May 17, 2008 – *Bates stamp: KJ7202, PK_SEC_023504*), and as Michael Peca testified to the 2011 SDNY Grand Jury and re-confessed to the 2015 trial court (*Tr.498-99*) (acknowledged by the court at *ECF No. 501 at 9*).

---

[10] With John Kaiser as the Managing Member of Na'alehu Ventures 2006 since 2007, Kaiser documented all of the incremental contributions to the company in his accounting records. Kaiser never raised criminal or civil issues to his LLC members since 2007 (12 years ago), because Kaiser and the rest of the 26 members he represented were wholly aware of the authorized activities at all times (like Kaiser and Manfredi confessed to the FBI independently in October 2010; leaving no equivocation of transparency, in real time).

The *Evans II* court, also opined that the government and district court's tainted calculations produced an erroneous number of victims, identical to the instant case calculations.  **The *Evans II* court confirmed that <u>without loss, there could be no victims.</u>**

Four-and-a-half years post-trial, only Kenner has produced an accounting of investments versus loss (a.k.a. none), with irrefutable back up.   Concurrent with *Evans II*, "[t]he government has not proven how much loss, if any, resulted from Mr. Evans fraud.  Even if the government had limited information, the court had to base the restitution order on the amount of actual loss."  *United States v. Hudson*, 483 F.3d 707, 710 (10th Cir 2007).

Ultimately, after the second appellate opinion in *Evans*, Evans was released "time served" and no restitution was ordered (as a full reduction based on equity owners and their inherent risks).  In a concurring opinion in *Evans II*, Judge O'Brien, like in the instant case disclosures, stated:

> "[Evans] adequately disclosed the risky nature of the projects to the investors and, to sweeten the deal, offered 12% per annum interest on invested funds.   That debt burden, along with other [global market] factors, produced disastrous results.   By April 2005, several things became clear: The rehabilitation costs were considerably more than anticipated [identical to the Jowdy loans extending past the expectation of the spring 2006 Mexico-Lehman Brothers closing][11], the projects were undercapitalized and the

---

[11] Peca SDNY Grand Jury (*ECF No. 668 at 108-09*) -- Sydor SDNY Grand Jury (*ECF No. 668 at 137-38*) – Stevenson (*ECF No. 668 at 137-38*) -- and Kaiser 2009 (*ECF No. 668 at 190-91*).

John Kaiser testified during a 2009 Arizona arbitration that he *did not hold Kenner responsible* for the Jowdy non-payments, either (*Nolan arbitration Day 5, Tr.928-929*):
> *Q: Has this ever been a secret that Mr. Kenner lent this money to Mr. Jowdy?*
>
> ***A [Kaiser]: No.***
>
> *Q: Was this a transaction that, as your view as an investor was open and disclosed to everyone?*
>
> ***A [Kaiser]:*** *It was open.*   ***There was no secret handshakes or nothing like that***.
>
> *Q: Even now, sitting here in May 2009, is there anything you've uncovered, as someone who obviously knows how to investigate, that Mr. Kenner has done anything inappropriate throughout these transactions?*
>
> ***A [Kaiser]: No.***

interest obligations to investors were disastrously large and unrelenting.   As a consequence, the project took on a gloomy countenance, revealing the business model to have been, at best, overly ambitious or, more likely, inherently flawed.   None of that, as all agree, amounted to fraud."

Judge O'Brien continued (with parallels to the instant case) that "the answer [] has resulted in a sentencing dilemma – how does one measure the damages reasonably resulting from the fraud (not being candid with investors), rather than merely estimating the economic losses flowing from a flawed business plan, poor timing and market dynamics?   What are the damages caused by the fraud?   Simply stated they are the money investors lost as a result of not having full and timely knowledge of the depth and breadth of the projects' shortcomings.   In other words, what the investors additionally lost by being deprived of an opportunity to mitigate foregone losses.   But we know one thing: much of the loss had been incurred or was inextricably destined to be incurred before any fraudulent conduct commenced.   It was necessary for the government to produce sufficient evidence from which a reasonable estimate of damages resulting from the fraud could be computed."   See U.S.S.G. § 2B1.1, comment. (n.3(c)).

**[*The remainder of this page left intentionally blank*]**

---

*Q: Not one complaint?*

**A [Kaiser]: No.**

*Q.   At the time this money was lent to Mr. Jowdy to be spent in the Mexican project, did anybody anticipate he wasn't going to pay you back when the Cabo deal closed, the Lehman's Cabo deal?*

**A [Kaiser]: No.  Otherwise I wouldn't have lent it.**  *I wouldn't want to go down that route.*

*Q.   Do you blame Mr. Kenner for him [Jowdy] not paying the money back?*

**A [Kaiser]: No.**

*Conclusion…*
In *Evans II*, contrasting *Turk*, there cannot be a loss attributed to "equity" investors
due to the inherent risks they assume (governed by the corporate Little Isle 4 By
Laws at all times).   In *Evans II*, the Court opined that even though Evans never told
the investors of the cash-flow issues, the district court could not hold him
accountable for any loss and *ordered a zero loss factor* (and the resulting "no
victims", "no enhancement for loss" and the associated reduced guidelines to 4-10
months; almost four years into his incarceration).

The Hawai'i "objects" are and have always been authorized elements of the
corporate Little Isle 4 By Laws (its governing document).   As such, the mere
inability for four of the 26 Hawai'i equity partners to "remember what they used to
know" (and previously testified to) &/or "never read" when they received the
corporate documents is *not* a fraud eligible for loss calculation – because they
"*trusted Phil*" (who followed the By Laws) (*Tr.1955-Nash, 2062-Nolan, 2200, 2222-
Sydor, 2572-Gaarn, 2719, 2799-Rucchin, 2861-Ranford, 3042, 3157-58-Berard*).

*Summary tables without back-up are not acceptable to substantiate loss…*
In addition, after four-and-a-half years since trial, the government has still not
fulfilled their burden to prove the underlying loss with back-up documentation.  The
government has the burden.   It is not Kenner's responsibility to "un-prove" their
"summary tables" which are unacceptable for loss calculations, or unsupported PSR
conclusions.

Kenner objected to the method of calculation used in the PSR as well as the resultant
loss figures, but the government presented no evidence or objections tending to
prove the challenged figures (*See Kenner's March 27, 2019 PSR objections, ProSe*).
"If the defendant objects to any of the factual allegations contained [in the PSR]…the
government must present evidence at the sentencing hearing to prove the existence
of the disputed facts."   *United States v. Jenners*, 473 F.3d 894, 897-98 (8th Cir 2007)
(quoting *United States v. Poor Bear*, 359 F.3d 1038,1041 (8th Cir 2004)).

The government did present summary tables of its position regarding an accounting
of the alleged investors and underlying investment amounts (wholly incomplete
even in its summary form).   Summary tables of accounting data that are based on
evidence not before the court, and that a party has challenged as inaccurate, are not
sufficient to support a court's factual findings.   *United States v. Green*, 428 F.3d
1131, 1134 (8th Cir 2005) ("[T]he charts may 'include assumptions and conclusions,
but said assumptions and conclusions must be based upon evidence in the record.'")
(quoting *United States v. Wainright*, 351 F.3d 816, 821 (8th Cir 2003)).   When

challenged, the conclusions and assumptions stated in the summary accounting data are not evidence in and of themselves, but are more akin to representations by litigants.

Because the burden to "unprove" loss at all should never have been shifted in this manner to Kenner over the last four-and-half years (post-trial), the court should not punish Kenner due to the government's ineptitude and lack of formulation.   It was the government's burden to present evidence to prove a loss; specifically after Kenner's objections.   It has never been Kenner's burden to present evidence in an attempt to chip away, victim-by-victim, object-by-object, from the government's unproven claims (but to strengthen Kenner's forensic argument of "no loss" – Kenner has presented the court with a detailed object-by-object, victim-by-victim analysis; verified by a forensic accountant).

This EDNY court went so far to alert the government in 2019 that it has been expected (and apparently overdue) (*July 2, 2019 hearing Tr.24-25*):

> "*I'm a judge.   I'm not a business person, so I don't know all of the intricacies of something like this.   So I'm relying on the government's assessment of the way to do this to protect what the government is trying to accomplish here without overreaching in a way that is going to hurt everybody.   And I don't think we're at that point.   If the government just continues to not really focus on this, I'm going to have to try to figure out myself in terms of where I should draw the line.*"

Based on *Evans*, and its underlying equity-based analysis, there are no losses.[12]   The government knows this and has run from production of evidence that does not exist

---

[12] However argued by the government (if attempting to apply a non-*Evans* application of the law), the Mandatory Victims Recovery Act ("MVRA") statutes do *not* allow for a restitution judgment to provide a *windfall* of money by double collecting at any time in the future, especially for an asset that was "**never lost**" to Little Isle 4 and its investors – and have negotiated and settled thru independent counsel for Nolan, Juneau, and the remaining members of CSL Property (including Berard, Sydor, Rucchin, Nolan and Peca) *versus Jowdy*.

The superseding indictment contains *no individuals* (*ECF No. 214*) who have *not* previously settled their claims for everything and anything related to the Jowdy involvement (Little Isle 4 corporate authorized loans to Jowdy, personally – *3500-KJ-2 at 24-25*).

If it is an asset that *cannot* be double-collected thru restitution – and has *never been lost* by Little Isle 4 (simply un-collected at the moment due to coordinated obstruction) – then how could the Court deem it to be part of loss?

&/or can be easily refuted as inaccurate by Kenner in front of the court; *clearly waiting four-and-a-half years since trial to submit anything if at all*.  The government fears another embarrassment – like the introduction of *government-forfeiture-36* and *government-forfeiture-44*, which destroyed their trial theories and lies that "*Kenner stole all of the Hawai'i money and used it to buy his Cabo equity*" (which obviously never happened according to their-own forensic production).

The government knew:

1.  Jowdy confessed to the Hawai'i loans during his January 2010 2-day deposition in California (delivered to FBI agent Galioto by attorney Ronald Richards), and
2.  Jowdy authenticated the loan agreement during his December 2010 Nevada trial defense (for another $791,000 he stole from a Kenner client, Glen Murray [and lost, while trying to blame it on Kenner like the government is currently]), and
3.  The government had six years to confer with Jowdy and his attorneys pre-trial to determine the "flow" of the Hawai'i loans (fully confirmed independently), and
4.  Post-trial, the government closed the loop by submitting *government-forfeiture-44* in an un-thought-out attempt to create a forfeiture nexus, because Jowdy received authorized and documented loans from his investors/lenders in Hawai'i…BUT

Nevertheless, thru rebuttal summation, the government lied repeatedly (only a subset below)…

*(Tr.5721) [Michiewicz]*
*"And what do you find out [about the Jowdy loan]? You find out, what did that 5 million or however much more or less that netted out to be, what did it buy Mr. Kenner? It bought him a 39 percent interest in Ken Jowdy's Cabo San Lucas. Didn't buy the players a 39 percent interest. Him. And if you read it, you will see that Ken Jowdy, himself, is only a 40 percent shareholder in the parent company. Can't get too much closer to being equal partners. To this day, right now, he is a partner in that resort. That's where the money went. That's what it bought him. And on the backs, on the portfolios, of the hockey players."*

*(Tr.5722-5723) [Michiewicz]*
*"And if you look at the Centrum loan, I can not think of a more perfect example of*

---

- It certainly cannot be deemed as an "actual loss" – since it is still an active – and government acknowledged asset of the Hawai'i partners (*government-forfeiture-44*)!

*proof beyond a reasonable doubt -- actions speak louder than words -- no reason to mortgage Honu'apo parcel. No reason other than for Kenner to get his 39 percent. Because remember, this is happening at the same time as, you know, some of the other transactions we have already talked about. To get his piece of the pie, that resort in Cabo. No reason. Actions speak louder than words. And in this case the action is pure fraud."*

*(Tr.5990) [Komatireddy]*
*"...you know what, Baja Development Corporation, on that chart, but there is some sort of misconduct; you don't know what the money was for. You know exactly what the money was for. In fact, Mr. LaRusso, when the first witness got on the stand, one of his first exhibits he entered into evidence was a record of the Baja Development Corporation. Those records are in evidence. Mr. Kenner told you that he used that money to get his piece in the Mexico investment with Ken Jowdy. You know exactly what that's for. That's in evidence."*

==All lies...==and uncorrected to the jury, the court, or the alleged victims who the FBI, Jowdy (*per ECF No. 628*) and the government continue to fool...

Respectfully submitted,

*Phil Kenner*