**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
| |
**UNITED STATES OF AMERICA** |
| |
   against- |
|      **Docket No. 13-cr-607 (JFB)**
| |
**PHILLIP A. KENNER and** |
**TOMMY C. CONSTANTINE,** |
| |
| |
**Defendants.** |
-------------------------------------------------------X

**Supplemental Sentencing Memorandum**

**On Behalf Of**

**Philip A. Kenner**

(*Forensic analysis*)

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES...3                                              3

Object by object:

- Hawai'i partners (Little Isle 4) .........*9*
- Global Settlement Fund (GSF) .........*28*
- Eufora private stock sales .........*31*

Investor by investor:

- Michael Peca .........*34 (Summation at 47)*
- Owen Nolan ......... *49 (Summation at 59)*
- Darryl Sydor ......... *60 (Summation at 67)*
- Bryan Berard ......... *69 (Summation at 86)*
- Steve Rucchin ......... *87 (Summation at 91)*
- William Ranford ......... *93 (Summation at 99)*
- Tyson Nash ......... *100 (Summation at 111)*
- Jay McKee ......... *113 (Summation at 123)*
- Joe Juneau ......... *124 (Summation at 129)*
- Nick Privitello ......... *130*
- Ethel Kaiser ......... *131*
- John Kaiser ......... *139*

Conclusion.........*149*

2

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)...*

## TABLE OF AUTHORITIES

### CASES

*Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A.*, 461 Fed. Appx. 61; 2012 U.S. App. LEXIS 3012.........*20,25,38,58,65,70,92,94,102*

*United States v. Berger*, 295 U.S. 78 (1935).........131

*United States v. Binday*, 804 F.3d at 595 .........*5*

*United States v. Coppola*, 671 F.3d 220, 250 (2d Cir 2012).........*5*

*United States v. Middlebrook, 553 F.3d 572, 578 (7th Cir 2009)* .........*5,18*

*United States v. Confredo, 528 F.3d 143, 152 (2d Cir 2008)* .........*5*

*United States v. Yihao Pu, 814 F.3d 818, 826 (7th Cir 2016)* .........*5*

*United States v. Blastos, 258 F.3d 25, 30 (1st Cir 2011)* .........*8*

*United States v. Haggart, 980 F.2d 8, 12-13 (1st Cir 1992)*.........*8*

*United States v. Dunnigan, 507 U.S. 87, 94 (1993)*.........*30,42,50,66,71,75*

### STATUES

*U.S.S.G. §2B1.1 cmt. 3(C)*.........*5,19*

*U.S.S.G. § 2B1.1(b)(2)(A)*.........*108*

*U.S.S.G. §2B1.1 cmt. 3(A)(ii)*.........*5*

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…*

**Each investment/dollar amount that is referenced in this forensic evaluation has been offered for verification to Accountant Eric Mendelsohn of KurciasJaffe…**

The accountant has been requested to examine the banking records; e-mails, spreadsheets, and other documentation provided to analyze the cash flow related to the instant case.   The accountant was tasked with verifying the calculations and numbers on this report for veracity and reliability.   *This report is being submitted on behalf of Kenner only*.   The accountant's procedures consisted of examining and tracing various banking records using e-mails, spreadsheets and other documentation to determine their origin and destination.   Accordingly, the results of the accountant's verifications are below:

**There are no elements of the charged conspiracy counts that required the jury to find "loss" as a factor.**

Despite assisting with the investments for his investors (per the terms of their advisory agreement)[1], *Kenner had every investor sign-off on their own financial transactions*.  Each investor was *always* in control of the verbal authorization of the transactions with their-own 3rd party custodians and advisors prior to any transaction, to promote transparency.

- *Kenner was not convicted of any offense having loss as an element.*

The government and the probation department seek to increase Kenner's sentencing exposure by arguing that the Guidelines base offense level of 7 should be increased 22 levels based on a $25,000,000 plus loss enhancement.   However, as argued below, the Court should find that there is *no loss* enhancement because there is no evidence that Kenner caused an actual loss, or intended to cause a loss, to any of the investors in this case (100% supported by empirical evidence).

- In fact, the government's protection of Ken Jowdy (the Kenner investors' development partner) and their obstruction in the investors' efforts to collect the loans (*ECF Nos. 553, 554*) and investments from Jowdy have led some

---

[1] This agreement between Kenner and his clients was never subject to governance by **FINRA**.

[2] The government defended their witnesses' catastrophic *memory loss* – in amazingly harmonized synchronicity – as *faulty memory, confusion and mistakes*; incorrectly referencing the legal basis in *United States v. Dunnigan*, 507 U.S. 87, 94 (1993) (*ECF No. 440 at 16*).   Nevertheless -- the government continues to defend their "concealment-based"   4
*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…*

investors to the brink of desperation (based solely on their-own individual factors _unrelated_ to Kenner, *infra*) (*ECF No. 482 at 3*).

- This is a cover-up scandal can be traced all the way to the top of Mount Olympus as pay-for-play protectionism at its filthiest.   This has left a portion of the investors misinformed (but only the small subset that the FBI case agent convinced pre-trial to "*forget everything so they can get their money back that _Kenner stole to buy his piece of the Mexico project_*" (although 100% false). [2]  It is exactly what the FBI and government involved in the instant case need (in contradiction to the empirical evidence) – to continue their misleading ruse on the investors that Kenner "*stole*" all of their Hawai'i money (*the ruse corroborated in Kenner's favor by Kristen Peca's 2012 FBI recording, infra, and John Kaiser's shocking 2019 letter to the court – ECF No. 628*).

Accordingly, as the Court examines each of the charges that could conceivably lead to a finding of loss under the guidelines, the Court should, respectfully, proceed from the standpoint that the jury did not find a loss or deprivation, nor can such a finding be inferred from the jury's verdict.

**Intended loss...**

The Court should also find that the Kenner counts do not have an intended loss. Under the guidelines, "intended loss" means "the pecuniary harm that a defendant purposely sought to inflict." *U.S.S.G. §2B1.1 cmt. 3(A)(ii)*.   The District Court is "not required to calculate loss with 'absolute precision'," *See United States v. Binday*, 804 F.3d at 595 (quoting *United States v. Coppola*, 671 F.3d 220, 250 (2d Cir 2012)), but it must "make a reasonable estimate of the loss" that is based in "available information" and supported by a preponderance of the evidence, *Id.* (quoting *U.S.S.G. §2B1.1 cmt. 3(C)*).  *See also United States v. Middlebrook*, 553 F.3d 572, 578 (7th Cir 2009) ("[T]he true measure of intended loss [is] in the mind of the defendant.")

---

[2] The government defended their witnesses' catastrophic *memory loss* – in amazingly harmonized synchronicity – as *faulty memory, confusion and mistakes*; incorrectly referencing the legal basis in *United States v. Dunnigan*, 507 U.S. 87, 94 (1993) (*ECF No. 440 at 16*).  Nevertheless -- the government continues to defend their "concealment-based" conviction theories with individuals who have since trial (a.k.a. new evidence) participated in litigation versus the National Hockey League, alleging **CTE** (Chronic Traumatic Encephalopathy) symptoms; *specifically acknowledging their-own _memory loss_ and _dementia_ symptoms.*

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)...*

Before making an intended loss determination, however, a district court must make a specific factual finding regarding the scope of the defendant's subjective intent. *See United States v. Confredo*, 528 F.3d 143, 152 (2d Cir 2008) (remanding case for resentencing for the district court to consider the defendant's subjective intent before determining the intended loss amount); *see also United States v. Yihao Pu*, 814 F.3d 818, 826 (7th Cir 2016) (remanding the case for resentencing where there was no evidence in the record that the defendant intended any loss to the victims).

Consequently, in order to base the loss amount on intended loss for the courts, the evidence would need to establish that Kenner "purposely sought to inflict" monetary harm on his investors.   There is no evidence whatsoever, at trial or otherwise, supporting such an assertion.   Moreover, the evidence *actually* established that Kenner spearheaded legal efforts to recoup the investors' real losses thru multiple lawsuits and investigations versus the individuals who "*did wrong*" -- as the whistleblower.

Even though, as the Managing Member of Little Isle 4, Kenner was not personally responsible for the *authorized* transactions of the LLC (per its corporate By-Laws, *infra*), Kenner sought recompense on behalf of the investors; fulfilling the role and responsibilities as Managing Member once Jowdy's criminal intent was discovered in late 2006. [3]   In addition, with respect to Eufora (and the private stock sales), Kenner provided 100% transparency and support to the 2010 investigation of Constantine and "*everything Eufora*" once notified by the Eufora Board and Rudy Giuliani's investigative team of the ongoing investigation.

---

[3] After Kenner received documented *bribe* offers of millions of annual dollars and FBI protection from Jowdy and his cabal in 2007 to "*just go along*" – Kenner *declined* and immediately began litigation in Mexico to recover the funds and initiated negotiations in the U.S. (ended by Jowdy's attorneys in 2008).

Once the negotiations were terminated in 2008 by Jowdy's counsel (Tom Harvey and Louis Freeh) (*See Bates stamp: KJ7208 and PK_SEC_023505*) [Ex.B], Kenner and Kenner investors initiated a series of U.S. litigations versus Jowdy to recover the "same" funds that are currently subject to the government's loss calculation [lawsuits in: 2008 in Nevada [*filed: September 19, 2008*] [Ex.C] – 2008 in Arizona [*See Bates stamp: PKHome-012836-50 -- filed: October 29, 2008*] [Ex.D] – 2009 (2) in California [*filed: June 18, 2009*] [Ex.E, Ex.F] – with 100% sign-off acknowledgments by the investors involved in the instant case (in evidence – confirming Kenner's full transparency with the investors' 3rd party independent attorneys)] [Ex.F1].

For the Hawai'i investor/lenders, the evidence proves that future Jowdy employees (John Kaiser and Bryan Berard) stopped all litigation efforts versus Jowdy (the individual who received 100% of the Hawai'i partners investment funds – at all times, per the government's accounting records) (*See government-forfeiture-44*) [Ex.G].    Kenner was not personally liable for the investors' losses -- *if any*.

Michael Peca confirmed this to the 2011 SDNY Grand Jury (*Michael Peca at 17-18*) [Ex.A] (identical to 19 of the Hawai'i-Mexico investors pre-trial):

> *Q: When did you make that investment?*
>
> *A [Michael Peca]: It round the same time, 2004, 2005.  I want to say they were my very much – they were presented to me.  **On all of them, through all the times, I made the final decision**.  I may not have done as much due diligence as some may have done.  It's not like I had to say yes or forced.   I made the decision to say, yeah, I want to do that.  **Based on the money I was making at the time it didn't bother me to invest those kinds of dollars**.*

John Kaiser testified during a 2009 Arizona arbitration that he *did not hold Kenner responsible* for the Jowdy non-payments, either (*Nolan arbitration Day 5, Tr.928-929*):

> *Q: Has this ever been a secret that Mr. Kenner lent this money to Mr. Jowdy?*
>
> ***A [Kaiser]: No.***
>
> *Q: Was this a transaction that, as your view as an investor was open and disclosed to everyone?*
>
> ***A [Kaiser]:*** *It was open.  **There was no secret handshakes or nothing like that***.
>
> *Q: Even now, sitting here in May 2009, is there anything you've uncovered, as someone who obviously knows how to investigate, that Mr. Kenner has done anything inappropriate throughout these transactions?*
>
> ***A [Kaiser]: No.***
>
> *Q: Not one complaint?*
>
> ***A [Kaiser]: No.***

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…*

*Q.   At the time this money was lent to Mr. Jowdy to be spent in the Mexican project, did anybody anticipate he wasn't going to pay you back when the Cabo deal closed, the Lehman's Cabo deal?*

*A [Kaiser]: No.  Otherwise I wouldn't have lent it.  I wouldn't want to go down that route.*

*Q.   Do you blame Mr. Kenner for him [Jowdy] not paying the money back?*

*A [Kaiser]: No.*

While some investors may have lost the ability to access their capital investments (under a liquidity issue due to Jowdy's malfeasance), the trial testimony confirms that they were aware that investments could take up to 20 years to complete (Kristen Peca at *Tr.757* – Steve Rucchin at *Tr.2762*). [4]

- *Nevertheless, the illiquidity of an investment is not a crime.*

In fact – it is the government's documented obstructionist actions (in front of this Court) have deprived the investors from knowing:

(1) That Jowdy received 100% of their Hawai'i partners loan funds (not Kenner) (*See government-forfeiture-44*) [Ex.G], and

---

[4] Kristen Peca (*Tr.757*) --

*Q Does that refresh your recollection whether Phil told you, in substance, with reference to real estate investments, profitability may take between 5 and 20 years?*

*A [Kristen Peca]: At the end, yes.*

Steve Rucchin (*Tr.2762*) --

*Q Do you recall, sir, that during the course of the conversation that you had with Phil as relates to the Hawaiian project, you were aware that the timeline on the project could be five years, perhaps as far as 20 years? Do you have a recollection of that?*

*A [Rucchin]: I do have a recollection of a timeline, and it was not a very short one.*

*Q Not a very short one, true?*

*A [Rucchin]: Yes. I had an understanding that any development would take some time.*

8

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)...*

(2) That the government has refused to cooperate with Kenner's offers to expose Jowdy and pursue the recovery of the funds since Kenner's 2013 arrest (not the other way around) (*ECF Nos. 553, 554*).

The documented Jowdy frauds (*ECF No. 667*) [Ex.X] and the government's own accounting records post-trial confirm any "lack of intent" to create a loss to the investors at any time; certainly never benefitting Kenner.

- *Government-forfeiture-36* [Ex.H] [***confirms*** all *untainted* Cabo san Lucas equity investments, specifically for Kenner and his Baja Ventures 2006 partners, Jozef *Stumpel and Jere Lehtinen with $4.1 million capital contributions out of the initial $6.250 million; or 65.6% of capital*] – and
- *Government-forfeiture-44* [Ex.G] [***confirms*** all Hawai'i partners' funds received and documented to Ken Jowdy, *only – not Kenner as the government told the EDNY jury to prejudice Kenner and taint the verdict*].
  - These loans (thru the authenticated loan agreement – *See 3500-KJ-2 at 24-25*) were *titled to the Little Isle 4 investors* at all times.

This case is simply *not* comparable to the usual investment fraud cases where the defendant fails to invest the funds and instead misappropriates the investors' funds to support his own lifestyle -- demonstrating the defendant's subjective intent to deprive the investors of the money. [5]   Thus, to the contrary, the instant case's evidence supports the conclusion that *Kenner had no intent* to cause any pecuniary harm to anyone, immediately was the whistleblower once the frauds were discovered by Kenner -- AND *there is no intended loss amount*.

Hawai'i:
- **There are no financial victims...[6]**

| Investor | Investment Funds | Accumulated Value | Gain/(Loss) |
|---|---|---|---|

---

[5] The First Circuit has long recognized that there are two types of fraud: "The first type of fraud implicates the 'true conspiracy artist'...who intends only to pocket the money without rendering [anything] in return.   The second type of fraud involves a person who would not have attained the contract or loan but for the fraud, but who fully intends to perform." *United States v. Blastos*, 258 F.3d 25, 30 (1st Cir 2011) (quoting *United States v. Haggart*, 980 F.2d 8, 12-13 (1st Cir 1992)).

[6] All financial back-up detail is *infra*, *investment by investment*, *investor by investor*.

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)...*

| | | |
|---|---|---|
| **Nolan** | 2,300,000 | *9,630,657* | **7,330,657** |
| **Peca** | 1,875,000 | *6,406,605* | **4,531,605** |
| **Sydor** | 950,000 | *3,353,768* | **2,403,768** |
| **Rucchin** | 1,100,000 [7] | *2,974,766* | **1,874,766** |
| **Juneau** | 0 | *2,170,000* | **2,170,000** |
| **Berard** | 750,000 | *3,513,667* | **2,763,667** |

- *__There are no losses__* -- only uncollected assets due to government obstructionism and John Kaiser's negligence while employed by Jowdy (and acting as his co-conspirator [2012-2017] to cover-up the known Jowdy criminal activity (*See Document 628*)...

Alleged Hawai'i victims from the superseding indictment include (1) **Owen Nolan** [$2,300,000 investment], (2) **Michael Peca** [$1,875,000 investment], (3) **Darryl Sydor** [$950,000 investment], (4) **Steve Rucchin** [$800,000 investment], (5) **Joe Juneau** [$0 – because he was bought out by Owen Nolan after he was paid from the Lehman Brothers joint venture in 2006][8] and (6) **Bryan Berard** [$750,000 investment][9].  This totals **$6,675,000** (subtracting Rucchin's $300,000 independent disbursement).

- Nolan and Juneau signed settlement agreements with Jowdy in 2008, acquiring an extra 1% equity stake in the Diamante Cabo project *in exchange*

---

[7] It should be noted that after the initial use of Rucchin's LOC for the Hawai'i project, *after* his August 25, 2006 LOC re-payment of $313,400, Rucchin chose to invest $300,000 from his LOC into a 3rd party investment on 3-12-2007 (unrelated to the instant case – further reducing Rucchin's exposure and risk to the Hawai'i partners investment) (*See Bates stamp: TNTC000124*) [Ex.Z23 *at 2,* Ex.Z72 *– Bates stamp: BN-P-000228*].

[8] This is verified by comparing Nolan's equity from the 2006 Little Isle 4 operating agreement (13.44%) [Ex.K] -- and his 2006 Little Isle 4 K1 (*found in Nolan's possession – further __acknowledging Nolan's unfettered awareness to his original $2.3 million Hawai'i partners investment__ after he bought out Juneau (18.102209%) (*See Bates stamp: NOLAN0005044*) [Ex.L].

[9] Although Berard and Sydor "*could not remember*" their LOC investments in 2015 – they both signed LOC collateral reduction letters directly with Northern Trust Banker Aaron Mascarella [Ex.Z48] – and followed-up by completing a new, full LOC package (in 2006-07) with their reduced collateral (*in the 2015 Northern Trust Bank subpoena*).  All Mascarella's clients received the *__identical__* reduction offer – but not all participated (further exposing their independent knowledge of the "use of funds" at all times – and underlying investment exposure).

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)...*

for all transactions involving Jowdy (and any potential underlying losses)…and as such, Nolan and Juneau have been fully recompensed for any perceived loss in the Hawai'i project for the loans to Jowdy (and cannot double collect per the MVRA guidelines).

- o These settlement agreements can be subpoenaed from Jowdy and/or the Nolan-Juneau parties for verification. Juneau confirmed these deals in 2015 testimony (*Tr.354*).

- 5 of these investors (excluding Juneau) were paid $**42,553** each in August 2006 after the closure of the Lehman Brothers joint venture (totaling $**212,765**) (*See Bates stamp: NAAZ0000433-434*) [Ex.J1].
  - o Any unverified amounts, per the forensic verification, can be wholly verified with Northern Trust Bank and/or Charles Schwab account subpoenas.

- 3 of these investors settled litigation with Northern Trust Bank (totaling $**1,400,000** -- *or more per their trial testimony*; Peca "*over $600,000*" [*Tr.506*], Nolan "*$500,000*" [*Tr.2074*], Berard "*$300,000 after lawyer fees*" [*Tr.3042*].

- All 6 of these investors collectively received $**1,601,572** in tax-free bond interest during the timeframe of the collateralized investment (in total – and broken down per investor, *infra*, based on their personal banking records from Northern Trust Bank [Ex.56]) (*in evidence* -- investor by investor thru Northern Trust Bank end-of-year bank statements [Ex.56a]).

- All 6 of these investors received $**646,272** in 1099-int tax write-offs during the timeframe of the collateralized investment from interest payments made by Kenner and the Hawai'i partners capital accounts. [10]

---

[10] Part and parcel to the leveraged investment strategy suggested by Northern Trust Bank President, David Highmark, the LOC Hawai'i investors reaped the tax benefits annually for interest payments made by the Hawai'i partners funds (*as expected; corroborated by Berard 2009 arbitration testimony, Kristen Peca 2012 FBI phone recordings, and 2009 arbitration affidavits signed by Stumpel, Norstrom, Gonchar, Peca, Nash, Murray, etcetera*.)

The 2008 Northern Trust Line of Credit ("LOC") interest payments totaled approximately $480,000.  Extrapolated over the 2003-2008 timeframe of the LOCs, the interest benefit of the group would approximately be $2.4 million (tax write offs on 1099-int IRS forms). Norstrom, Gonchar and Murray were not named Superseding Indictment victims – with their LOCs representing approximately 32% of the LOC investments amounts.

Conversely, the named Superseding Indictment victims benefitted from their proportionate share of $1,632,000 of tax deductions.  Since they were all at the 39.6% marginal tax rate, throughout the life of their respective LOCs, their actual realized benefit would have been approximately $**646,272** (tax credit – dollar for dollar versus income).

11

o   Please note that *none* of these taxes write-offs are included in the investors' individual total net gain/loss calculations, *infra, thus incremental to their Hawai'i investment benefits.*

- Steve Rucchin invested $**300,000** on 3-12-2007 (*See Bates stamp: TNTC000124*) [Ex.Z23 *at 2*, Ex.Z72 – *Bates stamp: BN-P-000228*] from his available LOC into a 3rd party investment, unrelated to the instant case (addressed in the Rucchin individual section, *infra*).

The remaining capital account investment in Little Isle 4 is retained equity of $**3,460,663**– *prior to the Jowdy-loan calculation.*

**Net value of Little Isle 4 investment**:

| Hawai'i | Equity % of Little Isle 4 | Hawai'i LOC Investment | Approximate Value (incl. Jowdy loan) | Bond interest earned | 2015 Testified recovery amount | Net value of Little Isle 4 investment |
|---|---|---|---|---|---|---|
| Nolan | 18.102[11] | 2,198,910 | 3,502,651 | 592,878 | 500,000 | 4,595,529 |
| Peca | 10.37 | 1,794,392 | 2,560,386 | 300,052 | 600,000 | 3,460,438 |
| Berard | 6.36 | *649,405* | 1,119,195 | 129,314 | 300,000 | 1,548,509 |
| Sydor | 7.85 | 856,200 | 1,436,051 | 249,215 | ? | 1,685,266 |
| Rucchin | 6.82 | 1,010,645 | 1,514,413 | 210,113 | ? | 1,724,526 |
| Juneau [12] | 0 | 0 | 0 | 120,000 | | 120,000 earned |
| **Totals:** | | **6,809,552** | **10,132,696** | **1,601,572** | **1,400,000** | **13,134,268** |

- *As such, this amount is a direct offset to any alleged loss amount; specifically for guideline calculations.*

[11] Nolan increased his Little Isle 4 ownership from 13.44% to 18.102% after his buyout of Joe Juneau's Little Isle 4 equity and the recalculated Little Isle 4 equity positions, post other JV buyouts [Ex.L].

[12] Juneau was completely bought out of his Hawai'i investment in 2007 by Owen Nolan at Juneau's request [Ex.Z30 *at 3*] – *without loss or consequence* – with Juneau receiving an approximate $**120,000 tax-free interest profit** during the period of time he maintained a Northern Trust bond account as collateral for his LOC investment.

- The Little Isle 4 investors, *supra*, named in the superseding indictment, as victims, own 49.502% of the LLC, post 2006 joint venture-Lehman Brothers closing.

**The government documented the 2004-06 loans to Ken Jowdy** from the Hawai'i partners (*government-forfeiture-44*) [Ex.G] – with Jowdy's assistance immediately following trial – so as to *not* interfere with their trial theories that "*Kenner stole all of the Hawai'i money to buy his stake in the Cabo project*". [13]

***The government-documented Jowdy loan is now worth over $33 million*** (thru summer 2019) to the Hawai'i partners (Little Isle 4). *It is and always has been a documented asset of Little Isle 4.* The loan agreement confirms Little Isle 4's legal rights to the loan (*See 3500-KJ-2 at 24-25*). [14]

---

[13] Notwithstanding, the Hawai'i investors named in the 2015 Superseding Indictment whose capital account funds were loaned to Jowdy *thru Little Isle 4's capital account*, as part of the now (2019) ***$33 million plus*** net loan due to the Little Isle 4 members ("lenders") -- Hawai'i LOC contributions traceable from their capital accounts thru forensic tracing confirms *their* contributions totaled $1,315,000 of the approximate $5 million in principal that Jowdy received [Ex.G1]:
1) Michael Peca ($**240,000** distributed to Jowdy thru Little Isle 4's capital account),
2) Darryl Sydor ($**200,000** distributed to Jowdy thru Little Isle 4's capital account),
3) Owen Nolan ($**425,000** distributed to Jowdy thru Little Isle 4's capital account),
4) Steve Rucchin ($**300,000** distributed to Jowdy thru Little Isle 4's capital account), and
5) Bryan Berard ($**150,000** distributed to Jowdy thru Little Isle 4's capital account).

[14] The government thru *government-forfeiture-44* [Ex.G]– *not Kenner* – documented Jowdy's loans from Hawai'i as *authentic* – **thus verifying the government lied to the court and jury in 2015** – while Kenner was vilified for telling the truth (*Tr.4598, 4602, 5064-65*).  The court cannot punish Kenner at this point for funds that the government documented as received solely by Jowdy – in spite of their ongoing ruse to the investors that "*Kenner stole your Hawai'i money and bought his Cabo equity with it*".

- *Government-forfeiture-36* also proves the Diamante Cabo equity is 100% "untainted" for Kenner and his 2 partners (Stumpel & Lehtinen) in Baja Ventures 2006 – **and cannot be subject to forfeiture**.

These loans [Ex.Z88] are worth approximately **$33,784,150**.

|  **UNPAID PRINCIPAL + interest (at 15%)**  |  **Balance Due**  |
|---|---|
|  March-06 (*Lehman Brothers closing*)  |  $4,774,668.60 [15]  |

| Annual date | With 15% interest |
|---|---|
| Mar-2007 | $5,490,868.89 |
| Mar-2008 | $6,314,499.22 |
| Mar-2009 | $7,261,674.11 |
| Mar-2010 | $8,350,925.22 |
| Mar-2011 | $9,603,564.01 |
| Mar-2012 | $11,044,098.61 |
| Mar-2013 | $12,700,713.40 |
| Mar-2014 | $14,605,820.41 |
| Mar-2015 | $16,796,693.47 |
| Mar-2016 | $19,316,197.49 |
| Mar-2017 | $22,213,627.11 |
| Mar-2018 | $25,545,671.18 |
| Mar-2019 | $29,377,521.86 |
| Mar-2020 | $33,784,150.14 |

*Ken Jowdy's defense team authenticated the 2004 Hawai'i loan agreement during his December 2010 Nevada trial defense* (*See Murray v. Jowdy – Day 1 at 195-199*) [Ex.O].

---

[15] Jowdy and Lehman Brothers' February 2006 closing document for the Diamante Cabo project confirmed that Lehman Brothers expected to pay **$7,000,000** to return the Jowdy capital (*including interest due at that time*) (*See Bates stamp: 23196*) [Ex.M *at 11*].   The document also verified a **$17,310,000** "commission" that disappeared after the closing (*See Bates stamp: 23196*) [Ex.M *at 11*].   Those "commission" funds were designated to repay the Hawai'i partners and all individual Kenner and Kenner investors' outstanding loans – as part and parcel to the March 2006 investors' final sign-off with Jowdy and Lehman Brothers (*See Bates stamp: 23186-23217*) [Ex.M].

- **It was all a hoax** – since neither was paid after the March 2006 closing to the Hawai'i partners or the other outstanding loans Jowdy owed to Kenner and Kenner investors.   Only unfulfilled promises continued regarding repayment of the various loans until the late 2006 confrontation between Kenner and Jowdy (and Jowdy's documented bribes to Kenner "*to just go along*"). (*See Bates Stamps [from the Jowdy production] 23186-23217 at 23196[11]*) [Ex.M].

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…*

14

- *The government ignored* the 2010 Kenner *verification* to frame their "*bogus*" (*Tr.5708 (2x), 5709*), "*phony*" (*Tr.4597, 4598*) and "*supposed*" (*Tr.5707-5708*) unsubstantiated attacks on Kenner during trial; *referring to Kenner* as "*lying about everything*" (*Tr.5064-5065*).

John Kaiser has been the Managing Member in Hawai'i since 2007 (*See Bates stamp: ED-0002949-2950*) [Ex.N], thus no one person has been more responsible to the Hawai'i partners to seek collection of the Jowdy loans for over a decade.  *Kaiser failed miserably*.    In contradiction to logic, Kaiser (and Bryan Berard) abandoned the Hawai'i partners in late 2011 and received jobs from Jowdy in Mexico; fully obstructing any recovery efforts for John Kaiser's Hawai'i investors (now working to protect Jowdy – *for pay*). [16]

Now -- in February 2019 – Kaiser refers to Jowdy as a "*crook*" (*ECF No. 628 at 4*) – eerily echoing his recording played at trial of Kaiser calling Jowdy a "*thief*".   Kaiser first denied it (*Tr.1229-1232*) – and later recanted under pressure of the surreptitious recording of his own voice presented in open court (*Tr.1311*).

---

[16] In 2012 -- Kaiser testified in a Mexico courtroom that his name was **forged** on his testimonial document in the $1,600,000 criminal case *Jozef Stumpel v. Jowdy (from the money Jowdy stole from the Baja Ventures 2006 capital account – see government-forfeiture-36)* [Ex.H]– as soon as Jowdy hired Kaiser.
- Jowdy stole these $1,600,000 funds from the Baja Ventures 2006 capital account contributions (*See government-forfeiture-36* [Ex.H]).
- Stumpel's litigation started November 2008 in Mexico – as soon as Jowdy and his attorneys terminated the settlement negotiations [Ex.B].

**2012 FBI recordings prove that Kaiser signed the document in Mexico** (further exposing his propensity to lie about forgeries -- like Jowdy and Berard).

- *The government avoided any discussion about this document in front of this Court after proffering the document to the EDNY Court as a Kaiser forgery in 2014 during a pre-trial hearing.   In 2014 -- Kenner alerted his trial counsel about the 2012 FBI recording,* **which confirmed the Kaiser forgery lie**.
- Trial counsel *leaked* the *critical* impeachment info to the government – unknown to Kenner for months.  The government promptly dropped all representations of that Mexico Kaiser forgery to the court *without alerting the court about the Kaiser forgery fraud they represented as inauthentic.*   It was disingenuous -- at a minimum -- considering Jowdy was paying Kaiser -- and they both had millions to gain (*stolen from Kenner personally*) with Kenner incarcerated and unable to pursue them legally.

- During 2016 forfeiture hearings – when the government admitted *government forfeiture-44* [Ex.G] (*forfeiture hearing Tr.66-67, thru Wayne*) – it hi-lighted that when the government alleged the Jowdy-Hawai'i loan and its agreement were "*bogus*" (*Tr.5708 (2x), 5709*), "*phony*" (*Tr.4597, 4598*) and "*supposed*" (*Tr.5707-5708*) -- during the attacks on Kenner's veracity during trial, ==they knew the loans were authentic – and they lied to the jury and Court==, anyhow.
  - *Kenner was 100% prejudiced – and the government has not made amends with the Court for their gross misrepresentations.*

- During 2016 forfeiture hearings -- when the government admitted *government forfeiture-36* [Ex.H]– it debunked the government's repeated denigration of Kenner during trial and their false theory that Kenner "*stole*" the investors Hawai'i money.

Nevertheless – the trial allegations (without foundational or empirical evidence) opened the door for the government to complete their known-trial lies and conclude for a sponge-like jury who viewed the government ***above reproach***.

[*Tr.5721* – Michiewicz summation]:
"*It bought him [Kenner] a 39 percent interest in Ken Jowdy's Cabo San Lucas*".

And – [*Tr.5990* – Komatireddy rebuttal summation]:
"*Mr. Kenner told you that he used that money to get his piece in the Mexico investment with Ken Jowdy. You know exactly what that's for. That's in evidence."*

Clearly – *government-forfeiture-36* [Ex.H] proves the government ==lied== at trial thru rebuttal summation and *prejudiced Kenner*.   The AUSAs made multiple, additional references to "*Kenner stealing the Hawai'i money to buy his Cabo equity*" during summation – clearly never proven and prejudicing Kenner to the jury (*Tr.5996, 5721, 5722-23, 5744-45, 5990, 5991-92, 5707-5709*).
- *No instructions from the Court could un-ring that bell...*

**BECAUSE -- neither of these statements was proven at trial – nor were they ever true!**

**None of that is in evidence.   The government produced just the opposite to this court thru the forfeiture exhibits...*and no one seems to care*!!**

16

- **Kenner can only hope the jury did not take them on their honor, and perceived responsibility as officers of the Court, _above reproach_!!**

**Further disturbing and ignored by the government is the salient fact that 22 of 26 Hawai'i partners had given pre-trial, "_under oath_" testimony** and **signed-off** on multiple litigation confirming they were 100% aware of the "_Jowdy loans_" at all times; _including but not limited to **Michael Peca**_ who recanted his trial testimony and confessed to his prior "_group_" knowledge during vigorous cross-examination pressures, _infra_ (_Tr.498_).

The Court should note that Michael Peca also confirmed (_Tr.533-535_) to the Court that he was part of a group email from Constantine (_Defense Exhibit C 24_) that confirmed the Hawai'i loans to Jowdy (despite Peca denying Hawai'i had anything to do with Jowdy, or perhaps more **CTE** (or otherwise persuaded testimony) (_Tr.457, on direct-examination_):

> _Q. I'm just going to read a few more and I may have questions. I want to finish this up: The fact that we were able to negotiate a cash-out scenario for our settlement costs, in any market let alone this one, is a huge win for us. This will allow us to make good on all Jowdy Mexico related investments, any personal loans made to Jowdy, **including Hawaii**, by any of you and our legal fees, while -- in brackets -- all of us retaining an equity share –_

> _THE COURT: Stake._
> _MR. LARUSSO: I'm sorry, Judge?_
> _THE COURT: You said share, it's stake._

> _BY MR. LARUSSO: Q. I'm sorry, stake in the new project in Cabo, with a capable and well-funded developer. Again, this is consistent with your reason for making the contribution. Is that right?_

> _**A [Michael Peca]: Yes.**_

The government even got Michael Peca to make up a story about his concerns (during direct-examination), that allegedly went unanswered, about the source of the Peca partners' Peca Ventures 2006 capital account (_Peca.424_)...which if it were really asked...Constantine or Peca or Peca's attorney (Ronald Richards), who were all present that day, _would have debunked it immediately_ (as _government-forfeiture-36_ proves), so why would anyone _not_ have stopped that nonsense in its tracks...thus

_Kenner Sentencing Memo With Forensic Accounting (And Back-Up)..._

==it <u>*never*</u> was asked &/or could not have been without the privilege of a recently fabricated storyline to corroborate the "*Kenner stole the Hawai'i money*" narrative "*to buy his piece of the Cabo project*".==

- ***It was wholly fabricated with intent...***

Not a single pre-trial statement was given in opposition to "knowledge" of the Jowdy loans, or lacking the "knowledge" Kenner was criminally charged for a decade after the well-documented "*group decision*" to lend funds to Jowdy [==Ex.A==]; confirmed during three (3) independent 2011 SDNY Grand Jury testimonies.

- Now -- the government needs the court to <u>*ignore*</u> the evidence of the "*group*" decision, <u>*verified by Peca*</u> *(plus 22 others)*, to maintain their conviction that only 3 of the 26 Hawai'i partners were "allegedly" unaware as the basis for a concealment crime; yet *simply unreasonable*?
    - Sydor, who verified the group lending decision in his 2011 SDNY Grand Jury is one (1) of the four (4) who "*could not remember*" anything (including his 2011 Grand Jury testimony) four (4) years later during trial (*Tr.2156-2316*).
    - ==Sydor could not remember his own texts, emails, documented phone calls, documents he signed, documents he received in the mail (and sent texts about)…but *Sydor was 100% certain he was never told exactly what he did tell the 2011 SDNY Grand Jury without hesitation*.==

**Michael Peca** confirmed the "*group*" decision to the 2011 SDNY Grand Jury and 2015 trial court and was documented by the Court's response at *ECF No. 501 at 9*.

- The court stated "*However, he [Michael Peca] <u>admitted</u> that he had testified before the grand jury that he was aware of a short-term loan made to Jowdy using Little Isle IV's capital account.*" (*Tr.499*).

- How could Michael Peca remember the "*group*" decision (via conference calls) and the three (3) who gave 2015 "I don't remember" testimony were also involved in the meetings, as presented by the government?   That cannot be the basis for a concealment crime (specifically considering the lingering **CTE**[17]

---

[17] **CTE** -- *Chronic Traumatic Encephalopathy* is defined by the Boston University neurological center (for brain trauma research) as *any post-concussion symptom* including but not limited to **memory loss**, **forgetfulness**, light sensitivity, **amnesia**, **faulty memory**, disorientation, **dementia**, **general cognitive problems**, **confusion**, impaired judgment, mood swings, sleeplessness, &/or **inability to concentrate.**

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…*

issues left unaddressed by the Court – *discovered post-trial*).  Twenty-two (22) other members (plus Michael Peca) of the Hawai'i partners have acknowledged "on the record" and "under oath" that they were aware at all times of the "*group*" decision to loan money to Jowdy; without contradiction.   Nevertheless, the government hangs their prosecutorial laurels on the remaining four (4) of the Hawai'i partners "*who cannot remember*" <u>anything empirical</u>.

- It further hi-lights the irrationality of the government's demand to forfeit the Baja Ventures 2006 (Cabo equity) from Kenner, Stumpel and Lehtinen (the latter, both non-victims [to date]) (*ECF No. 652*).

- <u>*The government confirmed*</u> the Baja Ventures 2006 capital account equity was paid for with 100% "**untainted**" funds (*See government-forfeiture-36*) [Ex.H].  In fact – the government confirmed $4.1 million was contributed by Kenner's partners, *not the $2.5 million that Jowdy documented in the Diamante operating agreement* – after stealing $1.6 million for his benefit (*ECF No. 667 at 6-7*) [Ex.X], *ECF No. 652*, [Ex.I].
  - How could those "**untainted**" funds (<u>*not considering a further 8th amendment – excessive fines clause issues*</u>) be the basis to "repay" four (4) Hawai'i investors whose money is not traceable to anything Kenner acquired; specifically <u>*not*</u> in Cabo san Lucas with his Baja Ventures 2006 partners (in Baja Ventures 2006's capital account)?

- Are the other 23 Hawai'i members (including Michael Peca after re-canting his "no knowledge" claims) supposed to benefit from a faulty forfeiture that they confirmed they knew about <u>*at all times*</u> pre-trial (lacking any nexus) -- and then make Baja Ventures 2006 partners Stumpel and Lehtinen the two (2) biggest victims of Jowdy's "**separate**" loan frauds?
  - *It is irrational at best.*

---

- In a 2012 lawsuit by 300+ NHL players versus the NHL for **CTE** – the lawsuit defined the symptoms as **memory loss, dementia, depression, CTE, and related symptoms**. The lawsuit alleged that players continue to suffer on a daily basis from headaches, *loss of train of thought*, depression, anxiety, *memory loss*, *confusion*, aggression, paranoia, irritability, impulse control problems, <u>*inability to concentrate*</u>, light sensitivity, <u>*concentration difficulties*</u>, sleep disorder and *cognitive deficit*.

19

- Why is the government ignoring that Jowdy **confessed** to the FBI in March 2010 that he received (*See 3500-KJ-2-r at 12-13*) and refused to repay the Hawai'i loan money (a.k.a. -- stole)? [18]
  - o *Jowdy's confession in 2010 confirmed* Kenner had *nothing* to do with the Jowdy frauds…and the government documented *that fact* for the Court – *suspiciously only after trial*.

**The Hawai'i operating agreement** (By-Laws – *See Bates stamp: PKHome 00011904-907*) [Ex.P] gave the Managing Member "*authorization to pay 3rd parties*" to perform activities for the LLC -- like the Constantine consulting deal, *infra*. [19]  The court should note that Constantine was one (1) of 17 hard moneylenders who received consulting payments from the Hawai'i partners between 2003-2006.  *The Little Isle 4 By-Laws authorized them* (and *Kenner received zero benefit* from any of the 17 consulting payments) [Ex.Z57].

**Constantine consulting payments…**
Constantine was one (1) of only two (2) hard moneylenders who *performed* under the terms of their agreements.  *None* of the other 16 lenders were deemed to be part of a conspiratorial act, ironic considering 15 of them *failed to perform* and retained

---

[18] The court should note that Kristen Peca verified the Peca's Jowdy loan knowledge and the cover-up lies to protect Jowdy during her 2012 FBI recordings with Kenner (contradicting the government's trial arguments; *government-forfeiture-36* [Ex.H] and *government-forfeiture-44* [Ex.G]:

*Kristen Peca – Matt [Galioto] told Michael and I that you stole all of the Hawai'i money and never gave it – the loan money -- to…uhhhh…Jowdy.*

*Kenner – Kristen – I have all of the bank records that prove the money went to Jowdy and his accounts at all times.  I told you that already. You told me that you saw the bank records after I sent them to Michael.  You know -- the attorneys who sued Jowdy for the money in Mexico and Arizona and California used them to confirm the loans before we sued?*

*Kristen Peca – but – I don't understand why he would say it.*

[19] The government presented Chris Petrellese as an expert accounting witness during their case-in-chief.   Petrellese explained to the Court during direct examination (*Tr.3934*):

*Q: From December 2004 up until December 2005, how much money did the Constantine Management Group get from Little Isle 4 and Ula Makika"*

*A [Petrellese]: The net amount is $1,000,900.*

20

==all of the prepayment fees.==   The Hawai'i partners and Kenner sued three (3) of them for recovery (*in evidence*).

- Hawai'i partners COO Chris Manfredi confirmed to the FBI in 2010 that he was aware of the Constantine consulting deal(s) (*See 3500-CM-2-r at 1*) – and others.



- Thus – ==if the government maintains that the Kaiser signatures on the two (2) Constantine agreements were forgeries (as part of the concealment) (GX-7004 and GX-7005 – but _never_ admitted during trial because they admitted pre-trial they recovered them from Kaiser's own house!??!?!)...==

  ==Then _where are the real ones that Manfredi proffered to the FBI_?==[20]

---

[20] The alleged Kaiser forgeries of the two (2) Constantine consulting agreements were the only evidence to support the alleged "*concealment*" presented at trial (*ECF No. 501 at 2*), **yet this incredible evidence is the actual "ink" versions of the alleged John Kaiser forgeries that were ==recovered from John Kaiser's own home in Long Island NY== (GX-7004, GX-7005) – and never admitted during the expert testimony or thru Kaiser --** ==because the admission of where they recovered them from "on the eve of trial" would have embarrassed the government for yet another hoax they perpetrated on this Court and jury== (without consequence, to date),

Hawai'i COO Manfredi told the FBI in October 2010 that (*See 3500-CM-2-r*):
- Manfredi knew "*Constantine was paid early*" for his consulting work (*at 1*),
- Manfredi "*did get 1 or 2 to lend[er] $*" – which were Urban Expansion [Constantine] and Centrum Financial [Berreth] (*at 1*)**,
- Manfredi "*tried to get involved in raising $*" (*at 1*), and
- "*Constantine brought in $ to project-Hawai'i*" (*at 1*).

==In 2010== -- What could Manfredi have known about Constantine's complete funding efforts -- *and told the FBI*, that he conveniently "*could not remember*" in 2015, unless he was assisted by government preparation for his testimony – failing his "*memory test*" (*Tr.3016*) -- so the government could claim "*concealment*" from some critical evidence Manfredi clearly knew (in real time) and proffered to the FBI 5-years before trial?

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)...*

21

==Highlight== The crown jewel was the fact Manfredi confirmed the Constantine consulting agreements when he told the FBI (*at 1*) –

==Highlight== "*Agreement – between PK [Kenner] or LLCs + Constantine*"

The court should note that during the November 13, 2013 search and seizure at Kenner home, the FBI recovered *photocopies* of the two (2) Constantine agreements.   The government documented them with BATES STAMPS *along with 100% of the hundreds of thousands of seized documents that day*, as follows:

- o   2004 agreement – *PKHOME00012892-12895* [Ex.Q]
- o   2005 agreement – *PKHOME12887-12890* [Ex.R]

==Highlight== Yet, on the "eve" of the May 2015 trial, the government announced that they had recovered the "*ink*" version of the two (2) Constantine agreements – **FROM KAISER, himself**.

- Further confirming that the "*ink*" versions were from Kaiser's home (after being held for ten [10] years -- since Kaiser respectively signed the agreements) -- **they were *not* BATES STAMPED, at all**.   Instead -- they were "only" labeled for trial as:

  - ▪   2004 agreement – *GX-7004*
  - ▪   2005 agreement – *GX-7005*

It is suspicious, *at a minimum*, that Kaiser would possess the "*ink*" versions if someone – ***at his home***, *forged his name* (?).   *It is wholly unexplainable*.  If the defense had produced evidence under the same "protocol" – the government would have screamed wholly hell to the court…and called them *frauds – frauds – frauds*…

- The gall of the government to continue with their forgery ruse at trial (after Kenner exposed their other 2 forgery lies pre-trial) was commensurate with their ½ pregnant approach to their false predicate that "*Kenner stole the Hawai'i money*" -- and revisionary trial testimony "with Kristen Peca in the 2005 Hawai'i investment meetings she confirmed on her 2012 FBI recordings – *that she knew nothing about*".

  - o   ==Highlight== Thankfully for the government's respect for the court, they defended these unexplainable anomalies as *faulty memory, confusion and mistakes – **NOT THE TRUTH***.

**It should be noted that Owen Nolan turned over a copy of the Big Isle 5 operating agreement from his personal files for the 2009 arbitration.   It was *Nolan Arbitration Exhibit No. 82 – further displaying transparency (See NOLAN00005782-5786)* [Ex.S].   The operating agreement was signed off by Centrum before they authorized the final $3 million loan *that Kenner personally guaranteed*.   The agreement confirmed:

*Article II: PURPOSE*

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…*

22

***Tracing the Constantine consulting payments identified by the government expert…[21]***

Another accounting item the government does <u>not</u> want the Court to identify is that the four (4) Hawai'i partners[22] [Nolan, Berard, Sydor, and Rucchin] are the only

---

> *At all times, the Company, through its Managing Member Philip A. Kenner, reserves the right to borrow, **lend** or invest on behalf of the Company.*

• The Centrum loan funds that Jowdy received – per his conversation and agreement with Hawai'i partners COO Manfredi (*See KJ1861 and PK_SEC_018158*) [Ex.Z46] were 100% authorized by Centrum and the paperwork that closed the transaction.

[21] Government witness and IRS special Agent Joshua Wayne confirms accounting funds are fungible (*Tr.4024*):

> *Q: Well, money is, and I'm going to use the word fungible; isn't that true, sir?*

> ***A [IRS Agent Joshua Wayne]: <u>It is</u>.***

[22] The government <u>needs</u> the court to disregard Berard's 2009 arbitration testimony that he approved the Jowdy loans, *infra*, and was 100% aware that Kenner was the Managing Member of Little Isle 4 -- specifically after several visits with Kenner, Manfredi and Kaiser to the Hawaiian project site in 2004-2006 -- despite his 2015 "*memory loss*" (*Tr.3099-3100*):

> *Q: By the way, when you invest in Hawaii, you and Phil Kenner, or <u>did Phil discuss with you how the investment would be organized from a corporate structure</u>, something known an LLC?*

> ***A [Berard]: No.*** [Ex.K *– at 1, 4 -- signed by Berard at 12*]

> *Q: Well, <u>did you have an understanding as to who would have the control, but also the responsibility for use of the line of credit funds when you invested</u>?*

> ***A [Berard]: No.*** [Ex.Z15]

> *Q: You had no understanding of that?*

> ***A [Berard]: No understanding, no.***

> *Q: Was the name managing member ever mentioned to you -- withdrawn. <u>Was the name "managing member" or the term "managing member," ever discussed between you and Phil in relation to your investment in the Hawaiian project</u>?*

> ***A [Berard]: I don't recall.*** [Ex.K *– at 1, 4 -- signed by Berard at 12*]

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…*

partners of the 26 Hawai'i partners in 2015 "*who could not remember their participation in the authorized Little Isle 4 By Laws activities*" (*loans to multiple individuals* [including Jowdy, Kaiser, Nolan, Manfredi – *but never Kenner*] – and *distributions to 3rd parties for authorized activities* [like legal, consulting, archeology, engineering, planning, etcetera]).

**None of the Constantine consulting payments originates from any alleged superseding indictment victims...**

And -- they have **$0** [ZERO] of their own originating capital contributions distributed to the Constantine consulting payments out of the $1,000,900 according to Petrellese (*Tr.3934*), *infra*.

- Christopher Petrellese is a *forensic accountant* for the FBI (*Tr.3909*).

**Little Isle IV payments** ($**247,500** – included in the $1,000,900, according to Petrellese) (*Tr.3933*) -- *via the Constantine consulting agreement* – identified by Hawai'i partners COO Chris Manfredi to the FBI in October 2010 as known by all management parties (a.k.a. "*not concealed*", *supra* (*3500-CM-2 at 1*):

    12-30-2004 transfer -  $130,000 (*Bates Stamp: NAAZ 153*)

        o  *From non-victim* -- Mattias Norstrom Northern Trust LOC (Loan# 279574)

    4-21-2005 transfer -  $37,500 (*Bates Stamp: NAAZ 166*)

        o  *From non-victim* -- Little Isle 4 LLC Northern Trust LOC

    5-27-2005 transfer -  $20,000 (*Bates Stamp: NAAZ 171*)

        o  *From non-victim* -- Jere Lehtinen 100,000 deposit of 5-25-2005 to Little Isle 4 account

    5-27-2005 transfer -  $60,000 (*Bates Stamp: NAAZ 171*)

        o  *From non-victim* -- Jere Lehtinen 100,000 deposit of 5-25-2005 to Little Isle 4 account

---

And...ignore the Sydor 2011 SDNY Grand Jury testimony that he also approved the loans, *supra* (both, at all times) – but in sync in 2015..."*could not remember*" any of it 6 and 4 years later, respectively, thru the haze of **CTE** or undue influence; *never the corroborated truth with empirical evidence in the government's possession.*

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)...*

**Ula Makika payments** (remaining $**743,400** – included in the $1,000,900, *supra*) -- *via the Constantine consulting agreement* – identified by Hawai'i partners COO Chris Manfredi to the FBI in October 2010 as known by all management parties, *supra* (*3500-CM-2 at 1*):

6-15-2005 transfer -  $3,500 (*Bates Stamp: NAAZ 529*)

- o **From non-victims** -- From LI4 -- $20,000 Gonchar (5-31 deposit) -- and $20,000 Lehtinen (5-25 deposit)

6-15-2005 transfer -  $25,000 (*Bates Stamp: NAAZ 529*)

- o **From non-victims** -- From LI4 -- $20,000 Gonchar (5-31 deposit) -- and $20,000 Lehtinen (5-25 deposit)

7-22-2005 transfer -  $350,000 (*Bates Stamp: NAAZ 531*)

- o **From non-victim** -- From 7-21-05 Centrum loan proceeds (to Big Isle 5) [23]

8-10-2005 transfer -  $275,000 (*Bates Stamp: NAAZ 533*)

- o **From non-victims** -- From Ka'u deposit (Tesoriero 150,000 and Ethel Kaiser 550,000) thru Ula Makika

8-24-2005 transfer -  $25,000 (*Bates Stamp: NAAZ 534*)

- o **From non-victims** -- From $20,000 Gonchar (8-16 deposit to Ula Makika) -- and 5,000 balance from Ka'u deposit (Tesoriero 150,000 and Ethel Kaiser 550,000) thru Ula Makika

9-29-2005 transfer -  $4,900 (*Bates Stamp: NAAZ 537*)

- o **From Kenner (GDM) deposits** of 9-23 ($50,000) -- 9-23 ($250,000) – and 9-30 ($50,000)

9-29-2005 transfer -  $60,000 (*Bates Stamp: NAAZ 537*)

---

[23] Centrum's loan to Big Isle 5 authorized "*lending*" pursuant to Big Isle 5's operating agreement – which Centrum signed off *prior* to completing the loan.   Owen Nolan produced the actual Big Isle 5 operating agreement into evidence -- further displaying full transparency to the Hawai'i partners by Kenner at all times [Ex.S *at 2, 4*].

      ○ ***From Kenner (GDM) deposits*** of 9-23 ($50,000) -- 9-23 ($250,000) – and 9-30 ($50,000)

The *Court M&O at 33* (*ECF No. 501*) verified: "*Petrellese testified that, from December 2004 to September 2005, CMG received a net amount of $1,000,900 from Little Isle IV and Ula Makika*". (*Tr. 3934*; *GX-41-B*).

**TRUE** – Constantine was paid pursuant to his 2004 and 2005 Hawai'i consulting agreements; *verified by the Hawai'i partners COO Chris Manfredi to the FBI in October 2010* -- and **countersigned by John Kaiser** (*who produced the "**ink**" versions of his signature(s) from his home custody to the Court on the "eve of trial" – but maintained they were forged – although in his possession for 10 years?!?*). [24]   Constantine was one (1) of seventeen (17) hard moneylenders that were paid by the Hawai'i partners, ***none of which benefitted Kenner at any time***.

Even though the government asked multiple witnesses if they were aware of the Constantine payments, *none* of them would have known Constantine's name with 1-

---

[24] This was the 3rd incident in front of this EDNY Court where Kaiser previously claimed his name was forged on a document – and it proved to be logistically impossible &/or defying logic…***or confirmed by FBI recordings that Kaiser lied about the forgeries***.

Kaiser was also found to have lied in a 2015 Arizona lawsuit about 5 more times his name was signed on Promissory Notes totaling over $500,000 of past due guarantees that he and his co-defendant [Bryan Berard] were trying to steal from sale proceeds after fraudulently conveying title [a.k.a. stealing] from Kenner [Ex.Z25 at ¶ 20, **26**, 27, 32].

- It should be noted that Berard best-friend, Lanie Donlan (*Tr.3438, 3454-3457*) was caught as complicit in the Kaiser-Berard lies about forgeries in the 2013-2015 Arizona case, as well [Ex.Z25 at ¶ 49], [Ex.Z58] (*See 3500-LD-2*).  Donlan's 2015 EDNY appearance was to solely corroborate some alleged "*tracing*" activity by Kenner that was never substantiated by a single document of the millions in government possession – or produced by Donlan for the FBI.  Donlan told the court that the FBI never asked her for the alleged "*tracing*" document.
    - *Government records show that Kenner did not spend a single night in Boston in 2005…when Donlan claimed this "event" occurred.*

- BUT -- Donlan concluded her "*tracing*" testimony during cross-examination – *without empirical evidence* –stating under duress attempting to maintain her testimony as true:

"*I don't know. I don't know. It's in '05. I don't have it. I have the memory of it. It's just something I really remembered.*"

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…*

2 exceptions in 2004 when Constantine met face-to-face in Arizona with Hawai'i partners COO Chris Manfredi to begin the consulting work (*Tr.3004*). [25]

- Why would the individual investors know Constantine's name or any of the other sixteen (16) hard money lenders that were paid; or any paid attorneys, contractors, engineers, architects, environmental engineers, etcetera?

    ANSWER: "*They would not have any reason to know their names.*"

*It is not explainable that <u>ZERO</u> dollars are traceable to the 4 Hawai'i partners "who cannot remember what they previously knew -- and testified about years earlier" and was the primary basis of their lawsuits versus Jowdy -- yet <u>none</u> of their funds are directly traceable to the payments the government's own "expert" confirmed as $1,000,900 (Tr.3934).*

- Nevertheless (without nexus) – the government wants the Court to call those funds a fraud (from non-victims).   It is more indefensible "*smoke and mirrors*".

- The government had a 6-year investigation that could have convinced any of the other 22 Hawai'i partners (or all of them) to testify.   *They did not*…

---

[25] [Hawai'i partners COO Chris Manfredi testimony about his initial 2004 meeting with Constantine – further verifying the concerted efforts by Constantine and the Hawai'i partners to raise development funds] (*Tr.3004*):

> *Q. Well, did you speak to Mr. Constantine at any point in regards to the Hawaiian projects?*
>
> *A [Manfredi]: Yes.*
>
> *Q. In person or by e-mail?*
>
> *A [Manfredi]: <u>I recall in person</u>.*
>
> *Q. And <u>where was that</u>?*
>
> *A [Manfredi]: That was in Scottsdale, Arizona.*
>
> *Q. Other than that one -- when was that? I should put a time frame on that, Mr. Manfredi.*
>
> *A [Manfredi]: I don't recall the exact year.   It was prior to '05 [when Kaiser signed the first consulting agreement with Constantine].*

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…*

*The government underlined_needs the Court to look the other way – and ignore the empirical evidence in their possession -- to avoid sheer embarrassment again.*

**Global Settlement Fund ("GSF"):**
- **There are no financial victims…**

| Investor | Investment funds | Current equity ** | Gain/(Loss) |
|---|---|---|---|
| Peca | 250,000 | *??* | **(935)** |
| McKee | 250,000 | *??* | **(935)** |
| Sydor | 250,000 | *??* | **(935)** |
| Rucchin | 50,000 | *??* | **(186)** |
| Ranford | 300,000 | *??* | **(1,123)** |
| Nash | 100,000 | *??* | **(374)** |

** Please note that the GSF contributors *also* received shares of Eufora from Constantine as part of the GSF funding.   The government has never submitted an appraisal or current 3rd party valuation to assert that Eufora has ever been valued under the 2009 Neptune Capital independent valuation of $20,000,000.   Thus – no Eufora value is included in the retained assets – although there is clearly value in the Eufora patents that are still valid today. [26]

---

[26] The government has *not* presented evidence that the Eufora patents are worthless – or retain any less value than the 2008-09 Neptune $20,000,000 valuation – **and**

*The 2010 Giuliani investigative team's demand to acquire 6% of Eufora's equity in exchange for their vetting work for the AZ Eufora Partners I investors.*

Text from Jay McKee to Kenner following his independent meeting with Giuliani's team:



| 14797 | +17168034903 Jay McKee* | 7/15/2010 12:03:01 PM(UTC+0) | Read | Hopefully you're getting some sleep right now; I am planning on sending the letter this morning.. **Within our package or plan in taking the lender out, where is the 6% for Guilani partners comming from?** |
|---|---|---|---|---|

The Court must "make a reasonable estimate of the loss" that is based in "available information" and supported by a preponderance of the evidence, *Id.* (quoting *U.S.S.G. §2B1.1 cmt. 3(C)*).  *See also United States v. Middlebrook*, 553 F.3d 572, 578 (7th Cir 2009) ("[T]he true measure of intended loss [is] in the mind of the defendant.")   Before making an intended loss determination, however, a district court must make a specific factual finding regarding the scope of the defendant's subjective intent.

28

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…*

o The government *lied* during summation and claimed there was no Eufora operating agreement (*Tr.5988*) (*GX-210*...*there own evidence*).

Alleged GSF victims from the superseding indictment include (1) **Jay McKee** [$250,000], (2) **Michael Peca** [$250,000], (3) **Darryl Sydor** [$250,000], (4) **Steve Rucchin** [$50,000], (5) **Bill Ranford** [$300,000] and (6) **Tyson Nash** [$100,000]. This totals $**1,200,000**.

In spite of the court's own minimalist evaluation of the Gonchar-Constantine side deal (*Tr.4826-27*) – and *ignoring* the Constantine $124,982 personal contribution (*Tr.5460*), the court has found no more than $**17,077** as "overspent" by Constantine alone (never including Kenner).

The Court confirmed in *ECF No. at 60* that Constantine (alone) overspent the GSF by $**17,077.40**.   The Court knows that Constantine stipulated at trial to have (1) controlled 100% of the GSF, (2) made all of its decisions, and (3) directed its underlying disbursements – ***at all times***.

- Yet, the court *failed* to account for the Constantine deposit to the Ronald Richards Trust fund on 9-8-2009 for $124,982 (*Tr.5460*).

- The court *failed* to recognize Sergei Gonchar's testimony that he allowed Constantine to have personal access to his entire $1,500,000 contributions to the Ronald Richards Trust account (*Tr.4826-27*) (not just his initial $250,000). [27]

---

- The government has not presented any evidence – *clearly falling short of any preponderance standard*.

[27] Gonchar testimony (*Tr.4826-4827*):

*Q. And was that agreement also, did it cover the other monies that you --*

*A [Gonchar]. Yes. As I said, like in my understanding it was like as long as he is going to pay it back, I don't mind him using the money I'm putting in.*

*Q. That would include all of the monies that you had put into the Ron Richards' account?*

***A [Gonchar]. Yes.***

*Q. Is that right?*

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)...*

Nevertheless – the government presented over a dozen non-victim witnesses to verify **legal** transactions from the Ronald Richards Trust account to Constantine's 3rd party payees (all with authorization from Sergei Gonchar – another non-victim in the superseding indictment). [28]

- *No person can be considered a victim to the GSF* – despite Kenner and Kenner investors' disappointment in Constantine's poor business decisions, tactics and execution of his proposed GSF plan...

*BECAUSE*...
- Each GSF contributor **signed-off** on the use of funds directly for Constantine [Ex.Z50]
- Each contributor **authorized** the use of funds after face-to-face meetings with Constantine [Ex.Z50] (*See McKee text communication – Kenner PSR objections at 38-40*)

---

*A [Gonchar]. Yes.*

[28] **Tyson Nash** (*Tr.1919-22, 1944, 1989-90, 2003*) and **Kenner** (*Tr.4925-26*) gave testimony during the trial to verify the "*bad apples*" (Nolan, Juneau, Moreau and Myrick) that were being extracted from the group's investment deals – utilizing the GSF as the signed-off authorizations (and pre-cursor) emails all verified in detail [Ex.Z49 -- Peca] [Ex.Z24 – McKee].

The "bad apples" testimony was further corroborated by **Jay McKee**'s 2009 text communication with Kenner confirming _McKee knew 100% of the GSF uses_ – including the juxtaposed "*black sheep*" (*ECF No. 668 Appendix at 49-50*) – and he spoke to **Michael Peca** about it before both of them agreed to contribute to the GSF – and **signed off** (*See Bates stamp: SMC-000015* [Kristen Peca] [Ex.T], *See Bates stamp: SMC-000018* [Jay McKee] [Ex.U], and *See Bates stamp: ED-002051 and BX20-SD-000075* [Michael Peca] [Ex.V]).   *See Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A.*, 461 Fed. Appx. 61; 2012 U.S. App. LEXIS 3012.
- In *Horvath*, **the investor argued that the terms and conditions were _written in Portuguese_, which he did not understand, but the court of appeals found that the investor was charged with knowing and understanding the contents of the documents that he signed**.

- If the signer can read the instrument, not to have read it is gross negligence; if he cannot read it, not to procure it to be read is equally negligent; in either case the writing binds him.  Parties are bound by documents expressly incorporated by reference into agreements to which they manifest their assent.

- Each investor was represented by independent counsel (*See Bates stamp: DS-000515-519 and HARV P-0000025-29*) [Ex.Z59]
- Attorney Ronald Richards **confirmed** Constantine's 100% control and the unabated contributors' knowledge during his 2015 testimony (*Tr.3805-06*) (complimenting Richards' 2012 response to the Michael Peca and Jay McKee California Bar complaints (*See Bates stamp: DS-0000277-282*) [Ex.W] – written by Jowdy's attorney, Tom Harvey, to distract the investors from the actual Jowdy crimes and Harvey's-own documented criminal complicity) (*ECF No. 667 at 23-24*) [Ex.X].

With Kenner maintaining *zero control* and receiving *zero benefit* in the GSF (identical to the Jowdy loans), what reasonable trier of fact would deem Kenner to have conspired to defraud anyone?
- The Court and government know that Michael Peca and Tyson Nash confirmed Kenner's non-involvement (*Tr.540 [Peca], 3500-TN-3 at deposition pg.12*).

**Eufora private stock:**
- **There are no financial victims…**
  - **Full consideration was transferred and documented for each 2008-09 private stock investor by the Eufora CEO…and vetted by their-own attorneys…**

| Investor | Investment funds | Current equity †† | Gain/(Loss) |
|---|---|---|---|
| Peca | 100,000 | ?? | (0) |
| Sydor | 50,000 | ?? | (0) |
| Rucchin | 150,000 | ?? | (0) |
| Ranford | 300,000 | ?? | (0) |
| Nash | 100,000 | ?? | (0) |

†† Please note that the 2008-09 Eufora private stock purchasers, *supra*, received their stock from Constantine and Gaarn (*See trial exhibit Kenner 80* [Ex.Y] and *Bates stamp: ED-000773-810 at 35, 37*) [Ex.Z]. [29]   The government has never submitted an

---

[29] Kenner's text to McKee the night of McKee's face-to-face GSF meeting (5-9-2009) with Constantine and McKee in Buffalo, New York, as part and parcel to the meetings *transparent* recap text communication:

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…*

31

appraisal to assert that Eufora has ever been valued under the 2009 Neptune Capital independent valuation of $20,000,000.   Thus – no Eufora value is included in the retained assets – although there is clearly value in the Eufora patents that are still valid today.

- This applies to all of the 2008-09 Eufora private stock sales by Gaarn and Constantine.

- The government lied during rebuttal summation claiming (*Tr.5988*):   *"There is no backup. There is no [Eufora] operating agreement"* (GX-210).
  - Obviously there was, they numbered it in their-own evidence for trial, and another prejudicial lie was espoused [Ex.Z].

Alleged GSF victims from the superseding indictment include (1) **Michael Peca** [$100,000], (2) **Darryl Sydor** [$50,000], (3) **Steve Rucchin** [$150,000], (4) **Bill Ranford** [$300,000] and (5) **Tyson Nash** [$100,000]. This totals $**800,000**. [30]



| | | | | |
|---|---|---|---|---|
| 8269 | +17168034903 Jay McKee* | 5/9/2009 2:32:11 PM(UTC +0) | Sent | Tommy said you will get 1/10th of everything that is acquired of theirs which includes 20% (2% for you) of the airpark building, **1/10th of their 3.64% of their Eufora shares (.364% for you which puts you just over 1% in Eufora)** and then a small piece of the jet which TC is still crunching numbers on but it will probably be 1% of it. |

[30] The court should note that **Kenner** (approximately $1.5 million), **Sydor** ($50,000), **Rucchin**  ($150,000) and **Ranford** ($300,000) all filed adverse proceedings (in ProSe) versus Constantine's 2012 bankruptcy [Ex.Z2a].

Each individual represented in ProSe to the Arizona bankruptcy court that *they had purchased stock directly from Constantine* in 2008 and were asking the court to intervene and confirm their individual shares were properly transferred in lieu of the bankruptcy proceeding (*See trial exhibit Kenner 80* [Ex.Y] and *Bates stamp: ED-000773-810 at 35, 37*) [Ex.Z].

As a result – "knowledge" of their private stock purchases could not have been "concealed" (just the transparent opposite again) – including the independent, incremental vetting by Rudy Giuliani's investigative group (signed off by 27 Eufora investors on July 16, 2010 – [Ex.Z3]).

- 6 other non-victim investors filed ProSe claims versus the Constantine bankruptcy with the identical private stock purchase acknowledgements: Greg **deVries**, Mattias **Norstrom**, Glen **Murray**, Rem **Murray**, Jozef **Stumpel** and Brian **Campbell** -- all of which were independently represented by the Giuliani group.

There is **$800,000** of investments into Constantine's Eufora in 2008-09 from the named superseding indictment alleged victims.

**Rudy Giuliani's investigative group, led by New York corporate attorney, Michael Stolper, _represented all of them_**.   Attorney Stolper had 27 of the Eufora investors sign off on his full disclosure letter [Ex.Z3 *at 9-18*] regarding the 2008-09 Constantine and Gaarn private stock sales -- and the loan buy out efforts [although completely _forgotten_ by Berard (*Tr.3111*), Peca (*Tr.604*), Kaiser (*Tr.1400*) and Gaarn (*Tr.2640*) in perfect synchronicity during trial].   Hundreds of their own "real time" texts with Kenner in 2010-11 fully impeach each of them – notwithstanding **CTE** or *faulty memory, confusion and mistakes*.

- *Nothing could possibly have been concealed; after verification from their-own texts with Kenner and each other* [Ex.Z62, Z62a].   it was simply another government-coordinated fraud on the court; unless the five (5) main loan buy out investors could not remember something in sync that occupied nearly a year of their lives in 2010-2011.   It is confounding and unexplainable, short of harmonized suborned perjury or **CTE**.

Nevertheless – Eufora received a $3,000,000 loan from Neptune Capital in early 2009 – in the middle of the private stock purchase period.  Neptune funded Eufora after a 6-month due diligence period and their independent resulting _$20,000,000 valuation_.    Constantine and Eufora have the valuation back-up verifications.

One year later (2010) – Giuliani's group demanded a 6% equity stake in Eufora, in lieu of payments for their legal and investigative efforts, *supra*.   Both of these independent valuations – *confirming the clear intrinsic value of Eufora* – demonstrated that full consideration was given to the individual private stock investors at the time of the bonafide purchases for value by the Eufora Board; _independent of any Kenner actions_.

All Eufora Board Members signed the 2009 Eufora operating agreement, documenting the 2008-09 stock transfers (including Tim Gaarn acknowledging his-own remaining Eufora shares thru his 100%-owned Standard Ventures, LLC – *Tr.2570-2571*) [Ex.Z at 35] (*GX-210*).   Kenner had not been a Eufora board member since 2005, when the responsibility and Kenner stock was transferred to Tim Gaarn.

- _Only_ FBI intervention post-2012 has affected the value of Eufora and its underlying equity owners, *if at all*.

- No loss of value can be attributed to Kenner – if in fact Eufora has even lost value since the fully vetted private stock transactions by Gaarn and Constantine thru 2011.

**Individual investors:**

Each of the superseding indictment investors will be addressed, *infra*, with the understanding that the evidence that applies to one – for forensic accounting review – applies to all of them.   The government has not raised any special circumstances to include or exclude any specific individual from the analysis...

**Michael Peca:**

| Hawai'i | Eufora | GSF |
|---------|--------|-----|
| 1,875,000 | 100,000 | 250,000 |

According to several sources on the Internet, Michael Peca earned a career total of approximately **$23,299,273**.   His investments in the instant case were a small subset of his overall investment strategy and totals, at all times. [31]   Any financial hardship is a result of his-own financial malfeasance and lifestyle decisions, and not a representation of a small subset his overall, fully signed off and authorized investment strategy.

Michael Peca told the 2011 SDNY Grand Jury that he was *in charge* and *made all of the final decisions* on his investments, *never forced*.   Michael Peca also explained that he was comfortable with the amounts of money he invested in each of the investment deals, as follows (*at SDNY Tr.18*) [Ex.A]:

> "*On all of them [investments], through all the times, I made the final decision.  I may not have done as much due diligence that some may have done.  Its not like I had to say yes or forced.   I made the decision to say, yeah, I want to do that.  Based on the money I was making at the time it didn't bother me to invest those kinds of dollars.*"

---

[31] The court should note that Michael Peca also received a **$3,000,000** tax-free insurance payment from a disability insurance policy that Kenner secured for him, simply adding to his career "take".   This is similar to the $5,000,000 insurance payout settlement that Owen Nolan received in 2006.

34

*Hawai'i* – Michael Peca told the 2011 SDNY Grand Jury he was 100% aware of the Jowdy loans – after his LOC funds and another $100,000 was *authorized* by him to deposit in the Little Isle 4 (Hawai'i partners) capital account (*Michael Peca SDNY Grand Jury Tr.30-31*) [Ex.A].  **Michael Peca cannot be a victim of what he was aware of and authorized – regardless of CTE &/or faulty memory, confusion and mistakes**.

- The court needs to ask who else was part of the "*group*" decision that Peca told the 2011 SDNY Grand Jury about.   Corroborated by two (2) Hawai'i partners – it was Darryl Sydor and Turner Stevenson, *infra*, who established the same "*group*" verification during their independent and secret SDNY Grand Jury testimony, that same day.
    o **At a minimum, that <u>also</u> must eliminate Sydor as a victim of anything to do with loans to Jowdy that he verified and confimred in 2011, *infra*…**

Turner Stevenson (a non-victim in the 2015 superseding indictment) testified to the 2011 SDNY Grand Jury *with FBI agent Galioto present* (*at SDNY Tr.17-18*) [Ex.A]:

> *Q: So are you saying that <u>you agreed to transfer some of the money from the Hawai'i project to the Cabo project</u>?*
>
> **A [Stevenson]: I would say that, <u>yes</u>.**
>
> *Q:  Who made that decision?*
>
> **A [Stevenson]: <u>I think all of us as a group</u>.**
>
> *Q: What do you mean as a "group", who is the group?*
>
> **A [Stevenson]: <u>All the guys who were invested in it</u>.**

Michael Peca granted Kenner full permission to withdraw the LOC funds thru Peca's **one-page**, signed ***Letter of Authorization to Northern Trust Bank,*** *infra*– which Mike Peca also affirmed to the 2011 SDNY Grand Jury *at SDNY Tr.39* [Ex.A]:

> **"It was prepared for me, I read it, and signed it".** [32]

---

[32] See *Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A.* – confirming that once Peca signed the document (which he confirmed to the SDNY Grand

The Northern Trust Authorization letter with identical content for all of the Hawai'i
partners LOC investors stated:

Michael Peca's Northern Trust *Letter of Authorization* specified to Northern Trust
Bank (*Bates Stamp -- TNTC000091*) [Ex.Z1]:

> "*This letter is your authorization to allow Philip A. Kenner to access my above
> referenced line of credit for direct deposit to the Little Isle 4 account at
> Northern Trust.    He is authorized to sign for the release of funds related to the
> line.*"

*Michael Peca cannot be a victim of concealment* – after his own verification of the
*Letter of Authorization* [Ex.Z1].

> As a non-victim in the superseding indictment, government witness Glen
> Murray confirmed his blanket authorization to Kenner, as well (*Tr.3512*):
>
> > *Q. And then we know, sir, that you ultimately signed a document
> > authorizing your line of credit to be accessed by Phil for purposes of the
> > Hawaii project. Isn't that correct?*
> >
> > **A [Glen Murray]: Yes.**

**Michael Peca re-canted his "no knowledge" synchronized testimony...**

During 2015 cross-examination – Michael Peca re-canted his "*lack of knowledge*"
testimony -- and confirmed he "*knew at all times*" of the Jowdy loans.  Peca verified
that he confirmed to the 2011 SDNY Grand Jury the "*group*" decision to loan the
Hawai'i partners' funds to Jowdy (*under subpoena from FBI Agent Galioto*) (*SDNY
Tr.30*) [Ex.A]:

> *[Michael Peca]: "A short-term loan [was made] to Mr. Jowdy because at the
> time Cabo – we hadn't gotten the lending from Lehman Brothers yet.  **We** made
> a short-term loan until the lending came in.  Once the lending came through
> they were to pay back the loan, I think in the neighborhood of five-and-a-half*

---

Jury in 2011 – the related authorizations are his burden to understand; not subject to
further and never-ending re-documentation or explanations).

36

*million dollars, on the closing.   It was never paid back.  And then communication basically seized [sic] at that point from him [Jowdy].  That was kind of the whole sticking point as far as me **and the other guys** with Mr. Jowdy."*

In spite of Mike Peca's inconsistent testimony in 2015 (*Tr.436*), when he claimed "*no knowledge*" of the defaults and Kenner's alleged lack of explanations, Mike Peca did <u>*NOT*</u> mention any of that to the 2011 SDNY Grand Jury, **under oath (four [4] years closer to the actual events)**.

In fact, Mike Peca represented exactly the opposite – four (4) years before trial -- with the following statements, when asked how much money he invested in Hawai'i (*thru Little Isle 4's capital account*).   Instead of stating $1.8 million (or some unknown amount) and pausing his testimony "due to concealment", he offered a meticulous and eloquent narrative of the use of funds and his planned participation in the loans to Jowdy "*as a group*", as follows (*SDNY Tr.30-31*) [Ex.A]:

*Q: How much did you put into Little Isle 4?*

*A [**Mike Peca**]: "$100,000 cash investment that was going towards that.  Then we had lines of credit.  I had one out for $1.7 million that was going to be used at the time.  Here's where a lot of the cross starts to happen.  **A short-term loan to Mr. Jowdy, because at the time Cabo – we hadn't gotten the lending from Lehman Brothers yet.  <u>We</u>** made a short-term loan until the lending came in.  Once the lending came through they were to pay back the loan, I think in the neighborhood of five-and-a-half million dollars, on the closing.  It was never paid back.  And then communication basically seized at that point from him [Jowdy].  **That was kind of the whole sticking point as far as <u>me and the other guys</u> with Mr. Jowdy.***

*The 1.7 along with the $100,000 and **whatever else put in this a capital account**, Little Isle 4, I believe.  **<u>The Capital account was loaned to Ken Jowdy</u>**, our business partner, so there is no need <u>at the time</u> to be worried about anything.  **<u>The money was loaned to Ken Jowdy to basically help some of the purchase of the Cabo property so we can get the funding</u>**.   <u>And then it was supposed to [be] a short-term loan.</u>"*

- Please note that Mike Peca told the 2011 Grand Jury that he expected 100% of his Hawai'i "capital account" funds (over **$1.8 million**) were supposed to be **in** Little Isle 4's capital account and **loaned to Jowdy**.
  - Peca's "expected" contribution to the Jowdy loans is _more than_ the entire superseding indictment alleged victims contributed to the 2004 Little Isle 4 By-Laws authorized "loans" – of $1,315,000 (including Peca and Sydor).

As a result of Peca's contradictory previous knowledge (supporting Kenner's full transparency), the court _cannot_ overlook the sheer perjury of Kristen Peca regarding her alleged knowledge of the LOC and its usage.

As the Court knows, Kristen Peca recorded Kenner for the FBI for five (5) hours in 2012.

_During the surreptitious recording of Kenner_ -- Kristen Peca confirmed she was _not_ aware of _her husband's_ LOC until sometime in 2008-09 when Michael Peca was playing and living with his family in Ohio.

[At approximately 5.45 of the 1:34.50 call] – Kristen Peca tells Kenner:

> **[Kristen Peca]** – _Well, I was referencing the earlier stuff that you said, I don't remember a large amount being distributed back to our account and the timing of the years of the loan, the line of credit, that happened when we were in Ohio [2008 & 2009]?   I don't understand how it could have been open for 5 years before that?   Because we had a bond account going?   Do you mean the Hawai'i; you had a line of credit, **but not for us**?_

> **[Kenner]** – _No, no, you guys had lines of credit for 5 years at Northern Trust._

> **[Kristen Peca]** – _**for 5 years?**_

> **[Kenner]** – _for 5 years!   When you were in OHIO, that's when the thing [LOC] closed._

- _Kristen Peca cannot believe that she is finding out on a phone call in 2012 that her husband, Kenner's client, had a LOC open for five (5) years_ _without_ _her knowledge._

How could Kristen Peca have agreed to a 6-month LOC in 2005, when she admitted on the FBI call that she did not know about the LOC until 3-4 years later (_in 2008-09 when it was about to close_)?

38

_Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…_

○ *It is logistically impossible; nevertheless, the government let the testimony stand uncorrected.*

Kristen Peca also confessed that she was not aware that $555,571 was distributed back to Michael Peca's LOC in August 2006 (*from the Lehman Brothers closing*) or the $42,553 deposited into Michael Peca's Charles Schwab investment account (*also not in her joint name*) in 2006.

• Kristen Peca *confessed* on the FBI call that she did not know about the Hawai'i LOC investment until 2008-09. She even guessed that Kenner was mistaken because:

  ==*Do you mean the Hawai'i; you had a line of credit, but not for us?*==

How could Kristen Peca have participated in the 2005 set-up meeting or the 2006 distributions to their Northern Trust and Schwab accounts (documented in Rule 16 evidence)?  ***She could not***!

• Planned perjury is the only 2015 answer to her injurious claims – and the government willingly allowed it as planned.

**Kristen Peca and Michael Peca synchronized lie about vertical construction…**

Nevertheless, after Michael Peca said "*nothing*" to the 2011 SDNY Grand Jury about using his money solely for "*vertical construction*" (*supra*) [Ex.A], it became the main fabricated "theme" of his and his wife's testimony in 2015.  *The coordination of Kristen Peca's testimony verified that she and her husband had been prepped to perform in sync* and according to the government's theories and new storyline; *not in concert with their previous empirical evidence (and Kristen Peca's admitted "lack of knowledge of anything until 2008-09".*  It was an epic sham on the court.

Michael Peca told the 2015 EDNY court (*Tr.381*):

  *Q: And how much money did you invest in the project?*

  *A [Michael Peca]: The investment was in two pieces. There was a hundred thousand dollars cash portion that was invested. And then there was going to be a line of credit for $1.775 million that I had the ability to do. That was also going to be invested, which was going to be used, I was told to expedite some of the vertical construction, building some ranches, infrastructure, things like that. And that was to give me roughly 12 to 13 percent of the Little Isle IV, LLC.*

And Kristen Peca followed her script perfectly – despite Michael Peca never mentioning any of those items to the Grand Jury, four (4) years earlier.  *Suborned* is the only explanation – because Kristen Peca is not subject to a *faulty memory, confusion and mistakes* defense based on **CTE**.

Kristen Peca testified (*Tr.697*):

> *Q: And was there another part of the investment?*
>
> *A [Kristen Peca]: Yes. The other part that he mentioned was -- and this is going to be a little more difficult to explain, but our line of credit, he needed to gather -- he said he needed to get a line of credit -- I'll explain what that is in a moment -- would help with the development in -- vertical development, infrastructure, construction to get the land going, and the land and/or Lehman Brothers would come in with their funding that he was looking into and we would get the money paid off that would be done.*

How did Kenner explain to her in 2005 about "*vertical construction*" when she recorded herself in 2012 that she did not even know about the LOC investment until 2008-09 at the earliest – when the Hawai'i joint venture deal closed?!?

- Again – logistically impossible...but left to stand by the knowing government...

**Kristen Peca lies about her "bonds" that went to Northern Trust Bank as collateral...**

Kristen Peca's lie became even more elaborate about the LOC and the collateral bonds (*Tr.698-699*) – **BECAUSE**

> **Michael Peca *never* moved a bond portfolio to Northern Trust bank...**

Kristen Peca's testimony was 100% a lie – solely fabricated for emotional effect – and dishonest.  *Michael Peca transferred $2,000,000 in cash*.  Michael Peca's March 2005 Northern Trust bank statement confirms it – and the government knew it [Ex.Z55 at 7].   But what did the government's (mis)leading Q&A elicit?:

> *Q: When Mr. Kenner first proposed to you to move the safety net and make it collateral for the line of credit, were you able to do that?*

40

*A [Kristen Peca]: No. I said right away, no, no, no, no, no, not touching that, that's my baby. I put that together. That's our safety net, I don't like that. And he reassured us over and over no, no, no, this not the money account, the line of credit, that's collateral, nothing is going to happen to it, not a penny will go missing, Kristin it's okay, this is only six months, he kept reassuring me, nothing will happen to it. The bank needs to hold on to it in order for us to get the money for the project.*

*Q: Did you ultimately decide to invest and move your bond account?*

*A [Kristen Peca]: Yeah, we did.*

- *No bond account was ever moved*!   Someone needs to hold the government and Kristen Peca accountable for their suborned perjury.  Kristen Peca's "bonds" story was a 100% fabrication by her and the government who tried to elicit sympathy by lying to the court and jury.
  - *Apparently the lies worked...*

In addition – there was no communication or expectation prior to February 2005 that Lehman Brothers was going to have anything to do with financing the Hawai'i project.   SO – even if Kristen Peca was in the meeting, Lehman Brothers could never have been discussed as an exit strategy any more than a collusionary bank in the Kremlin.  It was another fraud perpetrated on the court by a prosecutorial effort to mis-align every logistical element of the truth and recreate their theories to support conviction at all costs; even suborned perjury, which cannot be disputed in the face of the reality (*supra*).

**Control of the Hawai'i partners (Little Isle 4) capital:**

The Little Isle 4 By-Laws "**controlled**" the "**use of funds**" once the _authorized_ transfer from Michael Peca (and the other Hawai'i LOC investors) was granted [Ex.P].

This is simple business-practice law, ignored by the government to claim, "*if a specific transaction was not remembered thru their failed memory test*" (10 years later), there was a fraud perpetrated on the investors, via "*concealment*".

41

The "*memory test*" standard was unreasonable and cannot be the basis for a concealment prosecution that only 4 of the 26 Hawai'i partners claimed, they "*could not remember*" – including Peca's re-canting on cross-examination.  Accentuating the unreasonable standard is the fact that:

- 19 of the 26 Hawai'i partners sued Jowdy to recover the funds starting in 2008 (in Mexico, Arizona, Nevada and California) [Ex.Z21, Ex.Z43, Ex.C, Ex.E, Ex.F],
- Several Hawai'i partners gave civil testimony to confirm their knowledge [Ex.Z64, Ex.Z65],
- Several Hawai'i partners proffered to the FBI about their knowledge (*3500-JK-1-r at 2,3,10, and 3500-SG-2 at 8-9*),
- Several Hawai'i partners signed affidavits to confirm the Jowdy loans and their underlying knowledge and forwarded them to the FBI years before trial (*3500-SG-4 at 4-5 -- and 3500-MN-2 at 3*), and
- Several Hawai'i partners testified that they possessed the actual 2004 Hawai'i-Jowdy loan agreement (*Tr.1127 [John Kaiser], Tr.3608 [Glen Murray]*)...

But – in 2015, the government was able to solicit from **Michael Peca** (until his recanting – *Tr.498-99*), **Owen Nolan** (*Tr.2065-66*), **Darryl Sydor** (*Tr.2156-2316*), and **Steve Rucchin** (*Tr.2721-23*) that they "*could not remember*" the Jowdy loans.

Non-victim Glen Murray confirmed (*Tr.3608*):

> *Q Now, when Mr. Miskiewicz asked you questions about <u>the lawsuit you brought against Ken Jowdy, you confirmed that the loan agreement itself you had received through and from Phil Kenner, is that correct?</u>*

> **A [Glen Murray]: Correct.**

> *Q But though you received the promissory note from Phil Kenner, <u>it was a promissory note wherein Ken Jowdy agreed to pay you back the money that you were loaning, isn't that true?</u>*

> *MR. MISKIEWICZ: Objection; hearsay.*
> *THE COURT: Overruled based upon the redirect. Go ahead.*

> **A [Glen Murray]: <u>Correct.</u>**

Non-victim John Kaiser confirmed (*Tr.1127*):

42

*Q Did you ever see, sir, a document entitled Revolving Line of Credit Loans December 7, 2004 which purports to be or is a written loan agreement between Ken~~ner~~ [sic] Jowdy and the Hawaii Project?*

*A [John Kaiser]: Yes; Mr. Kenner sent it to my residence.*

- *Both government witnesses confirmed __nothing__ was concealed from them.*

But – in 2015, the government was able to elicit from **Michael Peca** (until his recanting – *Tr.498-99*), **Owen Nolan**, **Darryl Sydor**[33], and **Steve Rucchin** that they "*could not remember*" the Jowdy loans.

Although the government did *not* name **Turner Stevenson** as a superseding indictment victim – Stevenson gave "*under oath*" testimony to the 2011 SDNY Grand

---

[33] Four (4) years earlier at the 2011 SDNY Grand Jury -- Darryl Sydor confirmed the Jowdy loan from the Hawai'i partners -- and his underlying knowledge without hesitation (*See Sydor SDNY Grand Jury Tr.25-26*) [Ex.A]:

*Q:  Was that [the LOC at Northern Trust Bank] also for Little Isle 4 as far as you know?*

*A [Sydor]: Yes, but then we put it towards a short-term loan to Mr. Jowdy until Lehman Brothers came up with the money that was supposed to be paid back."*

*Q: Did you know in advance that it was going to be used, this Little Isle 4 money, to be used to salvage the Cabo investment?*

*A [Sydor]: Yes.  It was to help with the short-term loan to keep funding the Cabo, but then its supposed to be paid back, but that's –*

*Q: Paid back to you or to Little Isle 4?*

*A [Sydor]: Paid back to Little Isle 4.*

*Q: So –*

*A [Sydor]: Back to Hawai'i, not me personally.*

*Q: Bu that didn't happen?*

*A [Sydor]: That didn't happen.   And Lehman came up with the $129 million loan. It was supposed to be back at closing.*

43

Jury as well, *infra*.  Stevenson confirmed his unfettered knowledge of the Jowdy loans and the "*group*" decision to provide the lending deal to Jowdy. [34]

The court must use a reasonable standard to ask -- "*Did Kenner include 22 of the Hawai'i partners in the decision to loan the funds to Jowdy in 2004 (100% authorized by the LLC By-Laws) – and consciously decide to exclude the 4 future government witnesses who were suffering (in 2015) from* **CTE** *or* faulty memory, confusion and mistakes *(ECF No. 440 at 16 [35])?*"

---

[34] Turner Stevenson testified at the 2011 Grand Jury.  Stevenson was the 3rd handpicked witness (*by FBI Agent Galioto*) (*See Stevenson SDNY Grand Jury testimony at 17-18*) [Ex.A]:

 *Q:  When you put up $100,000 for Hawai'i, did you have any understanding of whether the money could be used to pay for the Mexico project or was it just supposed to go to the Hawai'i project?*

**A [Stevenson]: In the beginning it was supposed to go to Hawai'i. Then I saw they needed, the group of us got together [emphasis added], we have this piece of land that's available for purchase in Mexico that we need to wait on or get funds on to transfer as a group like one big blanket to get money into Cabo and pay for that land to hold it until the loan came.**

*Q: So are you saying that you agreed to transfer some of the money from the Hawai'i project to the Cabo project?*

**A [Stevenson]: I would say that, yes.**

*Q:  Who made that decision?*

**A [Stevenson]: I think all of us as a group.**

*Q: What do you mean as a "group", who is the group?*

**A [Stevenson]: All the guys who were invested in it.**

After the three (3) Grand Jury testimonies in 2011 (*and no evidence in contradiction thru that date – seven [7] full years after the loans to Jowdy began*), there could be no question about the Jowdy loan knowledge "***as a group***".

[35] A witness perjures herself when "she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of *confusion, mistake, or faulty memory*." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).

It is highly illogical, specifically considering all of the Hawai'i partners were friends, teammates &/or acquaintances of one another – making the alleged "secret"[36] even more difficult to fathom.

_____

[36] The Managing Member of the Hawai'i partners (since 2007) – John Kaiser – gave 2009 arbitration testimony (*Nolan. v. Kenner*).   Kaiser confirmed there were _no secret handshakes_ with all of the Hawai'i partners he had met thru 2009 (while serving as the Hawai'i partners' Managing Member).

**Kaiser confirms no secrets about the Jowdy loans from the Hawai'i investors** (*Nolan Day 5 – Tr.928-929*) --

> *Q: Has this ever been a secret that Mr. Kenner lent this money to Mr. Jowdy?*
>
> **A [Kaiser]: No.**
>
> *Q: Was this a transaction that, as your view as an investor was open and disclosed to everyone?*
>
> **A [Kaiser]:** It was open.   **There was no secret handshakes or nothing like that**.

**In May 2009 – Kaiser has "NO COMPLAINTS" about Kenner** (*Nolan Day 5 – Tr.929*) --

> *Q: Even now, sitting here in May 2009, is there anything you've uncovered, as someone who obviously knows how to investigate, that Mr. Kenner has done anything inappropriate throughout these transactions?*
>
> **A [Kaiser]: No.**
>
> *Q: Not one complaint?*
>
> **A [Kaiser]: No.**

**Kaiser confirms 6-month Jowdy loan (during his 2009 arbitration testimony) – not 30 days (per his tailored 2015 testimony)** (*Nolan Day 5 – Tr. 926-928*) --

> *Q.   So at the time was there any representation about getting paid back this money when the Cabo deal closed?*
>
> **A [Kaiser]:** It was supposed to be a short-term loan.  **I thought it was three to six months**, because I had also raised some other funds from family and friends that were getting a little antsy about it.
>
> *Q.  You'd been dealing with Mr. Kenner now for a couple of years?*
>
> **A [Kaiser]: Yes.**
>
> *Q. Have you ever seen him do anything inappropriate?*

*Kenner Sentencing Memo With Forensic Accounting
(And Back-Up)...*

45

- If the testimony was not planned-perjury (and known at all times to the government) – it is incredibly synchronized *faulty memory, confusion and mistakes* (a.k.a. "*memory loss*"), then it can <u>*never*</u> be deemed reliable or sufficient for a "*concealment*" prosecution.

The **2004 Little Isle 4 By-Laws** (*which governed the Hawai'i project and the loans to Jowdy*) specifically expressed <u>*authority to lend*</u> in the beginning of the agreement (*See Bates stamp: PKHome000011904-07*) [Ex.P]:

***Article II. Purpose***

> *Little Isle IV, LLC is an organized group of investors established to <u>**invest in a series of opportunities**</u> review[ed] by the Managing Member [Kenner] and deemed in the best interest of the partnership at all times.*

> *At the sole discretion of the Managing Member, Little Isle 4, <u>**may participate as a lender**</u> if deemed by the Managing Member to be in the best interest of the LLC.*

> *The Managing Member, <u>at their sole discretion</u>, can engage in outside ventures deemed to be in the best interest of the LLC, <u>including but not limited to other Private Equity Funds and **Lending Opportunities**</u>.*

Regarding (1) the consulting agreements (with Constantine and 16 other hard moneylenders) – (2) hiring employees – (3) hiring 3rd party vendors (for legal, architecture, engineering, planning) etcetera – the Little Isle 4 By-Laws also expressly granted those rights to the Managing Member (Kenner at the time).

---

> ***A [Kaiser]: No.***

> *Q.   <u>At the time this money was lent to Mr. Jowdy to be spent in the Mexican project, did anybody anticipate he wasn't going to pay you back when the Cabo deal closed, the Lehman's Cabo deal?</u>*

> ***A [Kaiser]: No.  Otherwise I wouldn't have lent it.*** *I wouldn't want to go down that route.*

> *Q.   <u>Do you blame Mr. Kenner for him not paying the money back?</u>*

> *A [Kaiser]: No.*

46

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…*

**The Little Isle 4 By-Laws** – *(See Bates stamp: PKHome000011904-07)* [Ex.P]:

> *Section 5.   The Managing Member [Kenner], at their sole discretion, **can compensate any and all members and non-members for their roles in the LLC**, including but not exclusive to the Managing Member.*

In 2009 – Jozef Stumpel, Mattias Norstrom, Sergei Gonchar, Jere Lehtinen, and Michael Peca in support of Kenner signed affidavits during the *Nolan v. Kenner* Arizona arbitration (*in evidence*).   The affidavits affirmed:

> "**_In addition to setting up a Line of Credit for the sole use and benefit of the Hawai'i investment Group_**, *I wired $100,000 to Northern Trust Bank…**for the express purpose of making funds available to Phil Kenner, which were to be used at his discretion.**   I was aware that my funds would be used to make distributions for the company, including but not limited to; Land acquisitions, Travel & Entertainment expenses, legal fees, Planning fees, Payroll, permitting fees, **loans to outside entities** and **distributions to other members that would satisfy their monthly Line of Credit payments to Northern Trust Bank**…Phil has always disclosed the complete and detailed use of these funds with me from time to time at every request*."

==Michael Peca (forensic conclusions):==

*Hawai'i initial $1,875,000*
- Received $**42,553** payment August 2006 (*Bates Stamp – NAAZ000434*) [Ex.J1]
- Received $**300,052** in tax-free bond interest from 2005-2009 (pursuant to the collateral investment strategy – [Ex.56, 56a])
- Received "*just over $600,000*" from Northern Trust settlement (*Tr.506*)…
- Received his 10% portion of the 4.6% CSL Properties LLC equity increase in Diamante Cabo san Lucas from the Jowdy 2017 settlement agreement worth approximately $**943,000** [Ex.Z67 *at 20*] [37]

---

[37] Assuming the "time detection" of the alleged fraud was when Jowdy hired Kaiser and Berard in 2012, the Cabo san Lucas project was valued at $330,000,000 and had an announced debt of $125,000,000 (according to Kaiser and Berard proffers).
- **The net value of the investment was $205,000,000.**

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…*

47

- Owns 10.37% of Little Isle 4 [Ex.K at 10-11]– which has Jowdy's uncollected **$33 million-plus** loan outstanding – worth approximately **$4,521,000** [38]
  - Peca net is **PLUS $4,531,605** (*$6,406,605 minus 1,875,000*)
    - *NO LOSS…*

### GSF initial $250,000

- Constantine overspend is **$17,077.40** (*ECF No. 501 at 60*) (or nothing by including the $124,982, 9-8-2009 documented Constantine contribution to the Ronald Richards Trust account (*Tr.5460*) – and ignoring the Gonchar $1,250,000 additional funds provided personally to Constantine [*Tr.4826-4827*])
  - **Peca net is $935** ($4,555,322 divided into Peca's $250,000 GSF contribution = 5.48%) – even though the government has not identified whose $17,077 was overspent – *if at all [but never by Kenner]*)

### Eufora initial $100,000

- Constantine sold his Eufora private stock to Peca on 4-7-2008 -- and repaid Kenner a documented $100,000 advance Kenner made to Constantine weeks earlier (*documented in government evidence – GX-1706 at 2, 3*) (*See Bates Stamp: CBKR-000602*) [Ex.Z2].
- Eufora was independently valued by Neptune capital at $20,000,000 *after* Peca's 4-7-2008 investments.  Peca's 2008 Eufora shares were granted at the $20,000,000 valuation and documented by Tim Gaarn and Eufora CEO CR Gentry in the 2009 Eufora operating agreement (*See Bates Stamp: ED-000773-810*) [Ex.Z at 37] (*GX-210*).

---

[38] The government thru *government-forfeiture-44* [Ex.G] – *not Kenner* – documented Jowdy's loans from Hawai'i as *authentic* – **thus verifying the government lied to the court and jury in 2015** – while Kenner was vilified for telling the truth – and not a liar (*Tr.4598, 4602, 5064-65*).  The court cannot punish Kenner at this point for funds that the government-itself documented as received solely by Jowdy – in spite of their ongoing ruse to the investors that "*Kenner stole your Hawai'i money and bought his Cabo equity with it*", *supra*.

- *Government-forfeiture-36* [Ex.H] also proves the Diamante Cabo equity is 100% "**untainted**" for Kenner and his 2 partners (Stumpel & Lehtinen) in Baja Ventures 2006 – and should not be a forfeiture consideration (punishing Kenner's 2 investors and their "**untainted**" government-documented $4.1 million cash contribution).

- o The government lied during summation and claimed there was no Eufora operating agreement (*Tr.5988*) [Ex.Z] (*GX-210*).
- Peca's 2008 private stock purchase was vetted by his own attorney (Michael Stolper) in 2010.   There was no concealment – and Peca signed-off on Stolper's July 16, 2010 disclosure about the private stock sales and loan buyout efforts, *supra* [Ex.Z3 *at 10*].
  - o **Peca net investment is $100,000** (but -- <u>no loss</u> occurring due to Kenner actions).
  - o The government has failed to prove that Eufora's patents are worthless – or the private stock has even reduced in value since 2008.
    - ▪ *NO LOSS...*

**Owen Nolan:**[39]

| Hawai'i | Eufora | GSF |
|---|---|---|
| 2,300,000 | 0 | 0 |

According to several sources on the Internet, Owen Nolan earned a career total of approximately **$43,387,277**.   His investments in the instant case were a small subset of his overall investment strategy and totals, at all times.[40]   Any financial hardship is a result of his-own financial malfeasance and lifestyle decisions, and not

---

[39] Please note that all analysis that applies to the previous investors, *supra*, applies to **Nolan** unless specifically differentiated by evidentiary issues.

[40] The court should note that Nolan also received a **$5,000,000** insurance settlement from the Toronto Maple Leafs in 2006, which is not included in his career totals above.   These funds were always under his wife's control and disbursements -- which she depleted in less than 15 months (*Bates Stamp: PKHome-0001496*) [Ex.Z4], <u>unknown to Owen</u> at the time (and verified by Owen's text to Kenner 2-years later when his IRS taxes were due.  100% of the funds were disbursed by his wife, with no new investments (Kenner reply in yellow):

| 1 1 6 5 | +14169970110 **Owen Nolan***  | 6/6/2008 2:19:38 PM(UTC +0) | R e a d | **What did we invest the settlement money in** |
|---|---|---|---|---|
| 1 3 5 4 | +14169970110 Owen Nolan* | 6/6/2008 4:26:44 PM(UTC +0) | S e n t | **I'll get all that info this afternoon and get u a full breakdown of where it went. Pk** |

a representation of a small subset his overall, fully signed off and authorized investment strategy.

_Hawai'i_ – in 2009 -- Nolan's attorney deposed Northern Trust banker Aaron Mascarella (March 24, 2009) – one month before the _Nolan v. Kenner_ arbitration.

**Northern Trust Banker Mascarella <u>confirmed</u> that he had been in independent communication with Nolan between 2003-2006** (the first four [4] years of Nolan's LOC).   This contradicted Nolan's 2009 testimony that he was _not aware_ of his LOC (unless he was already suffering from **CTE**) (_Day 1 arbitration Tr.84_):

> _Q: Did he [Kenner] discuss with you securing a line of credit for the Hawaii investment?_
>
> _A [Nolan]: No._

Nolan verified every one of his 30+ signed Northern Trust LOC documents during the arbitration – but testified that he _could not remember_ any of them (_2009 arbitration Day 1 testimony_). [41]   Nolan also alleged during his 2009 testimony that he did not know who was going to be in charge of the Hawai'i partners or even how it was going to be operated (_Day 1 arbitration Tr.82-83_):

> _Q. When Mr. Kenner discussed the Hawaii project with you did he tell you anything about using the money from Hawaii for any purposes other than developing land in Hawaii?_
>
> _A [Nolan]: No._
>
> _Q. Did he tell you anything about how the Hawaii investment was being operated?_
>
> _A [Nolan]: No._
>
> _Q. Did you know that Mr. Kenner was running the Hawaii investment?_
>
> _A [Nolan]: No._

---

[41] Nolan's entire Day 1 testimony in 2009 presented nearly 100 occurrences of _not being able to remember anything_ that occurred in his personal or professional life.

But – without knowing anything -- Nolan invested anyhow with the one person he
espoused to trust in the world; _Kenner_:

> *Q Aside from being a business client of his, would you say that from time to time*
> *you would be willing to socialize with him?*
>
> *A [Nolan]: Absolutely. Considered him a great friend, almost like a brother.*
>
> *Q You trusted him?*
>
> *A [Nolan]: **Very much**.*

Nolan's attorney ignored Mascarella's "full knowledge confirmations" during the
pre-arbitration deposition (only weeks earlier) -- and allowed Nolan's 2009
perjured testimony to proceed without corrections.

Nevertheless – **Northern Trust banker Aaron Mascarella** confirmed "*under oath*"
pre-arbitration [==Ex.Z63==]:

[Mascarella deposition -- *Page 23*]:
> *Q.    Okay.  Now, with regard to the line of credit account, who was authorized*
> *to make transfers out of that line of credit?*
>
> *A [Mascarella]: Owen and Phil.*
>
> *Q.    Was there any limitation on Mr. Kenner's ability to transfer money out of*
> *the account?*
>
> *A [Mascarella]: No.  It was -- Yes.  I'm sorry.  It was -- The proceeds were only to*
> *go to Little Isle Ventures, Little Isle IV, I think, if I remember correctly.  He*
> *signed -- Owen Nolan signed a bank authorization or an authorization letter to*
> *the bank authorizing Phil Kenner to transfer money from the line of credit into*
> *the Little Isle IV account.*

[Mascarella deposition -- *Page 24*]:
> *Q.    During the time period from -- From the time you opened the Nolan*
> *account until the end of 2006, did you have conversations with Mr. Nolan*
> *concerning the line of credit?*
>
> *A [Mascarella]: Conversations -- I spoke to Owen infrequently.  I've only had*
> *brief conversations with him.  And my guess is that it was only relating to the*
> *payments, that the payments were being made or not being made.  There was a*
> *few times when the payments were slow, that we sent out default letters, which*

51

*probably -- You know, I can't remember every conversation I had with him but I assume he might have responded to one of those default letters.*

[Mascarella deposition -- *Page 34*]:

> *Q.   At some point, was a -- And I'm talking about the <u>2004 to 2005 time frame</u>. <u>Was a line of credit opened up for Little Isle IV?</u>*
>
> *A [Mascarella]: I believe so.  That would -- It's my understanding the answer is yes.*
>
> *Q.   <u>And do you recall who were signatories on that line of credit?</u>*
>
> *A [Mascarella]: **<u>I wasn't involved at that time on the lending side, so I don't know.  I know that if it was set up in the business name -- I would only be speculating.  So I don't know.</u>***

[Mascarella deposition -- *Page 35*]:

> *A [Mascarella]: We have a separate commercial lending department and a lender there **[Ed Wilson]** would have established the relationship on the lending side.*[42]
>
> *Q.   And <u>during this time period, can you remember who would have been in that position</u>?*
>
> *A [Mascarella]: <u>I don't</u>.  It changed a couple of times during when their relationship was initially started.*

- Obviously -- Mascarella <u>*never*</u> concealed information from his client, Owen Nolan, after verifying he spoke with Nolan on the phone about his LOC between 2003-06.

- Nolan's "epic memory failure" <u>*cannot*</u> make Kenner criminally liable for what his-own Northern Trust banker verified "*under oath*" – just because of Nolan's

---

[42] Ed Wilson –the Head of the Northern Trust Bank Lending Department – signed all Northern Trust documents; *unknown to Mascarella (in the 2015 Northern Trust Bank subpoena).*

- *The government presented <u>no first hand evidence</u> from the people who handled the Northern Trust LOC accounts…that they were ever instructed by Kenner to "conceal" information from their own clients (governed by the 2001 Patriot Act)…*

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…*

==**CTE** or *faulty memory, confusion and mistakes* – six (6) full years before he still could *not* remember his LOC in 2015 (*Tr.2065-66*).==

Nolan's **CTE**-laden testimony in 2009 exposed his "*memory loss*" issues -- unrelated to Kenner's full transparency -- with Nolan and his wife who signed off on most of the family transactions (in evidence – including the specific 2006 LOC payments to Northern Trust Bank, *for further transparency*). [43]

[Nolan May 2009 arbitration -- *Day 1 at 105*]:
> *Q:  Is there ever an agreement in your life that you've ever read that you can identify here today? Have you ever taken the time on your own to read?*
>
> *A [Nolan]:  I can't think of any offhand.*

[Nolan arbitration May 2009 -- *Day 1 at 109-110*]:
> *Q: You've testified that you've never read a document ever that you can think of sitting here today before you signed it.   At any time in your lifetime has someone advised you to take the strategy of never reading a document when you sign it?*
>
> *A [Nolan]:  No.*

[Nolan arbitration May 2009 -- *Day 5 at 1049*]:

==Judge Meyerson & Nolan's attorney (Meeks):==

> ==*Mr. Meeks [Nolan's attorney]:  He [Nolan] admits that's his signature.[44]  His testimony is he wasn't aware.*==
>
> ==*Judge Meyerson:  So somebody signs a statement that says, **Please grant Philip A. Kenner access to a line of credit for direct deposit into Little Isle 4**.  Doesn't somebody have to take responsibility for that? [45]*==

---

[43] *See Bates Stamp NOLAN0005249* [==Ex.Z5==] and *NOLAN0005267*  [==Ex.Z6, Z6a==] – both turned over by Nolan in the 2009 Arbitration – and *not* in Kenner's possession after Standard Advisors' former assistant Myrick stole the corporate files in 2007, when fired for cause. Myrick was working for Nolan and Jowdy at the time of the 2009 arbitration.  In turn – for full transparency -- Kenner turned these exculpatory documents over to the SEC in 2011 (once received).

[44] Nolan *confirmed* signing his **one-page** *Letter of Authorization* with Northern Trust Bank to allow Kenner access to his LOC for the Little Isle 4 capital account in October 2004 (*See Bates Stamp -- TNTC000048*) [==Ex.Z7==].

53

Owen Nolan's October 24, 2004 Northern Trust *Letter of Authorization* specified to Northern Trust Bank (identical for all of the Hawai'i partners LOC investors) (*Bates Stamp -- TNTC000048*) [Ex.Z7]:

> "*Please allow Philip A. Kenner to access this outstanding LOC for direct deposit to the Little Isle IV account at Northern Trust.   He is authorized to sign for the release of funds related to my LOC.*"

<u>*Owen Nolan cannot be a victim of concealment*</u> – after his own Northern Trust private banker confirmed their independent communication -- and

Nolan's wife paid the LOC fees in 2006 -- with help from Kenner's former assistant -- and their independent private banker from Wells Fargo [Ex.Z5] [Ex.Z6] [Ex.Z6a].

- Even if Owen Nolan cannot remember any of his investment details, his wife certainly handled the transactions with two (2) independent parties; *excluding* Kenner for full transparency.

Owen Nolan also carried on a 5-day text communication (with several documented phone calls within) before independently signing his 4th LOC renewal package in 2007.

From Kenner to Nolan (conversation Day 1):



| 37 | +14169970110 Owen Nolan* | 12/23/2007 3:40:50 PM(UTC+0) | Sent | *I need to send you via FEDEX LOC docs from Northern Trust that MUST be signed and returned by the end of the year.* Where are you the day after XMAS?? |

From Nolan to Kenner (conversation Day 1):



| 41 | +14169970110 | 12/23/2007 6:40:59 PM(UTC+0) | Read | **What r the papers for** |

---

[45] *See Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A. See also PaineWebber Incorporated v. Bybyk, 81 F.3d 1193; 1996 U.S. Appx. LEXIS 8728. ("...a party's **failure to read** a duly incorporated document will not excuse the obligation to be bound by its terms"); See also Ecoline, Inc. v. Local Union No. 12 of the International Association of Heat and Frost Insulators and Asbestos Workers, AFL-CIO, 271 Fed. Appx. 72; 2008 U.S. Approximately. LEXIS 6390, ("In general, individuals are charged with knowledge of the contents of documents they sign" and "a person who signs a written contract is bound by its terms regardless of his or her **failure to read** and understand its terms".)*

54

| | Owen Nolan* | | | |
|---|---|---|---|---|
| 42 | +14169970110 Owen Nolan* | 12/23/2007 6:41:26 PM(UTC+0) | Read | **And why the sudden rush** |

From Kenner to Nolan (conversation Day 1):

| | | | | |
|---|---|---|---|---|
| 38 | +14169970110 Owen Nolan* | 12/23/2007 7:09:24 PM(UTC+0) | Sent | ***The papers are for your Line of Credit at Northern Trust. The Bank sent them to me for the renewal of the LOC on friday and said they MUST be signed and returned by end of year. Its not just you. All of the guys have to do it. I don't make these rules.*** **Where can I send them for next Wednesday or thurday fedex delivery?? PK** |
| 39 | +14169970110 Owen Nolan* | 12/23/2007 7:12:23 PM(UTC+0) | Sent | Can you also plz ask Diana for the ppwk I faxed a while ago for VortalOptics?? I need you to ***sign and fax*** them to me at 480.314.3795. Then, we can have your shares registered. ***Your ppwk is the last of the guys to get done.*** Happy Holidays. I hope the kids are well!! |

From Nolan to Kenner (conversation Day 3):

| | | | | |
|---|---|---|---|---|
| 45 | +14169970110 Owen Nolan* | 12/26/2007 5:26:24 AM(UTC+0) | Read | Westin bayshore vancouver we leave tommorow |

From Kenner to Nolan (conversation Day 3):

| | | | | |
|---|---|---|---|---|
| 42 | +14169970110 Owen Nolan* | 12/26/2007 1:34:06 PM(UTC+0) | Sent | It already was sent to Calgary. It will be there when you return. Please just sign and return asap. Happy Holidays!! |

- As part of the government's Rule 16 production – they produced Kenner's FedEx records and AMEX account records.  It confirmed Kenner sent Nolan the 2007 renewal docs via FEDEX *independently to Northern Trust Bank* on 12-26-07 (*Bates Stamp -- BNK-AMEX-1638*) [Ex.Z8]:



From Nolan to Kenner (conversation Day 5):

| 46 | +14169970110 Owen Nolan* | 12/28/2007 6:04:48 PM(UTC+0) | Read | ***Where's the package that needs signed*** plus jp needs 200000 for toronto settlement **where r we getting that money since everything is tied up** |
|---|---|---|---|---|
| 47 | +14169970110 Owen Nolan* | 12/28/2007 6:06:04 PM(UTC+0) | Read | He said in order to write it off it needs to be paid this year |
| 48 | +14169970110 Owen Nolan* | 12/28/2007 6:07:04 PM(UTC+0) | Read | ***Call me need to discuss this*** |

- Kenner and Nolan spoke about the LOC paperwork on the phone at this point – per the following message the next day from Nolan to Kenner…

From Nolan to Kenner (conversation Day 6):

| 49 | +14169970110 Owen Nolan* | 12/29/2007 3:46:45 AM(UTC+0) | Read | ***Can u call me <u>back</u> I have a question about <u>papers</u>*** |
|---|---|---|---|---|

- As part of the government's Rule 16 production – they produced Kenner's FedEx records and AMEX account records.  It confirmed Nolan *returned his LOC documents independently* to Northern Trust Bank utilizing Kenner's FedEx account – *after his follow-up conversation with Kenner (Bates Stamp -- BNK-AMEX-1640)* [Ex.Z8 *at 2*]:



Please note that Nolan's text on December 28, 2007 acknowledged:

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…*

"***where r we getting that money*** *[$200,000 for his agent's bill]* ***since everything is tied up***"

- *This is <u>clear</u> confirmation that Nolan knew in December 2007 that his ~$2 million bond account at Northern Trust was <u>pledged</u> for the LOC – in addition to the monthly bank statements confirming the PLEDGED account.*

- The December 2007 texts proved that it was wholly impossible for Nolan to be unaware of his Northern Trust Bank LOC &/or the paperwork he had signed for 4+ years to date…(and discussed multiple times on the phone with Kenner).

Nolan used Kenner's FedEx after they spoke on the phone (*supra*) to return his signed paperwork to Northern Trust Bank in December 2007.
- *This was over 2-years <u>before</u> Nolan's first documented amnesia symptoms (**CTE**) occurred during the 2009 arbitration, albeit known at all times as a fraud by his own attorney who deposed Nolan's Northern Trust Banker, Aaron Mascarella, just prior to the arbitration.*

**Control of the Hawai'i partners (Little Isle 4) capital:**

The Little Isle 4 By-Laws "**controlled**" the "**use of funds**" once the <u>authorized</u> transfer from Owen Nolan (and the other Hawai'i LOC investors) was granted [Ex.P].

This is simple business-practice law, ignored by the government to claim, "*if a specific transaction was not remembered thru their failed memory test*", there was a fraud perpetrated on the investors, via "*concealment*".  The "*memory test*" standard was unreasonable and cannot be the basis for a concealment prosecution that only four (4) of the 26 Hawai'i partners claimed, they "*could not remember*" (same as Peca, *supra*).

Accentuating the unreasonable standard is the fact that:
- 19 of the 26 Hawai'i partners sued Jowdy to recover the funds starting in 2008 (in Mexico, Arizona, Nevada and California) [Ex.Z21, Ex.Z43, Ex.C, Ex.E, Ex.F],
- Several Hawai'i partners gave civil testimony to confirm their knowledge [Ex.Z64, Ex.Z65],
- Several Hawai'i partners proffered to the FBI about their knowledge (*3500-JK-1-r at 2,3,10, and 3500-SG-2 at 8-9*),

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…*

- Several Hawai'i partners signed affidavits to confirm the Jowdy loans and their underlying knowledge and forwarded them to the FBI years before trial (*3500-SG-4 at 4-5 -- and 3500-MN-2 at 3*), and
- Several Hawai'i partners testified that they possessed the actual 2004 Hawai'i-Jowdy loan agreement (*Tr.1127 [John Kaiser], Tr.3608 [Glen Murray]*)...

But – in 2015, the government was able to solicit from **Michael Peca** (until his recanting – *Tr.498-99*), **Owen Nolan** (*Tr.2065-66*), **Darryl Sydor** (*Tr.2156-2316*), and **Steve Rucchin** (*Tr.2721-23*) that they "*could not remember*" the Jowdy loans.

Although the government did not name **Turner Stevenson** as a superseding indictment victim – Stevenson gave "*under oath*" testimony to the 2011 SDNY Grand Jury as well – confirming his unfettered knowledge of the Jowdy loans and the "*group*" decision to make the deal [Ex.A].

The court must use a reasonable standard to ask -- "*Did Kenner include 22 of the Hawai'i partners in the decision to loan the funds to Jowdy in 2004 (and Peca by 2011 and 2015 confession) – and consciously decide to exclude the four (4) future government witnesses who were suffering (in 2015) from* **CTE** *or* faulty memory, confusion and mistakes (ECF No. 440 at 16[46])?"

It is highly illogical, specifically considering all of the Hawai'i partners were friends &/or acquaintances of one another – making the alleged "secret"[47] even more difficult to fathom (for only 4 of 26 – who eleven (11) years later "*cannot remember*").
- If the testimony was not planned-perjury (and known at all times to the government) – and is in fact synchronized *faulty memory, confusion and mistakes* (a.k.a. "*memory loss*"), then it can <u>never</u> be deemed reliable or sufficient for a "*concealment*" prosecution.

---

[46] A witness perjures herself when "she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).

[47] As the Managing Member of the Hawai'i partners (since 2007) – John Kaiser gave 2009 arbitration testimony (*Nolan. v. Kenner*).  Kaiser confirmed there were <u>no secret handshakes</u> with all of the Hawai'i partners he had met thru 2009 (while serving as the Managing Member) [Ex.Z64 *at 6*].

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)...*

**Owen Nolan's (forensic conclusions):**

*Hawai'i initial $2,300,000*

- Received $**42,553** payment August 2006 (*Bates Stamp – NAAZ000434*) [Ex.J1] [Ex.Z4]
- Received $**592,878** in tax-free bond interest from 2005-2009 (pursuant to the collateral investment strategy – [Ex.56] [Ex.Z56a])
- Received "***500,000***" from Northern Trust settlement (*Tr.2074*)...
- Received his 5% portion of the 4.6% CSL Properties LLC equity increase in Diamante Cabo san Lucas from the Jowdy 2017 settlement transaction worth approximately $**471,500** [Ex.Z67 *at 20*] [48]
- Received 1% Diamante Cabo transfer from Jowdy in 2008 (for Jowdy's misuse of Hawai'i-Mexico funds) worth approximately $**2,050,000** [49]
  - ○ *If the Court needs further confirmation of this all-encompassing settlement (covering all Hawai'i funds that Jowdy may have received)...they can subpoena the Jowdy or Nolan parties...*
- Owns 18.1022% of Little Isle 4 (*Bates Stamp – NOLAN000504*) [Ex.L] – which has Jowdy's uncollected $33 million-plus loan outstanding – worth approximately $**5,973,726** [50]
  - ○ Nolan net is **PLUS $7,330,657** (*$9,630,657 minus 2,300,000*)
    - ▪ *NO LOSS...*

---

[48] Assuming the "time detection" of the alleged fraud was when Jowdy hired Kaiser and Berard in 2012, the Cabo san Lucas project was valued at $330,000,000 and had an announced debt of $125,000,000 (according to Kaiser and Berard proffers).
- **The net value of the investment was $205,000,000.**

[49] The 2008 deal between Nolan and Jowdy resulted in Nolan waving any legal rights to any and all funds that Jowdy received from Nolan directly or any Nolan related entity.   Thus – the deal Nolan signed with Jowdy absolved the Hawai'i partners and Kenner from any additional claims, as well.

[50] The government thru *government-forfeiture-44* [Ex.G]– *not Kenner* – documented Jowdy's loans from Hawai'i as *authentic* – **thus verifying the government lied to the court and jury in 2015** – while Kenner was vilified for telling the truth (*Tr.4598, 4602, 5064-65*).   The court cannot punish Kenner at this point for funds that the government documented as received solely by Jowdy – in spite of their ongoing ruse to the investors that "*Kenner stole your Hawai'i money and bought his Cabo equity with it*".

- *Government-forfeiture-36* [Ex.H] also proves the Diamante Cabo equity is 100% "untainted" for Kenner and his two (2) partners (Stumpel & Lehtinen) in Baja Ventures 2006 – **and cannot be subject to forfeiture** (*See Document 652*).

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)...*

**Darryl Sydor**: [51]

| Hawai'i | Eufora | GSF |
|---------|--------|-----|
| 950,000 | 50,000 | 250,000 |

According to several sources on the Internet, Darryl Sydor earned a career total of approximately **$31,715,000**.  His investments in the instant case were a small subset of his overall investment strategy and totals, at all times.[52]   Any financial

---

[51] Please note that all analysis that applies to the previous investors, *supra*, applies to **Sydor** unless specifically differentiated by evidentiary issues.

[52] In 2009 – when the discussions about the Jowdy loans and the LOC defaults were in real time – Sydor panicked about his poor financial situation (*because of his wife's never-ending spending habits*) – but never once did Sydor blame any of it on Kenner when Sydor sent the January 2009 texts to Kenner.   Sydor had approximately $2,000,000 illiquid private equity deals, and the remainder of his income was spent by his wife and him, as follows:

| 5 1 6 1 | +19725 230505 **Darryl Sydor*** | **1/27/2009** 9:55:51 PM(UTC +0) | R e a d | I will call u after game what area zone u in. **Shit u say hang in there but last 2 contracts 18 mill and all I have is 99 k invested** then the ones with u that who knows if they go, no college fund for 3 boys and having another baby and still have house payments back home. **I am worse the owen nolan for f sakes** |
|---|---|---|---|---|

- Please note that Sydor and many others around the NHL knew that Owen Nolan and his wife had spent their $40,000,000-plus hockey fortune and were _broke_ – before Nolan and his attorneys teamed up with Jowdy hoping to be repaid some of Jowdy's stolen funds…

Kenner reply:

| 6 1 2 5 | +19725 230505 Darryl Sydor* | 1/27/2009 7:42:16 PM(UTC +0) | S e n t | *That's correct. That's why we are looking to SAVE BIG!!* |
|---|---|---|---|---|

Sydor finished his panicked rant:

| 5 1 6 3 | +19725 230505 **Darryl Sydor*** | 1/27/2009 10:13:51 PM(UTC +0) | R e a d | K I will I need a couple more years. My life is in ur hands *I will save this year.* I do have a couple bills like ronny and blazers. |
|---|---|---|---|---|

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…*

hardship is a result of his-own financial malfeasance and lifestyle decisions (as admitted), and not a representation of a small subset his overall, fully signed off and authorized investment strategy.

Darryl Sydor's November 3, 2004 Northern Trust *Letter of Authorization* specified to Northern Trust Bank (identical for all of the Hawai'i partners LOC investors) (*Bates Stamp -- TNTC000137*) [Ex.Z9]:

> "*Please allow Philip A. Kenner to access this outstanding LOC for direct deposit to the Little Isle IV account at Northern Trust.     He is authorized to sign for the release of funds related to my LOC.*"

Despite his 2015 **CTE** symptoms -- Sydor was 100% aware – *in real time* -- of his 2009 LOC seizure from Northern Trust Bank:

| 6316 | +19725230505 Darryl Sydor* | 4/1/2009 8:48:29 PM(UTC+0) | Read | **Hey someone from northern trust called with someone from schwabb. And want to do a conference call in a hour with erin someone** |
|------|----------------------------|----------------------------|------|-------------------------------------------------------------------------------------------------------------------------------------|

- April 1, 2009 was the day Sydor's $856,200 LOC collateral seizure occurred according to Aaron [erin] Mascarella's Screen prints (*Tr.884* – Northern Trust banker Mascarella) (*Bates Stamp – TNTC000136*) [Ex.Z10 *at 4*].

- *Clearly Sydor was aware and authorized it*.   The LOC payment for Sydor's LOC was not due until 2-days *later* on 4-3-2009 -- per Sydor's LOC monthly statement in evidence addressed to his own Dallas, Texas home (*Bates Stamp – TNTC000142 and TNTC000136*) [Ex.Z11] [Ex.Z10 *-- paid on April 1, 2009*].



| 51 66 | +19725 230505 **Darryl Sydor*** | 1/27/2009 10:39:52 PM(UTC +0) | Read | *Sorry to bug u with this today. I am in panic mode as u know me.* Talk later |
|-------|---------------------------------|-------------------------------|------|--------------------------------------------------------------------------------|
| 51 68 | +19725 230505 **Darryl Sydor*** | 1/27/2009 11:41:35 PM(UTC +0) | Read | *Well there's nothing I can do about now with the past just focus on future talk later bud* |

- o   The bank would *never* seize the LOC collateral before its due date – thus *confirming explicit authorization was granted by Sydor* (and all other LOC clients – except for Nolan).   So apparently – Kenner was not "*insane*" as Komatireddy claimed during her rebuttal summation (*Tr.5998*); *prejudicing Kenner*.

Sydor's **CTE** or *faulty memory, confusion and mistakes* could not recall his-own Northern Trust Bank LOC default letter and confirmation text he sent Kenner – in real time…

==[Sydor confirmed the *specific amount* of money on his March 2009 default letter -- *after* receiving the default letter *he claimed in 2015 that he never saw*]== (*Tr.2166-2167*):



| 6083 | +197252 30505 Darryl Sydor* | ==3/23/2009== 1:59:36 AM(UTC+ 0) | R e a d | What funds ? **And this thing says I owe 855,351.03 right now.** |
| --- | --- | --- | --- | --- |

- Jim Graham at Greenberg, Graham Assoc. was Sydor's independent investment advisor [FINRA regulated], thus, if there was a question in March 2009 (or any time), Sydor had his independent financial advisor to discuss any concerns with.
  - o   *He did not…*

The next problem (of **CTE** or *faulty memory, confusion and mistakes*) that the government cannot reconcile is that Sydor's ==March 19, 2009== default letter (*See* ==GX-2119== *– Bates stamps – NTC012836-37*) also verifies Northern Trust LOC documents that **Sydor signed** (*all his LOC multi-page documents – and countersigned by Northern Trust bankers Mascarella and Catherine Brill – who Michael Peca identified on his LOC collateral seizure call to Kenner via text*), including:

- *The 2006 Sydor Master Note – dated November 3, 2006* (*Bates Stamp – TNTC000636-644*) [Ex.Z12]
- *The 2006 Sydor Pledge Agreement – dated November 3, 2006* (*Bates Stamp – TNTC000660-674*) [Ex.Z13]
- *The 2006 Sydor Securities Account Control Agreement – dated November 3, 2006* (*See Bates Stamp – TNTC000652-659*) [Ex.Z14]

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…*

The March 19, 2009 default letter also identifies the *exact* "*aggregate total as of today of $855,351.03*" [*GX-2119 at 1*].   This amount perfectly corresponds with Sydor's text communication to Kenner *in real time*, *supra*, leaving no doubt that *Sydor had seen the letter* six (6) years *before* his prejudicial testimony at trial.

- **The government was aware of Sydor's untruthful testimony at all times; and they let it stand uncorrected.**  *See Napue v. Illinois, 360 U.S. 264, 269 (1959)*

Both default letters (February 2009 and March 2009) to Sydor's Texas home address also noted:

> **"*You may request an accounting by calling us at 602 468-2537*".**

Every default letter (both February 2009 and March 2009) from Northern Trust Bank directly *to all their LOC clients*' addresses of record included the same contact information, <u>yet not a single LOC client called Northern Trust Bank, according to Northern Trust Banker Aaron Mascarella's testimony</u> (*Tr.898*).

It is impossible that not one of them called considering six (6) years later, Kenner was criminally charged with the investors "*not knowing*" about the LOC and the "*use of funds*" when they cannot even remember receiving documents that they clearly received, directly from their bank; *not thru Kenner* -- and ***SIGNED***...

Specifically related to Sydor's **CTE** or *faulty memory, confusion and mistakes* – when Sydor was shown his actual text message to Kenner from 3-23-2009 during cross-examination confirming the exact amount from the default letter ($**855,351.03**)...

| 6083 | +1972523050 5 Darryl Sydor* | 3/23/2009 1:59:36 AM(UTC+0) | R e a d | What funds ? **And this thing says I owe 855,351.03 right now.** |
|---|---|---|---|---|

...the best Sydor could offer was (*Tr.2090-91*):

> *Q Let's take a look at the document marked 2119. As relates to document 2119 [GX-2119], sir, is it correct that in March of 2009 you were residing at 3613 Haynie Avenue, Dallas, Texas 75205, is that true?*
>
> *A [Sydor]: Yes, sir.*

*Q And we can agree, sir, can we not, that this document begins, "RE: Notice of Default and Intent to Sell Collateral"? We can agree with that, can we not?*

*A [Sydor]: Yes.*

*Q Is it your testimony, sir, that for the first time, since 2009, you learned of the sale of your bond and collateral to the line of credit when you met with the government back on May 17th through May 20th of this year?*

*A [Sydor]: Re-ask the question.*

*Q Sure. Is it your testimony, sir, that the first time you learned that there had been a default and the sale of your collateral as relates to the bond referenced to the line of credit in the amount of $850,000 as set forth on 2119, was only a few days ago when you saw those documents as presented to you by the prosecutor and the agent? Is that your testimony?*

*A [Sydor]: **As I recall, yes. If I saw this letter and it said Notice of Default and Intent to Sell Collateral, I would remember that, yes**.*

*Q Sir, we're talking about -- if I may. <u>For the past six years, throughout the pendency of this matter in terms of the investigation, you had no knowledge of the default and the sale of your bonds. Is that your testimony?</u>*

*A [Sydor]: **That's what I'm saying, yes**.*

<u>*It is simply not believable*</u> – since Sydor's own empirical text evidence, *supra*, confirmed that he received the default letter and told Kenner about it -- *in real time*. Either **CTE** or *faulty memory, confusion and mistakes* was responsible for Sydor's epic aloofness – unless foul play (suborned perjury) was at play...*but under any of those scenarios, Kenner <u>cannot</u> be held responsible by "concealment" for Sydor's monumental "failed memory test".*

**Control of the Hawai'i partners (Little Isle 4) capital:**

The Little Isle 4 By-Laws "**controlled**" the "**use of funds**" once the <u>*authorized*</u> transfer from Darryl Sydor (and the other Hawai'i LOC investors) was granted [Ex.P].

64

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)...*

This is simple business-practice law, ignored by the government to claim, "*if a specific transaction was not remembered thru their failed memory test*", there was a fraud perpetrated on the investors, via "*concealment*". The "*memory test*" standard was unreasonable and cannot be the basis for a concealment prosecution that only 4 of the 26 Hawai'i partners claimed, they "*could not remember*" (same as Peca and Nolan, *supra*).

Accentuating the unreasonable standard is the fact that:

- 19 of the 26 Hawai'i partners sued Jowdy to recover the funds starting in 2008 (in Mexico, Arizona, Nevada and California) [Ex.Z21, Ex.Z43, Ex.C, Ex.E, Ex.F],
- Several Hawai'i partners gave civil testimony to confirm their knowledge [Ex.Z64, Ex.Z65],
- Several Hawai'i partners proffered to the FBI about their knowledge (*3500-JK-1-r at 2,3,10, and 3500-SG-2 at 8-9*),
- Several Hawai'i partners signed affidavits to confirm the Jowdy loans and their underlying knowledge and forwarded them to the FBI years before trial (*3500-SG-4 at 4-5 -- and 3500-MN-2 at 3*), and
- Several Hawai'i partners testified that they possessed the actual 2004 Hawai'i-Jowdy loan agreement (*Tr.1127 [John Kaiser], Tr.3608 [Glen Murray]*)...

But – in 2015, the government was able to solicit from **Michael Peca** (until his recanting – *Tr.498-99*), **Owen Nolan** (*Tr.2065-66*), **Darryl Sydor** (*Tr.2156-2316*), and **Steve Rucchin** (*Tr.2721-23*) that they "*could not remember*" the Jowdy loans.

Yet – four (4) years earlier at the 2011 SDNY Grand Jury -- *Darryl Sydor confirmed* the Jowdy loan from the Hawai'i partners -- and his underlying knowledge -- without hesitation (*See Sydor SDNY Grand Jury Tr.25-26*) [Ex.A]: [53]

> *Q: Was that [the LOC at Northern Trust Bank] also for Little Isle 4 as far as you know?*
>
> **A [Sydor]: Yes, but then we put it towards a short-term loan to Mr. Jowdy until Lehman Brothers came up with the money that was supposed to be paid back."**

---

[53] Michael Peca and Tuner Stevenson corroborated Sydor's 2011 SDNY Grand Jury testimony -- the same day [Ex.A].

*Q: Did you know in advance that it was going to be used, this Little Isle 4 money, to be used to salvage the Cabo investment?*

*A [Sydor]:* <u>*Yes.  It was to help with the short-term loan to keep funding the Cabo, but then its supposed to be paid back,*</u> *but that's –*

*Q: Paid back to you or to Little Isle 4?*

*A [Sydor]: Paid back to Little Isle 4.*

*Q: So –*

*A [Sydor]:* <u>*Back to Hawai'i, not me personally.*</u>

*Q: Bu that didn't happen?*

*A [Sydor]: That didn't happen.   And Lehman came up with the $129 million loan. It was supposed to be back at closing.*

- Sydor even confirmed that his LOC funds were known by him to <u>*belong*</u> to the <u>*Little Isle 4 capital account*</u> (*supra*) *– and no longer belonging to him –* further explaining his distinctive understanding of his pledged LOC *– four (4) years closer to the actual events (pre-CTE or undue influence)*.

Although the government did not name **Turner Stevenson** as a superseding indictment victim – Stevenson also gave concurrent "*under oath*" testimony to the 2011 SDNY Grand Jury – confirming his unfettered knowledge of the Jowdy loans and the "*group*" decision to make the deal [Ex.A].

The court must use a reasonable standard to ask -- "*Did Kenner include 22 of the Hawai'i partners in the decision to loan the funds to Jowdy in 2004 – and consciously decide to exclude the four (4) future government witnesses who were suffering (in 2015) from* **CTE** *or* <u>*faulty memory, confusion and mistakes*</u> *(ECF No. 440 at 16[54])?*"

---

[54] A witness perjures herself when "she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).

66

It is highly illogical, specifically considering all of the Hawai'i partners were friends &/or acquaintances of one another – making the alleged "*secret*"[55] even more difficult to fathom.

- If the testimony was not planned-perjury (known at all times to the government) – and is in fact synchronized *faulty memory, confusion and mistakes* (a.k.a. "*memory loss*"), then it can <u>never</u> be deemed reliable or sufficient for a "*concealment*" prosecution.

## Darryl Sydor's (forensic conclusions):

### *Hawai'i initial $950,000*

- Received $**40,000** payment August 2006 (*Bates Stamp – NAAZ000434*) [Ex.J1]
- Received $**249,215** in tax-free bond interest from 2005-2009 (pursuant to the collateral investment strategy – [Ex.Z56] [Ex.Z56a])
- Received $**0** from Northern Trust settlement (*Tr.2166-67*) [56]
- Received his **5**% portion of the 4.6% CSL Properties LLC equity increase in Diamante Cabo san Lucas from the Jowdy 2017 settlement agreement worth approximately $**471,500** [Ex.Z67 *at 20*] [57]
- Owns 7.85% of Little Isle 4 (*per Bates Stamp – PKHome-00012541*) [Ex.K] – which has Jowdy's uncollected $33 million-plus loan outstanding – worth approximately $**2,590,500** [58]

---

[55] The Managing Member of the Hawai'i partners (since 2007) – John Kaiser – gave 2009 arbitration testimony (*Nolan. v. Kenner*).  Kaiser confirmed there were <u>no secret handshakes</u> with all of the Hawai'i partners he had met thru 2009 (while serving as the Managing Member) [Ex.Z64].

[56] Sydor gave 2015 testimony that he only discovered his LOC collateral loss in 2015 – a week before his incredible 2015 testimony – and despite his empirical evidence thru Grand Jury testimony -- and his-own texts to Kenner, *supra* (*Tr.2166-67*).

[57] Assuming the "time detection" of the alleged fraud was when Jowdy hired Kaiser and Berard in 2012, the Cabo san Lucas project was valued at $330,000,000 and had an announced debt of $125,000,000 (according to Kaiser and Berard proffers).
  - **The net value of the investment was $205,000,000.**

[58] The government thru *government-forfeiture-44* [Ex.G] – <u>not Kenner</u> – documented Jowdy's loans from Hawai'i as <u>authentic</u> – **thus verifying the government <u>lied</u> to the court and jury in 2015** – while Kenner was vilified for telling the truth (*Tr.4598, 4602, 5064-65*).  The court cannot punish Kenner at this point for funds that the government documented as received solely by Jowdy – in spite of their ongoing ruse to the investors that "*Kenner stole your Hawai'i money and bought his Cabo equity with it*".

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…*

o Sydor's net is **PLUS $2,401,215** (*$3,351,215 minus 950,000*)
- *NO LOSS…*

**GSF initial $250,000**
- Constantine overspend is **$17,077.40** (*ECF No. 501 at 60*) (or nothing by including the $124,982, 9-8-2009 documented Constantine contribution to the Ronald Richards Trust account (*Tr.5460*) – and ignoring the Gonchar $1,250,000 additional funds provided personally to Constantine [*Tr.4826-4827*])
  - o **Sydor net is $935** ($4,555,322 divided into Sydor's $250,000 GSF contribution = 5.48%) – even though the government has not identified whose $17,077 was overspent – *if at all [but never by Kenner]*)

**Eufora initial $50,000**
- Constantine sold his Eufora private stock to Sydor (*Bates Stamp: CBKR-000602*) [Ex.Z2 *at 12*].
- Eufora was independently valued by Neptune capital at $20,000,000 *after* Sydor's 7-7-2008 investment.   Sydor's 2008 Eufora shares were granted at the $20,000,000 valuation and documented by Tim Gaarn and Eufora CEO CR Gentry in the 2009 Eufora operating agreement (*Bates Stamp: ED-000773-810*) [Ex.Z *at 35, 37*] (*GX-210*).
  - o The government lied during summation and claimed there was no Eufora operating agreement (*Tr.5988*) (*GX-210*).
- Sydor's 2008 private stock sales were vetted by his own attorney (Michael Stolper) in 2010.   There was no concealment – and Sydor signed-off on Stolper's July 16, 2010 disclosure about the private stock sales and loan buyout efforts, *supra* [Ex.Z3 *at 10*].
  - o **Sydor's net investment is $100,000** (but -- *no loss* occurring due to Kenner actions).
  - o The government has failed to prove that Eufora's patents are worthless – or the private stock has even reduced in value since 2008.
    - *NO LOSS…*

---

- *Government-forfeiture-36* [Ex.H] also proves the Diamante Cabo equity is 100% "untainted" for Kenner and his 2 partners (Stumpel & Lehtinen) in Baja Ventures 2006 – **and cannot be subject to forfeiture**.

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…*

68

**Bryan Berard**: [59]

| Hawai'i | Eufora | GSF |
|---|---|---|
| 750,000 [60] | 0 | 0 |

According to several sources on the Internet, Bryan Berard earned a career total of approximately **$14,135,000**.   His investments in the instant case were a small subset of his overall investment strategy and totals, at all times. [61]   Any financial hardship is a result of his-own financial malfeasance and lifestyle decisions, and not a representation of a small subset his overall, fully signed off and authorized investment strategy.

- Berard invested more than 50% of his investment funds with a 3rd party investment advisor at Merrill Lynch (under FINRA) who was completely unrelated to Kenner at all times.  Berard liquidated 100% of those investment funds as well, to pay for his lifestyle expenses *before* accepting the 2011 job from Ken Jowdy and Tom Harvey in Mexico (at the same time as John Kaiser).

---

[59] Please note that all analysis that applies to the previous investors, *supra*, applies to **Berard** unless specifically differentiated by evidentiary issues.

[60] Please note that Berard signed a LOC reduction package with Northern Trust Banker Aaron Mascarella after his August 2006 distribution of $42,553 cash and his $282,386 LOC payment (*Bates stamp: TNTC000002* [Ex.Z47 *at 2*]) – per their independent correspondence (*Bates stamp: PKHome-012162* [Ex.Z48]).

[61] The court should note that just prior to Berard's "*memory loss*" testimony in 2015 to this EDNY court regarding his Hawai'i partners investment "knowledge" (exactly contradicting his voluntary 2009 arbitration testimony – six (6) years earlier and only weeks *after* the seizure of his Northern Trust Bank LOC collateral).

Also -- Berard sued a former insurance company in the SDNY (*See Case 1:14-cv-04174-AT [Judge Torres] – Document 1*) – with his underlying claim that "*he did not read the insurance settlement agreement*" and "*he was not represented by legal counsel*".

Both of these items – *identical to his false 2015 testimony* – were proven "false" in the SDNY case and the case was ruled in the favor of his opponent (Standard Security Life Insurance Company of New York) (*See Nolan arbitration Day 5 Tr.917-918, infra*) [Ex.Z65].

69

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…*

Government witness Berard gave *voluntarily* testimony in the 2009 *Nolan v. Kenner* arbitration as follows (*only weeks after his Northern Trust collateral seizure – and acknowledged and documented by Berard's-own text communication with Kenner, infra*):

[Berard's 2009 arbitration testimony affirmed – *Nolan arbitration Day 5 at 916-918*] [Ex.Z65]:

> *Q: When you were – as far as the Hawai'i deal, were you made aware of any sort of transaction Mr. Kenner set up where you can give a commitment or pledge a credit line in lieu of putting all your money in initially?*

> *A [Berard]: Yes.*

> *Q: Can you tell the panel what was your understanding?*

> *A [Berard]: Basically the company – it was set up.  The company would pay the payments.   I would pledge the money, obviously to get a loan for the property.   Again, the company would pay the payments, and I was not forfeiting all the amount of money for the piece of property.*

> **The Court should note that Kenner was charged in Counts 7 & 8 for making the 59th and 60th payments for 5-year-long Little Isle 4 LOC loans that Berard verified he expected to be paid by Kenner...**
> - o  **What reasonable standard did the government employ?**

> *Q: Were you aware that Mr. Kenner got a credit line against some securities or investments you had?*

> *A [Berard]: Yes.*

> *Q: And later on were you aware that Mr. Kenner started lending this money to another principal in the Cabo project named Ken Jowdy?*

> *A [Berard]: Yes.*

> *Q: Where did you think the money that Mr. Jowdy – were you told where the money was going to be used that was given Mr. Jowdy as far as the Mexican project?  Was there anything you were told about that?*

70

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)...*

*A [Berard]: Basically just loan him the money for the project.*

*Q: What about bank statements; did you have any problem getting any of your bank statements from Mr. Kenner at any time?*

*A [Berard]: Not at all.*

*Q: And prior to signing any of these documents did you have access to your own attorney unconnected to Mr. Kenner to review this?*

*A [Berard]: Yes I did.   We have a family attorney back home where before I sign any documents basically – I went to his office, sat with him.   We reviewed them, and I signed them and basically FedEx'd them to Phil [Kenner].*

It should be noted that _after_ Berard received his high-paying job from Tom Harvey and Ken Jowdy in Cabo san Lucas Mexico in late 2011 (with John Kaiser), _Berard reversed_ his voluntary 2009 arbitration testimony and told the FBI (and the 2015 trial Court) that:

- His money was not supposed to be used (*Tr.3035-3036*),
- He was unaware of it (*Tr.3082*), and
- He believed Kenner was "*not legit*" immediately after he returned from Russia in March or April 2009 (*See* 3500-BB-1-r *at 3*) *– which would have been* prior *to his May 2009 arbitration testimony.*

Berard _falsely_ proffered to the FBI that he received a letter in the mail from Northern Trust stating that his collateral had been seized (*Tr.3039-3040*).

<mark>That letter does not exist, anywhere</mark> –

**And contradicts Berard's real time text communication with Kenner, immediately prior to Berard's approved collateral seizure (*infra*).**

**FBI agent Galioto knows that critical fact and help perpetrate the lie (by not correcting it – his obligation to the Court); *another Napue violation*.**  Berard's voluntary arbitration testimony in 2009 would have been within one (1) month of receiving that "*ghost letter*" and believing Kenner was "*not legit*", *supra*.

71

Yet -- Berard's 2009 _voluntary_ testimony, _supra_, was exclusively:
1) _About his knowledge of the LOC_ --
2) _The LOCs approved usage_ -- and
3) _The LOCs authorized loan to Jowdy_...

The 2009 testimony included Berard's _expectation that (as stated 2 times by Berard, supra):_

"**_The company would pay the payments._**

**_I would pledge the money, obviously to get a loan for the property._**

**_Again, the company would pay the payments_**".

Not once during Berard's 2009 voluntary testimony did Berard claim any of the 2015 recent fabrications that Berard – now (6 years later) -- "_remembered_" knowing "_nothing_" about the LOC and the Jowdy loans (perhaps in concert with his newfound 2011 job in Mexico).   This revisionary pattern was identical to John Kaiser reversing his Mexico testimony in the _Stumpel v. Jowdy_ case ($1.6 million stolen by Jowdy – _his employer_ – from the Baja Ventures 2006 capital account); where Kaiser reversed prior testimony "of knowledge" and claimed that his signed Mexico court testimonial – was now a _forgery_) (_ECF No. 667 at 6-7_) [Ex.X], _ECF No. 652_, and [Ex.I].[62]

---

[62] **Unfortunately for the truth** (yet ignored by the desperate government again) – Bryan Berard admitted on his 2012 FBI recording with Robert Gaudet that he and John Kaiser **signed** "_blank documents_" (special notary papers) in Mexico before they left the prosecutors office to complete their testimonials – _clearly not forgeries_.

At 9:40 – Berard stated: "_**We did not make testimonies, we waited outside forever, it took too long, we actually signed FAKE, not FAKE, uhh, we signed BLANK PIECES OF PAPER, with our signatures...**_"

• _Kenner was not in Mexico when Kaiser and Berard met with Robert Gaudet at the prosecutor's office with their-own Mexico attorney, Javier Barreras, where they decided to sign the documents and give sworn-testimony after-the-fact with their own attorney._

  o _Please note that Kaiser and Berard flew from the east coast of the USA to Cabo san Lucas (about a ten [10] hour travel day) solely to give testimony in the Stumpel v. Jowdy criminal case and returned to the USA the next day.  **The sole purpose of their trip was to give signed-testimony.**_

72

Berard's 2013 FBI proffer contradictions (to his *voluntary*, pro-Kenner 2009 arbitration testimony) seemed to raise no concerns for the interviewing agents when Berard changed his tune to: "*…In March or April 2009, he [Berard] started to realize that Kenner was not legitimate*", instead, it only fueled the foundationless theories of *concealment* based on the collectively-planned future fabrications at trial by the government and their willing witnesses who were lied to pre-trial that "*Kenner stole all your Hawai'i money and used it to buy his piece of the Cabo project*".

   • *Who would not assist the FBI after that [mis]representation above reproach*?

In spite of Berard's 2009 acknowledgements of signed authorizations – his synchronized 2015 perjury produced the following (*Tr.3082*):

   "*Absolutely not.  My [Hawai'i] money was not supposed to be used in Mexico.*"

Berard had clearly ignored his opportunity to malign Kenner in 2009, *one (1) month after the real-time collateral seizure event* [*May 2009*] where he confirmed his crystal clear knowledge of the Jowdy loans and his full expectations of the use of his LOC-Little Isle 4 Capital Account for the loan.   Berard knew the LOC was being seized

---

   o Kenner paid for the flight travel on his AMEX credit card (*in evidence*).

• *Nonetheless* in 2014, the government presented the Kaiser Mexico document to the EDNY court as a *forgery*…related to Kenner to slander Kenner pre-trial in front of the EDNY Court.

How did Kaiser and Berard claim their signatures were FORGERIES if they both SIGNED BLANK DOCUMENTS (to add their verbal testimonials in the *Stumpel v. Jowdy Mexico criminal* case) *and admitted to it*?

   • This is notwithstanding the fact that Kaiser testified in a Mexico court **under oath** that his (*Berard-acknowledged*) signature was a forgery – further delaying the 2012 criminal cases against Jowdy another 12 months (*until just before Galioto arrested Kenner*).   All of these hostile efforts were initiated once, Jowdy in Mexico, employed Kaiser and Berard.

The alleged forgery in the Mexico Court was more of the calculated recklessness by Jowdy, Kaiser and Berard to disrupt Kenner and Kenner's investor's efforts in Mexico to seek justice from the multitude of Jowdy thefts (*ECF No. 667*) and *government-forfeiture-44* [Ex.G] (**with Kaiser and Berard acting as Jowdy co-conspirators for pay**, *verified by Kaiser's 2019 co-conspirator letter ECF No. 628*).

over a week before it occurred when he communicated with Kenner to inquire about his remaining balance, post seizure, *infra*.

*In total contradiction to Berard's fabricated 2015 testimony -- on March 26, 2009 – and four (4) days before the pay off of Berard's LOC -- Berard was clearly in communication with Kenner about the transparent and expected LOC collateral seizure -- <u>and had no concerns</u> – in addition to being fully aware of its use and Hawai'i/Jowdy issues (as he testified one [1] month later during the arbitration):*

<mark>Berard to Kenner re: his LOC payoff:</mark>

| 6 2 0 7 | +14015 246929 Bryan Berard* | 3/26/2009 6:53:59 PM(UTC+0) | R e a d | **When u get chance can we look at *how much money will b freed up <u>after payn off line of credit NT</u>*??? Thanks** |
|---|---|---|---|---|

Kenner replied seven (7) minutes later (<mark>hi-lighted</mark>):

| 7280 | +14015246929 Bryan Berard* | 3/26/2009 7:00:51 PM(UTC+0) | Sent | **~300k** |
|---|---|---|---|---|

- If Berard were unaware of his LOC *"use of funds"* at that point in time – it would have been simple for Berard to reply -- *"WTF happened to my collateral?"*…But instead…

Berard replied four (4) minutes later:

| 6 2 0 8 | +140152 46929 Bryan Berard* | 3/26/2009 7:04:18 PM(UTC+0) | R e a d | *<u>Cool thanks</u>*!!! When will that b freed **Gonna use 200 for a cool oppurtunity will show u and talk 2 u abt it later. <u>Good for all of us n future.</u>** |
|---|---|---|---|---|

Kenner replied (<mark>hi-lighted</mark>):

| 7282 | +14015246929 Bryan Berard* | 3/26/2009 7:30:08 PM(UTC+0) | S e n t | **Can't wait to hear!** |
|---|---|---|---|---|

***So – as soon as Berard discusses the LOC seizure "plan" with Kenner – Berard wants to get his remaining funds from Northern Trust (~300k) -- and <u>wants Kenner involved</u> in the next deal with him in addition to vetting his next deal…***

- <mark>*Berard had 100% unfettered knowledge of the seizure – despite his 2015 perjury to the EDNY Court, supra.*</mark>

- *This text communication also refuted Berard's 2013 FBI proffer statements (while under Jowdy's employment) (3500-BB-1-r at 3).*

***This clearly supports the need for discovery about the witnesses' incredible synchronized memory loss (known as CTE); or faulty memory, confusion and mistakes.***

The court should note that the government also knew that for the seizures to occur, each Northern Trust client had to authorize their acceptance <u>verbally</u> to Northern Trust Bank (*ECF No. 668, footnote 133 at 264-265*) -- and then <u>signed</u> at least two (2) sets of transfer documents in the following 30 days to close their respective accounts.

  o **That is in evidence** [63] -- <u>yet no objection.</u>

Berard also confirmed his personal expectation that <u>Kenner and Little Isle 4 would make the LOC monthly payments</u>.

- The court must recognize that these are the "**expected**" payments that the government actually charged Kenner with in **Counts 7 & 8** as frauds.
  o *It is irreconcilable with reality.*

- In addition to Berard, Kristen Peca's 2012 FBI recordings also confirmed that she and Michael Peca "*expected*" Kenner to make the LOC payments as well – as were handled for five (5) years prior to default.

In fact, Berard told the FBI (*specifically Galioto*) on 9-12-2013 (*3500-BB-1-r at 1*) that -- "*The LOC would be used to pay the interest on the loans against the Hawai'i property*".

- FBI Agent Galioto is the author of these notes, yet he endorsed charging Kenner for exactly what Berard testified to in the 2009 arbitration -- and again face-to-face in 2013 "**what was expected by Berard**" (one [1] month before the Kenner indictment).

- Regardless of Kenner acting how Berard verified he was expected to act, Kenner was charged for "making the payments" in his Superseding Indictment, *supra*.

---

[63] See Steve Rucchin's multiple sign-offs in *ECF No. 668, Appendix at 334-335* – for April 2009 and May 2009 – identical to Berard, Peca, and Sydor (and all LOC clients of Northern Trust Bank) – *all in evidence*.

75

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)...*

How does FBI agent Galioto Indict Kenner for payments (*Counts 7 and 8*) that Berard told him one (1) month before the original Indictment were exactly what Kenner was supposed to do and "**expected**"?  *(See 3500-BB-1-r at 1)*

*Hawai'i* – Bryan Berard *also* granted Kenner full permission to withdraw the LOC funds thru Berard's **one-page**, signed *Letter of Authorization to Northern Trust Bank (Bates stamp: TNTC000005)* [Ex.Z15].

Berard's March 11, 2005 Northern Trust *Letter of Authorization* stipulated to Northern Trust Bank (identical for all of the Hawai'i partners LOC investors) (like Peca, *supra*, *Bates Stamp -- TNTC000091*) [Ex.Z1] (and received in the Northern Trust subpoena mid-trial) (*Tr.4205-06*):

> "*This letter is your authorization to allow Philip A. Kenner to access my above referenced line of credit for direct deposit to the Little Isle IV account at Northern Trust.    He is authorized to sign for the release of funds related to the line.*"

*Bryan Berard cannot be a victim of concealment* – after his own verification thru the *Letter of Authorization* [Ex.Z15]. [64]

**Government ignored more evidence to attempt lie about "*consciousness of guilt*" to the court and jury…**

The court should note that although the government proffered that they wanted John Kaiser to claim that Kenner had "*berated*" Kaiser in October 2010 for interviewing with the FBI when they surprised him at this home (*Tr.1032*), Kenner and Berard exchanged a text communication *the day of* and *the day after* the FBI spoke to Kaiser.   Berard was excited to speak with the FBI to tell them the truth, as was Kenner since his canceled 2009 EDNY Grand Jury testimony (*See government document: F.#2009R01218 – of July 27, 2009*) [Ex.Z17] (and fraudulently slandered by AUSA Michiewicz during trial– *Tr.5014-5015, 5048-5049, 5051-5052*):

---

[64] See *Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A.* – confirming that once Peca signed the document (which he confirmed to the SDNY Grand Jury in 2011 – the related authorizations are his burden to understand; not subject to further and never-ending re-documentation or explanations).

*Q [Michiewicz]: And your testimony is that the AUSA, the U.S. Attorney's Office in Manhattan did not want you under oath in a deposition essentially or transcript which might at some point prove valuable, like right here. Is that your testimony?*

*A [Kenner]: I was excited and willing to testify in front of the Southern District or whoever the Government asked me to testify at that point in 2009.*

AUSA Michiewicz knew that his-own office presented the original July 17, 2009 subpoena thru AUSA Jeff Goldberg (*See F.#2009R01218*) [Ex.Z16] and cancelled it [Ex.Z17] – and made the slanderous claims anyhow.

[Michiewicz – *Tr.1032*]:

*"However, we will say that after the [Kaiser] interview was over – and I said it was the FBI.  I guess it was a Southern District of New York investigator.  When they left the house, he made a call to Kenner, and told Mr. Kenner, in sum and substance, the FBI was here.  You should talk to them.   He will testify, I'm quoting what he has said – he has a very clear recollection of how Mr. Kenner reacted – he said "Are you fucking crazy?   Did you talk to them?"  And he berated him for talking to them.  I am offering this as evidence of consciousness of guilt."*

AUSA Michiewicz' presentation of the pending Kaiser testimony to the court was in full contradiction to the truth – and exactly the opposite of what Berard and Kenner discussed by welcoming the FBI visit – in real time (*infra*)...

Kenner travelled to Mexico the day of the Kaiser 10-19-2010 FBI interview (*3500-JK-1-r*) to work with the investors' criminal attorneys and the Mexico Federales to arrest Jowdy in his four (4) Mexico criminal case(s), while waiting on action from the FBI since June 2009 (Kenner replies hi-lighted in yellow):

[10-19-2010 – the day of the FBI-Kaiser proffer between Berard and Kenner]:

| 17260 | +14015246929 Bryan Berard* | 10/19/2010 4:09:21 PM(UTC+0) | Read | **Get that fucker Jowdy locked up for good down there** |
|---|---|---|---|---|
| 10396 | +14015246929 Bryan | 10/19/2010 4:11:39 | Sent | **We will get him for sure!** |

| | Berard* | PM(UT C+0) | | |
|---|---|---|---|---|

[10-20-2010] – The day after the Kaiser-FBI interview, Berard contacted Kenner in Mexico to discuss it, as follows (<mark>Kenner replies hi-lighted in yellow</mark>):

| 172 68 | +1401524 6929 Bryan Berard* | 10/20/2 010 3:36:37 PM(UT C+0) | Read | **Hosw Mexico? U get in safe** |
|---|---|---|---|---|
| 104 02 | +1401524 6929 Bryan Berard* | 10/20/2 010 4:12:53 PM(UT C+0) | Sent | **So far so good. Tucked away safely!** |
| 172 69 | +1401524 6929 Bryan Berard* | 10/20/2 010 4:20:06 PM(UT C+0) | Read | **U hear abt Johnys visit yesterday??** |
| 104 03 | +1401524 6929 Bryan Berard* | 10/20/2 010 4:20:06 PM(UT C+0) | Sent | **Yep. I think it's great** |
| 172 70 | +1401524 6929 Bryan Berard* | 10/20/2 010 4:25:59 PM(UT C+0) | Read | **Me too. He was rattled. But I'm glad they** |
| 172 71 | +1401524 6929 Bryan Berard* | 10/20/2 010 4:26:15 PM(UT C+0) | Read | **They went and saw him face to face. I wish they wld call me or come see me too** |
| 104 04 | +1401524 6929 Bryan Berard* | 10/20/2 010 4:27:29 PM(UT C+0) | Sent | **Soon enough as well. They seemed very uninformed according to johnny!** |
| 172 72 | +1401524 6929 Bryan Berard* | 10/20/2 010 4:30:37 PM(UT C+0) | Read | **what's the name of Jowdy's lawyer who was X FBI?? I'm sure he's not giving them any true info at all** |
| 104 05 | +1401524 6929 Bryan | 10/20/2 010 4:30:43 | Sent | **Former FBI director Louis Freeh** |

| | Berard* | PM(UTC+0) | | |
|---|---|---|---|---|
| 17273 | +14015246929 Bryan Berard* | 10/20/2010 4:32:31 PM(UTC+0) | Read | That's his lawyer right? |
| 10409 | +14015246929 Bryan Berard* | 10/20/2010 5:36:52 PM(UTC+0) | Sent | **Freeh is his criminal attorney for the investigation FBI's visitors were asking about. He has probably looted 1-2mm from the Mexico budget to pay him! It's a joke!** |
| 17275 | +14015246929 Bryan Berard* | 10/20/2010 5:38:52 PM(UTC+0) | Read | Got it. Yup fuckn joke. <u>Hell get his</u> |
| 10410 | +14015246929 Bryan Berard* | 10/20/2010 5:42:38 PM(UTC+0) | Sent | **We have some work ahead of us from what I heard!** |
| 17276 | +14015246929 Bryan Berard* | 10/20/2010 5:44:26 PM(UTC+0) | Read | <u>what u heard is bad</u>?? How's things down in Mexico so far? |
| 10411 | +14015246929 Bryan Berard* | 10/20/2010 5:45:04 PM(UTC+0) | Sent | <u>**I just think they need the WHOLE story since they've only really spoken with myrick, Moreau, Nolan, Jowdy**</u>**, etc. Mexico is good!** |
| 17277 | +14015246929 Bryan Berard* | 10/20/2010 5:46:11 PM(UTC+0) | Read | <mark><u>**Great. I agree. Once they talk to us. I think it will switch over**</u></mark> |

Notwithstanding the fact that Kaiser was Jowdy's co-conspirator at the time of the 2015 trial (*ECF No. 628*) – there is nothing that comports with the AUSA Michiewicz proffer to the Court about the alleged Kenner-Kaiser conversation in October 2010 – and exactly what the Kenner-Berard communication confirms about the lack of "*evidence of consciousness of guilt".*

• This was clearly another orchestrated fraud on the court by the knowing FBI and AUSAs with the same texts in evidence (notwithstanding the ignored truth in the matter).

79

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…*

Only months earlier – exposing his personal knowledge of the Jowdy frauds since 2002, Berard rebuffed Tom Harvey and Jowdy's close friend at the NY Daily News (Michael O'Keefe) for writing multiple slander stories about Kenner, as follows: [65]

[Kenner (sent) in RED hi-lighted – Berard (reply) in **BLACK**]:

| 15177 | +14015246929 Bryan Berard* | 5/1/2010 12:06:48 AM(UTC+0) | Sent | **Good job with the reporter. Who was it?** |
|---|---|---|---|---|
| 13185 | +14015246929 Bryan Berard* | 5/1/2010 12:11:12 AM(UTC+0) | Read | **The douchebag from daily news. <u>Told him he's an idiot for printing these articles and he can quote me that I've been to both properties over a dozen times and Jowdy has not done his job.</u>** |
| 13186 | +14015246929 Bryan Berard* | 5/1/2010 12:11:34 AM(UTC+0) | Read | **He shut up right away and said sorry for bothern u. And hung up** |

- With Berard and Kaiser joined at the hip from 2010 until Kenner's 2015 trial, there was nothing they were apparently not aware of with Jowdy prior to taking their Mexico jobs and abandoning their responsibilities to the Hawai'i partners (with Kaiser as Managing Member since 2007) and Eufora (with Kaiser and Berard – leading the litigation efforts with Giuliani's team). [66]

---

[65] The court should take note that these NY Daily News stories are the ones proffered by Tom Harvey in his April 2009 extortion email to Kenner's attorney to denigrate Kenner (*Bates Stamp: ED-0003068-69*) [Ex.Z33].  The FBI was clearly aware of the extortion threat to Kenner in April 2009 just prior to the bribery offer "*to just go along*" and Kenner DECLINE in May 2009 (*Bates Stamp: 27888* – from Jowdy's production) [Ex.Z19].

In 2008 -- O'Keefe wrote "*Roger Clemens – American Icon*" – and Jowdy and Harvey were prominently featured in O'Keefe's book for their assistance in thwarting the government's perjury case against Clemens (with whistleblower – Brian McNamee payoffs from Jowdy in evidence stolen by Jowdy from Owen Nolan – *See Bates Stamp: PKHome-0016860*) [Ex.Z20].

[66] The NY Daily News (*November 13, 2013*) touted Kaiser and Berard as "<u>*heroes*</u>" for their efforts with FBI Agent Galioto and featured them in an arrest-day article titled – "***Former NHL Player Bryan Berard and ex-cop help Feds nail two Arizona men in massive fraud***".

- After Jowdy fired Kaiser (*ECF No. 628*) – Kaiser <u>*cannot*</u> get an audience with the FBI to "rat" on his 2012-2017 co-conspirator, Ken Jowdy!!   The court should take note in the irony…Kaiser's "prodigal son" status has been revoked when in opposition to Jowdy's cabal -- which hi-lights the question –

80

**Control of the Hawai'i partners (Little Isle 4) capital:**

The Little Isle 4 By-Laws "**controlled**" the "**use of funds**" once the <u>authorized</u> transfer from Bryan Berard (and the other Hawai'i LOC investors) was granted [Ex.P].

- This is simple business-practice law, ignored by the government to claim, "*if a specific transaction was not remembered thru their failed memory test*", there was a fraud perpetrated on the investors, via "*concealment*".  The "*memory test*" standard was unreasonable and <u>cannot</u> be the basis for a concealment prosecution that only four (4) of the 26 Hawai'i partners claimed, they "*could not remember*".  Accentuating the 19 of the 26 Hawai'i partners sued Jowdy to recover the funds starting in 2008 (in Mexico, Arizona, Nevada and California) [Ex.Z21, Ex.Z43, Ex.C, Ex.E, Ex.F],
- Several Hawai'i partners gave civil testimony to confirm their knowledge [Ex.Z64, Ex.Z65],
- Several Hawai'i partners proffered to the FBI about their knowledge (*3500-JK-1-r at 2,3,10, and 3500-SG-2 at 8-9*),
- Several Hawai'i partners signed affidavits to confirm the Jowdy loans and their underlying knowledge and forwarded them to the FBI years before trial (*3500-SG-4 at 4-5 -- and 3500-MN-2 at 3*), and

---

**"*Who is investigating the investigators?*"**

- The Court should consider following in DC Circuit Judge Emmitt Sullivan's footsteps – with the instant case echoing the Alaska Senator Stevens prosecutorial ruse by the FBI and Sullivan's recommendation to the Justice Department to "*investigate the investigators*".
    - The subsequent investigation, recommended by Judge Sullivan, opened Pandora's box and exposed gross ethical and legal malfeasance amongst the government's willing participants.  It was a scar on the system, but it took monumental steps towards restoring confidence in the justice system wrought with pay-for-play graft.

- Investigation in the instant case would run to the top of Mount Olympus; beginning with already exposed "unethical" tactics to behave above the law, diverting attention from the real criminal activity and those who have spent over a decade to cover-up the real crimes.
    - *Sometimes justice needs a hero…*

81

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…*

- Several Hawai'i partners testified that they possessed the actual 2004 Hawai'i-Jowdy loan agreement (*Tr.1127 [John Kaiser], Tr.3608 [Glen Murray]*)...

But – in 2015, the government was able to solicit from **Michael Peca** (until his recanting – *Tr.498-99*), **Owen Nolan** (*Tr.2065-66*), **Darryl Sydor** (*Tr.2156-2316*), and **Steve Rucchin** (*Tr.2721-23*) that they "*could not remember*" the Jowdy loans.

In spite of the Berard 2009 arbitration testimony, *supra*, a prepared Berard (or thru the haze of **CTE**) testified on direct-examination – <u>*6 years later*</u> -- that he was not aware of the Jowdy loans (*Tr.3035-3036*).

In 2015 – and on cross-examination, Berard hedged his knowledge of the Jowdy loans once faced with his 2009 arbitration testimony.   It further hi-lighted Berard's previous knowledge and the "proverbial pickle" he had to wiggle out of to maintain the government's synchronized "*I don't remember*" and "*I was never aware*" and "*I never authorized the loans*" testimony of all the Hawai'i-Mexico investors who participated in more than four (4) previous lawsuits versus Jowdy to recover the loans in Mexico, Arizona and California (**and signed off on all of them**) (*Tr.3082-83*):

> *Q: When you testified on direct that you thought your line of credit was being utilized only for Hawaii, is it your testimony that at no point in time you became aware that your line of credit and/or others committed to the Hawaii project were being used to extend a loan to Ken Jowdy with a return of 15 percent interest on that loan?*
>
> *A [Berard]: Absolutely not. My money was not supposed to be used in Mexico.*
>
> *Q: That's not my question sir. I know you told that on direct. My question is did there not come a point in time, though you are certain you weren't told to it initially, but did there come a time that you learned that line of credit money was being used for purposes of extending a loan to Ken Jowdy at 15 percent interest?*
>
> *A [Berard]: I heard of it, but I never heard of a line of credit loan.  <u>A Mexican loan is what I heard through Phil Kenner.</u>*
>
> <u>*Q: But do you have an understanding that the source of that money was coming out of Little Isle IV?*</u>

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)...*

*A [Berard]: I did not know that, no.*

- Berard signed off on the Arizona loan disclosure from independent attorney Tom Baker which stated on page 1 [Ex.Z21 *at 1*]:

  "*the gist of the lawsuit is to recover certain monies loaned to Mr. Jowdy from Mr. Kenner, Little Isle 4 and Ula Makika LLC.   Mr. Kenner estimates the total amount of monies loaned to Mr. Jowdy which have not been repaid to be approximately $5,000,000.   This is the estimated principle only, exclusive of accrued interest.  In summary, Mr. Jowdy denies that the monies were loans but rather characterizes them as investments.*"

Every page of the Baker disclosure was **initialed** and **signed** by the Hawai'i partners -- and **returned** to Attorney Baker, independently.

  o  *No greater transparency could be possible, although the government withheld this discovery until the post-trial forfeiture production (creating another unresolved Brady issue).*

- The California lawsuits versus Jowdy to recover the allegedly "unknown" loans confirmed [Ex.E *at 7*] [Ex.F *at 7*]:

  "*Mr. Najam was in charge of the corporate governance while under Jowdy's direction and control received over eight million dollars ($8,000,000) from a LLC in Hawai'i.   Mr. Najam failed to properly account for those funds and has placed the Jowdy investors in a vulnerable and compromised position.*"

  o  *No greater transparency could be possible.*

Each investor signed off on the Ronald Richards California lawsuits [Ex.Z43] although Berard told the 2015 court he "*did not read*" the lawsuit when he signed off (*Tr.3157*):

  *Q: Did you ever receive copies of the complaints?*

  *A [Berard]: I think I did, yes.*

  *Q: And from whom did you receive copies of the complaints?*

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…*

*A [Berard]: I would say Phil Kenner or Ron Richards.*

*Q: I guess the question then would be having received the copies of the complaints, did you look at them?*

**A [Berard]: I said before I did not read them, no. [67]**

==Willful blindness "by the investor" is not a civil or criminal prosecutorial standard that the court can accept as sufficient or providing confidence.== The court must use a reasonable standard to ask -- "*Did Kenner include 22 of the Hawai'i partners in the decision to loan the funds to Jowdy in 2004 – and consciously decide to exclude the four (4) future government witnesses who were suffering (in 2015) from CTE or faulty memory, confusion and mistakes (ECF No. 440 at 16[68])?*"

It is highly illogical, specifically considering all of the Hawai'i partners were friends &/or acquaintances of one another – making the alleged "**secret**" even more difficult to fathom [Ex.Z64 *at 6*].

• Kristen Peca responded to their attorney's (Ronald Richards) November 2009 group email – *which included Berard* -- and offers to meet independently with Ken Jowdy and his attorneys to address the outstanding loans and other embezzlement issues, at hand [Ex.Z44]. [69]

---

[67] *See Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A.*

[68] A witness perjures herself when "she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).

[69] The offer to meet Jowdy and his attorneys without Kenner was seven (7) months *after* the seizure of collateral – and only three (3) months *after* FBI agent Galioto cancelled all of the investors' individual interviews that Kenner set up in July 2009 (*in evidence*). It was also "while" they allegedly could not get a hold of Kenner and he was "hiding in a cave in Mexico" (*Tr.712*).

And –- as AUSA Michiewicz berated Kenner with an insulting question directed at Kenner's pure veracity (*Tr.5051*), wouldn't the same idea have applied to all of the Hawai'i-Mexico investors whom Galioto cancelled their "*under oath*" testimony in July 2009?

*Q [Michiewicz]: And your testimony is that the FBI, the U.S. Attorney's Office in Manhattan did not want you under oath in a deposition essentially or transcript which might at some point prove valuable, like right here. Is that your testimony?*

• Dr. Seuss would have retorted – "*What's good for the goose....*"

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)...*

o _The meetings with Jowdy were proposed without Kenner_ (who was not even copied on the email string) – so no greater transparency could have occurred between the 18 Hawai'i-Mexico investors, their-own independent attorney, and Jowdy's people.

o _Any alleged conspiracies would have been flushed out without interference…_

- All Hawai'i-Mexico investors who were not working hand-in-hand with Ken Jowdy by 2009 (_like the bad apples -- Tr.1919, 1989-90, 2003 [Nash] – including Nolan, Juneau, Moreau and Myrick_) were included in the independent mediation offers.   Kristen Peca replied to their independent attorney, Ronald Richards [Ex.Z44 _at 1_]:

"_We are putting our trust in you, so we will do whatever you recommend is best for getting our $$ out.   Thanks, Michael and Kristen Peca_"

- Kristen Peca told the 2015 EDNY court that she and Michael Peca could not get a hold of Kenner during this period of time (_Tr.712-713_) with Kenner _alleging conspiracies that Jowdy received all of the Hawai'i loan money and would not repay it_ -- which the Court discovered thru _government-forfeiture-44_ [Ex.G]…_Jowdy did_; and 100% of it.

- But – Kristen Peca chose _not_ to meet with the one person (Jowdy) who was alleged by Kenner (and _now proven_ by the government's-own accounting) to have stolen the money from the Pecas and the Hawai'i partners, covered-up by the FBI case agent since Kenner's June 24, 2009 FBI proffer (Galioto), and perpetrated as a fraud to four (4) of the 26 Hawai'i partners investors throughout the 2015 trial (in front of the court and jury); thru _government-forfeiture-36_ [ExH] and _government-forfeiture-44_ [Ex.G].

- If the Berard testimony, _supra_, was not purely **CTE**-based – and is in fact synchronized _faulty memory, confusion and mistakes_ (a.k.a. "_memory loss_"), then it can _never_ be deemed reliable or sufficient for a "_concealment_" prosecution.

85

**Bryan Berard (forensic conclusions):**

***Hawai'i initial $750,000***

- Received **$42,553** payment August 2006 (*Bates stamp: NAAZ000434*) [Ex.J1]
- Received **$129,314** in tax-free bond interest from 2005-2009 (pursuant to the collateral investment strategy – [Ex.56] [Ex.56a])
- Received "*roughly $300,000 after lawyers fees*"[70] from Northern Trust settlement (*Tr.3042*)...
- Received his 10% portion of the 4.6% CSL Properties LLC equity increase in Diamante Cabo san Lucas from the Jowdy 2017 settlement agreement worth approximately $**943,000** [Ex.Z67 *at 20*] [71]
- *Received a job from Jowdy from 2012 thru 2017 (with Kaiser) worth $$, annually (another form of repayment – or bribes)?*
- Owns 6.36% of Little Isle 4 [Ex.K *at 10, 12*]– which has Jowdy's uncollected $33 million-plus loan outstanding – worth approximately $ **2,098,800** [72]
  - Berard's net is **PLUS $2,763,667** (*$3,513,667 minus 750,000*)

---

[70] Upon information and belief – Tom Harvey handled the litigation with Northern Trust Bank for the investors to provide a greater divide between the Jowdy thefts and the investors' discovery of their truths.  ***Harvey has been concerned about his own criminal complicity in the Jowdy cabal (in evidence) since Kenner's initial confrontation with Jowdy and Najam in Cabo san Lucas Mexico in early 2007***.  Harvey was the author of the fraudulent "lien letter" to Nolan and the other Kenner investors to "secure" their initial $500,000 investment in Jowdy and Diamante del Mar [Ex.Z66].
  - **It was obviously a fraud and Harvey needed to cover his own complicity up.**

[71] Assuming the "time detection" of the alleged fraud was when Jowdy hired Kaiser and Berard in 2012, the Cabo san Lucas project was valued at $330,000,000 and had an announced debt of $125,000,000 (according to Kaiser and Berard proffers).
  - **The net value of the investment was $205,000,000.**

[72] The government thru *government-forfeiture-44* [Ex.G]– *not Kenner* – documented Jowdy's loans from Hawai'i as *authentic* – **thus verifying the government lied to the court and jury in 2015** – while Kenner was vilified for telling the truth (*Tr.4598, 4602, 5064-65*).  The court cannot punish Kenner at this point for funds that the government documented as received solely by Jowdy – in spite of their ongoing ruse to the investors that "*Kenner stole your Hawai'i money and bought his Cabo equity with it*".

- *Government-forfeiture-36* [Ex.H] also proves the Diamante Cabo equity is 100% "untainted" for Kenner and his two (2) partners (Stumpel & Lehtinen) in Baja Ventures 2006 – **and cannot be subject to forfeiture**.

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)...*

▪ *NO LOSS*

*Upon information and belief – Berard was also granted additional equity in the Cabo san Lucas project (like Nolan, supra) after Berard received his 2012 employment from Jowdy in exchange for dismissing Jowdy's criminal liability in the previous Diamante del Mar deal (which Jowdy defrauded all of the investors – ECF No. 667) [Ex.X].  This is additional – and unaccounted for recompense related to Berard's investments, not included in the calculation, supra.*

**Steve Rucchin**: [73]

| Hawai'i | Eufora | GSF |
|---|---|---|
| 1,100,000 | 50,000 | 50,000 |

According to several sources on the Internet, Steve Rucchin earned a career total of approximately **$23,247,000**.  His investments in the instant case were a small subset of his overall investment strategy and totals, at all times.   Any financial hardship is a result of his-own financial malfeasance and lifestyle decisions, and not a representation of a small subset his overall, fully signed off and authorized investment strategy.

Steve Rucchin called his memory of the Hawai'i partners LOC investment "*foggy*" when asked to recall the details of the transaction (*Tr.2721-22*):

*Q: And what was your understanding of what the line of credit was?*

*A [Rucchin]: It was, that's still, that's the hard part for me...I took a line of credit out with a big financial institution, so the interest was going to be paid off and **that was to be somehow used with the Hawaii venture**.*

**The Court should note that Kenner was charged in Counts 7 & 8 for making the 59th and 60th payments for 5-year-long Little Isle 4 LOC loans that Rucchin verified he expected to be paid by Kenner...**
  o **What reasonable standard did the government employ?**

---

[73] Please note that all analysis that applies to the previous investors, *supra*, applies to **Rucchin** unless specifically differentiated by evidentiary issues.

*Q: How much did he propose the amount for the line of credit would be?*

*A [Rucchin]: Yeah, first suggested $500,000, you know, but kind of convinced me to up it to a million because what that line of credit helped was just helped my stake in the ownership of the deal, if I went from 500 to a million that was going to in the end mean that I would have a bigger stake in everything.*

*Q: And just in terms of your understanding of that line of credit, <u>did you have an understanding of whether that line of credit was going to be secured by bonds of any sort</u>?*

*A [Rucchin]: **<u>See, that is still a little foggy</u>**, but all I know is that it was a whole line of credit. You know, <u>to go back and think about it how it was going to be secured, I can't say for certain</u>. But I do know it was just a line of credit that was going to be under my name.*

The best Rucchin could remember was "*<u>that was to be somehow used with the Hawaii venture</u>*" (although he was on multiple conference calls with the remainder of the investors in 2004 before the first loaned funds were delivered to Jowdy) -- and the Little Isle 4 By-Laws authorized the entire operations of the Hawai'i partners – including but not limited to lending money (*Bates stamp: PKHome-0011904-11907*) [Ex.P *at 1-2*].

- The Court should note that Rucchin signed his-own bond transfer request from his Schwab account to his Northern Trust Bank account to effectuate the collateralized LOC [Ex.Z71].

Rucchin participated in three (3) U.S. lawsuits versus Jowdy (Arizona and California) -- and multiple ones in Mexico [Ex.D, Ex.E, Ex.F].   *Rucchin personally signed off on all of them independently* [Ex.Z21].   Rucchin personally attended the California 2010 mediation with Jowdy and his attorney, Ronald Richards in February 2010.  Rucchin declined the offer (like the majority of the Hawai'i-Mexico investors) to attend the 2-day January 5-6, 2010 Jowdy depositions in Los Angeles, California (with Rucchin living one [1] hour away in Anaheim, California). [74]   Never

---

[74] Two (2) allegedly concerned Hawai'i-Mexico investors (Bryan Berard and Steve Rucchin) were living in Southern California (within an hour of the critical Jowdy deposition location *at their attorneys' office*) – yet neither of them made the effort to attend the January 2010 full confession depositions.  **It was pure conscious avoidance** for guys who gave personal authorization for their LOC collateral seizure less than one (1) year earlier – because of

once in the February 2010 group setting did Rucchin or anyone in the Hawai'i-Mexico litigation with Jowdy raise the issue of "unknown loans"; _the specific basis for the California litigation_.

_Rucchin suffered a major series of concussions in 2000_.
- From 2000 thru the 2002 NHL season – _Rucchin did not play professional hockey_ while suffering for almost two (2) years and recovering from post-concussion symptoms (the precursor to **CTE**).

Steve Rucchin's October 27, 2004 Northern Trust _Letter of Authorization_ specified to Northern Trust Bank (identical for all of the Hawai'i partners LOC investors, _supra_) (_Bates Stamp -- TNTC000127_) [Ex.Z22]:

> "_Please allow Philip A. Kenner to access this outstanding LOC for direct deposit to the Little Isle 4 account at Northern Trust.   He is authorized to sign for the release of funds related to my LOC._" [75]

_Steve Rucchin cannot be a victim of concealment_ – after his own verification of the _Letter of Authorization_ [Ex.Z22].

Rucchin confirmed he received both Northern Trust bank default letters (_GX-2121 and GX-2122_) (_Tr.2727-28_).

- Each letter from Northern Trust banker Aaron Mascarella stated:

> "_You may request an accounting by calling us at 602-468-2537._"

> - **_Nothing was concealed by Kenner from Steve Rucchin._**

---

Jowdy not repaying the Hawai'i-Jowdy loans.  **_Kenner could not offer more ongoing transparency to investors who did not care._**

- **_Only Jason Woolley [non-victim] and Greg deVries [non-victim] exorcized their concerns -- and attended the 2-day Jowdy deposition with Kenner as Hawai'i-Mexico investors._**

[75] See _Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A._ – confirming that once Peca signed the document (which he confirmed to the SDNY Grand Jury in 2011 – the related authorizations are his burden to understand; not subject to further and never-ending re-documentation or explanations).

89

**Control of the Hawai'i partners (Little Isle 4) capital:**

The Little Isle 4 By-Laws "**controlled**" the "**use of funds**" once the *authorized* transfer from Steve Rucchin (and the other Hawai'i LOC investors) was granted [Ex.P].

This is simple business-practice law, ignored by the government to claim, "*if a specific transaction was not remembered thru their failed memory test*", there was a fraud perpetrated on the investors, via "*concealment*".  The "*memory test*" standard was unreasonable and cannot be the basis for a concealment prosecution that only 4 of the 26 Hawai'i partners claimed, they "*could not remember*".  Accentuating the unreasonable standard is the fact that:

- 19 of the 26 Hawai'i partners sued Jowdy to recover the funds starting in 2008 (in Mexico, Arizona, Nevada and California) [Ex.Z21, Ex.Z43, Ex.C, Ex.E, Ex.F],
- Several Hawai'i partners gave civil testimony to confirm their knowledge [Ex.Z64, Ex.Z65],
- Several Hawai'i partners proffered to the FBI about their knowledge (*3500-JK-1-r at 2,3,10, and 3500-SG-2 at 8-9*),
- Several Hawai'i partners signed affidavits to confirm the Jowdy loans and their underlying knowledge and forwarded them to the FBI years before trial (*3500-SG-4 at 4-5 -- and 3500-MN-2 at 3*), and
- Several Hawai'i partners testified that they possessed the actual 2004 Hawai'i-Jowdy loan agreement (*Tr.1127 [John Kaiser], Tr.3608 [Glen Murray]*)...

But – in 2015, the government was able to solicit from **Michael Peca** (until his recanting – *Tr.498-99*), **Owen Nolan** (*Tr.2065-66*), **Darryl Sydor** (*Tr.2156-2316*), and **Steve Rucchin** (*Tr.2721-23*) that they "*could not remember*" the Jowdy loans.

The court must use a reasonable standard to ask -- "*Did Kenner include 22 of the Hawai'i partners in the decision to loan the funds to Jowdy in 2004 – and consciously decide to exclude the four (4) future government witnesses who were suffering (in 2015) from* **CTE** *or faulty memory, confusion and mistakes (ECF No. 440 at 16[76])?*"

---

[76] A witness perjures herself when "she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).

It is highly illogical, specifically considering all of the Hawai'i partners were friends &/or acquaintances of one another – making the alleged "secret" [Ex.Z64] even more difficult to fathom.

- If the testimony was not planned-perjury (known at all times to the government) – and is in fact synchronized *faulty memory, confusion and mistakes* (a.k.a. "*memory loss*"), then it can *never* be deemed reliable or sufficient for a "*concealment*" prosecution.

Steve Rucchin (forensic conclusions):

*Hawai'i initial $1,100,000 (actually $800,000)*

- Rucchin invested $**300,000** on 3-12-2007 from his Northern Trust Bank LOC into a 3rd party investment, unrelated to the instant case – further reducing his Hawai'i partners investment exposure [Ex.Z23 *at 2*, Ex.Z72 – *Bates stamp: BN-P-000228*].
- Received $**42,553** payment August 2006 (*Bates stamp: NAAZ000434*) [Ex.J1] [Ex.J2]
- Received $**210,113** in tax-free bond interest from 2005-2009 (pursuant to the collateral investment strategy – [Ex.Z56] [Ex.Z56a])
- Received $**0** from Northern Trust settlement (*Tr.2729-30*) [77]
- Received his 5% portion of the 4.6% CSL Properties LLC equity increase in Diamante Cabo san Lucas from the Jowdy 2017 settlement agreement worth approximately $**471,500** [Ex.Z67 *at 20*] [78]
- Owns 6.82% of Little Isle 4 – which has Jowdy's uncollected $33 million-plus loan outstanding – worth approximately $**2,250,600** [Ex.K *at 10*] [79]

---

[77] Rucchin gave 2015 testimony that he only discovered his LOC collateral loss in late 2013 – based on FBI agent Galioto's presentation to him...but Steve Rucchin received both default letters (*GX-2121 and GX-2122* – *confirmed at Tr.2727-28*) – discussed the collateral seizure directly with Northern Trust Bank (as required by all LOC clients prior to collateral seizure).
- *Only **CTE** or planned perjury can account for his testimony.*

[78] Assuming the "time detection" of the alleged fraud was when Jowdy hired Kaiser and Berard in 2012, the Cabo san Lucas project was valued at $330,000,000 and had an announced debt of $125,000,000 (according to Kaiser and Berard proffers).
- **The net value of the investment was $205,000,000.**

[79] The government thru *government-forfeiture-44* [*Ex.G*] – *not Kenner* – documented Jowdy's loans from Hawai'i as *authentic* – **thus verifying the government lied to the court and jury in 2015** – while Kenner was vilified for telling the truth (*Tr.4598, 4602, 5064-65*).  The court cannot punish Kenner at this point for funds that the government documented as received solely by Jowdy – in spite of their ongoing ruse to the investors that "*Kenner stole your Hawai'i money and bought his Cabo equity with it*".

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)...*

- Rucchin net is **PLUS $2,174,766** (*$2,974,766 minus 800,000*)
  - *NO LOSS…*

***GSF initial $50,000***

- Constantine overspend is **$17,077.40** (*ECF No. 501 at 60*) (or nothing by including the $124,982, 9-8-2009 documented Constantine contribution to the Ronald Richards Trust account (*Tr.5460*) – and ignoring the Gonchar $1,250,000 additional funds provided personally to Constantine [*Tr.4826-4827*])
  - **Rucchin net is $186** ($4,555,322 divided into Rucchin's $50,000 GSF contribution = 1.09%) – even though the government has not identified whose $17,077 was overspent – *if at all [but never by Kenner]*)

***Eufora initial $150,000***

- Tim Gaarn sold *his* Eufora private stock to Rucchin (*See trial exhibit Kenner 80*) [Ex.Y] and repaid Kenner approximately $77,500 in repayments from advance-loans Kenner made to Gaarn years earlier (documented in government evidence) (*Tr.2580*).
- Eufora was independently valued by Neptune capital at $20,000,000 *before* Rucchin's 2009 investments.  Rucchin's 2009 Eufora shares were granted at the $20,000,000 valuation and documented by Tim Gaarn and Eufora CEO CR Gentry in the 2009 Eufora operating agreement (*Bates Stamp: ED-000773-810*) [Ex.Z *at 35, 37*] (*GX-210*).
  - The government *lied* during summation and claimed there was no Eufora operating agreement (*Tr.5988*) (*GX-210*).
- Rucchin's 2008 private stock sales were vetted by his own attorney (Michael Stolper) in 2010.  There was no concealment – and Rucchin signed-off on Stolper's July 16, 2010 disclosure about the private stock sales and loan buyout efforts [Ex.Z3 *at 14*].
  - **Rucchin net investment is $150,000** (but -- *no loss* occurring due to Kenner actions).  *Gaarn sold his private stock* -- as the 2005-2008 Eufora tax records and 100% of the internal Eufora messages confirmed since 2005 (*including* Ex.Y).

---

- *Government-forfeiture-36* [Ex.H] also proves the Diamante Cabo equity is 100% "untainted" for Kenner and his two (2) partners (Stumpel & Lehtinen) in Baja Ventures 2006 – **and cannot be subject to forfeiture**.

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…*

- *Gaarn testified that he was not part of any conspiracy to sell his stock with Kenner (Tr.2563-64).*
  - The government has failed to prove that Eufora's patents are worthless – or the stock has even reduced in value since 2008.
    - *NO LOSS...*


**William Ranford:**[80]

| Hawai'i | Eufora | GSF |
|---------|--------|-----|
| 0 | 300,000 | 300,000 |

According to several sources on the Internet, Bill Ranford earned a career total of approximately **$11,953,976**.  His investments in the instant case were a small subset of his overall investment strategy and totals, at all times.   Any financial hardship is a result of his-own financial malfeasance and lifestyle decisions, and not a representation of a small subset his overall, fully signed off and authorized investment strategy.

*Eufora*:   William Ranford gave an FBI proffer on September 7, 2012 to FBI agent Galioto and SDNY Criminal Investigator Scott Romanowski. [81]   Ranford confirmed at trial he spoke to the agents *without* conferring with Kenner *prior* to the FBI proffer (*3500-WR-2-r*) (*Tr.2906*):

> *Q: Did Phil Kenner tell you that you should related that information to the FBI? When you say you have a conversation with him, when you called him up to say, hey, the FBI told me this? Is that what you're thinking when you say that's what Phil Kenner told you to say?*
>
> *A [Ranford]: No, that was my recollection at the time of the interview, how much I invested in Eufora.*

---

[80] Please note that all analysis that applies to the previous investors, *supra*, applies to **Ranford** unless specifically differentiated by evidentiary issues.

[81] These notes may need verification (*3500-WR-2-r*) – as AUSA Komatireddy told the 2015 trial court that notes *not* from an FBI agent are as good as *useless* (*as if some magical note-taking skill is bestowed on FBI agents that a mere mortal working for another federal government agency was incapable of creating – Tr.5992*).   AUSA Komatireddy was *vouching* for John Kaiser's credibility following his incredible testimony (*Tr.1120-22*).

93

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)...*

*Q: When you had the conversation that you say that you had with Phil Kenner before you were interviewed by the FBI, did you take note of that conversation, so you knew what to tell the FBI based on what Phil Kenner was telling you?*

***A [Ranford]: I had no idea that the FBI was contacting me until they contacted me. I -- Phil and I didn't discuss the FBI calling me.***

*Q: Oh, I thought you said that after you were contacted by the FBI and called up Phil –*

***A [Ranford]: Afterwards.***

*Q: It's my problem. Afterwards. It is my fault. After you spoke to the FBI on September 2012 you told me you spoke to Phil Kenner, correct?*

*A [Ranford]: Yes.*

*Q: So it is not a fact that Phil Kenner in any way told you what to say in advance of September of 2012, correct?*

***A [Ranford]: That is correct.***

The government *cannot* reconcile that Ranford accurately remembered his investment amounts and the month/year of the three (3) independent Eufora investments – *but 3 years later* – Ranford was adamant that he never made the investments or told that to the FBI (*Tr.2823-24*).

- Only outside influence could explain the incredible anomaly (like **CTE**, *faulty memory, confusion and mistakes,* or "**undue influence**").

Because Ranford had to verbally authorize the actual payments to buy the private stock to both his custodian (Schwab International) and his FINRA regulated investment advisor (Greenberg Graham and Ass.), Ranford was able to confirm in his 2012 FBI proffer that his $200,000-2008 investment was transferred from his Schwab account to the payee of record.

- Independently -- Ranford confirmed the exact date of July 2008 and amount of $200,000 at *3500-WR-2-r at 1*.
- Independently -- Ranford confirmed the exact dates of February 2009 and May 2009 investments of $100,000 each at *3500-WR-2-r at 2*.

How could Ranford independently explain that to the FBI in 2012 (without any influence other than his-own memory – as he testified, *supra*) – but three (3) years later has no recollection of it (trying to create testimony of confidence)?

- As the court knows -- *it is not possible*… [82]

Ranford signed off on the Giuliani investigations and disclosure letter of July 16, 2010 from Eufora investor's attorney Michael Stolper [Ex.Z3 *at 13*].   Independent counsel for Ranford – and all of the AZ Eufora Partners I investors – **vetted** the 2008-09 stock sales – as the letter represents to all of the signed-off investors.

*GSF*:

Ranford created an identical enigma for the court with more incredibly inconsistent testimony.   Not only did Ranford "correctly" explain his total contribution to the Constantine GSF during his 2012 FBI proffer (*3500-WR-2-r at 2*), but Ranford gave a September 17, 2014 deposition to Jowdy, Kaiser and Berard's adverse-Arizona counsel who peppered Ranford with GSF questions thru an unrelated case (on behalf of FBI agent Galioto – according to the Berard deposition in Arizona) (*3500-WR-3*).

In September 2014 -- Ranford confirmed his $100,000 and $300,000 deposits to the GSF account (Ronald Richards' attorney Trust Account) – despite *not* remembering any of it eight (8) months later during Ranford's controversial EDNY trial testimony:

*Q. And you never asked questions about how your money was being spent?*

*A [Ranford]:* ***Yes, I did****. I'm, I'm familiar with Eufora in this Global Settlement Fund.· I mean, I'm very familiar with the -- with Eufora, but* –

*Q. You just stated that the money was to be used for projects in Mexico?*

*A [Ranford]:  Well, that's what I thought it was, but I'm· incorrect. Now that I see the name Eufora, I· understand that that's what that was for, and I was familiar with the information on that, yes.*

---

[82] A witness perjures herself when "she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…*

*Q. So now it's your understanding the money was for Eufora?*

*A [Ranford]:  Yes. Correct.*

*Q. Okay. If you could turn to the third page,· please. And <u>do you see the entry on June 5th of 2009</u>? Is that your name there, William Ranford?*

*A [Ranford]:  Yes, it is.*

*Q. <u>And how much does it say was credited at that time</u>?*

**A [Ranford]:  100,000.**
   • **(Bates stamp: BNK-CS-00014144-45 and BNK-CS-00014230)**

*Q. And <u>do you see the entry on June 12th of 2009</u>?*

**A [Ranford]:  Yes.**

*Q. And is that also your name?*

*A [Ranford]:  Yes, it is.*

*Q. And how much does it say that you received?*

*A [Ranford]:  That I received.*

*Q. Yes. <u>Do you see the $100,000 debit there</u>?*

**A [Ranford]:  Yeah. Yes.**
   • **(Bates stamp: BNK-CS-00003287-96 at 6)**

*Q. Okay. And then if you could flip to the next page, please, at the top.· <u>Do you see the entry dated July 3rd -- or July 13th of 2009</u>?*

*A [Ranford]:  Yep.*

*Q. And is that your name as well?*

*A [Ranford]:  Correct.*

**Q. <u>And that's $300,000 that you deposited?</u>**

**A [Ranford]:  Yep.**

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)...*

- *(Bates stamp: BNK-CS-00014135-36 and BNK-CS-00014224 and BNK-CS-00003297-3306 at 5)*

Ranford's September 2014 testimony *exactly re-confirmed* the statements he made to the FBI during his 9-7-2012 proffers (*3500-WR-2-r at 2*) (two [2] years earlier) – *and confirmed by his own Schwab statements* (with his home mailing address).

- Ranford's *faulty memory, confusion and mistakes* (or **CTE** – *ahem...*) forced him to amazingly forget all of this just eight (8) months later.

    o ***How is that even possible?***

**The 2014 Arizona deposition ruse backfired as Ranford authenticated his-own $300,000 total contribution including,** *supra*:

1. The $100,000 to the GSF on June 5, 2009 – and
2. The $100,000 returned to Ranford on June 12, 2009 – and
3. The final $300,000 transfer to the GSF and Constantine on July 13, 2009). [83]

- The government and the FBI agent ignored the September 2014 testimony (that the FBI agent, himself, induced) – and forged forward with their "*lack of memory*" testimony thru Ranford in 2015 based on his short-term **CTE issues** or "*undue influence*" in the eight (8) months prior to trial (*Tr.2838, 2858-60*) – and *after* his full Arizona disclosure of the identical facts, *supra* – fully known to Ranford independently.

    o *It is unexplainable – again...*

Any 2015 "*loss of memory*" or testimonial results from "*undue influence*" other than **CTE** and *faulty memory, confusion and mistakes* is *inexcusable* – and a by-product of the government's prosecutorial desires; never including the truth &/or justice.

In fact – the 2014 attorneys peppered Ranford for agent Galioto (and while representing Berard and Kaiser in the deposition) further tried to divide Ranford from Kenner – to no available again.   ==**Ranford had no issues with Kenner**== – even after Kenner's Indictment and 1-½ years of EDNY detainment.   Ranford testified in the Arizona September 2014 deposition (*3500-WR-3 at 27*):

---

[83] Please note that the *government evidence* confirms that Kenner and Ranford met face-to-face in Los Angeles California *the day before* Ranford's final $300,000 transfer to Ronald Richards trust account – authorized by Ranford to his custodian and FINRA advisor, *supra*.

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)...*

*Q. Reading this paragraph in the [Kenner] Indictment, does that change your thinking about how your money was used, your hundred thousand dollars was used?*

**A [Ranford]: No.**

*Q. It doesn't make you concerned that it was perhaps used for something else by Phil Kenner?*

**A [Ranford]: No.**

**Ranford confirmed in September 2014 that Kenner was <u>still</u> his business manager (even after Kenner's Indictment and 1-½ years of EDNY detainment – and non-stop communication):**

*Q. When did he [Kenner] become your financial advisor?*

*A [Ranford]: It would have been probably the late '80s.*

*Q. Did you know him before then?*

*A [Ranford]:  No.*

**Q. Is he still your financial advisor?**

**A [Ranford]: Yes.**

- What complaints could Ranford have had with Kenner in 2015 considering Kenner was in federal custody – for allegedly stealing money and concealing it **from him** – as accused by the FBI and the EDNY – *and Ranford **still** considered Kenner his financial advisor during his September 2014 deposition*?

Only undue influence in the eight (8) months between Ranford's September 2014 Arizona deposition testimony and the 2015 trial testimony could have altered Ranford's perception of Kenner – specifically considering Ranford was openly communicating with Kenner in detention – alerting Kenner to the ongoing FBI lies to him and the other Hawai'i-Mexico investors that claimed -- "*Kenner stole your money to buy his Cabo equity*" (even though Ranford was not an investor in hat deal).

98

==Bill Ranford's (forensic conclusions):==

### *GSF initial $300,000*

- Constantine overspend is **$17,077.40** (*ECF No. 501 at 60*) (or nothing by including the $124,982, 9-8-2009 documented Constantine contribution to the Ronald Richards Trust account (*Tr.5460*) – and ignoring the Gonchar $1,250,000 additional funds provided personally to Constantine [*Tr.4826-4827*])

  o **Ranford's net is $1,123** ($4,555,322 divided into Ranford's $300,000 GSF contribution = 6.58%) – even though the government has not identified whose $17,077 was overspent – *if at all [but never by Kenner]*)

### *Eufora initial $300,000*

- Constantine sold $200,000 of his Eufora private stock to Ranford (*Bates Stamp: CBKR-000602*) [==Ex.Z2== *at 12*].
- Eufora was independently valued by Neptune capital at $20,000,000 *before* Ranford's 7-7-2008 $200,000 investment.  Ranford's 2008 Eufora shares were granted at the $20,000,000 valuation and documented by Tim Gaarn and Eufora CEO CR Gentry in the 2009 Eufora operating agreement (*Bates Stamp: ED-000773-810*) [==Ex.Z==] (*GX-210*).

  o The government lied during summation and claimed there was no Eufora operating agreement (*Tr.5988*) (*GX-210*).

- Gaarn sold $100,000 of his Eufora private stock to Ranford in 2009.
- Gaarn's shares were documented in Eufora CEO Gentry email to AZ Eufora Partners I Managing Member Tim Gaarn (*See trial exhibit Kenner 80*) [==Ex.Y==]– and registered in the 2009 Eufora operating agreement (*See Bates Stamp: ED-000773-810*) [==Ex.Z== *at 35, 37*] (*GX-210*).
- Ranford's 2008 private stock sales were vetted by his own attorney (Michael Stolper) in 2010.  There was no concealment – as Ranford personally **signed-off** on Stolper's July 16, 2010 disclosure about the private stock sales and loan buyout efforts, *supra* [==Ex.Z3== *at 13*].

  o **Ranford's net investment is $300,000** (but -- *no loss* occurring due to Kenner actions).

    ▪ *Gaarn sold his stock* -- as the 2005-2008 Eufora tax records and 100% of the internal Eufora messages (*including* ==Ex.Y==) confirmed since 2005.
    ▪ *Gaarn testified that he was not part of any conspiracy to sell his stock with Kenner* (*Tr.2563-64*).

o   The government has failed to prove that Eufora's patents are worthless – or the private stock has even reduced in value since 2008.

■   *NO LOSS...*

<mark>Tyson Nash</mark>: [84]

| Hawai'i | Eufora | GSF |
|---------|--------|-----|
| 100,000 | 100,000 | 100,000 |

According to several sources on the Internet, Tyson Nash earned a career total of approximately $**5,325,500**.  His investments in the instant case were a small subset of his overall investment strategy and totals, at all times.[85]   Any financial hardship is a result of his-own financial malfeasance and lifestyle decisions, and not a representation of a small subset his overall, fully signed off and authorized investment strategy.

• **Tyson Nolan had 37 career bare-knuckle fights** and *suffered multiple concussions* throughout his amateur and professional career.  Nash's fight totals are only second to Nolan **Nolan's 109 career fights** (as part of the superseding indictment individuals).   It was Nolan who proved to the court that he could *not* remember anything that happened to him and his investments for decades – and confirmed it thru testimony in 2009, *supra*.

---

[84] Please note that all analysis that applies to the previous investors, *supra*, applies to **Nash** unless specifically differentiated by evidentiary issues.

[85] The court should note that in 2013 – Tyson Nash (and Sydor, Lehtinen, Khristich and Ranford) sued John Kaiser and Bryan Berard as interveners in Arizona (*See Superior Court of Arizona – Maricopa County case #2012-cv055576 at Docket 926*) after Kenner caught Kaiser and Berard stealing a house in 2012 (*yes -- that is correct*!!) thru a fraudulent conveyance of title (*See Arizona ruling filed: 7-24-2015 at 12 ¶57*) [<mark>Ex.Z25</mark> *at 12*].   Kaiser and Berard refused to repay the five (5) interveners for the Promissory notes that Kaiser signed.   <mark>*Kaiser's defense in the case was -------- "forgeries"!!*</mark>
• *Kaiser and Berard lost to the interveners in 2015 – because empirical evidence at trial confirmed that Kaiser signed all of the Promissory notes; lying about his name being forged again!!*
• *Kaiser and Berard shared Arizona counsel with Ken Jowdy and Tom Harvey.*

100

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)...*

*Hawai'i*:

Nash was a participant in the 2008-09 Arizona lawsuit versus Jowdy to recover the Jowdy-loaned funds (*See Baker disclosures – recovered after trial thru the government's forfeiture production, i.e. Brady issue*) *signed* and *initialed* by Nash personally, stating [Ex.Z21 *at 1*]:

> "*the gist of the lawsuit is to recover certain monies loaned to Mr. Jowdy from Mr. Kenner, Little Isle 4 and Ula Makika LLC.   Mr. Kenner estimates the total amount of monies loaned to Mr. Jowdy which have not been repaid to be approximately $5,000,000.   This is the estimated principle only, exclusive of accrued interest.  In summary, Mr. Jowdy denies that the monies were loans but rather characterizes them as investments.*"

Jowdy was able to get the Arizona case dismissed in mid-December 2009 thru a series of unethical legal filings and documented *threats* to Kenner attorneys (*Bates stamp: PK_SEC_000800-802*) [Ex.Z18 *at 1-3*].

Shocking all Hawai'i-Mexico investors, Jowdy confirmed the truth less than three (3) weeks later *during* his California deposition (January 5-6, 2010).  **Jowdy confessed** to *all of the funds* being loans during his 2-day California deposition in another Hawai'i-Mexico investor case suing Jowdy for the loans -- contradicting Jowdy's-own 1-½ year Arizona defense strategy of "*no loans*", *supra (in the Baker disclosures Ex.Z21 at 1)*.

Jowdy's newfound "loan" confessions only three (3) weeks after receiving the Arizona dismissal "based on his "no loans defense" *shocked* Kenner and those present as Kenner communicated with Constantine and others – to trigger re-opening the Arizona case versus Jowdy with his confessions of the truth (finally)…

Kenner text messages to Constantine and Kaiser (who was present):

| | | | | |
|---|---|---|---|---|
| 13255 | +16023635676<br>**Tommy Constantine** | 1/5/2010 7:15:25 PM(UTC+0) | S e n t | **Did you just hear that? Total perjury!!!!!!!!!!!** |
| 13258 | +16312350308<br>**John Kaiser** | 1/5/2010 7:15:52 PM(UTC+0) | S e n t | **Did you just hear that? Total perjury!!!!!!!!!!!** |

101

From Kaiser to Kenner about the "loans":



| 11471 | +16312350308<br>**John Kaiser*** | 1/5/2010 6:32:34 PM(UTC+0) | Read | **Unbelieveable !** |
|---|---|---|---|---|

Kenner text message to Constantine about the Jowdy confessions:



| 13260 | +16023635676<br>Tommy Constantine* | 1/5/2010 7:18:00 PM(UTC+0) | Sent | **All the funds from Hawaii were for loans and maybe converted to equity!!!!!! But then he said they weren't converted** |
|---|---|---|---|---|

Constantine reply to Kenner:

| 11478 | +16023635676<br>Tommy Constantine* | 1/5/2010 7:25:58 PM(UTC+0) | Read | **So now it IS a LOAN?** |
|---|---|---|---|---|

Kenner response about the Arizona case versus Jowdy (3 weeks after its dismissal):

| 13261 | +16023635676<br>Tommy Constantine* | 1/5/2010 7:26:16 PM(UTC+0) | Sent | **Baker should have his trump card now!** |
|---|---|---|---|---|

Both California cases identified the same Jowdy loans in the 2-filed Complaints versus Jowdy (*See Los Angeles Superior Court case # BC416081 at 7* and *Los Angeles Superior Court case # BC416082 at 7*) [Ex.E *at 7*] [Ex.F *at 7*]:

> "*Mr. Najam was in charge of the corporate governance while under Jowdy's direction and control received over eight million dollars ($8,000,000) from a LLC in Hawai'i.  Mr. Najam failed to properly account for those funds and has placed the Jowdy investors in a vulnerable and compromised position.*"

*Despite Jowdy's lies to the Arizona courts in 2008-09 to trigger the dismissal of the Hawai'i partners lawsuits versus him for the "loans" – only two (2) months after the January 2010 California deposition confessions -- Jowdy* **personally** *re-affirmed the loans in March 2010 (*3500-KJ-2 *at 11-14*) by confessing *to FBI Agent Galioto and*

102

other SEC officers (with his attorney, Louis Freeh at his side – and operating in a full Teflon status).   Jowdy re-affirmed that he had received 100% of the Hawai'i funds and had no plans to repay any of them.

The agents noted Jowdy's full confession of his embezzlements and Hawai'i loan confirmations in their *raw notes*, as follows:

> *At 3* -- KJ [Jowdy] – "*all the funds were not used for DDM*"
> *At 11* -- KJ [Jowdy] – "*if I was not allowed to use $ then it was a problem*"
> *At 12* -- KJ [Jowdy] – "*thought I could use $*"
> *At 12* -- KJ [Jowdy] – "*$ from -- $ from PK loans -- Little Isle 4 – Ula Makika*"

- No one has held Jowdy and his Arizona counsel responsible for their clear frauds on the Arizona court – fully harming Kenner and Kenner investors for ten (10) years to follow from the unpaid Hawai'i-loans.
  - In fact, Jowdy and his counsel employed a former FBI forensic analyst to claim Jowdy's signature was a forgery in the Arizona case.   *The agent, perhaps the only one in this morass with ethics, refused to substantiate the Jowdy "forgery" claims.*
  - Less than one (1) year later, Jowdy and his Nevada counsel authenticated the same agreement they alleged as a forgery in their Arizona defense [Ex.O].
    - This is the same "criminal" activity Jowdy's Arizona counsel alleged in their _threats_ to the initial Arizona counsel representing Little Isle 4 and Ula Makika [Ex.Z18].

Tyson Nash and the other Hawai'i-Mexico investors were told by the FBI (with Kenner on at least two [2] of the phone calls) that the confessed Jowdy embezzlements of tens of millions of dollars from day 1 in the Diamante del Mar investment and its prodigy were _only_ civil issues, _not criminal_ [Ex.Z26].
- **Thus, *Nash and others were told the FBI could not do anything about them*.**

When Nash was asked in 2015 about the Jowdy loans...(*Tr.1955-56*):

> *Q And at that point in time, when you became aware of this issue regarding moneys loaned by Little Isle IV to Ken Jowdy and his refusal to repay, did you object to a lawsuit being filed for purposes of recovering those monies? Yes or no?*

*A [Nash]: Again, there was a lot of moving parts. <u>I can't say yes or no to that.  I trusted Phil Kenner</u>. He was fighting on our behalf. He was doing a great job from my understanding. <u>He talked to us anytime I had a question. Anytime I had an issue, I would pick up the phone, he'd answer, and he would tell me what was going on.</u> Again I didn't know the other side of it. I just new Phil's side and it always seemed to put me at ease, and <u>I understand for the most part it was very complex</u>. That's all I can say. But it seemed like he was doing a good job.*

*Q Well, when this discussion about the lawsuit involving the recovery of the money loaned to Ken Jowdy with all the other moving parts was discussed as you told us a moment ago, <u>did you say</u> in sum and substance, <u>Gee, Phil, you never told me about this loan from Little Isle IV to Ken Jowdy, I have no knowledge of it, and what is this all about.  Did you say something to Phil about that at that point in time? Yes or no?</u>*

*A [Nash]: I heard it much later after <mark>I think</mark> after it happened. <u>Again Phil talked to me about it in great detail</u>. **<u>It is a <mark>little foggy</mark> at this point but there was a definite issue there</u>**. I think that's how this whole thing started with the original lawsuit with Diamonte [sic].*

Nash cannot place an accurate timeframe to his learned knowledge of the Hawai'i-Jowdy loans, although he was on multiple conference calls with the remainder of the investors once he invested in the Hawai'i partners on or about 5-19-2005. His initial investment was **almost eight (8) months after the Jowdy loans began** – so he certainly knew about it <u>only</u> "*after it happened*" (*Bates stamp: NAAZ000339*) [Ex.Z27 *at 2*].

It makes sense ten (10) years later that, "**<u>It is a little foggy at this point</u>**" (*supra*) – since the loans were only "open" for eight (8) more months before full repayment was expected.   Darryl Sydor is Nash's best friend and introduced Nash to Kenner and the Hawai'i investment.   The Court should note Sydor's 2011 SDNY Grand Jury confirmation of the Jowdy loans, known at all times, *supra* [Ex.A].

Clearly – Nash would not have been part of the initial 2004 conference calls, because he was not involved in the Hawai'i project at the time.   Nevertheless, once Nash was involved, nothing would have deterred him from his participation in the monthly status conference calls or receiving the project "*update letters*" that Kaiser confirmed to the FBI during his October 19, 2010 proffer (*3500-JK-1-r at 3*):

104

"*PK made these many times*"

Tracing of the Nash deposit to the Hawai'i partners reveals that <u>none</u> of Nash's capital account contributions ended up as part of the Jowdy loans (*Bates stamp: NAAZ000172 and NAAZ000339*) [Ex.Z27] [Ex.Z28 *at 3*].

<u>Eufora</u>:

Nash signed off on the Giuliani investigations and disclosure letter of July 16, 2010 from Eufora investor's attorney Michael Stolper [Ex.Z3 *at 10*].   Independent counsel for Nash – and all of the AZ Eufora Partners I investors – **vetted** the 2008-09 stock sales – as the letter represents to all of the signed-off investors.

The court should note that in 2012 when ten (10) investors involved with Constantine and Eufora sued his bankruptcy proceedings to confirm the private stock transfers from 2008 (*See 2:12-bk-04842-EWH – U.S. Bankruptcy Court – District of Arizona*) [Ex.Z2, Ex.Z2a]– Tyson Nash did <u>not</u> sue the bankruptcy filing, because he had the transfer documentation he required from Constantine, fully acknowledging the source of his shares; *Constantine Management Group* (*See GX-764*).

- Nash's best friend, Darryl Sydor, did sue Constantine, thus fully aware of the Nash documented transaction.

Nash alerted Kenner about receiving the document from Constantine in a November 2, 2012 text – after Kenner asked about it (fully transparent).

105





Nash is referring to the Eufora transfer document he handled directly with Constantine (*See GX-764*) – again eliminating Kenner from the transaction.

**This is the identical protocol for every former Kenner investor…**
The court should also note that *GX-760* confirms multiple transparency issues that were present for each and every investor transaction; *minimizing Kenner's control of any money transfer **to zero***.

The government's evidence confirms that after Kenner signed a wire transfer with the appropriate transfer information (bank accounts, payees, etcetera) as limited Power of Attorney; the document was faxed to both independent advisors for Nash (just like every other investor).  *The fax headers for both advisors are on the transfer document, supra.*  Both **Charles Schwab Institutional Custodians** and **Greenberg Graham Associates** *independently* were required to contact Nash by phone to verbally authorize the transaction that Kenner submitted [Ex.Z60].

1.  An identical email was sent from Schwab to *all* Kenner's clients before oral authorization was given for any transfer -- thus it was impossible for any funds to transfer without the clients specific knowledge of the AMOUNT and PAYEE destination…

**That is the specific protocol – and no other.**  The *Bates stamp: EMAIL-00000092* [Ex.Z61] (*See GX-764*) was received by the government or FBI from an independent

source, further distancing Kenner from any ability to conceal even a single money transfer for any *Doe* named in the superseding indictment.

- It proves that *in real time* that -- every transaction had multiple "fail safes".

- It proves that Kenner *could not* move investor funds "unknown to them" regardless of their *faulty memory, confusion and mistakes* 6-7 years after the transaction.

- It proves that each investor *had* to sign off on every transaction – with oral authorization by the client and the multiple advisors, **period**.

Although all of the transfer protocol "fail-safes" was followed, Nash gave testimony in contradiction to the evidence in the government's possession, *supra*, pre-trial (*Tr.1916*):

> *Q. Now, at the time of your investment in Eufora, did Mr. Kenner tell you that your money was being wired to Constantine Management Group?*
>
> *A [Nash]: No. I had no idea what that really meant.*

After Constantine sold Nash some of his Eufora private stock in April 2008, Nash received the official transfer agreement; independent from Kenner's involvement. Even after Nash signed on to the AZ Eufora Partners I litigation versus Constantine (*See Stolper July 16, 2010 letter at 10*) [Ex.Z3 *at 10*] – there is no record of Nash or Giuliani's people complaining about the Nash transfer document as illegitimate (*GX-764*).   The Nash Eufora transfer shares were recognized on every adverse proceeding filed versus Constantine's 2012 Arizona bankruptcy (*See CBKR-0000602*) [Ex.Z2 *at 12*].  Even without Nash filing a bankruptcy adverse proceeding - - *nothing was concealed.*
- Nash received full consideration from Constantine independently.   After the transaction – four (4) days later (on 4-28-2008) Constantine repaid Kenner $17,000 of a $25,000 loan (from 4-11-2008 – 17 days earlier) with Constantine's (Constantine Management Group) private stock proceeds that are documented by the government's-own accounting (in evidence).

Nash told the EDNY Court that *all he was sure about* from his stock purchase was (*Tr.1915*):

107

*Q. At the time that you invested money in Eufora, what did Mr. Kenner tell about how the money would be used?*

*A [Nash]: Again we didn't really talk in great depth. <u>I was **guessing** it was for those commercials that they [Eufora] wanted to shoot.</u> Get those up and running. **And again I got a piece of a great, great company or it was worth a lot of money.**

- The court should note that on direct examination, Nash told the court that he saw the commercials at the Eufora office (which was not even built yet), and met the staff -- before he agreed with Constantine to purchase the Constantine Management Group stock; all independent from Kenner.   Neither could have happened logistically.

- Nash also told the court he thought his investment funds were for commercials that Eufora (nothing to do with Kenner) "***wanted to shoot***" (future tense), *supra*.
  - It does not reconcile – since he also claimed he saw them at the office <u>*before*</u> he invested!

<u>*GSF*</u>:

Nash gave a September 17, 2014 deposition to Jowdy, Kaiser and Berard's Arizona counsel who peppered Nash with GSF questions thru an unrelated case (on behalf of FBI agent Galioto – according to the Berard deposition in Arizona) (<mark>*3500-TN-3*</mark>).

<u>*Nash could not have been clearer*</u> that Kenner had little to no involvement in the GSF (identical to Michael Peca's 2015 testimony – *Tr.540*):

*Q: <u>Before the money went, before the money had been spent,</u> before you were apprised of that, what was your belief as to <u>who was in charge of the Global Settlement Fund</u>?*

*A [<mark>Michael Peca</mark>]: Initially Ron Richards and, as it was ongoing, Tommy Constantine.*

*Q: <u>And what was Phil Kenner's participation in that, as you recall?</u>*

<mark>*A [Michael Peca]: <u>He didn't seem to have one.</u>*</mark>

- What conspiracy was Kenner involved in – since Kenner was the largest monetary contributor to the GSF – and had no involvement according to the contributors?

The 2014 "Pearl Harbor" attack on Nash was identical to the ambush on William Ranford, *supra* – but ironically – they were both ignored by the government to continue the trial ruse in 2015 that Kenner was in some conspiratorial role with Constantine (*See* 3500-TN-3 *at 10-12*):

*Q: What's your understanding of the purpose of the Global Settlement Fund?*

*A [Nash]: The Global Settlement Fund, um, my understanding it was – it's very broad.   It was gonna be used for a number of things.*

*Q: What were those things?*

*A [Nash]: When Tommy [Constantine] approached me about it in my house, asking for the money, it was gonna be used for basically to try and fix a lot of the wrongs that, um, had been done to us over the years, with the lawsuits, with Cabo, with Hawai'i, with – I guess all of it that we had invested in over the years, pay lawyers.*

*Q: Can you explain that a little bit more?   What issues, what troubles, what lawsuits?*

*A [Nash]: Um. I think the main one was the lawsuit in Cabo with Ken Jowdy dealing with that.   They needed extra funds – to basically – at that time it was supposed to finish the deal.  We were – we were gonna finally cross the finish line, they both loved to say, um, and we needed to put more money into it, and on top of the money that we put in, we were also gonna gain more interest in current investments that we had already been involved with.*

*Q:  When you say "they loved to say that", who was "they"?*

*A [Nash]: Tommy and Phil.*

*Q:  And so the purpose was to try and resolve some of the issues that were going on in Cabo?*

*A [Nash]: <u>In Cabo and in a lot of other investments,</u> I believe, yes.   I, I wasn't privy to everything, but –*

*Q: Did you contribute to the Global Settlement Fund?*

*A [Nash]: Yes, I did.*

*Q:  Do you remember how much you contributed?*

*A [Nash]: 100,000*

*Q: Do you remember when that was?*

*A [Nash]: No, I don't.*

*Q: <u>Did you ever receive an accounting of how the money in the Global Settlement Fund was used?</u>*

*A [Nash]: <u>Tommy had gone over it with me</u> at one – at one point, basically showing me where it had all gone and went to, on one of his white boards in his Eufora building.   <u>Other than that, I had spoke to his accountant, I believe, at one – at one point as well</u>.*

*Q: Do you remember who that accountant was?*

*A [Nash]:  I don't.*

*Q:  <u>Do you remember how Tommy Constantine told you the money was used?</u>*

*A [Nash]: <u>Yes. He tried to show me on the white board where it all went to and</u>*

*Q: Do you remember where it went to?*

*A [Nash]: I don't.*

*Q: Do you remember when that occurred?*

*A [Nash]:  I don't.*

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…*

*Q: Did you talk to Phil Kenner about the Global Settlement Fund?*

*A [Nash]: No.*

It was clear in September 2014 – nine (9) months *before* the EDNY trial -- that Nash was 100% aware of the Global Settlement Fund "*use of funds*" after talking to Constantine and Constantine's accountant.   It certainly was *not concealed* by anyone with whom Nash was discussing it; Tommy Constantine.    Nash confirmed explicit GSF usage and his expectation at trial.   There was no room for analysis or argument of Nash's 100% understanding (*Tr.1919-21*).

- **It was also 100% clear that Kenner was *not* involved in the Nash Global Settlement Fund issues – just like Peca confirmed at trial,** *supra*.

Tyson Nash's (forensic conclusions):
### *GSF initial $100,000*
- Constantine overspend is **$17,077.40** (*ECF No. 501 at 60*) (or nothing by including the $124,982, 9-8-2009 documented Constantine contribution to the Ronald Richards Trust account (*Tr.5460*) – and ignoring the Gonchar $1,250,000 additional funds provided personally to Constantine [*Tr.4826-4827*])
  - **Nash's net is $374** ($4,555,322 divided into Nash's $100,000 GSF contribution = 2.19%) – even though the government has not identified whose $17,077 was overspent – *if at all [but never by Kenner]*)

### *Eufora initial $100,000*
- Constantine sold $100,000 of his Eufora private stock to Nash (*Bates Stamp: CBKR-000602*) [Ex.Z2 *at 12*].
- Nash – like 100% of the investors thru Kenner – gave independent verbal authorization to their-own independent 3rd party custodian of record and their-own independent 3rd party financial advisors (neither related to Kenner) (*GX-760*).
- Nash and Constantine exchanged a certificate (*GX-764*) validating the transaction that was documented in the 2009 Eufora operating agreement and signed by all Eufora Board members (*Bates stamp: ED-0000773-810 at 33-37*) [Ex.Z *at 35, 37*] (*GX-210*).

111

- Eufora was independently valued by Neptune capital at $20,000,000 at or about the time of Nash's 4-24-2008 $100,000 investment.  Nash's 2008 Eufora shares were granted at the $20,000,000 valuation and documented by Tim Gaarn and Eufora CEO CR Gentry in the 2009 Eufora operating agreement (*Bates Stamp: ED-000773-810*) [Ex.Z *at 37*] (*GX-210*).
  - The government *lied* during summation and claimed there was no Eufora operating agreement (*Tr.5988*) (*GX-210*).
- Nash's 2008 private stock sales were vetted by his own attorney (Michael Stolper) in 2010.  There was no concealment – as Nash personally **signed-off** on Stolper's July 16, 2010 disclosure about the private stock sales and loan buyout efforts, *supra* [Ex.Z3 *at 10*].
  - **Nash's net investment is $100,000** (but -- *no loss* occurring due to Kenner actions).
  - The government has failed to prove that Eufora's patents are worthless – or the private stock has even reduced in value since 2008.
    - *NO LOSS...*

### *Hawai'i initial $100,000*

- Received **$42,553** payment August 2006 (*Bates Stamp – NAAZ000434*) [Ex.J1] [Ex.J2]
- Received his 5% portion of the 4.6% CSL Properties LLC equity increase in Diamante Cabo san Lucas from the Jowdy 2017 settlement agreement worth approximately **$471,500** [Ex.Z67 *at 20*] [86]
- Owns 2.25% of Little Isle 4 [Ex.K *at 10*]– which has Jowdy's uncollected **$33 million-plus** loan outstanding – worth approximately **$742,500** [87]

---

[86] Assuming the "time detection" of the alleged fraud was when Jowdy hired Kaiser and Berard in 2012, the Cabo san Lucas project was valued at $330,000,000 and had an announced debt of $125,000,000 (according to Kaiser and Berard proffers).
- **The net value of the investment was $205,000,000.**

[87] The government thru *government-forfeiture-44* [Ex.G]– *not Kenner* – documented Jowdy's loans from Hawai'i as *authentic* – **thus verifying the government lied to the court and jury in 2015** – while Kenner was vilified for telling the truth (*Tr.4598, 4602, 5064-65*).  The court cannot punish Kenner at this point for funds that the government documented as received solely by Jowdy – in spite of their ongoing ruse to the investors that "*Kenner stole your Hawai'i money and bought his Cabo equity with it*".

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)...*

      o  Nash's net is **PLUS $1,156,553** (*$1,256,553 minus 100,000*)

          ▪  *NO LOSS…*

**Jay Mckee**: [88]

| Hawai'i | Eufora | GSF |
|---------|--------|---------|
| 0 | 0 | 250,000 |

According to several sources on the Internet, Jay McKee earned a career total of approximately **$17,533,300**.  His investments in the instant case were a small subset of his overall investment strategy and totals, at all times.   Any financial hardship is a result of his-own financial malfeasance and lifestyle decisions, and not a representation of a small subset his overall, fully signed off and authorized investment strategy.

*GSF*:

During the 2015 trial, the government confirmed during a sidebar discussion that *Jay McKee was **only** an alleged victim of the GSF scheme*.   The underlying issue with the alleged criminal scheme was that McKee – like others – were not aware of the various "*use of funds*" -- as solely distributed, managed and controlled by Constantine (as Constantine stipulated to during trial); *never Kenner*.

The government's confirmation of this took place as follows – *Sidebar discussion –* (*Tr.1846*):

> *THE COURT: Everyone can be seated. Mr. McKee, you can take your lunch break, thank you.*
> *(Witness leaves the courtroom.)*
>
> *THE COURT: What's the objection?*
>
> *MS. KOMATIREDDY: Your Honor, we object based on relevance. We also objected because **Mr. McKee is here as a witness with respect to the Global***

---

- *Government-forfeiture-36* [Ex.H] also proves the Diamante Cabo equity is 100% "untainted" for Kenner and his two (2) partners (Stumpel & Lehtinen) in Baja Ventures 2006 – **and cannot be subject to forfeiture**.

[88] Please note that all analysis that applies to the previous investors, *supra*, applies to **McKee** unless specifically differentiated by evidentiary issues.

113

*Settlement Fund. He's not alleged to be a victim of the Eufora fraud in this case.*

- Jay McKee is <u>not</u> involved in the Hawai'i partners, the 2008-09 Eufora transactions, or the Cabo san Lucas investment thru Jowdy.

  o McKee did <u>not</u> participate in any other investment in the superseding indictment.

**McKee discussed the GSF with Michael Peca before "someone" in McKee's family returned the authorization email for the use of funds...**

Jay McKee confirmed to the government that he also spoke with his wife **and former teammate and friend – Michael Peca** [89] – after the GSF presentation by Constantine at dinner in Buffalo, N.Y. on May 8, 2009 (*Tr.1817*):

> *Q. Did you ultimately decide to participate?*
>
> *A [McKee]:  I did.*
>
> *Q. Why?*
>
> *A [McKee]: I believed in what they said. I felt we would have had a chance to get some money back. I obviously wasn't happy with nothing being achieved in the property [Diamante del Mar] that I invested half a million dollars into. So after talking to them my wife and I went home and talked about it, I talked to some other former teammates, and thought that this would be the best course of action to recoup some money.*

After the alleged follow-up discussions, McKee <u>*authorized*</u> the wire transfer for the GSF contribution.   Immediately afterwards McKee (*or someone from his home – perhaps unknown to him as he testified*) returned the authorization form, which detailed Constantine's expected "*use of funds*" -- as "***ACKNOWLEDGED and APPROVED...***" (*Bates stamp: SMC-00000018*) [Ex.Z29]:

---

[89] Michael Peca was the <u>*only*</u> teammate of McKee's that participated in Constantine's GSF, thus, Peca and McKee spoke directly after the full-text Kenner-McKee communication of May 9, 2009, *infra*, **leaving nothing unknown to McKee, and conversely also to Peca based on McKee's first-hand testimony – and real time text messages (that McKee could not remember in 2015 – six [6] years later)**.

These specific terms of "**use**" according to Constantine were, as follows:

> *Per our conversation, please acknowledge your approval and authorization for me [Kenner] to have transferred $250,000 to Attorney Ronald Richards' Trust Account for your proportionate contribution to the Global Settlement Fund.   In addition to the fund paying for **various legal fees**, PR Agency Fees, as well as other protective advances and settlement costs, you will be receiving transfer of membership agreements from Tommy for acquisition of additional interest in Eufora, LLC as well as your new LLC and operating agreements reflecting your ownership interest in Avalon Airpark real estate Project, the Falcon 10 Aircraft, and the two Palms Place condominium units.   You may not remember Tommy or I mentioning the Palms units in our conversation.   In any case, because Moreau and Tommy settled that case as part of the Global Settlement, he has graciously elected to include you as a beneficiary in the significant equity that exists in those two units as part of this transaction.   As we discussed, instead of throwing money away only on legal fees, this strategy, which effectively acquires significant assets while providing a legal remedy, is by far our best solution.*
>
> *Tommy has requested from all of us and will provide to us, written documentation of every element of this transaction.   Please respond, **ACKNOWLEDGED and APPROVED**, to this email accordingly ASAP.*

On May 18, 2009, Jay McKee responded, "*Acknowledged and approved…*" [Ex.Z29]. McKee did not raise a single issue of confusion at that time.  *See Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A.*, 461 Fed. Appx. 61; 2012 U.S. App. LEXIS 3012.

In fact, McKee received another full disclosure email from Constantine the same day [Ex.Z24]:

> *From: Tommy Constantine <tommy@eufora.com>*
> *Sent: Monday, May 18, 2009 10:33 AM*
> *To: nicjay74@aol.com*
> *Cc: Phil Kenner*
> *Subject: Global Settlement*
> *Attachments: AZ Eufora Partners LLC McKee 5.4.09.xls*
>
> *Nicole and Jay:*
>
> *You will be receiving a Transfer of Membership Agreement for your increased interest in Eufora, LLC from our CEO (C.R. Gentry) later this week or next week*

115

*at the latest. We just have to wait for the other side to sign the Transfer docs as part of the settlement, which is supposed to be in the next few days. In the meantime, this email shall serve as written confirmation that you will be receiving 1/10th of the interest that we acquire from Nolan, Juneau and Moreau with respect to Eufora.* **Specifically, you will be receiving an additional .364% which is 1/10 of the 3.64% interest that they currently own or owned. The attached excel spreadsheet shows your current ownership interest and the interest that we are acquiring from the three of them as part of the settlement.** *The dollar amounts on the right are the current value of those interest at the $20M valuation (for the whole company). Again, your interest is 1/10 of that and will be added to the .70% you already own.*

*Additionally, Juneau and Nolan owned 10% each (20% total) of the <u>Avalon Airpark project</u>. We are buying out their 20%, so you will also receive 1/10th of this interest (2%). It is currently valued at $3.3M and the office space is currently being rented by Eufora. You will also be receiving an LLC and operating agreement reflecting your new proportionate share of ownership of this building.*

*Frankly, although this one is more of a luxury than an investment, you will also own 1/10th of 20% (2%) of the <u>Falcon 10 airplane</u>. It is worth approximately $1M but will be very difficult if not impossible to sell. In any case, this will not cost you guys anything going forward. Ultimately you guys should take advantage of the fact that we now all own an airplane together and when it's geographically feasible, you guys should use it to make owing a piece of it worthwhile. Just let me know whenever you want to use it. You just have to pay for the hourly costs for fuel and the daily costs for the pilots and landing fees.*

*Finally, as Phil and I stated, I also settled the <u>Palms condo</u> issue with Moreau as part of this global settlement transaction. Moreau had absolutely no right to sue me for the Palms units and I would have crushed him in that lawsuit because we had a signed agreement when he bought it. Nevertheless, since we got that issue resolved as part of the settlement as well, I have elected to share in the ownership of those units and the equity that exists in them with all of the great partners that have stepped up and helped us fix this problem with all these problem individuals. Specifically, these Palms units are a one bedroom and an adjacent studio on the 31st floor with a strip view. They are worth approximately $1.5M today and were worth $1.8-$2M some time ago. I believe they will recover in the future and be worth more than they are today. In any case, you will also be receiving an LLC and operating agreement reflecting your new proportionate ownership of these units. Although Juneau, Nolan and Moreau did not own any interest in these units, to keep things simple, I will just match what we are doing in the Avalon project so you will also receive 1/10th*

116

*of a 20% interest in these (2%).*

*Please do not hesitate to call me if you have any questions and please just to follow the program in terms of documentation.*

*TC*
*(602) 363-5676*

McKee actually told the trial court that he really did not even remember the "*ACKNOWLEDGED AND APPROVED*" authorization despite it clearly was sent to his email address, received, and responded to by someone with access to <u>*his*</u> email account.

- At a minimum – wouldn't that make someone related to McKee's email account responsible for the authorization, as detailed (*Tr.1859-1860*)?   See *Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A.*

No email to Kenner or Constantine ever followed from McKee or his wife – *or any other contributor to the GSF overall actions* -- after each and every person returned the **AUTHORIZATION** alleging newfound confusion – <u>*not one*</u>.

**CTE** or *faulty memory, confusion and mistakes* was to blame for McKee's clearly erroneous testimony in contradiction to everything in the government's pre-trial possession.   The government never stopped the 2015 proceedings to correct the known-false McKee testimony, or any of the overabundant mis-statements.   *They embraced it.   This was another documented Napue violation*.

At the 2015 trial, McKee confirmed that based on his "*memory*" at the time (in 2015) he thought the entire GSF was to <u>*only*</u> send funds to Ronald Richards to sue Ken Jowdy – clearly contradicting his authorization email, *supra*, his fully documented text communication in real time with Kenner, *infra*:

And not <u>*only*</u> "<u>***various legal fees***</u>" (*Tr.1820-1821*):

*Q. Did either Mr. Kenner or Mr. Constantine explain or tell you that any money from the Global Settlement Fund would be used to pay any lawyers other than Ron Richards?*

***A [McKee]: No.***

117

Then, at least as planned by the government and expecting McKee's suborned perjury or "*lack of memory*" about the use of funds, the government led McKee thru a series of leading questions intended to **CONFIRM** the **CONCEALMENT** of the actual use of funds, per the government's prosecutorial theories – critically important since the Gonchar-Constantine "side deal" showed that at most – Constantine overspent the smallest side-deal calculation by $**17.077.40** – nothing more from the $4 million-plus contributions.

<u>In concert with the government's prosecutorial theories</u> -- McKee claimed "*no knowledge*" of the GSF use of funds as specifically outlined in the <u>authorization</u> email (*Tr.1821-1824*):

> *Q. In addition to the fund being for -- sorry. Let's go on the rest of that. You will be receiving transfer of membership agreements from Tommy for your acquisition of additional interest in <u>Eufora</u>, LLC, as well as your new LLC and operating agreements reflecting your ownership interest in the <u>Avalon Airpark real estate project</u>, the <u>Falcon 10 aircraft</u> and the <u>2 Palms Place condominium units</u>. First of all, this Air Park, the Falcon and the Palms condominium units, did Mr. Kenner or Mr. Constantine mention those things before you gave them money?*

> **A [McKee]:  I don't recall those, no. I don't recall those.**

> *Q. In your conversation with them in the restaurant, did they mention those things?*

> **A [McKee]:  Not that I recall.**

> *Q. In this e-mail where it says you're going to get transfer of membership agreement for an interest in <u>Eufora</u>, did you intend for any of your money in the Global Settlement Fund to be used for Eufora?*

> **A [McKee]: <u>No</u>.**

> *Q. Would you have given any money to the Global Settlement Fund if you had been told that any portion of it would be used for <u>Eufora</u>?*

> **A [McKee]:  <u>No</u>.**

118

*Q. Did you intend any of your money in the Global Settlement Fund Tommy Constantine used for a <u>Falcon 10 aircraft</u>?*

> *MR. HALEY: I would object again just leading nature.*
> *THE COURT: Again, you can't ask these questions that nonleading way so I'm going to allow it. There's no way to cover these items in a nonleading way.*
> *MR. HALEY: Thank you.*

Then, for further emphasis by the government once McKee failed to recall any of the authorized uses or his text conversation with Kenner, *infra*, the government asked McKee the same questions **_again_** – *this time* – receiving a more <u>_firm_</u> "**_No_**" response for each of the <u>signed-off</u> and <u>approved</u> uses.

McKee followed the government script <u>_flawlessly_</u> by denying 100% of what was discussed at the GSF dinner meeting on May 8, 2009 – six (6) years earlier (*Tr.1823-1824*):

> *Q. <u>Let me ask it again</u>. Did you intend for any of your money in the Global Settlement Fund to go to a <u>Falcon 10 aircraft</u>?*

> **_A [McKee]:  <u>No.</u>_**

> *Q. Would you have given money to the Global Settlement Fund if you had been told that any of it would go to a <u>Falcon 10 aircraft</u>?*

> **_A [McKee]:  <u>No.</u>_**

> *Q. Would you have -- did you intend any of your money in the Global Settlement Fund to go to <u>two Palms Place condominium units</u>?*

> **_A [McKee]:  <u>No.</u>_**

> *Q. Would you have given any money to the Global Settlement Fund if you knew that any portion of it would go to pay for <u>two Palms Place condominium units</u>?*

> **_A [McKee]:  <u>No, I would not</u>._**

119

*Q. This e-mail says that you would be getting an interest in these things. Why would you be getting interest in these things?*

**A [McKee]:  I don't have an answer.**

*Q. Did they explain either Kenner or Constantine explain to you?*

**A [McKee]:  Not that I recall, no.**

If McKee were 100% truthful about these critical 6-year-old issues (or in turn did not "*fail his memory test*"), which played a heavy role in the conspiracy conviction of concealment by Kenner and Constantine – it could be deemed appropriate and damming testimony...

But – to reach that "*concealment*" conclusion – the government would have to 100% ignore the fully detailed and 100% contradicting text communication between Kenner and McKee -- immediately *after* the May 8, 2009 dinner (*infra*):

McKee testified (*Tr.1815*):

*Q. And at the time that you were having this conversation and deciding to give money to the fund, what did Mr. Kenner and Mr. Constantine tell you about how the money would be used?*

*A [McKee]: I was under the impression that the money would be used to buy Ronald Richards for his expenses to again go after Ken Jowdy for the northern property in Mexico.*

In spite of McKee's gross **CTE** symptoms in front of the Court (*or other undue influences*) -- McKee conducted a full text conversation with Kenner immediately after the May 9, 2009 dinner (*infra*)...

• At no time (post-dinner) does McKee act aloof or concerned that he had not heard the "same" text details during the dinner meeting that had just completed only hours before...(all *prior* to his acknowledged follow-up independent communication with Michael Peca about the GSF) (*Tr.1817*):

McKee in BLACK (read) -- Kenner responses hi-lighted (sent):

120

| 7032 | +171680349 03 **Jay McKee*** | 5/9/2009 3:46:20 AM(UTC+0) | Read | Thx 4 making the trip bud.. **Took in alot from the talk tnite**.. Drive safe, be in touch.. |
| 8255 | +171680349 03 Jay McKee* | 5/9/2009 3:55:39 AM(UTC+0) | Sent | Good stuff |

Then, McKee continued by re-engaging eight (8) hours later:

| 7039 | +171680349 03 **Jay McKee*** | 5/9/2009 12:36:25 PM(UTC+0) | Read | **Can u do me a favor.. Can u email me, so I can look at it on paper, everything my 25O turns into.. Nicole was speaking with Tommy when u explained to me all the areas where we are benefiting..** |
| 8265 | +171680349 03 Jay McKee* | 5/9/2009 12:37:21 PM(UTC+0) | Sent | **I will have tommy do it so it's <u>consistent with the discussion</u>** |
| 7040 | +171680349 03 Jay McKee* | 5/9/2009 12:37:42 PM(UTC+0) | Read | **Perfect, tks** |

Then, McKee continued by re-engaging one and a half (1-½) hours later:

| 7043 | +17168034903 **Jay McKee*** | 5/9/2009 2:12:22 PM(UTC+0) | Read | **Hey, also, could u email me what the 3 black sheep are getting in the end result, as well as Tommy bullet points they had 2 agree too.. Tks** |
| 8269 | +17168034903 Jay McKee* | 5/9/2009 2:32:11 PM(UTC+0) | Sent | **Tommy said you will get 1/10th of everything that is acquired of theirs which includes 20% (2% for you) of the <u>airpark building</u>, 1/10th of their 3.64% of their Eufora shares (.364% for you which puts you just over 1% in <u>Eufora</u>) and then a small piece of the <u>jet</u> which TC is still crunching numbers on but it will probably be 1% of it.** |
| 8270 | +17168034903 **Jay McKee*** | 5/9/2009 2:35:46 PM(UTC+0) | Sent | **TC will send you the bullets they agreed to but has to wait till it's actually signed. Should be a day or two. They have only agreed by email so far. He will also send you the media summary** but he wants you to convince the owner of Chef's to send him the tomato sauce Fed Ex. |
| 7044 | +17168034903 | 5/9/2009 2:43:44 | Read | Haha.. Consider it done.. I'll have Lou |

| | Jay McKee* | PM(UTC+0) | | put some bottles together with the extra meat for the real flavor.. |
|---|---|---|---|---|
| 8271 | +17168034903 Jay McKee* | 5/9/2009 2:45:55 PM(UTC+0) | Sent | Thx |

Then, McKee continued by re-engaging forty-five (45) minutes later:

| 7045 | +17168034903 Jay McKee* | 5/9/2009 3:36:47 PM(UTC+0) | Read | **Did TC say the jet was worth 25Om last night?** |
|---|---|---|---|---|
| 8273 | +17168034903 Jay McKee* | 5/9/2009 3:44:10 PM(UTC+0) | Sent | **The jet is worth 1.5m. He invested 250k to repair it** |

| 7046 | +17168034903 Jay McKee* | 5/9/2009 3:45:53 PM(UTC+0) | Read | **Aha.. Thats where the 25O number came from..** |
|---|---|---|---|---|

| 7048 | +17168034903 Jay McKee* | 5/9/2009 3:53:08 PM(UTC+0) | Read | **In the deal, the 3 guys get their money back from their involvement with TC, but nothing back from their Mexico deals, correct..** |
|---|---|---|---|---|
| 8276 | +17168034903 Jay McKee* | 5/9/2009 3:54:14 PM(UTC+0) | Sent | **Correct!** |

Then, McKee continued by re-engaging two (2) hours later:

| 7053 | +17168034903 Jay McKee* | 5/9/2009 5:43:22 PM(UTC+0) | Read | **If we get control of Jowdys Cabo equity and move to sell Cabo - we get our 5OO back from del mar, and what percent of Cabo do we end up with?** |
|---|---|---|---|---|
| 8282 | +17168034903 Jay McKee* | 5/9/2009 5:48:03 PM(UTC+0) | Sent | **Its impossible to say until we know everyone who's involved in getting Jowdy's 40%. For example, the new bank/investor may want half of it to do the deal. But...whatever it is, you will get 1/10 of it.** |

Then, McKee continued by re-engaging four (4) hours later:

| 7060 | +17168034903 Jay McKee* | 5/9/2009 10:01:18 PM(UTC+0) | Read | **So is it correct to say we'd get our 5OO back from del mar, as well as a prob minumium 2% of Cabo? Sorry to keep asking - just trying to get it right..** |
|---|---|---|---|---|

If McKee did not *lie* on purpose in 2015 to support the government's claims of "*conspiracy by concealment*", then the *inaccurate* and *unreliable* testimony by McKee, certainly and prejudiciously contributed to the ongoing collective amnesia (a.k.a.

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)...*

122

**CTE**) by the GSF contributors.   The _faulty_ and _inconsistent_ testimony was entirely in the government's favor while seeking a conviction of Kenner and Constantine – for alleged crimes that McKee – in particular – exhibited **_faulty memory, confusion and clearly_** made a mistake.

- What is the government or McKee doing to make sure the court is alerted to the error?   To date – they are doing nothing about a conviction relying heavily based on _faulty memory, confusions and mistakes_…&/or a series of "_failed memory tests_".

- **According to the government – this was the only relevant testimony to support the government conviction allegations thru McKee – and it is clearly FALSE…**

_McKee is not a victim of anything but memory loss_, at best and planned suborned perjury at worst…

Jay McKee's (forensic conclusions):
  **_GSF initial $250,000_**
- Constantine overspend is **$17,077.40** (_ECF No. 501 at 60_) (or nothing by including the $124,982, 9-8-2009 documented Constantine contribution to the Ronald Richards Trust account (_Tr.5460_) – and ignoring the Gonchar $1,250,000 additional funds provided personally to Constantine [_Tr.4826-4827_])
    - **McKee's net is $935** ($4,555,322 divided into McKee's $250,000 GSF contribution = 5.48%) – even though the government has not identified whose $17,077 was overspent – _if at all [but never by Kenner]_)

_Considering the fully documented text communication between Kenner and McKee -- which verified their exact meeting discussions only hours earlier, McKee cannot be deemed a victim of anything in the instant case._

_In addition to Michael Peca's Hawai'i confession (on cross-examination – Tr.498-99) that he was at all times aware of the Jowdy loans from the Hawai'i partners (supra) [Ex.A] – McKee's testimony confirmed that he spoke with Michael Peca about the GSF parameters and objectives prior to their self-authorized contributions (outlined in the May 2009 text communication) – and as such had nothing "concealed from him"…either -- and thus, Michael Peca also cannot be a GSF victim._

123

**Joe Juneau**: [90]

| Hawai'i [91] | Eufora | GSF |
|---|---|---|
| $319,244.38 | 0 | 0 |

According to several sources on the Internet, Joe Juneau earned a career total of approximately **$19,944,000**.   His investments in the instant case were a small subset of his overall investment strategy and totals, at all times.   Any financial hardship is a result of his-own financial malfeasance and lifestyle decisions, and not a representation of a small subset his overall, fully signed off and authorized investment strategy.

- Juneau invested approximately one-half of his career earnings (or more) with his French investment advisor (Jean Turpin), who Juneau verified in 2009 (13 years earlier) had stolen millions from him thru a Bahamian bank scheme, *infra*.

Kenner had _not_ been Juneau's business manager since March 2003.   Juneau was _never_ a client of Kenner's Standard Advisors, LLC (started April 1, 2003).   Juneau was last a Kenner client on March 31, 2003 under Assante Asset Management of Los Angeles, California.

Juneau sued Kenner for his Hawai'i investment in 2008 – _over a year after Owen Nolan already bought him out of the Hawai'i investment – and Juneau independently confirmed it with Northern Trust Banker Aaron Mascarella_ [Ex.Z31 *at 1-4*] – *providing full transparency at all times*.   Juneau also sued in 2008 for his $100,000 Eufora investment, which had _also_ been re-paid "in full" three (3) years before the lawsuit.   It demonstrated Juneau's **CTE** symptoms as early as 2008.

---

[90] Please note that all analysis that applies to the previous investors, *supra*, applies to **Juneau** unless specifically differentiated by evidentiary issues.

[91] Owen Nolan bought Juneau out of his LOC investment position on 3-23-2007 (*Bates stamp: TNTC000045*) [Ex.Z30 *at 3*].   As a result Nolan acquired 100% of Juneau's Hawai'i equity -- and Juneau was 100% bought out of the investment at his prior request (*Bates stamp: NOLAN0005044*) [Ex.L] – with _no loss_ possible for Juneau eight (8) full years before the Kenner trial of 2015.

- Juneau did _not_ participate in any other investment in the superseding indictment.

124

The Juneau direct communication with Northern Trust Banker Mascarella was a follow-up after Juneau told Kenner that it was his personal desire to only have Kenner manage _his_ bond portfolio and get out of his private investments – having nothing adverse to do with Kenner in 2005 [Ex.Z32] – Juneau verified:

"*Phil, like I told you a few times already.   I'm not very comfortable with this situation.   It's [sic] has nothing to do with you but everything to do with the way I am.   I want a very simple head hake [sic] free life.   I'm worth between 15 and 20 million depending on some of the investments with you.*"

**Juneau's discomfort in May 2005 had "nothing to do with you [Kenner]".**

And – then to conclude his "**comfort**" with Kenner – Juneau tells Kenner that he wants Kenner to manage all of his investments at Northern Trust as follows –

**"Under you management"**

"*This is roughly around 7 millions [sic] CAD and I just want to have it invested in BONDS with Northern Trust under your management.*"

- The 2008-arbitration case was dismissed in Kenner's favor – with Juneau being represented by the same attorney as Owen Nolan in 2008-09 (while working with Jowdy's attorney, Tom Harvey).   *Juneau was charged approximately $250,000* for the filing of the case and duplicate investigations (allegedly) done in the Nolan case.
  - Juneau received a settlement deal from Jowdy for any and all thefts by Jowdy (now empirically proven by the government – *government-forfeiture-44* and *government-forfeiture-36*); thus _none_ as a result of Kenner actions.

**Juneau cannot be a victim.**

- *The same attorney working with Jowdy-Harvey for the arbitration versus Kenner charged Nolan over $500,000 in legal fees!   They also charged Ethan Moreau approximately $250,000 for a cookie-cut case filed that was also dismissed after Kenner's arbitration with Nolan -- and no res judicata available to either wrongfully advised investor.*

125

Juneau was bought out of the Hawai'i project upon his request (by Owen Nolan – who acquired Juneau's equity [in 2007]) – **documented on the Nolan 2006 K1 tax document** – *See NOLAN0005044*) [Ex.L]. [92] Nolan produced the Little Isle 4 2006 K1 tax document during his 2009 arbitration (*Nolan v. Kenner*) **confirming** that Nolan had received it from the Hawai'i project and Kenner; *and Nolan's $2.3 million investment was never concealed.*

- Juneau suffered innumerable concussions during his amateur and professional hockey careers.   Juneau suffered two (2) severe broken jaws during his NHL hockey career, and the resulting long-term post-concussion symptoms emblematic of **CTE** victims.

Ultimately, Juneau received approximately **$120,000 PROFIT** in tax-free interest from his pledged Northern Trust bond investment strategy during the five (5) years he was invested in the Hawai'i project (2003-2007).   In addition, Juneau received a 1099-tax form directly from Northern Trust Bank annually for the interest that was paid by Little Isle 4 on his behalf each year, further allowing Juneau to reap the benefits of the corporate (LLC) investment strategy thru his pledged collateral as a tax write off versus income.

It was Juneau's desire to "get out" of the Hawai'i project.
- **Juneau's desire to be "bought out" was unusually granted.**

The Court's *Memorandum and Order (Document 501) at 6* verified: "*Juneau testified that he had lost money on other investments.*"

---

[92] *Bates stamp: NOLAN0005044* [Ex.L] -- The Nolan tax document confirmed that Nolan had $2.3 million invested in the project and had just received a distribution totaling **$761,458** in 2006 as a result of the Lehman Brothers JV.   The tax document also recognized the increase (to 17.6516%) in Hawai'i project equity Nolan owned since his signing of the July 21, 2006 Hawai'i-JV disclosure statement (from 13.44%) and the 2006 Little Isle 4 operating agreement. See *Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A. (supra)*
- Only Nolan and Juneau's complete willful blindness, **CTE**, or complete disregard for reading anything sent to them or signed by them could plausibly explain their complete lack of understanding.
- **Nolan gave testimony in the 2009 arbitration that he has not read a single document since "before" he signed his first (1st) NHL contract in 1991 – 18 years earlier**, *supra.*

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…*

- **None of these were related to Kenner or the superseding indictment.**

**The Court's statement may be true, but it was wholly misleading** (*as the government intended at trial*).   The Court identified Juneau's testimony that he had lost money on other investments, yet these were related to over $2 million Juneau invested with his Quebec stock broker in the 90s (*Tr.232-3*), most of which was stolen as part of an offshore-Bahamian investment scheme by his Quebec "friend"; *nothing to do with Kenner*.

As color to this never-ending charade, Juneau's French Canadian investment advisor [Mr. Turpin] accompanied Juneau to the EDNY courthouse in 2015 for his "non-victim" testimony, in spite of his millions in losses/thefts from Turpin's offshore investment scam that he pulled on Juneau in the 1990s.   Juneau confirmed Turpin's scam in 2009 during his arbitration testimony (**13+ years after the Bahamian scam by Turpin**) (*See Nolan Arbitration Day 2 at 417-418*):

> *Q. BY MR. RICHARDS: Isn't it true that Mr. Turpin took you to the Bahamas with Mr. Kenner to look at a Bahamian bank that he recommended?*
>
> ***A [Juneau]: Yes. To look at different banks.***
>
> *Q. And you lost all your money in that investment, right?*
>
> *A [Juneau]: I don't know if I lost all my money.*
>
> *Q. You don't know if you lost -- you don't remember how much you lost?*
>
> ***A [Juneau]: No.***
>
> *Q. Have you received any money back from the Bahamian bank that Mr. Turpin recommended?*
>
> ***A [Juneau]: No.***

- The government chose to ignore this *critical detail* to paint an unrelated loss as somehow related to Kenner's superseding indictment (during their first witness testimony).   It was another known fraud on this Court and jury.

127

**Juneau received Cabo equity in 2008 after cooperating with Jowdy's attorney, Tom [Harvey] -- for the frauds Kenner exposed to the investor group in 2007 by Jowdy (***Tr.354***):**

> *Q: Your investment in Del Mar, you said that you got some interest in the southern project from Mr. Jowdy, is that correct?*
>
> **A [Juneau]: Yes, it is.**
>
> *Q: Can you tell the ladies and gentlemen of the jury what that is, if you recall it?*
>
> *A [Juneau]: Well, it's a percentage of this project. I'm not sure what percentage it is. But that was the agreement that we made with Ken Jowdy.*
>
> *Q: Would it be fair to say that the reason you came to that agreement is because the project in Del Mar was going nowhere? Would that be fair?*
>
> *A [Juneau]: I wouldn't say that it was more because -- I believe his name was on the -- also mentioned in the case, in the lawsuit that I started. You know, we somehow made contact with him and came up with this kind of an agreement. This thing we did with Tom [Harvey].* [93]

The court should note that this was the first (1st) failed "*memory test*" for a government witness; *cleverly disguised as Kenner's concealment of investments*.   The Juneau attempt failed under Juneau's own cross-examination admissions and the underlying empirical evidence the government *misconstrued* and *ignored*, on purpose, to create a false reality and confuse the jury from the start of their case-in-chief.

> **Juneau has no loss.  Juneau is a non-victim.  It is irrefutable.**

---

[93] This was the *initiation* of the "*Kenner stole all of your money to buy his piece of the Cabo project*" stories by Jowdy's cabal – **which is still untrue today** (*See government-forfeiture-36* [Ex.H] and *government-forfeiture-44* [Ex.G]) – despite Harvey's April 29, 2009 attempted extortion of Kenner by threatening FBI-led jail time on a wholly untrue basis; "**fake Jowdy loans**" (*Bates stamp: ED-00003068-3069*) [Ex.Z33].

==Joe Juneau  (forensic conclusions)==:

> ***Hawai'i initial $319,244.38 (LOC guarantee only)***
> - ***Juneau was fully repaid – and bought out of the Hawai'i investment on March 23, 2007 by Owen Nolan, who acquired his Little Isle 4 equity in full, supra.***
> - Juneau did *not* receive the $42,553 distribution payment in August 2006 (*Bates Stamp – NAAZ000434*) – because Juneau *never* contributed the $100,000 cash (per another change of mind by Juneau) (*Tr.170-71*). [94]
> - Juneau received approximately $**120,000** in tax-free bond interest from 2003-2007 (pursuant to the collateral investment strategy – in evidence)
> - Received 1% Diamante Cabo transfer from Jowdy in 2008 (for Jowdy's misuse of Hawai'i-Mexico funds) worth approximately $**2,050,000** [95] (*Tr.354*).
>
> - ***If the Court needs further confirmation of this all-encompassing settlement (covering all Hawai'i funds that Jowdy may have received)...they can subpoena the Jowdy or Juneau parties...***
>
> - Juneau's net is ==PLUS $2,170,000== (*$2,050,000 plus 120,000*)
>   - *NO LOSS*

---

[94] Notwithstanding Juneau's 2015 testimony (*Tr.170-71*) that he believed he had $100,000 "cash" invested in the Hawai'i project (**CTE** perhaps), Kenner clarified it completely to Juneau in Kenner's immediate June 2006 reply email response (9 years before trial) stating (*3500-JJ-14*):

> [Kenner]: "***The $100k is the cash you were supposed to ALSO put in the [Hawai'i] deal***, ***but you never did****. I didn't bother you for it even though every other investor had to invest the cash in the deal **even with the LOC signatures**. The investment is 3% in Little Isle IV. The whole Hawai'i deal is worth (appraised land) ~$90m right now. pk"*

- The government systematically ignored another empirical piece of pro-Kenner evidence received as part and parcel to the 6-year FBI investigation and 3500 materials; ***creating another Napue violation***.

[95] Assuming the "time detection" of the alleged fraud was when Jowdy hired Kaiser and Berard in 2012, the Cabo san Lucas project was valued at $330,000,000 and had an announced debt of $125,000,000 (according to Kaiser and Berard proffers). ==The net value of the investment was $205,000,000.==

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)...*

**Non-Kenner clients**:

- *Ethel Kaiser, John Kaiser, and Nick Privitello (all non-victims of Kenner)*

**Nick Privitello**: [96]

| Hawai'i | Eufora | GSF |
|---------|--------|-----|
| 0 | 200,000 | 0 |

**Kenner was found "not guilty" of the 2 counts related to Nick Privitello (*Counts 5 & 6*).**

- *There is no loss attributable to Kenner.*

Nevertheless – the government lied to this Court by trying to corroborate their own fictional storyline that Kenner and Constantine were sending texts to each other about "*kicking Nick in the balls*" as something to do with the "*METABANK*" deal that Constantine and Eufora were working on at the time.
  - *The government lied – and they knew they were doing it.*

The government was fully aware that Kenner was suing his former employee, <u>Nick James</u> for stealing from Kenner and Kenner's company, and taking James' deposition that day (November 13, 2009); <u>that exact day in Los Angeles California</u>.

The Kenner texts in evidence confirm the James deposition and the fact that Kenner's attorney was putting a lot of pressure on Nick James, for lying, and Kenner's retort was about "*kicking Nick [James] in the balls*".

- *Wrong Nick...and the government knew it at all times.*

[Michiewicz summation at *Tr.5748*]:

> "*This is November 13, 2009, just before the Privitello wire, right about the time that Eufora allegedly got some sort of terrific deal with MetaBank and it was going to be great. And what does Kenner say in response? **I'll yell MetaBank as I kick***

---

[96] Please note that all analysis that applies to the previous investors, *supra*, applies to **Privitello** unless specifically differentiated by evidentiary issues.

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)...*

*__Nick in the balls__. Constantine says perfect. __They knew about the discussion how to sell Nick Privitello__.*"

[Komatireddy rebuttal summation at *Tr.5961*]:

"*Mr. Privitello testified that it was Kenner who told him about Metabank. Now, there is no reason to think that Mr. Privitello saw that text message that explicitly said Metabank. That is a text message between Kenner and Constantine. There is no reason to think that he was tailoring his testimony, __but his testimony is corroborated by that text message__.*"

- ***No it is not!***

Ethel Kaiser: [97]

| Hawai'i | Eufora | GSF |
|---|---|---|
| 390,000 [98] | 0 | 0 |

***Ethel Kaiser has no loss in the instant case.***

---

[97] Please note that all analysis that applies to the previous investors, *supra*, applies to **Ethel Kaiser** unless specifically differentiated by evidentiary issues.

[98] (*Tr.933*):   Kenner __never__ met Ethel Kaiser until 2006 (after the 2005 Hawai'i loans were made):

*Q Who actually asked you? Did the defendant ask you or did someone else ask you on his behalf?*

*A [Ethel Kaiser]: __Phil Kenner and my son John__.*

*Q Would this have been in or around 2003 or 2004?*

*A [Ethel Kaiser]: __I think it was 2005__.*

*Q How much of a loan was that supposed to be?*

*A [Ethel Kaiser]: 390,000.*

***Q You put in 390,000?***

***A [Ethel Kaiser]: Yes.***

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…*

131

- The court should note that notwithstanding the other non-victim issues (like Juneau, McKee, etcetera), *supra*, the elimination of Nick Privitello and Ethel Kaiser as alleged victims also eliminates the government enhancement for "*more than 10 victims*" **U.S.S.G. § 2B1.1(b)(2)(A).**

Ethel Kaiser confirmed that the money she gave her son, John Kaiser (and not Kenner), in 2005 was paid back by John Kaiser (*Tr.934*):

> *Q Were you eventually repaid by anybody?*
>
> *A [Ethel Kaiser]: Down the line, from my son.*

- **There is no loss attributable to Kenner.**

The court knows that **John Kaiser stole $460,000 from his mother** during that 2005-06 transaction, because $850,000 was transferred from Ethel (in the banking records) to the Hawai'i partners' account in August 2005 *(Bates stamp: NTC012759-761)* [Ex.Z34] in three (3) separate transactions.

> o   *Apparently, John Kaiser only told his mother about $390,000 of it.*

The court knows that **John Kaiser and Bryan Berard stole an additional $147,000 from John Kaiser's mother** on August 20, 2010, as John Kaiser actually confirmed in 2015 (*Tr.1160*).  Ethel had already refuted any lending to her son and Bryan Berard (*Tr.940-941*) [99].   After John Kaiser stole the $147,000 from his mother in August 2010, he forwarded $95,000 to his partner, Bryan Berard (*Bates stamp: BK-MM-0000233*) [Ex.Z35] – unknown to Ethel as a victim of her son -- and now Berard.   These were clearly ignored criminal acts over many years – *withheld from*

---

[99] Ethel Kaiser denies knowledge of loan to John Kaiser and Berard (*leaving their theft caught red-handed – and ignored by the government*):

> *Q At any point in time, ma'am, did you have discussions where you discussed with your son John a matter where he would borrow money from you and then, in turn, loan that money to Bryan Berard?*
>
> *MR. MISKIEWICZ: Objection. Scope.*
> *THE COURT: Overruled. You can answer.*
>
> *A [Ethel Kaiser]: No, that didn't happen.*

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…*

132

*Ethel Kaiser by the government* – in order to "use" her for recently fabricated testimony about meeting Kenner in 2005, *infra*.  They were one (1) year <u>*too early*</u> for the meeting (*infra*) – per their-own evidence – but ignored it nevertheless, repeating their trial protocols to fit their "*square peg*".

• John Kaiser received $816,000 in August 2006 from the Lehman Brothers closing [Ex.J].   *None* of it was for *"back pay"* or *"expenses"* *(Tr.1413-1414)*.

  o Kenner has submitted multiple requests to the court and government for Kaiser to verify these financial fabrications to the court – thru subpoena. No evidence has been forthcoming – and the court denied Kenner's requests as of July 2, 2019.

  o The "*back pay*" and *"expenses"* are another contrived fraud on the court (and Kenner's jury) – and the requested information would 100% prove to be to the detriment of Kaiser's integrity and the government's fabricated claims.

  o As such – the fabrications of "*back pay*" and "*expenses*" <u>*cannot*</u> be accepted as truth in the instant matter because the "in camera" evidence is available thru Kaiser and the IRS case agent (Joshua Wayne)…further accentuating the trial fabrications and planned perjury to harm Kenner in front of the jury.   If actually true, they are easily proven.   Instead, the government continues to run from the truth at every turn – because of the known destruction to their "house of cards"…

    ▪ *That is empirical and ignored by the government.*

  o John Kaiser also <u>*signed*</u> a 2006 agreement with Kenner (in evidence – *Bates stamp: ED-0002870*) [Ex.Z36].   Kenner executed the Managing Member transfer to Kaiser in 2007 [Ex.N], which was part of the agreement to accept the $360,000 of the 2005 loan amounts as his future responsibility.

    ▪ *Kaiser received $1,176,000 in total for full repayment of the 2005 friends & family loans.   Thus -- <u>it eliminates Ethel Kaiser and himself as a victim of anything financially from the Hawai'i partners</u>.*

The government went so far to ask Ethel Kaiser to <u>verify</u> the alleged 2005 "event" that she met Kenner to discuss the "*loans to Hawai'i*" with her son (<u>*never loans to Kenner*</u>) (*Tr.934*):

133

*Q I'm showing you what has been marked for identification as **Government 942**. Do you recognize who is depicted in that photograph?*

*A [Ethel Kaiser]: Yes; Phil Kenner, my son John, and his baby.*

*Q Which baby is that?*

*A [Ethel Kaiser]: A grandchild that John had just had.*

The problem with the government "**cover story**" is that John Kaiser's previous baby boy died in 2005 (stillborn) and the baby girl pictured in the photo (GX-942) was not even born until the following year (2006) – after Ethel was repaid "*[d]own the line, from my son*" (*Tr.934*), as she told the EDNY.

John Kaiser confirmed the fabrication in his testimony moments later (*Tr.976*):

*Q And why was he [Kenner] asking you for a loan, if you know?*

*A [John Kaiser]: Excuse me?*

*Q Do you know?*

*A [John Kaiser]: He was giving me an opportunity. I was actually home at the time because in June my wife and I had lost a baby so I was home. He had called to say he was sorry for what happened, but that he had an opportunity for me to make or -- you know, to make some good interest on a loan that was approximately 30 days.*

*Q And what was the total that you were asked to loan him?*

*A [John Kaiser]: The total was $1 million.*

Clearly the government and Ethel Kaiser were wrong; one (1) year off in the timing (2006 v. 2005) – *but wholly to their benefit.*   No trier of fact could have deciphered the timing of the events and believed that the government (above reproach) would "use" a septuagenarian to further their fraud.

- *But – unequivocally – they did.*

134

This was another outrageous fact pattern the government fabricated with willing participants to prejudice Kenner – contradicting themselves.   Ethel Kaiser met Kenner no earlier than 2006 at the baby christening she described to the EDNY court, *supra* (GX-942); *clearly not in 2005 prior to the loan*.

John Kaiser actually told the EDNY court that Kenner "*called*" to make the loan offer in 2005, which was also untrue, as Kenner, Manfredi and Kaiser were in Hawai'i by early August 2005 to handle ongoing Hawai'i partners' business.

- The 2005 Kaiser friends & family loan occurred when multiple hard moneylenders failed to close on their 2005 lending with the Hawai'i partners.

Kenner and Hawai'i partners COO Chris Manfredi addressed this with a hard moneylender (at the same time) on August 12, 2005 [Jeff Leitner] (*Bates stamp: KJ2288*) [Ex.Z37] – only a week *after* Manfredi, Kaiser and Kenner *cancelled* the 2005 Lehman Brothers Waikapuna $5 million loan for being too "*egregious*" *according to Manfredi* (*Bates stamp: KJ2343 and PK_SEC_018640*) (*not Kenner's words*) [Ex.Z38].

Kenner's August 12, 2005 message to Leitner about closing expectations was as follows:
> "*Jeff…We are planning to close with your lenders by Wednesday [August 17] @ the latest.  Please let us know what documents are missing at all times, so we don't slow the process and jeopardize all of our efforts to date.   Thanks for the help.   Phil*"

Only three (3) days later – with trouble from Leitner's closing group, Jowdy suggested that Kenner contact his attorney, Tom Harvey (who was working with Jowdy and the Mexico-Lehman Brothers deal at the time).   Kenner expressed in the days leading up to the 2005 Lehman Brothers closing that he still needed to get the Waikapuna loan closed – fully confirming there was no 2005 deal in place with Lehman Brothers &/or some fabricated "*delay*" to get Urban Expansion (Constantine and Grdina) involved in the transaction (*7 weeks later at the expense of $451,000 in late fee closing costs*).   Kenner's August 14, 2005 email explains [Ex.Z52]:

> *Tom [TAHarvey28@aol.com]:  I need to close on a $4.296m purchase this Thursday in Hawai'i.*

135

*I have $720k cash in the deal.  The cash is hard and will be gone if I don't close. There are no extensions.*

*I would offer 6-8 points from closing proceeds and 12% interest on the deal.*

*We can provide ALL the necessary due diligence immediately.   My partner, COO [Manfredi], can be in NYC within a few hours to meet with any principles…*

*Please let me know if there is any addition info I can provide to help any discussions you might have with a potential lender/"partner".*

*Thanks for the help.   Phil*

This email to Harvey was two (2) days before the Manfredi "*egregious*" email to another hard moneylender [Ex.Z38].

- If there was a "delay" deal with Lehman Brothers – Harvey and Jowdy would have been aware of it – thus the timing of the "desperate" lending email because of other last-minute hard money lender failures could not have existed.

   o The court should note that these are both *prior* to the Constantine-led Urban Expansion loan that closed seven (7) weeks later.   The failed Leitner loan was amongst over a dozen other 2005 failed lending attempts [Ex.Z51].

In October 2005 -- just *prior* to Manfredi and Kaiser accepting the Urban Expansion loan terms and conditions (and six [6] weeks after Manfredi's "*egregious*" email [Ex.Z38]) -- Hawai'i partners COO Chris Manfredi stated clearly to Kenner on September 30, 2009 after another failed lending effort led by Manfredi and Kaiser (*Bates stamp: KJ2467-68*) [Ex.Z39]:

[Manfredi to Kenner -- September 30, 2009]:
   "*I, like you, have been hearing the same old stories for so long, everyone can "get it done" and nobody does…I think the likelihood of losing Waikapuna and Moa Ula Makika [another parcel under agreement] is very real.   I never thought I would be leaving this trip without funding.*

   *Chris Manfredi*
   *COO/Project Manager*
   *Big Isle Ventures, LLC*

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…*

*516-526-xxxx"*

In fact – immediately after the closing of the Urban Expansion (Grdina/Constantine) loan – Kenner, attorney Najam, and Manfredi expected a different lender "**Note Buyers of Texas**" and "**Premier Financial Solutions**" to re-do the Waikapuna loan – and "**replace**" the Urban Expansion funding during its legal cancellation period (according to Najam and the Hawai'i partners' attorneys at Carlsmith Ball) (*Bates stamp: KJ2524*) [Ex.Z40].

Under Kenner's *mens rea* (a.k.a. -- critical state of mind) -- how could Kenner have been part of an Urban Expansion conspiracy – if – Kenner, Manfredi and Najam were waiting on another lender to supersede and replace the Urban Expansion loan only six (6) days later – *and unknown to Grdina/Constantine*?
  • It is wholly confounding – but ignored by the government to frame their false theory of "delay" again.

The entire summer 2005 lending process was sheer chaos after Lehman Brothers tried to run a "*typical deal-to-steal*" revised offer on the Hawai'i partners at the 11th hour (the week of the proposed closing). As Manfredi confirmed to a 3rd party lender, on August 16, 2005, "*The deal with Lehman was cancelled by us as being too egregious*" (*Bates stamp: KJ2343 and PK_SEC_018640*) (and -- *not cancelled solely by Kenner as the government claimed*) [Ex.Z38].

  • In August, September, and October 2005 -- Manfredi, Kenner and Kaiser worked with a myriad of lenders that were introduced to the Hawai'i partners from Constantine, Gaudet, Gaarn, Rae and other paid hard moneylenders and consultants *after* the Lehman Brothers deal collapsed the week of the signing from its new "*egregious*" terms.
    ○ The court should also note that the Lehman Brothers 2005 deal was *only* a $5 million Waikapuna property purchase loan – not the eventual $105 million August 2006 deal.

  • Approximately a dozen "legit" lenders and brokers were in constant communication with Manfredi and Kenner to attempt a Waikapuna closing. All of the emails are in evidence [Ex.Z51] and were actually turned over by Ken Jowdy and Attorney William Najam to the government, confirming more 3rd party participation in the 2005 funding efforts – *all prior to the Urban Expansion opportunity*.

137

No reasonable trier of fact could review the onslaught of potential lenders and follow the government down the rabbit hole that, "*He also tells you that Lehman is interested. In 2005 Lehman is interested in investing in Hawaii but* <u>*Kenner puts them off for another year and he sets up the Urban Expansion loan…*</u>*" (Tr.5996 -- Komatireddy]*

- **Because** – Manfredi explained that the 2005 Lehman Brothers loan was "*egregious*" and "*cancelled by us*" [the Hawai'i partners management team] [==Ex.Z38==].

- And – Manfredi explained that there were "*no other choices*" (*Tr.2954*). [100]

- And – the Centrum loan – Manfredi said the Urban Expansion loan "*happened even before Centrum*" – but either way – <u>*it was not enough to close on the Waikapuna parcel*</u> – **so it fails on face value**.

- And – it is entirely unexplainable why Kenner would "*put off Lehman Brothers for a year*" <u>*so Kenner could*</u>:

     (1) <u>*Lose*</u> control of the Hawai'i partners deal (and the future monthly developer's fee – *like Jowdy's $220,000 per month in Mexico*),

     (2) <u>*Lose*</u> his Hawai'i home for a loss as a condition of the 2006 deal terms with Lehman Brothers and Windwalker (JV partner), and

     (3) <u>*Not take*</u> any of his capital account out of the deal at closing (with no benefits)!

---

[100] Hawai'i partners COO Manfredi explains his desperate efforts to fund unusual development land deal on a remote Hawai'i property [Waikapuna] (*Tr.2954*):

   *Q: Were you part of the decision-making to enter into this [Urban Expansion] loan?*

   *A [Manfredi]: Well, no, I really didn't have -- really didn't have a choice.* <u>**We had been through the gamut of trying to find these hard money lenders**</u>*,* <u>and this happened even before Centrum</u>*, so* <u>I was working on it pretty much nonstop and not being able to close on Waikapuna</u>*,* <u>not having been successful to that point</u>*, you know,* <u>**there wasn't a lot of choices left**</u>*.*

**John Kaiser**: [101]

| Hawai'i | Eufora | GSF |
|---------|--------|-----|
| 0 | 0 | 0 |

**John Kaiser has <u>no</u> money invested in any object of the 2015 superseding indictment.**

- ***Thus -- there is no loss attributable to Kenner.***

John Kaiser was repaid the 2005 loan amount plus interest for his friends & family in August 2006 (*Bates stamp: NAAZ000433-434*) [Ex.J].   The Kaiser repayments total $1,176,000.  Nothing is unpaid.   John Kaiser chose to "**keep**" the repayment funds for himself.

Two (2) years later when Kaiser was in trouble for non-re-payment to his friends & family, <u>Kenner made fun of him</u> for keeping the money to buy himself a new Jaguar (car) amongst other personal expenses and home renovations.

| 403 | +163123503 08 John Kaiser* | 4/15/2008 1:37:40 AM(UTC +0) | R e a d | Hey , thanks for that jaguar hit ,<u>**has if am not in enough shit!!!!**</u> Jk |
|-----|---------------------------|------------------------------|---------|---------------------------------------------------------------------------|

***John Kaiser was more than 100% paid back for his California renovation project from Kenner (in evidence – and not a charged offense) thus his thefts from his friends & family with the funds he received has no bearing on Kenner…*[Ex.Z41]**

Even years later (2011) – Kaiser was still making excuses to his friends & family about the funds he never repaid.  Kaiser *never* claims Kenner "*ruined his life*" – or Kenner owed him the funds his friends & family were seeking (contradicting the Kaiser trial fabrications [*Tr.1089*]).   Just prior to his employment with Jowdy – he expressed his guilt to Kenner – while <u>*never*</u> blaming Kenner for anything:

| 1 9 9 | +16312350308 John Kaiser* | 2/17/2011 8:40:28 PM(UTC | R e a | **On the phone w / willy he is going to be suing me** |
|-------|---------------------------|---------------------------|-------|-------------------------------------------------------|

---

[101] Please note that all analysis that applies to the previous investors, *supra*, applies to **John Kaiser** unless specifically differentiated by evidentiary issues.



| 7 5 | | +0) | d | |
|---|---|---|---|---|

- Willy [Krueger] is Dr. Frank Sconzo's partner who was planning to sue Kaiser for the funds Kaiser took from him -- and never returned per his own confession to the FBI in 2010 (and ignored) (*3500-JK-1-r at 7*).

  - Of the 10,000 plus texts and emails between Kenner and John Kaiser in evidence – there is *not one* when Kaiser asks for or demands any sort of repayment from Kenner – because there was never one as fabricated at trial (*Tr.1042, 1413-14*).

- This was the beginning of the end for Kaiser with overwhelming friends & family pressures for his stolen and documented frauds – "just" before he joined Jowdy (with Berard) in Mexico and turned on Kenner and all the other Hawai'i-Mexico victims by Jowdy at the end of 2011.

Kenner addressed *some* of the John Kaiser thefts with Kaiser's brother, *including but not limited to*:
- Ethel Kaiser's (Mom's) money,
- Their handi-capped brother, Keith Kaiser's money (*3500-JK-1-r at 7*),
- LedBetter partner, Vincent Tesoriero's money (*3500-VT-1-r*),
- The two (2) title thefts (with co-conspirator Bryan Berard) with forged and fabricated documents (*in evidence*) of --
  - The Arizona renovation property [Ex.Z25 *at ¶57*] and
  - The Sag Harbor Property [LedBetter] (*Tr.672-673*) [Ex.Z53 (forged) – *GX-702*, *GX-703 (original LedBetter operating agreement), GX-704, GX-705*].

The following text communication occurred in December 2012 after Rich Kaiser (John's brother) allegedly "borrowed" $50,000 worth of Kenner's power tools (a.k.a. theft under false pretense for his brother one [1] year earlier in January 2012) and never returned them.  Kenner had already filed two [2] lawsuits in Arizona versus Kaiser (and Berard) for stealing the two [2] real estate properties by fraudulent conveyance with *forged* and *fabricated* documents.

From Kenner (hi-lighted in yellow) to Rich Kaiser:

| 120 66 | +16313 984887 Rich | 12/9/2012 9:47:12 PM(UTC+ | S e n | You disappeared 27 days ago when you said you were sending my tools back. Let me know how you want to handle this. No more screwing around. Your brother |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| | Kaiser* | 0) | t | [John] is in a lot of trouble. You need to decide what side you're on. I was your friend and host at my home for many years...not your brother! |
| 120 67 | +16313 984887 Rich Kaiser* | 12/9/2012 9:53:51 PM(UTC+ 0) | S e n t | I hear your brother tells anyone that'll listen I screwed guys...well, we will see what happens when the legal process plays out. **He tried to STEAL the PV [Arizona] house from me** when I have over $1.5mm into the home and he has ZERO! I cannot wait to drag him through that one in court. **He will pay for the Long Island [Sag Harbor – LedBetter] theft as well**. It is COMING SOON! How does Vinny [Tesoriero] feel about being fucked by him! **Remember, John took all your mom's $$ [Ethel] and Keith's $$, not me! That's fucked up!! Now he is Jowdy's right hand guy**! KARMA...IT'S A BITCH WHEN SHE BITES BACK. pk |

Nevertheless – the government tried to tie the Kenner-Kaiser California renovation Project to *Counts 2, 3 and 4.*

- Please note that the California renovation project was *not* a charged object of the superseding indictment (*Tr.1036-1037*) – yet the government and Kaiser fabricated the "non-payment" back story, in lieu of -- and in contradiction to 100% of the Kenner-Kaiser banking records [Ex.Z41 *and* Ex.Z41a (*back-up records*)] that verified 100% of the "owed" funds were repaid to Kaiser – and timely (and then some).

(Michiewicz at *Tr.1020*):

> *"The reason some of those wire transfers go to Mr. Kaiser and some of these are the substantive wire fraud counts two, three, four, the reason they go to Mr. Kaiser is because he has no money to complete a subsequent project. He's still owed money from this Hermosa Beach project and, again, Mr. Kenner is controlling the funds."*

**Kaiser was *not* owed any money at the time of the February 2009 wires from Tim Gaarn to Kaiser...**

- The bank records from Kaiser and Kenner [Ex.Z41 *and* Ex.Z41a (*back-up records*)] confirm that under any accounting method – *Kaiser was fully repaid* by Kenner no later than May 2008 – over eight (8) months *prior to the loans he received from Tim Gaarn in February 2009 and later*...

141

==The counts must be dropped – resulting in grander _venue issues_ for the entire prosecution (**BECAUSE** these fake transactions related to "unpaid money to Kaiser" were fabricated solely to create a venue nexus)...==

Due to the fact that Kaiser was _not_ owed any funds from Kenner by the time that Gaarn wired two (2) loans to Kaiser in 2009 and Kenner loaned Kaiser funds in 2009 – the entire fabrication (per Michiewicz' own words to the court) are a fraud and the counts cannot be charged.

- Currently – pursuant to Kenner's Rule 29-33 reconsideration motion – or on direct appeal, _these counts must be dismissed_, resulting in absolutely no transactions occurring in the EDNY; _not just these fabrications_.

- Notwithstanding – John Kaiser is _not_ a victim of anything; inapposite, owing Kenner millions of documented dollars that will have to be resolved during civil litigation post-Kenner's release; similar to the Jowdy-admitted Hawai'i loans (_government-forfeiture-44_ [Ex.G]); argued by the government at trial as "_bogus_" (_Tr.5708 (2x), 5709_), "_phony_" (_Tr.4597, 4598_) and "_supposed_" (_Tr.5707-5708_) – and the Jowdy thefts simply a "_Kenner cover-up story_".
    - Apparently – it was not...but the prejudicial damage was done and irreversible...

[Michiewicz at _Tr.1036-1037_]:

> _"That's fine, Your Honor. Two -- two suggestions. It's going to be Hermosa, and there's another property which is known generically as the Paradise Valley or PV [Arizona] house. I'm not going to even ask about the name of the house. He can testify generically that he was also involved in another property, it was in the context of that second property in Scottsdale because of the Hermosa Beach failure to pay, lack of repayment, however you want to phrase it. That's why he was asking for money from Mr. Kenner, and that's why the wire transfers that are reflected in Count 2 and 4 occur. I would ask the Court to consider that it's not these other real estate ventures that are subject of the fraud. Rather, by way of background, because they represent, in the government's view, the proceeds of one of the frauds."_

142

| Count | Approximate Date of Wire Transmission | Description of Wire Transmission |
|-------|---------------------------------------|----------------------------------|
| TWO | February 12, 2009 | $30,000 wire transfer from an account at Wachovia Bank in Closter, New Jersey to John Doe 10's TD Bank account in the Eastern District of New York. |

*Count 2:*

Count 2 is a resulting wire from Tim Gaarn (uncharged individual) to John Kaiser from private stock sale funds that Gaarn raised by selling stock that he owned thru his 100%-owned Standard Ventures LLC (*Tr.2570-2571*) [Ex.Y] [Ex.Z].  The predicate private stock sale was from Gaarn (Standard Ventures) to an individual *not* named in the superseding indictment (Greg deVries), thus the follow-up Gaarn to Kaiser transfer cannot even be considered part of a fraud, without Gaarn charged as a co-conspirator.

> o  **The charge should be dismissed.**

*Count 4:*

| FOUR | May 22, 2009 | $25,000 wire transfer from KENNER's account at Bank of America in Scottsdale, Arizona to John Doe 10's Wells Fargo account in the Eastern District of New York. |
|------|--------------|------------------------------------------------------------|

The **May 22, 2009 $25,000 wire from Kenner's Bank of America account to John Kaiser** originated from a Gaarn private stock sale to a non-victim (Glen Murray) in the superseding indictment on (4-17-2009), without Gaarn charged as a co-conspirator.

> o  **The charge should be dismissed.**

Nevertheless, the empirical bank records in evidence – confirmed several critical items about the government lies about Kaiser being owed any funds from Kenner (*affecting the government's "reasons" for Counts 2, 3 and 4*) [Ex.Z41]:

1.  John Kaiser was 100% (and more) repaid by Kenner from the closing of the 2006-07 California renovation project -- *and owed nothing by 2009*.

143

- John Kaiser *never* paid IRS taxes on his approximately $653,000 of individual profits [Ex.Z41 and Ex.Z41a (back-ups)] – and

2. John Kaiser kept almost 100% of the Kenner disbursements for himself (in lieu of repayments to Ethel Kaiser, his handi-capped brother Keith, and other investors on Kaiser's behalf, *supra*).
   - None of the residual Kaiser thefts from his friends & family are relevant to Kenner – after Kenner fulfilled his full disbursement obligations (and uncharged) [Ex.Z41 and Ex.Z41a (back-ups)] – and

3. The April 2009 $25,000 transfer to Kaiser was because Kaiser was perpetually "*broke*" – and borrowing money from Kenner and others (in Mexico [Ex.Z54]) personally – *and Gaarn in February 2009*, *regardless of the concocted back-story that fails on the launch pad due to empirical evidence in the government's possession at all times pre-trial*).
   - Kaiser proffered his "broke" issues to the FBI (October 19, 2010) (*See 3500-JK-1-r*).

   o Kaiser confirmed that he *robbed* $550,000 from his friends & family again for another investment (*unrelated to Kenner*) – but diverted it (with full knowledge of the protecting FBI agent who needed Kaiser to spread pre-trial propaganda (*See Kristen Peca 2012 FBI recordings, supra*) and provide the EDNY Court with unbelievable testimony.
      - Kaiser proffered this specific friends & family theft to the FBI on October 19, 2010 (*3500-JK-1-r at 7*).  FBI agent Galioto ignored another Kaiser theft – because at the time – Galioto needed Kaiser (and Berard) to help spread slander and get Kenner off Jowdy's back.

- In November 2008, *long after* Kaiser was fully repaid his 2007 California profits and the initial funds he borrowed to participate with Kenner in the California project, *supra* – Kaiser and Kenner discussed the Arizona project and Kenner's 100% funding status, as follows (*Bates stamp: ED-0000602-606*) [Ex.Z42]:

   [Kenner] – "*Sent the wire to you...pk*"

   [Kaiser] -- "*Needed it thx*"

   [Kenner] – "*Paid the guys again for the 8224 [Arizona] work...pk*"

144

[Kaiser] -- "*Im broke cant help*"...

[Kenner] – "*I didn't ask...pk*"...

[Kaiser] – "*I know. Just tired of needing money. Gotta finish tje [sic] house so we can get our money out. U and me*" [102]

The court should note that there is *not* a single text or email in the thousands (1,000s) between Kenner and Kaiser when Kaiser demands or even suggests Kenner still owes him money for anything (California – Hawai'i – etcetera).   This storyline was 100% fabricated by the government and Kaiser for prejudicial effects at trial.   It clearly had an effect...

- The Court knows that if the government had "one" message – they would have waived it around like a winning lottery ticket.   *They did not...*

Kenner filed multiple requests with the EDNY court and the government to produce evidence of Kaiser's "*back pay*" and "*expenses*".   Neither was produced -- and the court "**denied**" the requests (June 2, 2019 – see hearing transcripts).   A fulfilled IRS and "expense" request would have "hi-lighted" the obtuse Kaiser-government lies – and created even more reformative effects on the jury verdict, wholly lacking any confidence at this point.

The Court denial – which if "approved" instead -- would easily prove that the government-Kaiser planned fabrications led to another Kaiser fraud on the Court (*ECF No. 628 at 1*).   In 2019 -- Kaiser claimed that with Jowdy's help (during his co-conspirator involvement with the Jowdy cabal: 2012-2017), Kaiser is the true owner of Baja Ventures 2006; not Kenner.

- *Even if the fabricated and forged agreements were true – they have been fully paid back thru 100% of the empirical evidence making Kaiser and Najam and Jowdy*

---

[102] The court should note that Kaiser and Berard stole the Arizona project mentioned in the "8224" payments (the Arizona house address number), *supra*.   A 2015 Arizona court adjudicated their *fraudulent conveyance* -- victimizing Kenner.  Kenner was forced to previously drop his civil suit (for their criminal theft) *after* they assisted FBI agent Galioto arrest Kenner in November 2013 with the case pending (*See Superior Court of Arizona -- Maricopa County case: cv2012-055576 at 12 ¶ 57 – filed 7-24-2015 [weeks after the Kenner EDNY trial ended]*) [Ex.Z25 *at ¶ 57*].

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)...*

145

*(signed off in 2014) even worse crooks than Kaiser said they were in his 2019 letter...*

- o It is another unchecked fraud to protect Jowdy's criminal involvement in anything.
- o This illegal transfer letter/agreement between Najam, Jowdy and Kaiser took place years <u>after</u> Kaiser joined "team Jowdy" in 2012 – but ironically after the Kenner arrest and bail refusals by the Court; not immediately after the agreements would have matured on January 1, 2010 (only days before the Jowdy California deposition, which Kaiser attended – and said nothing about...).

Attorney Ronald Richards gave 2015 testimony and confirmed Kaiser's presence at the January 5-6, 2010 Diamante Cabo deposition versus Jowdy.   Ronald Richards stated (*Tr.3846-3847*):

*Q Dealing with the Jowdy deposition, who was present for the Jowdy deposition; do you recall?*

*A [Ronald Richards]: <u>John Kaiser</u>. I think Phil Kenner. You know, if you had the transcripts -- I actually intentionally have the reporter list the people present -- then I wouldn't have to guess. They are on the face sheets of the transcripts, who was present. <u>But I remember John Kaiser specifically because I was given an e-mail that morning by Sergei Gonchar authorizing him to appear as his representation.</u> He wasn't a party in the case. And then I had other people there. Players were there sitting next to the deponent. Myself, Mr. Jowdy's lawyer. They were all present. But the names are on the face sheet of the deposition.*

*Q You anticipated my question in regards to <u>Mr. Kaiser. He was not a party in this litigation</u>?*

*A [Ronald Richards]: No, no.*

*Q And I believe that's what you testified to?*

*A [Ronald Richards]: He was not a party in the litigation, no.*

*Q Can you tell us why he was present at a deposition with Mr. Jowdy if he was not a party to the litigation?*

146

*A [Ronald Richards]: Like I said, Mr. Gonchar indicated he wanted him there as his representative, and he was a former police officer, and everybody in the group liked him and respected him. And let's face it, they felt comfortable with him. He was law enforcement.*

If the Kaiser-Baja Ventures 2006 agreements were <u>not</u> forgeries and fabrications (by Kaiser and Jowdy) – Kaiser would have fully vested as the largest shareholder of the Diamante Cabo project just five (5) days before the Jowdy California deposition. How could Kaiser have been present for the deposition and not announced to every relevant party that he was now the biggest Cabo shareholder and Kenner had nothing to do with the deal any longer?   It is irrational.

Jowdy, Jowdy's Diamante attorneys, Kenner, Ronald Richards [the Cabo investors attorney] – and the stenographer were all present during the 16 hours of deposition over two (2) days...and Kaiser made no such representation, *because <u>it was 100% fabricated after the Kaiser-Jowdy tandem was born in 2011</u>*.

It also raises the incredible question – if the transfer was true – and Kaiser had been working for Jowdy from 2012 thru 2015 by the time of his EDNY testimony – how could Kaiser have claimed the following (*Tr.1089*):

*Q. As a result of what you claim are the financial losses you suffered, as well as your mother, family members and friends, through the investments through Phil Kenner, you have a deep-seated hatred for him today. Correct?*

**A [John Kaiser]: Yes. You can say that. <u>He ruined my life</u>.**

- Kaiser and his friends & family would have won the proverbial lottery.   It is 100% nonsense – fully perpetrated on the Court by the U.S. Attorneys and the FBI case agent, while <u>*laughing*</u> at Kenner and the unknowing Court.   Baja Ventures 2006 would have had a value of approximately $150 million by January 2010.   <u>*That would not ruin anyone's life*</u>.

The government chose to hi-light their planned fraud during summation as follows (*Tr.5753*):

[Michiewicz]: *"He did tell you that, you know, he was best friends, he was a close friend and then after time hit the very end, **he ruined my life**. **That's***

147

*legitimate*, *you must evaluate his bias and his anger, his anger. I submit there is a difference between biased and lying and being biased because you are angry because you've been defrauded for years by one man."*

- *If the agreements were real* – Kaiser would have had them *signed* and *in place* before anyone was allegedly "lied" to.   He would have shown them to someone in the nine (9) years between their alleged, "signing" and when he "discovered" them; ironically after the Kenner 2013 arrest date.
  - It is a complete sham on the court and the jury.


- If the agreements were real and Kenner had somehow refused to acquiesce to the deal, Kaiser never brought legal action versus Kenner to effectuate the $100 million plus "gain" for his "*ruined*" life (*Tr.1089*).   *It does not comport.*

Kaiser cannot possibly claim a loss to Kenner (or anyone) since he is millions *ahead* from the funds he diverted from Kenner [Ex.Z41], his friends & family [Ex.J] – and tried to blame on Kenner (just like Jowdy with FBI agent Galioto's assistance) for nearly a decade now; including their criminal arrest of Kenner in Mexico and subsequent jailhouse beatings!

148

==Conclusion==:

The Court should find _no loss_ factor in the instant case, actual or intended, for all of the reasons, *supra*.

The **Hawai'i project** still maintains a valuable asset that the government refuses to assist in collection -- the Jowdy loans, *supra* (*ECF No. 653, 654*).   Hawai'i partners Managing Member [Ex.N]; John Kaiser has also ignored the collection of the asset since 2012 when he received a job from the wrongdoer and his co-conspirator, Ken Jowdy (*ECF No. 628*).   The convenience is bewildering.   The government _verified_ the actual and collectible loan via *government-forfeiture-44* [Ex.G].

- ==They cannot argue their own evidence against themselves (although they continue to do so); hoping the Court will be overwhelmed and _not_ notice.==

The **Eufora stock** has _not_ been proven to be without value.   The Court knows it is the government's responsibility to prove its value "*by a preponderance of the evidence*" – especially after two (2) independent valuations _during_ and _after_ the private stock purchases received a $20 million valuation in 2009 (the actual timing of the transactions in question).   The government has not provided the Court any substantiation to the contrary; other than unsupported rhetoric.
   - That is not sufficient after the 2008-09 bonafide purchases for value.

The **Global Settlement Fund** "may" have been overspent by Constantine by $17,044.40 (*ECF No. 501 at 60*) (but not by Kenner) – under the most extreme calculations; ignoring another $1,375,000 that Constantine and Gonchar specifically contributed and were expressly unrelated to the other GSF contributors (per the Gonchar-Constantine side-deal (*Tr.4826-4827*), *supra*.   Tyson Nash and Michael Peca gave testimony that they _never_ thought Kenner had any involvement in the GSF, *supra*.   *What could contradict that?*   _Kenner's non-involvement_ is further confirmed by Ronald Richards [Ex.W], *supra*, in his 2012 California Bar complaint reply.   Notwithstanding, Constantine's counsel stipulated to Constantine's 100% control of the GSF (never Kenner).

Specifically, the government's false trial representations about Kenner "*stealing the Hawai'i money to buy…*" and blaming it on Ken Jowdy (*Tr.27-31*) to further his conspiratorial ways fails at every representation.

149

**The government <u>submitted</u> and <u>verified</u> *government-forfeiture-36* [Ex.H] and *government-forfeiture-44* [Ex.G] conveniently – post-trial.**

The incredible timing (production of the documents allegedly three [3] weeks after trial) – of forensically critical information that <u>*escaped their investigative hands during the six (6) years of pre-trial investigation*</u>, *defies all logic* – and specifically from the most powerful law enforcement agency in the world with unlimited resources that the defendant, himself, counts on for integrity as much as the court relies on them for trustworthiness.   This post-trial evidence confirms "*beyond a reasonable doubt*".........."*Kenner did <u>not</u> steal anyone's money*".

Nevertheless – as the government manufactured – that bell cannot be un-rung without this court's intervention.   It may be time to recommend that someone "*investigate the investigators*".   The government post-trial production simply verifies "exactly" what Kenner told the FBI, the SEC and the EDNY U.S. attorneys office on June 24, 2009.   We are eleven (11) years into the cover-up hoax to protect Ken Jowdy (as Kenner exposed), and **the government refuses to act (*ECF No. 667*)**.

They continue to harm Kenner (and his freedom), Kenner's unknowing investors (who still believe Kenner "*stole*" their Hawai'i money) – and the system itself; perhaps its biggest crime as the protector of the Constitution and the Republic its safeguards.

> ***The jury views the government above reproach – so as such – their courtroom behaviors must reflect the public expectations of the highest morals and honor.***

> ***The government failed its highest responsibility; and grossly, to reach their goal of conviction – <u>not justice</u>.***

Their collective falsities tainted every aspect of the case, beginning with pre-trial witness manipulation (*See Kristen Peca 2012 FBI recordings, supra*) thru wholly false and misleading summations (*ECF No. 668 at 479-506, and supra*).

A fraud on this Court, the Kenner investors, and Kenner himself has taken place at epic levels that deserve further examinations.   It has been thoroughly documented since Kenner's June 24, 2009 FBI proffer (and before from Jowdy's counsel, Tom Harvey) that the FBI was going to assist in the false dissemination of facts regarding

150

Kenner (*supra*) via the media, the FBI and other cooperating government agencies Harvey and his co-counsel could "influence".

The investors' attorney, Michael Stolper, told the SEC in August 2011 what the Kenner investors he represented (about 27 of them) thought about the Jowdy hoax. Several months *after* Kenner clients Michael Peca, Darryl Sydor, and Turner Stevenson gave 2011 SDNY Grand Jury testimony, New York based attorney Michael Stolper's represented his participation and transparency with Kenner and the same Kenner investors *related to Jowdy* as clear and unambiguous, when he affirmed to the SEC (*SEC Tr. 683-685*):

[NY Attorney, Michael Stolper – August 2011] [Ex.Z73]:

> *The only thing I would like to clarify was that I think in your line of questioning, which may not come through in the transcript, whether he [Kenner] disclosed that the SEC has sought enforcement of subpoenas to his clients.   I think that the suggestion in your question was that it was something negative that he should disclose to his clients as sort of a warning or red flag to his clients who are relying on him.*
>
> ***And I think that the conversations that I have been a part of****, without waving privilege, **and also my own view** of SEC's involvement in this whole Diamante del Mar, et. al. is a welcome one and that **we** and Mr. Kenner, are really looking to the SEC to enforce the securities laws against Mr. Jowdy and those [Jowdy's cabal] who did wrong here.   And we see it as a welcome thing, as a positive thing.*
>
> *So the tenor of the conversations with Phil's friends, co-investors, clients is that this is a welcome thing and maybe because we are having this direct communication with the SEC, and then perhaps subsequently with the US Attorneys Office, that maybe they will finally get some justice out of this.*
>
> *And I know I have said that off the record with you and I just wanted to clarify that in response to that line of questioning.   Just a point of information.*

Nevertheless, the government's ruse had to be concluded with desperate abandon of the truth, as follows…[Komatireddy during rebuttal summation – *Tr.5990*]:

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…*

*"Mr. Kenner told you that he used that money to get his piece in the Mexico investment with Ken Jowdy. You know exactly what that's for. That's in evidence."*

**Apparently – it was not in evidence.**

(According to *government-forfeiture-36*)

[Michiewicz -- *Tr.5722-5723*]:

*"No reason other than for Kenner to get his 39 percent. Because remember, this is happening at the same time as, you know, some of the other transactions we have already talked about. To get his piece of the pie, that resort in Cabo. No reason. Actions speak louder than words. And in this case the action is pure fraud."*

**And apparently – that was not true, either.**

(According to *government-forfeiture-44*)

This was the diversion spread by Jowdy's cabal (starting in 2008) – with Galioto's assistance (starting in 2009). Galioto's failed 2011 SDNY Grand Jury confirmed unequivocally that Michael Peca, Darryl Sydor, and Turner Stevenson all verified that "*as a group*" of Hawai'i partners – they were at all times aware of the Hawai'i loans to Ken Jowdy (*supra*).

The FBI knew it was true because Jowdy confessed to it directly to the FBI – and specifically FBI agent Galioto (*3500-KJ-2 at 12-14*).

Kristen Peca confirmed the fabrication to Kenner during her surreptitious 2012 FBI recordings of Kenner:

*Kristen Peca – Matt [Galioto] told Michael and I that you stole all of the Hawai'i money and never gave it – the loan money -- to…uhhhh…Jowdy.*

• *The Court knows that no red-blooded American would ever believe Kenner over a seasoned law enforcement officer from the FBI – like Matt Galioto – after being told that Kenner stole their money…*

• Perhaps – Galioto's *lie* about the "*stolen Hawai'i money*" (and the perpetual reinforcements by Kaiser and Berard after 2012, *supra*) is the basis for the

152

Michael Peca and Kristen Peca "*agreement*" to suborn perjury and cooperate helping the government convict Kenner, under false pretenses.

- o  It would be hard to argue that is not plausible (or for Sydor, Ranford, and others with empirical testimony and FBI raw notes pre-trial of "total knowledge of everything"…*only* to change their testimony years later, in sync) – *now* that they "*knew*" (according to the FBI case agent) who "really" stole their money.   This paralleled the government's opening remarks with Kenner "allegedly blaming the Hawai'i loan thefts on Jowdy" (*Tr.27-31*) (*See government-forfeiture-44*) [Ex.G].

- o  Apparently – *government-forfeiture-36* [Ex.H] and *government-forfeiture-44* [Ex.G] prove *Kenner was truthful* and the *government actors lied* to the investors, the Court, and the unsuspecting jury.

And finally – after the Kenner investors were all berated pre-trial with "*Kenner stole your Hawai'i money*" claims from the FBI agent (and spread by Kaiser, Berard and other Jowdy cabal members who were viewed above reproach – according to Kristen Peca's 2012 FBI recordings).   The government called Kenner's confirmation of the *government-forfeiture-44* [Ex.G] loans to Jowdy…"*bogus*" (*Tr.5708 (2x), 5709*), "*phony*" (*Tr.4597, 4598*) and "*supposed*" (*Tr.5707-5708*) – and the Jowdy thefts simply a "*Kenner cover-up story*".

- •  If *Government-Forfeiture-44* is *cumulative (as the government defended post-trial)*, then the government and Court must be condoning the ignorance by the prosecutorial team of all the alleged cumulative, empirical evidence they *needed to reject* in order to construct their false trial narrative of "*stolen by Kenner*" (not Jowdy).

- •  Otherwise, the fairness and grave responsibility of the prosecution expressed by the Supreme Court in *Berger* (1935) has been constitutionally ignored – and significant revisionary issues are unresolved from an improperly pursued conviction "at all costs"; lacking confidence in the most critical prosecutorial "object"; and critical reformative questions of "new evidence" unanswered in the interest of justice.   See *United States v. Berger*, 295 U.S. 78 (1935).

153

*==The government lies to the 2015 trial court about the source of the Baja Ventures 2006 -- $2.5 million capital account in the DCSL investment…==*

The government desires to seek a wrongful forfeiture under *18 U.S.C. 981* and *18 U.S.C. 982*.  Their own *government-forfeiture-36* [==Ex.H==] accounting proves that Kenner's two (2) partners in Baja Ventures 2006 contributed $4.1 million to the Cabo project (thru deposits specifically to Ken Jowdy; the control person), or 65.6% of the capital contributions to the Diamante Cabo purchase in March 2006.  ==The government has *not* traced a single dollar of "ill-gotten gains" to Kenner, or from any illicit source.   *That is their obligation, and they have failed.*==

The government for four (4) years has now perpetrated another fraud on this Court by demanding forfeiture of the Baja Ventures 2006 LLC – without nexus of tangible proceeds of crime by Kenner – as proven in Kenner's favor by their own accounting (*See government-forfeiture-44 and government-forfeiture-36*).

The government has gone so far afield as to drag approximately 6,000 post-purchase investors in the Diamante Cabo san Lucas project into the forfeiture issues. The Court and the government know the government is fearful of pursuing a Jowdy indictment for Racketeering (at a minimum) with a myriad of well-documented and high profile co-conspirators since 2002 (despite the fact they have documented-proof that Jowdy stole tens of millions of dollars from Kenner and Kenner investors and the various projects: unrelated to Kenner – *ECF No. 667*) [==Ex.X==].

**The government fear of a Jowdy indictment and whom it implicates…**
A potential Jowdy indictment clearly spreads fear thru the investigative actors in the ten (10) year Kenner ruse (since June 24, 2009) to deflect attention from the real criminal activity; Ken Jowdy's cabal and their-own culpability.   The unequivocal evidence is in the government's hands – as assimilated by Kenner solely with Rule 16 evidence provided by the same government and hidden it for years from the investors -- who previously confirmed 100% transparency by Kenner of all investments *(ECF No. 667)* [==Ex.X==].

The government claimed that after a 6-year investigation with Jowdy's people working hand-in-hand to indict and convict Kenner, they received this critical exculpatory evidence 3-weeks *after* trial when Kenner pressed them about the production of it post-forfeiture (*Government-Forfeiture-44*) [==Ex.G==] (*ECF No. 440 at 5*). The government dragged their feet for years and ultimately the Court denied Kenner's access to the back-up records and proof that the exculpatory evidence was

not in the government's hands during the prior six (6) years and available during trial to exonerate Kenner as proof and major *Brady* violation.

Not only did the government attack the veracity of the actual loans (now acknowledged post-trial as ***authentic*** and not "*bogus*", "*phony*" and "*supposed*") – but the government claimed that Kenner "*stole*" those funds from his Hawai'i partners to purchase his share of the Cabo san Lucas real estate project in Mexico (thru rebuttal summation – *Tr.5996, 5721, 5722-23, 5744-45, 5990, 5991-92, 5707-5709*).

**The government's <u>proven</u> untrue and outrageous claims** were known at all times to be deceitful (a clear *Napue* violation) – with contradicting, empirical evidence in their possession pre-trial (*and government-forfeiture-36 accounting to verify their lies*).   Throughout the post-trial motions, Kenner has provided the Court with the government's Rule 16 documents <u>confirming 100% of the unconnected funds</u> from Kenner's Baja Ventures 2006 partners [103] – yet they slandered and prejudiced Kenner thru the completion of AUSA Komatireddy's rebuttal summation, *supra*.

At no time during the guilt phase of the Government's case – and certainly not during forfeiture -- did the government present any foundational evidence that funds from any alleged scheme were used to purchase Baja Ventures 2006 (*owned by Kenner, Stumpel and Lehtinen*).

---

[103] Jozef Stumpel and Jere Lehtinen funded the Baja Ventures 2006 LLC with **$4.1 million** (*despite Jowdy's crooked accounting of only $2.5 million – yet another unresolved issue with Jowdy*) (*See government-forfeiture-36*).

Baja Ventures 2006 is the LLC that the three (3) partners acquired their independent equity for the Diamante Cabo san Lucas project.

**Neither of Kenner's Baja Ventures 2006 partners [Stumpel or Lehtinen] were alleged victims in the 2015 Superseding Indictment**.   Stumpel provided affidavits in 2014 for an attempted Mexico prosecution of Jowdy for all of his known thefts, as well as a follow-up affidavit in 2017 [Ex.Z68 – referencing Ex.Z70] further reiterating the "*group knowledge*" of the Jowdy crimes as outlined by Kenner and their independent attorneys in Mexico, Arizona and California since 2007.

Mexico-Hawai'i investors Mattias Norstrom and Rem Murray provided similar affidavits in 2015 regarding all of the knowledge of the Jowdy loans and his underlying thefts of them – "*by the group of investors*".   They were forced by 2015 to seek justice thru the Mexico legal system – since there was no cooperation by the knowing FBI investigative agent; simply obstructionist opposite behavior to quash all Jowdy-adverse activity…

*Kenner Sentencing Memo With Forensic Accounting (And Back-Up)…*

The Superseding Indictment (*ECF No. 214*) makes no claims about the Kenner involvement in the Cabo san Lucas project, any conspiratorial issues with Jowdy, or allegations that the Cabo project is somehow related to the alleged criminal conduct.

Kenner's **Baja Ventures 2006** funding partners (*Stumpel and Lehtinen*) are *not* named as alleged *Does*.

Specifically, the Government relies on their fabricated claims (*prosecutorial misconduct*) during summations to cram in a false nexus:

- During rebuttal summation, AUSA Komatireddy lied to the jury about the same loaned funds by falsely claiming; "*Mr. Kenner told you that he used that money [Hawai'i loans to Jowdy] to get his piece in the Mexico investment with Ken Jowdy. You know exactly what that's for.   That's in evidence.*"
  - Clearly, *Kenner never testified to that*, nor was it or has it ever been true; and certainly **not** "*in evidence*".  Notwithstanding, the jury was completely polluted with defendant Kenner unable to respond after rebuttal summation. *Tr.5990*.

- AUSA Komatireddy doubled-down while deliberately misleading the jury related to the Baja Ventures 2006 equity again, when she claimed, "*He [Kenner] used it [the Centrum loan] for personal use to get an interest in that resort in Cabo.*"
  - Again, the Government was 100% aware of the source of the Baja Ventures 2006 capital account (*government-forfeiture-36*), thus further misleading the jury in an attempt to tie up their version of the foundationally flawed "*fake loans to Jowdy prosecutorial theory*" (*Tr.5996)*.

- This second misrepresentation further discolored the jury's perspectives.  The summation statements by Komatireddy were in spite of the Government's well-defined knowledge of the authenticated loans to Jowdy (*which Jowdy confessed in his 2-day California deposition in January 2010*).   In addition, the government knew that Jowdy's own 2010 defense team authenticated the actual 2004 Hawai'i loan agreement (*3500-KJ-2 at 24-25*) during the December 2010 Nevada trial as Jowdy's primary defense exhibit [Ex.O] (*supra*).

156

Nevertheless, Michiewicz attacked Kenner about the authenticity of the loan agreement (*Tr.4597-4598*), insinuating Kenner's dishonesty about the loan agreement, he himself knew to be authentic:

> *Q:  So you would agree with me Mr. Kenner, that <u>if the loan document proves to this jury to be phony</u>, <u>everything you have said</u> in your direct testimony about money going to Mexico and not being stolen <u>is a lie</u>?*

AUSA Michiewicz' assault on the known truths continued:

> *Q:  And if that loan document proves to be <u>phony</u>, then you are <u>lying</u>?   Correct?*

If AUSA Michiewicz' assaults thru well-devised and misleading questions were not enough to leave doubt on the minds of the jurors with no empirically contravening evidence to the document's authenticity [Ex.O], ***thus real***, Michiewicz continued in summation with more affirmations of known falsities (*Tr.5707-5708*):

> *"...the signing of that <u>supposed</u> document?"*

AUSA Michiewicz continues with more affirmations of known falsities (*Tr.5708*):

> *"...the evidence, <u>I submit to you</u>, is that the loan agreement is <u>bogus</u>. <u>Never happened</u>.  <u>Didn't exist</u>.  Created as part of the hall of mirrors as part of the deception and lies to divert attention away from these two men."*

AUSA Michiewicz continues with more affirmations of known falsities (*Tr.5708-5709*):

> *"And that's all we got, th[is loan] document, this piece of paper saying: Oh, I hereby loan my clients' money to Ken Jowdy down in Mexico.  But it is more than just that.   The bogus nature of the loan agreement."*

The accounting of real assets, *supra*, and the untainted acquisition of the Baja Ventures 2006 LLC (with the government's own evidence – post-trial) leaves this Court with clear and empirical evidence to support a finding of <u>no loss</u>, <u>no intended loss</u>, and <u>no nexus for forfeiture of Baja Ventures 2006</u> – which, if granted, would make Kenner's partners, Jozef Stumpel and Jere Lehtinen the two (2) biggest victims of this 2-decade-long ruse by Jowdy and those who have agreed to participate in Jowdy's conspiratorial cover-ups (*ECF No. 628*).

157

The Court has the authority and wherewithal to see though the 6-years of EDNY deceptive machinations and decipher the truths in this matter.   The defendant implores the Court to "*investigate the investigators*", see the real truths with perfect hindsight that only time has uncovered, and expose the reality for those who have "*bent the law*" for years against Kenner and Kenner investors...and finally, push the justice system to pursue the crimes that they, themselves, have empirically documented.


Respectfully submitted,



Philip A. Kenner