FILED
CLERK

2:14 pm, Oct 28, 2019

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,  . Criminal No. 13-cr-00607-JFB-AYS
                  .
        Vs.        .
                  . 100 Federal Plaza
PHILLIP A. KENNER        . Central Islip, NY  11722
TOMMY CONSTANTINE,      .
                  . October 11, 2019
. . . . . . . . . . . . . . .

TRANSCRIPT OF STATUS CONFERENCE
BEFORE HONORABLE JOSEPH F. BIANCO
UNITED STATES VISITING JUDGE

APPEARANCES:

For the Government:        UNITED STATES ATTORNEYS OFFICE
                        EASTERN DISTRICT OF NEW YORK
                        BY:  SARITHA KOMATIREDDY, ESQ.
                             MATTHEW HAGGANS, ESQ.
                             DIANE LEONARDO, ESQ.
                             MADELINE O'CONNOR, ESQ.
                        271 Cadman Plaza East
                        Brooklyn, NY  11201

For the Defendant Kenner:     PHILLIP KENNER, Pro se
                        MATTHEW BRISSENDEN, ESQ.
                          (Standby Counsel)
                        666 Old Country Road
                        Garden City, NY  11530

For Defendant Constantine:    TALKIN MUCCIGROSSO & ROBERTS
                        BY:  SANFORD TALKIN, ESQ.
                          (Telephonically)
                        40 Exchange Place, 18th Floor
                        New York, NY  10005

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**TRACY GRIBBEN TRANSCRIPTION, LLC**
859 Nutswamp Road
Red Bank, New Jersey 07701
**(732) 263-0044    Fax No. 732-865-7179**
**800 603-6212**
www.tgribbentranscription.com

ADDITIONAL APPEARANCES:

Marc Wolinsky:                    WACHTELL LIPTON ROSEN & KATZ
                                 BY:  MARC WOLINSKY, ESQ.
                                 51 West 52nd Street
                                 New York, NY 10019

                                 VENABLE, LLP
                                 BY: GEORGE KOSTOLAMPROS, ESQ.,
                                 1270 Avenue of the Americas
                                 New York, NY  10020

3

1                              I N D E X

2

3                                         PAGE

4   ORAL ARGUMENT

5       RE: Resort                        17

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE CLERK:  Calling case number 13-criminal-607,

2   United States of America versus Phillip Kenner and Tommy

3   Constantine.  Counsels, please state your appearances for the

4   record.

5          MS. KOMATIREDDY:  Good afternoon, Your Honor, Saritha

6   Komatireddy, for the United States.  I'm joined by Matthew

7   Haggans, also an AUSA, as well as Diane Leonardo and Madeline

8   O'Connor, our forfeiture AUSAs, special agents Matthew Galioto

9   and Joshua Wayne, the TSA Agents on the case.

10         THE COURT:  Good afternoon to all of you.

11         MR. BRISSENDEN:  Good afternoon, Your Honor, Matthew

12   Brissenden, standby counsel for Mr. Kenner.

13         THE COURT:  Good afternoon, Mr. Brissenden.

14         MR. KENNER:  Mr. Kenner, pro se defendant.

15         THE COURT:  Good afternoon, Mr. Kenner.   And Mr.

16   Talkin and Mr. Constantine, are you on the phone?

17         MR. TALKIN:  Yes, we are.

18         MR. CONSTANTINE:  Yes, Your Honor.

19         THE COURT:  All right.  So I scheduled this

20   conference for a number of reasons.  I know Mr. Kenner, you had

21   requested through Mr. Brissenden that you not have to appear as

22   it related to the issues with regard to the resort and the

23   plenary forfeiture order issue, but I'm going to discuss also

24   other things related to the sentencing. So that's why I wanted

25   to make sure you were here.

1          So, and then a couple of other miscellaneous issues

2    have come up which I guess I'll try to address the bail issue

3    first, just so we can resolve it.  First of all, the Court is

4    aware that Mr. Constantine's wife executed the bond in Nevada,

5    is that correct?

6          MR. TALKIN:  Yes, Your Honor.

7          THE COURT:  So we now have a copy of that, which is

8    being docketed here.  The Government submitted a letter which

9    I'm sure Mr. Talkin and Mr. Constantine have seen on October

10   8th, indicating that there was some application to change the

11   registration with respect to the airplane, so Mr. Talkin, you

12   want to address that?

13         MR. TALKIN:  Yes, Your Honor.  I've looked into that.

14   And that has nothing to do with us beyond the extent that Mr.

15   Gonchar (phonetic) had called Mr. Constantine and asked him

16   some questions.  But Mr. Constantine has nothing to do with it.

17   And it's his position, he has no ownership in that.  So he has

18   no right to do anything with that plane.  So it has nothing to

19   do with him, he didn't instigate it.  And had nothing to do

20   with it.  So, I don't think that's an issue at all.

21         Along similar lines, just so Your Honor, there was

22   also the issue of the Trustee.

23         THE COURT:  Yes.

24         MR. TALKIN:  And Mr. Constantine has resolved that

25   issue.  He, with the lawyers in Arizona figured out that there

1  was a way he could assigned or could appoint at least a

2  temporary Trustee for a long term temporary Trustee. And that

3  has been done.  So, he is no longer the Trustee.  I think the

4  term now is the Trustee is a special Trustee and that Trustee

5  will stay in place until -- and won't be changed without notice

6  to the Court and the Government.

7            THE COURT:  Okay.  So let me just ask the Government,

8  first on the issue of the airplane, I know you're pointing to

9  testimony during the trial that suggested some type of group

10 interest, but do you want to address, do you want to respond to

11 what Mr. Talkin said?

12           MS. O'CONNOR:  Your Honor, that's useful information,

13 we have, for purposes of forfeiture, because the plane is

14 subject to forfeiture, we have asked the FAA not to go through

15 with the registration.  If the Government obtains additional

16 information related to that plane we'll let the Court know.

17           THE COURT:  Okay, and then on the trust, it sounds

18 like, does the Government agree that that issue is, that the

19 proposed resolution is okay?

20           MR. HAGGANS:  That was all news to the Government,

21 Your Honor, I did speak with counsel for the other claimant

22 earlier this week.  And she did not, she did not raise this

23 issue.  It's possible it was something that happened --

24           MR. TALKIN:  It just happened in the last -- it just

25 happened, so.

1          THE COURT:  All right, well --

2          MR. TALKIN:  I was actually preparing an email to the

3 Government about it. But it just happened.

4          THE COURT:  All right, you can look into it, you can

5 let me know if you have any issues, okay?

6          MR. HAGGANS:  Absolutely, Your Honor, thank you.

7          THE COURT:  All right.

8          MR. TALKIN:  And Your Honor, I have paperwork I'll

9 forward to the Government.

10         THE COURT:  Okay, good.  Second thing is, as you

11 know, I did issue the motion denying Mr. Constantine's motion

12 for a new trial.  I was looking at Mr. Kenner's motion for

13 reconsideration of his motion.  And there was one thing I just

14 wanted to ask the Government to provide the Court, which I

15 don't think should be hard to provide.  One of the issues Mr.

16 Kenner raised was the venue issue, and the Government stated

17 their position, that they believe that it's waived by the

18 failure to raise it in connection with the motion for

19 acquittal.  But and stated that the Government would provide

20 briefing on the merits if the Court requested it.

21         I would like the Government, when I say briefing on

22 the merits, I just want the Government just to, so I don't have

23 to go fish for it for myself, just to highlight the portions of

24 the trial transcript and/or exhibits that would establish the

25 venue that is articulated in the indictment. I know the wire

1  transfers are laid out in the indictment.  And the, with

2  respect to the property, closing on Long Island, taking place

3  with respect to the property. So if the Government could just

4  submit a short letter pointing us to the evidence in the record

5  with respect to that.

6         MS. O'CONNOR:  Yes, Your Honor.

7         THE COURT:  Could you do that within a week from

8  today?

9         MS. O'CONNOR:  Yes, Your Honor.

10        THE COURT:  Okay. And Mr. Kenner if you want to

11 respond to that. I'm just going to ask them to provide the

12 citations to the record. I have your other legal arguments with

13 respect to venue, but I'll give you a week to respond to what

14 they're submitting.  Do you understand what I'm telling them

15 to do?

16        MR. KENNER:  I just couldn't hear, Your Honor.

17 Because of my hearing --

18        THE COURT:  You had put in this issue about venue on

19 your renewed motion, and I'm telling the Government, even

20 though they think it's waived, just to give me the citations to

21 the trial where their theory of venue, which is laid out in the

22 indictment, the wire transfers and the closing on the property,

23 relates to the Long Island property, to give me the cites to

24 the transcript where that was placed in evidence.  So they're

25 going to give me a letter within a week of that.  I don't know

1  that it requires any response, but I was going to give you one

2  more week after they submit it to put in anything you want to

3  respond to, just on that issue, okay?

4          MR. KENNER:  Yes, sir.

5          THE COURT:  All right.

6          MR. TALKIN:  Your Honor.

7          THE COURT:  Yes.

8          MR. TALKIN:  I have one issue on, and it's not about

9  your decision, but in your decision, the most recent one on the

10  ineffective assistance, I believe it was in a footnote you said

11  that to the extent that Brady issues were raised, they were

12  waived.  And I just want to tell the Court what's kind of been

13  going on.  Basically I've been asking the Government to

14  reproduce to me what they've, what they produced concurrent

15  with the two discovery letters they pointed to in their

16  responses.  I know they're working on it and it's not easy.  But

17  I haven't gotten that yet, and that's why it hasn't been

18  addressed yet.

19          I have about 20 boxes in my office that were given to

20  me third hand and it's impossible for me to tell what discs or

21  what goes with what.  So I can't figure out what was turned

22  over.  So I've been waiting to get that.  So I just, I

23  understand that there hasn't been action on the Brady aspect,

24  and maybe there isn't a Brady issue.  But I'm not 100 percent

25  convinced yet.  So I just need to wait for the Government to

1  give me the reproductions of what they produced with those

2  letters.  And then I'll be able to either say there is or is

3  not a Brady issue.  Or at least an argument for a Brady issue.

4         THE COURT:  Okay, does the Government want to respond

5  to that?

6         MS. O'CONNOR:  Your Honor, our position is that the

7  defendant is making the suggestion that there's a Brady issue,

8  but without any basis. He's admitted himself that he has not

9  actually looked at the discovery. There's no indication that

10 the discovery did not go out as it was represented that it went

11 out.  We have, as we've cited to the Court, a record of turning

12 over the contents of Mr. Kenner's devices, both to Mr. Kenner

13 and after privilege review to Mr. Constantine.  We stand by

14 that record.  Discovery is long over in this case.

15        THE COURT:  All right.

16        MR. TALKIN:  Your Honor, I'm not saying that there's

17 anything intentional that happened here. The problem is, when

18 downloads happen from phones, often it's my experience, not

19 everything makes it.  Not everything is in readable portion,

20 sometimes it comes out just in code. I don't know. But from my

21 discussions with Mr. Kenner, it seems that, and I don't know

22 whether this is the case or not, but it seems that some of the

23 stuff may not have gotten to the defense. And it's my

24 obligation to track this down. And the only way I know how to

25 do that is to ask them to reproduce what they gave so I can

1 look at it.  Otherwise it's impossible for me to tell.

2          I don't disagree with their statement that yes,

3 discovery is over and that they gave what they gave. I just

4 need to firm up what they gave.  And the only, the best way to

5 do it is, and the only way I can tell to do it, is for them to

6 reproduce it.  They must have it segregated somewhere where

7 they can just reproduce what they gave with those two letters.

8          THE COURT:  Is that a difficulty for the Government

9 to do?

10          MS. O'CONNOR:  Honestly, Your Honor, we don't have it

11 easily. I have attempted to locate it and have not been able to

12 locate it so far. It was two physical productions that were

13 physical discs that we don't have electronic copies of.  And at

14 this point it's --

15          THE COURT:  Well, I guess I thought maybe I

16 misunderstood what you said last time.  I thought you said you

17 retained a copy of what was produced, or did I misunderstand

18 it.  The Government doesn't have a copy of what it produced?

19          MS. O'CONNOR:  Right now we cannot find a copy of

20 those two productions.  No, Your Honor, we don't have an

21 electronic copy of that production. It was an extremely

22 voluminous production of 65,000 or so documents.

23          THE COURT:  But you didn't keep a copy of the disc

24 that you produced?

25          MS. O'CONNOR:  Unfortunately Your Honor, it looks

1   like we cannot find the disc from four years ago at this point.

2

3       THE COURT:  And you don't have -- and Mr. Talkin, you

4   and your client don't have the discs either? I don't

5   understand.  Do you have the discs the Government produced or

6   you don't?

7       MR. TALKIN:  I don't know if I do, it's hard to tell,

8   there's -- there are so many discs and documents that they

9   relate to, I can't tell what is what, that is the whole point.

10      THE COURT:  Okay, why don't I suggest this then, you

11  know, why don't you bring whatever you have in terms of the

12  discs that, and meet physically with the Government and allow

13  the Government to look at those discs and see if they can help

14  you locate where those text messages are within those

15  productions.  I can't think of any other better way of doing it

16  given that the Government can't find a duplicate.  All right?

17  If you're having trouble.  Is the Government willing to do

18  that, if he sits down with you and gives you the discs?

19      MS. O'CONNOR:  Honestly, Your Honor, I'm willing to

20  trying whatever the Court asks us to try.  But I fear that

21  essentially we're going into a project that involves going

22  through megabytes or terabytes or data, and I don't actually

23  know if we're going to be able to sort through that in any sort

24  of timely manner. And I'm not, I don't believe the defense has

25  a made a showing of any sort of basis to now sort through

1    discovery from years ago and find a needle in a haystack.  This
2    case, these text messages that the defense counsel is referring
3    to, first of all, they were referenced in discovery letters
4    multiple times, and they were referenced at trial.  And they've
5    been quoted and referenced in multiple post trial filings.
6    Never at any of those years has any defense attorney or
7    defendant said, well, the Government is talking about these
8    text messages, but we never got them.  This is the first time
9    it's coming up, years afterwards.   And it seems just, it seems
10   like it's coming out of nowhere and it's a way to delay the
11   proceedings.

12            THE COURT:  Well, it's not delaying anything because
13   we have other things going on.  But again, you're saying it's
14   going to be very difficult, but if the Government retained its
15   own copies of these, that's usually the easiest way to resolve
16   these things.  Your Honor, we have a copy of these and I know
17   some of them have been referenced, but not every single text
18   message was referenced during the trial.  I have no reason to
19   believe they weren't on the discs.  But, and clearly some of
20   them being referenced shows that it was --

21            MR. TALKIN:  Well, Your Honor, I can clear that up
22   for a second.  The ones that are referenced at trial are from a
23   different batch of text messages.  The ones we're talking about
24   here are not, were not brought out at trial.  That's why
25   they're new and that's why I couldn't ask for them before

1  because I didn't know about them because I didn't know about

2  them until before.  That's the problem. And that's why we need

3  to see -- I don't know whether they're talking about set A of

4  text messages or set B of text messages.  I'm not disputing

5  that some text messages were turned over.  But it looks like

6  from the trial transcript they're in a totally different format

7  than the text messages we're dealing with here.

8            THE COURT:  Are documents searchable in any way on

9  those productions, like by word or any -- like, how do you

10 locate documents within those discs?

11           MR. TALKIN:  Mr. Kenner probably is in the best

12 position to answer that.

13           THE COURT:  Mr. Kenner.

14           MR. KENNER:  Yes, Your Honor?

15           THE COURT:  On the productions by the Government are

16 you able, if you were trying to find text messages would you be

17 able to search them in some electronic way to find where they

18 are, as opposed to looking at every single document?

19           MR. KENNER:  At this point no, because the --

20           THE COURT:  Put the mic a little closer so they can

21 hear you.

22           MR. KENNER:  I'm sorry, Your Honor.  At this point no

23 because as Your Honor knows about two years ago the one

24 external hard drive that I was given disappeared at MDC and

25 since then the 200 or so discs have also disappeared --

1             THE COURT:  I'm talking about --

2             MR. KENNER:  -- out of my property.

3             THE COURT:  I'm not talking about necessarily your

4    particular discs.  To the extent that Mr. Talkin is in

5    possession right now of those discs, the same ones that were

6    produced to you, would they be, when you had them, were they

7    searchable by words, in other words, to locate a particular

8    document.  I assume they were, right?

9             MR. KENNER:  The ones with text messages, no.  They

10   were not searchable. I had to go through all 81,000 one by one.

11            THE COURT:  All right, again, I'm going to make, to

12   the extent the Government believes this is delaying things, we

13   have other things going on right now.  I want Mr. Talkin, you

14   to meet with the Government, show them the discs that you have

15   from those productions and see if the Government could

16   determine where those text messages are.

17            MR. TALKIN:  We'll endeavor to do that, Your Honor.

18            THE COURT:  All right.

19            MR. TALKIN:  Thank you.

20            THE COURT:  With regard to, before you get to the

21   preliminary or the forfeiture issues that have been raised

22   since the last conference, the, in terms of the sentencing

23   itself, I did receive the sentencing memos from Mr. Constantine

24   September 25th, Mr. Kenner October 8th, excuse me, October 7th

25   and October 8th.  And I did just grant the Government until

1  October 14th for its additional, to its response.

2          I was a little confused because when Mr. Brissenden,

3  you asked me to excuse me Mr. Kenner's appearance, you said

4  something about him continuing to work on his sentencing

5  submissions.  So what else am I expecting from Mr. Kenner?

6          MR. BRISSENDEN:  No, Your Honor, I don't anticipate

7  at this point filing anything additional in writing.  I think

8  the idea was just to prepare for the hearing itself.

9          THE COURT:  I understand, okay, all right.  And so

10  I'm going to adjust the, I'm getting a lot of information to

11  try to digest with respect to the sentencing, and I'm still

12  working on the forfeiture.  So I'm going to propose another

13  date in early November where I'm going to resolve the issues

14  regarding the loss amount and the objections to the PSR.

15          The other thing that's happening is, the probation

16  officer, I spoke to the probation officer a week or so ago, and

17  although she did do an addendum addressing Mr. Kenner's, I

18  think Mr. Kenner's lawyer's first objections to the presentence

19  report, she had not put in an addendum addressing Mr. Kenner's

20  pro se objections. So she told me that she would be able to do

21  in the next week or two.  So that's also an additional reason

22  why we need a few more weeks before we can go forward with the

23  conference regarding the guidelines issues.

24          So I was going to propose November 5th or November

25  14th for that.  Mr. Talkin, are you available on the 5th or the

1  14th?

2          MR. TALKIN:  The 14th is better, but I could figure

3  out the 5th if it had to be for the other, for the Government

4  and Mr. Brissenden.

5          THE COURT:  I think the 14th is probably okay. Is the

6  14th okay with the Government?

7          MS. O'CONNOR:  Yes, Your Honor.

8          THE COURT:  All right, so and then on that date I'll

9  set the sentencing date.  So November 14th at --

10         MS. O'CONNOR:  Can I request the morning, Your Honor?

11         THE COURT:  Hold on one second, we don't have a

12  calendar out here.  You said morning?

13         MS. O'CONNOR:  Yes, Your Honor, if that's possible.

14         THE COURT:  10 a.m.

15         MS. O'CONNOR:  That works for me.

16         THE COURT:  Okay, Mr. Talkin, 10 a.m. on the 14th?

17         MR. TALKIN:   That's fine, for me, thank you, Your

18  Honor.

19         THE COURT:  Okay, so moving to the issues regarding

20  the resort.  Obviously the Court received a series of letters

21  since the last conference from all the interested parties,

22  including the DCSL, the DCSL parties, the bank, CSL Properties

23  submitted a couple of letters.  Mr. Wolinsky submitted a

24  letter.  The Government submitted a September 27th letter

25  stating its position. Some of the, and there were some letters

1 in response to that.  So, and obviously a lot of their letters

2 were asking me to continue to try to have the Government

3 address, before any preliminary order of forfeiture is entered,

4 some of the issues that everybody is concerned about.

5 So I did, let me just ask the Government, I have a

6 couple of things I want to ask the Government.  And I have to

7 just say, these letters still give me a continuing concern that

8 the Government has not -- the Government's response doesn't

9 fully address what they believe will happen upon the Court if

10 the Court enters a preliminary order of forfeiture with respect

11 to the resort.  It's kind of radio silence from the Government

12 on that.

13 So for example, in one of the letters CSL Properties

14 puts a list of questions.  As I read the questions, I was

15 thinking the Government hasn't really told the Court what they

16 intend with respect to that.  So, I want you to answer some of

17 these questions just so I can understand, has the Government

18 really thought out what would happen. Obviously we talked about

19 this many times, and all these interested parties, and I would

20 say to some extent at least, to a large extent, innocent

21 parties, have, I think legitimate concerns about what's going

22 to happen to the resort, the value of the resort, upon the

23 entry of a preliminary order of forfeiture, that I don't think

24 the Government has addressed exactly what's going to happen.

25 So, maybe I'm missing it, maybe I don't remember.

1  But one of the questions is, who is going to manage the day to

2  day activities of the property during the ancillary

3  proceedings, including the management of the project that are

4  currently underway.  So, what's the Government's response to

5  that?

6          MS. O'CONNOR:  Your Honor, we met with the bank to

7  discuss these issues.  And we made it clear to the bank that we

8  would work with them and they had told us that they would, they

9  wanted Jati (phonetic) to continue in the management of the

10 resort. And we said we were willing to work with them to that

11 end.

12         They did raise a concern that perhaps Jati would not

13 continue to manage the resort if his interests would be

14 forfeited.  And then we said, well, we'd welcome discussions

15 about any management company that would suggest to put in

16 place, that we would perform our own due diligence and search

17 for management companies.  We've in fact spoken with the

18 marshals of Complex Assets Group, they're prepared to have a

19 management company go in place if one if necessary. We've taken

20 all the steps needed to prepare for that eventuality.

21         However, we are willing to work with the bank on that

22 issue.  They did not come forward with any suggested management

23 companies of their own.  But we have certainly broached the

24 topic with them and we're ready to deal with that issue if it's

25 an -- if it becomes an issue for us.

1          In terms of preserving the value of the resort, if

2    Your Honor will recall, the Government met with the bank and

3    the bank had many suggested modifications to the preliminary

4    order.  And the Government incorporated essentially every one

5    of the requested modifications, other than those aimed at Scope

6    (phonetic), and included in those two requested modifications

7    were modifications that the bank asked for.  One, language

8    stating that the Government would not immediately seize the

9    resort.  And two, language providing that the protective order

10   would remain in effect. The Government incorporated those

11   provisions.   Those were their requested provisions to preserve

12   the status quo of the resort.

13          So the Government did that.  The Government in the

14   meantime has been preparing for the forfeiture of the resort if

15   it's so ordered.  The marshals are preparing to conduct an

16   appraisal of the resort during the week of November 18th.

17   They're in the process of preparing a business valuation of the

18   resort.  The Government is in the process of retaining an

19   expert to assist with an interlocutory sale of the resort.

20          We insure the Court that the Government is taking the

21   appropriate steps to plan for the forfeiture of the resort in

22   the event it is ordered forfeited.

23          THE COURT:  They did submit, I put it under seal,

24   because I believed it was confidential business information, an

25   appraisal of the resort from, I think it was 2017.  So is that,

1  I know the Government said it's going to have its own appraisal

2  done. But I assume that that was helpful to the Government to

3  see, right?

4         MS. O'CONNOR:  Yes.  Actually, Your Honor, the US

5  Marshals Complex Asset Unit did a, performed a comparison of

6  the two most recent appraisals of the resort.  One was in 2015

7  and then one was in 2017.  And they determined that one of the

8  major reasons for a near $200 million discrepancy in the value

9  of the resort is that the reported over head costs for sales,

10  marketing and administration more than doubled in the two

11  appraisals.  And importantly, we believe that those companies

12  that are paid the overhead expenses are the companies that are

13  owned and operated by Jati.

14         And that difference explains the reason in the value

15  change in the two appraisals.   But the marshals are prepared

16  to perform their own appraisal, and we're willing to work with

17  the bank in finding another independent appraisal if necessary.

18         THE COURT:  When you incorporated everything that the

19  bank wanted, I thought from the letters I read from the bank,

20  that they were hopeful through their negotiations with the

21  Government that there could be some language proposed to the

22  Court with regard to an interlocutory sale that would be part

23  of the preliminary order itself, or am I wrong about that?

24         MS. O'CONNOR:  The Government's position has always

25  been that no language about an interlocutory sale is necessary

1  to be included in the POF.  And in fact entering into any kind

2  of agreement with the Jati at this stage when we still haven't

3  determined who the other potential owners are, could prejudice

4  the other potential owners.  There are other owners who have a

5  right to be heard with regard to an interlocutory sale and

6  those owners will not be known to the Government until the

7  ancillary proceeding commences.

8          THE COURT:  What about the issue regarding the fact

9  that the resort is in Mexico and any attempt by the Government

10 to forfeit this, assuming there's not some settlement reached

11 that it could be going on for years that there's no clear path

12 to forfeiting real property in Mexico?  What's the Government's

13 response to that?

14         MS. O'CONNOR:  Well, there is a process, Your Honor.

15 The money laundering asset recovery section of an injustice,

16 we've been speaking with any attorney who's specifically

17 assigned to Mexico to handle forfeitures in Mexico and she has

18 assured that you know we're able to move forward with this as

19 well as the Marshals Complex Asset Group which handles

20 forfeitures of this size and foreign property as well.  So we

21 are not without a means to handle the forfeiture and we are

22 taking all the steps down that road in the meantime.

23         So although there is concern about the time, if you

24 recall we modified the POF to carve out thousands of interests

25 which as a result will shorten the length of any kind of

1   ancillary proceeding.  So at this point the process should be

2   much more streamlined and we're prepared although we remain

3   hopeful that we'll be able to reach a settlement with the bank

4   once an order is entered and we start moving along that path.

5          THE COURT:  Well, one of the things the bank said

6   that they proposed to the Government, and maybe you've already

7   answered this to some extent, is negotiating a discounted lien

8   and making you know a cash payment that could go to the victims

9   in the case and he suggested the Government was not interested

10  in that.  And obviously the CSL properties representatives

11  were, seem to be very interested in that potential resolution.

12  Do you want to respond to that?

13         MS. O'CONNOR:  We do, Your Honor.  The Government

14  cannot agree to that proposal because in a criminal case there

15  are only two ways that a victim can be paid restitution.  One

16  way is when a defendant is convicted and the Court orders the

17  defendant to pay restitution and then the other way is when

18  Amwar (phonetic) in its sole discretion determines that

19  forfeited funds should be applied towards restitution.  So

20  entering into this kind of agreement would be an end around

21  Amwar's sole discretion and the law as a forfeiture law.  We're

22  not able to enter into that kind of agreement.

23         THE COURT:  What's Amwar's?

24         MS. O'CONNOR:  Amwar's would be the money laundering

25  asset recovery section of main justice.  There the section of

1  main justice the attorney general --

2         THE COURT:  I know but when you say it's an end

3  around, why couldn't you potentially engage them now to say

4  look, we have this proposal on the table.  We want you to

5  consider it now.  The whole point of these efforts, I think is

6  to try to avoid a long period of time that is going to go by if

7  the Court does order the forfeiture where there's all this

8  delay and ambiguity about what's going to happen that could

9  completely undermine the value to everybody.  So is there any

10 reason why to the extent that they are the ones who would make

11 that decision that that discussion couldn't begin even now?

12        MS. O'CONNOR:  Your Honor, that requires several

13 factors in terms of determining the restitution amount, the

14 forfeiture amount, whether other assets are available for the

15 forfeiture.  It's premature, that normally occurs after the

16 fact and also it would make more sense if they're willing to do

17 something like that to settle their claim for a lower amount

18 rather than require a payout and then circumventing the

19 process.  So it's not that we're not willing to consider it.

20 We would have to do it in a way that would be, I think more

21 streamlined in accordance with the rules --

22        THE COURT:  All right.  And Mr. McSouther (phonetic)

23 his letter I know you mentioned and the Government did carve

24 out all the different interests as the Court had urged in the

25 revised proposed order, but Mr. McSouther objects to the fact

1  that he says there's a long list of people who continue, who

2  are in the forfeiture order who he thinks there is not a

3  sufficient basis to have their interests subject to that

4  preliminary order.  So have you had a discussion with him about

5  information they could provide regarding those individuals to,

6  you know avoid them necessarily being placed in the order?  I

7  don't know who all those people are.

8          MS. O'CONNOR:  Your Honor, the individuals listed in

9  there are primarily former bank Danske (phonetic), current or

10 former Danske Lehman (phonetic) or DCSL employees.  And the

11 carve out was intended to exclude innocent third parties who

12 have no connection to the litigation and the conduct at issue.

13 So the individual and entities who were included in the carve

14 out who are excluded from that carve out were those who were

15 central to Jati's and the resort's operations in the

16 transactions.

17         The Government has a good faith basis for excluding

18 Danske's employees from the carve out.  If Your Honor will

19 recall, John Kaiser (phonetic), a witness who testified and

20 whose testimony was helpful in the convictions of the

21 defendants, filed a letter with the Court on February 28th of

22 2019.  And his letter contained serious allegations about

23 Jati's management of the resort that the Government cannot

24 disregard.

25         It also contained allegations about the bank's

employees.  Mr. Kaiser stated that two Danske's employees who
were specifically excluded from the carve out, during the
course of servicing the loan routinely stayed at Jati's private
residence rather than at hotel rooms off property that were
reserved by them.

Mr. Kaiser's letter also alleges that at least one
former Lehman employee who played a significant role in
arranging the original loan for the resort, owns a percentage
of the resort through a straw person.  He further alleges that
same former Lehman employee attempted to purchase property from
the resort through an entity in recent years, the Silver Peak
Seal (phonetic) that has been discussed in Court.

In addition, the bank has engaged in a very atypical
side agreement with Jati in its most recent loan modification.
The bank is designated their loan documents confidential but
the Government is more than willing to discuss it with the
Court if the Court is so inclined.

THE COURT:  No, I don't need all the details right
now.

MS. O'CONNOR:  Your Honor, I would like to also
mention that in an appraisal that was performed by the bank,
the appraiser specifically noted a conversation with a resort
employee who told the appraiser that sales at the resort
occurred to family and friends first.  And we would also like
to point out that we learned that in just a matter of couple

 1 weeks ago, Jati sold his personal residence at the resort even

 2 though it was very clear through conversations and the Court

 3 proceedings that the Government intended to forfeit his home

 4 down there .

 5          So the Government has a good faith basis for

 6 scrutinizing claims if any such claims were to be filed with

 7 the Court.

 8          THE COURT:  All right.  But it sounds like with

 9 respect to the ongoing management of the resort if there is a

10 preliminary order of forfeiture that you have been discussing

11 with I guess Mr. Kostolampros, correct?

12          MS. O'CONNOR:  We have.

13          THE COURT:  So I don't know if he wanted to be heard

14 or any of the other people who are here.  I see Mr. McSouther

15 but if you want to say anything I'll hear from you.  Go ahead.

16          MR. KOSTOLAMPROS:  Thank you.  Thank you, Your Honor,

17 George Kostolampros of Venable for Danske Bank.  Yes, Your

18 Honor, I would like to address several of the items that you've

19 raised with the Government.  We think all of those issues that

20 CSL has raised and you've raised here remain.  The Government's

21 assurance that they've spoken with their attorneys within DOJ

22 and that there's some plan out there, that still doesn't take

23 into account the time period for which ultimately they would be

24 some finality here in what we believe would be an interlocutory

25 sale.

 1          And what happens in the resort during that time

 2   period?  There's liquidity needs, funding.  How long would Mr.

 3   Jati stay on the property?  Who knows?  Those things are left

 4   unresolved.  And we've come up with a plan that we've raised

 5   with the Government that we think provides no risk solution

 6   here for the Government frankly.  And it guarantees an up-front

 7   payment to victims here and I don't quite understand why you

 8   would want more of a discount over our claim when if you take

 9   our appraisal, the latest appraisal that we provided, we don't

10   think that even that discounted claim is going to be met in the

11   sale.

12          But nevertheless, what we believe here provides the

13   safest avenue for insuring that the resort stays as a going

14   concern, or at least the best option for that case and provides

15   a no risk solution for the Government.

16          THE COURT:  Yes, I'm not sure, I understand what

17   you're saying and obviously that caught my eye when I read the

18   letters, but given the way the decisions work, I'm not sure

19   that that could be done in, you know at this point.  I don't

20   think they could sit down with you in a room, you know over,

21   you know the next couple of days and reach that type of

22   agreement.  There are factors that have to be considered.  They

23   want to have their own appraisal done which I'm glad to hear

24   that they're lining up rather than waiting.

25          So and that ultimately may be the best proposal but

1  I'm just not sure that that's the type of thing to avoid any

2  risk --

3           MR. KOSTOLAMPROS:  But Your Honor --

4           THE COURT:  -- can be done in advance.  But the

5  bottom line is, one of my concerns when I was reading these

6  letters, is the Government had no plan for the ongoing

7  operation of the resort.  They were going to throw everybody

8  out.  Okay, and that would be a big problem.  But it sounds

9  like that they are wisely in consultation with the bank.  They

10 said they're open to considering all the different options of

11 keeping Mr. Jati in place.  If you have a different proposal.

12          MR. KOSTOLAMPROS:  We don't, Your Honor, but the

13 consultation with the bank is really just us coming to the

14 Government and asking look, would you consider these proposals

15 and getting no.  It's not really much of a consultation.

16          THE COURT:  When you say --

17          MR. KOSTOLAMPROS:  They have consulted with us about

18 who they're talking to, who could come in and manage the resort

19 if Mr. Jati was not.  And frankly we don't even know how that

20 could possibly be done.  How could the Government who has got

21 no jurisdiction over this property in Mexico substitute some

22 entity to go in there and run the resort.

23          THE COURT:  I'm not saying, I don't know either.

24 Those are complicated questions.  But what I'm saying to you

25 is, you know your client obviously has a lot of money at stake

1    here.  Who are you, what is your proposal as to how in the

2    event of a appointed forfeiture, how to leave undisturbed to

3    the greatest extent possible, the day to day operations of the

4    resort?  Have you proposed to the Government this is what, we

5    want Mr. Jati to continue to run it or?

6             MR. KOSTOLAMPROS:  Well, we've asked that question

7    and we've asked the Government, look, do you have a problem

8    with Mr. Jati?  If you want somebody else there.  We didn't

9    come to them and said we want Mr. Jati there.  We left it up

10   for them and said look, we've been through this in four years

11   now.  You tell us what you plan on doing.  And they said well,

12   look, if you have an issue with Mr. Jati, you let us know.

13   Well, we don't have one.  You're the ones that have

14   consistently said there are issues but yet you're fine with him

15   being there.  They said they're fine with him.

16             We said look, the best --

17             THE COURT:  So that's a good thing, right?

18             MR. KOSTOLAMPROS:  That is a good thing.  And the

19   best thing we said is look, how long is this proceeding going

20   to take?  We have no clarity on how long an interlocutory sale

21   process will go.  What we can tell, and I've been through this

22   before in other cases as well.  The Government takes a lot of

23   time.  It's just the way that things work.  This case has taken

24   a lot of time.

25             But we would like some sort of agreed to procedure

1  and I understand, we're not going to be able to come to that

2  agreement in within the next week or two.  But what we can do

3  is agree in principal first let's agree that there should be an

4  interlocutory sale.  Put that in the preliminary order of

5  forfeiture.

6          Allow for further court proceedings, further

7  discussions between these parties --

8          THE COURT:  But you heard what she said regarding

9  that.  She said that there are people who obviously would have

10  a potential say in that who the Government feels it would not

11  be proper for them to agree to that in advance without giving

12  them an opportunity to at least to be heard on that.

13          MR. KOSTOLAMPROS:  Your Honor, our suggestion to them

14  and we provided them with a draft preliminary order with our

15  suggestions in there.  It came from them originally.  They

16  proposed, I believe it was in May, of an interlocutory sale

17  process.  And ultimately we didn't go forward with that process

18  then.  But they were willing to propose it then.  Why now, now

19  come back and say we can't do that.  Every interested third

20  party will have an opportunity to object to the interlocutory

21  sale process.  It's not going to happen right now.  It will

22  happen after a preliminary order is issued.  So they'll have an

23  opportunity to submit their claim and be heard and object to

24  the interlocutory sale process.

25          And we would ask for the Court to move and the

1  Government to move as expeditiously as possible once that

2  happens.

3         THE COURT:  And you think having that language in the

4  order, -- explain to me exactly why having that particular

5  language in the order will address all the things that you're

6  concerned about happening?

7         MR. KOSTOLAMPROS:  Because we want to show to

8  potential buyers here that there is an agreed to solution here.

9  What we would want is to quickly move forward after we have

10  that language in the preliminary order of forfeiture as part of

11  submission to this Court on a motion for an interlocutory sale

12  a commitment by the bank to fund the resort during this

13  interlocutory sale process.  A commitment for sums to actually

14  go to the Government for ultimately how they want to distribute

15  it.  Our idea was that it would go to victims but of course

16  they have to get approval from Amwars but they could get that.

17         But ultimately what that does is send a message of

18  number one, the resort has a commitment, a funding through the

19  interlocutory sale process and there is an interlocutory sale

20  process agreed to and it will, what will have is some detail in

21  there about what the timing ultimately will be.  This is all

22  about assuring some viable path so that potential buyers who

23  come on the resort, and the buyers who are there now, don't

24  have a mass sale frankly.  You know this is about assuring as

25  best as we can the value of the resort.  Frankly, I'm left

1  bewildered as to why we can't agree to this.  I mean I don't

2  understand what the downside is to the Government ultimately.

3        They've raised in their letter the only thing that

4  we've asked for is recognition of our discounted claim.  But

5  we've always proposed this in conjunction with what DOJ policy

6  is.  And DOJ policy is to these settlement say look, you know

7  the Government always reserves the right to the extent they

8  find evidence that a bank is not an innocent owner.  That they

9  could, the agreement would be null and void.

10        And that gets me to another point that I wanted to

11  raise with Your Honor.  We've raised it in our letter as the

12  last point is, two employees of the company are named in the

13  forfeiture order.  I mean, the Government doesn't appreciate

14  what that means for employees of a bank to be named in a

15  forfeiture order as if they did something wrong.  We've raised

16  to them those employees are willing to submit an affidavit and

17  a declaration which I have right here waiting to give to them

18  saying look, they have no ownership interest in here.  Take

19  their names out of there.

20        But they're unwilling to do so and the only thing

21  that they could point to is because they stayed over at Jati's

22  home.  I mean they don't have any evidence that these two

23  employees have any ownership interest on the resort.  And

24  frankly there will be evidence that will be subject to perjury

25  that look, they don't have any ownership interest.  But this is

1   what we're dealing with here.  We're in this acrimonious

2   position when we should not be.  We should be collectively.

3   Truly is in the bank's interest to get the most that it can out

4   of this resort property.  And which ultimately it benefits

5   everyone and we're willing to discount our loan and provide an

6   up-front guarantee to victims, to the Government to ultimately

7   give to victims.

8              THE COURT:  You want to respond, Ms. O'Connor?

9              MS. O'CONNOR:  Yes, Your Honor.  It is true the

10  Government proposed a preliminary order involving language

11  about an interlocutory sale.  We were not incorporating a

12  stipulation.  In an effort to reach an agreement with them, we

13  referenced a sale and put in language that we would forfeit

14  proceeds of a sale and in the event a sale did not occur, we

15  would forfeit the resort.  But that did not satisfy the bank.

16             And I think this is a very clear example of the

17  difficulty we've been having with the bank.  The bank

18  constantly changes its mind.  For example, if Your Honor will

19  recall we met with the bank on September 5th, the day of the

20  last court conference to discuss a sale of the bank's note.  To

21  that end, we requested certain documentation including evidence

22  of bank's outstanding loan balance.

23             However, we did not receive any of the requested

24  documentation from the bank.  And then on September 13th,

25  approximately one week later, the Government had a phone

1 conference with the bank during which time the bank changed its

2 position and demanded that the Government include language in

3 the POF regarding an interlocutory sale of the resort as

4 opposed to the note.

5       When we asked why the bank no longer wanted to

6 discuss the sale of their note, the bank's counsel stated that

7 a sale of the note was no longer a path the bank wanted to

8 pursue.  And this has been the pattern over the past four

9 years.

10       MR. KOSTOLAMPROS:  Your Honor, that's not correct.

11 It's not about the bank not wanting to pursue it.  This has

12 been a fluid situation.  We've gone to the Government for four

13 years and asked them what are you planning on doing.  And

14 they've told us consistently you're getting ahead of yourself.

15 We don't even know.  The only reason we've gotten the clarity

16 that ultimately there will be an interlocutory sale.  We

17 proposed a sale of our note, but we proposed it and said would

18 you even consider it.  They said okay, look, come back to us.

19       The bank went and spoke to experts, consultants and

20 said look, could you sell, could we sell this note and they

21 came back to us and said no, you can't because there's no

22 clarity as to who the owner would be.  No one is going to

23 purchase your note when they don't know who the owner is going

24 to be.  So we went back to them and we didn't demand anything.

25 We went back to them and said look, we can't sell this note.

1  We need to consider, can you consider going back to an

2  interlocutory sale.

3          THE COURT:  Ms. O'Connor, what's the wording for a

4  moment and any caveats that would be in there, what is the

5  issue with the Government putting in language regarding its

6  intention to the extent its able to have an interlocutory sale

7  of the resort itself?  Why is that not some type of language

8  that could be included?

9          MS. O'CONNOR:  Well, we actually proposed that

10 language to them.

11         THE COURT:  Of the resort?

12         MS. O'CONNOR:  Of an interlocutory sale of the resort

13 and in the event that didn't occur within a specified time

14 period that we would forfeit the resort directly and they

15 rejected that language.

16         MR. KOSTOLAMPROS:  We did, Your Honor, at the time

17 period because we thought we could get a note sale quicker.

18         THE COURT:  Okay.

19         MR. KOSTOLAMPROS:  We thought it would take too long

20 for an interlocutory sale of the resort.

21         THE COURT:  Okay, but how about at this point?

22         MR. KOSTOLAMPROS:  At this point, we've gone back and

23 we said we can't even get a bank note sale.  What we could do

24 is the interlocutory sale process, an agreed to interlocutory

25 sale process.  Go forth as quickly as we can through that.  And

1  that's what we proposed to them.  We went back with this very

2  same language that they proposed to us.

3          THE COURT:  So you're agreeable to the language that

4  they had proposed?

5          MR. KOSTOLAMPROS:  Yes, they had proposed it to us.

6          THE COURT:  I know you initially said no but you're

7  saying now you're agreeable to that.

8          MR. KOSTOLAMPROS:  We are because we went back to

9  them and said we would like, we wanted to consider the bank

10 note sale because we would think it would take too long for an

11 interlocutory sale.

12         THE COURT:  I understand that.  Okay, so if they're

13 agreeable to the exact language the Government proposed, then

14 what's the problem with that?

15         MS. O'CONNOR:  Because Your Honor, none of this

16 language is necessary for the order and given the constant

17 change in position which at this point occurs almost weekly, we

18 would rather have entry of the order and then be able to pursue

19 a path.  We would like to point out that in 2016, we presented

20 the bank with a buyer for its note.  Goldman Sachs they

21 wouldn't even pursue the possibility.  So again it's very, it's

22 a difficult situation when it's a constantly moving target that

23 the Government can't seem to meet.  So it seems to make the

24 most sense that the order be entered when this language isn't

25 required in the first place.  And then for the Government to

1  reach an agreement that would be, that would form the basis for

2  a separate stipulation which there's no deadline required for

3  that.

4          THE COURT:  I know but don't you --

5          MS. O'CONNOR:  And the Government can move forward.

6          THE COURT:  -- understand the whole point, when you

7  say it's not required, nobody in this courtroom believes this

8  is required but they're suggesting they believe and apparently

9  many others who are innocent parties who are watching this

10 believe that this would be helpful to retain the value of the

11 resort and avoiding any disturbance where people are trying to

12 start sell their ownership interests and you have not

13 articulated why this is, if this is something the Government

14 proposed you know, I'm not faulting the Government, that other

15 offers that were put out there, but where we are now and it

16 seems like there is no, a better option for the Government, for

17 you know innocent third parties than an interlocutory sale.

18 That seems to be like the clear best option from everybody's

19 standpoint.  So even if the Government doesn't believe it's

20 necessary, even if the Government for whatever reason doesn't

21 believe that that language would have any positive impact in

22 terms of the retaining the value and the ongoing operation of

23 the resort, you haven't articulated what the harm would be if

24 this is what the Government believes is ultimately going to be

25 the best option and again whatever concerns you have about

1  third party being able to raise objections and raise their own

2  rights, it sounds like the first time around you already put in

3  language that said if it's not, if it ultimately doesn't

4  happen, then the Government would retain the ability to forfeit

5  the resort.  So I guess I haven't heard you tell me why this is

6  a bad idea at this point, whether it's necessary or not.  Why

7  is it a bad idea to put that language in?

8          MS. O'CONNOR:  Your Honor, the Government doesn't

9  believe it's a bad idea.  It's just an idea that was proposed

10  and rejected.

11          THE COURT:  Okay.

12          MS. O'CONNOR:  And at this point we would like to

13  move forward and pursue the option.  But if the Court would

14  like us to submit another preliminary order including the

15  language we originally suggested we will do so.

16          THE COURT:  I would like that.  Okay.

17          MR. KOSTOLAMPROS:  And Your Honor, again, I reiterate

18  our point is we would like our employees --

19          THE COURT:  So these two employees, you said you have

20  affidavits from them?

21          MR. KOSTOLAMPROS:  We have affidavits from them,

22  David Daniels and Peter Hughes.

23          THE COURT:  Is the Government, you were reciting to

24  me some issues you had with some of the names in there, but I

25  don't know whether these affidavits would be sufficient for the

1  Government.

2          MS. O'CONNOR:  Your Honor, the Government would have

3  to decide whether an affidavit would be acceptable, although it

4  doesn't, we would like to make sure that we're protecting our

5  interests in the way it's written as of now protects those

6  interests to the best of our abilities.

7          THE COURT:  I know the Government was articulating

8  its good faith basis for having various names in there, but if

9  the Government doesn't have any indication other than they were

10 at a party, is that what you said?

11         MR. KOSTOLAMPROS:  They've spent time at Mr. Jati's

12 house.

13         THE COURT:  Yes.  If that's the only evidence the

14 Government has, that's giving it, trying to retain their

15 rights, that seems a pretty thin basis to put someone in an

16 order because they spent some time there.  If they put in a

17 sworn statement --

18         MR. KOSTOLAMPROS:  That's my point, Your Honor, is

19 that they're putting in a sworn statement that says they don't

20 have an ownership interest.

21         THE COURT:  Right.

22         MR. KOSTOLAMPROS:  And frankly we've tried to talk to

23 the Government.  And we're willing to take any language that

24 they'd like in there.

25         THE COURT:  All right.  They're going to look at it,

1    and I'll ask the Government to submit to the Court within a

2    week the proposed new forfeiture order, plenary forfeiture

3    order.  And if the Government, hopefully they'll be satisfied

4    and those names will be out, okay.

5              MR. KOSTOLAMPROS:  Thank you, Your Honor.

6              THE COURT:  All right.

7              MR. WOLINSKY:  Good afternoon, Your Honor, Marc

8    Wolinsky from Wachtell Lipton, but I'm representing myself.

9              THE COURT:  Yes, yes.

10             MR. WOLINSKY:  Hopefully ably.  Your Honor, maybe

11   there's some progress you've heard today, and I say that maybe

12   because what I actually hear is a lot of delay and a long

13   process.  And what the Government has done is put a cloud over

14   the property, and frankly it's raining on us, the homeowners.

15             One issue that I have been adamant with, with the

16   bank and with Mr. Jowdy, and if I had an opportunity I'd be

17   adamant with the Government, but the Government actually hasn't

18   seen fit to engage with the homeowners.  The property is

19   currently, we bought into a master development plan.  It

20   provides generally for low-rise properties there are certain

21   areas dedicated to hotels, three golf courses of a unique

22   character.

23             What I've been clear with the bank, and I think I

24   have the bank's agreement, is that if there's going to be a

25   sale the purchaser has to honor the existing master development

1  plan and operate the property in the way we bought into.  We

2  did not buy it, obviously I go to Cabo San Lucas quite often,

3  I'm going this week, next week.  There are portions of Cabo San

4  Lucas that are developed like Miami Beach and there are

5  portions that are developed like Diamante.  And we don't want

6  someone to come in an change our homes, our property, into

7  Miami Beach with a row of high-rise hotels lining the beach.

8  It's not what we bought, it's not what we believe we're

9  entitled to.

10         So our very deep fear is that someone will come in

11  and change the character of our resort and our homes.  And if

12  there's going to be a sale the purchaser in the order has to

13  commit to develop the property in accordance with the master

14  development plan.  That is a huge, huge issue for us, Your

15  Honor.

16         THE COURT:  And you said the bank is on board with

17  that?

18         MR. WOLINSKY:  I've had extensive conversations with

19  the bank on that.  I believe they're on board with it.

20         THE COURT:  But your concern is that the Government

21  is going to somehow overrule that?

22         MR. WOLINSKY:  Absolutely.  The Government will, and

23  I'll just be very frank, and I've had the conversation with Mr.

24  Jowdy.  It could be that the highest bidder is someone who

25  wants to build high-rise hotels along the beachfront and

1 destroy the home sites that were sold behind that beachfront.

2 And frankly, I'm fortunate enough to be on the beachfront, and

3 I didn't buy a home with the idea that a hotel was going to be

4 erected in front of my home.

5         And that is a huge issue for us, Your Honor, I've

6 constantly been beating --

7         THE COURT:  I know, but you don't believe you have a

8 legal basis to resist that based upon these agreements that you

9 already have in place, you believe that those can be

10 overwritten?

11        MR. WOLINSKY:  We don't, our rights are not, this is

12 not a U.S. condominium plan.  It's Mexico.

13        THE COURT:  All right.  And is the Government aware

14 of this issue, has the Government thought about this issue?

15        MS. O'CONNOR:  Yes, Your Honor.  Well, to begin with,

16 we'd like to point out that Mr. Wolinsky's interest has been,

17 is one of the many thousands carved out.  So we will not be

18 forfeiting his interest.

19        THE COURT:  No, but this relates to the nature of the

20 sale.

21        MS. O'CONNOR:  Yes, Your Honor.  And in terms of

22 that, what he's asking the Government to do is something that

23 if the property were to be sold in the normal course and it

24 were not subject to a forfeiture proceeding, but for argument's

25 sake if the resort itself were sold he wouldn't be given any

1  kind of guarantee that he's asking the Government to guarantee

2  now.

3        If it's not in writing, if it's something in writing

4  it will, the resort will be sold subject to those agreements.

5  But if it's not in writing we can't guarantee anything that he

6  wouldn't have been guaranteed in the first instance.

7        THE COURT:  Right.

8        MR. WOLINSKY:  The difference, Your Honor, is that

9  this is now a forced sale.  This is a forced sale.  This is not

10  a voluntary sale.

11        THE COURT:  No, but I think what she suggested, if

12  the bank turned around and was going to sell the property

13  because of the default, for example, you would be in the same

14  position you'd be in pursuant to this forfeiture.

15        MR. WOLINSKY:  But right now Mr., the likelihood, if

16  the note sale had gone through the likely purchaser was Mr.

17  Jowdy who was committed to the master development plan.  And

18  Your Honor, the homeowners are not without recourse.  In the,

19  as a practical matter if the homeowners are up in arms the

20  value of the property will be diminished.  Ultimately it's in

21  the, and this was my argument with the bank as to why the bank

22  ultimately agreed to provide that in a sale it would require

23  the purchaser to honor the master development plan because the

24  bank recognized, like the homeowners recognized, and as I hope

25  the Government will recognize, that if the homeowners are up in

1  arms the value of the property ultimately is going to be

2  diminished.

3          THE COURT:  Well, but I think, I understand the

4  issue.  I just, I don't know that you're going to, and I assume

5  in connection with any interlocutory sale the Court through the

6  ancillary proceeding would see supervision over that, correct?

7          MS. O'CONNOR:  Supervision, I'm sorry, I want to be

8  sure.

9          THE COURT:  Regard to any agreements with regard to

10 the interlocutory sale of the property.

11         MS. O'CONNOR:  We would, yes, we would be involved in

12 the process.  And again we would make sure to the best of our

13 abilities that any agreements that are in writing, those

14 agreements would continue through the new ownership.

15         THE COURT:  These are in writing, aren't they?  Or

16 they're not writing, I thought you said that --

17         MR. WOLINSKY:  There's a condominium plan, and

18 actually I'm having a call this afternoon with Mexican counsel

19 which is a place where I didn't want to be.  But my

20 understanding is that unlike the U.S. condominium plan our

21 rights as homeowners are limited relative to what you would see

22 in the U.S.

23         THE COURT:  Okay.  But whether the, the rights, it's

24 still in writing, though, or you don't know if --

25         MR. WOLINSKY:  Yes, but we, there's nothing, there

1   are environmental laws that would keep you from doing certain

2   things --

3          THE COURT:  I understand that.

4          MR. WOLINSKY:  But Your Honor, we are being put in a,

5   let me step back.  Your Honor is being asked to do something

6   that I frankly don't think you have jurisdiction to do.  This

7   is a Mexican property.  Your Honor there have been a lot of

8   focus on the corporate entities and which entity received which

9   dollars.  But if Your Honor, I'd like to focus Your Honor if I

10  may on actually how this property is owned.  So you can see why

11  I think ultimately if we can't come to a consensual resolution

12  the result should be that the Court declines order forfeiture

13  of the resort.

14         THE COURT:  I know, but the, this is not, as you

15  know, and you may disagree with this, but it's the law.  This

16  is not the process, this is not the timing of that.  This is a

17  preliminary order of forfeiture.  You would have the right as

18  would other people have the right to make those arguments to

19  the Court before a final order was issued.  That's the way the

20  law works here so this is not the time for me to start

21  considering your arguments with respect to those types of

22  issues, right?

23         MR. WOLINSKY:  But Your Honor, with respect I think

24  you do, you are the gatekeeper here.  And you have to be

25  satisfied that you have jurisdiction to issue the order that

1   the Government is asking you to enter.  And respectfully, I

2   don't believe you have the power to order the sale of real

3   estate in Mexico that's held in a Mexican trust.

4          THE COURT:  If that's so clear then everything you're

5   concerned about, you shouldn't be concerned about at all.  If

6   it's so clear I don't have the power to do it, why are you even

7   concerned about this?

8          MR. WOLINSKY:  Because the entry of the preliminary

9   order of forfeiture itself is going to be hurting the

10  homeowners.  And the property and the resort.

11         THE COURT:  All right.  What's the Government's

12  response to the Court lacking jurisdiction to even enter this

13  order?

14         MS. O'CONNOR:  Your Honor has jurisdiction under 18

15  USC 83.  I believe it's Subsection (k), but I'm not sure.  I'd

16  have to check.

17         MR. WOLINSKY:  Your Honor, I'm not arguing statutory

18  jurisdiction, I'm arguing the Court's power as a U.S. Court to

19  effect real estate interests in Mexico that are held in a

20  Mexican trust.

21         THE COURT:  I know, but that's, how am I going to

22  determine the answer to that question?  They say they have

23  experts who are advising them that they're going to be able to

24  do this in Mexico.  You're telling me it's not possible.  But

25  you know, that's not a basis to not award forfeiture here,

1  where their ability to implement it is a different issue.

2          MR. WOLINSKY:  Your Honor, I don't think you have the

3  power.  And I say that, I say that respectfully and there's an

4  anecdote with Judge Sweet that reminds me that I should be very

5  careful to say that.

6          THE COURT:  No, when you're saying the power, they're

7  saying that power, statutory power exists.  Whether or not

8  they'll be, whether Mexico under their laws will allow the

9  Government to effectuate what the Court has ordered under, that

10 I have the power to do under U.S. law is a different question.

11 I have the power to do it under U.S. law, whether or not

12 they're going to be able to, you know, similar judgment  I

13 could issue a judgment here, whether or not that judgment is

14 going to be enforced in another country is whole different

15 question, right?

16         MR. WOLINSKY:  Who is your order directed to, that's

17 my point, Your Honor.  the property is owned by, the property

18 is held in trust by a Mexican bank.  You are not in a position

19 to order a Mexican bank to do anything.  The Mexican bank is

20 not here.

21         THE COURT:  So where, the Mexican bank will have a

22 opportunity to be heard in the ancillary proceedings if they

23 think I don't have the jurisdiction to do this, that, right.

24         MR. WOLINSKY:  The Mexican bank may not even show up.

25         THE COURT:  Does the Government want to respond to

1  that?

2          MR. WOLINSKY:  Your Honor, it goes back to --

3          THE COURT:  I understand what you're saying.  I'm not

4  suggesting, I'm not suggesting that this is a, you know, all of

5  these thoughts have gone through my mind as well.  I think I

6  asked the Government that question I think three months ago

7  with regard to the forfeiture of real property in other

8  countries.  So I understand the complexities of it.

9          But again, I'm not, that, I have the statutory power

10  to do it under the forfeiture laws of the United States so I'm

11  not sure there would be a basis for me telling, you know,

12  victim's money has flown into, flowed into this resort to just

13  leave it on the table and say I'm not, this is a complicated

14  thing, I don't know how the Mexican banks are going to react to

15  this, I'm not going to allow the Government to pursue that.  I

16  think that --

17          MR. WOLINSKY:  I'm not saying that, Your Honor.  I

18  think what I am saying is that what is subject to the Court's

19  jurisdiction are legal entities that were the conduits for the

20  flow of illicit funds.  Those legal entities are second place

21  beneficiaries under the trust.  Those second place

22  beneficiaries, that second place interest is subject to

23  forfeiture because those are subject to Your Honor's

24  jurisdiction, those were the instrumentalities of the crime.

25          THE COURT:  Right.

1          MR. WOLINSKY:  But the trust itself is not here.

2          THE COURT:  Ms. O'Connor, do you want to respond?

3          MS. O'CONNOR:  Yes, the Trust might not be here but

4     the property is subject to Your Honor's jurisdiction and once

5     the Government gets a final order of forfeiture it serves it on

6     the Mexican Government who then executes it on behalf of the

7     United States.  That's the procedure.

8          However, we're hoping to avoid that by entering into

9     some of agreement for an interlocutory sale.  But there is

10    certainly a means, and Your Honor does have jurisdiction.

11         THE COURT:  All right.  Okay.  Thank you, Mr.

12    Wolinsky.

13         MR. WOLINSKY:  Thank you, Your Honor.

14         THE COURT:  Mr. McCuller.

15         MR. SOUTHER:  Sorry, Your Honor, may I be heard?

16         THE COURT:  Sure.

17         MR. SOUTHER:  Thank you.  Thank you, Your Honor,

18    Thomas Souther, Fries, Fork & Sullivan on behalf of the DCSL

19    parties.  The first part I'd just like to address, Your Honor,

20    is that, you know, again another accusation today from the

21    Government, unsubstantiated, that Mr. Jowdy has violated a

22    court order and sold his property.  It's not true.  I don't

23    know where they come up with this, whether it's, you know,

24    they're sourcing their information from, you know, Mr. Kaiser

25    who seems to be the source of a lot of their information.  But

1  it's just, it's another example of them disparaging Mr. Jowdy

2  in open court.

3          THE COURT:  So he still has that residence?

4          MS. O'CONNOR:  He owns that property.  He

5  understands, he would like to see it but he knows he can't

6  because it's subject to a protective order.  And he knows he

7  can't sell it.  But for them to suggest that he's gone ahead

8  and done that and flouted an order, it's just, it's very

9  frustrating, Your Honor.

10         THE COURT:  All right.  All right, what's the bottom

11 line issue then?

12         MR. SOUTHER:  The bottom line issue is we've been

13 trying to promote a collaborative solution because, you know,

14 even the entry of a preliminary order is going to have an

15 impact on sales.  We've said this repeatedly.  The Government

16 doesn't seem to accept that.

17         THE COURT:  I know, but we've got --

18         MR. SOUTHER:  What is Mr. Jowdy supposed to do?

19         THE COURT:  We've come a long way from the first time

20 you raised that issue with me.  The Government has put

21 carveouts in for the homeowners to be able to engage in

22 transactions.  They're, to my agreement they are not taking the

23 position that they're going to remove Mr. Jowdy, they're

24 working with the bank and I assume they were to speak to you,

25 that if, you know, it may be that the current management team

1  will stay in place while they pursue this interlocutory sale.

2          So I think we've made a lot of progress despite Mr.

3  Wolinsky telling me I made no progress since, you know, three

4  or six months ago.  So I don't know what, they're willing to

5  consider having Mr. Jowdy stay exactly where he is, they're

6  willing to put in the language of our interlocutory sale and

7  the preliminary forfeiture order that's proposed to the Court.

8  So what else can they do, what else can the Court do to

9  minimize the risk to the resort?

10          MR. SOUTHER:  Well, I think if the Court excluded

11  from the preliminary order the notion that the resort would be

12  sold, then that would --

13          THE COURT:  No, that's not happening.  That's not --

14          MR. SOUTHER:  That would make a difference.

15          THE COURT:  I know.  Your thinking is completely

16  different than my thinking on that.

17          MR. SOUTHER:  Well, no, but Your Honor, put yourself

18  in Mr. Jowdy's position.  He's got to meet face to face with

19  prospective purchasers of real estate and has to walk them

20  through the hurdles that are now going to have to be overcome.

21  How are we even supposed to make a single sale, let alone

22  enough sales to maintain the operations.

23          That's why, you know, the bank's proposal of coming

24  in, coming to a, like a pre-planned agreement so that it's,

25  you're able to tell the story to people as they come in and try

53

1   and make a determination as to whether they're going to

2   purchase a timeshare membership or purchase a real estate lot,

3   they at least know what the plan is and they know that there's

4   an institution that has resources to fund this process during

5   an interlocutory sale.  Right now this project is on the brink

6   of insolvency.

7          THE COURT:  I know, but the bank has a lot of money

8   already invested in this.  I have no reason to believe that

9   they're going to just walk away and not try to preserve the

10  value of the, they have a built-in incentive to avoid some of

11  these things that you're suggesting might happen, right?

12         MR. SOUTHER:  I mean, absolutely.  And Mr. Jowdy is

13  willing to work with the bank to try to maximize the value.

14         THE COURT:  It sounds like both Mr. Wolinsky and I

15  assume Mr. Jowdy and the bank are working collaboratively.  The

16  issue has been, your concern that the Government would somehow

17  upset everything that everybody else agrees would be in the

18  best interest of the resort.  And as far as I can tell whatever

19  obstacles there existed with regard to that conversation

20  before, the Government has made substantial progress on it, in

21  terms of the carve-out to the homeowners.  You know, we say

22  that's a difficult conversation, it's a lot less difficult than

23  it was with, you know, the Government's initial order because

24  you can tell them if they're going to be able to transact with

25  respect to their property without interference from the

1  Government.

2          The Government is looking for an interlocutory sale

3  as quickly as possible and the Government is not going to

4  insist that they, you know, try to manage a resort in Mexico

5  because they would be ill equipped to do that.  So those,

6  that's a lot to work with.  The situation obviously is not

7  ideal, but it is what it is.  The money got into that resort.

8          So I cannot think of other things that can be done to

9  minimize the risk.  What you're suggesting I don't think is the

10  appropriate solution.  But you know, that's all I can think of

11  at this point.

12          MR. SOUTHER:  Well, the only thing I would add, Your

13  Honor, you know, I just would refer you back.  Early in

14  February, February 22, we submitted a letter and attached to

15  that was a District Court opinion from the Western District of

16  Louisiana in which the other, and it's not directly analogous

17  because frankly this situation is unique, I've not encountered

18  a forfeiture case like the one that is before the Court right

19  now.

20          THE COURT:  Me neither.

21          MR. SOUTHER:  But in that instance, Your Honor, the

22  Court certainly was weighing the issue of whether proceeds from

23  a tainted bank account which were then used to make a mortgage

24  payment on the defendant's residence, whether that was enough

25  to then warrant the forfeiture of the entire residence.  And

1  the Court concluded no, it wasn't, it would be excessive.

2          And I'm suggesting it's analogous here.

3          THE COURT:  Yes.

4          MR. SOUTHER:  And so what the Court did, the solution

5  there was the Court, you know, focused on entering an order, a

6  preliminary order with a dollar value of what the forfeiture

7  amount was, what the amount was of the illicit proceeds that

8  may have passed through this.  And again, you know, I think one

9  of the other things we've --

10         THE COURT:  I don't think that situation is analogous

11  to here and I, you know, I've lived with this case for a lot of

12  years.  Your client's role in this and the money that went into

13  this development, you know, I think Mr. Wolinski used the

14  example of Facebook, I don't know, one of the letters had

15  something along those lines.

16         MR. SOUTHER:  Right, right, Facebook.

17         THE COURT:  Yes, I don't see that as, I understand

18  that argument.  But this, I don't view this as that type of

19  situation.  This money went in, Mr. Jowdy took the money.  I

20  understand a lot has gone on since then, but this is not some

21  peripheral, you know, investment that is now sort of upsetting

22  an entire resort that was built independently of that money.

23  That was part of the core money back then.

24         MR. SOUTHER:  Right, but it was a small fraction,

25  Your Honor, of the original money that was, that was used as

1  part of a downpayment.

2          THE COURT:  Yes, okay, I don't want to get into a

3  debate about this.  I know, I saw that case.  And again, you

4  know, I think you can tell from having the conferences we've

5  had on this and how much, how many times I've gone back to the

6  Government to tell them to, you know, speak to you, to speak to

7  the bank and to come back with more language.  So I'm sensitive

8  to everything that you're saying.  But I can't think of a

9  better language in a preliminary order than what we're now up

10  to.  But okay, thank you.

11          MR. SOUTHER:  Your Honor, I understand.  I would just

12  ask the opportunity to then have the Government speak with us

13  because they actually have not been speaking to us.  They've

14  refused to speak to us, saying that they would only speak to

15  the bank and they would then decide whether it was necessary to

16  speak to us.  We would like to be part --

17          THE COURT:  Speak to you about, like the operation of

18  the resorts or to you about what, the --

19          MR. SOUTHER:  No, no, about trying to come up with a

20  resolution to this that is going to preserve the value.

21  Because that's our objective, trying to preserve the value.

22          THE COURT:  Okay, all right.  Yes, look, the

23  Government, obviously the primary conversation is with the

24  bank, but obviously you should include Mr. Souther to the

25  extent that one of the options is, one of the considerations is

keeping Mr. Jowdy involved and who's going to run the resort.

It makes sense to have Mr. Souther involved as well, okay.

MS. O'CONNOR:  Yes, Your Honor.

MR. SOUTHER:  Thank you, Your Honor.

THE COURT:  All right, thank you.

MR. KOSTOLAMPROS:  Your Honor, may I add a couple,

address a couple of points.  Thank you, Your Honor, I just have

three points that I wanted to raise.  One is addressing Mr.

Wolinsky's point about, you know, these promises that

essentially, about the master plan of the resort.  As you

recognize the bank is in a position where it can't force a

potential buyer to do frankly whatever.  I mean ultimately we

would like to work with Mr. Wolinsky and get the best result

that frankly would make it, make this process just go quicker

and easier for everyone.

So that's one.  Number two is as part of that we

think it's important that ultimately whatever is sold is the

equity shares, because that will then bring all of the

obligations that the equity had agreed to.  So that's one way

of addressing that issue.

Then the third point that I should have raised

earlier is the Government had raised some agreement, side

agreement or I forget how they had phrased it, but atypical,

that every agreement that the bank has made with, on the resort

since the forfeiture order or the protective order we've run by

1   the Government.  So I'd be happy to talk to them at some point

2   if they want to raise these issues, as opposed to raising it to

3   the Court without even addressing with us.

4           Again, we've addressed all of these issues with them

5   before we finalized any agreement.

6           THE COURT:  All right, I don't think that --

7           MR. KOSTOLAMPROS:  So those are the points I just,

8   just for the record.

9           THE COURT:  Yes, I understand that.  But I don't, I

10  mean, you can have a conversation with them, but the bottom

11  line is they're willing to put the interlocutory sale language

12  in there.  So whatever concerns that they have and their

13  reasoning behind their position I don't think is critical at

14  this point for purposes of the Court.  But I understand why you

15  wanted to clarify that.

16          MR. KOSTOLAMPROS:  Thank you.

17          THE COURT:  All right, so, and in terms of the

18  homeowners obviously my expectation, Mr. Wolinsky makes the

19  point that to the extent that the homeowners' interests are not

20  being considered at all, it's going to be the economic, you

21  know, that could create economic issues with regard to the sale

22  of the interlocutory sale.  I mean, that makes sense as well.

23  It makes, I think from an economic standpoint as opposed from

24  an equitable standpoint it makes sense to engage Mr. Wolinsky

25  and the other homeowners to make sure that any sale goes

1   smoothly.

2            MR. KOSTOLAMPROS:  Right.

3            THE COURT:  So I think everybody is on the same page

4   with that.  But obviously if the Court does enter a preliminary

5   order we'll continue to hear those types of issues, okay.

6            MR. KOSTOLAMPROS:  Thank you, Your Honor

7            THE COURT:  All right.  All right, so I'm going to

8   ask the Government to put in a proposed revised preliminary

9   order by Friday, next weekend, is that okay?

10           MS. O'CONNOR:  Yes, Your Honor.

11           THE COURT:  All right.  And then the Court will be

12   issue a decision soon thereafter, all right.  All right, I'm

13   sorry, Mr. Kenner, do you have anything that you want to add?

14           MR. KENNER:  Your Honor, I just listened to the

15   different parties here.  Again, I have the same empathy that

16   the Court does and, for the guys who invested and weren't part

17   of these different deals.  But Your Honor actually asked the

18   Government back on July 2, I think it was somewhere around page

19   25 of the transcript, to trace the money that was involved with

20   the loans that were given to Mr. Jowdy in order to be able to

21   determine what monies flowed through to this Mexican property

22   that we now have gone through 3-and-a-half years of

23   deliberation since 2016.

24           In 2016 the Government did trace the money.  They

25   traced all of it.  They traced it on Government Document #44

1    with Mr. Jowdy and his attorneys, and they admitted it in the

2    transcripts, I think at about page 66, 67 through IRS Agent

3    Wayne.  And they also submitted Government #36 during

4    forfeiture, and I believe that traced the $6 million and change

5    that went into the deal.

6           Of all the money that they traced from the original

7    loans that went personally to Mr. Jowdy that are, the

8    Government has documented in Mr. Jowdy's 3500 material.  I

9    think it's KJ2 at page 24 and page 25.  That loan agreement is

10   to Mr. Jowdy personally and he transitioned $350,000 through to

11   his Capital account.  That's the only money traceable through

12   to the Diamante Resort in Mexico.  Zero dollars are traceable

13   through my LLC that was fully capitalized by my two European

14   partners and the Government did trace the money as Your Honor

15   has asked recently, as recently as July 2.

16          I have got tremendous sympathy for the homeowners

17   like Mr. Wolinsky and the others involved in the bank's issue

18   on what may or may not happen down there with the land being

19   stuck into a, in trust held by a Mexican bank.  It's been an

20   issue we've had since 2009, and the Government today raised the

21   issue that in, I believe it's ECF628, Mr. Kaiser's letter of

22   February 28 of this year to the Court that although the

23   Government traced all of the funds Mr. Jowdy wants the Court to

24   believe that I stole all of the money and used it to buy

25   something in Mexico with.

1          The Court knows it didn't happen because of the

2    Government's own submissions.  But everything Mr. Kaiser echoes

3    in that letter of February of this year, ECF628 is no different

4    than what myself and the other investors told the FBI over 10

5    years ago starting on June 24, 2009.

6          THE COURT:  All right.  I'll go back, I'll look at

7    some of the things you just listed, I've been going through

8    these things along with my clerk.

9          MR. KENNER:  I understand.  And I'll submit a very,

10   very brief letter to you just to summarize what I just said so

11   you have it all in one place, Your Honor.

12         THE COURT:  All right.  You have until Friday, okay.

13         MR. KENNER:  Yes, I will get it to you as soon as

14   possible.

15         THE COURT:  All right.  All right, and thank you, Mr.

16   Brissenden, you do an excellent job, Mr. Brissenden, of

17   facilitating Mr. Kenner's submissions.  So I appreciate that.

18         MR. BRISSENDEN:  You're welcome, Your Honor.

19         THE COURT:  All right, Mr. Talkin, is there anything

20   you want to add?

21         MR. TALKIN:  No, thank you, Your Honor.

22         THE COURT:  All right.  So I think we have dates for

23   everything.  Okay, are there any other issues from the

24   Government today?

25         MS. O'CONNOR:  No, Your Honor.  We would --

1          THE COURT:  All right.

2          MS. O'CONNOR:  I'm sorry.

3          THE COURT:  Go ahead.

4          MS. O'CONNOR:  We would just ask that when the

5   Marshalls do go down that they have full cooperation at the

6   resort properties so they can perform their appraisal, and that

7   any documents that they need in order to perform that appraisal

8   and business valuation will be produced to us.

9          THE COURT:  From Mr.?

10          MS. O'CONNOR:  The bank and/or the resort.

11          THE COURT:  Okay.  Well again, don't just send the

12   Marshalls down there, I would talk to both of the lawyers for

13   those, you know, clients here.  You know, tell them what you

14   would need, what access you would need, what documents you

15   would need.  And if there are any issues let me know.  But it's

16   not in their interest to delay that process.  Okay.

17          MS. O'CONNOR:  Thank you, Your Honor.

18          THE COURT:  All right --

19          MS. KOMATIREDDY:  Your Honor, I'm sorry, if I can

20   just add one request.  Given the sentencing time line, if we

21   could have until Friday to submit our, send something in

22   response I would appreciate it.

23          THE COURT:  Yes, that's fine.

24          MS. KOMATIREDDY:  Thank you, Your Honor.

25          THE COURT:  All right, have a good weekend.

1          MS. O'CONNOR:  Thank you, Your Honor.

2          MR. Wolinsky:  Thank you, Your Honor.

3          MR. TALKIN:  Thank you, Your Honor.

4                    * * * * *

5          **C E R T I F I C A T I O N**

6          I, **TRACY GRIBBEN**, court approved transcriber,

7   certify that the foregoing is a correct transcript from the

8   official electronic sound recording of the proceedings in the

9   above-entitled matter.

10

11  _/s/_ **_TRACY GRIBBEN_**

12

13

14  TRACY GRIBBEN TRANSCRIPTION, LLC      October 23, 2019

15                                        Date

16

17

18

19

20

21

22

23

24

25