October 25, 2019

The Honorable Judge Bianco
U.S. District Court – EDNY
100 Federal Plaza
Central Islip, NY 11722

Your Honor:

Defendant Kenner is in receipt of the government's latest attempt to substantiate a nexus to the EDNY with respect to Kenner's alleged criminal activity (*ECF No. 752*) thru three specific avenues: (1) Brazen lies; (2) Preparatory Acts; and (3) Non-victim activity.   None of these create proper venue in the instant case. Nevertheless, Kenner is subsequently forced to dig-up and reveal the government's-own evidence for the Court and disprove their desired result with empirical evidence they had to ignore.

Incrementally, the Second Circuit routinely uses a "substantial contacts test" in its venue deliberations.    Accordingly, the Court in *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1188 (2d Cir 1988), stated:

> The test [for constitutional venue] is best described as a substantial contacts rule that takes into account a number of factors – the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate fact-finding, see also *United States v. Reed*, 773 F.2d 477, 481 (2d Cir – 1985), and we have noted that it is helpful to examine the "key verbs" used by the statute in defining the offense, *United States v. Chesnut*, 533 F.2d 40, 46-47 (2d Cir), *cert denied*, 429 U.S. 829, 50 L. Ed. 2d 93, 97 S. Ct. 88 (1976).

The government alleged in its superseding indictment (*ECF No. 214*) that starting in August 2002, there was a scheme devised to defraud Kenner investors with Constantine.    Kenner's clients' initial investments in any of the objects of the overarching conspiracies began in October 2003, not earlier.   Yet, there are no alleged overt acts until over a year later, when the loans to Jowdy began, as verified as "*group*" authorized by alleged "concealment victim" Darryl Sydor in 2011 to the SDNY Grand Jury (after he participated as a plaintiff in 3-independent lawsuits to recover the well-documented Hawai'i-Jowdy loans).[1]

---

[1] Darryl Sydor confirmed the Jowdy loan from the Hawai'i partners -- and his underlying knowledge -- without hesitation (*Sydor SDNY Grand Jury Tr.25-26*):

> *Q:  Was that [the LOC at Northern Trust Bank] also for Little Isle 4 as far as you know?*
>
> ***A [Sydor]: Yes, but then we put it towards a short-term loan to Mr. Jowdy until Lehman Brothers came up with the money that was supposed to be paid back."***
>
> *Q: Did you know in advance that it was going to be used, this Little Isle 4 money, to be used to salvage the Cabo investment?*
>
> ***A [Sydor]: <u>Yes</u>.  <u>It was to help with the short-term loan to keep funding the Cabo, but then its supposed to be paid back</u>, but that's –***
>
> *Q: Paid back to you or to Little Isle 4?*
>
> ***A [Sydor]: Paid back to Little Isle 4.***
>
> *Q: So –*
>
> ***A [Sydor]: <u>Back to Hawai'i</u>, <u>not me personally</u>.***
>
> *Q: Bu that didn't happen?*
>
> ***A [Sydor]: That didn't happen.   And Lehman came up with the $129 million loan. <u>It was supposed to be back at closing</u>.***

- Sydor's affirmation to the SDNY Grand Jury is corroborated by the Lehman Brothers closing documents that were provided to Kenner and Kenner investors one month prior to the original February 2006 closing date, documented as return of capital (which disappeared by the time of the closing) (*Bates stamp: 23186-23217 at 11 – from the Jowdy Rule 16 production records*).
- Ironically (in typical Jowdy fashion), the $17 million sales commission (*Id. at 11*) has never been accounted for by Jowdy and/or the former Lehman Brothers lender that John Kaiser documents (*ECF No. 628*) as *still complicit* in the on-going Cabo san Lucas embezzlements and diversions; the exact same actions that Constantine is accused of illegally receiving "consulting fees".

<u>Turner Stevenson</u> (a non-victim in the 2015 superseding indictment) <u>confirmed</u> Sydor's testimony to the 2011 SDNY Grand Jury *with FBI agent Galioto present* (*Stevenson SDNY Tr.17-18*):

> *Q: So are you saying that <u>you agreed to transfer some of the money from the Hawai'i project to the Cabo project</u>?*
>
> ***A [Stevenson]: I would say that, <u>yes</u>.***
>
> *Q:  Who made that decision?*
>
> ***A [Stevenson]: <u>I think all of us as a group</u>.***
>
> *Q: What do you mean as a "group", who is the group?*

The Court should note, relative to the substantial contacts test, approximately 99% of the Hawai'i partners' transactions originated from Arizona and over 95% of the transactions related specifically to Hawai'i transactional events.   With less than 1% _at most_ contacts with the EDNY, and _no capital investors_ in the deal, it produces negligible EDNY tangibility, at best.

This observation is particularly apt where the charged crime is a conspiracy, because any district in which an overt act "in furtherance" of the conspiracy was committed is properly designated as the "district where the offense was committed," so long as the act was performed:
    (1) **by any conspirator**, and
    (2) **was undertaken for the purpose of accomplishing the objectives of the**
        **conspiracy**.

*Is John Kaiser a newly discovered co-conspirator?*
The government's only option is to now accuse John Kaiser as a co-conspirator (identical to their post-trial Jowdy reformations).   Kaiser's 2012-2017, self-admitted (*ECF No. 628*), Jowdy co-conspirator status is obvious for prosecutorial means for a Jowdy prosecution that the investors have been waiting for (10 years and counting), but it is identically without testimony on the record to support it (*Tr. 5746-47* -- in contradiction).   That 11th-hour option has also vanished thru firm pro-Kaiser advocacy by the U.S. Attorneys at trial.

*The government lied to introduce Ethel Kaiser and Michael Peca as EDNY residents for venue.   It was fabricated and the government knew it in 2015 (*Tr.5638*):*
      *MS. KOMATIREDDY: Yes, your Honor. So with respect to Hawaii, there are first*
      *of all several investors who are based in the Eastern District of New York*
      *including Mr. John Kaiser and **Mrs. Ethel Kaiser**. In addition **Mr. Peca and***
      ***Mrs. Peca** also resided in Long Island during the years in which they were*
      *involved in the Hawaii investments.*
- ***John Kaiser was no longer a Hawai'i investor after 2003 when Kenner repaid***
  ***his $1,000 investment.***
- ***It is simply untrue...but their 2019 advocacy for the same fairytales cannot***
  ***be excused a second time...***

***Brazen lies...***

---

    *A [Stevenson]: All the guys who were invested in it.*

Was Michael Peca consciously assisting the government in the misrepresentation of clear and obvious evidence in the Rule 16 – or did the government take advantage of Michael Peca and others with their "*memory loss*" symptoms (a.k.a. **CTE**)?

> o  Either way, the evidence is tainted.

Now – why is the government grandstanding on their known falsities regarding nexus, as dis-proven by Kenner repeatedly?   Is the government "*throwing sh\*\* against the wall to see what sticks*" at this point?   There is no plausible excuse for their on-going and specific misrepresentations about testimony that they know specifically is in direct contradiction to the government's empirical evidence and their-own witnesses previous testimonies.   Who is holding the government responsible for their ethical breaches to this court and justice?

Despite their strong advocacy, perhaps inspired by the good in *Berger* (1935)[2], they cannot confirm that any communication with Peca occurred in the EDNY during the alleged conspiracies, because Michael Peca would not have joined the earliest of them until his March 2005 Hawai'i partners initial contributions (*Tr. 375, 377*). Why did the government thru Michael Peca claim that Kenner was living in Long Island in 2002-03, when they know that Kenner never lived in Long Island or anywhere close to it (*Tr.377*)?

> *Q: Okay, I just want to just focus your attention now to the period of let's say approximately 2002/2003. Where were you living?*
>
> *A [Michael Peca]: 2002/2003 I was living on Long Island, New York.*
>
> *Q: <u>Do you know where Mr. Kenner was living?</u>*
>
> *A [Michael Peca]: <u>I believe Mr. Kenner was on Long Island.</u>*

- Michael Peca did <u>*not*</u> invest in the Hawai'i partners (his earliest "object" investment) <u>*until March 2005*</u>, when Michael Peca signed his *Letter of Authorization* for Northern Trust Bank, so Kenner and Little Isle 4 could access his LOC funds as a passive-equity investor; verified by Michael Peca to the SDNY Grand Jury (*3500-MP-5 at 39*) (*Ex. 3*).

- The government lies again to the Court about Pecas $100,000 wire transfer – because the Michael Peca wire transfer (signed and faxed individually by him –

---

[2] *Berger v. United States*, 295 U.S. 78, 55 S. Ct 629, 79 L. Ed 2d 1314 (1935)

*GX-749*) for $100,000 to the Little Isle 4 bank account -- is in the record -- as sent June 23, 2005 (Peca fax stamp confirms) (after his LOC investment started months earlier) (*Tr.382*).

  o Michael Peca's testimony is erroneous (again) -- because he was not one of the few December 2003 investors (the first Hawai'i deposits), as insinuated by the government and verified falsely by Michael Peca.

• The government knew it all of this, *supra* -- and let the record stand, again, prejudicing Kenner.

  o Peca's first Hawai'i transaction occurred in 2005 (LOC in March 2005 and individual wire transfer in June 2005), when he was living in Edmonton, Alberta (where his LOC statements were being sent by Northern Trust Bank) – despite trial allegations that Kenner was concealing the statements – *Ex. 1*).[3]   Kristen Peca verified their 2005 Edmonton home during direct-examination (*Tr.700*).

    ▪ Peca contemporaneously received LOC statements at his Getzville (Buffalo), New York residence where Peca received and signed for the use of his funds (*Ex. 2*) – confirming another trial lie of "no knowledge" (*Tr.429-430*).

  o Peca was living full time in Getzville, N.Y. by April 2004 (the Western District of NY).   There is no evidence on the record that Kenner met with Peca in Long Island at any point in time, because it never occurred.

***Preparatory Acts…***

**Michael Peca** -- 2002-03 Hawai'i related communication with Peca in Long Island could not have occurred, because the Hawai'i project was introduced to Kenner no earlier than November 2003.  Nothing in the record confirms Long Island nexus to any of these alleged communications.   Peca began his Hawai'i partners investments in March 2005 (*Ex. 3*), thus any prior communication could only be deemed a preparatory act (even though they never occurred).

> ***Whether the crime being continuing or noncontinuing, venue is not proper in a district in which the only acts performed by the defendant were preparatory to the offense and not part of the offense***.  See *United States v. Bozza*, 365 F.2d at 220-21 (noncontinuing crime of receipt of stolen

---

[3] The government alleged that LOC statements were somehow concealed by Kenner – without Northern Trust Bank's complicity – **but the Northern Trust Bank subpoena exposed another lie** – with the actual statements being sent to Peca's primary address in the Western District of NY -- and Peca's secondary address…**in Edmonton**!

goods); *United States v. Davis*, 666 F.2d at 200 (continuing crime of possession of drugs with intent to distribute).

**John Kaiser** -- The government claimed soliciting John Kaiser and others in Long Island created venue (*Tr.975*), but if it were true (which it was not), it would merely be a preparatory act, *supra*.   John Kaiser explained to the 2009 Arizona arbitration (*Nolan v. Kenner*) that he personally solicited his friends and family; never once alleging Kenner had anything to do with it.[4]  *That is in evidence*.

---

[4] Kaiser testified to the 2009 arbitration panel about raising money from his friends & family – with "*no secrets*" about the Jowdy loan.   It should be noted that Kaiser had been the Managing Member of the Hawai'i partners for about 1-½ years by the time he gave his May 2009 voluntary testimony.   Less than one year later, Kaiser gave proffer to FBI agent Galioto and confirmed that he had possession of the "*Jowdy loan agreement*" and "*had seen all of the Hawai'i bank statements*" (*3500-JK-1-r at 3, 10*) (*Nolan arbitration Day 5, Tr.928-929*):

> *Q: Tell us what your experience was with respect to that money right at the point there was a decision to start loaning money to Mr. – that Mr. Kenner had made a decision to start loaning some of that investor money to Mr. Jowdy?*
>
> *A [John Kaiser]: ...So if we had some funds that were – that was stagnant and that warrant purchasing land, **we would utilize it for a loan**, so we actually made some money off if it.*
>
> *Q: Was Mr. Jowdy at that time someone that appeared credible to you?*
>
> *A [John Kaiser]: Well, the first thing, Mr. Kenner told me that he was, **and I met him a couple of times**.   He seemed – **a big thing it was 15 percent interest rate**, and I thought it was a good move.*
>
> *Q: So at the time was there any representation about getting paid back this money when the Cabo deal closed?*
>
> *A [John Kaiser]: **It was supposed to be a short-term loan**.   I thought it was three to six months, **because I had also raised some other funds from family and friends** that were getting a little antsy about it.*
>
> *Q: At the time this money was lent to Mr. Jowdy...did anybody anticipate he wasn't going to pay you back when the Cabo deal closed, the Lehman Cabo deal?*
>
> *A [John Kaiser]: No.  Otherwise, **I wouldn't have lent it**.   **I wouldn't want to go down that route**.*
>
> *Q: **When you made the decision** – or when you were made aware that some of this money was going to be lent, rather than sitting idle in an account, at 15 percent, did you know there were some risks?*

**Ethel Kaiser** -- Kenner never met Ethel Kaiser until a 2007 christening as referenced by the government – to cover-up for their trial frauds using a septuagenarian for jury empathy.   Thru leading Q&A, the government originally prodded Ethel Kaiser to claim that she met with Kenner at the christening in 2005 (*Tr.934, GX-942*) *before* she agreed to give her son (not Kenner) funds.   The actually christening occurred April 15, 2007 (*Tr.1011*).  In fact, despite the government's trial misrepresentations to the Court (*Tr.5638*) (and in the current opposition),

---

> *A [John Kaiser]: At the 15 percent – actually, **the loans**, I didn't think they were going to be – to me it wasn't a risky loan...**but the loans -- even the investors I brought in – I said.   Listen.   This guy – I gave him the whole story of Ken Jowdy back by land.   It's good.   Better than your money sitting somewhere.***

John Kaiser testified that he *did not hold Kenner responsible* for the Jowdy non-payments, and there was no secret to he Hawai'i partners he represented, either:

> *Q: Has this ever been a secret that Mr. Kenner lent this money to Mr. Jowdy?*

> *A [Kaiser]: No.*

> *Q: Was this a transaction that, as your view as an investor was open and disclosed to everyone?*

> *A [Kaiser]: It was open.  **There was no secret handshakes or nothing like that.***

> *Q: Even now, sitting here in May 2009, is there anything you've uncovered, as someone who obviously knows how to investigate, that Mr. Kenner has done anything inappropriate throughout these transactions?*

> *A [Kaiser]: No.*

> *Q: Not one complaint?*

> *A [Kaiser]: No.*

> *Q.   At the time this money was lent to Mr. Jowdy to be spent in the Mexican project, did anybody anticipate he wasn't going to pay you back when the Cabo deal closed, the Lehman's Cabo deal?*

> *A [Kaiser]: No.  **Otherwise I wouldn't have lent it.**  I wouldn't want to go down that route.*

> *Q.   Do you blame Mr. Kenner for him [Jowdy] not paying the money back?*

> *A [Kaiser]: No.*

**Ethel Kaiser is a Northern District of NY resident; not EDNY**.   Ultimately, Ethel gave clear testimony that she was paid back by her son, leaving Ethel as a non-victim in the instant case (*Tr.934*).[5]

---

[5] Ethel Kaiser deposited $850,000 in August 2005 into a Hawai'i partners' bank account (*GX-2109*) as part of a loan solicited by her son (confirmed in 2009 arbitration testimony, *supra*).   Ethel testified that her son repaid her the $390,000 "plus interest" that she bargained with him for (*Tr.933-34*).

- *The record shows that John Kaiser robbed his mother of $460,000 (minus the interest)* in that transaction, which she is still unaware of.

Further exposing the fabricated testimony and synchronized by John Kaiser and his mother (thru the government), John Kaiser testified that he was not repaid the loan amount within 30 days (as he alleged the loan-deal was agreed upon) and sold his house within 2-weeks to repay everyone (*Tr.979-80*).   If this was true, and John Kaiser did not repay all of his friends & family in August 2006 thru the Lehman Brothers joint venture payout (and corroborating bank documents in evidence), but paid from the September 2005 house sale, then Ethel would have been repaid in the 30-day timeframe and lied or exhibited more *faulty memory, confusion and mistakes*: harming Kenner.

- In fact, commensurate with a lender (like Ethel Kaiser's $850,000) or all the passive-equity Hawai'i partners investors, Ethel Kaiser did *not* know who her son's best-friend and Hawai'i partners COO, Chris Manfredi was, even with her son procuring her life savings (*Tr.950*) in the loan she gave her son (*Tr.939*).

- How could a passive-equity investor (like any of the government witnesses) be expected to know Hawai'i partners COO Manfredi, Constantine, Carlsmith Ball LLP attorneys, the archeologists, Hawai'i partners employees, LEEDS certified engineers, 16 other hard-money lenders, Centrum financial, etcetera?   There is no plausible reason they would know any of them as passive-equity investors, and Ethel Kaiser proved it again; unless her son "concealed" that from her and it is also deemed a criminal act...

  - John Kaiser confirmed to the FBI in October 2010 (when Kaiser was the Hawai'i partners Managing Member) that Kenner sent out regular Hawai'i partners update letters (*3500-JKK-1-r at 3*), so if the Hawai'i partners investors chose to "*not read*" the updates, like their identical testimony about the majority of their important private equity documents, that cannot be Kenner's fault; certainly not criminally.

- The standard, *supra*, would be as unreasonable for Kaiser as it is for the current prosecution and government leading questions of "*authorizing consulting money for Constantine*" when hardly any of the instant case investors would even know who Constantine was in 2004 (*Tr.1909 [Nash], 2165 [Sydor], 2724 [Rucchin], et.al.*).

<mark>Despite the now-known Kaiser lies about knowing who Constantine was in December 2004 when he signed the first Constantine consulting agreement (*Tr.992*), his best friend and Hawai'i partners COO (Chris Manfredi) verified to the court that he actually met with Constantine in 2004 (*Tr.3004*) (despite two unchallengeable issues: (1) Manfredi having no reason to fly to Scottsdale Arizona and meet Constantine other than the beginning of the joint funding efforts, and (2) Manfredi's own memory loss when</mark>

*Kaiser and the government fabricate the reason for the $1,176,000 paid to Kaiser...*
Nevertheless, by the time Kenner met Ethel Kaiser in 2007, she had been fully repaid by her son who received "full repayment" of the 2005 loans after the August 2006 Hawai'i joint venture closing (receiving $1,176,000 in transfers) from Na'alehu Ventures 2006 (*GX-2103*).   The court should note that John Kaiser claimed during trial that the $816,000 in cash transfers to him were for "*back pay*" and "*expenses*" (*Tr.1413-14*), but at no time did the government produce the Kaiser IRS confirmations or copies of any complementing "*expenses*" (because they never transpired).   Kaiser was also paid approximately $50,000 in the 4-5 months surrounding the joint venture, in the trial record.   The government opposed Kenner's "in camera" request for the Kaiser IRS taxes verification (of "*back pay*") and "*expenses*" production.

- The court denied Kenner's request on July 2, 2019.   This factual information (wholly confirmable with Kenner's prior request) – *of no back pay and no expenses paid* – also designates John Kaiser as a non-victim of anything.   The government can request the information to disprove the truths (and confirm more manufactured trial perjury by Kaiser with a knowing government).

- ==Kenner re-news his subpoena request of the Kaiser information for "in camera" review, if the government persists in claiming Kaiser as a victim of anything in the instant case.==

**Non-victim activity...**

*John Kaiser has no money in the instant case...*
John Kaiser had no money invested in any Kenner transaction in the instant case, thus cannot be deemed a victim (for venue – or other elements of the government's case).

---

==confronted with his email communication directly with Constantine related to real time funding efforts between the two of them (*Tr.3005-3018*).   So – how could anyone be tasked with knowing who Constantine was in 2004; specifically passive-equity investors?==

The $460,000 theft by Kaiser from his mother is incremental to the $147,000 theft confirmed by John Kaiser (*Tr.1160*) that he and Berard  ($95,000 transferred from Kaiser to Berard the next day – *Bates stamp: BK-MM-0000233*) perpetrated on John's mother (who denied giving him the money – *Tr.940-41*).

*Kenner is not involved in the Privitello Eufora transactions, organized by Kaiser...*
Kenner was found not guilty of the two Nick Privitello related charges, with zero
supportive empirical evidence produced by the government to contradict the
verdict.   In fact, the 20-ish emails in the record confirm that Privitello, Kaiser and
Constantine were organizing the Privitello deposits; specifically without any other
persons involved.   Kenner's name is <u>*never*</u> mentioned in any of the Privitello
transactions.

The 2012 FBI recordings between Privitello and Constantine also confirm that
$50,000 of the Privitello transaction was being re-directed from the Privitello funds
by Kaiser to his-own benefit (appearing to shock Privitello before his reluctant
agreement of the diversion on the 2012 recordings).   Nevertheless, this further
distanced Kenner from any transactional related nexus, perhaps adding Kaiser as a
co-conspirator (when considering the evidence in the Privitello transaction).

- The record shows that Kenner was not aware of the Privitello transactions
  (*Tr.4362*).   In fact, Privitello initiated 3-separate legal actions versus Constantine
  for the December 2009 transactions in Arizona and the EDNY (in 2010, 2011,
  and 2015) with others Constantine allegedly defrauded.

- At no time, under advice of the same legal counsel in all three lawsuits, did
  Privitello name Kenner as a defendant in an act the government deems part of a
  criminal conspiracy.[6]   The criminal allegations were meritless, specifically
  considering Privitello recorded Kenner in 2012 for over 3-hours and refused to
  turn the recordings over to Kenner pre-trial, or thru the request of counsel to the
  government (a separate *Brady* issue).

*Workers travelling from Long Island to Hawai'i fail nexus argument...*
The government mentions (on page 2) that several people travelled back and forth
from Long Island N.Y. to Hawai'i to work.   So what?   There is no nexus to "an act in
furtherance" of anything.   Neither Manfredi nor John Kaiser are victims of anything
in the present case (only employees); in fact based on their summer 2006, hard-line
negotiations for payouts in exchange for their required joint venture "sign off", they
are the only two people involved in the Hawai'i project that walked away from the
August 2006 joint venture ahead of the game (with neither of them having personal
investments in Hawai'i – per Manfredi's October 2010 FBI proffer *3500-CM-2-r at 2*).

---

[6] The government lied to the jury during cross-examination, claiming that different
attorneys filed the EDNY lawsuit, when they were deftly aware of the Privitello case in the
same courthouse versus Constantine (*Tr.5960*), with Eufora lead investigative attorney,
Michael Stolper, filing the lawsuit.

*Kaiser's Sag Harbor re-purchase…*

John Kaiser's police training partner, Vincent Tesoriero, explained to the FBI *after* the Kenner indictment and arrest (in 2014) that Kenner was involved in the Sag Harbor transaction to fund construction (*3500-VT-1-r at 2* -- "*Kenner's role in the Sag Harbor deal would be to raise money to build the property*") (*Tr.4464-65*).   Tesoriero also confirmed that, "*Kaiser told Tesoriero that they needed to get Manfredi out of the Sag harbor deal and that Phil Kenner and Bryan Berard were coming in the deal*". *Id.* at 2.   Ironically, this contradicted another Kaiser fabrication at trial, claiming he was unaware of the Berard participation until years later (*Tr.1005*).   Tesoriero confirmed to the FBI that Kaiser, himself, gave the LedBetter operating agreement (*GX-703*) to Tesoriero; verifying more Kaiser trial lies.   The FBI noted in the 2014 proffer, "*Tesoriero was under the assumption from the start of the 'LedBetter deal' Berard and Kenner were coming in the deal.   Tesoriero received the LedBetter agreement only from Kaiser*".  *Id.* at 2.

- All of Tesoriero's FBI statements in 2014 wholly contradict Kaiser's feigned ignorance of anything to do with the October 2006 LedBetter transaction with Kenner.   The lack of believability is further exposed based on Kaiser's additional fabrications that he had just become aware with Manfredi that "Kenner stole $1 million" from the Hawai'i partners and confronted him (*Tr.983*); clearly never occurring.

Kenner sued Kaiser and Berard in 2013 for a second fraudulent conveyance of title in the Sag Harbor property, this time by forging Kenner's friend's name on an operating agreement (not the one produced by the government witness – *GX-703*, but in the government's possession and awareness) (*Tr.672*).   In the Kaiser-Berard defense, they affirmed, "*Kenner has no money in the Sag Harbor property*", while claiming their names were forged, yet again.   Their forgery defense claims were disproven again -- and debunked by the Arizona judge with empirical evidence (their own emails) during the 2015 contemporaneous civil trial, which Kenner provided to the Kaiser-Berard victims (Sydor, Nash, Ranford, Khristich and Lehtinen) and their trial attorney.

Thus, according to Tesoriero's 2014 FBI proffer and the Kaiser-Berard 2013 Arizona civil defense, the 2006 short-term loan that Kaiser negotiated in exchange for his Hawai'i joint venture signature (along with full 2005 loan repayments of $1,176,000 – per the Na'alehu Ventures 2006 August 2006 bank records in the record) belonged exclusively to Kaiser; *never Kenner*.   Kaiser repaid the short-term loan and no harm occurred (intended or otherwise) to any member of the Hawai'i partners from the 11-day banking transaction.   Kenner verified the details of the Kaiser

horse-trading to the court; unopposed by government evidence (*Tr.4453*). Additional evidence seized from Kenner's home office also verifies the short-term loan was 100% for Kaiser (available upon request by the court).

- There were no "acts in furtherance" of any conspiratorial issues related to the Kaiser short-term loan (*Tr.4453*).

- Kaiser's "signature" and approval permitted the $105,000,000 Lehman Brothers transaction to occur in August 2006 -- and approximately $7 million to be returned to the Little Isle 4 and Na'alehu Ventures 2006 partners thru the Lehman Brothers closing (*GX-2103*).

*Berard independently invests in Sag Harbor project (unrelated to the instant case)...* Berard's October 2006 transfers to become a passive-equity partner in the Sag Harbor deal has nothing to do with the Hawai'i partners or the instant case.   The government misleads the court again, claiming the deposited funds came from Berard's LOC.

**_Incorrect_**...

Berard authorized two separate transfers; *neither of which originated from his LOC funds*.
- On October 23, 2006 Berard signed the authorization to transfer $275,000 from his Northern Trust investment account (for the LedBetter deal) – and...
- On October 24, 2006, Berard approved the $100,000 authorization to transfer the funds from his Charles Schwab bank account (for the LedBetter deal).

In fact, on Kenner cross-examination, AUSA Michiewicz represented to the jury (in a 100% Jowdy style comment) that *after* Kenner had negotiated the short-term loan with Kaiser in exchange for his joint venture "signature", Kenner should have "stiffed" Kaiser because Kenner "*was a business man*".  Michiewicz' audacity was shocking as if the best solution for Kenner was to trigger litigation between the Hawai'i partners and Kaiser, post closing (*Tr.4700-01*):

> *Q. When was Sag Harbor?*

> *A [Kenner]: That was two months after the closing of the financing from Lehman Brothers.*

> *Q. So he already signed on the dotted line for the Lehman closing before any of this stuff happened with the Sag Harbor property. Isn't that correct?*

*A [Kenner]: Yes, sir. He signed after we had agreed to give him a short-term loan.*

*Q. Not much leverage at that point, right? I mean, Lehman is on board, Kaiser, Manfredi, everybody signs the closing documents, and then he forces you or demands from you this short-term loan?*

**A [Kenner]: Are you suggesting that after we agreed to it prior to the signature I should have lied to him and not given him the loan***?*

*Q. Well, you are a businessman, sir, aren't you?*

**A [Kenner]: Not one to lie to people, if that's what you are insinuating.**

- Perhaps, at that time, AUSA Michiewicz was auditioning for a job with Tom Harvey (Jowdy's attorney who was present in the courtroom throughout the trial assisting Michiewicz at breaks), and that is how "big business" is supposed to happen amongst the anointed.

Despite the unexplainable ethical abyss espoused by Michiewicz, preempting a covert plan to lie to investors as commonplace in his mind, none of the Sag Harbor transactions were "acts in furtherance" of a conspiracy.   There was no harm (actual or intended) in the short-term loan, in fact it created a $7 million benefit of Lehman Brothers funded closing money for the Hawai'i partners.  Once the funds were returned to the Hawai'i partners 11-days later as contemplated, the funds were subsequently used within the following two months for more authorized uses (per the corporate signed operating agreement) to maintain the business of Na'alehu Ventures 2006 and Little Isle 4.

The government's droning on (at page 2) about other Long Island people who were "bought out" (from Kaiser's North Point Property corporation) by the Kaiser re-purchase have nothing to do with Kenner or the instant case; certainly not a basis for nexus.

*Gaarn nexus...*
Tim Gaarn is not a co-conspirator (indicted or not).   Gaarn vehemently denied it during testimony (*Tr.2503-04, 2563-64, 2599-2600*).   The government failed to elicit anything on the record other than a re-direct attack on Gaarn that they could charge him if they wanted to (*Tr.2672*)....and then based on Gaarn's non-conspirator affirmations, post-trial, "they did not"!

13

Kaiser was not owed money from the Hawai'i project (confirmed by Kenner's forensic analysis at *ECF No. 736-1 Ex.Z41*).  The government promised the court that the unpaid Hawai'i-debt was the predicate act to Counts 2, 3 and 4 (*Tr.1020-21*), and the payments by Gaarn were intended to conceal "something" – even without Kaiser an investor in any "object" in the instant case.   The testimony that Kenner "told" Gaarn to wire funds to Kaiser (Count 2 and 3), is a *preparatory act* and not applicable to establish venue for a conspiracy; nor is it proper to establish venue for a single noncontinuing overt act.   See *Beech-Nut*.   Yet, as far as conspiracy venue for Eufora, AUSA Michiewicz told the jury specifically that (*Tr.5744*):

> "*Count 2 which is a wire transfer that occurs, this is a substantive charge, not part of the conspiracy...*"

In furtherance of Kenner's argument (that Kaiser cannot be a co-conspirator now, like the government's reformative claims about Jowdy over a year after trial), Michiewicz repeatedly told the jury regarding the receipt of funds "by mistake" that:

> "*Kaiser is not involved in ripping anyone off*" (*Tr.5746*)  -- and –

> "*Again, Kaiser is building something, he's not involved in this...*" (*Tr.5747*).[7]

Thus, *none* of the Kaiser wire transfers could be deemed "*in furtherance*" supported by the venue statutes' own language, specifically when the first element of "*by any conspirator*" is not satisfied with the statute being joined by "*and*".   As previously stated:

> The well-settled, Second Circuit case law confirms, this observation is particularly apt where the charged crime is a conspiracy, because any district in which an overt act "in furtherance" of the conspiracy was committed is properly designated as the "district where the offense was committed," *so long as the act was performed*:
> (1) **by any conspirator**, *and*
> (2) **was undertaken for the purpose of accomplishing the objectives of the conspiracy**.

*Constantine sends personally traceable money to Long Island on 8-15-2006...*

---

[7] Because Kaiser received approximately $138,153 from Gaarn's private stock sale proceeds, had the government chose to designate Kaiser as an unindicted co-conspirator (like they tried and failed with Gaarn) – then – ***maybe*** – their venue argument might hold water.   By presenting Kaiser as a non-conspirator, the government sunk their only possible, valid venue argument (similar to avoiding all Jowdy references as such).

The government continued with their misrepresentations to the Court regarding Constantine's $17,500 personal payment to a car business on 8-15-2006.   The government represents that *GX-1733* confirms his frauds.   Not only is money fungible according to IRS agent Wayne's testimony (*Tr.4024*), but Constantine had a personal deposit of $275,000 (from an unrelated source) deposited into his account on 8-14-2006 (the day before his $17,500 outbound transaction – unrelated to the instant case).   The government cannot refute the specific transaction or independent source of funds.   Venue fails again.

*Counts 5 & 6...*
Kenner was found not guilty of the two overt wire fraud acts related to Privitello, primarily because there is no empirical evidence tying Kenner to the transactions.

Although Kaiser attempted to claim with government fabricated testimony that Kenner's funds from the California project had something to do with money he thought he invested in Constantine's Eufora.   The government claimed a "*grocery list*" or "*shopping list*", was Kaiser's proof.    Kaiser took Kenner's hand-written list from Kenner's office and replicated 6-days *before* Kaiser admitted to Kenner he took it (and faxed it to his home), in the record (evidence available upon request). Kenner's hand0written list was the alleged basis for Kaiser's personal Eufora investment (*Tr.1404-06*).   This fraudulent testimony by Kaiser is debunked by Kenner's forensic accounting, again (*736-1 at 139-144 – Ex.Z41*).

*Kaiser is not owed any money by the time of the Gaarn loans to him money in February 2009 (additionally claimed as a "mistake" according to Kaiser [Tr.1048-49])...*
The court knows that venue cannot be established if the defendant has **no intent** for coming in contact with the district.   Kaiser's own answer on direct-examination confirms that Kenner had "no intent" for the Gaarn transfer to arrive in the EDNY, even though it was also sent by a non-conspirator (*Tr.2563-64, 2578-79, 2599-2600*), Tim Gaarn (further destroying the venue argument for the government).  The Second Circuit confirmed this in *Svoboda*.
- In *United States v. Svoboda*, 347 F.3d 471 (2d Cir – 2003), we stated that "venue is proper in a district where (1) the defendant <u>intentionally</u> or <u>knowingly</u> causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is <u>foreseeable</u> that such an act would occur in the district of venue [and it does]. 347 F.3d at 483.

*Count 4...*
The wire transfer to Kaiser in May 2009 cannot be deemed in furtherance of any conspiracy since Kaiser was not owed any money (nor deemed a co-conspirator),

nor was Kaiser involved in any way in the Gaarn-Eufora transactions.   Kaiser was merely borrowing more money from Kenner to repay other friends & family he had stolen funds from, in the record and concealed (a *Brady* violation by Galioto, discovered during the forfeiture disclosures by the government).[8]   Kaiser still owes Kenner these funds in 2019 (totaling into the millions of dollars, his liability only tolled by his 2012-2013 assistance to have Kenner arrested, per the NY Daily News).[9]   Kenner's arrest saved Kaiser millions in civil litigation judgments, so far.

The Count 4 funds Kaiser received were transferred to Kenner from Gaarn's private stock sales, fully vetted by the investors'-own independent attorneys (*Ex. 5*), and originated from a Gaarn sale to a non-victim in the instant case, Glen Murray.

The Eufora investors' attorney, Michael Stolper's letter exposed any perceived "concealment" by Kenner, as Stolper and Giuliani stated (*See Ex. 5*):

> At 1: "*...to give him [Constantine] the opportunity to support his allegations against his co-managers at Eufora.*"

> At 4: "*Lee, you claim to have been "informed" about "very disturbing facts relating to the actions of several investors and managers on the Eufora saga.*"

> "*We want to address these points as well, not with finger-pointing and conjecture, but real evidence (documents).   I invited Constantine to support his allegations but he has yet to provide a single piece of evidence or agree to meet with us.*"

> At 7: "*Constantine made allegations against Gentry (Eufora CEO) and Phil Kenner, a money manager of the members of the company [AZ Eufora Partners I];*"

> At 7: "*Stolper repeatedly requested that Constantine come to New York to address the findings and support his allegations about Gentry, Kenner, Eufora financing and the defaulted loan.*"

---

[8] The *Brady* materials were delivered post-trial under the file name "*victim - Frank Sconzo & Willy_Redacted*" (*Ex. 4*), and the specifically withheld documents confirming Kaiser's theft from another Long Island person are at *15-17*.   This *Brady* violation occurred to protect Kaiser's alleged integrity as the government's star-witness; specifically with his victims visiting the 2015 trial courtroom, under the belief that their funds, which were directly and <u>only</u> traceable to Kaiser were somehow stolen (as well) by Kenner thru magic (like the Jowdy December 2010 Nevada trial defense, which also failed).

[9] The NY Daily News (*November 13, 2013*) touted Kaiser and Berard as "<u>*heroes*</u>" for their efforts with FBI Agent Galioto and featured them in an arrest-day article titled – "***Former NHL Player Bryan Berard and ex-cop help Feds nail two Arizona men in massive fraud***".

At 7: "*...neither Constantine nor his counsel have provided the documents that Constantine said he was going to provide, and has otherwise not agreed to meet with Stolper and Hatzimemos [Giuliani's right-hand-man] to resolve the open issues;*"

After two-plus years representing the Eufora investors and preparations for representing the Hawai'i-Mexico investors versus Jowdy in new litigation, attorney Stolper independently represented Kenner for the first time in 2011 – with Kenner giving testimony to the SEC for approximately 24 hours.   At the abrupt conclusion and termination of the 2009-2011 Kenner-SEC investigation (originally prompted by Jowdy's attorney, Tom Harvey, and verified in Harvey's April 2009 extortion email to Kenner and counsel – *Ex. 6*), attorney Stolper told the SEC investigators:

[NY Attorney, Michael Stolper – August 2011]:

*The only thing I would like to clarify was that I think in your line of questioning, which may not come through in the transcript, whether he [Kenner] disclosed that the SEC has sought enforcement of subpoenas to his clients.   I think that the suggestion in your question was that it was something negative that he should disclose to his clients as sort of a warning or red flag to his clients who are relying on him.*

***And I think that the conversations that I have been a part of****, without waving privilege, **and also my own view** of SEC's involvement in this whole Diamante del Mar, et. al. is a welcome one and that **we** and Mr. Kenner, are really looking to the SEC to enforce the securities laws against Mr. Jowdy and those [Harvey, Freeh, and Najam] who did wrong here.   And we see it as a welcome thing, as a positive thing.*

*So the tenor of the conversations with Phil's friends, co-investors, clients is that this is a welcome thing and maybe because we are having this direct communication with the SEC, and then perhaps subsequently with the US Attorneys Office, that maybe they will finally get some justice out of this.*

*And I know I have said that off the record with you and I just wanted to clarify that in response to that line of questioning.   Just a point of information.*

*Kaiser was not due any money from Kenner or the Hawai'i partners despite his lies of millions to the court...*

17

Notwithstanding Kaiser was fully repaid (authenticated thru forensic verification at *Ex.Z41*), Kaiser and the government fabricated more Kaiser allegations in the Kenner Cabo san Lucas home purchase (*Tr.1087*).

- Kaiser never had any interest in the Kenner Mexico home.

*Kaiser and Jowdy attempt another fraud on the court…*
On top of the fully documented Kaiser repayments (of 100%-plus, *supra at Ex. Z41*), Kaiser and Jowdy fabricated two promissory notes with Kenner (never seen until after Kenner's November 2013 arrest and Kaiser working full-time for Jowdy). The fabricated notes claimed Kaiser actually owned the Kenner Baja Ventures 2006 equity (for the same funds that he has been re-paid over-and-over) (*ECF No. 628 at 1*).[10]

*Allegations of tequila company frauds (at page 3)…*
During trial, the government told the court that they were going to "*trace*" funds from the GSF (controlled by stipulation by Constantine at all times) to the purchase of some tequila company by Kenner (*Tr.1074-75*).[11]

- They never did it, *because it never happened*.

---

[10] The banking records and forensic accounting confirm Kaiser was overpaid by Kenner by approximately $1 million (a.k.a. Kenner lending money to Kaiser to complete the Arizona renovation project 9-months before the Gaarn -> Kaiser loans in February 2009).   If the Kaiser testimony were accurate (and not wholly fabricated to portray himself as a victim for prosecutorial benefit), ***Kaiser would have been overpaid by Kenner by over $4 million***.

- It is irrational; specifically for a government witness who claimed Kenner "*ruined his life*" (*Tr.1089*).  Kaiser would have been $100 million-plus richer, while working for Jowdy in Mexico.   *The dichotomy is irreconcilable.*

[11] The government claimed they were tracing GSF funds to a tequila company and as a result, Kenner had bottles shipped to NY from Mexico, an ATF violation – and logistically impossible with liquid content without the identical paperwork the government produced for the actual shipment to Russia (corroborated by texts messages between the parties – not illegally to NY).   In fact – the theory fails again because the email is dated about one year *before* Constantine managed the GSF in mid-2009; notwithstanding the government *never* traced any funds to anywhere (again):

> *MR. MISKIEWICZ: Your Honor, Government Exhibit 304 is an email from Mr. Kenner to John Kaiser. The subject matter says MosquitoRojoTequila. It is dated August 6, 2008. There is a certificate from Mexico that represents that Mr. Kenner is the owner, or at least a representative, of this company. And we are going to later on trace that he bought this company, it was a tequila company, using his funds from the global settlement fund.*

Nevertheless, the government still perpetuates their foundationless trial claims, while lacking any empirical evidence 4-½ years later to prove Kaiser received a tequila bottle in Long Island, yet, somehow constituting a criminal action by Kenner (although also untrue).   As previously evidenced by Kenner, the bottle was stolen from Kenner's Cabo san Lucas home in or about April 2014 when Kenner's Mexico home was reported as ransacked and robbed (the same time the FBI was interviewing Robert Gaudet in Cabo san Lucas).   There were six identical bottles in Kenner's Cabo san Lucas home, which matched the one the government produced in the courtroom (but never pre-trial, knowing that required early presentation of the evidence would have allowed the defense to prepare for the nonsense and debunk it with real evidence).   It was another "eve of trial" scheme.   See *United States v. Gil*, 297 F.3d 93 (2d Cir 2002). [12]

The text and emails in evidence with Robert Gaudet confirm the alleged and only bottles were actually shipped directly to Russia from Mexico, as the documentation required (from a century old tequileria who would certainly know the U.S. import-export laws -- or face losing his livelihood in Mexico for the violation from "Consejo Regulador del Tequila, A.C." to ship "fake" bottles to the USA).

The government never answered the obvious question that if the bottle was supposed to be sent to Kaiser's Russian contact in 2008, what was Kaiser doing with an empty bottle 7-years later (and why wasn't it presented to the defense as part of their Rule 16 production).   The bottle (*GX-4509*), if produced again for the Court would prove that the bottle is "fake" and is embossed in the glass with the owner of the distillery, "*Don Abraham*"; not having anything to do with Kenner or a tequila company conspiracy.

- As a matter of principle for the 5-year tequila hoax by the government on the court, Kenner is demanding that the government produce the bottle (*GX-4509*) for the Court to view during the November 14, 2019 scheduled hearing.   This will terminate yet another government and Kaiser premeditated ruse.

---

[12] In *United States v. Gil*, ("the government wrongfully suppressed evidence favorable to the defendant [that was] exculpatory and impeaching information, seriously undermining confidence in [the] guilty verdict, and was not disclosed timely enough for it to be useful to defendant.   The production of the documents on the eve of trial did not provide defendant the opportunity to read it, identify its usefulness, and use it.")

Lastly, the ruse is exposed by the simple fact that the tequila was shipped to Russia (per the texts and emails, *infra*)[13] and as a result of *GX-4507* (which includes the Russian mailing address):

From the shipping coordinator, Gaudet, to Kenner on January 9, 2009:

> *PK,*
>
> *It has been requested for us to provide the name and a copy of the id for the person who will picking up the tequila.*
> *Following is what I have:*
>
> > *Rostest-Moscow*
> > *Attn: Evgenia E. Nersesian/Fred Granik*

---

[13] The following is the text exchange between Kenner and Gaudet (*in Mexico*) who was assisting Kenner at the time with the distributor:

***Tequila bottles with <u>no labels</u> designated by Kenner to be shipped to Russia – NOT New York (with the label on the bottle)...***

Kenner "**sent**" is hi-lighted – "**read**" is received from Gaudet (the shipping coordinator):

| | | | | |
|---|---|---|---|---|
| 4 1 7 0 | +52624151 5995 Bobby Gaudet | 10/22/2008 1:11:31 AM(UTC+0) | S e nt | Santander statements?? Taking off for Europe now!! **Did you arrange for the tequila shipments per johnny's email??** |
| 3 4 3 6 | +52624151 5995 Bobby Gaudet | 10/22/2008 3:28:44 AM(UTC+0) | R e a d | Do we know what bottles/labels. Blanco ,rep [reposado], anj [anejo]. |
| 4 1 7 3 | +52624151 5995 Bobby Gaudet | 10/22/2008 9:45:02 AM(UTC+0) | S e nt | **No labels**. Just DA [Don Abraham] bottles with 3 of each...blanco, repo, & anèjo. Pk |
| 3 4 3 8 | +52624151 5995 Bobby Gaudet | 10/22/2008 9:49:21 AM(UTC+0) | R e a d | Bueno |

In fact – the Cyrillic information that was presented at trial was for the direct distribution with the bottles from Mexico to Russia (*GX-304*) – and accompanied the bottles.

The court should note that under ATF law, if Kaiser were to be caught receiving illegally shipped alcohol from a foreign country, he would be criminally prosecuted, thus, none of the government and Kaiser's fabrication make sense; and they should be held accountable for another attempted falsehood on the court (having already been perfected on the jury).

*31, Nakhimovsky Prospect*
*Moscow, Russia*
*117418*

Yet -- AUSA Michiewicz reinforced the tequila fraud theory to the judge once again without any proof (*Tr.1075-76*):

*THE COURT: I think the allegation is, it went to the tequila company. Right?*

**MR. MISKIEWICZ: Yes.**

*...*
*MR. MISKIEWICZ: Mr. Richards was handling all the disbursements out of the Ron Richards escrow account.*

*THE COURT: So it went from the Ron Richards account to another?*

**MR. MISKIEWICZ: To the tequila company account.**

Another, "*just because I say so...*" testimony from John Kaiser consisting of an incremental lie to the court cannot create the basis for nexus (*Tr.1084*); specifically when the government failed to fulfill their promise of "*tracing the money*" to a tequila company from the GSF (the predicate act) – *because it never happened and they knew it all along.*   Nevertheless, the misdirection continued thru summation about the known-"fake" bottle (*Tr.5752, 6002-03*) and some "*Kenner pet project*".

*Kaiser's 2007 christening (not 2005 as the government lied during trial thru Ethel Kaiser; with her knowing and assisting...or simply a confused older person)...*
Either way, this event was misrepresented by the government, for purpose, as happening in 2005 to create a solicitation event (*GX-942*), pre-loan, thru Ethel Kaiser's testimony (*Tr.933-34*).  It was debunked by Kenner with empirical evidence in Kenner's Rule 33 Reconsideration memo (*ECF No. 668 at 48*).

After Kenner debunked their falsehood again -- the government **now** claims the picture (*GX-942*) was from a 2007 event; leaving the jury prejudice to clearly stand, since the alleged event occurs 2-years after Ethel's full repayment (*Tr.979-80*) (*GX-2103 at 1-2*), effectively creating a meaningless occurrence and unrelated to anything in the instant case.   Now, the government changes their theory and claims it is part of maintaining a relationship with Kaiser and his mother (Ethel), for nexus. The government knows and hides from the fact that the "2005 loan" was already subsequently re-paid in full to John Kaiser's friends & family via the instructions Kaiser provided in August 2006 (totaling $1,176,000 in payments – none for "*back*

*pay*" or "*expenses*" lies Kaiser and the government tried to force on the court) (*Tr.1413-14*); assuming Kaiser's "sell my house to repay them" testimony was also fabricated.

*More false preparatory acts with Ethel Kaiser…*
The government discusses more preparatory acts of Kenner allegedly discussing the idea of investing in Hawai'i with Ethel Kaiser at a Long Island birthday party that Kenner (*Tr.937*), his girlfriend and another person did not arrive until after 11pm that night due to flight problems from the west coast and driving mishaps from JFK airport (after arrival).   Kenner is certain Ethel Kaiser (at the age of 75-ish) was not still attending the event after 11pm when Kenner arrived; and certainly not more than briefly on exit.   Kenner left the next morning for another commitment with his girlfriend and other traveller.   Nevertheless, the government fails to alert the court that in their same line of questioning to Ethel Kaiser, she is not aware that her son was the originator of the Hawai'i investment, and is adamant of that fact (albeit empirically incorrect).   Yet -- John Kaiser's origination was verified by AUSA Komatireddy, contradicting Ethel Kaiser's testimony (*Tr.5694*).

The government claimed Kenner was still communicating with Kaiser about his friends & family's 2005 loan, but they never produced a single (1) IP Address, (2) phone statement, (3) tower "ping" report, or otherwise to confirm Kaiser was in the EDNY during any of the "alleged" communication with Kenner or Constantine (*Tr.979*).

The fact that the government and Kaiser want the court to believe Kaiser was upset enough <u>within 30 days</u> of the August 2005 loan (the same transaction that he told the 2009 arbitration panel was a "*3-6-month loan*", *supra and infra*) that he put his Long Island house for sale is another fabrication at best (notwithstanding he also testified that his baby died and he and his wife wanted to move on from the home at the exact same time) (*Tr.979-80*).

*Kaiser's own 2009 testimony exposes more prejudicial testimony and recently fabricated story lines to fit the government's narrative…*
Kaiser explained to the 2009 arbitration panel about the "*3-6 month loan*" (6 years closer to the actual events) and at a time (2009) without ever blaming Kenner (in fact, just the opposite).   Yet -- according to Kaiser's fabricated 2015 testimony, he would have been (1) robbed by Kenner in Hawai'i, (2) robbed by Kenner in California, (3) robbed by Kenner in Sag Harbor, but chose to conduct two additional renovation projects with Kenner and Berard in Arizona (2008), and Kenner and

Peca also in Arizona (2008) (*3500-MP-4 at 3*) ("smelling" exactly like the post-Jowdy 2012 hiring and revisionary testimony that it is).

The court should note that Kaiser gave his voluntary May 2009 testimony and never alleged anything untoward about Kenner, in fact just the opposite of his 2015 pro-government testimony.    In 2009, Kaiser specifically verified his solicitation and expectations of the loans to Jowdy: [14]

> *Q: So at the time was there any representation about getting paid back this money when the Cabo deal closed?*
>
> *A [John Kaiser]:* **It was supposed to be a short-term loan**.   *I thought it was three to six months,* **because I had also raised some other funds from family and friends** *that were getting a little antsy about it.*
>
> *Q: At the time this money was lent to Mr. Jowdy…did anybody anticipate he wasn't going to pay you back when the Cabo deal closed, the Lehman Cabo deal?*
>
> *A [John Kaiser]:* **No.  Otherwise, I wouldn't have lent it.   I wouldn't want to go down that route.**
>
> *Q: When you made the decision* – *or when you were made aware that some of this money was going to be lent, rather than sitting idle in an account, at 15 percent, did you know there were some risks?*
>
> *A [John Kaiser]:* At the 15 percent – actually, **the loans**, I didn't think they were going to be – to me it wasn't a risky loan…**but the loans -- even the investors I brought in – I said.   Listen.   This guy – I gave him the whole story of Ken Jowdy back by land.   It's good.  Better than your money sitting somewhere.**

---

[14] Although the 2009 testimony confirmed his expectations that his friends & family $1 million was part of the Jowdy loans, the bank records confirm that *only* $135,000 went to the Jowdy loans and the rest paid operating expenses of the Hawai'i partners.   The Court should note that Kaiser was present in the 2008 Hawai'i partners litigation versus Jowdy in Arizona and the two 2009 California litigations versus Jowdy.   If Kaiser was still owed money at the time, he would have been a plaintiff in either or both of the lawsuits.   **John Kaiser was not a plaintiff in either.**

In fact, it is more perplexing *because* Kaiser was the Managing Member of the Hawai'i partners at the time of both lawsuits; clearly in control of the litigation related to his company.

The court should note that the similarities between Kaiser's 2009 arbitration testimony and his February 28, 2019 "shocking" new evidence letter to the court about Jowdy' frauds cannot be considered mere happenstance (*ECF No. 628*).

- Kaiser knew about the Jowdy frauds in 2009 (and before).
- Then, Kaiser conveniently and defiantly forgot about all of them in 2015 for his trial testimony (going so far as to deny his October 19, 2010 FBI proffer notes of full disclosures between himself and Jowdy in "loan meetings", with FBI agent Galioto sitting on his proverbial hands at the prosecutorial table, knowing the Kaiser testimony was fabricated) (*3500-JK-1-r at 2, 3, 10*) (*Tr.1120-22*).
- But, in 2019 (after Jowdy fired him), Kaiser recalls all of his original truths and years of calling Jowdy a "thief" and a "crook" (*Tr.1230-33*). The court should note that after Kaiser's confession in 2015 about calling Jowdy a "thief", he denied recollection of his-own morning's testimony to the court again (*Tr.1311-14*).

*Gross revisionary effects still left unaddressed…*
The court should consider the reformative effects on the trial as a whole – with John Kaiser as their star-witness. If Kaiser had espoused the same anti-Jowdy defiance and exposures in 2015, as he did before the trial "under oath" (*See footnote 4, supra*) and after he was terminated in 2019 (*ECF No. 628*) from his pay-for-protection co-conspirator job in Mexico, what would the jury have thought?

- Kaiser's truthful testimony about Jowdy being a thief and stealing the Hawai'i partners money that all investors were aware of, coupled with the government's post-trial productions of *government-forfeiture-36* (a.k.a. admissions that "*Kenner did not steal the Hawai'i money to buy anything….*", but rather Jowdy did -- proving 100% of the Kenner Baja Ventures 2006 capital account is "untainted" and unrelated to the instant case) and *government-forfeiture-44* (that Jowdy actually did receive 100% of the Hawai'i partners funds – in opposition to the government's trial advocacy calling Kenner "lying" (*Tr.4598, 5064-65*) and vouching for his thefts thru repeated summation denigrations – *Tr.5996, 5711, 5722-23, 5744-45, 5990, 5991-92, 5707-5709)*, where would the "memory loss" verdict have turned out?

Kaiser's 2019 new-found (and revisionary) truths hauntingly echo Kenner's June 24, 2009 FBI proffer about the Jowdy frauds.

- The court should note that Jowdy's executive assistant, Ms. Hughes proffered to the same FBI case agent, and specifically corroborated Kenner's statements 5-

24

days after the Kenner proffer (*3500-SH-1-r*) – also echoing the 2019 Kaiser revisions.

*The final "Hail Mary"...Gaarn is still alleged as a co-conspirator?*
As their final "throw-in" (at the bottom of page 4), the government tries to resurrect Tim Gaarn as a co-conspirator, despite providing no trial evidence of it.   In fact, as the Court is aware, the government's witness (Gaarn) was specifically asked about his any potential co-conspirator status...and he vehemently denied it (*Tr.2503-04, 2563-64*).   The government had nothing to offer to resurrect their theory during re-direct-examination of Gaarn.

The government suggests that *Tr.594* hi-lights a meeting in Long Island between Gaarn and Peca, but ironically for Peca's testimony based solely in "*memory loss*", the actual quoted transcript page hi-lights Peca's specific **CTE**-symptoms *of something else*.   The government produced no evidence on the record that Peca and Gaarn ever met or spoke, let alone in Long Island.

Peca's "*memory loss*" testimony clearly admitted "lacking recall" in the most critical of trial issues, notwithstanding he re-canted his original knowledge "denial" of the loans to Jowdy by the Hawai'i partners "*group*" as he, Darryl Sydor and Turner Stevenson verified in 2011 to the SDNY Grand Jury.
- Incremental to the failed nexus with Peca in Long Island is the salient issue that Peca admitted to the Court that he was aware at all times of the Jowdy loans (*Tr.498-99*); thus as a matter of law, Peca cannot be a victim of the Hawai'i transaction.

On the government's mis-quoted transcript pages, Peca was asked about emails he personally exchanged with Constantine about the GSF update conference calls with the group.  He claimed he could not recall them in frustration, in a timeframe that was 4-years closer to his 2015 testimony than the Jowdy loan conference calls he verified to the SDNY Grand Jury in 2011 and this court in 2015 on re-cant (*Tr.489-99*):

> *Q. And then Defendant's Exhibit C-32, do you recognize that group e-mail?*

> *A [Michael Peca]: I don't recall that, no.*

> *Q. Do you recognize it as an e-mail you received along with conference call e-mails discussing issues relative to the settlement fund referencing the names down at the bottom?*

> **A [Michael Peca]: It's so long ago I can't recall.**

25

*Q. Could that possibly be one of the ones you recall receiving?*

**A [Michael Peca]: I guess it could be possible.**
*...*
*Q. And again instructions on how to participate. And then conference call 4, this is dated October 22, 2009. Actually this one starts off with a **response** from your e-mail address; is that correct?*

**A [Michael Peca]: Yes, it does.**

*Q. It says to Mr. Constantine, we understand?*

*A [Michael Peca]: Correct.*

*Q. Do you remember this one in particular?*

**A [Michael Peca]: No.**

*Q. But it follows an e-mail from Mr. Constantine to you. It states, on October 22nd, 2009, subject, conference call 4. I am just waiting for a few more guys to respond and I will let you know. If possible, I will move the call to accommodate your schedule. You can probably imagine what it's like rounding up 20 guys in multiple time zones globally. Keep you posted. Tommy Constantine. Do you see that?*

*A [Michael Peca]: Yes.*

*Q. Do you have a recollection now of engaging in conversation so you participated in one of those conference calls?*

**A [Michael Peca]: Yeah. It was a long time ago. I vaguely remember.**

Now, the clearly lacking venue nexus is fabricated again by the government with evidence that just doesn't match the requirements of the statute.    None of the (1) "loss of memory" testimony, (2) falsely proffered representations by their star-witnesses, and (3) unchallengeable misrepresentations leave a feeling of confidence in the government's attempts to maintain the verdict, at all costs...let alone a proper nexus.

Submitted October 25, 2019.

26

Respectfully,
Phil Kenner