SK/JMH
F.#2013R00948

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                                   No. 13-CR-607 (S-2) (JFB)

PHILLIP A. KENNER,
      also known as
      "Philip A. Kenner," and
TOMMY C. CONSTANTINE,
      also known as
      "Tommy C. Hormovitis,"

                   Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE GOVERNMENT'S SENTENCING MEMORANDUM

                                          RICHARD P. DONOGHUE
                                          United States Attorney
                                          Eastern District of New York

Saritha Komatireddy
J. Matthew Haggans
Assistant U.S. Attorneys
      (Of Counsel)

PRELIMINARY STATEMENT

As overwhelmingly proven at trial, the defendant Phillip Kenner used his financial training and the trust placed in him by his clients—a number of professional hockey players and other investors—to commit a large-scale and elaborate fraud over the course of a decade that served to further his own interests and the interests of his co-defendant, Tommy Constantine. For years, Kenner held himself out as the players' trusted financial advisor, a seemingly reputable advisor who had worked at several well-known investment firms and who, as a former college hockey player, connected with the players over common interests. He formed close personal relationships with the players, making them feel like he was not only their advisor but also their friend—as one player described it, "like Jerry Maguire"—and someone who would take great care to ensure that the investors' "money was safe in the investment." But Kenner's assurances were irreconcilable with his conduct. In reality, Kenner repeatedly violated his duty to his clients, working with Constantine and others to steal millions of dollars of cash from them. He betrayed his clients and his friends, over and over again.

Constantine, in turn, capitalized on the relationships of trust and friendship that Kenner had built with his clients and used them for his own benefit. He initially profited while remaining in the backdrop of the scheme, letting Kenner serve as the front man for the pair's deceptions. Eventually, as Kenner's credibility with his clients began to wane, Constantine took a more leading role, inserting himself into meetings with the hockey players and other investors and pitching them on new uses for their money. Over time, seeing millions of dollars disappear without any evidence of where it went, the investors grew

desperate—for answers, documentation, and some semblance of their retirement accounts. Constantine capitalized on that desperation.  He gave them many confabulated answers, spun many deceits, and extracted more money for himself and Kenner in the process.

The defendants must be held to account for these serious crimes.  Their sentences must also send a message to others who may be tempted to swindle those whom they have the duty to protect.  But the defendants' sentencing submissions seek to minimize their conduct, blame third parties, perpetuate long-running falsehoods, and defy the jury's verdict.  They fixate on the diversion of investors' money to the Mexican real estate project and pretend that the entirety of the case "revolved around" that unauthorized investment, while ignoring the countless diversions of investors' money that were blatant cash transfers to the defendants' personal accounts and personal expenses.  The defendants' sentencing submissions also reflect the lives that they had prior to their convictions (and in the case of Constantine, even after his conviction)—a loving family, supportive friends, a close community, a profitable and prestigious career with all of its attendant perks and privileges. The defendants chose to gamble away those lives when they agreed to commit crimes.

The defendants are not entitled to the lenient sentences that they seek.  The defendants were not victims or unfortunate bystanders who were just trying to achieve profit for their investors.  They are thieves.  They stole investor money outright.  They committed their crimes knowingly and deliberately over the course of a decade.  They were convicted because of the actions they chose to take.  And the loss of some aspects of the defendants' pre-conviction lives—lives that most defendants who come before courts in this district can only dream of having—is not sufficient punishment for their crimes.  The defendants are not

entitled to special treatment because they had more wealth, or more supportive family and friends, than most defendants have.

The defendants sentencing submissions also make clear that neither Kenner nor Constantine are sorry for anything that they did.  It is one thing, and perfectly understandable, for a defendant to preserve his appellate rights by not taking responsibility for his criminal conduct.  But it is quite another thing—an astonishing thing—for these defendants to admit no wrongdoing at all, to show no humility, to concede not even an error in judgment.

For the reasons set forth below, the government urges the Court to sentence the defendants to a substantial sentence of no less than 20 years' imprisonment.

I.     FACTUAL BACKGROUND

The government realizes that the Court is already familiar with the offense conduct in this case, having presided over the nine-week trial and having issued multiple detailed opinions summarizing the evidence during post-trial litigation.  A comprehensive overview of the offense conduct and relevant background information is also set forth in the Pre-Sentence Investigation Reports for Kenner and Constantine, dated January 25, 2015 ("Kenner PSR"), and January 21, 2016 ("Constantine PSR"), respectively.  See Kenner PSR ¶¶ 10-46; Constantine PSR ¶¶ 12-48.

The following sections are therefore intended to provide only a high-level overview of the basic facts of the crimes for which the defendants were convicted.  For Kenner, those crimes consisted of the conspiracy to steal money from investors in a scheme involving the Hawaii land development project, Eufora, and the Global Settlement Fund (Count One), the conspiracy to launder proceeds of that scheme (Count Nine), three instances of wire fraud in furtherance of the Eufora aspect of the scheme as it related to hockey player investments (Counts Two through Four), and one instance of wire fraud in furtherance of the Led Better scheme (Count Seven).  For Constantine, those crimes consisted of the conspiracy to steal money from investors in the scheme involving the Hawaii land development project, Eufora, and the Global Settlement Fund (Count One), the conspiracy to launder proceeds of that scheme (Count Nine), three instances of wire fraud in furtherance of the Eufora aspect of the scheme as it related to hockey player investments (Counts Two through Four), and two instances of wire fraud in furtherance of the Eufora aspect of the scheme as it related to Nicholas Privitello's investment (Counts Five and Six).

A.      The Defendants

Kenner was a licensed financial advisor.  Over the course of his career, he held positions at several established financial firms before eventually creating his own company. See GX-2802R.  His college roommate—Joe Juneau, who went on to become a professional hockey player—introduced Kenner to a retired professional hockey player who had become a representative for an investment firm.  Tr. at 128-29.  Kenner took advantage of the connection and proceeded to build a clientele of professional hockey players.  See Tr. at 375 (in pitching his advisory services to prospective clients, Kenner told them "a long touching story" about how the retired player had been "conned by his advisor"); Tr. at 2913-2914; see, e.g., GX-726L; Tr. at 130.

Constantine was the founder and Chief Executive Officer of Eufora, a prepaid credit card company that has never been profitable.  See GX-8021R at 5 (Constantine stating in a deposition that Eufora was "not worth mentioning" because "it's not a profitable endeavor" and "it never has been to date").  Constantine also claimed to be a professional race car driver, but even that endeavor was not profitable.  See GX-8021R at 6, 13, 55 (Constantine stating in a deposition that his racing company was "basically defunct" and that he did not receive money from several of his sponsors); Tr. at 3667 (Constantine's team manager testifying that Constantine was not a professional race car driver because he did not make a living as a driver).

Constantine and Kenner were longtime business partners, since at least 2002, when both held positions as officers of Eufora.  C-265.

B.      Hawaii Project

Between approximately 2003 and 2006, Kenner led the Hawaii project—a plan to acquire and develop several parcels of land on the Big Island of Hawaii for profit.  Tr. at 2915-2916.  Kenner was responsible for raising funds for the project.  Tr. at 2920.  Kenner approached several of the investors that he advised—including Bryan Berard, Michael Peca, Darryl Sydor, Steve Rucchin, Owen Nolan, and Joe Juneau—and persuaded them to invest in the Hawaii project.  In furtherance of the investment, Kenner persuaded some of the investors to transfer bonds to Northern Trust Bank and open up lines of credit secured by those bonds.  Kenner represented that investor money from the lines of credit would be used for the Hawaii project.  Tr. at 3033-3036, 349-387, 2163-2165, 2720-2723, 137-138, 2063-2067.  However, Kenner and Constantine diverted those funds for their personal benefit.  GX-CHART-1 through GX-CHART-9.  To maintain the lines of credit during the course of the conspiracy and conceal their misuse, Kenner made a series of Ponzi-like transactions, drawing from one investor's line of credit to pay the interest payments on other investors' lines of credit.  GX-20 through GX-40.  In the end, by March 2009, all of the investors' lines of credits went into default, the investors received no advance warning from Kenner of the default, and the bank seized their collateral (the investors' bond accounts).  See GX-2112 through GX-2132 (default letters); GX-2162 through GX-2184 (bank statements showing more than $7.7 million in collective losses form the lines of credit alone); GX-506A (Kenner stating to Kristin Peca in a recorded call, "I'm saying sorry right now that you didn't get a call before Northern Trust collapsed those lines of credit, okay?").

From December 2004 to July 2005, Kenner siphoned millions of dollars out of the investors' lines of credit and to Kenner's and Constantine's personal benefit through the Centrum loan.  Specifically, Kenner used approximately $3.5 million gathered from four victims' lines of credit to purchase the Honuapo parcel of land in Hawaii.  GX-CHART-4. He then mortgaged the land to Centrum Financial Services, stating that the proceeds of the mortgage would go to the development of the Hawaii project.  GX-3702 (mortgage); GX-3703 (statement of use of loan proceeds).  Instead of using the proceeds for the Hawaii project, however, Kenner diverted the proceeds of the mortgage to Kenner's and Constantine's personal benefit.  GX-CHART-5.  Kenner used approximately $2.4 million to buy a personal stake in property in Mexico.  GX-2013; GX-2018.  Constantine used approximately $650,000 to buy a personal stake in luxury condominium units at the Palms resort in Las Vegas, Nevada. GX-4408.

Constantine and Kenner than arranged to get a windfall from the Hawaii project with the Urban Expansion loan.  The Urban Expansion loan was completely unnecessary: there were sufficient funds from the investors' lines of credit and the Centrum Loan to fund the Hawaii project, and Lehman was simultaneously offering to take a substantial stake.  Tr. at 4307-4308.  Nevertheless, by diverting the money from the investors' lines of credit and the Centrum Loan for their personal use and putting off the Lehman offer by one year, Kenner and Constantine created an opportunity for self-dealing—the Urban Expansion loan.  See GX-50.  Constantine solicited $3.5 million from another business partner, James Grdina, and Constantine and Grdina's company—Urban Expansion—loaned the money to the Hawaii project.  Tr. at 2363-2366.  Kenner agreed to the loan on behalf of the project.  GX-3802.  The

terms of the loan included a high interest rate (15%) and a hefty prepayment penalty

($2,000,000) if the loan was paid off in less than five years. GX-3802; Tr. at 2372

(prepayment penalty was Constantine's idea). Of course, at the time that the loan was entered

into, Lehman had already expressed interest in investing in the Hawaii project. Tr. at 4307-

4308. Sure enough, approximately ten months later, Kenner permitted Lehman to make their

proposed investment and Urban Expansion received a payout for the amount of the loan plus

the prepayment penalty (approximately $7 million). GX-2417; GX-2420. From there,

Constantine diverted money for his own and Kenner's personal benefit. GX-CHART-7; GX-

BINDER-6. The money diverted to pay back the Urban Expansion loan and prepayment

penalty would have otherwise been enough to significantly pay down the investors' lines of

credit and protect their bond accounts. GX-21.

      Constantine obtained a steady stream of proceeds from the Hawaii accounts

throughout the pendency of the Hawaii project. Constantine obtained more than $1 million in

cash from withdrawals from the victims' lines of credit, approximately $650,000 from line-of-

credit money laundered through the Centrum Loan, and approximately $2 million from line-

of-credit money diverted through the Urban Expansion loan. GX-41B; GXCHART-5; GX-

CHART-7. In each case, Constantine spent those funds for his own personal benefit.

      Kenner and Constantine kept Constantine's receipt of Hawaii funds hidden

from the investors. See, e.g., Tr. at 2164-2165 (Sydor); Tr. at 2724 (Rucchin); Tr. at 4851-

4852 (Gonchar). However, Constantine boasted to friends in the racing community about his

incoming cash. See Tr. at 3665, 3675 (Stewart testifying that Constantine "talked about a

deal that he had in Hawaii and a deal that he had in Mexico, always assuring me that when

those deals came to fruition, everything was going to be great and there would be plenty of

money for everybody"; testifying also that, at one point, Constantine showed him an ATM receipt reflecting a bank balance "in excess of $2 million"); Tr. at 3694 (Rosser testifying that Constantine said he "had some other deals cooking" and there "will be plenty of money").

   Constantine was involved in efforts to cover up his part in the Hawaii fraud. Constantine signed consulting agreements to justify the more than $1 million he received from the victims' lines of credit.  GX-5104.  Those consulting agreements, however, were a sham: the agreements were backdated, contained forged signatures, and purported to give money to Constantine for work that he did not do. See Tr. 4676-4677 (backdated); Tr. at 991-995, 3627 (signatures forged); Tr. at 2961-2963 (Manfredi testifying that Constantine did not work on the Hawaii project).  Constantine also took pains to avoid turning over bank records in related litigation to prevent others from discovering the true source of his funds.  See GX-7450 (Constantine stating in a text message to Kenner, "You need the settlement I STOP all subpoenas for CMG records as well"); GX-8021R at 83-84 (Constantine stating in a deposition (for a lawsuit pertaining to a racing deal) that he used his CMG account for "personal use, things like that, car payments, mortgages" and denying having used it for racing expenses); GX-8021R at 23-24, 67-68 (refusing to provide specific answers about the funds used to finance his racing activities).

  C. <u>Eufora</u>

   In 2002, Constantine started Eufora, a prepaid credit card company.  The original operating agreement listed Constantine as the President and CEO of the company and Kenner as the Secretary.  C-265; GX-210.

In a series of transaction from April 2008 to July 2008, Kenner solicited investments from various victims representing that the money would be used for Eufora.  See, e.g., Tr. at 470 (M. Peca testifying that Kenner told him that he "was investing in Eufora and that's where [his] money was going"); Tr. at 813 (K. Peca testifying that their "money was to be used just on some last minute filing of paperwork and legal work because they had the deal ready to go with the bank and they just needed to cover these last few costs to get everything going"); Tr. at 1913 (Nash testifying that he "was under the understanding that that money was going to be used for some upcoming commercials to finish off"); Tr. at 2171 (Sydor testifying that Kenner told him that the money would be used "for Eufora" to "get it over the hump and get everything finalized, in production").  During this time, Eufora was "desperate for funding and advertising dollars" and "needed to raise capital."  Tr. at 5190. Internal company emails—that included both Constantine and Kenner on the distribution list—showed that there was a persistent negative balance in the company's operating account. GX-4710, GX-4715 through GX-4722.  They also reflected an expectation that the individuals on the emails—including Constantine and Kenner—would be raising money for the company.  GX-4716 ("ETA of $200k?"); GX-4717 ("I have yet to hear from anyone on the ETA of the $200k or any other funding").  All the while, Constantine actively schemed with Kenner to use the money on themselves and their various debts.  See, e.g., GX-203A, GX-204A (Constantine discussing, in text messages with Kenner, the allocation of Nash's $100,000 in "eufora $" to various personal expenses); GX-7401 (Kenner informing Constantine, in a text message, that Peca's $100,000 Eufora investment "is in your account"); GX-7416 (Constantine stating, in a text message with Kenner sent 48 hours before Sydor's

and Ranford's Eufora investments, "If you can get me $ in the next 48 hours, I will go to Izbekistan on Wed."); see also GX-7401 through GX-7418 (text messages between Constantine and Kenner discussing the need to pay pending personal debts); cf. GX-7413 (Constantine stating, "Im going down in flames bro" and how he planned to use money from Eufora's value load account for personal racing expenses).  All of the money was transferred directly from the investors' bank accounts to Constantine's CMG bank account, without the investors' knowledge, and with Kenner signing the wire transfers on behalf of the investors. GX-753; GX-760; GX-5004; GX-1512; Tr. at 416, 1914, 2172, 2822.  Through subsequent wire transfers, Constantine then spent the money for his own and Kenner's benefit. GXCHART-10 through GX-CHART-13; GX-BINDER-8.

Afterwards, Constantine was involved in efforts to cover up the fraudulent nature of these transactions.  For example, Kenner told Nash that Eufora needed money to produce commercials and Nash invested with the understanding that his money would be put to that end.  It was not.  GX-CHART-11.  Nevertheless, after the investment, Constantine met with Nash in Eufora's offices and "was excited to show [Nash] the commercials that were made, that were in production, and [Nash] was impressed."  Tr. at 1916.  Later, in 2012, when Nash persisted in questioning Constantine about obtaining documentation of his Eufora investment, Constantine met with Nash in his office and instantly provided him with a backdated transfer document stating that Nash had received a 0.5% interest directly in Eufora as of April 2008. GX-764; Tr. at 1946-1947.  This transfer document was a sham: the interest was not reflected in Eufora's 2009 operating agreement, did not receive board or membership approval, and conflicted with Kenner's documentation listing Nash as having a 0.48% interest in Eufora as part of AZ Eufora Partners I. GX-210; K-228.  Similarly, Constantine executed

additional such transfer documents purporting to transfer interest in Eufora from former business partner Dan Kennedy to Constantine's entity CMG—presumably to later justify the wire transfers that went directly into CMG's account.  See C-266 (Kennedy's interest reduced from 10% to 8%); C-267 (Kennedy's interest reduced from 8% to 4%); Tr. at 5605-5606 (Kennedy testifying that Constantine came to him and said, "I really need to change your position once again" and that Kennedy "ended up signing or gifting another percentage" because he was not "going to see the upside" of any interest in Eufora).  However, those transfer documents were also a sham: the transfers conflicted with Eufora's filed tax returns for those years, which indicated that Kennedy (through his company C9 Consulting) retained a 9% interest in Eufora.  GX-4729; GX-4730.

        In a second series of transactions from December 2008 to May 2009 (within which fall Counts Two through Four), Kenner again solicited investments from various victims representing that the money would be used for Eufora.  See, e.g., Tr. at 2731-32 (Rucchin testifying that his "understanding it was just going to Eufora and just and into the company itself"); Tr. at 3497-98 (Murray testifying that he did not authorize any of his money to go to Kenner or Gaarn).  Again, in the time period leading up to, and during, this solicitation, Constantine actively schemed with Kenner to use the money on themselves and their various debts.  See, e.g., GX-7444 (Constantine asking Kenner in a text message around the time of Murray's Eufora investment, "Can you wire CMG a little dough? It's -$220"); GX-CHART-14 ($1,000 from Murray's Eufora investment diverted to CMG); GX-7448, GX-7449 (Constantine asking Kenner in a text message shortly before Rucchin's Eufora investment, "Any way to get Tom something small (like $5k) for Moreau case?");

GXCHART-16 ($5,000 from Rucchin's Eufora investment diverted to Constantine's personal attorney Tom Baker); GX-7419 through GX-7455 (text messages between Constantine and Kenner discussing the need to pay pending personal debts). All of the money was transferred from the investors' bank accounts to Eufora's bank account (controlled in part by C.R. Gentry); the money was then transferred from Eufora's bank account to Gaarn's bank account, and onwards for Kenner's and Constantine's benefits. GX-CHART-14 through GX-CHART-19; GX-BINDER-9. In particular, the wire transfers charged in Counts Two and Three represented investor money being diverted to Kenner's and Constantine's personal benefit, and the wire transfer charged in Count Four represented Kenner's use of investor money on a personal expense (reimbursement for Kaiser's construction work on properties in Paradise Valley and Hermosa Beach).

Constantine admitted that he knew about all of the money that came directly from the investors to the Eufora bank account. GX-503.1 (stating in a recorded call, "All the money that came to Eufora on behalf of the players, came directly from the players to Eufora . . . . their money went from their bank account to Eufora, LLC's bank account. I know exactly how much money they put in."). He also spoke to Kenner about having that money be diverted for his benefit. GX-7448 ("Waiting on CR"; "Any way to get Tom something small (like $5k) for Moreau case?"); GX-7449. Constantine then obtained proceeds from this series of fraudulently-induced Eufora investments, including a $1,000 cash payment, a $15,000 payment to his creditor Gilmartin, Magence & Ross to pay down a loan in his name for his personal stake in two Palms condominium units, and a $5,000 payment to his personal attorney Tom Baker to pay down his legal fees. GX-CHART-14 through GX-CHART-16; GX-8021R at 77-78 (Constantine stating in a deposition that Tom Baker was an attorney in

Arizona that he "use[d] from time to time"). In each instance, the funds were for Constantine's personal benefit.

Constantine was also involved in efforts to cover up the fraudulent nature of this second series of transactions. In order to paper over the fraudulent nature of the transactions, Kenner backdated a Eufora transfer document to make it appear as through Gaarn owned an interest in Eufora in August 2005, so that the series of money transfers from Eufora to Gaarn in 2008 could be (falsely) explained as a selling of that interest. GX-TG-2; Tr. at 2500. Constantine, in tandem, backdated Eufora's 2005 tax return to mimic the same purported transfer. GX-4728 (Eufora 2005 tax return signed by Constantine in 2009). In his August 2010 conversation with Kenner at Home Depot, Constantine (speaking to Kenner) discussed the Eufora fraud involving Gaarn and discussed covering it up:

> What do you think is gonna happen when seven hundred thousand dollars shows up, going from the players that already bought it the first time, to the bank account, back to Tim Gaar-- to Eufora's bank account -- back to Tim Gaarn's account, to your account? Like, this is not gonna look good, right? There's so much shit that you're not thinking about in this whole equation that needs to just be put to bed and move forward productively, and I'm here to ask you to not blow, burn down the house. Don't burn down the house. It's a good thing that we have. I think it could fix everything.

GX-4500; see also GX-4500 ("Do you remember the things that happened? I mean, you think that this is only to protect me? I'm protecting you; I'm protecting Tim too. I'm protecting everybody.").

In December 2009, Constantine—then the CEO of Eufora—solicited Privitello for an investment in Eufora. See GX-208.1 through GX-208.11; GX-508.1, GX-508.9 (Eufora board of managers appointing Constantine as CEO and President of Eufora in August

2009).  In doing so, Constantine represented that, "upon our receipt of $200,000, Eufora's members will formally execute a Membership Transfer Consent Form and amend the company's Operating Agreement to reflect a 1.5% Interest in Eufora, LLC which shall be held by: Nicholas L Privitello," directing Privitello to wire the money to the attorney escrow account of Ronald Richards. GX-208.1, GX-208.7, GX-208.9. Constantine further represented that the funds would be used for Eufora's business expenses.  Tr. at 1433.

At the time that Constantine solicited this investment from Privitello, Eufora was nearly in default with one of its suppliers (Bancorp) and lenders (Brent Nerguzian), and Constantine himself had overdue legal bills at a firm in Florida (Carey Rodriguez Greenberg) that had represented him on a personal matter. GX-508.3 through GX-508.8 (Constantine stating in a recorded call that "we're all in a very tough time financially" (referring to Eufora), that he was not being paid anymore, and that he was seeking to raise $3-5 million for Eufora, including for a half-a-million payment to Brent Nerguzian that was "imminent"; stating also, "I'm asking for . . . the authority to do whatever it takes to pay Brent"); GX-8021R at 197-200 (Constantine stating that he had overdue legal bills, that he was broke, and that he "borrowed" money to pay prior legal bills).  Constantine exhibited haste in his conversations with Privitello and emphasized that he needed the money transfer to happen quickly.  Tr. at 1448 (Privitello testifying that, "As per Tommy it was urgent"); GX-208.6 (requesting a wire transfer or cashier's checks "or we will be delayed").

Based on Constantine's representations, Privitello wired $200,000—in increments of $150,000 (Count Five) and $50,000 (Count Six)—to the Ronald Richards account.  GX-3301, GX-3302, GX-3304 through GX-3306.  The money was wired from

Privitello's accounts in Long Island, New York, to Richards' account in Los Angeles, California.  On the wire transfer, Privitello noted that the money was being wired "FOR 1.5% INTEREST/OWNERSHIP IN EUFORA LLC." GX-3306.

Constantine interposed Richards as an intermediary in the transaction, which he later used to obfuscate whether he had received Privitello's funds in the first place or knew their purpose.  GX-208.7 and GX-208.9 (emails from Constantine directing Privitello to send wire transfers to the Law Offices of Ronald Richards); GX-503.2 (Privitello noting, in a recorded call, "I wrote right on my wire it's for 1.5 percent of the thing," and Constantine subsequently responding, "you said I even wrote it on my wire. Who received that wire? . . . you could have wrote 'fuck you Ronnie and your mother' on that.").

Eufora did not then—or at any time thereafter—formally execute a Membership Transfer Consent Form or amend the company's Operating Agreement to reflect the 1.5% interest Constantine had promised Privitello.  Tr. at 1458; GX-210.  Constantine subsequently disavowed any ownership interest on the part of Privitello in Eufora.  GX-503.6 (stating to Privitello in a recorded call, "You weren't shareholders.").  In addition, Constantine spent Privitello's money immediately, sending $150,000 to Bancorp for a Eufora expense and sending $15,000 to Carey Rodriguez Greenberg—an unauthorized personal expense.  GX-CHART-20.  Both transfers were complete by December 15, 2009.  During that time period, Constantine never offered to return Privitello's money to him.  Tr. at 1602-1603.

Nevertheless, several months later, after Privitello began making efforts to recoup his losses, Constantine used double-speak, evasion, and deflection of blame to deny his fraud.  GX-503.5 (asking Privitello in a recorded call, "Why didn't you take it back before

we spent it?"); GX-503.3 (stating in a recorded call that, "It was not me saying I want you to send it there. It's, it's Johnny Kaiser who's controlling the investors and the investment saying I'm going to send it there" and explaining that "the reason that . . . your money was directed to the lawyer's office instead of to us is because if we saw how much money was going directly to us, we'd know exactly where it came from and who" but "if it goes to Ron Richards' office and then we get one wire from Ron Richards, then we have no idea who the money came from into Ron Richards"); GX-503.4 (stating in a recorded call that "when we look at the inbound wire transfers that went into Ron Richards' account, . . . [the money] came from Theodore Hughes, Bob Rizzi and you" (referring to Privitello)); GX-503.7 (stating in a recorded call, "You asked me why it went to Ron Richards' account. I have no fucking idea.").

D.    Global Settlement Fund

In May 2009, Kenner and Constantine launched the Global Settlement Fund. Constantine and Kenner worked together in pitching the GSF to investors.  See, e.g., GX-7453, GX-7454 (discussing a GSF pitch in text messages).  Constantine induced investors to contribute money to the GSF based on oral representations at in-person meetings that the money would be used to fund litigation against Ken Jowdy to recover an investment in Mexico.  See, e.g., Tr. at 684-685 (Pecas); Tr. at 1814 (McKee); Tr. at 2749 (Rucchin); Tr. at 3545 (Murray); GX-503.8 (Constantine stating in a recorded call that the money "was for the lawsuit against Ken Jowdy").[1]  Constantine directed investors to send their money to the law

---

[1] Constantine's representation to Tyson Nash included that GSF money would be used to buy out the investment interests of the "bad apples"—namely, Juneau, Moreau, Nolan, and Myrick.  Tr. at 1920-1921, 1944.

firm account of Ronald Richards; Constantine did not disclose that he (Constantine) would be in control of the money, rather than Richards.  See, e.g., Tr. at 688 (K. Peca); Tr. at 1815 (McKee).

Meanwhile, Constantine and Kenner schemed to use the bulk of the money on themselves and their various debts.  See, e.g., GX-7451 (Constantine referring, in text messages, to the negotiation of a settlement with Rick Rozenboom for the airplane loan in Kenner's and Gonchar's names); GX-7452 (Constantine referring, in text messages, to his home being in foreclosure, his intent to "talk each one" of the interested buyers "out of making an offer by telling them about the pending litigation," and his plan to "sell" the home "to Eric" Edenholm).  At the time that Constantine and Kenner were soliciting investments for the GSF, both were in default on millions of dollars in loans.  See GX-8021R at 3-4, 8-9 (Constantine stating in a deposition that he was moving of his home due to foreclosure and that his assets have "all been basically foreclosed upon"; "I own nothing anymore"); GX-8021R at 169-170 (Constantine stating in a deposition that he was being sued for a personal guaranty on a loan that he defaulted on from 82nd Street, LLC (the holding company for the airplane hangars)); Tr. at 1697 (bills and debt on hangars past due); GX-3502 (Palms loan three months past due in payments); Tr. at 3273 (airplane loan past due in payment).  All of the money was transferred from the investors' bank accounts to Ronald Richards' bank account.  GX-1102.

Kenner and Constantine subsequently sent email communications to investors designed to obfuscate the fraud and provide cover against future allegations.  Constantine alluded to his practice of writing such cover-up emails in his conversation with Kenner at Home Depot: "They're not gonna fucking pinch the guy who drove the getaway car, they're

gonna pinch the guy that fucking robbed the bank.  And I know you think I robbed the bank,
but I have answers for everything.  Everything.  In writing, and I'm trying to make it stop."
GX-4500.  In the emails, Kenner and Constantine described additional investment properties
that investors would acquire in exchange for participating in the GSF as "significant assets."
GX-757.  In reality, those properties were not significant assets: the investors were not told
that the hangars were in bankruptcy, that the planes were in repossession, that the Palms units
were in default, and that Eufora was in such a dire state that it was "not worth
mentioning" and that its patent had been pledged as collateral for a loan.  GX-8021R at 5; see
GX-769 (patent security agreement); Tr. at 817-818.  Constantine directed GSF funds to
those investments not for the investors' benefit but for his and Kenner's, as either
Constantine or Kenner or both were personally liable for loans on each one.  GX-3428
(Constantine liable for payments for hangars); GX-4212 (Kenner was liable as guarantor for
planes); GX-3507 and GX-3508 (Constantine was borrower and Kenner was guarantor on
Palms units).  The emails made no mention of Kenner and Constantine using GSF funds for
personal uses.

Constantine then directed the distribution of the funds from Richards' bank
account.  Tr. at 3806-3820.  Only $225,000 went to fund the litigation against Jowdy.  GX-
RR-1.  The remaining approximately $4 million in funds went to Constantine's and Kenner's
pet projects and personal benefit, including to pay down loans for airplane hangars (for which
Constantine was borrower), airplanes (for which Kenner was guarantor), Palms units (for
which Constantine was borrower and Kenner was guarantor), and Eufora (for which
Constantine was CEO), as well as to pay off pending bills for past projects including racecars
and equipment, legal fees relating to a racing sponsorship lawsuit in Florida, a tequila

company in Mexico, an effort to build a helipad, an attempted acquisition of Playboy

Enterprises, Constantine's rent, and straight cash back to Kenner.  GX-80; GX-BINDER-11;

GX-506B (Kenner stating in a recorded call that "Constantine fucked it up" (referring to the

GSF) and "defrauded us").

   To the extent that Kenner and Constantine promised ownership interests in

additional property in the emails that they sent to investors, that too proved to be a false

promise.  The investors acquired none of those assets; instead, Constantine and Kenner sold

them off to other unrelated individuals.  The hangars were sold off to other unrelated

individuals. GX-3434; GX-3437.  So were the Palms condos.  GX-3503; GX-3504.  There are

multiple conflicting ownership arrangements for the Falcon 10 plane.[2]  And Eufora as a

company "is not really operational right now" and has no reliable records regarding

investors' interests.  Tr. at 5303; see Tr. at 5317 (D'Ambrosio testifying that defense color

chart C-279 accurately reflected investor interests "based on [his] memory" but later

testifying that it was not accurate because "C.R. is not on the flowchart"); see, e.g., Tr. at 548,

1844 (M. Peca and McKee testifying that they have "no idea" if they own any piece of

Eufora today).

---

  [2] See GX-4218 (May 29, 2009 operating agreement naming Constantine,
Edenholm, and Ferguson as owners); Tr. 4884-86 & GX-4602 (June 8, 2010 email and operating
agreement naming Constantine, Gonchar, and new unrelated investors as owners (with agreement
backdated June 1, 2009)); GX-4246 (March 15, 2011 operating agreement naming Constantine
and another individual as owners); GX-8012C at 4 (April 5, 2012 bankruptcy petition listing
Constantine as a 50% owner); GX-4601 (October 15, 2012 email from Constantine stating that he
"los[t] the airplane to foreclosure" and that "Gonchar subsequently bought it from the bank along
with a number of other unrelated individuals who invested in the airplane with him" and that
Constantine "now manage[s] the company for [Gonchar] who owns the airplane with the others").

Constantine later described his diversion of GSF funds for personal benefit with Kenner, including his paying down of a delinquent airplane loan with First Source Bank (Rick Rozenboom) that Kenner and Gonchar were responsible for:

> [E]verything's done and buttoned up with a bow on it. Exactly what you want. You -- I know you don't believe me, but the thing with First Source -- done. You guys don't owe anything. The hundred and ten thousand dollar deficiency I got rid of. . . . the First Source thing is wrapped, done. The airplane is fucking gone. Done. The building, the penthouses, everything, it's being done.

GX-4500. By the end, all of the money in the GSF was gone. Tr. at 430; GX-767.

E.   Continuing Conspiracies

Throughout the course of their fraud, Constantine and Kenner conspired to transfer proceeds of their fraud in a manner that concealed or disguised the nature, source, and control of the proceeds. See, e.g., GX-CHART-10 through GX-CHART-13 (after diversion of investor money to Constantine (unauthorized purpose), Constantine made multiple wire transfers to Kenner and for personal expenses); GX-CHART-14 through GXCHART-19 (after diversion of investor money to Gaarn (unauthorized purpose), Kenner (himself and through directing Gaarn and Kaiser) made multiple wire transfers before the money was ultimately routed to personal expenses); GX-CHART-1 and GX-CHART-2 (after diversion of investor money to son's account (unauthorized purpose), Kenner made multiple wire transfers under $10,000 to direct the money to himself).

Constantine and Kenner also consistently failed to provide the investors with documentation of their investments. See, e.g., Tr. at 678 (Pecas received no official paperwork of Eufora investments); Tr. at 2844 (Ranford nothing that his "biggest issue was not getting the documentation").

In August 2010, Constantine confronted Kenner in a conversation at Home Depot about their long-running, multi-faceted fraud against the investors. During the conversation, which was recorded, Constantine stated, "It's all coming down. And it's gonna be bad, dude. It's gonna be bad for them; it's gonna be bad for all of us," noting subsequently that the "fucking FBI is all over this fucking thing." GX-4500. Constantine acknowledged that he and Kenner were "in the trenches together" and advocated working together and continuing the conspiracy so that they could "all go back to [their] lives, whatever's left of them." GX-4500. During the conversation, Constantine also referred to himself and Kenner as co-conspirators in a bank robbery, stating, "They're not gonna fucking pinch the guy who drove the getaway car, they're gonna pinch the guy that fucking robbed the bank." GX-4500.

## II.   PROCEDURAL HISTORY

On October 29, 2013, Kenner and Constantine were indicted and charged with conspiracy to commit wire fraud, conspiracy to commit money laundering, and multiple counts of substantive wire fraud. ECF No. 1. Prior to trial, the government obtained superseding indictments containing the same charges but simplified in other respects. ECF No. 214.

On July 9, 2015, following a nine-week trial, Kenner was found guilty of six of the nine counts with which he was charged (Count One, 18 U.S.C. § 1349, conspiracy to commit wire fraud; Counts Two through Four and Seven, 18 U.S.C. §§ 1343, wire fraud; Count Nine, 18 U.S.C. § 1956(h), conspiracy to commit money laundering), and Constantine was found guilty of all of the seven counts with which he was charged (Count One, 18 U.S.C. § 1349, conspiracy to commit wire fraud; Counts Two through Six, 18 U.S.C. §§ 1343, wire fraud; Count Nine, 18 U.S.C. § 1956(h), conspiracy to commit money laundering).

In the four years since the verdict, the parties have briefed and argued motions relating to forfeiture, motions for a judgment of acquittal, and motions for a new trial.  ECF Nos. 346, 370, 382, 407, 438, 453, 483, 484, 485, 499, 500, 513, 521, 522, 523, 634, 668, 675, 681, 704, 712, 716, 719, 752.  The parties have also briefed objections to the Probation Office's Presentence Investigation Report (the "PSR") and the appropriate calculation of the advisory range of imprisonment under the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.").  ECF Nos. 381, 402, 414, 471.  Oral argument on the PSR objections is scheduled for November 14, 2019.

III.   <u>APPLICABLE PENALTIES</u>

The government sets forth below the applicable Guidelines ranges of imprisonment, mandatory restitution amounts, and fines.  Forfeiture has been addressed in separate submissions.  ECF Nos. 401, 607, 751.

   A.   <u>Imprisonment</u>

In their sentencing memoranda, Kenner and Constantine continue to lodge objections to the Guidelines ranges calculated in their respective PSRs, including the loss amounts and every enhancement that Probation and the government have determined to be applicable.  The government has responded to the defendants' PSR objections in separate briefing and remains available to address questions from the Court regarding the PSR objections at oral argument.  The government therefore declines to re-engage with those objections here.

For purposes of sentencing, the government sets forth below the appropriate Guidelines calculations for each defendant.  These calculations adjust the loss amounts by limiting them to the specific scheme to defraud that was charged in the indictment and proven

at trial, thereby excluding uncharged frauds.  The calculations otherwise include every enhancement that Probation and the government have determined to be applicable.

        1.    <u>Kenner</u>

        The government respectfully submits that the appropriate Guidelines calculation for Kenner—<u>i.e.</u>, the calculation set forth in the PSR minus the uncharged frauds—is set forth below (Kenner PSR ¶¶ 57-79):

<u>Conspiracy to Commit Wire Fraud and Wire Fraud</u>

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2B1.1(a)(1)) | 7 |
| Plus:  Loss Greater Than $9.5 Million (§ 2B1.1(b)(1)(K)) | +20 |
| Plus:  Involved More Than 10 Victims (§ 2B1.1(b)(2)(A)) | +2 |
| Plus:  Sophisticated Means (§ 2B1.1(b)(10)(C)) | +2 |
| Plus:  Role in the Offense as Organizer or Leader (§ 3B1.1(a)) | +4 |
| Plus:  Abuse of a Position of Trust (§ 3B1.3) | +2 |
| Plus:  Obstruction of Justice (§ 3C1.1) | <u>+2</u> |
| Adjusted Offense Level: | <u>39</u> |

<u>Conspiracy to Commit Money Laundering</u>

| | |
|---|---|
| Offense Level for the Underlying Offense (U.S.S.G. § 2S1.1(a)) | 31 |
| Plus:  Convicted Under 18 U.S.C. § 1956 (§ 2S1.1(a)(2)(B)) | +2 |
| Plus:  Role in the Offense as Organizer or Leader (§ 3B1.1(a)) | +2 |
| Plus:  Obstruction of Justice (§ 3C1.1) | <u>+2</u> |
| Adjusted Offense Level: | <u>37</u> |

<u>Greater of the Adjusted Offense Levels</u>

| | |
|---|---|
| Total Offense Level: | <u>39</u> |

Kenner has a criminal history score of zero, and thus a criminal history category of I.  (Kenner PSR ¶ 82).  Based on the total offense level of 39 and a criminal history category of I, Kenner's Guidelines range of imprisonment is 262 to 327 months.  Because this Guidelines range is in Zone D of the Sentencing Table, the Guidelines "do not authorize a sentence of probation."  U.S.S.G. § 5B1.1 cmt. 2; see also U.S.S.G. § 5C1.1(f) ("If the applicable guidelines range is in Zone D of the Sentencing Table, the minimum term shall be satisfied by a sentence of imprisonment.").  As a result, Kenner "is ineligible for probation."

      2.    <u>Constantine</u>

The government respectfully submits that the appropriate Guidelines calculation for Constantine—<u>i.e.</u>, the calculation set forth in the PSR minus the uncharged frauds—is set forth below (Constantine PSR ¶¶ 60-81):

<u>Conspiracy to Commit Wire Fraud and Wire Fraud</u>

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2B1.1(a)(1)) | 7 |
| Plus:  Loss Greater Than $9.5 Million (§ 2B1.1(b)(1)(K)) | +20 |
| Plus:  Involved More Than 10 Victims (§ 2B1.1(b)(2)(A)) | +2 |
| Plus:  Fraud During Bankruptcy Proceeding (§ 2B1.1(b)(9)(B)) | +2 |
| Plus:  Sophisticated Means (§ 2B1.1(b)(10)(C)) | +2 |
| Plus:  Role in the Offense as Organizer or Leader (§ 3B1.1(a)) | +4 |
| Plus:  Obstruction of Justice (§ 3C1.1) | <u>+2</u> |
| Adjusted Offense Level: | <u>39</u> |

<u>Conspiracy to Commit Money Laundering</u>

| | |
|---|---|
| Offense Level for the Underlying Offense (U.S.S.G. § 2S1.1(a)) | 32 |

Plus:  Convicted Under 18 U.S.C. § 1956 (§ 2S1.1(a)(2)(B))                    +2

Plus:  Role in the Offense as Organizer or Leader (§ 3B1.1(a))               +2

Plus:  Obstruction of Justice (§ 3C1.1)                                      <u>+2</u>

Adjusted Offense Level:                                                      <u>38</u>

<u>Greater of the Adjusted Offense Levels</u>

Total Offense Level:                                                         <u>39</u>

   Constantine has a criminal history score of three, and thus a criminal history

category of II.  (Constantine PSR ¶ 88).  Based on the total offense level of 39 and a criminal

history category of II, Constantine's Guidelines range of imprisonment is 292 to 365 months.

Because this Guidelines range is in Zone D of the Sentencing Table, the Guidelines "do not

authorize a sentence of probation."  U.S.S.G. § 5B1.1 cmt. 2; <u>see also</u> U.S.S.G. § 5C1.1(f) ("If

the applicable guidelines range is in Zone D of the Sentencing Table, the minimum term shall

be satisfied by a sentence of imprisonment.").  As a result, Constantine "is ineligible for

probation."

  B. <u>Restitution</u>

   The Mandatory Victims Restitution Act ("MVRA") requires that a defendant

convicted of specific offenses "in which an identifiable victim or victims has suffered a . . .

pecuniary loss" be ordered to make restitution to the victim.  18 U.S.C. § 3663A(a)(1), (c)(1).

A "victim" is any "person directly and proximately harmed as a result of the commission of

an offense," and, "in the case of an offense that involves as an element a scheme, conspiracy,

or pattern of criminal activity, any person directly harmed by the defendant's criminal

conduct in the course of the scheme, conspiracy, or pattern."  18 U.S.C. § 3663A(a)(2).[3]

Restitution extends to all losses caused "by the specific conduct that is the basis of the offense

of conviction."  Hughey v. United States, 495 U.S. 411, 413 (1990); id. at 420 ("the loss

caused by the conduct underlying the offense of conviction establishes the outer limits of a

restitution order").

"[T]he purpose of restitution is essentially compensatory: to restore a victim, to

the extent money can do so, to the position he occupied before sustaining injury."  United

States v. Boccagna, 450 F.3d 107, 115 (2d Cir. 2006).  The "primary and overarching" goal of

the MVRA is "to make victims of crime whole, to fully compensate these victims for their

losses and to restore these victims to their original state of well-being."  Id. (quoting United

States v. Simmonds, 235 F.3d 826, 831 (3d Cir. 2000)).  It is "significant that the statute

mandates that courts 'order restitution to each victim in the full amount of each victim's

losses as determined by the court[.]'"  United States v. Quarashi, 634 F.3d 699, 703 (2d Cir.

2011) (quoting 18 U.S.C. § 3664(f)(1)(A)).

In the context of theft crimes, compensable losses are measured by "the value

of the property on the date of the damage, loss, or destruction . . . less . . . the value (as of the

date the property is returned) of any part of the property that is returned."  18 U.S.C.

§ 3663A(b)(1)(B); see also United States v. Bengis, 631 F.3d 33, 40 (2d Cir. 2011) ("A

---

[3]  See United States v. Boyd, 222 F.3d 47, 50-51 (2d Cir. 2000) (when the offense of conviction is a conspiracy, all convicted co-conspirators may be ordered to make restitution to all victims of the conspiracy, even if the specific acts that caused the victims' losses constitute uncharged or acquitted conduct); but see United States v. Pollak, 844 F.2d 145, 149-52 (3d Cir. 1988) (a defendant named in counts charging an overall scheme to defraud may not be required to pay restitution with respect to counts on which he was acquitted).

victim's pecuniary losses may be considered lost 'property' where the victim has been deprived of 'money to which it is entitled by law.'" (internal alteration omitted)); United States v. Boccagna, 450 F.3d 107, 112 (2d Cir. 2006) (victim's out-of-pocket loss offset by the value of recouped collateral).  The "law recognizes a number of reasonable measures of property value."  Boccagna, 450 F.3d at 115.  The measure need not be complicated, however; "complexity does not inhere in value determinations where the property lost is cash . . . ."  Qurashi, 634 F.3d at 699.  In addition to the value of lost money, victims are also entitled to recoup the time value of money, or prejudgment interest.  Id. at 704.  This is for good reason: in a case like this one where victims are deprived of money earmarked for savings and investment, the law recognizes that "[m]oney is not static" and people "do not store their reserves under mattresses for safekeeping."  Id. at 703 (noting this in the context of corporate funds).

Restitution may be offset only by funds that are actually received by a victim. United States v. McGinn, 787 F.3d 116, 131 (2d Cir. 2015); see also United States v. Cadet, 664 F.3d 27, 34 (2d Cir. 2011) (requiring offset for funds actually received).  "The case law can be restated in a simple principle: restitution may not result in double recovery."  United States v. Dharia, 284 F. Supp. 3d 262, 270 (E.D.N.Y. 2018) (internal quotation marks omitted).

"Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence."  18 U.S.C. § 3664(e).  The government bears the burden of proving the amount of the loss sustained by a victim as a result of the offense. Id.  The defendant bears the burden of proving offsets those losses.  See also United States v. Smathers, 879 F.3d 453, 461 (2d Cir. 2018).

The court may apportion restitution among the defendants and make the varying restitution amounts joint and several, see 18 U.S.C. § 3664(h) and United States v. Klein, 476 F.3d 111, 114 (2d Cir. 2007), or it may order each defendant to make full restitution and make that liability joint and several as well, United States v. Nucci, 364 F.3d 419, 422 (2d Cir. 2004). The court must explain its decisions regarding apportionment and joint and several liability on the record. See United States v. Desnoyers, 708 F.3d 378, 390 (2d Cir. 2013); see, e.g., United States v. Boyd, 222 F.3d 47, 50 n.1 (2d Cir. 2000) (example explanation).

In accordance with the forgoing principles, the government sets forth the following amounts of restitution based on the evidence presented at trial in this case. The amounts reflect the total moneys that each investor contributed to the Hawaii project, Eufora, and the GSF, as reflected in the counts of conviction, less the amounts recovered from Lehman and Northern Trust Bank. At a minimum, the Court should order the defendants, jointly and severally, to pay restitution to each of the victims listed below, with prejudgment interest:

| Victim | Kenner | Constantine |
|---|---|---|
| Bryan Berard | $781,852 | $406,852 |
| Sergei Gonchar | $899,221.00 | $899,221.00 |
| John Kaiser | $200,000 | $200,000 |
| Jay McKee | $250,000 | $250,000 |
| Glen Murray | $1,800,216 | $1,800,216 |

| Tyson Nash | $257,447 | $257,447 |
| Owen Nolan | $1,656,357.00 | $1,656,357.00 |
| Michael Peca | $1,601,839 | $1,601,839 |
| Nicholas Privitello | $0 | $200,000 |
| William Ranford | $700,000 | $700,000 |
| Steven Rucchin | $1,168,092 | $1,168,092 |
| Darryl Sydor | $1,216,200 | $1,216,200 |

In order to avoid double recovery upon an order of joint and several liability, the court should make clear in its restitution order that a given victim will not be allowed to receive compensation in excess of his loss.  See Nucci, 364 F.3d at 424.

The government notes that it has limited its proposed restitution amounts to the scheme charged in the indictment and proven at trial.  Therefore, the Court need not determine the value of the Mexico properties for purposes of offsetting restitution.  Many of the investors were separately invested in Mexico land development projects.  Assets received in connection with uncharged frauds (if they were in fact received) should not offset losses suffered in connection with the charged frauds.

Federal law accords the victims the "right to full and timely restitution as provided in law," 18 U.S.C. 3771(a)(6), and the "right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding," 18 U.S.C. § 3771(a)(4), and provides an opportunity for victims "to submit information to the

probation officer concerning the amount of the victim's losses" and "file with the probation officer a separate affidavit relating to the amount of the victim's losses subject to restitution." 18 U.S.C. § 3664(d)(2)(A)(iii), (vi). Multiple victims have availed themselves of that opportunity here. In their affidavits, several of the victims claim additional losses related to "lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense," which is another compensable loss under the MVRA. 18 U.S.C. § 3663A(b)(4). The Court may credit these claims on their face, United States v. Gushlak, 728 F.3d 184, 193-94 (2d Cir. 2013) (rejecting challenge by defendant to district court's reliance on affidavits in determining restitution), or require additional documentation or testimony on the issue, 18 U.S.C. § 3664(d)(4), (6).

To the extent that the Court ultimately determines that the victims suffered an actual loss that is greater or lesser than the loss amounts listed in the table above, the Court should order the defendants to pay restitution to the victims in the amount of that actual loss. See 18 U.S.C. § 3663A; Kenner PSR ¶¶ 131-32 (restitution is mandatory); Constantine PSR ¶¶ 138-39 (same).

    C.    Fine

Title 18, United States Code, Section 3572(a) sets forth the factors to be considered by the Court before imposing a fine, in addition to the factors set forth in Section 3553(a). Those factors include: (1) the defendant's income, earning capacity, and financial resources; (2) the burden that a fine will impose upon the defendant and any dependents; (3) any pecuniary loss inflicted upon others as a result of the offenses; (4) whether restitution is

ordered; (5) the need to deprive the defendant of illegally obtained gains from the offenses; and (6) the expected costs to the government of any imprisonment.  18 U.S.C. § 3572(a).

The Guidelines provide, in turn, that a district court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine."  U.S.S.G. § 5E1.2(a) (emphasis added).  The Guidelines further provide that "[t]he amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive."  Id.  The defendant bears the burden of demonstrating an inability to pay a fine at present and in the future.  See United States v. Camargo, 393 F. App'x 796, 798 (2d Cir. 2010) (upholding imposition of a fine despite the fact that Probation and the defendant argued the defendant was currently unable to pay such a fine because court concluded defendant was likely to be able to pay a fine in the future); United States v. Salameh, 261 F.3d 271, 276 (2d Cir. 2001).

    1.   Kenner

The statutory maximum fine is $250,000 for each of Counts One through Four and Seven and $500,000 for Count Nine (Kenner PSR ¶¶ 125-26), and the Guidelines fine range for the offenses of conviction is $25,000 to $500,000 (Kenner PSR ¶ 128).  See U.S.S.G. § 5E1.2(c)(3).   As detailed above, it is the government's position that Kenner should be ordered to pay forfeiture and restitution.  As a result, the Court's consideration of "whether restitution is ordered"; whether a fine will impose a "burden" on Kenner; and whether a fine, taken together with other sanctions, is "punitive," will depend on the amount of forfeiture and restitution the Court ultimately imposes.

2.    Constantine

The statutory maximum fine is $250,000 for each of Counts One through Six and $500,000 for Count Nine (Constantine PSR ¶¶ 132-33), and the Guidelines fine range for the offenses of conviction is $25,000 to $500,000 (Constantine PSR ¶ 135).  See U.S.S.G. § 5E1.2(c)(3).  As detailed above, it is the government's position that Constantine should be ordered to pay forfeiture and restitution as well.  As a result, the Court's consideration of "whether restitution is ordered"; whether a fine will impose a "burden" on Constantine; and whether a fine, taken together with other sanctions, is "punitive," will depend on the amount of forfeiture and restitution the Court ultimately imposes.

Regardless of the magnitude, Constantine has failed to demonstrate that he is unable to pay a fine because he has refused to provide Probation with the required information necessary to determine his financial resources.  Constantine PSR ¶ 116.

IV.    LEGAL STANDARD

A "district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted).  Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented."  Id. at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     the need for the sentence imposed—

    (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)     to afford adequate deterrence to criminal conduct; [and]

    (C)     to protect the public from further crimes of the defendant.

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2)(D).  "[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the Court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation."  18 U.S.C. § 3582(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988).  Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  18 U.S.C. § 3661.  Thus, the Court should first calculate the applicable Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

V.     ARGUMENT

As explained in greater detail below, a substantial sentence of incarceration is warranted for both Kenner and Constantine given the nature and seriousness of their criminal

offenses; their history and characteristics; the need for both specific and general deterrence; and the need to avoid unwarranted sentencing disparities. See 18 U.S.C. § 3553(a). For these reasons, the government respectfully submits that a sentence of imprisonment of no less than 20 years is sufficient, but not greater than necessary, to satisfy the goals of sentencing. Id. The government further submits that Kenner's role as a trusted investment advisor, and his betrayal of that trust, is reason to impose an enhanced sentence on Kenner relative to Constantine.

      A.      <u>The Nature and Seriousness of the Offenses</u>

      Kenner and Constantine ran a decade-long scheme that resulted in millions of dollars of losses and compromised the savings of numerous investors. Multiple victims testified at trial about the impact that Kenner and Constantine's scheme had on their lives, both financially and personally: how they were "in shock" and "taken aback" when they found out that their retirement accounts had been completely compromised, and the "sense of desperation" they felt in attempting to get answers about where their savings had gone and realizing that Kenner was "the only avenue" they had.

      Constantine argues that the Guidelines' range related to fraud offenses is the subject of long-standing criticism and not a legitimate benchmark in these circumstances. However, the defendant's argument is misplaced in this case. The concerns expressed by courts with respect to the fraud Guidelines refer to select circumstances where the loss amount does not correlate to the extent of actual victimization. See <u>Algahaim</u>, 842 F.3d at 798 (food stamp fraud defendants' loss enhancements based on amount of cash defendants exchanged with confidential informant and customer in return for benefits); <u>United States v. Corsey</u>, 723 F.3d 366, 368 (2d Cir. 2013) (wire fraud defendant's loss enhancement based on

"conspiracy to defraud a non-existent investor of three billion dollars"); United States v. Gupta, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012) (securities fraud defendant's loss enhancement based on unpredictable monetary gains made by others); United States v. Emmenegger, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (securities fraud defendant's loss enhancement based on "a kind of accident" related to a single victim's security procedures); United States v. Adelson, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (securities fraud defendant's loss enhancement based on decline in stock price multiplied by millions of outstanding shares); United States v. Johnson, No. 16-CR-457, 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018) (wire fraud defendant's loss enhancement based on gain from fraudulent trades).  Those same concerns—of loss being untethered to concrete victimization—do not pertain to this case.  The evidence at trial proved that the defendants caused the victims actual losses.

   For these reasons, the nature and seriousness of the defendants' offenses— which were complex, spanned years and involved both defendants' active participation— warrant a substantial sentence of incarceration.

  B. <u>History and Characteristics</u>

   Even though this is Kenner's first conviction, and Constantine's first conviction in relation to a crime of fraud, the duration of the scheme in this case demonstrates that both have devoted significant periods of their life to committing fraud.  The defendants spent more than a decade engaged in this sophisticated scheme proven at trial, which itself involved one sophisticated deceit after another.  It is notable that the defendants did not halt the scheme at raising money for the Hawaii project, "the lion's share" of which Constantine claims was

"invested in the Mexico project for the benefit of the victims."  ECF No. 718 at 8.  Instead, the defendants unhesitatingly launched a second aspect of the scheme (Eufora), and then a third (GSF), the lion's shares of which were used for the defendants' personal expenses.

Both defendants argue that they should obtain a lenient sentence because imprisonment would cause pain to their families.  While a defendant's family circumstances are one factor the Court should consider as part of its Section 3553(a) analysis, the law is clear that the very considerations upon which the defendants rely—including the potential for his incarceration to impact his children—are <u>not</u> proper grounds for a downward departure at sentencing.  Nor do they weigh heavily in a Section 3553(a) analysis, given that, as the case law and the Guidelines recognize, <u>any</u> imprisonment of <u>any</u> parent or supportive family member has adverse consequences for a defendant's family.  Absent extraordinary circumstances, a defendant with a family that will be adversely affected by his sentence should be treated no differently than other defendants with families.

Second Circuit courts "have consistently held that ordinary family responsibilities do not warrant [a downward] departure," in part because "innumerable defendants" could demonstrate that their parental responsibilities will be affected by incarceration.  <u>United States v. Johnson</u>, 964 F.2d 124, 128 (2d Cir. 1992) ("Disruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration.").  The Guidelines also state that "family ties and responsibilities are not ordinarily relevant" to determining whether a downward departure is warranted.  U.S.S.G. § 5H1.6.  <u>See also</u> <u>Koon v. United States</u>, 518 U.S. 81, 95 (1996) ("the defendant's family ties and responsibilities" are a "discouraged" basis for a departure (citing U.S.S.G. § 5H1.6)).  Only "extraordinary family circumstances" may justify departure from

the Guidelines, because courts are "reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing." Id. at 129 (emphasis added). Downward departures for "family circumstances" are "impermissible in less compelling circumstances, especially where other relatives could meet the family's needs." United States v. Selioutsky, 409 F.3d 114, 119 (2d Cir. 2005). Although the law related to "downward departures" largely developed in the pre-Booker era, the logic and reasoning of these decisions applies to a Section 3553(a) analysis as well—the unfortunate fact that imprisoning a defendant will cause hardship to his family, including his children, is not a reason to reduce an otherwise appropriate sentence. It is another consequence of a convicted defendant's choices.

As a result of the demanding standard, the Second Circuit repeatedly overturned a downward departure based on family circumstances, including where a defendant was the parent of small children. See, e.g., United States v. Mateo-Ruiz, 112 F. App'x 790, 792 (2d Cir. 2004) (holding that the district court "acted outside of permissible limits" by granting a departure where the defendant was a single mother of a four-year-old); United States v. Madrigal, 331 F.3d 258, 260–61 (2d Cir. 2003) (district court abused its discretion in making a downward adjustment where the defendant had six children, the three youngest had "very serious problems," and the defendant's parents were having trouble taking care of the children because "the court did not conclude that [the defendant] was the only person capable of providing adequate care for the youngest children" and there was evidence that "the family as a whole remained cohesive," the older three children were doing well, and the defendant's "extended family was also available for caregiving"); United States v. Carrasco, 313 F.3d 750, 756–57 (2d Cir. 2002) (family circumstances were not a basis for

departure where the defendant's father was ill and where the defendant provided "some support for his three children" because "being the father of three children is in no sense an exceptional circumstance" and because the defendant's siblings could help financially support the defendant's father); United States v. Ruttner, 4 F. App'x 66, 68–69 (2d Cir. 2001) (holding that the fact that the defendant "has three young children cannot, without more, give rise to a downward departure," and that the defendant "failed to demonstrate that there is anything extraordinary about his family circumstances other than the presence of three young children").[4]

In the rare case where the Second Circuit affirmed a downward departure based on family circumstances, or a district court adopted such a departure, the family circumstances were truly dire, involving what would be tantamount to the complete destruction of a family and the rendering of children without any care or support.  See, e.g., United States v. Galante, 111 F.3d 1029, 1034–36 (2d Cir. 1997) (defendant was the sole

---

[4] See also, e.g., United States v. Cutler, 520 F.3d 136, 164–66, 171–72 (2d Cir. 2008) (downward adjustment not supported where defendant had three children who partially depended on his financial support, a brother who suffered from mental retardation and cerebral palsy, and an elderly mother-in-law because he was not the primary care-giver for either of them); United States v. Khan, 94 F. App'x 33, 38 (2d Cir. 2004) (holding that the district court erroneously departed from the Guidelines because the record did not suggest that the defendant "was the primary—let alone sole—support of any of the many people that he claims to support"); United States v. Osorio, 305 F. Supp. 2d 319, 322 (S.D.N.Y. 2004) (holding that because "the hardships [the defendant] and his family must now face are no more extraordinary than those faced by any defendant who is sentenced to a term of imprisonment and has a family that depends, in part, on his or her financial support," and that "there is nothing so extraordinary in this case beyond what may commonly befall the young children of incarcerated defendants"); United States v. Jimenez, 212 F. Supp. 2d 214, 216 (S.D.N.Y. 2002) (holding that family circumstances alone were not grounds for departure where the defendant was "a single mother with three children who will suffer grievously from her absence," one child had "significant disabilities," and the defendant's family, who could care for the children, "are themselves so poor that they have been unable to maintain a household in the United States for their own children").

source of support for his wife and two children, his father was "critically ill and on life support," and his mother, who earned $7,000 a year working in a factory, could require financial support in the near future); United States v. Johnson, 964 F.2d 124, 129–30 (2d Cir. 1992) (defendant was a single parent and where "[t]he number, age, and circumstances of [the] children all support[ed] the finding that [the defendant] faced extraordinary parental responsibilities"); United States v. Alba, 933 F.2d 1117, 1122 (2d Cir. 1991) (district court appropriately granted a downward adjustment where the defendant, his wife, his mother, and his two daughters lived with his disabled father, who needed the defendant to get him in and out of his wheelchair, and worked two jobs to support his family).[5]

_____

[5] See also, e.g., United States v. White, 301 F. Supp. 2d 289, 291–92 (S.D.N.Y. 2004) (defendant was the sole caregiver of six children ranging from age five to age 14, one of whom had a behavioral disorder and another of whom had asthma, and there were no adults "willing or able to take care of the children"); United States v. Mateo, 299 F. Supp. 2d 201, 212–13 (S.D.N.Y. 2004) (defendant's "two young children have been thrust into the care of [the defendant's] relatives," and "will be raised apart from both biological parents for as long as [the defendant] is incarcerated," presenting an "especially acute" harm to the defendant's newborn); United States v. Greene, 249 F. Supp. 2d 262, 266–67 (S.D.N.Y. 2003) (defendant was the sole provider for three children: one who was born addicted to heroin and cocaine who was placed in foster care at birth, one whose natural mother died of AIDS when he was a child, and one who suffered from learning and mental disabilities); United States v. Rose, 885 F. Supp. 62, 63–66 (E.D.N.Y. 1995) (defendant helped support his 69-year-old retired grandmother, who did not have Social Security or a pension and who had raised the defendant and was raising four children whose parents were unable to care for them); United States v. Ekwunoh, 888 F. Supp. 369, 373 (E.D.N.Y. 1994) (defendant was the sole source of support for her three children and oldest child was suffering from emotional difficulties); United States v. Rodriguez, No. 94 CR. 39 (RWS), 1994 WL 381488, at *1 (S.D.N.Y. July 19, 1994) (defendant's child had diabetes and the child's father, a co-defendant, faced a "substantial prison sentence," noting that applying the guidelines "could deprive a medically-disadvantaged child of the attention and care of both its parents"); United States v. Gerard, 782 F. Supp. 913, 914-16 (S.D.N.Y. 1992) (defendant, "a model parent," was the sole provider for her two children because the father "openly disavowed his responsibility to pay child support and . . . had virtually no contact with his children for the past six years"); United States v. Mills, No. 88 CR. 956 (CSH), 1990 WL 8081, at *2–3 (S.D.N.Y. Jan. 17, 1990) (probation officer had "never encountered a defendant so deprived of any other responsible adult who could take over for the children" the defendant was caring for, noting the "extreme vulnerability of very young children, and the quite startling lack of any other adult available to

To read about other defendants who have—and have not—been found eligible for special consideration related to "family circumstances" is to see how clearly this defendant does not present "extraordinary circumstances" supporting a departure either from the Guidelines or as part of the Section 3553(a) analysis.

The defendants' children are fortunate enough to have a mother, a comfortable home, and sources of financial support aside from the defendant.  The very letters of support on which the defendants rely demonstrate the extraordinary network of family, friends and community members who are available and willing to support his wife and children.

Ultimately, any difficulties faced by the defendants' families as a result of his imprisonment will not be caused by this Court.  The blame will lie solely with the defendants.  This is unfortunate, but no different than in any of the hundreds of other cases in this district and in this Circuit in which a spouse, a parent, and a friend decides to commit crimes.  The only difference is that, in this case, unlike so many others, there is an extensive support network already in place for the defendant's family.

C.    Seriousness of the Offenses and Deterrence

The deterrent effect of the defendants' sentences is critically important.  It will send a message to both the defendants and similarly situated individuals that this type of criminal conduct will not be tolerated.

---

help"); United States v. Gonzalez, No. S 88 CR. 559 (CSH), 1989 WL 86021, at *4 (S.D.N.Y. July 27, 1989) (making a downward adjustment where the defendant had three children because it "would place minor children at hazard" not to, because her children's father was incarcerated and her limited family in the area could not care for them).

Specific deterrence is important because both Kenner and Constantine have refused to acknowledge not just the criminality of their conduct, but any mistakes or wrongdoing, and have repeatedly deflected blame to others.  The lack of any remorse—or any pretense of remorse—causes serious concerns about the defendants' ability or desire to reform.  Indeed, post-trial filings and letters submitted in support of the sentencings have contained numerous indications that both defendants continue to perpetuation falsehoods from the scheme, deflect blame, and maintain a cadre of followers who are completely blind to the truth.  Kenner's sentencing submissions show a continued commitment to "the finger pointing, blaming others, all these elaborate conspiracies" that his victims described at trial, and incessantly repeat his claims that government witnesses lied at trial and government agents engaged in misconduct.  Constantine's sentencing submissions include a multitude of letters from supporters who claim that he did not commit any crimes at all and that he was wrongly prosecuted.  In these circumstances, the defendants' lack of remorse, efforts to deflect responsibility, and continued insistence that they have done nothing wrong are a basis for withholding leniency.  See, e.g., Robinson v. Heath, No. 12-CV-2116, 2013 WL 5774544, at *11 (E.D.N.Y. Oct. 24, 2013) (Garaufis, J.) ("lack of remorse and failure to acknowledge responsibility consistently have been recognized as constitutionally-permissible factors that courts may take into account in determining an appropriate sentence") (citing cases); see, e.g., United States v. Jeffers, 505 F. App'x 223, 227 (3d Cir. 2012) (the Court may consider the defendant's behavior at trial in imposing sentence).

In addition, the need for general deterrence is also high.  Sophisticated fraud schemes like the defendants' scheme are difficult to detect and disrupt.  Indeed, the evidence

at trial evidence demonstrated that numerous previous attempts to hold the defendants accountable— through arbitration, civil litigation, and criminal investigation—failed.  That is all the more reason to impose a serious sentence when such disruption is finally successful. See, e.g., Harmelin v. Michigan, 501 U.S. 957, 988 (1991) (noting that "since deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties"). Moreover, because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."  See, e.g., United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White–Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005)) (internal quotation marks omitted)); United States v. Heffernan, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Drago Francesco, Roberto Galbiati & Pietro Vertova, The Deterrent Effects of Prison: Evidence From a Natural Experiment, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence.").

<u>CONCLUSION</u>

For the foregoing reasons, the government respectfully submits that the Court should sentence the defendants to a substantial sentence of no less than 20 years' imprisonment, which is sufficient, but not greater than necessary, to advance the goals of sentencing.

Dated:  Brooklyn, New York
        November 1, 2019

                                        Respectfully submitted,

                                        RICHARD P. DONOGHUE
                                        United States Attorney
                                        Eastern District of New York

                        By:     /s/
                                        Saritha Komatireddy
                                        J. Matthew Haggans
                                        Assistant U.S. Attorneys
                                        (718) 254-7000

cc:    Clerk of the Court (JFB)
       All Counsel of Record (By ECF)
       Philip A. Kenner, Defendant <u>Pro Se</u> (By Certified Mail)