November 8, 2019

The Honorable Judge Bianco
U.S. District Court – EDNY
100 Federal Plaza
Central Islip, NY 11722

Your Honor,

Defendant Kenner respectfully submits a reply to the government-sentencing memo (*ECF No. 765*), which was submitted one month after Kenner's submission (*ECF No. 736*).

At sentencing, "the Court is virtually unfettered with respect to the information it may consider."  *United States v. Alexander*, 860 F.2d 508, 513 (2d Cir 1988).

*The government's shocking pigheadedness to the real evidence – specifically their-own forensic accounting to "**TRACE THE MONEY**" -- continues without ethical boundaries… (Appendices providing the court with detailed calculation breakdowns, etcetera, infra)*

- *Appendix 1 – Credits against loss charts (infra, at about 53);*
- *Appendix 2 – Government sentencing memo lies (infra, at about 73); and*
- *Appendix 3 – Top 10 -- non-reusable prosecutorial lies -- A.k.a. Impossible future testimony (rendering the verdict <u>not timeless</u>) (infra, at about 93)…*

*Loss claims…*
Because the government re-focuses their loss claims on the Hawai'i partners, the first Hawai'i question from the government should have been – "*Did the individuals in the Hawai'i partners expect or know that Kenner was the Managing Member of the Hawai'i partners*?"  The July 2006 disclosure letter that every Hawai'i partners signed confirmed it (*Tr.1132-33 [Kaiser "did not read" testimony]*) – whether or not Kenner's investors "who blindly trusted him" would verify their actual knowledge or not.   Assuming the obvious answer was "*YES*" – then Kenner had the By-Laws to govern his actions (nothing else) (*Tr.4458*, referencing *Kenner trial exhibit 25*) – and <u>HE DID</u>.    Nevertheless – the Managing Member of any company is explicitly governed by his corporate operating document.  *That is the law.*   And -- Kenner followed them without error, variance or concealment (*with the Hawai'i partners management team, multiple FBI proffers to confirm; 3500-CM-2-r – 3500-JK-1-r*)…

1

*10-years too late…*

The government should have analyzed the actual transactions versus the Hawai'i partners governing document, *supra*, to determine (before bringing an indictment) whether or not fraud occurred based on the documented governance; and certainly not basing their prosecutorial hopes on a "*memory test*", wholly counting on every witness to re-cant previous testimony to secure their theories as "having merit" (as forgotten as many as 10 years after the real time events in the case), *infra*.   As such, it was completely misleading to ask if *passive-equity investors* knew whom any of the individuals involved in 3rd party transactions were in the project, or any specific detail; *nor should they* (ask or know) – insinuating any lack of knowledge results in criminal activity.

If you ask the same questions of the Cabo project members (including Kenner-himself) – then everyone would go to jail, with all of Kaiser's exposé information never-known by Kenner's Baja Ventures 2006 LLC members until February 2019 (*ECF No. 628*) – *just like every company in America under that outrageous standard.* It is a faulty prosecutorial standard – but it was clever enough to fool the Court and the jury!   It should not stand as a proper method of prosecution or a verdict of confidence…

- As the Court knows, there was not one transaction under Kenner's management that could be construed as for Kenner's "benefit" in detriment to the Hawai'i partners; *not one*!

The government produced nothing but a summation table (*ECF No. 765 at 30-31, including two un-named individuals from the superseding indictment – ECF No. 214* [Murray and Gonchar]), without ever representing "but for" and causation applications to the alleged "loss" calculations for the others.   The Court knows that this is not sufficient.   Also, there is no nexus to the $200,000 they document for John Kaiser (*ECF No. 765 at 31*), perhaps simply trying to back-door a future nexus argument for appeal defense of no investor related to Kenner existing in the EDNY; *none.*[1]   The government clearly avoids "the required" in the hopes that the Court will not notice their negligence and simply side with their rhetoric.   No back-up documentation was or even could be provided to substantiate their obligation to define within "a preponderance of the evidence" that they have separated the "fraud" from the "non-fraud" factors for the Court.   They have not because they cannot.   Kenner has, *infra* (again).

---

[1] Kaiser's only relevant testimony claims he sent money to Ronald Richards's trust account for "*three other individuals*", not himself (*Tr.1058-59, 1339*, *re-verifying it*).

*Government-forfeiture-36* and *government-forfeiture-44...*

- The government persistent refusal to admit to and accept as the specific evidence **they submitted to the Court**[2] "supporting" Kenner's trial testimony, confirmed (1) the loans to Jowdy were real, (2) the loans were authorized by the Hawai'i corporate operating agreement, (3) the knowledge of the loans was re-confirmed by Michael Peca at trial (as decided by the "*group*"); and (4) John Kaiser confirmed to the FBI in October 2010 (as the Managing Member of the Hawai'i partners) that "*never got money back from Jowdy/Mexico*" (*3500-JK-1-r at 3*), etcetera.

- The government's stubbornness completely and unequivocally destroys all prosecutorial credibility of alleged victims the government could only defend post-testimony with *faulty memory, confusion and mistakes*[3] for their 100s of "inconsistent statements" (*ECF No. 440 at 16*); but amazingly, they <u>never</u> vehemently defended their 2015 testimonies as the truth, <u>*just mis-remembered*</u>!

*The government's avoidance of detailed loss calculations...*

Notwithstanding the fact that the government could not prosecute the same case theories again (*See Appendix 3, infra*); with the post-trial findings (thru *Brady*-esque submissions by the government, perhaps by self-indicting mistakes), the following exculpatory discoveries would expose the majority of the government witnesses' "*I was never told*" and "*I don't remember*" claims with empirical evidence and destroy character witnesses credibility (while stealing from friends & family and lying directly to the FBI); including but not limited to:

1. *Government-forfeiture-36* and *government-forfeiture-44*:
   a. Confirming Kenner neither stole the Hawai'i money, nor used it to buy his Mexico equity (or anything);

---

[2] *Government-forfeiture-44* traced 100% of the funds that were loaned to Jowdy from the documented 2004 Hawai'i loans (**proving the government lied at trial to prejudice Kenner**). And – *government-forfeiture-36* traced 100% of the funds used by Jowdy (a 3rd party to the instant case) to fund the $6 million-plus down payment to the seller of the Cabo san Lucas property (**proving the government lied at trial to prejudice Kenner**).
- None of those funds benefitted Kenner or are traced to his assets – specifically <u>not</u> Baja Ventures 2006; **none of them in spite of the government's wishes...**

[3] *United States v. Dunnigan*, 507 U.S. 87, 94 (1993) ("A witness perjures herself when "she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of *confusion, mistake, or faulty memory*.")

2. The Arizona Attorney Tom Baker disclosures:
   a. Confirming 19 Hawai'i partners (of the 26, including Peca, Berard, Rucchin, and Sydor from the instant case) signed 7-page disclosures about the suing Jowdy in Arizona in 2008 "***for the Hawai'i loans***";
3. The Northern Trust subpoena LOC documents:
   a. Confirming that Peca, Berard, Nolan, Rucchin and Sydor all signed significant individual LOC packages annually; including:
      i. *Letters of Authorization* (confirming the unfettered access to their LOC funds as "investments" in the Hawai'i partners),
      ii. *Extension of Credit* forms (confirming the investment amount of the Hawai'i partners),
      iii. Annual *Disbursement Request & Authorization* forms (confirming the specific amount used by the Hawai'i partners thru the date of their signature),
      iv. Annual *Master Note* (to reconfirm the one-year extension on their open LOC),
      v. Annual *Pledge Agreements* (to reconfirm the one-year extension on their open LOC and its collateral account),
      vi. Annual *Securities Account Control Agreements* (to reconfirm the one-year extension on their open LOC and its collateral account), *etcetera*.
4. The Kaiser-Privitello fabricated Mexico contract (with FBI proffer lies to cover-up: *3500-JK-7* and *3500-NP-5 at ¶ 4, 5; cover-up fraud at ¶ 9, 10*);[4] and
5. The Kaiser-Sconzo thefts and hidden documents received 3-20-2014 via fax from Sconzo (including 2 checks totaling $200,000 stolen by Kaiser -- delivered post-trial as: *"victim - Frank Sconzo & Willy" at 15-17*).

*The government's own evidence destroys their theories…*

Kenner has unequivocally dissected and exposed the government "theories" with their-own documents and evidence.   The government can only counter the arguments with a *faulty memory, confusion and mistakes* rebuttal, *supra*.   As such, the government continues to raise its ire towards Kenner (for exposing the lack of forfeiture nexus thru *government-forfeiture-36*), and virtually no loss in the instant case (specifically based on 2nd Circuit and Supreme Court case law precedents) coupled by the gross admissions of 3rd party actors (with Jowdy deemed innocent by

---

[4] For an alleged fraud that was insinuated but not charged, Los Frailes (Mexico) was mentioned over 25 times during the trial – and presented breadth to the government's unproven theories of decades of widespread malfeasance.

the government from 2009 thru at least 2016).   Kenner has done nothing more than fight thru the never-ending morass of lies and exercise his Constitutional rights. The government advocates punishing him for it.

*Credits against loss...*

Ken Jowdy and Northern Trust Bank settled with various Kenner investors, *Appendix 1 infra*.   These settlements occurred _after_ Kenner led relentless legal litigations efforts **with the investors** as named Plaintiffs until his November 13, 2013 arrest and detainment; the arrest relying heavily on the actions of two Jowdy employees (Kaiser and Berard -- per the NY Daily News arrest day article written by Jowdy's close friend, Michael O'Keefe).   The further the government's scheme is exposed, the more the government doubles-down to demand unprecedented incarceration, perhaps a decade more than any relatable case with significantly more funds at stake (*See Kenner sentencing memo – ECF No. 730 at 177-78*).   The Kenner investors in the superseding indictment (*ECF No. 214*) have a maximum of $8.675 million "invested" (gross) in the "objects" of the instant case.   That _must_ be the high-water mark for the loss factor, with credits against loss (*infra*) levied in concert with case law to determine the most applicable amount; not government *ipsi dixit.*

The government's "concealment" prosecution – with a "memory loss" Q&A style examination -- grossly contradicts every effort Kenner spearheaded from the earliest date of detection and public announcements of the various misdeeds uncovered related to Jowdy (in the Mexico-Hawai'i dealings in late 2006) and Constantine (in the Eufora-GSF investigations in late 2009).[5]

- That is the pure contradiction of "concealment" under every definition.
  - *"Disguise", "camouflage", "suppress", "cover-up"...*

Kenner (1) filed a multitude of public lawsuits, (2) exposed the wrongdoers to his investors and the courts, (3) cooperated with multiple FBI interview requests, (4) recorded and produced the Constantine diatribe (at Home Depot, only exposing his propensity for fabrications and incomprehensible analogies – *Tr.4425*)[6], and (5)

---

[5] The Court should note that when Kristen Peca – *a non-Kenner-client* – spoke with Kenner for 5-hours in 2012 (recorded for the FBI), Kenner told Kristen Peca to "*trace the money*" (*Tr.4594*).   That is not the act of concealment.

[6] Constantine attorney, LaRusso, confirms his empathy for Constantine's indecipherable analogies (*Tr.4425*):
> *A [Kenner]: Well, I remember the reference to the bank robber and the getaway car and Mr. Constantine was trying to make a reference to Mr. Jowdy, either being the*

returned to Mexico with various investors to meet with law enforcement and the investors' attorneys for years _after_ Kenner's jailhouse beating to deter Kenner from pursuing those who stole from himself and his investors.

- The Home Depot recording, allegedly full of conspiratorial evidence (according to the government who hears only what they want to hear and not the actual ramblings spoken by Constantine, only) was turned over immediately by Kenner to Rudy Giuliani's investigative group, which included a former CIA operative. Kenner was not represented by them at the time of the recording disclosure.

- If any conspiratorial admissions or insinuations were present, the investors' attorneys certainly had ample connections to the Second Circuit entities to establish a criminal investigation if they thought it had any veracity.   The investors' attorneys knew the Constantine ramblings were just that, and replied about the same rhetoric weeks later as "_predictable_" (_ECF No. 668 Appendix at 82-85_).   The entire recording begins with Kenner discounting anything Constantine was about to say but recorded it for the Eufora attorneys nevertheless:

> _Constantine: "So, I know you are not going to believe anything I tell you, but I'm gonna to try anyways."_
>
> _Kenner: "OK."_

_Gross misrepresentations continue throughout the government-sentencing memo -- as if the truth does not exist (and Kenner hasn't debunked it undeniably) (Appendix 2)..._

One -- In spite of forensic accounting evidence they-themselves presented, _supra_, the government is consistent with its insults to the Court and the defendant's right to fairness, by claiming "_Kenner used approximately $2.4 million to buy a personal_

---

_bank robber or driving the getaway car. And I couldn't follow his analogy at the time, which was somewhat common when Mr. Constantine was trying to make analogies for me to try to explain situations that may be similar._

**Q [Constantine attorney LaRusso]: I know what you mean.**

_These same trial attorneys claimed in reply to Constantine's IAC that he had a propensity for making up stories to re-create the history around a simple event._
- Ockham's Razor is the scientific principle that explains when there are many factors and explanations in play, the simplest one is usually the most apt to be correct.

*stake in property in Mexico.*" (*ECF No. 765 at 8*).[7]  By now – this has been debunked ad nauseum.

- As the Court knows, the forensic money tracing in *government-forfeiture-36* and *government-forfeiture-44* proved their trial theory was not true (*See summation lies, infra*) – but the government continues to ignore their-own evidence and lie to the Court – again (to salvage a forfeiture demand that will fail without this nonsense accepted by the Court).   Yet – later in their memo, they try to run from their repeated slander of Kenner – and the fake "*thefts in Hawai'i to buy Mexico property*" – by claiming "*They fixate on the diversion of the investors' money to the Mexican real estate project and pretend that the entirety of the case 'revolved around' that unauthorized investment…*" (*ECF No. 765 at 3*).
  - This is certainly the case because the Court deemed the Constantine-GSF diversions to be **$17,077** (*ECF No. 501 at 60*), and the **$800,000** of Eufora private stock purchases to be bona fide purchases for value, requiring a significant *offset* (of approximately 96%) – and no government valuation ever done, which is required to prove the current value, if any loss at all; *See Leonard*. [8]

- Although the government "victim" table (*ECF No. 765 at 30-31*) is not supported by any back-up data (as required by statute), the lion's share of the "loss factor" they claim **is** from the Hawai'i project initial investments (***despite the government not separating the alleged fraud and non-fraud factors in the case – or recognizing the alleged transgressions occurred after the solicitation of the investment funds; which were governed by the corporate control document***) (*Tr.4458*) (*Kenner trial exhibit 25, introduced at Tr.4520* – authorized "*lending*" and "*payments to 3rd parties*").

---

[7] If this nonsense had any validity, then Kenner and his Baja Ventures 2006 partners would have a $6.5 million capital account in the Cabo san Lucas project.  *Government-forfeiture-36* proves they have $4.1 million invested.   The government records show that Jowdy stole $1.6 million of those funds from the Stumpel deposit of 5-23-2005 to Jowdy's LOR Management account (and was sued for it in Mexico in 2008 -- only terminated in 2012 after John Kaiser gave his umpteenth "forgery" lie testimony; proven as *another forgery fraud by Kaiser* on a 2012 FBI recording)…And, Jowdy *only* documented $2.5 million to the Baja Ventures 2006 capital account on the Lehman Brothers closing documents.

[8] *United States v. Leonard*, 529 F.3d 83, 92 ("A fraud may involve the misrepresentation of the value of an item that does have some value (in contrast to an item that is worthless). Where, for example, a defendant fraudulently represents that stock is worth $40,000 and the stock is worth only $10,000, the loss is the amount by which the stock is overvalued (*i.e. $30,000*).)"

- o Kenner has attached an additional loss chart (*Appendix 1*) for the Court's simplified benefit...

- The Second Circuit opined in *United States v. Ebbers*, 458 F.3d 110 (2d Cir 2006) – "**"[t]he loss must be the result of the fraud**." *Id*. at 128.   "**[l]osses from causes other than the fraud must be excluded from the loss calculation**." *Id.*

Two – the government claim Kenner was a financial advisor (*ECF No. 765 at 6*). ***Kenner never was***.   Kenner was a business manager (a glorified accountant); never regulated by FINRA (*Tr.2476*) (as the government knew), but presented an erroneous "*standard of care*" and "*duty*" argument to the Court, prejudicing Kenner. The government possesses Kenner's "business management agreements" with his clients – wholly disconnected from FINRA activity and regulation; presenting the bargained-for agreements between the parties (*Tr.3516*).  In fact, the government knew that Kenner was no longer registered under FINRA licenses by the time the alleged "instances" of illegal activity occurred in the instant case (*Tr.2480*); the "loan" transfers to Jowdy (*Appendix 2, "At 6"*) per the December 7, 2004 agreement (*3500-KJ-2 at 24-25*).

*The jury was fooled...*
Accepting the known diversion as an accurate "duty of care" standard, the jury's first read-back during deliberations proves the government scheme was successful.  If the FINRA regulations on Kenner were true – the government would have charged Kenner with "Investment Advisor fraud", but they did not -- because they knew Kenner was not -- and it was another non-provable action against Kenner, <u>never a financial advisor</u>.  The government chose to "back door" the tainted nonsense thru their expert (*Tr.2477 et.al.*), who should have been excluded thru a properly conducted *Daubert* hearing.

- Instead the government further misrepresents Kenner's contractual role with his clients and demands an "*enhanced sentence on Kenner*" (*ECF No. 765 at 36*).

Regardless of Kenner's contractual role with his clients, the government cannot refute (while *claiming* Kenner concealed transactions from his clients) that:

(1) Kenner sued his billion-dollar publically traded company in 2003 when Kenner caught them stealing from his clients thru a mutual fund scheme (costing Kenner over $1 million personally in legal fees to protect his clients); and

(2) Kenner initiated all of the 2007 Nevada, 2007 Mexico, 2008 Arizona, and 2009 California litigation versus Jowdy when Jowdy's plethora of schemes were first discovered – with all investors represented by independent counsel; and

(3) Kenner was the participating leader in the disclosures of the Constantine frauds (Eufora and GSF) that were investigated and documented by Giuliani's NY investigative team (led by Attorney Michael Stolper).

None of those _public acts_ – related to _all_ of the transactions in the instant case – resemble "concealment" even under the loosest of government definitions, just the transparent opposite (as the evidence revealed).

- "[A] Judge assessing a proffer of expert scientific testimony under Rule 702 should also be mindful of other applicable rules [under the Federal Rules of Evidence], "including Rule 403, which permits exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." _Daubert v. Merrell Dow Pharms., Inc._, 509 U.S. 579, 595, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) (internal quotation marks and alteration omitted).

  - That was clearly the case here.

Three -- The government concealment thru "forgery" argument (of the Kaiser signatures) deserves its own hearing – because the government knows they duped the Court by never admitting the two "_ink_" signatures that the government and Kaiser **_recovered from Kaiser's home_** on the eve of trial (_Appendix 3, #1_).

- The Court knows that the government never gave the "ink" versions to the signature expert, with the back-story of recovering them from Kaiser's 10-year possession (_Tr.3622_).

This government "forgery" epiphany was **_after_** telling the Court in 2014 that Kaiser's signature was "_real_" on the photocopies they recovered from the Hawai'i partners' files at Kenner's home, "_just a signature from a blank document Kaiser had previously signed_"…

- How could the 2014 "authentic" signature (allegedly added to a fabricated agreement after-the-fact – with both signatures different) -- then become "pure-forgeries" after Kaiser turned over the "_ink_" versions that were in his possession for 10-years prior to trial (_Tr.993_, retrospectively claiming – "_it doesn't look like my signature_")?

9

- o  Please note that no "blank" documents were recovered from Kenner's home with signatures of anyone (waiting for another superimposition).

- But – the government's forensic expert had to blow the "**photocopy**" signatures up 20x to describe the intimate details and subtle reproductive anomalies of what Kaiser and the government called "real" in 2014?

- The expert testified that he was only given the photocopies (*GX-5104, introduced at Tr.3622-23*)[9] – obviously, _never_ been alerted to the "*ink*" versions found at Kaiser's home after 10-years in his possession.   The sheer magnitude of the government's expert scam, alone, deserves a new trial – considering the government presented an expert (considered above reproach to a jury) -- and **hid** the "*real 'ink'*" from him to consider authenticity of the photocopies (clearly an enormous consideration of the fraud the "expert" needed to weigh in his evaluation) (*See Appendix 3, #1*).

  > *It is a mind-blowing position that could _never_ be tried again, now that the government fraud has been exposed to this Court.*

- Incrementally, the Court should note that Hawai'i partners COO Manfredi _also_ told the FBI during his 2010 proffer (*3500-CM-2-r at 1*) that _he was aware of the agreements between the Hawai'i LLCs and Constantine._  It was more incredible testimony that Manfredi "*could not remember*" 5-years later in 2015 (*Tr.2960*) – even after being shown his own FBI proffer notes (*Tr.2997-99*) – and personal emails with Constantine (*Tr.3005-08*).

---

[9] The government signature expert confirms he was only given the photocopies of Kaiser's signature to review – never the "*original 'ink'*" version, defying all stdsd in Berger (1935) (*Tr.3622*):

> *Q: I will show you what's been admitted into evidence in this case as Government's Exhibit 5104 and the documents contained therein. Mr. Osborn, are those the documents that you were asked to analyze?*

> *A [Government signature expert Osborne]: Exhibit 5104 is a series of two financial consulting agreements, and I was asked to perform examinations of those documents with specific respect to a signature appearing on the last page of each.*

> *Q: Just so we know what you are looking at or what you were looking at. This is the consulting agreement that you were asked to look at?*

> *A [Government signature expert Osborne]: One of the two, yes.*

- o Furthering mystifying the "*memory loss*" fraud on the Court -- Manfredi also testified that he met face-to-face with Constantine in Scottsdale, Arizona before Kaiser signed the first agreement in 2004 (*Tr.3004*).
- o Clearly the record confirms that Kaiser knew who Constantine was in 2004; with Kenner, Manfredi and Kaiser the only three management members in the Hawai'i project -- and Manfredi having been Kaiser's best friend at the time (*Tr.957*), and only a recent acquaintance of Kenner; *unless Manfredi concealed his meeting as COO from Kaiser.*

- If Manfredi did not lie to the FBI in 2010 – then ==*where are the real consulting agreements that Manfredi proffered*==?
    - o Again – it is unexplainable using any evidentiary standard.

- Referred to as a *Napue* violation, if it is established that the government knowingly permitted the introduction of false testimony reversal is "**virtually automatic.**"  *United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir 1975) (citing *Napue v. Illinois*, 360 U.S. 264, 269, 3 L. Ed. 2d 1217, 79 S. Ct. 1173 (1959)), *cert denied*, 429 U.S. 819, 97 S. Ct. 65, 50 L. Ed. 2d 80 (1976).  Where the government was unaware of a witness' perjury, however, a new trial is warranted only if the testimony was material and "the Court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *Sanders*, 863 F.2d at 226; see also *United States v. Seijo*, 514 F.2d 1357, 1364 (2d Cir 1975) (The test "'is whether there was a significant chance that this added item, **developed by skilled counsel**[10]...*could have induced* a reasonable doubt in the minds of enough of the jurors to avoid a conviction.'") (Citations omitted).

*The government fabricated testimony with a non-Kenner-client (Appendix 3, # 3)...* The government utilized Kristen Peca (never a Kenner-client) to: (1) testify about a 2005 meeting with Kenner (*Tr.696-700*) that her-own 2012 FBI recording confirmed she was never part of (*ECF No. 668 Appendix at 69-70*)[11], confessing that

---

[10] Kenner's trial counsel refused to argue the fact that the government did not admit the "*ink*" versions recovered at Kaiser's home on the "*eve of trial*" (*GX-7004* and *GX-7005*) -- and actually stipulated to the fact that the "evidence" (*GX-5104*) the expert and Kaiser testified about (the photocopies), were recovered from the Hawai'i partners records at Kenner home (*Tr.990*) – extending the deception to the Court and jury that Kenner possessed the "*ink*" copies; *notwithstanding ineffective assistance of counsel issues on a critical prosecutorial matter.*

[11] [At approximately 5.45 of the 1:34.50 call] – Kristen Peca tells Kenner:

she did not know about the Hawai'i investment until 2008-09 when she was living in Ohio; (2) discounting her soliloquy about "*her bonds were her baby*" and begging Kenner not to move them, while the Michael Peca banking records confirm that *Michael Peca never moved his bonds to Northern Trust bank*, only a cash deposit to collateralize his LOC.  Again, the government ignored their own Rule 16 production and fabricated a story that can never be presented in open court again (one would hope); and (3) further discount their most surreptitious use of Kristen Peca to claim she received – *in Ohio* – the Northern Trust bank default letter "without notice" (*Tr.711*) and waited in "*shock*" (*Tr.710*) until her husband returned from the Columbus Ohio arena, when the default letter was mailed "return receipt and FedEx" to their home in Getzville (Buffalo), New York; making her fabrication logistically impossible (except for a presentation to support the government's "bad guy" theories;  (3a) Kristen Peca and the government *ignored* the "heads up text" that Michael Peca asked Kenner to send his wife – but claimed there was none (*ECF No. 765 at 7*).  Obviously, *Kenner did*:



- The Court must note that Kristen Peca and Michael Peca could have made the past due LOC payments themselves as Owen Nolan personally chose to do after receiving the second (2nd) default notice (in March 2009).   No collateral would have been seized at the time.   But -- *that is not what Michael Peca chose to do* (commensurate with the remainder of the LOC investors participating in

---

**Kristen Peca** – Well, I was referencing the earlier stuff that you said, *I don't remember a large amount being distributed back to our account* and the timing of the years of the loan, the line of credit, *that happened when we were in Ohio [2008 & 2009].   I don't understand how it could have been open for 5 years before that?*   Because we had a bond account going.   Do you mean the Hawai'i; you had a line of credit, but not for us?

**Kenner** – No, no, you guys had lines of credit for 5 years at Northern Trust.

**Kristen Peca** – *for 5 years?*

**Kenner** – *for 5 years!*   When you were in OHIO, that's when the thing [LOC] closed.

- *Kristen Peca cannot believe that she is finding out on a phone call in 2012 that her husband, Kenner's client, had a LOC open for five (5) years without her knowledge.*

litigation versus Jowdy since mid-2008 – long before the GSF initiation by Constantine in May 2009).

- This refuted the "concealed knowledge" of the Jowdy loans (already being sued for in Arizona in 2008, and the false (*Tr.33*) claims by the government that the May 2009 GSF was the "initiation" of the "fake" litigation versus Jowdy. *Woops...*

Kenner's 2012 recording about feeling sorry to Kristen Peca for what she claimed she did not know (as a non-Kenner-client) was referring to her husband concealing his business affairs with Kenner from her (*ECF No. 765 at 7*); certainly not any obligation Kenner owed her (although disclosed, *supra*, anyhow).   *Woops, again!*

Michael Peca's own text in real time (one-month after Peca authorized the collateral seizure with Northern Trust via phone call)[12], then confirmed to Kenner his-own concealment from his wife:

| 68 51 | +17163 743234 Michael Peca* | 5/1/2009 5:57:01 PM(UTC +0) | R e a d | Get in touch with Glen yet. **Also, NT sent an email to my wifes aol acct. Attatched is the transfer info. She's going to f'n loose it when she sees loan paid** |
|---|---|---|---|---|

---

[12] Peca confirms independent authorization with Northern Trust Bank employees; Mascarella and Catherine Brill prior to his collateral seizure that same day (Kenner text hi-lighted):

| 7 4 1 5 | +171637 43234 Michael Peca* | 4/1/2009 10:38:15 PM(UTC+ 0) | S e nt | **A Northern trust person will Call you to confirm your transfer to Schwab. Please acknowledge**. Keep the call short. NT is the enemy |
|---|---|---|---|---|
| 6 3 2 3 | +171637 43234 Michael Peca* | 4/1/2009 10:39:44 PM(UTC+ 0) | R ea d | What #? And why r they the enemy. Seems a little dramatic. |
| 7 4 1 7 | +171637 43234 Michael Peca* | 4/1/2009 10:40:55 PM(UTC+ 0) | S e nt | They refused to deal appropriately with me for us after the Nolan attys corrupted them. Made the ccount management impossible. It will be a 602#. Probably Catherine Brill. Thx |
| 6 3 2 5 | +171637 43234 Michael Peca* | 4/1/2009 10:44:43 PM(UTC+ 0) | R ea d | **Got it. Call already done**… |

Nevertheless…this list goes on-and-on in opposition of the government's misleading trial claims (many reiterated in their sentencing memo) – against the weight of the empirical evidence.   Yet – when confronted with the real time evidence that the investors all "knew" and testified under oath pre-trial, they ignored it.   The government knew that Kenner sued the appropriate parties with the investors participating as Plaintiffs (led by Kenner at all times – further dismissing any logic of concealment by Kenner, *including* recording and turning over the nonsense-filled, indecipherable Constantine ramblings of the Home Depot tape – *where Constantine refers to himself as the "getaway driver" and the "bank robber" in the same sentence*.[13])

---

[13] It is inconceivable how the government continues to claim that Constantine was referring to Kenner in either of those roles, as Constantine-himself finishes his unintelligible analogy by confirming Kenner thinks Constantine is both (*ECF No. 765 at 19-20*)!  Their reference to Kenner and Constantine being in the "*trenches*" (*Id. at 23*) was clearly referencing the 18-months of insanity while negotiating with Jowdy – his attorneys – and Lehman Brothers to resolve the decade of Jowdy discovered frauds (thru 2007) – and the subsequent FBI subpoenas of all Kenner records to disrupt the efforts coordinated by Kenner versus Jowdy in Mexico and the USA (2007-2013).

- The myriad of Jowdy thefts included the first two (2) years of Diamante Cabo budget thefts that Kenner documented from the Diamante bank records in evidence (*ECF No. 667 at 11-17*).

Lastly, the government referenced the Gaarn Eufora private stock sales (*ECF No. 765 at 15*) as another conspiratorial actions in Constantine's rant – but they want the Court to ignore the fact that it references Constantine's 2010 "fabrication" that Gaarn and the former Eufora CEO (CR Gentry) actually stole the stock from the Eufora investors and sold it to them again – all organized by Kenner.

- These Constantine fabrications were fully flushed out and exposed in the Eufora investors' attorney letter to the group on July 16, 2010 (*ECF No. 708 at 89-90, Ex.24 at 1, 4, 7*).
- The attorneys' letter was signed off by 29 Eufora investors and related parties to confirm their knowledge of the Constantine false allegations with a specific demand for evidence, if Constantine was going to substantiate it with any but government-similar rhetoric without proof (*Id. at 9-18*).

As Constantine's trial attorneys said in their IAC reply affidavits, Constantine has a propensity for re-creating history to fit his storyline and beliefs, ending up as a provable lie (opposed by real evidence), and this was another Constantine fabrication to blame Gaarn and Gentry (the two [2] board members he fired) after they hired Rudy Giuliani's group in 2010 with Kenner to investigate "everything Eufora" for the investors (a non-concealing action).

- They did investigate Eufora and every element of it for three (3) months in 2010.  They discovered the Constantine diversions from the company – not related to private stock sales but related to operating accounts – and Constantine was deflecting to anyone he could to claim Giuliani and Attorney Stolper were covering-up for Gaarn.  The entire Home Depot tape is a Constantine rant to scare and cover-up his prior actions as

*Government's demand for harshness...*

Despite the government's consistent advocacy for sentencing and punitive harshness, the government continues to rely heavily on theories supported with witness testimony from trial that 100% contradicts their-own empirical evidence; specifically their witnesses-own pre-trial statements (*Appendix 2* and *Appendix 3*). The government fails to acknowledge to the Court that their tiny subset of Kenner investors (only 6 of the 26 Hawai'i partners) was miraculously able to all "forget" in unison, in spite of their previous lawsuits versus Constantine and Jowdy – with full disclosure of items that Kenner was charged with criminally concealing.

- The Court found out that Juneau was a non-victim (dropping him from their victim table after Kenner provided proof to the Court in previous memos – *ECF No. 765 at 30-31*).   Juneau was bought out of his investments (at his request – *Bates stamp: DS-00004, 3500-JJ-6 at 1*) 8-years before trial (providing zero testimonial value), and Michael Peca re-canted his synchronized "no Jowdy loan knowledge" testimony, confirming his full knowledge of the Jowdy loans, at all times, as part of the Hawai'i partners "*group*" decision (*3500-MP-5 at 30-33, 35, 40, 42, and 45*).

This dichotomy is in spite of Kenner initiating public lawsuits in five public and independent jurisdictions, specifically including the investors as Plaintiffs.   The Plaintiff participation to recover the Jowdy funds in multiple lawsuits should provide collateral estoppel for the investors' revisionary claims (over 6-years after the matters), as orchestrated by the government.

- None of that <u>*real evidence*</u> is prosecutable as Kenner "denying the truth" (the government's fabricated truths); in contradiction, ***it is the truth*** (opposite *ECF No. 765 at 4*).

*The government ruse continues in the face of <u>all</u> conflicting, real-empirical evidence from Rule 16 production -- and <u>all</u> pre-trial FBI proffers, <u>all</u> Grand Jury testimonies, <u>all</u> civil trial testimonies and <u>all</u> depositions raised by Kenner post-trial to prove overwhelming inconsistent testimony...*

---

discovered by the investors' attorneys with Kenner's assistance, which the government confirmed at trial.

- As the taped exposes -- Constantine was always claiming to be protecting everyone!
  - *Thank G-d for his never-ending protection.*

- *Is the government's current position that Kenner should testify (or admit) to the Court that he no longer supports his own trial testimony and the decade of corroborating statements by his-own investors, including 3rd party attorneys – and re-cant to agree with the foundationless theories of the government because they do not like being proven wrong?*

<u>Kenner corroborated the following pre-trial **evidence** with his trial testimony, including</u>:

1. The 2011 pre-trial SDNY Grand Jury testimony (Peca, Sydor, Stevenson);
2. The 2009 Arizona arbitration testimony (Kaiser, Berard);
3. The 2009 Arizona arbitration affidavits (Norstrom, Stumpel, Gonchar, Lehtinen, Peca);
4. The 2008 Arizona complaint versus Jowdy for the Hawai'i funds (19 Hawai'i investors);
5. The 2009 California complaint for the Hawai'i funds (19 Hawai'i investors);
6. The 2007 Nevada complaint for more funds stolen by Jowdy (Glen Murray – <u>acknowledging the Hawai'i loan to Jowdy in the NV complaint</u>);
7. The 2008 Mexico lawsuit *Stumpel v. Jowdy* (for $1.6 million stolen by Jowdy from the Baja Ventures 2006 capital account – verified in *government-forfeiture-36*);[14]
8. The 2007 Hawai'i-Mexico investors lawsuit versus Jowdy in Mexico, for the stolen Hawai'i funds and embezzled Mexico funds (22 Hawai'i and Mexico investors); and
9. The 2010 Hawai'i-Mexico investors lawsuit versus Jowdy in Mexico, for the stolen Hawai'i funds and embezzled Mexico funds (22 Hawai'i and Mexico investors)...*OR*...

---

[14] The Court should note <u>this is</u> the Mexico document the government and Kaiser presented to the Court in 2014, alleging that his name was *forged* (again).  The Court may not recall the Mexico document was "dropped" by the government <u>after</u> Kenner exposed to his trial counsel (in 2014) that Bryan Berard verified on a 2012 FBI recording that he and Kaiser actually <u>signed</u> documents in the Cabo san Lucas Courthouse with their Mexico attorney – exposing another Jowdy-cabal "*forgery*" fraud, executed by Kaiser (**for the 4th time Kaiser has been caught lying about "forgeries" in different jurisdictions – including this EDNY courtroom**).

- This 2012 Mexico Courtroom lie was Kaiser's first act as a new-2012 Jowdy employee. Kaiser gave 2012 testimony in the Mexico Court that his name was *forged* on the document supporting Stumpel's 2008 case against Jowdy.  His testimony led to the termination the *Stumpel v. Jowdy* lawsuit (waiting to be re-filed in 2013 when Kenner was arrested).

...Is Kenner supposed to accept the government theories as claimed, now that they-themselves debunked with *government-forfeiture-36* and *government-forfeiture-44* but still want the Court to ignore the forensic facts?

President John Adams said: *"Facts are a stubborn thing; and whatever may be our wishes, our inclinations, or our dictates of our passions, they cannot alter the state of facts and evidence..."*

Nevertheless...

*"the government is stuck with theirs..."*

*Government-forfeiture-44* and *government-forfeiture-36* debunked the following prejudicial summation claims, without challenge:

[*Tr.5711* – Michiewicz summation]:
> *"And what do you find out [about the Jowdy loan]? You find out, what did that 5 million or however much more or less that netted out to be, what did it buy Mr. Kenner? It bought him a 39 percent interest in Ken Jowdy's Cabo San Lucas. Didn't buy the players a 39 percent interest. Him. To this day, right now, he is a partner in that resort. That's where the money went. That's what it bought him. And on the backs, on the portfolios, of the hockey players."*

[*Tr.5722-5723* – Michiewicz summation]:
> *"And if you look at the Centrum loan, I can not think of a more perfect example of proof beyond a reasonable doubt -- actions speak louder than words -- no reason to mortgage Honu'apo parcel. No reason other than for Kenner to get his 39 percent. To get his piece of the pie, that resort in Cabo. No reason. Actions speak louder than words. And in this case the action is pure fraud."*

And – [*Tr.5990* – Komatireddy rebuttal summation]:
> *"...you know what, Baja Development Corporation, on that chart, but there is some sort of misconduct; you don't know what the money was for. You know exactly what the money was for. In fact, Mr. LaRusso, when the first witness got on the stand, one of his first exhibits he entered into evidence was a record of the Baja Development Corporation. Those records are in evidence. Mr. Kenner told you that he used that money to get his piece in the Mexico investment with Ken Jowdy. You know exactly what that's for. That's in evidence."*

And – [*Tr.5996* – Komatireddy rebuttal summation]:

*"He [Kenner] used it for personal use to get an interest in that resort in Cabo."*

***NONE OF THAT IS TRUE...***

- The Court and the government know that these abusive summations, amongst multiple other insinuations and misleading questions during Kenner's cross-examination, **were *false***, but fully prejudicial against Kenner – and left uncorrected, absolutely affected the jury's deliberations.

But – "appallingly" the government claims in their sentencing memo (*ECF No. 765 at 4*) that it still is true, or true again (*Id. at 8*) – and Kenner should be additionally punished for refusing to acknowledge the *government lies* "as truths".  This unforgiveable position is in spite of their post-trial *government-forfeiture-36* and *government-forfeiture-44* confirmations that Kenner "*told the truth at trial*" and the government repeatedly and falsely denigrated him about "*stealing the money*"; prejudicing Kenner with false rhetoric – now proven false (*infra*)...

In concert, the government knew that Darryl Sydor confirmed the following during a July 2009 deposition (3-months after his LOC collateral was seized):

> [Darryl Sydor]: "*She [Myrick] goes, 'Don't worry.   Phil Kenner is not stealing any of your money.  Just get your paperwork.  And I had my paperwork in about six days.*"

This affirmation related to Kenner's 2008-terminated employee who stole the Kenner-Standard Advisors corporate server.   Owen Nolan – who is represented by Myrick since 2008 – confirmed to the FBI that "Myrick stole the Kenner-corporate server" and Kenner had to sue her for recovery (until Myrick's attorney, working with Jowdy) claimed the server had been deleted (*See 3500-ON-1 at 3*).

Although a former insider to Kenner's business management company confirmed Kenner was *not stealing any of the money*, immediately after she was terminated for cause, the Nolan camp sent the following message to Kenner post-trial, still believing from the FBI case agent that "*Kenner stole all of the money*" (Nolan's included) (despite introduction of *government-forfeiture-36* and *government-forfeiture-44*):

*[Nolan's camp emailed]:*

***"Just tell us where all of the fucking money is"***

There is no other explanation for Nolan, who settled with Jowdy in 2008 for the same funds Jowdy stole (*government-forfeiture-44*) and the government proved were **not** used to buy the Kenner Cabo equity (*government-forfeiture-36*), yet the FBI agent (or other government officials) are perpetuating the same pre-trial slander of debunked facts (by themselves)...

*The dichotomy of the government's demands...*
If Kenner acquiesced to the government's position, and Kenner were to admit to any of the Hawai'i partners transactions as *unauthorized* or *intended to cause pecuniary harm* to his investor base (who regularly confirmed all of it thru independent counsel and Plaintiff litigation over 6-years before trial, *supra*), the government could then use any of the tens of thousands of pages of empirical evidence (they *ignored* pre-trial – and Kenner exposed) to call Kenner a "liar" for refuting the same empirical evidence. The position is paradoxical upon itself. Kenner cannot refute the empirical evidence, now, and agree with the synchronized empirical contradictions and reformative trial testimony of the tiny subset of investors the government confused about passive-equity investments thru a "memory test" and failure to know or recall authorized Hawai'i expenditures to 3rd parties under the corporate controlling By Laws.

- The theory itself is irrational in any business climate and the government knows it; *specifically with a passive-equity investor base*.

Nevertheless, in their sentencing memo (*ECF No. 765 at 3*), the government appears to halfheartedly be backing away from their abusive Mexico falsehood claims used to convict, now that Kenner has repeatedly exposed their double-talk ("*stolen*" versus *government-forfeiture-44*).

*Kenner's litigation actions defy the cover-up mantra the government portrays...*
The government makes salacious claims about Kenner's privileged lifestyle pre-arrest throughout their memo, despite Kenner originating and growing his business management practice into one of the five largest in the world from "scratch" – *GX-726*. Notwithstanding, the government claims throughout, without evidence, that Constantine **and Kenner** were routinely diverting funds for their own personal expenses. **False**. The entire universes of funds traceable to the instant case that Kenner received are, as follows.

These are not the cover-up plans of a 20-year extraordinary career Kenner "*chose to gamble away...when they agreed to commit crimes*" (*ECF No. 765 at 3*). The repeated exposure of anyone in Kenner's life (business or personal) who appeared to "do

wrong" was immediately uncovered at the risk of all potentially known or unknown consequences to Kenner as a result of his transparency.[15]   The government cannot argue that:

(1) Kenner sued his 2003 company to defend his investors;
(2) Kenner sued three (3) hard money lenders in 2005 who defrauded the Hawai'i partners;
(3) Kenner sued Jowdy in Mexico in 2007 when his frauds were discovered;
(4) Kenner sued Jowdy in Nevada in 2008 when his thefts from Glen Murray were discovered;
(5) Kenner sued Jowdy in Arizona in 2008 when his frauds were discovered;
(6) Kenner helped Jozef Stumpel sue Jowdy in Mexico for the $1.6 million Jowdy stole from Stumpel and the Baja Ventures 2006 capital account (*government-forfeiture-36*);
(7) Kenner sued Jowdy in California in 2009 when his frauds were discovered;
(8) Kenner re-sued Jowdy in 2009 in Mexico after Jowdy dismantled his criminal lawsuits thru bribes and graft;
(9) Kenner led the 2010 investigations and subsequent Arizona lawsuits versus Constantine and the Eufora members when his frauds were discovered;
(10)   Kenner led the 2011 EDNY lawsuit versus Constantine when his frauds were discovered;
(11)   Kenner sued Kaiser and Berard in Arizona in 2012 when they fraudulently conveyed real estate to themselves,
    a. Then, Kenner alerted 5 investors (Nash, Lehtinen, Khristich, Sydor and Ranford) whom Berard and Kaiser were stealing $750,000 they were due thru Kaiser-signed Promissory notes – and initiated the litigation (prompting full recovery for 4 of the 5 investors in 2015 when Kaiser and Berard were caught by the Arizona judge repeatedly lying about their names being......."*forged*" -- again), the 5th intervener dropping his case after repeated badgering and interference in the civil dispute by FBI agent Galioto to sue Kenner instead for the Kaiser-Berard thefts;

---

[15] As the Court knows, Kenner was beaten to near-death for 3-½ days in a Mexico jail while travelling to Cabo san Lucas to give testimony in open court against Jowdy for the Kenner investors in a criminal case.   Kenner's attorney was murdered after he received an "amparo" in the Federal District of Mexico (similar to a U.S. "writ") to release Kenner from the maximum-security facility.   After recovery, the Court knows that Kenner continued to return to Mexico under Mexican Federal protection and manage the transparent litigation process versus Jowdy to recover the loans and embezzlements in Mexico until the date of his 2013 arrest.

(12)     Kenner sued Kaiser and Berard in the Sag Harbor real estate deal in 2013 after it was discovered they "*fabricated*" documents and "*forged*" signatures (*Bates stamp: BINDER-450, 452*) to illegally transfer and sell a $700,000 piece of real estate and avoid disclosures and payments to Kenner and another investor (*3500-VT-1 at ¶ 11*); and

(13)     Kenner was preparing litigation versus Kaiser as Managing Member of the Hawai'i partners for his negligence in pursuing Jowdy for the unpaid loans, Lehman Brothers and Windwalker for the $11 million in budget thefts, and the 3rd party accounting firm who authorized all of the transactions[16]...as well as two other individuals who absconded with Kenner and Kenner investors funds in Nevada...

*The three superseding indictment "objects"...*
From the three "objects" of the alleged conspiracies, Kenner has verified to this Court thru oral presentation (during the forfeiture hearings) and submissions that Kenner received the following from "objects" in the superseding indictment (*ECF No. 214*):

(1) $**117,000** from Constantine -- after his 2008 private stock sales (to repay government-documented loans Kenner previously made to Constantine);

(2) $**162,500** from an innocent 3rd party, *infra* (Tim Gaarn) -- after his 2009 private stock sales (to repay government-documented loans Kenner previously made to Gaarn);[17]

(3) $**22,425** of GSF documented-expense reimbursements (with over $100,000 of un-repaid expenses – with Constantine in full control of the proceeds) (*Tr.3805-16*), *noting that this documented "expense-reimbursement" transfer*

---

[16] It should be noted that this 3rd party accounting firm in California was the same one utilized by Jowdy and Lehman Brothers lender, Masood Bhatti (*See ECF No. 628 for on-going complicit Jowdy frauds*), to loot the DCSL (Cabo) project budgets (*ECF No. 667 at 13-18*), the $17 million DCSL 2006 closing commission (*Jowdy Bates stamp: 23196*), and the 2007 Jowdy-Bhatti Lehman Brothers funded Texas and Tennessee projects; both bankrupted in 2008 – washing tens of millions of additional RICO act embezzlements away -- and ignored by Galioto after Kenner's June 24, 2009 disclosures.

[17] Gaarn cross-examination confusion after confirming to the FBI the Kenner loans (*3500-TG-1-r at 3-4*), lacking memory of the loans (*Tr.2582*) after confirming he received funds one minute earlier (*Tr.2580*):

> *Q: And does that refresh your recollection whether on or about January 2012 you told the FBI that you did receive loans from Phil Kenner throughout the years?*
>
> *A [Gaarn]: No, I don't really remember. I'm reading it, but I -- will you ask it again?*

> *was not from a superseding indictment victim (although claimed by the government as "straight cash back to Kenner" (ECF No. 765 at 21);*

(4) **$0** from the Hawai'i-Jowdy loans; and

(5) **$0** from the Hawai'i-Constantine consulting payments.[18]

---

[18] The government continues during their instant memo to allege Kenner illegally received benefits from Constantine's deal with Grdina (Urban Expansion).   The funds distributed to Kenner were _fully disclosed_ in the 1800-page Hawai'i joint venture closing documents prepared by 10 law firms (supplied by Sydor during trial – *Tr.2204, GX-770 verified at Tr.3023-24*) -- and the expectation of payments to Kenner was cleared thru the Hawai'i management team members (Kaiser and Manfredi) months before the August 2006 closing (*Tr.1164*)...and in the closing documents themselves signed off by each investor (*Tr.4317-20*).

Yet, at the height of Kaiser's-alleged concern with Kenner (retrospectively in summer 2006), per his fabricated 2015 testimony (*Tr.983*), the most critical legal documents in his life were "*not read*" by Kaiser contemporaneously when he would have allegedly discovered, with Manfredi, that Kenner stole his mom's $1 million loan and "*confronted*" Kenner.  To "*not read*" under these circumstances is not the actions of a reasonable person (or a former NYPD cop) with $1 million of his friends & family money at stake, or Kenner's fault – certainly with critical disclosures involved in the alleged criminality of the instant case.

- The Court should note that the Representations and Warranty document was also turned over by Owen Nolan during his 2009 arbitration (*Bates stamp: NOLAN000828*); just like his 2006 Little Isle 4 K1 (*Bates stamp: NOLAN005044*).  Every investor had possession of the disclosure -- and signed off on it in their July 2006 JV disclosure letter, authored by Hawai'i counsel Larry Markowitz with Lehman Brothers' legal approvals.

- The Court should _also_ note the government claimed Nolan did not possess the 2006 Little Isle 4 k1 -- re-confirming his full $2 million-plus Hawai'i investment and repayments in 2006 that Nolan could not recall (*Tr.2065-66*).

  - An unprepared trial counsel for defendant Kenner failed to alert the Court to the obvious "*Nolan###*" Bates stamp (*Tr.2144-47*), the _confirming element of the document_ of _origination_ as produced by Nolan during his 2009 arbitration production (as Kenner "silently screamed" from the defense table to counsel's deaf ears) (*Kenner trial Exhibit 62 – referenced at Tr.2112*).

All transfers to Kenner – post Urban Expansion closing were authentic and from disconnected transactions as the Hawai'i closing disclosures acknowledged.  Kenner was repaid by Constantine after the deal for two (2) previous transactions that the Hawai'i joint venture documents disclosed (*Tr.4317-20*):

(1) Kenner was due approximately $400,000 after selling his Miami, FL condo to Constantine on July 26, 2006 (*Parcel Number - 02-3211-073-2120*) in Rule 16 production thru the government; and

(2) Kenner was still due $386,000 (plus interest) from Eufora for the 2005-06 loans that Kenner loaned (documented on the 2005 and 2006 Eufora tax records) (*GX-4728 at 10*).

That _cannot_ be the breadth of what the government considers Kenner's extremely reckless criminality to benefit (some unknown way – and recover approximately $300,000 in documented loans), while throwing away "*lives that most defendants who come before courts in this district can only dream of living*".

- The Court should note that the majority of the loan reimbursements from Gaarn and Constantine were subsequently spent on legal expenses for the Jowdy litigation and ongoing loans to John Kaiser, who was perpetually *broke* after robbing his friends & family (with evidence too abundant to repeat as previously outlined – including his own trial testimony verifications and FBI proffers confirmations of his thefts...) (*ECF No. 736 #1, Exhibit Ex.Z41 and Ex.Z41a [back-ups], with forensic verifications*).

*Kenner was never "broke"...*

In contradiction to the government desires for motive, Kenner was never "*broke*" as the government thru AUSA Komatireddy lied during summation (*Tr.5982*).  Kenner's consulting LLC generated over $400,000 in the same calendar year the false government statement addresses; including Kenner possessing more than $1 million in cash in Kenner's various bank accounts (in evidence).   The "*broke*" status was completely fabricated by Komatireddy to finger a motive.   Yet, that golden prosecutorial nugget was released during rebuttal summation so as to remain unchallengeable and providing a "false motive" that never existed in Kenner's life. The government also tries to conflate any Constantine financial issues with Kenner, as in "*huge debt*" both at trial (*Tr.5689, 5744, 6006*) and during their memo (*ECF No. 765 at 11, 13, 14, 19, et. al.*); **both of which were never true**.  The government also lied that Kenner was part of selling off GSF assets to unrelated individuals (*Id. at 21*).

- *Kenner is not even aware of what assets the government may be referencing; with none of them in Kenner's control at any time.*

*False representations of debt...*

The Court must note that if the government considers a person who has a loan against their home to be in huge debt, then all of America is in huge debt.  But -- the reality is that if you have a $500,000 loan against a $2,000,000 asset, you are not in huge debt.  **_You have a $1,500,000 asset_**.   _That is accounting 101_.  Yet, that is a fact that the government refuses to admit and dilute their falsehoods.

---

- No undisclosed or conspiratorial "kickback" funds were distributed to Kenner; **zero**. *The government's confabulations cannot make them so.   The facts are the facts...*

(1) The Falcon jet was worth approximately $1 million in 2009 -- and had half of that on its loan (guaranteed by Kenner and Gonchar – after the Jowdy loan default);

(2) The Palms units acquired by the GSF contributors were worth approximately $1.8 million in 2009 and had a $1 million loan on it -- and generated revenues of approximately $7,000 per month (or $84,000 per year); and...

(3) Kenner had no "skin in the game" with Constantine's Avalon airpark airplane hangars (thus more government haranguing).

The government's representations and accounting standards leave much to be desired.

*Offset -- Loss factors...*

- Owen Nolan (thru independent counsel) received over $3.25 million in compensation when he settled with Jowdy in 2008 "*for all Hawai'i-Mexico transactions that Jowdy received and controlled*"; **specifically including the <u>only</u> Hawai'i-related funds -- $350,000 (5-4-2005 transaction) – the government traced to the Cabo transaction in government-forfeiture-36** (*Appendix 1*)– and

- The CSL property investors settled with Jowdy (represented by independent counsel) in 2017 for all Hawai'i-Mexico transactions that Jowdy controlled, after protracted Delaware litigation – continuing Kenner's exact theme of Jowdy theft and embezzlements (*Appendix 1*).[19]

---

[19] The Court should note that Hawai'i-Mexico investor, Greg deVries, and Delaware plaintiff versus Jowdy in the 2014 filing, visited Kenner in 2014 while incarcerated in New York to gather additional background information for the litigation versus Jowdy.

deVries was also the Hawai'i-Mexico investor who was present in October 2013 with Kenner "in chambers" with two (2) Cabo san Lucas Supreme Court justices and the newly hired investors' legal team to identify the specific criminal acts Jowdy violated while paying off Mexico government officials thru bribery and graft since Kenner exposed him in 2006 to the investors.

In December 2013 -- deVries was scheduled with Kenner to return to Cabo san Lucas to give open court testimony to the Supreme Court and acquire the DCSL property control thru receivership.  It was only the suspiciously timed Kenner detention in November 2013, weeks before the Supreme Court testimony and granting of receivership, which saved Jowdy and his cabal from expulsion in December 2013.

This is the same Jowdy cabal that the government has recently claimed to be conducting criminal activity in Mexico and draining $200 million of DCSL value from 2015 thru 2017 by over-paying Jowdy's friends & family.   This is one of the allegations John Kaiser (the Jowdy

*The FBI agent persuaded the CSL investors to sign the settlement agreement with Jowdy in 2017...*

After CSL Properties independent legal counsel conferred with FBI agent Galioto thru early 2017 about the proposed Jowdy settlement, attorney Steve Main told the CSL group of investors via email (in support of signing the settlement agreement with Jowdy), on February 20, 2017:

> "*Finally for those of you who are convinced that Jowdy is guilty of some crime... I simply note that the circumstances surrounding the Diamante del Mar project and the Cabo project and the relationship between Kenner and Jowdy has been exhaustively investigated over several years by the FBI, SEC and the U.S. Attorney of the EDNY.*"

The 2017 settlement presents the identical "*offset*" parameters that the government has agreed with Kenner related to the Northern Trust Bank litigation settlements (*ECF No. 765 at 30*).   Thus, the arguments against the 2008 and 2017 Jowdy settlements cannot be different.   The 3rd party, independent offset agreement is "for value" (as wholly agreed upon).

- Also, Kaiser's intervention in the Hawai'i partners as Managing Member (2007 thru present) relieves Kenner from any perceived loss from that date forward with Kaiser in full control of the legal collectability of the loans to his 2012-2017 co-conspirator, Ken Jowdy; See *Evans*, confirming an intermediary or receiver's actions to the detriment of investors is no longer the financial concern of the originator (i.e. Kenner).   Kaiser's 2009 arbitration testimony confirmed his knowledge (*ECF No. 736 #1 at 30-31*), and as such it would have been impossible for Kenner to conceal the loans and the 2007 thru 2009 LOC payments from Kaiser (the Managing Member of the Hawai'i partners).
  - Kaiser confirmed to the FBI in October 2010 (*3500-JK-1-r*) that he "*never got the money back from Jowdy/Mexico*" (*Id. at 3*) and "*did see Hawai'i bank account statements*" (*Id. at 10*).
- The Court must also note that with all of Kaiser's "integrity" at stake as the government's star-witness in the 2015 trial, he claimed Jowdy's morals and ethics (while he was working for him) were slandered by Kenner.
  - Kaiser was the Managing Member of the Hawai'i partners since 2007;

---

co-conspirator from 2012-2015) divulged to this EDNY Court in February 2019 (*ECF No. 628*).

- o Kaiser was present during the 2008 Arizona litigation and the 2009 California litigation (specifically including the 2-day January 2010 Jowdy California depositions);
  - At no time did Kaiser reach out to Jowdy or legal counsel for either party and suggest that as Managing Member, and 1 of the 3 former Hawai'i management team members that he was unaware of the loans to Jowdy; the specific basis for the litigation;
- o The Court should also note that on January 5th or 6th, 2010 (the two deposition days with Jowdy, Jowdy's counsel, and the Hawai'i partners counsel present), Kaiser never told a sole that he would have become the largest equity stake holder in the Cabo project as of 5-days earlier (December 31, 2009), via the fabricated agreement he presented in support of Jowdy in the Delaware litigation (*ECF No. 628 at 1*) – only discovered by Kaiser a year *after* Kenner was arrested and detained, but never in the preceding 4-years!?!
  - At a minimum, the Court should assume that Kaiser would have told the FBI 10-months later during his 2-hour-15-minute proffer while blaming Jowdy (not Kenner) for the Hawai'i partners funds that have not been returned (*3500-JK-1-r at 3*); but perhaps, Kaiser's revisionary memory fixed that when he claimed 5-years later during trial testimony that "*Mr. Jowdy had not stolen money*" (*Tr.1229*).

*Offsets mutually agreed upon…*

The government agrees with Kenner's forensic analysis that the Northern Trust Bank settlements are applicable to the "credits against loss" calculation (although their math is incorrect in the tables, even in their admissions -- at *ECF No. 765 at 30-31*).

- As example, Berard had a $650,000 LOC and received "*after lawyer fees and stuff, it was close to 300,000*" (*Tr.3042*), yet the government presented a loss of $781,852 (more than Berard even has in the instant case).
- Berard received a 1% transfer from Jowdy during his 2012-2017 employment in Mexico; and
- Berard was a party to the CSL Properties (2017) settlement with Jowdy, generating another recovery amount of approximately $943,000 (*ECF No. 736 #1 at 86*).
  - o Berard cannot possibly be deemed to have a loss in anything in the instant case; thus at least $781,852 "*off*".

The Court should note that:

(1) Owen Nolan received $500,000 from Northern Trust Bank (*Tr.2074*), but *only $425,000* of Nolan's funds are traceable to the Jowdy loans -- and *none* to the Constantine consulting payments – fully repaying him for any frauds in the instant case (See *Ebbers*);[20]

(2) Bryan Berard received $300,000 from Northern Trust Bank (*Tr.3042*), but *only $150,000* of Berard's funds are traceable to the Jowdy loans -- and *none* to the Constantine consulting payments – fully repaying him for any frauds in the instant case (See *Ebbers*); and

(3) Michael Peca received $600,000 from Northern Trust Bank (*Tr.506*), but *only $240,000* of Peca's funds are traceable to the Jowdy loans -- and *none* to the Constantine consulting payments – fully repaying him for any frauds in the instant case (See *Ebbers*).

Only Michael Peca was involved in the other "objects" in the instant case.   Thus, as the *Evans II* court opined, "[w]ithout an actual loss, there could be no victims".

- *Berard and Nolan cannot be victims*.   They have no other exposures in the instant case.

*Money is fungible…*
In fact, the government's IRS agent, Wayne, told the court that funds are fungible (*Tr.4024*), and as such, when Michael Peca told the 2011 SDNY Grand Jury that he expected all of his $1.8[75] million in his Hawai'i capital account to go to Jowdy (*confirmed in 2015 – Tr.498-99*), that far exceeds the $1.315 million that is traceable to any of the superseding indictment investors as part of the Jowdy loans.   Even Kristen Peca agreed with Wayne's fungible fact (*Tr.760*).

No money from the Centrum loan has ever been part of the Kenner Baja Ventures 2006 capital account.   It is more confabulations by the government to fit their failing "square peg" theories into their-own "round hole".   The government tried to ignore the empirical evidence of the Centrum loan funds, which Centrum authorized to be used for "*commercial purposes*" -- and Centrum authorized the underlying borrower, Big Isle 5, LLC operating agreement; with authority to "*lend*".   Lehman Brothers repaid the Centrum funds during the 2006 joint venture transaction, and no loss occurred as a result of the legal and authorized transaction; managed by four law firms (*ECF No. 765 at 8*).   *Victims are based on losses; not alleged acts.*

---

[20] *United States v. Ebbers*, 458 F.3d 110 (2d Cir 2006) – "'[t]he loss must be the result of the fraud." *Id*. at 128.   "[l]osses from causes other than the fraud must be excluded from the loss calculation." *Id*.

- In fact, the Court should recall that Hawai'i partners COO Manfredi managed the entire Centrum loan acquisition and independently negotiated the loan amount that Jowdy received, directly with Jowdy on July 13, 2005 (*Jowdy Bates stamp from the California case: KJ1854, forwarded by Kenner to the SEC in 2011: PK_SEC_018151*).   Jowdy promised Manfredi a "*30-day*" turnaround on the funds, although that was part of Jowdy's 3rd party fraud on the Kenner and Kenner investors (*Jowdy Bates stamp from the California case: KJ1714*); *see MacCallum, infra.*  (See *government-forfeiture-44*).

- In spite of Manfredi's false trial claims that he thought the Centrum loan was supposed to close the Waikapuna parcel (eventually funded by the Urban Expansion loan for $1 million more than the Centrum funding[21]; making it financially impossible in the first instance to even close with the Centrum funds),

- Manfredi received a $100,000 payment from the Centrum funds on July 27, 2005 thus self-indicting his own claims of concern (*Bates stamp: NAAZ000179*).

  - ***Kenner received none, again!***

*Jowdy settlement credits…*
The government agreed to the Northern Trust Bank credits, but ignores the obvious Jowdy "3rd party credits" resulting in full bargained-for value against loss (independently); for a 3rd party fraud that must equally be credited; See *United States v. MacCallum*, 2018 U.S. Dist. LEXIS 101047 (WDNY – 2018), with the Court ruling against the government position to include funds as loss when a 3rd party defrauded the defendant (who was the manager of investment funds – despite MacCallum having fraudulently induced the underlying funds (unlike the instant

---

[21] It took over 3-months to close the Centrum loan (in banking evidence), and the management team (Kaiser, Manfredi and Kenner) decided to accept the Centrum loan even though the development plan had not been approved by the Ka'u County Development office.   The process to secure hard money was expensive and draining on the Hawai'i resources, so as a management tea, they decided to take the loan and re-loaned it until the development plan was approved; organized by Manfredi as the loan-closing emails confirm with the various lenders and attorneys.   Unfortunately, the Ka'u District Planning office delayed all development plans for over 5-years.   Kaiser testified to the 2009 arbitration panel (regarding the Centrum loan funds – since they were the only loan funds):

[John Kaiser -- *Day 5 at 81*]: "***Any money that was allocated towards land for the Hawaiian Investment Group that wasn't being used*** – *the due diligence takes a long time. So if we had some funds that were – that was stagnant and that warrant purchasing land,* ***we would utilize if for a loan, so we actually make some money off it***".

case) the 3rd party robbed from the investment pool [a.k.a. Jowdy loans])
("Defendant intended to use the money to purchase a second home for his in-laws"
and as a result the Court held the defendant responsible for *only* that portion of the
invested funds [$200,000 of the full $850,000 deposit].).

- Kenner *never* fraudulently induced the Hawai'i partners' investments, which
  all occurred before the Jowdy loans began, nor did Kenner use the funds or
  intend to use the funds for anything but the benefit of the Hawai'i partners.
  Kaiser confirmed this to the 2009 arbitration panel, *supra*.   The Court must
  note **Kaiser was the Managing Member of the Hawai'i partners when he
  gave his testimony in 2009**.

*In 2019 -- The Court acknowledged Jowdy has all of the funds…*

The Court confirmed to the government "…*you know, Mr. Kenner has been pointing
out for years and its obvious from the trial that the money – that money went to Mr.
Jowdy and his entities*" (*July 2, 2019 hearing – Tr.21*). [22]  This contradicted

---

[22] The funds that the District Court addressed have been *at all times* titled to the Hawai'i
partners from loans to Jowdy (*3500-KJ-2 at 24-25*)– confessed to by Jowdy during a March
2010 FBI proffer (*Id. at 11-14*) – and sued for by over 90% of the Hawai'i partners from
2008 (See Baker disclosures withheld by government in pre-trial – a.k.a. *Brady* issue) thru
Kenner's 2013 arrest and detainment (effectively stopping Kenner, the transparent head of
the litigation process versus Jowdy and his cabal, in the U.S. and Mexico).

Although there is irrefutable pre-trial testimony from *all* involved parties involving the
authenticity of the loans (specifically including Jowdy-himself, *supra*), the government
*ignored* all of it and berated Kenner throughout trial claiming Kenner's in-trial confirmation
of the (*government-forfeiture-44* verified) loans to Jowdy as…"*bogus*" (*Tr.5708 (2x), 5709*),
"*phony*" (*Tr.4597, 4598*) and "*supposed*" (*Tr.5707-5708*) – and…

The government referred to the actual Jowdy thefts simply a "*Kenner cover-up story*",
claiming Kenner "*stole more than $10 million*" (*Tr.27*) [untrue], "*bought land in Hawai'i, sold
it, took the profit for himself*" (*Tr.29-30*) [untrue], and "*This is the fraud where the defendants
lie to the investors about who's stealing from them, and find a way to steal from them all over
again. The defendants tell the investors that a guy in Mexico named Ken Jowdy, stole their
money and ran away with it*" (*Tr.31*) [untrue – except that Jowdy did steal it], "*and to fund a
tequila company he was starting in Mexico*" (*Tr.33*) [untrue].

**None of the allegations about Kenner proved to be true.**

- The government defended the "new evidence" of *government-forfeiture-44* (confirming
  Jowdy received 100% of the Hawai'i loans) as "cumulative" in opposition to Kenner's
  initial Rule 33 motion…but…

- If *government-forfeiture-44* is *cumulative* (as the government defended – *ECF No. 370)*,
  then the government must be condoning the ignorance by their prosecutorial team of *all*

government proffers from opening remarks (*Tr.27-33*) thru multiple summations (*Tr.5996, 5711, 5722-23, 5744-45, 5990, 5991-92, 5707-5709*) alleging Kenner "*stole*" <u>*all*</u> of the money for himself – *when* **<u>none</u>** *of it is traceable to Kenner or Kenner's Baja Ventures 2006 equity (and the government knew it at all times).*

- The government has ignored their-own evidence again and burdened the Court with 3-½ years of demands for forfeiture of the Baja Ventures 2006 LLC without nexus, at all (not even subject to a preponderance challenge).

The plain language of U.S. Sentencing Guidelines Manual § 2B1.1 (b)(1) application n. 3 states clearly that the credit against loss is the actual amount recovered or recoverable at sentencing, without reference to the foreseeability analysis.

As example, **the *Jowdy loan*** ...
- The government loss chart (*ECF No. 765 at 30-31*) relies heavily on the initial Hawai'i LOC contributions (although misrepresented, *supra*) that were part of the investors' capital accounts <u>*before*</u> the alleged fraud of lending to Jowdy (*see MacCallum*, *supra*) or paying Constantine (out of the other 16 hard money lenders) became a crime.  As the <u>*Evans*</u> Court explained, *infra*, <u>*if there is no fraud on the inducement, then only the fraud factors are applicable to loss calculation*</u>.

The government's instant case was clear during trial.   The government claimed two frauds:
(1) The "loans to Jowdy" totaling $**1.315 million** traceable to the superseding indictment investors, <u>*before offsets of:*</u>
    a. The Peca re-cant (*Tr.498-99*) of full loan knowledge ($240,000 traceable to Peca);
    b. The Nolan-Jowdy 2008 settlement agreement (worth over $3.25 million);
    c. The 2017 4.6% CSL Properties-Jowdy settlement agreement ***offsets*** (worth millions more; no less than $4.6 million [pending the Kenner

---

*the alleged cumulative*, empirical evidence they <u>*needed to ignore*</u> in order to construct their false trial narrative of "*stolen by Kenner*" (not Jowdy).
    o *It was opposite 100% of the bank records -- and still is.*

- Otherwise, "<u>new evidence</u>" is present – demanding a new trial, and the fairness and grave responsibility of the prosecution expressed by the Supreme Court in *Berger* (1935) has been constitutionally ignored – and significant revisionary issues are unresolved from an improperly pursued conviction "at all costs"; lacking confidence in the most critical prosecutorial "object"; and critical reformative questions of "new evidence" unanswered in the interest of justice.  See *United States v. Berger*, 295 U.S. 78 (1935).

request for the 2017 DCSL appraisal]) (including Berard, Sydor, Rucchin); and

    d.   The Northern Trust Bond interest (of $1,601,572)…and

(2) The Constantine $1,000,900 consulting payments (*Tr.3934* – government forensic witness Petrellese) totaling <u>ZERO dollars</u> traceable to the superseding indictment investors (and $64,000 directly-traceable to Kenner contributions).

- **$1.315 million** *is where the Hawai'i partners' loss calculation begins, not ends.*

Notwithstanding the distribution of the funds from the Hawai'i partners pursuant to the By Laws' "authorized lending" (corporate control document – *ECF No. 736, Ex.2*), the government only traced $350,000 from funds loaned to Jowdy (personally – *3500-KJ-2 at 24-25*), **that Jowdy-himself allocated to the Cabo project** (*government-forfeiture-36*) (settlement with Nolan discussed, *infra*).

Ironically, Jowdy's non-use of the funds entirely for the Mexico projects actually defrauded the essential understanding of what the funds were expected by Kenner and Kenner investors to be used for (*See Michael Peca Grand Jury testimony, infra*) (*and Tr.498-99*).  Jowdy solely controlled and distributed the remainder of the borrowed funds for unknown &/or untraceable reasons; <mark>but we know for a fact that they are <u>*not*</u> traceable to the Cabo project for Kenner (for forfeiture)</mark>.

Despite this critical "***tracing the money***" fact – as the Court has demanded from the government since 2016 (and should have as a matter of ethics before they lied to the Court and claimed for 9-weeks of trial that "*Kenner stole the Hawai'i money to buy his equity in Cabo*"), *supra*; the government deceptively espoused thru trial proffer, Q&A, and summations that the funds were *all* sent to Mexico to "*buy the Cabo resort for Kenner*"…not for the Hawai'i investors…"*And on the backs, on the portfolios, of the hockey players*".

- These were critically <u>*untrue*</u> representations, left unchecked and prejudicial to the defendant at all times.

The Second Circuit opined in *United States v. Ebbers*, 458 F.3d 110 (2d Cir 2006) – "'**[t]he loss must be the result of the fraud**." *Id*. at 128.   "**[l]osses from causes other than the fraud must be excluded from the loss calculation**." *Id*.

*Evans I…*

In *Evans I* (under the appellate review of Judges <u>*Gorsuch*</u>, Kelly, and Holmes)[23], the Court recognized that the district Court relied on *United States v. Turk*, 626 F.3d 743 (2d Cir 2010), in stating that even if extrinsic factors were partially responsible for the eventual bankruptcies of the properties, the only loss that needed to be foreseeable to Mr. Evans was the loss of the "unpaid principal." I R 90. The Court found irrelevant the fact that there was no fraud in the inducement of the investments. IV R. 112-13. <u>*Mr. Evans argued that the district Court erred in calculating loss because there was no fraud in the inducement of the investments*</u>. *Aplt Br. 34-38.* **The Appellate Court agreed**.

- In the instant case, the Court must account for the fact that it has never been alleged that there was fraud with respect to the business model to acquire and develop the Hawai'i project; irrespective of the contentions towards the broad authorizations in the Hawaii partners By Laws authorizing "lending" and "payments to 3rd party vendors" from the government on behalf of four Hawai'i equity investors (Berard, Sydor, Rucchin, and Nolan) who testified they routinely "*did not read*" the documents presented to them by Kenner for their investments.[24] As Managing Member of the Hawai'i partners since 2007, John

---

[23] *United States v. Evans*, 744 F.3d 1192; 2014 U.S. App. LEXIS 4490 (10th Cir 2014) (*referencing Turk – 2nd Cir*) (*Evans I*)...and

- *2nd appeal for improper calculation (again) -- United States v. Evans*, 677 Fed. Appx. 469; 2017 U.S. App. LEXIS 1942 (10th Cir 2017) (*Evans II*).

[24] The repeated – "*I did not read*" and "*I trusted Phil*" refrains overwhelmed any potential belief that any one of the investors would have known, let alone cared about the finite details of the day-to-day efforts to manage the Hawai'i project and its inter-machinations. See *Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A.*, 461 Fed. Appx. 61; 2012 U.S. App. LEXIS 3012.

- See Kristen Peca "**trust**" discussions with her husband's independent California attorney regarding recovering funds from Jowdy (*ECF No. 736, Ex.21*); allegedly 9-months after she could barely get a hold of Kenner, leaving her supposedly desperate (*Tr.712-713*). **If true**, they could have sued Kenner for the funds, exactly at the time the entire Hawai'i partners were suing Jowdy for the known-loans (6-months <u>*after*</u> the LOC collateral seizures).

The Second Circuit Appeals Court has confirmed that "***Failure to read a contract that is signed by the victim***" is the <u>burden of the victim</u> and cannot create a fiduciary void or similar for activities of an individual tasked with presentation or management of the documents execution.

The Court should note that the prosecutorial theories at trial were not based on Kenner stealing anyone's money although alleged as the truth during aggressive cross-examination (*Tr.4588*) and desperate prosecutorial summations (*Tr.5996, 5711, 5722-23, 5744-45, 5990,*

Kaiser confirmed to the FBI on October 19, 2010, that Kenner made "*update letter[s] on Hawai'i project…PK made these: many times…*" and finished by clarifying to the FBI agents, "*yes, I recall the letter[s]*" (*See 3500-JK-1 at 3*).

The appellate decision in *Evans I* opined, "[T]he district Court should have inquired into what loss, if any, the investors would have suffered if Mr. Evans had come clean regarding the status of the securities [or Jowdy loans, assuming they were concealed, yet authorized, *notwithstanding Michael Peca agreeing with the Kenner*

---

*5991-92, 5707-5709*) but moreover, that Kenner did not explain "enough" (a.k.a. "conspiracy by concealment") what was happening with this tiny subset of investors and their passive-equity investments -- *and quiz them for retention of knowledge.*

- Kenner's Baja Ventures 2006 partner, Jozef Stumpel (with $2.6 million contributed to the Baja Ventures 2006 capital account – *per government-forfeiture-36*), wrote to the Court to **confirm he was present on the 2004 conference calls with all of the Hawai'i investors** (identical to the 2011 Peca, Sydor and Stevenson Grand Jury testimonies) **and everyone was 100% aware of the loans to Jowdy at the time; specifically including Berard and Kaiser** (*ECF No. 652*).

These specific investments have been properly titled to the investors' individual and corporate holdings at all times (and from the first instance); *thus never stolen or misappropriated by Kenner for his-own benefit (See 3500-KJ-2 at 24-25)*. The transactions are also 100% authorized by the Hawai'i equity partners' By Laws (the corporate governing document – *Tr.4288-89, 4458, 4520, 4526*).

The government conducted "*memory tests*" of corporate business details with the passive-equity investors to frame their case of concealment. They were corporate elements one would *never* expect a passive-equity investor to remember (or even know); by investors who repeatedly said they "*signed*" but "*did not read*" anything Kenner gave them (*Tr.1164, 2178, 2193, 3157*) (*ECF No. 675 at 205-6, 292, 304-5*). After nearly 3-months of unconvincing prosecution, the government had to double-down with their misrepresentations that "*Kenner stole all of the Hawai'i money and used it to buy his equity in the Cabo project*" (summation proffers, *supra*).

- The aggressive misrepresentations by the government's two summations laid the groundwork for jury confusion after a drawn-out trial of nearly three months. The prosecution's comments violated Kenner's due process rights to a fair trial by undermining Kenner's right to have his guilt or innocence determined solely on the basis of the evidence introduced at trial.

- *The Second Circuit Appeals Court clearly defines that absent substantive unconscionability or fraud, parties are charged with knowing and understanding the contents of documents they knowingly sign. If the signer can read the instrument, not to have read it is gross negligence; if he cannot read it, not to procure it to be read is equally negligent; in either case the writing binds him. Parties are bound by documents expressly incorporated by reference into agreements to which they manifest their assent.*

33

*defense position*]...".   This requires a determination of the value of the securities at the time the fraud began, which is the correct starting point for loss calculation in this case.  The Court opined, "**In making that calculation, the fact that the securities had lost value due to poor or unsustainable business model would not be chargeable to Mr. Evans**."

- In the instant case, (1) the "*group*" decision to lend the money to Jowdy (*See Peca and Kaiser testimony, supra and infra*), (2) the Lehman Brothers September 2008 bankruptcy, (3) the JV partner-Lehman Brothers documented budget thefts of $11 million in 2006-2008, (4) the Lehman Brothers refusal to pay the $4 million in negotiated JV milestone payments (including Kaiser's refusal to sue them for it as Managing Member since 2007), and (5) the global real estate recession in 2009 are <u>not</u> Kenner's fault and cannot be chargeable offenses (as substantial non-fraud factors).

Next, *Evans* argued that the district Court should have considered the effect and foreseeability of <u>non-fraud factors</u> in determining loss.  *Aplt Br. 38-41*.  The Court opined, "***Again, he is correct***".   The Court continued that the district Court relied on *Turk* in stating that the receiver's actions and market conditions were irrelevant to determining actual loss.   The Court opined, "***that reliance was misplaced***".

Nevertheless, there is no proof, supporting, that the eventual LOC payment distributions would have been altered while assessing the best remedy for recovering the Jowdy loans (once Jowdy's attorneys and Jowdy terminated the pre-GSF settlement negotiations in 2008), and as Michael Peca testified "*group*" knowledge to the 2011 SDNY Grand Jury, *infra*, and re-confessed to the 2015 trial Court (*Tr.498-99*) (acknowledged by the Court at *ECF No. 501 at 9*).

> *[Michael Peca]: A short-term loan [was made] to Mr. Jowdy because at the time Cabo – we hadn't gotten the lending from Lehman Brothers yet.  **We** made a short-term loan until the lending came in.  Once the lending came through we were to pay back the loan, I think in the neighborhood of five-and-a-half million dollars, on the closing.   **It was never paid back**.  <u>And then communication basically seized [sic] at that point from him [Jowdy].  That was kind of the whole sticking point as far as me **and the other guys** with Mr. Jowdy.</u>*

The *Evans II* Court also opined that the government and district Court's tainted calculations produced an erroneous number of victims, identical to the instant case calculations.

➤ **The *Evans II* Court confirmed that <u>without loss</u>, there could be no victims.**

34

Four-and-a-half years post-trial, only Kenner has produced a detailed accounting of investments versus loss (a.k.a. none), with irrefutable back up (*ECF No. 736, #1 and #2*) (*infra, Appendix 1*).   Concurrent with *Evans II*, "[t]he government has not proven how much loss, if any, resulted from Mr. Evans fraud.   Even if the government had limited information, the Court had to base the restitution order on the amount of actual loss."  *United States v. Hudson*, 483 F.3d 707, 710 (10th Cir 2007).

Ultimately, after the second appellate opinion in *Evans*, Evans was released "time served" and no restitution was ordered (as a full reduction based on passive-equity owners and their inherent risk/reward expectations).   In a concurring opinion in *Evans II*, Judge O'Brien, like in the instant case disclosures, stated:

> "[Evans] adequately disclosed the **risky** nature of the projects to the investors and, to sweeten the deal, offered 12% per annum interest on invested funds.   That debt burden, along with other [global market] factors, produced disastrous results.   By April 2005, several things became clear: The rehabilitation costs were considerably more than anticipated [*identical to the Jowdy loans extending past the expectation of the spring 2006 Mexico-Lehman Brothers closing*][25], the projects were undercapitalized and the interest

---

[25] Peca SDNY Grand Jury (*ECF No. 668 at 108-09*) -- Sydor SDNY Grand Jury (*ECF No. 668 at 137-38*) – Stevenson (*ECF No. 668 at 137-38*) -- and Kaiser 2009 (*ECF No. 668 at 190-91*).

John Kaiser testified during a 2009 Arizona arbitration that he *did not hold Kenner responsible* for the Jowdy non-payments, either (*Nolan arbitration Day 5, Tr.928-929*):

> *Q: Has this ever been a secret that Mr. Kenner lent this money to Mr. Jowdy?*
>
> *A [Kaiser]: No.*
>
> *Q: Was this a transaction that, as your view as an investor was open and disclosed to everyone?*
>
> *A [Kaiser]: It was open.   There was no secret handshakes or nothing like that.*
>
> *Q: Even now, sitting here in May 2009, is there anything you've uncovered, as someone who obviously knows how to investigate, that Mr. Kenner has done anything inappropriate throughout these transactions?*
>
> *A [Kaiser]: No.*
>
> *Q: Not one complaint?*
>
> *A [Kaiser]: No.*

obligations to investors were disastrously large and unrelenting.   As a consequence, the project took on a gloomy countenance, revealing the business model to have been, at best, overly ambitious or, more likely, inherently flawed.   None of that, as all agree, amounted to fraud."

*Kaiser described the ambitious management decision as Managing Member...*

[John Kaiser – *2009 -- Day 5 arbitration testimony at 81*]: *"Any money that was allocated towards land for the Hawaiian Investment Group that wasn't being used – the due diligence takes a long time. So if we had some funds that were – that was stagnant and that warrant purchasing land, we would utilize if for a loan, so we actually made some money off it".*

*Risk...*
The Kenner investors all described their "risk" conversations with Kenner in real time (*Tr.260 [Juneau], 492 [Michael Peca], 758-9 [Kristen Peca], 1171 [Kaiser re: loan risks to Jowdy], 1905, 1910 [Nash], 2162, 2201, 2221-22 [Sydor], 3526 [Murray], 4902 [Gonchar]*).
- Jay McKee had already told the FBI pre-trial on February 8, 2010 that "*Kenner would tell him about the 'risk' when he pitched the investment*" (*See 3500-JM-2-r at 2, ironically forgotten 5-years later at trial: Tr.1853, 1855*).
- Darryl Sydor confirmed to a California Court that he always understood the risks based on conversations with Kenner in real time (*See 3500-DS-3 at 57-58*).
- Another hands-on Hawai'i-Mexico investor (former Cabo employee and ex-NHL player, Jason Woolley) confirmed his knowledge of the "risk" parameters of all of his Kenner-related investments (*Tr.44-45*).   Woolley was fired in 2008 by Jowdy with Kenner and the rest of the Cabo sales team for filing and supporting litigation against Jowdy to recover the "stolen Hawai'i loan funds" in Mexico and Arizona.

---

*Q.   At the time this money was lent to Mr. Jowdy to be spent in the Mexican project, did anybody anticipate he wasn't going to pay you back when the Cabo deal closed, the Lehman's Cabo deal?*

*A [Kaiser]: No.  Otherwise I wouldn't have lent it.  I wouldn't want to go down that route.*

*Q.   Do you blame Mr. Kenner for him [Jowdy] not paying the money back?*

*A [Kaiser]: No.*

Judge O'Brien continued (with parallels to the instant case) that "the answer [] has resulted in a sentencing dilemma – how does one measure the damages reasonably resulting from the fraud (not being candid with investors), rather than merely estimating the economic losses flowing from a flawed business plan, poor timing and market dynamics?   What are the damages caused by the fraud?   Simply stated they are the money investors lost as a result of not having full and timely knowledge of the depth and breadth of the projects' shortcomings.   In other words, what the investors additionally lost by being deprived of an opportunity to mitigate foregone losses.   *But we know one thing: much of the loss had been incurred or was inextricably destined to be incurred before any fraudulent conduct commenced.* It was necessary for the government to produce sufficient evidence from which a reasonable estimate of damages resulting from the fraud could be computed."   See U.S.S.G. § 2B1.1, comment. (n.3(c))."

- The government has only offered conclusory tables to the Court (*ECF No. 765 at 30-31*), lacking any substantive back-ups or verification of causation.   That is not sufficient.   See *18 U.S.C. § 3664(e)*.   "The government bears the burden of proving the amount of the loss sustained by a victim as a result of the offense".

In *Evans II*, contrasting *Turk*, there cannot be a loss attributed to "equity" investors due to the inherent **risks** they assume (governed by the corporate By Laws at all times).   In *Evans II*, the Court opined that even though Evans never told the investors of the cash-flow issues, the district Court could not hold him accountable for any loss and *ordered a zero loss factor* (and the resulting "no victims", "no enhancement for loss" and the associated reduced guidelines).

*Full corporate knowledge of the Jowdy loans pre-trial…*
The Hawai'i loan to Jowdy was *verified* by 25 of the 26 Hawai'i equity partners (pre-trial and re-verified by Michael Peca during trial)[26], while the unrealized return of

---

[26] Only Owen Nolan is absent in the Hawai'i investor group (of the 26) – **because Nolan signed a 2008 settlement agreement with Jowdy**; exchanging a 1% Cabo equity stake worth at least $3.25 million in 2008 (to Nolan) for Jowdy's liability release and acquisition of any funds originating from Nolan (equity or Hawai'i debt) that Jowdy acquired.

- Jowdy's 2008 settlement allows Jowdy to "*stand in Nolan's shoes*" for the *only* traceable money from the Hawai'i partners to the Cabo project (per *government-forfeiture-36*), thus the *only* government nexus has been *removed* as required for a forfeiture nexus to anything related to the Cabo project – and…

the Hawai'i partners' remaining asset (the Jowdy loan repayment of over $33 million – *ECF No. 736, #1 at 13*) is solely based on Ken Jowdy's government-documented criminality (*government-forfeiture-44*) and the FBI agent's negligence, since Kenner's June 24, 2009 FBI proffer (over ten [10] years ago).

- Jowdy's smoke-screen distractors included his employees, Kaiser and Berard during their 5-year co-conspirator efforts (2012-2017; including their inconsistent and obstructive 2015 trial testimony).

*Kaiser's "shocking" disclosure post-trial creating unresolved reformative issues with his-own testimony...*

The Court should note that after five years as Jowdy's co-conspirator, John Kaiser now returns to support Kenner's pre-trial position that Jowdy has been robbing the investors and the Diamante Cabo san Lucas project (*ECF No. 628*); just like Kenner has maintained since 2006; *only "concealed"* by Kaiser and Berard's revisionary statements to the other investors supporting Jowdy and the FBI case agent's deceptions (now unequivocally proven untrue with *government-forfeiture-36* and *government-forfeiture-44*).

Now – during the October 11, 2019 hearing, the government claims they now believe it (creating more reformative issues in the instant case).   The government even quoted Kaiser's "*shocking*" 2019 reversal of his-own trial opinion (*Tr.1229*) that Jowdy did not steal any money.

- That testimony, if presented at trial, would have rocked the foundation of the government's case from their earliest misrepresentations (*Tr.33*).   **But – the jury never heard it.   They heard Kaiser's advocacy for Jowdy's veracity**.

- The loan was duly authorized by the corporate By-Laws (*ECF No. 736 at 88 f.36, Ex.2*); the controlling document on what the corporation and its officers could and could not do with the passive-equity investments.[27]

---

- It completely removes Nolan as a victim of anything in the Hawai'i "object" (his only connection to the instant case – *ECF No. 736 (at 35 f.12) – attachments #1 (at 49,59) and #2*), with his Hawai'i capital account funds traceable as transferred to Jowdy, per the 2008 settlement.

[27] In fact, commensurate with a lender (like Ethel Kaiser's $850,000) *or all the passive-equity Hawai'i partners investors*, Ethel Kaiser did *not* know who her son's best-friend and Hawai'i partners COO, Chris Manfredi was, even with her son procuring her life savings (*Tr.950*) in the loan she gave her son (*Tr.939*).   *Was that a crime*?

How could a passive-equity investor (like any of the government witnesses) be expected to know (1) Hawai'i partners COO Manfredi, (2) Constantine in 2004, (3) the Carlsmith Ball

The government ignores the fact that the allege concealment of the Jowdy loan was also fully disclosed, transaction by transaction, company by company, in the 2008 Arizona complaint versus Jowdy for the recovery of the same funds – with all of the investors represented by independent counsel as Plaintiffs.

*Brady issue (unresolved)...*
In fact, withheld from pre-trial disclosures were the Arizona attorney, Tom Baker, _signed_ disclosures.   _The government turned them over during forfeiture_ – after the trial (raising significant *Brady* issues).   The disclosures were 19 of the Hawai'i partners (including alleged victims of concealment; Berard, Sydor, Peca[28], Nash, and Rucchin) all signing and initializing their independent attorneys' 7-page disclosure document.   The government withheld the Baker documents in their possession -- and prevented the defense from their ability to cross-examine one (1) critical fact: ***"knowledge" in real time***.   The first page of the disclosure clearly defined:

> "*the gist of the lawsuit is to recover certain monies loaned to Mr. Jowdy from Mr. Kenner, Little Isle 4 and Ula Makika LLC.   Mr. Kenner estimates the total amount of monies loaned to Mr. Jowdy which have not been repaid to be*

---

LLP attorneys, (4) the archeologists, (5) the land planners, (6) the Hawai'i partners employees, (7) the LEEDS certified engineers, (8) 16 other hard-money lenders, (9) Centrum financial, etcetera?   There is no plausible reason they would know any of them as passive-equity investors, and Ethel Kaiser proved it again; unless her son "concealed" that from her and it is deemed a co-conspiratorial criminal act...

The "*memory test*" standard, *supra*, would be as unreasonable for Kaiser as it is for the current prosecution of Kenner -- and government leading questions of "*authorizing consulting money for Constantine*" when hardly any of the instant case investors would even know who Constantine was in 2004 (*Tr.1909 [Nash], 2165 [Sydor], 2724 [Rucchin], et.al.*) – or retain that level of detail in the transaction as passive-equity investors; *See Evans; see also Leonard*.

[28] The Court should note that Michael Peca and 18 other Hawai'i partners and Mexico investors sued Jowdy in 2009 (for a second time in the U.S.), with another independent counsel in California, for the same Hawai'i loans.   **The group included alleged victims Sydor, Berard, Peca, Nash, and Rucchin**.   Not one email or communication was presented at trial to show "real time" concerns about "how" their Hawai'i corporate money ended up with Jowdy thru the loans.   The two (2) California lawsuits complaints specifically noted:

> "*Mr. Najam was in charge of the corporate governance while under Jowdy's direction and control received over eight million dollars ($8,000,000) from a LLC in Hawai'i. Mr. Najam failed to properly account for those funds and has placed the Jowdy investors in a vulnerable and compromised position*."

*approximately $5,000,000.   This is the estimated principle only, exclusive of accrued interest.  In summary, Mr. Jowdy denies that the monies were loans but rather characterizes them as investments.*"

The Court should recall that Michael Peca re-canted his "no knowledge" testimony during cross-examination (*Tr.498-99*).  Peca verified that his 2011 SDNY Grand Jury testimony was "*truthful*" and accurate.   Peca, like Hawai'i partners Darryl Sydor and Turner Stevenson, verified the "*group*" knowledge of the loan, the same day, to the same 2011 Grand Jury (with FBI agent Galioto participating in the Grand Jury events).

Is the government claiming Michael Peca is now part of the "*cadre of followers who are completely blind to the truth*" (*ECF No. 765 at 43*)?

- *Government-forfeiture-44* and *government-forfeiture-36* respectively confirmed post-trial that Kenner did not "*steal the Hawai'i money*" and did not *"use it to buy his piece of that Cabo resort*".

- So when Michael Peca confirmed "his knowledge of the Jowdy loans" as accurate during trial, breaking ranks from the fully revisionary "*memory loss*" of Sydor, Rucchin, Nash and Berard, *is Peca an unindicted co-conspirator of Kenner -- and part of the "cadre"*?

Michael Peca confirmed to the 2011 SDNY Grand Jury that he and the remainder of the Hawai'i partners "*as a group*" had no concerns (*ECF No. 668 at 108-09*):

*Q: How much did you put into Little Isle 4?*

*A [**Michael Peca**]: "$100,000 cash investment that was going towards that. Then we had lines of credit. I had one out for $1.7 million that was going to be used at the time. Here's where a lot of the cross starts to happen. A short-term loan to Mr. Jowdy, because at the time Cabo – we hadn't gotten the lending from Lehman Brothers yet. We made a short-term loan until the lending came in. Once the lending came through they were to pay back the loan, I think in the neighborhood of five-and-a-half million dollars, on the closing. It was never paid back. And then communication basically seized at that point from him [Jowdy]. That was kind of the whole sticking point as far as me and the other guys with Mr. Jowdy.*

*The 1.7 along with the $100,000 and whatever else put in this a capital account, Little Isle 4, I believe. The Capital account was loaned to Ken Jowdy,*

*our business partner, so there is no need at the time to be worried about anything. The money was loaned to Ken Jowdy to basically help some of the purchase of the Cabo property so we can get the funding. And then it was supposed to [be] a short-term loan."*

*The government and FBI used a non-Kenner-client for outrageous and fabricated testimony...*
Kristen Peca (*Appendix 3 at #3*), <u>*although never a Kenner client*</u> (nor part of 95% of the Kenner-Michael Peca meetings) verified to Kenner in her 2012 FBI recordings that FBI agent Galioto had **lied to her** and Michael Peca, claiming Kenner "*stole all the Hawai'i money*" and "*never gave it to...Jowdy*", simply <u>*another false iteration*</u> of the facts that *government-forfeiture-44* and *government-forfeiture-36* disproved; but to the incalculable benefit of the government's verdict who thought the "alleged" Kenner thefts to send Hawai'i partners money to Mexico "*to buy some of the Cabo project*" was the cornerstone crime (*Tr.5996, 5711, 5722-23, 5744-45, 5990, 5991-92, 5707-5709*).

> ==*Kristen Peca – Matt [Galioto] told Michael and I that you stole all of the Hawai'i money and never gave it – the loan money -- to...uhhhh...Jowdy.*==

> *<u>Kenner</u> – Kristen – I have all of the bank records that prove the money went to Jowdy and his accounts at all times.  I told you that already. You told me that you saw the bank records after I sent them to Michael.  You know -- the attorneys who sued Jowdy for the money in Mexico and Arizona and California used them to confirm the loans before we sued?*

> *<u>Kristen Peca</u> – but – I don't understand why he would say it.*

The Court must critically note that even when Kristen Peca exposed the FBI agents' lie to her about the loan, *supra* (on the 2012 recording) – and continued thru the government's sentencing memo (*ECF No. 765 at 8*), <u>*Kristen Peca did not say*</u> "**what loan?**"

She and her husband knew "*which loan*", *supra* -- and that cannot be challenged or conflated to make Michael Peca a victim of the loan transaction; *just like Michael Peca told the 2011 SDNY Grand Jury* (along with Sydor and Stevenson) <u>*4-years before*</u> he confirmed Kenner's transparency and re-canted his direct-examination *faulty memory, confusion and mistakes* testimony (*Tr.422-24*) by confirming his knowledge at all times as part of the Hawai'i partners "*group*" decision (*Tr.498-99*).

- Again – the government cannot hide from the "empirical" details and repeat ad nauseum their falsehoods about Kenner stealing money that their bank records and forensic accounting debunk – in order to maintain a verdict they prosecuted with basic premises "*they knew to be false*" (from 100% of the pre-trial evidence, a *Napue* violation) – and deplorably confirmed in Kenner's favor post trial with *government-forfeiture-44* and *government-forfeiture-36*.

✓  *The facts are a stubborn thing…and the government is stuck with theirs*…

Although the government proved post-trial that Kenner was *not* lying (per *government-forfeiture-44* and *government-forfeiture-36*), their repeated claims that the loans to Jowdy were …"*bogus*" (*Tr.5708 (2x), 5709*), "*phony*" (*Tr.4597, 4598*) and "*supposed*" (*Tr.5707-5708*), produced an ethical standard, which was reprehensible at best; prejudicing Kenner.

- During their sentencing memo, unexplainably, they revert back to the same lies hoping the Court will "*just go along because they said so*…" (*ipsi dixit*) in the face of their-own evidence, which destroys their keystone theory (*ECF No. 765 at 8*).

*The tequila Red Herring (continues)…*
Although the government promised the Court two times during trial that they would trace the GSF money to Kenner buying a tequila company (*Tr.1074-76*), **they never did**.  They still have not – because *it never happened,* but they include it in the sentencing memo anyhow (*ECF No. 765 at 19, 20-21, 22*).  In fact – the alleged "shipping" ruse of bottles to Kaiser in NY (*Tr.1084*) instead of the actual evidence that shows the bottles went to the Russian Cyrillic address with the Russian instructions (*GX-304*) all take place months before the GSF was even initiated (*Tr.1074, 1081*); *woops*!!

*The loan agreement found in Hawai'i partners' possession (clearly not concealed)…*
The Hawai'i funds were actually loaned to Ken Jowdy, as Michael Peca explained to the SDNY, *supra*.   It is also complimented by the actual language in the 2004 Hawai'i lending agreement that John Kaiser (*Tr.1127*) and Glen Murray (*Tr.3608*)[29] told the EDNY Court they had in their possession for a decade.

---

[29] The Court should recall that Glen Murray was not a named victim in the superseding indictment – and was the only government witness not prepped before his testimony. Murray was also ironically the only investor who was clearly able to recall releasing his LOC funds for the Hawai'i investment and recalled receiving the cash and LOC payouts from the Lehman Brothers investment in 2006.   No other government witness could recall these transparent facts years after the actual events; but an un-prepped Murray could, breaking

The government cannot reconcile their own trial falsehoods – but want to demonstratively ignore their own malfeasances and refute their own evidence to continue seeking harshness at sentencing, instead of correcting the record for the Court.

- These government ruses are commensurate with claiming none of the investors received documents about their LOC from Northern Trust Bank in real time, until the Northern Trust Bank subpoena arrived seven weeks into the trial, with LOC monthly statements included to the individual investors home addresses of record.  *Another uncorrected farce*.
- In fact, the Court should be aware that the government possessed the full Northern Trust Bank subpoenas *years before* the trial as Michael Peca verified to Kenner via text in 2010.

Michael Peca confirmed the FBI Northern Trust subpoena in 2009, as follows in a text to Kenner after Peca requested copies of the records for himself and Kenner via notarized document in August 2009:



| 102 93 | +17163743 234 Michael Peca* | 10/16/20 09 1:42:01 PM(UTC+ 0) | Read | **Were you aware that a subpoena was issued for the NT acct? Just got a letter from NT today.** |

The government sent a second subpoena to the Northern Trust accounts approximately two months later – and Michael Peca alerted Kenner:



| 109 59 | +17163743 234 Michael Peca* | 12/7/200 9 6:30:57 PM(UTC +0) | Read | **Received a subpoena for NT account. Thought that already happened a while back**. Call me tonight to explain and run through some shit w/ me |

Kenner attempted to acquire the statements to apply to a proper defense strategy, but was *denied* and then *delayed* by a knowledgeable government opposition to the truths that would destroy their witnesses' *faulty memory, confusion and mistakes* testimony.

- **The court *cannot* excuse this government *Brady* violation...**

---

the highly-unusual pattern of the synchronized testimony (in opposition to all pre-trial statements).

At a minimum, the government could focus on the Eufora private sales (and its underlying evidence) and the fully disclosed and signed-off GSF transactions, controlled exclusively by Constantine, as verified by attorney Ronald Richards to the 2015 trial Court (*Tr.3805, 3806-16*).   In spite of Tyson Nash's complete recollection of the GSF set-up meeting with Constantine (*ECF No. 765 at 18, footnote 1*), he could *not* recall the series of Constantine conference calls to discuss the ongoing use of funds and progress under Constantine (*Tr.2004*); identical to Michael Peca (*Tr.592-597*); exhibiting **CTE** symptoms.

- Corroborating the Ronald Richards trial testimony, the Court should also note that both Michael Peca (*Tr.540*) and Tyson Nash (*3500-TN-3 at deposition pg.12*) were asked directly what involvement Kenner had in the GSF, to which they specifically responded, "*none*".

Again, the Court must still separate the fraud and non-fraud factors; see *Ebbers, supra*.

*Eufora private stock…*
Despite the government's, Kenner "*selling their stock*" lies (*Tr.2173 [Sydor], 2732 [Rucchin], 5971 [rebuttal summation]*) and "*no corporate document*" summation lies stunningly continued in their sentencing memo (*ECF No. 765 at 12*), it was refuted by their own submission malfeasance (*GX-210*).

The government knows Kenner was not a Eufora member or manager since the end of 2004, replaced by Tim Gaarn on January 1, 2005, as 100% of the Eufora documents (emails, internal corporate text system, and tax records) confirm.   As such, Tim Gaarn, the government's witness would have possessed all AZ Eufora Partners I LLC agreements (not Kenner); representing at least the Gaarn, 2008-09 sales (*per Kenner trial exhibit 80, introduced at Tr.2570-71*).   The government has *GX-210*, signed by Gaarn as AZ Eufora Partners I Managing Member (*Id. at 35*); Gaarn's Standard Ventures and AZ Eufora Partners I stock percentages (*Id. at 37*); and the Eufora tax records to confirm Gaarn was in charge of the investors' documentation.

- ==*The government cannot hold Kenner responsible for documentation he has no legal authority to produce.*==
  - *This fraudulent mis-representation was spread by the FBI case agent and Bryan Berard in 2012-2013 to multiple Eufora members and debunked, without Kenner having any Eufora control.*

Notwithstanding, the 2009 signed Eufora operating agreement increased the AZ Eufora Partners I equity commensurate with the 2008-09 transactions, specifically when compared to the 2007 Eufora tax filings.  Thus, and although never Kenner's responsibility for production, the corporate documents do reflect the proper equity transfers.

*After the Tim Gaarn sales…*
Gaarn distributed ($**162,500**) to Kenner:
> *2-19-2009 -- **$30,000** from the Rucchin transaction thru Gaarn to Kenner,*
> *4-17-2009 -- **$47,500** from the Rucchin transaction thru Gaarn to Kenner, and*
> *5-04-2009 -- **$85,000** from the Ranford transaction thru Gaarn to Kenner…*

- No other funds are traceable to superseding indictment investors thru the Gaarn private stock sales.

Gaarn is not a co-conspirator (*Tr.2503-04, 2563-64, 2578-79, 2599-2600, 2608*).

In the *United States v. Contorinis*, 692, F.3d 136, 148 (2d Cir 2012), the Court "observed that neither the language of the criminal forfeiture statute nor Circuit case law supported the proposition that a defendant must forfeiture proceeds that 'go directly to an innocent third party and are never possessed by the defendant'" *Id.* at 147.

- As the Court is aware, Gaarn testified that he had received personal loans from Kenner (substantiated by the bank records presented to Gaarn during trial). The $162,500, *supra*, was the only superseding indictment alleged victim funds obtained by Kenner (repaying the previously documented loans from Kenner).

*Nash Eufora private stock purchase from Constantine…*
Nash received full consideration from Constantine independently.   After the transaction – four days later (on 4-28-2008) Constantine repaid Kenner $17,000 of a $25,000 loan (from 4-11-2008 – 17 days earlier) with Constantine Management Group private stock proceeds that are documented by the government's-own accounting (in evidence).

Nash told the EDNY Court that <u>*all he was sure about*</u> from his stock purchase was (*Tr.1915*):
> *Q. At the time that you invested money in Eufora, what did Mr. Kenner tell about how the money would be used?*

*A [Nash]: Again we didn't really talk in great depth. I was **guessing** it was for those commercials that they [Eufora] wanted to shoot. Get those up and running.* **And again I got a piece of a great, great company or it was worth a lot of money.**

As the Court knows, if the investor received full value for what he expected, there is no loss even when alleged inducement occurred thru fraud. At a minimum, precedent confirms that the government is required to confirm the "value" received by the investor in order to subtract a "lesser" value if appropriate.

As described in *United States v. Leonard*, 529 F.3d 83, 92 ("A fraud may involve the misrepresentation of the value of an item that does have some value (in contrast to an item that is worthless). Where, for example, a defendant fraudulently represents that stock is worth $40,000 and the stock is worth only $10,000, the loss is the amount by which the stock is overvalued (*i.e. $30,000*).)"

"The government must show a 'discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver." *United States v. Starr*, 816 F.2d 94, 98 (2d Cir 1987). "It is not enough to show that the defendant used deception to induce victims to enter into transactions they would otherwise avoid." See *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir 2007). "Intent to harm cannot be found when alleged victims 'received all they bargained for, and [defendant]'s conduct did not affect an essential element of those bargains." *United States v. Novak*, 443 F.3d 150, 159 (2d Cir 2006).

Nash's own testimony refutes on direct-examination that he expected to receive anything but stock in a great company, similar to Gonchar's recollection during Constantine's defense case (*Tr.4802-03*). See *Leonard at 94*; in *Leonard* like the instant case: ("After all, the investors did obtain an interest in a company engaged in producing and distributing a motion picture. Accordingly, the district Court erred in not deducting from the purchase price the actual value of the instruments.").

*Further acknowledgement of Eufora company value…*
One year after the private stock sales of Gaarn and Constantine were completed, the investors' own attorneys (the Giuliani Group – led by corporate attorney Michael Stolper) determined value in Eufora after a 4-month forensic scrubbing. They demanded a 6% equity stake in the company in lieu of the $500,000 in legal fees

they accrued.    Prior Eufora investor, Jay McKee, confirmed this information to Kenner:

| 147 97 | +17168034903 Jay McKee* | 7/15/2010 12:03:01 PM(UTC+0) | Read | Hopefully you're getting some sleep right now; I am planning on sending the letter this morning.. **Within our package or plan in taking the lender out, <u>where is the 6%</u> <u>for Guilani partners comming from</u>?** |

The 2008-09 Constantine and Gaarn stock sales had been vetted and the investors' attorneys, the corporate value was formulated, and they wanted "in".

This was further affirmation of the $20 million valuation calculated by February 2009 corporate lender, Neptune Capital, and resulting from their 6-month due diligence before offering a operating loan to Eufora.   The Court should note that none of the Constantine sales occurred when the company had liens on anything, yet the government interjected a misleading Q&A with Kristen Peca to allege the patents were pledged when her husband bought his stock on April 7, 2008 (*Tr.703*), 10-months too early:

> *Q. Did he tell you at the time you invested those in Eufora whether those patents held were as collateral for a loan?*
>
> *A [Kristen Peca]: **If they were held as collateral? No. No. Never**.*
>
> *Q. <u>Would that have been important to you in deciding whether to invest money?</u>*
>
> *A [Kristen Peca]: **Yeah, of course**.*

*Peca Eufora private stock purchase from Constantine...*
Peca received full consideration from Constantine independently as referenced in multiple Adverse Proceedings filed in 2013 (Arizona federal bankruptcy court) versus Constantine's bankruptcy (*at page 11 of the Adverse proceedings by 10 separate Constantine investors – Bates stamp: CBKR-0000602*).   After the Peca transaction of 4-2-2008 – Constantine repaid Kenner the $100,000 loan (4-7-2008 – 5 days later) from Constantine Management Group private stock proceeds that are documented by the government's-own accounting.

*The government knew that Michael Peca lied about knowledge that 2008 wire went to Constantine Management Group...*

Related to the Peca 2008 Eufora investment (*ECF No. 501 at 8*), the court stated that "*Kenner did not provide an explanation*" for the Constantine Management Group wire

transfer (allegedly discovered by Michael Peca "*in or around 2011 or 2012*") (*Tr.446-47, 452*).

- o **This was not possible.**

On Peca's confirmation from Schwab, mailed to his Getzville (Buffalo), New York home, it states in **BOLD**:

<b>"Notice of Wire and Third Party Disbursement(s)"</b>

- Schwab also designates at the bottom of the same wire transfer confirmation:

"*If you do not recognize this transaction or if you have any other questions regarding this transaction, please contact us immediately at the telephone above.
Questions: 800-515-2157*"

*Another "lack of knowledge" theory fails for multiple reasons...*

This fails for a myriad of reasons, logistically impossible and glossed over by the government:

**First** -- the only communication between Kenner and Peca by mid-2011 thru 2012 was the five hours of surreptitious recordings by Michael Peca and his wife of Kenner for the FBI.

- *At no time during the 2012 recordings does Michael Peca address the Eufora-Constantine Management Group issue.*

**Second** -- although Michael Peca refers to Ken Jowdy as Kenner's co-conspirator in his 2017 independent submission to the EDNY court (*ECF No. 482 at 2 (Peca letter)*), it must be noted that Peca worked actively with Jowdy, Tom Harvey and Louis Freeh in 2012-13 to *fight against* the ongoing Kenner-led efforts in the USA and Mexico to recover funds from Jowdy for the Hawai'i loans and Mexico embezzlements.   In 2012, Peca submitted a California Bar Complaint versus the Hawai'i group's attorney (Ronald Richards).   It was drafted (along with four others) by Jowdy's attorney, Tom Harvey to further disrupt the efforts of anyone versus his client; Jowdy.   Harvey's subterfuge with Peca was part and parcel to Jowdy's employees (Bryan Berard and John Kaiser) representing to the entire Hawai'i investment group that Jowdy *never* received any of the Hawai'i "loans" (as scripted by FBI agent Galioto and Jowdy's attorneys), *infra*.  This *iteration* of Kenner stealing the Hawai'i money echoed the Kristen Peca 2012 FBI recording admission what FBI agent

Galioto told her.[30]   Thus, they claimed that Kenner *also* stole all of the "loans" and attorney Ronald Richards helped him conceal it.

Clearly – and according to Jowdy's documentation, Jowdy's bank records, and the *government-forfeiture-44* admission post-trial, *only Jowdy* received 100% of those funds in spite of "*bogus*" (*Tr.5708 (2x), 5709*), "*phony*" (*Tr.4597, 4598*) and "*supposed*" (*Tr.5707-5708*) trial manifestations by the U.S. Attorneys, seeking conviction at all costs – and proffering it to the jury a "*Kenner cover-up story*".

After Peca's frivolous 2012 Bar Complaint was swiftly dismissed following Ronald Richards' reply (*Bates stamp: ED-0001257-1262*), Peca was left without options other than to follow the FBI fabrications at the 2015 trial with Galioto's underlying promises that he would immediately receive 100% of some incalculable funds back from Kenner if found guilty.

- *Kristen Peca admitted this FBI stratagem to Kenner on her 2012 FBI recordings.*

➢ Because there was "no communication" between Kenner and Peca from late 2011 thru Kenner's November 2013 arrest – no conversation could have ever occurred to "address" or "refuse to address" the Constantine Management Group transfers in 2008 for Constantine's Eufora stock.

**Third** – and commensurate with the Ranford **CTE** trial-symptoms, Peca would have received his transfer confirmations from Charles Schwab related to the 2008 *transfer (Tr.2850-51, 2854-55).   They would have included the destination account; Constantine Management Group.*   If Peca had any questions about the veracity of the recipient – no time would have been better to demand an answer than in 2008 from

---

[30] Kristen Peca 2012 FBI recording of Kenner:

> *Kristen Peca – Matt [Galioto] told Michael and I that you stole all of the Hawai'i money and never gave it – the loan money -- to…uhhhh…Jowdy.*

> *Kenner – Kristen – I have all of the bank records that prove the money went to Jowdy and his accounts at all times.  I told you that already. You told me that you saw the bank records after I sent them to Michael.  You know -- the attorneys who sued Jowdy for the money in Mexico and Arizona and California used them to confirm the loans before we sued?*

> *Kristen Peca – but – I don't understand why he would say it.*

Kenner &/or Charles Schwab; yet **Peca did not, according to his own testimony** (*Tr.446*).

**Fourth** – in order for any transfer to occur from Michael Peca's Schwab account – or any other Schwab client whether or not they are related to Kenner – *the actual client was required give oral confirmation to Schwab before the funds were transferred*.   This protocol specifically includes the documents Kenner signed on behalf of Peca and others as their *limited Power of Attorney*.  This is confirmed by the following text communication between Kenner and Peca – after his verbal approval with his independent Charles Schwab representative to release the funds:

Peca texts in BLACK (read); Kenner replies <mark>hi-lighted</mark> and in <span style="color:red">RED</span> (Sent):

| | | | | |
|---|---|---|---|---|
| 4 8 2 0 | +17163 743234 Michael Peca* | 1/12/2009 7:19:44 PM(UTC+0) | Read | Just got Shwab statement and saw the 600+k in and 1m+ out. **Please send wire request so I have it for my records** |
| 5 7 5 2 | +17163 743234 Michael Peca* | 1/12/2009 7:30:11 PM(UTC+0) | Sent | <u>You bet. I'm back in my office tonight.</u> Hope you are well. Happy New Year... |
| 4 8 2 1 | +17163 743234 Michael Peca* | 1/12/2009 7:31:23 PM(UTC+0) | Read | Thanks. |
| 5 7 5 3 | +17163 743234 Michael Peca* | 1/12/2009 7:33:56 PM(UTC+0) | Sent | Welcome buddy |

**Fifth** – as a **FINAL** and **FAIL-SAFE** security mechanism for Peca and all other Kenner clients who had funds transferred from Schwab to Constantine Management Group (or anywhere), they also had to give a secondary confirmation by phone to their investment advisory firm (who frankly was under FINRA requirements – unlike Kenner); *Greenberg Graham Advisors*.  Kenner's former assistant verified this salient fact to the FBI during her 9-9-2010 proffer (*3500-KM-1-r at 5*).  The FBI "raw notes" confirmed, with FBI agent Galioto present, that:

> "*JG [Jim Graham of GGA – the FINRA manager for the Kenner clients] wanted access to clients accounts....for wires JG would want access to clients directly*"

Thus, for five independent reasons, *supra* – it was wholly impossible for Michael Peca (or anyone who transferred funds to Constantine Management Group -- or any other recipient) to not be aware of the fund movement (payee and amount) <u>*before*</u> the funds left his account.

### Kenner's alleged grand-scheme to gamble his life away...

Kenner received $**117,000** from Constantine's private stock sales to repay the government-documented loans.   Kenner received $**162,500** from Gaarn's private stock sales to repay the government-documented loans (verified by Gaarn to the FBI thru proffer -- and at trial).

Constantine's loan repayments to Kenner -- and Gaarn's loan repayments to Kenner totaled the <u>only</u> money Kenner received "*over the course of a decade*"-plus elaborate scheme (*ECF No. 765 at 3*).  The government claimed Kenner was willing to "*gamble away...lives...of perks and privilege*"(*Id. at 3*); and alleged using sophisticated means, breaching the trust of his friends and colleagues, etcetera...for approximately $**279,500** in total.

- Kenner earned that amount of money virtually every quarter in his businesses, but took a decade of scheming and personally spent millions in litigation to defend his clients for that "windfall"...with the government seeking "*no less than 20 years imprisonment*" (*Id. at 4*).

These are the "*defendants' scheme that was difficult to detect and disrupt*" (*Id. at 43*), perhaps -- after?...

> (1) Kenner filed a half-dozen lawsuits <u>with his investors</u> for the alleged "undetectable" funds in four jurisdictions (including two countries);
> (2) Filed media stories to announce the litigation in the U.S., Canada, and Mexico; and
> (3) Then helped expose Constantine and his Eufora management schemes with the most well-known prosecutor (Rudy Giuliani) in America.

- **How is this difficult to detect or even concealed; unless in never-never-land?**

*Nature and circumstance of the offense...*

Hopefully, there is more money and substance to the government's alleged scheme for Kenner who (1) spent millions in litigation to protect his investors and recover funds, (2) risked a near-death 3-plus-day beating in a Mexico jail, (3) exposed loans and equity funds misused by Jowdy (*ECF No. 667*), Constantine, Kaiser, Berard and others since 2003 (all thru independent counsel and separate litigation efforts

primarily funded by Kenner), and (4) while the investors were represented by independent counsel in every instance.

Clearly, the alleged victims were not beholden to Kenner for their recovery at any point in time (*Tr.713 [Kristen Peca], Tr.1830 [McKee]*), contradicting another government false theme (*Id. at 36*).

# Appendix 1
# (Credits against Loss Charts)

**Hawai'i -- CREDIT AGAINST LOSS CHART:**
- **NO POSSIBLE CALCULATION OF LOSS...**

| Hawai'i | Gross LOC investment amount (ø) [Information only] | Capital account traceable to Constantine consulting (¥) | Capital account traceable to Jowdy loans (†) | Minimum 2008 Jowdy settlement value [Also signed by Juneau & Moreau] | Minimum 2017 Jowdy settlement value | Bond interest earned (From capital account investment strategy) | 2015 Testified recovery amount | "Net positive" recovery value of Hawai'i investment |
|---|---|---|---|---|---|---|---|---|
| Nolan | 2,198,910[31] | 0 | 425,000[31] | 3,250,000[32] | 0 | 592,878 | 500,000 | 2,143,968 |
| Peca [33] | 1,794,392 | 0 | 240,000 | 0 | 0 | 300,052 | 600,000 | X [32] |
| Berard | 649,405 | 0 | 150,000 | 0 | 943,000 | 129,314 | 300,000 | 722,909 |
| Sydor | 856,200 | 0 | 200,000 | 0 | 471,500 | 249,215 | ? | 606,513 |
| Rucchin | 1,010,645 | 0 | 300,000 | 0 | 471,500 | 210,113 | ? | 329,032 |
| Totals: | | 0 | 1,315,000 | 3,250,000 | 1,886,000 | 1,601,572 | 1,400,000 | x |

[31] Please note that Nolan had his 2006 Little Isle 4 (Hawai'i) K-1 tax document in his personal possession and produced it to Kenner during the 2009 *Nolan v. Kenner* arbitration with *Bates stamp: NOLAN00005044* (which Kenner forwarded to the SEC in 2011, for further disclosure as *PK_SEC_013677*).
- The government tried to claim that only Kenner had copies of it at his home (*Tr.2145-46*). This was another unmitigated fraud on the Court that the government was deftly aware of; knowing the truth would destroy another "*did not know my money was used*" testimony (*Tr.2064-65*).

[32] Owen Nolan received a 1% transfer "settlement" from Jowdy in 2008 for all transactions Jowdy received directly or indirectly from Nolan (for debt or equity). This included any funds traceable to Nolan's Hawai'i funds ($425,000), *supra*. The offset value of the Jowdy 1% transfer was no less than $3,250,000 in 2009. Jowdy acquired Nolan's $425,000 and conveyed recompense of the equity value. From that date forward (settlement date), Nolan's financial future was specifically and independently chosen -- by him -- to align with Jowdy; whether Nolan (whose attorney was partnered with Jowdy) was aware of the prior and ongoing Jowdy crimes or not. Either way – they are neither Kenner's concern nor fault.

[33] Michael Peca verified he knew about the loans to Jowdy during his 2015 trial (*Tr.498-99*) and 2011 SDNY Grand Jury testimony (*3500-MP-5 at 30-33, 35, 40, 42, and 45*) and as such, *cannot* be deemed a victim of a transaction he authorized in real time.
- The question in front of the Court is who else was part of the "*group*" that Peca, Darryl Sydor and Turner Stevenson testified to the SDNY Grand Jury they were part of when the decision was made?

Per the chart, *supra*, and the detailed back-up information, *infra* **no losses and no victims can be adduced from the Hawai'i "object" of the alleged conspiracies**; *See Evans II, supra.*

Ø – This amount is solely for reference.   Each Hawai'i investor capitalized their Hawai'i partners' capital account using their-own LOC capital -- via a *signed* "*Extension of Credit*" document delivered in the Northern Trust Bank subpoena, which was received in week-7 of the trial (and unable to be used for cross-examination) with the following affirmations:

- o **Nolan** – "*$2,200,000 – investment in Little Isle 4 LLC*"
    - ▪ *Bates stamp: TNTC000764-65*

- o **Peca** – "*$1,775,000 – increase to loan used for speculative real estate investments*" (*noting that Peca had already signed  $1.6 million Extension of Credit*)
    - ▪ *Bates stamp: TNTC000305-06*

- o **Berard** – "*$900,000 – investment in speculative real estate*"
    - ▪ *Bates stamp: TNTC000209*
    - ▪ Please note that Berard *re-signed* his LOC package with Northern Trust Bank for $650,000 in 2006 -- *after* he received the Lehman Brothers JV settlement payment of $282,036.20 on 8-25-2006 (*Bates stamp: TNTC00002*) -- and reduced his collateral based on his *direct* communication with Northern Trust Banker, Aaron Mascarella *(Bates stamp: PKHome-012162) (ECF No. 736 #1 at 52, footnote 52, Exhibit Ex.Z48)...*thus nothing was possibly concealed about the use of funds and amount contributed to his capital account.

- o **Rucchin** – "*$1,000,000 – investment in Little Isle 4 LLC*" (Rucchin's second *signed* LOC *Extension of Credit*, within 60-days of his original $480,000 LOC on 11-4-2004)
    - ▪ *Bates stamp: TNTC000592-93, and TNTC000421-22, respectively...*

- ➢ Please note that the Northern Trust Bank subpoena was *grossly incomplete* and did not contain the Darryl Sydor *Extension of Credit* document.

† -- These funds are traceable from the superseding indictment originating investors to the Jowdy 2004-06 Hawai'i loans.   These are the only funds that can be deemed based on fraudulent conduct to start the "credits against loss" calculation.

¥ -- There are _no_ funds traceable from the superseding indictment originating investors to the Constantine consulting payments (*ECF No. 736 #1 at 24-26*); clearly rendering a "*no loss*" factor related to the By-Law authorized consulting payments.

*See United States v. Ebbers*, 458 F.3d 110 (2d Cir 2006) – "'**[t]he loss must be the result of the fraud**." *Id*. at 128.   "**[l]osses from causes other than the fraud must be excluded from the loss calculation**." *Id*.

The Court should note that _no funds are traceable_ to the $1,000,900 that FBI forensic analyst, Petrellese, told the 2015 EDNY court Constantine received from his consulting payments (*Tr.3934*) – from superseding indictment alleged victims; _none_.
o   The consulting funds paid to Constantine are traced and stated in Kenner's verified forensic submission (*ECF No. 736 #1 at 24-26*).
o   Chris Manfredi verified the Constantine consulting agreements to the FBI during his October 2010 proffer (*3500-CM-2-r at 1*); leaving a critical question unanswered…"*Where are the agreements if Kaiser and the government claimed GX-5104 are 'forged' with Kaiser's signature?*"
 ▪   *It is indefensible by Kaiser or the government*.

*The only traceable funds to the alleged Hawai'i frauds…*
Hawai'i LOC contributions traceable from their capital accounts thru forensic back-tracing confirm _their_ contributions totaled $**1,315,000** of the approximate $5 million in principal that Jowdy received (the remainder from non-victims).   Kenner was not charged with any corporate frauds, nor ever sued civilly by Kaiser and the Hawai'i partners since Kaiser Managing Member in 2007.
•   The documented Jowdy-loan (*government-forfeiture-44*) is still collectible, in spite of the government's un-willingness to assist Kenner or any Hawai'i members thru multiple letter-requests by Kenner to the government…
•   The Court should note that the government agents continue to tell the investors that Kenner received the money, not Jowdy (like FBI agent Galioto told Kristen Peca and Michael Peca to sway them after Michael Peca's 2011 SDNY Grand Jury (*See footnote 30*).

1)   Michael Peca ($**240,000** distributed to Jowdy thru Little Isle 4's capital account),
2)   Darryl Sydor ($**200,000** distributed to Jowdy thru Little Isle 4's capital account),
3)   Owen Nolan ($**425,000** distributed to Jowdy thru Little Isle 4's capital account),
4)   Steve Rucchin ($**300,000** distributed to Jowdy thru Little Isle 4's capital account), and

5) Bryan Berard (**$150,000** distributed to Jowdy thru Little Isle 4's capital account)

- 100% of these funds have been *offset* thru:
  (1) Northern Trust settlements (thru independent counsel) ($1,400,000)[34];
  (2) Northern Trust Bond interest received as part of the alleged cover-up by the government ($1,601,572); and
  (3) And the 2008 and 2017 settlement agreements with Ken Jowdy (thru independent counsel) *($$$ -- millions and millions of independently negotiated value: violating MVRA restrictions on double-collection and loss calculations).*

***No other superseding indictment alleged victims' funds are traceable to the allegations in the instant case.***

As such -- there is <u>no loss</u> in the Hawai'i "object" for any alleged victim in the superseding indictment…

*See United States v. Rutkoske*, 506 F.3d 170 (2d Cir 2007), and

*United States v. Evans*, 744 F.3d 1192; 2014 U.S. App. LEXIS 4490 (10th Cir 2014) (*referencing Turk*) (*Evans I*)…and
- *2nd appeal for improper calculation (again) -- United States v. Evans*, 677 Fed. Appx. 469; 2017 U.S. App. LEXIS 1942 (10th Cir 2017) (*Evans II*);

"**[w]ithout an actual loss, there could be no victims**"

*Owen Nolan calculation…*
**Owen Nolan** has **$425,000** of Hawai'i partners' funds traceable to the Jowdy loans.

---

[34] The government submitted to this **$1.4 million "offset"** in their sentencing memo (*ECF No. 765 at 30*); wholly exceeding the entire "fraud" loss for the Jowdy loans to Peca, Nolan and Berard.  Any other perceived loss from their "investments" is categorically designated to "non-fraud" factors.

***At most*** – the Rucchin ($300,000) and Sydor ($200,000) "losses" can be the starting point for any loss calculation; before their own 2017 Jowdy settlement, and fungible (*Tr.4024* [Wayne]) argument that Peca told the 2011 SDNY Grand Jury that he expected his entire $1.8[75] million to be used for the Jowdy loans (*3500-MP-5 at 30-33, 35, 40, 42, and 45*). Darryl Sydor echoed the identical Grand Jury testimony in 2011 (*3500-DS-2 at 19, 24, 25*), and his lack of memory of the 4-year-old testimony *cannot* be his basis for a "concealed loss"; *See Alexander.*

Nolan _recovered_ $**500,000** from Northern Trust Bank – _exceeding_ the amount of funds – traced to his capital contribution – that was loaned to Jowdy, Nolan's only nexus to the alleged frauds in the instant case.

- **Nolan fully recovered his funds**; alleged as fraudulently handled.

Nolan _received_ $**592,878** in tax-free bond interest from 2003-2009 (pursuant to the collateral investment strategy).   This is clearly another recovery, ignored by the government who claimed the collateralized investment was the cover-up scheme. ***It must be calculated in the offset, as such***.   Nolan's _signed_ a Northern Trust bank _Extension of Credit_ document (_Bates stamp: TNTC000764-65_) verifying his investment commitment – and received in the week-7 Northern Trust Bank subpoena, which confirmed Nolan's implicit knowledge of the underlying collateralized investment plan.

**Nolan** signed a 2008 settlement agreement with Ken Jowdy (identical to Juneau [_Tr.354_] and non-witness Ethan Moreau – a.k.a. Bad Apples).   _Nolan received a 1% stake of the Diamante Cabo project from Jowdy_.   This had a minimum value of $3,250,000 in 2009 (_$450 million appraisal minus $125 million Lehman Brothers-Danske Bank debt maximum_).

- **Appraisal** – _Bates stamp: 6694-6967 at 4_ (from Jowdy's 2010 California production); and
- **Debt** – _Bates stamp: BNK-DANSKE-00001-00005 at 1_ (from Danske summary of DCSL transaction)...

- In 2008 – Nolan, under advice of counsel, chose to tie his financial destiny to Ken Jowdy, the recipient of all funds Nolan had failed to recover related to the instant case.   Nolan made the decision to accept the full recovery thru the Jowdy settlement without duress or communication with Kenner.

At the time of the negotiated settlement recovery for the various Nolan transactions, Jowdy "benefitted" from the following funds received thru Nolan:

- $500,000 at Diamante del Mar (and pilfered, records in evidence);
- $100,000 stolen thru Baja Development Corp [_Bates stamp: TD197, from the Jowdy 2010 California production, and PKHome-0016860_] for DCSL (records in evidence); and
- ***$425,000 from the Hawai'i partners' loan***...

***As compensation for the above transactions --*** **Nolan** <u>recovered</u> the 1% value of the DCSL project.   **That net value recovered by Nolan, thru independent negotiations totaled no less than $3,250,000**.

- Nolan's recovery was independently negotiated for and received as re-compensation; wholly designated as an offset to loss and governed by MVRA statute to not double-collect or effectuate a windfall recovery, certainly not above the value of the fraud-factor calculations of $425,000 that Jowdy received thru the Hawai'i partners' loans.

- <mark>Nolan has no loss and cannot be deemed a victim; *see Evans* "[w]ithout an actual loss, there could be no victims"</mark>

*Michael Peca calculation...*
<mark>**Michael Peca** has $240,000 of Hawai'i partners' funds traceable to the Jowdy loans.</mark>

**Michael Peca** <u>confirmed</u> to the 2015 trial Court that his 2011 SDNY Grand Jury truthfully depicted his knowledge of the Jowdy loans (*Tr.498-99*).   As such, Michael Peca cannot be deemed a victim of a corporate authorized transaction that he also authorized and verified as:

> *[**Michael Peca**]: "$100,000 cash investment that was going towards that. Then we had lines of credit. I had one out for $1.7 million that was going to be used at the time. Here's where a lot of the cross starts to happen. A short-term loan to Mr. Jowdy, because at the time Cabo – we hadn't gotten the lending from Lehman Brothers yet. We made a short-term loan until the lending came in. Once the lending came through they were to pay back the loan, I think in the neighborhood of five-and-a-half million dollars, on the closing. It was never paid back. And then communication basically seized at that point from him [Jowdy]. That was kind of the whole sticking point as far as me and the other guys with Mr. Jowdy.*
>
> *The 1.7 along with the $100,000 and whatever else put in this a capital account, Little Isle 4, I believe. <u>The Capital account was loaned to Ken Jowdy, our business partner</u>, <u>so there is no need at the time to be worried about anything</u>. <u>The money was loaned to Ken Jowdy to basically help some of the purchase of the Cabo property so we can get the funding. And then it was supposed to [be] a short-term loan.</u>"*

- <u>The Court should note that Michael Peca expected his entire $1.8[75] million capital account to be loaned to Jowdy as part of the Mexico project fortifications</u>, *supra*.   This is far more than the entire traceable $1.315 million that Jowdy

received from the individuals in the superseding indictment.   Agent Wayne confirmed that corporate funds are fungible (*Tr.4024*), thus, Peca's authorization could be determined to have covered the entire outlay to Jowdy.

No funds from Michael Peca (or any superseding indictment alleged victim) are traceable to the Constantine consulting payments.

**Peca** *received* $**300,052** in tax-free bond interest from 2005-2009 (pursuant to the collateral investment strategy).   This is clearly another recovery, ignored by the government who claimed the collateralized investment was the cover-up scheme. It must be calculated in the offset, *as such leaves Peca with no loss*.

- Peca's *signed* a Northern Trust bank *Extension of Credit* document (*Bates stamp: TNTC000305-06*).   It was received in the week-7 subpoena and confirmed his knowledge of the underlying collateralized investment strategy.

Additionally, **Michael Peca** *testified* he *recovered* $**600,000** from Northern Trust Bank – *exceeding* the amount of funds – traced to his capital contribution – that was loaned to Jowdy.   Michael Peca fully recovered his funds; alleged as fraudulently handled (in spite of his testimony that he authorized it in the first place, *supra*), *as such leaves Peca with no loss*.

- The Court should note that Peca, Sydor and Stevenson (*3500-TS-1 at 17-18*) all verified their "*group*" knowledge with "*all of the investors*" (*also See ECF No. 652*); leaving the enigma of who could not have known, notwithstanding willful blindness.
- ==Michael Peca has no loss in the "Hawai'i object" and cannot be deemed a victim; *see Evans* =="[w]ithout an actual loss, there could be no victims"

*Bryan Berard calculation…*

==**Bryan Berard** has $150,000 of Hawai'i partners' funds traceable to the Jowdy loans.==

- Berard's 2017 settlement agreement was clearly a tremendous offset, *specifically with Berard working for Jowdy at the time*, and fully comprehending first-hand, Jowdy's world-class development prowess.

**Berard** *received* a 2017 settlement agreement from Ken Jowdy – who was his boss at the time (receiving separate compensation to assist in the arrest and detainment of Kenner; terminating lawsuits against Jowdy, Berard and Kaiser at the time). Berard's independently negotiated value was approximately $**943,000** at the time of the settlement as an offset to any potential Hawai'i loss, *as such leaves Berard with no loss*.

Berard _received_ $**129,314** in tax-free bond interest from 2003-2009 (pursuant to the collateral investment strategy).   This is clearly another recovery, ignored by the government who claimed the collateralized investment was the cover-up scheme. ***It must be calculated in the offset, as such***.   Berard's second Northern Trust bank 2005 _Extension of Credit_ document (_Bates stamp: TNTC000209_) was received in the week-7 subpoena.  It confirmed Berard's knowledge of the underlying collateralized investment.

- Upon information and belief, Berard also signed the same 1% deal that Nolan received, _supra_, during the pendency of his 2012-2017 involvement with Jowdy in Mexico.   In the Nolan calculation, this was valued at $**3,250,000**.

Berard _recovered_ approximately $**300,000-plus** from Northern Trust Bank (_Tr.3042_) – _exceeding_ the amount of funds – traced to his capital contribution – that was loaned to Jowdy.   Berard fully recovered his funds; alleged as fraudulently handled (in spite of his 2009 arbitration testimony that he authorized it in the first place, _infra_), _as such leaves Berard with no loss_.

Berard 2009 arbitration testimony only two months after his phone-authorized collateral seizure directly with Northern Trust Bank employees, Mascarella and Brill (_Berard, Day 5 at 76-77_):

> _Q. Were you aware that Mr. Kenner got a credit line against some securities or investments you had?_
>
> _A [Berard]: Yes._
>
> _Q. And later on were you aware that Mr. Kenner starting lending this money to another principal in the Cabo project named Ken Jowdy?_
>
> _A [Berard]: Yes._
>
> _Q. Were you aware that he had disclosed to you that he was going to lend this money at a rate of interest to benefit the investors?_
>
> _A [Berard]: Yes._
>
> _Q: And later on were you aware that Mr. Kenner started lending this money to another principle in the Cabo project names Ken Jowdy?_
>
> _A [Berard]: **Yes**._

61

*Q: Where did you think the money that Mr. Jowdy – were you told where the money that was given Mr. Jowdy as far as the Mexican project?  Was there anything you were told about that?*

*A [Berard]: **Basically just loan him the money for the project.***

- Berard has no loss in the "Hawai'i object" and cannot be deemed a victim; *see Evans* "[w]ithout an actual loss, there could be no victims"

*Darryl Sydor calculation...*
**Darryl Sydor** has $200,000 of Hawai'i partners' funds traceable to the Jowdy loans.
- His 2017 CSL Properties settlement agreement was clearly a sufficient offset.

Sydor *received* his **5%** portion of the 4.6% CSL Properties LLC equity increase in Diamante Cabo san Lucas from the Jowdy 2017 settlement agreement worth approximately **$471,500**, *as such leaves Sydor with no loss*.

Sydor *received* $**249,215** in tax-free bond interest from 2004-2009 (pursuant to the collateral investment strategy).  This is clearly another recovery, ignored by the government who claimed the collateralized investment was the cover-up scheme. ***It must be calculated in the offset***, *as such leaves Sydor with no loss*.

Sydor had no offset from Northern Trust Bank recoveries, like Rucchin, as Sydor testified that he was not aware of the collateral loss until 2-weeks before trial (6-years after the event) (*Tr.2166-67, 2191*).  Sydor's **CTE**-laden testimony was debunked by his own 2009 text messages with Kenner in real time that confirmed he received the March 2009 default letter, which he could not recall at trial even after being shown his text verifying the receipt (and matching the default letter **$855,351.03** total – *GX-2119 at 1*), which the government knew and ignored:



| 6083 | +19725230505 Darryl Sydor* | 3/23/2009 1:59:36 AM(UTC+0) | R e a d | What funds ? **And this thing says I owe 855,351.03 right now.** |
|---|---|---|---|---|

Sydor also testified he could not recall talking to Northern Trust Bankers prior to his collateral seizure authorization (*Tr.2211-12*).  This was also debunked with another 2009 text conversation between Sydor and Kenner the day of his phone calls with Erin [sic] Mascarella, his **Northern Trust Banker; Aaron Mascarella**:

| 6316 | +1972523 0505 **Darryl Sydor**\* | 4/1/2009 8:48:29 PM(UTC+ 0) | R e a d | **Hey someone from northern trust called with someone from schwabb. And want to do a conference call in a hour with erin [sic] someone** |
|------|------|------|------|------|

The Court may recall that Sydor also confirmed his Jowdy loan knowledge as part of the "*group*" to the 2011 SDNY Grand Jury (*3500-DS-2 at 18, 24, 25*):

> *Q:  Was that [the LOC at Northern Trust Bank] also for Little Isle 4 as far as you know?*
>
> **A [Sydor]: Yes, but then we put it towards a short-term loan to Mr. Jowdy until Lehman Brothers came up with the money that was supposed to be paid back."**
>
> *Q: Did you know in advance that it was going to be used, this Little Isle 4 money, to be used to salvage the Cabo investment?*
>
> **A [Sydor]: <u>Yes.  It was to help with the short-term loan to keep funding the Cabo, but then its supposed to be paid back,</u> but that's –**
>
> *Q: Paid back to you or to Little Isle 4?*
>
> **A [Sydor]: Paid back to Little Isle 4.**
>
> *Q: So –*
>
> **A [Sydor]: <u>Back to Hawai'i, not me personally.</u>**
>
> *Q: Bu that didn't happen?*
>
> **A [Sydor]: That didn't happen.   And Lehman came up with the $129 million loan. It was supposed to be back at closing.**

In spite of Sydor's full verifications of Jowdy loan knowledge in 2011, mis-remembered for any number of reasons in 2015 (previously and fully briefed by Kenner), there is more than full compensatory offset agreed to and recovered by Sydor from the Jowdy 2017 settlement agreement and his Northern Trust Bond interest.

- Sydor has no loss in the "Hawai'i object" and cannot be deemed a victim; *see Evans* "[w]ithout an actual loss, there could be no victims"

*Steve Rucchin calculation…*

**Steve Rucchin** has $300,000 of Hawai'i partners' funds traceable to the Jowdy loans.

- His 2017 CSL Properties settlement agreement was clearly a sufficient offset.

Rucchin *received* his **5**% portion of the 4.6% CSL Properties LLC equity increase in Diamante Cabo san Lucas from the Jowdy 2017 settlement agreement worth approximately $**471,500**, *as such leaves Rucchin with no loss*.

Rucchin *received* $**210,113** in tax-free bond interest from 2004-2009 (pursuant to the collateral investment strategy).   This is clearly another recovery, ignored by the government who claimed the collateralized investment was the cover-up scheme. *It must be calculated in the offset, as such*.   Rucchin's *signed* Northern Trust bank *Extension of Credit* document was received in the week-7 subpoena from Northern Trust Bank.  It confirmed his knowledge of the underlying collateralized investment startegy.

Rucchin had no offset from Northern Trust Bank recoveries, like Sydor, as Rucchin testified that he was not aware of the collateral loss until 2-weeks before trial (6-years after the event) (*Tr.2729-30*).   In spite of his trial testimony, Rucchin signed at least three (3) independent transfer documents with Northern Trust Bank to close his account after the collateral seizure (following his verbal authorization, identical to Sydor, Peca and the remainder of the LOC clients of Northern Trust Bank, *supra*). Rucchin's *signed* documents transferred:
>    (1) His remaining bonds back to his Schwab account (4-8-2009);
>    (2) His remaining cash back to his Schwab account (4-9-2009);
>    (3) 3-weeks later, another cash position back to his Schwab account (4-27-2009); and
>    (4) 1 month later, the final cash transfer to his Schwab account (5-1-2009) (*commemorated by: Bates stamp: PK_SEC_05504*).

- It is not credible, *or even logistically possible*, that Rucchin was unaware of the fund deficiencies during his four independent transfer activities with the Northern Trust and Schwab banking officials; in addition to his FINRA investment advisor, Jim Graham, who would have confirmed the funds received verbally and via email (in Rule 16 production).

- This also ignores the fact that Rucchin's Schwab account would have verified the amount of funds received on his April and May 2009 statements; leaving no independent question about the amounts of funds left over after his voluntary collateral seizures.
  - o Only willful ignorance could account for this mental anomaly, unless Rucchin's severe **CTE** symptoms are at fault (understandably, just not an impossible concealment scenario as portrayed by the government and orchestrated by Kenner).

Rucchin invested $**300,000** on 3-12-2007 from his Northern Trust Bank LOC into a 3rd party investment, unrelated to the instant case – further reducing his net Hawai'i partners investment exposure (*Bates stamp: BN-P-000228*).

**CREDIT AGAINST LOSS CHART – Eufora private stock sales:**

| Eufora | Investment amount | 3.38% reduction value | Net value of Eufora investment (assuming fraud calculation) |
|---|---|---|---|
| Ranford | 300,000 | 10,140 | 289,860 |
| Peca | 100,000 | 3,380 | 96,620 |
| Nash | 100,000 | *3,380* | 96,620 |
| Sydor | 50,000 | 1,690 | 48,310 |
| Rucchin | 150,000 | 5,070 | 144,930 |
| **Totals:** | **700,000** | **23,660** | **676,340** |

*2008 purchases from Constantine...*
- Peca -- $100,000
- Nash -- $100,000
- Sydor -- $50,000
- Ranford -- $200,000

As documented, *supra*, **Kenner received $117,000** in previous loan repayments from Constantine as a result of funds traceable to Constantine's private stock sales ($17,000 from the 2008 Nash transaction – and $100,000 from the 2008 Peca transaction).

*2009 purchases from Gaarn (an innocent 3rd party in the instant case)...*

- In the *United States v. Contorinis*, 692, F.3d 136, 148 (2d Cir 2012), the Court "observed that neither the language of the criminal forfeiture statute nor Circuit case law supported the proposition that a defendant must forfeiture proceeds that 'go directly to an innocent third party and are never possessed by the defendant'" *Id.* at 147.

  - Rucchin -- $150,000 ($117,800 to Kenner)
  - Ranford -- $100,000 ($42,500 to Kenner)

As documented, *supra*, **Kenner received approximately $160,000** in previous loan repayments from Gaarn as a result of funds traceable to Gaarn's private stock sales.

***Bona fide purchasers for value…***

- *United States v. Leonard*, 529 F.3d 83, 92 ("A fraud may involve the misrepresentation of the value of an item that does have some value (in contrast to an item that is worthless).   Where, for example, a defendant fraudulently represents that stock is worth $40,000 and the stock is worth only $10,000, the loss is the amount by which the stock is overvalued (*i.e. $30,000*).)"

Neptune Capital valued Eufora at $20,000,000 as part of their 2008-09 due diligence before they loaned Eufora and Constantine a $3,000,000 operating capital loan in February 2009; with strict provisions of use.   Neptune's default penalty would have triggered a 40% equity stake in Eufora (with full forgiveness of the $3,000,000 operating capital loan).

- The Court should note that this "penalty" amount is no more or less onerous than the Urban Expansion $1,000,000 (mis-represented as a $2,000,000 pre-pay penalty; *ECF No. 765 at 9*) – or the Lehman Brothers $125,000,000, pre-payment penalty (on their initial $125,000,000 Cabo loan).   Heavy pre-payments were the norm for capital loans; not the outlier as portrayed by the government ad nauseum.

The Neptune valuation was contemporaneous with all of the Eufora private stock sales by Constantine (2008) and Gaarn (2008-09).

Under Neptune's $20,000,000 valuation, if $700,000 was incrementally supposed to be acquired by the company, the value could not be valued at more than $20,700,000.   Using Neptune's calculation methodology, the "alleged diverted proceeds" would have reduced the corporate value by **3.38**% (after all of the Gaarn purchases were complete).   *That would be the only calculation needed to determine the value not received as bargained for*.

- "Intent to harm cannot be found when alleged victims 'received all they bargained for, and [defendant]'s conduct did not affect an essential element of those bargains."   *United States v. Novak*, 443 F.3d 150, 159 (2d Cir 2006).

The Court must also note that Nash (*Tr.1915*) and Gonchar (a non-victim) (*Tr.4854*) expressly told the 2015 trial court they expected to receive a part of a great company.   **They did**; *see also Leonard*.

***Nevertheless, under the calculation method in Leonard or Novak, supra, the total loss from fraud factors <u>cannot</u> be more than $23,660.***

**CREDIT AGAINST LOSS CHART – Global Settlement contributions:**

| GSF | GSF Contribution Amount | Percentage of total GSF contribution overspent by Constantine | Value of $17,077 overspend by Constantine [35] | Net non-fraud value - - after Constantine overspend |
|---|---|---|---|---|
| McKee | 250,000 | .374% | 935 | 249,065 |
| Peca | 250,000 | .374% | 935 | 249,065 |
| Ranford | 300,000 | .374% | 1,123 | 298,877 |
| Sydor | 250,000 | .374% | 935 | 249,065 |
| Nash | 100,000 | .374% | 374 | 99,626 |
| Rucchin | 50,000 | .374% | 186 | 49,814 |
| **Totals:** | **1,200,000** | | **4,488** | **1,195,512** |

The individuals in the superseding indictment have a *net loss of value* from the Constantine overspend of $4,488 (*per ECF No. 501 at 60*); *once the fraud and non-fraud factors are separated.*

- The Second Circuit opined in *United States v. Ebbers*, 458 F.3d 110 (2d Cir 2006) – "**[t]he loss must be the result of the fraud**." *Id*. at 128.   "**[l]osses from causes other than the fraud must be excluded from the loss calculation**." *Id*.

Three government witnesses gave "*I only expected legal fees versus Jowdy*" testimony (*Tr.739 [Kristen Peca]*).   The government confirms this testimony – but errs again in unrelated transcript citations with Michael Peca at *Tr.684-85 (unrelated)*, while McKee[36] at *Tr.1814 (confirmed)*, and Rucchin at *Tr.2749 (confirmed)* (with a $75,000

---

[35] The Court determined under their calculation methods in 2017 that Constantine overspent the GSF contributions by **$17,077** in Constantine's favor (*ECF No. 501 at 60*).
- This calculation specifically ignored the additional $1,250,000 Gonchar verified to the Court Gonchar also authorized for Constantine's use (*Tr.4826-27*); and

- This calculation suggested that the $124,985 that Constantine contributed to the Ronald Richards Trust account on 9-8-2009 with the other GSF contributions was a "pay back" against other funds he used – and not an incremental contribution for his own future use.

[36] The court should note that Jay McKee and Kenner conducted a detailed text communication the same night as the McKee-Constantine dinner to "pitch" the GSF concept.

GSF transfer to Ronald Richards legal fees the same day as Rucchin's $50,000 entire contribution – ***removing Rucchin as a victim from any possible concealment*** of other, unknown uses or frauds – *GX-767, introduced at Tr.1826*).   Rucchin's proportionate share of the $17,077 Constantine-overspend ($186) *must* be removed from calculation; and as Second Circuit Judge William H. Pauley III was once infamously quoted, and tell them "*they can keep the change*"; *Dial Corp. V. News Corp.*, 2017 U.S. Dist. LEXIS 196637.

- The net loss (of $17,077) from the alleged Constantine mis-management still allowed Constantine to distribute over $500,000 in legal fees to the various attorneys working on behalf of the GSF group (not the $225,000 espoused by the government – *ECF No. 765 at 20 -- and Tr.5752, 5755, 6004*).
  - Kenner also made approximately $250,000 in direct payments and litigation expenses thru the pendency of the GSF to the attorneys handling the GSF efforts; including but not limited to attorneys, (1) Ronald Richards, (2) Tom Baker, (3) JT Fox, (4) Maximus Guerrero, (5) Javier Troncoso, (6) Ruben Carillo, (7) Francisco Duarte, (8) Paul Augustine, (9) Jonathan Dessaules, (10) Kevin Harper, (11) Akin Gump, (12) Epstein Becker, etcetera (all in Rule 16 evidence).

The contributors were not deprived of any "expected" value as a result of the alleged Constantine mis-management.   In fact, the Court knows that *legal efforts cannot be deemed to have a guaranteed result*.   Constantine hired the attorneys to deal with Jowdy and the "Bad Apples" issues.   Constantine paid the attorneys approximately $500,000 from the GSF, as expected (*See Ronald Richards testimony – Tr.3805, 3806-3816*) (*GX-767*).

Jay McKee actually testified that he had no guaranteed expectation of recovery, simply the expectation of a legal fight.   [McKee discussing the Constantine GSF "pitch"] (*Tr.1813-14*):

*"They talked about, there was a number of guys, friends of mine, former teammates, that were invested in the golf course in Mexico the northern property, and it was a talk*

---

The texts expose that no element of the GSF plan was concealed from McKee (*ECF No. 668 Appendix at 49-51*), including the fact McKee told the 2015 EDNY court that he spoke with Michael Peca immediately after the meeting to discuss the details of the new Constantine strategy (*Tr.1817*) (exposing any disingenuous concealment allegations by the government with Peca – notwithstanding Peca's-own signed disclosure documents and text/email communications with Kenner and Constantine – in real time, concealing nothing).
- ***McKee cannot be a victim of the GSF – with full, unfettered, real-time knowledge documented in his own text messages***.

*about how we could go after Ken Jowdy legally, they talked about hiring a high-powered attorney out of California, Ronald Richards, and they talked about how we could* **potentially** *recoup some of what I felt was lost money…I believe we wanted to get control of the property legally from Ken Jowdy.* **If** *we could do that and sell the property, we could get our money back."*

Kristen Peca confirmed (*Tr.716*):   *"He [Constantine] said it was going to be kept at attorney Ronald Richards' escrow account at his law offices, and that was the exact attorney we were using to sue Jowdy. So that from that aspect made sense, it was held safe in a lawyer's escrow account. It wasn't an investment, it was for a lawsuit for a legal fund."*

- In addition -- the Court should take notice that the *government never traced funds to a tequila company* as they repeatedly promised the Court they would (*Tr.33, 726, 1074-76, 4722, 4938, 5752, 6003*).   Nevertheless, they doubled-down on their false rhetoric again during their sentencing memo fantasies (*ECF No. 765 at 20-21*), based on an illogical and impossible timeline of events, proven by Kenner as another government fraud on the Court, ad nauseum.

*Lawsuits are not guaranteed – so if they fail – they fail…*
- California attorney Ronald Richards was able to solicit 2-days of Jowdy confessions of all the money Jowdy **stole** from Kenner and Kenner investors (the Hawai'i loans specifically included).  Jowdy's attorney's gave independent verification of the Jowdy thefts thru Jowdy's-own money-laundering LLC; Baja Development Corp.) (*See January 5, 2010 Jowdy California deposition at 291*).[37]

---

[37] Jowdy's California Attorney Robin Crowther *confirmed* Jowdy's receipt of the known loans – only 3 weeks after the Jowdy Arizona "no loans" defense received dismissal in that case, thru other legal malfeasance by Jowdy's attorneys (alleging criminal complicity of the Hawai'i partners attorneys because they supported the facts that the funds Jowdy received were loans) (*Bates stamp: PK_SEC_000800-802*):

*Q [Attorney Ronald Richards]: Do you know where we can get an accurate accounting of the checks that were issued and how the [Baja Development Corp loan] money was spent?*

*A [Jowdy]: for what?*

*Q [Attorney Ronald Richards]: For Baja Development Corp.*

   *[Jowdy's attorney Ms. Crowther]:  Objection.  Assumes facts that you're entitled to that.*

   *Mr. Richards:  Well, we wired him money.*

- It has been the FBI case agent (for the last 10 years) who has had no interest in Jowdy's January 2010 confessions of obtaining the various loans -- and having no repayment plans of the $5 million-plus Hawai'i loans and the remaining millions to Kenner and other Kenner investors "*because of the press releases about him*" (apparently hurting Jowdy's feelings after his thefts).   On February 12, 2010, Kenner confirmed, to Sergei Gonchar, sending the Jowdy California depositions to FBI agent Galioto (*Bates stamp: PK_SEC_004409*).
  - All Kenner received in return was a phone call, tongue lashing about never sending unsolicited evidence to Galioto ever again.

Ironically, the Jowdy "hurt feelings" echoes the Kaiser February 2019 letter that Jowdy repeated no one would recover their funds from him; *ever* (*ECF No. 628*). The irony only expands when the Court recalls that John Kaiser was in full attendance for the 2-day California deposition of Jowdy and Jowdy's full confessions 9-½ years ago!

After being fired by Jowdy after his 5-year co-conspirator protection role, Kaiser now wants the Court to know that:

> *"'the hockey guys will never see a dime' because they said he [Jowdy] was a crook".*

On January 5, 2010 – Jowdy and his attorneys already confessed to that!

*Shockingly*…
9-½-years-later, the government renews their fraud on the Court, Kenner and the investors by fabricating that "*Kenner used approximately $2.4 million to buy a personal stake in Mexico.*" (*ECF No. 765 at 8*).  Is that the Kenner obstinacy the government refers to in "*not taking responsibility*" (*Id. at 4*)?  Wasn't the government's false summation proffers enough prejudice (*Tr.5996, 5711, 5722-23, 5744-45, 5990, 5991-92, 5707-5709*)?

- Perhaps, there have not been enough confessions (including *government-forfeiture-36* and *government-forfeiture-44* – by the government themselves) to conclude…

> "*Kenner did not steal any of the Hawai'i partners funds, nor use them to buy anything (let alone something in Mexico)…*"

---

*Ms. Crowther:  **So what?  You gave him a loan.  That doesn't entitle you to an accounting of how it was spent.***

# Appendix 2
# (Government Sentencing memo lies)

*Napue* violation[38], if it is established that the government knowingly permitted the introduction of false testimony reversal is "**virtually automatic**."

The government continues to lie to the Court about transfers to Kenner for "*personal benefit*", "*pet projects*", and "*personal expenses*" – when the record confirms that <u>*none of these are true*</u>; including "*approximately $2.4 million to buy a personal stake in property in Mexico*" (*ECF No. 765 at 8*).

Almost without explanation, the government has ignored their-own forensic evidence production of 4-plus years ago (from the forfeiture hearing to promote their case findings or "nothing") – and has reverted to the debunked claims all over again.

It is inexcusable, because Kenner's relentless advocacy (with the government's-own evidence used against their trial lies) proves they grossly prejudiced Kenner at trial, effectively announcing its verdict as unsustainable in a future courtroom.  But now -- they must double-down to maintain both their *faulty* verdict (certainly related to the "Hawaii object"), as well as their false claims of nexus to any Kenner "*ill-gotten gain*" in Mexico – for a fraudulent forfeiture demand on this Court.

- *The government has rarely been right about the facts in the case, but their advocacy has never waned or appeared in doubt.   For that, they should be proud, since it is only a man's freedom at stake as a result of their continued promotion for their-own errors…*

| *ECF No. 765* | **Government statement…** | **Rebuttal…** **Government claims are false…** **BECAUSE…** |
|---|---|---|
| *At 2* | "*money was safe*" | False – because -- out of Kenner's control -- the |

---

[38] *United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir 1975) (citing *Napue v. Illinois*, 360 U.S. 264, 269, 3 L. Ed. 2d 1217, 79 S. Ct. 1173 (1959)), *cert denied*, 429 U.S. 819, 97 S. Ct. 65, 50 L. Ed. 2d 80 (1976).

|  |  | investments were safe *until* Jowdy stole funds from DDM, Diamante Air (planes), DCSL, Hawai'i loans, corporate loans, and personal loans (*ECF No. 667*) – and were relentlessly sued for by Kenner until his 2013 arrest, relying heavily on 2-Jowdy employees (per the November 13, 2013 NY Daily News article). |
| *At 3* | *"millions of dollars disappear without evidence of where it went"* | False – because Jowdy was sued for the Hawai'i funds in Mexico and Nevada (in 2007) and in Arizona (2008) immediately after Jowdy's attorneys terminated settlement discussions – and California (2009). <br> • Then – Kenner and Kenner investors sued Constantine after the 2010 transparent Giuliani investigations. <br> • Kenner recorded and turned over the Constantine fantastical ramblings in the *Home Depot* recordings (with Constantine blaming others – not Kenner). |
| *At 3* | *"blame third parties"* | False – because the government claimed Jowdy was a co-conspirator (a.k.a. criminal) (*See May 14, 2019 Tr.37*), so whom else was Kenner blaming (*with Giuliani's group blaming Constantine*)?[39] <br> • The government documents confirm both Jowdy (*3500-KJ-2 at 11-15*) and Kaiser (*3500-JK-1-r at 7*) |

---

[39] Giuliani lead attorney, Michael Stolper, told the SEC what he knew and learned over 2-years working with Kenner and Kenner investors, after the SEC deposed Kenner for nearly 24-hours:

[NY Attorney, Michael Stolper – August 2011] [Ex.Z73]:

> *The only thing I would like to clarify was that I think in your line of questioning, which may not come through in the transcript, whether he [Kenner] disclosed that the SEC has sought enforcement of subpoenas to his clients.   I think that the suggestion in your question was that it was something negative that he should disclose to his clients as sort of a warning or red flag to his clients who are relying on him.*
>
> ***And I think that the conversations that I have been a part of**, without waving privilege, **and also my own view** of SEC's involvement in this whole Diamante del Mar, et. al. is a welcome one and that **we** and Mr. Kenner, are really looking to the SEC to enforce the securities laws against Mr. Jowdy and those [Jowdy's cabal] who did wrong here.   And we see it as a welcome thing, as a positive thing.*
>
> *So the tenor of the conversations with Phil's friends, co-investors, clients is that this is a welcome thing and maybe because we are having this direct communication with the SEC, and then perhaps subsequently with the US Attorneys Office, that maybe they will finally get some justice out of this.*
>
> *And I know I have said that off the record with you and I just wanted to clarify that in response to that line of questioning.   Just a point of information.*

|  |  | stole money from a myriad of sources (unrelated to Kenner), as did Kaiser's testimony at trial, implicating himself and Berard (*Tr.1160-61*); robbing Ethel Kaiser (*Tr.950*), thinking her son only borrowed $390,000 in August 2005, not $850,000 per the banking records in evidence (*Tr.978*) (*GX-65A, introduced at Tr.3916*). <br>• *Government-forfeiture-44* confirms _Jowdy did receive_ and _steal_ 100% of the Hawai'i loan funds. <br>• *Government-forfeiture-36* confirms Kenner _did not_ steal any funds to acquire his Cabo project equity (which the government wrongfully seeks thru forfeiture, _without nexus_) (*ECF No. 765 at 8*). <br>• In fact, Jowdy did not use the loaned funds as the 3 SDNY Grand Jury testimonies (and Kenner) expected – and as corroborated by Kaiser and Berard 2009 arbitration testimony – and the Kaiser October 2010 FBI proffers (*3500-JK-1-r at 2, 3, 10*). |
| *At 3* | "Mexican...unauthorized investment" | False – because per *government-forfeiture-36* – only $350,000 originating from Owen Nolan was traced by the government to the Cabo equity – yet, authorized under the Little Isle 4 corporate control agreement. <br>• In 2008 -- Jowdy and Nolan settled all transactions between the parties with Nolan receiving a 1% stake in the Cabo project worth over $3,250,000 at the time. |
| *At 3* | "they stole investor money outright" | False – because the Eufora private stock sales were all bona fide purchases for value. <br>• And in the Hawai'i project -- Kenner took ZERO developer fees in 4-years while running the project – in contradiction to Hawai'i Windwalker manager, Alan Worden receiving $1,250,000 annually – and Jowdy receiving $220,000 per month ($2.64 million annually). <br>• And -- Kenner received no capital account reimbursements from the 2006 Hawai'i joint venture. <br>• And -- Kenner was forced to give up his Hawai'i home to the project JV to facilitate the JV deal at a $250,000 loss. <br>• And -- Kenner gave up all "future" developer fees he would have obtained by strong-arming Lehman Brothers into keeping Kenner as Managing Member and jeopardizing the joint venture funding. |
| *At 5* | "LedBetter scheme" | False – because the alleged "concealment" payment by the Little Isle 4 corporate account was another government Red Herring -- with the alleged payments #59 and #60 (Counts 7 & 8) expected by Berard (as proffered to the FBI (*3500-BB-2-r* and *Tr.3035*) and in Kristen Peca's 2012 FBI recording confessions with |

| | | |
|---|---|---|
| | | Kenner.<br><br>The November and December payments are **not possible** concealments with Michael Peca (origination of the 11-day loan funds to Kaiser) and 18 other Hawai'i partners as plaintiffs in the 2008 Arizona lawsuit versus Jowdy to recover the funds. [40]<br>• Per the government, the concealment would have extended *after* the date the investors sued Jowdy in 2008 for the funds Kenner was allegedly concealing. Thus – *logistically impossible!*<br>• The 2006 short-term loan was documented to Kaiser (not Kenner). Kaiser re-confirmed the loan in his 2013 Arizona lawsuit defense as 100% "his" (*never for Kenner's benefit*).<br>• The FBI proffer of LedBetter partner Tesoriero also confirms Kenner was only producing the development funds; not the acquisition funds (per Kaiser's own representations prior to the closing in 2006) (*3500-VT-1-r at 2 ¶ 8-9*). |
| *At 6* | *"Kenner was a licensed financial advisor"*<br><br>• **FINRA fraud on the Court…** | False – because **Kenner was never a financial advisor**.<br>• Kenner was not licensed thru FINRA during the timeframe of the transactions in the alleged conspiracies (*Tr.2481*). The alleged conspiracy transactions began after Kenner relinquished his previous licenses, used solely as part of the 2003 California lawsuit to protect his clients. Kenner, who was *never* a financial advisor – and *never* used the licenses; acquiring them in the mid-90s for education purposes only. |
| *At 6* | *"Constantine and Kenner were longtime business partners"* | False – because Kenner was a passive-equity Eufora investor from 2004-05 and a Eufora lender in 2005-06; never anything more. |
| *At 7* | *"diverted…for personal benefit"* | False – because the government misrepresents the "diversions" for Kenner's benefits thru conflation of Constantine's various misdeeds (behind his Chinese Wall of control – akin to Jowdy) were *never* transferred to Kenner without prior transactions (documented loans to Constantine) (*Tr.1163-64*) and disclosures (Hawai'i joint venture agreement) (*Tr.4317, 297 [Juneau]*) (*Bates stamp: ED-0003161-3165 at 3*). |
| *At 7* | *"Ponzi-like transactions"* | False – because the payments of monthly LOC payments were made from the investors' funds *signed–off* and |

---

[40] The government withheld the Arizona attorney Tom Baker 7-page disclosures until their forfeiture production (most likely as another mistake by the new AUSA forfeiture attorneys; "*the right hand not knowing what the left hand had previously concealed*": a.k.a. *Brady* violation).

| | | designated for the Hawai'i partners' capital accounts.<br>• Northern Trust Banker, Mascarella testified that the efficient monthly withdrawals were normal protocols and authorized per the bank's documentation they received from their-own LOC clients (*Tr.856-57*). |
|---|---|---|
| *At 7* | *"no advanced warning from Kenner of default"* | False – because All LOC investors received a February 2009 and March 2009 default warning letters (*Tr.897-900 [Mascarella]*) – and they all received monthly statements independently (*Tr.912 [Mascarella]*) – and independently chose to release their LOC collateral 3-4 days *before* the due date (hardly concealed – with Owen Nolan independently choosing to continue the monthly payments himself).<br>• Berard text communication with Kenner requested his balance amount -- that would be remaining after his planned seizure – 5-days before the seizure (*ECF No. 668 Appendix at 361-62*).<br>• Kristen Peca received a text from Kenner – after her husband thought she would "discover" his Northern Trust LOC, *supra* (and *ECF No. 668 Appendix at 105*).<br>• Kenner and Sydor communicated via text about the Northern Trust bank disclosure call 3-4 days prior to his LOC due date (*ECF No. 668 Appendix at 171-72*),<br>• Etcetera |
| *At 7* | *"sorry right now that you did not get a call"* | False – because the government conflates the Kenner recorded statement about "what Michael Peca did not tell her" (not Kenner) – *because Kristen Peca was not a Kenner client.*<br>• It was solely Michael Peca's choice to inform his wife about "his" investments with Kenner, or not. |
| *At 8* | *"to Kenner's...personal benefit"* | Again, no funds are transferred (as illegally obtained or without lending to Constantine and Gaarn personally) to Kenner – or for Kenner's "benefit". |
| *At 8* | *"mortgaged land to Centrum...stating proceeds would go to development"* | False – because Kenner never stated that.<br>• Centrum signed off on the "commercial use" of the funds.<br>• Centrum approved the "borrowers" Big Isle 5's operating agreement with the "lending provision".<br>• Owen Nolan disclosed the Big Isle 5 operating agreement during his 2009 arbitration production, further exposing the Kenner transparency whether or not investors chose to read the documents or not). |
| *At 8* | *"Kenner used approximately $2.4 million to buy a personal stake in property in Mexico"* | Perhaps – this is the most ***egregious*** government lie that they keep *rejuvenating* in the face of their-own evidence (*government-forfeiture-44* and *government-forfeiture-36*).<br>• It is inexcusable (yet repeated as if they ignored every post-trial submission by themselves to desperately "cling" to their forfeiture demands of the Kenner Mexico LLC (Baja Ventures 2006), which has |

|  |  | no nexus to the instant case and no "ill-gotten funds". [41] |
| --- | --- | --- |
|  |  | • The government repeatedly attacked Kenner from opening remarks (*Tr.27-33*), during cross-examination (*Tr.4598, 5064-65*), and in demonstrative closing argument that "*Kenner stole the Hawai'i proceeds and used it to buy his equity stake in the Ken Jowdy Cabo san Lucas project*" (*Tr.5996, 5711, 5722-23, 5744-45, 5990, 5991-92, 5707-5709*). |
|  |  | ***It is still untrue -- and the government should be held liable for the never-ending lies to this Court!*** |

---

[41] *United States v. Contorinis*, 692 F.3d 136, 147 (2d Cir 2012) ("[E]xtending the scope of forfeiture to include proceeds that have never been acquired either by a defendant or his joint actors would be at odds with the broadly accepted principle that forfeiture is calculated based on the defendant's gains."); *United States v. Dobruna*, 146 F. Supp. 3d 458, 460 (EDNY 2015) ("the measurement of a defendant's gains-the proceeds subject to disgorgement-is not a speculative event.").

| At 8 | *"Urban Expansion loan…was unnecessary"* | False – because Hawaii COO Manfredi emailed Kenner about his desperation after $400,000-plus of penalty fees were paid to extend the acquisition of the 2000-acre oceanfront gem (Waikapuna) under contract for $4.2 million and appraised for over $35 million (*Bates stamp: KJ2467, from the Jowdy California production*).[42]<br>• Completely discounting the government's fraudulent theory, Hawai'i COO Manfredi and Kenner were planning to close a another loan to "take out" the Urban Expansion loan for better terms "within the cancelation timeframe of the deal" (6 days later) – under advice of Carlsmith Ball LLP (the Hawai'i partners' attorneys) (*Bates stamp: KJ2524, from the Jowdy 2010 California production*); quoting Kenner to the attorney: "*I have the lender and the broker flying to Hawai'i today [October 20, 2005] to sign documents tomorrow.*"<br>• This completely debunks any grand-plan to conceal the Urban Expansion loan -- and put off Lehman Brothers for a year, as fabricated by the government. |
|---|---|---|

---

[42] After Manfredi denounced the 2005 Lehman Brothers $5 million triple-cross-collateralized "deal-to-steal" the Hawai'i project lands from the Hawai'i partners as "*egregious*" to another potential lender on August 16, 2005 -- Manfredi cried to Kenner on September 30, 2005 (*ECF No. 668 Appendix at 417*):

> [Manfredi]: "*I, like you, have been hearing the same old stories for so long, everyone can 'get it done' and no one does…I think the likelihood of losing Waikapuna and MoaUla is very real, which means I will have wasted a lot of time…I never thought I would be leaving this trip without funding…*".

• The Commonwealth Financial deal (in the same email, *supra* – *Bates stamp: KJ2467*) was actually introduced by Constantine to Manfredi and handled between the two (2) of them without Kenner day-to-day.
  o **Commonwealth's deal that Manfredi wanted to close required a $3 million fee – up front (no different than the Urban Expansion loan and every other offer).**

| | | |
|---|---|---|
| | | • Manfredi calls the 2005 Lehman Brothers loan offer that the Hawai'i partners canceled as "*egregious*" (*ECF No. 668 Appendix at 12, 78, 219, 302-03*).<br><br>The government made additional *false* claims that the Centrum loan was supposed to close the Waikapuna parcel with the proceeds (incorrect), and Manfredi confirmed this thru direct-examination with the Urban Expansion loan efforts *before* the Centrum funding (*Tr.2594*). [43] |
| *At 8* | "*Lehman was simultaneously offering to take a substantial stake*" | False – because Manfredi calls the 2005 Lehman Brothers loan offer "*egregious*" that the Hawai'i partners stopped (*ECF No. 668 Appendix at 12, 78, 219, 302-03*).<br>• The loan was *only* for $5 million and required a triple-cross-collateralization of all the Hawai'i partners' lands.<br>• Lehman Brothers would have stolen the entire Hawai'i project within 2-years, as their "*egregious*" 11th-hour terms required their authorization to release any funds needed to pay down their loans from land sales (***guaranteeing a failure***).<br>• ==*If Kenner and the management team accepted the 2005 Lehman Brothers deal, they would be wholly incompetent – but under the government's fabricated standards; not criminally liable for anything.*== |
| *At 8* | "*Centrum loan for [Kenner's] personal use*" | False – because Kenner *never* received a single dollar or benefit from the Centrum loan – despite Kenner personally guaranteeing the entire loan (identical to the Urban Expansion loan) (*Tr.2982*). |
| *At 9* | "*Lehman had already expressed interest*" | See Manfredi's independent "*egregious*" email statements, *supra*. |
| *At 9* | "*prepayment penalty ($2,000,000)*" | False – because the government is aware that it was only a $1 million prepayment deal – and Lehman Brothers and Windwalker (new 2006 JV partner) negotiated a separate business management "buy out" with the Urban Expansion partners for the additional $1 million.<br>• This buy-out created independence from 3rd party |

---

[43] Hawai'i COO Chris Manfredi confirms the Urban Expansion was desperately needed after his months of trying to acquire the Waikapuna acquisition funding with Kenner and over 12-other hard moneylenders who repeatedly failed (while $451,000 in non-refundable extension fees were paid to the seller to keep the deal afloat): (*Tr.2594*):

   *Q: Were you part of the decision-making to enter into this [Urban Expansion] loan?*

   *A [Manfredi]: Well, no, I really didn't have -- really didn't have a choice. We had been through the gamut of trying to find these hard money lenders, **and this happened even before Centrum**, so I was working on it pretty much nonstop and not being able to close on Waikapuna, not having been successful to that point, you know, there wasn't a lot of choices left.*

| | | involvement (other than the Kenner investors), and allowed the Windwalker-Lehman Brothers connection to loot $11 million from the Hawai'i-Lehman budget in 18-months pre-Lehman Brothers bankruptcy (and never be caught) – without any measurable work completed. |
|---|---|---|
| | | • Kaiser, as the Hawai'i partners' Managing Member refused to sue Lehman Brothers, Windwalker, the 3rd party forensic accounting corporate – but rather took a job in Mexico where Jowdy, the Lehman Brothers partner (Bhatti) and the Windwalker partner (Worden) were looting the Cabo budgets (ECF No. 628). |
| At 9 | OUTRAGEOUS CLAIM: "the money diverted to pay back the Urban Expansion loan and prepayment penalty would have otherwise been enough to significantly pay down the investors' lines of credit and protect their bond accounts".<br><br>The government is aware of their ridiculousness... | False – because the government knows that it was not Kenner's money (from the Lehman Brothers JV) to pay or not pay any of the Lehman Brothers decisions (with Centrum, Urban Expansion, the Hawai'i partners, etcetera).<br>• In contrast to the government's "Kenner control theory" -- Lehman Brothers pulled $4 million at the 11th hour (after the Hawai'i partners terminated another Constantine lender (Exhibits C-261 and C-262, admitted thru Kenner at Tr.4969-70, 5065-66) [Trillium].<br>• Kenner could not even get Lehman Brothers to uphold their-own negotiated pre-JV deal (always changing the parameters to "more" as they got their lending "teeth" into the Hawai'i partners' lands; leaving no other options available, other than mass-defaults as a result of the 6-month closing promises and transactions. |
| At 9 | "Constantine obtained more than $1 million in cash...from the victims' lines of credit" | False – because none of the funds traceable to the Constantine consulting payments originate from any superseding indictment individual (Tr.3934). [44] |
| At 9 | "Kenner and Constantine kept Constantine's receipt of the Hawai'i funds hidden from the investors" | False – because John Kaiser was the Managing Member of the Hawai'i partners in 2007 and confirmed to the FBI (raw notes) that he "did see the Hawai'i bank statements" (3500-JK-1-r at 10).<br>• Hawai'i COO Manfredi also confirmed to the FBI that he was aware of the Constantine payments and the agreement between Constantine and the Hawai'i LLCs (3500-CM-2-r at 1), which ironically are the same agreements that Kaiser claimed as "forgeries" of his name (Tr.991)...in spite of turning over the original "ink" versions from his home on the "eve of |

---

[44] *United States v. Ebbers*, 458 F.3d 110 (2d Cir 2006) – "'[t]he loss must be the result of the fraud." *Id.* at 128.  "[l]osses from causes other than the fraud must be excluded from the loss calculation." *Id.*

| | | |
|---|---|---|
| | | trial" (*and the government hid from the court and their-own signature expert*), *infra*. |
| *At 10* | *"Constantine signed consulting agreements"* | The government knew Kaiser had the "*ink*" versions in his possession for 10-years before trial (*GX-7004* and *GX-7005*) and **hid that information from the Court and their-own signature expert**.<br>• The government only admitted the photocopies (*GX-5104*), so they could avoid telling the court where the "*ink*" versions were found.<br>• Further defrauding the court, the government forensic expert failed to admit the "*ink*" versions he "blew up" 20x to make his "authenticity" analysis.<br> o Did the expert even know the "*ink*" came from Kaiser's home? **He did not** (*Tr.3622*).<br>• *The Court must recall* that the government claimed in a 2014 hearing that Kaiser's name was "definitely photocopied from 'blank pages' he signed for Kenner in the past" -- and then superimposed on the 2-consulting agreements.<br> o Yet, 1-year later at trial, the expert told the court that the signature was definitely not Kaiser's.<br> o No "blank documents" with signatures were recovered from Kenner's home in support of their fabricated theory.<br><br>**How was that evidentiary contradiction possible**? |
| *At 10* | *"Manfredi testifying that Constantine did not work on the Hawai'i project"* | False – because Manfredi told the FBI in October 2010 that Constantine had an agreement with the Hawai'i LLCs to raise money (*3500-CM-2-r at 1*) – and "*brought in loan*".<br>• Manfredi gave testimony that he visited Constantine "*prior to 2005*" in "*Scottsdale, AZ*" (*Tr.3004*) – with no prior relationship, and the sole purpose to discuss lending plans and working together (independent of Kenner) – before Manfredi's best friend, John Kaiser, signed the first (2004) consulting agreement.<br>• Ironically, Manfredi could not recall a single email he and Constantine exchanged despite his own replies included (*Tr.3005-18*).<br><br>Manfredi's "memory loss" testimony was as wholly incredible as it was consistently defiant (akin to Kaiser's – *Tr.1120-22*). |
| *At 11* | *"Kenner to use the [Eufora] money on themselves and various debts"* | False – because it has been documented that the only funds Kenner received from the Constantine (117,000) and Gaarn (163,000) private stock sales were the repayment of loans the government documented as authentic from Kenner to them respectively. |

| | | |
|---|---|---|
| | | • _No other funds_ were transferred to Kenner from superseding indictment victims thru the Constantine and Gaarn sales.<br>• The Giuliani Group (the investors' own attorneys) vetted all of the 2008-09 private stock sales.<br>• All of the private sales were documented on the 2009 Eufora operating agreement (_GX-210_) in spite of the government falsely claiming thru proffer and misleading Q&A that there were no records – including in their sentencing memo. |
| _At 12_ | _"Kenner discussing the need to pay pending personal debts"_ | False – because the government knew Constantine was crying about his racing hobby which had nothing to do with Kenner or Kenner debts; **never**! |
| _At 12_ | _"Constantine then spent the money for his own and Kenner's benefit"_ | False – because the government knows Kenner did not own anything with Constantine, nor did Constantine ever pay money to Kenner for his "benefit" that was not part of a legit and fully documented transaction; **never**. |
| _At 12_ | _"sham: the interest was not reflected in Eufora's 2009 operating agreement"_ | False – because the government knew (_GX-210_) the 20009 Eufora operating agreement included the appropriate increase of equity from the 2008-09 private sales, included in the Gaarn managed AZ Eufora Partners I LLC.  Gaarn signed (_Id. at 35_) for it in the new operating agreement – and documented the increase (_Id. at 37_). |
| _At 12_ | _"conflicted with Kenner's documentation"_ | False – because the government knows Kenner was not a party to the Eufora corporation since January 1, 2005. As a result, the only documents Kenner would have received were from Eufora CEO Gentry (in evidence – _Tr.2569-71_, _introduction of trial exhibit Kenner 80_) and AZ Eufora Partners I Managing Member Gaarn (_GX-210_). |
| _At 13_ | _"Kenner to use the money [for] various debts"_ | False – because Kenner was not in debt, nor misused funds to pay for debt that Kenner was not a beneficiary to (and specifically _none_ in the instant case).<br>• ==The government records confirm that Constantine (identical to Kaiser, Berard, Jowdy, Gaarn, Sydor, Moreau, Nolan, Eufora, etcetera) was always asking Kenner for personal loans – and receiving them from Kenner – _never_ the other way around.== |
| _At 14_ | _"Kenner discussing the need to pay personal debts"_ | False – because Kenner was not in debt (or "_broke_" – _Tr.5982_) as AUSA Komatireddy lied to the jury during rebuttal summation.<br>• When Gaarn sold his private stock – to bona fide purchasers for value – Gaarn repaid some of his debt to Kenner, which he confirmed at trial (_Tr.2580_); identical to the 2-Constantine transactions. |
| _At 14_ | _"Counts two and three represented…money…diverted to Kenner"_ | False – because Kenner was being repaid by Gaarn's independent stock sales.  Gaarn told the 2015 trial court he was not part of a conspiracy with Kenner – and the government left Gaarn's representations unchallenged (_Tr.2563-64, 2599-2600_).  Gaarn was a Eufora Board |

| | | Member and the Managing Member of AZ Eufora Partners I (the Kenner investors' LLC).   Gaarn would have known if he was covering-up something; prior to himself hiring the Giuliani Group to investigate "everything Eufora" (including the 2008-09 transactions). |
|---|---|---|
| *At 14* | *"reimbursement for Kaiser construction work"* | False – because Kaiser was "*broke*" (*ECF No. 668 Appendix at 212, footnote 109*) and Kaiser was desperately requesting Kenner to loan him more money for his personal lifestyle expenses – <u>*after*</u> Kaiser was fully repaid from his friends & family Hawai'i loans (no later than August 2006) and his California renovation project with Kenner (no later than summer 2008) (*See ECF No. 736, Ex. #1 at 139-141, 1443-44, 148, and Ex.Z41 [with full back-up records, EX.Z41a]*) |
| *At 14* | *"Kenner backdated a Eufora transfer document"* | False – because Kenner was not involved in Eufora to produce a corporate document (since 2005).<br>• Gaarn gave 2012 FBI proffer (*3500-TG-2 at 2*) that confirmed he received the transfer documentation from his Eufora CEO, Gentry (who was his co-whistleblower on Constantine -- and co-Eufora Board Member); ***not Kenner***. |
| *At 15* | *"what do you think is gonna happen…"*<br><br>*[Constantine rant]* | False – because 100% of this Constantine story is made-up (*Tr.284-86, regurgitated by Constantine's trial attorney about Constantine blaming someone else about nonsense*) and the government used Constantine's fabrications during his pre-trial proffer to make those foundationless claims in the first indictment (*ECF No. 1*).<br>• Constantine claimed that Gaarn and Gentry stole Eufora stock from previous investors and was trying to "re-sell" the equity to the same people (*Tr.608 --* Michael Peca confirmations of transparency – and Constantine fabrications with the investors' attorneys on the same conference call).<br><br>*The Constantine lies were ferretted out – specifically with Kenner's Home Depot recording disclosure to the Giuliani investigators; defying any concealment claims against Kenner.* |
| *At 17* | *"Constantine interposed Richards as an intermediary"* | Kenner was not involved in the Ronald Richards-GSF activity (as Ronald Richards testified, *Tr.3805, 3806-16*).<br>• Michael Peca testified Kenner was not involved (*Tr.539-40*); and<br>• Tyson Nash testified pre-trial in a series of questions created by FBI agent Galioto that Kenner was not involved in the GSF (*3500-TN-3 at 12*).<br>• Attorney Richards also verified the $22,000 expense reimbursement for verified Kenner expenses to the GSF (*Tr.3830*). |

| At 18 | *"Constantine induced investors to contribute money"* | CORRECT – because Kenner was not involved in the Ronald Richards-GSF activity (as Ronald Richards testified, *Tr.3805, 3806-16*).<br>• Michael Peca testified Kenner was not involved (*Tr.539-40*); and<br>• Tyson Nash testified pre-trial in a series of questions created by FBI agent Galioto that Kenner was not involved in the GSF (*3500-TN-3 at 12*).<br><br>Assuming Constantine only used the GSF funds for litigation versus Jowdy – what appreciable "value" could the investors have "expected" other than the 2009-2010 litigation Constantine spearheaded?<br>• *There could be no "loss" associated with Constantine's "legal only" solicitations (with no possible guarantees of results) – in spite of the "signed-off" disclosures, confirming emails from Constantine, the conference calls discussing the breadth of Constantine's GSF fund usage, and McKee texts, supra (all confirming the broad usages by Constantine's plan) (ECF No. 765 at 18, footnote 1*). |
| At 18 | *"Constantine directed investors to send their money…"* | Not Kenner! |
| At 19 | *"Constantine did not disclose that he would be in control of the money…"* | False – because Michael Peca verified it (*Tr.539-540*) [45] – contradicting his wife's testimony resulting from the same meeting in May 2009 (*referencing Tr.688, misquoted by the government*).<br>• The government quoted a confused McKee about his recollection of the GSF meeting, clearly 100% mis-remembered per his own texts, *supra*, with Kenner.<br>• McKee actually testified that he spoke with Michael Peca after the meeting (*Tr.1817*); contradicting McKee's own recollection again. |
| At 19 | *"Kenner schemed to use the bulk of the money on…various debts"* | False – because Kenner was not in debt.  Second, the only funds Kenner received from the GSF were documented by attorney Ronald Richards' testimony |

---

[45] Michael Peca testimony (*Tr.539-40*):

*Q. So from your perspective, who would you say was the one that was primarily responsible, if more than one, answer that as well.*

*A [Michael Peca]: From my understanding **Tommy was in charge of Global Settlement Fund**.*

*Q. And what was Phil Kenner's participation in that, as you recall?*

*A [Michael Peca]: **He didn't seem to have one**.*

|  |  | (*Tr.3830*) as verified expenses  -- and not all of them (per Constantine's unrestrained control decision). |
|---|---|---|
| *At 19* | *"both were in default millions of dollars"* | False – because Kenner was not in debt.  The government references a Constantine deposition that Kenner was not a party to (*GX-8021R*). <br> • The government again attempts to conflate Constantine's poor financial situation with Kenner; *against 100% of the evidence.* |
| *At 19* | *"cover-up emails"* | Constantine wrote disclosure emails to the GSF contributors (as expected).   Constantine received REPLY confirmations (a.k.a. sign-offs) (also as expected). <br> • Nothing in the disclosures contradict the Nash testimony (*Tr.1920-21, 1944*) -- or the McKee real time texts, *supra* – so how are they deemed "cover-ups" in real time? |
| *At 19-20* | *Home depot recoding (by Kenner): "they're not gonna fucking pinch the guy who drove the getaway car, they're gonna pich the guy who robbed the bank.  And I know that you think I robbed the bank..."* | Confounding – because at no time does Constantine refer to Kenner as either party, yet the government continues to tell the Court that "*it is raining while they are pissing on its leg*". <br><br> • *There is no evidence that Constantine referred to Kenner as either party.* |
| *At 20* | *"the Palms units were in default"* | False – because the payments were current and the value of the units were approximately $750,000 more than the debt in 2009. |
| *At 20* | *"GSF funds...not for the investors' benefit but for...Kenner's"* | False – because Kenner was never listed as an owner in any entity that he was even a previous owner of (even though he was the largest airplane contributor, largest Palms lender, Avalon airpark lender, Eufora lender and |

| | | pending 20% Eufora owner). |
|---|---|---|
| | | • Cleary – _none of the GSF funds were for any Kenner benefit_ (per the Constantine produced LLC agreements for the acquired entities, _supra_, from the "Bad Apples"). |
| _At 20_ | _"the emails made no mention of Kenner…using GSF for personal uses"_ | Because -- **Kenner never did**.<br><br>**The Tequila back-story was a farce.**  The government never traced the funds – and still cannot.  They promised Kenner and the Court they would trace them (_Tr.33, 726, 1074-76_, _5752_). [46]<br>• The tequila company was started over a year before the GSF began (_GX-304, introduced at Tr.1074-75_), refuting the use of the GSF funds to "_buy a tequila company_" sometime in late 2009.  _More nonsense…_ |
| _At 20_ | _"only $225,000 went to fund litigation against Jowdy"_ | Approximately $500,000 is traceable to attorneys who sued Jowdy and Jowdy parties.<br>• The government claim cannot be that attorney Ronald Richards should have used $3 million in fees to sue Jowdy instead – and then there would not be a |

---

[46] U.S. Attorney Michiewicz lied to the court to allow the "tequila side-show" and allow more unsubstantiated and false proffers, **misleading the Court** and the jury, and prejudicing Kenner (_Tr.1074-75_):

> _[MR. MISKIEWICZ]: "Your Honor, Government Exhibit 304 is an email from Mr. Kenner to John Kaiser. The subject matter says MosquitoRojoTequila. It is dated August 6, 2008. There is a certificate from Mexico that represents that Mr. Kenner is the owner, or at least a representative, of this company. And we are going to later on trace that he bought this company, it was a tequila company, using his funds from the global settlement fund."_

o  **FIRST -- No funds were ever traced, as proposed.**

o  SECOND -- The government's 2008 email evidence (_GX-304_) of the tequila company and alleged solicitation of Kaiser (_Tr.1074-1075_) took place almost a year before Constantine's 2009 initiation of the GSF – _thus creating another timeline that proves to be illogical_ – but nevertheless used to create another hall-of-mirrors for their faulty prosecutorial means and _Red Herrings_.

|  |  | chargeable offense, or |
|---|---|---|
|  |  | • Would the government have claimed the disclosures the investors "signed," said the funds would be used for "other things" as well – and that is the criminal act (not using it by Constantine). |
|  |  | ○ Either claim is arguable…so they must follow the "signed" authorizations (from real time), like the McKee text communication from the night of the meeting – not his *faulty* "memory of the meeting" 6-years later. |

|  |  | Regardless of the legal status of the Avalon hangers, each of the assets in 2009 that Constantine included in his GSF proposal were worth more than the debt on them.   The government cannot refute that.<br>• If Constantine mis-managed the assets and cash flow from that moment in 2009 forward, that is just poor business management, not a crime regardless of Kenner and Kenner investors' macro-disappointments.[47] |

---

[47] In *United States v. Evans*, 744 F.3d 1192, 1197; 2014 U.S. App. LEXIS 4490 (10th Cir 2014) (under the appellate review of Judges *Gorsuch*, Kelly, and Holmes), the district court should have inquired into what loss, if any, the investors would have suffered if Mr. Evans had come clean regarding the status of the securities [or Constantine's side-deal with Gonchar, assuming they were concealed, yet authorized]…".

The Court opined, "**In making that calculation [for loss], the fact that the securities had lost value due to poor or unsustainable business model would not be chargeable to Mr. Evans.**"

| At 20-21 | *"Kenner pet projects"…"tequila company in Mexico"* | **There were no pet projects for Kenner**.   It was another calculated Red Herring by the government.<br><br>No funds were traced to a tequila company, but summation bottle-banging sure would have convinced a juror otherwise. |
|---|---|---|
| *At 21* | *"straight cash back to Kenner"* | False – because Kenner <u>only</u> received a $22,000 verified expense reimbursement.<br>• Attorney Ronald Richards confirmed it thru testimony (*Tr.3830*).  Constantine even denied some of the expenses that Kenner paid specifically for Constantine-himself; further expanding on Constantine's control of the GSF proceeds, **alone**. |
| *At 21* | *"Kenner: 'Constantine fucked it up' and 'defrauded us'"* | On a recorded call, this certainly does not sound like Kenner concealing anything about the Constantine-controlled GSF transactions (*identical to recording and turning over Constantine's Home Depot rant*).<br>• After Constantine "*pitched*" the GSF to Kenner and Kenner investors (specifically convincing Kenner of |

| | | his plans), Constantine refused to fund the critical Mexico part of the litigation (out of Kenner's control and against Kenner's main priority).<br>• Michael Peca confirmed Constantine's resistance to the Mexico litigation, because he could not "control" it as the sole controlling person (*Tr.539-540*). [48] |
|---|---|---|
| *At 21* | *"Kenner sold them [GSF assets] off to other unrelated individuals"* | Kenner neither controlled any GSF assets, nor sold any of them.<br>• In fact, the record shows that as a result of Constantine's GSF actions, *Kenner lost the most money in the passive-contributor effort (including Kenner)*. |
| *At 21* | *"Peca and McKee testifying they have 'no idea' if they own any piece of Eufora today"* | The government chose not to ask their AZ Eufora Partners I Managing Member, Tim Gaarn, to produce his operating agreement while on the witness stand.<br>• The government lied to the court (in their sentencing memo) that there was no Eufora documentation about the equity (*contradiction GX-210*).<br>• Gaarn signed the 2009 Eufora operating agreement as the Managing Member of AZ Eufora Partners I and |

---

[48] Michael Peca confirms Constantine ultimate GSF control (*Tr.539-40*) – and refusal to contribute to Mexico legal efforts.   Kenner was able to secure to small payments for the Mexico attorneys (5-14-09 for $22,000 [traceable to the initial Gonchar $250,000 contribution], and 11-6-09 for $85,000 [traceable to the subsequent Gonchar $362,355.58 contribution]; neither of which are from superseding indictment contributors.

*Q. At the time of the meeting, and thereafter, were you able to form an opinion as to who was in charge of the Global Settlement Fund around the time you first became aware of it and agreed to participate?*

*A [Michael Peca]: Well, around the time from inception, our belief is it was going to the attorney Ron Richards account, that he would kind of oversee given it was a legal fund. But I do remember a conversation that I had with Phil regarding litigation in Mexico and he said he couldn't do it because he didn't have money and I remember calling Tommy to ask him why we couldn't use money from the global settlement for Phil and the answer was Mexico was too much of a crap shot and unpredictable legally. So there's no money to go towards the Mexican part of it.*

*Q. So from your perspective, who would you say was the one that was primarily responsible, if more than one, answer that as well.*

*A [Michael Peca]: From my understanding **Tommy was in charge of Global Settlement Fund**.*

*Q. And that came from whom?*

*A [Michael Peca]: That came from both Phil Kenner and Ron Richards.*

| | | has possession of the underlying operating agreement; neither of which is Kenner's responsibility.<br><br>The government cannot conflate the issues without Kenner carrying any duty. |
|---|---|---|
| *At 22* | "*personal benefit of Kenner*" | The Constantine rants about "*saving the world*" and "*fixing everything for everyone*" was another uninterrupted monologue that was droned out by historical non-performance by him (resulting in Constantine's mis-management of the GSF plan; *see Evans*).<br>• Kenner was partially reimbursed for expenses Kenner actually paid (verified by Ronald Richards and Kenner American Express statements), leaving Kenner with more un-reimbursed GSF costs.<br>• With Constantine's mis-management, Kenner was also saddled with about $100,000 of expenses in the California case versus Jowdy for the California plaintiffs, in addition to the documented $250,000-plus in additional Mexico legal expenses after Constantine's refusal to distribute the funds as agreed upon (*Tr.539-40 [Michael Peca]*). |

**[The remainder of this page left intentionally blank]**

# Appendix 3
# (Top 10 -- non-reusable prosecutorial lies -- A.k.a. Impossible future testimony)

*Napue* violation, if it is established that the government knowingly permitted the introduction of false testimony reversal is "**virtually automatic**."

*United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir 1975) (citing *Napue v. Illinois*, 360 U.S. 264, 269, 3 L. Ed. 2d 1217, 79 S. Ct. 1173 (1959)), *cert denied*, 429 U.S. 819, 97 S. Ct. 65, 50 L. Ed. 2d 80 (1976).

Where the government was unaware of a witness' perjury, however, a new trial is warranted only if the testimony was material and "the Court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted."   *Sanders*, 863 F.2d at 226; see also *United States v. Seijo*, 514 F.2d 1357, 1364 (2d Cir 1975) (The test "'is whether there was a significant chance that this added item, **developed by skilled counsel**[49]…*could have induced* a reasonable doubt in the minds of enough of the jurors to avoid a conviction.'") (Citations omitted).

*Post-trial concerns by the government for their faulty memory testimony…*
When the government was notified of a web site – post-trial – that exposed all of the "inconsistent statements" by the government witnesses; whether knowingly (suborned or not) or inadvertently thru **CTE** (a.k.a. *faulty memory, confusion and mistakes – ECF No. 440 at 16*), they asked of the web site to be shut down thru a sealed motion.   The language in the government's demand, "*Shocks the conscience*" regarding the evidence on the web site and their concerns at a future re-trial:

---

[49] Kenner's trial counsel refused to argue the fact that the government did not admit the "*ink*" versions recovered at Kaiser's home on the "*eve of trial*" (*GX-7004* and *GX-7005*) -- and actually stipulated to the fact that the "evidence" (*GX-5104*) the expert and Kaiser testified about (the photocopies), were recovered from the Hawai'i partners records at Kenner home (*Tr.990*) – extending the deception to the Court and jury that Kenner possessed the "*ink*" copies.

*"Its only purpose is to dissuade Victim Witnesses from testifying or speaking against Kenner in a manner consistent with their prior statements [from 2015], if they do, the Email intones, "**the real evidence**" will "**show your lies**".*

If the government witness testimony was factually inaccurate in 2015 (as they defend thru *faulty memory, confusion and mistakes*), yet thoroughly exposed throughout the ample Kenner submissions, shouldn't the investors be made aware, *specifically as the responsibility of the prosecutorial team to seek justice; not convictions*?   Isn't this the basis for the opinion in *Berger*?

- Wasn't the government concerned that the witnesses' inaccurate testimony in 2015 is based on *perjury* (*suborned or not*), *lies* &/or *faulty memory, confusion and mistakes*?   Shouldn't they seek to rectify all of the inaccuracies in the name of justice?

- Was the government REALLY alleging that witnesses' exposure to the "*real evidence*" would make it more difficult to elicit the same "*inaccurate testimony*" in a pending Kenner re-trial?   *The government position defies justice...*

| Government witness | Un-reusable perjury – Now debunked with empirical evidence... |
|---|---|
| **John Kaiser**<br><br>**#1** | *"forged signatures"...*<br>• Kaiser turned over the "*ink*" versions to the government on the "eve of trial" after 4-years of cooperation with the FBI (*GX-7004*) and (*GX-7005*).   Upon review of the "*ink*" documents, it debunked the government's prior claim to the EDNY Court that the signatures were "*real*" and the consulting agreements were super-imposed over the "*real Kaiser signatures*" from blank pages.  **Untrue!**<br>• The government at trial <u>never</u> introduced the "originals".<br>    ○ The government only introduced the photocopies (*GX-5104, introduced at Tr.990-91*) |

94

|  | recovered from the Hawai'i partners' corporate files (as expected) to avoid explaining how Kaiser had possession of his "*ink*" signatures for 10-years. |
|---|---|

recovered from the Hawai'i partners' corporate files (as expected) to avoid explaining how Kaiser had possession of his "*ink*" signatures for 10-years.
- o ***This cover-up falls below any ethical requirement by the government...***

- o ***The government never had the forensic expert review the originals.*** [50]

The Court should note that government introduced the alleged forgeries in 2014 during a hearing to claim the "*signatures were real*", but "*Kaiser had left Kenner with 'blank pages' and his signatures*".
- The government claimed the 2-Constantine consulting agreements were *superimposed* over the Kaiser "real" signatures.
- At trial – the government signature expert "blew up" the photocopy signatures 20x to explain how they were now "forged" – without knowing the originals were available (just concealed by the government) (*Tr.3622*).

***None of this protocol can be defended as ethical as Officer's of the Court; specifically with a man's FREEDOM at stake...***

Second -- The government ignored that Hawai'i partners COO Manfredi (and Kaiser best friend) told the FBI in October 2010 (*3500-CM-2-r at 1*) that there were agreements between Constantine and the Hawai'i partners LLCs that paid Constantine for his work.
- If the Kaiser signatures are forged – as presented at trial – then where are the "*originals*" that Manfredi verified 5-years before trial?  *It cannot be explained.*
- Yet on cue, Manfredi could not recall any of his Constantine interactions at trial (*Tr.2997-3000, 3004-3019*), with the exception of his trip to visit Constantine face-to-face in Scottsdale Arizona alone in 2004

---

[50] FBI signature forensic expert, Osborne, confirmed the government only asked him to review *GX-5104*, the photocopies.  **It was inexcusable fraud on the Court, the defendant, and justice.**

> *Q I will show you what's been admitted into evidence in this case as Government's Exhibit 5104 and the documents contained therein. Mr. Osborn, are those the documents that you were asked to analyze?*
>
> *A [Osborne]: Exhibit 5104 is a series of two financial consulting agreements, and I was asked to perform examinations of those documents with specific respect to a signature appearing on the last page of each.*

| | |
|---|---|
| | (*Tr.3004*), with no prior relationship and perfect timing for the original Kaiser signature (*which Kaiser retained the original*). |
| **John Kaiser**<br><br>#2 | The government allowed Kaiser to refute the "raw notes" of his 2 hour, 15 minute FBI interview (*Tr.1120-22*) at his home October 19, 2010 (*3500-JK-1-r*).<br><br>• During this meeting (in the raw notes) – Kaiser confirmed the Hawai'i partners' full knowledge of the loans to Jowdy thru his independent face-to-face meetings with Jowdy 5-6 times; only mis-remembered as part of his Mexico employment with Jowdy in 2015.<br><br>The Court knows that if Kaiser had been "consistent" (a.k.a. truthful) about his FBI proffers and knowledge of the Jowdy loans (repeating his 2009 arbitration solicitation testimony of his families contributions thru him to the Jowdy loans) (*ECF No. 736 at 45, footnote 36*) (*Kenner trial exhibit 39*) (*Tr.1125-27*), then the jury could not have believed the government claims of Kenner's concealment of the loans (specifically with Michael Peca's re-cant and confirmation of the "group" investors' knowledge) (*Tr.498-99*) (*and 3500-MP-5 at 30-33, 35, 40, 42, and 45*), coupled with Hawai'i partners Managing Member of 8-plus years, Kaiser verifying the loans (and transparent pre-loan communications).<br><br>• Clearly, Kaiser's February 2019 "shocking letter" to the Court (*ECF No. 628*) would be instrumental in any future Kaiser testimony about the Jowdy loans and what he learned about Jowdy first-hand as his co-conspirator between 2012-2017.<br><br>To further their frauds and create a false *mens rea* argument -- the government tried to claim Kenner "*berated*" Kaiser for talking to the FBI (*Tr.1032-36*), notwithstanding Kenner had been trying to give Grand Jury testimony the year prior after submitting to a voluntary FBI proffer on June 24, 2009.  FBI agent Galioto cancelled the Kenner Grand Jury appearance; not Kenner, as the government berated Kenner at trial (*Tr.5065*). [51]<br><br>• The government was aware that Kenner was travelling to Mexico to testify against Ken Jowdy in another criminal case about the stolen Hawai'i loans and Mexico embezzlements the same day as the Kaiser FBI proffer.<br><br>• The government and FBI knew Kenner spoke with Bryan Berard on October 19 and October 20, 2010 about the |

---

[51] Kenner was forced to produce the EDNY Grand Jury subpoena and cancellation of the subpoena from AUSA Michiewicz' own office – further making Michiewicz' slanderous yet planned attack on Kenner more reprehensible and ethically insufficient, at a minimum (*Tr.5154-55, Kenner trial exhibits K239, K-240, K-241*).

| | |
|---|---|
| | Kaiser meeting, in unequivocal support of the FBI meeting, via text messages (*after the Appendix, infra, on or about 94*). |
| ***Kristen Peca***<br><br>**#3** | Kristen Peca gave emotional testimony about multiple events that *allegedly* occurred as a result of a 2005 Hawai'i meeting between Kenner and her husband (*Tr.696-700*).<br>• Kristen Peca *never* attended that 2005 meeting or knew about the Hawai'i partners' investment by her husband until 4-5 years later. [52] *The government knew it and* |

---

[52] Kristen Peca 2012 FBI recording of Kenner verified her 2015 fabrications about anything to do with the 2005 meeting between Kenner and Peca (which occurred on the phone with Peca unemployed and living in Buffalo, NY [*a.k.a. no venue – Tr.5638, certainly not Peca*]):

**[Kristen Peca]** *– Well, I was referencing the earlier stuff that you said, I don't remember a large amount being distributed back to our account and the timing of the years of the loan, the line of credit, that happened when we were in Ohio [2008 & 2009]?  I don't understand how it could have been open for 5 years before that? Because we had a bond account going?  Do you mean the Hawai'i; you had a line of credit, but not for us?*

**[Kenner]** *– No, no, you guys had lines of credit for 5 years at Northern Trust.*

**[Kristen Peca]** *– for 5 years?*

**[Kenner]** *– for 5 years!  When you were in OHIO, that's when the thing [LOC] closed.*

*Kristen Peca cannot believe that she is finding out on a phone call in 2012 that her husband, Kenner's client, had a LOC open for five (5) years without her knowledge.*

| | |
|---|---|
| | *induced her perjury.* Her own-2012-FBI recording verifies her lies were orchestrated with the government. |
| | Kristen Peca lied that she begged Kenner not to transfer her bonds; her "*baby*" (*Tr.698*, as part of the *Tr.696-700* fabrication).<br>• Not only was Kristen Peca *not* part of the meeting by her own 2012 FBI recorded admissions – but *she did not know about her husband's LOC in 2012* (*more outrageous, supra*); but…<br>• Second -- there were *never* any bonds transferred as verified by Michael Peca's Northern Trust Bank statement (March 2005) (*ECF No. 736 #1 at 40, Ex.Z55 at 7*).<br>    o <mark>Thus, without pre-fabrication verification by the government and Kristen Peca, they fabricated the entire testimony and collectively ignored the facts and evidence.</mark> |
| ***Government-forfeiture-44*** **and** *government-forfeiture-36*<br><br><mark>**#4**</mark> | The government lied to the Court and jury about "*Kenner stealing the Hawai'i money and using it to buy his Cabo equity*" (*Tr.27-33, opening remarks*).<br>• After prejudicial cross-examination of Kenner – while knowing they were misleading the Court – they called Kenner's truthful statements about the loans to Ken Jowdy, "*bogus*" (*Tr.5708 (2x), 5709*), "*phony*" (*Tr.4597, 4598*) and "*supposed*" (*Tr.5707-5708*).<br>• They ignored that their-own witness, Michael Peca, who caved-in on cross-examination and confirmed the "*truthful*"[53] "*group*" knowledge of the Jowdy loans |

---

[53] Michael Peca confirmed his 2011 SDNY Grand Jury testimony as truthful:

> *Q: Well, at that point in time, sir, when you testified before the grand jury in the Southern District of New York, the answer that you gave to that question was **truthful**, was it not?*
>
> *A [Michael Peca]: **Yes, it was.***

| | |
|---|---|
| | (*Tr.498-99*) just as he explained to the 2011 SDNY Grand Jury 4-years before trial (*3500-MP-5 at 30-33, 35, 40, 42, 45*) (*Kenner trial exhibit 20*) (identical to Darryl Sydor and Turner Stevenson's Grand Jury testimonies). |
| |    o   Michael Peca also verified his SDNY Grand Jury testimony that he _signed_ and _authorized_ the use of his funds to the Hawai'i partners' corporate account (Little Isle 4) (*Tr.650*). |
| |    o   FBI agent Galioto is also caught by Kristen Peca's 2012 confession that he lied to her and Michael Peca about Kenner stealing the money. [54] |
| | •  Yet, during summation, the government doubled-down on their frauds to re-claim "*even Kenner admitted to the alleged thefts*" (when known as 100% untrue) (*Tr.5996, 5711, 5722-23, 5744-45, 5990, 5991-92, 5707-5709*). |
| | In spite of admitting thru *government-forfeiture-44* and *government-forfeiture-36* confirming their trial prejudice of Kenner was untrue – they doubled-down again (4-years later in their sentencing memo to claim…that in the face of their-own evidence – "*Kenner stole the Hawai'i money and using it to buy his Cabo equity*" (*ECF No. 765 at 8*). |
| | •  Because Kenner refuses to accept the government's false theories of Hawai'i theft, they claim Kenner's obstinacy deserves "*no less than 20 years imprisonment*" (*Id. at 4*). *It is inexcusable…* |
| ***Kenner was "broke"*** (*Tr.5982*)<br><br>**#5** | The government was in possession of _all_ of Kenner's bank statements (as delivered in their Rule 16 production). |
| | •  The bank records confirmed Kenner had over $1 million in his Mexico bank account during the time of the Eufora private stock sales. |
| | •  The bank records confirmed that Kenner's consulting business grossed over $400,000 in the 12-months surrounding the Eufora private stock sales. |
| |    o   Not considering Kenner's remaining income |

---

[54] [On the 2012 FBI recording] – Kristen Peca tells Kenner:

*Kristen Peca – Matt [Galioto] told Michael and I that you stole all of the Hawai'i money and never gave it – the loan money -- to…uhhhh…Jowdy.*

*Kenner – Kristen – I have all of the bank records that prove the money went to Jowdy and his accounts at all times. I told you that already. You told me that you saw the bank records after I sent them to Michael. You know -- the attorneys who sued Jowdy for the money in Mexico and Arizona and California used them to confirm the loans before we sued?*

*Kristen Peca – but – I don't understand why he would say it.*

| | |
|---|---|
| | sources, neither of these fabrications create an ethical or empirical foundation for the false and prejudicial statement that "*Kenner was broke*"; ***ever***!<br><br>The government was 100% -- in the knowledge – that the ZERO BALANCE bank statements they referred to were a result of the FBI subpoena and the normal bank protocols to "close accounts under government subpoena" per the "terms and conditions" of every bank account in America; not a condition of Kenner being "*broke*" (*Tr.5982*). |
| ***Owen Nolan***<br><br>#5 | Owen Nolan testified that he never was aware of his Northern Trust LOC (*Tr.2065-66*).<br>• The government was aware that Nolan's Northern Trust Banker, Aaron Mascarella gave a 2009 deposition to Nolan's-own attorney weeks before the 2009 arbitration.<br>• The government knew that Mascarella confirmed that he had been in direct communication with Nolan about his LOC between 2003-06; debunking the Nolan "memory loss" theory (actual from **CTE**, or fabricated).<br>• The government was aware that Kenner and Nolan carried on a December 2007, 5-day text and phone communication when Nolan was required to re-sign his Northern Trust LOC for the 4th time in 2007 (*ECF No. 736 #1 at 54-57*).<br>  ○ *The government cannot argue Nolan's lack of first-hand knowledge (not again)…* |
| ***Jay McKee***<br><br>#6 | The government alleged thru leading Q&A that McKee was unaware of the multiple uses of the GSF per the dinner "*pitch*" from Constantine in May 2009 (*Tr.1821-24*).<br>• The text communication (*ECF No. 736 #1 at 120-23*) that exact night between Kenner and McKee (post-dinner) confirms that McKee was 100% aware "in real time" and in agreement with his signed GSF disclosure for Constantine (*GX-6602, entered at Tr.1819*).<br>  ○ *The government could not solicit the same testimony from McKee again…* |
| ***FINRA testimony…***(*Tr.2477-81*)<br><br>#7 | The government knew FINRA did not govern Kenner under any scenario during the superseding indictment timeframe (*ECF No. 214*) with the first alleged illegal transaction occurring in November 2004; after the date the FINRA representative confirmed Kenner was not even licensed thru their agency (*Tr.2481*).<br><br>There were no FINRA regulated duties Kenner bargained for in his Standard Advisors (corporate) service agreement with his clients (*Tr.487 [Peca, not including his wife], Tr.1837 [McKee], Tr.2083 [Nolan, confirmed by Ronald Richards* |

| | |
|---|---|
| | *Tr.3832], Tr.134 [Juneau, GX-6016]*).[55] <br> • The Kenner-Standard Advisors agreement with his clients offered no FINRA regulated activities.  The government knew it – yet presented the false "duty of care" standard to confuse the jury. <br>    o The jury request for the FINRA testimony as its first deliberation read-back.  It proved the scam on the court was successful – wrongly subjecting Kenner to a "duty" he never bargained for. <br>    o *It is inapplicable...*[56] |
| **Michael Peca** <br><br> **#8** | The government knows that Michael Peca will become a star-witness for Kenner with his 2015 re-confirmation of his 2011 SDNY Grand Jury testimony that confirmed the "*group*" knowledge of the Hawai'i partners loans to Jowdy, at all times (notwithstanding removing his wife from any future-relevant investment testimony as debunked thru her-own 2012 FBI recording of Kenner). <br><br> In a subsequent trial, the government knows that **Peca would be joining** the "*cadre of [Kenner] followers who are completely blind to the truth*" (*ECF No. 765 at 43*). |
| **Bryan Berard** <br><br> **#9** | The government knows that Berard would be confronted with his 2009 arbitration testimony confirming his decision with the Hawai'i partners to loan money to Jowdy (*3500-BB-3 at 4-7*) (*Kenner trial exhibit 92, introduced at Tr.3084*). <br><br> Berard confirmed his Jowdy loan knowledge as accurate at *Tr.3088-90*. <br> • This makes Berard a non-victim in the instant case and solely a pro-Kenner witness in a future proceeding, |

---

[55] Kenner confirmed to the EDNY that the Standard Advisors agreement between his company and his clients "defined" the relationship (*Tr.4257*):

> *Q: What was the purpose in having that agreement in place between you and your hockey player clients?*

> *A [Kenner]: It was for the purpose of representing and **defining the relationship** between myself, my company and my individual clients.*

[56] See *United States v. Foley*, 73 F.3d 484, 493 (2d Cir 1996) ("When...the jury has been presented with several bases for conviction, one of which is invalid as a matter of law, and it is impossible to tell which ground the jury selected, the conviction must be vacated."), abrogated on other grounds, *Salinas v. United States*, 522 U.S. 52, 139 L. Ed. 2d 352, 118 S. Ct. 469 (1997); see also *United States v. Zvi*, 168 F.3d 49, 55 (2d Cir 1999) ("[A] conspiracy conviction must be reversed where one or more objects is invalid and 'it is impossible to tell which ground the jury selected.'") (quoting *Foley*, 73 F.3d at 493).

| | |
|---|---|
| | joining the "*cadre of [Kenner] followers who are completely blind to the truth*" (*ECF No. 765 at 43*).<br><br>The government knows Berard would also be confronted with his "forgery lies" as proven in the contemporaneous 2015 Arizona civil lawsuit (*3500-BB-xx(?); never turned over to Kenner, introduced at Tr.3135 and testimony in connection with FBI agent Galioto's instructions, at Tr.3199, 3244*) (*ECF No. 668 Appendix at 60-63*), which he and Kaiser claimed over a half-dozen more forgeries (all debunked with empirical evidence – provided to the 2015 interveners in Arizona by Kenner).<br><br>This would compliment the *3500-JK-11* Kaiser Arizona depositions that Kenner never received pre-trial (falsely claiming more forgeries of his name) – in spite of the government's Kenner Rule 33 opposition claiming it was turned over to trial counsel (*ECF No. 440 at 8*).<br>• These golden nuggets of Kaiser and Berard "*forgery fabrications*" would not be left unused in a future proceeding with Kenner in ProSe. |
| ***Ranford***<br><br>**#10** | **Ranford** testified that he never invested $300,000 in the Constantine-GSF fund (*Tr.2838*).[57]<br>• But – Ranford confirmed to the FBI, three years earlier, on 9-7-2012 (in their *raw notes – 3500-WR-2-r at 2*):<br><br>   "*$300k gave to GSF July 2009*"<br><br>• And -- Ranford during his October 2014 Arizona deposition (*3500-WR-3 at 11, 12*) further confirmed (1) his knowledge of the initial $100,000 that he wired to the GSF account, (2) the $100,000 that was returned from the GSF account (days later), and (3) the follow-up $300,000 that he wired to Ronald Richards' trust account in July 2009 (after a confirmed face-to-face meeting with Kenner in California) – when asked the suspiciously unrelated questions by the Jowdy-Kaiser-Berard attorneys working hand-in-hand with FBI agent Galioto at that time. *Berard confessed to this collective effort with the FBI case agent during his own 2014 Arizona deposition, infra.*<br>   o *Only undue influence could have changed Ranford's clear 2012 and 2014 understanding of his GSF contributions thru two well-documented proffers – just months later to the EDNY in 2015.*<br>      ▪ *It is unexplainable…*<br>   o And – Kenner's AMEX statements (in evidence) |

---

| | |
|---|---|
| | confirm that Kenner travelled to Los Angeles to meet with Ranford *the day before* Ranford made his $300,000 GSF deposit, confirming face-to-face communication in real time related to the second (2nd) GSF transfer.<br><br>Next (perhaps under equal duress at the 2015 trial), **Ranford** testified he "*did not*" make the three independent investments in Eufora in July 2008 ($200,000), February 2009 ($100,000) and May 2009 ($100,000) (*Tr.2823-2824*).<br>• But – Ranford confirmed those exact dates to the FBI, three years earlier, in their *raw notes (See 3500-WR-2-r at 1, 2)*.<br>• And – Ranford's Charles Schwab banking records and individual transaction confirmations verified the exact transactions that Ranford confirmed he received at his home address (*Tr.2854-55*) (*Bates stamp: BNK-CS-014240, Bates stamp: BNK-CS-014232*).<br><br>• **BEFORE ANY WIRE IS SENT FROM Schwab:**<br>   o Multiple confirmations occurred *by Ranford himself* -- AND –<br>   o His Investment Advisor [Greenberg Graham, FINRA regulated] received the fax copy *from Schwab* to independently verify the amount and the payee.<br>      ▪ *Identical to every Schwab transaction requirement (See ECF No. 668 Appendix at 349 [critical]).* |
| ***John Kaiser "grocery list" and "owed money from Kenner" lies…***<br><br>**BONUS** | Thru banking records and forensic back-up – it has been confirmed that Kaiser was fully repaid his 2005 friends & family $1 million loan as part of the Lehman Brothers JV payouts (*Bates stamp: NAAZ000433-435*) -- and the 2007 California renovation project (*ECF No. 736 #1 at 139-148*) independently with Kenner.<br>• Kenner's subpoena requests for "in camera" IRS filings of "back pay" and acknowledgments of evidence about Kaiser's alleged "expenses" (*Tr.1413-14*) totaling $816,000 were denied post-trial.<br>   o This fraud could not be re-created, as subpoenas would be granted before a future proceeding if the government confirmed they were going to present the same fraud again, as real.<br><br>Kenner has provided the Court with a forensic report (*Ex.Z41 and Ex.Z41a [back-ups], with forensic verification*) of Kaiser's full California repayment, plus over $1 million in overpayment loans Kaiser owes Kenner.  *It is irrefutable,* |

| | |
|---|---|
| | and as such, Counts 2, 3 and 4 cannot be charged as any fraud again *"because Kaiser was not a victim of anything" and there is nothing "in furtherance" with him or money owed to him.*<br><br>Considering Kaiser owes Kenner over $1 million from the Arizona renovation project loans (from post-California repayment), *it is shocking* that the government solicited Kaiser to claim Kenner told him $2 million from the "*grocery list*" loans (*Kenner trial exhibit 37*) to Constantine (from Kenner) were his (*Tr.1404-05*), and then to double-down on their frauds, claiming Kenner "used" some of Kaiser's funds to buy Kenner's Mexico home (*Tr.1087*).<br>• Those additional fabrication would put Kaiser <u>over $4 million owed to Kenner</u>. Only Kenner is a victim of Kaiser – notwithstanding Kaiser and Berard stealing the Arizona renovation project thru fraudulent conveyance and the Sag Harbor (LedBetter) property LLC thru fabricated LLC documents and forged signatures; all in evidence; and<br>• Now – claiming at trial and post-trial that Kenner "*ruined his life*" (*Tr.1089*) – at the same time Kaiser allegedly received a $100 million equity stake from Kenner in Mexico (*ECF No. 628 and Tr.1089*) (and did nothing to sell or transfer it in the 5 years he worked with Jowdy…even to simply un-ruin his life for a paltry $1 million here or there…).<br> o AUSA Michiewicz' summation reminded the jury of the Kaiser fabrications (*Tr.5753*).<br><br>The government fabricated the Kaiser issues to construct venue where there is none. These falsities could <u>*never*</u> be tried again. |
| ***Venue & ProSe representation***<br><br>==**BONUS**== | Before any re-trial, the government would have to substantiate that they have any investors related to Kenner and not the trial lies they told the court about the Pecas and Ethel Kaiser (*Tr.5638*) in EDNY…<br>• They will never survive a substantial contacts test, routinely used by the Second Circuit.[58] |

---

[58] The United States Court of Appeals for the Second Circuit has routinely supplemented its venue inquiry with a "*substantial contacts*" test that takes into account a number of factors including the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of the venue for accurate fact-finding. The Second Circuit has acknowledged that this is not a formal constitutional test, but has nevertheless found it to be a valuable safeguard for a defendant whose contacts with the district of prosecution are *minimal*.

| | |
|---|---|
| | In addition and in ProSe, Kenner will be defending a "concealment" conspiracy prosecution. |
| | • Kenner will proceed by calling every 3rd party attorney and banking witnesses (*ECF No. 675 IAC motion at 26-27*) who represented Kenner's clients while the government claimed, "*they only knew Kenner*". |
| | • This will ensure that the Court and the jury hear that the investors were routinely represented by independent counsel and thus, nobody was independently relying on Kenner for recovery of 3rd party investments that were robbed by Jowdy, and at the time of the first trial (2015) were not be sought for recovery by Hawai'i partners Managing Member John Kaiser because of his corrupted position as Jowdy co-conspirator and employee in Mexico (2012-2017) (*Tr.711-13 [Kristen Peca], Tr.1830 [McKee]*). |

**[The remainder of this page left intentionally blank]**

**ENDNOTE: Top 10 -- non-reusable prosecutorial lies -- A.k.a. Impossible future testimony**

**Kenner-Berard texts refute that Kenner was "*berating*" Kaiser for talking to the FBI -- on the exact days the government and Kaiser claimed in 2015 (*Tr.1032*).**

- The Court should note Kenner voluntarily proffered with the FBI again in 2011, two times; never dodging or ducking the request to "help"...

*Fully contradicting the AUSA's fabrications...*
Kenner and Berard confirmed their collective enthusiasm for the Kaiser-FBI proffer via text communication on the exact day of the FBI interview of Kaiser – never close to a "*berating*" as lied again by the government (*Tr.1032*), suggesting a "*consciousness of guilt*":

[Michiewicz]: *"However, we will say that after the [Kaiser] interview was over – and I said it was the FBI.   I guess it was a Southern District of New York investigator.   When they left the house, he made a call to Kenner, and told Mr. Kenner, in sum and substance, the FBI was here.   You should talk to them.   He will testify, I'm quoting what he has said – he has a very clear recollection of how Mr. Kenner reacted – he said "Are you fucking crazy?   Did you talk to them?"  And he berated him for talking to them.  I am offering this as evidence of consciousness of guilt."*

The Court should note that on October 19, 2010, Kenner was travelling to Mexico to give more criminal testimony about Jowdy, clearly looking for any help to secure the Kenner and Kenner investors' money that Jowdy had routinely defrauded since 2002.

The government proffer is not just fabricated, but wholly unreasonable under the real time circumstances – notwithstanding the Kenner-Berard text confirmations that the government lied to the Court again.

[10-19-2010] – The *same day* as the FBI-Kaiser proffer between Berard and Kenner (Kenner replies hi-lighted in yellow):

| 17260 | +14015246929 Bryan Berard* | 10/19/2010 4:09:21 PM(UTC +0) | Read | **Get that fucker Jowdy locked up for good down there** |
|---|---|---|---|---|
| 10396 | +14015246929 | 10/19/2010 | Sent | **We will get him for sure!** |

| | Bryan Berard* | 4:11:39 PM(UTC +0) | | |
|---|---|---|---|---|

[10-20-2010] – The day _after_ the Kaiser-FBI interview, Berard contacted Kenner in Mexico to discuss it, as follows (Kenner replies hi-lighted in yellow):

| | | | | |
|---|---|---|---|---|
| 172 68 | +14015246929 Bryan Berard* | 10/20/2010 3:36:37 PM(UTC +0) | Read | Hosw Mexico? U get in safe |
| 104 02 | +14015246929 Bryan Berard* | 10/20/2010 4:12:53 PM(UTC +0) | Sent | So far so good. Tucked away safely! |
| 172 69 | +14015246929 Bryan Berard* | 10/20/2010 4:20:06 PM(UTC +0) | Read | U hear abt Johnys visit yesterday?? |
| 104 03 | +14015246929 Bryan Berard* | 10/20/2010 4:20:06 PM(UTC +0) | Sent | **Yep. I think it's great** ⭐ |
| 172 70 | +14015246929 Bryan Berard* | 10/20/2010 4:25:59 PM(UTC +0) | Read | Me too. He was rattled. But I'm glad they |
| 172 71 | +14015246929 Bryan Berard* | 10/20/2010 4:26:15 PM(UTC +0) | Read | They went and saw him face to face. I wish they wld call me or come see me too |
| 104 04 | +14015246929 Bryan Berard* | 10/20/2010 4:27:29 PM(UTC +0) | Sent | Soon enough as well. They seemed very uninformed according to johnny! |
| 172 72 | +14015246929 Bryan Berard* | 10/20/2010 4:30:37 PM(UTC +0) | Read | what's the name of Jowdy's lawyer who was X FBI?? I'm sure he's not giving them any true info at all |
| 104 05 | +14015246929 Bryan Berard* | 10/20/2010 4:30:43 PM(UTC +0) | Sent | Former FBI director Louis Freeh |
| 172 73 | +14015246929 Bryan Berard* | 10/20/2010 4:32:31 PM(UTC | Read | That's his lawyer right? |

| | | +0) | | | |
|---|---|---|---|---|---|
| 104 09 | +14015246 929 Bryan Berard* | 10/20/20 10 5:36:52 PM(UTC +0) | Sent | **Freeh is his criminal attorney for the investigation FBI's visitors were asking about. He has probably looted 1-2mm from the Mexico budget to pay him! It's a joke!** |
| 172 75 | +14015246 929 Bryan Berard* | 10/20/20 10 5:38:52 PM(UTC +0) | Read | Got it. Yup fuckn joke. <u>Hell get his</u> |
| 104 10 | +14015246 929 Bryan Berard* | 10/20/20 10 5:42:38 PM(UTC +0) | Sent | **We have some work ahead of us from what I heard!** |
| 172 76 | +14015246 929 Bryan Berard* | 10/20/20 10 5:44:26 PM(UTC +0) | Read | <u>what u heard is bad</u>?? How's things down in Mexico so far? |
| 104 11 | +14015246 929 Bryan Berard* | 10/20/20 10 5:45:04 PM(UTC +0) | Sent | **<u>I just think they need the WHOLE story since they've only really spoken with myrick, Moreau, Nolan, Jowdy</u>, etc. Mexico is good!** |
| 172 77 | +14015246 929 Bryan Berard* | 10/20/20 10 5:46:11 PM(UTC +0) | Read | **<u>Great. I agree. Once they talk to us. I think it will switch over</u>** |

- In October 2010 -- Kenner was risking his life (again), shortly after recovering from the Mexico jailhouse beatings, to give criminal testimony for his investors and himself about the Jowdy crimes.   But -- the government attempted to claim Kenner did not want the help of the FBI (thru a Kaiser proffer – and 100% of the *3500-JK-1-r* raw notes in Kenner's favor)?  *It makes no logical sense...*

- How could a "*berating*" of Kaiser make any sense for exposing the Jowdy truths and offering interview with Kenner and Kenner investors?

  - The government and Kaiser must be held responsible for the planned fabrication to slander Kenner and make him appear anti-FBI.  The Court should note that Kenner has repeatedly asked the Court to push the government and FBI (absent agent Galioto) to meet with Kenner, still thru 2019, to work towards a legal conclusion to the 2-decades of Jowdy documented embezzlements and racketeering activities (*ECF No. 667*).

Respectfully submitted,
Phil Kenner