2:15 pm, Dec 10, 2019

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

FILED
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------X  Docket#
UNITED STATES OF AMERICA,      :  13-cr-00607-JFB
                               :
     - versus -                :  U.S. Courthouse
                               :  Central Islip, New York
                               :
KENNER, et al.,                :  December 6, 2019
              Defendants       :  2:30 PM
------------------------------X
```

TRANSCRIPT OF CRIMINAL CAUSE FOR STATUS CONFERENCE
BEFORE THE HONORABLE VISITING JUDGE JOSEPH F. BIANCO

A  P  P  E  A  R  A  N  C  E  S:

**For the Government**:          **Richard P. Donoghue, Esq.**
                              United States Attorney

                      BY:    **Saritha Komatireddy, Esq.**
                             **Matthew Haggans, Esq.**
                             **Diane Leonardo, Esq.**
                             **Madeline O'Connor, Esq.**
                             Assistant U.S. Attorney
                             100 Federal Plaza
                             Central Islip, NY 11722

**For Defendant Constantine**:  **Sanford Talkin, Esq.**
                             **Noam Greenspan, Esq.**
                             Talkin, Muccigrosso
                             & Roberts LLP
                             40 Exchange Place, 18th Fl.
                             New York, NY 10005

**For Defendant Kenner**:        **Phillip Kenner, pro se**

**Danske Bank**:                 **George Kostolampros, Esq.**
                             Venable
                             1290 Avenue of the Americas
                             New York, NY 10104

**Transcription Service**:       **Transcriptions Plus II, Inc.**
                             61 Beatrice Avenue
                             West Islip, New York 11795
                             laferrara44@gmail.com

Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

                        Proceedings

1           THE COURT:   Criminal Cause for a Status

2    Conference in 13-cr-607, United States of America v.

3    Phillip Kenner and Tommy Constantine.

4           Counsel, please state your appearances for the

5    record.

6           MS. KOMATIREDDY:  Good afternoon, your Honor.

7           Saritha Komatireddy, for the United States.   I

8    am joined by AUSAs Matthew Haggans, Diane Leonardo, and

9    Madeline O'Connor.

10          THE COURT:  Okay.  Good afternoon all of you.

11          MR. HAGGANS:  Good afternoon.

12          MR. TALKIN:  Good afternoon, your Honor.

13          Sam Talkin and Noam Greenspan for Mr.

14   Constantine, who is seated between us.

15          THE COURT:  Yes.  Good afternoon to both of

16   you.  Good afternoon, Mr. Constantine.

17          DEFENDANT CONSTANTINE:  Good afternoon, your

18   Honor.

19          DEFENDANT KENNER:  Good afternoon, your Honor.

20          Phil Kenner, pro se with standby counsel, Matt

21   Brissenden.

22          THE COURT:  Good afternoon, Mr. Kenner.

23          MR. BRISSENDEN:  Good afternoon, your Honor.

24          THE COURT:  And good afternoon, Mr. Brissenden.

25   And I apologize, we had an unexpected conference in a

3

Proceedings

1    criminal case that I had to address.  So I apologize for

2    keeping you all waiting but obviously there are a number

3    of different issues that I think are either unresolved or

4    anew since the last time we met, so I have sort of an

5    agenda that I want to go through today, and then I'll

6    obviously address any other open issues that we haven't

7    covered, all right?

8              So I wanted to start with the forfeiture issue.

9    So I know from the back and forth, obviously I've

10   received and reviewed all the letters since our last

11   conference, from all the individuals and entities who are

12   involved in the forfeiture issue.

13             So let me just ask the government to update the

14   Court.  Did the government go down for the appraisal?

15   Did that happen?

16             MS. O'CONNOR:  Yes, your Honor, about two weeks

17   ago the government went down.  We met with Mr. Jowdy, the

18   DCSL employees, and Mr. Souther.  DCSL has been

19   cooperative in providing documents, and the appraisal is

20   underway.

21             THE COURT:  All right.  What's the estimate in

22   terms of when the appraisal will be complete?

23             MS. O'CONNOR:  Your Honor, hopefully towards

24   the end of January.  There are certainly no guarantees.

25   There might be additional documentation needed but that's

4

Proceedings

1   the government's hope.

2           THE COURT:  All right.  I guess we'll come back

3   to that.  Mr. Wolinsky submitted, you probably saw it, a

4   letter in the last couple of days, and the one of the

5   things -- I think I know the government's answer to this

6   but one of the things he's raising is that the outcome of

7   that appraisal may affect the government's decision

8   making as to whether or not it makes sense to try to

9   forfeit the resort or not.  So do you want to respond to

10  that?

11          MS. O'CONNOR:  Yes, your Honor.  The government

12  -- the law doesn't require the government to obtain an

13  appraisal to demonstrate a certain amount of equity in

14  property.  The government's only burden is to demonstrate

15  the requisite nexus between the property and the crimes

16  of conviction.

17          Although the appraisal might assist the

18  government in determining whether to continue the process

19  after the property is ordered forfeitable, in the event

20  it's ordered forfeitable, waiting for an appraisal

21  result, there's no need to do that.  It shouldn't delay

22  the entry of the POF, and sentencing of the defendants.

23          Worst case scenario, the government always has

24  the ability to move the Court to vacate the POF as to the

25  resort, if necessary.

5

                    Proceedings

1        THE COURT:  All right.  Maybe I will come back
2   to that as well, but I had a couple of other questions.
3   One of the things that came up -- I mean, I know the
4   government has obviously made a lot of modifications to
5   the proposed order, the preliminary order, based upon the
6   concerns raised and the Court's discussions regarding
7   that.
8        The one that I saw in the letters that I guess
9   I am not sure, and again, I understand all these things
10  don't have to be under the law, but were obviously trying
11  to address any concerns that people have regarding what
12  the impact would be, and what limitations there might be
13  in the future based upon the preliminary order.
14       One issue was making clear that it's possible
15  that the government could decide that selling the equity
16  in the property, as opposed to the resort itself might be
17  more advantageous and putting some language in there to
18  make clear that that -- not that that was going to be a
19  requirement, but that that was a possibility, I think.
20  If my understanding of the letters are correct, they
21  thought that would be helpful in avoiding any limitations
22  on the options available to the government in the future,
23  or any adverse consequences.
24       So is there -- as long as it's not binding the
25  government in anyway, but it's just put in there to make

6

Proceedings

1   clear that that's a possibility, does that create any

2   issues?

3          MS. O'CONNOR:  Your Honor, limiting the

4   government's forfeiture of the equity interest is

5   problematic, due to the way THE PROPERTY IS OWNED.  The

6   property is owned right now by the trust, not by the

7   entities.  So the first place beneficiary is the bank,

8   and then the second place beneficiaries would be all the

9   entities.

10          So by limiting ourselves to the forfeiture of

11  the entities interest, the bank could turn around and

12  foreclosure, and then there would be no forfeiture.  So

13  that, first and foremost, is a very clear issue for us.

14          THE COURT:  Yeah, again, I didn't -- and we

15  have some of the attorneys here, I didn't understand them

16  to saying that I was going to order that it be limited to

17  the equity interest but they seem to believe that this is

18  a scenario where it may be in everybody's interest,

19  including the government's interest, to do it that way.

20          So, as long as it's not indicating that it has

21  to be done that way, but maybe -- does someone want to

22  come up and explain that to make sure I am not

23  misunderstanding that?

24          MR. KOSTOLAMPROS:  Thank you, your Honor.

25          George Kostolampros of Venable representing

7

Proceedings

 1    Danske Bank.

 2              THE COURT:  Yes.

 3              MR. KOSTOLAMPROS:  You're right, your Honor.

 4    We're not asking the Court to limit the government's

 5    ability.  We want to just set forth that this is

 6    something that is an option that can be taken by the

 7    government, and frankly, could be made in a motion by

 8    Danske if it wanted to move for an interlocutory sale,

 9    that it wasn't limited to just a forfeiture of the resort

10    property, and a sale of the resort property, but could

11    offer the Court look, the way that we think the best way

12    to proceed is through the equity interest.  So we want

13    to --

14              THE COURT:  I guess they're suggesting that

15    there's going to be -- maybe they think there's going to

16    be no scenario by which that would be the most

17    advantageous -- maybe for the bank it might be but

18    they're saying there's no scenario -- I don't know

19    whether they're saying that but --

20              MR. KOSTOLAMPROS:  I don't know that they are,

21    your Honor.  I think this is a fluid situation, and

22    frankly, you know, we've spoken with experts, JLL is one

23    of which, who has told us there would be more value in

24    selling the equity.

25              The government's right, the property right now

8

                         Proceedings

1    sits and is owned by the trust, but you know ultimately

2    what the -- if this was an agreed to interlocutory sale,

3    the Danske Bank would be agreeing to that sale, and then

4    would make every effort that the trust would then sell

5    that or would execute on however that -- the sales moved

6    forward.

7              So ultimately, what we wanted here was not to

8    be limited by an order that could be read to say look,

9    the only thing that could be sold ultimately is the

10   resort property and not the equity.

11             And again, our understanding is that there

12   would be more value ultimately if the resort were seized

13   and there was ultimately a sale, that that sale would be

14   of a going concern entity, as opposed to the resort

15   property itself, and not the business.

16             And there are a number of reasons for that

17   because there are contracts that come along with that,

18   employees -- all of those agreements.

19             THE COURT:  All right.

20             MS. O'CONNOR:  Your Honor, there's another

21   primary issue with limiting the forfeit or forfeiting the

22   equity interest.  At present, the entities have

23   contingent future interests in the property, not present

24   interest in the real property.  So forfeiting these

25   equity interests will not give the government present

9

Proceedings

1   title which would be needed to forfeit the real property.

2           THE COURT:  Well, maybe it's just a matter of

3   the wording though, if the Court were to -- if it would

4   be a preliminary order of forfeiture of the property, but

5   have language in there that suggests the parties in

6   connection with trying to resolve the forfeiture issue

7   could propose to the Court an alternative of, you know,

8   the equity interest.

9           So it wouldn't be that the forfeiture -- the

10  preliminary forfeiture itself would only be for the

11  equity interest.  It would be of the resort itself with

12  making it clear that one of the options down the line

13  would be interlocutory -- potentially interlocutory sale,

14  right?  Is that --

15          MR. KOSTOLAMPROS:  That's right, your Honor.

16          THE COURT:  Because what they're saying is that

17  it creates problems to make the order -- the preliminary

18  order only relate to the equity interest but that's not

19  what you're suggesting.

20          MR. KOSTOLAMPROS:  That's not what we're

21  saying.

22          THE COURT:  All right.

23          MR. KOSTOLAMPROS:  I mean frankly, I mean it

24  could be in a footnote --

25          THE COURT:  Right.

10

Proceedings

1     MR. KOSTOLAMPROS:  -- that it's not limited,

2  and it could very well be the equity interest or the

3  resort property itself.

4     THE COURT:  All right.  Again, I think the

5  government understands -- we've been through this so many

6  times now that my view of this is that to the extent that

7  these types of accommodations can be made without

8  prejudicing the government's, you know, rights in anyway

9  in connection with the order, that we try to have

10  something in there that accommodates that.

11     So even if it's in a footnote, if it -- you

12  know, the government, I think understands what they're

13  hoping to do.  You can create the language to make it so

14  that it doesn't interfere with anything you may want to

15  do down the line, or if you want them to propose it, I'll

16  ask them to propose it but I don't know, would you want

17  them to propose the language?

18     MS. O'CONNOR:  Yes, your Honor.

19     THE COURT:  All right.

20     MR. KOSTOLAMPROS:  Okay, we will.

21     THE COURT:  So could you do that?

22     MR. KOSTOLAMPROS:  Yeah.

23     THE COURT:  All right.  While I have you

24  standing there, are there any other issues?

25     MR. KOSTOLAMPROS:  There are two issues that

Proceedings

1    we've raised, your Honor.  One is assuming the Court

2    issues a preliminary order of forfeiture that includes a

3    resort property, including the language we just

4    discussed, we would like to see an expedited process

5    where we would move forward with what's next to do on the

6    property itself.  Is there going to be an interlocutory

7    sale?

8              You've raised the issue that Mr. Wolinsky has

9    raised as to whether the government should hold off, get

10   its appraisal first.

11             Now we agree with Mr. Wolinsky, if the

12   government was willing to do that, we think why not?  At

13   the end of the day, if ultimately the government would

14   walk away and say look, there is no equity value here,

15   and ultimately it's going to enure to just causing more

16   victims here ultimately, if there's no value that would

17   find its way back to the victims here, then why not hold

18   off?

19             The government has said that they expect this

20   to be done by January.  I understand that the Court has

21   its timing, and perhaps they could fit in this timing.  I

22   am not sure when the Court is expecting to -- for

23   sentencing in this matter.  So if it could be aligned

24   with sentencing, and we could hold off on a preliminary

25   order of forfeiture until then, then why not do that?  I

12

Proceedings

 1   mean it's not limiting the government in any way.

 2              THE COURT:  Do you want to respond to that?

 3              MS. O'CONNOR:  Your Honor, the government last

 4   court appearance agreed to file the revised preliminary

 5   order with two specific changes.  We did so.  Your Honor

 6   recognized that there wasn't anything more that your

 7   Honor could think of, that the government could do.

 8              Even though the third-parties were present at

 9   the last court conference, were heard at length, you had

10   no other suggestions for how the government should revise

11   the POF that the Court deemed appropriate, the third

12   parties nevertheless filed letters immediately after the

13   government filed the agreed upon revised proposed order

14   objecting to the language.

15              We were reluctant to file the revised order

16   because we were concerned that the third-party complaints

17   would continue, and they have.  This is clear that this

18   is a cycle of the government filing revised orders,

19   followed by complaints that will continue in perpetuity

20   until the POF is ultimately entered.

21              So at this point, your Honor, the government's

22   position is that the POF is appropriate.  It protects the

23   government's interest in the property.  Nothing more is

24   required.  And --

25              THE COURT:  Well, why is -- and again, I am not

Proceedings

1    going to -- we have to deal with the sentencing issues,

2    as well.  So this is not going to hold up to the extent

3    that the Court is going to proceed with sentencing.

4    Forfeiture would have to go along with it, but -- and my

5    plan is to try to proceed with the sentencing as soon as

6    possible, but I guess I just want to understand if --

7    there's two things going on here.  One is if it does turn

8    out to be less than, what is it $160 million or --

9              MR. KOSTOLAMPROS:  $180 million, your Honor.

10              THE COURT:  $180 million, I mean it seems like

11    there is at least a possibility the government would say

12    this is not worth it, right?

13              MS. O'CONNOR:  There --

14              THE COURT:  Or am I misunderstanding that?

15              MS. O'CONNOR:  If the government --

16              THE COURT:  Suppose it comes out to be a $160

17    million, you know, appraisal?

18              MS. O'CONNOR:  If that occurs, and the

19    government exercises its discretion not to pursue the

20    forfeiture, it can simply move the Court to vacate that

21    aspect of the POF that pertains to the forfeiture of the

22    resort.

23              So there's no reason not to enter the POF, and

24    the government can later pursue a modification of the

25    POF.  So to hold up any sentencing for it, is

14

Proceedings

1  unnecessary.

2          THE COURT:  I'm not holding off the sentencing.

3  I'm saying to the extent that -- why wouldn't I just wait

4  at a minimum until what the actual sentencing date or

5  close to it, just to see if the government can get the

6  appraisal done, maybe sooner than January 30th, and to

7  see what the results of that is.

8          And I did want to speak about the restitution

9  issue, as well, because I'm not sure I completely

10  understand why the appraisal is not relevant for purposes

11  of either the loss amount or restitution.  I'm trying to

12  process that.  I did read the government's sentencing

13  memo, but I am not sure I completely understand that.

14          But let me -- I guess I should just say it the

15  reverse way.  If the Court didn't enter a preliminary

16  order next week but it was 30 days from now, what's the

17  harm to the government at this point?

18          MS. O'CONNOR:  Your Honor, there might not be

19  any harm to the government, but there's also no harm in

20  entering the order.

21          THE COURT:  Well, the --

22          MS. O'CONNOR:  The government then pursue --

23          THE COURT:  I know, but you know, you've sat

24  through enough of these conferences, they've been telling

25  me for months that the preliminary order itself is going

Proceedings

1    to have harm, which is some of the reasons why we've been

2    going through all these iterations of the preliminary

3    order.

4              So I know the government doesn't believe

5    anything is going to happen when I enter that order but I

6    am balancing what they're telling me they are concerned

7    is going to happen with any prejudice that the government

8    by waiting a couple of weeks.

9              But I understand the issue.  Let me think about

10   it some more, okay?

11             MR. KOSTOLAMPROS:  Okay.

12             THE COURT:  All right.  Thank you.

13             MR. KOSTOLAMPROS:  Thank you, your Honor.  And

14   the last issue that we had was the way that it reads now,

15   the preliminary -- the proposed preliminary order of

16   forfeiture, still includes in the carve-out employees

17   current, or ex-employees of Danske Bank that may have

18   purchased an interest in the resort property.

19             THE COURT:  Yeah, I saw that.  You know, when

20   they had particular names in there, obviously that's a

21   bigger issue.

22             MR. KOSTOLAMPROS:  Right.

23             THE COURT:  I'm not sure just having that as a

24   potential carve-out in an abundance of caution, you know,

25   I am not sure I feel as strongly about that being some

16

Proceedings

1   kind of unfair --

2           MR. KOSTOLAMPROS:  The only thing I would ask

3   for the Court to consider is practically though, what are

4   the limitations on that, including all employees without

5   any time frame within there?  I mean --

6           THE COURT:  I know, but how many employees have

7   some interest in the resort?

8           MR. KOSTOLAMPROS:  I am not aware of any --

9           THE COURT:  Okay, so --

10          MR. KOSTOLAMPROS:  -- but then again, there

11  could be one, right, that was an ex-employee --

12          THE COURT:  All right.  So they would have to

13  show --

14          MR. KOSTOLAMPROS:  -- they or their family

15  member --

16          THE COURT:  They'd have to show, you know,

17  documentation on how they acquired it, I guess, right?

18  Wouldn't that be the result?  I mean, I don't --

19          MR. KOSTOLAMPROS:  Right.

20          THE COURT:  Exactly.

21          MR. KOSTOLAMPROS:  And ultimately, too, getting

22  those individuals notice, and you know that's sort of --

23  I've been wondering, is practically how do you get those

24  individuals notices?  We don't know which ones but

25  potentially, there could be family members, relations

17

Proceedings

1    that were ex-employees, that could share an interest in

2    that property, and without any showing that there are any

3    Danske employees --

4              THE COURT:  Yeah, well I assume --

5              MR. KOSTOLAMPROS:  -- that have an interest on

6    this property.

7              THE COURT:  -- I don't know, does the

8    government have an answer to that, how you would identify

9    those people, I guess?

10             MS. O'CONNOR:  Your Honor, we would seek

11   Danske's assistance in identifying any employees based

12   upon the names of owners, but that would be our burden,

13   but we would point out, this would be something that all

14   interest parties are ordinarily required to do.  They

15   have this legal obligation to present proof of their

16   interest.

17             THE COURT:  Right.  Okay.  I am not going to --

18   I don't think it's necessary to change that, okay?

19             MR. KOSTOLAMPROS:  Okay.

20             THE COURT:  All right.

21             MR. KOSTOLAMPROS:  Thank you, your Honor.

22             THE COURT:  Thank you.  All right.  So Mr.

23   Kenner, you have your hand up there.  Is there something

24   you want to say?

25             DEFENDANT KENNER: Yeah, your Honor, I just

Proceedings

1   wanted to add in the context of being concerned about

2   making sure people are made whole for whatever forfeiture

3   issues need to be addressed by the Court, your Honor back

4   during the forfeiture hearing asked why couldn't the

5   Court just determine what money from went from Hawaii to

6   the entity that was unauthorized, in order that amount or

7   percentage forfeited.

8           In the context of the government presenting

9   their forfeiture case, they presented Government

10  Forfeiture 36 which traced $350,000 to the Cabo resort,

11  and nothing else.

12          That would effectively be the money.  There's a

13  side issue with that that Mr. Jowdy already settled --

14          THE COURT:  Say that -- what number again?  Say

15  that again.

16          DEFENDANT KENNER:  Government Forfeiture 36.

17          THE COURT:  Right.

18          DEFENDANT KENNER:  I believe it was the May

19  4th, 2005 wire transfer for $350,000. Mr. Jowdy already

20  did a side settlement back in 2008 for that money.

21          But ultimately, you also had Mr. Wayne gave

22  testimony during the trial, during the forfeiture

23  hearing, where he confirmed that 100 percent of the money

24  that purchased the 39 percent interest in Baja Ventures

25  came from my two European partners, Mr. Stumpel and Mr.

Proceedings

1  Lehtinen.

2          Notwithstanding those issues, and the recent

3  ruling I think that the Court's aware of in Shkreli,

4  where they -- with a 18-cr-819 at the appellate level

5  quoted, "Criminal forfeiture focuses on the disgorgement

6  by a defendant of his ill-gotten gains, Contorinis at 692

7  F.3d at 146 in U.S. v. Torres, 703 F.3d 194, at 203",

8  both a Second Circuit, where forfeiture is deem based --

9  not based on the losses to victims.  And that's in the

10  memo at page 6 and 7.

11          The point behind it is when the government

12  traced this money, and they're trying to separate ill-

13  gotten gains from an unauthorized destination, I know

14  that in the papers that I've read on the preliminary

15  order of forfeiture, Danske Bank has made a very -- a

16  very strong offer to put up some money, and take out any

17  of the -- the victims that are traceable to the Cabo San

18  Lucas project, in order to avoid any further

19  consternation with the CSL property members, five of

20  which were in this case.  I think seven, or eight, or

21  nine of them were not.

22          And then keep the other 6,000 timeshare and

23  homeowners, and Mr. Wolinsky's Diamante Doce, LLC out of

24  any of this conflict, and because it's a $350,000 tracing

25  that goes only to Mr. Jowdy's LLC, Mr. Jowdy settled that

20

Proceedings

1  with Mr. Nolan (ph.) back in 2008, already for those

2  funds.  Perhaps Danske Bank can make an offer just to

3  take out whatever that nominal money is that goes to Cabo

4  San Lucas, because there really has been no other nexus

5  proven.  That's what the government proved during their

6  forfeiture case.

7          THE COURT:  Yes, I guess I am a little confused

8  by the $350,000 reference.  Does the government want to

9  respond to that?  I don't --

10          DEFENDANT KENNER:  It's in their G-36 that they

11  submitted during the forfeiture hearing.

12          DEFENDANT KENNER:  Right.

13          MS. O'CONNOR:  Your Honor, I am not entirely

14  sure what he's -- Mr. Kenner's referring to.  If we're

15  talking about the Lehtinen and Stumpel money going -- the

16  purchase of Baja Ventures, if that's what he is

17  referring, or if the question is the wire transfers and

18  money to Cabo going to Mr. Jowdy.  So I am not really

19  sure what you would like me to respond to.

20          THE COURT:  I thought he was referring to the

21  ones that went to Mr. JOwdy, and he was saying he was

22  limited to $350,000.  Is that what you're --

23          DEFENDANT KENNER:  Yes, sir, your Honor.  On

24  Government 36 where they traced for the forfeiture

25  hearings back in March of 2016, they traced the money

21

Proceedings

1  that went to the Cabo San Lucas project that Mr. Jowdy

2  applied to the application of any of the LLCs.  There was

3  a little over $6 million traced to the LLC --

4           THE COURT:  Right.

5           DEFENDANT KENNER:  -- excuse me, to the

6  purchase, and only $350,000 comes from one of the victims

7  in the case, and that is Mr. Nolan.  And as a result, I

8  think with some forethought, Mr. Jowdy settled with Mr.

9  Nolan for that money, and other business transactions

10 back in 2008.

11          Mr. Juneau actually made reference to those

12 settlements during th trial here.  I can get to the

13 transcript number if you would like, that Mr. -- that

14 Juneau actually referenced it.  It will just take me a --

15          MS. O'CONNOR:  And your Honor, if Mr. Kenner is

16 seeking to have that money credited towards the

17 forfeiture, the forfeiture the government is seeking is

18 gross proceeds.  So the money the government traced would

19 be the entire amount of forfeitable property, which is a

20 different issue from restitution or loss amount.

21          THE COURT:  All right.  I will go back and look

22 at it, Mr. Kenner, okay?  I don't want to get too side-

23 tracked from the issues but I am obviously very focused

24 on the forfeiture part of the case, and resolving it

25 completely.

Proceedings

1          One of the things I did, and Mr. Talkin is

2     there anything you want to add, because I did -- I had an

3     issue -- no?

4          MR. TALKIN:  Not on this issue, no.

5          THE COURT:  Well, I just have an issue -- it's

6     been appraised previously by -- it may have been both Mr.

7     Talkin and prior counsel, which is this -- the money

8     judgment that the government is seeking which is $36

9     million against both defendants, Mr. Kenner obviously has

10    his objections to that because much of it relates to, you

11    know, money that the government is not claiming was the -

12    - or is not trying to prove was part of the fraud, and

13    that the investors knew the money was going to, for

14    example, Los Frailes, and del Mar.  So that's Mr.

15    Kenner's issue.

16         But Mr. Constantine has another issue that Mr.

17    Kenner doesn't have, which is Mr. Constantine's argument

18    is that none of that was even reasonably foreseeable to

19    him, that he wasn't involved in del Mar, he wasn't

20    involved in Frailes, and the government -- I went back

21    and sort of looked at the forfeiture submissions, what

22    the government's response to that was, and I think the

23    government just said oh, it's -- you know, he was in the

24    conspiracy but I think the government realizes that there

25    has to be a reasonable foreseeability, even in forfeiture

23

Proceedings

1    there has to be some reasonable foreseeability by a co-
2    conspirator of what's going on.
3           So it's not clear to me that Mr. Constantine
4    would have any knowledge of what was going on with
5    respect to much of what the government is including in
6    the money judgment part of the case.  So does the
7    government want to address that?  What evidence is there
8    that Mr. Constantine had any knowledge of what was going
9    on with Mr. Kenner taking money for, you know, $10
10   million for del Mar.  How would Mr. Constantine know
11   about that?
12          MS. O'CONNOR:  Your Honor, could the government
13   have the opportunity to address that in writing?
14          THE COURT:  Yes, that's fine.  You know,
15   there's a lot of different properties, but -- yeah.  In
16   other words, why shouldn't Mr. Constantine's money
17   judgment forfeiture be limited.  You know, the global
18   settlement fund and Eufora are obviously different
19   because he was centrally involved in those, but as it
20   relates to the lines of forget, which the government, I
21   think -- and I think I saw in the sentencing memo, the
22   government said in response to Mr. Constantine saying
23   that, you know, that he had nothing to do with the lines
24   of credit, and the government I think did try to point
25   out that there were some aspects of it, maybe that

24

Proceedings

1    touched on him, but the bottom line is that really the

2    line of credit weren't something that he was intimately

3    involved in, so why shouldn't his money judgment

4    forfeiture be limited to the global settlement fund

5    money, the Eufora money, and some portion of the Hawaii

6    money that he either received as ill-gotten gains or had

7    some, at least, reasonable foreseeability to, I don't

8    know if there was something beyond what he received

9    himself for the central loan or things like that, that he

10   would've had to have had some reasonable foreseeability

11   about but does the government understand what I am

12   asking?

13          MS. O'CONNOR:  Yes, your Honor.

14          THE COURT:  And it could be in the form of a

15   letter, and then I will give Mr. Talkin, you a chance to

16   respond to that, okay?

17          MR. TALKIN:  Thank you.

18          THE COURT:  But the government also, do you

19   want to address in writing the issue that Mr. Kenner has

20   regarding those properties or are you -- do you want to

21   address that now?

22          I mean his argument is essentially, it's a

23   little bit different because he was involved in it, but

24   his argument is that the government is not trying to

25   prove that he committed fraud in connection with Frailes,

25

Proceedings

1    or del Mar, the Palms, so it's disproportionate to say

2    because there may have been one portion of a line of

3    credit that went in there, a couple of hundred thousand

4    dollars, that $10 million should then be part of the

5    money judgment against him under those types of

6    circumstances.

7              MS. O'CONNOR:  We'll address that in writing as

8    well, your Honor.

9              THE COURT:  Okay.  Are there any other issues

10   -- and Mr. Kenner, I will give you a chance to respond to

11   that, okay?  You did raise that.  I read in the letter

12   this morning where you raised that precise issue.  I

13   don't remember what date --

14             DEFENDANT KENNER:  Yes, your Honor.

15             THE COURT:  -- it was on probably multiple

16   dates but I will let you address it further once you get

17   that, okay?

18             DEFENDANT KENNER:  Thank you, sir.

19             THE COURT:  And if the government is part of

20   that, the government is going to propose some alternative

21   money judgment amount for either of them.  I would be

22   helpful to sort of break it out in that letter if you

23   decide based upon my questions, and what I am asking you

24   want to revise with the amount of the money judgment, I'm

25   asking that you try to do that in the letter, okay?

Proceedings

1          MS. O'CONNOR:  Yes, your Honor.

2          THE COURT:  All right.  Anything else on the

3    forfeiture?  All right.  So before we get to the

4    sentencing issues I want to talk about today, I did want

5    to address the ongoing text issues.  You wrote the letter

6    to the Court in late November, and I guess found the

7    discovery that you think, so that you --

8          MR. TALKIN:  Yeah.

9          THE COURT:  -- can you just --

10          MR. TALKIN:  I'll summarize the steps.

11          THE COURT:  Yeah.

12          MR. TALKIN:  Your Honor, had asked us -- the

13    parties to check the files and see what we had, and I

14    went through the files that I had in my office, which is

15    some 20 boxes, maybe more.  I didn't find anything, but

16    Mr. Constantine was able to find the items I described in

17    detail in the November 27th letter.

18          It seems that those are exactly what was turned

19    over with the discovery letters that I don't think

20    there's any dispute cover the disclosures that are in

21    question here.

22          The practical problem is is mostly the thumb

23    drive that was given -- that went with the February 20th,

24    2015 letter, contains -- it appears to be over a million

25    pages of documents, and it raises one practical issue,

27

Proceedings

1    and one real issue.  The practical issue is how in the

2    world do we review all those to figure out if the text

3    messages are in there.

4            The --

5            THE COURT:  You can't search it.

6            MR. TALKIN:  You can but it is going to take --

7    right.  No, well, I would have to get everyone

8    relativity --

9            THE COURT:  No, no, I meant search by word.

10   Like you can't word search it or you can?

11           MR. TALKIN:  Right.  No, you can't.  What --

12   they are all PDFs and the PDFs have PDFs that have PDFs

13   that have PDFs, to give you an idea of what's going on

14   there.

15           So I think that putting it into relativity or a

16   similar program would certainly then enable us to do

17   searching, but of course that's an expense, and that also

18   takes a long time.

19           The other problem is this, and I -- and your

20   Honor, I -- you have been very, very patient with me with

21   this ineffective assistance of counsel issue, and you've

22   made your ruling, but what this has raised for me, and

23   I'm obligated to bring to the Court's attention is,

24   arguably three months -- less than three months prior to

25   trial, the government dumped on the defense over a

Proceedings

1  million documents.  A preliminary review of those

2  documents show that there's a bunch that are relevant

3  that could have and should have been used at trial.

4          Now I don't know, I mean I would probably have

5  to interview trial counsel, or the Court would, but I

6  don't know that they were ever reviewed, but I can

7  certainly say anecdotally from my experience, if I am

8  given a million documents, three months before trial, I

9  am going to write a letter to the Court asking for time

10  to figure out what's going on.  And that, I am certain

11  did not happen.

12          I'm not at this point asking to reopen that

13  issue but I think I know, it's my obligation to follow

14  that issue to the end because if it does indicate further

15  ineffective assistance of counsel, it's something that I

16  have to raise, especially your Honor, it seems that some

17  of the documents just from preliminary review are things

18  I would've used on cross-examination.

19          So I'm not saying that I know that for sure,

20  and I don't want to give that impression.  It's a very

21  preliminary review, but that's just a secondary, but

22  equally important issue of the thumb drive.

23          Now there's another issue, the second

24  submission which was in April 7th, which purported to be

25  the same production as happened on February 20th, I can

29

                        Proceedings

1   tell you even from somebody who knows little or nothing

2   about computers or terabytes, there's no way they're the

3   same.

4            The second comes on one disc, and does not

5   contain in any -- there may be some overlap, but doesn't

6   contain the documents that are in the first disclosure of

7   February 20th.  And importantly, the second disclosure on

8   April 7th, 2015, does have the text messages -- does have

9   text messages but they are not the text messages we're

10  talking about.  And it's those text messages that are in

11  the April 7th, 2015, which have caused great confusion in

12  this case of what we're talking about, which has been a

13  recurring theme in this case because of the overwhelming

14  amount of documents, and some that are similar and

15  overlap.

16           But that's an important issue here because

17  there were text messages talked about during the trial,

18  and shown, and put into evidence.  However, the ones

19  we're talking about are not them.

20           And the final practical problem is the only

21  reason we found out about this was from Mr. Kenner's

22  filings.  Mr. Kenner had a two terabyte, according to my

23  discussions with him, and what he said in court, had a

24  two terabyte hard drive, which is a large one, and that's

25  where they came from.  That's something, and I am not --

30

Proceedings

1   whether we were entitled to that when he got it, probably

2   not, because it had to go through a taint team, and all

3   of those gyrations, but ultimately after the taint

4   examination was done, we never got that two terabyte.

5          And to make things even more muddled for your

6   Honor, that two terabyte hard drive has disappeared

7   because of the conditions Mr. Kenner is enduring at the

8   MDC.  So I don't know that we're ever going to have the

9   opportunity to review what Mr. Kenner had.  So I'm trying

10  to piece all of this together but that's what caused the

11  letter because there is -- you know, it would take not an

12  army but more than just my office to handle this.

13         THE COURT:  Let me just ask the government, if

14  you agree with his recitation of what was on each one,

15  and whether there is differences between the productions.

16  I don't know if you can address that.

17         MS. KOMATIREDDY:  Yes, your Honor, and I

18  appreciate the opportunity to address this.  I know we

19  discussed this briefly at the last court conference, and

20  since that time I had spent some extensive time reviewing

21  the record on this and I would like an opportunity to

22  just explain how we got here.

23         THE COURT:  Okay.

24         MS. KOMATIREDDY:  First of all, with respect to

25  the specific items that Mr. Talkin's client has found

Proceedings

1   that are now in Mr. Talkin's possession, the government

2   has not yet had had an opportunity to view those himself

3   -- ourselves, and I think it is a best -- would be a best

4   practice to copy them before having us also view them.

5           But putting that aside for a moment, first I

6   understand that this is frustrating in that in the

7   ordinary course with every discovery production, it is

8   our best practice to keep a copy, a physical copy, an

9   electronic copy, and to review the contents of the

10  production before turning it over.

11          And normally, answering this question of

12  whether something was turned over should be easy by just

13  looking at that copy, and it's frustrating not to be able

14  to do that here.

15          I just want to make clear why we are in this

16  position.  One is that this particular production was not

17  the normal sort of documentary production.  It was an

18  electronic production that had to go through privilege

19  review, and so the prosecution team was walled off from

20  putting that production together.  Myself, and Mr.

21  Miskiewicz simply were not involved.

22          Second, when it was turned over, the filter

23  team turned that production over -- the same thing over

24  to us, the prosecution team, as well as Constantine.  So

25  whatever we had, I'm confident that Mr. Constantine had.

Proceedings

1   Our own review of that production was limited because as

2   the Court will recall, at the same time, Mr. Kenner had

3   brought a Fourth Amendment challenge against the

4   prosecution team for continuing to search his computer.

5            He alleged that that was a violation of his

6   rights, and he asked us not only to stop our search but

7   to purge any files that we had not culled for us as

8   exhibits at trial.  In resolving that motion, we argued

9   that we should be able to continue review for some

10  limited time period.  We did continue to review for some

11  limited time period, and then we represented to the Court

12  that we would stop our search, which is what we did.

13           And as part of that search, I recall, I

14  remember that many of the documents from those electronic

15  devices were redundant and cumulative of documents that

16  had already been turned over in discovery because the

17  history of this case shows that the same frauds, the same

18  losses, have been litigated multiple times, and

19  investigated multiple times in civil litigation, and SEC

20  litigation.  And so many of the documents on Mr. Kenner's

21  computer and phone and been previously disclosed in those

22  litigations, and we had already disclosed that

23  documentation in discovery.

24           All of that documentation in discovery.  All of

25  that is to say when it came time for trial, the

Proceedings

1   government did not mark very many exhibits from the

2   electronic devices -- very many of those documents as

3   exhibits, and we did not use any of those text messages

4   at trial affirmatively against the defense.  Those are

5   not part of the production that we culled.

6          But I have reviewed the trial record in detail,

7   and I can tell you affirmatively that Mr. Constantine's

8   trial counsel did.  Constantine Exhibit 326 is one of the

9   text messages that we are talking about.  I can hand this

10  up to the Court, if the Court would like it.  And that I

11  am handing to the defense.

12          DEFENDANT KENNER:  If I could see a copy too,

13  your Honor, please.

14          MS. KOMATIREDDY:  But just to be clear, this is

15  -- there should be no confusion.  There were two types of

16  text messages used at trial; one was the bubble text

17  messages that were screenshots from Mr. Kenner's

18  computer, and two were the plain text messages that were

19  extracted from Mr. Kenner's phone.  Both were used at

20  trial, both were discussed at trial.  And in fact, the

21  trial transcript has a lengthy discussion from Mr. Kenner

22  testifying on the stand about how these were turned over

23  in discovery, more than a dozen of this type of text

24  messages, the plain text text message from Mr. Kenner's

25  phone were admitted as trial exhibits, and Mr.

34

Proceedings

1   Constantine's counsel admitted one of them, and cross-

2   examined using it.

3           All of this is to say even though I cannot

4   affirmatively tell you that I saw with my own eyes that

5   the text messages were turned over in discovery, I had

6   every reason to believe based on the trial record, and

7   the record set forth in the discovery letters that those

8   text messages were available to Mr. Constantine.  They

9   were -- you know, as Mr. Kenner's testimony, and the

10  trial transcript shows, they were on his computer that

11  was sitting at defense table throughout the trial, a

12  trial in which both defendants conferred extensively, and

13  they were used by defense counsel which means defense

14  counsel -- this is not evidence that was suppressed by

15  the government.  Defense counsel was fully on notice that

16  it existed, not once did defense counsel, either defense

17  counsel raise any possibility that they had not been

18  disclosed.

19          And fr those reasons, we think that this should

20  really resolve the question of whether there was any

21  issue.  There's really no basis to question whether

22  they're turned over when both defense attorneys were

23  using the text messages at trial.

24          THE COURT:  Well --

25          MS. KOMATIREDDY:  Furthermore --

35

Proceedings

1          THE COURT:  Go ahead.

2          MS. KOMATIREDDY:  I'm sorry, your Honor.

3          THE COURT:  No.

4          MS. KOMATIREDDY:  Just one more point which is

5   since trial, of course these text messages have been

6   coded in every filing essentially, and every round of

7   motion practice, and so they -- our position is they've

8   been fully litigated.  Everything that could be helpful

9   to the defense has been submitted to the Court.  Mr.

10  Kenner's first Rule 33 motion had an appendix with issues

11  by witness, which ran hundreds of pages, and in each of

12  those witness reports, Mr. Kenner included copies of text

13  messages from those witnesses that he felt were

14  impeaching as to their testimony.  The Court already

15  reviewed all of those, and rejected them as a basis to

16  undermine the verdict in this case.

17         With that record, we feel that there need not

18  be a further investigation at least on the part of the

19  government about whether these text messages were

20  available to the defense.  Any kind of claim of this sort

21  is really -- it's the defense's burden to make.

22         And so if -- we defer to the Court as to

23  whether to provide the defense with more resources to do

24  their research but we don't think this is a reason to

25  delay sentencing in this case.

Proceedings

1            THE COURT:  Let me just ask you a couple of --

2    that was helpful but I guess this last point that Mr.

3    Talkin raised, which isn't inconsistent with everything

4    you've said which I fully agree with, it's obvious there

5    were text messages that were available, and were used

6    during the trial, but he is suggesting that what --

7    potentially what happened -- what may have happened, and

8    maybe I will let Mr. Kenner speak to this as well, is

9    that Mr. Kenner may have had his two terabyte hard drive,

10   and Mr. Talkin is suggesting that what prior counsel may

11   have received in this April 17th production, this

12   February 20th production, might have been some subset of

13   that.  Is that -- yes?

14           MR. TALKIN:  At the most, yes.

15           THE COURT:  So is that something that the

16   government can speak to?  Is that a possibility that -- I

17   mean, you're pointing out that, you know, he introduced

18   one text message and Mr. Kenner obviously had a lot of

19   text messages but is there a possibility that Mr. Kenner

20   got more than Mr. Constantine, I guess?

21           MS. KOMATIREDDY:  Your Honor, that is a

22   possibility.  That makes sense to me that it would be a

23   possibility because the phone -- the reason it would be a

24   subset, and to be clear, that same subset would be what

25   the prosecution team had.  We had the exact same thing.

Proceedings

1          So the filter team and Mr. Kenner would've had

2    the full two terabytes, and the prosecution team and Mr.

3    Constantine had the post-filter subset.

4          I believe based again on the trial record, that

5    at least some portion of that phone would've had

6    privileged communications, and I say that because in the

7    trial transcript, you see that Mr. Kenner discusses a

8    text message sent to him by Mr. Stolper, who was an

9    attorney in this case.  And so it would not surprise me

10   if there was a subset but that doesn't mean it's

11   improper.

12         And I am happy -- I know this is a lot of

13   information, your Honor, I am happy to write this in a

14   letter, and put it in a brief for the Court as well, to

15   make a record.

16         THE COURT:  Yeah.  Well, part of what I have

17   been doing all along is to the extent they've come up,

18   I've looked at them to see whether or not I thought if

19   they had been introduced, whether they would have made a

20   difference, given what was already introduced.  So I've

21   done that to the best that I can up to this point.

22         But it's always helpful to know, and now that I

23   am on the Court of Appeals, I know that they would -- to

24   the extent that this is appealed later, they would like

25   to know in the first instance, was there a failure to

Proceedings

1    produce at all because that could be a threshold question

2    independent of whether or not if there was a failure to

3    produce, whether that had any impact, or whether there

4    was ineffective assistance of counsel claim -- you don't

5    know whether there's an ineffective assistance of counsel

6    claim, once you know whether it's produced or not.

7           So I understand that the Court has looked at

8    what Mr. Kenner has submitted in terms of texts that

9    weren't introduced, and made some rulings on that, but at

10   least Mr. Talkin's also suggesting there's more but --

11          MR. TALKIN:  I think the -- and (indiscernible)

12   wouldn't know this but the -- this exhibit she just

13   pointed out actually proves our point.  This was

14   generated by Mr. Kenner off his computer during trial,

15   and given to the trial counsel who didn't know where it

16   came from at the time, and used it on the fly as trial --

17   you know, as happens during trial.  So I think it clearly

18   shows that, you know, this subset discussion is very

19   relevant.

20          THE COURT:  Let me ask Mr. Kenner that.  Is

21   that -- you're not -- you believe you've got a complete

22   set of the text messages, is that accurate, when you got

23   the hard drive copy of your computer?

24          DEFENDANT KENNER:  I don't believe my set was

25   complete, and I have to go based on recollection because

39

Proceedings

1   it was a one terabyte drive, your Honor, by the way.  I

2   believe they said that they delivered in one of their

3   letters two terabyte drives but I only ever had one

4   terabyte drive.  And that's the one -- that's the one

5   that we --

6           THE COURT:  I know.  What makes you think what

7   you have is incomplete?  Why do you think yours was

8   incomplete?

9           DEFENDANT KENNER:  Because there were --

10          THE COURT:  You were introducing text messages

11  all over the place, right?

12          DEFENDANT KENNER:  Yes, sir.  That is correct.

13          THE COURT:  Okay.

14          DEFENDANT KENNER:  What we did recover, there

15  were 89,000 text messages plus or minus, but there big

16  gaps in the -- in the data that I had.  So there might've

17  been a six-month gap where there were no sent messages

18  which was clearly not possible, considering the volume of

19  my text.

20          THE COURT:  Yeah.

21          DEFENDANT KENNER:  So that being said, that I

22  don't have a comment on, but what Mr. Talkin just

23  referenced was, in fact, the case that after direct

24  examination, I believe it was at 5 -- transcript page

25  5042.  Mr. LaRusso had cross-examined me with this

40

Proceedings

1   because my trial counsel failed to introduce this in

2   contradiction to some of Mr. Peca's testimony.  So I had

3   printed it out, and handed it to them from that joint

4   printer that we were using at trial.

5            THE COURT:  Does the government have --

6            DEFENDANT KENNER:  But I --

7            THE COURT:  -- a copy of the -- of what Mr.

8   Kenner -- I mean, not you, maybe the other -- the taint

9   team has a copy of what was produced to him, or they

10  don't have that.

11           MS. KOMATIREDDY:  You know, your Honor, that

12  would've been created by -- I can ask FEI Cart (ph.) if

13  they have a record -- that would've been a complete copy

14  of the original evidence, what would've gone over to Mr.

15  Kenner because it was one of the first productions in the

16  case, and it was simply the seized devices copied and

17  turned over since they were seized from him.

18           I can look for a particular record in their

19  computer system that might reflect that.

20           THE COURT:  All right.  That might be helpful.

21  And then on Mr. Talkin's point, I am not inclined to

22  authorize the resources necessary to do this at this

23  point in this case, of having someone manually go through

24  these records.  It would delay the sentencing forever,

25  and would be a lot of money.

Proceedings

1        But let me just ask the government, if they

2   produced back to you these -- the February 20th, and

3   April 7th productions, is there anyway the government

4   could, without doing it manually, figure out whether some

5   of these text messages they're saying they never had

6   would be in those productions, or the government couldn't

7   do that either?

8        MS. KOMATIREDDY:  Your Honor, I think we're

9   probably operating under the same technical limitations

10   which is that the format that the privilege review

11   occurred in was this PDF format, and so Mr. Kenner had it

12   in a more easily manipulative format.

13        This also actually is discussed with the Court

14   in one of the sidebars during trial.  I was reminded of

15   this as when I was going through the transcript

16   because we too, when this was produced at trial, sort of

17   faced the same issue.

18        So unfortunately, I think we would face the

19   same difficulties that Mr. Talkin would in terms of

20   trying to put it on some sort of database and going

21   through it.

22        THE COURT:  Okay.  I'm not --

23

24        MS. KOMATIREDDY:  And of course, we would also

25   seek the Court's blessing to do that as a prosecution

42

Proceedings

1   team because we expect that Mr. Kenner's Fourth Amendment

2   challenge will be renewed on appeal, that we should --

3   you know, his position was that we shouldn't have any of

4   this data beyond what was used at trial anymore at all.

5   That we should purge anything that we're not actually

6   using.  This was at a time when the Ginias (ph.) case had

7   been decided at the panel level, but not vacated en banc.

8   That Mr. Kenner's challenge was that our review should

9   end at anything that we had not culled out should be

10  purged.

11           So if the Court were to ask us to conduct such

12  a search, we would just ask for the Court's blessing that

13  we are ale to do that, consistent with the Fourth

14  Amendment.

15           THE COURT:  Yeah.  Well, if you're telling me

16  you can't do that search, I mean, without doing it

17  manually, the only benefit would be is if the government

18  had some type of technological way to do some type of

19  word search of those productions, but you don't think

20  that's --

21           MS. KOMATIREDDY:  I don't think so, your Honor.

22           THE COURT:  All right.

23           MS. KOMATIREDDY:  We're facing the same issue.

24           THE COURT:  And we already know that they're in

25  Mr. Kenner's -- we know that they're in -- right, isn't

Proceedings

1    that how -- the ones that you had found --

2           MR. TALKIN:  In other words, they had -- the

3    only way I would know they even exist is that they were

4    produced by Mr. Kenner which means at some point he had

5    them.

6           THE COURT:  Right. But the ones you've given to

7    the Court now, you've gotten all of them from Mr. Kenner

8    essentially?

9           MR. TALKIN:  Yeah, I've gotten them out of

10   public filings from Mr. Kenner.  In other words, my real

11   concern is there's a whole treasure trove here.  You

12   know, and it's not -- based on the few that I have seen

13   that are -- that clearly, whether they -- you know,

14   whether the -- your Honor decides -- has decided or will

15   decide they would turn over a case or not.  They're

16   clearly tend to (indiscernible) the defendant, and as

17   those pile up, the effect piles up.

18           So you know that's what really concerns me

19   here.  If there's ten emails that contradict Peca and he

20   had to -- excuse me, ten text messages that contradict

21   Peca, and he would've had to have been under cross-

22   examination of ten that clearly contradicted everything

23   he said, we all know what the result of that would've

24   been.

25           THE COURT:  Yeah.  Although, I mean some of the

44

Proceedings

1  ones you say clearly contradict, I think -- I don't agree

2  with that, they don't clearly contradict.

3          MR. TALKIN:  We can --

4          THE COURT:  They could be consistent with his

5  testimony, is --

6          MR. TALKIN:  I --

7          THE COURT:  Are there other ones that you

8  haven't put before me already that that are --

9          MR. TALKIN:  There - I believe you have what I

10  have so far.

11          THE COURT:  All right.  Did you give me anymore

12  after I made the ruling with respect to this issue or

13  have there been any since then or --

14          MR. TALKIN:  Yeah.  I think I put in a

15  supplemental filing.

16          THE COURT:  After my opinion?

17          MR. TALKIN:  Before.

18          THE COURT:  All right.  I will go back and look

19  at it again, okay?

20          MR. TALKIN:  Your Honor, there is some

21  technology available from Adobe that makes this manual

22  search faster but it's still a manual search.  It makes

23  it much faster.  In other words instead of -- you don't

24  have to click on each PDF.  You can actually look at a

25  screen of multiple PDFs, and you can tell whether or not

45

                            Proceedings

1   text messages or not, and move on.  That's my

2   understanding, just so you have that information, as

3   well.

4              THE COURT:  Well, it may be if -- maybe this

5   because was -- was it 89,000, is that what you said?

6              DEFENDANT KENNER:  Yes, sir.

7              THE COURT:  Is till a lot less than a million

8   or millions of documents, right?

9              MR. TALKIN:  Right, but there's two issues

10  here.  There's the 89,000 text messages which I am saying

11  I believe there's Brady material.

12             THE COURT:  Right.

13             MR. TALKIN:  I have reason to believe.  Then

14  you have the other -- the balance to the million

15  documents, are the ones that concern me for ineffective

16  assistance of counsel, which again I believe I've got to

17  look at.

18             THE COURT:  Yeah, as I said with respect to

19  that, I am not going to hold up the case.  Obviously

20  those can be brought on collateral review to the extent

21  you find anything, but we're not going to leave this

22  case, especially where we're at, hoping so that you can

23  review everything that's ever been produced, so --

24             MR. TALKIN:  Your Honor, I am going to abide by

25  whatever the Court rules, but I feel that this is

46

Proceedings

1   something --

2            THE COURT:  But --

3            MR. TALKIN:  -- that you need -- that the Court

4   needs to know before we proceed.

5            THE COURT:  All right.  No, I appreciate that.

6   If the government could check with the cart, on the ones

7   that you believe you may not have gotten, they're saying

8   that some of them may have been privileged, and the

9   reason -- that's the reason you didn't get them is that

10  you don't believe that that's the case, that there was a

11  reason you didn't get them?

12           MR. TALKIN:  No, I don't believe that there --

13  I don't know what their reasoning was, and it could

14  simply be a mess up, it could be a technological problem,

15  there could be anything, but the end result is there's

16  multiple nonprivileged communications that we're entitled

17  to that are out there.

18           THE COURT:  Yeah, some may be with a lawyer,

19  but it sounds like they're talking about ones with Peca.

20  There will be no privilege.

21           MR. TALKIN:  Right, people had testified --

22           THE COURT:  Right.

23           MR. TALKIN:  -- and to the extent that these

24  lawyers testified, they clearly -- that there's a waiver

25  of any privilege, so they've already testified in court

47

Proceedings

1   about their communication.  so other communications

2   regarding their communications can't be privileged.

3           THE COURT:  All right.  If the government could

4   submit to me, file a letter, just after you speak to the

5   Cart team, I guess one of the possibilities would be with

6   respect to the 89,000 text messages that exist, whether

7   there's a way to isolate them from the original --

8           MR. TALKIN:  Well, just thinking out loud, one

9   thing we do know is, and Mr. Kenner can correct me if I

10  am wrong, they're from the phone.  So we can cut out the

11  whole computer aspect of these giga -- of this.  so now

12  we can focus just on the phone, which I think narrows it

13  right there.

14          THE COURT:  Well, was one of these productions

15  just to the phone, or that --

16          MR. TALKIN:  No, I think that the text messages

17  -- no, it was both, right.

18          THE COURT:  But the problem may be there may be

19  ones -- again, this went to a taint team, so you're not

20  entitled -- I can't say to the government give Mr. Talkin

21  all 89,000, so that's a problem. 2

22          MR. TALKIN:  Yes, it is.  I agree.

23          THE COURT:  Okay.  I don't know.  The

24  government's going to have to help me figure out the best

25  way to deal with this.  I can't think of an easy way that

48

Proceedings

1   -- obviously, they're focused on the text messages.

2   They're raising an issue with respect to everything but

3   the Court's focused on the text messages, trying to

4   figure out if the government can determine what text

5   messages Mr. Constantine received, and what he may not

6   have received from the 89,000.  I don't know if you're

7   able to do that or not.

8            MS. KOMATIREDDY:  Your Honor, I will file a

9   follow-up letter --

10           THE COURT:  Okay.

11           MS. KOMATIREDDY:  -- of what we've discussed

12   and attempt to propose a way forward.

13           THE COURT:  All right.

14           MR. TALKIN:  Your Honor, just one last thing,

15   would it make sense -- there was really two applications

16   in that letter for funding, maybe it would make sense, at

17   least, and I don't think this would be too expensive,

18   it's more just having the equipment that I do at least

19   make the copies of what I got, so I can give those to the

20   government, so they can use those to work off.

21           THE COURT:  When you say the copies, you say

22   the February 20th, and the --

23           MR. TALKIN:  Right, in other words, either the

24   thumb drive from February 20, and the disc.

25           THE COURT:  Yes, yes.

Proceedings

1         MR. TALKIN:  I will get them that ASAP --

2         THE COURT:  Yes.

3         MR. TALKIN:  -- so at least you'll be working

4    with the --

5         THE COURT:  Yeah, that's granted, okay?

6         MR. TALKIN:  Okay.

7         THE COURT:  All right.  I think we've done all

8    we can on that today.  Just to turn to the -- as you know

9    from my notification to you, I was just trying to -- you

10   know, I've begun in addition to finalizing the

11   forfeiture, have -- and I did issue the opinion with

12   respect to Mr. Kenner's supplemental motion, I assume you

13   had a copy of that Mr. Kenner?

14        DEFENDANT KENNER:  Yes, sir.

15        THE COURT:  All right.  So I have begun to

16   focus on the objections and the rulings on the

17   objections, so I wanted to give you all an opportunity

18   today, if there's anything you want to supplement orally

19   to what you've given me.  I did want to address the loss

20   amount issue is something that I'm focused on.  The

21   government addressed in its sentencing memo, so let me

22   just turn to that for a minute.

23        It seemed like the government is suggesting

24   because there have been requests for FAtico hearings on

25   some of the other alleged frauds or potential frauds,

Transcriptions Plus II, Inc.

Proceedings

1   that the government was going to, for purposes of

2   sentencing, in terms of the loss amount, not pursue, the

3   things in paragraph 29 -- and excuse me, paragraph 29 is

4   I think is what's left.  Paragraph 29 -- let me just pull

5   it out.  Right.

6            So paragraph 29 of I guess Kenner, I don't know

7   if it's the same number in Constantine, let me find it,

8   it's paragraph 31 in Constantine, it's the PSR now,

9   attempts to catalogue the loss amounts for purposes of

10  the charge schemes of the trial.  It comes up with a $13

11  million-and-change amount.

12           So the government never said like we think you

13  should use for purposes of the sentencing as the loss

14  amount.  Is that what the government is asserting?

15           MS. KOMATIREDDY:  Yes, your Honor.  That's

16  right.  We went through the math again and determined

17  that we fall in the range of --

18           THE COURT:  Two levels lower.

19           MS. KOMATIREDDY:  -- greater than 9.5 million.

20           THE COURT:  Right.

21           MS. KOMATIREDDY:  At the 20 --

22           THE COURT:  Right.

23           MS. KOMATIREDDY:  -- point enhancement.

24           THE COURT:  Rather than a 22, a 20.

25           MS. KOMATIREDDY:  Yes, your Honor.  And in that

51

Proceedings

1   case, we all -- and I believe Mr. Talkin came to the same

2   conclusion in his letter, so we agree with him.

3           THE COURT:  All right.  And then on the issue

4   that's been raised by Mr. Kenner, and Mr. Constantine may

5   have raised it as well, but to the extent that there is

6   some value of the investments of the diverted money that

7   went to Mexico, can you explain to me why that would

8   potentially lower that amount in terms of like the actual

9   loss amount?

10          MS. KOMATIREDDY:  Yes, your Honor.  Well, I

11  think it -- there are two aspects of significance there,

12  one is how does it affect loss, and two, how does it

13  affect restitution?

14          THE COURT:  Right.

15          MS. KOMATIREDDY:  But loss -- it doesn't affect

16  loss at all because the test under the guidelines is

17  intended loss, and fraud is as soon as the money is

18  diverted from its intended purpose, the fraud is

19  complete.  So our position is that the entirety of the

20  money, even if it's -- whether it's diverted to some

21  profitable enterprise or not, and whether it results in

22  some asset or not, has been fraudulently taken, and

23  therefore all of it should count against the loss amount.

24  After --

25          THE COURT:  Because it's intended loss?

52

Proceedings

1          MS. KOMATIREDDY:  Yes, your Honor.

2          THE COURT:  Okay.  And then on restitution?

3          MS. KOMATIREDDY:  On restitution, your Honor,

4    the -- here, the -- it's a little bit more tricky but we

5    don't credit Mr. Kenner for the -- any sort of assets in

6    Mexico because as a matter of process with restitution,

7    first the Court must determine the loss, and the burden

8    is on the government to establish the victim's loss, and

9    then second, determine any offsets for value actually

10   received by the victim, and the burden is on the

11   defendant for showing that they have actually received

12   money.

13          And the issue here is threefold; one, Mr.

14   Kenner has not established that the monies -- excuse me,

15   the shares in CSL were actually in compensation for money

16   that the victims sent for Hawaii.  Remember that many of

17   these victims also separately invested in Mexico, and

18   these shares in CSL were gained from some sort of

19   negotiated settlement with Mr. Jowdy.  There's no

20   evidence in the record that the settlement actually had

21   to do with diverted money from Hawaii, or an attempt to

22   compensate for Hawaii.  It could easily just be some sort

23   of --

24          THE COURT:  Other money.

25          MS. KOMATIREDDY:  -- separate side deal for the

Proceedings

1   Mexico frauds which were uncharged frauds.  So that's one

2   issue that has not been established.

3            Second, Mr. Kenner's own forensic accountant

4   repeatedly states that he cannot confirm the interest.

5   So that's -- there's not actually -- we don't believe Mr.

6   Kenner has met his burden of showing the existence that

7   the victims have, in fact, an interest in an asset that

8   is going to be enforceable that is actually going to

9   result in some sort of value for them.

10           And third, given the ongoing litigation about

11  the value of the resort, there is no evidence that there

12  is any value there.  So given that -- all that

13  speculation and lack of evidence, Mr. Kenner hasn't met

14  his burden of establishing an offset.

15           Now the way restitution works is that it's --

16  again, it's a process.  So if he is able to establish

17  that in the future, if after forfeiture there are, in

18  fact, shares that the victims have that they sell, Mr.

19  Kenner can make an application to the Court and ask that

20  his restitution order be modified, and reduced

21  accordingly, and that's a separate application.  He

22  certainly has the right to do that, and could entertain

23  it then.

24           At this point, there's just not enough evidence

25  for that.  So at this point, we would suggest that the

54

Proceedings

1   Court institute -- impose restitution as we have proposed

2   for the counts of conviction, minus value actually

3   received, which we have measured -- we have acknowledged

4   that there were certain settlements with Northern Trust

5   Bank, and that there were some payments back from Lehman,

6   and we reduced those in our proposed amounts.

7            And to the extent that there's any other value

8   received by the victims in the future, that can be the

9   subject of future applications.

10            MR. TALKIN:  Your Honor, I just think that -- I

11   just need to clear something up on loss amount, as far as

12   Mr. Constantine is concerned because we were talking

13   about a discussion in light of their concession that

14   they're not going to ask for loss on the uncharged or

15   unproven crimes.

16            In our -- the most recent sentencing

17   submission, that's September 25 of 2019, the agreement

18   that we have -- the extent that we agreed -- the extent

19   that we agreed with the government was that the loss

20   enhancement should be plus 20 at the most, and that's a

21   significant at the most, because we've made many prior

22   objections as to how we even get to 20 but the point made

23   in our letter is even if your Honor were to accept their

24   arguments, it's still two points less than the PSR.

25            We are not agreeing to that amount, and

55

Proceedings

1    actually the amount we -- we had at it at 11-526 and
2    change, as at the most amount but again, that doesn't
3    affect the guidelines.  We're still above -- we're still
4    in the plus 20.

5            THE COURT:  Right.

6            MR. TALKIN:  I just want the record to be clear
7    on that, going -- harkening back to the letter filed by
8    Mr. Oliveras, a long time ago where there was a strenuous
9    objection to even getting to that amount.

10           THE COURT:  Yes, I saw that.  I read that
11   recently.  All right.

12           Mr. Kenner, do you want to add anything?

13           DEFENDANT KENNER:  Yes, your Honor, there's
14   several items that --

15           THE COURT:  Just pull the mic closer?

16           DEFENDANT KENNER:  I'm sorry, your Honor.
17   Thank you, your Honor, several items, if I may.

18           Based on paragraph 29 from the -- I think the
19   February - excuse me, the pre-sentence investigation
20   report.  Many of these numbers that total up to $13
21   million are not related to victims that the government
22   nominated in their superseding indictment, I think it's
23   ECF 214.

24           And in their recent sentencing memorandum, they
25   -- at page 30 and 31, I think it's ECF 765 at page 30 and

56

Proceedings

1  31, they conceded even more nonvictims in the case.  So

2  there's a discrepancy between what the PSR originally

3  sought with the number of the people who are -- the

4  government doesn't even deem as victims in the case.

5          You have Mr. Don Chawer (ph.), for one, Mr.

6  Glenn Murray, second, John Kaiser (ph.), they have him

7  listed as $200,000 as the victim.  So when I went back

8  into the testimony to see what Mr. Kaiser's referencing

9  related to $200,000, which I couldn't even recall, I saw

10  that it was $200,000 that he had taken from two police

11  officers and his mother.  It wasn't even his money.  So I

12  am not sure why Mr. Kaiser was involved in that.

13          I think Mr. McKee's (ph.) $250,000, on page 30,

14  is relative to the text messages that Mr. Talkin was

15  talking about earlier, where Mr. McKee has a full-blown

16  conversation the night of his dinner, of exactly what his

17  money is going to be used for after the dinner, but then

18  six years later, couldn't recall any of it, I think

19  during trial.

20          Nevertheless, I have on my own my most recent

21  filing, ECF 770, I put an appendix in that actually went

22  through the credits against loss charts, starting at it's

23  again, ECF 770, starting at page 53, was for the --

24  excuse me, page 53 is where it starts, and it does a

25  chart for your Honor for Hawaii, with credits against

57

Proceedings

1  loss.  It does one for Eufora, several pages later, and

2  then one for the global settlement fun, all related to

3  prevailing case law, and the Second Circuit and how they

4  value these different propositions.

5          Now I was a little bit confused by Mr.

6  Komatireddy when she said that the forensic accountant

7  suggested that he can't corroborate that there's any

8  value or any investment in CSL properties.  It's been

9  litigated in multiple jurisdictions, including the

10  Delaware Chancery Court that your Honor was involved as

11  an interested observer a few years ago, leading up to the

12  2017 settlement agreement with Mr. Jowdy.

13          I have a copy of it.  I was able to acquire the

14  2017 settlement, although I know I had asked the Court

15  for a subpoena to get it.  I was able to get a copy of

16  it.  In there, the settlement between all of the CSL

17  members which includes the alleged victims in this case,

18  in the instant case, Mr. Jowdy is settling as an

19  individual in his capacity as a managing member of

20  Diamante del Mar, Diamante Cabo San Lucas, KAJ Holdings,

21  which is the only traceable funds from Hawaii to the Cabo

22  San Lucas project that's the $350,000 we talked about

23  before that the government admitted on Government

24  Forfeiture 36.

25          But under related parties in the agreement for

58

Proceedings

1   related persons at definition 1.8, it says "For any
2   person specified in the settlement agreements means with
3   respect to such persons: (1) Any respective past,
4   present, or future, direct or indirect, parent entities'
5   affiliates, subsidiaries, controlled entities, families,
6   controlling persons, associates, investment advisors,
7   general partners, managing members, and (2) each and all
8   of their respective past, present, or future direct, or
9   indirect officers, directors, stockholders, principals,
10  managing directors, representatives, employees,
11  attorneys, fiduciaries, financial advisors, investment
12  advisors, insurers, reinsurers, consultant" --
13          THE COURT:  All right.  So what that --
14          DEFENDANT KENNER:  -- "et cetera, including
15  limited liability companies, their associated entities,
16  and assigns."  And I skipped over some more of the
17  typical --
18          THE COURT:  All right.  What was the amount of
19  that settlement?
20          DEFENDANT KENNER:  It was 4.6 percent of the
21  Diamante Cabo San Lucas project which they entered into
22  in 2017.  That was one of the reasons I asked your Honor
23  for at least an in camera review of the valuation of
24  Diamante Cabo from 2017.
25          And based on that, the Court should also note

Proceedings

1    that settlement was entered into after the government

2    entered G -- excuse me, Government Forfeiture 44 during

3    the forfeiture hearing, which was Mr. Jowdy and his

4    attorney's documentation that he had received all of

5    money that we documented as loans, and 19 of the Hawaii

6    investors at pre-trial.

7           THE COURT:  All right.  I don't want to get too

8    in the weeds on this for purposes of today but the bottom

9    line is for purposes of restitution, the most bottom line

10   question is we don't even know whether that's worth

11   anything at this point, right?  That 4.6 percent --

12          DEFENDANT KENNER:  That --

13          THE COURT:  -- might be worth zero, right?

14          DEFENDANT KENNER:  It may be worth zero.  It

15   may be worth a multitude of dollars, but what I guess the

16   Courts should -- from my perspective, the Court should

17   assess is back in 2017, based on the individuals knowing

18   that Mr. Jowdy had received 100 percent of the Hawaii

19   loans, as we had documented, and most of them had

20   previously testified to, and all of them had participated

21   as plaintiffs in, what was the value back in 2017 when

22   they entered into that agreement because my belief is

23   that they tied their financial future for anything Mr.

24   Jowdy had controlled, the Diamante del Mar project, the

25   Diamante airplanes, the Cabo San Lucas, and the Hawaii

60

Proceedings

1   loans that we had given --

2              THE COURT:  All right.

3              DEFENDANT KENNER:  -- to Mr. Jowdy.

4              THE COURT:  All right.  I will go back -- I

5   want to go back, I will look at your ECF 770, you said

6   page 53?

7              DEFENDANT KENNER:  Yes, 53 is where the

8   appendix begins.  The Hawaii chart and explanation starts

9   on 54.  The next one is the Eufora chart which starts on

10  page 66.  And the global settlement fund chart begins on

11  page 69, and the associated case law from the Second

12  Circuit is also referenced on how I came to the different

13  conclusions in there.

14             THE COURT:  All right.  Okay.  The only other

15  question --

16             DEFENDANT KENNER:  I can put some of them on

17  the record if you would like, and right now I have the

18  citations, and the cases.

19             THE COURT:  No, that's okay.

20             DEFENDANT KENNER:  Okay.

21             THE COURT:  The other thing I was going to do

22  today, and I'll be guided by counsel whether you want to

23  -- it's clear to me we're going to have to have another

24  -- one more conference before we set the sentencing, so

25  if you want to do this at the next conference, I was

Proceedings

1    going to give you a chance if you wanted to discuss some

2    of these other objections to the enhancements that -- you

3    know, the obstruction f justice, and role, and things

4    like that.

5            MR. TALKIN:  I definitely do want to do that.

6    I'm happy to do that at another time, your Honor, but --

7            THE COURT:  Okay.

8            MR. TALKIN:  -- I think that they are -- the

9    problem is they are convoluted discussions.

10           THE COURT:  Yeah, it's 3:30 and --

11           MR. TALKIN:  Yeah.

12           THE COURT:  -- it's partially my fault because

13   we started late, but we're going to have to have another

14   conference anyway, there's too many outstanding issues,

15   and I do want the government to give a closer look on the

16   issue of the money judgment because I am concerned about

17   the scope of it, okay?

18           So how long -- what's the government, in terms

19   of putting in the letter on that, what do you think is a

20   reasonable day.

21           MS. KOMATIREDDY:  Is the 27th all right with

22   the Court, your Honor?

23           THE COURT:  The 27th, you said?

24           MS. KOMATIREDDY:  Yes, your Honor.

25           THE COURT:  All right.

Proceedings

1          DEFENDANT KENNER:  What day is that, your

2    Honor?

3          MR. TALKIN:  2-7.

4          DEFENDANT KENNER:  27th.

5          THE COURT:  27th.  It will be the government's

6    supplemental submission on the money judgment and then --

7    I know that's right in the middle of the holidays but two

8    weeks from -- January 10th?

9          MR. TALKIN:  That's fine, Judge.

10         THE COURT:  Okay, Mr. Kenner?

11         DEFENDANT KENNER:  What was that date, your

12   Honor?

13         THE COURT:  They're going to put in their

14   submission on December 27th, on the money judgment, and

15   January 10th would be for you, Mr. Constantine to

16   respond, and then --

17         MS. KOMATIREDDY:  Your Honor, we would ask for

18   the same time line for the letter --

19         THE COURT:  Yeah.

20         MS. KOMATIREDDY:  -- following up about the

21   text messages.

22         THE COURT:  27th, and then if there's anything

23   on the text messages, you want to respond the same date,

24   okay?

25         MR. TALKIN:  Yes.

63

Proceedings

1          THE COURT:  All right.  I mean, I just think

2    it's a much bigger issue than two weeks but --

3          MR. TALKIN:  I understand.  At least we'll know

4    where we're going at that point.

5          THE COURT:  Right.  All right.  And then let's

6    see if we can have a conference either the week of the

7    13th or the week of the 20th.  Do you have any trials in

8    that period?

9          MR. TALKIN:  Which week, Judge?

10         THE COURT:  The week of the 13th or the week of

11    the 20th of January.

12         MR. TALKIN:  The later the better, I don't have

13    a trial but I do have a major appeal due, so just --

14         THE COURT:  All right.  And is the government

15    available the week of the 20th?  Is that --

16         MS. KOMATIREDDY:  Sorry, your Honor, December

17    or January -- just January?

18         THE COURT:  January.

19         MS. KOMATIREDDY:  Your Honor, we're available

20    any day except Friday.  I believe Monday is Martin Luther

21    King Day, your Honor.

22         THE COURT:  All right.  How about -- how about

23    the 22nd at 1 p.m.?

24         MR. TALKIN:  That's fine for me, your Honor.

25         MS. KOMATIREDDY:  Thank you, your Honor, that

64

Proceedings

1    works.

2              THE COURT:  So what we'll do on then we'll --

3    I'll give you a chance to orally address -- we'll have a

4    subsequent discussion regarding any of these outstanding

5    issues.  Obviously, money judgment issue will -- I'm

6    going to hold off on the forfeiture before I need to

7    receive those filings, so --

8              DEFENDANT KENNER:  Your Honor, with respect to

9    the forfeiture, could I just raise the Court's attention

10   that my partner, one of my European partners had

11   submitted ECF 771 with respect to the Baja Ventures

12   forfeiture issue.

13             THE COURT:  Okay.  I will look at that again.

14             DEFENDANT KENNER:  Thank you, your Honor.

15             THE COURT:  All right.  But I would just ask

16   the government, in light of the discussion we had about

17   the forfeiture, and the appraisal, I don't -- you said by

18   the end of January.  Can you -- I don't know who is doing

19   the appraisal but whoever is doing the appraisal, you

20   could tell them we're having this conference, you know.

21   Your submission is going to -- I mean, I am sorry, the

22   defense submission is going to come in on January 10th,

23   and then we're going to have this conference.  I would

24   really like to have that appraisal prior to that

25   conference, so that we can finalize the forfeiture issue,

65

                        Proceedings
1  okay?
2          MS. KOMATIREDDY:  We'll convey that, your
3  Honor.
4          THE COURT:  All right.  Are there any other --
5  I know everybody may be frustrated that we haven't been
6  able to move forward completely but obviously these are
7  all important issues, and I think everybody is working
8  diligently to try to resolve as many as we can in a
9  thorough way, all right?  So we're getting there.  All
10 right?
11         Yes, Mr. Kenner?
12         DEFENDANT KENNER:  Yes, your Honor.  I just
13 wanted to raise that I had submitted back to the Court
14 bak on October 21st, I apologize I don't know the ECF
15 number, but it was just a request for several subpoenas
16 or the equivalent assistance from the government to get
17 the 2008/2009 Ken Jowdy-Owen Nolan settlement agreement.
18 Again, that can be delivered under seal with all the
19 signed stipulations.
20         With respect to the loss and offset, just like
21 we just discussed the --
22         THE COURT:  Does the government have that
23 already in its chart?
24         MS. KOMATIREDDY:  No, your Honor, I am sorry.
25 Could -- what -- there's a sealed filing?  I'm not sure

                   Transcriptions Plus II, Inc.

Proceedings

66

1   if I actually have it.

2         THE COURT:  Which settlement is that?

3         DEFENDANT KENNER:  Mr. Jowdy and Mr. Nolan had

4   settled in 2008 for again, the identical issues that the

5   rest of them settled for in 2017, nine years later.

6         THE COURT:  You think the government has that

7   settlement?

8         DEFENDANT KENNER:  I was just asking if we

9   could receive it somehow.

10        THE COURT:  Oh, you want a subpoena for it?

11  The government is not aware of that?

12        DEFENDANT KENNER:  It's docket number 756, and

13  766.  Thank you, Mr. Brissenden.

14        THE COURT:  And you know about that settlement

15  how?

16        DEFENDANT KENNER:  We knew about it back in

17  2009 during Mr. Nolan's arbitration, when Mr. Jowdy

18  testified, and then here at trial, Mr. Juneau gave

19  testimony while represented by the same counsel, that he

20  had also settled with Mr. Jowdy back then.  They received

21  a one percent stake in the property.  The appraisal minus

22  the Danske Bank loan at the time made that one percent

23  transaction a $3.25 million transaction for Mr. Nolan at

24  the time.

25        THE COURT:  All right.  Can the government look

67

Proceedings

1   into that because that would be potentially an offset.

2          MS. KOMATIREDDY:  I understand, your Honor, and

3   I do remember Mr. Kenner's motions for discovery on this.

4   I don't believe we have it.  This would be something

5   either in the possession of Mr. Jowdy or Mr. Nolan, and

6   the --

7          THE COURT:  Yeah, he's asking for a subpoena,

8   so I would ask -- I don't know if you could contact Mr.

9   Nolan.  I'm just asking whether or not if there is a

10  settlement, then I am -- you know, I am looking at your

11  chart.  You don't have any offset for Mr. Nolan, but --

12         DEFENDANT KENNER:  Okay.

13         THE COURT:  -- depending on what it was, it

14  could be an offset.  Okay?

15         DEFENDANT KENNER:  The offset, your Honor,

16  would be one, two, three, four -- the fifth column on

17  page 54, the $3.25 million offset.

18         THE COURT:  Wait, page 54 of what?

19         DEFENDANT KENNER:  On page 54 of ECF 770.

20         THE COURT:  All right.

21         DEFENDANT KENNER:  It's the fifth column,

22  minimum 2008 Jowdy settlement value.

23         THE COURT:  All right.

24         DEFENDANT KENNER:  And I think I -- I believe

25  that I reference Mr. Juneau's testimony.

Proceedings

1          THE COURT:  I'm just asking the government to

2    look at that.  You could put that in your letter to me,

3    as well.  Just whether it -- there was a settlement, and

4    if -- why it can't be produced to the Court, and to Mr.

5    Kenner, and to Mr. Constantine if necessary, okay?

6          MS. KOMATIREDDY:  Your Honor, we defer to the

7    Court, and of course we will follow the Court's order.  I

8    would just note that the restitution statute makes clear

9    that the victims are not supposed to be ordered to

10   participate in a restitution order in any way.  They're

11   not supposed to be required to do that.

12         THE COURT:  What do you mean?  If there is an

13   offset, if they recovered money that you're seeking $1.6

14   million from Mr. Nolan, right?  On page 31 of your

15   sentencing memo you have how much they lost.

16         MS. KOMATIREDDY:  Yes.

17         THE COURT:  And then you have -- right?

18         MS. KOMATIREDDY:  I understand the Court's

19   point.

20         THE COURT:  I assume that you -- all right.  I

21   thought that you have offset those amounts to anything

22   that -- right?  Or am I misunderstanding what that means.

23         MS. KOMATIREDDY:  In our charts, we offset the

24   amounts against the 40,000 or so that was received from

25   Lehman, and any Northern Trust settlements.  We are not

Proceedings

1    aware of a Nolan settlement.  I understand the Court's

2    order to find out if there was a monetary settlement with

3    Mr. Nolan for this money, for Hawaii money, as opposed to

4    some separate Mexico money.

5              THE COURT:  Right.

6              MS. KOMATIREDDY:  I understand.

7              THE COURT:  If it's unrelated to what the

8    government is seeking here in terms of the offense of

9    conviction, then I am not interested but if it relates to

10   the offense of conviction, we should have an offset for

11   it.  Okay?

12             MS. KOMATIREDDY:  Okay.

13             THE COURT:  All right.

14             DEFENDANT KENNER:  Your Honor, and will I be

15   able to get a copy of that agreement?

16             THE COURT:  Well, let's see what they get

17   first, whether there is such an agreement, what they say

18   it states, and then we'll talk about getting a copy of

19   it, okay?

20             DEFENDANT KENNER:  Okay.  And on that chart,

21   you'll also see the bond interest earned from Northern

22   Trust is part of the transaction, as well as the 2015

23   testified recovery from Northern Trust Bank, totaling

24   $1.6 million, and $1.4 million respectively.

25             THE COURT:  For --

70

Proceedings

1            DEFENDANT KENNER:  So you --

2            THE COURT:  - for who?

3            DEFENDANT KENNER:  That's the total for Nolan,

4    Peca, Berard, Sedor and Rouchan (ph.), the five

5    individuals that were involved in the superseding

6    indictment that were Hawaii investors.

7            THE COURT:  All right.  I will go back and look

8    at it, okay?

9            DEFENDANT KENNER:  Yes, sir, your Honor.

10           THE COURT:  All right.  Thank you very much.

11   Have a good weekend.

12           MS. KOMATIREDDY:  Thank you, Judge.

13           MR. TALKIN:  Thank you, Judge.

14               (Matter Concluded)

15                   -o0o-

16

17

18

19

20

21

22

23

24

25

71

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **10th** day of **December**, 2019.

*Linda Ferrara*
Linda Ferrara

AAERT CET 656
Transcriptions Plus II, Inc.