1                 UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF NEW YORK
2

3    ------------------------------------X
                                         :
4    UNITED STATES OF AMERICA,           :   13-CR-00607 (JFB)
                                         :
5                                        :   100 Federal Plaza
                   v.                    :   Central Islip, New York
6                                        :
     PHILLIP F. KENNER, *et al.*,        :   March 1, 2019
7                                        :
                         Defendants.     :
8    ------------------------------------X

9         TRANSCRIPT OF CRIMINAL CAUSE FOR ORAL ARGUMENT
            BEFORE THE HONORABLE JOSEPH F. BIANCO
10               UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Government:        MADELINE M. O'CONNOR, ESQ.
                                DIANE C. LEONARDO-BECKMANN, ESQ.
13                              U.S. Attorney's Office EDNY
                                610 Federal Plaza
14                              Central Islip, New York 11722

15                              MATTHEW HAGGANS, ESQ.
                                U.S. Attorney's Office EDNY
16                              271 Cadman Plaza East
                                Brooklyn, New York 11201
17
     The Defendant:            PHILLIP A. KENNER, *Pro Se*
18                              No. 07480-408
                                MDC Brooklyn
19                              Metropolitan Detention Center
                                PO Box 329001
20                              Brooklyn, New York 11232

21   For Mr. Constantine:       SANFORD TALKIN, ESQ.
                                Talkin Muccingross & Roberts, LLP
22                              40 Exchange Place, Floor 18
                                New York, New York 10005
23
     Court Transcriber:         RUTH ANN HAGER, C.E.T.**D-641
24                              TypeWrite Word Processing Service
                                211 North Milton Road
25                              Saratoga Springs, New York 12866


     Proceedings recorded by electronic sound recording, transcript
     produced by transcription service.

2

1   (Proceedings began at 1:41 p.m.)

2           THE CLERK:  Calling case 13-CR-607, USA v. Kenner

3   and Constantine.

4           Counsel, please state your appearance for the

5   record.

6           MS. O'CONNOR:  Madeline O'Connor, Diane Leonardo,

7   and Matthew Haggans for the Government.  Also sitting with the

8   Government are Special Agents Josh Wayne and Mack Alietto

9   [ph.].  Good afternoon, Your Honor.

10          THE COURT:  Okay.  Good afternoon to all of you.

11          MR. TALKIN:  Good afternoon, Your Honor.  Sanford

12  Talkin for Mr. Constantine, who's seated to my right.

13          THE COURT:  Okay.  Good afternoon, Mr. Talkin; good

14  afternoon, Mr. Constantine.

15          MR. CONSTANTINE:  Good afternoon, Your Honor.

16          MR. KENNER:  Good afternoon, Your Honor.  Phil

17  Kenner, defendant.

18          THE COURT:  Good afternoon, Mr. Kenner.  As you

19  know, we're here for I guess closing arguments on the

20  forfeiture aspect of the case.  Are both sides ready to

21  proceed?

22          MS. O'CONNOR:  Yes, Your Honor.

23          MR. TALKIN:  Yes, Your Honor.

24          MR. KENNER:  Yes, Your Honor.

25          THE COURT:  All right.  So again, I just want to

3

1    highlight that you don't have to go through everything that's

2    in your papers.  This is really is an opportunity to summarize

3    your positions, highlight anything you want to highlight.  I

4    hope -- I don't set time limits, but I'm hoping that, you

5    know, up to 20 minutes for each per -- each party should be

6    sufficient.  That was my estimate just based upon the written

7    submissions.  But I did want to note for the record obviously

8    in addition to the submissions by the parties I did receive a

9    series of letters, some of which came in and I asked the

10   Government to respond to, which they did in the February 11th

11   letter.  And a number of letters have come in and some of them

12   came in and weren't docketed, but all of them now have been

13   docketed, at least that I'm aware of.

14          So we have a letter from Mr. Kaiser, we have a

15   letter from Mr. Pecca [ph.], we have a letter from CSL

16   Properties 2006, LLC, we have letters from Danske Bank, we

17   have letters DCSL parties, all on the issue of the

18   Government's attention to forfeit the resort and I just want

19   to clarify when I asked the Government obviously I'm reading

20   all these submissions.  I asked the Government to respond to

21   submission and I also was hoping the Government would respond

22   today to some of the additional submissions that have come in

23   since their letter on February 11th.

24          I don't view these.  The Government noted that

25   there's no right of intervention in a forfeiture proceeding

4

1  such as this.  I don't -- this -- no motion has been made to

2  intervene.  These are obviously interested parties who are

3  trying to advise the Court of some of the practical

4  ramifications of the forfeiture that the Government is

5  seeking.  So I just view it as helpful to the Court to

6  under -- I obviously don't understand all the ramifications

7  and I'm not -- I don't know whether the Government fully

8  understands all the ramifications, so I -- and certainly part

9  of the complication is that there are conflicting views as to

10 what should be done and what the ramifications are.  But I

11 think it's certainly helpful to me and I hope helpful to the

12 Government to understand in a complex situation like this what

13 the impact may be.  So I just wanted to make sure, that's the

14 role of all of these letters and I do want the Government to

15 discuss that in its closing argument.

16         All right.  It's the Government, so obviously you --

17 motion for forfeiture so I'll let the Government go first.  Go

18 ahead.  You can remain seated.

19         MS. O'CONNOR:  The Government's reply memorandum

20 addressed primarily to money laundering forfeiture statute,

21 982(a)(1).  This afternoon I'd like to highlight for the Court

22 the forfeiture statute pertaining to the wire fraud

23 convictions 981(a)(1)(C).  Threshold issue before the Court is

24 whether the forfeiture money judgment sought by the Government

25 should be reduced in light of the Supreme Court's decision in

5

1   <u>Honeycutt v. United States</u> and the short answer is no.

2           For the defendant's conviction to wire fraud and

3   wire fraud conspiracy, money laundering conspiracy, defendants

4   must pay a forfeiture money judgment in an amount determined

5   by the Court and forfeit the previously restrain or seize

6   assets.

7           During the course of the forfeiture hearing and the

8   briefing, the Government provided ample evidence that

9   demonstrates the requisite nexus between the specific property

10  it seeks to forfeit and the crimes of conviction, as well as

11  the amount of the money judgment it seeks against each

12  defendant.

13          Kenner and Constantine both invoke <u>Honeycutt</u> and

14  <u>Honeycutt</u> does not affect their forfeiture liability in this

15  case.  <u>Honeycutt</u> does not limit the forfeiture for the money

16  laundering convictions under 982(a)(1) because the money

17  laundering forfeiture statute requires the defendants to

18  forfeit all of the property involved in the money laundering

19  conspiracy.  The forfeiture under 981(a)(1)(C) in this case is

20  also unaffected by <u>Honeycutt</u> because the Government is not

21  seeking to hold the defendants jointly and severally liable

22  for proceeds that they did not personally obtain.

23          Here the Government seeks to hold the defendants

24  individually liable for the total amount of proceeds because

25  as the ring leaders of the wire fraud conspiracy they each

6

1   obtained either directly or indirectly the proceeds of the
2   conspiracy.

3           The money laundering forfeiture statute that applies
4   in this case, 982(a)(1) contain significantly different
5   wording from the language of the narcotics forfeiture statute
6   at issue in Honeycutt, 852(a).  In Honeycutt the Supreme Court
7   predicated its decision on the language of 853(a)(1) which
8   limits forfeiture for narcotics offenses to property that the
9   defendant obtained when he personally possessed or used.

10          Section 982(a)(1) by contrast contains no such
11  limitation and subjects a forfeiture of all property involved
12  in the money laundering offenses.  Besides that, Honeycutt
13  concerned a defendant who is in no way like the defendants
14  here.  The defendant in Honeycutt played a minor role in a
15  drug conspiracy and profited very little from it.  In this
16  case, both defendants were the ringleaders of the money
17  laundering conspiracy and reaped significant financial benefit
18  from it.

19          And just as the defendants were the ring leaders of
20  their money laundering conspiracy, they were the ring leaders
21  of their wire fraud conspiracy and obtained the proceeds of
22  the wire fraud conspiracy either directly or indirectly.  In a
23  post-Honeycutt decision, United States v. Ward, 2017 W.L.
24  4051753, Western District of Michigan, August 24, 2017, the
25  court found the defendant individually liable for the total

7

1    amount of the drug conspiracy's proceeds, reason that because

2    the defendant was the mastermind of the conspiracy he obtained

3    all of the proceeds even if indirectly.

4            The court stated that although the Government did

5    not establish that the defendant directly obtained the full

6    amount of the proceeds, the statute does not require the

7    Government to do so.

8            In reaching its decision, the court compared the

9    facts of that case to the hypothetical proposed by the Supreme

10   Court in Honeycutt which involves a farmer who masterminds a

11   scheme to distribute marijuana and earns three million a year

12   from the scheme and a college student recruited by the

13   mastermind who earns only $3600 from delivering the

14   mastermind's drug packages.

15           The court in Ward reasoned that the defendant in

16   Ward was closely akin to the hypothetical marijuana mastermind

17   described in Honeycutt.  In a very recent decision, U.S. v.

18   Bangeoff [ph.], 2019 W.L. 645050, Eastern District of

19   Virginia, February 14, 2019, the district court analyzed

20   Honeycutt and stated that Honeycutt bases its reasoning on

21   drawing a distinction between a mastermind and controls the

22   criminal operation and a lower figure who only has access to

23   and control over the smaller amount of tainted property

24   directly in his possession.

25           The court further stated that picking up on this

8

1  distinction lower courts have declined to apply <u>Honeycutt</u> in

2  cases where the defendant held a position of control in a

3  criminal operation.  That decision cites <u>Ward</u> as well as the

4  Second Circuit's decision in <u>SEC v. Metter</u>, 706 Federal

5  Appendix 699, Second Circuit 2017, which also declined to

6  apply <u>Honeycutt</u> to a defendant who controlled the enterprise

7  at issue.

8          Much like the defendants in <u>Ward, Bangeoff</u> and

9  <u>Metter</u>, the defendants in this case are closely akin to the

10  hypothetical mastermind in <u>Honeycutt</u>.  Neither defendant was a

11  mere low level co-conspirator who received a small payment for

12  his role in a scheme that was masterminded by someone else.

13          On the contrary, both Kenner and Constantine

14  masterminded and controlled their criminal enterprise in which

15  they stole millions of dollars from investor victims and

16  diverted those funds for their own benefit which is noted by

17  the Court in its Rule 29 and Rule 33 decision.

18          In fact, the decision states on page 2 that:

19          "The witness testimony and documentary evidence

20      adduced at trial sufficient established that Constantine

21      agreed with Kenner to participate in all of the

22      objections of conspiracy.  In particular, bank records

23      show that both defendants routinely diverted third-party

24      funds intended to finance a Hawaii project Eufora in the

25      global settlement fund to pay for undisclosed personal

9

1    expenditures, such as in Constantine's case race cars,

2    rent and lawsuits unrelated to those investments."

3         Clearly, these defendants are not the type of low-

4    level conspirators that the Supreme Court in Honeycutt was

5    concerned about.  And contrary to Constantine's assertion that

6    the money judgment the Government seeks should be reduced

7    under Honeycutt because he did not personally acquire all the

8    property, the facts in this case shall let Constantine

9    personally obtain the proceeds whether directly or indirectly

10   as a ring leader and controlling member of the conspiracy.

11        As outlined in the Court's Rule 29 and 33 decision,

12   Constantine reaped significant financial benefit from and

13   played a significant role in all three objects of a

14   conspiracy.  The court states in its decision on page 52 that:

15        "The Hawaii project evidence showed a long-running,

16        multi-faceted scheme in which Constantine played an

17        integral role by (1) siphoning funds intended to finance

18        at development; (2) manufacturing of fraudulent pretext

19        for those payments; and (3) securing additional funding

20        for the Hawaii project by loan proceeds that he

21        subsequently diverted to his and Kenner's benefit."

22        Similarly, in addressing the Eufora object of the

23   conspiracy the court stated on page 53 that:

24        "As with the Hawaii project, the evidence at trial

25        demonstrated that Constantine routinely siphoned Eufora

10

1    investments to cover his personal expenses."

2        And in addressing a global settlement fund object of

3    the conspiracy on pages 58 and 59 of the decision the court

4    stated that there were "A plethora of personal expenses by

5    Constantine," using the global settlement funds and that

6    Constantine admits that he played a significant role in the

7    global settlement fund object of the conspiracy.

8        Now, because Constantine had partnered with Kenner

9    in their schemed conspiracies, there was a division of labor

10   in terms of each person's roles and duties in their overall

11   criminal venture.  Kenner obviously received some of the money

12   from their frauds.  But even if he -- every dollar didn't land

13   directly in Constantine's hands and someone to his partner in

14   crime, the proceeds nevertheless were obtained by both

15   defendants as they were the ring leaders and controlling

16   members of the criminal operation.  In fact, the Supreme Court

17   in Honeycutt did not tie the act of obtaining to physical

18   position.  In his hypothetical the court recognized that the

19   marijuana mastermind obtained drug proceeds even when he

20   directed his customers to pay, not him, but an intermediary

21   such as a college student.  So in this case, Constantine

22   directly obtained any proceeds he did not directly obtain and

23   he certainly enjoyed the overall benefit from them.

24       In sum, there's no Honeycutt issue for the

25   forfeiture pertaining to the money laundering conspiracy in

1   this case because the money laundering forfeiture statute

2   requires the defendants to forfeit all of the property

3   involved in the money laundering conspiracy which includes the

4   property involved in, used to commit or used to facilitate the

5   money laundering conspiracy.  In addition, there's no

6   <u>Honeycutt</u> issue for the forfeiture pertaining to the wire

7   fraud conspiracy charge in this case because the Government is

8   not seeking to hold the defendants jointly and severally

9   liable proceeds that they did no personally acquire.

10          Here, as the masterminds of their wire fraud

11   conspiracy, the defendants personally obtained all of the

12   proceeds, whether directly or indirectly, and personally

13   benefitted from these proceeds.

14          Your Honor, the Government has met its burden of

15   demonstrating the requisite nexus between the crimes of

16   conviction and the forfeitable assets, as well as the amount

17   of the requested money judgments and respectfully requests

18   that the Court enter orders requiring the defendants to

19   forfeit the previously seized or restrained properties and

20   impose money judgments in the amount of $36,739,048.59.

21          And with regard to the filings by the third parties,

22   the Government's position is that the well-settled law is that

23   they cannot intervene in the sense that they cannot tell the

24   court the kind of language that can be included in the

25   preliminary order of forfeiture or that property cannot be

12

1   ordered forfeited if the Government demonstrated the requisite

2   nexus to the -- between the property and the crime, which is

3   what the Government has done in this case.  Any issues that

4   they have with regard to their entries are involved in the

5   ancillary proceeding.

6          Now, there's no prejudice to having the third

7   parties wait to have their interests resolved at that time and

8   they've done demonstrated that anything that has occurred to

9   date or that the criminal proceedings, the forfeiture

10  proceedings or that the restraining order, the protective

11  order have harmed the operations of the resort.  It's the

12  Government's position that if the property is ordered

13  forfeited that it will continue to be managed and operated in

14  the same manner that it has been.  And they have not come

15  forward with any evidence that the resort is not functioning

16  well.  And, in fact, Jowdy filed his letter stating that the

17  resort is meetings its sales goals.

18         So with that in mind, Your Honor, there's nothing

19  that -- to prevent the Court from ordering the preliminary

20  order forfeiture that was attached to its moving brief.  Thank

21  you.

22         THE COURT:  Well, just -- I want to focus on that

23  last point because --

24         MS. O'CONNOR:  Yes.

25         THE COURT:  -- I guess -- I don't understand.  Even

1   if the Government has met its burden with respect to the nexus

2   and the forfeiture clearly you have multiple parties who are

3   suggesting that notwithstanding the resort has been operating

4   as a going concern that this next step by the court is going

5   to further complicate the entire financial situation and

6   jeopardize the ability for them to meet their debt

7   obligations, to get investors.  You know, I don't understand

8   why the Government in its discretion as it relates to how it

9   seeks forfeiture would not want to consider those things.  I

10  just don't understand that.

11          In fact, in a letter on February 20th, Ms. Martin

12  argued that one of the things that's going to complicate the

13  Government's path here is that if the property is in Mexico

14  and by a Mexican trust, the Government would have to go

15  through the Mexican government in order to seek forfeiture of

16  that.  So that seems like there -- based upon what they're

17  citing that they're correct on that, right?

18          MS. O'CONNOR:  It's true, Your Honor, although we

19  had no -- we had no reason to believe that we would not be

20  able to forfeit the property if the Court orders it

21  forfeitable and --

22          THE COURT:  I know, but they're suggesting that this

23  could then be tied up for years.  Years and years and years in

24  the Mexican government and that the Government in forfeiting

25  this property could be harming the very victims who the

14

1  Government in this case is trying to make whole and innocent

2  third parties who had nothing to do with this case.

3          So why wouldn't the Government want to consider all

4  those things?  Have you ever met with them and tried to

5  understand what the ramifications would be?  I assume the

6  Government doesn't understand every aspect of what the

7  implications would be of forfeiting the entire resort.

8          MS. O'CONNOR:  Your Honor, we have --

9          THE COURT:  Why is the Government so confident

10 "nothing -- everything is going to be just fine, nothing is

11 going to happen to that resort, trust us, we know what we're

12 doing" when you have all these parties who are suggesting that

13 there -- you know, could be major financial ramifications.

14         MS. O'CONNOR:  Well, Your Honor, first and foremost

15 to address your point about the property being located in

16 Mexico, we did want to point out the interest -- the ownership

17 interests are held by domestic United States formed LLCs.

18         THE COURT:  All of them?

19         MS. O'CONNOR:  Well, the entities that we listed in

20 our preliminary order, forfeited the proposed order which are

21 the majority ownership, 99 percent ownership of that resort is

22 a one percent ownership by Jowdy.  Now, granted, they're under

23 an umbrella of a Mexican LLC but that's what Mexican law

24 requires.

25         But the majority -- the ownership fo the resort is

1  held by domestic LLCs.  Furthermore, we have spoken at length

2  with the bank and with the resorts about its operation.  Now,

3  Jowdee filed a letter to Your Honor matter of weeks ago saying

4  that it met its sales goals.  What we hear are speculative

5  concerns.  There's no evidence that the resort isn't meeting

6  its goals.  We understand that it's -- there are issues with

7  it, but there's no -- there's been no evidence demonstrating

8  that it's a direct result of the forfeiture proceeding and not

9  that it's related to something else, for example, generally

10  that sales are -- all over the world aren't doing as well as

11  they used to or that efforts have been made -- proper efforts

12  have been made to make -- to sell property down there.  And

13  there's been no -- as far as we're aware the restraining

14  orders had no effect on the property in the four years.  And

15  we're at the point, Your Honor, where if this property is

16  ordered forfeited we move to an ancillary proceeding.  There's

17  no reason the Government can't reach a resolution with the

18  property owners.

19          But this is the only asset of value and the concern

20  is that these victims if they want to see any money this is

21  the asset that would provide it.  So the Government does feel

22  very strongly about forfeiting the resort.

23          THE COURT:  I know, but even -- there -- I think

24  they're suggesting also obviously they don't -- at least some

25  of them don't believe the Government as a practical matter --

16

1  it would be in the best interests to forfeit the resort.  But

2  even assuming that's true, why aren't there issues with

3  respect to the language of the order itself, even if the

4  resort were forfeited, there could be provisions put in the

5  order that might address some of their concerns with respect

6  to how it would satisfy, you know, investors or other

7  people -- people going forward with respect to -- you know,

8  also could just be modifications of the order that would help

9  him, even if the property itself was forfeited.  Have you

10 considered that?

11         MS. O'CONNOR:  We had spoken with the bank and their

12 concern was that the language is that the Government will go

13 in and seize the resort.  And we assured them we have no

14 present intention of doing so, which is what we convened to

15 the Court in a letter and that the protective order remain in

16 place and essentially that the resort would continue to

17 operate status quo, which as of now the evidence shows that's

18 been insufficient.

19         THE COURT:  I know, but wouldn't -- are they asking

20 you to have that language put in the order itself, like -- I

21 know you put that in your letter, but maybe for purposes of --

22 you know, it might be important that that be in the order

23 itself.  If the Government is saying that in a letter, why

24 wouldn't you be willing to have the court sign something to

25 say that so that anybody who's looking at the resort would see

17

1   that in a judge's order.  I think that's -- that -- in my

2   experience it's more significant when it's in the order itself

3   than when it's simply a representation by the Government in a

4   letter.

5          MS. O'CONNOR:  Your Honor, we can put something like

6   that in the order if that's what the Court would like.  At the

7   time we put in the -- in the proposed order we hadn't spoken

8   with them about it.  The complaints came thereafter and if the

9   Court orders a forfeiture of the property we can put in any

10  language that the Court deems appropriate.

11         THE COURT:  Okay.  I'm just going to request that

12  you try to hear all their concerns and after hearing their

13  concerns submit another order to the Court consistent with all

14  the Government's objectives, you know, any modifications you

15  can make to try to minimize any potential negative impact, the

16  operation of the resort to innocent third parties.  Ms. Martin

17  suggested having a magistrate judge involved in trying to

18  assist you.  You know, I can certainly have a magistrate judge

19  do that if everyone thought that was helpful.  I don't know

20  what your view is on that.  Do you think it would be helpful?

21         MS. O'CONNOR:  Your Honor, I think we could attempt

22  to resolve it first --

23         THE COURT:  Okay.

24         MS. O'CONNOR:  -- and then if it rises to that level

25  where we need that intervention we can do that.

18

1           THE COURT:  All right.  Yeah, I was going to

2    suggest.  You have a meeting.  Hear them out.  I understand

3    obviously you might get conflicting views but, you know, I

4    think it's important that you give this serious consideration

5    that there's not some unintended consequences that are going

6    occur that are going to be hard to undue.  If something

7    happens, some adverse affect, it may be very hard to undue if

8    it's not anticipated and dealt with in the best possible

9    manner in the order itself, assuming the Court were to grant

10   it.

11          All right.  So we'll talk at the end about the

12   timing of that.  Let me hear from them, okay?

13          MS. O'CONNOR:  Yes, Your Honor.

14          THE COURT:  Go ahead, Mr. Talkin.

15          MR. TALKIN:  Thank you, Your Honor.  Picking up

16   where you left off very briefly about the Mexico property,

17   Mr. Constantine's position is that he wants the property to be

18   in the position so that any victim of this case and third

19   parties, but the victims will be in the best place to get

20   their money back.  That's -- and in our papers and I think

21   previously to the court we've said as far as we're concerned

22   we'll do whatever we can relinquish any rights so that

23   happens.

24          But there's an important point to the Honeywell

25   argument that lies in the Mexico property and that's this, the

1   fact that we have a room full of lawyers here and some of the

2   victims here shows you that that's where the lion's share of

3   the money went.  It eventually ended up there.  It may be a

4   real amount.  It may not be a real amount.  We'll find out

5   someday.

6           But we also know where it didn't go and it didn't go

7   to Tommy Constantine.  Now, that's an important factor.  It

8   doesn't affect whether or not -- you know, we're here, we're

9   convicted of a crime, forfeiture is under Your Honor is

10  conducting an analysis under Gill.  That's why you're doing a

11  forfeiture.  That's not the point I'm trying to make.  The

12  point I'm trying to make is that's an important concern in

13  forfeiture and under Honeycutt.  It's dealing with Honeycutt.

14          I think our papers are very clear about where the

15  applicability of Honeycutt and the Government rightfully

16  focused a lot of their reply to the response on whether it

17  applies to money -- the money laundering statute 982.  But I

18  just want to quickly talk about 981.

19          First of all, Your Honor, I do have to -- I believe

20  I -- since I argued this in my papers that only one circuit

21  had said that 981 Honeycutt is not applicable.  In doing my

22  research last night just to see if any new cases came out,

23  this week the Eighth Circuit joined the Sixth Circuit as the

24  only circuit that said that the -- 982 does not apply to

25  Honeycutt or Honeycutt, should I say, does not apply to 981,

1   but the case for that is <u>United States v. Peithman</u>, P-E-I-T-H-

2   M-A-N, and that's 2019 W.L. 242825.  I think I'm obligated

3   since I argued that to bring that to the Court's attention.

4          However, that's still now two circuits versus the

5   many other circuits I've cited that did find <u>Honeycutt</u>

6   applicable to the fraud's forfeiture statutes.  So I don't

7   think that changes my argument at all, but it's certainly

8   something the Court needs to be aware of before you make your

9   decision.

10          The -- what I heard from the people was it's not

11  talking about the wire fraud forfeiture it's not the fact that

12  <u>Honeycutt</u> applies or doesn't apply, it's irrelevant to our

13  discussions because they're not seeking joint and several

14  liability.  They're seeking liability in its entirety from

15  both, which I don't think legally makes sense.  It's joint and

16  severable because if they got it from one, they're certainly

17  not entitled to get it from two.  So they don't get to double

18  it.  So it's clearly a joint and several liability in its

19  practicality.

20          Their argument about whether or not in trying to use

21  the example of <u>Honeycutt</u> and talk about whether we're

22  masterminds or not masterminds is not exactly how much of the

23  litigation has panned out.  It's really what we're talking

24  about is what they received.  I mean, <u>Honeycutt</u> very clearly

25  states or the Supreme Court in <u>Honeycutt</u> very -- from the -- I

21

1    think it's the first paragraph of the opinion says, look, the

2    purpose of the criminal forfeiture are to -- really, three.

3    Two that are applicable in this case.  One, to essentially

4    disgorge defendants, convicted criminals of the undue gain

5    that they'd gotten from their fraud.

6             The second one, which is interesting because it goes

7    back to what we're talking about in Mexico is it's to make

8    sure that the victims of the crime get their money back to the

9    best of everyone's ability.  That's really -- the third one

10   talks about criminal organizations, so it's not really -- that

11   purpose isn't really applicable here.  But I think you need to

12   look at forfeiture, especially in the area of the Supreme

13   Court as the cases are coming out of -- you know, Honeycutt

14   did start -- did start the change of the forfeiture, how we

15   look at forfeiture.

16            And courts have taken it from the drug statute,

17   taken it to the fraud statutes, and unfortunately we haven't

18   had an opinion yet on the money laundering statute.  And the

19   people correctly pointed -- excuse me, the Government.  I'm

20   sorry.  I'm in a trial in state court now, so it's a tough

21   transition.  The Government correctly states that the language

22   is different.  There's no question the language is different,

23   but the goal is the same and the goal is to not punish someone

24   more than they should be punished.

25            Now, that's not to say that punishment isn't

22

1    warranted.  They are.  The punishment is to the extent that

2    someone has ill-gotten gain and to the extent that it can help

3    get somebody back what they lost.

4            But the money laundering statute's different

5    language and it's pointed out that -- and the Government

6    points out in their papers the <u>Bermudas</u> case where it talks

7    about where the Second Circuit has said that the language from

8    covering substituted assets of the drug statute apply to the

9    money laundering statute, but the Second Circuit said that's

10   the only way it applies and that there is no -- it doesn't

11   alter the under -- underpinnings of the money laundering

12   statute, meaning 982.

13           But that statute is done by the Second Circuit pre-

14   <u>Honeycutt</u> and not in the context of recovering money from the

15   individual -- not in the context of recovering what the

16   individual defendant actually gained.  That was in the context

17   of where does a money judgment or a substitute asset judgment

18   is that applicable to the money laundering statute and the

19   answer was yes, and the defendant argued no, for a lot of the

20   same underpinnings that are in the <u>Honeycutt</u> argument.  But it

21   kind of came from the opposite angle where they obviously

22   approached.  So I do not believe that that gives us any

23   precedential value as to how <u>Honeycutt</u> applies to money

24   laundering statute.

25           Unfortunately, in this case this may be the case in

23

1  the Second Circuit that we do someday have an argument in the

2  appellate court about whether Honeycutt applies to the money

3  laundering statute one way or the other.  But even the case by

4  the Supreme Court recently having nothing to do with money

5  laundering but having to do with forfeiture as to the state of

6  Indiana, again, the Supreme Court has expressed its opinion

7  that forfeiture should be tied to what's actually gained.  So

8  now I just want to move onto what's actually gained as far as

9  Tommy Constantine because --

10          THE COURT:  Before you get to that I guess I don't

11  need -- I understand your argument but you -- I can start it

12  by saying, notwithstanding the differences in the statutory

13  language but why should the Court overlook that?  I mean,

14  isn't that significant?

15          MR. TALKIN:  Well, I'm not -- I'm not saying the

16  Court should overlook that.

17          THE COURT:  So then how do you get around that one

18  statute?

19          MR. TALKIN:  Well --

20          THE COURT:  How do you get around that one statute

21  says obtained and the other says involvement?  Why isn't that

22  significant --

23          MR. TALKIN:  Well --

24          THE COURT:  What you're arguing to me is even though

25  it says "involved in" I should interpret it as money that he

1  obtained but I don't know how you can read the term "involved

2  in" to mean that you have to have obtained it.  I just don't

3  think you can do that.  I don't understand.

4         MR. TALKIN:  Well, I don't necessarily agree with

5  that -- I mean, disagree with that.  But what I'm saying is,

6  Your Honor, in the -- in the larger context of where we're

7  going and you have -- you know, the Eighth Amendment is saying

8  that it -- that it's a -- it's improper to have this extensive

9  punishment.  The Supreme Court has said it's improper.  I

10  don't have a case, as you point out that the lang -- that

11  tells you that that language has been extended.  But

12  Mr. Constantine is making the argument today that when this

13  is -- if this is reviewed that when you put it in the context

14  of duly unharsh punishment, when you put it in the context of

15  Honeycutt and the underpinnings of the purpose of forfeiture

16  that is quickly evolved into what I've talked about, that if

17  we don't make this argument, Your Honor, then we're not going

18  to have that opportunity for somebody to litigate it at a

19  later time.

20         I understand that the statute -- statutory language

21  is very different.  I get that.  But you know what?  When they

22  started looking at 953 that statute -- that language was

23  different.  And then the courts then analyzed 981.  That

24  statutory language is different.  This is just, yes, an

25  extension of the different language, but the underlying

25

1   concepts haven't changed and that's what I think is going to

2   eventually be looked at.  And that's what I'm asking Your

3   Honor to foresee.  I'm asking Your Honor to say, you know

4   what, that makes sense.  And maybe I should analyze it from

5   that point of view.  And there's not a case -- I understand

6   there's for sure not a case that says you should do that and I

7   don't believe from my research that I updated as recent as

8   last night that there's one that says you can.  So what I'm

9   asking Your Honor to do is to analyze it from that point of

10  view.

11          THE COURT:  All right.  Are you going to go now to

12  what he obtained?  I did see your papers.  You do lay it out

13  with the help of the forensic accountant.

14          MR. TALKIN:  Right, right.  And then I just -- and I

15  think it's important because we talk about this kingpin and

16  mastermind.  When you look at the amount of money and that's

17  when -- it kind of goes back to where I started as far as a

18  lot of the money ended up in Mexico, the money that was

19  shipped out to Constantine through the testimony here is

20  $20,000 here, $30,000 there, $50,000 except for the one large

21  chunk which was the finder's fees money from Hawaii which

22  we've taken responsibility for in our account.  In other

23  words, we're not looking to not take responsibility for what

24  we gained.  The numbers are 2.4 million or something, two

25  point -- 2.2 million give or take.  And that's not an

1  insignificant amount of money.  We understand that we were

2  convicted of that crime and because of that we got money from

3  Hawaii for that.

4          But there's a lot of money here that was taken from

5  the players that had nothing to do with Constantine.  Never

6  went through him, never touched him, and ended up in what's

7  called "with Jowdy" because, you know, we'll it Mexico, but

8  ended up there.

9          So to hold him responsible for that we believe, you

10  know, violates the Eighth Amendment as well as with the

11  finding in Honeycutt is.

12          Your Honor, I may be inaccurate on the exact amount

13  of numbers or how much money went back and forth, but it might

14  even be a less number, but clearly the number I'm talking

15  about is far below 30 million dollars.

16          THE COURT:  I understand.

17          MR. TALKIN:  And forensic accounting is in detail

18  does lay that out accurately.

19          THE COURT:  All right.  Thank you.  All right.

20          Mr. Kenner, you're up.

21          MR. KENNER:  Thank you, Your Honor.

22          MS. O'CONNOR:  Thank you, Your Honor.

23          MR. KENNER:  First, I just wanted to acknowledge

24  that I did hear Your Honor's concerns about the Cabo project

25  and the breakout of the equity to the different partners and

27

1  how it may affect the ongoing management --

2              MS. O'CONNOR:  Excuse me, Your Honor.  I'm sorry to

3  interrupt that although Mr. Kenner is here to represent

4  himself on his own behalf, we'd just ask the Court to remind

5  him that anything he says can be used against him at

6  sentencing.

7              THE COURT:  You understand that, Mr. Kenner?

8              MR. KENNER:  Yes, sir.  I continue to.

9              THE COURT:  All right.  Go ahead.  Thank you.

10             MR. KENNER:  Thank you.  The -- so I am very

11  cognizant of the fact that as Your Honor represents if the

12  Government were to forfeit the entire Cabo project that it

13  could throw into disarray some ability for any of the equity

14  shareholders at some point in time to actually recover some

15  portion of their investment or all of it.  You know, to that

16  tune I couldn't agree more with some of the cases that I've

17  read that clearly lays out that innocent third parties who are

18  involved in transactions are not (1) part of the money

19  laundering transactions if they're an innocent third party in

20  the context that, you know, money was wired perhaps from my

21  personal bank account to, let's say, Mr. Kaiser's personal

22  bank account.  He can't be involved in a money laundering

23  transaction unless the Government makes him a co-defendant.

24             But on that context I do think that the investment

25  LLCs that are held by my former clients should not be touched

28

1    and should not be put at risk to recover at some point in

2    time.

3          Now, I have read the paperwork that went in last

4    night I believe from John Kaiser and also from Michael Pecca

5    and I did corroborate some of those statements with paperwork

6    that went in from somebody refer -- one of the myriad of

7    attorneys who represent Mr. Jowdy.  I think it's Mr. Souther

8    [ph.] or Souther.  I apologize if I'm saying his name

9    incorrectly.

10          But if I could address those just kind of one by one

11   and just delineate the position I have with respect to what's

12   gone on, I do believe that Mr. Constantine's recent submission

13   where he represents something in the neighborhood of two

14   million dollars -- and I'll defer to the paperwork for what it

15   actually said -- it -- are funds that flowed through to

16   Mr. Constantine.  And because there was no directed verdict on

17   the three objects of the conspiracy, I think it will be left

18   in Your Honor's hands to determine if paying Mr. Constantine a

19   hard-money fee like the 17 other hard money lenders we paid in

20   Hawaii, if his is part of a conspiracy and the other 16 were

21   not part of a conspiracy for some reason, it should be pointed

22   out that Mr. Constantine was one of two out of those 17 that

23   actually delivered a loan for us where the other 15 did not.

24   And my most recent February submission lays out the fact that

25   we as a group sued I think three or four of those entities for

29

someone in the neighborhood of a million dollars of fees that
we paid just like to Mr. Mr. Constantine and they did not
follow through.

           The real money that we're discussing here in the
Hawaii project, Your Honor, is money that did go to Mr. Jowdy
and there's no equivocation about that.  It's in the banking
records.  But that money did not go to Diamonte Del Mar.  That
money did not go to Diamonte Cabo San Lucas, regardless of
where the bank transaction took place.  In fact, I think
Mr. Souther represents in one of his letters to the court
that -- if I may have a moment -- I think he represented that
Mr. Jowdy did not -- I think he says on page 3 of his January
letter to the court that Mr. Jowdy never agreed to borrow any
of the funds used to fund any portion of the down payment from
Kenner or anyone else personally.  And I've have to agree with
him on that because the money that -- and if you review the
line -- the loan agreement that was signed with Mr. Jowdy that
was held in Mr. Kaiser's possession for, you know, upwards of
ten years before this trial that that loan agreement is a loan
to Mr. Jowdy personally.  It was under advice of counsel that
we were told to write that loan agreement to Mr. Jowdy
personally.  So regardless of where he used the funds on his
end behind his Chinese wall we would always be able to attach
to Mr. Jowdy.

           And it should be pointed out to the Court that

30

1    without a forensic accounting of the funds that were loaned to

2    Mr. Jowdy through the Hawaii partners that loan today is worth

3    about 31 million dollars.  Now, Mr. Jowdy is still a world-

4    class developer according to Mr. Souther's letter.  His

5    project is running magnificently, notwithstanding the comments

6    in Mr. Kaiser's letter of yesterday.  But as a result -- and I

7    think the Government a few months ago mentioned that Mr. Jowdy

8    receives a developer's fee somewhere in the neighborhood of

9    $225,000 a month.  That's money that certainly could go back

10   to these loans.

11           But, you know, the Government has taken a very

12   specific position since my June 24, 2009 proffer to the FBI

13   including Mr. Galliato [ph.] that Mr. Jowdy was not part of

14   any criminal activity and as such, you know, Mr. Jowdy if we

15   wanted to pursue him had to go after the loans in a civil

16   manner.

17           I do have for the court from Glen Murray, who is one

18   of the investors in the Diamonte project and one of the non-

19   named -- unnamed victims in the superseding indictment, an

20   original million-dollar judgment against Mr. Jowdy in Nevada

21   where Mr. Jowdy authenticated the loan agreement by which we

22   get -- lent him the money, it corroborated the loan agreement

23   that virtually every witness that you met in the courtroom in

24   2015 had previously verified.  And I believe in the Court's

25   memorandum and order, docket 501, if I recall correctly, Your

31

1  Honor did confirm that Mr. Pecca on cross-examination

2  impeached himself and admitted that he did approve Mr. Jowdy's

3  loans through the Hawaii project and that his testimony he

4  gave to the Southern District of New York in 2011 to their

5  grand jury was, in fact, accurate really putting Mr. Pecca in

6  a difficult position, notwithstanding the fact that I would

7  enjoy nothing more than to see each of the investors get their

8  money back from this 17 years we've been dealing with

9  Mr. Jowdy and whatever other ancillary issues that came up

10 during the trial, Your Honor.

11         With respect to Mr. Kaiser's -- one last mention in

12 that is regardless of what money we sent to Mr. Jowdy, all of

13 the money we sent him was with the specific intent.  I think

14 one of Mr. Pecca's letters prior to this a few years ago told

15 the court that CSL Properties Investment, LLC, had actually

16 given 2.3 million dollars to the Cabo San Lucas project, which

17 I concur.  Mr. Jowdy was the one who put the final paperwork

18 together at two million dollars and that was just one of the

19 myriad of issues that Mr. Jowdy defrauded us all on at the

20 closing and that just months later when we discovered the

21 initial frauds we didn't try to fix one problem at a time.  We

22 effectively tried to create a global resolution through

23 mediation and then through a series of civil litigations and

24 criminal litigation in Mexico.

25         Complimenting that, the Government is seeking to

32

1    forfeit Baja Ventures 2006, LLC, which is an LLC I established

2    with two investor friends of mine, Joseph Stumpel [ph.] and

3    Yuri Leftonin [ph.], neither of which were named in the

4    superseding indictment at any point in time.

5            Between the -- Mr. Stumpel and Mr. Leftonin, our

6    capital account registers 2.5 million dollars at Diamonte, but

7    in essence and according to the Government's own accounting

8    which I believe is Government forfeiture document 36, we

9    contributed to Baja Ventures 4.1 million dollars.  That was a

10   1.6 million-dollar difference between what we contributed to

11   Mr. Jowdy and behind the Chinese wall that he decided to

12   contributed to any of his entities.

13           As a result of the 1.6 million-dollar difference,

14   Mr. Stumpel was forced to file both criminal and civil

15   litigation in Mexico against Mr. Jowdy to recover the

16   difference in those funds in concert with myself filing a

17   separate fund for all the lawsuit for all the investors.

18   Mr. Matese Nordstrom [ph.] filing a suit for $400,000 for a

19   separate investment and Mr. Jowdy's former golf pro Bob Goudet

20   [ph.] filing a multi -- excused me, about a $400,000 lawsuit

21   for unpaid loans from Mr. Jowdy.

22           The nexus of the 1.6 million-dollar lawsuit that

23   Mr. Stumpel had filed in Mexico was that John Kaiser had

24   actually filed a -- signed a testimonial in Mexico in support

25   of Mr. Stumpel's lawsuit which basically said that Mr. Kaiser

33

was aware that Mr. Stumpel had transferred 1.6 million

dollars.  It did not say that he was part of the transaction,

that he participated in it or he was aware of it at the time.

It simply was called a testigo in Mexico and it's a signed

affidavit required by the criminal courts.

Well, once Mr. Kaiser who we found out pursuant to

his letter today is not very pleased with Mr. Jowdy

whatsoever, it only took him about 12 years longer than it

took me to find out Mr. Jowdy was doing inappropriate things

to all of us.

That being said, once Mr. Kaiser took his job in

Mexico in 2012 he immediately claimed to the Mexican court on

behalf of Mr. Jowdy that his name was forged on that document.

In 2014 that was represented to the court and to Your Honor by

Mr. Miskiewicz in a pretrial hearing that they were going to

register that as a forged document with Mr. Kaiser's name

forged on it.

Well, I guess unfortunately prior to trial I told my

trial counsel that we would have tremendous impeachment

material and Mr. Kaiser lying about a forged document because

on a 2012 FBI recording Mr. Kaiser's co-worker, Brian Berard

[ph.], was recorded confirming that he and Mr. Kaiser had

signed those documents and Mr. Kaiser himself had signed that

document in the Mexican courthouse verifying that it was not a

forgery and that Mr. Kaiser in order to get Mr. Stumpel's

34

1  lawsuit against Mr. Jowdy terminated, but he represented to

2  the FBI, the U.S. Attorney and then consequence to Your Honor

3  lying about a forgery now in multiple jurisdictions which seem

4  to have a large impact on the trial here with the signature

5  expert that was brought to us.

6  　　　　　THE COURT:  I just want to -- I don't mean to

7  interrupt you, Mr. Kenner.  I'm going to give you the 20

8  minutes.  I just want to you to know you have ten minutes

9  left.  If you're going to talk about the trial I don't know

10 what you want to say on the forfeiture, but just -- I just

11 want you to know you have about ten minutes left, okay?

12 　　　　　MR. KENNER:  Thank you, Your Honor.  I appreciate

13 that.

14 　　　　　So the last issue with respect to Mr. Kaiser's

15 forgery problem is that he was contemporaneously found to be

16 lying in an Arizona court about five other promissory notes

17 that he allegedly did not sign.  And it was email traffic

18 between himself and the third party that he had signed the

19 document for that verified that he was lying about those

20 forgeries.

21 　　　　　The irony here in the Eastern District courthouse,

22 Your Honor, is that the U.S. Government recovered the

23 photocopy versions of the two agreements they claimed with

24 Mr. Constantine to have Kaiser's name forged on them.  They

25 recovered them from my house, but they were photocopy

1  versions.  If Your Honor recalls about a month before trial or

2  so Mr. Kaiser, lo and behold, turned over the original ink

3  versions to the Government that he had in his own possession

4  at his own home.  So just as I suspected all along, those ink

5  versions of Mr. Kaiser's name allegedly being forged were

6  custodied at his own home for over ten years before trial.  I

7  addressed some of the other issues in my February filing.

8          With respect to Mr. Kaiser, his letter, it raises

9  two interesting issues.  One, Your Honor, I think he's -- he

10 had submitted some forged and fabricated documents to the

11 Delaware Chancery court in an effort to suggest that the Baja

12 Ventures equity all belongs to him.  I would renew my request

13 to the Court to require an in-camera review of Mr. Kaiser's

14 '06 and '07 taxes, which would verify that Mr. Kaiser was not

15 paid back pay at the closing of the Hawaii deal and that the

16 money was for his friends and family million-dollar loan.

17          I would also renew my request to the court to ask

18 Mr. Kaiser to produce all of his '05 and '06 expenses that he

19 deemed to be part and parcel of the $816,000 payment at trial

20 in lieu of those funds being returned to his friends and

21 family from the million-dollar loan.  Neither of those are

22 going to show that Mr. Kaiser was honest or ethical with the

23 courts here, Your Honor.  And as such these two documents that

24 purport that Mr. Kaiser owns the Baja venture as a third party

25 is going to show to the court that it's -- Mr. Kaiser has been

36

inaccurate once again about forged and fabricated documents
and now with me incarcerated and this forfeiture proceeding
trying to undermine that process.

Mr. Kaiser was present in January of 2010 when
Mr. Jowdy was deposed, which would have been three, four or
five days following Mr. Kaiser's acquisition -- final
acquisition of that property and with Jowdy, Jowdy's lawyers,
the investors' lawyers and three other investors in addition
to me, Mr. Kaiser didn't say a word about it.  In fact, he
told this courtroom that I had ruined his life, which would be
a tall order if in fact Mr. Pecca -- or excuse me.  Mr. Kaiser
had acquired a piece of property as collateral worth tens of
millions of dollars.  It just doesn't comport.

Mr. Pecca's letter I received just a few hours ago.
I concur with Mr. Pecca that there's a lot of chaos that goes
on with this and the CSL property should not be forfeited in
this.  Frankly, the -- if the tracking -- if the Government
had done their proper tracking on this -- on this case they
would see that all the funds that myself and my investors had
sent to Mr. Jowdy far surpass the 6.625 million-dollar deposit
that went onto the Cabo San Lucas property.  Thus, none of the
funds that we gave Mr. Jowdy with intent should have ended up
in the capital accounts.  There are hundreds -- there are --
excuse me -- there are millions of dollars that do not show up
in the capital accounts as a result of those issues with

37

1   Mr. Jowdy.  So they are just out in the wind in funds that are

2   frankly either part and parcel to the 31 million-dollar loan

3   that I've offered to help the Government collect on behalf of

4   all of the Hawaiian investors that they've denied me twice

5   and/or it's part of individuals loans by other investors like

6   Mr. Murray, who has the judgment here in Nevada, or

7   Mr. Stumpel's unpaid loan in Mexico or Mr. Nordstrom's

8   multiple unpaid loans to Mr. Jowdy.

9            I mean, Your Honor, this case is a unique case that

10  throughout the trial the Government alleged that I was

11  stealing funds from my clients for my own benefit and clearly

12  the Government formed their theories without doing a forensic

13  accounting of the money.  If they did, they would have

14  discovered that unless they indicted Ken Jowdy or Tim Garn

15  [ph.] or John Kaiser or all of them.  There were almost no

16  funds obtained by Kenner, involved in or traceable to any

17  money laundering issues with respect to a co-defendant of

18  mine.  Because the Government chose to ignore all the Jowdy

19  and the Kaiser frauds involved in the case and seek their

20  prosecution, the bank records prove that I received only about

21  $100,000 of loan repayment from Mr. Kaiser through his U4

22  [ph.] stock sales and approximately $400,000 that Mr. Garn's

23  private U4 stock sales also from documented loans documented

24  with bank records.  Nothing more.

25           The Government as they know that they've represented

38

through <u>Conterenis</u> many times in the Second Circuit cannot

forfeit funds that were sent to an innocent third party.  The

Government conceded many times during trial that Jowdy, Garn,

Kaiser were not co-defendants, were not co-conspirators.  It

was their own concessions that made these representations to

the jury, you know.  And the definitions that I think are

important in the case are that proceeds under the <u>Oxford's</u>

<u>Tenth Edition</u> states that it's "money obtained from an event

or an activity, possessed as having something as property or

owned, possession, a state of owning something, a thing

owned."

        And during this process just as Mr. Talkin had

eloquently suggested that Mr. Constantine received a certain

amount of money through the alleged charges at trial and

convictions, I have as well and I believe the proper forensic

accounting would show in fact that, that I was repaid short-

term loan from Mr. Constantine within days of my fronting the

money to him.  And the same from Mr. Garn.

        As a result, you know, Your Honor is aware that

<u>Conterenis</u> case, which the facts were an insider trading case.

And in <u>Conterenis</u> it said you can't be ordered to forfeit

profits that are never received or possessed, again

referencing the definitions.  <u>Conterenis</u> and consequently

<u>Nicolo</u> [ph.], which is a Second Circuit appellate case dealing

with kick-backs on fraudulent contracts it was -- Mr. Voight

39

1   had laundered money and bought jewelry with it.  And there's

2   an excellent example used by the Supreme Court and many other

3   appellate courts where it effectively said if Mr. Voight

4   received $500,000 in cash, put it in his house.  That money

5   would be involved in his money laundering conspiracy.  If

6   Mr. Voight had gone out and taken $250,000 of it and bought an

7   automobile with it, the Government would be entitled to

8   forfeit that as traceable to the money laundering offense.

9          I concur with that.  And in fact, in the Third

10  Circuit appellate court case Brown, which was a mortgage fraud

11  case, it was a -- it was dealing with criminal forfeiture

12  under 982 and it effective says that defendant cannot launder

13  money to an innocent third party like Jowdy or like Kaiser

14  with no money laundering benefit to the defendant.  And that

15  effectively supports 2004 Hawaii loan that Mr. Kaiser had in

16  his possession for a decade, that Mr. Jowdy had verified in a

17  December 2010 Nevada courthouse as authentic contradicting

18  what the Government tried to apply during their theories.

19  Under the Brown ruling in the Third Circuit appellate court it

20  says that Honeycutt applies with equal force to 982(a) as it

21  does to Honeycutt under Title 21.

22         The last thing I would just suggest, and I think

23  this complements Mr. Talkin, is for an indication of where the

24  Second Circuit is headed the Court should look at the

25  Government in the Second Circuit conceding several cases in

40

1    <u>U.S. Fuijmono</u>, which is 2018 U.S. Appeal Lexus 1541.  It was a

2    mortgage fraud scheme case in <u>U.S. v. Gil Guerrero</u>, which was

3    2018 U.S. Appellate Lexus 36066, which was also conceded by

4    the Government in light of <u>Honeycutt</u> in order to save

5    resources going forward.

6         Ultimately with the money laundering conspiracy

7    under 18 U.S.C. 1956(h) Jowdy, Garn and Kaiser were not deemed

8    to be co-defendants or co-conspiracies at trial.  That's all

9    the funds that went to innocent third parties based on case

10   law cannot be part of forfeiture or money judgment under

11   982(a) like <u>Brown</u> and the Third Circuit.  Their statuses were

12   all well thought out and I'm talking about Mr. Jowdy, Garn and

13   Kaiser.  Their status is well thought out by the FBI agent

14   with all the evidence in his hand for six years before trial

15   and they can't move the goalposts now to suggest that any one

16   of those received ill-gotten gains because none of them either

17   benefitted myself or came back to myself or Mr. Constantine

18   according to his paperwork.

19        Again, I received almost none of the funds and they

20   were both documented as return of short-term loans through

21   banking records and I was the whistle blower on Ken Jowdy in

22   2007 when we found out what he was doing and what he wasn't

23   doing with our money.  I documented multiple times the tens of

24   millions of dollars Mr. Jowdy diverted, embezzled, et cetera,

25   from us over the years.  I know that his attorneys advocate

41

1  hard for Mr. Jowdy but, you know, we've -- I've outlined today

2  alone that Mr. Jowdy screwed the Baja Ventures capital account

3  out of  1.6 million dollars leading to more litigation.  He

4  screwed the CSL properties which involves Mr. Pecca out of

5  $300,000 in the original capital account agreement.

6          He stole 2.5 million dollars for his own capital

7  account and in his affidavit or declaration that he's now

8  submitted two times to this court in 2016 and 2019 he puts

9  together a false premise by which he received his 2.5 million-

10  dollar capital account.  It's clearly disprovable with

11  Mr. Jowdy's own emails.  I've outlined it several times and it

12  shows it again he's just trying to use revisionary history to

13  support the problem of the day.

14          I appreciate his high-paid lawyers from multiple law

15  firms across this country to stick up for him and other

16  friends and family that he brings in and writes letters, like

17  one of the other letters I saw just today but these are people

18  that I have done business with them.  And perhaps Your Honor

19  only needs to look just a little bit further to see that

20  Mr. Kaiser who was fully aware of what Mr. Jowdy had done to

21  everybody by -- and gave testimony to it in 2009 in an

22  arbitration being very crystal clear about money he

23  specifically solicited from his friends and family to

24  participate in a 15 percent loan to Mr. Jowdy through the

25  Hawaii partners.  It was -- there was no word vomit, like he

42

1   tried to produce in 2015 represented in the Court's M&O at one

2   point.  It was crystal clear that Mr. Kaiser was aware of it

3   at all times.  But when he fell on hard times personally after

4   being fully repaid from his Hawaii investments and his

5   California investments with banking records to prove it,

6   Mr. Kaiser took a job with Mr. Jowdy and decided to put his

7   head in the sand.  His letter now outlines very clearly what

8   Mr. Kaiser has learned since 2012 where he outlines years and

9   years of more theft by Mr. Jowdy behind the back of the

10  investors, Mr. Jowdy reiterating the same mantra that he did

11  in his two -- January 2010 deposition that he would never pay

12  back money to any investors Kenner or otherwise because we

13  turned on him.  Well, effectively, Your Honor, in Jan --

14  excused me, in early 2007 when I discovered Mr. Jowdy's frauds

15  I was the first one that turned on Mr. Jowdy when he offered

16  me a documented bribe and testified to it in his own January

17  2010 deposition of tens of millions of dollars to go along

18  with him in his protection.  I declined and I opened up

19  everything to my investors.  Since then we've been fighting

20  it.

21          Mr. Kaiser now had his own come-to-Jesus recognition

22  of this with Mr. Jowdy and has outlined the same type of back-

23  door non-third party schemes that I outlined to everybody in

24  the 19 plaintiff lawsuit in 2008 versus Mr. Jowdy to recover

25  the money and the two California 19 plaintiff lawsuits, et

43

1  cetera.

2        All of that being said, Your Honor, I think with

3  respect to money judgment and forfeiture the Government has

4  not proven a nexus to the funds that ended up in Baja Ventures

5  2006 LLC.  Those funds, the 2.5 million dollars, clearly come

6  from Joseph Stempel and Yuri Leftonin and as I outlined it's

7  actually 4.1 million dollars.  Mr. Jowdy just behind his own

8  Chinese wall when he set up the final paperwork did not put in

9  the full amount.  It's been taken, stolen, misappropriated,

10  embezzled, et cetera.

11        THE COURT:  Now, you're over the --

12        MR. KENNER:  The C --

13        THE COURT:  -- 20 minutes.  I'm just going to ask

14  you to wrap up.

15        MR. KENNER:  Okay.  Yes, sir, Your Honor.  And

16  ultimately the 2.3 million dollars that Mr. Pecca and the

17  other investors put in was also supposed to be recognized.

18  There's a February 19, 2006 letter that recognizes Mr. Jowdy,

19  which is altering the ownership percentages "for now," in

20  order to satisfy some lien closing arrangement and that it

21  would be corrected after the fact.

22        So I concur with Mr. Kaiser -- excuse me -- with

23  Mr. pecca and all the other investors' angst and anxiety.  I

24  also concur with Your Honor when you say that the management

25  of the DCSL project could cause problems and not allow any of

44

1   the investors to recover their funds.  Could be a big problem.

2   But I would implore the Government to take a step back and

3   realize that they need to go through the same process they go

4   through with anyone and that's to indict to take to trial, to

5   convict and seek through forfeiture funds that they believe

6   are misappropriate to someone like Mr. Jowdy.

7           I'm not happy about that.  I don't agree with it.

8   I'm offering to help the Government and conclude it, but with

9   respect to the money judgment forfeiture nothing in Baja

10  Ventures, no funds should have entered as Mr. Souther says,

11  the capital accounts in Mexico, nor do I believe they did.

12          And ultimately the funds that -- if the Court is

13  going to hold me responsible I should be held responsible for

14  funds that I benefitted from and I should be separated from my

15  ill-gotten gains as a result of the money transactions that

16  took place in this case.

17          THE COURT:  All right.  Thank you, Mr. Kenner.

18          If the Government wants to, I'll give you five-

19  minute rebuttal if you want to say anything.

20          MS. O'CONNOR:  Briefly, Your Honor.  Defendant

21  Constantine seems to suggest that a defendant can only be

22  liable for proceeds that he retained, rather than proceeds

23  that he obtained.  But even Section 853(a) doesn't require

24  that the defendant have been shown to retain proceeds.  That

25  simply isn't the case.  In addition, he argues that proceeds

1  can only go to one or the other, but he doesn't cite any cases

2  which say that proceeds can only have been obtained by one

3  defendant or the other, but not both because that simply isn't

4  the law.

5          And Your Honor, we would again point the Court to

6  the hypothetical proposed by the Supreme Court which is not

7  the act of obtaining a physical possession.  The Supreme Court

8  recognized that proceeds can be obtained even if to goes to

9  another member of the conspiracy if that individual was a

10  controlling figure in the conspiracy which both of these

11  defendants were.

12          THE COURT:  All right.  Go ahead.  I'm sorry.

13          MS. O'CONNOR:  And just also briefly on the point of

14  Bermudas, the Government's point in citing Bermudas as to

15  Section 982(b)(1), which is a statute that incorporates the

16  substitute asset provision was merely shown that in relying on

17  substitute asset provision in Honeycutt Supreme Court looked

18  to 853(p) as referring to the forfeitable property described

19  in 853(a) because in that case it was a narcotic statute and

20  that's forfeitable property.

21          But in this case forteitable property is described

22  in 982(a)(1), which is what the Second Circuit recognized in

23  Bermudas.  So rather than 853(p) looking at 853(a)(1) in this

24  case 853(p) would refer to 982(a)(1) to describe the

25  forfeitable property.  And that was the point the Government

46

1   was making in its brief.

2          And as to Defendant Kenner's arguments, the

3   Government would just briefly point out that Defendant Kenner

4   repeatedly argues that the Hawaii money that went to Jowdy

5   went there as a loan.  But as the Court recognized in its Rule

6   33 decision there's ample evidence that the investors did not

7   give permission to have their Hawaii investment money go

8   anywhere other than Hawaii.  So it's completely irrelevant how

9   Mr. Kenner labels those transactions.

10          The rest of his arguments, Your Honor, are

11   adequately addressed by the Government's briefs.

12          THE COURT:  All right.  All right.  Thank you.

13   Okay.  So the matter is under submission by the Court.  With

14   respect to the dialogue with the third parties, how long do

15   you think is a reasonable time to submit a letter to the

16   Court?  I expect the letter would indicate hopefully that a

17   meeting or conference call where you hear out their concerns

18   for those lawyers who were here who are representing those

19   entities or individuals are, if there are individuals here

20   it's in advance of that meeting.  You want to send the

21   Government, you know, language for example in the order of

22   forfeiture that if the Court were to grant it that you think

23   would be helpful in connection with avoiding some of the

24   consequences, I would suggest that you, you know, put those

25   types of suggestions in writing to the Government so they can

47

1  consider them even advanced -- in advance of this meeting or

2  conference call, whatever it might be.

3          So I would expect the Government to send a letter to

4  me indicating perhaps in light of those discussions we're

5  proposing the following modifications to any order of

6  forfeiture that the Court would enter to the one you had

7  previously submitted.

8          If you think after that initial meeting that having

9  a magistrate judge facilitate it would be helpful, you can put

10  that in the letter and I'll arrange for that to happen.  So

11  it's basically just having that conference call or meeting and

12  then telling the Court and if you need more time you can put

13  that in the letter as well.  So a couple of weeks.  I don't

14  know.  What do you you think?

15          MS. O'CONNOR:  Two weeks?

16          THE COURT:  Two weeks.  Okay.  So March 15th the

17  Government will submit a letter to the Court updating it on

18  that issue.  All right.  And then just to address a couple

19  of -- because I do want the remainder of the case to move

20  forward and Mr. Talkin, I know you're still on trial but

21  there's the issue of whether or not you wanted to put some

22  supplemental submission in on the ineffective assistance

23  claim.

24          MR. TALKIN:  Yes, Your Honor.  I understand that you

25  want us -- for it to be a few pages and we will do that.

48

1          THE COURT:  How much longer -- how much longer do
2  you --
3          MR. TALKIN:  Some in Monday.
4          THE COURT:  Okay.
5          MR. TALKIN:  Very -- let's say by the end of the
6  week, so --
7          THE COURT:  Okay.  Just want to give me a date for
8  that then?
9          MR. TALKIN:  Yeah, I'm going to ask them -- it's
10 been multiple months, so I would ask for just three weeks
11 after the end of next week.
12         THE COURT:  Okay.  That's reasonable.
13         MR. TALKIN:  For that letter.
14         THE COURT:  March 29th?
15         MR. TALKIN:  That's fine.
16         THE COURT:  And then I'll give the Government a
17 chance to respond to that.  You want ten days, is that enough?
18         MR. TALKIN:  Yes, Your Honor.
19         THE COURT:  So say April 9th and then as of
20 April 9th once I get the letter, once I believe I have any
21 questions based upon those submissions, then that motion will
22 be fully submitted for the Court and then -- I don't remember.
23 With respect to sentencing if you can remind me.  I don't have
24 the docket sheet.
25         MR. HAGGANS:  I think where we are on the sentencing

49

1   is PSR has been done.  The objections have been filed.  We do

2   not have a sentencing memorandum filed.

3          THE COURT:  Did the Probation Department do an

4   addendum based upon your objections or not?

5          MR. HAGGANS:  I do not believe so.

6          MR. TALKIN:  We filed a response to the defense's

7   objections.  I do not believe Probation has filed an addendum.

8          THE COURT:  Okay.  I'm going to have my deputy

9   contact the Probation office to see because that was a long

10  time ago, right?

11         MR. HAGGANS:  It was, Your Honor.

12         MR. TALKIN:  Your Honor, there may be -- it may make

13  sense, especially since Mr. Constantine has been out for re-

14  interview, on just -- not on the whole issue but if you're

15  going to speak to Probation if you would ask that, we'll

16  make that available.

17         THE COURT:  Okay.

18         MR. TALKIN:  Because it's probably information you

19  want to hear from them --

20         THE COURT:  All right.

21         MR. TALKIN:  -- in the sentencing.

22         THE COURT:  Mr. Kenner, remind me.  Did you put in

23  your objections as well to the PSR?

24         MR. KENNER:  Your Honor, I just received from

25  Mr. Siegel the list of PSR correspondence just this week, so I

50

1  haven't had a chance to look at anything to submit an addendum

2  to the PSR.

3          THE COURT:  Okay.

4          MR. KENNER:  As you know, those --

5          THE COURT:  When you say "addendum" you mean

6  objections?

7          MR. KENNER:  Objections.  I apologize, Your Honor.

8          THE COURT:  That's okay.

9          MR. KENNER:  Objections.

10         THE COURT:  So you want --

11         MR. TALKIN:  I'm sorry, Your Honor.  My recollection

12  is that by I believe two counsels ago did submit a number of

13  objections to the PSR.

14         THE COURT:  Right.

15         MR. TALKIN:  I believe Mr. Siegel may have submitted

16  additional objections and the Government has responded to all

17  the objections that have been filed.

18         THE COURT:  Okay.  But I'll -- if Mr. Kenner -- he's

19  now representing himself.  If he wants to potentially

20  supplement it, we have -- you know, we have other things going

21  on anyway.  There's no harm giving him some time.

22         So Mr. Kenner, if you have any supplemental

23  objections on the PSR I would just ask you to do it by the

24  same date as Mr. Talkin, March 29th, okay?

25         MR. KENNER:  Yes, sir.

1          THE COURT:  And then want to anticipate what will

2    happen, you know, if Probation is going to do an addendum I

3    would want to get that first but then I think we'll have

4    another conference just to address as many objections, figure

5    out whether there's any type of hearing that would be needed,

6    if I had a co-hearing.  And then subsequent that we could set

7    another date for sentencing going forward, okay?  Does anyone

8    have any -- Mr. Kenner, I know Mr. Siegel submitted a list of

9    documents that you've gotten.  I don't know if you -- do you

10   see that letter?

11         MR. KENNER:  Just today, Your Honor.

12         THE COURT:  Okay.  So take a look at it.  If you

13   think there's other things on there, you know, that you still

14   need I know you asked for all the pretrial transcripts but

15   after we -- I got off the bench last time it's a lot of

16   transcripts.  I have to mindful of the taxpayer dollars that

17   would go into giving you every transcript.

18         So what I'm going to ask you to do is -- and it can

19   be *ex par* -- it should be *ex parte*.  Just if you want to write

20   a letter to me, if there's something in particular that you're

21   looking for in those transcripts, me and my staff might be

22   able to identify where it is because, as you know, you've sat

23   through a lot of those.  A lot of them were non-substantive --

24         MR. KENNER:  Correct.

25         THE COURT:  -- and I don't want to have to have the

52

1    taxpayers spend all that money because there's one transcript

2    in particular -- even if it's a couple of transcripts.  So

3    just write a letter to me just exactly what you're looking for

4    in those transcripts and I'd be willing to give you those

5    transcripts in particular, okay?

6              MR. TALKIN:  Your Honor, may I just have a moment,

7    please?

8              THE COURT:  Yeah.  No, these are status conferences.

9              MR. TALKIN:  Oh, okay.  I --

10             THE COURT:  I think we had 30 status conferences, so

11   this is before the trial.

12             MR. TALKIN:  Okay.  Because I have a ton of

13   transcripts --

14             THE COURT:  No, no.  He has all those, but --

15             MR. TALKIN:  Okay.

16             THE COURT:  -- if there's something that he wants to

17   document and so I'm just -- just put a letter in to me and

18   we'll see if we can figure out what date it was or dates it

19   was, okay?

20             MR. KENNER:  Okay.  Your Honor, there's a handful of

21   housekeeping items then so I'll just submit them also to you.

22             THE COURT:  Yeah, that'd be great.

23             MR. KENNER:  Okay.

24             THE COURT:  All right.  Anything else?

25             MS. O'CONNOR:  No, Your Honor.

53

1          MR. HAGGANS:  Was Your Honor intending to set a date

2  for the hearing on PSR matters?  Government requests --

3          THE COURT:  Sure.

4          MR. HAGGANS:  Respectfully requests the Court to set

5  such a date.

6          THE COURT:  Yeah, it's just a little bit hard

7  because -- I'll do it -- I don't know what the Probation

8  Department is going to say about the addendum but let's set a

9  date.  So how about April -- wait.  The -- April 9th is when

10  you're putting in --

11          MR. TALKIN:  Correct, Your Honor.

12          THE COURT:  -- Mr. Talkin?

13          THE COURT:  Yeah.  How about April 22nd at 1:30,

14  Monday, April 22nd.  So this would be to address objections to

15  the pre-sentence report.

16          MR. HAGGANS:  It's good for the Government, Your

17  Honor.

18          THE COURT:  Mr. Talkin, is that okay with you?

19          MR. TALKIN:  I'm sorry.

20          THE COURT:  April 22nd at 1:30?

21          MR. TALKIN:  It is, Your Honor.  If it becomes a

22  problem --

23          THE COURT:  Okay.

24          MR. TALKIN:  -- I'll know in the next week.  I

25  just --

54

1          THE COURT:  And Mr. Constantine, I would want you to
2  be present at that because that would be substantive as well.
3          MR. CONSTANTINE:  Whatever you say, Your Honor, I'll
4  be here.
5          THE COURT:  Yeah.
6          MR. CONSTANTINE:  I just needed a little notice to
7  buy the ticket.
8          THE COURT:  Okay.  Just make sure you -- before you
9  buy the ticket that it's going to be a firm date because I
10  don't want you to have --
11          MR. CONSTANTINE:  Thank you, Your Honor.
12          THE COURT:  All right.  Have a good weekend.
13          PARTIES:  Thank you, Your Honor.
14  (Proceedings concluded at 2:54 p.m.)
15                    *  *  *  *  *  *
16
17
18
19
20
21
22
23
24
25

55

1          I certify that the foregoing is a court transcript

2     from an electronic sound recording of the proceedings in the

3     above-entitled matter.

4

5

6     _____

7                         Ruth Ann Hager, C.E.T.**D-641

8     Dated:   March 4, 2019

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25