December 11, 2019

The Honorable Judge Bianco
U.S. District Court – EDNY
100 Federal Plaza
Central Islip, NY 11722

## **Material Witness Perjury Left Unaddressed** [1]

Your Honor,

*Kristen Peca fabricated surreal and logistically incredible testimony "for effect"…* Multiple egregious and logistically impossible testimonies were given at trial by Kristen Peca; *prejudicing the defendants*.   In particular, it appears that **Kristen Peca** was "used" by the prosecutorial team to present fabricated testimony as if it were based on her first-hand knowledge, affecting the integrity of material issues in the case.
- See "*KPeca PERJURY-Chronology is CRITICAL*" (*Ex.C*)

*Kristen Peca recorded Kenner for the FBI in 2012…*

During her 5-hours of recordings, Kristen Peca admitted she had no idea that her husband had a Line of Credit ("LOC") at Northern Trust Bank; **ever thru the date of the 2012 FBI recordings**.   Kristen Peca even questioned Kenner during the 2012 recording, thinking Kenner was perhaps blurring a Hawai'i corporate LOC with something that her husband did with Kenner **and never told her about**.   Kristen Peca confirmed she was *not* even aware of *her husband's* LOC in 2008-09 when Michael Peca was playing and living with his family in Columbus, Ohio. The conversation was as follows:

> **[Kristen Peca]** – *Well, I was referencing the earlier stuff that you said, I don't remember a large amount being distributed back to our account and the timing of the years of the loan, the line of credit, that happened when we were in Ohio?   I don't understand how it could have been open for 5 years before that?   Because we had a bond account going?   Do you mean the Hawai'i; you had a line of credit, **but not for us**?*

---

[1] At sentencing, "the Court is virtually unfettered with respect to the information it may consider."  *United States v. Alexander*, 860 F.2d 508, 513 (2d Cir 1988).

1

> **[Kenner]** – *No, no, you guys had lines of credit for 5 years at Northern Trust.*
>
> **[Kristen Peca]** – *for 5 years?*
>
> **[Kenner]** – *for 5 years!   When you were in OHIO, that's when the thing closed.*

- Kristen Peca cannot believe that she is finding out on a phone call in 2012 that her husband, Kenner's client, had a LOC open <u>without</u> her knowledge.

Please note that Kristen Peca had confessed to Kenner during the five hours of FBI calls that "*Matt [Galioto] told Michael and I that you stole all of the Hawai'i money and never gave it – the loan money -- to…uhhhh…Jowdy.*"

- The fraud on the Court compounds – **BECAUSE** -- Kristen Peca *was aware* that the Hawai'i partners had given Jowdy a loan -- just like her husband testified to the SDNY Grand Jury one year earlier (*3500-MP-5 at 30-33, 35, 40, 42, and 45*) (*Ex. 13*).
- Kristen Peca was *only* concerned about the fact that Galioto apparently convinced her and Michael Peca that Kenner stole the loan money; although proven 100% untrue post-trial by the government's own submissions (*government-forfeiture-36 and government-forfeiture-44*).
    - If the FBI is allowed to lie to its potential witnesses to "influence" their recollection of events that Kristen Peca never participated in (specifically the 2005 Hawai'i meeting, confessed *supra*), then sobeit; *but…*
    - If the premeditated lie is *not* an allowable witness coercion tactic, then there are a myriad of issues related to professional culpability and prosecutorial misconduct left unaddressed by the District Court.

*Premeditated fraud on the Court* (*Tr.698-700*)…

Obvious *Napue* violations occurred in the instant case.

- If it is established that the government knowingly permitted the introduction of false testimony reversal is "**virtually automatic**."

United States v. Stofsky, 527 F.2d 237, 243 (2d Cir 1975) (citing *Napue v. Illinois*, 360 U.S. 264, 269, 3 L. Ed. 2d 1217, 79 S. Ct. 1173 (1959)), *cert denied*, 429 U.S. 819, 97 S. Ct. 65, 50 L. Ed. 2d 80 (1976).

Where the government was unaware of a witness' perjury, however, a new trial is warranted only if the testimony was material and "the Court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted."  *Sanders*, 863 F.2d at 226; see also *United States v. Seijo*, 514 F.2d 1357, 1364 (2d Cir 1975) (The test "'is whether there was a significant chance that this added item, **developed by skilled counsel**[2]…*could have induced* a reasonable doubt in the minds of enough of the jurors to avoid a conviction.'") (Citations omitted).

**Here the *Napue* violations were known in advance and jointly prepared; specifically based on the government's knowledge from their-own 2012 FBI recordings.**   How could Kristen Peca have agreed with her husband to participate in a "*6-month LOC*" in 2005 (*Tr.698-700*), when she admitted on the 2012 FBI call that she *still did not know* anything about her husband having a LOC years later?

- *It was logistically impossible; nevertheless, the government let the prejudicially fabricated testimony stand uncorrected*.

How could Kristen Peca have participated in the 2005 set-up meeting or any follow-up activities?
- o ***She could not*!**

*Planned perjury* is the only 2015 answer to her multiple injurious claims – and the government willingly allowed it as planned, because…

- ***She was not part of the 2005 set-up meetings (per her own admission in 2012)***;
- She was not aware of her husband's LOC, **ever** while it was open (pre-April 2009 closing);
- She was *not* aware of the underlying collateral, *bonds or not* (since she was unaware of the actual LOC; predicate act);
- She did *not* participate in a LOC conversation about her "*baby*" (*infra*);

---

[2] Kenner's trial counsel refused to utilize any of the government's exculpatory recordings with Kenner related to Kristen Peca, Michael Peca, Gaarn or others: based on his inability to comprehend the electronic medium and prepare "*truncated files*" for presentation at trial. In context, trial counsel also refused to hire additional resources to prepare a defense in a case deemed complex by the District Court over a year prior to trial; refusing to request a paralegal, a forensic accountant, a signature expert, a technical expert, a computer expert, etcetera – *blamed repeatedly on the Court as unnecessary and not approvable costs under the CJA Act*…

3

- She could *not* have received the FedEx default letters from Northern Trust Bank – because she would have clearly known about the LOC at that point (not remaining oblivious to the existence of the LOC, 3-years later in 2012); and
- For the **crown jewel** of mis-representations, Kristen Peca could not have received the default letter and delivered honest "*in shock*" testimony (*Tr.710*); certainly not while living in Ohio when the letter was delivered via FedEx to her New York home (another logistical impossibility left unexplained to the Court).

A witness commits perjury by willfully giving false testimony concerning a material matter. *United States v. Monteleone*, 257 F.3d 210, 219 (2nd Cir 2001) (citing *United States v. Dunnigan*, 507 U.S. 87, 94, 113 S. Ct. 1111, 122 L. Ed. 2d 445 (1993)). In correct testimony resulting from confusion, mistake, or faulty memory, or simple inaccuracies or inconsistencies in testimony likewise do not rise to the level of perjury. See *Monteleone*, 257 F.3d at 219; *United States v. Sanchez*, 969 F.2d at 1414-15.

Kristen Peca's testimony was jointly fabricated with her premeditated admission of the LOC "story" (*Tr.709*), quoting: "*Do you want me to get into the line of credit situation?*" Kristen Peca continued*:*

*"I was home alone at the time. Michael wasn't home yet from practice. And I opened it up and the first thing I see in big bold letters was the word default. My eyes were scanning through it. Realizing it had to do with the line of credit, it felt like everything went blank around me. All I could think of was, oh my gosh, that was our safety net. He guaranteed that wouldn't be touched. The letter [GX-717 – with a New York mailing address] talked about taking the money out of our bond account, and I can't even describe how I felt. I think I stood there holding that letter and didn't really move much until Michael got home [in Ohio]. I was pretty much in shock. When Michael got home, I just handed it to him and I started crying immediately. And he called Phil right then and there and just started laying into him, how could this happen, you guaranteed this wouldn't happen, and used all sorts of choice language. And Phil, when we heard back from him, he basically said, don't worry, buddy, it's safe in the investment. And he was trying to diffuse the situation and downplay it. We didn't understand, not only how this could happen, but how he didn't have the decency to give us a heads-up and let us know we were about to get such a shocking notice in the mail."*

The Court knows that Kenner and Michael Peca were in direct communication about the LOC default plans and the verbal confirmation Michael Peca had to provide to Northern Trust Bankers prior to the release of collateral *4 days before* the due date

(of April 5, 2009, and collateral seized April 1, 2009 immediately following Peca's April 1, 2009 confirmation to Northern Trust Bank, *infra*).

Michael Peca confirmed independent authorization with Northern Trust Bank employees; Aaron Mascarella and Catherine Brill prior to his authorization call the same day as the collateral seizure (*Bates stamp: TNTC00087-90*) (Kenner sent text hi-lighted):

| | | | | |
|---|---|---|---|---|
| 74155 | +17163743234 Michael Peca* | 4/1/2009 10:38:15 PM(UTC+0) | Sent | **A Northern trust person will Call you to confirm your transfer to Schwab. Please acknowledge**… |
| 63255 | +17163743234 Michael Peca* | 4/1/2009 10:44:43 PM(UTC+0) | Read | **Got it. Call already done**… |

On May 1, 2009 -- one month after the authorized LOC collateral seizure, Michael Peca sent Kenner an exculpatory text further confirming Kristen Peca had *never* received the default letter or knew anything about it (now fully considering her 2012 FBI confessions, *supra*):

| | | | | |
|---|---|---|---|---|
| 6851 | +17163743234 Michael Peca* | 5/1/2009 5:57:01 PM(UTC+0) | Read | Get in touch with Glen yet. **Also, NT sent an email to my wifes aol acct. Attatched is the transfer info. She's going to f'n loose it when she sees loan paid** |


***The bonds are "my baby" [Kristen Peca]…***

*In another fabricated fraud -- Kristen Peca alleged at trial that she begged Kenner not to move her bonds, during her fabricated participation in the 2005 meeting.* Kristen Peca emotionally referred to her husband's bond account as "*my baby*" (*Tr.698-99*):

> *Q. When Mr. Kenner first proposed to you to move the safety net and make it collateral for the line of credit, were you able to do that?*
>
> *A [Kristen Peca]:* ***No. I said right away, no, no, no, no, no, not touching that, that's**** my baby. I put that together. That's our safety net****, I don't like that. And he reassured us over and over no, no, no, this not the money account, the line of credit, that's collateral, nothing is going to happen to it, not a penny will go*

5

> *missing, Kristin it's okay, <u>this is only six months</u>, he kept reassuring me, nothing will happen to it. The bank needs to hold on to it in order for us to get the money for the project.*
>
> *Q. <u>Did you ultimately decide to invest and move your bond account</u>?*
>
> *A [Kristen Peca]: Yeah, we did.*

In addition to Kristen Peca's admissions that she <u>never</u> knew about the LOC in 2012 (8 years after it was opened) -- ==No bond account was ever moved==!

- Someone needs to hold the government and Kristen Peca accountable for their incredible fabrication. Kristen Peca's "*bonds*" story was obviously a 100% invention by her and the government who tried to elicit sympathy by lying to this Court and jury.
    - Apparently the lies worked...

Kristen Peca's story was methodically fabricated -- **because** <u>Michael Peca transferred $2 million in cash</u> to his newly created Northern Trust Bank investment account; <u>zero bonds</u>. Peca initial Northern Trust Bank statement from March 2005 confirms that not one dollar of bonds was ever transferred to Peca's Northern Trust account (*Bates stamp: illegible*) (*ECF No. 736 #1 at 40, ExZ55 at 7*). Kristen Peca and the government's coordinated testimony are <u>irreversible</u> for damage and <u>inexcusable</u> for its obvious premeditation.

Michael Peca's Northern Trust March 2005 initial bank statement was addressed to Michael Peca's Getzville, New York (Buffalo) home (*ECF No. 736, Ex.Z55 at 7*), the same as his default letters five years later:



*Peca never transferred funds to the Hawai'i partners until 2005 while residing in the Western District of NY...*

For the record, it should be noted that Michael Peca gave more erroneous testimony (or **CTE**-based) about his $100,000 initial Hawai'i partners deposit; complicating the EDNY venue argument (for Kenner's underprepared trial counsel) (*ECF No. 774*

*at 8*).  Michael Peca claimed he transferred $100,000 cash to the Hawai'i partners account in 2003 when he was a Huntington, Long Island resident (*Tr.382*).  The Hawai'i project began in December 2003 and Peca had no participation in it for almost 18 months.  Unless the government and Michael Peca mutually agreed to defraud the Court with planned false testimony, the *faulty memory* is incrementally attributable to Michael Peca's **CTE** symptoms (like the other government witnesses). [3]

**The Michael Peca $100,000 transfer did not occur until June 23, 2005** (*GX-749*), after Michael Peca *signed* his wire transfer request for his Charles Schwab account and sent the transfer request from his Western District of NY home (per the Buffalo, NY home fax number confirmation number on the government document [716]6344571) [fax header]:



The government knew this and actually noted it on the actual transfer document during their pre-trial investigation, ***but ignored it to bolster their case***:



Although Kenner has *never* lived in Long Island, the government coordinated with Michael Peca to claim Kenner lived in Long Island, NY (*Tr.377*), as well:
>  *Q Do you know where Mr. Kenner was living?*
> 
>  *A [Michael Peca]: I believe Mr. Kenner was on Long Island.*

---

[3] The government defended its witnesses' synchronized memory loss at trial by asserting that there was no perjury, only *faulty memory, confusion and mistakes*.  The defense by the government is wholly incredible considering they prosecuted based on "legal" transactions that could not be verified by alleged victims who were relying on CTE-Alzheimer's symptoms to verify what they were never told.  *See United States v. Dunnigan*, 507 U.S. 87, 94 (1993).

### *More concealment by Michael Peca from his wife…*

Michael Peca's (1) Northern Trust LOC and (2) its payoff concealment from his wife was contemporaneous with (3) his agreement to pay his past-due premiums and interest on a $3 million tax-free insurance policy Kenner convinced Lloyds of London to pay out to Michael Peca (*infra*).
- o   Michael Peca never told Kristen Peca about either.

*Michael Peca allows mis-representation by his wife to the FBI during their February 2012 FBI proffer in-person (knowingly or thru **CTE**)…*

During the Peca's in-person February 22, 2012 FBI proffer in Long Island, Kristen Peca was unaware of her husband's disability insurance repayment (*infra*) and told the FBI "*Kenner withdrew $180,000 (2 times) from their accounts without their permission or knowledge*": [4]



---

[4] It has been mis-represented throughout the instant case that Kenner could transfer any money for his clients without specific verbal authorization by each individual investor to their FINRA representative at Greenberg Graham Assoc. and their custodian at Charles Schwab.  The independent client authorizations occurred *after Kenner submitted the wire instructions* thru Kenner's *limited Power of Attorney*; so as to simplify the transfer instructions for the client's bank (part of the convenience Kenner provided as part of his Standard Advisors agreements with his clients).
- **Kenner could *not* move client money; *never*.**

8



In February 2012 -- Michael Peca sat silently in front of the FBI (Galioto) and SDNY investigator (Romanowski), leaving the impression that he was also unaware of his previous approvals. Yet – Michael Peca had previously sent Kenner the following texts to get the insurance settlement letter prepared for him to sign by the insurance agents, and **to specifically <u>not</u> tell his wife.**

After 2 months of threatened litigation by the Lloyds of London insurance carrier (HCC Specialty Underwriters), Michael Peca agreed to signoff (*infra, via text instructions to Kenner*) on the premium repayments and transfers the $360,000 ($180,000 and $180,000) without his wife's knowledge:

| | | | | |
|---|---|---|---|---|
| 52887 | +17163743234 Michael Peca* | 2/2/2009 8:07:47 PM(UTC+0) | Read | Have an idea. **Agaist my better judgement and my wife is not to know.** Call me |
| 52889 | +17163743234 Michael Peca* | 2/2/2009 8:27:44 PM(UTC+0) | Read | **Just get me a general letter saying the matter is concluded without mention of the payment.** |

Kenner reply to his client, Michael Peca:



| | | | | |
|---|---|---|---|---|
| 62227 | +17163743234 Michael Peca* | 2/2/2009 8:40:14 PM(UTC+0) | Sent | **My pleasure** |

- Kenner replied "*my pleasure*" and took care of the settlement (*per Michael Peca's terms of <u>anonymity</u> from his wife*, as usual) after the 2+ months of strife between Kenner's client and the pending Lloyds litigation.   In litigation, Michael Peca

9

would have lost the entire $3 million benefit; not just the $360,000 premium payments he refused to make for the underlying disability insurance policy premiums that had already paid him.   Michael Peca was afraid to tell his wife they owed the $360,000 premium for the $3 million payout; perhaps based on not disclosing the premium amount prior to signing for the disability insurance.

Michael Peca's habit of concealing his investment/business information from Kristen Peca *must* have included intercepting and hiding Kenner's direct reply-explanation to Kristen Peca about the same two, $180,000 transfers that Michael Peca signed (*infra*).
- Perhaps alternatively, Kristen Peca planned her FBI proffer perjury to "dirty" Kenner and Michael Peca agreed to go along with it, immediately after Kenner informed the Pecas in 2012 that he was filing litigation (and a lis pendens) in Las Vegas to protect his $650,000+ deposit and contributions to their joint Vegas-agreement, which Peca breached by withholding the $150,000 in annual rental revenues from Kenner (*Bates stamp: LV-0001576 and DS-000248*).

*Full disclosure of the disability insurance agent's email to Michael Peca -- and Kenner's immediate (full disclosure) reply, in spite of what Michael Peca chose to conceal from his wife &/or the FBI (Bates stamp: PK_SEC_5430)...*

10



*Michael Peca's underlying knowledge of the Jowdy loans makes him a <u>non-victim</u> of the $240,000 of his Hawai'i investment funds that were transferred to Jowdy in 2005...* Although Michael Peca told the 2015 trial court (*Tr.498-99*) that he was fully aware of his loans to Ken Jowdy – per his 2011 SDNY Grand Jury testimony (*3500-MP-5 at 30-33, 35, 40, 42, and 45*) (*Ex. 13*), it is clear that he never shared any of his investment business with his wife.

Nevertheless, somehow Kristen Peca was prepared pre-trial to falsely claim (in conflict to her 2012 FBI recording) that she was deceived by Kenner in 2005 resulting in her fabricated and emotional "*No. I said right away, no, no, no, no, no, not touching that, that's <u>my baby</u>. I put that together. That's our safety net*" testimony (*Tr.698*).

The egregious 18 U.S.C. 1001 perjury must be further investigated for its fabricated source and determinative prejudice to Kenner at trial.   Kristen Peca's planned

11

perjury (whether suborned or not) cannot be left without consequences; the least of which should include federal perjury charges for her frauds on a Federal Court.

Respectfully submitted (December 2019).

Phil Kenner