2012 UPDATE letter to Mexico and Hawaii partners -- including Berard and Kaiser (while they were working with Jowdy and sharing this with him in real-time.

85-2   Filed 01/03/20   Page 1 of 23 PageID #: 449

I know that you have been receiving a lot of information over the last month and a half. I apologize for the volume of material, but I am forwarding all of the information that I believe you need to digest based on everything that has been said, good & bad, over the last 6+ months. With the total amount of funds that we have invested and loaned to Ken Jowdy over the last 10 years, this information should represent the efforts necessary to pursue resolution. There have been a lot of comments made about the "lack of information" that's been shared regarding this pursuit over the last 5 years, but it is in fact the same volume of activity that has gone on day in & day out over that period of time.

We had another court hearing at the end of last week in Mexico City on July 12. All of our lawyers were present. The results were that the Mexico City courts received and acknowledged all of the documents that we have spent the last two years certifying as official in two other court systems. These are all of the banking records; operating agreements related to Diamante Cabo San Lucas, government certified accounting translations, and any other accounting that was necessary and required by the other courts. We were forced to present them again to another court because Jowdy claimed (during the July 9 hearing in San Jose) those documents were now fraudulent (per his July 9 declaration to the courts). The presentation of the documents from the San Jose courts (State Court) to the judge in Mexico City (Federal District court) will allow us to pursue the issues related to the San Jose Judge who has disregarded the District Attorneys orders to post a bond amount ($11mm to $33mm) which allows Jowdy to maintain the Amparo (temporary stoppage for the Arrest and Search Warrants). Our legal team is pursuing issues with the Mexican PGR (similar to our FBI) that relates to these cases. There will be more information to follow this week, as we expect to have a few official rulings and orders as a result of our recent efforts.

Just as a side note, please keep in mind that EVERYONE involved in this process has been compromised at every level by Jowdy's ongoing reluctance to deal with the actual issues related to our investments & loans, since I called him out in the summer of 2007 when his frauds were originally discovered by me. There have been too many hurdles to recall related to our collective efforts for resolve through negotiations and litigation. Many of the hurdles were due to Jowdy's ability to prey on our fears, distress, and exhaustion while dealing with his frauds over the last 5 years. Don't forget that Jowdy and his family/friends and have continued to make hundreds of thousands of dollars a year from the Cabo project without a single concern for the return of our funds.

Here are a few other thoughts in the meantime about some of the hurdles we have had to survive during this process.

PK-000155357
PK-000155357

We have dealt with every form of corruption, including payoffs, deception, witness tampering, denial, & delays through this process.  Our never-ending process is documented in the court's Setencia of February 14, 2012, in spite of Jowdy's team's rhetoric.

I am aware through many of you about the efforts headed by Jowdy's NY legal team (& their messengers) to scare you about some of our transaction, alleging wrongdoings over the last few years.  I have ALL the paperwork (not 1/2 as their insinuations are based upon) that shows each of our dealings are clean & there are no issues related to what you are being scared about. I have shared the "other 1/2" of the documents with those of you that have called to discuss the allegations. In hindsight, and with 1/2 of the paperwork, nothing can be reviewed properly. Contact me, as many of you already have, if you care to see all of the supporting documents.

If Jowdy wants to proclaim that his marketing strategy with Diamante was to fly Roger Clemens, girls to different cities for Clemens, pay for hotels and meals for all of them for years, burn significant portions of our invested funds for that purpose, we CANNOT judge his bad business sense.   We have to live with it.
  BUT…when Jowdy took out a $3mm hard money loan in 2006 with no purpose and pledges our $69mm piece of land that we owned free and clear…& then takes over $600,000 for himself and his cousin Eddy from the proceeds for loans that Jowdy allegedly made to purchase the land (didn't happen) and leaves the project in foreclosure, THAT IS A FRAUD!

Remember in the Nolan arbitration case, Nolan spent $120,000 on a forensic accountant hired by his self-serving attorney, Michael Meeks (who made over $1mm off Nolan, Stumpel, Moreau, Juneau and Myrick).   That accountant spent 3 hours in testimony in 2009 telling the judges that the $1.5mm wire that Jowdy received for the investment in Cabo through Baja Ventures 2006, LLC (owned by Kenner, Stumpel and Lehtinen) was stolen from the Hawaii investors.   The accountant was adamant, and professed there was no other possible answer why Jowdy received $1.5mm for the Cabo project (even though the wire they were talking about was part of the loan that Jowdy has not paid us back for from Hawaii).   In the end, Attorney Meeks failed (even though he had the evidence in his possession) to reveal to the court or his own forensic accountant that there was another wire for $1.5mm that was sent to Jowdy from Jere Lehtinen as part of the Baja Ventures 2006, LLC investment.   The moral of the story is: Beware of what you hear unless you have all of the documents…1/2 of them can only mislead you!   Attorney Meeks tried this in court for Nolan and lost…

In Mexico, Jowdy is pulling out all of the possible legal maneuvers to delay the

PK-000155358
PK-000155358

inevitable just like he did in the Glen Murray case in NV.   Even though Murray won the case, it cost Glen nearly $200,000 in legal fees to pursue Jowdy who ultimately delayed going to trial for 2 1/2 years and spent over $500,000 in legal fees that he took from the Cabo budget to pay for his personal defense.   One year into the lawsuit, Jowdy changed his strategy to BLAME the money from Murray that he did not repay on Kenner by petitioning the courts suggesting that he just then (a year into the case) discovered that somehow he did not benefit from the funds, but Kenner did!.   That has become his legal defense in every case since.   OBVIOUSLY, it did not work in the Nevada case, which is the only one that made it to trial.

  Every other case that we have sued Jowdy, he has simply spent millions of dollars (from our budgets) to try and pass the blame and delay the cases.   This delay strategy has been effective as far as keeping his position as the Manager of Diamante Cabo and professing to the world that the development is so beautiful, he does not know why anyone would sue him!?!   Recently, he tricked some of you into that same mindset.   The property is beautiful, that is why I wanted us to buy it in the first place!

Another short delay occurred again last week in the most recent Mexican hearing. Jowdy and his attorneys sought an Amparo in Mexico City to divert the attention on the case from the San Jose court. They were denied on their appeal to the courts to permanently dismiss the case.   They were granted (as I represented in the first court email) a temporary Amparo until the bond hearing dates.   At their appearance in Mexico City on July 4th, they petitioned the courts again stating that the San Jose del Cabo courts have not been properly notified of the Mexico City case...THAT THEY STARTED.   Thus, they asked for the court to reschedule the hearing for July 30th.   Again, after all of these years, Jowdy still refuses to address any of the issues related to the loans and equity investments he received.
   DELAY, DELAY, and DELAY!

Please read the following which is just a 2-page passage of 1000 pages from the Jowdy testimony...

Jowdy testimony:

3 BY MR. RICHARDS:
4 Q. I ASKED YOU IF YOU WERE AWARE OF
5 ANY LAWSUITS FILED OR PENDING YESTERDAY, AND
6 YOU -- YOU PROVIDED SOME TESTIMONY.
7 ARE -- ARE YOU AWARE THAT THERE'S A
8 CLAIM FROM JOZEF STUMPEL FOR A 1.6 MILLION DOLLAR
9 LOAN TO PROPIEDADES D.D.M.?
10 A. NO.

The ultimate plan was to get the FBI to arrest Kenner -- so Jowdy could claim "*Kenner stole $7 million from his clients for his Cabo investment*"*

(***ECF No. 628***)...

PK-000155359
PK-000155359

11 Q. DID THEY BORROW MONEY FROM

12 JOZEF STUMPEL?

13 A. I DON'T BELIEVE SO.

14 Q. WHAT -- HOW -- DO YOU KNOW IF

15 JOZEF STUMPEL EVER GAVE ONE OF YOUR ENTITIES 1.6

16 MILLION DOLLARS?

17 A. HE DID.

18 Q. AND WAS THAT PAID BACK?

19 A. NO.

20 Q. AND WHEN IS IT GOING TO BE PAID

21 BACK?

22 A. I DON'T KNOW.

23 Q. WHAT ABOUT MATTIAS NORSTROM, DID HE

24 GIVE 400,000 DOLLARS TO LOR MANAGEMENT FOR THE

25 C.S.L. AIRPORT IN MEXICO?

412

1 A. I THINK SO.

2 Q. HAS THAT BEEN PAID BACK?

3 A. NO.

4 Q. DID MATTIAS NORSTROM GIVE -- WAS

5 THERE -- THERE WAS A -- YOU TESTIFIED YESTERDAY

6 THAT THERE WAS A 500,000 DOLLAR CHECK FROM BAJA

7 DEVELOPMENT CORP. THAT WAS ISSUED TO

8 MATTIAS NORSTROM BUT NEVER CASHED.

9 DO YOU REMEMBER THAT?

10 A. YES.

11 Q. IS THAT GOING TO -- IS THAT CHECK

12 GOING TO BE MADE GOOD AT ANY TIME THAT YOU'RE

13 AWARE OF?

14 A. I DON'T KNOW.

15 Q. GLEN -- GLEN MURRAY SPENT 800,000

16 DOLLARS FOR THE PALM UNITS THAT -- THAT -- THAT

17 THERE'S -- THAT THERE'S LITIGATION WITH YOU.

18 ARE YOU AWARE OF THAT LITIGATION?

19 A. YES.

20 Q. AND THEN THERE WAS A -- THERE WAS A

21 LAWSUIT THAT WE FOUND WITH SOME OF THESE HAWAIIAN

22 ENTITIES IN FEDERAL COURT IN ARIZONA FOR 5.5

23 MILLION DOLLARS.

24 ARE YOU AWARE OF THAT LAWSUIT?

25 A. WHAT LAWSUIT IS THAT?

413

1 Q. A LAWSUIT IN PHOENIX.

2 A. WHO -- WHO'S --

3 Q. SOME OF THOSE HAWAIIAN ENTITIES,

4 LIKE ULA MAKIKA AND LITTLE ISLE 4, AND I THINK

5 PHIL KENNER. I THINK MAYBE JUST THOSE.

6 ARE YOU FAMILIAR WITH THAT

7 LITIGATION AT ALL?

8 A. ARE YOU STAYING THAT'S A PENDING

9 LITIGATION?

10 Q. NO. JUST WAS THERE A LAWSUIT

11 RELATED --

12 A. THERE WAS, YES.

13 Q. AND WHAT HAPPENED TO THAT LAWSUIT?

14 A. IT'S BEEN DISMISSED.

15 Q. YOU KNOW WHY IT WAS DISMISSED?

16 A. I KNOW IT'S BEEN DISMISSED.

17 Q. I'M JUST ASKING YOU BECAUSE,

18 BELIEVE IT OR NOT, I DON'T FOLLOW EVERY SINGLE

19 THING.

20 A. THAT'S FINE.

21 Q. I MEAN --

22 A. I HAVE NO PROBLEM.

23 Q. YEAH. I JUST WANT -- I FEEL

24 THAT -- I JUST WANT YOU TO KNOW THAT YOUR -- YOUR

25 FORMER COLLEAGUE HERE, THEY LIVE THIS STUFF EVERY

414

1 DAY. I DON'T. I GOT PLENTY OF CASES.

2 SO THAT'S WHY I JUST WANT TO MAKE

3 SURE I COVER THIS. SO IF IT SOUNDS -- DON'T

4 ASSUME I KNOW THE ANSWER BECAUSE I DON'T.

5 A. NO PROBLEM.

6 Q. ALL RIGHT. I'M JUST -- I'M JUST

7 LETTING YOU KNOW. I'M NOT TRYING TO BADGER YOU

8 ABOUT IT.

9 NOW, WAS THERE EVER A CLAIM FROM --

10 DO YOU KNOW IF THERE'S A DISPUTE OVER SOME OF

11 THESE AIRPLANES THAT DIAMANTE AIR OWNED AND THEN

12 LOST, IF THERE'S ANY CLAIM FOR DAMAGES AS A RESULT

13 OF THOSE?

14 A. I DON'T KNOW.

15 Q. DO YOU -- WHAT TRIPS DID YOU TAKE

16 THAT YOU'RE AWARE OF WITH THE INTENTION OF

PK-000155361
PK-000155361

17 ACQUIRING ADDITIONAL LAND OR PROJECTS FROM 2003 TO
18 2007 THAT WEREN'T RELATED TO THE CABO PROJECTS?
19 A. ALL TRIPS.

According to this 2 page excerpt from the Jowdy January 2010 2-day deposition, it is clear that Jowdy received MILLIONS of our collective dollars, but he has no understanding of how he plans or even if he plans to return the funds to us. There are two full days of this. Jason Woolley, Greg deVries and John Kaiser were present with Ron Richards and myself for these two days. Everyone left in disbelief of what Jowdy remembered OR DIDN'T! If you would like to read (or re-read) the transcripts, let me know. I will forward them to you in their entirety. I can assure each and every one of you that regardless of what Jowdy tells you about wanting to pay you back, and his desire to do so, he has made it crystal clear through his actions that last ten years that he does not care where any of the money has come from, he isn't giving it back. In this deposition, he clearly states to Ron Richards during those two days that he would rather see the projects go to bankruptcy than pay back any of the people who have "done these things to him".

All you have to do to understand his intentions is see this single Q&A again and digest the meaning of it:

15 Q. DO YOU -- WHAT TRIPS DID YOU TAKE
16 THAT YOU'RE AWARE OF WITH THE INTENTION OF
17 ACQUIRING ADDITIONAL LAND OR PROJECTS FROM 2003 TO
18 2007 THAT WEREN'T RELATED TO THE CABO PROJECTS?
19 A. ALL TRIPS.

ALL TRIPS! ALL TRIPS! ALL TRIPS!...were NOT related to Diamante?!?

Jowdy was travelling 100% at our expense, looking for additional projects, not interested in the least in sharing them with us (the people who funded all of his interests before Lehman's loan) and moving on. I can assure you that if there was any progress in Texas or Tennessee on those Jowdy projects that started after the Cabo deal went stagnant in 2006, we would never have seen him in Cabo again, just like Diamante del Mar. Keep in mind that Jowdys' $408,000/year On-Site Project Manager, Ken Ayers, spent less than 12 days in Cabo San Lucas in the first 18 months under Jowdy's watch! That means that the guy who was helping Jowdy drain the budget by signing invoices in year 1 with Lehman Brothers was NEVER there. He would simply fly into Cabo on the days that Lehman's accounting group out of Orange County, CA came to visit for on-site inspections and then immediately leave for his other

See ECF 667 -- "The Jowdy Hoax"

full-time job at The Bridges Resort in Southern California.

In some additional incredulous testimony, Jowdy states that he offered me, Phil Kenner, 20% of his project in Texas at one point. First of all, this is total nonsense, since there is not a single document on the planet that would support this offer, and second, I was not aware of the project for months while Jowdy was transporting (most of the time on our Diamante jets) all of our Cabo personnel to Texas on a regular basis to inspect & to do due diligence. In fact, he had a large Diamante contingency in Texas to show strength in numbers at a cocktail party and reception to announce Jowdy as the NEW owner of the Hal Sutton resort. In addition to all of the unpaid loans and investment neglected by Jowdy until this point, this was the straw that finally broke the camel's back. Jowdy and his newly formed Development team (assisted by Masood Bhatti at Lehman Brothers) milked millions of dollars of budget funds from that project as well before it was forced into bankruptcy in 2008, instead of working daily on our project in Cabo. Again, do not take my word for any of this. You can find out all of the truth from Hal Sutton and Gilbert Little who endured the same level of frauds in Texas that we have in Cabo, El Rosario, et. al. You can call Hal Sutton and Gilbert Little in Texas to confirm at (318) 393-9360 all of these details. The only reason Jowdy ever ended up at Boot Ranch in Texas is because Roger Clemens and his wife, for those of you who did not know that he was married, told Jowdy they would not accept a FREE house at Diamante as a gift from Jowdy to Clemens (at our expense), and that they wanted to build at a resort in Texas (called Boot Ranch) to be next to their close friend, Andy Petite. Jowdy and his development team, that did not include any of the Diamante investors, worked day and night on site in Texas and in the Diamante offices, to pull off the funding deal with Masood Bhatti from Lehman Brothers a year after we closed in Cabo and had made no progress. No other lender on the planet would have funded another deal for Jowdy (considering there was NO development progress in Cabo) before he showed some successes. Even more astonishing, later that same year (2007), Jowdy and Bhatti funded another project in Tennessee that Jowdy became the owner of the deal without any of the Diamante investors involved. Please call Philip Jones from Tantara Partners in Tennessee (work-(615) 591-8847 or cell-(615) 394-2029) to confirm that all of the Cabo and El Rosario frauds, all of the Texas frauds, are in fact the same scams and frauds that Bhatti and Jowdy pulled on them in Tennessee. Jowdy and his development team, Legacy Properties, also milked millions of dollars out of the Tennessee project before it was forced into bankruptcy in 2008. Please ask Philip Jones if he was told within 18 months he would be paid $3 million as a result of signing over the deal to Jowdy and Lehman Brothers. This is the same scam that Jowdy and Masood Bhati from Lehman Brothers

had us sign in Hawaii one year earlier. YOU CANNOT MAKE THIS STUFF UP. Again, Philip Jones can be reached at work: (615) 591-8847 or cell: (615) 394-2029.

If there is nothing for Jowdy to hide from, why is he continuing to spend tens of thousands of dollars on Mexican legal work to avoid being in a courtroom and facing the frauds? He again has presented to the courts in Mexico City that the San Jose Courts are not in sync with Mexico City and has asked for another delay. Keep in mind that he has lost his actions in both courts. His day is coming and his lies have been exposed. He is playing his last, desperate card, DELAY!

I know that many of you have been listening to the Jowdy led rhetoric through the voice of Bryan Berard and John Kaiser who have a personal bone to pick with me unrelated to any of you. I am glad to discuss the details of that issue with any of you that I have not shared this with already, so you have 100% of the details. Again, I have nothing to hide. They are unfortunately dragging each of you into their issues with me, to the 100% detriment of getting any of your funds back from the Jowdy frauds over the years. I have heard from many of you that Berard and/or Kaiser have stated they never knew about loans that were made to Jowdy over the years. These are lies led by their complete and utter frustrations. They have told all of you that there has never been legal actions &/or arrest and search warrants for Jowdy in Mexico based on their personal research in Mexico for all of you and Jowdy's legal team's assistance. These are lies led by their complete and utter frustrations. You have now seen the Federal Court websites to contradict these statements. Jowdy has again worked very hard to avoid paying any of us for the loans and investments we made as well as spread erroneous information to anyone who would like to listen. He has found a number of suckers along the way who have done just that.

IF some of you are now upset about decisions that were made in the Hawaii project, keep in mind that John Kaiser was with me side-by-side during every decision from 2002 to the Lehman closing in 2006. The group in Hawaii received almost $7mm at the closing that was distributed to everyone involved in the project. Each one of you involved in Hawaii signed the consent forms acknowledging the entire deal. If you need a copy of the 7-page disclosure letter that each of you received in order to sign this Consent Letter, I will gladly send it to you. LEHMAN BROTHERS required that EACH ONE OF YOU SIGN THIS CONSENT LETTER IN ORDER TO FACILITATE CLOSING. Nothing is hidden from you regarding the entire scope of the Joint Venture we did in Hawaii in 2006. Keep in mind that the disclosure letter was

written by Bill Najam (Jowdy's brother-in-law) and approved by Lehman Brothers as the necessary disclosure for everyone to know everything before the closing. Nothing was kept from the investors. John Kaiser reviewed, signed and approved the letter, as well. If you think that Kaiser was unaware of the loan business with Jowdy for Mexico, you will enjoy the Kaiser testimony below specifically related to his personal $1mm investment in Hawaii for the purpose of lending the funds to Jowdy at a 15% return. By the way, Jowdy has still not paid back that loan either! Berard graciously testifies to his 100% knowledge of the loans PLUS the fact he had his own family attorneys look at EVERYTHING before he signed it, EVERYTHING! Please see the attached By-Laws from Little Isle 4, LLC that were written in 2002 that clearly state in the Special Projects section that the Managing Member can ...."xxxxxxxx" as long as it is consistent with the intentions of the LLC. Obviously, making money was an intention of the LLC, unless someone wants to debate this with me.

Berard and Kaiser testimony from the Nolan Arbitration:

FROM The NOLAN v. Kenner ARBITRATION in 2009

19 BRYAN BERARD,
20 having been first duly sworn, was examined and testified as
21 follows:
22
23 DIRECT EXAMINATION
24 BY MR. RICHARDS:
25 Q. Do you know who the first pick of the 1994 NHL
_ 914
1 draft was?
2 A. Yes.
3 Q. Who's that?
4 A. '94, Jovanovski.
5 Q. What about '95?
6 A. Myself.
7 Q. Now, do you see anybody in the room that you
8 know?
9 A. Yes.
10 Q. And can you point out to someone that's currently
11 your business manager?
12 A. Yes, Phil Kenner.
13 Q. Are you an investor in some real estate deals in
14 Hawaii and Cabo San Lucas?

15 A. Yes.

16 Q. And prior to investing in those transactions can

17 you just tell the panel what type of diligence or things

18 you did before you made the investment?

19 A. Sure. I knew Phil was involved with a few land

20 deals that to me sounded pretty interesting. I kind of

21 called Phil. We had a discussion about the properties. I

22 got on the plane. I met Phil.

23 I think it was Mexico -- the North Baja property

Page 75

Day5.txt

24 I saw first. I loved it. I got involved in that. I

25 invested $500,000 of my money into that, and I believe Cabo

__ 915

1 was next. I took a plane and went down and saw Cabo. It

2 looked like a great piece of property. I was interested in

3 it. I obviously invested money, $200,000.

4 Q. You don't need to tell us the amount. That's

5 your personal business.

6 A. Again, in Hawaii, I was definitely interested. I

7 got on a plane and went and saw Hawaii. Again, I thought

8 it was a great deal, and I got involved.

9 Q. When you were -- as far as the Hawaii deal, were

10 you made aware of any sort of transaction Mr. Kenner set up

11 where you can give a commitment or pledge a credit line in

12 lieu of putting all your money in initially?

13 A. Yes.

14 Q. Can you tell the panel what was your

15 understanding?

16 A. Basically the company -- it was set up. The

17 company would pay the payments. I would pledge the money,

18 obviously to get the loan for the property. Again, the

19 company would pay the payments, and I wasn't forfeiting all

20 the amount of money for the piece of property.

21 Q. Were you aware that Mr. Kenner got a credit line

22 against some securities or investments you had?

23 A. Yes.

24 Q. And later on were you aware that Mr. Kenner

25 starting lending this money to another principal in the

__ 916

1 Cabo project named Ken Jowdy?

2 A. Yes.

Kenner was charged with Count 7 & 8 for making the payments Berard and the other investors expected to be made...

PK-000155366
PK-000155366

Page 76

Day5.txt

3 Q. Were you aware that he had disclosed to you that

4 he was going to lend this money at a rate of interest to

5 benefit the investors?

6 A. Yes.

7 Q. And with respect to the --

8 MR. MEEKS: Objection. Leading.

9 ARBITRATOR MEYERSON: I'm sorry?

10 MR. MEEKS: I just want to point out that we're

11 leading this witness quite a bit.

12 ARBITRATOR MEYERSON: Sustained.

13 Q. BY MR. RICHARDS: Where did you think the money

14 that Mr. Jowdy -- were you told where the money was going

15 to be used that was given Mr. Jowdy as far as the Mexican

16 project? Was there anything you were told about that?

17 A. Basically just loan him the money for the

18 property.

19 Q. What about bank statements; did you have any

20 problem getting any of your bank statements from Mr. Kenner

21 at any time?

22 A. Not at all.

23 Q. And prior to signing any of these documents did

24 you have access to your own attorney unconnected to

25 Mr. Kenner to review this?

_ 917

1 A. Yes, I did. We have a family attorney back home

2 where before I sign any documents basically -- I went to

3 his office, sat with him. We reviewed them, and I signed

4 them and basically FedEx'd them to Phil.

5 Q. At any time did Phil ever recommend or push these

6 investments on you?

Page 77

Day5.txt

7 A. Not at all. It was something I wanted to be

8 involved in.

9 Q. At any time did Phil pressure you to sign any

10 documents let's say on property or anything?

11 A. Not at all.

12 Q. Was everything very transparent and relaxed?

13 A. Something I wanted to do. I saw the properties

14 in person, and I was very interested.

PK-000155367
PK-000155367

15 Q. At any time did Mr. Kenner or the people that
16 were showing you the properties, like Mr. Jowdy, promise
17 you some sort of return on your investment?
18 A. Not at all.
19 Q. At any time did someone tell you that you would
20 be able to get this money back at a specific date?
21 A. Not at all.
22 Q. Did you understand that investing in a
23 transaction like this, that your money could be tied up for
24 a while?
25 A. Yes, I understand how that works.
__ 918
1 MR. RICHARDS: I have no further questions.
2 ARBITRATOR MEYERSON: Thank you.
3
4 CROSS-EXAMINATION
5 BY MR. MEEKS:
6 Q. Good morning. Thank you for coming. Did you and
7 Mr. Kenner own a property here in Scottsdale together?
8 A. Own a property?
9 Q. Yes.
10 A. I don't think I own --
11 Q. You did not own a property together?
Page 78
Day5.txt
12 A. I think there's a mortgage that was in my name.
13 Q. Could you flip to Exhibit Number 170? It's in
14 front of you. If you could look in this book down towards
15 the bottom there's a tab on the right that says 170.
16 I'm sorry. I think I've got the wrong number on
17 my notes. I'm sorry. 171.
18 Mr. Berard, did you sign this quitclaim deed
19 along with Mr. Kenner?
20 MR. RICHARDS: What exhibit are you on?
21 Q. BY MR. MEEKS: Did you sign this quitclaim deed
22 along with Mr. Kenner to this property to John Kaiser?
23 A. Yes.
24 Q. You signed this last year after this lawsuit was
25 filed?
__ 919
1 A. Yes.
2 Q. But actually did Mr. Kaiser pay anything for that

*This is the deed that Berard claimed was a forgery during the 2015 Arizona trial...*

PK-000155368
PK-000155368

3 property?

4 A. Not that I know of.

5 MR. MEEKS: Thank you. No further questions.

6 MR. RICHARDS: No further questions.

7 ARBITRATOR MEYERSON: Questions?

8 ARBITRATOR CAMPBELL: What's the property about?

9 MR. RICHARDS: It's nothing to do with this case.

10 ARBITRATOR CAMPBELL: I was asking him.

11 THE WITNESS: The property is a house in PV

12 basically they are renovating to sell. I think the

13 mortgage is in my name.

14 ARBITRATOR MEYERSON: Anything else?

15 Frank, any questions?

16 Thank you very much. Have a nice day.

Page 79

JOHN Kaiser TESTIMONY IN 2009

17 MR. RICHARDS: John Kaiser.

18

19 JOHN KAISER,

20 having been first duly sworn, was examined and testified as

21 follows:

22

23 DIRECT EXAMINATION

24 BY MR. RICHARDS:

25 Q. Can you tell the panel what your background and

_ 920

1 training in law enforcement is?

2 A. I was a New York City police officer for

3 approximately six years, and I went to Suffolk County, who

4 I retired from, Suffolk County Police Department in New

5 York. I was a defensive tactics instructor, trained

6 throughout the country and world.

7 I specialized in narcotics and taking guns,

8 working both. I also did some community orientation of

9 police enforcement out in Suffolk County.

10 Q. Are you presently the manager of any LLC in the

11 state of Hawaii?

12 A. Yes.

PK-000155369

PK-000155369

13 Q. What's that?

14 A. Na'Alehu Ventures.

15 Q. Are you familiar with the properties that were

16 subject to the Lehman Brothers financing that are issued in

17 this litigation?

18 A. Yes, I am.

19 Q. And are you aware that the Nolans are investors

20 in Little Isle IV, which is part of a group of LLCs that

21 owns 50 percent of a joint venture with Windwalker, the

Page 80

Day5.txt

22 Nolans and Alan Wordan?

23 A. Yes, I have.

24 Q. Have you spoken to the Nolans on the phone

25 before?

_ 921

1 A. Yes.

2 Q. What was that conversation about?

3 A. I had a couple of conversations. We also

4 talked -- they were trying to build a house, so I was

5 trying to help him out. I don't think we ever met. They

6 were very nice -- they were very nice people.

7 The last conversation I had was in reference to

8 the house, if they needed help on it or any kind of -- they

9 were trying to get a house built.

10 Q. Now, with respect to cash, the entities that made

11 up your investor pool with Little Isle IV, did they have

12 some cash that was sitting around waiting for a potential

13 closing to occur?

14 A. Yes.

15 Q. Tell us what your experience was with respect to

16 that money right at the point there was a decision made to

17 start loaning money to Mr. -- that Mr. Kenner had made a

18 decision to start loaning some of that investor money to

19 Mr. Jowdy.

20 A. Any money that was allocated towards land for the

21 Hawaiian Investment Group that wasn't being used -- we

22 ended up ultimately purchasing about 6,000 acres. There

23 were some parcels we were looking at.

24 The due diligence in Hawaii takes a long time, so

25 if you find something, it takes a long time to actually do

_ 922

PK-000155370
PK-000155370

Page 81
Day5.txt

1 all the due diligence to purchase it. So if we had some
2 funds that were -- that was stagnant and that warrant
3 purchasing land, we would utilize it for a loan, so we
4 actually made some money off of it.
5 Q. Just so the panel doesn't get confused, I'm
6 talking -- I want to direct your attention prior to April
7 26th, 2006. Were you a manager prior to that time?
8 A. No, I was not.
9 Q. At that time were you an investor?
10 A. Yes.
11 Q. How much of your own money did you have invested
12 in this Hawaii project?
13 A. 1.1 million.
14 Q. Dollars?
15 A. Dollars.
16 Q. Did Mr. Kenner make you aware that he was going
17 to be lending some money?
18 ARBITRATOR CAMPBELL: Can you just clarify for me
19 when he went from an investor to being an actual manager of
20 the property again?
21 Q. BY MR. RICHARDS: August of 2006 -- after the
22 Lehman Brothers -- after the Lehman Brothers refinancing
23 did you become a manager?
24 A. It wasn't right away. I actually thought it was
25 in '07. I don't have --
_ 923
1 Q. '07?
2 A. I don't have the document in front of me.
3 MR. RICHARDS: Prior to '07 he was an investor
4 only.

Ethel Kaiser denied this at the 2015 trial (*Tr.938*)

Page 82
Day5.txt

5 THE WITNESS: I'm actually the person who found
6 the property in 2002 and who funded it prior to Mr. Kenner.
7 Q. BY MR. RICHARDS: Okay. And at some point you
8 were made aware as an investor that this money was going to
9 be lent on a short-term basis to Mr. Jowdy?
10 A. Yes.
11 Q. And what was your understanding of how it was
12 supposed to get paid back?

13 A. Well, the first -- my first concern was to make
14 sure that he had some collateral so it could get paid back,
15 which he did. It was a parcel in Mexico, on North Baja,
16 and that was his collateral. I think he had 70 percent
17 interest, and I think the property was appraised maybe at
18 30-, 35 million.

Kaiser confirms loan agreement with Jowdy (*3500-KJ-2 at 24-25*)

19 Q. Was Mr. Jowdy at that time someone that appeared
20 credible to you?
21 A. Yes.
22 Q. Why is that?
23 A. Well, the first thing, Mr. Kenner told me he was,
24 and I met him a couple of times. He seemed -- a big thing
25 it was 15 percent interest rate, and I thought it was a
_ 924
1 good move.
2 Q. Did Mr. Jowdy have anything to do with bringing
3 Lehman Brothers to your Hawaii project?
4 A. Yes.
5 ARBITRATOR MEYERSON: I'm a little confused. I
6 understood the warrants were made before 2006. He didn't
7 become the manager until 2007 --
8 MR. RICHARDS: You're right.
9 ARBITRATOR MEYERSON: And so was his status at
Page 83
Day5.txt
10 the time simply an investor?
11 MR. RICHARDS: Yes. That's why I'm offering him
12 as a witness. That's correct.
13 ARBITRATOR MEYERSON: I thought you were offering
14 him as some special knowledge about --
15 MR. RICHARDS: He found the property. He had a
16 lot of knowledge, but I wanted to show you that he became a
17 manager later, but at the time --
18 ARBITRATOR MEYERSON: He was an investor in the
19 same status as the other investors at the time of these
20 transactions?
21 MR. RICHARDS: $1.1 million.
22 ARBITRATOR MEYERSON: I understand.
23 Q. BY MR. RICHARDS: So in your investor pool, your
24 money was with all the other investor money, correct?
25 A. Correct.
_ 925

1 Q. So at the time was there any representation about
2 getting paid back this money when the Cabo deal closed?
3 A. It was supposed to be a short-term loan. I
4 thought it was three to six months, because I had also
5 raised some other funds from family and friends that were
6 getting a little antsy about it.
7 Q. Go ahead.
8 A. That's it.
9 Q. Now, you retired from the police due to a medical
10 reason?
11 A. Yes.
12 Q. An injury on the job?
13 A. Injuries, yes.
14 Q. You'd been dealing with Mr. Kenner now for a
Page 84
Day5.txt
15 couple of years?
16 A. Yes.
17 Q. Have you ever seen him do anything inappropriate?
18 A. No.
19 Q. As a police officer you have no problem arresting
20 Mr. Kenner if you saw him stealing your money basically?
21 A. I certainly would.
22 Q. And you have never been convicted of any offense,
23 correct?
24 A. No. No.
25 Q. You are also an expert in martial arts?
... 926
1 A. Correct.
2 Q. And you have $1.1 million of your money in this
3 deal?
4 A. Correct.
5 Q. Did anybody at the time anticipate that Mr. Jowdy
6 wasn't going to pay you guys back when the Cabo deal
7 closed?
8 A. Say that again.
9 Q. At the time this money was lent to Mr. Jowdy to
10 be spent in the Mexican project, did anybody anticipate he
11 wasn't going to pay you back when the Cabo deal closed, the
12 Lehman's Cabo deal?
13 A. No. Otherwise I wouldn't have lent it. I
14 wouldn't want to go down that route.

This would have post-dated the fabricated "*confrontation*" meeting (Tr.983) -- and allegedly not being re-paid by Kenner-Hawaii for the 30-day loan (Tr.1105) -- and allegedly not being repaid the million-plus from the California project (Tr.1042) -- and allegedly stealing the Sag Harbor money from him (Tr.1005,1009)...
*

***BUT NOTHIGN INAPPROPRIATE!***

PK-000155373
PK-000155373

15 Q. Did Mr. Jowdy -- as far as the credibility issue,
16 why did you feel it was credible that he was bring -- why
17 did it give Jowdy credibility that he bought Lehman to
18 Hawaii?
19 A. He had a very good relationship with, I believe
Page 85
Day5.txt
20 his name is Masood, who actually he was the lead guy for
21 Lehman, and they were very close.
22 Q. Did Mr. Jowdy appear to be someone that was
23 credible and had assets or someone that was broke and a
24 thief?
25 A. No. He had assets. I believe he was very
__ 927
1 credible at the time.
2 Q. As you're aware he hasn't paid the money back,
3 right?
4 A. Correct.
5 Q. Do you blame Mr. Kenner for him not paying the
6 money back?
7 A. No.
8 Q. When you made the decision -- or when you were
9 made aware that some of this money was going to be lent,
10 rather than sitting idle in an account, at 15 percent, did
11 you know there were some risks?
12 A. At the 15 percent -- actually, the loans, I
13 didn't think they were going to be -- to me it wasn't a
14 risky loan.
15 Now, some of the land purchases were a risk. It
16 was a few miles away from a volcano. It was a tough sale.
17 But the loans -- even investors that I brought in, I said,
18 Listen. This guy -- I gave him the whole story about Ken
19 Jowdy backed by land. It's good. Better than your money
20 sitting somewhere.
21 Q. And being in the course of the years you've been
22 over in Hawaii dealing with this, have you met a lot of
23 investors of Mr. Kenner?
24 A. Yes.
Page 86
Day5.txt
25 Q. Has this ever been a secret that Mr. Kenner lent
__ 928

Kaiser is referencing the loan agreement that he confirmed in 2015 he had at his home for over a decade since his first meetings with Jowdy about the loans (Tr.1127) -- as he described to the FBI in 2010 (*3500-JK-1-r at 2,3,10*)

PK-000155374
PK-000155374

1 this money to Mr. Jowdy?

2 A. No.

3 Q. Was this a transaction that, as your view as an

4 investor was open and disclosed to everybody?

5 A. It was open. There was no secret handshakes or

6 nothing like that.

7 Q. Even now, sitting here in May of 2009, is there

8 anything that you've uncovered, as someone that obviously

9 knows how to investigate, that Mr. Kenner has done anything

10 inappropriate throughout these transactions?

11 A. No.

12 Q. Not one complaint?

13 A. None.

14 MR. RICHARDS: I'll pass the witness.

15 ARBITRATOR MEYERSON: Thank you.

16

17 CROSS-EXAMINATION

18 BY MR. MEEKS:

19 Q. Mr. Kaiser, how are you?

20 A. I'm hanging in there.

21 Q. Good. In 2000 -- at some point did Mr. Kenner

22 transfer --

23 MR. RICHARDS: Mr. Kaiser, just face the court

24 because they have to hear you.

25 Q. BY MR. MEEKS: At some point did Mr. Kenner

_ 929

1 transfer like 90 percent of his interest in the Na'alehu

2 entity to you?

Page 87

Day5.txt

3 A. Yes.

4 Q. When did that happen?

5 A. In '07.

6 Q. Right. And why did that happen?

7 A. He needed some money. He was actually trying to

8 actively work out a negotiation with Mr. Jowdy.

9 Q. Okay. And you paid him for that?

10 A. Yes.

11 Q. How much did you pay him?

12 A. I don't recall the exact amount.

13 Q. Can you recall roughly?

14 A. 3- or 400,000.

See list, *supra...*

15 Q. 3- or 400,000 for --

16 A. It was more of a -- if I can finish. It was more

17 of a loan. He always had an option to get it back, to get

18 out from under, so ...

19 Q. As of today you own 90 percent of Mr. Kenner's

20 interest in Na'alehu Ventures?

21 A. That's correct.

22 Q. And do you recall on October 10th of last year

23 Mr. Kenner and Mr. Berard quitclaiming a deed to the

24 property here in Phoenix to you?

25 A. What's the address?

_ 930

1 Q. It's in Camelback Country Club Estates. It says

2 it's a quitclaim to John R. Kaiser, trustee of the

3 Shangri-La Trust in 1999.

4 A. M'hum. Yes.

5 Q. What was the reason for that transfer?

6 A. I paid for the house.

7 Q. You paid for the house?

Page 88

Day5.txt

8 A. Yes. Myself and investors.

9 Q. And when did you pay for the house?

10 A. On the purchase.

11 Q. When?

12 A. I don't know. You have the document in your

13 hand.

14 Q. In October --

15 A. I want to say about a year ago.

16 Q. On October 3rd, 2008, you paid for this house?

17 A. Yes.

18 Q. How much did you pay?

19 A. 1.6-.

20 MR. RICHARDS: Well, don't confuse the witness.

21 You're looking at the quitclaim deed. Don't confuse --

22 ARBITRATOR MEYERSON: Direct your comments to me.

23 MR. RICHARDS: My --

24 ARBITRATOR MEYERSON: Hang on. If you have an

25 objection, make it.

_ 931

1 MR. RICHARDS: My objection is it's not proper

2 questioning if counsel has a document that he knows is not

PK-000155376
PK-000155376

3 the grant deed. He knows it's a quitclaim deed. He's

4 intentionally confusing the witness.

5 ARBITRATOR MEYERSON: I don't think

6 intentionally.

7 MR. RICHARDS: I'm not saying intentionally,

8 but --

9 ARBITRATOR MEYERSON: If you have any questions

10 and want to refer to a document, you're free to answer.

11 Q. BY MR. MEEKS: Was your name on the title to that

12 property when you purchased it?

Page 89

Day5.txt

13 A. No.

14 Q. Whose name was on the title?

15 A. Mr. Kenner.

16 Q. Why was Mr. Kenner's name on the title?

17 A. Because I live in New York. He lives here, right

18 next to the place.

19 As far as doing renovation, the permit process --

20 I have four kids at home. I didn't want to be going back

21 and forth. It was just easier that way.

22 MR. MEEKS: No further questions.

23 REDIRECT EXAMINATION

24 BY MR. RICHARDS:

25 Q. Did you have any problem trusting Mr. Kenner to

__ 932

1 transfer the property to you at the time you wanted it

2 transferred?

3 A. No. Once I said I wanted it transferred, he did

4 it.

5 Q. That wasn't part of some underhanded secretion of

6 assets from Mr. Kenner, was it?

7 A. No. I know they had a forensic accountant that

8 charged $120,000. I'm sure he could track it down, where

9 the funds came from.

10 Q. The bottom line is you had no problem trusting

11 Mr. Kenner to acquire this house for you, right?

12 A. Exactly right. Correct.

13 ARBITRATOR CAMPBELL: What side of management do

14 you do for the Hawaii properties?

15 THE WITNESS: My role has been basically, since I

16 became managing member, working on getting our K-1s back,

PK-000155377

PK-000155377

17 and reaching those milestones. That's my primary objective

Page 90

Day5.txt

18 back and forth.

19 ARBITRATOR CAMPBELL: Is there any development

20 going on?

21 THE WITNESS: Right now all the permits in -- all

22 the permits on the property is in a holding pattern right

23 now in reference to the funding and as to the issue with

24 legal.

25 ARBITRATOR CAMPBELL: Do you spend a substantial

_ 933

1 amount of time out there on the Big Island?

2 THE WITNESS: I used to fly back and forth quite

3 a lot. Not anymore. I'm sure everyone knows -- Windwalker

4 actually took over the day-to-day operation, who are our JV

5 partners.

6 ARBITRATOR CAMPBELL: They're doing most of the

7 work on it now?

8 THE WITNESS: They are still waiting for

9 infrastructure. Like I said, it's a very tough task to get

10 all the permit process. All that is up to date and ready

11 to go. We'll start digging as soon as we get some funding

12 again, which Alan is working on right now.

13 MR. RICHARDS: Just for the panel, I drew like

14 a -- what's this thing called when you have bubbles and

15 then the lines? Diagram? I had a diagram drawn for me

16 that I put on my computer. Would it help if I draw a

17 diagram of the various entities that make up the 50/50 --

18 once I saw it in a diagram it made sense.

19 ARBITRATOR CAMPBELL: No.

20 ARBITRATOR MEYERSON: Thank you very much.

21 MR. RICHARDS: I have one follow-up based on your

22 question.

Page 91

Day5.txt

23 Q. BY MR. RICHARDS: Just so we're clear, Windwalker

24 Holdings, slash, Alan Wordan, they're responsible now to

25 get the funding. They are in charge of the project?

_ 934

1 A. That is correct.

2 Q. Is that why you're not flying out there?

Kaiser took a job with Jowdy in 2011 instead of filing litigation for the $4 million of MILESTONE payments et. al. versus Jowdy's friend from Lehman Brothers and the Hawaii JV partner -- another friend who is being paid by Jowdy in Cabo according to Kaiser's February 2019 shocking letter (*ECF 628*)...

PK-000155378

PK-000155378

3 A. Windwalker actually took over the day-to-day
4 operation. So they're in charge of that unless -- any big
5 decisions, they'll notify me if something is going to
6 change, a big movement or to re-fund it again. Right now
7 they are just kind of crawling along.
8 Q. Do you think they are in a better position than
9 you are to get it funded?
10 A. Yes.
11 MR. RICHARDS: Thank you.
12 ARBITRATOR MEYERSON: No questions. Thank you
13 very much.

Is there any wonder about what Kaiser and Berard have known all along, but now they want to try and find another way to get their money back, at anyone or everyone's expense.  If Jowdy is left as the only solution to getting our money back from loans or investments, there is NO CHANCE you will ever see a dime.  Trust me, I would like to believe it is possible, because I stand to recover funds like everyone else.  He has not made a single effort to discuss a payment option, even with Glen Murray who won a $1mm judgment, with any of us.  Instead, Jowdy continues to hide behind the Chinese wall in Cabo with 24-hour security.  In conclusion, Jowdy has received over $20mm of our funds in the last 10 years, he has repaid none to us, he has squandered millions on Roger Clemens, women for Clemens, trips for Clemens, paid tens of thousands of dollars to Brian McNamee to try and dissuade McNamee from testifying against his friend, bankrupted projects, left our planes to foreclosure...& oh yeah, made millions along the way from the budgets he has looted.  QUESTIONS?

As always, I am available for discussions...IF YOU WANT TO GET YOUR MONEY BACK!

pk

PK-000155379
PK-000155379