January 10, 2020

The Honorable Judge Bianco
U.S. District Court – EDNY
100 Federal Plaza
Central Islip, NY 11722

### Re: Forfeiture And Money Judgment Reply To Government ECF No. 780

Your Honor,

The defendant is in receipt of the government's forfeiture and money judgment submission of 12/20/2019.  Once again, they have ignored their responsibilities to "**trace the money**" and comply with statute and precedent controlling case law – that requires for forfeiture and money judgment:

1. Separating the criminal from their ill-gotten gains (*See United States v. Shkreli, 2019 U.S. Appx. LEXIS 21248 (2nd Cir 2019)*).

The Shkreli Court opined: "Criminal forfeiture focuses on the disgorgement by a defendant of his ill-gotten gains."  *United States v. Contorinis*, 692 F.3d at 146 (internal quotation marks omitted); *United States v. Torres*, 703 F.3d 194, 203 (2nd Cir 2012) ("'[F]orfeiture is gain based' not based on the losses (or gains) to victims." (internal quotation marks omitted)); *Shkreli at 6-7*.

This response is not addressing the statutory requirements for "credits against loss issues", or "separating the fraud from the non-fraud factors" (*Ebbers*), &/or the investors "receiving all they bargained for" (*Novak, Leonard*) as the Second Circuit has demanded for loss calculations – related to sentencing guidelines and restitution.

The assessment of "ill-gotten gains" (**a.k.a. proceeds**) that Kenner obtained as part of the government allegations is the focus, *infra*.   *No more than $280,000 ill-gotten gains can be traced to Kenner.*

- Although this amount is disputed by Kenner (as well), the Court should note that Kenner was forced to walk-away from over $500,000 of profit in his Hawai'i home when the 2006 JV partner and Lehman Brothers demanded it at Kenner's original purchase price (minus appreciation) "as part of the deal" to consummate the August 2006 deal "or else".   For almost twice the alleged and calculable "*ill-gotten*" amount, Kenner could have simply sold his Hawai'i home in 2006, abandoned the project whose financing issues became difficult, and passed the

1

Managing Member status to John Kaiser earlier than the 2007 documented transfer (which included another $360,000 Kaiser acquired at the closing and retained from his friends & family documented thefts).  *It is completely nonsensical*, and certainly not the actions of an individual the government claim "*threw away his life of privilege when he agreed to pursue a life of crime*".

The Second Circuit has recently opined regarding the Supreme Court *Honeycutt*[1] ruling in 2017, "While we have not yet fully defined the parameters of *Honeycutt*, this much is true: *Honeycutt*'s bar against joint and severable forfeiture for co-conspirators applies only to co-conspirators who never possessed the tainted proceeds of their crimes."  See *id. at 1630* ("[A] defendant may not be held joint and severably liable for property that his co-conspirator derived from the crime but that the defendant himself did not acquire." (emphasis added)); *id. at 1631-33*.  Since the Honeycutt decision, the government in the Second Circuit conceded the *Honeycutt* application to Title 18 cases *Gil-Geurerro* and *Fuimano* (like the instant case), conceding its inevitability so as not to waste the court's time and resources in the future on remand.

- Under Honeycutt's Supreme Court logic, only the loan repayment amounts (totaling approximately $280,000) from Constantine and Gaarn's private Eufora stock sales would be attributable to Kenner for forfeiture and money judgment.

In *United States v. Tanner*, 942 F.3d 60 (2d Cir 2019), the Court referenced *Honeycutt*, ("the District Court erred in ordering the defendants to forfeit more than the amount of their criminal proceeds").  In the instant case, the government seeks $36 million forfeiture money judgment, when the entire universe of alleged victim contributions (before all offsets, deductions and non-fraud factors) does not exceed $8.8 million.  It is wholly unreasonable under any calculation methodology (certainly one that is unsubstantiated by the government or Probation, short of an unacceptable *ipse dixit* method, which has not been approved in any district to date).

Probation's summary table (at page 11 of their original submission)[2] of loss was objected to by Kenner; on the basis of totals, their indications of nexus, and at least three individuals who were not named in the superseding indictment by the

---

[1] *Honeycutt v. United States*, ____ U.S. ____, 137 S. Ct. 1626, 198 L. Ed. 2d 73 (2017)

[2] The Court should note that Probation prepared the Kenner report on January 25, 2015 – four (4) months *before* the Kenner trial even began.

government, by choice (*ECF No. 214*); see *Hughey*.[3]  Probation was given the opportunity by the District Court in 2019 to reply to Kenner's final (ProSe) objections of March 27, 2019.  *They declined*.  The statute requires that, if challenged thru objection, the government or Probation <u>must</u> provide substantive back-up data to support their calculations and present their methodology to the Court for review and face oral argument by the defendant.  *They declined to do so*.

The government's summary tables (*ECF No. 765 at 30-31*) <u>*again*</u> included several individuals that are not named in the superseding indictment; while finally conceding several other non-victims (with no money involved in the instant case). Kenner raised this objection during the December 6, 2019 hearing (*ECF No. 780-1 at 56*) and previously via letter to the Court (*ECF No. 770 at 2*).  It went unresponded to by the government, primarily because there is no proper or contrarian responsive position that isn't meritless.

Thus, the "*proceeds*" received by Kenner as part and parcel of the superseding indictment's allegations are documented for the Court, *infra*.

[The remainder of this page left intentionally blank]

---

[3] Since the Supreme Court decided *Hughey* almost thirty years ago, prosecutorial decisions to frame indictments with a "view to success at trial rather than to a victim's interest in full compensation" are made with a full understanding of the potential consequences; See *Hughey v. United States*, 495 U.S. 411, 421 (1990).  **There are tradeoffs in such decisions**.

## Money Judgment And Forfeiture Calculations

(Funds traceable to the "objects" of the charges)

| | Hawai'i (£) | GSF (ø) | Eufora (∞) |
|---|---|---|---|
| Peca | 240,000 | 250,000 | 100,000[4] |
| Nolan | 425,000 | | |
| Berard | 150,000 | | |
| Rucchin | 300,000 | 50,000 | 150,000[5] |
| Sydor | 200,000 | 250,000 | 50,000 |
| Ranford | | 300,000 | 300,000[5] |
| McKee | | 250,000 | |
| Nash | | 100,000 | 100,000[4] |
| J. Kaiser | 1,280,000 [6] | | |
| E. Kaiser | | | 66,667[7] |
| Privitello | | | 200,000 (Ω) |
| Hughes (μ) | | | 66,667[7] |
| Rizzi (μ) | | | 66,667[7] |
| **TOTALS** | **1,315,000** | **1,200,000** | **1,100,000** |

[4] Constantine distributed (**$117,000**) to Kenner:

> *4-7-2008 -- $100,000 from the Peca transaction thru Constantine to Kenner; and*
> *4-28-2008 -- $17,000 from the Nash transaction thru Constantine to Kenner...*

[5] Gaarn distributed (**$162,500**) to Kenner:

> *2-19-2009 -- $30,000 from the Rucchin transaction thru Gaarn to Kenner;*
> *4-17-2009 -- $47,500 from the Rucchin transaction thru Gaarn to Kenner; and*
> *5-04-2009 -- $85,000 from the Ranford transaction thru Gaarn to Kenner...*

[6] Kaiser was fully repaid in August 2006 as originally negotiated and consistent with his 2009 arbitration testimony confirmed.  It is 100% confirmed by the Hawai'i banking records (*Bates stamp: NAAV000433-35*), pursuant to the 2006 Lehman Brothers closing.

Wholly fabricated in 2015 -- Kaiser testified that his friends & family were repaid by him personally in 2006 (*Tr.980*), but his own 2011 texts to Kenner and other debunking evidence (*ECF No. 785 at 7*), *infra*, confirm more Kaiser trial perjury &/or a willing government suborning the perjury, perhaps including Ethel Kaiser as well (*Tr.933*) to cover her son's "repayment story lie".

- The government has failed to produce Kaiser's 2006 or 2007 IRS tax returns to substantiate his "*back pay*" claims of $195,000 (*Tr.1413-14*).
- The government and Kaiser have also refused to produce even a single dollar of "*expenses*" Kaiser claims the balance of the $816,000 he received in August 2005 was applied towards.  Zero "*expenses*" or anything similar were due to Kaiser from the Hawai'i project in 2006; premeditated *thus clearly another fraud on the Court and the jury – prejudicing the verdict.*

[7] Identical to the December 2009 Privitello-Eufora transaction, Kenner was wholly unaware of the John Kaiser-led transactions between his friends & family and Constantine (*Tr.1058-59*).

(µ) – Hughes and Rizzi were not named in the superseding indictment (*ECF No. 214*). They have been recently added to attempt and realize the U.S.S.G. § 2B1.1(b)(2)(A) enhancement (more than ten victims).   It is another attempt 5 years *after* the trial to move the goalposts.

(Ω) – Kenner was found not guilty of the two Privitello charges at trial.

(£) – **The Hawai'i "object"** charged two specific frauds; despite both charges being *authorized by the Little Isle 4 operating agreement* which imposed the authority of the Managing Member and governed its underlying corporate activities (*Kenner exhibit 217, introduced at Tr.4525-26*); (1) the Constantine consulting payments and (2) the 2004-06 loans to Ken Jowdy.  The details of each will be independently addressed, *infra*.   Source *ECF No. 770 at 54*.   Please note that no superseding indictment individuals were a traceable source of funds to the Constantine consulting payments (*ECF No. 214*).  The Constantine $1,000,900 consulting payments have <u>ZERO dollars</u> traceable to the superseding indictment investors (and $64,000 directly-traceable to Kenner's personal contributions). Government forensic witness Petrellese confirmed this to the Court (*Tr.3934*).

- *$1.315 million is where the Hawai'i partners' maximum calculation begins, not ends.*
- *==ZERO dollars are traceable to Kenner…thus no ill-gotten gains…==*

**Nexus**: The government **concedes** their forfeiture demand for DCSL after the Kenner oration on December 6, 2019 (*ECF No. 781-1 at 18-21*)…

The government realized they had been fully exposed by Kenner during his oral presentation of the $350,000 traceable to Nolan (and settled between Nolan and Jowdy over a decade ago).  The $350,000 is the only funds *government-forfeiture-36* connects to the Jowdy-Danske project in Cabo (thru the government's own **nexus** submission, implicating "Jowdy has it", not Kenner).   They cannot argue their-own evidence because they are unhappy with its specific results.

➢ The government attempted to disguise their "Plan B" in *footnote 2* asking for a $350,000 money judgment based on Nolan's lack of remembering "anything" about his LOC – hinting that assuming "*the Court does not order the forfeiture of DCSL in its entirety as property involved in and traceable to defendant' money laundering conspiracy*" (*ECF No. 780 at 6*).
➢ The government cannot arbitrarily say that the loans "*no one allegedly knew about were supposed to be used by Jowdy for the Cabo project*".  **That logic is dichotomous and meritless**.  Jowdy *stole* the authorized loan funds (as he was

sued for by the entire investment group in Mexico, Arizona, California and Delaware) and used it for "*only G-d knows what*"…That does not create a nexus to Kenner's LLC or anything Kenner.

(ø) – **The Global Settlement Fund ("GSF") "object"** charged misappropriation by Constantine of the GSF proceeds.  The Court determined that **Constantine overspent** the fund by **$17,077** using the most aggressive calculation against Constantine's spending (*ECF No. 501 at 60*).  Although the Court suggested at *ECF No. 501 at 60, footnote 18* that the $450,000 involved in the Juneau-GSF payoff may not have been authorized "by some", none of the $450,000 is traceable to any individual in the superseding indictment (*ECF No. 214*) (*GX-767*).

*No Kenner involvement…*
Testimony at trial by Michael Peca confirmed Kenner "*didn't seem to have one*" when asked about Kenner's GSF participation (*Tr.540*).  Testimony at trial by the custodian of the GSF funds (attorney Ronald Richards) confirmed "every" transaction was managed and authorized solely by Constantine (*Tr.3805-3816*).  Pre-trial, government witness, Tyson Nash, testified that Kenner had no role in the GSF (*3500-TN-3 at 12*).  Despite the government's droning about a *Kenner tequila company* (having something to do with the instant case), the government *never* traced money as promised, simply presenting a Red Herring to the Court and jury (*Tr.33, 726, **1074-76**, 1080-84, 1154, 4722-23 [GX-4509, **fake** tequila bottle], 4726-28, 5752 [summation while banging the bottle on the jury counter claiming it is real]*).  The details of each will be independently addressed, *infra starting at approximately page 40*.  Source *ECF No. 770 at 69*.

> ➢ *$1.2 million is where the GSF maximum calculation begins, not ends.*

> ➢ <mark>*Only $22,435 expense reimbursements are traceable to Kenner from the GSF (and originating from a non-victim)…thus no ill-gotten gains…*</mark>

(∞) – **The Eufora "object"** charged the 2008-09 private stock sales by Eufora Board member and AZ Eufora Partners I Managing Member, Tim Gaarn – and Eufora founder Tommy Constantine as "legal transactions", but concealed as to the post-sale use of proceeds (private stock sales versus treasury stock argument).  Although it was mis-represented at trial repeatedly by the government (*Tr.2173, 5970-71, 5973-74*), Kenner was neither a management member of Eufora or a shareholder of Eufora during the period of time of the private stock sales (2008-09) (and specifically *neither* since 2005, per the Eufora tax records – *GX-4728 at 10, 47* – and corporate records in evidence).  The government's own evidence verified these

crucial mis-representations (*GX-210 at 37*).   Kenner was merely a Eufora lender
(*GX-4728 at 10)* of $386,971.   The details of each will be independently addressed,
*infra starting at approximately page 39*.   Source *ECF No. 770 at 66*.

➤ *$700,000 is where the Eufora maximum loss begins, not ends.*

➤ ***$117,000** is traceable to Kenner from the Constantine 2008 sales and* $**162,500** *is
traceable to Kenner* from an innocent 3rd party, Tim Gaarn from his 2009 sales
    o ***Both*** re-paid Kenner for government-documented loans Kenner
      previously made to Constantine and Gaarn (*Tr.2580*);

➤ *…Thus no more than $280,000 ill-gotten gains can be traced to Kenner -- assuming
the vetted stock transactions by Rudy Giuliani's investigative team were
insufficient in determining the transactions they investigated for the same
investors in 2010-11…*
    o Please note that 29 Eufora investors and related parties signed-off on the
      Giuliani Groups' *July 16, 2010 disclosure letter*, which hi-lighted the alleged
      stock frauds by Gaarn – ironically alleged by Constantine himself (*ECF No.
      668 Appendix at 83-84*).   These sign-offs included *every* alleged superseding
      indictment victim PLUS Hughes and Rizzi (*ECF No. 781 at 1*) now alleged as
      victims; **both** *wholly unknown to Kenner.*
    o Over a year later – Giuliani attorney Stolper told the SEC he was in support of
      Kenner – and working side-by-side with Kenner's investors (from the instant
      case) (*ECF No. 730 at 41-42*) versus Jowdy for all of the frauds Kenner
      documented to this Court (*ECF No. 667*).
    o During Constantine's August 2010 Eufora conference call with all the Eufora
      investors, attorney Stolper called the Gaarn sales, claimed by Constantine as
      a criminal fraud, "*predictable*" – *because he and Giuliani's team had
      thoroughly investigated the allegations and found them meritless after
      discussing all of the 2008-09 investors knowledge of their private stock
      purchases* (*ECF No. 668 Appendix at 298-99, footnote 145*).
    o Michael Peca verified his real time knowledge of the allegations that his
      independent counsel refuted as "*predictable*" (*Tr.608*), so what about the
      private stock that Peca bought from Constantine could be considered
      concealed or criminal?

The government sought forfeiture under 18 U.S.C. § 981 (a)(1)(C), which renders
subject to forfeiture "[a]ny property, real or personal, which constitutes or is
derived from **proceeds** traceable to" a number of offenses…  "In cases involving
lawful goods or lawful services that are sold or provided in an illegal manner, the
term 'proceeds' means the amount of money *acquired* through the illegal

transactions resulting in forfeiture, less the direct costs incurred in providing the goods or services." *Id.* § 981 (a)(2)(B).

***Definitions:*** Several important word definitions apply in this instant case.   The *Oxford 10th Edition Dictionary* defines the following:

> **PROCEEDS**: Money **obtained** from an activity or event.

> **POSSESSED**: Have something as property; **own**.
> - As highlighted in *Contorinis*.

> **POSSESSION**: 1) A state of **owning** something, 2) A thing **owned**.

### Money Judgment And Forfeiture Calculations
### (*Funds traceable to Kenner as ill-gotten*)

|  | Hawai'i | GSF (Δ) | Eufora |
|---|---|---|---|
| Peca | 0 | 0 | 100,000[8] |
| Nolan | 0 |  |  |
| Berard | 0 |  |  |
| Rucchin | 0 | 0 | 77,500[9] |
| Sydor | 0 | 0 | 0 |
| Ranford |  | 0 | 85,000[9] |
| McKee |  | 0 |  |
| Nash |  | 0 | 17,000[8] |
| J. Kaiser | 0 |  |  |
| E. Kaiser |  |  | 0 |
| Privitello |  |  | 0 |
| Hughes |  |  | 0 |
| Rizzi |  |  | 0 |
| **TOTALS** | **0** | **0** | **279,500** |

(Δ) – The $22,435 expense payment distributed to Kenner from the GSF contributions originated 100% from a non-victim in the instant case (*GX-767*), nor was it ill-gotten.

As documented, *supra*, Kenner acquired no more than $280,000 from all "objects" of the instant case, far from the breadth of what the government considers Kenner's extremely reckless criminality to benefit (some undocumented way – and recover

---

[8] Distributed to Kenner as a result of the Constantine Eufora private stock sales.

[9] Distributed to Kenner as a result of the Gaarn Eufora private stock sales.

approximately $280,000 in documented loans), while throwing away "*lives that most defendants who come before courts in this district can only dream of living*" (*ECF No. 765 at 2*).  The government requested harsher punishment for Kenner for his "repayment" conduct that was vetted by Rudy Giuliani's investigation team without concern (not some 2-cent, legal schmuck) (*ECF No. 765*).   It is logically absent of reality.

*No uncharged conduct...*
During the July 2, 2019 hearing, Judge Bianco denied any *Fatico* hearing, while verifying that he was only considering charged conduct in his guideline calculations – while regurgitating the government's previous representations -- and other rulings (*Tr.33*):

> *[Judge Bianco]: "I just want to make clear that I think I've said this before, but it is in the court's view and its consistent with the government's letter to the court, you know, two years ago that we're not – that the government is not seeking to hold the defendants accountable for any uncharged frauds.   The scope of sentencing relates only to the frauds that were proved at trial..."*

- Yet – in the government's forfeiture brief (5 years after trial) they demand forfeiture and money judgment for uncharged conduct in the (1) Jowdy-Del Mar project funds, (2) the Gaudet-Frailes project funds, and (3) the Palms real estate that was controlled (and squandered) by Michael Peca and Jay McKee, at all times.
- The "Plan B" approach arrived only after Kenner exposed the government's 4-year ruse of "false nexus" to Kenner's Diamante Cabo san Lucas project equity in Baja Ventures 2006 (a.k.a. none) (*ECF No. 771*) (*government-forfeiture-36*).   The government's own footnote 2 (*ECF No. 780 at 6*) confirms their "Plan B" request to the Court after the December 6, 2019 oral arguments by Kenner.

==*The Hawai'i "object"...*==

During the March 9, 2016 forfeiture hearing, Your Honor clairvoyantly asked (*Tr.59*): "*Why couldn't the Court just determine what money went from Hawai'i to the entity that was unauthorized and order that amount or percentage forfeited?*"

**That is exactly the point of forfeiture**.  *The Court hit the nail on the head.   The Second Circuit reiterated it in a recent decision, See Shkreli*, *supra.*    But -- the government cannot live by that standard since they framed the last 11 years versus Kenner (since Kenner's June 24, 2009 FBI proffer) as "*Kenner stole all of the Hawai'i money and used it to buy his Cabo san Lucas equity*"; all the while knowing they were

lying to the investors (since 2009), the Court (since the 2013 indictment) and the jury (in 2015) (*Tr.5996, 5711, 5722-23, 5744-45, 5990, 5991-92, 5707-5709*).

- The Court knows thru empirical evidence that Kenner received none of the funds the government proffered repeatedly thru improper trial summations...

[*Tr.5711* – Michiewicz summation]:

> *"And what do you find out [about the Jowdy loan]? You find out, what did that 5 million or however much more or less that netted out to be, what did it buy Mr. Kenner? It bought him a 39 percent interest in Ken Jowdy's Cabo San Lucas. Didn't buy the players a 39 percent interest. Him. [] To this day, right now, he is a partner in that resort. That's where the money went. That's what it bought him. And on the backs, on the portfolios, of the hockey players."*

[*Tr.5722-5723* – Michiewicz summation]:

> *"And if you look at the Centrum loan, I can not think of a more perfect example of proof beyond a reasonable doubt -- actions speak louder than words -- no reason to mortgage Honu'apo parcel. No reason other than for Kenner to get his 39 percent. To get his piece of the pie, that resort in Cabo. No reason. Actions speak louder than words. And in this case the action is pure fraud."*

And – [*Tr.5990* – Komatireddy rebuttal summation]:

> *"...you know what, Baja Development Corporation, on that chart, but there is some sort of misconduct; you don't know what the money was for. You know exactly what the money was for. In fact, Mr. LaRusso, when the first witness got on the stand, one of his first exhibits he entered into evidence was a record of the Baja Development Corporation. Those records are in evidence. Mr. Kenner told you that he used that money to get his piece in the Mexico investment with Ken Jowdy. You know exactly what that's for. That's in evidence."*

And – [*Tr.5996* – Komatireddy rebuttal summation]:

> *"He [Kenner] used it for personal use to get an interest in that resort in Cabo."*

- ==The Court and the government know that these abusive summations, amongst multiple other insinuations and misleading questions during Kenner's cross-examination, *infra*, were *false*, but fully prejudicial against Kenner – and left uncorrected, absolutely affected the jury's deliberations.==

Michiewicz attacked Kenner about the authenticity of the loan agreement, insinuating Kenner's dishonesty about the loan agreement; he himself knew to be authentic (*Tr.4597-4598*):

> *Q: So you would agree with me Mr. Kenner, that if the loan document proves to this jury to be phony, everything you have said in your direct testimony about money going to Mexico and not being stolen is a lie?*

AUSA Michiewicz' assault on the known truths continued:

> *Q: And if that loan document proves to be phony, then you are lying?   Correct?*

**The government produced no supportive evidence.   The government produced just the opposite to this court thru the forfeiture exhibits** (*government-forfeiture-36* and *government-forfeiture-44*).
- **Kenner can only hope the jury did not take them on their honor, and perceived responsibility as officers of the Court, *above reproach*…**

The FBI case agent went so far to persuade Kristen Peca and Michael Peca pre-trial as Kristen Peca told Kenner on their 2012 FBI recordings:

> [Kristen Peca]: "*you [Kenner] stole all of the Hawai'i money and never gave it – the loan money -- to…uhhhh…Jowdy*";

Kristen Peca obviously knew there was a loan to Jowdy (thru her husband) – but was under the impression thru FBI agent Galioto that Kenner never gave it to Jowdy. The case agent *misled* the Pecas pre-2012 regarding the exact funds they previously knew the Hawai'i partners loaned to Ken Jowdy (as they both expected per Kristen Peca's 2012 FBI recording response[10] and Michael Peca's 2011 SDNY Grand Jury -- *3500-MP-5 at 30-33, 35, 40, 42, and 45*).   Michael Peca was a plaintiff in the 2008-09

---

[10] Kristen Peca 2012 FBI recording of Kenner:

> *Kristen Peca – Matt [Galioto] told Michael and I that you stole all of the Hawai'i money and never gave it – the loan money -- to…uhhhh…Jowdy.*

> *Kenner – Kristen – I have all of the bank records that prove the money went to Jowdy and his accounts at all times.  I told you that already. You told me that you saw the bank records after I sent them to Michael.  You know -- the attorneys who sued Jowdy for the money in Mexico and Arizona and California used them to confirm the loans before we sued?*

> *Kristen Peca – but – I don't understand why he would say it.*

Arizona case and 2009-2010 California case(s) versus Jowdy for the recovery of the "loans" along with 18 other Hawai'i-Mexico investors (and no issue was ever raised about lacking the loan knowledge).   The Court should note that Berard, Sydor, Rucchin, Nash, and Ranford also participated as individual "signed off" plaintiffs in all three cases.   Owen Nolan did not – because he had already signed his settlement deal with Jowdy (*fraudulently denied by the government – ECF No. 781 at 6*).

*$36 million of forfeiture and money judgment requested by government...*
In the government's forfeiture and restitution memo (*ECF No. 780*), they requested forfeiture money judgment amounts totaling approximately $36 million; including specifically <u>*uncharged*</u> conduct in the **Del Mar** project (Jowdy 100% controlled – *ECF No. 667 at 20-28*); the **Los Frailes** project (100% Robert Gaudet controlled – non party to the instant case); and **the Palms** transactions (100% Jay McKee and Michael Peca controlled – both of which defrauded Kenner under their respective agreements by withholding revenue distributions – *Bates stamp: LV-0001576*).[11]

- These uncharged items should be dismissed as non-issues (specifically considering the "control" of proceeds always belonged to 3rd parties; never Kenner).

*What is the Court looking for to substantiate forfeiture and money judgment?*
In the July 2, 2019 hearing, Judge Bianco defined exactly what he wanted (unfortunately misrepresented by the government's 6-year ruse -- *Tr.25*):

---

[11] The government *PSR at 14* falsely claimed Kenner somehow took $500,000 of John Kaiser money in October 2008 and misappropriated it – but it contradicts specific evidence FBI agent Galioto was aware of.   One – Kaiser proffered to him on October 19, 2010 (*3500-JK-1-r at 7*) and verified "*PK was not involved in Palms R/E as far as Kaiser remembers*"; only two years after the transactions. Second – ***Galioto's own email confirmed that Kaiser signed and notarized a document in October 2008*** (*Bates stamp: ED-002146 and BX20-SD-000235)* for those transactions to buy a portion of Kenner's equity in another property (*Bates stamp: DS-000121 [Galioto email knowledge]*) (*both available upon request by the Court*).

- o Only the government could have provided the $500,000 mis-representations (*lied about by AUSA Michiewicz at Tr.1020 as the source for counts 2, 3 and 4*) – since there was no mention of this in the trial record (*ECF No. 736 at 141-42*).
- o **More frauds about the same funds:** Kaiser and Berard also claimed this same $500,000 was Kaiser's personal investment in the Arizona renovation project during their 2014 depositions and the 2015 Arizona trial; fabricating a third expected use by Kaiser of the money he stole from his friends & family (*confessed to the FBI at 3500-JK-1-r at 7*).
  - ▪ When the FBI case agent looks the other way on all Jowdy-related matters, there are no rules.

*[Judge Bianco]: "What I want the government to do is try to obviously focus its attention on the core of the case which is the entities that were controlled by the defendants and those entities that the money was moved into and protect all of that…"*

The Hawai'i "object"…
**None** of the "*entities*" involved in the Cabo san Lucas project, controlled by Kenner, *have ever had Hawai'i funds traceable to them* (specifically including Baja Ventures 2006 and CSL Properties).

*Government-forfeiture-36* confirms it – **but the government does <u>not</u> want the Court to realize it**, because their nexus requirement will fail.

100% of the funds in Baja Ventures 2006 (Kenner's entity -- $4.1 million from Stumpel (*ECF No. 771*) and Lehtinen per *government-forfeiture-36*) and CSL properties 2006 (the $2.3 million investors) are "*clean*", "*untainted*" and "*traceable*" to the various Kenner investors (*ECF No. 750 at 6-9*).

The $4.1 million Baja Ventures 2006 capital contributions are "clean funds" and traceable as follows (*back-up to government-forfeiture-36*):

- 5-17-2005: Stumpel fund transfer of $350,000 (thru Little Isle 4 account) (*Bates stamp: NAAZ000171*);
- 5-17-2005: Stumpel fund transfer of $325,000 (thru Ula Makika account) (*Bates stamp: NAAZ000527*);
- 5-17-2005: Stumpel fund transfer of $225,000 (thru Ula Makika account) (*Bates stamp: NAAZ000527*);
  - Please note that that an additional $45,000 was transferred to Jowdy's Baja Development Corp account (thru the Little Isle 4 account on 5-18-2005 per Jowdy's request for "Cabo legal expenses" -- *Bates stamp: NAAZ000171*);
- 5-23-2005: Stumpel fund transfer of $1,599,973 to Jowdy's LOR Management (Mexico corporate). According to *government-forfeiture-36* and the Diamante Cabo san Lucas operating agreement (*Bates stamp: PKHome-15207-243 at 37, in the Arizona loan case versus Jowdy as Case 2:09-cv-142-SRB Document 8-5 filed 1/30/2009*);[12]

---

[12] This is the $1.6 million Stumpel was forced to sue Jowdy for in Mexico (*Bates stamp: PK-116953 and PK-109539*). This case produced <u>another Kaiser forgery lie</u> about his testimonial signed at the Cabo san Lucas courthouse with Bryan Berard. **Berard confirmed his and Kaiser's signatures on his 2012 FBI recording**. This fraudulent "forgery claim" was presented to the Court in 2014 by U.S. Attorney Michiewicz -- but withdrawn after Kenner's trial counsel "leaked" the information of the impeaching FBI

- 6-7-2005: Jere Lehtinen fund transfer of $1,499,990 to Jowdy's Propiedades DDM Management account (at Banamex)

❖ _None of the Hawai'i investor funds are traceable to the $4.1 million Baja Ventures 2006 contributions or CSL Properties $2.3 million capital accounts; and certainly nothing tainted_ (the basis for disgorging ill-gotten gains in criminal forfeiture); See Shkreli, supra.

Further disintegrating the Constitutional process is that when the Court (and Judge Bianco) are looking to the government for guidance (a.k.a. ethics), the government failed everyone (_July 2, 2019 hearing at Tr.24_):

_[Judge Bianco]: "I'm a judge.  I'm not a business person, so I don't know all of the intricacies of something like this.   So I'm relying on the government's assessment of the way to do this to protect what the government is trying to accomplish here without overreaching in a way that is going to hurt everybody."_

During the July 2, 2019 hearing, Judge Bianco echoed more of the government's fraudulent misdirection – after years of being misled by the government's fraudulent portrayal of the Hawai'i loans to Jowdy (_July 2, 2019 hearing at Tr.29_) and alleged Kenner usage of them:

_[Judge Bianco]: "I understand that not every dollar was, you know, dissipated and spent on other things.   I understand that a significant amount of the money went to Mexico."_

**_It did not_**. Ken Jowdy personally received it – just like the loan agreement documented (_3500-KJ-2 at 24-25_) – and dissipated it himself.   The loan agreement was confirmed as possessed by John Kaiser (_Tr.1127_) (_3500-JK-1-r at 3_) and Glen Murray at trial (_Tr.3608_); further documented at _ECF No. 785 at 2-4 (Kaiser perjury submission)_ as re-received by all Little Isle 4 members no later than February 2006 for the 2nd time.

---

recording-confession to the government. Nevertheless, once employed by Jowdy in 2012, Kaiser immediately testified in Mexico that his signature was forged -- and the $1.6 million case was dismissed.  Jowdy succeeded with Kaiser as his forgery pawn.  The FBI recording confirmed Kaiser's willing and immediate perjury fabrication for his new boss.  Jowdy confessed to the $1.6 million theft during his _January 5-6, 2010 depositions at 411_.  Kenner and attorney Ronald Richards mailed these confessions to the FBI case agent (Galioto) in 2010.  After his January 2010 confessions of all the Hawai'i money and individual money he _stole_, Jowdy further confessed to receiving all of the Kenner and Kenner investors' funds to the FBI during his March 2010 proffer (_3500-KJ-2 at 11-14_).

The government has misrepresented this critical issue "any way that suits that day in Court" for over 6 years, **first** claiming "*Kenner stole the Hawai'i money*" during trial – and **second,** now verifying that Jowdy has it, *all of it* – thru *government-forfeiture-44*).  This critical "change" in possession of the Hawai'i funds would have altered the government's case from opening remarks (*Tr.33*) thru both summations (*Tr.5996, 5721, 5722-23, 5744-45, 5990, 5991-92, 5707-5709*).

- They *only* represented the 100% Jowdy possession *at all times after* the conviction; *after* leaning on the closing lies that "*Kenner stole it all and bought his Cabo equity with it*" for prejudicial conviction.   Clearly that critical issue was incorrect and significantly biased Kenner to the jury.  The Court is aware that when the U.S. Government &/or the FBI tell someone that "*Kenner stole your money*" (even without empirical evidence)…those people listen like it is unchallengeable scripture.

*The Hawai'i lending agreement was confirmed pre-trial and during trial…*

As verified by *government-forfeiture-36* – only $350,000 (on 5-4-2005) went to Mexico *solely for Jowdy's benefit*, *no more*.[13]   The government and Jowdy produced

---

[13] During the Mexico State Supreme Court criminal case versus Jowdy (brought by Kenner and Kenner investors – in 2012-13 – *including Mexican in-person testimony by Bryan Berard, Mattias Norstrom, Greg deVries, Rem Murray, Turner Stevenson and other Hawai'i-Mexico investors*), it was *verified* thru corporate banking records to the Supreme Court that Jowdy's Mexico attorney, Fernando Garcia, and Jowdy forced the seller of the Cabo property to wire transfer $750,000 from the purchase proceeds (including the original $350,000) to an offshore account shared by Garcia and Jowdy (a portion of the Supreme Court criminal proceedings versus Jowdy and his cabal in 2013 when the FBI arrested Kenner to STOP the scheduled December 2013 Supreme Court required-in-person testimony by Kenner).

&gt; None of the cash purchase proceeds (of the $6,250,000 deposit, from *government-forfeiture-36*) – was received by either Kenner managed LLC [Baja Ventures 2006 or CSL Properties].  ZERO comes from the Hawai'i loans; *__leaving no forfeiture nexus__*, and certainly nothing acquired by Kenner as "*ill-gotten*" gains or funds traceable to the instant case (*See Contorinis, infra*).

&gt; This mis-direction is the critical ruse the government wants the Court to be blinded by – so they can capture thru forfeiture, portions of the Cabo deal even though they cannot trace a single dollar to any defendant in the instant case.

In the *United States v. Contorinis*, 692, F.3d 136, 148 (2d Cir 2012), the Court "observed that neither the language of the criminal forfeiture statute nor Circuit case law supported the proposition that a defendant must forfeiture proceeds that 'go directly to an innocent third party and are never possessed by the defendant'" *Id.* at 147.

- **Jowdy was never charged in the instant case, *by the government's premeditated choice*.**   And – Jowdy was **still** referred to as a victim thru the Probation offices July 18,

the real Jowdy-Hawai'i loan agreement (*3500-KJ-2 at 24-25*).   Non-victims John Kaiser (*Tr.1127*) and Glen Murray (*Tr.3608*) testified they possessed the Jowdy-Hawai'i loan agreement.  Kaiser verified it to the FBI (*3500-JK-1-r at 3*).   Berard verified it to the 2009 Nolan arbitration panel (*3500-BB-3 at 5-7*).  That agreement was verified by Michael Peca to the 2011 SDNY Grand Jury (*Peca SDNY Grand Jury Tr.30-33*) and 2015 trial Court (*Tr.499* and *Document 501 at 9*), corroborating Darryl Sydor's SDNY Grand Jury testimony (*Sydor SDNY Grand Jury Tr.25-26*) – that __Jowdy was supposed to receive the funds__.

**"Involved in" or "traceable to"…**
In *United States v. Nicolo*, 597 F. Supp 2d 342, 348 (W.D.N.Y. 2009), the Second Circuit ruling further defined the terms of *18 U.S.C. 982 (a)(1)* by referring to *United States v. Voigt*, 89 F.3d 1050, 1084-87 (3rd Cir)   Nicolo's Court opined: in *Voigt*, the Third Circuit illustrated the distinction between "*involved in*" and "*traceable to*" through the following example:

> "If the defendant _receives_ $500,000 cash in a money laundering transaction and hides the money in his house, the government may seize that money as property "*involved in*" the money laundering offense.   If the defendant purchased a $250,000 item with that money, the government may seek the remaining cash as "*involved in*" the offense, whereas the item purchased is

---

2016 addendum to their PSR submissions – over a year after trial; *See Hughey v. United States*, 495 U.S. 411, 421 (1990).

Since the Supreme Court decided *Hughey* almost thirty years ago, prosecutorial decisions to frame indictments with a "view to success at trial rather than to a victim's interest in full compensation" are made with a full understanding of the potential consequences; See *Hughey v. United States*, 495 U.S. 411, 421 (1990).  **The Supreme Court acknowledged that there are tradeoffs in such decisions**.

- This also applies to the **Tim Gaarn** private Eufora stock sales, other than Gaarn's $162,500 of loan repayments to Kenner with Gaarn's private stock sale proceeds (for government documented loans Kenner provided to Gaarn years earlier).
  - The Court should note that although the stock belonged to Tim Gaarn (documented by Eufora's own tax records since 2005), the government asked the witnesses if they knew they were "*buying stock from Kenner*"; clearly a fraud on the witnesses, the jury, and the Court (*Tr.2173, 2732, 5970-1, 5974, 6011 [after the Court was misled by the government]*).
  - Kenner did not own Eufora stock that could have been sold per the government misrepresentations; _and they knew it all along_ thru their-own evidence (*GX-210 at 37*).

subject to forfeiture as property "*traceable to*" property involved in the money laundering offense."   *Voigt*, 89 F.3d at 1087.

In the Second Circuits well defined position on *18 U.S.C. 982 (a)(1)* in *Nicolo*, at all times they continue to recognize that the defendant had to "receive[s]" the proceeds.   **Receiving** the proceeds is the predicate act to either "*involved in*" or "*traceable to*", according to the Third Circuit's explanation.   This is the real issue at hand, since the object of the alleged conspiracies are absent of a co-conspirator for the lion's share of the funds sought in money judgment and forfeiture by the government; certainly related to the Diamante Cabo forfeiture issues.

The government's renewed claims – without proof of any frauds (and certainly not presented at trial) – is that the Del Mar project, the Palms real estate, and the Frailes project transactions are now frauds and money judgment should be granted.   None of them were charged in the superseding indictment (*ECF No. 214*).   If the government wants to include these items, the defendant requests a *Fatico* hearing to prove *no fraud*, *no loss*, *no nexus*, etcetera (after the government previously avoided the *Fatico* – with no supporting evidence except *ipse dixit*).   The government had 11 years to investigate those transactions (6 years before trial), and avoided them "*by choice*"; *See Hughey v. United States*, 495 U.S. 411, 421 (1990).

*Proceeds (a.k.a. "ill-gotten" funds)...*
Kenner received <u>none</u> of the Hawai'i "*proceeds*", thus there is nothing forfeitable as a result without "*tainted funds*" (certainly not Kenner's Baja Ventures 2006).   The government cannot clear that statutory hurdle.   In *Contorinis*, the Court vacated the forfeiture judgment because the <u>custody</u> of the illegal profits (the required destination of tainted funds) was in the hands of an innocent third party – *his employer*.   Those funds, the Court held, were insufficiently subject to Contorinis' dominion and control to be forfeited by Contorinis.   *Id.* at 148.

In fact, separate from the loans that Jowdy acquired (*government-forfeiture-44*) -- the government also cannot avoid IRS agent Wayne's 2016 forfeiture testimony verifying Ken Jowdy confirmation that all of the Baja Ventures 2006 capital account funding originated from Kenner's two European partners, *infra*, (*ECF No. 771*) and no alternative-traceable-source; thus **no nexus**.   Five years later, the government still told the trial court "*Kenner stole the Baja Ventures 2006 money from the Hawai'i partners*".   It cannot be reconciled with ethics expected in Berger; *See Berger v. United States*, 295 U.S. 78, 55 S. Ct 629, 79 L. Ed 2d 1314 (1935).

*The government "**traced the money**" (post-trial) – but did not like what they found (after alleging for 3-months of trial that Kenner stole it)...*

- **Their-own evidence confirmed that Kenner _neither_ stole the money from Hawai'i (*government-forfeiture-44*), _nor_ used it to buy his Cabo san Lucas equity (*government-forfeiture-36*).**

   - **That is their-own evidence...**

*NEXUS: Only $350,000 traceable to the Cabo project thru Jowdy's KAJ Holdings LLC...* Kenner hi-lighted during the December 6, 2019 hearing that the government did "*trace the money*" thru their *government-forfeiture-36* forfeiture submission. Kenner testified "*because it's a $350,000 tracing that goes only to Mr. Jowdy's LLC, Mr. Jowdy settled that with Mr. Nolan back in 2008, already for those funds...there really has been no other nexus proven. That's what the government proved during their forfeiture case*" (*December 6, 2019 hearing at Tr.19-20*).

The Court replied: "*Yes, I guess I am a little confused by the $350,000 reference. Does the government want to respond to that?*" (*Id. at 20*).

Kenner followed up: "*...traced to the [Cabo] LLC...purchase...and only $350,000 comes from one of the [alleged] victims in the case, and that is Mr. Nolan. And as a result, I think with some forethought, Mr. Jowdy settled with Mr. Nolan for that money, and other business transactions in 2008*" (*Id. at 21*).

- *Yet – there is <u>no nexus</u> to any ill-gotten <u>proceeds</u> Kenner received or even benefitted from -- and the government <u>cannot</u> clear that statutory hurdle!*

The Court outlined this "nexus" unicorn in the instant case during the 2016 forfeiture hearing. The Court opined, "*why couldn't the Court just determine what money went from Hawai'i to the entity that was unauthorized, and order that amount or percentage forfeited?*"

- That is exactly what the forfeiture statute demands the Court do, but the government <u>cannot</u> meet that burden – and certainly have not to date.

In fact, IRS agent Wayne explained to the Court during the March 9, 2016 forfeiture hearing that Kenner's two European partners (Jozef Stumpel and Jere Lehtinen) paid for 100% of the Baja Ventures 2006 equity, following his own temporary

amnesia on the specific material forfeiture fact under analysis at that 2016 moment; **nexus** (*See March 9, 2016 -- Tr.44-45*):

> *Q:  In the course of that interview, did Mr. Jowdy tell you – I don't need you to look at the entire document.   I am just trying to move it along.   In the course of that interview, did Mr. Jowdy tell you how Kenner obtained his 39% interest in the Diamante Cabo san Lucas project?*
>
> ***A [Wayne]: I don't recall him saying that.   But...***
>
> *Q: Would you kindly take a look at Page 2 of **Kenner Exhibit F-2**?   The third paragraph.   Does that refresh your recollection as to what Mr. Jowdy told you as to how Philip Kenner acquired his 39 percent interest in Diamante Cabo san Lucas?*
>
> *A [Wayne]: **Yes***.
>
> *Q: What is your recollection of that, sir?*
>
> *A [Wayne]: **That Kenner borrowed the money from Jozef Stumpel and Jerry Linton** [sic]*.
>
> *Q:  It was through the borrowing money from Jerry Linton [sic] and Jozef Stumpel that Kenner acquired his 39 percent interest in the Diamante Cabo san Lucas through August 2006, correct?*
>
> *A [Wayne]: Can you repeat the question?*
>
> *Q: Sure.  Ken Jowdy told you that the source of the funds by which Philip Kenner acquired his 39 percent in Diamante Cabo san Lucas was through money loaned to him by Jerry Linton [sic] and Jozef Stumpel, correct?* [14]
>
> *A [Wayne]: Yes.*

So what is forfeitable?  *Kenner received no "proceeds", let alone anything that was ill-gotten*.  **Agent Wayne confirmed it**.   The government has not produced any contradicting evidence to support their post-trial nexus theories except *ipse dixit*.

---

[14] See Baja Ventures 2006 partner, Stumpel, letter to the Court (*ECF No. 771*).

*Little Isle 4 (Hawai'i) By-Laws (corporate controlling document)…*
- How is Stumpel and Lehtinen's Cabo contributions related to Hawai'i transactions?  **They are not**.

The Hawai'i corporate control document authorized lending funds to Jowdy (or anyone in the interest of the corporation, like the October 2006 Kaiser loan).   The Little Isle 4 By-Laws were introduced at *Tr.4525 with Kenner exhibit 217*, and *unopposed* by the government.  The details were simply "*not remembered*" by a tiny subset of passive-equity investors (like Bryan Berard) – who admitted to Alzheimer's (**CTE**) symptoms post-trial.   The RFA-**CTE** request is still unaddressed by the Court (*ECF No. 782*).
- The **CTE** admission presents an irreconcilable standard for the Court without further discovery and analysis (as previously requested by Kenner to the Court thru RFAs "under seal" related to the documented **CTE** issues).

***As the Court knows -- the Hawai'i partners (Little Isle 4 By Laws) authorizes the loans*** *(Kenner exhibit 217, introduced at Tr.4525-26)*.

### *Article II. Purpose*

> *Little Isle IV, LLC is an organized group of investors established to <u>**invest in a series of opportunities**</u> review[ed] by the Managing Member [Kenner] and deemed in the best interest of the partnership at all times.*

> *<u>At the sole discretion of the Managing Member</u>, Little Isle 4, <u>**may participate as a lender**</u> if deemed by the Managing Member to be in the best interest of the LLC.*

> *The Managing Member, <u>at their sole discretion</u>, can engage in outside ventures deemed to be in the best interest of the LLC, <u>including but not limited to other Private Equity Funds and <b>Lending Opportunities</b></u>.*

*Little Isle 4 lawsuits to recover stolen Jowdy loans…*
Nineteen (19) of the 26 Hawai'i investors participated in lawsuits for nearly eight (8) years prior to Kenner's arrest to recover the loans in the USA and Mexico; specifically from Ken Jowdy (and no one else) thru multiple independent counsel in multiple jurisdictions.
- The Court should note that is all of Jowdy's wild-myriad of defenses, he never alleged that Kenner stole the money and gave it to him (unknown source) (*3500-KJ-2 at 11-14*).

The loan agreement and the Little Isle 4 operating agreement that _authorized_ the loans were in the possession of every Hawai'i partners, verified by the Hawai'i attorneys' February 24, 2006 email to the investors; including the re-verification of the "delay" per Jowdy, Najam, and Bhatti (from Lehman Brothers) at the 11th hour of the Cabo closing (_See ECF No. 785, "Kaiser perjury submission" at 2-4, excerpt_):

> "_For those of you who are not aware Ken Jowdy and Bill Najam have informed us that the Lehman Brothers closing in Cabo will be delayed another 30 days. They have legal issues to handle in Mexico prior to their final signoff and funding._
>
> _We have been informed that part of the closing process at Lehman Brothers rejected the original proposal to repay the Hawai'i loans at the closing by collateralizing Ken's 20% equity he received for managing the Cabo project..._
>
> _Based on the meetings John Kaiser had with Ken before we agreed to lend him the money in 2004 Phil has asked me again to attach for your records a copy of the lending agreement.  Please contact me with any questions but you should already have your copy from previous communications._
>
> _The questions during our last conference call by Owen Nolan, Mike Peca and Bryan Berard were important to all of you.  If you are still confused about the individual equity you invested in the Cabo project versus the Hawaii equity and loans, please reply to me.  I thought Phil clarified this but I want all of you to be clear.  Most of you are involved in both deals.   You should have the operating agreements I previously forwarded to you after every member signed them.   If not please contact me about what you cannot find in your personal records and I will forward them to you or your advisors._"

_Nothing was concealed_, notwithstanding willful blindness by passive-equity investors (who are entitled to that passive blindness – but not to criminal or civil restitution because of it).

As such, the prosecutorial standard was incredible, as it would place every businessman in America under criminal auspice regardless if they followed the parameters of the corporate By-Laws or operating agreement, as Kenner did religiously without variance.  Under this ridiculous standard, _any_ defendant the government wanted to convict could be indicted simply by soliciting shareholder testimony that they "_could not remember_" ever being told about "legal" actions governed by the corporate doctrine and followed without deviation or private equity fund disclosures, as signed-off by the investors (as in the instant case).

*Former U.S. Attorney for the State of Utah, Brett Tolman, espoused the "power" of the position…*

When he was U.S. attorney for Utah, Brett Tolman would deliver the same line in front of business leaders over and over again:

> *"Give me the executives of any company and I could prosecute them for a federal crime"*

At the time, it was said with the intention of telling business leaders to shape up, stay complaint with the law, don't dodge the IRS.   But now, after nearly eight years removed from that office, he sees things differently, and stated:

> *"I look back at that speech and I realize how absolutely horrifying that is.   That I could prosecute any individual because that's how broad I felt the law was and how powerful I felt my position was?  It's pretty haunting now."*

In fact, on Kenner cross-examination, AUSA Michiewicz represented to the jury (in a 100% Jowdy style comment) that *after* Kenner had negotiated the 2006 short-term loan with Kaiser (again, authorized in the Little Isle 4 By-Laws) in exchange for his joint venture "signature", Kenner should have "stiffed" Kaiser for the "short-term LedBetter loan" because Kenner "*was a business man*".  **Michiewicz' audacity was shocking** as if the best solution for Kenner was to trigger litigation between the Hawai'i partners and Kaiser, by defrauding Kaiser post closing (*Tr.4700-01*):

> *Q. When was Sag Harbor?*
>
> *A [Kenner]: That was two months after the closing of the financing from Lehman Brothers.*
>
> *Q. So he already signed on the dotted line for the Lehman closing before any of this stuff happened with the Sag Harbor property. Isn't that correct?*
>
> *A [Kenner]: Yes, sir. He signed after we had agreed to give him a short-term loan.*
>
> *Q. <u>Not much leverage at that point, right? I mean, Lehman is on board, Kaiser, Manfredi, everybody signs the closing documents, and then he forces you or demands from you this short-term loan?</u>*
>
> ***A [Kenner]: Are you suggesting that after we agreed to it <u>prior</u> to the***

*signature I should have lied to him and not given him the loan?*

*Q. Well, you are a businessman, sir, aren't you?*

*A [Kenner]: Not one to lie to people, if that's what you are insinuating.*

- Perhaps, at that time, AUSA Michiewicz was auditioning for a job with Tom Harvey (Jowdy's attorney who was present in the courtroom throughout the trial assisting Michiewicz at breaks with evidence), and that is how "big business" is supposed to happen amongst the anointed.

The government affirmed, "*The government's only burden is to demonstrate the requisite nexus between the [Kenner] property and the crimes of conviction.*" [*December 6, 2019 hearing at Tr.4*].

- **They have not** (*See government-forfeiture-44 and government-forfeiture-36*) with ZERO "*ill-gotten funds*" traced to anything Kenner owns; specifically not Baja Ventures 2006, LLC.

*The traceable funds Jowdy received from the superseding indictment individuals (ECF No. 214)…*
The $1,315,000[15] money traced from the alleged victims in the superseding indictment to the Jowdy-loan goes to an *innocent third party; See Contorinis*.  No more than that amount can even be alleged as unauthorized for forfeiture, money judgment, restitution &/or sentencing guidelines.   Only a lower calculation is calculable after reviewing the empirical evidence, which confirmed the investors' previous knowledge versus their self-admitted current **CTE** Alzheimer's symptoms causing and "in sync" reversal of recollection (absent their previous knowledge and affirmations under oath).

*The government needed to manufacture a nexus…*
The government cannot "move the goalposts" years after trial to accommodate a faulty indictment strategy to expand a forfeiture (still without nexus); *See Hughey*.

---

[15] *See ECF No. 770 Appendix 1 at 54*:
  1) Michael Peca (**$240,000** distributed to Jowdy thru Little Isle 4's capital account);
  2) Darryl Sydor (**$200,000** distributed to Jowdy thru Little Isle 4's capital account);
  3) Owen Nolan (**$425,000** distributed to Jowdy thru Little Isle 4's capital account);
  4) Steve Rucchin (**$300,000** distributed to Jowdy thru Little Isle 4's capital account);
  5) Bryan Berard (**$150,000** distributed to Jowdy thru Little Isle 4's capital account)…

They attempted to rationalize their "no nexus" problem in front of Magistrate Shields (*See May 14, 2019 hearing at Tr.37*) by referring to Jowdy 4-years after trial and facing forfeiture nexus problems. They called Jowdy an undicted co-conspirator. *They needed to manufacture a nexus*, so they have been forced to "move the goalposts". Kenner was not prosecuted as a Jowdy co-conspirator; fundamentally changing everything to do with the instant case.

[Ms. O'Connor]: "*Your Honor, the government does have certain concerns that it's being run by Jowdy, who is somebody that the government feels is an unindicted co-conspirator.*"

In 2016, the government traced the funds (*government-forfeiture-36*) for the acquisition of the Cabo san Lucas property (with the help of their prosecutorial partner, attorney Tom Harvey – a.k.a. Jowdy's co-conspirator) and admitted it during their February 12, 2016 forfeiture hearing.

• ***They desperately want to un-ring that bell.***

*Government-forfeiture-36* proves that Kenner received *none* of the Jowdy loan funds (certainly not as Galioto lied to the Pecas, *supra at footnote 11*), thus only the $350,000 that Ken Jowdy specifically chose to use from his authorized Hawai'i partners loans (from the May 4, 2005 wire transfer) is forfeitable as *tainted funds* (from Jowdy's KAJ Holdings LLC).

Jowdy was exactly what Judge Bianco's Jowdy 9, 2016 question to the government meant about tracing the funds to Mexico. **The answer is**: "*That is $350,000 of the Jowdy $2.5 million capital account Jowdy documented on the 2006 Diamante Cabo san Lucas final operating agreement 'REGISTRATION OF CLASS A MEMBERS'*" (*Bates stamp: PKHome-15207-243 at 37*); all traceable to Jowdy from Nolan's initial Hawai'i contribution (and settled as part of the Jowdy-Nolan settlement agreement). Joe Juneau testified about the identical Jowdy settlement agreements in 2015 (*Tr.354-55*).

*The Jowdy-Nolan settlement (ECF No. 780 at 6)...*
The government's double-talk answer about the Jowdy-Nolan settlement skirts the boundaries of *lying*, while certainly laying square in the circle of *disingenuous*. The government claims Kenner presented "no proof" or "relevance". Kenner told the Court in oral arguments that the "deal" was announced during the 2009 Nolan arbitration between the parties, when Nolan's attorney explained why Ken Jowdy and Bill Najam were testifying on behalf of Owen Nolan, whom Jowdy personally (1) robbed at Del Mar (*ECF No. 667 at 24-28*), (2) lied about placing a lien to protect him

thru attorney Tom Harvey's fraudulent lien letter (identical to the criminal acts in *United States v. Turk*, 626 F.3d 743 (2d Cir 2010) (*Bates stamp: BATES: BN-P-000109-110*)), and (3) robbed at Diamante Cabo (*Bates stamp: TD197 and PKHome-0016860*).

- These three (3) thefts from Nolan by Jowdy are irrefutable.  Jowdy settled civilly with Nolan for his criminal activity.   The government cannot dispute that fact, despite their carefully crafted skirting of the truth (*ECF No. 780 at 6*).

The identical 2009 lawsuits by Nolan, Juneau, and Moreau versus Jowdy for <u>*all*</u> funds received by Jowdy were "dropped" when the three "bad apples" received their additional Cabo equity as settlements (as Juneau testified to the EDNY in 2015 – *Tr.354-55*).

> *Q <u>Your investment in Del Mar, you said that you got some interest in the southern project from Mr. Jowdy, is that correct?</u>*
>
> **A [Juneau]: Yes, it is.**
>
> *Q Can you tell the ladies and gentlemen of the jury what that is, if you recall it?*
> *A [Juneau]: Well, it's a percentage of this project. I'm not sure what percentage it is. But that was the agreement that we made with Ken Jowdy.*
>
> *Q Would it be fair to say that the reason you came to that agreement is because the project in Del Mar was going nowhere? Would that be fair?*
>
> *A [Juneau]: I wouldn't say that it was more because -- I believe his name was on the -- also mentioned in the case, in the lawsuit that I started. You know, we somehow made contact with him and came up with this kind of an agreement.* **This thing we did with Tom [Harvey].**
>
> *Q But you were fortunate enough to get Mr. Jowdy to transfer your interest to Cabo, is that right?*
>
> **A [Juneau]: Yeah. I guess so, yes.**

The government has reminded Kenner on more than one occasion that "what Kenner says in Court is under oath"; the equivalent to evidence (or challengeable as perjury).   The Court has requested Kenner's acknowledgment of this salient point each time it is raised thru the government's concern.   Thus, Kenner *testified* to the existence of the Jowdy-Nolan settlement agreement.

- The Court should note that the 2017 Jowdy-investor settlement agreement is absent the signatures of Owen Nolan, Ethan Moreau (not in the instant case), and Bryan Berard; *who all previously settled with Jowdy for their incremental 1% Cabo san Lucas equity* (for *all* previous transactions between the parties and their progeny; specifically including Hawai'i funds from the 2004-06 Jowdy loans – *3500-KJ-2 at 11-14*).

- California attorney Michael Meeks represented Juneau (*Tr.354-55*), Moreau and Nolan ("the bad apples").   Meeks negotiated the 1% Cabo settlements for each investor for "all things Jowdy" at the same time; as the other Jowdy victims did in 2017 (thru "informed" independent counsel), *infra*.

- Bryan Berard received his settlement when he received his 2012 job.   Berard announced it on a 2012 conference call that Kenner eavesdropped on, before the others knew he and Kaiser received jobs from Jowdy.   Berard offered "from Jowdy" that if anyone wanted to sign off with Jowdy for all of the previous Hawai'i and Mexico transactions he was involved in, Jowdy was willing to sign over 1% of the Cabo deal to them.   After the call, Kenner encouraged all of them to consider it considering the five-plus years of litigation to date in 2012.   They all turned down the offer, while represented by independent U.S. and Mexico counsel.

  o Ironically, John Kaiser's "*carrot*" from Jowdy's cabal was the fabrication of collateral agreements with Kenner (with Kenner's name photocopied onto the agreement) to "steal" Kenner's Baja Ventures 2006 equity on January 1, 2010 – *for the money Kaiser had already been repaid*.  ==Even the fabricated agreement failed the "repayment" clauses, 100% supported by evidence in the government's Rule 16 production== (*ECF No. 736 #1, Ex. Z41*).   Only Kaiser's suborned trial lies about "*back pay*" and "*expenses*" could attempt to undue what empirical evidence debunks (*Tr.1413-14*) (*Bates stamp: NAAZ0433-435*).

  o Kaiser can neither produce IRS tax records for 2006 or 2007 to substantiate his alleged $195,00 of "*back pay*" – or the remaining (approximately $500,000) of "previous" contributions to the Hawai'i project "*expenses*" (*Tr.1413-14*).

    ▪ Kaiser cannot produce even $25,000 in expenses to the Hawai'i project at any time.   Let the government and Kaiser explain that fraud on the Court for the funds Kaiser stole in August 2006 from his friends & family 2005 lies.   In fact, the Kaiser testimony (shared by perjurer Ethel Kaiser) about being repaid by her son (*Tr.933*) *fails based on Kaiser's 2011 text admission to Kenner*

*that he <u>never</u> repaid her (6-years later)*.   Perhaps, an aging septuagenarian was simply *confused* by her son and the government's preparations for trial.

***Kaiser 2011 confession to Kenner about the money he stole from his mom, Ethel, and never re-paid – confirming his trial lies about selling his home to repay his friends & family:***

| 1 2 6 7 2 | +16312 350308 **John Kaiser*** | 7/22/2011 2:17:04 PM(UTC +0) | R e a d | [Kaiser]: Yes and ==**that is ~~nit~~ [sic] [not] the only money that is owed out**==, that I have been working everyday to pay back everyone |
|---|---|---|---|---|
| 1 2 6 7 4 | +16312 350308 **John Kaiser*** | 7/22/2011 2:57:35 PM(UTC +0) | R e a d | [Kaiser]: 5k month for back taxes on the sale of 87 laurel made 250 k [his prior home that allegedly paid back $1 million in loans], ==**100k went to u**== [to Kenner for loan repayments], 150 vin [Tesoriero] owes [confirmed by *3500-VT-1-r at 2* to the FBI] [16], 3300 a month goes towards cards from Pv [Arizona] Reno, ==**was paying my mother [Ethel], $ 2500 a month for the 1 mil we took from her, left her with no money to live**==, now paying her $1500 a month, ==**Took 380k from brother Keith, left him w/shit**==, we where supposed to send him back money after sale of [Kenner's] little house in mex, u sent me 4k for him, i send him $500 a monyh to live on . . And 4k to 6k to Pv a month . Should I continue ????? It's a fucking joke. ==**And please don't tell me about Mex I am not one of the hockey guys**== |

- Kaiser and the government cannot explain any of their $1,280,000 "move the goalpost" losses that Kaiser has allegedly "now" suffered (*ECF No. 781*) regarding their star-witness that had not been addressed by the government before Kenner "outed" them during the December 6, 2019 hearing (*ECF No. 780-1 at 56*)

---

[16] The Court should note that the revised government forfeiture and money judgment request claimed Kaiser had $180,000 of his own money in the 2005 Hawai'i loan (*ECF No. 781 at 2*).   ***This cannot be true*** – unless 9-11 First Responder Vincent Tesoriero lied to the FBI in 2014 (*3500-VT-1-r at 2 ¶12-13*) -- and the August 2005 Hawai'i bank records are inaccurate.  Ethel Kaiser contributed at least $700,000.  Vincent Tesoriero contributed at least $150,000.  The "unnamed" $150,00 that completed the $1 million of August 2005 deposits belongs to Vincent Tesoriero's parents (*3500-VT-1-r at 2 ¶13*) – ***not John Kaiser*** (*Bates stamp: PKHome-11042 – Northern Trust Bank -- Ka'u holdings bank records*).  In addition – the math is improper according to the revised government and Kaiser lies, totaling $1,030,000.

for claiming $200,000 Kaiser solicited from non-victims in the superseding indictment (Hughes and Rizzi *some ones* – unknown to Kenner).

○ The Court cannot overlook Kaiser's heart-wrenching testimony that Kenner "*ruined his life*" (*Tr.1089*).  It is outrageous, considering he presented the Court in his February 2019 stunning letter of Jowdy malfeasance (*ECF No. 628*) that he was the owner of Kenner's Baja Ventures 2006 equity since January 1, 2010 – as collateral for his 2005 Hawai'i friends & family loans.   Kaiser worked for Jowdy for over 5 years and could have sold the equity stake (if real) for 1-cent on the dollar and recouped some *phantom-loss* value.

○ Notwithstanding the fabrication of the document and photocopied Kenner signature on the document...there is no way that Kaiser received over **$100 million** from Kenner as collateral in 2010 for $1 million (even though the empirical evidence confirms he was repaid) – **yet somehow**, Kaiser's life was "*ruined*".  ***It is irreconcilable***.

▪ That would have been the greatest collateral deal (if real) in the history of business.   *Perhaps, the $21 of beads the pilgrims bought Long Island from the native Indians would fall a distant second*?

▪ And – Kaiser's own claim to the Baja Ventures 2006 collateral agreement in his February 2019 letter cannot make him a victim of anything – considering the agreement he presented (although fabricated) would have made Kenner the "*most stand-up businessman in history*" – not a criminal..."ruin[ing]" Kaiser's life!

• Kaiser would have been a character witness for Kenner.

• The Court should note that Kenner previously exposed the $200,000 that was not Kaiser's funds in *ECF No. 770 at 2*, again ignored by the government while hoping the Court will simply overlook the lack of nexus and proper supporting documentation and follow the government's lead *ipse dixit*.

*The Nolan-Juneau-Moreau-Berard & 2017 settlements...*
It is unconvincing by the government proffer, in any light, to believe that Jowdy's attorneys negotiated the settlements for only the Mexico funds he *stole* (as raised in multiple public lawsuits by the investors in Mexico, Arizona, California, Nevada and Delaware – yet *never* versus Kenner) – and not the $5 million-plus he *stole* from the Hawai'i investors (admitted to the FBI in March 2010– *3500-KJ-2 at 11-14*) and

other personal loans (entirely admitted to in his January 2010 California depositions).

- How could they have erred as such when Jowdy's attorneys are the "*best and most connected his stolen money can buy*"?

- Kenner documented the complete exonerated parties list to the Court during the December 6, 2019 hearing at (*ECF No. 780-1 at Tr.57-58*).  There is no question that the Hawai'i investors have been recompensed – as they independently bargained for with Jowdy under advice of counsel -- for the funds they previous approved (whether they remembered or not 10 years after the lawsuits, follow-up emails, and conference calls).[17]

As such, every transaction related to the Hawai'i partners and Jowdy has been settled for far more than their initial capital accounts that Jowdy received (authorized or not).

*Opposite the current case -- the government quotes full Ponzi scheme cases and complete shams...*
The government claims they can take the entire DCSL project (regardless of the single $350,000 transaction with Jowdy) (*ECF No. 780 at 6*), claiming the case law "*applies because the scheme was entirely illegal*".

In this case, it is completely the opposite.   The ten-plus million that was invested in the Hawai'i project between 2003 and 2009:
  (1) Acquired over 6000 acres of land (appraised at $95 million in 2006), including 2+ miles of Hawaiian coastline;
  (2) Created a 501(c)(3) charity for the local community "give-back" program;
  (3) Employed approximately 10 people;
  (4) Engaged with 17 hard moneylenders;
  (5) Dozens of bankers;
  (6) Land planners;
  (7) Engineers;
  (8) Archeologists and architects as consultants; and

---

[17] In Kenner's December 2019 submission "*Kaiser perjury submission*" (*ECF No. 785 at 2-4*), the Hawai'i partners closing attorney verified Kaiser's FBI proffer that "**updates**" were made "**many times**" to the Hawai'i partners (*3500-JK-1-r at 3*).   Every member was included in the attorney "update" leaving more incredible testimony to scratch one's head about; notwithstanding full-blown **CTE** symptoms (of Alzheimer's amnesia).

(9) Ultimately generated a $105 million lending deal with one of the prominent commercial bankers in the world "at the time" (Lehman Brothers).

The "loan to Jowdy" was authorized by the corporate controlling document (*Kenner trial exhibit 217*), discussed in emails with Lehman Brothers and related attorneys (*Bates stamp: KJ2674-75, and turned over to the SEC in 2010 as PK_SEC_018971-72*) – and was "**not remembered**" by 4 of the 26 Hawai'i partners in 2015 (over 10 years after the loan occurred), <u>suspiciously in sync</u>.

*2014 CTE lawsuits for brain damage (akin to Alzheimer's)…*
Now – **new evidence** has exposed that the government's star "memory witnesses" (Berard, Nolan, Rucchin and Sydor) about "*what they remember never being told*". They all sued the NHL for *brain damage* thru a 2014 **CTE** lawsuit.   100% of the empirical evidence *in Rule 16 production* refutes the government's "concealment" argument at trial; *including but not limited to their previous individual participation as named plaintiffs in*:

> (1) The 2008 Mexico litigation versus Jowdy *to recover the loans*;
> (2) The 2008 Arizona litigation versus Jowdy *to recover the loans*;
> (3) The 2008 Nevada litigation versus Jowdy *to recover the loans*;
> (4) The 2009 California litigation versus Jowdy *to recover the loans*;
> (5) The 2012 Mexico litigation verses Jowdy *to recover loans*; and
> (6) The 2014 Delaware litigation versus Jowdy *to recover the loans* …

- The Court should note that the government could not convince 19 other Hawai'i partners to participate in their "lending" sham prosecution, because they were able to remember the real-time conference calls and actions they participated in; and
- As Michael Peca <u>also</u> tried to follow the government storyline during direct-examination – but under the pressures of cross-examination (and his strict religious born-again principles), he verified that his 2011 SDNY Grand Jury testimony was "*truthful*" and he knew as part of a "*group*" decision at all times that Jowdy received the loans as authorized and documented (*Tr.498-99, ECF No. 501 at 9*).
  - In 2011 – Michael Peca went so far as to explain that it was Jowdy's lack of communication that was the final breakdown in the relationship with the investors and Jowdy (*3500-MP-5 at 30*):

[Michael Peca]: *"Here's where a lot of the cross starts to happen.   A short-term loan [was made] to Mr. Jowdy because at the time Cabo – we hadn't gotten the*

*lending from Lehman Brothers yet.  **We** made a short-term loan until the lending came in.  Once the lending came through they were to pay back the loan, I think in the neighborhood of five-and-a-half million dollars, on the closing.  **It was never paid back**.  And then communication basically seized [sic] at that point from him [Jowdy].  That was kind of the whole sticking point as far as me **and the other guys** with Mr. Jowdy."*

Nevertheless, nothing represents anything similar to an entirely unlawful scheme the government now announces.   Even under the "*gross amount he took from investors*" theory; the funds are *not* traceable to Kenner; See *United States v. Sigillito*, 899 F. Supp. 2d 850, 865 (E.D. Mo. 2012); also contradicting the government's representation that 981(a)(2)(A) applies because the scheme was entirely unlawful.

- The Jowdy loans were unique transactions, as part of hundreds of transactions between 2003-and 2006 that facilitated a $100 million-plus Hawaiian real estate project that the global recession in 2009 and the Lehman Brothers 2008 bankruptcy derailed – not a Ponzi scheme as now alleged for the first time in 10+ years;
    - See *United States v. Ebbers*, 458 F.3d 110 (2d Cir 2006) – "'[t]he loss must be the result of the fraud." *Id*. at 128.   "[l]osses from causes other than the fraud must be excluded from the loss calculation."   *Id*.

The government also claimed "*proceeds from several other sources were traced to the purchase of DCSL*" (*ECF No. 780 at 6*).   **This is also disingenuous, because** *government-forfeiture-36* traced 100% of the funds from parties who have "only" participated as litigants *versus* Jowdy (*for his documented embezzlements – ECF No. 667, ECF No. 628*) as the source of the DCSL acquisition funds.

- *The government presented the evidence – not Kenner…*

*Ironically*, as Baja Ventures 2006 partner, Jozef Stumpel explained to the Court (*ECF No. 771*), John Kaiser[18] assisted Jowdy against Jozef Stumpel's Mexico litigation to recover the $1.6 million Stumpel wired to Jowdy on May 23, 2005 (documented on *government-forfeiture-36, back ups available upon request from the Court*) for the Baja Ventures 2006 capital account by lying about a forgery in a Mexico court. Jowdy *stole* those funds, leaving only $2.5 million in the Baja Ventures 2006 capital account for the March 2006 closing (only discovered when the rest of the Jowdy schemes were uncovered in late 2006 – post Hawai'i closing – and settlement

---

[18] The author of *ECF No. 628* – intended to shock the Court and expose the Jowdy cabal after 5-years in Mexico as Jowdy's co-conspirator.

negotiations had already begun for the 5-years of documented criminality by Jowdy at that point in time).[19]   The government cannot connect any ill-gotten funds – from a Kenner scheme – to the Cabo project acquisition as "**other sources**"; either.   It is a Red Herring – like the tequila bottle/company fabrication.

*Owen Nolan complete memory loss (severe CTE)…*
Based on *Alexander*[20], the Court must note that Owen Nolan has not been able to remember anything related to his investments including during his 2009 arbitration testimony.   In 2015:

**First**: Nolan testified he was unaware of his own LOC (*Tr.2065-66*) – thus prohibiting the following government questions as having any relevance when asked about underlying loans to Jowdy.

> - *How could Nolan remember the "Jowdy loans" – if he could not even recall his own "signed" underlying investment LOC in 2009 or 2015, or who the Hawai'i Managing Member was (answer: Kenner whom he trusted "like a brother" (Tr.2062))?*

> - *The foundationless testimony cannot support "B" if they cannot even recall "A", the necessary predicate act.*

**Second:** The government *concealed* the March 2009-deposition testimony of Northern Trust Banker Aaron Mascarella (less than 2 months before the 2009 arbitration).   Mascarella verified that he had independently spoken with Owen Nolan (himself) between 2003-06 about his LOC.

Northern Trust banker Aaron Mascarella 3-9-2009 deposition (*Page 24*):
> *Q:    During the time period from -- From the time you opened the Nolan account until the end of 2006, did you have conversations with Mr. Nolan concerning the line of credit?*
>
> *A [Mascarella]: Conversations -- I spoke to Owen infrequently.  I've only had brief conversations with him.  And my guess is that it was only relating to the*

---

[19] Kaiser lied to the 2012 Mexico court, claiming his signature was "forged" on the testimonial he actually signed in the Courthouse years earlier for Stumpel's case versus Jowdy.

[20] At sentencing, "the Court is virtually unfettered with respect to the information it may consider."  *United States v. Alexander*, 860 F.2d 508, 513 (2d Cir 1988).

> *payments, that the payments were being made or not being made.  There was a few times when the payments were slow, that we sent out default letters, which probably -- You know, I can't remember every conversation I had with him but I assume he might have responded to one of those default letters.*

**Third:** Nolan possessed his-own 2006 Little Isle 4 K-1 tax document -- and produced it as part of his 2009 arbitration evidence production, further verifying his first-hand knowledge (in spite of **CTE** symptoms) of his $2 million investment in Hawai'i "in real time" (*Bates stamp: Nolan0005044*).

**Fourth:** the government knew they had Rule 16 evidence that Nolan's wife was personally making payments on Owen's LOC in 2006, including the repayment of a loan with her private Wells Fargo banker and Kenner's assistant (refuting all concealment issues or lack of knowledge):

- *Bates stamp: MYR0001066,* produced by Nolan's investment advisor during a 2009 litigation;
- *Bates stamp: NOLAN0005249*, produced by Nolan himself during the 2009 arbitration, further verifying his real time retention of the transparent emails; and
- *Bates stamp: NOLAN0005044*, Nolan's 2006 Hawai'i partners K-1 tax document, produced by Nolan during the 2009 arbitration confirming Nolan retained it from his 2006 tax records, wholly verifying the exact amount of his LOC funds and Hawai'i partners investment)
  - ***All available to the Court upon request***.

The August 2006 Northern Trust LOC communication, *supra*, included Owen Nolan's wife (Diana), her personal business manager, and her Wells Fargo private banker; wholly removing any possible concealment of anything from any Nolan advisor about Nolan's LOC: ***and hi-lighting the severe Nolan CTE at the time of his 2015 testimony (9 years later).***

**Fifth:** Nolan exchanged a 6-day text communication with Kenner in December 2007 (including 2 documented phone calls) before he signed his entire 2007 LOC renewal package independent from Kenner and returned it via FedEx to Northern Trust Bank using Kenner's FedEx account (*ECF No. 786 at 6-13 – December 26 dated submission*).  This package included documents in the 2015 Northern Trust bank subpoena (*Kenner trial exhibit 210*) that were delivered *too late* for defendant's

33

counsel to properly utilize (under any circumstance); See *United States v. Gil*, 297 F.3d 93 (2d Cir 2002).[21]

---

[21] *United States v. Gil*, 297 F.3d 93 (2d Cir 2002) ("the government wrongfully suppressed evidence favorable to the defendant [that was] exculpatory and impeaching information, seriously undermining confidence in [the] guilty verdict, and <u>was not disclosed timely enough for it to be useful to defendant</u>.   The production of the documents on the eve of trial did not provide defendant the opportunity to <u>read it</u>, <u>identify its usefulness</u>, and <u>use it</u>.").

The Court opined, "To the extent that a prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation, grounded in the 14th Amendment, to disclose that evidence to the defendant.  Information coming within the scope of this principle includes not only evidence that it is exculpatory, i.e. going to the heart of the defendant's guilt or innocence, <u>but also evidence that is useful for impeachment</u>, i.e. having the potential to alter the jury's assessment of the credibility of a <u>significant</u> prosecution witness."   *Leka v. Portuondo*, 257 F.3d 89, 98 (2d Cir 2001) (alterations in original) (quoting *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir 1998)).

In *Gil*, a guilty verdict was vacated and remanded for "late discovery" of exculpatory information that "*was not disclosed timely enough for it to be useful to defendant*".   In *Gil*, *supra*, the Court was disturbed that "*the production of the [exculpatory] document on the eve of trial did not provide defendant the opportunity to <u>read it</u>, <u>identify its usefulness</u>, and <u>use it</u>*".

Michael Peca confirmed a previous FBI-Northern Trust subpoena in 2009, as follows in a text to Kenner after Peca requested copies of the records for himself and Kenner via notarized document in August 2009 (*Bates stamp: PK_SEC_005395*):

| 10293 | +17163743234 Michael Peca* | 10/16/2009 1:42:01 PM(UTC+0) | Read | **Were you aware that a subpoena was issued for the NT acct? Just got a letter from NT today.** |
|---|---|---|---|---|

The government sent a second subpoena to the Northern Trust accounts approximately two months later – and Michael Peca alerted Kenner (again):

| 10959 | +17163743234 Michael Peca* | 12/7/2009 6:30:57 PM(UTC+0) | Read | **Received a subpoena for NT account. Thought that already happened a while back.** Call me tonight to explain and run through some shit w/ me |
|---|---|---|---|---|

- Kenner attempted to acquire the statements to apply to a proper defense strategy thru pre-trial subpoena requests, but was *<u>denied</u>* months before trial -- and then *<u>delayed</u>* by a knowledgeable government opposition to the truths that would destroy their witnesses' <u>planned</u> *faulty memory, confusion and mistakes* testimony.

34

**Nolan's 2007 renewal documents** (post-text communication with Kenner) included at least the following loan documents included the 2015 subpoena (*Kenner trial exhibit 210*):

*2007 Disbursement Request & Authorization* (**1-page signature document**)
- <mark>**Confirmed $2,189,796.02**</mark> -- "*Amount paid to others on borrower's behalf*"
  - *Bates stamp: TNTC0000738*

*2007 Change in Terms Agreement* (**1-page signature document**)
- Confirmed extending the *2006 Change in Terms Agreement*
  - *Bates stamp: TNTC0000719*

Nolan also signed the *2007 Master Note*, the *2007 Pledge Agreement*, and the *2007 Securities Control Agreement* (as did all other LOC clients of Northern Trust Bank at the same time).   They are referenced in the 2009 default letters received by each of the LOC clients from Northern Trust Bank.   Their personal signatures and returning of the 2007 LOC packages were sent by the individuals using Kenner's FedEx account, identical to Nolan (*Bates stamp: BNK-AMEX-0001632-40*).

_Sydor's CTE symptoms…_
- The Court should note that Sydor (thru his haze of **CTE**) could not recall receiving his default letter in 2009 – even after being shown *GX-2119* during the 2015 trial.   He claimed he was unaware of the default 6-years later, only 2-3 weeks before his EDNY testimony (*Tr.2185-87*).
- *Sydor was wrong* thru his haze of **CTE** – because his own March 2009 text to Kenner three days after the default letter was mailed to his home address referenced the exact default amount of **$855,351.03**, which is not referenced, on any other document in evidence.

| 6083 | +19725 230505 Darryl Sydor* | **3/23/2009** 1:59:36 AM(UTC+0) | Read | [Sydor]: What funds ? **And this thing says I owe <u>855,351.03</u> right now.** |
|---|---|---|---|---|

*Nolans first default letter (referenced in the Mascarella deposition, supra)…*
The Court should note that the documents Nolan signed in 2007 were renewed 6-months after Nolan received a *2007 Default letter* addressed to his Arizona residence (*Bates stamp: TNTC00051*).   This is more likely than not the "default

letter" that Northern Trust Banker Mascarella testified about discussing with Nolan on the phone during his March 2009 deposition, *supra*.

*Independent 2017 settlement agreement with Jowdy…*
- **After government-forfeiture-44 was exposed** *(with 100% of the Hawai'i partners loans traceable to Jowdy – not Kenner)…*

In addition, and further thwarting the government's argument (or general lack of knowledge claims from their prosecution), the 2017 deal was done *after* the government presented *government-forfeiture-44* in 2016 and shared it with he Hawai'i partners and Jowdy-Mexico investors.  Kenner mailed the *government-forfeiture-44* disclosure admission to the investors Hawai'i-Mexico attorney Steve Main for his negotiating knowledge, thru counsel immediately following its *stunning* disclosure in 2016 by the government.

The **government-Jowdy** accounting record verified that Jowdy received 100% of the expected Hawai'i partners' loans between 2004-06, as Kenner testified about vehemently throughout trial; although scorned by the AUSA as "*lying*" about the funds (*Tr.4598, 5064-65*).  As a result, the attorneys for the Hawai'i-Mexico investors were clearly aware of the monies Jowdy received, and as such, settled for them part and parcel to their macro agreement -- *because* section '1.8 Definitions' identified every possible permutation of Jowdy, the investors/lenders, and their perceivable connections to any money Jowdy "obtained", ***directly or indirectly*** *(ECF No. 781-1 at 57-58)*.

*The investors were fully recompensed (even without a government forfeiture nexus)…* In the 2017 settlement, the group of investors received an incremental 4.6% of the Diamante Cabo project (worth approximately $13.5 million) directly from Ken Jowdy equity.  **The net resort value in 2017 – at the time of the settlement – was well over $300,000,000** ($450,000,000 appraised value and approximate $150,000,000 Danske Bank loan).   The government claimed in a 2019 hearing "*in the last two years Jowdy and his management team have drained $200,000,000 from the value based almost solely on their management salaries and expenses*".  That is an issue between the investors and Jowdy – and their underlying 2017 settlement – not a reflection on forfeiture, money judgment, restitution or "loss" calculations for Kenner.

Independently, the investors could have continued their lawsuit in Delaware with Jowdy; specifically considering the Jowdy embezzlement banking records and Danske complicity records are in evidence thru Kenner submissions (*ECF No. 667 at*

*16-17*).  Nothing was concealed as a result of Kenner's discovery dig for the investors (further exposed post-trial thru the voluminous government Rule 16 production); the opposite of the government's reluctance to pursue an indictment of Jowdy.

*CTE complicates the "concealment" prosecution with "new evidence"…*
- The **CTE** influence (akin to Alzheimer's) was undiscoverable until Bryan Berard admitted it on a 2018 podcast (*on GoProvLocal.com*) that he had participated in a 2014 class-action lawsuit versus the National Hockey League for **CTE**.
- Berard is only involved in the Hawai'i object of the superseding indictment, and his inconsistent testimony (from his 2009 arbitration "knowledge", *infra*) is that in 2015 he could not remember ever being told by Kenner about the "loans to Jowdy" (complimented by the fact that Berard was employed by Jowdy in Mexico at the time of his testimony – like John Kaiser, and in separate litigation with Kenner over two independent properties they stole from Kenner totaling millions of dollars of loss to Kenner as a result of Kenner's arrest and inability to complete the civil cases – at their hands).[22]

The underlying prosecutorial theme of "concealment" thru 4-6 of Kenner's 30-ish investors involved in the identical transactions (both in scope and timing) "*remembering what they were never told*" despite the "real time" empirical evidence that confirms their specific involvement in the exact transactions – while represented by independent counsel.

Complicating this "*conspiracy by concealment*" prosecution (the lack of knowledge of authorized and "legal" transactions -- opposite a person who sells stolen goods) is this "**new evidence**" that Bryan Berard **admitted** on a 2018 podcast while promoting his tell-all book.
- Berard confirmed he has been suffering from brain damage symptoms since years *before* the 2015 trial -- and was a plaintiff in a 300+ person class-action lawsuit versus the National Hockey League for **CTE** (which included Owen Nolan, Darryl Sydor, Steve Rucchin amongst 300+ others).[23]

---

[22] The NY Daily News (*November 13, 2013*) touted Kaiser and Berard as "*heroes*" for their efforts with FBI Agent Galioto and featured them in an arrest-day article titled – "***Former NHL Player Bryan Berard and ex-cop help Feds nail two Arizona men in massive fraud***".

[23] **Wikipedia**: Chronic Traumatic Encephalopathy (CTE) is a neurodegenerative disease **caused by repeated head injuries**. Symptoms may include behavioral problems, mood problems, and **problems with thinking**.  *Symptoms typically do not begin until years after the injuries*. *CTE often gets worse over time and can result in **dementia***. It is unclear if the risk

Berard's real-time 2009 arbitration testimony about his *full Hawai'i partners loan knowledge* and *knowledge of his use of funds* was in **direct contradiction** to his 2015 testimony that he was not aware of anything to do with his investments (at all – **a.k.a. amnesia**).  His tell-all book also fabricated the same false storylines, confabulating loss amounts to $6 million, when Kenner *never* administered more than $1.5 million cumulatively for Berard; *ever.*  Berard's 2009 voluntary arbitration testimony (6 weeks after his documented knowledge of the Northern Trust LOC collateral seizure – *ECF No. 786 at 4-5*, and not via phone call as he fabricated during trial, *Tr.3039-40*) confirmed that he was part of the decision to lend money to Ken Jowdy (personally), with the expectation that Jowdy would be furthering the group's efforts in multiple Mexico projects with the funds he personally borrowed (*3500-KJ-2 at 24-25*).

*Berard confirmed Jowdy-loan knowledge thru Kenner to the 2015 Court (a.k.a. non-victim)…*
After Berard's denial of any knowledge on direct examination, he impeached himself and confirmed that Kenner had told him about the Jowdy loans (*Tr.3055*):

*Q. And did you have any firsthand knowledge about any of those -- about the money going from Hawaii to Mexico?*

> *MR. HALEY: Objection.  Just the leading -- I object. Without a speaking objection, I object.*
> *THE COURT: Overruled. That one's okay. You can answer that.*

*A [Berard]: I was only familiar with what Phil Kenner told me about some money that was going from Hawaii to Mexico.*

**Berard was 100% aware**, **per his own confirmation** – thus he *cannot* be a victim of the loans he was aware of.   This is identical to Michael Peca's re-cant during cross-examination that he was 100% aware as he testified to the 2011 SDNY Grand Jury (*3500-MP-5 at 30-33, 35, 40, 42, and 45*).

---

of suicide is altered.  Most documented cases have occurred in athletes involved in contact sports such as boxing, American football, wrestling, **ice hockey**, rugby and soccer.  Other risk factors include being in the military, prior domestic violence, and **repeated banging of the head**.  The exact amount of trauma required for the condition to occur is unknown.  Definitive diagnosis can only occur at autopsy.  Chronic traumatic encephalopathy is a form of tauopathy   There is no specific treatment.   Rates of disease have been found to be about 30% among those with a history of multiple head injuries.

- The government's tracing of these Jowdy-loan-funds (*government-forfeiture-44*) confirm Jowdy received 100% of what was expected, but including no more than $1,315,000 from the alleged victims in the superseding indictment (*ECF No. 214*).
- Jowdy was touted as an innocent-third-party during the 2015 trial and thru several Probation submissions thru July 2016.

As the Court knows, forfeiture cannot be ordered from a defendant when funds are received directly by an innocent third party.   In the *United States v. Contorinis*, 692, F.3d 136, 148 (2d Cir 2012), the Court "observed that neither the language of the criminal forfeiture statute nor Circuit case law supported the proposition that a defendant must forfeiture proceeds that 'go directly to an innocent third party and are never possessed by the defendant'" *Id.* at 147.

### The Eufora "object"...

**The Eufora "object"** charged the 2008-09 private stock sales by Eufora Board member and AZ Eufora Partners I Managing Member, Tim Gaarn – and Eufora founder Tommy Constantine as legal transactions, but concealed as to the post-sale use of proceeds (private stock sales versus treasury stock argument).

Tim Gaarn was not charged in the instant case.   Gaarn testified that he had nothing to do with any conspiratorial acts, even arriving as a government witness who had been thoroughly prepared for his testimony (*Tr.2503-04, 2563-64*).   In fact – the government failed to tell the Court or Jury that Gaarn had recorded Kenner for nearly five hours during the course of 2012 and never once asked Kenner about any illegal activities related to the stock Gaarn had owned since January 2005 (per the Eufora tax filings [*GX-4728 at 21, 35, 47*] and corresponding corporate records [*GX-210 at 37*]).   Gaarn never insinuated it was Kenner's stock during the five hours of FBI recordings.   The FBI knew at the time of the 2012 recordings that Kenner would have "stopped Gaarn in his tracks" if he tried to allege any of the fabricated malfeasance that the government claimed "without Gaarn's supporting testimony at trial".

Although mis-represented at trial repeatedly by the government (*Tr.2173, 5970-71, 5973-74*), the tax filings and corporate records, *supra*, confirmed that Kenner was neither a management member of Eufora or a shareholder of Eufora during the

period of time of the private stock sales. Kenner was merely a Eufora lender (*GX-4728 at 10*).

**$700,000** *is where the Eufora maximum loss begins, based on total sales by Constantine and Gaarn to the superseding indictment individuals.*

➤ **$117,000** *is traceable to Kenner from the Constantine 2008 sales and* **$162,500** *is traceable to Kenner from an innocent 3rd party, Tim Gaarn from his 2009 sales*
   ○ **Both** re-paid Kenner for government-documented loans Kenner previously made to Constantine and Gaarn (*Tr.2580*);
➤ *…Thus no more than $280,000 ill-gotten gains can be traced to Kenner --assuming the vetted stock transactions by Rudy Giuliani's investigative team were insufficient in determining the transactions they investigated for the same investors in 2010-11…*


**The Global Settlement Fund ("GSF") "object"…**

The "object" charged misappropriation by Constantine of the GSF proceeds.  The Court determined that **Constantine overspent** the fund by **$17,077** using the most aggressive calculation against Constantine's spending (*ECF No. 501 at 60*).  Although the Court suggested at *ECF No. 501 at 60, footnote 18* that the $450,000 involved in the Juneau payoff may not have been authorized, none of the $450,000 is traceable to any individual in the superseding indictment (*ECF No. 214*) (*GX-767*).

*Kenner considered not involved in the GSF by all parties (other than as the largest contributor)…*
Testimony at trial by Michael Peca confirmed Kenner "*didn't seem to have one*" when asked about Kenner's GSF participation (*Tr.540*).

Testimony at trial by the custodian of the GSF funds (attorney Ronald Richards) confirmed "every" transaction was managed and authorized solely by Constantine (*Tr.3805-3816*).

Pre-trial, government witness, Tyson Nash, testified that Kenner had no role in the GSF (*3500-TN-3 at 12*).

Despite the government's droning about a *Kenner tequila company* (having something to do with the instant case), the government *never* traced money as

promised, simply presenting a Red Herring to the Court and Jury (*Tr.33, 726, **1074-76**, 1080-84, 1154, 4722-23 [GX-4509, **fake** tequila bottle], 4726-28, 5752 [summation while banging the bottle on the jury counter]*).

***$1.2 million** is where the GSF maximum calculation begins, based on gross contributions by alleged superseding indictment victims to the Constantine-GSF "object".*

➢ *Only $22,435 expense reimbursements are traceable to Kenner (and originating from a non-victim)...thus no ill-gotten gains...*

**Conclusion...**

Under 21 U.S.C. 853, permitting money judgment, mandatory forfeiture is concerned not with how much an individual has *but with how much he received in connection with the commission of the crime*.

The Shkreli Court opined: "Criminal forfeiture focuses on the disgorgement by a defendant of his ill-gotten gains." *United States v. Contorinis*, 692 F.3d at 146 (internal quotation marks omitted); *United States v. Torres*, 703 F.3d 194, 203 (2nd Cir 2012) ("'[F]orfeiture is gain based' not based on the losses (or gains) to victims." (internal quotation marks omitted)); *Shkreli at 6-7*.

As such, the government requests for $36 million in forfeiture money judgment and the forfeiture of the Baja Ventures 2006 equity position are meritless.   Kenner recently learned that the government has spent approximately $25 million since Kenner gave proffer to the FBI on June 24, 2009.   This is approximately half of the money the U.S. government spent on the Mueller probe in 2017-2019.   The government has been tasked with "moving the goalposts" to support any recovery possible to recoup the alleged frauds that have never existed if the real time evidence is followed and the actual money is traced.

The government's money judgment letter is a disgrace and dereliction of their duty to the Court.   The records in the government's hands confirm that:
- Kenner (and others) got robbed by Ken Jowdy;
- Kenner (and others) got robbed by John Kaiser;
- Kenner (and others) got robbed by Tommy Constantine;
- Kenner (and others) got robbed by Bryan Berard; and

- The FBI case agent has lied on the record to influence testimony – and ignored critical exculpatory evidence to frame his investigation.

At this point in time…who cares?  Kenner does not in this instant – because the government is not following the statutes for forfeiture/money judgment.

The government is required to "*trace the money*" – specifically when the defendant objects.  Kenner has vehemently objected.   The totals do not need to be finalized with precision as the government likes to opine (*United States v. Roberts*)[24], but they must follow statute and case law to arrive at a realistic number; see also *United States v. Boccagna*, 450 F.3d 107, 112 (2nd Cir 2006) (victim's out-of-pocket loss offset by the value of recouped collateral).  The "law recognizes a number of reasonable measures of property value."  *Boccagna*, 450 F.3d at 115.

*Government-forfeiture-36…*
The government traced the Cabo transaction money.  $350,000 is there.  Nothing more.   Kenner hi-lighted this to the Court during the December 6, 2019 hearing.  The government wants the Court to remain confused by their "inflatable-balloon-man" replies, lacking all substance.

**Hawai'i** (*ECF No. 770 at 54*) -- **$1,315,000** went to Jowdy (an innocent third party – See *United States v. Contorinis*, 692 F.3d 136, 147 (2d Cir 2012), "A defendant who participates in a [] conspiracy is subject to forfeiture not only of his own proceeds from the offense, but also the proceeds *obtained by co-conspirators*, to the extent that those proceeds were reasonable foreseeable to the defendant."

- The government vehemently defended Ken Jowdy as a victim in the instant case thru the PSR addendum submission in July 2016.

The FBI has always known about the *Jowdy-loans* thru:
  (1) Kenner's 2009 FBI proffer;
  (2) Jowdy's executive assistant's 2009 FBI proffer (*3500-SH-1-r*);
  (3) Jowdy's own 2010 confessions to the FBI (*3500-KJ-2 at 11-14*); and
  (4) Jowdy's 2-day California deposition have never changed the reality of the documented transactions; **never for Kenner**.

---

[24] "[T]he law does not demand mathematical exactitude in calculating the proceeds subject to forfeiture.   Indeed, because the purpose of forfeiture is punitive rather than restitutive, district courts are not required to conduct an investigative audit [.]" *United States v. Roberts*, 660 F.3d 149, 166 (2nd Cir 2011).

As a starting point for top-end forfeiture calculation -- the $1,315,000 total must also consider the previous acknowledgments of:

(1) Peca verification 2015 (based on his 2011 SDNY Grand Jury testimony);

(2) Sydor's 2011 SDNY Grand Jury verification (and his 2015 **CTE** symptoms);

(3) Berard's 2009 arbitration verification (and his 2018 admission of **CTE**-related brain damage [a.k.a. Alzheimer's symptoms] prior to participating as a plaintiff in the **CTE** lawsuit versus the National Hockey League in 2014, prior to the EDNY trial); and

(4) Rucchin (along with Berard, Peca and Sydor) participated in three (3) USA lawsuits in 2008-2010 as Plaintiffs to recover the "loans" from Jowdy – while giving "*foggy*" (*Tr.2722*) recollection of the entire Hawai'i deal in 2015.

The Court must also consider the effects of **CTE** on the "memory loss" resulting in diametrically opposed inconsistent statements of "no memory" related to what they previous "knew" (via documented conference calls and attorney emails), "sued for"[25] (in Mexico, Arizona, California, Nevada, and Delaware) and "testified specifically about" (in arbitrations and a 2011 SDNY Grand Jury).

- The transactions were repeatedly discussed in a "*group*" setting – as Turner Stevenson explained to the 2011 SDNY Grand Jury (*3500-TS-1 at 17-18*).  This is corroborated by the "update" letter from a Hawai'i attorney in February 2006, *supra*, following the changes allegedly dictated by Lehman Brothers for the Cabo closing and planned $7,000,000 cash-out payback for the Hawai'i loans (*Bates stamp: 23186-23217; specifically at 11 [23196] [from the Ken Jowdy production]*).

---

[25] Rucchin, Sydor, Peca and Berard participated in a 2008 Arizona lawsuit (with 19 of the Hawai'i partners) versus Jowdy to specifically recover the unpaid Hawai'i loans – filed immediately after Jowdy and his attorneys terminated the original 2007-08 settlement discussions for the myriad of Jowdy crimes (*ECF No. 667*).  The independent attorney disclosure was signed-off (with all 7-pages initialized by the individuals.   The first page of the disclosure confirmed:

> "***the gist of the lawsuit is to recover certain monies loaned to Mr. Jowdy from Mr. Kenner, Little Isle 4 and Ula Makika LLC***.  *Mr. Kenner estimates the total amount of monies loaned to Mr. Jowdy which have not been repaid to be approximately $5,000,000.   This is the estimated principle only, exclusive of accrued interest.  In summary, Mr. Jowdy denies that the monies were loans but rather characterizes them as investments.*"

- There is no ambiguity as to what they were all suing for, and not a single complaint, email, text, or otherwise represents a dissenting opinion about Kenner &/or the Jowdy loan lawsuit in Rule 16 production.

ZERO dollars can be traced from the alleged superseding indictment victims to the Constantine payments as outlined by the government expert Petrellese (*Tr.3934*) (*GX-41B*).   The government has not produced any proof otherwise.

**GSF** (*ECF No. 770 at 69*) -- **$1,200,000** contributed by individuals named in the superseding indictment (*ECF No. 214*), but the Court recognized that Constantine (*never Kenner per the custodial attorney's own trial testimony – Tr.3805-3816*) overspent the funds by **$17,077** (*ECF No. 501 at 60*).   At *footnote 18 (ECF No. 501 at 60)*, the Court mentions that other expenses, such as the $450,000 transaction that Constantine effectuated *solo* may or may not have been approved as Nash (*Tr.1919-22, 1944, 1989-90, 2003*) and Kenner (*Tr.4925-26*) verified to the Court was expected.   But again – the government did <u>not</u> trace the $450,000.   Those funds originate from two individuals who are not in the superseding indictment.   *They are not victims* (*GX-767*).
- Based on the miniscule amount of funds allegedly overspent by Constantine *solo*, there is no reason to even back-trace the $17,077.

This is all despite the fact that every GSF contributor signed off on the "specific use of funds" via email within a 7 days period of their respective contributions.   **The government and the Court cannot dismiss that as controlling** (whether they read it or simply "*trusted Phil*"); See *Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A.*, 461 Fed. Appx. 61; 2012 U.S. App. LEXIS 3012.
- In *Horvath*, **the investor argued that the terms and conditions were <u>*written in Portuguese*</u>, which he did not understand, but the court of appeals found that the investor was charged with knowing and understanding the contents of the documents that he signed**.

- If the signer can read the instrument, not to have read it is gross negligence; if he cannot read it, not to procure it to be read is equally negligent; in either case the writing binds him.  Parties are bound by documents expressly incorporated by reference into agreements to which they manifest their assent.

**Tyson Nash** (*Tr.1919-22, 1944, 1989-90, 2003*), **Kenner** (*Tr.4925-26*), and **Darryl Sydor** (*Tr.2280*) gave testimony during the trial to verify the "*bad apples*" (Nolan, Juneau, Moreau and Myrick) that were being extracted from the group's investment

deals – utilizing the GSF as the signed-off authorizations (and pre-cursor) emails all verified in detail (Peca[26]) (McKee – *ECF No. 736 at 115-117*).

The "bad apples" testimony was further corroborated by **Jay McKee**'s 2009 text communication with Kenner confirming <u>McKee knew 100% of the GSF uses</u> – including the juxtaposed "*black sheep*" (*ECF No. 668 Appendix at 49-50*).  And – McKee testified that he spoke to **Michael Peca** about Constantine's GSF plan before both of them agreed to contribute to the GSF – and *signed off* (*See Bates stamp: SMC-000015* [Kristen Peca], *See Bates stamp: SMC-000018* [Jay McKee], and *See Bates stamp: ED-002051 and BX20-SD-000075* [Michael Peca]).
  • *All original records available upon request from the Court.*

**Eufora private stock sales** (*ECF No. 770 at 66*) -- **$700,000** was purchased by the alleged superseding indictment victims from Constantine ($450,000) and Eufora Board Member, Tim Gaarn ($250,000).

As vetted by Rudy Giuliani's own attorneys and investigative team, no civil issues were raised during their 4-month, 2010 investigation of "everything Eufora" even after Constantine alleged Gaarn and former Eufora CEO CR Gentry "stole the stock

---

[26] Kristen Peca replied to the Constantine, full-disclosure email: *"Hey, before we sign off on an "approved" letter, can we please have the written documentation to exactly how much (%) we obtained with our contribution?" (ECF No. 719 at 10, Ex. 1a)*

Both Peca's signed off independently (*id. at Ex.3* and *Ex.5 – over a week later*).   Thus, they both received answers to the exact question(s) they were requesting answers to -- <u>and the resulting satisfactory paperwork from Constantine.</u>   Michael Peca even followed-up immediately after the meeting a week <u>before</u> he sent his "signed" email authorization:



| 7042 | +17163743234 Michael Peca* | 5/9/2009 2:04:59 PM(UTC +0) | Read | Make sure I get a statement of somekind to where my $250k is going. **How much in ea of the two companies. Thanks** |

This response clearly demonstrated that she and her husband reviewed the details of the authorization letter and had every, real time, opportunity to reply to its contents, and did as they needed clarity.   Constantine emailed the Pecas a full disclosure letter, separate and apart from the authorization email stating, in part (*id. at Ex.6*):

> *"The attached excel spreadsheet shows your current ownership interest that we are acquiring from the three [bad apples] of them as part of the settlement."*
>
> *…"…Avalon Airpark project.  We are buying out their 20%, so you will also receive 1/10th of this interest (2%)."*

from the company" and resold it as Gaarn's stock (never claiming as the government did 5 years later that the stock somehow "*thru magic*" belonged to Kenner (*Tr. 2732, and Tr.5970, 5973-74 [rebuttal summation[27]]*)), contradicting the government's pre-trial evidence (*GX-210 at 37, and GX-4728 at 21*).   Attorney Stolper hi-lighted the allegations of illegal stock sales to 29 Eufora interested parties on July 16, 2010 (*ECF No. 736 at 33, Ex.Z3*).

The Eufora investors' attorney, Michael Stolper's letter exposed any perceived "concealment" by Kenner, as Stolper and Giuliani stated:

> At 1: "*…to give him [Constantine] the opportunity to support his allegations against his co-managers at Eufora.*"

> At 4: "*Lee, you claim to have been "informed" about "very disturbing facts relating to the actions of several investors and managers on the Eufora saga.*"

> "*We want to address these points as well, not with finger-pointing and conjecture, but real evidence (documents).   I invited Constantine to support his allegations but he has yet to provide a single piece of evidence or agree to meet with us.*"

> At 7: "*Constantine made allegations against Gentry (Eufora CEO) and Phil Kenner, a money manager of the members of the company [AZ Eufora Partners I];*"

> At 7: "*Stolper repeatedly requested that Constantine come to New York to address the findings and support his allegations about Gentry, Kenner, Eufora financing and the defaulted loan.*"

> At 7: "*…neither Constantine nor his counsel have provided the documents that Constantine said he was going to provide, and has otherwise not agreed to meet with Stolper and Hatzimemos [Giuliani's right-hand-man] to resolve the open issues;*"

Not one investor replied that they were unaware of the private stock sales.   Not one!  They all signed off on the full disclosure letter "confirming the Gaarn stock sales" (*ECF No. 736, Ex.Z3 at 9-18*).   Michael Peca told Kenner *after* the Constantine

---

[27] Komatireddy [rebuttal summation]: "*Because after all, they [Constantine and Kenner] were just selling their shares in Eufora.*"; and "*The founder of the company is selling his shares, your financial advisor is selling his shares*"; and (*Tr.2732*):

> *Q. Did Mr. Kenner tell you anything about your money going to buy out either Mr. Constantine or Mr. Kenner's shares in the company?*

> *A [Rucchin]: No, he did not.*

conference call rant about the "*stolen stock*" issue (with no obvious concealment –
yet testified as unknown by Michael Peca 5 years later – *Tr.446*):



| 1 5 7 9 6 | +17163 743234 Michael Peca* | 8/19/2010 2:40:01 PM(UTC+0) | R e a d | I will later. **Hopefully everyone can get together to put the allegations to rest. <u>There are bad ones going both ways.</u>** |
|---|---|---|---|---|

Even the lead Giuliani attorney (Stolper) exchanged texts with Kenner *during* the
call about the nonsensical "*stolen stock*" and Constantine's efforts to get law
enforcement to go after everyone.

There was *no secret* about either the Gaarn (2008-2009) &/or the Constantine
(2008) Private Stock sales concealed from Stolper &/or the Plaintiffs he
represented.

**Kenner personally alerted the attorney for the investors – leaving no room for
a "concealment" claim**:



| 1 8 2 7 1 | 1917626 1175 Michael Stolper* | 8/18/2010 8:09:12 PM(UTC +0) | S e n t | **[Kenner]: Tommy has the Kenner gave Gaarn stock as an illegal transfer issue on the table. He's threatening with law enforcement to go after us** |
|---|---|---|---|---|

Reply from Stolper:

| 1 5 7 5 0 | 1917626 1175 Michael Stolper* | 8/18/2010 8:10:45 PM(UTC +0) | R e a d | **[Stolper]: Predictable** |
|---|---|---|---|---|

Then – Constantine makes another immediate and unfounded allegation about the
private stock sales.   Kenner passed the information along to the investors' attorney
Stolper again – one minute later, as follows:



| 1 8 2 7 2 | 1917626 1175 Michael Stolper* | 8/18/2010 8:10:37 PM(UTC +0) | S e n t | **[Kenner]: He just threatened law enforcement involvement to settle the issue with the Kenner/Gaarn transfer!** |
|---|---|---|---|---|

And Stolper again responded:

47

| 1 5 7 5 1 | 191762611 75 Michael Stolper* | 8/18/2010 8:12:24 PM(UTC+0) | R e a d | **[Stolper]: Hopefully recorded**. |
|---|---|---|---|---|

*Home Depot recording…*

The government and the court have repeatedly referenced Constantine's diabolical rants on the Home Depot recording Kenner made and immediately turned over to Giuliani's group in August 2010.  In Constantine's verbal vomit, he alleges that Gaarn and Gentry stole the stock from the company and re-sold it (*ECF No. 501 at 38*):

> [Constantine]: "*What do you think is gonna happen when seven hundred thousand dollars shows up, going from the players that <u>already bought it the first time</u>, to the bank account, back to Tim Gaarn – to Eufora's bank account – back to Tim Gaarn's account, to your account?   Like, this is not gonna look good, right?*"

And – based on the nonsensical "*cover-up*" allegations by Constantine:
> **Question:** What did Kenner do with the surreptitious Home Depot recording Kenner made?
> **Answer**:  Kenner immediately copied the recording and sent it FedEx to the attorneys for the investors that Kenner would have criminally defrauded.

There is no applicable logic for Kenner's actions -- if the transaction were ever concealed and not just another confabulation by Constantine, ultimately conflicting with what he told Privitello on a 2012 recording <u>*about the same transactions*</u>:

[Constantine at 22.50 to Privitello]: "*…then the 700 grand went to Tim Gaarn and went to Mexico -- God knows where and what for and then Tim Gaarn and Phil and CR [Gentry] were the ones who convinced all you guys to do all this [investigate Eufora thru Giuliani and Stolper][28]…you say that you are not surprised what Phil did but Phil*

---

[28] See *ECF No. 736, Ex.Z3 at 6* -- Stolper clearly explained to the AZ Eufora Partners I investors that **Tim Gaarn alone hired Giuliani and Hatzimemos and Stolper to investigate "everything" Eufora** – and they were granted access to all of the Eufora corporate records thru Board Members Gaarn and CEO Gentry.
  - *Kenner had no ability to conceal anything as a non-party to the investigation or Eufora for that matter.*

*is the one who did all of this…"*

- Please note that none of the funds went to Mexico – nor "*for God knows where and what…*".

It is consistent with Constantine's own trial counsel beliefs (*ECF No. 729 at 14*): "*Trial counsel asserts generally that Constantine presents '*half-truths or outright misrepresentations of the facts'*"* …

Constantine alerted all of the investors during the conference call, as Michael Peca verified via text, *supra*.

These statements, *supra*, have proven to be nothing more than the ramblings of a guilty conscious, like the rumors Jowdy continues to spread, per the Kaiser shocking February 2019 letter (*ECF No. 628*), claiming:

> "*Jowdy would like the Court to think that Kenner stole $7 million from the Hockey Players…*"

Only the funds traceable to the alleged superseding indictment victims can be attributable to the money judgment thru forfeiture – <u>once those assets have been traced to Kenner as "ill-gotten gains"</u>; *See Shkreli, supra*.   Forfeiture or real property must be traceable to the funds from the crimes proven at trial.

Specifically, the government has not traced funds from any alleged superseding indictment victim to the Baja Ventures 2006, LLC in the Cabo san Lucas project equity that is owned by Kenner and his two European partners; Jozef Stumpel and Jere Lehtinen (*ECF No. 771*).

Only the funds represented by Kenner in this document are traceable for money judgment *starting points*, *supra*, as the government should have done ten years ago when they began their "*investigation*" of Kenner, just days <u>after</u> his June 24, 2009 proffer about the tens of millions of known Ken Jowdy crimes (*subset, ECF No. 667*), which the government and former Jowdy co-conspirator (from 2012-17), John Kaiser (*ECF No. 628*) now claim as true.

Defendant Kenner requests the Court observe the "***tracing of the money***" and apply the appropriate forfeiture and money judgment based on what really happened (*See Shkreli*) and not the government's continued confabulations -- as their case nexuses continue to fail, regardless of how many times they "move the goalposts".

The funds **_traceable_** to Kenner are from the Gaarn and Constantine loan repayments; post Eufora private stock sales equaling approximately $280,000, _nothing else_.   The government's $36 million request and the Baja Ventures 2006 nexus (or otherwise) are solely based on non-evidence that "every" civil case surrounding these identical matters would perish in the Federal Courtrooms.

Respectfully submitted,

Phil Kenner