January 14, 2020

The Honorable Judge Bianco
U.S. District Court – EDNY
100 Federal Plaza
Central Islip, NY 11722

**Re: Restitution Reply To ECF No. 781**

Your Honor,

The defendant is in receipt of the government's restitution submission of
12/27/2019.  Once again, they have ignored their responsibilities to "**trace the
money**" and comply with statute and precedent controlling case law – that requires
they:

1. Separate the "fraud versus non-fraud factors" (See *Ebbers*, *infra*);
2. Calculate what the investors received that they "bargained for" (See *Leonard*[1]
   -- and *Evans, Horvath, Novak, Starr, Shellef* [2], *infra*); and
3. Calculate the "credits against loss" for recovered or retained assets; See
   *Boccagna*[3], and  (U.S.S.G. § 2B1.1 (b)(1) application n. 3).[4]

---

[1] *United States v. Leonard*, 529 F.3d 83, 92 (2nd Cir) ("A fraud may involve the

[2] *United States v. Starr*, 816 F.2d 94, 98 (2d Cir 1987).   It is not enough to show that a
defendant used deception to induce victims to enter into transactions they would otherwise
avoid.  See *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir 2007).   Rather, the government
must show a "discrepancy between benefits reasonably anticipated because of the
misleading misrepresentations and the actual benefits which the defendant delivered, or
intended to deliver.  *Starr*, 816 F.2d at 98.   Intent to harm cannot be found when alleged
victims "received all they bargained for, and defendant's conduct did not affect an essential
element of those bargains."  *United States v. Novak*, 443 F.3d 150, 159 (2d Cir 2006).

[3] *United States v. Boccagna*, 450 F.3d 107, 115 (2nd Cir 2006) (victim's out-of-pocket loss
offset by the value of recouped collateral).

[4] The plain language of U.S. Sentencing Guidelines Manual § 2B1.1 (b)(1) application n. 3
states clearly that the credit against loss is the actual amount recovered or recoverable at
sentencing, *without reference to the foreseeability analysis.*

During the July 2, 2019 hearing, the Court denied a *Fatico* hearing for the government, while verifying that he was only considering charged conduct in his guideline calculations and other rulings, specifically based on the government's prior submissions (*Tr.33*):

> *[Judge Bianco]: "I just want to make clear that I think I've said this before, but it is in the court's view and its consistent with the government's letter to the court, you know, two years ago that we're not – that the government is not seeking to hold the defendants accountable for any uncharged frauds.  The scope of sentencing relates only to the frauds that were proved at trial…"*

*Non-victims?*

Nevertheless, the government submitted only a summary table (without any sound methodology) (*ECF No. 781 at 5*) that included several individuals who were not charged in the superseding indictment (Gonchar, Murray, Hughes, Rizzi)[5], in an attempt to bolster their alleged victim and loss numbers, when they are neither -- and the artifice is simply trying to muck up the proceedings even further, 4+ years after trial.   If any of them are now considered "victims", Kenner request that an evidentiary hearing is ordered to present the corroborating FBI proffers, etcetera, related testimony and legal filings, all known to the government before they filed their first indictment – or the two follow-up indictments; See *Hughey*.[6]

*The most recent "move the goalposts" approach follows the government's contemporary forfeiture concession…*

This new introduction of uncharged victims is on the heels of the government's concession (*ECF No. 780 at 6, footnote 2*) that their forfeiture ruse was exposed by Kenner during oral arguments, December 6, 2019 (*ECF No. 781-1 at 18-21*).   Kenner explained to the Court that the government's-own accounting (*government-forfeiture-36*) verified only $350,000 of Hawai'i funds (of any classification) are "involved in" or "traceable to" the entire Diamante Cabo san Lucas property the

---

[5] Notwithstanding, significant Rule 16 production by the government, including 3500 materials and trial testimony, the empirical evidence verifies non-victim status for each of these individuals; certainly related to Kenner (who never interacted with either Rizzi or Hughes).

[6] Since the Supreme Court decided *Hughey* almost thirty years ago, prosecutorial decisions to frame indictments with a "view to success at trial rather than to a victim's interest in full compensation" are made with a full understanding of the potential consequences; See *Hughey v. United States*, 495 U.S. 411, 421 (1990).   The Tenth Circuit opined, "**There are tradeoffs in such decisions**"; *United States v. Mendenhall*, Case No. 19-7006 (10th Circuit December 23, 2019).

government have fought for 4+ years to forfeit – specifically with **NO MONEY** traceable to any Kenner controlled entity; only to Ken Jowdy's KAJ Holdings. Kenner has also debunked the government's foundationless claim that Kenner "*stole the Hawai'i funds*" with the government's-own *government-forfeiture-44* submission; with 100% of the funds traceable to Jowdy, as expected (contradicting FBI proffer in 2012 to the Pecas, *infra*).   The government realized their hoax was up under the Second Circuit who opined in *United States v. Shkreli*, 779 Fed. Appx. 38; 2019 U.S. App. LEXIS 21248.

The Shkreli Court opined, "Criminal forfeiture focuses on the disgorgement by a defendant of his ill-gotten gains."  *United States v. Contorinis*, 692 F.3d at 146 (internal quotation marks omitted); *United States v. Torres*, 703 F.3d 194, 203 (2nd Cir 2012) ("[F]orfeiture is gain based." (internal quotation marks omitted).  "In cases involving legal goods or lawful services that are sold or provided in an illegal manner, the term 'proceeds' means the amount of money **acquired** through the illegal transactions resulting in forfeiture…" 18 U.S.C. § 981(a)(2)(B); see also *Contorinis* at 145 n.3.

*Provable loss…*
As the Court knows, the purpose of restitution is compensatory and 18 U.S.C. § 3664(f)(1)(A) provides that restitution order is limited to "the full amount of each victim's actual, provable loss." *United States v. Zangari*, 667 F.3d 86,91 (2nd Cir 2012), and the amount of restitution ordered must reflect a "reasonable approximation of **losses supported by a sound methodology**"; *See United States v. Gushlak*, 728 F.3d 184, 196 (2nd Cir 2013).

The government *must* provide this information for the Court to conclude it, far beyond the government's current assertions based on *ipse dixit*.   Only Kenner has submitted calculations based on sound methodology and *supported* them with empirical evidence on the record, further complimented by the government's Rule 16 production materials (*ECF No. 770 at 53-72*); both ignored by the government to reach their foundationless conclusions (*ECF No. 781 at 5*).

Congress, not the U.S. Attorneys office governs the parameters of restitution. Congress dictated 18 U.S.C. §3663A(a)(1) to "make restitution to the victim of the offense".  "Victim" is defined, as relevant here, as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered."  18 U.S.C. §3663A(a)(2).   The instant case prosecuted the defendants for "legal transactions" that were alleged as "concealed".   The government attempted to prove their theories based on a minor subset of the total participants

(approximately 6 of 30 individuals – 20%) who gave varying "*foggy*" (*Tr.1956, 2722*) and "*I don't remember*" testimony about "*crucial and material information, in passive-equity investments, that they had previously verified and acknowledged 'under oath'*".

In *Hughey*, the Supreme Court interpreted the restitution statute; See 495 U.S. 411, 415-16 (1990) (interpreting what is now 18 U.S.C. §3663).   The Court held that statutory language authorizing restitution to the victim of "an offense" permitted district courts to order restitution "only for losses caused by the conduct underlying the offense of conviction." *See Id. at 416.*

*Civil remedies…*
Victims have independent recourse thru a civil action.   *See Griffith v. McBride*, 108 P.2d 109 (Okla. 1940) (recognizing tort of conversion).

Empirical evidence (Rule 16 production) was produced thru the government's 6-years of investigations pre-trial -- and apparently some "game-changing" post-trial "new evidence" revelations coupled with undisclosed *Brady* items, such as:

    (1) *Government-forfeiture-36* (*traced* Cabo san Lucas capital account money);[7]

    (2) *Government-forfeiture-44* (*traced* Jowdy-loans);[7]

    (3) The 17 Arizona attorney Baker *signed-off* disclosures of full Jowdy-loan knowledge, confirmed by the Little Isle 4 members (*produced only during the forfeiture production*);

    (4) The $200,000 *Kaiser theft* fax documents from his friend, Dr. Sconzo in FBI agent Galioto's possession and systematically *removed* from evidence;

---

[7] Debunking the government trial proffers that "*Kenner stole the Hawai'i funds and bought his Cabo San Lucas equity with it*" (*Tr.5996, 5711, 5722-23, 5744-45, 5990, 5991-92, 5707-5709*) – **now 100% proven false by their own post-trial submissions**.

The government confirmed to Kenner and the jury that Kenner was a defendant -- because he stole his clients money (*Tr.4588*):

    *Q. You understand that the indictment in this case does not blame you for losing money in a risky venture. Right?*
    *A [Kenner]: That's my understanding.*

    *Q. You understand that the indictment charges you with stealing money from your clients, correct?*
    *A: [Kenner]:* **That's my understanding.**

(5) The *fabricated* operating agreements between Kaiser and Privitello for another Mexico project – and its corresponding *perjury* to the FBI documented in their respective 3500 proffer notes; and

(6) The *fabricated* and *forged* Baja Ventures 2006 agreements by Kaiser, Jowdy and Najam to steal Kenner's equity in Cabo after Kenner's arrest, etcetera...)

All of the evidence is available for the previous Kenner investors to settle any civil matters in the future.

- Kenner is willing to waive all statute of limitation issues for any and all individual investors (former Kenner clients, and specifically including John Kaiser) who want to pursue civil remedies with Kenner once Kenner is released to defend their specific civil allegations.

*The Mandatory Victim's Restitution Act ("MVRA") prohibits double collection by any alleged victim...*

Under the MVRA, 18 U.S.C. §3663A, restitution is available following conviction for certain Title 18 offenses where "an identifiable victim or victims has suffered a...pecuniary loss."  But – "restitution may not result in double recovery"; *United States v. Dharia*, 284 F. Supp. 3d 262, 270 (EDNY 2018) (internal quotations omitted).

- In fact, the government bears the burden of proving the amount of the loss sustained by a victim as a result of the offense; not by *ipse dixit* but thru <u>sound methodology</u> and <u>empirical evidence</u>.

Kenner has previously documented in detail the "offsets based on loss credits" in detail for the Court (*ECF No. 770*).  The government did <u>not</u> provide the Court any contrarian evidence to refute Kenner's representation resulting in no loss; or *certainly less than $100,000 thru all three "objects" of the conspiracies charged.*

## Restitution Calculations – BEFORE CREDITS

(***Gross investment funds*** traceable to the "objects" of the superseding indictment –
some of which are unsubstantiated by empirical evidence;
Only government *ipse dixit*)

|  | Hawai'i | GSF | Eufora |
|---|---|---|---|
| Peca | 1,875,000 | 250,000 | 100,000 |
| Nolan | 2,300,000 |  |  |
| Berard | 750,000 |  |  |
| Rucchin | 1,100,000 | 50,000 | 150,000 |
| Sydor | 950,000 | 250,000 | 50,000 |
| Ranford |  | 300,000 | 300,000 |
| McKee |  | 250,000 |  |
| Nash | 100,000 | 100,000 | 100,000 |
| J. Kaiser | 1,280,000[8] |  |  |
| E. Kaiser |  |  | 66,667 |
| Privitello |  |  | 200,000 |
| Hughes (μ) |  |  | 66,667 |
| Rizzi (μ) |  |  | 66,667 |
| **TOTALS** | **7,075,000[π]** | **1,200,000** | **1,100,000** |

(μ)  -- Added as victims 5 years after the 2015 trial for the first time – with only Kaiser's direct solicitation of these two NY police officers on the record; and no nexus to Kenner whatsoever (*Tr.1058-59, 1061, 1064, 1070*); *nor ever known to Kenner*.

[π] – This total does *not* include Kaiser's perjury about not being repaid in August 2005 from the Lehman Brothers JV payout – in direct contradiction to the bank records evidence (hi-lighting his own lack of evidence to support it), *infra*.
* The government does not want to provide the necessary back-up records to Kaiser's perjury (*tax records and expense documentation*), **because they do not exist** (again).

---

[8] **The government's math does not comport**.  Kaiser did not lose $80,000 of "expected interest" -- and his *alleged* $180,00 personal contribution to the 2005 Hawai'i-loans would be double counted after his theft of Vincent Tesoriero's parent actual $150,000.   The government is aware that Kaiser's former NYPD training officer gave 2014 FBI proffer (after Kenner's arrest) and confirmed to the FBI that Kaiser had stolen the $150,000 (somehow juxtaposed now as $180,000 – and Kenner's fault) from Vincent Tesoriero's parents (*3500-VT-1 at ¶ 13*).  **It was never Kaiser's money (again).**

Nevertheless -- Kaiser was fully repaid in August 2006 – confirmed by the Hawai'i banking records (*Bates stamp: NAAV000433-35*).  At trial, Kaiser fabricated testimony that his friends & family were repaid by him personally in 2006 (*Tr.980*), but Kaiser's own 2011 texts to Kenner and other debunking evidence (*ECF No. 785 at 7*), *infra*, confirm more Kaiser trial perjury – and, a willing government who suborned John Kaiser's perjury, perhaps including Ethel Kaiser as well about repayment (*Tr.933*).  Kaiser testified in detail that in the 2009 arbitration **he** (not Kenner) solicited his friends & family for the $1 million loan in 2005, *infra*.  **There was no fraud on the inducement...Kaiser testified to it, personally**.

- Please note that the government did not claim this amount until after Kenner's December 6, 2019 oral arguments, which confirmed John Kaiser is not a victim of anything (always tying himself to other people's money; like his planned "*grocery list perjury*" – (*Tr.1404-05*)) – *to cover-up for 15+ years of robbing his friends & family*.
- Please note that if Kenner had actually given Kaiser the 2006 collateral agreement for Baja Ventures 2006 (*ECF No. 628 at 1*), why would Kenner have told Kaiser 3-years *later* he "also" gave Constantine $2 million for him – making Kaiser millions *overpaid*, while he was still borrowing money from Kenner and his friends.   *It is indefensible...*

*Offset factors...*

After identifying the "*gross amounts invested*" in the instant case "objects" from each of the individuals named in the superseding indictment, *supra*, (plus the December 2019 Hughes and Rizzi additions – 6 years after the superseding indictment) -- the Court *must* begin to apply all case law that governs the offset factors of "loss" (critical to restitution -- and guideline factors).[9]

*Fraud versus non-fraud factors (Hawai'i, GSF "objects")...*

The Court must begin its analysis with *Ebbers*.   The Second Circuit opined in *United States v. Ebbers*, 458 F.3d 110 (2d Cir 2006):

> "'**[t]he loss must be the result of the fraud**." *Id.* at 128.   "**[l]osses from causes other than the fraud must be excluded from the loss calculation**." *Id.*

---

[9] As the *Evans* Court explained, *infra*, *if there is no fraud on the inducement, then only the fraud factors are applicable to loss calculation*.   In *Evans I* (under the appellate review of Judges *Gorsuch*, Kelly, and Holmes), the Court recognized that the district Court relied on *United States v. Turk*, 626 F.3d 743 (2d Cir 2010), in stating that even if extrinsic factors were partially responsible for the eventual bankruptcies of the properties, the only loss that needed to be foreseeable to Mr. Evans was the loss of the "unpaid principal."  I R 90.  The Court found irrelevant the fact that there was no fraud in the inducement of the investments.  IV R. 112-13.   *Mr. Evans argued that the district Court erred in calculating loss because there was no fraud in the inducement of the investments*.  Aplt Br. 34-38.   **The Appellate Court agreed**; See *United States v. Evans*, 744 F.3d 1192; 2014 U.S. App. LEXIS 4490 (10th Cir 2014) (*referencing Turk*) (*Evans I*)...and *2nd appeal for improper calculation (again)* -- *United States v. Evans*, 677 Fed. Appx. 469; 2017 U.S. App. LEXIS 1942 (10th Cir 2017) (*Evans II*).

- Evans was released "time served" after the second appeal, with **no loss** (even that which was solicited after his accounting fraud began) and **no victims**.
- All alleged superseding indictment victims in the Hawai'i "object" were Hawai'i investors for *over a year* before John Kaiser met with Jowdy and recommended the loans to Kenner and Kenner investors, as well as his friends & family (*3500-JK-1-r-at 2, 3, 10*), *infra*.

*What did the investors bargain for (Eufora, GSF, Hawai'i "objects")?*
Then, the Court must calculate what the individual investors "bargained for" and received.  *United States v. Starr*, 816 F.2d 94, 98 (2d Cir 1987).   It is not enough to show that a defendant used deception to induce victims to enter into transactions they would otherwise avoid.  See *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir 2007).   Rather, the government must show a "discrepancy between benefits reasonably anticipated because of the misleading misrepresentations and the actual benefits which the defendant delivered, or intended to deliver.  *Starr*, 816 F.2d at 98. Intent to harm cannot be found when alleged victims "received all they bargained for, and defendant's conduct did not affect an essential element of those bargains." *United States v. Novak*, 443 F.3d 150, 159 (2d Cir 2006).

*What intrinsic value was received (Eufora, Hawai'i "objects")?*
Then, the Court must evaluate what value (or loss of value) has been retained or not. *United States v. Leonard*, 529 F.3d 83, 92 ("A fraud may involve the misrepresentation of the value of an item that does have some value (in contrast to an item that is worthless).   Where, for example, a defendant fraudulently represents that stock is worth $40,000 and the stock is worth only $10,000, the loss is the amount by which the stock is overvalued (*i.e. $30,000*).)"

"Intent to harm cannot be found when alleged victims 'received all they bargained for', and [defendant]'s conduct did not affect an essential element of those bargains." *United States v. Novak*, 443 F.3d 150, 159 (2d Cir 2006).

**Restitution Calculations**

(**After** the separation of fraud versus non-fraud factors

in *Horvath, Leonard, Starr, Shellef, Novak, Evans* and *Ebbers*)

| | Hawai'i | GSF | Eufora (∞) |
|---|---|---|---|
| Peca | 0 | 0 | 3,380 |
| Nolan | 0 | | |
| Berard | 0 | | |
| Rucchin | 0 | 0 | 5,070 |
| Sydor | 0 | 0 | 1,690 |
| Ranford | | 0 | 10,140 |
| McKee | | 0 | |
| Nash | 0 | 0 | 3,380 |
| J. Kaiser | 0 (Δ) | | 0[10] |
| E. Kaiser | | | 0[11] |

---

[10] Kenner was unaware of Kaiser's allegations that he either invested $200,000 in Eufora (*shockingly* without any back-up bank records) – or a separate $275,000 via funds that Kenner gave to Constantine on his behalf. **Both are a fraud – and actually based on the same lie by Kaiser** (*first to the Arizona court in the first 2010 lawsuit versus Constantine via sworn affidavit -- and Eufora and re-submitted via sworn affidavit in the EDNY 2011 lawsuit*).

- To the contrary with sound methodology and back-up banking records -- Kenner verified in *ECF No. 736, Ex.Z41*, that Kaiser had been fully repaid his entire California renovation project investment plus his 50% share of the profits (notwithstanding he never filed IRS taxes for the profits), regardless of the Kaiser trial perjury that he had possession of Kenner's (not Kaiser's) loan journal for the funds Kenner personally loaned to Constantine; claiming them as his own (*Tr.1404-1405*).
- Kenner fully documented the Kaiser and government lies about the "*grocery list*" Kaiser had with "Kenner's funds" at *ECF No. 668, Appendix at 223-226*.
  - As such, if Kaiser's trial testimony was true, when everything is added up from verified bank records stipulated into evidence – PLUS – the government-induced Kaiser-testimony (*including but not limited to: Tr.1087, 1404-05*)– Kaiser would owe Kenner approximately $3,915,620.
  - The government-Kaiser fraud on this Court is beyond comprehensible – but thoroughly explains why Kaiser needed Kenner arrested in 2013 in order to blame Kenner for the millions Kaiser stole from his Long Island friends & family (fully documented), while working for Jowdy, who also needed to desperately "*get rid of Kenner*" before Kenner's scheduled and discovered, game-changing December 2013 Supreme Court testimony in Mexico – ending the Jowdy 11-year hoax & 6-year Kaiser ruse at that same time.

[11] Kenner was unaware of the other John Kaiser friends & family $200,000 investment until 2015 during Kaiser's trial testimony (*Tr.1058-59*).

| | | | |
|---|---|---|---|
| Privitello | | | $0^{12}$ |
| Hughes (µ) | | | $0^{11}$ |
| Rizzi (µ) | | | $0^{11}$ |
| **TOTALS** | **0 (£)** | **17,077 (ø)** | **23,660** |

(ø) – The Court opined in 2017 that the GSF frauds resulted in $17,077 of "*overspend*" by Constantine (the <u>sole</u> controlling person involved in the GSF transaction) (*ECF No. 501 at 60*).   Based on the miniscule amount, (1) relative to the 13 years this case has continued since Kenner's whistleblowing on Jowdy's criminality, (2) the 13 witnesses the government presented to verify Constantine's payments to them, and (3) the government's $25 million of prosecutorial expenses, the actual tracing of the $17,077 has not been done (more likely than not from any alleged superseding indictment victim).

(Δ) – John Kaiser was fully repaid for his friends & family 2005 loan to the Hawai'i partners (not Kenner personally as the government continues to conflate).   If not repaid – Kaiser presented an alleged Baja Ventures 2006 collateral agreement (although fabricated with Kenner's name photocopied on the documents) (*ECF No. 628 at 1*).   That agreement would have granted Kaiser 100-times-over his collateral – thus fully repaid 10 years ago (on January 1, 2010).   *Yet – because the government cannot get their joint-lies straight with Kaiser for the Court (a typical problem with revisionary history) – another head-scratcher is presented without empirical back-up (ECF No. 781 at 5)...*

**Renewed subpoena request**:[13]

---

[12] Kenner was found not guilty of the two Privitello charges – for the money Kaiser solicited from Privitello for Constantine and Eufora.

[13] The Court cannot overlook Kaiser's *heart-wrenching* testimony that Kenner "*ruined his life*" (*Tr.1089*) – and the pointed summation reclamation of that lie (*Tr.5753*).  It is outrageous, considering he presented the Court in his stunning February 2019 letter of Jowdy malfeasance (*ECF No. 628*) that he was the owner of Kenner's Baja Ventures 2006 equity since January 1, 2010 (*Id. at 1*) – as collateral for his 2005 Hawai'i friends & family loans.

- Kaiser worked for Jowdy for over 5 years and could have sold the equity stake (if real) for 1-cent on the dollar and recouped some *phantom-loss* value; far in excess of his fabricated collateral amount.

Notwithstanding the fabrication of the document and photocopied Kenner signature on the document...it would be inconceivable that Kaiser received over **$100 million** as collateral from Kenner in 2010 for $1 million *not* loaned to Kenner (even though the empirical evidence confirms Kaiser was repaid by the Hawai'i project, who received his loan) – **yet somehow**, Kaiser's life was "ruined" – and by Kenner.   ***It is irreconcilable***.

- The government and Kaiser have refused to verify that any of the $195,000 Kaiser received in August 2005 and claimed at trial were "*back pay*" (*Tr.988*) &/or the balance of approximately $605,000 (*ECF No. 781 at 2*) were for "*expenses*" (*Tr.988*).
    - o Kaiser's 2006 or 2007 taxes can un-prove the government hoax on the Court for their joint "*back pay*" fabrication.   Neither Kaiser nor the government have produced them, even "in camera"; and
    - o More disturbing -- the government and Kaiser have refused to produce a single dollar of Hawai'i expenses verifications or contributions, which should be easy with the "***under oath***" contention that **over $600,000** is involved in previous "*expenses*" – with the government reiterating their Kaiser-subterfuge (*ECF No. 781 at 2*).

- None of the government's Kaiser-Hawai'i contentions are provable with empirical evidence, while Kenner has irrefutably documented the Kaiser-government ruse on the Court (*ECF No. 736, Ex.Z41, Tr.4706-07*).
- *Kaiser's trial testimony* regarding his "*repayment to his friends & family by selling his home*" (*Tr.980*) *was also fabricated perjury*.
    - o **6-years after** he took the $1 million from his mother, Ethel, in 2005, **John Kaiser sent Kenner a confession text** that *he never repaid her* – *fully contradicting his 2015 testimony*, *infra*.
- According to Ethel's confused testimony, she thought her son paid her back, when his own confession 6-years later shows he lied to a confused septuagenarian (considering the original wire totaling $700,000 from her was *$310,000 more* than she testified about recovering from her son) (*Tr.933*):



| 1 2 2 6 7 2 | +163123 50308 **John Kaiser*** | 7/22/2011 2:17:04 PM(UTC+0) | R e a d | [Kaiser]: Yes and **that is ~~nit~~ [sic] [not] the only money that is owed out**, that I have been working everyday to pay back everyone |
|---|---|---|---|---|

- If the fake agreement were true -- it would have been the greatest collateral deal (if real) in the history of American business.  *Perhaps, the $21 of beads the pilgrims bought Long Island from the native Indians would fall a distant second*?

Overlooked is that Kaiser's own claim to the Baja Ventures 2006 collateral agreement in his February 2019 letter cannot make him a victim of anything – considering the agreement he presented (although fabricated) would have made Kenner the "*most stand-up businessman in history*" – not a criminal…"ruin[ing]" Kaiser's life!   **Kaiser would have been a character witness for Kenner.**



| 1 2 6 7 4 | +163123 50308 **John Kaiser\*** | 7/22/2011 2:57:35 PM(UTC+ 0) | R e a d | [Kaiser]: 5k month for back taxes on the sale of 87 laurel made 250 k [Ω], **100k went to u** [≈], 150 vin [ç] owes[14], 3300 a month goes towards cards from Pv [Arizona] Reno, **was paying my mother [Ethel], $ 2500 a month for the 1 mil we took from her, left her with no money to live**, now paying her $1500 a month, **Took 380k from brother Keith, left him w/shit**, we where supposed to send him back money after sale of [Kenner's] little house in mex, u sent me 4k for him, i send him $500 a monyh to live on . . And 4k to 6k to Pv a month . Should I continue ????? It's a fucking joke. **And please don't tell me about Mex I am not one of the hockey guys** [μ] |

[Ω] – Kaiser's prior home that allegedly paid back $1 million in loans – while only making $250,000 (*Tr.979-80*)...

[≈] – Paid to Kenner for previous loan repayments...

[ç] – Kaiser robbed Vincent Tesoriero along with his parents according to Tesoriero's FBI interview (confirmed by *3500-VT-1-r at 2* to the FBI)...

[μ] – *Kaiser's confession that he has no interest in the Mexico property* that 3 years later – while employed by Jowdy – he produced fabricated agreements – with photocopied Kenner signatures to allege he owned Kenner's Baja Ventures 2006 equity (*ECF No. 628 at 1*) in the greatest collateral deal in history.[15]

---

[14] The Court should note that the revised government forfeiture and money judgment request claimed Kaiser had $180,000 of his own money in the 2005 Hawai'i loan (*ECF No. 781 at 2*).  ***This also cannot be true*** – unless 9-11 First Responded Vincent Tesoriero lied to the FBI in 2014 (*3500-VT-1-r at 2 ¶12-13*) -- and the August 2005 Hawai'i bank records from Northern Trust Bank are *phony*, *bogus* or *supposed*.

Per the Northern Trust records, Ethel Kaiser contributed at least $700,000.  Vincent Tesoriero contributed at least $150,000.  The "unnamed" $150,00 that completed the $1 million of August 2005 deposits belongs to Vincent Tesoriero's parents (*3500-VT-1-r at 2 ¶13*) – ***not John Kaiser*** *(Bates stamp: PKHome-11042 – Northern Trust Bank -- Ka'u holdings bank records)*.  In addition – the math is improper according to the revised government and Kaiser lies, totaling $1,030,000.

[15] John Kaiser is the same government witness who claimed he only found out about his money going to Mexico (only $135,000 of the actual $1 million) thru a "*confrontation*" started by Hawai'i COO Manfredi (*Tr.983*) prior to the Lehman Brothers JV closing. Manfredi has never verified such meeting.
- **But** -- Manfredi told the FBI in 2010 that he did not know that Kaiser invested any more than the first $1,000 (yes, one thousand dollars) in the project (*3500-CM-2-r at 2*), debunking any possible 2006 confrontation about $1 million *Manfredi started*;
- **And** -- Kaiser testified in the 2009 arbitration that he, *not Kenner*, solicited the money from his friends & family *specifically* for the 15% Jowdy loans (which would have been 3 years *after* the fabricated 2006 confrontation event) (*Tr.1170-72*):

*Q My question is simply this, did you or did you not, during the course of that deposition, give this answer to this question (reading [from the 2009 transcripts]):*

> *"QUESTION: So at the time, was there any representation about getting paid back this money when the Cabo deal closed?*
>
> *ANSWER: It was supposed to be a short-term loan. I thought it was three to six months, because I also had raised some other funds from family and friends that were getting a little antsy about it." Is that the answer that you gave to the question, yes or no?*

*A [John Kaiser]: Yes.*

*Q Now, I'm almost finished. I'm going to ask you to take a look at page 927 of this deposition. Specifically, beginning at line 8. Did you or did you not give these answer to the question as indicated (reading [from the 2009 transcripts]):*

> *"QUESTION: When you made the decision -- or when you were made aware that some of this money was going to be lent out rather than sitting idle in the account, that 15 percent, did you know there was some risk?*
>
> *ANSWER: That the 15 percent -- actually, the loans, I didn't think they were going to be, to me, it wasn't a risky loan. Now, some of the land purchases were a risk. It was a few miles away from a volcano. It was a tough sale period. <u>But the loans, even investors that I brought in</u>, I said, listen, this guy, <u>I gave him a whole story about</u> <u>Kenn~~er~~ [sic] Jowdy backed by land</u>. It's good. Better than your money sitting somewhere." Is that the answer that you gave to that question, yes or no?*

*A [John Kaiser]: Yes.*

Despite claiming in 2015 that Kenner lied to him and stole the money, during Kaiser's 2009 arbitration, Kaiser confirmed:

> **Q: Do you blame Mr. Kenner for him [Jowdy] not paying the money back?**
>
> **A [John Kaiser]: No.**

It should be noted that Kaiser testified to the FBI on October 19, 2010 (*3500-JK-1-r at 2, 3, 10*) that he met with Jowdy 5-6 times independently to confirm the Hawai'i partners' loan plans *prior* to commencement in 2004.   Kaiser testified in 2015 that he received a copy of the signed loan agreement from Kenner (*Tr.1127*), as did Hawai'i-Mexico investor Glen Murray (*Tr.3608*).

Five years after Kaiser's 2010 FBI proffer, Kaiser vehemently *denied* at ever telling the FBI in October 2010 about the Jowdy meetings before agreeing to the loans (*Tr.1120-22*) – or that he verified there "*was an agreement*" (*3500-JK-1-r at 3*); doubling down that he never saw them taking the 11-pages of handwritten notes during the 2 hour and 15 minute proffer (*Tr.1122*).

For flair, AUSA Komatireddy told the jury during rebuttal summation that the notes were

***Offsets to loss amounts…***
("[A] district court must consider that the purpose of restitution is essentially compensatory: to restore a victim, to the extent money can do so, to the position he occupied before sustaining the injury." (citations omitted)); 18 U.S.C. § 3663A(b)(B)(ii) (requiring that any order of restitution credit "the value as of the date the property is returned of any part of the property that is returned").

**(£) -- *The Hawai'i "object"…***

In the **Hawai'i "object"** of the instant case, the alleged frauds were related to the funds transferred from the superseding indictment individual's capital accounts in Hawai'i to the "Jowdy loans". At least during trial, the government claimed Kenner "*stole that money and bought his equity in the Cabo san Lucas project with it*" (*Tr.5996, 5711, 5722-23, 5744-45, 5990, 5991-92, 5707-5709*).

- Shocking their "above reproach" integrity standards, the government admitted *government-forfeiture-36* during their forfeiture hearing (post-trial) -- and admitted thru their-own evidence (*government-forfeiture-44*). *These documents confirmed* that Kenner *never* used any of the alleged (at trial) ill-gotten money to purchase "anything" in Mexico (not even a tequila company, having *never traced* a single dollar to this 10-year-ruse, as repeatedly promised).

Further stunning the defense -- during the government's forfeiture case in March 2016, they admitted *government-forfeiture-44* (the verification that Jowdy received all of the loan money; also debunking the government's bail motion that Jowdy's Baja Development Corp account was Kenner's money and "*waiting for him*"). The post-trial admission of *government-forfeiture-44* verified that the government's trial proffers to the Court and jury was ***false*** (seeking conviction in lieu of justice); wholly prejudicing the proceedings.

---

not reliable because an FBI agent did not actually write them (with FBI agent Galioto present), and the jury could not tell if the notes were written "*before*" or "after" the meeting; defying logic to vouch for Kaiser's fabricated testimony [*Komatireddy*] *(Tr.5991-92)*:

> *"And then they allege that the government sat silently by while Mr. Kaiser testified. That's not true. The very exhibit they showed you, Kenner 43, was stipulated into evidence by the government so you could see what it is and what it isn't. What is it? It's the notes of an investigator from another office, not the notes of an FBI agent, an investigator from another office. What is it not? It is not a transcript. It's not questions and answers. It's not direct quotes. You can't tell from the notes when they were written, if they were written before the interview or after the interview."*

14

The "Jowdy loans", originating from the alleged superseding indictment victims, totaled $1,315,000.[16]   This is the *only* "Hawai'i investment amount" from the alleged acts in the superseding indictment that applies, ***as a starting point***, to calculations of loss for the Hawai'i "object".
- According to *Ebbers*, the remainder of the non-fraud factors must be eliminated.

*Jowdy settlement credits...*
*United States v. Boccagna*, 450 F.3d 107, 115 (2ⁿᵈ Cir 2006) (victim's out-of-pocket loss offset by the value of recouped collateral).

There is no equivocation that Jowdy and the Hawai'i-Mexico investors finalized a macro settlement with Jowdy in 2017 (*Ex.A*).   This occurred specifically *after* the government admitted that Jowdy received 100% of the Hawai'i loans (*government-forfeiture-44*) (contradicting trial summations and pre-trial FBI fabrications, *infra*).

The 2017 settlement followed the Nolan 2008-09 settlement, and the 2012 Berard settlement; both for incremental 1% equity stakes in the DCSL project (fully recompensing both of them for any Hawai'i "loan" issues).  **It is admitted to and documented in the 2017 settlement agreement**, *infra*.
- The Court must note that Nolan and **Berard** were absent in the 2017 Jowdy settlement (as was non-victim Ethan Moreau – CSL Properties LLC investor, like Juneau), **because** they had previously settled with Jowdy for all of his Hawai'i-Mexico frauds and received a 1% "full" compensation, *independently negotiated*.

*2017 Jowdy settlement (Ex.A)...*
- *4.6% of DCSL equity was granted by Jowdy to the following individuals, in addition to their respective shares (% of CSL properties and respective settlement value).  In addition to the 2017 settlement equity-transfers, Jowdy also agreed to repay their previous capital contribution amounts – totaling over $10,000,000 (out-of-his-own-pocket).   Offsets are based on the 2017 net value of DCSL of $205,000,000 (2017 appraised value minus Danske Bank loan amount) at the time of the settlement between the parties...*

---

[16] *See ECF No. 770 Appendix 1 at 54*:
1) Michael Peca (**$240,000** distributed to Jowdy thru Little Isle 4's capital account);
2) Darryl Sydor (**$200,000** distributed to Jowdy thru Little Isle 4's capital account);
3) Owen Nolan (**$425,000** distributed to Jowdy thru Little Isle 4's capital account);
4) Steve Rucchin (**$300,000** distributed to Jowdy thru Little Isle 4's capital account);
5) Bryan Berard (**$150,000** distributed to Jowdy thru Little Isle 4's capital account)...

|  | *Peca (10%)* | *Sydor (5%)* | *Rucchin (5%)* | *Nash (5%)* |
|---|---|---|---|---|
| *Hawai'i Offset* | 943,000 | 471,500 | 471,500 | 471,500 |

Thus, Peca, Sydor, Rucchin, and Nash have all been fully recompensed for any Hawai'i loans that went to Jowdy, although none originated from Nash's capital account of $100,000 (net $57,500 after the 2006 Lehman Brothers JV payments).

In the instant case, the Hawai'i investors, *supra*,[17] settled with Ken Jowdy on January 5, 2017 for all funds transacted between them (and their related entities and progeny) and Ken Jowdy (and his related entities and progeny).  Kenner read the "header" (*Id. at 1*) and the "1. Definitions – 1.8 Related Parties" section of the 2017 settlement agreement (*Id. at 5-6 to the agreement*) into the record during the December 6, 2019 hearing (*Tr.57-59*).  There were no possible transactions between Jowdy and any investor-lender left out of the settlement discussions for any related party -- for several obvious reasons:

**One** – the 2014 Delaware litigation that prompted the settlement was merely an extension of the myriad of lawsuits filed pre-Kenner-arrest in November 2013 to recover 100% of the Jowdy loans in Arizona, California, Nevada, and Mexico (the country) (spearheaded by Kenner); and

**Two** – the government had presented *government-forfeiture-44* during its March 2016 forfeiture hearing, which confirmed that Ken Jowdy had received 100% of the Hawai'i loan funds (per the 2004 Hawai'i-Jowdy loan agreement) despite the government's crucial mis-representation during their summations[18] and pre-trial lies to Kristen Peca and Michael Peca[19]; and

---

[17] Hawai'i members: **Michael Peca, Darryl Sydor, Steve Rucchin, Tyson Nash** received **full-compensation**; in addition to over a dozen others who have been victims of Jowdy's 17+ year fraud (dating back to the initial August 2002 investment-deposits into Jowdy's Baja Development Corp account by Kenner, Woolley and Khristich).  **Because –** the government subpoenaed Jowdy's bank records *weeks before the 2015 trial*, and as such *was in full knowledge* that Jowdy began robbing Kenner and Kenner investors within 2 days of the initial August 2002 investment – *ECF No. 667 at 24-28*).  Bank record are available to the Court upon request.

[18] [*Tr.5711* – Michiewicz summation]:
  "And what do you find out [about the Jowdy loan]? You find out, what did *that 5 million* or however much more or less that netted out to be, *what did it buy Mr.*

**Three** – *when* the Hawai'i-Mexico investors' independent attorney finalized the 2014-2017 negotiations with Jowdy's well-paid counsel, every detail of the Hawai'i funds that some of the investors were told by the FBI "*Kenner stole*" were clarified at

---

> *Kenner? It bought him a 39 percent interest in Ken Jowdy's Cabo San Lucas. Didn't buy the players a 39 percent interest. Him. [] To this day, right now, he is a partner in that resort. That's where the money went. That's what it bought him. And on the backs, on the portfolios, of the hockey players.*"

[*Tr.5722-5723* – Michiewicz summation]:
> *"And if you look at the Centrum loan, I can not think of a more perfect example of proof beyond a reasonable doubt -- actions speak louder than words -- no reason to mortgage Honu'apo parcel. No reason other than for Kenner to get his 39 percent. To get his piece of the pie, that resort in Cabo. No reason. Actions speak louder than words. And in this case the action is pure fraud."*

And – [*Tr.5990* – Komatireddy rebuttal summation]:
> *"...you know what, Baja Development Corporation, on that chart, but there is some sort of misconduct; you don't know what the money was for. You know exactly what the money was for. In fact, Mr. LaRusso, when the first witness got on the stand, one of his first exhibits he entered into evidence was a record of the Baja Development Corporation. Those records are in evidence. Mr. Kenner told you that he used that money to get his piece in the Mexico investment with Ken Jowdy. You know exactly what that's for. That's in evidence."*

And – [*Tr.5996* – Komatireddy rebuttal summation]:
> *"He [Kenner] used it for personal use to get an interest in that resort in Cabo."*

- ==The Court and the government know that these abusive summations, amongst multiple other insinuations and misleading questions during Kenner's cross-examination, *infra*, were *false*, but fully prejudicial against Kenner – and left uncorrected, absolutely affected the jury's deliberations.==

[19] From Kristen Peca's own admission during her surreptitious 2012 FBI-Kenner recordings:
> ==*Kristen Peca – Matt [Galioto] told Michael and I that you stole all of the Hawai'i money and never gave it – the loan money -- to...uhhhh...Jowdy.*==

> *Kenner – Kristen – I have all of the bank records that prove the money went to Jowdy and his accounts at all times. I told you that already. You told me that you saw the bank records after I sent them to Michael. You know -- the attorneys who sued Jowdy for the money in Mexico and Arizona and California used them to confirm the loans before we sued?*

> *Kristen Peca – but – I don't understand why he would say it.*

the conclusion of the settlement and known as "received by Jowdy" only thru *government-forfeiture-44* (the government's Jowdy loan verification).

Thus, there is no legal possibility in 2017 that after Jowdy transferred 4.6% of the Cabo san Lucas equity to the Hawai'i-Mexico investors (valued at least $7.8 million), that Jowdy's attorneys left him ½-exposed for his documented Hawai'i-loan thefts.[20] Neither Kenner, nor any alleged Kenner actions, carries any foreseeability burden from the January 2017 settlement point when the investors received *full-negotiated settlement value* from Ken Jowdy (for 100% of the funds they were transparently aware he received and embezzled – *ECF No. 667*).  The Court must note that within months of Jowdy's *public* Hawai'i loan admission (*government-forfeiture-44*) and the government specifically choosing to enter it into evidence, Jowdy and his attorneys settled with the Hawai'i-Mexico investors.

Effectively, the investors chose in January 2017 to tie their financial prospects to Jowdy, the recipient of 100% of the Hawai'i loan funds (*a total of $1,315,000 for the individuals named in the superseding indictment – ECF No. 214*); *individually releasing Jowdy from any future liability for the loans he received personally – and his 15+ years of his documented Mexico embezzlements (ECF No. 667)*.

*3rd Party Credits…*

|  | Peca[21] | Sydor | Nolan | Berard[22] | Rucchin |
|---|---|---|---|---|---|
| *Hawai'i Offset* | *240,000* | *200,000* | *425,000* | *150,000* | *300,000* |

The government agreed to the Northern Trust Bank credits (totaling $1,400,000 for Nolan, Peca, and Berard legal settlements). The amounts were *also* far greater than their traceable "Jowdy-loan-amounts" – *i.e. non-victim, infra*).

---

[20] DCSL was appraised at $350 million in 2017 and the Danske Bank debt was not greater than $180 million, leaving a net DCSL value of at least $170 million.   4.6% equals at least $7.82 million "received as settlement".

[21] Michael Peca testified at trial that he was aware of the Jowdy loans and approved them (*Tr.499*) – corroborating his 2011 SDNY Grand Jury testimony of the same detail, without equivocation (*3500-MP-5 at 30-33, 35, 40, 42, 45*).

[22] Bryan Berard testified at trial that he was aware of the Jowdy loans "from Kenner", *infra* (*Tr.3055, on direct-examination*) – *corroborating* his 2009 arbitration testimony.

But – the government ignored the obvious Jowdy "**3rd party credits**" (already resulting in full bargained-for value against loss, independently with Northern Trust bank and Jowdy) based on addressing 3rd party fraud factors, *See MacCallum.*

A 3rd party fraud must equally be credited (a.k.a. -- Jowdy stealing the loans, authorized by the Little Isle 4 By Laws); See *United States v. MacCallum*, 2018 U.S. Dist. LEXIS 101047 (WDNY – 2018), with the Court ruling against the government position to exclude funds as loss when a 3rd party defrauded the defendant, who was the manager of investment funds.   This is akin to the instant case.  *Despite* MacCallum having fraudulently induced the underlying funds (*unlike* the instant case) the 3rd party robbed the investment pool ("Defendant intended to use the money to purchase a second home for his in-laws" and as a result the Court held the defendant responsible for *only* that portion of the invested funds [$200,000 of the full $850,000 deposit]; *Id.*).

- Kenner *never* fraudulently induced the Hawai'i partners' investments.  All of the investors initiated their Hawai'i capital accounts *before* the Jowdy loans had begun.  And -- nor did Kenner use the funds or intend to use the funds for anything but the benefit of the Hawai'i partners (*3500-KJ-2 at 24-25; with the loan agreement titled to the Little Isle 4 partners with Jowdy, at all times*). Kaiser confirmed this to the 2009 arbitration panel, *supra, and the FBI in 2010 (3500-JK-1-r at 2, 3, 10)*.

- In the instant case, the Court should account for the fact that it has never been alleged that there was fraud with respect to the business model to acquire and develop the Hawai'i project (or restrictions on financing methodology).  Irrespective of the government's contentions towards the broad authorizations in the Hawai'i partners By Laws authorizing "lending" and "payments to 3rd party vendors", *only four* Hawai'i equity investors (Berard, Sydor, Rucchin, and Nolan) appeared unaware (most likely thru the haze of documented **CTE**, unless undue influence planned their synchronized memory loss).  Furthermore, these specific investors testified that they routinely "*did not read*" the documents presented to them by Kenner to sign for their investments.[23]   As Managing

---

[23] Berard alone, the repeated – "*I did not read*" (*Tr.3151, 3155, 3156, 3157*) and "*I trusted Phil*" (*Tr.3042, 3053, 3158*) refrains overwhelmed any potential belief that any one of the investors would have known, let alone cared about the finite details of the day-to-day efforts to manage the Hawai'i project and its inter-machinations.  See *Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A.*, 461 Fed. Appx. 61; 2012 U.S. App. LEXIS 3012.

- See Kristen Peca "**trust**" discussions with her husband's independent California attorney regarding recovering funds from Jowdy (*ECF No. 736, Ex.21*); allegedly 9-

Member of the Hawai'i partners since 2007, John Kaiser confirmed to the FBI on October 19, 2010, that Kenner made "*update letter[s] on Hawai'i project…PK*

---

months after she could barely get a hold of Kenner, leaving her supposedly desperate (*Tr.712-713*).  **If true**, they could have sued Kenner for the funds, exactly at the time the entire Hawai'i partners were suing Jowdy for the known-loans (6-months *after* the LOC collateral seizures).

The Second Circuit Appeals Court has confirmed that "**Failure to read a contract that is signed by the victim**" is the <u>burden of the victim</u> and cannot create a fiduciary void or similar for activities of an individual tasked with presentation or management of the documents execution.

The Court should note that the prosecutorial theories at trial were not based on Kenner stealing anyone's money although alleged as the truth during aggressive cross-examination (*Tr.4588*) and desperate prosecutorial summations (*Tr.5996, 5711, 5722-23, 5744-45, 5990, 5991-92, 5707-5709*) but moreover, that Kenner did not explain "enough" (a.k.a. "conspiracy by concealment") what was happening with this tiny subset of investors and their passive-equity investments -- *and quiz them for retention of knowledge*.

- ==Kenner's Baja Ventures 2006 partner, Jozef Stumpel (with $2.6 million contributed to the Baja Ventures 2006 capital account – *per government-forfeiture-36*), wrote to the Court to **confirm he was present on the 2004 conference calls with all of the Hawai'i investors** (identical to the 2011 Peca, Sydor and Stevenson Grand Jury testimonies – and *ECF No. 785 at 2-4*) **and everyone was 100% aware of the loans to Jowdy at the time; specifically including Berard and Kaiser** (*ECF No. 771*).==

The government conducted "*memory tests*" of corporate business details with the passive-equity investors to frame their case of concealment.  They were corporate elements one would <u>never</u> expect a passive-equity investor to remember (or even know); by investors who repeatedly said they "*signed*" but "*did not read*" anything Kenner gave them (*Tr.1164, 2178, 2193, 3157*) (*ECF No. 675 at 205-6, 292, 304-5*).   After nearly 3-months of unconvincing prosecution, the government had to double-down with their misrepresentations that "*Kenner stole all of the Hawai'i money and used it to buy his equity in the Cabo project*" (summation proffers, *supra*).

- ==*The Second Circuit Appeals Court clearly defines that absent substantive unconscionability or fraud, parties are charged with knowing and understanding the contents of documents they knowingly sign.  If the signer can read the instrument, not to have read it is gross negligence; if he cannot read it, not to procure it to be read is equally negligent; in either case the writing binds him.  Parties are bound by documents expressly incorporated by reference into agreements to which they manifest their assent.*==

- The aggressive misrepresentations by the government's two summations laid the groundwork for jury confusion after a drawn-out trial of nearly 3 months.   The prosecution's comments violated Kenner's due process rights to a fair trial by undermining Kenner's right to have his guilt or innocence determined solely on the basis of the evidence introduced at trial.

*made these: many times...*" and finished by clarifying to the FBI agents, "*yes, I recall the letter[s]*" (*See 3500-JK-1 at 3*) (*ECF No. 785 at 2-4, one of the attorney update letters*).

Berard and Nolan were Hawai'i investors over a year before Kaiser negotiated the loans with Jowdy (*3500-JK-1-r at 2, 3, 10 -- and ECF No. 785 at 2-4*), thus not defrauded on the inducement, notwithstanding the transaction was authorized by the "*group*" (*3500-TS-1 at 17-18*) and the Little Isle 4 operating agreement (*Kenner trial exhibit 217 at 1-2, introduced at Tr.4525-26*).

- The Court must note **Kaiser was the Managing Member of the Hawai'i partners when he voluntarily gave his pro-Kenner corroborating testimony in 2009; *six-years before the Jowdy induced amnesia, infra***.

*Constantine Consulting Payments...*
In multiple previous submissions, Kenner provided empirical proof (from the government's Rule 16 productions) that <u>no funds</u> for the Constantine consulting payments originated from any of the superseding indictment victims, *<u>thus no victims, no loss</u>; See Evans.*

*Northern Trust credits -- bond interest credit <u>ignored</u> by the government...*[24]
- *The "credit" totals were verified by forensic accounting (ECF No. 736 at 12)...(further reducing every Jowdy loan dollar to ZERO, <u>for the 3rd time</u>)...*

|  | Peca | Sydor | Nolan | Berard | Rucchin |
|---|---|---|---|---|---|
| *Hawai'i Offset* | 300,052 | 249,215 | 592,878 | 129,314 | 210,113 |

As part of the collateralized investment strategy (even if it is induced thru graft) the credits are applicable as "loss credits".  Nevertheless, no inducement thru fraud existed.  The Northern Trust LOC investors received bond interest totaling **$1,601,572** between 2003-2009. This is another *offset* versus loss from the Hawai'i

---

[24] Northern Trust bond interest received (totaling **1,601,572) – further exceeding all loss amounts traced to the Jowdy loans (*thus no loss, no victims*)**:
- **Nolan** bond interest received = $**592,878**;
- **Peca** bond interest received = $**300,052**;
- **Berard** bond interest received = $**129,314**;
- **Sydor** bond interest received = $**249,215**; and
- **Rucchin** bond interest received = $**210,113**...

project.   It further wipes out 100% of the alleged "unauthorized" Jowdy loan totals based on separating fraud and non-fraud factors, *See Ebbers*) (*ECF No. 770 at 54*)…

*Independent Northern Trust settlements…*

|  | Peca | Nolan | Berard |
|---|---|---|---|
| *Hawai'i Offset* | 600,000 | 500,000 | 300,000 |

Furthermore, Nolan (*Tr.2074*), Peca (*Tr.506*), and Berard (*Tr.3042*) settled with Northern Trust Bank for "undisclosed" reasons about their LOC accounts totaling *over* **$1,400,000** – incrementally further offsetting any loss for those three individuals; *See Boccagna*.

Those offsets *alone*, *supra*, "wipe out" and *exceed* any potential "loss from fraud" recovery for the $1,315,000 that Jowdy received from these investors.

➢ *See Evans,* "**[w]ithout an actual loss, there could be no victims**"

• *With Berard and Nolan only involved in the Hawai'i "object" of the instant case, the Evans reasoning removes them as victims in the instant case.*

*Other Jowdy settlements (2008-09 [Nolan, Juneau and Moreau] and 2012 [Berard])…*

|  | Nolan | Juneau[25] | Moreau[23] |
|---|---|---|---|
| *Hawai'i Offset* | 3,250,000 | 3,250,000 | 3,250,000 |

Absent from the 2017 Jowdy settlement with the Hawai'i-Mexico investors was Owen Nolan and Bryan Berard -- as well as Joe Juneau and Ethan Moreau (Hawai'i-Mexico investor).   In 2008-2009, the same California attorney represented Juneau, Moreau, and Nolan.  Their attorney worked hand-in-hand with Ken Jowdy and his attorney, Tom Harvey (as Juneau testified at trial, *Tr.354-55,* soliciting nearly 100 Kenner clients alleging "*Kenner stole their money to buy his Cabo san Lucas equity*"; *the initiation of the government's perpetuated lie thru trial summations*).

---

[25] Non-victims in the instant case, but they signed the identical settlement deals with Jowdy for 1% DCSL interest to offset Jowdy's verified (but not admitted to) Hawai'i-Mexico criminal acts.   Juneau testified about the deals at trial (*Tr.354-55*).

Their California attorney negotiated a settlement with Jowdy (*similar to the 2017 agreement, noticed in Ex.A at 5 [actual page 4 of the agreement]*) and announced the settlement terms during the 2009 Nolan arbitration proceedings when Jowdy and his Mexico "COO-General Counsel-brother-in-law", William Najam voluntarily appeared on Nolan's behalf at the arbitration; confirming Jowdy received "*over $6 million of payments*" to his entities from the Hawai'i partners, but as the COO and General Counsel for the various Jowdy entities, Najam was unaware of what the money was for (*See Nolan Arbitration Day 2 at 377-78*).

Najam and Jowdy's 2009 testimony started the "*no loans*" lies that the government re-fabricated at trial in 2015 – in direct contradiction to Jowdy and his attorney's admissions to the 2010 California Court and FBI in 2010, and the EDNY in 2015 (*but 3 weeks after the trial – ECF No. 440 at 5*) (*government-forfeiture-44*):

> [Najam]: "*I'm familiar with the allegations [that Jowdy received the funds]. And substantially all of the money that came in came in as investments*".

- Clearly, this was an early misdirection LIE from the Jowdy cabal (Jowdy's general counsel) about all the money he later admitted to stealing and settled from the various Kenner and Kenner investors' parties.

Kenner confirmed the 2008-09 Nolan settlements to the EDNY Court during the December 6, 2019 hearing (*Tr.20-21*).
- Nolan has been fully recompensed <u>well beyond</u> the $425,00 of his originating Hawai'i funds that were part of the Jowdy loans.

***As compensation for the above transactions -- Nolan*** <u>recovered</u> 1% equity in the DCSL project. **That net value recovered by Nolan, thru independent negotiations totaled no less than $3,250,000, at the time of the settlement**.
- Nolan's recovery was independently negotiated for by his attorneys and received as re-compensation; wholly designated as an offset to loss and governed by MVRA statute to not double-collect or effectuate a windfall recovery, certainly <u>not</u> above the value of the fraud-factor calculations of $425,000 that Jowdy received thru the Hawai'i partners' loans.

- Nolan has no loss and cannot be deemed a victim; *see Evans* "[w]ithout an actual loss, there could be no victims"[26]

*Berard 2012 settlement with Jowdy…*

|  | *Berard* |
|---|---|
| *Hawai'i Offset* | *3,250,000* |

Once Bryan Berard (along with Kaiser) was hired by Jowdy, he announced on an investor conference call in 2012, which Kenner eavesdropped on thru another investor, that anyone who wanted to **forgive all Jowdy liability** "*as he had just done*", they would receive a 1% equity stake in the Cabo project from Jowdy just like he, Nolan, Juneau, and Moreau had already settled for.   The 2012 DCSL value was far greater than the only traceable funds ($150,000) from Berard's Hawai'i investment to Jowdy (as part of the 2004-06 loans); coupled with Berard's confession at trial he knew about the loans (*Tr.3055*).

- Berard has no loss and cannot be deemed a victim; *see Evans* "[w]ithout an actual loss, there could be no victims"

In *Evans*, Judge O'Brien opined (with parallels to the instant case) that:

"the answer [] has resulted in a sentencing dilemma – how does one measure the damages reasonably resulting from the fraud not being candid with investors, rather than merely estimating the economic losses flowing from a flawed business plan, poor timing and market dynamics?   What are the damages caused by the fraud?   Simply stated they are the money investors lost as a result of not having full and timely knowledge of the depth and breadth of the projects' shortcomings.   In other words, what the investors additionally lost by being deprived of an opportunity to mitigate foregone losses.   *But we know one thing: much of the loss had been incurred or was inextricably destined to be incurred before any fraudulent conduct commenced.* It was necessary for the government to produce sufficient evidence from which a

---

[26] As the *Evans* Court explained, *"if there is no fraud on the inducement, then only the fraud factors are applicable to loss calculation."   Evans* was released "time served" with no loss and no victims after the factors were applied properly…

The *Evans* Court (with Justice Gorsuch) opined "[w]ithout an actual loss, there could be no victims".

reasonable estimate of damages resulting from the fraud could be computed."   See U.S.S.G. § 2B1.1, comment. (n.3(c)).

The appellate decision in *Evans I* opined, "[T]he district Court should have inquired into what loss, if any, the investors would have suffered if Mr. Evans had come clean regarding the status of the securities [or Jowdy loans, assuming they were concealed, yet authorized, *notwithstanding Michael Peca and Bryan Berard testifying at trial that they were 100% aware of the loans via Kenner*]…".   This requires a determination of the value of the securities at the time the fraud began, which is the correct starting point for loss calculation in this case.   The Court opined, "**In making that calculation, the fact that the securities had lost value due to poor or unsustainable business model would not be chargeable to Mr. Evans**."

- In the instant case, (1) the "*group*" decision to lend the money to Jowdy (*Peca Tr.498-99, Berard Tr.3055 [27] and Kaiser testimony, infra*), (2) the Lehman

---

[27] Berard testified on direct-examination that he knew about the Jowdy-loans -- and it was ***not concealed*** by Kenner (*Tr.3055*):

> *Q. And did you have any firsthand knowledge about any of those -- about the money going from Hawaii to Mexico?*
>
> *MR. HALEY: Objection. Just the leading -- I object. Without a speaking objection, I object.*
> *THE COURT: Overruled.  That one's okay. You can answer that.*
>
> *A [Berard]: I was only familiar with what Phil Kenner told me about some money that was going from Hawaii to Mexico.*

Berard's 2015 testimony echoed his previous *voluntarily* confirmations to the 2009 arbitration panel in *Nolan v. Kenner* (*ECF No. 668 Appendix at 3358-59*) (*Nolan arbitration Day 5 at 76*):

> *Q: When you were – as far as the Hawai'i deal, were you made aware of any sort of transaction Mr. Kenner set up where you can give a commitment or pledge a credit line in lieu of putting all your money in initially?*
>
> ***A [Berard]: Yes.***
>
> *Q: Can you tell the panel what was your understanding?*
>
> ***A [Berard]: Basically the company – it was set up.  The company would pay the payments.  I would pledge the money, obviously to get a loan for the property. Again, the company would pay the payments, and I was not forfeiting all the amount of money for the piece of property.[27]***
>
> *Q: Were you aware that Mr. Kenner got a credit line against some securities or investments you had?*

Brothers September 2008 bankruptcy, (3) the JV partner-Lehman Brothers
documented budget thefts of $11 million from 2006-2008, (4) the Lehman
Brothers refusal to pay the $4 million in negotiated JV milestone payments
(including Kaiser's refusal to sue them for it as Managing Member since 2007),
and (5) the global real estate recession in 2009 are _not_ Kenner's fault and cannot
be chargeable offenses (as substantial non-fraud factors, affecting any funds not
transferred by the alleged superseding indictment victims to Jowdy totaling
$1,315,000).

- o  Thus, separating the fraud and non-fraud factors (See *Ebbers*), the
     charged frauds traceable to alleged superseding indictment victims
     cannot exceed $1,315,000 (before offsets).

Next, *Evans* argued that the district Court should have considered the effect and
foreseeability of _non-fraud factors_ in determining loss.  *Aplt Br. 38-41*.  The Court
opined, "**_Again, he is correct_**".  The Court continued that the district Court relied on
*Turk*[28] in stating that the receiver's actions [Kaiser's actions as Hawai'i Managing

---

*A [Berard]: Yes.*

*Q: And later on were you aware that Mr. Kenner started lending this money to another
principal in the Cabo project named Ken Jowdy?*

**A [Berard]: Yes.**

*Q: Where did you think the money that Mr. Jowdy – were you told where the money
was going to be used that was given Mr. Jowdy as far as the Mexican project?  Was
there anything you were told about that?*

**A [Berard]: Basically just loan him the money for the project.**

*Q: And prior to signing any of these documents did you have access to your own
attorney unconnected to Mr. Kenner to review this?*

**A [Berard]: Yes I did.   We have a family attorney back home where before I sign
any documents basically – I went to his office, sat with him.   We reviewed them,
and I signed them and basically FedEx'd them to Phil [Kenner].**

[28] *Turk* is a Second Circuit loan case (**not equity like the instant case**) – but identical to the
Jowdy-Harvey fraud on Kenner and Kenner investors in Del Mar staring within days of the
first 2002 Kenner and Kenner investors' deposits into Jowdy's Baja Development Corp
money-laundering account; *Bates stamp: BN-P-000109-110*); *United States v. Turk*, 626 F.3d
743 (2d Cir 2010) (*ECF No. 667 at 23-24*).  **The evidence is available to the Court upon
request**.

Member since 2007] and market conditions were irrelevant to determining actual loss.   The Court opined, "***that reliance was misplaced***".

Under *Evans'* appeal (relating it to the instant case), there is likewise no supporting proof, that the eventual LOC payment distributions after the JV would have been altered while assessing the best remedy for recovering the Jowdy loans (once Jowdy's attorneys and Jowdy terminated the pre-GSF settlement negotiations in 2008), and as Michael Peca testified "*group*" knowledge to the 2011 SDNY Grand Jury, *infra*, and re-confessed to the 2015 trial Court (*Tr.498-99*) (acknowledged by this Court at *ECF No. 501 at 9*):

> *[Michael Peca]: A short-term loan [was made] to Mr. Jowdy because at the time Cabo – we hadn't gotten the lending from Lehman Brothers yet.  **We** made a short-term loan until the lending came in.  Once the lending came through they were to pay back the loan, I think in the neighborhood of five-and-a-half million dollars, on the closing.  **It was never paid back**.  And then communication basically seized [sic] at that point from him [Jowdy].  That was kind of the whole sticking point as far as me **and the other guys** with Mr. Jowdy.*

The *Evans II* Court also opined that the government and district Court's tainted calculations produced an erroneous number of victims, identical to the instant case calculations.

➢ **The *Evans II* Court confirmed that <u>without loss</u>, <u>there could be no victims</u>.**

Four-and-a-half years post-trial, only Kenner has produced a detailed accounting of investments versus loss (a.k.a. none), with irrefutable back up (*ECF No. 736, #1 and #2*) (*ECF No. 770 at 53-72*).   Concurrent with the *Evans II* opinion, "[t]he government has not proven how much loss, if any, resulted from Mr. Evans fraud. Even if the government had limited information, the Court had to base the restitution order on the amount of actual loss."  *United States v. Hudson*, 483 F.3d 707, 710 (10th Cir 2007).

Ultimately, after the second appellate opinion in *Evans*, Mr. Evans was released "time served" and no restitution was ordered (as a full reduction based on passive-equity owners and their inherent risk/reward expectations).  In a concurring opinion in *Evans II*, Judge O'Brien, like in the instant case disclosures, further stated:

> "Evans adequately disclosed the **<u>risky</u>** nature of the projects to the investors and, to sweeten the deal, offered 12% per annum interest on invested funds. That debt burden, along with other global market factors, produced disastrous results.   By April 2005, several things became clear: The

rehabilitation costs were considerably more than anticipated [*identical to the Jowdy loans extending past the expectation of the spring 2006 Mexico-Lehman Brothers closing*][29], the projects were undercapitalized and the interest obligations to investors were disastrously large and unrelenting.   As a consequence, the project took on a gloomy countenance, revealing the business model to have been, at best, <u>overly ambitious</u> or, more likely, inherently flawed.  **None of that, as all agree, amounted to fraud**."

---

[29] Peca SDNY Grand Jury (*3500-MP-5 at 30-33, 35, 40, 42, 45*) -- Sydor SDNY Grand Jury (*3500-DS-2 at 19, 24 and 25*) – Stevenson (*3500-TS-1 at 17, 18*) all in the prosecutions possession 4 years before trial and two years before accusing Kenner of concealment in opposition to the testimony of 2 of the same 3 guys 5 years before trial -- and John Kaiser in 2009 (*ECF No. 668 at 190-91, infra*) (*ECF No. 785 at 2-4*).

John Kaiser testified during a 2009 Arizona arbitration that he *did not hold Kenner responsible* for the Jowdy non-payments, either (*Nolan arbitration Day 5, Tr.928-929*):

> *Q: Has this ever been a secret that Mr. Kenner lent this money to Mr. Jowdy?*
>
> *A [Kaiser]: No.*
>
> *Q: Was this a transaction that, as your view as an investor was open and disclosed to everyone?*
>
> *A [Kaiser]: It was open.*  **There was no secret handshakes or nothing like that**.
>
> *Q: Even now, sitting here in May 2009, is there anything you've uncovered, as someone who obviously knows how to investigate, that Mr. Kenner has done anything inappropriate throughout these transactions?*
>
> *A [Kaiser]: No.*
>
> *Q: Not one complaint?*
>
> *A [Kaiser]: No.*
>
> *Q.   At the time this money was lent to Mr. Jowdy to be spent in the Mexican project, did anybody anticipate he wasn't going to pay you back when the Cabo deal closed, the Lehman's Cabo deal?*
>
> *A [Kaiser]: No.  Otherwise I wouldn't have lent it.  I wouldn't want to go down that route.*
>
> *Q.   Do you blame Mr. Kenner for him [Jowdy] not paying the money back?*
>
> *A [Kaiser]: No.*

*Hawai'i results (after the application of credits, supra)…*
- There are no losses resulting from the Hawai'i "object" of the instant case after "*loss credits*"…

*Outstanding loan with Jowdy (admitted by Jowdy and the government as government-forfeiture-44)…*
- *To be determined thru legal counsel would be whether or not individuals from the Hawai'i partners who settled with Jowdy in 2008 (Nolan, Juneau, Moreau), or 2012 (Berard), or 2017 (Peca, Sydor, Rucchin, Nash, etcetera) are barred from pursuing the loan as settled as individuals, in lieu of a corporate action per the agreement (3500-KJ-2 at 24-25).*

Notwithstanding the credits against loss calculations (**resulting in no losses, no victims;** *see Evans*), the Little Isle 4 partners still have a corporate legal action versus Jowdy for over $35 million (gross with interest, and increasing) from the $5 million (capital) loan that Jowdy admitted to:
   (1) During his 2010 Nevada defense case;
   (2) During his January 2010, 2-day California depositions, while being sued for the Hawai'i loans by the alleged victims in this criminal case; and
   (3) During his *stunning-reversal* confessions of "*all loans*" to the FBI in March 2010 (3500-KJ-2 at 11-14)…

It leaves no equivocation that the "legit" loan is still a collectible asset of Little Isle 4 (government-forfeiture-44) – simply not pursued by Managing Member John Kaiser -- perhaps based on personal compromise during his 5-years as Jowdy's Mexico co-conspirator before he was "used-up" by Jowdy's cabal and terminated; exposing "shocking" Jowdy's malfeasance in ECF No. 628.   Perhaps, future legal actions will need to remove Kaiser as Little Isle 4's Managing Member after 13 years of non-activity and non-reporting for the Little Isle 4 members – other than receiving a 2012 job from Jowdy in Mexico (with Berard) and refusing to sue the parties who defrauded the Hawai'i project, after the August 2006 JV settlement.

Lastly, the Court should be reminded that according to Jowdy's documentation, Jowdy's bank records, and the government-forfeiture-44 admission post-trial, *only Jowdy* received 100% of those funds in spite of repeated trial manifestations by the U.S. Attorneys of "*bogus*" (Tr.5708 (2x), 5709), "*phony*" (Tr.4597, 4598) and "*supposed*" (Tr.5707-5708) testimony by Kenner, seeking conviction at all costs – and proffering it to the jury a "*Kenner cover-up story*" (Tr.33).

- *See Evans* "[w]ithout an actual loss, there could be no victims"

==The Eufora private stock "object"...==

- *Kenner received less than $280,000 in total from the alleged superseding indictment private stock sales – thru documented loan repayments (Tr.2580) to Constantine – and an "innocent third party", Tim Gaarn (Tr.2503-04, 2563-64, 2579, 2599-2600, 2608)...*
  - *Thus, unlike a typical fraudster who gains a financial benefit (for the only funds traceable to Kenner in the instant case), Kenner had already laid-out the loan funds to two business acquaintances who paid Kenner back by selling their documented assets (GX-210 at 33-37); similar to the contemporaneous personal loans to Kaiser, Berard, Moreau, Sydor, Eufora, etcetera (all still outstanding today).*

*Acknowledgement of Eufora company's intrinsic value...*

One-year after the private stock sales by Gaarn and Constantine were completed, the investors' own attorneys determined a significant intrinsic value in Eufora's private equity after a 4-month forensic scrubbing; by the Giuliani Group – led by corporate attorney Michael Stolper.  The Giuliani Group demanded a 6% equity stake in the company in lieu of the $500,000-plus in legal and investigative fees they accrued. Prior Eufora investor, Jay McKee, confirmed this information to Kenner:



| 14797 | +17168034903 Jay McKee* | 7/15/2010 12:03:01 PM(UTC +0) | Read | [McKee]: Hopefully you're getting some sleep right now; I am planning on sending the letter this morning.. **Within our package or plan in taking the lender out, where is the 6% for Guilani partners comming from?** |
|---|---|---|---|---|

- The investors' attorneys had vetted the 2008-09 Constantine and Gaarn stock sales.  Eufora's corporate value was formulated -- **and they wanted "in"**.

This substantiated the $20 million valuation in February 2009 by corporate lender, Neptune Capital, resulting from their 6-month due diligence; *prior* offering a $3 million operating loan to Eufora.   The Court should note that none of the Constantine sales occurred when the company had liens on anything (regardless of its non-effect on value), yet the government interjected prejudicial Q&A with Kristen Peca to allege the patents were pledged when *her husband* bought his stock on April 7, 2008 (Tr.703), *10-months too early* (insinuating subterfuge and non-value as a result, that did not exist):

> *Q. Did he tell you at the time you invested those in Eufora whether those patents held were as collateral for a loan?*
>
> *A [Kristen Peca]: **If they were held as collateral? No. No. Never**.*
>
> *Q. Would that have been important to you in deciding whether to invest money?*
>
> *A [Kristen Peca]: **Yeah, of course**.*

*The government also knew that Michael Peca lied about knowledge that his 2008 wire went to Constantine Management Group...*
Related to the Peca 2008 Eufora investment (*ECF No. 501 at 8*), the court stated that "*Kenner did not provide an explanation*" for the Constantine Management Group wire transfer (allegedly discovered by Michael Peca "*in or around 2011 or 2012*") (*Tr.446-47, 452*).

- o **This was not possible.**

**First** -- On Peca's confirmation from Schwab, mailed to his Getzville (Buffalo), New York home, it states in **BOLD** (in evidence):

**"Notice of Wire and Third Party Disbursement(s)"**

- Schwab also designates at the bottom of the same wire transfer confirmation:

"*If you do not recognize this transaction or if you have any other questions regarding this transaction, please contact us immediately at the telephone above. Questions: 800-515-2157*"

**Second** – and commensurate with the Ranford **CTE** trial-symptoms of amnesia about his transfers[30], Peca would have received his transfer confirmations from Charles Schwab related to the 2008 *transfer (Tr.2850-51, 2854-55). They would have included the destination account; Constantine Management Group.* If Peca had any questions about the veracity of the recipient – no time would have been better to demand an answer than in 2008 from Kenner &/or Charles Schwab; yet **Peca did not, according to his own testimony** (*Tr.446*).

---

[30] Ranford's **CTE** (or amnesia) occurred *after* confessing the exact transactional details independently to the FBI 3-years before trial (*3500-WR-2-r at 1-2, confirming his own testimony to the FBI was accurate and uninfluenced by Kenner in 2012, Tr.2906-07*), while wholly forgetting any of it in 2015 (*Tr.2824, 2858-60*)...

**Third** – in order for any transfer to occur from Michael Peca's Schwab account – or any other Schwab client whether or not they are related to Kenner – ***the actual client <u>was required</u> give oral confirmation to Schwab*** (and another party, *infra*) ***<u>before the funds were transferred</u>***.   This protocol specifically included the transfer requests Kenner signed on behalf of Peca and others as their <u>*limited Power of Attorney*</u>.   This is confirmed by the following text communication between Kenner and Peca – after his verbal approval with his independent Charles Schwab representative to release the funds:

Peca texts in BLACK (read); Kenner replies <mark>hi-lighted</mark> and in <span style="color:red">RED</span> (Sent):

| | | | | |
|---|---|---|---|---|
| 4 8 2 0 | +17163 743234 Michael Peca* | 1/12/2009 7:19:44 PM(UTC+0) | Read | [Peca]: Just got Shwab statement and saw the 600+k in and 1m+ out. **Please send wire request so I have it for my records** |
| 5 7 5 2 | +17163 743234 Michael Peca* | 1/12/2009 7:30:11 PM(UTC+0) | Sent | [Kenner]: <u>You bet</u>. I'm back in my office tonight. Hope you are well. Happy New Year... |
| 4 8 2 1 | +17163 743234 Michael Peca* | 1/12/2009 7:31:23 PM(UTC+0) | Read | [Peca]: Thanks. |
| 5 7 5 3 | +17163 743234 Michael Peca* | 1/12/2009 7:33:56 PM(UTC+0) | Sent | [Kenner]: Welcome buddy |

**Fourth** – as a **FINAL** and **FAIL-SAFE** security mechanism for Peca and all other Kenner clients who had funds transferred from Schwab to Constantine Management Group (or anywhere), they also had to give a secondary confirmation by phone to their investment advisory firm (who frankly was under FINRA requirements – unlike Kenner); ***Greenberg Graham Advisors***.   Kenner's former assistant verified this salient fact to the FBI during her 9-9-2010 proffers (*3500-KM-1-r at 5*).   The FBI "raw notes" confirmed, with FBI agent Galioto present, that:

> "*JG [Jim Graham of GGA – the FINRA manager for the Kenner clients] wanted access to clients accounts....<u>**for wires JG would want access to clients directly**</u>*"

- <mark>Thus, for four independent reasons, *supra* – it was wholly impossible for Michael Peca (or anyone who transferred funds to *Constantine Management Group* -- or any other recipient) to not be aware of the fund movement (payee and amount)</mark>

*before* the funds left their account – *with their-own verbal authorization to two independent parties*.

**CREDIT AGAINST LOSS CHART – Eufora private stock sales** (*originally from ECF No. 770 at 66*):

| Eufora | Investment amount | 3.38% reduction value… (a.k.a. loss) | Net value of Eufora investment (assuming fraud calculation) |
|---|---|---|---|
| Ranford | 300,000 | 10,140 | 289,860 |
| Peca | 100,000 | 3,380 | 96,620 |
| Nash | 100,000 | *3,380* | 96,620 |
| Sydor | 50,000 | 1,690 | 48,310 |
| Rucchin | 150,000 | 5,070 | 144,930 |
| **Totals:** | **700,000** | **23,660** | **676,340** |

*2008 purchases from Constantine…*
- Peca -- $100,000
- Nash -- $100,000
- Sydor -- $50,000
- Ranford -- $200,000

As documented, *supra*, **Kenner received $117,000** in previous loan repayments from Constantine as a result of funds traceable to Constantine's private stock sales ($17,000 from the 2008 Nash transaction – and $100,000 from the 2008 Peca transaction).

*2009 purchases from Gaarn (an innocent 3rd party in the instant case)…*
- Rucchin -- $150,000 ($117,800 to Kenner)
- Ranford -- $100,000 ($42,500 to Kenner)

In the *United States v. Contorinis*, 692, F.3d 136, 148 (2d Cir 2012), the Court "observed that neither the language of the criminal forfeiture statute nor Circuit case law supported the proposition that a defendant must forfeiture proceeds that

'go directly to an innocent third party and are never possessed by the defendant'" *Id.* at 147.

As documented, *supra*, **Kenner received approximately $160,000** in previous loan repayments from Gaarn as a result of funds traceable to Gaarn's private stock sales.

### *Bona fide purchasers for value (Eufora offset credits)...*

*Loss factor credit under Novak for the Eufora stock...*
If the Court deems the private stock transactions as "illegal", under *Novak*, *Leonard*, *Starr* and *Shellef, infra,* they must value the residual purchases.

*What did the investors bargain for?*
Then, the Court must calculate what the individual investors "bargained for" and received. *United States v. Starr*, 816 F.2d 94, 98 (2d Cir 1987).  It is not enough to show that a defendant used deception to induce victims to enter into transactions they would otherwise avoid.  See *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir 2007).  Rather, the government must show a "discrepancy between benefits reasonably anticipated because of the misleading misrepresentations and the actual benefits which the defendant delivered, or intended to deliver.  *Starr*, 816 F.2d at 98. Intent to harm cannot be found when alleged victims "received all they bargained for, and defendant's conduct did not affect an essential element of those bargains." *United States v. Novak*, 443 F.3d 150, 159 (2d Cir 2006).

*What intrinsic value was received?*
Then, the Court must evaluate what value (or loss of value) has been retained or not. *United States v. Leonard*, 529 F.3d 83, 92 ("A fraud may involve the misrepresentation of the value of an item that does have some value (in contrast to an item that is worthless).

> Where, for example, a defendant fraudulently represents that stock is worth $40,000 and the stock is worth only $10,000, the loss is the amount by which the stock is overvalued (*i.e. $30,000*).)"

"Intent to harm cannot be found when alleged victims 'received all they bargained for', and [defendant]'s conduct did not affect an essential element of those bargains." *United States v. Novak*, 443 F.3d 150, 159 (2d Cir 2006).

*Valuation of Eufora stock...*
Neptune Capital valued Eufora at $20,000,000 as part of their 2008-09 due diligence before they loaned Eufora and Constantine a $3,000,000 operating capital loan in February 2009; with strict provisions of use.   Neptune's default penalty would have triggered a 40% equity stake in Eufora (with full forgiveness of the $3,000,000 operating capital loan).[31]

The Neptune valuation was contemporaneous with all of the Eufora private stock sales by Constantine (2008) and Gaarn (2008-09).

Under Neptune's $20,000,000 valuation, if $700,000 was incrementally supposed to be acquired by the company, the value could not be valued at more than $20,700,000.  Using Neptune's calculation methodology, the "alleged diverted proceeds" would have reduced the corporate value by **3.38**% (after all of the Gaarn purchases were complete).  *That would be the only calculation needed to determine the value not received as bargained for*.

- "Intent to harm cannot be found when alleged victims 'received all they bargained for, and [defendant]'s conduct did not affect an essential element of those bargains."  *United States v. Novak*, 443 F.3d 150, 159 (2d Cir 2006).

The Court must also note that Nash (*Tr.1915*) and Gonchar (a non-victim) (*Tr.4854*) expressly told the 2015 trial court they expected to receive a part of a great company.  **They did** *without any other specific beliefs*; *See Leonard*.

The alleged victims in the superseding indictment that bought stock from Constantine (2008) and Gaarn (2009) received exactly what they "*bargained for*"; Eufora private stock.

Tyson Nash told the EDNY Court that *all he was sure about* from his stock purchase was (*Tr.1915*):

> *Q. At the time that you invested money in Eufora, what did Mr. Kenner tell about how the money would be used?*

---

[31] The Court should note that this "penalty" amount is no more or less onerous than the Urban Expansion $1,000,000 (mis-represented as a $2,000,000 pre-pay penalty; *ECF No. 765 at 9*) – or the Lehman Brothers $125,000,000, pre-payment penalty (on their initial $125,000,000 Cabo loan) (*Tr.5947-48*).   Heavy pre-payments were the norm for capital loans; not the outlier as portrayed by the government ad nauseum thru summation (*Tr.5997-98*).

*A [Nash]: Again we didn't really talk in great depth. I was **guessing** it was for those commercials that they [Eufora] wanted to shoot. Get those up and running. **And again I got a piece of a great, great company or it was worth a lot of money.**

- According to trial testimony thru Nash, he saw the actual commercials after completion (*Tr.1916*).

As the Court knows, if the investor received full value for what he expected, there is no loss even when alleged inducement occurred thru fraud.   At a minimum, precedent confirms that the government is required to confirm the "value" received by the investor in order to subtract a "lesser" value based on fraud, if appropriate; see *Leonard, Starr, Shellef, and Novak, supra*.

Nash's own testimony confirmed during *direct-examination* that he *only* expected to receive stock in a great company, similar to Gonchar's recollection during Constantine's defense case (*Tr.4802-03*).   See *Leonard at 94*; in *Leonard* like the instant case: ("After all, the investors did obtain an interest in a company engaged in producing and distributing a motion picture.   Accordingly, [the Circuit Court opined] the district Court erred in not deducting from the purchase price the actual value of the instruments.").

***Nevertheless, under the calculation method in Leonard or Novak, supra, the total loss from fraud factors cannot be more than $23,660 (3.38% of $700,000).***

**The Constantine-Global Settlement Fund ("GSF") "object"...**

The Court surmised that Constantine *overspent* the GSF by *$17,077* on his personal expenses (or only $4,488 thru the alleged superseding indictment victims) utilizing the most aggressive calculation methods against Constantine's expenditures (*ECF No. 501 at 60*).   The Court is aware that Kenner's only role in the GSF was as a contributor (the largest of all contributors), participating just like all of the other contributors (*Tr.3805-16 [Attorney Richards], Tr.540 [Peca], 3500-TN-3 at 12 [Nash]*).

- *Even the $22,435 of partial-expenses Kenner was reimbursed for his payments 2-months later was not from a superseding indictment individual's contribution (GX-767).*

*Full disclosures signed…*

Each investor _signed_ a disclosure document with Constantine, after they:

    (1) Received an in-person "pitch" by Constantine,

    (2) Received an incremental disclosure email, *Jay McKee example infra*, and

    (3) Received a "*use of proceeds*" disclosure (which all of them signed for Constantine).

Then, based on the "signed-off" disclosure, Constantine utilized the GSF proceeds as he saw fit; *See Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A.*, 461 Fed. Appx. 61; 2012 U.S. App. LEXIS 3012

- In *Horvath*, **the investor argued that the terms and conditions were _written in Portuguese_, which he did not understand, but the court of appeals found that the investor was charged with knowing and understanding the contents of the documents that he signed**.

- The Court opined, ("If the signer can read the instrument, not to have read it is gross negligence; if he cannot read it, not to procure it to be read is equally negligent; in either case the writing binds him.  Parties are bound by documents expressly incorporated by reference into agreements to which they manifest their assent.") *Id.*

 "Intent to harm cannot be found when alleged victims 'received all they bargained for, and [defendant]'s conduct did not affect an essential element of those bargains." *United States v. Novak*, 443 F.3d 150, 159 (2d Cir 2006).

**CREDIT AGAINST LOSS CHART – Global Settlement contributions:**

| GSF | GSF Contribution Amount | Percentage of total GSF contribution overspend by Constantine | Value of $17,077 overspend by Constantine[32] | Net non-fraud value -- after Constantine overspend |
|---|---|---|---|---|
|  |  |  |  |  |

---

[32] The Court determined under their calculation methods in 2017 that Constantine overspent the GSF contributions by **$17,077** in Constantine's favor (*ECF No. 501 at 60*).

- This calculation specifically ignored the additional $1,250,000 Gonchar verified to the Court Gonchar also authorized for Constantine's use (*Tr.4826-27*) (*GX-767*); and

- This calculation suggested that the $124,985 that Constantine contributed to the Ronald Richards Trust account on 9-8-2009 with the other GSF contributions was a "pay back"

| GSF | GSF Contribution Amount | Percentage of total GSF contribution overspent by Constantine | Value of $17,077 overspend by Constantine [32] | Net non-fraud value -- after Constantine overspend |
|---|---|---|---|---|
| McKee [31] | 250,000 | .374% | 935 | 249,065 |
| Peca | 250,000 | .374% | 935 | 249,065 |
| Ranford | 300,000 | .374% | 1,123 | 298,877 |
| Sydor | 250,000 | .374% | 935 | 249,065 |
| Nash | 100,000 | .374% | 374 | 99,626 |
| Rucchin | 50,000 | .374% | 186 | 49,814 |
| **Totals:** | **1,200,000** | | **4,488** | **1,195,512** |

The individuals in the superseding indictment have a _net loss of value_ from the Constantine overspend of $4,488 (*per ECF No. 501 at 60*); *once the fraud and non-fraud factors are separated*.

- The Second Circuit opined in *United States v. Ebbers*, 458 F.3d 110 (2d Cir 2006) – "'**[t]he loss must be the result of the fraud**.'" *Id.* at 128. "**[l]osses from causes other than the fraud must be excluded from the loss calculation**." *Id.*

Three government witnesses gave "*I only expected legal fees versus Jowdy*" testimony (*Tr.739 [Kristen Peca]*). The government confirms this testimony (*ECF No. 765*) – but errs again in unrelated transcript citations with Michael Peca at *Tr.684-85 (unrelated)*, while McKee[33] at *Tr.1814 (confirmed)*, and Rucchin at *Tr.2749*

---

against other funds he used – and not an incremental contribution for his own future use (*GX-767*).

[33] The court should note that Jay McKee and Kenner conducted a detailed text communication the same night as the McKee-Constantine dinner to "pitch" the GSF concept (*ECF No. 786 at 18-19*). The texts expose that no element of the GSF plan was concealed from McKee (*ECF No. 668 Appendix at 49-51*), including the fact McKee told the 2015 EDNY court that he spoke with Michael Peca immediately after the meeting to discuss the details of the new Constantine strategy (*Tr.1817*) (exposing any disingenuous concealment allegations by the government with Peca – notwithstanding Peca's-own signed disclosure documents and text/email communications with Kenner and Constantine – in real time, concealing nothing).

- ***McKee cannot be a victim of the GSF*** *– with full, unfettered, real-time knowledge documented in his own text messages; and only perjury or CTE affecting his memory of events that were documented in real time.*

*(confirmed)* (with a $75,000 GSF transfer to Ronald Richards legal fees the same day as Rucchin's $50,000 entire contribution – ***removing Rucchin as a victim from any possible concealment*** of other, unknown uses or frauds – *GX-767, introduced at Tr.1826*).   Rucchin's proportionate share of the $17,077 Constantine-overspend ($186) <u>*must*</u> be removed from calculation.

- The net loss (of $17,077) from the alleged Constantine mis-management still allowed Constantine to distribute over $500,000 in legal fees to the various attorneys working on behalf of the GSF group (not the $225,000 espoused by the government – *ECF No. 765 at 20 -- and Tr.5752, 5755, 6004*).
  - Kenner also made approximately $250,000 in direct payments and litigation expenses thru the pendency of the GSF to the attorneys handling the GSF efforts; including but not limited to attorneys, (1) Ronald Richards, (2) Tom Baker, (3) JT Fox, (4) Maximus Guerrero, (5) Javier Troncoso, (6) Ruben Carillo, (7) Francisco Duarte, (8) Paul Augustine, (9) Jonathan Dessaules, (10) Kevin Harper, (11) Akin Gump, (12) Epstein Becker (13) Holland & Hart (14) Ross Goodman, etcetera (all in Rule 16 evidence).

Even though Constantine's "overspend" was a mere $17,077, the contributors were not deprived of any "expected" value as a result of the alleged Constantine mis-management.   In fact, the Court knows that <u>*legal efforts cannot be deemed to have a guaranteed result*</u>.   Constantine hired the attorneys to deal with Jowdy and the "Bad Apples" issues (*Tr.1919-22*).   Constantine paid the attorneys approximately $500,000 from the GSF, as expected (*See Ronald Richards testimony – Tr.3805, 3806-3816*) (*GX-767*).

Jay McKee actually testified that he had no guaranteed expectation of recovery, simply the expectation of a legal fight.   [McKee discussing the Constantine GSF "pitch"] (*Tr.1813-14*):

*"They talked about, there was a number of guys, friends of mine, former teammates, that were invested in the golf course in Mexico the northern property, and <u>it was a talk about how we could go after Ken Jowdy legally</u>, they talked about hiring a high-powered attorney out of California, Ronald Richards, and <u>they talked about how we could **potentially** recoup some of what I felt was lost money</u>…I believe we wanted to get control of the property legally from Ken Jowdy. <u>**If** we could do that and sell the property, we could get our money back</u>."*

Jay McKee, Michael Peca and the other GSF contributors received further disclosure letters from Constantine, _before_ they "signed off" and Constantine began the use of their funds:

***[the remainder of this page left intentionally blank]***

| | |
|---|---|
| **From:** | Tommy Constantine <tommy@eufora.com> |
| **Sent:** | Monday, May 18, 2009 10:33 AM |
| **To:** | nicjay74@aol.com |
| **Cc:** | phil kenner |
| **Subject:** | Global Settlement |
| **Attachments:** | AZ Eufora Partners LLC MCKEE 5.4.09.xls |

Sent to McKee hours before h
returned the "signed" acknowl
of Constantine's use of GSF f
the same email address he di
remember receiving the
"Acknowledgment" sign off e

Nicole and Jay:

You will be receiving a Transfer of Membership Agreement for your increased interest in Eufora, LLC from our CEO (C.R. Gentry) later this week or next week at the latest. We just have to wait for the other side to sign the Transfer docs as part of the settlement, which is supposed to be in the next few days. In the meantime, this email shall serve as written confirmation that you will be receiving 1/10th of the interest that we acquire from Nolan, Juneau and Moreau with respect to Eufora. Specifically, you will be receiving an additional .364% which is 1/10 of the 3.64% interest that they currently own or owned. The attached excel spread sheet shows your current ownership interest and the interest that we are acquiring from the three of them as part of the settlement. The dollar amounts on the right are the current value of those interest at the $20M valuation (for the whole company). Again, your interest is 1/10 of that and will be added to the .70% you already own.

Additionally, Juneau and Nolan owned 10% each (20% total) of the Avalon Airpark project. We are buying out their 20%, so you will also receive 1/10th of this interest (2%). It is currently valued at $3.3M and the office space is currently being rented by Eufora. You will also be receiving an LLC and operating agreement reflecting your new proportionate share of ownership of this building.

Frankly, although this one is more of a luxury than an investment, you will also own 1/10th of 20% (2%) of the Falcon 10 airplane. It is worth approximately $1M but will be very difficult if not impossible to sell. In any case, this will not cost you guys anything going forward. Ultimately you guys should take advantage of the fact that we now all own an airplane together and when it's geographically feasible, you guys should use it to make owing a piece of it worthwhile. Just let me know whenever you want to use it. You just have to pay for the hourly costs for fuel and the daily costs for the pilots and landing fees.

Finally, as Phil and I stated, I also settled the Palms condo issue with Moreau as part of this global settlement transaction. Moreau had absolutely no right to sue me for the Palms units and I would have crushed him in that lawsuit because we had a signed agreement when he bought it. Nevertheless, since we got that issue resolved as part of the settlement as well, I have elected to share in the ownership of those units and the equity that exists in them with all of the great partners that have stepped up and helped us fix this problem with all these problem individuals. Specifically, these Palms units are a one bedroom and an adjacent studio on the 31st floor with a strip view. They are worth approximately $1.5M today and were worth $1.8-$2M some time ago. I believe they will recover in the future and be worth more than they are today. In any case, you will also be receiving an LLC and operating agreement reflecting your new proportionate ownership of these units. Although Juneau, Nolan and Moreau did not own any interest in these units, to keep things simple, I will just match what we are doing in the Avalon project so you will also receive 1/10th of a 20% interest in these (2%).

Please do not hesitate to call me if you have any questions and please just to follow the program in terms of documentation.

TC
(602) 363-5676

Kristen Peca confirmed (*Tr.716*):  "*He [Constantine] said it was going to be kept at attorney Ronald Richards' escrow account at his law offices, and that was the exact attorney we were using to sue Jowdy. So that from that aspect made sense, it was held*

*safe in a lawyer's escrow account. It wasn't an investment, it was for a lawsuit for a legal fund."*

- In addition -- the Court should take notice that the ==*government never traced funds to a tequila company*== as they repeatedly promised the Court they would (*Tr.33, 726, 1074-76, 4722, 4938, 5752, 6003*); and for manufacturing bottles that do not exist (*GX-4509*) (*Tr.5752*).   Nevertheless, they doubled-down on their false rhetoric again during their sentencing memo fantasies (*ECF No. 765 at 20-21*), based on an illogical and impossible timeline of events, proven by Kenner as another government fraud on the Court, ad nauseum.
  - The government took pleasure in conflating the Constantine financial woes and use of funds (whether authorized or not) and lumping Kenner in with the insinuation that Kenner was also "*broke*" (*Tr.5982*) and Kenner was paying for his "pet projects"; wholly fabricated for effect (*ECF No. 765 at 2, 3, 11, 13, 14, 19, 20, 21, 22, 38*).

*Lawsuits are not guaranteed – so if they fail – they fail…*
- In January 2010, California attorney Ronald Richards was able to solicit 2-days of Jowdy confessions of all the money Jowdy **stole** from Kenner and Kenner investors (the Hawai'i loans specifically documented).[34]  Jowdy's attorney's gave independent verification of the Jowdy thefts thru Jowdy's-own money-laundering LLC; Baja Development Corp.) (*See January 5, 2010 Jowdy California deposition at 291*).[35]

---

[34] The Hawai'i-Mexico investors signed off on two (2) California lawsuits in 2010 (thru the Constantine GSF stratagem) versus Jowdy that **both** stated:
*"Mr. Najam was in charge of the corporate governance and while under Jowdy's direction and control, received over eight million dollars ($8,000,0000) from a LLC in Hawai'i.   Mr. Najam failed to properly account for those funds and has placed the Jowdy investors in a vulnerable and compromised position."*

[35] Jowdy's California Attorney Robin Crowther brashly _confirmed_ Jowdy's receipt of the Hawai'i loans – only 3 weeks after the Jowdy Arizona "no loans" defense received dismissal in that case, thru other legal malfeasance by Jowdy's attorneys (alleging criminal complicity of the Hawai'i partners attorneys because they supported the facts that the funds Jowdy received were loans) (*Bates stamp: PK_SEC_000800-802*):

*Q [Attorney Ronald Richards]: Do you know where we can get an accurate accounting of the checks that were issued and how the [Baja Development Corp loan] money was spent?*

*A [Jowdy]: for what?*

*Q [Attorney Ronald Richards]: For Baja Development Corp.*

42

- It has been the FBI case agent (for the last 10 years) who has had no interest in pursuing Jowdy's January 2010 confessions of obtaining the various loans – with no repayment plans for the $5 million-plus Hawai'i loans (*government-forfeiture-44*) and the remaining millions to Kenner and other Kenner investors "*because of the press releases about him*".  Apparently they hurt Jowdy's feelings after his-own thefts.   On February 12, 2010, Kenner confirmed, to Sergei Gonchar that he was sending the Jowdy California depositions to FBI agent Galioto (*Bates stamp: PK_SEC_004409*).
  - o   All Kenner received in return was a phone call, tongue lashing about never sending unsolicited evidence to Galioto or the FBI ever again.

Ironically, the Jowdy "hurt feelings" echoes the Kaiser February 2019 letter that Jowdy repeated no one would recover their funds from him; *ever* (*ECF No. 628*). The irony only expands when the Court recalls that John Kaiser was in full attendance for the 2-day California deposition of Jowdy and Jowdy's full confessions 9-½ years ago!

After being fired by Jowdy after his 5-year co-conspirator protection role, Kaiser now wants the Court to know that:

> *"'the hockey guys will never see a dime' because they said he [Jowdy] was a crook".*

On January 5, 2010 – Jowdy and his attorneys already confessed to that!

*Shockingly*…
9-½-years-later, the government renews their fraud on the Court, Kenner and the investors by fabricating that "*Kenner used approximately $2.4 million to buy a personal stake in Mexico.*" (*ECF No. 765 at 8*).  Is that the Kenner obstinacy the government refers to in "*not taking responsibility*" (*Id. at 4*)?  Weren't the government's false summation proffers enough prejudice (*Tr.5996, 5711, 5722-23, 5744-45, 5990, 5991-92, 5707-5709*)?

---

> *[Jowdy's attorney Ms. Crowther]:  Objection.  Assumes facts that you're entitled to that.*

> *Mr. Richards:  Well, we wired him money.*

> *Ms. Crowther:  So what?  You gave him a loan.  That doesn't entitle you to an accounting of how it was spent.*

- Perhaps, there have not been enough confessions (including *government-forfeiture-36* and *government-forfeiture-44* – by the government themselves) to conclude…

  "*Kenner did not steal any of the Hawai'i partners funds,*
  *nor use them to buy anything (let alone something in Mexico)…*"

## Conclusion…

The alleged victims in the superseding indictment (*ECF No. 214*) cannot be deemed to have suffered any loss; certainly nothing appreciable.[36]   The prosecutorial "concealment" claims were the basis for the conviction as droned upon by the government; notwithstanding their dishonest summation proffers that "*Kenner stole the money*" (5 times).

*The government's forfeiture "Plan B"…*
In the 5th year since trial, the government has finally conceded its Diamante forfeiture mandate to the Court without nexus (*ECF No. 780 at 6, footnote 2*) by delicately offering a "Plan B", merely asking for the $350,000 "*traceable*" to the Cabo project, Nolan's original capital account as used by Jowdy (never Kenner).

*The Jowdy-Nolan settlement ruse…*
The Jowdy-Nolan settlement agreement also was disingenuously denied as relevant by the government thru clever double-talk (*id. at 6*), claiming "*it is the government's understanding that no settlement matching Kenner's description exists*" (*ECF No. 781 at 3*), despite clear and convincing evidence that "there is an agreement between Nolan and Jowdy" and Jowdy's uber-expensive and well-connected attorneys would not have failed Jowdy's criminal interests by only settling for ½ of his-own known frauds versus Nolan (and the others) when he had Nolan convinced with the FBI's assistance that "*Kenner stole all of Nolan's money*", not him (stealing the Hawai'i loans and the Jowdy controlled Mexico funds)".[37]

---

[36] Hawai'i "object = $0; GSF "object" = $4,488; and Eufora "object" = $23,660…

[37] Kenner read the 2017 "header" (*Ex.A at 1 to the agreement*) and the "1. Definitions – 1.8 Related Parties" section of the 2017 settlement agreement (*Ex.A at 5-6 to the agreement*) into the record during the December 6, 2019 hearing (*Tr.57-59*).
- Clearly thru trial (from opening remarks thru summation) the government claimed, "*Kenner stole the money to buy his Cabo equity*", which they later admitted post-trial in *government-forfeiture-44* (the Jowdy loans) and *government-forfeiture-36* (the Cabo capital contributions) that *Kenner did not steal any money*.

*The 2017 settlement verifies the Nolan settlement for "all things related to Jowdy"...*
In the 2017 settlement agreement (*Ex.A at 5 [actual page 4 of the agreement]*),the document discloses the prior settlement, and considering the only other related investments Nolan, Juneau and Moreau had with Jowdy were the Hawai'i project (the Jowdy stolen "loans") and Diamante del Mar (the Jowdy embezzlement frauds), the agreements must be presented to the Court to verify Jowdy was 100% "covered" in legal-speak for all funds received by him or "any associated entity in his control or involved in his interests", as stated:

> "*WHEREAS, plaintiffs' Counsel and the Parties have been made aware that Ethan Moreau, Owen Nolan, and Joe Juneau all of whom were Kenner clients (a) never filed or participated in any of the Kenner-initiated legal proceedings and complaints against Jowdy or any Jowdy-controlled entities [where Jowdy laundered the various investment and loan funds], and (b) entered into separate settlement agreements with Jowdy &/or Jowdy-related entities as the result of other litigation...*"

The 2017 settlement prohibits the involvement of any "related party" in any future action versus Jowdy and Jowdy-related-entities (a thorough release agreement – *Ex.A at 13, Section 6.1*), and there is no conceivable belief that the previous Nolan agreement lacked any similar language.   Further bolstering the effect of the Jowdy-attorney "release" language is "Mutual Releases, Section 6.3.3" (*Id. at 15*):

> "*6.3.3 Upon the Effective Date, the Plaintiff Releasing Persons and the Defendant Releasing Persons shall be deemed to have fully, completely, finally, and forever released, relinquished, and discharged the Defendant Released Persons and the Plaintiff Released Persons, respectively, form the Released Claims, **including unknown claims**.   This includes claims that are not known at the time of the release, and which if known might have affected the decision to enter into this settlement.*"

Surely, the government and Jowdy's attorneys shared *government-forfeiture-36* (Cabo capital accounting) and *government-forfeiture-44* (Jowdy loan receipts from Hawai'i) prior to the final 2017 settlement with the various Hawai'i-Mexico investors.

---

- Yet they quadrupled-down in their sentencing memo to claim, "*Kenner used approximately $2.4 million to buy a personal stake in Mexico.*" (*ECF No. 765 at 8*)...

- Somehow, the government, Jowdy's attorneys, and the Nolan attorneys claim that a "*separate settlement agreements with Jowdy &/or Jowdy-related entities as the result of other litigation*" has nothing to do with money "*Ken Jowdy*" and "*Ken Jowdy-controlled-entities*" received and has been part of litigation between all of the parties (including Nolan, Juneau and Moreau) since 2007.

    o Kenner requests that the a Court either accept that Nolan has been fully recompensed by the Nolan-Jowdy settlement (and has no loss, no victim status for the only $350,000 he has involved in the instant case; *See Evans*), the same that Juneau testified about at trial (*Tr.354*) – or -- subpoena the originals for examination and oral argument as Kenner has previously requested for verification (because it exists).   The government's disingenuous response (*ECF No. 781 at 3*), while possessing the contradicting evidence in their hands is another breach of duty as officers to the Court and the Constitution under *Berger; United States v. Berger*, 295 U.S. 78 (1935).

The actual Nolan agreement will confirm that Jowdy settled (and the other two *bad apples*, Juneau and Moreau) for "anything" and "everything" related to himself, personally, plus all of his associates, his entities, and every possible permutation of their progeny.   The government's *ipse dixit* explanations do not suffice at this point in time – considering they have "*moved the goalposts*" repeatedly since the original indictment – while refusing to "*trace the money*".

- Ultimately, the government confessed (government's 2016 admissions, post-trial) that **Jowdy actually stole the money**.   Kenner testified to the truths during trial and was called "*bogus*" (*Tr.5708 (2x), 5709*), "*phony*" (*Tr.4597, 4598*) and "*supposed*" (*Tr.5707-5708*).   Notwithstanding the incredible trial prejudice, the victims of the Jowdy thefts "settled" with the guy who stole the money.

- There is no greater offset to compensate for the trial misrepresentations from opening remarks (*Tr.33*) thru rebuttal summation (*Tr.5996, 5711, 5722-23, 5744-45, 5990, 5991-92, 5707-5709*) – than the government-Jowdy admissions and settlements with the individuals Jowdy robbed from day one (*ECF No. 667*).

***Kenner's alleged grand-scheme to gamble his life away...***
Kenner acknowledged during his forfeiture oral arguments to the Court that he received $**117,000** from Constantine's private stock sales as repayment for the previous government-documented loans.   And -- Kenner received $**162,500** from Gaarn's private stock sales to repay their previous government-documented loans to Kenner (verified by Gaarn to the FBI thru proffer -- and at trial).

Constantine's loan repayments to Kenner -- and Gaarn's loan repayments to Kenner totaled the <u>only</u> money Kenner received "*over the course of a decade*"-plus elaborate scheme (*ECF No. 765 at 3*).  The government claimed Kenner was willing to "*gamble away…lives…of perks and privilege*"(*Id. at 3*); and alleged Kenner used sophisticated means, breaching the trust of his friends and colleagues, etcetera…for approximately $**279,500** in total (loan repayments of his own money).

*The indescribable lunacy of the alleged criminality…*
The Court must note that in the 2006 Hawai'i JV deal (alone), Kenner walked away from over $500,000 in personal real estate profits when he was forced to sell his personal Hawai'i home to the JV partnership, or else (with over $500,000 in unrealized gains); notwithstanding not taking any of the commensurate 42.553% repayments received by all the other investors (except John Kaiser who negotiated to be 100% repaid for his 2005 Hawai'i loan advances, plus the subsequent short-term LedBetter loan).

- Kenner received <u>*zero payout*</u> from his $600,000 plus capital account; and
- Kenner received <u>*zero*</u> "developer fees" in 4 years as the Managing Member (2003-2006) before the Lehman Brothers JV –
  - Considering the new Hawai'i JV partner received $109,000 **per month post-JV** – and the government espoused during a 2019 hearing that Jowdy was receiving $225,000 **per month** from the Cabo project; while both robbing the budgets thru documented thefts; and
- Kenner earned the alleged "*ill-gotten amount*" virtually every quarter in his businesses, but according to the government took a decade of scheming for his "repayment windfall", while personally spending millions in litigation to defend his clients form wrongdoers…with the government seeking "*no less than 20 years imprisonment*" (*Id. at 4*) for his "*brazen*" actions (of defying the government's proffer that the Jowdy loans were fake).

These were the "*defendants' scheme[s] that was difficult to detect and disrupt*" (*Id. at 43*), perhaps -- after?…
  (1) Kenner filed a half-dozen public lawsuits <u>with his investors</u> for the alleged "undetectable" funds in four jurisdictions (including two countries); and
  (2) Filed media stories to announce the litigation in the U.S., Canada, and Mexico; and
  (3) Then, Kenner helped expose Constantine and his Eufora management schemes with the most well-known prosecutor (Rudy Giuliani) in America.

- ***How is this difficult to detect or even concealed; unless in never-never-land?***

*Nature and circumstance of the offense...*

Hopefully, there is more money and substance to the government's alleged scheme for Kenner who:

(1) Personally spent millions in litigation to protect his investors and recover funds; and

(2) Risked a near-death 3-plus-day beating in a Mexico jail and continued the litigation in-person for 3 more years (thru November 2013), before his Mexico attorney was murdered; and

(3) Publically exposed the loans and equity funds misused by Jowdy (*ECF No. 667*), Constantine, Kaiser, Berard and others since 2003; and

(4) Assisted independent counsel who represented the investors in every instance (primarily funded by Kenner).

Clearly, the alleged victims were not beholden to Kenner for their recovery at any point in time (*Tr.713 [Kristen Peca], Tr.1830 [McKee]*), contradicting another government false theme (*ECF No. 765 at 36*); **with no discernable loss**.

Respectfully submitted,

Phil Kenner

48