FILED
CLERK
2:11 pm, Jan 24, 2020
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------X
                           :
UNITED STATES OF AMERICA,    :
                           :   13-CR-00607 (JFB)
                           :
       v.               :   100 Federal Plaza
                           :   Central Islip, New York
KENNER, *et al.*,        :
                           :   January 22, 2020
           Defendants.   :
--------------------------------X


TRANSCRIPT OF CRIMINAL CAUSE FOR STATUS CONFERENCE
BEFORE THE HONORABLE JOSEPH F. BIANCO
UNITED STATES VISITING JUDGE

APPEARANCES:

For the Government:        MATTHEW HAGGANS, ESQ.
                        U.S. Attorney's Office, EDNY
                        271 Cadman Plaza East
                        Brooklyn, New York 11201

                        MADELINE M. O'CONNOR, ESQ.
                        DIANE C. LEONARDO-BECKMANN, ESQ.
                        U.S. Attorney's Office, EDNY
                        610 Federal Plaza, 5th Floor
                        Central Islip, New York 11722

For Himself:              PHILLIP A. KENNER, *Pro Se*
                        No. 07480-408
                        MDC Brooklyn
                        Metropolitan Detention Center
                        PO Box 329001
                        Brooklyn, New York 11232

As Stand-By Counsel for   MATTHEW W. BRISSENDEN, ESQ.
Phillip Kenner:           Matthew W. Brissenden, P.C.
                        666 Old Country Road
                        Suite #501
                        Garden City, New York 11530


Proceedings recorded by electronic sound recording, transcript produced by transcription service.

```
 1                                                            2

 2

 3    APPEARANCES:   (Continued)

 4
      For Tommy C. Constantine:   SANFORD TALKEN, ESQ.
 5                                Talkin Muccigrosso & Roberts, LLP
                                  40 Exchange Place
 6                                18th Floor
                                  New York, New York 10005
 7
      Court Transcriber:          RUTH ANN HAGER, C.E.T.**D-641
 8                                TypeWrite Word Processing Service
                                  211 North Milton Road
 9                                Saratoga Springs, New York 12866

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1   (Proceedings began at 1:21 p.m.)

2           THE CLERK:  Criminal cause for a status conference

3   in 13-CR-00607, <u>United States of America v. Phillip Kenner,</u>

4   <u>Tommy Constantine</u>.  Counsel, please state your appearances for

5   the record.

6           MR. HAGGANS:  Good afternoon, Your Honor.  Matthew

7   Haggans for the United States.  I'm joined today by AUSAs

8   Maddy O'Connor and Diane Leonardo.  I'm also -- excuse me,

9   Diane Beckmann.  I'm also joined by Special Agent Matthew

10  Galiado [ph.].  And behalf of AUSA Komatiereddy, who could not

11  be here today -- she's preparing for trial -- I wanted to let

12  the Court know that she's unfortunately unavailable.

13          THE COURT:  Okay.  Good afternoon.

14          MR. HAGGANS:  Thank you, Your Honor.

15          THE COURT:  Good afternoon to all of you.

16          MR. TALKEN:  Good afternoon, Your Honor.  Sam Talken

17  for Mr. Constantine, who's seated to my left.

18          THE COURT:  Yes, good afternoon.  Good afternoon,

19  Mr. Constantine.

20          MR. CONSTANTINE:  Good afternoon, Your Honor.

21          MR. KENNER:  And good afternoon, Your Honor.  Phil

22  Kenner, *pro se* defendant with stand-by counsel Matthew

23  Brissenden.

24          THE COURT:  Good afternoon, Mr. Kenner; good

25  afternoon, Mr. Brissenden.

4

1          MR. BRISSENDEN:  Good afternoon, Your Honor.

2          THE COURT:  As you know, this is a status conference

3   oral argument that I've scheduled in connection with the

4   outstanding issues, so I'm just going to tell you what I hope

5   to accomplish today.  Obviously, we had some additional

6   briefing on the forfeiture issue, which I had requested.  I

7   also received under seal today the Government provided a copy

8   of the appraisal and I appreciate the Government getting that

9   done as I had requested prior to this conference.  So I wanted

10  to discuss the forfeiture issue and then the other reason is

11  for both sides to highlight anything they want to highlight

12  from the objections to the PSR.  So that was my plan.

13          I think because I know there are people here who are

14  here for the forfeiture.  As I usually do, I'll start with the

15  forfeiture.  I just want to note, the Government submitted the

16  appraisal under seal *ex parte* and put in a letter that they do

17  not intend to disclose the appraisal to the parties or any

18  third party, correct?

19          MS. O'CONNOR:  That's correct, Your Honor.

20          THE COURT:  I -- I just want to emphasize because I

21  did receive it and obviously I strongly urged the Government

22  to have that appraisal and to get it done quickly.  And I'm

23  assuming that I'm going to get a request from the defendants

24  to get a copy of that appraisal.  But I don't believe it --

25  they really didn't need to submit it to me because it has no

5

1  bearing on the legal question regarding the forfeiture of the

2  property.  In other words, the property is either forfeitable

3  or it's not forfeitable based upon the evidence that the

4  Government presented.

5          The issue is that the value of the property really

6  was just a matter of prosecutorial discretion.  In other

7  words, if the property is forfeitable under the law if there

8  was not sufficient equity in the property to make it

9  beneficial to the Government to pursue it because of all the

10 collateral consequences that various lawyers and parties have

11 been suggesting would happen from the forfeiture of the

12 property, economic consequences to innocent third parties,

13 this obviously has been something that the Court has continued

14 to urge the Government to look at.  They revised the orders

15 even further to try to minimize those risks and the various

16 concerns that parties have raised and that the Court has

17 raised with the Government and I'm glad to see that they did

18 that.

19         But with respect to the appraisal, it has -- it has

20 no bearing.  So there's no reason for me to require the

21 Government to disclose that to anybody.  I would just note I

22 don't think the Government has any issue with me disclosing

23 the fact that the -- that by virtue of the appraisal that the

24 equity in the property exceeds what the bank would be owed.

25 So the Government's purpose in providing it to me is to show

6

1  that based upon their appraisal they believe that there is

2  money that can be recovered.  But in terms of the amounts,

3  again there's no -- I don't think it has any legal bearing.

4  So -- but if anyone -- if anyone wants to be heard on that

5  issue, Mr. Talken, I -- before I hear from the lawyers I'm

6  just --

7          MR. TALKEN:  Your Honor, I don't need specifics from

8  our point of view.  You know clearly what our position is as

9  far as who gets it and --

10         THE COURT:  Okay.

11         MR. TALKEN:  The only issue we have is it's

12 important that there is equity that exceeds the bank amount

13 because that means there is money available to the victims of

14 these crimes and that's something that we'll take up at the --

15 when we actually do the sentencing and deal with 3553(a)

16 factors.

17         THE COURT:  Okay.  Mr. Kenner.

18         MR. KENNER:  Well, Your Honor, I just wanted to

19 point out to the Court that in the Government's submission at

20 ECF 780, Page 6 at Footnote 2, that based on our conversation

21 in the last hearing on December 6 --

22         THE COURT:  Hold on a second.  Can you just move

23 over a little bit so I can -- that's okay.  Go ahead.

24         MR. KENNER:  Thank you.  Based on the Government's

25 submission, ECF 780 at Page 6, Footnote 2, the Government has

7

1  effectively conceded that the only traceable funds from this

2  case that went to Ken Jowdy and Diamonte [ph.] or any Diamonte

3  entity was the $350,000 that I had told the Court that

4  originated with Owen Nolan and that Mr. Jowdy had, in fact,

5  settled for back in '08.  I know there was some colloquy about

6  whether or not the agreement had any relative nature or if

7  there was an agreement at all between Mr. Jowdy and Mr. Nolan.

8  And on that same Page 6 at ECF 780 the Government in very

9  selective language said there wasn't a specific language

10 agreement, as I had suggested.  Now, again I'm just speaking

11 from what I was told ten years ago during our arbitration.

12          But what I was able to find, and you'll find it in

13 my ECF submission 790, Exhibit A, on Page 5 of this -- of the

14 exhibit,.= is language that confirms that Mr. Nolan did have a

15 separate agreement with Mr. Jowdy where it says:

16          "Whereas, plaintiff's counsel and the parties have

17      made aware that Ethan Monroe, Owen Nolan and Joe Juno

18      [ph.], all of whom were also Kenner clients, never filed

19      or participated in any Kenner initiated legal proceedings

20      and complaints against Jowdy or any Jowdy controlled

21      entities; and (b) entered into prior separate settlement

22      agreements with Jowdy and/or Jowdy-related entities as

23      the result of our litigation."

24          THE COURT:  Well, again, settlement agreements are a

25 different issue that I don't -- I want to stay focused on this

 1   issue regarding the resort.  And again, I -- what footnote are

 2   you referring to?

 3          MR. KENNER:  On -- the Government -- I believe it

 4   was the Government's submission 780.

 5          THE COURT:  What -- yeah.

 6          MR. KENNER:  Page 6.  I believe it was Footnote 2.

 7   And what they're basically --

 8          THE COURT:  I don't -- I don't -- and the Government

 9   can correct me if I'm wrong -- I don't believe the Government

10   has conceded that only $350,000 of the victim's money went to

11   the resort.  I don't know where that's coming from.

12          MS. O'CONNOR:  We do not concede that.

13          THE COURT:  Yeah, I don't -- that doesn't say that

14   on Page 6.  I have Page 6 in front of me.  All the footnote

15   talks about is regarding the money judgment.  Doesn't even

16   have an amount.  So --

17          MR. HAGGANS:  The money judgment, Your Honor, the --

18   that language I believe is related to -- if I may just find

19   it -- it was the -- during the December 6 transcript at

20   Page 19 and 20, I had told the Court that the Government did

21   trace all of the money in this case that had gone to Mr. Jowdy

22   or any Jowdy --

23          THE COURT:  Let me just ask.  Then what's -- I don't

24   know if you have this num -- what's the Government's position

25   regarding how much money went to Mr. Jowdy or the victim's

9

1    money approximately?

2            MS. O'CONNOR:  Your Honor, I wouldn't be able to say

3    offhand, but the Government's position is, is it's ultimately

4    irrelevant because the Government is seeking forfeiture of the

5    resort in its entirety.

6            THE COURT:  I know.  I understand that, but I

7    just -- I don't want to get into a dispute about how much it

8    was.  But at least my memory is it's significantly -- right,

9    more than $350,000?

10           MS. O'CONNOR:  In the overall scheme it would be a

11   minimal amount.

12           THE COURT:  All right.

13           MR. KENNER:  Your Honor, with the Government during

14   the forfeiture hearings Mr. Wayne had submitted while on the

15   stand Government forfeiture of 36 which traced all of the

16   money that went to the Cabo San Lucas resort and that was a

17   total of $350,000.

18           THE COURT:  Oh, I'll look at the issue again,

19   Mr. Kenner, but the Government is correct.  It's -- the law is

20   that it's still forfeitable.  There's no threshold amount that

21   must be met in order for the -- if the money goes into the

22   property such as that, the law is that the property is

23   forfeitable regardless of the amount.

24           So I'll go back and I'll look at it, but ultimately

25   it doesn't affect legal analysis.  All right?  But -- go

1   ahead.

2          MR. KENNER:  Yes, Your Honor.  My point was that the

3   $350,000 went to Mr. Jowdy and he utilized it for his LLC.

4   The funds were never ill-gotten for My Baja Ventures 2006,

5   which my two partners had put all the money into that deal and

6   no money went to CSL Properties, the other investors --

7          THE COURT:  All right.

8          MR. KENNER:  -- entities.  And that was through the

9   Government's own money tracing.

10         THE COURT:  All right.  I'll go back and look at it,

11  Mr. Kenner, okay?

12         MR. KENNER:  Yes, sir, Your Honor.

13         THE COURT:  Let me just -- I know the lawyers for

14  the bank and other entities are back there, so I'll allow them

15  to be heard.  Just state your name so we have it for the

16  record.

17         MR. CANSTALVERIS:  George Can --

18         THE COURT:  Just pull the mic up.

19         MR. CANSTALVERIS:  Yep.  George Canstalveris [ph.]

20  of Venerable for Danske Bank.  Your Honor, again, it's

21  unfortunate that the Government is unwilling to share the

22  appraisal with us.  It is what it is.  We would hope that we'd

23  be able to work with them.  You know, we think that the law is

24  what you've said it is.  I mean, at the end of the day it's

25  the Government pursuing this forfeiture.  But pursuant to

1   their own guidance they have to take into account the net

2   equity value of the resort including the expenses that would

3   be anticipated and going forward with however they proceed,

4   whether it's an interlocutory sale or any other way they

5   intend to pull value from the resort.

6           So for us obviously it's really important as to what

7   that value is, whether it's worth going through this continued

8   process that frankly has just taken a lot of time.  And, you

9   know, we urge the Court to again urge the Government to sit

10  down with us and have a conversation as to what's next.  We

11  haven't heard what's next.  We've heard forfeiture of the

12  resort but what does that mean in practicalities.

13          THE COURT:  Well, I -- yeah, it's up to them whether

14  they want to share the appraisal.  I don't even know what

15  their thinking is on that.  I would think if they're trying to

16  resolve the matter with the bank that that would be an

17  important thing to share.  And I know in the past at least the

18  bank has said that it would be willing to offer a certain

19  amount of money to try to resolve it.  I don't know whether

20  the -- you know, now that the Government has the appraisal,

21  has a better sense what might be obtained overall from an

22  interlocutory sale where that's something, they can go back to

23  now with the bank.  But my -- a lot of what I hope to

24  accomplish I think has been accomplished in terms of the

25  wording of the order.  They have the appraisal in hand so a

12

1   lot of the concerns -- I mean, obviously I know there are

2   concerns in general, but in terms of there being this big

3   delay where nothing is going to happen, I don't think we're in

4   that position any longer.  My hope would be that when the

5   Court enters a preliminary forfeiture order, which I hope to

6   be soon, I won't deal with the money judgment part of it, but

7   that the Government will immediately sit down with you and the

8   other interested parties and try to figure out what makes

9   sense under their own guidance for the victims and for

10  innocent third parties.  That would be my hope and obviously

11  I'll be supervising it.  Okay?

12            MR. CANSTALVERIS:  Thank you, Your Honor.

13            THE COURT:  All right.

14            MR. YOLINSKY:  Your Honor, good afternoon.  Mark

15  Yolinsky [ph.].

16            THE COURT:  Yes, good afternoon, Mr. Yolinsky.

17            MR. YOLINSKY:  At this point I think there are about

18  400 million dollars of property owners who I'm not their

19  lawyer but they've asked me to appear today and -- but I'm

20  speaking for myself.

21            Frankly, I'm really surprised that the Government

22  hasn't agreed to share the appraisal.  I thought that was a

23  given that in order to move the ball forward everyone would

24  get a chance to see -- at least interested parties would get a

25  chance to see it.

1          And the reason why it's important to see it is

2    because we -- we, speaking for myself and the other

3    homeowners, we need to know whether we're talking about a

4    dollar of equity or a meaningful amount of equity.  If it's a

5    dollar or even ten million dollars, when you factor in the

6    sales commission and the fact that the property is going to go

7    cash flow negative starting this May, there may not be equity

8    and that's a really important issue for us.

9          I think, Your Honor, once you entered this order of

10   forfeiture we're heading into a sales process that in the best

11   of circumstances is going to take a year and probably is going

12   to take 18 months to sell property of this magnitude and this

13   property is going to go cash flow negative in that time frame

14   with no assurance that it's -- with no source of funds to keep

15   it running and that really hurts the homeowners.  So, Your

16   Honor, just to say that there is equity without giving a sense

17   of the amount of equity is really extremely unsatisfying to

18   us.

19         The other thing that has not been discussed is the

20   basis for the appraisal.  I advised the Court in a prior

21   letter that the homeowners were planning to have a homeowners'

22   association meeting to adopt a resolution, which we then did

23   limiting the development of the property to the existing

24   master plan.  If the appraisal was done on some other basis

25   then we believe the appraisal is invalid.  And frankly, if it

1   was done on some other basis we're going to -- we may feel

2   that we need to institute litigation in Mexico, which is again

3   counterproductive to everything Your Honor is trying to

4   accomplish.  What should come out of this process is some

5   resolution, not continued -- not another front of litigation

6   in Mexico which, you know, to protect our interests, as Your

7   Honor really correctly pointed out, we would have to do.

8          So the idea that this is going to go forward in

9   secrecy without people having some assurance that there really

10  is a there -- there is -- is very dissatisfying.  And I hope

11  Your Honor -- I understand the legal parameters that guide

12  Your Honor, but I hope as an equity and practical matter Your

13  Honor will prevail on the Government to disclose the appraisal

14  to the people who are directly affected by it and that's my --

15  my request.  Thank you, Your Honor.

16          THE COURT:  All right.  Again, I -- there's no legal

17  basis for me to require the Government to disclose that

18  appraisal.  I understand what you've said but for purposes of

19  today I hope the Government will take what they've heard and

20  consider it.  And, you know, as I said, when this preliminary

21  order gets entered I plan to keep this on a very tight rein to

22  make sure that these issues are resolved as quickly as

23  possible.  At some point I may ask the Government -- I'm not

24  going to ask them to do that today because they just got this

25  appraisal -- to articulate to me, you know, what the basis is

15

1  for not -- in an effort to try to resolve this not sharing it,

2  but I'm not going to get into that today.  All right.

3          MR. YOLINSKY:  Thank you.

4          THE COURT:  Thank you.  All right.  Is there any

5  other issues with respect to the resort?

6          MS. O'CONNOR:  Your Honor, the Government would like

7  to address something Mr. Yolinsky just mentioned.  He filed a

8  letter with the Court in December stating that he and the

9  other homeowners took steps to adopt a resolution limiting the

10  authority of the administrating beach estate condominium to

11  prove any modification to the resort's master plan.

12  Mr. Yolinsky further emailed the Government's appraiser

13  without seeking the Government's permission to do so to

14  instruct the appraiser to consider the impact of the

15  resolution when performing an appraisal in determining the

16  value of the resort.

17          The Government views these actions as a direct

18  violation of the protective order.  As Mr. Yolinsky has

19  admitted to the Court, what he wants is something he was never

20  guaranteed.  He cannot be permitted to effect the value of the

21  resort now in contravention of the protective order by

22  adopting a resolution or taking other similar action.  So we

23  would request the Court to direct Mr. Yolinsky to remedy the

24  situation at once and cease taking action and perhaps value

25  the resort and impedes and instructs the forfeiture in this

16

1    case.

2    　　　　MR. YOLINSKY:  At the last conference I specifically

3    said that the -- that the homeowners were concerned if the

4    master plan was in jeopardy.  Your Honor said, "Don't you have

5    rights?" and I said we had -- I had a call scheduled that

6    afternoon with Mexican counsel and we were going to proceed to

7    explore to protect our rights, which we have done in Mexico.

8    Your Honor invited, encouraged us to take steps to protect the

9    master plan which is what the homeowners have done.

10   　　　　THE COURT:  Well, I don't -- "inviting," "encourage"

11   I think would be a little bit strong, but certainly to the

12   extent the Government is arguing that this was a violation of

13   the protective order, I -- there was no discussion of that.

14   This did come up.  Mr. Yolinsky I think was clear about what

15   he was going to try to do at the last conference and if the

16   Government believed -- it didn't occur to me that that could

17   be a violation of the protective order and if the Government

18   believed that, certainly --

19   　　　　MR. YOLINSKY:  And, Your Honor, just -- you know, I

20   really --

21   　　　　THE COURT:  I'm not saying it is a violation of the

22   order.  But I'm saying they didn't --

23   　　　　MR. YOLINSKY:  Your Honor, I really take umbrage at

24   this because before the homeowners meeting took place I wrote

25   a letter advising that was in the works.

17

1          THE COURT:  I understand that.

2          MR. YOLINSKY:  And no one said at that time --

3          THE COURT:  All right.  But the bottom line is --

4          MR. YOLINSKY:  -- that we were proceeding in

5    violation --

6          THE COURT:  -- there's nothing going on right now.

7    This resolution was passed?

8          MR. YOLINSKY:  Resolution was passed.

9          THE COURT:  All right.  So --

10          MR. YOLINSKY:  But, Your Honor, I want to be clear.

11    We decided to institute litigation in Mexico to im -- to

12    protect the action it took.

13          THE COURT:  No, no.  What it -- I want to make

14    clear.  Instituting litigation to try to protect your rights

15    is not a violation of the protective order, okay?

16          MR. YOLINSKY:  Thank you.  Good.

17          THE COURT:  That's not happening.  All right.  But

18    again, this just highlights what I've been saying all along to

19    everybody involved including the Government that the best

20    thing that can be done once the Court enters this order is to

21    sit down with all the interested parties because having

22    litigation with the homeowners, you know, having a sale taking

23    18 months I don't think is in anybody's interests.

24          So again, I'm assuming the Government is going to

25    act in a prudent and wise manner but obviously provides in the

18

1   whole process, all right?

2         MR. YOLINSKY:  Thank you.

3         THE COURT:  All right.  All right.  I -- do you want

4   to talk about the money judgment part of it?  And I did

5   receive the Government's December 20th letter and Mr. Kenner

6   and Mr. Talken responded to that.  And the Government didn't

7   put a reply in, so I do want the Government to address

8   Mr. Talken's letter because he makes certain statements

9   regarding what the Government is acknowledging or not

10  acknowledging and I just want to get the Government's position

11  with respect to that.  Do you want me to ask questions or do

12  you want to address it first?

13        MS. O'CONNOR:  We're happy to address any questions

14  you have, Your Honor.

15        THE COURT:  Well, he says, for example, in the

16  beginning of the letter the Government is tacitly

17  acknowledging by your submission that Honeycutt applies to

18  money laundering forfeiture under 982(a)(1).  And he cites in

19  a footnote other cases for the Government under 981(a)(1)(C)

20  apparently is conceding that -- in cases before the circuit.

21  So I just want to make sure I understand what the Government's

22  current position is with regard to the application of

23  Honeycutt to 982(a)(1).

24        MS. O'CONNOR:  The Government's position is that

19

1   Honeycutt does not apply to a money laundering forfeiture

2   statute, Your Honor.  We never argued that it did.  Our

3   position has --

4           THE COURT:  Well --

5           MS. O'CONNOR:  -- always been that the laundering

6   forfeiture statute is very different from the forfeiture

7   statute that was addressed in Honeycutt.

8           THE COURT:  Well, I think he's arguing that because

9   the Government is now incorporating parts of Tanner, which in

10  terms of the joint several liability issue and also because he

11  says that Tanner also involved money laundering as -- in

12  addition to fraud that somehow Tanner and the Government's

13  application of Tanner here somehow is some type of tacit

14  acknowledgment.  So I don't know if you want to address that.

15          MS. O'CONNOR:  Yes, Your Honor.  The Second Circuit

16  in Tanner did address the money laundering statute and

17  forfeiture, but the courts merely stated that there are two

18  things to note when criminal proceeds result from money

19  laundering offenses under 1956.  The court has said:

20          "The court in imposing sentence on a person

21          convicted of an offense in violation of Section 1956

22          shall order that the person forfeit to the United States

23          any property real or personal involved in such offense;

24          (2) a defendant who acted merely as an intermediary but

25          no longer possesses the property acquired as a result of

20

1 money laundering may be required to forfeit substitute

2 property, but only if the defendant conducted three or

3 more separate transactions involving a total of $100,000

4 or more in a 12-month period."

5  And this is addressed by the Government during oral

6 argument in its reply brief.  The court in Tanner then stated:

7  "In that case the defendant Davenport was an active

8 participant in the unlawful activity that his money

9 laundering was designed to conceal rather than a mere

10 intermediary in the money laundering scheme.  But even if

11 he fell into the intermediary category of 982(b)(2), that

12 provision safe harbor would not extend to him because the

13 evidence showed that he wired a total of 9.7 million in

14 four separate transactions within a year."

15  So the Government's argument is very similar.  In

16 this case both defendants were not mere intermediaries.  They

17 were the masterminds of the money laundering conspiracy.  They

18 should be held liable for the full amount.

19  The 1956 -- the money laundering forfeiture statute

20 is very different because it -- it addresses the concerns that

21 Honeycutt had -- the court in Honeycutt had regarding

22 forfeiture of proceeds.  It already provides a safe harbor for

23 the intermediary, which neither of these defendants are in

24 this case.

25  So it's the Government's position that both

21

1  defendants are liable for the full amount of the forfeiture

2  under the money laundering statute and that Honeycutt is

3  inapplicable.

4         THE COURT:  Well, let me just go back to this issue

5  because Mister -- I'll hear from Mr. Talken in a minute, but

6  in his response he took issue with the idea that

7  Mr. Constantine was the mastermind of all aspects of the

8  schemes that were at issue here.  And specifically, you know,

9  the Government is seeking about 20 million dollars in

10 forfeiture against Mr. Constantine and Mr. Kenner.  But in

11 properties that -- I think the Government concedes that

12 Mr. Constantine had nothing to do with and I think the

13 Government can see there's no indication that any knowledge --

14 I'm talking about Freylies [ph.], the Key Palm units, Del Mar,

15 Mar Palm units, the Peca Palm units.  I don't think there's

16 any evidence they had any involvement in those or had any

17 knowledge of those, right?

18        MS. O'CONNOR:  No, Your Honor.  In fact, we say the

19 opposite.  The forfeiture the Government is seeking relates to

20 the three frauds that were proven at trial:  the Hawaii

21 investment fraud; the Global Settlement Fund -- fraud; and the

22 Euphoria fraud.  All of the proceeds that the Government

23 traced were generated by these three frauds.  The fact that

24 the Government traced pro --

22

1          THE COURT:  Well, first of all, I have to stop you,

2  okay, because at the trial the Government specifically said

3  Mr. Kenner has been focused on this in many of his submissions

4  and it's 100 percent true that those properties came up during

5  the trial and Mr. Miskieweicz -- I think it was a sidebar, but

6  I remember this specifically, even though it was many years

7  ago -- I said, "Is the Government trying to prove the fraud

8  with respect to these?" and he said, "No, we're not seeking."

9          So that -- when you say that fraud --

10  Mr. Miskieweicz specifically said, "Judge, we're not

11  attempting to prove that the investors were defrauded with

12  respect to Freylies, with respect to the Palm units or with

13  respect to Del Mar, so I don't know why you're saying that

14  when the Government took a different position during the case.

15          MS. O'CONNOR:  Yes, Your Honor, the Government is

16  not trying to prove any of these frauds, but the Government is

17  trying --

18          THE COURT:  Then why are you calling them frauds?

19          MS. O'CONNOR:  Because that's the language that was

20  used in their opposition papers.

21          THE COURT:  So what --

22          MS. O'CONNOR:  The point the Government is making is

23  that there were the three frauds at trial and the Government

24  traced the proceeds generated by those frauds to numerous

23

1   properties including Freylies, Del Mar and the lines of credit

2   were involved, so --

3           THE COURT:  Okay.  So it's basically by virtue of

4   the lines of credit that you're saying under money laundering,

5   not fraud, right, or is it -- are you operating on the money

6   laundering here or are you operating on the fraud?

7           MS. O'CONNOR:  We're tracing the proceeds from the

8   Hawaii -- and mainly for these properties the Hawaiian

9   investment fraud.  For example, for Freylies --

10          THE COURT:  No, let's focus on Mr. Constantine for a

11  minute.  What evidence is there that Mr. Constantine knew with

12  respect to Hawaii, okay?  Obviously there's -- you can correct

13  me if I'm wrong -- I think it was one million dollars he

14  received.  He's shaking his head no.  One million dollars that

15  the Government says he shouldn't have received that were

16  victims with respect to Hawaii and then there's the Centrum

17  [ph.] loan and the urban expansion loan wherein the Government

18  is saying he received money for both of those things as well.

19  Right?

20          MS. O'CONNOR:  Yes, Your Honor.  Your -- the

21  Government's position is that Constantine by virtue of his

22  role as a co-conspirator in these -- in the conspiracy, the

23  wire fraud conspiracy, he is liable for the full amount of

24  proceeds generated by the frauds.  And Your Honor found --

25          THE COURT:  What evidence is there that

24

1   Mr. Constantine knew beyond what I just talked about, beyond

2   his involvement in the Centrum loan, the urban expansion loan,

3   and the one million dollars he received, what evidence is

4   there that he knew anything about any of the other lines of

5   credit or what Mr. Kenner was doing with anything else related

6   to the lines of credit, other than those three things?  What

7   evidence is there of that?

8            MS. O'CONNOR:  Your Honor, Rule 29 and 33 decision

9   found in so many words that Constantine was the mastermind of

10  the three frauds that were proven at trial.  To quote, Your

11  Honor, the witness's testimony and documentary evidence

12  adduced at trial sufficient established that Constantine

13  agreed with Kenner to participate in all of the objects of the

14  conspiracy.

15           THE COURT:  I know but, first of all, I didn't hear

16  the word "mastermind" in there.  Did I use the word

17  "mastermind"?

18           MS. O'CONNOR:  Not that exact phrase, Your Honor.

19           THE COURT:  Okay.  Then what I was --

20           MS. O'CONNOR:  Right.

21           THE COURT:  -- talking about there were the

22  particular things that I just talked about.  I made a ruling

23  that Mr. Constantine was involved in all three of the frauds:

24  GSF fraud, the Euphoria fraud, and the Hawaii fraud.  But I

25  didn't make a ruling -- I did not make a ruling that

25

1  Mr. Constantine was involved in or knew every aspect of what

2  was going on with respect to the lines of credit and the

3  Hawaii money.  I didn't make any ruling on that.  That

4  wasn't -- the jury didn't have to find, in fact, that it

5  wasn't even offered to them.  There's no argument made to them

6  that Mr. Constantine knew about all the lines of credit and

7  all the monies that were going.  That argument wasn't even

8  made because there's no evidence of that.  And that's what I'm

9  asking you and you haven't pointed to any evidence by any

10 witness or any document that Mr. Constantine was aware of all

11 the lines of credit.

12         So you're saying he was the mastermind of this --

13 what would amount to the victims' lines of credit is six

14 million dollars, 6.2 million dollars.  And then all those

15 other properties that I just told you about where -- where

16 parts of the lines of credit went, that he's responsible for

17 all those things even though there's not any evidence that

18 Mr. Constantine had any knowledge of the existence of those

19 investments or the lines of credit that funded those

20 investments, and I find that remarkable.  That was my whole

21 point in asking the Government to brief this issue and all I

22 got back was he's a mastermind of the whole thing with no

23 cites to the record.

24         So I'm persuaded that there's any evidence that

25 Mr. Constantine knew about all these other lines of credit and

1  all the money that went to those properties.  And I'm

2  unpersuaded that that should be something that he should be --

3  a forfeiture money judgment as having been either involved in

4  for purposes of money laundering or for purposes of fraud.  I

5  remain unconvinced, but I'm giving you an opportunity to

6  explain to me what evidence I'm missing.

7      MS. O'CONNOR:  Your Honor, the Government's position

8  is based on the law which finds that the Government does not

9  have to show that Constantine obtained every penny personally.

10  Because he was -- he played in Your Honor's exact terminology,

11  an integral role in the Hawaii fraud.  He encountered --

12      THE COURT:  But in only one aspect of the Hawaii

13  fraud.  That's the whole -- the whole point.  I understand.

14  I'm not holding you that he had to have personally obtained

15  it.  I'm holding you to that he had to -- he had to know of

16  its existence.  He had to know of its existence.  How could he

17  be held responsible for proceeds, be it money laundering or

18  fraud, when the Government has no evidence that he even knew

19  of the existence of the money?

20      MS. O'CONNOR:  Your Honor, the courts don't require

21  the Government to show every dollar was seen -- was known by

22  him or obtained by him personally.

23      THE COURT:  I -- you keep repeating that.  I'm not

24  arguing with you about that.  I'm not saying he had to obtain

25  it personally.  He has to know that Mr. Kenner had the money

27

1    and was doing something with that money, either from a fraud

2    standpoint or money laundering standpoint, right?

3              MS. O'CONNOR:  Your Honor, the Government doesn't

4    have to show that he knew about every specific dollar.  The

5    hypothetical by the -- the Supreme Court's hypothetical in

6    Honeycutt discusses a hypothetical farmer mastermind who uses

7    low-level individuals to obtain money.  The farmer himself

8    doesn't actually acquire that money.  He uses his low-level

9    individuals in the conspiracy to obtain the money.

10             It's a similar concept here.  The court wouldn't

11   require the Government to show that every person retained

12   money on behalf of the farmer, that the farmer knew that

13   occurred.  This is a large scheme over several years in which

14   the two defendants worked together.  The scheme was well

15   known.  He was -- they participated together --

16             THE COURT:  What point to the record the Government

17   has any awareness that Mr. Constantine had as to a larger

18   scheme beyond the three things that we've talked about, which

19   is the money that he got from the Hawaii investment and

20   Centrum and the urban expansion loan.  What evidence is there

21   that Mr. Kenner or anybody else told him that there were all

22   these other lines of credit out there and that Mr. Kenner was

23   making all these other investments or doing anything with

24   respect to any other money other than what Mr. Constantine was

25   involved in?

28

1          These cases that you're citing are different

2     scenarios whereas someone who's at the top of it was aware,

3     whereas what I'm suggesting to you is there's no evidence that

4     Mr. Constantine was overlooking with Mr. Kenner these lines of

5     credit more broadly and had an understanding of all these

6     other things that Mr. Kenner was doing.

7          MS. O'CONNOR:  Your Honor, I understand what you're

8     asking and our position is that under the law the Government

9     can't possibly show that each defendant knew of every single

10    movement of the co-defendant.  There was a general

11    understanding that they had this -- that they had this scheme

12    together.  The lines of credit were established to fund the

13    Hawaii development project.  The proceeds stem from Hawaii

14    fraud in which Constantine played the integral role.  Each

15    defendant whacked up duties.  There are only so many hours in

16    the day.  Each one had a role in it.  But generally speaking,

17    these two defendants conspired together to defraud victims in

18    the Hawaii development project.

19          So the fact that Constantine may not have known

20    about the line of credit money *per se*, but was involved in

21    another aspect, it was certainly foreseeable to him.  Their

22    entire scheme was based upon representing the investors that

23    their money would be used to develop the project in Hawaii, to

24    steal money and then diverting it for their own purposes.  And

25    that line of credit money was withdrawn and used for both of

29

1   their purposes.

2           The money was commingled in the Luao Four [ph.]

3   account, moved to the Ula Makika account, and then moved to

4   other properties.  There's -- the extensive commingling alone

5   makes it impossible for Constantine to assert that he didn't

6   receive any of the line of credit proceeds.  So in a case like

7   this, it's a burden that the Government is showing because of

8   his role with Kenner that they designed this scheme together,

9   each one had jobs.  There's only so many hours in the day, but

10  at the end of the day he received the benefit of it.

11          He was aware of the scheme and even if the

12  Government can't possibly prove that he knew every single

13  aspect of what Kenner was doing, he still was aware of the

14  scheme, participated and benefitted from it.

15          THE COURT:  Okay.  I disagree.  All right.  There's

16  no -- and again, I've given the Government multiple

17  opportunities to point to me the evidence that Mr. Constantine

18  was aware of this broader scheme with respect to Hawaii.  He

19  was aware of the things that I've cited.  There's evidence of

20  that at the trial and that's what I think the jury found him

21  guilty of.

22          To the extent the Government is arguing that

23  Mr. Constantine was broadly aware of the other -- all these

24  lines of credit and things that Mr. Kenner was doing with

25  respect to the lines of credit, the Government has failed to

1   cite any evidence of that.  I'm aware of no evidence of that

2   and I don't believe -- the Government keeps saying, you

3   keep -- you're setting up  a straw man.  The Government can't

4   possibly have to prove that he knew where every dollar went.

5   I'm not suggesting the Government has to prove where every

6   dollar went.  But the Government does have to prove that he

7   was aware of the broader scheme and the Government has failed

8   to do that.  Okay.

9           So Mr. Talken, if you want to add anything on that.

10          MR. TALKEN:  I have nothing to add to that.  The

11  only discussion I'd like to have just very briefly is where

12  you started talking about <u>Honeycutt</u> and money laundering.  I

13  remember when we had one of the many oral arguments we've had

14  and that's one of the things you said to me was, I hear you

15  about -- you know, we know that <u>Honeycutt</u> applies -- is based

16  in -- is founded in the drug forfeiture statute.  You sort of

17  agree with me that you can see how it's heading towards being

18  applied to the fraud statutes, but you said to me, cite me

19  some authority as to how it goes to money laundering.

20          And I think that we have that cite in <u>Tanner</u> because

21  it's clear that if they weren't con -- and they even talk

22  about, they even said, you know, their hedged their bets a

23  little bit in here and even saying in <u>Tanner</u>, look, it's still

24  unclear how it applies to how money laundering and <u>Honeycutt</u>

25  interact, but it's important that in this money laundering

31

1   case what the Court of Appeals didn't say is no, it's moot.

2   We're dealing with the money laundering case here.   Honeycutt

3   doesn't apply.   So why are we writing this 15 to 10-page

4   opinion.

5           THE COURT:   I don't think you can read -- read that

6   into -- the failure to say that sometimes the circuit just

7   avoids dealing with an issue they don't have to deal with and

8   they basically found because those defendants were involved

9   in -- or mast -- I don't know if they used the term

10  "mastermind," but basically the facts of that case didn't

11  require them to make the conclusion that -- I think it's still

12  undecided.

13          MR. TALKEN:   I --

14          THE COURT:   I can't read Tanner to say the Second

15  Circuit has implicitly by -- looking at the evidence more

16  closely conceded that Honeycutt applies to 920 -- 982(a)(1).

17  But -- and I just think the language of 982(a)(1) is

18  different, obviously.

19          MR. TALKEN:   We agree that the language is

20  different, but the point I had made was really the underlying

21  concept of why Honeycutt exists is entirely the same.   The

22  concept is very simple.   You know, making people forfeit what

23  they didn't gain is inherently unfair and it -- it's really

24  not based in the equities.   And this is a very -- I agree with

25  Your Honor they don't state that money -- that it applies to

32

1  money laundering, but I also think it's a little above where

2  you said.  I think that they really do enter into an analysis

3  of Honeycutt in this money laundering case.  And by -- and by

4  doing that, they have indicated that it's heading that way and

5  I --

6          THE COURT:  Well, it may -- the other thing is, how

7  in viewing the forfeiture issue in this case it relates to the

8  money judgment.  It may moot out some of those issues because

9  if I ask the Government to revise the numbers to reflect

10  things that Mr. Constantine was personally involved in,

11  these -- some of these Honeycutt issues would go away.

12          MR. TALKEN:  I agree and then that's why I didn't

13  address them and in your point, you know, I'm abiding by rule

14  one because I understand where we are in this.  I just wanted

15  to --

16          THE COURT:  Okay.

17          MR. TALKEN:  That small issue I just think is

18  important to discuss because --

19          THE COURT:  All right.  Well, and I'll --

20          MR. TALKEN:  -- it may be a fall-back position at --

21          THE COURT:  All right.  And it's preserved.

22  Obviously --

23          MR. TALKEN:  -- at a later time.

24          THE COURT:  Obviously you can -- you preserved the

25  argument that Honeycutt should apply in the first instance,

1    but again, it may be mooted out if -- if, in fact, what I

2    for -- ask Mr. Constan -- what I require Mr. Constantine to

3    forfeit in terms of a money judgment or things that he was

4    personally involved in.  All right.

5              MR. TALKEN:  And that's all I have to add.  It's

6    just making that portion of the record clear --

7              THE COURT:  All right.

8              MR. TALKEN:  -- from our side.

9              THE COURT:  Mr. Kenner, I'll allow you to briefly be

10   heard on this issue.

11             MR. KENNER:  Thank you, Your Honor.  I just wanted

12   to raise that the Government through Agent Petrolisia [ph.],

13   3934 of the transcript, did confirm Mr. Constantine was paid

14   approximately one million dollars and the back tracing on

15   those funds, none of the money comes from any of the

16   individuals in the superseding indictment.

17             And to reiterate the other point was that with

18   respect to the monies that did come from superseding

19   indictment individuals that went through Mr. Jowdy as part of

20   his loans was 1.315 million.  That takes into consideration

21   the fact that Mr. Peca was one of those individuals who said

22   at trial he was aware of the loans and authorized them.

23   Mr. Berard also at trial, I think at transcript 3055, also

24   said that I had -- he was aware of the loans and I had told

25   him just like he had previously testified six years prior and

34

1    in arbitration.

2             Under Tanner I just wanted to add, Your Honor, that

3    the one -- the one item that I continue to read into the

4    Honeycutt issues that continue to emerge in the different

5    circuits as well as Tanner is that joint and several

6    forfeiture of a co-conspirators applies only to co-

7    conspirators who never possessed the tainted properties of

8    their crimes.  And as far as the Government prosecution of

9    this case and clearly through at least 2017, two years after

10   trial, the Government only alleged that Mr. Constantine and I

11   were co-conspirators.  It wasn't until I believe Ms. O'Connor

12   through she was losing her -- some of her forfeiture and/or

13   money judgment nexus that she addressed that she believed

14   Mr. Jowdy was now a co-conspirator in the case years after the

15   case.

16            In fact, when Probation made their submission on

17   July 18th they referred to Mr. Jowdy as a victim witness in

18   their pleading.  And on page 1 actually -- although they

19   preferred to Mr. Jowdy and Mr. Kaiser and Mr. Kaday [ph.] as

20   having given testimony for an obstruction issue with me, at

21   those forfeiture hearings we know that none of those three

22   individuals gave testimony.  So I don't know where they got

23   the basis for this, but they continued to -- Probation

24   continues to refer to Mr. Jowdy deep into 2016 as a victim of

25   this case as opposed to playing any other role.

35

1          And lastly, in <u>Nicolo</u>, 597 F.Supp. 2(d), 342 from

2    Second Circuit 2009, they do refer to property traceable to

3    these property acquisition of which is attributable to the

4    money laundering scheme, rather than some money obtained from

5    untainted sources.

6          And again, I just wanted to reiterate to the Court

7    that if you could just refer my partner Joseph Stumple's

8    letter to the Court, ECF 771, where he refers to having paid

9    for 70 percent of Baja Ventures and he refers to our other

10   partner Uri Letnin [ph.] as having paid for the other 30

11   percent of Baja Ventures.  There are zero ill-gotten gains

12   traceable to the Baja Ventures, LLC.

13         The money that goes to Mr. Jowdy from this instant

14   case is the 1.315 million from the five individuals that were

15   in the case that had lines of credit.  There are some issues

16   with each one, but as a maximum number that's how much money

17   from the superseding indictment individuals went to Mr. Jowdy.

18         Also from -- I just wanted to make it clear for the

19   Court Mr. Constantine was not involved in the Centrum loan

20   whatsoever.  He played no role in that.  Mr. Constantine got

21   involved after Centrum was involved in our -- in our company

22   already lending money for the Hanawapo [ph.] deal that

23   Mr. Manfredi had negotiated.

24         THE COURT:  All right.  All right.  Thank you,

25   Mr. Kenner.

1        So with respect to the forfeiture, what I'm going to

2   ask the Government to do is submit a revised chart to me

3   similar to what you did way back when you did your initial

4   forfeiture brief where you went through each property, the

5   proceeds, and then deducted double-counting to come up with

6   your money judgment.  I want you to give me a revised chart.

7   I'm going to go look up some of the issues that we discussed

8   but in order not to have additional delay I want to have all

9   the potential options available to me with -- and obviously

10  the -- it's important that we make sure there's no double-

11  counting.

12        So for purposes of Mr. Constantine, what the numbers

13  would be if what was included as related to him was the money

14  that he received from Hawaii, which I think was approximately

15  one million dollars, whatever that amount is, the urban

16  expansion money and then the Centrum loan money and, again,

17  I'll get to that issue, Mr. Kenner, that you just raised, but

18  I want to have the numbers available to me, and then any other

19  Eufora money and then the CSF money.

20        And then for Mr. Kenner I want the same chart but

21  his should obviously be broader; should go:  GSF, the lines of

22  credit, the Hawaii investment money, Eufora, Centrum.  You

23  know, I think I said the urban expansion thing, but I think

24  for purposes of forfeiture that's not in there.  I may have

25  made a mistake on that, right?  I don't think that was in the

1   Government's chart, right?

2           MS. O'CONNOR:  I don't believe so, Your Honor.

3           THE COURT:  All right.  So take -- so

4   Mr. Constantine it's Centrum, Eufora, GSF, the money he got

5   from Hawaii, and that's it.

6           And for Mr. Kenner, it's GSF, the lines of credit,

7   the Hawaii investment money, Eufora and Centrum.  That -- you

8   understand what I'm asking?

9           MS. O'CONNOR:  I do.

10          THE COURT:  And then obviously make sure there's no

11  double-counting and I want to see what those numbers are.  All

12  right.  And I don't know how -- it's really just math.  Can

13  you get me that in a few days?  What -- how long would that

14  take?

15          MS. O'CONNOR:  By next Friday, Your Honor?

16          THE COURT:  How about a week from today?  A week

17  from today?  And then I'll give the defendants a week to

18  respond to that chart.  I don't want any additional argument

19  at this point.  I just want the numbers.  Okay.  I think both

20  sides have briefed these issues sufficiently for me to make a

21  decision.  All right.  My hope would be that the forfeiture

22  decision will come out shortly thereafter, two weeks from

23  today.

24          All right.  Let's move to the -- everybody okay to

25  continue?  Do you need a five-minute break or are you okay to

38

1   keep going?  Everybody is good?

2          MR. HAGGANS:  I -- Your Honor, with the Court's

3   indulgence, I did have a 2:30 appearance scheduled in another

4   matter.  So depending on how we could -- we could perhaps take

5   a break at that --

6          THE COURT:  That's good.

7          MR. HAGGANS:  I think that appearance may be as much

8   as half an hour, but we may be done by then.

9          THE COURT:  Who's that before?

10          MR. HAGGANS:  It's for Magistrate Judge Tomlinson,

11   Your Honor.

12          THE COURT:  Okay.

13          MR. HAGGANS:  It's a guilty plea in a different

14   matter.

15          THE COURT:  All right.  So why don't we see how long

16   this takes.  We'll keep going at least till 2:30 and then

17   we'll see -- and then we'll figure out what to do.

18          MR. HAGGANS:  All right.  Thank you, Your Honor.

19          THE COURT:  All right.  Go ahead, Mr. Talken.  So

20   again, my hope is not that you go through every last detail of

21   your submissions but just highlight anything you want to

22   highlight with regard to objections.  Okay.

23          MR. TALKEN:  Thank you, Judge.  I'll -- for that

24   reason I'm not going to get into the loss amount.  I think

25   there's been a lot of --

1          THE COURT:  Well, actually, I'm glad you raised

2    that, though.

3          MR. TALKEN:  -- filing and concessions by the

4    Government.

5          THE COURT:  I need to ask the Government because I

6    do then want the Government to revise the loss amount for --

7    because that will be a different number than the forfeiture

8    amount.  So the loss amount should be revised to reflect that

9    as well.  Do you understand what I'm saying?  For purposes of

10   the guidelines calculation, I think what's going to end up

11   happening is it's going to be the 3.5 and nine-point -- right

12   now it's over 9.5 so I think it's going to go --

13         MR. TALKEN:  Two-point difference.

14         THE COURT:  Two-point difference.  Okay.

15         MR. TALKEN:  And I'll just react to that when --

16         THE COURT:  Okay.

17         MR. TALKEN:  -- it happens.  That's fine.  That's

18   how we'll deal with that.

19         THE COURT:  All right.

20         MR. TALKEN:  And I think that's the length of this

21   discussion.

22         In my letter of September 25th of last year I

23   concentrated on a few of the enhancements and they're concrete

24   or discrete enhancements and I just want to talk about those

25   briefly.

40

1          THE COURT:  Okay.

2          MR. TALKEN:  The obstruction of justice found in

3    paragraphs 45 through 48, 57, 66 and 73 of the PSR.  It's

4    based on really three levels of conduct alleged by -- three

5    pieces of conduct allegedly committed by Mr. Constantine that

6    rises to the level of obstruction of justice, the first one of

7    which is his discussion during the trial with Mr. Kenner about

8    questions he was going to ask when Kenner testified.  That's

9    not obstructive conduct at all.  There's no evidence that

10   there was any hint of manipulating the answers, of telling him

11   what he should say, telling him what he shouldn't say.

12          Nowhere in any of the many filings on this case or

13   during the record Your Honor dealt with this fairly

14   extensively during the trial.  There was a long sidebar if not

15   a hearing about this.  And nowhere in there is there any

16   allegation that in him -- in Mr. Constantine asking Mr. Kenner

17   what the questions were that there was anything untoward.

18          Additionally, it was first discussed with his

19   lawyer.  He spoke to his trial counsel and let his trial

20   counsel knew he was going to do that and then everything blew

21   up in the courtroom once that Mr. Kenner's counsel brought it

22   to the Court's attention.  But that certainly doesn't rise.

23   That's just -- that is perfectly admissible conduct and cannot

24   serve as the basis of an obstruction of justice enhancement.

25          Similarly, there's the allegation that

41

1   Mr. Constantine in pretrial filings through his attorneys made

2   false allegations against the Government mostly talking about

3   how some of the evidence was withheld from him.  When he made

4   those allegations through his attorney there was no evidence

5   that he didn't truly believe those allegations.  The

6   Government takes issue with them and I understand that they

7   take issue.  That's not a ridiculous approach to take to it,

8   but taking issue with it doesn't mean that it's obstructive

9   conduct.  You have an individual who honestly believes that

10  the Government is not giving him information that he's

11  required to be given.  That's not obstruction of justice.

12  Bringing that to the Court's attention is not obstruction of

13  justice and is actually very chilling that for a defendant to

14  accuse the Government of misconduct is -- will be the basis of

15  obstruction of justice enhancement because obviously he has or

16  any defendant has a right to bring that up if they honestly

17  believe that they're not getting what they're entitled to.

18  Mr. Constantine possessed such an honest belief and obviously

19  that is not a proper grounds for enhancement for obstruction

20  of justice.

21          And finally and probably the most baffling of the

22  grounds is this -- these emails that were allegedly fabricated

23  by Mr. Constantine during the trial.  The idea that these

24  emails were fabricated has no founding in fact.  There is not

25  a single piece of evidence that has been presented to this

42

1    court during the trial or afterwards that these emails were

2    fabricated.

3          And most importantly, the emails that they're --

4    that they talk about in this -- in the PSR, which is the

5    information provided by the Government, are talking about

6    emails that are totally unrelated to the emails at trial that

7    are alleged to have been fabricated.  This individual Rosser

8    [ph.] didn't even testify about Hawaii.  However, in the PSR

9    they're talking about how Mr. Constantine fabricated Rosser's

10   emails about Hawaii.  It just shows you how convoluted, how

11   confusing and how unfair some of the record in this case is

12   against Mr. Constantine.

13         There -- they are -- they are taking two separate

14   incidents, combining them into one, putting them in front of

15   Probation without any foundation whatsoever and asking this

16   court to base an enhancement to increase the sentencing

17   guidelines on that without a single piece of supporting

18   evidence.

19         And as I said in my letter, it was real easy.

20   Government does it all the time.  All they had to do was

21   subpoena Google, find out where these emails are and see

22   whether they existed or didn't exist and they didn't do that

23   and there's no evidence that it existed.  And, Your Honor, I

24   suggest to you that if they did do that, and it's my

25   understanding that Mr. Constantine during the trial or shortly

1  thereafter before as counsel was able to -- was offered his

2  password to let the Government do that, there was nothing

3  fabricated.  There was no emails fabricated.  It was sitting

4  here at the trial table.

5          So I don't see how in the world that has risen --

6  could -- has risen to the level of the preponderance of

7  evidence to allow that to support an obstruction.  So those

8  are the three bases upon that and all three of them didn't

9  exist or were unfounded.

10          THE COURT:  All right.  You want to move to the next

11  enhancement?

12          MR. TALKEN:  The next one is the offense -- the

13  paragraphs 29, 62 and 120 that the offense involved a

14  misrepresentation during a -- excuse me -- that the offense

15  involved a misrepresentation or other fraudulent action during

16  the course of a bankruptcy proceeding.  This offense didn't

17  have anything to do with a bankruptcy proceeding.  And going

18  back to the record Your Honor -- I know it was a long time

19  ago, but you may remember this sentence from the Government

20  when you asked them, "Are you alleging any bankruptcy fraud?"

21  and the Government said, "No, we're not."

22          This case had nothing to do with it.  They made an

23  allegation in order to attack Mr. Constantine's credibility

24  and maybe his intent in general.  I'm not exactly sure how it

25  was admitted or why it was admitted, but it was without

44

1  objection that he didn't say --

2          THE COURT:  Do you have the cite to the record for

3  that?

4          MR. TALKEN:  Where he said that?

5          THE COURT:  Yeah.

6          MR. TALKEN:  I do if -- I can find it.

7          THE COURT:  Yeah.

8          MR. TALKEN:  I'll -- I mean, I don't --

9          THE COURT:  Send it -- just send it to me.

10         MS. O'CONNOR:  Sure.

11         THE COURT:  Okay.

12         MR. TALKEN:  But that was said.  And importantly,

13 it -- even if that wasn't said, this case has nothing to do

14 with it.  That was a small point during a small examination

15 that was tangentially relevant to an examination in this case.

16 What it was irrelevant to was the frauds in this case or the

17 facts of this case and that's why there's no way that that

18 enhancement is applicable in this case.

19         You know, also getting into what it said was

20 actually fraudulent to the bankruptcy -- during the bankruptcy

21 proceedings whether or not what -- what he said was -- what he

22 actually said and what the Government allegedly said, there

23 are several words that are different that make a difference,

24 but I don't think we need to get into the specifics of that as

25 far -- yeah, if Your Honor agrees with me on the first point,

45

1  you don't need to get to the second point.

2          THE COURT:  Why don't you just give me 30 seconds on

3  that?

4          MR. TALKEN:  Well, the 30 seconds on that is that

5  Mr. Constantine said during the deposition in the bankruptcy

6  proceedings that Eufora is worthless.  And what he said was,

7  "At this point in time it has no value" --

8          MR. CONSTANTINE:  No, opposite.

9          MR. TALKEN:  Sorry.  One second.

10          [Pause in the proceedings.]

11          I'm sorry.  He said that it has value but it wasn't

12  profit.  I mean, those are -- you know, it's a very important

13  distinction and even -- even if you take that worst case in

14  the light least favorable to Mr. Constantine it still has

15  nothing to do with this case.

16          THE COURT:  All right.  What's the next enhancement?

17          MR. TALKEN:  And the next enhancement is the

18  leadership and the role.  And it's a difficult -- and Your

19  Honor kind of touched on a lot of these issues when we're

20  talking about forfeiture and I understand that mastermind, as

21  they talked about in Honeycutt, is different than the

22  guidelines, role and leadership, but there are two issues that

23  I think are important to this enhancement.

24          First of all, one, if it does apply it should be the

25  two points, not the four points because you don't have five or

1  more participants.  And I laid out clearly and Your Honor well

2  knows what the participants are and what they aren't.

3  Participants aren't innocent individuals that are involved in

4  the activity.  There has to be some criminal knowledge or some

5  knowledge that something was untoward going on by those

6  participants.  They don't necessarily have to be guilty of a

7  crime, but they have to have some knowledge that a crime is

8  being perpetrated to become a participant at a minimum and

9  there is no evidence that there was that many people involved

10 that had that knowledge, the requisite knowledge of the

11 enhancement.

12        I think the more -- the other important aspect is,

13 was he.  Even if there were that many people involved, which

14 there weren't, should even get the two-point enhancement for

15 being an organizer leader.  It's a 6,000-page record and it's

16 hard to parse out.  There was many different aspects or

17 tentacles of the fraud and each one had different conduct

18 committed by -- allegedly committed by Mr. Constantine that

19 brought him guilt into that and why the jury found him guilty.

20 As Your Honor noted, importantly some of them he had nothing

21 to do with, so he certainly isn't an organizing leader of

22 that.

23        As to focusing on Global Settlement Fund which is

24 one where that the Government brought out probably the most

25 during the trial, it's a very -- financially it's a small

47

1  portion of the fraud and the overall fraud in this case that

2  he's being held accountable for.  And he had a role -- he had

3  an active role in it and we're not disputing that.  He

4  certainly talked to the victims that -- and they testified to

5  that.  And he certainly made representations to the victims

6  and they testified about that, although some of the emails

7  we've talked about have brought -- excuse me, the text that we

8  talked about have brought that into question but that's a

9  different issue.

10          But even accepting all of that conduct, that doesn't

11  rise to the level of organizer or leader.  He was an active

12  participant.  He was, if you compare it both in this fraud and

13  importantly as the case law requires you can compare it to

14  other frauds of a similar nature.  His role was -- was not

15  that of a manager or a leader.  And then if you take it -- the

16  overall fraud, the fraud conspiracy he was convicted of, and

17  the overall fraud to apply that enhancement to the fraud

18  conspiracy, he certainly had a -- I would contest that his

19  role was very most squarely in the middle of no enhancement,

20  no reduction applicable because his conduct did not

21  demonstrate all of those classic hallmarks of leadership or

22  organizer, recruitment, control over a lot of the decision-

23  making and so forth.

24          Now, I think that when you -- we talk about Global

25  Settlement on its own, he certainly rose to a higher and with

1   more responsibilities, but he did not give rise to the

2   responsibilities of that of an organizer leader.  And then

3   when you take that little subset in the big picture, there's

4   no way in the world he was an organizer and leader of the

5   overall fraud.  And that's why that enhancement shouldn't be

6   applicable to him.

7           And that's -- those are really basically all the --

8           THE COURT:  All right.  Thank you.

9           MR. TALKEN:  And the only other thing, it's not --

10  you know, there was some discussion about the sophisticated

11  means and all of that and, Your Honor, I understand that the

12  sophisticated means of the threshold, especially the examples

13  that are given in the guidelines application notes are very

14  low as far as what's sophisticated and what's not.  But I

15  think that the sophisticated -- as far as what Constantine's

16  involvement in this was that it was -- the sophistication was

17  lacking and it came -- it's very clear from the trial that it

18  was lacking and many of the things that led to his conviction

19  is because it was so unsophisticated and open and obvious.

20          So I don't think that should apply and if Your Honor

21  does apply it, I think we'll talk about this under 3553(a)

22  later on, but some of the quotes have kind of addressed that

23  as almost a -- as almost an automatic tack going based on the

24  guidelines and that the Court should consider that as 3553(a)

25  as maybe overstating it.  It's like an automatic overstate --

1   making the face offense level instead of being six almost

2   making it a seven, in this case making it nine.  So that's the

3   other point, though I think that's probably better fit for

4   discussion on another day.

5          THE COURT:  All right.  Thank you.  Thank you for

6   being so concise.  All right.

7          Mr. Kenner, I'm hoping you can be as concise.  Go

8   ahead.

9          MR. KENNER:  Yes, sir, Your Honor.  First up, I

10  guess I'll start with --

11         THE COURT:  Just move the mic a little closer.

12         MR. KENNER:  Yes, I'm sorry, Your Honor.  First I'll

13  start with leadership.  The -- under the Government's -- and I

14  know Mr. Talken had addressed the PSR issues and I think

15  there's a number of similarities in there, but I'm just going

16  to touch on a couple from the Government, the PSR's addendum

17  to the pre-sentence report which actually gave them a shot at

18  a reply to one of our first objections.  I think they

19  submitted it July 18, 2016.  Under leadership, the real retort

20  was the fact that they said that the defendants pocketed

21  millions of dollars from the case -- from the frauds and, you

22  know, and this may be addressed better under a loss factor.

23  But when -- with respect to pocketing millions of dollars, the

24  tracing of the money back to me is the repayment of two subset

25  loans from Mr. Gaarn and Mr. Constantine of funds that

50

1  originated with people in the superseding indictment.  There

2  were no other traceable funds and those total a little bit

3  less than $280,000.

4       So 12 or 13-year alleged macro conspiracy to have

5  Mr. Constantine repay me about 117 grand of loans that I'd

6  given him weeks earlier and Mr. Gaarn about 160-something

7  thousand from superseding indictment victim purchases of

8  Eufora stock.  Just doesn't seem like a leadership role the

9  way that they're defending it.

10       In addition, you know, the guidelines are providing

11  for an upward adjustment with the defendants, the criminal --

12  organizer of criminal activity, of five or fewer, but it's

13  inapplicable where there's only -- where there's only -- the

14  only other participant in the scheme is an equal partner.  As

15  Your Honor knows under 3B1.1(c).  And in any of these

16  scenarios that I heard the Government describe at trial with

17  respect to myself or Constantine everything appeared to be --

18  that I -- I was managing a project in Hawaii, had investors

19  that were under me as business management clients.  And when

20  time came to invest or do other transactions, Mr. Constantine

21  happened to be one of the 17 hard money lenders that were paid

22  by our corporation and the only one the Government deemed to

23  be an illegal payment.  Strangely enough, Mr. Constantine was

24  one of only two of the 17 lenders that actually got us some

25  money for what we were looking for.

51

1            You know, under <u>U.S. v. Greenfield</u>, 44 F.3d 1141

2   (2d. Cir. 1995), you know, they mentioned that the defendant

3   must have at least played a significant role in the decision

4   to recruit or supervise lower level participants and there was

5   no recruitment on the record of any other participants.  And

6   there's certainly no lower level administrative people in our

7   deal.

8            In fact, with respect to Mr. Constantine's

9   transaction, the million dollars he was paid, although none of

10  it came from the superseding indictment individuals,

11  Mr. Manfredi, who was the chief operating officer in Hawaii,

12  testified at trial at Transcript 3004 that he flew to Arizona

13  to meet specifically with Mr. Constantine before any of the

14  consulting payments were made to Mr. Constantine.

15           So Mr. Manfredi was part of the decision to hire

16  Mr. Constantine because neither of them knew each other when

17  Mr3. Manfredi flew on his own to go visit Mr. Constantine

18  ahead of the consulting payments.

19           As the FBI knows, Mr. Manfredi when he was deposited

20  in -- excuse me, when he gave proffer in October of 2010 five

21  years before trial, Mr. Manfredi also confirmed to the FBI

22  that there were consulting agreements between Hawaii and

23  Mr. Constantine for his payments and his service.  Ultimately,

24  I guess it raises another issue that I briefed the Court.  I

25  think it's ECF 8073 that Mr. Manfredi confirmed to the FBI

52

1   five years before trial that there were consulting agreements.

2   Those are the agreements as Your Honor recalls are mentioned

3   in the obstruction of justice issue that Mr. Kaiser said he

4   never signed.  They were submitted at trial, I believe, as

5   Government Exhibit 5104.  They were the photocopies of two

6   agreements that were recovered from my Hawaii files in my

7   office, which is where I would have expected the copies of

8   those consulting agreements to be.

9           As Your Honor may recall, about a year before trial

10  the Government presented those first to the court and said

11  that they -- Mr. Kaiser's name was not forged on the original

12  documents but they were near signatures Mr. Kaiser had left on

13  blank documents for me and I had super-imposed those two

14  contracts on top of his signature.

15          But perhaps unknown to the Court even through today

16  is that a week before trial Mr. Miskiewicz brought me into

17  this building from NBC and showed me the two original

18  copies -- the two original ink signatures that Mr. Kaiser had

19  recovered from his own house that he had in custody for ten

20  years before trial.

21          On those documents it was clear that Mr. Kaiser's

22  signature was signed over top of the printer paper, which

23  means that it was not super-imposed as the Government had told

24  the Court the year before the trial.  But probably more

25  distressing the fact that they used that single document --

53

1  those single documents as an obstruction of justice for myself

2  and Mr. Constantine is that at trial Mr. Kaiser only

3  authenticated the photocopy versions during his testimony.

4  And when the Government utilized their signature expert he

5  only confirmed to the court during testimony that he had only

6  seen the photocopy versions of those.  So the Government had

7  withheld under best evidence rule, Rule 1002, and withheld the

8  original ink versions that the Government recovered from

9  Mr. Kaiser himself a week before trial.

10         The reason I raise that, Your Honor, is that the

11  chief operating officer, who had originally met with

12  Mr. Constantine to approve the authorization of the consulting

13  agreement with Mr. Constantine, subsequently managed the

14  entire Centrum loan process with our Hawaii lawyers at Carl

15  Smith Ball and the subsequent negotiation of the short-term

16  loan with Mr. Jowdy, which is documented in a few of my briefs

17  as PK22.  And I can get you the Bates stamp number if you like

18  is that Mr. Manfredi did tell the FBI that there were

19  consulting agreements with Mr. Constantine, so I'd just ask

20  where those consulting agreements are and if the ones that

21  were presented only as photocopies to the court I now -- are

22  not the authentic consulting agreements Mr. Manfredi was

23  referring to at the time.

24        THE COURT:  Let me -- I want to -- it's 2:30 so I

25  want to try to get this done.  But how do you want to deal

54

1  with -- I'm going to give Mister -- I'm just going to tell

2  Mr. Kenner, I'm going to give you 15 more minutes.

3           MR. KENNER:  Yes, sir.

4           THE COURT:  Again, this is just to highlight -- I

5  have all your submissions and you're certainly thorough in

6  your writings, so don't feel -- this is -- you can cover

7  whatever you want, but I'm only going to give you 15 minutes.

8  Okay.

9           But do you want me to call Magistrate Judge

10 Tomlinson or do you want to take a break from here and come

11 back?

12          MR. HAGGANS:  I think my reply to arguments that are

13 made will be brief and if that's the last issue the Court

14 wishes to address today --

15          THE COURT:  Yeah.

16          MR. HAGGANS:  -- I would think -- I would hope we

17 would be done by 3 o'clock and if the Court would make that

18 call --

19          THE COURT:  Okay.

20          MR. HAGGANS:  -- I would be most grateful.

21          THE COURT:  All right.  Okay.  Go ahead, Mr. Kenner.

22 You've got 15 minutes.

23          MR. KENNER:  All right.  Thank you, Your Honor.  So

24 we've got -- as far as leadership goes, you know, Mister --

25 excuse me.  Under U.S. v. Greenfield, which I quoted the

55

1    citation earlier, the -- there was no recruitment or
2    supervision of lower-level participants that are on the record
3    having worked for me or been recruited by me.  And at best on
4    the record it showed that any connection to the case
5    Mr. Constantine and I shared, you know -- handled our
6    individual roles in whatever deemed fraud there was in the
7    case.  Even in U.S. v. Greenfield, they referred to U.S. v.
8    Katora, K-A-T-O-R-A, 981 F.2d 1398, 1992 in the Third Circuit,
9    where they -- they refer to it as offense level was improperly
10   increased in Katora under the sentencing guidelines on the
11   grounds that the defendants were organizers.  But the
12   defendants were the only participants in the offense and
13   shared equal responsibility and were organizers only in the
14   sense that they were planners of the offense.  And the
15   district court could not enhance sentences of the duo when
16   they bore equal responsibility for organizing their own
17   commission of the crime, even though they also organized non-
18   culpable office staff or outsiders to the fraud, and in our --
19   and in the instant case there were no other organized non-
20   culpable office staff or anyone who worked for us.
21            Under -- to finish on that, I also did reference --
22   and I'd just refer Your Honor to my *pro se* submission of ECF
23   642 to address the last of the Government's objections.  But
24   in -- in *Rajraj Rotnum* [ph.] at Page 17 in my submission, you
25   know, it also claim -- it also quotes from the Second Circuit

1   the factors the court should consider include the claimed

2   right to a larger fruit of the crime.  And as the record

3   shows, there's effectively no fruit of the crime that ends up

4   in my proceeds, in my possession as ill-gotten gains

5   notwithstanding the Court's view of Mr. Constantine repaying

6   me the $117,000 and Mr. Gaarn repaying me about $160,000 from

7   the loans he testified to the court that were part of the

8   case.

9          With respect to loss factor, Your Honor, you know,

10  I've briefed it very thoroughly and I've -- and I've referred

11  quite often in those briefings to Second Circuit cases Ebers

12  [ph.] to the Second Circuit case Novak, Leonard.  Each of

13  those cases require the court for loss factor to separate the

14  fraud and the non-fraud factors in the case where they

15  effectively suggest that even in one of the cases where -- in

16  McCallum, which is a Western District here in the Second

17  Circuit, an individual actually went out and recruited --

18  solicited $600,000 for an investment with the knowledge ahead

19  of time that he was going to steal $200,000 and buy a house

20  for his in-laws.  And the court held that McCallum, the

21  defendant, was solely responsible for the $200,000, not the

22  $400,000 that went into the actual investment.

23         The Government has during their forfeiture memo had

24  suggested that the -- excuse me -- quoted all Ponzi scheme

25  cases and cases where the entire case, the entire transactions

1   were based on nothing but a fraud where people were soliciting

2   money to buy stock and they never bought stock.

3          And that is just not the case in any of these

4   transactions.  There's been litigation for years over the

5   Eufora Corporation.  In fact, when we hired Rudy Giuliani's

6   investigation group his group after -- after their due

7   diligence decided they wanted a six percent equity stake in

8   Eufora and this was after they had vetted all of Mr. Gaarn and

9   Mr. Constantine's stock that was raised and I reference that

10  in my reply memo to the -- to the court.

11         The Hawaii project we effectively were able to --

12  through our transactions between myself, Mr. Kaiser and

13  Mr. Manfredi as the management team were able to secure 105

14  million-dollar loan from Lehman Brothers a year after we

15  walked away from their five million-dollar loan.  So it was a

16  much different transaction we walked away from and

17  Mr. Manfredi had documented to the Court as an egregious loan

18  that we would have lost the entire property to Lehman

19  Brothers.

20         And lastly, under the loss factor under the Global

21  Settlement, I think Your Honor at ECF 501, Page 60, had

22  referenced that Mr. Constantine had overspent based on the

23  most aggressive estimates, $17,000 of the Global Settlement

24  Fund that he solely curated and managed according to

25  Mr. Peca's testimony at trial and Mr. Richards -- Attorney

58

1  Richards' testimony at trial and Tyson Nash's testimony in a

2  separate proceeding pretrial that was in the 3500 material.

3         The loss factor I would just encourage Your Honor to

4  take a look at my most recent submission on that to utilize

5  both the star, the Schelaff [ph.], the Novak, the Leonard and

6  the Ebers factors with respect to separating fraud and non-

7  fraud factors, understanding what the individuals receive that

8  they bargain for.

9         And if I could just suggest that in the Eufora

10 transaction at the exact contemporaneous time that

11 Mr. Constantine and Mr. Gaarn had sold their stock

12 Mr. Constantine and Eufora had secured a three million-dollar

13 operations loan for the corporation.  And after their six

14 months of third-party independent valuation on the corporation

15 had a 20 million-dollar value on the company.  So even under

16 the most egregious and aggressive calculations under Novak and

17 the Novak ruling, you would see that approximately 3.38

18 percent of the value the individuals bargained for is what

19 they effectively lost out of the $700,000 of stock that was

20 purchased by individuals in the superseding indictment,

21 whether it be from Mr. Constantine or Mr. Gaarn.

22        With respect to sophisticated means, Your Honor, I

23 know that -- and I would agree with Mr. Talken that, you know,

24 it's -- it's an incredible -- it's a very diverse case with a

25 number of different issues that took place over a significant

1  period of time.  But PSR and the Government have effectively

2  relied heavily on the fact that they suggested for

3  sophisticated means that it was the cover-up that we had used

4  by allegedly forging Mr. Kaiser's name on two documents.  And

5  as I briefed again at ECF 783 and have just referenced to the

6  Court a few minutes ago, you know, the Government I think

7  pulled a fast one on the -- on the court and the jury by not

8  submitting the original link version to their expert and

9  letting the expert know that those original ink versions were

10  custody-ed [ph.] at Mr. Kaiser's house for ten years which

11  just boggles my mind at how he could hold the original ink

12  signatures at his house for ten years, that they were somehow

13  forged.

14         I mean, in one of the law journals I just recently

15  read it said that a prosecutor would have to think that this

16  piece of evidence is so exculpatory in nature that it actually

17  undermines my belief that a guilty verdict would be worthy of

18  confidence.  Once I turned over this evidence I can assume my

19  zealous efforts to obtain a guilty verdict that I have just

20  concluded will not be worthy of confidence.  And it's from the

21  book *Fallen Super Heroes and Constitutional Mirages*, <u>Brady v.</u>

22  <u>Maryland</u>.  You know, it just reminded me of what the

23  Government had done with the non-submission of the ink

24  versions.

25         They do have the actual ink versions in their

60

1  documentation that I saw after trial as GX7004 and GX7005, but

2  they consciously avoided submitting that both to the court,

3  admitting it through their expert, admitting it to Mr. Kaiser

4  and certainly not letting their expert know that Mr. Kaiser

5  was in possession creating real issues.

6           THE COURT:  You have like five minutes left and I

7  want to make sure -- I don't know what else you want to cover.

8  I want to make sure you have time for the obstruction of

9  justice enhancements, so maybe you should move to that just to

10  make sure you cover it.

11           MR. KENNER:  Yes, sir.  Thank you.  I will move

12  exactly there.

13           Under obstruction of justice 3C1.1, I'd just like

14  to, you know, again ask the Court to refer to my ECF 642

15  submission and just remind the Court that in 2006 I was the

16  whistleblower on the Jowdy crimes to all of my investors.  I

17  was the first person to proffer to the FBI in 2009 when they

18  contact -- finally contacted me and the investors about the

19  Jowdy crimes.  I was the one who volunteered for grand jury

20  testimony in 2009.  The Government cancelled it in spite of

21  calling me a liar for that during trial at Transcript 5064 and

22  65 and also again a liar at 5051 saying that there were no

23  such subpoena and cancellation of subpoena documents, even

24  though they came right out of Mr. Miskiewicz's own office in

25  the Eastern District.

61

1        You know, I was the one who organized the FBI

2   interviews for all the Hawaii line of credit and Mexico

3   investors within three months of their line of credit seizures

4   which a couple guys testified at trial that they were unaware

5   of even though the empirical evidence shows that they were

6   communicating with me on the exact days that the seizure took

7   place and they were communicating directly with Northern Trust

8   Bank.

9        But I set up the phone calls six days after my

10  proffer to the FBI on June 24 of '09 and I set it up for

11  Mr. Sydor, Peca, Berard, McKee, Norstrom and Stevenson.  Five

12  of those guys were line of credit holders.  So there could

13  have been no better time for the FBI to interview each of them

14  if they were truly upset about the line of credits being

15  seized and having no knowledge of them or the use of them

16  despite the dozens of documents they signed annually that I've

17  submitted to the court to show that it was not just improbable

18  but impossible for them not to be aware of their annual use of

19  those funds.

20       But it was a -- it was Mr. Galliado [ph.] who

21  cancelled all those -- all of those interviews.  Probably at

22  the most apropos time to have an interview contemporaneous

23  with the seizure of those -- of that collateral.  You know,

24  the Government suggested that I had obstructed justice by

25  continuing to forward evidence and documents to my investors

1   for subsequent litigation they were filing in Mexico against

2   Mr. Jowdy.  The irony is the guys that received those

3   documents were the same ones that were simultaneously or

4   contemporaneously suing Mr. Jowdy in Delaware on a books and

5   records matter and I was helping them proceed in Mexico on a

6   Mexican matter through contacts that I had established before

7   they had arrested me.  But I was in possession of all the

8   evidence as the Government turned over to me so that was my

9   participation in assisting my investors get the money.

10          You know, throughout trial the Government has made

11  five summation statements including in addition to an opening

12  remarks statement that I had stolen the money and bought my

13  equity in Mexico with that.  At post-trial we found out that

14  none of that was true, that I didn't steal any of the Hawaiian

15  money and none of it was used to buy my properties in Mexico.

16  None of it whatsoever.  And that's what the -- the lawsuits

17  were that the individuals were filing in Mexico at that time.

18          I also delivered the Home Depot tape that I had made

19  of my conversation with Mr. Constantine immediately to Rudy

20  Giuliani investigation team the day after I received it and

21  it's specifically referring to himself as both the bank robber

22  and the get-away driver, never referencing me.  You know, even

23  Constantine's attorneys through the 30 minutes of ramblings,

24  you know, said that they failed to understand his references

25  in those when Mr. Luroso [ph.] spoke at Transcript 4425 and

63

1   26.   And during Luroso's in effect of counsel reply it refers

2   to an ECF 729 at Page 14 Constantine's references to half-

3   truths throughout the entire representation of the statements.

4          So, you know, anything that the Home Depot

5   conversation was there was no problem with that ever coming

6   into the trial.  I think we're the ones who introduced it into

7   the trial because it was a -- it was just a verbal vomit of

8   the typical Constantine language that Mr. Stolper [ph.] and

9   Mr. Giuliani's team had become accustomed to and so had we as

10  investors or associates with the Hawaii -- excuse me, the

11  Eufora project.

12         Lastly --

13         THE COURT:  You have less than one minute.

14         MR. KENNER:  -- under use of trust if I can have one

15  minute, Your Honor --

16         THE COURT:  Yeah.

17         MR. KENNER:  -- it's just that the Government only

18  claimed that -- has claimed that at ECF 471 at 9 that I was a

19  financial advisor that they put on the FINRA representative.

20  I forget what the gentleman's name is.  Maybe Mr. Nealy [ph.].

21  At Transcript 2481 he actually says that my FINRA registration

22  which was never used by me in my entire business career, by

23  the way, terminated on November 5th of 2004.  That's when the

24  FINRA approval ended.  The first transaction related to

25  somebody in the superseding indictment isn't till months and

64

months later.

So I was not a FINRA representative.  I didn't ever accept the FINRA duty of care standard in this and that's where they suggested the abuse of trust is because I was a financial advisor, which I have never been a financial advisor.  I've been a marketing rep and a business manager through my entire career and I know it parses words, but they're very important words at that point.  But I was never held under FINRA standards.  And if Your Honor reviews my standard advisor agreements that any of my investors were under at the time in 2003 and beyond, there is no standard of care that references an abuse of trust that the Government can point to throughout the entire case.

And even with -- lastly, even with the limited power of attorney that I had, Your Honor, there's evidence on the record and there's evidence in the Government's Rule 16 production that I never had the ability to transfer funds without the client's double independent verbal authorization with their actual FINRA agent and their custodian of record. And that's at ECF 668, Appendix at 124.  It's at also at 258, 260 with Government Exhibit 760 when Mr. Nash testified to it and also through Mr. Ranford at 347 and 48 in that same appendix.

You know, I had no Eufora control at any point in time, Your Honor.  I had no GSF control at any point in time

1   as testified by Attorney Richards at 3805 to 3816.  Mr. Peca

2   testified to the same at Transcript 540 and Mr. Nash, as I

3   previously said, had testified pretrial in 3500 material TN-3

4   at Page 12.  And there was not a single unauthorized Hawaiian

5   transaction that Your Honor will find.  If Your Honor refused

6   the operating agreement that I was held to in Hawaii as the

7   managing partner that we had admitted as Kenner Exhibit 217 at

8   Transcript 4525, those are the -- those are the documents I

9   was legally bound to operate within.  And at all times,

10  whether it be the Constantine transaction for consultancy or

11  the 16 other consultants we hired or the loans to Mr. Jowdy or

12  the other entities that had received short-term loans that

13  were all repaid, they all operated inside those agreements and

14  that's what the Government had referred to in probation and

15  referred to as abuse of trust.

16          THE COURT:  All right.  Thank you, Mr. Kenner.

17          MR. KENNER:  I'm sorry, Your Honor, for going over a

18  few minutes.

19          THE COURT:  No, that's okay.  You had a lot to cover

20  and obviously, as I said, I have your -- your written

21  submissions as well.  All right.

22          Mr. Haggans, do you want to respond?

23          MR. HAGGANS:  Thank you, Your Honor.  Government

24  believes it's addressed all of the points raised in the course

25  of both arguments in its prior submission ECF number 471 back

66

1   in May of 2017.  And so I'll only highlight a couple of points

2   for the Court's consideration.

3           First, on the obstruction objections made by both

4   defendants, with respect to Mr. Constantine, counsel did not

5   address some of the other examples that the Government cited

6   in its brief.  In particular, some sworn statements submitted

7   by Mr. Constantine that were directly contradicted by trial

8   testimony of other witnesses.

9           I'd also note, although it did not exist at the

10  time, the Court can and should consider the submissions in the

11  course of the Rule 33 in effect of assistance of counsel

12  allegations.  As the Government pointed out in its opposition

13  to the defendant's briefs on those points, he made a number of

14  allegations in a sworn statement to the court about the nature

15  of his relationship and communications with counsel that

16  counsel's response more than adequately refuted, demonstrated

17  were not accurate.

18          With respect to Mr. Kenner's obstruction objection

19  as the Court will remembers Mr. Kenner testified at trial on

20  numerous points and the jury's verdict is in direct refutation

21  of his testimony.

22          Turning to the leadership enhancement, both

23  defendants focus on the word "leadership" but tend not to

24  focus on the words "organizer" or "manager," either of which

25  would qualify for these enhancements.

1          With respect to Mr. Constantine, it sounds like the

2   parties agree that it's at least the two-point enhancement, so

3   the only issue is whether it's a four-point enhancement or

4   not.  The Government cited in its brief a number of cases

5   including a Second Circuit case as recent as 2016 for the

6   proposition that the leadership need not be of an entirely

7   criminal group of persons.  It can involve non-criminal

8   persons so long as they're involved in and necessary for the

9   execution of the scheme.  And the Government cited in its

10  earlier filing the long list of people that both defendants

11  have to involve to execute the schemes that were proven at

12  trial.

13          Turning to Mr. Constantine's specific objection to

14  the bankruptcy enhancement -- excuse me, the enhancement

15  relating to a misrepresentation in the course of a bankruptcy

16  proceeding, the nexus of that as outlined in our brief was

17  that it related to the ownership of Eufora.  Ownership of

18  Eufora was clearly a disputed issue at trial.  It was one of

19  the vehicles of the fraud and the jury's verdict demonstrates

20  that the multiple representations that Mr. Constantine made

21  about its value and about its ownership, including in the

22  course of that bankruptcy proceeding, should not be credited.

23          Turning to sophistication, I think the trial record

24  on its face makes clear that the means of the frauds were

25  sophisticated and involved numerous wire transfers by numerous

68

1   banks amongst numerous investment vehicles including

2   investments in multiple states and overseas.  This was a

3   sophisticated scheme.

4        Finally, and only because I feel like I must respond

5   to it, Mr. Kenner's objection to the abuse of trust

6   enhancement on the theory that because he was not a FINRA

7   registered advisor he did not owe -- he did not occupy a

8   position of trust with respect to his clients.

9        Every individual owes to others the duty not to

10  commit crimes against them and Mr. Kenner was clearly an

11  advisor of these individuals of these victims.  He was a

12  custodian of their funds.  He invested funds on their behalf.

13  He gave them investment advice.  He had their trust.  He

14  abused it.  The enhancement is warranted.  Other than that the

15  Government rests on its papers, Your Honor.

16        THE COURT:  All right.  Thank you.

17        So what I'd like to do just to set two dates.  One

18  date would be I -- I'm going to place my rulings on the record

19  with respect to these various objections and resolve the

20  guidelines calculation in advance of the sentencing date.

21  Mr. Constantine, you can appear by phone for that because I'm

22  just going to be putting on the record my rulings.  There's no

23  going to be any argument or discussion.  Okay?

24        MR. CONSTANTINE:  Thank you, Your Honor.

25        THE COURT:  Mr. Talken, I'd prefer having you here,

1   but for some reason you can't make it, but I'd prefer to have

2   you here just in case something else comes up, okay?  And

3   Mr. Kenner will be here in person.

4           So -- and then the second date would be the actual

5   sentencing date and I know the Government mentioned that there

6   may be some victims who may be from out of town who want to

7   come, so I want to give them sufficient notice to do that.

8           MR. HAGGANS:  Yes, Your Honor.

9           THE COURT:  And obviously the forfeiture decision

10  will come out in the interim.  So just give me one second.

11          Do you have the calendar, Jim?

12          THE CLERK:  Yes.

13          THE COURT:  Yeah, so I'm looking at like March 3rd,

14  4th or 5th for the actual sentencing date.  Is that week okay

15  for the Government now?

16          MR. HAGGANS:  I'm tentatively scheduled to be out of

17  the country that week, Your Honor.  I don't know -- that's

18  a -- I should specify that's a business trip, not a personal

19  trip.  I don't know if my colleague, Ms. Komatireddy, is also

20  scheduled to be busy that day, but I think the next week would

21  work for the Government.

22          THE COURT:  March 10th?

23          MR. HAGGANS:  It's fine.  That's fine for the

24  Government, Your Honor.

25          THE COURT:  Wait.  Hold on one second.

70

1                    [Pause in the proceedings.]

2              Is that okay with -- well --

3              MR. TALKEN:  If it has -- I'd prefer the 11th but

4  the 10th --

5              THE COURT:  Okay.  No, 11th is good.

6              MR. TALKEN:  -- has to be for the Government.

7              THE COURT:  So let's say Mr. Kenner, 10:30 on

8  March 11th; Mr. Constantine at 11:30.  And I want that -- I

9  want that to be a firm date, okay?  Make sure -- because we

10  have people making -- buying plane tickets and things like

11  that, if there are any issues that come up between then we

12  have to make sure they're resolved prior to that date, okay?

13  Obviously this case is an old case.  We need to move forward,

14  all right?  And then let me just get a date for -- I think

15  what I'll do is -- just give me one second.

16              So the Government is going to get me that chart by

17  the 29th.  Defendants can respond to that chart by

18  February 5th.  So how about February 13th for this conference?

19  No good?

20              MR. TALKEN:  No, I'm here -- I think I'm in front of

21  you at 10:30 on that day, so I guess we both need to miss that

22  time.

23              THE COURT:  Yeah.

24              MR. TALKEN:  Florez.

25              THE COURT:  Yeah.

1           MR. TALKEN:  So --

2           THE COURT:  So why don't we say 1:30?

3           MR. TALKEN:  Yes.

4           THE COURT:  Is that okay with the Government?

5           MR. HAGGANS:  Yes, Your Honor.

6           THE COURT:  So 1:30 on that date.  I'll make my

7    rulings on the objections and have the guidelines calculation

8    completed and obviously if there any forfeiture issues at that

9    point.  My expectation will be the decision will be issued by

10   that date.  So if there are any follow-up issues, we can

11   address them as well.

12          All right.  You got those dates, Mr. Kenner?

13          MR. KENNER:  Yes, Your Honor.

14          THE COURT:  All right.  The other thing is, I just

15   want to note that I know in your letter you mentioned this

16   issue regarding -- Ms. Komatireddy is not here, but I know she

17   had said she was going to propose a path forward with respect

18   to just memorializing this discovery issue.  So I'm -- have

19   you talked to her about that, Mr. Haggans?  I don't know --

20          MR. HAGGANS:  I only had an opportunity to speak

21   with her briefly.  Could I ask the Court if we could have

22   until the same date as the defense reply --

23          THE COURT:  Sure.

24          MR. HAGGANS:  -- for the Government to file that?

25          THE COURT:  Yeah.  Have you had conversations about

72

1   that with her maybe?  I don't know.

2              MR. TALKEN:  I've -- you know, I FedEx'd her the --

3   I reproduced them; actually was able to do it myself, so I

4   didn't need funding for that, so --

5              THE COURT:  Okay.

6              MR. TALKEN:  -- I reproduced them, Fed-Ex'd them

7   over.

8              THE COURT:  You haven't heard back?

9              MR. TALKEN:  No, but that's not -- that's not

10  surprising based on --

11             THE COURT:  Okay.  All right.

12             MR. TALKEN:  -- the volume of the materials.

13             THE COURT:  All right.  So yeah, if we could just

14  get that letter.  All right.

15             MS. O'CONNOR:  Your Honor, we just wanted to clarify

16  something with regard to the charts.  You mentioned that you'd

17  like us to address the Global Settlement Fund, the Hawaii

18  investment funds, the line of credit to Eufora and Centrum

19  loan money.  But Your Honor did mention the other properties

20  involving the chart, Freylies, the three Palms units and Del

21  Mar.

22             THE COURT:  Yeah, I want those taken out of -- taken

23  out.

24             MS. O'CONNOR:  It's the Government's understanding

25  that defendant Constantine conceded his involvement in the

73

1   Palms fraud.  It was he objected to their Freylies, Del Mar

2   and the line of credit investment monies.

3          THE COURT:  You could put in that letter where he

4   conceded his involvement in the Palms fraud.  I'll look at it

5   again, but just give me the chart the way I asked, but if

6   you -- I'll let you address that limited issue.  Want to point

7   me in the record where he conceded, which fraud?  The --

8          MS. O'CONNOR:  Palms.

9          THE COURT:  All --

10         MS. O'CONNOR:  The three Palms.

11         THE COURT:  All three Palms?

12         MS. O'CONNOR:  I believe so, Your Honor.

13         THE COURT:  All right.  I'll look at it.  All right.

14  All right.  Thank you.  Have a good day.  |Your Honor, before

15  we go just very quick --

16         THE COURT:  Yeah.

17         MR. TALKEN:  -- very briefly.  This -- the one issue

18  that's outstanding is this -- the trust issue.  Trust still

19  hasn't -- the money still is -- has not been released.  I've

20  been back and forth.  The financial advisor has advised me

21  that he needs an order from this Court saying that should the

22  trustee that's been appointed, the special trustee be

23  appointed, that they are ordered to inform the Court that that

24  trustee is no longer in existence.

25         The reason for that is the way the original trust is

74

1   set up Mr. Constantine has the authority to hire and fire this

2   special trustee, which obviously doesn't address the concerns

3   of the Court and the Government.  This will take care of that

4   concern, but I just want Your Honor to know I'm going to give

5   you a letter on that.  I just want you to know where that's

6   coming from.

7              THE COURT:  All right.  Yeah, and if you could

8   direct the language of the proposed order that would be

9   helpful, all right?

10             MR. TALKEN:  Will do, thank you.

11             THE COURT:  All right.  Thank you.  Have a good day.

12             ATTORNEYS:  Thank you, Your Honor.

13  (Proceeding concluded at 3:01 p.m.)

14                         *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25

75

1          I certify that the foregoing is a court transcript

2    from an electronic sound recording of the proceedings in the

3    above-entitled matter.

4

5

6                              _____

7                              Ruth Ann Hager, C.E.T.**D-641

8    Dated:   January 23, 2020

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25