

Ken Jowdy

3/24/10 @ 10:15AM

Government Exhibit
3500 - KJ - 2
13-CR-607(JFB)

Tom Harvey
Louis Freeh
Joel Friedman
Mike McCall
Ken Jowdy

Continue of Letter Agreement dated 2/25/10

Ken Joseph
Chris Castano  } SEC
Julian Moore
Scott Romanowski
Matt Galioto

How does Castano and Joseph not look at the DDM title docs and the KSI loan docs to show Jowdy and Harvey stole the investor money and never transfered title to an investor entity...?? (*TIMELINE 020*)

Harvey complicit in Jowdy frauds from September 2002 letter to Nolan and other initial investors until present...

KJ = PGR officials in Mexico ≡ 3 weeks ago — happened on Monday, 3/22/10

- came to his property looking for someone
≡ took pictures of garbage & vehicles
- (KJ) thinks it was him they were looking for
- said looking for drug dealer, child molester....
- may be rogue operation

-(LF) - spoke to Gov't officials - state no investigation on going w/ (KJ) in Mexico

? (JF) - have discussions w/ (PK) re: (PK) clients ≡ to (KJ)

answer (PK) ≡ always a phone call away from his (PK) clients.
(KJ)
(KJ) - had discussions w/ (PK) early on in relationship -
(KJ) had very little contact w/ (PK) clients ≡ Jason Woolley - saw once file of (PK)
once
Turner Stevenson - saw w/ (PK)
≡ (KJ) - docs provided by (TH) re: subpoena
Bernard Kristich
started 2/24/19 ago Thelmann & (KJ) reconstructed docs - receipts
invoices
- Baja Mnsmt
- TLJ Mnsmt

(KJ) (PT) did not generate any paperwork on his own re: DDM + DCSL investments/projects

≠(KJ) = spoke early on w/ (PT) re: other investments outside Baja Develop.
Bates 13088 - states "funds be used fund other projects of Developer"

PPM's

2/7/03 - Baja Mngmt, LLC
         -for original investors prior to PPM being drafted
              ▷ from Promisory Notes from investors (initial)
              ▷ $ going into Baja Development acct initially.
   might have been
   drafted by 8/9/02    -suppose to be delivered to investors by (PT) + return signed

Bates # 13228 =
              1st paragraph =
(KJ) - $ to be in Diamante
              ▷ Diamante Del Mar
                 (KJ) Managing Member

- BD Corp =
   Baja Development - owned by (KJ)
         ▷ used before offering - El Rosario project + other things

②

initial investment given w/ a written agreement
Promissory Notes issued
    $ to Diamante

≡ 3rd paragraph –
        $110k to be invested by (KJ)

≡ $ From Baja Development Corp.
        $ - from initial 6 investors = (KJ)

– then to Baja Mngmt - Diamante Del Mar
        (KJ) - b/c PPM said that (KD) needed to contribute
                                                        $

Bates # 13231 –
        ≡ Source of $110k from BD Corp - from initial
                                            investors $

Bates # 13232 –
        (KJ) - all the funds were Not used for DDM

Bates # 13233 -
        (KJ) founding offering not consumated

Bates # 13234
        – (KJ) – $350 k –
            $200k - to (KJ)
            $150k - to (BN)

– Consult fee's = (PK) – marketing consulting
            - don't recall how much paid (PK)

– composite Suzanne Tabour                              ③

- financial reports = re: PPM
  - (KJ) - did not receive these exact reports

(KJ) + (PE) - did create memos OF project
   which thinks (PE) shared w/ investors
   Project Information Memo's =
      included = cash flow projections
             = sales projections
             → (KJ) worked w/ sales people,
                consultants to get
                #'s for projections

= (KJ) - does not thinks this satisfies PPM required docs
   to investors.

= (KJ) = does not know reason he did not supply docs
   required by PPM

= (KJ) - does not recall role he played in creating PPM
   (KJ) he read PPM - yes

(KJ) - PPM - given to (PE) → given to clients

(KJ) - (PE) handling communications w/ clients/investors

Bates 13236 - overview of DDM

(KJ) - came up w/ idea of 2 courses ← Fazio
                                       Love
   - showed property to Davis Love = had previous relationship
                                      w/ (DL) - met
(KJ) - doesn't recall - how met Tom Fazio      through friend

④

- (TF) - sent down his reps to look

(KJ) ① Love course - conceptual design → to set price for cours

② Fazio course more involved → to construction drawings
    - irrigation     ⎤ studies
    - erosion control ⎦

- had 4-5 biddin on construction for course

(KJ) - wil be exclusive Fazio + Love courses

(KJ) dealt  Dennis Wise ⎤ architect for Fazio
            Tom Fazio   ⎦ worked w/ Fazio company
(DDM) dealt w/  → limited dealings

⇒ Dave Boyden - landscape architect = Would have been on-site
                                         vep for Fazio
2006 ⟶ ⇒ (KJ) = hired for ICSL
                  after left Fazio
                = not dealings w/ DDM

⇒ not sure if there term limits on contract w/
  Fazio
    ⇒ couple hundred thousand $'s - paid by (KJ)
    $2M - contract Total        ⇒ $ from DDM acct

(KJ) could not call Fazio design + need to make
     material changes to course if sever contract
     before construction.

⑤

dated — Bates ☑
11/1/02 ☑ DDM offering —
— specifically for DDM
not through any other entity/agreement

≡ Suppose to be delivered to investors (15 investors)
by (PK)
— told by (PK) - delivered to investors

KJ
investors: — Stumpel
— Mckee
— Berard
— U. Tsyglicou
— DeVries
— Scott Ericson - outside of (PK) - friend of (KJ) - baseball player
— ₣₴ KD delivered PPM
SFR
— Nolan
— Moureau
— Murray
—

Bates# 13336 = (KJ) ORSA - Mexican comp held Leases

(KJ) only other profits out of after intial member drive or
property sale

Bates 13379 —

Ⓕ

Bates 13339 -

(KJ) = Promisory Notes  w/ Baja Mngmt - $2.75M

↓ $ Came in summer + fall of 2002

dates = Securities attny retained in Sept 02 -
of ?? — dealt w/ PPM then PD PPMs
PPM ?

Bates 13341 = (KJ) never raised $70M in dive

- Mngmt Fee's - (KJ)
                (BN)

Expenses:
- Suzanne J. - never compensated for
- (PK) - consult fee's + expenso     ABL  SFR
     - $14K per month = initially = 4-5 mos.
Stopped salary → then paid expenses + other salary if brought
based upon                              (in investors)
lack of funds
in company

Bates 13349
- Mngmt Compensation
  (KJ) - never made $150K contribution to comp

- $2.75M = from investors / initial
  - $110K (KJ) contributed from this $

(7)

12/1/03   DDM Club = PPM

(KJ) - not equity in DDM - just part of Club

≡ right to lot + villa

— Founding Member
(KJ) - carry project forward

— would go to (PK) → to potential founding members

— there is a dividend / pmt - outlined in PPM   } not share in DDM profits

provided   (KJ)   Joseph Essa      } 3 relatives        } $30k each
PPM                Cindy Essa      }                    }
to                 Joe Thompkinson } Friends            ↓
in 03-04           Suzanne Desmond }                    into DDM acct

— (PK) brought in 3 others

'03-'04 - airstrip SFR                    $210k total

$210k      to operating expenses of DDM
total

Bates #13899

4th paragraph —
(KJ) never hit #'s to be given certificate

⑧

Bates #13913

(KJ) - $210k collected from Funding members
— Used for expenses for DDM

= (KJ) - wasn't Trust set up initially - not sure (KJ)

= Founder Member Offering
↓
(KJ) never closed

Break - 12 PM

Start 1:10 PM

asked (KJ) to
(JF) - attny - advice - for 1PM
(KJ) - was my idea to go to attny for 1PM

(KJ) - regularly consulted w/ attny

Nirjam - attny also. - (KJ) consulted w/ (BN) also

(BN) - went w/ (KJ) attny's also

⑨

≡ Promissory Notes - (KJ) executed shortly after funds
were rec'd

Carl Essa - 2/11/04 (KJ) for investment made around that
time = late '03 - early '04
(KJ) - don't know why separate subscription agreement

(KJ) Baja Management - each investor signed offering+
subscription agreement
(KJ) - doesn't know whis idea it was

(KJ) - provided MM to one player ⟹ Erickson
- 2 relatives - Essa's
- 2 friends.

≡ Byron Defoe ≈ $ in late 2002 - $ to BD Corp
- (KJ) doesn't think his writing on front page
(KJ) - yes signature on back page

Dmitri Kristich ≈ August 2002 - rec'd $

Jason Allison ≈ late 2002 - funds rec'd
- Agreement signed in 4/03
-

⑩

Joe Juneau ≈ Sept. '02 - funds rec'd
        Agreement = 3/03

Jason Wooley ≈
        Note
        Agreement

Owen Nolan
        Note
        Agreement

Bank Accts

- 2002 - First Union & Wachovia - (KJ) personal accts

- now Capital One + TD Bank Nwth
        ⅃ last 3 yrs opened

This is a lie (**See R33 rebuttal 003**) with Jowdy laundering funds with Najam's help to create the illusion of a $100,000 Jowdy investment...

- DDM - $ from (EJ)

- '02 - (KJ) - $ used as downpayment from investor $

personal - rent + car - $ used from BD Corp acct
        - not part of DDM

(KJ) - if I wasn't allowed to use $ then it was a problem                    (11)

- (KJ) - thought I could use $

- Moye + Barbara Wicks -
   - pmts to them for

- negotiated deal w/ (MW) + (BW) = to give up home + lease in Rosario

- bought them a house in Alabama

(KJ) $200k salary took from beginning
      only to $1500 over 3 pmts - 02-03

            DDM → BM → (KJ)

$ | B Develp. = $100k Salary for 2 yrs = 03-04

   $ from - $ from (PE) loans

02-06 - $ used from BD        ⟲ Little Isle IV
        to pay personal exp.   ⟲ Ula Makika

- (KJ) - not using $ now to pay personal expenses

- → 06 - salary from DCSL

⟲ booked as loans from BD

8/02 | $250k from Q Khristich → BD → Eufora → Eufora
      1 yr later - $ came back from 2 → other hats/players for
                                                            Eufora

Another Jowdy lie based on the fact the 2007 Baja Management taxes show Khristich with a full $500,000 capital account -- *See R33 rebuttal 025...*

- Khristich was never repaid for the $.02 Azzolc $ that went to Eufora

- (KJ) - believed Eufora part of a developer project

- TLJ Management - (KJ) owns
    - CA corp
formed for = lease house in CSL + airplane - falcon 10

- $ came from BD - that came from (PK) and/or its entities ←

More acknowledged loaned funds from Kenner (cash and wires personally) and Hawaii LLCs

- Defoe
  Allison  } were (PK) clients @ time of investment
             but no longer

Little Isle IV = Lehman financed = Masood Bhatti
                                   = brought in a developer-goi...

2006  - (PK) gave  5% of 50% To (KJ) + (BN)
         → N Alahu Venture

Jowdy admits to the FBI that he took money from Hawaii as loans -- despite his contrarian defense positions in Mexico and AZ cases (2008-09) -- now with the FBI aware of the frauds on the courts...

= Little Isle $ to DDM
  (KJ) - Little Isle is (PK) company
  (KJ)  DDM needed $
       $ is treated as loan or converted to equity ←
         → Never converted to equity

TLJ Mgmt
Arizona case ✓
Mexico case ✓

⑬

*Jowdy paid to dissuade from testifying in Federal Case v. Roger Clemens -- See Baja Development Corp (Jowdy) August 2006 bank records et.al.*

— Brian McNamee — he's a trainer
— 1999 = (KJ) - met thrush Roger Clemens

≡ has not had contact since 2007

— worked out w/ (BM)
— brought to CSL - several times - up 2007
      ⌐ 2003 - 2007
— @ time use (BM) to put together fitness program

— paying (BM) - 25k /month
         — to train & work w/ (KJ)'s relative = Ed Essa
                  — #

Money from PK (personally) and players

DDM— owed BD over $2M ← from players $/(PK)
   ≡ # to BD → time paid to DDM vs paid expenses DDM - so payable to BD
(KJ) - Hedging of Promissory Notes ≡ to        DD 6 investors → BM PPM
         = Baja Management (owns 92% of DDM)      $2,75M
Met Mindy McCready through Roger Clemens

   $25k ←          Jowdy STOLE DDM funds to pay off Roger
                   Clemens mistress before she died

≡ Roger Clemens ask (KJ) to write check — possibly
                                                      to make
                                                      a record
≡ rec'd $ back from (RC) in pmts

Since the 2015 conviction -- Galioto has used every opportunity to tell the Kenner investors that Kenner has NO MONEY in any investment -- despite the Jowdy confessions (within) and the millions documented in the numerous bank records for Hawaii, Mexico, all renovation projects, "Grocery list loans", Gaarn loans, Kaiser loans, etcetera -- creating fully slanderous prejudice from all remaining supporters -- culminating in the Jowdy settlement discussions -- with no faith in the real Kenner documented truths...

≡ Adrienne Moore
         DCSL
2006-   (KJ) met her out w/ (RC) @ a bar - Vegas
2007

(14)

(AM) = wanted a job

= (KJ) - had her fill out application

= left company after Lehman Bankruptcy

= (KJ) - paid through DCSL acct
& also (KJ) paid weekly/monthly from personal
acct for her expenses.

KSI Capital - hard $ lender
loan for DDM - 2006 =
$3M total
$215K holdback

- used $ for expenses on DDM project = $38k to $41k
monthly

- $ from Legacy Properties
pmts for KSI interest; security/guard

Jowdy, Najam and Essa looted over $800k of the loan funds personally and drained the entire loan amount within 2 months -- UNKNOWN to ALL of the investors

(15)

— (KJ) - did fly people down to CSL
  - wives
  - friends
  -

— Shawn Hughes would bring friends ≡ 6-8 friends

(C) Shown e-mail - 1/24/05
  - Palm Springs - Bob Hope Tournament
    - did not pay them; (KJ) may be strippers
    pay - maybe flight = use Credit Card
              (KJ) - not sure where it came from to pay
                  for flights

— e-mail ≡ 1/26/05
  - not sure

— email =
    "quality" ≡ (KJ): fun, outgoing, girls

    - just paid for flights; stayed @ house in CSL

[boxed:] (KJ) - doesn't know of anyone paying for Sex

Bates # 1976 - 79
  (KJ) - doesn't recall exact email
  - Players Clubs
    - (KJ) doesn't know how set up

(16)

— @ time of CSL closing

(PK) - Mossure w/ Hawaii

Bates  19674-75

— don't know what (PK) talking about ✓

— (PK) needs to make pmts ←

Jowdy lies to the FBI after previously disclosing to the FBI (above) that the money from Hawaii and Kenner were loans (*see R33 rebuttal 008*)

(KJ) - not involved w/ player c/o/c

//

Bates # 19714

Bates # 19672

email ≡ 1-2dy after lunch w/ (MB) — in NYC

asked (PK) to break down $

Bates # 19663

— (KJ) - did send $ out

— (KJ) - thought (PK) put $ already for Peca, so this $ was back to (PK)

(17)

≠ Peca was investing in DCSL LLC
    no 11M provided

2005 — (Pk) puts $ up  ⎱ 50%
        (KJ) does work ⎰  ↓  split
                          50%

4/2005 — 10% dwnpmt due
         (Pk) didn't have $

5/05 = $ started coming in
       $ coming from (Pk)

9/05 — $ from players coming in — doesn't know what was
                                   said between (PE) & players
       (KJ) thinks $ coming in from loan from (Pk)

$ treated as loan in beginng ; then changed to
   equity

Bates # 19621
  — 10 days before closing — (Pk) had already given
                                          breakdowns to
         19607 ⟶                              (KJ)

                                              ⑱

Bates 19607 - "double up option"
   — We already had $ in

Bates 19578

   — trying to get an idea of players % for
      operating Agreements

Bates #19348

   — talking about house in Vegas

Bates 19297

   — $ from J. Stumpel
   —

Bates #198499

— talking about Ruby scam
— Rodney Dalton — from England ——→ KJ met in London
                                              once
                              ←—— KJ 2nd time met in D.C.
← 2004  Todd Burkhart — (PK) — met in MN
        (PK) — lent $200k - $215k —
           — Burkhart said waiting for $3M from an investment
             →investment w/ Rodney Dalton

   — KJ told this by PK
   — used $ from PPP SFR Little Isle

(19)

- (PK) - said $1/M from Little Isle

(PK) told (EJ) - profits from investment had to go to an outside U.S. development = which would be DDM
→ help investment out w/ profits

(KJ) - don't know what - "start a clean record"

- (KJ) - didn't sign anything

Bates - 18456

- $ from Jere Lehtinen
  - $ for CSL

- "0% risk"
  - (EJ) - thought (PK) was near closing in Hawaii
  - thought (PK) believed it - no s
- (EJ) never spoken to Jere Lehtinen
- (EJ) never told (PK) that there was risk associated; nor had anyone else from (EJ) company

Bates - 19534

(KJ) if everything fell through w/ CSL then have to sell El Rosario

(KJ) don't recall letter
(KS) - I would not have prepared it

19506

How could this be true -- since as history revealed Jowdy's $3mm KSI loan in Feb 2006 that Najam and he looted and then left for foreclosure -- with ZERO loss to Jowdy and Najam since they had diverted millions from 2002 thru 2006 already...

(20)

Bates 19506
- for Operating Agreements
- not for financials

Bates 198547

- doesn't recall email
- (EP) got docs to (PK) for D Air

Bates 19561

(PK) - Operating Agreements
(EP) that's all we have

Tim Gearn - friend of (PK)
(KJ) Met once

oct/08 - went w/ (PK) to inspect (EJ) books
- doesn't know if accountant or in finance industry
- in NJ
                              BD (all
- (KJ) did wire $25k to Tim Gearn
                        ↓           Pintrod to Kevin
(KJ) doesn't know what for              ↳ Lehman                ㉑

- Mount Zion ⟶ Joseph Gata
  - hard $ lender - (PK) talked to
- (PK) engaged Hawaii deal
  - paid $ Commitment fee
  - also talked about DDM

= Mark Peterson
In pictures from (RB)
3 Palms
  marketing firm

= Lannie Donlon - w/ (PK) friends w/ Krystie Myric in MA -
  (RB) hired her for (PK) as assistant - both on payroll for 1 Vegas

Nick James - worked w/ (PK)   - pending lawsuit
  ← falling out w/ (PK)              in CA

- (PK) suing (NJ)
  Counter sue

Gov't aware of "Nick" lawsuit when they falsely claimed "Kick Nick in the balls was Nick Privitello on the day of the Nick James deposition...

Hermosa Beach CA
= d. w/ Some house - sold for $8.5M
  Wells Fargo - loan

= Something like $4M profit - fraudulent(?)

Jowdy and Harvey spread this false claim in 2008 to all Kenner investors -- and others in the sports industry -- to disrupt the cohesive efforts versus Jowdy..

22

(1) $IBM used for:   2002 - 2004
                              2006 - & still owed KSI loan
                                              - paid

☐ airstrip
☐ land
☐ Engineering
☐ studies
☐ hydrology
☐ roadway systems
☐ water
☐ electric
☐ design gdf course
☐ marketing
☐ sales
☐ some salaries
☐
☐ no gdf courses on IDM

4:30PM
END

(23)

Revolving line of Credit Loans
12-7-2004

Pursuant to the verbal agreement of July 9, 2004 to secure a revolving Line of Credit for Kenneth Aboud Jowdy to use at his sole discretion, this Revolving Line of Credit will be executed by all related parties _December 7_, 2004.

For VALUE RECEIVED, the undersigned, Kenneth Aboud Jowdy, individual ("Borrower") promises to pay to the order of Philip A. Kenner ("Kenner"), individual and Little Isle IV, LLC a Delaware LLC ("LI4"), ("Lenders"), and any other related individual or entity involved in the future by Kenner to facilitate the ongoing Revolving Line of Credit to Borrower. Lenders have a principle place of business located at 10705 East Cactus Road, Scottsdale, AZ 85259 or at such other place that the Lenders hereof may from time to time designate in writing. Borrower promises to pay Lenders, the aggregate unpaid principle balance of each advance made by Lenders to Borrower hereunder at an interest thereon at the rate of fifteen percent (15%) per annum. Subject to the other terms and conditions hereof, Borrower may borrow, repay and reborrow hereunder until the principle balance and all interest sums payable hereunder are paid in full as follows in lawful money of the United States of America. Lenders have no obligation to refinance or extend the terms of this agreement with Borrower.

1) The note shall mature and the entire principle balance hereof is due upon completion of any transaction whereas Borrower facilitates funding for the Real Estate Development known as Diamante Del Mar ("DDM") located in El Rosario, Baja Mexico, of which the Borrower is the Managing Member. The note will be due in full including interest if the Borrower on behalf of DDM receives benefit equal to or in excess of the total outstanding loan amount including interest due from proceeds of the loan thru the funding date to Lenders.

2) In the event Borrower fails to pay the entire principle indebtedness evidenced by this Note, or any portion thereof as described by events described above in paragraph 1, the note may be demanded for full payment including all accrued interest.

3) In the event the total funding amount for DDM is not sufficient to cover the outstanding funds due to the Lenders, at least 50% of the funds raised will be paid towards the outstanding Principle balance and the interest on the Revolving Line of Credit will continue to accrue until the entire note, principle plus full interest are paid to the Lenders.

4) The note shall mature and the entire principle balance hereof is due upon completion of any transaction whereas Borrower facilitates funding for the Real Estate Development known as Diamante Cabo San Lucas ("DCSL") located in Cabo San Lucas, Baja Mexico, of which the Borrower is expected to be the Managing Member. The funding for DCSL is expected to occur per the Borrower on or before December 31, 2005. The note will be due in full including interest if the Borrower on behalf of DCSL receives benefit equal to or in excess of the total outstanding loan amount including interest due from proceeds of the loan thru the funding date to Lenders.

5) In the event Borrower fails to pay the entire principle indebtedness evidenced by this Note, or any portion thereof as described by events described above in paragraph 4, the note may be demanded for full payment including all accrued interest.

6) Borrower pledges his individual interest in DDM, DCSL and any related entity controlled by Borrower as additional consideration for the loan presented by Lenders.

Borrower agrees that:

    a) Borrower will pay all costs and expenses of collection of this Note if the note matures and is unpaid within 30 days of maturity upon demand by Lenders.

    b) The entire principle balance of the Note shall bear interest after maturity at the standard interest rate on the entire unpaid balance as described above until paid in full.

Borrower may pay this Note at any time, in whole or in part, without penalty or premium.

Failure of the Lenders hereunder to exercise any option hereunder shall not constitute a waiver of the right to exercise the same in the event of any subsequent default or in the event of continuance of an existing default for strict performance hereof.

Borrower waves any exemption rights affecting full collection of this Note, and waives presentment, diligence, notice of dishonor and protest.

This Note shall be governed by the State of Arizona.

Witness:

Borrower:

Kenneth Aboud Jowdy, individual

By:

LENDERS:

Philip A. Kenner, Little Isle IV, LLC a Delaware LLC

By:

Philip A. Kenner, Individual

By:

Philip A. Kenner, Managing Member, Little Isle IV, LLC a Delaware LLC

Dated: 7 - Dec - 2004

# Exhibit 1

1

**NOT FOR PUBLICATION**

2

3

4

5

6          IN THE UNITED STATES DISTRICT COURT

7          FOR THE DISTRICT OF ARIZONA

8

9  Little Isle IV, LLC, et al.,          )    No. CV09-0142-PHX-SRB
                                         )
10            Plaintiffs,                 )    **ORDER**
                                         )
11  vs.                                   )
                                         )
12                                        )
   Kenneth A. Jowdy,                      )
13                                        )
              Defendant.                  )
14                                        )

15  ─────────────────────────────

16

17        Plaintiffs filed their complaint in state court on October 29, 2008.  Among the

18  allegations in the complaint were that the Plaintiff Philip Kenner was a resident of the State

19  of Arizona and that the corporate defendants were Delaware corporations authorized to do

20  business in Arizona.  After Defendant waived service of process in late December 2008, he

21  filed a Notice of Removal to this Court claiming diversity jurisdiction pursuant to 28 U.S.C.

22  § 1332 because he is a citizen of Nevada and the amount in controversy exceeds $75,000.00.

23  Defendant also filed a Motion to Dismiss.

24        The first of several unusual events then occurred.  When Plaintiffs responded to the

25  Motion to Dismiss they attached a document purporting to be a promissory note which, as

26  the Court noted in its order granting the Motion to Dismiss, had terms inconsistent with the

27  terms alleged in the Complaint for the alleged loans that were the subject of the suit.

28  Defendant alleged that the note was a forgery and sought expedited discovery concerning the

1    document. The Court granted the motion for this limited discovery. Plaintiffs also attempted
2    to save their complaint from dismissal by improperly alleging numerous additional facts in
3    their response to the Motion to Dismiss. Plaintiffs also claimed that they did not have
4    possession of the original note asserting that Defendant was the holder of the original note.

5         The second unusual event occurred when Plaintiffs filed their First Amended
6    Complaint on May 22, 2009. In the Amended Complaint, Plaintiffs alleged for the first time
7    that Plaintiff Kenner was a citizen, not of Arizona, but of Nevada. Plaintiffs also filed a
8    Motion for Remand to state court arguing that the original complaint did not identify
9    Kenner's citizenship and Defendant, in his original Notice of Removal, wrongly assumed
10   that Kenner's state of residency and state of citizenship were the same. Also asserted as a
11   basis for remand was that Defendant did not meet his burden of establishing that the
12   members of the corporate Plaintiffs, as listed in Plaintiffs' Corporate Disclosure Statement,
13   were citizens of states other than Nevada. Plaintiff ignores the fact that Defendant could not
14   have made that allegation at the time of the removal because Plaintiffs did not file their
15   corporate disclosure statement as required. On January 26, 2009, a Notice of Deficiency was
16   issued to the corporate plaintiffs advising them of the requirement to file a Corporate
17   Disclosure Statement. They were given 15 days to file it. No Corporate Disclosure Statement
18   was filed. The Court then issued an Order to Show Cause on March 31, 2009, advising
19   Plaintiffs that if they failed to file their Corporate Disclosure Statement within 10 business
20   days that sanctions would be imposed. It was only after this Court Order threatening
21   sanctions that the Corporate Disclosure Statement was filed. Shortly thereafter Defendant
22   amended his Notice of Removal to allege the diversity of the members of each corporate
23   defendant.

24        Because of Plaintiff Kenner's new assertion that he was a citizen of Nevada rather
25   than of Arizona a question arose concerning this Court's subject matter jurisdiction. In
26   response to the Motion for Remand, Defendant challenged the assertion that Kenner was a
27   Nevada citizen and accused Kenner of making this false claim solely to defeat diversity
28   jurisdiction. Defendant requested discovery from Plaintiffs about Kenner's citizenship.

1        On July 15, 2009, the Court granted Defendant's request for discovery on the

2   jurisdictional question arising from Kenner's claim of Nevada citizenship. The Court

3   included in its order that jurisdictional discovery could include a request for production of

4   documents of Plaintiff Kenner, Kenner's deposition and the depositions of Tracy Kenner and

5   Rebekah Baumgardner.  Defendant was ordered to advise the Court in writing concerning

6   the completion of the jurisdictional discovery so that the Court could determine whether an

7   evidentiary hearing was needed and when it could rule on the Motion to Remand. Defendant

8   promptly attempted to complete the authorized discovery.

9        On October 16, 2009, Defendant filed a Status Report concerning jurisdictional

10  discovery advising the Court that jurisdictional discovery was not yet complete because

11  Kenner had refused to provide a date for the rescheduling of his deposition and had refused

12  to respond to Defendant's inquiries regarding deficiencies in his responses to the Request for

13  Production of Documents.   Around the same time Plaintiffs' counsel sought leave to

14  withdraw.   In the report to the Court, Defendant advised that Kenner's deposition was

15  originally scheduled for June 15, 2009. On the morning of the deposition Plaintiffs' counsel

16  advised Defendant that Kenner was out of town and would not be attending. Kenner failed to

17  provide any alternate dates for his deposition. It was then noticed by Defendant for July 14,

18  2009.

19       Kenner appeared on July 14, 2009, but left before the deposition could be completed

20  claiming he needed to catch a flight. As of October 16, 2009, Kenner had not provided any

21  date to complete his deposition. Defendant re-noticed Kenner's deposition for December 4,

22  2009 at which time Kenner appeared.

23       Plaintiffs' counsel's Motion to Withdraw was granted on October 23, 2009.  On

24  November 3, 2009, the Court issued an order advising Plaintiffs that there was a pending

25  Motion to Remand filed May 22, 2009 and that the Court had entered an order permitting

26  limited discovery that Defendant could take in connection with that motion. The order

27  summarized the difficulties in completing discovery outlined in the October 16, 2009 report.

28  The Court also noted that Plaintiffs were presently without counsel and advised Plaintiffs that

1  Philip Kenner could represent himself but the corporate plaintiffs would be required to be
2  represented by counsel. The Court ordered that Little Isle IV and Ula Makika, LLC's claims
3  would be dismissed if counsel did not make an appearance on their behalf within 30 days of
4  November 2, 2009. The Court also ordered Kenner to advise the Court in writing within 30
5  days of November 2, 2009, whether he intended to proceed with his case *pro se* and to
6  respond to the allegations made about his failure to make himself available for deposition.
7  Kenner was advised that the case[1] would be dismissed without further notice if Kenner failed
8  to comply with the Court's order.

9      While a Notice of Appearance was filed by a lawyer on behalf of Philip Kenner, Little
10  Isle IV and Ula Makika on December 3, 2009, no written response to the Court's order was
11  ever filed. On December 15, 2009, the Court dismissed the case in accordance with its
12  November 2, 2009 order for Plaintiffs' failure to comply with that order. Approximately four
13  weeks later, and only after Defendant had noticed the lodging of a form of judgment,
14  Plaintiffs filed the pending motion entitled "Plaintiffs' Motion for New Trial and/or to
15  Alter/Vacate Order Dated December 16, 2009." This Court's December 16, 2009 order was
16  noticed electronically to Plaintiffs' counsel on December 16, 2009 at 10:53 a.m.

17      Plaintiffs' new counsel argues that the Court should vacate its order of dismissal
18  because Plaintiffs obtained new counsel who filed an appearance within the time specified in
19  the Court's November 2, 2009 order and because Plaintiff Kenner appeared for the
20  continuance of his deposition on December 4, 2009. Counsel then attempts to convince the
21  Court that he acted diligently, by initiating discovery, by noticing Defendant's deposition and
22  by serving a first request for production of documents. Apparently Plaintiffs' counsel has not
23  reviewed the file in this case to note that discovery, except for the limited discovery
24  previously authorized by the Court on the citizenship of Kenner and on the alleged forged
25  note, is not yet authorized to proceed. Plaintiffs' counsel argues that because he has done

26  _____

27      [1]Kenner is the managing member of both corporate plaintiffs and the sole member of
    Ula Makika, LLC. Kenner's failures to cooperate with discovery and comply with court
28  orders therefore are also failures of the companies he controls.

1   more to prosecute Plaintiffs' case within the two weeks prior to the Court's order of dismissal

2   than Plaintiffs' prior attorneys did that dismissal would result in manifest injustice. It is not

3   clear to this Court that Plaintiffs' counsel has any idea that Plaintiffs have challenged this

4   Court's jurisdiction. Counsel also attaches a deposition of over 400 pages taken of Defendant

5   in an unrelated case arguing that if the Court were to review this deposition it would find that

6   Defendant has taken a different position with respect to the money at issue in this case in that

7   unrelated case and that this testimony somehow warrant's reversal of the Court's order of

8   dismissal. The Court has not reviewed the 400 pages deposition and finds it irrelevant to the

9   pending motion.

10          In response to Plaintiffs' motion, Defendant raises numerous unanswered questions.

11   For example, Plaintiffs' motion states that it is brought under Rule 59 allegedly because Rule

12   59 is the only Rule that would permit this motion to be timely. Rule 59 motions can be filed

13   28 days after the entry of the order or judgment from which a new trial is sought. Defendant

14   argues that Plaintiffs' motion is one for reconsideration. A Motion for Reconsideration must

15   be filed 14 days after the order from which reconsideration is sought. Citing the standards for

16   a Motion for Reconsideration, Defendant argues that Plaintiffs have not shown that the

17   Court's order dismissing the action amounted to a clear error of law because the five factors

18   justifying dismissal weigh in Defendant's favor. Defendant's response also notes the

19   unexplained failure of Plaintiff to file any timely Motion for Reconsideration despite receipt

20   of the Court's order until after Defendant lodged a proposed form of judgment 20 days after

21   the order of dismissal was entered. Defendant's response also remarks on the failure of

22   Plaintiffs' motion to address the additional six day delay between the notice of the lodging

23   of the proposed form of judgment and the filing of Plaintiffs' motion.

24          Despite the fact that Plaintiffs' motion still fails to explain Kenner's past failures to

25   appear at his deposition and comply with document requests, and despite the new and

26   disturbing assertion about Plaintiff's failure to attend his June 15, 2009 deposition Plaintiffs

27   failed to file a reply. The explanation given by Plaintiffs' attorney in a June 15, 2009 e-mail

28   was, "Mr. Kenner is traveling and missed his flight to Phoenix last night and will not be able

- 5 -

1  to appear for his deposition scheduled this morning." Defendant provides evidence that this

2  assertion was false and that Kenner had intentionally travel to Mexico where he gave sworn

3  testimony on June 15 in support of a criminal complaint against Defendant. Robert Gaudet,

4  the witness on the alleged forgery was to be deposed on June 16, 2009.  Instead he

5  accompanied Kenner to Mexico and gave sworn testimony on June 16 cancelling his

6  deposition by Defendant.  Plaintiff has provided no response to these allegations either in a

7  reply or in response to the Court's November 3 order.

8       Plaintiffs brought this lawsuit 17 months ago.  Four months after removal Kenner

9  suddenly realized that he was not a citizen of Arizona but of Nevada and moved to remand.

10  This case has been pending in this Court for over one year and the jurisdictional issue has not

11  been resolved because of Plaintiffs' obstruction of discovery.  Moreover, despite the

12  suspicious facts and circumstances that have been continuously raised by Defendant with

13  respect to this case Plaintiffs have failed to respond.  Even with counsel now presently

14  representing Plaintiffs, the motion filed to set aside the December order contains no

15  explanation as required in this Court's November 2, 2009 order only counsel's assertion that,

16  "Mr. Kenner never meant to fail to comply with this Court's order dated November 2, 2009,

17  and believed that by retaining new counsel and appearing for his deposition as scheduled, he

18  would be in compliance with this Court's order of November 2, 2009." This explanation is

19  not credible. The Court has been told of an alleged forgery and a false claim of Nevada

20  citizenship.  The Court ordered expedited discovery many months ago and Plaintiffs have

21  delayed and obstructed it.  In the light of the assertions in Defendant's response, this Court

22  draws the inference that no reply has been filed and no excuse has been offered for Plaintiffs'

23  delay and failures to comply with discovery because the facts asserted surrounding the

24  cancellation of the deposition are true. Plaintiffs' failures to respond also lend credence to the

25  claims of forgery and false claim to Nevada citizenship.

26       The Court finds that no Rule 59 motion can appropriately be filed from this Court's

27  December 16, 2009 order because Rule 59(a)(1) states that the ground for new trial are to be

28  asserted after a jury trial or a non-jury trial. Altering or amending a judgment under Rule

- 6 -

1    59(e) is not the same as vacating a judgment.  Plaintiffs' motion is either an untimely Motion

2    for Reconsideration or a Rule 60 Motion for Relief From Judgment or Order.  In either case,

3    Plaintiffs have not satisfied the requirements for relief under either Rule 60 or LRCiv 7.2(g).

4          For the reasons outlined in Defendant's Response in Opposition to Plaintiffs' Motion,

5    which have not been controverted either legally or factually in a reply,

6          IT IS ORDERED denying Plaintiffs' Motion for New Trial and/or to Alter/Vacate

7    Order Dated December 16, 2009.  (Doc. 88).

8          IT IS FURTHER ORDERED overruling the objections to the proposed form of

9    judgment and ordering that the proposed form of judgment (doc. 87) be entered by the Clerk.

10

11          DATED this 12th day of March, 2010.

12

13

14

15                                    _____
                                      Susan R. Bolton
16                                    United States District Judge

17

Two weeks later -- Jowdy **_confessed_** to all of the loans in his 2-day
California deposition -- contradicting every underlying reason for the
"**_expedited discovery_**" -- and then one year later (Dec 2010), admitted
the actual loan document (*claimed as a forgery in the AZ case*) as
authentic in his Nevada trial defense as the key evidence to support his
defense theory (**_which he lost resoundingly_**)...

22

23

24

25

26

27

28

                                    - 7 -

03/17/2010  11:55    1-212-683-6550         HARVEY&HACKETT                    PAGE  14

## AGREEMENT

AGREEMENT, dated as of March    , 2003, among BAJA DEVELOPMENT CORPORATION, a Delaware corporation ("Developer"), BAJA MANAGEMENT, LLC, a New York limited liability company (the "Managing Member"), each of which has its principal offices at 2 Dogwood Drive, Danbury, Connecticut 06811 and the person whose name and address are set forth at the end of this Agreement ("Lender").

### WITNESSETH:

WHEREAS, an affiliate of Developer, LOR Management, S.A. de C.V., a Mexican corporation, has acquired the rights to a leasehold interest in and an option to purchase approximately 8,000 acres of undeveloped land, including nearly three miles of direct ocean frontage on the Pacific Ocean, in El Rosario, Baja California, Mexico (the "Property");

WHEREAS, the Managing Member has organized Diamante del Mar, LLC, a Delaware limited liability company (the "Company");

WHEREAS, the Company plans to develop a portion of the Property into *Diamante del Mar*, an exclusive, private golf community and resort with as many as three golf courses, tennis courts and other recreational facilities, a golf club, fitness center, spa, lodge with apartments, recreational lake, marina and residential villas (the "Resort");

WHEREAS, the Managing Member has prepared an Offering Memorandum for use in raising $7,500,000 to $10,000,000 to finance the pre-development activities of the Managing Member's current development plan for the Resort (the "Offering"), and has provided a copy of such Offering Memorandum to Lender;

WHEREAS, Developer has required funds to finance certain land acquisition costs, consultant studies, tests, preliminary golf course designs and master site plan expenses prior to the first closing of the Offering referred to above, as well as to fund certain other projects of the Developer;

WHEREAS, Lender has loaned $500,000 to Developer to finance a portion of such expenses (the "Loan"), and Lender wishes to participate in the development of the Resort and the Property on the terms and conditions set forth below; and

WHEREAS, Developer has executed and delivered to Lender a five-year promissory note payable to the order of Lender in the principal amount of the Loan, bearing interest at the rate of 3.75% per annum, with principal and interest payable in full on maturity (the "Note", a copy of which is attached to this Agreement);

NOW, THEREFORE, the parties agree as follows:

NEWYORK.4185363

13088

1.      At the Managing Member's request, Lender shall assign the Note to, and contribute the Note to the capital of, the Managing Member in consideration of Lender's admission to the Managing Member as a Class A member and the issuance to Lender of a Class A membership interest in the Managing Member. The Lender's initial capital account in the Managing Member shall be equal to the principal amount of the Note. The Lender shall thereupon execute the Operating Agreement of the Managing Member (the "Operating Agreement"). The Managing Member will then assign the Note to, and contribute the Note to the capital of, the Company.

2.      If the development of the Resort is successful, it is expected that the Company will make cash distributions from time to time to its members, including the Managing Member. The Managing Member, in turn, will distribute any such cash received from the Company, net of expenses and reasonable reserves for expenses, to its members, including Lender, as provided in the Operating Agreement.

3.      On the fifth anniversary date of the Note, Developer shall pay to Lender an amount equal to the original principal amount of the Note, plus all accrued interest thereon, less the amount of all cash distributions made to Lender by the Managing Member prior to such date and the amount of any interest paid by the Company on account of any Private Residence Club Certificate or Home Site Certificate distributed to Lender by the Managing Member. Developer shall not be obligated to make any payments with respect to the Note prior to such fifth anniversary.

4.      This Agreement sets forth the entire understanding of the parties with respect to its subject matter and merges and supersedes all prior agreement, instruments and understandings (including any prior promissory notes) of the parties with respect to its subject matter. No provision of this Agreement may be waived or modified, in whole or in part, except by a writing signed by each of the parties. Failure of any party to enforce any provision of this Agreement shall not be construed as a waiver of its rights under such or any other provision. No waiver of any provision of this Agreement in any instance shall be deemed to be a waiver of the same or any other provision in any other instance.

NEWYORK.4185363

5.       This Agreement shall in all respects be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and fully to be performed in such state, without giving effect to conflicts of law principles.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

BAJA DEVELOPMENT CORPORATION

By _____
        Kenneth A. Jowdy, President

BAJA MANAGEMENT COMPANY, LLC

By _____
        Kenneth A. Jowdy, President

Lender:

_____
                Signature

_Dimitri Khristich_
                Print Name

_____
                Address

_____

NEWYORK.418536.3