Day5.txt
17          MR. RICHARDS:  John Kaiser.

18

19                    JOHN KAISER,

20   having been first duly sworn, was examined and testified as

21   follows:

22

23                  DIRECT EXAMINATION

24   BY MR. RICHARDS:

25       Q.   Can you tell the panel what your background and

920

1   training in law enforcement is?

2       A.   I was a New York City police officer for

3   approximately six years, and I went to Suffolk County, who

4   I retired from, Suffolk County Police Department in New

5   York.  I was a defensive tactics instructor, trained

6   throughout the country and world.

7            I specialized in narcotics and taking guns,

8   working both.  I also did some community orientation of

9   police enforcement out in Suffolk County.

10       Q.   Are you presently the manager of any LLC in the

11   state of Hawaii?

12       A.   Yes.

13       Q.   What's that?

14       A.   Na'Alehu Ventures.

15       Q.   Are you familiar with the properties that were

16   subject to the Lehman Brothers financing that are issued in

17   this litigation?

18       A.   Yes, I am.

19       Q.   And are you aware that the Nolans are investors

20   in Little Isle IV, which is part of a group of LLCs that

21   owns 50 percent of a joint venture with Windwalker, the

Page 80

Day5.txt

22    Nolans and Alan Wordan?

23        A.    Yes, I have.

24        Q.    Have you spoken to the Nolans on the phone

25    before?

921

1        A.    Yes.

2        Q.    What was that conversation about?

3        A.    I had a couple of conversations.  We also

4    talked -- they were trying to build a house, so I was

5    trying to help him out.  I don't think we ever met.  They

6    were very nice -- they were very nice people.

7              The last conversation I had was in reference to

8    the house, if they needed help on it or any kind of -- they

9    were trying to get a house built.

10        Q.    Now, with respect to cash, the entities that made

11    up your investor pool with Little Isle IV, did they have

12    some cash that was sitting around waiting for a potential

13    closing to occur?

14        A.    Yes.

15        Q.    Tell us what your experience was with respect to

16    that money right at the point there was a decision made to

17    start loaning money to Mr. -- that Mr. Kenner had made a

18    decision to start loaning some of that investor money to

19    Mr. Jowdy.

20        A.    Any money that was allocated towards land for the

21    Hawaiian Investment Group that wasn't being used -- we

22    ended up ultimately purchasing about 6,000 acres.  There

23    were some parcels we were looking at.

24              The due diligence in Hawaii takes a long time, so

25    if you find something, it takes a long time to actually do

922

Day5.txt

```
1   all the due diligence to purchase it.  So if we had some
2   funds that were -- that was stagnant and that warrant
3   purchasing land, we would utilize it for a loan, so we
4   actually made some money off of it.
```

5        Q.   Just so the panel doesn't get confused, I'm
6   talking -- I want to direct your attention prior to April
7   26th, 2006.  Were you a manager prior to that time?
8        A.   No, I was not.
9        Q.   At that time were you an investor?
10        A.   Yes.
11        Q.   How much of your own money did you have invested
12   in this Hawaii project?
13        A.   1.1 million.
14        Q.   Dollars?
15        A.   Dollars.
16        Q.   Did Mr. Kenner make you aware that he was going
17   to be lending some money?

18        ARBITRATOR CAMPBELL:  Can you just clarify for me
19   when he went from an investor to being an actual manager of
20   the property again?
21        Q.   BY MR. RICHARDS:  August of 2006 -- after the
22   Lehman Brothers -- after the Lehman Brothers refinancing
23   did you become a manager?
24        A.   It wasn't right away.  I actually thought it was
25   in '07.  I don't have --

923

1        Q.   '07?
2        A.   I don't have the document in front of me.
3        MR. RICHARDS:  Prior to '07 he was an investor
4   only.

Page 82

Day5.txt

5           THE WITNESS:  I'm actually the person who found

6    the property in 2002 and who funded it prior to Mr. Kenner.

7          Q.   BY MR. RICHARDS:  Okay.  And at some point you

8    were made aware as an investor that this money was going to

9    be lent on a short-term basis to Mr. Jowdy?

10         A.   Yes.

11         Q.   And what was your understanding of how it was

12   supposed to get paid back?

13         A.   Well, the first -- my first concern was to make

14   sure that he had some collateral so it could get paid back,

15   which he did.  It was a parcel in Mexico, on North Baja,

16   and that was his collateral.  I think he had 70 percent

17   interest, and I think the property was appraised maybe at

18   30-, 35 million.

19         Q.   Was Mr. Jowdy at that time someone that appeared

20   credible to you?

21         A.   Yes.

22         Q.   Why is that?

23         A.   Well, the first thing, Mr. Kenner told me he was,

24   and I met him a couple of times.  He seemed -- a big thing

25   it was 15 percent interest rate, and I thought it was a

924

1    good move.

2          Q.   Did Mr. Jowdy have anything to do with bringing

3    Lehman Brothers to your Hawaii project?

4          A.   Yes.

5               ARBITRATOR MEYERSON:  I'm a little confused.  I

6    understood the warrants were made before 2006.  He didn't

7    become the manager until 2007 --

8               MR. RICHARDS:  You're right.

9               ARBITRATOR MEYERSON:  And so was his status at

Page 83

Day5.txt

10   the time simply an investor?

11        MR. RICHARDS:  Yes.  That's why I'm offering him

12   as a witness.  That's correct.

13        ARBITRATOR MEYERSON:  I thought you were offering

14   him as some special knowledge about --

15        MR. RICHARDS:  He found the property.  He had a

16   lot of knowledge, but I wanted to show you that he became a

17   manager later, but at the time --

18        ARBITRATOR MEYERSON:  He was an investor in the

19   same status as the other investors at the time of these

20   transactions?

21        MR. RICHARDS:  $1.1 million.

22        ARBITRATOR MEYERSON:  I understand.

23        Q.   BY MR. RICHARDS:  So in your investor pool, your

24   money was with all the other investor money, correct?

25        A.   Correct.

925

1        Q.   So at the time was there any representation about

2   getting paid back this money when the Cabo deal closed?

3        A.   It was supposed to be a short-term loan.  I

4   thought it was three to six months, because I had also

5   raised some other funds from family and friends that were

6   getting a little antsy about it.

7        Q.   Go ahead.

8        A.   That's it.

9        Q.   Now, you retired from the police due to a medical

10   reason?

11        A.   Yes.

12        Q.   An injury on the job?

13        A.   Injuries, yes.

14        Q.   You'd been dealing with Mr. Kenner now for a

Page 84

Day5.txt

15   couple of years?

16        A.   Yes.

17        Q.   Have you ever seen him do anything inappropriate?

18        A.   No.

19        Q.   As a police officer you have no problem arresting

20   Mr. Kenner if you saw him stealing your money basically?

21        A.   I certainly would.

22        Q.   And you have never been convicted of any offense,

23   correct?

24        A.   No.  No.

25        Q.   You are also an expert in martial arts?

926

1        A.   Correct.

2        Q.   And you have $1.1 million of your money in this

3   deal?

4        A.   Correct.

5        Q.   Did anybody at the time anticipate that Mr. Jowdy

6   wasn't going to pay you guys back when the Cabo deal

7   closed?

8        A.   Say that again.

9        Q.   At the time this money was lent to Mr. Jowdy to

10   be spent in the Mexican project, did anybody anticipate he

11   wasn't going to pay you back when the Cabo deal closed, the

12   Lehman's Cabo deal?

13        A.   No.  Otherwise I wouldn't have lent it.  I

14   wouldn't want to go down that route.

15        Q.   Did Mr. Jowdy -- as far as the credibility issue,

16   why did you feel it was credible that he was bring -- why

17   did it give Jowdy credibility that he bought Lehman to

18   Hawaii?

19        A.   He had a very good relationship with, I believe

Page 85

Day5.txt

20    his name is Masood, who actually he was the lead guy for

21    Lehman, and they were very close.

22         Q.   Did Mr. Jowdy appear to be someone that was

23    credible and had assets or someone that was broke and a

24    thief?

25         A.   No.  He had assets.  I believe he was very

                                                              927


1     credible at the time.

2          Q.   As you're aware he hasn't paid the money back,

3     right?

4          A.   Correct.

5          Q.   Do you blame Mr. Kenner for him not paying the

6     money back?

7          A.   No.

8          Q.   When you made the decision -- or when you were

9     made aware that some of this money was going to be lent,

10    rather than sitting idle in an account, at 15 percent, did

11    you know there were some risks?

12         A.   At the 15 percent -- actually, the loans, I

13    didn't think they were going to be -- to me it wasn't a

14    risky loan.

15            Now, some of the land purchases were a risk.  It

16    was a few miles away from a volcano.  It was a tough sale.

17    But the loans -- even investors that I brought in, I said,

18    Listen.  This guy -- I gave him the whole story about Ken

19    Jowdy backed by land.  It's good.  Better than your money

20    sitting somewhere.

21         Q.   And being in the course of the years you've been

22    over in Hawaii dealing with this, have you met a lot of

23    investors of Mr. Kenner?

24         A.   Yes.

Day5.txt

25        Q.   Has this ever been a secret that Mr. Kenner lent

928

1    this money to Mr. Jowdy?

2        A.   No.

3        Q.   Was this a transaction that, as your view as an

4    investor was open and disclosed to everybody?

5        A.   It was open.  There was no secret handshakes or

6    nothing like that.

7        Q.   Even now, sitting here in May of 2009, is there

8    anything that you've uncovered, as someone that obviously

9    knows how to investigate, that Mr. Kenner has done anything

10   inappropriate throughout these transactions?

11       A.   No.

12       Q.   Not one complaint?

13       A.   None.

14            MR. RICHARDS:  I'll pass the witness.

15            ARBITRATOR MEYERSON:  Thank you.

16

17                      CROSS-EXAMINATION

18   BY MR. MEEKS:

19       Q.   Mr. Kaiser, how are you?

20       A.   I'm hanging in there.

21       Q.   Good.  In 2000 -- at some point did Mr. Kenner

22   transfer --

23            MR. RICHARDS:  Mr. Kaiser, just face the court

24   because they have to hear you.

25       Q.   BY MR. MEEKS:  At some point did Mr. Kenner

929

1    transfer like 90 percent of his interest in the Na'alehu

2    entity to you?

Page 87