February 7, 2019

The Honorable Judge Bianco
U.S. District Court – EDNY
100 Federal Plaza
Central Islip, NY 11722

**<u>Re: REPLY To Government Money Judgment (ECF No. 799)</u>**

Your Honor,

Kenner received less than $280,000 as 'proceeds' under any calculation method in
the instant case.   It has been repeatedly documented with the government's
evidence multiple previous times.   It is again, *infra*, for the Court's convenience.
Constantine's calculation affirms approximately $2.8 million in 'proceeds' received
by him.   *Nothing else was received – certainly not "ill-gotten"*.   Before proper
analysis of the actual funds, *infra*, and *Honeycutt* application to bifurcate the liability
issues, those are the top end calculations.

The government's forfeiture money judgment numbers and analysis continue to be
devoid of the reality in the case, while avoiding their requirements to "trace the
money" to "ill-gotten gains", the baseline test for government forfeiture.   Their
ongoing mis-representations to the Court cannot be based on ignorance of the law
that an autodidact has grasped, but only explainable as malice for a defendant who
is exercising his rights under the Constitution; challenging their prosecutorial
theories as devoid of empirical evidence and calculations bereft of factual basis,
while depriving him and the Court by ethically refusing to provide the necessary
back-up evidence to their conclusions. They have specifically chosen to "move the
goalposts" again by including dozens of investors who tersely objected to the
government's pre-trial theories and refused to participate with the prosecution.
Instead, the government avoids statute and Second Circuit case law by "tracing the
money" to the individuals <u>*not*</u> in <u>*their*</u> superseding indictment (*ECF No. 214*),
ignoring mandatory "gains" language, all to grossly inflate their numbers eons
outside of reality; *See Hughey*.[1]

---

[1] Since the Supreme Court decided *Hughey* almost thirty years ago, prosecutorial decisions
to frame indictments with a "view to success at trial rather than to a victim's interest in full
compensation" are made with a full understanding of the potential consequences; See
*Hughey v. United States*, 495 U.S. 411, 421 (1990).   The Tenth Circuit opined, "**There are
tradeoffs in such decisions**"; *United States v. Mendenhall*, Case No. 19-7006 (10th Circuit
December 23, 2019).

1

As such, Kenner is requesting the Court schedule a hearing to determine what facts the government is basing their foundationless forfeiture money judgment amounts on (and to support it with case law and statute), if the Court is considering any of their outlandish assumptions as reality for individuals not named, by choice, in their 2015 superseding indictment.   Although the Court has allowed them to structure and re-structure their totals on multiple occasions (after repeatedly not following the Court's instructions), it is the defendant's belief that while absent any real forfeiture money judgment (following the law and Second Circuit precedent)[2], the government has chosen a "torch the earth" approach to their numbers, inflating them so grossly (without back-up) while praying that the Court will proceed with their false calculations, just based on the inherent belief that they are "*above reproach*" and are proceeding on behalf of justice for the system, and not malevolence for the defendant's decision to expose each and every witness lie and government misstep since his ProSe admission in the case.

*By Choice -- The Government Chose Not To Trace Funds Pretrial…*
Without tracing funds pretrial to support their prosecutorial theories and to the alleged victims (ignoring any future forfeiture, restitution, and guideline calculation dilemmas), the government proceeded to trial and is now stuck with their facts and their resulting nominal values.

One -- The government is frustrated that Kenner did not actually steal any of the money they proudly espoused during various summation lies (*Tr.5996, 5711, 5722-23, 5744-45, 5990, 5991-92, 5707-5709*) (*ECF No. 788 at 10-11*); the same money that the FBI case agent told the Pecas and any other investor "*Kenner stole to buy his equity in Cabo san Lucas*" (ironically echoing the Jowdy defense rants and public denials (*ECF No. 611-1 at 2, 7 [f.4], and 29*).   John Kaiser confirmed the oddly-aligned Jowdy-FBI mis-representations about Kenner years after the trial in his shocking February 2019 admission-letter to this Court (*ECF No. 628 at 1*), verifying:

---

[2] In the entire instant case totals, Kenner received less than $280,000, all from the Eufora private stock sale 'proceeds' thru loan repayments from Constantine ($117,000) and Tim Gaarn ($162,500), an innocent third party to the instant case; *See Contorinis*, *infra*. Constantine has acknowledge, in the same light, that he received approximately $2,800,000 from "objects" in the instant case, but approximately $2 million of the funds do not originate from any alleged superseding indictment victim (identical to the Gonchar deposits for the GSF); thus, the government's 11-year investigation and prosecution should result in no more than a $280,000 forfeiture money judgment for Kenner (and the similar application of fundamental accounting and tracking for Constantine).  The government prosecuted their case by choice and must be held to their facts and circumstances.

*"Jowdy would like the court to think that Kenner stole $7 million from the hockey players and others…"*

And -- (*ECF No. 784 at 2*), Kristen Peca's trial testimony fabrication about a 2009 default letter for her husband's LOC she admitted on a 2012 FBI call with Kenner she knew nothing about…**in 2012** – debunked her entire testimony at trial and opening Pandora's Box of how and from whom the fabrication story originated (*Tr.709*).

- The identical misleading storylines to the investors cannot be coincidence between FBI case agents mis-leading statements about "*Kenner stealing the Hawaii money for himself*" and Jowdy's continued defiance of the truths that Kenner documented for this Court (*ECF No. 667*); unchallengeable and substantiated by the government's own evidence (See Kristen Peca 2012 FBI confessions regarding Kenner stealing the Jowdy loan funds per Galioto, *infra*).

And – both the government and Constantine's counsel continue to extend the false belief that any investors' LOC funds were surreptitiously transferred from their Northern Trust LOC accounts to the Hawaii project 'without their inherent knowledge'.   These comments defy the reality of:

(1) The five-plus-years of 2003-2009 banking records (including dozens of one-page, individually signed affirmations: [3]

(a) <u>*Granting*</u> 'authorization' to access their LOC funds for the Little Isle 4 project (*Peca example: Ex.T1a [but identical available for all LOC investors]*),

(b) <u>*Verifying*</u> the specific purpose of 'investment in Little Isle 4, speculative real estate' (*Peca example: Ex.T1b*), and

(c) <u>*Verifying*</u> the 'annual use of funds' from the LOC (*Peca example: Ex.T1c [conflicting with Peca's "no knowledge" testimony [Tr.429-30] -- 4 years after his unambiguous Grand Jury verifications [Ex.1b at 30-33, 35, 40, 42, and 45]*]);

---

[3] See *Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A.*, 461 Fed. Appx. 61; 2012 U.S. App. LEXIS 3012

- In *Horvath*, **the investor argued that the terms and conditions were <u>written in Portuguese</u>, which he did not understand, but the court of appeals found that the investor was charged with knowing and understanding the contents of the documents that he signed**.

  The Court opined "If the signer can read the instrument, not to have read it is gross negligence; if he cannot read it, not to procure it to be read is equally negligent; in either case the writing binds him.  Parties are bound by documents expressly incorporated by reference into agreements to which they manifest their assent."

- <u>*All of the critical signed documents are one-page signature documents*</u> -- thus nothing was concealed.   All of the documents were entered into evidence as *Kenner trial exhibit 210*, arriving after week 7 of the trial (because the government strategically objected to the pretrial subpoena over a month before trial), when they already had possession of the Northern Trust documents. Michael Peca's 2009 texts confirmed this to Kenner – *ECF No. 788 at 36*), raising significant *Gil* issues[4];

Michael Peca confirmed a FBI-Northern Trust subpoena in 2009, as follows to Kenner after Peca requested copies of the records for himself and Kenner via notarized document in August 2009 (*Bates stamp: PK_SEC_005395*):



The government requested a second subpoena to the Northern Trust accounts approximately two months later, further harassing Kenner's clients – and Michael Peca alerted Kenner (again):



---

[4] *United States v. Gil*, 297 F.3d 93 (2d Cir 2002) ("the government wrongfully suppressed evidence favorable to the defendant [that was] exculpatory and impeaching information, seriously undermining confidence in [the] guilty verdict, and <u>was not disclosed timely enough for it to be useful to defendant</u>.   The production of the documents on the eve of trial did not provide defendant the opportunity to <u>read it</u>, <u>identify its usefulness</u>, and <u>use it</u>.").

The Court opined, "To the extent that a prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation, grounded in the 14th Amendment, to disclose that evidence to the defendant.  Information coming within the scope of this principle includes not only evidence that it is exculpatory, i.e. going to the heart of the defendant's guilt or innocence, <u>but also evidence that is useful for impeachment</u>, i.e. having the potential to alter the jury's assessment of the credibility of a <u>significant</u> prosecution witness."   *Leka v. Portuondo*, 257 F.3d 89, 98 (2d Cir 2001) (alterations in original) (quoting *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir 1998)).

In *Gil*, a guilty verdict was vacated and remanded for "late discovery" of exculpatory information that "*was not disclosed timely enough for it to be useful to defendant*".   In *Gil*, *supra*, the Court was disturbed that "*the production of the [exculpatory] document on the eve of trial did not provide defendant the opportunity to <u>read it</u>, <u>identify its usefulness</u>, and <u>use it</u>*".

4



- Kenner attempted to acquire the Northern Trust documents to apply to a proper defense strategy thru pre-trial subpoena requests, but was _denied_ before trial -- and then _delayed_ by a knowledgeable government opposition to the truths that would destroy their witnesses' planned _faulty memory, confusion and mistakes_ testimony; and

(2) Multiple direct phone calls with Northern Trust Bank employees and their LOC clients were mandatory, verifying the March-April 2009 decision to seize collateral (in lieu of ongoing payments personally, like Nolan chose in April 2009)[5]; and

(3) Each investor made multiple independent calls with Northern Trust bankers -- and signed multiple transfer documents with the post-seizure collateral balances to terminate their banking relationship with Northern Trust (_ECF No. xxx at xxx_); and

(4) Each investor received two (2) default letters in February 2009 and March 2009 directly from Northern Trust Banker Aaron Mascarella – who verified he mailed them to the addresses of record during trial (_Tr.898_):

> _Q After these letters were sent out, February 9, 2009, the letters indicating you are about to go into default, what if any communication did you or anyone at Northern Trust receive from any one of these account holders with reference to that notice of default letter?_
>
> _A [Mascarella]: **No notice from any one of those letters** –_

---

[5] Michael Peca confirms he independently spoke with Northern Trust bank the day of the collateral seizure and never questions the "use of funds":

| | | | | |
|---|---|---|---|---|
| 7 4 1 5 | +171637432 34 Michael Peca* | 4/1/2009 10:38:15 PM(UTC+0) | S e n t | _[Kenner]: A NOrthern trust person will Call you to confirm your transfer to Schwab._ Please acknowledge. |
| 6 3 2 5 | +171637432 34 Michael Peca* | 4/1/2009 10:44:43 PM(UTC+0) | R e a d | _[Peca]: Got it. Call already done. Was this the plan b/c it makes sense to pay the line off or b/c the the loan defaulted? Honestly_ |

- How can it be explained that any person – *who allegedly had their use of funds concealed from them* – received a default letter substantiating they were losing their collateral for funds they were allegedly 'unaware of' and (1) never called the bank, or (2) sent Kenner a message, or (3) even discussed the issue with independent counsel, who they were all represented by thru their NHL contracts?   It is unexplainable -- because they all knew – and signed off on the LOCs and its respective usages for 5 years-plus;
  - Specifically Owen Nolan who admitted to **CTE** and cannot remember anything in his business past related to his LOC despite direct communication with Kenner (*ECF No. 736 at 6-13*) -- and his Northern Trust Banker, Aaron Mascarella (*Ex.F at 2-3*).
- Berard actually exchanged text communication directly with Kenner about his remaining balance <u>*5 days prior*</u> to his collateral seizure after receiving the default letter in the mail (or a phone call from Kenner), thus never concealed:

| | | | | |
|---|---|---|---|---|
| 620 7 | +140152 46929 Bryan Berard* | **3/26/2009** 6:53:59 PM(UTC+0) | R e a d | **[Berard]: When u get chance can we look at** <u>***how much money will b freed up after payn off line of credit NT***</u>**??? Thanks** |
| 728 0 | +140152 46929 Bryan Berard* | **3/26/2009** **7:00:51** **PM(UTC+0)** | S e n t | **[Kenner]: ~300k** |
| 620 8 | +140152 46929 Bryan Berard* | **3/26/2009** 7:04:18 PM(UTC+0) | R e a d | **[Berard]: Cool thanks!!! <u>When will that b freed Gonna use 200 for a cool oppurtunity will show u and talk 2 u abt it later. Good for all of us n future.</u>** |

- Berard did not ask "what collateral seizure?" for "what use of funds?"; and
- Berard did not find out about his loss of collateral from a Northern Trust Bank phone call after he returned from Russia months later (*lying to the Court at Tr.3039-40*).
  - Nor would that be realistic considering Berard testified less than two (2) months after the April 1, 2009 seizure date for Kenner in the *Nolan* arbitration, <u>*verifying his complete and unfettered knowledge of the use of funds and the loans to Jowdy*</u> (*Ex.E*).
- Only Berard's self-admitted **CTE** (*ECF No. 782*) (and his Jowdy employment status) could have created the *faulty memory, confusion and mistakes (ECF No. 440 at 16)*.   Please note that Berard's 2018 podcast admissions verify <u>*he believes*</u> he lost as much as $6 million from this alleged *forged* line of credit,

with clear knowledge, *supra*, *and a total LOC of $650,000*.   His confabulation, recreating his own reality, is a documented side effect of his **CTE**.

The Court must note that *the government has not produced* a single document on the record, which represents any *unknown* LOC activity, but as much as 12 years after the initiation of most of the LOCs (in 2003-04), the government contends that individuals were unaware thru criminal intent.

The individual 'use of funds knowledge' is coupled with the 'Jowdy loan verifications', as follows in:

    (1) The Peca (*Ex.1b*), Stevenson (*Ex.1c*), and Sydor (*Ex.1d*) Grand Jury confirmations in 2011;

    (2) The Kaiser (*Ex.O*) and Berard (*Ex.E*) 2009 arbitration confirmations;

    (3) The 19 plaintiffs who sued Jowdy for the funds in 2008-09 in Arizona (*Ex.T1, Ex.T2, Ex.T3, Ex.T4*) (including *all the alleged superseding indictment victims* except Nolan who previously settled with Jowdy after discovering Jowdy actually stole his money, not Kenner);

    (4) The 19 plaintiffs who sued Jowdy for the funds in 2009-10 in California[6] (including *all the alleged superseding indictment victims* except Nolan who previously settled with Jowdy after discovering Jowdy actually stole his money, not Kenner)…

- In addition -- *Multiple* Hawaii-Mexico investors signed affidavits in the 2009 arbitration (1) confirming the "loans" -- and (2) their expectations that their LOC funds could and would be used to satisfy corporate expenses including paying other line of credit fees (and they were turned over to the FBI by the individuals pretrial – (*Ex.1m*) *3500-MN-2 [Norstrom]* and (*Ex.1n*) *3500-SG-4 [Gonchar], as example*).   The affidavits verified:

  "*I was aware that my funds would be used to make distributions for the company, including but not limited to: …loans to outside entities [Jowdy entities] and distributions to other members that would satisfy their monthly line of credit payments to Northern Trust Bank*"

---

[6] The two (2) California lawsuits claimed:

    *"Mr. Najam was in charge of the corporate governance and while under Jowdy's direction and control, received over eight million dollars ($8,000,000) from a LLC in Hawaii.  Mr. Najam failed to properly account for those funds and has placed the Jowdy investors in a vulnerable and compromised position."*

"*Phil Kenner has always disclosed the complete and detailed use of these funds to me from time to time and per my every request.*"

Two -- The government is frustrated with their facts that the Eufora stock actually belonged to Tim Gaarn and *not* Kenner despite their misleading claims to the investors on the witness stand that "*Kenner was selling his stock*" (*GX-210*) (*Tr.5970, 5973-74*).

And Three -- The government is disappointed that *Kenner never had control* over the GSF funds (*Tr.3805-16, testimony of attorney Ronald Richards*) and that *only* Constantine overspent Gonchar's original $250,000 contribution on 5-5-2009 (*GX-767*) by $17,077 (*ECF No. 501 at 60*) – in spite of presenting over a week and a half of trial testimony thru approximately 13 witnesses only to verify transactions that Gonchar's approved funds actually paid for.

The government was 100% aware of the *Gonchar-Constantine deal* pretrial and proceeded anyhow.   The Court should note that although its-own calculation discounted Gonchar allowing Constantine to utilize his additional $1,250,000 GSF deposit in the same vane as his original $250,000 (thus covering everything and anything Constantine spent money on thru the GSF), even the government *concedes* that Gonchar's $1,250,000 cannot be included in their GSF totals (as Gonchar testified it belonged to his deal with Constantine – *Tr.4826-27*); leaving that enigma unresolved.

During the July 2, 2019 hearing, Judge Bianco denied any *Fatico* hearing, while verifying that he was only considering charged conduct in his calculations – while restating the government's previous statements -- and other rulings (*Tr.33*):

> *[Judge Bianco]: "I just want to make clear that I think I've said this before, but it is in the court's view and its consistent with the government's letter to the court, you know, two years ago that we're not – that the government is not seeking to hold the defendants accountable for any uncharged frauds.   The scope of sentencing relates only to the frauds that were proved at trial..."*

In nearly identical forfeiture circumstances, the Seventh Circuit Court of Appeals denied the government's misplaced reliance on *Contorinis* (2nd Circuit) in *United States v. Burns*, 843 F.3d at 690-91 (7th Cir 2016), relying on the fact that any funds still had to be deemed "ill-gotten proceeds" to satisfy a defendant's forfeiture.   The same analysis is relevant here.   The Court defined "proceeds" in 18 U.S.C. § 981(a)(2)(A) or (B), as:

8

"Under either section, the defendant must forfeit 'proceeds'; the difference in the subsections is in how 'proceeds' is defined.  Put simply, 'proceeds' may mean either 'receipts' (in subsection (A)) or 'profits' (in subsection (B))."

Kenner effectively received neither, other than a negligible amount, *discussed infra*.  Nevertheless, the government has reduced their $36 million money judgment demands to $17 million, still lacking 100% substance under the statute and precedent case law of "ill-gotten proceeds".

The Second Circuit *Shkreli* Court opined July 18, 2019: "Criminal forfeiture focuses on the disgorgement by a defendant **of his ill-gotten gains**."  Citing *United States v. Contorinis*, 692 F.3d at 146 (internal quotation marks omitted); And *United States v. Torres*, 703 F.3d 194, 203 (2nd Cir 2012) ("'[F]orfeiture is gain based **not based on the losses (or gains) to victims**." (internal quotation marks omitted)); *Shkreli at 6-7.*

In *Burns*, the government sought $3.3 million that was received by a third party (to Burns' alleged frauds) and were never 'proceeds' in his control; identical to virtually every dollar sought by the government in the instant case.   The *Burns* Appellate Court hi-lighted under preexisting case law that "the government has not cited, any decision standing for the proposition that a defendant may be required to forfeit funds never acquired by him or someone working in concert with him."  *Contorinis*, 692 F.3d at 147.   The Court concluded that the government's position, in contradiction to statute, caused an "error affect[ing] Burns's substantial rights because he was ordered to pay more than he gained from his fraud " citing "[f]orfeiture is based on the theory that a defendant should not profit from his illegal activity, and thus, forfeiture orders reflect the defendant's gain as opposed to the victims' loss." *United States v. Webber*, 536 F.3d 584, 603 (7th Cir 2008); *United States v. Genova*, 333 F.3d 750, 761 (7th Cir 2003).

### *Kenner Received/Obtained Less Than $280,000 Of Any Proceeds From Alleged Superseding Indictment Victims…*

Kenner exposed the fact that he received *less than $280,000* of total funds from the schemes the government alleged taking over a decade to carry out.  Kenner has proven that the $280,000 he received was solely as a result of "loan repayments" (from Constantine and Gaarn) that are traceable to individuals in the superseding indictment, they were vetted by the investors' own investigative group without issue of embezzlement or any inappropriate transactions (led by Rudy Giuliani's team – *Ex.B*); and *nothing more* despite the government's never-ending *ipse dixit*.

_The $280,000 is the basis for forfeiture_ by "separating a defendant from his ill-gotten gains".   Instead, the government has reverted back to the same foundationless lies the FBI case agent began telling the Kenner investors in 2011.   Agent Galioto claimed (along with the help of John Kaiser and Bryan Berard once they were employed by Ken Jowdy in 2011), "_Kenner stole everything and never transferred money to anyone, at anytime_".[7]  Relying on their claims of total and unabated fraud about "everything", the government asserts they have a basis for "ill-gotten" gains thru forfeiture and money judgment forfeiture, as if every deal Kenner's investors were involved in were straight theft &/or Ponzi schemes.   **_Neither is true, nor has it ever been_**.

- Kristen Peca's 2012 FBI recording confessions (footnote, _infra_) raise two bifurcated issues for the government.   **One** – how did Kristen Peca know about the 'loan' without a problem in 2012 (if it was concealed), re-confirming her husband's 2011 SDNY Grand Jury testimony of approving it and excepting his entire LOC contribution of $1,775,000 to go to Jowdy (_Ex.1b at 31_) – **BUT, two** – she was concerned that "Kenner stole" the Jowdy-loan funds that she and her husband were aware and expected to go to Ken Jowdy, as part of the Hawaii loan Michael Peca verified to the 2011 SDNY Grand Jury (at least until FBI agent Galioto lied to them _after_ Michael Peca 2011 Grand Jury appearance and _before_ the 2012 FBI phone recording)?
  - As a result, the government actually got Peca to fabricate testimony about 'Kenner buying his Cabo equity with Hawaii funds', which if really asked of Constantine in 2010 as Peca testified, it would have been shot down as a fraud instantly and the source would have been confronted immediately, not ignored (since _government-forfeiture-44_ and

---

[7] Kristen Peca's 2012 FBI recording of Kenner -- over a year after Michael Peca explained to the 2011 SDNY Grand Jury that _he was aware_ of all the Jowdy loan money and was part of the "_group decision_" to authorize the funds to their business partner, Ken Jowdy (_Ex.1b -- 3500-MP-5 at 30-33, 35, 40, 42, and 45_):

> _Kristen Peca_ **–** _Matt [Galioto] told Michael and I that you stole all of the Hawai'i money and never gave it – the loan money -- to...uhhhh...Jowdy._

> _Kenner_ **–** _Kristen – I have all of the bank records that prove the money went to Jowdy and his accounts at all times.  I told you that already. You told me that you saw the bank records after I sent them to Michael.  You know -- the attorneys who sued Jowdy for the money in Mexico and Arizona and California used them to confirm the loans before we sued?_

> _Kristen Peca_ **–** _but – I don't understand why he would say it._

*government-forfeiture-36* also verify the "nothing-burger" fraud perpetrated on Peca and others by Galioto) (*Tr.424*)[8].

- The attempted diversion from the truth is not a path the government can re-join what really occurred with cover-up stories starting with Jowdy's people (in 2007), FBI case agent Galioto (in 2009), and then re-coupled by Kaiser and Berard (in late 2011, once they were hired to protect Jowdy as co-conspirators, whether they were aware of their cooperation or not, by choice).

### *Constantine Received/Obtained Approximately $2,800,000 (but less than $1 million from alleged superseding indictment victims)…*

Constantine, thru counsel, has affirmed that *at most* he "obtained" $2.8 million from various payments (consulting agreements – and Urban Expansion payments from Lehman Brothers) and private equity stock sales (from Eufora).

The Court should note that approximately $2,000,000 of the funds Constantine 'acquired' emanated from the Hawaii project -- but are *not traceable to any victim in the superseding indictment*; thus not causing any harm (from authorized transactions under the controlling corporate agreements) (*Ex.M, Ex.J*).

- First, approximately $1 million from the consulting payments is from non-victims in the superseding indictment (*ECF No. 736 at 24-26*);
  - One of the Hawaii attorneys sent regular updates to the Hawaii-Mexico investors (*Ex.A*).  John Kaiser confirmed the "regular updates" to the FBI in 2010 (*Ex.1a -- 3500-JK-1-r at 3*), but with the trial symphony of "*did not read*" testimony from almost all of the investors, *examples infra*, how could the investors know about authorized elements of their Hawaii investment, let alone recall them over a decade after the real time events; *when they did not care about them in real time*.
  - As such in 2004-06 if investors never cared to "read anything", then **_none of the Hawaii investors would have known Constantine's name_**, John Kaiser's name, Chris Manfredi's name, or any of the other 16 hard money

---

[8] Peca unsolicited testimony re: Kenner using Hawaii funds to buy his Cabo equity (solely influenced by the Galioto lie Kristen Peca exposed in her 2012 FBI recording confession to Kenner):

*Q. Were there a number of lawsuits pending that you were aware of?*

*A [Michael Peca]: …In fact we had a mediation in California in 2010, the first time I meet him [Constantine] prior was before getting into a car going back to the airport, where I confronted him and said **did Phil use our money from Little Isle to buy the home equity [sic] in Cabo** with Ken Jowdy and I never got an answer.*

brokers or lenders.  That cannot rise to criminality based on their self-admitted negligence and resulting lack of knowledge.   The conviction cannot rely on updates they didn't care about; and just "*trusted Phil*" (*Tr.1955, 2572, 2719, 2799, 2861, 3042, 3158*).

- o Darryl Sydor testified in 2015 he was not aware who the Managing Member in Hawaii was, when it was Kenner (*Tr.2203-04*).  How could he recall any other party to the transaction; considering the first sentence of the July 2006 JV agreement Sydor signed acknowledges that Kenner was the Managing Member (*Ex.S, with Sydor signature at 18*)?

- o Furthermore, none of the investors could verify, even today, the Hawaii law firm that handled over $1 million of business for the Hawaii project, or the architects, archeologists, engineering firms, etcetera; and

- Second, approximately $1 million is from payments made by Lehman Brothers to the Urban Expansion payoff (which Constantine independently negotiated his percentages with his partner, Grdina).   The Lehman Brothers payment was negotiated directly between Lehman Brothers, Windwalker (the new JV partner), and Grdina/Constantine; **neither causing harm, proximate or otherwise to any alleged superseding indictment victim or any other person**.

  - o The Representations and Warranties section of the 1800-page joint venture agreement disclosed externally unrelated transactions that the various parties were already part of and not subject to restrictions imposed by the joint venture settlements (*Tr.4217-18*) (*Kenner trial exhibit 38, introduced at Tr.4513*).[9]

  - o Manfredi and Kaiser were sent the specific sections by Kenner over a month before the closing to verify the contents (*Ex.U3 at 3*) (*Bates stamp: ED-0003163*, acquired from Kaiser or Manfredi with the *ED-xxxxx* bates

---

[9] John Kaiser claimed he "*did not read the Lehman Brothers closing documents*" despite his allegations that Kenner had just defrauded him (*Tr.983*) (so he signed the deal blindly) (*Tr.1164*):

> *Q Incidentally, the closing documents in connection with the Lehman closing did contain various representations and warranties in the body of the closing documents themselves, is that true?*
>
> *A [John Kaiser]: I didn't read the Lehman closing documents.*
>
> *Q Did you have any interest, sir, before the closing, in knowing what representations and warranties were going to be made between the various business entities as relates to the closing?*
>
> *A [John Kaiser]: No. His attorney was working on it. Like I said, I did not read the Lehman closing docs related to Hawaii.*

stamp), but apparently Kaiser was not reading documents that controlled over $1 million of his friends & family funds.

*Centrum Funding And Payments From Lehman Brothers Never Affects Any Investors (in the superseding indictment or otherwise)...*

The Centrum loan funds (received by Constantine, Manfredi, Jowdy and others, *but never Kenner*) were wholly *authorized* by the signed operating agreement and loan agreement documents with Centrum (*GX-3703*).   The funds were authorized to be re-loaned or invested (*Ex.J at 1*) (*Ex.O at 2-3, 8*), thus *never* constituting a fraud (with or without victims).   The principles of the Centrum loan signed off on the documents (which Kenner specifically followed) *before* wiring the balance of the $3 million loan funds to the Hawai'i partners account.   Centrum was fully repaid at the Lehman Brothers closing thru un-related joint venture funds, *having no monetary effect on any superseding indictment individual, or anyone in the Hawaii project.*

- In fact, Kenner was the personal guarantor of the loan (identical to the Urban Expansion personal guarantee without benefit, only risk), protecting the other 30-plus Hawaii investors, while Kenner received *none* of the money.
- One of the Centrum principles (Berreth), who was fully repaid plus his negotiated profit by Lehman Brothers in 2006, *cannot* be the basis to allege some fraud just because his testimony *contradicts* the actual documents he and his partners *approved* and *signed* on behalf of the loan over a decade earlier, while represented by Hawaii real estate counsel at *Nakamoto, Okamoto, and Yamamoto* (a well-respected Hawaii real estate firm), engaging with the Hawai'i partners' attorneys at Carlsmith Ball LLP (the pre-emanate real estate law firm in Hawaii) (*Ex.U4 at 2, opinion letter verifying commercial and business use according to the Big Isle 5 operating agreement approved by Centrum lenders (Ex.J*).
  - **The Centrum transaction has no individuals as monetary victims** (in spite of Jowdy refusing to repay the funds to the Hawai'i partners loan – verified as received by Jowdy by the government during their forfeiture case submissions; see *government-forfeiture-44* and *government-forfeiture-36*).

*Kenner's Representations To The Court Under Forfeiture Statute...*

During forfeiture oral arguments, Kenner proffered to the Court that he "obtained" less than $280,000 from the documented loan repayments *after* Constantine ($117,000 – from Peca and Nash) -- and *after* former Eufora Board Member, Tim Gaarn ($162,500 – from Rucchin and Ranford) sold their documented stock (*GX-210 at 37*) to individuals in the superseding indictment.   The government has not met its burden that any other ill-gotten funds were "obtained" or "received" as "proceeds"

by Constantine or Kenner in the instant case from alleged superseding indictment victims.   These amounts, *as a maximum, supra*, can be applied to Constantine and Kenner in sum or individually (depending on the Court's application of *Honeycutt[10]*) for forfeiture money judgment; not more.

*Streamlined Superseding Indictment…*
The government specifically "streamlined" its superseding indictment on the eve of trial (4-22-2105) and announced it to the Court.   What the government did not explain to the Court was that their "streamlining" was a result of non-cooperation pretrial from dozens of investors who told the FBI and U.S. Attorneys personal that they knew the real truths and did not agree with the government's prosecutorial theories.   The government could not and did not take a chance that:

(1) Those investors would confirm what everyone knew about the Jowdy loans (*ECF No. 771*) and had confirmed pretrial by legal counsel for the parties (*Ex.A*) -- and the investors (*Ex.1b -- 3500-MP-5 at 30-33, 35, 40, 42, 45*) (*Ex.1c -- 3500-TS-1 at 17-18*), (*Ex.1d -- 3500-DS-2 at 19, 25-27*) (*Ex.E*) (*Ex.O at 2-8*); and

(2) They would face the reality that the investors had been fully informed by their independent counsel since 2007 that Jowdy refused to repay the loans (*Ex.T1, T2, T3, T4, T5, T6, etcetera; concealed by the government until post trial forfeiture production – i.e. Brady issues*); and

(3) That Jowdy's own California attorney confirmed in January 2010 that Jowdy <u>*received the Hawaii loans*</u>, with three Hawai'i partners present in addition to Kenner, and the 2-day deposition being live-streamed by investor, Jason Woolley (the <u>*same loans*</u> the government vilified Kenner for at trial, claiming he was lying about them and "*everything*" (*Tr.4598, 5064-65*) (*Ex.I2 at 42-43, f.35*)); and

(4) That the investors' own independent counsel had investigated the 2008-09 Eufora private stock sales (*Ex.B*)…

   •   Thus, they were forced to 'streamline' to salvage their case…

*Glen Murray Added As Victim Post-Trial Despite His Loan Verifications Et Al…*
The Court should note that even Glen Murray, a non-victim in the case, was attacked by AUSA Michiewicz on re-direct-examination for his 'memory' after confirming during cross-examination that <u>*he did recall*</u> the funds his LOC received from the August 2006 JV agreement (*Tr.3514-15*), bringing laughter to the courtroom after replying 'yeah, I thought I remembered that'.

---

[10] *Honeycutt v. United States*, ____ U.S. ____, 137 S. Ct. 1626, 198 L. Ed. 2d 73 (2017)

Nevertheless, on re-direct-examination, AUSA Michiewicz asked Murray where his documents were that supported his 'memory' to which Murray replied 'he wasn't aware he was supposed to bring paperwork with him' – raising more laughter in the courtroom.

Next, Murray verified his personal possession of the Hawaii-Jowdy loan agreement (*Tr.3608*) as received from one of the Hawaii attorneys (*Ex.A*).

Lastly, Murray verified his Jowdy loan knowledge from Hawaii, further verifying the 2011 Grand Jury "*group decision*" testimony (of Peca, Sydor, and Stevenson) and conflicting with the 2015 memory loss of Rucchin, Sydor (conflicting his own Grand Jury verification, *Ex.1d*), and Berard (conflicting his own 2009 arbitration testimony, *Ex.E*) (*Tr.3540*):

> *Q: My question is, sir, do you have an understanding, based upon conversations you have had with individuals, that as relates the Hawaii investment, the Hawaii project, <u>Ken Jowdy also, by virtue of a loan made to him for monies from the Hawaii project, has not paid that back?</u>*
>
> *A [Glen Murray]:* **Correct. No, he hasn't**.

*Non-Victims In The Superseding Indictment...*
This case is <u>not</u> similar to the *United States v. Shkreli, 2019 U.S. Appx. LEXIS 21248 (2nd Cir 2019)*, where the Second Circuit identified that *"false promises were routinely made [in writing]"* or *United States v. Kalish*, 626 F.3d 165, 168 (2d Cir. 2010) where voluminous fraudulent statements were made to investors "*by written instruments*" promising mortgages after paying "*advance fees*".   **It is exactly the opposite**.   Thus in *Shkreli*, including all of the private equity fund members in *Shkreli* as victims -- or in *Kalish,* including the thousands of mail fraud loan promises made by letter to the *Kalish* victims made sense in those cases.   In *Kalish* and *Shkreli*, the facts presented an unchallenged "pattern of lies" and deceptions to individuals the Court (1) heard from and (2) did not hear from.   <u>But</u> -- in the instant case, the dozens of individuals who were not present at trial (including Glen Murray and Sergei Gonchar[11] who were) have, at a minimum, opposed the government's prosecutorial theories during independent:

(1) Grand Jury testimony;

---

[11] The government specifically chose not to include over 20 individuals in their superseding indictment, actually removing them from previous indictments after being told by each investor pretrial that they were <u>*not victims*</u> of anyone but Jowdy for stealing their money.

(2) Civil trial testimony;
(3) Signed under oath affidavits (for civil cases);
(4) Signed legal disclosures with their independent attorneys;
(5) Signed the GSF disclosures for Constantine's use of funds; and
(6) Participated in five independent lawsuits versus Ken Jowdy to recover the loaned funds.

There are no statements on the record from any of the dozens of former Kenner clients, not named in the superseding indictment, that substantiate any misleading statements en masse, or individually.   The empirical evidence is exactly the opposite, thus avoided by the government (or concealed, a.k.a. Brady, like attorney Baker's Arizona disclosures, *Ex.T1*, etcetera).  The government is simply relying on a minor subset of individuals who routinely *could not recall* a single detail of their passive-equity investments, in addition to repeating the refrain that they "*did not read*" the critical documents they verified they actually received from Kenner and independent attorneys.

*Sergei Gonchar And Glen Murray Are <u>Not</u> In Superseding Indictment As Victims "By The Government's Choice"...*

- *The government listed them to bolster their forfeiture &/or guideline calculations (ECF No. 781 at 5), while specifically removing both of them from the superseding indictment after independent pretrial interviews; See Hughey, supra.*

Several individuals -- **not alleged as victims in the instant case** -- gave FBI proffers years before the trial, specifically including Sergei Gonchar, confirming they independently spoke with Jowdy and Kenner about the Hawaii loans to Jowdy before they occurred (*Ex.1e -- 3500-SG-2 at 8-9*):

"*SG [Gonchar] – PK told SG $ in Hawaii <u>will be loaned</u> to KJ [Jowdy]*".

The FBI notes denoted the *<u>future tense</u>* of Gonchar's 2010 recollection (5 years before trial) – and continued with:

"*SG heard from KJ that $ from Hawaii loaned to KJ*".

Gonchar's proffer is further corroborated by the "*updates*" to the entire Hawaii investment group (*Ex.A*) that John Kaiser verified to the FBI on October 19, 2010 (*Ex.1a -- 3500-JK-1-r at 3, infra*).

- Only willful blindness by a passive-equity investor or severe **CTE**[12] symptoms could erase their empirical knowledge, transparently delivered to them.   Five (5) years after the 2010 Gonchar proffer, the government cannot arbitrarily name Gonchar as a post-trial victim, when no legal strategy was required at trial (or ineffectively used by trial counsel) to debunk his "uncharged" victim status and unfettered knowledge at all times; like Michael Peca debunked himself during cross-examination (*Tr.498-99*) and Bryan Berard debunked himself during direct-examination (*Tr.3055*)[13], making both of them _non-victims_ of "what they verified they knew" about the Jowdy loans.

Independently, non-victim Glen Murray also filed a lawsuit in 2008 versus Jowdy in Nevada for an additional $791,000 Jowdy stole from him.   Thru independently hired counsel at Holland & Hart, LLP (in Nevada), Murray acknowledged that his Nevada loan was the second he participated in with Jowdy (*ECF No. 730, Ex.34 at 3*), _verifying the Hawaii loan as the first_ in his complaint versus Jowdy in September 2008; wholly known and verified independently.

It is also indisputable that the Little Isle 4 (Hawaii) By-Laws authorized the use of funds for the loans (*Ex.M*) -- and the investors were aware of them, in their own independent affirmations, like Peca, Berard, Murray, and Gonchar, *supra*.   Kaiser verified in his 2009 arbitration testimony, while he was the Hawaii partners' Managing Member – and wholly responsible to the investors since 2007 (*Ex.O*).

---

[12] Chronic Traumatic Encephalopathy or **CTE** is a catastrophic disease first associated with boxers long ago, results when a toxic protein, Tau, accumulates in the brain, kills brain cells, and leads to symptoms such as **cognitive dysfunction**, **memory loss**, sleeplessness, depression, diminished impulse control, episodes of anger, and **dementia**, among others. Until recently, **CTE** could only be confirmed through an autopsy. **Tau proteins are released whenever a concussion occurs**.

[13] At trial, Berard testified he knew about the Jowdy loans from Kenner.   _Kenner is the exact person he was supposed to hear it from_, further verifying his 2009 arbitration testimony (*Ex.E*).  Yet, Kenner was charged with concealing it?  Berard debunked his own victim status (*Tr.3055*):
> *Q: Did you have any firsthand knowledge about any of those -- about the money going from Hawaii to Mexico?*
> > *MR. HALEY: Objection. Just the leading -- I object. Without a speaking objection, I object.*
> > *THE COURT: Overruled. That one's okay. You can answer that.*
> **A [Berard]: I was only familiar with what Phil Kenner told me about some money that was going from Hawaii to Mexico.**

The government's desire to bolster their financial numbers for forfeiture money judgment or sentencing cannot be an acceptable reason to ignore the evidence – the statute – and the Second Circuit controlling case law; See *United States v. Contorinis*, 692, F.3d 136, 147 (2d Cir 2012), the Court "observed that neither the language of the criminal forfeiture statute nor Circuit case law supported the proposition that a defendant must forfeiture proceeds that 'go directly to an innocent third party and are never possessed by the defendant'"; *See also United States v. Torres*, 703 F.3d 194, 203 (2nd Cir 2012) ("'[F]orfeiture is gain based' not based on the losses (or gains) to victims." (internal quotation marks omitted)).

Under 18 U.S.C. § 982(a)(2), with 'proceeds' defined as 'ill-gotten funds', the district court must order forfeiture of any and all proceeds of the offense and any property derived from those proceeds.   The Second Circuit clearly agrees with this thru *Contorinis* and *Torres, supra*, while each case referred to the facts of *United States v. McGinty*, 610 F.3d 1242 (10th Cir 2010) to support their forfeiture findings. *McGinty*'s court explained that, "The government is entitled to a money judgment against McGinty for the money he 'obtained' from the criminal activity"; See *United States v. Candaleria-Silva*, 166 F.3d 19, 42 (1st Cir 1999) ("[T]he government is entitled to an *in personam* judgment against the defendant for the amount of money the defendant 'obtained' as proceeds of the offense.").   *McGinty*'s court continued that, "Forfeiture, in contrast [to restitution], is punitive; it seeks to disgorge any profits that the offender 'realized' from his illegal activity." (internal citations omitted).

- The government cannot argue with evidence that in the entire instant case, Kenner received no more than the $280,000 from Constantine and Gaarn's Eufora stock sales as repayments for previous documented loans Kenner advanced to them, respectively.   The government's misleading summation statements that "*Kenner stole*" all of the Hawaii money to buy his Cabo equity was and still is a lie.  That has never been resolved for the prejudice is formed in front of the jury.
- Even if Kenner plotted for a decade to recover the $280,000 in loans (a mere subset of the millions Constantine, Berard, Kaiser, Jowdy and others still owe Kenner from personal documented loans), it is not the "brazen" act of a hardened criminal that the government describes in their sentencing memo in order to harshly punish Kenner for not agreeing to their prosecutorial theories.

President John Adams said: *"Facts are a stubborn thing; and whatever may be our wishes, our inclinations, or our dictates of our passions, they cannot alter the state of facts and evidence…"*

Nevertheless…

*"the government is stuck with theirs…"*

*Full Knowledge Litigation Versus Jowdy…*
In fact, <u>*none*</u> of the other 22 Hawaii partners have a single "on the record" statement that they were unaware of the transactions in real time (absent the recently acquired 2015 "memory loss" of Sydor, Rucchin, Berard and Nolan).

The entire Rule 16 production by the government confirms that twenty-two (22) other Hawaii investors participated in eight (8) years of transparent litigation versus Jowdy <u>*before*</u> Kenner was abducted in November 2013.  Unexplainably if Kenner had in fact robbed the Hawaii and Mexico investors, the investors, *absent Kenner*, continued suing Jowdy in Delaware <u>*after*</u> Kenner's arrest for the **same loan thefts** and embezzlements in 2014; further substantiating the investors' knowledge that Jowdy had all of the Hawaii-loan money (*government-forfeiture-44*) that the government alleged Kenner was lying about throughout trial (*Tr.4598, 5064-65*).

The January 2017 Delaware litigation settlements concluded <u>*after*</u> the government's forfeiture disclosure in 2016 verified that Jowdy actually received all the money (*government-forfeiture-44*), <u>*never*</u> Kenner. Nevertheless, the government falsely blamed Kenner for stealing it at trial to secure their verdict (*Tr.5996, 5711, 5722-23, 5744-45, 5990, 5991-92, 5707-5709*) (*ECF No. 788 at 10-11*).  Now – they are attempting to increase Kenner's money judgment forfeiture for funds that the government knows Ken Jowdy received (an innocent third party, by their prosecutorial choice) and ignore precedent and case law.   The Delaware litigation versus Jowdy led to the 2017 settlement (*ECF No. 790, Ex A*) with him for <u>*all*</u> of the Hawaii-Mexico investors Jowdy defrauded since 2002, <u>*after*</u> Kenner led almost a decade of relentless litigation efforts in the USA and Mexico (at his near-life-ending risks).  It is not Kenner's fault that the government is too intimidated by Jowdy's legal counsel to pursue and indict he and his cabal with the available empirical evidence (*ECF No. 667*).

*CTE (admitted post-trial by the government's alleged victims – altering the foundation of voluminous trial testimony)…*
The eight (8) years of litigation (2006-2013) included the four (4) investors as Plaintiffs who were plagued by "*memory loss*" resulting from their self-admitted **CTE**; filing litigation versus the NHL for brain damage in 2014 (pretrial).   Those critical "memory loss" admissions were withheld from the defendants (specifically with Kenner restricted from any internet access and independent investigations).

The investors' self-admitted symptoms clearly affected their recollection abilities years after the actual events, perhaps defining their amnesia source (if not undue influence to "forget what they used to remember").   But – 6-years prior to filing litigation for _brain damage_, they each signed and initialed specific "Jowdy loan" disclosures for their independent attorney in Arizona, leaving their knowledge unchallengeable – in spite of their current memory:

> _Arizona Attorney Tom Baker's Jowdy-Loan Disclosures (including **19** in total turned over during forfeiture by the U.S. Attorney's office):_
> - Michael Peca (_Ex.T1_);
> - Bryan Berard (_Ex.T2_);
> - Darryl Sydor (_Ex.T3_);
> - Steven Rucchin (_Ex.T4_);
> - Glen Murray (_Ex.T5_); and
> - Sergei Gonchar (_Ex.T6_)…

It is 100% certain that after the government _withheld_ these Arizona disclosures specifically from their Rule 16 production pretrial (i.e. critical _Brady_ materials), that even if they were presented to Peca, Berard, Sydor, Rucchin or non-victims Murray and Gonchar at trial -- or _today_, they would not recall signing them (thru the haze of **CTE** or other influence).   The disclosures began on page 1 (and not one email or complaints exists about the actual loans they were suing Jowdy to recover):

> "_the gist of the lawsuit is to recover certain monies loaned to Mr. Jowdy from Mr. Kenner, Little Isle 4 and Ula Makika LLC.   Mr. Kenner estimates the total amount of monies loaned to Mr. Jowdy which have not been repaid to be approximately $5,000,000.   This is the estimated principle only, exclusive of accrued interest.   In summary, Mr. Jowdy denies that the monies were loans but rather characterizes them as investments._"

Notwithstanding the **19** Hawaii investors _initialed every page_ of the disclosure and _filled in their contact information on the last page in their own handwriting_.
- Ironically, both Nolan (_Tr.2116_) and Berard refused during trial testimony to authenticate their signatures on documents they also signed _after_ and _including_ filling out the "PRINT" section in their own handwriting, which they reluctantly verified.

Owen Nolan (along with the other alleged superseding indictment victims) sued the NHL for **CTE** in 2014 as part of the class action lawsuit.   This critical "memory loss"

information was withheld from the defense by a knowing government.   Medically, Pandora's box would have been opened and exposed a brutal reality for the investors -- but it would have segregated their 'memory issues' from 'criminal actions' in the instant case – considering the hype of **CTE** trauma in the news at that time (and now).

Owen Nolan testified (*Tr.2118*):
> *Q Your memory is much better years ago, correct, back in 2009 than it would be in 2015?*
>
> *A [Nolan]: Some things come and go.*

- Nolan was unable to recall his own LOC (*Tr.2065-66*) that his wife, his personal assistant, and his Wells Fargo private banker managed for him (*Ex.C, Ex.D*), removing all equivocation about transparency; wholly nullifying Nolan's **CTE**-laden (and admitted) recollection distress.

*Further Group Verifications And Transparency…*
The Hawaii attorney's "**updates**" (as verified by Kaiser to the FBI -- *Ex.1a -- 3500-JK-1-r at 3*) clearly identifies the group's unfettered knowledge (*Ex.A*).   It is again indisputable what occurred in real time; which only Alzheimer's-like symptoms of **CTE** could have changed with the four (4) individuals who "*could not remember what they used to know*" as many as 11 years after the actual events.

Now – the government has submitted forfeiture calculations based solely on the gross investment dollars in the various "legit" projects for _all of the investors_; not the petite subset of investors FBI agent Galioto (with John Kaiser and Bryan Berard's help, after being hired by Jowdy in 2011) was able to convince that "Kenner stole all of their money".   Galioto convinced the agreeable investors that if they testified against Kenner about "no knowledge", _Galioto would give them the money back he traced to Kenner and froze_.

In concert with the misleading promises pretrial, when they did not receive the funds they were promised were in Kenner's frozen accounts post-trial, Owen Nolan's private assistant (who was handling the Nolan LOC payments in 2006 with Nolan's wife – *Ex.C, Ex.D*) emailed Kenner's son post-trial and demanded:

> *"They want to know where their fucking money is!"*

Sadly, the government and the Court know that Jowdy received (*government-forfeiture-44*) all of it but the lies to the investors form the FBI agent has distorted the reality, again to blame Kenner (equaling Kaiser's presentation to the Court of what Jowdy and the FBI have been telling "everyone", not just instant case individuals – *ECF No. 628 at 1*).

*Owen Nolan is no longer a victim of anything…*
Owen Nolan is <u>only</u> involved in the Hawaii project.   $425,000 is traceable from Nolan's Hawaii capital account to the Jowdy loans (and none to the Constantine payments), of which Nolan could barely remember being involved in the actual investment.   Yet thru counsel, Nolan and Jowdy settled in 2008 for the funds Jowdy received from Nolan (*ECF No. 790, Ex.A at 5*).   Jowdy did not admit wrongdoings in the settlement but it eliminated the only nexus to the Diamante Cabo san Lucas project – as the government's forfeiture evidence confirms, whether they are happy about it or not) (*government-forfeiture-36*).   The government traced only $350,000 from any alleged superseding indictment victim to the purchase of the Cabo san Lucas property; <u>all originating from Nolan</u>.

In fact, Jowdy's attorney during his January 2010 depositions confirmed that Kenner and Kenner investors were not entitled to what Jowdy did with the rest of the loan money (*Ex.I2*), *but somehow the government still called it a fraud claiming the loan was fake five-and-a-half years later during trial; classic.*

> *Ms. Crowther:  "So what? You gave him a loan. That doesn't entitle you to an accounting of how it was spent."*

Nolan's 2008 settlement with Jowdy also made Nolan a non-victim of anything after his "agreement" (valued at $3,250,000 at the time of settlement), 12 years ago -- and 7 years prior to trial.   Perhaps, Nolan did not read the agreement he signed with Jowdy, either, and just signed it?

The crass statement, *supra*, from Nolan's personal assistant re-confirmed that the investors, especially Nolan, were told by FBI agent Galioto pre-trial that "*Kenner stole all of their money*" (as Kristen Peca's 2012 FBI recording also verified as a lie) -- and post-trial that, "*Kenner was convicted of stealing all of their Hawaii money that the investors <u>thought</u> went to Jowdy, while Galioto and the FBI post-trial cannot find where the money is…*" (as if Kenner magically moved it).

*We 'Trusted' But 'Did Not Read'…*

The government witnesses repeated hundreds of times at trial that they "*trusted Phil*" and "*did not read*" the investment documents and litigation paperwork Kenner <u>and their attorneys</u> presented to them.[14]   The government cannot argue that Kenner did not follow the Little Isle 4 By-Laws (in lending funds or securing funding thru hard money lenders and hard money brokers) to the letter of the document (*Ex.M*). <u>Kenner received none of the funds</u> – which is unexplainable for white collar criminal activity that allegedly spans over a decade – but without a single perceptible benefit to Kenner.   It defies logic.

Henry Ford was once quoted: "*If I had asked people what they wanted they would have said faster horses.*"

- If the Hawaii partners, GSF contributors, and Eufora stock purchasers (who were represented by Rudy Giuliani's investigative group) never read: (1) emails, (2) agreements, (3) disclosures they signed, or even (4) their lawsuits versus Jowdy that their independent attorneys filed, <u>then what alternative decision would they have made if they "trusted Phil"…and Phil Kenner never stole their money</u>?

The Court and the government <u>cannot</u> explain how the Hawaii partners management team of Kenner, Kaiser and Manfredi were supposed to raise development and construction funds after the initial acquisition funds were invested, while managing an extremely complex transaction.  There is no feasible answer without introducing outside lending options and the brokers the market

---

[14] Berard trial testimony (*Tr.3157-58*):

> *Q. Well, when you say e-mail, <u>you have a recollection of receiving e-mails from either Mr. Kenner or Mr. Constantine or even Mr. Richards where they enclosed copies of the complaints that were filed against Mr. Jowdy?</u>*
>
> *A [Berard]: **Yes**.*
>
> *Q. And it's your testimony, just to be fair to you, <u>you didn't read any of them?</u>*
>
> *A [Berard]: **I did not**.*
>
> *Q. <u>Did you discuss or ask them what's in here, what suit am I becoming a party to?</u>*
>
> *A [Berard]: **I did not**.  At that time I trusted Phil Kenner. He was my manager and I trusted him.*

- It is Berard's choice to willfully ignore information that was emailed to him by parties he was counting on.   But – when it is alleged as <u>***concealing***</u> information from him in the future to substantiate "what he was never told" – it represents an incredible and non-prosecutable legal position or criminality with intent.

required to fund them at that time; *See Alexander Realty Capital, Inc. v. Laurel Cove Development, LLC, 2009 U.S. Dist. LEXIS 17907 (M.D. of Tennessee 2009).*[15]

*Following The Hawaii By-Laws…*
The Hawaii management team of Manfredi, Kaiser, and Kenner hired 17 various hard money brokers between 2003 and 2006 and secured two (2) loans; Centrum and Urban Expansion.

Fifteen (15) lenders *failed* -- and the Hawai'i partners sued four (4) of them for recovery of advance fees; totaling approximately $1 million.   Without explanation, the two (2) acquisitions and development loans that actually were secured are deemed criminal acts a decade later (despite nearly a dozen law firms involved in all of the transactions).   It leaves no logical answer of how the Hawaii partners' management team would have been able to fund the development without breaking the law (under the outrageous prosecutorial standards); despite following the operating agreement restrictions and constraints; while fully disclosing every step of the project to investors who testified to this Court they did not care to read the fully transparent information they received (*Ex.A*).

If these loans were criminal, then it is irrational that Kaiser and Manfredi could not have been culpable under the same façade.   They had hands-on involvement in every detail; specifically Manfredi (*Ex.U, Ex.U2, Ex.V, Ex.V2*).

---

[15] Ironically, this Tennessee case involved litigation for unpaid hard money broker fees in a Tennessee development deal – *after Jowdy and the same Lehman Brothers lenders defrauded* the original developer (Tantara partners) and reneged on the hard money broker fees; eerily echoing AUSA Michiewicz' Q&A "as normal" with Kenner on cross-examination explaining to Kenner and the jury that Kenner should have reneged on the short-term loan deal with John Kaiser (triggering corporate litigation), *after* receiving Kaiser's signature sign-off in July 2006 (like Jowdy did to all of the people and companies that loaned and invested money with him)…questioning Kenner reply of honesty, " *Well, you are a businessman, sir, aren't you?*" (*Tr.4700-01*).

## MONEY JUDGMENT AMOUNTS

Notwithstanding the 'proceeds' obtained directly or indirectly for Kenner and Constantine, the **total transactions** in the superseding indictment that are related to the alleged victims are _no more than_ **$8.5 million** (_ECF No. 770 at 54_ _[$6,509,552 – Hawaii], at 66 [$700,000 – Eufora], and at 69 [$1,200,000 – GSF]_).   Thus under any circumstance, the forfeiture money judgment cannot exceed the entire universe of invested/contributed funds.

Not only were other alleged schemes not proven at trial, but also the government specifically announced that they were not pursuing them as frauds (primarily because there was no empirical evidence to support those claims), _supra_.

_What is the Court looking for to substantiate forfeiture and money judgment?_ In the July 2, 2019 hearing, Judge Bianco defined exactly what he wanted (unfortunately misrepresented by the government's 6-year ruse -- _Tr.25_):

_[Judge Bianco]: "What I want the government to do is try to obviously focus its attention on the core of the case which is the entities that were controlled by the defendants and those entities that the money was moved into and protect all of that…"_

Defendant Kenner agrees.

In the _United States v. Contorinis_, 692, F.3d 136, 148 (2d Cir 2012), the Court "observed that neither the language of the criminal forfeiture statute nor Circuit case law supported the proposition that a defendant must forfeit proceeds that 'go directly to an innocent third party and are never possessed by the defendant'" _Id._ at 147.  "Because the 'proceeds' sought by the government here [_Contorinis_] were acquired by the [private equity] fund over which appellant lacks control, it is difficult to square the statute with the forfeiture order." _Id._

This is the case here…

## Money Judgment And Forfeiture Calculations

[Actual **money** *traceable* to the alleged "objects" **-- and –**
*Received* by Kenner or Constantine *from superseding indictment victims*]

The *Shkreli* Court opined: "Criminal forfeiture focuses on the disgorgement by a defendant of his ill-gotten gains."  *United States v. Contorinis*, 692 F.3d at 146 (internal quotation marks omitted); *United States v. Torres*, 703 F.3d 194, 203 (2nd Cir 2012) ("'[F]orfeiture is gain based' **not based on the losses (or gains) to victims**." (internal quotation marks omitted)); *Shkreli at 6-7.*

The government made specific choices not to indict:
- (1) Ken Jowdy,
- (2) John Kaiser,
- (3) Chris Manfredi, or
- (4) Tim Gaarn as co-defendants in the instant case…

"**There are tradeoffs in such decisions**"; *See Mendenhall, supra.*   As such, the funds they received are not subject to forfeiture.

| | Hawai'i (£) | GSF (ø) | Eufora (∞) |
|---|---|---|---|
| Peca | **0** | ?? | **100,000** |
| Nolan | **0** | | |
| Berard | **0** | | |
| Rucchin | **0** | ?? | **77,500** |
| Sydor | **0** | ?? | **50,000** |
| Ranford | | ?? | **285,000** |
| McKee | | ?? | |
| Nash | | ?? | **100,000** |
| J. Kaiser | **0** | | |
| E. Kaiser | | | **66,667** |
| Privitello | | | **200,000** |
| Hughes | | | **66,667** |
| Rizzi | | | **66,667** |
| **Kenner TOTALS from the charged fraud effects** | **0**[16] | **17,000** | **611,500** **(Constantine totals $811,500 with Privitello 'proceeds')** |

---

[16] *See Hughey*; All funds were traced to Ken Jowdy (*government-forfeiture-44*), an innocent third party in the instant case, corroborated by the government and Probation over a year after trial; *thus clearly not stolen by Kenner "for anything"*.

26

(£) – In the Hawaii "object" – the government ignores that no funds are traceable to any superseding indictment victim for the Constantine consulting payments (*GX-41B, Tr.3934 -- Petrellese*).   The government also ignores that the Jowdy loans (verified by Peca [*Tr.498-99*] and Berard [*Tr.3055*] at trial) <u>*never*</u> go to Kenner or Constantine in the instant case, eliminating any "ill-gotten" status for forfeiture; *See Contorinis, also see Torres*.

Although the government ignored the empirical evidence of Kaiser's full Hawaii repayment from his friends & family 2005 loans, the evidence confirms that Kaiser was fully repaid in August 2006 as originally negotiated.   The repayments are consistent with his 2009 arbitration testimony (*Ex.O*).  It is 100% confirmed by the Hawai'i banking records (*Bates stamp: NAAV000433-35*), pursuant to the 2006 Lehman Brothers closing.

Wholly fabricated in 2015 at trial -- Kaiser testified that his friends & family were repaid by him personally in 2006 (*Tr.980*), but his own 2011 texts to Kenner and other debunking evidence (*ECF No. 785 at 7-8*) confirm more Kaiser trial perjury &/or a willing government to suborn the perjury, perhaps including Ethel Kaiser as well (*Tr.933*) to cover her son's "repayment story lie".  **The court should note**:

- The government has <u>*refused*</u> to produce Kaiser's 2006 or 2007 IRS tax returns to substantiate his "*back pay*" claims of $195,000 (*Tr.1413-14*); and
- The government and Kaiser have also <u>*refused*</u> to produce even a single dollar of "*expenses*" Kaiser claims the balance of the $816,000 he received in August 2006 was applied towards.  **It is 100% fabricated** -- because zero "*expenses*" or anything similar were due to Kaiser from the Hawai'i project in 2006.   This cover-up testimony was premeditated *and clearly another fraud on the Court and the jury – prejudicing the verdict, and effecting forfeiture and guideline calculations*; and
- Further confounding the Kaiser-government lies is that Kaiser told the Court in February 2019 (*ECF No. 628 at 1*) that he owns the Kenner Mexico equity (Baja Ventures 2006) from a collateral agreement in 2006, **thus Kaiser could never have been a victim of anything he now says he agreed to** (*Ex.X, Ex.X2, Ex.X3*).
    - The underlying confusion in nearly all transactions related to Kaiser, Berard, and Jowdy is that they have continued to lie about *forgeries* in multiple jurisdictions (including the EDNY – *Tr.990-91*) etcetera; mostly created by themselves (*See government-forfeiture-61 at 2 and government-forfeiture-62 at 2, more forgeries of Kenner's name by Jowdy's*

27

*cabal*) and changed their stories to fit their needs of the day (*ECF No. 783*).

(ø) – In the GSF "object" -- the Court determined that Constantine overspent his $250,000 allocation from Sergei Gonchar by $17,077 (*ECF No. 501 at 60*).   These funds represent 1.4% of the funds the superseding indictment individuals contributed to Constantine's GSF (*Tr.3805*) – and 0.6% of the total $2,514,853 funds (ironically not counting the additional $1,250,000 Gonchar subsequently contributed to cover <u>all</u> Constantine expenses, which Gonchar verified as part of a side deal between the two of them – *Tr.4826-27*).

The $17,077 may or may not be traceable to the superseding indictment individuals but are negligible compared to the entire $3 million plus Constantine raised.   The only funds traceable to Kenner are $22,435 GSF expense reimbursements Kenner expensed for the fund members months earlier, and again Kenner paid them himself.   *None* of Kenner's expense funds are traceable to a superseding indictment individual (*GX-767*).

(∞) – In the Eufora "object" -- there is $700,000 of gross private equity stock sales traceable to superseding indictment individuals ($450,000 to Constantine, and $250,000 to Tim Gaarn, but only $162,500 of Gaarn's $250,000 in sales to superseding indictment individuals was forwarded to Kenner to repay Gaarn's personal loan debt).   Kenner has verified to the Court that he received $117,000 in documented loan repayments from Constantine 'proceeds' and $162,500 from Tim Gaarn's sales of his stock (an innocent third party, *Tr.2503-04, 2563-64*) (*GX-210, GX-4728, GX-4729*), <u>totaling less that $280,000</u>.   Constantine has $450,000 traceable to his sales to superseding indictment individuals, not more.

- Constantine distributed (==$117,000==) to Kenner:
  - ○ *4-7-2008 -- $100,000 from the Peca transaction thru Constantine to Kenner; and*
  - ○ *4-28-2008 -- $17,000 from the Nash transaction thru Constantine to Kenner…*

- Gaarn distributed (==$162,500==) to Kenner:
  - ○ *2-19-2009 -- $30,000 from the Rucchin transaction thru Gaarn to Kenner;*
  - ○ *4-17-2009 -- $47,500 from the Rucchin transaction thru Gaarn to Kenner; and*
  - ○ *5-04-2009 -- $85,000 from the Ranford transaction thru Gaarn to Kenner…*

28

Commensurate with the December 2009 Privitello-Eufora transaction, Kenner was wholly unaware of the John Kaiser-led transactions between his friends & family and Constantine (*Tr.1058-59*). *Nothing on the record* identifies any Kenner knowledge of Kaiser's solicitations of the Hughes-Rizzi-Ethel Kaiser funds -- and texts between John Kaiser and Kenner *7-months later* confirm Kenner learned about the Hughes-Rizzi-Ethel Kaiser funds months *after* Kaiser solicited them for Constantine directly (and without Kenner) (*Ex.01*).

     o   Not in Kenner's forfeiture totals...

Kenner was found not guilty of two charges related to Privitello stock purchases, with the government's case lacking any single document or email tying Kenner to their allegations.

     o   Not in Kenner's forfeiture totals...

*Ill-Gotten Funds?*

In the instant case, (1) Kenner never possesses ill-gotten Hawaii funds that are 'obtained' by Jowdy (an innocent third party) (*government-forfeiture-44*); and (2) Kenner never possesses the ill-gotten Tim Gaarn private equity sales funds that were 'obtained' from Gaarn's Eufora stock (an innocent third party) other than the $162,500 Gaarn transferred to Kenner to repay his documented-previous debt to Kenner.

In *Contorinis*, the Second Circuit opined, "Moreover, we are not aware of, and the government has not cited, any decision standing for the proposition that a defendant may be required to forfeit funds never acquired by him or someone working in concert with him.   Neither our opinion in *United States v. Royer*, 549 F.3d 886 (2d Cir 2008) nor our summary order in *United States v. Copoccia*, 402 F. App'x 639 (2d Cir 2010) are to the contrary.  In neither case were we presented with a situation where a defendant had been asked to forfeit [ill-gotten] funds that were never under his or his co-conspirator's control.  While 'property need not be personally or directly in the possession of the defendant, his assignees, or his co-conspirators in order to be subject to forfeiture,' *Capoccia*, 402 F. App'x at 640, the [ill-gotten] property must have, at some point, been under the defendant's control or the control of his co-conspirators in order to be considered 'acquired' by him. Finally, extending the scope of a forfeiture to include [ill-gotten] proceeds that have never been acquired by a defendant or his joint actors would be at odds with the broadly accepted principle that forfeiture is calculated based on the defendant's gains; see *United States v. McGinty*, 610 F.3d at 1247 (10th Cir 2010).   This extends to forfeiture proceedings, where the general principle is that a defendant is liable for the reasonably foreseeable acts of his co-conspirators"; *Contorinis* at 148-49.

- In the instant case, the government made a conscious decision to avoid naming Jowdy as a co-conspirator in the six years pre-trial.   They cannot change their opinions because the alternative is 'more convenient' to support their forfeiture demands; See *Hughey, supra*.

*Honeycutt Is Outstanding...*

The Second Circuit has recently opined regarding the Supreme Court *Honeycutt*[17] ruling in 2017, "While we have not yet fully defined the parameters of *Honeycutt*, this much is true: *Honeycutt*'s bar against joint and severable forfeiture for co-conspirators applies only to co-conspirators who never possessed the tainted proceeds of their crimes."  See *id. at 1630* ("[A] defendant may not be held joint and severably liable for property that his co-conspirator derived from the crime but that the defendant himself did not acquire." (emphasis added)); *Id. at 1631-33*.; see also *United States v. Tanner*, 942 F.3d 60 (2d Cir 2019).

- Since the *Honeycutt* decision, the government in the Second Circuit conceded the *Honeycutt* application to Title 18 cases in *Gil-Geurerro*, 2018 U.S. App. LEXIS 1541, No 16-cr-3250, January 2018 and *Fuimano*; 2018 U.S. App. LEXIS 36066, No 17-cr-773, December 2018 (like the instant case), conceding its inevitability so as not to waste the court's time and resources in the future on remand.

While the Court has a decision to make under the changing environment of joint and severable liability for co-defendants based on *Honeycutt*, the gross 'proceeds' received by Constantine (*ECF No. 789 at 1*, $2,797,400) must be the high water mark for Kenner as well, *if* the government can prove a nexus to victims in the crimes of conviction for individuals in the superseding indictment.   They have not for approximately $2 million these funds, *infra*.   Kenner has proffered to the Court that he received $162,500 from innocent third party, Tim Gaarn; in the instant case as a result Gaarn's private stock sale proceeds.   Kenner is unaware if that total is included in the Constantine totals, but no additional funds are traceable to Kenner as 'obtained'.

*$2 Million Not From Superseding Indictment Victims (In Constantine's Calculation)...*

The Constantine accounting includes funds that do not satisfy a "proximate harm" challenge for any superseding indictment individuals.

- The **$1,000,900** Constantine received from the consulting agreements originates from non-victims in the superseding indictment (*GX-41B*). In fact, $64,900 is traceable to Kenner's individual capital account, further perplexing a

---

[17] *Honeycutt v. United States*, ____ U.S. ____, 137 S. Ct. 1626, 198 L. Ed. 2d 73 (2017)

criminal nexus argument.

- The **$1 million** Constantine received from the Lehman Brothers payments in August 2006 (thru the independent negotiations by Constantine and Grdina) resulted in no calculable or proximate harm to any superseding indictment alleged victim.
    - ○ The government's trial summation that the investors would have received the funds from Lehman Brothers ***but for*** the outstanding loans is preposterous.   It is clearly lacking any relationship to reality in the business world, but nevertheless it was thrown against the jury's 'proverbial wall' as uneducated real estate persons.
- **Only** $700,000 of Eufora private stock sales is connected to the alleged victims in the superseding indictment.  As the government confirmed at trial, Kenner received less than $280,000 of re-payments from Gaarn and Constantine for loans that had previously been documented from Kenner's personal funds to them, respectively.   The sales were acknowledged and vetted by the investors' attorneys and Giuliani's investigative team in 2010 (*Ex.B*) finding the exact antithesis of the government's prosecutorial theory of concealment, five years earlier, defying logic.

"[P]roximate cause, as distinct from actual cause or cause in fact" (commonly labeled "but-for" causation) is a "flexible concept" that "defies easy summary." *Paroline v. United States*, 572 U.S. 434, 444 (2014) (internal quotation marks and citations omitted); see also *CSX Transparency., Inc. v. McBride*, 564 U.S. 685, 701 (2011) (labeling proximate cause "a term notoriously confusing").   "Proximate cause" is in essence a "shorthand for a concept: Injuries have countless causes, and not all should give rise to legal liability." *CSX Transp.*, 564 U.S. at 692.   The central goal of proximate cause requirement is to limit the defendant's liability to the kinds of harms he risked by his conduct, the idea being that if a resulting harm was too far outside the risks his conduct related; it would be unjust or impractical to impose liability.   See Prosser & Keeton, The Law of Torts 281 (5th Ed. 1984).

- The Urban Expansion loan secured the Waikapuna $35 million development parcel when Hawaii COO Chris Manfredi verified to the 2015 trial Court it would have been lost otherwise (*Ex.U, Ex.U2, Ex.V*) in spite of his "responsive coyness"; including the $1 million hard money deposit on the original contract plus $451,000 in extension fees.   No harm was caused to any superseding indictment investors, or otherwise.
- Under the government's prosecutorial theory, if Manfredi, Kaiser, and Kenner walked away from the Urban Expansion loan and forfeited the approximate $1,500,000 hard deposits and lost the $35 million oceanfront parcel, no criminal

31

act would have occurred.   But -- Manfredi confirmed (*Tr.3012-13*):

> *Q. Again, so without the moneys from Urban Expansion, Mr. Kenner would have been in default of that contract and have lost the down payment, whatever the amount might have been, if he didn't find that funding.*
>
> *A [Manfredi]: **Well, you are making an assumption** based on a timeline and you are also making an assumption that Urban Expansion money was the only money in the world.*
>
> *Q. Well, was anybody else coming up with the money at that time, Mr. Manfredi?*
>
> *A [Manfredi]: **No, sir**.*
>
> *Q. It was pretty urgent to get that money from Urban Expansion to pay off this contract so that they could purchase the property. Is that correct?*
>
> *A [Manfredi]: **You would have to define urgent**.*
>
> *Q. Any other lender come forward and say, I'll pay the money, forget Urban Expansion, I can give you better deals?*
>
>  *A [Manfredi]: **No, sir, not to my knowledge**.*

Only weeks before the Urban Expansion loan, Manfredi was distraught and emailed Kenner after the 4th hard moneylender and broker failed to close (after dismissing the "egregious" 2005 Lehman Brothers final loan offer (*Ex.U*).  Hawai'i COO Chris Manfredi – as the Hawaii partners' COO and managing the closing processes -- stated his frustration with the funding problems to Kenner on September 30, 2009 (*Ex.V*):

> *"I, like you, have been hearing the same old stories for so long, everyone can "get it done" and nobody does...I think the likelihood of losing Waikapuna and Moa Ula Makika [another parcel under agreement] is very real.   I never thought I would be leaving this trip without funding.*
>
> *Chris Manfredi*
> *COO/Project Manager*
> *Big Isle Ventures, LLC*
> *516-526-xxxx"*

32

Under *Honeycutt's* Supreme Court logic, only the loan repayment amounts (totaling approximately $280,000) from Constantine and Gaarn's private Eufora stock sales would be attributable to Kenner for forfeiture and money judgment.

In the instant case, (1) Kenner never possesses GSF funds that were 'obtained' and 'controlled' by Constantine at all times (overspent by 17,077 – *ECF No. 501 at 60*) (*Tr.3805-16 – Attorney Richards*); (2) Kenner never possesses Hawaii Constantine consulting funds that were 'obtained' and 'controlled' by Constantine at all times (*GX-41B*); and (3) Kenner never possesses any of Constantine's Eufora private stock 'proceeds' -- other than the documented $117,000 loan re-payment amount.

- *Leadership Quandary…*
  Separately, Kenner's lack of ill-gotten 'proceeds' or 'control' over the Eufora and GSF funds, coupled with Kenner's Hawaii transactions never deviating from the Little Isle 4 By Laws (*Ex.M*) for authorized transactions, signed authorizations of the LOC accounts (*Peca example: Ex.T1b*), *nor Kenner financially benefitting from them*, leaves the government's "leadership" enhancement without logic and meritless.   *See United States v. Greenfield*, 44 F.3d 1141 (2nd Cir 1995). Applications of enhancements under management responsibility over property, assets, or activities *may not be basis* for enhancements under Sentencing Guideline providing for increase where defendant is organizer of criminal activity involving five or fewer persons. U.S.S.G. §3B1.1(c), 3B1.1, comment. N(2), 18 U.S.C. A.S.C.A. App.

*Hawai'i Object…*
In the instant case, $1,315,000 of funds is traceable to alleged victims in the superseding indictment[18].   They are all traceable to the Jowdy loans, notwithstanding two (2) of the alleged victims testified during trial that they were aware of the Jowdy loans, *effectively eliminating them from being deceived by anyone or victims of the alleged Jowdy loan fraud*.   Michael Peca (*Tr.498-99*) had $240,000 traceable to the loans, and Bryan Berard (*Tr.3055*) had $150,000 traceable to the loans.   Both had previously testified four and six years before trial, respectively, in independent proceedings, *verifying in tremendous detail* their underlying knowledge

---

[18] *See ECF No. 770 Appendix 1 at 54*:
1) Michael Peca (**$240,000** distributed to Jowdy thru Little Isle 4's capital account);
2) Darryl Sydor (**$200,000** distributed to Jowdy thru Little Isle 4's capital account);
3) Owen Nolan (**$425,000** distributed to Jowdy thru Little Isle 4's capital account);
4) Steve Rucchin (**$300,000** distributed to Jowdy thru Little Isle 4's capital account);
5) Bryan Berard (**$150,000** distributed to Jowdy thru Little Isle 4's capital account)…

of the Jowdy loans and their personal approvals of them (*Peca: Ex.1b -- 3500-MP-5 at Tr.30-33 – and Berard: Ex.1k -- 3500-BB-3 at 5-7*).  As the Court knows, Darryl Sydor (just like the Rucchin "*foggy*" (*Tr.2722*) and Nolan "*I have no memory of anything*" testimony (*Tr.2065-66*)) appeared to suffer critically from "memory loss" (a primary symptom of **CTE**) during his trial testimony.  Yet, Sydor had previously verified his full knowledge and approvals of the Jowdy loans to a 2011 SDNY Grand Jury, four (4) years before his severe "memory loss" **CTE**-symptoms appeared during the 2015 trial (*Sydor: Ex.1d -- 3500-DS-2 at 19, 25-27*).

Sadly, at trial, Sydor could not remember his own communication with Kenner surrounding the March 2009 default letter from Northern Trust Bank and the collateral seizure despite his real time text conversation (*Ex.E2 at 203-05 [from Kenner forfeiture reply], including f.125 and f.126*). Both Sydor (*Ex.T3*) and Rucchin (*Ex.T4*) (along with Michael Peca [*Ex.T1*] and 16 other Hawaii-Mexico investors) also signed-off on the 2008 Arizona lawsuit disclosure statements with independent attorney Tom Baker (**withheld** by the government from Rule 16 evidence – but turned over post-trial during the forfeiture proceedings, more likely than not in error by the under-informed forfeiture team – i.e. *Brady*).   The hidden signed-disclosures stated:

> "*the gist of the lawsuit is to recover certain monies loaned to Mr. Jowdy from Mr. Kenner, Little Isle 4 and Ula Makika LLC.   Mr. Kenner estimates the total amount of monies loaned to Mr. Jowdy which have not been repaid to be approximately $5,000,000.   This is the estimated principle only, exclusive of accrued interest.   In summary, Mr. Jowdy denies that the monies were loans but rather characterizes them as investments.*" (*Ex.T1 [Peca], Ex.T2 [Berard], Ex.T3 [Sydor], Ex.T4 [Rucchin]*)

Owen Nolan did not participate in the 2008 Arizona litigation because he had already settled his Hawaii and Mexico transactions with Jowdy in a 2008 settlement (*Ex.A2 at 5*), acknowledged in the 2017 Jowdy settlement agreement with the remainder of the Hawaii and Mexico investors whom Jowdy has criminally defrauded since 2002 (*ECF No. 667*); simply ignored by the FBI for some unexplainable reasons while reiterated by former Jowdy co-conspirator (2011-2017), John Kaiser in February 2019 (*ECF No. 628*).

No funds are traceable to the Constantine consulting payments from alleged superseding indictment victims, *as noted supra.*

- As such, $1,315,000 must be the <u>maximum</u> amount of calculation for forfeiture money judgment from the Hawaii object of the instant case – <u>with none of the funds going to a co-conspirator</u>; in opposition of forfeiture money judgment statute and case law precedent; *See Shkreli and progeny.*[19]

At all times throughout the trial and thru at least Probation's July 2016 addendum letter to the Court, Ken Jowdy was portrayed as "innocent" and protected as a "victim" of Kenner, beginning in the government's opening remarks, none of which are true or in the record (*Tr.29-33*):

   *"Well, Kenner bought land in Hawaii, sold it, took the profit for himself."*
   - STILL UNTRUE and UNPROVEN…

   *"This is the fraud where the defendants lie to the investors about who's stealing from them [Jowdy], and find a way to steal from them all over again."*
   - STILL UNTRUE and UNPROVEN…while blaming it on something the government conceded in *government-forfeiture-44*; conveniently after trial…

   *"The defendants tell the investors that a guy in Mexico named Ken Jowdy, stole their money and ran away with it"*
   - The government conceded Jowdy stole the money 100% for himself – thus never for Kenner's benefit (nor ill-gotten proceeds)…

   *"Kenner used the victims' money to pay for the mortgage on his million dollar home in Scottsdale, Arizona, for beach-front property in California, and to fund a tequila company he was starting in Mexico."*
   - STILL UNTRUE and UNPROVEN…

---

[19] Separating the criminal from their ill-gotten gains (*See United States v. Shkreli, 2019 U.S. Appx. LEXIS 21248 (2nd Cir 2019)*).

The Shkreli Court opined: "Criminal forfeiture focuses on the disgorgement by a defendant of his ill-gotten gains."  *United States v. Contorinis*, 692 F.3d at 146 (internal quotation marks omitted); *United States v. Torres*, 703 F.3d 194, 203 (2nd Cir 2012) ("'[F]orfeiture is gain based' not based on the losses (or gains) to victims." (internal quotation marks omitted)); *Shkreli at 6-7.*

Kenner never received the funds from the Jowdy loans, in spite of FBI agent Galioto's misleading statements to the Pecas[20] and others that Kenner *"stole all the Hawai'i money and never gave it…to Jowdy"* (which would have been the foundation of criminal activity, concealed or not); *but it never happened*.

*Unknown standards of coercion to illicit testimony…*
**If** the FBI is allowed to lie to people to seduce them into changing their testimony and fabricating impossible events and circumstances (*ECF No. 784*), then sobeit; *but it does not make it true*.

> ==*Kristen Peca – Matt [Galioto] told Michael and I that you stole all of the Hawai'i money and never gave it – the loan money -- to…uhhhh…Jowdy.*==

Post-trial, the government presented *government-forfeiture-44* during their forfeiture case (perhaps, also by mistake). *Shockingly*, it verified that the government "lied" throughout trial about the Hawai'i funds – vilifying Kenner in front of the jury for "telling the truth" about the loans and the loan agreement (*Tr.4598):*

> *Q:  So you would agree with me Mr. Kenner, that if the loan document proves to this jury to be phony, everything you have said in your direct testimony about money going to Mexico and not being stolen is a lie?*

AUSA Michiewicz' assault on the known truths continued:

> *Q:  And if that loan document proves to be phony, then you are lying?  Correct?*

After AUSA Michiewicz experienced more frustration because his investigation information from the FBI case agent was *incorrect* and *Kenner would not acquiesce*

---

[20] Kristen Peca 2012 FBI recording of Kenner (after Michael Peca verified his unfettered knowledge and approval of the Jowdy loan to the 2011 SDNY Grand Jury – *Ex.1b -- 3500-MP-5*):

> ==*Kristen Peca – Matt [Galioto] told Michael and I that you stole all of the Hawai'i money and never gave it – the loan money -- to…uhhhh…Jowdy.*==

> *Kenner – Kristen – I have all of the bank records that prove the money went to Jowdy and his accounts at all times.  I told you that already. You told me that you saw the bank records after I sent them to Michael.  You know -- the attorneys who sued Jowdy for the money in Mexico and Arizona and California used them to confirm the loans before we sued?*

> *Kristen Peca – but – I don't understand why he would say it.*

to criminal activity he did not do, Michiewicz re-applied the "lying" language to intimidate Kenner and influence the jury (*Tr.5064-65*):

> *Q. Aren't you just <u>making all of this up</u> as you sit there?*
> *A [Kenner]: No, sir.*
>
> *Q. Aren't you <u>lying</u> about these documents, your interactions with the people who relied upon you to take care of their money? Aren't you just lying about 5 everything?*
> *A [Kenner]: No, sir.*
>
> *Q. Are you <u>lying</u> about even being summoned to the grand jury and then dropped like a hot potato?[21]*
>> *MR. HALEY: Now I will object, your Honor.*
>> *THE COURT: Sustained.*
>> *MR. HALEY: Thank you.*
>
> *Q. Aren't you <u>lying</u> about being summoned to the grand jury and then the FBI deciding they were going to favor Mr. Jowdy in Mexico over you. Aren't you lying about that?*
>
>> *MR. HALEY: Judge, I object.*
>> *THE COURT: Sustained.*

*The Court verified beyond a reasonable doubt that the lending agreement is real...* During the forfeiture hearing, pursuant to the Court's request (*April 6, 2016 forfeiture hearing at Tr.289-90*), three (3) independent verifications by independent sources, specifically including the document "witness" (Jowdy's Director of Golf in December 2004, Robert Gaudet) were delivered to the Court (*including Ex.R*), <u>*confirming*</u> Kenner was 100% truthful in the face of the government's cross-examination denigration (*reprimanded outside of the jury at Tr.5076, but the damage had been done*).

The government's final forfeiture money judgment chart (*ECF No. 765 at 30-31*) assumed that all funds received for the Hawaii investments from superseding indictment investors *<u>and non-victims</u>* are involved in the alleged conspiracies (just

---

[21] AUSA Michiewicz was 100% aware that his EDNY office issued and terminated the Kenner Grand Jury subpoena to expose all of the known Jowdy frauds of $25 million-plus by 2009 (more verified post-incarceration thru 100,000+ emails and documents that Kenner never saw in Jowdy's possession) (*Ex.K, Ex.L*).

like their January 31, 2020 filing), specifically related to the Hawai'i object.  This is simply not the case here.

As the _Evans_ Court with Justice Gorsuch opined[22], _if there is no fraud on the inducement, then only the fraud factors are applicable to loss calculation_.   All of the Hawai'i investors had invested prior to the first Jowdy transaction (or the Constantine consulting payments, despite none of their funds traceable to Constantine's payments).  As previously noted, $64,900 of the $1,000,900 originated from Kenner's Hawaii capital contributions.

- In the instant case, the Court must account for the fact that it has never been alleged that there was fraud with respect to the business model to acquire and develop the Hawai'i project (identical to _Evans_); irrespective of the government's opinions about the broad authorizations in the Hawai'i partners By Laws authorizing "lending" and "payments to 3rd party vendors" (_Kenner trial exhibit 217, introduced at Tr.4525-26, and unopposed by any government evidence_) (_Ex.M_).  Only three (3) of the 26 Hawai'i equity investors (Sydor, Rucchin, and Berard) testified to be unaware at trial, but they also testified they routinely "_did not read_" the documents presented to them by Kenner for their investments.[23]

---

[22] _United States v. Evans_, 744 F.3d 1192; 2014 U.S. App. LEXIS 4490 (10th Cir 2014) (_referencing United States v. Turk_, 626 F.3d 743 (2d Cir 2010)) ("_Evans I_")...and _2nd appeal for improper calculation (again) -- United States v. Evans_, 677 Fed. Appx. 469; 2017 U.S. App. LEXIS 1942 (10th Cir 2017) ("_Evans II_");

        "**[w]ithout an actual loss, there could be no victims**"

[23] The repeated – "_I did not read_" and "_I trusted Phil_" refrains overwhelmed any potential belief that any one of the investors would have known, let alone cared about the finite details of the day-to-day efforts to manage the Hawai'i project and its inter-machinations. Nolan (like Sydor) testified that he was not even aware who the Managing Member of the Hawai'i project was, despite signing off on the July 2006 JV agreement (_Ex.S_) which identified Kenner's Managing Member role; See _Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A._, 461 Fed. Appx. 61; 2012 U.S. App. LEXIS 3012.

The government conducted "_memory tests_" of corporate business details with the passive-equity investors to frame their case of concealment.  They were corporate elements one would _never_ expect a passive-equity investor to remember (or even know); by investors who repeatedly said they "_signed_" but "_did not read_" anything Kenner gave them (_Tr.1164, 2178, 2193, 3157_) (_ECF No. 675 at 205-6, 292, 304-5_) – because they "trusted" Kenner.

- After nearly 3-months of unconvincing "memory loss" prosecution, the government had to double-down with their _misrepresentations_ and simplify their allegations to "_Kenner stole all of the Hawai'i money and used it to buy his equity in the Cabo project_" in summation proffers (although still untrue) (_Tr.5996, 5711, 5722-23, 5744-45, 5990, 5991-92, 5707-5709_).

- Owen Nolan actually testified in 2009 that he had not read a single document since 1991 (or so) (*Nolan arbitration – Day 1*):

    *Q. Is there ever an agreement in your life that you've ever read that you can identify here today? Have you ever taken the time on your own to read?*

    *A [Nolan]:* **I can't think of any offhand. That's why I pay people to do it.**

    *Q. You've testified that you've never read a document ever that you can think of sitting here today before you signed it. At any time in your lifetime has someone advised you to take the strategy of never reading a document when you sign it?*

    *A [Nolan]: No.*

- To the contrary (and in support of Kenner's full transparency of the Jowdy loans), Bryan Berard (*Tr.3055*) and Michael Peca (*Tr.498-99*) testified to the Court their knowledge of the Jowdy loans as part of the "*group decision*" (*Ex.N, from Ex.1c -- 3500-TS-1*), posing the question of "how was it considered a criminal act?"   it was also verified by non-victim, Glen Murray (*Tr.3540*).  It <u>cannot</u> be because the "memory test" was failed by three (3) of the 26 Hawai'i partners; specifically considering the significant **CTE**[24] issues for all three who participated in a 2014 class-action lawsuit for **CTE** damage from professional hockey concussions; also including Berard as a verified plaintiff thru his 2018 podcast confession of "*brain damage*".

- Berard, Peca and 17 other Hawai'i investors sued Ken Jowdy for eight (8) years for the money that only 3 of the 26 total investors could not recall in 2015 (10

---

[24] **Wikipedia**: Chronic Traumatic Encephalopathy (CTE) is a neurodegenerative disease **caused by repeated head injuries**. Symptoms may include behavioral problems, mood problems, and **problems with thinking**.   *Symptoms typically do not begin until years after the injuries*. <u>CTE often gets worse over time and can result in **dementia**</u>. It is unclear if the risk of suicide is altered.  Most documented cases have occurred in athletes involved in contact sports such as boxing, American football, wrestling, **ice hockey**, rugby and soccer.  Other risk factors include being in the military, prior domestic violence, and **repeated banging of the head**.  The exact amount of trauma required for the condition to occur is unknown. Definitive diagnosis can only occur at autopsy.   Chronic traumatic encephalopathy is a form of tauopathy   There is no specific treatment.   Rates of disease have been found to be about 30% among those with a history of multiple head injuries.

years after the actual events concluded).   Sydor and Rucchin were individual Plaintiffs in those exact lawsuits versus Jowdy -- and signed off on their independent attorneys disclosure, which confirmed their knowledge (see attorney Baker disclosure, *Ex.T3, Ex.T4*).

*Nothing Was Concealed Prior To FBI Agent Galioto's Intervention In The Jowdy Litigation In Or About June 2009.*

- Willful blindness by passive-equity investors -- who are entitled to that passive blindness is fine – but they are not entitled to criminal or civil restitution because of it.

The Court must recall that Michael Peca (who has $240,000 traceable to the Jowdy loans, and no more to the Hawai'i "object") testified to the 2011 SDNY Grand Jury about the Hawaii project; and specifically the Jowdy loans.  Peca testified that he approved his *entire* $1,875,000 capital account to go to Jowdy as part of the loan. This is more than the entire $1,315,000 that is traceable to the Jowdy loans for the superseding indictment victims.  Thus, under the auspice of "fungible money" (verified by IRS Agent Wayne – *Tr.4024* – and Kristen Peca at *Tr.760*), Michael Peca's capital account could logically be deemed responsible for 100% of the transfers to Jowdy, leaving no victims of the Jowdy loans in the instant case. Based on his own Grand Jury testimony, Michael Peca certainly could not argue with that conclusion (*Ex.1b -- 3500-MP-5 at 30-31*):

> *Q: How much did you put into Little Isle 4?*
>
> *A [**Michael Peca**]: "$100,000 cash investment that was going towards that. Then we had lines of credit. I had one out for $1.7 million that was going to be used at the time. Here's where a lot of the cross starts to happen. A short-term loan to Mr. Jowdy, because at the time Cabo – we hadn't gotten the lending from Lehman Brothers yet. We made a short-term loan until the lending came in. Once the lending came through they were to pay back the loan, I think in the neighborhood of five-and-a-half million dollars, on the closing. It was never paid back. And then communication basically seized at that point from him [Jowdy]. That was kind of the whole sticking point as far as me and the other guys with Mr. Jowdy.*
>
> *The 1.7 along with the $100,000 and whatever else put in this a capital account, Little Isle 4, I believe. <u>The Capital account was loaned to Ken Jowdy, our business partner, so there is no need at the time to be worried about anything. The money was loaned to Ken Jowdy to basically help some of the</u>*

*purchase of the Cabo property so we can get the funding. And then it was*
*supposed to [be] a short-term loan.*

*I knew 100 percent it was going to Little Isle IV initially.  Shortly after that the*
*short-term loan was something that took place."*

❖ Kenner implores the Court to read the entire 2011 Michael Peca SDNY Grand
   Jury testimony (*Ex.1b -- 3500-MP-5*) to understand, 4-years prior to trial, what
   Peca knew as part of the collective group efforts to recover the Jowdy loan funds
   – before FBI agent Galioto began influencing the investors.

   o It will hi-light the unambiguous understanding Michael Peca had about
      the Hawai'i project *along with his partners*.   It will document Peca's truest
      recollection much closer to the actual events (pre-**CTE** factors) -- all prior
      to meeting FBI agent Galioto *following* his 2011 SDNY Grand Jury
      proceedings.

   o It further hi-lights the FBI malfeasance, which Kristen Peca documented
      in her 2012 FBI recordings with Kenner, *supra,* about being "influenced"
      by Galioto that "*Kenner stole all of your money that was supposed to go to
      Jowdy*" theory (not even pretending the Hawaii loan funds were
      concealed or unauthorized -- and used to buy Kenner's Cabo equity).

   o At that point -- Kristen Peca was simply told by FBI agent Galioto that
      "*Kenner stole it and never gave it to Jowdy*", *supra.*

*Further Independent Knowledge Of The Jowdy Loans…*

As Managing Member of the Hawai'i partners since 2007, John Kaiser confirmed to
the FBI on October 19, 2010, that Kenner made "*update letter[s] on Hawai'i
project…PK made these: many times…*" and finished by clarifying to the FBI agents,
"*yes, I recall the letter[s]*" (*Ex.1a -- 3500-JK-1 at 3*) (*See Ex.A – from ECF No. 785 at 2-
4*).

One of the update letters from a Hawaii attorney stated in February 2006:

"*We have been informed that part of the closing process at Lehman Brothers rejected
the original proposal to repay the Hawaii loans at the closing by collateralizing Ken's
[Jowdy] 20% equity he received for managing the Cabo project….Based on the
meetings John Kaiser had with Ken [Jowdy] before we agreed to lend him the money in
2004 Phil [Kenner] has asked me again to attach for your records a copy of the lending
agreement.  Please contact me with any questions but you should already have your
copy from previous communications.*"

- Please note that John Kaiser (*Tr.1127*) (*Ex.1a -- 3500-JK-1-r at 3, confirmed to the FBI in 2010*) and Glen Murray (*Tr.3608*) testified at trial that they had their Hawaii-Jowdy-loan agreement copies at their own homes.

The attorney continued:

"*The questions during our last conference call by <u>Owen Nolan</u>, <u>Mike Peca</u>, and <u>Bryan Berard</u> were important to all of you.   If you are still confused about the individual equity you invested in the Cabo project versus the Hawaii equity and loans, please reply to me.   I thought Phil clarified this but I want all of you to be clear.  Most of you are involved in both deals.   You should have the operating agreements I previously forwarded to you after every member signed them.  If not please contact me about what you cannot find in your personal records and I will forward them to you or your advisors.*

*Based on the delay I have also resent updated loan calculation from the Hawaii loan to Jowdy for your records.   It has been given to Masood [Bhatti] at Lehman Brothers so he is aware of the amount that is continuing to accrue to Jowdy.   As a result of the phone call with Ken [Jowdy] and bill [Najam] about the delayed closing they confirmed the 15% was still accruing in spite of the delay.   They were confident that the initial real estate sales in Cabo in the first year would produce the funds needed to fully repay the loans plus additional interest.   I find comfort in their representations.*"

*Hawaii Partners COO Manfredi's Independent Constantine Consulting Knowledge...*
In 2004, the Court is aware thru trial testimony that Chris Manfredi recalled his independent trip to Arizona to meet with Constantine to discuss Constantine's consulting arrangement before it began (*Tr.3004*), further distancing Kenner from any alleged covert activity:

    *Q. Well, did you <u>speak</u> to Mr. Constantine at any point in regards to the Hawaiian projects?*
    *A [Manfredi]: **Yes**.*

    *Q. In <u>person</u> or by e-mail?*
    *A [Manfredi]: **I recall in person**.*

    *Q. And <u>where</u> was that?*
    *A [Manfredi]: **That was in Scottsdale, Arizona**.*

    *Q. Other than that one -- when was that? I should put a <u>time frame</u> on that, Mr. Manfredi.*

*A [Manfredi]:* **I don't recall the exact year. It was prior to '05.**

Manfredi verified Constantine's consulting agreements to the FBI in October 2010 (*Ex.1f -- 3500-CM-2-r at 1*).   These are the same agreements that Kaiser and the government alleged as *forgeries*, <mark>*so where are the ones Manfredi told the FBI about*</mark>? This anomaly still leaves unanswered the issue of collective malfeasance by the government and Kaiser for not producing the "*original ink*" versions of the Constantine consulting agreements *that were recovered from Kaiser's home on the eve of trial* -- under Fed.R. Evi. Rule 1002 (*ECF No. 785*).

*Severe Rule 1002 violation infecting the integrity of the government's own signature expert...*
The government failed to submit the "*original ink*" versions to either (1) the Court (during trial – only offering the photocopy versions found at Kenner's office with the rest of the Hawai'i documents – *GX-5104 [Kaiser introduced at Tr.990-91 -- and Osborne introduced at Tr.3622, 3626] – never introducing the originals: GX-7004 and GX-7005*) or (2) their-own forensic signature expert, *supra*; who clearly would have raised a queer-eye to the 10-year custody by Kaiser of documents Manfredi verified existed yet were somehow "magically" *forged* while always in Kaiser's own possession?   It is irreconcilable.   There is a *Rule 1002 – Best Evidence Rule* violation that cannot be deemed "harmless" considering the government and Probation lean on the alleged forgeries for their "obstruction of justice" enhancements (and left unopposed at *ECF No. 501 at 50, f.9*).

*The Hawai'i Lending Transactions (Centrum And Urban Expansion)...*
• Wholly managed by Hawai'i partners COO Manfredi; *not Kenner*...

In the same October 2010 FBI proffer (*Ex.1f -- 3500-CM-2-r at 1*), Hawai'i COO Manfredi verified that Manfredi "*did get 1 or 2 to lend $*"; *not Kenner*.  That was a significant element of Manfredi's day-to-day job as COO, with no development possible while Kaiser and Manfredi were waiting on Ka'u County permits. Manfredi told the FBI that "*most lender contacts came through PK*" and "*then CM send out package – pro forma – maps – plans*".   With the FBI in 2010 - Manfredi was specifically taking credit for:
>        (1) The Constantine-Urban Expansion loan; and
>        (2) The Centrum funds.

• The Court should note that Manfredi told the FBI in 2010 that he was unaware of several other hard money consultants (*Id. at 1*) at the same time *he was able* to identify the details of (1) the Constantine consulting agreements, (2) the

Constantine consulting payments, and (3) what Manfredi did with Constantine to close the Urban Expansion loan; further exculpating the Urban Expansion loan as a "sham". Yet -- Manfredi's 'amnesia' five years later was stunning (*Tr.2999 – not remembering telling the FBI about Constantine, and Tr.3008, 3016 – not remembering his own emails with Constantine even after seeing them at trial*). It contrasted with the transactional details he espoused while attempting to impress the Court and his imaginary throng of his innate knowledge.

- Contradicting his 2010 FBI proffer, Manfredi tried to downplay the necessary funds from Urban Expansion. Only under cross-examination pressures, he admitted through _his_ efforts that there were _no other funds available_ at the time to close the $35 million Waikapuna deal _one week later_, after 7 more unsuccessful weeks – and _after_ walking away from Lehman Brothers, *supra*.

- A few weeks before the Urban Expansion loan was proposed, Manfredi was distraught from losing another lender that failed to close (*Ex.V*).

**Arms-length from Kenner**, 100% of the emails in the government's Rule 16 production verify that Manfredi managed the entire Centrum lending deal in 2005 between Centrum and the Hawai'i partners' attorneys at Carlsmith Ball LLP (Hawai'i's largest real estate law firm, with real estate managing partner, Steve Lim).

In fact, the day before the Centrum loan closed, Manfredi personally negotiated the $1.5 million advance to Ken Jowdy as part of the Jowdy loans (*Ex.H*). Kenner emailed Jowdy on July 13, 2005, "*you might want to follow up with Chiris [Manfredi]. Cell 15165265010. leave a msg on the imveocita [email] address about what you work out*". Clearly, nothing was concealed from the management team's Chief Operating Officer, Manfredi who negotiate the final terms, and was present in Hawaii for the closing; contradicting Manfredi's trial testimony that the Centrum loan was to buy the Waikapuna parcel (*Tr.2950-51*).

- The Centrum loan was over $1 million _short_ of the funds needed for the Waikapuna closing (thus an impossible proposition) -- and the Lehman Brothers 2005 Waikapuna loan was still pending for another month before Manfredi cancelled it with its 11th-hour "*egregious*" terms.

- Manfredi (not Kenner) told another lender post Lehman Brothers in 2005 (*Ex.U*):

    "*The deal with Lehman was cancelled by us as being too egregious.*"

- Manfredi also received a $100,000 personal distribution from the Centrum loan, further discrediting his 'Centrum loan for Waikapuna purchase' story; making it wholly unfeasible (*Bates stamp: NAAZ000179*).

44

     o   *Kenner received no funds* or *benefits* from the Centrum transaction, but personally guaranteed the entire $3 million loan for the project.

Four (4) hours later, after Jowdy and Manfredi concluded their July 13, 2005 negotiations and independent from Kenner, Jowdy informed Attorney William Najam and Kenner that the $1.5 million loan to Jowdy (part of the Hawai'i loan deal, approved that day by Manfredi) would only be for "*30 days*" (*Ex.I*).

- Kenner's ultimate transparency and hands-off actions could not have consummated in some "intent to harm" or "concealed activity".
- In fact, four (4) other hard money brokers were paid from the Centrum funds (initiated by Constantine for the Hawai'i partners) (*Bates stamp: NAAZ000179*), while Manfredi and Constantine continued to search collectively for larger development loans with the project requiring over $25 million for Phase I infrastructure; prior to the Urban Expansion loan completion (*Ex.U2*), and exclusive of the pending Lehman Brothers $5 million Waikapuna acquisition "only" loan.
- Neither the Centrum loan nor its eventual payoff caused any 'harm' (proximate or otherwise) to any superseding indictment individual; nor any of the Hawai'i partners.

*No Superseding Indictment Investor Was Harmed In Any Way From The Centrum Transaction...*
Every transaction was 100% legal and approved by the Centrum loan *documents signed* in 2005 (regardless of Berreth's trial testimony 9-years *after* being fully repaid); nor was Centrum harmed financially thru the transaction, resulting in a full payout they independently negotiated with Lehman Brothers at the JV in August 2006 (with Kenner fully guaranteeing the loan, personally).

The Centrum-Big Isle V Ventures. LLC "Use of Loan Proceeds" statement signed for the July 2005 closing stated: "*the proceeds of the above described loan will be exclusively used for business and commercial purposes*" (*GX-3703*).   **They were...**

The Big Isle V LLC operating agreement (*Ex.J*) was ratified by Centrum prior to their loan closing as part of the closing package, as the entity that was responsible for the loan (with Kenner as the $3 million personal guarantee -- required by Centrum). The operating agreement specifically allowed "borrowing" and "lending" based on the current market conditions of the project.   It stated:

> "*At all times, the Company [Big Isle V Ventures, LLC], though its Managing Member Philip A. Kenner, reserves the right to borrow, lend, or invest on behalf of the company.*"

- *Kenner neither received Centrum funds directly or indirectly*.  There is nothing in the record for the government can refute it.   Ken Jowdy was not a co-conspirator; see *Contorinis*.

The email records in Rule 16 production confirm, the Centrum loan was obtained thru Manfredi's leadership efforts as COO while Manfredi and Kaiser were waiting for the development permits from Ka'u District in Hawaii.   Kenner was not part of that process.    The development permits were constantly being delayed (as Kaiser verified to the 2009 arbitration panel)[25], but as agreed by Manfredi, Kaiser, and Kenner -- the larger development funds were hard to obtain and should be acquired when possible (*Tr.3012-13*), specifically considering the group's efforts with over 30 potential lenders, originated thru 17 hard money brokers, like Constantine; and the never-ending consternations (*Ex.V – Manfredi confessions*).

One of the Hawaii attorneys explained in February 2006 update email to the Hawaii-Mexico investors (*ECF No. 785 at 2-4*):

> "*You should recall that the Centrum loan from 2005 could also be extended upon request and verification when construction and development funds are required.   Lehman Brothers has suggested that once they complete the Cabo funding they want to sit down with Phil [Kenner] again and try to finance the entire project.   They have proposed a macro lending deal not just the $5,000,000 acquisition loan that caused the 2005 issue and termination prior to the Tommy Constantine loan that saved the oceanfront parcel in the eighth extension week which Phil [Kenner] negotiated with Hawaii Senator Chumbley. We will determine Lehman Brothers future involvement in time since Tommy has another developer that he an Phil have been dealing with.*
>
> *For those of you who are Mexico investors if there are questions you want to discuss with Ken [Jowdy] or bill [Najam] directly I am sure they would welcome your calls about the delay issues.*"

---

[25] Kaiser testimony at 922-23 – Day 5 arbitration: "*The due diligence in Hawaii takes a long time, so if you find something, it takes a long time to actually do all the due diligence to purchase it.  So if we had some funds that were -- that was stagnant and that warrant purchasing land, we would utilize it for a loan, so we actually made some money off of it.*"

As the Managing Member of the Hawai'i partners, John Kaiser voluntarily explained to the 2009 arbitration panel (before his Jowdy-employment-induced amnesia in 2015) that the loans were "known by all of the investors" whom _he knew and met_ (and critical because Kaiser was the Managing Member of the Hawai'i project for almost 2 full years by the time of his 2009 arbitration testimony (*Ex.O*):

> *Q. And being in the course of the years you've been over in Hawaii dealing with this, have you met a lot of investors of Mr. Kenner?*
> *A. Yes.*
>
> *Q. Has this ever been a secret that Mr. Kenner lent this money to Mr. Jowdy?*
> **A. No.**
>
> *Q. Was this a transaction that, as your view as an investor was open and disclosed to everybody?*
> **A. It was open. There was no secret handshakes or nothing like that.**

John Kaiser referenced both the Centrum loan funds and the Little Isle 4 capital accounts:

> *Q: Was Mr. Jowdy at that time someone that appeared credible to you?*
>
> *A [John Kaiser]: Well, the first thing, Mr. Kenner told me that he was, **and I met him [Jowdy] a couple of times**.[26]   He seemed – **a big thing it was 15 percent interest rate**, and I thought it was a good move.*
>
> *Q: So at the time was there any representation about getting paid back this money when the Cabo deal closed?*
>
> *A [John Kaiser]: **It was supposed to be a short-term loan**.   I thought it was three to six months, **because I had also raised some other funds from family and friends** that were getting a little antsy about it.[27]*

---

[26] Kaiser proffered *unexpectedly* with the FBI on October 19, 2010 at his home in Long Island NY.   During the initial interview, _Kaiser confirmed the Jowdy loans_ and at least 5 meetings he had with Jowdy "prior to" and "during" the pendency of the loans (*Ex.1a -- 3500-JK-1-r at 2, 3, 10*).   Kaiser *shocked* the courtroom at trial in 2015 by claiming he never told the FBI that he met Jowdy during the initial meetings (*Tr.1120-22*).   The meetings Kaiser *denied thru graft* were validated by the attorney's "update letters"; _perhaps the grossest of Napue violations with the FBI agent silent at the prosecution table_.

[27] Kaiser altered his 2009 testimony at trial to claim it was a 30-day loan (*Tr.976-79, 1210-11*); not the 3-6 months he testified about in 2009.   More grossly, Kaiser lied to the Court

*Q: At the time this money was lent to Mr. Jowdy...did anybody anticipate he wasn't going to pay you back when the Cabo deal closed, the Lehman Cabo deal?*

*A [John Kaiser]: No.  Otherwise, <u>I wouldn't have lent it.   I wouldn't want to go down that route.</u>*

*Q: <u>When you made the decision</u> – or when you were made aware that some of this money was going to be lent, rather than sitting idle in an account, at 15 percent, did you know there were some risks?*

*A [John Kaiser]: At the 15 percent – actually, <u>the loans</u>, I didn't think they were going to be – to me it wasn't a risky loan...<u>but the loans -- even the investors I brought in – I said.   Listen.   This guy – I gave him the whole story of Ken Jowdy back by land.   It's good.   Better than your money sitting somewhere.</u>*

*Q.  You'd been dealing with Mr. Kenner now for a couple of years?*

*A [Kaiser]: Yes.*

*Q. <u>Have you ever seen him do anything inappropriate?</u>*

*A [Kaiser]: No.*

*Q.  <u>Do you blame Mr. Kenner for him not paying the money back?</u>*

*A [Kaiser]: No.*

*Q: <u>Has this ever been a secret that Mr. Kenner lent this money to Mr. Jowdy?</u>*

---

when he testified that he sold his Long Island home and *repaid* Ethel Kaiser, Vincent Tesoriero and Tesoriero's parents (*debunked by Tesoriero during his 2014 FBI proffer Ex.1h - - 3500-VT-1-r at¶ 12-13*).   **A 2011 text to Kenner from Kaiser verified Kaiser never repaid them**. The text was 6 years after the date Kaiser testified at trial that he had repaid his friends & family by selling his home (*ECF No. 788 at 27-30*) (*Ex.P*).   This incremental perjury was another unchecked Kaiser fabrication, known by the government and FBI, perhaps including his mother's participation who claimed her son repaid her (*Tr.933-34*), either coerced into testimony or another unfortunate but synchronized *faulty memory, confusion and mistake*.

> *A [Kaiser]: No.*
>
> *Q: Was this a transaction that, as your view as an investor was open and disclosed to everyone?*
>
> *A [Kaiser]: It was open.* **There was no secret handshakes or nothing like that***.*

Kaiser *shocked* the conscious by disclaiming his unfettered knowledge of the Jowdy loans in 2015, his participation in the set up meetings (*previously verified by the Hawai'i partners' attorney ECF No. 785 at 2-4*) (*Ex.A*).

*John Kaiser Is Not A Victim Of Anything (ECF No. 628 At 1)...*
- *Kaiser produced a collateral agreement to prove it* (along with a letter signed in 2014 by his then-employer, Jowdy).   Kaiser verified it to the Court in February 2019 -- but ironically not during trial, when he claimed Kenner "*ruined his life*" (*Tr.1089*) somehow by Kenner giving him a $100 million-plus collateral agreement (*ECF No. 628 at 1*) (*Ex.X3*)...

Nevertheless, **John Kaiser cannot be a victim**.   Kaiser presented documents in 2014 *after* Kenner's arrest in the Delaware lawsuits versus Jowdy, in support of Jowdy, that claimed he was given the Kenner Baja Ventures 2006 (*Ex.X*) as collateral for his 2005 friends & family loan ($1 million) – convertible on January 1, 2010.

Although this is another fabrication by Kaiser-Jowdy (this time by photocopying or forging Kenner's signature onto two documents) after the Kaiser employment in Mexico commenced (*Ex.X2, X3*), **Kaiser has stated in the Court's record** (*ECF No. 628 at 1*) that he was fully recompensed for the 2005 funds; ***thus cannot be a victim***.   That is the end of story for Kaiser, yet Kaiser testified that Kenner "*ruined his life*" (*Tr.1089*) by not repaying him (because the $1,176,000 he received in August 2006 were allegedly "*back pay*" and "*expenses*"; although 100% *unsupported* by empirical evidence – *Tr.1413-14*).
- It is another irreconcilable Kaiser lie – and planned misdirection by the government to claim Kaiser as a victim of anything (as their star-witness), while Kaiser is nothing more than a nonstop Benedict Arnold turncoat who is desperate to maintain the illusion that he did not rob his friends & family money that was repeatedly repaid (with banking records to prove it) from Kenner and the Hawai'i partners in every unchallengeable occurrence.

- The government has neither produced Kaiser's IRS records or Hawaii expenses to verify Kaiser did not perjure himself at trial.

- **Neither exist**, so the government is again hoping the Court will not raise the issue of Kaiser's premeditated fraud and demand the subpoena documents Kenner has repeatedly requested; not just corroborating "no loss-no victim" status for John Kaiser but his conspiratorial ploy with agent Galioto to mislead the Court and alter known facts in evidence that do not support their deceptions.

- The government doubled-down on the Kaiser lies during rebuttal summation (*Tr.5753*).

*Kaiser's reality with the collateral is unexplainable…*
Kaiser worked for Jowdy for 5 years while he was allegedly the largest equity owner in the Cabo san Lucas resort (valued at over $100 million) – yet Kaiser never attempted to transfer or sell his 39% stake in the ½ billion dollar project for even the million or so dollars (*at 1 cent on the dollar*) to repay the money he stole from his friends & family and never repaid (*Ex.P*).   These Kaiser thefts include the $200,000 he stole from Dr. Frank Sconzo, with the *Brady* evidence selectively removed by FBI agent Galioto from Rule 16 production pretrial after he received it via fax from Sconzo a year *after* Kenner's arrest (*Ex.Z4, corroborated by Sconzo's 2014 FBI proffer Ex.1g -- 3500-FS-1, ignored by the prosecutions investigation duo (Ex.Z5), and Kaiser's notarized document, Ex.Z3*).   It is more irreconcilable nonsense from every Jowdy-Kaiser related party – *and their necessary protection* -- in the instant case.

*Manfredi's Knowledge Of The Urban Expansion Loan…*
After the late August 2005 cancellation of the egregious terms Lehman Brothers offered at the 11th hour of the closing for a *triple-collateralized* $5 million loan (effectively handcuffing any development without Lehman Brothers' approvals, *guaranteeing* a complete loss of all Hawai'i property after the 2-year 23% annual loan), Manfredi sent Kenner a distraught communication – in real time -- on September 30, 2005 (one month later) after four (4) more failed hard money lenders:

[Manfredi to Kenner -- September 30, 2009]:
> "*I, like you, have been hearing the same old stories for so long, everyone can "get it done" and nobody does…I think the likelihood of losing Waikapuna and Moa Ula Makika [another parcel under agreement] is very real.   I never thought I would be leaving this trip without funding.*

*Chris Manfredi*
*COO/Project Manager*
*Big Isle Ventures, LLC*
*516-526-xxxx*"

Two (2) weeks after Manfredi's consternation about the $65 million in property [Waikapuna and Moa Ula] about to expire under contract, he and Constantine closed the Urban Expansion (Grdina/Constantine) loan (*Ex.1f -- 3500-CM-2-r at 1, verified by Manfredi in 2010 to the FBI*).

*Urban Expansion Loan Take-Out Within Cancellation Period (refutes any conspiracy claims)...*
Less than five (5) business days after the Waikapuna-Urban Expansion closing, Kenner, attorney Bill Najam, and Manfredi also expected a different lender "**Note Buyers of Texas**" and "**Premier Financial Solutions**" to re-finance the Waikapuna loan – and "**replace**" the Urban Expansion funding during its legal cancellation period (according to Najam and the Hawai'i partners' attorneys at Carlsmith Ball) (*Bates stamp: KJ2524*) (*Ex.V2*):

   "*Bill: Can you please review this [attached loan offer commitment] for me??  I have the lender and the broker flying to Hawaii to sign docs (which I have not seen yet) tomorrow...They have asked to discuss our Mexico dealings after the signing. Thanks in advance.  pk*"

- What Urban Expansion conspiracy could have occurred if Kenner flew to Hawaii to sign new closing documents *with Manfredi* and another hard money broker and lender to replace the Urban Expansion at no cost, days later?

- The Court should note that the replacement lender had a $3 million front-end fee for their $15,000,000 development loan for Waikapuna; making the Urban Expansion penalties commensurate with every hard moneylender Manfredi engaged.

Under Kenner's *mens rea* (a.k.a. -- critical state of mind) -- how could Kenner have been part of an Urban Expansion conspiracy – if – Kenner, Manfredi and Najam were expecting another Waikapuna lender to supersede and replace the Urban Expansion loan only five (5) days later – *and unknown to Grdina/Constantine*?
   - It is wholly confounding – but ignored by the government to frame their false theory of "delay" (*Tr.5996-97*).

After the entire summer 2005 lending process of sheer chaos when Lehman Brothers tried to run a "*typical deal-to-steal*" revised offer on the Hawai'i partners at the 11th hour (the week of the proposed closing), Manfredi confirmed to a 3rd party lender, on August 16, 2005, "*The deal with Lehman was cancelled by us as being too egregious*" (*Bates stamp: KJ2343 and PK_SEC_018640*) (and -- *not cancelled solely by Kenner as the government claimed*) (*Ex.U*).

It would be hard to convince a jury – with the current evidence in hand that there was a surreptitious lending act performed by Kenner and Constantine *in a vacuum* when the empirical evidence confirms Manfredi's fingerprints are all over the day-to-day inter-machinations of the (1) summer 2005 Lehman Brothers cancellation (*Ex.U*),  (2) the Waikapuna loan process with Urban Expansion (*Ex.1f -- 3500-CM-2-r at 1*), and (3) expectations to literally remove the Urban Expansion loan days later (*Ex.V2*), *unknown to Constantine and Grdina*.

Nevertheless, no parties in the superseding indictment were "harmed" with any loss due to the Constantine consulting (with no monies traced from any victim-party to Constantine) and no residual loss to any of the Hawai'i partners (alleged victims or not).  In fact, without the Urban Expansion Waikapuna loan, the $35 million appraised Waikapuna parcel would have been lost and approximately $1-½ million of hard deposits would have been forfeited (but irreconcilably, no crimes would have occurred).

- The 2015 acre Waikapuna parcel with "**2-miles of ocean front**" was the key to every lender who demanded ocean front access if they were to get involved, like Lehman Brothers eventually did in late 2006 *after* Manfredi, Kaiser and Kenner collectively chose them over the Constantine development partners from Arizona and Canada (*Ex.A*).

*Eufora…*
Tommy Constantine ($450,000) and Tim Gaarn ($250,000) sold $700,000 of private Eufora stock to individuals who were named in the superseding indictment.  The government cannot seek $1,650,000, including totals of people who were never presented as victims in the instant case (including Gonchar and Norstrom, *Ex.B2*).  $700,000 must be the maximum funds sought thru forfeiture money judgment.

- Kenner received a loan *re-payment* from Constantine of $117,000 ($100,000 from the Michael Peca purchase -- and $17,000 from the Tyson Nash purchase).
- Kenner received a loan *re-payment* from Gaarn (an innocent third party, *see Contorinis, supra*) of $162,500 ($77,500 from the Rucchin purchases – and $85,000 from the Ranford purchase).

(1) **This totaled $279,500, thus under the application of *Honeycutt*, this is the maximum attributable to Kenner (assuming the loan re-payments are deemed a fraud)**.

Constantine and Tim Gaarn (an innocent third party in the case – *Tr.2503-04, 2563-64, 2599-2600*) sold their private Eufora stock the government had documented with the Eufora operating agreement (*GX-210 at 35, 37*) and the Eufora 2005 (*GX-4728 at 21, 35*) and Eufora 2006 (*GX-4729 at 22*) IRS tax returns.   But – the Court should note that the government misled the Court and the jury, claiming that it was Kenner's stock that was being sold (*Tr.2732*):

> *Q. Did Mr. Kenner tell you anything about your money going to buy out either Mr. Constantine or Mr. Kenner's shares in the company?*
>
> *A [Rucchin]: **No, he did not***.

- Rucchin only purchased stock in 2009 from Tim Gaarn, *never* Kenner or Constantine.

Komatireddy rebuttal summation – recalls false and misleading Sydor Q&A (*Tr.5970-71*):
> *"QUESTION: Now, at the time that you invested in Eufora, did the defendant say anything to you about your money being used to buy out other investors?*
>
> *ANSWER [Sydor]: No.*
>
> > *QUESTION: To buy out Tommy Constantine?*
> > *ANSWER [Sydor]: No.*
> >
> > ***QUESTION: To buy out Phil Kenner?***
> > ***ANSWER [Sydor]: No.***

The Court should also note that less than one year after the Constantine and Gaarn transactions, the investors' investigation team led by Rudy Giuliani and New York attorney, Michael Stolper, wanted a 6% equity stake in the company for their $750,000 of investigation and legal fees.   Clearly, the 2008-09 stock the investors bought, and Giuliani's group vetted, held significant value, almost two (2) years after the early transactions.

Jay McKee confirmed this deal to Kenner via email:



| 14797 | +17168034903 Jay McKee* | 7/15/2010 12:03:01 PM(UTC+0) | Read | Hopefully you're getting some sleep right now; I am planning on sending the letter this morning.. **Within our package or plan in <u>taking the lender out</u>, where is the 6% for Guilani partners comming from?** |

Under *Novak*[28] and *Leonard*[29], the Eufora investors "received" all they bargained for. These private stock transactions lie outside the heartland of common securities frauds, considering Tim Gaarn was instrumental in hiring the Giuliani group to investigate "everything Eufora" (*Ex.B at 6*) and Kenner was one of the active participants in the 4-month investigation and one-plus-year mediation and litigation efforts.   Kenner was not represented by Giuliani's group and would have been fully exposed, if deemed part of some civil or criminal malfeasance (*Id. at 9-18*).

In fact, the Court should recall that Tim Gaarn recorded Kenner for 5 hours over the course of 6-months in 2012 during multiple calls (*Tr.2505-06*).   During *Operation Pederpuck*, <u>*never*</u> once did Gaarn mention to Kenner that his Standard Ventures (*Tr.2570-71*) private stock belonged to Kenner or that there was some conspiratorial cover-up that they were involved in.

Lastly, Kenner recorded Constantine at Home Depot in 2010.   The recording included Constantine's indecipherable ramblings about "things that have happened" and "lives being ruined".   Whatever insinuations he made about Kenner were so outlandish that Kenner immediately copied the recording and sent it to Giuliani's investigation team in New York.   This is not the *mens rea* of a guilty person.   In fact, after one year of attorney Stolper (and his team) investigating "everything

---

[28] *United States v. Starr*, 816 F.2d 94, 98 (2d Cir 1987).   It is not enough to show that a defendant used deception to induce victims to enter into transactions they would otherwise avoid.  See *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir 2007).   Rather, the government must show a "discrepancy between benefits reasonably anticipated because of the misleading misrepresentations and the actual benefits which the defendant delivered, or intended to deliver.  *Starr*, 816 F.2d at 98.  Intent to harm cannot be found when alleged victims "received all they bargained for, and defendant's conduct did not affect an essential element of those bargains."  *United States v. Novak*, 443 F.3d 150, 159 (2d Cir 2006).

[29] *United States v. Leonard*, 529 F.3d 83, 92 (2nd Cir) ("A fraud may involve the misrepresentation of the value of an item that does have some value (in contrast to an item that is worthless).   Where, for example, a defendant fraudulently represents that stock is worth $40,000 and the stock is worth only $10,000, the loss is the amount by which the stock is overvalued (*i.e. $30,000*).)"

Constantine" and prepping for future litigation versus Jowdy[30], Stolper made a pro-Kenner statement in front of the SEC (after 24 hours of Kenner's proffers). Stolper's Eufora investigation and the Home Depot tape raised no Kenner issues.   The transactions with Jowdy were fully exposed during his preparations for the early 2012 lawsuits.

Stolper told the SEC on August 2011:

> *The only thing I would like to clarify was that I think in your line of questioning, which may not come through in the transcript, whether he [Kenner] disclosed that the SEC has sought enforcement of subpoenas to his clients.   I think that the suggestion in your question was that it was something negative that he should disclose to his clients as sort of a warning or red flag to his clients who are relying on him.*
>
> ***And I think that the conversations that I have been a part of***, *without waving privilege,* ***<u>and also my own view</u>*** *of SEC's involvement in this whole Diamante del Mar, et. al. is a welcome one and that* ***<u>we</u>*** *and Mr. Kenner, are really looking to the SEC to enforce the securities laws against Mr. Jowdy and those [Jowdy's cabal] who did wrong here.   And we see it as a welcome thing, as a positive thing.*
>
> *So the tenor of the conversations with Phil's friends, co-investors, clients is that this is a welcome thing and maybe because we are having this direct communication with the SEC, and then perhaps subsequently with the US Attorneys Office, that maybe they will finally get some justice out of this.*
>
> *And I know I have said that off the record with you and I just wanted to clarify that in response to that line of questioning.   Just a point of information.*

---

[30] Attorney Stolper and his legal team quit their representation efforts with Kenner and Kenner investors immediately after Kaiser and Berard received jobs from Jowdy and Tom Harvey in Mexico – effectively ending the investors' U.S. legal strategies, just so Kaiser and Berard could get out of perpetual "brokenness" due to their-own eccentric lifestyle expenses.   *They were easy bribery targets for the unscrupulous criminals in Jowdy's cabal.*

- The Court should recall that within a month of Kaiser's first Mexico paycheck, he lied to a Mexico court that his name was *forged* on a testimonial in opposition to Jowdy in the $1.6 million Stumpel-Jowdy criminal case, which he previously signed for Stumpel in Mexico.   A 2012 FBI recording by Berard confirms the forgery lies (again).   Kaiser's courtroom lies immediately led to the dismissal of the 2-year legal proceedings versus Jowdy (now documented by Jowdy and the government as stolen as sued – *government-forfeiture-36*).

*GSF…*

A total of $1,200,000 was transferred to the Ronald Richards' trust account for Tommy Constantine to operate the GSF plans as signed off by every contributor named in the superseding indictment.  This is the maximum the government can demand, notwithstanding the trial statements of the various uses of the funds by Constantine, all verified by signed-off disclosure statements.   The government continues to seek $3,130,000, including $1,930,000 from individuals who were not presented as victims in the superseding indictment.   It does not follow statute or Second Circuit case law.  *See Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A.*, 461 Fed. Appx. 61; 2012 U.S. App. LEXIS 3012.

The money judgment cannot be more than the total originating funds ($1,200,000), if the Court assumes that Constantine's plan was to have the Hawaii-Mexico investors (1) contribute the $1,200,000, (2) misappropriate the $17,077 (*ECF No. 501 at 60*), and (3) conceal the funds from his contributors, including Kenner.   As the records in front of the Court show, it would have been far simpler for Constantine to simply rob the $17,077 (or more) from Kenner, like the $1,500,000-plus he previously "borrowed without repaying" it (Jowdy-style) (*Tr.4514*) (*Ex.Z1 -- with Kenner shorthand for the Hawaii consulting payments to Constantine as "Ula + LI4 + Na'alehu Ventures 2006", Ex.Z2 – and with Kaiser's transcribed shorthand* <u>*including*</u> *the Hawaii consulting payments to Constantine as "Hawaii"*).[31]

The District Court opined *(ECF No. 501 at 60)* that Constantine, *not Kenner*, had overspent the Gonchar $250,000 contribution to the GSF by $17,077.   The Court referenced in *footnote 18* that Constantine may have misspent another $450,000 he

---

[31] The Court should note that *if* Kaiser was not fully aware of the Constantine consulting payments (as the Managing Member of the Hawai'i partners at this time), it would have been impossible for Kaiser to transcribe the "Kenner short hand text" to "*Hawaii*" (*Ex.Z2*)…thus Kaiser's testimony about not knowing of the Constantine consulting payments is further debunked as planned perjury.   Further identifying Kaiser's independent knowledge of the Constantine payments, Kaiser did not tell Kenner he took Kenner's loan list for 6 more days (via text from Kaiser):

| 11064 | +16312350308 John Kaiser* | 12/12/2009 4:43:29 PM(UTC+0) | Read | **[Kaiser]: I rewrote that list to show him , is that ok???** |
|---|---|---|---|---|
| 11065 | +16312350308 John Kaiser* | 12/12/2009 4:48:01 PM(UTC+0) | Read | **[Kaiser]: Call me** |

used to complete the "bad apple" deal with Joe Juneau, but the government's own evidence (*GX-767*) confirms that those funds do not originate with any person in the superseding indictment, thus not an issue in the instant case, as nothing on the record asserts their independently signed disclosures were insufficient; *See Horvath.*

As the Court recalls, attorney Ronald Richards testified on direct-examination with AUSA Michiewicz as to the total management control of the GSF during trial (*Tr.3805-3816*).   Richards' unequivocally verified that Constantine, *and only Constantine*, had control of the GSF (*Tr.3805*):

> *Q. Now, if there are disbursements that represented funds that were sent under the authority of Mr. Constantine, again, for the record, who did you receive each and every one of those disbursements authorizations from?*
>
> *A [Ronald Richards]:* **Only Mr. Constantine***.*

In fact, when Michael Peca testified about the use of the GSF during trial, he confirmed that Kenner was not permitted by Constantine (the control person) on behalf of the Hawaii-Mexico investors to continue using the GSF funds for litigation versus Jowdy in Mexico (*Tr.539*):

> *[Michael Peca]: "But I do remember a conversation that I had with Phil regarding litigation in Mexico and he said he couldn't do it because he didn't have money and I remember calling Tommy to ask him why we couldn't use money from the global settlement for Phil and the answer was Mexico was too much of a crap shot and unpredictable legally. So there's no money to go towards the Mexican part of it."*

As the government's records show, Kenner was forced to pay approximately $250,000 to the Mexico attorneys to continue the existing litigation *after* the initiation of Constantine's GSF when *Constantine refused* to release the funds completely under his control, *supra.*

Nevertheless, the government, Michael Peca, and Jay McKee (*Tr.1830*) tried to lay their investment recovery burden on Kenner.   This "burden" would have been contemporaneous with Michael Peca's independent-group legal representation by attorneys:
   (1) Tom Baker in Arizona (2008-09);
   (2) Kevin Harper and Jonathan Dessaules in Arizona (2008-09);

(3) Ronald Richards in California (2008-2011);

(4) JT Fox in California (2008-2011);

(5) Ruben Carillo and Javier Duarte in Mexico (all versus Jowdy for the Hawaii loan funds and other project embezzlements) (2006-2011);

(6) Paul Donion and Karlos de la Puerta in Mexico (2012-2014); and subsequently

(7) Rudy Giuliani's investigation group with lead-attorney Michael Stolper in New York.

With this dynamic, independent legal team (from 2006-2014) in multiple jurisdictions to recover funds from Jowdy (and later Constantine), this can hardly be considered "solely relying on Kenner".

Yet, Michael Peca testified (*Tr.539*): "*That was the fear, it all hinged on Phil.*"

But when Michael Peca was asked who was in charge of the GSF, 6 years after he contributed $250,000, without Kenner's involvement – in his words Peca said (*Tr.540*):

> *Q. Before the money went, before the money had been spent, before you were apprised of that, what was your belief as to who was in charge of the Global Settlement Fund?*
>
> *A [Michael Peca]:* **Initially Ron Richards and, as it was ongoing, Tommy Constantine.**
>
> *Q. And what was Phil Kenner's participation in that, as you recall?*
>
> *A [Michael Peca]:* **He didn't seem to have one.**

On cross-examination with Constantine attorney, *Michael Peca further detailed* the "control" person for the GSF, Constantine (*Tr.539-40*):

> *Q. So from your perspective, who would you say was the one that was primarily responsible, if more than one, answer that as well.*
>
> *A [Michael Peca]:* **From my understanding Tommy was in charge of Global Settlement Fund.**
>
> *Q. And that came from whom?*

*A [Michael Peca]: **That came from both Phil Kenner and Ron Richards**.*

It just does not reconcile.   It cannot all "*hinge*" on Kenner when it was verified that Kenner had "no control".  Kenner could not even get Constantine to repay him for expense funds that Kenner laid out for the various GSF transactions in the record.

*Conclusion…*

The government's follow-up submission of January 31, 2020 requests money judgment forfeiture for funds that were never 'ill-gotten' or 'proceeds' received by either co-defendant in the instant case (including but not limited to Jowdy, Kaiser, Gaarn, Manfredi).   This contradicts statute and Second Circuit case law.

The government simply seeks to bolster their forfeiture numbers thru the application of additional investors who flatly rejected the government, the FBI, and Jowdy's pretrial theories of the case and Kenner thefts.   The government specifically withdrew nearly ten (10) of the original victims (*ECF No. 1*) after repeated communication by the prosecutorial team (*ECF No. 771*).

For trial, the government chose, instead, to focus on the investors they fooled into believing Kenner stole all of their Hawaii funds and never gave the loans to Jowdy – *never questioning the actual loans or underlying knowledge* (as Kristen Peca admitted during her surreptitious 2012 FBI recordings to Kenner), *supra*.

The Court should consider that between Berard's **CTE** (*ECF No. 782*) (as well as Nolan, Sydor, Rucchin and others filing in 2014 for brain damage claims against the NHL), and Kaiser's voluminous trial malfeasance and testimonial defiance (*ECF No. 785*) – *while both employed by Jowdy* – it raises a critical credibility issues.

This coupled with Kristen Peca's 2015 trial perjury (*ECF No. 784*), concocted after her own 2012 FBI admissions of not knowing about her husband's LOC in 2012, it debunked her have soured the entire 7 years since the original indictment; discounting any and all credibility…leaving the government's unsupported money judgment requests unexplainable; certainly not sustainable against challenge by statute or case law precedent.

The Court's decision rests in their interpretation of case law precedent, leaving approximately $2.8 million for Constantine (minus the arguments of lacking nexus for $2 million to alleged superseding indictment victims) – and no more than

$280,000 traceable to Kenner as part and parcel to Constantine and Gaarn's loan repayments to Kenner from their Eufora stock proceeds (if they are deemed as part of a conspiracy that Rudy Giuliani's investigative for the actual investors 5 years before trial debunked and dismissed).

The government chose their alleged victims during 6-years of pretrial, their allies thru pomp and circumstance, and their facts systematically by deduction and ignorance of the whole truths to present and secure a conviction, and they cannot "move the goalposts" now simply to satisfy a forfeiture they are unhappy with after this 11-year charade.

Kenner requests that the Court reject the government's baseless forfeiture money judgment demands of $17,000,000, for the well-articulated solutions *supra*, with virtually no ill-gotten funds traced to Kenner by the government, their clear and unavoidable obligation.

*Baja Ventures 2006 forfeiture...*
Five (5) years after the 2016 forfeiture hearing debunking that "Kenner stole the Hawaii money to buy his Cabo equity" lie from trial and pre-trail to the investors (See Kristen Peca 2012 FBI recording, *supra*) thru admission of *government-forfeiture-36* and *government-forfeiture-44*, the government renews their fraud on the Court, Kenner and the investors by fabricating that "*Kenner used approximately $2.4 million to buy a personal stake in Mexico.*" (*ECF No. 765 at 8*).  Is that the Kenner obstinacy the government refers to in "*not taking responsibility*" (*Id. at 4*)?

How could Kenner agree to it, as it is still <u>untrue</u> **13 years** after Jowdy and his attorneys began that salacious rumor in 2007 once Jowdy was exposed by Kenner to the investors the first time?   The government simply chose to echo it thru trial even without their-own back-up tracing.   Weren't the government's false summation proffers enough prejudice (*Tr.5996, 5711, 5722-23, 5744-45, 5990, 5991-92, 5707-5709*) just to secure a conviction?
- Perhaps, there have not been enough confessions (including *government-forfeiture-36* and *government-forfeiture-44* – by the government themselves, only post-trial) to conclude...
  > "*Kenner did not steal any of the Hawai'i partners funds, nor use them to buy anything (let alone something in Mexico)...*"

The Court has a decision at hand to recover only $350,000 that Ken Jowdy received and used for his KAJ holdings from a superseding indictment victim (the 5-4-2005 transfer, *government-forfeiture-36*, originating from Nolan's Hawaii investment

funds).  The government *delicately* conveys this position, in lieu of the macro Cabo property forfeiture, harming millions of innocent investment dollars of non-parties to the case (*ECF No. 780 at 6, f.2*); despite their denials during oral arguments January 22, 2020.  In addition, the government's recent pigheadedness about the reality of the Jowdy-Nolan 2008 settlement (*ECF No. 780 at 6*), Kenner proved its existence during the January 22, 2020 hearing by reading the legal document acknowledgment to the Court (*ECF No. 790, Ex.A at 5*).   Nolan was relieved, over 12 years ago by Jowdy, as a victim of anything to do with the Hawaii or Mexico investments in the instant case.  Nolan received $3,250,000 of Diamante Cabo san Lucas equity as full compensation in 2008, splitting from the remainder of the Hawaii-Mexico investor base at the time by choice.

Nevertheless, none of the Nolan or Hawaii funds benefitted Kenner or his two (2) partners in Baja Ventures 2006, certainly not as forfeiture-defined "ill-gotten" anything.

Kenner also requests that the Court reject the government's forfeiture of Baja Ventures 2006 with no ill-gotten funds traced to Kenner's LLC (*ECF No. 771*).

Sincerely,

Phil Kenner, Pro Se