February 7, 2020

The Honorable Judge Bianco
U.S. District Court – EDNY
100 Federal Plaza
Central Islip, NY 11722

Your Honor,

_A few following housekeeping items, infra, are discussed from the recent January 22,_
_2020 hearing date._

_Hearing misrepresentations…_
There are several overarching items that were again _misrepresented_ by the
government, and contradicting evidence on the record, during the January 22, 2019
hearing.[1]  Briefly, they were unresponded to, and are as follows:

_Personal expenses…_
The government claimed Kenner used the investors' Lines of Credit ("LOC") for his
own "_personal expenses_" (_Tr.xxx_).  This was echoed by Attorney Talkin in
Constantine's January 10, 2020 brief (_ECF No. 789_).  This _never_ happened.  No LOC
money from the superseding indictment victims is traceable to Kenner; and
_specifically not for any alleged scheme in the instant case_.
1. Nothing on the record would support this deceitful statement by either party;
2. In fact and in addition, Kenner _never_ paid himself a developer fee during the 4-
   years Kenner managed the Hawai'i project prior to Lehman Brothers taking over
   the management in August 2006; while all other management team members
   (Manfredi and Kaiser) and staff (over a dozen employees) received full pay-for-
   work.
   1. According to the JV "arms-length" deal post JV-closing, Kenner could have
      paid himself up to the **$109,000 per month** the new partner received
      (over $1,300,000 per year)[2]; and

[1] At sentencing, "the Court is virtually unfettered with respect to the information it may
consider."  _United States v. Alexander_, 860 F.2d 508, 513 (2d Cir 1988).

[2] The government explained to the Court in 2019 that Jowdy was receiving **$220,000 per**
**month** in Cabo san Lucas as the developer; a portion of the $200 million the government
claimed decreased the Diamante value by 2017 as a result of Jowdy's egregious
management practices (echoed by John Kaiser's February 2019 letter to the Court – _ECF No._
_628_).  _Again, Kenner never paid himself anything from the project as Managing Member for 4_
_years; leaving millions of unpaid "back pay"._

1

3. Kenner _never_ received any payout from his $600,000-plus capital account at the time of the JV closing.  Kenner was the only member to not receive a 42.5% payout (while contributing at least $267,000 more post closing, after Jowdy terminated the 2007-08 negotiations with the Hawai'i-Mexico investors/lenders and their attorneys);

4. And, Kenner was forced to accept selling his million-dollar Hawai'i home in Na'alehu to the JV for over $500,000 under market value fully furnished (at Kenner's original purchase price from years earlier), in a take-it-or-leave-it deal for the JV to conclude, or be cancelled.  _Kenner agreed_...**leaving millions of his personal funds on the table for the benefit of his investors**.

The government _cannot_ argue that those are _not_ the actions of a Managing Member (Kenner) who was attempting to defraud his investors, as portrayed by the government, while receiving _none_ of the Jowdy loan funds (directly or indirectly)[3] -- or Constantine consulting funds (directly or indirectly), either.

The government grandstanded at trial that _Jowdy was an innocent victim_ of Kenner and Constantine as the critical backdrop to their alleged schemes.  Post-trial, Probation independently supported the same Jowdy innocence-theme more than a year after trial in their July 2016 addendum submission (_at 1_).

• It should be noted that the Probation addendum was submitted even after Jowdy attorneys, complicit with the government, submitted during their February-March 2016 forfeiture case -- both _government-forfeiture-44_ (confirming all of the Hawaii funds were received by Jowdy and _not_ "stolen by Kenner") and _government-forfeiture-36_ (confirming that Kenner did _not_ steal any funds to purchase his equity in Cabo san Lucas, or anything else: **i.e. no ill-gotten gains**).

• This contradicted the government's 10-week trial themes but has gone unresolved post-trial under this game-changing revelation, in spite of the government's 5-plus summation statements that "_Kenner stole the funds_" (_Tr.5996, 5711, 5722-23, 5744-45, 5990, 5991-92, 5707-5709_) (_ECF No. 788 at 9-10_).

• The government prejudice was further reinforced by Komatireddy's rebuttal summation statements that misled the jury claiming Kenner was "_broke_" during the time of the alleged thefts; thefts which never even occurred) (_Tr.5982_).  The

---

[3] In the _United States v. Contorinis_, 692, F.3d 136, 148 (2d Cir 2012), the Court "observed that neither the language of the criminal forfeiture statute nor Circuit case law supported the proposition that a defendant must forfeiture proceeds that 'go directly to an innocent third party and are never possessed by the defendant'" _Id._ at 147.

bank records in the government's Rule 16 production confirm Kenner had over $1 million in his various bank accounts during the alleged periods of theft; hardly "*broke*" while contemporaneously grossing over $500,000 annually in his primary consulting business, only.

> o Perhaps, Kenner's actual "*non-broke*" status is why Jowdy, Kaiser, Berard, Constantine, Nolan, Sydor, Gaarn, Eufora, and others all repeatedly came to Kenner "for a favor" and borrowed significant money (all in the Rule 16 records); totaling over $2 million at the same period of time the government called him "*broke*".  *It was outrageous and prejudicial.*

***The government cannot "move the goalposts" on the Jowdy "status" simply because it is no longer convenient for him to be a victim***.  Jowdy cannot be a "secret" co-conspirator simply for the purpose of the government's forfeiture nexus to property or money judgment, because Kenner exposed their nexus dilemma.  It flies in the face of *Contorinis* and Second Circuit long-standing precedent.  The government conceded that "if the Court did not find a requisite nexus" (for the first time they made this admission – 5 years after trial), then they would request the Court forfeit thru money judgment the $350,000 that is traced to Ken Jowdy's KAJ Holdings LLC for his capital account in Cabo san Lucas (*government-forfeiture-36*); *none to Kenner* (*ECF No. 780 at 6, footnote 2*).

- In concert with the Second Circuit's recent *Honeycutt* positions on joint and severable liability, *without* Kenner receiving any of the Hawai'i proceeds, the government is saddled with forfeiture for the funds Constantine received *from the superseding indictment individuals (which they have not delineated with evidence)*, if they seek it from both defendants; if it is decided to *not follow Honeycutt*.

*It was impossible for Kenner to transfer funds without full client involvement…* Next, the government claimed Kenner moved money to the Eufora purchases and the GSF from the investors' Charles Schwab accounts without their knowledge (of payee).  This was logistically impossible because there was a 5-step process for Kenner (with limited Power of Attorney) for the account-holder to transfer money. *Kenner only participated in the first step*, which was the presentation of the "Power of Attorney signed" wire instructions to the Schwab custodians.  From that point forward, the individual investor was *required* to verbally authorize the transfer *amount* and *payee* to (1) his Schwab custodian and (2) his FINRA financial advisor at Greenberg Graham and Assoc.   *Kenner could not intervene in those steps*.  Then, the investor would receive a written confirmation in the mail from Schwab to confirm the payee and amount of the transfer they had previously authorized verbally (as

Ranford confirmed at trial – *Tr.2854-55-51*).   Ultimately, the transaction would show up on their following month's statement from Schwab, thus it was logistically impossible for money to move "only by Kenner" and "concealed" (as Peca lied to the court – *Tr.457*).   The *required* transfer process is detailed at *ECF No. 790 at 31-33*.

*The government lied that Kenner utilized illegal overseas wires…*
Next, the government claimed that "*overseas*" (*Tr.xxx*) wires were part of Kenner's "sophisticated means" but no transactions matching this claim are in the record (or anywhere – other than Kenner's Baja Ventures 2006 non-victim-partners' *untainted* $1.6 million wired to Jowdy for the Baja Ventures 2006 purchase (*ECF No. 771*) (of the total $4-plus million Jowdy received for Baja Ventures 2006's capital account) – *government-forfeiture-36*); *See United States v. Nicolo*, 597 F.Supp.2d 342, 348 (2nd Cir 2009) ("[P]roperty 'traceable to' means property…the acquisition [of which] is attributable to the money laundering scheme rather than money obtained from untainted sources.") (alterations in original).

*The government discounts the relevancy of their FINRA trial fraud on the Court, the jury, and Kenner…*
Next, the government agreed that Kenner was *not* a FINRA registered representative during the pendency of the alleged conspiracy but their mistake to present the FINRA representatives testimony was *harmless*, because Kenner was the "*custodian of funds*" (*Tr.xxx*).   This was also *never* true.   Kenner has *never* been the custodian of funds for his business management clients, or before.   The government claimed it to fit their square peg theories into another round hole; without substantiation, obfuscating their trial prejudice.

1. The mere testimony by the FINRA representative placed a "standard of care" duty that Kenner never had in place with his clients, *nor was ever bargained for* (*Tr.2477-88*).[4]

    i. One of the attorneys hired for the Hawai'i-Mexico investors clearly identified this information during the 2009 Nolan arbitration.   As such, the arbitration panel *denied* testimony from a FINRA representative in *Nolan, attempting the same mis-direction scheme.*

    ii. The government simply recycled the FINRA falsity, which Kenner's EDNY trial counsel was too scared to request a stay in the proceedings for a *Daubert* hearing (based on previous documented intimidation by the FBI case agent – *ECF No. 675, Ex 3*) (*Ex.Q*).

---

[4] See *United States v. Foley*, 73 F.3d 484, 493 (2d Cir 1996) ("When…the jury has been presented with several bases for conviction, one of which is invalid as a matter of law, and it is impossible to tell which ground the jury selected, the conviction must be vacated.").

2. At no time in Kenner's professional career was he a stockbroker, or did Kenner perform any business function that would have fallen under FINRA scrutiny (even while holding the securities licenses – and thoroughly vetted by the SEC in 2010-11 as initiated and predicted by Jowdy's attorneys in an April 2009 extortion email – *Bates stamp: ED-003068-69*).[5]

   i. As the Court knows, the jury asked for a read-back of the FINRA testimony as their first act during deliberations, thus the calculated misdirection *was* prejudicially effective on their 12-person audience.

   ii. But – now the government downplays it with a subsequent lie to the Court about being a "*custodian of funds*".

3. Further disturbing to the government's scheme on the Court, Kenner's FINRA registration had terminated several years *before* any alleged unauthorized transaction in the superseding indictment occurred; confirmed by the FINRA rep, Melley (*Tr.2481*).   Kenner re-instated the licenses in 2003 for one-year to facilitate a lawsuit versus Kenner's former California firm when Kenner "whistle blew" and exposed their fraudulent SEC investment activities in 2003.   Kenner's litigation led to the $1 billion Canadian publicly traded company closing their U.S. operations one-year after Kenner's April 1, 2003 complaint was filed and the SEC frauds were exposed.   Kenner's entire livelihood was put-at-risk while fighting a counter-claim attempting to restrict Kenner from the Business Management world for one year and total restraint from any of his 125+ former clients (akin to the risk Kenner endured for the last 14 years after exposing Jowdy's crimes once first discovered in late 2006).

   i. All Hawai'i investors knew about the Jowdy loans (*See Ex.A – from ECF No. 785 at 2-4*) and were informed immediately of the subsequent frauds (confirmed by:

      ii. [Peca] *Ex.1b -- 3500-MP-5 at 30-32*);

---

[5] Kenner was forced to sue Jowdy and his NY attorney, Tom Harvey, for extortion (*Ex.Y*) in California for threatening in the April 2009 email that if Kenner did not relinquish all of his Jowdy related equity "in all projects" to Jowdy and others that Kenner would go to jail at the hands of the FBI; specifically for claiming the Hawai'i money that Jowdy received were "loans".   Sadly, less than one year after the threatening FBI-led jail time email, Jowdy confessed to the FBI (*Ex.1i -- 3500-KJ-2 at 11-14, with Louis Freeh at Jowdy's side*) that he did in fact take all of the money as loans from the Hawai'i partners pursuant to the loan agreement (which he subsequently authenticated in his December 2010 Nevada case defense as his exhibit in chief) (*Ex.R*) (*Ex.1i -- 3500-KJ-2 at 24-25, loan titled to the Hawai'i partners*).  Jowdy's March 2010 FBI confessions followed his January 2010 California deposition confessions of the same "*acceptance of the loans and no plans to repay Kenner and Kenner investors*". Jowdy and his attorney got the extortion case dismissed, regardless of the extortion threats of FBI-led jail time, by claiming California "freedom of speech" under a SLAPP motion defense.

      iii.   [Sydor] *Ex.1d -- 3500-DS-2 at 19, 25-27*);

      iv.   [Stevenson] *Ex.1c -- 3500-TS-1 at 17-18*); and

      v.   As verified to the FBI by John Kaiser in 2010 (*Ex.1a -- 3500-JK-1-r at 3*).

4.  Willful neglect (by the investors) cannot be the basis for criminal prosecution and liability, despite Berard confirming he refused to read emails related to his business transactions with Kenner, and somehow it became Kenner's criminal fault for what Berard can no longer recall (*Tr.3151*):

    *Q. You got an e-mail and you didn't read it, is that what you're telling this jury?*

    *A [Berard]:* **Yes, absolutely**. *I wouldn't have read this e-mail. Again, I did not invest in the AZ Falcon Partners, I did not invest in the airplanes.*

    *Q. You do that often, Mr. Berard, get e-mails and decide not to read them?*

    *A [Berard]: Yes.*

As the record from trial and the underlying government Rule 16 production confirms, despite the government's droning about Kenner "stealing money" in a decade-plus of criminality, as insinuated by AUSA Michiewicz at trial thru cross-examination Q&A (*Tr.4588*), Kenner received proceeds of no more than the $280,000 in total as funds from any alleged "unauthorized" transaction ($117,000 from Constantine Eufora stock sales – and $162,500 from Tim Gaarn Eufora stock sales; partial repayments of previous and documented personal loans).

*Eufora stock sales were fully vetted by he investors' own attorneys...*
As the Court knows, the July 16, 2010 letter from Rudy Giuliani's investigation attorney, Michael Stolper, reveals, the investor's attorneys were *fully aware* of the 2008 (Constantine) and 2009 (Gaarn) private stock sales and dismissed them as "known" and a "non-issue" for the same investors the government deemed a criminal act 5 years later (*See Ex.B – Stolper letter and "Written Consent of Members" signed off by 29 Eufora related individuals 2 weeks before Kenner turned over the Constantine Home Depot incoherent ramblings immediately to Giuliani's team*); *See Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A.*, 461 Fed. Appx. 61; 2012 U.S. App. LEXIS 3012. [6]

---

[6] In *Horvath*, **the investor argued that the terms and conditions were *written in Portuguese*, which he did not understand, but the court of appeals found that the**

Based on (1) the market conditions of the 2008 real estate recession, (2) the Lehman Brothers 2008 bankruptcy, and (3) the government's confirmation question that they were not blaming Kenner for those *non-fraud factors, infra*, it is clear that Kenner was only on trial for the money he stole, as specified by AUSA Michiewicz. Thus, it is clear that the *Ebbers* factors should be applied in starting the money judgment calculation (as well as the loss factors for guideline calculations); See *United States v. Ebbers*, 458 F.3d 110 (2d Cir 2006).  "'[t]he loss must be the result of the fraud." *Id*. at 128.  "**[l]osses from causes other than the fraud must be excluded from the loss calculation.**" *Id*.

No more than the original $1,315,000 of Hawai'i investment funds can be traceable to the alleged superseding indictment victims (*ECF No. 770 at 53*) thru the Jowdy loan transactions – *before discounting*:

(1) **Michael Peca**'s testimony (*Tr.498-99, re-verifying his prior 2011 SDNY Grand Jury testimony confirmations – Ex.1b -- 3500-MP-5 at 30-33, 35, 40, 42, and 45*); and

(2) **Bryan Berard** verifications at trial that they were aware of the Jowdy loans (*Tr.3055, recertifying his voluntary 2009 arbitration testimony – Ex.E -- ECF No. 770 at 61-62*); and

(3) **Darryl Sydor** 2011 Grand Jury testimony (*Ex.1d -- 3500-DS-2 at 19, 25-27*) of his awareness before the horrible sight of his **CTE** struggles on the witness stand to recall anything in his past, echoing "I don't remember" or "I don't recall" over 30 times on cross-examination of the details of the same investments he was rock-sold sure of during his direct examination confirming that he "*remembered what he was never told*", and

(4) **Owen Nolan**'s inability to recall his own LOC (*Tr.2065-66; the government specifically asking about his "memory"*), despite:

    i.   His wife, his personal assistant, and his Wells Fargo private banker managing the LOC for Owen Nolan (*ECF No. 788 at 34-38*) (*See Ex.C, Ex.D*), verified at trial by Nolan (*Tr.2112*); *Q. Who, in let's say 2006 and 2007, would handle your federal and state income taxes?  A [Owen Nolan]: My wife did a lot of the*

---

investor was charged with knowing and understanding the contents of the documents that he signed.

The Court opined "If the signer can read the instrument, not to have read it is gross negligence; if he cannot read it, not to procure it to be read is equally negligent; in either case the writing binds him.  Parties are bound by documents expressly incorporated by reference into agreements to which they manifest their assent."

*paperwork.*;

ii.   Northern Trust Banker Aaron Mascarella's 2009 deposition testimony that he and Owen Nolan had discussed Nolan's LOC between 2003-2006 (*Ex.F – from ECF No. 736 at 50-52*); and

iii.   Nolan's *possession* in 2009 of his 2006 Little Isle 4 (Hawai'i) K1 tax document, identifying his $2.3 million investment; as *Bates stamp: Nolan0005044* by Nolan for the 2009 arbitration (*Ex.G*), although the government *lied* to the Court (again) and claimed Nolan's K1 only resided in Kenner's office (*Tr.2145*).

AUSA Michiewicz cross-examination of Kenner (*Tr.4588*):

*Q. You understand that the indictment in this case does not blame you for losing money in a risky venture. Right?*

*A. That's my understanding.*

*Q. You understand that the indictment charges you with stealing money from your clients, correct?*

**A. That's my understanding.**

*Q. So the fact that Lehman Brothers went belly up, that the great recession happened, the real estate market bubble burst, you understand there's nothing in the indictment that blames you for that, right?*

*A. I understand that.*

Respectfully submitted in response to false government claims and insinuations during the January 22, 2020 hearing for the Court's consideration during this crucial case conclusion.


Sincerely,

Phil Kenner

8