8:55 am, Feb 26, 2020

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

FILED
CLERK

1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
2

3     --------------------------------X
                                      :
4     UNITED STATES OF AMERICA,       :
                                      :   13-CR-00607 (JFB)
5                                     :
              v.                      :   100 Federal Plaza
6                                     :   Central Islip, New York
      KENNER, *et al.*,               :
7                                     :   February 13, 2020
                  Defendants.         :
8     --------------------------------X

9

10        TRANSCRIPT OF CRIMINAL CAUSE FOR DECISION CONFERENCE
             BEFORE THE HONORABLE JOSEPH F. BIANCO
11               UNITED STATES VISITING JUDGE

12    APPEARANCES:

13    For the Government:        SARITHA MONATIREDDY, ESQ.
                                 MATTHEW HAGGANS, ESQ.
14                               U.S. Attorney's Office, EDNY
                                 271 Cadman Plaza East
15                               Brooklyn, New York 11201

16                               MADELINE M. O'CONNOR, ESQ.
                                 DIANE C. LEONARDO-BECKMANN, ESQ.
17                               U.S. Attorney's Office, EDNY
                                 610 Federal Plaza, 5th Floor
18                               Central Islip, New York 11722

19    For Himself:              PHILLIP A. KENNER, *Pro Se*
                                No. 07480-408
20                              MDC Brooklyn
                                Metropolitan Detention Center
21                              PO Box 329001
                                Brooklyn, New York 11232

22    As Stand-By Counsel for   MATTHEW W. BRISSENDEN, ESQ.
      Phillip Kenner:           Matthew W. Brissenden, P.C.
23                              666 Old Country Road
                                Suite #501
24                              Garden City, New York 11530

25

      Proceedings recorded by electronic sound recording, transcript
      produced by transcription service.
      APPEARANCES:  (Continued)

```
 1                                                                    2

 2

 3

 4    For Tommy C. Constantine:   SANFORD TALKEN, ESQ.
                                  Talkin Muccigrosso & Roberts, LLP
 5                                40 Exchange Place
                                  18th Floor
 6                                New York, New York 10005

 7    For Danske Bank:            DOREEN S. MARTIN, ESQ.
                                  Venable, LLP
 8                                Rockefeller Center
                                  1270 Avenue of the Americas
 9                                24th Floor
                                  New York, New York 10020
10
      Court Transcriber:          RUTH ANN HAGER, C.E.T.**D-641
11                                TypeWrite Word Processing Service
                                  211 North Milton Road
12                                Saratoga Springs, New York 12866

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1  (Proceedings began at 12:54 p.m.)

2          THE CLERK:  Calling case number 13-CR-00607, United

3  States of America v. Phillip Kenner, Tommy Constantine.

4          Counsels, please state your appearances for the

5  record.

6          MS. KOMATIREDDY:  Good afternoon, Your Honor.

7  Saritha Komatireddy for the United States.  I'm joined by AUSA

8  Matthew Haggans, Diane Beckmann and Madeline O'Connor and

9  Special Agent Galiado [ph.].

10          THE COURT:  Okay.  Good afternoon to all of you.

11          MR. TALKEN:  Good afternoon, Your Honor.  Sam Talken

12  for Tommy Constantine, who is -- I checked.  He is on the

13  telephone.

14          THE COURT:  Yes.  Good afternoon.

15          Mr. Constantine, can you hear okay?

16          MR. CONSTANTINE:  Yes, Your Honor.

17          THE COURT:  All right.

18          MR. KENNER:  And good afternoon, Your Honor.  Philip

19  Kenner.  I'm pro se with Matthew Brissenden here as stand-by

20  counsel.

21          THE COURT:  Yes, good afternoon, Mr. Kenner; good

22  afternoon, Mr. Brissenden.

23          And Mr. Wolinsky, are you on the line as well?

24          MR. WOLINSKY:  Yes, I am, Your Honor.

25          THE COURT:  All right.

4

 1          MR. WOLINSKY:  Thank you for accommodating me.

 2          THE COURT:  Sure.  I just want to apologize.  The

 3   Marshal had asked me to move the time up.  I agreed to that

 4   and then I realized that we were going to try to get all the

 5   lawyers here, but I forgot the fact that you and Mr. Southers

 6   here and other people might not get notice, so I'm glad that

 7   everybody is able to participate in person or by phone.

 8          So as I think both sides know, we have several

 9   things on the agenda today.  The primary purpose was for me to

10   rule on the objections to the PSR, so I plan to do that.  I

11   did get the letter from Government regarding the discovery

12   issues, so I guess we can discuss that.  We have the Trustee

13   issue, which I received the letters on; and on the forfeiture

14   issue, you know, it wasn't my intention to really discuss that

15   today unless someone has something they want to raise with me.

16   I did receive the Government's charts and then the responses.

17          Mr. Kenner, I did get all of your submissions as

18   well as Mr. Talken's submissions, so I really didn't have

19   anything in terms of the forfeiture issues that I had to cover

20   with any of the parties, but let me just see if anybody wants

21   to be heard on that.

22          Does the Government have anything on the forfeiture

23   issues?

24          MS. KOMATIREDDY:  No, Your Honor.

25          THE COURT:  I would just -- in terms of the timing

5

1  of this, my intention was to issue the opinion at least a week

2  before the sentencing.  My understanding, and the parties can

3  correct me if they're wrong, I -- the fact that it will be a

4  preliminary order of forfeiture, I don't think impacts the

5  sentencing going forward.  Obviously the ancillary proceedings

6  will proceed in the normal course.  But for purposes of the

7  sentencing, I think that we don't need the final order of

8  forfeiture for purposes of the sentencing as relates to these

9  defendants, correct?

10             MS. KOMATIREDDY:  That's correct, Your Honor.

11             THE COURT:  All right.  Correct?

12             MR. KENNER:  That seems right, Your Honor.

13             THE COURT:  All right.  Do you understand what I'm

14  saying, Mr. Kenner?

15             MR. KENNER:  Yes, sir, Your Honor.

16             THE COURT:  Okay.  So does the defense -- any of the

17  defendant -- Mr. Talken, Mr. Kenner, is there anything on the

18  forfeiture issue beyond what you already submitted that you

19  wanted to say today?

20             MR. TALKEN:  No, thank you, Your Honor.

21             THE COURT:  All right.

22             MR. KENNER:  No, Your Honor.

23             THE COURT:  All right.  And just make sure that mic

24  is on, Mr. Kenner.  I'm not sure.

25             MR. KENNER:  Yes, sir.

6

1          THE COURT:  There we go.  All right.  And
2   Mr. Wolinsky, is there anything you want to say with respect
3   to that?
4          MR. WOLINSKY:  Your Honor, just a point of
5   information because I don't want to get cross-wise with the
6   Government or the Court, we've begun discussions with
7   Mr. Jowdy to relax the resolution -- the terms of the
8   resolution that the homeowners adopted to give the developer
9   more flexibility than it currently would have.  I think that
10  would be -- I can't imagine there would be any objection to
11  that from any quarters.  But we are engaging in discussions
12  that would be beneficial to the developer and to the value of
13  the property, so -- but I just wanted people to be alerted to
14  that.
15         THE COURT:  All right.  Obviously Government -- as I
16  encourage the Government to do previously to have a continuing
17  dialogue with you and with the bank, so I don't know if the
18  Government has anything you want to add with respect to that.
19         MS. KOMATIREDDY:  Your Honor, the Government was
20  actually planning to meet with the bank and the resort at noon
21  today, so we can rescheduled that meeting with them for after
22  this conference.
23         THE COURT:  Oh, great.  All right.  So Mr. Souther,
24  is there anything you want to add?
25         MR. SOUTHER:  No, Your Honor.

7

1          THE COURT:  All right.  Thank you.  All right.  So

2  why don't we deal first with --

3          MR. SOUTHER:  Your Honor, I'm sorry.  I believe the

4  bank --

5          THE COURT:  Oh, I'm sorry.

6          MR. SOUTHER:  -- [indiscernible] would like to

7  [indiscernible].

8          THE COURT:  Yes.  I didn't recognize you as being an

9  attorney for the bank.  I'm sorry.

10          MS. MARTIN:  That -- not a problem, Your Honor.

11  Good afternoon.

12          THE COURT:  Good afternoon.

13          MS. MARTIN:  My name is Doreen Martin and on behalf

14  of Danske Bank --

15          THE COURT:  Yes.

16          MS. MARTIN:  -- and Venable, LLP.  I just want to

17  let you know that the Government did reach out to us and asked

18  us if we could come in for a meeting for a resolution and we

19  hope and are encouraged by this that we can reach some

20  resolution without any adverse effects on the property.

21          We did want to let you know, though, that debt

22  service is no longer being paid by the borrower and we do even

23  more than ever think an expedited settlement or sale is

24  necessary because the default now interest rate, the -- Danske

25  Bank's claim is growing.

8

1          We also wanted to let you know that, of course,

2     liquidity is also a concern here as we head into in a few

3     months into a low season.  We want to make sure that the

4     business maintains -- continues as a going concern.

5          Some of the options we plan on talking with the

6     Government today include some interlocutory sale as well as

7     possibly having Danske Bank exercise its rights under the loan

8     agreements and consider foreclosure in Mexico.  So these are

9     some of the things we're talking about -- hopefully we'll be

10    talking about today with the Government.  And we also really

11    hope that the Government will share the valuation with us

12    because we think that's a very important part of this process.

13         THE COURT:  All right.  Well, thank you for updating

14    me.  That's helpful to know.  And, as you heard, my intention

15    no later than a week before the sentencing to issue the

16    preliminary order and the opinion with respect to that.  And

17    then I will continue the supervision, obviously the process.

18    So I'm glad to hear and I expect -- I mean, I urge the

19    Government to have this dialogue with you so that there's not

20    a lot of delay, as well as with Mr. Wolinsky as well.  So I'm

21    glad to hear you're meeting and I assume you'll continue to

22    meet, but then I'll be involved as well.  If you're not -- if

23    you feel like there's not enough movement with respect to the

24    process, I'm willing to get involved as well.  All right?

25         MS. MARTIN:  Thank you, Your Honor.

9

1          THE COURT:  All right.  Okay.

2          So let me move to the objections.  I'm going to

3    start with Mr. Constantine.  There are a couple of things that

4    I may need some additional information before the sentencing.

5    I don't think it's going to affect the ultimate guidelines

6    calculations, but there's just a few ambiguities that I want

7    the parties to just look into.

8          So with respect to Mr. Constantine -- and again,

9    we're not talking about the forfeitures.  We're talking about

10   for purposes of sentencing I believe that he should be -- in

11   terms of the loss amount that he should be held responsible

12   for the loss amounts as it relates to GSF, Euphoria and the

13   Hawaii investment, but not of the line of credits -- the lines

14   of credit nor obviously the Ledbetter [ph.] to which he was

15   not -- the Ledbetter accounts for which he was not involved.

16   I don't believe for reasons I've already indicated I think

17   through my questioning the Government -- the Government has

18   shown that he was aware of Mr. Kenner's uses -- unauthorized

19   uses of the lines of credit with respect to Hawaii.  He was --

20   I do believe he was involved in Hawaii fraud as I outlined in

21   detail in my opinion on the Rule 29 motion.  But I don't

22   believe that he -- it was foreseeable to him or that he should

23   be held responsible for the lines of credit that Mr. Kenner

24   drew in connection with the various hockey players.

25          So I believe what's going to happen, and we

1  discussed this a little bit at the last conference, that it

2  going to put him at level 8 -- 18 additional levels based upon

3  a fraud amount of three point -- between 3.5 and 9.5.  What

4  I'm struggling with a little bit is where -- what the exact

5  number would be within that range because the Government when

6  they did the chart -- and I asked the Government to give me a

7  separate guidelines calculation -- the Government just

8  essentially repeated the forfeiture chart, which neither the

9  Probation Department nor the Government has ever suggested

10  that the forfeiture number is the loss amount for purposes of

11  guidelines calculations and I don't think that's correct.

12        So I don't think it's 8.5 or something -- I don't

13  have it in front of me right now.  What I believe that -- I

14  think the most accurate way to try to calculate that and

15  obviously Mr. Talken and your client you can go through this

16  as well, I know obviously you object to the ruling overall but

17  just in terms of what my ruling is, what should the dollar

18  amount be, there is a paragraph in the PSR 31 that lists by

19  hockey player and putting aside obviously the relevant conduct

20  that was in the PSR, the Government has already said that they

21  were not going to ask for a fatico hearing to try to prove

22  fraud with respect to his other transactions, so those were

23  off the table for purposes of guideline loss a long time ago.

24        So if you look at that paragraph 31 the -- assuming

25  that paragraph is accurate with regard to the hockey players

11

1   and the amounts of the investments and which -- what the

2   investments were for, if I take out the numbers in that

3   paragraph that relate to the line of credit or to Ledbetter

4   because it's broken down by whether it's GSF, whether it's

5   Euphoria, whether it's Ledbetter, whether it's a line of

6   credit, my calculation then is I think 5.2 million.  Right,

7   5.2 million would be the amount.

8           So, you know, it's not going to impact the

9   sentence -- the Sentencing Guidelines and it's actually not

10  going to impact my stance where the number -- you know, but I

11  want to be as accurate as possible, so --

12          MR. CONSTANTINE:  Understood.  We'll look --

13          THE COURT:  If the Govern -- yeah, I'm going to ask

14  the Government to look at it first to see with my ruling what

15  they believe that number should be and whether or not that

16  Paragraph 31 is the way to calculate that.  And then we'll --

17  putting a letter on that and then you can obviously do the

18  same.  We'll come back to that.

19          All right.  So that's the -- in terms of the loss

20  amount I believe it's within that range.  I'm going to

21  determine the precise number once I have more input from the

22  parties.

23          With regard to the enhancement for the bankruptcy

24  fraud I'm not imposing that enhancement.  I don't believe the

25  Government has met its burden of proof with respect to that

1   enhancement applying to the facts of this case.  As was

2   pointed out, and I read the letter from Mr. Talken and I

3   understand this doesn't preclude the Government from making

4   this argument but at trial the Government did say we're not

5   trying to prove a bankruptcy fraud with respect to that,

6   although that doesn't -- it's not like they can't say for

7   purposes of sentencing they want to try to prove it.  But in

8   any event, it wasn't proven at the trial and I don't believe

9   what the Government and the Probation Department would put

10  before the Court at sentencing would allow me to make the

11  findings that would be necessary for that enhancement to

12  apply.

13          As was pointed out by Mr. Talken, it's unclear which

14  documents and which statements are accurate, the conflicting

15  statements, but it's not even clear to me at least which

16  version is accurate.  Even assuming that what was told to the

17  Bankruptcy Court was not accurate, I can't really determine

18  the materiality of that or Mr. Constantine's intent whether or

19  not that was something that would -- that he was trying to

20  hide from the Bankruptcy Court or just misstatements and it's

21  not even clear to me what the materiality would have been in

22  the bankruptcy proceeding.

23          So I just don't believe that that should apply in

24  this case and I view it as very tangential to what is tried

25  here and I don't believe I have a sufficient factual basis to

13

1  find that enhancement in this case, so that will not be

2  applied.

3         With respect to the number of victims I believe that

4  there are clearly more than ten victims involved in the

5  fraud -- the various frauds that I find took place here and,

6  again, this is in the pre-central portion.  I'm just going to

7  list who would make up the more than ten.  I think if you look

8  at Paragraph 31 they're all listed there.  Some of them --

9  obviously, if some of them are GSF and Euphora and, you know,

10  there are different combinations of where they invested the

11  money, I find Mr. Constantine was involved in all the

12  different -- all the objectives of the fraud.

13         The only people that would be excluded for his

14  purposes would be someone who the only -- the only issue they

15  had with respect to the line of credit I think Mr. Gonshar

16  [ph.], for example, would potentially fall into that category.

17  But even putting -- it was clearly at least ten people

18  including Jay McKee [ph], Turner Stevenson, Glenn Murray,

19  Tyson Nash, Michael Pecca, Kristin Pecca [ph.], Nicholas

20  Privatello [ph.], William Ranford [ph.], Steven Rouchen [ph],

21  Darryl Sedore [ph.], Owen Nolan.  I think that's 11 right

22  there.  And again, I'm not suggesting that's all of them, but

23  that certainly is more than ten that relate to

24  Mr. Constantine's criminal conduct in this case and the

25  conspiracy.  So that enhancement will be applied.

14

1         The sophisticated means enhancement I find is

2    appropriate.  Clearly Mr. Constantine in concert with

3    Mr. Kenner, who I'll get to in a minute, used multiple -- as

4    the Probation Department noted and the Government noted there

5    were multiple real estate investments here, various corporate

6    entities through which the money was funneled from the

7    victims' investments, some of which were for the defendants'

8    personal benefit, but the use of these various entities and

9    any real estate investments hid their activities from the

10   victims.  Other intermediaries were used including with

11   respect to the GS Fund and attorney and I'm not suggesting

12   knowledge by the attorneys, but intermediaries used to conceal

13   the forward of funds and some of the true uses of the funds

14   and also there were documents that the Court believes were

15   forged as well.  So certainly the sophisticated means

16   enhancement applies based upon that find -- those findings.

17   And obviously all of these are by a preponderance of the

18   evidence based upon my presiding over the trial and the

19   forfeiture hearing and assessing the credibility of the

20   witnesses to the extent that would be necessary for any of

21   these findings.

22         With respect to the obstruction of justice, I agree

23   with Mr. Talken.  I don't think the objection of justice

24   should apply to Mr. Constantine.  The instances -- obviously

25   he didn't testify at the trial so there's no basis for any

15

 1  type of finding related to any trial testimony.  The

 2  Government that -- points out that he did square with the

 3  Government, encouraged a victim investor to dismiss the

 4  lawsuit against Constantine, filed one against Kenner.

 5  Mr. Nash testified that the agent did not suggest any lawsuits

 6  but, as Mr. Talken pointed out, you know, it's unclear what

 7  Mr. Constantine -- the basis for that belief was.  It could

 8  have been someone told him that.

 9        So even if obviously it turned out to be inaccurate,

10  and I believe Mr. Nash was credible, it does not necessarily

11  mean that Mr. Constantine was intentionally lying.  I don't

12  think given the lack of information about where he received

13  that information from that I can conclude that that was an

14  attempt to obstruct justice in any way.

15        The Home Depot recording is more complicated.

16  Mr. Constantine did swear that it was selectively edited and

17  shortened but, again, the -- and Mr. Kenner obviously did

18  testify in detail about that.  What that was based upon is not

19  completely clear.

20        For example, it could have been through a

21  conversation with Mr. Kenner -- certainly Mr. Kenner, although

22  ultimately he did say it was accurate.  But for a long time

23  Mr. Kenner was claiming that it was doctored and certainly

24  Mr. Constantine -- you know, I know there's allegations that

25  Mr. Constantine was influencing Mr. Kenner.  But the bottom

16

1  line is the Court does not believe that I conclude that

2  Mr. Constantine at least at the time that he made that

3  statement did not believe that there was a possibility that

4  there was some editing of the tape that had occurred.  So I'm

5  not going to impose the enhancement based upon that.

6          And then the final thing the Government pointed to,

7  again Mr. Talken I think is correct.  There was an argument

8  that an email was forged regarding consulting fees.  You know,

9  Mr. Talken, Mr. Constantine have repeatedly denied that.  So I

10  think we'd have to have a hearing on that, which we are -- I'm

11  not going to do at this point.  I know Mr. Rosser stated

12  apparently to the Government in a post-trial meeting with the

13  agents that the email was forged, but certainly that's not

14  something I can credit.  It wasn't made before me.  I would

15  have to assess Mr. Rosser's credibility on that issue.  So I

16  don't believe based upon this record that that could be a

17  basis for an obstruction of justice.  So for those reasons I'm

18  not imposing the obstruction of justice enhancement.

19          With respect to the organizer leader enhancement I

20  don't believe the four-level enhancement is warranted for

21  Mr. Constantine, but I do believe he should get a two-level

22  increase.  There were certain individuals as both the

23  Probation Department and the Government pointed out that

24  Mr. Constantine did manage in order to effectuate the fraud

25  here.

17

1        For example -- and again, they do not have to be co-
2   conspirators in order for the -- this enhancement, this two-
3   level enhancement to apply.  But, for example, he had to
4   utilize the services of Mr. Richards to set up the accounts
5   for the GSF funds, some of which were diverted for personal
6   use.  Mr. Gardenya [ph.] was used to set up the urban
7   expansion loan which obviously is part of the conspiracy.  The
8   court finds the Government to have been prove here.  So there
9   are various indiv -- the Government also points to individuals
10  related to Euphora.  Again, even if they're not co-
11  conspirators who Mr. Constantine had to utilize in order to
12  effectuate the fraud.  So I believe that -- although I don't
13  believe it will rise to a four-level enhancement because, for
14  reasons I'll explain in a moment, I believe Mr. Kenner is
15  certainly the leader of this conspiracy, that he shouldn't --
16  Mr. Constantine should get the two-level enhancement based
17  upon his managing various individuals which were essential to
18  the fraud and these weren't like normal interactions.  In
19  other words, these weren't people -- maybe with respect to
20  Euphora he was dealing with people like Mr. Richards, the
21  urban expansion loan with Mr. Gardenya.  These were all
22  individuals.  In order for him to effectuate the fraud it was
23  necessary for him to give directions to in order to implement
24  it or to hide it, including people of Euphora.  So for those
25  reasons, I believe the two- level enhancement is warranted.

18

1        So unless Mr. Talken corrects me if I'm wrong, I

2   think that resolves all the objections to the guidelines

3   calculation.   So based upon my revised calculation it would be

4   a base offense level of seven, the loss enhancement would be

5   18.   Over two victims would be two-level enhancement.

6   Sophisticated means would mean a two-level enhancement, role

7   would be two-level enhancement for a total offense level on

8   the fraud counts of 31.   Constantine is a criminal history

9   category two, so I believe that's 121 for an advisory range

10  obviously of 121 to 151 months -- excuse me.   I'm sorry.

11  Yeah, 100 -- I'm just double-checking, 121 to 151 months.

12       The other thing I'm going to ask the Government to

13  do again in the first instance and then the defendants can

14  respond, there is the money laundering offense calculation

15  which obviously depends on large part on the underlying crime

16  which is fraud here.   In the Government's letter I think the

17  Government said that the -- again, this was based on different

18  numbers that the Government was already in the Court to adopt

19  that they -- the money laundering -- they were going to be

20  grouped and the money laundering offense level was not going

21  to be higher than the fraud one.   But I'm just going to ask

22  the Government based upon my findings to recalculate the money

23  laundering guideline just to -- so I can make sure that

24  that's -- that there's not going to be any increase on the

25  money laundering guideline.

19

 1          MR. TALKEN:  In other words, Your Honor, it could

 2  be -- it could change the grouping analysis which would make

 3  it -- I guess could possibly make a one-point difference.

 4          THE COURT:  Yeah, I think -- yes, I think --

 5          MR. TALKEN:  Okay.

 6          THE COURT:  -- what may happen is -- again, I just

 7  want to double-check this is that under the -- under the money

 8  laundering guideline there's a two-level increase because it

 9  was under Section 1956, but there may be some other

10  enhancement that doesn't apply under money laundering.  So it

11  could be that it could be one level higher under the money

12  laundering, but maybe I'm wrong about that, you know.

13          MR. TALKEN:  Yeah, I have to check.  I think there

14  also might be the overall grouping, which means there wouldn't

15  be different groups.  But we'll -- I'll talk to the

16  Government.

17          THE COURT:  Yeah.

18          MR. TALKEN:  We'll work out way through that.

19          THE COURT:  I don't want to do that without the

20  guidance of the parties.  Okay?  I could ask the Probation

21  Department to redo it, but I don't think that's --

22          MR. TALKEN:  That's fine.

23          THE COURT:  -- useful at this point because I think

24  that would --

25          MR. TALKEN:  I think that's going to be what it is.

1   I don't think they'll -- we'll figure it out and I don't think

2   there'll be a dispute.

3           THE COURT:  All right.  All right.  All right.  But

4   are there any other objections you made to the guideline

5   calculation that I haven't covered?

6           MR. TALKEN:  I don't believe so, but I'll --

7           THE COURT:  Okay.

8           MR. TALKEN:  -- double-check, but --

9           THE COURT:  Yeah, you can double-check.  The

10  Government noted in its letter many years ago on the -- on the

11  objections there are a number of other objections I guess that

12  were made --

13          MR. TALKEN:  By prior counsel maybe.

14          THE COURT:  Yeah, but none of them -- I agree with

15  the Government.  None of them are going to -- and I want you,

16  Mr. Constantine -- not going to impact the guideline

17  calculation and they're not -- to the extent he's disputing

18  certain things that were in the PRS, those -- you know,

19  they're not going to impact the sentence, so --

20          MR. TALKEN:  Right.  I think most of them were

21  factual disputes.

22          THE COURT:  Right, right.

23          MR. TALKEN:  Which is -- we defended the case in

24  which [indiscernible] same place.

25          THE COURT:  Right.  All right.  But obviously if you

1    have to review it with Mr. Constantine, you think there's

2    something that I need to rule on that I left out, don't wait

3    until March.  Just write me a letter just so I know in advance

4    of the sentence there's something else you need me to rule on.

5    Okay, Mr. Talken?

6              MR. TALKEN:  Yes, thank you, Your Honor.

7              THE COURT:  All right.  The Government have any

8    questions of Mr. Constantine?

9              MS. KOMATIREDDY:  No, Your Honor.

10             THE COURT:  All right.  Mr. Kenner, I do believe

11   based upon the evidence at trial that Mr. Kenner should be

12   held in responsible in terms of the loss amount for not only

13   the losses that I've held Mr. Constantine accountable for, but

14   in addition the Ledbetter and the lines of credit monies.  So

15   it's the same paragraph in his.  It's just numbered

16   differently.  I think it's paragraph 29 in his -- that was

17   the -- again, by victim, how much money they invested in each

18   of those things.  The Probation Department said it totaled

19   $13,026,542, but when I had my law clerk add up all the

20   amounts multiple times it came out to $14,072,097.

21             So again, I want the Government to -- and Mr.

22   Kenner, you can look at that chart again.  That's the chart

23   I'm utilizing to calculate the numbers.  It obviously excludes

24   all the other alleged frauds the Government has not proven at

25   trial and is not going to try to prove at a fatico hearing.

22

1  So that would I believe -- again, I want to get the number

2  correct but I believe it's going to be 20 levels enhancement

3  because it's going to be over -- want to get the exact amount

4  that it would be over.  Yeah, over 9.5 million is 20 levels,

5  so it's clearly going to be over that amount.

6        The ten victims -- again, there's more than ten

7  victims and obviously Mr. Kenner and to the extent there's an

8  individual like Mr. Gonchar [ph.] in that chart who's only got

9  the line of credit money as part of the loss that would be

10  additional, but it's unnecessary.  Even without that it's

11  certainly over ten victims.  Sophisticated means, again, my

12  finding with respect to Mr. Constantine applies equally to

13  Mr. Kenner.  They were both utilized in the same types of

14  means in order to divert the money, hide the money, conceal

15  the money including real estate investments and corporate

16  shells and attorneys' account, intermediaries, and forged

17  documents.

18        The obstruction of justice enhancement  I am

19  applying to Mr. Kenner and I'm going to put aside the Home

20  Depot tape.  Mr. Kenner certainly testified at page 2440 that

21  he's 100 percent sure that there were references that were not

22  contained on the recording.  He ultimately did retract that.

23  I don't believe the retraction in and of itself would mean

24  that the enhancement could not apply if he only retracted it

25  because it became clear based upon all the other evidence that

23

1   that was not possible or was not accurate, I guess.  The

2   enhancement could be applied there and also the Government

3   points to the loan agreement with Mr. Jowdy with -- which

4   there's been a lot of back and forth on, but the Court doesn't

5   even need to rely on those because obviously Mr. Kenner

6   testified for hours and hours and hours and, in my view, his

7   testimony was riddled with lies.  And in particular because

8   the Court wants to make the specific findings that the law

9   requires -- give me one second -- the Second Circuit in U.S.

10   v. Thompson, among other cases, 808 F.3d 190 (2d. Cir. 2015)

11   has stated what the Court in order to make a finding based

12   upon perjury with the findings the Court needs to make which

13   mirror the perjury statute and I find based upon -- again, I

14   sat through the trial.  I assessed Mr. Kenner's credibility,

15   so with all the witnesses I believe that he willfully and

16   materially committed perjury which was intent -- which was the

17   intentional giving of false statement on various material

18   matters.  And I specifically find that he consciously acted

19   with the purpose of obstructive justice, obviously with the

20   purpose of preventing his conviction on what was the truth of

21   the matter.

22          And in terms of the specific instances that I'll

23   point to -- and again, these aren't all of them, but I think

24   they're more than sufficient for the purposes of the

25   enhancement -- on Page 36 of my opinion of October 13, 2017,

24

1   where I summarized Mr. Kenner's testimony, I actually listed

2   all the specific instances where Mr. Kenner, as he is, always

3   very thorough went through all the Government witnesses and

4   explained why they were lying and he was telling the truth.

5   And again, I'm not going to repeat all of them.  They were all

6   on Page 36.

7           But just to give some examples, he swore that

8   Mister -- or Ms. Donlan's testimony returning to

9   missed practice [ph.] with the client's signatures was

10  untruthful.  He said Pecca was completely aware of the

11  establishment of the lines of credit and the purpose behind

12  it.  He said he never represented to Mrs. Pecca that the

13  northern trust line of credit would only be open for six to

14  nine months.  He said Mr. Ruchin [ph.] was aware of the loss

15  of his line of credit, collateral prior to 2013.  He said

16  Mr. Sedore did communicate with Northern Trust about the

17  default on his line of credit, said Nolan was aware of the

18  line of credit before 2008.  He said he never prohibited

19  Mascarella [ph.] from communicating with clients.  Mr. Murray,

20  he said, he was aware of the collateral for the Northern Trust

21  line of credit that it was seized prior to his testimony at

22  the trial.  He said he never advised his clients that the

23  Hawaii project wasn't going to impose a risk.  That one is not

24  particularly critical but, you know, as to the core of the

25  matter he said -- Mr. Kenner testified at Pages 43 and 84 that

25

1   the -- all of the various lines of credit holders were fully

2   aware of the transactions that he made on their behalf and

3   that there was absolutely no deceit on his part.

4        He further testified at Pages 42 -- 88 to 92 that

5   they had complete knowledge.  That's a quote of the lines of

6   credit, how they were being used including Mr. Jowdy and

7   the -- also gave testimony I also find was false with respect

8   to Euphora, that he didn't represent to his clients the

9   investment to be used for any particular purpose and he

10  deceived them with respect to that by sending their funds to

11  CMG.

12       So I find that -- again, I heard the witnesses'

13  testimony that contrary under oath I find them credible in

14  these various matters, not Mr. Kenner.  And this was the heart

15  of the case.  This is what the jury in part, you know, through

16  a lot of different frauds that were charged but certainly as

17  it relates to their testimony with regard to the lines of

18  credit and the investments in Hawaii and Euphora, Mr. Kenner

19  directly swore that they were fully aware of everything that

20  he was doing and all these details that they testify to and I

21  find that that testimony was false.  It was certainly material

22  to the jury's decision and this was not a failure of

23  recollection on Mr. Kenner's part or some type of

24  misunderstanding.  I believe that it was intentional and it

25  was done in order to effect the trial and the jury's verdict.

26

1       So for all those reasons, I find that he clearly

2   committed perjury.  And again, those are just examples.  If

3   you go through the Court's opinion there are many others that

4   I rely on in connection with the ruling on the Rule 29 motion,

5   so I am imposing the two-level enhancement for obstruction of

6   justice.

7       On the organizer leader I am imposing a four-level

8   enhancement.  I do believe that Mr. Kenner was the mastermind

9   of the frauds here, although again, Mr. Constantine through

10  various aspects of it certainly played a critical role and

11  should receive the two-level enhancement.  I do not believe he

12  was as culpable as Mr. Kenner, nor did he supervise other

13  individuals on this issue of -- I just want to make clear on

14  the law, and the Government did point this out in their letter

15  and I'd have to go back and make sure both in the commentary,

16  the guidelines, as well as the case law in the otherwise

17  extensive portion of the enhancement for four levels, the

18  Court can include both knowing and unknowing participants.

19      Mr. Kenner has this back and forth about whether,

20  for example, Mr. Gorham [ph.] was a co-conspirator or not a

21  co-conspirator.  But the Second Circuit has made clear that

22  even if someone is not a co-conspirator they didn't have

23  knowledge of the fraud.  For purposes of otherwise extensive

24  under the four-level enhancement that can be calculated that's

25  in -- including a case called Carrozzella, 105 F.3 796 (2d.

27

1  Cir. 1997) case, which is discussed in detail in the case the

2  Government cited in Manas, 272 F.3d 159 (2d. Cir. 2001).  The

3  Second Circuit has said in another case including U.S. v.

4  Bennett, 252 F.3d 559 (2d. Cir. 2011), which the firm the

5  court finds that there were a wide array of witting or

6  unwitting brokers, accountants and bankers in that case to

7  justify the four-level enhancement and summary order.  U.S. v.

8  Stitsky, 536 Fed. Appx. 98 (2d. Cir. 2013).

9         So under that case law I find that when you include

10  both the knowing and potentially unknowing participants in the

11  conspiracy as a whole that Mr. Kenner, in my view, was

12  supervising and directing, with respect to the unknowing

13  participants the -- he was, in my view, organizing their

14  activities, leading their activities with specific criminal

15  intent on his part.  And I also conclude that the services for

16  which he was asking these -- the unknowing participants were

17  peculiar and necessary to the criminal scheme and they

18  include, again among others but these are in Probation

19  Department's pre-sentence report and the Government's letter

20  using Mr. Mascarella to create and manage the Hawaii accounts

21  and the lines of credit using Mr. Garn [ph.] in particular to

22  divert some of the victim's money back to himself using

23  Ms. Donlan to assist in forging paperwork, using Mr. Gentry

24  [ph.] to create a spreadsheet to reflect purportedly the

25  victims' interest in Euphora, I find that he supervised

28

1  Mr. Constantine to a large extent in some of these various

2  activities and Mr. Keizer he utilized in order to divert the

3  victims' money back to himself.  So that's six right there.

4          So I view that his enhancement applies under --

5  because his role was otherwise extensive with respect to both

6  knowing participants like Mr. Constantine and as well as

7  unknowing participants to his fraudulent scheme.

8          On the abuse of trust advancement I'm applying an

9  abuse of trust enhancement of 3(b) 1.3.  Certainly

10  Mr. Kenner -- again, there's overwhelming evidence that he

11  used and abused the private trust that he had as a -- what do

12  you call it, a financial advisor, money manager to the victims

13  in the Hawaii scheme including all lines of credit, he -- they

14  clearly gave him discretion over these investments.  I went

15  back and looked at my opinion everywhere I -- again, in detail

16  talked about what they testified that he was there, money

17  manager, their financial advisor.  They gave him the money if

18  he -- they gave him very little direction in terms of exactly

19  how it would be invested, although obviously they testified

20  adamantly that they thought it was going to be in Hawaii, not

21  in Mexico.  In terms of where in Hawaii and, you know, the

22  details of how he was going to invest that money in the land

23  in Hawaii, they left it to his discretion and trusted him and

24  his expertise as they understood it.

25          So that -- there's no question that enhancement

29

1   applies here.  Mr. Kenner pointed out in his supplemental

2   submission, pointed out again and he noted this orally that he

3   wasn't registered as a FINRA agent and that was not

4   therefore -- could not qualify under the law as a broker or a

5   financial advisor under the law.  A Second Circuit has made

6   clear that that is not required in a case called U.S. v H-U-S-

7   S-E-Y, 254 F.3d 428.  As long as you're -- they -- in that

8   case they've said that the defendants were creating the

9   impression to their victims and enjoying a relationship of

10  trust with respect to the defrauded investors the fact that

11  there was no license or, you know, equivalent of a fiduciary

12  relationship.  If it has the aspects of a fiduciary

13  relationship in that they entrusted those defendants, the

14  Second Circuit said with the kind of discretionary authority

15  that is characteristic of a position of trust, the Second

16  Circuit noted this distinction as crucial because the primary

17  trait that distinguishes a position of trust from other

18  positions is the extent to which the position provides the

19  freedom to commit a difficult-to-detect wrong.  And they noted

20  in that case that the defendants enjoyed a great deal of

21  freedom to commit a difficult-to-detect wrong in how they

22  created the impression that they were a money manager at a

23  fiduciary-like relationship.

24          The Second Circuit has repeated this in other cases

25  in other circuits, U.S. v. Queen, 10th Cir. case, 4 F.3d 925,

30

said that the fact that the person wasn't actually an

investment advisor or broker is not dispositive, as long as

the person held himself out to be the equivalent of that, as

well as the First Circuit in U.S. v. Tardiff, 969 F.2d 1283

(1st Cir. 1972), said the exact same thing.

On the facts here there's no question that these

victims believed that Mr. Kenner was operating as their

advisor -- their financial advisor and money manager.  It's

the whole purpose of the relationship.  They gave him the

money.  They gave him a lot of freedom in terms of the details

of how the money would be invested in places like Hawaii.  And

even with respect to the GSF money was supposed to fund the

litigation against Jowdy, but the details of how, you know, it

would be spent, they were not directing, you know, it should

go to this, it should go to that.  The details once they gave

the direction and had the understanding of what it was going

to be used for was -- generally was left to him and he abused

that without question.

So the enhancement applies here.  So I think that

resolves the objections, the guidelines, so my calculation for

Mr. Kenner is he has a base offense level of seven, a loss

enhancement of 20, over two -- ten victims, two levels,

sophisticated means two levels, abuse of trust levels, role

four levels, and obstruction two levels, which in my math is a

level 20 -- excuse me, level 39.  He has a criminal history

31

1   category one.  So that would be 262 to 327 months under the

2   advisory range.

3            So -- and again, I'm asking the Government to go

4   back and do the money laundering calculation to see if that

5   alters that range.  But Mr. Kenner, I believe that covers the

6   objections to the guidelines  Obviously your objections are

7   preserved for appellate purposes, but are there any

8   enhancements I did not cover, Mr. Kenner?

9            MR. KENNER:  No, Your Honor.

10           THE COURT:  All right.  All right.  All right.  So

11  obviously I have the submissions overall with respect to the

12  sentencing.  These are only advisory guideline ranges.  The

13  Court obviously -- is only going to consider them as one

14  factor among all the factors.

15           So I think other than these issues regarding the

16  money laundering guideline calculation and the actual loss

17  amounts, I think we'll be ready to proceed in March.

18           Is there anything the Government believes with

19  respect to the sentencing itself that we need to cover today?

20           MS. KOMATIREDDY:  No, Your Honor.

21           THE COURT:  Okay.  And obviously if -- I would -- I

22  want the sentencing to be as orderly as possible.  So if the

23  Government could put in maybe a week before the sentencing

24  if -- if any victims -- obviously victims can be present

25  obviously.  But if the Government is going to go -- if any of

32

1   the victims advise the Government that they wish to be heard

2   at the sentencing if you could just give me the list a week

3   before the sentencing, obviously the other side, too, so that

4   we know.

5           MR. TALKEN:  And, Your Honor, if there any victims

6   that want to speak, even though we're in the second

7   sentencing, we'll be sure to be here when Mr. Kenner is

8   sentenced so that --

9           THE COURT:  Yeah, that's --

10          MR. TALKEN:  -- they don't have to talk twice.

11          THE COURT:  That's an excellent point.  So, yeah,

12  you and Mr. Constantine should be here for Mr. Kenner's

13  sentencing and then obviously if he wants -- if he wants to

14  respond -- you want to respond to anything the victims said,

15  you can do so during your proceeding, but that's a good point.

16  Thank you.

17          MR. TALKEN:  Yes.

18          THE COURT:  All right.  Is there anything else then

19  on the sentencing?

20          MS. KOMATIREDDY:  No, Your Honor.

21          THE COURT:  Do you have any --

22          MR. TALKEN:  Nothing on sentencing.

23          THE COURT:  All right.  Mr. Kenner?

24          MR. KENNER:  No, Your Honor.

25          THE COURT:  All right.  On the discovery issue,

33

1  Mr. Talken, I think you probably know where we're at on that.

2  I don't -- based upon the information before me, again I've

3  said this before, the Government pointed out that I've said

4  this before and I'll say it again, I don't believe you've

5  established that there's been any type of discovery violation

6  by the Government.

7            I also have not -- at least to state what you've

8  shown the Court, none of the additional texts that

9  Mr. Constantine, you know, that -- obviously a lot of tests

10  were utilized during the trial and were available and they

11  pointed to Mr. Kenner's testimony about how many texts he had

12  so I don't -- I haven't seen anything, either individually or

13  cumulatively that I think would impact the jury's verdict in

14  any way.  But you can continue to work at this issue and then

15  there's always a --

16            MR. TALKEN:  Your Honor, if I could just -- I had

17  just some concise points I want to put on the record --

18            THE COURT:  Okay.

19            MR. TALKEN:  -- about that.  I read the Government's

20  letter and there's just a few things that I need to make

21  clear.  The problem for Mr. Constantine here is, you know,

22  he's put in a position of proving something that he didn't get

23  and now we know that the versions that he's claiming did

24  contain these emails -- excuse me, these texts were one of two

25  places:  (1) with the Government where they didn't keep an

1    extra copy and (2) that Mr. Kenner who eventually -- I think

2    it was the BOP took away the hard drive and it was never

3    replaced.

4              So we don't have the opportunity to prove -- we -- I

5    understand you're saying we haven't shown you that these text

6    messages weren't given to us, but we don't have the

7    opportunity to prove that we didn't get them other than

8    showing to the Government what we were given.  I've provided

9    them with copies with that and I know they either have or are

10   going to run the comparison.

11             I've done a non-complete comparison, but just the

12   mere volume that those text messages would hold it's fairly

13   certain to me that in the -- what Mr. Constantine received

14   that was from the tenor of the search warrant and more

15   specifically the electronic devices, those weren't in it.  I

16   don't think he ever received that.  I don't think it's

17   physically possible.  In other words, there's 90,000 text

18   messages that he did not receive.

19             THE COURT:  That you say Mr. Kenner had access to,

20   that he didn't have access to?

21             MR. TALKEN:  Correct.  What happened -- and it's all

22   because of when they were originally given to Kenner, they

23   were given to him *en masse* because the privilege review wasn't

24   his problem because it was his privilege that -- and when they

25   were given to us, it was some type of different version.  And

1   again, we don't say that the Government intentionally took out

2   these text messages.  I just think that somewhere in the

3   process between the privilege review and what was delivered to

4   us, those text messages weren't in there.

5          THE COURT:  And Mr. Kenner still has those --

6          MR. TALKEN:  The problem is he doesn't because they

7   were on a hard drive that he had during the trial, but post-

8   trial his items were taken and he can speak to this and I

9   think he's told you on this.  I know during one of the many --

10  it probably wasn't in context when he told you this so it

11  didn't mean as much as what I'm saying now, but eventually he

12  was -- his items were taken and when he got back -- what he

13  got back that hard drive was not in there and we have nowhere

14  to compare that to.  That's the problem with that.

15         The other issue is -- and Your Honor, I read after

16  the Government pointed out in their letter that you had ruled

17  on some of the test messages I went back and read that and

18  that's the point that you just made.

19         Since then Mr. Kenner has pulled out more.  Again, I

20  can't -- I don't -- if I have the opportunity to go read every

21  one of these text messages I think that there's a reasonable

22  possibility I would go in and dig out more to the point that I

23  would get there it might have made a difference.

24         In other words, those ones that you -- that Your

25  Honor ruled on, it was a small sampling, but they did go to

1   the heart of the cross-examination of the important issues.  I

2   understand Your Honor made the ruling that even assuming that

3   the -- that trial counsel has been able to cross with those it

4   wouldn't have changed events.

5          But at some point that would have tipped.  In other

6   words, okay, I crossed you once, I crossed you twice.  Maybe

7   that didn't do it.  But when I start crossing you 15 and 20

8   times at some point in time I believe that that might have

9   changed your -- or would -- I know it would have changed the

10  calculus of the witness's credibility.  Again, I don't have

11  the opportunity to produce those to Your Honor.  What I have

12  done it's hard to do because --

13         THE COURT:  You also haven't confirmed whether or

14  not -- I -- you haven't gone through what Mr. Constantine had

15  to make sure that he didn't get those.

16         MR. TALKEN:  Well, I mean, I personally haven't done

17  it, but there's two things.  One, on our side people have done

18  it.  Not individuals, I'm willing to proffer to the Court, as

19  it's not there.  I'm not making that position but just

20  preliminarily --

21         THE COURT:  I thought you told me they'd have to go

22  through manually --

23         MR. TALKEN:  They do, but there's ways -- we're --

24  that's what I'm saying but we're looking at there's ways to

25  look at screenshots of each .pdf so you can kind of tell

37

1   what's in there.  That's what I'm saying, it's not a

2   scientific -- I can't -- it's not enough for me to say to the

3   Court, "It's not there."  My suspicions are that they're not

4   there.  I think that -- and the reason I asked for that expert

5   was I think that -- or a paralegal, when that search is done,

6   they're not going to be there.

7            Also, just the sheer fact that we were given a thumb

8   drive and a disk as the two disclosures, there's no way they

9   fit on there.  I mean, I'm -- I am probably the most computer-

10  inclined person in this room and even I can tell you that, so

11  that's another issue.

12           So I have very strong suspicions and I'm sorting

13  through, you know, how to resolve this problem.  I don't

14  exactly know how short of having an expert, for lack of a

15  better term, can look through but that's where that's coming

16  from.

17           THE COURT:  All right.  Look, I'm always open to

18  getting additional information on it but I think we've all

19  discussed this -- you know, the case has to move forward.  I

20  can't --

21           MR. TALKEN:  I understand that part of it and I'm

22  not sure exactly where this point is going to get litigated --

23           THE COURT:  Okay.

24           MR. TALKEN:  -- but the two reasons I'm putting on

25  the record now I just wanted to kind of crystalize it with

38

1   Your Honor so you understand where we're coming from.

2          THE COURT:  All right.

3          MR. TALKEN:  And, two, when someone looks at this

4   later they'll understand I don't want the question to be, why

5   didn't we do this now and I don't want there to be any kind of

6   waiver issues.

7          THE COURT:  All right.

8          MR. TALKEN:  We are working on it reasonably.

9          THE COURT:  I don't know if the Government wants to

10  respond to that.

11         MS. KOMATIREDDY:  Yes, Your Honor.  I'll just make a

12  few points for the record.  I think there are two -- I know

13  the Court is looking for a way for the Court to move forward,

14  and so are we.  I think there are two frameworks to look at

15  this though.

16         First, as a discovery violation I think the Court is

17  correct, there's no discovery violation.  The defense has put

18  on notice through the letters and put on notice throughout the

19  trial of existence of these text messages and the law is clear

20  that the defense once put on notice even assuming for a

21  moment, just for argument's sake, that Mr. Talken is correct

22  and that the actual -- there's some sort of copying glitch and

23  they didn't make it over onto the thumb drive that

24  Mr. Constantine's counsel received, which again has not been

25  established.

39

1        But assuming that for argument's sake, they had

2   noticed that these are part of the evidence in the case and

3   from the very outset of the trial those text messages were

4   used in court in front of Mr. Constantine's counsel and in

5   front of Mr. Constantine.

6        Looking back at the record identified on the record

7   during the cross of the Government's second witness in the

8   case, Mr. Michael Pecca, he was crossed by Mr. Haley using

9   Kenner Exhibit 21, which is one of the text messages between

10  Mr. Kenner and Mr. Pecca.

11       At that moment, there was no one jumping up from

12  defense table saying, we don't have these, we don't know where

13  they are, we need to get them.  There was every opportunity to

14  do so throughout the nine-week trial.  And, in fact, those

15  text messages were sitting at the table, that very table on

16  Mr. Kenner's computer.  And if the Court recalls, Mr. Kenner

17  was printing excerpts of those text messages during the trial

18  so that Mr. Haley could use them during cross-examination.

19       All of that is to say that there's no discovery

20  issue here.  The only claim that could be made is in effective

21  assistance of counsel issue and the Court has already made

22  clear a time for ineffective assistance of counsel claims is

23  past as part of this phase of the litigation.

24       And so I think the best way for us to move forward

25  is to move to sentencing, to find that there's no discovery

40

1  violation and to address any issues that may remain in a 2255

2  posture and that way the victims' rights to a speedy

3  sentencing is not prejudiced and the defendant's claim is not

4  prejudiced.

5           THE COURT:  Well, I don't think -- you didn't hear

6  Mr. Talken ask me to put off the sentencing.  I think he

7  understands that and that's what my intention was.  I'm not

8  going to hold off the sentencing, especially how long this

9  case has gone on for, but I just -- I guess I don't

10  completely -- I certainly don't believe that they've

11  demonstrated a discovery violation to date, but I'm not sure I

12  understand the Government's point that simply because

13  Mr. Constantine and his lawyer were aware that there were text

14  messages that they necessarily understand that they were

15  missing some, I don't know -- you know, that would be the key

16  issue is that just because they received text messages and

17  were utilizing text messages doesn't -- how would

18  Mr. Constantine and Mr. Yurosso [ph.] know that they were

19  missing some.  As you're trying to argue they should have

20  realized this, I'm not sure how they would know that.  If you

21  could show, for example, that Mr. Kenner was using ones that,

22  you know, they should have realized what -- we're missing

23  these, then maybe you would have an ineffective assistance of

24  counsel claim but I don't think the fact that they have --

25  they got text messages means it's their fault because they

1 would have to know that they've got an incomplete set and I

2 don't think the Government has demonstrated that they would

3 have known that.

4          MS. KOMATIREDDY:  I understood Mr. Talken's claim to

5 be that Mr. Constantine didn't receive any text messages.

6          THE COURT:  No, I --

7          MR. TALKEN:  Well, there's -- yes.  I mean, well --

8          THE COURT:  That's your claim.  I didn't know that.

9          MR. TALKEN:  No, no.  There's two different kinds.

10 Is there text messages that appeared in the form of a bubble

11 that kind -- that looked like screenshots off the phone.  He

12 did get those.  But the ones that appear in Mr. Kenner's

13 filings that are blocks that look like certain blocks, that

14 look like certain blocks, you've seen them in the many

15 filings, yes, the claim is that's in -- that's said of the

16 90,000.  Now --

17          THE COURT:  Why wouldn't he realize that instantly

18 that he only got bubble texts and didn't get those or his

19 lawyer at least?

20          MR. TALKEN:  Well, I --

21          THE COURT:  If Mr. Kenner is introducing text

22 messages that -- none of which he ever received, I understand

23 the point now.

24          MR. TALKEN:  Right.  Mr. Kenner -- during the trial

25 Mr. Kenner did introduce.  However, Constantine and his

42

1    counsel didn't know where they were coming from.  In other

2    words, Mr. Kenner is the only one.  He was pulling them off of

3    the -- that drive on his computer.

4              THE COURT:  I know, but Mr. Constantine --

5              MR. TALKEN:  Only --

6              THE COURT:  His lawyer could have said, wait a

7    second.  We only have these bubble texts.  Where are these

8    texts coming from; we want these, right?

9              MR. TALKEN:  I don't necessarily disagree with that

10   except, you know, in -- you have a case with millions of

11   documents and you have a case where except -- I think

12   Constantine used one of them.  Most of them were used by a co-

13   defendant and cross on -- by the co-defendant on his cross.

14   It wasn't Constantine himself using them.  It wouldn't

15   necessarily dawn on them that they're missing something or the

16   extent of what they're missing or, you know, maybe they were

17   missing those but not that they're missing a whole 90,000 that

18   can contain this whole world, this whole treasure trove of

19   information.

20             Again, that's something that is going -- will have

21   to be sorted out.

22             THE COURT:  All right.  Let me just ask you because

23   I'm a little confused.  I know Mr. Kenner has told me about

24   this hard drive many times before, but my understanding is

25   that the Government didn't retain a copy of what was produced

43

1   to defense lawyers in terms of the flash drives, whatever they

2   were, right.  But there is still -- there is not either the

3   original hard drive or some -- is -- does the Government have

4   a record of the -- I know this wouldn't have been you, but the

5   taint tea of what they determined was producible and not

6   producible or there's not even that.

7           MS. KOMATIREDDY:  Your Honor, it was on the physical

8   hard drive.  That's the issue.  We don't have that physical

9   hard drive.

10          THE COURT:  Who has the physical hard drive?

11          MS. KOMATIREDDY:  Well --

12          MR. CONSTANTINE:  [Indiscernible] on the phone.

13          THE COURT:  Who had -- are we talking about the

14  phone or are you talking about the computer?

15          MR. TALKEN:  Well, the phone -- it's either the

16  physical phone or the hard drive they downloaded it onto.

17  It's one of those two things, right?  You have the physical

18  phone.  That would have the texts that they got it from, which

19  I don't think we have or -- or, you know, the regular process

20  where they take the phone, they download it to a hard drive

21  and I think that's what they're talking about, the hard drive

22  that had the contents of the phone.

23          MS. KOMATIREDDY:  Yeah, I just want the record to be

24  clear.  What came out of the taint review was a body of files

25  marked in a not privileged which were all .pdfs.  And what

44

1   went into the taint review was imaged copies of all of

2   Mr. Kenner's devices that were seized during the search

3   warrant.  So computers, hard drives, phones, et cetera.

4           THE COURT:  Which all still exist -- or that still

5   exist.

6           MS. KOMATIREDDY:  The original evidence still

7   exists.  Yes, Your Honor.

8           THE COURT:  Right.  Okay.  But this .p -- the --

9   what the trial team got, these .pdfs --

10          MS. KOMATIREDDY:  Yes.

11          THE COURT:  -- putting aside what was given to

12  defense counsel is -- has -- does the Government have

13  somewhere on a -- any form that body of what the taint team

14  produced to the trial team I guess is the question.

15          MS. KOMATIREDDY:  Yeah, I understand the Court's

16  question and I -- I believe the answer is I don't think so.  I

17  would want to double-check that and the reason is because we

18  then had to as the prosecution team in order to execute the

19  warrant appropriately had to review that material for what was

20  relevant and within the scope of the warrant.  And given that

21  we were preparing for trial at the time, we did that through a

22  limited review as I noted in our letter.  We pulled out those

23  things that we marked as exhibits at trial and we set aside

24  the rest.

25          And so for our purposes, because we had to call an

1    end to that search given again that ongoing litigation at the

2    time about ongoing Fourth Amendment interests and ongoing

3    searches and the Court's request that we call an end to that

4    search at the beginning of trial, we did that.  We pulled out

5    a concrete set of exhibits.  I believe those exhibits were --

6    all were marked in the 6,000 and 7,000 series and then moved

7    forward.  We did not mark for trial purposes any of these text

8    messages and the record reflects that -- the record reflects

9    Mr. and Ms. Savitch [ph.] describing that we -- that these

10   text messages were not part of the Government's evidence.  And

11   if the Court recalls in the Court's transcript there's a

12   conversation between the parties and the Court about rule of

13   completion and the introduction of text messages.

14          THE COURT:  All right, all right.  The bottom line

15   is I think it's -- it doesn't sound like your process is going

16   to be complete by March so this is going to be under a 2255

17   posture at some point potentially.  All right.  But you've --

18          MR. TALKEN:  I just -- yeah, I --

19          THE COURT:  -- made the record the best you can.

20          MR. TALKEN:  I hope so.

21          THE COURT:  All right.

22          MR. TALKEN:  And if anything --

23          MR. CONSTANTINE:  Your Honor -- Your Honor --

24          THE COURT:  Wait --

25          MR. CONSTANTINE:  Your Honor, I'm sorry -- Your

46

1   Honor, I'm so sorry to interrupt but I'm at a little bit of a

2   disadvantage because I can't communicate with my attorney.   Is

3   there any way I could have a ten-second phone call with him on

4   this matter?

5              THE COURT:  Sure.

6              MR. CONSTANTINE:  I just want him to know a couple

7   of facts.

8              THE COURT:  Sure.  He'll go outside and call you on

9   his cell.

10              MR. CONSTANTINE:  I'm very sorry to interrupt but --

11              THE COURT:  That's okay.  That's okay.

12              MR. CONSTANTINE:  Yeah, that would be fine, Your

13   Honor.

14              THE COURT:  All right.  He's walking outside the

15   courtroom right now, okay?

16              MR. CONSTANTINE:  Thank you very much.

17              THE COURT:  Has anyone -- you want to take a ten-

18   minute break or is everybody okay to keep going?  Mr. Kenner,

19   are you okay to keep going?

20              MR. KENNER:  Yes, sir.

21              THE COURT:  All right.

22                    [Pause in the proceeding.]

23              MR. TALKEN:  Thank you.  Thank you for the

24   opportunity to speak to my client, Your Honor.  Just two quick

25   clarifications that I think are on the record already, but I

1   just want to be sure.

2          One, that the -- it seems that the amount of data

3   that would be required for the 90,000 texts to be disclosed

4   did not exist so that's one point.  The second point is that

5   Mr. Constantine and some other individuals have done a

6   preliminary review of that and there is no -- those text

7   messages are not in there.  And third, the test messages that

8   I spoke about, the bubbles, those were in the March 7, 2018 --

9   I think it's '18 -- disclosure, but those are a totally

10  different emails than what we're discussing here and that it's

11  the defense position that the 90,000, including maybe the ones

12  that Mr. Kenner was using at trial, never received by the

13  defense, meaning Constantine, not Kenner.

14          MR. CONSTANTINE:  Any of them.

15          MR. TALKEN:  Any of them.

16          THE COURT:  All right.  But again, I just want to

17  emphasize, if my understanding is correct and, again, this is

18  not for purposes of today but at some point this was going to

19  be litigated one of the issues would be if, in fact, some of

20  these were not -- inadvertently not produced.  And I don't

21  remember how many of these Mr. Kenner introduced at the trial

22  why Mr. Constantine or Mr. Laruso as soon as they saw a text

23  messages in a different format than any other text messages

24  that they had ever received -- they weren't the bubble ones,

25  they were some other ones -- why there was not an immediate,

48

1    "Your Honor, there's something wrong here."  We -- you know,

2    that's going to be an issue, but --

3                MR. TALKEN:  I agree.

4                THE COURT:  Okay.

5                MR. TALKEN:  And if Your Honor I had known that

6    issue before I filed my long ineffective assistance motion it

7    would have been in there but it wasn't.

8                THE COURT:  All right.

9                MR. TALKEN:  Because we weren't there.

10               THE COURT:  All right.

11               MR. TALKEN:  We didn't know that at the time.

12               THE COURT:  All right.  All right.  So the only

13   other two issues I have before is to check to see if there's

14   anything else you want to cover.  The -- give me one second.

15   Actually, I think we're up to one -- this trustee issue --

16               MR. TALKEN:  Yeah.

17               THE COURT:  -- but I want you to respond.  The

18   Government had some other things in there that --

19               MR. TALKEN:  I'm ready to respond.

20               THE COURT:  Okay.  Go ahead.

21               MR. TALKEN:  Very briefly and we've already talked.

22   I've given the Government previews so I think I can do this

23   fairly quickly.

24               THE COURT:  All right.  Go ahead.

25               MR. TALKEN:  Starting with issue number one, the

1  language of this order, I think we're in a agreement that's

2  really just the result of me not being an estates and trust

3  lawyer.  I think eventually if we need to we can work out that

4  language and also, you know, we've -- we'll work with the

5  lawyer in Arizona and we'll get the right language and I don't

6  think there's any disagreement about the concept.  It's simply

7  the language and that's just a matter of the proper language

8  for both an Arizona court and of an estates and trust

9  attorney, so I don't think that's an issue at all.  I think

10  that will be resolved without the Court.

11          The only issue the Court will have to deal with is

12  you'll have to read another letter in another order --

13          THE COURT:  That's okay.

14          MR. TALKEN:  -- but other than that, I think that's

15  it.

16          THE COURT:  Well, also, the Government has some

17  concern that these individuals we can make clear that they

18  know this order exists somehow that, like, an affidavit of

19  service or something they said affidavit from them, but just

20  something indicating they're aware of the order.

21          MR. TALKEN:  And again, we'll check all the boxes

22  to --

23          THE COURT:  All right.

24          MR. TALKEN:  -- make sure that all the parties, and

25  the Government being one of them, are satisfied that what Your

50

1  Honor wanted to have accomplished will get accomplished.

2          THE COURT:  All right.

3          MR. TALKEN:  The second, the motorcycle.  Very

4  quickly, that motorcycle was a motorcycle that was built by

5  Tommy Constantine and SueEllen Ferguson's [ph.] son in the

6  early '90s.  Unfortunately, Mr. Ferguson's son passed away

7  from leukemia, so it has a sentimental value.

8          Mr. Constantine was the owner of it.  In 2014 when

9  he was incar -- for the period that he was incarcerated he had

10 a financial debt to Mr. DeAmbrosio and somehow Mr. DeAmbrosio

11 became the owner of it.  Mr. Constantine is in jail so he's

12 not exactly sure how, but what happened was that deed -- and

13 you can see it was notarized back in 2017.  In other words, a

14 lot of times in the automobile business deeds are signed and

15 notarized to make them liquid and then -- for transfer and

16 then so when someone does it they can go ahead and do it and

17 you'll notice that that notarization was 2007.  So what

18 happens; Mr. DeAmbrosio got ownership of it.

19         After that SueEllen Ferguson understanding the

20 sentimental value of it, it's worth about $20,000 is my

21 understanding.  Got it back from Mr. DeAmbrosio and wanted to

22 give it to Constantine.  And, Your Honor, I think I've said

23 this before.  You have to understand Ms. Ferguson is like a

24 second mother to Mr. Constantine.  This isn't a stranger and

25 you know that through the many -- she was a sureter in the

1    many dealings we've had here.  So she wanted to make sure it

2    went back into -- to go to his children and that's why it was

3    placed in the trust.

4            It's important to know that that vehicle is now

5    driven.  It's -- it's the same miles.  I mean, maybe it's four

6    or five miles but it's not -- it's not like Mr. Constantine is

7    riding around in that.  It's in -- the trust was two things:

8    (1) it's an asset; it's a Harley Davidson that can increase in

9    value; and (2) and more importantly, it's got the sentimental

10   value.  And just anecdotally there -- I believe the children

11   have in trust a car or -- somewhere from Ms. Ferguson as well,

12   so this isn't an unprecedented thing.  This is something.

13   It's an asset.

14           So that's where that comes from and I don't think

15   there's anything un toward or I don't think it's exemplary of

16   him abusing his position as a trust.  He was satisfying

17   Ms. Ferguson's wishes when it went into the trust.

18           THE COURT:  All right.

19           MR. TALKEN:  So --

20           THE COURT:  Government satisfied with that

21   explanation?

22           MR. HAGGANS:  The documentation simply looks odd to

23   the Government and we wanted to bring it to the Court and

24   counsel's attention and the Government is not asking for any

25   relief on that issue at this time.

52

1           THE COURT:  I'm satisfied with the explanation.

2           All right.  On the Euphora.

3           MR. TALKEN:  Okay, Euphora.  As the -- as

4    Mr. Constantine has claimed throughout Euphora there were --

5    Euphora is really not Euphora.  Euphora is just a holding

6    company for these patents Your Honor knows well about.  It

7    turns out that those patents, although they were encumbered

8    sometime later than 2009 they are unencumbered and have been

9    for some time and have some value.  There's companies --

10   there's been companies that have thought about purchasing

11   these over the years.

12          Now, Mr. Constantine is nothing more than a board

13   member of Euphora.  He's not a signer on the bank account or

14   anything of that nature.  Recently -- and I'm not going to

15   list names or anything because this could actually end up in

16   public trading, a company has expressed and gone through the

17   steps to purchase Euphora for its patents and I haven't

18   mentioned that to anybody because I -- until it happens I

19   didn't want to bring it to the forefront.

20          However, it's important, Your Honor, to know that

21   from the beginning he's been -- Mr. Constantine has kept

22   Pretrial Services apprised of each and every move on this so

23   that we didn't want any problems about, you know, what he was

24   up to as far as Euphora so there wouldn't be any issues.  So

25   Pretrial has known about it and approved his involvement in

1   it.

2           So it seems that they have a buyer for Euphora.  The

3   good news is that one of the shareholders, a fairly large

4   shareholder of Euphora, as Your Honor knows from the trial, is

5   AC -- AZ Euphora, LLC.  The owners of that are the various

6   hockey players and victims.  How they split it among

7   themselves is my understanding that their attorney -- the

8   attorney that used to represent that was contacted.  I'm not

9   sure he's interested in it, but how they split it among

10  themselves, we're not sure but the hope is --

11          MR. CONSTANTINE:  No --

12          MR. TALKEN:  What --

13          THE COURT:  Let him finish, Mr. Constantine.

14          MR. TALKEN:  Let me finish and then we'll talk

15  privately --

16          MR. CONSTANTINE:  Yeah, I just [indiscernible] again

17  to clarify.  Okay.  Thank you, thank you.

18          MR. TALKEN:  So the -- when that -- if that sale of

19  the stock shares go, there could be millions of dollars

20  available to the victims of this crime through -- by nature of

21  their ownership of AC Euphora.

22          Now, I've personally spoken to the CEO of the

23  company that's thinking about buying it recently because -- to

24  verify things.  There's a possibility and it's not done yet,

25  but what happened was -- and bear with me on this because it's

54

1   all in the way of explanation -- and the company that's buying

2   it had some filing problems with the SEC and when that

3   happened they wanted to fight.  They didn't believe they had

4   filing problems but they wanted to fight it, but that was at

5   the same time when the Supreme Court said that the SEC's

6   regulatory courts did not have any authority and so everything

7   got frozen.

8           The way that company decided to deal with that is

9   they voluntarily delisted because then they can get everything

10  in order and relist.  They're still in that period and they

11  expect their listing to happen soon.  Once that happens the

12  stock comes live and then the players that own AZ will be able

13  to trade in their -- the shares that they have, hopefully.

14  There's a belief that they could be worth now presently or

15  when they open at $5.00 a share and there's a significant

16  amount of shares out there.

17          So that's what that's all about.  But the most

18  important part -- or not the most important part, but the part

19  that I think is significant to the Court and the Government is

20  as part of the sale there's also an attach aspect to it.

21  There's certain people that lent money and are owed money by

22  AZ Euphora.  One of those people is Mr. Constantine and

23  there's a decent amount of money that might be coming to him.

24          I confirmed this with the CEO.  Should that happen,

25  that money is not going to go to Mr. Constantine.  It goes

1  into my escrow account and then it will be forwarded to the

2  Government and I guess there may be a little discussion

3  whether it's forfeiture or restitution, but it's one or the

4  other.

5       So Mr. Constantine is not going to reap any kind of

6  cash value from this, even though -- even if he gets the loans

7  he was paid and whatever he's paid, but there's also another

8  aspect, the cash -- the Privatello [ph.] group.  I think

9  there's about $600,000 give or take, somewhere between two and

10 $600,000 that --

11      MR. CONSTANTINE:   [Indiscernible]

12      MR. TALKEN:   -- that they will also go into -- well,

13 I don't think it will make -- that won't make my escrow

14 account.  That will directly go to them.  I think Mr. Gonchar

15 and there's also Tyson Nash individually outside of AC.

16 Euphora has a large amount of shares.  That will go directly

17 to him.  So there is this possibility and, Your Honor, I'd

18 hoped that this would happen before a sentencing date.  It may

19 or may not because if it does then it's just another factor

20 for you to consider under 3553(a).

21      What I will do in a sentencing date is get you as

22 firm a picture of where this is going and hopefully get some

23 kind of affidavit from maybe the CEO about what's going to

24 happen and I guess I'd file under seal but that's what that's

25 all about. But there's nothing again that -- if anything

56

1    that's trying to work -- you know, trying to make, you know,

2    lemonade out of the lemons that we're dealing with here and

3    also get some of these victims repaid.

4            THE COURT:  All right.  Yeah.  Whatever updated

5    information you have at the sentencing would be helpful.

6            MR. TALKEN:  Yes.

7            THE COURT:  The only other issue that Mr. Kenner has

8    raised and you have raised, this -- with respect to the

9    restitution, you know, I'm not sure how all these variables we

10   have affects the Court's restitution order, but, you know, I

11   want to think about that and the Government when you submit

12   this letter we'll set a date for maybe you can -- I know

13   you've written me on restitution before and with respect to

14   Hawaii and with respect to Mexico you said it's unclear how

15   much, if anything, because I -- the victims will get out of

16   that at this point.  But I guess my question -- there will be

17   two options.  One will be to hold off the restitution order.

18   Court doesn't have to do that at the time of sentencing.  So

19   if we believe that within a reasonable period of time we're

20   going to have more clarity both on the resort and on -- before

21   I could just hold off the restitution decision.  But if the

22   Government is not suggesting that I'm not sure -- if I order

23   restitution because these gains haven't been realized by the

24   victims, what would be the mechanism then for modifying it?

25   Obviously they shouldn't double recover.  So I haven't had a

1  situation like that where as a result of something going on

2  the victim has obtained the money back after the court ordered

3  the restitution whether it be a mechanism for them to modify

4  the restitution order.  I don't know if the Government wants

5  to respond to that now.

6          MR. HAGGANS:  This is a bit off the cuff, Your

7  Honor.  I believe in that scenario in particular since counsel

8  has indicated that Mr. Constantine would have some knowledge

9  at some point when these distributions of proceeds would be

10 made he could advise -- I believe it's the Probation

11 Department has authority to then credit those amounts if it's

12 appropriate against the order of restitution.  And if

13 necessary, there would be an application to Your Honor to rule

14 on that issue.

15         THE COURT:  All right.  But I mean, the bottom line

16 is, and I think you understand this and Mr. Kenner should

17 understand this, whether I hold off the restitution or impose

18 a restitution order before these things get resolved, I'm

19 going to double-check that what you said was accurate, my

20 intention would be, for example, if through the resort --

21 negotiations with the resort, interlocutory sale or this deal

22 with Euphora, the victims get money back, certainly that's

23 going to be credited.  Okay.

24         All right.  Mr. Kenner, is there anything else you

25 want to cover today with the Court?

1          MR. KENNER:  Just two items, Your Honor.  Just as a

2  follow-up to what Mr. Talken had just mentioned.  Will there

3  be a finding whether it be for loss amount where there's a

4  delineation of individual by individual and the different

5  Second Circuit cases that I've quoted in my filings that

6  determine let's say, for example, like the Euphora purposes

7  you may have Mr. Nash who purchased $100,000 as part and

8  parcel to this case and under Leonard or Novack in the Second

9  Circuit, you know, there was an expectation of what he was

10  going to require.  The Government had insinuated a Ponzi

11  scheme on each and every one of these transactions.  Clearly

12  with Mr. Constantine's new information through Mr. Talken

13  Euphora was never a Ponzi scheme.

14          Much the same the Hawaii project.  You know, however

15  the Government chose to prosecute and interpret the bylaws,

16  the corporate governing documents and what we did to raise

17  funding for the project, we commenced $105,000,000 lending

18  deal with Lehman Brothers which returned seven million dollars

19  to our investors.  You know, it's certainly taking it out of

20  the realm of a Ponzi scheme.

21          THE COURT:  Yeah, I don't -- look.  I don't want to

22  get caught up on the term "Ponzi scheme" or not -- but for

23  purposes of the loss amount and the guidelines calculation,

24  the fact if -- if misrepresentations were made to the victims

25  and/or the money was used in an unauthorized fashion, both of

1  which I think occurred here for purposes of the guidelines

2  calculation, for purposes of the loss amount that doesn't

3  alter that if a fraud was committed, the fact that as it

4  turned out it worked -- it worked out in a favorable way to

5  the victims or they got some portion of it back doesn't mean

6  that changes the loss amount.  The loss amount is the loss

7  amount.  It does affect restitution, as we've talked about,

8  and Mr. Talken has pointed out and you should -- you know,

9  obviously you're representing yourself at sentencing.

10        Even though it doesn't matter for purposes of the

11  guidelines calculation it certainly matters, in my view, for

12  purposes of the sentencing.  In other words, there's a

13  difference between a Ponzi scheme and investments that are

14  made based upon misrepresentations but are going to another --

15  you know, another investment but not -- you know, not

16  necessarily being used to pay off someone else's money.

17        So I understand these distinctions that both you and

18  Mr. Talken are making and is something out of the -- what's

19  called -- what the 3553 factors that the Court can consider in

20  terms of what the intent was in part or in whole.  It's not

21  all one big picture.  Some of it -- you know, certainly there

22  was evidence that a line of credit money for one person would

23  be used to pay a line of credit money for another person.  So

24  when I think the Government uses the word "Ponzi scheme"

25  that's the type of thing that is sort of a classic Ponzi

1  scheme where a person controlling money gets behind and

2  borrows money from one person to pay off another person, so --

3  but that doesn't necessarily mean that every dollar that you

4  took from these victims was in that category and I'm certainly

5  looking at all that.  Okay.

6         MR. KENNER:  So, Your Honor, when -- I'm in

7  concurrence with your opinion on that and your evaluation.  By

8  all means.  And I have submitted affidavits that were

9  submitted back in real time by a number of the investors that

10  did specifically mention that they expected their lines of

11  credit to be used to pay of all expenses including other lines

12  of credit.  So those are in some of my filings.  I hope Your

13  Honor has gone through them.

14         And just lastly I know -- I do apologize.  There was

15  a voluminous submission Mr. Brissenden had put in after you

16  had granted me the extension because of our five-day

17  quarantine.

18         THE COURT:  Yeah, that's okay.  I'm -- you know, I

19  understood -- I know these things happen, so it's not a

20  problem.

21         MR. KENNER:  Okay.  So I just wanted to just put on

22  the record that I believe it was ECF 805 and 806 and I would

23  in response to the Government's ECF 799 there are a lot of

24  affidavits.  There are a lot of exhibits in there.  I

25  apologize for the voluminosity -- the voluminous nature of it,

1  but I thought they were critical in this stage of just

2  evaluating what -- where we are in the case.

3          THE COURT:  Yeah.  That's why obviously I'm -- with

4  respect to the forfeiture, I'm still going through that and as

5  relates to the sentencing as well, I'm going to go through it

6  as well.  All right.

7          MR. KENNER:  Okay.  Your Honor, I appreciate you --

8          THE COURT:  All right.

9          MR. KENNER:  -- reviewing those documents.

10          THE COURT:  All right.  And if there's anything

11  else, I've already gotten letters on your behalf and

12  Mr. Talken has submitted letters for Mr. Constantine, but you

13  can continue.  If anybody else wants to submit a letter on

14  your behalf, any of those types of things you can -- I would

15  just add a week before the sentencing would be great.  I

16  don't -- you know, okay.

17          MR. KENNER:  Yes.

18          MR. TALKEN:  Your Honor, I apologize for testing but

19  I'm testing just to talk -- communicating things to

20  Mr. Constantine.

21          THE COURT:  All right.

22          MR. TALKEN:  -- to make sure that we have everything

23  on the record and we do, so we --

24          THE COURT:  All right.  Good.  All right.  So when

25  does the Government think you can get me the loss number and I

1  guess the money laundering calculation and the loss number?

2          MS. KOMATIREDDY:  A week before sentencing

3  [indiscernible].

4          THE COURT:  As week before sentencing?

5          MS. KOMATIREDDY:  Yes.

6          THE COURT:  Well, I want to give them time to

7  respond.  I mean, I -- how about by the end of next week?

8          MS. KOMATIREDDY:  [Indiscernible] --

9          MR. TALKEN:  Your Honor, I don't think I'll need a

10 ton of time to respond.  We'll communi -- on the money

11 laundering issue, that's kind of like criminal history.  It

12 either is or isn't.

13         THE COURT:  Right.

14         MR. TALKEN:  We'll work that out and the other

15 aspect I think it doesn't really affect the guideline range --

16         THE COURT:  All right.

17         MR. TALKEN:  -- too much so we'll -- I don't think

18 it will take that much time for me to respond.

19         THE COURT:  So the 26th?

20         MS. KOMATIREDDY:  Yes, Your Honor.

21         THE COURT:  And then March 4th, Mr. Kenner and

22 Mr. Talken, you can put in a response on that, all right?  And

23 then move the sentencing date, right?  I don't have the

24 [indiscernible], but I know the Government has to move it and

25 everybody is okay with a new date.

63

1          MR. TALKEN:  March 12th.

2          THE COURT:  Right.

3          MS. KOMATIREDDY:  Just so I have everything clear to

4   confirm, the Government has already addressed the revised --

5   confirmed the revised [indiscernible] specific loss

6   [indiscernible] opportunity for Mr. Kenner --

7          THE COURT:  Right.  Based upon whether or not that

8   chart --

9          MS. KOMATIREDDY:  Yes, Your Honor.  Just on

10  Paragraphs 29 and 31.

11         THE COURT:  Right.

12         MS. KOMATIREDDY:  And also checks [indiscernible]

13  change for the grouping, especially grouping analysis.

14         THE COURT:  Right.

15         MS. KOMATIREDDY:  [Indiscernible] --

16         THE COURT:  Certainly the number is going to change.

17  The question is whether it -- the grouping will alter the --

18  the total range.

19         MS. KOMATIREDDY:  And confirm our standing that any

20  [indiscernible] to the restitution.

21         THE COURT:  Correct.  All right.  All right.  Thank

22  you for everybody that -- I know that was a long conference,

23  but obviously we accomplished a lot.  All right.  Have a good

24  day.

25         THE PARTIES:  Thank you, Your Honor.

64

1   (Proceeding concluded at 2:15 p.m.)

2                        * * * * *

65

1        I certify that the foregoing is a court transcript

2   from an electronic sound recording of the proceedings in the

3   above-entitled matter.

4

5

6                                    _____

7                                    Ruth Ann Hager, C.E.T.**D-641

8   Dated:  February 24, 2020

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25