March 4, 2019

The Honorable Judge Bianco
U.S. District Court – EDNY
100 Federal Plaza
Central Islip, NY 11722

**Loss Calculation
(For sentencing guidelines/MVRA);
And
Forfeiture Money Judgment
(Separating a defendant from his 'ill-gotten' gains)** [1]

Your Honor,

**'But for' _and_ 'proximate' causation have _not_ been established**, with _both_ _required_ to establish a loss factor attributable to the defendant, by the government or PSR; and specifically relevant here considering the Court utilized PSR's _summary loss table_ (_PSR at ¶29_) for its determination of loss calculation -- and somehow associated the same unverified figures to 'ill-gotten gains' for forfeiture money judgment, avoiding statutory requirements and Second Circuit case law precedent.

_Uncharged conduct…_
Regarding the government calculations, the Court opined during the July 2, 2019 hearing.  The Court denied holding a _Fatico_ hearing, while verifying that it was only considering charged conduct in its calculations.  The Court regurgitated the government's previous representations of the same, _infra_ (_Tr.33_):

> _[Judge Bianco]: "I just want to make clear that I think I've said this before, but it is in the court's view and its consistent with the government's letter to the court, you know, two years ago that we're not – that the government is not seeking to hold the defendants accountable for any uncharged frauds.  The scope of sentencing relates only to the frauds that were proved at trial…"_

---

[1] The Court is well aware that the fraud guidelines have been extensively criticized for producing excessive sentences for first-time offenders, largely due to the prominence the amount of loss is given in determining a guidelines sentencing range.  This case represents a perfect illustration of that concern.  We will not belabor the point in this brief, but we would turn the Court's attention to a few of the most poignant criticisms.  In _United States v. Algahaim_, No. 15-2024, slip op. at 11, (2d Cir Dec. 1 2016), a panel of Judges Newman, Cabranes and Winter wrote, "[w]here the Commission has assigned a rather low base offense level to a crime and then increases it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-guideline sentence."  _See also, United States v. Corsey_, 733 F.3d 366 (2d Cir 2013) (concurring opinion by Underhill, J., sitting by designation) (criticizing the guidelines' overemphasis on loss as "misguided"); Jed S. Rakoff, '_Why the Federal Sentencing Guidelines Should BE Scrapped_', 26 Fed. Sent'g Rep. 6, 6-9 (October 2013) (criticizing sentencing ranges driven principally by "numbers…drawn from nowhere").   At sentencing, "the Court is virtually unfettered with respect to the information it may consider."  _United States v. Alexander_, 860 F.2d 508, 513 (2d Cir 1988).

1

At trial, in summation, the government told the Court, "*The government called 39 witnesses in this case, multiple victims, every John Doe.*" (*Tr.5993*).   There cannot be new 'does' who were never alleged as victims five (5) years after the trial to 'pad' their victim numbers (U.S.S.G. § 2B1.1(b)(2)(A)) and loss calculations (U.S.S.G. § 2B1.1), *infra*.   These were the government's own words, chosen carefully, for prosecutorial emphasis.

AUSA Michiewicz confirmed to the Court during Kenner's cross-examination that they were not attempting to charge Kenner with proximate causation, not caused by Kenner (nor can they) (*Tr.4588*):

> *Q. You understand that the indictment in this case does not blame you for losing money in a risky venture. Right?*
> *A [Kenner]: That's my understanding.*
>
> *Q. You understand that the indictment charges you with stealing money from your clients, correct?*
> *A [Kenner]: That's my understanding.*
>
> *Q. So the fact that Lehman Brothers went belly up, that the great recession happened, the real estate market bubble burst, you understand there's nothing in the indictment that blames you for that, right?*
> *A [Kenner]: I understand that.*

*"Loss causation" (or legal causation, or proximate causation)…*
The requirement of a causal link (or proximate cause) between the alleged offense conduct and loss arises most often in the securities fraud context, but it is equally applicable here.   The concept, known as "loss causation", requires a finding of a causal link between a defendant's alleged misrepresentation or omissions and the decline of investor's equity value.  See *United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir 2007) (citing *United States v. Olis*, 429 F.3d 540, 546 (5th Cir 2005), quoting "District Courts must take a 'realistic, economic approach to determine what losses the defendant truly caused, or intended to cause.'"  *United States v. West Coast Aluminum Heat Treating Co.*, 265 F.3d 986, 991 (9th Cir 2001)).   Though it originated in the civil fraud context, it is also applicable in criminal cases.  *See Rutkoske*, 506 F.3d at 179.   The Second Circuit has held that it applies at sentencing.  *See id.* ("Moreover, we see no reason why considerations relevant to the loss causation in a civil fraud case should not apply, at least as strongly, to a sentencing regime in which the amount of loss caused by a fraud is a critical determinant of the length of a defendant's sentence.").   The defendant's conduct in no way contributed to (1) the macro economic failure of the 2008 global recession or (2) the 2008 Lehman Brothers bankruptcy, nor were they being asserted by the government as a 'proximate cause' for any loss (*Tr.4588*).   These factors were clearly out of the control of the defendant and each failure was due to reasons completely outside of the defendant's universe, making the causal connection even more remote or non-existent.

Take the classic tort case of *Berry v. Sugar Notch Burrough*, 191 Pa. 345, 43 A. 240 (1899), in which a falling tree damages a negligently speeding trolley car.  The wrongfulness – *the speeding* – is a but-for cause of the accident and injury: had the trolley car not been speeding, it would have been elsewhere when the tree fell.   As a general matter, though, and apart from the chance occurrence in this case, speeding does not make it likelier that trees would fall on trolley cars.   Indeed, speeding arguably reduces the likelihood of such accidents by reducing the amount of time that one is under a given tree.   ***But-for cause is present; causal link or tendency is not***.  See Guido Calabresi, *Concerning Cause and the Law of Torts*, 43 U. Chi. L. Rev. 69, 72 (1975).)   <u>The train conductor is not held liable for the loss</u>.

The requirements of transaction and loss causation are exactly analogous to but-for cause and causal tendency in this classis torts case.   Suppose a real estate company misrepresents that a certain house belonged to Abraham Lincoln, and a buyer purchases the house because of this.  Suppose the buyer can show that, absent the *lie*, she would not have bought the house and would instead have bought a house in another part of town.   Subsequently, a flood destroys her house and others in the neighborhood, while leaving the "other part of town" unscathed.   The loss to her would not have occurred but-for the fraud.   And yet, so long as the neighborhood was not more prone to flooding, the *lie* in no way increased the chances of the actual damage to her house.   ***Transaction causation is present (but-for); loss causation (proximate) is not***.   <u>The real estate agent is not held liable for the loss</u>.

Where does this leave us in the present case?  An investor may agree to invest in a certain private passive-equity transaction because his "advisor" falsified – or neglected to mention – some detail but then suffered a loss due to nationwide recession.   Loss (proximate) causation is lacking.  *See Powers v. British Vita, P.L.C.*, 57 F.3d 176, 189 (2d Cir 1995).   <u>The defendant is not liable for the loss</u>.

The Court followed the PSR summary table (*at ¶29*), which included all gross investment/contribution totals (without proving 'sound methodology' for their numbers) including figures attributable to the proximate causation that the government told Kenner they were not alleging as part of some fraud (nor can they in the instant case) (*Tr.4588*), *supra*.   The proximate causation of the 'perfect storm' of the 2008 global recession and the 2008 Lehman Brothers bankruptcy wholly affected: (1) the 'risk' of the Hawaii project real estate values (not accounting for the Lehman Brothers-Windwalker frauds post-JV, exposed by Kenner in 2008 with John Kaiser as Managing Member), (2) the 'risk' of benefit for the GSF 'company shares' that Constantine promised to the GSF contributors (Palms real estate, the airplane, the airplane hangar real estate, and the additional Eufora shares), and (3) the 'risk' of success for the Eufora private stock purchases (although attorney Talkin verified as '*pending sale*', wholly rewarding the investors for the alleged purchases thru criminal conduct, *verifying no loss after receiving everything the bargained for*; certainly absent of proximate causation); see *United States v. Starr*, 816 F.2d 94, 98

(2d Cir 1987).[2]

*Sergei Gonchar and Glen Murray…*
At a minimum, Sergei Gonchar and Glen Murray were <u>not</u> named in the superseding indictment, by choice.[3]   Thus, the defense was not charged with defending unannounced charges or verifying their underlying knowledge of the various 'objects'.   In fact, voluminous exculpatory evidence exists (in Rule 16 production) which verifies each of their independent knowledge of their personal underlying transactions, *including but not limited to*: (1) Gonchar's 2010 proffer to the FBI that Kenner and Jowdy independently confirmed to him the Hawaii-Jowdy loans prior to their 2004 commencement (*3500-SG-2 at 8-9*); (2) Gonchar's 2009 affidavit about 'Jowdy loan knowledge' and the 'use of his LOC funds', specifically authorized to pay other LOC fees (*3500-SG-4 at 4-5*); and (3) Murray's 2008 independently filed Nevada complaint versus Ken Jowdy for another unpaid loan, in which Murray verified his independent knowledge that "*Jowdy had sought and obtained several previous loans with the assistance of Kenner*".

- The two previous loans, independently referenced by Murray, are: (1) the $500,000, 2004 Norstrom loan to Jowdy, *still unpaid* (*Bates stamp: PKHome-0017314*); and (2) the 2004 Jowdy-Hawaii loan (*ECF No. 785 at 2-4*), *still unpaid*; *and none other*.   <u>This is an over-counting of $2,741,990</u> (*PSR at ¶29*).

==In 2019 -- The Court acknowledged Jowdy has all of the funds…==
The Court confirmed to the government "…*you know, Mr. Kenner has been pointing out for years and its obvious from the trial that the money – that money went to Mr. Jowdy and his entities*" (*July 2, 2019 hearing, Tr.21*).[4]  This contradicted government

---

[2] *United States v. Starr*, 816 F.2d 94, 98 (2d Cir 1987).   It is not enough to show that a defendant used deception to induce victims to enter into transactions they would otherwise avoid.  See *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir 2007).  Rather, the government must show a "discrepancy between benefits reasonably anticipated because of the misleading misrepresentations and the actual benefits which the defendant delivered, or intended to deliver.  *Starr*, 816 F.2d at 98.  Intent to harm cannot be found when alleged victims "received all they bargained for, and defendant's conduct did not affect an essential element of those bargains."  *United States v. Novak*, 443 F.3d 150, 159 (2d Cir 2006).

[3] Since the Supreme Court decided *Hughey* almost thirty years ago, prosecutorial decisions to frame indictments with a "view to success at trial rather than to a victim's interest in full compensation" are made with a full understanding of the potential consequences; See *Hughey v. United States*, 495 U.S. 411, 421 (1990).   The Tenth Circuit opined, "**There are tradeoffs in such decisions**"; *United States v. Mendenhall*, Case No. 19-7006 (10th Circuit December 23, 2019).

[4] The funds that the District Court addressed have been <u>at all times</u> titled to the Hawai'i partners from loans to Jowdy (*3500-KJ-2 at 24-25*)– confessed to by Jowdy during a March 2010 FBI proffer (*Id. at 11-14*) – and sued for by over 90% of the Hawai'i partners from 2008 (See Baker disclosures withheld by government in pre-trial – a.k.a. *Brady* issue) thru Kenner's 2013 arrest and detainment (effectively stopping Kenner, the transparent head of the litigation process versus Jowdy and his cabal, in the U.S. and Mexico).

Although there is irrefutable pre-trial testimony from <u>all</u> involved parties involving the authenticity of the loans (specifically including Jowdy-himself, *supra*), the government <u>ignored</u> all of it and

proffers from opening remarks (*Tr.27-33*) thru multiple summations (*Tr.5996, 5711, 5722-23, 5744-45, 5990, 5991-92, 5707-5709*) alleging Kenner "*stole*" *all* of the money for himself – *when* **_none_** *of it is traceable to Kenner or Kenner's Baja Ventures 2006 equity (and the government knew it at all times)*.

- The government has ignored their-own evidence again and burdened the Court with 3-½ years of demands for forfeiture of the Baja Ventures 2006 LLC without nexus.

*Northern Trust Bank subpoena…*
In 2015 (over a month pretrial) the government vehemently objected to Kenner's request for **Northern Trust bank subpoenas** for all the LOC clients including Gonchar and Murray (*supra*, but the government objected *because* they argued that they were not charged in the superseding indictment); concluding it as a "*fishing expedition*".   The Court *agreed* with the government and *denied* the subpoena in its entirety.   On the eve of trial, the government agreed to a pared down Northern Trust subpoena that *did not include* Gonchar and Murray (or several other un-named superseding indictment individuals with Northern Trust accounts).   Thus, *the government conceded* that they were not victims and their exculpatory information was un-needed by the defense.   *Furthering their concession*, they

---

berated Kenner throughout trial claiming Kenner's in-trial confirmation of the (*government-forfeiture-44 verified*) loans to Jowdy as…"*bogus*" (*Tr.5708 (2x), 5709*), "*phony*" (*Tr.4597, 4598*) and "*supposed*" (*Tr.5707-5708*); and…

The government referred to the actual Jowdy thefts simply a "*Kenner cover-up story*", claiming Kenner "*stole more than $10 million*" (*Tr.27*) [untrue], "*bought land in Hawai'i, sold it, took the profit for himself*" (*Tr.29-30*) [untrue], and "*This is the fraud where the defendants lie to the investors about who's stealing from them, and find a way to steal from them all over again (Tr.31)* [untrue]*…The defendants tell the investors that a guy in Mexico named Ken Jowdy, stole their money and ran away with it*" (*Tr.31*) [TRUE: *government-forfeiture-44* proves Jowdy did steal it], "*and to fund a tequila company he was starting in Mexico*" (*Tr.33*) [untrue].

**None of the allegations about Kenner proved to be true.**

- The government defended the "new evidence" of *government-forfeiture-44* (confirming Jowdy received 100% of the Hawai'i loans) as "*cumulative*" in opposition to Kenner's initial Rule 33 motion; but…

- If *government-forfeiture-44* is *cumulative* (as the government defended – *ECF No. 370)*, then the government must be condoning the ignorance by their prosecutorial team of *all the alleged cumulative*, empirical evidence they *needed to ignore* in order to construct their false trial narrative of "*stolen by Kenner*" (not Jowdy), *supra*.
  - *It was opposite 100% of the bank records, FBI proffers, and testimony -- and still is.*

- Otherwise, reformative "new evidence" is present – demanding a new trial, and the fairness and grave responsibility of the prosecution expressed by the Supreme Court in *Berger* (1935) has been constitutionally ignored – and significant revisionary issues are unresolved from an improperly pursued conviction "at all costs"; lacking confidence in the most critical prosecutorial "object"; and critical reformative questions of "new evidence" unanswered in the interest of justice.   *See United States v. Berger*, 295 U.S. 78 (1935).

removed Gonchar and Murray (amongst many others) from their superseding indictment weeks before trial (*ECF No. 214*), *because* multiple investors had told the FBI pretrial that they were not Kenner-victims and only wanted their Hawaii funds back from Jowdy as part of the Hawaii loans Jowdy agreed to ten (10) years earlier. Notwithstanding ineffective counsel issues, if the defendant was aware of the victim statuses of Gonchar and Murray (or even Stevenson in the GSF, per the *PSR at ¶29*), the defense would have taken the time necessary (many weeks or even months) to thoroughly pursue document discovery and witness testimony, including expert testimony, on the causation issue.   As the Court knows, such evidence is critical in assessing loss causation.  *E.g.*, *United States v. Rutkoske*, 506 F.3d 170, 180 (2nd Cir 2007) ("Normally, expert opinion and some consideration of the market in general and relevant segments in particular, [like the 2009 global recession and Lehman Brothers 2008 bankruptcy,] will enable a sentencing judge to approximate the extent of the loss caused by a defendant's fraud.").

The consideration of uncharged conduct is a beast born to life by the Sentencing Commission.   The Court need not indulge it.   See *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) ("[A]s a general matter, 'courts may vary [from guideline ranges] based solely on policy considerations, including disagreements with the guidelines.'") (citation omitted); *cf. Rita v. United States*, 551 U.S. 338, 350-51 (2007) (providing reasons why sentencing court may reject the guidelines).   Most importantly, un-named superseding indictment persons are *still* not victims, *still* do not suffer losses, and even if they did, there is *still* no causal link between the defendant's actions and any such imaginary losses.

For months during trial, the jury listened to the government's theories that the **Hawaii project** (1) Jowdy loans and (2) Constantine consulting payments were *unauthorized*, yet no 'causal loss' has been presented to the Court based on required 'proximate causation' analysis (*$6,755,107 attributable to PSR summary table at ¶29; excluding the incremental John Kaiser and Ethel Kaiser computations, discussed infra*). Next, the government theorized that **Constantine's GSF** concealed and omitted *his* actual uses of the funds (*Tr.3805-16*) (despite detailed emails, that reiterated face-to-face meetings, followed by irrefutable 'sign-off authorizations' for Constantine's 'use of funds' by each and every contributor).   Although the Court determined that Constantine misused $17,077 of his GSF funds (*ECF No. 501 at 60*), the government (nor PSR) ever represented proximate causation to that or any GSF loss. Constantine's 'overspend' cannot be the 'proximate cause' of millions of properly signed-off transactions (*$1,550,000 attributable to PSR summary table at ¶29*).[5]

_____

[5] See *Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A.*, 461 Fed. Appx. 61; 2012 U.S. App. LEXIS 3012

- In *Horvath*, **the investor argued that the terms and conditions were _written in Portuguese_, which he did not understand, but the Court of Appeals found that the investor was charged with knowing and understanding the contents of the documents that he signed**.

   The Court opined "If the signer can read the instrument, not to have read it is gross negligence; if he cannot read it, not to procure it to be read is equally negligent; in either case the writing binds

Lastly, the government theory that the **Constantine and Gaarn Eufora private stock sales** provided the purchasers with 'something less' than what they 'bargained for' resulted in a loss; *See Starr*, and its progeny.   Even if their 'but for' actions were deemed illegal, there is still no 'proximate causation' to actual or intended pecuniary loss (with none occurring to date); specifically considering the February 2020 in-court representations by Constantine's counsel that final and imminent negotiations are concluding to "*sell Eufora's patents-assets to a 3rd party for millions of dollars of profits*", clearly demonstrating that there is 'no proximate loss' possible (*$800,000 attributable to PSR summary table at ¶29, with Ranford over-counted by $100,000, reducing his Eufora total to $300,000, and the grand Eufora totals to $700,000*).

- The remainders of the PSR table summary 'loss' representations are addressed *infra*.

Now, the government without fulfilling their requirements to prove 'proximate causation' wants to change horses, allege Ken Jowdy as a co-conspirator after defending his integrity for almost a decade (including Probation thru their July 2016 addendum), add victims, and allege $36 million of 'ill-gotten gains' (for forfeiture) and similar for 'loss' (affecting guideline sentencing range, astronomically increasing the guideline range by decades).   The Court relied on PSR's unsubstantiated summary tables (*at ¶29*) to determine both factors during its specific pre-sentencing hearing in February 2020; *without the causation analysis* (*fervently objected to by the defendant orally and in writing, reserving Kenner's objection to the sentencing analysis under Booker*).

*Voluminous discovery still plagues the verdict's confidence…*
As recently argued by Kenner and his co-defendant's counsel, the volume of discovery that was either not delivered by the government pre-trial (raising *Brady* issues) or the gross late delivery (raising *Gil*[6] issues -- or *28 U.S.C. 2255* issues), the

---

him.  Parties are bound by documents expressly incorporated by reference into agreements to which they manifest their assent."

[6] *United States v. Gil*, 297 F.3d 93 (2d Cir 2002) ("the government wrongfully suppressed evidence favorable to the defendant [that was] exculpatory and impeaching information, seriously undermining confidence in [the] guilty verdict, and was not disclosed timely enough for it to be useful to defendant.   The production of the documents on the eve of trial did not provide defendant the opportunity to read it, identify its usefulness, and use it.").

The Court opined, "To the extent that a prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation, grounded in the 14th Amendment, to disclose that evidence to the defendant.  Information coming within the scope of this principle includes not only evidence that it is exculpatory, i.e. going to the heart of the defendant's guilt or innocence, but also evidence that is useful for impeachment, i.e. having the potential to alter the jury's assessment of the credibility of a significant prosecution witness."  *Leka v. Portuondo*, 257 F.3d 89, 98 (2d Cir 2001) (alterations in original) (quoting *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir 1998)).

Court had previously represented to Kenner during forfeiture hearings (2016) (*Tr.207-08*):

> *"If you have uncovered any documents since the trial that you believe suggest that there is <u>something inaccurate about the testimony at trial</u>, Mr. Haley [trial counsel] should submit them to me."*

***Chronic Traumatic Encephalopathy ("CTE") is new evidence...[7]***

Post-trial, the incredible revelation of witness **CTE** was discovered.   The ability to recall facts from events that occurred up to 13 years prior to trial were *mentally impossible* for most of the government witnesses but never revealed as known by the government to the defense pretrial (either way resulting in crucial 'new evidence' – or – 'prosecutorial misconduct').   This reformative issue, alone, raises disastrous effects for the government on the confidence in the verdict and remains unaddressed (after Kenner's December 2018 verified discovery of the **CTE** and requests for further 'new evidence' discovery submitted to this Court).

Bryan Berard (confirmed thru his 2018 podcast, *GoLocalProv.net*) and Nolan, Sydor, Ranford, McKee and Rucchin (named by Kenner's investment partner to Kenner, *ECF No. 771*) all participated in the 300+ person, 2014 class-action lawsuits versus the National Hockey League for **CTE** related brain damage, resulting in **cognitive degenerative issues** – specifically including ***memory loss*** (*with the prosecution concentrating on their 'memories' of specific details involved in their passive-equity investments*).

- They were asked by the government if they "*remember what they were never told*"...to support Kenner's alleged criminal act of concealment.
- <mark>An individual would need to have *NSA-level perfected-memory*, 100% absent of any cognitive deficiencies, in order to *remember what they were never told*.</mark>
  - Further verifying previous knowledge that was contradicted by trial testimony, Berard told the 2009 arbitration that he had a family attorney that reviewed all of his investment documents *<u>before</u>* signing any of them – removing any allegation that he only signed 'one-page-signature-documents' (*Day 5 Nolan arbitration at Tr.917-918*):

---

In *Gil*, a guilty verdict was vacated and remanded for "late discovery" of exculpatory information that "*was not disclosed timely enough for it to be useful to defendant*".   In *Gil*, *supra*, the Court was disturbed that "*the production of the [exculpatory] document on the eve of trial did not provide defendant the opportunity to <u>read it</u>, <u>identify its usefulness</u>, and <u>use it</u>*".

[7] The primary symptoms of **CTE** have been described by neurological experts (including Dr. Ann McKee) at Boston University's Neurological Center as:

> *CTE, a catastrophic disease first associated with boxers long ago, results when a toxic protein, Tau, accumulates in the brain, kills brain cells, and leads to symptoms such as **<u>cognitive dysfunction</u>, <u>memory loss</u>**, sleeplessness, depression, **diminished impulse control**, **episodes of anger**, and **<u>dementia</u>**, among others. Until recently, CTE could only be confirmed through an autopsy. **Tau proteins are released whenever concussion occurs**.*

*Q: What about bank statements; did you have any problem getting any of your bank statements from Mr. Kenner at any time?*

**A [Berard]: Not at all.**

*Q: And prior to signing any of these documents did you have access to your own attorney unconnected to Mr. Kenner to review this?*

**A [Berard]: Yes I did.   We have a family attorney back home where before I sign any documents basically – I went to his office, sat with him.   We reviewed them, and I signed them and basically FedEx'd them to Phil [Kenner].**

*Jay McKee…*
As a substantial example (with McKee only present relative to the GSF 'object' per AUSA Komatireddy, *Tr.1846*), whether a result of his-known **CTE** or undue influences, McKee's 5/9/2009 text conversations with Kenner immediately following his 5/9/2009 GSF dinner with Constantine (the same night), confirmed there was nothing McKee could not have been aware of *in real time (and shared with Michael Peca, Tr.1817)*; with McKee specifically not objecting to items newly revealed during the exculpatory text communication (if they were).  McKee's text Q&A with Kenner provided the restated explanations of *exactly* what Constantine was planning to do with McKee's GSF money.  The texts were written and replied to by McKee himself, *in real time (ECF No. 668 Appendix at 49-51*).  It 100% contradicted his trial testimony (*Tr.1821-24*), *six years after the events he could not recall*, thru his haze of **CTE** (or otherwise).

McKee continued with his 'memory loss' on cross-examination, hi-lighting his crucial **CTE** factors contributing to his memory-vacant his testimony (*Tr.1870-75*).  McKee *could not recall*: (1) the GSF conference calls he received emails to announce (from Constantine), (2) his responses made to the same emails, &/or (3) his personal participations on the calls.  Yet, the government *relied* on his ability to '*remember what he was never told*' about the contemporaneous events he cannot recall with any specificity.

McKee's $250,000 cannot be a loss based on concealment (for forfeiture or guideline loss calculation, *PSR at ¶29*), notwithstanding the two (2) additional and specific follow-up documents exchanged with McKee the following week requiring his sign-off – by him personally (*GX-6602, introduced by the government at Tr. 1819*).  The government (as did PSR) failed to prove 'proximate causation' regardless; specifically with McKee testifying about his expectations when Constantine *"talked about how we could potentially recoup some of what I felt was lost money." (Tr.1814)*.  In fact, *none* of Constantine's 'overspend' is traceable to McKee's 5/11/2009 contribution *(GX-767)*.

*Loss calculation requires 'but for' and 'proximate' causation analysis (for sentencing guideline calculation or MVRA)...*

For the purposes of calculating the Guideline range, the loss is defined as "the greater of actual loss or intended loss". *United States v. Certified Envtl. Servs. Inc.*, 753 F.3d 72, 103 (2d Cir 2014) (quoting U.S.S.G. §2B1.1 cmt 3(A)). "Intended loss" means "the pecuniary harm that a defendant purposely sought to inflict." U.S.S.G. §2B1.1 cmt.3(A)(ii).  The district court is "not required to calculate loss with 'absolute precision'," See *United States v. Binday*, 804 F.3d at 595 (quoting *United States v. Coppola*, 671 F.3d 220, 250 (2d Cir 2012)), but it must "make a reasonable estimate of the loss" that is based in "available information" and supported by a preponderance of the evidence, *Id.* (quoting U.S.S.G. §2B1.1 cmt. 3(C)).

Based on the summary table submitted for sentencing (*ECF No. 765 at 30-31*), the government sought forfeiture and guideline calculations based on some untraceable gross transaction amounts that may or may not have been involved in the Hawaii project, the Eufora private stock sales, and the Global Settlement Fund ("GSF"); *including uncharged conduct they dismissed at trial*.  Regardless, the government *never* presented any 'but for' or 'proximate' causation analysis to support the gross amounts (for either calculation); *with both required by statute.*[8]  Kenner challenged their basis (under Second Circuit precedent and statute) during his written and oral objections.  In response, the government failed to reply and substantiate any of the amounts with 'empirical evidence' or 'sound methodology' as required to rely on 'but for' and 'proximate' causation analysis.  Rather, they relied on *ipse dixit* reasoning.  Next, Probation provided a separate summary table (*Date report prepared: January 25, 2015 'four months before trial' at ¶29*), without back-up calculations. They were more un-corroborated amounts, *infra*, including: (1) double counting funds, (2) individuals not named in the superseding indictment (or specifically removed in their "streamlining" claims pretrial; *See Hughey supra*) and individuals not mentioned as victims of the 'objects' now claimed as loss, *infra*, allowing proper cross-examination of persons alleged as victims under the

---

[8] The government asked Kenner at trial if he was aware that the government believed he stole money from his investors --- and was *not* at trial because of: (1) risky investments; (2) the 2008 Lehman Brothers bankruptcy; or (3) the 2009 global real estate recession (*Tr.4588*).  Without evidence, the government proffered during both summations that Kenner "*stole*" his investors' Hawaii money and used it to buy his Cabo san Lucas project equity (*Tr.5996, 5711, 5722-23, 5744-45, 5990, 5991-92, 5707-5709*).  **None of that was true -- or proven at trial**.  Post-trial -- the government *debunked* their-own theory during the forfeiture hearings by admitting *government-forfeiture-36* (confirming all of the Cabo equity funds were legit, and not 'ill-gotten' to Kenner) and *government-forfeiture-44* (confirming that Jowdy received 100% of the Hawaii loan funds) *in contradiction to Kristen Peca's 2012 FBI recording confession about her conversations with FBI agent Matt Galioto, when Kristen Peca said*:

   "*Matt told Michael and I that you stole all of the Hawai'i money and never gave it – the loan money -- to...uhhhh...Jowdy.*"

• It should be hi-lighted that Kristen Peca was *not* concerned about the actual Jowdy loan -- because she knew about it thru her husband, previously *verified* by Michael Peca to the 2011 SDNY Grand Jury (*ECF No. 770 at 34, 40-41*), **but moreover** that Kenner '*stole the Hawaii money*' and '*did not give it to Jowdy*' *as they expected (because the FBI told them Kenner stole it instead)*!

defendant's "Right to Confront".  Kenner challenged the Probation totals during Kenner's oral arguments and throughout every written objection.  Probation failed to substantiate their summary tables with back-up information (or provide the required 'but for' *and* 'proximate' cause analysis); specifically after the Court offered the government/Probation an opportunity to submit substantiation of their 'sound methodology' during a 2019 hearing.  *Probation refused*, claiming they were relying on their prior submissions (without back-up or analysis) (*Tr.4588*).

Probation also documented their summary table as "*sustained monetary losses*" (*¶29*); in fact ignoring evidence in the trial record.   The totals were completely _unproven_ during trial or during their subsequent forfeiture presentations; including failure to mitigate losses with _all_ appropriate 'offset' factors, even excluding 'offsets' conceded by the government in their sentencing memo (*ECF No. 765*) (as Kenner presented thru oral and written submissions to the Court).

Probation's chart (*¶29*) grossly over-counted the entire universe of alleged victim 'contributions' (the maximum starting calculation), before all causation arguments, _offsets_, _deductions_ and _non-fraud factors_: required as part of the 'loss analysis'.  The gross investments of the alleged superseding indictment victims do not exceed $8.8 million.  Probations totals are unreasonable under any calculation methodology (certainly one that is unsubstantiated by the government or Probation, short of an unacceptable *ipse dixit* method, which has not been followed by any Circuit to date).

- Like Probation, the government has only offered conclusory tables to the Court (*ECF No. 765 at 30-31*), lacking any substantive back-ups or verification of causation.   **That is not sufficient**.  See *18 U.S.C. § 3664(e)*.  "The government bears the burden of proving the amount of the loss sustained by a victim as a result of the offense".

*Forfeiture money judgment (and resulting non-loss factors for sentencing)…*
In *United States v. Shkreli, 2019 U.S. Appx. LEXIS 21248 (2nd Cir 2019),* the Court opined: "Criminal forfeiture focuses on the disgorgement by a defendant of his ill-gotten gains."  *United States v. Contorinis*, 692 F.3d at 146 (internal quotation marks omitted); *United States v. Torres*, 703 F.3d 194, 203 (2nd Cir 2012) ("'[F]orfeiture is gain based' not based on the losses (or gains) to victims." (internal quotation marks omitted)); *Shkreli at 6-7*.

Baja Ventures 2006, LLC full capital contributions have been verified by the government's testimony as **untainted** and '**not ill-gotten'** (*government-forfeiture-36*).   In fact, IRS agent Wayne explained to the Court during the March 9, 2016 forfeiture hearing that Kenner's two European partners (Jozef Stumpel and Jere Lehtinen) paid for 100% of the Baja Ventures 2006 capital contribution equity, following his own temporary amnesia on the specific-material forfeiture facts under analysis at that 2016 moment; **the government's critical nexus** (*See March 9, 2016 -- Tr.44-45*):

> *Q:  In the course of that interview, did Mr. Jowdy tell you – I don't need you to look at the entire document.   I am just trying to move it along.   In the course of*

11

*that interview, did Mr. Jowdy tell you how Kenner obtained his 39% interest in the Diamante Cabo san Lucas project?*

**A [Wayne]: I don't recall him saying that.   But...**

*Q: Would you kindly take a look at Page 2 of* **Kenner Exhibit F-2**?   *The third paragraph.   Does that refresh your recollection as to what Mr. Jowdy told you as to how Philip Kenner acquired his 39 percent interest in Diamante Cabo san Lucas?*

*A [Wayne]:* **Yes**.

*Q: What is your recollection of that, sir?*

*A [Wayne]:* **That Kenner borrowed the money from Jozef Stumpel and Jerry Linton** *[sic]*.

*Q:  It was through the borrowing money from Jerry Linton [sic] and Jozef Stumpel that Kenner acquired his 39 percent interest in the Diamante Cabo san Lucas through August 2006, correct?*

*A [Wayne]: Can you repeat the question?*

*Q: Sure.  Ken Jowdy told you that the source of the funds by which Philip Kenner acquired his 39 percent in Diamante Cabo san Lucas was through money loaned to him by Jerry Linton [sic] and Jozef Stumpel, correct?* [9]

*A [Wayne]: Yes.*

*United States v. Nicolo*, 597 F.Supp.2d 342, 348 (2nd Cir 2009) ("[P]roperty 'traceable to' means property...the acquisition [of which] is attributable to the money laundering scheme rather than money obtained from untainted sources.") (alterations in original).

So what is forfeitable or subject to forfeiture money judgment?  *Kenner received no 'proceeds', let alone anything that was ill-gotten; or alleged as dissipating the funds.* **Agent Wayne confirmed it**.

- In spite of Wayne's testimony and forensic accounting evidence they-themselves presented (*government-forfeiture-36* and *government-forfeiture-44*) the government is consistent with its ethical breech to the Court and the defendant's right to Constitutional fairness four (4) years later, by contradicting their-own evidence and claiming "*Kenner used approximately $2.4 million to buy a personal stake in property in Mexico.*" (*ECF No. 765 at 8*).

---

[9] See Baja Ventures 2006, LLC partner, Stumpel, letter to the Court (*ECF No. 771*).

12

*Honeycutt severability decision is still outstanding…*
The Second Circuit has recently opined regarding the Supreme Court *Honeycutt*[10] ruling in 2017, "While we have not yet fully defined the parameters of *Honeycutt*, this much is true: *Honeycutt*'s bar against joint and severable forfeiture for co-conspirators applies only to co-conspirators who never possessed the tainted proceeds of their crimes."  See *id. at 1630* ("[A] defendant may not be held joint and severably liable for property that his co-conspirator derived from the crime but that the defendant himself did not acquire." (emphasis added)); *Id. at 1631-33*.; see also *United States v. Tanner*, 942 F.3d 60 (2d Cir 2019).

- Since the *Honeycutt* decision, the government in the Second Circuit conceded the *Honeycutt* application to Title 18 cases in *Gil-Geurerro*, 2018 U.S. App. LEXIS 1541, No 16-cr-3250, January 2018 and *Fuimano*; 2018 U.S. App. LEXIS 36066, No 17-cr-773, December 2018 (like the instant case), conceding its inevitability so as not to waste the court's time and resources in the future on remand.

- In *Cooper*, the D.C. District Court recently refused to hold a defendant liable for funds that were paid to a non-party in the illegal transaction (similar to Jowdy receiving funds in the instant case), because they opined that 'the government chose not to indict that person', and if they did, they would have held them responsible for the joint and severable forfeiture liability, not the defendant.  *See United States v. Cooper, 2018 U.S. District LEXIS 6-13* (DC December 13, 2018, Judge Emmett G. Sullivan).

- Judge Sullivan further defined 'mastermind' in *Cooper* as the person "*receiving the lion's share of the 'proceeds'*", unlike Kenner who virtually received nothing related to any 'object' of the instant case; while contemporaneously fronting millions in litigation expenses in Mexico, Nevada, Arizona, New York and California for the alleged victims while exposing the persons who the government verified received 'proceeds' (Jowdy, Constantine, Kaiser, Berard, etcetera).  The Court should note that this is the same timeframe (2008-09) the government referred to Kenner as "*broke*" to incite the jury during rebuttal summation (*Tr.5982*).   Its reasoning is the antithesis of logical or empirical when assessing underlying 'intent'.

While the Court has a decision to make under the changing environment of joint and severable liability for co-defendants based on *Honeycutt*, the gross 'proceeds' received by Constantine (*ECF No. 789 at 1*, $2,797,400, but not tied to 'proximate causation') must be the high water mark for Kenner as well, *if* the government can prove a nexus to victims in the crimes of conviction for individuals in the superseding indictment.   They have not for approximately $2 million these funds; not even venturing into the causation analysis issues.   Kenner has proffered to the Court that he received $162,500 from innocent third party, Tim Gaarn; in the instant case as a result Gaarn's 2009 private stock sale proceeds.   Kenner is unaware if that total is included in the Constantine totals, but no additional funds are traceable to Kenner as 'proceeds obtained'.   The $117,000 Kenner received from Constantine in

---

[10] *Honeycutt v. United States*, ____ U.S. ____, 137 S. Ct. 1626, 198 L. Ed. 2d 73 (2017)

2008 for the repayment of government-documented loans was included in Constantine's total.

In *United States v. Tanner*, 942 F.3d 60 (2d Cir 2019), the Court referenced *Honeycutt*, stating: ("the District Court erred in ordering the defendants to forfeit more than the amount of their criminal proceeds"). The forfeiture money judgment totals clearly need to apply *Honeycutt* based on Kenner's minuscule traceable funds to the 13-years of alleged criminality. Kenner received *less than $280,000* (exclusively verified as loan repayments, further minimizing any perceived Kenner-benefit based on alleged '*mastermind*' control and intent) (*ECF No. 805 at 9-10, 13, 28, Kenner's reply submission to government ECF No. 799*). 'Proceeds' received by Kenner were certainly no more than 10% of the total funds Constantine received; even though only the sale of Constantine's personal Eufora stock (*$450,000*), the alleged knowledge of the Gaarn illegal sales (*$162,500, ECF No. 788 at 4, f.4*), and Constantine's complete control of the GSF (*Tr.540 [Peca], Tr.3805-3816 [Ronald Richards[11]], 3500-TN-3 at 12 [Nash]*) (*$17,077, ECF No. 501 at 60*) resulted in alleged 'ill-gotten gains' from alleged superseding indictment victims.

In the instant case, the government sought a $36 million forfeiture money judgment for over four (4) years (2016-2020), and the government confused it with Probation's mis-calculations titled "*sustained monetary losses*" at approximately $14 million; wholly juxtaposed with some mis-calculation of 'gross funds', never causal losses. This is notwithstanding the hi-lighted calculation errors, *supra* and *infra*. Neither the government nor Probation draws the required 'nexus' to 'ill-gotten gains' for Kenner or 'trace the money'; the statutory requirement for forfeiture; *See Shkreli, referencing Contorinis and Torres*.

***The Centrum and Urban Expansion loans*** caused 'no loss' to any of the Hawaii partners as a result of 'but for' or 'proximate' causation…

- The government's Rule 16 production confirmed that Hawaii COO Manfredi negotiated the final terms with both lenders, *independent of Kenner*, and Manfredi <u>re-verified</u> this exculpatory fact to the FBI in 2010 (*3500-CM-2-r at 1*) (in spite of his memory loss in 2015, 5-years later) (*Tr.2960*).
  - The Court should note that during Manfredi's 2010 FBI proffer, he could not recall several other paid money brokers who recommended hard moneylenders at the same time, but Manfredi was 'crystal clear' in 2010 that he had worked hand-in-hand with Constantine based on

---

[11] Attorney Ronald Richards verified only Constantine controlled the GSF and its proceeds at all times (*Tr.3805-16*):

> *Q. Now, if there are disbursements that represented funds that were sent under the authority of Mr. Constantine, again, <u>for the record, who did you receive each and every one of those disbursements authorizations from?</u>*
> *A [Ronald Richards]: **Only Mr. Constantine**.*

"*agreements*" between Constantine and the Hawaii partners (*3500-CM-2-r at 1*) since 2004 (*Tr.3004*).[12]

The Court should note that *neither* the 2005 *Centrum loan* negotiated by Hawaii COO Manfredi, *including* its subsequent $1,500,000 distribution to Jowdy as part of the Hawaii-Jowdy loans (also negotiated alone by Manfredi) (*Bates stamp: KJ1854 and PK_SEC_018151*) and Manfredi's 7/27/2005, $100,000 personal distribution (*Bates stamp: NAAZ000179*) -- *nor* the *Urban Expansion loan* (which saved the $35.5 million Waikapuna parcel from an imminent $1.5 million Hawaii partners' loss) (*Bates stamp: KJ2467-2468*) resulted in any loss to the investors.

- In 2006, both lenders were fully repaid thru their-independent negotiations with Lehman Brothers and the Lehman Brothers-introduced Joint Venture partner, Windwalker.  **Neither has a loss.  Neither caused any loss to the Hawaii partners thru 'proximate' causation or otherwise**.  **$650,000** of Centrum "*sustained monetary losses*" (*PSR at ¶29*) was included in the Court's calculation, as a result.  *There are none.*[13]

Probation's calculations (*¶29*) that reference Centrum mortgage are misplaced, without any funds originating from any Hawaii partner or causing a 'proximate' loss. The Centrum 2005 'signed' loan documents, personally guaranteed by Kenner (just like Kenner's personal Urban Expansion loan guarantee), authorized the use of Centrum funds for further 'lending' (*ECF No. 805-806 at 13, Ex. J – produced by Nolan during the 2009 arbitration, further emphasizing Kenner's transparency thru one of the Hawai'i partners – Bates stamp: NOLAN0005782-5786*).

*Ill-gotten gains…*

---

[12] This opens Pandora's box regarding the 'same' agreements Kaiser called a "*forgery*" of his name (*GX-5104, photocopies only introduced at Tr.990 thru Kaiser and re-confirmed as the same by the government signature expert at Tr.3622, 3626*), despite possessing the '*original ink*' versions at his home for 10 years prior to trial (*GX-7004 and GX-7005, not introduced at trial or thru their-own signature expert, resulting in a significant unaddressed Fed. R. Evi. Rule 1002 violation*).

- At a minimum, someone must ask where the '*agreements*' are that Manfredi is aware that Kaiser signed, as Kaiser's best friend – and verified to the FBI in 2010 in his proffer, *supra*?

[13] It took over 3-months to close the Centrum loan (in Rule 16 evidence), and the management team (Kaiser, Manfredi and Kenner) decided to accept the Centrum loan even though the development plan had not been approved by the Ka'u County Development office.   The process to secure hard money development funds was expensive and draining on the Hawaii resources, so as a management team, they decided to take the loan and re-loaned it until the development plan was approved; organized by Manfredi as the loan-closing emails confirm with the various lenders and attorneys. Unfortunately, the Ka'u District Planning office delayed all development plans for over 5-years. Kaiser testified to the 2009 arbitration panel (regarding the Centrum loan funds – since they were the only loan funds):

[John Kaiser -- *Day 5 at 81*]: "*Any money that was allocated towards land for the Hawaiian Investment Group that wasn't being used – the due diligence takes a long time. So if we had some funds that were – that was stagnant and that warrant purchasing land, we would utilize if for a loan, so we actually made some money off it*".

15

To be included as the entirety of an investment in the entry of a forfeiture money judgment, ill-gotten gains must be based on 'fraud on the inducement'.   This is not the case for Kenner, specifically with respect to the Hawaii 'object' of the case (*totaling $6,755,107 of the PSR loss table*).   *Every* investor had invested in the Hawaii project prior to the *Kaiser-approved* (*See 3500-JK-1-r at 2, 3, 10*) loans to Jowdy.

In addition, Kaiser proffered to the FBI on October 19, 2010 that many 'updates' were made for the Hawaii project (*id. at 3*) (*ECF No. 785 at 2*).   Kaiser's pre-lending meetings with Jowdy were verified by Hawaii attorney Madia to the investors in one of his '*update*' emails on February 24, 2006, explaining to all of the Hawaii-Mexico investors: "*Based on the meetings John Kaiser had with Ken [Jowdy] before we agreed to lend him the money in 2004 Phil [Kenner] has asked me again to attach for your records a copy of the lending agreement.*"   Attorney Madia made sure the Jowdy loans versus equity in the Hawaii and Mexico deals was clear by further offering, "*The questions during our last conference call by Owen Nolan, Mike Peca, and Bryan Berard were important to all of you.   If you are still confused about the individual equity you invested in the Cabo project versus the Hawaii equity and loans, please reply to me.   I thought Phil [Kenner] clarified this but I want all of you to be clear.*" Ultimately, in real time (February 2006), attorney Madia also forwarded the re-calculation of the outstanding Jowdy loans to the individual Hawaii-Mexico investors, stating, "*Based on the delay I have also resent the updated loan calculation from the Hawaii loan to Jowdy for your records.*" (*ECF No. 785 at 2-4*).

- *Nothing was concealed*, notwithstanding willful blindness by passive-equity investors *who are entitled to that passive blindness* – but not to criminal or civil restitution because of it.

*"Trace the money" (MVRA: restitution)...*
The government is required to '*trace the money*' for forfeiture and guideline calculation (wholly affecting MVRA, victim restitution, and sentencing guidelines) – specifically when the defendant objects, *supra*.   As the Court knows, Kenner has vehemently objected.   The totals do not need to be finalized with precision as the government enjoys opining (*United States v. Roberts*)[14], but they must follow statute and case law to arrive at a realistic number; *see also United States v. Boccagna*, 450 F.3d 107, 112 (2nd Cir 2006) (victim's out-of-pocket loss offset by the value of recouped collateral).   The "law recognizes a number of reasonable measures of property loss."   *Boccagna*, 450 F.3d at 115.

The MVRA permits restitution to be ordered only to a "victim" of an offense.   18 U.S.C. § 3663A(a)(1)-(a)(3).   The statute defines a "victim" as "a person *directly* (but-for) and *proximately* harmed as a result of the commission of an offense for which restitution may be ordered," including harm from "the defendant's criminal

---

[14] "[T]he law does not demand mathematical exactitude in calculating the proceeds subject to forfeiture.   Indeed, because the purpose of forfeiture is punitive rather than restitutive, district courts are not required to conduct an investigative audit [.]" *United States v. Roberts*, 660 F.3d 149, 166 (2nd Cir 2011).

conduct in the course of" a scheme or conspiracy.  Id. § 3663A(a)(2) (emphasis added).  Thus, the MVRA "by its language" imposes "a requirement of proximate cause"; *See United States v. Archer*, 671 F.3d 149, 169 n.13 (2d Cir 2011).  The MVRA's requirement that the victim have been "directly and proximately harmed as a result of" the offense, 18 U.S.C. § 3663A(a)(2), incorporates the common law requirement of proximate causation.  *See Archer*, 671 F.3d at 171 & n.16.

MVRA requires direct *and* proximate causation, because the loses resulting from the 2008 global recession (affecting all GSF companies promised by Constantine to the GSF contributors) and the 2008 Lehman Brothers bankruptcy, cannot be attributable to any Kenner 'proximate' actions.  Any loss (if they even exist) were not in any sense "directly *and* proximately" caused by Kenner's conduct.  18 U.S.C. § 3663A(a)(2).  The direct cause of those loses were the crises Kenner undisputedly had nothing to do with and were *specifically excluded by the government* (*Tr.4588*).

The MVRA provides redress to the victims of fraud, but it does not supply a windfall for those who independently enter into a risky financial enterprise thru no fault of the fraudsters.  As the Second Circuit stated in *Archer*, "[i]f a person gives the defendant his money to bet, knowing that the bet might lose, his later loss, for purpose of restitution, is, in this fundamental sense, caused not by the defendant accepting his money but by the outcome of the bet." 671 F.3d at 171.

[*2011 Peca SDNY Grand Jury at 17-18 (3500-MP-5)*]:

> *Q: When did you make that [Hawaii] investment?*
>
> *A [Michael Peca]: It round the same time, 2004, 2005.  I want to say they were my very much – they were presented to me.  **On all of them, through all the times, I made the final decision**.  I may not have done as much due diligence as some may have done.  It's not like I had to say yes or forced.  I made the decision to say, yeah, I want to do that.  **Based on the money I was making at the time it didn't bother me to invest those kinds of dollars**.*

[*2011 Peca SDNY Grand Jury at 39-40 (3500-MP-5)*]:

> *Q: Did you understand at the time if you didn't pay back the line ever credit the bank was going to take your bonds?*
>
> *A [Michael Peca]: **Yes. And they did**. What they took was just under $2 million, I believe it was in 2008, maybe after a while.  We were just, when the loan, the short-term loan from Mr. Jowdy was not paid back, the line of credit time matured.  They had taken what was loaned, I guess, lent to me plus interest.*
>
> *Q:  Let me show you what is marked Grand Jury Exhibit 106, which is the pledge agreement dated November 5, 2007.  Kind of technical document, do you remember signing documents putting up the bonds to secure the line of credit?*
>
> *A [Michael Peca]: Uh-huh, yes.   I was very well aware of that scenario.*

17

[*2011 Peca SDNY Grand Jury at 31-32 (3500-MP-5)*], referring to his entire $1.775 million LOC funds, never alleging that Kenner was required to further 'clear' transaction by transaction:

> *Q: When you signed those papers, <u>where do you think that money was going</u>?*
>
> *A [Michael Peca]:* **It was going to a capital account for Little Isle 4**.
>
> *Q: How much did you put into Little Isle 4?*
>
> *A [**Michael Peca**]: "$100,000 cash investment that was going towards that. Then we had lines of credit. I had one out for $1.7 million that was going to be used at the time. Here's where a lot of the cross starts to happen. A short-term loan to Mr. Jowdy, because at the time Cabo – we hadn't gotten the lending from Lehman Brothers yet. We made a short-term loan until the lending came in. Once the lending came through they were to pay back the loan, I think in the neighborhood of five-and-a-half million dollars, on the closing. It was never paid back. And then communication basically seized at that point from him [Jowdy]. That was kind of the whole sticking point as far as me and the other guys with Mr. Jowdy.*
>
> *The 1.7 along with the $100,000 and whatever else put in this a capital account, Little Isle 4, I believe. <u>The Capital account was loaned to Ken Jowdy, our business partner, so there is no need at the time to be worried about anything. The money was loaned to Ken Jowdy to basically help some of the purchase of the Cabo property so we can get the funding. And then it was supposed to [be] a short-term loan.</u>*

- <u>Michael Peca verified</u> four (4) years before trial that he was deftly aware (testified to under the secrecy of a Grand Jury proceeding) *that his entire 1.7 million (+/-) Hawaii capital account was part of the Jowdy loan* (even though only $240,000 actually was).   Under the theory of fungible funds, the Court could determine that Peca was the only person needed to authorize his funds to be loaned to Jowdy, since only $1,315,000 (including Peca's contribution) was transferred to Jowdy from alleged superseding indictment victims, and Peca authorized all of it.
- <u>Peca further verified</u> that his LOC funds were available to pay all Little Isle 4 expenses, including other LOC payments [*2011 Peca SDNY Grand Jury at 45 (3500-MP-5)*]:
  *Q: <u>Would you have authorized your line of credit to be transferred to pay his line of credit off?</u>*

  *A [Michael Peca]: I think, I don't think they came in separately to that extent.* **It was all in one account.**

18

Is the government claiming Michael Peca is now part of the "*cadre of followers who are completely blind to the truth*" (*ECF No. 765 at 43*)?

- *Government-forfeiture-44* and *government-forfeiture-36* respectively confirmed post-trial that Kenner did *not* "*steal the Hawai'i money*" and did *not* "*use it to buy his piece of that Cabo resort*".

- So when Michael Peca confirmed "his knowledge of the Jowdy loans" as accurate during trial, breaking ranks from the fully revisionary "*memory loss*" of Sydor, Rucchin, Nash and Berard, *is Peca an unindicted co-conspirator of Kenner -- and part of the "cadre"*?

In addition, how could the Eufora private stock purchasers, as alleged victims, if at all (*ECF No. 790 at 33*), be entitled to anything more than their original investment amount at this time, assuming Eufora consummates a sale of its patents?  They are supposedly victims (causing criminal liability for the defendants, even after Giuliani's full vetting of the transactions in 2010) but are retaining their purchased stock to assume the windfall-benefits of the equity transactions they exactly 'bargained for'; *see Starr*.

- Required for 'proximate loss causation', the government never proved that the value of Eufora stock, as purchased in 2008-09, was ever diminished in value, causing a loss to anyone ('but-for' or 'proximate').  Just because AUSA Komatireddy proffered (*Tr.5981*): "*2008, Constantine's broke. He's using Eufora to cash out. In 2009, it's Kenner's turn.*"

- *So what if Constantine's 'cash' broke*?  He had illiquid assets that he sold to raise personal funds.  Constantine's '*broke*' status had nothing to do with Kenner demanding that Gaarn and Constantine repay some of their prior loans by selling assets that Giuliani's investigative team verified had value, *after* a lender verified the same a year earlier (February 2009).  Apparently, in 2020, after a decade of morass surrounding the company, centered on the indictment of Constantine, the company is poised to sell its assets for values 'never questioned', even by the 2010-11 Giuliani investigative efforts.

A "victim" for the purpose of MVRA is "a person *directly and proximately harmed* as a result of the commission of the offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2) (emphasis added).  To qualify as a "victim", then, a party must have endured a financial loss that was "directly *and* proximately" caused by the defendant's fraud.  See *United States v. Paul*, 634 F.3d 668, 676 (2d Cir 2011) ("In determining the proper amount of restitution, a court must keep in mind that the loss must be the result of the fraud." (internal quotation marks, brackets, and citation omitted)).

"[P]roximate cause, as distinct from actual cause or cause in fact" (commonly labeled "but-for" causation) is a "flexible concept" that "defies easy summary." *Paroline v. United States*, 572 U.S. 434, 444, 134 S. Ct. 1710, 188 L. Ed. 2d 714 (2014) (internal quotation marks and citation omitted); *see also CSX Transp., Inc. v. McBride*,

564 U.S. 685, 701, 131 S. Ct. 2630, 180 L. Ed. 2d 637 (2011) (labeling proximate cause "a term notoriously confusing").   "Proximate cause" is in essence a "shorthand for a concept: Injuries have countless causes, and not all should give rise to legal liability." *CSX Transp.*, 564 U.S. at 692.   The central goal of a proximate cause requirement is to limit the defendant's liability to the kinds of harms he risked by his conduct, the idea being that if a resulting harm was too far outside the risks his conduct created; it would be unjust or impractical to impose liability.   See Prosser & Keeton, *The Law of Torts 281* (5th ed. 1984).

The Second Circuit has accordingly viewed the MVRA's proximate cause requirement as a "tool[]" to both "limit a person's responsibility for the consequences of that person's own acts" and to promote efficiency in the sentencing process.   *United States v. Reifler*, 446 F.3d 65, 135 (2d Cir 2006).   When interpreting the MVRA, the Second Circuit has clarified that "a misstatement or omission" is the "proximate cause" of an investment loss for the purpose of restitution, "if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor."   *United States v. Marino*, 654 F.3d 310, 321 (2d Cir 2011) (internal quotation marks and citation omitted).   The MVRA's proximate causation requirement is therefore "akin to the well-established requirement that there be 'loss causation' in the []fraud cases and not merely transaction ('but-for') causation."   *Archer*, 671 F.3d at 171 n.16; *see also Marino*, 654 F.3d at 321 (equating "proximate causation" under the MVRA to "loss causation" in the securities context).   And to establish loss causation, "a plaintiff must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered."   *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir 2005) (internal quotation marks, ellipses, and citations omitted).

- Here, as the government verified during Kenner's cross-examination (*Tr.4588*), Kenner was not responsible for: (1) the risky nature of the investments[15], (2) the

---

[15] *Kaiser testified to the 2009 arbitration panel:*

> *Q: Tell us what your experience was with respect to that money right at the point there was a decision to start loaning money to Mr. – that Mr. Kenner had made a decision to start loaning some of that investor money to Mr. Jowdy?*
> *A [John Kaiser]: …So if we had some funds that were – that was stagnant and that warrant purchasing land, __we would utilize it for a loan__, so we actually made some money off if it.*

> *Q: Was Mr. Jowdy at that time someone that appeared credible to you?*
> *A [John Kaiser]: Well, the first thing, Mr. Kenner told me that he was, __and I met him a couple of times__.   He seemed – __a big thing it was 15 percent interest rate__, and I thought it was a good move.*

> *Q: So at the time was there any representation about getting paid back this money when the Cabo deal closed?*
> *A [John Kaiser]: __It was supposed to be a short-term loan__.   I thought it was three to six months, __because I had also raised some other funds from family and friends__ that were getting a little antsy about it.*

> *Q: At the time this money was lent to Mr. Jowdy…did anybody anticipate he wasn't going to pay you back when the Cabo deal closed, the Lehman Cabo deal?*

2008 Lehman Brothers bankruptcy, and (3) the 2008 macro global real estate collapse.

- Furthermore, in *United States v. MacCallum*, 2018 U.S. Dist. LEXIS 101047 (WDNY – 2018), the Court ruled against the government position to include funds as loss when a 3rd party defrauded the defendant, the recipient of the investment funds – despite MacCallum having fraudulently induced the underlying funds [unlike the instant case].  The 3rd party robbed from the investment pool [akin to the Jowdy loans]) ("Defendant intended to use the money to purchase a second home for his in-laws" and as a result the Court held the defendant responsible for *only* that portion of the invested funds [$200,000 of the full $850,000 deposit].) *Id*.

==Even when 'but for' causation is present, if 'proximate' causation is lacking (as a result of non-fraud factors, *See Ebbers*), the defendant's conduct "is not a legal cause of the loss." Restatement (Second) of Torts § 548A cmt. b.==

In the context of "financial fraud", the Second Circuit has applied a "*zone of risk*" test under which a fraud "is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions." *United States v. Marino*, 654 F.3d 310, 320-21 (2d Cir 2011).  The "risk that caused the loss[es]" – the possibility that the global macroeconomic meltdown would occur or Lehman Brothers would file bankruptcy could not have been within the purview of misrepresentations and omissions on which the conviction was based.  *Marino*, 654 F.3d at 320-21.   Nothing in the record suggests that Kenner could have stopped either.

The "subject of" Kenner's asserted "fraudulent statement[s]" bore no relationship to the risk of the Lehman Brothers bankruptcy or 2008 macro global recession. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir 2005), *cited in Marino*, 654 F.3d at 321, 323 n.8, and could not have "directly *and* proximately" caused the resulting losses; certainly not beyond any fraud traceable to the Jowdy loans (of $1,315,000) from the alleged superseding indictment victims for the Hawaii 'object'.

*Nick Privitello...*

---

*A [John Kaiser]: No.  Otherwise, I wouldn't have lent it.   I wouldn't want to go down that route.*

*Q: When you made the decision – or when you were made aware that some of this money was going to be lent, rather than sitting idle in an account, at 15 percent, did you know there were some risks?*
*A [John Kaiser]: At the 15 percent – actually, the loans, I didn't think they were going to be – to me it wasn't a risky loan...but the loans -- even the investors I brought in – I said.   Listen.   This guy – I gave him the whole story of Ken Jowdy back by land.   It's good.  Better than your money sitting somewhere.*

Kenner was found 'not guilty' of the two Privitello charges.  His $200,000 investment had nothing to do with Kenner, thus is not applicable to either calculation (money judgment forfeiture or guideline loss) (*PSR at ¶29*).

*Ethel Kaiser...*
It should be noted that the Court relied on Probation's assertion that Ethel Kaiser had a $700,000 "*sustained monetary loss*" (*PSR at ¶29*).  *This is untrue.*  She testified at trial that her son repaid her the entire amount (*Tr.933-34*).   There cannot be money judgment forfeiture or a guideline loss factor for funds that were exclusively borrowed by her son and repaid by her son (*within 30 days, Tr.980*), as she testified, over a year before Kenner ever met her or even spoke with her.   The Court may recall that the government tried to 'slide' a photo of Kenner into evidence (*GX-942*), taken about two years <u>*after*</u> the Ethel Kaiser loan was made, as the 'event' "*in or about this time*" (*Tr.934*) that Ethel met Kenner to discuss lending funds.   The transaction was over and repaid (*Tr.980*) by the date of the photo and the government was well aware of their ruse.   It was slick but not ethical, specifically not under the guise of *Berger; See Berger v. United States*, 295 U.S. 78, 55 S. Ct 629, 79 L. Ed 2d 1314 (1935).[16]   U.S. Attorney General Barr recently opined regarding the application of *Berger* in a similar egregious guideline calculation: *"<u>This axiom does not simply apply to the process of bringing charges or securing conviction it also 'must necessary extend' to the point where a prosecutor advocates for a particular sentence</u>."*   John Kaiser verified the actual date after-the-fact (*Tr.1013*), exposing the ruse but indecipherable in the relative timeline morass to the Court and jury.  *The government knew what they were doing to mislead the Court*, with Ethel, who may have been legitimately confused as a septuagenarian, but Ethel Kaiser cannot be a victim for any calculation.

*John Kaiser...*
The Court relied on Probation's assertion that John Kaiser had a $1,000,000 "*sustained monetary loss*" (*PSR at ¶29*), based on the *lie* that he repaid his friends & family for the $1 million loan/investment (*Tr.980*).   **Kaiser has been fully repaid, per his own words and representations to this Court**.
- In 2011, via text message to Kenner, Kaiser verified that he: (1) had <u>*not*</u> repaid his mother's $1 million, while (2) he was repaying Kenner for money <u>*he owed Kenner*</u> (not the other way around), after (3) he <u>*robbed*</u> his handi-capped brother

---

[16] Recently quoted by U.S. Attorney Barr in *United States v. Roger Stone*: "*It is well-established that the prosecutor 'is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.'*"  *Barr continued: "<u>This axiom does not simply apply to the process of bringing charges or securing conviction it also 'must necessary extend' to the point where a prosecutor advocates for a particular sentence</u>.*"   See *United States v. Shanahan*, 574 F.2d 1228, 1231 (5th Cir 1978) (reviewing sentencing conduct of prosecutor).

Keith, and (4) he _still owed_ "Vin"cent Tesoriero money (his NYPD training partner).[17]

_Kaiser's 'repayment story' is untrue_ for many reasons and the government knew it; notwithstanding the government refused to substantiate Kaiser's trial claims, when objected by Kenner for its preposterousness, that the entire $1,176,000 Kaiser received during the August 2006 Lehman Brothers closing was for "_back pay_" and "_expenses_" (_Tr.1413-14_), when the total was _literally zero_.

- No IRS filings or expenses (back-up transactions) were ever produced by Kaiser or the government, because _they do not exist_.

In addition, Kaiser testified that Baja Ventures 2006 was his investment, not Kenner's (_Tr.1089_).  Doubling-down in February 2019, Kaiser submitted to the Court a letter (_ECF No. 628 at 1_) alleging again that he owned Kenner's Baja Ventures 2006, writing, "_Baja Ventures was transferred to me due to the unpaid Kenner loan_".  _Although the agreement will be contested as a forgery when appropriate (for obvious reasons)_, Kaiser's own representations to this Court, the jury and the government are that he was fully repaid by Kenner at the expiration of the agreement (January 1, 2010, with collateral allegedly transferred to Kaiser's possession in 2006 per the agreement) – and _must be taken at face-value_.  As of that date (over 14 years ago), the Kaiser agreement states that Kenner's stake in the Cabo project thru Baja Ventures 2006 belongs to Kaiser for his $1 million 'loan'; with Baja Ventures 2006 _valued at over $150 million at that time._ [18]  As unfathomable as that may be as part of the "mastermind's" scheme the government described to this Court, **_Kaiser is not and cannot be a victim of anything_**.  Kenner did not "_ruin_" Kaiser's life (_Tr.1089, 5753 [Michiewicz summation]_).  _Kenner would have made Kaiser richer than his wildest dreams_; specifically considering Kaiser went to work for Jowdy in 2011-2017 and could have sold any part of his $150 million equity stake, to anyone, at any time (with his co-conspirator Jowdy constantly self-approving and transferring equity as part of his myriad of settlement deals, covering his 15 years of criminality, _ECF No. 667_).  The dichotomy of Kaiser's reality is irrational at best and strung together by pixie dust from Never-Never-land with the government to create some illusion of how Kenner would not have been the 'grandest collateral giver' _of all time_ at the same time he was the 'mastermind' of a 13-year scheme (like Robin Hood).  _Kaiser should have been Kenner's greatest_

---

[17] Kaiser's 7/22/2011 text of guilt to Kenner months before he accepted a co-conspirator job with Jowdy in Mexico: "_that is n[o]t [sic] the only money that is owed out, that I have been working everyday to pay back everyone._  **100k went to u, 150 vin owes**, _was paying my mother, $ 2500 a month_ **for the 1 mil took from her, left her with no money to live,** _now paying her $1500 a month,_ **Took 380k from brother Keith, left him w/shit**. _And please don't tell me about Mex I am not one of the hockey guys._"

[18] Assuming Kaiser's assertion is taken at face-value (_ECF No. 628 at 1_), if Kenner was giving a personal guaranty for a personal loan – with no other supporting documents in existence, then it is irrational that anything Kenner did with the funds can be challenged as 'unauthorized' or 'illegal' – **because they became Kenner's personal funds**.  The government, Probation, and Kaiser cannot have it both ways...

*character witness*.   *Kaiser is not a victim of anything*, except his-own conspiratorial confabulation, and his $1 million must be removed from all calculations (notwithstanding his trial perjury and effects on the verdict that stand uncorrected).

*Turner Stevenson…*
The Court relied on Probation's assertion that Turner Stevenson had a $100,000 "*sustained monetary loss*" (*PSR at ¶29*) in the GSF.   *This is untrue* for many reasons; notwithstanding he was not named in the superseding indictment, purposely; *See Hughey*.   If Stevenson was named as a victim in the instant case, the government knew Stevenson would have verified his 2011 SDNY Grand Jury testimony (represented during opening remarks by defense counsel), as follows (*Tr.44*):

> *"Turner Stevenson on that very point, ladies and gentlemen, and I won't go through all the testimony but I will read this: When Turner Stevenson was asked in the grand jury this question: So you are saying that you agreed to transfer some of the money from the Hawaii project to the Cabo project. Stevenson, I would say that yes. Who made that decision? Stevenson: I think all of us as a group. What do you mean as a group? Who is the group? Stevenson, all the guys who were investing in this."*

The government could not name him as a victim and chose to avoid Stevenson's exculpatory Hawaii verification, opening the inevitable unanswered question still hanging on this Court: "*If it was a group decision, verified by 'update' letters from Hawaii legal counsel, sued for recovery in multiple jurisdictions and Mexico, verified by John Kaiser (the Hawaii partners Managing Member) to the FBI, and corroborated by Peca and Sydor's contemporaneous Grand Jury testimony in 2011, who was this concealed from?*"   **ANSWER: No one**…

The government never once mentioned Stevenson's name during trial related to the GSF 'object' in the instant case.   **Stevenson's $100,000 cannot be part of any calculation** (for either guideline loss or forfeiture money judgment).  Stevenson signed off on Constantine's 'use of funds' disclosure, and no one can attest to what Stevenson was told by Constantine in their face-to-face meeting in Arizona.  In addition, whatever alleged loss has never been substantiated by 'but for' or 'proximate' cause analysis.

*Hawaii Offsets for loss calculation (a.k.a. sentencing guideline) include (infra)…*
- There are no unrecovered Hawaii investment funds; regardless of calculation methodology…*because* **there are no losses** (even before 'proximate cause' analysis)…

The Hawaii investors recovered vis-à-vis their Hawaii investments:

(1) Approximately **$1,400,000** of Northern Trust Bank settlements with Nolan (*Tr.2074*), Peca (*Tr.506*), and Berard (*Tr.3042*) – conceded by the government (*ECF No. 765 at 30*);[19]

   a) The Court should note that (*supra*):

      ○ <u>Owen Nolan received $500,000</u> from Northern Trust Bank (*Tr.2074*), but <u>only $425,000</u> of Nolan's funds are traceable to the Jowdy loans -- and <u>none</u> to the Constantine consulting payments – fully repaying him for any frauds in the instant case (See *Ebbers*); and

      ○ <u>Bryan Berard received $300,000</u> from Northern Trust Bank (*Tr.3042*), but <u>only $150,000</u> of Berard's funds are traceable to the Jowdy loans -- and <u>none</u> to the Constantine consulting payments – fully repaying him for any frauds in the instant case (See *Ebbers*); and

      ○ <u>Michael Peca received $600,000</u> from Northern Trust Bank (*Tr.506*), but <u>only $240,000</u> of Peca's funds are traceable to the Jowdy loans -- and <u>none</u> to the Constantine consulting payments – fully repaying him for any frauds in the instant case (See *Ebbers*).

Only Michael Peca was involved in the other "objects" in the instant case.   Thus, as the *Evans II* court opined, "[w]ithout an actual loss, there could be no victims".

<u>Berard and Nolan cannot be victims</u>.   They have no other exposures in the instant case.

(2) **$1,601,572** of Northern Trust Bank bond interest payments were made to the Hawaii LOC investors (*ECF No. 736, Ex.#1 at 11-12*), calculable as recovery 'offsets'; and

(3) Nolan's 2008 Jowdy settlement for all Hawaii-Mexico transactions (valued at approximately **$3,250,000** in 2008 at the time of the settlement, with Nolan represented by independent counsel who worked hand-in-hand with Jowdy versus Kenner and Kenner investors) (*ECF No. 790 at 45, Ex.A at 5*); and

(4) The 2017 4.6% CSL Properties-Jowdy settlement agreement <u>*for all Hawaii-Mexico transactions involving Jowdy*</u> (worth millions more; and **no less than $4.6 million in 2017,** *ECF No. 770 at 30-31*) (with recovery including Berard, Sydor, Rucchin);

---

[19] The government submitted to this **$1.4 million "offset"** in their sentencing memo (*ECF No. 765 at 30*); <u>*exceeding*</u> the entire "fraud" loss for the Jowdy loans related to Peca, Nolan and Berard.   Any other perceived loss from their "investments" is categorically designated to "non-fraud" factors (*Tr.4588*).   Neither the government nor Probation has proven 'proximate' causation otherwise.

***At most*** – the Rucchin ($300,000) and Sydor ($200,000) "losses" can be the <u>*starting point*</u> for any loss calculation; before their own 2017 Jowdy settlement, and fungible (*Tr.4024* [Wayne]) argument **because** Mike Peca told the 2011 SDNY Grand Jury that he expected his entire $1.8[75] million to be used for the Jowdy loans (*3500-MP-5 at 30-33, 35, 40, 42, and 45*), exceeding the traceable $1,315,000 loan funds.   Darryl Sydor echoed the identical Grand Jury testimony in 2011 (*3500-DS-2 at 19, 24, 25*), thus his lack of memory of the 4-year-old testimony <u>*cannot*</u> be his basis for a "concealed loss"; *See Alexander.*

a.  The Court must note that the various settlements with Jowdy offset 100% of all *known and unknown funds* that Jowdy received from the Hawaii-Mexico investors since 2002, as Kaiser told the FBI in 2010 (*3500-JK-1-r at 2, 3, 10*).   The 2008 and 2017 Jowdy settlements, *with airtight legal liability language for Jowdy*, included each and every Jowdy related entity and associated entity from the beginning of time thru Armageddon (*ECF No. 790, Ex.A at 2, 6-7, 13-15, 17-18, exhibit pages offset from numbered pages*).

(5) And, $42,553 was *each* received by Berard, Nash (*Tr.1909-10*), Peca, Rucchin and Sydor (excluding Murray and Gonchar in the calculation as non victims), totaled **$212,765** of un-credited repayments from the Lehman Brothers closing in August 2006.

The Court was presented with exculpatory evidence by Kenner during the recent forfeiture hearings (*ECF No. 790 at 45, Ex. A at 5*) that Owen Nolan (amongst all other Hawaii-Mexico investors) settled with Ken Jowdy (the *actual* recipient of Nolan's $425,000 of Hawaii loan money, *infra*, and the *only* funds traceable from an alleged superseding indictment victim to the Cabo project).   *None of the funds are traceable to Kenner's Baja Ventures 2006 LLC* (*See government-forfeiture-36* and *government-forfeiture-44, verified by the government's own submission, post-trial*).

• Nolan's 2008-09 settlement 'offset' was valued at **$3,250,000**; 1% of the Diamante Cabo $450 million property value in 2008 *minus* the Danske maximum loan amount in February 2009 of $125 million, equaling $325 million in 2008-09, the time of the independently negotiated Nolan-Jowdy settlement (*ECF No. 790 at 22-24*).   This far exceeds Nolan's traceable $425,000 of allegedly unknown funds to the Hawaii project (*ECF No. 785 at 2-4, refuting Nolan's memory loss with real time exculpatory evidence*).

• The government *refused* to acquire the Nolan-Jowdy agreement, rather choosing to parse words in their reply to the Court, claiming '*Kenner's exact representation was not exactly present in any agreement between the parties*' hi-lighting their continued propensity to *mislead* the Court, in the face of the actual verification in the '2017 Jowdy-Hawaii-Mexico investors' agreement as presented by Kenner during the last oral arguments (*January 6, 2020, reading directly from ECF No. 790, Ex.A at 5*).

*Other Offsets (loss credits)…*

*Supra*, the government *conceded* the Northern Trust Bank settlements (*ECF No. 765 at 30*).  The **$1,400,000** (approximately) were unused in PSR's final calculations, *supra*; *see Boccagna*.  Those offsets *alone*, "wipe out" and *exceed* any potential 'loss resulting from fraud' recovery for the $1,315,000 that Jowdy received (related to required 'proximate' causation analysis), traceable from these investors; *See Evans, infra* (as Justice Gorsuch opined): "**[w]ithout an actual loss, there could be no victims**".

- *With Berard and Nolan <u>only</u> involved in the Hawaii "object" of the instant case, the Evans reasoning removes them as victims in the instant case (ECF No. 770 at 54).[20]*

The government and Probation ignored the Northern Trust credits; *bond interest credit…*[21]

- *The bond interest "credit" totals of $1,601,572 were verified by forensic accounting (ECF No. 736 at 12)…further reducing every Jowdy loan dollar to ZERO, <u>for the 3rd time</u>…*

The Northern Trust LOC investors received their '*bond interest*' totaling **$1,601,572** between 2003-2009 as part of the '*Hawaii investment plan*', so even if the '*plan*' was deemed the '*scheme*', they received those funds as part of the transaction at hand. This *offset* versus loss from the Hawaii project is inarguably '*recovered funds*'.   It further erases 100% of the alleged "unauthorized" Jowdy loan totals ($1,315,000) based on separating fraud and non-fraud factors related to 'proximate causation'; *See Ebbers, infra* (ECF No. 770 at 54)…

---

[20] Berard's *LedBetter losses are none*…Probation listed Berard as a $375,000 victim in the LedBetter scheme, but the records show that Berard and Kaiser <u>stole</u> the LedBetter LLC in 2011 from Kenner thru <u>fabrication</u> of the LedBetter operating agreement and a <u>forged</u> Managing Member signature (*Bates stamp: BINDER-000452 and 000450*) <u>after</u> they began working for Jowdy in Mexico and with FBI agent Galioto versus Kenner (contemporaneous with their un-charged 'fraudulent conveyance of title' in the Arizona real estate project – saving themselves over $1 million they owed Kenner).  The <u>fabricated</u> and <u>forged</u> LedBetter agreement was used to steal and sell the property without Kenner's knowledge in the Sag Harbor project (*Tr.672*).  Long Island tax records confirm Berard and Kaiser sold the Sag Harbor property on 5-9-2012 to Larry & James Realty LLC and retained the entire $740,000 sale proceeds for themselves -- in fact robbing Kaiser's former NYPD partner Tesoriero of most of his investment (*3500-VT-1-r at ¶11*).  **Berard had a full recovery, plus profit, thru his and Kaiser's criminal actions in 2011-12; verified thru his own 2015 testimony (Tr.3093)**.  Although the Court previously stated Berard's LedBetter funds came from his Northern Trust LOC, *this was <u>also</u> untrue*.  Berard signed a $275,000 transfer from his Northern Trust investment account (*GX-707, Bates stamp: BINDER000458, separated by the government pretrial into trial BINDER production, thus known as misrepresented to the Court at all times and not corrected – again in their favor*).

- Added to the fabricated testimony by Berard and Kaiser related to the LedBetter transaction, they both misrepresented the 50% ownership of the project, Kaiser claiming Kenner owned it (with the original operating agreement in Kaiser's possession documenting Kaiser, Berard, Kenner and Tesoriero as 25% owners each – *Tr. 1009* [*lie*] [*See 3500-VT-1-r at ¶8-9*]) and the Berard fabrication that he was the 50% owner (*Tr.3093*).  The sad irony is that the forged and fabricated LedBetter operating agreement documented John Kaiser as the 50% partner.  **Neither of them could get their revisionary lies coordinated after they criminally stole the LedBetter LLC and Sag Harbor asset from Kenner and Tesoriero.**

[21] Northern Trust bond interest received (totaling **1,601,572) – further exceeding all loss amounts traced to the Jowdy loans (*thus no loss, no victims*)**:

- **Nolan** bond interest received = **$592,878**;
- **Peca** bond interest received = **$300,052**;
- **Berard** bond interest received = **$129,314**;
- **Sydor** bond interest received = **$249,215**; and
- **Rucchin** bond interest received = **$210,113**…

In the recent 2019 Second Circuit ruling in *Calderon*, the Court remanded for re-calculation because the district court failed to separate the 'but for' causation of the fraud from the 'proximate' cause.   The Court ordered a re-calculation of restitution and guideline by the District Court using proper methodology, not just 'but-for' causation.   The restitution, as a result of the remand, was *reduced from $18 million to zero*, because the "other factors" following the 'but-for' causation were the determinant for loss, not the 'but for' fraud.   The 'proximate' cause analysis in *Calderon* was far more complex than the linear elements of the instant case.   In *United States v. Calderon*, 2019 U.S. App. LEXIS 48, the Court also applied and followed the well-seasoned Second Circuit opinion in *United States v. Ebbers*, 458 F.3d 110 (2d Cir 2006) – "'[t]he loss must be the result of the fraud." *Id.* at 128. "[l]osses from causes other than the fraud must be excluded from the loss calculation." *Id*.

- *That is the case here*.   After the separation of the fraud and non-fraud factors, per *Ebbers*, and the tracing of the funds from the alleged superseding indictment victims to the Jowdy loans and the Constantine consulting payments (not conceding that either was a criminal act with or without intent), the Constantine totals are zero (from alleged victims) and the Jowdy loans are $1,315,000. [22]

---

[22] *See ECF No. 770 Appendix 1 at 54*:

1) Michael Peca (**$240,000** distributed to Jowdy thru Little Isle 4's capital account);
2) Darryl Sydor (**$200,000** distributed to Jowdy thru Little Isle 4's capital account);
3) Owen Nolan (**$425,000** distributed to Jowdy thru Little Isle 4's capital account);
4) Steve Rucchin (**$300,000** distributed to Jowdy thru Little Isle 4's capital account);
5) Bryan Berard (**$150,000** distributed to Jowdy thru Little Isle 4's capital account)...

The Court should note that Peca confirmed (*Tr.498-99*) that his 2011 SDNY Grand Jury testimony that verified his 'Jowdy loan knowledge' and 'approvals' was "*truthful*" (eliminating Peca from being a victim of the concealment necessary under the prosecutorial theme) (*3500-MP-5 at 30-33, 35, 40, 42, and 45*).

Next, as the Court is aware, Bryan Berard verified at trial (*Tr.3055*) that he learned about the Jowdy loans from Kenner (not concealed).   This echoed Berard's 2009 **pre-CTE** arbitration testimony less than two (2) months after his phone-authorized collateral seizure directly with Northern Trust Bank employees, Mascarella and Brill (*Berard, Day 5 at 76-77*):

> *Q. Were you aware that Mr. Kenner got a credit line against some securities or investments you had?*
> *A [Berard]: Yes.*
>
> *Q. And later on were you aware that Mr. Kenner starting lending this money to another principal in the Cabo project named Ken Jowdy?*
> *A [Berard]: Yes.*
>
> *Q. Were you aware that he had disclosed to you that he was going to lend this money at a rate of interest to benefit the investors?*
> *A [Berard]: Yes.*
>
> *Q: And later on were you aware that Mr. Kenner started lending this money to another principle in the Cabo project names Ken Jowdy?*
> *A [Berard]: **Yes**.*

- The remainder of the LOC investments was documented as paid to 'other' authorized transactions under the Little Isle 4 By Laws (the controlling document for 'use of funds') *(Kenner exhibit 217, introduced at Tr.4525-26)*.  As such, the balance of the funds that were lost as a result of: (1) risky investments, (2) the 2008 global real estate crisis and (3) the September 2008 Lehman Brothers bankruptcy are *not chargeable factors to Kenner*.  AUSA Michiewicz confirmed this to the Court (*Tr.4588*), *supra*.

Ultimately, after the second appellate opinion in *Evans*, Evans was released "time served" and restitution was ordered to be reduction to *ZERO* based on passive-equity owners and their inherent risk/reward expectations.  In a concurring opinion in *Evans II*, Judge O'Brien, like the instant case disclosures, stated:

> "[Evans] adequately disclosed the **risky** nature of the projects to the investors and, to sweeten the deal, offered 12% per annum interest on invested funds.  That debt burden, along with other [global market] factors, produced disastrous results.  By April 2005, several things became clear: The rehabilitation costs were considerably more than anticipated [*identical to the Jowdy loans extending past the expectation of the spring 2006 Mexico-Lehman Brothers closing, ECF No. 785 at 2-4*][23], the projects were undercapitalized

---

*Q: Where did you think the money that Mr. Jowdy – were you told where the money that was given Mr. Jowdy as far as the Mexican project?   Was there anything you were told about that?*
*A [Berard]: Basically just loan him the money for the project.*

As such, Berard has no loss in the "Hawaii object" and cannot be deemed a victim; As the *Evans* Court explained, *"if there is no fraud on the inducement, then only the fraud factors are applicable to loss calculation*."  *Evans* was released "time served" (after the second remand for recalculation of proper loss factors) with *no loss* and *no victims* after the factors were applied properly.  The *Evans* Court (with Justice Gorsuch) opined "[w]ithout an actual loss, there could be no victims".  See *United States v. Evans*, 744 F.3d 1192; 2014 U.S. App. LEXIS 4490 (10th Cir 2014) (*referencing Turk, 2nd Circuit*) (*Evans I*)...and *2nd appeal for improper calculation (again)* -- *United States v. Evans*, 677 Fed. Appx. 469; 2017 U.S. App. LEXIS 1942 (10th Cir 2017) (*Evans II*).

[23] Peca SDNY Grand Jury (*ECF No. 668 at 108-09*) -- Sydor SDNY Grand Jury (*ECF No. 668 at 137-38*) – Stevenson (*ECF No. 668 at 137-38*) -- and Kaiser 2009 (*ECF No. 668 at 190-91*).  John Kaiser testified during a 2009 Arizona arbitration that he *did not hold Kenner responsible* for the Jowdy non-payments, either (*Nolan arbitration Day 5, Tr.928-929*):
> *Q: Has this ever been a secret that Mr. Kenner lent this money to Mr. Jowdy?*
> *A [Kaiser]: No.*

> *Q: Was this a transaction that, as your view as an investor was open and disclosed to everyone?*
> *A [Kaiser]: It was open.  There was no secret handshakes or nothing like that.*

> *Q: Even now, sitting here in May 2009, is there anything you've uncovered, as someone who obviously knows how to investigate, that Mr. Kenner has done anything inappropriate throughout these transactions?*
> *A [Kaiser]: No.*

> *Q: Not one complaint?*

and the interest obligations to investors were disastrously large and unrelenting.   As a consequence, the project took on a gloomy countenance, revealing the business model to have been, at best, overly ambitious or, more likely, inherently flawed.   **None of that, as all agree, amounted to fraud**."

In fact in *United States v. Rutkoske*, 506 F.3d 170 (2d Cir 2007), applying the teaching of the Supreme Court in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005), where the Fifth Circuit stated that "there is no loss attributable to the misrepresentations unless and until the truth is subsequently revealed and the price of the [investment] accordingly declines" and that the portion of *the price decline caused by other factors must be excluded from the loss calculation*."

- The Court is aware that Attorney Talkin verified current Eufora value (notwithstanding only 2008-09 value is relevant) – with a sale of the company patents pending in 2020 – resulting in value returned for what the investors 'bargained for', *See Starr*; and
- The Court knows that the 'Hawaii-Jowdy loans' are the basis for the only value remaining in the Hawaii project (which triggered their macro-2017 settlement agreement with Jowdy, *ECF No. 790 at 15-18, Ex.A*), in spite of the (1) 2008 Lehman Brothers bankruptcy, and (2) the 2008 global real estate recession.
  - Thus, the criminal actions alleged throughout the trial and forfeiture-sentencing phase of this case have resulted in attainable 'proceeds' in the various 'object' investments *for the investors* as 'bargained for' without harm, pecuniary or otherwise.   It is *not* consistent with the throws of a 13-year macro-conspiracy for Kenner to receive '*no benefit*' and '*less than $280,000 in loan repayments due to him*' (which ironically were spent primarily on more litigation versus Jowdy for the same investors by Kenner).   *It is illogical...*

As the Court is aware, the investors were represented by Rudy Giuliani's investigative team, led by New York corporate attorney Michael Stolper (originally for the Eufora investigation and then expanded to the Jowdy criminality).   Attorney Stolper deduced from his 4-month 2010 Eufora investigation that the company was legit (requested a 6% equity stake with Giuliani for their work, *ECF No. 790 at 30*), simply concerned with its management under Constantine's team and the diversions/embezzlements/and accounting frauds discovered (while never concerned about the 2008-09 Constantine and Gaarn stock sales.  Stolper

---

*A [Kaiser]: No.*

*Q.   At the time this money was lent to Mr. Jowdy to be spent in the Mexican project, ==did anybody anticipate he wasn't going to pay you back when the Cabo deal closed, the Lehman's Cabo deal?==*
*A [Kaiser]: No.  **Otherwise I wouldn't have lent it**.  I wouldn't want to go down that route.*

==*Q.   Do you blame Mr. Kenner for him [Jowdy] not paying the money back?*==
==*A [Kaiser]: **No**.*==

documented these specific issues in his July 16, 2010 letter to <u>his</u> 29 Eufora-related clients; *specifically excluding Kenner*).   Stolper extended his investigation to Jowdy and the Hawaii JV frauds with Lehman Brothers; the underlying frauds Kenner has outlined for his investors since their discovery in 2006.[24]   Attorney Stolper, while representing over 25 of the Hawaii-Mexico investors told the SEC in 2011, while preparing to sue Jowdy, Lehman Brothers and several complicit parties for their decade of frauds (*Bates stamp: TR-SEC000426*):

> [Stolper]: *"The only thing I would like to clarify was that I think in your line of questioning, which may not come through in the transcript, whether he [Kenner] disclosed that the SEC has sought enforcement of subpoenas to his clients.   I think that the suggestion in your question was that it was something negative that he should disclose to his clients as sort of a warning or red flag to his clients who are relying on him.*
>
> ***And I think that the conversations that I have been a part of**, without waving privilege, **and also my own view** of SEC's involvement in this whole Diamante del Mar, et. al. is a welcome one and that **we** and Mr. Kenner, are really looking to the SEC to enforce the securities laws against Mr. Jowdy and those [Jowdy's cabal] who did wrong here.   And we see it as a welcome thing, as a positive thing.*
>
> *So the tenor of the conversations with Phil's friends, co-investors, clients is that this is a welcome thing and maybe because we are having this direct communication with the SEC, and then perhaps subsequently with the US Attorneys Office, that maybe they will finally get some justice out of this.*
>
> *And I know I have said that off the record with you and I just wanted to clarify that in response to that line of questioning.   Just a point of information."[25]*

---

[24] Berard texted Kenner in October 2010 about the pending litigation with Jowdy and the Hawaii JV partner (both conspiring with Lehman Brothers):

| 1 6 9 5 7 | +14015246 929 Bryan Berard* | 10/7/2010 11:56:06 PM(UTC+0) | R e a d | **[Berard]: Hopefully can go after Leaman Borthers soon too** |
|---|---|---|---|---|
| 1 7 1 5 0 | +14015246 929 Bryan Berard* | 10/15/2010 1:27:47 AM(UTC+0) | R e a d | **[Berard]: Any word when ur coming to NYC yet to meet wth <u>Stolper and Lawyer from Rhode Island</u> for the Hawaii lawsuit** |

[25] Please note that 29 Eufora investors and related parties (1) signed-off on the Giuliani Groups' *July 16, 2010 disclosure letter*, which hi-lighted the alleged stock frauds by Gaarn – ironically alleged by Constantine himself (*ECF No. 668 Appendix at 83-84*).   These sign-offs included *every* alleged superseding indictment victim PLUS Hughes and Rizzi (*ECF No. 781 at 1*) now alleged as victims; **both** *wholly unknown to Kenner*; (2) Over a year later – Giuliani attorney Stolper told the SEC he was in support of Kenner – and working side-by-side with Kenner's investors (from the instant case) (*ECF No. 730 at 41-42*) versus Jowdy for all of the frauds Kenner documented to this Court (*ECF No. 667*); (3) During Constantine's August 2010 Eufora conference call with all the Eufora investors, attorney

The *Rutkoske* government contended, "the principles set forth in *Dura Pharmaceuticals*, a civil case, should not apply to loss calculation in a criminal case." The Second Circuit opined: "The dicta in Ebbers strongly undermines that position. Moreover, we see no reason why considerations relevant to loss causation in a civil fraud case should not apply, at least as strongly, to a sentencing regime in which the amount of loss caused by fraud is a critical determinant of the length of a defendant's sentence.   Determining the extent to which a defendant's fraud, as distinguished from market or other forces, caused the shareholders' losses inevitably cannot be an exact science."  See *Ebbers*, 458 F.3d at 127 ("no easy task").

- That is the case here, yet Kenner *detailed* the loss credits and fraud factors in *ECF No. 770*.   The government has not met their calculation burden.   Kenner has proven 'no loss' (*Id. at 54-65 [Hawaii], at 66-68 [Eufora], and at 69-72 [GSF]*).

The Second Circuit continued, "The [*Rutkoske*] District Court basic failure to at least approximate the amount of the loss caused by the fraud without even considering other factors relevant to a decline in NetBet share price requires a remand to redetermine the amount of the loss, both for purposes of the sentence and restitution."

*Less than $280,000 ill-gotten gains (if any)?...*
The three 'objects' fail to show *ill-gotten* funds that Kenner received, *other than* the well-documented 'loan repayments' from Constantine ($117,000) and Tim Gaarn ($162,500); wholly acknowledged by Kenner without conceding any 'intent to harm'.   Kenner received *less than $280,000* in total from the alleged superseding indictment private stock sales (vetted by Giuliani's team) – thru documented loan repayments (*Tr.2580*) to Constantine – and a self-proclaimed "innocent third party", Tim Gaarn (*Tr.2503-04, 2563-64, 2579, 2599-2600, 2608*)...[26]

---

Stolper called the Gaarn sales, claimed by Constantine as a criminal fraud, "*predictable*" – ==because he and Giuliani's team had thoroughly investigated the allegations and found them meritless after discussing all of the 2008-09 investors knowledge of their private stock purchases== (*ECF No. 668 Appendix at 298-99, footnote 145*); and (4) Michael Peca verified his real time knowledge of the allegations that his independent counsel refuted as "*predictable*" (*Tr.608*), so what about the private stock that Peca bought from Constantine could be considered concealed or criminal?

[26] It is unexplainable how direct nexus to the Eufora company thru two (2) 'objects' of the alleged criminal activity (Eufora and GSF) does *not* result in full-government forfeiture, but no nexus to anything in Mexico other than a corrupt third party, Jowdy failing to repay the documented loans, and utilizing $350,000 of it (*government-forfeiture-36*) (less than 5% of the acquisition cash for the Cabo project, as previously testified to as expected by Berard, Peca, Sydor, Stevenson, Gonchar, Stumpel, Norstrom, Murray, etcetera…) (and settled in the 2008 Nolan-Jowdy settlement) becomes the legal basis for full forfeiture; *specifically* leaving Kenner and his two (2) partners (Stumpel and Lehtinen) victims of the government over-reach with the lion's share of the acquisition funds traceable to the purchase thru Kenner and his **Baja Ventures 2006** partners (resulting in new $5 million-plus victims by the government).

- Under the precedent of securities law, only the $350,000 is disgorgeable, *assuming there is no other possible source for that money available at the time*.   Clearly, there was ten million other

- If Kenner has been charged criminally for transactions, alleged by the government (*ECF No. 765 at 30-31*) and PSR (*PSR at ¶29*) to have resulted in a complete loss (although miscalculated, *see Starr*), then the alleged victims are not entitled to more than there original investment amounts returned in the event of a Eufora asset sale, under MVRA.
  - o **The Eufora assets should be subject to forfeiture**, since Kenner's debt and capital account (remaining from the 2005 Gaarn transfer are now effective casualties of the Constantine frauds and government prosecution, as well).

Kenner, unlike a typical fraudster who gains or attempts to gain a financial-windfall benefit (for the only 'proceeds' traceable to Kenner in the instant case), the Court must recognize that Kenner had already laid-out the approximate $280,000 loan funds to two (2) business acquaintances who paid Kenner back by selling their documented Eufora assets (*GX-210 at 33-37*); (1) <u>vetted</u> by the Eufora investors' attorneys five years before trial, (2) <u>verified</u> by their independent attorney to the investors, and (3) <u>signed off</u> by each of them, on July 16, 2010 (*ECF No. 708 at 89-90, Ex.24 at 1, 4, 7*).

- The Kenner loans to Constantine and Gaarn were similar to the contemporaneous personal loans to Kaiser, Berard, Moreau, Sydor, Eufora,

---

dollars that Jowdy received from Kenner and Kenner investors and could have been diverted by Jowdy for the $350,000 he, alone, applied to his LLC (KAJ Holdings), not Kenner's LLC.

In the **Eufora** context, Kenner was alleged to have sold his "*shares*" as the basis for criminal activity (*Tr.272, 2173, 2732, 5970-71 [rebuttal summation]*), when all government evidence refutes the government's main allegation (*GX-210, GX-4728, GX-4729, all tax records, and corporate emails verified the 2005 transfer to Gaarn, including Kenner's approximate $1.5 million capital account, GX-210 at 37, while still a $386,000 Eufora lender, GX-4729 at 9*). **Yet, the government misrepresented <u>all</u> of their Rule 16 evidence to prejudice Kenner and obtain a verdict**.  But now, although Constantine verified Kenner's LLCs 12% Eufora ownership as a result of the Giuliani investigation pressures in August 2010 (but yet to be transferred at the time of his discovered criminal thefts from Eufora, Constantine documented Kenner's 'untainted equity' in *Eufora's August 5, 2010 operating agreement presented to Giuliani's team for settlement at 43*; resulting from the alleged "*grocery list*" (*Tr.1404-05*) loans to Constantine from Kenner (not Kaiser) (*Kenner trial exhibit 37, introduced at Tr.1418*).  **Kenner appears to be the only 'victim' of the Eufora ruse at this point; financially and criminally**.

The February 2005 conversation between the Eufora CEO (Gentry) and Eufora Secretary (Edrozo) documented $500,000 of the million-plus Constantine and Brent Nerguizian (the Neptune Founder) stole from Eufora as discovered in the Giuliani investigation was as follows, unknown to Kenner and the Kenner investors, concealed by Constantine's employees (but exposed based on Kenner's efforts with Giuliani's team, from Eufora IM messaging records):

> *[Edrozo]: "he [Mark D'ambrosio] knows about the $500[,000] to Brent, and knows tc and Brent were meeting there at bank (I didn't tell him, he knew)"*
> *[Gentry]: "ok"*
> *[Edrozo]: "he feels very jaded, I'm sure – tc [Constantine] makes all these side deals with Eufora and mark never sees any of it."*

etcetera (all *still* outstanding today, and an enormous financial windfall to those who testified versus Kenner about "forgetting what they previously testified to 'under oath'").

*The Northern Trust Bank LOC knowledge and 'use of funds' was unfettered at all times* (*Kenner trial exhibit 210, Northern Trust Bank LOC subpoena documents*)...
The Court wrote: "To the extent that Kenner now argues that these materials undermine the testimony of other government witnesses as to their knowledge about the lines of credit, Kenner could have said as much at trial based on his professed familiarity with the Northern Trust Documents."
• There is no record that Kenner had seen the lion's share of the documents prior to their week 7 arrivals during trial; nor did he.

The Court continued: "In any event, these records are not material because they, at best, show that various Hawaii Project investors *regularly signed documents* that, among other things, *authorized extensions of their lines of credits* [*See 3500-MP-5 at 31-32, 39-40, supra*].   They do not demonstrate that the investors permitted Kenner to transfer their money to Jowdy-led developments in Mexico or to Constantine and CMG." (*ECF No. 501 at 84-85*).

The Court has clearly demonstrated that they do not challenge:
   (1) That the client-signed documents in the Northern Trust subpoena are authentic (nor did the government at trial); and
   (2) The investors' signed the annual confirmations of their underlying knowledge of the '*use of funds*' (annually re-authorized by the individual investors); and
   (3) That the investors '*authorized the funds to transfer to Little Isle 4*' under Kenner's authority; and
   (4) That the investors '*extended credit for the Little Isle 4 investment*'.

The Court's challenge of 'Kenner's authority to act' under the corporate By Laws *hinges on* whether or not passive-equity investors had to subsequently authorize business decisions of the management team in Hawaii (wholly authorized by the LLC's controlling By Laws) (*Kenner trial exhibit 217, introduced at Tr.4525-26, and unopposed by any government evidence*) *without further written authorizations* – or – in the alternative required the investors' ability to pass a 'memory test' about dozens of the hundreds of LLC transactions more than ten (10) years *after* the events in question.   *This standard is unequalled or paralleled in any Circuit decision discovered by the defendant.*
• The Court must note that in 2004-05, less than five (5) Hawaii partners even knew who Tommy Constantine was, because they had never interacted with him, thus re-calling the name of a 3rd party consultant (like the other 16 who were paid advance broker fees) would be an incredible feat.  Michael Peca could not verify another hard money broker during his Grand Jury testimony (*3500-MP-5 at 46, "Q: Do you know who Lewis Volpini is?  A [Michael Peca]: Never heard the*

*name before."*).  But – this was not considered concealed.   What is the standard?

- The Court must be reminded that Hawaii partners COO Chris Manfredi verified Constantine's consulting payments and agreements to the FBI in October 2010. *Manfredi proffered to the FBI while he was an arch-enemy of Kenner*...because Kaiser and Kenner caught Manfredi stealing company funds in 2006 thru the corporate credit cards.   Manfredi was being terminated at the time of the Lehman Brothers introduction; the basis for Manfredi's demand of $180,000 JV closing funds (or withholding his *required* signature, *Bates stamp: ED-3140-3146*) and leading to his removal from the Sag Harbor project by Kaiser (and the need for the short-term LedBetter loan *for Kaiser*, *Bates stamp: HER-00133-34, BNK-MM-000100-101, PKHome-0010927*).

- Ironically, Hawaii COO Manfredi could *not* name several of the other prominent advance fee brokers that referred him hard moneylenders.   As such, how could the uninvolved-passive-equity-investors have any knowledge, *if even required* (notwithstanding the three 2011 SDNY Grand Jury testimonies that all confirmed the "*group knowledge*" and "*authorization*" of, at least, the Jowdy loans: (Peca [*3500-MP-5*], Sydor, and Stevenson [*3500-TS-1*]])?

  - The Court should note, again, that no superseding indictment investor funds are traceable to the Constantine consulting payments; and Kenner responsible for a significant amount of the $1,000,900 (*Tr.3934*, *Petrellese*).

Sydor 2011 Grand Jury testimony (*3500-DS-2 at 18, 24, 25*):

*Q:  Was that [the LOC at Northern Trust Bank] also for Little Isle 4 as far as you know?*

**A [Sydor]: Yes, but then we put it towards a short-term loan to Mr. Jowdy until Lehman Brothers came up with the money that was supposed to be paid back."**

*Q: Did you know in advance that it was going to be used, this Little Isle 4 money, to be used to salvage the Cabo investment?*

**A [Sydor]: Yes.  It was to help with the short-term loan to keep funding the Cabo, but then its supposed to be paid back, but that's –**

*Q: Paid back to you or to Little Isle 4?*

**A [Sydor]: Paid back to Little Isle 4.**

*Q: So –*

**A [Sydor]: Back to Hawai'i, not me personally.**

*Q: Bu that didn't happen?*

> *A [Sydor]: That didn't happen.   And Lehman came up with the $129 million loan. It was supposed to be back at closing.*

As a result, the investors cumulatively participated as passive-equity investors in the Hawaii project, by choice.   The Little Isle 4 By Laws governed the '*use of funds*' once received under the auspice of the LLC.  There are no other legally binding documents. The investors <u>*did not sign*</u> any special restrictions for their '*use of funds*' other that the expectations that the By Laws would govern the LLC and its management activity (identical to every LLC in corporate America).

The By Laws specifically authorized Kenner and the management team to '*lend money*' and '*pay 3rd party consultants*' for the project.
- The government has proven a case versus Kenner that questions the passive-equity investors' specific knowledge of transactions they repeatedly claimed they "*trusted Phil*" and "*did not read*" the related documents they signed (*Tr.3151, 3157*, Berard) (*Tr.1164, Kaiser*) (*Tr.2178, 2193, Sydor*); See Horvath.[27]

*Other Northern Trust-Hawaii details…*
- *One-page documents…*

Nevertheless, the Court wrote: "Notably, in response to these inquiries, several witnesses said that Kenner often sent them documents to sign with missing pages. (*See, e.g., id.* at 141-42 (Juneau); *id.* at 517 (Peca); *id.* at 2197 (Sydor).)"   (*ECF No. 501 at 85*).
- ==All of the critical Northern Trust subpoena documents were <u>*one-page documents*</u> – <u>*and signed*</u>.==
- In the course of Kenner's consulting business with his clients, the only other documents that clients signed for Kenner were their-own wire transfers – which were also <u>*one-page*</u> documents; leaving <u>*nothing*</u> presented at trial or in reality that could have been part of a 'one-page' concealment scheme; and regardless, *see Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A.*, 461 Fed. Appx. 61; 2012 U.S. App. LEXIS 3012.

First, the Northern Trust documents produced via subpoena demonstrate that ***every critical document is a one-page document***, but there is no evidence that any one-

---

[27] Owen Nolan testified in 2009 that he had not read a single document since 1991 (or so) (*Nolan arbitration – Day 1*):

*Q. Is there ever an agreement in your life that you've ever read that you can identify here today? Have you ever taken the time on your own to read?*

*A [Nolan]:* **I can't think of any offhand. That's why I pay people to do it.**

*Q. You've testified that you've never read a document ever that you can think of sitting here today before you signed it. At any time in your lifetime has someone advised you to take the strategy of never reading a document when you sign it?*

*A [Nolan]:* **No**.

page document was ever sent by Kenner for the Hawaii project.   The Northern Trust documents have their clients' home addresses of record.

Owen Nolan's *one-page-signed* October 24, 2004 Northern Trust *Letter of Authorization* specified to Northern Trust Bank (identical for all of the Hawai'i partners LOC investors) (*Bates Stamp -- TNTC000048*):

> "*Please allow Philip A. Kenner to access this outstanding LOC for direct deposit to the Little Isle IV account at Northern Trust.    He is authorized to sign for the release of funds related to my LOC.*"

***As the Court knows -- the Hawai'i partners (Little Isle 4 By Laws) authorizes the loans*** *(Kenner exhibit 217, introduced at Tr.4525-26)*.   There is no secondary authorization for distributions required by the investors or the By Laws.   The By Laws state:

*Article II. Purpose*
> *Little Isle IV, LLC is an organized group of investors established to **invest in a series of opportunities** review[ed] by the Managing Member [Kenner] and deemed in the best interest of the partnership at all times.*
>
> *At the sole discretion of the Managing Member, Little Isle 4, **may participate as a lender** if deemed by the Managing Member to be in the best interest of the LLC.*
>
> *The Managing Member, at their sole discretion, can engage in outside ventures deemed to be in the best interest of the LLC, including but not limited to other Private Equity Funds and **Lending Opportunities**.*

Second, and ***annually***, each Northern Trust client directly signed a '*Disbursement Request & Authorization*' form verifying and re-authorizing the '*use of funds*' from their individual LOC.   As an example, this *one-page* document impeached Michael Peca's 'memory' that he was never told his funds were used 'in real time' (*Tr.429-30*):

> *Q. During this period of time of October of '06 did you get any statement whether from the bank or Mr. Kenner or anybody, saying that you have drawn down $1.6 million on your line of credit?*
>
> *A [Michael Peca]: **No.***

Even if based on *faulty memory, confusion and mistakes* (*ECF No. 440 at 16*), Peca's inability to recall what *he signed* (addressed to his home) over a year prior to the timeframe of the question (and 10 years prior to trial), his **CTE**-laden memory cannot be anything Kenner did to conceal the '*use of funds*' from Peca, certainly not rising to the level of criminal or loss based on 'proximate' causation.   Peca's 2005

_one-page-signed_ statement, _addressed to his New York home_, confirmed (_Bates stamp: TNTC000307, from the Northern Trust subpoena_):



Third, each LOC client signed at least one _Extension of Credit_ for Northern Trust Bank during the creation of their LOCs.   Each _one-page-signed_ document identified (Nolan example) (_Bates stamp: TNTC00764, from the Northern Trust subpoena_):

38

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM

## Statement of Purpose for an Extension of Credit Secured By Margin Stock
### (Federal Reserve Form U-1)

### NORTHERN TRUST BANK, N.A.

This report is required by law (15 U.S.C. 78g and 78w; 12 CFR 221).

The Federal Reserve may not conduct or sponsor, and an organization (or a person) is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

Public reporting burden for this collection of information is estimated to average 10 minutes per response, including the time to gather and maintain data in the required form and to review instructions and complete the information collection. Send comments regarding this burden estimate, including suggestions for reducing this burden, to Secretary, Board of Governors of the Federal Reserve System, 20th and C Streets, N.W., Washington, D.C. 20551; and to the Office of Management and Budget, Paperwork Reduction Project (7100-0115), Washington, D.C. 20503.

**INSTRUCTIONS**

1.  This form must be completed when a bank extends credit in excess of $100,000 secured directly or indirectly, in whole or in part, by any margin stock.

2.  The term "margin stock" is defined in Regulation U (12 CFR 221) and includes, principally: (1) stocks that are registered on a national securities exchange; (2) debt securities (bonds) that are convertible into margin stocks; (3) any over-the-counter security designated as qualified for trading in the National Market System under a designation plan approved by the Securities and Exchange Commission (NMS security); and (4) shares of most mutual funds, unless 95 percent of the assets of the fund are continuously invested in U.S. government, agency, state, or municipal obligations.

3.  Please print or type (if space is inadequate, attach separate sheet).

**PART I** To be completed by borrower(s)

1.  What is the amount of the credit being extended?    $2,200,000

2.  Will any part of this credit be used to purchase or carry margin stock?    ☐ Yes    ☒ No

If the answer is "no", describe the specific purpose of the credit. _____

Investment in Little Isle IV LLC

I (We) have read this form and certify that to the best of my (our) knowledge and belief the information given is true, accurate, and complete, and that the margin stock and any other securities collateralizing this credit are authentic, genuine, unaltered, and not stolen, forged, or counterfeit.

Signed: _____ 10/29/04

Borrower's Signature            Date

Owen Nolan

Print or Type Name

Signed: _____

Borrower's Signature            Date

Print or Type Name

This form should not be signed if blank.

A borrower who falsely certifies the purpose of a credit on this form or otherwise willfully or intentionally evades the provisions of Regulation U will also violate Federal Reserve Regulation X, "Borrowers of Securities Credit."

This document was signed and dated by Nolan in his own hand-writing.  It is the third-crucial *one-page-signed* document for the investors (*Letter of Authorization, Extension of Credit, Distribution Request & Authorization*), thus the testimony that several people were unaware of the entirety of their banking documents from the time of their initially-signed LOC opening documents fails versus empirical and exculpatory evidence.  **CTE**-laden testimony cannot be the 'evidence viewed in the light most favorable' – while deemed categorically unreliable.

Despite **CTE** symptoms -- the Court cannot overlook the fact that 'whenever' the LOC investors recall their LOC being open, it is irrational to believe that they simply '*put their heads in the sand*' (all eight of them?) and just went along because they "*trusted Phil*". If they did, *see Horvath*, *supra*. At least one of them would have contacted outside counsel, or the bank *at a minimum* to claim they had no idea about the LOC in their names. ***This never occurred***.

In fact, Northern Trust Banker, Aaron Mascarella confirmed that the critical 2009 default letters that he sent to *his* LOC clients triggered ZERO responses (*Tr.898, Q After these letters were sent out, February 9, 2009, the letters indicating you are about to go into default, what if any communication did you or anyone at Northern Trust receive from any one of these account holders with reference to that notice of default letter? **A No notice from any one of those letters** --*). *That is not possible* for eight (8) different people who were alleged as wholly unaware for the prior six (6) years they signed LOC documents and renewal documents (like Nolan's 2007 text communication with Kenner *verifying* full transparency, *ECF No. 736 at 54-57*).

The government relied on Nolan's **CTE**-laden memory to claim 'no knowledge', but as the Court knows, Second Circuit precedent relies on the premise that "*if you sign it, you are responsible for it*"; *See PaineWebber Incorporated, see also Horvath.* [28]

Nolan's testimony, based on his **CTE**-memory loss (*Tr.2065*):
> *Q There has been testimony in this case about lines of credit. Did you ever have a line of credit associated with your investment in Hawaii?*
> *A [Nolan]: No.*
>
> *Q Did you ever authorize Mr. Kenner to open up a line of credit in your name?*
> *A [Nolan]: No.*

- Nothing on the record shows that any LOC was opened by Kenner in Nolan's name, or any other investor at any time.

The Court should note that in 2009, Nolan personally verified signing his *Letter of Authorization* for Northern Trust Bank during his arbitration testimony, but his attorney argued that he should not be responsible for it because "*he wasn't aware*" of this *one-page* document. The seasoned federal trial judge refuted the Nolan

---

[28] In *PaineWebber Incorporated v. Bybyk, 81 F.3d 1193; 1996 U.S. Appx. LEXIS 8728.* ("…a party's ***failure to read*** a duly incorporated document will not excuse the obligation to be bound by its terms"); *See also Ecoline, Inc. v. Local Union No. 12 of the International Association of Heat and Frost Insulators and Asbestos Workers, AFL-CIO, 271 Fed. Appx. 72; 2008 U.S. App. LEXIS 6390*, ("In general, individuals are charged with knowledge of the contents of documents they sign" and "a person who signs a written contract is bound by its terms regardless of his or her ***failure to read*** and understand its terms".)

nonsense from Nolan's attorney, Meeks (who was working hand-in-hand with Jowdy at the time of the arbitration):

```
13            MR. MEEKS:  He admits that's his signature.  His
14   testimony is he wasn't aware.
15            ARBITRATOR MEYERSON:  So somebody signs a
16   statement that says, Please grant Philip Kenner access to a
17   line of credit for direct deposit into Little Isle IV.
18   Doesn't somebody have to take responsibility for that?
```

1049      Day5.txt

Next, with Nolan and his knowledge (or fleeting knowledge from early-onset symptoms of **CTE**), the Court knows that his Northern Trust banker, Aaron Mascarella verified in a 2009 deposition (only weeks before the 2009 arbitration) that he had been in *direct* and *independent* communication with Nolan between 2003-06 about Nolan's LOC) (*ECF No. 788 at 34-35*), over a year before Kenner and Nolan discussed the 2007 renewals via text over a 5-day, 2-phone-call communication (*ECF No. 786 at 6-13*).

Northern Trust banker Aaron Mascarella's 3/9/2009 deposition (*Page 24*):
> *Q:   During the time period from -- From the time you opened the Nolan account [2003] until the end of 2006, did you have conversations with Mr. Nolan concerning the line of credit?*
>
> *A [Mascarella]: Conversations -- I spoke to Owen infrequently.  I've only had brief conversations with him.  And my guess is that it was only relating to the payments, that the payments were being made or not being made.  There was a few times when the payments were slow, that we sent out default letters, which probably -- You know, I can't remember every conversation I had with him but I assume he might have responded to one of those default letters.*

- The Northern Trust subpoena also produced a 2007 Northern Trust LOC '*default letter*' for Nolan, *addressed to his home address in Scottsdale Arizona* at the time (*Bates stamp: TNTC00051*) (further minimizing any possible concealment), which Mascarella was referring to during his 2009 deposition.

And lastly, the Court is also aware – related to Nolan's underlying 'ability' to know or recall his Hawaii investment, that: (1) Nolan's wife, (2) Nolan's personal assistant (who was working for Kenner and *still* for Nolan today), and (3) Nolan's independent Wells Fargo private banker were *all* involved in the management of

Nolan's LOC payments to Northern Trust bank, eliminating all potential for concealment from Owen Nolan, *unless they were all in conspiracy with Kenner (not alleged to date, yet).*

The government knew they had Rule 16 evidence that Nolan's wife was personally making payments on Owen's LOC in 2006, including the repayment with the assistance of her and Owen's private Wells Fargo banker and Kenner's assistant (refuting all concealment issues or lack of knowledge) (*ECF No. 788 at 35*).

• *Bates stamp: MYR0001066, produced by Nolan's investment advisor* (including the 2006 cc: to Nolan's private banker, Kim, at Wells Fargo) during a 2009 litigation (and stolen from Kenner's original corporate server by *MYR*):

> *"Hi Diana, Below is the payment information for the payment that needs to be sent to your LOC at Northern Trust: Please send $134,396.00 using the following instructions…I have copied Kim crane [your Wells Fargo private banker] on these instructions. You will need to call her for verification to send the wire. Please let me know when the wire is sent so I can follow up with Northern Trust. Thank you. Kristine."*

Kim Crane at Wells Fargo responded this to, as follows:

> *"Diana – please print this email out, sign it, and fax to me at 213 626-xxxx. Thanks. Kim"*

• *Bates stamp: NOLAN0005267, produced by Nolan himself* during the 2009 arbitration, from Nolan's personal assistant to his wife, further verifying his real time retention of the transparent 2006 emails:

> *"I asked Phil to get me a list of all the payments that need to be made and where the $ needs to be sent. You need to send about $190k to the LOC at Northern Trust. Have a good night. Kristine"*

• *Bates stamp: NOLAN0005249, produced by Nolan himself* during the 2009 arbitration, from Nolan's personal assistant to his wife, further verifying his real time 2006 retention of the transparent emails:

> *"Hi Diana, I hope I am not bugging you the same way Phil has, but I am getting concerned that the wire requests have not been getting submitted to kim [Nolan's Wells Fargo private banker]. I am receiving calls from the LOC guys at Northern Trust. Thank you! Kristine."*

• *Bates stamp: NOLAN0005044 -- produced by Nolan himself,* Nolan's 2006 Hawai'i partners K-1 tax document, introduced by Nolan during the 2009 arbitration confirming Nolan retained it from his 2006 tax records, wholly verifying the exact amount of his LOC funds and Hawai'i partners investment):

> *"Capital contribution during the year: $2,300,000"*
> *"Withdrawals and other distributions: $761,458"*
> *"Ending capital account: $1,538,542"*

- o  Nolan (*Tr.2112*); *Q. Who, in let's say 2006 and 2007, would handle your federal and state income taxes?  A [Owen Nolan]: My wife did a lot of the paperwork.*

- **All originals available to the Court upon request**.


**Conclusion…**

*Money judgment forfeiture…*
Per the recent 2019 *Shkreli* Appellate ruling, referencing *Contorinis* and *Torres'* well-seasoned standard, *supra*, the government and Probation failed to 'trace' money judgment forfeiture 'ill-gotten proceeds' to Kenner, *with the exception of the self-verified $117,000* (thru Constantine's Eufora 'object' private stock sales and Kenner-loan repayments) *and $162,500* (thru Gaarn's Eufora 'object' private stock sales and Kenner-loan repayments).  No 'proceeds' have been traced to Kenner thru the GSF 'object' or the Hawaii 'object'; which remains highly unbelievable for a defendant deemed by the government to be the 'mastermind' of a 13-year scheme to defraud, and <u>literally</u> zero net benefit.

- The government attempted to fabricate an 'ill-gotten' amount thru their sentencing memo mis-representation (*ECF No. 765 at 8*). [29]
    - o  By now – this has been debunked ad nauseum.

*Guideline calculations/MVRA…*

- In accordance with *United States v. Smathers*, 879 F.3d 453, 460-61 (2d Cir 2018), Kenner has submitted the previous 'offset' calculation proof, *supra*, (notwithstanding the Court's obligation to substantiate 'proximate causation' first).

Similarly, the government and Probation failed to support any loss or intended loss calculation with '*but-for*' **and** '*proximate*' causation analysis (both required by statute), while failing to apply the credits-against-loss 'offsets' (previously argued by Kenner, *supra and ECF No. 770, 790*) -- and <u>separate</u> the fraud and non-fraud factors in the case, *see Ebbers* and its progeny, coupled with the fact the investors '*got what they bargained for*' per Second Circuit rulings in *Novak*, *Starr* and *Shellef* (*ECF No. 790 at 1, f.2*), *Leonard* (*ECF No. 790 at 1, f.1*) et.al..

---

[29] If this nonsense had any validity, then Kenner and his Baja Ventures 2006 partners would have at least a $6.5 million capital account in the Cabo san Lucas project (or more).  *Government-forfeiture-36* proves they have at least $4.1 million invested.  The government records show that Jowdy stole $1.6 million of those funds from the Stumpel deposit of 5-23-2005 to Jowdy's LOR Management account (and was sued for it in Mexico in 2008 -- only terminated in 2012 after John Kaiser gave his umpteenth "forgery" lie testimony; proven as <u>another forgery fraud by Kaiser</u> on a 2012 FBI recording)…And, Jowdy <u>only</u> documented $2.5 million to the Baja Ventures 2006 capital account on the Lehman Brothers closing documents.  **The government records show no 'ill-gotten proceeds' are traced to Kenner of his Baja Ventures 2006 LLC**.

In light of the calculations lacking all statutory requirements and ignoring Second Circuit precedent, the defendant requests the Court reconsider the approximate $14 million forfeiture money judgment and loss calculation for guidelines – and find forfeiture money judgment of _no more than $279,500_ 'ill-gotten proceeds received' by Kenner (or some subset of Constantine's totals, if the Court rules that _Honeycutt_ does not apply to the instant case), and _zero victim loss_ for guideline calculations after applying all of the appropriate Second Circuit case law and statutes for 'offset credits' (even before the pending Eufora corporate sale); specifically considering the government did not admit that Jowdy received any of the Hawaii funds (_government-forfeiture-44_) until _after_ they received their convictions, while leveraging their prosecutorial theory without back-up that "_Kenner stole all of the Hawaii funds and purchased his Cabo equity with it_" (_government-forfeiture-36_) (with both proven as false by the government's own submissions).[30]   In the Hawaii project, there should be no calculation for loss enhancement to the Sentencing Guidelines, _because no loss exists_.   Certainly, no 'but for' _and_ 'proximate' causation has been established, with both required to establish a loss factor, by the government or PSR; and specifically relevant considering the Court utilized the PSR summary loss table (_at ¶29_) for its determination of loss (and somehow related the same unverified figures to 'ill-gotten gains' for forfeiture money judgment).

As demonstrated above, the transactions resulted in no losses based on 'proximate' causation, not just no loss based on 'offsets'.   The purpose of loss calculation is to determine whether the offense level should be increased.   _The Court has deemed it a 20-level increase for Kenner, enhancing the base sentence guideline by a factor of decades_.   Accordingly, "the guidelines do not require a loss calculation greater than zero." _United States v. Pu_, 814 F.3d 818, 828 (7th Cir 2016) (citation omitted). Instead, the "loss determination is a special offense characteristic that increases the guidelines offense level." Id.   "[T]he government is not entitled to a punitive loss calculation, even in cases involving fraud, absent evidence of actual or intended pecuniary loss." _United States v. Free_, 839 F.3d 308, 323 (3d Cir 2016).   Thus there should be no enhancement to the offense level here, given that there was no loss with respect to the transactions that the jury may have deemed unlawful or unauthorized (all or in part).   In determining loss, it is critical to identify what cannot be considered in the loss calculation.   Now that the trial is over, the government does not want to be constrained by its own facts.

As the Second Circuit has explained, a "loss must be the result of the fraud." _United States v. Ebbers_, 458 F.3d 110, 128 (2d Cir 2006) (citation omitted).   Here, it is

---

[30] This was echoed by FBI agent Galioto to _coerce_ the Pecas before Kristen Peca's 2012 FBI recording with Kenner when she told Kenner: "_Matt told Michael and I that you stole all of the Hawai'i money and never gave it – the loan money -- to...uhhhh...Jowdy._" – corroborating Kaiser's February 2019 letter to the Court _(ECF No. 628 at 1)_ that _"Jowdy would like the court to think that Kenner stole $7 million from the hockey players and others..."_.   This fallacy has lasted over a decade thru Jowdy and his cabal (including FBI agent Galioto's false representations).

undisputed per the government's own trial representations (*Tr.4588*) that: (1) the 2008 global real estate recession, (2) risky investments, and (3) the Lehman Brothers bankruptcy (all 'proximate causations issues' not addressed by PSR or the government) were <u>not</u> the reason Kenner was indicted and at trial.   The ultimate global macroeconomic factors had absolutely no causal connection to any actions by Kenner.  The government recognized, *supra*, that Kenner had no causal relationship to the Lehman Brothers collapse, bankruptcy, and default on the Hawaii real estate joint venture, as the resulting 'cause' of any Hawaii losses, or the recession's effects on the Constantine-GSF 'offered' company equity.   See *Ebbers*, 458 F.3d at 128 ("Losses from causes other than the fraud must be excluded from the loss calculation.") (citation omitted).


Sincerely submitted,


Phil Kenner
ProSe litigant

45