# EXHIBIT 40

# AMENDED AND RESTATED LOAN AGREEMENT

**for a loan in an amount up to**

**$125,138,327.83**

**MADE BY AND BETWEEN**

**DIAMANTE CABO SAN LUCAS S. DE R.L. DE C.V.**
**a Mexican limited liability company,**
**as Borrower**

**and**

**DANSKE BANK A/S, LONDON BRANCH,**
**the London Branch of a company incorporated in Denmark,**

**as Lender**

Dated as of March __, 2009

"Diamante Cabo San Lucas", Cabo San Lucas, Baja California Sur, Mexico

::ODMA\PCDOCS\BA3DOCS1\412820\8

# TABLE OF CONTENTS

ARTICLE I INCORPORATION OF RECITALS AND EXHIBITS ..... 7

Section 1.1 Incorporation of Recitals ..... 7

Section 1.2 Incorporation of Exhibits ..... 7

ARTICLE II DEFINITIONS ..... 7

Section 2.1 Defined Terms ..... 7

ARTICLE III REPRESENTATIONS AND WARRANTIES ..... 19

Section 3.1 Representations and Warranties ..... 19

Section 3.2 Reaffirmation of Representations and Warranties ..... 22

ARTICLE IV LOAN AND LOAN DOCUMENTS ..... 23

Section 4.1 Agreement to Borrow and Lend ..... 23

Section 4.2 Loan Documents ..... 23

Section 4.3 Term of the Loan ..... 25

Section 4.4 Prepayments ..... 26

Section 4.5 Late Charge ..... 26

ARTICLE V INTEREST; PROFIT PARTICIPATION FEE; ORDER OF PAYMENT ..... 27

Section 5.1 Interest Rate ..... 27

Section 5.1 Interest Rate ..... 27

Section 5.2 Profit Participation Fee ..... 28

Section 5.4 Order of Priority ..... 30

ARTICLE VI LOAN EXPENSE AND ADVANCES ..... 30

Section 6.1 Loan and Administration Expenses ..... 30

Section 6.2 Brokerage Fees ..... 31

Section 6.3 Protective Advances ..... 31

::ODMA\PCDOCS\BA3DOCS1\412820\8

ARTICLE VII CONDITIONS TO THE MAKING OF THE LOAN ........ 31

Section 7.1 Conditions Precedent ........ 31

ARTICLE VIII CONDITIONS PRECEDENT TO THE FIRST DISBURSEMENT FOR CONSTRUCTION COSTS ........ 33

Section 8.1 Required Construction Documents ........ 33

ARTICLE X CONSTRUCTION BUDGET ........ 34

Section 9.1 Construction Budget ........ 34

Section 9.2 Budget Line Items ........ 34

Section 9.3 Contingency Reserve ........ 35

Section 9.4 Tax and Insurance Reserve ........ 35

ARTICLE X SUFFICIENCY OF LOAN ........ 35

Section 10.1 Loan In Balance ........ 35

ARTICLE XI CONSTRUCTION PAYOUT REQUIREMENTS ........ 36

Section 11.1 Documents to be Furnished for Each Disbursement ........ 36

Section 11.2 Retainage ........ 37

Section 11.3 Future Equity Requirement ........ 37

ARTICLE XII FINAL DISBURSEMENT FOR CONSTRUCTION COSTS ........ 40

Section 12.1 Final Disbursement for Construction Costs ........ 40

Section 12.2 Retainage ........ 40

ARTICLE XIII COVENANTS ........ 40

Section 13.1 Certain Covenants ........ 40

Section 13.2 Insurance ........ 45

Section 13.3 Special Purpose Covenants ........ 48

ARTICLE XIV CASUALTY AND CONDEMNATION ........ 49

Section 14.1 Lender's Election to Apply Proceeds to the Debt ........ 49

Section 14.2 Borrower's Obligation to Rebuild ........ 49

::ODMA\PCDOCS\BA3DOCS1\412820\8

ARTICLE XV TRANSFERS .... 49

Section 15.1 Prohibition of Assignments and Transfers by Borrower .... 49

Section 15.2 Prohibition of Transfers in Violation of ERISA .... 49

Section 15.3 Successors and Assigns .... 49

ARTICLE XVI SPECIAL PROVISIONS RE: PARTICULAR PHASES .... 49

Section 16.4 Opportunities upon Maturity or Sooner Prepayment .... 49

ARTICLE XVII SERVICER .... 49

Section 17.1 Servicer .... 49

ARTICLE XVIII EVENTS OF DEFAULT .... 49

Section 18.1 Events of Default .... 49

ARTICLE XIX LENDER'S REMEDIES IN EVENT OF DEFAULT .... 49

Section 19.1 Remedies Conferred Upon Lender .... 49

ARTICLES XX GENERAL PROVISIONS .... 49

Section 20.1 Captions .... 49

Section 20.2 Modification, Waiver .... 49

Section 20.3 Governing Law .... 49

Section 20.4 Acquiescence Not to Constitute Waiver of Lender's Requirements .... 49

Section 20.5 Disclaimer by Lender .... 49

Section 20.6 Partial Invalidity; Severability .... 49

Section 20.7 Definitions Include Amendments .... 49

Section 20.8 Execution in Counterparts .... 49

Section 20.9 Entire Agreement .... 49

Section 20.10 Waiver of Damages .... 49

Section 20.11 Jurisdiction .... 49

Section 20.12 Set-Offs .... 49

Section 20.13 Authorized Representative ..... 49

Section 20.14 Non-Recourse Provisions ..... 49

Section 20.15 Time is of the Essence ..... 49

ARTICLE XXI NOTICES ..... 49

ARTICLE XXII WAIVER OF JURY TRIAL ..... 49

ARTICLE XXIII GROSS-UP ..... 49

Section 23.1 Gross-Up ..... 49

ARTICLE XXIV SALE OF NOTE AND SECURITIZATION ..... 49

Section 24.1 Cooperation ..... 49

Section 24.2 Intentionally Omitted ..... 49

Section 24.3 Loan Components ..... 49

Section 24.4 Costs ..... 49

Section 24.5 Conversion of Loan and Creation of Subordinate Debt ..... 49

Section 24.6 Securitization Indemnification ..... 49

Section 24.7 Rating Surveillance ..... 49

Section 24.8 Assignment ..... 49

**AMENDED AND RESTATED**

**LOAN AGREEMENT**

Project commonly known as "Diamante Cabo San Lucas",
Cabo San Lucas, Baja California Sur, Mexico

THIS AMENDED AND RESTATED LOAN AGREEMENT ("**Agreement**") is made as of March __, 2009, between **DIAMANTE CABO SAN LUCAS S. DE R.L. DE C.V.**, a Mexican limited liability company with variable capital, having an address at Alikan s/n, Col. Amoliacion Mariano Matamoros, Cabo San Lucas, Mpio. De Los Cabos CP 23460 Baja California Sur ("**Borrower**"), and **DANSKE BANK A/S, LONDON BRANCH**, the London Branch of a company incorporated in Denmark ("**Lender**").

**RECITALS**

A. On March 10, 2006, Lehman Brothers Holdings Inc. ("**Lehman**") made a loan to Borrower in the original principal amount of One Hundred Twenty Five Million Dollars ($125,000,000.00) ("**Original Loan**") to be used to fund certain acquisition and pre-development costs in connection with that certain resort project located in the City of Cabo San Lucas, Baja California Sur, Mexico.

B. The Original Loan is evidenced and secured by loan documents dated March 10, 2006 and identified on the Schedule of Original Loan Documents attached hereto as **Schedule 1** ("**Original Loan Documents**").

C. Pursuant to that certain Omnibus Assignment and Assumption dated January 13, 2009 by and between Lehman, as assignor, and Lender, as assignee, Lehman assigned to Lender, and Lender assumed from Lehman all of Lehman's right, title and interest in the Original Loan and the Original Loan Documents.

D. Lender, Borrower and certain guarantors have agreed to modify certain terms and conditions of the Original Loan Documents and in connection therewith, have agreed to reaffirm, amend and/or amend and restate the Original Loan Documents (as reaffirmed, amended and/or amended and restated, "**Amended Loan Documents**").

E. Lehman and Lender executed certain assignment agreements dated February 27, 2009 whereby the assignment of Lehman's rights under the Original Trust Agreement, the Pledge Agreement (Membership Interests in Borrower: Mexico) and the Pledge Agreement (Assets) in favor or Lender was perfected in accordance with Mexican law.

F. Among the several modifications that have been agreed to, Lender, as the holder of that certain Promissory Note dated March 10, 2006 in the original principal amount of $125,000,000.00 ("**Original Note**"), and Borrower, as the borrower under the Original Note, have agreed to split the indebtedness evidenced by the Original Note into two (2) separate obligations of indebtedness as evidenced by:

      (i) Substitute Promissory Note (Facility A) dated as of the date hereof in the amount of One Hundred Nine Million One Hundred Thirty-Eight Thousand Three Hundred Twenty Seven and 83/100 Dollars ($109,138,327.83); and

(ii) Substitute Promissory Note (Facility B) dated as of the date hereof in the amount of Sixteen Million and 00/100 Dollars ($16,000,000.00).

F. Lender and Borrower have agreed to amend and restate in its entirety that certain Loan Agreement dated March 10, 2006 ("**Original Loan Agreement**"), and enter into this Agreement for the purpose of doing the same.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto agree as follows:

## ARTICLE I
## INCORPORATION OF RECITALS AND EXHIBITS

Section 1.1 Incorporation of Recitals.

The foregoing preambles and all other recitals set forth herein are made a part hereof by this reference.

Section 1.2 Incorporation of Exhibits.

The Exhibits and Schedules to this Agreement are incorporated in this Agreement and expressly made a part hereof by this reference.

## ARTICLE II
## DEFINITIONS

Section 2.1 Defined Terms.

The following terms as used herein shall have the following meanings:

2009 Value: As defined in Section 5.3(d).

Affiliate: With respect to a specified Person, any Person which, directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such Person, including, without limitation, any general or limited partnership in which such Person is a partner.

Agreement: This Amended and Restated Loan Agreement.

Amended and Restated Trust Agreement: The Amended and Restated Irrevocable Guaranty Trust Agreement dated as of the date hereof among Borrower, Lender and Trustee.

Amended Loan Documents: Collectively, this Agreement, the Assignment of Leases and Rents, the Omnibus Assignment, the Completion Guaranty, the Environmental Indemnity, the

Payment Guaranty, the Recourse Guaranty, the Pledge Agreements, and the UCC-1 Financing Statements, together with the documents and instruments listed in Section 4.2 and all other documents and instruments entered into from time to time to amend, reaffirm and/or amend and restate the Original Loan Documents.

Appointment Period: As defined in Section 5.3(d)(iii).

Appraisal: An appraisal of the Land and any improvements thereon, prepared at Borrower's expense, by an appraiser approved by Lender and in form and content satisfactory to Lender.

Appraisal Period: As defined in Section 5.3(d)(iii)

Appraiser: As defined in Section 5.3(d)(iii).

Appointment Period: As defined in Section 5.3(d)(iii)(1).

Architect: The architect in respect of the Project, selected by Borrower and approved by Lender.

Architect's Certificate: A certificate by the Architect in form satisfactory to Lender to the effect that the Improvements, upon completion, shall comply with Laws and as to such other matters as Lender requires.

Assignment of Leases and Rents: The Assignment of Leases and Rents dated March 10, 2006 and executed by Borrower in favor of Lender.

Authorized Representative: Kenneth A. Jowdy and/or William J. Najam, Jr.

Balance: As defined in Section 10.1 hereof.

Bankruptcy Code: Title 11 of the United States Code, entitled "Bankruptcy", as now or hereafter in effect, or any successor thereto or any other present or future bankruptcy or insolvency statute, or any bankruptcy or insolvency statute of the United Mexican States.

Borrower: Diamante Cabo San Lucas S. DE R.L. DE C.V., a Mexican limited liability company.

Borrower's Election Notice: As defined in Section 5.3(d)(i).

Borrower Parties: Guarantor, Diamante Member, and Diamante Member Parties.

Breakage Costs: All costs and fees incurred by Lender in connection with any prepayment of the Loan (in whole or in part), which amounts shall be determined by Lender in its sole, but reasonable, discretion.

Budget Line Item(s): As defined in Section 9.2(a).

Business Day: Any day other than a Saturday, Sunday or day on which banks are required or authorized to be closed in New York, New York.

Change Orders: As defined in Section 13.1(c).

Collection Account: The account established by Lender from time to time for purposes of collecting amounts due from Borrower under this Agreement and the Amended Loan Documents. Unless and until Lender advises Borrower that a different account has been established, for purposes of this Loan, Borrower shall direct any payments due Lender to the following account: Wells Fargo Bank, San Francisco, CA, ABA#121000248, Account #4121813786, Credit Danske Bank A/S Collection Account TriMont Real Estate Advisors Inc. as Servicer.

Completion Date: The Maturity Date (without giving effect to any extension of the Term), i.e., March 31, 2012.

Completion Guaranty: The Completion Guaranty dated March 10, 2006 and executed by Guarantor in favor of Lender.

Construction: The construction of the Improvements in accordance with the Plans and Specifications.

Construction Budget: The budget for the Construction of the Improvements and the development, sale and marketing of the Project in the form of **Exhibit A** annexed hereto.

Construction Contracts: All contracts for the design, engineering and construction of the Improvements.

Construction Schedule: A schedule, satisfactory to Lender, establishing a timetable for completion of the Construction, showing, on a monthly basis, the anticipated progress of the Construction, and confirming that the Improvements can be completed on or before the Completion Date.

Contingency Reserve: As defined in Section 9.3.

Control: As such term is used with respect to any Person, including the correlative meanings of the terms "controlled by" and "under common control with", the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

Current Value: As defined in Section 5.3(d)(ii).

Current Value Review Period: As defined in Section 5.3(d)(ii).

Danske Group: As defined in Section 24.6(b).

Debt: The outstanding principal balance of the Notes from time to time, together with all accrued and unpaid interest thereon, the Profit Participation Fee, the Non-Utilization Fee and all other sums now or hereafter due under the Amended Loan Documents.

Default or default: Any event, circumstance or condition, which, if it were to continue uncured, would, with notice or lapse of time or both, constitute an Event of Default.

Default Rate: A rate per annum equal to twenty percent (20%), compounded monthly, but not in excess of the highest rate permitted by law.

Deficiency Deposit: As defined in Section 10.1.

Depositary Bank: Wells Fargo Bank, Banco Santander Serfin or such other depositary bank as Lender shall approve from time to time.

Development Fee: The Budget Line Item for payment of a development fee.

Diamante Member: Diamante Cabo San Lucas LLC, a Delaware limited liability company.

Diamante Member Parties: Jowdy Parties and Kenner Parties.

Disclosure Document: As defined in Section 24.6(a).

Dollars or $: United States dollars.

Effective Date: The date of this Agreement.

Environmental Indemnity: The Environmental Indemnity dated March 10, 2006 by Borrower and Guarantor in favor of Lender.

Environmental Laws: As defined in the Environmental Indemnity.

Environmental Proceedings: Any environmental proceedings, whether civil (including actions by private parties), criminal, or administrative proceedings, relating to the Property.

Environmental Report: The environmental report prepared by Environmental Resources Management on May 30, 2006 and updated by that certain Phase I Due Diligence Update dated February 2009 and addressed to Lender.

ERISA: The Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder from time to time.

Event of Default: As such term is defined in Article XVIII.

Exchange Act: As defined in Section 24.6(a).

Extension Notice: The notice given by Borrower to Lender to extend the maturity of the Loan as required in Section 4.3(b)(i).

Extension Period: The two year period described in Section 4.3(b).

Facility A Interest Rate: The rate of interest that is three hundred (300) basis points in excess of the three-month LIBOR for U.S. Dollar deposits which appears on Reuters LIBOR 01 as of 11:00 a.m. London time on the first day of each Interest Period during the term of the Facility A Loan. Once established, the Facility A Interest Rate shall remain fixed until the end of the Interest Period. The foregoing notwithstanding, if such rate is not available on Reuters or a successive service, Lender will determine a comparable rate in its sole but reasonable discretion.

Facility B Interest Rate: The rate of interest that is five hundred (500) basis points above the three month LIBOR for U.S. Dollar deposits which appears on Reuters LIBOR 01 as of 11:00 a.m. London time on the first day of each Interest Period during the term of the Facility B Loan. Once established, the Facility B Interest Rate shall remain fixed until the end of the Interest Period. The foregoing notwithstanding, if such rate is not available on Reuters or a successive service, Lender will determine a comparable rate in its sole but reasonable discretion.

Facility A Loan: The term loan made by Lender to Borrower in the amount of $109,138,327.83 and evidenced by the Facility A Note. The Facility A Loan is fully funded.

Facility A Note: The Substitute Promissory Note (Facility A) in the principal amount of $109,138,327.83, dated as of the date hereof, and executed by Borrower to the order of Lender.

Facility B Loan: The revolving line of credit loan made by Lender to Borrower in the amount of $16,000,000 and evidenced by the Facility B Note.

Facility B Note: The Substitute Promissory Note (Facility B) in the principal amount of $16,000,000.00, dated as of the date hereof, and executed by Borrower to the order of Lender.

Fair Market Factor: As defined in Section 5.3(b).

First Draw: The aggregate amount of the first draw against the Facility B Note made by Borrower.

Fitch: Fitch, Inc.

Future Equity Requirement: The requirement that Borrower, subsequent to the First Draw, pay to Lender the amounts set forth in Section 11.3.

General Contract: A contract between Borrower and General Contractor for the Construction of the Improvements (or any lesser portion thereof approved by Lender), in form and substance satisfactory to Lender.

General Contractor: The contractor(s) under the General Contract(s), selected by Borrower and approved by Lender.

Geotechnical Report: The geo-technical report obtained by Borrower at the closing of the Original Loan and subsequent updates prepared thereto by an environmental consultant, together with a letter of reliance obtained at Borrower's expense and addressed to Lender.

Golf Course Operations: The operation of the golf course, club house and related facilities, including but not limited to the facilities for the sale of food and beverages, golf lessons, retail merchandise, and any and all ancillary and/or related operations.

Golf Course Revenue: Any and all sales and revenue generated by the Golf Course Operations.

Governmental Authority: Any federal, state, county or municipal government having jurisdiction over the Property.

Guarantor: Kenneth A. Jowdy.

Hard Costs: All costs for labor, materials or equipment supplied to or incorporated in the Project.

Hazardous Material: Any hazardous or toxic material, substance or waste (including, without limitation, gasoline, petroleum, asbestos-containing materials and radioactive materials) which is regulated under Environmental Laws.

Improvements: Collectively, (i) engineering, transportation, mechanical and other infrastructure required for the development of the first phase of the Project, including roads, a waste water treatment plant and a desalination plant, (ii) a clubhouse, (iii) the "Dunes" golf course, (iv) construction of temporary clubhouse facilities, (v) construction of the first residential villa, and (vi) such other development and construction items as are included under the heading "Phase I" in the Construction Budget, all as more particularly shown on the Master Plan and all as more particularly described in the Plans and Specifications approved by Lender.

Included Taxes: As defined in Section 23.1.

Indemnified Party: As defined in Section 13.1(1).

Insurance Premiums: As defined in Section 13.2(b).

Interest Period: The three month period commencing on the Effective Date and ending on the date that is three (3) calendar months thereafter, and each successive three (3) month period (which shall commence on the calendar date immediately following the end of the preceding Interest Period) during the term of the Facility A Loan or the Facility B Loan. *By way of example only, the Interest Period commencing on February 15th will end on May 14th and the next Interest Period will commence on May 15th and continue through August 14th.*

Internal Revenue Code: The Internal Revenue Code of 1986, as amended from time to time.

Jowdy Parties: Guarantor, Diamante Properties, LLC, and KAJ Holdings, LLC.

Kenner Parties: Baja Ventures 2006, LLC and CSL Properties 2006, LLC

Land: The parcel of land located in the City of Cabo San Lucas, Baja California Sur, Mexico and more particularly described on **Exhibit B** annexed hereto.

Late Charge: As such term is defined in Section 4.5.

Laws: All federal, state and local laws, statutes, codes, ordinances, orders, rules and regulations of the United States of America, the United Mexican States (including, without limitation, Environmental Laws).

Leases: All leases, licenses and occupancy agreements affecting the Property or any part thereof now or hereafter existing.

Lehman: Lehman Brothers Holdings Inc.

Lender: Danske Bank A/S, London Branch.

Lender's Consultant: The consultant retained by Lender, at Borrower's expense, to act as Lender's representative in respect of the Construction, as provided in this Agreement.

Lender Notice: As defined in Section 5.3(d)(ii).

Liabilities: As defined in Section 24.6(b).

LIBOR: London inter bank offered rate.

Loan: Collectively, the Facility A Loan and Facility B Loan.

Loan-to-Value Ratio: The ratio obtained by dividing the outstanding principal balance due on the Loan by the fair market value of the Property.

Major Contracts: All Construction Contracts which provide for an aggregate contract price equal to or greater than $100,000.

Master Plan: The master plan for the Project annexed hereto as **Exhibit C**.

Material Adverse Change or material adverse change: If, in Lender's reasonable determination, the business prospects, operations or financial condition of a Person or property has changed in a manner which could impair the value of Lender's security for the Loan, prevent timely repayment of the Loan or otherwise prevent the applicable Person from timely performing any of its obligations under the Amended Loan Documents.

Maturity Date: March 31, 2012, or, if extended pursuant to Section 4.3(b) h erein, March 31, 2014.

Moody's: Moody's Investors Service, Inc.

Net Operating Profit: As defined in Section 13.1(v).

Non-Utilization Fee: A fee payable by Borrower to Lender equal to two and one-half percent (2.5%) of the average, undrawn daily balance of the Facility B Loan during the term.

Notes: Collectively, the Facility A Note and the Facility B Note.

OFAC: Office of Foreign Asset Control of the Department of the Treasury of the United States of America.

Omnibus Assignment: The Omnibus Assignment dated March 10, 2006 and executed by Borrower for the benefit of Lehman.

Original Loan: The loan made on March 10, 2006 by Lehman to Borrower pursuant to the Original Loan Agreement.

Original Loan Agreement: The Loan Agreement dated March 10, 2006 between Lehman and Borrower.

Original Loan Documents: The loan documents dated March 10, 2006 and identified on the Schedule of Original Loan Documents attached hereto as Schedule 1.

Original Note: The Promissory Note dated March 10, 2006 in the original principal amount of $125,000,000.00 and executed by Borrower for the benefit of Lehman.

Original Trust Agreement: The Irrevocable Guaranty Trust Agreement dated March 10, 2006, among Borrower, Lehman and Banco J.P. Morgan, S.A.

Operating Account: A deposit account opened and maintained by Borrower with Depositary Bank, on behalf of Lender, to be utilized in the manner set forth in Section 4.1(d).

Opportunity: As defined in Section 16.1.

Order of Priority: As defined in Section 5.4.

Payment Date: The first Business Day following the conclusion of each Interest Period.

Payment Guaranty: The Payment Guaranty dated March 10, 2006 and executed by the Borrower Parties in favor of Lehman.

Permits. Any building permit, environmental permit, utility permit, zoning permit or other permit required in respect of the Property.

Permitted Exceptions: The matters disclosed by the Title Policy issued to Lender on the date hereof.

Person: Any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any U.S. or Mexican federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

Personal Property: All personal property, fixtures and equipment required or beneficial for the operation of the Land or the Improvements.

Phase(s): The individual (or collective) reference to the portions of the Project shown on the Master Plan and identified as: (i) Future Development (209.4 acres), (ii) Hotel Site (65.46 acres), (iii) Ocean Vista Villas 1 (100 units), (iv) Ocean View Estates (86 lots), (v) Village Villas (100 units), (vi) Ocean Vista Villas 2 (100 units), (vii) Oasis Estates (40 lots), (viii) Golf Villas (66 units), (ix) Sunset Hill (78 lots), and (x) Beachfront (193.27 acres).

Plans and Specifications: Plans and specifications for the Improvements, prepared by Architect and approved by Lender.

Pledge Agreement (Assets): The Pledge Agreement (Assets) dated March 10, 2006 and executed by Borrower in favor of Lehman.

Pledge Agreement (Membership Interests in Borrower: Mexico): The Pledge Agreement (Membership Interests in Borrower: Mexico) dated March 10, 2006 and executed by Diamante Member and Guarantor in favor of Lehman.

Pledge Agreement (Membership Interests in Borrower: US): The Pledge Agreement (Membership Interests in Borrower: US) dated March 10, 2006 and by Diamante Member and Guarantor in favor of Lehman.

Pledge Agreement (Membership Interests in Diamante Member): The Pledge Agreement (Membership Interests in Diamante Member) dated March 10, 2006 and executed by Diamante Properties LLC, Baja Ventures 2006, LLC, CSL Properties 2006, LLC and KAJ Holdings, LLC and Guarantor in favor of Lehman.

Pledge Agreements: The collective reference to the Pledge Agreement (Assets), the Pledge Agreement (Membership Interests in Borrower: US), the Pledge Agreement (Membership Interests in Borrower: Mexico) and Pledge Agreement (Membership Interests in Diamante Member).

Prepayment Fee: An amount equal to one percent (1%) of the then-outstanding principal balance (including capitalized interest) of the Facility A Note.

Policy: As defined in Section 13.2(b).

Proceeding: As defined in Section 20.11.

Proceeds: As defined in Section 14.1.

Profit Participation Fee: As defined in Section 5.3.

Project: A resort and residential development consisting of residences, two golf courses, a club house, restaurant, spa and fitness center and other amenities, all as more particularly shown on the Master Plan.

Property: The Land and any improvements located thereon.

Provided Information: As defined in Section 24.1.

Rating Agencies: Each of S&P, Moody's and Fitch.

REA: A reciprocal easement, homeowners' association or other agreement in form satisfactory to Lender, containing such easements, covenants and other agreements as Lender shall reasonably require for the maintenance of Project common elements and the sharing of Project infrastructure following the completion of all or any portion of the Project and the conveyance to third parties thereof.

Reaffirmation of Assignment of Leases and Rents: The Reaffirmation of Assignment of Leases and Rents dated as of the date hereof and executed by Borrower in favor of Lender.

Reaffirmation of Completion Guaranty: The Reaffirmation of Completion Guaranty dated as of the date hereof and executed by Guarantor in favor of Lender.

Reaffirmation of Environmental Indemnity: The Reaffirmation of Environmental Indemnity dated as of the date hereof and executed by Borrower and Guarantor in favor of Lender.

Reaffirmation of Payment Guaranty: The Reaffirmation of Payment Guaranty dated as of the date hereof and executed by Guarantor and Diamante Member in favor of Lender, pursuant to which such parties reaffirm the guaranty of repayment of the Loan.

Reaffirmation of Pledge Agreement (Membership Interests in Borrower: US): The Reaffirmation of Pledge Agreement dated as of the date hereof, governed by U.S. law, and executed by Diamante Member and Guarantor in favor of Lender, in respect of their respective membership interests in Borrower.

Reaffirmation of Pledge Agreement (Membership Interests in Borrower: Mexico): The Amendment to Pledge Agreement dated as of the date hereof governed by Mexican law, and executed by Diamante Member and Guarantor in favor of Lender, in respect of their respective membership interests in Borrower.

Reaffirmation of Pledge Agreement (Membership Interests in Diamante Member): The Reaffirmation of Pledge Agreement dated as of the date hereof and executed by Guarantor in respect of his membership interest in Diamante Member.

Reaffirmation Pledge Agreements: The collective reference to the Reaffirmation of Pledge Agreement (Membership Interests in Borrower: US), the Reaffirmation of Pledge Agreement (Membership Interests in Borrower: Mexico) and the Reaffirmation of Pledge Agreement (Membership Interests in Diamante Member).

Reaffirmation of Recourse Guaranty: The Reaffirmation of Recourse Guaranty dated as of the date hereof and executed by Guarantor in favor of Lender, pursuant to which Guarantor reaffirms its guarantees to Lender of the payment of the Recourse Obligations.

Reaffirmation of U.S. Pledge Agreements: The collective reference to the Reaffirmation of Pledge Agreement (Membership Interests in Borrower: US) and the Reaffirmation of Pledge Agreement (Membership Interests in Diamante Member).

Recourse Guaranty: The Recourse Guaranty dated March 10, 2006 and executed by Guarantor in favor of Lehman.

Recourse Obligations: As defined in the Notes.

Registration Statement: As defined in Section 24.6(b).

Related Parties: As defined in Section 13.3(d).

Release Price: As defined in Section 16.1.

Requisition: A request for an advance of a portion of the Loan (other than the First Draw) in the form required by Lender.

S&P: Standard & Poor's Ratings Group, a division of McGraw-Hill, Inc.

Sales Target: As defined in Section 11.3(c).

Securities: As defined in Section 24.6(a).

Securities Act: As defined in Section 24.6(a).

Securitization: As defined in Section 24.1.

SEMARNAT: As defined in Section 8.1(d).

Servicer: As defined in Section 17.1.

Servicing Agreement: As defined in Section 17.1.

Servicing Fees: As defined in Section 17.1.

Soft Costs: All costs, other than Hard Costs, to be incurred in respect of the Improvements including, without limitation, architects' fees, engineers' fees, Taxes, Insurance Premiums and bond fees.

SRE Permit: As defined in Section 13.1(s).

Subordinate Loan: As defined in Section 24.5.

Taxes: All real estate taxes and assessments and charges of every kind levied or assessed with respect to the Property.

Tax and Insurance Reserve: As defined in Section 9.4.

Tenant: A tenant or licensee under a Lease.

Title Insurer: Stewart Title Guaranty de Mexico, S.A. de C.V., as agent for Stewart Title Guaranty Company, and Fidelity National Global Solutions, Inc., each as co-insurers of 50% of the liability under the Title Policy.

Title Policy: An ALTA Mortgagee's Loan Title Insurance Policy or its equivalent, issued by Title Insurer, insuring Lender's interest as first place beneficiary under the Amended and Restated Trust Agreement, subject only to the Permitted Exceptions, and otherwise in form satisfactory to Lender.

Transfer: Any sale, transfer, lease, conveyance, alienation, pledge, assignment, mortgage, encumbrance hypothecation or other disposition of (i) all or any portion of the Land or any of the improvements thereon, (ii) all or any portion of Borrower's right, title and interest (legal or equitable) in and to the Land or any of the improvements thereon, or (iii) any interest in Borrower or any interest in any Person which directly or indirectly holds an interest in, or directly or indirectly controls, Borrower.

Trust: The trust created by the Amended and Restated Trust Agreement.

Trustee: The Bank of New York Mellon, S.A., Institución de Banca Múltiple.

UCC Financing Statements: The financing statements required to be filed to perfect, continue, or correct the security interests conferred on Lender by the Reaffirmation of Pledge Agreements.

UCC Policy: The policy of UCC title insurance, issued by UCC Title Insurer, insuring Lender's first priority, perfected security interest in the collateral under the Reaffirmation of U.S. Pledge Agreements.

UCC Title Insurer: Commonwealth Land Title Insurance Company.

Underwriter Group: As defined in Section 24.6(b).

Waiver and Release Agreement: The Waiver and Release Agreement by and among Borrower, Diamante Member, and Jowdy Parties in favor of Lender.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

Section 3.1 Representations and Warranties.

To induce Lender to execute this Agreement and to perform its obligations hereunder, Borrower hereby represents and warrants to Lender as follows:

(a) Trustee has good and marketable legal title to the Property, subject only to the Permitted Exceptions.

(b) Except as set forth on Exhibit 3.1(b), no litigation or proceedings are pending, or, to the best of Borrower's knowledge, threatened, against Borrower, Diamante Member, any of the Jowdy Parties or the Property. To the best of Borrower's knowledge, without inquiry, no litigation or proceedings are pending or threatened against Kenner Parties, except that Borrower believes that there is a possibility that the Kenner Parties could be joined into the litigation described in Exhibit 3.1(b). There are no pending, or, to Borrower's knowledge, threatened, Environmental Proceedings in respect of the Property.

(c) Borrower (i) is a limited liability company with variable capital (*sociedad de responsibilidad limitada de capital variable*), duly organized and validly existing under the laws of the United Mexican States, (ii) has full power and authority to execute, deliver and perform all Amended Loan Documents to which it is a party, and (iii) such execution, delivery and performance have been duly authorized by all requisite action on the part of Borrower. Each of Borrower Parties (other than Guarantor) (x) is a limited liability company, duly organized and validly existing under the laws of the State of Delaware, (y) has full power and authority to execute, deliver and perform all Amended Loan Documents to which it is a party, and (z) such execution, delivery and performance has been duly authorized by all requisite action on the part of each of such Borrower Parties.

(d) Neither Borrower, Diamante Member, nor any of the Jowdy Parties is subject to any liens or judgments, other than, with respect to Borrower, liens for real estate taxes which are not yet due, and other than, with respect to Guarantor, such liens as are disclosed on the financial statements furnished to Lender in connection with its underwriting of the Loan. To the best of Borrower's knowledge, without inquiry, none of the Kenner Parties is subject to any liens or judgments.

(e) Each of Borrower, Diamante Member and the Jowdy Parties is in compliance with all Laws applicable to it and, other than with respect to Guarantor, has obtained all permits required for it to operate. To the best of Borrower's knowledge, without inquiry, each of the Kenner Parties is in compliance with all Laws applicable to it and has obtained all permits required for it to operate.

(f) Neither Borrower, Diamante Member, nor any of the Jowdy Parties is involved in any dispute with any taxing authority. Neither Borrower, Diamante Member, nor any of the Jowdy Parties is in default of any obligation to pay taxes to any taxing authority. To the best of Borrower's knowledge, without inquiry, none of the Kenner Parties is involved in any

dispute with any taxing authority or is in default of any obligation to pay taxes to any taxing authority.

(g) Borrower has never owned any property, or engaged in any business, other than the ownership of its interest in the Property. Neither Diamante Member nor any of the Jowdy Parties (other than Guarantor) has ever owned any property, other than its direct or indirect interest in Borrower, and neither has engaged in any business, other than business incidental to its direct or indirect ownership of an interest in Borrower. To the best of Borrower's knowledge, without inquiry, none of the Kenner Parties has ever owned any property, other than its indirect ownership interest in Borrower, and none has engaged in any business, other than business incidental to its direct or indirect ownership of an interest in Borrower.

(h) No consent, approval or authorization of or declaration, registration or filing with any Governmental Authority or nongovernmental Person, including any creditor, partner, or member of Borrower, Diamante Member and Jowdy Parties, is required in connection with the execution, delivery and performance of this Agreement or any of the Amended Loan Documents, other than the registration of the Amended and Restated Trust Agreement in the Public Registry of Property and Commerce of Cabo San Lucas, notation in the corporate book of Borrower of the Reafirmation of Pledge Agreement (Membership Interest in Borrower: Mexico), and the filing of the UCC Financing Statements in the Offices of the Delaware and Nevada Secretaries of State.

(i) The execution, delivery and performance of this Agreement, the execution and payment of the Notes and the creation of the Trust and the other security interests under the Original Loan Documents and the other Amended Loan Documents does not and will not constitute a breach or default under any other agreement to which Borrower, Diamante Member or Guarantor is a party or may be bound, or a violation of any law or court order which may affect the Property.

(j) There is no Default or Event of Default under this Agreement, the Original Loan Documents or the other Amended Loan Documents.

(k) There are no pending or, to Borrower's knowledge, threatened, condemnation or eminent domain proceedings in respect of the Land.

(l) Upon completion of the Improvements, the Property will have adequate water, gas and electrical supply, storm and sanitary sewerage facilities, other required public utilities, fire and police protection, and means of access between the Property and public streets.

(m) Borrower has dealt with no broker or finder in connection with this Agreement or the Loan.

(n) All financial statements and other information previously furnished by Borrower, Diamante Member, any of the Jowdy Parties, and any of the Kenner Parties (or any Affiliate of any of them) in connection with the Loan are true, complete and correct in all

material respects and fairly present the financial conditions of the subjects thereof as of the respective dates thereof and do not fail to state any material fact necessary to make such statements or information not misleading, and no Material Adverse Change with respect to Borrower, Diamante Member or any of the Jowdy Parties has occurred since the respective dates of such statements and information. Neither Borrower, Diamante Member, nor any of the Jowdy Parties has any material liability, contingent or otherwise, not disclosed in such financial statements.

(o) The amounts set forth in the Construction Budget represent a full and complete itemization by category of all costs, expenses and fees which Borrower reasonably expects to pay or reasonably anticipates becoming obligated to pay to complete the Construction.

(p) Neither the construction of the Improvements nor the use thereof when completed will violate (i) any Laws or (ii) any restrictions of record or agreements affecting the Property. Neither the zoning authorizations, approvals, or variances nor any other right to construct or to use the Property is or will be to any extent dependent upon or related to any real estate other than the Land. All Governmental Approvals required for the Construction in accordance with the Plans and Specifications have been obtained, or will be obtained prior to the commencement of Construction, and all Laws relating to the Construction and operation of the Improvements have been complied with.

(q) Except as disclosed in the Environmental Report: (i) the Property is free of Hazardous Material and is in compliance with all Laws; (ii) neither Borrower nor, to the best knowledge of Borrower, any other Person, has ever caused or permitted any Hazardous Material to be placed, held, located or disposed of on, under, at or in a manner to affect the Property and the Property has never been used (whether by Borrower or, to the best knowledge of Borrower, any other Person) for any activities involving, directly or indirectly, the use, generation, treatment, storage, transportation, or disposal of any Hazardous Material; and (iii) there are no underground tanks, vessels, or similar facilities for the storage or containment of Hazardous Materials of any sort on, under or affecting the Property.

(r) The Property is taxed separately without regard to any other property and for all purposes the Property may be conveyed and otherwise dealt with as an independent parcel.

(s) There are no Leases, subleases or other arrangements for occupancy of space within the Property.

(t) The Loan is not being made for the purpose of purchasing or carrying "margin stock" within the meaning of Regulation G, T, U or X issued by the Board of Governors of the Federal Reserve System, and Borrower agrees to execute all instruments necessary to comply with all the requirements of Regulation U of the Federal Reserve System.

(u) Borrower is not a party in interest to any plan defined or regulated under ERISA, and the assets of Borrower are not "plan assets" of any employee benefit plan covered by ERISA or Section 4975 of the Internal Revenue Code.

(v) Neither Borrower, Diamante Member, nor any Jowdy Party, nor, to the best of Borrower's knowledge, without inquiry, any Kenner Party, nor any Person holding a direct or indirect interest in any of them is (or will be) a person with whom Lender is restricted from doing business under OFAC (including Persons named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and shall not engage in any dealings or transactions or otherwise be associated with such Persons. In addition, Borrower hereby agrees to provide Lender with any additional information that Lender deems reasonably necessary from time to time in order to ensure compliance with any and all laws to which Lender, Borrower, any Borrower Party, the Project, or the Property may be subject from time to time concerning money laundering and similar activities.

Section 3.2 Reaffirmation of Representations and Warranties.

Borrower agrees that all of the representations and warranties set forth in Section 3.1 and elsewhere in this Agreement are true as of the Effective Date and, except for matters which have been disclosed by Borrower and approved by Lender, will be true at all times thereafter. Lender shall be deemed to have approved changes to such representations and warranties occurring subsequent to the date hereof, if the same arise by reason of acts undertaken by Borrower in accordance with the terms hereof. Each request for a disbursement under this Agreement shall constitute a reaffirmation of such representations and warranties, as deemed modified in accordance with the disclosures made and approved (or deemed approved) as aforesaid, as of the date of such request. It shall be a condition precedent to the making of all advances (including the First Draw) under Facility B that each of said representations and warranties is true and correct as of the date of such requested disbursement, except as aforesaid.

## ARTICLE IV
## LOAN AND LOAN DOCUMENTS

Section 4.1 Agreement to Borrow and Lend.

Subject to the terms, provisions and conditions of this Agreement, the Original Loan Documents and the Amended Loan Documents, Borrower agrees to borrow from Lender and Lender agrees to lend to Borrower the Loan, for the purposes and subject to all of the terms, provisions and conditions contained in this Agreement.

(a) The Loan shall be made to Borrower on the terms and conditions hereinafter set forth. The Loan will bear interest at the rate or rates, and will be repaid, as set forth in this Agreement and in the Notes. Borrower shall use the proceeds of the Loan solely for the purposes specified herein.

(b) The aggregate amount of the Loan shall not exceed (i) with respect to the Facility A Note, One Hundred Nine Million One Hundred Thirty-Eight Thousand Three Hundred Twenty-Seven and 83/100 Dollars ($109,138,327.83); and (ii) with respect to the

Facility B Note, Sixteen Million and 00/100 Dollars ($16,000,000). The Facility A Note is not revolving in nature, and amounts repaid may not be subsequently readvanced. The Facility B Note is revolving in nature and, subject to satisfaction of the conditions and requirements set forth herein, Borrower may obtain, repay and re-obtain disbursements under the Facility B Note.

(c) Provided that Borrower satisfies the conditions to funding the First Draw set forth in Article VII hereof, Lender shall disburse the First Draw to Borrower on the Effective Date.

(d) Borrower authorizes Lender to disburse the Loan proceeds by crediting the Operating Account; provided, however, that Lender shall not be obligated to use such method. At Lender's option, disbursements may be made by Lender into an escrow held by Stewart Title Guaranty Company and subsequently disbursed by Stewart Title Guaranty Company to Borrower. If such option is exercised, Loan proceeds so disbursed shall be deemed to be disbursed to Borrower on the date of deposit into the escrow and interest shall accrue thereon from that date, regardless of the date such proceeds are released to Borrower by Title Insurer.

(e) Borrower and Lender acknowledge and agree that Borrower's total obligations to Lender as of the date hereof are as set forth in this Agreement and the Amended Loan Documents.

Section 4.2 Loan Documents.

(a) At the initial closing on March 10, 2006, Borrower and the Borrower Parties executed and delivered to Lender the Original Loan Documents. Except for (i) this Agreement (which amends and restates the terms of the Original Loan Agreement), (ii) the Amended and Restated Trust Agreement (which amends and restates the terms of the Original Trust Agreement), and (iii) the Notes (which are given in substitution of the Original Note), the other Original Loan Documents, as reaffirmed by the Amended Loan Documents, survive as binding and enforceable obligations on the parties named therein, and their permitted successors and assigns.

(b) On the Effective Date, Borrower shall execute and deliver (and cause any party thereto other than Borrower or Lender to execute and deliver) to Lender and Trustee, as appropriate, the following (in the presence, where required, of a Mexican notary);

(i) The Note Splitter and Modification Agreement:

(ii) The Facility A Note;

(iii) The Facility B Note;

(iv) The Amended and Restated Trust Agreement;

(v) The Reaffirmation of Assignment of Leases and Rents;

(vi) The Reaffirmation of Omnibus Assignment;

(vii) The Reaffirmation of Completion Guaranty;

(viii) The Reaffirmation of Recourse Guaranty;

(ix) The Reaffirmation of Payment Guaranty;

(x) The Reaffirmation of Environmental Indemnity;

(xi) The Reaffirmation of Pledge Agreement (Membership Interests in Borrower: US);

(xii) The Reaffirmation of Pledge Agreement (Membership Interests in Borrower: Mexico);

(xiii) The Reaffirmation of Pledge Agreement (Membership Interests in Diamante Member);

(xiv) This Agreement;

(xv) The Waiver and Release Agreement;

(xvi) The Pledge and Security Agreement (of the member interests in Diamante Member) to be executed by PF Ventures, LLC; and

(xvii) Such other documents, instruments or certificates as Lender or its counsel shall require.

Section 4.3 Term of the Loan.

(a) All principal, interest, the Profit Participation Fee, the Non-Utilization Fee, and any other charges or sums due hereunder or under the Amended Loan Documents shall be payable in full on the Maturity Date.

(b) Borrower may elect to extend the Maturity Date of the Loan for the Extension Period, subject to the satisfaction of each of the following conditions:

(i) Borrower furnishes Lender with not less than sixty (60), but not more than one hundred twenty (120), days' advance written Extension Notice of its election to extend the Maturity Date;

(ii) No Default or Event of Default exists under this Agreement or any of the other Amended Loan Documents;

(iii) In respect of Borrower's exercise of the extension option, Borrower shall have paid to Lender amounts sufficient to pay down the outstanding principal balance of the Facility A Note to no more than Eighty-Four Million Dollars ($84,000,000);

(iv) Borrower shall deliver to Lender an updated Appraisal of the Project that establishes an aggregate Loan-to-Value Ratio of no more than fifty percent (50%);

(v) Guarantor executes and delivers to Lender a reaffirmation of the Recourse Guaranty, Completion Guaranty, and the Environmental Indemnity;

(vi) Guarantor executes and delivers to Lender a reaffirmation of the Payment Guaranty and Pledge Agreement (Membership Interests in Diamante Member), and Borrower's counsel shall deliver an opinion that the Payment Guaranty and Pledge Agreement (Membership Interests in Diamante Member) are enforceable without defense or offset against the Jowdy Parties and Kenner Parties;

(vii) Borrower causes Title Insurer to deliver to Lender an endorsement to the Title Policy, insuring Lender's interest as first place beneficiary under the Trust Agreement, subject only to the Permitted Exceptions; and

(viii) Borrower causes UCC Title Insurer to deliver to Lender an endorsement to the UCC Policy, insuring Lender's first priority security interest in the collateral under the Pledge Agreements.

(ix) Borrower agrees to deliver to Lender such other agreements and materials as Lender may reasonably require, and to pay or reimburse Lender for the third-party costs incurred by Lender in connection with effectuating the extension.

(c) The provisions of Section 4.3(b) notwithstanding, Borrower shall not be entitled to any further disbursements of Loan proceeds during the Extension Period. Notwithstanding the foregoing, Borrower shall be entitled, during the first six (6) months of the Extension Period (if applicable), to advances for costs of Construction incurred, but not paid, prior to the expiration of the initial term of the Loan, subject to Borrower's satisfaction of the conditions to advance set forth in this Agreement.

Section 4.4 Prepayments.

(a) Subject to the provisions of Section 16.2 hereof, Borrower may prepay the Facility A Loan in whole or in part upon not less than three (3) Business Days' written notice to Lender and satisfaction of the following conditions:

(i) If the prepayment shall be for the full amount of the Facility A Loan, Borrower shall pay: (1) the principal balance due under the Facility A Note, (2) all interest accrued on the Facility A Note through the date of prepayment, (3) the Profit Participation Fee (to the extent not yet paid), (4) the Prepayment Fee, and (5) any Breakage Costs.

(ii) If the prepayment shall be for less than the full amount of the Facility A Loan, Borrower shall pay: (1) a portion of the principal balance due under the Facility A Note, (2) all interest accrued on the portion of the principal balance that Borrower has elected to prepay (with interest calculated through the date of prepayment), (3) the Prepayment Fee attributable to the portion of the principal balance that Borrower has elected to prepay, and (4) any Breakage Costs attributable to the portion of the principal balance that Borrower has elected to prepay.

(b) Borrower may prepay the Facility B Loan in whole upon not less than three (3) Business Days' written notice to Lender and satisfaction of the following conditions: If the prepayment shall be for the full amount of the Facility B Loan with the intention that the Facility B Loan shall be retired in full, Borrower shall pay: (1) the principal balance due under the Facility B Note, (2) all interest accrued on the Facility B Note through the date of prepayment, (3) the Non-Utilization Fee, and (4) any Breakage Costs.

Section 4.5 Late Charge.

Any amount due hereunder or under the other Amended Loan Documents which remains unpaid more than ten (10) days after the date said amount was first due and payable shall incur a fee ("**Late Charge**") of five percent (5%) of said amount, which payment shall be in addition to all of Lender's other rights and remedies under the Amended Loan Documents.

## ARTICLE V
## INTEREST; PROFIT PARTICIPATION FEE; ORDER OF PRIORITY

Section 5.1 Interest Rate – Facility A.

(a) Interest shall accrue on the Facility A Loan at the Facility A Interest Rate commencing February 1, 2009.

(b) Interest, calculated in arrears at the Facility A Interest Rate, shall be payable on each Payment Date. Notwithstanding the foregoing, unless funds are available for payment of interest on any Payment Date, accrued and unpaid interest shall be capitalized on such Payment Date, whereupon such capitalized interest shall be added to the principal balance of the Facility A Note as of such Payment Date and thereafter such amount shall bear interest at the Facility A Interest Rate in accordance with the terms of this Agreement and the Facility A Note.

(c) All payments (whether of principal, interest or any other amount payable hereunder) shall be deemed credited to Borrower's account only if received by 2:00 p.m. (New York time) on a Business Day; otherwise, such payment shall be deemed received on the next Business Day.

(d) Interest on the outstanding principal balance of the Facility A Loan shall be calculated by multiplying (i) the actual number of days elapsed in the Interest Period by (ii) a

daily rate based on a three hundred sixty (360) day year and then multiplying the product by (iii) the outstanding principal balance of the Facility A Note.

(e) The Facility A Loan shall bear interest at the Default Rate at any time during which an Event of Default exists.

Section 5.2 Interest Rate – Facility B.

(a) Interest shall accrue on the Facility B Loan at the Facility B Interest Rate.

(b) Interest, calculated in arrears at the Facility B Interest Rate, shall be payable on each Payment Date. Notwithstanding the foregoing, unless funds are available for payment of interest on any Payment Date, accrued and unpaid interest shall be capitalized on such Payment Date, whereupon such capitalized interest shall be added to the principal balance of the Facility B Note as of such Payment Date and thereafter such amount shall bear interest at the Facility B Interest Rate in accordance with the terms of this Agreement and the Facility B Note; provided, however that in no event shall the aggregate amount of the outstanding principal balance of the Facility B Note ever exceed $16,000,000.00. In the event that the principal balance of the Facility B Note shall at any time equal $16,000,000.00, Borrower shall pay all interest due on the Facility B Note on the next Payment Date.

(c) All payments (whether of principal, interest or any other amount payable hereunder) shall be deemed credited to Borrower's account only if received by 2:00 p.m. (New York time) on a Business Day; otherwise, such payment shall be deemed received on the next Business Day.

(d) Interest on the outstanding principal balance of the Facility B Loan shall be calculated by multiplying (i) the actual number of days elapsed in the Interest Period by (ii) a daily rate based on a three hundred sixty (360) day year and then multiplying the product by (iii) the outstanding principal balance of the Facility B Note.

(e) The Facility B Note shall bear interest at the Default Rate at any time during which an Event of Default exists.

Section 5.3 Profit Participation Fee.

(a) Borrower shall pay to Lender, in addition to interest and all other amounts due hereunder, the Profit Participation Fee. The Profit Participation Fee shall be fully earned on the Effective Date, and shall be payable, subject to the Order of Priority, (i) on the Maturity Date, (ii) the earlier repayment of the Debt by acceleration or otherwise; or (iii) such earlier date as Borrower shall elect. For purposes of this Agreement and the Notes, "**Profit Participation Fee**" shall mean the greater of (i) $45,000,000, or (ii) thirty percent (30%) of the amount that is equal to the difference between: (x) the Current Value as determined in accordance with Section 5.3(d) below, less (y) the amount that is the lesser of (1) the outstanding principal balance of the Loan, or (2) the original face amount of the Notes (i.e., $125,138,327.83).

(b) The provisions of the preceding section notwithstanding, if Borrower elects to prepay the Profit Participation Fee (but not the Loan) in advance of the dates the fee would otherwise be payable in accordance with Sections 5.3(a) and 5.3(c), the Profit Participation Fee shall be calculated as follows:

(i) if the payment is made in full on or before March 31, 2010, the Profit Participation Fee shall be the amount that is the greater of (1) $35,000,000, or (2) the product obtained by dividing the Current Value by the 2009 Value (such quotient being hereafter referred to as the "**Fair Market Factor**"), then multiplying the Fair Market Factor by $35,000,000. ***By way of example only, if Borrower elects to pay the Profit Participation Fee on January 30, 2010, then the applicable Profit Participation Fee would be calculated as follows: assuming that the Current Value equals $300,000,000, then the Fair Market Factor would be equal to $300,000,000/$275,138,328, or 1.09. The Fair Market Factor (1.09) multiplied by $35,000,000 equals $38,162,622. In this instance, the amount of Profit Participation Fee would equal $38,162,622. If the Current Value equals $250,000,000, then the Fair Market Factor would be equal to $250,000,000/$275,138,328, or .91. The Fair Market Factor (.91) multiplied by $35,000,000 equals $31,850,000. In this instance, the amount of the Profit Participation Fee would equal $35,000,000.***

(ii) if the payment is made in full after April 1, 2010 but before September 30, 2011, the Profit Participation Fee shall be the amount that is the greater of (1) $40,000,000, or (2) the product obtained by dividing the Current Value by the 2009 Value to arrive at the Fair Market Factor, then multiplying the Fair Market Factor by $40,000,000.

(c) The foregoing provisions of this Sections 5.3 notwithstanding, if Borrower elects to prepay and retire the Loan and the Profit Participation Fee in advance of the Maturity Date, the fee shall be calculated as follows:

(i) if the pre-payment is made in full on or before March 31, 2010, the Profit Participation Fee shall be the amount that is the greater of (1) $15,000,000, or (2) the product obtained by dividing the Current Value by the 2009 Value to arrive at the Fair Market Factor, then multiplying the Fair Market Factor by $15,000,000.

(ii) if the pre-payment is made in full after April 1, 2010 but before September 30, 2011, the Profit Participation Fee shall be the amount that is the greater of (1) $20,000,000, or (2) the product obtained by dividing the Current Value by the 2009 Value to arrive at the Fair Market Factor, then multiplying the Fair Market Factor by $20,000,000.

(d) Current Value. Borrower and Lender acknowledge and agree that the fixed dollar component of the Profit Participation Fee calculation set forth in Sections 5.3(a), (b) and (c) above are based on the value of the Project being equal to approximately $275,138,328 ("**2009 Value**"). It is the intent of Borrower and Lender that the Profit Participation Fee shall be increased if, and to the extent that, the fair market value of the Project increases during the term of the Loan. Accordingly, Borrower and Lender agree that the following procedures shall govern the determination of Current Value for purposes of calculating the Fair Market Factor and the Profit Participation Fee.

(i) Borrower's Election to Prepay. If Borrower shall elect to prepay the Profit Participation Fee before the Maturity Date in accordance with either Section 5.3(b) or Section 5.3(c), then no later than thirty (30) days prior to the anticipated payment date, Borrower shall deliver to Lender written notice regarding Borrower's election and the anticipated date on which Borrower shall pay the Profit Participation Fee ("**Borrower's Election Notice**").

(ii) Lender's Election to Review Current Value; First Negotiation. Upon Lender's receipt of Borrower's Election Notice, if Lender believes that the then-current fair market value ("**Current Value**") of the Project is greater than the 2009 Value, Lender shall send a written notice to Borrower ("**Lender Notice**"), and the parties shall have five (5) business days from Borrower's receipt of such Lender Notice ("**Current Value Review Period**") to negotiate and agree on the Current Value of the Project. If the parties are able to agree on the Current Value, such amount shall then be used to calculate the Fair Market Factor and the Profit Participation Fee as set forth above.

(iii) Appraisal Methods. If Borrower and Lender do not agree upon the Current Value of the Project during the Current Value Review Period, then the Current Value shall be determined in accordance with one of the appraisal methods described below.

1. One Appraiser Method. First, Lender and Borrower shall have three (3) business days ("**Appointment Period**") to agree on the identity of an independent and qualified appraiser with not less than seven (7) years appraisal experience who is knowledgeable in commercial real estate in the Cabo San Lucas market ("**Appraiser**"). If the parties are able to reach agreement during the Appointment Period, they shall jointly engage the selected Appraiser, and shall charge such Appraiser to complete the appraisal within thirty (30) days and to deliver copies of the completed appraisal to both parties simultaneously. Borrower and Lender agree to share the cost of the appraisal equally and further agree that the Current Value of the Project, as determined by the Appraiser, shall be final and conclusive for purposes of determining the Fair Market Factor and the Profit Participation Fee.

2. Two Appraisal Method. If Borrower and Lender are unable to agree on the identity of an Appraiser within the Appointment Period, then no later than five (5) business days after the expiration of the Appointment Period, each party shall identify and engage a qualified Appraiser. Each party shall instruct the selected Appraisers to complete its appraisal within thirty (30) days and to deliver copies of the completed appraisal to both parties simultaneously. Upon completion of the two appraisals, Borrower and Lender shall have a second five (5) business day period to attempt to reach agreement on the Current Value of the Project. If the parties are able to agree on the Current Value, such amount shall then be used to calculate the Fair Market Factor and the Profit Participation Fee as set forth above. Borrower and Lender shall each bear the cost of its appointed Appraiser and shall share equally the cost of any third Appraiser appointed pursuant to Section 5.3(d)(iii)3 below.

3. Third Appraiser. If Borrower and Lender cannot agree on the Current Value within the five (5) business day period set forth in Section 5.3(d)(iii)2 above, then the two Appraisers shall agree on the appointment of a third Appraiser who shall determine

the Current Value of the Project taking into consideration any information provided by each of the initial two (2) Appraisers. The third (3rd) Appraiser shall determine the Current Value for purposes of calculating the Fair Market Factor and Profit Participation Fee; provided however that the Current Value determined by the third (3rd) Appraiser shall in no event be an amount greater than the highest value of the original two (2) Appraisals or less than the lowest value of the original two (2) Appraisals.

Section 5.4 Order of Priority. All payments made by Borrower shall be applied in the following order of priority: (i) first, to pay any accrued, unpaid interest at the Default Rate in respect of the Loan, (ii) second, to pay other amounts (*e.g.*, protective advances and the Breakage Fee) due in respect of the Loan, (iii) third, to pay current interest in respect of the Facility B Loan, (iv) fourth, to pay the outstanding principal balance of the Facility B Loan, (v) fifth, to pay the Non-Utilization Fee; (vi) sixth, to pay current interest in respect of the Facility A Loan and the Profit Participation Fee (on a pari passu basis), (vii) seventh, to pay the outstanding principal balance of the Facility A Loan.

## ARTICLE VI
## LOAN EXPENSE AND ADVANCES

Section 6.1 Loan and Administration Expenses.

Borrower shall reimburse Lender, from time to time upon five (5) days' demand therefor, for reasonable, out-of-pocket expenses incurred by Lender in connection with the Loan, including all amounts payable pursuant to Sections 6.2 and 6.3 hereof and any and all other fees owing to Lender pursuant to the Amended Loan Documents, and also including, without limitation: (i) all recording, filing and registration fees, (ii) all fees of the Trustee under the Trust Agreement, (iii) mortgage or documentary taxes, (iv) insurance premiums, title insurance premiums and other charges of Title Insurer or UCC Title Insurer, (v) premiums and fees payable in connection with the UCC Policy and the Title Policy, (vi) survey fees and charges, (vii) cost of premiums on surety company bonds, (viii) appraisal fees, (ix) insurance consultant's fees, (x) Lender's Consultant's fees, (xi) environmental consultant's fees and (xii) travel-related expenses, and (xii) all costs and expenses (including due diligence-related expenses and legal fees) reasonably incurred by Lender in connection with the preparation, negotiation, execution and delivery of the Amended Loan Documents and the other closing deliveries. Further, if any Default or Event of Default occurs or if the Loan is not paid in full when and as due, Borrower shall pay to Lender upon five (5) days' demand therefor, all costs and expenses of Lender (including, without limitation, reasonable attorneys' fees and court costs) incurred in attempting to enforce payment of the Loan or to realize upon the security therefor. Borrower agrees to pay Lender's fees and disbursements incurred in connection with title updates and title endorsements ordered by the Lender in connection with each disbursement of Loan proceeds.

Section 6.2 Brokerage Fees.

Borrower shall pay all brokerage, finder or similar fees or commissions payable in connection with the transactions contemplated hereby and shall indemnify and hold Lender harmless against all claims, liabilities, costs and expenses (including attorneys' fees and

expenses) incurred in relation to any claim by any broker, finder or similar person; provided however, as an inducement to Borrower to make the foregoing undertaking, Lender represents to Borrower that Lender has not dealt with any broker, finder or similar person in connection with this Loan.

Section 6.3 Protective Advances.

If Borrower fails to perform any of Borrower's covenants, agreements or obligations contained in this Agreement or any of the other Amended Loan Documents (after the expiration of applicable grace periods, except in the event of an emergency or other exigent circumstances), Lender may (but shall not be required to) perform any of such covenants, agreements and obligations, and any amounts expended by Lender in so doing shall be added to the Debt and bear interest at the Default Rate.

## ARTICLE VII
## CONDITIONS TO THE MAKING OF THE LOAN

Section 7.1 Conditions Precedent.

Lender's obligation to fund the First Draw and thereafter to make any further disbursements of the Facility B Loan is conditioned upon Borrower's satisfaction of the following conditions precedent in form and substance satisfactory to Lender.

(a) There shall exist no Default or Event of Default;

(b) Intentionally deleted;

(c) Intentionally deleted;

(d) Borrower shall have furnished Lender with the Title Policy, together with legible copies of all title exception documents cited in the Title Policy and all other legal documents affecting the Property or the use thereof;

(e) Borrower shall have furnished Lender with the UCC Policy;

(f) Borrower shall have furnished to Lender an updated ALTA/ACSM "Class A" Land Title Survey of the Land or its equivalent for the Property;

(g) Borrower shall have furnished Lender with a certificate from the appropriate Governmental Authority confirming that the Land is not subject to any "*ejido*" regime;

(h) Borrower shall have furnished Lender with policies or binders evidencing that Borrower has obtained and maintains insurance coverage in respect of Borrower and the Property in compliance with the requirements of Section 13.2 hereof, and paid all Insurance Premiums in respect thereof;

(i) All of the representations of Borrower set forth in Article III hereof shall be true and correct in all material respects;

(j) Borrower shall have furnished Lender with opinions from U.S. and Mexican counsel to Borrower and Borrower Parties as to:

(1) the due authorization, execution, delivery and enforceability of the Amended Loan Documents, as applicable;

(2) Kenneth Jowdy's authority to act on behalf of and bind Borrower and the Diamante Member;

(3) such other matters as Lender shall reasonably require.

(k) Borrower shall have furnished Lender with current bankruptcy, federal tax lien, litigation, judgment and UCC searches in respect of Borrower, Borrower Parties, and such other Persons as Lender shall require;

(1) Borrower shall have furnished Lender with current, certified annual financial statements of Guarantor and such other Persons as Lender shall require;

(m) Borrower shall have furnished and Lender shall have reviewed and approved the Environmental Report, the Geotechnical Report, or updates of such reports, and such other documents as Lender determines in its sole discretion.

(n) Borrower shall have furnished the required powers of attorney of Borrower in form acceptable to the Lender in accordance with the terms of the Amended and Restated Trust Agreement; and

(o) Borrower shall have furnished the irrevocable power of attorney in favor of the process agent appointed under the last paragraph of section 20.11 of this Agreement in a form acceptable to Lender.

## ARTICLE VIII
## CONDITIONS PRECEDENT TO THE FIRST DISBURSEMENT FOR CONSTRUCTION COSTS

Section 8.1 Required Construction Documents.

In addition to satisfying the requirements set forth in Article XI hereof, Borrower shall, as a condition to the first disbursement of proceeds of the Facility B Loan for Construction costs, submit each of the following to Lender, each of which shall be satisfactory to Lender in its sole discretion.

(a) Fully executed copies of: (i) the General Contract in respect of the Construction (or such portion thereof as Lender approves); (ii) Major Contracts representing not less than eighty percent (80%) of the aggregate dollar amount of all Construction Contracts in respect of the Construction (or such portion thereof as Lender approves); (iii) the Architect's Agreement and (iv) all contracts with engineers;

(b) A current annual financial statement of General Contractor, satisfactory to Lender and certified as being true, complete and correct by General Contractor;

(c) A schedule of values, including a trade payment breakdown, setting forth a description of all Construction Contracts;

(d) Evidence that the Project has been approved by the Mexican Federal Ministry of the Environment and Natural Resources ("SEMARNAT") and all other Governmental Authorities, including, without limitation, evidence that the Land has been rezoned from forestry and vegetation ("*forestal*") use to recreational tourist real estate use;

(e) All Permits then required in respect of the Construction;

(f) The Plans and Specifications;

(g) A Bond in favor of Lender, guaranteeing the obligations of General Contractor under the General Contract;

(h) The Construction Schedule;

(i) A report from Lender's Consultant which contains an analysis of the Plans and Specifications, the Construction Budget, the Construction Schedule, the General Contract and all Construction Contracts. Such report shall contain (i) an analysis demonstrating the adequacy of the Construction Budget to complete the Project, and (ii) a confirmation that the Construction Schedule is realistic. Lender's Consultant shall monitor construction of the Improvements and shall visit the site at least one (1) time each month, and shall certify as to amount of Construction costs for all requested advances. Borrower shall reimburse Lender from time to time for costs incurred by Lender in connection Lender's Consultant's performance of the foregoing;

(j) The Architect's Certificate, executed by the Architect;

(k) Consents from the General Contractor, the Architect and other Persons reasonably specified by Lender to the collateral assignment by Borrower to Lender of construction documents including, without limitation, the General Contract, the Architect's Agreement, engineering contracts, the Plans and Specifications and all permits, licenses and approvals in respect of the Project; and

(l) Such other materials and documents as Lender may reasonably require with respect to the Construction.

## ARTICLE IX
## CONSTRUCTION BUDGET

Section 9.1 Construction Budget.

Disbursements of the Facility B Loan shall be governed by the Construction Budget. The Construction Budget shall include, in addition to the Budget Line Items described in Section 9.2 below, the Contingency Reserve and the Tax and Insurance Reserve. Borrower shall not modify the Construction Budget without first obtaining Lender's prior written consent thereto.

Section 9.2 Budget Line Items.

(a) The Construction Budget includes as line items ("**Budget Line Items**") all Hard Costs and Soft Costs. All Facility B Loan proceeds disbursed by Lender shall be used only for the Budget Line Items for which such proceeds were disbursed.

(b) Lender shall not be obligated to disburse any amount for any category of costs set forth as a Budget Line Item which is greater than the amount set forth for such category in the applicable Budget Line Item. Borrower shall pay as they become due all amounts set forth in the Construction Budget with respect to costs to be paid by Borrower. If any Budget Line Item shall be completed without the expenditure of all amounts in the Construction Budget allocated to such Budget Line Item, Borrower may reallocate the savings, provided that: (i) Lender shall have theretofore approved a revised Construction Budget reflecting the reallocation of Budget Line Items; (ii) no Budget Line Item for Hard Costs shall be reallocated to pay any Budget Line Item for Soft Costs until Borrower has paid all Hard Costs and completed the Improvements; and (iii) amounts shall not be reallocated from the Tax and Insurance Reserve and/or the Contingency Reserve. Further, subject to the provisions of clauses (i) through (iii) above, Borrower may reallocate savings between unfinished Budget Line Items, provided that Lender determines, in its sole discretion, that such reallocation shall not result in an increase in the Construction Budget or otherwise cause the Construction Budget or any Budget Line Item to be out of Balance.

Section 9.3 Contingency Reserve.

The Construction Budget shall contain a Budget Line Item for additional, unforeseen costs and expenses ("**Contingency Reserve**"). Borrower may from time to time request that Lender permit the reallocation of portions of the Contingency Reserve to pay costs of the Improvements for which amounts remaining in any Budget Line Item are insufficient. Borrower agrees that the decision with respect to utilizing portions of the Contingency Reserve in order to keep the Loan in Balance shall be made by Lender in its sole discretion, and that Lender may require Borrower to make a Deficiency Deposit even if funds remain in the Contingency Reserve.

Section 9.4 Tax and Insurance Reserve.

The Construction Budget shall contain Budget Line Items for payment of Taxes and Insurance Premiums ("**Tax and Insurance Reserve**"). Borrower hereby authorizes Lender from time to time, for the mutual convenience of Lender and Borrower, to disburse Loan proceeds to pay Taxes and Insurance Premiums, to the extent then due and payable, regardless of whether Borrower shall have specifically requested disbursement of such amount. Any such disbursement, if made, shall be added to the outstanding principal balance of the Notes and shall, when disbursed, bear interest at the Interest Rate. The authorization hereby granted, however, shall not obligate Lender to make disbursements of the Loan for Taxes and Insurance Premiums, unless Borrower requests, and qualifies for, disbursement of the portion of the Construction Budget allocated therefor.

## ARTICLE X
## SUFFICIENCY OF LOAN

Section 10.1 Facility B Loan In Balance.

Anything contained in this Agreement to the contrary notwithstanding, the Facility B Loan shall at all times remain in Balance, on a Budget Line Item basis and in the aggregate. A Budget Line Item shall be deemed to be in "Balance" only if Lender, in its sole discretion, determines that the amount of such Budget Line Item is sufficient for its intended purpose. The Facility B Loan shall be deemed to be in Balance in the aggregate only when the total of the undisbursed portion of the Facility B Loan less the Contingency Reserve equals or exceeds the aggregate of: (i) the costs required to complete the Construction in accordance with the Plans and Specifications and the Construction Budget; (ii) the amounts to be paid as retainages to persons who have supplied labor or materials to the Project; (iii) the amount required to pay interest on the Facility A Loan and Facility B Loan through the Maturity Date; (iv) the amount required to pay Taxes and Insurance Premiums and through the Maturity Date and (v) all other Hard Costs and Soft Costs not yet paid for in connection with the Project, as such costs and amounts described in clauses (i) through (v) above may be estimated and/or approved in writing by Lender from time to time. If, in Lender's sole discretion, either any Budget Line Item or the aggregate amount of the undisbursed portion of the entire Facility B Loan is insufficient for such purpose, Borrower shall, within ten (10) days after written request by Lender, deposit the deficiency with Lender ("**Deficiency Deposit**"). The Deficiency Deposit shall first be exhausted before any further disbursement of the applicable Loan proceeds shall be made. Any Deficiency Deposit remaining after a particular Budget Line Item or the Facility B Loan, as the case may be, is back in Balance shall be returned to Borrower. Lender shall not be obligated to make any Facility B Loan disbursements if and for as long as the Facility B Loan is not in Balance.

## ARTICLE XI
## CONSTRUCTION PAYOUT REQUIREMENTS

Section 11.1 Documents to be Furnished for Each Disbursement.

As a condition precedent to each disbursement of Facility B Loan proceeds (other than the First Draw), Borrower shall furnish or cause to be furnished to Lender the following documents covering such disbursement, in form and substance satisfactory to Lender:

(a) A Requisition, duly executed by an Authorized Representative;

(b) An AIA form of cost certification, executed by the General Contractor, as to all Hard Costs included within the request for disbursement (all of which costs shall have been verified by Lender's Consultant);

(c) Such invoices, contracts or other information as Lender may require to evidence that Borrower has incurred all costs covered by the request for disbursement;

(d) Paid receipts or other proof of payment (including, with respect to Hard Costs, lien waivers or the equivalent) of all Construction costs covered by the prior disbursement of the Loan;

(e) An endorsement to the Title Policy though the date of the disbursement, confirming Lender's position first place beneficiary under the Trust Agreement, subject only to the Permitted Exceptions;

(f) Copies of any Change Orders executed since the date of the last disbursement;

(g) Copies of all Construction Contracts which have been executed since the last disbursement;

(h) All Permits then required in respect of the Construction; and

(i) Such other instruments, documents and information as Lender or Title Insurer shall require in their sole discretion.

Section 11.2 Retainage.

At the time of each disbursement of Facility B Loan proceeds, ten percent (10%) of the total amount then due the General Contractor and the various contractors under the Construction Contracts for Hard Costs shall be withheld from the amount disbursed. The retained amounts will be disbursed only at the time of the final disbursement of Facility B Loan proceeds pursuant to Article XII hereof. Notwithstanding the foregoing, Lender shall disburse to Borrower retained amounts in respect of any trade itemized in the Construction Budget if Lender determines, in its reasonable discretion, that such trade has been completed for not less than ninety (90) days,

provided, however, that until the final disbursement of Facility B Loan proceeds pursuant to Article XII hereof, in no event shall retained amounts equal less than five percent (5%) of Hard Costs theretofore advanced by Lender.

Section 11.3 Future Equity Requirement.

Borrower shall pay to Lender, in addition to any and all other amounts due hereunder, the Future Equity Requirement. The Future Equity Requirement shall be due and payable in accordance with the schedules set forth at Section 11.3(a) and 11.3(b) below. For purposes of this Agreement, "**Future Equity Requirement**" shall mean the payment obligation of Borrower equal to $4,000,000, or, if the Maturity Date of the Loan is extended in accordance with Section 4.3 above, an additional payment obligation equal to $4,000,000 during the extended term, such that the total Future Equity Requirement shall be $8,000,000 if the Maturity Date is so extended.

(a) Future Equity Requirement Payment Schedule During Initial Term of Loan. During the initial term of the Loan, Borrower shall pay the Future Equity Requirement in accordance with the following schedule:

(i) 2010 Future Equity Requirement.

1. On or before June 1, 2010, Borrower shall pay to Lender $1,000,000 towards the Future Equity Requirement; provided, however, if Borrower has generated an aggregate amount of $10,000,000 or more in sales (net of reasonable and customary closing expenses as approved by Lender) and such sales proceeds have been applied to the Loan in accordance with the Order of Priority, then this portion of the Future Equity Requirement shall be deemed satisfied by Borrower and no cash payment shall be required.

2. On or before November 1, 2010, Borrower shall pay to Lender $1,000,000 towards the Future Equity Requirement; provided, however, if Borrower has generated an additional, aggregate amount of $10,000,000 or more of sales (net of reasonable and customary closing expenses as approved by Lender) from and after the immediately preceding Future Equity Requirement payment date (June 1, 2010), and such sales proceeds have been applied to the Loan in accordance with the Order of Priority, then this portion of the Future Equity Requirement shall be deemed satisfied by Borrower and no cash payment shall be required.

(ii) 2011 Future Equity Requirement.

1. On or before June 1, 2011, Borrower shall pay to Lender $1,000,000 towards the Future Equity Requirement; provided, however, if Borrower has generated an additional, aggregate amount of $11,000,000 or more of sales (net reasonable and customary closing expenses as approved by Lender) from and after the immediately preceding Future Equity Requirement payment date (November 1, 2010), and such sales proceeds have been applied to the Loan in accordance with the Order of Priority, then this portion of the Future

Equity Requirement shall be deemed satisfied by Borrower and no cash payment shall be required.

2. On or before November 1, 2011, Borrower shall pay to Lender $1,000,000 towards the Future Equity Requirement; provided, however, if Borrower has generated an additional, aggregate amount of $12,000,000 or more of sales (net of reasonable and customary closing expenses as approved by Lender) from and after the immediately preceding Future Equity Requirement payment date (June 1, 2011), and such sales proceeds have been applied to the Loan in accordance with the Order of Priority, then this portion of the Future Equity Requirement shall be deemed satisfied by Borrower and no cash payment shall be required.

(b) Future Equity Requirement Payment Schedule During Extended Term. If the Maturity Date of the Loan is extended, then during the extended term of the Loan Borrower shall pay the Future Equity Requirement in accordance with the following payment schedule:

(i) 2012 Future Equity Requirement.

1. On or before June 1, 2012 Borrower shall pay $1,000,000 towards the Future Equity Requirement; provided, however, if Borrower has generated an additional $14,000,000 of sales (net of reasonable and customary closing expenses as approved by Lender) from and after the immediately preceding Future Equity Requirement payment date (November 1, 2011), and such sales proceeds have been applied to the Loan in accordance with the Order of Priority, this portion of the Future Equity Requirement shall be deemed satisfied by Borrower and no cash payment shall be required.

2. On or before November 1, 2012 Borrower shall pay $1,000,000 towards the Future Equity Requirement; provided, however, if Borrower has generated an additional $15,000,000 of sales (net of reasonable and customary closing expenses as approved by Lender) from and after the immediately preceding Future Equity Requirement payment date (June 1, 2012), and such sales proceeds have been applied to the Loan in accordance with the Order of Priority, then this portion of the Future Equity Requirement shall be deemed satisfied by Borrower and no cash payment shall be required.

(ii) 2013 Future Equity Requirement.

1. On or before June 1, 2013 Borrower shall pay $1,000,000 towards the Future Equity Requirement; provided, however, if Borrower has generated additional $16,000,000 of sales (net of reasonable and customary closing expenses as approved by Lender) from and after the immediately preceding Future Equity Requirement payment date (November 1, 2012), and such sales proceeds have been applied to the Loan in accordance with the Order of Priority, then this portion of the Future Equity Requirement shall be deemed satisfied by Borrower and no cash payment shall be required.

2. On or before November 1, 2013 Borrower shall pay $1,000,000 towards the Future Equity Requirement; provided, however, if Borrower has

generated an additional $17,000,000 of sales (net of reasonable and customary closing expenses as approved by Lender) from and after the immediately preceding Future Equity Requirement payment date (June 1, 2013), and such sales proceeds have been applied to the Loan in accordance with the Order of Priority, then this portion of the Future Equity Requirement shall be deemed satisfied by Borrower and no cash payment shall be required.

(c) Sales Targets. For purposes of this Section 11.3(c), "**Sales Target**" means any of the dollar figures for net sales applied to the payment of the Loan set forth in the numbered subparagraphs of clauses (i), (ii) and (iii) of this Section 11. Notwithstanding the contrary provisions of Section 11.3(b), if any Sales Target is only partially achieved, the related portion of the Future Equity Requirement shall still be deemed satisfied, but only partially, in strict proportion to the amount of the Sales Target that is achieved. Accordingly, if a Sales Target is only partially achieved, the related $1,000,0000 portion of the Future Equity Requirement shall be deemed satisfied in an amount calculated by multiplying $1,000,000 by a fraction, the numerator of which shall be the actual amount of sales generated by Borrower (net of reasonable and customary closing expenses as approved by Lender) from and after the immediately preceding Future Equity Requirement payment date (or in the case of the portion payable on or before June 1, 2010, from and after the Effective Date) and the denominator of which shall be such Sales Target, and Borrower shall be required to pay to Lender an amount equal to $1,000,000 less the amount deemed satisfied as aforesaid on the relevant payment date. ***By way of example only, if Borrower were to achieve $12,000,000 of net sales during the applicable period prior to November 1, 2012 and the net Sales Target for such period is $15,000,000, then the cash payment requirement due from Borrower to Lender would be reduced to $200,000 as follows: $12,000,000/$15,000,000, or .8, multiplied by $1,000,000 which equals $800,000, thereby reducing the $1,000,000 by $800,000 to $200,000.***

## ARTICLE XII
## FINAL DISBURSEMENT FOR CONSTRUCTION COSTS

Section 12.1 Final Disbursement for Construction Costs.

Lender will advance to Borrower the final disbursement for costs of Construction (including retainages) when the following conditions have been satisfied, provided that all other conditions in this Agreement for disbursements have also been satisfied:

(a) There shall exist no Default or Event of Default;

(b) The Improvements have been substantially completed in substantial accordance with the Plans and Specifications, free and clear of construction liens and security interests;

(c) Borrower shall have furnished Lender with a certificate from the Architect stating that (i) the Improvements have been substantially completed in accordance with the Plans and Specifications and (ii) the Improvements, as so substantially, completed comply with Laws

and any requirements imposed by SEMARNAT in connection with its approval of the Project; and

(d) Lender shall have received a certificate from Lender's Consultant for the sole benefit of Lender that the Improvements have been substantially completed in accordance with the Plans and Specifications.

Section 12.2 Retainage.

Notwithstanding the provisions of Section 12.1 hereof, the disbursement of the retainage shall be subject to the retention of such sums as Lender's Consultant shall determine are necessary to assure full completion of punch-list items. Upon the completion of such punch-list items, Lender shall disburse any remaining retainage to Borrower.

## ARTICLE XIII
## COVENANTS

Section 13.1 Certain Covenants.

(a) Inspections. Borrower will cooperate with Lender in arranging for inspections by Lender and/or Lender's consultant of the Property and the books and records of Borrower.

(b) Construction of the Improvements. Borrower shall perform the Construction in a good and workmanlike manner with materials of high quality and in substantial accordance with the Plans and Specifications. Borrower shall prosecute the Construction with due diligence and continuity in accordance with the Construction Schedule and shall substantially complete the Construction before the Completion Date.

(c) Change Orders. No changes will be made to the Plans and Specifications (any such change, a "**Change Order**") without the prior written approval of Lender; provided, however, that Borrower may make changes to the Plans and Specifications without Lender's consent if (i) Borrower notifies Lender in writing of such change within five (5) Business Days thereafter; (ii) Borrower obtains the approval of all parties whose approval is required, including sureties and Governmental Authorities; (iii) the structural integrity of the Improvements is not impaired; (iv) no material change in architectural appearance is effected; and (v) the cost of or reduction resulting from such change (x) does not exceed $50,000, and (y) when added to all other changes which have not been approved by Lender in writing, the resulting aggregate cost or reduction does not exceed $250,000. Changes in the scope of Construction or to any Construction Contract shall be documented with a Change Order on the AIA Form G701.

(d) Liens. Borrower will not suffer or permit any lien claims to be filed or otherwise asserted against the Property, and will promptly discharge the same in case of the filing of any claims for lien or proceedings for the enforcement thereof; provided, however, that Borrower may contest in good faith and with reasonable diligence the validity of any such lien or claim, provided that Borrower posts a statutory lien bond which removes such lien from title to

the Property within thirty (30) days after Borrower's receipt of written notice thereof. Lender will not be required to make any further disbursements of the proceeds of the Loan until any lien claims have been removed (by payment or by posting a bond) and Lender may, at its option, restrict disbursements to reserve sufficient sums to pay 150% of the lien. If Borrower shall fail timely to (i) discharge any such lien, or (ii) post a statutory lien bond, Lender may, at its election (but shall not be required to), procure the release and discharge of such lien and any judgment or decree thereon and, further, may in its sole discretion, settle or compromise the same, or may furnish such security or indemnity as Title Insurer shall require to insure Lender against the enforcement thereof, and any amounts so expended by Lender shall be added to the Debt. In settling, compromising or discharging any claims for lien, Lender shall not be required to inquire into the validity or amount of any such claim.

(e) Payment of Taxes. Borrower shall pay all Taxes and assessments and charges of every kind upon the Property before the same become delinquent; provided, however, that Borrower may pay such tax under protest or to otherwise contest any such tax or assessment, but only if (i) such contest has the effect of preventing the collection of such taxes so contested and also of preventing the sale or forfeiture of the Property or any part thereof or any interest therein, (ii) Borrower has notified Lender of Borrower's intent to contest such taxes and (iii) Borrower has deposited security for the payment of contested taxes in form and amount satisfactory to Lender. If Borrower fails to commence such contest or, having commenced to contest the same, thereafter fails to prosecute such contest in good faith or with due diligence, or, upon adverse conclusion of any such contest, shall fail to pay such tax, assessment or charge, Lender may, at its election (but shall not be required to), pay and discharge any such tax, assessment or charge, and any interest or penalty thereon, and any amounts so expended in excess of any security posted by Borrower shall be added to the Debt and bear interest at the Default Rate. Borrower shall furnish Lender with evidence that taxes are paid at least ten (10) days prior to the last date for payment of such taxes and before imposition of any penalty or accrual of interest. Notwithstanding the foregoing, Lender shall not assert a default for failure to pay Taxes, provided that (x) there exists no Event of Default and (y) adequate funds for the payment of Taxes and Insurance Premiums exist in the Tax and Insurance Reserve.

(f) Personal Property. Borrower shall keep all Personal Property incorporated in the Project free of all liens, encumbrances and security interests, other than the liens, encumbrances and security interests in favor of Lender created by the Amended Loan Documents.

(g) Leases. Without the prior written consent of Lender, Borrower shall not (i) enter into any Lease of all or any portion of the Property, (ii) materially modify or terminate (other than by reason of a default by the tenant thereunder) any Lease of any portion of the Property, or (iii) accept any rental payment in advance of one month of its due date. Borrower shall deposit all security deposits under Leases in a segregated account with a financial institution reasonably acceptable to Lender.

(h) Construction Contracts. Borrower shall not enter into, or materially modify, any Major Contract unless Borrower shall theretofore obtain Lender's prior written consent thereto. Promptly following its execution or modification thereof, Borrower shall

furnish Lender with a copy of each Construction Contract. Borrower shall timely perform its obligations under each Construction Contract. Promptly following its receipt thereof, Borrower shall furnish Lender with a copy of any material notice received or delivered by Borrower in respect of any Construction Contract including, without limitation, any notice of default.

(i) Appraisals. Borrower shall, within thirty (30) days after the date hereof, furnish Lender with a reliance letter in form reasonably satisfactory to Lender with respect of the Appraisal heretofore furnished to Lender. Lender may obtain a new or updated Appraisal of the Property from time to time. Borrower shall cooperate with Lender in this regard. Notwithstanding the foregoing, Lender shall not obtain a new or updated Appraisal more than once in any twelve (12) month period, unless either (i) an Event of Default exists, or (ii) such Appraisal is then required under the terms of this Agreement. Borrower shall reimburse Lender upon demand for the cost of any Appraisal obtained by Lender in accordance with the terms of this Section 13.1(i).

(j) Furnishing Information. Borrower shall deliver or cause to be delivered to Lender, within ninety (90) days after the end of each calendar year, (i) with respect to Borrower, an annual financial statement, in a form satisfactory to Lender, audited by an independent, certified public accountant reasonably satisfactory to Lender, and (ii) with respect to Guarantor, a personal financial statement, in a form satisfactory to Lender, certified as true and correct by the party to whom it relates. Within ten (10) days after request by Lender, Borrower shall deliver to Lender the most recently filed federal annual income tax returns with respect to Borrower (U.S. and Mexican) and Guarantor. Borrower and Guarantor shall provide such additional financial information as Lender reasonably requires. Upon reasonable advance notice from Lender, Borrower shall permit Lender to review all of Borrower's books and records regarding the development and operation of the Property. Notwithstanding the foregoing, Borrower's annual financial statement need only be reviewed, and not audited, by Borrower's accountant, until such time as Lender furnishes Borrower with notice that it has effectuated a Securitization or syndication of the Loan, whereupon Borrower shall be obligated to furnish Lender with audited, annual financial statements as provided above. Within ten (10) days after request from Lender, Borrower shall deliver an updated Construction Budget.

(k) Lost Notes. Upon Lender's delivery to Borrower of an affidavit to such effect, Borrower shall, if the Notes is mutilated, destroyed, lost or stolen, deliver to Lender, in substitution therefor, a new note or notes containing the same terms and conditions.

(l) Indemnification. Borrower shall indemnify Lender and its officers, directors, employees and consultants (each, an "**Indemnified Party**") and defend and hold each Indemnified Party harmless from and against all claims, injury, damage, loss and liability, cost and expense (including reasonable attorneys' fees and court costs) of any and every kind to any persons or property by reason of (i) the operation or maintenance of the Property; (ii) any breach of representation or warranty, default or Event of Default; or (iii) any other matter arising in connection with the Loan, the Improvements or the Property. No Indemnified Party shall be entitled to be indemnified against its own gross negligence or willful misconduct. The foregoing indemnification shall survive repayment of the Debt.

      (m) Compliance With Laws. Borrower shall comply with all Laws applicable to the Property including, without limitation, (i) any requirements imposed by SEMARNAT in connection with its approval of the Project, and (ii) Article 225 of the Mexican Income Tax Law.

(n) Furnishing Reports. Upon Lender's request, Borrower shall provide Lender with copies of all inspections, reports, test results and other information received by Borrower which in any way relate to the Property.

(o) Furnishing Notices. Borrower shall provide Lender with copies of all material notices received by Borrower pertaining to the Property, including notices from Governmental Authorities.

(p) Hold Disbursements in Trust. Borrower shall receive and hold in trust for the sole benefit of Lender (and not for the benefit of any other person including, but not limited to, contractors or any subcontractors) all advances made hereunder directly to Borrower, for the purpose of paying the cost of the Budget Line Item for which such disbursement was made. Borrower will pay all other costs, expenses and fees relating to the acquisition, equipping, use and operation of the Property.

(q) Alterations. Except in accordance with the approved Plans and Specifications, Borrower shall not make any material alterations to the Property.

(r) Cash Distributions. At all times until the Loan (including, without limitation, the Profit Participation Fee and the Non-Utilization Fee) is paid in full, Borrower shall not make any distributions to its shareholders, partners or members, other than the Development Fee. The foregoing shall not preclude the payment of salaries and other amounts contemplated by the Construction Budget.

(s) SRE Permit. Promptly following the execution and delivery hereof, Borrower shall request, on behalf of the Trust, that the Mexican Foreign Ministry issue a permit in respect of the Trust, as more particularly described in Clause Eighteenth of the Amended and Restated Trust Agreement ("**SRE Permit**"). Thereafter, Borrower shall comply with the provisions of Clause Eighteenth of the Amended and Restated Trust Agreement, until such time as the Mexican Foreign Affairs Ministry has issued the SRE Permit.

(t) Title Exceptions. Borrower shall obtain Lender's prior written consent to any homeowners' association agreement, condominium declaration, easement agreement or other agreement that would burden the Property, other than the Permitted Exceptions.

(u) Deliveries in English. Any and all documents, information, reports, contracts, or other such informational matters requested of Borrower by Lender shall be delivered in English or, if such information is generated and/or produced initially in Spanish, then together with an English translation.

(v) Golf Course Operations and Operating Revenue.

(i) Within ninety (90) days following the Effective Date, and thereafter before each April 1st during the term of the Loan, Borrower shall provide to Lender an annual operating budget for the Golf Course Operations. In addition, Borrower shall maintain (or cause to be maintained by any operator) true, accurate and complete financial records in accordance with GAAP consistently applied. Borrower shall permit or arrange, as applicable, with reasonable advance notice, any authorized representative designated by Lender to visit and inspect any of the books and records of Borrower and any operator (including, without limitation, its books of account, records, correspondence and other papers and to make extracts therefrom) during business hours and to discuss the affairs, finances and accounts of Borrower and any operator with the respective officers and the respective independent certified public accountant or other parties preparing statements for or on behalf of the Borrower and any operator. Lender shall have the right to have an audit made of Borrower's and any operator's books and records pertaining to all receipts and Golf Course Revenue. Borrower shall promptly pay Lender any deficiency found in Borrower's payment of Net Operating Revenue (as hereinafter defined). Borrower shall pay for any and all reasonable costs and fees of such audit within fifteen (15) days after notice from Lender.

(ii) Borrower shall pay to Lender, in addition to all other amounts due hereunder all Net Operating Profit generated by the Golf Course Operations. Net Operating Profit shall be due and payable in accordance with the remittance schedule set forth below and shall be paid to Lender by deposit into the Collection Account. For purposes of this Agreement "**Net Operating Profit**" shall mean all revenues received and/or generated during the specified period of time by the Golf Course Operations, net of (A) reasonable and customary expenses incurred by the Golf Course Operations during the specified period, and (B) reasonable reserves established by Borrower for the payment of estimated taxes due in connection with the Golf Course Revenue received during the specified period, all as approved by Lender. Net Operating Profit shall be paid to Lender for application to the Loan in the Order of Priority as follows:

1. For calendar year 2009, Borrower shall deliver to Lender annual reports and remittances in accordance with the following schedule: No later than February 1, 2010, Borrower shall deliver to Lender a written report describing in reasonable detail the Net Operating Profit for the applicable period of time; and no later than February 15, 2010, Borrower shall remit to Lender the Net Operating Profit for calendar year 2009 by payment of the same into the Collection Account.

2. For calendar year 2010, Borrower shall deliver to Lender semi-annual written reports and remittances in accordance with the following schedule: No later than August 1, 2010 and February 1, 2011, Borrower shall deliver to Lender written reports describing in reasonable detail the Net Operating Profit for the semi-annual periods of (A) January 1 through June 30, and (B) July 1 though December 31; and no later than August 15, 2010 and February 15, 2011, Borrower shall remit to Lender the Net Operating Profit for such semi-annual period by payment of the same into the Collection Account.

3. For calendar year 2011 through the Maturity Date (as it may be extended), Borrower shall deliver to Lender quarterly written reports and remittances in accordance with the following schedule: No later than May 1, 2011, August 1, 2011,

CONFIDENTIAL

November 1, 2011 and February 1, 2012 (and, during any extension period, no later than May 1, August 1, November 1, and February 1 for calendar years 2013 and 2014 respectively), Borrower shall deliver to Lender a written report describing in reasonable detail the Net Operating Profit for the quarterly periods of (A) January 1 through March 31, (B) April 1 through June 30, (C) July 1 through September 30, and (D) October 1 through December 31; and no later than May 15, 2012, August 15, 2012, November 15, 2012, and February 15, 2012 (and, during any extension period, no later than May 15, August 15, November 15, and February 15 for calendar years 2013 and 2014 respectively), Borrower shall remit to Lender the Net Operating Profit for such quarterly period by payment of the same into the Collection Account.

(w) Spanish Translation of Loan Documents.

(i) A Spanish translation of this Agreement shall be prepared by Lender's Mexican counsel and delivered to Borrower's Mexican counsel within sixty (60) days following the Effective Date. If such translation is not approved or disapproved by Borrower's Mexican counsel within ninety (90) days following the date of receipt, then the translation prepared by Lender's Mexican counsel shall be deemed to be approved.

(ii) Subject to the provisions of Section 13.1(w)(i), if such translation is disapproved by Borrower's Mexican counsel within the time period set forth in Section 13.1(w) (i), then Lender and Borrower shall use commercially reasonable efforts to promptly resolve any disagreement respecting such translation. Once approved or deemed approved, the Spanish translation shall include the following statement from the Borrower: ***"The Spanish translation is hereby expressly accepted by the Borrower, and Borrower hereby expressly and irrevocably (i) acknowledges and agrees to accept the Spanish translation as a valid translation of this Agreement; and (ii) waives any right it may have to challenge the validity or accuracy of the Spanish translation or any provision thereof."***

(iii) Notwithstanding the foregoing provisions of this Section 13.1(w), if for any reason a mutually satisfactory Spanish translation of this Agreement or any Amended Loan Document, is not agreed upon by Borrower and Lender at any time when Lender has begun to exercise its remedies under the Amended Loan Documents, then Lender shall be entitled, without Borrower's consent, review or approval, to request the corresponding Spanish translation to be made by any of (1) Victor Hermosillo Perez, Francisco J. Laguardia Pulido or Araceli Ruiz Vivanco, all of whom are sworn translators licensed in Mexico, Federal District, to translate this Agreement into Spanish, or (2) if none of such translators is available, any other sworn translator approved by the Superior Tribunal of Justice of the Federal District (*Tribunal Superior de Justicia del Distrito Federal*). Any such Spanish translation shall be expressly accepted by the Borrower, and Borrower hereby expressly and irrevocably (A) acknowledges and agrees to accept the Spanish translation prepared by such persons as a valid translation of this Agreement, and (B) waives any right it may have to challenge the validity or accuracy of the Spanish translation or any provision thereof.

Section 13.2 Insurance.

(a) Borrower shall obtain and maintain, or cause to be maintained, insurance for Borrower and the Property as follows:

(i) comprehensive all risk insurance on the Improvements and the Personal Property, including contingent liability from Operation of Building Laws, Demolition Costs and Increased Cost of Construction Endorsements, in each case (A) in an amount equal to one hundred percent (100%) of the "Full Replacement Cost," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) with a waiver of depreciation; (B) containing an agreed amount endorsement with respect to the Improvements and Personal Property; (C) permitting no deductible in excess of $25,000, except for the deductible for hurricane, earthquake, volcano and flood insurance which is customarily a percentage of the face value of the policy not to exceed five percent (5%) of the replacement cost value, and waiving all co-insurance provisions (unless coverage is in an amount not less than 100% of the full replacement cost of the Improvements and Personal Property insured); and (D) containing an "Ordinance or Law Coverage" or "Enforcement" endorsement if any of the Improvements or the use of the Property shall at any time constitute legal non-conforming structures or uses. In addition, Borrower shall obtain earthquake insurance in amounts and in form and substance satisfactory to Lender in the event the Property is located in an area with a high degree of seismic activity.

(ii) commercial general liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (A) permitting a deductible acceptable to Lender, (B) to be on the so-called "occurrence" form with a combined limit, of not less than $2,000,000, (C) to continue at not less than the aforesaid limit until required to be changed by Lender in writing by reason of changed economic conditions making such protection inadequate; and (D) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) contractual liability for legal contracts; and (5) contractual liability covering the indemnities contained in Loan Agreement;

(iii) employer's liability insurance in an amount not less than $1,000,000 and worker's compensation insurance in accordance with all applicable laws and regulations;

(iv) at all times during which structural construction, repairs or alterations are being made to the Improvements, (A) owner's contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the above mentioned commercial general liability insurance policy; and (B) the insurance provided for in subsection (i) above written in a so-called builder's risk completed value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to subsection (i) above, (3) including permission to occupy the Improvements, and (4) with an agreed amount endorsement waiving co-insurance provisions (unless coverage is in an amount not less than 100% of the full replacement cost of the Improvements and Personal Property insured);

(v) comprehensive boiler and machinery insurance, if applicable, in amounts as shall be reasonably required by Lender on terms consistent with the commercial property insurance policy required under subsection (i) above;

(vi) umbrella liability insurance in an amount not less than $25,000,000, on an occurrence basis and on an aggregate basis, on terms consistent with the commercial general liability insurance policy required under subsection (ii) above;

(vii) motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence, including umbrella coverage, of $25,000,000; and

(viii) upon thirty (30) days' written notice from Lender, such other reasonable insurance, in such reasonable amounts, as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Property located in or around Cabo San Lucas, Mexico.

(b) All insurance provided for in Section 13.2(a) hereof shall be obtained under valid and enforceable policies (collectively, "**Policies**" or in the singular, "**Policy**"), shall be subject to the approval of Lender as to insurance companies, amounts, deductibles, loss payees and insureds, and shall be enforceable in the United States of America. The Policies shall be issued by financially sound and responsible insurance companies authorized to do business in the state of Baja California Sur and having a claims paying ability rating of "A" or better by S&P or "A2" or better by Moody's. The Policies described in Section 13.2(a) (other than those strictly limited to liability protection) shall designate Lender as loss payee. Not less than thirty (30) days prior to the expiration dates of the Policies theretofore furnished to Lender, certificates of insurance evidencing the renewal of the Policies, accompanied by evidence satisfactory to Lender of payment of the premiums thereunder ("**Insurance Premiums**"), shall be delivered by Borrower to Lender. Notwithstanding the foregoing, Lender shall not assert a default for failure to pay Insurance Premiums, provided that (x) there exists no Event of Default and (y) adequate funds for the payment of Taxes and Insurance Premiums exist in the Tax and Insurance Reserve.

(c) Any blanket insurance Policy shall specifically allocate to the Property the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Section 13.2(a) hereof.

(d) All Policies of insurance provided for by Section 13.2(a) hereof shall name Borrower as the insured and Lender as the additional insured, as their respective interests may appear, and in the case of property damage, boiler and machinery, flood and earthquake insurance, shall contain a so-called New York standard non-contributing mortgagee clause in favor of Lender providing that the loss thereunder shall be payable to Lender.

(e) All Policies of insurance provided for in Section 13.2(a) hereof shall contain clauses or endorsements to the effect that:

       (i) the Policy shall not be materially changed (other than to increase the coverage provided thereby) or canceled without at least thirty (30) days' prior written notice to Lender and any other party named therein as an additional insured;

(ii) the issuers thereof shall give written notice to Lender if the Policy has not been renewed fifteen (15) days prior to its expiration; and

(iii) Lender shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder.

(f) If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, without notice to Borrower, to take such action as Lender deems necessary to protect its interest in the Property including, without limitation, the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate. All Insurance Premiums incurred by Lender in taking such action or obtaining such insurance shall be added to the Debt and shall bear interest at the Default Rate.

(g) Notwithstanding the foregoing, Lender shall not assert a default for failure to pay Insurance Premiums, provided that (i) there exists no Event of Default, and (ii) adequate funds for the payment of Insurance Premiums exist in the Tax and Insurance Reserve.

Section 13.3 Special Purpose Covenants.

(a) The purpose for which Borrower is organized is and shall be limited solely to (i) owning, holding, constructing, selling, leasing, transferring, exchanging, operating and managing the Property, (ii) entering into this Agreement and the other Amended Loan Documents, and (iii) transacting any business that is incident, necessary and appropriate to accomplish the foregoing.

(b) Borrower has not owned, does not own and will not own any asset or property other than (i) the Property, and (ii) incidental personal property necessary for and used or to be used in connection with the ownership or operation of the Property.

(c) Borrower has not engaged in and will not engage in any business other than the ownership, construction, management and operation of the Property.

(d) Borrower has not entered and will not enter into any contract or agreement with any Affiliate of Borrower, any constituent party of Borrower, any guarantors of the obligations of Borrower or any Affiliate of any constituent party, owner or guarantor (collectively, "**Related Parties**"), except upon terms and conditions that are intrinsically fair, commercially reasonable and substantially similar to those that would be available on an arms-length basis with third parties not so affiliated with Borrower or such Related Parties.

(e) Except for the Loan, Borrower shall neither incur nor guarantee any indebtedness (whether personal or non-recourse, secured or unsecured) other than customary

trade payables contemplated by the Budget, aged not in excess of sixty (60) days, and unsecured loans from members of Borrower that are subordinate to the Loan.

(f) Borrower has not made and will not make any loans or advances to any Person and shall not acquire obligations or securities of any Related Party.

(g) Borrower is and will remain solvent and Borrower will pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due.

(h) Borrower has done or caused to be done and will do all things necessary to observe organizational formalities and preserve its existence, and Borrower will not, nor will Borrower permit any Related Party to, amend, modify or otherwise change the partnership certificate, partnership agreement, articles of incorporation and bylaws, operating agreement, trust or other organizational documents of Borrower or such Related Party without the prior written consent of Lender.

(i) Borrower has maintained and will maintain all of its books, records, financial statements and bank accounts separate from those of any other Person and Borrower's assets will not be listed as assets on the financial statement of any other Person. Borrower has filed and will file its own tax returns and will not file a consolidated federal income tax return with any other Person. Borrower shall maintain its books, records, resolutions and agreements as official records.

(j) Borrower will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other Person (including any Affiliate or other Related Party), shall correct any known misunderstanding regarding its status as a separate entity, shall conduct business in its own name, shall not identify itself or any of its Affiliates as a division or part of the other and shall maintain and utilize a separate telephone number and separate stationery, invoices and checks.

(k) Borrower will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations.

(l) Neither Borrower nor any Related Party will seek the dissolution, winding up, liquidation, consolidation or merger in whole or in part of Borrower, or the sale of material assets of Borrower.

(m) Borrower has not commingled and will not commingle its assets with those of any other Person and will hold all of its assets in its own name;

(n) Borrower has not guaranteed and will not guarantee or become obligated for the debts of any other Person and does not and will not hold itself out as being responsible for the debts or obligations of any other Person.

(o) Borrower shall allocate fairly and reasonably any overhead expenses that are shared with an Affiliate, including paying for office space and services performed by any employee of an Affiliate or Related Party.

(p) Borrower shall not pledge its assets for the benefit of any Person, other than Lender.

(q) Borrower shall maintain a sufficient number of employees in light of its contemplated business operations and pay the salaries of employees from its own funds and the proceeds of the Loan.

(r) Borrower shall not engage, hire or contract with any employees, all of whom shall be engaged or hired by a third party approved by Lender.

## ARTICLE XIV
## CASUALTY AND CONDEMNATION

Section 14.1 Lender's Election to Apply Proceeds to the Debt.

(a) Subject to the provisions of Section 14.1(b) below, Lender may elect to apply to the Debt, in the Order of Priority, all proceeds of insurance or condemnation (individually and collectively referred to as "**Proceeds**"), after deduction of all expenses of collection and settlement, including attorneys' and adjusters' fees and charges. Any Proceeds remaining after repayment of the indebtedness under the Amended Loan Documents shall be paid by Lender to Borrower.

(b) Notwithstanding anything in Section 14.1(a) to the contrary, in the event of any casualty to the Improvements or any condemnation of part of the Property, Lender agrees to make the Proceeds available for restoration of the Improvements if (i) no Default or Event of Default exists, (ii) all Proceeds are deposited with Lender, (iii) in Lender's reasonable judgment, the amount of Proceeds available for restoration of the Improvements (together with undisbursed proceeds of the Loan or other security acceptable to Lender deposited with Lender by Borrower for such purpose) is sufficient to pay the full and complete costs of such restoration, (iv) in Lender's reasonable determination, the Property can be restored to an architecturally and economically viable project in compliance with applicable Laws, and (v) in Lender's reasonable judgment, following the restoration of the Property, the Loan to Value Ratio shall not exceed 75%.

Section 14.2 Borrower's Obligation to Rebuild.

(a) If Lender does not elect (or does not have the right) to apply the Proceeds to the Debt, as provided in Section 14.1 above, Borrower shall:

(i) Proceed with diligence to make settlement with insurers or Governmental Authorities and cause the Proceeds to be deposited with Lender;

(ii) In the event of any delay in making settlement with insurers or Governmental Authorities or effecting collection of the Proceeds, deposit with lender such amount as Lender reasonably deems appropriate to insure the timely restoration of the Property;

(iii) If the Proceeds and the undisbursed balance of the Loan are insufficient to keep the Loan in Balance, promptly deposit with Lender any amount necessary to restore the Loan to Balance; and

(iv) Promptly proceed with the resumption of Construction of the Improvements and restore the Property to its former condition.

(b) Any request by Borrower for a disbursement by Lender of Proceeds and funds deposited by Borrower shall be treated by Lender as if such request were for an advance of the Loan hereunder, and the disbursement thereof shall be conditioned upon Borrower's compliance with and satisfaction of the same conditions precedent as would be applicable under this Agreement for an advance of the Loan.

## ARTICLE XV
## TRANSFERS

Section 15.1 Prohibition of Assignments and Transfers by Borrower.

Borrower shall not assign its rights under this Agreement and any purported assignment shall be void. Except to the extent permitted pursuant to Article 16 hereof, Borrower shall not, without first obtaining the prior written consent of Lender (which consent may be withheld by Lender in its sole discretion), suffer or permit (a) any change in the management (whether direct or indirect) of the Property or of Borrower or (b) any Transfer. Notwithstanding the foregoing to the contrary, the following Transfers shall be permitted without the need for any such Lender approval: (i) Transfers to Lender or any other party by reason of Lender's exercise of its remedies under the Pledge Agreements; and (ii) Transfers of direct or indirect ownership interests in Borrower by any of its constituent members as of the date hereof if made to effect bona fide estate planning needs, so long as following any such transfer pursuant to this clause (y), no more than 70% of the beneficial economic interest in Borrower (whether directly or indirectly) has been transferred in the aggregate and Control of Borrower has not changed, provided, further, that in connection with any permitted Transfer pursuant to this Section 15.1, Lender receives: (i) all documentation evidencing the Transfer; (ii) confirmation that such Transfer shall not cause a breach of the representation made by Borrower in Section 3.1(v) hereof, in respect of OFAC, (ii) evidence satisfactory to Lender that the Transfer does not derogate in any way from the liens and security interests created by the Pledge Agreements, or otherwise impair Lender's first priority security interest thereunder; (iii) an endorsement to the UCC Policy to the effect that, after giving effect to the Transfer, Borrower retains a first priority security interest in the collateral under the Pledge Agreements; and (iv) payment for all out-of-pocket expenses incurred by Lender in connection with its review of the Transfer documentation and the issuance of the endorsement to the UCC Policy. Lender's consent if given in connection with any Transfer request shall not be deemed to be a waiver of Lender's right to require such

consent in the future. Any Transfer made in contravention of this Agreement shall be null and void and of no force or effect.

Section 15.2 Prohibition of Transfers in Violation of ERISA.

In addition to the prohibitions set forth in Section 15.1 above, Borrower shall not permit any Transfer, if such Transfer would cause the Loan, or the exercise of any of Lender's rights in connection therewith, to constitute a prohibited transaction under ERISA or the Internal Revenue Code or otherwise result in Lender being deemed in violation of any applicable provision of ERISA. Borrower agrees to indemnify and hold Lender free and harmless from and against all losses, costs (including attorneys' fees and expenses), taxes, damages (including consequential damages) and expenses Lender may suffer by reason of the investigation, defense and settlement of claims and in obtaining any prohibited transaction exemption under ERISA necessary or desirable in Lender's sole judgment or by reason of a breach of the foregoing prohibitions. The foregoing indemnification shall be a recourse obligation of Borrower and shall survive repayment of the Debt, notwithstanding any limitations on recourse contained herein or in any of the Amended Loan Documents.

Section 15.3 Successors and Assigns.

Subject to the foregoing restrictions on Transfers contained in this Article 15, this Agreement shall inure to the benefit of, and shall bind, the parties hereto and their respective successors and assigns.

## ARTICLE XVI
## SPECIAL PROVISIONS RE: PARTICULAR PHASES

Section 16.1 Phases and Opportunity.

(a) Borrower has advised Lender that it may wish to convey one or more Phases or portions thereof (including single family home lots or villas) to a third party purchaser or purchasers unaffiliated with Borrower or any Borrower Party prior to the Maturity Date (as the same may be extended in accordance with the terms hereof). Lender hereby agrees that, upon the request of Borrower from time to time, it shall cause Trustee to release the lien of the Trust Agreement from the applicable Phase (or portion thereof) upon the consummation of a bona fide, third party sale to a party other than an Affiliate of Borrower or any of Borrower Party, provided that:

(i) there shall then be no Default or Event of Default;

(ii) Borrower shall pay to Lender an amount in respect of the applicable Phase (or portion thereof) equal to the greater of (A) the applicable Release Price, or (B) the net sale proceeds (*i.e.*, gross sale proceeds less reasonable and customary closing expenses approved by Lender, including brokerage commissions), for prompt application by Lender in the Order of Priority;

(iii) Borrower has theretofore subjected the Property (or such portions thereof as Lender shall require) to an REA;

(iv) Borrower shall have theretofore caused the applicable Phase (or portion thereof) to be lawfully subdivided, in a manner reasonably acceptable to Lender, for real estate, zoning and other purposes required by Laws;

(v) Borrower (or the purchaser) shall pay all transfer taxes, trustees fees and other amounts associated with the conveyance of the Phase (or portion thereof);

(vi) Borrower furnishes Lender with an endorsement to the Title Policy, insuring Lender's interest as first place beneficiary under the Trust Agreement in respect of the remainder of the Property, subject only to the Permitted Exceptions;

(vii) in respect of any conveyance of a portion of a Phase, Lender, acting reasonably, shall have concluded that such conveyance shall not impair the development of the remainder of the Phase; and

(viii) Borrower reimburses Lender for all fees and expenses (including, without limitation, reasonable attorneys' fees) incurred by Lender in connection with evaluating and effectuating such release.

The term "**Release Price**" shall mean an amount equal to 100% of the fair market value of such released parcel, as determined by Lender in its sole discretion, net of reasonable and customary closing expenses approved by Lender, including brokerage commissions. Upon Lender's request therefor, Borrower shall execute such instrument as Lender shall require to establish the Release Price in respect of a Phase (or portion thereof). Any and all amounts paid to Lender shall be applied promptly by Lender in the Order of Priority.

(b) Borrower has further advised Lender that it may wish to either commence "vertical" improvements or pre-development improvements not contemplated by the Construction Budget in respect of one or more Phases prior to the Maturity Date (as the same may be extended in accordance with the terms hereof). As consideration for Lender's agreement to make the Loan, Borrower hereby irrevocably grants Lender a first opportunity to consider, make or refuse each and every loan, financing opportunity or equity investment in any new or restructured financing, equity investment or recapitalization contemplated by Borrower (or its affiliates) with respect to any such Phase (each, an "**Opportunity**"). If Borrower wishes to enter into an Opportunity, Borrower shall promptly notify Lender in writing of all of the material terms thereof and shall thereafter attempt to negotiate in good faith with Lender a mutually satisfactory agreement with respect to Lender's involvement in the Opportunity. If Lender fails to respond to Borrower's notice of an Opportunity within fifteen (15) days after Lender's receipt thereof (or the parties, notwithstanding Borrower's compliance with the provisions of this Section 16.1, fail to agree upon the terms of the Opportunity within thirty (30) days after Borrower's receipt of Lender's acceptance of an Opportunity), Lender shall be deemed to have waived the Opportunity. Notwithstanding the foregoing provisions of this Section 16.1, Lender shall not be deemed to have waived an Opportunity by reason of its failure to respond to

Borrower's notice thereof unless such notice states, in capital letters, that Lender's failure to respond thereto in the time provided shall result in the waiver of its rights. Borrower shall not contact or engage any party other than Lender in connection with an Opportunity unless Lender has theretofore waived its rights in respect of such Opportunity in writing or otherwise consents in writing thereto. If Lender waives (or is deemed to have waived) its Opportunity in respect of a Phase, Lender shall release its lien if, and only if, Borrower satisfies the terms and conditions relating to the release of a parcel set forth in Section 16.1(a).

Section 16.2 Opportunities upon Maturity or Sooner Prepayment.

The provisions of Section 16.1 hereof shall apply to any Opportunity contemplated by Borrower in respect of the Property upon the maturity of the Loan or any sooner prepayment of the Loan.

## ARTICLE XVII
## SERVICER

Section 17.1 Servicer. At the option of Lender, the Loan may be serviced by a servicer or trustee ("**Servicer**") selected by Lender and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Amended Loan Documents to the Servicer pursuant to a servicing agreement ("**Servicing Agreement**") between Lender and Servicer. Borrower shall be responsible for any reasonable set-up fees or any other initial costs relating to or arising under the Servicing Agreement. Thereafter, Borrower shall reimburse Lender for the monthly servicing fees payable under the Servicing Agreement ("**Servicing Fees**"). Borrower shall further reimburse Lender upon demand for reasonable out-of-pocket costs and expenses incurred by Servicer in (i) reviewing Borrower's requisitions for advances of the Loan, (ii) reviewing proposed Leases, (iii) conducting inspections of the Property, (iv) applying the provisions of this Agreement to any casualty or condemnation proceeding affecting the Property, (v) responding to any Default or Event of Default, or (vi) otherwise incurred in connection with this Agreement.

## ARTICLE XVIII
## EVENTS OF DEFAULT

Section 18.1 Events of Default.

The occurrence of any one or more of the following shall constitute an "**Event of Default**" as said term is used herein:

(a) Failure of Borrower (i) (A) to make any payment of principal, interest, the Profit Participation Fee, the Breakage Fee, the Non-Utilization Fee, the Future Equity Requirement, and any periodic payments of Net Operating Revenue due hereunder or under the other Amended Loan Documents of, when due, or (B) for a period of ten (10) days after written notice from Lender that the same is due and payable, to observe or perform any of the other covenants or conditions by Borrower to be performed under the terms of this Agreement or any other Amended Loan Document concerning the payment of money, or (ii) for a period of

thirty (30) days after written notice from Lender, to observe or perform any non-monetary covenant or condition contained in this Agreement or any other Amended Loan Documents; provided that if any such failure concerning a non-monetary covenant or condition is susceptible to cure and cannot reasonably be cured within said thirty (30) day period, then Borrower shall have an additional sixty (60) day period to cure such failure and no Event of Default shall be deemed to exist hereunder so long as Borrower commences such cure within the initial thirty (30) day period and diligently and in good faith pursues such cure to completion within such resulting ninety (90) day period from the date of Lender's notice; and provided further that if a different notice or grace period is specified under any other subsection of this Section 18.1 with respect to a particular breach, or if another subsection of this Section 18.1 applies to a particular breach and does not expressly provide for a notice or grace period, the specific provision shall control;

(b) Any Transfer or other disposition in violation of Article XV hereof;

(c) If any warranty, representation, statement, report or certificate made now or hereafter by Borrower, Diamante Member, or any of the Jowdy Parties is untrue or incorrect in any material respect at the time made or, subject to the provisions of Section 3.2 hereof, deemed remade;

(d) Borrower or any Guarantor shall commence a voluntary case concerning Borrower or Guarantor under the Bankruptcy Code; or an involuntary proceeding is commenced against Borrower or Guarantor under the Bankruptcy Code and relief is ordered against the applicable party, or the petition is controverted but not dismissed or stayed within sixty (60) days after the commencement of the case, or a custodian (as defined in the Bankruptcy Code) is appointed for or takes charge of all or substantially all of the property of Borrower or Guarantor; or Borrower or Guarantor commences any other proceedings under any reorganization, arrangement, readjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar Law of any jurisdiction whether now or hereafter in effect relating to Borrower or Guarantor; or there is commenced against Borrower or Guarantor any such proceeding which remains undismissed or unstayed for a period of sixty (60) days; or Borrower or Guarantor fails to controvert in a timely manner any such case under the Bankruptcy Code or any such proceeding, or any order of relief or other order approving any such case or proceeding is entered; or Borrower or Guarantor by any act or failure to act indicates its consent to, approval of, or acquiescence in any such case or proceeding or the appointment of any custodian or the like of or for it for any substantial part of its property or suffers any such appointment to continue undischarged or unstayed for a period of sixty (60) days;

(e) Borrower or Guarantor shall make an assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts generally as they become due, or shall consent to the appointment of a receiver or trustee or liquidator of all of its property or the major part thereof or if all or a substantial part of the assets of Borrower or Guarantor are attached, seized, subjected to a writ or distress warrant, or are levied upon, or come into the possession of any receiver, trustee, custodian or assignee for the benefit of creditors;

(f) One or more final, unappealable judgments are entered (i) against Borrower in amounts aggregating in excess of $100,000, or (ii) against Guarantor in amounts aggregating in excess of $250,000, and said judgments are not satisfied, stayed or bonded over within thirty (30) days after entry;

(g) Borrower's failure to pay Taxes in accordance with Section 13.1(e) of this Agreement;

(h) Borrower's failure to pay any trustees' fees as and when due;

(i) Borrower's failure to pay any Insurance Premium or otherwise maintain insurance as required pursuant to Section 13.2 of this Agreement; and

(j) The occurrence of any other event or circumstance denominated as an Event of Default in this Agreement or under any of the other Amended Loan Documents and the expiration of any applicable grace or cure periods, if any, specified for such Event of Default herein or therein, as the case may be.

## ARTICLE XIX
## LENDER'S REMEDIES IN EVENT OF DEFAULT

Section 19.1 Remedies Conferred Upon Lender.

Upon the occurrence of any Event of Default, Lender may pursue any one or more of the following remedies concurrently or successively, it being the intent hereof that none of such remedies shall be to the exclusion of any other:

(a) Withhold further disbursement of the proceeds of the Loan and/or terminate Lender's obligations to make further disbursements hereunder;

(b) Declare the Notes to be immediately due and payable;

(c) Exercise all of Lender's rights under the Amended and Restated Trust Agreement and/or Pledge Agreements; and

(d) Exercise or pursue any other remedy or cause of action permitted under this Agreement or any other Amended Loan Documents, or conferred upon Lender by Laws.

## ARTICLE XX
## GENERAL PROVISIONS

Section 20.1 Captions.

The captions and headings of various Articles, Sections and subsections of this Agreement and Exhibits pertaining hereto are for convenience only and are not to be considered as defining or limiting in any way the scope or intent of the provisions hereof.

Section 20.2 Modification, Waiver.

No modification, waiver, amendment or discharge of this Agreement or any other Loan Document shall be valid unless the same is in writing and signed by the party against which the enforcement of such modification, waiver, amendment or discharge is sought.

Section 20.3 Governing Law.

THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTES DELIVERED PURSUANT HERETO WERE AND WILL BE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY. IN ALL RESPECTS INCLUDING, WITHOUT LIMITATION, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE AND APPLICABLE LAW OF THE UNITED STATES OF AMERICA. TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, AND THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW. NOTWITHSTANDING THE FOREGOING, PROVISIONS IN THIS LOAN AGREEMENT AND THE OTHER AMENDED LOAN DOCUMENTS WITH RESPECT TO THE CREATION, PERFECTION, PRIORITY, ENFORCEMENT AND FORECLOSURE OF THE LIENS AND SECURITY INTERESTS CREATED HEREUNDER AGAINST PROPERTY LOCATED IN THE UNITED MEXICAN STATES SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE UNITED MEXICAN STATES.

Section 20.4 Acquiescence Not to Constitute Waiver of Lender's Requirements.

Each and every covenant and condition for the benefit of Lender contained in this Agreement may be waived by Lender, provided, however, that to the extent that Lender may have acquiesced in any noncompliance with any construction or nonconstruction conditions

precedent to the making of the First Draw or to any subsequent disbursement of Loan proceeds, such acquiescence shall not be deemed to constitute a waiver by Lender of such requirements with respect to any future disbursements of Loan proceeds.

Section 20.5 Disclaimer by Lender.

(a) This Agreement is made for the sole benefit of Borrower and Lender, and no other Person shall have any benefits, rights or remedies under or by reason of this Agreement, or by reason of any actions taken by Lender pursuant to this Agreement. Lender shall not be liable to any contractors, subcontractors, supplier, architect, engineer, Tenant or other party for labor or services performed or materials supplied in connection with the Property. Lender shall not be liable for any debts or claims accruing in favor of any such parties against Borrower or others or against the Property. Lender, by making the Loan or taking any action pursuant to any of the Amended Loan Documents, shall not be deemed a partner or a joint venturer with Borrower or fiduciary of Borrower. No payment of funds directly to a contractor or subcontractor or provider of services shall be deemed to create any third party beneficiary status or recognition of same by Lender. Without limiting the generality of the foregoing:

(i) Lender shall have no liability, obligation or responsibility whatsoever with respect to the Property. Any inspections of the Property made by or through Lender are for purposes of administration of the Loan only and neither Borrower nor any third party is entitled to rely upon the same with respect to the quality, adequacy or suitability of materials or workmanship of the Property or any portion thereof.

Section 20.6 Partial Invalidity; Severability.

If any of the provisions of this Agreement, or the application thereof to any person, party or circumstances, shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such provision or provisions to persons, parties or circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected thereby, and every provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

Section 20.7 Definitions Include Amendments.

Definitions contained in this Agreement which identify documents including, but not limited to, the Amended Loan Documents, shall be deemed to include all amendments and supplements to such documents from the date hereof, and all future amendments, modifications, and supplements thereto entered into from time to time to satisfy the requirements of this Agreement or otherwise with the consent of Lender. Reference to this Agreement contained in any of the foregoing documents shall be deemed to include all amendments and supplements to this Agreement.

Section 20.8 Execution in Counterparts.

This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

Section 20.9 Entire Agreement.

This Agreement, taken together with all of the other Amended Loan Documents and all certificates and other documents delivered by Borrower to Lender, embody the entire agreement and supersede all prior agreements, written or oral, relating to the subject matter hereof.

Section 20.10 Waiver of Damages.

In no event shall Lender be liable to Borrower for punitive, exemplary or consequential damages including, without limitation, lost profits, whatever the nature of a breach by Lender of its obligations under this Agreement or any of the Amended Loan Documents, and Borrower for itself and Guarantor waives all claims for punitive, exemplary or consequential damages.

Section 20.11 Jurisdiction.

TO THE GREATEST EXTENT PERMITTED BY LAW, BORROWER HEREBY WAIVES ANY AND ALL RIGHTS TO REQUIRE MARSHALLING OF ASSETS BY LENDER. WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDINGS RELATING TO THIS AGREEMENT (EACH, A "**PROCEEDING**"), BORROWER IRREVOCABLY (A) SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT SITTING IN NEW YORK COUNTY, NEW YORK, AND (B) WAIVES ANY OBJECTION WHICH IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY PROCEEDING BROUGHT IN ANY SUCH COURT, WAIVES ANY CLAIM THAT ANY PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM AND FURTHER WAIVES THE RIGHT TO OBJECT, WITH RESPECT TO SUCH PROCEEDING, THAT SUCH COURT DOES NOT HAVE JURISDICTION OVER SUCH PARTY. NOTHING IN THIS AGREEMENT SHALL PRECLUDE LENDER FROM BRINGING A PROCEEDING IN ANY OTHER JURISDICTION, NOR WILL THE BRINGING OF A PROCEEDING IN ANY ONE OR MORE JURISDICTIONS PRECLUDE THE BRINGING OF A PROCEEDING IN ANY OTHER JURISDICTION. BORROWER FURTHER AGREES AND CONSENTS THAT, IN ADDITION TO ANY METHODS OF SERVICE OF PROCESS PROVIDED FOR UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY PROCEEDING IN ANY STATE OR FEDERAL COURT SITTING IN NEW YORK COUNTY MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO BORROWER AT THE ADDRESS INDICATED BELOW, AND SERVICE SO MADE SHALL BE COMPLETE UPON RECEIPT; EXCEPT THAT IF BORROWER SHALL REFUSE TO ACCEPT DELIVERY, SERVICE SHALL BE DEEMED COMPLETE FIVE (5) DAYS AFTER THE SAME SHALL HAVE BEEN SO MAILED.

BOTH PARTIES AGREE THAT NOTWITHSTANDING THE FOREGOING, PROVISIONS IN THIS LOAN AGREEMENT AND THE OTHER AMENDED LOAN DOCUMENTS WITH RESPECT TO THE CREATION, PERFECTION, PRIORITY, ENFORCEMENT AND

FORECLOSURE OF THE LIENS AND SECURITY INTERESTS RELATED HERETO AGAINST ASSETS LOCATED IN THE UNITED MEXICAN STATES SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE UNITED MEXICAN STATES AND IN SUCH CASES THE PARTIES SUBMIT TO THE NON EXCLUSIVE JURISDICTION OF THE COMPETENT COURTS LOCATED IN MEXICO CITY OR CABO SAN LUCAS, AT THE ELECTION FO THE LENDER.

Borrower hereby irrevocable designates and appoints Laurence Markowitz, Esq., with an office on the date hereof at Baker & Hostetler LLP, 45 Rockefeller Plaza, New York, New York 10111, as its authorized agent to accept and acknowledge on it's behalf service of any and all process which may be served in any suit, action or proceeding in any Federal or State court in New York. Borrower agrees that service of process upon said agent at said address, together with written notice of said service mailed or delivered to Borrower in the manner provided herein shall be deemed in every respect effective service of process upon Borrower in any such suit, action or proceeding. Borrower (i) shall give prompt notice to Lender of any change of address of its authorized agent hereunder, (ii) may at any time and from time to time, upon the receipt of written consent from Lender, designate a substitute authorized agent with an office within the Unite States of America (which substitute agent and office shall be designated as the person and address for service of process). Borrower shall deliver to Lender a Notarial Instument (Escritura Pública) in form satisfactory to Lender granted before a Mexican Notary Public containing a Special Power of Attorney in a form reasonably acceptable to Lender.

Section 20.12 Set-Offs.

After the occurrence and during the continuance of an Event of Default, Borrower hereby irrevocably authorizes and directs Lender from time to time to charge Borrower's accounts and deposits with Lender (or its Affiliates), and to pay over to Lender an amount equal to any amounts from time to time due and payable to Lender hereunder, under the Notes or under any other Loan Document. Borrower hereby grants to Lender a security interest in and to all such accounts and deposits maintained by Borrower with Lender (or its Affiliates).

Section 20.13 Authorized Representative.

Each Authorized Representative shall deal with Lender on behalf of Borrower in respect of any and all matters in connection with this Agreement, the other Amended Loan Documents, and the Loan. Each Authorized Representative shall have the power, in his discretion, to give and receive all notices, monies, approvals, and other documents and instruments, and to take any other action on behalf of Borrower. All actions by either Authorized Representative shall be final and binding on Borrower. Lender may rely on the authority given to each Authorized Representative until actual receipt by Lender of a duly authorized resolution depriving such Authorized Representative of his authority. No more than two Persons shall serve as Authorized Representative at any given time.

Section 20.14 Non-Recourse Provisions.

The provisions of Article IX of the Notes pertaining to the personal liability of Borrower and its members, officers, directors and employees are hereby incorporated herein by reference.

Section 20.15 Time is of the Essence.

Time is of the essence under this Agreement.

## ARTICLE XXI
## NOTICES

Any notice, demand, request or other communication which any party hereto may be required or may desire to give hereunder shall be in writing and shall be deemed to have been properly given (a) if hand delivered, when delivered, (b) if mailed by United States Certified Mail (postage prepaid, return receipt requested), three Business Days after mailing, (c) if by Federal Express or other reliable overnight courier service, on the next Business Day after delivered to such courier service, or (d) if by telecopier on the day of transmission so long as copy is sent on the same day by overnight courier as set forth below:

If to Borrower:

Diamante Cabo San Lucas S. de R.L. de C.V.
c/o Kenneth A. Jowdy
74 Innisbrook Avenue
Las Vegas, Nevada 89113
Telecopy: 702-222-9281

With a copy to:

Diamante Cabo San Lucas S. de R.L. de C.V.
c/o William J. Najam, Jr.
457 Main Street, Suite 1A
Danbury, Connecticut 06811
Telecopy: (203) 205-0016

With a copy to:

Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Attention: Laurence Markowitz, Esq.
Telecopy: 212-589-4291

If to Lender:

Danske Bank A/S London Branch
London Branch

75 King William Street
London EC4N 7DT
Attn: Mr. Jovan Atkinson
Telecopy: +44 207 410 8001

With copies to:

Venable LLP
750 E. Pratt Street
Baltimore, Maryland 21202
Attention: Mitchell Kolkin, Esq. and M. Jay Yurow, Esq.
Telecopy: (410) 224-7742

TriMont Real Estate Advisors, Inc.
Attn: Toni Meyer
3424 Peachtree Rd. Suite 2200
Atlanta, GA 30326
Reference: Asset #1133601-Diamante Cabo San Lucas
Telecopy: 404-581-7810

or at such other address as the party to be served with notice may have furnished in writing to the party seeking or desiring to serve notice as a place for the service of notice.

**ARTICLE XXII**
**WAIVER OF JURY TRIAL**

BORROWER AND LENDER EACH WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT AND THE OTHER AMENDED LOAN DOCUMENTS OR RELATING THERETO OR ARISING FROM THE LENDING RELATIONSHIP WHICH IS THE SUBJECT OF THIS AGREEMENT AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

**ARTICLE XXIII**
**GROSS-UP**

Section 23.1 Gross-Up.

ALL PAYMENTS BY BORROWER HEREUNDER AND UNDER ANY OF THE OTHER AMENDED LOAN DOCUMENTS SHALL BE MADE FREE AND CLEAR OF AND WITHOUT DEDUCTION FOR ANY PRESENT OR FUTURE TAXES, LEVIES, IMPOSTS, DEDUCTIONS, CHARGES OR WITHHOLDINGS, AND ANY LIABILITIES WITH RESPECT THERETO, EXCLUDING, IN THE CASE OF LENDER, TAXES IMPOSED ON ITS NET INCOME OR CAPITAL AND FRANCHISE TAXES IMPOSED ON IT BY THE

JURISDICTION UNDER THE LAWS OF WHICH LENDER IS ORGANIZED OR ANY POLITICAL SUBDIVISION THEREOF (ALL SUCH NON-EXCLUDED TAXES, LEVIES, IMPOSTS, DEDUCTIONS, CHARGES WITHHOLDINGS AND LIABILITIES BEING HEREINAFTER REFERRED TO AS "**INCLUDED TAXES**"). IF BORROWER SHALL BE REQUIRED BY LAW TO DEDUCT ANY INCLUDED TAXES FROM OR IN RESPECT OF ANY SUM PAYABLE HEREUNDER, OR UNDER ANY ANCILLARY AGREEMENT, TO LENDER (I) THE SUM PAYABLE SHALL BE INCREASED AS MAY BE NECESSARY SO THAT AFTER MAKING ALL REQUIRED DEDUCTIONS (INCLUDING DEDUCTIONS APPLICABLE TO ADDITIONAL SUMS PAYABLE UNDER THIS SECTION) LENDER RECEIVES AN AMOUNT EQUAL TO THE SUM IT WOULD HAVE RECEIVED HAD NO SUCH DEDUCTIONS BEEN MADE, (II) BORROWER SHALL MAKE SUCH DEDUCTION, AND (III) BORROWER SHALL PAY THE FULL AMOUNT DEDUCTED TO THE RELEVANT TAXATION AUTHORITY OR OTHER AUTHORITY IN ACCORDANCE WITH APPLICABLE LAW. BORROWER WILL INDEMNIFY LENDER FOR THE FULL AMOUNT OF INCLUDED TAXES PAID BY LENDER, ANY LIABILITY (INCLUDING PENALTIES, INTEREST AND EXPENSES) ARISING THEREFROM OR WITH RESPECT THERETO, WHETHER OR NOT SUCH INCLUDED TAXES WERE CORRECTLY OR LEGALLY ASSERTED. PAYMENT UNDER THIS INDEMNIFICATION SHALL BE MADE WITHIN 10 DAYS FROM THE DATE LENDER MAKES WRITTEN DEMAND THEREFOR. A CERTIFICATE AS TO THE AMOUNT OF SUCH INCLUDED TAXES SHALL BE SUBMITTED TO BORROWER BY LENDER AND SHALL, IN THE ABSENCE OF MANIFEST ERROR, BE PRIMA FACIE EVIDENCE OF THE AMOUNT DUE BY BORROWER TO LENDER. WITHIN 10 DAYS AFTER THE DATE OF ANY PAYMENT OF INCLUDED TAXES BY BORROWER TO THE APPROPRIATE TAXING AUTHORITY, BORROWER WILL FURNISH TO LENDER EVIDENCE OF PAYMENT THEREOF SATISFACTORY TO LENDER. THE PROVISIONS OF THIS ARTICLE XXIII SHALL SURVIVE REPAYMENT OF THE DEBT. PROMPTLY FOLLOWING THE DATE HEREOF, LENDER SHALL TAKE SUCH REASONABLE MEASURES AS SHALL BE REQUIRED TO REGISTER WITH THE MEXICAN FOREIGN REGISTRY FOR BANKS, FINANCIAL INSTITUTIONS, PENSION FUNDS AND INVESTMENT FUNDS OF THE MEXICAN TREASURY (*SECRETARÍA DE HACIENDA Y CRÉDITO PUBLICO*) UNDER ARTICLES 5 AND 195 OF THE MEXICAN INCOME TAX LAW, AND ARTICLE 11 OF THE CONVENTION BETWEEN THE GOVERNMENT OF THE UNITED MEXICAN STATES AND THE GOVERNMENT OF THE UNITED STATES OF AMERICA FOR THE AVOIDANCE OF DOUBLE TAXATION AND THE PREVENTION OF FISCAL EVASION WITH RESPECT TO TAXES ON INCOME, TO THE EXTENT REQUIRED TO OBVIATE (TO THE EXTENT POSSIBLE) ANY WITHHOLDING REQUIREMENT ON THE PART OF BORROWER.

## ARTICLE XXIV
## SALE OF NOTES AND SECURITIZATION; ASSIGNMENT

Section 24.1 Cooperation.

Borrower acknowledges that Lender may sell the Loan to a party who may pool the Loan with a number of other loans and grant participations therein or issue one or more classes of

Mortgage Backed, Pass-Through Certificates or other securities evidencing a beneficial interest in a rated or unrated public offering or private placement (such sale and/or securitization, a "**Securitization**"; the securities evidencing such Securitization the "**Securities**") or syndicate the Loan to one or more third parties. In connection therewith, Borrower agrees to make available to Lender such financial and other information with respect to the Property, Borrower and Guarantor as Lender reasonably requests (collectively, the "**Provided Information**"). The Securities and/or the Loan may be rated by one or more of the Rating Agencies. Lender may share the Provided Information with the investment banking firms, Rating Agencies, accounting firms, law firms and other third-party advisory firms involved with the Loan or the Securities. The Provided Information may ultimately be incorporated into the offering documents for the Securities or in connection with syndication and thus such information may be disclosed to various investors. Lender and all of the aforesaid third-party advisors and professional firms shall be entitled to rely on the information supplied by, or on behalf of, Borrower. Lender, at its sole option, may also elect to split the Loan into two or more loans, each secured by liens on the Property, and sell, assign, pledge or otherwise hypothecate one or more of such loans to third parties. Borrower shall cooperate in all such efforts by executing and delivering all such documents, certificates, instruments and other things reasonably necessary to evidence or confirm Borrower's obligations hereunder; provided, however, that in no event shall the Debt or Borrower's obligations hereunder be increased as a result thereof. Upon presentation of paid receipts or invoices therefor, Lender shall reimburse Borrower for out-of-pocket costs (including, without limitation, reasonable legal fees) paid or incurred by Borrower in connection with the performance of its obligations under this Section 24.1.

Section 24.2 Intentionally Omitted.

Section 24.3 Loan Components.

Borrower agrees that in connection with any Securitization or syndication of the Loan, upon Lender's reasonable request and at Lender's sole cost and expense, Borrower shall deliver one or more new component notes to replace the original Notes or modify the original Notes to reflect multiple components of the Loan. Such new notes or modified Notes shall bear interest at the Interest Rate and shall otherwise be on the same terms as the original Notes. In the event of a prepayment of the Loan, Lender shall be entitled to apply the amount of such prepayment to one or more of the new component notes as Lender in its sole discretion decides.

Section 24.4 Costs.

Lender shall bear all costs and expenses incurred by Lender in connection with any Securitization or syndication of the Loan.

Section 24.5 Conversion of Loan and Creation of Subordinate Debt.

Lender shall have the right, at Lender's sole cost and expense, to convert a portion of the Loan into subordinate financing, including, but not limited to, mezzanine debt, subordinate debt or participations in the Loan (collectively, "**Subordinate Loan**"), provided that (i) the aggregate principal amount of the Loan and the Subordinate Loan on the date of such adjustment shall

equal the aggregate outstanding principal balance of the Loan immediately prior to such adjustment, and (ii) the notes evidencing the Loan and the Subordinate Loan shall bear interest at the rates and shall otherwise be on the same terms as the original Notes. Borrower shall cooperate with all reasonable requests of Lender in connection with any such adjustment of the Loan and shall execute and deliver such documents as shall reasonably be required by Lender in connection therewith.

Section 24.6 Securitization Indemnification.

(a) Borrower understands that certain of the Provided Information may be included in disclosure documents in connection with the Securitization, including, without limitation, a prospectus, prospectus supplement or private placement memorandum (each, a "**Disclosure Document**") and may also be included in filings with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended ("**Securities Act**"), or the Securities and Exchange Act of 1934, as amended ("**Exchange Act**"), or provided or made available to investors or prospective investors in the Securities, the Rating Agencies, and service providers relating to the Securitization. In the event that the Disclosure Document is required to be revised prior to the sale of all Securities, Borrower will cooperate with the holders of the Notes in updating the Disclosure Document by providing all current information necessary to keep the Disclosure Document accurate and complete in all material respects.

(b) Borrower agrees to provide in connection with each of (i) a preliminary and a private placement memorandum, or (ii) a preliminary and final prospectus or prospectus supplement, as applicable, an indemnification certificate (A) certifying that Borrower has carefully examined such memorandum or prospectus, as applicable including, without limitation, the sections entitled "Special Considerations," "Description of the Mortgages," "Description of the Mortgage Loans and Mortgaged Property," "The Manager," "The Borrower" and "Certain Legal Aspects of the Mortgage Loan," and such sections (and any other sections reasonably requested) do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, (B) indemnifying Lender (and for purposes of this Section 24.6(b), Lender hereunder shall include its officers and directors), the Affiliate of Lender that has filed the registration statement relating to the securitization ("**Registration Statement**"), each of its directors, each of its officers who have signed the Registration Statement and each Person who controls the Affiliate within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, "**Danske Group**"), and Lender, each of its directors and each Person who controls Lender within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act (collectively, "**Underwriter Group**") for any losses, claims, damages or liabilities (collectively, "**Liabilities**") to which Lender, the Danske Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in such sections or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated in such sections or necessary in order to make the statements in such sections or in light of the circumstances under which they were made, not misleading and (C) agreeing to reimburse Lender, the Danske Group and the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the Danske Group and the Underwriter Group in

connection with investigating or defending the Liabilities; provided, however, that Borrower will be liable in any such case under clauses (B) or (C) above only to the extent that any such loss claim, damage or liability arises out of or is based upon any such untrue statement or omission made therein in reliance upon and in conformity with information furnished to Lender by or on behalf of Borrower in connection with the preparation of the memorandum or prospectus or in connection with the underwriting of the Debt, including, without limitation, financial statements of Borrower, operating statements, rent rolls, environmental site assessment reports and property condition reports with respect to the Property. This indemnity agreement will be in addition to any liability which Borrower may otherwise have. Moreover, the indemnification provided for in Clauses (B) and (C) above shall be effective whether or not an indemnification certificate described in (A) above is provided and shall be applicable based on information previously provided by Borrower or its Affiliates if Borrower does not provide the indemnification certificate.

(c) In connection with filings under the Exchange Act, Borrower agrees to indemnify (i) Lender, the Danske Group and the Underwriter Group for Liabilities to which Lender, the Danske Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon the omission or alleged omission to state in the Provided Information a material fact required to be stated in the Provided Information in order to make the statements in the Provided Information, in light of the circumstances under which they were made not misleading, and (ii) reimburse Lender, the Danske Group or the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the Danske Group or the Underwriter Group in connection with defending or investigating the Liabilities.

(d) Promptly after receipt by an indemnified party under this Section 24.6 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 24.6, notify the indemnifying party in writing of the commencement thereof, but the omission to so notify the indemnifying party will not relieve the indemnifying party from any liability which the indemnifying party may have to any indemnified party hereunder except to the extent that failure to notify causes prejudice to the indemnifying party. In the event that any action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof with counsel satisfactory to such indemnified party. After notice from the indemnifying party to such indemnified party under this Section 24.6, the indemnifying party shall not be responsible for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation; provided, however if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there are any legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party or parties. The indemnifying party shall not be liable for the expenses of more than one such separate

counsel unless an indemnified party shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to another indemnified party.

(e) In order to provide for just and equitable contribution in circumstances in which the indemnity agreements provided for in Sections 24.6(b) or (c) is or are for any reason held to be unenforceable by an indemnified party in respect of any losses, claims, damages or liabilities (or action in respect thereof) referred to therein which would otherwise be indemnifiable under Sections 24.6(b) or (c), the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such losses, claims, damages or liabilities (or action in respect thereof); provided, however, that no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. In determining the amount of contribution to which the respective parties are entitled, the following factors shall be considered: (i) Lender's and Borrower's relative knowledge and access to information concerning the matter with respect to which claim was asserted; (ii) the opportunity to correct and prevent any statement or omission; and (iii) any other equitable considerations appropriate in the circumstances. Lender and Borrower hereby agree that it would not be equitable if the amount of such contribution were determined by pro rata or per capita allocation.

(f) The liabilities and obligations of both Borrower and Lender under this Section 24.6 shall survive the termination of this Agreement and the satisfaction and discharge of the Debt.

Section 24.7 Rating Surveillance.

Borrower will retain the Rating Agencies to provide rating surveillance services on any certificates issued in a Securitization. Such rating surveillance will be at the expense of Borrower in an amount determined by Lender in its reasonable discretion prior to the occurrence of a Securitization. Such expense will be paid in monthly installments.

Section 24.8 Assignment.

Lender shall have the right to sell, assign, pledge, participate and otherwise transfer all or any portion of its rights and interests in and under either or both of the Loans to any third party at any time and from time to time. Borrower, Borrower Parties, and Guarantor shall fully cooperate with any and all such sales, assignments, pledges, participations and/or transfers by Lender.

[NEXT PAGE IS THE SIGNATURE PAGE]

IN WITNESS WHEREOF, this Agreement has been executed by the undersigned as of the date first set forth above.

LENDER:

DANSKE BANK A/S, LONDON BRANCH

By: ______________________________

Name: Jovan Atkinson — DAVID DANIEL

Title: Legal Counsel — ASSISTANT GENERAL MANAGER

IN WITNESS WHEREOF, this Agreement has been executed by the undersigned as of the date first set forth above.

BORROWER:

DIAMANTE CABO SAN LUCAS S. DE R.L. DE C.V., a Mexican limited liability company with variable capital

By: ______________________________
Name: Kenneth A. Jowdy
Title: General Administrator

-68-

BA3DOCS1-#412820-v6-Danske_Cabo_Amended_and_Restated_Loan_Agreement.DOC

CONFIDENTIAL DANSKE_0013933

ACKNOWLEDGED AND AGREED TO BY:

DIAMANTE MEMBER:

DIAMANTE CABO SAN LUCAS, LLC, a Delaware limited liability company

By: ______________________________
Name: Kenneth A. Jowdy
Title: Managing Member

GUARANTOR:

KENNETH A. JOWDY

______________________________
Kenneth A. Jowdy, an individual

-69-
BA3DOCS1-#412820-v6-Danske_Cabo_Amended_and_Restated_Loan_Agreement.DOC

CONFIDENTIAL DANSKE_0013934

## SCHEDULE 1

## SCHEDULE OF ORIGINAL LOAN DOCUMENTS

**(All dated as of March 10, 2006 unless otherwise described)**

1. Loan Agreement by and between Borrower and Lehman

2. Letter Agreement dated May 23, 2006 between Lehman and Borrower modifying the Original Loan Agreement

3. Promissory Note in the principal amount of $125,000,000 by Borrower in favor of Lehman

4. Irrevocable Guarantee Trust Agreement by Borrower in favor of Lehman

5. Deed No. 65,011 (evidencing the conveyance of the Property to the Trust)

6. Assignment of Leases and Rents by Borrower to Lehman

7. Completion Guaranty by Jowdy in favor of Lehman

8. Recourse Guaranty by Jowdy in favor of Lehman

9. Payment Guaranty by Diamante Member, Jowdy and the Member Guarantors in favor of Lehman

10. Pledge Agreement (Assets) by Borrower in favor of Lehman

11. Pledge Agreement (Membership Interests in Borrower: US) by Diamante Member and Jowdy in favor of Lehman

12. UCC-1 Financing Statements (Delaware and Nevada) with respect to Item 11 above

13. Pledge Agreement (Membership Interests in Borrower: Mexico) by Diamante Member and Jowdy in favor of Lehman

14. Pledge Agreement (Membership Interests in Diamante Member) by Diamante Properties LLC, Baja Ventures 2006, LLC, CSL Properties 2006, LLC and KAJ Holdings, LLC and Jowdy in favor of Lehman

15. UCC-1 Financing Statements (Delaware and Nevada) with respect to Item 14 above

16. Environmental Indemnity Agreement by Borrower and Jowdy in favor of Lehman

17. Omnibus Assignment by Borrower to Lehman

# EXHIBIT A

## Construction Budget

-73-

::ODMA\PCDOCS\BA3DOCS1\412820\8

CONFIDENTIAL

DANSKE_0013937

# DCSL Budget/Phase 1 Summary
## February 26, 2009

| **Phase I: 1/2009 thru 12/2009 ($16,000,000)** | **Cost** |
|---|---|
| Dunes Golf Course | |
| Dunes Golf Course and Practice Facility | 439,950 |
| Temporary Clubhouse/Sales Center | 225,000 |
| Golf Course Maintenance Equipment/Hand Tools | 210,000 |
| Golf Carts (40) | 210,000 |
| Two (2) Comfort Stations | 257,670 |
| Golf Course Grow-in | 922,000 |
| Diamante Boulevard | |
| Entry Gatehouse/Security Offices, Signage and Landscaping | 500,000 |
| Primary Site Access Roadway including lighting and landscaping | 1,060,000 |
| Mainline Water distribution system | 225,000 |
| Mainline Sewer distribution system | 25,000 |
| Mainline Electrical/Telecommunication conduit | 290,000 |
| Security Walls/Fencing | 150,000 |
| Offsite Access Road | 500,000 |
| Highway Exit/Signage | |
| Offsite Access Roadway to Project Entry | |
| Golf Villas (66 Villas) | |
| Secondary Roadways including lighting and landscaping | 415,000 |
| Water distribution system | 25,000 |
| Sewer distribution system | 7,500 |
| Electrical system/Telecommunication conduit | 290,000 |
| Construct one (1) golf villa model | 1,000,000 |
| Sunset Hill (78 House Lots) | |
| Secondary Roadways including lighting and landscaping | 137,500 |
| Water distribution system | 30,000 |
| Sewer distribution system | 27,500 |
| Electrical system/Telecommunication conduit | 146,667 |
| Community/Golf Course Infrastructure | |
| Maintenance Building | 418,750 |
| Desalination Plant Operation and Maintenance, Wells and Pumps | 665,000 |
| Preliminary Wastewater Treatment Facilities | 25,000 |

**DCSL Budget/Phase I Summary**
**February 26, 2009**

| | |
|---|---|
| Consulting/Accounting/Legal Services and Permit Fees | 823,490 |
| Sales and Marketing | 1,400,000 |
| Development Management, Personnel, Administrative and Office Expe | 3,414,043 |
| Payment of Outstanding Invoices | 1,200,000 |
| Contingency (Hard/Soft) | 959,930 |
| **Total** | **16,000,000** |

# DCSL Budget/Phase I Summary
## February 26, 2009

**2/8/2009**
**Reductions**

90,000 Site Electrical Bill

100,000 Elec Conduit (Ayala Contract)

162,500 Deferred to 2010
5,000 Deferred to 2010
21,250 Deferred to 2010
128,333 Deferred to 2010
**317,083** Total

**DCSL Budget/Phase I Summary**
**February 26, 2009**

| | |
|---|---|
| 84,000 | Mex Payroll |
| 44,000 | US Payroll |
| 20,000 | Mex Office |
| **148,000** | |
| 49,108 | Deferred to 2010 |
| 1,600,000 | Initial Danske Distribution |
| **2,304,191** | |

CONFIDENTIAL

## Diamante Cabo San Lucas - Phase 2
### Account Detail - Cash Flow Site Development Budget

| Code | ACCOUNT DESCRIPTION | TOTAL | Dec-08 | Jan-09 | Feb-09 | Mar-09 | Apr-09 | May-09 | Jun-09 | Jul-09 | Aug-09 | Sep-09 | Oct-09 | Nov-09 | Dec-09 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | LAND COST | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2 | CONSULTANTS | | | | | | | | | | | | | | | |
| 2.1 | Master Planner | | | | | | | | | | | | | | | |
| 2.1.1 | Master Planner - Primary | $ 10,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 5,000 | $ 5,000 | $ 10,000 |
| 2.1.2 | Master Planner - Secondary | $ 5,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 5,000 |
| 2.2 | Engineering | | | | | | | | | | | | | | | |
| 2.2.1 | Civil Engineer | $ 10,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 5,000 | $ 5,000 | $ 10,000 |
| 2.2.2 | Surveyor | $ 14,000 | $ - | $ - | $ - | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ - | $ - | $ - | $ 14,000 |
| 2.2.3 | Soil/Geotech Engineer | $ 6,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 3,000 | $ 3,000 | $ 6,000 |
| 2.2.4 | Environmental Engineer | $ 9,000 | $ - | $ - | $ - | $ - | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 9,000 |
| 2.2.5 | Electrical Engineer | $ 4,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 4,000 |
| 2.2.6 | Utility Consultants (Water/Sewer) | $ 2,500 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,250 | $ 1,250 | $ 2,500 |
| 2.4 | Special Consultants | | | | | | | | | | | | | | | |
| | Agronomy | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | Hydrology/Arroyo Delineation | $ 2,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,000 | $ - | $ - | $ - | $ - | $ - | $ 1,000 | $ 2,000 |
| | Special Permitting | $ 5,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ 2,500 | $ - | $ - | $ - | $ - | $ - | $ 2,500 | $ 5,000 |
| | Storm Drainage | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | Testing (QA/QC) Firms | $ 24,000 | $ - | $ - | $ - | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 3,000 | $ 24,000 |
| 2.5 | Architects | | | | | | | | | | | | | | | |
| 2.5.1 | General Architect | | | | | | | | | | | | | | | |
| 2.5.1.1 | Golf Clubhouse (Permanent) | $ 20,000 | $ - | $ - | $ - | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ 20,000 |
| 2.5.1.2 | Golf Clubhouse/Sales Center (Temporary) | $ 10,000 | $ - | $ - | $ - | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ - | $ - | $ - | $ - | $ - | $ - | $ 10,000 |
| 2.5.1.3 | Maintenance Building | $ 10,000 | $ - | $ - | $ - | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ - | $ - | $ - | $ - | $ - | $ - | $ 10,000 |
| 2.5.1.4 | Pumphouses | $ 5,000 | $ - | $ - | $ - | $ 1,250 | $ 1,250 | $ 1,250 | $ 1,250 | $ - | $ - | $ - | $ - | $ - | $ - | $ 5,000 |
| 2.5.1.5 | Comfort Stations | $ 10,000 | $ - | $ - | $ - | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ - | $ - | $ - | $ - | $ - | $ - | $ 10,000 |
| 2.5.1.6 | Entry Gate House/Monumentation | $ 10,000 | $ - | $ - | $ - | $ 2,500 | $ 2,500 | $ 2,500 | $ 2,500 | $ - | $ - | $ - | $ - | $ - | $ - | $ 10,000 |
| 2.5.1.7 | Health Club/Spa | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2.5.1.8 | Town Square/Retail/Restaurants/Retail/Theater | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2.5.1.9 | Outdoor Sports Complexes (Master Plan) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2.5.1.10 | Water Activities | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2.5.1.11 | Equestrian Center | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2.5.2 | Renderings | $ 10,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 5,000 | $ 5,000 | $ - | $ - | $ - | $ 10,000 |
| 2.5.3 | Reimbursables | $ 20,000 | $ - | $ - | $ - | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ 20,000 |
| 2.6 | Golf Course Architect | $ 200,000 | $ - | $ - | $ - | $ 20,000 | $ 20,000 | $ 20,000 | $ 20,000 | $ 20,000 | $ 20,000 | $ 20,000 | $ 20,000 | $ 20,000 | $ 20,000 | $ 200,000 |
| 2.7 | Landscape Architect | $ 15,000 | $ - | $ - | $ - | $ - | $ - | $ 5,000 | $ 5,000 | $ 5,000 | $ - | $ - | $ - | $ - | $ - | $ 15,000 |
| 2.8 | Interior Design | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2.9 | Permitting Consultant/Liason | $ 12,000 | $ - | $ - | $ - | $ 1,200 | $ 1,200 | $ 1,200 | $ 1,200 | $ 1,200 | $ 1,200 | $ 1,200 | $ 1,200 | $ 1,200 | $ 1,200 | $ 12,000 |
| | TOTAL | $ 413,500 | $ - | $ - | $ - | $ 46,450 | $ 47,450 | $ 52,450 | $ 55,950 | $ 31,200 | $ 32,200 | $ 34,200 | $ 27,200 | $ 41,450 | $ 44,950 | $ 413,500 |
| 3 | ACCOUNTING/TAXES/INSURANCE | | | | | | | | | | | | | | | |
| | TOTAL | $ 103,500 | $ - | $ - | $ 30,375 | $ 7,313 | $ 7,313 | $ 7,313 | $ 7,313 | $ 7,313 | $ 7,313 | $ 7,313 | $ 7,313 | $ 7,313 | $ 7,313 | $ 103,500 |
| 4 | LEGAL FEES | | | | | | | | | | | | | | | |
| | TOTAL | $ 106,490 | $ - | $ - | $ 16,876 | $ 53,052 | $ 4,063 | $ 4,063 | $ 4,063 | $ 4,063 | $ 4,063 | $ 4,063 | $ 4,063 | $ 4,063 | $ 4,063 | $ 106,490 |
| 5 | PERMITS, FEES, BONDS, ENTITLEMENTS | | | | | | | | | | | | | | | |
| 5.1 | Bonds/Security | $ - | | | | | | | | | | | | | | |
| 5.2 | Federal Government | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 5.3 | State Government | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 5.4 | County | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 5.5 | Water District | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 5.6 | Sewer District | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 5.7 | Fire Department | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 5.8 | School District | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 5.9 | Electric | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 5.10 | Gas | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 5.11 | Cable TV | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 5.12 | Phone | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | TOTAL | $ 200,000 | $ - | $ - | $ 100,000 | $ 25,000 | $ - | $ - | $ 25,000 | $ - | $ - | $ 25,000 | $ - | $ - | $ 25,000 | $ 200,000 |
| 6 | SALES, MARKETING, HOA | | | | | | | | | | | | | | | |
| 6.1 | Web Site, CRM | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 6.2 | Merchandising | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 6.3 | Marketing | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 6.4 | HOA/CC&R's/Club Documents | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 6.5 | Sales Building, Displays & Operations | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 6.6 | Public Relations | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 6.7 | Travel & Entertainment | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 6.8 | Flight Operations | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 6.9 | Salaries | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | TOTAL | $ 1,400,000 | $ - | $ - | $ - | $ 140,000 | $ 140,000 | $ 140,000 | $ 140,000 | $ 140,000 | $ 140,000 | $ 140,000 | $ 140,000 | $ 140,000 | $ 140,000 | $ 1,400,000 |
| 7 | SITE IMPROVEMENTS - GOLF VILLAS | | | | | | | | | | | | | | | |
| 7.1 | General Unit Information | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 7.2 | Rough Grading/Earthwork | $ 265,000 | $ - | $ - | $ - | $ 44,167 | $ 44,167 | $ 44,167 | $ 44,167 | $ 44,167 | $ 44,167 | $ - | $ - | $ - | $ - | $ 265,000 |
| 7.3 | Street Improvements | $ 125,000 | $ - | $ - | $ - | $ 20,833 | $ 20,833 | $ 20,833 | $ 20,833 | $ 20,833 | $ 20,833 | $ - | $ - | $ - | $ - | $ 125,000 |
| 7.4 | Storm Drains | $ 25,000 | $ - | $ - | $ - | $ 4,167 | $ 4,167 | $ 4,167 | $ 4,167 | $ 4,167 | $ 4,167 | $ - | $ - | $ - | $ - | $ 25,000 |
| 7.5 | Water | $ 25,000 | $ - | $ - | $ - | $ 4,167 | $ 4,167 | $ 4,167 | $ 4,167 | $ 4,167 | $ 4,167 | $ - | $ - | $ - | $ - | $ 25,000 |
| 7.6 | Sewer | $ 7,500 | $ - | $ - | $ - | $ 1,250 | $ 1,250 | $ 1,250 | $ 1,250 | $ 1,250 | $ 1,250 | $ - | $ - | $ - | $ - | $ 7,500 |
| 7.7 | Common Trench (Fiber Optic Conduit and Cable) | $ 150,000 | $ - | $ - | $ - | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | $ - | $ - | $ - | $ - | $ 150,000 |
| 7.8 | Erosion Control | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 7.9 | Landscaping | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 7.10 | Blasting | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 7.11 | Block Walls & Fencing | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 7.12 | Repairs to Improvements | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 7.13 | Sewer Pump Station | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 7.14 | Electrical (Conduit and Cable) | $ 140,000 | $ - | $ - | $ - | $ 23,333 | $ 23,333 | $ 23,333 | $ 23,333 | $ 23,333 | $ 23,333 | $ - | $ - | $ - | $ - | $ 140,000 |
| 7.15 | Other Dry Utilities | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | TOTAL | $ 737,500 | $ - | $ - | $ - | $ 122,917 | $ 122,917 | $ 122,917 | $ 122,917 | $ 122,917 | $ 122,917 | $ - | $ - | $ - | $ - | $ 737,500 |
| 7(a) | VERTICAL - GOLF VILLAS (1) | | | | | | | | | | | | | | | |
| | TOTAL | $ 1,000,000 | $ - | $ - | $ - | | $ 333,333 | $ 333,333 | $ 333,333 | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,000,000 |

DANSKE_0013942

CONFIDENTIAL

**Diamante Cabo San Lucas - Phase 1**
**Account Detail - Cash Flow Site Development Budget**

| Code | ACCOUNT DESCRIPTION | TOTAL | Dec-08 | Jan-09 | Feb-09 | Mar-09 | Apr-09 | May-09 | Jun-09 | Jul-09 | Aug-09 | Sep-09 | Oct-09 | Nov-09 | Dec-09 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8 | SITE IMPROVEMENTS - PHASE I VILLAGE | | | | | | | | | | | | | | | |
| 8.1 | General Unit Information | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 8.2 | Rough Grading/Earthwork | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 8.3 | Street Improvements | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 8.4 | Storm Drains/Culverts | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 8.5 | Water | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 8.6 | Sewer | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 8.7 | Common Trench | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 8.8 | Erosion Control | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 8.9 | Landscaping | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 8.10 | Blasting | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 8.11 | Block Walls & Fencing | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 8.12 | Repairs to Improvements | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 8.13 | Sewer Pump Station | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 8.14 | Electrical | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 8.15 | Other Dry Utilities | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | TOTAL | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 8(a) | VERTICAL/AMENITIES - PHASE I VILLAGE | | | | | | | | | | | | | | | |
| 8.16 | Health Club/Spa | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 8.17 | Retail/Administration | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 8.18 | Restaurant(s) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 8.19 | Pools/Amenities | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | TOTAL | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 9 | SITE IMPROVEMENTS - DIAMANTE BLVD | | | | | | | | | | | | | | | |
| 9.1 | General Unit Information | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 9.2 | Rough Grading/Earthwork | $ 110,000 | $ - | $ - | $ - | $ 18,333 | $ 18,333 | $ 18,333 | $ 18,333 | $ 18,333 | $ 18,333 | $ - | $ - | $ - | $ - | $ 110,000 |
| 9.3 | Street Improvements | $ 800,000 | $ - | $ - | $ - | $ 133,333 | $ 133,333 | $ 133,333 | $ 133,333 | $ 133,333 | $ 133,333 | $ - | $ - | $ - | $ - | $ 800,000 |
| 9.4 | Storm Drains | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 9.5 | Water Mainline, Cisterns, Pump Stations | $ 225,000 | $ - | $ - | $ - | $ 37,500 | $ 37,500 | $ 37,500 | $ 37,500 | $ 37,500 | $ 37,500 | $ - | $ - | $ - | $ - | $ 225,000 |
| 9.6 | Sewer Mainline | $ 25,000 | $ - | $ - | $ - | $ 4,167 | $ 4,167 | $ 4,167 | $ 4,167 | $ 4,167 | $ 4,167 | $ - | $ - | $ - | $ - | $ 25,000 |
| 9.7 | Common Trench (Fiber Optic Conduit and Cable) | $ 175,000 | $ - | $ - | $ - | $ 29,167 | $ 29,167 | $ 29,167 | $ 29,167 | $ 29,167 | $ 29,167 | $ - | $ - | $ - | $ - | $ 175,000 |
| 9.8 | Erosion Control | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 9.9 | Landscaping/Lighting | $ 150,000 | $ - | $ - | $ - | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | $ - | $ - | $ - | $ - | $ 150,000 |
| 9.10 | Blasting | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 9.11 | Block Walls & Fencing | $ 150,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 50,000 | $ 50,000 | $ 50,000 | $ - | $ - | $ - | $ 150,000 |
| 9.12 | Sewer Pump Station | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 9.13 | Electrical (Conduit and Cable) | $ 115,000 | $ - | $ - | $ - | $ 19,167 | $ 19,167 | $ 19,167 | $ 19,167 | $ 19,167 | $ 19,167 | $ - | $ - | $ - | $ - | $ 115,000 |
| 9.14 | Other Dry Utilities | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 9.15 | Entry Gates/Security | $ 500,000 | $ - | $ - | $ - | $ - | $ - | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ - | $ - | $ - | $ 500,000 |
| 9.16 | Signage | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | TOTAL | $ 2,250,000 | $ - | $ - | $ - | $ 266,667 | $ 266,667 | $ 366,667 | $ 366,667 | $ 416,667 | $ 416,667 | $ 150,000 | $ - | $ - | $ - | $ 2,250,000 |
| 9(a) | OFFSITE IMPROVEMENTS | | | | | | | | | | | | | | | |
| 9.17 | Access from Highway to Site, incl landscaping/lighting | $ 500,000 | $ - | $ - | $ - | $ - | $ - | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ - | $ - | $ - | $ 500,000 |
| 9.18 | Replace Overhead Power Line w/Subsurface Lines | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 9.19 | Offsite Electrical Substation (Future Phases) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | TOTAL | $ 500,000 | $ - | $ - | $ - | $ - | $ - | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ - | $ - | $ - | $ 500,000 |
| 10 | SITE IMPROVEMENTS - SUNSET HILL | | | | | | | | | | | | | | | |
| 10.1 | General Unit Information | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 10.2 | Rough Grading/Earthwork | $ 100,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 33,333 | $ 33,333 | $ 33,333 | $ 100,000 |
| 10.3 | Street Improvements | $ 37,500 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 12,500 | $ 12,500 | $ 12,500 | $ 37,500 |
| 10.4 | Storm Drains | $ 12,500 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 4,167 | $ 4,167 | $ 4,167 | $ 12,500 |
| 10.5 | Water | $ 17,500 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 5,833 | $ 5,833 | $ 5,833 | $ 17,500 |
| 10.6 | Sewer | $ 21,250 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 7,083 | $ 7,083 | $ 7,083 | $ 21,250 |
| 10.7 | Common Trench (Fiber Optic Conduit and Cable) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 10.8 | Erosion Control | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 10.9 | Landscaping/Lighting | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 10.10 | Blasting | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 10.11 | Block Walls & Fencing | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 10.12 | Sewer Pump Station | $ 6,250 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 2,083 | $ 2,083 | $ 2,083 | $ 6,250 |
| 10.13 | Electrical (Conduit and Cable) | $ 146,667 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 73,333 | $ 73,333 | $ 146,667 |
| 10.14 | Other Dry Utilities | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | TOTAL | $ 341,667 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 65,000 | $ 138,333 | $ 138,333 | $ 341,667 |
| 10(a) | VERTICAL - SUNSET HILL (Spec Homes - 3) | $ - | | | | | | | | | | | | | | |
| | TOTAL | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 11 | COMMUNITY/GOLF MAINTENANCE | | | | | | | | | | | | | | | |
| | Desalination Plant (Permanent) | $ 665,000 | | | | | | | | | | | | | | |
| 11.1 | General Construction/Civil | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 11.2 | Plant Equipment | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 11.3 | Well Drilling | $ 30,000 | $ - | $ - | $ - | $ - | $ 15,000 | $ - | $ 15,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ 30,000 |
| 11.4 | Pumps and Equipment | $ 30,000 | $ - | $ - | $ - | $ - | $ 5,000 | $ - | $ 10,000 | $ - | $ 5,000 | $ - | $ 5,000 | $ - | $ 5,000 | $ 30,000 |
| 11.5 | Water Lines | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 11.6 | Landscaping | $ 5,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ 5,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ 5,000 |
| 11.7 | Electrical | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 11.8 | Professional Fees and Expenses | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 11.9 | Other Owner Costs (Operations/Maintenance) | $ 576,000 | $ - | $ - | $ 192,000 | $ 48,000 | $ 48,000 | $ 48,000 | $ 48,000 | $ 48,000 | $ 48,000 | $ 48,000 | $ 48,000 | $ - | $ - | $ 576,000 |
| 11.10 | Contingency | $ 24,000 | $ - | $ - | $ 4,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 2,000 | $ 24,000 |
| | Wastewater Plant | $ 25,000 | | | | | | | | | | | | | | |
| 11.11 | General Construction/Civil | $ 15,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 5,000 | $ 5,000 | $ 5,000 | $ - | $ - | $ - | $ 15,000 |
| 11.12 | Equipment | $ 10,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 5,000 | $ 5,000 | $ - | $ - | $ - | $ 10,000 |
| 11.13 | Landscaping | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 11.14 | Professional Fees and Expenses | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 11.15 | Other Owner Costs | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 11.16 | Contingency | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | Maintenance Building | $ 418,750 | | | | | | | | | | | | | | |
| 11.17 | General Construction | $ 375,000 | $ - | $ - | $ - | $ 62,500 | $ 62,500 | $ 62,500 | $ 62,500 | $ 62,500 | $ 62,500 | $ - | $ - | $ - | $ - | $ 375,000 |
| 11.18 | Interior Furnishings | $ 20,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 | $ - | $ - | $ - | $ 20,000 |
| 11.19 | Landscaping | $ 5,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 5,000 | $ - | $ - | $ - | $ 5,000 |
| 11.20 | Professional Fees and Expenses | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 11.21 | Other Owner Costs | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 11.22 | Contingency | $ 18,750 | $ - | $ - | $ - | $ 3,125 | $ 3,125 | $ 3,125 | $ 3,125 | $ 3,125 | $ 3,125 | $ - | $ - | $ - | $ - | $ 18,750 |
| | TOTAL | $ 1,108,750 | $ - | $ - | $ 196,000 | $ 115,625 | $ 135,625 | $ 115,625 | $ 150,625 | $ 125,625 | $ 135,625 | $ 70,000 | $ 55,000 | $ 2,000 | $ 7,000 | $ 1,108,750 |

DANSKE_0013943

CONFIDENTIAL

**Diamante Cabo San Lucas - Phase [illegible]**
**Account Detail - Cash Flow Site Development Budget**

| Code | ACCOUNT DESCRIPTION | TOTAL | Dec-08 | Jan-09 | Feb-09 | Mar-09 | Apr-09 | May-09 | Jun-09 | Jul-09 | Aug-09 | Sep-09 | Oct-09 | Nov-09 | Dec-09 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12 | GOLF COURSE CONSTRUCTION | | | | | | | | | | | | | | | |
| 12.1 | Mobilization/Retention | $ 146,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 146,000 | $ - | $ - | $ - | $ 146,000 |
| 12.2 | Clearing/Grubbing | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 12.3 | Earthwork | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 12.4 | Storm Drain | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 12.5 | Shaping | $ 14,250 | $ - | $ - | $ - | $ 7,125 | $ 7,125 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 14,250 |
| 12.6 | Low Flow Drainage | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 12.7 | Irrigation | $ 33,750 | $ - | $ - | $ - | $ 16,875 | $ 16,875 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 33,750 |
| 12.8 | Pumping Station/System | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 12.9 | Greens Construction | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 12.10 | Tee Construction | $ 18,100 | $ - | $ - | $ - | $ 9,050 | $ 9,050 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 18,100 |
| 12.11 | Bunker Construction | $ 16,150 | $ - | $ - | $ - | $ 8,075 | $ 8,075 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 16,150 |
| 12.12 | Cart Path Construction | $ 200,000 | $ - | $ - | $ - | $ 33,333 | $ 33,333 | $ 33,333 | $ 33,333 | $ 33,334 | $ 33,334 | $ - | $ - | $ - | $ - | $ 200,000 |
| 12.13 | Bridges/Arroyo Crossings | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 12.14 | Finish Grading | $ 11,700 | $ - | $ - | $ - | $ 5,850 | $ 5,850 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 11,700 |
| 12.15 | Grassing | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 12.16 | Landscaping (Native Grassing) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 12.17 | Landscaping (Rescue Program) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 12.18 | Retaining Walls | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 12.19 | Tee thru Green Accessories | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 12.20 | Comfort Stations (2) | $ 257,670 | $ - | $ - | $ - | $ 57,976 | $ 57,976 | $ 57,976 | $ 57,976 | $ 25,767 | $ - | $ - | $ - | $ - | $ - | $ 257,670 |
| | TOTAL | $ 697,620 | $ - | $ - | $ - | $ 138,284 | $ 138,284 | $ 91,309 | $ 91,309 | $ 59,101 | $ 33,334 | $ 146,000 | $ - | $ - | $ - | $ 697,620 |
| 13 | GOLF COURSE CLUBHOUSE | | | | | | | | | | | | | | | |
| 13.1 | General Unit Information | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 13.2 | Rough Grading/Earthwork | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 13.3 | Street Improvements | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 13.4 | Parking | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 13.5 | Storm Drains | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 13.6 | Water | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 13.7 | Sewer | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 13.8 | Common Trench | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 13.9 | Erosion Control | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 13.10 | Landscaping | $ 25,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 25,000 | $ - | $ - | $ - | $ - | $ 25,000 |
| 13.11 | Blasting | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 13.12 | Block Walls & Fencing | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 13.13 | Electrical | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 13.14 | Other Dry Utilities | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 13.15 | Clubhouse Building | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 13.16 | Temporary Clubhouse | $ 200,000 | $ - | $ - | $ - | $ - | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ - | $ - | $ - | $ - | $ - | $ 200,000 |
| | TOTAL | $ 225,000 | $ - | $ - | $ - | $ - | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 25,000 | $ - | $ - | $ - | $ - | $ 225,000 |
| 14 | IRRIGATION LAKE | | | | | | | | | | | | | | | |
| 14.1 | Mobilization | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 14.2 | Clearing/Grubbing | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 14.3 | Earthwork | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 14.4 | Shaping | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 14.5 | Lining | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 14.6 | Landscaping | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 14.7 | Pump Station Building | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 14.8 | Temporary Irrigation Lake | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | TOTAL | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 15 | SOD FARM | | | | | | | | | | | | | | | |
| 15.1 | Mobilization | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 15.2 | Clearing/Grubbing | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 15.3 | Earthwork | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 15.4 | Irrigation System | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 15.5 | Pump Station | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 15.6 | Water Lines | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 15.7 | Management/Operations | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | TOTAL | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 16 | MAINTENANCE EQUIPMENT | | | | | | | | | | | | | | | |
| 16.1 | Equipment | $ 200,000 | $ - | $ - | $ - | $ 50,000 | $ - | $ 50,000 | $ - | $ 50,000 | $ - | $ 50,000 | $ - | $ - | $ - | $ 200,000 |
| 16.2 | Hand Tools | $ 10,000 | $ - | $ - | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ - | $ 10,000 |
| | TOTAL | $ 210,000 | $ - | $ - | $ 1,000 | $ 51,000 | $ 1,000 | $ 51,000 | $ 1,000 | $ 51,000 | $ 1,000 | $ 51,000 | $ 1,000 | $ 1,000 | $ - | $ 210,000 |
| 17 | GOLF CARTS/FACILITY | | | | | | | | | | | | | | | |
| 17.1 | Golf Carts | $ 200,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ 100,000 | $ - | $ - | $ 100,000 | $ - | $ - | $ - | $ 200,000 |
| 17.2 | Cart Facility Equipment | $ 10,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 5,000 | $ 5,000 | $ - | $ - | $ - | $ 10,000 |
| | TOTAL | $ 210,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ 100,000 | $ - | $ 5,000 | $ 105,000 | $ - | $ - | $ - | $ 210,000 |
| 18 | PERSONNEL - OTHER (Mexico) | | | | | | | | | | | | | | | |
| 18.1 | Security | $ 245,163 | $ - | $ - | $ 81,721 | $ 20,430 | $ 20,430 | $ 20,430 | $ 20,430 | $ 20,430 | $ 20,430 | $ 20,430 | $ 20,430 | $ - | $ - | $ 245,163 |
| 18.2 | General Personnel | $ 740,880 | $ - | $ - | $ 226,960 | $ 44,740 | $ 56,740 | $ 68,740 | $ 68,740 | $ 68,740 | $ 68,740 | $ 68,740 | $ 68,740 | $ - | $ - | $ 740,880 |
| | TOTAL | $ 986,043 | $ - | $ - | $ 308,681 | $ 65,170 | $ 77,170 | $ 89,170 | $ 89,170 | $ 89,170 | $ 89,170 | $ 89,170 | $ 89,170 | $ - | $ - | $ 986,043 |
| 19 | DEVELOPMENT MANAGEMENT/ ADMINISTRATIVE SERVICES | | | | | | | | | | | | | | | |
| 19.1 | Management & Admin (U.S.) | $ 2,168,000 | $ - | $ - | $ 588,000 | $ 158,000 | $ 158,000 | $ 158,000 | $ 158,000 | $ 158,000 | $ 158,000 | $ 158,000 | $ 158,000 | $ 158,000 | $ 158,000 | $ 2,168,000 |
| | TOTAL | $ 2,168,000 | $ - | $ - | $ 588,000 | $ 158,000 | $ 158,000 | $ 158,000 | $ 158,000 | $ 158,000 | $ 158,000 | $ 158,000 | $ 158,000 | $ 158,000 | $ 158,000 | $ 2,168,000 |
| 20 | GENERAL OFFICE EXPENSES | | | | | | | | | | | | | | | |
| 20.1 | Office Supplies | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 20.2 | Office Equipment/Furniture | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 20.3 | Equipment Rental | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 20.4 | Phone | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 20.5 | Auto | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 20.6 | General Expenses | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 20.7 | Utilities | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 20.9 | Temporary Office Space (Off-site) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 20.9 | Construction Staging/Office (On-site) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | TOTAL | $ 260,000 | $ - | $ - | $ 60,000 | $ 20,000 | $ 20,000 | $ 20,000 | $ 20,000 | $ 20,000 | $ 20,000 | $ 20,000 | $ 20,000 | $ 20,000 | $ 20,000 | $ 260,000 |
| 21 | PAYMENT OF OUTSTANDING DRAWS/INVOICES | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | TOTAL | $ 1,200,000 | $ - | $ - | $ 1,200,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,200,000 |
| | CONSTRUCTION BUDGET (SUB-TOTAL) | $14,118,069 | $ - | $ - | $ 2,500,932 | $ 1,209,476 | $ 1,501,821 | $ 1,701,846 | $ 1,815,346 | $ 1,375,055 | $ 1,290,288 | $ 1,099,745 | $ 566,745 | $ 512,158 | $ 544,658 | ######## |
| 22 | GROW-IN BUDGET | $ 922,000 | $ - | $ - | $ 234,000 | $ 86,000 | $ 86,000 | $ 86,000 | $ 86,000 | $ 86,000 | $ 86,000 | $ 86,000 | $ 86,000 | $ - | $ - | $ 922,000 |
| 23 | DEVELOPMENT COST INSURANCE | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 24 | CONTINGENCY (5% Soft) | $ 281,877 | $ - | $ - | $ 55,197 | $ 25,749 | $ 22,700 | $ 23,550 | $ 24,975 | $ 22,487 | $ 22,537 | $ 23,887 | $ 22,287 | $ 18,541 | $ 19,966 | $ 281,877 |
| 25 | CONTINGENCY (10% Hard Costs) | $ 678,054 | $ - | $ - | $ 19,700 | $ 69,449 | $ 104,783 | $ 113,085 | $ 121,585 | $ 82,531 | $ 73,954 | $ 52,200 | $ 12,100 | $ 14,133 | $ 14,533 | $ 678,054 |
| | GRAND TOTALS | $15,999,999 | $ - | $ - | $ 2,809,828 | $ 1,390,675 | $ 1,715,303 | $ 1,924,480 | $ 2,047,905 | $ 1,566,073 | $ 1,472,779 | $ 1,261,832 | $ 687,132 | $ 544,833 | $ 579,158 | ######## |

DANSKE_0013944

# Diamante Cabo San Lucas - Phase 1

Account Detail - Cash Flow Site Development Budget

| Code | ACCOUNT DESCRIPTION | TOTAL |
|---|---|---|
| 1 | **LAND COST** | $ - |
| | | |
| 2 | **CONSULTANTS** | |
| 2.1 | **Master Planner** | |
| 2.1.1 | Master Planner - Primary | $ 10,000 |
| 2.1.2 | Master Planner - Secondary | $ 5,000 |
| 2.2 | **Engineering** | |
| 2.2.1 | Civil Engineer | $ 10,000 |
| 2.2.2 | Surveyor | $ 14,000 |
| 2.2.3 | Soil/Geotech Engineer | $ 6,000 |
| 2.2.4 | Environmental Engineer | $ 9,000 |
| 2.2.5 | Electrical Engineer | $ 4,000 |
| 2.2.6 | Utility Consultants (Water/Sewer) | $ 2,500 |
| 2.4 | **Special Consultants** | |
| | Agronomy | $ - |
| | Hydrology/Arroyo Delineation | $ 2,000 |
| | Special Permitting | $ 5,000 |
| | Storm Drainage | $ - |
| | Testing (QA/QC) Firms | $ 24,000 |
| 2.5 | **Architects** | |
| 2.5.1 | General Architect | |
| 2.5.1.1 | Golf Clubhouse (Permanent) | $ 20,000 |
| 2.5.1.2 | Golf Clubhouse/Sales Center (Temporary) | $ 10,000 |
| 2.5.1.3 | Maintenance Building | $ 10,000 |
| 2.5.1.4 | Pumphouses | $ 5,000 |
| 2.5.1.5 | Comfort Stations | $ 10,000 |
| 2.5.1.6 | Entry Gate House/Monumentation | $ 10,000 |
| 2.5.1.7 | Health Club/Spa | $ - |
| 2.5.1.8 | Town Square/Retail/Restaurants/Retail/Theater | $ - |
| 2.5.1.9 | Outdoor Sports Complexes (Master Plan) | $ - |
| 2.5.1.10 | Water Activities | $ - |
| 2.5.1.11 | Equestrian Center | $ - |
| 2.5.2 | Renderings | $ 10,000 |
| 2.5.3 | Reimbursables | $ 20,000 |
| 2.6 | **Golf Course Architect** | $ 200,000 |
| 2.7 | **Landscape Architect** | $ 15,000 |
| 2.8 | **Interior Design** | $ - |
| 2.9 | **Permitting Consultant/Liason** | $ 12,000 |
| | **TOTAL** | **$ 413,500** |
| | | |
| 3 | **ACCOUNTING/TAXES/INSURANCE** | |
| | **TOTAL** | **$ 103,500** |
| | | |
| 4 | **LEGAL FEES** | |
| | **TOTAL** | **$ 106,490** |
| | | |
| 5 | **PERMITS, FEES, BONDS, ENTITLEMENTS** | |
| 5.1 | Bonds/Security | $ - |
| 5.2 | Federal Government | $ - |
| 5.3 | State Government | $ - |
| 5.4 | County | $ - |
| 5.5 | Water District | $ - |
| 5.6 | Sewer District | $ - |
| 5.7 | Fire Department | $ - |
| 5.8 | School District | $ - |
| 5.9 | Electric | $ - |
| 5.10 | Gas | $ - |
| 5.11 | Cable TV | $ - |
| 5.12 | Phone | $ - |
| | **TOTAL** | **$ 200,000** |
| | | |
| 6 | **SALES, MARKETING, HOA** | |
| 6.1 | Web Site, CRM | $ - |
| 6.2 | Merchandising | $ - |
| 6.3 | Marketing | $ - |
| 6.4 | HOA/CC&R's/Club Documents | $ - |
| 6.5 | Sales Building, Displays & Operations | $ - |
| 6.6 | Public Relations | $ - |
| 6.7 | Travel & Entertainment | $ - |
| 6.8 | Flight Operations | $ - |
| 6.9 | Salaries | $ - |
| | **TOTAL** | **$ 1,400,000** |
| | | |
| 7 | **SITE IMPROVEMENTS - GOLF VILLAS** | |
| 7.1 | General Unit Information | $ - |
| 7.2 | Rough Grading/Earthwork | $ 265,000 |
| 7.3 | Street Improvements | $ 125,000 |
| 7.4 | Storm Drains | $ 25,000 |
| 7.5 | Water | $ 25,000 |
| 7.6 | Sewer | $ 7,500 |
| 7.7 | Common Trench (Fiber Optic Conduit and Cable) | $ 150,000 |
| 7.8 | Erosion Control | $ - |
| 7.9 | Landscaping | $ - |
| 7.10 | Blasting | $ - |
| 7.11 | Block Walls & Fencing | $ - |
| 7.12 | Repairs to Improvements | $ - |
| 7.13 | Sewer Pump Station | $ - |
| 7.14 | Electrical (Conduit and Cable) | $ 140,000 |
| 7.15 | Other Dry Utilities | $ - |
| | **TOTAL** | **$ 737,500** |
| | | |
| 7(a) | **VERTICAL - GOLF VILLAS (1)** | |
| | **TOTAL** | **$ 1,000,000** |

| Code | ACCOUNT DESCRIPTION | TOTAL |
|---|---|---|
| 8 | SITE IMPROVEMENTS - PHASE I VILLAGE | |
| 8.1 | General Unit Information | $ - |
| 8.2 | Rough Grading/Earthwork | $ - |
| 8.3 | Street Improvements | $ - |
| 8.4 | Storm Drains/Culverts | $ - |
| 8.5 | Water | $ - |
| 8.6 | Sewer | $ - |
| 8.7 | Common Trench | $ - |
| 8.8 | Erosion Control | $ - |
| 8.9 | Landscaping | $ - |
| 8.10 | Blasting | $ - |
| 8.11 | Block Walls & Fencing | $ - |
| 8.12 | Repairs to Improvements | $ - |
| 8.13 | Sewer Pump Station | $ - |
| 8.14 | Electrical | $ - |
| 8.15 | Other Dry Utilities | $ - |
| | TOTAL | $ - |
| 8(a) | VERTICAL/AMENITIES - PHASE I VILLAGE | |
| 8.16 | Health Club/Spa | $ - |
| 8.17 | Retail/Administration | $ - |
| 8.18 | Restaurant(s) | $ - |
| 8.19 | Pools/Amenities | $ - |
| | TOTAL | $ - |
| 9 | SITE IMPROVEMENTS - DIAMANTE BLVD | |
| 9.1 | General Unit Information | $ - |
| 9.2 | Rough Grading/Earthwork | $ 110,000 |
| 9.3 | Street Improvements | $ 800,000 |
| 9.4 | Storm Drains | $ - |
| 9.5 | Water Mainline, Cisterns, Pump Stations | $ 225,000 |
| 9.6 | Sewer Mainline | $ 25,000 |
| 9.7 | Common Trench (Fiber Optic Conduit and Cable) | $ 175,000 |
| 9.8 | Erosion Control | $ - |
| 9.9 | Landscaping/Lighting | $ 150,000 |
| 9.10 | Blasting | $ - |
| 9.11 | Block Walls & Fencing | $ 150,000 |
| 9.12 | Sewer Pump Station | $ - |
| 9.13 | Electrical (Conduit and Cable) | $ 115,000 |
| 9.14 | Other Dry Utilities | $ - |
| 9.15 | Entry Gates/Security | $ 500,000 |
| 9.16 | Signage | $ - |
| | TOTAL | $ 2,250,000 |
| 9(a) | OFFSITE IMPROVEMENTS | |
| 9.17 | Access from Highway to Site, incl landscaping/lighting | $ 500,000 |
| 9.18 | Replace Overhead Power Line w/Subsurface Lines | $ - |
| 9.19 | Offsite Electrical Substation (Future Phases) | $ - |
| | TOTAL | $ 500,000 |
| 10 | SITE IMPROVEMENTS - SUNSET HILL | |
| 10.1 | General Unit Information | $ - |
| 10.2 | Rough Grading/Earthwork | $ 100,000 |
| 10.3 | Street Improvements | $ 37,500 |
| 10.4 | Storm Drains | $ 12,500 |
| 10.5 | Water | $ 17,500 |
| 10.6 | Sewer | $ 21,250 |
| 10.7 | Common Trench (Fiber Optic Conduit and Cable) | $ - |
| 10.8 | Erosion Control | $ - |
| 10.9 | Landscaping/Lighting | $ - |
| 10.10 | Blasting | $ - |
| 10.11 | Block Walls & Fencing | $ - |
| 10.12 | Sewer Pump Station | $ 6,250 |
| 10.13 | Electrical (Conduit and Cable) | $ 146,667 |
| 10.14 | Other Dry Utilities | $ - |
| | TOTAL | $ 341,667 |
| 10(a) | VERTICAL - SUNSET HILL (Spec Homes - 3) | $ - |
| | TOTAL | $ - |
| 11 | COMMUNITY/GOLF MAINTENANCE | |
| | Desalination Plant (Permanent) | $ 665,000 |
| 11.1 | General Construction/Civil | $ - |
| 11.2 | Plant Equipment | $ - |
| 11.3 | Well Drilling | $ 30,000 |
| 11.4 | Pumps and Equipment | $ 30,000 |
| 11.5 | Water Lines | $ - |
| 11.6 | Landscaping | $ 5,000 |
| 11.7 | Electrical | $ - |
| 11.8 | Professional Fees and Expenses | $ - |
| 11.9 | Other Owner Costs (Operations/Maintenance) | $ 576,000 |
| 11.10 | Contingency | $ 24,000 |
| | Wastewater Plant | $ 25,000 |
| 11.11 | General Construction/Civil | $ 15,000 |
| 11.12 | Equipment | $ 10,000 |
| 11.13 | Landscaping | $ - |
| 11.14 | Professional Fees and Expenses | $ - |
| 11.15 | Other Owner Costs | $ - |
| 11.16 | Contingency | $ - |
| | Maintenance Building | $ 418,750 |
| 11.17 | General Construction | $ 375,000 |
| 11.18 | Interior Furnishings | $ 20,000 |
| 11.19 | Landscaping | $ 5,000 |
| 11.20 | Professional Fees and Expenses | $ - |
| 11.21 | Other Owner Costs | $ - |
| 11.22 | Contingency | $ 18,750 |
| | TOTAL | $ 1,108,750 |

CONFIDENTIAL

## Diamante Cabo San Lucas - Phase 1

### Account Detail Cash Flow Site Development Budget

| Code | ACCOUNT DESCRIPTION | TOTAL |
|---|---|---|
| 12 | **GOLF COURSE CONSTRUCTION** | |
| 12.1 | Mobilization/Retention | $ 146,000 |
| 12.2 | Clearing/Grubbing | $ - |
| 12.3 | Earthwork | $ - |
| 12.4 | Storm Drain | $ - |
| 12.5 | Shaping | $ 14,250 |
| 12.6 | Low Flow Drainage | $ - |
| 12.7 | Irrigation | $ 33,750 |
| 12.8 | Pumping Station/System | $ - |
| 12.9 | Greens Construction | $ - |
| 12.10 | Tee Construction | $ 18,100 |
| 12.11 | Bunker Construction | $ 16,150 |
| 12.12 | Cart Path Construction | $ 200,000 |
| 12.13 | Bridges/Arroyo Crossings | $ - |
| 12.14 | Finish Grading | $ 11,700 |
| 12.15 | Grassing | $ - |
| 12.16 | Landscaping (Native Grassing) | $ - |
| 12.17 | Landscaping (Rescue Program) | $ - |
| 12.18 | Retaining Walls | $ - |
| 12.19 | Tee thru Green Accessories | $ - |
| 12.20 | **Comfort Stations (2)** | $ 257,670 |
| | **TOTAL** | **$ 697,620** |
| 13 | **GOLF COURSE CLUBHOUSE** | |
| 13.1 | General Unit Information | $ - |
| 13.2 | Rough Grading/Earthwork | $ - |
| 13.3 | Street Improvements | $ - |
| 13.4 | Parking | $ - |
| 13.5 | Storm Drains | $ - |
| 13.6 | Water | $ - |
| 13.7 | Sewer | $ - |
| 13.8 | Common Trench | $ - |
| 13.9 | Erosion Control | $ - |
| 13.10 | Landscaping | $ 25,000 |
| 13.11 | Blasting | $ - |
| 13.12 | Block Walls & Fencing | $ - |
| 13.13 | Electrical | $ - |
| 13.14 | Other Dry Utilities | $ - |
| 13.15 | Clubhouse Building | $ - |
| 13.16 | **Temporary Clubhouse** | $ 200,000 |
| | **TOTAL** | **$ 225,000** |
| 14 | **IRRIGATION LAKE** | |
| 14.1 | Mobilization | $ - |
| 14.2 | Clearing/Grubbing | $ - |
| 14.3 | Earthwork | $ - |
| 14.4 | Shaping | $ - |
| 14.5 | Lining | $ - |
| 14.6 | Landscaping | $ - |
| 14.7 | Pump Station Building | $ - |
| 14.8 | Temporary Irrigation Lake | $ - |
| | **TOTAL** | **$ -** |
| 15 | **SOD FARM** | |
| 15.1 | Mobilization | $ - |
| 15.2 | Clearing/Grubbing | $ - |
| 15.3 | Earthwork | $ - |
| 15.4 | Irrigation System | $ - |
| 15.5 | Pump Station | $ - |
| 15.6 | Water Lines | $ - |
| 15.7 | Management/Operations | $ - |
| | **TOTAL** | **$ -** |
| 16 | **MAINTENANCE EQUIPMENT** | |
| 16.1 | Equipment | $ 200,000 |
| 16.2 | Hand Tools | $ 10,000 |
| | **TOTAL** | **$ 210,000** |
| 17 | **GOLF CARTS/FACILITY** | |
| 17.1 | Golf Carts | $ 200,000 |
| 17.2 | Cart Facility Equipment | $ 10,000 |
| | **TOTAL** | **$ 210,000** |
| 18 | **PERSONNEL - OTHER (Mexico)** | |
| 18.1 | Security | $ 245,163 |
| 18.2 | General Personnel | $ 740,880 |
| | **TOTAL** | **$ 986,043** |
| 19 | **DEVELOPMENT MANAGEMENT/ ADMINISTRATIVE SERVICES** | |
| 19.1 | Management & Admin (U.S.) | $ 2,168,000 |
| | **TOTAL** | **$ 2,168,000** |
| 20 | **GENERAL OFFICE EXPENSES** | |
| 20.1 | Office Supplies | $ - |
| 20.2 | Office Equipment/Furniture | $ - |
| 20.3 | Equipment Rental | $ - |
| 20.4 | Phone | $ - |
| 20.5 | Auto | $ - |
| 20.6 | General Expenses | $ - |
| 20.7 | Utilities | $ - |
| 20.9 | Temporary Office Space (Off-site) | $ - |
| 20.9 | Construction Staging/Office (On-site) | $ - |
| | **TOTAL** | **$ 260,000** |
| 21 | **PAYMENT OF OUTSTANDING DRAWS/INVOICES** | $ - |
| | **TOTAL** | **$ 1,200,000** |
| | **CONSTRUCTION BUDGET (SUB-TOTAL)** | **$ 14,118,069** |
| 22 | **GROW-IN BUDGET** | **$ 922,000** |
| 23 | **DEVELOPMENT COST INSURANCE** | **$ -** |
| 24 | **CONTINGENCY (5% Soft)** | **$ 281,877** |
| 25 | **CONTINGENCY (10% Hard Costs)** | **$ 678,055** |
| | **GRAND TOTALS** | **$ 16,000,000** |

# EXHIBIT B

## Land

-74-

::ODMA\PCDOCS\BA3DOCS1\412820\8

CONFIDENTIAL DANSKE_0013948

Parcel I:

Lot I of identified by La Laguna, Municipality of Cabo San Lucas, Baja California Sur, México, with the following measurements and boundaries: From point G to H heading North a distance of 191.89 meters and Azimuth of 115º 38' 05" abutting with Lot (VII) seven; from point H to I heading North, a distance of 127.52 meters and Azimuth of 120º 09' 21" abutting with Lot (VII) seven; from point I to J heading North, a distance of 31.50 meters and Azimuth of 197º 08' 24" abutting with Lot (VII) seven; from point J to A heading North, a distance of 125.00 meters and Azimuth of 107º 08' 24" abutting with Lot (VII) seven; from point B to C heading South, a distance of 125.00 meters and Azimuth of 287º 08' 24" abutting with Lot (III) three; from point C to D heading South, a distance of de 31.50 meters and Azimuth of 17º 08' 24" abutting with Lot (III) three; from point D to E heading South, a distance of 127.52 meters and Azimuth of 300º 09' 21" abutting with Lot (III) three; from point E to F heading South, a distance of 191.88 meters and Azimuth of 295º 38' 05" abutting with Lot (IV) four; from point A to B heading East, a distance of 135.00 meters and Azimuth of 197º 08' 24" with property of Francisco Arballo; and from point F to G heading West, a distance of 135.00 meters and Azimuth of 17º 08' 24" abutting with Lot (II) two.

Parcel II:

Lot II of identified by La Laguna, Municipality of Cabo San Lucas, Baja California Sur, México, with the following measurements and boundaries: From point L to M heading North, a distance of 299.94 meters and Azimuth of 114º 38' 35" abutting with Lot (VII) seven; from point F to D-5 heading South 116.98 meters and Azimuth of 294º 38' 35" abutting with Lot (V) five; from point D-5 to K heading South, a distance of 183.01 meters and Azimuth of 294º 38' 35" abutting with Lot (VI) six; from point M to G heading East, a distance of 65.00 meters and Azimuth of 197º 08' 24" abutting with Lot (VIII) seven; from point G to F heading East 135.00 meters and Azimuth of 197º 08' 24" abutting with Lot (I) one; and from point K to L heading West, a distance of 200.00 meters and Azimuth of 17º 08' 24" abutting with property of Atilio Colli.

Parcel III:

Lot III of identified by La Laguna, Municipality of Cabo San Lucas, Baja California Sur, México, with the following measurements and boundaries: From point D-1 to D heading North, a distance of 61.58 meters and Azimuth of 300º 09' 21" abutting with Lot (I) one; from point D to C heading North, a distance of 31.50 meters and Azimuth of 17º 08' 24" abutting with Lot (I) one; from point C to B heading North, a distance of 125.00 meters and Azimuth of 287º 08' 24" abutting with Lot (I) one; from point V-I to V-2 heading South, a distance of 171.26 meters with Pacific Ocean; from point V-2 to D-2 heading South, a distance of 16.96 meters abutting with Ocean Pacific; from point V-1 to B heading East, a distance of 617.87 meters and Azimuth of 17º 08' 24" abutting with property of Francisco Arballo; and from point D-1 al D-2 heading West, a distance of 628.56 meters and Azimuth of 197º 08' 24" abutting with Lot (IV) four. Save and except "Affectation Area along the Pacific Ocean of 10,609.95 square meters as shown on survey dated February 10, 2009, by Topografía y Dibujo (J. Alfredo Ontiveros Macario)".

Parcel IV:

Lot IV of identified by La Laguna, Municipality of Cabo San Lucas, Baja California Sur, México, with the following measurements and boundaries: from point D-1 to E heading North, a distance of 65.93 meters and Azimuth of 300º 09' 21" abutting with Lot (I) one; from point E to D-3 heading North, a distance of 122.10 meters and Azimuth of 295º 38' 05" abutting with Lot (I) one; from point D-4 to VZF-5 heading South, a distance of 4.95 meters and Azimuth of 119º 55' 06" abutting with Pacific Ocean; from point VZF-5 to V-4 heading South, a distance of 60.27 meters and Azimuth of 117º 07' 54" abutting with Pacific Ocean; from point V-4 al V-3 heading South, a distance of 74.40 meters and Azimuth of 117º 55' 10" abutting with Pacific Ocean; from point V-3 to D-2 heading South, a distance of 48.86 meters and Azimuth of 119º 36' 06" abutting with Pacific Ocean; from point D-2 al D-1 heading East, a distance of 628.56 meters and Azimuth of 17º 08' 24" abutting with Lot (III) three; from point D-3 to D-4 heading West, a distance of 625.87 meters and Azimuth of 197º 08' 24" abutting with Lot (V) five. Save and except "Affectation Area along the Pacific Ocean of 9,671.71 square meters as shown on survey dated February 10, 2009, by Topografía y Dibujo (J. Alfredo Ontiveros Macario)".

Parcel V:

Lot V of identified by La Laguna, Municipality of Cabo San Lucas, Baja California Sur, México, with the following measurements and boundaries: From point D-3 to F heading North, a distance of 69.78 meters and Azimuth of 295º 38' 05" abutting with Lot (II) two; from point F to D-5 heading North, a distance of 116.98 meters and Azimuth of 294º 38' 35" abutting with Lot (II) two; from point D-6 to VZF-6 heading South, a distance of 99.17 meters and Azimuth of 122º 53' 10" abutting with Pacific Ocean; from point VZF-6 to D-4 heading South, a distance of 91.81 meters and Azimuth of 119º 55' 07" abutting with Pacific Ocean; from point D-4 al D-3 heading East, a distance of 625.87 meters and Azimuth of 17º 08' 24" abutting with Lot (V) five; and from point D-5 al D-6 heading West, a distance of 604.23 meters and Azimuth of 197º 08' 24" abutting with Lot (VI) six. Save and except "Affectation Area along the Pacific Ocean of 7,127.60 square meters as shown on survey dated February 10, 2009, by Topografía y Dibujo (J. Alfredo Ontiveros Macario)".

Parcel VI:

Lot VI of identified by La Laguna, Municipality of Cabo San Lucas, Baja California Sur, México, with the following measurements and boundaries: From point D-5 to K heading North, a distance of 183.01 meters and Azimuth of 294º 38' 35" abutting with Lot (II) two; from point D-7 to VZF-9 heading South, a distance of 67.36 meters and Azimuth of 269º 51' 08" abutting with Pacific Ocean; from point VZF-9 to VZF-8 heading South, a distance of 46.26 meters and Azimuth of 114º 34' 05" abutting with Pacific Ocean; from point VZF-8 to VZF-7 heading South, a distance of 66.73 meters and Azimuth of 111º 07' 02" abutting with Pacific Ocean; from point VZF-7 to D-6 heading South, a distance of 1.77 meters and Azimuth of 122º 53' 15" with Pacific Ocean; from point D-6 to D-5 heading East, a distance of 604.23 meters and Azimuth of 17º 08' 24" abutting with Lot (V) five; and from point K to D-7 heading West, a distance of 613.71 meters and Azimuth of 197º 08' 24" abutting with property of Atilio Colli. Save and except "Affectation Area along the Pacific Ocean of 5,673.26 square meters as shown on survey dated February 10, 2009, by Topografía y Dibujo (J. Alfredo Ontiveros Macario)".

Parcel VII:

Lot VII of identified by La Laguna, Municipality of Cabo San Lucas, Baja California Sur, México, with the following measurements and boundaries: From point 96 to 60 heading North, a distance of 87.67 meters and Azimuth of 117º 15' 23" abutting with property of Atilio Colli; from point 60 to 64 heading North, a distance of 54.26 meters and Azimuth of 113º 29' 56" abutting with property of Atilio Colli; from point 64 to R heading North, a distance of 59.19 meters and Azimuth of 120º 51' 16" abutting with property of Atilio Colli; from point R to 65 heading North, a distance of 75.37 meters and Azimuth of 112º 48' 01" abutting with property of Atilio Colli; from point 65 to 68 heading North, a distance of 57.64 meters and Azimuth of 114º 22' 21" abutting with property of Atilio Colli; from point 68 to 69 heading North, a distance of 77.33 meters and Azimuth of 127º 28' 03" abutting with property of Atilio Colli; from point 69 to 73 heading North, a distance of 40.74 meters and Azimuth of 115º 39' 35" abutting with property of Atilio Colli; from point 73 to 74 heading North, a distance of 74.11 meters and Azimuth of 104º 58' 12" abutting with property of Atilio Colli; from point 74 to 80 heading North, a distance of 44.26 meters and Azimuth of 98º 31' 27" abutting with property of Atilio Colli; from point 80 to 79 heading North, a distance of 34.90 meters and Azimuth of 128º 42' 46" abutting with property of Atilio Colli; from point 79 to 78 heading North, a distance of 46.34 meters and Azimuth of 117º 18' 42" abutting with property of Atilio Colli; from point 78 to 77 heading North, a distance of 51.26 meters and Azimuth of 123º 57' 37" abutting with property of Atilio Colli; from point 77 to 83 heading North, 44.09 meters and Azimuth of 110º 40' 31" abutting with property of Atilio Colli; from point 117 to J heading South, a distance of 127.83 meters and Azimuth of 287º 08' 24" abutting with Lot (I) one; from point J to I heading South, a distance of 31.50 meters and Azimuth of 17º 08' 36" abutting with Lot (I) one; from point I to H heading South, 127.50 meters and Azimuth of 300º 09' 20" abutting with Lot (I); from point H to G heading South, a distance of 191.89 meters and Azimuth of 295º 38' 05" abutting with Lot (II) two; from point G to M heading South, a distance of 65.00 meters and Azimuth of 17º 08' 57" abutting with Lot II(two); from point M to L heading South, a distance of 299.94 meters and Azimuth of 294º 39' 15" abutting with Lot (II) two; from point 83 to 117 heading East, a distance of 395.92 meters and Azimuth of 196º 54' 59" abutting with property of Francisco Arballo; and from point L to 96 heading West, a distance of 315.33 meters and Azimuth of 18º 13' 32" abutting with property of Atilio Colli.

Parcel VIII:

Polygon I of identified by La Laguna, Municipality of Cabo San Lucas, Baja California Sur, México, with the following measurements and boundaries: To the North in two fractions a distance of 2,299.705 meters abutting with property of Victor Hugo Ceseña, plus 139.771 meters with Polygon III, to the South in three fractions, a distance of 139.815 meters with Polígono III, plus 1,605.070 meters abutting with Federal Maritime Zone of Pacific Ocean, plus 747.160 meters abutting with Lot (VII) seven, to the East in two fractions, a distance of 1,714.370 meters abutting with property of Nestor Herrera, plus 1,129.040 meters abutting with Lots (II) two, (VI) six and (VII) seven; and to the West, in three fractions, a distance of 1,995.580 meters abutting with Polygon II, plus 100.00 meters abutting with Polygon III, plus 374.414 meters abutting with property of Luis Bulnes Molleda. "Save and except Affectation Area along the Pacific Ocean of 9-47-06.51 hectares as shown on survey dated February 10, 2009, by Topografía y Dibujo (J. Alfredo Ontiveros Macario)".

**EXHIBIT C**

**Master Plan**

-77-

::ODMA\PCDOCS\BA3DOCS1\412820\8

CONFIDENTIAL DANSKE_0013951



Vialidad existente
OCEAN VISTA VILLAS 1
100 UNITS
OCEAN VISTA VILLAS 2
100 UNITS
OCEAN VIEW ESTATES
(86 LOTS)
FUTURE DEVELOPMENT
847,387.40m2
(209.40 Acres)
OASIS ESTATES
(40 LOTS)
NESTOR JOSE HERRERA RITCHIE
FRACCION "B"
VILLAGE VILLAS
(100 UNITS)
SUNSET HILL
(78 LOTS)
GOLF VILLAS
(66 UNITS)
Hotel Site
264,939.47m2
(65.46 Acres)
Beach front
782,150.97m2
(193.27 Acres)
EJIDO CABO SAN LUCAS
OCEANO PACIFICO

CONFIDENTIAL DANSKE_0013952

**Exhibit 3.1(b)**

[Description of Litigation]

1. United States District Court
District of Arizona
Little Isle IV, LLC, a Delaware Limited Liability company; Ula Makika, LLC, a Delaware Limited Liability Company; and Philip Kenner, Plaintiffs
v.
Kenneth A. Jowdy, et al, Defendant
No. CV-09-142-PHX-SRB