# EXHIBIT 47

DANSKE BANK A/S, LONDON BRANCH
75 King William Street
London EC4N 7DT

June 29, 2012

<u>VIA EMAIL</u>
DIAMANTE CABO SAN LUCAS S. DE R.L. DE C.V.
c/o Mr. Kenneth Jowdy, General Administrator
Boulevard Marina S/N Local 1 Centro
Cabo San Lucas, B.C.S. C.P. Mexico 23450

      RE:    **<u>Diamante Cabo Loan: Extension of Maturity Date</u>**

Dear Mr. Jowdy:

Reference is made to the loan made to Diamante Cabo San Lucas S. De C.V. ("**Borrower**") that is now held by Danske Bank A/S, London Branch ("**Lender**") and is more particularly described on <u>Schedule A</u> attached hereto and incorporated herein. By that letter agreement dated April 2, 2012 (the "**First Letter Extension Agreement**"), Lender, Borrower, Kenneth A. Jowdy ("**Jowdy**"), Diamante Cabo San Lucas, LLC ("**Diamante**") Diamante Properties, LLC ("**Diamante Properties**"), and KAJ Holdings, LLC ("**KAJ**") (Jowdy, Diamante, Diamante Properties and KAJ are collectively referred to as "**Guarantors**" and Guarantors and Borrower are collectively referred to herein as "**Obligors**") agreed to extend the Maturity Date of the Loan to June 29, 2012 and modify certain applicable interest rates as more particularly set forth therein. Subject to the terms and conditions set forth in this second extension letter agreement (this "**Second Extension Agreement**"), Lender and Obligors agree to extend the Maturity Date of the Loan from June 29, 2012 to September 28, 2012 and provide for certain other obligations of Borrower all as more particularly set forth herein. Collectively, Lender and Obligors are referred to herein as "**Parties**". Initially capitalized terms used herein and not otherwise defined (including any definitions set forth on Schedule A) shall have the meaning ascribed to such term in the Loan Documents.

In consideration of the foregoing and the acknowledgements, representations, warranties, and covenants of Obligors contained herein, the Parties, by their signatures below, enter into this Second Extension Agreement as follows:

    1.    <u>Confirmation of the Notes, the Security Instruments and the other Loan Documents; Conditions to Closing.</u>

        a.    Obligors hereby ratify and confirm their respective obligations under the Notes and the Loan Documents. Borrower hereby acknowledges and agrees that the Notes evidence advances made to Borrower and that the Loan Documents secure, among other obligations, Borrower's obligations to Lender pursuant to the Notes, the Trust and the other Loan Documents, with first lien priority. As of <u>June 26, 2012</u>, Borrower acknowledges and agrees that it is indebted to Lender for the following amounts:

1392262-v4

| Facility A Loan: | Original principal balance: $109,138,327.83 |
| | Capitalized Interest: $11,314,585.86 |
| | Plus all accrued and unpaid interest thereon. |
| Facility B Loan: | Principal balance: $13,889,927.52 |
| | Deferred Interest: $2,546,072.32 |
| | Plus all accrued and unpaid interest thereon. |

Obligors further acknowledge that the foregoing does not take into account any other amounts, charges or other sums (including, without limitation, attorneys' fees, lender fees, updated title reports and expenses and other amounts) other than as enumerated above that may be payable pursuant to the Loan Documents.

    b.    <u>Conditions to Extension; Post-Closing Obligations.</u>

    1.    <u>Conditions to Extension.</u>  As a condition to Lender's execution and delivery of this Agreement, Borrower shall have provided to Lender the following:

    a.    Current information with respect to all product sales at the Project together with any other information reasonably requested by Lender; and

    b.    Preliminary financial statements for Borrower and Guarantor in accordance with the terms set forth in Section <u>13.1(j)</u> of the Loan Agreement.

    2.    <u>Post-Closing Obligations of Borrower.</u>  No later than July 31, 2012, Borrower shall deliver to Lender the following:

    a.    Final audited financial statements for Borrower and financial statements for Guarantor certified as true by the party to whom each relates in accordance with the terms set forth in Section <u>13.1(j)</u> of the Loan Agreement; and

    b.    Evidence of insurance required under <u>Section 13.2</u> of the Loan Agreement with respect to all Improvements located upon the Project.  Such evidence of insurance shall be subject to the review and approval of Lender which may be granted or withheld in it reasonable discretion.  Borrower and Lender expressly acknowledge and agree that the definition of "Improvements" as set forth in the Loan Agreement shall include any and all development and construction improvements located upon the Project (including but not limited to the DRC club house, preliminary development and construction in the resort phase of the Project, and construction of villas in any phases of the Project), regardless of whether the same are included under the heading "Phase I" in the Construction Budget attached to the Loan Agreement or shown on the Master Plan.

    c.    Executed trustee acknowledgements to those time share contracts designated by Lender.

    2.    <u>Acknowledgement of Default and Entitlement to Exercise Remedies.</u>  Without confirming or denying that there may be other defaults by Borrower or Guarantor under any of

1392262-v4

CONFIDENTIAL

DANSKE_0010887

the Loan Documents, an Event of Default has occurred with respect to the Loan due to the Borrower's failure to pay the Future Equity Requirements as and when due (pursuant to Section 11 of the Loan Agreement) and Borrower's failure to pay down the principal balance of Facility B by December 31, 2010 as required under the Loan Documents. All applicable notice and cure periods with respect to the Events of Default have expired and but for the forbearance by Lender during the term of the Loan (as extended hereby), Lender has the right to exercise any and all rights and remedies of Lender under the Loan Documents and applicable law. Neither Borrower nor any Guarantor, has nor shall have, against Lender any defense, setoff, claim, counterclaim or cause of action of any kind or nature whatsoever with respect to: (i) the Loan, the Loan Documents or any Event of Default thereunder; (ii) the administration or funding of the Loan or the development, operation or financing of the Project; (iii) any acts or omissions of Lender; or (iv) any other transaction, matter or occurrence between Borrower or Guarantor and Lender. Any release of funds by Lender to Borrower during the remaining term of the Loan is not and shall not be construed as a waiver of any Events of Default currently existing or any other defaults under the Loan or the Loan Documents, or be construed as a reinstatement, satisfaction, or modification of the Loan or the Loan Documents, or as a waiver, relinquishment or forbearance by Lender of any rights or remedies under the Loan or the Loan Documents, all of which defaults, rights and remedies have been and hereby are expressly reserved by Lender and that the release of the Funds does not constitute a waiver by Lender of its security interest in the Project and any other collateral of the Loan. This Agreement and the Loan Documents to which each of Borrower and Guarantor is a party constitute the valid and legally binding obligations of Borrower and Guarantor (each to the extent applicable), enforceable against each of Borrower and Guarantor in accordance with their respective terms. The execution and delivery of this Agreement does not contravene, result in a breach of, or constitute a default under any mortgage, pledge agreement, deed of trust, loan agreement, indenture or other contract or agreement to which each Obligor (or their respective underlying equity owners) are bound, nor would such execution and delivery constitute a default with the passage of time or the giving of notice, or both.

3.      Extension of Maturity Date.      The Maturity Date is hereby extended from June 29, 2012 to September 28, 2012. Any and all references in the Loan Documents to **"Maturity Date"** shall mean the date of September 28, 2012.

4.      Interest Rates on Facility A Loan and Facility B Loan. Article V, Section (b)(ii) and (iii) of the Loan Agreement are hereby amended as follows:

a.      Section 5(b)(ii) and (iii) are hereby deleted in their entirety and replaced with the following:

"(ii)      2012 Facility A Interest. For the period commencing January 1, 2012, interest calculated in arrears at the 2012 Facility A Interest Rate shall be payable as follows:

1.   On the April Payment Date, Borrower shall pay the interest calculated in arrears at the 2012 Facility A Interest Rate on the then-outstanding principal balance of the Facility A Loan (such amount, the **"First Quarter Facility A Interest Payment"**); and

2.   On the July Payment Date, Borrower shall pay the interest calculated in arrears at the 2012 Facility A Interest Rate on the then-outstanding principal

CONFIDENTIAL

DANSKE_0010888

balance plus all capitalized interest thereon of the Facility A Loan (such amount, the "**Second Quarter Facility A Interest Payment**"); and

3. On the Maturity Date, Borrower shall pay the interest calculated in arrears at the 2012 Facility A Interest Rate on the then-outstanding principal balance plus all capitalized interest thereon of the Facility A Loan (such amount, the "**Third Quarter Facility A Interest Payment**")

(iii)   <u>Monthly Interest Reserve Deposit</u>.

1. In addition to the payment obligations due from Borrower on the April Payment Date, July Payment Date and Maturity Date, Borrower shall deposit with Lender to be held in the Interest Reserve Account an amount equal to $400,000 (such amount, "**Monthly Interest Reserve Deposit**") on each of May 1, 2012, June 1, 2012, July 1, 2012, August 1, 2012 and September 1, 2012 as additional security for the Loan.

2. Borrower hereby collaterally assigns, grants a security interest in and pledges to Lender, to the extent not prohibited by applicable law, a first priority continuing security interest in the Interest Reserve Account and all cash, checks, drafts, securities, entitlements, certificates, instruments and other property, including without limitation all deposits and/or wires transfers from time to time deposited or held in or credited to or made to the Interest Reserve Account including all interest accrued thereon. Lender shall have all of the rights and remedies with respect to the Interest Reserve Account available to a secured party at law or in equity, including without limitation, the rights and remedies of a secured party under the UCC, as if such rights and remedies were fully set forth herein. The Interest Reserve Funds shall be used solely by Borrower for payment of the Quarterly Interest Payments.

3. Borrower and Lender acknowledge and agree that if there are sufficient funds in the Collection Account to pay the Monthly Interest Reserve Deposit due from Borrower on such Payment Date, then Lender shall direct the transfer of such amount from the Collection Account to the Interest Reserve Account. If there is any shortfall in funds available in the

1392262-v4

CONFIDENTIAL

> Collection Account to pay such amounts when due, then Borrower shall remit the difference to Lender on the applicable Payment Date. Borrower's failure to make such payment shall be an Event of Default. Lender may apply any funds in the Interest Reserve Account to the payment of the Quarterly Interest Payments due from Borrower. If an Event of Default shall occur, Lender may apply the Interest Reserve Funds in its sole discretion."

For purposes of this Agreement, the following terms shall have the following meanings:

**"July Payment Date"** shall mean July 1, 2012.

**"Interest Reserve Account"** shall mean the blocked interest reserve account established by Lender as secured party.

**"Interest Reserve Funds"** shall mean all funds transferred to or deposited in the Interest Reserve Account.

      b.   <u>Section 5.2(b)(ii) and (iii)</u> of the Loan Agreement are hereby deleted in their entirety and replaced with the following:

"(ii)    <u>2012 Facility B Interest</u>. For the period commencing January 1, 2012, interest calculated in arrears at the 2012 Facility B Interest Rate shall be payable as follows:

    1.    On the April Payment Date, Borrower shall pay the interest calculated in arrears at the 2012 Facility B Interest Rate on the then-outstanding principal balance of the Facility B Loan (such amount, the **"First Quarter Facility B Interest Payment"**, and collectively with the First Quarter Facility A Interest Payment, the **"First Quarter Interest Payment"**); and

    2.    On the July Payment Date, Borrower shall pay the interest calculated in arrears at the 2012 Facility B Interest Rate on the then-outstanding principal balance plus all capitalized interest thereon of the Facility B Loan (such amount, the **"Second Quarter Facility B Interest Payment"**, and collectively with the Second Quarter Facility A Interest Payment, **"Second Quarter Interest Payment"**); and

    3.    On the Maturity Date, Borrower shall pay the interest calculated in arrears at the 2012 Facility B Interest Rate on the outstanding principal balance and all capitalized interest thereon of the Facility B Note (such amount, the **"Third Quarter Facility B Interest Payment"**, and collectively with the Third Quarter Facility A Interest Payment, the **"Third Quarter Interest Payment"**). The First Quarter Interest Payment, Second Quarter Interest Payment, and Third Quarter Interest Payment are collectively referred to herein as the **"Quarterly Interest Payments"**).

      c.    Borrower expressly acknowledges and agrees that in addition to the Events of Default described in the Loan Documents, it shall be an Event of Default if

1392262-v4

Borrower fails to pay Lender the payments set forth in <u>Section 5.1(b)</u> and <u>Section 5.2(b)</u> described above.

        d.      Borrower and Lender acknowledge and agree that if there are sufficient funds in the Interest Reserve Account to pay the Quarterly Interest Payments due from Borrower pursuant to Section 5.1(b) and 5.2(b) above, then Lender shall direct the transfer of such amount on the Maturity Date.  If there is any shortfall in funds available in the Interest Reserve Account, then Lender shall direct the transfer of funds from the Collection Account to pay the Second Quarterly Interest Payment when due.  If there is a shortfall in funds available in the Collection Account, then Borrower shall remit the difference to Lender on the Maturity Date, and Borrower's failure to make such payment shall be an Event of Default

       5.    <u>Waiver</u>.  Each Obligor hereby waives (a) any defense based upon any legal disability or other defense of Borrower, any other Obligor, or other person, or by reason of the cessation or limitation of the liability of Borrower or any other Obligor from any cause other than full payment of all sums payable under the Notes or any of the other Loan Documents; (b) any defense based upon any lack of authority of the officers, directors, partners or agents acting or purporting to act on behalf of Borrower, any other Obligor or any principal of Borrower or any other Obligor or any defect in the formation of Borrower or any other Obligor or any principal of Borrower or any other Obligor; (c) any defense based upon the application by Borrower or any other Obligor of the proceeds of the Loan for purposes other than the purposes represented by Borrower or any other Obligor to Lender or Danske or intended or understood by Lender or Danske or any Obligors; (d) all rights and defenses arising out of an election of remedies by Lender or Danske, even though that election of remedies, such as a non-judicial foreclosure with respect to security for a guaranteed obligation has destroyed such Pledgor's or Guarantor's rights of subrogation and reimbursement against Borrower; (e) any defense based upon Lender's or Danske's failure to disclose to Pledgors or Guarantors any information concerning Borrower's financial condition or any other circumstances bearing on Borrower's ability to pay all sums payable under the Notes or any of the other Loan Documents; (f) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in any other respects more burdensome than that of a principal; (g) any defense based upon any borrowing or any grant of a security interest under Section 364 of the Federal Bankruptcy Code; (h) any defense based upon Lender's election, in any proceeding instituted under the Federal Bankruptcy Code, of the application of Section 1111(b)(2) of the Federal Bankruptcy Code or any successor statute (i) any right of subrogation, any right to enforce any remedy which Lender may have against Borrower and any right to participate in, or benefit from, any security for the Notes or the other Loan Documents now or hereafter held by Lender; (j) presentment, demand, protest and notice of any kind; (k) the benefit of any statute of limitations affecting the liability of any Pledgor or Guarantor hereunder or the enforcement hereof.  In addition, each Obligor waives all rights and defenses that each may have because Borrower's debt is secured by real property.  This means, among other things: (l) Lender may collect from Guarantors and/or Pledgors without first foreclosing on any real or personal property collateral pledged by Borrower; and (m) if Lender forecloses on any real property collateral pledged by Borrower, then (i) the amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price, and (ii) Lender may collect from Guarantors and/or Pledgors  even if Lender, by foreclosing on the real property collateral, has destroyed any right Guarantors and/or Pledgors may have to collect from Borrower.  The foregoing sentence is an unconditional and irrevocable waiver of any rights and defenses Obligors may have because Borrower's debt is secured by real property.  Finally, Obligors agree that the payments of all sums payable under the Notes or any of the other

1392262-v4

DANSKE_0010891

Loan Documents or any part thereof or other act which tolls any statute of limitations applicable to the Notes or the other Loan Documents shall similarly operate to toll the statute of limitations applicable to Obligors' liability hereunder.

6.      Release.  By its execution of this Agreement, each Obligor signing hereto, for itself and to the full extent legally possible, for and on behalf of each of its predecessors, successors, assigns, members, partners, managers, stockholders, officers, directors, employees, affiliates, agents and representatives (collectively, "**Releasing Parties**"), hereby releases and forever discharges Lender and Danske, each of its affiliates and subsidiaries, and each of their respective past, present or future members, managers, partners, stockholders, beneficiaries, directors, officers, employees, attorneys, agents and representatives, including successors and assigns of any kind of the foregoing ("**Released Parties**"), from any and all claims, demands, actions, losses, liabilities, costs and expenses, including without limitation attorneys' fees and costs (collectively "**Claims**"), whether such Claims arise under theories of reinstatement, waiver, course of dealing, mortgagee in possession or otherwise, including but not limited to Claims arising from events occurring or circumstances existing on or prior to the date hereof in any way related to the Loan, the Loan Documents (including but not limited to the Notes, Trust Agreement, and Pledge Agreements), the Project or any other collateral securing the Loan, including without limitation, Claims arising from or under construction contracts or subcontracts or any work performed on or materials provided to the Project or the Property, and any and all discussions and negotiations regarding proposed terms and conditions for a possible extension and/or modification of the Loan (collectively "**Released Loan Claims**").

7.      Indemnification.  Each Obligor agrees jointly and severally that it shall indemnify and hold harmless: Lender and all of its officers, directors, shareholders, employees, affiliates, agents, representatives, successors and assigns (each an "**Indemnified Party**"), from and against any and all Claims, including but not limited to the Released Loan Claims, incurred by any Indemnified Party arising out of or in any way related to the advance and release of the Funds made pursuant to this Agreement, whether such Claims arise under theories of reinstatement, waiver, course of dealing, mortgagee in possession or otherwise.

8.      Covenant Not to Sue.  Each Obligor that executes and delivers this Agreement agrees on behalf of itself and its respective Releasing Parties not to bring, or to assist in bringing, any Claims. Each Obligor, for itself and each of its respective Releasing Parties, hereby covenants and agrees that it shall not sue, commence, assert, bring or file, in any court or other tribunal, in any jurisdiction, any suit, action, litigation, complaint, counterclaim, cross-claim, cross-complaint, third-party complaint or other pleading setting forth any claim or cause of action, or otherwise seeking affirmative relief, against any Released Parties, for any claims or causes of action of any kind or nature whatsoever, known or unknown, which any Obligor or its respective Releasing Parties has, had or may have against Released Parties arising out of, or relating directly or indirectly to, the Released Loan Claims.

9.      Miscellaneous.

(a)      Except as expressly set forth herein, all of the terms, conditions and covenants of the Loan Documents (including the First Letter Extension Agreement) shall remain unaltered and in full force and effect and shall be binding upon Obligors in accordance with their terms in all respects and are hereby ratified and confirmed.

(b)      Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this

1392262-v4

CONFIDENTIAL

DANSKE_0010892

Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

(c)   Governing Law; Submission to Jurisdiction.  This Agreement shall be governed by and construed in accordance with the laws of the state of New York, without giving affect to conflict of law provisions.  The provisions of Section 20.3 of the Loan Agreement are hereby incorporated herein by reference, except that all references to "Borrower" therein shall be deemed to be "Obligors".

(d)   Counterparts.  This Agreement may be executed by the parties hereto individually or in any combination, in one or more counterparts, each of which shall be an original and all of which together constitute one and the same agreement.

(e)   No Partnership, Joint Venture or Agency.  Neither this Agreement nor any of the Loan Documents shall in any respect be interpreted, deemed or construed as making Lender a partner or joint venturer with any of the Obligors, nor shall they be interpreted, deemed or construed as making Lender the agent or representative of any of Obligors, and Obligors agree not to make any contrary assertion, contention, claim or counterclaim in any action, suit or other legal proceeding involving Lender.

(f)   Successors and Assigns.  The terms and conditions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their successors and permitted assigns.

(g)   Integration and Entire Agreement.  THIS AGREEMENT, TAKEN TOGETHER WITH THE LOAN DOCUMENTS, EMBODIES THE ENTIRE AGREEMENT BETWEEN OBLIGORS AND LENDER WITH RESPECT TO THE LOAN AND THE SUBJECT MATTER OF THIS AGREEMENT AND FULLY SUPERSEDES ALL PRIOR AGREEMENTS AND UNDERSTANDING BETWEEN THE OBLIGORS PERTAINING TO SUCH SUBJECT MATTER.

(h)   Final Agreement.  THIS AGREEMENT REPRESENTS THE FINAL AGREEMENT AMONG THE OBLIGORS REGARDING THE MATTERS SET FORTH HEREIN, AND MAY NOT BE CONTRADICTED BY THE OBLIGORS.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE OBLIGORS AND LENDER.

(i)   EACH OBLIGOR HAS THOROUGHLY READ AND REVIEWED THE TERMS AND PROVISIONS OF THIS AGREEMENT AND IS FAMILIAR WITH SAME, AND EACH OF THE OBLIGORS HAS ENTERED INTO THIS AGREEMENT VOLUNTARILY, WITHOUT DURESS OR UNDUE INFLUENCE OF ANY KIND, AND WITH EITHER: (I) THE ADVICE AND REPRESENTATION OF LEGAL COUNSEL SELECTED BY SUCH OBLIGOR; OR (II) THE KNOWING AND VOLUNTARY ELECTION NOT TO RECEIVE THE ADVICE AND REPRESENTATION OF LEGAL COUNSEL. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH OBLIGOR HAS ESTABLISHED TO ITS SATISFACTION WHETHER SUCH OBLIGOR, OR ANY OTHER OBLIGOR IN WHICH SUCH OBLIGOR HOLDS A DIRECT OR INDIRECT OWNERSHIP INTEREST, HAS BEEN REPRESENTED OR OTHERWISE ADVISED BY LEGAL COUNSEL WITH RESPECT TO THE LOAN, THE LOAN DOCUMENTS, THE PROJECT AND/OR THIS AGREEMENT;

[SIGNATURES BEGIN ON NEXT PAGE]

1392262-v4

DANSKE_0010893

[SIGNATURE PAGE TO AGREEMENT]

**LENDER**

DANSKE BANK A/S, LONDON BRANCH

By: _____
Name: DAVID DANIEL
Its: AUTHORISED SIGNATORY

By: _____
Name: JOVAN ATKINSON
Its: AUTHORISED SIGNATORY

Date:

[SIGNATURES CONTINUE ON NEXT PAGE]

1392262-v4

CONFIDENTIAL

DANSKE_0010894

ACKNOWLEDGED AND AGREED:

**OBLIGORS:**

**DIAMANTE CABO SAN LUCAS S. DE R.L. DE C.V.**, a Mexican limited liability company with variable capital

By: _____
Name: Kenneth A. Jowdy
Title: General Administrator

**DIAMANTE CABO SAN LUCAS, LLC**, a Delaware limited liability company

By: _____
Name: Kenneth A. Jowdy
Title: Managing Member

**DIAMANTE PROPERTIES, LLC**, a Delaware limited liability company

By: _____
Name: Kenneth A. Jowdy
Title: Managing Member

**KAJ:**

**KAJ HOLDINGS, LLC**, a Delaware limited liability company

By: _____
Name: Kenneth A. Jowdy
Title: Managing Member

[SIGNATURES CONTINUE ON NEXT PAGE]

1392262-v4

CONFIDENTIAL

DANSKE_0010895

KENNETH A. JOWDY

_____
Kenneth A. Jowdy, an individual

1392262-v4

CONFIDENTIAL

DANSKE_0010896

## SCHEDULE A
(Description of Loan)

Reference is made to that certain loan made by Lehman Brothers Holdings Inc. ("**Lehman**") to Diamante Cabo San Lucas S. De R. L. De C.V. a Mexican limited liability company ("**Borrower**") in the original principal amount of One Hundred Twenty Five Million Dollars ($125,000,000.00) ("**Original Loan**") to be used to fund certain acquisition and pre-development costs in connection with that certain resort project located in the City of Cabo San Lucas, Baja California Sur, Mexico.

The Original Loan is evidenced and secured by loan documents dated March 10, 2006 and identified on the Schedule of Original Loan Documents attached hereto as Schedule 1 ("**Original Loan Documents**"). Pursuant to that certain Omnibus Assignment and Assumption dated January 13, 2009 by and between Lehman, as assignor, and Lender, as assignee, Lehman assigned to Lender, and Lender assumed from Lehman all of Lehman's right, title and interest in the Original Loan and the Original Loan Documents.

Lehman and Danske Bank A/S, London Branch, the London Branch of a company incorporated in Denmark ("**Lender**") executed certain assignment agreements dated February 27, 2009 whereby the assignment of Lehman's rights under the Original Trust Agreement, the Pledge Agreement (Membership Interests in Borrower: Mexico) and the Pledge Agreement (Assets) in favor or Lender was perfected in accordance with Mexican law.

Lender, Borrower and Guarantors agreed to modify certain terms and conditions of the Original Loan Documents and in connection therewith, reaffirmed, amended and/or amended and restated the Original Loan Documents pursuant to certain Amended Loan Documents listed on Schedule 2 (as reaffirmed, amended and/or amended and restated, "**2009 Amended Loan Documents**").

Among the several modifications made pursuant to the 2009 Amended Loan Documents, Lender, as the holder of that certain Promissory Note dated March 10, 2006 in the original principal amount of $125,000,000.00 ("**Original Note**"), and Borrower, as the borrower under the Original Note, agreed to split the indebtedness evidenced by the Original Note into two (2) separate obligations of indebtedness as evidenced by:

  (i) Substitute Promissory Note (Facility A) dated as of March 6, 2009 in the amount of One Hundred Nine Million One Hundred Thirty-Eight Thousand Three Hundred Twenty Seven and 83/100 Dollars ($109,138,327.83); and

  (ii) Substitute Promissory Note (Facility B) dated as of March 6, 2009 in the amount of Sixteen Million and 00/100 Dollars ($16,000,000.00) ("**Facility B Note**").

Lender, Borrower and Guarantors agreed to further modifications of certain terms and conditions of the Original Loan Documents and 2009 Amended Loan Documents, and in connection therewith reaffirmed and amended certain of the Original Loan Documents and 2009 Amended Loan Documents listed on Schedule 3, (as reaffirmed and amended,

1392262-v4

CONFIDENTIAL

DANSKE_0010897

"**2010 Amended Loan Documents**," and together with the 2009 Amended Loan Documents, the First Extension Letter Agreement, Second Extension Letter Agreement, and any and all other documents delivered in connection with the Loan, the "**Loan Documents**"), which amendments include, *inter alia*, increasing the principal balance available under Facility B Note from $16,000,000 to $20,000,000.

Lender, Borrower and Guarantors agreed to further modifications to the Loan pursuant to the Letter Agreement Regarding Extension of Maturity Date dated April 2, 2012 ("**First Extension Letter Agreement**").

1392262-v4

CONFIDENTIAL

DANSKE_0010898