# EXHIBIT 58
# (Part 2 of 2)

## ARTICLE IV
## LOAN AND LOAN DOCUMENTS

Section 4.1    Agreement to Borrow and Lend.

Subject to the terms, provisions and conditions of this Agreement, the Original Loan Documents and the Danske Amended Loan Documents, Borrower agrees to borrow from Lender and Lender agrees to lend to Borrower the Loan, for the purposes of and subject to all of the terms, provisions and conditions contained in this Agreement.

(a)    The Loan shall be made to Borrower on the terms and conditions hereinafter set forth. The Loan will bear interest at the rate or rates, and will be repaid, as set forth in this Agreement and in the Notes. Borrower shall use the proceeds of the Loan solely for the purposes specified herein.

(b)    The aggregate amount of the Loan shall not exceed (i) with respect to the Facility A Note, One Hundred Twenty-Three Million Five Hundred Thousand and 00/100 Dollars ($123,500,000.00); and (ii) with respect to the Facility B Note, Eighteen Million and 00/100 Dollars ($18,000,000); (iii) with respect to Replacement Facility C Note, Fifteen Million Dollars ($15,000,000.00). The Facility A Note is not revolving in nature, and any amounts repaid under such Note may not be subsequently readvanced. The Facility B Note and the Replacement Facility C Note are each revolving in nature, and, subject to satisfaction of the conditions and requirements set forth herein, Borrower may obtain, repay and re-obtain disbursements under the Facility B Note and Replacement Facility C Note.

(c)    Intentionally deleted.

(d)    Borrower authorizes Lender to disburse the Loan proceeds by crediting the Wells Fargo Income Account, provided, however, that Lender shall not be obligated to use such method. At Lender's option, disbursements may be made by Lender into an escrow account with an escrow agent designated by Lender and subsequently disbursed by such escrow agent to Borrower. If such option is exercised, Loan proceeds so disbursed shall be deemed to be disbursed to Borrower on the date of deposit into the escrow, and interest shall accrue thereon from that date, regardless of the date such proceeds are released to Borrower by Title Insurer.

(e)    Borrower and Lender acknowledge and agree that Borrower's total obligations to Lender as of the date hereof are as set forth in this Agreement and the Danske Amended Loan Documents.

(f)    The proceeds of the Replacement Facility C Loan shall be used solely for partially funding the construction and completion of those construction and infrastructure items set forth in the Project Construction Budget and for no other purpose.

7585436-v6

CONFIDENTIAL

DANSKE_0012274

Section 4.2    Loan Documents.

(a)    At the initial closing on March 10, 2006, Borrower and the Borrower Parties executed and delivered to Lender the Original Loan Documents.  At the first loan modification closing on March 9, 2009, Borrower and the Borrowing Parties executed and delivered the 2009 Loan Modification Documents.  At the second modification closing on January 20, 2010, Borrower and Borrowing Parties executed and delivered the 2010 Loan Modification Documents.  Pursuant to the 2012 and 2013 Extension Letters and the 2013 Additional Advance Agreement, certain other terms and conditions of the Original Loan Documents, 2009 Amendment Loan Documents, and 2010 Amended Loan Documents were amended.  At the third modification closing on April 30, 2013, Borrower and Borrower Parties executed and delivered the 2013 Amended Loan Documents.  Except for (i) this Agreement (which amends and restates the terms of the Second Amended and Restated Loan Agreement), (ii) the Replacement Facility C Note, which consolidates, amends and restates the Facility C Note and Facility D Note and increases the available principal amount thereunder by $10,000,000), the other Original Loan Documents, as reaffirmed by the 2014 Amended Loan Documents, survive as binding and enforceable obligations on the parties named therein, and their permitted successors and assigns.  If there is any conflict among the terms and provisions of this Agreement and any prior loan agreement, the provisions of this Agreement shall govern and be binding upon the parties.

(b)    On the Effective Date, Borrower shall execute and deliver (and cause any party thereto other than Borrower or Lender to execute and deliver) to Lender and Trustee, as appropriate, 2014 Amended Loan Documents (in the presence, where required, of a Mexican notary).

Section 4.3    Term of the Loan.

(a)    Except as provided in sub-section (b) hereof with respect to Replacement Facility C Loan, all principal, interest, the Profit Participation Fee, the Non-Utilization Fee, and any other charges or sums due hereunder or under the 2014 Amended Loan Documents shall be payable in full on the Maturity Date.

(b)    With respect to Replacement Facility C Loan, all principal, interest, Non-Utilization Fees, and any other charges or sums due hereunder or under any other 2014 Amended Loan Document with respect to Replacement Facility C Loan shall be payable in full on the Replacement Facility C Maturity Date.

Section 4.4    Prepayments.

(a)    Subject to the provisions of Section 16.2 hereof, Borrower may prepay the Facility A Loan in whole or in part upon not less than three (3) Business Days' written notice to Lender and satisfaction of the following conditions:

(i)    If the prepayment shall be for the full amount of the Facility A Loan, Borrower shall pay: (1) the principal balance due under the Facility A Note, (2) all interest

-39-

CONFIDENTIAL    DANSKE_0012275

accrued on the Facility A Note through the date of prepayment, (3) the Profit Participation Fee (to the extent not yet paid), (4) the Prepayment Fee, and (5) any Breakage Costs.

(ii)     If the prepayment shall be for less than the full amount of the Facility A Loan, Borrower shall pay: (1) a portion of the principal balance due under the Facility A Note, (2) all interest accrued on the portion of the principal balance that Borrower has elected to prepay (with interest calculated through the date of prepayment), (3) the Prepayment Fee attributable to the portion of the principal balance that Borrower has elected to prepay, and (4) any Breakage Costs attributable to the portion of the principal balance that Borrower has elected to prepay.

(b)     Borrower may prepay the Facility B Loan in whole upon not less than three (3) Business Days' written notice to Lender and satisfaction of the following conditions: If the prepayment shall be for the full amount of the Facility B Loan with the intention that the Facility B Loan shall be retired in full, Borrower shall pay: (1) the principal balance due under the Facility B Note, (2) all interest accrued on the Facility B Note through the date of prepayment, (3) the Non-Utilization Fee, and (4) any Breakage Costs.

(c)     Borrower may prepay the Replacement Facility C Loan in whole or in part upon not less than three (3) Business Days' written notice to Lender and satisfaction of the following conditions: If the prepayment shall be for the full amount of the Replacement Facility C Loan with the intention that the Replacement Facility C Loan shall be retired in full, Borrower shall pay: (1) the principal balance due under the Replacement Facility C Note, (2) all interest accrued on the Replacement Facility C Note through the date of prepayment, and (3) any Breakage Costs. If the prepayment shall be for less than the full amount of the Replacement Facility C Loan with the intention that the outstanding principal balance of Replacement Facility C be permanently reduced by such pre-paid amount, then Borrower shall pay: (1) the partial pre-payment principal balance due under the Replacement Facility C Note, (2) all interest accrued on the Replacement Facility C Note through the date of prepayment, and (3) any Breakage Costs.

Section 4.5     Late Charge.

Any amount due hereunder or under the other Original Loan Documents, Danske Amended Loan Documents, 2013 Amended Loan Documents, and 2014 Amended Loan Documents which remains unpaid more than ten (10) days after the date said amount was first due and payable shall incur a fee ("**Late Charge**") of five percent (5%) of said amount, which payment shall be in addition to all of Lender's other rights and remedies under the Danske Amended Loan Documents.

## ARTICLE V
## INTEREST; NON-UTILIZATION FEE; PROFIT PARTICIPATION FEE; MANDATORY PRINCIPAL PAYDOWNS; ORDER OF PRIORITY

Section 5.1     Interest Rate and Non-Utilization Fee – Facility A.

(a)     Interest shall accrue on the Facility A Loan at the Original Facility A Interest Rate for the period commencing February 1, 2009 and ending December 31, 2011.

7585436-v6

CONFIDENTIAL                                                                 DANSKE_0012276

Commencing January 1, 2012, interest shall accrue on the Facility A Loan at the Applicable Interest Rate.

(b)     Facility A Interest (Prior to January 1, 2012; On and after January 1, 2012).

(i)     For the period expiring December 31, 2011, interest calculated in arrears at the Original Facility A Interest Rate accrued and all such unpaid interest has been capitalized on each Payment Date, whereupon such capitalized interest has been added to the principal balance of the Facility A Note as of such Payment Date and thereafter such amount has accrued interest at the Original Facility A Interest Rate.

(ii)    2012 Facility A Interest. For the period commencing January 1, 2012, interest calculated in arrears at the Applicable Interest Rate shall be payable on each Quarterly Payment Date.

(c)     All payments (whether of principal, interest or any other amount payable hereunder) shall be deemed credited to Borrower's account only if received by 2:00 p.m. (New York time) on a Business Day; otherwise, such payment shall be deemed received on the next Business Day.

(d)     Interest on the outstanding principal balance of the Facility A Loan shall be calculated by multiplying (i) the actual number of days elapsed in the Interest Period by (ii) a daily rate based on a three hundred sixty (360) day year and then multiplying the product by (iii) the outstanding principal balance of the Facility A Note.

(e)     The Facility A Loan shall bear interest at the Default Rate at any time during which an Event of Default exists.

Section 5.2     Interest Rate; Non-Utilization Fee; Budgeted Principal Paydown– Facility B.

(a)     Interest shall accrue on the Facility B Loan at the Original Facility B Interest Rate for the period commencing February 1, 2009 and ending December 31, 2011. Commencing January 1, 2012, interest shall accrue on the Facility B Loan at the Applicable Interest Rate.

(b)     Facility B Interest (Prior to January 1, 2012; On and after January 1, 2012).

(i)     For the period expiring December 31, 2011, interest calculated in arrears at the Original Facility B Interest Rate shall be payable on each Payment Date and, notwithstanding the foregoing, unless funds are available for payment of interest on any Payment Date, accrued and unpaid interest shall be capitalized on such Payment Date, whereupon such capitalized interest shall be added to the principal balance of the Facility B. Note as of such Payment Date and thereafter such amount shall bear interest at the Facility B Interest Rate.

-41-

CONFIDENTIAL                                                                    DANSKE_0012277

(ii)　2012 Facility B Interest. For the period commencing January 1, 2012, interest calculated in arrears at the Applicable Interest Rate shall be payable with respect to Facility B on each Quarterly Payment Date.

(c)　All payments (whether of principal, interest or any other amount payable hereunder) shall be deemed credited to Borrower's account only if received by 2:00 p.m. (New York time) on a Business Day; otherwise, such payment shall be deemed received on the next Business Day.

(d)　Interest on the outstanding principal balance of the Facility B Loan shall be calculated by multiplying (i) the actual number of days elapsed in the Interest Period by (ii) a daily rate based on a three hundred sixty (360) day year and then multiplying the product by (iii) the outstanding principal balance of the Facility B Note.

(e)　The Facility B Note shall bear interest at the Default Rate at any time during which an Event of Default exists.

(f)　Budgeted Principal Paydown. Borrower shall pay to Lender the Budgeted Principal Paydown (Facility B) on each Payment Date during a month in which such amount is shown as being paid by Borrower on any budget approved by Lender.

(g)　Non-Utilization Fee on Facility B Loan. The Non-Utilization Fee shall accrue on the Facility B Loan with respect to any undrawn balance of the Loan outstanding from time to time. The Non-Utilization Fee calculated in arrears shall be payable on each Quarterly Payment Date.

Section 5.3　Interest Rate; Budgeted Principal Paydown – Replacement Facility C.

(a)　Interest shall accrue on the Replacement Facility C Loan at the Applicable Interest Rate (Replacement Facility C) on the fully committed Replacement Facility C Loan (i.e., $15,000,000) regardless of the principal balance outstanding from time to time.

(b)　Interest, calculated in arrears at the Applicable Interest Rate (Replacement Facility C), shall be payable on each Quarterly Payment Date on the full amount of the Replacement Facility C Loan regardless of the principal balance outstanding at such time.

(c)　All payments (whether of principal, interest or any other amount payable hereunder) shall be deemed credited to Borrower's account only if received by 2:00 p.m. (New York time) on a Business Day; otherwise, such payment shall be deemed received on the next Business Day.

(d)　Interest on the outstanding principal balance of the Replacement Facility C Loan shall be calculated by multiplying (i) the actual number of days elapsed in the Interest Period by (ii) a daily rate based on a three hundred sixty (360) day year and then multiplying the product by (iii) $15,000,000.

7585436-v6

CONFIDENTIAL　　　　　　　　　　　　　　　　　　　　　　　　　　　DANSKE_0012278

(e)     The Replacement Facility C Note shall bear interest at the Default Rate at any time during which an Event of Default exists.

(f)     Budgeted Principal Paydown. Borrower shall pay to Lender the Budgeted Principal Paydown (Facility C) on each Payment Date during a month in which such amount is shown as being paid by Borrower on the Consolidated Cash Flow Statement or any other budget as approved by Lender.

Section 5.4     Intentionally deleted.

Section 5.5     Monthly Interest Reserve Deposit.

(a)     In addition to the payment obligations due from Borrower on each Quarterly Payment Date with respect to Facility A, Facility B, and Replacement Facility C, on each Monthly Payment Date Borrower shall deposit with Lender to be held in the Interest Reserve Account an amount equal to the Monthly Interest Reserve Deposit as additional security for the Loan.

(b)     Borrower hereby collaterally assigns, grants a security interest in and pledges to Lender, to the extent not prohibited by applicable law, a first-priority continuing security interest in the Interest Reserve Account and all cash, checks, drafts, securities, entitlements, certificates, instruments and other property, including without limitation all deposits and/or wire transfers from time to time deposited or held in or credited to or made to the Interest Reserve Account, including all interest accrued thereon. Lender shall have all of the rights and remedies with respect to the Interest Reserve Account available to a secured party at law or in equity, including, without limitation, the rights and remedies of a secured party under the UCC, as if such rights and remedies were fully set forth herein. The Interest Reserve Funds shall be used solely by Borrower for payment of the Quarterly Interest Payments and the Quarterly Non-Utilization Payments.

(c)     If there is any shortfall in funds available in the Interest Reserve Account to pay the Quarterly Interest Payment and Quarterly Non-Utilization Payment when due, then Borrower shall remit the difference to Lender on the applicable Payment Date. Borrower's failure to make such payment shall be an Event of Default hereunder. Lender may apply any funds in the Interest Reserve Account to the payment of the Quarterly Interest Payments or Quarterly Non-Utilization Payments due from Borrower. If an Event of Default shall occur, Lender may apply the Interest Reserve Funds in its sole discretion.

Section 5.6     Intentionally deleted.

Section 5.7     Profit Participation Fee. Borrower shall pay to Lender, in addition to interest and all other amounts due hereunder with respect to the Loan, the Profit Participation Fee. The Profit Participation Fee shall be fully earned on the Effective Date, and shall be payable, subject to the Order of Priority, (i) on the Maturity Date, (ii) upon the earlier repayment of the Debt by acceleration or otherwise; or (iii) on such earlier date as Borrower shall elect.

7585436-v6

CONFIDENTIAL                                        DANSKE_0012279

Section 5.8    Order of Priority. Except as set forth in Section 5.7 (with respect to the payment of the Profit Participation Fee) and except as set forth in Section 13.17 of this Agreement, all payments made by Borrower to Lender shall be applied in the following order of priority: (i) first, to pay accrued, unpaid interest at the Default Rate (if any) in respect of the Loan, (ii) second, to pay other amounts (*e.g.*, protective advances, Breakage Fees, and the Profit Participation Fee, *pari passu*) due in respect of the Loan, (iii) third, to pay current interest in respect of each of the Facility A Note, Facility B Note, and Replacement Facility C Note on a *pari passu* basis, (iv) fourth, to pay the Non-Utilization Fee with respect to the Facility B Note, (v) fifth, to pay the outstanding principal balance of the Facility C Loan; (vi) sixth, to pay the outstanding principal balance of the Replacement Facility B Loan; and (vii) seventh, to pay the outstanding principal balance of the Facility A Loan. Notwithstanding any provision hereof to the contrary, during the continuance of an Event of Default, Lender may apply any payments received in respect of the Debt in such order, manner and amount as Lender shall determine in its sole discretion.

## ARTICLE VI

## LOAN EXPENSE AND ADVANCES

Section 6.1    Loan and Administration Expenses.

Borrower shall reimburse Lender, from time to time upon five (5) Business Days' demand therefor, for reasonable, out-of-pocket expenses incurred by Lender in connection with the Loan, including all amounts payable pursuant to Sections 6.2 and 6.3 hereof and any and all other fees owing to Lender pursuant to the 2014Amended Loan Documents, and also including, without limitation: (i) all recording, filing and registration fees, (ii) all fees of the Trustee under the Trust Agreement, (iii) mortgage or documentary taxes, (iv) insurance premiums, title insurance premiums and other charges of Title Insurer or UCC Title Insurer, (v) premiums and fees payable in connection with the UCC Policy and the Title Policy, (vi) survey fees and charges, (vii) cost of premiums on surety company bonds, (viii) appraisal fees, (ix) insurance consultant's fees, (x) Lender's Consultant's fees, (xi) environmental consultant's fees and (xii) travel-related expenses, and (xii) all costs and expenses (including due diligence-related expenses and legal fees) reasonably incurred by Lender in connection with the preparation, negotiation, execution and delivery of the 2014Amended Loan Documents and the other closing deliveries. Further, if any Default or Event of Default occurs or if the Loan is not paid in full when and as due, Borrower shall pay to Lender upon five (5) Business Days' demand therefor, all costs and expenses of Lender (including, without limitation, reasonable attorneys' fees and court costs) incurred in attempting to enforce payment of the Loan or to realize upon the security therefor. Borrower agrees to pay Lender's fees and disbursements incurred in connection with title updates and title endorsements ordered by the Lender in connection with each disbursement of Loan proceeds.

Section 6.2    Brokerage Fees.

Borrower shall pay all brokerage, finder or similar fees or commissions payable in connection with the transactions contemplated hereby and shall indemnify and hold Lender harmless against all claims, liabilities, costs and expenses (including attorneys' fees and

-44-

CONFIDENTIAL                                                                                    DANSKE_0012280

expenses) incurred in relation to any claim by any broker, finder or similar person; <u>provided</u> <u>however,</u> as an inducement to Borrower to make the foregoing undertaking, Lender represents to Borrower that Lender has not dealt with any broker, finder or similar person in connection with this Loan.

Section 6.3    <u>Protective Advances</u>.

If Borrower fails to perform any of Borrower's covenants, agreements or obligations contained in this Agreement or any of the other 2014Amended Loan Documents (after the expiration of applicable grace periods, except in the event of an emergency or other exigent circumstances), Lender may (but shall not be required to) perform any of such covenants, agreements and obligations, and any amounts expended by Lender in so doing shall be added to the Debt and bear interest at the Default Rate.

## ARTICLE VII
## CONDITIONS TO THE MAKING OF THE LOAN

Section 7.1    <u>Conditions Precedent</u>.

Lender's obligation to fund the Replacement Facility C draw requests and thereafter to make any further disbursements of Replacement Facility C, is conditioned upon Borrower's satisfaction of the following conditions precedent in form and substance satisfactory to Lender.

(a)    There shall exist no Default or Event of Default;

(b)    Borrower shall have furnished Lender with the Title Policy, together with legible copies of all title exception documents cited in the Title Policy and all other legal documents affecting the Property or the use thereof;

(c)    Borrower shall have furnished Lender with the UCC Policy;

(d)    Borrower shall have furnished to Lender the 2014 ALTA Survey for the Property;

(e)    Borrower shall have furnished Lender with policies or binders evidencing that Borrower has obtained and maintains insurance coverage in respect of Borrower and the Property in compliance with the requirements of Section 13.2 hereof, and paid all Insurance Premiums in respect thereof;

(f)    All of the representations of Borrower set forth in Article III hereof shall be true and correct in all material respects;

(g)    Borrower shall have furnished Lender with opinions from U.S. and Mexican counsel to Borrower and Borrower Parties as to:

(1)    the due authorization, execution, delivery and enforceability of the Amended Loan Documents, as applicable;

7585436-v6

CONFIDENTIAL

DANSKE_0012281

(2)      Kenneth Jowdy's authority to act on behalf of and bind Borrower and the Diamante Member;

(3)      such other matters as Lender shall reasonably require.

(h)      Borrower shall have furnished a certificate of no liens evidencing the trustee as the owner of the Property;

(i)      Borrower shall have furnished the Pledge of Borrower Assets;

(j)      Borrower shall have furnished the Pledge of Accounts;

(k)      Borrower shall have furnished Lender with current bankruptcy, federal tax lien, litigation, judgment and UCC searches in respect of Borrower, Borrower Parties, and such other Persons as Lender shall require;

(l)      Borrower shall have furnished Lender with current, certified annual financial statements of Borrower, Diamante Member, Diamante Club, Diamante CSL, Diamante Life, the Jowdy Parties and such other Persons as Lender shall require;

(m)      Borrower shall have furnished and Lender shall have reviewed and approved the 2014 Environmental Report, the 2014 Geotechnical Report, or updates of such reports, and such other documents as Lender determines in its sole discretion;

(n)      Borrower shall have furnished to Lender the fully executed Trustee Acknowledgments for all Time Shares executed on or after June 1, 2013; and

(o)      Borrower shall have furnished to Lender all Construction Budgets, the Consolidated Cash Flow Statement, the 2014 Operating Budgets and Administrative Budget, each in a form approved by Lender in its sole discretion.

(p)      Borrower shall have caused Diamante Club to deliver a collateral assignment of interests in all Golf Membership Contracts, pledge in all bank accounts of Diamante Club, and subordination agreement in favor of Lender.

(q)      Borrower shall have provided to Lender certified, unaudited financial statements for calendar year 2013 for Borrower, Diamante Member, Diamante Club, Diamante CSL, Diamante Life, and the Jowdy Parties.

(r)      Borrower shall have delivered to Lender a report regarding the scheduled delivery dates required under all Time Share Sales occurring through December 31, 2013.

(s)      Borrower shall have delivered to Lender the Pledge and Security Agreement (Accounts).

(t)      Borrower shall have delivered to Lender the Assignment of MGM Term Sheet.

7585436-v6

CONFIDENTIAL

DANSKE_0012282

(u)     Borrower shall have delivered to Lender the Legacy Operating Agreement and Legacy Development Agreement, each in a form approved by Lender in its sole discretion.

(v)     Borrower shall have delivered to Lender the Subordination Agreement with respect to the Legacy Operating Agreement and Legacy Development Agreement, each in a form approved by Lender in its sole discretion.

(w)     Borrower shall have paid to Lender the Monthly Payment Towards Costs (as defined in Section 13.19 hereof);

(x)     Borrower shall have delivered to Lender an opinion from a local Los Cabos, Mexico attorney approved by Lender in its sole discretion which opinion provides that (i) the completed Improvements were completed in accordance with local entitlement and zoning laws, rule, and regulations and are currently being operated in accordance with the same; and (ii) the hotel and residence improvements contemplated in the MGM Term Sheet are permitted by the local entitlement and zoning laws as a matter of right and without payment of any additional impact fees, costs, or land donations; and (iii) such other matters as Lender shall determine in its sole discretion.

(y)     Lender shall be in receipt of an Appraisal that satisfies the covenant set forth in Section 13.4 hereof as determined by Lender in its sole discretion.

(z)     Borrower shall have delivered to Lender confirmation of and supporting documentation regarding the status of the interest of the Kenner Parties., including but not limited to the status of the "managing member" filing.

(aa)    Borrower shall have satisfied other conditions precedent required of Lender.

## ARTICLE VIII
## CONDITIONS PRECEDENT TO THE
## DISBURSEMENT FOR CONSTRUCTION COSTS (REPLACEMENT FACILITY C)

Section 8.1     Replacement Facility C – Required Construction Documents.

In addition to satisfying the requirements set forth in Article XI hereof, unless Lender delivers written notice to Borrower that Lender waives such requirement, Borrower shall, as a condition to the disbursement of proceeds of the Replacement Facility C Loan for construction costs of the Improvements set forth in the Project Construction Budget, submit each of the following to Lender, each of which shall be satisfactory to Lender in its sole discretion.

(a)     Fully executed copies of: (i) any general contractor's agreement in respect of the Lagoon Improvements (or such portion thereof as Lender approves), if any; (ii) Major Contracts representing not less than eighty percent (80%) of the aggregate dollar amount of all Construction Contracts in respect of the Lagoon Improvements (or such portion thereof as Lender approves); (iii) all contracts with engineers, if any;

-47-

7585436-v6

DANSKE_0012283

(b)    A schedule of values, including a trade payment breakdown, setting forth a description of all Lagoon Improvements Construction Contracts;

(c)    All Permits then required in respect of the construction of the Lagoon Improvements;

(d)    The Plans and Specifications for the applicable phase of the Improvements;

(e)    if required by Lender, a Bond in favor of Lender, guaranteeing the obligations of General Contractor under the General Contract;

(f)    The Construction Schedule for the applicable phase of the Improvements;

(g)    A report from Lender's Consultant which contains an analysis of the applicable Improvements, applicable Plans and Specifications, applicable line item in the Project Construction Budget, applicable phase with respect to the Construction Schedule, the General Contract and all Construction Contracts with respect to the applicable Improvements.   Such report shall contain (i) an analysis demonstrating the adequacy of the line item in the Construction Budget to complete the applicable Improvements, and (ii) a confirmation that the Construction Schedule is realistic.   Lender's Consultant shall monitor construction of the Improvements and shall visit the site at least one time each month, and shall certify as to the amount of construction costs for all requested advances.   Borrower shall reimburse Lender from time to time for costs incurred by Lender in connection with Lender's Consultant's performance of the foregoing;

(h)    Fully executed and complete copies of all Product Sales Agreements (including but not limited to all timeshare contracts with Trustee Acknowledgments and lot sale agreements) each as the case may be, and as required by Lender.

(i)    Such other materials and documents as Lender may reasonably require with respect to the Construction.

## ARTICLE IX
## BUDGETS

Section 9.1    Intentionally deleted.

Section 9.2    Construction Budget – Replacement Facility C.

(a)    Disbursements of the Replacement Facility C Loan shall be governed by the Project Construction Budget.   Borrower shall not amend or modify the Project Construction Budget (in whole or in part) without first obtaining Lender's prior written consent thereto.

-48-

CONFIDENTIAL                                                    DANSKE_0012284

(b)     Budget Line Items – Facility C.

(i)     The Project Construction Budget includes as line items ("**Resort Construction Budget Line Items**") all Hard Costs and Soft Costs with respect to completion of all Improvements described in such budget. All Replacement Facility C Loan proceeds disbursed by Lender shall be used only for the Project Construction Budget Line Items for which such proceeds were disbursed.

(ii)    Lender shall not be obligated to disburse any amount for any category of costs set forth as a Resort Construction Budget Line Item which is greater than the amount set forth for such category in the applicable Resort Construction Budget Line Item. Borrower shall pay as they become due all amounts set forth in the Resort Construction Budget with respect to costs to be paid by Borrower. If any Resort Construction Budget Line Item shall be completed without the expenditure of all amounts in the Resort Construction Budget allocated to such Resort Construction Budget Line Item, Borrower may reallocate the savings, provided that: (x) Lender shall have theretofore approved a revised Resort Construction Budget reflecting the reallocation of Resort Construction Budget Line Items; (y) no Resort Construction Budget Line Item for Hard Costs shall be reallocated to pay any Resort Construction Budget Line Item for Soft Costs of the Resort Construction Improvements until Borrower has paid all Hard Costs and completed the Resort Construction Improvements; and (z) amounts shall not be reallocated from the Tax and Insurance Reserve and/or the Contingency Reserve. Further, subject to the provisions of clauses (x) through (z) above, Borrower may reallocate savings between unfinished Resort Construction Budget Line Items, provided that Lender determines, in its sole discretion, that such reallocation shall not result in an increase in the Resort Construction Budget or otherwise cause the Resort Construction Budget or any Resort Construction Budget Line Item to be out of Balance.

(c)     Contingency Reserve – Facility C. The Project Construction Budget shall contain a Resort Construction Budget Line Item for additional, unforeseen costs and expenses ("**Resort Contingency Reserve**"). Borrower may from time to time request that Lender permit the reallocation of portions of the Resort Contingency Reserve to pay costs of the Resort Construction Improvements for which amounts remaining in any Resort Construction Budget Line Item are insufficient. Borrower agrees that the decision with respect to utilizing portions of the Resort Contingency Reserve in order to keep the Replacement Facility C Loan in Balance shall be made by Lender in its sole discretion, and that Lender may require Borrower to make a Deficiency Deposit even if funds remain in the Resort Contingency Reserve.

(d)     In addition to the requirements of this Section 9.2, any disbursement or advancement of the Replacement Facility C Loan shall be subject to the Consolidated Cash Flow Statement and the provisions of Section 13.17.

Section 9.3     Intentionally deleted.

Section 9.4     Budget Approval Process.

Borrower shall submit to Lender no later than November 1 in each calendar year the proposed Consolidated Cash Flow Statement, Operating Budgets and Project Construction

-49-

CONFIDENTIAL

DANSKE_0012285

Budget (and all phases thereof) for the subsequent calendar year for Lender's review as set forth herein (each Budget approved (or deemed approved) by Lender pursuant to this Section is referred to herein as an "**Approved Annual Budget**"). Lender shall have thirty (30) days to review and approve the proposed Annual Budget or provide Borrower with the basis of Lender's disapproval thereof, which approval shall not be unreasonably withheld, conditioned or delayed within such thirty (30) day period. Prior to the expiration of the thirty (30) day review period, if Lender objects in its reasonable discretion to all or any portion of the information contained in or omitted from such proposed Annual Budget, Lender may deliver a notice to Borrower (a "**Notice Disapproving Budget**") setting forth in reasonable detail the nature of such objection(s). Borrower shall modify the proposed Annual Budget, taking into account Lender's objections, and shall resubmit the same to Lender for its reasonable approval within ten (10) days thereafter, and Lender may deliver further Notices Disapproving Budget (if any) with respect to such portion of any of the proposed Annual Budgets to which Lender may object, within ten (10) days thereafter (in which event, the resubmission and review process described above in this sentence shall continue until the proposed Annual Budget or such portion thereof in question is accepted and consented to by Lender or is deemed to be so accepted and consented to by the same). As to any portion of the proposed Annual Budget that is the subject of a Notice Disapproving Budget, with respect to Operating Budgets only, the Approved Annual Budget for the immediately preceding calendar year shall be deemed to control, pending resolution of the disputed items. In the event that an Approved Annual Budget has not been approved at the time the prior year's Approved Annual Budget expires and Borrower has not provided Lender with a proposed Annual Budget, Borrower shall thereafter operate the Property in accordance with any current Approved Annual Budget line items that were not the subject of a Notice Disapproving Budget given by Lender, and in accordance with the prior year's Approved Annual Budget, line items for those line items which were the subject of a Notice Disapproving Budget from Lender. Notwithstanding the foregoing, failure to obtain approval from Lender of the Approved Annual Budget or any line item shall not excuse Borrower from performance of Borrower's obligations and covenants under the Loan Documents, including, without limitation, Borrower's covenants relating to the maintenance and operation of the Property. Borrower shall furnish to Lender (or Lender's Consultant) within ten (10) Business Days after request (or as soon thereafter as may be reasonably possible), such further detailed information with respect to the operation of the Project and the financial affairs of any Borrower as may be reasonably requested by Lender.

## ARTICLE X
## SUFFICIENCY OF LOAN

Section 10.1   Replacement Facility C Loan in Balance.   Anything contained in this Agreement to the contrary notwithstanding, the Replacement Facility C Loan shall at all times remain in Balance, on a Resort Construction Budget Line Item basis and in the aggregate. Each Resort Construction Budget Line Item shall be deemed to be in "Balance" only if Lender, in its sole discretion, determines that the amount of such Resort Construction Budget Line Item is sufficient for its intended purpose. The Replacement Facility C Loan shall be deemed to be in Balance in the aggregate only when the total of the undisbursed portion of the Replacement Facility C Loan less the Resort Contingency Reserve equals or exceeds the aggregate of: (i) the costs required to complete the Resort Construction Improvements in accordance with the Resort Construction Plans and Specifications and the Resort Construction Budget; (ii) the amounts to be

7585436-v6

CONFIDENTIAL                                                                                          DANSKE_0012286

paid as retainages to persons who have supplied labor or materials to the Resort Construction Improvements; (iii) the amount required to pay interest on the Replacement Facility C Loan through the Replacement Facility C Maturity Date; (iv) the amount required to pay Taxes and Insurance Premiums and through the Maturity Date; as such costs and amounts described in clauses (i) through (iv) above may be estimated and/or approved in writing by Lender from time to time. If, in Lender's sole discretion, either any Resort Construction Budget Line Item or the aggregate amount of the undisbursed portion of the entire Replacement Facility C Loan is insufficient for such purpose, Borrower shall, within ten (10) days after written request by Lender, deposit the deficiency with Lender ("**Resort Deficiency Deposit**"). The Resort Deficiency Deposit shall first be exhausted before any further disbursement of the applicable Loan proceeds shall be made. Any Resort Deficiency Deposit remaining after a particular Resort Construction Budget Line Item or the Replacement Facility C Loan, as the case may be, is back in Balance shall be returned to Borrower. Lender shall not be obligated to make any Replacement Facility C Loan disbursements if and for as long as the Replacement Facility C Loan is not in Balance.

## ARTICLE XI
## CONSTRUCTION PAYOUT REQUIREMENTS

Section 11.1    Documents to be Furnished for Each Disbursement.

As a condition precedent to each disbursement of proceeds of the Facility B Loan, and the Replacement Facility C Loan, Borrower shall furnish or cause to be furnished to Lender (or Lender's Consultant or Servicer, as directed by Lender) the following documents covering such disbursement, in form and substance satisfactory to Lender:

(a)    A Requisition, duly executed by an Authorized Representative;

(b)    A certification, executed by Borrower, as to all costs included within the request for disbursement (all of which costs shall have been verified by Lender's Consultant);

(c)    Such invoices, contracts or other information as Lender may require to evidence that Borrower has incurred all costs covered by the request for disbursement;

(d)    Paid receipts or other proof of payment (including, with respect to Hard Costs, lien waivers or the equivalent) of all Construction costs covered by the prior disbursement of the Loan;

(e)    Copies of any Change Orders executed since the date of the last disbursement, if required by Lender or Lender's Consultant;

(f)    Copies of all Construction Contracts which have been executed since the last disbursement if required by Lender or Lender's Consultant;

(g)    Borrower shall certify to Lender that: with respect to the Improvements (and any part thereof, as applicable) (i) the construction of the Improvements is in accordance

-51-

CONFIDENTIAL                                                                                  DANSKE_0012287

with the Plans and Specifications and the Construction Agreements therefor and has been completed in a good and workmanlike manner; (ii) that the remaining work described in the Construction Budget and more particularly described in the applicable Plans and Specifications can be completed on or before the completion date thereunder for an amount not greater than the aggregate amount of undisbursed sums shown in the applicable Construction Budget; (iii) that all accounts payable in respect of the Project for the period set forth in the previous draw request have been paid by Borrower or will be paid by Borrower in the ordinary course and in accordance with the applicable Project Budget, and that Borrower has received no notice of any claim or application for lien.

(h)     Lender's Consultant shall have furnished to Lender verifications as to the following with respect to the Improvements, each as applicable: (i) that the construction of the applicable Improvements is in general accordance with the applicable Plans and Specifications and the applicable Construction Agreements therefor and has been completed in a good and workmanlike manner; (ii) that the remaining work under the applicable Plans and Specifications budgeted for the applicable period can be completed on or before the completion date thereunder for an amount not greater than the aggregate amount of undisbursed sums shown on the applicable Project Budget and Consolidated Cash Flow Statement; (iii) that the aggregate amount of all payments made to the Contractors plus the Loan advance applied for does not exceed 100% of the value – such value being calculated as if the work and materials were part of a completed structure, as determined by Lender – of all work acceptably done, all materials and equipment actually incorporated into the applicable Improvements to the date thereof, and all materials and equipment delivered to and stored on the construction site (or off-site if approved in writing by Lender) for incorporation into the Improvements; and (iv) that the unadvanced portion of the proceeds of Replacement Facility C, is sufficient to complete the applicable Improvements as set forth in the Project Construction Budget, as applicable. Such verification by Lender's Consultant shall be separate from Borrower's, and may state that it is being furnished for the sole benefit of the Lender. If the Lender's Consultant is unable to reconcile the Project (or any Phase thereof) expense statements as provided by Borrower, Lender reserves the right to suspend further advances until the discrepancy has been resolved to the satisfaction of Lender and the Lender's Consultant. Additionally, Lender can deem such discrepancy to be a Triggering Event, in which event Section 13.17(b) shall apply.

(i)     all Accounts Payable in respect of the Project for the period set forth in the previous draw request have been paid or will be paid by Borrower and Borrower has received no notice of any claim or application for lien.

(j)     All Permits then required in respect of any ongoing Construction shall be provided to Lender's Consultant and Servicer; and

(k)     Borrower shall have delivered to Lender all Product Sales Contracts in the form approved by Lender for the Project, including, but not limited to the following:

(i)     The preliminary, contingent final, final and supplemental (if any) public reports and approvals, including that of Procuraduria Federal Del Consomidor ("**PROFECO**"), and all other documents filed with the federal, state, municipal and local

7585436-v6

CONFIDENTIAL                                                                                                  DANSKE_0012288

Governmental Authorities, for registration of the Project (and all parts and phases thereof) with such changes of the documents as Lender may require;

        (ii)    Forms of reservation agreements, sales contracts, and proposed conveyance documents;

        (iii)    Documentary evidence satisfactory to Lender that the Project is registered in accordance with all applicable laws of all applicable jurisdictions.

        (iv)    Trustee acknowledgements to each Time Share Contract entered into and paid in full since the last draw request.

        (l)    Borrower shall have furnished to Lender and Lender shall have approved an updated Project Schedule and an updated Consolidated Cash Flow Statement showing the estimated amount and time of disbursement of each advance by Lender and the actual costs and expenses of Borrower for all construction and operations at the Project incurred to date. The Lender's Consultant shall be furnished a quarterly construction and operations schedule update.

        (m)    Borrower shall have provided evidence reasonably satisfactory to Lender that Borrower has complied with all Laws regarding withholdings at source and remittance to the applicable fiscal Governmental Authority.

        (n)    Borrower shall have provided to Lender's Consultant ongoing inspection reports, if any, from civil, soil, structural, mechanical, and electrical engineers as well as the architect, all to Lender's Consultant's satisfaction. Notwithstanding anything to the contrary in this Agreement, Lender shall have no obligation to make any advance under any Note if Lender determines there is, or reasonably expects there is, a Material Adverse Change to the Property.

        (o)    Borrower shall have certified to Lender that it is in compliance with the Payment Covenants described in Section 13.7 herein.

        (p)    Borrower shall have certified to Lender that it is in compliance with the Sales Performance and Sales Covenants set forth in Section 13.8 and Section 13.9 herein.

        (q)    Borrower shall have certified to Lender as to the fact that the Schedule of Accounts continues to be a true, accurate and complete schedule of all accounts of Borrower Parties and that no other such accounts exist with respect to any Borrower Party, the Project or otherwise.

        (r)    Borrower shall certify to Lender that there exists no Default or Event of Default.

        (s)    Borrower shall deliver to Lender and Servicer an affidavit in the form attached hereto and incorporated herein as Exhibit 11.1.

7585436-v6

CONFIDENTIAL DANSKE_0012289

(t)     If required by Lender, Borrower shall provide with respect to the Property a public registry update to verify trustee is still the record owner and no liens have been registered.

Such other instruments, documents and information as Lender or Title Insurer shall require in its sole discretion.

Section 11.2     Retainage.

To the extent required by any construction contract entered into by Borrower, ten percent (10%) of the total amount then due such contract and the various contractors under the Construction Contracts for Hard Costs shall be withheld from the Loan amount disbursed. The retained amounts will be disbursed only at the time of the final disbursement of Loan proceeds pursuant to Article XII hereof. Notwithstanding the foregoing, Lender shall disburse to Borrower retained amounts in respect of any trade itemized in the Construction Budget if Lender determines, in its reasonable discretion, that such trade has been completed for not less than ninety (90) days, provided, however, that until the final disbursement of Facility B Loan proceeds pursuant to Article XII hereof, in no event shall retained amounts equal less than five percent (5%) of Hard Costs theretofore advanced by Lender.

Section 11.3     Separate and Distinct Facility Draw Requests.

Borrower shall submit separate and distinct draw requests for requested draws under Facility B and Replacement Facility C, respectively.

Section 11.4     Final Disbursement for Construction Costs.  . Lender will advance to Borrower the final disbursement for costs of Construction (including retainages) in accordance with the applicable Construction Budget and when the conditions described in Section 11 have been satisfied, and the Improvements have been substantially completed in accordance with the Plans and Specifications, free and clear of construction liens and security interests, and Lender shall have received a certificate from Lender's Consultant for the sole benefit of Lender that the applicable Phase of the Improvements has been completed in accordance with the applicable Plans and Specifications.

# ARTICLE XII
# (RESERVED)

# ARTICLE XIII
# COVENANTS

Section 13.1     Certain Covenants.

(a)     Inspections.   Borrower will cooperate with Lender in arranging for inspections by Lender and/or Lender's consultant of the Property and the books and records of Borrower and any Borrower Party for the purposes of verifying construction, management, and operations of the Project.

-54-

7585436-v6

CONFIDENTIAL

DANSKE_0012290

(b) <u>Construction of the Improvements</u>. Borrower shall perform all Construction in a good and workmanlike manner with materials of high quality and in substantial accordance with the Plans and Specifications. Borrower shall prosecute the Construction with due diligence and continuity in accordance with the Project Schedule and, subject to the terms and conditions of this Agreement and as required hereunder, shall substantially complete the Construction before the Completion Date.

(c) <u>Change Orders</u>. No changes will be made to the Plans and Specifications (any such change, a "**Change Order**") without the prior written approval of Lender, <u>provided, however</u>, that Borrower may make changes to the Plans and Specifications without Lender's consent if (i) Borrower notifies Lender in writing of such change within five (5) Business Days thereafter; (ii) Borrower obtains the approval of all parties whose approval is required, including sureties and Governmental Authorities; (iii) the structural integrity of the Improvements is not impaired; (iv) no material change in architectural appearance is effected; and (v) Borrower continues to be in compliance with and otherwise "in balance" with respect to all Construction Budgets and the Consolidated Cash Flow Statement. Borrower shall deliver notice to Lender's Consultant of any material change in the Plan and Specifications.

(d) <u>Liens</u>. Borrower will not suffer or permit any lien claims to be filed or otherwise asserted against the Property, and will promptly discharge the same in case of the filing of any claims for lien or proceedings for the enforcement thereof, provided, however, that Borrower may contest in good faith and with reasonable diligence the validity of any such lien or claim, provided that Borrower posts a statutory lien bond which removes such lien from title to the Property within thirty (30) days after Borrower's receipt of written notice thereof. Lender will not be required to make any further disbursements of the proceeds of the Loan until any lien claims have been removed (by payment or by posting a bond) and Lender may, at its option, restrict disbursements to reserve sufficient sums to pay 150% of the lien. If Borrower shall fail timely to (i) discharge any such lien, or (ii) post a statutory lien bond, Lender may, at its election (but shall not be required to), procure the release and discharge of such lien and any judgment or decree thereon and, further, may in its sole discretion, settle or compromise the same, or may furnish such security or indemnity as Title Insurer shall require to insure Lender against the enforcement thereof, and any amounts so expended by Lender shall be added to the Debt. In settling, compromising or discharging any claims for lien, Lender shall not be required to inquire into the validity or amount of any such claim.

(e) <u>Payment of Taxes</u>. Borrower shall pay all Taxes and Assessments and charges of every kind upon the Property before the same become delinquent, provided, however, that Borrower may pay such tax under protest or to otherwise contest any such tax or assessment, but only if (i) such contest has the effect of preventing the collection of such taxes so contested and of preventing the sale or forfeiture of the Property or any part thereof or any interest therein, (ii) Borrower has notified Lender of Borrower's intent to contest such taxes, and (iii) Borrower has deposited security for the payment of contested taxes in form and amount satisfactory to Lender. If Borrower fails to commence such contest or, having commenced to contest the same, thereafter fails to prosecute such contest in good faith or with due diligence, or, upon adverse conclusion of any such contest, shall fail to pay such tax, assessment or charge, Lender may, at

-55-

CONFIDENTIAL

DANSKE_0012291

its election (but shall not be required to), pay and discharge any such tax, assessment or charge, and any interest or penalty thereon, and any amounts so expended in excess of any security posted by Borrower shall be added to the Debt and bear interest at the Default Rate. Borrower shall furnish Lender with evidence that taxes are paid at least ten (10) days prior to the last date for payment of such taxes and before imposition of any penalty or accrual of interest. Notwithstanding the foregoing, Lender shall not assert a default for failure to pay Taxes, provided that (x) there exists no Event of Default and (y) adequate funds for the payment of Taxes and Insurance Premiums exist in the Tax and Insurance Reserve. Borrower shall deliver to Servicer evidence of payment of Taxes and Assessments paid with respect to the Property no later than thirty (30) days after making payment.

(f) <u>Personal Property; Accounts</u>. Borrower shall keep all Personal Property incorporated in the Project and Accounts free of all liens, encumbrances and security interests, other than the liens, encumbrances and security interests in favor of Lender created by the Amended Loan Documents.

(g) <u>Leases</u>. Without the prior written consent of Lender, Borrower shall not (i) enter into any Lease of all or any portion of the Property, (ii) materially modify or terminate (other than by reason of a default by the tenant thereunder) any Lease of any portion of the Property, or (iii) accept any rental payment in advance of one month of its due date.

(h) <u>Construction Contracts</u>. Borrower shall not enter into, or materially modify, any Major Contract unless Borrower shall theretofore obtain Lender's prior written consent thereto. Promptly following its execution or modification thereof, Borrower shall furnish Lender with a copy of each Construction Contract. Borrower shall timely perform its obligations under each Construction Contract. Promptly following its receipt thereof, Borrower shall furnish Lender with a copy of any material notice received or delivered by Borrower in respect of any Construction Contract including, without limitation, any notice of default.

(i) <u>Appraisals</u>. Lender may obtain a new or updated Appraisal of the Property from time to time. Borrower shall cooperate with Lender in this regard. Notwithstanding the foregoing, Lender shall not obtain a new or updated Appraisal more than once in any twelve (12) month period, unless either (i) an Event of Default exists, or (ii) such Appraisal is then required under the terms of this Agreement; or (iii) Lender has reason to believe that a Material Adverse Change has occurred with respect to the Property, Project, or any part thereof. Borrower shall reimburse Lender upon demand for the cost of any Appraisal obtained by Lender in accordance with the terms of this Section 13.1(i).

(j) <u>Lost Notes</u>. Upon Lender's delivery to Borrower of an affidavit to such effect, Borrower shall, if the Notes are mutilated, destroyed, lost or stolen, deliver to Lender, in substitution therefor, a new note or notes containing the same terms and conditions.

(k) <u>Indemnification</u>. Borrower shall indemnify Lender and its officers, directors, employees and consultants (each, an "**Indemnified Party**") and defend and hold each Indemnified Party harmless from and against all claims, injury, damage, loss and liability, cost and expense (including reasonable attorneys' fees and court costs) of any and every kind to any

-56-

CONFIDENTIAL                                                                    DANSKE_0012292

persons or property by reason of (i) the operation or maintenance of the Property; (ii) any breach of representation or warranty or covenant, default or Event of Default; or (iii) any other matter arising in connection with the Loan, the Improvements or the Property. No Indemnified Party shall be entitled to be indemnified against its own gross negligence or willful misconduct. The foregoing indemnification shall survive repayment of the Debt.

(l) <u>Compliance with Laws</u>. Borrower shall comply with all Laws applicable to the Property, including, without limitation, (i) any requirements imposed by SEMARNAT in connection with its approval of the Project, and (ii) Article 225 of the Mexican Income Tax Law; and (iii) rules and regulations of PROFECO; and (iv) any and all other federal, state, municipal or local Laws. No work associated with the construction of the Improvements, or any part thereof, will be commenced by Borrower unless and until all building, construction and other permits necessary or required in connection with the commencement of the construction of the Improvements have been validly issued and all fees required in connection therewith have been paid or posted, as the circumstances may require.

(m) <u>Furnishing Reports</u>. Upon Lender's request, Borrower shall provide Lender with copies of all inspections, reports, test results and other information received by Borrower which in any way relate to the Property.

(n) <u>Furnishing Notices</u>. Borrower shall provide Lender with copies of all material notices received by Borrower pertaining to the Property, including notices from Governmental Authorities.

(o) <u>Hold Disbursements in Trust</u>. Borrower shall receive and hold in trust for the sole benefit of Lender (and not for the benefit of any other person, including, but not limited to, contractors or any subcontractors) all advances made hereunder directly to Borrower, for the purpose of paying the cost of the Budget Line Item for which such disbursement was made. Borrower will pay all other costs, expenses and fees relating to the acquisition, equipping, use and operation of the Property.

(p) <u>Alterations</u>. Except in accordance with the Plans and Specifications, Borrower shall not make any material alterations to the Property.

(q) <u>Cash Distributions</u>. At all times until the Loan (including, without limitation, the Profit Participation Fee and the Non-Utilization Fee) is paid in full, Borrower shall not make any distributions to its shareholders, partners or members. The foregoing shall not preclude the payment of salaries and other amounts contemplated by the Operations Budget approved by Lender.

(r) <u>SRE Permit</u>. Promptly following the execution and delivery hereof, Borrower shall request, on behalf of the Trust, that the Mexican Foreign Ministry issue a permit in respect of the Trust, as more particularly described in Clause Eighteenth of the Amended and Restated Trust Agreement ("**SRE Permit**"). Thereafter, Borrower shall comply with the provisions of Clause Eighteenth of the Amended and Restated Trust Agreement, until such time as the Mexican Foreign Affairs Ministry has issued the SRE Permit.

7585436-v6

CONFIDENTIAL

DANSKE_0012293

(s)     Title Exceptions.   Borrower shall obtain Lender's prior written consent to any homeowners' association agreement, condominium declaration, easement agreement or other agreement that would burden the Property, other than the Permitted Exceptions.

(t)     Deliveries in English.   Any and all documents, information, reports, contracts, or other such informational matters requested of Borrower by Lender shall be delivered in English or, if such information is generated and/or produced initially in Spanish, then together with an English translation.

(u)     Anti-Corruption.

(i)     Neither Borrower nor any of its subsidiaries or Affiliates will engage (directly or indirectly) in any activity, practice or conduct that would constitute an offence under the Bribery Act if such activity, practice or conduct had been undertaken by an organisation which carries on business in the United Kingdom or Mexico.

(ii)     Borrower shall supply to Lender, promptly on becoming aware of them, details of any investigation, enquiry or enforcement proceedings by any governmental, administrative or regulatory body relating to any offence or alleged offence against it or any of its subsidiaries relating to bribery or corruption.

(v)     Spanish Translation of Loan Documents.

(i)     A Spanish translation of this Agreement shall be prepared at Lender's Mexican counsel's direction by any of the translators described in Section (iii) below, which translations shall be delivered to Borrower's Mexican counsel within ninety (90) days following the Effective Date.  If such translation is not approved or disapproved by Borrower's Mexican counsel within ninety (90) days following the date of receipt, then the translation prepared at Lender's Mexican counsel direction shall be deemed to be approved.

(ii)     Subject to the provisions of Section 13.1(v)(i), if such translation is disapproved by Borrower's Mexican counsel within the time period set forth in Section 13.1(v)(i), then Lender and Borrower shall use commercially reasonable efforts to promptly resolve any disagreement respecting such translation. Once approved or deemed approved, the Spanish translation shall include the following statement from the Borrower: *"The Spanish translation is hereby expressly accepted by the Borrower, and Borrower hereby expressly and irrevocably (i) acknowledges and agrees to accept the Spanish translation as a valid translation of this Agreement; and (ii) waives any right it may have to challenge the validity or accuracy of the Spanish translation or any provision thereof."*

(iii)     Notwithstanding the foregoing provisions of this Section 13.1(v), if for any reason a mutually satisfactory Spanish translation of this Agreement or any Amended Loan Document is not agreed upon by Borrower and Lender at any time when Lender has begun to exercise its remedies under the Amended Loan Documents, then Lender shall be entitled, without Borrower's consent, review or approval, to request the corresponding Spanish translation to be made by any of (1) Victor Hermosillo Perez, Francisco J. Laguardia Pulido or Araceli Ruiz

-58-

CONFIDENTIAL

Vivanco, all of whom are sworn translators licensed in Mexico, Federal District, or (2) if none of such translators is available, any other sworn translator approved by the Superior Tribunal of Justice of the Federal District (*Tribunal Superior de Justicia del Distrito Federal*). Any such Spanish translation shall be expressly accepted by the Borrower, and Borrower hereby expressly and irrevocably (A) acknowledges and agrees to accept the Spanish translation prepared by such persons as a valid translation of this Agreement, and (B) waives any right it may have to challenge the validity or accuracy of the Spanish translation or any provision thereof.

Section 13.2    Insurance

(a)    Borrower shall obtain and maintain, or cause to be maintained, insurance for Borrower and the Property as follows:

(i)    comprehensive all-risk insurance on the Improvements and the Personal Property, including contingent liability from Operation of Building Laws, Demolition Costs and Increased Cost of Construction Endorsements, in each case (A) in an amount equal to one hundred percent (100%) of the "Full Replacement Cost," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) with a waiver of depreciation; (B) containing an agreed amount endorsement with respect to the Improvements and Personal Property; (C) permitting no deductible in excess of $25,000, except for the deductible for hurricane, earthquake, volcano and flood insurance which is customarily a percentage of the face value of the policy not to exceed five percent (5%) of the replacement cost value, and waiving all co-insurance provisions (unless coverage is in an amount not less than 100% of the full replacement cost of the Improvements and Personal Property insured); and (D) containing an "Ordinance or Law Coverage" or "Enforcement" endorsement if any of the Improvements or the use of the Property shall at any time constitute legal non-conforming structures or uses.  In addition, Borrower shall obtain earthquake insurance, tsunami insurance, and hurricane insurance in amounts and in form and substance satisfactory to Lender.

(ii)    commercial general liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (A) permitting a deductible acceptable to Lender, (B) to be on the so-called "occurrence" form with a combined limit, of not less than $2,000,000, (C) to continue at not less than the aforesaid limit until required to be changed by Lender in writing by reason of changed economic conditions making such protection inadequate; and (D) to cover at least the following hazards:  (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) contractual liability for legal contracts; and (5) contractual liability covering the indemnities contained in Loan Agreement;

(iii)    employer's liability insurance in an amount not less than $1,000,000 and worker's compensation insurance in accordance with all applicable laws and regulations, if applicable;

(iv)    at all times during which vertical structural construction, repairs or alterations are being made to the Improvements, (A) owner's contingent or protective liability

7585436-v6

CONFIDENTIAL

DANSKE_0012295

insurance covering claims not covered by or under the terms or provisions of the above mentioned commercial general liability insurance policy; and (B) the insurance provided for in subsection (i) above written in a so-called builder's risk completed value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to subsection (i) above, (3) including permission to occupy the Improvements, and (4) with an agreed amount endorsement waiving co-insurance provisions (unless coverage is in an amount not less than 100% of the full replacement cost of the Improvements and Personal Property insured);

(v) comprehensive boiler and machinery insurance, if applicable, in amounts as shall be reasonably required by Lender on terms consistent with the commercial property insurance policy required under subsection (i) above;

(vi) umbrella liability insurance in an amount not less than $25,000,000, on an occurrence basis and on an aggregate basis, on terms consistent with the commercial general liability insurance policy required under subsection (ii) above;

(vii) motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence, including umbrella coverage, of $25,000,000; and

(viii) subject to sub-section (ix) below, with respect to any partially built Improvement, in lieu of the builder's risk coverage described above in sub-section (iv), Borrower may obtain and maintain, or cause to be maintained, comprehensive all-risk insurance on the partially constructed Improvements, so long as such coverage amounts are increased to cover the full replacement costs of such partially completed Improvements in accordance with the following schedule: Construction with respect to such Improvement is: 30% complete, 60% complete and 100% complete.

(ix) upon thirty (30) days' written notice from Lender, such other reasonable insurance, in such reasonable amounts, as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Property located in or around Cabo San Lucas, Mexico.

(b) All insurance provided for in Section 13.2(a) hereof shall be obtained under valid and enforceable policies (collectively, "**Policies**" or in the singular, "**Policy**"), shall be subject to the approval of Lender as to insurance companies, amounts, deductibles, loss payees and insureds, and shall be enforceable in the United States of America. The Policies shall be issued by financially sound and responsible insurance companies authorized to do business in the state of Baja California Sur and having a claims paying ability rating of "A" or better by S&P or "A2" or better by Moody's. The Policies described in Section 13.2(a) (other than those strictly limited to liability protection) shall designate Lender as both mortgagee and loss payee. Not less than thirty (30) days prior to the expiration dates of the Policies theretofore furnished to Lender, certificates of insurance evidencing the renewal of the Policies, accompanied by evidence satisfactory to Lender of payment of the premiums thereunder ("**Insurance Premiums**"), shall be delivered by Borrower to Lender and Servicer.

7585436-v6

CONFIDENTIAL DANSKE_0012296

(c)     Any blanket insurance Policy shall specifically allocate to the Property the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Section 13.2(a) hereof.

(d)     All Policies of insurance provided for by Section 13.2(a) hereof shall name Borrower as the insured and Lender as the additional insured, as their respective interests may appear, and in the case of property damage, boiler and machinery, flood and earthquake insurance, shall contain a so-called New York standard non-contributing mortgagee clause in favor of Lender providing that the loss thereunder shall be payable to Lender. Additionally, all Policies of insurance with respect to commercial general liability shall name the Trustee as an additional insured.

(e)     All Policies of insurance provided for in Section 13.2(a) hereof shall contain clauses or endorsements to the effect that:

(i)     the Policy shall not be materially changed (other than to increase the coverage provided thereby) or canceled without at least thirty (30) days' prior written notice to Lender and any other party named therein as an additional insured;

(ii)    the issuers thereof shall give written notice to Lender if the Policy has not been renewed fifteen (15) days prior to its expiration; and

(iii)   Lender shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder.

(f)     If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, without notice to Borrower, to take such action as Lender deems necessary to protect its interest in the Property including, without limitation, the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate. All Insurance Premiums incurred by Lender in taking such action or obtaining such insurance shall be added to the Debt and shall bear interest at the Default Rate.

(g)     Notwithstanding the foregoing, Lender shall not assert a default for failure to pay Insurance Premiums, provided that (i) there exists no Event of Default, and (ii) adequate funds for the payment of Insurance Premiums exist in the Tax and Insurance Reserve.

Section 13.3   Special Purpose Covenants.

(a)     The purpose for which Borrower is organized is and shall be limited solely to (i) owning, holding, constructing, selling, leasing, transferring, exchanging, operating and managing the Property, (ii) entering into this Agreement and the other Amended Loan Documents, and (iii) transacting any business that is incident, necessary and appropriate to accomplish the foregoing.

-61-

CONFIDENTIAL                                                                      DANSKE_0012297

(b)     Borrower has not owned, does not own and will not own any asset or property other than (i) the Property, and (ii) incidental personal property necessary for and used or to be used in connection with the ownership or operation of the Property.

(c)     Borrower has not engaged in and will not engage in any business other than the ownership, construction, management and operation of the Property.

(d)     Borrower has not entered and will not enter into any contract or agreement with any Affiliate of Borrower, any constituent party of Borrower, any guarantors of the obligations of Borrower or any Affiliate of any constituent party, owner or guarantor (collectively, "**Related Parties**"), except upon terms and conditions that are intrinsically fair, commercially reasonable and substantially similar to those that would be available on an arms-length basis with third parties not so affiliated with Borrower or such Related Parties.

(e)     Except for the Loan, Borrower shall neither incur nor guarantee any indebtedness (whether personal or non-recourse, secured or unsecured) other than customary trade payables contemplated by the Budget, aged not in excess of sixty (60) days, and unsecured loans from members of Borrower that are subordinate to the Loan.

(f)     Borrower has not made and will not make any loans or advances to any Person and shall not acquire obligations or securities of any Related Party.

(g)     Borrower is and will remain solvent and Borrower will pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due.

(h)     Borrower has done or caused to be done and will do all things necessary to observe organizational formalities and preserve its existence, and Borrower will not, nor will Borrower permit any Related Party to, amend, modify or otherwise change the partnership certificate, partnership agreement, articles of incorporation and bylaws, operating agreement, trust or other organizational documents of Borrower or such Related Party without the prior written consent of Lender.

(i)     Borrower has maintained and will maintain all of its books, records, financial statements and bank accounts separate from those of any other Person and Borrower's assets will not be listed as assets on the financial statement of any other Person. Borrower has filed and will file its own tax returns and will not file a consolidated federal income tax return with any other Person. Borrower shall maintain its books, records, resolutions and agreements as official records.

(j)     Borrower will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other Person (including any Affiliate or other Related Party), shall correct any known misunderstanding regarding its status as a separate entity, shall conduct business in its own name, shall not identify itself or any of its Affiliates as a division or part of the other and shall maintain and utilize a separate telephone number and separate stationery, invoices and checks.

CONFIDENTIAL                                                                                DANSKE_0012298

(k)     Borrower will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations.

(l)     Neither Borrower nor any Related Party will seek the dissolution, winding up, liquidation, consolidation, spin-off, split-up or merger in whole or in part of Borrower, or the sale of material assets of Borrower.

(m)     Borrower has not commingled and will not commingle its assets with those of any other Person and will hold all of its assets in its own name;

(n)     Borrower has not guaranteed and will not guarantee or become obligated for the debts of any other Person and does not and will not hold itself out as being responsible for the debts or obligations of any other Person.

(o)     Borrower shall allocate fairly and reasonably any overhead expenses that are shared with an Affiliate, including paying for office space and services performed by any employee of an Affiliate or Related Party.

(p)     Borrower shall not pledge, mortgage, lien, or secure in any fashion its assets for the benefit of any Person, other than Lender.

(q)     Borrower shall maintain a sufficient number of employees in light of its contemplated business operations and pay the salaries of employees from its own funds and the proceeds of the Loan.

(r)     Borrower shall not engage, hire or contract with any employees, all of whom shall be engaged or hired by a third party approved by Lender.

Section 13.4     Financial Covenants.

Borrower shall maintain a Loan to Value Ratio of 70% or less tested annually ("**Required Loan to Value Ratio**"). Borrower's failure to maintain the Required Loan to Value Ratio shall be an Event of Default hereunder.

Section 13.5     Reporting Covenants.

(a)     Weekly Reports. Borrower shall provide to Lender, Lender's Consultant, and Servicer on a weekly basis and no later than Friday in each such week:

(i)     Reports regarding Product Sales including an accounting of all actual sales of Product, the full purchase price, amount of deposit received, accounts receivable, and itemized deposit information with reasonable detail supporting each such deposit, together with any other information regarding Product Sales required by Lender, Servicer, of Lender's Consultant, provided, however, with regard to timeshare sales, Product Sales shall be reported

-63-

CONFIDENTIAL                                                                  DANSKE_0012299

only after the cancellation period required by law (which period is currently five (5) days) has expired;

(ii)  Income Account deposit reports for the week immediately preceding that show an itemized accounting of all amounts deposited into each such Income Account with reasonable detail supporting such deposit;

(iii)  Copies of all deposit agreements, reservation agreements, sales contracts, and trust agreements entered into with respect to all Product Sales all in a form approved by Lender in its reasonable discretion. This reporting requirement may be satisfied by Borrower's uploading all such information to www.box.net; and

(iv)  If requested by Lender or Servicer, with respect to all deposits into any or all Accounts for the week immediately preceding, itemized deposit information with reasonable detail supporting such deposit.

(b)  <u>Monthly Reports</u>. Borrower shall provide to Lender, Lender's Consultant, and Lender's servicer, on a monthly basis and no later than the date that is fifteen (15) days following the last day of the immediately preceding month:

(i)  Reports regarding actual Product Sales (including detailed information regarding accounts receivable with respect to such sales and net of Commissions) as compared to Projected Product Sales for the Measured Period;

(ii)  Reports regarding actual Product Sales Receipts as compared to projected Product Sales Receipts for the Measured Period;

(iii)  Reports regarding actual Product Sales as compared to Budgeted Construction Expenses;

(iv)  Reports regarding (1) Budgeted Operating Expenses as compared to Actual Operating Expenses for the Prior Budget Period; and (2) Budgeted Operating Expenses as compared to Projected Operating Expenses for the Projected Period;

(v)  Reports regarding (1) Budgeted Construction Expenses as compared to Actual Construction Expenses for the Prior Budget Period; and (2) Borrower's certification to Lender that the scheduled completion dates described in <u>Section 13.10(d)</u> remain accurate with respect to projected completion of each such described Improvement;

(vi)  Certified Resort In Balance Report (as defined in Section 13.8(c) below);

(vii)  Reports regarding Commissions (paid and accrued);

(viii)  Reports regarding scheduled delivery dates required under all Time Share Sales occurring through the last day of the immediately preceding month;

-64-

CONFIDENTIAL

DANSKE_0012300

(ix)     Reports regarding all obligations of Borrower that are necessary to fulfill pursuant to non-Time Share Product Sales occurring through the last day of the immediately preceding month, including but not limited to delivery dates of utilities and related infrastructure together with a status report of the estimated delivery date of such utilities and related infrastructure;

(x)     Pledge of Time Share Contracts reflecting the assignment of all Time Share Contracts entered into during the prior month, if required by Lender;

(xi)     Reports regarding IVA Position Statement which shall include an English translation of the monthly IVA tax return;

(xii)     Reports regarding Accounts Payable with detail describing days in arrears;

(xiii)     Copies of the Trustee Acknowledgement pages with respect to each Time Share Sale that has been fully paid in the prior month.

(xiv)     With respect to any Phase of the Project, after Completion of Construction of the applicable Improvements, Borrower shall deliver to Lender an updated Operations Budget (which shall be subject to Lender's prior approval as set forth in Section 9.4 hereof) reflecting projected operating expenses associated with the completed new Phase together with an operating statement showing actual expenses incurred to the extent not included in (iv) above. Such operating budgets and statements shall be delivered to Lender upon the earlier to occur of (y) within ten (10) Business days after Lender's request; and (z) thirty (30) days after any new phase of operations commence.

(c)     Quarterly Reports. Borrower shall provide to Lender, its Lender's Consultant, and its servicer, on a monthly basis: Reports regarding Acquired Time Share Interests update to reflect the interests acquired since delivery of the last report.

(d)     Annual Reports.

(i)     Borrower shall deliver or cause to be delivered to Lender, no later than October 31st the calendar year following the end of immediately preceding calendar year, (y) with respect to Borrower, and if required by Lender, any Borrower Party, an annual financial statement, in a form satisfactory to Lender, audited by an independent, certified public accountant reasonably satisfactory to Lender, and (z) with respect to all Borrower Parties, a personal financial statement, in a form satisfactory to Lender, certified as true and correct by a duly authorized officer of the party to whom it relates. Within ten (10) days after request by Lender, Borrower shall deliver to Lender the most recently filed federal annual income tax returns with respect to Borrower (U.S. and Mexican) and Guarantor. Borrower and Guarantor shall provide such additional financial information as Lender reasonably requires. Upon reasonable advance notice from Lender, Borrower shall permit Lender to review all of Borrower's books and records regarding the development and operation of the Property. Within

-65-

CONFIDENTIAL

DANSKE_0012301

ten (10) days after request from Lender, Borrower shall deliver an updated Construction Budget and/or Operating Budget as requested by Lender.

(ii)    Evidence of Borrower's payment of real estate taxes prior to the date on which any fine, late charge or other penalty for late payment may be imposed, which evidence shall be provided within ten (10) days of payment;

(iii)    Evidence satisfactory to Lender of the renewal of such insurance policies as are required under this Agreement thirty (30) days prior to the expiration of such insurance policies;

(iv)    Annual budgets and forecasts for the Project in accordance with this Agreement; and

(v)    Such other financial information as may be reasonably requested by the Lender from time to time to evaluate the financial condition and cash flow of the Project, the Loan Parties and the Guarantor.

(vi)    All financial reporting shall be submitted in accordance with the procedures set forth in Exhibit 13.5(d)(vii), attached hereto.

(e)    Borrower's failure to comply with the reporting requirements set forth herein within five (5) Business Days after notice from Lender shall be an Event of Default hereunder.

Section 13.6    Appraisals, Title Reports and Environmental Reports.

(a)    Appraisal. Until the Obligations are repaid in full, the Lender shall have the right, prior to occurrence of an Event of Default, to obtain an Appraisal with respect to the Project as set forth herein. After the occurrence of an Event of Default and so long thereafter as such Event of Default shall remain uncured, the Lender shall have the right to obtain such Appraisals as it may require at the sole cost and expense of the Borrower without limitation.

(b)    Title Reports. At the option of Lender exercised not more than once each calendar year prior to the occurrence of an Event of Default, the Lender may request and Borrower shall deliver within thirty (30) days of such request, an updated title report on the Project, prepared and issued by the same title insurance company that delivered to Lender the lender's policy of title insurance in connection with the delivery of the Mortgage at the sole cost and expense of Borrower. After the occurrence of an Event of Default and so long thereafter as such Event of Default shall continue to exist, the Borrower shall furnish such title reports, endorsements or policies as the Lender shall reasonably require. If the Borrower fails to deliver the title updates, reports, endorsements or policies required pursuant to this subsection 7.1(b), Lender, may obtain such item(s) and Borrower shall reimburse Lender, upon demand for any and all costs incurred by Lender in connection therewith.

7585436-v6

CONFIDENTIAL

DANSKE_0012302

(c)     Environmental Reports.  Within thirty (30) days following the request of Lender, (i) if the Lender reasonably suspects that there has been a breach of the Environmental Indemnity Agreement, (ii) if a previously undisclosed adverse environmental condition becomes apparent, (iii) if a change in applicable Law with respect to environmental matters should occur, or (iv) at any time following the occurrence and during the existence of an Event of Default, the Borrower shall cause an Environmental Report of the Project to be prepared at Borrower's sole reasonable cost and expense, which Environmental Report will be in form and performed by a consultant approved by Lender, and if Borrower does not respond to Lender's request within thirty (30) days, the Lender shall cause an Environmental Report of the Project to be performed and the Borrower shall, upon demand, reimburse Lender, for any and all costs incurred by Lender in connection therewith.

Section 13.7     Payment Per Budget Covenants.

(a)     Sales Proceeds and Consolidated Cash Flow Statement.  From all proceeds of Product Sales, Borrower shall (i) pay all Commissions, and (ii) apply the Working Capital Contribution towards payment of all operating expenses in strict accordance with the Operations Budget.  Borrower acknowledges and agrees that the Consolidated Cash Flow Statement describes the application of Net Sales Proceeds to projected, budgeted amounts as set forth on the Construction Budgets and Administrative Budget. Borrower shall apply all Net Sales Proceeds in accordance with the Consolidated Cash Flow Statement, the applicable Construction Budget, Administrative and the Cash Management Order or Priority in accordance with the terms and conditions of this Agreement and for no other purpose except as otherwise approved by Lender in writing and in its sole, subjective and absolute discretion.

(b)     Construction Expenses.  Borrower shall pay all Construction Expenses in accordance with the Construction Budgets and in accordance with the Consolidated Cash Flow Statement, Cash Management Order of Priority and terms and provisions of this Agreement.

(c)     Draw Requests for Construction Expenses.  For all costs and expenses to be paid pursuant to Construction Budgets, Borrower shall submit to Lender a detailed draw request pursuant to Section 8, 10 and 11 hereof for Lender's approval (such draw request, "**Budgeted Expense Draw Request**").  If Lender approves such Budgeted Expense Draw Request, then Borrower shall apply any drawn amounts in accordance with costs incurred pursuant to the Construction Budgets, as applicable. If Lender does not approve such Budgeted Expense Draw Request, then Borrower shall apply such drawn amounts in the order or priority as Lender directs Borrower in writing, which order or priority Borrower acknowledges and agrees may be different than the Cash Management Order of Priority described in Section 13.17 hereof. Borrower shall promptly upload to www.box.net all order documents and supporting information evidencing the expenditure of costs in accordance with the Construction Budget.  Borrower's failure to apply amounts in accordance with this Section 13.7(c) shall be an Event of Default hereunder.

(d)     Except as set forth in sub-section (c) hereof, Borrower's failure to comply with any of the covenants set forth in this Section 13.7 shall be deemed a Triggering Event

-67-

CONFIDENTIAL                                                                                    DANSKE_0012303

hereunder and Lender shall have no obligation to make additional advances under Facility B and Replacement Facility C.

Section 13.8    Sales Performance Covenants.

(a)    Aggregate Product Sales (Actual vs. Projected).    Actual Product Sales shall be equal to or greater than eighty-five percent (85%) of the Projected Product Sales for the Measured Period.  This covenant shall be tested on a monthly basis on the twenty-eighth day following the last day of the immediately preceding calendar month.

(b)    Aggregate Cash Receipts from Product Sales (Actual vs. Projected). Actual Cash Receipts from Product Sales shall be equal to or greater than eighty-five percent (85%) of the Projected Cash Receipts from Product Sales for the Measured Period.  This covenant shall be tested on a monthly basis on the twenty-eighth day following the last day of the immediately preceding calendar month.

(c)    In Balance Test – Proceeds to Complete (Project). Available Accounts Receivable for Actual Product Sales plus all unadvanced proceeds of the Replacement Facility C Loan shall be equal to or greater than one hundred twenty-five percent (125%) of the Costs to Complete Commenced Vertical Product Construction ("**Resort In Balance Report**").  This covenant shall be tested on a monthly basis on the twenty-eighth day following the last day of the immediately preceding twelve (12) month period.

(d)    In Balance Test – Contractual Construction Obligations v. Budgeted Construction. Contractual Resort Construction Obligations shall not exceed the construction obligations budgeted and approved by Lender pursuant to the applicable Project Construction Budget.

(e)    Remittance of Excess Sales Proceeds.    If, on a cumulative basis, the aggregate Actual Cash Receipts from Product Sales exceeds one hundred twenty percent (120%) of the Projected Cash Receipts (such excess amount, the "**Excess Sales Proceeds**"), then any expenditure of such Excess Sales Proceeds shall be applied per Section 13.17(b) hereof subject to Lender's prior written approval and, if Lender delivers written notice thereof to Borrower, Borrower shall remit the Excess Sale Proceeds to Lender no later than two (2) Business Days after such notice.  For purposes of this Agreement, this covenant shall be tested for the period commencing January 1, 2014.

(f)    Borrower's failure to comply with the forgoing covenants within fourteen (14) days after notice from Lender shall be deemed a Triggering Event and Lender shall have no obligation to make additional advances under Facility B Note and Replacement Facility C Note.

-68-

CONFIDENTIAL                                                                    DANSKE_0012304

Section 13.9    <u>Sales Covenants</u>.

(a)    <u>Maintenance of Time Share Project</u>.    Borrower shall take all steps necessary to maintain the Phases of the Project including time share Products as a Time Share project in strict compliance with all applicable Laws or requirements of Governmental Authorities having jurisdiction over such development.

(b)    <u>Approval By Lender</u>.    Borrower shall obtain Lender's prior written approval of all documents filed in any land registration, security registry, court, or federal agency or any counterpart thereto in other jurisdictions where the Project is registered or marketed, for any purpose with respect to the Property, the Improvements or the Project. Without limiting the generality of the foregoing, and to the extent not already filed and furnished to Lender, Borrower shall obtain Lender's prior written approval of any amendment to any association documents (including the master association, sub-association, declaration, by-laws, etc.), the Time Share public reports (as amended from time to time), any time share map, the form of contract, deposit, and any other sale agreement regarding time share or any Lot, the specimen reservation agreement for any Product Sale, the escrow agreement (if any), all broker listing agreements, and the contract for managing the Project. Borrower hereby represents and warrants to Lender that it will provide copies to Lender of all existing literature, brochures and materials used in sales of Time Share and Lots in the Project within a reasonable period of time after Lender's or Servicer's request therefor. Borrower shall furnish Lender with copies of proposed changes to such existing documents and copies of any such new literature, brochures and materials reasonably in advance of the use thereof for review by Lender, and Borrower shall use commercially reasonable efforts to respond to any reasonable concerns raised by Lender to Borrower; <u>provided, however,</u> that Borrower will make or will cause to be made all changes to any of such documents which may from time to time be requested by Lender or its counsel in order that, in the opinion of Lender and its counsel, such documents will comply with all Laws or applicable Governmental Authorities. Lender shall not be required to execute the Time Share Documents, the Time Share public reports (if any) or any amendment thereto. So long as the Loan is outstanding, if an Event of Default has occurred and is continuing, or any condition exists which, after notice or lapse of time, or both, would constitute an Event of Default, and which condition Lender determines might not be cured prior to the expiration of any applicable cure period under this Agreement, and to the extent permitted under applicable law, Lender shall have the right:

1.    To exercise, as a member of the association of apartment owners of the Project, if any (the "**Association**") all voting rights appurtenant to any Lot or condominium unit subject to the Mortgage;

2.    To vote, as a member of the Association, on all subsequent operating budgets;

3.    As a member of the Association, to vote for the election of directors of the Association, to receive notices of and to attend meetings of the directors; and

4.    To vote for any succeeding managing agent.

-69-

CONFIDENTIAL                                                                            DANSKE_0012305

Borrower represents and warrants to Lender that the documents for the Master Condominium Regime and each of the Sub-association Regimes shall provide Lender or the Trustee the rights set forth above if such rights are not already available to Lender under Mexican Law. Lender shall have the right to approve the initial and all operating budgets of all Associations and the managing agent whether or not an Event of Default exists and such budgets shall be submitted for Lender review in accordance with Section 9.4 hereof.

      (c)    Sales.

      1.    In general, Borrower shall conduct, or cause to be conducted, all Product Sales in strict compliance with the provisions of all Laws and Governmental Authorities, having jurisdiction. Borrower shall undertake and diligently pursue a program for Product Sales. Each such Product Sale shall be in accordance with sub-sections (2) and (3) below, as applicable, and Borrower shall diligently proceed to close the sale comprehended thereby and to repay the Loan from the proceeds of such sale or apply the proceeds in accordance with the terms and conditions of this Agreement. All escrowed funds deposited shall be deposited with a title company or financial institution approved by Lender.

      2.    With respect to any Whole Ownership Sales, all such Whole Ownership Contracts shall be pursuant to a form previously approved by Lender or otherwise acceptable to Lender in its reasonable discretion and the purchase price payable under each such Whole Ownership Contract shall be equal to or greater than the release price approved by Lender in its sole discretion. All sales-specific modifications to or variations from the form of Whole Ownership Contract approved by Lender (other than completion of the blanks and changes required by applicable Laws or the Governmental Authorities) which are negotiated in connection with the sale of a particular Whole Ownership Contract shall be on commercially reasonable terms determined by Borrower exercising commercially reasonable business judgment in the interest of maximizing overall value of the Project. Borrower will institute such sales procedures as will ensure that the advertising of Product for sale and the sales activities of it or its agents do not constitute the offering of a "security" as that term is used in the Securities Act of 1933 or the Securities Exchange Act of 1934 and similar applicable Laws. Borrower represents and covenants that if sales activities for the Project have occurred or will occur, outside Mexico, Borrower shall comply with all applicable Laws and Governmental Authorities, including, but not limited to, time share registration and sales requirements for Mexico and such other jurisdictions. In connection with every Whole Ownership Contract and Whole Ownership Sale, Borrower shall deliver to Lender and Servicer, the following: (i) no later than ten (10) Business Days after execution, with respect to each Whole Ownership Contract, a fully executed and exhibited Whole Ownership Contract inclusive of any deposit agreement, escrow arrangement, and agreement to enter a fideicomiso; and (ii) no later than ten (10) Business Days after closing on a Whole Ownership Sale, a fully executed and exhibited instruction letter to the Trustee, the escritura including the special powers of attorney issued by the Trustee with respect to such instructed sale, and the public instrument (escritura) containing the fideicomiso releasing the Unit from the Trust. Borrower shall timely delivery to Lender and Servicer any additional information requested by Lender and Servicer.

7585436-v6

CONFIDENTIAL

DANSKE_0012306

3.    With respect to Time Share Sales, all such Time Share Contracts shall be pursuant to a form previously approved by Lender or otherwise acceptable to Lender in its reasonable discretion for a purchase price approved by Borrower exercising commercially reasonable business judgment in the interest of maximizing overall value of the Project.  In no event shall any Time Share Interest be for a period of time less than seven (7) consecutive calendar days.  All Time Share Contracts shall be on the form approved by Lender and shall include the Trustee Acknowledgement.  If required by Lender, with respect to each sale, Borrower shall deliver to Lender the Pledge of Time Share Contract in the form attached hereto as Exhibit 13.9(c)(3) assigning to Lender all of Borrower's rights and interest in the Time Share Contract without assignment of any of Borrower's obligations thereunder.

(d)    Compliance with the Act and Escrow Agreements.  Borrower shall not do, permit or suffer any act or omission which would constitute a violation of, or give any person any right to maintain any action for rescission of any sale of, or agreement to sell, any such Product.  Borrower shall comply with and fulfill all provisions of any escrow agreement for the Product Sale, the Whole Ownership Contracts, Time Share Contracts and any other documents in connection with the Project on the part of Borrower to be complied with or fulfilled.

(e)    Use of Deposits.  Borrower represents and warrants to Lender that the Laws and Government Authorities permit Borrower to use all deposits and proceeds from Time Share Sales for Construction of the Improvements.  Borrower represents and warrants that any escrow agreement entered into by Borrower with respect to any sale of a Lot shall permit escrow agent to disburse proceeds received, and that such escrow agent will disburse to Lender pursuant to any escrow agreement, all sums held by the escrow agent pursuant to the escrow agreement.  Any such escrow arrangement, agreement, or escrow agent shall be subject to Lender's prior written approval.

(f)    Borrower's failure to comply with any of the covenants set forth in this Section 13.9 shall be deemed an Event of Default hereunder.

Section 13.10  Construction Covenants.

(a)    All Construction shall be completed timely and in accordance with the scope and cost as set forth in the applicable Construction Budget, taking into account any costs of completion projected for any budgeted period occurring after the period set forth in the applicable Construction Budget.  This covenant shall be tested on a monthly basis on the twenty-eighth day following the last day of the immediately preceding month.

(b)    All Construction Costs shall remain in balance as provided in Article X hereof taking into account any costs of completion projected for any budgeted period occurring after the period set forth in the applicable Construction Budget.

(c)    The Non-Resort Improvements shall be commenced and completed by the following dates:

| Vertical Construction: | Commencement Date: |
| --- | --- |
| Completion Date: | |

7585436-v6

CONFIDENTIAL

DANSKE_0012307

| Golf Villa #8 (Residence Club) | March 1, 2014 | March 1, 2015 |
| Beach Estate #27(Residence Club) | March 1, 2014 | March 1, 2015 |
| Las Casitas #1 | June 1, 2014 | March 1, 2015 |
| Las Casitas #2 | July 1, 2014 | April 1, 2015 |

| Infrastructure: | Commencement Date: | Completion Date: |
|---|---|---|
| Diamante Blvd | | |
| Repair and Improvements | April 1, 2014 | December 31, 2014 |
| | | |
| Sunset Hill | | |
| Diamante Blvd. Ext. to Sunset Hill | January 1, 2014 | February 1, 2015 |
| Sunset Hill Grade and Compact | March 1, 2014 | February 1, 2015 |
| | | |
| Golf Villas | | |
| Golf Villas Pavement | January 1, 2014 | December 31, 2014 |
| | | |
| Beach Estate | | |
| Beach Estate Grade and Compact | January 1, 2014 | March 1, 2015 |
| Beach Estate sewer and lift station | January 1, 2014 | March 1, 2015 |
| Beach Estate Water | January 1, 2014 | March 1, 2015 |
| Beach Estate Power | January 1, 2014 | March 1, 2015 |
| Beach Estate Arroyo Protection | January 1, 2014 | March 1, 2015 |
| Casitas | | |
| Grading and Compacting Roads | January 1, 2014 | September 1, 2014 |
| Water, Power, Sewer, Storm Drain | June 1, 2014 | March 1, 2015 |
| Off-Site Road | July 1, 2014 | March 1, 2015 |
| Power Lines to Municipal Desal Plant | September 1, 2014 | June 1, 2015 |

(d)     The Resort Improvements shall be commenced and completed by the following dates:

| Vertical Construction: | Commencement Date: | Completion Date: |
|---|---|---|

7585436-v6

CONFIDENTIAL

DANSKE_0012308

| | | |
|---|---|---|
| Resort Multi-Unit | | |
| Resort Tower and Units Phase 1A | March 1, 2014 | May 1, 2015 |
| Beach Bungalows | | |
| Bungalow #3 | March 1, 2014 | December 1, 2014 |
| Bungalow #4 | June 1, 2014 | March 1, 2015 |
| Lagoon Residence Units | | |
| 2U3 | February 1, 2014 | October 1, 2014 |
| 2U4 | April 1, 2014 | December 1, 2014 |
| 2U5 | June 1, 2014 | February 1, 2015 |
| Health Club | March 1, 2014 | September 1, 2014 |
| Spa | May 1, 2014 | December 1, 2014 |
| Infrastructure | | |
| Road to Tower | October 1, 2014 | May 1, 2015 |
| Infrastructure to Tower | October 1, 2014 | May 1, 2015 |

(e)    The TW Golf Course shall be completed no later than December 1, 2014.

(f)    Borrower's failure to comply with the forgoing covenants shall be an Event of Default hereunder.

Section 13.11    <u>Operational Covenants</u>.

(a)    Borrower shall pay, perform, and execute all operations at the Project in accordance with the scope and cost described in the Operations Budgets. Borrower shall pay all payroll costs and expenses timely and in accordance with all Laws. Borrower shall operate and maintain all aspects of the Project consistent with a luxury, first class resort and golf community. Borrower shall not apply any Sales Proceeds to support operating costs or operating shortfall of any kind, except that Borrower shall be permitted to apply the Working Capital Contribution in strict accordance with the Operations Budget.

(b)    Borrower shall make available to Lender's Consultant all books and records requested by Lender's Consultant in connection with its review of operations at the Project, including but not limited to Accounts Payable reports and all such other information reasonably requested by Lender or Lender's Consultant. If Lender's Consultant identifies any significant shortfalls or deviations with respect to any Accounts Payable of Borrower (an "**Significant Accounts Payable Shortfall**"), including but not limited to payroll, servicers, vendors, suppliers, and other third party payees, then Lender's Consultant shall provide notice to

-73-

CONFIDENTIAL
DANSKE_0012309

Borrower and Lender. Within thirty (30) days of such notice, Borrower and Lender shall undertake a review of the Construction Budgets, Operations Budget, Administrative Budget and Consolidated Cash Flow Statement for purposes of determining what budget line items may be reallocated, and after such determination, Borrower shall implement any revised budget required by Lender. Alternatively, Lender may deem such Significant Accounts Payable Shortfall a Triggering Event.

(c)     Borrower shall apply any profit attributable to operations of the Dunes Golf Course (and, to the extent completed, the TW Golf Course) to fund on-going operating expenses associated with the operations and maintenance of the Dunes Golf Course (and, to the extent completed, the TW Golf Course).

(d)     Borrower's failure to comply with the forgoing covenant set forth in sub-section (a)-(c) hereof shall be an Event of Default hereunder.

Section 13.12 <u>Special Project Covenants</u>.    In addition to the foregoing, Borrower expressly covenants and agrees as to the following:

(a)     <u>URCONSA</u>.    Borrower represents and warrants that the URCONSA Schedule of Lots attached hereto and incorporated herein as <u>Exhibit 13.12(a)</u> is a true, accurate and complete list of Lots subject to conveyance to URCONSA Contractor as consideration for work performed pursuant to the URCONSA Contract as of the Effective Date. Any additional Lots to be included within the scope of Lots subject to the URCONSA Contract shall be subject to Lender's prior written approval.

(b)     <u>Donation Area Obligations</u>.    Borrower shall timely pay and perform all obligations to City of Los Cabos pursuant to the Donation Area Agreement, including but not limited to payment of $2,340,000 ("**Donation Area Fee**") as and when required under the Subdivision Approval.

(c)     <u>Water Treatment Contracts</u>.    Borrower shall pay and perform all obligations under the Water Treatment Contracts.

(d)     <u>Master Associations and Sub-Associations</u>.

(i)     No later than September 30, 2014, Borrower shall provide to Lender for its review and approval (i) proposed budgets for the Master Association and all sub-associations (such budgets, the "**Association Budgets**") which Association Budgets shall provide for all costs associated with the management, maintenance and operation of the Association Amenities; and (ii) a listing of the Association Amenities for the Master Association and each sub-association.

(ii)     So long as the Loan is outstanding, if an Event of Default has occurred and is continuing, or any condition exists which, after notice or lapse of time, or both, would constitute an Event of Default, and which condition Lender determines might not be cured prior to the expiration of any applicable cure period under this Agreement, and to the extent

-74-

CONFIDENTIAL                                                                  DANSKE_0012310

permitted under applicable law, then Trustee, as owner of the Project, shall be deemed to be the member of any such Association, and Trustee shall have the right as member pursuant to the association documents to (i) upon direction from Lender exercises all voting rights of Borrower; (ii) upon direction from Lender, vote, as a member of any such Association, on all operating budgets; (iii) as a member of any such Association, at the direction of Lender, to vote for the election of directors of any such Association, to receive notices to and to attend meetings of the directors; and (iv) at the direction of Lender, to vote any managing agent.

(iii)     As a condition to closing hereunder, Borrower shall create all easements, maintenance and cost sharing agreements, rules and regulations necessary and required to obligate each and every of the Sub-condominium Regimes and all owners therein, to pay a designated proportionate share for on-going use and maintenance of shared infrastructure, amenities, and common areas within the Project.  All such agreements shall be subject to the prior review and approval of Lender.

(iv)     In no event later than September 30, 2014, Borrower shall cause each and every Master Association and Sub-condominium Regime, together with the Dunes Residence Condominium Units, to be registered with and duly approved by the State Planning Ministry as required by Article 12, fraction XV of the Urban Development Law of the State of Mexico.  For each and every master condominium or homeowner's association and any sub-condominium or homeowner's association created after the Effective Date hereof (except for the Dunes Residence Condominium Units, which authorization shall be obtained in accordance with the prior sentence hereof), Borrower shall obtain the State Planning Ministry approval prior to obtaining any approvals from Municipal Planning Authorities as required by Article 12, fraction XV of the Urban Development Law of the State of Mexico.

(e)     <u>Legacy Payments Subordinate</u>.  All payments due by Borrower to Legacy or its Affiliates, including but not limited to those due pursuant to any of the Operating Budgets, Administrative Budget or Construction Budgets, or those amounts having accrued prior to the date hereof (collectively all such amounts accrued or to be paid, the "**Legacy Subordinate Payments**") are subject and subordinate to the obligations of Borrower with respect to the Loan hereunder pursuant to the Subordination Agreements delivered pursuant to Article VII hereof. Borrower shall not make any payments on the Legacy Subordinate Payments unless Lender provides prior written approval of such payment.  If there exists a default under this Loan Agreement, the payments due on the Loan are not current or if the making of such Legacy Subordinate Payments will result in the occurrence of a failure of a covenant in Section 13.4, Section 13.7, Section 13.6, or Section 13.11, then regardless of whether Lender has previously consented to such payment, Borrower shall not pay any of the Legacy Subordinate Payments.

(f)     <u>Diamante Club Payments Subordinate</u>.   Prior to the Effective Date, Borrower has provided to Lender a copy of the Access agreement by and between Borrower and Diamante Club for review and approval by Lender ("**Access Agreement**").   The Access Agreement shall be subject and subordinate to the Loan pursuant to the Subordination Agreement delivered by Diamante Club pursuant to Article VII of this Agreement.

(g)     <u>Diamante Club Assignment of Proceeds</u>. As a condition to closing

-75-

CONFIDENTIAL                                                                                          DANSKE_0012311

hereunder, Borrower shall cause to be assigned to Lender all rights of Borrower and any Affiliate pursuant to any membership agreement with Diamante Club, including but not limited to any payment of deposits and purchase amounts as well as payment of on-going membership dues, fees and charges that may be payable to Diamante Club. Diamante Club hereby consents to the assignment to Lender of all of Borrower's and Diamante Club's rights under all Membership Agreements, including but not limited to amounts that may be due to or otherwise paid to Borrower or Diamante Club pursuant to any membership agreements with Diamante Club and shall execute and deliver to Lender any instrument of assignment or other document required by Lender to effect and perfect such assignment.

Section 13.13  Appointment of Lender's Consultant.

Lender shall retain, at the sole cost and expense of Borrower, the Lender's Consultant to review all operations at the Project (including books and records of Borrower), to review and inspect the Plans and Specifications, to inspect the construction of the Improvements, to report to Lender on the conformity of such construction with the Plans and Specifications, to certify requests for Change Orders (to the extent Lender approval is required for any such Change Order), disbursements of Advances and to perform such other services as may be requested by Lender including the following:

(a)  Prior to the first advance of the Replacement Facility C Loan, the Lender's Consultant shall review the Plans and Specifications, the applicable Project Budgets, the applicable Project Schedules, all cash flow projections, all construction contracts, and any other relevant material related to the Project (or applicable Phase thereof). Based on the foregoing, the Lender's Consultant shall supply to Lender, at the time of his Project Budget review, his written professional opinion with regard to the following:

(i)  Operations at the Project, including but not limited to Accounts Payable review;

(ii)  completeness of the Plans and Specifications;

(iii)  compliance with all applicable development requirements, regulations and decrees of all Governmental Authorities having jurisdiction that have been obtained or will be issued, as and when required by Laws;

(iv)  adequacy of the applicable Project Budget;

(v)  acceptability of the available survey, environmental studies and soil studies; and

(vi)  other pertinent aspects which in the Lender's Consultant's opinion should be known to Lender with respect to the on-going construction and operations at the Project.

7585436-v6

CONFIDENTIAL

DANSKE_0012312

(b) Lender's Consultant shall make an on-site inspection as required to review on-going construction and operations of the Project, and will submit a report to Lender commenting upon:

(i) the draw review report prepared by Borrower;

(ii) the progress of construction;

(iii) any deficiencies noted during the inspection;

(iv) conformance with the Plans and Specifications for work in place;

(v) adherence to the Project Schedule;

(vi) other pertinent aspects of the Project, which, in the Lender's Consultant's opinion, should be known to Lender with respect to the on-going construction and operations at the Project; and

(vii) acceptability of Borrower's soft cost budget as submitted and evaluate the reasonableness thereof; and

(viii) operations and administration of the Project and all Phases thereof, including review of Accounts Payable.

(c) Permit Delivery; Permit Review. Borrower shall deliver to Lender and Servicer promptly and timely after receipt, copies of any and all Permits required under all Governmental Authorities and Laws. At least annually and from time to time as required by Lender in its sole discretion, Lender may engage a third party at Borrower's expense to review and opine as to the condition and good standing of all Permits with respect to the Project. In such event, Borrower shall provide such third-party any documentation or information reasonably requested by such third-party.

No consent, approval or other action by the Lender's Consultant shall be deemed to be a release or waiver of any of the terms and conditions of this Agreement or the other Loan Documents.

(d) Status Reports. At least monthly, or more frequently if requested by Lender, Borrower shall cause its management personnel to meet with Lender's Consultant, or other representatives of Lender at times and locations designated by Lender to discuss the progress of construction and Project operations, to furnish pertinent information relating to the Project (including any Permits) and other such information as Lender may request.

Section 13.14 Lender's Right of Entry and Inspection. Lender, the Lender's Consultant and the agents of either shall at all reasonable times and after giving advance notice, during the construction of the Improvements (or any Phase thereof) have the right of entry upon and free access to the construction site and the right to inspect all work done, labor performed, materials and equipment furnished with respect to such construction, and to inspect, and to make extracts

-77-

CONFIDENTIAL

DANSKE_0012313

from or copies of, the plans and specifications as amended from time to time and all books, contracts, subcontracts, records and papers, wherever located, of Borrower relating to the Project. All such books, contracts, subcontracts, records and papers will be made available to Lender, the Lender's Consultant or the agents of either promptly upon demand by Lender. Lender shall be under no duty to supervise or to inspect the work or construction or any books and records, it being understood that any such inspection by the Lender's Consultant or the agents of Lender is for the sole purpose of preserving Lender's rights hereunder. Any such inspection not followed by notice of default shall not constitute a representation by Lender that there has been or will be compliance with the Plans and Specifications or that the work is free from defective materials and workmanship or that Borrower is not otherwise in default hereunder.

Section 13.15 <u>Default in Construction.</u> If at any time prior to the completion of the construction and equipping of the Improvements an Event of Default shall have occurred and be continuing, then, and in any such event, Lender, at its option, may refuse to make further disbursements of Advances, may accelerate the indebtedness under the Notes and other Loan Documents as provided in this Agreement, and, in addition, without thereby impairing any of the rights, powers or privileges of Lender under any of the Loan Documents, may enter into possession of the construction site and perform any and all work and labor necessary to complete the Improvements substantially according to the Plans and Specifications, and all sums expended by Lender in so doing, including, but not limited to, a construction supervision fee, payable to Lender, equal to five percent (5%) of all such sums (but without duplication of any fees paid for Borrower's account to another party for the performance of the same services), shall be deemed to be paid for the account of Borrower and secured by the Trust Agreement, notwithstanding that such expenditures (including such fee) may exceed the amount of the Loan or the cost set forth in any other contracts. For this purpose, Borrower hereby constitutes and appoints Lender its true and lawful attorney-in- fact, with full power of substitution, to complete such construction and equipping in the name of Borrower, and hereby empowers such attorney or attorneys:

      (a)     To use any of the Loan proceeds, escrowed amounts, reserve deposits, or other Borrower funds which may remain unadvanced or undrawn for the purpose of completing the construction and equipping in the manner called for by the Plans and Specifications;

      (b)     To make such changes and corrections in the Plans and Specifications as shall be necessary or desirable to complete the construction in substantially the manner contemplated by the Plans and Specifications;

      (c)     To employ such contractors, subcontractors, agents, engineers, architects and inspectors as shall be required for such purposes;

      (d)     To pay, settle or compromise all bills and claims which may be or become liens or security interests against the Project, or any part thereof;

      (e)     To execute applications and certificates in the name of Borrower which may be required by the Construction Agreements, the Loan Documents or any other agreement or instrument executed by Borrower in connection with the Project;

7585436-v6

CONFIDENTIAL

DANSKE_0012314

(f)     To prosecute and defend all actions or proceedings in connection with the construction of the Improvements or the Collateral, and to take such action and require such performance as such attorney deems necessary under the Construction Agreements and the Loan Documents;

(g)     To submit any applications to governmental agencies in connection with the registration of the Project and Whole Ownership Sales or Time Share Sales therein and to prosecute and defend all actions, administrative or judicial, in connection therewith;

(h)     To enter into and cancel brokers' agreements and to sell at foreclosure or in any manner permissible at law the Project, or any part, lot or phase thereof;

(i)     To enter into possession of and to rent or sublease any part of the Project; and

(j)     To do any and every other act which Borrower might do in its own behalf in connection with the construction and completion of the Improvements. This power of attorney shall be deemed to be a power coupled with an interest and shall be irrevocable. Borrower hereby assigns and quitclaims to Lender all sums to be advanced under the Loan as well as all draws under the any escrow amounts or reserve deposits, conditioned upon the use of such sums in trust for the completion and equipping of the Improvements and for payment of the Loan due Lender pursuant to the terms of the Loan Documents.

Section 13.16  <u>Development and Management of the Project</u>.

(a)     Borrower shall develop and manage, or cause to be developed and managed, the Project and all Phases thereof, including, without limitation, all marketing, leasing, collections, maintenance and servicing duties, in a competent and professional manner. Borrower shall not enter into, materially modify or amend, terminate or cancel any development agreement or management agreement (if any) for the Project or agreements with agents or brokers with respect to the Project, without the prior written approval of the Lender. As of the Effective Date, Borrower has engaged Legacy to perform such development services and operations management services pursuant to the Development Management Agreement and Operations Management Agreement respectively.

(b)     Upon the occurrence of (i) an Event of Default hereunder or (ii) a default or event of default which remains uncured beyond any applicable cure periods under the Legacy Development Management Agreement by the development manager named therein, in either case, Lender has the right to terminate the Legacy Development Management Agreement and, upon such termination, Borrower shall cooperate with the Lender in hiring a third party developer (development manager) for the Project.

(c)     Upon the occurrence of (i) an Event of Default hereunder or (ii) a default or event of default which remains uncured beyond any applicable cure periods under the Legacy Operations Management Agreement by the operations manager named therein, in either case, Lender has the right to terminate the Legacy Operations Management Agreement and, upon such

-79-

CONFIDENTIAL                                                                 DANSKE_0012315

termination, Borrower shall cooperate with Lender in hiring a third party operations manager for the Project.

(d) Upon the occurrence of (i) an Event of Default hereunder or (ii) a default or event of default which remains uncured beyond any applicable cure periods under any agreement with any time share manager, if any, for any part of the Project, in either case, Lender has the right to terminate such time share management agreement and, upon such termination, the Borrower shall cooperate with the Lender in hiring a third party time share manager for such part of the Project.

Section 13.17 <u>Cash Management</u>.

(a) Borrower shall apply all Net Sales Proceeds in accordance with Consolidated Cash Flow Statement and applicable Operations and Construction Budget, giving effect to the following order of priority ("**Cash Management Order of Priority**"):

(i) First, to pay all Administrative Expenses for the applicable period as set forth in the line items for Administrative Budget described in the Project Construction Budget;

(ii) Second, to pay Non-Resort Timeshare and Whole Ownership Expenses for the applicable period as set forth in the Non-Resort Timeshare and Whole Ownership Budget sub-section of the Project Construction Budget, which amounts include the Monthly Interest Reserve Deposit payments; and to pay Resort Timeshare and Whole Ownership Expenses for the applicable period as set forth in the Resort Timeshare and Whole Ownership Budget sub-section of the Project Construction Budget;

(iii) Third, to pay the Budgeted Principal Paydown (Facility B), if any;

(v) Fourth, to pay the Budgeted Principal Paydown (Replacement Facility C);

(b) If, and only if, there is excess cash remaining after application of the Net Sales Proceeds per the Cash Management Order of Priority, then subject to obtaining prior Lender approval, which may be granted or denied in Lender's sole discretion, such excess cash may be applied as follows:

(i) to pay operating shortfalls; or

(ii) to Lender to be applied in accordance with the Order of Priority.

(c) From and after a Trigging Event, until an Event of Default, to the extent of funds received into the Wells Fargo Income Account, Banorte Accounts, and if directed by Lender, from the Santander Account, Lender shall disburse funds in these accounts pursuant to draw requests that Borrower submits to Lender in accordance with the terms and conditions of this Agreement or as otherwise required by Lender. Upon a Triggering Event, Lender shall be

CONFIDENTIAL

DANSKE_0012316

permitted to cause the transfer of all funds received into any of the Wells Fargo Income Accounts, Banorte Accounts, and if requested by Lender, the Santander Account, to the Clearing Account or such other account of Lender or Servicer on behalf of Lender as Lender shall determine in its sole discretion.

(d)     Notwithstanding anything contained herein to the contrary, upon the occurrence and during the continuance of an Event of Default, Lender may, in addition to any and all other rights and remedies available to Lender, apply any sums then present in any or all of the Accounts to the payment of the Debt in any order in its sole discretion or apply such funds for the purposes for which they were held.  Nothing in this Article13 shall limit in any way any right or remedy granted Lender elsewhere under the Loan Documents as a result of the occurrence of an Event of Default.

(e)     <u>Security Agreement</u>.

To secure the full and punctual payment and performance of all of the Debt, Borrower hereby sells, assigns, conveys, pledges and transfers to Lender and grants to Lender a first and continuing Lien on and security interest in and to, all of Borrower' rights, title and interest in the following property, whether now owned or existing or hereafter acquired or arising and regardless of where located (collectively, the "**Account Collateral**"):

(i)     the Accounts, if any, from time to time deposited or held in the Accounts);

(ii)     any and all amounts invested;

(iii)     all interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing; and

(iv)     to the extent not covered by clauses (i), (ii) or (iii) above, all "proceeds" (as defined under the UCC as in effect in the State in which the Accounts are located) of any or all of the foregoing.

(f)     Borrower covenants that (i) all revenue shall be deposited into the Accounts, as applicable, in accordance with this Agreement and (ii) so long as any portion of the Debt is outstanding, Borrower shall not open (nor permit any Manager or any Person to open) any other account for the collection of revenue without Lender's prior written approval and delivery of any control or mandate agreement required by Lender.

(g)     Borrower authorizes Lender to file a financing statement or statements in connection with any account collateral in the form required to properly perfect Lender's security interest in the Account Collateral to the extent that it may be perfected by such a filing and at any time and from time to time, at the expense of Borrower, to file all further instruments, and take all further action, that Lender may reasonably request, in order to perfect and protect the pledge, security interest and lien granted or purported to be granted hereby, or to enable Lender to

-81-

CONFIDENTIAL

DANSKE_0012317

exercise and enforce Lender's rights and remedies hereunder with respect to, any account collateral.

(h)     Borrower agrees that Borrower will not sell or otherwise dispose of any of account collateral other than pursuant to the terms hereof and of the other Loan Documents, or create or permit to exist any lien upon or with respect to all or any of the account collateral, except for the lien granted to Lender under this Agreement.

(i)     Beyond the exercise of reasonable care in the custody thereof, Lender shall not have any duty as to any account collateral or any income thereon in Lender's possession or control or in the possession or control of any agents for, or of Lender, or the preservation of rights against any Person or otherwise with respect thereto. Lender shall be deemed to have exercised reasonable care in the custody of the account collateral in Lender's possession if the account collateral is accorded treatment substantially equal to that which Lender accords Lender's own property, it being understood that, except to the extent of Lender's gross negligence, willful misconduct, or intentional or criminal acts, Lender shall not be liable or responsible for any loss or damage to any of the account collateral, or for any diminution in value thereof.

(j)     Effective upon and during the continuance of an Event of Default, Borrower hereby irrevocably constitutes and appoints Lender as Borrower's true and lawful attorney-in-fact, with full power of substitution, at any time, to execute, acknowledge and deliver any instruments and to exercise and enforce every right, power, remedy, option and privilege of Borrower with respect to the account collateral, and do in the name, place and stead of Borrower, all such acts, things and deeds for and on behalf of and in the name of Borrower with respect to the account collateral, which Borrower could or might do or which Lender may deem necessary or desirable to more fully vest in Lender the rights and remedies provided for herein with respect to the account collateral and to accomplish the purposes of this Agreement. The foregoing powers of attorney are irrevocable and coupled with an interest.

(k)     This Section shall create a continuing pledge of, lien on and security interest in the account collateral and shall remain in full force and effect until payment in full of the Debt. Lender shall have with respect to the account collateral, in addition to the rights and remedies herein set forth, all of the rights and remedies available to a secured party under the UCC, as if such rights and remedies were fully set forth herein. This Agreement constitutes a security agreement for purposes of the UCC and other applicable law.

(l)     Establishment and Control Agreements with respect to Wells Fargo Income Accounts, Banorte Accounts and Santander Accounts. Borrower has caused to be executed and delivered to Lender the Deposit Account Control Agreement with respect to the Wells Fargo Income Accounts in the form attached hereto and incorporated herein as Exhibit 13.17(l-1) and the Mandate Control Agreement with respect to the Banorte Accounts. If required by Lender, no later than thirty (30) days after the Effective Date hereof, Borrower shall cause to be executed and delivered to Lender the Mandate Control Agreement with respect to the Santander Account in the form required by Lender. Borrower acknowledges and agrees that at any time and from time to time, if Lender requires deposit account control agreements or mandate agreement with respect to any Account of Borrower, Borrower shall

-82-

CONFIDENTIAL                                                  DANSKE_0012318

cause such agreements to be delivered to Lender in a form approved by Lender no later than thirty (30) days after any written request by Lender.

Section 13.18 <u>Covenant Regarding Accounts</u>.   Promptly after closing hereunder, in good faith and exercising commercially reasonable efforts, Borrower shall undertake all steps required by Lender with respect to Lender obtaining a perfected security interest in all of the Accounts, including but not limited to executing and control agreement, mandate agreement, Trustee control agreement, or such other agreement as may be required by Lender regarding such Accounts.

Section 13.19 <u>Covenant Regarding Payment of Lender's Expenses</u>.   In addition to all other payment obligations of Borrower due to Lender hereunder, commencing on the date hereof and continuing on each Payment Date until Lender provides written notice to Borrower that such payments are no longer due, Borrower shall pay to Lender each month an amount equal to $50,000 ("**Monthly Payment Towards Costs**") which amount Lender shall apply towards all accrued costs, fees and expenses of Lender.   Borrower and Lender acknowledge and agree that if there are sufficient funds in the Interest Reserve Account to pay the Monthly Payment Towards Costs due from Borrower pursuant to this Section, then Lender shall direct the transfer of such amount on each such Payment Date.   If there is a shortfall in funds available in the Interest Reserve Account, then Borrower shall remit the difference to Lender on the monthly payment date, and Borrower's failure to make such payment shall be an Event of Default.   From time to time and as reasonably requested by Borrower, Lender shall provide to Borrower an update as to accrued costs, fees and expenses to which the Monthly Payment Towards Costs is to be applied. Lender shall also provide Borrower a monthly invoice in such form as may be necessary under Mexican Law to enable Borrower to obtain a tax deduction for such costs, fees and expenses.

Section 13.20 <u>Covenant Regarding Consultants</u>.   Borrower shall fully cooperate with Lender in connection with Lender's requirement for the engagement of a third-party consultant(s) to advise Lender with respect to (a) phasing of the Project and allocation of cash, debt and equity resources; (b) identification of a construction finance lender to fund the planned hotel and branded residences development and construction project; (c) identification of a debt or equity lender to participate in the Loan and/or fund cash and capital needs of the Project (collectively, items (a) through (c) are referred to herein as the "**Consultant Work**").   Lender and Borrower have identified and engaged a hotel consultant to prepare a Feasibility Study and Project Memorandum in response to Lender's and Borrower's requested scope of work.   The selected consultant(s) will be tasked with completing the Consultant Work within the time frames prescribed by Lender and Borrower.

Section 13.21 <u>Cooperation Covenants</u>.   At the written request of Lender, Borrower Parties agree to use commercially reasonable efforts to cooperate with, and assist, the Lender in its efforts to seek a third party purchaser of the Loan (or any part thereof).   Such cooperation and assistance shall take the form of:

(a)     Borrower Parties shall cooperate in due diligence efforts of any loan assignee of Lender, which cooperation shall include, but not be limited to, making its personnel, contractors and consultants available for interviews with loan assignee and its consultants and instructing them to share project documents and work product.   Additionally, Borrower Parties

-83-

CONFIDENTIAL                                                                                              DANSKE_0012319

shall waive confidentiality covenants to extent necessary or appropriate to facilitate due diligence efforts of loan assignee;

(b)     Borrower Parties shall execute and/or enter into confirmatory and reaffirmation loan documents, including a novation of any loan documents for the direct benefit of any loan assignee of Lender;

(c)     Borrower Parties shall add loan assignee as an additional insured on all insurance policies, upon Lender entering into an agreement for assignment.  Any assignee of Lender will be deemed an additional beneficiary covered by all indemnification obligations of the Borrower Parties and Borrower Parties shall execute such additional documentation as required by Lender or its assignee to ratify the same.

(d)     Borrower Parties acknowledge and agree that Lender shall have the express right to assign its commitment to advance any unfunded portion of the Replacement Facility C and Borrower shall cooperate fully with respect to any such assignment.  Borrower Parties shall release Lender and loan assignee from all lender liability claims in connection with such assignment.

(e)     Borrower Parties shall request that Legacy or other third parties take such actions as Lender reasonably requests in writing; provided that Borrower Parties shall not be liable for any failure by Legacy or such third parties to comply with any such requests and any such failure shall not constitute a default by Borrower Parties under this Agreement.

(f)     Borrower Parties shall provide access to the Project for Lender and any prospective purchasers of the Loan and /or the Project.

## ARTICLE XIV
## CASUALTY AND CONDEMNATION

Section 14.1     <u>Lender's Election to Apply Proceeds to the Debt</u>.

(a)     Subject to the provisions of Section 14.1(b) below, Lender may elect to apply to the Debt, in the Order of Priority, all proceeds of insurance or condemnation (individually and collectively referred to as "**Proceeds**"), after deduction of all expenses of collection and settlement, including attorneys' and adjusters' fees and charges.  Any Proceeds remaining after repayment of the indebtedness under the Amended Loan Documents shall be paid by Lender to Borrower.

(b)     Notwithstanding anything in Section 14.1(a) to the contrary, in the event of any casualty to the Improvements or any condemnation of part of the Property, Lender agrees to make the Proceeds available for restoration of the Improvements if (i) no Default or Event of Default exists, (ii) all Proceeds are deposited with Lender, (iii) in Lender's reasonable judgment, the amount of Proceeds available for restoration of the Improvements (together with undisbursed proceeds of the Loan or other security acceptable to Lender deposited with Lender by Borrower for such purpose) is sufficient to pay the full and complete costs of such restoration, (iv) in Lender's reasonable determination, the Property can be restored to an architecturally and

-84-

CONFIDENTIAL                                    DANSKE_0012320

economically viable project in compliance with applicable Laws, and (v) in Lender's reasonable judgment, following the restoration of the Property, the Loan to Value Ratio shall not exceed 70%.

Section 14.2    Borrower's Obligation to Rebuild.

(a)    If Lender does not elect (or does not have the right) to apply the Proceeds to the Debt, as provided in Section 14.1 above, Borrower shall:

(i)    Proceed with diligence to make settlement with insurers or Governmental Authorities and cause the Proceeds to be deposited with Lender;

(ii)    In the event of any delay in making settlement with insurers or Governmental Authorities or effecting collection of the Proceeds, deposit with lender such amount as Lender reasonably deems appropriate to insure the timely restoration of the Property;

(iii)    If the Proceeds and the undisbursed balance of the Loan are insufficient to keep the Loan in Balance, promptly deposit with Lender any amount necessary to restore the Loan to Balance; and

(iv)    Promptly proceed with the resumption of Construction of the Improvements and restore the Property to its former condition.

(b)    Any request by Borrower for a disbursement by Lender of Proceeds and funds deposited by Borrower shall be treated by Lender as if such request were for an advance of the Loan hereunder, and the disbursement thereof shall be conditioned upon Borrower's compliance with and satisfaction of the same conditions precedent as would be applicable under this Agreement for an advance of the Loan.

## ARTICLE XV
## TRANSFERS

Section 15.1    Prohibition of Assignments and Transfers by Borrower.

Borrower shall not assign its rights under this Agreement and any purported assignment shall be void. Except to the extent permitted pursuant to Article 16 hereof, Borrower shall not, without first obtaining the prior written consent of Lender (which consent may be withheld by Lender in its sole discretion), suffer or permit (a) any change in the management (whether direct or indirect) of the Property or of Borrower or (b) any Transfer. Notwithstanding the foregoing to the contrary, the following Transfers shall be permitted without the need for any such Lender approval:    (i) Transfers to Lender or any other party by reason of Lender's exercise of its remedies under the Pledge Agreements; and (ii) Transfers of direct or indirect ownership interests in Borrower by any of its constituent members as of the date hereof if made to effect bona fide estate planning needs, so long as following any such transfer pursuant to this clause (y), no more than 70% of the beneficial economic interest in Borrower (whether directly or indirectly) has been transferred in the aggregate and Control of Borrower has not changed,

-85-

7585436-v6

CONFIDENTIAL    DANSKE_0012321

provided, further, that in connection with any permitted Transfer pursuant to this Section 15.1, Lender receives: (i) all documentation evidencing the Transfer; (ii) confirmation that such Transfer shall not cause a breach of the representation made by Borrower in Section 3.1(v) hereof, in respect of OFAC, (ii) evidence satisfactory to Lender that the Transfer does not derogate in any way from the liens and security interests created by the Pledge Agreements, or otherwise impair Lender's first priority security interest thereunder; (iii) an endorsement to the UCC Policy to the effect that, after giving effect to the Transfer, Borrower retains a first priority security interest in the collateral under the Pledge Agreements; and (iv) payment for all out-of-pocket expenses incurred by Lender in connection with its review of the Transfer documentation and the issuance of the endorsement to the UCC Policy. Lender's consent if given in connection with any Transfer request shall not be deemed to be a waiver of Lender's right to require such consent in the future. Any Transfer made in contravention of this Agreement shall be null and void and of no force or effect.

Section 15.2    Prohibition of Transfers in Violation of ERISA.

In addition to the prohibitions set forth in Section 15.1 above, Borrower shall not permit any Transfer, if such Transfer would cause the Loan, or the exercise of any of Lender's rights in connection therewith, to constitute a prohibited transaction under ERISA or the Internal Revenue Code or otherwise result in Lender being deemed in violation of any applicable provision of ERISA. Borrower agrees to indemnify and hold Lender free and harmless from and against all losses, costs (including attorneys' fees and expenses), taxes, damages (including consequential damages) and expenses Lender may suffer by reason of the investigation, defense and settlement of claims and in obtaining any prohibited transaction exemption under ERISA necessary or desirable in Lender's sole judgment or by reason of a breach of the foregoing prohibitions. The foregoing indemnification shall be a recourse obligation of Borrower and shall survive repayment of the Debt, notwithstanding any limitations on recourse contained herein or in any of the Amended Loan Documents.

Section 15.3    Successors and Assigns.

Subject to the foregoing restrictions on Transfers contained in this Article 15, this Agreement shall inure to the benefit of, and shall bind, the parties hereto and their respective successors and assigns.

## ARTICLE XVI
## SPECIAL PROVISIONS RE: PARTICULAR PHASES

Section 16.1    Phases and Opportunity.

(a)    Borrower has advised Lender that it may wish to convey one or more Phases or portions thereof (including single family home lots or villas) to a third party purchaser or purchasers unaffiliated with Borrower or any Borrower Party prior to the Maturity Date (as the same may be extended in accordance with the terms hereof). Lender hereby agrees that, upon the request of Borrower from time to time, it shall cause Trustee to release the lien of the Trust Agreement from the applicable Phase (or portion thereof) upon the consummation of a

-86-

CONFIDENTIAL                                                                  DANSKE_0012322

bona fide, third party sale to a party other than an Affiliate of Borrower or any of Borrower Party, provided that:

(i)     there shall then be no Default or Event of Default;

(ii)     Borrower shall pay to Lender an amount in respect of the applicable Phase (or portion thereof) to be released from the first priority lien of the Trust Agreement equal to the greater of (A) the applicable Release Price, or (B) the net sale proceeds (*i.e.*, gross sale proceeds less reasonable and customary closing expenses approved by Lender, including brokerage commissions), for prompt application by Lender in the Order of Priority;

(iii)     Borrower has theretofore subjected the Property (or such portions thereof as Lender shall require) to an Master Condominium Regime and Sub-Condominium Regimes (as applicable);

(iv)     Borrower shall have theretofore caused the applicable Phase (or portion thereof) to be lawfully subdivided, in a manner reasonably acceptable to Lender, for real estate, zoning and other purposes required by Laws;

(v)     Borrower (or the purchaser) shall pay all transfer taxes, trustees fees and other amounts associated with the conveyance of the Phase (or portion thereof);

(vi)     Borrower furnishes Lender with an endorsement to the Title Policy, insuring Lender's interest as first place beneficiary under the Trust Agreement in respect of the remainder of the Property, subject only to the Permitted Exceptions;

(vii)     in respect of any conveyance of a portion of a Phase, Lender, acting reasonably, shall have concluded that such conveyance shall not impair the development of the remainder of the Phase; and

(viii)     Borrower reimburses Lender for all fees and expenses (including, without limitation, reasonable attorneys' fees) incurred by Lender in connection with evaluating and effectuating such release.

The term "**Release Price**" shall mean an amount equal to 100% of the fair market value of such released parcel, as determined by Lender in its sole discretion, net of reasonable and customary closing expenses approved by Lender, including brokerage commissions. Upon Lender's request therefor, Borrower shall execute such instrument as Lender shall require to establish the Release Price in respect of a Phase (or portion thereof). Any and all amounts paid to Lender shall be applied promptly by Lender in the Order of Priority.

As consideration for Lender's agreement to make the Replacement Facility C Loan, Borrower hereby irrevocably grants Lender a first opportunity to consider, make or refuse each and every loan, financing opportunity or equity investment in any new or restructured financing, equity investment or recapitalization contemplated by Borrower (or its affiliates) with respect to any Phase (each, an "**Opportunity**"). If Borrower wishes to enter into an Opportunity, Borrower

7585436-v6

CONFIDENTIAL

DANSKE_0012323

shall promptly notify Lender in writing of all of the material terms thereof and shall thereafter attempt to negotiate in good faith with Lender a mutually satisfactory agreement with respect to Lender's involvement in the Opportunity. If Lender fails to respond to Borrower's notice of an Opportunity within thirty (30) days after Lender's receipt thereof (or the parties, notwithstanding Borrower's compliance with the provisions of this Section 16.1, fail to agree upon the terms of the Opportunity within thirty (30) days after Borrower's receipt of Lender's acceptance of an Opportunity), Lender shall be deemed to have waived the Opportunity. Notwithstanding the foregoing provisions of this Section 16.1, Lender shall not be deemed to have waived an Opportunity by reason of its failure to respond to Borrower's notice thereof unless such notice states, in capital letters, that Lender's failure to respond thereto in the time provided shall result in the waiver of its rights. Borrower shall not engage any party other than Lender in connection with an Opportunity unless Lender has theretofore waived its rights in respect of such Opportunity in writing or otherwise consents in writing thereto. If Lender waives (or is deemed to have waived) its Opportunity in respect of a Phase, Lender shall release its lien if, and only if, Lender consents in writing to the Opportunity and Borrower satisfies the terms and conditions relating to the release of a parcel set forth in Section 16.1(a).

Section 16.2    Opportunities upon Maturity or Sooner Prepayment.

The provisions of Section 16.1 hereof shall apply to any Opportunity contemplated by Borrower in respect of the Property upon the maturity of the Loan or any sooner prepayment of the Loan.

## ARTICLE XVII
## SERVICER

Section 17.1    Servicer.  At the option of Lender, the Loan may be serviced by a servicer or trustee ("**Servicer**") selected by Lender and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Amended Loan Documents to the Servicer pursuant to a servicing agreement ("**Servicing Agreement**") between Lender and Servicer. Borrower shall be responsible for any reasonable set-up fees or any other initial costs relating to or arising under the Servicing Agreement.  Thereafter, Borrower shall reimburse Lender for the monthly servicing fees payable under the Servicing Agreement ("**Servicing Fees**").  Borrower shall further reimburse Lender upon demand for reasonable out-of-pocket costs and expenses incurred by Servicer in (i) reviewing Borrower's Requisitions for advances of the Loan, (ii) reviewing proposed Leases, (iii) conducting inspections of the Property, (iv) applying the provisions of this Agreement to any casualty or condemnation proceeding affecting the Property, (v) responding to any Default or Event of Default, or (vi) otherwise incurred in connection with this Agreement.  Servicer will request and review and Borrower shall make available to Servicer, actual cancelled checks for costs paid on previous Draw Requests and the Lender's Consultant shall report back to Lender on status of payment to the various trades. This review is to take place quarterly.

7585436-v6

CONFIDENTIAL

DANSKE_0012324

# ARTICLE XVIII
# EVENTS OF DEFAULT

Section 18.1    Events of Default.

The occurrence of any one or more of the following shall constitute an "**Event of Default**" as said term is used herein:

      (a)    Failure of Borrower (i) (A) to make any payment of principal, interest reserve payment, construction reserve deposit, the Profit Participation Fee, the Breakage Fee, the Non-Utilization Fee, and any periodic payments of due hereunder or under the other 2014Amended Loan Documents of, when due, it being expressly acknowledged and agreed that default under any Note shall constitute an Event of Default under all Notes, or (B) for a period of ten (10) days after written notice from Lender that the same is due and payable, to observe or perform any of the other covenants or conditions by Borrower to be performed under the terms of this Agreement or any other Amended Loan Document concerning the payment of money, or (ii) for a period of thirty (30) days (or such other period of time provided herein) after written notice from Lender, to observe or perform any non-monetary covenant or condition contained in this Agreement or any other 2014Amended Loan Documents; provided that if any such failure concerning a non-monetary covenant or condition is susceptible to cure and cannot reasonably be cured within said thirty (30) day period, then Borrower shall have an additional sixty (60) day period to cure such failure and no Event of Default shall be deemed to exist hereunder so long as Borrower commences such cure within the initial thirty (30) day period and diligently and in good faith pursues such cure to completion within such resulting ninety (90) day period from the date of Lender's notice; and provided further that if a different notice or grace period is specified under any other subsection of this Section 18.1 with respect to a particular breach, or if another subsection of this Section 18.1 applies to a particular breach and does not expressly provide for a notice or grace period, the specific provision shall control;

      (b)    Any Transfer or other disposition in violation of Article XV hereof;

      (c)    If any warranty, representation, statement, report or certificate made now or hereafter by Borrower, Diamante Member, or any of the Jowdy Parties is untrue or incorrect in any material respect at the time made or, subject to the provisions of Section 3.2 hereof, deemed remade;

      (d)    Borrower or any Guarantor shall commence a voluntary case concerning Borrower or Guarantor under the Bankruptcy Code; or an involuntary proceeding is commenced against Borrower or Guarantor under the Bankruptcy Code and relief is ordered against the applicable party, or the petition is controverted but not dismissed or stayed within sixty (60) days after the commencement of the case, or a custodian (as defined in the Bankruptcy Code) is appointed for or takes charge of all or substantially all of the property of Borrower or Guarantor; or Borrower or Guarantor commences any other proceedings under any reorganization, arrangement, readjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar Law of any jurisdiction whether now or hereafter in effect relating to Borrower or Guarantor; or there is commenced against Borrower or Guarantor any such proceeding which

7585436-v6

CONFIDENTIAL

DANSKE_0012325

remains dismissed or unstayed for a period of sixty (60) days; or Borrower or Guarantor fails to controvert in a timely manner any such case under the Bankruptcy Code or any such proceeding, or any order of relief or other order approving any such case or proceeding is entered; or Borrower or Guarantor by any act or failure to act indicates its consent to, approval of, or acquiescence in any such case or proceeding or the appointment of any custodian or the like of or for it for any substantial part of its property or suffers any such appointment to continue undischarged or unstayed for a period of sixty (60) days;

(e)     Borrower or Guarantor shall make an assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts generally as they become due, or shall consent to the appointment of a receiver or trustee or liquidator of all of its property or the major part thereof or if all or a substantial part of the assets of Borrower or Guarantor are attached, seized, subjected to a writ or distress warrant, or are levied upon, or come into the possession of any receiver, trustee, custodian or assignee for the benefit of creditors;

(f)     One or more final, unappealable judgments are entered (i) against Borrower in amounts aggregating in excess of $100,000, or (ii) against Guarantor in amounts aggregating in excess of $250,000 (excluding the Murray Judgment), and said judgments are not satisfied, stayed or bonded over within thirty (30) days after entry;

(g)     Borrower's failure to pay Taxes in accordance with Section 13.1(e) of this Agreement;

(h)     Borrower's failure to pay any trustees' fees as and when due;

(i)     Borrower's failure to pay any Insurance Premium or otherwise maintain insurance as required pursuant to Section 13.2 of this Agreement; and

(j)     The occurrence of any other event or circumstance denominated as an Event of Default in this Agreement or under any of the other Amended Loan Documents and the expiration of any applicable grace or cure periods, if any, specified for such Event of Default herein or therein, as the case may be.


## ARTICLE XIX
## LENDER'S REMEDIES IN EVENT OF DEFAULT

Section 19.1     Remedies Conferred Upon Lender.

Upon the occurrence of any Event of Default, Lender may pursue any one or more of the following remedies concurrently or successively, it being the intent hereof that none of such remedies shall be to the exclusion of any other:

(a)     Withhold further disbursement of the proceeds of the Loan and/or terminate Lender's obligations to make further disbursements hereunder;

7585436-v6

CONFIDENTIAL                                                                                      DANSKE_0012326

(b)     Declare the Notes to be immediately due and payable;

(c)     Exercise all of Lender's rights under the Amended and Restated Trust Agreement and/or Pledge Agreements; and

(d)     Exercise or pursue any other remedy or cause of action permitted under this Agreement or any other Amended Loan Documents, or conferred upon Lender by Laws.

Section 19.2   Borrower's Cooperation Covenants upon Event of Default.   Upon an Event of Default, Borrower Parties shall cooperate in any sale of the Project, and Borrower Parties hereby acknowledge and agree that purchase price achieved in such sale is not reasonably likely to exceed aggregate outstanding loan balance.   Additionally, if any of Borrower Parties goes into bankruptcy or insolvency, Lender and any assignee of Lender shall be entitled to a court order lifting any automatic stay on exercise of remedies and Borrower Parties covenant and warrant that each shall execute any and all such additional documents as may be necessary to effectuate the same.

## ARTICLE XX
## GENERAL PROVISIONS

Section 20.1   Captions.

The captions and headings of various Articles, Sections and subsections of this Agreement and Exhibits pertaining hereto are for convenience only and are not to be considered as defining or limiting in any way the scope or intent of the provisions hereof.

Section 20.2   Modification, Waiver.

No modification, waiver, amendment or discharge of this Agreement or any other Loan Document shall be valid unless the same is in writing and signed by the party against which the enforcement of such modification, waiver, amendment or discharge is sought.

Section 20.3   Governing Law.

THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDER AND ACCEPTED BY BORROWER PARTIES IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTES DELIVERED PURSUANT HERETO WERE AND WILL BE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY. IN ALL RESPECTS INCLUDING, WITHOUT LIMITATION, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE AND APPLICABLE LAW OF THE UNITED STATES OF AMERICA. TO THE FULLEST EXTENT PERMITTED BY

7585436-v6

CONFIDENTIAL                                                          DANSKE_0012327

LAW, BORROWER PARTIES HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVE ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, AND THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW. NOTWITHSTANDING THE FOREGOING, PROVISIONS IN THIS LOAN AGREEMENT AND THE OTHER AMENDED LOAN DOCUMENTS WITH RESPECT TO THE CREATION, PERFECTION, PRIORITY, ENFORCEMENT AND FORECLOSURE OF THE LIENS AND SECURITY INTERESTS CREATED HEREUNDER AGAINST PROPERTY LOCATED IN THE UNITED MEXICAN STATES SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE UNITED MEXICAN STATES.

Section 20.4 <u>Acquiescence Not to Constitute Waiver of Lender's Requirements</u>.

Each and every covenant and condition for the benefit of Lender contained in this Agreement may be waived by Lender, provided, however, that to the extent that Lender may have acquiesced in any noncompliance with any construction or non-construction conditions precedent to the making of the First Draw or to any subsequent disbursement of Loan proceeds, such acquiescence shall not be deemed to constitute a waiver by Lender of such requirements with respect to any future disbursements of Loan proceeds.

Section 20.5 <u>Disclaimer by Lender</u>.

(a)     This Agreement is made for the sole benefit of Borrower and Lender, and no other Person shall have any benefits, rights or remedies under or by reason of this Agreement, or by reason of any actions taken by Lender pursuant to this Agreement. Lender shall not be liable to any contractors, subcontractors, supplier, architect, engineer, Tenant or other party for labor or services performed or materials supplied in connection with the Property. Lender shall not be liable for any debts or claims accruing in favor of any such parties against Borrower or others or against the Property. Lender, by making the Loan or taking any action pursuant to any of the Amended Loan Documents, shall not be deemed a partner or a joint venturer with Borrower or fiduciary of Borrower. No payment of funds directly to a contractor or subcontractor or provider of services shall be deemed to create any third party beneficiary status or recognition of same by Lender. Without limiting the generality of the foregoing:

(i)     Lender shall have no liability, obligation or responsibility whatsoever with respect to the Property. Any inspections of the Property made by or through Lender are for purposes of administration of the Loan only and neither Borrower nor any third party is entitled to rely upon the same with respect to the quality, adequacy or suitability of materials or workmanship of the Property or any portion thereof.

Section 20.6 <u>Partial Invalidity; Severability</u>.

If any of the provisions of this Agreement, or the application thereof to any person, party or circumstances, shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such provision or provisions to persons, parties or

-92-

CONFIDENTIAL                                                                    DANSKE_0012328

circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected thereby, and every provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

Section 20.7 <u>Definitions Include Amendments</u>.

Definitions contained in this Agreement which identify documents including, but not limited to, the Amended Loan Documents, shall be deemed to include all amendments and supplements to such documents from the date hereof, and all future amendments, modifications, and supplements thereto entered into from time to time to satisfy the requirements of this Agreement or otherwise with the consent of Lender. Reference to this Agreement contained in any of the foregoing documents shall be deemed to include all amendments and supplements to this Agreement.

Section 20.8 <u>Execution in Counterparts</u>.

This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

Section 20.9 <u>Entire Agreement</u>.

This Agreement, taken together with all of the other Amended Loan Documents and all certificates and other documents delivered by Borrower to Lender, embody the entire agreement and supersede all prior agreements, written or oral, relating to the subject matter hereof.

Section 20.10 <u>Waiver of Damages</u>.

In no event shall Lender be liable to Borrower for punitive, exemplary or consequential damages including, without limitation, lost profits, whatever the nature of a breach by Lender of its obligations under this Agreement or any of the Amended Loan Documents, and Borrower for itself and Guarantor waives all claims for punitive, exemplary or consequential damages.

Section 20.11 <u>Jurisdiction</u>.

TO THE GREATEST EXTENT PERMITTED BY LAW, BORROWER HEREBY WAIVES ANY AND ALL RIGHTS TO REQUIRE MARSHALLING OF ASSETS BY LENDER. WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDINGS RELATING TO THIS AGREEMENT (EACH, A "**PROCEEDING**"), BORROWER IRREVOCABLY (A) SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT SITTING IN NEW YORK COUNTY, NEW YORK, AND (B) WAIVES ANY OBJECTION WHICH IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY PROCEEDING BROUGHT IN ANY SUCH COURT, WAIVES ANY CLAIM THAT ANY PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM AND FURTHER WAIVES THE RIGHT TO OBJECT, WITH RESPECT TO SUCH PROCEEDING, THAT SUCH COURT DOES NOT HAVE JURISDICTION OVER SUCH PARTY.

7585436-v6

CONFIDENTIAL                                                                 DANSKE_0012329

NOTHING IN THIS AGREEMENT SHALL PRECLUDE LENDER FROM BRINGING A PROCEEDING IN ANY OTHER JURISDICTION, NOR WILL THE BRINGING OF A PROCEEDING IN ANY ONE OR MORE JURISDICTIONS PRECLUDE THE BRINGING OF A PROCEEDING IN ANY OTHER JURISDICTION. BORROWER FURTHER AGREES AND CONSENTS THAT, IN ADDITION TO ANY METHODS OF SERVICE OF PROCESS PROVIDED FOR UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY PROCEEDING IN ANY STATE OR FEDERAL COURT SITTING IN NEW YORK COUNTY MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO BORROWER AT THE ADDRESS INDICATED BELOW, AND SERVICE SO MADE SHALL BE COMPLETE UPON RECEIPT; EXCEPT THAT IF BORROWER SHALL REFUSE TO ACCEPT DELIVERY, SERVICE SHALL BE DEEMED COMPLETE FIVE (5) DAYS AFTER THE SAME SHALL HAVE BEEN SO MAILED.

BOTH PARTIES AGREE THAT NOTWITHSTANDING THE FOREGOING, PROVISIONS IN THIS LOAN AGREEMENT AND THE OTHER AMENDED LOAN DOCUMENTS WITH RESPECT TO THE CREATION, PERFECTION, PRIORITY, ENFORCEMENT AND FORECLOSURE OF THE LIENS AND SECURITY INTERESTS RELATED HERETO AGAINST ASSETS LOCATED IN THE UNITED MEXICAN STATES SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE UNITED MEXICAN STATES AND IN SUCH CASES THE PARTIES SUBMIT TO THE NON EXCLUSIVE JURISDICTION OF THE COMPETENT COURTS LOCATED IN MEXICO CITY OR CABO SAN LUCAS, AT THE ELECTION OF THE LENDER.

Borrower hereby irrevocably designates and appoints Laurence Markowitz, Esq., with an office on the date hereof at Baker & Hostetler LLP, 45 Rockefeller Plaza, New York, New York 10111, as its authorized agent to accept and acknowledge on its behalf service of any and all process which may be served in any suit, action or proceeding in any Federal or State court in New York. Borrower agrees that service of process upon said agent at said address, together with written notice of said service mailed or delivered to Borrower in the manner provided herein shall be deemed in every respect effective service of process upon Borrower in any such suit, action or proceeding. Borrower (i) shall give prompt notice to Lender of any change of address of its authorized agent hereunder, (ii) may at any time and from time to time, upon the receipt of written consent from Lender, designate a substitute authorized agent with an office within the United States of America (which substitute agent and office shall be designated as the person and address for service of process). Borrower shall deliver to Lender a Notarial Instrument (Escritura Pública) in form satisfactory to Lender granted before a Mexican Notary Public containing a Special Power of Attorney in a form reasonably acceptable to Lender.

Section 20.12 Set-Offs.

After the occurrence and during the continuance of an Event of Default, Borrower hereby irrevocably authorizes and directs Lender from time to time to charge Borrower's accounts and deposits with Lender (or its Affiliates), and to pay over to Lender an amount equal to any amounts from time to time due and payable to Lender hereunder, under the Notes or under any other Loan Document. Borrower hereby grants to Lender a security interest in and to all such accounts and deposits maintained by Borrower with Lender (or its Affiliates).

7585436-v6

CONFIDENTIAL                                                                                    DANSKE_0012330

Section 20.13  Authorized Representative.

Each Authorized Representative shall deal with Lender on behalf of Borrower in respect of any and all matters in connection with this Agreement, the other Amended Loan Documents, and the Loan. Each Authorized Representative shall have the power, in his discretion, to give and receive all notices, monies, approvals, and other documents and instruments, and to take any other action on behalf of Borrower. All actions by either Authorized Representative shall be final and binding on Borrower. Lender may rely on the authority given to each Authorized Representative until actual receipt by Lender of a duly authorized resolution depriving such Authorized Representative of his authority. No more than two Persons shall serve as Authorized Representative at any given time.

Section 20.14  Non-Recourse Provisions.

The provisions of Article IX of the Notes pertaining to the personal liability of Borrower and its members, officers, directors, employees and Affiliates (collectively, "**Exculpated Parties**") are hereby incorporated herein by reference.

Section 20.15  Time Is of the Essence.

Time is of the essence under this Agreement.

## ARTICLE XXI
## NOTICES

Any notice, demand, request or other communication which any party hereto may be required or may desire to give hereunder shall be in writing and shall be deemed to have been properly given (a) if hand delivered, when delivered, (b) if mailed by United States Certified Mail (postage prepaid, return receipt requested), three Business Days after mailing, (c) if by Federal Express or other reliable overnight courier service, on the next Business Day after delivered to such courier service, (d) if by mail on the date of transmission as confirmed by evidence of receipt, or (e) if by telecopier on the day of transmission so long as copy is sent on the same day by overnight courier as set forth below:

If to Borrower and any of the Borrower Parties under any of the Loan Documents:

Diamante Cabo San Lucas S. de R.L. de C.V.
c/o Kenneth A. Jowdy, General Administrator
Boulevard Diamante s/n Col Los Cangrejos
Carretera Cabo San Lucas a Todos Santos Km 6.8
Cabo San Lucas B.C.S., C.P. 23463
Telecopy: 203-794-1135
Email: kj@legacyproperties.com

7585436-v6

CONFIDENTIAL                                                                                    DANSKE_0012331

With a copy to:

Diamante Cabo San Lucas S. de R.L. de C.V.
c/o William J. Najam, Jr.
131 Deer Hill Avenue, Suite B
Danbury, Connecticut 06811
Telecopy: 203-794-1135
Email: bn@legacyproperties.com

With a copy to:

Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Attention: Laurence Markowitz, Esq.
Telecopy: 212-589-4291

If to Lender:

Danske Bank A/S London Branch
London Branch
75 King William Street
London EC4N 7DT
Attn: Mr. Jovan Atkinson and Mr. David Daniel
Telecopy: +44 207 410 8001

With copies to:

Venable LLP
750 E. Pratt Street
Baltimore, Maryland 21202
Attention: Kelly Shubic Weiner, Esquire
Telecopy: (410) 224-7742

TriMont Real Estate Advisors, Inc.
Attn: Toni Meyer
3424 Peachtree Rd. Suite 2200
Atlanta, GA 30326
Reference: Asset #1133601-Diamante Cabo San Lucas
Telecopy: (404) 581-7810

     or at such other address as the party to be served with notice may have furnished in writing to the party seeking or desiring to serve notice as a place for the service of notice.

7585436-v6

CONFIDENTIAL

DANSKE_0012332

## ARTICLE XXII
## WAIVER OF JURY TRIAL

BORROWER AND LENDER EACH WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT AND THE OTHER AMENDED LOAN DOCUMENTS OR RELATING THERETO OR ARISING FROM THE LENDING RELATIONSHIP WHICH IS THE SUBJECT OF THIS AGREEMENT AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

## ARTICLE XXIII
## GROSS-UP

Section 23.1    Gross-Up.

ALL PAYMENTS BY BORROWER HEREUNDER AND UNDER ANY OF THE OTHER AMENDED LOAN DOCUMENTS SHALL BE MADE FREE AND CLEAR OF AND WITHOUT DEDUCTION FOR ANY PRESENT OR FUTURE TAXES, LEVIES, IMPOSTS, DEDUCTIONS, CHARGES OR WITHHOLDINGS, AND ANY LIABILITIES WITH RESPECT THERETO, EXCLUDING, IN THE CASE OF LENDER, TAXES IMPOSED ON ITS NET INCOME OR CAPITAL AND FRANCHISE TAXES IMPOSED ON IT BY THE JURISDICTION UNDER THE LAWS OF WHICH LENDER IS ORGANIZED OR ANY POLITICAL SUBDIVISION THEREOF (ALL SUCH NON-EXCLUDED TAXES, LEVIES, IMPOSTS, DEDUCTIONS, CHARGES WITHHOLDINGS AND LIABILITIES BEING HEREINAFTER REFERRED TO AS "**INCLUDED TAXES**"). IF BORROWER SHALL BE REQUIRED BY LAW TO DEDUCT ANY INCLUDED TAXES FROM OR IN RESPECT OF ANY SUM PAYABLE HEREUNDER, OR UNDER ANY ANCILLARY AGREEMENT, TO LENDER (I) THE SUM PAYABLE SHALL BE INCREASED AS MAY BE NECESSARY SO THAT AFTER MAKING ALL REQUIRED DEDUCTIONS (INCLUDING DEDUCTIONS APPLICABLE TO ADDITIONAL SUMS PAYABLE UNDER THIS SECTION) LENDER RECEIVES AN AMOUNT EQUAL TO THE SUM IT WOULD HAVE RECEIVED HAD NO SUCH DEDUCTIONS BEEN MADE, (II) BORROWER SHALL MAKE SUCH DEDUCTION, AND (III) BORROWER SHALL PAY THE FULL AMOUNT DEDUCTED TO THE RELEVANT TAXATION AUTHORITY OR OTHER AUTHORITY IN ACCORDANCE WITH APPLICABLE LAW. BORROWER WILL INDEMNIFY LENDER FOR THE FULL AMOUNT OF INCLUDED TAXES PAID BY LENDER, ANY LIABILITY (INCLUDING PENALTIES, INTEREST AND EXPENSES) ARISING THEREFROM OR WITH RESPECT THERETO, WHETHER OR NOT SUCH INCLUDED TAXES WERE CORRECTLY OR LEGALLY ASSERTED. PAYMENT UNDER THIS INDEMNIFICATION SHALL BE MADE WITHIN 10 DAYS FROM THE DATE LENDER MAKES WRITTEN DEMAND THEREFOR. A CERTIFICATE AS TO THE AMOUNT OF SUCH INCLUDED TAXES SHALL BE SUBMITTED TO BORROWER BY LENDER AND SHALL, IN THE ABSENCE OF MANIFEST ERROR, BE PRIMA FACIE EVIDENCE OF THE AMOUNT DUE BY BORROWER TO LENDER. WITHIN 10 DAYS AFTER THE DATE OF ANY PAYMENT OF INCLUDED TAXES BY BORROWER TO THE APPROPRIATE TAXING AUTHORITY, BORROWER WILL FURNISH TO LENDER EVIDENCE OF PAYMENT THEREOF

7585436-v6

CONFIDENTIAL
DANSKE_0012333

SATISFACTORY TO LENDER. THE PROVISIONS OF THIS ARTICLE XXIII SHALL SURVIVE REPAYMENT OF THE DEBT. PROMPTLY FOLLOWING THE DATE HEREOF, LENDER SHALL TAKE SUCH REASONABLE MEASURES AS SHALL BE REQUIRED TO REGISTER WITH THE MEXICAN FOREIGN REGISTRY FOR BANKS, FINANCIAL INSTITUTIONS, PENSION FUNDS AND INVESTMENT FUNDS OF THE MEXICAN TREASURY (*SECRETARÍA DE HACIENDA Y CRÉDITO PUBLICO*) UNDER ARTICLES 5 AND 195 OF THE MEXICAN INCOME TAX LAW, AND ARTICLE 11 OF THE CONVENTION BETWEEN THE GOVERNMENT OF THE UNITED MEXICAN STATES AND THE GOVERNMENT OF THE UNITED STATES OF AMERICA FOR THE AVOIDANCE OF DOUBLE TAXATION AND THE PREVENTION OF FISCAL EVASION WITH RESPECT TO TAXES ON INCOME, TO THE EXTENT REQUIRED TO OBVIATE (TO THE EXTENT POSSIBLE) ANY WITHHOLDING REQUIREMENT ON THE PART OF BORROWER.

WITHIN A REASONABLE PERIOD OF TIME AFTER THE EFFECTIVE DATE HEREOF LENDER AGREES TO UNDERTAKE A REASONABLE INQUIRY WITH ITS TAX ADVISORS TO DETERMINE WHETHER IT WOULD BE ELIGIBLE TO OBTAIN A CREDIT AGAINST ITS INCOME TAX RETURN WITH RESPECT TO ANY INCOME TAX WITHHOLDING AMOUNTS PAID BY BORROWER ON BEHALF OF LENDER IN ACCORDANCE WITH THE FORGOING PARAGRAPH. IF LENDER IS ELIGIBLE FOR SUCH A CREDIT AT NO EXPENSE TO LENDER, THEN LENDER WILL TAKE COMMERCIALLY REASONABLE EFFORTS AT NO EXPENSE TO LENDER TO PURSUE AN AVAILABLE CREDIT UPON BORROWER'S DELIVERY OF ALL INFORMATION LENDER REQUIRES TO PURSUE SUCH CREDIT.

## ARTICLE XXIV
## SALE OF NOTES AND SECURITIZATION; ASSIGNMENT

Section 24.1    <u>Cooperation</u>.

Borrower acknowledges that Lender may sell the Loan to a party who may pool the Loan with a number of other loans and grant participations therein or issue one or more classes of Mortgage Backed, Pass-Through Certificates or other securities evidencing a beneficial interest in a rated or unrated public offering or private placement (such sale and/or securitization, a "**Securitization**"; the securities evidencing such Securitization the "**Securities**") or syndicate the Loan to one or more third parties. In connection therewith, Borrower agrees to make available to Lender such financial and other information with respect to the Property, Borrower and Guarantor as Lender reasonably requests (collectively, the "**Provided Information**"). The Securities and/or the Loan may be rated by one or more of the Rating Agencies. Lender may share the Provided Information with the investment banking firms, Rating Agencies, accounting firms, law firms and other third-party advisory firms involved with the Loan or the Securities. The Provided Information may ultimately be incorporated into the offering documents for the Securities or in connection with syndication and thus such information may be disclosed to various investors. Lender and all of the aforesaid third-party advisors and professional firms shall be entitled to rely on the information supplied by, or on behalf of, Borrower. Lender, at its

7585436-v6

CONFIDENTIAL

DANSKE_0012334

sole option, may also elect to split the Loan into two or more loans, each secured by liens on the Property, and sell, assign, pledge or otherwise hypothecate one or more of such loans to third parties. Borrower shall cooperate in all such efforts by executing and delivering all such documents, certificates, instruments and other things reasonably necessary to evidence or confirm Borrower's obligations hereunder; provided, however, that in no event shall the Debt or Borrower's obligations hereunder be increased as a result thereof. Upon presentation of paid receipts or invoices therefor, Lender shall reimburse Borrower for out-of-pocket costs (including, without limitation, reasonable legal fees) paid or incurred by Borrower in connection with the performance of its obligations under this Section 24.1.

Section 24.2    Intentionally Omitted.

Section 24.3    Loan Components.

Borrower agrees that in connection with any sale, Securitization or syndication of the Loan, upon Lender's reasonable request and at Lender's sole cost and expense, Borrower shall deliver one or more new component notes to replace the original Notes or modify the original Notes to reflect multiple components of the Loan. Such new notes or modified Notes shall bear interest at the Interest Rate and shall otherwise be on the same terms as the original Notes. In the event of a prepayment of the Loan, Lender shall be entitled to apply the amount of such prepayment to one or more of the new component notes as Lender in its sole discretion decides.

Section 24.4    Costs.

Lender shall bear all costs and expenses incurred by Lender in connection with any sale, Securitization or syndication of the Loan.

Section 24.5    Conversion of Loan and Creation of Subordinate Debt.

Lender shall have the right, at Lender's sole cost and expense, to convert a portion of the Loan into subordinate financing, including, but not limited to, mezzanine debt, subordinate debt or participations in the Loan (collectively, "**Subordinate Loan**"), provided that (i) the aggregate principal amount of the Loan and the Subordinate Loan on the date of such adjustment shall equal the aggregate outstanding principal balance of the Loan immediately prior to such adjustment, and (ii) the notes evidencing the Loan and the Subordinate Loan shall bear interest at the rates and shall otherwise be on the same terms as the original Notes. Borrower shall cooperate with all reasonable requests of Lender in connection with any such adjustment of the Loan and shall execute and deliver such documents as shall reasonably be required by Lender in connection therewith.

Section 24.6    Securitization Indemnification.

(a)    Borrower understands that certain of the Provided Information may be included in disclosure documents in connection with the Securitization, including, without limitation, a prospectus, prospectus supplement or private placement memorandum (each, a "**Disclosure Document**") and may also be included in filings with the Securities and Exchange

-99-

CONFIDENTIAL                                                                           DANSKE_0012335

Commission pursuant to the Securities Act of 1933, as amended ("**Securities Act**"), or the Securities and Exchange Act of 1934, as amended ("**Exchange Act**"), or provided or made available to investors or prospective investors in the Securities, the Rating Agencies, and service providers relating to the Securitization. In the event that the Disclosure Document is required to be revised prior to the sale of all Securities, Borrower will cooperate with the holders of the Notes in updating the Disclosure Document by providing all current information necessary to keep the Disclosure Document accurate and complete in all material respects.

(b) Borrower agrees to provide in connection with each of (i) a preliminary and a private placement memorandum, or (ii) a preliminary and final prospectus or prospectus supplement, as applicable, an indemnification certificate (A) certifying that Borrower has carefully examined such memorandum or prospectus, as applicable including, without limitation, the sections entitled "Special Considerations," "Description of the Mortgages," "Description of the Mortgage Loans and Mortgaged Property," "The Manager," "The Borrower" and "Certain Legal Aspects of the Mortgage Loan," and such sections (and any other sections reasonably requested) do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, (B) indemnifying Lender (and for purposes of this Section 24.6(b), Lender hereunder shall include its officers and directors), the Affiliate of Lender that has filed the registration statement relating to the securitization ("**Registration Statement**"), each of its directors, each of its officers who have signed the Registration Statement and each Person who controls the Affiliate within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, "**Danske Group**"), and Lender, each of its directors and each Person who controls Lender within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act (collectively, "**Underwriter Group**") for any losses, claims, damages or liabilities (collectively, "**Liabilities**") to which Lender, the Danske Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in such sections or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated in such sections or necessary in order to make the statements in such sections or in light of the circumstances under which they were made, not misleading and (C) agreeing to reimburse Lender, the Danske Group and the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the Danske Group and the Underwriter Group in connection with investigating or defending the Liabilities; provided, however, that Borrower will be liable in any such case under clauses (B) or (C) above only to the extent that any such loss claim, damage or liability arises out of or is based upon any such untrue statement or omission made therein in reliance upon and in conformity with information furnished to Lender by or on behalf of Borrower in connection with the preparation of the memorandum or prospectus or in connection with the underwriting of the Debt, including, without limitation, financial statements of Borrower, operating statements, rent rolls, environmental site assessment reports and property condition reports with respect to the Property. This indemnity agreement will be in addition to any liability which Borrower may otherwise have. Moreover, the indemnification provided for in Clauses (B) and (C) above shall be effective whether or not an indemnification certificate described in (A) above is provided and shall be applicable based on information previously provided by Borrower or its Affiliates if Borrower does not provide the indemnification certificate.

7585436-v6

CONFIDENTIAL

DANSKE_0012336

(c)     In connection with filings under the Exchange Act, Borrower agrees to indemnify (i) Lender, the Danske Group and the Underwriter Group for Liabilities to which Lender, the Danske Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon the omission or alleged omission to state in the Provided Information a material fact required to be stated in the Provided Information in order to make the statements in the Provided Information, in light of the circumstances under which they were made not misleading, and (ii) reimburse Lender, the Danske Group or the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the Danske Group or the Underwriter Group in connection with defending or investigating the Liabilities.

(d)     Promptly after receipt by an indemnified party under this Section 24.6 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 24.6, notify the indemnifying party in writing of the commencement thereof, but the omission to so notify the indemnifying party will not relieve the indemnifying party from any liability which the indemnifying party may have to any indemnified party hereunder except to the extent that failure to notify causes prejudice to the indemnifying party.  In the event that any action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof with counsel satisfactory to such indemnified party.  After notice from the indemnifying party to such indemnified party under this Section 24.6, the indemnifying party shall not be responsible for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation; provided, however if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there are any legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party or parties. The indemnifying party shall not be liable for the expenses of more than one such separate counsel unless an indemnified party shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to another indemnified party.

(e)     In order to provide for just and equitable contribution in circumstances in which the indemnity agreements provided for in Sections 24.6(b) or (c) is or are for any reason held to be unenforceable by an indemnified party in respect of any losses, claims, damages or liabilities (or action in respect thereof) referred to therein which would otherwise be indemnifiable under Sections 24.6(b) or (c), the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such losses, claims, damages or liabilities (or action in respect thereof); provided, however, that no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.  In

7585436-v6

CONFIDENTIAL                                                                                          DANSKE_0012337

determining the amount of contribution to which the respective parties are entitled, the following factors shall be considered: (i) Lender's and Borrower's relative knowledge and access to information concerning the matter with respect to which claim was asserted; (ii) the opportunity to correct and prevent any statement or omission; and (iii) any other equitable considerations appropriate in the circumstances. Lender and Borrower hereby agree that it would not be equitable if the amount of such contribution were determined by pro rata or per capita allocation.

(f)     The liabilities and obligations of both Borrower and Lender under this Section 24.6 shall survive the termination of this Agreement and the satisfaction and discharge of the Debt.

Section 24.7     Rating Surveillance.

Borrower will retain the Rating Agencies to provide rating surveillance services on any certificates issued in a Securitization. Such rating surveillance will be at the expense of Borrower in an amount determined by Lender in its reasonable discretion prior to the occurrence of a Securitization. Such expense will be paid in monthly installments.

Section 24.8     Assignment.

Lender shall have the right to sell, assign, pledge, participate and otherwise transfer all or any portion of its rights and interests in any or all of the Loans to any third party at any time and from time to time. Borrower, Borrower Parties, and Guarantor shall fully cooperate with any and all such sales, assignments, pledges, participations and/or transfers by Lender.

SECTION 24.9     WAIVER OF CLAIMS; RELEASE AND COVENANT NOT TO SUE.

(A)     WAIVER. EACH OBLIGOR HEREBY WAIVES (A) ANY DEFENSE BASED UPON ANY LEGAL DISABILITY OR OTHER DEFENSE OF OBLIGORS, OR OTHER PERSON, OR BY REASON OF THE CESSATION OR LIMITATION OF THE LIABILITY OF ANY OBLIGOR FROM ANY CAUSE OTHER THAN FULL PAYMENT OF ALL SUMS PAYABLE UNDER THE NOTES OR ANY OF THE OTHER LOAN DOCUMENTS; PROVIDED HOWEVER, THAT THE FORGOING SUB-SECTION (A) IS NOT INTENDED TO LIMIT THE EXCULPATION PROVISIONS INCORPORATED BY REFERENCE PURSUANT TO SECTION 20.14 HEREOF AS APPLICABLE TO EXCULPATED PARTIES (B) ANY DEFENSE BASED UPON ANY LACK OF AUTHORITY OF THE OFFICERS, DIRECTORS, PARTNERS OR AGENTS ACTING OR PURPORTING TO ACT ON BEHALF OF ANY OBLIGOR OR ANY PRINCIPAL OF ANY OBLIGOR, OR ANY DEFECT IN THE FORMATION OF ANY OBLIGOR OR ANY PRINCIPAL OF ANY OBLIGOR; (C) ANY DEFENSE BASED UPON THE APPLICATION BY ANY OBLIGOR OF THE PROCEEDS OF THE LOAN FOR PURPOSES OTHER THAN THE PURPOSES REPRESENTED BY OBLIGOR TO LENDER OR INTENDED OR UNDERSTOOD BY LENDER; (D) ALL RIGHTS AND DEFENSES ARISING OUT OF AN ELECTION OF REMEDIES BY LENDER, EVEN THOUGH THAT ELECTION OF REMEDIES, SUCH AS A NON-JUDICIAL FORECLOSURE WITH RESPECT TO SECURITY FOR A GUARANTEED OBLIGATION HAS DESTROYED SUCH BORROWER DIAMANTE PARTY'S OR JOWDY PARTY'S RIGHTS OF SUBROGATION AND REIMBURSEMENT AGAINST BORROWER; (E) ANY DEFENSE BASED UPON LENDER'S FAILURE TO DISCLOSE TO BORROWER DIAMANTE PARTIES OR JOWDY PARTIES ANY INFORMATION CONCERNING BORROWER'S FINANCIAL CONDITION OR ANY OTHER CIRCUMSTANCES BEARING ON BORROWER'S ABILITY TO PAY ALL SUMS

7585436-v6

CONFIDENTIAL     DANSKE_0012338

PAYABLE UNDER THE NOTES OR ANY OF THE OTHER LOAN DOCUMENTS; (F) ANY DEFENSE BASED UPON ANY STATUTE OR RULE OF LAW WHICH PROVIDES THAT THE OBLIGATION OF A SURETY MUST BE NEITHER LARGER IN AMOUNT NOR IN ANY OTHER RESPECTS MORE BURDENSOME THAN THAT OF A PRINCIPAL; (G) ANY DEFENSE BASED UPON ANY BORROWING OR ANY GRANT OF A SECURITY INTEREST UNDER SECTION 364 OF THE FEDERAL BANKRUPTCY CODE; (H) ANY DEFENSE BASED UPON LENDER'S ELECTION, IN ANY PROCEEDING INSTITUTED UNDER THE FEDERAL BANKRUPTCY CODE, OF THE APPLICATION OF SECTION 1111(B)(2) OF THE FEDERAL BANKRUPTCY CODE OR ANY SUCCESSOR STATUTE (I) ANY RIGHT OF SUBROGATION, ANY RIGHT TO ENFORCE ANY REMEDY WHICH LENDER MAY HAVE AGAINST BORROWER AND ANY RIGHT TO PARTICIPATE IN, OR BENEFIT FROM, ANY SECURITY FOR THE NOTES OR THE OTHER LOAN DOCUMENTS NOW OR HEREAFTER HELD BY LENDER; (J) PRESENTMENT, DEMAND, PROTEST AND NOTICE OF ANY KIND; (K) THE BENEFIT OF ANY STATUTE OF LIMITATIONS AFFECTING THE LIABILITY OF ANY OF BORROWER DIAMANTE PARTIES OR JOWDY PARTIES HEREUNDER OR THE ENFORCEMENT HEREOF. IN ADDITION, EACH OBLIGOR WAIVES ALL RIGHTS AND DEFENSES THAT EACH MAY HAVE BECAUSE BORROWER'S DEBT IS SECURED BY REAL PROPERTY. FINALLY, EACH BORROWER PARTY AGREES THAT THE PAYMENTS OF ALL SUMS PAYABLE UNDER THE NOTES OR ANY OF THE OTHER LOAN DOCUMENTS OR ANY PART THEREOF OR OTHER ACT WHICH TOLLS ANY STATUTE OF LIMITATIONS APPLICABLE TO THE NOTES OR THE OTHER LOAN DOCUMENTS SHALL SIMILARLY OPERATE TO TOLL THE STATUTE OF LIMITATIONS APPLICABLE TO EACH BORROWER PARTY' LIABILITY HEREUNDER.

(B)     RELEASE.  BY ITS EXECUTION OF THIS AGREEMENT, EACH OBLIGOR SIGNING HERETO, FOR ITSELF AND TO THE FULL EXTENT LEGALLY POSSIBLE, FOR AND ON BEHALF OF EACH OF ITS PREDECESSORS, SUCCESSORS, ASSIGNS, MEMBERS, PARTNERS, MANAGERS, STOCKHOLDERS, OFFICERS, DIRECTORS, EMPLOYEES, AFFILIATES, AGENTS AND REPRESENTATIVES (COLLECTIVELY, "**RELEASING PARTIES**"), HEREBY RELEASES AND FOREVER DISCHARGES LENDER AND EACH OF ITS AFFILIATES AND SUBSIDIARIES, AND EACH OF THEIR RESPECTIVE PAST, PRESENT OR FUTURE MEMBERS, MANAGERS, PARTNERS, STOCKHOLDERS, BENEFICIARIES, DIRECTORS, OFFICERS, EMPLOYEES, ATTORNEYS, AGENTS AND REPRESENTATIVES, INCLUDING SUCCESSORS AND ASSIGNS OF ANY KIND OF THE FOREGOING ("**RELEASED PARTIES**"), FROM ANY AND ALL CLAIMS, DEMANDS, ACTIONS, LOSSES, LIABILITIES, COSTS AND EXPENSES, INCLUDING WITHOUT LIMITATION ATTORNEYS' FEES AND COSTS (COLLECTIVELY "**CLAIMS**"), WHETHER SUCH CLAIMS ARISE UNDER THEORIES OF REINSTATEMENT, WAIVER, COURSE OF DEALING, MORTGAGEE IN POSSESSION OR OTHERWISE, INCLUDING BUT NOT LIMITED TO CLAIMS ARISING FROM EVENTS OCCURRING OR CIRCUMSTANCES EXISTING ON OR PRIOR TO THE DATE HEREOF IN ANY WAY RELATED TO THE LOAN, THE LOAN DOCUMENTS (INCLUDING BUT NOT LIMITED TO THE NOTES, TRUST AGREEMENT, AND PLEDGE AGREEMENTS), THE PROJECT OR ANY OTHER COLLATERAL SECURING THE LOAN, INCLUDING WITHOUT LIMITATION, CLAIMS ARISING FROM OR UNDER CONSTRUCTION CONTRACTS OR SUBCONTRACTS OR ANY WORK PERFORMED ON OR MATERIALS PROVIDED TO THE PROJECT OR THE PROPERTY, AND ANY AND ALL DISCUSSIONS AND NEGOTIATIONS REGARDING PROPOSED TERMS AND CONDITIONS FOR A POSSIBLE EXTENSION AND/OR MODIFICATION OF THE LOAN (COLLECTIVELY "**RELEASED LOAN CLAIMS**").

(C)     COVENANT NOT TO SUE.  EACH OBLIGOR THAT EXECUTES AND DELIVERS THIS AGREEMENT AGREES ON BEHALF OF ITSELF AND ITS RESPECTIVE RELEASING PARTIES NOT TO BRING, OR TO ASSIST IN BRINGING, ANY CLAIMS. EACH OBLIGOR, FOR ITSELF AND EACH OF ITS RESPECTIVE RELEASING PARTIES, HEREBY COVENANTS AND AGREES THAT IT SHALL NOT SUE,

7585436-v6

CONFIDENTIAL                                                                                        DANSKE_0012339

COMMENCE, ASSERT, BRING OR FILE, IN ANY COURT OR OTHER TRIBUNAL, IN ANY JURISDICTION, ANY SUIT, ACTION, LITIGATION, COMPLAINT, COUNTERCLAIM, CROSS-CLAIM, CROSS-COMPLAINT, THIRD-PARTY COMPLAINT OR OTHER PLEADING SETTING FORTH ANY CLAIM OR CAUSE OF ACTION, OR OTHERWISE SEEKING AFFIRMATIVE RELIEF, AGAINST ANY RELEASED PARTIES, FOR ANY CLAIMS OR CAUSES OF ACTION OF ANY KIND OR NATURE WHATSOEVER, KNOWN OR UNKNOWN, WHICH ANY OBLIGOR OR ITS RESPECTIVE RELEASING PARTIES HAS, HAD OR MAY HAVE AGAINST RELEASED PARTIES ARISING OUT OF, OR RELATING DIRECTLY OR INDIRECTLY TO, THE RELEASED LOAN CLAIMS.

[NEXT PAGE IS THE SIGNATURE PAGE]

7585436-v6

CONFIDENTIAL

DANSKE_0012340

IN WITNESS WHEREOF, this Agreement has been executed by the undersigned as of the date first set forth above.

LENDER:

DANSKE BANK A/S, LONDON BRANCH

By: _____
Name: DAVID DANIEL
Title: Authorized Signatory

By: _____
Name: JUAN ATKINSON
Title: Authorized Signatory

*[THIRD AMENDED AND RESTATED LOAN AGREEMENT]*

CONFIDENTIAL

IN WITNESS WHEREOF, this Agreement has been executed by the undersigned as of the date first set forth above.

BORROWER:

DIAMANTE CABO SAN LUCAS S. DE R.L. DE C.V., a Mexican limited liability company with variable capital

By: _____
Name:    Kenneth A. Jowdy
Title:    General Administrator

*[SIGNATURE PAGE TO THIRD AMENDED AND RESTATED LOAN AGREEMENT]*

CONFIDENTIAL

ACKNOWLEDGED AND AGREED TO BY:

DIAMANTE MEMBER:

DIAMANTE CABO SAN LUCAS, LLC, a Delaware
limited liability company

By: _____
Name: Kenneth A. Jowdy
Title:   Managing Member

GUARANTOR:

KENNETH A. JOWDY

_____
Kenneth A. Jowdy, an individual

OTHER JOWDY PARTIES:

Diamante Properties, LLC, a Delaware limited liability
company

By: _____
Name: Kenneth A. Jowdy
Title:   Managing Member

*[SIGNATURE PAGE TO THIRD AMENDED AND RESTATED LOAN AGREEMENT]*

KAJ Holdings, LLC, a Delaware limited
liability company

By: _____
Name: Kenneth A. Jowdy
Title:  Managing Member


Diamante Life S. DE R.L. DE C.V., a Mexican limited
liability company with variable capital

By: _____
Name: Kenneth A. Jowdy
Title:  General Administrator


Diamante Club, LLC, a Delaware limited
liability company

By: _____
Name: Kenneth A. Jowdy
Title:  Managing Member


Diamante CSL, LLC, a Delaware limited
liability company

By: _____
Name: Kenneth A. Jowdy
Title:  Managing Member


*[SIGNATURE PAGE TO THIRD AMENDED AND RESTATED LOAN AGREEMENT]*

DANSKE_0012344

JOINDER BY LEGACY TO ACKNOWLEDGE
AGREEMENT TO SECTION 13.12(e)

Legacy Properties, LLC, a Delaware limited
liability company

By: _____
Name: Kenneth A. Jowdy
Title: Managing Member

CONFIDENTIAL