# EXHIBIT 62

*Final Execution Copy*

## FIRST AMENDMENT TO THIRD AMENDED AND RESTATED LOAN AGREEMENT AND MODIFICATION AGREEMENT

**THIS FIRST AMENDMENT TO THIRD AMENDED AND RESTATED LOAN AGREEMENT AND MODIFICATION AGREEMENT** (this "**Agreement**"), dated as of the 30th day of October 2014 ("**Closing Date**"), is made by and between **DIAMANTE CABO SAN LUCAS S. DE R.L. DE C.V.**, a Mexican limited liability company with variable capital, having an address at Boulevard s/n, Col. Los Cangrejos, Carretera Cabo San Lucas a Todos Santos Km 6.8 Cabo San Lucas B.C.S., C.P. 23473 ("**Borrower**"), and Borrower Parties described on Schedule 1 (collectively with Borrower, "**Obligors**"), and **DANSKE BANK A/S, LONDON BRANCH**, the London Branch of a company incorporated in Denmark ("**Lender**").

### RECITALS

A.      On March 10, 2006, Lehman Brothers Holdings Inc. ("**Lehman**") made a loan to Borrower in the original principal amount of One Hundred Twenty Five Million Dollars ($125,000,000.00) ("**Original Loan**") to be used to fund certain acquisition and pre-development costs in connection with that certain resort project located in the City of Cabo San Lucas, Baja California Sur, Mexico.

B.      The Original Loan is evidenced and secured by loan documents dated March 10, 2006 and identified on the Schedule of Original Loan Documents attached as Schedule 2 to the Loan Agreement ("**Original Loan Documents**").

C.      Pursuant to that certain Omnibus Assignment and Assumption dated January 13, 2009 by and between Lehman, as assignor, and Lender, as assignee, Lehman assigned to Lender, and Lender assumed from Lehman all of Lehman's right, title and interest in the Original Loan and the Original Loan Documents.

D.      Lehman and Lender executed certain assignment agreements dated February 27, 2009 whereby the assignment of Lehman's rights under the Original Trust Agreement, the Pledge Agreement (Membership Interests in Borrower: Mexico) and the Pledge Agreement (Assets) in favor of Lender was perfected in accordance with Mexican law.

E.      Lender, Borrower and Guarantors agreed to modify certain terms and conditions of the Original Loan Documents and, in connection therewith, reaffirmed, amended and/or amended and restated the Original Loan Documents pursuant to the Amended Loan Documents listed on Schedule 3 of the Loan Agreement (as reaffirmed, amended and/or amended and restated, "**2009 Amended Loan Documents**").

F.      Among the several modifications made pursuant to the 2009 Amended Loan Documents, Lender, as the holder of that certain Promissory Note dated March 10, 2006 in the original principal amount of $125,000,000.00 ("**Original Note**"), and Borrower, as the borrower under the Original Note, agreed to split the indebtedness evidenced by the Original Note into two (2) separate obligations of indebtedness as evidenced by:

(i)      Substitute Promissory Note (Facility A) dated as of March 6, 2009 in the amount of One Hundred Nine Million One Hundred Thirty-Eight Thousand Three Hundred Twenty-Seven and 83/100 Dollars ($109,138,327.83) ("**Facility A Note**"); and

8707646-v5

(ii)    Substitute Promissory Note (Facility B) dated as of March 6, 2009 in the amount of Sixteen Million and 00/100 Dollars ($16,000,000.00) ("**Facility B Note**").

G.      Lender, Borrower and Guarantors agreed to further modifications of certain terms and conditions of the Original Loan Documents and 2009 Amended Loan Documents, and in connection therewith reaffirmed and amended certain of the Original Loan Documents and 2009 Amended Loan Documents listed on Schedule 4, (as reaffirmed and amended, "**2010 Amended Loan Documents,**" and together with the 2009 Amended Loan Documents, the "**Amended Loan Documents**"), which amendments include, *inter alia*, increasing the principal balance available under Facility B Note from $16,000,000 to $20,000,000.

H.      Lender, Borrower and Guarantors agreed to extend the Maturity Date of the Loan to June 29, 2012 and modify certain applicable interest rates as more particularly set forth therein in that Extension Letter Agreement dated April 2, 2012 ("**First Extension Agreement**").

I.       By that letter agreement dated June 29, 2012, by and between Lender and Obligors, Lender agreed to extend the Maturity Date of the Loan from June 29, 2012 to September 28, 2012 and provided for certain other obligations of Borrower as more particularly set forth therein (the "**Second Extension Agreement**").

J.       By that letter agreement dated September 28, 2012, by and between Lender and Obligors, Lender agreed to extend the Maturity Date of the Loan from September 28, 2012 to December 31, 2012 and provided for certain other obligations of Borrower as more particularly set forth therein (the "**Third Extension Agreement**").

K.      By that letter agreement dated December 31, 2012, Lender and Obligors agreed to extend the Maturity Date of the Loan from December 31, 2012 to March 31, 2013 and provide for certain other obligations of Borrower, all as more particularly set forth therein ("**Fourth Extension Agreement**").

L.      By that letter agreement dated February 15, 2013, Lender and Obligors agreed to advance up to $2,000,000 under Facility B in accordance with the terms and conditions set forth in that 2013 Additional Advance Letter ("**2013 Additional Advance Agreement**").

M.      By that letter agreement dated March 29, 2013, Lender and Obligors agreed to extend the Maturity Date of the Loan from March 31, 2013 to April 15, 2013 and provide for certain other obligations of Borrower, all as more particularly set forth therein ("**Fifth Extension Agreement**").

N.      Pursuant to the terms and conditions of the 2013 Loan Modification Documents, Lender, Borrower and Guarantors agreed to certain amendments, modifications and extensions, including but not limited to: (i) increasing the principal indebtedness of Facility A Note to $123,500,000 to reflect the capitalization of all accrued interest thereon and on Facility B, together with certain costs and expenses of Lender; and (ii) splitting the indebtedness evidenced by Facility B Note into (y) Second Substitute Promissory Note (Facility B) dated as of April 30, 2013 in the amount of Eighteen Million Dollars ("**Facility B Note**"); and (z) Promissory Note (Facility C) dated as of April 30, 3013, in the amount of $2,000,000 ("**Facility C Note**"); and (iii) advancing an additional loan in the amount of $3,000,000 pursuant to Promissory Note (Facility D) dated as of April 30, 2013 in the principal amount of Three Million Dollars ($3,000,000) ("**Facility D Note**") all as more particularly set forth in the Second Amended and Restated Loan Agreement and the other 2013 Amended Loan Documents.

O.      Pursuant to the terms and conditions of the Third Amended and Restated Loan

8707646

2

Agreement dated April 29, 2014 (as amended hereby, the "**Loan Agreement**"), Lender, Borrower and Guarantors agreed to certain amendments, modifications and extensions to the 2013 Modification Documents, including but not limited to: (i) consolidating and replacing Facility C Note and Facility D Note with Replacement Facility C Note, and thereunder advancing an additional amount of $10,000,000, dated as of even date herewith, in the aggregate principal amount of $15,000,000 ("**Replacement Facility C Note**") all as more particularly set forth in the Loan Agreement.

P.      Pursuant to the public instrument No. 111, 339, dated April 23, 2014, authorized by Mr. Amando Mastachi Aguario, Notary Public No. 121, of Mexico, Federal District; The Bank of New York Mellon, S.A., Institución de Banca Múltiple, agreed to merge with CI Banco, S.A., Institución de Banca Múltiple, provided that The Bank of New York Mellon, S.A., Institución de Banca Múltiple survived as the merging company, and CI Banco, S.A., Institución de Banca Múltiple, as merged company, ceased to exist. Pursuant to this same instrument, the parties agreed to change the name of the surviving entity to "CI Banco, S.A., Institución de Banca Múltiple" which will be considered as trustee under that certain Amended and Restated Irrevocable Guaranty Trust Agreement dated as of March 9, 2009 among Borrower, Lender and Trustee, as amended from time to time.

Q.      Lender and Borrower desire to extend the maturity dates of the Loan and modify certain other terms and conditions of the Loan Agreement all in accordance with the terms and conditions of this Agreement.

**SECTION 1.     Defined Terms; Recitals**.  Capitalized terms used in this Agreement and not defined herein are defined in the Loan Agreement.  The Recitals are hereby incorporated by reference.

**SECTION 2.     Confirmation of the Note, the Deed of Trust and the other Loan Documents**.

2.1      Obligors, each as applicable and pursuant to the terms and conditions therein, hereby ratify and confirm their obligations under the Notes, the Trust, and the other Loan Documents, as such documents may be amended herein.  Obligors hereby acknowledge and agree that the Notes evidence advances made by Lender to Borrower and that the Trust and the other Loan Documents secure, among other obligations, Borrower's obligations to Lender pursuant to the Notes, Trust, and the other Loan Documents, with the same lien priority as immediately prior to the execution (i.e., first lien).  As of the Closing Date, Obligors acknowledge and agree that Borrower is indebted to Lender for the following amounts:

Unpaid principal: $156,500,000.00

<u>Plus</u>: Accrued and unpaid interest, if any.

Obligors further acknowledge that the foregoing does not take into account any other amounts, charges or other sums (including, without limitation, attorneys' fees, lender fees, updated title reports and expenses and other amounts) other than as enumerated above that may be payable pursuant to the Loan Documents.

8707646

3

**SECTION 3.   Modifications to the Loan Agreement**.

3.1    **Article II (Definitions)**:  Article II of the Loan Agreement is hereby modified as follows:

a.    Section 2.1 shall be modified by deleting therefrom and replacing each in its entirety the following defined terms:

"2014 Amended Loan Documents:  All of the loan documents dated of even date herewith and listed on Schedule 2 attached hereto and incorporated herein."

"Applicable Interest Rate (Replacement Facility C):  With respect to the aggregate outstanding principal balance of Replacement Facility C, the fixed rate of interest that is fifteen percent (15%)."

"Maturity Date:  October 30, 2024."

"Monthly Interest Reserve Deposit:  An amount equal to $487,000, as may be adjusted by Lender in its reasonable discretion and with advance notice to Borrower."

"Net Sales Proceeds:  collectively, the Whole Ownership Sales Net Proceeds and the Time Share Sales Net Proceeds."

"Non-Resort Vertical Improvements:  all vertical and infrastructure Improvements located on a Golf Villa Lot, Beach Estate Lot, Sunset Hill Estates Lot, or such other lot approved by Lender from time to time."

"Non-Utilization Fee:  A fee payable by Borrower to Lender equal to (i) one percent (1%) of the average, undrawn daily balance of the Facility B Loan during the term; and (ii) six percent (6%) of the average, undrawn daily balance of the Facility C Loan during the term.

"Replacement Facility C Maturity Date:  October 31, 2017."

b.    Section 2.1 shall be modified by adding thereto the following new defined terms:

"Annual Test Date:  December 31 of each calendar year."

"Annual Required Principal Repayment Amount:  for each applicable calendar year, the amount set forth in the Amortization Schedule attached hereto as Schedule 3."

"Excess Principal Repayment Amount:  the amount by which the sum of the Whole Ownership Proceeds Due Lender and Time Share Proceeds Due Lender actually paid by Borrower during the applicable calendar year exceeds the Annual Required Principal Repayment Amount."

"Facility A Target Principal Amount:  the required principal paydown amount for Facility A for a calendar year as set forth on Schedule 3 attached hereto in the column entitled "Facility A Target Principal Amounts.""

8707646

4

DANSKE_0013829

"Facility C Target Principal Amount:  the required principal paydown amounts for Facility C set forth on Schedule 3 attached hereto in the column entitled "Facility C Target Principal Amounts.""

"Monthly Payment Date:  the first (1st) day of every calendar month occurring during the term."

"Monthly Time Share Proceeds Applicable to Principal Repayment:  the aggregate amount of Time Share Proceeds Due Lender for the applicable monthly period."

"Non-Resort Vertical Expenses:  Lender approved construction costs and expenses incurred by Borrower with respect to the construction and completion of the Non-Resort Vertical Improvements."

"Quarterly Principal Repayment Amount: the quarterly amounts payable to Lender as determined by Lender from time to time which in the aggregate for a calendar year shall equal the Annual Required Principal Repayment Amount.  For the calendar year 2015 such amounts are as follows:  Quarter 1: $1,800,000; Quarter 2: $1,100,000; Quarter 3:  $800,000; and Quarter 4: $900,000.  Lender shall establish such amounts on an annual basis in connection with reviewing and approving the Budget pursuant to Section 9.4 hereof."

"Real Estate Closing Date: the date on which Borrower closes on the sale of Product pursuant to a Whole Ownership Contract."

"Time Share Gross Sales:  all Sales Proceeds from the sale of a Time Share Product pursuant to a Time Share Contract."

"Time Share Sales Net Proceeds:  an amount equal to the Time Share Gross Sales less reasonable and customary commissions, sales, marketing and operation costs approved in advance by Lender in its reasonable discretion.  For the period commencing on the Closing Date and expiring December 31, 2015, the Time Share Sales Net Proceeds shall equal fifty percent (50%) of Time Share Gross Sales.  Lender shall establish such amounts on an annual basis in connection with reviewing and approving the Budget pursuant to Section 9.4 hereof."

"Time Share Proceeds Percentage Share: a percentage of Time Share Sales Net Proceeds that Borrower is obligated to pay to Lender, which amount shall be determined by Lender in its reasonable discretion from time to time.  For the period commencing on the Closing Date and expiring December 31, 2015, the Time Share Proceeds Percentage Share shall equal twenty-nine percent (29%) of Time Share Sales Net Proceeds. Lender shall establish such amounts on an annual basis in connection with reviewing and approving the Budget pursuant to Section 9.4 hereof."

"Time Share Proceeds Due Lender: an amount equal to the product of the Time Share Proceeds Percentage Share and the total Time Share Sales Net Proceeds for the measured period as determined by Lender in its reasonable discretion."

"Whole Ownership Gross Sales:  the Sales Proceeds from the sale of a Whole Ownership Product pursuant to a Whole Ownership Contract."

CONFIDENTIAL

DANSKE_0013830

"<u>Whole Ownership Sales Net Proceeds</u>: an amount equal to Whole Ownership Gross Sales Proceeds <u>less</u> reasonable and customary closing costs and commissions approved by Lender in its reasonable discretion. For the period commencing on the Closing Date and expiring on December 31, 2015, the Whole Ownership Sales Net Proceeds shall equal eighty percent (80%) of Whole Ownership Gross Sales. Lender shall establish such amounts on an annual basis in connection with reviewing and approving the Budget pursuant to Section 9.4 hereof."

"<u>Whole Ownership Proceeds Percentage Share</u>: a percentage share of Whole Ownership Sales Net Proceeds that Borrower is obligated to pay to Lender, which amount shall be determined by Lender in its reasonable discretion from time to time. For the period commencing on the Closing Date and expiring December 31, 2015, the Whole Ownership Proceeds Percentage Share shall equal fifty percent (50%) of Whole Ownership Sales Net Proceeds after deduction of Lender approved and budgeted Non-Resort Vertical Expenses, if applicable. Lender shall establish such amounts on an annual basis in connection with reviewing and approving the Budget pursuant to <u>Section 9.4</u> hereof."

"<u>Whole Ownership Proceeds Due Lender</u>: an amount equal to the product of the Whole Ownership Proceeds Percentage Share and the total Whole Ownership Net Sales for the measured period as determined by Lender in its reasonable discretion."

c.   <u>Section 2.1</u> shall be modified by deleting therefrom the following defined terms:

"Budgeted Principal Paydown (Facility B)"

"Budgeted Principal Paydown (Facility C)"

8707646

6

DANSKE_0013831

3.2 **Article IV (Loan and Loan Documents)**:  Section 4.4 of Article IV of the Loan Agreement is hereby amended as follows:

    a. Section 4.4(a)(i) is hereby amended by deleting therefrom sub-section (4).

    b. Section 4.4(a)(ii) is hereby amended by deleting therefrom sub-section (3).

    c. Section 4.4 is hereby amended by adding the following new sub-section (d) immediately following sub-section (c) thereof:

        "(d) Notwithstanding anything to the contrary forgoing, Borrower may make the prepayments required pursuant to Section 5.6 of the Loan Agreement and any other prepayments of the Loan without any Prepayment Penalty."

3.4 **Article V (Interest; Non-Utilization Fee; Profit Participation Fee; Mandatory Principal Paydowns; Order of Priority)**:  Article V of the Loan Agreement is hereby amended as follows:

    a. Section 5.2(f) is deleted in its entirety and replaced with "Intentionally deleted."

    b. Section 5.3(a) is hereby deleted in its entirety and replaced with the following:

        "(a) Interest shall accrue on the Replacement Facility C Loan at the Applicable Interest Rate (Replacement Facility C) on the outstanding principal balance of Replacement Facility C Loan and at the Non-Utilization Fee rate on the undrawn remaining daily balance of the Facility C Note."

    c. Section 5.3(d) is hereby deleted in its entirety and replaced with the following:

        "(d) Interest on the outstanding principal balance of the Replacement Facility C Loan shall be calculated by multiplying (i) the actual number of days elapsed in the Interest Period by (ii) a daily rate based on a three hundred sixty (360) day year and then multiplying the product by (iii) the outstanding principal balance of the Replacement Facility C Note."

    d. Section 5.3(f) is deleted in its entirety and replaced with "Intentionally deleted."

    e. Section 5.6 is hereby deleted in its entirety and replaced with the following new Section 5.6:

        "Section 5.6   Required Principal Repayments.

        (a) Annual Principal Repayment Amounts.  In addition to the payment obligations due from Borrower on each Monthly Payment Date and Quarterly Payment Date with respect to Facility A, Facility B, and Replacement Facility C, on each Annual Test Date Borrower shall have paid to Lender funds sufficient to equal at least the Annual Required Principal Repayment Amount for the applicable calendar year.  If there is any shortfall in funds paid to Lender on account of the Annual Required Principal Repayment Amount for the applicable calendar year as of the Annual Test Date as determined by Lender in its reasonable discretion, then Borrower shall have a cure period of ninety (90) days to deposit the shortfall.  Borrower's failure to pay the funds sufficient to cure the shortfall by the expiration of the ninety (90) day cure period shall be

8707646

7

DANSKE_0013832

an Event of Default under the Loan Agreement. Any amounts received by Lender shall be applied by Lender in accordance with sub-sections (e), (f), and (g) hereinbelow.

(b)    Quarterly Principal Repayment Amounts.  In addition to the payment obligations due from Borrower on each Monthly Payment Date and Quarterly Payment Date with respect to Facility A, Facility B, and Replacement Facility C, on each Quarterly Payment Date, Borrower shall pay to Lender an amount equal to the Quarterly Principal Repayment Amount.  If there is any shortfall in funds paid to Lender on account of the Quarterly Principal Repayment Amount for the applicable period, then Borrower shall have a cure period of ninety (90) days to deposit the shortfall.  Borrower's failure to pay funds sufficient to cure the shortfall by the expiration of the ninety (90) day cure period shall be an Event of Default hereunder.  Any amounts received by Lender shall be applied by Lender in accordance with sub-sections (e), (f), and (g) hereinbelow.

(c)    Monthly Proceeds Applicable to Principal Repayment.  In addition to the payment obligations due from Borrower on each Monthly Payment Date and Quarterly Payment Date with respect to Facility A, Facility B, and Replacement Facility C and in accordance with Section 13.9(c)4 hereof, on each Monthly Payment Date Borrower shall pay to Lender an amount equal to the Monthly Time Share Proceeds Applicable to Principal Repayment.  Any amounts received by Lender shall be applied by Lender in accordance with sub-sections (e), (f), and (g) hereinbelow.

(d)    Sales Proceeds From Whole Ownership Closings.  In addition to the payment obligations due from Borrower on each Monthly Payment Date and Quarterly Payment Date, no later than ten (10) days after each Real Estate Closing Date, Borrower shall pay to Lender the Whole Ownership Proceeds Due Lender and together with such payment shall provide an accounting and reconciliation of both the payments made by a buyer pursuant to a Whole Ownership Contract and the Non-Resort Vertical Improvements costs and expenses incurred as compared to such budgeted costs.  Any amounts received by Lender shall be applied by Lender in accordance with sub-sections (e), (f), and (g) hereinbelow.

(e)    Notwithstanding anything to the contrary forgoing, so long as no Event of Default shall have occurred, Lender shall apply the Monthly Time Share Proceeds Applicable to Principal Repayment and the Whole Ownership Net Sale Proceeds as follows: (i) first, payment towards the Monthly Interest Reserve Deposit due from Borrower pursuant to Section 5.5(a) hereinabove; (ii) second, payment towards the Facility C Target Principal Amount for the applicable calendar year; (iii) third, payment toward the Facility A Target Principal Amount for the applicable calendar year; (iv) fourth, payment towards the outstanding principal balance of Facility C, if any; and (v) if and when Facility C is fully paid and cancelled, then fifth, towards the outstanding principal balance of the Facility B Note (but not in prepayment and partial cancellation of the Facility B Note).

(f)    Notwithstanding anything to the contrary forgoing, Borrower Parties and Lender acknowledge and agree that Borrower may request from time to time draws of funds from Facility C (or Facility B once Facility C has been fully paid and cancelled) for payment of development or construction costs associated with new Improvements which costs are not set forth in the Approved Budget for the applicable calendar year.  In such event, Borrower shall submit to Lender a proposal for the new construction which shall include projected costs, time frame for completion and such

8707646

8

other information as Lender shall require.  Disbursement of such funds shall be subject to Lender's consent, which may be granted or denied in Lender's sole discretion, and shall be subject to Borrower complying with all draw requirements set forth in the Loan Agreement.  Lender's consent to disbursement of funds shall in no way be deemed to be a release or waiver of Borrower's obligation to pay to Lender as and when due the Quarterly Principal Repayment Amounts or Annual Principal Paydown Required Amounts due hereunder.

(g)     Notwithstanding anything to the contrary forgoing, on each Annual Test Date Lender shall:  (i) apply the Facility A Target Repayment Amount towards the prepayment, reduction and partial cancellation of the Facility A Note; and (ii) unless otherwise agreed by Borrower and Lender, apply the Facility C Target Repayment Amount to the paydown of the outstanding principal balance of the Facility C Note (but not in prepayment and partial cancellation of  the Facility C Note); and (iii) unless otherwise agreed by Borrower and Lender, apply the Excess Principal Repayment Amount to the outstanding principal balance of the Facility B Note (but not in prepayment and partial cancellation of the Facility B Note)."

3.5     **Article IX (Budgets)**:  Article IX is hereby amended as follows:

a.     Section 9.4 is hereby amended by adding thereto the following new sentences immediately following the last sentence thereof:

"In addition to reviewing and approving the proposed Consolidated Cash Flow Statement, Operating Budgets, and Project Construction Budget for the applicable budgeted year, Lender shall (i) determine the Construction Covenants for the forthcoming calendar year in accordance with Section 13.10(c); and (ii) determine the applicable amount of the (1) Time Share Proceeds Percentage Share for the budgeted year; (2) Whole Ownership Proceeds Percentage Share for the budgeted year; and (3) Quarterly Principal Repayment Amounts for the budgeted year.  Upon such determinations, Lender shall deliver written notice thereof to Borrower and such new amounts shall be deemed to be the "Time Share Proceeds Percentage Share", "Whole Ownership Proceeds Percentage Share", and "Quarterly Principal Repayment Amount" for the following budgeted year."

3.6     **Article XIII – Section 13.5 (Reporting Covenants)**.  Article XIII-Section 13.5 is hereby amended as follows:

a.     The following new Section 13.5(a)(v) is hereby added immediately following Section 13.5(a)(iv):

"(v)     All reports regarding Product Sales shall describe the Monthly Time Share Proceeds Applicable to Principal Repayment accrued during the week together with any supporting documentation requested by Lender or Servicer."

b.     The following new Section 13.5(b)(xv) i s hereby added immediately following Section 13.5(b)(xiv):

"(vi)     All reports regarding Product Sales shall describe the (i) Monthly Time Share Proceeds Applicable to Principal Repayment; and (ii) Whole Ownership Gross Sales, Whole Ownership Sales Net Proceeds, and Whole Ownership Proceeds Due Lender accrued during the month together with any supporting documentation requested by Lender or Servicer."

CONFIDENTIAL                                                                 DANSKE_0013834

c.     Section 13.5(c) is hereby deleted in its entirety and replaced with the following:

"(c)     Quarterly Reports. Borrower shall provide to Lender, its Lender's Consultant, and its servicer, on a quarterly basis:

(i)     Reports regarding Acquired Time Share Interests updated to reflect the interests acquired since delivery of the last report;

(ii)     An accounting of all Product Sales during the immediately preceding three (3) month period reconciled against the amounts Borrower has paid to Lender pursuant to Section 5.6(b), (c), and (d) hereof."

d.     The following new Section 13.5(d)(vii) is hereby added immediately following Section 13.5(d)(vi):

"(vii)    No later than thirty (30) days following December 31 in the applicable calendar year, an accounting of all Product Sales during the immediately preceding twelve (12) month period reconciled against the payments made by Borrower pursuant to Sections 5.6 (b), (c), and (d) hereof."

3.7     **Article XIII - Section 13.9 (Sales Covenants):**   Article XIII, Section 13.9 is hereby amended as follows:

a.     Section 13.9(c) is hereby amended by adding the following new sub-sections 4 and 5 immediately following sub-section 3 thereof:

"4.     With respect to each and every Time Share Sale, Borrower shall pay to Lender an amount equal to the Time Share Proceeds Due Lender.

5.     With respect to each and every Whole Ownership Sale, Borrower shall pay to Lender an amount equal to the Whole Ownership Proceeds Due Lender."

3.8     **Article XIII – Section 13.10 (Construction Covenants):**   Article XIII, Section 13.10 is hereby amended by adding thereto immediately following subsection (f) the following new sub-section (g):

"(g)     In connection with reviewing and approving Budgets pursuant to Section 9.4 hereof, prior to the commencing of each new calendar year, Lender shall, in consultation with Borrower, determine construction milestones to be achieved during such calendar year based on the Approved Budget. Upon such determination, Lender shall deliver written notice thereof to Borrower and such construction milestones shall be deemed to be the Construction Covenants applicable to Borrower for the applicable calendar year."

3.9     **Article XIII - Section 13.17 (Cash Management):**   Article XIII, Section 13.17 is hereby deleted in its entirety and replaced with the following:

"Section 13.17 Cash Management.

CONFIDENTIAL

DANSKE_0013835

(a)     Borrower shall apply all Net Sales Proceeds in accordance with Consolidated Cash Flow Statement and applicable Operations and Construction Budget, giving effect to the following order of priority ("**Cash Management Order of Priority**"):

(i)     First, to pay all "Non-Resort Vertical Expenses" line item for the applicable period as set forth in the Project Construction Budget.;

(ii)     Second, to pay all Administrative Expenses for the applicable period as set forth in "Management/Administrative" line item described in the Project Construction Budget;

(iii)     Third, in accordance with the Approved Annual Budget for such calendar year (as such Approved Annual Budget may be amended per agreement by Lender and Borrower);

(b)     If, and only if, there is excess cash remaining after application of the Net Sales Proceeds per the Cash Management Order of Priority, then subject to obtaining prior Lender approval, which may be granted or denied in Lender's sole discretion, such excess cash may be applied as follows:

(i)     to pay operating shortfalls; or

(ii)     to Lender to be applied in accordance with the Order of Priority."

3.10     **Article XIV (Casualty and Condemnation)**:  Article XIV is hereby amended as follows:

a.     The following new Section 14.3 is hereby added immediately following Section 14.2:

"14.3     Borrower Parties acknowledge and agree that all Proceeds received with respect to insurance claims made by Borrower Parties following Hurricane Odile are to be deposited with Borrower ("**Hurricane Odile Proceeds**") in Borrower's Banorte Account #0540653166 and applied towards costs and expenses associated with repair and rebuilding of the Improvements.  Borrower shall submit to Lender at the same time it submits to the insurance carrier the schedule of costs and expenses substantiating the insurance claim.  Borrower shall account to Lender for the costs and expenses of rebuilding the Improvements to which such Hurricane Odile Proceeds will be applied and submit to Lender and its Servicer with such accounting an Affidavit in the form attached hereto as Schedule 14.3 promptly."

3.11     **Section 18.1 (Event of Default)**:  Section 18.1(a) is hereby deleted in its entirety and replaced with the following:

"(a) Failure of Borrower (i) (A) to make any payment of principal, interest, reserve payment (including the Quarterly Principal Repayment Amount [subject to the cure provisions of Section 5.6(b) hereof], and the Annual Required Principal Repayment Amount), the Profit Participation Fee, the Breakage Fee, the Non-Utilization Fee, and any periodic payments of due hereunder or under the other 2014 Amended Loan Documents, when due, it being expressly acknowledged and agreed that

8707646

11

                                                                        DANSKE_0013836

default under any Note shall constitute an Event of Default under all Notes, or (B) for a period of ten (10) days after written notice from Lender that the same is due and payable, to observe or perform any of the other covenants or conditions by Borrower to be performed under the terms of this Agreement or any other Amended Loan Document concerning the payment of money, or (ii) for a period of thirty (30) days (or such other period of time provided herein) after written notice from Lender, to observe or perform any non-monetary covenant or condition contained in this Agreement or any other 2014Amended Loan Documents; provided that if any such failure concerning a non-monetary covenant or condition is susceptible to cure and cannot reasonably be cured within said thirty (30) day period, then Borrower shall have an additional sixty (60) day period to cure such failure and no Event of Default shall be deemed to exist hereunder so long as Borrower commences such cure within the initial thirty (30) day period and diligently and in good faith pursues such cure to completion within such resulting ninety (90) day period from the date of Lender's notice; and provided further that if a different notice or grace period is specified under any other subsection of this Section 18.1 with respect to a particular breach, or if another subsection of this Section 18.1 applies to a particular breach and does not expressly provide for a notice or grace period, the specific provision shall control."

**SECTION 4.   Budgets and Schedules; Sales Performance Covenants; Pre- and Post-closing Obligations; Santander Account**.

4.1      2015 Budgets and Construction Covenants.

    a.      Lender and Borrower acknowledge and agree that attached hereto as <u>Schedule 4.1(a)</u> is the agreed upon set of Budgets for the 2015 calendar year.

    b.      Lender and Borrower acknowledge and agree that attached hereto as <u>Schedule 4.1(b)</u> is the agreed upon Construction Covenants for the 2015 calendar year.

4.2      Sales Performance Covenants.

    a.      Aggregate Product Sales.  Pursuant to <u>Section 13.8(a)</u>, with respect to the Aggregate Product Sales (Actual v. Projected) for the period of October 1, 2014 through December 31, 2014, Actual Product Sales shall be equal to or greater than seventy-five percent (75%) of the Projected Product Sales for the Measured Period. Commencing January 1, 2015, the Actual Product Sales shall be equal to or greater than eighty-five percent (85%) of the Projected Product Sales for the Measured Period, as required by <u>Section 13.8(a)</u> of the Loan Agreement.

    b.      Aggregate Cash Receipts.  Pursuant to <u>Section 13.8(b)</u>, with respect to the Actual Cash Receipts from Product Sales for the period September 30, 2014 through December 31, 2014, the Hurricane Odile Proceeds shall be counted towards and included in the calculation of Actual Cash Receipts.  On and after January 1, 2015, the Hurricane Odile proceeds shall not be included in the calculation of Actual Cash Receipts.

4.3      Post-closing Obligations.

    a.      Post-closing Obligation (Association Documents).  No later than June 30, 3015, Borrower shall deliver to Lender and Servicer evidence of formation of the associations required under the Master Declaration for the purpose of completing all repair, maintenance and replacement of any open space, common areas and recreational amenities intended for the use in common of all owners of the Project which documents will include the Articles of Incorporation, Bylaws, and other governing

8707646

12

documents of the Master Association and the current budget for the Master Association including, without limitation, a reserve analysis.

        b.    <u>Post-Closing Obligation (Entitlement and Approvals Opinion)</u>.  No later than June 30, 2015, Borrower shall deliver to Lender an opinion from a local Los Cabos, Mexico attorney approved by Lender in its sole discretion which opinion provides that (i) the Improvements completed since April 30, 2014 were completed in accordance with local entitlement and zoning laws, rule, and regulations and are currently being operated in accordance with the same; and (ii) the hotel and residence improvements contemplated in the MGM Term Sheet are permitted by the local entitlement and zoning laws as a matter of right and without payment of any additional impact fees, costs, or land donations; and (iii) such other matters as Lender shall determine in its sole discretion.

        c.    <u>Post-Closing Obligation (Trustee Acknowledgements)</u>:  No later than December 31, 2014, Borrower shall deliver to Lender the Trustee Acknowlegements for all Product Sales prior to October 1, 2014 for which Lender has not yet received Trustee Acknowlegements.

    4.4    <u>Santander Account</u>.  Borrower agrees to maintain a cash balance of no more than $5,000 at any time in its account with Santander Bank.

**SECTION 5.  Conditions to Loan Modification**.  As a condition to Lender entering into this Agreement, Borrower shall make the following payments:

    5.1    Borrower shall deliver certificates of incumbency and authorization with respect to the authorization, execution and delivery of this Agreement by all Borrower Parties hereto.

    5.2    Borrower shall deliver a due authorization, execution, delivery and enforceability opinion of this Agreement and any other documents required by Lender and delivered by Borrower in connection with this Agreement.

    5.3    Borrower shall pay all third party costs, including attorneys' fees (collectively, "**Third Party Costs**") incurred in connection with this Loan Modification.

    5.4    Borrower shall execute and deliver any additional amendments to or reaffirmations of any other Loan Document as Lender shall require.

    5.5    Borrower shall satisfy any other condition precedent required by Lender.

**SECTION 6.  Representations and Warranties of Borrower Parties**.  As of the Closing Date, Borrower Parties, each as may be applicable, represent and warrant to Lender that:

    6.1    Each has the power and authority to enter into and to perform this Agreement, to execute and deliver all documents relating to this Agreement (as applicable), and to incur the obligations provided for in this Agreement, all of which have been duly authorized and approved in accordance with each Borrower Parties' organizational documents;

    6.2    This Agreement, together with all documents executed pursuant hereto, shall constitute when executed the valid and legally binding obligations of each Borrower Party in accordance with their respective terms; subject only to bankruptcy, insolvency, and similar laws affecting the enforcement of the rights or remedies of creditors generally or equitable principals of general application regardless of whether such enforcement is considered in a proceeding in law or equity;

8707646

13

DANSKE_0013838

6.3     All representations and warranties made in the Loan Documents to which each is a party are true and correct as of the date hereof, with the same force and effect as if all representations and warranties were fully set forth herein;

6.4     Borrower Parties' obligations under the Loan Documents, as amended and modified hereby, remain valid and enforceable obligations, and the execution and delivery of this Agreement and the other documents executed in connection herewith shall not be construed as a novation of any of the Loan Documents;

6.5     As of the Effective Date, Borrower Parties have no offsets or defenses against the payment of any of the Indebtedness;

6.6     There is no ownership interest, mortgage lien, or lien other than the Permitted Encumbrances, now outstanding against any portion of the Property, other than the rights of tenant as tenants only or as disclosed in or granted by the Loan Documents, as amended hereby; and

6.7     The financial statements of each Borrower Party, if any, which have been furnished to Lender in connection with this Agreement are complete and correct in all material respects and fairly present the financial condition of each Borrower Party, as of the date of such statement and, since the date of each such statement, there has been no material adverse change in the condition (financial or otherwise) of each Borrower Party, and as of the date hereof, to the knowledge of Borrower Parties, Borrower Party is solvent.

**SECTION 7.   Waiver of Claims.**   IN CONSIDERATION OF LENDER EXECUTING THIS MODIFICATION, AS OF THE DATE HEREOF, EACH BORROWER PARTY HEREBY UNCONDITIONALLY AND IRREVOCABLY FULLY RELEASE, ACQUIT, SETTLE, AND DISCHARGE ANY AND ALL CLAIMS, COUNTERCLAIMS, LIABILITIES, DAMAGES, DEFENSES, DEMANDS AND CAUSES OF ACTION THAT ANY OF SAID PARTIES HAVE OR MAY HAVE AGAINST LENDER, ITS OFFICERS, DIRECTORS, TRUSTEES, SERVICERS, SPECIAL SERVICERS, AGENTS, EMPLOYEES, ATTORNEYS, SUCCESSORS AND ASSIGNS (COLLECTIVELY, THE **"RELEASED PARTIES"**), WHETHER OR NOT ACTING IN THEIR OFFICIAL CAPACITY WITH RESPECT TO LENDER, IN THEIR PERSONAL CAPACITY OR IN ANY OTHER CAPACITY, RELATED TO OR THAT MAY HAVE ARISEN, MAY ARISE OR ARE OR BECOME ASSERTABLE AS A RESULT OF EVENTS OCCURRING IN CONNECTION WITH THE LOAN AND THE LOAN DOCUMENTS, TOGETHER WITH ANY AND ALL NEGOTIATIONS, DISCUSSIONS, ACTS, OMISSIONS, RENEWALS, EXTENSIONS, COLLATERAL DOCUMENTS, AND OTHER MODIFICATIONS AND ACTIONS RELATED THERETO, INCLUDING ANY CLAIMS, CAUSES OF ACTION OR DEFENSES BASED ON THE NEGLIGENCE OF LENDER OR ANY OF THE RELEASED PARTIES OR ON ANY OTHER "LENDER LIABILITY" THEORIES OF, AMONG OTHERS, BAD FAITH, BREACH OF IMPLIED COVENANT OF GOOD FAITH, UNFAIR DEALING, DURESS, COERCION, CONTROL, MISREPRESENTATION, OMISSIONS, MISCONDUCT, OVERREACHING, UNCONSCIONABILITY, DISPARATE BARGAINING POSITION, RELIANCE, EQUITABLE SUBORDINATION, FRAUD, OR OTHERWISE, AND DO HEREBY INTEND TO RELEASE, COMPROMISE AND SETTLE SUCH CLAIMS AND MATTERS, WHETHER KNOWN OR UNKNOWN, WHETHER REDUCED TO JUDGMENT, LIQUIDATED, UNLIQUIDATED, FIXED, CONTINGENT, MATURED, UNMATURED, DISPUTED, UNDISPUTED, LEGAL, EQUITABLE, SECURED OR UNSECURED AND WHETHER THEY AROSE COLLATERALLY, DIRECTLY, DERIVATIVELY OR OTHERWISE BETWEEN ANY OF BORROWER AND/OR GUARANTOR AND THE RELEASED PARTIES FROM THE BEGINNING OF THE WORLD TO AND

8707646

14

INCLUDING THE DATE OF THIS MODIFICATION (COLLECTIVELY, THE "**RELEASED CLAIMS**"). BORROWER AND GUARANTOR HEREBY REPRESENT AND WARRANT TO LENDER THAT THEY ARE PRESENTLY THE LEGAL AND BENEFICIAL OWNER AND LENDER OF ANY AND ALL OF THE RELEASED CLAIMS AND THAT NONE OF THEM HAS HERETOFORE EXPRESSLY OR IMPLIEDLY ASSIGNED, TRANSFERRED, PLEDGED, HYPOTHECATED, SOLD, CONVEYED OR OTHERWISE DISPOSED OF, FOR THE BENEFIT OF CREDITORS OR OTHERWISE, ANY OF THE RELEASED CLAIMS.

Borrower and Borrower Party Initials

**SECTION 8.** **Conditions of Effectiveness**. This Agreement shall become effective when, and only when, Borrower and Lender have executed and delivered this Agreement, at which time this Agreement shall be deemed effective as of the date appearing on the first page hereof.

**SECTION 9.** **Lift-Stay Covenant**.

    9.1     Bankruptcy Filing. Borrower will not file or allow to be filed any petition in bankruptcy or any application to any tribunal for the appointment of a receiver or trustee for Borrower or any substantial part of its property, or any proceeding relating to Borrower under any reorganization, arrangement, readjustment of debt, dissolution or liquidation law or statute if any jurisdiction, whether now or hereafter in effect. If despite Borrower's covenant in this Section 10.1 hereof, Borrower files or permits the filing of any petition in bankruptcy or any application to any tribunal for the appointment of a receiver or trustee for Borrower or any substantial part of its property, or any proceeding relating to Borrower under any reorganization, arrangement, readjustment of debt, dissolution or liquidation law or statute if any jurisdiction, whether now or hereafter in effect, Lender shall immediately become entitled, among other relief to which Lender may be entitled under the Loan Documents, and at law or in equity, to obtain an order from the court dismissing such filing.

    9.2     Lift Stay and Cash Collateral. As a material inducement to Lender to enter into this Agreement, Borrower covenants with Lender that if Borrower should become the subject of any petition in bankruptcy or any petition or application to any tribunal for the appointment of any receiver or trustee for Borrower or any substantial part of its property, or any proceeding relating to Borrower under any reorganization, arrangement, readjustments of debt, dissolution or liquidation law or statute of any jurisdiction, whether now or hereafter in effect, then Lender shall immediately become entitled, among other relief to which Lender may be entitled under the Loan Documents, and at law and in equity, to obtain upon *ex parte* application therefor and without further notice or action of any kind, (a) an order from the court prohibiting the use by the trustee in bankruptcy, or by Borrower as debtor-in-possession, of Lender's "cash collateral" (as such term is defined in Section 363 of the Bankruptcy Code) in connection with the Loan, and (b) an order from the Court granting immediate relief from the automatic stay (the "**Stay**") pursuant to Section 362 of the Bankruptcy Code so as to permit Lender to exercise all of its rights and remedies pursuant to the Loan Documents, and at law and in equity, and Borrower further acknowledges and agrees that the occurrence or existence of any Event of Default shall, in and of itself, constitute "cause" for relief from the Stay pursuant to the provisions of Section 362(d)(1) of the Bankruptcy Code. Finally, as a further material inducement to the Lender to enter into this Agreement, Borrower agrees and pledges that it shall consent to and not contest any motion by the Lender to lift the Stay.

8707646

15

CONFIDENTIAL

DANSKE_0013840

## SECTION 10.  <u>Miscellaneous</u>.

10.1     <u>References to the Note, the Deed of Trust and the Loan Documents</u>.   Upon the effectiveness of this Agreement (i) each reference in the Loan Agreement to "this Agreement" and each reference in the Loan Agreement and the Loan Documents to "the Loan Agreement" shall mean and be a reference to the Loan Agreement as amended hereby; and (iii) each reference in the Notes, the Loan Agreement, and the Loan Documents to "the Loan Documents" shall mean and be a reference to the Loan Documents as amended hereby.

10.2     <u>Effect on the Note, the Deed of Trust and the Loan Documents</u>.   Except as specifically amended above, the Notes, Loan Agreement, Trust and other Loan Documents shall remain in full force and effect and are hereby ratified and confirmed.   Without limiting the generality of the foregoing, the Property given to secure the Indebtedness prior to the date hereof does and shall continue to secure all Indebtedness under the Notes, Loan Agreement, Trust and the Loan Documents, as amended hereby and, except as provided in the Notes, Trust and the Loan Documents, no such Property shall be released until all conditions to such release contained in the Notes, the Trust or the Loan Documents are satisfied.

10.3     <u>No Waiver</u>.   The execution, delivery and effectiveness of this Agreement shall not operate as a waiver of any right, power or remedy of Lender under the Notes, the and the Loan Documents, nor constitute a waiver of any provision of any of the Notes, the Trust, or the Loan Documents.

10.4     <u>Counterparts</u>.   This Agreement may be executed in multiple counterparts, each of which shall be deemed an original document and all of which together shall constitute one and the same document.   Signature pages may be detached from such counterparts and reattached to form one original document.

10.5     <u>Governing Law</u>.   The provisions set forth in <u>Section 20.3</u> of the Loan Agreement shall govern with respect to governing law, jurisdiction and designation for service.

10.6     <u>Concerning the Lender</u>.   Lender is not acting in its individual capacity and, as such, shall have no personal liability with respect to this Agreement.

10.7     <u>No Partnership, Joint Venture or Agency</u>.   Neither this Agreement nor any of the Loan Documents, as amended hereby, shall in any respect be interpreted, deemed or construed as making Lender a partner or joint venturer with Borrower, nor shall they be interpreted, deemed or construed as making Lender the agent or representative of Borrower, and Borrower agrees not to make any contrary assertion, contention, claim or counterclaim in any action, suit or other legal proceeding involving Lender.

10.8     <u>Conflict</u>.   In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control.

8707646

16

CONFIDENTIAL

DANSKE_0013841

**IN WITNESS WHEREOF**, Borrower Parties and Lender have caused this Agreement to be signed by their duly authorized representatives under seal all as of the date and year first above written.

**LENDER:**

**DANSKE BANK A/S, LONDON BRANCH**

By: _____
Name: David Daniel
Title:  Authorized Signatory

*[LENDER SIGNATURE PAGE TO FIRST AMENDMENT TO THIRD AMENDED AND RESTATED LOAN AGREEMENT AND LOAN MODIFICATION]*

8707646

17

CONFIDENTIAL

DANSKE_0013842

**BORROWER**:

DIAMANTE CABO SAN LUCAS S. DE R.L. DE C.V., a
Mexican limited liability company with variable capital

By: _____
Name: Kenneth A. Jowdy
Title: General Administrator

*[BORROWER PARTY SIGNATURE PAGE TO FIRST AMENDMENT TO THIRD AMENDED AND
RESTATED LOAN AGREEMENT AND LOAN MODIFICATION]*

8707646

18

CONFIDENTIAL

DANSKE_0013843

**ACKNOWLEDGED AND AGREED TO BY BORROWER PARTIES:**

**DIAMANTE MEMBER:**

DIAMANTE CABO SAN LUCAS, LLC, a Delaware limited liability company

By: _____
Name: Kenneth A. Jowdy
Title:   Managing Member

**GUARANTOR:**

KENNETH A. JOWDY

_____
Kenneth A. Jowdy, an individual

**OTHER JOWDY PARTIES:**

Diamante Properties, LLC, a Delaware limited liability company

By: _____
Name: Kenneth A. Jowdy
Title:   Managing Member

*[BORROWER PARTY SIGNATURE PAGE TO FIRST AMENDMENT TO THIRD AMENDED AND RESTATED LOAN AGREEMENT AND LOAN MODIFICATION]*

8707646

19

DANSKE_0013844

KAJ Holdings, LLC, a Delaware limited
liability company

By: _____
Name: Kenneth A. Jowdy
Title:   Managing Member


Diamante Life S. DE R.L. DE C.V., a Mexican limited liability
company with variable capital

By: _____
Name: Kenneth A. Jowdy
Title:   General Administrator


Diamante Club, LLC, a Delaware limited
liability company

By: _____
Name: Kenneth A. Jowdy
Title:   Managing Member


Diamante CSL, LLC, a Delaware limited
liability company

By: _____
Name: Kenneth A. Jowdy
Title:   Managing Member


*[BORROWER PARTY SIGNATURE PAGE TO FIRST AMENDMENT TO THIRD AMENDED AND
RESTATED LOAN AGREEMENT AND LOAN MODIFICATION]*

8707646

20

DANSKE_0013845

JOINDER BY LEGACY TO ACKNOWLEDGE AGREEMENT TO SECTION 13.12(e)

Legacy Properties, LLC, a Delaware limited
liability company

By: _____
Name: Kenneth A. Jowdy
Title:  Managing Member

*[BORROWER PARTY SIGNATURE PAGE TO FIRST AMENDMENT TO THIRD AMENDED AND RESTATED LOAN AGREEMENT AND LOAN MODIFICATION]*

8707646

CONFIDENTIAL

DANSKE_0013846

## EXHIBITS AND SCHEDULES

Schedule 1 – Borrower Parties

Schedule 2 – 2014 Amended Loan Documents

Schedule 3 – Amortization Schedule

Schedule 14.3 -  Affidavit for Insurance Proceeds Disbursement

Schedule 4  - Approved 2015 Budgets

8707646

22

CONFIDENTIAL                                                                  DANSKE_0013847

## Schedule 1 – Borrower Parties

DIAMANTE CABO SAN LUCAS S. DE R.L. DE C.V., A MEXICAN LIMITED LIABILITY COMPANY WITH VARIABLE CAPITAL

DIAMANTE CABO SAN LUCAS, LLC, A DELAWARE LIMITED LIABILITY COMPANY

KENNETH A. JOWDY

DIAMANTE PROPERTIES, LLC, A DELAWARE LIMITED LIABILITY COMPANY

KAJ HOLDINGS, LLC, A DELAWARE LIMITED LIABILITY COMPANY

DIAMANTE LIFE S. DE R.L. DE C.V., A MEXICAN LIMITED LIABILITY COMPANY

DIAMANTE CLUB, LLC, A DELAWARE LIMITED LIABILITY COMPANY

DIAMANTE CSL, LLC, A DELAWARE LIMITED LIABILITY COMPANY

8707646

23

**Schedule 2 – 2014 Amended Loan Documents**

2014 Amended Loan Documents all dated effective as of April 30, 2014 unless noted otherwise

1.   Third Amended and Restated Loan Agreement by and between Borrower, Borrower Parties, and Lender.

2.   Consolidated, Amended and Restate Promissory Note (Replacement Note C) - $15,000,000.00

3.   Acknowledgement of Debt (Mexico Law)

4.   Reaffirmation of Completion Guaranty by Jowdy

5.   Reaffirmation of Recourse Guaranty by Jowdy

6.   Reaffirmation of Payment Guaranty by Diamante Member, Diamante Properties and KAJ

7.   Reaffirmation of Pledge Agreement by Jowdy (Membership Interests in Diamante Member)

8.   Reaffirmation of Pledge Agreement by Diamante Properties and KAJ (Membership Interests in Diamante Member)

9.   Reaffirmation of Environmental Indemnity Agreement by Borrower and Jowdy

10.   Reaffirmation of Omnibus Assignment by Borrower

11.   Reaffirmation of Pledge and Security Agreement by PF Ventures, LLC (Membership Interests in Diamante Member)

12.   Reaffirmation of Payment Guaranty by Diamante Club, LLC, Jowdy, and Diamante Member

13.   Reaffirmation of Pledge and Security Agreement by Jowdy and Diamante Member (Membership Interests in Diamante Club, LLC)

14.   Reaffirmation of Payment Guaranty by Diamante CSL, LLC, Jowdy, and Diamante Member

15.   Reaffirmation of Pledge and Security Agreement by Jowdy and Diamante Member (Membership Interests in Diamante CSL, LLC)

16.   Reaffirmation of Pledge and Security Agreement by Borrower (Accounts - U.S.)

17.   Legacy Subordination Agreement by Legacy

18.   Diamante Club Subordination Agreement by Club

19.   Mandate Agreement for Santander Account – POST-CLOSING DELIVERABLE REQUIRED

8707646

24

   DANSKE_0013849

20.   First Amendment to Third Amended and Restated Loan Agreement and Modification Agreement dated _____, 2014

CONFIDENTIAL

DANSKE_0013850

## Schedule 3 – Amortization Schedule

| Calendar Year | Minimum Annual Required Payment (USD) (inclusive of Facility Target Amounts) | Facility C Target Principal Amount | Facility A Target Principal Amount | Facility B Target Principal Amount | Closing Debt (USD) |
|---|---|---|---|---|---|
| 2015 | $4,600,000 | $3,500,000 | $1,100,000 | ------------- | $151,900,000 |
| 2016 | $5,400,000 | $5,000,000 | $400,000 | ------------- | $146,500,000 |
| 2017 | $7,700,000 | $6,500,000 | $1,200,000 | ------------- | $138,800,000 |
| 2018 | $10,300,000 | ------------- | $10,300,000 | ------------- | $128,500,000 |
| 2019 | $11,600,000 | ------------- | $11,600,000 | ------------- | $116,900,000 |
| 2020 | $19,100,000 | ------------- | $19,100,000 | ------------- | $97,800,000 |
| 2021 | $23,800,000 | ------------- | $23,800,000 | ------------- | $74,000,000 |
| 2022 | $25,100,000 | ------------- | $25,100,000 | ------------- | $48,900,000 |
| 2023 | $23,800,000 | ------------- | $23,800,000 | ------------- | $25,100,000 |
| 2024 | $25,100,000 | ------------- | $7,100,000 | $18,000,000 | $0.0 |

8707646

CONFIDENTIAL
DANSKE_0013851

**Schedule 14.3 - Affidavit for Insurance Proceeds Disbursement**

**Application for Disbursement**
**Owner/Borrower Affidavit**

**TRIMONT**
REAL ESTATE ADVISORS

State of Baja California Sur
Country of Mexico

Before me, the undersigned authority, on this day personally appeared William J. Najam, Jr. who, being first duly sworn by me, upon oath deposes and says that:

1. Said Officer is duly authorized to make this affidavit and is fully cognizant of all facts and matters herein stated.

2. All funds heretofore disbursed by TriMont Real Estate Advisors, Inc., as Servicer for Danske Bank NS. (Lender) to Diamante Cabo San Lucas S. de R.L. de C.V. (Borrower) by TriMont, as Servicer, to Borrower for use in connection with the construction of improvements and funds received by Borrower from sales proceeds have been applied to the payment of obligations due by Borrower for materials, labor, and other costs incurred in connection with such construction, or other costs approved in writing by TriMont, as Servicer for Lender, and for no other purpose.

3. Borrower represents and warrants that it has received the sum of [$2,100,000] into Banorte Account #_____ from [_____] [fill in insurance carrier] on October __, 2014 as partial payment of insurance proceeds payable as a result of damage caused by Hurricane Odile.

4. The Attached Application is a request for approval of application of an amount equal to $_____ from the first partial payment of insurance proceeds to pay for the following item: [Borrower can attach budget of costs and expenses incurred].

5. Borrower hereby certifies that the funds advanced by Lender shall be expended by Borrower for labor, materials and other costs strictly in accordance with the budget attached hereto pursuant to Paragraph 4. Borrower further agrees that any insurance proceeds spent by Borrower shall be accounted for in future submissions in such form as may be required by Lender and TriMont, as Servicer.

6. All insurance sums approved by TriMont, as Servicer, on account of the attached budget will be used solely for the purpose of paying obligations owing by the Borrower as shown on the budget submitted pursuant to Paragraph #4 and for no other purpose.

7. Upon disbursement by Borrower of the funds approved by TriMont, as Servicer, on account of the attached budget, all obligations for labor, materials, and other costs heretofore incurred by Borrower in connection with such construction, or other costs approved in writing by TriMont,

8707646

27

CONFIDENTIAL

DANSKE_0013852

as Servicer, and which are due and payable will be fully paid and satisfied.

8. All work and materials for which payment is requested have been performed and installed substantially in accordance with the plans and specifications, construction contracts, permits and authorizations pertaining thereto, and there has been no material deviation from the applicable Construction Budget (as defined in the Loan Agreement) or the construction schedule submitted to TriMont, as Servicer, by the Borrower.

9. The remaining work with respect to the budget for which this request for approval is requested and as more particularly described in the applicable Plans and Specifications can be completed on or before the projected completion date thereunder for an amount not greater than the aggregate amount of undisbursed sums shown in the applicable Construction Budget.

10. All accounts payable in respect of the Project for the period set forth in the previous draw request have been paid by Borrower or will be paid by Borrower in the ordinary course and in accordance with the applicable Budget, and that Borrower has received no notice of any claim or application for lien.

11. Borrower has delivered to Lender, Servicer and Lender's Consultant, all permits required with respect to the on-going construction.

12. Borrower has delivered to Lender and Servicer all Sales Contracts and Trustee Acknowledgements as required under the Loan Agreement.

13. Borrower has delivered to Lender and Lender has approved an updated Project Schedule and an updated Consolidated Cash Flow Statement showing the estimated amount and time of disbursement of each advance by Lender. Borrower certifies to Lender that construction remains on schedule in order to achieve the completion dates set forth in Section 13.10 of the Loan Agreement.

14. Borrower has complied with all Laws regarding withholdings at source and remittance to the applicable fiscal Governmental Authority and shall provide to Lender evidence reasonably satisfactory to Lender of such compliance.

15. Borrower has provided to Lender's Consultant ongoing inspection reports, if any, from civil, soil, structural, mechanical, and electrical engineers as well as the architect, all to Lender's Consultant's satisfaction.

16. Borrower certifies that it is in compliance with the following Payment Covenants:

(a) Sales Proceeds and Consolidated Cash Flow Statement. From all proceeds of Product Sales, Borrower has (i) paid commissions due under the !roman Contract, (Crystal Lagoons Contract, and Woods Contract, and (ii) applied the Working Capital Contribution towards payment of all operating expenses in strict accordance with the Operations Budget. Borrower acknowledges and agrees that the Consolidated Cash Flow Statement describes the application of Net Sales Proceeds to projected, budgeted amounts as set forth on the Construction Budgets. Borrower has applied all Net Sales Proceeds in accordance with the Consolidated Cash Flow Statement, the applicable Construction Budget, and the Cash Management Order of Priority in accordance with the terms and conditions of the Loan Agreement and for no other purpose except as otherwise approved by Lender in writing

8707646

28

DANSKE_0013853

and in its sole, subjective and absolute discretion.

(b) Construction Expenses. Borrower has paid all Construction Expenses in accordance with the Construction Budgets and in accordance with the Cash Management Budget, Cash Management Order of Priority and terms and provisions of the Loan Agreement.

(c) Draw Requests for Operating Expenses and Construction Expenses. For all costs and expenses to be paid pursuant to Construction Budgets, Borrower has submitted to Lender a detailed draw request pursuant to Section 8, 10 and 11 of the Loan Agreement for Lender's prior approval (such draw request, "Budgeted Expense Draw Request"). Borrower spent all such approved amounts in accordance with the applicable Budgets. If Lender has not approved such Budgeted Expense Draw Request, then Borrower has applied such amounts in the order of priority as Lender has directed.

17. Borrower certifies that it is in compliance with the following Sales Performance Covenants:

(a) Aggregate Product Sales (Actual vs. Projected). Borrower certifies that Actual Product Sales are equal to or greater than eighty-five percent (85%) of the Projected Product Sales for the Measured Period.

(b) Aggregate Cash Receipts from Product Sales (Actual vs. Projected). Borrower certifies that Actual Cash Receipts from Product Sales are equal to or greater than eighty-five percent (85%) of the Projected Cash Receipts from Product Sales for the Measured Period.

(c) In Balance Test – Proceeds to Complete (Project). Borrower certifies that Available Accounts Receivable for Actual Product Sales plus all unadvanced proceeds of Replacement Facility C are equal to or greater than one hundred twenty-five percent (125%) of the Costs to Complete Commenced Vertical Product Construction ("Resort In Balance Report").

(d) In Balance Test- Contractual Construction Obligations v. Budgeted Construction. Borrower certifies that Contractual Resort Construction Obligations do not exceed the construction obligations budgeted and approved by Lender pursuant to the applicable Resort Construction Budget.

(e) Remittance of Excess Sales Proceeds. Borrower certifies that it has applied any Excess Sales Proceeds (if any) in strict accordance with written instruction from Lender.

18. Borrower certifies that it is in compliance with the Sales Covenants described in Section 13.9.

19. Borrower certifies to Lender that the Schedule of Accounts attached hereto and incorporated herein as Schedule __ continues to be a true, accurate and complete schedule of all accounts of Borrower Parties and that no other such accounts exist with respect to any Borrower Party, the Project or otherwise.

20. The warranties and representations made in the various documents evidencing, governing, securing, guaranteeing or otherwise pertaining to that certain loan made to the Borrower by Danske Bank NS (the "Loan") are true and correct as of this date, such Loan is in full force and effect and no default or event of default of any party has occurred and is continuing under any homebuilder contract that would cause a Material Adverse Change.

21. Borrower has timely delivered all reports required under Section 13.5 (Reporting Covenants) of

8707646

29

the Loan Agreement as and when required.

22. Borrower agrees to provide to Lender or Servicer any supporting documentation or additional information requested to verify and confirm any Borrower certification, representation or warranty set forth herein.

23. No default or Event of Default has occurred and is continuing.

24. The following payments have been made timely by Borrower to Lender: (i) interest deposits due on the Monthly Payment Date; (ii) interest payments due on the Quarterly Payment Date; (iii) Non-utilization Fee payments due on the Quarterly Payment Date; (iv) principal payments due on the Monthly Payment Date; and (v) the Monthly Resort Vertical Construction Reserve Deposit.

25. If TriMont, as Servicer, has not received all of the items required to be delivered to it pursuant to the Loan, the making of any disbursement by TriMont, as Servicer, to the undersigned shall not be a waiver by TriMont, as Servicer, of any requirement of obligation to have any such item delivered to it as provided in the Loan.

26. Affiant understands that this affidavit is made for the purpose of inducing TriMont, as Servicer, to make a disbursement to Borrower, and that in making any such disbursement TriMont, as Servicer, will rely upon the accuracy of the matters stated in this affidavit.

27. There are no liens of record against the properties securing the Loan or any portion thereof arising out of the supplying of labor, materials, and/or services in connection with the construction thereof.

28. No other party other than Borrower and Danske Bank NS owns or claims, or has a right to claim, any interest in or lien or encumbrance on, the properties securing the Loan, except for ad valorem taxes not due and payable, and rights to liens to be dissolved upon payment of the disbursement hereby requested.

Initially capitalized terms used herein and not otherwise defined shall have the meaning ascribed to such term in the Third Amended and Restated Loan Agreement dated effective as of April 30, 2014 by and between Borrower, Lender and the other named parties therein.

Borrower:

Diamante Cabo San Lucas
S. DeR.L. De C.V.

_____

William J. Najam, Jr.
Chief Operating Officer

8707646

30

DANSKE_0013855

"Seal"

Subscribed and Sworn to before me this
_____day of _____, 20___.


_____
Notary Public


**AS APPROVED BY LENDER:**

**DANSKE BANK A/S, LONDON BRANCH**



By:    _____
Name: _____
Title:  Authorized Signatory

By:    _____
Name: _____
Title: Authorized Signatory

8707646

31

DANSKE_0013856

**Schedule 4.1(a)  - Approved 2015 Budgets**

**[FINAL TO BE ATTACHED]**

CONFIDENTIAL

DANSKE_0013857

CONFIDENTIAL

DANSKE_0013858

CONFIDENTIAL

DANSKE_0013859



CONFIDENTIAL

DANSKE_0013860

Diamante Cabo San Lucas: Account Detail - Cash Flow Site Development Budget

CONFIDENTIAL

DANSKE_0013861



CONFIDENTIAL

DANSKE_0013862

**Schedule 4.1(b)  - Approved 2015 Construction Covenants**

**[FINAL TO BE ATTACHED]**

8707646

33

CONFIDENTIAL

DANSKE_0013863

| Vertical Construction (Diamante Owned) | Commencement Date | Completion Date |
|---|---|---|
| Bungalow #7 | 5/1/2015 | 12/10/2015 |
| Bungalow #8 | 2/2/2015 | 10/1/2015 |
| Resort Towers | | |
| Tower #2 (9 Units) | 1/1/2015 | 4/29/2015 |
| Low Rise (Phase I – 16 Units) | 1/1/2015 | 12/29/2015 |
| Low Rise (Phase II – 18 Units) | 7/1/2015 | 12/29/2015 |
| Golf Villa #9 | 1/1/2015 | 10/1/2015 |
| Beach Estate #43 | 4/1/2015 | 12/29/2015 |

| Infrastructure Construction | Commencement Date | Completion Date |
|---|---|---|
| Overall Infrastructure | | |
| Site Improvements – Diamante Blvd | 1/1/2015 | 12/30/2015 |
| Off-Site Electrical Transmission Line | 1/1/2015 | 2/25/2015 |
| Desalination Plant | 1/1/2015 | 12/30/2015 |
| Sewer Treatment Plant | 1/1/2015 | 12/30/2015 |
| Golf Villas Infrastructure | | |
| Roads | 1/1/2015 | 12/30/2015 |
| Water | 1/1/2015 | 6/10/2015 |
| Electrical | 1/1/2015 | 2/25/2015 |
| Telecomm | 1/1/2015 | 12/30/2015 |
| Beach Estates Infrastructure | | |
| Roads | 1/1/2015 | 12/29/2015 |
| Electrical | 1/1/2015 | 12/29/2015 |
| Telecom | 1/1/2015 | 12/29/2015 |
| Sunset Hill Infrastructure | | |
| Roads | 1/1/2015 | 7/31/2015 |
| Water | 1/1/2015 | 7/31/2015 |
| Electrical | 1/1/2015 | 7/31/2015 |
| Telecom | 1/1/2015 | 7/31/2015 |
| Ocean View Estates Infrastructure | | |
| Road Grading | 8/1/2015 | 12/25/2015 |
| Cantina Villas Infrastructure | | |
| Mass Grading | 8/1/2015 | 12/25/2015 |

CONFIDENTIAL