# EXHIBIT 63

*Final Execution Copy*

## SECOND AMENDMENT TO THIRD AMENDED AND RESTATED LOAN AGREEMENT AND MODIFICATION AGREEMENT

**THIS SECOND AMENDMENT TO THIRD AMENDED AND RESTATED LOAN AGREEMENT AND MODIFICATION AGREEMENT** (this "**Agreement**"), dated as of the 8ᵗʰ day of September, 2018 and effective the 1ˢᵗ day of November, 2017 (the "**Effective Date**"), is made by and between **DIAMANTE CABO SAN LUCAS S. DE R.L. DE C.V.**, a Mexican limited liability company with variable capital, having an address at Boulevard s/n, Col. Los Cangrejos, Carretera Cabo San Lucas a Todos Santos Km 6.8 Cabo San Lucas B.C.S., C.P. 23473 ("**Borrower**") and the additional Borrower Parties described on <u>Schedule 1</u> (collectively, "**Obligors**"), and **DANSKE BANK A/S, LONDON BRANCH**, the London Branch of a company incorporated in Denmark ("**Lender**").

## RECITALS

A.      On March 10, 2006, Lehman Brothers Holdings Inc. ("**Lehman**") made a loan to Borrower in the original principal amount of One Hundred Twenty Five Million Dollars ($125,000,000.00) ("**Original Loan**") to be used to fund certain acquisition and pre-development costs in connection with that certain resort project located in the City of Cabo San Lucas, Baja California Sur, Mexico.

B.      The Original Loan is evidenced and secured by loan documents dated March 10, 2006 and identified on the Schedule of Original Loan Documents attached as <u>Schedule 2</u> to the Loan Agreement ("**Original Loan Documents**").

C.      Pursuant to that certain Omnibus Assignment and Assumption dated January 13, 2009 by and between Lehman, as assignor, and Lender, as assignee, Lehman assigned to Lender, and Lender assumed from Lehman all of Lehman's right, title and interest in the Original Loan and the Original Loan Documents.

D.      Lehman and Lender executed certain assignment agreements dated February 27, 2009 whereby the assignment of Lehman's rights under the Original Trust Agreement, the Pledge Agreement (Membership Interests in Borrower: Mexico) and the Pledge Agreement (Assets) in favor of Lender was perfected in accordance with Mexican law.

E.      Lender, Borrower and Guarantors agreed to modify certain terms and conditions of the Original Loan Documents and, in connection therewith, reaffirmed, amended and/or amended and restated the Original Loan Documents pursuant to the Amended Loan Documents listed on <u>Schedule 3</u> of the Loan Agreement (as reaffirmed, amended and/or amended and restated, "**2009 Amended Loan Documents**").

F.      Among the several modifications made pursuant to the 2009 Amended Loan Documents, Lender, as the holder of that certain Promissory Note dated March 10, 2006 in the original principal amount of $125,000,000.00 ("**Original Note**"), and Borrower, as the borrower under the Original Note, agreed to split the indebtedness evidenced by the Original Note into two (2) separate obligations of indebtedness as evidenced by:

(i)      Substitute Promissory Note (Facility A) dated as of March 6, 2009 in the amount of One Hundred Nine Million One Hundred Thirty-Eight Thousand Three Hundred Twenty-Seven and 83/100 Dollars ($109,138,327.83) ("**Facility A Note**"); and

(ii)    Substitute Promissory Note (Facility B) dated as of March 6, 2009 in the amount of Sixteen Million and 00/100 Dollars ($16,000,000.00) ("**Facility B Note**").

G.    Lender, Borrower and Guarantors agreed to further modifications of certain terms and conditions of the Original Loan Documents and 2009 Amended Loan Documents, and in connection therewith reaffirmed and amended certain of the Original Loan Documents and 2009 Amended Loan Documents listed on Schedule 4 (as reaffirmed and amended, "**2010 Amended Loan Documents**," and together with the 2009 Amended Loan Documents, the "**Amended Loan Documents**"), which amendments include, *inter alia*, increasing the principal balance available under Facility B Note from $16,000,000 to $20,000,000.

H.    Lender, Borrower and Guarantors agreed to extend the Maturity Date of the Loan to June 29, 2012 and modify certain applicable interest rates as more particularly set forth therein in that Extension Letter Agreement dated April 2, 2012 ("**First Extension Agreement**").

I.    By that letter agreement dated June 29, 2012, by and between Lender and Obligors, Lender agreed to extend the Maturity Date of the Loan from June 29, 2012 to September 28, 2012 and provided for certain other obligations of Borrower as more particularly set forth therein (the "**Second Extension Agreement**").

J.    By that letter agreement dated September 28, 2012, by and between Lender and Obligors, Lender agreed to extend the Maturity Date of the Loan from September 28, 2012 to December 31, 2012 and provided for certain other obligations of Borrower as more particularly set forth therein (the "**Third Extension Agreement**").

K.    By that letter agreement dated December 31, 2012, Lender and Obligors agreed to extend the Maturity Date of the Loan from December 31, 2012 to March 31, 2013 and provide for certain other obligations of Borrower, all as more particularly set forth therein ("**Fourth Extension Agreement**").

L.    By that letter agreement dated February 15, 2013, Lender and Obligors agreed to advance up to $2,000,000 under Facility B in accordance with the terms and conditions set forth in that 2013 Additional Advance Letter ("**2013 Additional Advance Agreement**").

M.    By that letter agreement dated March 29, 2013, Lender and Obligors agreed to extend the Maturity Date of the Loan from March 31, 2013 to April 15, 2013 and provide for certain other obligations of Borrower, all as more particularly set forth therein ("**Fifth Extension Agreement**").

N.    Pursuant to the terms and conditions of the 2013 Loan Modification Documents, Lender, Borrower and Guarantors agreed to certain amendments, modifications and extensions, including but not limited to: (i) increasing the principal indebtedness of Facility A Note to $123,500,000 to reflect the capitalization of all accrued interest thereon and on Facility B, together with certain costs and expenses of Lender; and (ii) splitting the indebtedness evidenced by Facility B Note into (y) Second Substitute Promissory Note (Facility B) dated as of April 30, 2013 in the amount of Eighteen Million Dollars ("**Facility B Note**"); and (z) Promissory Note (Facility C) dated as of April 30, 2013, in the amount of $2,000,000 ("**Facility C Note**"); and (iii) advancing an additional loan in the amount of $3,000,000 pursuant to Promissory Note (Facility D) dated as of April 30, 2013 in the principal amount of Three Million Dollars ($3,000,000) ("**Facility D Note**") all as more particularly set forth in the Second Amended and Restated Loan Agreement and the other 2013 Amended Loan Documents.

O.    Pursuant to the terms and conditions of the Third Amended and Restated Loan Agreement dated April 29, 2014 (as amended pursuant to the First Amendment and hereby, the "**Loan**

2

18673909-v19

**Agreement**"), Lender, Borrower and Guarantors agreed to certain amendments, modifications and extensions to the 2013 Modification Documents, including but not limited to: (i) consolidating and replacing Facility C Note and Facility D Note with Replacement Facility C Note, and thereunder advancing an additional amount of $10,000,000, dated as of even date herewith, in the aggregate principal amount of $15,000,000 ("**Replacement Facility C Note**") all as more particularly set forth in the Loan Agreement.

      P.      Pursuant to the public instrument No. 111, 339, dated April 23, 2014, authorized by Mr. Amando Mastachi Aguario, Notary Public No. 121, of Mexico, Federal District; The Bank of New York Mellon, S.A., Institución de Banca Múltiple, agreed to merge with CI Banco, S.A., Institución de Banca Múltiple, provided that The Bank of New York Mellon, S.A., Institución de Banca Múltiple survived as the merging company, and CI Banco, S.A., Institución de Banca Múltiple, as merged company, ceased to exist. Pursuant to this same instrument, the parties agreed to change the name of the surviving entity to "CI Banco, S.A., Institución de Banca Múltiple" which will be considered as trustee under that certain Amended and Restated Irrevocable Guaranty Trust Agreement dated as of March 9, 2009 among Borrower, Lender and Trustee, as amended from time to time.

      Q.      Pursuant to that First Amendment to Third Amended and Restated Loan Agreement and Modification Agreement dated October 30, 2014 ("**First Amendment**"), Lender and Borrower extended the Maturity Date and Facility C Maturity Date of the Loan and modified certain other terms and conditions of the Loan Agreement all in accordance with the terms and conditions of the First Amendment.

      R.      Lender and Borrower desire to extend the maturity date of the Replacement Facility C Loan and make such other amendments and modifications as more particularly set forth hereinafter.

**SECTION 1.**   **Defined Terms; Recitals.**  Capitalized terms used in this Agreement and not defined herein are defined in the Loan Agreement.  The Recitals are hereby incorporated by reference.

**SECTION 2.**   **Confirmation of the Note, the Deed of Trust and the other Loan Documents**.

      2.1     Obligors, each as applicable and pursuant to the terms and conditions therein, hereby ratify and confirm their obligations under the Notes, the Trust, and the other Loan Documents, as such documents may be amended herein.  Obligors hereby acknowledge and agree that the Notes evidence advances made by Lender to Borrower and that the Trust and the other Loan Documents secure, among other obligations, Borrower's obligations to Lender pursuant to the Notes, Trust, and the other Loan Documents, with the same lien priority as immediately prior to the execution (i.e., first lien).  As of December 31, 2017, Obligors acknowledge and agree that Borrower is indebted to Lender for the following amounts:

| | | |
|---|---|---|
| Unpaid principal: | Facility A: | $96,400,000 |
| | Facility B: | $18,000,000 |
| | Facility C: | $15,000,000, drawn at $14,799,481.47 |

Total Committed Loan: $129,400,000.00

Plus: Profit Participation Fee:   $50,000,000.00.

Plus: Accrued and unpaid interest, if any.

3

18673909-v19

Obligors further acknowledge that the foregoing does not take into account any other amounts, charges or other sums (including, without limitation, attorneys' fees, lender fees, updated title reports and expenses and other amounts) other than as enumerated above that may be payable pursuant to the Loan Documents.

**SECTION 3.** **Modifications to the Loan Agreement.**

3.1     **Article II - Section 2.1 (Definitions).**   Article II of the Loan Agreement is hereby modified as follows:

a.        **Section 2.1 shall be modified by deleting therefrom and replacing each in its entirety the following defined terms:**

"<u>Accounts</u>: All of Borrower Parties' income accounts and expense accounts as more particularly described on <u>2017 Account Schedule</u> attached hereto and incorporated herein."

"<u>Borrower Diamante Parties</u>:  Diamante Member, Diamante Club, LLC, Diamante CSL, LLC and Diamante Life S. DE R.L. De C.V., Diamante Development S. de R.L. de C.V., Diamante Residential Services S. de R.L. de C.V., and Diamante Management Services, Inc."

"<u>Cash Management Order of Priority</u>: As defined in <u>Section 13.17(a)</u>."

"<u>Costs to Complete Commenced Contractual Construction</u>:  The aggregate costs required to complete all Contractual Construction Obligations."

"<u>Deposit Account Control Agreement</u>: As defined in <u>Section 13.17(c)</u>."

"<u>Depository Bank</u>: TD Bank, Banorte, Santander, Scotia Bank or such other depositary banks as Lender shall approve from time to time."

"<u>Golf Memberships</u>: collectively, the membership interests transferred or sold with respect to the Dunes Golf Course, El Cardonal Golf Course (f/k/a the TW Golf Course), the Oasis Short Course and any other golf course now or hereinafter existing on the Property."

"<u>Improvements</u>: Collectively including, but not limited to, (i) engineering, electrical, transportation, mechanical and other infrastructure required for the development of the Project, including roads, a maintenance facility, a wastewater treatment plant and a desalination plant; (ii) Dunes Golf Course and Dunes Clubhouse; (iii) Dunes Residences Improvements; (iv) Lagoon Improvements; (v) Resort Improvements; (vi) TW Golf Course; (vii) Non-Resort Improvements; (viii) Health Club and Spa; (ix) Sunset Hill Estates Improvements; (x) Beach Estates Improvements; (xi) Ocean Club Improvements; (xii) Las Casitas; and (xiii) Cantinas Villas Improvements, all as more particularly shown on the Master Plan and all as more particularly described in the Plans and Specifications approved by Lender.

"<u>Monthly Interest Reserve Deposit</u>:  An amount equal to $500,000, as may be adjusted by Lender from time to time in its reasonable discretion and with advance notice to Borrower."

"<u>Monthly Principal Repayment Amount</u>: The monthly principal amounts payable to Lender as set forth on the Amortization Schedule, if any."

4

18673909-v19

CONFIDENTIAL

DANSKE_0011034

"Infrastructure Improvements:  All infrastructure Improvements located on the Project, including but not limited to the (i) grading, compacting, paving, repairs and improvements to Diamante Boulevard and the extension thereof through Sunset Hill Estates Condominium Regime, Golf Villas Condominium Regime, Beach Estates Condominium Regime, Ocean Club Condominium Regime, the Las Casitas Condominium Regime and the Resort Condominium Regime;  (ii) sewer and lift station, water, power and arroyo protection in the Beach Estates Condominium Regime; (iii) sewer, water, power, storm drainage and roads in the Sunset Hill Estates Condominium Regime, Golf Villas Condominium Regime, Beach Estates Condominium Regime, Las Casitas Condominium Regime, Ocean Club Condominium Regime, the Cantinas Villas Condominium Regime and the Resort Condominium Regime; and (iv) power lines to the municipal desalinization plant.

"Product:  Any time share, fractional membership, whole ownership, condominium, lot, villa or other interest in any portion of the Project, including but not limited to Beach Estate Lots, BRC Interests, Golf Villas, Golf Villa Lots, GVRC Interests, Sunset Hill Lots, TRC Interests, Dunes Residences Condominium Units, DRC Interests, Las Casitas, Cantinas Villas, Cantinas Villa Lots, OCR Interests, and Ocean Club Residences."

"Product Sales: All sales of interests in the Project, including but not limited to (i) time share interests in the DRC, BRC, GVRC, TRC and OCR; (ii) lots in the Sunset Hill Parcel; (iii) lots in the Golf Villas Parcel; (iv) Golf Villas; (v) lots in the Cantinas Villas Parcel; (vi) Cantinas Villas; (vii) lots in the Beach Estate Parcel; (viii) Dunes Residences Condominium Units; (ix) Las Casitas Villas; (x) lots in the Las Casitas Parcel; and (xi) Ocean Club Residences."

"Project Construction Budget: The construction budget describing all costs and expenses related to: (i) the Resort, including but not limited to, the Lagoon, Resort Vertical Improvements, Resort Infrastructure Improvements, Health Club, Spa, and all other improvements developed and constructed on the Resort Parcel; (ii) the Non Resort Improvements, including but not limited to, Non Resort Vertical Improvements, TW Golf Course Improvements and Private Home Construction Contracts, and (iii) the Debt service payments and all corresponding construction, development and administrative costs as set forth in the budget submitted to Lender and approved by Lender, as may be updated, amended or revised with Lender's prior written approval."

"Quarterly Principal Repayment Amount:  The quarterly principal amounts payable to Lender as set forth on the Amortization Schedule, if any, which in the aggregate for a calendar year shall equal the Annual Required Principal Repayment Amount."  For the period of time from the Effective Date through December 31, 2018, no Quarterly Principal Repayment Amounts shall be due, except as set forth on the Amortization Schedule."

"Replacement Facility C Maturity Date: December 31, 2018."

"Resort Product: All timeshare membership interests with respect to the TRC, and Spa Villa Condominium or other real estate condominium interests or rights with respect to the Resort Parcel."

"Resort Product Sales: All sales of Resort Product in the TRC and all Spa Villa and other condominium sales on the Resort Parcel."

"Time Share Product: any and all Product sold or to be sold in fractional ownership interests (more commonly known as "time shares") for the Project, including but not limited to, DRC Interests, BRC Interests, GVRC Interests, TRC Interests and OCR Interests."

5

18673909-v19

CONFIDENTIAL

DANSKE_0011035

"Triggering Event:  Borrower's failure to deliver to Lender the Weekly Cash Sweep Deposit Funds on the Weekly Cash Sweep Deposit Date, which failure continues for four (4) consecutive Weekly Cash Sweep Deposit Dates."

"Whole Ownership Contract: an agreement for the sale of Product in the Project not otherwise characterized as a Time Share Product, including but not limited to Golf Villa, Golf Villa Lot, Las Casitas Villa, Las Casitas Villa Lot, Spa Villa, Spa Villa Lot, Beach Estates Lot, Sunset Hills Estates Lot, Dunes Residences Condominium Unit, Cantinas Villa, Cantinas Villa Lot, Ocean Club Residences."

     b.    **Section 2.1 shall be modified by adding thereto the following new defined terms**:

"Amortization Schedule: As defined in Section 4.1(c) and as more particularly described on Schedule 4.1(c) attached hereto and incorporated herein."

"Anti-Corruption Laws:  the Bribery Acts and any and all Laws of any jurisdiction applicable to Borrower Parties and their respective Affiliates and subsidiaries from time to time concerning or relating to bribery or corruption."

"Cantinas Villa(s):  Whole Ownership villas to be constructed in the Cantinas Villas Condominium Regime."

"Cantinas Villas Condominium Regime:  The sub-condominium regime on which the Cantinas Villas Improvements are to be located."

"Cantinas Villas Improvements:  The Cantinas Villas, lots, and other infrastructure required for the development, construction, and operation of the Improvements in the Cantinas Villas Condominium Regime."

"Cantinas Villas Lot(s):  Collectively, the eleven (11) lots situated on the Cantinas Villas Parcel as more particularly shown on the Master Plan."

"Cantinas Villas Parcel:  The parcel of real property on which the Cantinas Villas Improvements and Cantinas Villas Lots are located, as shown on the parcel plats delivered to Lender."

"Condominium Regimes:  Each of the DRC Condominium Regime, Golf Villas Condominium Regime, Sunset Hill Estates Condominium Regime, Resort Condominium Regime, Beach Estates Condominium Regime, Cantinas Villas Condominium Regime, Ocean Club Condominium Regime, and Las Casitas Villas Condominium Regime."

"Contractual Construction Obligations: The obligations of Borrower or Borrower Parties, as the case may be, to complete certain Improvements within the Project pursuant to terms and conditions of any Product Sales Agreement.  For the period commencing January 1, 2018 through and including December 31, 2018, in addition to all on-going Whole Ownership Product and related infrastructure being built pursuant to Whole Ownership Contracts, the Improvements shall include Resort Product, OCR Product, Ocean Club Residences and the KTRC Improvements."

"Danske Controlled Facility C Account: The Diamante account established and exclusively controlled by Lender from time to time for purposes of collecting amounts due from Borrower under this Agreement and the Amended Loan Documents. Unless and until Lender advises

6

CONFIDENTIAL

Borrower that a different account has been established, for purposes of this Loan, Borrower shall direct all amounts required to be paid to or deposited with Lender to account number 4036 36030240."

"Danske Sub Accounts: The account(s) established by Lender from time to time for purposes of depositing certain amounts due from Borrower to Lender hereunder, including but not limited to the interest reserve account, commission reserve account and the tax reserve account."

"Deficiency Deposit: as defined in Section 10.1."

"Diamante Development: Diamante Development S. de R.L. de C.V., a Mexican limited liability company."

"Diamante Management: Diamante Management Services Inc., a Delaware corporation."

"Diamante Residential: Diamante Residential Services S. de R.L. de C.V., a Mexican limited liability company."

"El Cardonal Golf Course: the golf course on the Property, also known as the TW Golf Course, which opened in December 2014."

"KTRC Improvements: The improvements and other infrastructure required to be completed by Borrower on the Property pursuant to agreement with KTRC and required for the development, construction and operation of the Nobu hotel and Hard Rock hotel. Borrower's obligations with respect to the KTRC Improvements are more particularly set forth in that documentation submitted to Lender prior to the date hereof."

"KTRC Parcel: The parcel of real property commonly known as *Polígono 1, Fracción D, El Cardonal*, located in the Municipality of Los Cabos, Baja California Sur, as shown on the Master Plan."

"Las Casitas Villa(s): Whole Ownership villas to be constructed in the Las Casitas Villas Condominium Regime."

"Las Casitas Villas Condominium Regime: The sub-condominium regime on which the Las Casitas Villas Improvements are to be located."

"Las Casitas Villas Improvements: The Las Casitas Villas, lots, and other infrastructure required for the development, construction, and operation of the Improvements in the Las Casitas Villas Condominium Regime."

"Las Casitas Villas Lot(s): Collectively, all of the lots situated on the Las Casitas Villas Parcel as more particularly shown on the Master Plan."

"Las Casitas Villas Parcel: The parcel of real property on which the Las Casitas Villas Improvements and Las Casitas Villas Lots are located, as shown on the parcel plat delivered to Lender."

"Oasis Short Course: the "par 3" practice golf course constructed on the Property."

7

18673909-v19

DANSKE_0011037

"OCR:  Time share residence club Units constructed on the Ocean Club Parcel."

"OCR Interests: Collectively, the time share membership interests in the OCR Units."

"OCR Units:  The residence club condominium units in which OCR Interests are sold located on certain floor(s) of the Ocean Club Improvements."

"OCR Reception Center:  The reception center to be built on the ground floor at the Ocean Club Parcel as more particularly shown on the Master Plan."

"Ocean Club Parcel:  The parcel of real property on which the Ocean Club Improvements are located, as shown on the parcel plat delivered to Lender."

"Ocean Club Condominium Regime:  The sub-condominium regime comprised of the Ocean Club Improvements, as depicted on parcel plat delivered to Lender."

"Ocean Club Improvements:  The clubhouse, restaurants, pool facilities, the OCR Units, the Ocean Club Residences and all supporting infrastructure located within the Ocean Club Condominium and more particularly shown on the Master Plan and all as more particularly described in the Ocean Club Plans and Specifications approved by Lender."

"Ocean Club Residences:  Whole Ownership residences to be constructed in the Ocean Club Condominium Regime located certain floor(s) of the Ocean Club Improvements."

"Ocean Club Plans and Specifications:  Plans and specifications for the Ocean Club Improvements on the Ocean Club Parcel prepared by the Architect and approved by the Lender."

"Private Home Construction Contract(s): all Borrower contracts and agreements for Private Home Construction Projects."

"Private Home Construction Project(s): the residences and Improvements that Borrower is obligated to develop and construct for purchasers in the Project pursuant to Private Home Construction Contracts.

"Project Construction Budget Line Items: as defined in Section 9.2(b)(i)."

"Project Contingency Reserve: as defined in Section 9.2(c)."

"Second Amendment: that certain Second Amendment to Third Amended and Restated Loan Agreement dated as of [_____], 2018."

"Trustee Acknowledgement: that acknowledgement page to be signed by or on behalf of Lender and attached to each Time Share Contract, which shall also include sufficient information regarding the purchase price, purchaser and Time Share Product under contract."

"US Based Income Account: the income account of Borrower maintained at TD Bank, N.A. described on 2017 Account Schedule attached hereto and incorporated herein."

"Whole Ownership Product: the Product sold pursuant to any Whole Ownership Contract."

8

18673909-v19

CONFIDENTIAL

DANSKE_0011038

      c.      **Section 2.1** shall be modified by deleting therefrom each of the following defined terms:

      "Excess Principal Repayment Amount"

      "Hotel Site Entitlement Costs"

      d.      Replacement of Certain Defined Terms with Newly Defined Terms

      i.      The Loan Agreement shall be modified by removing therefrom all instances of "Resort Construction Budget Line Items" and replacing such references with the newly defined term "Project Construction Budget Line Items", such that any and all references to "Resort Construction Budget Line Items" shall mean "Project Construction Budget Line Items".

      ii.      The Loan Agreement shall be modified by removing therefrom all instances of "Resort Contingency Reserve" and replacing such references with the newly defined term "Project Contingency Reserve", such that any and all references to "Resort Contingency Reserve" shall mean "Project Contingency Reserve".

      iii.      The Loan Agreement shall be modified by removing therefrom all instances of "Wells Fargo Income Account" and replacing such references with the newly defined term "US Based Income Account", such that any and all references to "Wells Fargo Income Account" shall mean "US Based Income Account".

      iv.      The Loan Agreement shall be modified by removing therefrom all instances of "Clearing Account" and replacing such references with the newly defined term "Danske Clearing Account", such that any and all references to "Clearing Account" shall mean "Danske Clearing Account".

      v.      The Loan Agreement shall be modified by removing therefrom all instances of "Contractual Resort Construction Obligations" and replacing such references with the newly defined term "Contractual Construction Obligations", such that any and all references to "Contractual Resort Construction Obligations" shall mean "Contractual Construction Obligations".

      vi.      The Loan Agreement shall be modified by removing therefrom all instances of "Sub-condominium Regime" and replacing such references with the newly defined term "Condominium Regime", such that any and all references to "Sub-Condominium Regime" shall mean "Condominium Regime."

3.2      **Article III - Section 3.1 (Representations and Warranties)**.

      a.      Section 3.1(v) is hereby deleted in its entirety and replaced with the following:

      "(v)    (i)    OFAC. Neither Borrower, nor any Borrower Party, nor, to the best of Borrower's knowledge, without inquiry, any Kenner Party, nor any Person holding a direct or indirect interest in any of them is (or will be) a person with whom Lender is restricted from doing business under OFAC (including Persons named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support

9

18673909-v19

Terrorism), or other governmental action and is not and shall not engage in any dealings or transactions or otherwise be associated with such Persons.

        (ii)    <u>Anti-Money Laundering</u>.   The operations of each Borrower Party, has been and shall be conducted at all times in material compliance with all applicable financial recordkeeping and reporting requirements and anti-money laundering law, including but not limited to the PATRIOT Act and the Anti-Corruption Laws, and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Borrower Parties with respect to such anti-money laundering statutes is pending. Borrower represents and warrants that it maintains an anti-money laundering policy and at Lender's request Borrower shall provide a copy to Lender.

        (iii)    <u>Anti-Corruption</u>.  None of the Borrower Parties, nor any director, officer, or employee of the aforementioned, has taken or will take any action in furtherance of an offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or anything else of value, directly or indirectly, to any person to secure any improper business advantage for the Borrower Parties; and the Borrower Parties have conducted their business in compliance with all applicable OFAC, Anti-Corruption Laws and any such other law pertaining to anti-money laundering and bribery. Borrower represents and warrants that it maintains an anti-corruption policy and at Lender's request Borrower shall provide a copy to Lender.

        (iv)    Each of Borrower Parties hereby agrees to provide such information and take such actions are requested by Lender or otherwise required by Laws in order to assist Lender in maintaining compliance with OFAC, Anti-Corruption Laws, and any other anti-money laundering and bribery laws or activity related thereto.

        (v)    Each of Borrower Parties hereby agrees to provide Lender and Servicer promptly upon Lender or Servicer's request copies of monthly reports required by any Anti-Corruption Laws and any such other law pertaining to anti-money laundering and bribery."

    b.    <u>Section 3.1(uu)</u> is hereby deleted in its entirety and replaced with the following:

    "(uu)    INTENTIONALLY DELETED."

    c.    <u>Section 3.1</u> is hereby amended by adding the following new sub-sections (xx), (yy) and (zz) immediately following sub-section (ww):

    "(xx)    Obligors represent and warrant that, as of the Effective Date Obligors have delivered to Lender true, correct and complete schedule of revenue sources generated by the Project (including, but not limited to Sales Proceeds, membership dues and charges, health club charges, rents, maintenance fees and deposits, lease revenue and association dues), and the corresponding depository bank account(s) into which each revenue source is deposited. Borrower agrees that from the Effective Date until such time that the Loan is repaid in full, each revenue source shall continue to be deposited into its corresponding depository bank account(s) identified to Lender, unless (i) Lender institutes cash management pursuant to <u>Section 13.17(a)</u>, or (ii) as otherwise approved by Lender in writing, which consent shall not be unreasonably withheld."

10

18673909-v19

CONFIDENTIAL

DANSKE_0011040

"(yy)   Obligors represent and warrant that, as of the Effective Date of the Second Amendment, Obligors have delivered true, correct and complete copies of the documents, plans, schedules and organizational charts described on <u>Schedule 3.1(yy)</u>.

"(zz)   The MGM Term Sheet has been terminated."

3.3   **Article V**.  Article V is hereby amended as follows:

a.   <u>Section 5.3(b)</u> is hereby deleted in its entirety and replaced with the following:

"(b) So long as no Event of Default shall have occurred, the following amounts shall be due and payable from Borrower to Lender on each Quarterly Payment Date:  (i) interest, calculated in arrears at the Applicable Interest Rate (Replacement Facility C) shall be payable on each Quarterly Payment Date on the outstanding principal balance of Replacement Facility C Loan; and (ii) interest, calculated in arrears at the Non-Utilization Fee rate in accordance with Section 5.3(a) hereof shall be payable on each Quarterly Payment Date. "

b.   <u>Section 5.3(d)</u> is hereby deleted in its entirety and replaced with the following:

"(d) Interest payable on the outstanding principal balance of the Replacement Facility C Loan shall be calculated by multiplying (i) the actual number of days elapsed in the Interest Period by (ii) a daily rate based on the Applicable Interest Rate (Facility C) and a three hundred sixty (360) day year and then multiplying the product by (iii) the outstanding principal balance of the Replacement Facility C Note."

c.   <u>Section 5.6</u> is hereby deleted in its entirety and replaced with the following:

"<u>Section 5.6 Required Principal Repayments</u>.

(a)   <u>INTENTIONALLY DELETED</u>.

(b)   <u>Quarterly Principal Repayment Amounts</u>.  In addition to the payment obligations due from Borrower on each Monthly Payment Date and Quarterly Payment Date with respect to Facility A, Facility B, and Replacement Facility C, on each Quarterly Payment Date in accordance with the Amortization Schedule, Borrower shall pay to Lender an amount equal to the Quarterly Principal Repayment Amount.  If there is any shortfall in funds paid to Lender on account of the Quarterly Principal Repayment Amount for the applicable period, then Borrower shall have a cure period of ninety (90) days to deposit the shortfall.  Borrower's failure to pay funds sufficient to cure the shortfall by the expiration of the ninety (90) day cure period shall be an Event of Default hereunder.  For the period of time from the Effective Date through December 31, 2018, no Quarterly Principal Repayment Amounts shall be due. except as set forth on the Amortization Schedule.

(c)   <u>Monthly Proceeds Applicable to Principal Repayment</u>.   In addition to the payment obligations due from Borrower on each Monthly Payment Date and Quarterly Payment Date with respect to Facility A, Facility B, and  Replacement Facility C, on each Monthly Payment Date Borrower shall pay to Lender an amount equal to the Monthly Principal Repayment Amount.

(d)   <u>Sales Proceeds From Whole Ownership Closings</u>. In addition to the payment obligations due from Borrower on each Monthly Payment Date and Quarterly Payment Date, no later than ten (10) days after each Real Estate Closing Date, Borrower shall pay to Lender the Whole Ownership

11

18673909-v19

CONFIDENTIAL

DANSKE_0011041

Net Sales (defined as Gross Sales less Commissions and Budgeted Operating Expenses and less Vertical Improvement costs) and together with such payment shall provide an accounting and reconciliation of both the payments made by a buyer pursuant to a Whole Ownership Contract and the Non-Resort Vertical Improvement costs and expenses incurred as compared to such budgeted costs.

(e)     INTENTIONALLY DELETED.

(f)     Notwithstanding anything to the contrary forgoing, Borrower Parties and Lender acknowledge and agree that Borrower may request from time to time draws of funds from Facility C or Facility B for payment of development or construction costs associated with new Improvements which costs are not set forth in the Approved Budget for the applicable calendar year. In such event, Borrower shall submit to Lender a proposal for the new construction which shall include projected costs, time frame for completion and such other information as Lender shall require. Disbursement of such funds shall be subject to Lender's consent, which may be granted or denied in Lender's sole discretion, and shall be subject to Borrower complying with all draw requirements set forth in the Loan Agreement. Lender's consent to disbursement of funds shall in no way be deemed to be a release or waiver of Borrower's obligation to pay to Lender as and when due the Quarterly Principal Repayment Amounts or Annual Principal Paydown Required Amounts dereunder.

(g)     Borrower hereby authorizes Lender to disburse from Facility C sufficient proceeds to pay any Monthly Interest Reserve Deposits due on any Monthly Payment Date, Interest payments due on a Quarterly Payment Date, and the Monthly Payment Towards Costs due on a Monthly Payment Date. Notwithstanding the forgoing, if there shall be insufficient funds in Facility C to make such payments in full when due, Borrower shall remit any deficiency required to pay the Monthly Interest Reserve, Interest payments and the Monthly Payment Towards Costs amounts to Lender no later than Monthly Payment Date and Quarterly Payment Date, as applicable."

3.4     **Article IX – Section 9.2 (Construction Budget – Replacement Facility C).**

a.     Section 9.2(b)(i) is hereby deleted in its entirety and replaced with the following:

"(i)     The Project Construction Budget includes as line items ("**Project Construction Budget Line Items**") all Hard Costs and Soft Costs with respect to completion of all Improvements described in such budget. All Replacement Facility C Loan proceeds disbursed by Lender shall be used only for the Project Construction Budget Line Items for which such proceeds were disbursed."

b.     Section 9.4 (Budget Approval Process) is hereby amended by adding the following paragraph immediately following the last sentence thereof:

"Notwithstanding anything to the contrary in this Agreement, in addition to the forgoing Budget submission requirements, at the same time that Borrower submits to Lender the Budgets as required hereunder, Borrower shall submit to Lender a budget for Projected Operating Expenses and budgets for each of the HOA Associations, each of which shall be reviewed in the same manner as set forth herein. Such budgets, as approved (or deemed approved) by Lender pursuant to this Section shall be referred to herein as the "**Approved Operating Expense Budget**" and the "**Approved HOA Budgets**", respectively."

3.5     **Article X – Sufficiency of Loan.** Article X is hereby deleted in its entirety and replaced with "Intentionally Deleted."

12

18673909-v19

DANSKE_0011042

3.6     **Article XI – Section 11.4 (Final Disbursement for Construction Costs)**.

     a.     <u>Section 11.4</u> is hereby deleted in its entirety and replaced with the following:

"Section 11.4    <u>Final Disbursement for Construction Costs</u>. Lender will advance to Borrower the final disbursement for costs of Construction (including retainages) in accordance with the applicable Construction Budget and when the conditions described in <u>Section 11</u> have been satisfied, the Improvements described in such Construction (or such Lender-approved part or phase thereof) have been substantially completed in accordance with the Plans and Specifications, free and clear of construction liens and security interests, Lender has received As-Built Plans for such related infrastructure Improvements and underground utilities and Lender has received a certificate from Lender's Consultant for the sole benefit of Lender that the applicable Phase (or partial Phase as approved by Lender in its reasonable discretion) of the Improvements has been completed in accordance with the applicable Plans and Specifications."

3.7     **Article XIII** . Article XIII is hereby amended as follows:

     a.     <u>Section 13.1</u> is hereby amended by adding the following new sub-section (w) and (x) immediately following sub-section (v):

"(w) <u>Account Viewing Rights</u>. Borrower hereby grants Lender, and any Servicer, electronic viewing rights with respect to all deposits, withdrawals, transfers and any other activity with respect to the Accounts, such that Lender, and its Servicer, may exercise such rights at any time without notice (written or otherwise) to Borrower. Borrower shall take any and all actions as requested by Lender in furtherance of granting the rights contained in this sub-section, including, without limitation, delivering Lender accurate log-ins, passwords or other relevant information to allow Lender, and any Servicer, to review all such Accounts.

(x) Borrower shall have the Mandate Agreement amended so that it covers all Accounts that are maintained at Banorte."

     b.     <u>Section 13.2</u> is hereby deleted in its entirety and replaced with the following:

"Section 13.2    <u>Insurance</u>

     (a)     Borrower shall obtain and maintain, or cause to be maintained, insurance for Borrower and the Property as follows:

     (i)     comprehensive all-risk insurance on the Improvements and the Personal Property, including contingent liability from Operation of Building Laws, Demolition Costs and Increased Cost of Construction Endorsements, in each case (A) in an amount equal to eighty percent (80%) of the "Full Replacement Cost," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) with a waiver of depreciation; (B) containing an agreed amount endorsement with respect to the Improvements and Personal Property; (C) permitting no deductible in excess of $25,000, except for the deductible for hurricane, earthquake, volcano and flood insurance which is customarily a percentage of the face value of the policy not to exceed five percent (5%) of the replacement cost value, and waiving all co-insurance provisions (unless coverage is in an amount not less than 100% of the full replacement cost of the Improvements and Personal Property insured); and (D) containing an "Ordinance or Law Coverage" or "Enforcement" endorsement if any of the Improvements or the use of the Property shall at any time constitute legal non-conforming structures or uses.

13

18673909-v19

DANSKE_0011043

(ii)     Earthquake insurance, tsunami insurance, and hurricane insurance in amounts and in form and substance satisfactory to Lender.

(iii)     commercial general liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (A) permitting a deductible acceptable to Lender, (B) to be on the so-called "occurrence" form with a combined limit, of not less than $2,000,000, (C) to continue at not less than the aforesaid limit until required to be changed by Lender in writing by reason of changed economic conditions making such protection inadequate; and (D) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) contractual liability for legal contracts; and (5) contractual liability covering the indemnities contained in Loan Agreement;

(iv)     at all times during which vertical structural construction, repairs or alterations are being made to the Improvements, (A) owner's contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the above mentioned commercial general liability insurance policy; and (B) the insurance provided for in subsection (i) above written in a so-called builder's risk completed value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to subsection (i) above, (3) including permission to occupy the Improvements, and (4) with an agreed amount endorsement waiving co-insurance provisions (unless coverage is in an amount not less than 100% of the full replacement cost of the Improvements and Personal Property insured);

(v)     comprehensive boiler and machinery insurance, if applicable, in amounts as shall be reasonably required by Lender on terms consistent with the commercial property insurance policy required under subsection (i) above;

(vi)     umbrella liability insurance in an amount not less than $25,000,000, on an occurrence basis and on an aggregate basis, on terms consistent with the commercial general liability insurance policy required under subsection (ii) above;

(vii)     motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence, including umbrella coverage, of $25,000,000; and

(viii)     subject to sub-section (ix) below, with respect to any partially built Improvement, in lieu of the builder's risk coverage described above in sub-section (iv), Borrower may obtain and maintain, or cause to be maintained, comprehensive all-risk insurance on the partially constructed Improvements, so long as such coverage amounts are increased to cover the full replacement costs of such partially completed Improvements in accordance with the following schedule: Construction with respect to such Improvement is: 30% complete, 60% complete and 100% complete.

(ix)     upon thirty (30) days' written notice from Lender, such other reasonable insurance, in such reasonable amounts, as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Property located in or around Cabo San Lucas, Mexico.

(x)     the insurance referred to in this Section shall not be subject to any exclusion limiting the scope and extension of coverage required under this Section 13.2.

14

18673909-v19

   DANSKE_0011044

(b)     All insurance provided for in Section 13.2(a) hereof shall be obtained under valid and enforceable policies (collectively, "**Policies**" or in the singular, "**Policy**"), shall be subject to the approval of Lender as to insurance companies, amounts, deductibles, loss payees and insureds. The Policies shall be issued by financially sound and responsible insurance companies authorized to do business in the state of Baja California Sur and having a claims paying ability rating of "A" or better by S&P or "A2" or better by Moody's. The Policies described in Section 13.2(a) (other than those strictly limited to liability protection) shall designate Lender as both mortgagee and loss payee. Not less than thirty (30) days prior to the expiration dates of the Policies theretofore furnished to Lender, certificates of insurance evidencing the renewal of the Policies, accompanied by evidence satisfactory to Lender of payment of the premiums thereunder ("**Insurance Premiums**") and a certificate issued by the insurance broker of Borrower addressed to Lender, confirming that the Policies theretofore furnished to Lender (i) are legal, valid and binding, (ii) are in full force and effect, (iii) the Policies must expressly provide that the insurance company must inform the Lender the date in which payment of the premium under each insurance policy is due and must agree to maintain each and every policy at all times in full force and effect and not rescind, revoke or nullify the policies until after giving prior notice to the Lender regarding any such rescission, revocation or nullification of the policy. Furthermore, the Policies must provide that in case a potential termination of the Policies (or any one of them) results from lack of payment of the premium, the Policies (or such applicably Policy) shall not be terminated until after the Lender has been given the right to pay any premium due, as provided in Article 42 of the Insurance Contract Law, (iv) are fully compliant with each and every requirement and specification set forth in Section 13.2 hereof, and (v) have designated Lender as mortgagee and loss payee, shall be delivered by Borrower to Lender and Servicer.

(c)     Any blanket insurance Policy shall specifically allocate to the Property the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Section 13.2(a) hereof.

(d)     All Policies of insurance provided for by Section 13.2(a) hereof shall name Borrower as the insured and Lender as the additional insured, as their respective interests may appear, and in the case of property damage, boiler and machinery, flood and earthquake insurance, shall contain a so-called New York standard non-contributing mortgagee clause in favor of Lender providing that the loss thereunder shall be payable to Lender. Additionally, all Policies of insurance with respect to commercial general liability shall name the Trustee as an additional insured.

(e)     All Policies of insurance provided for in Section 13.2(a) hereof shall contain clauses or endorsements to the effect that:

(i)     the Policy shall not be materially changed (other than to increase the coverage provided thereby) or canceled without at least thirty (30) days' prior written notice to Lender and any other party named therein as an additional insured;

(ii)     the issuers thereof shall give written notice to Lender if the Policy has not been renewed fifteen (15) days prior to its expiration; and

(iii)     Lender shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder.

(f)     If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, without notice to Borrower, to take such action as Lender deems necessary to protect its interest in the Property including, without

15

CONFIDENTIAL

DANSKE_0011045

limitation, the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate. All Insurance Premiums incurred by Lender in taking such action or obtaining such insurance shall be added to the Debt and shall bear interest at the Default Rate.

(g)     The Borrower shall request the prior consent of the Lender to make any change to the properties insured under the Policies.  The Lender will have up to three business days to give its consent to make changes in the properties insured, which may not be unreasonably withheld.  In any case, the Lender hereby approves that the Borrower releases from the insurance coverage under the Policies properties that cease to be subject to any security interest in favour of Lender in the terms set forth in this Agreement.  Furthermore, for purposes hereof, it shall be understood that Borrower may move properties insured under any of these Policies to be insured under another of these Policies as a consequence of a change in their property status or condition on the understanding that they continue being under the security interest in favour of Lender in the terms set forth in this Agreement or under a bailment program with prior notice to Lender and subject to all restrictions on transfer set forth in this Agreement.

(h)     Notwithstanding the foregoing, Lender shall not assert a default for failure to pay Insurance Premiums, provided that (i) there exists no Event of Default, and (ii) adequate funds for the payment of Insurance Premiums exist in the Tax and Insurance Reserve.

The Borrower agrees to cooperate with the Lender in ensuring that Section 13.2. is duly complied with and to provide Lender with any reports or confirmations that may be required from the insurance company providing the insurance referred thereto and if applicable, the insurance broker advising the Borrower in connection with its insurance coverage.

The Borrower further agrees to provide the Lender with copies of any communications with the insurance company providing the insurance referred to in Section 13.2 hereto, and with the insurance broker that advised the Borrower in contracting such insurance, and hereby further agrees to take any actions that may be required to permit the Lender to communicate with any such insurance company and insurance broker as the Lender may be required or necessary to confirm compliance with Section 13.2 hereunder.

For purposes hereof, the Borrower agrees to cause the insurance company and the insurance broker to provide the Lender with any confirmations or reports that may be required under Section 13.2 of this Agreement."

c.     Section 13.5(b) is hereby amended by adding thereto the new Sections 13.5(b)(xv) and (xvi) immediately following Section 13.5(xiv):

"(xv)   Balance sheet and cash flow statement for Borrower and any other Affiliate of Borrower or any Guarantor required by Lender or Servicer; and

(xvi)   Accounting of the payments received under Private Home Construction Contracts and costs incurred with respect to each Private Home Construction Project together with all additional information pertaining thereto requested by Lender or Servicer."

d.     Section 13.8(c) is hereby deleted in its entirety and replaced with the following:

"(c)   In Balance Test – Proceeds to Complete (Project).  Available Accounts Receivable for Actual Product Sales plus all unadvanced proceeds of the Replacement Facility C Loan shall be equal to or greater than one hundred twenty-five percent (125%) of the Costs to Complete

16

18673909-v19

CONFIDENTIAL

DANSKE_0011046

Commenced Product Construction ("**Product In Balance Report**").  This covenant shall be tested on a monthly basis on the twenty-eighth day following the last day of the immediately preceding twelve (12) month period."

    e.    <u>Section 13.8(d)</u> is hereby deleted in its entirety and replaced with the following:

    "(d)  <u>In Balance Test – Contractual Construction Obligations v. Budgeted Construction</u>. Contractual Construction Obligations shall not exceed the construction obligations budgeted and approved by Lender pursuant to the applicable Project Construction Budget."

    f.    <u>Section 13.8(e)</u> is hereby deleted in its entirety.

    g.    <u>Section 13.11</u> is hereby amended by adding the following new sub-section (e) immediately following sub-section (d):

    "(e) <u>Special Project Covenants</u>. Borrower shall perform the obligations required of Borrower pursuant to the KTRC Letter Agreement dated December 17, 2017."

    h.    <u>Section 13.17</u> is hereby deleted in its entirety and replaced with the following:

"Section 13.17 <u>Cash Management</u>.

    (a)    <u>Borrower's Weekly Cash Sweep Deposit Obligations</u>.  On each Weekly Cash Sweep Deposit Date (defined hereinbelow), in addition to the payment obligations due from Borrower to Lender hereunder, Borrower shall deposit with Lender an amount equal to the following: (i) (a) all Time Share Sales Net Proceeds; <u>plus</u> (b) all Whole Ownership Net Sales Proceeds, received by Borrower during the Weekly Deposit Period (defined hereinbelow); <u>plus</u> (c) an amount equal to the Private Home Construction Management Fee (defined hereinbelow) attributable to the Whole Ownership Gross Sale Proceeds  received by Borrower pursuant to a Private Home Construction Contract during the Weekly Deposit Period.  Collectively, the aggregate funds to be deposited with Lender shall be referred to herein as the "**Weekly Cash Sweep Deposit Funds**".  For purposes of this Agreement, "**Weekly Cash Sweep Deposit Date**" shall be 5:00 pm local New York time on Friday of each calendar week.  "**Weekly Deposit Period**" shall be the one-week period immediately preceding the Weekly Cash Sweep Deposit Date commencing on Saturday and ending on the previous Friday. "**Private Home Construction Management Fee**" shall mean an amount equal to five percent (5%) of the Whole Ownership Gross Sales Proceeds received by Borrower pursuant to a Private Home Construction Contract.   No later than 5:00 pm local New York time on the Weekly Cash Sweep Deposit Date, Borrower shall deliver to Lender and Servicer an accounting of all Product Sales made during the Weekly Deposit Period together with any supporting additional information that Lender or Servicer shall request.   Notwithstanding the forgoing, upon the occurrence of a Triggering Event, Lender shall have the right at any time and from time to time to instruct Borrower to deposit all Sales Proceeds with Lender into the Danske Bank Account by providing written notice thereof to Borrower (such notice, a "**Cash Control Notice**"). In such event, Borrower shall take all steps necessary to cause the transfer of all Sales Proceeds received from and after the date of Lender's notice to be deposited with Lender in the Danske Bank Account and Borrower shall notify all purchasers of any Product regarding new payment instructions required by Lender and set forth in the Cash Control Notice to effectuate the deposit directly into the Danske Bank Account. Borrower's failure to comply with the Cash Control Notice shall be an Event of Default hereunder. In the event of a Cash Control Notice, so

18673909-v19

CONFIDENTIAL

DANSKE_0011047

long as no Event of Default shall have occurred and be continuing, Lender shall apply the Sales Proceeds received in the order of priority set forth in (b) and (c) below and make such distributions to Borrower pursuant to the Approved Budget and the Approved Operating Expense Budget for payment of the costs identified in items (c)(i) and (c)(ii)-(iv) below.

        (b)    <u>Lender's Application of Monthly Cash Sweep Deposit Funds</u>. Provided no Event of Default shall have occurred and then be continuing, on a weekly basis, Lender shall apply the Weekly Cash Sweep Deposit Funds for the paydown of the then-outstanding principal balance of Facility C.

        (c)    <u>Borrower's Cash Management Obligations</u>.  Borrower shall apply all Sales Proceeds in accordance with the Approved Budget giving effect to the following order of priority ("**Cash Management Order of Priority**"):

        (i)    First, to Lender, an amount equal to the Weekly Cash Sweep Deposit Funds;

        (ii)    Second, to pay all Budgeted Operating Expenses for the applicable period as and when due; and

        (iii)    Third, to pay all Commissions due Iron Man; Crystal Lagoons and Tiger Woods as and when due with respect to the Sales Proceeds received during the Weekly Deposit Period.

        (d)    From and after a Trigging Event, until an Event of Default occurs, to the extent of funds received into the Danske Bank Account, US Income Account, Banorte Accounts, and if directed by Lender, from the Santander Account and or Scotia Bank Account, Lender shall disburse funds in these accounts pursuant to draw requests that Borrower submits to Lender in accordance with the terms and conditions of this Agreement or as otherwise required by Lender.  Upon a Triggering Event, Lender shall be permitted to cause the transfer of all funds received into any of the US Income Account, Banorte Accounts, and if requested by Lender, the Santander Account, to the Danske Bank Account or such other account of Lender or Servicer on behalf of Lender as Lender shall determine in its sole discretion.

        (e)    Notwithstanding anything contained herein to the contrary, upon the occurrence and during the continuance of an Event of Default, Lender may, in addition to any and all other rights and remedies available to Lender, apply any sums then present in any or all of the Accounts to the payment of the Debt in any order in its sole discretion or apply such funds for the purposes for which they were held.  Nothing in this <u>Article 13</u> shall limit in any way any right or remedy granted Lender elsewhere under the Loan Documents as a result of the occurrence of an Event of Default.

        (f)    <u>Security Agreement</u>.

        To secure the full and punctual payment and performance of all of the Debt, Borrower hereby reconfirms its sale, assignment, conveyance, pledge and transfer to Lender and grant to Lender of a first and continuing Lien on and security interest in and to, all of Borrower' rights, title and interest in the following property, whether now owned or existing or hereafter acquired or arising and regardless of where located (collectively, the "**Account Collateral**"):

18

CONFIDENTIAL

DANSKE_0011048

(i)      the Accounts, if any, from time to time deposited or held in the Accounts);

(ii)     any and all amounts invested;

(iii)    all interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing; and

(iv)     to the extent not covered by clauses (i), (ii) or (iii) above, all "proceeds" (as defined under the UCC as in effect in the State in which the Accounts are located) of any or all of the foregoing.

(g)     Borrower covenants that (i) all revenue shall be deposited into the Accounts, as applicable, in accordance with this Agreement and (ii) so long as any portion of the Debt is outstanding, Borrower shall not open (nor permit any Manager or any Person to open) any other account for the collection of revenue without Lender's prior written approval and delivery of any control or mandate agreement required by Lender.

(h)     Borrower authorizes Lender to file a financing statement or statements in connection with any account collateral in the form required to properly perfect Lender's security interest in the Account Collateral to the extent that it may be perfected by such a filing and at any time and from time to time, at the expense of Borrower, to file all further instruments, and take all further action, that Lender may reasonably request, in order to perfect and protect the pledge, security interest and lien granted or purported to be granted hereby, or to enable Lender to exercise and enforce Lender's rights and remedies hereunder with respect to, any account collateral.

(i)     Borrower agrees that Borrower will not sell or otherwise dispose of any of account collateral other than pursuant to the terms hereof and of the other Loan Documents, or create or permit to exist any lien upon or with respect to all or any of the account collateral, except for the lien granted to Lender under this Agreement.

(j)     Beyond the exercise of reasonable care in the custody thereof, Lender shall not have any duty as to any account collateral or any income thereon in Lender's possession or control or in the possession or control of any agents for, or of Lender, or the preservation of rights against any Person or otherwise with respect thereto.  Lender shall be deemed to have exercised reasonable care in the custody of the account collateral in Lender's possession if the account collateral is accorded treatment substantially equal to that which Lender accords Lender's own property, it being understood that, except to the extent of Lender's gross negligence, willful misconduct, or intentional or criminal acts, Lender shall not be liable or responsible for any loss or damage to any of the account collateral, or for any diminution in value thereof.

(k)     Effective upon and during the continuance of an Event of Default, Borrower hereby irrevocably constitutes and appoints Lender as Borrower's true and lawful attorney-in-fact, with full power of substitution, at any time, to execute, acknowledge and deliver any instruments and to exercise and enforce every right, power, remedy, option and privilege of Borrower with respect to the account collateral, and do in the name, place and stead of Borrower, all such acts, things and deeds for and on behalf of and in the name of Borrower with respect to the account collateral, which Borrower could or might do or which Lender may deem necessary or desirable to more fully vest in Lender the rights and remedies provided for herein with respect to the account collateral and to accomplish the

19

18673909-v19

CONFIDENTIAL

purposes of this Agreement. The foregoing powers of attorney are irrevocable and coupled with an interest.

(l)　　This Section shall create a continuing pledge of, lien on and security interest in the account collateral and shall remain in full force and effect until payment in full of the Debt. Lender shall have with respect to the account collateral, in addition to the rights and remedies herein set forth, all of the rights and remedies available to a secured party under the UCC, as if such rights and remedies were fully set forth herein. This Agreement constitutes a security agreement for purposes of the UCC and other applicable law.

(m)　　Establishment and Control Agreements with respect to US Income Accounts, Banorte Accounts and Santander Accounts.  Borrower has caused to be executed and delivered to Lender the Mandate Control Agreement with respect to the Banorte Accounts.  If required by Lender, no later than thirty (30) days after the Effective Date hereof, Borrower shall cause to be executed and delivered to Lender the Mandate Control Agreement with respect to the Santander Account and Scotia Bank Account, and any other then-existing account in the form required by Lender. Borrower acknowledges and agrees that at any time and from time to time, if Lender requires deposit account control agreements or mandate agreement with respect to any Account of Borrower, Borrower shall cause such agreements to be delivered to Lender in a form approved by Lender no later than thirty (30) days after any written request by Lender. Additionally, within five (5) days after written notice of from Lender, Borrower shall execute and return to Lender (i) a deposit account control agreement (the "**Deposit Account Control Agreement**") with Lender and a depository institution selected by Lender in its sole discretion (the "**DACA Bank**") for the establishment of the DACA Account, which shall be owned and controlled by Lender and (ii) a cash management agreement (the "**Lockbox Agreement**") with Lender and a depository institution selected by Lender in its sole discretion (the "**Lockbox Bank**") for the establishment of the Lockbox Account, which shall be under the sole dominion and control of Lender for the purposes of (a) receiving and holding all daily distributions from the DACA Account and Banorte Accounts after a Triggering Event and (b) disbursing sums on deposit in accordance with the Lockbox Agreement. At Lender's election, such DACA shall be required with respect to the US Based Income Accounts. Borrower acknowledges and agrees that Lender may establish a cash waterfall in the Lockbox Agreement, including subaccounts for dedicated purposes, reserves and other segregated accounts as required by Lender, in its sole discretion, which waterfall may include, but is not limited to, interest, principal, insurance, replacement, tax, marketing, operating, construction, extraordinary expense and other reserves or sub-accounts and may restrict disbursements therefrom in its sole discretion. From and following the establishment of the DACA Account and until the Loan is repaid in full, Borrower shall cause all cash available in any Accounts, and all revenue from the Project, including, but not limited to, Sales Proceeds, golf membership revenue, greens fees, the portion of HOA Association dues and charges payable to Borrower, retail sales, food and beverage revenue, spa and health club sales, rents, maintenance fees and charges and any other revenue arising from the Project to be deposited directly into the DACA Account, or if such funds originated from Mexico, the Banorte Accounts in which Lender has a perfected security interest.

(n)　　From and following a Triggering Event, Lender shall instruct, and Borrower shall take any and all necessary action to cause, all cash available in any Accounts and all revenue from the Project, including, but not limited to, Sales Proceeds, golf membership revenue, greens fees, the portion of HOA Association dues and charges payable to Borrower, retail sales, food and beverage revenue, spa and health club sales, rents, maintenance fees and charges and any other revenue arising from the Project (excepting only the required minimum balances of the DACA Account and other accounts) to be swept daily from the DACA Account (and/or Banorte Accounts as

18673909-v19

CONFIDENTIAL                                                                                      DANSKE_0011050

applicable) into the Lockbox Account. Borrower shall be responsible for all fees, charges, costs and expenses arising from the DACA Account and Lockbox Account.

(o)     Borrower hereby pledges, transfers, assigns and sets over to Lender and grants Lender a continuing security interest in and to the DACA Account and the Lockbox Account, all monies deposited therein from time to time and all profits and proceeds therefrom. Borrower shall execute, acknowledge, deliver, file or undertake, at its sole cost and expense any assignments, notices, agreements or other documents as Lender requires to perfect the foregoing security interest, pledge and assignment. This Agreement constitutes a "security agreement" within the meaning of Article 9 of the Uniform Commercial Code of the State of New York, as from time to time amended or restated (the "**UCC**"). Lender shall have all rights and remedies under Article 9 of the UCC with respect to the DACA Account and the Lockbox Account, in addition to any and all other rights and remedies available at law or equity."

(i)     Section 13.19 is hereby deleted in its entirety and replaced with the following:

"Section 13.19 Covenant Regarding Payment of Lender's Expenses.   In addition to all other payment obligations of Borrower due to Lender hereunder, commencing on the date hereof and continuing on each Payment Date until Lender provides written notice to Borrower that such payments are no longer due, Borrower shall pay to Lender each month an amount equal to $100,000, as may be adjusted by Lender from time to time in its reasonable discretion and with prior notice to Borrower ("**Monthly Payment Towards Costs**") which amount Lender shall apply towards all accrued costs, fees and expenses of Lender. Borrower and Lender acknowledge and agree that if there are sufficient funds in the Interest Reserve Account to pay the Monthly Payment Towards Costs due from Borrower pursuant to this Section, then Lender shall direct the transfer of such amount on each such Payment Date. If there is a shortfall in funds available in the Interest Reserve Account, then Borrower shall remit the difference to Lender on the monthly payment date, and Borrower's failure to make such payment shall be an Event of Default. From time to time and as reasonably requested by Borrower, Lender shall provide to Borrower an update as to accrued costs, fees and expenses to which the Monthly Payment Towards Costs is to be applied. Lender shall also provide Borrower a monthly invoice in such form as may be necessary under Mexican Law to enable Borrower to obtain a tax deduction for such costs, fees and expenses."

3.8     **Article XVII (Servicer)**: Section 17.1 is hereby deleted in its entirety and replaced with the following:

"Section 17.1   Servicer. At the option of Lender, the Loan may be serviced by a servicer or trustee ("**Servicer**") selected by Lender and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Amended Loan Documents to the Servicer pursuant to a servicing agreement ("**Servicing Agreement**") between Lender and Servicer. Borrower shall be responsible for any reasonable set-up fees or any other initial costs relating to or arising under the Servicing Agreement. Thereafter, Borrower shall reimburse Lender for the monthly servicing fees payable under the Servicing Agreement ("**Servicing Fees**") and reasonable out-of-pocket expenses as set forth in the Servicing Agreement. Borrower shall further reimburse Lender upon demand for reasonable out-of-pocket costs and expenses incurred by Servicer in (i) reviewing Borrower's Requisitions for advances of the Loan, (ii) reviewing proposed Leases, (iii) conducting inspections of the Property, (iv) applying the provisions of this Agreement to any casualty or condemnation proceeding affecting the Property, (v) responding to any Default or Event of Default, or (vi) otherwise incurred in connection with this Agreement. All such

21

18673909-v19

DANSKE_0011051

payments to Servicer shall be made from the Monthly Payment Towards Costs paid by Borrower to Lender. At the request of Servicer or Lender's Consultant, Borrower shall make available to Servicer and Lender's Consultant, actual cancelled checks for costs paid on previous Draw Requests, if any."

    3.9    **Article XXI (Notices):**  Article XXI of the Loan Agreement is hereby amended as follows:

        a.    The reference to and notice address for TriMont Real Estate Advisors, Inc. is hereby deleted in its entirety and replaced with the following:

> W. C Asset Management
> 300 Baker Avenue, Suite 300
> West Concord, MA 01742
> Attn. William R. Dewey IV

**Section 4.**    **Modification Fee; Amortization Schedule; Covenants; Obligations.**

    4.1    Modification Fee.  The modification fee due and payable Lender in connection with this Second Amendment is $875,000 ("**Modification Fee**") and Lender has agreed that such fee shall be payable on the Facility C Maturity Date.  Borrower hereby acknowledges and agrees that the Modification Fee shall be paid on the Facility C Maturity Date.

    4.2    Amortization Schedule.  Lender and Borrower acknowledge and agree that attached hereto as Schedule 4.1(c) is the Amortization Schedule as of the Effective Date of the Second Amendment.

    4.3    Accounts Schedule.  Lender and Borrower acknowledge and agree that attached hereto as 2017 Account Schedule are the Accounts in place as of the Effective Date of the Second Amendment.

    4.4    Suspension of Loan-to-Value Test.  Lender agrees to suspend the Loan-to-Value test for the calendar year of 2018.

    4.5    Pre-Closing Covenants.  Borrower shall perform the following as a condition to Lender closing on this modification:

        a.    Organizational Chart.  Borrower shall deliver to Lender an organizational chart certified by Borrower as being true, accurate and complete in all material respects.

        b.    HOA Budgets.  Borrower shall deliver to Lender current HOA budgets for the 2017 fiscal year. Borrower shall deliver to Lender HOA budgets for the 2018 fiscal year on or before February 1, 2018.

        c.    Authorization. Borrower shall deliver certificates of incumbency and authorization with respect to the execution and delivery of this Agreement by all Borrower Parties hereto.

        d.    Anti-bribery Reports.  Borrower shall have delivered to Lender copies the monthly reports required by any Anti-Corruption Laws and any such other law pertaining to anti-money laundering and bribery for the months of December 2017 and January 2018.

22

CONFIDENTIAL

DANSKE_0011052

      e.    <u>Other Amendments</u>.    Borrower shall execute and deliver any additional amendments to or reaffirmations of any other Loan Document as Lender shall reasonably require.

      f.    <u>Other Conditions</u>.    Borrower shall satisfy any other condition precedent reasonably and customarily required by Lender for a transaction of the nature contemplated herein.

**SECTION 5.**  <u>Representations and Warranties of Obligors</u>.  As of the Closing Date, Obligors, each as may be applicable, represent and warrant to Lender that:

5.1    Each has the power and authority to enter into and to perform this Agreement, to execute and deliver all documents relating to this Agreement (as applicable), and to incur the obligations provided for in this Agreement, all of which have been duly authorized and approved in accordance with each such Obligors' organizational documents;

5.2    This Agreement, together with all documents executed pursuant hereto, shall constitute when executed the valid and legally binding obligations of each Obligor in accordance with their respective terms; subject only to bankruptcy, insolvency, and similar laws affecting the enforcement of the rights or remedies of creditors generally or equitable principals of general application regardless of whether such enforcement is considered in a proceeding in law or equity;

5.3    All representations and warranties made in the Loan Documents to which each is a party are true and correct as of the date hereof, with the same force and effect as if all representations and warranties were fully set forth herein;

5.4    Obligors' obligations under the Loan Documents, as amended and modified hereby, remain valid and enforceable obligations, and the execution and delivery of this Agreement and the other documents executed in connection herewith shall not be construed as a novation of any of the Loan Documents;

5.5    As of the Effective Date, Obligors have no offsets or defenses against the payment of any of the Debt;

5.6    There is no ownership interest, mortgage lien, or liens other than the Permitted Exceptions, now outstanding against any portion of the Property, other than the rights of tenants as tenants only or as disclosed in or granted by the Loan Documents, as amended hereby; and

5.7    The financial statements of each Obligor, if any, which have been furnished to Lender in connection with this Agreement are complete and correct in all material respects and fairly present the financial condition of each Obligor, as of the date of such statement and, since the date of each such statement, there has been no material adverse change in the condition (financial or otherwise) of each Obligor, and as of the date hereof, to the knowledge of Obligors, Obligor is solvent.

**SECTION 6.**  <u>Waiver of Claims</u>.   IN CONSIDERATION OF LENDER EXECUTING THIS MODIFICATION, AS OF THE DATE HEREOF, EACH OBLIGOR HEREBY UNCONDITIONALLY AND IRREVOCABLY FULLY RELEASES, ACQUITS, SETTLES, AND DISCHARGES ANY AND ALL CLAIMS, COUNTERCLAIMS, LIABILITIES, DAMAGES, DEFENSES, DEMANDS AND CAUSES OF ACTION THAT ANY OF SAID PARTIES HAVE OR MAY HAVE AGAINST LENDER, ITS OFFICERS, DIRECTORS, TRUSTEES, SERVICERS, SPECIAL SERVICERS, AGENTS, EMPLOYEES, ATTORNEYS, SUCCESSORS AND ASSIGNS (COLLECTIVELY, THE "**RELEASED PARTIES**"), WHETHER OR NOT ACTING IN THEIR OFFICIAL CAPACITY WITH

23

18673909-v19

DANSKE_0011053

RESPECT TO LENDER, IN THEIR PERSONAL CAPACITY OR IN ANY OTHER CAPACITY, RELATED TO OR THAT MAY HAVE ARISEN, MAY ARISE OR ARE OR BECOME ASSERTABLE AS A RESULT OF EVENTS OCCURRING IN CONNECTION WITH THE LOAN AND THE LOAN DOCUMENTS, TOGETHER WITH ANY AND ALL NEGOTIATIONS, DISCUSSIONS, ACTS, OMISSIONS, RENEWALS, EXTENSIONS, COLLATERAL DOCUMENTS, AND OTHER MODIFICATIONS AND ACTIONS RELATED THERETO, INCLUDING ANY CLAIMS, CAUSES OF ACTION OR DEFENSES BASED ON THE NEGLIGENCE OF LENDER OR ANY OF THE RELEASED PARTIES OR ON ANY OTHER "LENDER LIABILITY" THEORIES OF, AMONG OTHERS, BAD FAITH, BREACH OF IMPLIED COVENANT OF GOOD FAITH, UNFAIR DEALING, DURESS, COERCION, CONTROL, MISREPRESENTATION, OMISSIONS, MISCONDUCT, OVERREACHING, UNCONSCIONABILITY, DISPARATE BARGAINING POSITION, RELIANCE, EQUITABLE SUBORDINATION, FRAUD, OR OTHERWISE, AND DOES HEREBY INTEND TO RELEASE, COMPROMISE AND SETTLE SUCH CLAIMS AND MATTERS, WHETHER KNOWN OR UNKNOWN, WHETHER REDUCED TO JUDGMENT, LIQUIDATED, UNLIQUIDATED, FIXED, CONTINGENT, MATURED, UNMATURED, DISPUTED, UNDISPUTED, LEGAL, EQUITABLE, SECURED OR UNSECURED AND WHETHER THEY AROSE COLLATERALLY, DIRECTLY, DERIVATIVELY OR OTHERWISE BETWEEN ANY OF OBLIGOR AND THE RELEASED PARTIES FROM THE BEGINNING OF THE WORLD TO AND INCLUDING THE DATE OF THIS MODIFICATION (COLLECTIVELY, THE "**RELEASED CLAIMS**"). EACH OBLIGOR HEREBY REPRESENTS AND WARRANTS TO LENDER THAT SUCH OBLIGOR IS PRESENTLY THE LEGAL AND BENEFICIAL OWNER OF ANY AND ALL OF THE RELEASED CLAIMS AND THAT SUCH OBLIGOR HAS HERETOFORE EXPRESSLY OR IMPLIEDLY ASSIGNED, TRANSFERRED, PLEDGED, HYPOTHECATED, SOLD, CONVEYED OR OTHERWISE DISPOSED OF, FOR THE BENEFIT OF CREDITORS OR OTHERWISE, ANY OF THE RELEASED CLAIMS.

Borrower and Borrower Party Initials

**SECTION 7.** **Conditions of Effectiveness**. This Agreement shall become effective when, and only when, Obligors and Lender have executed and delivered this Agreement and all other deliverables required hereto, at which time this Agreement shall be deemed effective as of the date appearing on the first page hereof.

**SECTION 8.** **Lift-Stay Covenant**.

8.1   **Bankruptcy Filing**. Borrower will not file or allow to be filed any petition in bankruptcy or any application to any tribunal for the appointment of a receiver or trustee for Borrower or any substantial part of its property, or any proceeding relating to Borrower under any reorganization, arrangement, readjustment of debt, dissolution or liquidation law or statute if any jurisdiction, whether now or hereafter in effect. If despite Borrower's covenant in this Section 8.1, Borrower files or permits the filing of any petition in bankruptcy or any application to any tribunal for the appointment of a receiver or trustee for Borrower or any substantial part of its property, or any proceeding relating to Borrower under any reorganization, arrangement, readjustment of debt, dissolution or liquidation law or statute if any jurisdiction, whether now or hereafter in effect,  Lender shall immediately become entitled, among other relief to which Lender may be entitled under the Loan Documents, and at law or in equity, to obtain an order from the court dismissing such filing.

8.2   **Lift Stay and Cash Collateral**.  As a material inducement to Lender to enter into this Agreement, Borrower covenants with Lender that if Borrower should become the subject of any petition in bankruptcy or any petition or application to any tribunal for the appointment of any receiver or trustee

24

18673909-v19

DANSKE_0011054

for Borrower or any substantial part of its property, or any proceeding relating to Borrower under any reorganization, arrangement, readjustments of debt, dissolution or liquidation law or statute of any jurisdiction, whether now or hereafter in effect, then Lender shall immediately become entitled, among other relief to which Lender may be entitled under the Loan Documents, and at law or in equity, to obtain upon *ex parte* application therefor and without further notice or action of any kind, (a) an order from the court prohibiting the use by the trustee in bankruptcy, or by Borrower as debtor-in-possession, of Lender's "cash collateral" (as such term is defined in Section 363 of the Bankruptcy Code) in connection with the Loan, and (b) an order from the Court granting immediate relief from the automatic stay (the "**Stay**") pursuant to Section 362 of the Bankruptcy Code so as to permit Lender to exercise all of its rights and remedies pursuant to the Loan Documents, and at law and in equity, and Borrower further acknowledges and agrees that the occurrence or existence of any Event of Default shall, in and of itself, constitute "cause" for relief from the Stay pursuant to the provisions of Section 362(d)(1) of the Bankruptcy Code. Finally, as a further material inducement to the Lender to enter into this Agreement, Borrower agrees and pledges that it shall consent to and not contest any motion by the Lender to lift the Stay.

**SECTION 9.   Miscellaneous.**

9.1   <u>References to the Note, the Deed of Trust and the Loan Documents</u>.   Upon the effectiveness of this Agreement (i) each reference in the Loan Agreement to "this Agreement" and each reference in the Loan Agreement and the Loan Documents to "the Loan Agreement" shall mean and be a reference to the Loan Agreement as amended hereby; and (ii) each reference in the Notes, the Loan Agreement, and the Loan Documents to "the Loan Documents" shall mean and be a reference to the Loan Documents as amended hereby.

9.2   <u>Effect on the Note, the Deed of Trust and the Loan Documents</u>.   Except as specifically amended above, the Notes, Loan Agreement, Trust and other Loan Documents shall remain in full force and effect and are hereby ratified and confirmed.   Without limiting the generality of the foregoing, the Property given to secure the Debt prior to the date hereof does and shall continue to secure all Debt under the Notes, Loan Agreement, Trust and the Loan Documents, as amended hereby and, except as provided in the Notes, Trust and the Loan Documents, no such Property shall be released until all conditions to such release contained in the Notes, the Trust or the Loan Documents are satisfied.

9.3   <u>No Waiver</u>.   The execution, delivery and effectiveness of this Agreement shall not operate as a waiver of any right, power or remedy of Lender under the Notes, the and the Loan Documents, nor constitute a waiver of any provision of any of the Notes, the Trust, or the Loan Documents.

9.4   <u>Counterparts</u>.   This Agreement may be executed in multiple counterparts, each of which shall be deemed an original document and all of which together shall constitute one and the same document.   Signature pages may be detached from such counterparts and reattached to form one original document.

9.5   <u>Governing Law</u>.   The provisions set forth in <u>Section 20.3</u> of the Loan Agreement shall govern with respect to governing law, jurisdiction and designation for service.

9.6   <u>Concerning the Lender</u>.   Lender is not acting in its individual capacity and, as such, shall have no personal liability with respect to this Agreement.

9.7   <u>No Partnership, Joint Venture or Agency</u>.   Neither this Agreement nor any of the Loan Documents, as amended hereby, shall in any respect be interpreted, deemed or construed as making

18673909-v19

CONFIDENTIAL

DANSKE_0011055

Lender a partner or joint venturer with Borrower, nor shall they be interpreted, deemed or construed as making Lender the agent or representative of Borrower, and Borrower agrees not to make any contrary assertion, contention, claim or counterclaim in any action, suit or other legal proceeding involving Lender.

       9.8    <u>Conflict</u>.  In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control.

*[signatures on following pages]*

18673909-v19

26

**IN WITNESS WHEREOF**, Obligors and Lender have caused this Agreement to be signed by their duly authorized representatives under seal all as of the date and year first above written.

**LENDER**:

DANSKE BANK A/S, LONDON BRANCH

By:_____
Name: David Daniel
Title:  Authorized Signatory

By:_____
Name: Jovan Atkinson
Title:  Authorized Signatory

*[LENDER SIGNATURE PAGE TO SECOND AMENDMENT TO THIRD AMENDED AND RESTATED LOAN AGREEMENT AND LOAN MODIFICATION]*

CONFIDENTIAL

**BORROWER**:

DIAMANTE CABO SAN LUCAS S. DE R.L. DE C.V., a
Mexican limited liability company with variable capital

By: _____
Name:   Kenneth A. Jowdy
Title:   General Administrator

*[BORROWER PARTY SIGNATURE PAGE TO SECOND AMENDMENT TO THIRD AMENDED AND
RESTATED LOAN AGREEMENT AND LOAN MODIFICATION]*

CONFIDENTIAL

**ACKNOWLEDGED AND AGREED TO BY BORROWER PARTIES**:

**DIAMANTE MEMBER**:

DIAMANTE CABO SAN LUCAS, LLC, a Delaware limited liability company

By: _____
Name: Kenneth A. Jowdy
Title:   Managing Member

**GUARANTOR**:

KENNETH A. JOWDY

_____
Kenneth A. Jowdy, an individual

**OTHER JOWDY PARTIES**:

Diamante Properties, LLC, a Delaware limited liability company

By: _____
Name: Kenneth A. Jowdy
Title:   Managing Member

*[BORROWER PARTY SIGNATURE PAGE TO SECOND AMENDMENT TO THIRD AMENDED AND RESTATED LOAN AGREEMENT AND LOAN MODIFICATION]*

DANSKE_0011059

KAJ Holdings, LLC, a Delaware limited
liability company

By: _____
Name: Kenneth A. Jowdy
Title:  Managing Member


Diamante Life S. DE R.L. DE C.V., a Mexican limited liability
company with variable capital

By: _____
Name: Kenneth A. Jowdy
Title:  General Administrator


Diamante Club, LLC, a Delaware limited
liability company

By: _____
Name: Kenneth A. Jowdy
Title:  Managing Member


Diamante CSL, LLC, a Delaware limited
liability company

By: _____
Name: Kenneth A. Jowdy
Title:  Managing Member


*[BORROWER PARTY SIGNATURE PAGE TO SECOND AMENDMENT TO THIRD AMENDED AND
RESTATED LOAN AGREEMENT AND LOAN MODIFICATION]*

CONFIDENTIAL                                                                                                           DANSKE_0011060

JOINDER BY LEGACY TO ACKNOWLEDGE THE TERMS OF THIS AGREEMENT

Legacy Properties, LLC, a Delaware limited liability company

By: _____
Name: Kenneth A. Jowdy
Title:   Managing Member

*[BORROWER PARTY SIGNATURE PAGE TO SECOND AMENDMENT TO THIRD AMENDED AND RESTATED LOAN AGREEMENT AND LOAN MODIFICATION]*

CONFIDENTIAL

**INDEX OF SCHEDULES**

| Schedule Number | Description |
|---|---|
| 2017 Account Schedule | Account Schedule |
| 3.1(yy) | List of Documents, Plans, Schedules and Org Charts |
| 4.1(c) | Amortization Schedule |

CONFIDENTIAL

**2017 Account Schedule**

**Accounts**

(see attached)

CONFIDENTIAL

DANSKE_0011063

| Bank Name | Account # | Company Name | Currency | Description | Sources of Funds | Type of Payments Made | Banorte Mandate Agreement Signed? | Will Dewey has access to: |
|---|---|---|---|---|---|---|---|---|
| US | | | | | | | | |
| TD Bank | 4337813269 | DIAMANTE CSL, LLC | USD | Sales Revenue | Sales Revenue | Transfer to Banorte Accounts. US Vendors for Development. | N/A | YES |
| TD Bank | 4342295808 | DIAMANTE MANAGEMENT SERVICES, INC | USD | Operations/Private Construction | Deposits for Operations and Private Construction | Operations US Vendors | N/A | |
| Mexico | | | | | | | | |
| Banorte | 626436124 | DIAMANTE CABO SAN LUCAS S DE RL DE CV | MXP | Operations Revenue | Operations Revenue | Transfers to Operations Banorte Expense Accounts | | YES |
| Banorte | 626436160 | DIAMANTE CABO SAN LUCAS S DE RL DE CV | MXP | Operations Revenue | Transfers from Operations Banorte Accounts | Operations Expenses/Mexican Vendors | | YES |
| Banorte | 647958993 | DIAMANTE CABO SAN LUCAS S DE RL DE CV | MXP | Sales Revenue | Sales Revenue | Transfers to other Banorte Accounts (Commissions to Ops/Ironman, | | YES |
| Banorte | 885768006 | DIAMANTE CABO SAN LUCAS S DE RL DE CV | MXP | Private Construction Expenses/ Deposits | Private Construction Owner Deposits | Private Construction Expenses | | |
| Banorte | 811253725 | DIAMANTE CABO SAN LUCAS S DE RL DE CV | MXP | TRC Expenses | Transfers from 8993 or 7045 | TRC/ORC Expenses | | |
| Banorte | 537788291 | DIAMANTE CABO SAN LUCAS S DE RL DE CV | MXP | Development Expenses | Transfers from 8993 or 7045 | Development Expenses | | YES |
| Banorte | 654187045 | DIAMANTE CABO SAN LUCAS S DE RL DE CV | USD | Sales Revenue | Sales Revenue | Transfers to other Banorte Accounts (Commissions to Ops/Ironman, | | YES |
| Banorte | 629800744 | DIAMANTE CABO SAN LUCAS S DE RL DE CV | USD | Operations Expenses | Transfers from 6058 | Operations Expenses/Mexican Vendors | | YES |
| Banorte | 540653166 | DIAMANTE CABO SAN LUCAS S DE RL DE CV | USD | Development Expenses | Transfers from 3269 | Development Expenses/Transfers to Diamante | | YES |
| Banorte | 626436058 | DIAMANTE CABO SAN LUCAS S DE RL DE CV | USD | Operations Revenue | Operations Revenue | Transfers to Ops Expense Accounts | | YES |
| Banorte | 813490962 | DIAMANTE CABO SAN LUCAS S DE RL DE CV | USD | TRC Expenses | Transfers from 8993 or 7045 | TRC Expenses | | |
| Banorte | 893014436 | DIAMANTE CABO SAN LUCAS S DE RL DE CV | USD | Private Construction Expenses/ Deposits | Private Construction Owner Deposits | Private Construction Expenses | | |
| Banorte | 646208440 | DIAMANTE CABO SAN LUCAS S DE RL DE CV | USD | Closing Cost | Closing Cost | Marketing/Sales Expenses, Budget Shortfalls | | |
| Santander | 82-50060330 | DIAMANTE CABO SAN LUCAS S DE RL DE CV | USD | Operations Revenue | Ops Revenue | Transfer to Ops Expense Accounts | N/A | |
| Banorte | 404167402 | DCSL RESIDENTIAL SERVICES S DE RL DE CV | MXP | Residential Services | Residential Services Revenue | Transfers to 1215 | | |
| Banorte | 417271215 | DCSL RESIDENTIAL SERVICES S DE RL DE CV | MXP | Residential Services | Transfers from 7402 | Residential Services Expenses | | |
| Banorte | 404167224 | DCSL RESIDENTIAL SERVICES S DE RL DE CV | USD | Residential Services | Residential Services Revenue | Transfers to 6633 | | |
| Banorte | 420956633 | DCSL RESIDENTIAL SERVICES S DE RL DE CV | USD | Residential Services | Transfers from 7224 | Residential Services Expenses | | |
| Banorte | 218796607 | DIAMANTE DEVELOPMENT S DE RL | MXP | Construction Payroll Expenses | Transfers from 3166 and 8006 | Construction Payroll/Office Expenses | | |
| Banorte | 219135744 | DIAMANTE DEVELOPMENT S DE RL | USD | Construction Payroll Expenses | Transfers from 3166 and 4436 | Construction Payroll/Office Expenses | | |
| Banorte | 807291878 | DIAMANTE LIFE S DE RL | MXP | Dlife Exp - Dep | Revenue from RE and RE resales, Pedregal House | Vehicles, Pedregal House, Rental Program, Budget Shortfalls | | |
| Banorte | 540653184 | DIAMANTE LIFE S DE RL | USD | Dlife Exp - Dep | Revenue from RE and RE resales, Pedregal House | Vehicles, Pedregal House, Rental Program, Budget Shortfalls | | |
| Banorte | 212345937 | PRESTADORA DE SERVICIOS DIAMANTE S DE RL DE CV | MXP | Payroll Expenses | Semi-inactive | Miscellaneous office/legal | | |
| Banorte | 646208459 | PRESTADORA DE SERVICIOS DIAMANTE S DE RL DE CV | USD | Payroll Expenses | Semi-inactive | Miscellaneous office/legal | | |
| Banorte | 241523315 | PRESTADORA DE SERVICIOS TURISTICOS Y DE GOLF S DE | MXP | Payroll Expenses | Transfers from 6160, 3166, 1215 | Ops, Dev, Res Services Payroll Exp | | |
| Banorte | 242265256 | PRESTADORA DE SERVICIOS TURISTICOS Y DE GOLF S DE | USD | Payroll Expenses | Transfers from 3315 | Misc Expenses | | |

DANSKE_0011064

| | ??? | ??? | ??? | ??? | ??? | ??? | N/A | |
|---|---|---|---|---|---|---|---|---|
| Scotia Bank | | | ??? | ??? | | | N/A | |
| | | | | | | | | |
| UK | | | | | | | | |
| Danske | 90003664 | DIAMANTE CABO SAN LUCAS S DE RL DE CV | USD | Facility A | N/A | | N/A | N/A |
| Danske | 90003761 | DIAMANTE CABO SAN LUCAS S DE RL DE CV | USD | Facility B | N/A | | N/A | N/A |
| Danske | 36030240 | DIAMANTE CABO SAN LUCAS S DE RL DE CV | USD | Facility C | N/A | | N/A | N/A |
| Danske | 22028839 | DIAMANTE CABO SAN LUCAS S DE RL DE CV | USD | Interest Reserve | N/A | | N/A | N/A |
| Danske | 36030321 | DIAMANTE CABO SAN LUCAS S DE RL DE CV | USD | Tax reserve | N/A | | N/A | N/A |
| Danske | 36030453 | DIAMANTE CABO SAN LUCAS S DE RL DE CV | USD | Commission Reserve | N/A | | N/A | N/A |
| | | | | | | | | |
| HOAs | | | | | | | | |
| | 489827440 | Regimen Secundario de Propiedad en Condominium Casitas Fase 1 | MXP | | | | N/A | |
| | 489827507 | Regimen Secundario de Propiedad en Condominium Casitas Fase 2 | USD | | | | N/A | |
| | 485615694 | Diamante SCL Master HOA AC | MXP | | | | N/A | |
| | 485615649 | Diamante SCL Master HOA AC | USD | | | | N/A | |
| | 485615779 | Regimen de Propiedad en Condominio Beach Estates | MXP | | | | N/A | |
| | 488710536 | Regimen de Propiedad en Condominio Beach Estates | USD | | | | N/A | |
| | 485615818 | Sub-Regimen de Propiedad en Condominio 1 Golf Villas del RE | MXP | | | | N/A | |
| | 489827413 | Sub-Regimen de Propiedad en Condominio 1 Golf Villas del RE | USD | | | | N/A | |
| | 485615676 | Sub-Regimen de Propiedad en Condominio 2 Sunset Hill | MXP | | | | N/A | |
| | 485615621 | Sub-Regimen de Propiedad en Condominio 2 Sunset Hill | USD | | | | N/A | |
| | 485615742 | Sub-Regimen de Propiedad en Condominio Denominado DRC-Lote A | MXP | | | | N/A | |
| | 488710518 | Sub-Regimen de Propiedad en Condominio Denominado DRC-Lote A | USD | | | | N/A | |

CONFIDENTIAL

**<u>Schedule 3.1(yy)</u>**

**List of Documents, Plans, Schedules and Organizational Charts**

(i)      A schedule of all operator contracts affecting the Property

(ii)     All management contracts affecting the Property;

(iii)    All sales and marketing agreements affecting the Property;

(iv)     A schedule of service contracts affecting the Property,

(v)      A schedule of all construction contracts arising from construction on or about the Property,

(vi)     A schedule of Leases affecting the Property,

(vii)    A list of Plans and Specifications for all Improvements constructed on the Property,

(viii)   As-Built Plans for all underground utility Improvements constructed on the Property

CONFIDENTIAL

**Schedule 4.1(c)**

**Amortization Schedule**

| Calendar Year | Minimum Annual Required Payment (USD mio) (inclusive of Facility A cash amounts) | Facility C Target Principal Amount based on available facility | Facility C deferred extension fee | Facility A Target Principal Amount | Facility B Target Principal Amount | Closing Debt (USD mio) |
|---|---|---|---|---|---|---|
| Opening Balance as at 31st October 2017 | | 15.000 | | 96.400 | 18.000 | 129.400 |
| Nov-17 | 0.000 | 0.000 | | 0.000 | 0.000 | 129.400 |
| Dec-17 | 0.000 | 0.000 | | 0.000 | 0.000 | 129.400 |
| Jan-18 | 0.000 | 0.000 | | 0.000 | 0.000 | 129.400 |
| Feb-18 | 0.000 | 0.000 | | 0.000 | 0.000 | 129.400 |
| Mar-18 | 0.000 | 0.000 | | 0.000 | 0.000 | 129.400 |
| Apr-18 | 0.000 | 0.000 | | 0.000 | 0.000 | 129.400 |
| May-18 | 0.000 | 0.000 | | 0.000 | 0.000 | 129.400 |
| Jun-18 | 0.000 | 0.000 | | 0.000 | 0.000 | 129.400 |
| Jul-18 | 0.000 | 0.000 | | 0.000 | 0.000 | 129.400 |
| Aug-18 | 0.000 | 0.000 | | 0.000 | 0.000 | 129.400 |
| Sep-18 | 0.000 | 0.000 | | 0.000 | 0.000 | 129.400 |
| Oct-18 | 0.000 | 0.000 | | 0.000 | 0.000 | 129.400 |
| Nov-18 | 0.000 | 0.000 | | 0.000 | 0.000 | 129.400 |
| Dec-18 | 26.775 | 15.000 | 0.875 | 10.900 | 0.000 | 103.500 |
| Jan-19 | 0.967 | | | 0.967 | 0.000 | 102.533 |
| Feb-19 | 0.967 | | | 0.967 | 0.000 | 101.567 |
| Mar-19 | 0.967 | | | 0.967 | 0.000 | 100.600 |
| Apr-19 | 0.967 | | | 0.967 | 0.000 | 99.633 |
| May-19 | 0.967 | | | 0.967 | 0.000 | 98.667 |
| Jun-19 | 0.967 | | | 0.967 | 0.000 | 97.700 |
| Jul-19 | 0.967 | | | 0.967 | 0.000 | 96.733 |
| Aug-19 | 0.967 | | | 0.967 | 0.000 | 95.767 |
| Sep-19 | 0.967 | | | 0.967 | 0.000 | 94.800 |
| Oct-19 | 0.967 | | | 0.967 | 0.000 | 93.833 |
| Nov-19 | 0.967 | | | 0.967 | 0.000 | 92.867 |
| Dec-19 | 0.967 | | | 0.967 | 0.000 | 91.900 |
| 2020 | 19.100 | | | 19.100 | 0.000 | 72.800 |
| 2021 | 23.800 | | | 23.800 | 0.000 | 49.000 |
| 2022 | 25.100 | | | 25.100 | 0.000 | 23.900 |
| 2023 | 23.900 | | | 5.900 | 18.000 | 0.000 |
| 2024 | 0.000 | | | | | |

CONFIDENTIAL