**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
          |
**UNITED STATES OF AMERICA**          |
          |
    against-          |
          | **Docket No. 13-cr-607 (JFB)**
          |
**PHILLIP A. KENNER and**          |
**TOMMY C. CONSTANTINE,**          |
          |
          |
**Defendants.**          |
-------------------------------------------------------X

**Defendant, Kenner –**

**MOTION FOR PARTIAL STAY OF FORFEITURE**

## **Table Of Contents**

Table of Authorities………3

Introduction………4

Case Law………4

- *The First Factor*………7
- *The Second Factor*………14
- *The Third Factor*………14
- *The Fourth Factor*………15

Conclusion………16

## **Table Of Authorities**

**Referenced cases:**
*United States v. Silver*, 203 F. Supp.3d 370, 385 (SDNY 2016)………4
*United States v. Contorinis*, 692 F.3d at 146 (2nd Cir 2012)………4
*United States v. Torres*, 703 F.3d 194, 203 (2nd Cir 2012)………4
*United States v. Shkreli*, 2019 U.S. Appx. LEXIS 21248 (2nd Cir 2019)………*5*
*United States v. Nicolo*, 597 F.Supp.2d 342, 348 (2nd Cir 2009)………7


**Referenced statutes:**
Fed. R. Crim. P. 32.2(d)………4

## Introduction

Defendant Kenner submits this Motion to Stay Forfeiture pursuant to Fed. R. Crim. P. 32.2(d).

This Court may stay the order of forfeiture "on terms appropriate to ensure that the property remains available pending appellate review." As such, defendant Kenner moves for a stay of forfeiture with regards to the Baja Ventures 2006, LLC as part and parcel to the Diamante Cabo san Lucas forfeiture, in its entirety. "The purpose of the provision is to ensure that the property remains intact and unencumbered so that it may be returned to the defendant in the event the appeal is successful." Advisory Comm. Notes to Fed. R. Crim. P 32.2(d).

## Case Law

District Courts in this Circuit have generally considered four factors in determining whether to stay a forfeiture order pending appeal; "1) the likelihood of success on appeal; 2) whether the forfeited asset is likely to depreciate over time; 3) the forfeited asset's intrinsic value to defendant (i.e., the availability of substitutes; and 4) the expense of maintaining the forfeited property." *United States v. Silver*, 203 F. Supp.3d 370, 385 (SDNY 2016) (collecting cases).

*Ill-gotten gains…*
The Second Circuit has consistently relied on the punitive nature of criminal forfeiture to disgorge one of their ill-gotten gains. By definition, to be ill-gotten, the "proceeds" must be in the possession of, received by, or benefitting (at least by a co-defendant). **Here, they are not**. The Second Circuit has opined: "Criminal forfeiture focuses on the disgorgement by a defendant of his ill-gotten gains." *United States v. Contorinis*, 692 F.3d at 146 (2nd Cir 2012) (internal quotation marks omitted); *United States v. Torres*, 703 F.3d 194, 203 (2nd Cir 2012) ("'[F]orfeiture is gain based' not based on the losses (or gains) to victims."). Recently the Second Circuit relied

on this precedent in *United States v. Shkreli*, 2019 U.S. Appx. LEXIS 21248 (2nd Cir 2019) (internal quotation marks omitted)); See *Shkreli at 6-7*.

Two issues are relevant based on precedent:

(1) The funds traceable to the Cabo san Lucas capital account (*Ex. A*) were *received* and *exclusively* used by Diamante Managing Member, Ken Jowdy, "*individually*", as defined by the lending agreement (*Ex. AA at 24-25: 3500-KJ-2*) in the government's hands for 5-years prior to trial and verified by Jowdy (*Id. at 12, 13, 14*); and

(2) The traceable funds were '*used as authorized*', as *signed-off* by the individuals (*Ex. B-I*) -- and the Hawaii control documents (*Ex. J: Little Isle 4 [master LLC]*) (*Ex. HH: Big Isle 5 [Centrum loan]*).  They were used as expected.  The majority of Hawaii partners gave SDNY Grand Jury and civil testimony under oath years prior to trial, &/or sued Jowdy for the same Hawaii-loans (*Ex. X at 1: "the gist…"*) (*Ex. Y at 7, ¶11*) (*Ex. Z at 7, ¶9*); regardless of their *failed memory* of anything material (whether or not even necessary as passive-equity investors).  The *memory loss* testimony was up to 13 years after the actual events, notwithstanding unresolved CTE issues raised by the defendant and left *unaddressed* as *new evidence* once it was discovered post trial and raised to the court).[1]

---

[1] **Chronic Traumatic Encephalopathy ("CTE"):**  The primary symptoms of **CTE** have been described by neurological experts (including Dr. Ann McKee) at Boston University's Neurological Center as:

> *"CTE, a catastrophic disease first associated with boxers long ago, results when a toxic protein, Tau, accumulates in the brain, kills brain cells, and leads to symptoms such as cognitive dysfunction, **memory loss**, sleeplessness, depression, diminished impulse control, episodes of anger, and dementia, among others. Until recently, CTE could only be confirmed through an autopsy. **Tau proteins are released whenever a concussion occurs**."*

- Over 300 National Hockey League ("NHL") players – including Bryan Berard and several other alleged government victims (if not all) – sued the NHL in 2014 (pretrial) for CTE and its related symptoms.   The government hid this from the defendants and the Court.

5

*Tracing the money*: Baja Ventures 2006, LLC's entire capital contributions (of $4.1 million) were <u>verified thru testimony</u> by the government as **untainted** and '**not ill-gotten'** (*Ex. A: government-forfeiture-36*).   In fact, IRS agent Wayne <u>verified thru testimony</u> to the Court during the March 9, 2016 forfeiture hearing that Kenner's 2 European partners (Jozef Stumpel and Jere Lehtinen) paid for 100% of the $4.1 million, Baja Ventures 2006 capital contribution equity[2], following Wayne's own temporary amnesia on the specific-material forfeiture facts under analysis at that 2016 moment; **the government's critical nexus** (*See March 9, 2016 -- Tr.44-45*):

> *Q:  In the course of that interview, did Mr. Jowdy tell you – I don't need you to look at the entire document.   I am just trying to move it along.   <u>In the course of that interview, did Mr. Jowdy tell you how Kenner obtained his 39% interest in the Diamante Cabo san Lucas project</u>?*
>
> *A [Wayne]: **I don't recall him saying that.   But...***
>
> *Q: Would you kindly take a look at Page 2 of **Kenner Exhibit F-2**?   The third paragraph.   <u>Does that refresh your recollection as to what Mr. Jowdy told you as to how Philip Kenner acquired his 39 percent interest in Diamante Cabo san Lucas</u>?*
>
> *A [Wayne]: **Yes**.*
>
> *Q: What is your recollection of that, sir?*
>
> *A [Wayne]: **That Kenner borrowed the money from Jozef Stumpel and Jerry Linton** [sic]. (Ex. 683, Ex. 684)*
>
> *Q:  It was through the borrowing money from Jerry Linton [sic] and Jozef Stumpel that Kenner acquired his 39 percent interest in the Diamante Cabo san Lucas through August 2006, correct?*
>
> *A [Wayne]: Can you repeat the question?*

---

[2] The 2009 California lawsuit, *Nash et.al. [DCSL investors] v. Ken Jowdy,* identified Stumpel and Lehtinen **each** as 5% Baja Ventures 2006 "LLC" equity investors (*Ex. Z at 1-2, 5-6 [¶7]*).

- The government wants the court to continue ignoring the exculpatory and empirical evidence to sustain their forfeiture case ruling.

6

> *Q: Sure. <u>Ken Jowdy told you that the source of the funds by which Philip Kenner acquired his 39 percent in Diamante Cabo san Lucas was through money loaned to him by Jerry Linton [sic] and Jozef Stumpel, correct?</u> [3]*
>
> ==*A [Wayne]: <u>Yes</u>.*==

*United States v. Nicolo*, 597 F.Supp.2d 342, 348 (2nd Cir 2009) ("[P]roperty 'traceable to' means property…the acquisition [of which] is attributable to the money laundering scheme rather than money obtained from untainted sources.") (alterations in original) *(Ex. 683, Ex. 684).*

- *Government-forfeiture-36* (*Ex. A*) also confirms Jowdy *stole* an additional $1.6 million from Stumpel's 5-23-2005 Cabo deposit (*which Stumpel sued for in Mexico*); leaving the Baja Ventures 2006 capital account at $2.5 million (and ironically overlooked by the prosecution). This was the Mexico criminal lawsuit in which Kaiser lied to the Mexico courts about his signature. He claimed that his named was *forged*[4] on a court testimonial (*ECF No. 112-9*); in spite of the government's 2012 FBI recordings confirming Kaiser signed the documents in the Mexico courthouse with his attorney (recorded by Berard and the FBI, while working for Jowdy in Mexico).

*The First Factor…*

As to the First factor, it is clear under Second Circuit review that the district court rarely agrees with factor one, considering they were contemporaneously the reviewing court that ordered the forfeiture in the first place. The Appellate Courts appear to weigh that factor as least vital.

*But, the Court is fully aware that the Hawaii capital account funds were <u>authorized</u> as used/loaned and repeatedly verified (including at trial)…[5]*

---

[3] See Baja Ventures 2006, LLC partner, Stumpel, letter to the Court (*ECF No. 771*).

[4] Lying about *forgeries* has now **proven** to be a pattern for anyone working for Jowdy or with Jowdy; including Jowdy-himself, Attorney Harvey (April 2009 extortion email to Kenner), Kaiser, Berard, Donlan, Myrick, etcetera.

[5] The Court hi-lighted this *exact* issue during Kenner's original request for a Northern Trust bank subpoena months before trial and the existence of the critical exculpatory

7

Only a nominal portion of the *authorized* Hawaii loans to Ken Jowdy, *individually* *(Ex. AA at 24-25)*, resulted in traceable funds to the resort's acquisition (none attributable to a defendant, here).   The "loans" have been:

(1) <u>*Verified as authorized*</u> thru investors' <u>*signed*</u> *authorizations* to their bank (Northern Trust: *Exs. B-I*);[6]
(2) <u>*Verified as authorized*</u> thru the Hawaii corporate operating agreement (Little Isle 4's By-Laws: *Ex. J*);[7]
(3) <u>*Verified as authorized*</u> thru the related LLC corporate operating agreement (Big Isle 5, LLC: the sub-owner of the parcel which received the Centrum loan, *Ex. HH*);[8]
    a. And – used "*in connection*" **under advice of counsel** (*Ex. MM*) prior to well-documented use and distribution (none benefitting Kenner or

---

"*authorization*" documents.  Yet – the Court <u>*denied*</u> the subpoena, siding with the government's assertion that: (1) the "*authorizations*" (the central issue in the case), and (2) the full banking records were "*overbroad*" and a "*fishing expedition*".

[6] The named superseding indictment victims included Berard (*Ex. B*), Nolan (*Ex. C*), Peca (*Ex. D*), Rucchin (*Ex. E*), Sydor (*Ex. F*) – and specifically un-named LOC investors (removed from the superseding indictment 2 weeks before trial), Murray (*Ex. G*), Gonchar (*Ex. H*), and Norstrom (*Ex. I*); although incrementally added as victims post-trial, it added approximately $5 million to the alleged loss amounts – without affording the defense an opportunity to "*confront*" the un-named individuals under 'victim status'.

[7] The Hawaii Little Isle 4 By-Laws (*Ex. J*) represented the <u>*only controlling document*</u> for the management of the Hawaii LLC.   The By-Laws specifically allowed for the payment of employees, consultants, and **lending funds**:

*Article II. Purpose*
*Little Isle IV, LLC is an organized group of investors established to <u>invest in a **series of opportunities**</u> review[ed] by the Managing Member [Kenner] and deemed in the best interest of the partnership at all times.*

*<u>At the sole discretion of the Managing Member, Little Isle 4, **may participate as a lender**</u> if deemed by the Managing Member to be in the best interest of the LLC.*

*The Managing Member, <u>at their sole discretion</u>, can engage in outside ventures deemed to be in the best interest of the LLC, <u>including but not limited to other Private Equity Funds and **Lending Opportunities**</u>.*

[8] Lender, Centrum Financial, signed off on the Big Isle 5 operating agreement (*Ex. HH: held in the possession of investor Nolan*) – and its specific contents – prior to releasing the loan amount in July 2005.   The agreement specifically permits **<u>lending</u>** of funds (in paragraph 1) "*in connection*" with the benefit of the LLC.

8

received by him);
(4) *Verified thru litigation* by the majority of the Hawaii partners in Arizona (*Ex. X at 1: specifically hi-lighting the unpaid Jowdy loans as the nexus to the litigation dispute*) and California (*Ex. Y: specifically designating the unpaid Hawaii loans at 7 ¶11*, and *Ex. Z: specifically designating the unpaid Hawaii loans at 7 ¶9*) after settlement mediation was terminated in May 2008 by Ken Jowdy and his attorney, Tom Harvey (Louis Freeh's co-counsel); and
(5) *Verified thru testimony* by the many of the Hawaii LOC investors pre-trial (*and re-verified as authorized thru testimony during trial: including Michael Peca at Tr. 498-99; hi-lighted by the District Court at ECF No. 501 at 9, opining: "However, he admitted that he had testified before the Grand Jury that he was aware of a short-term loan made to Jowdy using Little Isle IV's capital account.").*

*Prior 2011 SDNY Grand Jury verification thru testimony:*

- Hawaii partners Darryl Sydor and Turner Stevenson *verified thru testimony* Peca's 2011 SDNY Grand Jury "*capital account*" and "*group*" decision testimony the same day, in 2011 (4 years before trial).[9]
- Sydor *verified thru testimony*: *"Yes. But then we put it towards a short-term loan for Mr. Jowdy until Lehman Brothers came up with the money that was supposed to be paid back…to Little Isle 4…back to Hawaii, not me personally."* Sydor hi-lighted in 2011 that he was clearly aware his funds, utilized as a loan to Jowdy *for the Cabo project*, were part of the Little Isle 4 corporate capital account and no longer personally belonged to him (regardless of his CTE *memory loss* issues 4-years later).
- Stevenson was unequivocal thru testimony with the same 2011 SDNY Grand Jury about his "*group*" knowledge:
    *Q: So are you saying that you agreed to transfer some of the money from the Hawaii project to the Cabo project?*
    *A [Stevenson]: I would say that, yes.*

    *Q: Who made that decision?*
    *A [Stevenson]: I think all of us as a group.*

---

[9] The government was deftly aware of the 2011 Grand Jury *admissions* by Peca, Sydor and Stevenson after AUSA Capwell delivered the exculpatory testimony, hi-lighting: "*You might deem some of the material in the transcripts to be helpful to the defense*" (*Ex. K*).  AUSA Capwell explained to Kenner and Kenner's attorney, post hearing that she was not previously aware of the prior Grand Jury proceeding but would look into it.  After the courtroom exchange, it was obviously that she was not told about the previous and exculpatory Grand Jury testimony when she authorized the October 2014 EDNY Grand Jury for FBI agent Galioto to solely present his findings.

9

> *Q: What do you mean as a "group", who is the group?*
> *A [Stevenson]: **All the guys who were invested in it**.*

Government star-witnesses, John Kaiser (*Ex. L*)[10] gave exculpatory testimony *6-years prior to trial* about his knowledge, expectations, and authorizations; as did Bryan Berard (*Ex. M*)[11] (in 2009).   None of these **voluntary** exculpatory statements

---

[10] John Kaiser -- while the Managing Member of the Hawaii partners -- **voluntarily** *verified thru testimony* (in 2009): "*So if we had some funds that were – that was stagnant and that warrant purchasing land, we would utilize it for a loan, so we actually made some money off it*" (specifically addressing the Centrum loan funds); and "*It was supposed to be a short-term loan.  I thought it was three to six months, because I had also raised some funds from family and friends that were getting a little antsy about it.*"; and "*At the 15 percent – actually, the loans, I didn't think they were going to be – to me it wasn't a risky loan…But the loans – even investors I brought in, I said, Listen.   This guy – I gave them the whole story about Ken Jowdy backed by land.   Its good.  Better than your money sitting somewhere.*"

- Please note that Kaiser *verified thru testimony* to the FBI on October 19, 2010 that he: (1) met with Jowdy at least 5 times (*and described each meeting and setting to the FBI agents: Ex. N at 2, 3, 10*), (2) confirmed there *"was an Agreement"* and "*KJ [Jowdy] to JK [Kaiser] - don't worry all money will come back; get repaid*" *(Id. at 3),* and (3) *re-verified thru testimony* at trial that he had the loan agreement in his possession at home (*Tr.1227*): " *Mr. Kenner sent it to my residence*".
- The government also knew that "loan agreement witness" (Robert Gaudet, who was interviewed approximately 10 times by the FBI) had *verified thru testimony* on July 2, 2009 that **Kaiser had a hand in the creation of the loan agreement** for Jowdy: "*He [Kaiser] told me that it was a document he needed for – it was a document he had for the Hawaii entity, for the Hawaii company*" (*Ex. V*).
    - The Court should note that although Gaudet: (1) *verified thru testimony* his authentic signature over a dozen times during the July 2, 2009 deposition by Jowdy's attorneys, (2) *verified thru testimony* his signature during the May 2009 arbitration testimony, and (3) *verified thru testimony* his signature during the December 2010 Jowdy defense case in Nevada – the government argued during the forfeiture hearings that Gaudet never testified that his signature was authentic (*April 6, 2016: Forfeiture Tr.288-290*); misleading the Court.
    - The Court *requested* and *received* Gaudet's 3 verifications of the loan authenticity thru submissions (from Kenner); leaving the government's position of denial defying logic; specifically considering the FBI proffered Gaudet repeatedly thru 2014: noting that Gaudet reported Berard's physical confrontation with Gaudet, the FBI noting: "*Berard put Gaudet in a choke hold and yelled he was going to kill Gaudet*" – because Gaudet was speaking with Kenner and still suing Jowdy in Mexico (with Kenner's evidentiary assistance for the defrauded investors) (*3500-RG-9 ¶9: April 30, 2014*).
        - Common CTE symptoms are "*diminished impulse control and episodes of anger*".

10

were without complete transparency as documented in real time by one of the Hawaii corporate attorneys thru regular "*update*" emails and conference calls. Government star-witness, and investor turncoat, John Kaiser (along with Berard, now employed by Jowdy), <u>verified thru testimony</u> to the FBI in 2010 that he had received these "*updates*" "*many times*" (*Ex. N at 3*).   The FBI presented a copy of the February 2006 "*update*" to Kaiser when they asked him in 2010 about the exculpatory email (*Ex. O*).   In fact, Glen Murray's memory-testimony at trial paralleled the Hawaii attorney's '*update*' email to himself and the other 25-plus Hawaii partners in February 2006, with the "*update*" email affirming:

> "*Based on the meetings John Kaiser had with Ken [Jowdy] before we agreed to lend him the money in 2004 Phil [Kenner] has asked me again to attach for your records a copy of the lending agreement.*" and "*The questions during our last conference call by Owen Nolan, Mike Peca, and Bryan Berard were important to all of you.   If you are still confused about the individual equity you invested in the Cabo project versus the Hawaii equity and loans, please reply to me.   I thought Phil [Kenner] clarified this but I want all of you to be clear.*" And -- "*Based on the delay I have also resent the updated loan calculation from the Hawaii loan to Jowdy for your records.*"

- The Court is aware that Glen Murray sued Ken Jowdy in 2008 in Nevada, with independent counsel, for a 2005 personal $791,000 short-term loan, which

---

[11] Berard **voluntarily** <u>verified thru testimony</u> 6-years prior to trial (in 2009):
*Q: Were you aware that Mr. Kenner got a credit line against some of the securities or investments you had?*
***A [Berard]: Yes.***

*Q: And later on <u>were you aware that Mr. Kenner started lending this money to another principle in the Cabo project named Ken Jowdy</u>?*
***A [Berard]: Yes.***

*Q: <u>Were you aware that he had disclosed to you that he was going to lend this money at a rate of interest to benefit the investors</u>?*
***A [Berard]: Yes.***

*Q: Where did you think the money that Mr. Jowdy – <u>were you told where the money was going to be used **that was given Mr. Jowdy** as far as the Mexican project? Was there anything that you were told about that?</u>*
*A [Berard]: **Basically just loan him [Jowdy] the money for the [Cabo] project**.*

11

>Jowdy defrauded him in Nevada (*Ex. W*).  Murray won after a 4-day bench-trial, 2 ½ years later (as did Kenner in defense of Jowdy's *late* 3rd party action for indemnity versus Kenner, in *Pro Se*).  In Murray's original Nevada complaint, he identified the Hawaii loan as *previously authorized* by him for Jowdy, noting (*Ex. W at ¶15*): "*Jowdy had sought and obtained several previous loans with the assistance of Kenner*" (*the 2004 Hawaii loans, Ex. T. at 1-3; and the 2005 Norstrom personal loan, Ex. T at 1*), and (*Ex. W at ¶17*): "*Murray authorized Kenner to lend monies to Jowdy*".

Another unnamed superseding indictment investor, Sergei Gonchar, <u>verified thru testimony</u> to the FBI in 2010 (5-years before trial): (*Ex. P 'raw notes' at 2*: "*$1M – SG -- invested in Hawaii = in beginning $100k-$150k – rest guarantee in bonds*" and "*SG – PK – told SG $ in Hawaii will be loaned to KJ [Jowdy]*" (*Id. at 3*) and  "*SG heard from KJ that $ from Hawaii loaned to KJ…*" (*Id. at 4*).

- Gonchar – like all of the Hawaii partners – was a recipient of the "*update*" emails (*Ex. O*).

The FBI was aware years before trial that Sergei Gonchar (*Ex. Q at 4-5*), Glen Murray, Jozef Stumpel (*Ex. R at 3-6*), Mattias Norstrom (*Ex. S at 3-4, 6*), Jere Lehtinen, Michael Peca and others -- in **voluntary** support of Kenner -- <u>signed</u> affidavits for the 2009 Nolan arbitration; in contradiction to Nolan's allegations.   The affidavits <u>verified</u> (amongst other issues: including Jozef Stumpel <u>verifying</u> the origination of the entire Jowdy-cabal false "*forgery*" narrative in 2008, *Ex. R at 3*) their personal and full knowledge of the LOCs, the uses by Kenner and Little Isle 4 for other monthly LOC payments and expenses, and the Jowdy loans:

>"***In addition to setting up a Line of Credit for the sole use and benefit of the Hawaii investment Group***, *I wired $100,000 to Northern Trust Bank…**for the express purpose of making funds available to Phil Kenner, <u>which were to be used at his discretion.</u>***   *I was aware that my funds would be used to make distributions for the company, including but not limited to; Land acquisitions, Travel & Entertainment expenses, legal fees, Planning fees, Payroll, permitting fees, **<u>loans to outside entities</u>** and **<u>distributions to other members that would satisfy their monthly Line of Credit payments to Northern Trust Bank</u>***…*Phil has always disclosed the complete and detailed use of these funds with me from time to time at every request*."

12

Ironically, the FBI's 2013 'press release' did <u>not</u> describe the Northern Trust LOC funds as 'unknown' or 'forged' when opened (*like at trial, Tr. 2065-66: Nolan "memory" loss example*[12]), rather hi-lighting: "*Kenner also convinced several NHL players to open lines of credit, to which Kenner was given access.*" (after their 4-year investigation pre-indictment); but again, the theory was changed at trial to a new narrative.   A June 2020 submission to the Court from an attorney for Nolan *also* confirmed Nolan's awareness of the LOC (contradicting his 2009 arbitration testimony (*Ex. JJ*) and 2015 EDNY trial testimony, *Tr. 2065-66*); simply claiming, now, '*Kenner stole the money*' (*<u>despite</u> proven untrue post-trial by the government, after the government traced the money: Ex. A, Ex. T, and 100% of the Northern Trust banking records*).   This was a *far stretch* from '*investors finding out after-the-fact*' as *their* CTE-laden testimony produced during trial (or was otherwise influenced) (*Tr.139: Juneau example of 2006 confusion, in contradiction to his own extensive 2005 emails with Kenner; 3500-JJ-6 at 2: Kenner confirming in 2005, "Hawaii. Your loan is well." after Juneau inquired about his Hawaii investment, noting Juneau never invested cash in the project, nor was Juneau a Kenner-client since March 2003*).

---

[12] The FBI and government were aware that, although Nolan could not even recall his LOC at Northern Trust Bank (due to severe CTE symptoms, or otherwise), they had exculpatory evidence of: (1) Nolan's Northern Trust Banker, Aaron Mascarella's 2009 deposition <u>*verifying thru testimony*</u> his direct 2003-06 communication with Owen Nolan about his LOC (*ECF No. 788 at 34-35*), (2) multiple emails between Nolan's wife, Nolan's private banker (at Wells Fargo) (*Ex. EE*), and Nolan's personal assistant making payments and managing Nolan's LOC (*Ex. CC*) (*Ex. DD*), (3) Nolan's 2006 Little Isle 4 K1 tax document produced by Nolan in 2009 from his custody (*Ex. BB: Bates stamp: Nolan0005044*) during the 2009 arbitration with Kenner, and (4) a 5-day Nolan-Kenner text communication and multiple phone calls in 2007 verifying that Nolan was re-signing his LOC renewal documents for Northern Trust Bank (*ECF No. 786 at 7-10*).   ==**16 months after the text communication about signing his LOC renewal documents (*Ex. KK*) – Nolan testified at a 2009 arbitration that he had *never* discussed a LOC with Kenner (clearly a fraud, if not exclusively from CTE-symptoms); *after* his attorney *verified* Nolan's authorization-signature (*Ex. JJ*) on Nolan's Letter of Authorization (*Ex. C*).**==

- It left no equivocation of Nolan's hands-on dealing – regardless of his documented and severe CTE "*memory loss*" symptoms.

13

*The Second Factor…*

As to the Second factor, it is clear that the issue of depreciation has been well documented.   In fact, in May 2020, the district court received evidence of that specific concern from Danske Bank (*ECF No. 835*).   They clearly identified that the property could not be worth less pre- or post- appeal than it is today (the date of this submission, based on the Covid-19 pandemic and the 2020 news of the government's order of forfeiture).   The property, from the date of submission looking forward, can only *increase* in value under all identifiable factors.   Danske has been the note holder on the property since the 2008-09 Lehman Brothers bankruptcy filings (*ECF No. 835-1*).   The government, to date, has seemingly ignored Danske's first position on the land, prior to and regardless of any court ordered forfeiture.

- It should be noted that the government has rejected clear and convincing efforts by Danske bank to alleviate any "investor" issues/losses by creating a "slush fund" to pay for any determined loss by the original investors traceable thru nexus to the Cabo san Lucas resort property.   Accordingly, the government presented the *tracing of funds* to the resort's capital accounts for closing (*Ex. A*), during their 2016 forfeiture case.

*The Third Factor…*

As to the Third factor, the appraised "value" of Baja Ventures 2006, LLC holds tremendous intrinsic value for Kenner, perhaps representing a significant amount of Kenner's un-litigated assets.[13]

---

[13] At the time of Kenner's arrest in November 2013, Kenner had multiple lawsuits in progress versus John Kaiser and Bryan Berard for 2 separate "*fraudulent conveyances of titles*" in Sag Harbor, NY and Paradise Valley, Arizona.  Between the 2 real estate projects, Kaiser and Berard had defrauded Kenner out of *over one million dollars* (fully documented thru banking records stipulated by the government at trial).   In addition, Kenner had several "open" criminal and civil lawsuits versus Ken Jowdy in Mexico (Kaiser and Berard's new employer/boss) for millions of unpaid loans and employment violations in Mexico.  ***All of those cases were forced into dismissals*** as Kenner remained in custody at the hands of the 2 government confidential informants and star-witnesses (Kaiser and Berard).   The arrest day article in the NY Daily news hi-lighted their responsibility for Kenner's arrest, titled: "*Former NHL player Bryan Berard and ex-cop* [*Kaiser*] *help feds nail two Arizona men in massive fraud*" (notwithstanding their ancillary financial relief of litigation for the millions they stole from Kenner and certain judgments).

14

Case 2:13-cr-00607-JFB-AYS   Document 862   Filed 06/22/20   Page 15 of 16 PageID #: 24166

*The Fourth Factor…*

As to the Fourth factor, although the Cabo san Lucas property carries a significant budget, Kenner has no responsibility for the expenses.   The parent LLC (a Mexican Diamante entity) has managed these expenses since March 2006 – with Kenner and his two Baja Ventures 2006 partners (Lehtinen and Stumpel) remaining passive-equity investors at all times.

---

- The Daily News coverage was predicted in 2009 (4-years in advance) by Jowdy's complicit NY attorney, Tom Harvey, (and Louis Freeh's co-counsel for Jowdy) in an extortion email to Kenner and his counsel.   It <u>verified</u> (without compliance to their "*demands*") slander and defamation stories would follow, as Harvey explained: "*The Daily News has been inundated with new information about Tommy and Phil…the paper will probably do a series on their misdeeds.*" "*…especially since Phil says in the Arizona case that he "<u>loaned</u>" Kenny the money*".
- Ironically, at the time of Harvey's April 2009 extortion email, <u>only</u> the loans to Jowdy had completed relative to the 2013 indictment allegations.  Jowdy and Harvey were subsequently sued for extortion in California, in July 2009.   It was Harvey who verified *for this Court* in 2015, 3 weeks after trial (*or more likely during the December 2014 Jowdy proffer: with missing "raw notes' or 'summary report' from 3500-KJ-8*), and to the government and FBI, that the funds Jowdy <u>received</u>, **were really loans** (*Ex. T: government-forfeiture-44*).
- **Five years before trial** -- <u>Jowdy confessed to the loans</u> during his 2010 FBI proffer with Harvey and Louis Freeh at his side (*Ex. AA at 1*), and during his January 2010 California depositions; his own California attorney arguing [*January 5, 2010 at 290*]:
    [*Ms. Crowther*]: *"So what? You gave him a loan. That doesn't entitle you to an accounting of how it was spent."*.
- The "*no loans*" story was the cornerstone of the Mexico criminal filings by Jowdy's cabal versus Kenner to attempt a Mexico arrest and detainment – after Kenner refused the well-documented 2007 bribes to "*go along*" with their criminality "*or else*" – *unlike Kaiser and Berard's 2011 acquiescence*.   Kenner spent a day in Mexican police custody when detained for this false allegation, on the day of planned criminal testimony versus Jowdy.
    - A Jowdy employee *verified thru testimony* to the FBI that *"…any bribes that were given to the Mexico Government were classified on the books as consulting fees" (3500-DBP-1-r at 3).*
- Attorney Tom Harvey was the individual Gaudet testified (*on July 2, 2009 at 49-50, 127-130*) was threatening him to "*un-remember*" his witness signature on the Jowdy loan document '*or people would be waiting for him in California when he flies from Mexico to Canada to regularly see his children*' because '*the FBI was all over this*'.
    - Hawaii-Mexico investors all *signed* 'no contact letters' to halt the onslaught of Tom Harvey threats of jail time to anyone against Jowdy (*Ex. FF: Peca, McKee and Norstrom included*) (*Ex. GG*).

15

## **Conclusion**

The District Court's review of the Motion to Stay Forfeiture *does not require* any specific number of factors to be satisfied to grant the stay. It may be granted in the interest of justice and preservation of an irreplaceable asset if dissipated during the pendency of the appellate process, post sentencing.

Dated May 25th, 2020, Brooklyn, NY.

Submitted by Philip A. Kenner, Pro Se