

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

JHK:DCL:MMO

*610 Federal Plaza*
*Central Islip, New York 11722*

July 3, 2020

Honorable Joseph F. Bianco
United States Circuit Judge
United States Court of Appeals for the Second Circuit
Long Island Federal Courthouse
Central Islip, New York 11722

Re: <u>United States v. Kenner and Constantine</u>
No. CR-13-607 (S-2) (JFB)

Dear Judge Bianco:

The government respectfully submits this letter pursuant to the Court's order on June 26, 2020 to address Danske Bank A/S London Branch's ("Danske") May 22, 2020 letter. <u>See</u> Docket Entry ("DE") 863. For the reasons set forth below, Danske's request that the Court strike several of the government's discovery requests should be denied.

I.  <u>Legal Framework</u>

The post-trial ancillary proceeding affords third parties an opportunity to establish their legal right, title or interest in criminally forfeited property. <u>See</u> 21 U.S.C. § 853(n); FED. R. CRIM. P. 32.2(c). The ancillary proceeding closely resembles a civil action and, as such, is generally governed by the same procedures as those set forth in the Federal Rules of Civil Procedure. <u>See</u>, e.g., <u>Pacheco v. Serendensky</u>, 393 F.3d 348, 352 (2d Cir. 2004) (commenting that civil procedures aid efficient resolution of claims in ancillary proceeding); FED. R. CRIM. P. 32.2(c)(1) (authorizing motions to dismiss, discovery, and motions for summary judgment in ancillary proceeding).

In order to advance a claim in an ancillary proceeding, a third-party claimant must first establish a "legal interest" in a particular asset identified in the order of forfeiture, within the meaning of 21 U.S.C. § 853(n)(2). <u>United States v. Watts</u>, 786 F.3d 152, 160 (2d Cir. 2015) (citing <u>United States v. Ribadeneira</u>, 105 F.3d 833, 835 (2d Cir. 1997)); <u>see also</u> <u>United States v. Timley</u>, 507 F.3d 1125, 1129 (8th Cir. 2007) ("[U]nder both § 853 and Rule 32.2, 'a party seeking to challenge the government's forfeiture of money or property used in violation of federal law must first demonstrate [a legal] interest in the seized item sufficient to satisfy the court of its standing to contest the forfeiture.'" (citation omitted)); <u>United States v. Salti</u>, 579

F.3d 656, 667 n.11 (6th Cir. 2009) (holding that standing must be supported in same way as any other matter on which claimant bears burden of proof (citation and quotation marks omitted)).

Only after a claimant makes a threshold showing of standing under Section 853(n)(2) by establishing a legal interest in the forfeitable property may a court reach the merits of a claim. Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009) ("[T]he doors of discovery" do not unlock for those "armed with nothing more than conclusions"); Citizens United v. Schneiderman, 882 F.3d 374, 384 (2d Cir. 2018) ("A litigant cannot merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory"). At that point, the court must determine whether the claimant has met its burden of proving its legal interest is a Section 853(n)(6) superior legal interest as compared to the government's interest at the time of the acts giving rise to forfeiture. Pacheco, 393 F.3d at 351; United States v. Timley, 507 F.3d 1125, 1130, n.2 (8th Cir. 2007) (distinguishing between "legal interest" required for claimant to establish standing under Section 853(n)(2), and "superior legal interest" required for claimant to ultimately prevail on merits under Section 853(n)(6)). The petitioner bears the burden of proving that it has a superior legal interest under Section 853(n)(6). Pacheco, 393 F.3d at 351; United States v. Nava, 404 F.3d 1119, 1125 (9th Cir. 2005) ("[T]he petitioner bears the burden of proving his right, title, or interest under Section 853(n)(6).").

In order to prove a superior legal interest, a claimant must either demonstrate under Section 853(n)(6)(A) that it had priority of ownership over the forfeited property at the time of the offense, or must demonstrate under Section 853(n)(6)(B) that it subsequently acquired the property as a bona fide purchaser for value without cause to believe the property was subject to forfeiture. Ribadeniera, 105 F.3d at 834-35. In addition, under the relation back doctrine, the government's exclusive interest in forfeited property "vests in the United States upon the commission of the act giving rise to forfeiture . . . ." 21 U.S.C. § 853(c); Nava, 404 F.3d at 1124 ("The title to forfeited property vests in the United States at the time the defendant commits the unlawful acts . . . .").

Thus, a defense to forfeiture under § 853(n)(6)(B) has three elements. A claimant must prove (1) a legal interest in the property; (2) that the interest was acquired as a bona fide purchaser for value; and (3) that the interest was acquired at a time when claimant was reasonably without cause to believe that the property was subject to forfeiture. Timley, 507 F.3d at 1130–31 (bona fide purchaser defense under § 853(n)(6)(B) has three elements: legal interest; bona fide purchase for value; and the absence of reason to know that the property was subject to forfeiture); United States v. Lazarenko, 575 F. Supp. 2d 1139, 1151 (N.D. Cal. 2008) (three elements of a claim under § 853(n)(6)(B) are legal interest, acquired as a bona fide purchaser for value, at a time when claimant was without reason to know the property was subject to forfeiture), rev'd on other grounds sub nom. United States v. Liquidators of European Fed. Credit Bank, 630 F.3d 1139 (9th Cir. 2011); United States v. Soreide, 2005 WL 8137780 (S.D. Fla. Mar. 23, 2005) (three elements of the defense are separate and conjunctive), aff'd on other grounds, 461 F.3d 1351 (11th Cir. 2006).

The Court does not reach the bona fide purchaser element if the claimant does not first establish a legal right, title, or interest in the forfeitable property. United States v. Madoff, 2012 WL 1142292, at *5 (S.D.N.Y. Apr. 3, 2012) (legal interest element of § 853(n)(6)(B) is the same as the legal interest required to establish standing under § 853(n)(2); attorney who never

2

perfected an attorney's lien under state law lacked standing and likewise cannot satisfy the first element of § 853(n)(6)(B)); United States v. O'Brien, 181 F.3d 105 (6th Cir. 1999) (Table) (because claimant had no legal interest in the property as a matter of state law, court need not reach bona fide purchaser claim). Further, the Court does not reach the "cause to believe" element if the claimant does not establish that it was a purchaser for value. United States v. Allmendinger, 2012 WL 966615, at *2 (E.D. Va. Mar. 21, 2012) ("If the claimant is a not a bona fide purchaser for value, it is unnecessary to decide whether the claimant was reasonably without cause to believe that the property was subject to forfeiture").

As discussed above, a claimant must also prove that it was reasonably without cause to believe that the property was subject to forfeiture. United States v. Petters, 857 F. Supp. 2d 841, 847–48 (D. Minn. 2012) (finding that claimant was a purchaser for value does not end the inquiry; claimant must still show that despite media attention to the investigation of defendant, it did not have reason to know defendant's property was subject to forfeiture when it acquired its liens).

Moreover, a claimant who was aware of the defendant's criminal conduct in connection with the property cannot be a bona fide purchaser for value. United States v. Parenteau, 647 F. App'x 601, 604 (6th Cir. 2016) (court of appeals affirmed dismissal of defendant's son's § 853(n) petition because at the time petitioner obtained assignment of interest in forfeited property, he was not reasonably without cause to believe that the property may be subject to forfeiture); United States v. Cox, 575 F.3d 352, 356–57 (4th Cir. 2009) (Government was justified in opposing wife's claim that she did not know the property she received from her husband in a divorce settlement was subject to forfeiture, where she knew he was under investigation but was mistaken as to the nature of his offense; what matters is that she knew his property was subject to forfeiture, not that she knew the statutory basis for the forfeiture); United States v. Frykholm, 362 F.3d 413, 416 (7th Cir. 2004) (a claimant who remains willfully blind cannot claim to have been without reason to know that defendant's property was subject to forfeiture; third party who acquired an interest in defendant's property knowing that defendant had engaged in fraud and the property was unencumbered by debt was on notice—or was willfully blind to the fact—that the property represented funds obtained from the fraud scheme); United States v. Simmons, 2019 WL 4412443 (S.D.N.Y. Sept. 16, 2019) (where claimant obtained purported interest in real property after husband was arrested in connect with fraud scheme that was ongoing when they purchased the property, claimant could not have a reasonable belief that the property was not subject to forfeiture at time she obtained her claimed interest); United States v. Dupree, 919 F. Supp. 2d 254, 273 (E.D.N.Y. 2013) (third party could not claim it was without reason to believe property was subject to forfeiture just because court granted motion to vacate pretrial restraining order for lack of probable cause; third party was on notice that government might still establish forfeitability by preponderance of the evidence at trial); aff'd in part, vac'd in part by United States v. Watts, 786 F.3d 152 (2d Cir. 2015); United States v. Weidner, 2004 WL 432251, at *7 (D. Kan. Mar. 4, 2004) (person who loans money and takes lien on forfeitable property, suspecting that there is something illegal going on, is not "reasonably without notice"; third party must be engaged in an arm's-length transaction); United States v. McCorkle, 143 F. Supp. 2d 1311, 1328–31 (M.D. Fla. 2001) (bank that exercises due diligence, knows that its customer is engaged in fraud and is under investigation by law enforcement, and knows that customer's account at the bank has been seized, yet proceeds to

3

acquire an interest in the customer's property, is not "without cause to believe" that the property was subject to forfeiture).

Significantly, media reports regarding the defendant's wrongdoing, which link the wrongdoing to the forfeitable property, have been held to put the third party on notice that the property is forfeitable. United States v. BCCI Holdings (Luxembourg) S.A. (In re Am. Express Bank II), 961 F. Supp. 287, 296 (D.D.C. 1997) (due to press coverage of defendant's misconduct, claimant knew or should have known that defendant's assets were subject to forfeiture; standard is objective reasonableness).

Courts have held that a claimant has an affirmative duty to conduct a reasonable inquiry into the forfeitability of the property. See United States v. Dreier, 952 F. Supp. 2d 582, 589 (S.D.N.Y. 2013) (agreeing that in appropriate circumstances, claimant has a duty to inquire before acquiring an interest in defendant's property, but finding that the facts were insufficient to trigger such a duty); United States v. Coffman, 2012 WL 5611510, at *2 (E.D. Ky. Nov. 15, 2012) (denying claimant's motion for summary judgment because there due to a dispute as to whether she conducted a reasonable inquiry to determine if the property she purchased was subject to forfeiture); United States v. Armstrong, 2007 WL 7335173, at *7 (E.D. La. June 1, 2007) (claimant "had a duty to conduct a reasonable inquiry into the facts and circumstances in the case before it attempted to acquire an interest in the forfeitable property"); see also FTC v. Network Servs. Depot, Inc., 617 F.3d 1127, 1144–45 (9th Cir. 2010) (defense attorney must undertake an "objectively reasonable and diligent inquiry" into the source of his fee; an attorney who remains "willfully ignorant of how his fees are paid," or who "simply take[s] his client at his word that the fees are not tainted," cannot be a bona fide purchaser); But see United States v. Petters, 2013 WL 269028 (D. Minn. Jan. 24, 2013) (after discovery was completed court found that bank had no affirmative duty to inquire as to the forfeitability of property in which it was acquiring a lien, despite media reports that spanned only a few days that defendant was under investigation). Furthermore, if a claimant avoids conducting a reasonable inquiry, he is chargeable with the knowledge which ordinary diligence would have elicited and cannot be considered a bona fide purchaser. United States v. Orozco-Prada, 636 F. Supp. 1537, 1544 (S.D.N.Y. 1986).

A claimant that is willfully blind cannot satisfy the "without cause to believe" requirement; the claimant's belief must be objectively reasonable. United States v. Coffman, 612 F. App'x 278, 284 (6th Cir. 2015) (LLC was not a bona fide purchaser of yacht after it failed to demonstrate "it was reasonably without cause to believe that the money was not proceeds of" defendant's fraud; defendant's wife was the sole proprietor of the LLC, and was aware of the "red flags" concerning defendant's finances around the time of purchase); BCCI Holdings, 961 F. Supp. at 295-96 (given extensive media coverage of defendant's misconduct, claimant knew or should have known that defendant's assets were subject to forfeiture; standard is objective reasonableness); United States v. Sabatino, 2018 WL 2074191, at *1 (S.D. Fla. Apr. 13, 2018), report and recommendation adopted, 2018 WL 2016500 (S.D. Fla. Apr. 30, 2018) (pawnbroker who purchased stolen luxury goods at pennies on the dollar, ignored numerous red flags suggesting that the goods were stolen, failed to make a reasonable inquiry, and ignored its own anti-money laundering compliance program, as well as state and federal law, failed to meet objective test demonstrating that it was reasonably without cause to believe that the goods were

forfeitable); In re Moffitt, Zwerling & Kemler, P.C., 846 F. Supp. 463, 475 (E.D. Va. 1994) (claim that third party was without cause to believe property was subject to forfeiture must be "objectively reasonable"; the issue in ancillary proceeding is not whether claimant believed that government would institute a forfeiture action, or knew that it had done so, but whether claimant knew the property was "subject to forfeiture"), aff'd sub nom. United States v. Moffitt, Zwerling & Kemler, P.C., 83 F.3d 660, 666 (4th Cir. 1996) (law firm had reason to know that the fee it received was subject to forfeiture). A claimant cannot just bury its head in the sand and consciously avoid diligently investigating fraud—to do so indicates that the petitioner has not acted in good faith. See, e.g., Gowan v. Westford Asset Mgmt. (In re Dreier LLP), 462 B.R. 474, 491 (Bankr. S.D.N.Y. 2011) (an investor cannot engaged in "willful blindness" and ignore substantial red flags supporting that fraud exists).

In addition, to qualify as a bona fide purchaser for value, a claimant must show that it paid valuable consideration and had neither constructive nor actual knowledge that the conveyance was fraudulent. Orozco-Prada, 636 F. Supp. at 1542. Where the terms of an investment are "too good to be true," a presumption of fraud arises. See Dreier, 462 B.R. at 492; Lowenstein v. Reikes, 60 F.2d 933, 936 (2d Cir.1932) ("A sale for a grossly inadequate consideration is recognized as one of the common badges of fraud, casting doubt upon the good faith of the purchaser.").

In order to sort out competing interests to forfeitable property, the government may conduct discovery that "is necessary or desirable to resolve factual issues" under Federal Rule of Criminal Procedure 32.2(c)(1)(B). United States v. BCCI Holdings (Luxembourg) S.A., 1993 WL 760232, at *4 (D.D.C. Dec. 8, 1993) (government may take discovery from claimant); United States v. Vithidkul, 2014 WL 1515130, at *3 (D. Md. Apr. 16, 2014) (when claimants' amended claims still failed to provide the detail required by § 853(n)(3), court authorizes government to conduct discovery); United States v. Hailey, 924 F. Supp. 2d 648, 658–59 (D. Md. 2013) ("Here it appears that there are factual issues to be resolved regarding the source of funds to Mrs. Hailey and the provenance of the Disney artwork. It is desirable that evidence on these issues be disclosed via discovery before a hearing.").

Courts have recognized that discovery is necessary for the government to litigate the merits of a claim, and, as a result, have held that a claimant's failure to respond to discovery requests can result in dismissal of its claim. United States v. Reyes, 307 F.3d 451, 457–58 (6th Cir. 2002) (under Rule 37, district court has authority to dismiss third party's claim for failure to comply with discovery without first issuing an order compelling compliance and without considering other sanctions; failure to provide requested documents prejudices government by preventing it from conducting depositions and other discovery); United States v. BCCI Holdings (Luxembourg) S.A. (In re BCP), 169 F.R.D. 220, 286 (D.D.C. 1996) (court dismisses third party claim for failure to comply with government's discovery requests; "because the failure to produce discovery blocks the United States' ability to litigate the merits of [the claim], a less severe sanction would not be effective"); United States v. Von Nothaus, 2016 WL 4180967, at *2 (W.D.N.C. Aug. 4, 2016) (petitioner's repeated refusals to answer interrogatories and to provide any documentation confirming his alleged purchase of coinage constituted a violation of Fed. R. Civ. P. 37(b) and warranted dismissal of his petition); United States v. Murray, 2015 WL 404779, at *2 (S.D. Ga. Jan. 29, 2015) (despite claimant's pro se status, dismissal of the claim

filed in ancillary proceeding is the appropriate sanction for his repeated failure to respond to discovery requests); United States v. Hopkins, 2009 WL 9054954, at *2 (D.S.C. Sept. 4, 2009) (noting that court dismissed claim as sanction for failing to respond to discovery requests).

II.     Background

The government and Danske began negotiating a settlement prior to the Court's entry of the preliminary orders of forfeiture. Although negotiations progressed, the one major obstacle to settling was Danske's repeated intransigence to providing proof of its claim. When the government refused to succumb to Danske's pressure to settle without adequate proof of its nearly $200 million claim, Danske elected to abandon settlement discussions. It then sought to bypass the normal procedures that would allow the government to test its claim through orderly discovery and sought Court intervention to press for an "expedited" determination of its claim. The government, nevertheless hopeful that it could reach a settlement with Danske, refrained from commencing the ancillary proceeding to avoid involving numerous third parties that would not have to be involved if a settlement could be reached outside of the ancillary process. However, settlement discussions do not relieve Danske of producing proof of its claim, as any claimant to forfeitable property must provide proof of its claim, whether it be voluntarily or through formal discovery in an ancillary proceeding. Danske made clear at the June 10 status conference that it desires to proceed with an ancillary proceeding, move for summary judgment, and abandon settlement negotiations. The discovery the government now seeks, through its carefully tailored document demands, is authorized by law and is aimed at the elements that Danske must prove to establish its claim to be a bona fide purchaser for value. More importantly, in a case such as the instant one, where Danske is claiming it is owed nearly $200 million dollars, and the resort in Diamante Cabo San Lucas ("DCSL resort") may be the only valuable asset available for forfeiture, the discovery sought by the government is imperative.

Danske's piecemeal document production over the course of several years has been and continues to be woefully inadequate. Although Danske, on more than one occasion, has represented to the court that it had provided all of the documents to determine its claim, Danske continues to produce documents to the government even after having moved for summary judgment. Indeed, on the evening of June 30, 2020, Danske filed a revised statement pursuant to Local Rule 56.1 and a revised exhibit consisting of 276 pages. See DE 870. Danske is attempting to convince the Court that its claim is simple. It is not. Danske's claim involves a complex set of factual and legal issues. Danske's request for "expedited" treatment is an attempt to obfuscate what appears to be its own failure to conduct any due diligence when it acquired its interest in the property or abide by ordinary lending standards. Danske also impermissibly seeks to shift its burden of proof to the government.

In order to simplify what the government has learned to date, Danske's claim can be broken down into two parts. First, there is the $125 million loan (the "Initial Loan") from Lehman Brothers ("Lehman") to the DCSL resort. According to Danske, at the time it acquired the loan from Lehman "[i]n early 2009, the Borrower owed Lehman $107,538,327.83 in principal and $49,132,479 in unpaid accrued interest." Danske Petition, DE 836, p. 8. As discussed more fully below, based on the documents filed in the Lehman bankruptcy proceedings, Danske appears to have acquired the Initial Loan at a substantial discount as part of

an assignment by Lehman to Danske. The Initial Loan was one of a pool of commercial loans that satisfied part of the amount of Danske's proof of claim in the bankruptcy proceedings. Second, there are the subsequent loans Danske alleges it made to the DCSL resort (the "Additional Loans"). Danske's total claim of $197.1 million consists of the combined total of the Initial Loan and Additional Loans, and the associated interest, unspecified miscellaneous fees and expenses to which Danske claims it is entitled.

In order to succeed on its claim as to these two tranches of loans, Danske has the burden of proving the following three elements: 1) that it has a valid legal interest; 2) that it was a bona fide purchaser for value of its interest; and 3) that it was reasonably without notice that the property was subject to forfeiture. Timley, 507 F.3d at 1130–31. Based on Danske's petition, the government served document demands with regard to the three elements that Danske must prove under the above summarized case law. Danske has failed to produce, and refuses to produce, evidence to meet its burden as to all three elements for the following reasons.

    III.    <u>Danske Failed to Produce and Refuses to Produce Documents Showing It Has a Valid Legal Interest</u>

First, contrary to its repeated refrain, Danske has not demonstrated that it has a valid legal interest in the Initial Loan because it has failed to produce the most basic evidence to support its claim, namely, evidence of when and how it acquired its interest in the Initial Loan. To date, Danske has not provided the government with any evidence, or even allegations, as to when or how Danske acquired its interest in the Initial Loan from Lehman. Instead, Danske alleges, in conclusory fashion, that it purchased the Initial Loan from Lehman for an unspecified amount of consideration on an unspecified date, pursuant to a 1999 Master Repurchase Agreement and 2005 committed repurchase facility agreement (collectively, the "Commercial Repo Agreements") -- both of which predate the existence of the Initial Loan and thus could not have specifically addressed the Initial Loan. Further, Danske summarily contends that it settled with Lehman with regard to a pool of commercial loans, including the Initial Loan, for an unspecified value in the Lehman bankruptcy proceedings. A review of the records from the Lehman bankruptcy proceeding -- that Danske did *not* provide, but which the government obtained after a review of the thousands of documents on the docket in the Lehman bankruptcy -- indicates that Danske acquired the Initial Loan for significantly less than its face value. According to Danske's proof of claim filed in the bankruptcy proceeding, it purchased commercial loans with a face value of $1.174 billion. See Schedule 1 to Danske's Proof of Claim, attached hereto as Exhibit A, at p. 8. However, Danske stated in its proof of claim that the actual value of those loans was only $248.2 million (i.e., approximately 21% of the face value of the loans). See id. Since the Initial Loan was one of the commercial loans, it is likely Danske took the position that the actual value of the Initial Loan was much less than its face value.

Lehman disputed the value of the assigned loans, and appraisers and valuation firms were engaged to value the assigned loans, including the Initial Loan, and ultimately Lehman and Danske reached a settlement with regard to the value of the loans. See Docket No. 08-13555 (Bankr. S.D.N.Y.), Declaration of Daniel Ehrmann in Support of Debtor's Motion ("Ehrmann Declaration") attached hereto as Exhibit B, at pp. 2-3. Notably, Danske is

7

represented by the same counsel here as it was in the bankruptcy proceedings, and is in possession of these appraisals and valuations, despite its assertion otherwise. Compare id. at p. 3 ("Upon receipt of the final appraisals, [Lehman] and Danske exchanged valuations on the assigned Loans and underlying real estate projects and proceeded to engage in negotiations regarding the calculation of a deficiency claim based on the parties [sic] respective valuations."), with Danske's Objections, DE 863, at p. 8 (stating that the appraisals and valuations "are not in Danske's custody or control because it is Danske's understanding that these entities were hired by Lehman.").

Thus, while the value of the loans was a central issue in the litigation between Danske and Lehman, and facts indicate that Danske attributed a significantly reduced value to the Initial Loan in the bankruptcy proceedings, Danske nonetheless claims the full value of the Initial Loan in this forfeiture proceeding, in what appears to be an attempt to obtain a windfall recovery for itself, at the expense of the government and the other claimants to the property, including several victims who are owners of the DCSL resort through CSL Properties, LLC. Under principles of judicial estoppel, Danske's claim to the Initial Loan should be limited to the amount Danske claimed as its value when it settled with Lehman in the bankruptcy proceedings. In similar circumstances, courts have refused to allow a party to change the valuation applied to property in order to take a more advantageous position in subsequent litigation. See In re 300 Washington Street, LLC, 528 B.R. 534, 546 (Bankr. E.D.N.Y. 2015) (applying judicial estoppel to require that the City be held to the dollar amount of its claim previously put forth in the bankruptcy case, and debtor be held to the value set forth in its plan—not its later claimed higher value, holding that judicial estoppel "prevents a party from switching to an inconsistent theory to gain an advantage in litigation."); Payne v. Wyeth Pharmaceuticals, 606 F. Supp. 2d 613 (E.D. Va. 2008) (plaintiff was estopped from seeking any amount above the $1 million value of the personal injury claim that he had scheduled in his bankruptcy case, even though he sought $25 million later in a personal injury action).

Indeed, Danske may not be able to demonstrate that it provided adequate value for the Initial Loan. Danske asserts in its petition that the Commercial Repo Agreements and Lehman bankruptcy documents form the basis for its acquisition of the Initial Loan. See DE 835-1 at ¶¶ 9-20. Yet, Danske has yet to produce any document setting forth the value of the Initial Loan at the time Danske acquired it. Accordingly, the government is entitled to the discovery about the circumstances of Danske's acquisition of, and subsequent litigation and settlement involving the value of, the Initial Loan.

Furthermore, Danske has not demonstrated that it has a valid legal interest in the Additional Loans.[1] Danske's documentary proof as to the Additional Loans suffers numerous deficiencies. For example:

---

[1] The government has retained a forensic accountant to review the records Danske has thus far produced. The forensic accountant has determined, in part, that Danske's records and "proof" are replete with inconsistencies and deficiencies, including, but not limited to, those discussed in this letter.

- Danske has failed to provide proof to support its claim that it is entitled to more than $3.5 million in "miscellaneous fees," in addition to other fees and charges totaling more than $5.6 million;

- Danske has failed to provide evidence to support its claim to more than $53 million it purportedly loaned to the DCSL resort. While Danske's records show those funds being wired from Danske to Trimont, there is no further proof to show that the money was wired from Trimont to the DCSL resort;

- Documentation Danske has provided indicates that Danske has overstated at least $98,000 of its claim, seeking that sum as "professional fees," despite the fact that Danske's loan servicer's records do not include these fees;

- Danske has failed to document its $50 million profit participation fee, which is a loan term Danske added after it acquired its interest from Lehman, and which fee is purportedly calculated based on a formula involving the fair market value of the resort;

- Danske has failed to document a $900,000 wire transfer on October 10, 2018 from Facility C to an unknown recipient; and

- Danske has failed to produce numerous summary statements, account statements, and invoices from Trimont, its loan servicer, which are necessary because several transactions in Danske's statements do not reconcile with the Trimont statements, and the missing statements will either provide an explanation for the discrepancies or demonstrate an issue of fact.

Accordingly, the government is entitled to discovery with regard to the missing documentation and the blatant and unexplained discrepancies in Danske's accounting.

IV. Danske Failed to Produce and Refuses to Produce Documents to Prove It is a Bona Fide Purchaser for Value

Second, Danske has failed to provide proof that it was a bona fide purchaser for value of a) the Initial Loan, and b) the Additional Loans. As stated above, Danske has failed to provide evidence that it purchased the Initial Loan from Lehman, and that it did so *for value*. Similarly, Danske's incomplete and inconsistent documentation belies Danske's contention that it is a bona fide purchaser for value of the Additional Loans.

In addition to the lack of evidence to substantiate the claimed Additional Loans, the evidence that has been produced raises questions about Danske's lender practices as pertains to the loans at issue and the actual amount of its claim. In this regard, a review of the records Danske has provided as to the Additional Loans reveals that a majority of the "payments" toward the loan

9

balance were, in reality, either funds drawn down from one facility to pay down another facility,[2] or payments on the revolver facilities that were withdrawn within a close proximity of the payments. The produced records indicate that: a) the loan balance did not decrease over time; b) there were only a few payments made against the principal for Facility A (the non-revolving facility); and c) the capitalization of the interest owed on Facility A resulted in an exponentially increasing debt in Danske's favor. In sum, the records Danske has produced to date fail to show a true paying down of the debt, while the interest, which was capitalized (i.e., compounded), continued to accrue to Danske's benefit at an exorbitant rate.[3]

Moreover, despite the DCSL resort's reported inability to meet its obligations under the loan, and the DCSL resort's numerous defaults on the loan, Danske continued to loan money to the DCSL resort, and has stated to this Court that it wants Kenneth Jowdy ("Jowdy"), to remain as the manager of the DCSL resort. Danske has made these representations to the court knowing that Jowdy has been: 1) unable to maintain the financial viability of the DCSL resort and pay down the balance of the debt, and 2) accused of wrongdoing involving the very asset at issue since as early as 2008. While a bona fide lender would presumably take measures to ensure that the borrower is able to meet its obligations, Danske, on the other hand, *inter alia*, 1) insisted that Jowdy remain as the DCSL resort manager; 2) has not shown that it was collecting from the DCSL resort the documentation that the loan agreements required be submitted as a precondition to the lending of funds to ensure that the funds were being properly used, despite the fact that nearly all of the loan money went to Jowdy or Jowdy-owned and controlled entities; 3) amended the loan agreements to confer a substantial, personal financial benefit on Jowdy, in the event the government successfully forfeits his equity interests, by paying him 10% of the principal payment received by Danske through a sale of the resort or its loan, even though Jowdy was and is being paid $225,000 *per month* through his entity Legacy Properties to manage the resort and it is his job to pay down the debt; 4) continued to loan to the DCSL resort after numerous defaults occurred beginning in 2010, and the DCSL resort's repeated failure to satisfy conditions precedent to the loaning of funds, while continuing to bury the DCSL resort in debt; 5) did not send the DCSL resort's bank statements, which showed the loan balance and other pertinent information, to the resort in Mexico, but rather sent them to various other addresses, including, at various points in time, to the address of Danske's own loan officers in London; 6) was aware that the DCSL resort utilized dozens of bank accounts to receive the loan funds, including at least 22 different accounts owned by the DCSL resort, including three DCSL resort accounts in the Cayman Islands, 18 accounts owned by DCSL resort affiliated entities, and 12 HOA accounts; and 7) charged exorbitant, if not usurious,

---

[2] For example, on April 29, 2013, $696,281 from Facility C was used to pay down Facility B.

[3] For years Danske has represented to the Court that it has infused the DCSL resort with additional funds to keep the DCSL resort afloat; however, the records provided to date show that Danske has not actually provided any new funds to the DCSL resort since 2014. Instead, Danske has merely allowed the DCSL resort to continue to pay down the revolver facilities and then withdraw the same funds. Importantly, this was a significant benefit to Danske because Danske did not have to loan any new funds, while the facilities continued to accrue interest at an exorbitant rate, creating an even greater debt in Danske's favor.

interest rates and fees.[4] Indeed, the facts and circumstances indicate that Danske did not meet ordinary lender standards and established what was essentially a subprime mortgage with the DCSL resort that would inure to Danske's benefit upon the DCSL resort's inevitable default on the loan, or, as it turned out, the forfeiture of the DCSL resort. Moreover, Danske's continued loaning of money to the DCSL resort despite the numerous red flags, and charging exorbitant interest, fees, and penalties, destroyed the value of the victims' ownership interest in the DCSL resort, while Danske stood to heavily profit.[5] The conduct described herein directly affects Danske's status as a bona fide purchaser for value. If the requested records demonstrate or confirm, for example, that Danske knew that Jowdy was siphoning funds from the DCSL resort, or that Danske and Jowdy had an arrangement through which Jowdy would stand silent as Danske systematically depleted the equity in the resort by amending the loan agreements further burying the resort in debt; in return Danske would look past Jowdy's mismanagement of the DCSL resort and pay him a substantial sum upon selling the property in a foreclosure, or after recovering its "investment" through a forfeiture sale, then Danske would not be considered a bona fide purchaser for value. Therefore, the government is entitled to discovery to determine the actual amount of loan monies that were advanced for the construction of the resort and the circumstances under which the funds were loaned.

V. <u>Danske Failed to Produce and Refuses to Produce Documents Regarding Its Knowledge of the Forfeitability of the Property</u>

Third, Danske has failed to provide evidence that it was reasonably without notice that the property was subject to forfeiture both: a) when it purchased the Initial Loan; and b) on each occasion when it entered into the Additional Loans and continued to fund the DCSL resort. On the contrary, evidence shows that as early as 2008, civil lawsuits were being brought by individuals and entities that asserted, *inter alia*, that the DCSL resort was connected to the Defendants' misconduct. In addition, between 2008 and 2013, there were at least 17 news

---

[4] The government's forensic accountant has determined that while Danske's claim amount is $197.1 million, Danske's unrecovered investment in the DCSL resort, based on documents available to the government, is approximately $103.2 million. Thus, by repeatedly extending its loan agreements with the DCSL resort, and allowing the DCSL resort to pay down the revolver facilities and then withdraw the same funds, without Danske having to invest any new money, and knowing that the DCSL resort could not pay down the debt as it stood, Danske was accruing interest at an exorbitant rate, and now stands to "expeditiously" make a profit of $94 million more than it invested in the DCSL resort in this forfeiture.

[5] As Your Honor may also recall, when Jowdy sought Court permission in January 2017 to settle the Delaware books and records action by providing several victims with a percentage of profit distributions from his ownership interest in the DCSL resort through KAJ Holdings, Jowdy's counsel admitted that none of the entities have received any distributions of profits to date, nor will they until Danske is fully paid. However, as Danske's financial records now show, and as it appears Danske and Jowdy knew in January 2017, Danske's multiple modifications to the loan, which enabled it to exponentially increase the debt owed to it, created a situation where it was virtually impossible for the entities and victims to receive distributions of profits, and Danske would almost certainly end up owning the DCSL resort through a foreclosure.

articles discussing the lawsuits, criminal conduct, and the resort's connection to potential misconduct, which should have put Danske on notice of the resort's potential forfeitability. See Exhibit C, list of lawsuits and articles. In its petition, Danske contends that it was without reason to believe that the DCSL resort was subject to forfeiture. See DE 835-1 at ¶¶ 21, 24, 25. Danske even alleges that after numerous loan extensions and loan modifications between 2009 and 2014, following the assignment of the Initial Loan in 2009, it was without reason to believe that the DCSL resort was subject to forfeiture. This allegation is contrary to the record. For example, Jowdy swore in a declaration that he "kept Danske fully informed on [his] continuing legal issues with Kenner and Kenner's clients and continues to do so." See DE 611-1 at ¶ 21. Moreover, in approximately 2013, Fortune Magazine interviewed Peter Hughes ("Hughes"), a Danske manager, regarding the DCSL Resort's management in which Hughes stated, "[i]f there had been mismanagement, I think it would have turned up in the due diligence we've conducted on the project over the past three years." This interview took place after the lawsuits and news reports concerning malfeasance, signaling that Danske was, at a minimum, willfully blind and ignoring the warning signs of fraud and was aware or should have been aware of the allegations that existed surrounding potential fraud involving the property. The government is entitled to discovery regarding this issue.

Danske objects to the government's carefully tailored document requests that seek discovery regarding Danske's knowledge about the forfeitability of the DCSL resort. See DE 863 at pp. 5-6. Danske cites to the declaration of David Daniels ("Daniels") made in support of summary judgment to support its position that Danske did not know about the potential forfeitability of the DCSL resort. See DE 860-9 at ¶ 7. In fact, Daniels merely asserts that he did not know about the potential forfeitability of the DCSL resort until the protective order was filed, and, further, that he was unaware of any other employee that knew about the potential forfeitability of the DCSL resort. Id. However, Hughes' statement to Fortune demonstrates that as far back as 2013 Danske was aware of allegations of wrongdoing that could potentially give rise to the forfeiture of the property. In addition, Jowdy swore that he kept Danske apprised of all his legal issues with Kenner (DE 611-1 at ¶21), which shows that Danske was on notice of the wrongdoing that gives rise to the forfeiture of the property. Indeed, "a genuinely held belief that property is not subject to forfeiture is unavailing unless the belief was objectively reasonable in the circumstances . . . . This standard precludes willful blindness on the part of a petitioner and imposes a duty of reasonable inquiry, where warranted, before objective reasonableness can be established." United States v. Armstrong, 2007 U.S. Dist. LEXIS 100821, at *8 (E.D. La. June 4, 2007). Danske's reliance on United States v. Watts, 786 F. 3d 172-74 (2d Cir. 2015) and United States v. Rodrigues-Perez, No. 10-CR-905, 2019 WL 188400, at *6-7 (S.D.N.Y. January 11, 2019) is misplaced. Neither case stands for the proposition that a claimant must have actual knowledge of a forfeiture proceeding. Based upon the foregoing, the government is entitled to discovery regarding the extent of Danske's knowledge that the property was subject to forfeiture, including any due diligence that was performed by Danske.

In any event, there can be no dispute that Danske was not a bona fide purchaser for value of the funds it loaned to the DCSL resort after the government filed the Bill of Particulars

on August 20, 2015, as Danske was indisputably on notice that the DCSL resort was subject to forfeiture at that time.[6]

## VI. The Government is Entitled to the Discovery Sought in its Document Demands

As a basic principle, the government has the right to discovery—Danske cannot thwart these efforts, hiding behind arguments that the government's requests are overly broad or burdensome, especially given that the documents the government is requesting are the very documents that support Danske's burden of proof and are, or certainly should be, in Danske's possession. Given the financial morass the government has to date uncovered, there is little doubt as to why Danske asks this Court to quickly determine based on its self-serving representations: 1) that it is a bona fide purchaser for value of the DCSL resort loan; 2) that it had no reason to know that the Resort was subject to forfeiture; and 3), that it is entitled to its claim in full. Danske demands this without providing all supporting documents and—indeed—attempting to frustrate the government's statutory obligation to fully evaluate its claim, even though Danske has the burden of proof, not the government.

Danske has objected to nearly every single document request. Danske objects to the phrase "any and all" documents as being overly broad. In fact, the document demands are not overly broad in nature, but request specified categories and sub-categories of documents. For example, Document Request 2 seeks "any and all documents concerning the acquisition of [Danske's] interest in the DCSL resort from Lehman and/or Lehman Bankruptcy estate, including, but not limited to, documents concerning (a) the date when [Danske] purchased the DCSL resort loan from Lehman and/or Lehman Bankruptcy estate; (b) the amount of consideration, if any, that [Danske] provided to purchase the DCSL resort loan from Lehman and/or the Lehman Bankruptcy estate; (c) the value attributed to the DCSL resort loan in [Danske's] settlement with Lehman and/or the Lehman Bankruptcy estate during the Lehman Bankruptcy; and (d) the transaction documents, under the Repo Agreement or otherwise, evidencing (i) the purchase price for the purchase of the DCSL resort loan and (ii) the terms of Lehman's repurchase of the DCSL resort loan." This request seeks information pertaining to Danske's acquisition of the Initial Loan. Moreover, it should not be unduly burdensome for Danske to locate the documents as many of them should be maintained in Danske's file relating to the Lehman bankruptcy.

Here, the government, informed by its forensic accountant's review and analysis, crafted categories of document requests to evaluate Danske's claims as a bona fide purchaser for value. The timeframe, as objected to by Danske, is based upon Danske's petition. For example, Danske maintains that it purchased the DCSL resort loan from Lehman pursuant to the terms of the Master Repurchase Agreement dated 1999. See DE 835-1 at ¶ 15. It is axiomatic that document requests are dated to encompass the dates of the documents relied upon by Danske to establish its claim. As discussed in the chart attached hereto as Exhibit D, each document request to which Danske objects seeks information pertaining to one or more of the elements that Danske is required to prove for its claim, and, therefore, is an appropriate document request.

---

[6] The government has never represented to Danske that it would deem Danske a bona fide purchaser.

13

The cases cited by Danske to support its objection to the document requests are inapposite. In Rodriguez v. NNR Global Logistics, USA, Inc., 2016 U.S. Dist. LEXIS 46093 (E.D.N.Y. Mar 31, 2016) and Henry v. Morgan's Hotel Grp., Inc., 15-CV-1789, 2016 U.S. Dist. LEXIS 8406 (S.D.N.Y. Jan. 25, 2016), the courts found that Rule 45 subpoenas duces tecum to non-parties, not document demands to parties, were overly broad. Mamakos v. United Airlines, Inc., 2018 WL 4861392 (E.D.N.Y. Sept. 28, 2018), involved "any and all" demands for documents concerning broad topics, such as "inter-office written / computer generated communication / reports." Id., at *5. By contrast, the document demands in this case concern specific areas relevant to the legitimacy of Danske's claim. Moreover, the Mamakos court also held that the party responding to the document requests improperly raised boilerplate objections, as Danske has done here. Id., at *4 ("Counsel does so, however, without setting forth, with particularity, why and how the documents sought are irrelevant or overbroad.); see also Jacoby v. Hartford Life & Accident Ins. Co., 254 F.R.D. 477, 478 ("boilerplate objections that include unsubstantiated claims of undue burden, overbreadth and lack of relevancy," while producing "no documents and answer[ing] no interrogatories . . . are a paradigm of discovery abuse"). Likewise, such boilerplate objections are no longer viable or acceptable as a result of the 2015 Amendments to the Federal Rules of Civil Procedure." See Hannah v. Wal-Mart Stores, Inc., 2014 U.S. Dist. LEXIS 75745, at *7 (D. Conn. June 4, 2014) ("The objecting party must do more than simply intone the familiar litany that the requests are burdensome, oppressive or overly broad. Instead, the objecting party must show specifically how, despite the broad and liberal construction afforded the federal discovery rules, each request is not relevant or how each question is overly broad, burdensome or oppressive by submitting affidavits or offering evidence revealing the nature of the burden.").

Danske objected to every single document request using virtually the same boilerplate language. For example, for Document Requests 29-33, Danske responded that it "objects to this request as overbroad, unduly burdensome, and irrelevant. Based on its objections, Danske will not produce documents called for in this request." However, these requests go directly to Danske's claim that it was without knowledge of the forfeitability of the DCSL resort. As discussed above, it is an objective standard and Danske had a "duty of reasonable inquiry, where warranted, before objective reasonableness can be established." Armstrong, 2007 U.S. Dist. LEXIS 100821, at *8. See also In re Petitions for Relief Concerning Consent Order of Forfeiture, 2020 WL 2739536, at *4 (D.D.C. May 26, 2020) ("These circumstances provide additional reasons why discovery is likely to illuminate whether petitioners were 'reasonably without cause to believe that the property was subject to forfeiture,' 21 U.S.C. § 853(n)(6)(B), and support the conclusion that the proposed discovery is relevant to the parties' claims pursuant to Federal Rule of Civil Procedure 26. The Court finds in its discretion that discovery is desirable to resolve the circumstances surrounding the Bank's acquisition of its interest in the properties, which are relevant to the petitioners' standing and status as bona fide purchasers under 21 U.S.C. § 853(n)(6)(B).").

For the foregoing reasons, the government respectfully requests that the Court deny Danske's discovery objections. In addition, given Danske's pending summary judgment motion, the government respectfully requests that the Court set a deadline for Danske's response to the discovery to provide the government with an opportunity to review the discovery and respond to Danske's summary judgment motion.

14

Thank you for Your Honor's consideration of this submission.

                Respectfully submitted,

                RICHARD P. DONOGHUE
                United States Attorney

By:    /s/ Madeline O'Connor
        Madeline O'Connor
        Diane C. Leonardo
        Assistant U.S. Attorneys
        (631) 715-7870
        (631) 715-7854

cc: Philip Kenner, by mail
    All counsel of record by ECF