

600 MASSACHUSETTS AVE., NW   WASHINGTON, DC 20001
T 202.344.4000   F 202.344.8300   www.Venable.com

George Kostolampros

T 202.344.4426
F 202.344.8300
gkostolampros@venable.com

July 6, 2020

**VIA ECF**

The Honorable Joseph F. Bianco
Visiting Circuit Judge (sitting by designation in below referenced matter)
U.S. Court of Appeals for the Second Circuit
100 Federal Plaza
Central Islip, New York 11722

Re:   **United States of America v. Kenner, Cr. No. 13-607 (JFB)**

Dear Judge Bianco,

      We write on behalf of Danske Bank A/S London Branch ("Danske") in reply to the Government's July 3, 2020 letter [Dkt. No. 871]. As set forth in our June 26, 2020 letter, Danske respectfully requests that the Court strike the government's requests for documents[1] and move forward with the summary judgment motion as originally scheduled. The government's letter is astounding in the breadth of the arguments the government seeks to raise at the eleventh hour. Disingenuously, the government asserts to this Court that the discovery it seeks is now "imperative," even though the government did not request the majority of these documents until now. The most astounding portions of the government's letter, beyond the misrepresentations regarding its dealings with Danske, is that the government asserts that Danske gave no value to acquire its interest and the government's challenge to the millions of dollars Danske advanced since 2009. The government's letter demonstrates that it seeks to prolong these proceedings at any cost and to engage in a fishing expedition into issues irrelevant to determining Danske's claim. It further seeks to create a new set of victims in Danske and its shareholders. As set forth in our June 22, 2020 letter [Dkt. No. 863] and in this reply, the government's arguments challenging Danske's claim and seeking additional discovery are meritless. Accordingly, Danske respectfully requests that the Court strike the government's document requests and move forward with the summary judgment briefing as originally scheduled.

---

[1]   Danske has produced all of the documents relevant to its claim. But for what Danske has produced and has agreed to produce, the government's document requests should be stricken.

The Honorable Joseph F. Bianco
July 6, 2020
Page 2

**First, as to the Government's recitation of the background in this matter, the government again misstates its dealings with Danske.** The government claims that the one major obstacle to settlement negotiations was Danske's purported "repeated intransigence" to providing proof of its claim. Danske has provided the government reams and reams of documents supporting Danske's claim. How else did the government end up with more than **sixteen thousand pages** of documents which Danske has provided to it over *years*?

It is the government that has continually refused to consider Danske's claim, initially claiming that any consideration of Danske's claim was premature prior to the Court issuing its Preliminary Order of Forfeiture. After the Court issued the Preliminary Order, the government delayed publishing notice under the pretense of settlement discussions with Danske. It, however, became clear in our "negotiations" with the government that the government was not engaged in a good faith attempt to reach a settlement. For instance, the government never responded to any of Danske's recent offers and would not even agree to a settlement in principle contingent on Danske providing any additional documents and supporting its full claim amount. Further, the two main issues the government now raises in challenging Danske's claim are ones the government could have raised months and years ago—*i.e.*, that somehow Danske did not give value in acquiring the initial loan from Lehman *in the 2009 Lehman bankruptcy* and that Danske somehow had knowledge of the potential forfeiture because of litigation against the borrower and one of the defendants. Instead, over the past five years, the government continually told Danske that it was premature to discuss its claim and then entered into protracted settlement discussions that appear were simply meant to forestall Danske asserting its rightful claim.

Finally, the government alleges that Danske has "abandon[ed]" settlement discussions—that is patently false. The government has had Danske's March 30, 2020 settlement offer before it for more than **three months**. If any party has abandoned settlement discussions, it is the government who, as explained above, simply refuses to engage in negotiations that might lead to a consensual resolution.

**Second, contrary to the government's argument, Danske has produced documents establishing its valid claim.** Among other things, this includes the Assignment Agreement between Lehman and Danske, dated January 13, 2009, which explicitly states that Lehman "confirms that it has sold, transferred, assigned, delivered, set-over and conveyed to Danske . ." its interest in the Resort Property and "*[f]or good and valuable consideration* . . ." *See* Exhibit 35 to the Kostolampros Declaration submitted in support of Summary Judgment Motion [D.E. 853-5]. The actual consideration paid was the extinguishment of a portion of debt owed to Danske in connection with the $800 million Danske paid to Lehman under the Master Repurchase Agreement.

Contrary to law, common sense, and the facts here, the government argues that Danske's own internal valuations of the loan represent the amount that Danske's claim should be limited to in this forfeiture proceeding. In an effort to muddy an issue that is simple and straight-forward, the government alleges that Danske would be obtaining a "windfall recovery" by asserting a claim to the full value of the loan. Danske's internal valuations, however, are irrelevant to Danske's claim and rights, each of which is governed by and set forth in the loan agreements (which the government has had for years). Moreover, it bears noting that contrary to the government's

The Honorable Joseph F. Bianco
July 6, 2020
Page 3

depiction of a windfall, Danske *overpaid* for its interests in the Resort Property and Equity Interests. The government ignores that Danske paid $800 million for its interest in a number of assets including Lehman's loan as to the Resort Property. Danske's overpayment is evidenced by the deficiency claim it filed in Lehman's bankruptcy—a claim that the bankruptcy court ultimately approved as a debt of $580 million.

The valuation of the loan over the Resort Property is simply irrelevant to determining Danske's claim. The two cases cited by the government to support its view that the valuation of the property at the time of the Lehman bankruptcy applies in setting Danske's claim are not applicable. *In re 300 Washington Street*, 528 B.R. 534 (E.D.N.Y. 2015) concerned an unsecured tax debt owed to the City of Syracuse where the bankruptcy did not allow for an unsecured tax debt if it exceeded the value of the interest of the estate in such property. *Id.* at 544. The government goes on to cite to a personal injury case that also has no relevance here. Strikingly absent from the government's letter is any case law citation that actually supports the government's perverted view. Of course, this is not at all surprising given that it is simply without doubt that Danske is a *bona fide* purchaser and its legal interest is the full amount outstanding under the original Lehman loan (along with the amounts it subsequently advanced). The situation here is akin to mortgage lender "A" selling its rights to a loan to another lender or servicer "B." Mortgage lender/servicer B's claim and legal interest is not the amount of an internal value at or the amount it specifically paid for the loan, but the original loan amount. Such is the case here, Danske paid value for its interest as payment for debt that was owed to Danske under the Master Repurchase Agreement and is owed the amounts due to Lehman by the borrower. *See U.S. v. Watts*, 786 F.3d 152, 167 n.7 (2d Cir. 2015) (recognizing the principle that "'[w]hen a valid assignment is made, the assignee steps into the assignor's shoes and acquires whatever rights the latter had.'"); *Dewees Mellor, Inc. v. Weise*, No. 91 CV 2518 (EKR), 1993 U.S. Dist. LEXIS 19299, at *3 (E.D.N.Y. Dec. 29, 1993) ("It is well established that an assignee will step into the shoes of the assignor, acquiring exactly what the prior mortgage holder had."); *Equator Int'l, Inc. v. NHS St. Investors, Inc.*, 43 Misc. 3d 251, 257-58 (N.Y. Sup. Ct. 2014) (enforcing assignee's right to full repayment of principal and interest); *LH 1440 L.L.C. v. State St. Bank (In re Lehman Bros. Holdings Inc.)*, No. 10 Civ. 6707 (LTS)(AJP), 2011 U.S. Dist. LEXIS 23352 (S.D.N.Y. Mar. 8, 2011) (enforcing assignee's right to repayment on a mortgage purchased from Lehman Brothers under the terms of a repurchase agreement).

Further, the government's argument that Danske may not be able to show it has a valid legal interest in the additional amounts Danske directly advanced is bizarre and defies basic principles of law and logic. The majority of the examples the government has provided are amounts due under the underlying agreements and rest on documents that the government has had for years. *See* 2009 Amended and Restated Loan Agreement (DANSKE_0013865, produced years ago) §§ 6.1 (setting forth Danske's entitlement to reimbursement of "reasonable, out-of-pocket expenses incurred by Lender in connection with the Loan . . ."), 5.3 (setting forth the Profit Participation Fee); 2014 Third Amended and Restated Loan Agreement, §§ 6.1 (DANSKE_0012231, produced years ago) (setting forth Danske's entitlement to reimbursement of "reasonable, out-of-pocket expenses incurred by Lender in connection with the Loan . . ."), 5.7 (setting forth the Profit Participation Fee).

The Honorable Joseph F. Bianco
July 6, 2020
Page 4

The government goes on to question certain advances Danske made totaling $53 million even though the government acknowledges Danske has provided the government with wire transfer information showing that those amounts were wired to third party servicer Trimont with the ordering customer listed as "Diamante Cabo San Lucas S. DE. R.L. DE C.V." Contrary to the government's claim that "there is no proof to show that the money was wired from Trimont to the DCSL resort," Danske has provided the government with invoices and spreadsheets provided by Trimont, a third-party, show that these amounts were advanced by Danske and owed by the borrower. Is the government claiming that Trimont did not in turn fund the $53 million it received from Danske to the borrower despite Trimont representing that these amounts were owed by the borrower? Is the government claiming that, if Trimont did not send these funds to the borrower, Danske should somehow be penalized for a third-party's fraud? How does the government think the Resort Property has been developed?

**Third, Danske has provided documents showing it was a *bona fide* purchaser without notice of potential forfeiture.** Danske has produced the original and superseding indictment in this matter as well as the Declaration of David Daniel setting forth that, until August 2015, Danske had no knowledge of potential forfeiture of the Resort Property.

In a desperate attempt to extract monies from Danske's rightful claim, the government asserts unfounded allegations challenging Danske's *bona fide* purchaser status. Following a pattern of ignoring facts inconvenient to its position, the government claims that Danske has not provided any additional funds to the Resort Property—other than allowing the borrower to tap into the revolver continually over the last six years. Perhaps the government misapprehends what "new money" is under a revolving facility—once the borrower paid down principal and then borrowed *more* under Facility C, that is new money and credit risk for Danske. The government then takes issue with the fact that Danske has allowed the Resort Property to continue to pay down the revolver and then withdraw the same funds. Is the government suggesting that Danske, a lender, was unentitled to repayment or that it should have foreclosed on those amounts, thus leading to the resort not continuing as a going concern and resulting in a foreclosure? Regardless, that Danske did not foreclose on the property is irrelevant to determining Danske's claim.[2]

The government then goes on to baselessly claim that somehow Danske's *bona fide* purchaser status is in question because Danske loaned funds to the borrower knowing of certain unsupported claims the government makes as to the developer of the Resort Property. It begs the question, if the government believes that Mr. Jowdy was, as the government references in its letter, "siphoning funds from the DCSL resort" then why has the government allowed Mr. Jowdy to remain as developer and why hasn't the government taken any action to remove Mr. Jowdy? The reason is that it has no credible evidence. The government's claim that Danske "insisted that Jowdy" remain as developer of the Resort Property has nothing to do with whether Danske is a

---

[2]     The government also baselessly asserts that given the loan documents, it was "inevitable" that the DCSL resort would default. As of October 2014, however, the loan documents provided a 10-year repayment period for the term loans and a repayment period of 3 years for the revolver loan—ample time for the Borrower to meet its obligations—and in fact the Borrower was in compliance with its amortization profile and was current with its interest obligations at the time of the entry of the protective order. So, what is the government's basis in claiming that the borrower would inevitably default?

The Honorable Joseph F. Bianco
July 6, 2020
Page 5

bona fide purchaser for value, and in all events is hardly probative of anything other than that Danske is making the best decisions it can for the investment it has in the Resort Property.

In yet another misleading statement, the government takes issue with an agreement reached with the developer in 2018 seeking to ensure continuity in case the Resort Property was subject to forfeiture. But Danske discussed this agreement with the government in a meeting on August 23, 2018—before the agreement was entered into. In fact, in the August 23, 2018 meeting with the government, the government agreed that Mr. Jowdy should stay on as developer and, as one government official commented at that meeting, needed to be "incentivized" to stay if his equity interest was forfeited so that the Resort Property could continue without any undue harm caused by a change in developer. The government never questioned any aspect of the commission agreement. The government now again sadly and disingenuously misstates the true facts. In any event, this issue has nothing to do with Danske's *bona fide* purchaser status and therefore, there is no reason to allow for prolonged discovery that is nothing more than an irrelevant fishing expedition.

Further, the government's claim that Danske is not a *bona fide* purchaser for any sums advanced after August 2015 neglects the practical realities created by the government's own actions. Essentially, under the government's theory now, Danske should have violated the protective order by refusing to fund new draws under the revolver, which would have almost certainly led to an earlier borrower default and to a deterioration of the value of the Resort Property—a result that is expressly barred by the protective order. Is the government now suggesting that banks with liens on properties and assets subject to a protective order should undertake self-help remedies to avoid the government challenging its status as a bona fide purchaser as to draws permitted following the entry of a protective order?

Finally, there is absolutely no basis for additional discovery as to Danske's knowledge of the potential forfeitability of the Resort Property and the equity interests. The government points to civil litigation and news articles referencing litigation amongst the developer and the defendant and litigation against the developer, but those articles and actions are not enough to challenge Danske's claim as a *bona fide* purchaser. The government in a purely conclusory statement says that the cases cited by Danske are "misplaced." But those cases show that here, where the government did not even include the Resort Property as subject to forfeiture until 2015, there is no basis to allege that Danske was aware of the potential forfeitability of the Resort Property. Specifically, in *U.S. v. Watts*, 786 F.3d 152 (2d Cir. 2015), the Second Circuit found that "the government's failure to establish probable cause at a *Monsanto* hearing may, under some circumstances, leave a defense attorney 'reasonably without cause to believe that [his client's] property was subject to forfeiture' for the purposes of § 853(n)(6)(B)." *Id.* at 173. And as the court in *U.S. v. Petters*, 2013 U.S. Dist. LEXIS 10396 (D. Minn. Jan. 24, 2013) stated, "[t]he bona fide purchaser defense turns on knowledge that specified property is subject to forfeiture; generalized knowledge of fraud is not enough . . . . In other words, evidence tending to show that Crown should have known Petters was engaged in fraud will not suffice. Rather, the evidence must show that Crown should have known the Keystone and Plymouth Properties were obtained with fraud proceeds—and, hence, forfeitable—when its interests arose." *Id.* at *18. Here, the government provides a list of news articles and litigation, but a review of those articles and

The Honorable Joseph F. Bianco
July 6, 2020
Page 6

complaints do not make the connection necessary to find that Danske was not a *bona fide* purchaser for value and that Danske knew or should have known that the Resort Property was potentially subject to forfeiture. That point is even clearer in light of the fact that the government itself did not even charge the defendants until October 2013—years after the civil litigation and before a number of the articles it notes were published. The government itself did not connect the Resort Property or Equity Interests to the defendants' crimes until it filed two bills of particular—first, in an April 2015 bill of particulars where Kenner's interests in two of the LLCs were included as potentially forfeitable (which did not even include the Resort Property) and then, in an August 2015 bill of particulars—filed almost *7 years* after Danske acquired its claim—where, for the first time, the Resort Property and all of the Equity Interests were listed as potentially forfeitable. How can the government possibly assert that Danske knew or should have known of potential forfeiture when the government itself did not seek forfeiture of the Resort Property until its second Bill of Particulars, two years after the initial indictment in this matter and years after Danske acquired its interest?

\*   \*   \*   \*

As set forth above, Danske has produced all of the documents necessary to determining Danske's claim and respectfully requests that the Court strike the government's documents requests and move forward with the summary judgment briefing as scheduled.

We thank the Court for its continued attention to this matter.

Respectfully,

*[signature]*

George Kostolampros
Doreen S. Martin
Xochitl S. Strohbehn

cc:   All parties of record via ECF
      Thomas McC. Souther, Esq. and Kevin P. Mulry, Esq. (by email)