EFiled: Jan 05 2017 12:16PM EST
Transaction ID 60024761
Case No. 11258-VCL

January 2017 settlement agreement

**EXHIBIT "A"**

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release (the "Settlement Agreement") is made and entered into this ___ day September, 2016, subject to the approval of the Court of Chancery of the State of Delaware (the "Court of Chancery"), pursuant to Court of Chancery Rule 23.1, and the United States District Court for the Eastern District of New York (the "U.S. District Court"), by and between: DIAMANTÉ DEL MAR, LLC, a dissolved Delaware limited liability company ("DDM"); BAJA MANAGEMENT, LLC, a dissolved New York limited liability company (on behalf of itself and as Managing Member of DDM) ("Baja"); DIAMANTÉ CABO SAN LUCAS, LLC, a Delaware limited liability company ("DCSL"); KAJ HOLDINGS, LLC, a Delaware limited liability company ("KAJ"); LEGACY PROPERTIES, LLC, a Delaware limited liability company ("Legacy Properties"); CSL PROPERTIES 2006, LLC, a Delaware limited liability company ("CSL Properties"); GREG DEVRIES (individually and derivatively on behalf of DDM); RAYMOND MURRAY (individually and derivatively on behalf of DDM); KENNETH JOWDY (individually and in his capacities as Managing Member of Baja, DCSL, KAJ, and Legacy Properties) ("Jowdy"); each individual DDM SIGNATORY (as defined below); and each individual CSL SIGNATORY (as defined below). Each of the foregoing parties is individually referred to as a "Party" and collectively referred to as the "Parties."

## RECITALS

### A. The Derivative Action.

WHEREAS, DDM is a dissolved Delaware limited liability company, initially formed on or around September 24, 2002, by the filing of a Certificate of Formation with the Secretary of State of the State of Delaware, for the purpose of, among other things, developing a resort property in El Rosario, Baja California, Mexico that was once known as Diamanté Del Mar;

WHEREAS, Baja is a dissolved New York limited liability company, initially formed on or around September 25, 2002, by the filing of a Certificate of Formation with the Secretary of State of New York, for the purpose of, among other things, acting as the Managing Member of Diamanté Del Mar;

WHEREAS, the following seventeen (17) individuals invested directly in DDM or indirectly in DDM through Baja: (1) Jason Allison; (2) Bryan Berard; (3) Byron Dafoe; (4) Greg DeVries; (5) Scott Erickson; (6) Sergei Gonchar; (7)Dimitri Khristich; (8) Jay McKee; (9) Glen Murray; (10) Raymond "Rem" Murray; (11) Mattias Norstrom; (12) Michael Peca; (13) Chris Simon; (14) Jozef Stumpel; (15) Darryl Sydor; (16) Vladimir Tsyplakov; and (17) Jason Woolley (together, the "DDM Investors");

WHEREAS, Baja was DDM's Managing Member;

WHEREAS, Jowdy was the President and sole Managing Member of Baja;

WHEREAS, Greg DeVries and Raymond Murray (together, "Plaintiffs") are individual Class A Members of DDM;

WHEREAS, on or about June 18, 2014, Plaintiffs, through their counsel, filed a Verified Complaint in the matter styled *Greg DeVries and Raymond Murray v. Diamanté Del Mar, L.L.C.,*

1

C.A. No. 9782-ML, in the Court of Chancery (the "DDM Books & Records Action") seeking to inspect certain books and records of DDM;

WHEREAS, DDM agreed to allow Plaintiffs to inspect certain company records and DDM produced documents responsive to Plaintiffs' records requests in the DDM Books & Records Action;

WHEREAS, based on their review of the voluminous financial records and other documents produced in the DDM Books & Records Action, Plaintiffs and their counsel ultimately determined to file a stockholder derivative action styled *Greg DeVries and Raymond Murray v. Kenneth Jowdy and Diamanté Del Mar, L.L.C.*, C.A. No. 11258-VCL (the "Derivative Action");

WHEREAS, Plaintiffs and their counsel have now conducted a thorough investigation relating to the claims and the underlying events and transactions alleged in both the DDM Books & Records Action and the subsequent Derivative Action that has included, among other things, research of the applicable law with respect to the claims and causes of action asserted in the Derivative Action and the potential defenses thereto, a review and analysis of the voluminous documents produced by DDM, extensive document discovery directed at multiple third-parties, and other evidence developed as a result of Plaintiffs and their counsel's own investigation;

WHEREAS, the DDM Books & Records Action is deemed closed by the Court of Chancery, and a prospective settlement of all claims is being proposed at this time regarding the Derivative Action;

**B.   The CSL Properties Books & Records Action.**

WHEREAS, DCSL is an active Delaware limited liability company, initially formed on or around February 3, 2006, by the filing of a Certificate of Formation with the Secretary of State of the State of Delaware, for the purpose of, among other things, developing a resort property near Cabo San Lucas, Baja California, Mexico, known as Diamanté Cabo San Lucas;

WHEREAS, Jowdy is the Managing Member of DCSL;

WHEREAS, CSL Properties is one of the four original Class A Members of DCSL;

WHEREAS, the following twelve (12) individuals have invested in and are members of CSL Properties: (1) Bryan Berard; (2) Brian Campbell; (3) Greg DeVries; (4) Sergei Gonchar; (5) Dimitri Khristich; (6) Tyson Nash; (7) Mattias Norstrom; (8) Michael Peca; (9) Steve Rucchin; (10) Turner Stevenson; (11) Darryl Sydor; and (12) Vladimir Tsyplakov (together, the "CSL Investors");

WHEREAS, CSL Properties is currently being managed by the 3-member "CSL Management Panel" consisting of Greg DeVries, Sergei Gonchar, and Mattias Norstrom, pursuant to a Member Resolution ratified and adopted by a majority of the CSL Properties' members on or about September 30, 2015, and Plaintiffs represent and warrant that they have full authority to negotiate on behalf of and bind CSL Properties;

WHEREAS, on June 12, 2014, CSL Properties, through its counsel, filed a Verified Complaint in the matter styled *CSL Properties, 2006, L.L.C.* et al. *v. Diamanté Cabo San Lucas, L.L.C.*, C.A. No. 9752-ML (now C.A. No. 9752-MZ), in the Court of Chancery (the "DCSL Books

& Records Action," and together with the DDM Books & Records Action, the "Books & Records Actions") seeking to inspect certain books and records relating to DCSL's past and current financial performance and ongoing operations;

WHEREAS, DCSL ultimately agreed to allow CSL Properties to inspect certain company records, and DCSL produced documents responsive to CSL Properties' records requests in the DCSL Books & Records Action;

WHEREAS, based on their review and analysis of the voluminous financial records and other documents produced in the DCSL Books & Records Action as well as other relevant materials obtained from third-parties, their research of the applicable law and analysis of other evidence developed as a result of their own investigation, and other pertinent considerations, including without limitation the ongoing forfeiture proceedings involving DCSL (as described herein), CSL Properties and its counsel elected to forego filing a stockholder derivative action or any other lawsuit beyond the DCSL Books & Record Action;

WHEREAS, the DCSL Books and Records Action is ongoing in the Court of Chancery;

### C. The Kenner Criminal Case.

WHEREAS, the Plaintiffs and all of the other DDM Investors (with the exception of Scott Erickson who was never a Kenner Client) and all of the CSL Investors (collectively, the "Kenner Clients") were at one time represented by a purported licensed financial advisor known as Phillip A. Kenner ("Kenner") who purported to provide the Kenner Clients with investment advice and financial consultation regarding their investment in both DDM and DCSL;

WHEREAS, on or about October 29, 2013, Kenner was indicted on a number of charges involving an alleged conspiracy to commit wire fraud and money laundering in an action styled *United States of America v. Phillip A. Kenner and Tommy C. Constantine*, Criminal Case No. CD-13-00607 (E.D.N.Y.) (the "Kenner Criminal Case"), which case is currently pending in the U.S. District Court;

WHEREAS, on or about July 9, 2015, Kenner was convicted on six (6) counts on which he was indicted for wire fraud, money laundering, and conspiracy in the U.S. District Court;

WHEREAS, the Kenner Clients acknowledge that they were formerly represented by Kenner who insisted that any and all communications and representations regarding the development and financial status of DDM and DCSL were to be made to the Kenner Clients through Kenner;

WHEREAS, Jowdy was Managing Member of Baja which, in turn, was the Managing Member of DDM and is also the Managing Member of DCSL;

WHEREAS, while Baja and Jowdy had certain reporting obligations to the Kenner Clients under the Operating Agreements for these companies, the Plaintiffs acknowledge and agree that Kenner preferred and insisted that all communications with the Kenner Clients regarding the development and the financial status of the DDM and DCSL projects should be undertaken exclusively through Kenner and, therefore, the Kenner Clients acknowledge that Jowdy had limited to no communications with the Kenner Clients;

3

WHEREAS, certain of the Kenner Clients and others (including Kenner) had filed and participated in a number of legal proceedings and complaints initiated in both the United States and Mexico beginning in or about 2008, and continuing after Kenner's conviction, against Jowdy and Jowdy-controlled entities, alleging a number of different issues regarding Jowdy's handling of the Kenner Clients' investments in DDM and DCSL and the management of the DDM and DCSL projects;

WHEREAS, it is now the Kenner Clients' understanding and belief that the basis of these allegations stemmed from inaccurate, overstated, or erroneous information that was provided to the Kenner Clients by Kenner and/or others associated with Kenner, but not from Jowdy, and that Kenner had repeatedly misrepresented information regarding Jowdy and the DDM and DCSL projects to the Kenner Clients;

WHEREAS, upon further discovery and investigation following the guilty verdict rendered against Kenner, it is now the Kenner Clients' understanding and belief that Jowdy acted in good faith and in accordance with his fiduciary and contractual duties to develop the DDM and DCSL projects and also with regard to his fiduciary duties in the management of DDM, Baja Management, DCSL and all other project related entities and Released Persons (as defined below);

WHEREAS, it is the Kenner Clients' further understanding and belief that the foreclosure of the DDM property by KSI Corporation only occurred after all reasonable efforts were made by Jowdy to develop and salvage the DDM project;

WHEREAS, the Kenner Clients acknowledge that the information that formed the basis of the complaints and allegations against Jowdy and the Jowdy-controlled entities both in Mexico and the United States, including the complaints that formed the basis of both the Derivative Action and the Books & Records Actions, were based on inaccurate, overstated, or erroneous information provided to the Kenner Clients by Kenner;

**D. Mediation & Settlement.**

WHEREAS, on June 27, 2016, representatives of the Parties participated in a mediation conference with the Honorable John W. Noble serving as mediator (the "Mediation") and engaged in arms-length negotiations regarding a comprehensive settlement of the Derivative Action, the Books & Records Actions, and all other disputes between the Parties;

WHEREAS, on or about July 5, 2016, the Parties entered into a Memorandum of Understanding, providing for a global settlement of the Derivative Action, the Books & Records Actions, and all disputes between the Parties on the terms and subject to the conditions set forth herein;



WHEREAS, Plaintiffs' Counsel and the Parties have been made aware that Ethan Moreau, Owen Nolan, and Joe Juneau (all of whom were also Kenner Clients) (a) never filed or participated in any of the Kenner-initiated legal proceedings and complaints against Jowdy or any Jowdy-controlled entities, and (b) entered into prior separate settlement agreements with Jowdy and/or Jowdy-related entities as the result of other litigation, which prior agreements will be unaffected by this Settlement Agreement, and Plaintiffs' Counsel and the Parties do not object to such separate agreements;

4

WHEREAS, Plaintiffs' Counsel and the Parties have been made aware that (1) Jason Allison and (2) Byron Dafoe (both of whom were also Kenner Clients) never filed or participated in any of the Kenner-initiated legal proceedings and complaints against Jowdy or any Jowdy-controlled entities; and

WHEREAS, Plaintiffs' Counsel and the Parties have been made aware that Scott Erikson (a) was never a Kenner Client, (b) never filed or participated in any of the Kenner-initiated legal proceedings and complaints against Jowdy or any Jowdy-controlled entities, and (c) invested in the DDM project directly through Jowdy;

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **Definitions.** As used in this Settlement Agreement the following terms have the meanings specified below:

   1.1. A "CSL Signatory" is each and every one of the CSL Investors who have expressly agreed to the terms of and signed the Settlement Agreement. Collectively, all such persons shall be referred to as the "CSL Signatories."

   1.2. "Danske" means Danske Bank A/S, London Branch, the London Branch of a company incorporated in the Kingdom of Denmark, and the principal lender for the DCSL project.

   1.3. The "DCSL Operating Agreement" means the Limited Liability Company Agreement of Diamanté Cabo San Lucas, LLC, dated March of 2006.

   1.4. A "DDM Signatory" is each and every one of the DDM Investors who have expressly agreed to the terms of and signed the Settlement Agreement. Collectively, all such persons shall be referred to as the "DDM Signatories."

   1.5. The "Defendant-Related Parties" means Jowdy, DDM, DCSL, Baja, KAJ, and Legacy Properties.

   1.6. "Defendants' Counsel" means Theodore A. Kittila, Esq., Greenhill Law Group, LLC, 1000 N. West Street, Suite 1200, Wilmington, Delaware 19801, Telephone: (302) 414-0510; E-mail: ted@greenhilllaw.com.

   1.7. "Plaintiffs' Counsel" means Steven R. Main, Esq., Hill, Rugh, Keller & Main, P.L, 390 North Orange Avenue, Suite 1610, Orlando, Florida; Telephone: (407) 926-7460; E-mail: smain@hrkmlaw.com; and Stamatios Stamoulis, Esq., Stamoulis & Weinblatt, LLC, 6 Denny Road, Suite 307, Wilmington, Delaware 19809; Telephone: (302) 999-1540; E-mail: stamoulis@swdelaw.com.

    1.8. "Related Persons" for any persons specified in this Settlement Agreement means with respect to such persons (1) any respective past, present, or future direct or indirect parent entities, affiliates, subsidiaries, controlled entities, families, controlling persons, associates, investment advisers, general partners, managing members, and (2) each and

5

all of their respective past, present, or future, direct or indirect, officers, directors, stockholders, principals, managing directors, representatives, employees, attorneys, fiduciaries, financial advisers, investment advisers, insurers, reinsurers, consultants, accountants, underwriters, lenders, agents, heirs, beneficiaries, distributees, executors, trustees, trusts, foundations, partners, partnerships, general and limited partners and partnerships, limited liability companies, managing members, managing agents, members, associated entities, joint ventures, family members, personal and legal representatives, estates, administrators, predecessors, successors, and assigns of such persons, and of each of the foregoing.

1.9.   In addition to the above definitions, certain words and phrases used in the Settlement Agreement may be defined in other portions of the Settlement Agreement.

## 2.   Settlement of Derivative Action.

2.1.   **Monetary Consideration.** To fully and finally resolve the claims asserted in the Derivative Action, the Parties agree to the following monetary consideration:

2.1.1.   KAJ will pay fifteen percent (15%) of the future profit distributions made by DCSL to KAJ (not including tax distributions to KAJ, if any) (the "15 Percent Share") over time to Plaintiffs' Counsel to be held as part of a settlement fund (the "Settlement Fund") for the DDM Signatories, until such time as KAJ has paid an amount not to exceed a total of **$8,250,000.00** (eight million two hundred and fifty thousand U.S. dollars), a sum which equates to the aggregate investment into DDM by the potential DDM Signatories (the "Aggregate DDM Investment"), with the 15 Percent Share and Aggregate DDM Investment amount to be potentially reduced as described below on the Settlement Deadline (as defined below). For the avoidance of any doubt, such payments from KAJ will be made only if and when KAJ receives profit distributions as a Class A Member of DCSL.

2.1.2.   Plaintiffs' Counsel shall promptly pay out of the Settlement Fund to each of the DDM Signatories their individual percentage interest of the 15 Percent Share (as scheduled on Exhibit A and identified as the "DDM Percentage Interest") as such distributions are received by Plaintiffs' Counsel from KAJ. Each of the DDM Signatories shall only be entitled to payments totaling their "DDM Repayment" (as scheduled on Schedule A), and no more.

2.1.3.   Notwithstanding the foregoing, Plaintiffs' Counsel shall be entitled to deduct any attorney's fees approved as part of this settlement from payments made to DDM Signatories; provided, however; that Plaintiffs' Counsel agree that Plaintiffs' Counsel will have no claim for attorney's fees or costs from any person with whom the Defendant-Related Parties have settled or with whom the Defendant-Related Parties may settle in the future.

2.1.4.   After KAJ has made its initial payment toward the Aggregate DDM Investment into the Settlement Fund, Plaintiffs' Counsel shall have one (1) year from the date of such payment (the "Settlement Deadline") to obtain the signature of any new DDM Signatories and to pay out such monies to persons who are new DDM Signatories.

6

All monies held in the Settlement Fund will be earmarked for each of the DDM Signatories and promptly distributed to each of the DDM Signatories based on their DDM Percentage Interest. Any monies remaining in the Settlement Fund from the initial payment by KAJ earmarked for DDM Investors that are not DDM Signatories and that have not been paid out as of the Settlement Deadline shall be remitted to KAJ within ten (10) business days. Plaintiffs' Counsel shall not deduct any attorneys' fees from the monies returned to KAJ.

2.1.5. The 15 Percent Share will be reduced by the DDM Percentage Interest of each DDM Investor who is not a DDM Signatory as of the Settlement Deadline and the Aggregate DDM Investment of $8,250,000.00 will be reduced by the amounts of the DDM Repayment of each DDM Investor who has not become a DDM Signatory as of the Settlement Deadline. For example, if there is only one DDM Investor who is not a DDM Signatory as of the Settlement Deadline, and the DDM Percentage Interest of such person is 6.06 percent, then the 15 Percent Share will be reduced by 6.06 percent from 15 percent to 14.091 percent. Furthermore, if there is only one DDM Investor who is not a DDM Signatory as of the Settlement Deadline, and the DDM Repayment of such person is $500,000.00, then the Aggregate DDM Investment will be reduced by $500,000.00 from $8,250,000.00 to $7,750,000.00. After the Settlement Deadline, the DDM Percentage Interest may be adjusted by the DDM Signatories on a *pro rata* basis, but in proportion with their respective investments in DDM, based on who is and who is not a DDM Signatory.

2.1.6. Once the Aggregate DDM Investment (as potentially reduced by the provisions above) has been paid in full to the Settlement Fund, KAJ will then, solely from future profit distributions made by DCSL to KAJ, reallocate and pay ten percent (10%) of subsequent profit distributions made by DCSL to KAJ (not including tax distributions, if any) (the "DDM 10 Percent Share"), in the manner described below. The DDM 10 Percent Share will be paid until DCSL and/or its property, Diamanté Cabo San Lucas, has been disposed of in its entirety and all final distributions to DCSL's members have been made in accordance with the DCSL Operating Agreement.

2.1.7. Payment of the DDM 10 Percent Share will be made to a to-be-formed flow-through entity (the "Settlement Entity"). The principal purpose of the Settlement Entity shall be to serve as a vehicle to receive future payments from KAJ as further described herein and make subsequent distributions to the DDM Signatories, less operating expenses and Plaintiffs' Counsel's attorneys' fees and costs awarded in connection with the settlement of the Derivative Action. The members of this to-be-formed Settlement Entity will be the DDM Signatories, with a *pro rata* ownership interest based on their respective investments in DDM, with such *pro rata* ownership to be adjusted upon the Settlement Deadline based on who is and who is not a DDM Signatory. The Managing Members of the DDM Settlement Entity shall be Plaintiffs (*i.e.*, Greg DeVries and Raymond Murray) and a third Member to be voted upon by the DDM Signatories once the Settlement Entity has been created. Plaintiffs' Counsel shall provide Defendants' Counsel the name of the Settlement Entity and wiring instructions for the purposes of making all payments envisioned hereunder.

2.1.8. The Parties acknowledge that the profit distributions discussed herein and which form the basis of the DDM Repayments and the DDM 10 Percent Share will be subject to the terms of DCSL Operating Agreement and that such profit distributions will be made solely from future profit distributions made by DCSL to KAJ, and are not guaranteed, as they are contingent on the occurrence of certain events that may or may not occur. Nevertheless, Jowdy represents that he will work in good faith to make reasonable efforts to request that Danske make profit distributions at an earlier date, with the determination of what constitutes reasonable efforts to be in the sole discretion of Jowdy.

2.2. **Benefits and Other Non-Monetary Consideration.** In addition to the above monetary consideration, to fully and finally resolve the claims asserted in the Derivative Action, the Parties agree to the following non-monetary consideration:

2.2.1. The DDM Signatories shall receive a free/waived Membership Initiation Fee in the Diamanté Club, along with a non-dues paying membership, to play golf at the Dunes Course, El Cardonal Course and the Short Course at Diamanté Cabo San Lucas, valid as long as Legacy Properties or any Jowdy-controlled entity or affiliate is the manager or operator of the DCSL property.

2.2.2. Member/Guest fees for golf for all guests accompanying a DDM Signatory will be waived, as long as Legacy Properties or any Jowdy-controlled entity or affiliate is the manager or operator of the property. A DDM Signatory must be present in the group in order to waive the Member/Guest fees for golf.

2.2.3. All rules and regulations applicable to other members of Diamanté Cabo San Lucas and the Diamanté Club shall also apply to DDM Signatories.

2.2.4. DDM Signatories, as well as any guests who accompany them, shall be offered and provided rates for units at any of the Residence Clubs (*i.e.*, timeshare/vacation club) or DCSL-owned properties at Diamanté Cabo San Lucas that are available at the time of booking, at a set rate of $100 (one hundred U.S. dollars) per room, per night (or, alternatively, a rate equal to the weekly maintenance fee for an available Residence Club Unit, if such amount is lesser). By way of example, the rate to reserve an available one-bedroom unit at The Resort at Diamanté will be $100 (one hundred U.S. dollars) per night, while the rate for a four-bedroom Golf Villa will be $400 (four hundred U.S. dollars) per night.

2.2.5. The room rates and other non-monetary consideration set forth above do not apply to unaccompanied guests. Scheduling of reservations will be subject to availability and annual rate increases of up to 4 percent may apply. Any food, transportation, or merchandise purchased by DDM Signatories or their guests will be charged at the same rates as those paid by a regular member at Diamanté Cabo San Lucas. All applicable taxes will apply to all charges and payments.

2.2.6. DCSL will provide the DDM Signatories with written instructions outlining the procedure for reserving or otherwise utilizing the golf and other accommodation benefits provided herein.

8

**3.  Settlement of All Other Disputes.**

3.1.  **Monetary Consideration.**  To fully and finally resolve all of the other disputes between the parties, the Parties agree to the following monetary consideration:

3.1.1.  KAJ and DCSL will pay a percentage of the future profit distributions as described below over time to CSL Properties for the CSL Signatories, until such time as KAJ and DCSL have paid an amount not to exceed a total of **$2,300,000.00** (two million three hundred thousand U.S. dollars), a sum which equates to the aggregate investment and/or payments into CSL Properties by the potential CSL Signatories (the "Aggregate CSL Investment"), with this amount to be potentially reduced as described below on the Settlement Deadline.  For the avoidance of any doubt, such payments from KAJ will be made only if and when KAJ receives profit distributions as a Class A Member of DCSL.

3.1.2.  The payment of the Aggregate CSL Investment (as potentially reduced by the provisions described herein) will be made over time and shall be derived solely from (a) a reallocation of ten percent (10%) of the future profit distributions made by DCSL to KAJ (not including tax distributions to KAJ, if any) (the "CSL 10 Percent Share") (as potentially reduced by the provisions described herein) and (b) the eight percent (8%) of the profit distributions made from DCSL to CSL Properties already provided for under the terms of the DCSL Operating Agreement, until the Aggregate CSL Investment (as potentially reduced by the provisions described herein) has been paid in full to all CSL Signatories.  Each of the CSL Signatories shall only be entitled to payments totaling their "CSL Repayment" (as scheduled on Schedule B), and no more.

3.1.3.  On the Settlement Deadline, the CSL 10 Percent Share will be reduced by the CSL Percentage Interest of each CSL Investor who is not a CSL Signatory as of the Settlement Deadline and the Aggregate CSL Investment of $2,300,000.00 will be reduced by the amounts of the CSL Repayment of each CSL Investor who has not become a CSL Signatory as of the Settlement Deadline.  For example, if there is only one CSL Investor who is not a CSL Signatory as of the Settlement Deadline, and the CSL Percentage Interest of such person is 4.348 percent, then the CSL 10 Percent Share will be reduced by 4.348 percent from 10 percent to 9.5652 percent.  All monies paid by KAJ as part of the CSL 10 Percent Share will be earmarked for each of the CSL Signatories based on their CSL Percentage Interest.  Any monies remaining in CSL Properties from the initial payment by KAJ earmarked for CSL Investors that are not CSL Signatories and that have not been paid out as of the Settlement Deadline shall be remitted to KAJ within ten (10) business days.  Plaintiffs' Counsel shall not deduct any attorneys' fees from the monies returned to KAJ. For purposes of this calculation only and for no other purpose, Ethan Moreau and Owen Nolan shall be deemed to be a CSL Signatories and the Parties hereto agree that each person shall receive his pro rata share of the CSL 10 Percent Share.

3.1.4.  Once the Aggregate CSL Investment has been paid in full to CSL Properties, KAJ will then, solely from future profit distributions made by DCSL to KAJ, reallocate and pay three percent (3%) of subsequent profit distributions made by DCSL to KAJ

(not including tax distributions, if any) (the "3 Percent Share"). The 3 Percent Share will be paid until DCSL and/or its property, Diamanté Cabo San Lucas, has been disposed of in its entirety and all final distributions to DCSL's members have been made in accordance with the DCSL Operating Agreement.

3.1.5. The Parties acknowledge that the profit distributions discussed herein and which form the basis of the CSL Repayment and the 3 Percent Share will be subject to the terms of DCSL Operating Agreement and that such profit distributions will be made solely from future profit distributions made by DCSL to KAJ, and are not guaranteed, as they are contingent on the occurrence of certain events that may or may not occur. Nevertheless, Jowdy represents that he will work in good faith to make reasonable efforts to request that Danske make profit distributions at an earlier date, with the determination of what constitutes reasonable efforts to be in the sole discretion of Jowdy.

3.2. **Benefits and Other Non-Monetary Consideration.** To fully and finally resolve all of the other disputes between the parties, the Parties agree to the following non-monetary consideration:

3.2.1. The CSL Signatories shall receive a free/waived Membership Initiation Fee in the Diamanté Club, along with a non-dues paying membership, to play golf at the Dunes Course, El Cardonal Course and the Short Course at Diamanté Cabo San Lucas, valid as long as Legacy Properties or any Jowdy-controlled entity or affiliate is the manager or operator of the DCSL property.

3.2.2. Guest fees for all guests accompanying a CSL Signatory will be waived, as long as Legacy Properties or any Jowdy-controlled entity or affiliate is the manager or operator of the property.

3.2.3. All rules and regulations applicable to other members of Diamanté Cabo San Lucas and the Diamanté Club shall also apply to CSL Signatories.

3.2.4. CSL Signatories, as well as any guests who accompany them, shall be offered and provided rates for units at any of the Residence Clubs (*i.e.*, timeshare/vacation club) or DCSL-owned properties at Diamanté Cabo San Lucas that are available at the time of booking, at a set rate of $100 (one hundred U.S. dollars) per room, per night (or, alternatively, a rate equal to the weekly maintenance fee for an available Residence Club Unit, if such amount is lesser). By way of example, the rate to reserve an available one-bedroom unit at The Resort at Diamanté will be $100 (one hundred U.S. dollars) per night, while the rate for a four-bedroom Golf Villa will be $400 (four hundred U.S. dollars) per night.

3.2.5. The room rates and other non-monetary consideration set forth above do not apply to unaccompanied guests. Scheduling of reservations will be subject to availability and annual increases of up to 4 percent may apply. Any food, transportation, or merchandise purchased by CSL Signatories or their guests will be charged at the same rates as those paid by a regular member at Diamanté Cabo San Lucas. All applicable taxes will apply to all charges and payments.

10

3.2.6. DCSL will provide the CSL Signatories with written instructions outlining the procedure for reserving or otherwise utilizing the golf and other accommodation benefits provided herein.

3.2.7. Parties that are both CSL Signatories and DDM Signatories shall not be permitted to double the benefits and other non-monetary consideration provided pursuant to this subsection or subsection 2.2.

4. **Inspection Rights.**  In addition to the inspection rights afforded under the DCSL Operating Agreement, Jowdy represents, warrants, and agrees that, upon written request and subject to the same confidentiality terms as are applicable in the Books & Records Actions, the same monthly and annual reports and other reporting information that DCSL provides to Danske will be provided to those DDM Signatories and the CSL Signatories. Jowdy shall provide the foregoing reports to any other DDM Investor and CSL Investor, subject to their agreement to keep such reports confidential, and the provision of such reports shall satisfy all of the reporting requirements under the DCSL Operating Agreement.

5. **Court Approval, Danske Approval, and Tolling Agreement.**

5.1.   The Parties further recognize and agree that a copy of this Settlement Agreement shall be provided by Jowdy to Danske for Danske's review and consent.

5.2.   Plaintiffs' Counsel and Defendants' Counsel shall seek approval from the Parties to the terms of the Settlement Agreement. Upon the signed approval of Jowdy, DDM, Baja, KAJ, Plaintiffs, a majority of the DDM Investors, CSL (through the CSL Management Panel), and a majority of the CSL Investors, Plaintiffs' Counsel shall submit this Settlement Agreement for approval from the Court of Chancery and the U.S. District Court in the Kenner Criminal Case as provided herein.

5.3.   The Parties recognize and agree that any agreement to settle derivative claims must be reviewed and approved by the Court of Chancery pursuant to Court of Chancery Rule 23.1. In addition to the approval of the Court of Chancery, the Parties recognize and agree that, pursuant to a protective order entered by the U.S. District Court in the Kenner Criminal Case on August 21, 2015 (the "Protective Order"), the terms of this Settlement Agreement must also be approved by Danske and the U.S. District Court.

5.4.   Until such date that the Settlement Agreement is consented to by Danske and approved in full by both the Court of Chancery and the U.S. District Court (the "Effective Date"), this Settlement Agreement shall not be effective.

5.5.   Simultaneously with their request for approval from the U.S. District Court in the Kenner Criminal Case, the Parties will request that the U.S. District Court vacate the Protective Order as to the U.S. Government's request for a forfeiture of the DCSL property and all DCSL membership interests, with the exception of any membership interests of Kenner in Baja Ventures 2006, LLC (one of the original four entities in DCSL, herein "Baja Ventures") and/or Diamante Properties, LLC. Nothing herein shall preclude Plaintiffs' Counsel from filing a claim with the U.S. District Court for a reallocation of the Kenner's membership interests in Baja Ventures or Diamante Properties, LLC to the CSL Investors or the DDM Investors, but any reallocation of

11

interests shall not affect the payments required to be made by KAJ pursuant to the terms of this Settlement Agreement.

5.6.   The Parties also recognize and agree that, in the event the U.S. District Court in the Kenner Criminal Case, or any other court of competent jurisdiction, enters a final order which forfeits to the U.S. Government or any other person any portion of Jowdy's membership interest in KAJ, Diamante Properties, LLC, DCSL, or any other entity, such forfeiture shall operate to void this Settlement Agreement.

5.7.   The Parties need and desire a reasonable opportunity to fully consummate this Settlement Agreement without concern of prejudicing their pending claims and defenses asserted in the Derivative Action and the DCSL Books & Records Actions due to the passage of time in seeking to finalize and obtaining the necessary approval for the Settlement Agreement, as further described in this Section. Accordingly, in the event that (a) the Court of Chancery denies approval of the Settlement Agreement, (b) the U.S. District Court in the Kenner Criminal Case denies approval of the Settlement Agreement, (c) Danske refuses to consent to the Settlement Agreement, (d) the U.S. District Court, or other court of competent jurisdiction, enters a final order which forfeits to the U.S. Government, or to any other person or entity, any portion of Jowdy's membership interest in KAJ, DCSL, or any other entity, or (e) the Settlement Agreement is otherwise voided for any reason whatsoever (the date of each such occurrence a "Fail Date"), the Parties recognize and agree that the claims in the Derivative Action and the DCSL Books & Records Action will be treated as tolled from June 27, 2016, to thirty (30) days after the Fail Date, and only for this period. The Parties further agree, however, that this tolling agreement shall not revive any claims on which the statute of limitations has already run or which would otherwise be barred by the doctrine of laches as of June 27, 2016.

5.8.   The Parties agree that the Derivative Action and the DCSL Books & Records Action shall be stayed pending the occurrence of the Effective Date. The Parties further agree that they will stay, and will not initiate, any other proceedings other than proceedings related to the settlement.

6.   **Cooperation, Dismissals, and Release.**

6.1.   The Parties agree to cooperate with each other to prevent, stay, or seek dismissal of or oppose entry of any interim or final relief in favor of any other Persons in any other litigation involving any of the Parties which challenges the terms of the Settlement Agreement or otherwise involves, directly or indirectly, a Released Claim. The Plaintiff-Related Parties agree (i) to refrain from commencing, prosecuting, instigating, or in any way participating in the commencement, prosecution or instigation of any action or proceeding asserting any Released Claim, either directly, representatively, derivatively, or in any other capacity against the Defendant-Related Parties or any of the Released Persons, and (ii) covenant not to sue any of the Defendant-Related Parties or Released Persons for any Released Claims; provided, however, that nothing herein shall be in any way construed as prohibiting the Parties from cooperating with the U.S. Government in the Kenner Criminal Case.

12

6.2.   Upon the Effective Date, the Derivative Action and the DCSL Books & Records Action shall be dismissed with prejudice, on the merits and without costs. A stipulation of dismissal (the "Dismissal Order") (substantially in the form attached hereto as Exhibit A) will be filed with the Court of Chancery. To the degree that the DDM Books & Records Action has not been already dismissed with prejudice, the Parties agree that such action is dismissed on the merits and without costs.

6.3. **Mutual Releases.**

6.3.1.   Upon the Effective Date, Greg DeVries and Raymond Murray (both individually and in their capacity as derivative plaintiffs on behalf of DDM), CSL, and each and every one of the DDM Signatories and the CSL Signatories, and any of their respective heirs, executors, administrators, estates, predecessors, predecessors in interest, successors, successors in interest, or assigns (or any person claiming by, through, in the right of or on behalf of them, directly or derivatively, by subrogation, assignment or otherwise) (collectively, the "Plaintiff Releasing Persons") release and forever discharge Jowdy, DDM, DCSL, Baja, KAJ, and Legacy Properties, and each and every one of its, his, or their individual and collective Related Persons (collectively, the "Defendant Released Persons"), from any and all manner of claims, demands, rights, actions, potential actions, causes of action, liabilities, damages, losses, obligations, judgments, duties, suits, agreements, costs, expenses, debts, interest, penalties, sanctions, fees, attorneys' fees, judgments, decrees, matters, issues, and controversies of any kind, nature or description whatsoever, whether legal or equitable, direct or derivative, known or unknown, contingent or absolute, suspected or unsuspected, foreseen or unforeseen, disclosed or undisclosed, liquidated or unliquidated, matured or non-matured, fixed or contingent, accrued or non-accrued, apparent or unapparent (including, but not limited to, any stockholder derivative claims for, based upon, arising out of, or related to any actual or alleged breach of fiduciary or other duty, negligence, fraud, or misrepresentation, or any other claims based upon or arising under any foreign, federal, state, local, statutory, regulatory, common, or other law or rule, including but not limited to any federal or state securities, antitrust, or consumer protection laws), that are, have been, or could have been asserted with respect to, Jowdy, DDM, DCSL, Baja, KAJ, Legacy Properties, the Plaintiffs, CSL, or in the Derivative Action, the Books & Records Actions, or that could have arisen, now arise, hereafter may arise out of, or are based upon, relate in any manner to, or involve, directly or indirectly, any of the acts, events, facts, matters, transactions, occurrences, conduct, statements, representations, misrepresentations, omissions, allegations, practices, or claims, or any other matters, things or causes whatsoever, or any series thereof, that were, could or might have been alleged, asserted, set forth, claimed, embraced, involved or referred to, directly or indirectly, in the Derivative Action and the Books & Records Action, whether now, or from the beginning of the world to the Effective Date (collectively, the "Released Claims"); provided however, that the Released Claims shall not include the right of the Parties to enforce (a) the terms of this Settlement Agreement, or (b) any contractual obligations under the terms of the DCSL Operating Agreement.

6.3.2.   Upon the Effective Date, Jowdy, DDM, DCSL, Baja, KAJ, and Legacy Properties, and any of their respective heirs, executors, administrators, estates, predecessors,

predecessors in interest, successors, successors in interest, or assigns (or any person claiming by, through, in the right of or on behalf of them, directly or derivatively, by subrogation, assignment or otherwise) (collectively, the "Defendant Releasing Persons") release and forever discharge Plaintiffs, CSL, the DDM Signatories, and the CSL Signatories, and each and every one of its, his, or their individual and collective Related Persons (collectively, the "Plaintiff Released Persons," and together with the Defendant Released Persons, the "Released Persons"), from the Released Claims; provided however, that the Released Claims shall not include the right of the Parties to enforce the terms of this Settlement Agreement.

6.3.3.   Upon the Effective Date, the Plaintiff Releasing Persons and the Defendant Releasing Persons shall be deemed to have fully, completely, finally, and forever released, relinquished, and discharged the Defendant Released Persons and the Plaintiff Released Persons, respectively, from the Released Claims, including unknown claims. This includes claims that are not known at the time of the release, and which if known might have affected the decision to enter into this settlement. In granting the releases herein, the Parties acknowledge that they have read and understand California Civil Code Section 1542, which reads as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

The Parties stipulate and agree that upon the Effective Date, the Parties shall be deemed to have, and by operation of the Dismissal Order shall have, expressly waived, relinquished and released all provisions, rights, and benefits conferred by or under California Civil Code Section 1542 or any law of the United States or any state of the United States or territory of the United States, or principle of common law, which is similar, comparable or equivalent to California Civil Code Section 1542. The Parties acknowledge that the foregoing waiver, relinquishment and release and the inclusion of "unknown claims" in the definition of "Released Claims" were separately bargained for and key elements of this settlement agreement and were relied upon by all of the Parties in entering into this Settlement Agreement. The Parties acknowledge, and each of the other Defendant Releasing Persons and Plaintiff Releasing Persons, by operation of law shall be deemed to have acknowledged, that they may discover facts different from, or in addition to, those which they now know or believe to be true with respect to the Released Claims, and in this event agree, or by operation of law shall be deemed to have agreed, that the releases contained in this Settlement Agreement shall be and remain effective in all respects and that it is the intention of the Parties, the Defendant Releasing Persons, and the Plaintiff Releasing Persons to completely, fully, finally, and forever extinguish any and all Released Claims, known or unknown, suspected or unsuspected, which now exist, or heretofore existed, or may hereafter exist, and without regard to the subsequent discovery of additional or different facts.

14

7. **Procedure for Approval.**

7.1.   As soon as practicable after execution of this Settlement Agreement by the necessary Parties and after the consent of Danske is obtained, Plaintiffs' Counsel and Defendants' Counsel shall submit this Settlement Agreement to the U.S. District Court in the Kenner Criminal Case for approval.  Approval shall be sought by a joint motion of the Parties.

7.2.   Concurrently with the submission of this Settlement Agreement to the U.S. District Court, Plaintiffs' Counsel shall submit this Settlement Agreement together with its exhibits by Motion to the Court of Chancery for preliminary review and shall request a hearing to request entry of a "Scheduling Order" (substantially in the form attached hereto as Exhibit B).

7.3.   The Scheduling Order shall schedule a settlement hearing (the "Settlement Hearing") at which the Court of Chancery will: (a) hear and determine any objections to the settlement; (b) determine whether the settlement, on the terms and conditions provided for in the Settlement Agreement is fair, reasonable, and adequate and in the best interests of, among others, DDM, Baja Management, and DCSL; (c) determine whether the Court should finally approve the Settlement Agreement and grant the Dismissal Order with the effect of extinguishing and releasing the Released Claims; and (d) rule on such other matters as the Court may deem appropriate.

7.4.   The Scheduling Order shall direct that a notice (the "Notice") (substantially in the form attached hereto as Exhibit C) be e-mailed or mailed by Plaintiffs' Counsel to all investors and members of DDM, Baja, and CSL Properties, pursuant to the terms of the Scheduling Order, to the e-mail addresses or mailing addresses available to Plaintiffs' Counsel, but no later than thirty (30) days prior to the Settlement Hearing.  Prior to the Settlement Hearing, Plaintiffs' Counsel shall file with the Court an appropriate declaration with respect to the preparation and dissemination of the Notice.

7.5.   The Scheduling Order shall approve the form and content of the Notice and find that the giving of notice in the manner set forth above meets the requirements of Court of Chancery Rule 23.1 and due process, and is the best notice practicable under the circumstances.

7.6.   Plaintiffs and CSL Properties (through its 3-Member Management Panel) represent and warrant that they will work in good faith and make reasonable best efforts to obtain written consent and approval from as many DDM Investors and CSL Investors as they can regarding the Settlement Agreement.  If the written consent and approval is not obtained from a majority of DDM Investors and CSL Investors, the Defendant-Related Parties shall, in their sole discretion, determine whether a sufficient number of persons have agreed to be signatories to the Settlement Agreement, in order to make further claims or litigation unlikely.

7.7.   At the Settlement Hearing, the Parties shall jointly request that the Dismissal Order be entered.

7.8.     The Dismissal Order shall provide that each of the requirements of Court of Chancery Rule 23.1 have been satisfied and that the Derivative Action have been properly maintained according to the provisions of Court of Chancery Rule 23.1.

7.9.     The Dismissal Order shall approve the settlement, finding that the Settlement Agreement to be fair, reasonable, adequate and in the best interests of the Parties, including the Plaintiff Released Persons and the Defendant Released Persons, and directing the consummation of the settlement in accordance with the terms and conditions of this Settlement Agreement.

7.10.    The Dismissal Order shall dismiss the Derivative Action on the merits with prejudice (subject only to compliance by the Parties with the terms of this Settlement Agreement and any Order of the Court concerning this Settlement Agreement) and shall fully, completely and forever discharge, settle, release, and extinguish the Released Claims and bar and permanently enjoin the Plaintiff Releasing Persons (and any person acting or purporting to act on any such Plaintiff Releasing Persons' behalf) from asserting, commencing, prosecuting, assisting, instigating, or in any way participating in the commencement or prosecution of any action or other proceeding, in any forum, asserting any Released Claims, either directly, representatively, derivatively, or in any other capacity.

7.11.    Immediately following entry of the Dismissal Order, Plaintiffs' Counsel shall file a stipulation of dismissal dismissing the DCSL Books & Records Action with prejudice substantially in the form attached hereto as Exhibit D (the "Books & Records Dismissal").

## 8.   Denial of Wrongdoing or Liability.

8.1.     This Settlement Agreement, whether or not approved by the Court, and any proceedings taken pursuant to this Settlement Agreement, any materials created by or received from another Party that were used in, obtained during, or related to settlement discussions, including, but not limited to all negotiations, documents, and statements in connection therewith, shall not be offered or received against any of the Parties as evidence of or construed as or deemed to be evidence of (a) any liability, negligence, fault or wrongdoing of any of the Parties, (b) a presumption, concession, or admission with respect to any liability, negligence, fault, or wrongdoing, or in any way referred to for any other reason as against any of the Parties, in any other civil, criminal, or administrative action or proceeding, other than such proceedings as may be necessary to effectuate the provisions of this Settlement Agreement, (c) a presumption, concession, or admission by any of the Parties with respect to the truth of any fact alleged in this Derivative Action or in the Books & Records Action or the validity of any of the claims or the deficiency of any defense that was or could have been asserted in this Derivative Action or in the Books & Records Action or of any infirmity in the claims asserted, or (d) an admission or concession that the consideration to be given hereunder represents the consideration which could be or would have been recovered at trial.

8.2.     The Defendant-Related Parties have denied, and continues to deny, each and all of the claims and contentions alleged in the Derivative Action and the Books & Records

Actions. The Defendant-Related Parties have denied, and continue to deny, any and all allegations of wrongdoing, fault, liability or damage and deny that Jowdy or any of DDM's, Baja's, KAJ's, DCSL's, or Legacy Properties' other officers or directors or any Defendant Released Persons engaged in, committed or aided or abetted the commission of any wrongdoing or violation of law or breach of duty, deny that DDM, Baja, DCSL, CSL Properties, or any of their members suffered any legally recoverable damage whatsoever, deny that they acted improperly in any way, believe that they acted properly at all times, maintain that they diligently and scrupulously complied with their fiduciary and other legal duties. Nonetheless, the Defendant-Related Parties and the Defendant Released Persons wish to settle all disputes on the terms and conditions stated in this Settlement Agreement so that all Parties will work together to ensure the financial success of the Diamanté Cabo San Lucas project, as well as to eliminate the uncertainties, burden, and expense of further protracted litigation and to put the claims to be released hereby to rest finally and forever.

8.3.    Plaintiffs and CSL Properties recognize and acknowledge the expense and length of proceedings necessary to prosecute these actions and have also have taken into account the uncertain outcome and the risk of any litigation, especially in complex actions such as the Derivative Action, as well as the difficulties and delays inherent in such litigation. Plaintiffs' Counsel also are mindful of the inherent problems of proof under and have been made aware of the Defendant-Related Parties' possible defenses to the claims asserted in the Derivative Action.

8.4.    The Parties have agreed to the issuance of the press release by the Defendant-Related Parties, substantially in the form of Exhibit E (the "Press Release"), any time after the Effective Date.

## 9.  Attorneys' Fees and Expenses.

9.1.    If the Court of Chancery and the U.S. District Court in the Kenner Criminal Case approve the terms of the Settlement Agreement provided herein, including any modifications thereto made with consent of the Parties, Plaintiffs' Counsel intends to apply to the Court of Chancery, by separate motion, for an award of attorneys' fees and expenses for services rendered in connection with the Derivative Action and in accordance with the terms of this Settlement Agreement. Any such attorney's fees and expenses awarded by the Court shall not increase any amounts to be paid by KAJ under this Settlement Agreement.

9.2.    After lengthy and adversarial negotiations, the Defendant-Related Parties have agreed not to oppose the foregoing application and motion for award of Plaintiffs' Counsel attorney's fees and expenses, so long as any award of fees is in accordance with the terms of this Settlement Agreement and does not increase any amounts to be paid by KAJ under this Settlement Agreement.

9.3.    Notwithstanding any other provision of this Settlement Agreement, no fees or expenses shall be sought by or paid to Plaintiffs' Counsel in the absence of approval of the Settlement Agreement and entry by the Court of a Judgment which contains a release of the Released Claims. Any attorneys' fees awarded to Plaintiffs' Counsel by the Court of

Chancery regarding legal services rendered in connection with the litigation and settlement of the Derivative Action shall be separate and apart from attorneys' fees paid or payable to Plaintiffs' Counsel regarding its contemporaneous representation of CSL Properties. Plaintiffs' Counsel and CSL Properties have entered into a separate, written fee agreement, and the scope of Plaintiffs' Counsel's engagement under that agreement encompasses legal and consulting services that are neither addressed nor contemplated by this Settlement Agreement.

9.4.   Failure of the Court to approve Plaintiff's Counsel's request for attorney's fees and expenses regarding the litigation and settlement of the Derivative Action, in whole or in part, shall have no effect whatsoever on the settlement set forth in this Settlement Agreement. Final resolution of any such request for attorneys' fees and expenses shall not be a condition to the dismissal of the Derivative Action or of the Books & Records Action.

## 10. **Miscellaneous Provisions.**

10.1.   The Parties and their respective counsel of record (a) acknowledge that it is their intent to consummate this Settlement Agreement, and (b) agree to act in good faith and cooperate to the extent reasonably necessary to effectuate and implement all terms and conditions of the Settlement Agreement and to exercise their best efforts to accomplish the foregoing terms and conditions of, and to obtain all necessary approvals of the Court of Chancery and the U.S. District Court (including, but not limited to, using their best efforts to resolve any objections raised to the Settlement by others).

10.2.   The Parties represent and agree that this Settlement Agreement was negotiated at arms-length and in good faith by the Parties, and that this Settlement Agreement was reached voluntarily based upon adequate information and sufficient discovery and after consultation with experienced legal counsel.

10.3.   The Parties intend the settlement to be a final and complete resolution of all disputes between or among them with respect to the Actions. The settlement compromises claims that are contested and shall not be deemed an admission by any Party as to the merits of any claim, allegation, or defense.

10.4.   The exhibits to this Settlement Agreement are a material and integral part hereof and are fully incorporated herein by this reference.

10.5.   The Settlement Agreement may be amended or modified only by a written instrument signed by or on behalf of all Parties or their respective successors-in-interest.

10.6.   The headings used herein are used for the purpose of convenience only and are not meant to have legal effect. However, the recitals of this Settlement Agreement shall be binding.

10.7.   This Settlement Agreement, together with the accompanying schedules and exhibits, constitute the entire agreement between and among the Parties and supersede any prior agreements between or among the Parties with respect to the subject matter hereof. No representation, warranty, or inducement has been made to or relied upon by any party

concerning the Settlement Agreement other than the representations, warranties, and covenants expressly contained and memorialized in such documents. This Settlement Agreement may be amended, or any of its provisions may be waived, only by a writing executed by all the Parties.

10.8.   The Settlement Agreement may be executed in one or more counterparts, including by facsimile and electronic mail. All executed counterparts and each of them shall be deemed to be one and the same instrument.

10.9.   After approval of the Settlement Agreement by the U.S. District Court in the Kenner Criminal Case, any action or proceeding arising out of or relating in any way to this Settlement Agreement or the Settlement, or to enforce any of the terms of the Settlement Agreement or Settlement, (i) shall be brought, heard and determined exclusively in the Court of Chancery, which shall retain jurisdiction over the Parties and all such disputes (provided that, in the event that subject matter jurisdiction is unavailable in this Court of Chancery, then any such action or proceeding shall be brought, heard and determined exclusively in any other state or federal court sitting in Wilmington, Delaware) and (ii) shall not be litigated or otherwise pursued in any forum or venue other than the Court of Chancery (or, if subject matter jurisdiction is unavailable in the Court of Chancery, then in any forum or venue other than any other state or federal court sitting in Wilmington, Delaware).

10.10.  The Settlement Agreement shall be binding upon, and inure to the benefit of, the Parties (and, in the case of the mutual releases, all Released Persons) and the respective legal representatives, heirs, executors, administrators, transferees, successors and assigns of all such foregoing Parties and Released Persons and upon any corporation, partnership, or other entity into or with which any party may merge, consolidate or reorganize, and it is not the intention of the Parties to confer third-party beneficiary rights or remedies upon any other person or entity.

10.11.  This Settlement Agreement, the settlement, and any and all disputes arising out of or relating in any way to this Settlement Agreement or Settlement, whether in contract, tort or otherwise, shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to conflicts of law principles.

10.12.  The waiver by any Party of any breach of this Settlement Agreement by any other Party shall not be deemed a waiver of any other prior or subsequent breach of any provision of this Settlement Agreement by any other Party.

IN WITNESS WHEREOF, the Parties have caused the Settlement Agreement to be executed, as of the day and year first above written.

*[Signature Pages to Follow]*

**[Settlement Agreement Signature Page]**

| | |
|---|---|
| DIAMANTÉ DEL MAR, LLC | CSL PROPERTIES 2006, LLC |
| By: **BAJA MANAGEMENT, LLC**, its Managing Member<br><br>By: _____<br>Name: Kenneth Jowdy<br>Title: Managing Member | By: _____<br>Name:  Greg DeVries<br>Title:  CSL Management Panel Member and<br>Authorized Person<br><br>By: _____<br>Name:  Sergei Gonchar<br>Title:  CSL Management Panel Member and<br>Authorized Person |
| DIAMANTÉ CABO SAN LUCAS, LLC<br><br>By: _____<br>Name: Kenneth Jowdy<br>Title: Managing Member | By: _____<br>Name:  Mattias Norstrom<br>Title:  CSL Management Panel Member and<br>Authorized Person |
| BAJA MANAGEMENT, LLC<br><br>By: _____<br>Name: Kenneth Jowdy<br>Title: Managing Member | GREG DEVRIES<br>(both individually and derivatively on behalf of DIAMANTÉ DEL MAR, LLC, and as a DDM SIGNATORY and a CSL SIGNATORY) |
| KAJ HOLDINGS, LLC<br><br>By: _____<br>Name: Kenneth Jowdy<br>Title: Managing Member | RAYMOND "REM" MURRAY<br>(both individually and derivatively on behalf of DIAMANTÉ DEL MAR, LLC, and as a DDM SIGNATORY) |
| LEGACY PROPERTIES, LLC<br><br>By: _____<br>Name: Kenneth Jowdy<br>Title: Managing Member | MATTIAS NORSTROM<br>(as a DDM SIGNATORY and a CSL SIGNATORY) |

[Settlement Agreement Signature Page]

DIAMANTE DEL MAR, LLC

By  BAJA MANAGEMENT, LLC, its
    Managing Member

    By
        Name: Kenneth Jowdy
        Title: Managing Member


DIAMANTE CABO SAN LUCAS, LLC

By
    Name: Kenneth Jowdy
    Title: Managing Member


BAJA MANAGEMENT, LLC

By
    Name: Kenneth Jowdy
    Title: Managing Member


KAJ HOLDINGS, LLC

By
    Name: Kenneth Jowdy
    Title: Managing Member


LEGACY PROPERTIES, LLC

By
    Name: Kenneth Jowdy
    Title: Managing Member


CSL PROPERTIES, LLC

By
    Name: Greg DeVries
    Title: CSL Management Panel Member
           and Authorized Person

By
    Name: Sergei Gonchar
    Title: CSL Management Panel Member
           and Authorized Person

By
    Name: Mattias Norstrom
    Title: CSL Management Panel Member
           and Authorized Person


GREG DeVRIES
(both individually and derivatively on behalf of
DIAMANTE DEL MAR, LLC, and as a DDM
SIGNATORY and a CSL SIGNATORY)


RAYMOND "REM" MURRAY
(both individually and derivatively on behalf of
DIAMANTE DEL MAR, LLC and as a DDM
SIGNATORY)


MATTIAS NORSTROM
(as a DDM SIGNATORY and a CSL
SIGNATORY)

[Settlement Agreement Signature Page]

| DIAMANTÉ DEL MAR, LLC | CSL PROPERTIES 2006, LLC |
|---|---|
| By: **BAJA MANAGEMENT, LLC**, its Managing Member<br><br>By: _____<br>　　　Name: Kenneth Jowdy<br>　　　Title: Managing Member | By: _____<br>　　Name: Greg DeVries<br>　　Title: CSL Management Panel Member<br>　　　　 and Authorized Person<br><br>By: _____<br>　　Name: Sergei Gonchar<br>　　Title: CSL Management Panel Member<br>　　　　 and Authorized Person |
| **DIAMANTÉ CABO SAN LUCAS, LLC**<br><br>By: _____<br>　　Name: Kenneth Jowdy<br>Title: Managing Member | By: _____<br>　　Name: Mattias Norstrom<br>　　Title: CSL Management Panel Member<br>　　　　 and Authorized Person |
| **BAJA MANAGEMENT, LLC**<br><br>By: _____<br>　　Name: Kenneth Jowdy<br>　　Title: Managing Member | _____<br>**GREG DEVRIES**<br>(both individually and derivatively on behalf of DIAMANTÉ DEL MAR, LLC, and as a DDM SIGNATORY and a CSL SIGNATORY) |
| **KAJ HOLDINGS, LLC**<br><br>By: _____<br>　　Name: Kenneth Jowdy<br>　　Title: Managing Member | _____<br>**RAYMOND "REM" MURRAY**<br>(both individually and derivatively on behalf of DIAMANTÉ DEL MAR, LLC, and as a DDM SIGNATORY) |
| **LEGACY PROPERTIES, LLC**<br><br>By: _____<br>　　Name: Kenneth Jowdy<br>　　Title: Managing Member | _____<br>**MATTIAS NORSTROM**<br>(as a DDM SIGNATORY and a CSL SIGNATORY) |

1

| | |
|---|---|
| KENNETH JOWDY | BRYAN BERARD<br>(as a DDM SIGNATORY and a CSL SIGNATORY) |
| GLEN MURRAY<br>(as a DDM SIGNATORY) | MICHAEL PECA<br>(as a DDM SIGNATORY and a CSL SIGNATORY) |
| BRIAN CAMPBELL<br>(as a CSL SIGNATORY) | CHRIS SIMON<br>(as a DDM SIGNATORY) |
| SERGEI GONCHAR<br>(as a DDM SIGNATORY and a CSL SIGNATORY) | DARRYL SYDOR<br>(as a DDM SIGNATORY and a CSL SIGNATORY) |
| DIMITRI KHRISTICH<br>(as a DDM SIGNATORY and a CSL SIGNATORY) | JOSZEF STUMPEL<br>(as a DDM SIGNATORY) |
| JAY MCKEE<br>(as a DDM SIGNATORY) | VLADIMIR TSYPLAKOV<br>(as a DDM SIGNATORY and a CSL SIGNATORY) |
| TURNER STEVENSON<br>(as a CSL SIGNATORY) | JASON WOOLLEY<br>(as a DDM SIGNATORY) |

2

**[Settlement Agreement Signature Page]**

| | |
|---|---|
| DIAMANTÉ DEL MAR, LLC<br><br>By: BAJA MANAGEMENT, LLC, its<br>    Managing Member<br><br>   By: _____<br>      Name:  Kenneth Jowdy<br>      Title:  Managing Member | CSL PROPERTIES 2006, LLC<br><br>By: _____<br>   Name:  Greg DeVries<br>   Title:  CSL Management Panel Member<br>      and Authorized Person<br><br>By: _____<br>   Name:  Sergei Gonchar<br>   Title:  CSL Management Panel Member<br>      and Authorized Person<br><br>By: _____<br>   Name:  Mattias Norstrom<br>   Title:  CSL Management Panel Member<br>      and Authorized Person |
| DIAMANTÉ CABO SAN LUCAS, LLC<br><br>By: _____<br>   Name:  Kenneth Jowdy<br>Title:  Managing Member | |
| BAJA MANAGEMENT, LLC<br><br>By: _____<br>   Name:  Kenneth Jowdy<br>   Title:  Managing Member | GREG DEVRIES<br>(both individually and derivatively on behalf of<br>DIAMANTÉ DEL MAR, LLC, and as a DDM<br>SIGNATORY and a CSL SIGNATORY) |
| KAJ HOLDINGS, LLC<br><br>By: _____<br>   Name:  Kenneth Jowdy<br>   Title:  Managing Member | RAYMOND "REM" MURRAY<br>(both individually and derivatively on behalf of<br>DIAMANTÉ DEL MAR, LLC, and as a DDM<br>SIGNATORY) |
| LEGACY PROPERTIES, LLC<br><br>By: _____<br>   Name:  Kenneth Jowdy<br>   Title:  Managing Member | MATTIAS NORSTROM<br>(as a DDM SIGNATORY and a CSL<br>SIGNATORY) |

[Settlement Agreement Signature Page]

| | |
|---|---|
| DIAMANTÉ DEL MAR, LLC<br><br>By: **BAJA MANAGEMENT, LLC**, its<br>Managing Member<br><br>By: _____<br>Name: Kenneth Jowdy<br>Title: Managing Member | CSL PROPERTIES 2006, LLC<br><br>By: _____<br>Name: Greg DeVries<br>Title: CSL Management Panel Member<br>and Authorized Person<br><br>By: _____<br>Name: Sergei Gonchar<br>Title: CSL Management Panel Member<br>and Authorized Person |
| DIAMANTÉ CABO SAN LUCAS, LLC<br><br>By: _____<br>Name: Kenneth Jowdy<br>Title: Managing Member | By: _____<br>Name: Mattias Norstrom<br>Title: CSL Management Panel Member<br>and Authorized Person |
| BAJA MANAGEMENT, LLC<br><br>By: _____<br>Name: Kenneth Jowdy<br>Title: Managing Member | _____<br>**GREG DEVRIES**<br>(both individually and derivatively on behalf of<br>DIAMANTÉ DEL MAR, LLC, and as a DDM<br>SIGNATORY and a CSL SIGNATORY) |
| KAJ HOLDINGS, LLC<br><br>By: _____<br>Name: Kenneth Jowdy<br>Title: Managing Member | _____<br>RAYMOND "REM" MURRAY<br>(both individually and derivatively on behalf of<br>DIAMANTÉ DEL MAR, LLC, and as a DDM<br>SIGNATORY) |
| LEGACY PROPERTIES, LLC<br><br>By: _____<br>Name: Kenneth Jowdy<br>Title: Managing Member | _____<br>**MATTIAS NORSTROM**<br>(as a DDM SIGNATORY and a CSL<br>SIGNATORY) |

| | |
|---|---|
| KENNETH JOWDY | BRYAN BERARD<br>(as a DDM SIGNATORY and a CSL<br>SIGNATORY) |
| GLEN MURRAY<br>(as a DDM SIGNATORY) | MICHAEL PECA<br>(as a DDM SIGNATORY and a CSL<br>SIGNATORY) |
| BRIAN CAMPBELL<br>(as a CSL SIGNATORY) | CHRIS SIMON<br>(as a DDM SIGNATORY) |
| SERGEI GONCHAR<br>(as a DDM SIGNATORY and a CSL<br>SIGNATORY) | DARRYL SYDOR<br>(as a DDM SIGNATORY and a CSL<br>SIGNATORY) |
| DIMITRI KHRISTICH<br>(as a DDM SIGNATORY and a CSL<br>SIGNATORY) | JOSZEF STUMPEL<br>(as a DDM SIGNATORY) |
| JAY MCKEE<br>(as a DDM SIGNATORY) | VLADIMIR TSYPLAKOV<br>(as a DDM SIGNATORY and a CSL<br>SIGNATORY) |
| | JASON WOOLLEY<br>(as a DDM SIGNATORY) |

| | |
|---|---|
| KENNETH JOWDY | BRYAN BERARD<br>(as a DDM SIGNATORY and a CSL SIGNATORY) |
| GLEN MURRAY<br>(as a DDM SIGNATORY) | MICHAEL PECA<br>(as a DDM SIGNATORY and a CSL SIGNATORY) |
| BRIAN CAMPBELL<br>(as a CSL SIGNATORY) | CHRIS SIMON<br>(as a DDM SIGNATORY) |
| SERGEI GONCHAR<br>(as a DDM SIGNATORY and a CSL SIGNATORY) | DARRYL SYDOR<br>(as a DDM SIGNATORY and a CSL SIGNATORY) |
| DIMITRI KHRISTICH<br>(as a DDM SIGNATORY and a CSL SIGNATORY) | JOSZEF STUMPEL<br>(as a DDM SIGNATORY) |
| JAY MCKEE<br>(as a DDM SIGNATORY) | VLADIMIR TSYPLAKOV<br>(as a DDM SIGNATORY and a CSL SIGNATORY) |
| TURNER STEVENSON<br>(as a CSL SIGNATORY) | JASON WOOLLEY<br>(as a DDM SIGNATORY) |

| | |
|---|---|
| KENNETH JOWDY | BRYAN BERARD<br>(as a DDM SIGNATORY and a CSL SIGNATORY) |
| GLEN MURRAY<br>(as a DDM SIGNATORY) | MICHAEL PECA<br>(as a DDM SIGNATORY and a CSL SIGNATORY) |
| BRIAN CAMPBELL<br>(as a CSL SIGNATORY) | CHRIS SIMON<br>(as a DDM SIGNATORY) |
| SERGEI GONCHAR<br>(as a DDM SIGNATORY and a CSL SIGNATORY) | DARRYL SYDOR<br>(as a DDM SIGNATORY and a CSL SIGNATORY) |
| DIMITRI KHRISTICH<br>(as a DDM SIGNATORY and a CSL SIGNATORY) | JOSZEF STUMPEL<br>(as a DDM SIGNATORY) |
| JAY MCKEE<br>(as a DDM SIGNATORY) | VLADIMIR TSYPLAKOV<br>(as a DDM SIGNATORY and a CSL SIGNATORY) |
| TURNER STEVENSON<br>(as a CSL SIGNATORY) | JASON WOOLLEY<br>(as a DDM SIGNATORY) |

2

| | |
|---|---|
| KENNETH JOWDY | BRYAN BERARD (as a DDM SIGNATORY and a CSL SIGNATORY) |
| GLEN MURRAY (as a DDM SIGNATORY) | MICHAEL PECA (as a DDM SIGNATORY and a CSL SIGNATORY) |
| BRIAN CAMPBELL (as a CSL SIGNATORY) | CHRIS SIMON (as a DDM SIGNATORY) |
| SERGEI GONCHAR (as a DDM SIGNATORY and a CSL SIGNATORY) | DARRYL SYDOR (as a DDM SIGNATORY and a CSL SIGNATORY) |
| DIMITRI KHRISTICH (as a DDM SIGNATORY and a CSL SIGNATORY) | JOSZEF STUMPEL (as a DDM SIGNATORY) |
| ____RIG ___(SIGNATORY) | VLADIMIR TSYPLAKOV (as a DDM SIGNATORY and a CSL SIGNATORY) |
| ____NSON ____(TORY) | JASON WOOLLEY (as a DDM SIGNATORY) |

| | |
|---|---|
| KENNETH JOWDY | BRYAN BERARD<br>(as a DDM SIGNATORY and a CSL SIGNATORY) |
| GLEN MURRAY<br>(as a DDM SIGNATORY) | MICHAEL PECA<br>(as a DDM SIGNATORY and a CSL SIGNATORY) |
| BRIAN CAMPBELL<br>(as a CSL SIGNATORY) | CHRIS SIMON<br>(as a DDM SIGNATORY) |
| SERGEI GONCHAR<br>(as a DDM SIGNATORY and a CSL SIGNATORY) | DARRYL SYDOR<br>(as a DDM SIGNATORY and a CSL SIGNATORY) |
| DIMITRI KHRISTICH<br>(as a DDM SIGNATORY and a CSL SIGNATORY) | JOSZEF STUMPEL<br>(as a DDM SIGNATORY) |
| JAY MCKEE<br>(as a DDM SIGNATORY) | VLADIMIR TSYPLAKOV<br>(as a DDM SIGNATORY and a CSL SIGNATORY) |
| TURNER STEVENSON<br>(as a CSL SIGNATORY) | JASON WOOLLEY<br>(as a DDM SIGNATORY) |

2

| | |
|---|---|
| KENNETH JOWDY | BRYAN BERARD<br>(as a DDM SIGNATORY and a CSL SIGNATORY) |
| GLEN MURRAY<br>(as a DDM SIGNATORY) | MICHAEL PECA<br>(as a DDM SIGNATORY and a CSL SIGNATORY) |
| BRIAN CAMPBELL<br>(as a CSL SIGNATORY) | CHRIS SIMON<br>(as a DDM SIGNATORY) |
| SERGEI GONCHAR<br>(as a DDM SIGNATORY and a CSL SIGNATORY) | DARRYL SYDOR<br>(as a DDM SIGNATORY and a CSL SIGNATORY) |
| DIMITRI KHRISTICH<br>(as a DDM SIGNATORY and a CSL SIGNATORY) | JOSZEF STUMPEL<br>(as a DDM SIGNATORY) |
| JAY MCKEE<br>(as a DDM SIGNATORY) | VLADIMIR TSYPLAKOV<br>(as a DDM SIGNATORY and a CSL SIGNATORY) |
| TURNER STEVENSON<br>(as a CSL SIGNATORY) | JASON WOOLLEY<br>(as a DDM SIGNATORY) |

| | |
|---|---|
| **KENNETH JOWDY** | **BRYAN BERARD**<br>(as a DDM SIGNATORY and a CSL SIGNATORY) |
| **GLEN MURRAY**<br>(as a DDM SIGNATORY) | **MICHAEL PECA**<br>(as a DDM SIGNATORY and a CSL SIGNATORY) |
| **BRIAN CAMPBELL**<br>(as a CSL SIGNATORY) | **CHRIS SIMON**<br>(as a DDM SIGNATORY) |
| **SERGEI GONCHAR**<br>(as a DDM SIGNATORY and a CSL SIGNATORY) | **DARRYL SYDOR**<br>(as a DDM SIGNATORY and a CSL SIGNATORY) |
| **DIMITRI KHRISTICH**<br>(as a DDM SIGNATORY and a CSL SIGNATORY) | **JOSZEF STUMPEL**<br>(as a DDM SIGNATORY) |
| **JAY MCKEE**<br>(as a DDM SIGNATORY) | **VLADIMIR TSYPLAKOV**<br>(as a DDM SIGNATORY and a CSL SIGNATORY) |
| **TURNER STEVENSON**<br>(as a CSL SIGNATORY) | **JASON WOOLLEY**<br>(as a DDM SIGNATORY) |

2

KENNETH JOWDY

BRYAN BERARD
(as a DDM SIGNATORY and a CSL SIGNATORY)

GLEN MURRAY
(as a DDM SIGNATORY)

MICHAEL PECA
(as a DDM SIGNATORY and a CSL SIGNATORY)

BRIAN CAMPBELL
(as a CSL SIGNATORY)

CHRIS SIMON
(as a DDM SIGNATORY)

SERGEI GONCHAR
(as a DDM SIGNATORY and a CSL SIGNATORY)

DARRYL SYDOR
(as a DDM SIGNATORY and a CSL SIGNATORY)

DIMITRI KHRISTICH
(as a DDM SIGNATORY and a CSL SIGNATORY)

JOSZEF STUMPEL
(as a DDM SIGNATORY)

JAY MCKEE
(as a DDM SIGNATORY)

VLADIMIR TSYPLAKOV
(as a DDM SIGNATORY and a CSL SIGNATORY)

TURNER STEVENSON
(as a CSL SIGNATORY)

JASON WOOLLEY
(as a DDM SIGNATORY)

STEVE RUCCHIN
(as a CSL SIGNATORY)

TYSON NASH
(as a CSL SIGNATORY)

JASON ALLISON
(as a DDM SIGNATORY)

BYRON DAFOE
(as a DDM SIGNATORY)

SCOTT ERICKSON
(as a DDM SIGNATORY)

**SCHEDULE A**
**TO SETTLEMENT AGREEMENT**

| DDM Investor | DDM Repayment | DDM Percentage Interest |
|---|---|---|
| Dimitri Khristich | $   500,000.00 | 6.06% |
| Vladimir Tsyplakov | $   500,000.00 | 6.06% |
| Bryan Berard | $   500,000.00 | 6.06% |
| Michael Peca | $   500,000.00 | 6.06% |
| Chris Simon | $   500,000.00 | 6.06% |
| Jason Woolley | $   250,000.00 | 3.04% |
| Greg DeVries | $   500,000.00 | 6.06% |
| Jozef Stumpel | $   500,000.00 | 6.06% |
| Sergei Gonchar | $   500,000.00 | 6.06% |
| Mattias Norstrom | $   500,000.00 | 6.06% |
| Darryl Sydor | $   500,000.00 | 6.06% |
| Raymond Murray | $   500,000.00 | 6.06% |
| Glen Murray | $   500,000.00 | 6.06% |
| Jay McKee | $   500,000.00 | 6.06% |
| Jason Allison | $   500,000.00 | 6.06% |
| Byron Dafoe | $   500,000.00 | 6.06% |
| Scott Erickson | $   500,000.00 | 6.06% |
| **TOTAL** | **$ 8,250,000.00** | **100%** |

## SCHEDULE B
## TO SETTLEMENT AGREEMENT

| CSL Investor | CSL Repayment | CSL Percentage Interest |
|---|---|---|
| Tyson Nash | $   100,000.00 | 4.348% |
| Bryan Berard | $   200,000.00 | 8.696% |
| Michael Peca | $   300,000.00 | 13.043% |
| Brian Campbell | $   100,000.00 | 4.348% |
| Greg DeVries | $   200,000.00 | 8.696% |
| Sergei Gonchar | $   100,000.00 | 4.348% |
| Mattias Norstrom | $   100,000.00 | 4.348% |
| Darryl Sydor | $   100,000.00 | 4.348% |
| Turner Stevenson | $   200,000.00 | 8.696% |
| Vladimir Tsyplakov | $   250,000.00 | 10.870% |
| Dimitri Khristich | $   250,000.00 | 10.870% |
| Owen Nolan | $   100,000.00 | 4.348% |
| Ethan Moreau | $   200,000.00 | 8.696% |
| Steve Rucchin | $   100,000.00 | 4.348% |
| **TOTAL** | **$   2,300,000.00** | **100%** |