August 5, 2020

The Honorable Judge Bianco
U.S. District Court – EDNY
100 Federal Plaza
Central Islip, NY 11722

**Re: <u>Ongoing Submissions Continue To Contradict The Government's
Prosecutorial Case And Witness Testimony</u>: (Nolan)**

Your Honor,

In 2016, the Court *instructed* Kenner during his forfeiture testimony (one-year post-trial) to inform the Court of all testimony that appeared "*inaccurate*" if evidence had been "*uncovered*" to prove the inaccurate testimony (*April 6, 2015, Forf.Tr.207-08*):

> *THE COURT: If you have uncovered any documents since the trial that you
> believe suggest that there is something inaccurate about the testimony in the
> trial, Mr. Haley should definitely submit them to me.*
>
> *THE WITNESS [Kenner]: Yes, sir. We will do so. Thank you, your Honor.*

*Well, we are here again – "uncovered" and "inaccurate"* (referenced *infra*).   The
defendant is requesting an evidentiary hearing to address the Nolan exculpatory
evidence in concert with his attorney's 2020 admissions (*ECF No. 843*).

The longer the pre-sentence process has dragged on (5+ years since trial and
counting), more *revelatory* statements and admissions have come forth, *debunking*
prosecutorial theories—supported only by testimony, which delivered a conviction.

The laborious task has been to connect the dots—with reformative statements, and
exculpatory evidence—in this 20-year saga that the FBI case agent and government
do not want the Court to connect, because it leads to complicity the FBI agent does
not want revealed.  Now twofold, more 'dots' have been revealed by the government
itself in (1) their attack on a Danske-Jowdy conspiracy (July 3, 2020 submission)
(further supporting Kenner's nonstop integrity about the Jowdy crimes; almost
paying for the defense of his investors with his *life*...and now his *freedom* for
opposing a well-fortified criminal enterprise), and (2) **in addition to a recap of
head-scratching reformative 'admissions' by Owen Nolan's N.Y. counsel** (*ECF
No. 843, infra*).   Collectively, it should lead any *neutral* observer to question the
source of the original objectives in the 2009 SDNY Kenner Grand Jury—only weeks

after Kenner's proffer of *everything 're: Jowdy to the EDNY investigators (and Galioto himself)'*—that the government submitted ***as fact*** (July 2020, 11-years later).  This included Lehman Brothers and Danske bank complicity (*ECF No. 667: Lehman Brothers complicity documented by Kenner years ago and ignored*).

Although, "the district courts have significant latitude in fashioning procedures to resolve sentencing disputes"; *United States v. Sabhnani*, 599 F.3d 215, 258 (2d Cir 2010)—it appears obvious, with the mounting volume of post-trial witness and government reformative admissions—the exculpatory and empirical evidence that exculpates Kenner's integrity <u>*requires*</u> an evidentiary hearing; wholly affecting sentencing for named <u>*and*</u> unnamed people in the superseding indictment (*ECF No. 214*).  The Court's "discretion is not limitless: the Due Process Clause requires that the defendant have 'an adequate opportunity to present his position.'" *Id.* at 258 (quoting *United States v. Maurer*, 226 F.3d 151-152 (2d Cir 2000).  *See United States v. Simmons*, 544 Fed. Appx. 21 (2d Cir 2015).

The Court requires that "the standard of proof at sentencing is a preponderance of the evidence" to accept the government's position of loss (related to actual victims in the first instance, sentencing enhancements, and restitution under MVRA); *United States v. Gaskin*, 364 F.3d 438, 464 (2d Cir 2004) (citations omitted).

- The Court is aware that the government <u>*only*</u> provided contradiction in testimony[1] by Nolan (and others) to the signed, exculpatory evidence in their possession—while asserting they were unaware of *personal authorizations* they *all* signed (*Ex. C: Nolan at 2*) and *corporate authorizations* (*Ex. V*) which controlled the investment funds that they testified they '*did not read*' (repeatedly, witness by witness), yet confoundingly delivered from their personal files to various litigations (*Ex. Q*).  It is unexplainable other than by 'memory loss'.

- Secondly, the inclusion of un-named victims from the superseding indictment—post-trial only—requires judicial review with nothing but exculpatory evidence in the government's possession; ***none opposing*** (i.e. Norstrom, deVries, Rem Murray, et.al.—separate submissions to follow).  An unsubstantiated "victim impact statement" does not constitute evidence to satisfy the 'preponderance standard'.  The "right to confront" clause of ones victims guarantees that.  **Noting**: Gonchar and Murray were removed as victims two weeks before trial by choice and cannot be assumed to have been confronted as victims, merely

---

[1] The only rebuttal by the government post-trial was that the witness testimony was based on *faulty memory, confusion and mistakes* by their witnesses; ***never the truth***! (*ECF No. 440 at 16: "A witness perjures herself when "she gives false testimony concerning a material*

witnesses (with Kenner's trial counsel leaving a multitude of exculpatory evidence at the defense table—unused—since there was no need to impeach as one would an alleged victim[2]); *See Hughey*.[3]

"A sentencing conducted on the basis of unreliable or false information violates the due process clause just as much as a sentencing conducted without a sufficient hearing."; *United States v. Fell*, No. 5:01-cr-12-01, 2018 U.S. Dist. LEXIS 229652 (D. Vt. Mar. 16, 2018).   The U.S.S.G. acknowledges that "[a]n evidentiary hearing may sometimes be the only reliable way to resolve disputed issues." U.S. Sentencing Guidelines Manual § 6A1.3 cmt. (2014).   The decision to hold or not hold a *Fatico*[4] hearing turns largely on whether the contested information is relevant to the trial court's potential sentence; *See Id.* § 6A1.3 cmt. (2014).  If the sentencing court does not plan to take the contested information into account, it need not grant a *Fatico* hearing to resolve the factual dispute.  Here, it is critical.

During the July 2, 2019 hearing, the Court denied any *Fatico* hearing, while verifying that the Court was only considering '**charged conduct**' in the guideline calculations—while regurgitating the government's previous representations of the same—and other rulings (*Tr.33*):

> *[Judge Bianco]: "I just want to make clear that I think I've said this before, but it is in the court's view and its consistent with the government's letter to the court, you know, two years ago that we're not – that the government is not seeking to hold the defendants accountable for any uncharged frauds.   The scope of sentencing relates only to the frauds that were proved at trial…"*

Although Kenner has changed his optimism for any revelation of truths *versus* the reality of the FBI-government's *desire* to continue ignoring Kenner's transparency

---

[2] This "non-victim" position was trial counsel's attempted sedation to Kenner as to why FBI notes, signed documents, personal legal filings, etcetera (all exculpating any Kenner concealment) were not presented during testimony of Murray and Gonchar.

[3] Since the Supreme Court decided *Hughey* almost 30 years ago, prosecutorial decisions to frame indictments with a "view to success at trial rather than to a victim's interest in full compensation" are made with a full understanding of the potential consequences; See *Hughey v. United States*, 495 U.S. 411, 421 (1990).   In concert, the Tenth Circuit opined, "**There are tradeoffs in such decisions**"; *United States v. Mendenhall*, Case No. 19-7006 (10th Circuit December 23, 2019).

[4] *United States v. Fatico*, 603 F.2d 1053, 1057 n.9 (2d Cir 1979), *cert. denied*, 444 U.S. 1073 (1980).

the last 18 years to protect his client-investors, the never-ending reformative and contradictory submissions—that continue to be submitted five years post-trial—by alleged victims, government star-witnesses, and the government (itself)—*reinforce* Kenner's exculpatory-based verifications to the Court that there is "*no there – there*".[5]

*Point the finger first...*
*There never was a "there"*...thus the government's recently documented list of NY Daily News and Fortune Magazine (Jowdy-Harvey pay-for-play graft) slander and defamation articles about Kenner (an exhibit to the government's July 3, 2020 submission), highlights juxtaposing every Jowdy-documented fraud as somehow done by Kenner to distract the investors until FBI-corroboration could convince investors (like Kristen Peca, *infra*) that the banking records and documents are *not real*—and Kenner even fabricated them.  Who could possibly unprove the chimera (when the FBI agent was part of touting of now-proven falsities over-and-over)?

*The new admissions supported by exculpatory evidence supports a hearing...*
• Nolan (and every investor) *signed off* and *authorized* every transaction to the government's chagrin...

*Case law (knowledge of signed documents and their respective contents)...*
A party to an agreement is "charged with knowledge of the contents of the [] contract and [is] bound by the clear and unambiguous terms of the same." *Johnson v. Hardware Mut. Cas. Co*., 108 Vt. 269, 187 A. 788, 794 (Vt. 1936) (alterations in original).  **In a statement stunningly apposite today—as it was nearly a century and a half ago—the Supreme Court opined**:

"It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained." *Upton v. Tribilcock*, 91 U.S. 45, 50, 23 L. Ed. 203 (1875) (*Hetchkop v. Woodlawn at Grassmere, Inc*., 116 F.3d 28, 34 (2d Cir 1997) (holding persons have a "basic responsibility...to review a document before signing it.").

Furthermore...in a 2012 Second Circuit appellate ruling, the Court opined that "Plaintiffs sworn statement that he received only pages one and eight does not create a question of fact, because '[a]bsent substantive unconscionability or

---

[5] Former FBI 7th Floor super-agent Peter Strozk's text confession to *another* massive FBI cover-up led by a Former FBI Director; his revelations exposing the wizard behind the curtain.

fraud...parties are charged with knowing and understanding the contents of documents they knowingly sign.'"   *Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A.*, 461 Fed. Appx. 61; 2012 U.S. App. LEXIS 3012 (2nd Cir 2012) (citing *AXA Versichherrung AG v. N.H. Ins. Co.*, 391 F. App'x 25, 30 (2nd Cir 2010) (summary order) ("If the signor could read the instrument, not to have read it was gross negligence; if he could not read it, not to procure it to be read was equally negligent; in either case the writing binds him."); *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir 1996) (Parties are bound by documents expressly incorporated by reference into agreements to which they manifest their assent) (citing *Pimpinello v. Swift & Co.*, 253 N.Y. 159, 162-63, 170 N.E. 530 (1930)); *Paper Express Ltd. V. Pfankuch Maschinen GmbH*, 972 F.2d 753, 758 (7th Cir 1992) ("the fact that the rules were in German [does not] preclude enforcement of the [forum selection clause].   In fact, a blind or illiterate party (or simply one unfamiliar with the contract language) who signs the contract without learning of its contents would be bound.   Mere ignorance will not relieve a party of her obligations and she will ne bound by the terms of the agreement") (alteration in original); *Morales v. Sun Constructors, Inc*, 541 F.3d 218, 222, 50 V.I 1069 (3rd Cir 2008) ("In the absence of fraud, the fact that an offeree cannot read, write, speak, or understand the English language is immaterial to whether an English-language agreement the offeree executes is enforceable"); *Weiss v. La Suisse*, 154 F.Supp.2d 734, 73 (SDNY 2001) ("While the Court was originally troubled by the fact that the paperwork to obtain the policies was printed in a language the plaintiffs do not speak, defendants remind me of the ancient contract maxim that even a blind man must protect himself by procuring someone to read a contract for him."); *Envirolite Enterprises, Inc. v. Glastechnische Industrie Peter Lisec Gesellschaft M.B.H.*, 53 B.R. 1007, 1013-14 (SDNY 1985) (enforcing a forum selection clause despite it being in German when the rest of the contract was in English); *Cheshire Place Associates v. West of England Ship Owners Mut. Insurance. Ass'n (Luxembourg)*, 815 F. Supp. 593, 597 (EDNY 1993) ("Presumably Frank reads and understands English.   Even if he does not, failure to read or investigate the terms of the contract one signs is not a defense to enforcement of the contract"); *Gaskin v. Stumm Handel GmbH*, 390 F. Supp. 361, 367 (SDNY 1975) (enforcing a forum selection clause in German even when one party did not speak German and asked for and did not receive an English translation).

### *Irrefutably known to Nolan and all in his inner-circle...*
*Here*, every transaction was *signed off* and *authorized* by the investors involved in the transactions—**specifically Owen Nolan**, before, during, and after his "*$2,200,000*" "*investment in Little Isle IV LLC*" (*Ex. PP*).   The Nolan LOC documents were *independently* administered by Northern Trust Bankers.   Northern Trust received Nolan's *authorization* (*Ex. QQ: Bates stamped by Nolan for his 2009*

arbitration, from his personal records); and _verified thru independent testimony_ their unobstructed interactions with Nolan between 2003 and 2006 about his LOC (Northern Trust banker Mascarella's March 9, 2009—pre-arbitration—deposition testimony: _the crucial first 4 years it was opened_).

> _Q:    During the time period from -- From the time you opened the Nolan account until the end of 2006, did you have conversations with Mr. Nolan concerning the line of credit?_
>
> _A [Mascarella]: Conversations -- **I spoke to Owen infrequently**.  I've only had brief conversations with him.  And my guess is that **it was only relating to the payments, that the payments were being made or not being made**._

- **It is clear that Nolan had independent communication with his LOC banker, Mascarella, at Northern Trust Bank during the first three years of his LOC account.**  Nolan's memory loss is apparent (regardless of the reasons for it).

_100% transparency with Nolan's wife, Wells Fargo private banker, and his personal assistant..._
Regardless of Nolan's 2015 memory (or maybe including the decade before that due to CTE)—Nolan's wife, private banker at Wells Fargo, and personal assistant managed Nolan's LOC transactions; making the concealment of anything _impossible_ (_Ex. FF, Ex. GG, Ex. HH, Ex. II_)—including his taxes (_Tr.2112-13_) (_Ex. EE_).  In particular, Nolan wife was tasked with signing off on a $100,000-plus transactions coordinated by Nolan's Wells Fargo private banker (Crane) and his personal assistant (Myrick) for the LOC in 2006:

[Myrick to Diana Nolan 2006] (_Ex. FF_): "_"Hi Diana, I hope I am not bugging you the same way Phil has, but I am getting concerned that the wire requests have not been getting submitted to kim [Nolan's Wells Fargo private banker].   I am receiving calls from the LOC guys at Northern Trust.  Thank you!  Kristine."_

[Myrick to Diana Nolan 2006] (_Ex. GG_): "_You need to send about $190k to the LOC at Northern Trust...Have a good night.  Kristine Myrick, Standard Advisors"_

[Myrick to Diana Nolan 2006] (_Ex. HH_): "_SUBJECT: Payment to LOC at Northern Trust...Hi Diana, Below is the payment information for the payment that needs to be sent to your LOC at Northern Trust: Please send $134,396.00 using the following instructions...I have copied Kim crane [your Wells Fargo private banker] on these instructions.  You will need to call her for verification to send the wire.  Please let me_

*know when the wire is sent so I can follow up with Northern Trust.   Thank you. Kristine."*

Kim Crane (Nolan's private banker) at Wells Fargo responded, as follows:
[Kim Crane]: *"Diana – please print this email out, sign it, and fax to me at 213 626-xxxx.  Thanks.  Kim"*

- Every person—including his own wife (Diana)—in Owen Nolan's life would have been complicit with concealing his LOC and usages from him (if true)—notwithstanding his sixteen (16) *independently* signed Northern Trust LOC documents (from 2004-2009) in the 2015 subpoena (*presented as exhibit Kenner 210 at Tr.4206*).

*Chronic Traumatic Encephalopathy ("CTE")—raises more reasons for a hearing…[6]*
- *This medically diagnosed issue is at the "heart" of the inconsistent prior statements (admitted by Berard and other post trial…and now Nolan's attorney)—raising crucial integrity issues in a government prosecution relying exclusively on 'memory recollection' of events that were <u>documented, cross-verified by independent attorney "updates"</u>, and <u>signed off</u> in real time by the same witnesses who 'could not remember any of it over one decade later (leaving the government to refer to it as concealment)…*

The material admission of 'new evidence', CTE, has <u>*never*</u> been addressed by this Court despite Kenner's repeated material offerings of 'new evidence' (witnesses-proclaimed 'memory loss') against the backdrop of the government's *concealment* charges from individuals who publically sued the National Hockey League (pretrial) for symptoms of '*no memory*' and other '*cognitive degenerative issues'.*   Owen Nolan's N.Y. counsel's June 2020 revelations hi-light this again (*ECF No. 843*).
- *Here,* counsel proclaims without ambiguity that Nolan is only involved in the Hawaii allegations for the *"contributions"* he made for the real estate at the *"heart of this matter".* Five-plus years post-trial, Nolan *re-remembers* his actual

---

[6] **CTE** is Chronic Traumatic Encephalopathy.   The primary symptoms of **CTE** have been described neurological experts, including Dr. Anne McKee at Boston University's Neurological Center as:
*"CTE, a catastrophic disease first associated with boxers long ago, results when a toxic protein, Tau, accumulates in the brain, kills brain cells, and leads to symptoms such as <u>cognitive dysfunction</u>, **<u>memory loss</u>**, sleeplessness, depression, diminished impulse control, episodes of anger, and <u>dementia</u>, among others. Until recently, CTE could only be confirmed through an autopsy. **Tau proteins are released whenever concussion occurs**."*

investment—although specifically contradicting his trial recollections *(Tr.2065-66)*. **Kenner agrees with his NY attorney.**

- Yet—more likely than not—Nolan's NY Counsel is unaware of the details (large and small) that have been forgotten by her-own client—and strategically ignored by the government (despite their thorough Rule 16 production of the same exculpatory evidence—contradicting their prosecutorial theories)…
  - They are refreshed for the Court's reference and the Nolan interested parties, *supra* and *infra*.

*ECF No. 843…*

Nolan's NY attorney's June 2020 submission to the Court <u>verified</u> his now-admitted "*contributions*" to real estate deals at the "*heart of this matter*" (*ECF No. 843: referring to his $2.3 million Hawaii <u>investment</u>*).

- **This is Nolan's only nexus to this case.**

*Verification of investment and unconcealed activity…*

- Nolan's Little Isle 4 k-1 tax document in his personal possession…

Nolan's actual $2 million-plus *reformative* verification was documented in real time by *his* 2006 Little Isle 4 K-1 (tax document).  <u>Nolan produced it from his personal records</u> during the 2009 arbitration (*Bates stamp: Nolan000005044*) (*Ex. EE: not as the government misrepresented to the Court during trial, Tr.2144-46):*

> [Michiewicz]: *"So the only place we know it lives is in the defendant's own home and records. We have no information that this information ever either got to Mr. Nolan or was filed with his return to the IRS."*).

This was obviously false and misleading to the Court—with full government knowledge.

- Nolan and counsel now (5+ years later) admit Nolan's *knowledge* of his $2 million Hawaii LOC investment that he opened via personal sign off with Northern Trust Bank (*Ex. UU: dated in his own hand-writing*)—while contemporaneously authorizing its distribution to Little Isle 4 at Kenner's discretion (*Ex. C at 2: like every other LOC-based investor; re-verified by Northern Trust banker, Mascarella, infra*).
- Under well-settled corporate law—and every legally recognized money-tracing standard, following the moment of distribution to Little Isle 4 by Nolan (and all other signed authorizations), the Little Isle 4 By Laws (*Ex. V*) '*controlled*' the administration of the capital account funds and were unchallengeable as followed by the Managing Member, Kenner—regardless of Nolan's "*faulty*

*memory, confusion and mistakes*" years and years after the events (as a passive-equity investor).

- The government's 'back-tracing' (*government-forfeiture-36*) identified *one* Little Isle 4 transaction that Jowdy received in 2005 (5/4/2005) and used for *his* personal equity purchase (documented to KAJ Holdings, LLC: a 100% owned Jowdy company).   No other investor funds created a nexus to the Jowdy acquisition in Cabo san Lucas that has stymied the conclusion of the *United States v. Kenner* case for five years post-trial.

  o Nolan's 2020 admission further *debunks* the prosecutorial theories that 'unknown' but *legal* transactions were illegal—while *never stolen by Kenner* or for Kenner's benefit—as Nolan's counsel continues to be misled by "someone".  The stipulated banking records still *do not support* this outrageous and misleading government claim (*ECF No. 765 at 8; after they-themselves debunked it post-trial*).[7]

*Jowdy-Nolan 'settlement' agreement...*
Nolan's counsel also *verified* the settlement agreement with Jowdy that the government misrepresented as 'not existing' to the Court (*ECF No. 781 at 3:* "*Based upon discussions with Nolan's counsel and counsel for the DCSL parties, it is the government's understanding that no settlement matching Kenner's description exists in 2008 [or] 2009*" (*Tr. 56, l. 17*), "*or at any other time*".

There is no excuse for the compounding 'errors'.   During the July 8, 2020 conference call with the Court, Nolan's attorney tried to back-peddle about the known and documented settlement (cross referenced in the 2017 Jowdy-investor settlement agreement as a Nolan, Juneau and Moreau "*settlement*"), now referring to it as an "*assignment*".   At the time of the 'assignment', the equity was valued at approximately $3,250,000 (**fully repaying Nolan** for *all* investment funds and Hawaii loan funds traceable to him—despite the Little Isle 4 By Laws *authorization* to transact the funds).

- **Noting**: the 2017 agreement specifically identifies "*The Plaintiff related-parties agree (i) to refrain from commencing, prosecuting, instigating, or in any way participating in the commencement, prosecution, or instigation of any action or proceeding asserting any Released Claim, either directly, representatively, derivatively, or in any other capacity against the Defendant-Related Parties, or any of the Released Persons...*".   And—the 2017 settlement agreement specifically

---

[7] "*Kenner used approximately $2.4 million to buy a personal stake in Mexico.*" (*ECF No. 765 at 8*).   The government has continued to ignore their own forfeiture hearing evidence and revert back to allegations that are simply *unsupported by evidence*—and are prejudicially *wrong*.

designates, "*Ethan Moreau, Owen Nolan, and Joe Juneau…(b) entered into prior separate <u>settlement agreements</u> with Jowdy and/or Jowdy related entities as a result of other litigation, which <u>prior agreements</u> will be unaffected by this Settlement Agreement, and Plaintiffs' Counsel and the Parties do not object to such separate agreements…*".

It is implausible that Jowdy, while settling with the "*bad apples*" (*Tr.1944: Nash*)—decided thru his legal counsel to forgo any future legal safeguards in exchange for his $3 million-plus 'generous' equity transfer—*each*—ten (10) years ago to the three Jowdy-victims.   If actually true—these "*bad apples*" agreements certainly do not meet legal requirements for *consideration*, thus, it is apparent that another agreement (or side-deal) is covering the future legal non-activity of the "*bad apples*" versus Jowdy with the remainder of their Jowdy-Mexico investors; specifically now that the government has documented that Kenner did not receive—or steal—any of their Mexico funds (or any for that matter).

- If not, it further hi-lights Jowdy's cabal efforts to strong-arm people into accepting 'value' that will never be refundable thru more Jowdy malfeasance (See Gov't June 3, 2020 letter re: Jowdy-Danske collusionary behavior)—while deflecting his criminal activity since 2002 onto Kenner as a scapegoat.

*Nolan fully recompensed…*
Nolan received a virtual windfall from the Jowdy settlement (as did Moreau and Juneau), in exchange for not suing Jowdy.
- Nolan received "an in-kind payment"; *See 18 U.S.C.A. §3664(f)(4)*; and
- The Second Circuit has held that, where a fraud victim acquires an interest in real property as a result of such fraud, the restitution offset should be calculated based upon the fair market value of such property on the date of its acquisition, not its ultimate sale price.   *United States v. Boccagna*, 450 F.3d 107, 113 (2d Cir 2006).

"While fair consideration does not require dollar-for-dollar equivalence, fair consideration cannot be disproportionately small compared to the value of the transferred property." *Kim v. Ji Sung Yoo*, 311 F. Supp. 3d 598, 611 (SDNY 2018) (internal citations omitted) (finding that $10 consideration was insufficient to sustain transfer of one-third interest in condominium).   "Where no consideration exists, and is required, the lack of consideration results in no contract being formed in the absence of a substitute for consideration"; See 17A Am. Jur. 2d Contracts § 18 (noting several formulations of the essential elements of contracts, each including consideration).
- Surely counsel for the "*bad apples*" knew the difference considering he

collectively charged Nolan, Juneau, and Moreau approximately $1 million in legal fees in 2007-09, while assisting Jowdy and Harvey in the defamation of Kenner—to cover their collective criminal activity that Kenner confirmed to the investor base in 2006, immediately upon discovery, and documented thru update emails to the investor group.

- Michael Peca *verified thru testimony* the transparency to the 2011 SDNY Grand Jury (*Tr.30: March 29, 2011*): "*Here's where a lot of the cross starts to happen. A short-term loan to Mr. Jowdy, because at the time – we hadn't gotten the lending from Lehman Brothers yet.  We made a short-term loan until the lending came in.  Once the lending came through they were to pay back the loan, I think in the neighborhood of five-and-a-half million dollars, on the closing.   It was never paid back.  And then the communication basically seized [sic] at that point from him.  That was kind of the whole sticking point as far as me and the other guys with Mr. Jowdy.*"

Nolan's contradicting revelations, coupled with the government's July 2020 reformative representations about the Jowdy-Lehman Brothers-Danske relationship, *sheds new light on material matters in this case* (more pro-Kenner integrity verification).   It continues to challenge the veracity of their prosecutorial themes, concocted over a decade ago by Jowdy's cabal and FBI agent Galioto (after Kenner's June 24, 2009 proffer to him).

Based on the Court's 2016 'request', Kenner has continued to prepare exculpatory and empirical evidence for everything "*inaccurate*" (*April 6, 2015, Forf. Tr.207-08*), in volumes, including the submission of *ECF No. 668 Appendix*, fully *debunking* all witness testimony (of question) and any misunderstandings of it—at trial.

- 100% of Kenner's submission were based on *exculpatory evidence* ignored by trial counsel's *unpreparedness* (with the volumes of exculpatory evidence *never* [re]viewed by Kenner's trial counsel) and the government (solely seeking conviction in lieu of the empirical truths); notwithstanding their previously hi-lighted *Brady* issues.[8]  It has led to a decade-plus of un-reconcilable innuendo.

---

[8] As one of a multitude and blatantly misrepresented analysis, the government asked (GSF only) witness, Jay McKee, if he was told about the 'use of funds' by Constantine (and the GSF plans) to include the (i) **Falcon 10 airplane**, (ii) the **Eufora company**, (iii) the **Avalon airplane hangars**, and (iv) the **Las Vegas Palms condos**.

- McKee answered specifically "*No*" to each of those (*Tr.1822-24*); **never told**.

**Noting**: McKee was *not* asked at trial about the *details* of these 'other elements' Constantine proposed to all contributors about cleaning up the unmitigated legal disaster by the "*3 black sheep*" (which included Nolan) (*Ex. X*) who were working with Jowdy and his cabal, which

*Attorney Steve Main (one of the investors' attorneys after Kenner's 2013 arrest)...*
FBI case agent Galioto continued to mislead the investors about Jowdy's known and documented crimes (*Ex. BB at 6, ¶17, ¶19*), while 'pushing' the 2017 settlement deal between Jowdy and the investors.  As a result, the investors' attorney, Steve Main, explained to his clients that ***Jowdy was not found to have defrauded any investors by the FBI, the SEC, and the U.S. Attorneys Office—only Kenner.***[9]   Attorney Main

---

they created thru a vigorous disinformation campaign.   The GSF *details* were a different matter, the exculpatory McKee texts 'confirm' without equivocation that McKee was specifically: (1) told (at dinner), (2) re-told (in the post-dinner texts within hours of the dinner-meeting, never appearing confused or aloof) (*ECF No. 668 at 49-51*), (3) emailed the details by Constantine (*Ex. R, Bates stamp: EMAIL-000231, identical to Peca [Ex. S]*), and (4) signed off by McKee (*Ex. T, Tr. 1859-60*), despite his lack of memory during trial (*Tr.1862*) – or -- **CTE** symptoms of 'memory loss' 6-years after the actual events – or -- ulterior motives (perhaps including the pending 2013-14 Nevada litigation by Kenner versus McKee for breaching the Kenner-McKee Palms agreement; same as the Peca breach and pending litigation (*Ex. U*)).

- **Noting:** Peca had informed Kenner he was going to sell the Vegas condo (he owned with Kenner, but controlled the title) and screw Kenner out of any sales proceeds (triggering the Nevada litigation by Kenner):

| 12 65 1 | +17163743234 **Michael Peca*** | 7/20/2011 6:05:07 PM(UTC+0) | R e a d | [Michael Peca]: **Let's chat soon, together about Vegas unit. I am leaning heavily towards taking Gene's advice** [Sotheby's real estate agent] **and reducing the price.** ==**That would obviously not be good for the others involved**==. |
| 12 65 2 | +17163743234 **Michael Peca*** | 7/20/2011 6:06:19 PM(UTC+0) | R e a d | [Michael Peca]: ==**Wouldn't be much if anything left after receiving every penny I have onto it.**== |

And despite the pressures from Jay McKee's soon-to-be estranged wife about not selling his Las Vegas Penthouse deal with Kenner (which she wanted to use for vacations) when Kenner recommended to "*sell it*" with a buyer in-hand *at a million dollar plus profit* (like Peca) in 2010 – McKee said "no" (with the title in his sole name and control).  Yet – McKee told Kenner that he commended Kenner 100% for his efforts versus Jowdy; ==**after hearing about Kenner's Mexico jailhouse beating from Peca and his wife**==.  McKee told Kenner via email that he deserves a:

"<em><strong>world of credit for your sacrifices</strong></em>"

Jay McKee continued to tell Kenner:
<em><strong>"There may not be another person out there who would have gone to the lengths you have.  I sincerely cannot thank you enough for what you have and are doing..."</strong></em>

[9] ==***Galioto was present during Jowdy's February and March 2010 FBI proffer confessions of stealing all the Mexico and Hawaii loan and equity monies***== (*Ex. Y at 12-14*). The government *re-confirmed* Jowdy's thefts pretrial with their subpoena of Jowdy's Baja Development Corp *August 2002 bank record* (*Ex. AA*)—yet still maintaining Jowdy's innocence days later (*Tr.31*):

had *no independent source* for these statements used to influence the Jowdy-investor settlements; absolving Jowdy of all wrongdoings, *known and unknown*, for any transactions that Jowdy or Jowdy related entities were *ever* involved in (specifically including '*equity*' and '*loan*' deals with the investors) (*Ex. DD*).   This surely conflicts with the government's June 3, 2020 assessment (albeit 11 years too late, by design).

- **Noting:** After John Kaiser's 2017 termination by Jowdy from his Mexican pay-for-play job, a reformed Kaiser 'exposed' the Jowdy-Galioto refrain about the funds Jowdy actually stole; *not Kenner* (*ECF No. 628*) (*verified as Jowdy's thefts by the government thru government-forfeiture-44 post-trial*):

---

[U.S. Attorney Komatireddy]: *"…Global Settlement Fund. This is the fraud where the defendants lie to the investors about who's stealing from them, and find a way to steal from them all over again.  The defendants tell the investors that a guy in Mexico named Ken Jowdy, stole their money and ran away with it."*

On February 20, 2017 – Hawaii-Mexico investors' attorney, **Steve Main**, communicated via email with twenty Hawaii-Mexico investors about the status of *United States v. Kenner*.  In the communication – Attorney Main *vouched* for the investigations of Jowdy by the U.S. Attorneys Office, the FBI, and the SEC – and proclaimed that "*nothing*" was discovered about Jowdy criminal activity (thru 2017) – despite **Jowdy's own confessions** (in 2010) and the decade plus of **documented** bank records (*ECF No. 667*), *LIES* to U.S. State and Federal courts (*ECF No. 611-1 at 2, 7 [f.4], and 29*) (as well as Mexico Federal courts with documented bribes (*infra*), forged documents by Jowdy and his attorneys (*Ex. QQ, government-forfeiture-61 at 2, government-forfeiture-62 at 2*), title frauds (*Ex. RR: implicating Attorney Tom Harvey at 4, who has socially distanced himself from Jowdy since his assistance at trial for AUSA Michiewicz*), bank frauds with forged and fabricated documents (*Ex. SS, Ex. TT [Jowdy's fabricated Diamante Air operating agreement]*), RICO activity with Lehman Brothers (2006-2008) (*ECF No. 667 at 10-16*) and Danske (2009-2020: according to the government's July 2020 submission), including the use of physical threats (**Kenner 2010 Mexico prison beatings and subsequent murder of the investors' Mexico attorney**).  All of this complimented the documented litigation threats by Tom Harvey, Bryan Berard and others on behalf of Jowdy's protection team (in the government's possession pretrial).

Jowdy's Mexican right-hand-man (Greg Carrafiello) explained to Jowdy's Mexico golf course consultant Boyden (as *recorded* by FBI agent Galioto on February 12, 2010: *David Boyden 3500 proffer notes 3500-DBP-1-r at 3*):
> "*Carrafiello told Boyden that any underlined bribes that were given to the Mexican Government were classified on the books as Consultant Fees.*"

Nonetheless without any foundation – investor attorney Steve Main declared February 20, 2017:
> "*Finally for those of you who are convinced that Jowdy is guilty of some crime… I simply note that the circumstances surrounding the Diamante del Mar project and the Cabo project (and the relationship between Kenner and Jowdy) has been exhaustively investigated over several years by the FBI, SEC and the U.S. Attorney of the EDNY.*"

[John Kaiser]: *"Jowdy would like the court to think that Kenner stole $7 million from the hockey players and others…"*

Kaiser's 2019 submission confirms his knowledge that <u>Kenner did not steal</u> the funds; wholly reformative for a guy who testified Kenner "*ruined*" his life (*Tr.1089*), reiterated by the government's summation (*Tr.5753*); <u>*untrue*</u> *and notwithstanding Kaiser's specific testimony about receiving $100 million collateral transfer from Kenner in 2006* (*Tr.1089, ECF No. 628 at 1*)!   *See Boccagna at 113.*  Perhaps, Kaiser and the government are utilizing a different definition of "*ruined*"?

- Between fall 2011 and Kaiser's 2017 termination by Jowdy, Kaiser (and Berard) *publicized* the false Jowdy and FBI agent's mantra previously utilized to all Kenner investors in a calculated attempt to influence their future trial testimony (including pay-for-play NY Daily News and Fortune Online stories).[10]
- Now, Kaiser's post-termination angst altered his recollection and blames Jowdy—as if he (and Berard) were learning about the Jowdy frauds on everyone for the first time (in 2019).

The Court and FBI know that Kaiser was aware of Jowdy's thefts, since 2006 (when Kenner exposed Jowdy's non-payment plans).   Kaiser <u>*verified thru testimony*</u> in his <u>*voluntary*</u> 2009 arbitration testimony that:

[Kaiser]: "*Any money that was allocated towards land for the Hawaiian Investment Group that wasn't being used–the due diligence takes a long time. <u>So if we had some funds that were</u> – that was stagnant and that warrant purchasing land, <u>we would utilize if for a loan, so we actually made some money off it</u>*" [specifically referring to the LOC "*investment*" funds (*Ex. UU*) and the 'Centrum loan funds' (*Ex. P, Ex. W*)]—and, "*Well, the first thing, Mr. Kenner told me that he was, and I met him [Jowdy] a couple of times.   He seemed – a big thing it was 15 percent interest rate, and I thought it was a good move."; —and, "It was supposed to be a short-term loan [to Jowdy].   I thought it was three to six months, because I had also raised some other funds from family and friends that were getting a little antsy about it.*" (*ECF No. 668 at 191-92*).[11]

---

[10] Kristen Peca's admission of FBI agent Galioto's attempted influence on her and Michael Peca.  From the surreptitious 2012 FBI recording of Kenner by Kristen Peca:

<mark>*Kristen Peca* – Matt [Galioto] told Michael and I that <u>you stole</u> all of the Hawaii money and never gave it – the loan money -- to…uhhhh…Jowdy.</mark>

[11] **Noting:** Kaiser lied to the 2015 EDNY Court by testifying (*thru a 'word vomit': Tr. 1107; and confusing the Court's analysis of his testimony: ECF No. 501 at 81-82*) that he did not learn about the money going to Mexico (Jowdy) until after his 2009 arbitration testimony;

- In addition (18 months later), Kaiser _verified thru testimony_ to the FBI (_documented in Galioto's October 2010 'raw notes': Ex. E at 10_): "_$5M-6M – KJ borrowed/rec'd/loaned...borrowed from the Hawaii project - to Mexico...KJ= might have repaid couple hundred thousand to Hawaii...JK [Kaiser] did see Hawaii bank acct statements_".   Kaiser described the details of his five (5) independent meetings with Jowdy to the FBI (_Id. at 2, 3, 10_).
  - Kaiser was the Managing Member of the Hawaii partners when he gave both verifications under oath in 2009 (arbitration testimony) and 2010 (FBI proffer).

In corroboration—Hawaii-Mexico investor, Jozef Stumpel, signed a 2014 affidavit for the Mexico City District Federal Supreme Court investigation of Jowdy and his documented thefts (_Ex. CC_)_: "I have discussed all of the loans and scams by Jowdy on me and my former teammates and friends independently with Arizona attorney, Tom Baker, and California attorney Ronald Richards, both of which sued Jowdy for the various frauds against me and the other investors.   I have also discussed all of the Jowdy scams with the other investors, since we began suing Jowdy in 2008.   Kenner made sure that everyone was 100% aware of all the funds that Jowdy received through actual Jowdy bank records and what Jowdy did with them, so no one was in the dark about it._

_Since April 2015, I have heard from Agent Galioto on a few occasions to let me know that Kenner is a thief and Jowdy did nothing wrong.   He is wrong, because I have seen the paperwork and bank records.   Jowdy stole from my friends and me.   I personally know that he scammed Kenner and me."_

---

attempting to distance himself from his inherent knowledge.  Kaiser's own 2015 testimony _contradicted_ this critical issue when he described an alleged summer 2006 "_confront[ation]_" meeting about Hawaii funds (including a small portion of his 2005 loan) going to Jowdy (_Tr.983-84_).   Neither Kaiser nor the government can reconcile that lie – because Kaiser told both sides of the fabricated contradiction.
- Kaiser testified that Kenner had allegedly reneged on the "_30 day_" loan deal in the first place—clearly hi-lighting and veracity issues (if true) in 2005 (_Tr.975-83_); not _after_ the 2009 Nolan arbitration testimony exculpating Kenner about any possible concealment.

The Hawaii attorneys "_update_" emails (_Ex. D_) confirmed Kaiser's _real-time knowledge_ of the loans (as well) and _participation_ in the decision (regardless of the completely authorized, by signature, transactions: _Ex. C_ (Northern Trust Letters of Authorization), _Ex. V_ (Little Isle 4 By Laws), _Ex. Q_ (Big Isle V operating agreement governing the Centrum loan transaction—ratified by the Centrum lenders), and _Ex. P_ (approved under 'advice of counsel').

- Stumpel signed a 2017 affidavit for the EDNY Court in support of Kenner, verifying the complete, inherent knowledge by all investors of the 'Jowdy loans' in real time (*Ex. BB*): *"As a group and individually, we began our efforts with Kenner to recover all of the funds I directly sent to Jowdy accounts or <u>we agreed as a group like Hawaii to send to Jowdy for short-term loans.  I was a participant in lawsuits for:</u>*

  a. *The $1.6 million loan I loaned Jowdy in Mexico from my account in Europe in 2005,*

  b. <u>*The $5 million plus Jowdy stole from me and the rest of our Hawaii investors in unpaid loans since 2004 known to all of the Hawaii investors I discussed it since 2004 when Kenner disclosed the idea to us as a group on a conference call...*</u>*"*

*Nolan participated in each of these events independently for years...*

*Kenner has hi-lighted for the Court additional "*inaccurate*" testimony (as requested by the Court in 2016 -- amongst other submissions), thru:*

1) *ECF No. 784*—Kristen Peca's surreal recollection of multiple events she admitted on FBI recordings she <u>*was not*</u> and <u>*could not*</u> have been aware of—and Michael Peca's complicit cover-up to *corroborate* her fabricated 2015 testimony with the government's knowledge;

2) *ECF No. 785* and *ECF No. 783*—A Kaiser hi-light perjury submission, including his complicit "*Best Evidence Rule 1002*" violation (with the government), resulting in another exposed *forgery* lie by multiple Jowdy cabal members (including Jowdy, Berard, and Donlan [*Tr.3454-57*]);

3) *ECF No. 782*—Berard's reformative CTE admissions and 2014 litigation, associated with Kenner's *December 2, 2019 letter* (*ECF No. 773*) focusing on the 'unaddressed' CTE 'new evidence' issues to the Court (once discovered and verified); and

4) *ECF No. 786*—The multiple exculpatory text messages contradicting the 'specific' solicited testimony of 'no memory' in contradiction to over-documented, real-time evidence (like Jay McKee, *supra*), etcetera.

**IF** the Court *overlooked* the original ECF submissions, *supra*; unresponded to by the government attempting to avoid all obvious evidentiary discrepancies—grossly affecting sentencing—Kenner petitions the Court to read them (or re-read), considering the recent 'new evidence' admissions, including:

(1) Nolan's attorney verifying the Jowdy "*settlement*" agreement on the June 2020 conference call, which *the government previously denied* after supposedly conferring with Jowdy and Nolan's counsels (clearly untrue);

(2) Nolan's attorney verifying that Nolan did "*contribute*" the $2,000,000-plus *investment* in the Hawaii real estate deal at the "*heart of this matter*" (*ECF No. 843 at 1: still under the impression from the FBI agent that Kenner "stole" the funds and did not invest them as Nolan expected (Id. at 3); contradicting his 'memory loss' testimony of no investments: Tr. 2065-66, and the actual 'tracing' of the funds*);

(i)  Nolan's attorney's disclosure eerily echoes Kristen Peca's 2012 recordings that FBI agent Matt Galioto *falsely* told her and Michael Peca:

> [Kristen Peca]: *Matt [Galioto] told Michael and I that you stole all of the Hawaii money and never gave it – the loan money -- to…uhhhh…Jowdy.*

- o  Kristen Peca (on the recording)—like Nolan's attorney—***exhibit no concerns for the loans to Jowdy***—merely alleging Kenner 'stole' it and never gave the known-loans to Jowdy…*yet still untrue*;

(3) John Kaiser's *stunning* admissions of conspiratorial cover-up and complicity with Jowdy from 2011-2017 (when Jowdy fired him) (*ECF No. 628*)—and his post-divorce exposés; and

(4) The government's scathing July 3, 2020 submission to the Court about the Jowdy-Danske criminal complicity (expressed during the government's opening remarks at trial as a cover-up fabrication by Kenner, *supra*, *Tr.27-33*), which includes millions of dollars of embezzlements from the Diamante Cabo san Lucas's budgets that Kenner previously hi-lighted to the FBI on June 24, 2009; over 11 years ago.   Documented in fact, it starting with the Jowdy-Lehman Brothers complicity (*ECF No. 667 at 10-16*) *after* Jowdy *stole* and *drained* (from Nolan and the other Jowdy-investors):

(i)      The Diamante del Mar capital accounts (*Id. at 20-28*);

(ii)     The Diamante Airplane capital accounts (*Id. at 28-32*);

(iii)    The Hawaii loans (*Id. at 19-20*);

(iv)    The Kenner, Stumpel (*Ex. BB*), Murray (*ECF No. 667 at 32-33*), Gaudet, Norstrom (*ECF No. 667 at 30*) personal loans—and other investments (sued for in Mexico); and

(v)     Misrepresented ***all*** of the Cabo equity as 100% his own with Danske in 2009 (*ECF No. 667 at 16-17*): all documented by Kenner thru stipulated banking records (*ECF No. 667*); *and indisputable.*

*Overwhelming exculpatory evidence is available and transparently irrefutable...*

**Noting:** The prosecutorial theme was that <u>*only*</u> a witnesses/investor *super-minority* subset (those FBI agent Galioto could convince by the 2015 trial that Kenner '*stole*' money Kenner <u>*never*</u> stole; *see Kristen Peca FBI recording supra*), relied on 'memory' of what they 'authorized' (as passive-investors who repeatedly '*signed all the authorizations*' and *testified* they "*trusted*" Kenner (*Tr.517 [Peca], 1925, 1955 [Nash], 2062, 2065 [Nolan], 2200 [Sydor], 2719, 2756, 2758, 2799 [Rucchin], 2861-62 [Ranford], 3042, 3053, 3158 [Berard], 3466 [Donlan], 3533 [Murray], 4799 [Gonchar], 5696 [Michiewicz summation]*).



*100% of the funds were authorized as used—regardless of CTE memory loss recollections...*

**At all times**, Kenner followed the signed *authorizations* (*Ex. C at 1-8: Northern Trust Letters of Authorization*) (*Ex. V: Little Isle 4 By Laws*) (the Big Isle V Operating agreement—<u>*certified*</u> by Centrum to control their loan proceeds: *Ex. W*, and <u>*produced by Nolan in 2009 for transparency*</u>).

Every transaction was documented thru FBI-known "*updates*" (*Ex. D*) ultimately verified by John Kaiser in 2010 (*Ex. E at 3*).

- **Noting:** The government's July 2020 submission about the Jowdy-Danske relationship echoed the majority of what Kenner proffered to the FBI in June 2009.  It hi-lights that Jowdy is being paid (thru his decade-plus incompetence under Danske's watch) **$225,000 per month as the developer**—netting tens of millions for himself, notwithstanding other diversions alleged in the government's letter and Kaiser's *stunning* 2019 exposé submission.

- Similarly—the Hawaii JV partner, Alan Worden (another close friend of former Lehman Brothers manager, Masood Bhatti[12]), was paid **$109,000 per month as the developer**, post-JV in the Hawaii development (worth over $1.3 million per year)—to compliment his $11 million total withdrawals in 18-months (pre-Lehman Brothers 2008 bankruptcy) as a "do nothing" developer; identical to Jowdy in the first four years of Lehman Brothers and Danske Bank sanctioned '*advances against the property loans*'.

  - In the government's alleged multi-year scheme, it is *unexplainable* that with Kenner '*authorized to be paid*' commensurate to any 3rd-party-arms-length "developer"—in four years as the Hawaii partners' developer/Managing Member prior to the August 2006 JV—**==Kenner paid himself ZERO==**!!

  - *Kenner was entitled to millions of dollars over that period of time* (under either calculation) and—*neither* diverted anything (illegally to himself) *nor* disbursed anything (legally) thru payroll or otherwise; while participating as one of the largest investors (neither recovering nor repaying his own capital account at the 2006 closing, resulting in a million-dollar-plus loss personally—to date).

*July 2006 Lehman Brothers Joint Venture disclosure letter…*
*Specifically including Nolan*, every Hawaii partner signed the 2006 joint venture *authorization*[13] (*Ex. JJ: Nolan signed and printed his name at 8*) verifying several critical facts (ensuring transparency related to their Hawaii 'investment' capital):

---

[12] See Kaiser's *ECF No. 628 at 2* for more *inside* Jowdy-Bhatti transactions—including specifically what Kenner was charged for paying Constantine; as a consultant to "find financing" (*although authorized by the Little Isle 4 By Laws: Ex. V*).

[13] **Noting**: The disclosure letter was written by Hawaii attorney Larry Markowitz and William Najam (confirmed by Najam in the 2009 Nolan arbitration).  **Five months earlier** – Najam identified all of the funds Jowdy received as part of the Hawaii 'loans' in his February 6, 2006 email to Kenner, Jowdy, and Mexico legal counsel for Diamante, Fernando Garcia (*Ex. KK at 2*).  Najam's authorship of the 'disclosure' for Lehman Brothers and the investors was with the ***full knowledge of the Jowdy-loan***, and as an attorney (with Markowitz) knew

1) Kenner's representations begin in ¶1, with: "*I am asking for your acknowledgement of, and consent to, these transactions, <u>as they will change your investment</u>...*";

2) "*One other 10-acre parcel, known as the Sugar Mill parcel, is owned by the Hono'apo Historical Society ("HHS"), a Hawaiian nonprofit corporation I organized to hold, environmentally remediate, and then develop, that parcel.*" (*Id. at 1*);

   a. **Noting**: Hawaii attorney Madia discussed the same nonprofit "strategy" in one of his "*update*" letters to the investors (*Ex. D at 2*);

   b. This not-for-profit activity of Little Isle 4 was granted in forfeiture as some 'unknown' scheme to defraud—*despite no concealment*—and a legally advised "*give back*" strategy (by Hawaii attorney Steve Lim at Carlsmith Ball LLP) to assist the long-term development relationships with the local Hawaiian people;

3) "*You may recall that Lehman Brothers financed the project in Cabo san Lucas, Mexico, in which some of you and I are also investors.*" (*Ex. JJ at 2*) (*Ex. D at 1-2*);

4) "*There can be no assurance, of course, that the development of the Parcels will be successful and, accordingly, that there will be cash to distribute to Na'alehu in the amounts contemplated above <u>or at all</u>.   Real estate by it [sic] nature is highly speculative and is subject to numerous risks construction, environmental, regulatory, financing, marketing and local macroeconomic risks, among others.*" (*Ex. JJ at 6*);

In conjunction with the JV disclosure letter—each investor[14] signed off on page 7 of the "*Response Form*", which included (*Ex. JJ at 8*):

---

what was or was not required to be included for full "*representations and warranties*" in the disclosure. ***Kenner followed advice of counsel – who worked hand-in-hand with Hawaii COO Chris Manfredi to complete the 1800-page JV documentation package*** (*Tr.2202-05*).

[14] **Noting (more disproven Jowdy cabal forgery claims)**: While Kenner's former assistant was working with Jowdy against Kenner (after Kenner terminated her 'for cause' in 2007), Myrick gave 2008 deposition in *Kenner v. Myrick* that her named was "*forged*" on the disclosure letter (*Ex. JJ at 26*) (California slander and defamation litigation settled in Kenner's favor pre-trial); another 'forgery' allegation perpetuating the Jowdy-cabal hoax that names were *forged* everywhere (*Ex. BB at 1, ¶ 5-8: Jozef Stumpel affidavit verifying more Myrick and Jowdy-related lies in 2008 about his name being forged on banking records **that never existed***).

• Myrick was 'in charge' of gathering all of the signed disclosures for attorney Markowitz and personally faxed *<u>her own signature page</u>* (*Ex. JJ at 26: including her home fax header*) along with multiple others to Markowitz from her home-office fax for the JV closing (*Id. at 25 [Gonchar], 28 [Murray], 33 [Simon]; making the forgery allegations more absurd*).

• It began the surreal "*forge everything*" soliloquy by anyone related to Jowdy from 2007 (*the discovery of the Jowdy frauds and non-repayment of loans (Ex. Y at 24-25: Hawaii-*

1) "*I have signed and dated this Response Form where indicated below to indicate that I consent to the transactions described in the Letter and to make the following representations and warranties to Mr. Kenner:*"

    a. "*I have received, carefully read and understood the Letter, including the copies of the proposed Limited Liability Company Agreement for Na'alehu Ventures 2006, LLC ("Na'alehu") and the proposed Limited Liability Operating Agreement for WWK Hawaii Holdings, LLC (the "Joint Venture").*  __*I have relied on no representation or warranty by any party with respect to this transaction other than as set forth in the Letter*__.*";*

---

*Jowdy loan agreement alleged as a forgery by Jowdy in his 2008-09 Arizona defense case –* but <u>verified as authentic</u> in his 2010 Nevada defense case) -- thru the massive litigation in multiple jurisdictions and two countries versus Jowdy (exposing more and more documents Jowdy was forging as cover-ups) -- and extending thru 2015 with Kaiser, Berard, and Donlan's (*Ex. MM at ¶49, ECF No. 668 at 60-63 [proof of Berard and Donlan signatures], Ex. NN [actual document]*) "*forgery*" claims on multiple court records (*Ex. MM at ¶9, ¶40 [caught fraudulently transferring the property title]*) and Promissory notes (*Id. at ¶20-22 [Sydor], ¶25-27 [Ranford], ¶32-33 [Khristich]*) in the 2012 Arizona lawsuit that Kaiser and Berard lost in 2015 for <u>fraudulent conveyance</u> of title (*Id. at ¶57*) (*robbing over $1 million from Kenner, but never recovered with Kenner in EDNY custody: Ex. MM at 2*) and approximately $750,000 with the five interveners (Ranford, Nash, Sydor, Khristich, and Lehtinen).  Berard attempted to claim $160,000 investment funds <u>with no documentation</u> with Kenner absent from the proceedings (*Id. at ¶34*).

    o Lehtinen (Kenner's Baja Ventures 2006 partner) dropped his case after being harangued by FBI agent Galioto about Kenner and on behalf of Kaiser and Berard (*Ex. LL*).

    o Kaiser and Berard pushed their defense trial off in Arizona until after the 2015 Kenner criminal trial – so as to avoid the acknowledgments of their "known forgery lies" by Galioto and the government to the EDNY Court (*Ex. MM at 1: filed and ORDERED "07/24/2015"*).

*NY Daily News slander to divert attention from Jowdy's cabal...*
Berard *falsely alleged* to the NY Daily News that his name was *forged* on multiple LOC documents -- but would not present that perjury at trial (*considering his personal assistant, Myrick, testified to the FBI, verifying Berard told her his LOC was "PK's L/O/C to be used for Hawaii project, PK taking care of it": 3500-KM-1-r at 3*).  The Daily News defamation was part and parcel to Attorney Harvey's extortion threats to Kenner in April 2009, which Harvey and Jowdy were sued for in California.   Harvey confirmed the NY Daily News planned defamation of Kenner via email (including FBI-led jail time because the 'loans'; were apparently not given to Jowdy; contradicted by Jowdy himself to the FBI eight-months later – <u>with Harvey and Louis Freeh at his side</u>).   The government hi-lighted the repeated NY Daily News denigration (by Jowdy-Harvey close friend Michal O'Keefe) in their July 2020 submission about the known-Jowdy-frauds available to Danske Bank.

    b.  "*I have been provided with the opportunity to discuss any of my questions about the Transactions, Na'alehu and the Joint Venture with Philip a. Kenner, as well as all information about them I have requested. I confirm that, in making my decision to consent to the Transactions, I have relied, as to legal, tax and all other matters, on independent investigations made by me and my advisors, if any, and that I have investigated the Transactions to the full extent I have deemed advisable.*" and (amongst others);

    c.  "*I understand that my investment in the Company, Naalehu and the Joint Venture is speculative and is subject to certain risks, including those disclosed in the Letter, and may remain so for an indefinite period.*".

*Further protecting Owen Nolan's Hawaii investment interest...*

- The two senior Hawaii management members—John Kaiser and Hawaii COO Manfredi—signed an independently prepared August 2006 JV disclosure letter by lead attorney Larry Markowitz (at Baker Law in NY) for full transparency...

**Kaiser's 2006 Hawaii joint venture disclosure hi-lighted his _complete_ capital repayment** (*Ex. OO at 6 ¶#4:* "==the risks attendant with your investments should be greatly reduced by the return of your capital...==")—**signed off by Kaiser** (*at 7*)—further *debunking* his trial perjury that he was never repaid the 2005 'loan' money from his friends & family (*Tr.1413-14*).  **_He signed it_**.

- **_Kaiser is not a victim of anything—after verifying he was fully repaid in 2006._**

Despite Kaiser's signed-off acknowledgement (*See Horvath*[15]*; and Upton v. Tribilcock, supra*), Kaiser's 'alleged' 2006 collateral agreement with Kenner _also_ represented his 'friends & family' money as an "*investment*" (*Ex. PP*); further hi-

---

[15] *See Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A.*, 461 Fed. Appx. 61; 2012 U.S. App. LEXIS 3012.   In *Horvath*, **the investor argued that the terms and conditions were _written in Portuguese_, which he did not understand, but the Court of Appeals found that the investor was charged with knowing and understanding the contents of the documents that he signed**.

- The Court opined "If the signer can read the instrument, not to have read it is gross negligence; if he cannot read it, not to procure it to be read is equally negligent; in either case the writing binds him.  Parties are bound by documents expressly incorporated by reference into agreements to which they manifest their assent."

lighting his *ever-changing* story ('loan' versus 'investment'; albeit with the agreement a forgery/fabrication in the first instance).

- The Court has never forced the government's hand to verify Kaiser's "*back pay*" and "*expenses*" testimony (*Tr.1413-14*) as his excuse for receiving $1,176,000 at the time of the August 2006 Hawaii-Lehman Brothers closing, in lieu of the well-documented 'repayment'.  Kenner knows the "*back pay*" reference is a fraud on the Court—**because** Kenner possessed Kaiser's taxes during that period of time—while assisting Kaiser with his personal Long Island mortgage loan modification.   Kaiser neither: (1) reported the 2006 "*back pay*" to the IRS, nor (2) had "*expenses*" due—let alone hundreds of thousands of dollars worth (approximately $600,000 under his testimonial calculations).

- It was a fabrication that the government is wholly aware of—specifically with IRS agent Wayne's involvement, *here.*
  - Kaiser with Berard have been the catalysts to support the Jowdy-FBI fabricated narrative since 2011—in spite of Kaiser's February 2019 revelations about Kenner '*not stealing the money that Jowdy wants the court to believe*' he is (*ECF No. 628*).

*CTE...*
- *Highlighted again by Nolan's counsel's revelation (ECF No. 843)...*

Despite the hands-on, signed-off knowledge *in real time*, the government witnesses systematically displayed extensive 'memory loss' at trial (defying any possible statistical norm), even refuting knowledge of emails, texts, signed disclosure, and bank records *they personally signed and handled—all with the government's blind-eye.*

The 'memory loss' was akin to their newly discovered self-admissions of **CTE** (as Plaintiff participants in 2014 litigation for brain damage versus the National Hockey League: pre-EDNY trial—and known).   This 'concealment' theme ran in direct contradiction to the exculpatory evidence the government *knew* was part of the Northern Trust subpoena records they vigorously objected to pretrial as a 'fishing expedition' (amongst a myriad of other exculpatory corroborating evidence).   The government's subpoena defensive position was despite the Court's specific suggestion that 'signed authorizations' (*Ex. C*) would be paramount to the defendant's defense of a concealment charge.   **The Court was correct**.

> [Court]: "*why wouldn't it be an important aspect of the case for Mr. Kenner to get whatever authorizations exist in the Northern Trust bank for the use of funds?*" (*ECF No. 235 at 47*).

These are the exact Northern Trust *Letters of Authorization*—signed by every LOC client (*Ex. CCC at 2: produced by Nolan in his 2009 arbitration production from his personal records*).

**There was no additional authorization required to access the investment funds**. The signed authorizations (by all) confirmed (*Ex. CCC: Nolan example*):

*RE: OWEN NOLAN - LOC*

*TO: Northern Trust:*

*Please allow Philip A. Kenner to access this outstanding LOC for direct deposit into the Little Isle IV account at Northern Trust Bank.   He is authorized to sign for the release of funds related to my LOC.*

*Thank you for your assistance in this matter.*
*/s/*
*Owen Nolan*
*(Bates stamp: NOLAN00649, produced as Nolan arbitration exhibit No. 38)*

*Concealed from the Court...*
The Court was not made aware that the FBI had subpoenaed these exact Northern Trust LOC records two times in 2009 from Northern Trust Bank; acknowledged by Michael Peca to Kenner in real time via text message.[16]  They convinced the Court of

---

[16] Michael Peca confirmed the first FBI-Northern Trust subpoena in 2009, to Kenner after Peca requested copies of the records for himself and Kenner via notarized document in August 2009 (thus *never* hidden from Kristen Peca by Kenner)(*Bates stamp: PK_SEC_005395*):



Less than two months later, the government requested a second subpoena to the Northern Trust accounts, further harassing Kenner's clients. Michael Peca alerted Kenner (again):



- Kenner attempted to acquire the Northern Trust documents to apply to a proper defense strategy thru pre-trial subpoena requests, but was *denied* before trial -- and

its immateriality, severely delaying the defense's receipt of the specific 'authorizations', hundreds of corresponding LOC applications, and renewals that could not have been signed without full inherent knowledge, year after year after year (*ECF No. 235 at 60, 66*); *sixteen (16) of them*—at a minimum—in the Nolan subpoena documents.

- **Noting**: Northern Trust Banker, Aaron Mascarella, *verified thru testimony* to Nolan's arbitration counsel in 2009 that he spoke independently with Nolan between 2003 and 2006 about Nolan's LOC (7 weeks before Nolan testified to the arbitration panel that he remembered '*nothing*').[17]

Based on this and other overwhelming exculpatory evidence *unused* by trial counsel (to be addressed in a pending ineffective counsel motion), there is no possibility that the government could bring any of the same allegations about the Hawaii, Global Settlement Fund, and the Eufora private stock sales transactions in a future trial under their concealment theory.

---

then *delayed* by a knowledgeable government opposition to the truths that would destroy their witnesses' planned *faulty memory, confusion and mistakes* testimony.

[17] Mascarella's March 9, 2009 (pre-arbitration) deposition testimony:
[Mascarella deposition -- *at Tr.23*]:

> *Q.   Okay.  Now, with regard to the line of credit account, who was authorized to make transfers out of that line of credit?*
> *A [Mascarella]: Owen **and Phil**.*

> *Q.   Was there any limitation on Mr. Kenner's ability to transfer money out of the account?*
> *A [Mascarella]: No.  It was -- Yes.  I'm sorry.  It was -- The proceeds were only to go to Little Isle Ventures, Little Isle IV, I think, if I remember correctly.  He signed --* **Owen Nolan signed a bank authorization** *or an authorization letter to the bank authorizing Phil Kenner to transfer money from the line of credit into the Little Isle IV account.*

[Mascarella deposition -- *at Tr.24*]:

> *Q:   During the time period from -- From the time you opened the Nolan account until the end of 2006, did you have conversations with Mr. Nolan concerning the line of credit?*
> *A [Mascarella]: Conversations --* **I spoke to Owen infrequently**.  *I've only had brief conversations with him.  And my guess is that it was only relating to the payments, that the payments were being made or not being made.  There was a few times when the payments were slow, that **we sent out default letters**, which probably -- You know, I can't remember every conversation I had with him but I assume he might have responded to one of those default letters.*

- Kenner pled with trial counsel on the eve of trial for a delay to review the entire 'late discovery' and volumes of exculpatory documents trial counsel *never* viewed pretrial (*Ex. A*).[18]   In addition—trial counsel shunned outside counsel's effort to voluntarily assist in the testimony of factually accurate events that occurred during the pendency of the alleged Hawaii scheme, etcetera.[19]

*Here, the government needs to avoid the actual facts...*
The government has refused to argue any of Kenner's post-trial submissions of the truths (thru empirical and exculpatory evidence), **because** they know if any one thread of their prosecutorial theories are pulled, their entire skein of yarn will unravel at an uncontainable scale, they know it, and will not be able to stop the avalanche.

*The introduction of Nolan's 'new' NY counsel in 2020...*
Her submissions/admissions, have raised even more contradictory testimony (*Tr. 2065-66*) and re-affirmation that Nolan (amongst others) have been systematically

---

[18] *United States v. Gil*, 297 F.3d 93 (2d Cir 2002) ("the government wrongfully suppressed evidence favorable to the defendant [that was] exculpatory and impeaching information, seriously undermining confidence in [the] guilty verdict, and was not disclosed timely enough for it to be useful to defendant.   The production of the documents on the eve of trial did not provide defendant the opportunity to read it, identify its usefulness, and use it.").

The Court opined, "To the extent that a prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation, grounded in the 14th Amendment, to disclose that evidence to the defendant.  Information coming within the scope of this principle includes not only evidence that it is exculpatory, i.e. going to the heart of the defendant's guilt or innocence, but also evidence that is useful for impeachment, i.e. having the potential to alter the jury's assessment of the credibility of a significant prosecution witness."   *Leka v. Portuondo*, 257 F.3d 89, 98 (2d Cir 2001) (alterations in original) (quoting *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir 1998)).

In *Gil*, a guilty verdict was vacated and remanded for "late discovery" of exculpatory information that "*was not disclosed timely enough for it to be useful to defendant*".   In *Gil*, *supra*, the Court was disturbed that "*the production of the [exculpatory] document on the eve of trial did not provide defendant the opportunity to read it, identify its usefulness, and use it*".

[19] Trial counsel *refused* to raise the discovery problems with the Court, always reiterating the refrain that he '*had everything under control*' (*Ex. A*).   During those final days, the government took advantage of the last minute, critical defense-preparation time and delivered hundreds of thousands (if not millions) of pages of *new evidence* disclosures to the defense (*ECF No. 191, 196, 198, 200, 202, 203, 205, 206, 208, and 209...and after the 4-22-2015 Kenner detention transfer ECF No. 231, 234, and 237*).

misled to believe '*Kenner stole their real estate investment "contributions" from Hawaii and bought his Cabo san Lucas equity with it*'.

**Noting:** The FBI announced (*thru its November 13, 2013 arrest day press release):* "*Kenner also underlined several NHL players to open lines of credit, to which Kenner was given access.*"—And the government re-verified 'a year later' that many of the Hawaii-Mexico investors were *aware* that their funds went to Jowdy personally and were utilized to pursue the eventual Cabo resort project, via proffer to the Court in 2014, pretrial:

> [Government]: "*And some of them will even say they understood that some of their money would go to a real estate development in northern [Baja] California run originally by Mr. Jowdy.   That's immaterial.*" (*ECF No. 235 at 46-47*).

- Clearly it was **material** and the "*heart of this matter*" of the Hawaii case.
    - ○ ***The government and FBI told the Court that they knew it—pretrial.***[20]

***The "contribution" is now acknowledged by Nolan's counsel*** on or about June 8, 2020—and was *verified thru testimony* dozens of times pretrial by every other Hawaii-Mexico investors; *none dissenting.*  Examples:
- **Mike Peca** independent verification of Jowdy loans and his "*group*" knowledge (*ECF No. 668 at 127-28);*
- **Mike Peca** SDNY Grand Jury testimony verification of Jowdy loans (*ECF No. 668 at 137-38*), re-verified thru testimony by Hawaii-Mexico investors **Sydor** (*Id. at 138-39*) and **Stevenson** (*Id. at 138*) to the same SDNY Grand Jury; and
- **Mike Peca** *verified thru testimony* that his *Letter of Authorization*: "*It was prepared for me, I read it, and signed it.*" (*Peca March 29, 2011 SDNY Grand Jury: Tr.38-39*); *See Upton v. Tribilcock, supra;*
- **Mike Peca** *verified thru testimony* in 2015 that his SDNY Grand Jury testimony about the Jowdy loans was "*truthful*" (*Tr.498*)—and *verified* he was previously aware of the loans (*ECF No. 501 at 9: confirming he cannot be a victim of loans he was aware of and approved to the EDNY Court because he does not like the outcome years later due to Jowdy's unchecked criminal actions*).[21]

---

[20] [Court]: "*why wouldn't it be an important aspect of the case for Mr. Kenner to get whatever authorizations exist in the Northern Trust bank for the use of funds?*" (*ECF No. 235 at 47*).
- The Court recognized their critical nature to the defendant's case.
- These are the exact Northern Trust *Letters of Authorization (not recovered en masse until week 7 of the trial: Tr. 4206).*  **They are signed by every LOC client** (*Ex. C*).
    - ○ ***There were no additional authorizations required to access the investment funds***.

- o **Peca** specifically told the SDNY Grand Jury that he knew he could lose his collateral related to the collateralized investment and loans to Jowdy (*ECF No. 668 at 119*);[22] and
- o **Non-victim, Mattias Norstrom** (amongst others) signed a 2014-15 affidavit for a Mexico City, Mexico District Federal case in front of the Mexico Supreme Court about the Jowdy loans, the underlying circumstances and knowledge—and Jowdy's thefts of them (*ECF No. 668 at 21-22, f.12*), etcetera, etcetera (ad nauseum)...

Nevertheless, the government offered their '*stolen*' theories (known as falsities) throughout their two summations (*Tr.5996, 5721, 5722-23, 5744-45, 5990, 5991-92, 5707-5709*).   As examples, they surmised:

[*Tr.5721* – Michiewicz summation]:

> *"And what do you find out [about the Jowdy loan]? You find out, what did <u>that 5 million </u>or however much more or less that netted out to be, <u>what did it buy Mr. Kenner?</u> <u>It bought him a 39 percent interest in Ken Jowdy's Cabo San Lucas.</u> Didn't buy the players a 39 percent interest. <u>Him.</u> To this day, right now, <u>he is a partner in that resort.</u> <u>That's where the money went.</u> <u>That's what it bought him. And on the backs,</u> <u>on the portfolios,</u> <u>of the hockey players."</u>*

- • **We know this was wholly false and prejudicial** (*government-forfeiture-36*)...

And – [*Tr.5990* – Komatireddy rebuttal summation]:

---

[21] *See United States v. Archer*, 671 F.3d 149, 169 n.13 (2d Cir 2011). The Second Circuit opined in *Archer*, "[i]f a person gives the defendant his money to bet, knowing that the bet might lose, his later loss, for purpose of restitution, is, in this fundamental sense, caused not by the defendant accepting his money but by the outcome of the bet." 671 F.3d at 171.

[22] [*2011 Peca SDNY Grand Jury at 39-40*]:
> *Q: <u>Did you understand at the time if you didn't pay back the line ever credit the bank was going to take your bonds?</u>*
> *A [Michael Peca]: <mark>Yes. And they did</mark>.   What they took was just under $2 million, I believe it was in 2008, maybe after a while.   We were just, when the loan, <mark>the short-term loan from Mr. Jowdy was not paid back</mark>, the line of credit time matured.   <mark>They had taken what was loaned, I guess, lent to me plus interest</mark>.*

> *Q:  Let me show you what is marked Grand Jury Exhibit 106, which is the pledge agreement dated November 5, 2007.  Kind of technical document, <u>do you remember signing documents putting up the bonds to secure the line of credit?</u>*
> *A [Michael Peca]: <mark>Uh-huh, yes.   I was very well aware of that scenario</mark>.*

> *"...you know what, <u>Baja Development Corporation</u>, on that chart, but there is some sort of misconduct; you don't know what the money was for. <u>You know exactly what the money was for.</u> In fact, Mr. LaRusso, when the first witness got on the stand, one of his first exhibits he entered into evidence was a record of the Baja Development Corporation. Those records are in evidence. <u>Mr. Kenner told you that he used that money to get his piece in the Mexico investment with Ken Jowdy</u>. <u>You know exactly what that's for.</u> <u>That's in evidence.</u>"*

- **We know this was wholly false and prejudicial (and it was not in evidence)...**

And – [*Tr.5996* – Komatireddy rebuttal summation]:
> *"He [Kenner] used it for personal use to get an interest in that resort in Cabo."*

- **We know this was wholly false and prejudicial...**

*Further Nolan verification of investment (contradicting his 2105 testimony)...*
Nolan's counsel <u>*verified*</u> that Nolan is upset about the potential "*$1,656,357*" restitution of funds.[23]   Counsel argues: "*That number <u>only</u> includes the money Mr. Nolan <u>contributed</u> to the various property and development projects at the heart of this matter*".
>      Noting: <mark>**Here, Nolan is *only* an investor in the Hawaii project, as charged**</mark>.

***Kenner agrees with Nolan's counsel*** that Nolan did "*contribute[]*" those funds to the "*various property and development projects at the heart of this matter".*  In a moment of clarity (11-years after his arbitration denials), Nolan (thru counsel) acknowledges that he "*contributed*" the funds to the Hawaii project (as he always knew—as did everyone else in his inner circle[24]), but he was misled by his arbitration attorney (Meeks), Jowdy, and the FBI to believe that Kenner "*stole*" them.

---

[23] This net total for Nolan was a result of the Northern Trust settlement with Nolan of approximately $500,000 (*Tr.2074*) from his original $2,300,000 Hawaii investment.  The net total does <u>not</u> include the **$592,878** that Nolan <u>also</u> received from interest payments during the *collateralized investment strategy* from 2003 thru 2009 – or his **$3,250,000** settlement (or 'assignment') offset with Jowdy (for every entity of Jowdy's, known or unknown, that received funds from Nolan, directly or indirectly).

- In total -- $2,088,324 of interest was paid to <u>all</u> of the LOC investors (including Norstrom, Gonchar, and Murray who were removed from the superseding indictment 2 weeks prior to trial – based on their defiance to participate in the government's theories of prosecution – verified by their exculpatory submissions pre-trial).

[24] **Owen Nolan's wife, Diana,** handled 100% of Nolan's business – specifically his Northern Trust LOC *(Ex. FF, Ex. GG, Ex. HH, Ex. II)* and taxes *(Tr.2112-13) (Ex. EE)*.

"*[V]arious property and development projects*"...

Nolan's counsel further hi-lights Nolan's knowledge (regardless of his intermittent memory of events almost 16 years ago) that the Hawaii funds were *authorized* and known as used for "*various properties*".

- What more is needed to prove that Nolan knowingly lied to the Court—OR—is suffering from severe CTE symptoms?   Either way—the Court should hold a hearing to determine the origination of the 'new evidence' that clears Kenner's *authorized* transactions as 100% legal.

It is indefensible by the government.   Disregarding their responsibility to proceed at all times with integrity, under *Berger*[25], they doubled down to maintain their fraud on the Court, Kenner, and the investors by fabricating: "*Kenner used approximately $2.4 million to buy a personal stake in Mexico.*" (*ECF No. 765 at 8*).  Is that the Kenner obstinacy the government refers to in "*not taking responsibility*" (*Id. at 4*)?

- This time it is *debunked*—again—but by Nolan's counsel.

*Government-forfeiture-36* and *government-forfeiture-44*...

The Court knows that the government submitted their post-trial "*tracing*" documents.   The "*tracing*" evidence *verified* (to Kenner's innocence) that all of the funds were delivered to Jowdy, and used by Jowdy, as expected by the investor-base (and apparently the FBI and government pretrial, *supra*)—and described by one of the Hawaii attorneys "*updates*" to all of the Hawaii-Mexico investors in 2005-06. This '*tracing*' evidence contradicts Jowdy and FBI agent Galioto's representations to the investors of the Hawaii loans to Jowdy.

Hawaii attorney, Madia, stated in February 2006 (*Ex. D*):

---

[25] It is their responsibility under *Berger v. United States*, 295 U.S. 78, 55 S. Ct 629, 79 L. Ed 2d 1314 (1935), as the Supreme Court noted in 1935:  *"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all, and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law.   He may prosecute with earnestness and vigor – indeed, he should do so.   But, while he may strike hard blows, he is not at liberty to strike foul ones.   It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction, as it is to use every legitimate means to bring about a just one."*

"*We have been informed that part of the closing process at Lehman Brothers rejected the original proposal to repay the Hawaii loans at the closing by collateralizing Ken's [Jowdy] 20% equity he received for managing the Cabo project....****Based on the meetings John Kaiser had with Ken*** [Jowdy] ***before we agreed to lend him the money in 2004*** *Phil [Kenner] has asked me again to attach for your records a copy of the lending agreement.  Please contact me with any questions but you should already have your copy from previous communications.*"

Attorney Madia continued (*hi-lighting Nolan's previous conference call involvement and specific questions*):

"*The questions during our last conference call by* **Owen Nolan**, *Mike Peca, and Bryan Berard were important to all of you.   If you are still confused about the individual equity you invested in the Cabo project versus the Hawaii equity and loans, please reply to me.   I thought Phil clarified this but I want all of you to be clear.  Most of you are involved in both deals.   You should have the operating agreements I previously forwarded to you after every member signed them.  If not please contact me about what you cannot find in your personal records and I will forward them to you or your advisors.*

*Based on the delay I have also resent updated loan calculation from the Hawaii loan to Jowdy for your records.   It has been given to Masood [Bhatti] at Lehman Brothers so he is aware of the amount that is continuing to accrue to Jowdy.   As a result of the phone call with Ken [Jowdy] and bill [Najam] about the delayed closing they confirmed the 15% was still accruing in spite of the delay.   They were confident that the initial real estate sales in Cabo in the first year would produce the funds needed to fully repay the loans plus additional interest.   I find comfort in their representations.*"

In fact, the FBI had these "*updates*" in 2010—and presented them to Hawaii Managing Member John Kaiser on October 19, 2010.   Managing Member Kaiser *verified* them during his proffer (*Ex. E at 3: ECF No. 770 at 32-33*); [John Kaiser]: "*update letters in Hawaii project…PK made these many times*"—and reiterated by clarifying to the FBI agents, "*yes, I recall the letters*".[26]

==Irrefutable Kenner transparency—including third parties in every transaction as a safeguard for the Hawaii investors== *(only a minor subset for brevity, here)…*
(1) Kenner had former NYPD and Hawaii management team member, John Kaiser, *independently* negotiate the original Jowdy loans—before commencement.

---

[26] His investors refer to Kenner as "*PK*" in addition to the FBI 'raw notes' shorthand as "*PK*".

- *Kaiser's <u>verified thru testimony</u> his involvement to the FBI in 2010: Ex. E at 2, 3, 10;*

(2) Kenner had Hawaii COO Chris Manfredi *independently* negotiate the consulting payments with Constantine—before Kaiser's signed the 2004 agreement and commencement of *authorized* consulting payments (*Ex. V at 2*).
- Manfredi <u>*verified thru testimony*</u> his involvement to the FBI in 2010 *(Ex. F at 1);*
- Manfredi <u>*verified thru testimony*</u> his face-to-face and *independent* meeting with Constantine to the Court in 2015 *(Tr. 3004)*—prior to Kaiser signing the 2004 Constantine consulting agreement (the first of three).[27]

> **None of those prosecutorial items were handled by Kenner in a vacuum.**

*Empirical evidence trumps CTE inconsistent testimony (and hi-lights them)…*
The following transparency *debunks* any possible concealment of the Jowdy loans and the underlying knowledge by all of the Hawaii partners; regardless of what investors were unable to *remember* up to twelve (12) years after the actual events (like Nolan).  Examples:
- **John Kaiser** (Hawaii partners Managing Member since 2007): Kaiser <u>*verified thru testimony*</u> to the FBI on October 19, 2010 that he met with Jowdy at least five (5) independent times to discuss the loans from the Hawaii partners to Jowdy—before they began (*Ex. E at 2, 3, 10*).
  - Kaiser had previously <u>*verified thru testimony*</u> the same loans as authorized at all times (in 2009—while he was the Managing Member of the Hawaii partners), with "*no secret handshakes*" (*Ex. VV at 6*); and
  - Kaiser <u>*verified thru testimony*</u> to the FBI that he had a copy of the loan agreement at his home in NY (*Ex. E at 3: confirmed at trial, Tr.1127*).
  - <mark>Loan agreement witness, Robert Gaudet, <u>*verified*</u> Kaiser's participation in the creation of the loan agreement—while under examination of Jowdy's 2009 counsel in the Arizona loan fraud litigation</mark> (*Ex. WW at 6-7*).
- **Michael Peca** complete 'lack of memory' testimony regarding 2005 events:
  *Tr.511, 583, 592-97: "It was a long time ago [in 2009]. I vaguely remember.", Tr. 599, Tr. 601:" So much time had gone by that so many things were going on [by 2011], that there were just -- it's hard to remember everything, so it was to help kind of maybe clear up some of the blurred areas."*

---

[27] **Noting**: The 2004 and 2005 Constantine consulting agreements have not been vetted after the '*original ink*' documents were both discovered at John Kaiser's home on the eve of trial; *Rule 1002 violation* (Best Evidence Rule); *representing a gross derelict of duty by the prosecutorial team; hidden from the Court*.

- **Hawaii COO Chris Manfredi**: Manfredi had forgotten 2+ years of well-documented consulting work with Constantine by the time he gave trial testimony—including his specific email correspondence (*Tr.2960, 3005-3015, finally testifying: "I mean, this is, what, 13 some odd years ago"*), and *shockingly* denying recollection all of it despite _verifying thru testimony_ his original face-to-face meeting "*prior to '05*" (*Tr.3004*)[28]—and Constantine's consulting work to the FBI in October 2010 that: "*Agreement between PK or LLCs + Constantine*" and "*Constantine – PK paid TC early*" (*Tr.2998-99*) (*Ex. F at 1*).

  o Manfredi, as COO, was the exclusive manager of every Hawaii closing with independent attorneys; and the exclusive authorized signor on any agreement that did not require Kenner's personal guaranty for the Hawaii partners (*Ex. O*) (*Ex. F at 1*) (*Ex. L: specifically instrumental in the cancelation of the "egregious" 2005 Lehman Brothers loan deal; verifying it was not a concealed Kenner scheme*); and

  o Manfredi communicated his level of *despair months after* the 2005 Lehman Brothers "*egregious*" cancellation (after $400,000-plus in non-refundable penalty fees to the seller)—and his pessimism of being able to close on the $35 million oceanfront parcel (Waikapuna), negotiated and under agreement for $4.2 million by Kenner and Manfredi (*Ex. M):*

  [Manfredi]:  *"I, like you, have been hearing the same old stories for so long, everyone can "get it done" and nobody does…I think the likelihood of losing Waikapuna and Moa Ula [another parcel under agreement] is very real.  I never thought I would be leaving this trip without funding. Chris Manfredi, COO/Project Manager, Big Isle Ventures, LLC, 516-526-xxxx"*).

**Noting:** in the same 'belly-aching' email from Manfredi—a  $3 million funding fee (like the Urban Expansion associated fees) was required by another lender whom

---

[28] This 2004 meeting, which Manfredi flew from New York to Scottsdale, for the one-day meeting, occurred prior to Kaiser signing the first consulting agreement with Constantine (*which Manfredi verified to the FBI: Ex. F at 1*).

**Noting** (*ECF No. 783*)**:** Kaiser and the government turned over the '*original ink*' consulting agreements from Kaiser's home on the eve of trial (making the 'forgery' claims surreal and impossible to explain).  Even with the Kenner exculpatory evidence *now exposed* – refuting the forgery allegations (now for the third time since Kenner's arrest), the government violated **Fed. R. Evi. Rule 1002 "Best Evidence Rule"** by not offering the 'originals' either to the Court at trial or inexcusably to the government's 'signature expert' for analysis.

- The government *only* offered the photocopy versions recovered from Kenner's Hawaii office files (as one would expect the duplicates to reside) thru Kaiser (*Tr. 990-91, 1124*) and thru government signature expert Osborn at (*Tr. 3622*).  It was a gross and unchecked fraud – and the government planned it.

Manfredi was attempting to work with (*Id. at 2*).   Penalty fees were never unique to the Urban Expansion loan, under the extreme lending stress (*Tr.2954):*
*[Manfredi: re-closing the Urban Expansion loan]: "I really didn't have -- really didn't have a choice. We had been through the gamut of trying to find these hard money lenders, and this happened even before Centrum, so I was working on it pretty much nonstop and not being able to close on Waikapuna, not having been successful to that point, you know, there wasn't a lot of choices left."*).

- **Manfredi** *never* mentioned a cross-collateralized purchase of the Waikapuna parcel with the Centrum loan funds in any contemporaneous email or text correspondence (still over a million dollars short—thus impossible, with the 2005 Lehman Brothers deal *still* pending, as well).
  - In fact—prior to the completion of the Centrum funding, it was Manfredi (as an interested third party for transparency) who negotiated the 'advance' to Jowdy days before the transaction (*Ex. N*); and
  - Further—Kenner received '***advice of counsel***' about the use of funds prior to the Jowdy transfer (*Ex. P*)—even though the Centrum-approved operating agreement allowed the "*lending*" (*Ex. Q: recovered thru Nolan's 2009 arbitration production*)[29]—just like John Kaiser explained to the 2009 arbitration panel (*Ex. VV at 1-2*).
    - In the tens of thousands of emails—neither the government nor Manfredi produced a single message asking about the closing of the Waikapuna property with the Centrum funds, yet Manfredi conveniently offered that at trial (*Tr.2950-51*).

**Noting**: A deal-killing cross collateralized Waikapuna purchase—with the centrum funds—would have eliminated the Lehman Brothers funding that was still pending in 2005 for the smaller acquisition loan (also managed by

---

[29] The Centrum-Big Isle V Ventures, LLC "*Use of Loan Proceeds*" statement signed for the July 2005 closing stated: "*the proceeds of the above described loan will be exclusively used for business and commercial purposes*" (*GX-3703*).   **They were…**

The Big Isle V LLC operating agreement (*Ex.Q*) was ratified by Centrum prior to their loan closing as part of the closing package, as the entity that was responsible for the loan (with Kenner as the $3 million personal guarantee -- required by Centrum).   The operating agreement specifically allowed "borrowing" and "lending" based on the current market conditions of the project.   It stated (*Id. at 1*):
> "*At all times, the Company [Big Isle V Ventures, LLC], though its Managing Member Philip A. Kenner, reserves the right to borrow, lend, or invest on behalf of the company.*"

Manfredi)—further thwarting some after-the-fact plan "*He also tells you that Lehman is interested. In 2005 Lehman is interested in investing in Hawaii but Kenner puts them off for another year and he sets up the Urban Expansion loan*" (*Tr.5996: Komatireddy rebuttal summation*). This government fabrication to manufacture a fraud one-year after Lehman Brothers tried to "*deal-to-steal*"[30] the project—and were terminated by Manfredi for their "*egregious*" last-minute attempt (*Ex. L*) are nonsensical at best.   The Court should not overlook that Manfredi was caught stealing corporate funds thru the Hawaii credit cards by Kaiser and Kenner in 2006 (in Rule 16 evidence), leading to Manfredi's animosity towards Kenner for embarrassing him.   His chance at 'payback' thru scripted testimony was obvious.

- **William Ranford**: Ranford *verified thru testimony* that his 2012 FBI proffer was spontaneous and *not* discussed with Kenner until after the interview *(Tr.2907: "I had no idea that the FBI was contacting me until they contacted me. I -- Phil and I didn't discuss the FBI calling me.")*.
  - Yet at trial—Ranford *denied* every proffered investment amount in the FBI 'raw notes' related to his *accurate* Global Settlement contribution recollection (corroborated by Ranford's banking records)—and his multiple Eufora purchase recollections (with specific dates) (*Tr.2838, 2854-55: while denying receipt of his Charles Schwab confirmation mailing to his home address, Tr.2858-60; and denying his multiple Eufora investment as the FBI 'raw notes' detailed: Ex. G at 1, 2*).
  - Like Kaiser, Peca, Manfredi, Sydor, etcetera, Ranford *would not verify* his previous FBI proffer statements (at times appearing aggravated by his previous contradictions.
    [Ranford]: *"You are asking me to remember something that happened many years ago. I'm trying to respond to the best of my recollection.")* *(Tr.2859).*

---

[30] Lehman Brothers was infamous for last-minute lending changes (similar to the $125 million Cabo penalty fee that Danska Bank is currently relying on for maximum payouts)— known in the industry as "*deal-to-steal*" thru foreclosures (*Ex. L*).

35

*Conclusion…*
The longer the pre-sentence drags on, the more revelations of previous FBI and government misleading statements to the various investors materialize.

Nolan's NY counsel is merely the most recent of the "*inaccurate*" testimony that Kenner has painstakingly "*uncovered*" (*April 6, 2015, Forf.Tr.207-08*).

*   The overwhelming participation of Nolan's 'inner circle' of bankers, personal assistants, private lenders, and his own wife presents in the impossibility that absent CTE or willful ignorance—Nolan's investments could not have been *concealed* from him; unless they were all in on it.

Kenner has lost optimism that the truth will prevail over the injustice of the decade-plus false narratives, begun with:

1)   Jowdy's attorneys (2002 thru present);
2)   Perpetuated by Kaiser and Berard (2011 thru present) once hired in Mexico by Jowdy; protecting themselves for the millions *they stole* from Kaiser's friends & family, Kenner, and other NHL players; and
3)   Completed by FBI agent Galioto (2009 thru present) including the AUSAs 'theory of the day'—typically landing around money Kenner never stole, possessed, acquired, or even benefitted from.

BUT—it is obvious to any neutral observer that the CTE (memory loss issues) of the investors is the *only source* of inconsistent testimony (without applying ulterior motives and undue influence) and contradiction to the overwhelming exculpatory evidence in the government's possession (since 2009-10). It continues to rear its exculpatory head favoring Kenner—time after time.

If the exculpatory and empirical evidence is viewed by any neutral observer—with Kenner counting on the Court's position to do so while protecting the rights of the defendant from the greatest power on Earth, it becomes crystal clear that there is "*no there – there*".

Transparency could not have been more obvious and redundant—protecting Nolan and the other investors—with Kenner employing third party, arms-length, investment partners (like Kaiser and Manfredi) to engage in decisions paramount to the Hawaii project—and attorneys at every step of the process to allow all investors a most-simple and *independent* advocate for their investment interests, *independently* protected under privilege from their relationship with Kenner, if anything felt "*uncomfortable*" (*Tr.601-02: Peca describing his "truthful"* and

*exculpatory SDNY Grand Jury testimony—which exonerated any lack of Kenner's transparency to the investment group*).

Kenner is requesting the Court view the 'new evidence' in the light it deserves and realizes that less than 10% of the actual realities have been presented by the government time after time; with their own alleged victims delivering their malevolence and double-talk—and exposing their-own cover-ups.   The government's 10-year-plus protection of *everything Jowdy* (and his cabal members: including Berard and Kaiser thefts) was perpetuated by Probation in their 2016 addendum to the Court; referring to Jowdy as an "*innocent victim*".   It is unexplainable when Kenner has exposed the frauds since 2006, the first date of discovery.

Michael Peca *verified* this *thru testimony* to the SDNY Grand Jury in 2011 (*SDNY Grand Jury at Tr.30*) (along with Sydor and Turner Stevenson):
[Michael Peca]: "*A short-term loan to Mr. Jowdy, because at the time Cabo – we hadn't gotten the lending from Lehman Brothers yet. We made a short-term loan until the lending came in. Once the lending came through they were to pay back the loan, I think in the neighborhood of five-and-a-half million dollars, on the closing. It was never paid back.* **And then communication basically seized at that point from him [Jowdy]. That was kind of the whole sticking point as far as me and the other guys with Mr. Jowdy.**

*The 1.7 along with the $100,000 and whatever else put in this a capital account, Little Isle 4, I believe.* **The Capital account was loaned to Ken Jowdy, our business partner, so there is no need at the time to be worried about anything. The money was loaned to Ken Jowdy to basically help some of the purchase of the Cabo property so we can get the funding. And then it was supposed to [be] a short-term loan.**

*I knew 100 percent it was going to Little Isle IV initially.  Shortly after that the short-term loan was something that took place.*"

Nolan participated—regardless of his memory of it—as documented in the Hawaii attorneys "*update*" correspondence with the entire "*group*" (*Ex. D*) as Peca, Stevenson, and Sydor *verified thru testimony* to the 2011 SDNY Grand Jury—in secrecy; in case they were "*uncomfortable*" with the truth!

Nothing has changed to date, while the fully vetted transactions (Eufora, Hawaii, and GSF) have been exclusively governed by *authorizations, full disclosure sign-offs,* and *operating agreements—all* religiously followed without deviation by Kenner.

Kenner pleas with the Court to consider the necessity for finality to this 2-decade fraud by those who stole from 'those of us' who fought to recover the legit investments (while led by Kenner in every instance for transparency), *at a cost far greater than any responsibility Kenner had to his investors*.

Even years after the LOC collateral was sized by Northern Trust Bank, never-ending '*thank you*'(s) were sent to Kenner…never an opposition until Jowdy was exposed!

Kristen Peca told Kenner during her 2012 FBI recordings:

[*Kristen Peca]: "…maybe that golf guy [Gaudet] told Michael about you being in jail and them hurting you – and…and the attorney guy getting killed.  Its too scary. ==Michael and I cant thank you enough for keeping the fight going after the jail thing and the attorney but -- I just want this to be over no matter what it takes.==   I know how mad Michael and the other guys are with Jowdy for not paying the loans back.   Who does that??*"

By Norstrom (July 2010):



| 1527 | +46708874363 **Mattias Norstrom** | 7/31/2010 2:29:53 PM(UTC+0) | R e a d | [Norstrom]: **Just wanna tell you that I can't thank you enough for all your hard work! //Matti** |

By Berard (while working with Giuliani's team versus Constantine, Jowdy, and Lehman Brothers):[31]

April 2010:



| 13144 | +14015246929 Bryan Berard* | 4/28/2010 8:54:28 PM(UTC+0) | Read | [Berard]: **Tell agent [Galioto] to shut the fuck up. Doesn't have a clue.** |

June 2010:

| 13711 | +14015246929 Bryan Berard* | 6/5/2010 9:43:24 PM(UTC+0) | Read | [Berard]: **I agree. I don't give a fuck abt him [Constantine]. Just don't want him to fuck this up like Jowdy.** |

October 2010:

---

[31] **Noting**:  Berard told the FBI in 2013 (after two years of Jowdy employment and Kenner slander) that he terminated his relationship with Kenner in 2009 after the Nolan arbitration.   Clearly—it was untrue and fabricated for effect (*3500-BB-1-r at 3*).

| 16949 | +14015246929 Bryan Berard* | **10/7/2010** 11:00:25 PM(UTC+0) | Read | **[Berard]: I wanna just get these guys there $ back and let's go do stuff wth small group** |
| 16950 | +14015246929 Bryan Berard* | 10/7/2010 11:03:41 PM(UTC+0) | Read | **[Berard]: Honestly. Fuck the rest.** |
| 16951 | +14015246929 Bryan Berard* | 10/7/2010 11:29:07 PM(UTC+0) | Read | **[Berard]: Same wth mexico too. Uve put up wth enough bullshit over the years. Try get them there $ back and wash ur hands wth all these retards.** |
| 16952 | +14015246929 Bryan Berard* | 10/7/2010 11:29:18 PM(UTC+0) | Read | **[Berard]: And I mean all of them** |
| 16956 | +14015246929 Bryan Berard* | 10/7/2010 11:55:51 PM(UTC+0) | Read | **[Berard]: hopefully this is the sign of the beginning of the end. 6 more months done all this shit** |
| 16957 | +14015246929 Bryan Berard* | 10/7/2010 11:56:06 PM(UTC+0) | Read | **[Berard]: Hopefully can go after Leaman Borthers soon too** |
| 17764 | +14015246929 Bryan Berard* | 11/9/2010 2:04:37 AM(UTC+0) | Read | **[Berard]: Basically we shld throw the whole kitchen sink at Tommy and also get on the feds and let's get movn on Lehman and jowdy?** |

Kenner prays the Court realizes the realities that actually existed before loyalties were skewed by misleading and ulterior motives—and applies this knowledge to the final sentencing—or in the immediately alternative, readdresses this 'new evidence' in an alternative venue available to the Court's discretion.


Sincerely,


Phil Kenner, Pro Se