August 11, 2020

The Honorable Judge Bianco
U.S. District Court – EDNY
100 Federal Plaza
Central Islip, NY 11722

**Re: <u>Recent witness impact statements</u> (Norstrom)**

Your Honor,

The government lacks representations at trial that the Hawaii project's alleged scheme reached any investor other than those named in the superseding indictment (*ECF No. 214*); notwithstanding the transactions alleged by the government as unauthorized were *authorized* by the corporate By Laws (*Ex. AA*)—and cannot be subject to a passive-investor's recollection over a decade after the *authorized* events and individual signoffs (a surreal prosecutorial standard, if allowed).

*No uncharged conduct…*
During the July 2, 2019 hearing, the Court denied any *Fatico* hearing, while verifying that it was only considering charged conduct in its guideline calculations—while regurgitating the government's previous representations (*Tr.33*):

> *[Judge Bianco]: "I just want to make clear that I think I've said this before, but it is in the court's view and its consistent with the government's letter to the court, you know, two years ago that we're not – <u>that the government is not seeking to hold the defendants accountable for any uncharged frauds.</u> The scope of sentencing relates only to the frauds that were proved at trial…"*

The February 2020 ruling by the Court (re: forfeiture and loss) and the follow-up 'affidavits of loss' by un-named victims, *supra*, raises more issues that can only be explained by CTE[1] symptoms (a.k.a. memory loss) or undue influence by the

---

[1] **Chronic Traumatic Encephalopathy** ("CTE") -- The primary symptoms of **CTE** have been described by neurological experts (including Dr. Ann McKee) at Boston University's Neurological Center as:

> *CTE, a catastrophic disease first associated with boxers long ago, results when a toxic protein, Tau, accumulates in the brain, kills brain cells, and leads to symptoms such as <u>cognitive dysfunction</u>, **<u>memory loss</u>**, sleeplessness, depression, diminished impulse control, episodes of anger, and <u>dementia</u>, among others. Until recently, CTE could only be confirmed through an autopsy. **Tau proteins are released whenever a concussion occurs**.*

prosecution members.   The government has attempted to re-convince investors who were 'in the know' about their personal transactions that their recollections of the truths were wrong—despite now being represented as Jowdy-frauds by the government in their July 2020 submission.   In contrast—they have doubled-down on the falsity that '*Kenner stole all of their Hawaii and Mexico investment-loan money*' (amongst other previously documented mis-representations) to whomever they could contact 5+ years after trial, requesting statements from non-victims (exculpatory evidence, *infra*).

- This filing complements similar mis-representations and reformative representations by Juneau, Nolan, and Kaiser (addressed in Kenner's June 16, 2020 submission to the Court).

To address the issues—Kenner requests an evidentiary hearing; wholly effecting sentencing, forfeiture, and restitution calculations.

*Case law regarding evidentiary hearings...*
Although, "the district courts have significant latitude in fashioning procedures to resolve sentencing disputes"; *United States v. Sabhnani*, 599 F.3d 215, 258 (2d Cir 2010)—it appears obvious, with the mounting volume of post-trial witness and government reformative admissions—the exculpatory and empirical evidence that exculpates Kenner's integrity *requires* an evidentiary hearing; wholly affecting sentencing for named *and* unnamed people in the superseding indictment (*ECF No. 214*).   The Court's "discretion is not limitless: the Due Process Clause requires that the defendant have 'an adequate opportunity to present his position.'" *Id.* at 258 (quoting *United States v. Maurer*, 226 F.3d 151-152 (2d Cir 2000).  *See United States v. Simmons*, 544 Fed. Appx. 21 (2d Cir 2015).

The Court requires that "the standard of proof at sentencing is a preponderance of the evidence" to accept the government's position of loss (related to actual victims in the first instance, sentencing enhancements, and restitution under MVRA); *United States v. Gaskin*, 364 F.3d 438, 464 (2d Cir 2004) (citations omitted).

- The Court is aware that the government *only* provided contradiction in testimony[2] by Nolan (and others) to *their* signed, and exculpatory evidence in their possession—while asserting they were unaware of *personal authorizations*

---

[2] The only rebuttal by the government post-trial was that the witness testimony was based on *faulty memory, confusion and mistakes* by their witnesses; ***never the truth***! (*ECF No. 440 at 16: "A witness perjures herself when "she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."* United States v. Dunnigan*, 507 U.S. 87, 94 (1993))

they *all* signed (*Ex. B: Norstrom at 8*) and *corporate authorizations* (*Ex. AA*) which controlled the investment funds that they testified they '*did not read*' (repeatedly, witness by witness), yet confoundingly delivered from their personal files to various litigations (*Ex. SS: produced by Owen Nolan during his 2009 arbitration from his personal files; as Arbitration Exhibit No. 82*).  It is unexplainable other than by 'memory loss'—as each Hawaii investor received the identical corporate document package that Nolan actually produced in 2009 from his personal files.

- Secondly, the inclusion of un-named victims from the superseding indictment— post-trial only—requires judicial review with nothing but exculpatory evidence in the government's possession; **none opposing** (i.e. deVries, Rem Murray, et.al. —separate submissions to follow).
  - An unsubstantiated "victim impact statement" does not constitute evidence to satisfy the 'preponderance standard'.  The "right to confront" clause of one's victims guarantees that.

**Noting**: Norstrom, Gonchar, Murray and several other investors were removed as victims two weeks before trial by the government and FBI's choice and cannot be assumed to have been confronted as victims (with Kenner's trial counsel leaving a multitude of exculpatory evidence at the defense table for Murray and Gonchar—*unused*—since there was no need to impeach as one would an alleged victim[3]); *See Hughey*.[4]

"A sentencing conducted on the basis of unreliable or false information violates the due process clause just as much as a sentencing conducted without a sufficient hearing."; *United States v. Fell*, No. 5:01-cr-12-01, 2018 U.S. Dist. LEXIS 229652 (D. Vt. Mar. 16, 2018).   The U.S.S.G. acknowledges that "[a]n evidentiary hearing may sometimes be the only reliable way to resolve disputed issues." U.S. Sentencing

---

[3] This "non-victim" position was trial counsel's attempted sedation to Kenner as to why FBI notes, signed documents, personal legal filings, etcetera (all exculpating any Kenner concealment) were not presented during testimony of Murray and Gonchar.

[4] Since the Supreme Court decided *Hughey* almost 30 years ago, prosecutorial decisions to frame indictments with a "view to success at trial rather than to a victim's interest in full compensation" are made with a full understanding of the potential consequences; See *Hughey v. United States*, 495 U.S. 411, 421 (1990).   In concert, the Tenth Circuit opined, "**There are tradeoffs in such decisions**"; *United States v. Mendenhall*, Case No. 19-7006 (10th Circuit December 23, 2019).

Guidelines Manual § 6A1.3 cmt. (2014).   The decision to hold or not hold a *Fatico*[5] hearing turns largely on whether the contested information is relevant to the trial court's potential sentence; *See Id.* § 6A1.3 cmt. (2014).  If the sentencing court does not plan to take the contested information into account, it need not grant a *Fatico* hearing to resolve the factual dispute.  Here, it is critical.

*The facts...*
Regardless of the government's ongoing blustering, the facts are clear that Kenner *never* received any ill-gotten Hawaii funds, any ill-gotten Global Settlement Fund funds; and *less than* $280,000 of 'legal' loan repayments from Constantine and Gaarn are traceable to Kenner receiving anything (arguably not 'ill-gotten', as vetted by the Eufora investors own attorneys, *Ex. Q at 1*).

**Noting**: None of the loan repayment funds originated from Norstrom's Eufora investment.   The loan repayment funds Kenner received were stipulated thru the government as actual loans that Kenner previously gave both of them—with his personal money—prior to 'their' repayments from 'their' transactions.   No other 'proceeds' in the alleged 13-year scheme are received by Kenner.   That is indisputable.

*Renewed request for evidentiary hearing...*
In the context of the empirical and exculpatory evidence, *infra*, Kenner requests the Court hold an evidentiary hearing to present the unchallengeable evidence of complete transparency—*specifically with Norstrom*—and *signed authorization* to conduct the Hawaii transactions for all of the members, as religiously followed by Kenner as Managing Member.   This evidence, *supra* and *infra*, augments the government's unsubstantiated 'loss' totals and 'forfeiture' demands *en masse* in their sentencing memo that the Court followed (with only contradictory evidence in their possession).   All of the alleged schemes are represented, *infra*, with empirical evidence that would not hold up under scrutiny of a neutral arbiter with any business acumen—after weighing empirical evidence (exculpatory for Kenner) versus clear 'memory loss' testimony.

*Every transaction was signed off for authorization as expected*...
  • *Case law (knowledge of signed documents and their respective contents)...*

---

[5] *United States v. Fatico*, 603 F.2d 1053, 1057 n.9 (2d Cir 1979), *cert. denied*, 444 U.S. 1073 (1980).

A party to an agreement is "charged with knowledge of the contents of the [] contract and [is] bound by the clear and unambiguous terms of the same." *Johnson v. Hardware Mut. Cas. Co.*, 108 Vt. 269, 187 A. 788, 794 (Vt. 1936) (alterations in original).  ***In a statement stunningly apposite today—as it was nearly a century and a half ago—the Supreme Court opined***:

"It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained." *Upton v. Tribilcock*, 91 U.S. 45, 50, 23 L. Ed. 203 (1875) (*Hetchkop v. Woodlawn at Grassmere, Inc*., 116 F.3d 28, 34 (2d Cir 1997) (holding persons have a "basic responsibility...to review a document before signing it.").  *See also Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A.*, 461 Fed. Appx. 61; 2012 U.S. App. LEXIS 3012

- In *Horvath*, **the investor argued that the terms and conditions were _written in Portuguese_, which he did not understand, but the court of appeals found that the investor was charged with knowing and understanding the contents of the documents that he signed**.

    The Court opined "If the signer can read the instrument, not to have read it is gross negligence; if he cannot read it, not to procure it to be read is equally negligent; in either case the writing binds him.  Parties are bound by documents expressly incorporated by reference into agreements to which they manifest their assent."

**Noting**: Kenner arranged for Norstrom to speak with FBI agent Galioto on June 30, 2009 (*Ex. K at 1, 2*)—only days after Kenner's June 24, 2009 voluntary proffer. Kenner also arranged FBI interviews for Hawaii-Mexico investors, Peca, McKee, Sydor, Stevenson, Murray, Gonchar, and Berard.  ***FBI agent Galioto canceled them***.

Norstrom—or any of these proffers would have been *critical* only three months *after* the Northern Trust LOC account collateral was seized for (1) **Norstrom**, (2) Peca, (3) Sydor, (4) Murray, (5) Gonchar and (6) Berard.[6]

*Recent graft...*
In was recently brought to Kenner's attention that the forfeiture AUSA's efforts to expose the Jowdy-Danske relationship (July 2020 submission) echoes Kenner's

---

[6] Only Owen Nolan was absent from the LOC investment group—because he and his attorneys were already working with Jowdy's cabal and having agreed to the Nolan-Jowdy 'settlement' (or 'assignment').  ***Kenner had nothing to hide***—but Galioto's immediate Jowdy-cover-up thwarted the perfect, *real-time* opportunity to know '*who knew what*'.

vetting of the complicit Jowdy-Bhatti[7] (Lehman Brothers) transactions as their predecessor.   In light of the new exposés, FBI agent Galioto has again been haranguing all of the Hawaii-Mexico witnesses who refused to testify in 2015, as he desired.   The government *specifically* chose to remove them on the eve of trial from the superseding indictment (*of 4-22-2015: ECF No. 214*).   Again recently, Galioto represented to an investors—'un-named' in the superseding indictment—that Kenner was convicted of 'stealing' all of the Hawaii and Mexico money (*despite the government's introduction of government-forfeiture-36 and government-forfeiture-44 in 2016 during the forfeiture hearings*).   Galioto has also represented that Kenner 'stole' the investment funds directly from 'other investments'; not related to the current case.   All of this is *still* empirically false. the Court should note that Galioto's ongoing misrepresentations echo John Kaiser's February 2019 letter to the Court parroting Jowdy, stating: "*Jowdy would like the court to think that Kenner stole $7 million from the hockey players and others…*" (*ECF No. 628 at 1*).   As such, Galioto has begged Kenner's former clients—like Norstrom to sign 'victim impact statements' for *all* of their independent investments—so they can recover their funds post-sentencing.

It is apparent that Galioto's complicity in the decade-plus Jowdy-cabal misdirection and cover-ups needs a new *smokescreen*—as the questions mount from the investors and the forfeiture AUSAs of how they identified over a decade of Jowdy macro-crimes in 2020—originally proffered by Kenner in June 2009 to Galioto—and Galioto remained unaware of any of it.   Galioto needs a distraction to avoid further complicit identification—and the haranguing of others to make new submissions is a see-through charade.

*Non-Victims In The Superseding Indictment…*
This case is *not* similar to the *United States v. Shkreli, 2019 U.S. Appx. LEXIS 21248 (2nd Cir 2019)*, where the Second Circuit identified that *"false promises were routinely made [in writing]"* or *United States v. Kalish*, 626 F.3d 165, 168 (2d Cir. 2010) where

---

[7] Masood Bhatti was the Lehman Brothers commercial portfolio manager in 2006 who authorized the original $125 million Cabo san Lucas loan with Jowdy in 2006.   He approved every transaction that Kenner documented in the first 18 months of the DCSL project as actually "stolen" by Jowdy (*ECF No. 667 at 10-19*).   Bhatti is also the individual that Kaiser exposed in his February 2019 letter to the Court (*ECF No. 628 at 2*) as complicit in receiving *unwarranted* consulting payments—unknown to the Cabo investors like Kenner.   The consulting payments—approved by Danske and Jowdy—are the identical 'basis' for the criminal charges against Kenner and Constantine, *here* (fully exposing a legal double-standard; if operating agreement *authorized* payments can be deemed illegal—via *ipse dixit* standards at will).

voluminous fraudulent statements were made to investors "*by written instruments*" promising mortgages after paying "*advance fees*".   **Here—it is exactly the opposite**.   In *Kalish* and *Shkreli*, the facts presented an unchallenged "pattern of lies" and deceptions to individuals the Court (1) heard from and (2) did not hear from.   <u>But</u>—*here*, the dozens of individuals who were not present at trial (including Norstrom, deVries, Rem Murray—and Glen Murray, Sergei Gonchar[8] who were) have, at a minimum, opposed the government's prosecutorial theories pretrial during independent:

(1) Grand Jury testimony;
(2) Civil trial testimony;
(3) Signed under oath affidavits (for civil cases);
(4) Signed legal disclosures with their independent attorneys;
(5) Signed the GSF disclosures for Constantine's use of funds; and
(6) Participated in five (5) independent lawsuits versus Ken Jowdy to recover the loaned funds—many of them signing affidavits as plaintiffs.

*Mattias Norstrom…*

Like the vast majority of Kenner's former clients—Mattias Norstrom—was in constant communication with Kenner while Norstrom was personally making the final decision in every transaction.  Between 2008 and 2011, Kenner and Norstrom exchanged over 600 texts and an equal number of emails (in Rule 16 production).  None of which have been presented to the Court by the government.   Kenner <u>never</u> had the final authorization to transact any fund transfer or investment without Norstrom's knowledge and ***approvals to 3rd parties (just like every Kenner client—although mis-represented at trial—even by Michael Peca*** (*Tr.506-07*).  In contradiction, Michael Peca actually <u>verified</u> this protocol to the 2011 SDNY Grand Jury (*3500-MP-5 at Tr.17-18*):

> *Q: When did you make that [Hawaii] investment?*
>
> *A [Michael Peca]: It round [sic] the same time, 2004, 2005.  I want to say they were my very much – <u>they were presented to me</u>.  **On all of them, <u>through all the times, I made the final decision</u>**.  I may not have done as much due diligence as some may have done.   <u>It's not like I had to say yes or forced.</u>  I*

---

[8] The government specifically chose <u>not</u> to include over 20 individuals in their superseding indictment, actually removing many of them from previous indictments after being told by each investor pretrial that they were <u>not victims</u> of anyone but Jowdy for stealing their money—and whatever Giuliani's group discovered in the Constantine-Eufora debacle after their 3-month thorough investigation of *everything Eufora—assisted by Kenner*.

*made the decision to say, yeah, I want to do that.* ***Based on the money I was making at the time it didn't bother me to invest those kinds of dollars.***

*Grand jury testimony…*

Norstrom spoke with all the three of the March 2011 SDNY Grand Jury individuals who gave testimony (Peca, Sydor, and Stevenson).  A day later, Norstrom sent a message to Kenner to check on the status—for more full transparency since none of the three were '*uncomfortable*' (*Tr.601-02*)—while openly communicating with every other Hawaii-Mexico investor:

| 1 0 9 2 0 | +4670887 4363 **Mattias Norstrom** | 4/1/2011 5:54:33 PM(UTC+0) | R e a d | [Norstrom]: Hi Phil, Hope you're good. **How did the testimony with the grand jury for the three guys go? Your friend Matti** |
|---|---|---|---|---|
| 1 5 0 0 2 | +4670887 4363 Mattias Norstrom* | 4/1/2011 6:03:46 PM(UTC+0) | S e n t | [Kenner]: Testimony went well. I'm in NYC end of April with the SEC. I hope it is educating the Feds, finally![9] |
| 1 0 9 2 4 | +4670887 4363 Mattias Norstrom* | 4/1/2011 6:08:06 PM(UTC+0) | R e a d | [Norstrom]: **Good news. Always on you side. Keep going. //Matti** |

*Norstrom's 2020 'affidavit of loss'…*

Norstrom listed a myriad of private equity deals he *independently* approved and *signed-off* with *independent* companies—known by Kenner—but independent in every way.  *Here*, Norstrom has raised Hawaii, GSF, and Eufora issues.   They will be

---

[9] After the conclusion of 24 hours of Kenner SEC testimony, attorney Stolper—who had represented the Eufora, Hawaii, and Mexico investors for approximately 18 months (while preparing to sue Jowdy, Lehman Brothers, etcetera) told the SEC in August 2011 (*Ex. TT*): [Stolper]: *The only thing I would like to clarify was that I think in your line of questioning, which may not come through in the transcript, whether he [Kenner] disclosed that the SEC has sought enforcement of subpoenas to his clients.   I think that the suggestion in your question was that it was something negative that he should disclose to his clients as sort of a warning or red flag to his clients who are relying on him.*

***And I think that the conversations that I have been a part of***, *without waving privilege,* **_and also my own view_** *of SEC's involvement in this whole Diamante del Mar, et. al. is a welcome one and that **we** and Mr. Kenner, are really looking to the SEC to enforce the securities laws against Mr. Jowdy and those [Jowdy's cabal] who did wrong here.   And we see it as a welcome thing, as a positive thing.*

*So the tenor of the conversations with Phil's friends, co-investors, clients is that this is a welcome thing and maybe because we are having this direct communication with the SEC, and then perhaps subsequently with the US Attorneys Office, that maybe they will finally get some justice out of this.*

*And I know I have said that off the record with you and I just wanted to clarify that in response to that line of questioning.   Just a point of information.*

addressed in detail with exculpatory and empirical evidence.   The other, *unrelated*, private equity deals will be identified with brevity—*since unrelated*.

*Hawaii ($1.2 million LOC and $100,000 cash transfer):*
The Hawaii issues primarily revolve around the investor's *authorization* to use their funds—for *authorized* transactions.   Norstrom *did not* give testimony at trial, thus, similar to the other 20+ un-named investors; only empirical evidence from Rule 16 government production exists to evaluate the merits of the *concealment* prosecutorial theories—and their application to an un-named trial victim.

*Norstrom's LOC at Northern Trust Bank*…
The government objected to the full subpoena of all Northern Trust LOC clients who were involved in the Hawaii project pretrial.   Notwithstanding, the Court recognized the *authorizations* were critical to the defense of the 'concealment' charges (*ECF No. 235 at 47*):

> [Court]: *"why wouldn't it be an important aspect of the case for Mr. Kenner to get whatever authorizations exist in the Northern Trust bank for the use of funds?"*

Yet, the Court accepted the government's 'fishing expedition' arguments—and <u>*no Norstrom Northern Trust documents*</u> were ever produced via subpoena.

*Kenner's Hawaii custody records (incomplete subset)…*
Kenner's office records had custody of *some* Norstrom <u>*signed*</u> Northern Trust LOC records—including (all available upon request to the Court):
   (1) ***Norstrom 2004 Letter of Authorization*** *(explained infra)*;
   (2) ***Norstrom 2005 Disbursement Request & Authorization*** *(explained infra)*;
   (3) *Norstrom 2004 Master Note*;
   (4) *Norstrom 2005 Master Note*;
   (5) *Norstrom 2006 Master Note*;
   (6) *Norstrom 2006 Pledge Agreement*;
   (7) *Norstrom 2006 Securities Account Control Agreement*; and
   (8) *Norstrom 2007 Change in Terms Agreement*.

Critically—Norstrom's <u>*signed*</u> his, **one-page,** October 27, *2004 Letter of Authorization* (authorizing access to the funds) *authorized* (*Ex. A*).   It gave full authorization to Kenner, as follows:

   *Re: MATTIAS NORSTROM -- LOC*

*TO: NORTHERN TRUST:*

*Please allow Philip A. Kenner to access this outstanding LOC for his direct deposit into the Little Isle IV account at Northern Trust Bank.   He is authorized to sign for the release of funds related to my LOC.*

*Thank you for your assistance in this matter.*
*/s/*
*Mattias Norstrom*

**There were no additional authorizations required to access Norstrom's investment funds**.   These are the exact Northern Trust *Letters of Authorization*—*signed* by every LOC client (*Ex. B at 1-8*) that the Court inquired about during the 3/13/2015 hearing, *supra*.

Next, Norstrom *signed* his **one-page** *2005 Disbursement Request & Authorization* (*Ex. C*).  It *verified* his $1.2 million LOC had distributed *the full* $1,200,000 to date. Northern Trust Bank addressed it to Norstrom's home in Manhattan Beach, California for signature and return.   The *2005 Disbursement Request & Authorization* identified:

**SPECIFIC PURPOSE**: *The specific purpose of this loan is: renewal of line of credit originally used for investment in Little Isle IV LLC.*

**X** *BUSINESS* (**including real estate investment**).

*Amount paid to others on borrowers behalf: $1,200,000*
        *$1,200,000 to Balance at the time of renewal*
        *Note Principal: $1,200,000*

It is clear that Norstrom *signed* a significant number of annual renewal documents—not in Kenner's custody—to *originate* and then *renew* his LOC (during the 5-year period of time).   In December 2007, banker Aaron Mascarella from Northern Trust requested that all of the LOCs be renewed by the end of 2007 to synchronize their renewal dates—the fourth (4th) renewal set for Norstrom.   This was the request that Nolan and Kenner handled *transparently* via text, phone, and FedEx in December 2007 (*ECF No. 668 at 272-74*)—eliminating every possible concealment argument by the government and Nolan.   Norstrom's documents are verified thru Kenner's FedEx records as FedEx'd to Norstrom, *signed by him*, and FedEx'd to Northern Trust by Norstrom (*Ex. D at 1*).

11

*Norstrom's default letter…*

Norstrom's March 2009 default letter (*Ex. E*) identified his default amount as "*$1,210,558.37*"—and identified the documents Norstrom *previously signed* as (and part of the 2007 FedEx package):

1) November 6, 2006 *Master Note*;
2) *Change in Terms Agreement* (dated November 6, 2007)
3) November 6, 2006 *Pledge Agreement*;
4) November 6, 2006 *Securities Account Control Agreement.*

None of this prompted Norstrom to file litigation against Kenner or Little Isle 4.  No one has presented any evidence of Norstrom's concerns for the LOC amounts or the default.  When accosted by Jowdy, Attorney Harvey—and later Galioto, Berard, and Kaiser allegations of 'Kenner theft', Norstrom *refused* to testify in the 2015 EDNY against Kenner.

*Kenner's clients were all aware of the Nolan litigation…*

- Every Kenner client had previously been hounded by Tom Harvey—Jowdy's lead counsel at the time—and Attorney Meeks (the attorney for Nolan, Juneau, Moreau, and Myrick) to allege wrongdoings by Kenner related to record keeping; but never stealing money.[10]  Each harangued Kenner client signed a no contact letter for their independent attorney—Paul Augustine—to present to Harvey and Meeks and the "*bad apples*" (*Ex. VV: signed 12 days after he signed an affidavit for the Nolan arbitration, infra*).

---

[10] Attorney Meeks deposed harangued Kenner client—Darryl Sydor— in a further harassment attempt, subsequent to the no contact letters.   Sydor testified to Meeks that Myrick told him **Kenner was not stealing his funds**—he just needed to make sure he had all his investment documents.   This was contemporaneous to Myrick working hand-in-hand with Jowdy and Meeks—and also a Kenner litigation defendant for 'slander, defamation, and stolen business documents' (*Ex. WW: Sydor email to explain his deposition testimony, on 2/8/2009*):   [Sydor]: "*No all I said was well the investments we have are they safe cause I don't have any paper work. **And she said don't worry he is not stealing your money** but make sure u get the paper work for them and u delivered those quick.*"

> **Noting**: Myrick was terminated 'for cause' and began slandering Kenner with vengeance.  She was an insider who dealt independently with every Kenner client and Northern Trust bankers for 6 years.   In real time—she knew there were no thefts—while working to upend Kenner's client base after her 'for cause' termination.   That narrative changed when the 'no paperwork' narrative failed to bother the Kenner clients—who had their own copies previously from Kenner.

In 2009—Norstrom was aware of the *Nolan v. Kenner* arbitration in Arizona. Norstrom <u>signed</u> an affidavit (similar to Peca, Stumpel, Gonchar, Nash, Murray, and others) on Kenner's behalf (*Ex. T*).   Norstrom delivered this affidavit to the FBI upon Galioto's request (*3500-MN-2*).   Norstrom *verified thru affidavit*:

> "*I was aware that my funds would be used to make distributions for the company, including but not limited to: ...***loans to outside entities** *[Jowdy entities] and <u>distributions to other members that would satisfy their monthly line of credit payments to Northern Trust Bank</u>*"

> "*Phil Kenner has always disclosed the complete and detailed use of these funds to me from time to time and per my every request.*"

> "*From day one, I have also been made aware of Phil Kenner's significant interest in the Hawaii Investment Group in consideration of his ongoing capital contributions, day-to-day management, personal loan guarantees (including securing the Waikapuna loan with his Arizona residence at the time), his environmental guarantee on behalf of the Joint Venture (so none of the other members would be liable), as well as other contributions.*"

Norstrom's 2009 affidavit also re-hi-lighted his knowledge of his personal loan to Jowdy and that of the Hawaii investment group (*Ex. T at 4*):

> "*I understand that approximately 18 months ago, Tommy Constantine negotiated a global settlement with Ken Jowdy, with the assistance of his brother-in-law, William Najam, to, a)* **relieve Jowdy of the $10m+ in personal debt**, *b) his management control of the project, and c)* **any additional personal financial obligations he had to our Hawaiian Investment Group**, *Glen Murray, Bob Gaudet,* **myself** *and others.*"

Norstrom's affidavit re-verified his knowledge and ability to seek outside assistance related to all Kenner advice: (*Id. at 5-6*):

> "*I was also aware that Ken Jowdy presented the settlement agreement to Masood Bhatti at Lehman Brothers in New York, who at that time was a Senior VP and was acting on behalf of the lender for the Cabo project. Subsequently, after Jowdy met with his brother in law William Najam and Masood Bhatti, Jowdy decided that he would not follow though with the agreement that he had made and elected to renig on the settlement that  [Constantine] and Ken Jowdy had negotiated over a six (6) month period of daily negotiations.  Furthermore, in spite of being a significant investor and shareholder of Diamante Cabo San Lucas, per an email recently written by Jowdy and sent to Phil Kenner, I as well as other investors, have been prohibited from entering the property. Among*

*other extravagant expenditures and instances of corporate waste, I am aware that Ken Jowdy has utilized various resources of the Diamante Cabo San Lucas project, including the use of personnel who were on the Cabo payroll and other financial resources to pay for several private jet flights around the country.   I am also aware that the individual in charge of the Lehman Brothers loan to Jowdy and Diamante Cabo San Lucas, Masood Bhatti, also acquired a secret equity interest in the Diamante Cabo San Lucas project through an entity owned by his Goddaughter named Somerset Properties, LLC. This was unknown to Phil Kenner or myself prior until recently.*

*I have always been made aware by Phil Kenner that I am able to request outside assistance from attorneys, accountants, or other professionals to audit the strategies that Phil Kenner has assisted in implementing.   I have always had direct access to third party advisors involved with the planning decisions for my family, whether I have included Phil Kenner or not in those conversations. Through conversations with other clients of Phil Kenner's over the years, I am aware that this is his common approach with his Family Office clients.*"

Norstrom's affidavit corroborated the email communication information he received of Hawaii "*updates*" (*Ex. V*) from one of his Hawaii attorneys.   John Kaiser, **while Managing Member of the Hawaii project**, <u>verified</u> the "*updates*" to the FBI on October 19, 2010, which every investor received (*Ex. U at 3*).

The Hawaii project attorney update <u>verified</u> (amongst other exculpatory issues, long-since forgotten by *undue* influence &/or *legit CTE issues*):
"*We have been informed that part of the closing process at Lehman Brothers rejected the original proposal to repay the Hawaii loans at the closing by collateralizing Ken's [Jowdy] 20% equity he received for managing the Cabo project….**Based on the meetings John Kaiser had with Ken [Jowdy] before we agreed to lend him the money in 2004** Phil [Kenner] has asked me again to attach for your records a copy of the lending agreement.  Please contact me with any questions but you should already have your copy from previous communications.*"

Attorney Madia continued:
"*The questions during our last conference call by <u>Owen Nolan</u>, <u>Mike Peca</u>, and <u>Bryan Berard</u> were important to all of you.   If you are still confused about the individual equity you invested in the Cabo project versus the Hawaii equity and loans, please reply to me.   I thought Phil clarified this but I want all of you to be clear.  Most of you are involved in both deals.  **You should have the operating agreements I**

14

*previously forwarded to you after every member signed them. If not please contact me about what you cannot find in your personal records and I will forward them to you or your advisors.*

*Based on the delay I have also resent updated loan calculation from the Hawaii loan to Jowdy for your records. It has been given to Masood [Bhatti] at Lehman Brothers so he is aware of the amount that is continuing to accrue to Jowdy. As a result of the phone call with Ken [Jowdy] and bill [Najam] about the delayed closing they confirmed the 15% was still accruing in spite of the delay. They were confident that the initial real estate sales in Cabo in the first year would produce the funds needed to fully repay the loans plus additional interest. I find comfort in their representations."*

**Noting:** The FBI had these "*updates*" in 2010, and presented them to Hawaii Managing Member, John Kaiser, on October 19, 2010.   Kaiser <u>verified</u> them during his proffer (*Ex. U at 3: ECF No. 770 at 32-33*):

> [John Kaiser]: "*update letters in Hawaii project...PK made these many times*" and re-verified by clarifying to the FBI agents, "*yes, I recall the letters*".

These "*updates*"—identified as received by Kaiser-himself (the Managing Member of the Hawaii partners at the time of his 2010 This proffer)—occurred prior to the date Kaiser tried to retroactively explain to the 2015 Court that he was not aware of the Jowdy loans and only discovered them and his 'investment' funds co-mingling years later (*Tr.1107: Kaiser's cover-up word vomit*).

- This was only one of many *temporal anomalies* that neither Kaiser nor the government can explain to support Kaiser's fabricated testimony of '*learning stuff after his 2009 arbitration testimony*'—in spite of his *other* 2015 testimony verifying he knew about the transactions beforehand (*Tr.983: "confront[ation]" testimony*).

*Norstrom gave voluntary 2013 Cabo san Lucas testimony versus Jowdy (and Kaiser and Berard)...*
In 2011—Norstrom was *confused* by the FBI full-court-press by Galioto claiming Kenner 'stole all his money'; along with Kaiser and Berard's prodding (post-employment by Jowdy, like every Kenner client).   After Norstrom's California Bar complaint was summarily dismissed—written by Jowdy attorney, Tom Harvey—Norstrom contacted Kenner to apologize and ask if he could begin further assistance *versus* Jowdy with all the investors in Mexico—once again.

15

Norstrom *confessed* to Kenner that he was defrauded by their 'stolen' lies; reinforced by FBI agent Galioto—who he expected to be above reproach.   Shortly thereafter—in a secret 2013 testimony to avoid harassment (like deVries and Murray) or imprisonment (like Kenner) in Mexico, Norstrom travelled to Cabo san Lucas and testified in-person about the Jowdy loan frauds and the complicity of Kaiser, Berard, Harvey, in multiple criminal cases.

> **Noting**: in 2015—Norstrom filed a criminal affidavit versus Jowdy (*Ex. F*)— along with Rem Murray and Jozef Stumpel in Mexico City District Federal Supreme Court (others available upon request).   Days prior to their scheduled April 2015 Supreme Court testimony, FBI agents Galioto and Michael Cassidy arrested the foreign individual who assisted the coordination of the new criminal litigation by Norstrom, Stumpel, and Murray versus Jowdy's cabal and their scheduled Supreme Court in-person testimony of April 2015.   After the arrest—Galioto called each of them to announce, "*You will never get Jowdy with me around*".   Norstrom verified the Galioto phone call to Kenner and others.

After their 2012 criminal testimonies in Cabo versus Jowdy—Rem Murray and Greg deVries contacted the investors—including Norstrom (***the biggest Jowdy victim other than Kenner and Stumpel***).   They explained the first-hand threats and harassment towards them by Berard and Jowdy's security henchmen in Mexico while in Mexico to give criminal testimony versus Jowdy's cabal.   After Norstrom's independent communication with Murray and deVries—he independently contacted Kenner to offer testimony versus Jowdy's cabal:



| 1 5 2 2 7 | +4670887 4363 **Mattias Norstrom** | 2/7/2013 4:01:48 AM(UTC+0 ) | R e a d | [Norstrom]: <mark>Hi Phil You need me to make a trip to Cabo?</mark> If you're available later tonight can I call? <mark>Long and costly trip!</mark> |
|---|---|---|---|---|
| 1 5 2 4 4 | +4670887 4363 **Mattias Norstrom** | 2/8/2013 2:15:55 AM(UTC+0 ) | R e a d | [Norstrom]: E mail me info and then let's talk when we can. <mark>Talked to Devo [deVries] and Rem [Murray] last week.</mark> |

Despite Norstrom's knowledge of the serious threats and harassment in Mexico— Norstrom flew from Sweden to Mexico and testified versus Jowdy (only 6-days later) in a one-day round-trip.   Immediately after his February 14, 2013 testimony in Cabo san Lucas—Norstrom flew to Phoenix to meet face-to-face with Kenner— and then back to Sweden:

| 1 5 | +4670887 4363 | 2/14/201 3 2:39:16 | R e | [Norstrom]: On a cunthair!! **Onboard, good to see you** Talk soon |
|---|---|---|---|---|

| 3 2 1 | Mattias Norstrom* | AM(UTC+0 ) | a d | |
|---|---|---|---|---|

Norstrom then spent time confirming to other investors that he was continuing to support the expensive legal efforts versus Jowdy—after Constantine exhausted the GSF legal budgets—despite Galioto's threats to '**STOP**':



| 1 6 6 3 6 | +4670887 4363 Mattias Norstrom* | 4/10/201 3 10:04:19 PM(UTC+0 ) | R e a d | [Norstrom]: I got an e mail from Jere [Lehtinen] Mon. He asked If I had given some money. I answered that I had the last 2 years all going towards legal efforts in Mexico. |

In fact—Norstrom continued to spearhead the financial efforts with the new attorneys Kenner hired in 2013 in Mexico—Paul Donion (from Seattle) and his partner, Karlos de la Puerta (in Mexico)—contradicting representations in Kenner's PSR that Kenner hired the attorneys to sell his Cabo interest:



| 1 6 7 9 8 | +4670887 4363 Mattias Norstrom* | 4/14/2013 9:14:48 PM(UTC+0) | R e a d | [Norstrom]: Talked to Muzz [Glen Murray] and he think he's gonna help. Jere [Lehtinen] send a weird text message that $5k was needed from him for bank records in Mexico |

**Noting**: Both Murray and Lehtinen paid the new attorneys $70,000 each directly in Fall 2013 after meeting face-to-face with *their* attorneys in Los Angeles.   Again— _none_ of the 3rd party legal fees flowed thru Kenner's control—as Jowdy, Berard, Kaiser, and Galioto alleged to taint Kenner.   The investors had *independent* meetings with their attorney, continuing with them *versus* Jowdy long after the FBI November 13, 2013 arrest of Kenner.

- This is *opposite* the government theories at trial that no one knew anything but what they learned from Kenner without independent information.

*More Norstrom independent actions in 2015…*
Despite the *coincidental* arrest of the person coordinating the efforts in Mexico City versus Jowdy, Kaiser, Berard and others—Norstrom was actively filing 2015 litigation in Mexico City District Federal at the Supreme Court versus Jowdy.   His testimony was halted by FBI agents Galioto and Cassidy because of the "obstruction of justice" arrest (but of what?).  Was Jowdy and his cabal members 'off limits' like other U.S. Attorneys and FBI agents explained to people helping Kenner (*ECF No. 730 at 54, Ex. 38*)?  Norstrom's 2015 affidavit (*Ex. F*) *verified* the Jowdy loans as:
  *"Hawaii loan:*

*In late 2004, Jowdy approached my Business Manager [Kenner] and asked if a group of investors including me from Hawaii would lend him some bridge funding **personally** until he could get either the current Diamante del Mar project funded in 2004 with development money and/or a project in Cabo san Lucas which several were pending at the time funded with a purchase and development loan.*

*As a group, we agreed to lend him funds at a 15% interest rate.   Jowdy signed an official loan agreement with us in December of 2004.   Although, Jowdy received over $7,000,000 directly from us via wire transfer and repaid over $2,000,000 from December 2004 to April 2006, he later claimed that the funds were "not loans" but rather investments from our group of lenders after he was sued in the USA for not repaying the loans.   In 2010, Jowdy finally confessed that the funds he received from our lending group were actually loans and not the 'investments' he declared as his defense in the case.  **Jowdy's own NY attorney, Tom Harvey, actually threatened my Business Manager [Kenner] alleging that he [Kenner] stole the funds that Jowdy actually received**.   Those funds remain unpaid of which about $1,700,000 in principle still outstanding is mine."*

Norstrom also addressed two other Jowdy frauds in his 2015 affidavit (now listed in the 'affidavit of loss'; **Jowdy's Diamante Airplane scam** [$250,000]—and **Jowdy's Cabo san Lucas airport scam** [$400,000].

- These are listed in Norstrom's victim impact statement erroneously as a Kenner issue while <u>*never*</u> in Kenner's control or to Kenner's benefit—like all transactions *supra* and *infra*.

*Jowdy's Cabo san Lucas airport scam…*

- Norstrom sued Jowdy for the recovery of the funds in Mexico with independent counsel *(Ex. H)*.

Jowdy solicited investment funds from Kenner and Norstrom, each, in 2005 for the Cabo airport investment—prior to the detection of the Jowdy Diamante del Mar, Diamante Airplane, and Diamante Cabo frauds by Kenner and Norstrom.   Jowdy gave testimony, *infra*, January 6, 2010 that confirmed Kenner and Norstrom's funds (of approximately $1.1 million) were in the Cabo airport deal—under Jowdy's full control with all the equity listed under *Jowdy's* LOR Management (a Mexico company owned 99% by Jowdy and 1% by his attorney, Fernando Garcia—zero percent to Norstrom or Kenner).   Jowdy verified thru testimony that he had no idea what was the legal status of the Kenner-Norstrom investment was 6 years later *(Ex. G: full transcript of Cabo airport issue)*:

16      *Q.  HOW MUCH MONEY [in the Cabo airport deal]?*
17      *A [Jowdy].   I BELIEVE 1,070,000.*
18      *Q.   AND WHO'S FILING -- WHO'S THE*
19   *PLAINTIFF IN THE LAWSUIT?*
20      *A [Jowdy].   I BELIEVE IT'S LOR MANAGEMENT.*
21      *Q.   BUT ISN'T THAT THE MILLION DOLLARS*
22   *THAT KENNER OR NORSTROM GAVE YOU?*
23      *A [Jowdy].   I DIDN'T SAY IT SHOULDN'T BE*
24   *RETURNED TO THEM WHEN IT GETS RESOLVED.*
25      *Q.   AND WHO'S PAYING THE LEGAL FEES FOR*
0655
1   *THAT?*
2      *A [Jowdy].   THERE AREN'T ANY RIGHT NOW.  WE DID*
3   *IT -- I BELIEVE IT'S BEING HANDLED ON A*
4   *CONTINGENCY.*
5      *Q.   BY A MEXICAN ATTORNEY?*
6      *A.   YES.*
...
11      *Q.   IF KENNER COULD GET THE APPROVAL OF*
12   *THE OWNER TO TRANSFER THE INTEREST FROM LOR TO*
13   *KENNER OR NORSTROM, WOULD YOU DO THAT?*
14      *A [Jowdy].   I'D HAVE TO SEE WHAT HE'S GOING TO*
15   *DO.*
16      *OUR INTENTION IS STILL TO CONTINUE*
17   *WITH THE INVESTMENT.  SO THE INTENTION WOULD BE TO*
18   *BE ABLE TO PURCHASE THE AIRPORT AS DESIRED AND*
19   *TO -- IF KENNER OR NORSTROM DIDN'T WANT THEIR*
20   *PIECE, OR WHOEVER'S INVESTED, THEY'D WANT THEIR*
21   *PIECE AT OUR PRO RATA BASIS, THEN THEY WOULD BE*
22   *BOUGHT OUT.*
23      *Q.   WELL, WHAT IS THE -- WHAT IS THE*
24   *STRUCTURE -- SINCE YOU DON'T HAVE ANY OF YOUR OWN*
25   *MONEY IN THE DEAL, I'M ASSUMING; CORRECT?*
0657
1      *A [Jowdy].   I BELIEVE I DO.  I DON'T*
2   *KNOW EXACTLY HOW MUCH.  I DON'T KNOW -- I DON'T*
3   *KNOW WHAT THE AMOUNT IS.*
4      *Q.   OKAY.*
5      *A [Jowdy].   BUT NOT A SIGNIFICANT AMOUNT*
6   *COMPARED TO THOSE.*

- Jowdy and Jowdy Mexico attorney Garcia had the airport owner arrested in 2008 (with the help of the Baja California Sur, Mexico Governor Agundez—like Kenner in 2010), while trying to extort the entire ownership of the airport from his control.

  **Noting**: Former Jowdy employee **David Boyden** told the FBI in February 2010 *per FBI notes* (*3500-DBP-1-r at 3*)—with Galioto present:

  "*Carrafiello [Jowdy's right-hand-guy] told Boyden that any bribes that were given to the Mexican Government were classified on the books as Consultant Fees.*" (*Ex. I*)

Norstrom's 2015 affidavit for the D.F. Mexico Supreme Court *verified*:

*"Cabo san Lucas Aeropuerto*

*In 2005, during the excitement in Cabo san Lucas as Jowdy and Kenner were continuing to close in on the purchase of the property in Cabo (found by Robert Gaudet and the current site for the Diamante Cabo san Lucas resort) with Lehman Brothers and a $125,000,000 purchase and Phase I development loan, Jowdy proposed another investment in the new Private Airport in Cabo through his new friend, Sebastian Romo.  Jowdy asked Kenner to fly to Cabo to meet with him and Romo, partly on my behalf.   After the meeting, Kenner explained to me on the phone that the downtown Cabo airport was only a few kilometers from the Diamante Cabo resort property and if we invested in the airport through Jowdy with Romo, we could work with the local government to construct a new road (semi-private) from the airport directly to the Diamante property.   Romo was the former mayor of Cabo san Lucas.   I wired $310,000 immediately to Jowdy in Mexico into his LOR Management account and shortly thereafter wired another $90,000 to his Baja Development Corp account as directed.  For the first year (through mid-2006), Jowdy continued to look for more investment money in Cabo—as he proposed he would do.   Later Kenner and I discovered through emails from Jowdy's attorney, Fernando Garcia, that Jowdy had also fraudulently diverted $500,000 from our friend, Jozef Stumpel, to the airport to satisfy funds he promised Romo.   Jowdy failed to raise the necessary funds for his portion of the commitment and later sued Romo.   In testimony in 2010, Jowdy confirmed that he had sued Romo, but the plaintiff was Jowdy and Garcia's company, LOR Management.  Kenner, Norstrom, and Stumpel were not recognized as members of the investment funds even though we represented 100% of the $1,000,000 PLUS in contributions according to Garcia's email to Kenner.   Jowdy proposed in the 2010 USA deposition that he was suing the airport owner and would gladly return the funds to the investors, but he never did.   After a five year legal battle, Romo won.  Kenner met with Romo in Cabo san Lucas in 2012 on our*

> *behalf.   Romo explained that Jowdy lost all of the funds as a result of the litigation. I am still at 100% loss for these funds."*

Thus—Kenner's only involvement with the Cabo airport funds were efforts in concert with Norstrom to recover the investment funds Jowdy stole from Norstrom and Kenner for himself and his Mexico attorney, Garcia.

*The Diamante airplane scam...*
- After Jowdy received Norstrom's original $250,000 contribution (*Ex. J at 3*), Jowdy immediately diverted the funds for his own benefit; fully defrauding Kenner, Norstrom, Sydor, and Stumpel from their initial 2004 deposits.   Jowdy failed to purchase the plane when the $1,000,000 deposits were sent to him in 2004; but lied that he did—only acquiring the plane thru more fraud over a year later in November 2005.

Norstrom's 2015 affidavit stated:

> *"Diamante Air (planes)*
> *In or about 2005, Jowdy approached the group of investors from the Diamante del Mar project and asked again through our Business Manager if we would like to purchase a private jet and begin a side business chartering flights.   The idea made sense to us because the projects that we were investing in Mexico were in the practice of leasing private jets several times per month for the resort promotions.   As a result, Jowdy claimed that we could make the difference in the rental fees versus the costs and our own company would be handling the chartering through the defined group of real estate prospects which the resort were paying for in the first place.   I invested $250,000 in Jowdy's Diamante Air and later found out that not only did Jowdy not pay me any dividends as promised in 2005, but he flew the planes over 90% of the time as his own without regard for the long-term condition of the planes or the existence of the loan he fraudulently signed for—further withdrawing $430,000 [in cash] over a 3 month period of time from November 2005 to January 2006 without knowledge or consent of the LLC or the two guarantors, one of which was Kenner.  Jowdy in 2007 after Kenner demanded repayment for the incredible outstanding loans and other frauds within the resort management allowed the planes to be repossessed.  Our LLC had lost our assets that we had paid for with no money from Jowdy—and Kenner and another partner Sergei Gonchar were sued by the lending bank for the unpaid $1,000,000 PLUS U.S. loan Jowdy defaulted on.   That project became a total loss for me and the other investors with only gains through fraud to Jowdy."*

Kenner has submitted a detailed analysis of the Jowdy frauds on all the Diamante Air investors previously to the Court, including Jowdy's collateralization of another plane (which he did not own at the time) to an individual unknown to the LLC investors—placing all the Diamante Air investors at greater financial risk while Jowdy scrambled to repay other stolen funds (*Ex. J: with all referenced exhibits originally submitted in Kenner's Rule 6(e) Motion at 30, and available to the Court upon request, since the FBI is not interested in any Jowdy cabal criminal activity—and others in the DOJ are scared—shocking the conscience of fair justice: Ex. NN*).

*Norstrom and his Hawaii-Mexico investor-partners sue Jowdy in California (2009)...* After the initial filing of the two California complaints versus Jowdy for 19 Hawaii-Mexico investors, the group under *independent* attorney Ronald Richards, chose not to pursue the Jowdy-Diamante Air (plane) frauds—because Ronald Richards *verified thru testimony* (*Tr.3855*): *"**His assets are in Mexico**. And when he [Jowdy] testified in this case related to the hockey players, he said all of his assets were in Mexico. And **that was one of the reasons why dismissing the case without prejudice** -- means they can file again. That was a big consideration. **Why sue somebody that doesn't have any assets in the United States?**"*

Norstrom and 19 other Hawaii-Mexico investors sued Jowdy to recover, in part, the Hawaii loans as *specifically* designated in both 2009 complaints (as a result of the Constantine-GSF efforts) (*Ex. L at 7, Ex. M at 7*), *verifying*:

> *"Mr. Najam was in charge of the corporate governance and while under Jowdy's direction and control, received over eight million dollars ($8,000,000) from a LLC in Hawaii.  Mr. Najam failed to properly account for those funds and has placed the Jowdy investors in a vulnerable and compromised position."*

*Norstrom and his Hawaii-Mexico investor-partners previously sued Jowdy in Arizona...* Prior to Constantine's GSF efforts—Norstrom was also a participant in the Arizona complaint versus Jowdy to recover the Hawaii loans—at a time Jowdy denied their existence as loans.   Norstrom—like 18 of his Hawaii partners—*signed*, *initialed*, and *dated* Arizona attorney Tom Baker's disclosure letter (*Ex. N at 73-80*)—*verifying* his knowledge that:

> "*the gist of the lawsuit is to recover certain monies loaned to Mr. Jowdy from Mr. Kenner, Little Isle 4 and Ula Makika LLC.   Mr. Kenner estimates the total amount of monies loaned to Mr. Jowdy which have not been repaid to be approximately $5,000,000.   This is the estimated principle only, exclusive of accrued interest.  In summary, Mr. Jowdy denies that the monies were loans but rather characterizes them as investments.*"

**Noting**: The 19 Baker disclosures were turned over by the government—during their forfeiture production (post-trial)—clearly violating their *Brady* requirements—and prejudicing Kenner. The post-trial production included fully exculpatory disclosures *signed*, *initialed*, and *dated* by named superseding indictment investors, including **Peca** (*Id. at 81-88*), **Sydor** (*Id. at 25-32*), **Berard** (*Id. at 9-16*), **Nash** (*Id. at 121-128*), and **Rucchin** (*Id. at 105-112*).

- o   Fourteen (14) other Hawaii-Mexico investors also signed the disclosure (including: **Campbell** (*Id. at 17-24*), **deVries** (*Id. at 49-56*), **Gonchar** (*Id. at 97-104*), **Murray** (*Id. at 41-48*), and **Norstrom** (*Id. at 73-80*)).

The cc: portion of the disclosure (*Id. at 7*) clearly explained the "*bad apples*" (*Tr.1919: Nash testimony*) and others who sided up to Jowdy's misdirection and the FBI early persuasion of altered realities: "*Little Isle IV, LLC members Owen Nolan, Joe Juneau, Kristine Myrick, Ethan Moreau, Brad Lukowich, Dan Boyle have taken openly hostile positions against Mr. Philip Kenner.*"

It is impossible for the government to allege there is anything inculpatory in the record that could substantiate Norstrom had not transparently participated in every aspect of the *authorized* Hawaii transaction—pursuant to *his 2004 Letter of Authorization to Northern Trust Bank (Ex. A); See Upton v. Tribilcock*—or the Little Isle 4 By Laws (*Ex. AA*), coupled with overwhelming circumstantial first-hand evidence.

*Eufora…*
Norstrom was 100% aware of his Eufora purchase—because he personally signed for it and "*Sent the fax to WF.*" (his Wells Fargo private banker) after exchanging texts with Kenner about "*Constantine Management Group*" and his "*1%*" acquisition (*Ex. S*)—just like every other Eufora investor (details *infra*). Nevertheless—there are a myriad of additional transparency verifications that apply to Norstrom and *every* Eufora investor. They are unchallengeable as independent and transparent.

*Independently*—the Giuliani Group represented Norstrom in 2010 (*Ex. R at 10*), after a 3-month *independent* investigation of everything Eufora. Giuliani's group was *independently* hired by Eufora Board Member Tim Gaarn and former Eufora CEO, CR Gentry—also a Board member at the time (*Id. at 6*)—further distancing Kenner from any possible cover-up scheme.

In July 2010, Norstrom—like his 29 co-interested parties—received a copy of a July 8, 2010 letter from his attorney, Michael Stolper (*Ex. Q*). Stolper *verified* to his clients they were requesting the '*back up*' transaction details from Constantine and

Constantine's Eufora attorneys—in order to re-verify the details that Board Members Gaarn and Gentry had revealed about the 2008-09 private stock sales and all transactions prior to that (*Id. at 1*).

- There was—clearly—no concealment of the 'charged' 2008-09 private stock sales as vetted by their *independent attorney* and *investigative team.*

Next—Norstrom received and <u>*signed off*</u> (*Ex. R at 10*) on Stolper's follow-up July 16, 2010 letter—with 29 interested parties—which further **hi-lighted** the Constantine-raised allegations that Tim Gaarn had 'stolen' his stock from Stolper's clients and 're-sold' it to them (in some surreal 'Beverly Hills Cop bearer bond' reference).  *It was complete nonsense*—but *vetted* nonetheless by the Eufora investors' *independent* attorneys and investigators.  These statements were specifically revealed—wholly dismissing any possible '*concealment*' by Kenner as resurrected by Galioto years later for the indictment—or two weeks later when Kenner surreptitiously recorded Constantine for Giuliani's group at Home Depot; *concealing nothing* about the Constantine rant of the <u>*same*</u> and <u>*previously exposed allegations*</u>.

As Stolper and Giuliani identified—two weeks before the Home Depot recording, the July 16, 2010 letter *exposed <u>after</u> vetting* any perceived 'concealment' by Kenner, (*Ex. R*):

> @1: "*...to give him [Constantine] the opportunity to* support his allegations *against his co-managers at Eufora.*"

> @4: "*Lee, you claim to have been "informed" about "*very disturbing facts *relating to the actions of several investors and managers on the Eufora saga.*"

> "We want to address these points *as well, not with finger-pointing and conjecture, but* real evidence *(documents).   I invited Constantine to support his allegations but he has yet to provide a single piece of evidence or agree to meet with us.*"

> @7: "Constantine made allegations *against Gentry (Eufora CEO) and Phil Kenner, a money manager of the members of the company [AZ Eufora Partners I];*"

> @7: "*Stolper repeatedly requested that Constantine come to New York to address the findings and* support his allegations *about Gentry, Kenner, Eufora financing and the defaulted loan.*"

24

> @7: "*...neither Constantine nor his counsel have provided the documents that Constantine said he was going to provide, and has otherwise not agreed to meet with Stolper and Hatzimemos [Giuliani's right-hand-man] to resolve the open issues;*"

No evidence has been presented to allege Norstrom was unaware of any of his transactions in Eufora—short of choosing '*not to read*' more exculpatory and fully-transparent information.   A multitude of evidence in concurrence of full knowledge exists and the government needs the Court to ignore it (again).

*Adverse Proceedings filed in Pro Se—referencing the same Eufora private stock transactions (Ex. BB)...*
As related to the '*Eufora scheme*', *here*, **Norstrom**, Ranford (*Tr.2860-61*), Sydor (*Ex. P [2013 adverse proceeding filing versus Constantine], Ex. O [contemporaneous text message confirmations of its filing with Sydor and all adverse filings]*), Peca, deVries, Glen Murray, Rem Murray, Campbell, Stumpel, and Rucchin, ***all filed adverse proceedings*** versus Constantine's 2013 Arizona bankrupty.   In the bankruptcy filings—each Plaintiff *independently* acknowledged their purchases of private equity stock ***from Constantine***.   Each adverse proceeding listed all of the 2008 Constantine sales (*Ex. P at 5: cross-referenced by every other purchaser for further transparency*).

Each adverse proceeding was seeking confirmation that Constantine had transferred *his private Eufora stock* to them for their 2008 acquisitions (or prior) (*Ex. H at 5, ¶ 16 [Sydor example]: "Sydor believes Constantine personally sold shares in Eufora"; reiterated by each filing individually*); in response to Constantine's bankruptcy filing that *denied* he owned the actual stock since April 2003 that he sold to each of them in 2008 (*Ex. P at 15*)—an un-charged issue, *here*.

The multiple Pro Se adverse proceedings hi-lighted all of the investor's *independent* knowledge of whom they bought their shares from—contradicting any 2015 testimony or government theories that they believed it was *corporate treasury stock*.

25

*Norstrom text verifications with Kenner regarding his private stock purchase from Constantine Management Group [Constantine]...[11]*

Before Norstrom's 2008 private stock purchase fund transfer to Constantine [Constantine Management Group], Norstrom sent a verification text to Kenner to re-verify that he was acquiring his private stock purchase from "*Constantine Management Group*".  The following text communication occurred, March 19, 2008 (*Ex. S*):

> **Norstrom**: "*Got it!  Account name:constantine Management group?*"
> **Kenner**: "*Yes.  That's where the 1% is being transferred from...*"
> **Norstrom**: "*Sent the fax to WF [Wells Fargo]*"
> **Kenner**: "*I'll confirm   Thx...*"

According to the adverse proceedings and the Eufora transaction documents recovered from Rule 16 production, March 19, 2008 was the same date as the Norstrom acquisition of Constantine stock; leaving no equivocation of full transparency of Norstrom's documented private stock purchase—and specifically '*from whom*'.

> **Noting**: Norstrom personally *verified* he sent the fax to his own banker at Wells Fargo following the text verification with Kenner to release the funds (*Ex. S*).

There is no evidence that Norstrom was not 100% clear about his 2008 Eufora private stock transaction with Constantine (Constantine Management Group). *Independent counsel who vetted the transaction represented Norstrom (Ex. R: signed at 10)*.  Neither the government nor Norstrom have produced a single inculpatory shred of evidence that any confusion was raised about Kenner's involvement in some illegal transaction and Norstrom's Eufora funds; *because none exist.*

---

[11] Norstrom verified his $300 adverse ProSe filing fee reimbursement to Kenner—which Galioto was deftly aware:

| | | | | |
|---|---|---|---|---|
| 1600 | +46708874363 Mattias Norstrom* | 3/22/2013 11:58:27 AM(UTC+0) | Read | [Norstrom]: Found a Western Union! Sent $300.00 Confirmation #905-666-2334 //Matti |
| 1454 | +46708874363 Mattias Norstrom* | 3/22/2013 3:02:14 PM(UTC+0) | Sent | [Kenner]: Thx... |

*Global Settlement Fund ("GSF")...*
Norstrom spoke directly with Tommy Constantine on May 4, 2009 via phone. Norstrom personally decided to transfer $250,000 to the Ronald Richards Trust Account on May 15, 2009—after conferring with former teammates Sydor, Lehtinen, and Glen Murray—who had also committed to contribute following their *independent* meetings with Constantine.

Norstrom <u>signed</u>  (electronically) his "*ACKNOWLEDGEMENT AND APPROVAL...Best Regards...Matti*" on May 17, 2009 once his funds were verified as received (*Ex. W*); *See Upton v. Tribilcock, supra.*

The next day, May 18, 2009, Norstrom received an email from Constantine—similar to all of the GSF contributors (*Ex. Y*).   Constantine's follow-up email further detailed the same dialog that happened two weeks earlier with Norstrom—eerily reflecting the text communication details shared with Jay McKee immediately after his May 9, 2009 dinner meeting with Constantine (*ECF No. 668 at 49-51*); ironically that McKee had **no recollection** 'of any of it' at trial, *not just the details* (*Tr.1818-24*).

The regurgitating Constantine email (*Ex. Y*) to Norstrom left no GSF detail unannounced as to how Constantine (alone) planned to utilize the funds—after Norstrom's full and previous authorization (*Ex. W*):

*From: Tommy Constantine <tommy@eufora.com>*
*Sent: Monday, May 18, 2009 10:51 AM*
*To: mattiasnorstrom@mac.com*
*Cc: phil kenner*
*Subject: Global Settlement*
*Attachments: AZ Eufora Partners LLC 5.4.09NORSTROM.xls*

*Matti:*

*You will be receiving a Transfer of Membership Agreement for your increased interest in <u>Eufora, LLC</u> from our CEO (C.R. Gentry) later this week or next week at the latest. We just have to wait for the other side to sign the Transfer docs as part of the settlement, which is supposed to be in the next few days. In the meantime, this email shall serve as written confirmation that you will be receiving 1/10th of the interest that we acquire from Nolan, Juneau and Moreau with respect to Eufora. **Specifically, you will be receiving an additional .364% which is 1/10 of the 3.64% interest that they currently own or owned. The attached excel spreadsheet shows your current ownership interest and the interest that we are acquiring from the three of them as part of the settlement.** The dollar amounts on the right are the current value of those interest at the $20M valuation (for the whole company). Again,*

*your interest is 1/10 of that and will be added to the .70% you already own.*

*Additionally, Juneau and Nolan owned 10% each (20% total) of the <u>Avalon Airpark project</u>. We are buying out their 20%, so you will also receive 1/10th of this interest (2%). It is currently valued at $3.3M and the office space is currently being rented by Eufora. You will also be receiving an LLC and operating agreement reflecting your new proportionate share of ownership of this building.*

*Frankly, although this one is more of a luxury than an investment, you will also own 1/10th of 20% (2%) of the <u>Falcon 10 airplane</u>. It is worth approximately $1M but will be very difficult if not impossible to sell. In any case, this will not cost you guys anything going forward. Ultimately you guys should take advantage of the fact that we now all own an airplane together and when it's geographically feasible, you guys should use it to make owing a piece of it worthwhile. Just let me know whenever you want to use it. You just have to pay for the hourly costs for fuel and the daily costs for the pilots and landing fees.*

*Finally, as Phil and I stated, I also settled the <u>Palms condo</u> issue with Moreau as part of this global settlement transaction. Moreau had absolutely no right to sue me for the Palms units and I would have crushed him in that lawsuit because we had a signed agreement when he bought it. Nevertheless, since we got that issue resolved as part of the settlement as well, I have elected to share in the ownership of those units and the equity that exists in them with all of the great partners that have stepped up and helped us fix this problem with all these problem individuals. Specifically, these Palms units are a one bedroom and an adjacent studio on the 31st floor with a strip view. They are worth approximately $1.5M today and were worth $1.8-$2M some time ago. I believe they will recover in the future and be worth more than they are today. In any case, you will also be receiving an LLC and operating agreement reflecting your new proportionate ownership of these units. Although Juneau, Nolan and Moreau did not own any interest in these units, to keep things simple, I will just match what we are doing in the Avalon project so you will also receive 1/10th of a 20% interest in these (2%).*

*Please do not hesitate to call me if you have any questions and please just to follow the program in terms of documentation.*

*TC*
*(602) 363-5676*

Further and independent verification of Constantine's sole control of the GSF…
In 2012 as previously identified—Norstrom was fooled by Jowdy, Harvey, Galioto, Berard and Kaiser about the GSF fund usages—alleged as stolen by Kenner at the

time; 11-months *before* Norstrom's criminal testimony versus all of them in Mexico—once he learned the truth, *supra*.[12]

Yet—while misled by Jowdy's cabal—Norstrom filed a California Bar complaint versus Ronald Richards; written by Tom Harvey (identical to Harvey's deceptive complaints versus Ronald Richards for Peca, McKee, Kaiser and Privitello: *all dismissed*).   The Harvey rouse afforded he and Jowdy another 9-12 month distraction from their 'now-verified' criminal behavior' in 2012—with Harvey complicit in Jowdy's original mortgage frauds since 2002 (*Ex. OO*).

The Norstrom complaint was summarily dismissed based on a lack of evidence and statutory requirements.   Ronald Richards' Bar response *verified* more *Constantine-only* GSF-control language (*Ex. X*):

> *"The complaints by Ms. Peca and by Messrs. Peca, McKee and **Norstrom** represent an unfortunate attempt by them to use the State Bar complaint process as a vehicle to seek the return of funds that were properly transmitted to my former client, Tommy Constantine, on behalf of the Complainants.*

> *It was apparent to me that each of the individuals involved in these transactions (including the Complainants, Constantine, Kenner) all understood that Constantine was handling the transaction for their mutual benefit.*

> *In May 2009, each of the Complainants authorized Constantine, in his unbridled discretion, to further capitalize their various investments.   These funds were to be used by Constantine for a variety of capital requirements.*

> *At no time did the Complainants ever suggest, either orally or in writing, that the previously wired funds were for me to monitor or that they were to be used exclusively for the payment of legal fees.*

> *I provided evidence to the Complainants that the funds were disbursed to various attorneys and entities at Constantine's direction.   There is no factual*

---

[12] After Constantine exhausted the GSF funds—and attorney Ronald Richards dismissed the California litigation versus Jowdy (post-Jowdy-confessional depositions)—Constantine called Jowdy to apologize—blaming Kenner for everything—in order to relieve himself from a frivolous California lawsuit (*Jowdy v. Constantine*) for malicious prosecution in 2010. Jowdy filed similar lawsuits versus Kenner and approximately 10 other Hawaii-Mexico investors who Jowdy owed the most money to &/or were actively litigating versus Jowdy in Mexico or other jurisdictions.   ***They were all dismissed as SLAPP motions***.

*dispute from anyone that Constantine received all the funds that were wired to him through my client trust account pursuant to the arrangement Constantine had made with the Complainants.*"

The only emails discovered in the government's Rule 16 production are direct confirmations of Constantine's complete control and mis-appropriation of a portion of the GSF funds (*ECF No. 501 at 60: alleging "$17,077" overspent by Constantine*); *never Kenner*.

- Additionally—only Constantine was a "*client*" of Ronald Richards related to the GSF transactions (*Ex. FF at 1: signed at 6*); *never Kenner*.

Nothing was presented at trial about Kenner-related control or mis-appropriations—because there are *none* with Kenner solely a contributor and participant like Norstrom and others—*simply juxtaposed by the government for conspiratorial convenience*.

- Kaiser and Privitello also filed contemporaneous California Bar complaints versus Ronald Richards (also written by Jowdy attorney, Harvey).   Likewise— their Bar complaints were dismissed lacking merit.   In Ronald Richards' response to the Bar, he *verified* that Kenner and attorney Stolper were managing the investigation of Constantine and his GSF expenditures—further exculpating Kenner of any concealment from his clients and their attorneys (*Ex. DD*).

  Ronald Richards wrote: "*I was contacted by Mr. Kaiser's attorney, Michael Stolper, in September 2010.  Mr. Stolper also represents Philip Kenner, a former client and business manager referenced in my response to the other complaint and in the pleadings in this case.  I provided Mr. Stolper and Mr. Kenner with all of the [GSF] evidence and confirmations they requested as to the transmittal of the funds to Mr. Constantine.*"[13]

*No Kenner GSF control—known by all contributors…*
Kenner *never* had any control over the GSF funds as repeatedly evidenced pre-trial (*thru Tyson Nash's 2014 deposition: Ex. Z at 2: "Q. Did you talk to Phil Kenner about this Global Settlement Fund?  A [Nash]. No", possessed by the FBI pretrial as 3500-TN-*

---

[13] **Noting**: Michael Peca testified he received the GSF spreadsheet but '*could not verify it*' (*Tr.652-53*)—while attorneys Ronald Richards and Michael Stolper represented him— *independently*.  Jay McKee testified that he could not receive it from Kenner *without a delay*—clearly not in Kenner's possession any earlier than it was also in two of his own attorney's possession (*Tr.1827*); perhaps more timeline confabulations or CTE symptoms; leaving unexplained innuendo and unexplainable temporal anomalies to prejudice Kenner.

*3*)—and during trial, Michael Peca *verified thru testimony* (*Tr.540: "Q. And what was Phil Kenner's participation in that [GSF], as you recall? A [Michael Peca]: He didn't seem to have one."*).  **None were dissenting**.

Nostrom was in direct communication with Ronald Richards related to the Hawaii-Mexico litigation thru the GSF efforts—as a California litigation client of Ronald Richards.   When Ronald Richards decided—after the 2-day Jowdy confessional depositions and the ongoing FBI criminal investigation—*or so Kenner and all of the investors believed*—Ronald Richards announced to Nostrom and his 20-ish other clients they would dismiss the case *without prejudice* (*Ex. CC*).   There were no dissenting arguments—or requests to return any Constantine-GSF deposits, despite testimony 6-years later that the funds were "*only*" for the Jowdy litigation—ignoring their *signed* disclosures (*Ex. EE: Nostrom at 8*) (*Tr.420: Michael Peca; Tr.1814: McKee, etcetera*).

There is no evidence that Nostrom was unclear about exactly what he *authorized* thru his *signed* GSF disclosure *for Constantine* (*Ex. W*); *See Upton v. Tribilcock*.   There is no evidence that Kenner exhibited any control over Nostrom's GSF funds—or anyone's for that matter.

*Other 'alleged losses'…*
Nostrom—like many of Kenner's business management clients agreed thru their signed-agreement with Standard Advisors—participated in multiple 3rd-party private equity deals.    **Kenner did not have any control over them—nor represented that he did**.   Nostrom—like every other private equity investor *independently signed* the private equity documents with the 3rd party companies—*not Kenner*…

- In Nostrom's 'affidavit of loss', he listed: Ecser. Co, Teknik Digital Arts, Impact Protective Equipment, Integrated Telecomm., TekConnect Corporate., Diamante del Mar, BSD, and Los Frailes.

There is no need to parse every private deal that Nostrom *independently* invested in (*supra*) and *signed independent* subscription documents with the 3rd parties (like every investor).   But—it should be noted that identical to the Hawaii project, Eufora, and the GSF contributions—Kenner received no 'ill-gotten' funds from any of them—despite the FBI agent's years of 'desire' to find something.

President John Adams addressed this exact issue in the context of truths, versus rhetoric, representing:

*"Facts are a stubborn thing; and whatever may be our wishes, our inclinations, or our dictates of our passions, they cannot alter the state of facts and evidence…"*

As denoted by President Adams, objective evidence and logical arguments are often not merely lacking but ignored in many discussions by those with the vision of the anointed.   Much that is said by the anointed in the outward form of an argument turns out not to be substantiated arguments at all.   Often the logical structure of an argument is replaced by preemptive rhetoric [*media reports, threats, and suborned perjury*] or, where an argument is made, its validity remains unchecked against any evidence, even when such evidence is abundant.   Evidence is often particularly abundant when it comes to statements about history, yet the anointed have repeatedly been demonstrably wrong about the past as about the present or the future – and as supremely confident.   *They remain often wrong, but never in doubt.*

*Los Frailes…*
- Jowdy, Kaiser, and Berard intervention in Mexico derailed Robert Gaudet's Los Frailes project—providing another smokescreen for Jowdy's cabal.

For brevity, the Los Frailes investment will be briefed—*briefly*.   Kenner invested side-by-side with his clients and contributed the initial $352,000 to the acquisition of the land-only acquisition deal.   Kenner was <u>*never*</u> a control person during the transactions thru the date of his detainment; November 13, 2013.   The transaction *stalled* as a Jowdy's influence in the Cabo region with the governor (*Ex. I*) and other municipal officers complicated the title-transfer transaction to spread more 'distraction' and 'morass'; creating the smokescreen necessary to keep *his* criminality off the radar and Kenner's clients 'confused'—assisted by Harvey, Berard, Kaiser, and Galioto (to shield their own criminal complicity).

The FBI interviewed Los Frailes property Managing Member, Robert Gaudet nearly a dozen times pretrial.   Gaudet arranged for all of the legal transactions that Kenner and his clients contributed to.   Each investor signed assignment agreements—for value.[14]

---

[14] The transactions were for legit value, unlike the January 1, 2011 'assignment' agreement Jowdy signed with Nolan for $10—in exchange for an appraised $3,250,000 million equity stake…*just because*?? (*ECF No. 843-1*); "While fair consideration does not require dollar-for-dollar equivalence, fair consideration cannot be disproportionately small compared to the value of the transferred property." *Kim v. Ji Sung Yoo*, 311 F. Supp. 3d 598, 611 (SDNY 2018)

During the 2008-2013 Mexico litigation versus Jowdy, Jowdy's cabal began to interject themselves in the title-transfer process thru payoffs and graft using the 'leverage' of his relationship with the Governor and the Diamante Cabo assets for bribes, *supra* (*Ex. I*).   Gaudet explained this to Michael Peca, *independently* after exchanging thanks and niceties about Gaudet's assistance in the civil and criminal litigation versus Jowdy—for DCSL—which Peca was deftly aware—like all of the Hawaii-Mexico investors; again not gathering all his Jowdy-related information only from Kenner as Peca and others testified (*Tr.712-13: Kristen Peca*) (*Ex. GG*):

[Gaudet]: "*The issue with Jowdy aligns with the former Governor and his office who are now being charged with many crimes.. [Ex.I] (I will send the article in a separate email)  This Governor was Jowdy's protector by way of the millions he paid for the support and personnel protection.   Hard to believe from any perspective!*
*Our concern has been to protect our related deal (east cape [Los Frailes]) from any unnecessary interference by Jowdy or related persons [Garcia, Kaiser, Berard].   Its not that Jowdy is so powerful but he has worked hard to be a bona fide criminal.   He has levered the groups assets for favors, used banking funds for pay out etc…*
*As you can imagine we do not want to give anyone the opportunity to interfere.*"

On May 3, 2011, *independently*, Gaudet replied to Michael Peca about the Mexico litigation and the status of Gaudet's Los Frailes project—equally available to all Gaudet's Frailes investors and the Jowdy litigation plaintiffs; like Nostrom and the remainder of the Hawaii-Mexico investor/lenders) (*Ex. GG at 1*):

[Gaudet]: "*Michael Thanks for the kind words!  Its such a waste of time to go through all of this but you have to do what's right.. The pressure is still on with respect to the Jowdy affair!  Cant wait to have this behind us – with of course a positive result.*

*As for Los Frailes – Do to the circumstances (Jowdy affair) it is in our best interest to keep the property off the radar at this time.  The amount of negative influence coming from the Jowdy camp would be a distraction.  (time and money) We do not want further compromise…Bob*"

This communication—turned over during forfeiture production by the government—further verified that 'no one' was dependent on Kenner to recover their well-documented 3rd-party investment funds.   Peca wrote on May 2, 2011 (*Id. at 1-2*):

[Michael Peca]: "*Bob, Hope all is well.  Wanted to personally thank you for all of your hard work down in Mexico.  Particularly the Jowdy affair.  Just checking*

*in again to see if any headway will soon be made with respect to Los Frailise [sic].   Thanks for any info you could pass along.   Michael Peca*"

*Kenner was the business manager…*
Via signed agreement with all of his clients—Kenner's 'role' was well-defined. Nowhere in the management agreement did it require Kenner to manage the day-to-day efforts of 3rd-party investments that the investors *independently signed* and invested—regardless of Kenner's knowledge and independent investment in the same companies.   Nevertheless—*Kenner always assisted*.   That does not make Kenner 'responsible'—certainly not criminally—for another investment, 'controlled' and managed by a 3rd-party that, once again.   Kenner received no special benefit for his efforts; regardless of the misleading testimony of the government's FINRA rep (*who polluted the parameters the relationship Kenner had with his clients: Tr.2477-78*).

Norstrom—like all of his co-investors—have always had unrestricted access to the 3rd-parties they invested with; *none of which paid Kenner for anything*.   These claims should be taken up with them; not further polluting the Kenner proceedings as FBI agent Galioto needs for a distraction of complicity with Jowdy's cabal.

*Norstrom was systematically removed from the superseding indictment on the eve of trial—for a reason…*

**Norstrom was going to tell the truth**—like he did to the Mexico Supreme Court via affidavit.   Six years later—he has been twisted into believing Kenner '*stole all his money*'.   The misdirection and graft have tortured another good person.
- There cannot be an assumed loss based on the prosecutorial themes of concealment in any element of the alleged case to Norstrom.   If not concurred by the Court—Kenner respectfully requests an evidentiary hearing to present this and the remainder of exculpatory evidence on the matter.

*Conclusion…*
As hi-lighted, *supra*, the government's exposure of Jowdy's corruption—eleven years after Kenner detailed thru testimony the same Jowdy-ruse to the FBI case agent (Galioto)—**the government now concurs with Kenner**.

*How did the cover-up last 11+ years?…*
Now—the spotlight shifts to the 11-years of cover-up of Jowdy's cabal malfeasance(s) totaling *tens of millions* of *more* embezzled benefits to all involved; **specifically once Kenner was neutralized**.

There is one and only one legit question.

- "If the FBI agent and the government alleged Kenner stole all of the money for his Cabo investment and benefit—and we now know it is empirically untrue—how did the FBI agent not know this in 2009 when Kenner explained it in detail?"

The only logical answer is that he was complicit with the myriad of Jowdy-cabal bad actors since 2009 to distract and misrepresent the truths.   It is overtly documented as such.   Now—in order to play the final distraction card, the FBI agent is once again haranguing any former Kenner client about submitting 'affidavits of loss'—based on the mis-representation that '*Kenner stole all of your money*'.

The investors whom the government specifically removed from their superseding indictment on the eve of trial—based on their expected adverse testimony—were extracted for a reason.    There is no evidence that information was systematically 'concealed' from all (let alone any) investors during the pendency of the investments and subsequent legal actions.   Only CTE &/or 'undue influence' can explain the confusion of what every investor _signed_, over-and-over; *See Upton v. Tribilcock* and its progeny.

To recapitulate—Kenner requests an evidentiary hearing in the interest of justice for the incrementally alleged victims; ***specifically, any person not named in the superseding indictment***.   Kenner possesses—from the government's Rule 16 and forfeiture productions—a myriad of corroborating cross-exculpatory empirical evidence in Kenner's defense, exposing no possible 'concealment' at any time.  The incremental submissions also ***hi-light the CTE issues that debunk the government's entire case.***

***These CTE issues, alone, require a specific hearing—as previously requested by Kenner.***

Sincerely, Phil Kenner, Pro Se litigant

Submitted August 11, 2020

35