August 12, 2020

The Honorable Judge Bianco
U.S. District Court – EDNY
100 Federal Plaza
Central Islip, NY 11722

**Re: Recent witness impact statements (Peca)**

Your Honor,

I understand Michael Peca and Kristen Peca re-entered their victim impact statement for the Court.   It raises a number of evidentiary issues that the government has been unwilling to address; wholly affecting the sentencing, restitution, and forfeiture issues.

- An evidentiary hearing is requested by Kenner to address the issues.

*Case law regarding evidentiary hearings...*
Although, "the district courts have significant latitude in fashioning procedures to resolve sentencing disputes"; *United States v. Sabhnani*, 599 F.3d 215, 258 (2d Cir 2010)—it appears obvious, with the mounting volume of post-trial witness and government reformative admissions—the exculpatory and empirical evidence that exculpates Kenner's integrity *requires* an evidentiary hearing; wholly affecting sentencing for named *and* unnamed people in the superseding indictment (*ECF No. 214*).   The Court's "discretion is not limitless: the Due Process Clause requires that the defendant have 'an adequate opportunity to present his position.'" *Id.* at 258 (quoting *United States v. Maurer*, 226 F.3d 151-152 (2d Cir 2000).  *See United States v. Simmons*, 544 Fed. Appx. 21 (2d Cir 2015).

The Court requires that "the standard of proof at sentencing is a preponderance of the evidence" to accept the government's position of loss (related to actual victims in the first instance, sentencing enhancements, and restitution under MVRA); *United States v. Gaskin*, 364 F.3d 438, 464 (2d Cir 2004) (citations omitted).

"A sentencing conducted on the basis of unreliable or false information violates the due process clause just as much as a sentencing conducted without a sufficient hearing."; *United States v. Fell*, No. 5:01-cr-12-01, 2018 U.S. Dist. LEXIS 229652 (D. Vt. Mar. 16, 2018).   The U.S.S.G. acknowledges that "[a]n evidentiary hearing may sometimes be the only reliable way to resolve disputed issues." U.S. Sentencing

Guidelines Manual § 6A1.3 cmt. (2014).   The decision to hold or not hold a *Fatico*[1] hearing turns largely on whether the contested information is relevant to the trial court's potential sentence; *See Id.* § 6A1.3 cmt. (2014).  If the sentencing court does not plan to take the contested information into account, it need not grant a *Fatico* hearing to resolve the factual dispute.  Here, it is critical.

The Court formally requested that Kenner alert the Court when these issue are discovered.  In 2016, the Court *instructed* Kenner during his forfeiture testimony (one-year post-trial) to inform the Court of all testimony that appeared "*inaccurate*" if evidence had been "*uncovered*" to prove the inaccurate testimony (*April 6, 2015, Forf.Tr.207-08*):

> *THE COURT: If you have uncovered any documents since the trial that you believe suggest that there is something inaccurate about the testimony in the trial, Mr. Haley should definitely submit them to me.*

> *THE WITNESS [Kenner]: Yes, sir. We will do so. Thank you, your Honor.*

*Well, we are here again…like Groundhog's Day.*

*Incremental case law (re—signing documents)…*
A party to an agreement is "charged with knowledge of the contents of the [] contract and [is] bound by the clear and unambiguous terms of the same." *Johnson v. Hardware Mut. Cas. Co*., 108 Vt. 269, 187 A. 788, 794 (Vt. 1936) (alterations in original).  **In a statement stunningly apposite today—as it was nearly a century and a half ago—the Supreme Court opined**:
"It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained." *Upton v. Tribilcock*, 91 U.S. 45, 50, 23 L. Ed. 203 (1875) (*Hetchkop v. Woodlawn at Grassmere, Inc*., 116 F.3d 28, 34 (2d Cir 1997) (holding persons have a "basic responsibility…to review a document before signing it.").

Furthermore…In a 2012 Second Circuit appellate ruling, the Court opined that 'Plaintiffs sworn statement that he received only pages one and eight does not create a question of fact, because "[a]bsent substantive unconscionability or fraud…parties are charged with knowing and understanding the contents of documents they knowingly sign."'  *Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A.*, 461 Fed. Appx. 61; 2012 U.S. App. LEXIS 3012 (2nd Cir

---

[1] *United States v. Fatico*, 603 F.2d 1053, 1057 n.9 (2d Cir 1979), *cert. denied*, 444 U.S. 1073

2012) (citing *AXA Versichherrung AG v. N.H. Ins. Co.*, 391 F. App'x 25, 30 (2nd Cir 2010) (summary order) ("If the signor could read the instrument, not to have read it was gross negligence; if he could not read it, not to procure it to be read was equally negligent; in either case the writing binds him."); *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir 1996) (Parties are bound by documents expressly incorporated by reference into agreements to which they manifest their assent) (citing *Pimpinello v. Swift & Co.*, 253 N.Y. 159, 162-63, 170 N.E. 530 (1930)); *Paper Express Ltd. V. Pfankuch Maschinen GmbH*, 972 F.2d 753, 758 (7th Cir 1992) ("the fact that the rules were in German [does not] preclude enforcement of the [forum selection clause].  In fact, a blind or illiterate party (or simply one unfamiliar with the contract language) who signs the contract without learning of its contents would be bound.   Mere ignorance will not relieve a party of her obligations and she will ne bound by the terms of the agreement") (alteration in original); *Morales v. Sun Constructors, Inc*, 541 F.3d 218, 222, 50 V.I 1069 (3rd Cir 2008) ("In the absence of fraud, the fact that an offeree cannot read, write, speak, or understand the English language is immaterial to whether an English-language agreement the offeree executes is enforceable"); *Weiss v. La Suisse*, 154 F.Supp.2d 734, 73 (SDNY 2001) ("While the Court was originally troubled by the fact that the paperwork to obtain the policies was printed in a language the plaintiffs do not speak, defendants remind me of the ancient contract maxim that even a blind man must protect himself by procuring someone to read a contract for him."); *Envirolite Enterprises, Inc. v. Glastechnische Industrie Peter Lisec Gesellschaft M.B.H.*, 53 B.R. 1007, 1013-14 (SDNY 1985) (enforcing a forum selection clause despite it being in German when the rest of the contract was in English); *Cheshire Place Associates v. West of England Ship Owners Mut. Insurance. Ass'n (Luxembourg)*, 815 F. Supp. 593, 597 (EDNY 1993) ("Presumably Frank reads and understands English.   Even if he does not, failure to read or investigate the terms of the contract one signs is not a defense to enforcement of the contract"); *Gaskin v. Stumm Handel GmbH*, 390 F. Supp. 361, 367 (SDNY 1975) (enforcing a forum selection clause in German even when one party did not speak German and asked for and did not receive an English translation).

- *Here*, every transaction was *signed off* and *authorized* by the investors involved in the transactions—specifically Michael Peca, before, during, and after they were all *independently* represented by *independent* counsel.

*Facts...*
*Hawaii...*
- Not a single transaction took place without Michael Peca's knowledge.   He repeatedly *verified* it *thru testimony* and his corroborating *actions*; *none dissenting*.   His CTE (or other influences) cannot be the source of his alleged Hawaii loss (or others).

*Kristen Peca's fraud on this Court cannot be minimized...[2]*

Kristen Peca recorded Kenner for the FBI for approximately five hours in 2012—following Michael Peca's one-hour recording the same weekend—all unknown to Kenner, who repeatedly told Kristen Peca to "*trace the money*"; hiding nothing.

- *ECF No. 784 includes more details of Kristen Peca's 18 U.S.C. 1001 issues with the FBI, the U.S. Attorneys, and this EDNY Court.*

Thru the date of the July 2012 FBI phone calls—Kristen Peca *clearly verified* thru her own words that she had no idea that her husband had a line of credit ("LOC") at Northern Trust Bank:

> [Kristen Peca]: *Well, I was referencing the earlier stuff that you said, I don't remember a large amount being distributed back to our account and the timing of the years of the [Jowdy] loan, the line of credit, that happened when we were in Ohio [2008 & 2009].   I don't understand how it could have been open for 5 years before that?   Because we had a bond account going.*  ==**Do you mean the Hawaii; you had a line of credit, but not for us**==?

> [Kenner]: *No, no, you guys had lines of credit for 5 years at Northern Trust.*

> [Kristen Peca]: ***For 5 years?***

---

[2] **Kristen Peca was never a Kenner client**.   Kenner had no responsibility to her.   Kenner met Kristen Peca less than 10 times (or so) in the 15 years Kenner was Michael Peca's business manager. What Michael Peca chose to tell his wife was Michael Peca's business, *not Kenner's.  Michael Peca's concealment from his wife* was repeatedly documented in Rule 16 production (*as one 18 U.S.C. 1001 violation example*), with Michael Peca sitting silent during his February 22, 2012 face-to-face FBI proffer at the Long Island Marriott (*3500-MP-3-r at 2*) when he refused to contradict his wife's claim that "*believe PK may taking $ out without their knowledge...2 $180k transactions don't know why*" – despite Michael Peca demanding the deal remain obscured from his wife:

| 5 2 8 7 | +17163743234 Michael Peca* | 2/2/2009 8:07:47 PM(UTC+0 ) | R e a d | [Michael Peca]: Have an idea. ==Agaist my better judgement and my wife is not to know==. Call me |
| 5 2 8 8 | +17163743234 Michael Peca* | 2/2/2009 8:16:16 PM(UTC+0 ) | R e a d | [Michael Peca]: Can u talk now |
| 5 2 8 9 | +17163743234 Michael Peca* | 2/2/2009 8:27:44 PM(UTC+0 ) | R e a d | [Michael Peca]: ==Just get me a general letter saying the matter is concluded without mention of the payment==. |

- This followed Kenner's email re-verification—with the original Power of Attorney transfer requests attached (which Michael Peca orally confirmed to his custodians at Schwab, **per required protocols, before the funds were transferred**) (*Ex. J*).   Michael Peca intercepted Kenner's reply to Kristen Peca's email request.

[Kenner]: *For 5 years!   When you were in OHIO, that's when the thing closed.*

How could Kristen Peca have agreed to a '6-month LOC' in 2005 *(Tr.696-700)*, when she *confessed* **in 2012** that **she did not know** about her husband's LOC—***8-years later*** during the 2012 FBI recording?

- It was a simple *timeline* fraud that the government and Kristen Peca constructed for trial—***while unprepared trial counsel could not decipher the clear perjury and mount a proper or effective defense***.
- Yet—the delivery was efficiently and mutually planned *(Tr.709)*:
  *Q. Did you receive any information after 2008 about your investment in Hawaii?*
  *A [Kristen Peca]:* Do you want me to get into the line of credit situation?

Coupling the fraud on the 2015 Court, Michael Peca reiterated his wife's testimony that she finally agreed—pursuant to Kenner's alleged begging—to transfer their bond account to Northern Trust Bank as collateral.   ***No bonds were ever transferred*** (*Ex. K*); identifying their synchronized fraudulent testimony; unless they both mis-remembered facts that never happened...*but together (Tr.699 [Kristen Peca], Tr.384 [Michael Peca]*)?

The FBI is aware that Kristen Peca lied on 9/6/2013 to the FBI -- and U.S. Attorneys Leonardo and Capwell (*according to FBI agent Galioto's summary notes: 3500-KP-1*)[3] when Kristen Peca proffered—without any firsthand knowledge (see FBI 2012 recording, *supra*)—that she did not want her Northern Trust bonds "*touched*". *There were no bonds* there when the 2005 LOC began—and *no bonds were transferred*.   She also proffered that she "*was against any type of line of credit (LOC) from the beginning.*"

Again—her 2012 FBI recording verified she *did not know* about her husband's LOC until Kenner discussed it **in 2012**.   She also testified that "*The [2009] letter talked about taking the money out of our bond account*" was the first of her knowledge (*Tr.710*).   Also *untrue*.   **There was no such letter ever delivered** (identical to Berard's FBI proffer fabrication of the same '**fake letter**' after working for Jowdy (*3500-BB-1-r at 2: also grossly misrepresenting his bond amount in September 2013—*

---

[3] **Noting**: It was FBI Agent Galioto—prior to Kristen Peca's 2012 FBI calls with Kenner—who Kristen Peca verified told her '*Kenner stole the funds she thought Jowdy was receiving as part of the Hawaii loans*'...ironically not concerned about the '*actual loans*'...just that Galioto said 'Kenner stole them':
  [Kristen Peca]: *Matt [Galioto] told Michael and I that you stole all of the Hawaii money and never gave it – the loan money -- to...uhhhh...Jowdy.*

*immediately after discovering with Jowdy that Kenner had pending Supreme Court testimony in Baja California Sur, Mexico about their criminal activity—some of which is hi-lighted in the government's July 2020 exposé to the Court*)).   The 'fake letter' testimony complimented Kristen Peca's ***2012 FBI recordings that <u>debunked</u> her previous proffer lies to the FBI.***   These are *immense* and *reformative 18 U.S.C. 1001* issues that the FBI and U.S. attorneys were either "aware of" and did not alert the Court—or "were complicit" in their eventual fabricated testimony in 2015.   Either way—they are inexcusable and prejudicial, requiring specific intervention from the Court in the name of justice; commensurate to the actions taken by SDNY Judge Nathan in the *United States v. Ali Sadr* 2020 dismissal for 'known' government misconduct.[4]

*Crucial signed authorizations (See Upton v. Tribilcock, supra)...*
 As Supreme Court and Second Circuit case law verifies, the Court also recognized the *authorizations* were critical to the defense of the 'concealment' charges (*ECF No. 235 at 47*):

> [Court]: "*why wouldn't it be an important aspect of the case for Mr. Kenner to get whatever authorizations exist in the Northern Trust bank for the use of funds?*"

***The Court hit the nail on the head*** (*Ex. B*).   Peca *expressly granted* his *authorization* for his LOC funds to be "*investments*"; documented as "*1,775,000*"..."*Increase to existing loan used for speculative real estate **investments**" on his *signed and dated* ("*6-30-2005"; in his own hand-writing*) *2005 Extension of Credit* for Northern Trust Bank and his LOC account (*Ex. A*).   There is no equivocation that Peca *expected* his funds to be used as "*investments*", even if this were the singular document to

---

[4] Compared to the instant case—Judge Nathan identified only a *few* items that had been withheld from the defense—some simply delayed in production into trial to minimize their effectiveness (*See United States v. Gil*, 297 F.3d 93 (2d Cir 2002)); unlike the multitude of post-trial production hiccups by the AUSA forfeiture team disclosures—including but not limited to—(i) the Baker disclosures (*Ex.AA*), (ii) the Kaiser thefts from Dr. Sconzo and Dr. Krueger (*Ex. BB*), (iii) the fabricated operating agreements by Privitello and Kaiser (*Ex. CC*)—all known by FBI agent Galioto and *selectively* withheld from Rule 16 production (cherry-picked out as a subset of other contemporaneous submissions). Judge Nathan quotes the government's admissions in her order, "*[t]he Court is familiar with disclosure related issues that arose during the March 2020 trial as well as in pre-trial and post-trial motion practice...*" (*Case 1:18-cr-00224-AJN, ECF No. 350 at 1*). As such—Judge Nathan dismissed the guilty jury verdict and ordered the government to answer unambiguous questions—holding them to task—such as (*Id. at 3*):

> "*a.   For each item responding to 1 [Brady failures], indicate all Government attorneys who were responsible for the disclosure failures, including supervisors.*
> *b. For each item responding to item 1, indicate whether the Government agrees or disagrees that the withholding of the item was intentional withholding of exculpatory evidence.*"

- Judge Nathan refused to allow the government's repeated malfeasances to go unchecked—even after trial, insuring justice post-guilty verdict.

support the LOC activity...*but it was not (a multitude infra)*.   Michael Peca's **one-page**, *2005 Extension of Credit* document was also countersigned by Northern Trust Vice President of Lending, Edward Wilson one day later (7-1-2005), *independently verified.*

Consistent with the Court's 2014 clairvoyance, Michael Peca did sign a specific *authorization* for Northern Trust Bank dated March 11, 2005 at the time of his initial *2005 Extension of Credit* document; suspiciously missing from the 2015 Northern Trust Bank subpoena—but clearly referenced in the 2nd signed and dated *Extension of Credit*, as an "*existing loan*" (*Ex. B*).

Michael Peca's *2005 Letter of Authorization* was concise and succinct in language (English: Michael Peca's first and only language), leaving no ambiguity as to what was *authorized*; opposite of many "forum selection clauses", *supra*, which tend to be buried deep in lengthy legal agreements (or compounded by an alien language, while still supported by the Second Circuit—in Kenner's favor).

Michael Peca's *2005 Letter of Authorization* specified:
> *March 11, 2005*
> *Northern Trust Bank of Arizona*
> *2398 East Camelback R.*
> *Suite 300*
> *Phoenix, AZ  85016*
>
> *Re; Northern Trust Bank Line of Credit #289369 – 1565 in the name of Michael Peca.*
>
> *Gentlemen:*
>
> ==*This letter is your authorization to allow Philip A. Kenner to access my above referenced lien [sic] of credit for the direct deposit to the Little Isle IV account at Northern Trust.   He is authorized to sign for the release of funds related to the line.*==
>
> *Thank you for your assistance in this manner [sic]*
> */s/*
> *Michael Peca*

- ***There is no other authorization required***...as control passes to the operating agreement for Little Isle 4 (*Ex. M*).

*Pretrial…*

The government argued that the 2003-2009 Northern Trust subpoena request was "*overbroad*" and part of a Kenner "*fishing expedition*".   **The Court agreed**—despite the fact the indictment alleged "concealment" of these exact authorizations for the underlying 2003-2009 transactions.   The Court concurred and *denied* the defense's crucial *timely* subpoena request, early enough to have *received it*, *analyzed it*, and *incorporated it into the defense*; See *United States v. Gil*, 297 F.3d 93 (2d Cir 2002).[5] This did not occur.

<u>*Brady*</u> *issue…*

In fact—the government knew Michael Peca had notified Kenner via text message, two independent times in 2009, that they, ***the FBI***, had subpoenaed the exact Northern Trust LOC documents from him—identical to all LOC accounts contemporaneously—thus, the government and FBI investigators in 2014 knew exactly what was in their possession (having not turned them over to the defendant) and they needed to avoid its timely delivery to prosecute an alleged 'concealment' of the accounts/transactions.[6]   Michael Peca also had two copies of these exculpatory

---

[5] *United States v. Gil*, 297 F.3d 93 (2d Cir 2002) ("the government wrongfully suppressed evidence favorable to the defendant [that was] exculpatory and impeaching information, seriously undermining confidence in [the] guilty verdict, and <u>*was not disclosed timely enough for it to be useful to defendant.*</u>   The production of the documents on the eve of trial did not provide defendant the opportunity to <u>*read it,*</u> <u>*identify its usefulness,*</u> and <u>*use it.*</u>"). *Gil*'s guilty verdict was vacated and remanded for "late discovery" of exculpatory information.

The Second Circuit opined, "To the extent that a prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation, grounded in the 14th Amendment, to disclose that evidence to the defendant.  Information coming within the scope of this principle includes not only evidence that it is exculpatory, i.e. going to the heart of the defendant's guilt or innocence, <u>but also evidence that is useful for impeachment</u>, i.e. having the potential to <u>alter</u> the jury's assessment of the credibility of a <u>significant</u> prosecution witness."   *Leka v. Portuondo*, 257 F.3d 89, 98 (2d Cir 2001) (alterations in original) (quoting *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir 1998)).

[6] Peca confirms FBI subpoena in October 2009:



| 10 29 3 | +1716374 3234 **Michael Peca*** | 10/16/2009 1:42:01 PM(UTC+0) | R e a d | **[Michael Peca]: Were you aware that a subpoena was issued for the NT acct? Just got a letter from NT today.** |
|---|---|---|---|---|

Peca confirms 2nd FBI subpoena in December 2009:

| 10 95 9 | +1716374 3234 **Michael Peca*** | 12/7/2009 6:30:57 PM(UTC+0) | R e a d | **[Michael Peca]: Received a subpoena for NT account. Thought that already happened a while back.** Call me tonight to explain and run through some shit w/ me |
|---|---|---|---|---|

documents.   This is a serious-outstanding *Brady* issue; specifically considering the government's purposeful avoidance of delivering the *Brady* materials, compounded by the late subpoena delivery arriving *incomplete* in every respect—missing as many documents as it delivered; leaving no time for a follow-up subpoena in week seven of the trial, nor did ineffective counsel request the supplemental subpoena Kenner demanded from him.

*Michael Peca specifically acknowledged his authorization for Kenner…*
During Michael Peca's 2011, *secret*, SDNY Grand Jury testimony, the U.S. Attorney specifically asked Michael Peca about his <u>*signature*</u> and <u>*knowledge*</u> of *his 2005 Letter of Authorization* (*2011 SDNY Grand Jury exhibit 107*) (*SDNY Grand Jury Tr.38-39*):

> *Q: Let me show you Grand Jury Exhibit 107, starting with the signature. Is that your signature?*
> *A [Michael Peca]:* **<u>It is</u>**.
>
> *Q: This letter is dated March 11, 2005, Gentlemen, this letter is your authorization to allow Philip A Kenner to access my above-referenced line of credit, it says for line of credit, for direct deposit to Little Isle IV account at Northern Trust, he is authorized to sign for the release of funds relating to the line.   <u>Do you remember signing this</u>?*
> *A [Michael Peca]:* <u>**I do.**</u>
>
> *Q. Did you write this or was it written and given to you?*
> *A [Michael Peca]:* <u>**It was prepared for me**</u>. <u>**I read it**</u>, <u>**and signed it**</u>.
>
> *Q. It references direct deposits to the Little Isle IV account.   <u>Is that what you were calling the capital account</u>?*
> *A [Michael Peca]:* <u>**Correct**</u>.

Michael Peca <u>*verified thru testimony*</u> to the 2011 SDNY Grand Jury that he was aware of the default provisions that he gave *authorization* to, without equivocation <u>*and a specific result of Jowdy's non-payment of the Hawaii-loan*</u> (*Michael Peca SDNY Grand Jury Tr.39-40*):

> *Q: Did you understand at the time if you didn't pay back the line <u>ever</u> credit the bank was going to take your bonds?*
> *A [Michael Peca]:* <u>**Yes**</u>. <u>**And they did**</u>.   *What they took was just under $2 million, I believe it was in 2008, maybe after a while.*  <mark>*We were just,* **when the loan, the short-term loan from Mr. Jowdy was not paid back**</mark>*, the line of credit time matured.  They had taken what was loaned, I guess, lent to me plus interest.*

*Q:  Let me show you what is marked Grand Jury Exhibit 106, which is the pledge agreement dated November 5, 2007 [Ex. U].  Kind of technical document, do you remember signing documents putting up the bonds to secure the line of credit?*
*A [Michael Peca]: Uh-huh, yes.   I was very well aware of that scenario.*

*Q.  Is this your signature?*
*A [Michael Peca]: That is, yes.*

**Under full knowledge**, Michael Peca transferred control of his Hawaii "*investments*" to the Little Isle 4 capital account with unrestricted knowledge.   Michael Peca's future displeasure, rooted in Ken Jowdy's thefts of the "loans" (as **he** testified to the SDNY Grand Jury—4 years before the EDNY trial) and the proximate effects of the 2009 global real estate recession cannot be a criminal act deemed under Kenner's conspiratorial actions (*Tr.4588*).  Michael Peca repeatedly affirmed to the 2015 trial court his 2011 SDNY Grand Jury statements were "*truthful*" (*Tr.498, 602, 626, 650*); *See United States v. Archer*, 671 F.3d 149, 169 n.13 (2d Cir 2011).

- As the Second Circuit opined in *Archer*, "[i]f a person gives the defendant his money to bet, knowing that the bet might lose, his later loss, for purpose of restitution, is, in this fundamental sense, caused not by the defendant accepting his money but by the outcome of the bet." 671 F.3d at 171.

*Another CTE[7] issue is raised—notwithstanding the occurrence of suborned perjury or fabrication...*
Michael Peca was asked—*at trial*—if he was *aware* that his LOC was distributed to the Little Isle 4 capital account, the destination account he *authorized*—by signature—and re-verified thru testimony to the SDNY Grand Jury 6-years after he signed his specific *authorization (Ex. B)*.   Michael Peca testified he was not aware; furthering the government's concealment prosecutorial theme—*despite Peca's blanket authorization to release the* "*investment*" *funds to Little Isle 4* (*Tr.429-30*):

*Q. During this period of time of October of '06 did you get any statement whether from the bank or Mr. Kenner or anybody, saying that you have drawn down $1.6 million on your line of credit?*

---

[7] **CTE** is Chronic Traumatic Encephalopathy.   The primary symptoms of **CTE** have been described neurological experts, including Dr. Anne McKee at Boston University's Neurological Center as:
*"CTE, a catastrophic disease first associated with boxers long ago, results when a toxic protein, Tau, accumulates in the brain, kills brain cells, and leads to symptoms such as cognitive dysfunction, **memory loss**, sleeplessness, depression, diminished impulse control, episodes of anger, and dementia, among others. Until recently, CTE could only be confirmed through an autopsy. **Tau proteins are released whenever concussion occurs**."*

*A [Michael Peca]: No.*

- ***This is incorrect—****because* Peca signed off on the Northern Trust disbursement form in real time (*Ex. C*).

The *2005 Disbursement Request & Authorization* <u>verified</u>, specifically:

"**SPECIFIC PURPOSE**: *The specific purpose of this loan is: Modification to increase line to $1,775,000, originally used to Speculative real estate investments.*

**UNDISBURSED FUNDS**: *$175,000*
*Amount paid to others on Borrowers behalf ($1,600,000 to Balance at time of modification): $1,600,000*

**NOTE PRINCIPAL**: *$1,775,000*"
- Michael Peca signed the **one-page** document—one inch away…

The government doubled-down on the fallacy for effect (*Tr.433*):
*Q. Did you know that within approximately a month of opening the line of credit that virtually all of your line of credit was already committed?*
*A [Michael Peca]: I didn't know that.*

- ***This is incorrect—****because* Peca signed off on the Northern Trust disbursement form in real time (*Ex. C*).

Also—the government used Peca to claim his LOC investment had nothing to do with Jowdy or Mexico—wholly contradicting his verbose and unfettered 2011 SDNY Grand Jury testimony—of full knowledge of the Jowdy frauds (*supra*)—4 years before this inconsistent testimony—and every *action* he pursued with his Hawaii partners to recover the 'loans' (*Tr.644*):
*Q. By the way, what if anything did that litigation that Mr. LaRusso asked you about regarding Mexico have to do with the millions or $1.775 million in your line of credit that you <u>authorized</u> for the Hawaii investment? What if anything?*
*A [Michael Peca]: Nothing.*

*Two CTE issues are raised…*
**One** -- How did Peca not recall—with the government in possession of his <u>*signed*</u> *2005 Disbursement Request & Authorization* (*Ex. C*)—that he personally <u>*signed off*</u> on

the $1.6 million "*disbursed*" funds within months of its authorized use—never raising an issue to Kenner or Northern Trust Bank?—and

**Two --** Despite Michael Peca's contradictory SDNY Grand Jury testimony—4 years closer to the actual events—*the equivalent of multiple lifetimes to a CTE 'memory loss' sufferer*—Michael Peca participated in multiple U.S. and Mexico litigation—*with Kenner and independent of Kenner*—versus Jowdy to recover the same-loaned funds?

*In the Arizona case*, to recover the loan funds from Jowdy, Michael Peca *signed, initialed* (on every page*), addressed*, and *dated* for his *independent* attorney, Tom Baker, the disclosure acknowledgement of litigation versus Jowdy that specifically *verified* on page 1 (*Ex. E*):

> "*the gist of the lawsuit is to recover certain monies loaned to Mr. Jowdy from Mr. Kenner, Little Isle 4 and Ula Makika LLC.   Mr. Kenner estimates the total amount of monies loaned to Mr. Jowdy which have not been repaid to be approximately $5,000,000.   This is the estimated principle only, exclusive of accrued interest.   In summary, Mr. Jowdy denies that the monies were loans but rather characterizes them as investments.*"

**Noting**: This disclosure document was also *signed* by 19 of the Little Isle 4 investors; only absent were investors Ken Jowdy settled his documented 'thefts' from—and acknowledged on page 7 of Attorney Baker's disclosure for more transparency.   *No one restricted the other nineteen (19) investors, including Peca, from contacting Ken Jowdy or the other six Little Isle 4 members in opposition—for more clarity.   No one could have been unaware when they signed attorney Baker's disclosures.*

- The government was in possession of Baker's 19 disclosure documents (including all five interveners versus Kaiser and Berard, *infra*)—but did not turn them over to the defendants until their forfeiture production, post-trial—raising another significant *Brady* issue left unresolved by the Court.

*Other related Arizona litigation versus Jowdy cabal members—using the redundant forgery defense after getting caught by Kenner for stealing money…*
In 2013, Kenner's Hawaii partners Nash, Ranford, Sydor, Khristich, and Lehtinen *independently* and together re-hired Arizona attorney Tom Baker to sue John Kaiser and Bryan Berard for a title fraud theft of approximately $750,000.   They all won full recovery after a 2015 civil trial—against Kaiser and Berard's—*with Lanie Donlan's Arizona perjury help*—after an attempted and failed defense that their names had been repeatedly *forged* (on 5 Promissory notes); having a familiar ring to the Jowdy defenses (and government prosecution)—despite empirical evidence to

the contrary [*available for the Court's review: ECF No. 782 at 8-10, ECF No. 783 at 5, ECF No. 773 at 4, referencing ECF No. 668 Appendix at 60-63 and 3500-LD-2 at 2, 3*]; <u>specifically including emails and texts</u> of Berard and Donlan's participations in the various signed transactions—and Kaiser's emails sending a receiving his signed Promissory notes.  It was a *Kamikaze* defense—but perpetrated in concert with FBI agent Galioto's and Jowdy's allegations that Kenner was forging "*everything*"— including banking records.  ***It all proved false***—but the idea was to create chaos in those opposed to Jowdy and his criminal cabal (now including Kaiser and Berard). Kaiser and Berard were represented by the same Arizona attorneys as Ken Jowdy at the time.

*The California lawsuits versus Jowdy...*
Michael Peca was a plaintiff in both 2009 lawsuits that clearly identified the unpaid Jowdy-loans; *Diamante del Mar v. Jowdy* (*Ex. F*), and *Diamante Cabo san Lucas v. Jowdy* (*Ex. G*).

On page 7 of both Complaints—naming Michael Peca as a Plaintiff in both headers— the complaints clearly identified the Hawaii-loans to Jowdy (*Ids. at 7*), as follows:
> *"Mr. Najam was in charge of the corporate governance and while under Jowdy's direction and control, received over eight million dollars ($8,000,000) from a LLC in Hawaii.  Mr. Najam failed to properly account for those funds and has placed the Jowdy investors in a vulnerable and compromised position."*

In regards to the California litigation, Kristen Peca *independently* responded to a November 2009 email from Michael Peca's *independent* attorney, Ronald Richards— *independent* from Kenner, who was not even cc'd on the plaintiffs group email (*Ex. H*):
> [Kristen Peca]: "*We are putting our trust in you [Ronald Richards], so we will do whatever you recommend is best for getting our $$$ out.*
>
> *Thanks, Michael and Kristen Peca*"

In the same email chain, Attorney Richards conveyed Jowdy's 2009 offer to meet face-to-face with Michael Peca and Kristen Peca *without Kenner*; for anyone who thought the information they were receiving about the Jowdy loans or multiple project frauds was erroneous:
> [Ronald Richards]: "<u>*If any of you want Jowdy to fly to meet you and I here in LA or at your residence, please let me know.   My belief is he will use it as a session to try and dissuade you from moving forward but we can certainly call him on it if you want.*</u>"

13

- Neither Kristen Peca and Michael Peca—nor any of the other 19 California plaintiffs met independently with Jowdy—apart from Kenner (as plainly offered). *Nothing could possibly have been unknown or concealed at that point in time.*

- This was 2-years *prior* to Michael Peca's exculpatory SDNY Grand Jury testimony, exonerating any issues with Kenner and the Hawaii project or his LOC "*investments*" when he exclusively *signed* his *2005 Letter of Authorization*.

*Additional independent Mexico litigation versus Jowdy...*

Further hi-lighting Michael Peca's *independent* knowledge and communication with other 'involved people' in the recovery efforts from the multitude of Jowdy thefts, Michael Peca was in direct communication with Jowdy's former Director of Golf—Robert Gaudet, who was also criminally and civilly suing Jowdy, in Mexico, independent of the Hawaii-Mexico investor Mexico litigation(s). The FBI interviewed Gaudet at least 6 different times, pretrial. Gaudet was the sole legal coordinator in Mexico for the 6-years of litigation versus Jowdy prior to Kenner's 2013 U.S. arrest—with Gaudet a fulltime Mexico resident—*and independent Jowdy victim* (*Ex. I*).

- Gaudet is the Hawaii-Jowdy loan 'witness' (*3500-KJ-2 at 24-25*). But—absent from every Gaudet interview are FBI notes about Gaudet's witness signature authenticity. The absence of that fact (or simple question) defies logic; considering the "keystone" issues it addresses.

- Yet—the government alleged the document was a hoax. They referred to Kenner's Jowdy-loan-representations during trial (*Tr.4333-4334: Kenner testimony*) as "*bogus*" (*Tr.5708 (2x), 5709*), "*phony*" (*Tr.4597, 4598*), and "*supposed*" (*Tr.5707-5708*) to slander Kenner's veracity; while specifically lacking any evidence to do so.

During the 2008-2013 Mexico litigation versus Jowdy, Jowdy's cabal began to interject themselves in Gaudet's Los Frailes (a.k.a. East Cape) title-transfer process thru payoffs and graft—using the 'leverage' of his relationship with the Baja California Sur Governor and the Diamante assets for bribes, *supra*. Jowdy's cabal was making false claims of ownership against Gaudet's seller's Los Frailes title to slow the transfer process, while funding other false claims to run up the Mexico legal bills and create more distractions and chaos for any person adverse to Jowdy's project(s) criminality (*whom that they could not buy off like they did with the "bad apples": Tr.1919-20, 1989-90, 2003; ECF No. 668 at 48-51 [McKee texts: exposing that the GSF topics were specifically discussed thru exculpatory text messages with Kenner]*).

14

Gaudet explained Jowdy's graft to Michael Peca, *independently* after exchanging '*thanks and niceties*' about Gaudet's assistance in the civil and criminal litigation versus Jowdy (in Mexico), which Peca was deftly aware (*like all of the Hawaii-Mexico investors; again Peca not gathering all his Jowdy-related information only from Kenner as Peca and others testified: Tr.712-13: Kristen Peca*) (*Ex. I*):

> [Gaudet: June 25, 2011]: "*The issue with Jowdy aligns with the former Governor and his office who are now being charged with many crimes.. (I will send the article in a separate email)  This Governor was Jowdy's protector by way of the millions he paid for the support and personnel protection.   Hard to believe from any perspective!*
>
> *Our concern has been to protect our related deal (east cape) from any unnecessary interference by Jowdy or related persons.   Its not that Jowdy is so powerful but he has worked hard to be a bona fide criminal.   He has levered the groups assets for favors, used banking funds for pay out etc…*
>
> *As you can imagine we do not want to give anyone the opportunity to interfere.*"  *(Ex. L)*

On May 3, 2011, *independently*, Gaudet replied to Michael Peca about the Mexico litigation and the status of Gaudet's Los Frailes project—equally available to all Gaudet's Frailes investors and the Jowdy litigation plaintiffs; like Nostrom and the remainder of the Hawaii-Mexico investor/lenders (*Ex. I at 1*):

> [Gaudet]: "*Michael Thanks for the kind words!  Its such a waste of time to go through all of this but you have to do what's right.. The pressure is still on with respect to the Jowdy affair!  Cant wait to have this behind us – with of course a positive result.*
>
> *As for Los Frailes – Do to the circumstances (Jowdy affair) it is in our best interest to keep the property off the radar at this time.  The amount of negative influence coming from the Jowdy camp would be a distraction.  (time and money) We do not want further compromise…Bob*"

This communication—turned over during forfeiture production by the government—further verified that 'no one' was dependent on Kenner to recover their well-documented 3rd-party investment funds.   Peca wrote on May 2, 2011 (*Id. at 1-2*):

> [Michael Peca]: "*Bob, Hope all is well.  **Wanted to personally thank you for all of your hard work down in Mexico.  Particularly the Jowdy affair**.  Just*

15

*checking in again to see if any headway will soon be made with respect to Los Frailise [sic].   Thanks for any info you could pass along.   Michael Peca*"

Kristen Peca was also aware of the monumental efforts to recover the Hawaii-loans from Jowdy, _thru conversations with her husband_—since she had _never_ been a client of Kenner.   Kristen Peca told Kenner on the 2012 FBI recording:

[Kenner]: *Kristen – please – are you really asking me that after all of the lies you have heard from Bryan – and John – and that matt [Galioto] guy who refuses to meet with me and review the evidence?   Why would they have beaten me in Mexico in that jail if I had the money – and then killed our attorney?*

[Kristen Peca]: *this is too scary.   I told you that when we heard from – I don't remember who –*

[Kenner]: *I did not tell you…*

[Kristen Peca]: *maybe that golf guy [Gaudet] told Michael about you being in jail and them hurting you – and…and the attorney guy getting killed.  Its too scary.  ==**Michael and I cant thank you enough for keeping the fight going after the jail thing and the attorney**== but -- I just want this to be over no matter what it takes.  ==**I know how mad Michael and the other guys are with Jowdy for not paying the loans back**==.  Who does that??*

[Kenner]: *A protected criminal – that's who."*

What possibly was unknown about the Jowdy loans by Michael Peca or Kristen Peca after *her* full confessions on the 2012 FBI recordings—and the macro efforts for years in the U.S. and Mexico to recover them—against insurmountable protectionism and odds?   *Nothing was hidden* in a silo from Michael Peca or any investor.   Michael Peca and Kristen Peca verified it repeatedly thru *independent communication*—and re-verification of the independent communication with Kenner, himself (*Ex. V: September 16, 2009 email to Kristen Peca: "Kristen…Can you please look into your files…we need to show…Jowdy perjured himself in the Nolan trial when he claimed that our 'loans' to him from the Hawaii group were 'investments'.  This is very important.   Thanks.   Phil*).   No response from Kristen Peca or Michael Peca asked "what loans"—despite Michael Peca telling the 2015 trial court he was unaware of the loans until 2010 or so (*Tr.424: "It started 2010 onward."*).

**Michael Peca cannot be a victim of the Hawaii transactions he *authorized*;** specifically when the subsequent Little Isle 4 transactions were fully authorized by the LLC By-Laws as well (*Ex. M at 1, 2*).[8]

*Eufora...*
Peca's Eufora transfers are verified by the fax copies in Michael Peca's possession (part of his June 29, 2020 submission).   His institutional custodian (Charles Schwab) had a copy of the signed transfer request—as ***did Peca***.   The multiple fax 'confirmations' on top and bottom of the multiple transfers Peca submitted with his 'affidavit of loss', verifies that at no time was Michael Peca unaware of the destination accounts of his funds.   With Schwab's protocols—it would not be possible.

- The Court must note that regardless of Kenner's "Limited Power of Attorney" that Michael Peca <u>signed</u> directly with Schwab to *authorize* Kenner to "initiate" his Schwab transfers, ==*no money could be transferred without Michael Peca's verbal authorization directly with a Schwab employee—including Peca's confirmation of the "amount" and "payee" prior to release*==.
  - Schwab's faxes "header confirmations" are on the transfers to Jowdy's Baja Development Corp, as well—submitted as part of Peca's June 29, 2020 package.
- As a second safety mechanism—Michael Peca's FINRA rep (Jim Graham ["JG"] at Greenberg Graham and Assoc.) also verified the transfers in real time with Michael Peca (and all JG clients; including every alleged victim in the superseding indictment, except Kaiser and Privitello).
- Kenner's former assistant confirmed this to the FBI during her September 9, 2010 proffer (*3500-KM-1-r at 2: "JG wanted access to client accounts...still took direction from PK for trades/stocks...**but for wires JG would want access to client directly"***).
- Simultaneous to the transfer confirmations—a Greenberg Graham and Associate account manager (typically Doug Jankowski) would email their client(s) the "transfer verification" (*Ex. N*); leaving no possibility they were unaware—

---

[8] CTE confabulation and confusion was rampant throughout trial testimony; as example, Michael Peca's $100,000 wire transfer to Little Isle 4 is signed by him (dated June 21, 2005).   The government was aware—because their hand-written notes are on Peca's disclosure document (part of the Peca June 29, 2020 submission package).   Yet—Michael Peca testified that he sent the funds to Hawaii in 2003, alleging it was when he "and Kenner" were living in Long Island, New York (*Tr.377, 382*).   Peca was 2 years off with his memory; crucial in a concealment prosecution as a star-witness.   His wife verified she was aware of the Hawaii investment (apparently just the $100,000 investment) in "*2005, 2006*" while they were living "*in Edmonton*", Canada (not Long Island, NY) (*Tr.700*).   **Noting**: Kenner <u>never</u> resided in Long Island, New York, further exhibiting confabulated memories—a specific symptom of CTE sufferers, if not planned fabrication, again.

despite Michael Peca's fabricated "lack of knowledge" about his 2008
Constantine Management Group transfer (*Tr.506-07*).   **The protocols made it
impossible**.

- o   The Schwab transfer protocols required that Michael Peca verbally verify
  the wire instructions, regardless if Michael Peca signed the request—or
  Kenner as Limited Power of Attorney.
- Second Circuit precedent agrees that when Peca signed for any authorization, he
  owns the consequence of it (absent unconscionable fraud—which did not occur
  here, specifically not according to Michael Peca's *secret* and exculpating 2011
  SDNY testimony about the crucial Hawaii investment facts—and lack of raising
  any other issue more than 2-years after his last transaction with Kenner) (*Ex. D*).

*Kenner turned over the Home Depot false allegations by Constantine to Peca's NY legal
team; under Rudi Giuliani for full transparency…*

- **Noting**: the Constantine fabrications were consistent with his prior statements
  to the investors' attorney in July 2010 (Michael Stolper: part of Giuliani's team).
  Stolper *identified* the Constantine fabrications—after fully vetted transactions by
  the investors' independent representatives—in multiple letters and emails to
  their clients (independent of Kenner) (*Ex. O*) (*Ex. P*).   Not one adverse issue was
  raised, by a single investor, based on Constantine fabrications months before the
  *same nonsense* was alleged on the Home Depot recording.

3-weeks after Kenner turned over the Home Depot recording to Peca and all the
Eufora investors thru Giuliani's team, Michael Peca told Kenner *after* the
Constantine conference call rant about the '*stolen stock*' issue—with no obvious
concealment:



| 1 5 7 9 6 | +171637 43234 Michael Peca* | 8/19/2010 2:40:01 PM(UTC+0) | R e a d | [Michael Peca]: I will later. ==Hopefully everyone can get together to put the allegations to rest==. <u>There are bad ones going both ways.</u> |
|---|---|---|---|---|

Nevertheless, Michael Peca testified the transactions were unknown 5-years later at
trial (*Tr.446*).  It was more calculated confabulation—due to CTE effects—or
fabricated for prosecutorial effect.

Even the lead Giuliani attorney (Stolper) exchanged texts with Kenner *during* the
August 18, 2010 conference call—the 4th public allegation of stock fraud—and
Constantine's efforts to get law enforcement to go after everyone—as a Jowdy-like
distraction technique. Kenner concealed nothing from Peca's attorney—*and 29 more*

*interested parties* (*Ex. P at 9-18*).   **Kenner personally alerted the investors'
attorney—leaving no room for a "concealment" claim**:

| 1 8 2 7 1 | 1917626 1175 Michael Stolper* | 8/18/201 0 8:09:12 PM(UTC+0 ) | S e n t | [Kenner]: Tommy [Constantine] has the Kenner gave Gaarn stock as an illegal transfer issue on the table. He's threatening with law enforcement to go after us |
|---|---|---|---|---|

Reply from Attorney Stolper:

| 1 5 7 5 0 | 1917626 1175 **Michael Stolper*** | 8/18/201 0 8:10:45 PM(UTC+0 ) | R e a d | [Stolper]: **Predictable** |
|---|---|---|---|---|

Then—Constantine made another allegation about the private stock sales.   Kenner
passed the information along to the investors' attorney—one minute later:

| 1 8 2 7 2 | 1917626 1175 Michael Stolper* | 8/18/201 0 8:10:37 PM(UTC+0 ) | S e n t | **[Kenner]: He just threatened law enforcement involvement to settle the issue with the Kenner/Gaarn transfer!** |
|---|---|---|---|---|

And Attorney Stolper again responded:

| 1 5 7 5 1 | 191762611 75 **Michael Stolper*** | 8/18/2010 8:12:24 PM(UTC+0) | R e a d | [Stolper]: **Hopefully recorded**. |
|---|---|---|---|---|

Only Peca's willful blindness in his passive-equity investment left him absent of
knowledge; certainly not a Kenner criminal concealment issue.

*GSF…*

Michael Peca (*Ex. R*) and Kristen Peca (*Ex. Q*) signed off on the GSF disclosure.   Their
"sign-off" followed the email disclosure Constantine sent them several days prior,
which laid out every expectation based on his management of the GSF contributions
(*Ex. T*):

*From: Tommy Constantine <tommy@eufora.com>*
*Sent: Monday, May 18, 2009 9:34 AM*
*To: kmppgp@aol.com*
*Cc: phil kenner*
*Subject: Re: Global Settlement*
*Attachments: AZ Eufora Partners LLC Peca 5.4.09.xls*

*Kristen and Michael:*

19

*You will be receiving a Transfer of Membership Agreement for your increased interest in ==Eufora, LLC== from our CEO (C.R. Gentry) later this week or next week at the latest. We just have to wait for the other side to sign the Transfer docs as part of the settlement, which is supposed to be in the next few days. In the meantime, this email shall serve as written confirmation that you will be receiving 1/10th of the interest that we acquire from Nolan, Juneau and Moreau with respect to Eufora.* ***Specifically, you will be receiving an additional .364% which is 1/10 of the 3.64% interest that they currently own or owned. The attached excel spreadsheet shows your current ownership interest and the interest that we are acquiring from the three of them as part of the settlement.*** *The dollar amounts on the right are the current value of those interest at the $20M valuation (for the whole company). Again, your interest is 1/10 of that and will be added to the .70% you already own.*

*Additionally, Juneau and Nolan owned 10% each (20% total) of the ==Avalon Airpark project==. We are buying out their 20%, so you will also receive 1/10th of this interest (2%). It is currently valued at $3.3M and the office space is currently being rented by Eufora. You will also be receiving an LLC and operating agreement reflecting your new proportionate share of ownership of this building.*

*Frankly, although this one is more of a luxury than an investment, you will also own 1/10th of 20% (2%) of the ==Falcon 10 airplane==. It is worth approximately $1M but will be very difficult if not impossible to sell. In any case, this will not cost you guys anything going forward. Ultimately you guys should take advantage of the fact that we now all own an airplane together and when it's geographically feasible, you guys should use it to make owing a piece of it worthwhile. Just let me know whenever you want to use it. You just have to pay for the hourly costs for fuel and the daily costs for the pilots and landing fees.*

*Finally, as Phil and I stated, I also settled the ==Palms condo== issue with Moreau as part of this global settlement transaction. Moreau had absolutely no right to sue me for the Palms units and I would have crushed him in that lawsuit because we had a signed agreement when he bought it. Nevertheless, since we got that issue resolved as part of the settlement as well, I have elected to share in the ownership of those units and the equity that exists in them with all of the great partners that have stepped up and helped us fix this problem with all these problem individuals. Specifically, these Palms units are a one bedroom and an adjacent studio on the 31st floor with a strip view. They are worth approximately $1.5M today and were worth $1.8-$2M some time ago. I believe they will recover in the future and be worth more than they are today. In any case, you will also be receiving an LLC and operating agreement reflecting your new proportionate ownership of these units. Although Juneau, Nolan and Moreau did not own any interest in these units, to keep things simple, I will just match what we are doing in the Avalon project so you will also receive 1/10th of a 20% interest in these (2%).*

*Please do not hesitate to call me if you have any questions and please just to follow the*

*program in terms of documentation.*

*TC*
*(602) 363-5676*

Michael Peca told the 2015 trial court that he <u>never</u> thought Kenner was in charge of the GSF; which was 100% factually accurate at all times (*Tr.540*):

> *Q. Before the money went, before the money had been spent, before you were apprised of that, what was your belief as to who was in charge of the Global Settlement Fund?*
> **A [Michael Peca]: Initially Ron Richards and, as it was ongoing, Tommy Constantine.**
>
> <mark>*Q. And what was Phil Kenner's participation in that, as you recall?*</mark>
> <mark>**A [Michael Peca]: He didn't seem to have one.**</mark>

Although Michael Peca and Kristen Peca were in the same 5/8/2009 meeting with Constantine, Kristen Peca testified she had no idea Constantine was in charge; contradicting her husband's recollection (*Tr.718-19;* **Noting***: they had never met or spoken to Ronald Richards thru that date—further debunking her logic*).

In addition to the May 18, 2009 email—their "signed" authorizations clearly outlined their knowledge; *See Upton v. Tribilcock*.   There were no email replies that contradict the "authorization" verification by Kristen Peca (*Ex. Q*) and Michael Peca (*Ex. R*).

The only reply to the prior email verification of expected 'use of funds' by Constantine (*Ex. S*) was Kristen Peca's demand for "*how much (%) we obtained*" in the deals she testified at trial "*we're not interested in anymore investments or we're done with them*".[9]   Clearly—in real time—Kristen Peca had a different view (*Tr.717-18*):

---

[9] **Noting**: months later, under the guidance of Giuliani's investigation team, Michael Peca demanded that he invest with the group that was buying out the Eufora/Constantine debt—clearly in contradiction to his wife's *recollection* of history.   To Kenner from Peca: **confirming Michael Peca's EDNY lack of memory**—mimicking Kaiser, Berard, and Gaarn's CTE issues (*Tr.604*):



| 1<br>4<br>7<br>2<br>7 | +17163743234<br>**Michael Peca** | 7/14/2010<br>12:20:53<br>AM(UTC+0) | R<br>e<br>a<br>d | [Michael Peca]: <mark><u>***If not all willing members get a chance to be part of the loan buyout***</u></mark>*, mean more % there may be <mark><u>a lynching. FYI</u></mark>* |
|---|---|---|---|---|

Kenner responded in the affirmative to Michael Peca, as follows:

[Kristen Peca]: "*Hey, before we sign off on an approval letter, can we please have the written documentation as to exactly how much (%) we obtained with our contribution?*" (*Ex. T at 2*).

In 2011—Kenner and attorney Stolper were doing due diligence for another lawsuit versus Constantine for the GSF distributions.   In 2012—Attorney Ronald Richards verified the Kenner-Stolper joint efforts to expose any wrongdoings related to the GSF in a California Bar complaint reply filed by John Kaiser and Nick Privitello (and complaint written by Jowdy attorney, Tom Harvey) (*Ex. W*).  The Kaiser-Privitello response mirrored the identical 2012 Peca-McKee-Norstrom Bar reply (*Ex. X*) (complaint also written by Tom Harvey as a distraction to Jowdy adverse investors, especially with <u>Harvey complicit</u> since September 2002 of title frauds (*Ex. Y*); identical to the criminal acts in *United States v. Turk*, 626 F.3d 743 (2d Cir 2010).

Ronald Richards verified to the California Bar:

"*I was contacted by Mr. Kaiser's attorney, Michael Stolper, in September 2010. Mr. Stolper also represents Philip Kenner, a former client and business manager referenced in my response to the other complaint and in the pleadings in this case.  I provided Mr. Stolper and Mr. Kenner with all of the [GSF] evidence and confirmations they requested as to the transmittal of the funds to Mr. Constantine.*"[10]

Emails were also requested from all contributors about exactly what they recalled—in 2011—about Constantine's 2009 GSF plans.   Kristen Peca replied on "*Wednesday, March 16, 2011 8:52am; Subject: Re: Global Settlement Fund (GSF) – Privileged & Confidential*":   "*Hi Phil,…In the spring of 2009, you (Phil) and Tommy Constantine*

| 16913 | +17163743234 Michael Peca* | 7/14/2010 12:21:28 AM(UTC+0) | Sent | **[Kenner]: I don't disagree** |
|---|---|---|---|---|
| 16914 | +17163743234 Michael Peca* | 7/14/2010 12:21:46 AM(UTC+0) | Sent | **[Kenner]: Why wouldn't they?** |

---

[10] **Noting**: Michael Peca testified he received the GSF spreadsheet but '*could not verify it*' (*Tr.652-53*)—while attorneys Ronald Richards and Michael Stolper represented him—*independently*.   Jay McKee testified that he could not receive it from Kenner *without a delay*—clearly not in Kenner's possession any earlier than it was also in two of his own attorney's possession (*Tr.1827*); perhaps more timeline confabulations or CTE symptoms; leaving unexplained innuendo and unexplainable temporal anomalies constructed or allowed by the knowing government to prejudice Kenner.

*(who we were meeting of the 1st time) came to visit us in Ohio, where Michael was playing for the [Columbus] BlueJackets.  We had an informal meeting in our living room, and you both told us about your new plan, called the Global Settlement Fund (in which each Jowdy lawsuit participant had to give an additional $250,000 in exchange for additional ownership % in Euphora [sic], legal fees, and other misc. items)."* Kristen Peca continued: *"...rather than asking all the investors to help him [Phil] with legal fees, the Global Settlement fund would not only help with legal fees, but would give us additional % of Euphora [sic] ownership (as some of the settlement was to buy out Nolan, Juneau and Moreau of their Euphora [sic] %)."*

At no point in Kristen Peca's email does she allege that she and Michael Peca were "*mad*" (*Tr.716*) at Kenner because of the Northern Trust LOC issue, which concluded only 5 weeks earlier.  **Her 2012 FBI recordings proved she 'did not know about the LOC' until 2012**—consistent with her 2011 email.  She clearly recounted the "*Global*" scope of the Constantine plan of contributing funds with the group "*in exchange for*" additional equity in "*Euphora*" and "*other misc. items*"—not just legal fees as she testified at trial (*Tr.714-18*).  The same day as Constantine's extensive email (*Ex. T*), her May 18, 2009-real time—responsive email demanded: "*Hey, before we sign off on an approval letter, can we please have the written documentation as to exactly how much (%) we obtained with our contribution?*" (*Ex. T at 2*).

Kristen Peca's demand resulted from the May 18, 2009 "acknowledgement and Acceptance" request of disclosures, which also detailed (*Ex. T at 2*):
*"Per our conversation, please acknowledge your approval and authorization for me [Kenner] to have transferred $250,000 to Attorney Ronald Richards' Trust Account for your proportionate contribution to the Global Settlement Fund.  In addition to the fund paying for **various legal fees**, PR Agency Fees, as well as other protective advances and settlement costs, you will be receiving transfer of membership agreements from Tommy for acquisition of additional interest in ==Eufora==, LLC as well as your new LLC and operating agreements reflecting your ownership interest in ==Avalon Airpark== real estate Project, the ==Falcon 10 Aircraft==, and the ==two Palms Place condominium units==.  You may not remember Tommy or I mentioning the Palms units in our conversation.  In any case, because Moreau and Tommy settled that case as part of the Global Settlement, he has graciously elected to include you as a beneficiary in the significant equity that exists in those two units as part of this transaction.  As we discussed, instead of throwing money away only on legal fees, this strategy, which effectively acquires significant assets while providing a legal remedy, is by far our best solution.*

***Tommy has requested from all of us** and will provide to us, written documentation of every element of this transaction.  Please respond, **ACKNOWLEDGED and APPROVED**, to this email accordingly ASAP."*

To this detailed regurgitation by Constantine of his GSF plans—Kristen Peca replied (*Ex. Q*):

> [Kristen Peca]: "*I understand and accept the terms of this settlement plan. Thanks*"

Kristen Peca is not subject to the severe CTE symptoms (or memory loss excuses) available to her husband and multiple other government witnesses—from decades of documented concussions and brain trauma resulting from thousands of sub-concussive hits.   ***The public admission of these symptoms by many—if not all—as Plaintiffs in a 2014 class action lawsuit versus the National Hockey League for damages[11]*** is reformative to what government witnesses "*could not recall*" during material 2015 testimony—up to 12 years after the actual events.   Without the CTE-excuse available to her—per the government's *Dunnigan[12]* defense of their witnesses' clearly-inconsistent testimony (*ECF No. 440 at 16*)—the Court is aware she either grossly '*changed*' her recollections of (like the GSF issues)—or outright '*fabricated*' for the trial (like her knowledge of the Northern Trust LOC prior to her 2012 FBI recordings).   None of it was ethical and *18 U.S.C. 1001* issues are raised with Kristen Peca's testimony; prejudicing Kenner.   The Court needs to hold her accountable—because her corroborating testimony—stunningly in sync with her husband's CTE and fabrications—coupled with her revisionary statements were clearly contrived to support a 'concealment' prosecution.   At all times—this contradicted the empirical evidence Michael Peca and Kristen Peca signed—and real time events that they documented (all to Kenner's exculpatory favor).

---

[11] This is a "*newly discovered evidence*" issue that the Court has <u>not addressed</u>—since Kenner's 2018 discovery of the monumental "memory loss admissions" post-trial and ==**hidden from the defense by he witnesses, the FBI, and the government**== (pre- and during trial).   Additionally, Kenner has not received a reply from the Court to address his 2018-19 ***requests*** for additional discovery and an evidentiary hearing in this reformative matter.

[12] ***Memory is everything in a concealment prosecution***.   Yet—the government hid their witnesses' 2014 **CTE** lawsuits from the Court and the defendants.   Post-trial—the government defended their witnesses' 2015 testimony, fully contradicting all of the witnesses' <u>own</u> pre-trial empirical evidence, as *faulty memory, confusion and mistakes* with reference to a Supreme Court case (*United States v. Dunnigan*, 507 U.S. 87, 94 [1993]).

- Post-trial, Kenner requested the Court submit a '*Requests for Admissions*' to each trial witness to verify their prior-known concussion issues—and any neurological discussions with professionals; *related to <u>memory loss</u> issues (ECF No. 782)*.

- ==*Kenner's follow-up letter of January 17, 2019 (ex parte) was left unaddressed—while hi-lighting stand-by counsel's ongoing negligence; first as uncooperative post-trial counsel—and subsequent refusal to submit other defense motions and requests while assigned as stand-by counsel.*==

Michael Peca—*whether or not Kristen Peca was ever aware—<u>signed off</u>* on 'every' transaction and participated in 'every' group email and conference call—regardless of his CTE 'memory loss'.   The results of his signed authorizations; *See Horvath; also See Upton v. Tribilcock*—and corroborating SDNY Grand Jury testimony—cannot in turn create the basis for loss of those funds (*See Archer*) or the criminal prosecutorial with Michael Peca as a victim.

*Conclusion…*
The Court must intercede as the neutral arbiter of justice and unwind this injustice, regardless of the 7-years of elapsed time.   ***Justice has no time limits***.   But proper resolution can still undo a lot of unnecessary damage and unintended consequences.

In a parallel 10th Circuit appeal case for business frauds, Circuit Judge O'Brien opined during the second appellate opinion in *Evans, infra; See United States v. Evans*, 744 F.3d 1192; 2014 U.S. App. LEXIS 4490 (10th Cir 2014) (*referencing Turk*) (*Evans I*)…and *2nd appeal for improper calculation; United States v. Evans*, 677 Fed. Appx. 469; 2017 U.S. App. LEXIS 1942 (10th Cir 2017) (*Evans II*).

- After two appeals, per Judge O'Brien's order, *Evans* was released "time served". Restitution was reduced to zero—as a full reduction based on passive-equity owners and their inherent risk/reward expectations.   Due to repeated miscalculation of loss by the district court, the Court determined there was no fraud in the inducement of the investments, and the district courts should have inquired into what loss, if any, the investors would have suffered even if defendant had "come clean" regarding the status of the investments.   *Here*, a multitude of pretrial exculpatory evidence exists that every Hawaii investor was aware of all Hawaii transactions in real time (*Ex. Z*).   Judge O'Brien opined that the district court should have considered the effect and foreseeability of <u>non-fraud factors</u>—like the 2009 Global recession—in determining loss in an *equity investment*, where the shareholders/investors assume the risk of their investment.

Judge O'Brien continued:
> "[Evans] adequately disclosed the risky nature of the projects to the investors and, to sweeten the deal, offered 12% per annum interest on invested funds.   That debt burden, along with other [global market] factors, produced disastrous results.   By April 2005, several things became clear: The rehabilitation costs were considerably more than anticipated [*identical to the Jowdy loans extending past the expectation of the spring 2006 Mexico-Lehman*

*Brothers closing*][13], the projects were undercapitalized and the interest obligations to investors were disastrously large and unrelenting.    As a consequence, the project took on a gloomy countenance, revealing the business model to have been, at best, overly ambitious or, more likely, inherently flawed.  **None of that, as all agree, amounted to fraud**."

Judge O'Brien continued:

"the answer [] has resulted in a sentencing dilemma – how does one measure the damages reasonably resulting from the fraud (not being candid with investors), rather than merely estimating the economic losses flowing from a flawed business plan, poor timing and market dynamics?   What are the damages caused by the fraud?  Simply stated they are the money investors lost as a result of not having full and timely knowledge of the depth and breadth of the projects' shortcomings.   In other words, what the investors

---

[13] See confirmations of the Jowdy loans at Peca SDNY Grand Jury (*ECF No. 668 at 108-09*) -- Sydor SDNY Grand Jury (*ECF No. 668 at 137-38*) – Stevenson (*ECF No. 668 at 137-38*) -- and Kaiser 2009 (*ECF No. 668 at 190-91*).

John Kaiser testified during a 2009 Arizona arbitration—while the Managing Member of the Hawaii partners—that he *did not hold Kenner responsible* for the Jowdy non-payments, either (*Nolan arbitration Day 5, Tr.928-929*):

*Q: Has this ever been a secret that Mr. Kenner lent this money to Mr. Jowdy?*

*A [Kaiser]: No.*

*Q: Was this a transaction that, as your view as an investor was open and disclosed to everyone?*

*A [Kaiser]:* It was open.  *There was no secret handshakes or nothing like that.*

*Q: Even now, sitting here in May 2009, is there anything you've uncovered, as someone who obviously knows how to investigate, that Mr. Kenner has done anything inappropriate throughout these transactions?*

*A [Kaiser]: No.*

*Q: Not one complaint?*

*A [Kaiser]: No.*

*Q.  At the time this money was lent to Mr. Jowdy to be spent in the Mexican project, did anybody anticipate he wasn't going to pay you back when the Cabo deal closed, the Lehman's Cabo deal?*

*A [Kaiser]: No.  Otherwise I wouldn't have lent it.  I wouldn't want to go down that route.*

*Q.  Do you blame Mr. Kenner for him [Jowdy] not paying the money back?*

*A [Kaiser]: No.*

additionally lost by being deprived of an opportunity to mitigate foregone losses.  <u>But we know one thing</u>: <u>much of the loss had been incurred or was inextricably destined to be incurred before any fraudulent conduct commenced</u>. It was necessary for the government to produce sufficient evidence from which a reasonable estimate of damages resulting from the fraud could be computed."   See U.S.S.G. § 2B1.1, comment. (n.3(c)).

- *Here*—the 2009 global recession was the sole trigger to the ultimate Hawaii project losses (notwithstanding the unchecked Lehman Brothers-Windwalker budget frauds, echoing the Jowdy-Lehman Brothers frauds); *not Kenner's causation*.  In fact—the Jowdy loan is still a viable and collectible asset of Little Isle 4; specifically with the government confirming Jowdy $225,000 per month salary (in their July 3 submission).   Only the government's interference—and continued allegations that '*Kenner never gave the money to Jowdy*'[14] has stopped its collection.   Managing Member, John Kaiser, verified thru submission to the Court in February 2019 that Jowdy and Galioto's ruse about Jowdy not receiving the Hawaii loan money is still proliferating amongst the Jowdy throng (*ECF No. 628 at 1*):

    [John Kaiser]: "*Jowdy would like the court to think that Kenner stole $7 million from the hockey players and others…*"

- Even Kaiser after being terminated by Jowdy (after his worth to Jowdy's criminal cover-ups was reduced to zero), confessed that the FBI-Jowdy ruse continues. Ironically—Kaiser and Berard were two of Jowdy's henchmen who assisted in the rumor spreading during their 5+-year complicit actions as Jowdy employees (2011-2017).

The government hi-lighted the proximate causation issues that were not Kenner's fault during their aggressive cross-examination of Kenner (*Tr.4588*); specifying:

    [Michiewicz]: "*Q: So the fact that Lehman Brothers went belly up, that the great recession happened, the real estate market bubble burst, you understand there's nothing in the indictment that blames you for that, right?*"

---

[14] **Noting**: It was FBI Agent Galioto—prior to Kristen Peca's 2012 FBI calls with Kenner—who Kristen Peca verified told her '*Kenner stole the funds she thought Jowdy was receiving as part of the Hawaii loans*'…**ironically not concerned about the '*actual loans*'**…just that Galioto said 'Kenner stole them':

[Kristen Peca]: <mark>*Matt [Galioto] told Michael and I that you stole all of the Hawaii money and never gave it – the loan money -- to…uhhhh…Jowdy.*</mark>

They were solely relying on money they alleged Kenner 'stole'; specifying:

> [Michiewicz]: *You understand that the indictment charges you with stealing money from your clients, correct?*

- **The Court knows this never happened—verified by government bank stipulation and *government-forfeiture-44*.**

In *Evans II*, contrasting *Turk*, there cannot be a loss attributed to "equity" investors due to the inherent risks they assume governed by the corporate By Laws at all timess.[15]   In *Evans II*, the Court opined that even though Evans never told the investors of the cash-flow issues, the district Court could not hold him accountable for any loss and <u>ordered a zero loss factor</u> and the resulting "no victims", "no enhancement for loss" and the associated reduced guidelines.

*Here*—not only did every Hawaii investor who gave testimony or signed affidavits pretrial agree that they were aware of the Jowdy loans and other Hawaii transactions—all authorized by the corporate documents (*Ex. M*)—but they actively participated in "*update*" emails and conference calls that John Kaiser, the Hawaii Managing Member, confirmed to the FBI:
[John Kaiser]: "*update letters in Hawaii project…PK made these many times*" and re-verified by clarifying to the FBI agents, "*yes, I recall the letters*".
> **Noting:** The FBI had these "*updates*" and presented them in-person to Hawaii Managing Member, John Kaiser, on October 19, 2010 (*Ex. Z*).

The attorney "*updates*"—as verified by Kaiser to the FBI—confirmed full access to the knowledge Kenner was prosecuted for allegedly concealing:

[Hawaii Attorney Madia: February 24, 2006]: "*We have been informed that part of the closing process at Lehman Brothers rejected the original proposal to repay the Hawaii loans at the closing by collateralizing Ken's [Jowdy] 20% equity he received for managing the Cabo project….**Based on the meetings John Kaiser had with Ken [Jowdy] before we agreed to lend him the money in 2004** Phil [Kenner] has asked me again to attach for your records a copy of the lending agreement.  Please contact*

---

[15] As the <u>*Evans*</u> Court explained, "<u>*if there is no fraud on the inducement, then only the fraud factors are applicable to loss calculation.*</u>"   *Evans* was released 'time served' with no loss and no victims after the factors were applied properly.   The *Evans* Court (with Justice Gorsuch) opined "*[w]ithout an actual loss, there could be no victims*".

*me with any questions but you should already have your copy from previous communications.*"

Attorney Madia continued:

"*The questions during our last conference call by <u>Owen Nolan</u>, <u>Mike Peca</u>, and <u>Bryan Berard</u> were important to all of you.   If you are still confused about the individual equity you invested in the Cabo project versus the Hawaii equity and loans, please reply to me.   I thought Phil clarified this but I want all of you to be clear.  Most of you are involved in both deals.   **You should have the operating agreements I previously forwarded to you after every member signed them**.  If not please contact me about what you cannot find in your personal records and I will forward them to you or your advisors.*

***Based on the delay I have also resent updated loan calculation from the Hawaii loan to Jowdy for your records***.  *It has been given to Masood [Bhatti] at Lehman Brothers so he is aware of the amount that is continuing to accrue to Jowdy.   As a result of the phone call with Ken [Jowdy] and bill [Najam] about the delayed closing they confirmed the 15% was still accruing in spite of the delay.   They were confident that the initial real estate sales in Cabo in the first year would produce the funds needed to fully repay the loans plus additional interest.   I find comfort in their representations.*"

- Only willful blindness could explain any lack of knowledge—but certainly not criminal intent.   Kenner—and those involved in the Hawaii project—could not have been more "clean" about information.

The appellate decision in *Evans I* opined, "[T]he district Court should have inquired into what loss, if any, the investors would have suffered if Mr. Evans had come clean regarding the status of the securities [or Jowdy loans, assuming they were concealed, yet authorized, <u>notwithstanding Michael Peca and Bryan Berard also testifying at trial that they were 100% aware of the loans via Kenner</u>]...".

The Court opined, "**In making that calculation, the fact that the securities had lost value due to poor or unsustainable business model would not be chargeable to Mr. Evans**."

Ultimately—as Judge O'Brien opined when overturning *United States v. Evans*, 677 Fed. Appx. 469; 2017 U.S. App. LEXIS 1942 (10th Cir 2017) (*Evans II*), a second time—after nearly 5 years in jail for Evans:

> [Judge O'Brien]: "*The result here may not be heralded as a model of perfect justice, but it will stand as a conscientious application of the law.*"

Justice Gorsuch's initial 10th Circuit *Evans I* appellate opinion in 2014 to calculate the *Evans'* fraud appropriately (See *United States v. Evans*, 744 F.3d 1192; 2014 U.S. App. LEXIS 4490 (10th Cir 2014)), was similarly prosecuted by allegations of concealment from *Evans'* investors during financial troubles in their real estate company.  As a result in the E*vans II* decision, Judge O'Brien (*who replaced Justice Gorsuch following his appointment to the Supreme Court in 2017*) was forced to:

> (1) Change the District Court judge;
> (2) Order no restitution or loss; and
> (3) Reduce the re-sentence guidelines to 4-10 months after the original 14-year sentence; once they determined and opined that *authorized* business transactions of a corporation *cannot* result in a "loss factor" for equity investors—as they accept the risk-reward premise of private equity—*identical to the instant case*.

The Court knows the corporate decisions were authorized by the corporate documents—specifically the Little Isle 4 By Laws (*Ex. M*).  And furthermore—the Managing Member (Kenner) was never a beneficiary of the transactions that were allegedly concealed from 4 of the 26 Hawaii partners—with Michael Peca re-canting his original '*no knowledge*' testimony on cross-examination (*Tr.498-99*) (*ECF No. 501 at 9*); leaving Peca unavailable as a victim of what he knew at all times.

- Michael Peca *verified thru testimony* that his 2011 SDNY Grand Jury testimony was "*truthful*" (*Tr.498, 602, 650*).

Kenner requests an evidentiary hearing to ferret out the details of the Peca 'loss' calculation (hi-lighting the lack of proximate causation by Kenner), considering its clear effects on the sentence guidelines, restitution calculations, and forfeiture totals.

Sincerely, Phil Kenner, Pro Se litigant

Submitted August 12, 2020

30