## PLEDGE AGREEMENT
(Securities Account-Standard-no Multi-Advisor Funds)
(Credit Extended to Debtor/Collateral Owner; Natural Person or Entity Debtor)

Dated as of November 5, 2007

This Pledge Agreement (as modified from time to time, the "Agreement") has been executed by Michael Peca, natural person(s) as debtor ("Debtor"), with Debtor's principal residence or office at c/o Phil Kenner, 10705 E. Cactus Road, Scottsdale, AZ 85259, in favor of NORTHERN TRUST, NA, a national association (together with any successor, assign or subsequent holder, acting both for itself and as collateral agent for any "Secured Party Affiliate" (as defined below), referred to as "Secured Party"), with a banking office at 2398 East Camelback, Suite #400, Phoenix, AZ 85016. If more than one person or entity executes this Agreement, "Debtor" refers to each of them individually and some or all of them collectively, and their obligations hereunder shall be joint and several. If any party comprising "Debtor" is a trustee(s), "Trust Agreement" means the governing trust agreement and/or instruments governing the trust, as modified from time to time, and all related documents and instruments, and "Debtor" also refers to the trustee(s) in its capacity as such and the trust individually and collectively. Various capitalized terms have the meanings set forth in the Section entitled "DEFINITIONS."

In consideration of Secured Party's extension of new financial accommodations or continuation of existing financial accommodations to Debtor, and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, Debtor agrees as follows:

1. **DEFINITIONS.**
    (a)    As used in this Agreement the following terms shall have the indicated meanings:

"Collateral", "Intermediary" and "Account"—see Section entitled "PLEDGE."

"Commingled Funds" means interests in so-called "common funds" and "collective funds," which are maintained by a bank or trust company. Commingled Funds are not mutual funds.

"Constituent Documents"—means the articles or certificate of incorporation, by-laws, partnership agreement, certificate of limited partnership, limited liability company operating agreement, limited liability company articles of organization, trust agreement, certificate of formation, and all other documents and instruments pertaining to the formation and ongoing existence of any person or entity which is not a natural person.

"Control Agreement"—see Section entitled "CONTROL AGREEMENTS".

"Dollar" and "$" means lawful money of the United States of America, unless otherwise specified.

"Event of Default"—see Section entitled "EVENTS OF DEFAULT."

"Guarantor" means any person, or any persons severally, who now or hereafter guarantees payment or collection of all or any part of the Liabilities or provides any collateral for the Liabilities.

"Investment Grade", as to a security, means a security bearing a current rating of "BBB-" (BBB minus) or higher by Standard & Poor's or Fitch Investors Service, or "Baa3" or higher by Moody's.

"Liabilities"—see Section entitled "LIABILITIES."

TNTC000351

"Listed," as to a security, means traded domestically on any national securities exchange or in the NASDAQ market.

"Minimum Liquidity Balance"—see Section entitled "CONTRACTUAL MINIMUM LIQUIDITY BALANCE."

"Multi-Advisor Funds" means ownership interests under the Restated Declaration of Trust of Northern Trust Multi-Advisor Funds dated April 1, 2005, as amended, restated, or replaced from time to time, and related documents.

"NT Corp Stock" means stock or other equity interests in Northern Trust Corporation, a Delaware corporation.

"Notice of Exclusive Control"—see Section entitled "ACCOUNT ACTIVITY."

The term "person" includes both natural persons and organizations.

"Rate Protection Agreement(s)" means, in each case if entered into with Secured Party or any Secured Party Affiliate, any agreement or understanding:

(i) pertaining to rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transaction of any combination of any of the foregoing (including any options to enter into any of the foregoing); or

(ii) which is any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement, together with any related schedules and confirmations thereunder.

"Related Document(s)" means this Agreement as well as any note, agreement, guaranty, Rate Protection Agreement, or other document or instrument previously, now or hereafter delivered to Secured Party or any Secured Party Affiliate in connection with the Liabilities or this Agreement.

"Related Party(ies)" means any Guarantor, any Subsidiary, and, in addition: (i) as to any Debtor which is a natural person, trusts for the benefit of Debtor; and (ii) as to any Debtor which is not a natural person, to the extent applicable, any general or limited partner, controlling shareholder, joint venturer, member or manager, of Debtor.

"Secured Party Affiliate" means Northern Trust Corporation or any direct or indirect subsidiary of Northern Trust Corporation (other than Secured Party itself).

"Subsidiary" means any corporation, partnership, limited liability company, joint venture, trust, or other legal entity of which Debtor owns directly or indirectly 50% or more of the outstanding voting stock or interest, or of which Debtor has effective control, by contract or otherwise.

"Unmatured Event of Default" means any event or condition that would become an Event of Default with notice or the passage of time or both.

"Unrestricted" means, as to a security, that the security is not in any way subject to or covered by Rules 144 or 145 of the United States Securities and Exchange Commission, as in effect from time to time,

TNTC000352

or any successor regulations, or to any stockholders' agreement or other consensual restriction on sale or transfer.

(b) As used in this Agreement, unless otherwise specified: the term "including" means "including without limitation"; the term "days" means "calendar days"; and terms such as "herein," "hereof" and words of similar import refer to this Agreement as a whole. Unless otherwise defined herein, all terms (including those not capitalized) that are defined in the Uniform Commercial Code of Arizona shall have the same meanings herein as in such Code, as such Code may be amended from time to time (the "UCC"). Unless the context requires otherwise, wherever used herein the singular shall include the plural and vice versa, and the use of one gender shall also denote the others. Captions herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof; references herein to sections or provisions without reference to the document in which they are contained are references to this Agreement.

2. **PLEDGE.** Subject to the Section hereof entitled "NT CORP STOCK AND COMMINGLED FUNDS," Debtor hereby grants to Secured Party a continuing security interest in, for the benefit of Secured Party and any Secured Party Affiliate, the following, whether now owned or hereafter acquired, wherever located (any or all of such, the "Collateral"):

(a) Securities account(s) no(s). 23-56571 with Northern Trust, NA (in its capacity as intermediary with respect thereto, "Intermediary"), in the name of Debtor or such other designation as may be required by Intermediary, any successor and/or replacement account(s), and any and all securities, security entitlements, financial assets, investment property, commodity contracts, money, instruments, documents, goods, chattel paper, accounts, general intangibles, deposit accounts, partnership and limited liability company interests, certificates of deposit, and other property and rights of any nature now or hereafter held in or constituting part of such account(s) (such account(s) and all successor and replacement accounts collectively, the "Account").

(b) With respect to any Collateral referred to in (a), but without limiting (a):

(i) all stock and bond powers, certificates and instruments;

(ii) all additions, replacements, substitutions, interest, cash and stock dividends, warrants, options, and other rights and amounts paid, accrued, received, receivable, or distributed with respect thereto from time to time,

(c) With respect to the foregoing, all products and proceeds thereof, including insurance proceeds and payments under the Securities Investor Protection Act of 1970, as amended.

3. **LIABILITIES.** The Collateral shall secure the payment and performance of all obligations and liabilities of Debtor:

(a) to Secured Party howsoever created, evidenced or arising, whether direct or indirect, absolute or contingent, now due or to become due, or now existing or hereafter arising, joint, several or joint and several, including obligations under or with respect to Rate Protection Agreements, future advances and letters of credit issued by Secured Party for the account of or at the request of Debtor and all reimbursement obligations arising therefrom;

(b) to any Secured Party Affiliate under or in connection with Rate Protection Agreements and letters of credit issued by any Secured Party Affiliate for the account of or at the request of Debtor and all reimbursement obligations arising therefrom; and

TNTC000353

(c)   to Secured Party or any Secured Party Affiliate under or in connection with: (i) Related Documents; (ii) any guaranty by Debtor of any obligations of any other person to Secured Party or (as to obligations covered by (b)) any Secured Party Affiliate; (iii) any expenses (including attorneys' fees, legal costs and expenses, and time charges of attorneys who may be employees of Secured Party or any Secured Party Affiliate, in each case whether in or out of court, in original or appellate proceedings or in bankruptcy) incurred or paid by Secured Party or any Secured Party Affiliate in connection with the enforcement or preservation of its rights hereunder or under any Related Document; and (iv) interest accruing after filing of a petition in bankruptcy

(any or all obligations and liabilities described in the foregoing portion of this Section, the "Liabilities"). This Agreement shall continue and remain in effect notwithstanding that at any particular time there may be no Liabilities outstanding. Notwithstanding the foregoing, if Debtor is a natural person the Collateral shall not secure any Liabilities subject to Regulation Z of the Federal Reserve Board unless the Truth in Lending disclosure pertaining to such Liabilities discloses the Collateral as security for such Liabilities.

4. **CONTROL AGREEMENT.** Debtor agrees to execute and deliver, and cause Intermediary to execute and deliver, to Secured Party a control agreement in the form supplied by Secured Party (the "Control Agreement"), the terms of which are incorporated herein by reference. Except as otherwise allowed hereby or by the Control Agreement, Intermediary shall act or not act with respect to the Account solely in accord with entitlement orders and instructions (including instructions to sell or otherwise dispose of any Collateral and to deliver any Collateral to Secured Party) given from time to time by Secured Party.

5. **NO MULTI-ADVISOR FUNDS.** Debtor agrees not to hold any Multi-Advisor Funds in the Account.

6. **CONTRACTUAL MINIMUM LIQUIDITY BALANCE.**
   (a)   Debtor agrees to take all steps, including placing additional assets in the Account, to ensure that the market value of the Collateral, as determined by Secured Party, at all times equals or exceeds the "Minimum Liquidity Balance" as defined below (such term also refers to the requirement to maintain such market value, as applicable). For purposes hereof "Minimum Liquidity Balance" means the greater of:

   (i) the amount necessary in Secured Party's judgment to comply with Regulation U of the Federal Reserve System as in effect from time to time, or any successor regulation; or

   (ii) the amount necessary to ensure that the outstanding amount of the Liabilities as determined by Secured Party does not exceed the sum of the below-indicated percentages of the market values of the below-indicated types of assets which are Collateral:

| | |
|---|---|
| 70% | Unrestricted Listed equity securities and convertible debt trading at more than $10 per share |
| 75% | Domestic collateralized mortgage obligations rated "AAA" or higher by Standard & Poor's or Fitch Investors Service, or "Aaa" or higher by Moody's |
| 80% | U.S. government agency securities not explicitly guaranteed by the full faith and credit of the U.S.; Investment Grade corporate and federally-tax-exempt domestic debt securities |
| 90% | Investment Grade commercial paper and bankers' acceptances |
| 95% | Securities issued by, or guaranteed by the full faith and credit of, the United States of America; money market mutual funds |
| 100% | U.S. Dollar-denominated deposit accounts with or certificates of deposit issued by Secured Party |

TNTC000354

(b) For purposes of the Minimum Liquidity Balance, mutual funds (other than money market mutual funds) will be allocated a percentage of market value corresponding to the type of assets which constitute the majority (by dollar value) of assets held in the mutual fund, as reasonably determined by Secured Party. Collateral not indicated in the above list continues to be Collateral, but its market value is not included in determining compliance with the Minimum Liquidity Balance. Collateral placed or held in a securities lending program is not included in determining compliance with the Minimum Liquidity Balance. Collateral may not be placed or held in a securities lending program if an Event of Default or Unmatured Event of Default has occurred and is continuing or would be caused thereby (including failure to maintain the Minimum Liquidity Balance). All Collateral must be acceptable to Secured Party; the list in (a) does not imply that Secured Party has agreed to accept particular assets as Collateral. The list in (a) does not take precedence over any Regulation U or other legal requirements (which requirements, as determined by Secured Party, Debtor agrees to abide by).

(c) For purposes of the Minimum Liquidity Balance, Debtor's and any other party's obligations under and with respect to any Rate Protection Agreement shall be deemed to be in the amount(s) notified to Debtor by Secured Party in Secured Party's discretion from time to time notwithstanding: (i) any other provision of this Agreement or any Related Document to the contrary; and (ii) the "notional amount" and other aspects of any Rate Protection Agreement. Neither this (d) nor any other provision of this Agreement or any other Related Document shall limit Debtor's or Borrower's obligations under any Rate Protection Agreement.

(d) The Minimum Liquidity Balance (requirement) hereunder is in addition to any requirement to maintain a "Minimum Liquidity Balance," amounts or types of assets, or borrowing base under any other agreement or instrument previously, now or hereafter executed by Debtor or any other party, unless otherwise specifically provided herein or in such other agreement or instrument.

7. **ACCOUNT ACTIVITY.**
    (a) Until Secured Party delivers to Intermediary a Notice of Exclusive Control:

    (i) Debtor will have full authority to exercise voting rights with respect to Collateral;

    (ii) Debtor may trade assets within the Account; and

    (iii) Debtor may receive and retain interest and regular cash dividends on Collateral.

Notwithstanding the foregoing portion of this (a), Debtor may not terminate or re-title the Account or (except as provided in (d) below) withdraw Collateral.

(b) If an Event of Default or Unmatured Event of Default (including failure to maintain the Minimum Liquidity Balance) has occurred and is continuing or would be caused by any action of Debtor, Secured Party may at any time give Intermediary a notice that Secured Party will exercise exclusive control over the Account (each, a "Notice of Exclusive Control"). Upon receipt of a Notice of Exclusive Control:

    (i) Intermediary will stop: (A) complying with any exercise by Debtor of voting rights with respect to the Account; (B) complying with trading instructions from Debtor with respect to the Account; and (C) distributing to Debtor interest and regular cash dividends on Collateral; and

    (ii) without limiting any other right of Secured Party, Secured Party may exercise any and all trading, withdrawal, distribution, voting and other rights with respect to the Account.

(c) Unless an Event of Default or Unmatured Event of Default (including failure to maintain the Minimum Liquidity Balance) has occurred and is continuing or would be caused by any action of Debtor, Secured Party will:

TNTC000355

 (i) not give Intermediary a Notice of Exclusive Control; and

 (ii) direct Intermediary to: (A) permit Debtor to make withdrawals from (including "free deliveries" out of) and trade assets within the Account, and to exercise voting rights with respect to Collateral; and (B) distribute to Debtor interest and regular cash dividends on assets in the Account.

(d) Intermediary will not be liable to Debtor for complying with a Notice of Exclusive Control, entitlement order or other direction originated by Secured Party, even if Debtor notifies Intermediary that Secured Party is not legally entitled to issue the entitlement order, Notice of Exclusive Control or other direction. Intermediary need not investigate whether Secured Party is entitled to give an entitlement order, Notice of Exclusive Control or other direction.

(e) Debtor shall promptly cause any interest, dividends, securities or other property received by Debtor itself with respect to any Collateral to be placed into the Account, but Debtor may thereafter withdraw any such property if otherwise allowed hereby.

(f) Notwithstanding any other provisions of this Agreement or any Related Document, Debtor agrees not to hold any Multi-Advisor Funds in the Account unless and until Debtor executes and delivers to Secured Party a so-called "redemption direction letter," replacement pledge and control agreements, and such additional documents and instruments as Secured Party may require, all in form satisfactory to Secured Party.

8. **NT CORP STOCK AND COMMINGLED FUNDS.**
 (a) Notwithstanding any other provision hereof or of the Control Agreement to the contrary or inconsistent with this (a):

 (i) the Collateral shall not include NT Corp Stock or Commingled Funds;

 (ii) balances in the Account consisting of NT Corp Stock or Commingled Funds shall be <u>excluded</u> in determining compliance with the Minimum Liquidity Balance.

(b) Debtor agrees not to (or to direct or authorize Intermediary to) sell or otherwise dispose of any other securities or assets now or hereafter in the Account in order to purchase additional NT Corp Stock (whether or not held in the Account), unless after any such sale or other disposition Debtor will be in compliance with the Minimum Liquidity Balance and no Event of Default or Unmatured Event of Default will have occurred and be continuing. Additional NT Corp Stock may be added to the Account with funds not part of or proceeds of the Account if and only if at such time the Minimum Liquidity Balance is met and no Event of Default or Unmatured Event of Default has occurred and is continuing.

(c) Debtor agrees not to hold any Commingled Funds in the Account unless Secured Party (in its capacity as such) specifically consents to such holding in writing. If Secured Party consents to any holding of Commingled Funds in the Account, such Commingled Funds shall (as provided in (a)) not be Collateral and shall be excluded in determining compliance with the Minimum Liquidity Balance.

9. **REPRESENTATIONS AND WARRANTIES.**
 (a) Debtor represents and warrants to Secured Party that:

 (i) Debtor's exact complete legal name is as set forth in the preamble hereto. If Debtor is an organization: Debtor's type of organization and jurisdiction of organization or formation are as set forth in the preamble hereto; Debtor's place of business or, if Debtor has more than one place of business, Debtor's chief executive office, is at Debtor's address set forth in the preamble hereto; and Debtor has never been organized or formed in any jurisdiction other than the jurisdiction set forth in

6

the preamble hereto. If Debtor is a natural person, Debtor's principal residence is at Debtor's address set forth in the preamble hereto. Except as and if specifically disclosed by Debtor to Secured Party IN WRITING prior to the execution hereof, during the five (5) years and six months prior to the date hereof:

    (A)    Debtor has not been known by any legal name different from the one set forth in the preamble hereto nor has Debtor been the subject of any merger, consolidation, or other corporate or organizational reorganization.

    (B)    If Debtor is a natural person, Debtor's principal place of residence has been at Debtor's address set forth in the preamble hereto.

    (C)    If Debtor is an organization, Debtor's place of business or, if Debtor has more than one place of business, Debtor's chief executive office has been at Debtor's address set forth in the preamble hereto.

    (ii)    Debtor (if Debtor is not a natural person) and any Subsidiary are validly existing and in good standing under the laws of their state of organization or formation, and are duly qualified, in good standing and authorized to do business in each jurisdiction where failure to do so might have a material adverse impact on the assets, condition or prospects of Debtor. The execution, delivery and performance of this Agreement and all Related Documents are within Debtor's powers and have been authorized by all necessary action required by law and (unless Debtor is a natural person) Debtor's Constituent Documents.

    (iii)    The execution, delivery and performance of this Agreement and all Related Documents have received any and all necessary governmental approval, and do not and will not contravene or conflict with any provision of law, any Constituent Document or any agreement affecting Debtor or its property.

    (iv)    There has been no material adverse change in the business, condition, properties, assets, operations or prospects of Debtor or any Related Party since the date of the latest financial statements provided by or on behalf of Debtor or any Related Party to Secured Party.

    (v)    No financing statement, mortgage, notice of judgment or any similar instrument (unless filed on behalf of Secured Party) covering any Collateral is on file in any public office, nor has Debtor entered into any agreement granting "control" (as defined in Articles 8 and 9 of the UCC) of any Collateral to any person other than Secured Party.

    (vi)    Debtor is the lawful owner of and has rights in or power to transfer all Collateral, free and clear of all liens, pledges, charges, mortgages, and claims other than any in favor of Secured Party, except liens for current taxes not delinquent.

    (vii)    Debtor has filed or caused to be filed all federal, state, and local tax returns that are required to be filed, and has paid or has caused to be paid all of its taxes, including any taxes shown on such returns or on any assessment received by it, to the extent that such taxes have become due.

    (viii)    Except for federal and state securities laws generally applicable to the sale, transfer or redemption of marketable securities which are held by members of the general public, sale, transfer and redemption of the Collateral by Secured Party: (A) are not prohibited or regulated by any federal or state law or regulation or any agreement binding upon Debtor, including any Constituent Document; and (B) require no registration or filing with, or consent or approval of, any governmental body, regulatory authority or securities exchange.

TNTC000357

(ix) Debtor has not acquired any Collateral in a transaction not involving a public offering within the meaning of applicable federal and state securities laws. Debtor is not an executive officer, director or other "affiliate" (as contemplated by Rules 144 and 145 of the Federal Securities and Exchange Commission) of any issuer of any Collateral.

(x) To Debtor's actual knowledge, all Collateral is duly and validly authorized and issued, non-assessable, fully paid and paid for, and outstanding.

(xi) If Debtor is not a natural person: (A) the execution, delivery and performance of this Agreement and all Related Documents are in Debtor's best interest in its current and future business operations and will materially benefit Debtor; (B) Debtor has received adequate, fair and valuable consideration, and at least reasonably equivalent value, to enter into and perform this Agreement and all Related Documents; (C) Debtor's assets at fair valuation exceed the sum of Debtor's debts; (D) Debtor is able to pay its debts as they become due; and (E) Debtor does not have unreasonably small capital with which to conduct its business.

(b) The request or application for any Liabilities by Debtor shall be a representation and warranty by Debtor as of the date of such request or application that: (i) no Event of Default or Unmatured Event of Default has occurred and is continuing as of such date; and (ii) Debtor's representations and warranties herein and in any Related Document are true and correct as of such date as though made on such date.

10. **DIRECT HOLDINGS OF CERTIFICATED AND UNCERTIFICATED SECURITIES.**
(a) This Section applies to: (i) certificated securities (if any) in the Account registered in the name of, payable to the order of, or specially indorsed to Debtor, and which have not been subsequently endorsed to the Intermediary or in blank; and (ii) uncertificated securities (if any) therein which are registered in Debtor's name on the issuer's books. This Section supplements any actions by or rights of Intermediary pursuant to any agreement between Intermediary and Debtor governing the Account.

(b) As to any such certificated securities in the Account:

(i) Debtor agrees to deliver to Intermediary the related certificates and to execute and deliver to Intermediary stock or bond powers in blank plus other related documents, all in such form as Secured Party or Intermediary request.

(ii) Secured Party and Intermediary may at any time take such other actions as they deem necessary or appropriate, including: (A) appointment of sub-agents or depositories to retain physical possession of such certificates, which may in Secured Party's discretion be held in the name of Secured Party, any such sub-agent or depository, or any nominee of the foregoing; (B) transferring such certificates into a "pledge position" or the like at any such sub-agent or depository; and (C) exchanging certificates for certificates of smaller or larger denominations.

(c) As to any such uncertificated securities in the Account:

(i) Debtor agrees to execute and deliver, and to cause the issuer of such uncertificated securities to execute and deliver, to Secured Party a control agreement in such form as Secured Party may require, in addition to the Control Agreement regarding the Account.

(ii) Secured Party and Intermediary may at any time cause such securities to be registered in Intermediary's or street name or the like.

(d) Without limiting Secured Party's and Intermediary's rights under (a)-(c) or any other provision hereof or of the Control Agreement regarding the Account: (i) Debtor agrees (and authorizes

8

Secured Party and Intermediary) to take or cause to be taken such actions, and execute or cause to be executed such documents and instruments, in connection with Secured Party's security interest in such certificated and uncertificated securities as Secured Party or Intermediary may reasonably require; and (ii) Debtor hereby appoints Secured Party and Intermediary as Debtor's attorneys-in-fact, which appointment is and shall be deemed to be irrevocable and coupled with an interest, for purposes of performing acts and signing and delivering any document or instrument on behalf of Debtor in order to effectuate this Section. Debtor immediately will reimburse Secured Party and Intermediary for all expenses so incurred. Debtor directs the issuers of, or any depository, registrar, transfer agent or similar party with respect to any of, such securities to accept the provisions hereof (without inquiry of any kind) as conclusive evidence of the right of Secured Party and Intermediary to take any action referenced above, and agrees to hold them harmless for doing so, notwithstanding any notice or direction to the contrary previously or hereafter given by Debtor or any other person.

(e)     Debtor shall be deemed to have granted a security interest in such certificated and uncertificated securities pursuant hereto and such certificated and uncertificated securities shall be subject to the other terms hereof, as in the case of other Collateral, even if under the UCC or other applicable law Debtor is treated as holding such securities directly rather than as having a security entitlement with respect thereto.

(f)     Notwithstanding any other provision hereof, at Secured Party's option such certificated and uncertificated securities shall not be included in determining compliance with the Minimum Liquidity Balance until any actions required by Secured Party or Intermediary pursuant to this Section and corresponding provisions of the Control Agreement are completed to Secured Party's satisfaction.

11. **GENERAL COVENANTS.** Debtor agrees that so long as this Agreement remains in effect, it will:

(a)     NOTIFY SECURED PARTY IN WRITING AT LEAST SIXTY (60) DAYS IN ADVANCE OF: (i) ANY CHANGE WHATSOEVER IN THE NAME OF DEBTOR; (ii) THE STATE OR JURISDICTION IN WHICH DEBTOR IS ORGANIZED OR FORMED OR, IF DEBTOR IS A NATURAL PERSON, IN WHICH DEBTOR'S PRINCIPAL RESIDENCE IS LOCATED; (iii) ANY NEW NAMES UNDER WHICH DEBTOR INTENDS TO DO BUSINESS; (iv) ANY NEW ADDRESSES AT OR FROM WHICH DEBTOR INTENDS TO DO BUSINESS. IF DEBTOR IS A REGISTERED ORGANIZATION, SUCH AS A CORPORATION, LIMITED LIABILITY COMPANY, OR LIMITED PARTNERSHIP, DEBTOR AGREES TO NOTIFY SECURED PARTY IMMEDIATELY IF DEBTOR'S STATE OR JURISDICTION OF ORGANIZATION DISSOLVES, SUSPENDS OR TERMINATES DEBTOR'S EXISTENCE OR PRIVILEGES, OR NOTIFIES DEBTOR THAT IT IS NOT IN COMPLIANCE WITH ANY REQUIREMENTS OF SUCH STATE OR OTHER JURISDICTION.

(b)     Defend the Collateral against the claims and demands of all persons other than Secured Party and promptly pay all taxes, assessments, and charges upon the Collateral. Debtor agrees not to sign, file, or authenticate, or authorize or permit the signing, filing or authentication of, any financing statements or other documents creating or perfecting a lien upon or security interest in any Collateral except in favor of Secured Party, or otherwise create, suffer, or permit to exist any liens, claims or security interests upon any Collateral other than in favor of Secured Party, except tax liens if removed before related taxes become delinquent.

(c)     Do such acts as Secured Party may request to establish and maintain a valid and perfected security interest in the Collateral free and clear of all other liens, claims, or security interests except as specifically permitted hereby.

(d)     Keep at its address for notices set forth in the preamble hereto its records concerning the Account, which records shall be of such character as will enable Secured Party to determine at any time the status thereof; and permit Secured Party, during normal business hours and upon at least three days' prior notice unless an Event of Default has occurred and is continuing, from time to time to inspect, audit, and

TNTC000359

make copies of, and extracts from, all records and all other papers in the possession or control of Debtor pertaining to the Account.

(e) Provide to Secured Party from time to time such financial statements of and other information concerning the Collateral, Debtor, and any Related Party as Secured Party shall reasonably request.

(f) Except if and to the extent permitted hereby, not sell, transfer, lease, grant a license or option or similar right with respect to, or otherwise dispose of, or agree to dispose of, any Collateral.

12. **EVENTS OF DEFAULT.** Each of the following shall constitute an "Event of Default":

(a) (i) failure to pay, when and as due, any principal payable on any of the Liabilities; (ii) failure to pay, when and as due, any interest or other amounts payable on any of the Liabilities; or (iii) failure to comply with or perform any agreement or covenant of Debtor contained herein or in any Related Document, which failure does not otherwise constitute an Event of Default, subject to any applicable notice, grace or cure period; or

(b) any default, event of default, or similar event shall occur or continue under any Related Document, and shall continue beyond any applicable notice, grace or cure period set forth in such Related Document; or

(c) there shall occur any default or event of default, any similar event, any event that requires the prepayment of borrowed money or permits the acceleration of the maturity thereof, or any event or condition that might become any of the foregoing with notice or the passage of time or both, under the terms of any evidence of indebtedness or other agreement issued or assumed or entered into by Debtor or any Related Party, or under the terms of any document or instrument under which any such evidence of indebtedness or other agreement is issued, assumed, secured, or guaranteed, and such event shall continue beyond any applicable notice, grace or cure period; or

(d) any representation, warranty, certificate, financial statement, report, notice, or other writing furnished by or on behalf of Debtor or any Related Party to Secured Party is false or misleading in any material respect on the date as of which the facts therein set forth are stated or certified; or

(e) this Agreement or any Related Document, including any guaranty of or pledge of collateral security for the Liabilities, shall be repudiated or shall become unenforceable or incapable of performance in accord with its terms; or

(f) Debtor or any Related Party (in each case if not a natural person) shall fail to maintain their existence in good standing in their state of organization or formation or shall fail to be duly qualified, in good standing and authorized to do business in each jurisdiction where failure to do so would reasonably be expected to have a material adverse impact on the assets, condition or prospects of Debtor or any Related Party; or

(g) Debtor or any Related Party shall die, be declared legally incompetent, dissolve, liquidate, merge, consolidate, or cease to be in existence for any reason; or, if Debtor is a partnership or joint venture, any general or limited partner or joint venturer of Debtor shall withdraw from Debtor, or any general partner shall become a limited partner; or the trust under the Trust Agreement shall terminate in whole or in part or be the subject of a distribution of other than income but, in the case of a distribution, only if such distribution would otherwise cause an Event of Default or Unmatured Event of Default to occur; or

TNTC000360

(h)     except for a successor trustee under the Trust Agreement, any person or entity presently not in control of a Debtor or Related Party which is not a natural person shall obtain control directly or indirectly of such a Debtor or Related Party, whether by purchase or gift of stock or assets, by contract, or otherwise; or

(i)     any proceeding (judicial or administrative) shall be commenced against Debtor or any Related Party, or with respect to any of their assets, which would reasonably be expected to have a material and adverse effect on the ability of Debtor to repay the Liabilities; or a judgment or settlement shall be entered or agreed to in any such proceeding which would reasonably be expected to have a material and adverse effect on the ability of Debtor to repay the Liabilities; or any garnishment, summons, writ of attachment, citation, levy or the like is issued against or served upon Secured Party for the attachment of any property of Debtor or any Related Party in Secured Party's possession or control; or

(j)     Debtor shall grant or any person (other than Secured Party) shall obtain or perfect a security interest in, or file any financing statement covering, any Collateral; Secured Party shall not have a security interest in any Collateral or other assets constituting security for the Liabilities, of first-priority except as allowed hereby or by the related collateral documents, and enforceable in accord with this Agreement (as to the Collateral) or the related collateral documents (as to such other assets); or any notice of a federal tax lien against Debtor or any Related Party shall be filed with any public recorder; or

(k)     there shall be any material loss or depreciation in the value of any Collateral or any other collateral for the Liabilities for any reason (except that the preceding part of this subsection shall not apply if Debtor and any Related Party are in compliance with any Minimum Liquidity Balance or other specific borrowing base or like requirement under this Agreement and all Related Documents); or Secured Party shall otherwise reasonably deem itself insecure; or, unless expressly permitted by this Agreement or the Related Documents, all or any part of any Collateral or any such other collateral or any direct, indirect, legal, equitable or beneficial interest therein is assigned, transferred or sold without Secured Party's prior written consent; or

(l)     any bankruptcy, insolvency, reorganization, arrangement, readjustment, liquidation, dissolution, or similar proceeding, domestic or foreign, is instituted by or against Debtor or any Related Party, and, if instituted against Debtor or any Related Party, shall not be dismissed or vacated within sixty (60) days after the filing or other institution thereof; or

(m)     Debtor or any Related Party shall become insolvent, generally shall fail or be unable to pay its debts as they mature, shall admit in writing its inability to pay its debts as they mature, shall make a general assignment for the benefit of its creditors, shall enter into any composition or similar agreement, or shall suspend the transaction of all or a substantial portion of its usual business.

### 13. DEFAULT REMEDIES.

(a)     Upon the occurrence and during the continuance of any Event of Default specified in (a)-(k) of the Section entitled "EVENTS OF DEFAULT," Secured Party at its option may declare the Liabilities (principal, interest and other amounts) immediately due and payable without notice or demand of any kind, **ALL OF WHICH ARE HEREBY EXPRESSLY WAIVED BY DEBTOR**, whereupon the entire unpaid principal balance of the Liabilities, all interest accrued thereon, and any other Liabilities shall thereupon at once mature and become due and payable. Upon the occurrence of any Event of Default specified in (l)-(m) of the Section entitled "EVENTS OF DEFAULT," all Liabilities (principal, interest and other amounts) shall be immediately and automatically due and payable without notice, demand or other action of any kind, **ALL OF WHICH ARE HEREBY EXPRESSLY WAIVED BY DEBTOR.** Upon the occurrence and during the continuance of any Event of Default, Secured Party may exercise any rights and remedies under this Agreement, any Related Document or other document or instrument (including any Related Document pertaining to collateral), and at law or in equity. The time of payment of the Liabilities is also subject to acceleration if an Event of Default occurs.

TNTC000361

(b)     If any Event of Default shall have occurred and be continuing, then, in addition to having the right to exercise any rights and remedies of a secured party upon default under the Uniform Commercial Code in effect in Arizona and any State in which any Collateral is located, Secured Party may, in its sole discretion:

(i) without being required to give any prior notice to Debtor apply the cash (if any) then held by it hereunder toward the Liabilities in such order as Secured Party shall determine in its sole discretion; and

(ii) if there shall be no such cash or the cash so applied shall be insufficient to pay all obligations in full, sell the Collateral, or any part thereof, at any public or private sale, for cash, upon credit or for future delivery, as Secured Party shall deem appropriate, provided, however, that Debtor shall be credited with proceeds thereof only when the proceeds are actually received in cash by Secured Party, and such sale shall be deemed commercially reasonable. Secured Party shall be authorized at any such sale (to the extent it deems it advisable to do so, in its sole discretion) to restrict the prospective bidders or purchasers to persons who will represent and agree that they are purchasing the Collateral then being sold for their own account for investment and not with a view to the distribution or resale thereof, and upon consummation of any such sale Secured Party shall have the right to assign, transfer and deliver to the purchasers thereof the Collateral so sold. Each such purchaser at any such sale shall hold the property sold absolutely free from any claim or right on the part of Debtor. **Debtor hereby waives (to the extent permitted by law) all rights of redemption, stay and/or appraisal which it now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted.** Secured Party has no obligation to marshal Collateral or to clean up or otherwise prepare Collateral for sale, and may specifically disclaim any warranties as to the Collateral, including those of title, merchantability, and fitness for a particular purpose. Secured Party may comply with any applicable local, state or federal law requirements in connection with a disposition of Collateral, and compliance will not be considered adversely to affect the commercial reasonableness of any sale of Collateral. Debtor grants to Secured Party the right to enter into or on any premises where Collateral may be located for the purposes of exercising any remedies upon the occurrence of an Event of Default. Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of Collateral if it takes such action for that purpose as Debtor requests in writing, but failure to do so shall not be deemed a failure to exercise ordinary care; no failure of Secured Party to preserve or protect any right with respect to Collateral against prior parties, or to do any act with respect to preservation of Collateral not so requested by Debtor, shall be deemed of itself a failure to exercise reasonable care in the custody or preservation of Collateral. To the extent that notice of sale shall be required to be given by law, Secured Party shall give Debtor at least ten days' written notice of any such public sale or the date after which any such private sale or sales will be held, and such notice shall be deemed commercially reasonable. Secured Party shall not be obligated to make any sale of Collateral if it shall determine not to do so, regardless of the fact that notice of sale of Collateral may have been given. Secured Party may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. In case sale of all or any part of the Collateral is made on credit or for future delivery, the Collateral so sold may be retained by Secured Party until the sale price is paid by the purchaser thereof, but Secured Party shall not incur any liability in case any such purchaser shall fail to take up and pay for the Collateral so sold; in the case of any such failure, such Collateral may be sold again upon like notice. As an alternative to exercising the power of sale herein conferred upon it, Secured Party may proceed by a suit at law or in equity to foreclose this Agreement and to sell the Collateral, or any portion thereof, pursuant to a judgment or decree of a court of competent jurisdiction. Except as and if otherwise required by law, any proceeds of the Collateral sold or disposed of pursuant hereto shall be applied toward the Liabilities in such order as Secured Party shall determine in its sole discretion. Any balance remaining shall be returned to Debtor or the party lawfully entitled thereto.

TNTC000362

(c) Secured Party may, by written notice to Debtor, at any time and from time to time, waive any Event of Default or Unmatured Event of Default, which shall be for such period and subject to such conditions as shall be specified in any such notice. In the case of any such waiver, Secured Party and Debtor shall be restored to their former position and rights hereunder, and any Event of Default or Unmatured Event of Default so waived shall be deemed to be cured and not continuing; but no such waiver shall extend to or impair any subsequent or other Event of Default or Unmatured Event of Default. No failure to exercise, and no delay in exercising, on the part of Secured Party of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies of Secured Party herein provided are cumulative and not exclusive of any rights or remedies provided by law.

(d) As to any Liabilities owed to any Secured Party Affiliate, Secured Party shall act as collateral agent for such Secured Party Affiliate and shall take or refrain from taking action, and shall distribute proceeds of Collateral and other amounts recovered hereunder or under any Related Document between such Secured Party Affiliate and Secured Party, as they shall from time to time agree. Except as and if required by law Debtor shall have no obligation or right whatsoever to inquire into any agreements or arrangements between Secured Party and any Secured Party Affiliate as to Secured Party's acting as collateral agent for any Secured Party Affiliate.

14. **RIGHTS OF SECURED PARTY.** Without limiting any other rights Secured Party has under the law, Secured Party may, from time to time, at its option (but shall have no duty to):

(a) perform any agreement of Debtor hereunder that Debtor shall have failed to perform;

(b) take any other action which Secured Party deems necessary or desirable for the preservation of the Collateral or Secured Party's interest therein and the carrying out of this Agreement, including: (i) any action to collect or realize upon the Collateral; (ii) the discharge of taxes, liens, security interests or other encumbrances at any time levied or placed on the Collateral; (iii) the discharge or keeping current of any obligation of Debtor having effect on the Collateral; (iv) receiving, endorsing and collecting all checks and other orders for the payment of money made payable to Debtor representing any dividend, interest payment or other distribution payable or distributable in respect of the Collateral or any part thereof, and giving full discharge for the same; and (v) causing any person or entity having possession of any Collateral to acknowledge that such person or entity holds such Collateral for the benefit of Secured Party; and

(c) sign, file and authenticate financing statements and related documents covering the Collateral in all public offices deemed necessary or appropriate by Secured Party.

Debtor hereby appoints Secured Party as Debtor's attorney in fact, which appointment is and shall be deemed to be irrevocable and coupled with an interest, for purposes of performing acts and signing and delivering any agreement, document, or instrument on behalf of Debtor in accordance with this Section. Debtor immediately will reimburse Secured Party for all expenses so incurred by Secured Party.

15. **WAIVER OF DEFENSES.** Except as and if otherwise provided herein, Debtor irrevocably waives presentment, protest, notice of intent to accelerate, demand, notice of dishonor or default, notice of acceptance of this Agreement, notice of any loans made, extensions granted or other action taken in reliance hereon, and all other demands and notices of any kind in connection with this Agreement or the Liabilities.

16. **SECURED PARTY MAY ALSO BE INTERMEDIARY OR FIDUCIARY.** Debtor hereby irrevocably waives, releases and forever relinquishes any claim or right of any nature whatsoever based upon the fact that Intermediary or a trustee or other fiduciary of any Debtor or Related Party is or may be Secured Party itself or a Secured Party Affiliate, and irrevocably consents to any such circumstance. The rights and powers of Secured Party shall not in any way be restricted by reason of any such present or future circumstance.

TNTC000363

17. **FURTHER ASSURANCES.** Debtor agrees to do (or cause to be done) such further acts and things, and to execute and deliver (or cause to be executed and delivered) such additional conveyances, assignments, agreements, and instruments, as Secured Party may at any time reasonably request in connection with the administration or enforcement of this Agreement or related to the Collateral or any part thereof or in order better to assure and confirm unto Secured Party its rights, powers and remedies hereunder.

18. **INVESTMENT DECISIONS.** Secured Party in its capacity as Secured Party shall have no duty or obligation to Debtor as to any adverse economic, investment, tax or other losses or consequences incurred due to actions or omissions by Secured Party with regard to purchasing, holding or selling Collateral while the same shall be under Secured Party's control.

19. **NOTICES.** All notices, requests and demands to or upon the respective parties hereto shall be deemed to have been given or made five business days after a record has been deposited in the mail, postage prepaid, or one business day after a record has been deposited with a recognized overnight courier, charges prepaid or to be billed to the sender, or on the day of delivery if delivered manually with receipt acknowledged, in each case addressed or delivered if to Secured Party to its banking office indicated in the preamble hereto (Attention: Banking) and if to Debtor to its address indicated in the preamble hereto, or to such other address as may be hereafter designated in writing by the respective parties hereto by a notice in accord with this Section.

20. **MISCELLANEOUS.** This Agreement, the Related Documents, and any document or instrument executed in connection herewith or therewith, unless in each case otherwise specifically provided therein: (i) shall be governed by and construed in accordance with the internal law of the State of Arizona, except to the extent if any that the UCC provides for the application of the law of a different State; and (ii) shall be deemed to have been executed in the State of Arizona. This Agreement shall bind Debtor, its(his)(her) heirs, trustees (including successor and replacement trustees), executors, personal representatives, successors and assigns, as well as all persons and entities who become bound as a debtor to this Agreement, and shall inure to the benefit of Secured Party, its successors and assigns, except that neither Debtor nor any person or entity who or which becomes bound as a debtor hereto may transfer or assign any rights or obligations hereunder without the prior written consent of Secured Party. Debtor agrees to pay upon demand all expenses (including reasonable attorneys' fees, legal costs and expenses, and time charges of attorneys who may be employees of Secured Party, in each case whether in or out of court, in original or appellate proceedings or in bankruptcy) incurred or paid by Secured Party in connection with the enforcement or preservation of its rights hereunder, under any Related Document, or under any document or instrument executed in connection herewith or therewith. This Agreement may be executed in two or more counterparts, and (if there is more than one party) by each party on separate counterparts, each of which shall be deemed an original but which together shall constitute one and the same instrument.

21. **WAIVER OF JURY TRIAL, ETC.** DEBTOR AND (BY ITS ACCEPTANCE HEREOF) SECURED PARTY HEREBY IRREVOCABLY AGREE THAT ALL SUITS, ACTIONS OR OTHER PROCEEDINGS WITH RESPECT TO, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY RELATED DOCUMENT SHALL BE SUBJECT TO LITIGATION IN COURTS HAVING SITUS WITHIN OR JURISDICTION OVER THE STATE OF ARIZONA AND THE COUNTY IN SUCH STATE WHERE THE OFFICE OF SECURED PARTY INDICATED IN THE PREAMBLE HERETO IS LOCATED. DEBTOR AND (BY ITS ACCEPTANCE HEREOF) SECURED PARTY HEREBY CONSENT AND SUBMIT TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURT LOCATED IN OR HAVING JURISDICTION OVER SUCH COUNTY AND STATE, AND HEREBY VOLUNTARILY, KNOWINGLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT THEY OR ANY OF THEM MAY HAVE TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) BETWEEN OR AMONG DEBTOR AND SECURED PARTY ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, ANY

TNTC000364

RELATED DOCUMENT, OR ANY RELATIONSHIP BETWEEN SECURED PARTY AND DEBTOR, TO TRANSFER OR CHANGE THE VENUE OF ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ACCORDANCE WITH THIS SECTION, OR TO CLAIM THAT ANY SUCH PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. NO PARTY HERETO MAY SEEK OR RECOVER PUNITIVE DAMAGES IN ANY PROCEEDING BROUGHT UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY RELATED DOCUMENT. THIS PROVISION IS A MATERIAL INDUCEMENT TO SECURED PARTY TO EXTEND CREDIT SECURED BY THE COLLATERAL.

22. **AMENDMENT & RESTATEMENT.** This Agreement amends, restates, renews and replaces in its entirety the Pledge Agreement dated March 31, 2006 among the same parties. All amounts outstanding under or secured by such prior Pledge Agreement shall be deemed automatically outstanding under and secured by this Agreement.

To the maximum extent permitted by applicable law, Secured Party is hereby authorized by Debtor without notice to Debtor to fill in any blank spaces and dates herein or in any Related Document to conform to the terms of the transaction and/or understanding evidenced hereby.

THIS WRITTEN LOAN AGREEMENT AND THE RELATED DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

DEBTOR: _____
Michael Peca

ACCEPTED:

NORTHERN TRUST, NA
By: _____
Aaron Mascarella
2nd Vice President

TNTC000365