September 2, 2020

The Honorable Judge Bianco
U.S. District Court – EDNY
100 Federal Plaza
Central Islip, NY 11722

**Re: <u>Rebuttal To Government Reply Of Motion To Stay Partial Forfeiture</u>**

Your Honor,

The government makes two main claims to argue against a stay of forfeiture for the Diamante Cabo san Lucas property and its sub-owner LLCs (specifically Baja Ventures 2006, LLC).   First—they suggest that Kenner must wait until after sentencing to file his Motion to Stay.   Second—they suggest that the Kenner cannot succeed on the merits—despite Kenner making a 'narrow' argument surrounding the funds loaned and utilized by an *innocent* third-party, to the instant case (Ken Jowdy).[1]   Part and parcel to the *authorized* loans—Jowdy acquired a portion of his personal LLC capital contribution (KAJ Holdings—*only* $350,000 tied to the Hawaii loans).   Nevertheless—**they are from *authorized* transactions**.   Kenner believes they are wrong in both instances—and the Court should stay the forfeiture in the interest of justice.

> In the *United States v. Contorinis*, 692 F.3d 136 (2d Cir 2012), the Court "observed that neither the language of the criminal forfeiture statute nor Circuit case law supported the proposition that a defendant must forfeiture proceeds that 'go directly to an innocent third party and are never possessed by the defendant'" *Id.* at 147.

Separating the criminal from their ill-gotten gains; see *United States v. Shkreli*, 2019 U.S. Appx. LEXIS 21248 (2nd Cir 2019).

> The Shkreli Court opined: "Criminal forfeiture focuses on the disgorgement by a defendant of his ill-gotten gains."  *United States v. Contorinis*, 692 F.3d at 146 (internal quotation marks omitted); *United States v. Torres*, 703 F.3d 194,

---

[1] See probation's July 2016 addendum affirmation of Jowdy being an: *"innocent victim" (at 1)* **one year after trial**—*echoing the government's trial themes*—while probation misrepresented to the Court that Jowdy testified at the forfeiture hearings, similar to their misrepresentations that Gaudet and Kaiser testified during the government's forfeiture hearing in the same addendum; all wholly inexcusable to support enhancement arguments—after Kenner *debunked* their prior assertions.  *Has anyone asked how probation—an independent arm of justice—identified people who were <u>never</u> there regarding their specific testimony?*

203 (2nd Cir 2012) ("'[F]orfeiture is gain based' not based on the losses (or gains) to victims." (internal quotation marks omitted)); *Shkreli* at 6-7.

The government also cites case law that suggests even when Kenner has the case reversed thru appeal—the government can recompense Kenner and his Baja Ventures 2006, LLC partners (Jozef Stumpel and Jere Lehtinen) for any monetary damage that has occurred due to government overreach during the proceedings. That could be satisfactory, but in the context of the government's resistance to their own evidence being admitted as the truth (after they admitted it)—like *government-forfeiture-44* which confirmed the legitimacy of Jowdy receiving and documenting the loans FBI agent Galioto and the government have denied to the investors for over a decade—Kenner finds any future cooperation impractical at a minimum.  In addition—the wasted government resources to deal with future proceedings to recover and repay Kenner, Kenner's partners—Stumpel and Lehtinen, and Baja Ventures 2006, LLC proper value (perhaps between $10 million and $100 million) appears to offer years of unnecessary court time after exhausting what has been years of government misdirection and graft already.   It should give the Court pause to proceed without an abundance of caution—perhaps considering that after the government's forfeiture submissions—*clearing the Baja Ventures 2006 capital account of any ill-gotten funds*—the government ignored their own exculpatory evidence and alleged—again 4-years later—that "*Kenner used approximately $2.4 million to buy a personal stake in property in Mexico.*" (*ECF No. 765 at 8*).[2]  **Still false!**

---

[2] If this nonsense had any validity, then Kenner and his Baja Ventures 2006 partners would have a $6.5 million (or more) capital account in the Cabo san Lucas project. Jowdy documented $2.5 million for Baja Ventures 2006—only (*Ex. EE: [May 17, 2007 Attorney Madia 'update' email: verified thru testimony* by John Kaiser to the FBI October 19, 2010 *(Ex. B at 3: "update Letter on Hawaii project – JK yes I recall letter PK made these many times")]: "Phil discussed [with Jowdy and Najam] misrepresentations and documentation issues raised by Phil at our last conference call including the $2.3 million capital account for CSL Properties, 2006, LLC (your investment LLC as attached) and the $5 million capital account for Baja Ventures 2006, LLC (the investment LLC for Phil, Stumpel, and Lehtinen that made all the initial investments before Lehman agreed to fund).  Phil discussed the 40% (Baja Ventures 2006) – the 40% (CSL) – 20% (Jowdy) equity split getting fixed that Jowdy changed for the closing with promised to reapplicate post funding…This also included their refusal to now address the Hawaii loan repayments like they don't exist.*").  This was well known and documented to all investors once discovered—post Cabo closing. *Government-forfeiture-36* (their own money-tracing submission) also proves it—notwithstanding Kenner's $1 million or so in expense contributions, purposely unaccounted for by Jowdy once Kenner exposed him (*Ex. FF: hi-lighting another $375,000 in Mexico expenses Kenner contributed—left unaccounted by Jowdy's fraud*). The government exculpatory evidence confirmed that Jowdy stole $1.6 million of those funds from the Stumpel deposit of 5-23-2005 to Jowdy's LOR Management account (*government-forfeiture-36*)—and was sued for it in Mexico in 2008 (*Ex. GG*).  The government does nothing about it.  Stumpel's Mexico litigation versus Jowdy was terminated in 2012 after John Kaiser gave his umpteenth "forgery" lie testimony (*ECF No. 112-9 at 1-4*); *debunked* as *another forgery fraud by Kaiser* on one of many 2012 FBI recording by Kaiser-Jowdy co-conspirator, Bryan Berard.

Ultimately—the government makes another, yet typically fruitless argument in misdirection about the Cabo project.  The government suggests, "*A stay will substantially injure the interests of Kenner's and Constantine's defrauded clients…*" (*ECF No. 869 at 6*).  The alleged victims have no ties—in the instant case—to the Cabo project.  In fact—in a 2017 press release encouraged by FBI agent Galioto—the Cabo "CSL Properties" investor group grandstanded about their "strong" support for Ken Jowdy as their *leader*; specifically because the FBI and the government have hidden the truths of *who really stole their money (See ECF No. 667—and Government July 3, 2020 submission).*[3]

Following the government and FBI misrepresentations to the Hawaii and Mexico investors, CSL Properties 2006, LLC attorney, Steve Main, announced the 'thorough' work of the collective DOJ agencies related to Jowdy; *professing Jowdy's innocence.*[4] How could this possibly change, now?   The government's manufactured theory is that Hawaii investors did not authorize 'legal' elements of the Hawaii project's operating agreement (*infra*)—with the results of the allegations (the Jowdy loans)— the sole remaining asset of the project that alternatively would have been a 100% loss as a result of the 2009 global real estate recession; not Kenner as the government has specifically acknowledged (*Tr.4588*).  They continue, "*…several of whom have an ownership interest in the DCSL property and could be compensated from the proceeds of the sale.*"   The mere fact that there are similar owners in the Cabo and Hawaii project has no relevance.  If the government suggests that a sale of the DCSL property is going to recompense alleged victims, *here*, other 3rd-party owners benefits are irrelevant (even if they are the same-Jowdy-supporting investors).  The government has shown—notwithstanding their current and

---

[3] John Kaiser explained to the Court in February 2019, "*Jowdy would like the court to think that Kenner stole $7 million from the hockey players and others…*" (*ECF No. 628 at 1*).  Kaiser and Berard spread these rumors—with complicity—since their 2011 engagement to Jowdy.  **Noting**: Jowdy is also not making these brazen pronouncements without the support of FBI agent Galioto.  Alternatively—Galioto could have *debunked* it with the truth in a single phone call to attorney Steve Main or the investors.  *He has not—because he is complicit in the cover-up since 2009.*

[4] Without any foundation—CSL Properties investors'-attorney Steve Main declared via email February 20, 2017:

 "*Finally for those of you who are convinced that Jowdy is guilty of some crime… I simply note that the circumstances surrounding the Diamante del Mar project and the Cabo project (and the relationship between Kenner and Jowdy) has been exhaustively investigated over several years by the FBI, SEC and the U.S. Attorney of the EDNY.*"

- What percent of "*exhaustively*" was not exhausted by the government's deep-dive in their July 3, 2020 submission—that was *stunningly* unknown to Galioto's investigative team since Kenner explained it in 2009?

- The Court should ask where the decade-plus cover-up began—and how?

separate issues with Jowdy and Danske bank (as previous hi-lighted by Kenner in 2009; 11 years ago)—that they are detached from the causal effects of their forfeiture actions (devaluation of the DCSL project) related to any of the investors—with irreparable investor harm on their proverbial plate due to forfeiture overreach.

*Case Law...*
The district court may stay the order of forfeiture "on terms appropriate to ensure that the property remains available pending appellate review."  Fed R. Crim. P. 32.2(d).  The language does not read 'when an appeal is pending'; just the opposite, as Justice Scalia would have opined as a Constitutional textualist.  Considering the seven years of contention to date, *here*, it is obvious thru previous filings, that an appellate review is ***pending;*** with only the government's 5-year delay on sentencing holding it up (originally scheduled November 2015).  There is nothing textual that substantiates it needs to be currently filed.   If it has not been clear about Kenner's intention to appeal certain elements *here*, appellate review of the Baja Ventures 2006, LLC forfeiture is *pending*.  "The purpose of the provision is to ensure that the property remains intact and unencumbered so that it may be returned to the defendant in the event the appeal is successful."; *Id*. advisory committee's notes to the 2000 amendments.   Kenner is not filing the appellate review—as the government suggests *citing Dillon v. United States (N.D. Tex 2018)*—but rather is petitioning the Court to use caution considering the extenuating circumstances, *here*.[5] "[T]he law governing when a district court should exercise its discretion to stay a forfeiture order has not been extensively developed."  *United States v. Davis*, No. CRIM.A 07-CR-11 (JCH), 2009 U.S. Dist. LEXIS 127153, 2009 WL 2475340, at *2 (D. Conn. June 15, 2009).   The government agrees with this by stating, "while neither Rule 32.2(d) nor precedent in the Second Circuit expressly articulate a standard for stays..." (*ECF No. 869 at 4*).   Then—the government follows by quoting the long-standing precedent in *United States v. Grote* (of 2020) as its standard.  It is double-talk to avoid the stay—regardless of the similar *Silver* or *Grote* standard, when all elements of the exculpatory evidence and common sense promote finding in the defendant's favor.   The proposed interlocutory sale—or similar to dissolve the project—conflicts with the provision, and irreparable harm 'of project success

---

[5] The global pandemic has dramatically delayed the proceedings (but only since April 2020), further delaying the defendant's ability to continue with appellate issues under a more normal timetable afforded to cases closer to the heartland of timeliness.   The government's position is that "[b]ecause it is not uncommon for sentencing to be postponed for an extended period to allow the defendant to cooperate with the government in an ongoing investigation"; *United States v. Bane*, 2018 WL 9963872, at *2 (MD Fla January 8, 2018), aff'd, 948 F.3d 1290 (11th Cir 2020), a delay is normalized (*ECF No. 869 at 3*).
  • That could not be further from the fact pattern *here*.

for everyone' would be done to the value of Baja Ventures 2006, LLC and the DCSL resort's long-term aspirations of its management team and lender, Danske Bank.

*Succeeding on the merits...*
Well-seasoned Supreme Court and 2nd Circuit case law confirms the century-plus old adage that "*if you sign it—you own it*" (*See Upton v. Tribilcock*, 91 U.S. 45, 50, 23 L. Ed. 203 (1875) and its progeny, *infra*).  Although the government continues to rely on investor's testimony that they did not give permission to use their LOC investment funds—or recall the details of their passive-equity investment (thru *faulty memory, confusion and mistakes*), there is no evidence that anyone ever raised an issue in the decade-plus prior to trial, in fact *only the opposite is true*.  A detailed evidentiary hearing would expose their fallacy and leave no hole in the *authorization* of every investment dollar—from cradle-to-grave—and the follow-up acknowledgement of the 'used "*investment*" funds' (for *indisputable verification* of use).  It continues to be an irrational standard that the actual exculpatory evidence—available to the Court and the government (*Kenner trial exhibit 210, received in week 7 at Tr.4205-06*)—of unfettered authorizations are a "trier of fact" issue.  They are all *signed authorizations* from the same individuals who—up to 12 years after the events in question—now (in 2015)—have no recollection of their overtly documented participation.  At a minimum (subsequent to their signed authorizations)—they participated in well-documented conference calls and cross-corroborated email "*updates*"[6] from their 3rd party attorneys who were involved in the same transactions (*Ex. C: one of several "updates" Managing Member, Kaiser, verified unambiguously in 2010 to the FBI: "based on the meetings John Kaiser had with Ken [Jowdy] before we agreed to lend him the money in 2004..." et.al.*).  In fact— John Kaiser verified the five (5) independent meetings *he had with Jowdy* to the FBI on October 19, 2010, as well (*Ex. B at 2, 3, 10*: hi-lighting amongst other exculpatory statements "*never got $ back from KJ/Mexico*").

• It defies logic to deny the *authorization*—that the Hawaii By-Laws-*authorized* loans (*Ex. D*: "*At the sole discretion of the Managing Member, Little Isle 4, **may participate as a lender** if deemed by the Managing Member to be in the best interest of the LLC....The Managing Member, at their sole discretion, can engage in outside ventures deemed to be in the best interest of the LLC, including but not limited to other Private Equity Funds and **Lending Opportunities**.*")—Coupled with the multitude of unopposed pretrial exculpatory verifications by:

---

[6] As the Hawaii Managing Member, John Kaiser, *verified thru testimony* to the FBI on October 19, 2010 that: "*update letters in Hawaii project...PK made these many times*"—and re-verified by clarifying to the FBI agents, "*yes, I recall the letters*".  **Noting:** The FBI had these "*updates*" and presented them in-person to Hawaii Managing Member, John Kaiser, on October 19, 2010 (*Ex. B at 3*).

(1) FBI proffer verifications (*Ex. B at 2, 3, 10 [Kaiser]; Ex. K at 2-4: "PK-told SG $ in Hawaii will be loaned to KJ [Jowdy]" [Gonchar—noting the future tense of the language in the raw notes]; Ex. M at 12-14: "$ from - $ from PK loans -> Little Isle IV -> Ula Makika" [Jowdy]*)—**Noting**: FBI agent Galioto was present for these <u>face-to-face</u> meetings;

(2) The Hawaii attorney "*updates*" (*Ex. C*)—verified by Managing Member Kaiser (*Ex. B at 3*);

(3) The signed Northern Trust *Letters of Authorization* (*Ex. E*); [7]

(4) The 2009 arbitration testimony (*Ex. F [Berard], Ex. G [Kaiser]*);

(5) The 2009 arbitration signed affidavits (*Ex. H [Stumpel]; s [Norstrom: 3500-MN-2]; Ex. J [Gonchar: 3500-SG-4]*);

    a. **Noting:** the FBI had possession of the 3500 exculpatory materials years before the 2013 indictment of Kenner—but alleged criminal activity in opposition to their <u>signed</u> affidavit disclosures—versus Kenner.

(6) The Arizona litigation to recover the funds; detailing the corporate transactions with full transparency (*Ex. N: transactions at 5-12*);

(7) The nineteen (19) <u>signed</u> attorney Baker disclosures regarding the Arizona complaint versus Jowdy to recover the loans (*Ex. O*) (**withheld by the government pretrial—constituting a *Brady* violation**);

(8) The two California litigations to recover the loaned funds (*Ex. P: loan details at 7 [DDM v. Jowdy]; Ex. Q: loan details at 7 [DCSL v. Jowdy]*);

(9) The Nevada litigation specifically identifying the authorization of the loans (*Ex. R at 3: Glen Murray*);

(10)       The Gaudet witness verification thru Jowdy's Nevada counsel—verifying the 2004 Hawaii loan agreement (*Ex. S*);

(11)       The myriad of Mexico testimonials and criminal litigation to recover the funds (*ECF No. 112-9 at 1-4: ironically signed by Kaiser—and later refuted*

---

[7] Both Sydor (*Ex. U at 20-21*) and Peca (*Ex. T at 38-39*) <u>*verified thru testimony*</u> that they signed the Northern Trust *Letters of Authorization* to the 2011 SDNY Grand Jury; ("It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained.") *Upton v. Tribilcock*, 91 U.S. 45, 50, 23 L. Ed. 203 (1875) (*Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 34 (2d Cir 1997) (holding persons have a "basic responsibility…to review a document before signing it.").   A seasoned federal judge completed the rhetorically similar colloquy with Nolan's 2009 Arizona arbitration attorney (Day 5 at 1049):

Mr. Meeks [Nolan's attorney]:   *He [Nolan] admits that's his signature. His testimony is he wasn't aware.*

Judge Meyerson:   *So somebody signs a statement that says, <u>Please grant Philip A. Kenner access to a line of credit for direct deposit into Little Isle 4.</u>   Doesn't somebody have to take responsibility for that?*

    **Noting**: Nolan produced his Northern Trust *Letter of Authorization* during his 2009 arbitration production [*Bates stamp: Nolan 00649*]—further defying logic of Nolan's lack of specific knowledge (*Ex. HH: titled—"Arbitration Exhibit No. 38"*).

as 'forged' after his employment[8]) (Norstrom[9]—referencing deVries and Murray testimony);

---

[8] Berard was caught verifying the Kaiser signature during a 2012 FBI recording—exposing one of Kaiser's forgery lies to this Court, the FBI, and the U.S. Attorneys office—if anyone cared [Berard at 9:40]: *"We did not make testimonies, we waited outside forever, it took too long, we actually signed FAKE, not FAKE, uhh, we signed BLANK PIECES OF PAPER, with our signatures..."*

- **Noting:** Mexico court **testigos** (testimonials) are signed on the edge of the paper (blank) and then the testimonial language is transcribed by the Prosecutor and printed **over** the '*ink*' as a form of courtroom/notary authentication.   Thus—every testigo is signed 'blank' prior to its courthouse printing—as Berard **verified**...confirming yet another Jowdy-cabal lie about forgeries without consequence when protected by the FBI.
    - Clearly—someone presented Kaiser's testigo to the FBI &/or U.S. Attorney, *here*, an act punishable under *18 U.S.C. 1001 (but not to the "anointed" – Thomas Sowell)*; specifically relevant for a star-witness who has claimed his name 'forged' in multiple jurisdictions—and proved a liar in each instance thru empirical evidence and surreal *debunking* circumstances.

[9] After their 2012 criminal testimonies in Cabo versus Jowdy—Rem Murray and Greg deVries *independently* contacted the other Hawaii-Mexico investors—including Norstrom (**the biggest Jowdy victim other than Kenner and Stumpel**).   They explained the first-hand threats and harassment towards them by Berard and Jowdy's security henchmen in Mexico while in Mexico to give criminal testimony versus Jowdy's cabal.  After Norstrom's *independent* communication with Murray and deVries—he *independently* contacted Kenner to offer testimony versus Jowdy's cabal:

| 1 5 2 2 7 | +4670887 4363 **Mattias Norstrom** | 2/7/2013 4:01:48 AM(UTC+0 ) | R e a d | [Norstrom]: Hi Phil You need me to make a trip to Cabo? If you're available later tonight can I call? Long and costly trip! |
|---|---|---|---|---|
| 1 5 2 4 4 | +4670887 4363 **Mattias Norstrom** | 2/8/2013 2:15:55 AM(UTC+0 ) | R e a d | [Norstrom]: E mail me info and then let's talk when we can. Talked to Devo [deVries] and Rem [Murray] last week. |

Despite Norstrom's knowledge of the serious threats and harassment in Mexico—Norstrom flew from Sweden to Mexico and testified versus Jowdy (only 6-days later) in a one-day round-trip. Immediately after his February 14, 2013 testimony in Cabo san Lucas—Norstrom flew to Phoenix to meet face-to-face with Kenner—and then back to Sweden:

| 1 5 3 2 | +4670887 4363 Mattias Norstrom* | 2/14/201 3 2:39:16 AM(UTC+0 ) | R e a d | [Norstrom]: On a cunthair!! **Onboard, good to see you** Talk soon |
|---|---|---|---|---|

Norstrom then spent time confirming to other investors that he was continuing to support the expensive legal efforts versus Jowdy—after Constantine exhausted the GSF legal budgets—despite Galioto's threats to '**STOP**':

| 1 6 6 3 6 | +4670887 4363 Mattias Norstrom* | 4/10/201 3 10:04:19 PM(UTC+0 ) | R e a d | [Norstrom]: I got an e mail from Jere [Lehtinen] Mon. He asked If I had given some money. I answered that I had the last 2 years all going towards legal efforts in Mexico. |
|---|---|---|---|---|

(12)    Kaiser (*Tr.1127*) and Murray's (*Tr.3608*) verification of possession of the Jowdy-loan agreement at their homes; and

(13)    Murray's verification of the Jowdy loan thru multiple discussions *independent* of Kenner (*Tr.3540*), etcetera...

> *Q: My question is, sir, do you have an understanding, based upon conversations you have had with individuals, that as relates the Hawaii investment, the Hawaii project, Ken Jowdy also, by virtue of a loan made to him for monies from the Hawaii project, has not paid that back?*
>
> *A [Glen Murray]:* **Correct. No, he hasn't***.*

With all of this exculpatory evidence in front of the Court—it would make all Hawaii partners complicit in the scheme to defraud themselves (at a minimum); *see Alexander*.[10]

- There was no controversy with the Jowdy loans until FBI agent Galioto, Jowdy, Kaiser, and Berard convinced Kristen Peca that Kenner '*stole*' the loan money and never **gave it to Jowdy** (*and only after Michael Peca's exculpatory March 2011 SDNY Grand Jury testimony verifying his unfettered knowledge of it all: Ex. T at 30-33, 35, 40, 42, and 45*).  Paradoxically—Galioto did not tread '*there*' during his initial coercion attempts to Kristen Peca and others (pre SDNY Grand Jury)— because Galioto knew they were aware of the loans.[11]  Galioto needed to ease into that fabrication over time thru wild promises of recovery from Kenner— based on Jowdy's innocence, *supra*—because the reality (as it still exists today) is that there is '*no there, there*'.

Kenner requests an evidentiary hearing if a motion to stay is not granted on the pleadings.  The exculpatory evidence is incontrovertible (more details *infra*)—about full knowledge and unambiguous authorization by *every* involved party.   Yet—the government supports its forfeiture position because "*this court found that the DCSL interest was forfeitable because it was purchased with traced stolen or diverted client funds intended for other purchases...*" (*ECF No. 869 at 5*).   The transactions—

---

[10] At sentencing, "the Court is virtually unfettered with respect to the information it may consider." *United States v. Alexander*, 860 F.2d 508, 513 (2d Cir 1988).

[11] [Kristen Peca]: *Matt [Galioto] told Michael and I that you stole all of the Hawaii money and never gave it – the loan money -- to...uhhhh...Jowdy.*

- Kristen Peca (on the 2012 recording)—like Nolan's attorney in 2020 (*ECF No. 843*)—*exhibits no concerns for the well-known loans to Jowdy via the Hawaii "contributions" in the real estate at "the heart of this matter"*—merely alleging Kenner "*stole*" it and never gave the known-loans to Jowdy...*yet still untrue*...

traceable to the Cabo project[12]—are exactly what *everyone* prior to trial expected to happen; minus the non-re-payment by Jowdy; *See United States v. Archer*, 671 F.3d 149, 169 n.13 (2d Cir 2011).[13]

- **Noting**: Jowdy confessed to the loans during his January 2010 California deposition in front of Hawaii Managing Member John Kaiser.   Kaiser never 'stopped' the proceeding—or raised the issue of some 'unknown' loans—or clarified for the record that Kenner made them without authorization or knowledge of the entire investment group; neither did Hawaii-Mexico investors Greg deVries or Jason Woolley—both present as well.

- **In fact**—the Hawaii-Mexico investors' attorney and Jowdy's attorneys were present for the two-day depositions in California—affording the perfect time to 'set the record straight'…***but it already was***.

Inarguably—every transaction in the Hawaii investment was *authorized* by the necessary *signed* investor documents and corporate documents; and expected.   The fact that the government prosecutorial narrative does not fit the facts in the case and the underlying exculpatory evidence—does not make it the truth based on

---

[12] Darryl Sydor 2011 SDNY Grand Jury (*Ex. U at Tr.25-26*):
- Michael Peca and Tuner Stevenson corroborated Sydor's 2011 SDNY Grand Jury testimony—the same day:

  *Q:  Was that [the LOC at Northern Trust Bank] also for Little Isle 4 as far as you know?*
  *A [Sydor]: Yes, ==but then we put it towards a short-term loan to Mr. Jowdy until Lehman Brothers came up with the money that was supposed to be paid back.==*"

  *Q: Did you know in advance that it was going to be used, this Little Isle 4 money, to be used to salvage the Cabo investment?*
  *A [Sydor]: ==Yes==.  It was to help with the short-term loan to keep funding the Cabo, but then its supposed to be paid back, but that's –*

  *Q: Paid back to you or to Little Isle 4?*
  *A [Sydor]: Paid back to Little Isle 4.*

  *Q: So –*
  *A [Sydor]: ==Back to Hawaii, not me personally==.*

  *Q: But that didn't happen?*
  *A [Sydor]: That didn't happen.   And Lehman came up with the $129 million loan. It was supposed to be back at closing.*

- Sydor even *verified thru testimony* that he knew his LOC "*investment*" funds were all contributed to his Little Isle 4 capital account.   this is verified on Sydor's signed Northern Trust Extension of Credit document.

[13] The Second Circuit opined in *Archer*, "[i]f a person gives the defendant his money to bet, knowing that the bet might lose, his later loss, for purpose of restitution, is, in this fundamental sense, caused not by the defendant accepting his money but by the outcome of the bet." 671 F.3d at 171.

vehement advocacy.  In fact—in contradiction to the typical heartland fraud case—the government's forfeiture has zero ties to any "proceeds" received by Kenner in the DCSL project or similar based on the Little Isle 4 *authorized* distributions.

During the July 2, 2019 hearing, Judge Bianco denied any *Fatico* hearing, while verifying that he was only considering charged conduct in his calculations—while restating the government's previous statements—and other rulings (*Tr.33*):

> *[Judge Bianco]: "I just want to make clear that I think I've said this before, but it is in the court's view and its consistent with the government's letter to the court, you know, two years ago that we're not – <u>that the government is not seeking to hold the defendants accountable for any uncharged frauds.</u>  The scope of sentencing relates only to the frauds that were proved at trial…"*

In nearly identical forfeiture circumstances, the Seventh Circuit Court of Appeals denied the government's misplaced reliance on *Contorinis* (2nd Circuit) in *United States v. Burns*, 843 F.3d at 690-91 (7th Cir 2016), relying on the fact that any funds still had to be deemed "ill-gotten proceeds" to satisfy a defendant's forfeiture.   The same analysis is relevant here.   The Court defined "proceeds" in 18 U.S.C. § 981(a)(2)(A) or (B), as:

> "Under either section, the defendant must forfeit 'proceeds'; the difference in the subsections is in how 'proceeds' is defined.  Put simply, 'proceeds' may mean either 'receipts' (in subsection (A)) or 'profits' (in subsection (B)).

In a textual analysis, under Justice Scalia's process, the Court would recognize that Kenner has no "ill-gotten proceeds" by definition; certainly none that the government falsely doubled-down about in their sentencing memo regarding the Cabo san Lucas investment (*ECF No. 765 at 8*).   The $350,000 was received by Jowdy on 5-4-2005 (*government-forfeiture-36*) thru the loan agreement (*Ex. M at 24-25; acknowledged by Kaiser to Galioto, Ex. B at 3: "=was Agreement to borrow $ from Hawaii –"; that "he needed", Ex. DD at 6-7; as authenticated by Jowdy and the loan signature witness, Gaudet, in Glen's Murray's Nevada trial versus Jowdy, Ex. S*).   Jowdy solely utilized the funds for his KAJ Holdings, LLC capital account.  Statute agrees it could be *disgorged*—assuming the lending provision in the Little Isle 4 By Laws (*Ex. D*) was so irrational that it was deemed criminal—up to 12 years after its execution and acknowledgements by all involved (*infra* and *supra*).   *Here*—the government has ignored typical disgorgement precedent, where its primary purpose "is to deprive violators of their ill-gotten gains".   *SEC v. First Jersey SEC. Inc.*, 101 F.3d 1450, 1474 (2d Cir 1996).   Their approach also contradicted the Second Circuit decision in *United States v. Contorinis*, 692 F.3d 136 (2d Cir 2012) ("Criminal forfeiture focuses on the disgorgement by a defendant of his 'ill-gotten gains'") *Id*. at

146; further opining that "[e]xtending the scope of a forfeiture to include proceeds that have never been acquired either by a defendant or his joint actors would be at odds with the broadly accepted principle that forfeiture is calculated based on a defendant's gains.").

**Success on the merits**: *Details of unfettered knowledge and authorizations…*
- *Specific exculpatory authorizations and knowledge confirmations by all Hawaii partners…*

*The sole corporate control document—Little Isle 4 By Laws…(Ex. D)*
The 2004 Little Isle 4 By-Laws governed the Hawaii project and the loans to Jowdy. The corporate control document specifically expressed <u>authority to lend</u>; beginning on page 1 of the agreement:
**Article II. Purpose**
> *Little Isle IV, LLC is an organized group of investors established to <u>**invest in a series of opportunities**</u> review[ed] by the Managing Member [Kenner] and deemed in the best interest of the partnership at all times.*
>
> *<u>At the sole discretion of the Managing Member,</u> Little Isle 4, <u>**may participate as a lender**</u> if deemed by the Managing Member to be in the best interest of the LLC.*
>
> *The Managing Member, <u>at their sole discretion,</u> can engage in outside ventures deemed to be in the best interest of the LLC, <u>including but not limited to other Private Equity Funds and</u> <u>**Lending Opportunities**</u>.*

*The Little Isle 4 By-Laws—consulting payments…*
Regarding (1) the consulting agreements (with Constantine and 16 other hard moneylenders); (2) hiring employees; (3) hiring 3rd party vendors (for legal, architecture, engineering, planning) etcetera—the Little Isle 4 By-Laws expressly granted those rights to the Managing Member (Kenner at the time) (*Ex. D at 2*):
> *Section 5.   The Managing Member [Kenner], at their sole discretion, <u>**can compensate any and all members and non-members for their roles in the LLC**</u>, including but not exclusive to the Managing Member.*

*Hawaii COO Manfredi verified the consulting agreements to the FBI in 2010…*
Despite John Kaiser and the government concocting a story that he did not sign the same consulting documents the government recovered during their November 13, 2013 search and seizure of Kenner's Arizona property—Hawaii COO confirmed to

the FBI in October 2010 that he had seen the agreements that they showed him (*Ex. A*).

Shocking the conscience is the unmitigated fact that the FBI had them three (3) years *before* the Kenner search and seizure—while with Manfredi.   There are one of two possibilities: (1) Manfredi provided the FBI the copies he had in his possession in order to verify them (*Id. at 1 [3500-CM-2-r]: "Agreement - between PK or LLCs + Constantine"*), or (2) the FBI showed Manfredi the originals Kaiser had in his possession—and hid with the FBI and U.S. Attorney's complicity from the 2015 trial court?[14]  Thus—with 3 years of FBI-pretrial work with Kaiser—where are the notes about the Constantine agreements that they had for years prior to the Kenner search and seizure?   It is impractical to believe that Manfredi lied to the FBI during his 2010 proffer—for no personal benefit.   Perhaps—there is another explanation; Kaiser, Jowdy's attorneys, and the FBI agent with the originals from Kaiser, fabricated the back-story—and hid the originals in their possession (*GX-7004, GX-7005*).

*Fed. R. Evi. Rule 1002 violation ...*
Regardless—a fouler issue at hand is their collective *Fed. R. Evi. Rule 1002* violation that Kaiser and the government perpetrated on the Court.   They prohibited their signature expert from viewing the Kaiser-custodied original Constantine consulting agreements. The government and Kaiser *only* shared the photocopy versions with the Court and their signature expert (*Tr.990-92 [Kaiser], Tr.3622-26 [signature expert—Osborn]*).   The Court is deftly aware that the mere admission that Kaiser possessed the originals—*of alleged forgeries of his name*—at his home would have made any expert laugh out loud at its absurdity—not just pause at the sheer intestinal fortitude required to present that hoax to a Federal Court.   Yet—they did.

*Affidavit Admissions from the 2009 arbitration...*
In 2009—Jozef Stumpel (*Ex. H*), Mattias Norstrom (*Ex. I [3500-MN-2]*), Sergei Gonchar (*Ex. J [3500-SG-4]*), Jere Lehtinen, Michael Peca, and others signed pro-

---

[14] Manfredi's ("CM") 2010 FBI proffer also hi-lights that he—personally—had no money in the Hawaii project and Kaiser had "*$1,000*" to the best of his knowledge—verifying: "*CM never increased investment – not sure if Kaiser did*" (*Ex. A at 2*).   This hi-lights the impossibility of Kaiser's 2015 testimony that he and Manfredi "*confronted*" Kenner in 2006 about stealing $1 million from the Hawaii project (*Tr.983*)—which never happened.   The government also disregards the other temporal anomalies Kaiser's testimonial fabrications present for the rest of '*what he knew and when*'. If the 2006 "*confront[ation]*" was true—Manfredi would have known Kaiser had more than a paltry "*$1,000*" invested.   It is another chronological impossibility—left unexplained in Kaiser's rambling testimonial morass (*Tr.1107-08: contradicting his "confronted" testimony*).

transparency affidavits during the *Nolan v. Kenner* Arizona arbitration in support of Kenner.  Their affidavits affirmed (as a subset):

> "***In addition to setting up a Line of Credit for the sole use and benefit of the Hawaii investment Group***, *I wired $100,000 to Northern Trust Bank…**for the express purpose of making funds available to Phil Kenner, which were to be used at his discretion.*  I was aware that my funds would be used to make distributions for the company, including but not limited to; Land acquisitions, Travel & Entertainment expenses, legal fees, Planning fees, Payroll, permitting fees, **loans to outside entities** and **distributions to other members that would satisfy their monthly Line of Credit payments to Northern Trust Bank**…Phil has always disclosed the complete and detailed use of these funds with me from time to time at every request*."

*Kaiser 2009 arbitration admissions…(Ex. G)*

- Kaiser's *voluntary* testimony affirmed (as a subset):

  > *Q: Tell us what your experience was with respect to that money right at the point there was a decision to start loaning money to Mr. – that Mr. Kenner had made a decision to start loaning some of that investor money to Mr. Jowdy?*
  > *A [John Kaiser]: …So if we had some funds that were – that was stagnant and that warrant purchasing land, **we would utilize it for a loan**, so we actually made some money off if it.*
  >
  > *Q: Was Mr. Jowdy at that time someone that appeared credible to you?*
  > *A [John Kaiser]: Well, the first thing, Mr. Kenner told me that he was, **and I met him a couple of times**.  He seemed – **a big thing it was 15 percent interest rate**, and I thought it was a good move.*
  >
  > *Q: So at the time was there any representation about getting paid back this money when the Cabo deal closed?*
  > *A [John Kaiser]: **It was supposed to be a short-term loan**.  I thought it was three to six months, **because I had also raised some other funds from family and friends** that were getting a little antsy about it.*

  - The 3-6 months timeframe—as Kaiser testified about in 2009—perfectly aligned with his friends & family August 2005 loan and the original December 2005 Cabo closing dates—eventually delayed and closed in March 2006).  The Cabo delays were routinely verified to Kaiser and the Hawaii investors thru attorney *"updates"* via conference calls and emails (*Ex. C [February 24, 2006]: "For those of you who are not aware Ken Jowdy and Bill Najam have informed us that the Lehman Brothers closing in Cabo will be delayed* <u>another 30 days</u>*….Based on the delay I have also resent the*

*updated loan calculation from the Hawaii loan to Jowdy for your records.";
and confirmed by Kaiser to the FBI: Ex. B at 3).*

- In 2015—Kaiser's fabricated trial testimony about a '30-day loan'
(*Tr.976-79*) also contradicts all empirical evidence if he—in fact—found
out after his 2009 Nolan testimony that Kenner was not trustworthy (*or
whatever his word-vomit lie-of-the-day explained: Tr.1107-08*).

*Q: At the time this money was lent to Mr. Jowdy...did anybody anticipate he
wasn't going to pay you back when the Cabo deal closed, the Lehman Cabo
deal?*
*A [John Kaiser]:* **No.  Otherwise, I wouldn't have lent it.   I wouldn't want to
go down that route.**

*Q:* <u>When you made the decision</u> *– or when you were made aware that some of
this money was going to be lent, rather than sitting idle in an account, at 15
percent, did you know there were some risks?*
*A [John Kaiser]: At the 15 percent – actually,* **the loans**, *I didn't think they were
going to be – to me it wasn't a risky loan...***but the loans -- even the investors
I brought in – I said.   Listen.   This guy – I gave him the whole story of Ken
Jowdy back by land.   It's good.  Better than your money sitting
somewhere.**

- Further clarifying any ambiguity—with Kaiser as Managing Member of the
Hawaii project during testimony and prior to that—he re-verified that there
were "*no secret handshakes*"—and he knew a lot of the actual Hawaii investors
first-hand.
   *Q. And being in the course of the years you've been over in Hawaii dealing with
   this, have you met a lot of investors of Mr. Kenner?*
   *A. Yes.*

   *Q.* <u>Has this ever been a secret that Mr. Kenner lent this money to Mr. Jowdy?</u>
   **A. No.**

   *Q.* <u>Was this a transaction</u> *that, as your view as an investor was* <u>open and
   disclosed to everybody?</u>
   **A. It was open. There was no secret handshakes or nothing like that.**

- The Court should note that Kaiser was not offering "*yes*" or "*no*" answers to
leading questions.   To the contrary--he explained in his detail the events as he
was aware—while Managing Member of the Hawaii project.

14

*Berard 2009 arbitration admissions...(Ex. F)*

- *Berard's voluntary* testimony affirmed (as a subset):

   *Q: When you were – as far as the Hawaii deal, were you made aware of any sort of transaction Mr. Kenner set up where you can give a commitment or pledge a credit line in lieu of putting all your money in initially?*
   *A [Berard]: Yes.*

   *Q: Can you tell the panel what was your understanding?*
   *A [Berard]: Basically the company – it was set up.  The company would pay the payments.   I would pledge the money, obviously to get a loan for the property.   Again, the company would pay the payments, and I was not forfeiting all the amount of money for the piece of property.* [15]

   *Q: Were you aware that Mr. Kenner got a credit line against some securities or investments you had?*
   *A [Berard]: Yes.*

   *Q: And later on were you aware that Mr. Kenner started lending this money to another principal in the Cabo project named Ken Jowdy?*
   *A [Berard]: Yes.*

   *Q: Where did you think the money that Mr. Jowdy – were you told where the money was going to be used that was given Mr. Jowdy as far as the Mexican project?  Was there anything you were told about that?*
   *A [Berard]: Basically just loan him the money for the project.*

   *Q: What about bank statements; did you have any problem getting any of your bank statements from Mr. Kenner at any time?*
   *A [Berard]: Not at all.*

   *Q: And prior to signing any of these documents did you have access to your own attorney unconnected to Mr. Kenner to review this?*
   *A [Berard]: Yes I did.   We have a family attorney back home where before I sign any documents basically – I went to his office, sat with him.   We*

---

[15] The Court should note that Kenner was charged in Counts 7 & 8 for making the 59th and 60th payments on the 5-year-long Little Isle 4 LOC loans that Berard verified he underlined expected to be paid by Kenner...What reasonable standard did the government use to make the charges?

15

*reviewed them, and I signed them and basically FedEx'd them to Phil [Kenner].*

**Noting**: Berard volunteered for his 2009 arbitration testimony *after* the date (per his 9-19-2013 FBI proffers: *3500-BB-1-r at 3*) that he no longer found Kenner "*legitimate*".   It is hard to reconcile his voluntary 2009-testimony under his reformative 2013 misrepresentations to the FBI—yet not held to an equal standard of justice while employed by Jowdy's well-protected cabal.

*Peca 2011 SDNY Grand Jury verifications thru testimony...(Ex. T)*
Michael Peca's testimony affirmed (as a subset):
*Q: How much did you put into Little Isle 4?*

*A [**Michael Peca**]: "$100,000 cash investment that was going towards that. Then we had lines of credit. I had one out for $1.7 million that was going to be used **at the time**. Here's where a lot of the cross starts to happen. A short-term loan to Mr. Jowdy, because at the time Cabo – we hadn't gotten the lending from Lehman Brothers yet. We made a short-term loan **until the lending came in**. Once the lending came through they were to pay back the loan, I think in the neighborhood of five-and-a-half million dollars, on the closing. It was never paid back. And then communication basically seized at that point from him [Jowdy]. That was kind of the whole sticking point as far as me and the other guys with Mr. Jowdy.*

*The 1.7 along with the $100,000 and whatever else put in this a capital account, Little Isle 4, I believe. The Capital account was loaned to Ken Jowdy, our business partner, so there is no need at the time to be worried about anything. The money was loaned to Ken Jowdy to basically help some of the purchase of the Cabo property so we can get the funding. And then it was supposed to [be] a short-term loan.*

*I knew 100 percent it was going to Little Isle IV initially.  Shortly after that the short-term loan was something that took place."* [16]

---

[16] **Noting**: Michael Peca was cherry-picked by FBI agent Galioto in 2011 after consulting with Jowdy and Jowdy-supporting people ("*bad apples*", etcetera)—based on who they thought would not confirm their 'lending' knowledge—to fabricate the original 'concealment' indictment plan.   *Their plan failed grossly*—but the exculpatory Grand Jury testimony was ignored to frame their desperate 2013 indictment—at all costs—and stop Kenner from his December 2013 Supreme Court testimony in Mexico versus Jowdy, Harvey, Kaiser, Berard and other Jowdy 'members'.

*Sydor 2011 SDNY Grand Jury verifications thru testimony...(Ex. U at 25-26)*
Darryl Sydor's testimony affirmed (as a subset):

*"Q:  Was that [the LOC at Northern Trust Bank] also for Little Isle 4 as far as you know?*
**A [Sydor]: Yes, but then we put it towards a short-term loan to Mr. Jowdy until Lehman Brothers came up with the money that was supposed to be paid back."**

*Q: Did you know in advance that it was going to be used, this Little Isle 4 money, to be used to salvage the Cabo investment?*
**A [Sydor]: Yes.  It was to help with the short-term loan to keep funding the Cabo, but then its supposed to be paid back, but that's –**

*Q: Paid back to you or to Little Isle 4?*
**A [Sydor]: Paid back to Little Isle 4.**

*Q: So –*
**A [Sydor]: Back to Hawaii, not me personally.**

*Q: Bu that didn't happen?*
**A [Sydor]: That didn't happen.   And Lehman came up with the $129 million loan. It was supposed to be back at closing."** [17]

*Stevenson 2011 SDNY Grand Jury verifications thru testimony...*
Turner Stevenson's testimony affirmed (as a subset):

*"Q: When you put up the $100,000 for Hawaii, did you have any understanding of whether the money could be used to pay for the Mexico project or was it just supposed to go to the Hawaii project?*
*A [Stevenson]:  In the beginning it was supposed to go to Hawaii.   Then **I saw** they needed, **the group of us got together**, we have this piece of land that's available for purchase in Mexico that we need to wait on or get funds on to **transfer as a group** like one big blanket to get money into Cabo and pay for that land to hold it until the loan came.*

---

- The irony should not be lost that Galioto—while working with Jowdy's cabal—chose not to place Nolan, Juneau, or Moreau in the 2011 SDNY Grand Jury for testimony—even as the known "*bad apples*".

[17] **Noting**: Darryl Sydor was likewise—cherry-picked by Galioto.

> *Q:   So you are saying you agreed to transfer some of the money from the Hawaii project to the Cabo project?*
> *A [Stevenson]:  **I would say that, YES.***
>
> *Q: Who made that decision?*
> *A [Stevenson]: **I think all of us as a group**.*
>
> *Q: What do you mean "as a group", who is the group?*
> *A:  **All the guys who were invested in it**." [18]*

*The Centrum funds…*
Hawaii COO Chris Manfredi's 3500-proffer materials (*Ex. A*)—and the underlying Hawaii emails late delivery, *infra*, confirm that the **Centrum loan** was arranged by Hawaii COO Manfredi (*Ex. V, Ex. W, Ex. Y, et.al.*) with the Hawaii LLC's attorneys at Carlsmith Ball, primarily *absent* Kenner's participation.   The $1.5 million (*government-forfeiture-36*) loan distribution to Jowdy on 7-20-2005 was negotiated between Manfredi and Jowdy (*Ex. Z*)—and verified between Jowdy and the Hawaii attorney, Najam (*Ex. AA at 2*), later the same night.   And—the "*Statement of Use*" (*Ex. BB: GX-3703*) between Big Isle 5 and Centrum identified "*shall be used in connection with the development of the property*" and "*for business and commercial purposes*", thus transferring the 'control' of the advances to the Big Isle 5 operating agreement—which *Centrum **approved** prior to granting the loan* (*Ex. X at 2:* **Noting**: *it was produced by Owen Nolan—as Ex. No. 082—during his 2009 arbitration production—further confirming transparency of all related Hawaii business*).[19]

The Big Isle 5 operating agreement included the following language in its first paragraph:

> "*At all times, the Company, through its Managing Member Philip A. Kenner, reserves the right to borrow, lend or invest on behalf of the Company*"—further identifying in—

---

[18] **Noting**: Turner Stevenson was likewise—cherry-picked by Galioto.

[19] Kenner *verified* thru "*advice of counsel*" prior to signing the final loan agreement documents with Centrum that the "*in connection*" language (*Ex. BB*) applied to the various pending uses, negotiated by Manfredi with Jowdy independently (*Ex. Z*) for the loaned funds until development permits were granted thru Kaiser and Manfredi's legal work in Hawaii (*Ex. Y*)—attorney "*update*" verification of the pending work permits to begin construction (*Ex. C*).  Not a single Kenner action as Managing Member was carried out in a vacuum as the government has alleged.

> "*Section 2. At the sole discretion of the Managing Member, special projects may be funded by current, new or borrowed funds, including new debt of Big Isle 5 Ventures, LLC*".

Finally, Hawaii Managing Member—John Kaiser *verified thru testimony* to a 2009 arbitration panel that money received by the Hawaii partners was used for 'other lending' so we could make some money off it while we waited for permits and development approvals—that he and Manfredi were in charge of (*Ex. G at 1*):

> [Kaiser]: *"Any money that was allocated towards land for the Hawaiian Investment Group that wasn't being used—the due diligence takes a long time. So if we had some funds that were – that was stagnant and that warrant purchasing land, **we would utilize if for a loan, so we actually made some money off it**".*

• This is—again—consistent with 100% of the empirical evidence—regardless of Kaiser's *faulty memory, confusion and mistakes* testimony 10 years later.

Regardless of CTE-based memory failures of the investors in 2015—notwithstanding *potential* undue influence by Jowdy's cabal and FBI agent Galioto to the investors to forget what they used to know—*they individually signed every necessary authorization*.   They transferred their "*investment*" funds to Little Isle 4 (*Ex. E*).   Once the authorization transactions occurred—the Little Isle 4 By Laws were the sole governing document in the Hawaii project (*Ex. D*).   Furthermore—the Centrum loan was governed by the Big Isle 5, LLC (*Ex. X*) (as a liability subset of Little Isle 4)—with both operating agreements permitting the "*lending*" of funds as corporate authorized transactions.

> As an example—Michael Peca's *signed* Northern Trust *2005 Extension of Credit* verified: "*$1,775,000*" "*Increase to existing loan used for speculative real estate investments*" (noting the plural use of 'investments') (*Ex. II*).   This **one-page** signed document provided the "*investment[]*" funds Peca *authorized* for distribution in his *2005 Letter of Authorization* (*Ex. E at 3*).   Peca *verified thru testimony* that he signed the *2005 Letter of Authorization* during his 2011 SDNY Grand Jury testimony (*Ex. T at 38-39: "Q: Let me show you Grand Jury Exhibit 107, starting with the signature.  Is that your signature?  A [Michael Peca]: It is."*).

*Peca 2015 direct-examination trial testimony admissions...(Tr.422)*
> *Q. Now, you testified yesterday and you agreed this morning that your understanding was that the sole purpose of the cash that you invested in*

*Hawaii and this $1.7 million loan per the line of credit was to be used for Little Isle IV solely for what? Do you remember what the told the grand jury?*
*A [Michael Peca]: I do.*

*Q. Do you remember what you told the grand jury on or about March 29, 2011, about where the money went?*
*A [Michael Peca]: Just for that purpose, for Hawaii.*

- The government has relied on the specific testimony of Peca, to allege his *lack of knowledge* during his direct examination.   Yet—Michael Peca told the Court the truth.   **It was for Hawaii**.  No funds ended up in any pocket that the corporate control documents did not identify specifically as *authorized; certainly none to Kenner as ill-gotten*—or without direct benefit to the Hawaii partners.

*John Kaiser had a hand in the 2004 loan agreement construction...*
The government has ignored while known—and hidden from this Court—that the 2004 Jowdy-Hawaii loan agreement was constructed under John Kaiser's direction after his preliminary and independent loan discussions with Jowdy in 2003 (*Ex. B at 2*).  Signature witness, Robert Gaudet, *verified* Kaiser's "*involvement*" *thru testimony* on July 2, 2009 during a deposition in the Arizona litigation versus Jowdy.[20]   Gaudet was subpoenaed and deposed by Jowdy's attorneys.   Gaudet's deposition verified (*Ex. DD at 6-7*):

> *Q: Did he [Kaiser] mention that he had any involvement in he creation of this loan agreement document?*
> *A [Gaudet]: Yes.*
>
> *Q: What did he tell you?*
> *A [Gaudet]: He told me that it was a document that he needed for – it was a document he had for the Hawaii entity, for the Hawaii company.*

- Despite the government's haranguing of Kenner throughout his cross-examination about the loans to Jowdy being cover-ups—and "*bogus*" (*Tr.5708*

---

[20] Gaudet is the loan agreement 'witness'.   Gaudet was interviewed approximately a dozen times by the FBI (in-person, including in Mexico)—yet never asked about his crucial 'signature'.
**Noting:** The two central participants in the signing of the 2004 Hawaii loan agreement (Robert Gaudet and Ken Jowdy) were repeatedly interviewed by the FBI pre-trial—but *not* presented by the government at trial to support the government's *bogus* allegations of fake loans of fake agreements. Instead—they counted on their star-witness—John Kaiser—to fabricate the allegation during unsolicited testimony (*Tr.1106-07*).

*(2x), 5709*), "*phony*" (*Tr.4597, 4598*), and "*supposed*" (*Tr.5707-5708*) to slander Kenner's veracity; they specifically lacked any evidence to do so.

During cross-examination—Michael Peca *verified thru testimony* that his 2011 SDNY Grand Jury testimony (*Ex. U*) was "*truthful*" (*Tr.498, 602, 626, 650*)—4 years prior to his CTE-altered memory at the 2015 trial.

*Berard 2015 direct-examination trial testimony admissions...(Tr.3055)*
> *Q. And did you have any firsthand knowledge about any of those -- about the money going from Hawaii to Mexico?*
>> *MR. HALEY: Objection. Just the leading -- I object. Without a speaking objection, I object.*
>> *THE COURT: Overruled. That one's okay. You can answer that.*
> *A [Berard]: I was only familiar with what Phil Kenner told me about some money that was going from Hawaii to Mexico.*

- Notwithstanding Berard's 2009 arbitration testimony—there was nothing more complex to discuss considering he is documented as participating in the Hawaii conference calls about the Jowdy loans et.al. (*Ex. C [Attorney Madia]: "The questions during our last conference call by Owen Nolan, Mike Peca, and Bryan Berard were important to all of you.  If you are still confused about the individual equity you invested in the Cabo project versus the Hawaii equity and loans, please reply to me"*); and
- John Kaiser cross-corroborated the Jowdy-loan agreement and discussions with Jowdy by explaining to the FBI that *after* his *independent* meeting with Jowdy—he "*discussed = Brian Berard = PK*" (*Ex. B at 3*).   The government and FBI cannot explain away how the FBI raw notes specifically include Berard and Kenner (per Kaiser's testimony)—but Berard was unaware thru *independent* communication with Kaiser, in real-time (let alone Kaiser's ignorance).

All of the prior statements deemed inconsistent after surreal trial testimony are grounded in severe memory loss—a.k.a. CTE.  They cannot be explained thru odds at infinitum that all of the government witness forgot what they used to know—in perfect synchronization years after the actual events.

- These 'memory loss' issues are not superficial or immaterial—since they go to the heart of the '*authorizations*' (testimonial contradictions versus empirical evidence).

**The Berard 2014 CTE litigation (admitted on his 2018 podcast) is 'new evidence' that goes to the heart of the prosecution's case (*ECF No. 782*)—yet to be addressed by this Court.**

*Obvious CTE Examples (Owen Nolan)…*
Nolan's CTE issues are hi-lighted in his December 2007 direct text communication with Kenner to sign the LOC renewal package in his possession (*ECF No. 668 at 270-74*)—and Northern Trust Banker Aaron Mascarella's 2009 deposition by Nolan's arbitration attorney confirming his *independent* communication with Owen Nolan (*ECF No. 668 at 170-71*). Both exculpatory evidence(s) contradict Nolan's 'memory' as early as his *faulty* 2009 arbitration testimony (*ECF No. 440 at 16*). Nolan's testimonial memory failure was only 15-months after his December 2007 text communication with Kenner—which lacked all ambiguity.

*Furthermore—100% transparency with Nolan's wife, Wells Fargo private banker, and his personal assistant is irrefutable (unless they were all 'in on it')…*
Everyone in Nolan's *inner-circle* participated routinely with the management of Owen's Northern Trust LOC. This logistically made it impossible for Nolan to be deceived thru concealment—yet with the government and deftly FBI aware—they continue to ignore its absurdity because it fails to fit their desired fact patterns—regardless of the injustice Nolan's *faulty* testimony contributed to.
Regardless of Nolan's 2015 memory (or maybe including the decade before that due to CTE)—(1) Nolan's wife, (2) Nolan's private banker at Wells Fargo, and (3) Nolan's personal assistant managed Owen Nolan's LOC transactions; making the concealment of anything *impossible* (*Ex. KK, Ex. LL, Ex. MM, Ex. NN*)—including his taxes *(Tr.2112-13) (Ex. JJ)*. In particular, Nolan wife was tasked with signing off on a specific Northern Trust LOC—$100,000-plus transaction—coordinated by Nolan's Wells Fargo private banker (Crane) and his personal assistant (Myrick) for the LOC in 2006:

[Myrick to Diana Nolan 2006] (*Ex. KK*): "*"Hi Diana, I hope I am not bugging you the same way Phil has, but I am getting concerned that the wire requests have not been getting submitted to kim [Nolan's Wells Fargo private banker]. I am receiving calls from the LOC guys at Northern Trust. Thank you! Kristine."*

[Myrick to Diana Nolan 2006] (*Ex. LL*): "*You need to send about $190k to the LOC at Northern Trust…Have a good night. Kristine Myrick, Standard Advisors*"

[Myrick to Diana Nolan 2006] (*Ex. MM*): "==SUBJECT: Payment to LOC at Northern Trust==*…Hi Diana, Below is the payment information for the payment that needs to be*

*sent to your LOC at Northern Trust: Please send $134,396.00 using the following instructions…I have copied Kim crane [your Wells Fargo private banker] on these instructions.  You will need to call her for verification to send the wire.  Please let me know when the wire is sent so I can follow up with Northern Trust.   Thank you.  Kristine."*

Kim Crane (Nolan's private banker) at Wells Fargo responded to Diana Nolan, as follows (*Ex. MM*)[21]:

[Kim Crane]: *"Diana – please print this email out, sign it, and fax to me at 213 626-xxxx.  Thanks.  Kim"*

- Every person—including his own wife (Diana)—in Owen Nolan's life would have been complicit with concealing his LOC and usages from him (if true)—notwithstanding his sixteen (16) *independently* signed Northern Trust LOC documents (from 2004-2009) in the 2015 subpoena (*presented as exhibit Kenner 210 at Tr.4206*).

*Further confirmation in Nolan's personal files…*

Ultimately—the government also misled the Court at trial to believe that another exculpatory document—Nolan's 2006 Little Isle 4 K-1 tax document (*Ex. JJ*)—from his personal files [*Bates stamp: NOLAN000005044*] and produced in the 2009 arbitration was not in Nolan's possession—when the government specifically knew otherwise.   Again—this did not fit their trial narrative—so it had to be 'slightly' altered to fit.  The government received it a second time—because Kenner forwarded it to the SEC after receiving it in the 2009 arbitration [*Bates stamp: PK_SEC_013677*].   The government malfeasance is inexcusable under *Berger*.  Nolan's K-1 (*Ex. JJ*) is not as the government represented it to the Court during trial (*Tr.2144-46*):

> [Michiewicz]: *"So the only place we know it lives is in the defendant's own home and records. We have no information that this information ever either got to Mr. Nolan or was filed with his return to the IRS."*

- This was obviously false and misleading to the Court—with full government knowledge.

---

[21] **Noting**: Each of the exculpatory email communications—whether Kenner was copied or not—were produced in the California slander-and-defamation lawsuit, *Kenner v. Myrick*—after she stole Kenner's corporate server (full back-up materials).   See the *MYR#####* bates stamps (*Ex. MM*)—or the *Nolan####* Bates stamp as possessed by Nolan or shared by Myrick and their joint "bad apples" attorney (Meeks) during her litigation assistance versus Kenner (*Ex. JJ, Ex., KK, Ex. LL*).

*Conclusion…*

The government's representation that any of these indisputable facts, *supra*, contributed to the Rule 33 denial by the Court—merely overlooks the purpose of the Rule 33 motion, more or less: to grant a new trial on the totality of the evidence presented at trial.   It fully discounts any ineffective counsel issues (pending). Incrementally—the Court could have simply viewed the Eufora private stock transactions as the singular factor of guilt—dismissing the alleged GSF and Hawaii schemes and reached the same Rule 33 judgment (*or otherwise naming Constantine's $17,077 overspend as the total criminal actions: ECF No. 501 at 60*).[22]

Paramount to the forfeiture—the specificity of the investors' loan knowledge and undisputable authorizations can support the Court to order a stay of the forfeiture, in the interest of justice.

---

[22] *Eufora…*The Court should note—the un-conceded Eufora scheme—was thoroughly investigated by Rudy Giuliani's investigative team thru unconcealed information—the least of which was Kenner's expose recording of Constantine's Home Depot bluster.

Yet—one of the greatest U.S. Attorneys of all time—in any district—was not good enough to uncover some stock purchase fraud when Kenner laid it out in front of him with full transparency—while Stolper opined about it in two independent letters to his clients (*Ex. OO [July 8, 2010]: hi-lighting his request for "All capital contributions to Eufora, AZ Eufora Partners I LLC, AZ Eufora Partners II LLC, AZ Eufora Partners III LLC, or AZ Eufora Partners IV LLC,*) (*Ex. PP [July 16, 2010]: signed off by 29 Eufora related individuals at 9-18: including Sydor, Peca, Rucchin, Nash, Ranford, John Kaiser, ethel Kaiser, Rizzi, Hughes, Privitello*) (the same ones named in the Kenner indictment—*but not Kenner*).

Perhaps—the government's unannounced position is that Giuliani was a co-conspirator with Kenner, former CIA operative Oliver Libby, and corporate attorney Michael Stolper to mislead their clients? Otherwise—the 2008 (Constantine) and 2008-09 (Gaarn) private stock purchases were fully vetted by all involved parties; leaving another un-answerable head-scratcher to reconcile—certainly not worthy of the relative life sentence the government and PSR seek with Kenner.

*GSF with Kenner assisting the Stolper GSF investigation as well…*
The government is aware that GSF Trust IOLTA fund owner, attorney Ronald Richards, <u>verified</u> to a California Bar in 2012 (*Ex. QQ*):

> [Ronald Richards]: "*I was contacted by Mr. Kaiser's attorney, Michael Stolper, in September 2010.  Mr. Stolper also represents Philip Kenner, a former client and business manager referenced in my response to the other complaint and in the pleadings in this case.  I provided Mr. Stolper and Mr. Kenner with all of the [GSF] evidence and confirmations they requested as to the transmittal of the funds to Mr. Constantine.*"

**Noting**: Michael Peca testified he received the GSF spreadsheet but '*could not verify it*' (*Tr.652-53*)—while attorneys Ronald Richards and Michael Stolper represented him—*independently*.   Jay McKee testified that he could not receive it from Kenner *without a delay*—clearly not in Kenner's possession any earlier than it was also in two of his own attorney's possession (*Tr.1827*); perhaps more timeline confabulations or CTE symptoms; leaving unexplained innuendo and unexplainable temporal anomalies to prejudice Kenner.

Nevertheless—the government knows that the indisputable facts of inherent *knowledge* and unconstrained *authorizations* would not allow the government to pursue the same, frivolous allegations when a new trial is granted thru collateral or appellate review; post sentencing.

In light of the clarity of unchallengeable exculpatory evidence (herein as a significant subset)—Kenner requests the Court stay the order of forfeiture—or in the alternative schedule an evidentiary hearing to review these 'known' prior admissions by each and every Hawaii-Mexico investor—and the surreal circumstances surrounding their synchronized and epic memory failure, notwithstanding CTE—and the government's feigned ignorance to the exculpatory evidence they had pretrial possession of and ignored to frame their narrative.[23]

Sincerely submitted,

Phil Kenner, Pro Se litigant

Submitted September 2, 2020

---

[23] **CTE** is Chronic Traumatic Encephalopathy.   The primary symptoms of **CTE** have been described neurological experts, including Dr. Anne McKee at Boston University's Neurological Center as:

> *"CTE, a catastrophic disease first associated with boxers long ago, results when a toxic protein, Tau, accumulates in the brain, kills brain cells, and leads to symptoms such as <u>cognitive dysfunction</u>, <u>**memory loss**</u>, sleeplessness, depression, diminished impulse control, episodes of anger, and <u>dementia</u>, among others. Until recently, CTE could only be confirmed through an autopsy. **Tau proteins are released whenever concussion occurs**."*

- The CTE symptoms are eerily similar to the government's post-trial defense of overwhelming inconsistent statements pointed out by Kenner's original Rule 33 submission—and backed up by his reconsideration Appendix (*ECF No. 668 Appendix*) on each and every issue at hand.   The *faulty memory, confusion and mistakes* defense by the government cannot support a prosecution of concealment (*ECF No. 440 at 16*); in lieu of their failure to also support the testimony as factually accurate—**which they know they cannot**.