August 17, 2020

The Honorable Judge Bianco
U.S. District Court – EDNY
100 Federal Plaza
Central Islip, NY 11722

**Re: Recent witness impact statements (deVries)**

Your Honor,

*Greg deVries...*
deVries invested in the Hawaii project, Eufora, and contributed to Constantine's GSF after meeting Constantine face-to-face in Nashville, Tennessee at his home.   There is nothing in the record—or in possession of the government—that would purport deVries is a victim of any transaction that he did not willingly participate in with full unfettered knowledge at all times—and personal sign off.   As such—Kenner is requesting an evidentiary hearing with the Court if the government continues to present deVries as a victim, *here*, including his contributions to Hawaii, GSF, &/or his Eufora private stock purchases.

The government lacks representations at trial that the Hawaii project's alleged scheme reached any investor other than those named in the superseding indictment (*ECF No. 214*); notwithstanding the transactions alleged by the government as unauthorized were *authorized* by the corporate By Laws (*Ex. AA*)—and cannot be subject to a passive-investor's recollection over a decade-and-a-half after the *authorized* events and individual signoffs (a surreal prosecutorial standard, if allowed).

*No uncharged conduct...*
During the July 2, 2019 hearing, the Court denied any *Fatico* hearing, while verifying that it was only considering charged conduct in its guideline calculations—while regurgitating the government's previous representations (*Tr.33*):

> *[Judge Bianco]: "I just want to make clear that I think I've said this before, but it is in the court's view and its consistent with the government's letter to the court, you know, two years ago that we're not – that the government is not seeking to hold the defendants accountable for any uncharged frauds.   The scope of sentencing relates only to the frauds that were proved at trial..."*

1

The February 2020 ruling by the Court (re: forfeiture and loss) and the follow-up 'affidavits of loss' by un-named victims, *supra*, raises more issues that can only be explained by CTE[1] symptoms (a.k.a. memory loss) or undue influence by the prosecution members (almost 6-years post-trial).  The government has attempted to re-convince investors who were 'in the know' about their personal transactions that their recollections of the truths were wrong—despite now being represented as Jowdy-frauds by the government in their July 2020 submission.  In contrast—they have doubled-down on the falsity that '*Kenner stole all of their Hawaii and Mexico investment-loan money*' (amongst other previously documented mis-representations) to whomever they could contact 5+ years after trial, requesting statements from non-victims (exculpatory evidence, *infra*).

- This filing complements similar mis-representations and reformative representations by Juneau, Nolan, and Kaiser (addressed in Kenner's June 16, 2020 submission to the Court).

To address the issues—Kenner requests an evidentiary hearing; wholly effecting sentencing, forfeiture, and restitution calculations.

*Case law regarding evidentiary hearings...*
Although, "the district courts have significant latitude in fashioning procedures to resolve sentencing disputes"; *United States v. Sabhnani*, 599 F.3d 215, 258 (2d Cir 2010)—it appears obvious, with the mounting volume of post-trial witness and government reformative admissions—the exculpatory and empirical evidence that exculpates Kenner's integrity <u>requires</u> an evidentiary hearing; wholly affecting sentencing for named <u>and</u> unnamed people in the superseding indictment (*ECF No. 214*).  The Court's "discretion is not limitless: the Due Process Clause requires that the defendant have 'an adequate opportunity to present his position.'" *Id.* at 258 (quoting *United States v. Maurer*, 226 F.3d 151-152 (2d Cir 2000).  *See United States v. Simmons*, 544 Fed. Appx. 21 (2d Cir 2015).

---

[1] **Chronic Traumatic Encephalopathy** ("CTE") -- The primary symptoms of **CTE** have been described by neurological experts (including Dr. Ann McKee) at Boston University's Neurological Center as:

> *CTE, a catastrophic disease first associated with boxers long ago, results when a toxic protein, Tau, accumulates in the brain, kills brain cells, and leads to symptoms such as <u>cognitive dysfunction</u>, **memory loss**, sleeplessness, depression, diminished impulse control, episodes of anger, and <u>dementia</u>, among others. Until recently, CTE could only be confirmed through an autopsy. **Tau proteins are released whenever a concussion occurs**.*

2

The Court requires that "the standard of proof at sentencing is a preponderance of the evidence" to accept the government's position of loss (related to actual victims in the first instance, sentencing enhancements, and restitution under MVRA); *United States v. Gaskin*, 364 F.3d 438, 464 (2d Cir 2004) (citations omitted).

- The inclusion of un-named victims from the superseding indictment—post-trial only—requires judicial review with nothing but exculpatory evidence in the government's possession; **none opposing** (i.e. Norstrom, Rem Murray, et.al. — under separate submissions).
    - An unsubstantiated "victim impact statement" does not constitute evidence to satisfy the 'preponderance standard'. The "right to confront" clause of one's victims guarantees that.

**Noting**: deVries, Norstrom, Gonchar, Murray and several other investors were removed as victims two weeks before trial by the government and FBI's choice and cannot be assumed to have been confronted as victims (with Kenner's trial counsel leaving a multitude of exculpatory evidence at the defense table for Murray and Gonchar—*unused*—since there was no need to impeach as one would an alleged victim[2]); *See Hughey*.[3]

"A sentencing conducted on the basis of unreliable or false information violates the due process clause just as much as a sentencing conducted without a sufficient hearing."; *United States v. Fell*, No. 5:01-cr-12-01, 2018 U.S. Dist. LEXIS 229652 (D. Vt. Mar. 16, 2018). The U.S.S.G. acknowledges that "[a]n evidentiary hearing may sometimes be the only reliable way to resolve disputed issues." U.S. Sentencing Guidelines Manual § 6A1.3 cmt. (2014). The decision to hold or not hold a *Fatico*[4] hearing turns largely on whether the contested information is relevant to the trial court's potential sentence; *See Id.* § 6A1.3 cmt. (2014). If the sentencing court does

---

[2] This "non-victim" position was trial counsel's attempted sedation to Kenner as to why FBI notes, signed documents, personal legal filings, etcetera—all exculpating any Kenner concealment—were *not* presented during testimony of Murray and Gonchar.

[3] Since the Supreme Court decided *Hughey* almost 30 years ago, prosecutorial decisions to frame indictments with a "view to success at trial rather than to a victim's interest in full compensation" are made with a full understanding of the potential consequences; See *Hughey v. United States*, 495 U.S. 411, 421 (1990). In concert, the Tenth Circuit opined— "**There are tradeoffs in such decisions**"; *United States v. Mendenhall*, Case No. 19-7006 (10th Circuit December 23, 2019).

[4] *United States v. Fatico*, 603 F.2d 1053, 1057 n.9 (2d Cir 1979), *cert. denied*, 444 U.S. 1073 (1980).

not plan to take the contested information into account, it need not grant a *Fatico* hearing to resolve the factual dispute.  Here, it is critical.

*Every transaction was signed off for authorization as expected…*
- *Case law (knowledge of signed documents and their respective contents)…*

A party to an agreement is "charged with knowledge of the contents of the [] contract and [is] bound by the clear and unambiguous terms of the same." *Johnson v. Hardware Mut. Cas. Co.*, 108 Vt. 269, 187 A. 788, 794 (Vt. 1936) (alterations in original).  **In a statement stunningly apposite today—as it was nearly a century and a half ago—the Supreme Court opined**:

"It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained." *Upton v. Tribilcock*, 91 U.S. 45, 50, 23 L. Ed. 203 (1875) (*Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 34 (2d Cir 1997) (holding persons have a "basic responsibility…to review a document before signing it.").  See also *Horvath v. Banco Comercial Portugues, S.A. and Millennium BCP Bank, N.A.*, 461 Fed. Appx. 61; 2012 U.S. App. LEXIS 3012
- In *Horvath*, **the investor argued that the terms and conditions were <u>written in Portuguese</u>, which he did not understand, but the court of appeals found that the investor was charged with knowing and understanding the contents of the documents that he signed**.

    The Court opined "==If the signer can read the instrument, not to have read it is gross negligence; if he cannot read it, not to procure it to be read is equally negligent; in either case the writing binds him.  Parties are bound by documents expressly incorporated by reference into agreements to which they manifest their assent.=="

*Hawaii…*
DeVries received a 42.553% capital account re-payment—of his $150,000 investment—after signing off on the 2006 joint venture agreement (*Ex. HH at 23*— *signed, dated, and name printed; just like Norstrom at 35*).   The language of the JV disclosure specifies in paragraph 1: "*I am asking for your acknowledgement of, and consent to, these transactions, as they will change your investment…*".   DeVries offered no opposition to the change—and *signed it.*

DeVries is a recipient of the "*update*" letter (*Ex. V, supra*) that Hawaii Managing Member John Kaiser *verified thru testimony* to the FBI in October 2010 that *he personally received* (after reviewing the emails in-person during his FBI proffer) (*Ex.*

4

*U at 3*).   As such—deVries was 100% aware like all his Hawaii partners that the Jowdy loans were 'in progress'—with the loan agreement and the loan calculation attached to the "*update*" email for his records.

There is no evidence in Rule 16 production indicating deVries was unaware of the transactions that the Little Isle 4 By Laws provided *authorization* to transact (*Ex. AA: "At the sole discretion of the Managing Member, Little Isle 4, <u>may participate as a lender</u> if deemed by the Managing Member to be in the best interest of the LLC.  The Managing Member, at their sole discretion, can engage in outside ventures deemed to be in the best interest of the LLC, <u>including but not limited to other Private Equity Funds and Lending Opportunities."</u>*)…Or the various *authorized* consulting payments (which included Constantine's payments): "*Section 5.   The Managing Member [Kenner], at their sole discretion,* **can compensate any and all members and non-members for their roles in the LLC***, including but not exclusive to the Managing Member.*"

*Baker disclosures (a Brady issue)…*
In addition—deVries participated as a plaintiff in the Arizona lawsuit versus Jowdy to recover the 'loans' that attorney Madia explained—for the umpteenth time in writing—to the investors years earlier (*Ex. V*).

deVries <u>signed</u> attorney Baker's disclosure identifying the Jowdy loans as the *significant* issue in the Arizona litigation (*Ex. N at 49-56*).   Page 1 of deVries' signature hi-lighted:
> "<u>the gist of the lawsuit is to recover certain monies loaned to Mr. Jowdy from Mr. Kenner, Little Isle 4 and Ula Makika LLC</u>.   Mr. Kenner estimates the total amount of monies loaned to Mr. Jowdy which have not been repaid to be approximately $5,000,000.   This is the estimated principle only, exclusive of accrued interest.   In summary, Mr. Jowdy denies that the monies were loans but rather characterizes them as investments.*"

- This language corresponds directly to Ken Jowdy's March 2010 FBI proffer (*Ex. XX at 12-14:* "*$ from - $ from PK loans -> Little Isle IV -> Ula Makika*" *[Jowdy]*)—
**Noting**: FBI agent Galioto was present for these *face-to-face* confessions.

The <u>signed</u> Baker disclosure identified the six (6) Hawaii partners who sided with Jowdy—for promise of an assignment agreement and based on his 2008 "no loans" Arizona defense—versus the Hawaii partners.
- Jowdy and his attorneys—in or about 2015—*debunked* their own 2008-09 lies to the Hawaii investors (who followed him) and the 2015 government trial theory

5

>that the Hawaii loans '*did not go to Jowdy*'—thru the admission of *government-forfeiture-44* and *government-forfeiture-36*.   Jowdy's attorneys submitted their "*tracing*" of the money Jowdy received to the FBI.   The government—thru agent Wayne—admitted the two money tracing documents during their 2016 forfeiture case.   The Court is aware the government had previously lied to the Court about this during their rebuttal summation—five (5) times; alleging the funds Jowdy received thru *his Baja Development Corp* account were Kenner's; leaving uncorrected prejudice abound.   Ironically—this was the same lie they told the Court in their '*Kenner no bail*' rhetoric—which Galioto knew from the same March 2010 FBI proffer (*Ex. XX at 2: "BD Corporate = Baja Development – owned by KJ"*).   Clearly—it is still untrue…

Nevertheless, the government offered their '*stolen'* theories (known as falsities) throughout their two summations (*Tr.5996, 5721, 5722-23, 5744-45, 5990, 5991-92, 5707-5709*).   As examples, they surmised:

[*Tr.5721* – Michiewicz summation]:
>*"And what do you find out [about the Jowdy loan]? You find out, what did that 5 million or however much more or less that netted out to be, what did it buy Mr. Kenner? It bought him a 39 percent interest in Ken Jowdy's Cabo San Lucas. Didn't buy the players a 39 percent interest. Him. To this day, right now, he is a partner in that resort. That's where the money went. That's what it bought him. And on the backs, on the portfolios, of the hockey players."*

- **We know this was wholly false and prejudicial** (*government-forfeiture-36*)…

And – [*Tr.5990* – Komatireddy rebuttal summation]:
>*"…you know what, Baja Development Corporation, on that chart, but there is some sort of misconduct; you don't know what the money was for. You know exactly what the money was for. In fact, Mr. LaRusso, when the first witness got on the stand, one of his first exhibits he entered into evidence was a record of the Baja Development Corporation. Those records are in evidence. Mr. Kenner told you that he used that money to get his piece in the Mexico investment with Ken Jowdy. You know exactly what that's for. That's in evidence."*

- **We know this was wholly false and prejudicial (and it was not in evidence)…**

And – [*Tr.5996* – Komatireddy rebuttal summation]:
>*"He [Kenner] used it for personal use to get an interest in that resort in Cabo."*

6

- **We know this was wholly false and prejudicial...**

*Mexico litigation versus Jowdy...*
In 2012—deVries (along with another investor—Rem Murray) gave *voluntary* testimony in Mexico versus Jowdy in one of the open criminal cases to recover the Hawaii loans.   Berard—who was Jowdy's henchman at the time—threatened deVries and Rem Murray about pending U.S. litigation versus them personally—and no further Diamante access for signing criminal testimony versus Jowdy (his boss).   Ironically—it echoed the identical Kaiser and Berard's Mexico testimony before receiving their pay-for-play job months earlier.   deVries passed along the Berard threat to Kenner (with former FBI agents watching/following deVries, Murray, Gaudet, and the investors attorneys at the federal courthouse), [deVries—a.k.a. "devo"]: "*Berard just sent threatening text to me.   They know you are in the parking lot [at the courthouse].   Just heads up.   Devo...—and then [forward from Berard]...'U 2 DUMB Bastards [deVries and Murray].   At court house with Bob Gaudet signing criminal papers against Jowdy??   You 2 will never get on property now and will be getting sued in the USA...*'"

*California litigation versus Jowdy...*
deVries was a plaintiff in both 2009 California litigations versus Jowdy (*Ex. L: DDM lawsuit*) (*Ex. M: DCSL lawsuit*).   In fact—deVries travelled with Kenner, Kaiser, and Woolley to Los Angeles to witness Jowdy's January 2010, 2-day deposition confessions about all of the money Jowdy stole from: (1) the Hawaii partners (thru loans), (2) the Mexico investors (thru loans and equity), and (3) other individuals (thru loans) (*Ex. KK: day 1*) (*Ex. LL: day 2*).   deVries had unabated access to Ronald Richards during the two deposition days—*as his client*—and never complained about the 'Jowdy loans'.   deVries sat silent, just like Kaiser did—because 100% of the investors were aware.   Both lawsuits hi-lighted the Jowdy loan frauds in their complaints (*Ex. L at 7*—and *Ex. M at 7*):
> "*Mr. Najam was in charge of the corporate governance and while under Jowdy's direction and control, received over eight million dollars ($8,000,000) from a LLC in Hawaii.  Mr. Najam failed to properly account for those funds and has placed the Jowdy investors in a vulnerable and compromised position.*"

With Jowdy's California counsel present for two full days of deposition, it would have been the perfect time for deVries—or any participant—to express their

7

concerns for the 'loans' if they were anything but what everyone had known about for the prior 6-years.   No one said a word…[5]

As such—no emails or texts exist that refute deVries' 100% knowledge and active participation in the recovery of the Hawaii loan funds from Jowdy—including but not limited to he and Rem Murray suing Jowdy in Delaware Chancery Court in 2014 after the Kenner arrest and detainment; carrying the legal 'ball' in the USA for the Hawaii-Mexico investors.   Their Delaware litigation was in addition to attempting the legal completion of Kenner's the *receivership* in Mexico thru the Courts in December 2013 (4 weeks after Kenner's arrest).
> **Noting:** deVries was the Hawaii-Mexico investor who accompanied Kenner in October 2013 to the Supreme Court justices' chambers in La Paz, Baja California Sur, Mexico to arrange the December 2013 testimony for himself, Kenner, and the Hawaii-Mexico investors.   deVries was more active in the recovery of all the Jowdy frauds than almost any other investor.

- With no evidence to the contrary—the government cannot arbitrarily make him a Kenner-victim of the Hawaii transaction.

*GSF…*
deVries maintained direct communication with Constantine in February 2012—even after the Eufora litigation began with Constantine (*with deVries represented by Giuliani's investigation team: Ex. R, signed at 13*).   deVries *still* had no interest in adding Kenner as a litigation defendant in the follow-up EDNY case versus Constantine (filed by deVries' attorney, Michael Stolper in 2012).

In addition—there is *nothing* in the record that suggests Kenner had any control over deVries' GSF funds; only Constantine.   deVries told Constantine in February May 2013 (*Ex. II*): "*Ronald Richards said you [Constantine] had 100% control of the 'GSF'…so can you detail where the rest of my money was spent, invested etc…   this includes 250k of my money.   if you could also send me some updates share information for these companies I have invested in, including Eufora, the 'airplane', the Avalon Building, or any other my money has gone in to.*"

---

[5] Kristen Peca re-verified this in 2012 on her FBI recordings to Kenner: "*I know how mad Michael and the other guys are with Jowdy for not paying the loans back.   Who does that?*"…and
**Jozef Stumpel** (Ex-NHL player, Hawaii-Mexico investor, and Kenner's Baja Ventures 2006 partner) wrote to the Court: "*Everyone I ever talked to about it was mad at Jowdy for not paying our money back when he was supposed to even though we had a contract with him for Hawaii.*"

8

Clearly – devries had no belief that Kenner had any 'control' over his 'proceeds' at any point in time.   deVries heard that directly from his *independent* attorney, Ronald Richards.

**Noting**: deVries also hi-lighted the underlying multi-faceted GSF approach laid out by Constantine (*Ex. II at 2*):
> [deVries to Constantine]: "*If you could send me updated share information for these companies I have invested in, including Eufora, the 'airplane', the Avalon Building, or any other my money has gone to.*"

- DeVries had full-unfettered access to Kenner at all times—thru his 2013 arrest—and communicated directly with Constantine about his GSF funds—because deVries knew Kenner was a contributor to the GSF like him…nothing more as Michael Peca told the 2015 trial Court (*Tr.540*):
  > *Q. And what was Phil Kenner's participation in that, as you recall?*
  > *A [Michael Peca]: He didn't seem to have one.*

- With no evidence to the contrary—the government cannot arbitrarily make him a Kenner-victim of the GSF transaction.

*Eufora…*
- Rudi Giuliani's investigative group *independently* represented deVries in the Eufora matter.

deVries <u>*signed*</u> the disclosure letter that *hi-lighted* Constantine's frivolous allegations about Tim Gaarn 'stealing' stock from the company and re-selling it to the investors (*of which deVries would have been in that group: Ex. R at 13*).

Prior to (*Ex. Q*) (*Ex. R*) and after (*Ex. MM*) the filing the Arizona litigation versus Constantine with Giuliani's group, deVries participated in every email with his *independent* attorney, Stolper (subset only).   DeVries had unabated access to attorney Stolper and the Giuliani group at all times.   These emails detailed the various issues Stolper, Giuliani, and their team had uncovered in the Constantine-Eufora transactions.
- None of these issues were related to either the 2008 Constantine private stock sales or the 2008-09 Gaarn private stock sales—after a full and documented vetting.

deVries – like 29 other co-interested Eufora people (*Ex. R at 9*), had direct access to *independent* attorneys, disconnected from Kenner.   No fraudulent issue was ever

9

alleged or raised related to Kenner by deVries' attorneys.   Neither deVries nor any other Eufora investor was ever solely reliant on Kenner for their 3rd-party investments, as Peca and McKee falsely testified at trial (*Tr.713 [Kristen Peca]; Tr.1830 [McKee]*).

The evidence verifies that deVries knew that his attorneys were aware of the 2008 and 2009 transactions—requested the specific information from Constantine and Eufora—and vetted them (*Ex. Q at 1*, [Stolper]: "*As a result, I want to ensure that your clients are preserving, and not destroying, all evidence related to:…(vii) All capital contributions to Eufora, AZ Eufora Partners I LLC, AZ Eufora Partners II LLC, AZ Eufora Partners III LLC, AZ Eufora Partners IV LLC.*").

- **Everything was vetted**.  Only willful blindness by the passive-equity investors could explain a lack of knowledge—unless CTE or undue influences were involved in any revisionary 'lack of' recollections.

*DeVries filed a ProSe adverse proceeding versus Constantine's bankruptcy…*
In fact, in 2013 (*Ex. BB*) his filing was attempting to <u>verify the 2008 stock he bought from Constantine</u> would be excluded from Constantine's bankruptcy proceedings (*Ex. P at 5*).

- With no evidence to the contrary—the government cannot arbitrarily make him a Kenner-victim of the Eufora transaction.

*Other 'alleged losses'…*
deVries—like many of Kenner's business management clients thru Standard Advisors, participated in multiple 3rd-party private equity deals.   **Kenner did not have any control over them**.   deVries—like every other private equity investor *independently* signed their private equity documents with the 3rd party companies…
- In deVries' 'affidavit of loss', he lists: "*Add'l payments for media services, and attorneys' fees*", Impact protective Equipment, Code Fire, Ad Shapers, TekConnect Corporate, Vortal Optics (believed to be the same as Ad Shapers), Diamante del Mar, and Los Frailes.
- None of these were Kenner-controlled companies.

The government removed deVries on the eve of trial from their superseding indictment for a reason.   None of the alleged schemes in the superseding indictment have evidence supporting a 'lack of knowledge' or 'lack of authorizations' by deVries in every transaction; like every other Hawaii, Mexico, Eufora, GSF investor/contributor.

10

- There cannot be an assumed loss based on the prosecutorial themes of concealment in any element of the alleged case to deVries.

If not concurred by the Court, Kenner respectfully requests an evidentiary hearing to present this and the remainder of exculpatory evidence.

To recapitulate—Kenner requests an evidentiary hearing in the interest of justice for the incrementally alleged victims; ***specifically, any person not named in the superseding indictment***.   Kenner possesses—from the government's Rule 16 and forfeiture productions—a myriad of corroborating cross-exculpatory empirical evidence in Kenner's defense, exposing no possible 'concealment' at any time.  The incremental submissions also ***hi-light the CTE issues that debunk the government's entire case.***

***These CTE issues, alone, require a specific hearing—as previously requested by Kenner.***

Sincerely, Phil Kenner, Pro Se litigant



Submitted August 17, 2020