**United States Bankruptcy Court Southern District of New York**
Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

# PROOF OF CLAIM

| In Re: | Chapter 11 |
|---|---|
| Lehman Brothers Holdings Inc., et al. | Case No. 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |

| Name of Debtor Against Which Claim is Held | Case No. of Debtor |
|---|---|
| Lehman Commercial Paper Inc. | 08-13900 |

UNIQUE IDENTIFICATION NUMBER:   1000193227

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities. (See definition on reverse side.)

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

LBH (CredNum # 1000193227)   Copies to:
Danske Bank A/S London Branch   Venable LLP
75 King William Street   Counsel to Danske Bank A/S London Branch
London EC4N 7DT   1270 Avenue of the Americas, 25th Fl.
United Kingdom   New York, New York 10020
Attn: Peter Hughes   Attn: Carollynn Callari & Edward Smith

☐ Check this box to indicate that this claim amends a previously filed claim.

**Court Claim Number:**
(If known)

Filed on: _____

Telephone number: 212-307-5500     Email Address:

Name and address where payment should be sent (if different from above)
Danske Bank A/S London Branch
75 King William Street; London EC4N 7DT; United Kingdom
Attn: Peter Hughes

Telephone number: (44) 207-410-8066     Email Address:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)       0000019487

1. **Amount of Claim as of Date Case Filed:** $ See Exhibit "A"
If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.
☐ Check this box if all or part of your claim is based on a Derivative Contract.*
☐ Check this box if all or part of your claim is based on a Guarantee.*
**\*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.**
☑ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is based on a Derivative Contract or Guarantee.

2. **Basis for Claim:** See Exhibit "A"
(See instruction #2 on reverse side.)

3. **Last four digits of any number by which creditor identifies debtor:** _____
3a. **Debtor may have scheduled account as:** _____
(See instruction #3a on reverse side.)

4. **Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff:  ☐ Real Estate    ☐ Motor Vehicle    ☐ Other
Describe: _____
Value of Property: $_____  Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____  Basis for perfection: _____
**Amount of Secured Claim:** $_____  **Amount Unsecured:** $_____

6. **Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $_____
(See instruction #6 on reverse side.)

5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

**Amount entitled to priority:**

$_____

7. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
8. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
**DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.**
If the documents are not available, please explain:

**FOR COURT USE ONLY**

FILED | RECEIVED
SEP 18 2009
EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date: 9/18/09 | **Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. |
|---|---|

PETER HUGHES
GLOBAL MANAGER

Jovan Atkinson
Legal Counsel

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, : | Case No. 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |

------------------------------------------------------------x

**DEBTOR: Lehman Commercial Paper Inc.**
**CASE NO.: 08-13900**

### EXHIBIT A
### TO PROOF OF CLAIM OF
### DANSKE BANK A/S, LONDON BRANCH ("DANSKE")

#### Item 1. Amount of Claim.

Claimant (defined below) asserts a Claim (defined below) in an amount that includes but is not limited to (i) an amount of at least $699,657,333.82 (as reflected on Schedule 1 hereto) plus additional interest, expenses, attorneys fees and disbursements, losses, and any and all other amounts due and owing under, or relating to, the MRA (defined below), and (ii) damages related to the Debtors' breach of, or related to, the MRA.

#### Item 2. Basis for Claim.

Danske and its successors, predecessors and assigns (collectively, the "Claimant") assert the following claims (collectively, the "Claim") against the Debtor:

A. The liability of the Debtor to the Claimant arises under that certain Master Repurchase Agreement dated August 30, 1999, as amended by certain letter agreements dated as of March 17, 2005 and March 23, 2007, respectively (as so amended, the "MRA"), and various related agreements. Under the MRA, Danske is the Buyer and the Debtor is the Seller. The Debtor defaulted under the MRA, whereupon the repurchase price became immediately due and payable pursuant to the terms of the MRA.

B. Any and all claims, rights and/or remedies the Claimant may have, arising as a matter of law or equity, including, but not limited to, claims for indemnification, contribution, rescission, breach of contract, fraud, specific performance, misrepresentation, reimbursement and/or subrogation, related to or arising from transactions by or among or involving Claimant, the Debtor and/or any of its respective affiliates, successors, predecessors or assigns, based upon or relating to, the relationship of the Claimant and the Debtor under the

MRA and all documents and agreements related thereto and/or in connection therewith (but excluding claims for which a separate allowed, valid proof of claim has been timely filed by the Claimant against the Debtor).

C. Any and all claims, rights and/or remedies, arising as a matter of law or equity, and/or arising in, in connection with and/or related to any and all transactions and/or transfers between or involving the Claimant and the Debtor including, but not limited to, any and all written or oral contract, pledge, security interest, lease, guaranty, indemnity, contribution, fiduciary obligation, trust, quasi-contract, property, replevin, conversion, misrepresentation, set off or fraud (but excluding claims for which a separate allowed, valid proof of claim has been timely filed by the Claimant against the Debtor).

D. The type and full extent of certain claims made herein are undetermined at this time.

## Item 4. Secured Claim.

The Claim is secured to the extent of any set off, right of recoupment, counterclaim or credit. The balance of the Claim is unsecured. The extent of any set off, right of recoupment, counterclaim or credit is undetermined at this time.

## Item 5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507(a).

To the extent that any portion of the Claim is entitled to administrative priority status under section 507 of the Bankruptcy Code, the Claimant claims such priority status in the maximum amount allowed by law. The filing of this proof of claim shall in no way be deemed a waiver of Claimant's right to assert that any or all of the amounts owed under the MRA are entitled to administrative priority status.

**Item 6.** Not Applicable.

## Item 7. Credits.

The amount of all payments on the Claim has been credited and deducted for the purpose of making this Claim.

## Item 8. Documents.

The Claimant believes that the Debtor has copies of all documents supporting the Claim. The documents upon which this Claim is based include, but are not limited to, those documents identified on the list annexed hereto. Some documents may be omitted or redacted due to their confident nature. Additional copies or copies of any other relevant materials will be provided upon request.

The description of the Claim and classification thereof set forth herein is not a concession or admission as to the correct characterization or treatment of any such claims or a waiver of any rights or claims of Claimant under the MRA. Claimant reserves the right to amend, modify

and/or supplement this proof of claim at any time and in any manner, and to file additional proofs of claim for additional claims, including without limitation, claims which may be based on the respective rights and obligations arising under the documents described above, the relationship described herein or the same events and circumstances described herein, or claims or requests for payment with respect to any other indebtedness, liability or obligation of the Debtor. In addition, the Claimant reserves the right to attach or bring forth additional documents supporting the Claim and additional documents that may become available after further investigation and discovery. The Claimant further reserves the right to file proofs of claim for administrative expenses, other claims entitled to priority, proofs of interest and proofs of claim against other parties, including but not limited to affiliated debtors.

Claimant is continuing to investigate the elements of the Claim and this proof of claim is filed under the compulsion of the Notice of Deadline for Filing Proofs of Claim, dated July 8, 2009, providing notice that September 22, 2009 has been established as the general claims bar date in the Debtor's chapter 11 case. Accordingly, this proof of claim is a protective proof of claim and is filed to protect the Claimant from potential forfeiture of any and all rights against the Debtor. Claimant does not submit itself to the jurisdiction of this Court for any purpose other than with respect to the claims asserted in this Claim. The filing of this proof of claim shall not constitute: (a) a waiver or release of any rights or remedies of Claimant against the Debtor or any other person, entity or property; (b) a waiver of the Claimant to contest the jurisdiction of this Court with respect to the subject matter of the Claim, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving the Claimant; or (c) an election of remedies or choice of law or limitation of rights or remedies. All rights, claims, remedies, actions, defenses, setoffs or recoupments to which Claimant is or may be entitled under any agreements, instruments or documents, in law or equity, are expressly reserved.

[Remainder of Page is Intentionally Left Blank]

- 3 -

**Notices**. All notices concerning this Claim should be sent to:

        Danske Bank A/S London Branch
        75 King William Street
        London EC4N 7DT
        UK
        Attn:   Jovan Atkinson, Esq. and Peter Hughes

            *with copies to*:

        Venable LLP
        Rockefeller Center
        1270 Avenue of the Americas, 25th Floor
        New York, New York 10020
        Attn:   Carollynn Callari, Esq. and Edward Smith, Esq.

            - and –

        Venable LLP
        750 E. Pratt Street, Suite 900
        Baltimore, Maryland 21202
        Attn:   Mitchell Kolkin, Esq.

## DOCUMENT LIST

1. Master Repurchase Agreement dated August 30, 1999 between Den Danske Bank Aktienselskab[1], Cayman Islands Branch and Lehman Brothers International (Europe) (annexed hereto), as amended by:

   (i) Amendment to Master Repurchase Agreement dated March 9, 2001 between Lehman Brothers International (Europe), Lehman Brothers, Inc., Lehman Commercial Paper Inc., Danske Bank A/S, Cayman Islands Branch and Danske Bank A/S, London Branch pursuant to which Lehman Brothers Inc., Lehman Commercial Paper Inc. and Danske Bank A/S, London Branch became parties to the Master Repurchase Agreement;

   (ii) Amendment to Master Repurchase Agreement dated January 21, 2002 between Lehman Brothers International (Europe), Lehman Brothers Inc., Lehman Commercial Paper Inc., Lehman Brothers Bankhaus AG, Danske Bank A/S, Cayman Islands Branch and Danske Bank A/S, London Branch pursuant to which Lehman Brothers Bankhaus AG became a party to the Master Repurchase Agreement;

   (iii) Amendment to Master Repurchase Agreement dated March 31, 2005 between Lehman Brothers Inc., Lehman Brothers Bankhaus AG, Lehman Commercial Paper Inc., Lehman Brothers International (Europe), Lehman Brothers Holdings Inc., Danske Bank A/S, London Branch and Danske Bank A/S, Cayman Islands Branch pursuant to which Lehman Brothers Holdings Inc. became a party to the Master Repurchase Agreement.

2. Committed Repurchase Facility Agreement dated March 17, 2005 between Danske Bank A/S, London Branch, Lehman Brothers Bankhaus AG, Lehman Brothers International Europe, Lehman Commercial Paper Inc., Lehman Brothers Japan Inc. and Lehman Brothers Holdings Inc. providing for a USD 800 million committed tri-party repurchase facility (annexed hereto), as amended by:

   (i) Amendment to the USD 800 million Committed Repurchase Facility Agreement dated March 7, 2008 between Lehman Brothers Bankhaus AG, Lehman Brothers International Europe, Lehman Commercial Paper Inc., Lehman Brothers Holdings Inc. and Danske Bank A/S, London Branch.

   (ii) Amendment to the USD 800 million Committed Repurchase Facility Agreement dated May 2, 2008 between Lehman Brothers Bankhaus AG, Lehman Brothers International Europe, Lehman Commercial Paper Inc., Lehman Brothers Holdings Inc. and Danske Bank A/S, London Branch.

   (iii) Amendment to the USD 800 million Committed Repurchase Facility Agreement dated July 23, 2008 between Lehman Brothers Bankhaus AG, Lehman Brothers

---

[1] Subsequently re-named Danske Bank A/S, Cayman Islands Branch (this branch has since been closed and its facilities have been moved to Danske Bank A/S, London Branch and to Danske Bank A/S (Copenhagen)).

International Europe, Lehman Commercial Paper Inc., Lehman Brothers Holdings Inc. and Danske Bank A/S, London Branch.

3.  Committed Repurchase Facility Agreement dated March 23, 2007 between Danske Bank A/S, London Branch and Lehman Commercial Paper, Inc. providing for a USD 300 million committed tri-party repurchase facility (annexed hereto), as amended by:

    (i)     Amendment to the Committed Repurchase Facility Agreement dated April 4, 2007 between Lehman Commercial Paper, Inc. and Danske Bank A/S, London Branch.

    (ii)    Amendment to the Committed Repurchase Facility Agreement dated March 7, 2008 between Lehman Commercial Paper Inc. and Danske Bank A/S, London Branch.

    (iii)   Amendment to the Committed Repurchase Facility Agreement dated May 2, 2008 between Lehman Commercial Paper Inc. and Danske Bank A/S, London Branch.

    (iv)    Amendment to the Committed Repurchase Facility Agreement dated July 23, 2008 between Lehman Commercial Paper Inc. and Danske Bank A/S, London Branch.

4.  Tri-Party Custody Agreement dated 21 April 2006 between Danske Bank A/S, London Branch, Lehman Commercial Paper, Inc. and JPMorgan Chase Bank N.A. (annexed hereto), as amended by:

    (i)     Letter agreement between JPMorgan Chase Bank N.A and Danske Bank A/S dated September 15, 2006 assigning Tri-Party Custody Agreement to The Bank of New York.

    (ii)    Amendment to the Tri-Party Custody Agreement between Danske Bank A/S, London Branch, Lehman Commercial Paper, Inc., and The Bank of New York dated 2 May 2008.

5.  Guarantee of Lehman Brothers Holdings Inc. in favour of Danske Bank A/S, London Branch dated 17 March 2005.

6.  Guarantee of Lehman Brothers Holdings Inc. in favour of Danske Bank A/S, London Branch dated 19 March 2007.

7.  Notice of Default dated September 23, 2008 from Danske Bank A/S, London Branch.

# Schedule 1 to Proof of Claim

## Deficiency between the value of the purchased assets and the repurchase price (all figures in USD)

| Assets | Face amount of Assets | Repurchase price | Value of the asset as at 23.09.08 | Deficiency amount |
|---|---|---|---|---|
| Commercial mortgage loan assets | 1,173,597,389.75 | 800,587,599.42 | 248,191,568.00 | 552,396,031.42 |
| Residential mortgage loans | 394,203,869.89 | 300,604,513.86 | 165,565,625.35 | 135,038,888.51 |
| Total | 1,567,801,259.64 | 1,101,192,113.28 | 413,757,193.35 | 687,434,919.93 |

Interest on total deficiency amount from 23 September 2008 - 22 September 2009:

6,722,413.89

Estimated legal, valuation, consultancy and other fees and expenses:

5,500,000.00

**Total claim amount as at 22 September 2009:**

USD    699,657,333.82

# Master Repurchase Agreement

Copy ◯ original Master Repurchase
Agreement re-executed by Lehman
Brothers International and signed
by Conrad Santos.



# Master Repurchase Agreement

September 1996 Version

Dated as of      **August 30, 1999**

Between:      **Den Danske Bank Aktieselskab, Cayman Islands Branch ("Buyer")**

and      **Lehman Brothers International (Europe) ("Seller")**

## 1. Applicability

From time to time the parties hereto may enter into transactions in which one party ("Seller")
agrees to transfer to the other ("Buyer") securities or other assets ("Securities") against the transfer
of funds by Buyer, with a simultaneous agreement by Buyer to transfer to Seller such Securities at a
date certain or on demand, against the transfer of funds by Seller. Each such transaction shall be
referred to herein as a "Transaction" and, unless otherwise agreed in writing, shall be governed by
this Agreement, including any supplemental terms or conditions contained in Annex I hereto and
in any other annexes identified herein or therein as applicable hereunder.

## 2. Definitions

(a) "Act of Insolvency", with respect to any party, (i) the commencement by such party as debtor of
any case or proceeding under any bankruptcy, insolvency, reorganization, liquidation, moratori-
um, dissolution, delinquency or similar law, or such party seeking the appointment or election
of a receiver, conservator, trustee, custodian or similar official for such party or any substantial
part of its property, or the convening of any meeting of creditors for purposes of commencing
any such case or proceeding or seeking such an appointment or election, (ii) the commence-
ment of any such case or proceeding against such party, or another seeking such an appoint-
ment or election, or the filing against a party of an application for a protective decree under the
provisions of the Securities Investor Protection Act of 1970, which (A) is consented to or not
timely contested by such party, (B) results in the entry of an order for relief, such an appoint-
ment or election, the issuance of such a protective decree or the entry of an order having a sim-
ilar effect, or (C) is not dismissed within 15 days, (iii) the making by such party of a general
assignment for the benefit of creditors, or (iv) the admission in writing by such party of such
party's inability to pay such party's debts as they become due;

(b) "Additional Purchased Securities", Securities provided by Seller to Buyer pursuant to Paragraph
4(a) hereof;

(c) "Buyer's Margin Amount", with respect to any Transaction as of any date, the amount obtained by application of the Buyer's Margin Percentage to the Repurchase Price for such Transaction as of such date;

(d) "Buyer's Margin Percentage", with respect to any Transaction as of any date, a percentage (which may be equal to the Seller's Margin Percentage) agreed to by Buyer and Seller or, in the absence of any such agreement, the percentage obtained by dividing the Market Value of the Purchased Securities on the Purchase Date by the Purchase Price on the Purchase Date for such Transaction;

(e) "Confirmation", the meaning specified in Paragraph 3(b) hereof;

(f) "Income", with respect to any Security at any time, any principal thereof and all interest, dividends or other distributions thereon;

(g) "Margin Deficit", the meaning specified in Paragraph 4(a) hereof;

(h) "Margin Excess", the meaning specified in Paragraph 4(b) hereof;

(i) "Margin Notice Deadline", the time agreed to by the parties in the relevant Confirmation, Annex I hereto or otherwise as the deadline for giving notice requiring same-day satisfaction of margin maintenance obligations as provided in Paragraph 4 hereof (or, in the absence of any such agreement, the deadline for such purposes established in accordance with market practice);

(j) "Market Value", with respect to any Securities as of any date, the price for such Securities on such date obtained from a generally recognized source agreed to by the parties or the most recent closing bid quotation from such a source, plus accrued Income to the extent not included therein (other than any Income credited or transferred to, or applied to the obligations of, Seller pursuant to Paragraph 5 hereof) as of such date (unless contrary to market practice for such Securities);

(k) "Price Differential", with respect to any Transaction as of any date, the aggregate amount obtained by daily application of the Pricing Rate for such Transaction to the Purchase Price for such Transaction on a 360 day per year basis for the actual number of days during the period commencing on (and including) the Purchase Date for such Transaction and ending on (but excluding) the date of determination (reduced by any amount of such Price Differential previously paid by Seller to Buyer with respect to such Transaction);

(l) "Pricing Rate", the per annum percentage rate for determination of the Price Differential;

(m) "Prime Rate", the prime rate of U.S. commercial banks as published in The Wall Street Journal (or, if more than one such rate is published, the average of such rates);

(n) "Purchase Date", the date on which Purchased Securities are to be transferred by Seller to Buyer;

(o) "Purchase Price", (i) on the Purchase Date, the price at which Purchased Securities are transferred by Seller to Buyer, and (ii) thereafter, except where Buyer and Seller agree otherwise, such price increased by the amount of any cash transferred by Buyer to Seller pursuant to Paragraph 4(b) hereof and decreased by the amount of any cash transferred by Seller to Buyer pursuant to Paragraph 4(a) hereof or applied to reduce Seller's obligations under clause (ii) of Paragraph 5 hereof;

(p) "Purchased Securities", the Securities transferred by Seller to Buyer in a Transaction hereunder, and any Securities substituted therefor in accordance with Paragraph 9 hereof. The term "Purchased Securities" with respect to any Transaction at any time also shall include Additional Purchased Securities delivered pursuant to Paragraph 4(a) hereof and shall exclude Securities returned pursuant to Paragraph 4(b) hereof;

(q) "Repurchase Date", the date on which Seller is to repurchase the Purchased Securities from Buyer, including any date determined by application of the provisions of Paragraph 3(c) or 11 hereof;

(r) "Repurchase Price", the price at which Purchased Securities are to be transferred from Buyer to Seller upon termination of a Transaction, which will be determined in each case (including Transactions terminable upon demand) as the sum of the Purchase Price and the Price Differential as of the date of such determination;

(s) "Seller's Margin Amount", with respect to any Transaction as of any date, the amount obtained by application of the Seller's Margin Percentage to the Repurchase Price for such Transaction as of such date;

(t) "Seller's Margin Percentage", with respect to any Transaction as of any date, a percentage (which may be equal to the Buyer's Margin Percentage) agreed to by Buyer and Seller or, in the absence of any such agreement, the percentage obtained by dividing the Market Value of the Purchased Securities on the Purchase Date by the Purchase Price on the Purchase Date for such Transaction.

## 3. Initiation; Confirmation; Termination

(a) An agreement to enter into a Transaction may be made orally or in writing at the initiation of either Buyer or Seller. On the Purchase Date for the Transaction, the Purchased Securities shall be transferred to Buyer or its agent against the transfer of the Purchase Price to an account of Seller.

(b) Upon agreeing to enter into a Transaction hereunder, Buyer or Seller (or both), as shall be agreed, shall promptly deliver to the other party a written confirmation of each Transaction (a "Confirmation"). The Confirmation shall describe the Purchased Securities (including CUSIP number, if any), identify Buyer and Seller and set forth (i) the Purchase Date, (ii) the Purchase Price, (iii) the Repurchase Date, unless the Transaction is to be terminable on demand, (iv) the Pricing Rate or Repurchase Price applicable to the Transaction, and (v) any additional terms or conditions of the Transaction not inconsistent with this Agreement. The Confirmation, together with this Agreement, shall constitute conclusive evidence of the terms agreed between Buyer and Seller with respect to the Transaction to which the Confirmation relates, unless with

respect to the Confirmation specific objection is made promptly after receipt thereof. In the event of any conflict between the terms of such Confirmation and this Agreement, this Agreement shall prevail.

(c) In the case of Transactions terminable upon demand, such demand shall be made by Buyer or Seller, no later than such time as is customary in accordance with market practice, by telephone or otherwise on or prior to the business day on which such termination will be effective. On the date specified in such demand, or on the date fixed for termination in the case of Transactions having a fixed term, termination of the Transaction will be effected by transfer to Seller or its agent of the Purchased Securities and any Income in respect thereof received by Buyer (and not previously credited or transferred to, or applied to the obligations of, Seller pursuant to Paragraph 5 hereof) against the transfer of the Repurchase Price to an account of Buyer.

## 4. Margin Maintenance

(a) If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Buyer is less than the aggregate Buyer's Margin Amount for all such Transactions (a "Margin Deficit"), then Buyer may by notice to Seller require Seller in such Transactions, at Seller's option, to transfer to Buyer cash or additional Securities reasonably acceptable to Buyer ("Additional Purchased Securities"), so that the cash and aggregate Market Value of the Purchased Securities, including any such Additional Purchased Securities, will thereupon equal or exceed such aggregate Buyer's Margin Amount (decreased by the amount of any Margin Deficit as of such date arising from any Transactions in which such Buyer is acting as Seller).  . . . . . .

(b) If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Seller exceeds the aggregate Seller's Margin Amount for all such Transactions at such time (a "Margin Excess"), then Seller may by notice to Buyer require Buyer in such Transactions, at Buyer's option, to transfer cash or Purchased Securities to Seller, so that the aggregate Market Value of the Purchased Securities, after deduction of any such cash or any Purchased Securities so transferred, will thereupon not exceed such aggregate Seller's Margin Amount (increased by the amount of any Margin Excess as of such date arising from any Transactions in which such Seller is acting as Buyer).

(c) If any notice is given by Buyer or Seller under subparagraph (a) or (b) of this Paragraph at or before the Margin Notice Deadline on any business day, the party receiving such notice shall transfer cash or Additional Purchased Securities as provided in such subparagraph no later than the close of business in the relevant market on such day. If any such notice is given after the Margin Notice Deadline, the party receiving such notice shall transfer such cash or Securities no later than the close of business in the relevant market on the next business day following such notice.

(d) Any cash transferred pursuant to this Paragraph shall be attributed to such Transactions as shall be agreed upon by Buyer and Seller.

(e) Seller and Buyer may agree, with respect to any or all Transactions hereunder, that the respective rights of Buyer or Seller (or both) under subparagraphs (a) and (b) of this Paragraph may be exercised only where a Margin Deficit or Margin Excess, as the case may be, exceeds a specified dollar amount or a specified percentage of the Repurchase Prices for such Transactions (which amount or percentage shall be agreed to by Buyer and Seller prior to entering into any such Transactions).

(f) Seller and Buyer may agree, with respect to any or all Transactions hereunder, that the respective rights of Buyer and Seller under subparagraphs (a) and (b) of this Paragraph to require the elimination of a Margin Deficit or a Margin Excess, as the case may be, may be exercised whenever such a Margin Deficit or Margin Excess exists with respect to any single Transaction hereunder (calculated without regard to any other Transaction outstanding under this Agreement).

## 5. Income Payments

Seller shall be entitled to receive an amount equal to all Income paid or distributed on or in respect of the Securities that is not otherwise received by Seller, to the full extent it would be so entitled if the Securities had not been sold to Buyer. Buyer shall, as the parties may agree with respect to any Transaction (or, in the absence of any such agreement, as Buyer shall reasonably determine in its discretion), on the date such Income is paid or distributed either (i) transfer to or credit to the account of Seller such Income with respect to any Purchased Securities subject to such Transaction or (ii) with respect to Income paid in cash, apply the Income payment or payments to reduce the amount, if any, to be transferred to Buyer by Seller upon termination of such Transaction. Buyer shall not be obligated to take any action pursuant to the preceding sentence (A) to the extent that such action would result in the creation of a Margin Deficit, unless prior thereto or simultaneously therewith Seller transfers to Buyer cash or Additional Purchased Securities sufficient to eliminate such Margin Deficit, or (B) if an Event of Default with respect to Seller has occurred and is then continuing at the time such Income is paid or distributed.

## 6. Security Interest

Although the parties intend that all Transactions hereunder be sales and purchases and not loans, in the event any such Transactions are deemed to be loans, Seller shall be deemed to have pledged to Buyer as security for the performance by Seller of its obligations under each such Transaction, and shall be deemed to have granted to Buyer a security interest in, all of the Purchased Securities with respect to all Transactions hereunder and all Income thereon and other proceeds thereof.

## 7. Payment and Transfer

Unless otherwise mutually agreed, all transfers of funds hereunder shall be in immediately available funds. All Securities transferred by one party hereto to the other party (i) shall be in suitable form for transfer or shall be accompanied by duly executed instruments of transfer or assignment in blank and such other documentation as the party receiving possession may reasonably request, (ii) shall be transferred on the book-entry system of a Federal Reserve Bank, or (iii) shall be transferred by any other method mutually acceptable to Seller and Buyer.

## 8. Segregation of Purchased Securities

To the extent required by applicable law, all Purchased Securities in the possession of Seller shall be segregated from other securities in its possession and shall be identified as subject to this Agreement. Segregation may be accomplished by appropriate identification on the books and records of the holder, including a financial or securities intermediary or a clearing corporation. All of Seller's interest in the Purchased Securities shall pass to Buyer on the Purchase Date and, unless otherwise agreed by Buyer and Seller; nothing in this Agreement shall preclude Buyer from engaging in repurchase transactions with the Purchased Securities or otherwise selling, transferring, pledging or hypothecating the Purchased Securities, but no such transaction shall relieve Buyer of its obligations to transfer Purchased Securities to Seller pursuant to Paragraph 3, 4 or 11 hereof, or of Buyer's obligation to credit or pay Income to, or apply Income to the obligations of, Seller pursuant to Paragraph 5 hereof.

---

### Required Disclosure for Transactions in Which the Seller Retains Custody of the Purchased Securities

Seller is not permitted to substitute other securities for those subject to this Agreement and therefore must keep Buyer's securities segregated at all times, unless in this Agreement Buyer grants Seller the right to substitute other securities. If Buyer grants the right to substitute, this means that Buyer's securities will likely be commingled with Seller's own securities during the trading day, Buyer is advised that, during any trading day that Buyer's securities are commingled with Seller's securities, they [will]* [may]** be subject to liens granted by Seller to [its clearing bank]* [third parties]** and may be used by Seller for deliveries on other securities transactions. Whenever the securities are commingled, Seller's ability to resegregate substitute securities for Buyer will be subject to Seller's ability to satisfy [the clearing]* [any]** lien or to obtain substitute securities.

\* Language to be used under 17 C.FR. ß403.4(e) if Seller is a government securities broker or dealer other than a financial institution.

\*\* Language to be used under 17 C.FR. ß403.5(d) if Seller is a financial institution.

---

## 9. Substitution

(a) Seller may, subject to agreement with and acceptance by Buyer, substitute other Securities for any Purchased Securities. Such substitution shall be made by transfer to Buyer of such other Securities and transfer to Seller of such Purchased Securities. After substitution, the substituted Securities shall be deemed to be Purchased Securities.

(b) In Transactions in which Seller retains custody of Purchased Securities, the parties expressly agree that Buyer shall be deemed, for purposes of subparagraph (a) of this Paragraph, to have agreed to and accepted in this Agreement substitution by Seller of other Securities for Purchased Securities; provided, however, that such other Securities shall have a Market Value at least equal to the Market Value of the Purchased Securities for which they are substituted.

## 10. Representations

Each of Buyer and Seller represents and warrants to the other that (i) it is duly authorized to execute and deliver this Agreement, to enter into Transactions contemplated hereunder and to perform its obligations hereunder and has taken all necessary action to authorize such execution, delivery and performance, (ii) it will engage in such Transactions as principal (or, if agreed in writing, in the form of an annex hereto or otherwise, in advance of any Transaction by the other party hereto, as agent for a disclosed principal), (iii) the person signing this Agreement on its behalf is duly authorized to do so on its behalf (or on behalf of any such disclosed principal), (iv) it has obtained all authorizations of any governmental body required in connection with this Agreement and the Transactions hereunder and such authorizations are in full force and effect and (v) the execution, delivery and performance of this Agreement and the Transactions hereunder will not violate any law, ordinance, charter, bylaw or rule applicable to it or any agreement by which it is bound or by which any of its assets are affected. On the Purchase Date for any Transaction Buyer and Seller shall each be deemed to repeat all the foregoing representations made by it.

## 11. Events of Default

In the event that (i) Seller fails to transfer or Buyer fails to purchase Purchased Securities upon the applicable Purchase Date, (ii) Seller fails to repurchase or Buyer fails to transfer Purchased Securities upon the applicable Repurchase Date, (iii) Seller or Buyer fails to comply with Paragraph 4 hereof, (iv) Buyer fails, after one business day's notice, to comply with Paragraph 5 hereof, (v) an Act of Insolvency occurs with respect to Seller or Buyer, (vi) any representation made by Seller or Buyer shall have been incorrect or untrue in any material respect when made or repeated or deemed to have been made or repeated, or (vii) Seller or Buyer shall admit to the other its inability to, or its intention not to, perform any of its obligations hereunder (each an "Event of Default"):

(a) The nondefaulting party may, at its option (which option shall be deemed to have been exercised immediately upon the occurrence of an Act of Insolvency), declare an Event of Default to have occurred hereunder and, upon the exercise or deemed exercise of such option, the Repurchase Date for each Transaction hereunder shall, if it has not already occurred, be deemed immediately to occur (except that, in the event that the Purchase Date for any Transaction has not yet occurred as of the date of such exercise or deemed exercise, such Transaction shall be deemed immediately canceled). The nondefaulting party shall (except upon the occurrence of an Act of Insolvency) give notice to the defaulting party of the exercise of such option as promptly as practicable.

(b) In all Transactions in which the defaulting party is acting as Seller, if the nondefaulting party exercises or is deemed to have exercised the option referred to in subparagraph (a) of this Paragraph, (i) the defaulting party's obligations in such Transactions to repurchase all Purchased Securities, at the Repurchase Price therefor on the Repurchase Date determined in accordance with subparagraph (a) of this Paragraph, shall thereupon become immediately due and payable, (ii) all Income paid after such exercise or deemed exercise shall be retained by the nondefaulting party and applied to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder, and (iii) the defaulting party shall immediately deliver to the nondefaulting party any Purchased Securities subject to such Transactions then in the defaulting party's possession or control.

(c) In all Transactions in which the defaulting party is acting as Buyer, upon tender by the nondefaulting party of payment of the aggregate Repurchase Prices for all such Transactions, all right, title and interest in and entitlement to all Purchased Securities subject to such Transactions shall be deemed transferred to the nondefaulting party, and the defaulting party shall deliver all such Purchased Securities to the nondefaulting party.

(d) If the nondefaulting party exercises or is deemed to have exercised the option referred to in subparagraph (a) of this Paragraph, the nondefaulting party, without prior notice to the defaulting party, may:

(i) as to Transactions in which the defaulting party is acting as Seller, (A) immediately sell, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, any or all Purchased Securities subject to such Transactions and apply the proceeds thereof to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder or (B) in its sole discretion elect, in lieu of selling all or a portion of such Purchased Securities, to give the defaulting party credit for such Purchased Securities in an amount equal to the price therefor on such date, obtained from a generally recognized source or the most recent closing bid quotation from such a source, against the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder; and

(ii) as to Transactions in which the defaulting party is acting as Buyer, (A) immediately purchase, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, securities ("Replacement Securities") of the same class and amount as any Purchased Securities that are not delivered by the defaulting party to the nondefaulting party as required hereunder or (B) in its sole discretion elect, in lieu of purchasing Replacement Securities, to be deemed to have purchased Replacement Securities at the price therefor on such date, obtained from a generally recognized source or the most recent closing offer quotation from such a source.

Unless otherwise provided in Annex I, the parties acknowledge and agree that (1) the Securities subject to any Transaction hereunder are instruments traded in a recognized market, (2) in the absence of a generally recognized source for prices or bid or offer quotations for any Security, the nondefaulting party may establish the source therefor in its sole discretion and (3) all prices, bids and offers shall be determined together with accrued Income (except to the extent contrary to market practice with respect to the relevant Securities).

(e) As to Transactions in which the defaulting party is acting as Buyer, the defaulting party shall be liable to the nondefaulting party for any excess of the price paid (or deemed paid) by the nondefaulting party for Replacement Securities over the Repurchase Price for the Purchased Securities replaced thereby and for any amounts payable by the defaulting party under Paragraph 5 hereof or otherwise hereunder.

(f) For purposes of this Paragraph 11, the Repurchase Price for each Transaction hereunder in respect of which the defaulting party is acting as Buyer shall not increase above the

amount of such Repurchase Price for such Transaction determined as of the date of the exercise or deemed exercise by the nondefaulting party of the option referred to in sub-paragraph (a) of this Paragraph.

(g) The defaulting party shall be liable to the nondefaulting party for (i) the amount of all reasonable legal or other expenses incurred by the nondefaulting party in connection with or as a result of an Event of Default, (ii) damages in an amount equal to the cost (including all fees, expenses and commissions) of entering into replacement transactions and entering into or terminating hedge transactions in connection with or as a result of an Event of Default, and (iii) any other loss, damage, cost or expense directly arising or resulting from the occurrence of an Event of Default in respect of a Transaction.

(h) To the extent permitted by applicable law, the defaulting party shall be liable to the non-defaulting party for interest on any amounts owing by the defaulting party hereunder, from the date the defaulting party becomes liable for such amounts hereunder until such amounts are (i) paid in full by the defaulting party or (ii) satisfied in full by the exercise of the nondefaulting party's rights hereunder. Interest on any sum payable by the default-ing party to the nondefaulting party under this Paragraph 11 (h) shall be at a rate equal to the greater of the Pricing Rate for the relevant Transaction or the Prime Rate.

(i) The nondefaulting party shall have, in addition to its rights hereunder, any rights other-wise available to it under any other agreement or applicable law.

## 12. Single Agreement

Buyer and Seller acknowledge that, and have entered hereinto and will enter into each Transaction hereunder in consideration of and in reliance upon the fact that, all Transactions hereunder constitute a single business and contractual relationship and have been made in consideration of each other. Accordingly, each of Buyer and Seller agrees (i) to perform all of its obligations in respect of each Transaction hereunder, and that a default in the perfor-mance of any such obligations shall constitute a default by it in respect of all Transactions hereunder, (ii) that each of them shall be entitled to set off claims and apply property held by them in respect of any Transaction against obligations owing to them in respect of any other Transactions hereunder and (iii) that payments, deliveries and other transfers made by either of them in respect of any Transaction shall be deemed to have been made in consideration of payments, deliveries and other transfers in respect of any other Transactions hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted.

## 13. Notices and Other Communications

Any and all notices, statements, demands or other communications hereunder may be given by a party to the other by mail, facsimile, telegraph, messenger or otherwise to the address specified in Annex II hereto, or so sent to such party at any other place specified in a notice of change of address hereafter received by the other. All notices, demands and requests hereun-der may be made orally, to be confirmed promptly in writing, or by other communication as specified in the preceding sentence.

### 14. Entire Agreement; Severability

This Agreement shall supersede any existing agreements between the parties containing general terms and conditions for repurchase transactions. Each provision and agreement herein shall be treated as separate and independent from any other provision or agreement herein and shall be enforceable notwithstanding the unenforceability of any such other provision or agreement.

### 15. Non-assignability; Termination

(a) The rights and obligations of the parties under this Agreement and under any Transaction shall not be assigned by either party without the prior written consent of the other party, and any such assignment without the prior written consent of the other party shall be null and void. Subject to the foregoing, this Agreement and any Transactions shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns. This Agreement may be terminated by either party upon giving written notice to the other, except that this Agreement shall, notwithstanding such notice, remain applicable to any Transactions then outstanding.

(b) Subparagraph (a) of this Paragraph 15 shall not preclude a party from assigning, charging or otherwise dealing with all or any part of its interest in any sum payable to it under Paragraph 11 hereof.

### 16. Governing Law.

This Agreement shall be governed by the laws of the State of New York without giving effect to the conflict of law principles thereof.

### 17. No Waivers, Etc.

No express or implied waiver of any Event of Default by either party shall constitute a waiver of any other Event of Default and no exercise of any remedy hereunder by any party shall constitute a waiver of its right to exercise any other remedy hereunder. No modification or waiver of any provision of this Agreement and no consent by any party to a departure herefrom shall be effective unless and until such shall be in writing and duly executed by both of the parties hereto. Without limitation on any of the foregoing, the failure to give a notice pursuant to Paragraph 4(a) or 4(b) hereof will not constitute a waiver of any right to do so at a later date.

### 18. Use of Employee Plan Assets

(a) If assets of an employee benefit plan subject to any provision of the Employee Retirement Income Security Act of 1974 ("ERISA") are intended to be used by either party hereto (the "Plan Party") in a Transaction, the Plan Party shall so notify the other party prior to the Transaction. The Plan Party shall represent in writing to the other party that the Transaction does not constitute a prohibited transaction under ERISA or is otherwise exempt therefrom, and the other party may proceed in reliance thereon but shall not be required so to proceed.

(b) Subject to the last sentence of subparagraph (a) of this Paragraph, any such Transaction shall proceed only if Seller furnishes or has furnished to Buyer its most recent available audited statement of its financial condition and its most recent subsequent unaudited statement of its financial condition.

(c) By entering into a Transaction pursuant to this Paragraph, Seller shall be deemed (i) to represent to Buyer that since the date of Seller's latest such financial statements, there has been no material adverse change in Seller's financial condition which Seller has not disclosed to Buyer, and (ii) to agree to provide Buyer with future audited and unaudited statements of its financial condition as they are issued, so long as it is a Seller in any outstanding Transaction involving a Plan Party.

## 19. Intent

(a) The parties recognize that each Transaction is a "repurchase agreement" as that term is defined in Section 101 of Title 11 of the United States Code, as amended (except insofar as the type of Securities subject to such Transaction or the term of such Transaction would render such definition inapplicable), and a "securities contract" as that term is defined in Section 741 of Title 11 of the United States Code, as amended (except insofar as the type of assets subject to such Transaction would render such definition inapplicable).

(b) It is understood that either party's right to liquidate Securities delivered to it in connection with Transactions hereunder or to exercise any other remedies pursuant to Paragraph 11 hereof is a contractual right to liquidate such Transaction as described in Sections 555 and 559 of Title 11 of the United States Code, as amended.

(c) The parties agree and acknowledge that if a party hereto is an "insured depository institution," as such term is defined in the Federal Deposit Insurance Act, as amended ("FDIA"), then each Transaction hereunder is a "qualified financial contract," as that term is defined in FDIA and any rules, orders or policy statements thereunder (except insofar as the type of assets subject to such Transaction would render such definition inapplicable).

(d) It is understood that this Agreement constitutes a "netting contract" as defined in and subject to Title IV of the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") and each payment entitlement and payment obligation under any Transaction hereunder shall constitute a "covered contractual payment entitlement" or "covered contractual payment obligation", respectively, as defined in and subject to FDICIA (except insofar as one or both of the parties is not a "financial institution" as that term is defined in FDICIA).

## 20. Disclosure Relating to Certain Federal Protections

The parties acknowledge that they have been advised that:

(a) In the case of Transactions in which one of the parties is a broker or dealer registered with the Securities and Exchange Commission ("SEC") under Section 15 of the Securities Exchange Act of 1934 ("1934 Act"), the Securities Investor Protection Corporation has

taken the position that the provisions of the Securities Investor Protection Act of 1970 ("SIPA") do not protect the other party with respect to any Transaction hereunder;

(b) in the case of Transactions in which one of the parties is a government securities broker or a government securities dealer registered with the SEC under Section 15C of the 1934 Act, SIPA will not provide protection to the other party with respect to any Transaction hereunder; and

(c) in the case of Transactions in which one of the parties is a financial institution, funds held by the financial institution pursuant to a Transaction hereunder are not a deposit and therefore are not insured by the Federal Deposit Insurance Corporation or the National Credit Union Share Insurance Fund, as applicable.

| | |
|---|---|
| **Lehman Brothers International (Europe) ("Seller")** | **Den Danske Bank Aktieselskab, Cayman Island: Branch ("Buyer")** |
| [Name of Party] | [Name of Party] |
| By: | By: |
| Title: Edward J. Parker - Director | PETRI LUUKKANEN   VICE PRESIDENT |
| Date: | Title: HENRIK IBSEN   VICE PRESIDENT |
| Conrad Santos | Date: Aug. 30, 1999 |

# Amendments to the Master Repurchase Agreement

# AMENDMENT TO MASTER REPURCHASE AGREEMENT

This Amendment to Master Repurchase Agreement (the "Amendment") is made by and among Lehman Brothers International (Europe) ("LBIE"), Lehman Brothers Inc. ("LBI"), Lehman Commercial Paper Inc. ("LCPI"), Danske Bank A/S, Cayman Islands Branch ("Danske Cayman"), Danske Bank A/S, London Branch ("Danske London") and Lehman Brothers Bankhaus AG ("LBBAG").

WHEREAS, LBIE, LBI, LCPI, Danske Cayman and Danske London entered into that certain Master Repurchase Agreement dated as of August 30, 1999 (the "Repo Agreement"), as amended from time to time;

WHEREAS, LBIE, LBI, LCPI, Danske Cayman and Danske London wish to add LBBAG as an additional party, to the Repo Agreement, subject to all of the rights and responsibilities as set forth in such Repo Agreement;

WHEREAS, LBBAG wishes to become an additional party to, and accepts all of the rights and responsibilities specified in the Repo Agreement;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree that LBBAG is named a party to the Repo Agreement, and that with regard to any Repurchase Transaction, the Confirmation provided by LBI, LCPI, LBIE, or LBBAG with regard to each Repurchase Transaction pursuant to Section 3(b) of the Repo Agreement will indicate the specific branch of Danske Bank to which that Repurchase Transaction applies.

All capitalized terms used and not defined herein shall have the meaning ascribed to them in the Repo Agreement.

This Amendment may be executed in one or more counterparts, and when each party hereto has executed at least one counterpart, this Amendment shall be deemed to be the one and the same document.

# AMENDMENT TO MASTER REPURCHASE AGREEMENT

This Amendment to Master Repurchase Agreement (the "Amendment") is made by and among Lehman Brothers International (Europe) ("LBIE"), Lehman Brothers Inc. ("LBI"), Lehman Commercial Paper Inc. ("LCPI"), Danske Bank A/S, Cayman Islands Branch ("Danske Cayman"), Danske Bank A/S, London Branch ("Danske London") and Lehman Brothers Bankhaus AG ("LBBAG").

WHEREAS, LBIE, LBI, LCPI, Danske Cayman and Danske London entered into that certain Master Repurchase Agreement dated as of August 30, 1999 (the "Repo Agreement"), as amended from time to time;

WHEREAS, LBIE, LBI, LCPI, Danske Cayman and Danske London wish to add LBBAG as an additional party, to the Repo Agreement, subject to all of the rights and responsibilities as set forth in such Repo Agreement;

WHEREAS, LBBAG wishes to become an additional party to, and accepts all of the rights and responsibilities specified in the Repo Agreement;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree that LBBAG is named a party to the Repo Agreement, and that with regard to any Repurchase Transaction, the Confirmation provided by LBI, LCPI, LBIE, or LBBAG with regard to each Repurchase Transaction pursuant to Section 3(b) of the Repo Agreement will indicate the specific branch of Danske Bank to which that Repurchase Transaction applies.

All capitalized terms used and not defined herein shall have the meaning ascribed to them in the Repo Agreement.

This Amendment may be executed in one or more counterparts, and when each party hereto has executed at least one counterpart, this Amendment shall be deemed to be the one and the same document.

This Amendment shall become effective on the date written below.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed as of January 21, 2002 by their respective authorized officers.

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

By: _____
Name:   Conrad Santos
Title:   Executive Director

**LEHMAN BROTHERS INC.**
**LEHMAN COMMERCIAL PAPER INCE.**

By: _____
Name:   Robert E. Guglielmo
Title:   Senior Vice President

**LEHMAN BROTHERS BANKHAUS AG**

By: _____
Name:   AN ANDERSON
Title:   Authorised Signatory

**DANSKE BANK A/S, CAYMAN ISLANDS BRANCH**

By: _____        By: _____
Name: GEORGE NEOFFIDIS      Name: JOHN A. O'NEILL
       VICE PRESIDENT              ASSISTANT GENERAL MANAGER
Title: _____       Title: _____

**DANSKE BANK A/S, LONDON BRANCH**

By: _____        By: _____
Name: _____       Name: S. DAY
Title: MANAGER              Title: AGM

## AMENDMENT TO MASTER REPURCHASE AGREEMENT

This Amendment to Master Repurchase Agreement (the "Amendment") is made by and among Lehman Brothers International (Europe) ("LBIE"), Lehman Brothers Inc. ("LBI"), Lehman Commercial Paper Inc. ("LCPI"), Danske Bank A/S, Cayman Islands Branch ("Danske Cayman"), Danske Bank A/S, London Branch ("Danske London") and Lehman Brothers Bankhaus AG ("LBBAG").

WHEREAS, LBIE, LBI, LCPI, Danske Cayman and Danske London entered into that certain Master Repurchase Agreement dated as of August 30, 1999 (the "Repo Agreement"), as amended from time to time;

WHEREAS, LBIE, LBI, LCPI, Danske Cayman and Danske London wish to add LBBAG as an additional party, to the Repo Agreement, subject to all of the rights and responsibilities as set forth in such Repo Agreement;

WHEREAS, LBBAG wishes to become an additional party to, and accepts all of the rights and responsibilities specified in the Repo Agreement;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree that LBBAG is named a party to the Repo Agreement, and that with regard to any Repurchase Transaction, the Confirmation provided by LBI, LCPI, LBIE, or LBBAG with regard to each Repurchase Transaction pursuant to Section 3(b) of the Repo Agreement will indicate the specific branch of Danske Bank to which that Repurchase Transaction applies.

All capitalized terms used and not defined herein shall have the meaning ascribed to them in the Repo Agreement.

This Amendment may be executed in one or more counterparts, and when each party hereto has executed at least one counterpart, this Amendment shall be deemed to be the one and the same document.

1

This Amendment shall become effective on the date written below.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed as of January 21, 2002 by their respective authorized officers.

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

By: _____
Name:        Conrad Santos
Title:        Executive Director

**LEHMAN BROTHERS INC.**
**LEHMAN COMMERCIAL PAPER INC.**

By: _____
Name:        Robert E. Guglielmo
Title:        Senior Vice President

**LEHMAN BROTHERS BANKHAUS AG**

By: _____        By: _____
Name:        David Rushton              Name:        Ray O'Connell
Title:        Director                   Title:        Executive Director

**DANSKE BANK A/S, CAYMAN ISLANDS BRANCH**

By: _____        By: _____

Name: _____        Name: _____

Title: _____        Title: _____

**DANSKE BANK A/S, LONDON BRANCH**

By: _____        By: _____

Name: _____        Name: _____

Title: _____        Title: _____

2

## AMENDMENT TO MASTER REPURCHASE AGREEMENT

This Amendment to Master Repurchase Agreement (the "Amendment") is made by and among Lehman Brothers International (Europe) ("LBIE"), Danske Bank A/S, Cayman Islands Branch ("Danske Cayman"), Lehman Brothers Inc. ("LBI"), Lehman Commercial Paper Inc. ("LCPI") and Danske Bank A/S, London Branch ("Danske London").

WHEREAS, LBIE and Danske Cayman entered into that certain Master Repurchase Agreement dated as of August 30, 1999 (the "Repo Agreement");

WHEREAS, LBIE and Danske Cayman wish to add LBI, LCPI, and Danske London as additional parties, to the Repo Agreement, each subject to all of the rights and responsibilities as set forth in such Repo Agreement;

WHEREAS, LBI, LCPI and Danske London each wishes to become an additional party to, and each accepts all of the rights and responsibilities specified in the Repo Agreement;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree that LBI, LCPI and Danske London are each named a party to the Repo Agreement, and that with regard to any Repurchase Transaction, the Confirmation provided by LBI, LCPI or LBIE with regard to each Repurchase Transaction pursuant to Section 3(b) of the Repo Agreement will indicate the specific branch of Danske Bank to which that Repurchase Transaction applies.

All capitalized terms used and not defined herein shall have the meaning ascribed to them in the Repo Agreement.

This Amendment may be executed in one or more counterparts, and when each party hereto has executed at least one counterpart, this Amendment shall be deemed to be the one and the same document.

1

This Amendment shall become effective on the date written below.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed as of March 9, 2001 by their respective authorized officers.

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

By:
Name:    Conrad Santos
Title:    Executive Director

**LEHMAN BROTHERS INC.**
**LEHMAN COMMERCIAL PAPER INCE.**

By:
Name:    Robert H. Bing
Title:    Vice President

**DANSKE BANK A/S, CAYMAN ISLANDS BRANCH**

By:                     By:
Name:  JOHN A. O'NEILL      Name:  ANDERS IVERSEN
       VICE PRESIDENT              VICE PRESIDENT
Title:                      Title:

**DANSKE BANK A/S, LONDON BRANCH**

By:                     By:
Name:  PP POWELL         Name:  S. DAY
Title:  MANAGER         Title:  ASST. GEN. MANAGER

2

## GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

To:    Danske Bank A/S, London Branch

As an inducement to you for, and in consideration of, your entering into transactions or making or extending in your discretion one or more loans or advances or other credit facilities or financial accommodations (all of which are hereinafter referred to as the "Obligations") under a Master Repurchase Agreement dated August 30, 1999 and amended on March 9, 2001 (the "Agreement") to Lehman Commercial Paper Inc. ("LCPI") upon such terms and in such amounts as LCPI may negotiate with and obtain from you, we do hereby absolutely and unconditionally guarantee to you, your successors, endorsees, and assigns, the payment by LCPI of its Obligations in an amount not to exceed $500,000,000.00[Five Hundred Million Dollars ] (the "Guaranteed Amount") to you, your successors, endorsees, and assigns, now existing, or which hereafter may be contracted or existing, as the same shall respectively become due, whether at maturity, by declaration, demand, or otherwise, together with accrued interest and charges, and we agree to reimburse you for all expenses including reasonable attorneys' fees of enforcing or obtaining or endeavoring to enforce or obtain payment thereof.

This Guarantee is absolute and unconditional without limitation as to duration up to the Guaranteed Amount. We shall have no right of subrogation with respect to any payments we make under this Guarantee until all Obligations of LCPI to you are paid in full.

This Guarantee is a guarantee of payment, and not of collection, and you may exercise your rights hereunder against us without first having to take any action against LCPI, or any other guarantor. We agree that in the event the Obligations which are guaranteed hereunder are paid, our liability as guarantor shall continue and remain in full force and effect in the event that all or part of such payment is recovered from you as a preference or fraudulent transfer under the Federal Bankruptcy Code, or any applicable state law.

We hereby waive diligence, presentment, protest, demand of any kind in connection with the delivery, acceptance, performance, default or enforcement of this Guarantee.

This Guarantee shall be binding upon us, our successors and assigns.

This Guarantee will remain in full force and effect until the first to occur of (a) a notice by us to you that we are terminating the Guarantee or (b) the Agreement is no longer in existence. Termination of this Guarantee shall not affect our liability hereunder as to the obligations incurred or arising out of transactions entered into prior to the termination hereof.

At such time as this Guarantee is delivered to you, this Guarantee shall entirely supersede and replace any other guarantee previously delivered by us or any of our affiliates to you

with regard to the Obligations of LCPI, and no previously delivered guarantee with regard thereto shall be honored by us or any of our affiliates.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York.

**IN WITNESS WHEROF,** I have hereunto set my hand on $\frac{3}{19}/2007$

LEHMAN BROTHERS HOLDINGS INC.

By: _____

Name: Christopher M. O'Meara
Title:  Chief Financial Officer, Executive
        Vice President and Controller

2

## AMENDMENT TO **MASTER REPURCHASE AGREEMENT**

This Amendment to the Master Repurchase Agreement, dated as of March 31[th] 2005, as amended from time to time (the "Amendment") is made by and among Lehman Brothers Bankhaus AG ("LBBAG"), Lehman Brothers Inc. ("LBI"), Lehman Commercial Paper Inc. ("LCPI"), Lehman Brothers International (Europe) ("LBIE"), Lehman Brothers Holdings Inc. ("LBHI"), Danske Bank A/S, Cayman Islands Branch ("Danske Cayman") and Danske Bank A/S, London Branch ("Danske London").

WHEREAS, LBBAG, LBI, LCPI, LBIE, Danske Cayman and  Danske London entered into that certain Master Repurchase Agreement dated as of August 17, 1995, as amended from time to time (the "Agreement");

WHEREAS, LBBAG, LBI, LCPI, LBIE, Danske Cayman and Danske London wish to add LBHI as an additional party to the Agreement, subject to all of the rights and responsibilities of Seller as set forth in such Agreement;

WHEREAS, LBHI wishes to become an additional party to, and accepts all of the rights and responsibilities of a Seller specified in, the Agreement;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree that LBHI is named a party to the Agreement.

All capitalized terms used and not defined herein shall have the meaning ascribed to them in the Agreement.

This Amendment may be executed in one or more counterparts, and when each party hereto has executed at least one counterpart, this Amendment shall be deemed to be the one and the same document.

This Amendment shall become effective on the date written below.

1

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed as of March 31th, 2005 by their respective authorized officers.

**LEHMAN BROTHERS INC.**

By: _____

Name: T. COURTNEY JENKINS

Title: VICE PRESIDENT

**LEHMAN BROTHERS BANKHAUS AG**

By: _____

Name:

Title:

**LEHMAN COMMERCIAL PAPER INC.**

By: _____

Name: T. COURTNEY JENKINS

Title: VICE PRESIDENT

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

By: _____

Name:

Title:

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____

Name:

Title:

2

Amendment to MRA

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed as of March 31th, 2005 by their respective authorized officers.

**LEHMAN BROTHERS INC.**

By:_____
Name:
Title:

**LEHMAN BROTHERS BANKHAUS AG**

By:_____
Name:   VIDALIE      Bormann
Title:   Executive    Director
         Director

**LEHMAN COMMERCIAL PAPER INC.**

By:_____
Name:
Title:

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

By:_____
Name:
Title:

**LEHMAN BROTHERS HOLDINGS INC.**

By:_____
Name:
Title:

2

Amendment to MRA

IN WITNESS WHEREOF, the parties hereto have caused this
Amendment to be executed as of March 31[th], 2005 by their respective authorized officers.

**LEHMAN BROTHERS INC.**

By:_____

Name:

Title:

**LEHMAN BROTHERS BANKHAUS AG**

By:_____

Name:

Title:

**LEHMAN COMMERCIAL PAPER INC.**

By:_____

Name:

Title:

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

By:_____

Name:  Jane Burrows

Title:  Authorised Signatory

**LEHMAN BROTHERS HOLDINGS INC.**

By:_____

Name:

Title:

2

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed as of March 31th, 2005 by their respective authorized officers.

**LEHMAN BROTHERS INC.**

By:_____

Name:

Title:

**LEHMAN BROTHERS BANKHAUS AG**

By:_____

Name:

Title:

**LEHMAN COMMERCIAL PAPER INC.**

By:_____

Name:

Title:

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

By:_____

Name: His Gilees

Title: Authorised Sputy

**LEHMAN BROTHERS HOLDINGS INC.**

By:_____

Name:

Title:

2

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed as of March 31th, 2005 by their respective authorized officers.

**LEHMAN BROTHERS INC.**

By:_____
Name:
Title:

**LEHMAN BROTHERS BANKHAUS AG**

By:_____
Name:
Title:

**LEHMAN COMMERCIAL PAPER INC.**

By:_____
Name:
Title:

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

By:_____
Name:
Title:

**LEHMAN BROTHERS HOLDINGS INC.**

By:_____
Name: Nahill Younis
Title:   Assistant Treasurer

2

Amendment to MRA

**DANSKE BANK A/S, LONDON BRANCH**

By: _____    By: _____

Name: *Ian Rosenthal*    Name: _____

Title: *Manager*    Title: MANAGER

3

**DANSKE BANK A/S, LONDON BRANCH**

By:_____    By:_____

Name:_____    Name:_____

Title:_____    Title:_____

**DANSKE BANK A/S, CAYMAN ISLANDS BRANCH**

By:_____    By:_____

Name:_____    Name:_____
        ANDERS IVERSEN         JOHN A O'NEILL
        VICE PRESIDENT        ASSISTANT GENERAL MANAGER

Title:_____    Title:_____

3

# $800,000,000 Committed Repurchase Facility

**LEHMAN BROTHERS BANKHAUS AG**
**LEHMAN BROTHERS INTERNATIONAL EUROPE**
**LEHMAN COMMERCIAL PAPER INC.**
**LEHMAN BROTHERS JAPAN INC.**
**LEHMAN BROTHERS HOLDINGS INC.**

March 17ᵗʰ, 2005

DANSKE BANK A/S, LONDON BRANCH
75 King William Street
London
EC4N 7DT, England
     Attention: Carol Powell, Manager—Credit Documentation

Re: Committed Secured Revolving Repurchase Facility

Ladies and Gentlemen:

I. This letter agreement (*"Committed Repurchase Facility Agreement"*) amends and restates the *Second Restated Facility Agreement* dated 20 November 2003 ("Existing Facility Agreement") by and among between **Danske Bank A/S, London Branch** ("Danske London") **Lehman Brothers Bankhaus AG** ("LBBAG") and **Lehman Brothers International (Europe)** ("LBIE"). This *Committed Repurchase Facility Agreement* shall be effective as of 17 March 2005 ("Effective Date").

II. Danske London, LBBAG and LBIE agree to add:

Lehman Commercial Paper Inc. ("LCPI") and

Lehman Brothers Holdings Inc. ("LBHI")

as parties to this *Committed Repurchase Facility Agreement* and LCPI and LBHI agree to become parties to this *Committed Repurchase Facility Agreement* and to be bound by its terms. For purposes of all Transactions under this *Committed Repurchase Facility Agreement*, any of LBBAG, LBIE, LCPI and LBHI may be Seller, and Danske London will be Buyer.

III. This *Committed Repurchase Facility Agreement* confirms the agreement of Danske London, LBBAG, LBIE, LCPI and LBHI to enter into repurchase transactions upon request by Seller from time to time subject to and upon the terms and conditions set forth herein and

- in the *Master Repurchase Agreement*, dated August 30, 1999, among Danske London, LBIE and LBBAG and others (as amended from time to time, the "Master Agreement"),
- the *Custodial Undertaking in Connection with Master Repurchase Agreement* (as amended from time to time, the "FI-Custodial Undertaking"), dated August 17, 1995, among Danske London, LBIE, LCPI and JPMorgan Chase Bank (formerly, The Chase Manhattan Bank) and others , and
- the *Custodial Undertaking in Connection with Master Repurchase Agreement* (as amended from time to time, the "WL-Custodial Undertaking"), dated August 30, 1999, among Danske London, LBIE, LBBAG and JPMorgan Chase Bank (formerly, The Chase Manhattan Bank) and others

(the Master Agreement, the FI-Custodial Undertaking, and the WL-Custodial Undertaking, collectively, the "Agreements").

Lehman $800m Facility Execution

IV. As from the Effective Date, all outstanding Transactions entered into by the parties pursuant to the Existing Facility Agreement shall continue and be governed by the terms of this *Committed Repurchase Facility Agreement*. For the avoidance of doubt, any change in economics arising from this *Committed Repurchase Facility Agreement* shall take effect on the Effective Date, provided, however, that for outstanding Transactions, the current Interest Period and the Pricing Rate, as provided in the Existing Facility Agreement, shall continue.

V. To the extent the terms of this *Committed Repurchase Facility Agreement* and the terms of the Agreements differ, the terms of this *Committed Repurchase Facility Agreement* shall control.

VI. All obligations of LBBAG, LBIE, and LCPI are guaranteed by LBHI in accordance with the guarantee dated 17 March 2005 and attached hereto as Schedule B.

VII. Capitalized terms not defined herein have the respective meanings given to them in the Agreements. The Facility Terms are as follows:

| FACILITY TERMS | |
|---|---|
| **1.   Maximum Quantity:** | The maximum aggregate Purchase Price outstanding at any one time shall be $800,000,000. |
| **2. // Seller:** | LBBAG , LBIE, LCPI or LBHI, as applicable. |
| **3.   Transactions; Minimum, Increases:** | The amount and term of each Transaction will be determined by Seller from time to time in its sole discretion. |
| **4. // Term of Transactions:** | Each Transaction under this *Committed Repurchase Facility Agreement* shall continue in existence until Notice of Termination is received from Buyer in accordance with Sections 5 and 6 below. |
| **5.   Termination and Buyer's Right to Terminate Facility Agreement or Transaction:** | (1)   Buyer's Right to Terminate Facility in the Event of Seller Default: This *Committed Repurchase Facility Agreement* shall terminate ("Facility Termination Date") with respect to a Seller on the date on which an Event of Default has occurred and been declared in respect of such Seller pursuant to the Master Agreement. Following such occurrence and declaration of an Event of Default, all Transactions hereunder with respect to such Seller shall terminate in accordance with the Master Agreement. |
| | For the avoidance of doubt, if an Event of Default occurs in respect one or more Sellers but not to all Sellers, this *Committed Repurchase Facility Agreement* shall terminate in respect of the defaulting Sellers and shall continue in full force and effect between Buyer and the non-defaulting Sellers, with no alteration of any terms hereof but for cessation of the defaulting Sellers as parties hereto. Termination with respect to a Seller shall not affect any liabilities of such terminated party owed to Buyer under this *Committed Repurchase Facility Agreement* prior to termination. |
| **6. // Maturity Dates** | The initial Maturity Date, in respect of the Facility, shall be the date falling fifteen-months after the Effective Date of this *Committed Repurchase Facility Agreement*. The Maturity Date shall automatically be extended by a period of three months at the end of each successive three-month anniversary of the Effective Date. |
| | The Buyer may at any time give notice to the Sellers that the Maturity Date will be the date falling fifteen months from the date on which the Buyer gives notice to the Sellers of the date which will, from the date of that notification, be the Final Maturity Date. |
| **7.   Eligible Collateral:** | As set forth on Schedule A and marked-to-market in accordance with the FI-Custodial Undertaking, and the WL-Custodial |

Lehman 800m Facility Execution

| FACILITY TERMS | |
|---|---|
| | Undertaking, as appropriate. |
| 8. **R** | **REDACTED** |
| 9. **Pricing Rate and Expenses:** | The Pricing Rate for any Transaction shall equal the per annum London Interbank Offered Rate ("LIBOR") corresponding to the Interest Period (as defined below) as calculated on the day that is two London Business Days prior to (1) the Purchase Date with respect to a new Transaction or (2) the expiration date of the elected Interest Period with respect to a continuing Transaction, plus 35 bps. |
| | The Interest Period is defined as the term of the Transaction (as recorded in the initial confirmation in respect of such Transaction), and shall be a seven-day, fourteen day, or one, two, three, or six month period, or such other Interest Period as the Borrower and Bank agree. If upon the expiration of the time for notification of any new Interest Period, the Borrower has failed to elect a new Interest Period to be applicable to such Borrowing as provided above, then the Borrower shall be deemed to have elected an Interest Period of seven days for such Borrowing |
| | In the event that Seller prepays a Transaction, in whole or in part, on a Business Day that is not the last day of the applicable Interest Period, Seller shall pay Buyer Breakage Costs (as defined below) in accordance with Section 17 herein. |
| | Further, Seller shall pay to Buyer on demand by Buyer an amount equal to the cost of all reserves actually imposed on, or actually incurred by, Buyer in connection therewith, provided however, that Buyer shall provide documentation reasonably acceptable to LBBAG, LBIE, LCPI or LBHI (as the case may be) detailing the amount and nature of such imposed reserves and costs thereof. |
| 10. **Interest Payments:** | Interest accrued shall be due and payable on each of (i) the last day of each Interest Period or (ii) on the Repurchase Date of any Transaction hereunder, or (iii) the date on which a Seller makes a prepayment in accordance with Section 14 herein, or (iv) termination of this *Committed Repurchase Facility Agreement*, either by its terms or for any reason whatsoever. |
| 11. **Facility Fee** | LBBAG, LBIE, LCPI and LBHI shall pay Buyer a facility fee (the "Facility Fee") calculated on the undrawn portion of the Purchase Price of $800,000,000. The computation of the Facility Fee shall be made on the basis of a year of 360 days, at an interest rate equal to 15 bps. The Facility Fee shall be calculated by Danske London, with such calculation to be conclusive and binding on LBBAG, LBIE, LCPI and LBHI in the absence of manifest error. The Facility Fee shall be payable in arrears quarterly on the last day of each March, June, September and December, commencing 31 March 2005, as well as on the Final Maturity Date and any Facility Termination Date. |
| 12. **Notice of Purchase:** | Seller shall notify Buyer via telephone or by way of an electronic messaging system ("Notice of Purchase") not later than 12:00 P.M. (New York City time) two Business Days prior to the Purchase Date for a particular Transaction of its intent to enter into a transaction. |
| | Each Transaction may be evidenced by a notice of purchase in substantially the form of Exhibit 1 hereto ("Notice of Purchase"), or, in the absence of such Notice of Purchase, a (i) Confirmation |

| FACILITY TERMS | |
|---|---|
| | pursuant to the *Master Agreement* or (ii) an "information statement" in accordance with Section 6 or 8 as the case may be of the applicable *Custodial Undertaking*. |
| **13. *Market Value:*** | As defined in the applicable Custodial Undertaking. |
| **14. *Voluntary Prepayments by Seller:*** | Seller shall be allowed to prepay the Purchase Price in whole or in part at any given time of any Business Day. Seller shall notify Buyer of such election to prepay not later than 10:00 AM (New York City time) on the Business Day on which Seller intends to prepay. |
| **15. *Custodian:*** | JPMorgan Chase Bank, New York, New York, or any successor thereto. |
| **16. *Substitution:*** | Without limiting the rights of a Seller under the Master Agreement, at any time, from time to time, Seller shall have the unlimited right to substitute or withdraw Purchased Assets and substitute other Eligible Assets provided that the substituted Assets are Eligible Assets as set forth in Schedule A herein and/or as provided for in the Custodial Undertaking. |
| **17. *Additional Terms:*** | Breakage Costs: The product of (i) the prepayment amount, (ii) the current Pricing Rate less the interpolated LIBOR with designated maturity equal to Breakage Days as determined on the prepayment date (if positive and if not positive then zero (0)), and (iii) Breakage Days divided by 360. The parties agree that if the current pricing rate is less than or equal to such interpolated LIBOR, there shall be no Breakage Costs. |
| | Breakage Days: The actual number of days from and including the prepayment date to the Business Day prior to the next scheduled day when interest payment is due. |
| | Intermediation by Lehman Brothers Inc. With respect to the execution of Transactions contemplated under this *Committed Repurchase Facility Agreement*, Lehman Brothers Inc. (an affiliate of LBBAG, LBIE, LCPI and LBHI) shall act as agent for LBBAG, LBIE, LCPI and LBHI. Such agency may take the form of communications with Buyer as well as the booking of Transactions. |
| **18. *Assignability:*** | No party may assign this *Committed Repurchase Facility Agreement* without the written consent of all other parties. |
| **19. *Governing Law:*** | State of New York, without giving effect to the conflict of law principles thereof. |
| **20. *Modification:*** | Any of the terms of this *Committed Repurchase Facility Agreement* may be modified or supplemented by mutual agreement of the parties evidenced by a writing signed by the parties hereto. |
| **21. *Usages:*** | "Business Day": as defined in the Custodial Undertaking. If any day upon which performance is due or action may be taken under this Letter Agreement is not a Business Day, then the immediately following Business Day shall be deemed the day upon which such performance is due or such action may be taken. |
| | Regarding currency: All amounts stated are in U.S. Dollars. |
| **22. *Information for Notices for Purposes of this Second Restated Facility Agreement*** | If to Danske London: <br><br> 75 King William Street <br> London, EC4N 7DT <br> —For *Credit matters*: Simon Howarth or Carol Powell |



**FACILITY TERMS**

Tel: +44 207 410 8175
Fax: +44 20 7410 8001
—For *Administration matters*: Mark Brown
Tel: +44 207 410 8167
Fax: +44 44 20 7410 8002

If to LBBAG:
c/o Lehman Brothers Inc.
745 Seventh Avenue, Fl. 4
New York City, NY 10019
Attention: Henry C. Lee
Tel: 212-526-7110

If to LBIE:
c/o Lehman Brothers Inc.
745 Seventh Avenue, Fl. 4
New York City, NY 10019
Attention: Henry C. Lee
Tel: 212-526-7110

If to LCPI:
c/o Lehman Brothers Inc.
745 Seventh Avenue, Fl. 4
New York City, NY 10019
Attention: Henry C. Lee
Tel: 212-526-7110

If to LBHI:
c/o Lehman Brothers Inc.
745 Seventh Avenue, Fl. 4
New York City, NY 10019
Attention: Henry C. Lee
Tel: 212-526-7110

This *Committed Repurchase Facility Agreement* may be executed in counterparts, each of which counterparts, when so executed and delivered, shall be deemed to be an original and all of which counterparts, taken together, shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page of this *Committed Repurchase Facility Agreement* by facsimile or other electronic transmission shall be as effective as delivery of a mutually signed counterpart hereof.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties have executed this *Second Restated Facility Agreement* on the respective dates specified below with effect from the date specified as the Effective Date on the first page.

Very truly yours,

**DANSKE BANK A/S, LONDON BRANCH**

By: _____     By: _____

Name: S. Howath.                   Name: Fox Fower

Title: Senior Manager              Title: Manager

Date: _____    Date: _____

**LEHMAN BROTHERS BANKHAUS AG**

By: _____

Name: _____

Title: _____

Date: _____

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

By: _____

Name: _____

Title: _____

Date: _____

IN WITNESS WHEREOF, the parties have executed this *Second Restated Facility Agreement* on the respective dates specified below with effect from the date specified as the Effective Date on the first page.

Very truly yours,

**DANSKE BANK A/S, LONDON BRANCH**

By: _____     By: _____

Name: _____     Name: _____

Title: _____     Title: _____

Date: _____     Date: _____

**LEHMAN BROTHERS BANKHAUS AG**

By: _____

Name: __VIDALIE__ __Bormann__

Title: __Executive__ __Director__

Date: __20 03 2005__ __29-3-2005__

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

By: _____

Name: _____

Title: _____

Date: _____

IN WITNESS WHEREOF, the parties have executed this *Second Restated Facility Agreement* on the respective dates specified below with effect from the date specified as the Effective Date on the first page.

Very truly yours,

**DANSKE BANK A/S, LONDON BRANCH**

By: _____          By: _____

Name: _____          Name: _____

Title: _____          Title: _____

Date: _____          Date: _____

**LEHMAN BROTHERS BANKHAUS AG**

By: _____

Name: _____

Title: _____

Date: _____

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

By: _____

Name: _____

Title: _____

Date: _____

IN WITNESS WHEREOF, the parties have executed this *Second Restated Facility Agreement* on the respective dates specified below with effect from the date specified as the Effective Date on the first page.

Very truly yours,

**DANSKE BANK A/S, LONDON BRANCH**

By: _____    By: _____

Name: _____    Name: _____

Title: _____    Title: _____

Date: _____    Date: _____

**LEHMAN BROTHERS BANKHAUS AG**

By: _____

Name: _____

Title: _____

Date: _____

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

By: _____

Name: _____

Title: _____

Date: _____

**LEHMAN COMMERCIAL PAPER INC.**

By: _____

Name: _____T. COURTNEY JENKINS_____

Title: _____VICE PRESIDENT_____

Date: _____

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____

Name: _____

Title: _____

Date: _____

**LEHMAN COMMERCIAL PAPER INC.**

By: _____

Name: _____

Title: _____

Date: _____

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____

Name: NAHILL YOUNIS

Title: ASSISTANT TREASURER

Date: _____

**EXHIBIT 1—**
**Form of Notice of Purchase**

To: _____
Danske Bank A/S, London Branch

From: _____
Lehman Brothers Bankhaus AG, Lehman Brothers International (Europe), Lehman Commercial Paper Inc., or Lehman Brothers Holdings Inc.

Date: _____, 200_

Subject: Notice of Repurchase Transaction [Number_____]

This communication serves as notice under that certain letter agreement dated [DATE], setting forth our agreement as to your commitment, as Buyer, to enter into repurchase transactions with us as Seller, in accordance with the terms thereof (the "*Committed Repurchase Facility Agreement*"). The purpose of this communication is to notify you of the terms and conditions of the above repurchase transaction to be entered into between us on the Purchase Date referred to below. Capitalized terms herein have the same meaning as set forth in the *Committed Repurchase Facility Agreement*.

This notice supplements and forms part of, and is subject to, the *Committed Repurchase Facility Agreement* (as the same may be amended from time to time). All provisions contained in the *Committed Repurchase Facility Agreement* govern this notice except as expressly modified below.

1. Purchase Date: _____

2. Repurchase Date:

3. Purchase Price: _____

4. Initial Interest Period (pursuant to section 8 of the *Committed Repurchase Facility Agreement*): _____

5. Additional Terms [if any:] _____

**Agreed to and Accepted by:**
**DANSKE BANK A/S, LONDON BRANCH**

| By: _____ | By: _____ |
|---|---|
| Name: _____ | Name: _____ |
| Title: _____ | Title: _____ |
| Date: _____ | Date: _____ |

Lehman $800m Facility Execution

# Schedule A

# REDACTED

# Schedule B

## Guarantee of LBHI

## GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

To:    Danske Bank A/S, London Branch

As an Inducement to you for, and in consideration of, your making or extending in your discretion one or more loans or advances or other credit facilities or financial accommodations (all of which are hereinafter referred to as the "Obligations") to Lehman Brothers Bankhaus AG ("LBBAG"), Lehman Brothers International (Europe) ("LBIE"), Lehman Commercial Paper Inc. ("LCPI") and Lehman Brothers Japan Inc. ("LBJ") (hereinafter called the "Borrowers") pursuant to the letter agreement ("Committed Repurchase Facility Agreement") dated 17 March 2005 by and among Danske Bank A/S, London Branch ("Danske London") LBBAG, LBIE, LCPI, LBJ and Lehman Brothers Holdings Inc., which agreement amended and restated the Second Restated Facility Agreement dated 20 November 2003 ("Existing Facility Agreement") by and among Danske London, LBBAG and LBIE,, we do hereby absolutely and unconditionally guarantee to you, your successors, endorsees, and assigns, the payment by the Borrowers of their Obligations to you, your successors, endorsees, and assigns, now existing, or which hereafter may be contracted or existing, as the same shall respectively become due, whether at maturity, by declaration, demand, or otherwise, together with accrued interest and charges, and we agree to reimburse you for all expenses including reasonable attorneys' fees of enforcing or obtaining or endeavoring to enforce or obtain payment thereof.

This Guarantee is absolute and unconditional without limitation as to monetary amount or duration. We shall have no right of subrogation with respect to any payments we make under this Guarantee until all Obligations of the Borrowers to you are paid in full.

This Guarantee is a guarantee of payment, and not of collection, and you may exercise your rights hereunder against us without first having to take any action against the Borrowers, or any other guarantor. We agree that in the event the Obligations which are guaranteed hereunder are paid, our liability as guarantor shall continue and remain in full force and effect in the event that all or part of such payment is recovered from you as a preference or fraudulent transfer under the Federal Bankruptcy Code, or any similar applicable state or foreign law.

We hereby waive diligence, presentment, protest, demand of any kind in connection with the delivery, acceptance, performance, default or enforcement of this Guarantee.

This Guarantee shall be binding upon us, our successors and assigns.

This Guarantee will remain in full force and effect until the first to occur of (a) a notice by us to you that we are terminating the Guarantee or (b) the Obligations are no longer in existence. Termination of this Guarantee shall not effect our liability hereunder as to the obligations incurred or arising out of transactions entered into prior to the termination hereof.

At such time as this Guarantee is delivered to you, this Guarantee shall entirely supersede and replace any other guarantee previously delivered by us or any of our affiliates to you with regard to the Obligations of the Borrowers, and no previously delivered guarantee with regard thereto shall be honored by us or any of our affiliates.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York.

IN WITNESS WHEREOF, I have hereunto set my hand on March 17, 2005.

LEHMAN BROTHERS HOLDINGS INC.

By: _____

Name:  **Oliver Budde**
Title:  **Vice President**

2

# Amendements to the $800,000,000
# Committed Repurchase Facility

**AMENDMENT**
**TO THE**
**$800,000,000**
**COMMITTED REPURCHASE FACILITY AGREEMENT**
**BETWEEN**
**LEHMAN BROTHERS BANKHAUS AG**
**LEHMAN BROTHERS INTERNATIONAL EUROPE**
**LEHMAN COMMERCIAL PAPER INC.**
**LEHMAN BROTHERS HOLDINGS INC.**
**AND**
**DANSKE BANK A/S, LONDON BRANCH**

WHEREAS, Lehman Brothers Bankhaus AG ("LBBAG"), Lehman Brothers International Europe ("LBIE"), Lehman Commercial Paper Inc. ("LCPI"), Lehman Brothers Holdings Inc. ("LBHI") and Danske Bank A/S, London Branch ("Danske London") entered into a $800,000,000 Committed Repurchase Facility Agreement dated 17th March 2005 as amended on the 7th March 2008 and the 29th April 2008 (together the "Agreement"); and

WHEREAS, LBBAG, LBIE, LCPI, LBHI and Danske London now wish to amend the Agreement in order to set out the new Buyer's Margin Percentage.

NOW, THEREFORE, in consideration of the premises and of the covenants and agreements contained herein and in the Agreement, LBBAG, LBIE, LCPI, LBHI and Danske London agree as follows:

1. Capitalised terms used but not defined in this Amendment shall have the meanings ascribed to them in the Agreement.

2. **REDACTED**

3. This amendment shall be deemed to have taken effect on 23rd July 2008.

4. Except as provided above, all terms and conditions of the Agreement shall remain unchanged and in full force and effect.

IN WITNESS WHEREOF the parties have caused this Amendment to be executed by their duly authorised signatories as of 23 / 7 / 2008.

**LEHMAN BROTHERS BANKHAUS AG**

By: _____

Name: _____

Title: _____

Date: 4 . 03 . 2008

**LEHMAN BROTHERS INTERNATIONAL EUROPE**

By: _____

Name: _____

Title: _____

Date: 4 . 08 . 2008

**LEHMAN COMMERCIAL PAPER INC.**

By: _____

Name: Robert Azerad / Janet Birney

Title: Authorized Signatory

Date: 8/11/2008

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____

Name: Robert Azerad / Janet Birney

Title: Authorized Signatory

Date: 8/11/2008

**DANSKE BANK A/S, LONDON BRANCH**

By: _____

Name: A. IVERSEN

Title: AE/1

Date: 30/7/08

By: _____

Name: S. DARMIR

Title: Credit Manager.

Date: 30.07.08

- 29/04 '08 10:20 FAX 020 7102 1132      LEHMAN BROTHERS                    ☒001

### AMENDMENT
### TO THE
### $800,000,000
### COMMITTED REPURCHASE FACILITY AGREEMENT
### BETWEEN
### LEHMAN BROTHERS BANKHAUS AG
### LEHMAN BROTHERS INTERNATIONAL EUROPE
### LEHMAN COMMERCIAL PAPER INC.
### LEHMAN BROTHERS HOLDINGS INC.
### UND
### DANSKE BANK A/S, LONDON BRANCH

WHEREAS, Lehman Brothers Bankhaus AG ("LBBAG"), Lehman Brothers International Europe ("LBIE"), Lehman Commercial Paper Inc. ("LCPI"), Lehman Brothers Holdings Inc. ("LBHI") and Danske Bank A/S, London Branch ("Danske London") entered into a $800,000,000 Committed Repurchase Facility Agreement dated 17th March 2005 as amended on the 7th March 2008 (together the "Agreement"); and

WHEREAS, LBBAG, LBIE, LCPI, LBHI and Danske London now wish to amend the Agreement in order to set out the new Buyer's Margin Percentage.

NOW, THEREFORE, in consideration of the premises and of the covenants and agreements contained herein and in the Agreement, LBBAG, LBIE, LCPI, LBHI and Danske London agree as follows:

1.   Capitalised terms used but not defined in this Amendment shall have the meanings ascribed to them in the Agreement.

2.   **REDACTED**

3.   This amendment shall take effect on 2nd May 2008.

4.   Except as provided above, all terms and conditions of the Agreement shall remain unchanged and in full force and effect.

IN WITNESS WHEREOF the parties have caused this Amendment to be executed by their duly authorised signatories as of May 2   2008.

**LEHMAN BROTHERS BANKHAUS AG**

By:

Name: Huss G Dees       DAVID RUSHTON

Title: Authorised Signatory.

Date:

**LEHMAN BROTHERS INTERNATIONAL EUROPE**

By:

Name: Huss G Dees       DAVID RUSHTON

Title: Authorised Signatory

Date:

**LEHMAN COMMERCIAL PAPER INC.**

By:

Name:

Title:  Robert E. Guglielmo
        Senior Vice President

Date:            5-2-08

**LEHMAN BROTHERS HOLDINGS INC.**

By:

Name:

Title:

Date:

**DANSKE BANK A/S, LONDON BRANCH**

By:

Name:

Title:

Date:

By:

Name:

Title:

Date:

LEHMAN BROTHERS BANKHAUS AG

By: _____

Name: _____

Title: _____

Date: _____

LEHMAN BROTHERS INTERNATIONAL EUROPE

By: _____

Name: _____

Title: _____

Date: _____

LEHMAN COMMERCIAL PAPER INC.

By: _____

Name: _____

Title: _____

Date: _____

LEHMAN BROTHERS HOLDINGS INC.

By: _____

Name: _____

Title: _____

Date: _____

DANSKE BANK A/S, LONDON BRANCH

By: _____

Name: S. Howarth

Title: Snr Manager

Date: 2.5-08

By: _____

Name: _____

Title: Manager

Date: 2-5-08

29/04 '08 10:21 FAX 029 7102 1132        LEHMAN BROTHERS                          ☒001/001

**LEHMAN BROTHERS BANKHAUS AG**

By: _____

Name: the G Rees    DAVID RUSHTON

Title: Authorised Signatory

Date: _____

**LEHMAN BROTHERS INTERNATIONAL EUROPE**

By: _____

Name: Hus G Rees    DAVID RUSHTON

Title: Authorised Signatory

Date: _____

**LEHMAN COMMERCIAL PAPER INC.**

By: _____

Name: _____

Title: __Robert E. Guglielmo__
      Senior Vice President

Time: ___5-2-08___

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____

Name: Julie Boyle

Title: SVP

Date: 5-5-08

**DANSKE BANK A/S, LONDON BRANCH**

By: _____

Name: _____

Title: _____

Date: _____

By: _____

Name: _____

Title: _____

Date: _____

28.04 '08 10:21 FAX 020 7102 1132     LEHMAN BROTHERS     ☒001/001

**LEHMAN BROTHERS BANKHAUS AG**

By: _____

Name: HLS G Der    DAVID RUSSITON

Title: Autherized Specity

Date: _____

**LEHMAN BROTHERS INTERNATIONAL EUROPE**

By: _____

Name: HLS G Der    DAVID RUSSITON

Title: Autherized Specity

Date: _____

**LEHMAN COMMERCIAL PAPER INC.**

By: _____

Name: _____

Title: __Robert E. Guglielmo__
      Senior Vice President

Date: ____5-2-58____

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____

Name: Janet Birney

Title: SVP

Date: 5-5-08

**DANSKE BANK A/S, LONDON BRANCH**

By: _____

Name: _____

Title: _____

Date: _____

By: _____

Name: _____

Title: _____

Date: _____

**AMENDMENT**
**TO THE**
**$800,000,000**
**COMMITTED REPURCHASE FACILITY AGREEMENT**
**BETWEEN**
**LEHMAN BROTHERS BANKHAUS AG**
**LEHMAN BROTHERS INTERNATIONAL EUROPE**
**LEHMAN COMMERCIAL PAPER INC.**
**LEHMAN BROTHERS HOLDINGS INC.**
**AND**
**DANSKE BANK A/S, LONDON BRANCH**

WHEREAS, Lehman Brothers Bankhaus AG ("LBBAG"), Lehman Brothers International Europe ("LBIE"), Lehman Commercial Paper Inc. ("LCPI"), Lehman Brothers Holdings Inc. ("LBHI") and Danske Bank A/S, London Branch ("Danske London") entered into a $800,000,000 Committed Repurchase Facility Agreement dated 17ᵗʰ March 2005 (the "Agreement"); and

WHEREAS, LBBAG, LBIE, LCPI, LBHI and Danske London now wish to amend the Agreement in order to set out the new Pricing Rate.

NOW, THEREFORE, in consideration of the premises and of the covenants and agreements contained herein and in the Agreement, LCPI and Danske London agree as follows:

1.   Capitalised terms used but not defined in this Amendment shall have the meanings ascribed to them in the Agreement.

2.   In the first paragraph of Section 9 of the Agreement the reference to "35bps" is hereby deleted and replaced with "100bps".

3.   These amendments shall take effect on 7ᵗʰ March 2008.

4.   Except as provided above, all terms and conditions of the Agreement shall remain unchanged and in full force and effect.

IN WITNESS WHEREOF the parties have caused this Amendment to be executed by their duly authorised signatories as of        March 2008.

**LEHMAN BROTHERS BANKHAUS AG**            **LEHMAN BROTHERS INTERNATIONAL EUROPE**

By: _____            By: _____

Name:  DAVID RUSHTON            Name: Hw G-lees

Title:  AUTHORISED SIGNATORY            Title: Managing Director

Date:  6/3/08            Date: _____

LEHMAN COMMERCIAL PAPER INC.

By: _____

Name: _____
      Paolo Tonucci
      Managing Director
Title:     Global Treasurer

Date: _____03-05-08_____

LEHMAN BROTHERS HOLDINGS INC.

By: _____

Name: _____
      Paolo Tonucci
      Managing Director
Title:     Global Treasurer

Date: _____03-05-08_____

DANSKE BANK A/S LONDON BRANCH

By: _____

Name: ___A. TVERELN____

Title: ____ABVT_____

Date: ____7/2/08_____

By: _____

Name: ____CROWN_____

Title: ___MANAGER_____

Date: ____7.3.08._____

## GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

To:     Danske Bank A/S, London Branch

As an inducement to you for, and in consideration of, your making or extending in your discretion one or more loans or advances or other credit facilities or financial accommodations (all of which are hereinafter referred to as the "Obligations") to Lehman Brothers Bankhaus AG ("LBBAG"), Lehman Brothers International (Europe) ("LBIE"), Lehman Commercial Paper Inc. ("LCPI") and Lehman Brothers Japan Inc. ("LBJ") (hereinafter called the "Borrowers") pursuant to the letter agreement ("Committed Repurchase Facility Agreement") dated 17 March 2005 by and among Danske Bank A/S, London Branch ("Danske London") LBBAG, LBIE, LCPI, LBJ and Lehman Brothers Holdings Inc., which agreement amended and restated the Second Restated Facility Agreement dated 20 November 2003 ("Existing Facility Agreement") by and among Danske London, LBBAG and LBIE,, we do hereby absolutely and unconditionally guarantee to you, your successors, endorsees, and assigns, the payment by the Borrowers of their Obligations to you, your successors, endorsees, and assigns, now existing, or which hereafter may be contracted or existing, as the same shall respectively become due, whether at maturity, by declaration, demand, or otherwise, together with accrued interest and charges, and we agree to reimburse you for all expenses including reasonable attorneys' fees of enforcing or obtaining or endeavoring to enforce or obtain payment thereof.

This Guarantee is absolute and unconditional without limitation as to monetary amount or duration. We shall have no right of subrogation with respect to any payments we make under this Guarantee until all Obligations of the Borrowers to you are paid in full.

This Guarantee is a guarantee of payment, and not of collection, and you may exercise your rights hereunder against us without first having to take any action against the Borrowers, or any other guarantor. We agree that in the event the Obligations which are guaranteed hereunder are paid, our liability as guarantor shall continue and remain in full force and effect in the event that all or part of such payment is recovered from you as a preference or fraudulent transfer under the Federal Bankruptcy Code, or any similar applicable state or foreign law.

We hereby waive diligence, presentment, protest, demand of any kind in connection with the delivery, acceptance, performance, default or enforcement of this Guarantee.

This Guarantee shall be binding upon us, our successors and assigns.

This Guarantee will remain in full force and effect until the first to occur of (a) a notice by us to you that we are terminating the Guarantee or (b) the Obligations are no longer in existence. Termination of this Guarantee shall not effect our liability hereunder as to the obligations incurred or arising out of transactions entered into prior to the termination hereof.

At such time as this Guarantee is delivered to you, this Guarantee shall entirely supersede and replace any other guarantee previously delivered by us or any of our affiliates to you with regard to the Obligations of the Borrowers, and no previously delivered guarantee with regard thereto shall be honored by us or any of our affiliates.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York.

IN WITNESS WHEREOF, I have hereunto set my hand on March 17, 2005.

LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name:           **Oliver Budde**
Title:          **Vice President**

2

# $300,000,000 Committed
# Repurchase Facility

## LEHMAN COMMERCIAL PAPER INC.

### March 23, 2007

DANSKE BANK A/S , LONDON BRANCH
75 King William Street
London
EC4N 7DT, England
    Attention: Credit Department

### Re: Committed Repurchase Facility Agreement

Ladies and Gentlemen:

I. This letter agreement ("Committed Repurchase Facility Agreement") confirms the agreement of **Danske Bank A/S, London Branch** ("Danske London" or "Buyer") and **Lehman Commercial Paper Inc.** ("LCPI" or "Seller") to enter into repurchase transactions upon request by Seller from time to time subject to and upon the terms and conditions set forth herein and

- in the Master Repurchase Agreement, dated August 30, 1999, among Danske London, Danske Bank A/S, Cayman Islands Branch ("Danske Cayman") Lehman Brothers International Europe ("LBIE"), Lehman Brothers Bankhaus AG ("LBBAG"), Lehman Brothers Inc. ("LBI"), and Lehman Brothers Commercial Paper Inc. ("LCPI") (as amended from time to time, the "Master Agreement"),

- the Custodial Undertaking in Connection with Master Repurchase Agreement (as amended from time to time, the "Custodial Undertaking"), dated August 30, 1999 among Danske London, Danske Cayman, LBIE, LBBAG, LBI, and LCPI and JPMorgan Chase Bank (formerly The Chase Manhattan Bank) as subsequently assigned by JPMorgan Chase Bank to The Bank of New York, (the Master Agreement and the Custodial Undertaking, collectively, the "Agreements").

II. To the extent the terms of this Committed Repurchase Facility Agreement and the terms of the Agreements differ, the terms of this Committed Repurchase Facility Agreement shall control.

III. All obligations of LCPI are guaranteed by LBHI in accordance with the guarantee dated/March, 2007 and attached hereto as Schedule B.

IV. Capitalized terms not defined herein have the respective meanings given to them in the Agreements. The Facility Terms are as follows:

V. This Committed Repurchase Facility Agreement shall become effective on March, **30,** 2007 (the "Effective Date").

| FACILITY TERMS | |
|---|---|
| **1. Purchase Price:** | The maximum aggregate Purchase Price of all outstanding Transactions between Buyer and the Seller at any one time shall be $300,000,000. |
| **2. Seller:** | LCPI |
| **3. Transactions; Minimum, Increases:** | The amount and term of each Transaction will be determined by Seller from time to time in its sole discretion. |
| **4. Term of Transactions:** | Each Transaction under this Committed Repurchase Facility Agreement shall continue in existence until Notice of Termination is received from Buyer in accordance with Sections 5 and 6 below. |
| **5. Termination and Buyer's Right to Terminate Facility Agreement or Transaction:** | Buyer's Right to Terminate Facility in the Event of Seller Default: This Committed Repurchase Facility Agreement shall terminate ("Facility Termination Date") on the date on which an Event of Default has occurred and been declared in respect of Seller pursuant to the Master Agreement. Following such occurrence and declaration of an Event of Default, all Transactions hereunder shall terminate in accordance with the terms of the Master Agreement. |
| **6. Maturity Dates:** | The initial Maturity Date, in respect of the Facility, shall be the date falling one hundred twenty [120] days after the Effective Date. The Maturity Date shall automatically be extended by a period of thirty [30] days at the end of each successive thirty-day anniversary of the Effective Date. |
| | The Buyer may at any time give notice to the Seller that the Maturity Date will be the date falling one hundred and twenty days from the date of such notice after which time the Facility shall no longer be available for utilisation. |
| **7. Eligible Assets as Purchased Securities:** | As set forth on Schedule A and marked to market in accordance with the Custodial Undertaking. |
| **8.** | |
| **9. Pricing Rate:** | The Pricing Rate for any Transaction shall equal the Federal Funds Open plus 15 basis points. |
| **10. Interest Payments:** | Interest accrued shall be reset daily and shall be due and payable (i) weekly on Wednesdays and (ii) on the Repurchase Date of any Transaction hereunder, or (iii) the date on which Seller makes a prepayment in accordance with Section 13 herein, or (iv) termination of this Committed Repurchase Facility Agreement, either by its terms or for whatever reason whatsoever. |
| **11. Notice of Purchase:** | Seller shall notify Buyer via telephone or by way of an electronic messaging system ("Notice of Purchase") not later than 12:00 P.M. (New York City time) two Business Days prior to the Purchase Date for a particular Transaction of its intent to enter into a transaction. |
| | Each Transaction may be evidenced by a notice of purchase in substantially the form of Exhibit 1 hereto ("Notice of Purchase"), or, in the absence of such Notice of Purchase, a (i) Confirmation pursuant to the Master Agreement or (ii) an information statement pursuant to the Custody Agreement. |
| **12. Market Value:** | As defined in the Custody Agreement. |

| FACILITY TERMS | |
|---|---|
| **13. Voluntary Prepayments by Seller:** | Seller shall be allowed to prepay the Purchase Price for one or more outstanding Transactions, in whole or in part, when notice is provided not later than 10:00 AM (New York City time) on the Business Day that is 5 Business Days prior to the day on which Seller intends to prepay. |
| **14. Custodian:** | The Bank of New York, or any successor thereto. |
| **15. Substitution:** | Without limiting the rights of a Seller under the Master Agreement, at any time, from time to time, Seller shall have the unlimited right to substitute or withdraw Purchased Assets and substitute other Eligible Assets provided that the substituted Assets are Eligible Assets as set forth in Schedule A herein. |
| **16. Additional Terms:** | Intermediation by Lehman Brothers Inc.  With respect to the execution of Transactions contemplated under this Committed Repurchase Facility Agreement, Lehman Brothers Inc. (an affiliate of LCPI) shall act as agent for LCPI. Such agency may take the form of communications with Buyer as well as the booking of Transactions. |
| **17. Assignability:** | No party may assign this Committed Repurchase Facility Agreement without the written consent of all other parties. |
| **18. Governing Law:** | State of New York, without giving effect to the conflict of law principles thereof. |
| **19. Modification:** | Any of the terms of this Committed Repurchase Facility Agreement may be modified or supplemented by mutual agreement of the parties evidenced by a writing signed by the parties hereto. |
| **20. Usages:** | "Business Day": as defined in the Custodial Undertaking. If any day upon which performance is due or action may be taken under this Letter Agreement is not a Business Day, then the immediately following Business Day shall be deemed the day upon which such performance is due or such action may be taken.<br><br>Regarding currency: All amounts stated are in U.S. Dollars. |
| **21. Notices for Purposes of this Committed Repurchase Facility Agreement:** | If to Danske London<br>75 King William Street<br>London, EC4N 7DT<br>—For *Credit matters:* Credit Department (with an additional copy to Simon Howarth/Anders Iversen)<br>Tel: +44 207 410 8175<br>Fax: +44 207 410 8001<br><br>If to LCPI:<br>c/o Lehman Brothers Inc.<br>745 Seventh Avenue, Fl. 4<br>New York City, NY 10019<br>Attention: Annina Youngblood<br>Tel: 212-526-9690 |

This Committed Repurchase Facility Agreement may be executed in counterparts, each of which counterparts, when so executed and delivered, shall be deemed to be an original and all of which counterparts, taken together, shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page of this Committed Repurchase Facility Agreement by facsimile or other electronic transmission shall be as effective as delivery of a mutually signed counterpart hereof.

IN WITNESS WHEREOF, the parties have executed this Committed Repurchase Facility Agreement on the respective dates specified below with effect from the date specified as the Effective Date on the first page.

Very truly yours,

**DANSKE BANK A/S, LONDON BRANCH**

By: _____

Name: _____Simon_Howorth___

Title: ____Senior_Manager____

Date: _____

By: _____

Name: _____P HUGHES_____

Title: ____ACM_____

Date: _____

**LEHMAN COMMERCIAL PAPER INC.**

By: _____

Name: ____Thomas_Luglio____

Title: ___Managing_Director___

Date: ____03/29/07_____

**EXHIBIT 1—**
**Form of Notice of Purchase**

To: _____
Danske Bank A/S, London Branch

From: _____
Lehman Commercial Paper Inc.

Date: _____, 200_

Subject: Notice of Repurchase Transaction [Number_____]

This communication serves as notice under that certain letter agreement dated [DATE], setting forth our agreement as to your commitment, as Buyer, to enter into repurchase transactions with us as Seller, in accordance with the terms thereof (the "Committed Repurchase Facility Agreement"). The purpose of this communication is to notify you of the terms and conditions of the above repurchase transaction to be entered into between us on the Purchase Date referred to below. Capitalized terms herein have the same meaning as set forth in the Committed Repurchase Facility Agreement.

This notice supplements and forms part of, and is subject to, the Committed Repurchase Facility Agreement (as the same may be amended from time to time). All provisions contained in the Committed Repurchase Facility Agreement govern this notice except as expressly modified below.

1. Purchase Date: _____

2. Repurchase Date:

3. Purchase Price: _____

4. Initial Interest Period (pursuant to section 8 of the Committed Repurchase Facility Agreement): _____

5 Additional Terms [if any:] _____

Agreed to and Accepted by:
**Danske Bank A/S, London Branch**

By: _____     By: _____

Name: _____     Name: _____

Title: _____     Title: _____

Date: _____     Date: _____

**Exhibit A
REDACTED**

**SCHEDULE B—**
**Guaranty provided by**
**Lehman Brothers Holdings Inc.**

## GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

To:   Danske Bank A/S, London Branch

As an inducement to you for, and in consideration of, your entering into transactions or making or extending in your discretion one or more loans or advances or other credit facilities or financial accommodations (all of which are hereinafter referred to as the "Obligations") under a Master Repurchase Agreement dated August 30, 1999 and amended on March 9, 2001 (the "Agreement") to Lehman Commercial Paper Inc. ("LCPI") upon such terms and in such amounts as LCPI may negotiate with and obtain from you, we do hereby absolutely and unconditionally guarantee to you, your successors, endorsees, and assigns, the payment by LCPI of its Obligations in an amount not to exceed $500,000,000.00[Five Hundred Million Dollars ] (the "Guaranteed Amount") to you, your successors, endorsees, and assigns, now existing, or which hereafter may be contracted or existing, as the same shall respectively become due, whether at maturity, by declaration, demand, or otherwise, together with accrued interest and charges, and we agree to reimburse you for all expenses including reasonable attorneys' fees of enforcing or obtaining or endeavoring to enforce or obtain payment thereof.

This Guarantee is absolute and unconditional without limitation as to duration up to the Guaranteed Amount. We shall have no right of subrogation with respect to any payments we make under this Guarantee until all Obligations of LCPI to you are paid in full.

This Guarantee is a guarantee of payment, and not of collection, and you may exercise your rights hereunder against us without first having to take any action against LCPI, or any other guarantor. We agree that in the event the Obligations which are guaranteed hereunder are paid, our liability as guarantor shall continue and remain in full force and effect in the event that all or part of such payment is recovered from you as a preference or fraudulent transfer under the Federal Bankruptcy Code, or any applicable state law.

We hereby waive diligence, presentment, protest, demand of any kind in connection with the delivery, acceptance, performance, default or enforcement of this Guarantee.

This Guarantee shall be binding upon us, our successors and assigns.

This Guarantee will remain in full force and effect until the first to occur of (a) a notice by us to you that we are terminating the Guarantee or (b) the Agreement is no longer in existence. Termination of this Guarantee shall not affect our liability hereunder as to the obligations incurred or arising out of transactions entered into prior to the termination hereof.

At such time as this Guarantee is delivered to you, this Guarantee shall entirely supersede and replace any other guarantee previously delivered by us or any of our affiliates to you

with regard to the Obligations of LCPI, and no previously delivered guarantee with regard thereto shall be honored by us or any of our affiliates.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York.

**IN WITNESS WHEROF,** I have hereunto set my hand on $3/19/2007$

LEHMAN BROTHERS HOLDINGS INC.

By: _____

Name: Christopher M. O'Meara
Title:  Chief Financial Officer, Executive
        Vice President and Controller

2

**Amendments to the $300,000,000
Committed Repurchase Facility**

**AMENDMENT**
**TO THE**
**$300,000,000**
**COMMITTED REPURCHASE FACILITY AGREEMENT**
**BETWEEN**
**LEHMAN COMMERCIAL PAPER INC.**
**AND**
**DANSKE BANK A/S, LONDON BRANCH**

WHEREAS, **Lehman Commercial Paper Inc. ("LCPI")** and **Danske Bank A/S, London Branch** ("Danske London") entered into a $300,000,000 Committed Repurchase Facility Agreement dated 23th March 2007 as amended on the 4th April 2007, 7th March 2008 and the 29th April 2008 (together the "Agreement"); and

WHEREAS, LCPI and Danske London now wish to amend the Agreement in order to set out the new Buyer's Margin Percentage.

NOW, THEREFORE, in consideration of the premises and of the covenants and agreements contained herein and in the Agreement, LCPI and Danske London agree as follows:

1. Capitalised terms used but not defined in this Amendment shall have the meanings ascribed to them in the Agreement.

2. **REDACTED**

3. **REDACTED**

4. This amendment shall be deemed to have taken effect on 23rd July 2008.

5. Except as provided above, all terms and conditions of the Agreement shall remain unchanged and in full force and effect.

IN WITNESS WHEREOF the parties have caused this Amendment to be executed by their duly authorised signatories as of 23 / 7 / 2008.

DANSKE BANK A/S, LONDON BRANCH

By: _____

Name: A. IVERSEN HONLOR PLAKKAL

Title: AEM

Date: 29/7/08

LEHMAN COMMERCIAL PAPER INC.

By: _____

Name: Robert Azarad   Janet Birney

Title: Authorized Signatory

Date: 8-11-2008

**AMENDMENT
TO THE
$300,000,000
COMMITTED REPURCHASE FACILITY AGREEMENT
BETWEEN
LEHMAN COMMERCIAL PAPER INC.,
AND
DANSKE BANK A/S, LONDON BRANCH**

WHEREAS, Lehman Commercial Paper Inc. ("LCPI"), and Danske Bank A/S, London Branch ("Danske London") entered into a $300,000,000 Committed Repurchase Facility Agreement dated 23rd March 2007 as amended by the amendments dated 4th April 2007 and 7th March 2008 (together the "Agreement"); and

WHEREAS, LCPI and Danske London now wish to amend the Agreement in order to set out the new Buyer's Margin Percentage.

NOW, THEREFORE, in consideration of the premises and of the covenants and agreements contained herein and in the Agreement, LCPI and Danske London agree as follows:

1. Capitalised terms used but not defined in this Amendment shall have the meanings ascribed to them in the Agreement.

2. REDACTED

3. REDACTED

REDACTED

4. These amendments shall take effect on 2nd May 2008.

5. Except as provided above, all terms and conditions of the Agreement shall remain unchanged and in full force and effect.

IN WITNESS WHEREOF the parties have caused this Amendment to be executed by their duly authorised signatories as of _____ 2008.

LEHMAN COMMERCIAL PAPER INC.

By: _____

Name: Robert E. Guglielmo

Title: Senior Vice President

Date: 5-2-08

DANSKE BANK A/S, LONDON BRANCH

By: _____

Name: S. Howath

Title: Snr Manager

Date: 2.5-08

By: _____

Name: Brown

Title: Manager

Date: 2.5.08

**AMENDMENT
TO THE
$300,000,000
COMMITTED REPURCHASE FACILITY AGREEMENT
BETWEEN
LEHMAN COMMERCIAL PAPER INC.,
AND
DANSKE BANK A/S, LONDON BRANCH**

WHEREAS, **Lehman Commercial Paper Inc. ("LCPI"),** and **Danske Bank A/S, London Branch** ("**Danske London**") entered into a $300,000,000 Committed Repurchase Facility Agreement dated 23rd March 2007 (the "Agreement"); and

WHEREAS, LCPI and Danske London now wish to amend the Agreement in order to set out the new Pricing Rate.

NOW, THEREFORE, in consideration of the premises and of the covenants and agreements contained herein and in the Agreement, LCPI and Danske London agree as follows:

1. Capitalised terms used but not defined in this Amendment shall have the meanings ascribed to them in the Agreement.

2. Section 9 of the Agreement is hereby deleted and replaced with the following.

   "The Pricing Rate for any Transaction shall equal the Federal Funds Open plus 75 basis points."

3.

4. These amendments shall take effect on 7th March 2008.

5. Except as provided above, all terms and conditions of the Agreement shall remain unchanged and in full force and effect.

IN WITNESS WHEREOF the parties have caused this Amendment to be executed by their duly authorised signatories as of ʌ March 2008.

LEHMAN COMMERCIAL PAPER INC.

By: ✗ _____

Name: _____ **Paolo Tonucci** _____
                **Managing Director**
Title: _____ **Global Treasurer** _____

Date: _____ 03 - 05 - 08 _____

DANSKE BANK A/S, LONDON BRANCH

By: _____

Name: _____ A. IVERSEN _____

Title: _____ AD/ _____

Date: _____ 7/3/8 _____

By: _____

Name: _____ ᗷᐤᒐᒧ _____

Title: _____ MANAGE _____

Date: _____ 7. 3. 08. _____

**AMENDMENT**
**TO THE**
**COMMITTED REPURCHASE FACILITY AGREEMENT,**
**BETWEEN**
**LEHMAN COMMERCIAL PAPER INC., and**
**DANSKE BANK A/S, LONDON BRANCH**

WHEREAS. Lehman Commercial Paper Inc. ("LCPI"), and Danske Bank A/S, London Branch ("Client") entered into a Committed Repurchase Facility Agreement dated March 23, 2007 (the "Agreement"); and

WHEREAS, LCPI and Client now wish to amend the Agreement in order to permit monthly payment of accrued interest;

NOW, THEREFORE, in consideration of the premises and of the covenants and agreements contained herein and in the Agreement, LCPI and the Client agree as follows:

1. Capitalized terms used but not defined in this Amendment shall have the meanings ascribed to them in the Agreement.

2. Section 10 of the Agreement is hereby deleted and replaced with the following.

   Interest accrued shall be reset daily and shall be due and payable (i) monthly on the 30th day of each calendar month (except that, if the 30th day of any calendar month is not a Business Day, then on the next Business Day, and in the case of February only, on February 28) and (ii) on the Repurchase Date of any Transaction hereunder, or (iii) the date on which Seller makes a prepayment in accordance with Section 13 herein, or (iv) termination of this Committed Repurchase Facility Agreement, either by its terms or for whatever reason whatsoever.

3. Except as provided above, all terms and conditions of the Agreement shall remain unchanged and in full force and effect.

   IN WITNESS WHEREOF, the parties have caused this Amendment to be executed by their duly authorized signatories as of $\text{Apri}\text{L}$ 4 , 20 07.

**LEHMAN COMMERCIAL PAPER INC.**

Name: Robert Gylielmo
Title SVP
Date:

**DANSKE BANK A/S, LONDON BRANCH**

Name: Simon Hownith
Title: Senior Manager
Date:

# Tri-Party Custody Agreement

# TRI-PARTY CUSTODY AGREEMENT

by and among

# DANSKE BANK A/S, LONDON BRANCH ("*Buyer*")

and

# LEHMAN COMMERCIAL PAPER INC. ("*Seller*")

and

# JPMORGAN CHASE BANK, N.A.
("*Master Custodian*" or "*Chase*")

Dated as of 21 April 2006

**TABLE OF CONTENTS**                                    Page

Section 1.   Definitions ...................................................................................................................1

Section 2.   Services of Master Custodian ....................................................................................5
    a.   Appointment of Master Custodian ..............................................................................5
    b.   Acceptance of Master Custodian ................................................................................5
    c.   Scope of Master Custodian's Duties ...........................................................................5
    d.   Sub-Custodians; Scope of Liability; Asset Custody ...................................................5

Section 3.   Representations, Warranties and Agreements.............................................................6
    a.   Representations of Buyer, Seller and Master Custodian. .............................................6
    b.   Further Representations and Covenants of Buyer and Seller. ......................................7
    c.   Further Representations and Covenants of Master Custodian.......................................8
    d.   Continuing Agreement of All Parties ..........................................................................9

Section 4.   Maintenance of Buyer's Master Custodial Account and Seller's Master
           Custodial Account.......................................................................................................9
    a.   Buyer's Master Custodial Account and Seller's Master Custodial Account ...............9
    b.   Transfer of Assets to Master Custodial Accounts........................................................9
    c.   Segregation of Assets..................................................................................................9
    d.   No Lien or Pledge By Master Custodian ...................................................................10

Section 5.   Arrangements Prior to Repurchase Transaction; Receipt of Instructions;
           Payment of Moneys; Delivery of Assets ..................................................................10
    a.   Seller's Instructions..................................................................................................10
    b.   Buyer's Purchase Price..............................................................................................10
    c.   Seller's Tender of Assets...........................................................................................11
    d.   Cash Accounts ..........................................................................................................11
    e.   Review of Sub-Custodian Data Files and Receipt of Trust
         Receipts By Master Custodian....................................................................................11
    f.   Single Trust Receipt..................................................................................................14
    g.   Failure of Seller to Transmit Seller's Asset Composition Data File..........................15
    h.   Failure of Seller to Transmit Seller's Repurchase Transaction Data File ..................15

Section 6.   Effecting Transactions; Grant of Security Interest ....................................................15
    a.   Purchase Date............................................................................................................15
    b.   Market Value of Assets.............................................................................................16
    c.   Determination of Aggregate Market Value ...............................................................17
    d.   Payment of Purchase Price.........................................................................................17
    e.   Repurchase Date .......................................................................................................17
    f.   Simultaneous Transactions ........................................................................................18
    g.   Effect of Notice of Levy, etc.....................................................................................18
    h.   Ownership of Purchased Assets.................................................................................18
    i.   Deliveries by Master Custodian.................................................................................18
    j.   Seller's Grant of a Security Interest ..........................................................................18

i

Section 7.  Valuation and Substitution of Assets ...........................................................19
    a.  Margin Deficit....................................................................................................19
    b.  Margin Excess.....................................................................................................19
    c.  Substitutions of Purchased Assets ...................................................................20
    d.  Release of Mortgage Files for Servicing .......................................................20

Section 8.  Master Custodian Statements.....................................................................21

Section 9.  Master Custodian Fee.................................................................................21

Section 10.  No Guaranty by Master Custodian ...........................................................21

Section 11.  Force Majeure ............................................................................................21

Section 12.  Concerning Master Custodian....................................................................22
    a.  Delay in Receiving Assets ...............................................................................22
    b.  Forgery; False Data.........................................................................................22
    c.  No Duty of Inquiry..........................................................................................23
    d.  Price Data..........................................................................................................23
    e.  Limitation of Liability.....................................................................................23

Section 13.  Indemnification ..........................................................................................24

Section 14.  Continuing Disputes...................................................................................24

Section 15.  Form of Instructions...................................................................................25

Section 16.  Termination ................................................................................................25

Section 17.  Notice of Default; Control .........................................................................25
    a.  Delivery of Notice of Default .........................................................................25
    b.  Effect of Buyer's Notice of Default ................................................................26
    c.  Control ..............................................................................................................26
    d.  Effect of Seller's Notice of Default.................................................................27
    e.  Further Assurances...........................................................................................27
    f.  Master Custodian's Knowledge ......................................................................27

Section 18.  Miscellaneous.............................................................................................27
    a.  Authorized Personnel.......................................................................................27
    b.  Funds Transfers.................................................................................................28
    c.  Notices ..............................................................................................................28
    d.  Amendments .....................................................................................................29
    e.  Binding Agreement...........................................................................................29
    f.  Examination of Master Custodian's Files; Examination of
        Sub-Custodian's Files......................................................................................29
    g.  Survival ............................................................................................................29
    h.  Applicable Law; Jurisdiction ..........................................................................29
    i.  Headings and References..................................................................................29

j.    Counterparts.................................................................................................................30
k.   Time Zone...................................................................................................................30
l.    Application of UCC Article 8....................................................................................30

## SCHEDULES

| | |
|---|---|
| SCHEDULE 1 | List of Additional Asset Types (Grade D Assets) |
| SCHEDULE 2 | Form of Master Custodian Data File |
| SCHEDULE 3 | Form of Seller's Repurchase Transaction Data File (Liability File) |
| SCHEDULE 4 | Form of Seller's Asset Composition Data File (Asset File) |
| SCHEDULE 5 | File Format for Spreads File |
| SCHEDULE 6 | Form of Detail Schedule for Buyer |
| SCHEDULE 7 | Assumed Prices for Commercial and Residential Mortgage Loans |
| SCHEDULE 8 | Form of Seller's Instructions to Master Custodian |
| SCHEDULE 9 | Form of Master Custodian's Notice to Buyer (Receipt of Seller's Instructions) |
| SCHEDULE 10 | Form of Seller's Pre-Allocation Schedule |

## EXHIBITS

| | |
|---|---|
| EXHIBIT A | REDACTED |
| EXHIBIT B | Form of Information as to Buyer |
| EXHIBIT C | Form of Seller Account Information |
| EXHIBIT D | Form of Tri-Party Sub-Custodial Agreement |
| EXHIBIT E | I/C/W Exhibit B, Signing Authority for Buyer |

This **TRI-PARTY CUSTODY AGREEMENT** is made and entered into as of the date written on the cover by and among Buyer, Master Custodian and Seller.

**WHEREAS,** Buyer and Seller have entered into the Master Repurchase Agreement and

**WHEREAS,** Buyer and Seller have agreed to enter into this Agreement to facilitate Repurchase Transactions pursuant to the Master Repurchase Agreement; and

**WHEREAS,** Master Custodian is willing, on a daily basis, to act as agent and bailee on behalf of Buyer or Seller, as their interests may appear, and to perform certain other duties more fully described herein.

**NOW, THEREFORE,** the parties hereby agree as follows:

Section 1. **Definitions**

"**Aggregate Market Value**" means, with respect to each Repurchase Transaction, the aggregate Market Value of all Purchased Assets located in Buyer's Master Custodial Account as of the time of determination which have been allocated to such Repurchase Transaction pursuant to Sections 6(c) and 7(c) hereof.

"**Agreement**" means this Tri-Party Custody Agreement, as amended from time to time.

"**Asset**" or "**Assets**" means any Grade A Asset, Grade B Asset, Grade C Asset or Grade D Asset.

"**Authorized Person**" means a person described as provided in Section 18(a).

"**Business Day**" means any day on which all of Buyer, Seller and Master Custodian are open for business.

"**Buyer's Master Custodial Account**" means, collectively, the accounts maintained by Master Custodian for Assets held for the benefit of Buyer pursuant to Section 4(a) hereof.

"**Cash**" means U.S. Dollars in immediately available funds.

"**Commercial Mortgage Loan**" means any Mortgage Loan with respect to which the indebtedness of the borrower is evidenced by a mortgage note and secured by a lien on income generating real property used exclusively for commercial or mixed-commercial/residential purposes.

"**Event of Default**" means an "Event of Default" as defined in the Master Repurchase Agreement.

"**FRBNY**" means The Federal Reserve Bank of New York, or any successor thereto.

"**Grade**" means, with respect to an Asset, either Grade A, Grade B, Grade C or Grade D.

"**Grade A Asset**" means Cash.

"**Grade B Asset**" means (a) a Trust Receipt evidencing the possession by a Sub-Custodian of one or more Residential Mortgage Loans, or, as the context shall require, one or more Residential Mortgage Loans held by a Sub-Custodian and evidenced by a Trust Receipt, and (b) in the event of a shortfall of the type of Assets enumerated in clause (a) of this definition, any Grade A Asset.

"**Grade C Asset**" means (a) a Trust Receipt, evidencing the possession by a Sub-Custodian of one or more Commercial Mortgage Loans or, as the context shall require, one or more Commercial Mortgage Loans held by a Sub-Custodian and evidenced by a Trust Receipt, and (b) in the event of a shortfall of the type of Assets enumerated in clause (a) of this definition, any Grade A Asset or Grade B Asset.

"**Grade D Asset**" means any Asset designated as such on a schedule in the form of <u>Schedule 1</u> hereto, which <u>Schedule 1</u> has been executed by each party hereto.

*REDACTED*

"**Market Value**" means, for each Purchased Asset, the price of such Purchased Asset as determined pursuant to the methodology set forth in Section 6(b) hereof.

"**Master Custodian**" means JPMorgan Chase Bank, N.A., its successors in interest or permitted assigns, or any successor Master Custodian pursuant to the terms hereof.

"**Master Custodian Data File**" means a data file in an electronic format in the form of <u>Schedule 2</u> hereto, compiled by Master Custodian from data transmitted by one or more related Sub-Custodians.

"**Master Custodian Held Asset**" means (a) Cash held by Master Custodian from time to time for the account of Buyer or Seller, as the case may be, pursuant to the terms hereof, (b) Trust Receipts, and (c) any other Asset described as a Master Custodian Held Asset on <u>Schedule 1</u> hereto from time to time.

"**Master Repurchase Agreement**" means the Master Repurchase Agreement, between Buyer and Seller, as supplemented and amended from time to time, a form of which has been provided to Master Custodian.

"**Mortgage Files**" means Mortgage Loans and all documentation related thereto, all of which shall be held from time to time by a Sub-Custodian pursuant to the terms of a Tri-

2

Party Sub-Custodial Agreement. The term "Mortgage File" when used herein without further specification shall be deemed to refer both files relating to Commercial Mortgage Loans and files relating to Residential Mortgage Loans.

"**Mortgage Loan**" means any mortgage loan, the interest in which is evidenced by a Trust Receipt. The term "Mortgage Loan" when used herein without further specification shall be deemed to refer to both Commercial Mortgage Loans and Residential Mortgage Loans.

"**Notice of Default**" means a written notice delivered by Seller to Master Custodian and Buyer or by Buyer to Master Custodian and Seller, as is more fully described in Section 17 hereof, which written notice identifies the defaulting party, the Repurchase Transaction, and the Event of Default.

"**Person**" means any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof.

"**Purchased Assets**" means Assets purchased by Buyer from Seller in a Repurchase Transaction and any Assets substituted therefor in accordance with the Master Repurchase Agreement.

"**Purchase Date**" means with respect to any Repurchase Transaction, the Business Day upon which Buyer purchases the related Assets from Seller.

"**Purchase Price**" means with respect to any Repurchase Transaction, the "Purchase Price" relating thereto as defined in the Master Repurchase Agreement.

"**Repurchase Date**" means with respect to any Repurchase Transaction, the earlier of (a) the Business Day upon which Seller is scheduled to repurchase the related Assets from Buyer, and (b) the Business Day upon which a Repurchase Date has been otherwise accelerated due to an Event of Default.

"**Repurchase Price**" means with respect to any Repurchase Transaction, the "Repurchase Price" as defined in the Master Repurchase Agreement.

"**Repurchase Transaction**" means any transaction between Buyer and Seller pursuant to the Master Repurchase Agreement.

## REDACTED

"**Residential Mortgage Loan**" means any Mortgage Loan with respect to which the indebtedness of the borrower is evidenced by a mortgage note and secured by a lien on real property constituting a one-to-four-family residence.

3

"**Seller's Asset Composition Data File**" means a data file in electronic format in the form of Schedule 4 hereto that is transmitted by or on behalf of Seller to Master Custodian pursuant to the terms of Section 5(e)(i) hereof.

"**Seller's Pre-Allocation Schedule**" means a data file in electronic format in the form of Schedule 10 hereto that is transmitted by or on behalf of Seller to Master Custodian pursuant to the terms of Section 5(e)(vi) hereof.

"**Seller's Repurchase Transaction Data File**" means a data file in electronic format in the form of Schedule 3 hereto that is transmitted by or on behalf of Seller to Master Custodian pursuant to the terms of Section 5(a) hereof.

"**Seller's Instructions**" means the instructions described in Section 5(a) as "Seller's Instructions", which shall be contained in a Seller's Repurchase Transaction Data File.

"**Seller's Master Custodial Account**" means, collectively, the accounts maintained by Master Custodian for Assets held by Master Custodian for the benefit of Seller.

"**Sub-Custodian**" means any entity reasonably acceptable to the Seller and the Master Custodian that has entered into a Tri-Party Sub-Custodial Agreement with Seller and Master Custodian.

"**Sub-Custodian Data File**" means a data file in electronic format in the form of Schedule 1 to the Tri-Party Sub-Custodial Agreement, transmitted to Master Custodian as provided pursuant to the terms of this Agreement and the relevant Tri-Party Sub-Custodial Agreement.

"**Tri-Party Sub-Custodial Agreement**" means an agreement among a Sub-Custodian, the Master Custodian and the Seller substantially in the form of Exhibit D hereto.

"**Trust Receipt**" means a receipt or certification executed by a duly authorized officer of the applicable Sub-Custodian, substantially in the form of Exhibit 1 to the applicable Tri-Party Sub-Custodial Agreement to which the related Sub-Custodian is a party, or in any other form subsequently agreed to in writing between the Seller and the Master Custodian.

"**Trust Receipt Delivery Date**" means, for each Sub-Custodian, the Purchase Date on which the initial Repurchase Transaction occurs with respect to which such Sub-Custodian is acting as sub-custodian pursuant to the related Tri-Party Sub-Custodial Agreement.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of New York.

Any term not defined in this Agreement shall have the meaning set forth in the Master Repurchase Agreement or the Tri-Party Sub-Custodial Agreement, as the case may be.

4

## Section 2.    **Services of Master Custodian**

a.    Appointment of Master Custodian.    Buyer hereby appoints Master Custodian as custodian to safekeep all Purchased Assets which are Master Custodian Held Assets at any time transferred or delivered to and held by Master Custodian for or on behalf of Buyer under this Agreement and as agent and bailee for Buyer for the purposes set forth in this Agreement. Seller hereby appoints Master Custodian as custodian to safekeep all Master Custodian Held Assets at any time transferred or delivered to or held by Master Custodian for or on behalf of Seller under this Agreement and as agent and bailee for Seller for the purposes set forth in this Agreement.

b.    Acceptance of Master Custodian.    Master Custodian accepts the appointments and, subject to the terms and conditions of this Agreement, agrees to receive Purchased Assets which are Master Custodian Held Assets in the manner specified herein, for or on behalf of Buyer, to be held hereunder, and to hold, release, or otherwise dispose of such Purchased Assets which are Master Custodian Held Assets as hereinafter provided. Master Custodian further agrees to receive Master Custodian Held Assets for or on behalf of Seller for transfer to Seller's Master Custodial Account to be delivered hereunder, and to hold, release, or otherwise dispose of such Master Custodian Held Assets as hereinafter provided.

c.    Scope of Master Custodian's Duties.    Master Custodian's duties hereunder shall continue until altered in writing by the parties hereto or until the termination of this Agreement. Master Custodian undertakes to perform only those duties as are expressly set forth in this Agreement and in the Tri-Party Sub-Custodial Agreement and no additional covenant or obligation shall be implied in this Agreement against Master Custodian. If a Repurchase Transaction shall not be completed for any reason whatsoever, Master Custodian's duties to Buyer and Seller shall be limited to holding Master Custodian Held Assets for the account of the party hereto owning such Assets prior to the contemplated but not completed Repurchase Transaction and following any other instructions received from Buyer and/or Seller as specifically provided for in this Agreement.

d.    Sub-Custodians; Scope of Liability; Asset Custody. (i) Buyer and Seller acknowledge that the use of Sub-Custodians to hold and review the Mortgage Files is contemplated throughout the term of this Agreement. Each Sub-Custodian shall be required to enter into a Tri-Party Sub-Custodial Agreement with respect to the transactions contemplated hereby and shall not be deemed to be the representative or agent of Master Custodian, provided, however that, subject to the provisions of Section 2(d)(ii) hereof, Sub-Custodian shall be deemed to be the agent and bailee of Master Custodian as provided pursuant to the terms of any Trust Receipt. Master Custodian shall not be responsible for the knowledge of the contents of any separate custody agreement between any Sub-Custodian and Seller to which it is not a party, and the parties hereto agree that Master Custodian shall not in any respect be bound by, or responsible in respect of, any such separate custody agreement.

(ii)    Notwithstanding any provision of this Agreement or any Tri-Party Sub-Custodial Agreement to the contrary, in no event shall Master Custodian be obligated to perform the obligations or duties of any Sub-Custodian under any Tri-Party Sub-Custodial Agreement or other custody agreement, if any, in the event that such

5

obligations or duties are not performed by said Sub-Custodian for any reason whatsoever. Further, except as specifically provided to the contrary in any Tri-Party Sub-Custodial Agreement, Master Custodian shall not be liable to any Person in any respect for any acts or omissions of any Sub-Custodian, including, but not limited to, (A) the failure of a Sub-Custodian to properly perform its duties under any Tri-Party Sub-Custodial Agreement or other custody agreement; (B) the failure of a Sub-Custodian to properly review, and/or certify as to the contents of any Mortgage Files in its custody; (C) any misstatement of fact or omission contained in any Trust Receipt delivered to Master Custodian or otherwise prepared in connection with a Repurchase Transaction; (D) the delivery or transmission by a Sub-Custodian of any other information or data to Master Custodian which is inaccurate, incomplete or misleading in any respect; (E) the failure by a Sub-Custodian to follow or comply with, as the case may be, any direction, authorization or instructions provided to it by any Person pursuant to the terms hereof or otherwise, or (F) the failure by a Sub-Custodian to deliver information regarding the Mortgage Files on a timely basis or its failure to perform any other act which would be required as a prerequisite to Master Custodian's being able to perform its obligations hereunder (including, but not limited to, its failure to deliver to the Master Custodian an original Trust Receipt as required pursuant to Section 5(e)(v) hereof).

(iii)   Master Custodian is not a party to any Master Repurchase Agreement. Master Custodian has not examined the Master Repurchase Agreement, has no responsibility for the content thereof and is not, and shall not be deemed to be, on notice as to any provision thereof. Master Custodian's obligations hereunder shall not be affected by, nor does Master Custodian assume any liability under, any Master Repurchase Agreement.

(iv)   Master Custodian shall not be liable for any act or omission of FRBNY in connection with the transactions contemplated hereby or by any Tri-Party Sub-Custodial Agreement.

Section 3.   **Representations, Warranties and Agreements**

Buyer, Seller and Master Custodian each represents and warrants to the others as of the date hereof, as of each Purchase Date and as of each Repurchase Date, the following:

a.   Representations of Buyer, Seller and Master Custodian.

(i)   It is duly organized and existing under the laws of the jurisdiction of its organization with full power and authority to execute and deliver this Agreement and to perform all of the duties and obligations to be performed by it hereunder.

(ii)   This Agreement and the performance of all transactions contemplated hereunder have been duly authorized, executed, and delivered by it in accordance with all requisite corporate action, and this Agreement

6

constitutes its valid, legal and binding obligation enforceable in accordance with its terms, except as may be limited by bankruptcy, insolvency, or similar laws, or by equitable principles relating to or limiting creditors' rights generally.

(iii)    The execution, delivery, and performance of this Agreement and the transactions contemplated hereunder will not violate any agreement by which it is bound or by which any of its assets are affected, or its charter, or by-laws, or any statute, regulation, rule, order or judgment applicable to it or its property.

b.    Further Representations and Covenants of Buyer and Seller.

(i)    Each has the power and authority to enter into the Repurchase Transactions and to deliver and transfer the Assets delivered or transferred hereunder.

(ii)    All Assets delivered or transferred by Seller to Master Custodian and all Assets delivered or transferred to Master Custodian by Buyer are delivered free, clear, and unencumbered by any lien, security interest charge, claim, or prior right of any third party, provided, however, the parties hereto agree and acknowledge that the Assets sold by Seller under the Master Repurchase Agreement or other financings may themselves be subject to a repurchase arrangement under which Seller purchased said Assets from a third party and are obligated to resell such Assets to such third party pursuant to such repurchase arrangement or other financing.

(iii)    In the event that with respect to any Repurchase Transaction Buyer checks the box on Exhibit B hereto indicating that it is acting on an agency basis and/or in a trust capacity only for the benefit of one or more of its customers, by checking such box Buyer shall be deemed to have represented, warranted and agreed that:

    (a)    Buyer is executing this Agreement on behalf of its customers and Buyer will be effecting Repurchase Transactions hereunder on an agency basis and/or in a trust capacity only;

    (b)    Master Custodian will not be required to recognize, follow, or observe the instructions of any such customer with respect to any Repurchase Transaction; and

    (c)    If Buyer acts beyond the authority granted to it pursuant to an agreement between it and any such customer, or between it and any entity acting on behalf of such customer or otherwise, Buyer shall be liable for all such actions and related transactions as if it were the principal with respect thereto, provided that the same shall not limit in any manner the liability of such customer or any other party for such actions and related transactions.

(iv) Buyer agrees to indemnify and hold Master Custodian and/or Seller harmless in the event that any customer of Buyer should make any claim against Master Custodian and/or Seller based upon or arising from a breach of any of the representations, warranties or agreements set forth in Section 3(b)(iii) above including, without limitation, a claim that any action taken by Master Custodian with respect to any transactions pursuant to an order, notice, instruction, or other communication from Buyer was unauthorized by such customer.

(v) By checking the appropriate box on Exhibit B hereto indicating that it is acting as principal, or by checking no box, Buyer represents, warrants, and agrees that it is executing this Agreement solely on its own behalf, and it will be entering into Repurchase Transactions as principal.

(vi) Seller is executing this Agreement solely on its own behalf, and it will be entering into any and all Repurchase Transactions as principal.

c. Further Representations and Covenants of Master Custodian.

(i) Master Custodian is a national banking association with its principal office at 270 Park Avenue, New York, New York 10017.

(ii) Master Custodian will maintain Buyer's Master Custodial Account as a custody account and, as requested by Seller and Buyer, as a "securities account" as defined in Section 8-501 of Article 8 of the UCC in which a "financial asset" as defined in Section 8-102(a)(9)(iii) of the UCC, is being held, and shall administer Buyer's Master Custodial Account as a securities intermediary in the same manner it administers similar accounts established for the same purpose. Master Custodian shall create and maintain the books and records created in connection with Buyer's Master Custodial Account in the State of New York.

(iii) Master Custodian will maintain Seller's Master Custodial Account as a custody account and shall administer Seller's Master Custodial Account in the same manner it administers similar accounts established for the same purpose. Master Custodian shall create and maintain the books and records created in connection with Seller's Master Custodial Account in the State of New York.

(iv) Master Custodian shall maintain at all times during the existence of this Agreement and keep in full force and effect fidelity insurance, theft of documents insurance, forgery insurance and errors and omissions insurance. All such insurance shall be in amounts, with standard coverage and subject to deductibles, as is customary for insurance typically maintained by banks which act as Custodian and in amounts and with insurance companies reasonably acceptable to Buyer and Seller.

8

d.      Continuing Agreement of All Parties.    Each party shall promptly notify all other parties hereto in writing in the event that any of the representations made by such party hereunder shall be or become untrue or misleading in any material respect.

Section 4.       **Maintenance of Buyer's Master Custodial Account and Seller's Master Custodial Account**

a.      Buyer's Master Custodial Account and Seller's Master Custodial Account. Master Custodian shall maintain such records and establish such accounts as may be required from time to time to receive, hold and account for all Purchased Assets which are Master Custodian Held Assets to be held for and on behalf of Buyer pursuant to this Agreement. Master Custodian shall maintain such records and establish such accounts as may be required from time to time to receive, hold and account for all Assets which are Master Custodian Held Assets to be held for and on behalf of Seller pursuant to this Agreement.

b.      Transfer of Assets to Master Custodial Accounts.  All Purchased Assets which are Master Custodian Held Assets shall be maintained by Master Custodian in Buyer's Master Custodial Account.  All Assets of Seller which are Master Custodian Held Assets shall be maintained in Seller's Master Custodial Account.  Master Custodian shall maintain Cash for Buyer's Master Custodial Account and Seller's Master Custodial Account in the State of New York.

c.      Segregation of Assets.    (i)    Master Custodian shall segregate and separately account on its books and records for all Purchased Assets which are Master Custodian Held Assets held for Buyer from assets it holds in its individual capacity, for Seller, or in any other trust or custodial capacity.  Master Custodian shall maintain and safekeep Master Custodian Held Assets held for Buyer until, (A) it shall receive Buyer's instructions to deliver or transfer to Buyer or its designee such Purchased Assets which are Master Custodian Held Assets (or, with respect to Trust Receipts, has received a copy of Buyer's instructions requesting that the related Sub-Custodian be directed by Master Custodian to deliver or transfer to Buyer or Buyer's designee the Mortgage Files held by such Sub-Custodian evidenced by such Trust Receipt as well as original instructions to Master Custodian to return the related Trust Receipts to such Sub-Custodian for cancellation); (B) Seller shall substitute Assets as provided in Section 7(c) hereof; (C) Master Custodian shall deliver Purchased Assets which are Master Custodian Held Assets to Seller or its designee as provided in Section 6(e) or 7(c) (or, with respect to Trust Receipts, authorize the related Sub-Custodian to transfer such Trust Receipts into the name of Seller); or (D) this Agreement is terminated and Master Custodian has received disposition instructions.

(ii)     Master Custodian shall segregate and separately account on its books and records for all Assets which are Master Custodian Held Assets held for Seller from assets it holds in its individual capacity, for Buyer, or in any other trust or custodial capacity.  Master Custodian shall maintain and safekeep Master Custodian Held Assets for Seller until (A) they are transferred into Buyer's Master Custodial Account pursuant to Section 6(a), (B) they are substituted pursuant to Section 7(c), or (C) it has received disposition instructions in connection with the termination of this Agreement in accordance with the provisions of Subsection 4(c)(i)(D).

9

d.     **No Lien or Pledge By Master Custodian.**   Neither Buyer's Master Custodial Account, including Purchased Assets therein which are Master Custodian Held Assets, nor Seller's Master Custodial Account, including Master Custodian Held Assets therein, shall be subject to any security interest, lien or right of setoff by Master Custodian or any third party claiming through Master Custodian. Except as required by law or regulation, Master Custodian shall not pledge, encumber, hypothecate, transfer, dispose of, or otherwise grant any third party an interest in, any Assets held in Buyer's Master Custodial Account or Seller's Master Custodial Account pursuant to this Agreement

Section 5.     **Arrangements Prior to Repurchase Transaction; Receipt of Instructions; Payment of Moneys; Delivery of Assets**

a.     **Seller's Instructions.**   Prior to 3:30 p.m. on any Business Day on which Seller and Buyer are to enter into one or more Repurchase Transactions, Seller shall deliver to Master Custodian by electronic means mutually agreed upon by Seller and Master Custodian and by facsimile pursuant to the terms of Section 18(c) hereof, a Seller's Repurchase Transaction Data File containing, among other things, for each Repurchase Transaction:

(i)     the Purchase Date and the Purchase Price;

(ii)     the Repurchase Date;

(iii)     the identity of Buyer; and

(iv)     instructions to Master Custodian to select Assets in Seller's Master Custodial Account to be transferred to Buyer's Master Custodial Account, such instructions to indicate what Grade(s) of Assets are eligible for transfer into Buyer's Master Custodial Account pursuant to the terms of the related Repurchase Transaction.

In the event that Seller does not deliver to Master Custodian a Seller's Repurchase Transaction Data File containing instructions identifying the Grade of Assets to be sold by Seller to Buyer (or if such instructions are not received by Master Custodian on a timely basis for any reason or lack the specificity necessary to enable Master Custodian to make such a transfer in accordance with such instructions), Master Custodian shall so notify the Seller and if the Seller is unable to rectify the problem in a reasonable period of time based upon the required daily schedule with respect to Repurchase Transactions set forth in this Agreement, the Master Custodian may reject the contents of such Seller's Repurchase Transaction Data File as not in compliance with the terms of this Agreement and in such event the Master Custodian shall act in accordance with the provisions of Section 5(g) hereof. Nothing provided herein shall be deemed to be an amendment or waiver of the provisions of Sections 12(b) or 15 of this Agreement.

b.     **Buyer's Purchase Price.**   No later than 3:00 p.m. on each Purchase Date, Master Custodian shall have received from the Buyer or its designee, for credit to Buyer's Master Custodial Account, sufficient Cash such that the total Cash balance in Buyer's Master Custodial Account equals or exceeds the aggregate Purchase Price contained in Seller's Repurchase Transaction Data File with respect to such Repurchase Transaction.

c.     Seller's Tender of Assets. Prior to 3:30 p.m. on the Purchase Date, Master Custodian shall transfer into Seller's Master Custodial Account those Assets described in Seller's Repurchase Transaction Data File as provided in Section 5(a)(iv) or in the next succeeding paragraph of Section 5(a).

d.     Cash Accounts. All payments of Cash to be credited to Buyer's Master Custodial Account shall be effected either by transfer from an account maintained by Seller at Master Custodian or by wire transfer through FRBNY to Buyer's Master Custodial Account designated in Exhibit B.

e.     Review of Sub-Custodian Data Files and Receipt of Trust Receipts By Master Custodian.

(i)     On each Business Day, Seller shall have, by 11:00 a.m. (A) reviewed those Sub-Custodian Data Files transmitted to Seller from one or more Sub-Custodians (which shall have been so transmitted to Seller no later than 6:00 p.m. on the immediately preceding Business Day pursuant to Section 3(c) of the Tri-Party Sub-Custodial Agreement), (B) transmitted the Seller's Asset Composition Data File to Master Custodian, and (C) informed the respective Sub-Custodian(s) of any discrepancies between data existing in the Sub-Custodian Data File and the Seller's Asset Composition Data File, and (D) transmitted to the Master Custodian, and pursuant to said Section 3(c) of the Tri-Party Sub-Custodial Agreement caused all applicable Sub-Custodian(s) to transmit to Master Custodian by electronic means mutually acceptable to Master Custodian and Seller, a final Sub-Custodian Data File containing data relating to the Mortgage Loans held by such Sub-Custodian(s). Subject to the provisions of the last sentence of this clause (e)(i), in the event that the data for any Mortgage Loan contained in a Sub-Custodian Data File is substantially complete but is missing some items of requested information, and one or more missing items of requested information may be obtained by Master Custodian through review of Seller's Asset Composition Data File delivered on the same Business Day (or for such Business Day as provided in Section 5(g) hereof), Master Custodian shall reflect in its files the information regarding such Mortgage Loan obtained from Seller's Asset Composition Data File if no information is provided in the related Sub-Custodian Data File with respect to such characteristic. In the event that such information is obtained from Seller's Asset Composition Data File and inserted into Master Custodian's files with respect to the relevant Mortgage Loan(s), Master Custodian (x) shall not be liable to any Person for any loss, cost or damage resulting from such insertion, and (y) shall be entitled to rely on the information set forth in Master Custodian's files with respect to the related Mortgage Loan(s) for the purposes of fulfilling each of its other obligations hereunder and shall not be liable to any Person in so relying thereon. Notwithstanding any other provision of this Agreement, in the event that any Sub-Custodian Data File shall be transmitted to Master Custodian at any time which does not contain information which on its

11

face appears accurate with respect to (A) the mortgage loan number, (B) the original principal balance, (C) the interest rate, and (D) the maturity date, in each case of any Mortgage Loan for which the related Mortgage File has been reviewed by a Sub-Custodian, such Mortgage Loan shall not be eligible for transfer by the Master Custodian into Buyer's Master Custodial Account, provided, however, that in the event for any reason the information required with respect to items (C) or (D) has not been provided by the Sub-Custodian but has been included in Seller's Asset Composition Data File, Master Custodian may use this information provided by Seller for inclusion in its files with respect to the related Mortgage Loans without any further duty of inquiry and without any liability to any Person and if thereafter all of the information required by clauses (A),(B),(C) and (D) of this Section 3(d) is included in the Master Custodian's files with respect to the related Mortgage Loan, such Mortgage Loan will be eligible for transfer by the Master Custodian into Buyer's Master Custodial Account.

(ii)     In the event that notwithstanding the provisions of subsection 5(e)(i) above Master Custodian receives notice from Seller by electronic means mutually acceptable to Seller and Master Custodian that Seller believes that there are discrepancies or inaccuracies in the Sub-Custodian Data File, Seller may attempt to reconcile such possible discrepancies or inaccuracies prior to 3:00 p.m. on the related Purchase Date, and will provide definitive instructions to Master Custodian no later than 3:00 p.m. on such date with respect to the inclusion or exclusion for transfer of any Mortgage Loans which it has previously determined may be subject to discrepancies or inaccuracies. Seller's determination of whether a discrepancy or inaccuracy exists in the Sub-Custodian's Data File shall be final and Master Custodian shall not be liable for any loss, cost, expense or liability resulting directly or indirectly from its making such a determination.

(iii)    In the event that on any proposed Purchase Date on which the relevant Sub-Custodian is open for business (which may be inferred by the Master Custodian if it has not received notice pursuant to Subsection 5(e)(iv) below) Master Custodian shall not have received one or more Sub-Custodian Data Files by 11:00 a.m., Master Custodian shall immediately inform Seller and await instructions from Seller regarding the Assets to be transferred in connection with such Repurchase Transaction. Upon receipt by Master Custodian of instructions substantially in the form of Schedule 8 hereto, Master Custodian shall promptly provide notice to the Buyer in the form of Schedule 9 hereto to the effect that Master Custodian has received instructions from the Seller, and pursuant to this Agreement shall, accept the transmission of a data file by Seller to Master Custodian in the same form as the Sub-Custodian's Data File ordinarily sent by such Sub-Custodian but by electronic means agreed upon between the Seller and the Master Custodian which may be different from the electronic means

12

ordinarily employed by Sub-Custodian for such purpose. In such event, upon receipt of such data file from the Seller, Master Custodian may rely upon the contents of such data file, including, but not limited to, the existence and completeness of the Mortgage Files evidenced thereby without further inquiry and in such event Master Custodian shall not be liable to any Person whatsoever in so relying thereon.

(iv) In the event that Master Custodian receives written notice from the Seller that one or more Sub-Custodians are not open for business on any Business Day, Master Custodian may rely upon the accuracy of the Sub-Custodian Data File from the previous Business Day on which such Sub-Custodian was open for business in determining Assets to be transferred to Buyer in connection with Repurchase Transactions occurring on such day and in such event Master Custodian shall not be liable to any Person whatsoever in so relying thereon; provided that if any Sub-Custodian is not open for business for more than two (2) consecutive Business Days, the Master Custodian shall promptly provide notice thereof to Buyer and Seller and request joint instructions executed by both Buyer and Seller with respect to further action regarding Assets appearing in such Sub-Custodian's most recently transmitted Sub-Custodian Data File and in the event Buyer and Seller cannot agree upon such instructions, the provisions of Section 14 hereof shall be applicable.

(v) Subject to the provisions of Section 5(f), prior to 3:30 p.m. on each Trust Receipt Delivery Date, Seller shall cause the respective Sub-Custodian, pursuant to Section 4 of the Tri-Party Sub-Custodial Agreement, to execute and deliver to the Master Custodian, each by facsimile (with paper copy to follow by overnight air courier, next day delivery, counterpart signature pages acceptable) a Trust Receipt. The information contained in the Sub-Custodian Data File transmitted to the Master Custodian on the Trust Receipt Delivery Date shall be deemed to constitute the schedule of Mortgage Loans referred to in such Trust Receipt. On each Business Day subsequent to the Trust Receipt Delivery Date, each Sub-Custodian Data File transmitted to the Master Custodian by such Sub-Custodian pursuant to Section 5(e)(i) shall be deemed to amend and restate the schedule of mortgage loans referred to in the Trust Receipt delivered to the Master Custodian on the Trust Receipt Delivery Date to take into account any substitutions of Assets which have occurred pursuant to Section 7(c). Upon receipt of a Notice of Default with respect to a Repurchase Transaction pursuant to Section 17 hereof from either the Buyer or Seller, the Master Custodian shall, at the request of the party sending such Notice of Default, convert the most recently received Sub-Custodian Data File to a paper copy and attach the same to the Trust Receipt.

(vi) Prior to 3:00 p.m. on any proposed Purchase Date, Seller shall have transmitted to Master Custodian in an electronic manner mutually acceptable to Seller and Master Custodian a Seller's Pre-Allocation

13

Schedule listing any Assets which Seller has requested be specifically allocated by Master Custodian for transfer from Seller's Master Custodial Account to Buyer's Master Custodial Account in connection with a particular Repurchase Transaction. By no later than 5:30 p.m. on any proposed Purchase Date, Master Custodian shall have reviewed the Seller's Pre-Allocation Schedule provided by Seller and compared it to the information provided in Seller's Instructions with respect to the particular Grade of Assets and other Asset criteria relating to the relevant Repurchase Transaction. If the Assets requested to be allocated to a particular Repurchase Transaction are acceptable for such pre-allocation based upon such review by the Master Custodian such Assets will be pre-allocated to the relevant Repurchase Transaction. If, however, for any reason the Assets requested to be allocated to a particular Repurchase Transaction are not acceptable for such pre-allocation based upon such review by the Master Custodian, the Master Custodian shall not pre-allocate such Assets to the relevant Repurchase Transaction and instead, without further notice to the Seller or other action of any kind, will make such Assets available for allocation to any other Repurchase Transaction on such day.

(vii) Prior to 5:30 p.m. on any proposed Purchase Date, (A) Seller shall have transmitted to Master Custodian in an electronic manner mutually acceptable to Seller and Master Custodian a schedule of the Assets which have previously been transferred into Seller's Master Custodial Account which it recommends should be transferred into Buyer's Master Custodial Account in accordance with Section 6(a) hereof, and (B) Master Custodian shall have determined whether, based upon the information provided to it by Seller in the schedule provided pursuant to clause (A) of this Section 5(e)(vii) and based upon the Sub-Custodian Data Files, there are sufficient Assets contained in Seller's Master Custodial Account to transfer into Buyer's Master Custodial Account such that a Margin Deficit (as described in Section 7(a) hereof) shall not occur, and, in the event that Master Custodian believes there are insufficient assets located in Seller's Master Custodial Account to prevent a Margin Deficit from occurring, Master Custodian shall immediately so inform Seller in writing by facsimile or mutually pre-approved electronic means.

f. Single Trust Receipt. Any provision of this Agreement to the contrary notwithstanding, the Master Custodian shall hold only one Trust Receipt from each Sub-Custodian relating to all Mortgage Loans held by such Sub-Custodian for the benefit of the Master Custodian hereunder. The Master Custodian will mark its books to reflect that portion of the Assets relating to each Trust Receipt that have been transferred to the Buyer's Master Custodial Account hereunder from time to time. The Master Custodian shall be under no obligation at any time to update, revise or amend any Trust Receipt received by it except to the extent specifically provided in Section 5(e)(v) hereof.

14

g.   Failure of Seller to Transmit Seller's Asset Composition Data File.  In the event that for any reason Master Custodian does not receive a Seller's Asset Composition Data File from the Seller which has been transmitted in the format required and by the time required for such electronic file pursuant to the provisions of this Agreement, Master Custodian shall so notify the Seller and if the Seller is unable to rectify the problem in a reasonable period of time based upon the required daily schedule with respect to Repurchase Transactions set forth in this Agreement, the Master Custodian may rely upon the accuracy of the Seller's Asset Composition Data File, as the case may be, from the previous Business Day on which Seller transmitted such electronic file in the format required and by the time required for such electronic file pursuant to the provisions of this Agreement in performing all tasks required of it hereunder in connection with Repurchase Transactions occurring on such day and in such event Master Custodian shall not be liable to any Person whatsoever in so relying thereon; provided that if the Master Custodian does not receive a Seller's Asset Composition Data File from the Seller which has been transmitted in the format required and by the time required for such electronic file pursuant to the provisions of this Agreement for more than two (2) consecutive Business Days, the Master Custodian shall promptly provide notice thereof to Buyer and Seller and request joint instructions executed by both Buyer and Seller with respect to further action regarding Assets appearing in such Seller's Asset Composition Data File and in the event Buyer and Seller cannot agree upon such instructions, the provisions of Section 14 hereof shall be applicable.  In the event that the Master Custodian shall be required to utilize the information set forth in a Seller's Asset Composition Data File from a prior Business Day, the Buyer and the Seller hereby irrevocably authorize the Master Custodian to make any manual adjustments to said data transmission as may be necessary (such as changing dates, etc.) to conform such transmissions to the requirements of its data processing systems or to properly identify such data in its books and records so long as such manual adjustments do not materially adversely affect the integrity of the information contained therein relating to the Assets, and the Master Custodian may evidence such manual adjustments by marking its internal books and records to reflect such adjustments upon their occurrence.  The Master Custodian shall not be liable to the Buyer, the Seller, any Sub-Custodian or any third-party resulting from its making such manual adjustments in accordance with the provisions of this Section.

h.   Failure of Seller to Transmit Seller's Repurchase Transaction Data File.  In the event that for any reason Master Custodian does not receive a Seller's Repurchase Transaction Data File from the Seller which has been transmitted in the format required and by the time required for such electronic file pursuant to the provisions of this Agreement, Master Custodian shall so notify the Seller and if the Seller is unable to rectify the problem in a reasonable period of time based upon the required daily schedule with respect to Repurchase Transactions set forth in this Agreement, Seller shall promptly (but in no event later than 4:00 p.m. New York time on the same Business Day) send to an Authorized Representative of the Master Custodian by facsimile transmission at the number listed in Section 18(c) hereof a copy of the Seller's Repurchase Transaction Data File for such Business Day and shall confirm the Master Custodian's receipt of such facsimile transmission telephonically.

Section 6.   **Effecting Transactions; Grant of Security Interest**

a.   Purchase Date.  Subject to the terms of this Agreement, and subject to time limitations imposed by the Federal Funds wire transfer system with respect to transfers to

15

parties outside of JPMorgan Chase Bank, N.A. in New York City (for which the Master Custodian shall not be liable), at or about 5:30 p.m. on the Purchase Date for any Repurchase Transaction, Master Custodian shall transfer to Seller Cash from Buyer's Master Custodial Account in an amount equal to the Purchase Price and shall transfer Assets from Seller's Master Custodial Account to Buyer's Master Custodial Account in accordance with Seller's Instructions contained in Seller's Repurchase Transaction Data File with respect to such Repurchase Transaction as provided in Section 5(a)(iv) hereof. Master Custodian shall examine all Trust Receipts on the related Trust Receipt Delivery Date to insure that (A) they are substantially in the form of Exhibit 1 to the Tri-Party Sub-Custodial Agreement or in another form subsequently agreed to in writing between the Buyer and Seller and consented to by the Master Custodian, such consent not to be unreasonably withheld, and (B) that they otherwise conform to all of Seller's Instructions, if any, contained in the related Seller's Repurchase Transaction Data File. In the event that any Trust Receipt is not in the proper form or does not conform to all of Seller's Instructions, if any, contained in the related Seller's Repurchase Transaction Data File, Master Custodian shall promptly notify Seller.

      b.    Market Value of Assets.

    (i)    Grade A Assets: The Market Value of Grade A Assets shall be their face amount.

    (ii)    Grade B Assets: The Market Value of Residential Mortgage Loans (each of which shall be evidenced by Trust Receipts but treated as individual Mortgage Loans respectively for purposes of determination of Market Value) shall be determined by Master Custodian and shall be equal to the lesser of the outstanding balance or the face amount of the note relating to such Mortgage Loan multiplied by the price, as quoted by a recognized pricing service not earlier than the close of business on the immediately preceding Business Day, of a GNMA, FNMA or FHLMC security backed by Residential Mortgage Loans with (1) a coupon which most closely approximates, but does not exceed the coupon on the Asset to be priced, and (2) a maturity date within three months of, the weighted average maturity of such security. If the pricing service fails to provide information on any day, Master Custodian shall use the "assumed price" of such Residential Mortgage Loan as provided herein in Schedule 7 attached hereto and which schedule shall be revised from time to time by means of distribution of a revised Schedule 7 which shall become effective when agreed to in writing by the Buyer and the Seller and receipt thereof acknowledged in writing by the Master Custodian.

    (iii)    Grade C Assets: In the event that the Buyer has indicated on Exhibit A hereto that it will accept Seller pricing of Grade C Assets by virtue of its having checked the box entitled "Agrees to Seller Pricing" therein, then upon the consent of the Master Custodian (such consent to be withheld only if the Master Custodian's computer and data processing systems have not yet been customized to perform Seller pricing in connection with this program), then the Market Value of Commercial Mortgage Loans (each of

16

which shall be evidenced by Trust Receipts but treated as individual Mortgage Loans respectively for purposes of determination of Market Value) shall be determined by Master Custodian and shall be equal to the price provided to Master Custodian by Seller not earlier than the close of business on the immediately preceding Business Day. If the Buyer has not indicated on Exhibit A hereto that it will accept Seller pricing of Grade C Assets by virtue of its having checked the box entitled "Agrees to Seller Pricing" therein, or the Seller fails to provide price information on any day, Master Custodian shall use the "assumed" price of such Commercial Mortgage Loan as provided herein in Schedule 7 attached hereto and which schedule shall be revised from time to time by means of distribution of a revised Schedule 7 which shall become effective when agreed to in writing by the Buyer and the Seller and receipt thereof acknowledged in writing by the Master Custodian.

(iv) Grade D Assets: The Market Value of each Grade D Asset shall be determined pursuant to a method agreed upon by each of the parties hereto and provided in an addendum to Schedule 1 hereto, executed by each of Buyer and Seller.

c. Determination of Aggregate Market Value. By no later than 5:30 p.m. on the Purchase Date for any Repurchase Transaction, Master Custodian shall determine the then Aggregate Market Value of all Assets to be transferred to Buyer's Master Custodial Account with respect to a Repurchase Transaction. Master Custodian shall exclude from the determination of the Aggregate Market Value and return to Seller's Master Custodial Account any Mortgage Loans evidenced by a Trust Receipt which is not in the proper form or any Asset which does not conform to all of Seller's instructions, if any, contained in the related Seller's Repurchase Transaction Data File as provided in Section 5(a)(iv) hereof.

d. Payment of Purchase Price. Provided the Aggregate Market Value of all Purchased Assets to be transferred to Buyer's Master Custodial Account with respect to a Repurchase Transaction equals or exceeds the Required Amount with respect to such Repurchase Transaction as provided in the related Seller's Repurchase Transaction Date File, Master Custodian shall, upon telephonic instructions from the Seller followed on the same Business Day by written confirmation thereof by facsimile, transfer such Assets from Seller's Master Custodial Account to Buyer's Master Custodial Account and shall disburse from Buyer's Master Custodial Account Cash in an amount equal to the Purchase Price. All payments of Cash representing the Purchase Price to be credited to Seller's Master Custodial Account (or such other account which Seller shall direct in writing) shall be effected either by transfer from an account maintained by the paying party at Master Custodian or by wire transfer through FRBNY to Seller's Master Custodial Account (or such other account which Seller shall direct in writing).

e. Repurchase Date. On the Repurchase Date for any Repurchase Transaction, Buyer hereby instructs Master Custodian to tender to Seller the Purchased Assets held by Master Custodian in Buyer's Master Custodial Account with respect to such Repurchase Transaction and to transfer the Purchased Assets from Buyer's Master Custodial Account to Seller's Master Custodial Account. Seller hereby instructs Master Custodian at the time

17

Purchased Assets are transferred to Seller's Master Custodial Account to make payment to Buyer of the Purchase Price by debiting Cash from Seller's Master Custodial Account and crediting Cash to Buyer's Master Custodial Account.

f.    Simultaneous Transactions.  Buyer and Seller agree that transfers of Cash and Assets for the purpose of effecting Repurchase Transactions pursuant to the provisions of this Section 6 are intended to be, and shall be deemed to be, simultaneous.  During any period that Cash and Assets are held by or for Buyer or Seller and payment has not been made therefor, the receiving party shall be deemed to hold the Cash and Assets in trust for the delivering party and shall be obligated to return the Cash and Assets upon the delivering party's request.

g.    Effect of Notice of Levy, etc.    Notwithstanding anything in this Agreement to the contrary, Master Custodian shall not be required to deliver or transfer Assets in contravention of any notice of levy, seizure or similar notice or order, or judgment, issued or directed by a governmental agency or court, or officer thereof, having jurisdiction over Master Custodian or its agents or affiliates, which on its face affects such Assets.  Master Custodian shall give Buyer and Seller prompt notice of any such notice or order.

h.    Ownership of Purchased Assets.    Until the Repurchase Date, or until Master Custodian shall receive from Buyer a Notice of Default, notification, instruction or entitlement order under Section 17, Buyer hereby instructs Master Custodian to hold Purchased Assets in Buyer's Master Custodial Account and to refuse to act upon any instructions of Buyer or Seller to deliver Purchased Assets other than as expressly provided in this Agreement.  Buyer hereby covenants, for the exclusive benefit of Seller, that it shall not, prior to the occurrence of an Event of Default (upon which the provisions of said Section 17 shall be controlling) without the prior written consent of Seller, sell, transfer, assign, pledge, or otherwise utilize or transfer Purchased Assets held in Buyer's Master Custodial Account with respect to any Repurchase Transaction.  Further, Buyer hereby covenants, for the exclusive benefit of Seller, that Buyer will not instruct Master Custodian to deliver any Purchased Assets in Buyer's Master Custodian Account to any person other than Seller unless and until an Event of Default has occurred as to which Seller is the defaulting party.  Notwithstanding the foregoing, the foregoing covenants in the preceding two sentences are for the exclusive benefit of Seller only and they shall in no way be deemed to constitute a limitation on (i) Buyer's right at any time to provide notifications, instructions or entitlement orders to Master Custodian with respect to the transfer of Assets, or (ii) Master Custodian's obligation to act upon such notifications, instructions or entitlement orders of Buyer.  To the extent not otherwise inconsistent with the foregoing, Buyer shall be entitled to exercise all of the rights of a secured party under the UCC with respect to Purchased Assets held in Buyer's Master Custodial Account.

i.    Deliveries by Master Custodian.    All deliveries permitted under this Agreement of Purchased Assets by Master Custodian to Buyer from Buyer's Master Custodial Account shall be made to Buyer by delivery in the manner requested by Buyer in writing.

j.    Seller's Grant of a Security Interest.    In the event that the transactions evidenced by the Master Repurchase Agreement are characterized as a financing notwithstanding the stated intention of the parties thereto to effect a sale, Seller hereby grants to Buyer, in consideration of Buyer's performance of its obligations hereunder and under the Master

18

Repurchase Agreement, a first priority security interest in all of Seller's right, title and interest in and to the Assets relating to each Repurchase Transaction and Buyer's Master Custodial Account.

Section 7.     **Valuation and Substitution of Assets**

No later than 5:30 p.m. on each Business Day, Master Custodian shall determine the then current Aggregate Market Value (in the manner provided in Section 6(e)) of all Purchased Assets held in Buyer's Master Custodial Account with respect to all Repurchase Transactions then outstanding.

a.     Margin Deficit.  In the event that the aggregate Required Amount with respect to all outstanding Repurchase Transactions is greater than the Aggregate Market Value of all Purchased Assets held with respect to such Repurchase Transactions (a "Margin Deficit") Master Custodian shall so notify Seller at 5:30 p.m..  No later than 7:00 p.m. on the date of any such notice, Seller shall transfer to Master Custodian additional Cash such that, after transfer thereof to Buyer's Master Custodial Account, the then Aggregate Market Value of all Purchased Assets (including the recently transferred Assets) held with respect to outstanding Repurchase Transactions equals or exceeds an amount equal to the aggregate Required Amount with respect to all outstanding Repurchase Transactions.  If Seller fails to transfer an appropriate amount of additional Assets by 7:00 p.m. on the date of any such notice, Master Custodian shall promptly notify Buyer and Seller and await further instructions. Master Custodian shall incur no liability to any Person with respect to any Margin Deficit in acting in accordance with the provisions of this Section 7(a).

b.     Margin Excess.  In the event the then Aggregate Market Value of Purchased Assets held with respect to outstanding Repurchase Transactions shall exceed an amount equal to the aggregate Required Amount with respect to all outstanding Repurchase Transactions (a "Margin Excess"), Master Custodian shall, notify Seller and (i) upon instructions from Seller to be delivered by Seller to Master Custodian on the date of execution hereof and to be effective until Master Custodian has received a revocation thereof in writing from Seller, Master Custodian shall transfer Purchased Assets from Buyer's Master Custodial Account to Seller's Master Custodial Account having an Aggregate Market Value less than or equal to the Margin Excess, and (ii) in accordance with such transfers as provided for in cause (i) hereof, upon instructions from Seller to be delivered by Seller to all relevant Sub-Custodians pursuant to Section 9(b) of the applicable Tri-Party Sub-Custodial Agreement, Sub-Custodian shall transfer Mortgage Files relating to the Mortgage Loans described in such instructions as directed in such instructions as provided in Section 9(b) of the applicable Tri-Party Sub-Custodial Agreement and subsequent to such release from custody such Mortgage Loans shall not be included in any subsequent Sub-Custodian Data Files transmitted by such Sub-Custodian to the Master Custodian hereunder, provided that in any event, subsequent to such transfers any requirements set forth in Seller's Instructions shall continue to be met. Buyer hereby irrevocably authorizes Master Custodian and each Sub-Custodian (as a third-party beneficiary of this Agreement for the limited purposes set forth herein) to accept the written instructions of Seller identifying the specific Purchased Assets to be released in accordance herewith.  Upon transfer from Buyer's Master Custodial Account, released Assets shall cease to be Purchased Assets for all purposes

hereunder and without further action the security interest granted by the Seller to the Buyer with respect to such Purchased Assets pursuant to Section 6(j) hereof shall be automatically released.

          c.     Substitutions of Purchased Assets.  Except as otherwise provided in Section 17, Buyer hereby authorizes Master Custodian from time to time to release to Seller Purchased Assets held in Buyer's Master Custodial Account pursuant to a release request from Seller, provided, however, that Seller shall simultaneously deliver to Master Custodian for transfer to Buyer's Master Custodial Account additional Assets that are of the same or higher Class as, and have an Aggregate Market Value equal to or greater than the then Aggregate Market Value of Purchased Assets released hereunder. The transfer of Assets shall be effected in the manner set forth in Section 6(a) with the following exceptions:  (i) Master Custodian shall calculate the Aggregate Market Value of the substitute Assets and determine that the Aggregate Market Value of the substitute Assets equals or exceeds the Aggregate Market Value of the Purchased Assets identified in Seller's release request; and (ii) Master Custodian shall transfer the identified Purchased Assets from Buyer's Master Custodial Account to Seller's Master Custodial Account and transfer the substitute Assets from Seller's Master Custodial Account to Buyer's Master Custodial Account, such transfer of released Purchased Assets and substitute Assets to be deemed to occur as provided in Section 6(f) and subject to the terms thereof. All substitute Assets received pursuant to this Section 7(c) shall be deemed to be Purchased Assets held by Master Custodian as of the Purchase Date of, and identified to, outstanding Repurchase Transactions as determined by Master Custodian. In connection with Master Custodian's performance of its duties under this Section 7(c), the parties hereto acknowledge that throughout each day during which Repurchase Transactions are outstanding, Master Custodian shall be entitled to, without specific instructions of any kind (other than Seller's Instructions), re-allocate Assets among Repurchase Transactions as many times as may be necessary in connection with the origination, rolling over and termination of various Repurchase Transactions and make appropriate substitutions from and into Buyer's Master Custodial Account in connection therewith, so long as such substitutions are made in accordance with this Section 7(c) and subject to the provisions of Section 17, and Master Custodian shall not be required to provide a statement or reconciliation of such Buyer's Master Custodial Accounts indicating such substitutions except as of the end of each such Business Day, such statement to be distributed pursuant to the provisions of Section 8 hereof.

          d.     Release of Mortgage Files for Servicing.  Pursuant to Section 7 of each Tri-Party Sub-Custodial Agreement, each Sub-Custodian is permitted and authorized, from time to time and as appropriate for the foreclosure or servicing of any of the Mortgage Loans, upon receipt of a Request for Release of Documents and Receipt in the form of Exhibit 2 to each Tri-Party Sub-Custodial Agreement, to release or cause to be released to the Seller or the Seller's Authorized Representative the related Mortgage File or the documents of the related Mortgage File set forth in such Request for Release. All Mortgage Files or documents of Mortgage Files released by a Sub-Custodian to the Seller or, at the Seller's written direction, the Seller's Authorized Representative are required to be held by the Seller or the Seller's Authorized Representative, as applicable, in trust for the benefit of the Master Custodian or other related holder of a Trust Receipt. Pursuant to Section 8 of each Tri-Party Sub-Custodial Agreement, the Seller or the Seller's Authorized Representative may not request to have released to the Seller or the Seller's Authorized Representative in total active Mortgage Files or documents (including those requested) pertaining to Mortgage Loans at the time being held by the Sub-Custodian

under the related Tri-Party Sub-Custodial Agreement with outstanding principal balances representing more than five percent (5%) of the total aggregate outstanding principal balance of Mortgage Loans held by the Sub-Custodian pursuant to the terms thereof without the prior written consent of the Buyer.

### Section 8.     Master Custodian Statements

Master Custodian shall provide Seller with daily information statements reflecting the Cash and Assets in Seller's Master Custodial Account and shall provide Buyer and Seller with daily information statements reflecting the Cash and Purchased Assets in Buyer's Master Custodial Account. Such statements will be provided prior to 10:00 p.m. each evening and shall be in the form of Schedules 5 & 6 hereto entitled "Schedule 5 - File Format For Spreads File" and "Schedule 6 - Detail Schedule For Buyer", respectively. The File Format For Spreads File shall be electronically transmitted by Master Custodian to Seller by a method of transmission mutually acceptable to the sending and receiving parties. The Detail Schedule for Buyer shall be sent by Master Custodian to Buyer by facsimile transmission at the telecopy number provided in Exhibit B hereto. Buyer and Seller shall promptly review such statements and shall promptly advise Master Custodian of any error, omission, or inaccuracy in the information reported. Master Custodian shall undertake to correct any errors, failures or omissions that are reported to Master Custodian by Buyer or Seller. Any such corrections shall be reflected on subsequent information statements.

### Section 9.     Master Custodian Fee

Seller shall pay Master Custodian's fees and reimburse it for certain expenses in connection with the services provided pursuant to this Agreement as is more fully provided in that certain Engagement Letter between Seller and Master Custodian dated June 4, 1999.

### Section 10.     No Guaranty by Master Custodian

BUYER AND SELLER SPECIFICALLY ACKNOWLEDGE THAT MASTER CUSTODIAN IS NOT GUARANTEEING PERFORMANCE OF THE OBLIGATIONS OF BUYER OR SELLER HEREUNDER, UNDER THE MASTER REPURCHASE AGREEMENT, UNDER THE TRI-PARTY SUB-CUSTODIAL AGREEMENT OR WITH RESPECT TO ANY TRANSACTION OR ASSUMING ANY LIABILITY WITH RESPECT TO THE PERFORMANCE OF BUYER OR SELLER, NOR IS MASTER CUSTODIAN UNDERTAKING ANY CREDIT RISK ASSOCIATED WITH THE TRANSACTIONS, WHICH LIABILITIES ARE THE SOLE RESPONSIBILITY OF BUYER AND SELLER. FURTHER, EXCEPT AS MAY BE ARRANGED BY A SEPARATE AGREEMENT, MASTER CUSTODIAN IS UNDER NO OBLIGATION TO UNDERTAKE TO MAKE ANY CREDIT AVAILABLE TO EITHER BUYER OR SELLER TO ENABLE EITHER OF THEM TO COMPLETE TRANSACTIONS.

### Section 11.     Force Majeure

Master Custodian shall not be liable for any expense, loss, claim or damage (including counsel fees or expenses) suffered by Buyer, Seller, or any third party arising out of or caused by any delay in, or failure of, performance by Master Custodian, in whole or in part

21

(other than such as may arise from Master Custodian's gross negligence or willful misconduct), arising out of, or caused by, circumstances beyond Master Custodian's control, including without limitation: acts of God; interruption, delay in, or loss (partial or complete) of electrical power or external computer (hardware or software) or communications services; act of civil or military authority; sabotage; natural disaster, epidemic; war or other government action; civil disturbance; flood, earthquake, fire; other catastrophe; strike or other labor disturbance by employees of nonaffiliates; government, judicial, or self-regulatory organization order, rule, or regulation; riot; energy or natural resource difficulty or shortage; and inability to obtain materials, equipment or transportation, provided the Master Custodian has exercised such diligence as the circumstances may reasonably require, and provided that the Master Custodian has used due care and has exercised due diligence in anticipating such event to the extent reasonably foreseeable and has taken all reasonable actions as may be necessary to respond to, correct and circumvent the effects of such event on the Master Custodian's performance of its duties and responsibilities hereunder, but provided further that the proviso herein shall not be applicable to any events or consequences resulting from the problem commonly know as the "Y2K Problem", which relates to effect of the year 2000 upon any computer systems or equipment containing embedded microchips (including systems and equipment supplied by others with which such systems or equipment interface).

Section 12.   **Concerning Master Custodian**

a.   Delay in Receiving Assets. Master Custodian shall not be liable for any expense, loss, claim or damage (including counsel fees or expenses) which Buyer, Seller or any third party may suffer by reason of any delay Buyer, Seller or Master Custodian may experience in obtaining Assets from, or by reason of any action or omission to act on the part of, any Sub-Custodian, depository, clearing agent, transfer agent, third party, clearing corporation, or FRBNY securities wire transfer system, or in obtaining Cash from any bank, including FRBNY, clearing agent, or third party (other than such as may arise from Master Custodian's gross negligence or willful misconduct). Master Custodian shall promptly notify Seller and Buyer of any such delay. Master Custodian shall not be liable in any event for any act or omission of any Sub-Custodian or of any act or omission of any agent or representative selected with due care.

b.   Forgery; False Data. Master Custodian is entitled to act upon any data or instructions received from any Sub-Custodian by computer transmission or other electronic means whether or not authorized or correct if received by it in good faith and in accordance with the security procedures set forth in Section 30 of any Tri-Party Sub-Custodial Agreement. Subject to the foregoing, Master Custodian shall not be liable for any expense, loss, claim or damage (including counsel fees or expenses) which Buyer, Seller or any third party may suffer by reason of any signature by anyone who is not an Authorized Person on, or forgery or wrongful alteration of, instructions or any other written instrument or inaccuracy, incompleteness, or falsity of data transmitted by any Person by computer tape or terminal or other computer facilities or electronic means, if Master Custodian reasonably shall have believed that such instructions, instrument or data was for the account or benefit of Buyer or Seller or that the writing was signed by, or the data was transmitted by, an Authorized Person, or in the case of any Sub-Custodian, any purportedly authorized person.

22

c. No Duty of Inquiry. Notwithstanding anything to the contrary in this Agreement and without limiting the generality of the foregoing, Master Custodian shall be under no obligation to inquire into, and shall not be liable for:

(i) the title, validity, or genuineness of any Asset;

(ii) the legality or effectiveness of the purchase or delivery or transfer of any Asset or the propriety of the price by which the same is acquired or sold under a Repurchase Transaction;

(iii) the due authority of any Authorized Person to act on behalf of Buyer or Seller with respect to Assets held in Buyer's Master Custodial Account or Assets held in Seller's Master Custodial Account, as applicable;

(iv) the due authority of Buyer to purchase or hold any Purchased Asset delivered to Master Custodian pursuant to this Agreement;

(v) the accuracy or completeness of any data or information with respect to Assets which has been provided to Master Custodian by Seller at any time pursuant to the terms of this Agreement (including, without limitation, for the failure by the Master Custodian to transfer Assets to the Buyer's Master Custodial Account in respect of any Repurchase Transactions which for any reason are excluded from the report sent by Seller to Master Custodian pursuant to Section 5(a) hereof);

(vi) the collectibility, insurability, effectiveness, marketability or suitability of any of the collateral underlying an Asset; or

(vii) the legal content of the provisions of any Trust Receipt or the legal adequacy thereof or of any purported transfer thereof.

d. Price Data. Master Custodian shall not be liable for any expense, loss, claim or damage (including counsel fees and expenses) (other than such as may arise solely from Master Custodian's gross negligence or willful misconduct) which Buyer, the Seller, or any third party may suffer by reason of any error by, or inaccuracy of, any price received from any recognized pricing source (including the Seller if the Buyer, Seller and Master Custodian have agreed at any time to permit Seller pricing) including any prices resulting from any formula used to obtain such prices except for the proper calculation of prices thereunder. Master Custodian shall have no duty to inquire into the appropriateness or relative change of any price nor shall Master Custodian be required to determine volatility factors with respect to any price.

e. Limitation of Liability. Master Custodian shall perform its duties with reasonable care. Master Custodian shall be liable to Buyer and Seller for loss of Assets resulting from Master Custodian's gross negligence or loss of the same by reason of robbery, burglary, or theft by it or its employees, agents or delegates. Master Custodian shall not be liable to any Person for loss of Assets in the care and custody of a Sub-Custodian. Notwithstanding any other provisions of this Agreement, Buyer and Seller agree that Master Custodian's liability under this Agreement shall be limited to direct damages resulting from Master Custodian's breach of this

23

Agreement. In no event shall Master Custodian be liable for special, consequential, or incidental damages incurred or suffered by Buyer, Seller, any Sub-Custodian or any other Person regardless of the form of action and even if such party is advised of the possibility of such damages.

Section 13.    **Indemnification**

Each of Buyer and Seller agrees, jointly and severally, to release, indemnify and hold harmless Master Custodian, its officers, directors, employees, agents and affiliated persons ("Indemnified Parties") for expenses, losses, claims, fines, penalties, or damages (including the reasonable fees of external legal counsel, accountants or auditors) (collectively, "Covered Costs") suffered by any Indemnified Party, if such Covered Costs (i) relate to those areas of liability from which Master Custodian has been expressly exculpated pursuant to the terms of this Agreement or any applicable Tri-Party Sub-Custodial Agreement, or (ii) result from any actual or alleged breach by the Seller, Buyer or Master Custodian of any provision of this Agreement, or any actual or alleged breach by the Seller, Master Custodian or any Sub-Custodian of any provision of any applicable Tri-Party Sub-Custodial Agreement, or failure in whole or in part, or delay in performing any duty or obligation hereunder or under any applicable Tri-Party Sub-Custodial Agreement, other than by reason of gross negligence or willful misconduct of Master Custodian or the Indemnified Party or for loss or theft as provided in Section 12(e) of this Agreement. Each of Buyer and Seller further agrees, jointly and severally, to indemnify and hold harmless the Indemnified Parties and to pay the reasonable costs and external counsel fees in connection with an Indemnified Party's defense of, or participation in, any action, claim, investigation, or administrative proceeding arising out of Master Custodian's performance of services under this Agreement or any applicable Tri-Party Sub-Custodial Agreement, other than by reason of gross negligence or willful misconduct of Master Custodian or of the Indemnified Party or for loss or theft as provided in Section 12(e) of this Agreement. Notwithstanding the foregoing, Buyer and Seller shall not be jointly and severally responsible for the reasonable counsel fees of more than one external counsel to the Indemnified Parties, regardless of the number of Indemnified Parties.

Section 14.    **Continuing Disputes**

With respect to Buyer's Account, the Assets at any time located in or to be transferred into Buyer's Account and any issues regarding the Buyer's right, title and interest into or under such account and Assets (including, without limitation, the transfer, sale or other liquidation of such Assets) or Seller's purported interest therein, notwithstanding anything to the contrary in this Agreement, in the event of any dispute between, conflicting claims by or conflicting instructions from Seller and Buyer with respect to such account or Assets, Master Custodian shall follow the instructions of Buyer and disregard the instructions of Seller. With respect to any other issues arising in connection with this Agreement, in the event of any dispute between or conflicting claims by Buyer and the Seller and any other person, Master Custodian shall promptly notify Seller and Buyer and shall either act on joint instructions or decline to comply with any and all claims, demands, or instructions with respect to such Assets so long as such dispute or conflict shall continue, and Master Custodian shall not be liable for failure to act or comply with such claims, demands, or instructions. With respect to issues covered by the immediately preceding sentence, Master Custodian shall be entitled to refuse to act or comply until either (i) such conflicting or adverse claims or demands shall have been determined in a

court of competent jurisdiction or settled by agreement between the conflicting parties and Master Custodian shall have received evidence satisfactory to it of the same, or (ii) Master Custodian shall have received security or an indemnity satisfactory to it and sufficient to hold it harmless from and against any and all losses or damages, including reasonable external counsel fees and expenses, which it may incur by reason of taking any action, except Master Custodian shall in all events accept Cash in substitution of any Purchased Assets pursuant to Section 7(c).

Section 15.    **Form of Instructions**

Notwithstanding that this Agreement may require written instructions, Master Custodian may in its discretion act on oral instructions of an Authorized Person if promptly confirmed in writing or on instructions received over any system whereby the receiver is able to verify by code or otherwise with reasonable certainty the identity of the sender of such communications. In such event, if subsequent written instructions differ in any respect from oral instructions, written instructions shall control. Failure to confirm in writing shall not affect the authority of any acts taken or omitted by Master Custodian pursuant to oral instructions. Instructions shall be effective from the time they are actually received by an Authorized Person of Master Custodian from an Authorized Person of the instructing party or from a person reasonably believed by Master Custodian to be an Authorized Person of the instructing party by telephone, by facsimile, or other facsimile machine, or any other means designated by Master Custodian.

Section 16.    **Termination**

Any of (x) Master Custodian, (y) Buyer or (z) Seller, may terminate this Agreement, without cause, by giving the other parties no less than ninety (90) days prior written notice specifying the date of such termination. Master Custodian shall deliver any Cash or Purchased Assets remaining in Buyer's Master Custodial Account on termination of this Agreement to a successor Master Custodian designated in written instructions from Buyer and Seller. If Buyer and Seller do not provide written instructions designating a successor Master Custodian prior to the termination date, Master Custodian shall (a) continue to hold Purchased Assets and Cash in Buyer's Master Custodial Account until the Repurchase Date with respect to each Repurchase Transaction then outstanding, or until it has received a Notice of Default, in connection therewith, and instructions in accordance with Section 17, or (b) in its sole discretion Master Custodian may deliver such Cash or Purchased Assets to Buyer or its designee.

Section 17.    **Notice of Default; Control**

a.    Delivery of Notice of Default.  If the Seller shall declare an Event of Default, it shall deliver a Notice of Default to Master Custodian. Master Custodian shall notify the Buyer of the receipt of a Notice of Default and shall send a notice of such Event of Default to each Sub-Custodian holding Mortgage Loans for the benefit of Buyer as determined pursuant to the most recently delivered Sub-Custodian Data File as provided in Section 9(c) of the related Tri-Party Sub-Custodial Agreement, but shall have no further obligation or duty to inquire into the nature or validity of the Event of Default set forth in the Notice of Default.

25

b.    Effect of Buyer's Notice of Default. If Buyer shall declare an Event of Default, it shall deliver a Notice of Default to Master Custodian. Master Custodian shall notify the Seller of the receipt of a Notice of Default and shall send a notice of such Event of Default to each Sub-Custodian holding Mortgage Loans for the benefit of Buyer as determined pursuant to the most recently delivered Sub-Custodian Data File as provided in Section 9(c) of the related Tri-Party Sub-Custodial Agreement. At any time during which Master Custodian has received a Notice of Default from Buyer with respect to any Repurchase Transaction, Master Custodian shall:

    (i)    give notice to Seller of such Notice of Default and hold all Purchased Assets in Buyer's Master Custodial Account, or transfer the same in accordance with Buyer's instructions to Master Custodian; and

    (ii)    cease (A) transferring (x) Assets from Seller's Master Custodial Account to Buyer's Master Custodial Account and (y) Cash from Buyer's Master Custodial Account to Seller, in each case pursuant to the provisions of Section 6(a) hereof in connection with any new Repurchase Transactions; (B) determining the Aggregate Market Value of Purchased Assets pursuant to Section 6(e); (C) tendering the Purchased Assets pursuant to Section 6(e); or (D) releasing to Seller Purchased Assets pursuant to Sections 7(a) and 7(b), except Master Custodian shall in all events accept Cash in substitution of any Purchased Asset pursuant to Section 7(c).

c.    Control. All property from time to time in Buyer's Master Custodian Account shall be owned and controlled solely by Buyer, and Bank shall follow only Buyer's instructions with respect to Buyer's Account. If requested in writing by Buyer, Master Custodian shall, notwithstanding anything to the contrary in this Agreement, comply with all notifications it receives originated by Buyer directing it to transfer or redeem any property in Buyer's Master Custodial Account and any other instructions or "entitlement orders" (as defined in Article 8 of the UCC) concerning Buyer's Master Custodial Account, in each case without further consent by Seller. Master Custodian shall have no duty to investigate or make any determination as to whether a default exists under the Master Repurchase Agreement and shall comply with any entitlement orders or other notifications or instructions from Buyer even if it believes that no such default exists, and Master Custodian shall have no liability to Seller or to any other Person for complying with orders from Buyer even if Seller notifies Master Custodian that Buyer has no right to give such instructions. Buyer hereby covenants, for the exclusive benefit of Seller, that Buyer will not instruct Master Custodian to deliver any Assets to any person other than Seller unless and until an Event of Default has occurred as to which Seller is the defaulting party. Notwithstanding the foregoing, the foregoing covenant is for the exclusive benefit of Seller only, and it shall in no way be deemed to constitute a limitation on (i) Buyer's right at any time to provide notifications, instructions or entitlement orders to Master Custodian with respect to the transfer of Assets, or (ii) Master Custodian's obligation to act upon such notifications, instructions or entitlement orders of Buyer. Nothing contained in this Section 17(c) is intended to, nor shall it be deemed to limit, modify or supersede in any respect the rights of the Seller provided in Section 17(d) hereof, it being agreed that Section 17(d) does not and shall not affect Buyer's control of the Buyer's Master Custodial Account

d.      Effect of Seller's Notice of Default.  At any time Master Custodian has received a Notice of Default from Seller, with respect to any Repurchase Transaction, Master Custodian shall:

(i)     give notice to Buyer of such Notice of Default and continue to hold all Purchased Assets then held in Seller's Master Custodial Account or transfer the same in accordance with Seller's Instructions to Master Custodian; and

(ii)    cease:  (A) transferring (x) Assets from Seller's Master Custodial Account to Buyer's Master Custodial Account and (y) Cash from Buyer's Master Custodial Account to Seller, in each case pursuant to Section 6(a) in connection with any new Repurchase Transactions; (B) determining the Aggregate Market Value of Purchased Assets pursuant to Section 6(c); (C) tendering the Purchased Assets pursuant to Section 6(e), or (D) releasing to Seller Purchased Assets pursuant to Sections 7(c) and 7(d), except that Master Custodian shall in all events accept Cash in substitution of any Purchased Asset pursuant to Section 7(c).

e.      Further Assurances.  In the event that Master Custodian receives a Notice of Default from Seller or any notification, instruction or entitlement order from Buyer as provided in clauses (b) and (c) above with respect to any Repurchase Transaction, Master Custodian shall continue to provide safekeeping services with respect to Purchased Assets and Cash held in Buyer's Master Custodial Account for a period not to exceed 90 days but shall not be required to provide additional services unless Seller gives Master Custodian adequate assurances that Seller shall pay Master Custodian's fees or Buyer undertakes in writing to pay Master Custodian's fees for such additional services.

f.      Master Custodian's Knowledge.  Master Custodian shall not be deemed to have independent knowledge or notice of the existence of an Event of Default.  Master Custodian shall be entitled to rely on Buyer's or Seller's written Notice of Default and shall have no duty to inquire into the nature or validity of an Event of Default.

Section 18.     Miscellaneous

a.      Authorized Personnel.  Exhibit B contains the names, titles, and specimen signatures of those individuals authorized to act on behalf of Buyer for the purposes for which each is authorized.  Seller shall deliver to Master Custodian such information for Seller's Authorized Persons.  It is understood that certain designated persons may be Authorized Persons for limited purposes set forth in such lists.  Buyer and Seller each agree to furnish to Master Custodian a written notice in the event that any such authorized individual ceases to be authorized or in the event that other or additional authorized individuals are appointed and authorized.  Upon receipt and acknowledgment of a notice from Buyer or Seller that an individual is no longer an Authorized Person, Master Custodian shall cease accepting instructions from such person as soon as practicable thereafter.

27

b.      Funds Transfers,

(i)     Account Identification. In receiving funds transfers for Buyer, Master Custodian may rely solely on the account number or identifying number on the funds transfer in identifying the funds transfer as received for Buyer. Master Custodian shall rely solely on the account number specified on Exhibit B in making a funds transfer to Buyer. Similarly, when Buyer sends a payment order identifying an intermediary bank (a bank other than Master Custodian's or Buyer's originating bank) or a recipient bank for Master Custodian with an identifying number, Master Custodian does not have to determine if the identifying number corresponds to the bank name Buyer provides.

(ii)    Transfer Procedure. Master Custodian will transfer all funds in Cash to Buyer and Seller as required herein pursuant to the wiring instructions provided on Exhibits B and C respectively, as such wiring instructions may be revised or superseded from time to time upon written notice to Master Custodian, such notice to be effective upon receipt by Master Custodian. No confirmation of the receipt of funds sent pursuant to standing wire transfer instructions will be made by telephone or other method of communication.

        c.      Notices. Any notice authorized or required by this Agreement shall be sufficiently given if addressed to the receiving party and hand delivered or sent by mail, telecopy or other facsimile machine to the individuals at the addresses specified herein or to such other person or persons as the receiving party may from time to time designate to the other parties in writing. Such notice shall be effective upon receipt or such later time as provided in this Agreement.

TO SELLER:          Lehman Commercial Paper Inc.
                    745 Seventh Avenue
                    New York, New York 10019
                    Attention: Robert E. Guglielmo, Senior Vice President
                    Transaction Management
                    Telephone: (212) 526-7121
                    Fax: (212) 526-7672

TO BUYER:           See Exhibit B.

TO MASTER
CUSTODIAN:          JPMorgan Chase Bank, N.A.
                    4 New York Plaza, 13th Floor
                    New York, New York 10004-2412
                    Attention: Glenn Hett, Vice President
                    Clearance & Collateral Management
                    Telephone: (212) 623-1855
                    Fax: (212) 623-2802

28

d.     Amendments.  Except as otherwise expressly provided hereunder, this Agreement may not be amended or modified in any matter except by a written agreement executed by an Authorized Person of all the parties.  No waiver or acceptance of performance other than as provided herein on the part of any party shall constitute a waiver or acceptance of such performance in the future.

e.     Binding Agreement.  This agreement shall extend to and shall be binding upon the parties hereto, and their respective successors and assigns; provided, however, that this Agreement shall not be assigned by any party without the written consent of the other parties hereto, and any purported assignment in the absence of such consent shall be void.  In the event that any provision of this Agreement shall be inconsistent or conflict with any provision of the Repurchase Agreement, with respect to Transactions to be processed under this Agreement, the provisions of this Agreement shall control.

f.     Examination of Master Custodian's Files; Examination of Sub-Custodian's Files.  Upon reasonable prior notice to Master Custodian, Seller and Buyer, and their agents, accountants, attorneys and auditors, will be permitted during normal business hours to examine the books and records of Master Custodian relating to the Master Custodian Held Assets held from time to time in each of their respective accounts. Upon the written request of Buyer, pursuant to Section 12(a) of the applicable Tri-Party Sub-Custodial Agreement, Buyer and its agents, accountants, attorneys and auditors shall have the right, upon three Business Days' prior notice, during normal business hours to examine the Mortgage Files and any other documents, records and papers in the possession of or under the control of any Sub-Custodian relating to any or all of the Mortgage Loans.  The Master Custodian shall not be responsible for any expenses in connection with such examinations.

g.     Survival.  All releases, exculpations and indemnifications provided in this Agreement shall survive the termination of this Agreement.

h.     Applicable Law; Jurisdiction.  This Agreement shall be construed in accordance with the laws of the State of New York applicable to agreements made to be performed in New York.  Each of the parties hereto irrevocably submits to the non-exclusive jurisdiction of any New York State court or Federal court located in the State and City of New York in any action or proceeding arising out of or relating to this Agreement, and each party irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York State or Federal court.  The parties hereto irrevocably consent to the service of any and all process in any such action or proceeding by the mailing of copies of such process to such party at its address specified in Section 18(c) hereof.  Each party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

i.     Headings and References.  The headings and captions in this Agreement are for reference only and shall not affect the construction or interpretation of any of its provisions.  Except as expressly provided herein, all references to Sections, Subsections and Exhibits refer to Sections, Subsections and Exhibits of this Agreement unless otherwise specified to the contrary.

29

j.     Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but such counterparts shall, together, constitute only one Agreement.

k.     Time Zone.  All times referred to herein shall be New York City time on the applicable date.

l.     Application of UCC Article 8.  The parties hereto acknowledge and agree that (i) the Mortgage Loans are not "securities" as defined in Section 8-102(a) of the UCC and (ii) all Assets held by Master Custodian in, or credited to, the Buyer's Master Custodial Account will be treated as "financial assets" (as defined in Section 8-102(a) of the UCC) under Article 8 of the UCC.

30

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed by their respective corporate officers, thereunto duly authorized as of the 21 April 2006.

**DANSKE BANK A/S, LONDON BRANCH,** as Buyer

By
Name: S. Howarth
Title: Snr Manager

By:
Name:
Title:

**LEHMAN COMMERCIAL PAPER INC.,** as Seller

By:
Name: T. Courtney Jenkins
Title: **Vice President**

**JPMORGAN CHASE BANK, N.A.,** as Master Custodian

By:
Name:
Title:
Gerard M. Pepe
Vice President

31

# Amendment



September 15, 2006

**JPMorgan Chase Bank, N.A.**
4 New York Plaza, 13th Floor
New York, New York 10004
Attention Gerard M. Pepe
Telephone: 212.623.1891

**Danske Bank A/S**
London Branch
75 King William Street
London EC4N 7DT
Attention Peter Hughes
Telephone: 020-7410-8066

Dear: Mr. Hughes :

Reference is made to that certain Tri-Party Custody Agreement dated as of April 21, 2006 among you, as Purchaser (the "<u>Buyer</u>"), Lehman Commercial Paper Inc. (the "<u>Seller</u>") and JPMorgan Chase Bank, NA. [as successor in interest to The Chase Manhattan Bank] (the "Master Custodian"), as amended by the parties thereto from time to time (as so amended, the "<u>Tri-Party Custody Agreement</u>").

Effective October 1, 2006 JPMorgan Chase & Co. ("JPMorgan") has entered into an agreement with The Bank of New York Company, Inc. ("BNY") pursuant to which JPMorgan intends to exchange select portions of its corporate trust business, including municipal, corporate and structured finance trusteeships and agency appointments, for BNY's consumer, small-business and middle-market banking businesses. Included in this exchange is the Tri-Party Repo Custody Program to which the Tri-Party Custody Agreement relates. This exchange transaction has been approved by both companies' boards of directors and is subject to regulatory approvals.

Accordingly, as of October 1, 2006, BNY, or one of its affiliates, will become the assignee of all right, title and interest of JPMorgan Chase Bank, NA. as Master Custodian under the Tri-Party Custody Agreement. In all other respects, the Tri-Party Custody Agreement shall be unchanged. As a part of the transactions, the material business and administrative people who administer the Tri-Party Custody Agreement for JPMorgan Chase Bank NA will also be transferring their employment to BNY and will continue to work on and administer this program. Transition details will be provided to you.

Pursuant to Section 18(e) of the Tri-Party Custody Agreement, we hereby request your consent to the assignment by JPMorgan Chase Bank, N.A. to BNY, or one of its affiliates, of all of its, right, title and interest as Master Custodian thereunder. In the event that you do not provide this consent, the Master Custodian will be required to terminate the Tri-Party Custody Agreement since JPMorgan Chase Bank, N.A. will no longer be in the business of providing these services as of such date.

Please execute this letter in the space provided below to indicate your consent.

Sincerely,

JPMORGAN CHASE BANK, N.A.

By: _____

Name: Gerard M. Pepe
Title: Vice President

We hereby consent to the assignment as
More fully provided above as of this
19th day of September, 2006

Danske Bank A/S

By: _____

Name: Peter Hughes
Title:

STUART EDMONDS
SENIOR MANAGER

**AMENDMENT
TO THE
TRI-PARTY CUSTODY AGREEMENT
BETWEEN
DANSKE BANK A/S, LONDON BRANCH
AND
LEHMAN COMMERCIAL PAPER INC.,
AND
THE BANK OF NEW YORK**

WHEREAS, Danske Bank A/S, London Branch ("Buyer"), Lehman Commercial Paper Inc. ("Seller"), and The Bank of New York ("Master Custodian") entered into a Tri-Party Custody Agreement dated 21st April 2006 (the "Agreement"); and

WHEREAS, Buyer, Seller and Master Custodian now wish to amend the Agreement in order to set out the new Margin Percentage for Grade B Assets.

NOW, THEREFORE, in consideration of the premises and of the covenants and agreements contained herein and in the Agreement, Buyer, Seller and Master Custodian agree as follows:

1.  Capitalised terms used but not defined in this Amendment shall have the meanings ascribed to them in the Agreement.

2.  *REDACTED*

3.  This amendment shall take effect on 2nd May 2008.

4.  Except as provided above, all terms and conditions of the Agreement shall remain unchanged and in full force and effect.

IN WITNESS WHEREOF the parties have caused this Amendment to be executed by their duly authorised signatories as of _____ 2008.

**DANSKE BANK A/S, LONDON BRANCH**

By: _____    By: _____

Name: S. Houssiny            Name: Crouch

Title: Snr Manager           Title: Manager

Date: 25.08                  Date: 2.5.08

**LEHMAN COMMERCIAL PAPER INC.**

By: _____          By: _____

Name: _____          Name: _____

Title: Robert F. _____imo            Title: _____
       Senior Vice President

Date: _____ 5-2-08             Date: _____


**THE BANK OF NEW YORK**

By: _____          By: _____

Name: _____          Name: _____

Title: _____          Title: _____

Date: _____          Date: _____

**LEHMAN COMMERCIAL PAPER INC.**

By: _____

Name: _____

Title: Robert F. Giuliano
Senior Vice President

Date: 5-2-08

By: _____

Name: _____

Title: _____

Date: _____

**THE BANK OF NEW YORK**

By: _____

Name: GLENN H. HETT
Vice President

Title: _____

Date: 5-2-08

By: _____

Name: _____

Title: _____

Date: _____

# Danske Bank A/S, London Branch
## Letter Dated September 23, 2008



London Branch
75 King William Street
London EC4N 7DT
Telephone   020 7410 8000
Facsimile   020 7410 8001
S.W.I.F.T.  DABAGB2L

www.danskebank.com/uk

Lehman Commercial Paper Inc.
c/o Lehman Brothers Inc.
745 Seventh Avenue, Fl. 4
New York City, NY 10019
Attn: Henry C. Lee
Tel: +1 212 526 7110
Attn: Annina Youngblood
Tel: +1 212 526 9690
(For MRA notice purposes)

Lehman Commercial Paper Inc.
745 Seventh Avenue, Fl. 4
New York City, NY 10019
Attn: Robert E. Guglielmo, Senior Vice President,
Transaction Management
Tel: +1 212 526 7121
Fax: +1 212 526 7672
(For TPCA notice purposes)

The Bank of New York Collateral Management Group
(Triparty Allocation)
The Bank of New York
Collateral Management
101 Barclay Street, 4th Floor
New York, NY 10286
United States of America
Fax: +1 732 667 9324 / +1 732 667 9325

23 September 2008

Dear Sirs

1.    We, Danske Bank A/S, London Branch (**"Danske London"**), refer to:

    (a)    the Letter Agreements (as amended from time to time, the **"Facility Agreements"**) dated 17 March 2005 between, amongst others, Danske London and Lehman Commercial Paper Inc. (**"LCPI"**) and 23 March 2007 between Danske London and LCPI;

    (b)    the Master Repurchase Agreement (as amended from time to time, the **"MRA"**) between, amongst others Danske London and LCPI dated as of 30 August 1999;

Authorised by
The Danish Financial Supervisory Authority (Finanstilsynet)
and regulated by the Financial Services Authority for UK business
Member of the London Stock Exchange

Registered Branch in England and Wales
Company No. FC011846
Branch No. BR000080

Danske Bank A/S
Incorporated in Denmark
CVR No. 61 12 62 28 Copenhagen



(c)    the Tri-Party Custody Agreement (as amended from time to time, the **"TPCA"**) between Danske London, LCPI and JPMorgan Chase Bank, N.A., (as assigned by JPMorgan Chase Bank, N.A. to The Bank of New York) (the **"Master Custodian"**).

2.    Terms defined in the MRA have the same meaning in this letter. References to **"Paragraphs"** are to paragraphs of the MRA unless the context requires otherwise.

3.    This is notice that an Event of Default under Paragraph 10 (*Events of Default*) of the MRA occurred as a result of the failure by LCPI to pay to Danske London the amount due on 19 September 2008 in respect of those Transactions which, on 17 September 2008, we had agreed to roll for 7 days, being an amount equal to the Price Differential as at 19 September 2008.

4.    Under Paragraph 11(a), Danske London opts to declare an Event of Default to have occurred so that the Repurchase Date for all Transactions has therefore occurred today, 23 September 2008.

5.    This notice is also a Notice of Default under and as defined in the TPCA and related to all Transactions between Danske London and LCPI. The Master Custodian is therefore required immediately to comply with its obligations under Section 17(b) of the TPCA, to the extent that it has not already done so.

Any questions regarding this notice should be addressed to Jovan Atkinson at Danske London.

Yours faithfully

**Danske Bank A/S**

By:
A. IVERSEN  S.Bashir
AGM.  Credit Manager

H
A
N
D

D
E
L
I
V
E
R
Y

RECEIVED BY:

FILED / RECEIVED

SEP 1 8 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC
DATE

4:15
TIME