<u>DIAMANTE CABO SAN LUCAS</u>

<u>LEGACY DEVELOPMENT MANAGEMENT AGREEMENT</u>

This LEGACY DEVELOPMENT MANAGEMENT AGREEMENT (this "Agreement") is entered into as of November 1, 2013, by and between Diamante Cabo San Lucas S. De R.L. De C.V. a Mexican limited liability company ("<u>Owner</u>"), having an office at Boulevard Diamante s/n Col. Los Cangrejos, Carretera Cabo San Lucas a Todos Santos Km.6.8, Cabo San Lucas B.C.S., C.P. and LEGACY PROPERTIES, LLC, a Delaware limited liability company ("Legacy" or "Project Developer"), having an office at 131 Deer Hill Avenue, Suite B, Danbury, CT. 06810.

RECITALS

Owner is the designated developer and beneficial owner of approximately 1,500 acres of land located in Cabo San Lucas, BCS, Mexico ("Diamante Resort" or "<u>Property</u>");

Owner is in the process of developing a private resort community on the Property with a Davis Love III designed championship golf course and clubhouse, a Tiger Woods designed championship golf course and clubhouse, one additional private Member only golf course and clubhouse, golf and social Memberships, lot, villa, and casita real estate sales, Residence Club (time share) Membership Units, a spa, fitness center, swimmable lagoon, beach club and other business, residential, recreational and social amenities (collectively, the "Project");

Owner engaged Project Developer in 2007 to render development and supervisory services on behalf of Owner in connection with the development of the Project on the Property (the "<u>Development</u>"), and Owner now seeks to formalize such engagement for development management and supervisory services with this Legacy Development Management Agreement; and

Project Developer has been so engaged in providing and performing the development and supervisory services and Project Developer now agrees to formalize such engagement, all as more particularly set forth herein;

NOW, THEREFORE, in consideration of the premises and the mutual undertakings herein contained, the Owner and the Project Developer hereby agree as follows:

ARTICLE I

DEVELOPMENT SERVICES

**Section 1.1.**  Project Developer, as independent contractor, shall perform the Development Services (as hereinafter defined) in accordance with the terms of this Agreement on behalf of Owner keeping Owner's best interest in mind.  In performing the Development

CONFIDENTIAL

Services, the Project Developer shall be authorized to use not only its own employees but also such third-party providers of labor, material or services, including, without limitation, project developers, contractors, subcontractors, surveyors, engineers, architects, consultants and other similar experts, as the Project Developer shall deem reasonably necessary, provided same are approved in advance by Owner.

The Project Developer, using its best efforts, and subject to Owner's approval, will perform the services set forth in this <u>Section 1.1</u> (collectively, "<u>Development Services</u>") in each of the phases of the Project. Project Developer and Owner acknowledge that some of the Development Services may be performed on an overlapping basis, as approved by Owner, in order to facilitate the Development, and that various elements of the Development Services may be performed on a staggered or phased basis (as approved by Owner), such that the various elements may be in different stages of completion at any given time. The identification of certain Development Services as being part of one particular phase below shall not absolve Project Developer from responsibility for performing such Development Services during other phases of the Development if, in the prudent exercise of prevailing professional development standards, the Project Developer should also perform such Development Services throughout other phases of the Development, as approved by Owner.

(a)     Pre-design and Feasibility Phase.

(i)     The Project Developer shall oversee and coordinate the creation of proposed site plans and preliminary drawings, plans and specifications with respect to the Project (collectively, "Drawings"), and perform a comprehensive site plan review focusing on the demographics of the area and potential purchasers of portions of the Project, and shall advise and consult with the Owner as to any recommendations the Project Developer has with respect thereto.

(ii)     The Project Developer shall coordinate and advise Owner regarding the processes necessary to obtain any and all required governmental entitlements and approvals in connection with the Project.

(iii)     The Project Developer shall inform the Owner as to consultants the Project Developer deems reasonably necessary in connection with the Project, such as surveyors, testing laboratories, traffic consultants, community relations consultants, planning consultants, governmental incentives consultants, environmental consultants, archaeological consultants, zoning counsel and consultants, expeditors, home owner association counsel, and any other special consultants where necessary for the proper completion of the Project, and, in addition, the Project Developer shall supervise and coordinate the activities of and direct the consultants in connection with the Project.

(iv)     The Project Developer shall supervise the consultants in preparing, furnishing and updating for the development all necessary surveys and reports describing the physical and archaeological characteristics, soil and storm water control conditions, subsurface conditions, legal limitations, utility locations, and a legal description of the Property (and the various proposed elements thereof).

CONFIDENTIAL

DANSKE_0012846

(v)     The Project Developer shall take all actions as may be required to cause the Project and the construction thereof to meet all requirements set forth in the construction budgets and Loan Documents, as amended, between Owner and DANSKE BANK A/S, LONDON BRANCH, the London Branch of a company incorporated in the Kingdom of Denmark, ("Lender" or "Danske Bank") including, without limitation, time frames for development and closing of sales, quality of construction and draw requests.

(vi)     The Project Developer shall strictly adhere to the schedule(s) for the pre-development, development, construction and sales of the Project, as well as the project construction budget(s), as modified from time to time, (the "Project Budget") and the Project Developer shall revise the same when necessary as determined by Owner with the approval of Lender.  The Project Developer shall promptly advise the Owner, Lender and the appropriate consultants if it becomes aware that the Project Budget and Construction Schedule is not being met or is in danger of not being met, and make recommendations for corrective action.  The performance of Project Developer's Services relating to the creation and monitoring of the Project Budget and Construction Schedule shall continue throughout all phases of the Project until completion.

(b)     Design-Development Phase.

(i)     The Project Developer shall, to the extent deemed necessary or appropriate by Owner, perform a comprehensive plan review and shall advise and consult with the Owner and its agents with respect to the location, size, design and feasibility of construction of the various elements of the Project.

(ii)     The Project Developer shall work and consult with the Project architect throughout the design process, the production and evolution of the Drawings and the determination of design materials, advise the Owner on such items and obtain the Owner's approval thereof.  Subject to the Owner's approval, the Project Developer shall supervise the performance of the architect under its agreement(s) with Owner.  The Project Developer shall make recommendations to Owner as to decisions to be made with respect to the Project architect and its Drawings, including, without limitation, decisions relating to the interior and exterior design of the Project.

(iii)     The Project Developer shall perform a comprehensive functional design review and advise the Owner and its agents with respect to the proper selection of functional materials, operational requirements for electric, mechanical, desalinization plants and equipment, water delivery, and sewage and plumbing systems, landscaping and irrigation systems, and proper location and design of other elements of the Project.

(iv)     The Project Developer shall schedule regular meetings with the architect, construction manager and such other consultants as the Owner shall deem reasonably appropriate, to discuss, among other things, construction and operational feasibility, availability of materials and labor, time requirements for installation and construction, and factors relating to cost, including possible value-engineering activities, cost of alternative designs for materials, preliminary budgets, and possible economies.

CONFIDENTIAL

DANSKE_0012847

(v)     The Project Developer shall prepare for Owner's approval pro forma budget(s) for the pre-development, development and construction of each phase of the Project (as modified from time to time, the "Construction Budget(s)") and shall revise the same when necessary with Owner's prior approval.  The Construction Budget(s) shall include the Project Developer's estimates of the hard costs and reimbursable expenses under Article IV.  In addition, the Project Developer shall prepare an estimate for the Construction Budget(s) based on a survey of the Drawings at the end of the preliminary design phase and shall update and refine such estimate as the development of the Drawings proceeds, and the Project Developer shall promptly advise the Owner and the appropriate consultants after it becomes aware that any phase of the Construction Budget(s) will be exceeded, and make recommendations for corrective action.  The performance of Project Developer's Services relating to the creation and monitoring of the Construction Budget(s) shall continue throughout all phases of the Project until completion.

(vi)   The Project Developer shall review the Drawings as they are being prepared and shall advise the Owner and the appropriate consultants with respect to alternative solutions whenever design details adversely affect construction or operational feasibility or the Construction Schedule or Construction Budget(s), without, however, assuming any of the consultants' responsibility for design or construction.

(vii)    The Project Developer shall recommend time frames for procurement of long-lead items to ensure their delivery by the required date and adherence to the Construction Schedule.

(viii)   The Project Developer shall review the Drawings with the consultants to eliminate areas of conflict and overlap in the work to be performed by the various trade contractors and subcontractors and shall assist in preparing pre-qualification criteria for bidders.

(ix)    The Project Developer shall coordinate the process for the selection by Owner of the contractor, construction manager, major trade contractors, subcontractors and supervisors.  When applicable, the Project Developer shall review bids on the work of the various contractors, construction managers, trade contractors and subcontractors.  After analyzing any such bids, the Project Developer shall recommend to the Owner the parties to whom it should award such contracts and subcontracts.  The Project Developer shall negotiate contracts with the construction personnel selected by Owner, all of which contracts shall be subject to Owner's prior approval and execution.

(c)     Construction Phase.

(i)     During each construction phase of the Project, the Project Developer shall serve as a general construction consultant and advisor to Owner and shall be responsible to oversee and cause the work to be completed in a timely manner in accordance with the Construction Budget for each phase of the Project.

(ii)    The Project Developer shall establish and use its best efforts to implement procedures for coordination among the Owner, project architect, consultants, construction manager and/or general contractor, the trade contractors and subcontractors with respect to all aspects of the Project.  The Project Developer shall oversee the performance of the project

- 4 -

DANSKE_0012848

architect, consultants, construction manager and/or general contractor, the trade contractors and subcontractors, and shall keep Owner advised of any problems involving any such party, and shall recommend to Owner enforcement measures if any such party shall be in violation of its agreement(s) with Owner or shall otherwise be acting in a manner detrimental to the Project. The Project Developer may, as appropriate, recommend special inspection or testing regarding work not performed in accordance with the Project requirements.

(iii)     The Project Developer shall schedule regular progress meetings at which the general contractor, contractor and/or construction manager and those of the consultants which are necessary for such meeting are present and shall discuss jointly such matters as procedures, progress, cost, problems and scheduling.

(iv)     The Project Developer shall consult with and advise the Owner of potential variances between scheduled and probable completion dates promptly after it becomes aware of the same, review the Construction Schedule for work not started or incomplete and consult with the Owner, the general contractor, contractor and/or construction manager, trade contractors and subcontractors as to adjustments in the Construction Schedule that may be necessary to meet the targeted completion date(s), and provide periodic reports of changes in the Construction Schedule for the Project promptly after it becomes aware of the same. The Project Developer shall advise Owner, the general contractor, contractor and/or construction manager and the various consultants on the Project as to potential strategies for minimizing the impact of construction delays so as to ensure completion of each phase by the targeted completion date set forth in the Construction Schedule.

(v)     The Project Developer shall develop and implement a system of cost control and inform the Owner as to any material variances between actual costs and estimates thereof or the amounts budgeted in the Construction Budget promptly after it becomes aware of the same, and the Project Developer shall advise the Owner and the appropriate consultants whenever projected cost exceeds estimates thereof or the amounts budgeted in the Construction Budget.

(vi)     The Project Developer shall develop and implement a system for the preparation, review and processing of Change Orders (as such term is hereinafter defined) and shall recommend necessary or desirable changes to the Owner and the consultants, review requests for changes, submit recommendations to the Owner and the consultants, and negotiate Change Orders as necessary. As used herein, "Change Orders" shall mean changes authorized by the Owner in the construction of the Project, including changes in design, materials and/or labor, and/or additional construction authorized by the Owner and/or omissions of certain aspects of the construction previously ordered by the Owner. The Project Developer may unilaterally authorize and implement "field changes" required to adapt to site conditions so long as such changes do not (i) increase the Construction Budget; (ii) adversely affect the value, use, or financing of the Project (other than to an immaterial extent); (iii) constitute a downgrading of the quality of the materials, equipment or systems (other than to an immaterial extent); (iv) affect the design or appearance of the Project (other than to an immaterial extent); (v) constitute a change in the scope (other than to an immaterial extent) of any element of the Project; or (vi) violate any of the terms of the loan documents between Owner and Lender (the "Loan Documents").

- 5 -

DANSKE_0012849

(vii)     The Project Developer will (A) coordinate the transfer of various elements of the Project as they are completed to Owner and Project Manager, (B) coordinate and monitor all necessary controlled inspections of the Project, and (C) assist Owner in identifying and overseeing the completion of any punch-list items and the issuance of certificate(s) of occupancy (and any other appropriate and necessary governmental permission to occupy and operate the Project, or any portion thereof, as intended).

(viii)    The Project Developer shall insure that the Project and the completion thereof are in compliance with the terms of the Loan Documents in all respects.  The Project Developer shall prepare all draw requests and periodic reports required by the Loan Documents and act as the Owner's representative in providing all documentation required by Lender's Construction Consultant and Servicer for the Loan.

(ix)     If applicable, the Project Developer shall coordinate the collection payment acknowledgement receipts from all contractors, subcontractors and other third parties providing materials, supplies and/or labor in connection with the Project.

(x)      The Project Developer shall advise the Owner promptly after discovering any material defaults or violations of applicable law or regulations by the general contractor, contractor and/or construction manager, trade contractors, subcontractors or consultants.

(xi)     In addition to the foregoing, the "Development Services" shall include (w) the coordination of all permitting, design, development and construction activities with each party that shall occupy any element of the Project, and the coordination of transfer of facilities to the Project Manager upon completion, (x) maintenance of detailed files, records and books of account pertaining to the Project, (y) such other services, if any, as are customarily provided by professional development managers in the development of projects similar to the Project, and (z) otherwise overseeing the development of the Project in a prudent manner.  The performance of any of these services herein stated by the Project Developer shall not relieve the architect, general contractor, contractor and/or construction manager, trade contractors or subcontractors or any other consultants of their responsibilities under their respective contracts, for the safety of persons and property or for compliance with all applicable statutes, rules, regulations and orders applicable to the conduct of the work performed.

Section 1.2      In the event that a third-party provider of labor, material or services to the Project does not perform the services such third party is required to perform, the Project Developer shall take such remedial action as the Project Developer deems necessary or appropriate, or as Owner may direct, to remedy such circumstance, provided that such action is in compliance with the Project Budget and Construction Budget(s) or approved by the Owner.

## ARTICLE II

## COVENANTS

**Section 2.1.**  The Project Developer covenants and agrees that it shall faithfully and diligently perform the Development Services and use its best efforts to ensure the timely completion and fulfillment of all aspects of the Development.

- 6 -

DANSKE_0012850

**Section 2.2.**  The Project Developer covenants and agrees that it shall not at any time during the term of this Agreement:

(a)  Sell, assign, transfer, pledge or hypothecate this Agreement or any of its rights or obligations hereunder without the prior approval of the Owner.

(b)  Engage or employ any real estate brokers or agree to pay or obligate the Owner to pay any compensation, fee or commission to any real estate broker or make any representation with respect to brokerage commissions to any real estate broker by reason of this Agreement without the prior written consent of Owner.  It is further understood that neither the Project Developer nor its employees nor any affiliated or related (i.e., parent or subsidiary companies or corporations or companies or corporations in which the equity holders of the Project Developer are equity holders) companies of the Project Developer shall claim any brokerage compensation, fee or commission by reason of this Agreement, except as expressly provided herein or in such other agreements executed by Owner.

**Section 2.3.**  Upon receipt of a written (including e-mail) request from either Owner or Lender for any request for information in connection with this Agreement, Owner and Project Developer agree to respond timely and in a manner reasonably calculated not to delay performance of the Construction Schedule or cause an Event of Default under this Agreement or the Loan Agreement as defined in Article X.

## ARTICLE III

### DEVELOPMENT AND OTHER FEES

**Section 3.1.**  As compensation for the Development Services and other services performed by Project Developer, the Owner shall pay the Project Developer a Project development fee ("Development Fee") of Two Hundred Twenty-Five Thousand Dollars ($225,000.00) payable monthly for the Term of this Contract or any extension thereof.  The Owner further agrees to review the Developer Fee annually to ensure that Project Developer has sufficient funds to provide for staffing needs and reasonable salary increases so long as this Agreement remains in full force and effect; provided, however, that any proposed increase in the Development Fee by Owner shall be subject to approval by Lender.  Project Developer shall use the Development Fee to compensate the existing employees of Project Developer and to pay general overhead expenses of the Project Developer.

**Section 3.2**  Promptly following the completion of the Project, the parties may elect to cause a final accounting to be performed, and any necessary adjustments to the amounts previously paid to Project Developer shall promptly be reconciled (i.e., Project Developer shall be paid any deficiency or Project Developer shall refund any excess payments previously made).

CONFIDENTIAL
DANSKE_0012851

## ARTICLE IV

### REIMBURSEMENT OF EXPENSES

**Section 4.1.**  Except to provide the Development Services contemplated hereby, the Project Developer shall not be required to advance any of its own funds for the payment of any costs and expenses incurred by or on behalf of Owner in connection with the development of the Project.  In addition to the fees provided in Article III, the Owner shall provide funds to the Project Developer to cover its reasonable out-of-pocket costs, expenses, fees, charges and outlays approved by Owner in advance and incurred in connection with the proper performance by the Project Developer of its duties under this Agreement, including (i) all reasonable compensation and other expenses of the Project Developer's employees engaged in work related to the Development and of all on-site personnel who do not perform any other duties for any other properties for which the Project Developer may provide development services or for any of the Project Developer's affiliated companies or corporations, (ii) off-site expenses specifically benefiting and properly allocable to the Development such as travel, entertainment, and conventions, (iii) all amounts payable by the Project Developer for the account of the Owner to any firm, corporation, person or entity engaged by the Project Developer (with Owner's approval) for the Development or any part or phase thereof, but excluding general overhead expenses of the Project Developer.  All reimbursements pursuant to this Article IV shall be subject to the amounts set forth in the line items of a Construction Budget approved by the Owner, as same may be increased as necessary for the incurrence of emergency expenditures.

**Section 4.2.**  Reimbursable costs shall not include (i) any cost due to the default, gross negligence or willful misconduct of the Project Developer, or failure to abide by the terms of this Agreement; (ii) any cost or expense to the extent the Project Developer or any affiliate of the Project Developer has already been reimbursed by the Owner or any affiliate thereof pursuant to any agreement other than this Agreement; and (iii) costs and expenses related to the Project Developer's United States' offices which the parties hereto agree have been incorporated into the Project Development Fee.

**Section 4.3.**  Reimbursable costs shall be due and payable by the Owner to the Project Developer at such time as Lender approves and disburses the funds to cover such costs.  The Project Developer shall provide the Owner with such supporting documentation as the Owner and Lender reasonably requests.  The Owner may, during business hours and upon reasonable advance notice, review so much of the Project Developer's books and records as may be necessary, at any time, in order to verify the accuracy of any such invoice for reimbursable costs.

## ARTICLE V

### TERM AND TERMINATION

**Section 5.1.**  The term of this Agreement shall commence on the date hereof, and unless sooner terminated as provided herein, shall terminate on the date set for completion of the

- 8 -

DANSKE_0012852

Development in the Construction Schedule, or any extension thereof agreed to in writing by Owner and Project Developer, or as otherwise set forth in this Article V.

**Section 5.2.**   After any applicable notice and cure periods required pursuant to Section 8.2, Owner may terminate this Agreement based on any of the following: (i) the cost of the Development exceeds or is expected to exceed the Construction Budget for any year by fifteen percent (15%) or more, (ii) the Development is behind the annual Construction Schedule by more than one hundred twenty (120) days, as determined by Owner, (iii) an Event of Default occurs in this Agreement, or (iv) the Development, or any actions or inactions of Project Developer, violates or does not comply with any material terms of the Loan Documents.

**Section 5.3.**   Upon the termination of this Agreement, the Project Developer shall, within ten (10) days of the date of such termination, deliver to the Owner: (i) all records and documents relating to the Development, including, without limitation, all permits, contracts, leases, sales agreements, agreements to lease and other agreements with contractors, governmental agencies, purchasers and prospective purchasers, tenants and prospective tenants and any financial records maintained by the Project Developer with respect to the Development; provided, however, that the Project Developer may retain copies of any of the foregoing for its records; and (ii) materials and supplies with respect to the Development which have been paid for by the Owner and are in the possession or control of the Project Developer.

## ARTICLE VI

### ASSIGNMENT

The Project Developer shall not assign any of its rights and responsibilities hereunder without the prior written consent of Owner and Lender (or any other holder of a mortgage lien on the Property).

## ARTICLE VII

### REPRESENTATIONS AND WARRANTIES

**Section 7.1.**   In order to induce Owner to enter into this Agreement, Project Developer represents and warrants to Owner as follows:

(a)      Project Developer is duly organized, validly existing and in good standing and qualified to do business in the jurisdiction of its organization and the State where the Property is located. Project Developer has all requisite organizational power and authority to execute, deliver and perform its obligations under this Agreement. Project Developer's formation and organizational documents remain in full force and effect and have not been amended or modified since they were delivered to Owner.

(b)      Project Developer and its members, partners, shareholders, officers and/or directors, as applicable, have taken all necessary action to authorize the execution, delivery and performance of this Agreement, and no consent, authorization or approval is necessary to

- 9 -

DANSKE_0012853

authorize Project Developer to execute, deliver and perform its obligations under this Agreement. This Agreement has been duly executed and delivered by or on behalf of Project Developer and constitutes the legal, valid and binding obligations of Project Developer enforceable against Project Developer in accordance with its terms.

(c)     The execution, delivery and performance of this Agreement by Project Developer does not and will not (i) conflict with, result in or cause any violation under any applicable law, (ii) conflict with or result in a breach of any term or provision of, or constitute a default under, any of Project Developer's organizational documents or any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which Project Developer is bound or by which Project Developer's property or assets are subject, (iii) result in the creation or imposition of any lien upon any of the property or assets of Project Developer, or (iv) result in any violation of the provisions of any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over the Project or Project Developer.

(d)     There are no actions, suits or proceedings at law or in equity by or before any governmental authority or any other Person now pending or threatened against the Project Developer.

(e)     Each financial statement concerning the Project provided to Lender by Owner or Project Developer from time to time fairly and accurately presents, in all material respects the financial position of the Project as of the date of such financial statement. Each such financial statement has been prepared in accordance with the requirements of the Loan Agreement.

(f)     Project Developer is not a debtor in any outstanding action or proceeding pursuant to any Bankruptcy Law and is not contemplating either (i) the filing of a petition by it under any Bankruptcy Law or the liquidation of all or any portion of its assets or property or (ii) aware that any other Person is contemplating the filing against Project Developer of a petition under any Bankruptcy Law.

(g)     The Master Plan and initial Construction Schedule attached hereto as Exhibit A reflects the Master Plan and 2014 Construction Schedule as of the date of this Agreement, and unless Project Developer has informed Owner and Lender in writing otherwise, will at all times hereafter reflect, Project Developer's best good faith estimate of the dates by which Project Developer has or will have commenced and completed each phase of the construction and development of the Project. The parties hereto agree to amend the Development and Construction Budgets and Construction Schedule at least annually.

(h)     No statement of fact made by or on behalf Project Developer to Owner or Lender contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading. There is no fact known to Project Developer which has not been disclosed in writing to Owner and Lender which has resulted in or may result in a Material Adverse Change. All reports, documents, instruments, information and forms of evidence delivered to Owner and Lender concerning the Loan or required by the Loan Documents are accurate, correct and sufficiently complete to give Owner and Lender true and

- 10 -

DANSKE_0012854

accurate knowledge of their subject matter, and do not contain any misrepresentation or omission.

Section 7.2.   Representations and Warranties.  Project Developer represents and warrants that, all of the representations and warranties in this Agreement are true and correct as of the date hereof, and except as the result of the acts of Owner, will continue to be true throughout the term of the Agreement as if remade at all times afterwards.  Project Developer shall inform Owner and Lender in writing within five (5) Business Days upon discovering any breach of such representations or warranties.

Section 7.3.   Reliance.  The Project Developer acknowledges that Owner entered into this Agreement in reliance upon the representations and warranties contained herein.  The Owner shall be entitled to such reliance notwithstanding any investigation which has been or will be conducted by Owner or on its behalf.

Section 7.4.   Notice.  Whenever a representation states "except as disclosed to Owner or Lender in writing," Project Developer shall be deemed to be in breach of such representation if Project Developer does not make such disclosure within five (5) Business Days of Project Developer first learning of any fact, event or circumstance which would be a breach of such representation if not disclosed to Owner or Lender in writing.

## ARTICLE VIII

### DEFAULTS; REMEDIES

Section 8.1.   Events of Default.  Subject to any applicable notice and cure periods required pursuant to Section 8.2, and except as specifically provided in Section 9.16 of this Agreement, the term "Event of Default" as used in this Agreement shall mean the occurrence of any one or more of the following events:

(a)      if any representation or warranty of Project Developer in this Agreement or in any certificate, report, financial statement or other instrument or document furnished by Project Developer to Owner or Lender shall have been false or misleading in any material respect when made (or deemed remade in accordance with Section 7.2);

(b)      if (i) any of the Development Services are not timely performed by Project Developer, as determined by Owner in its sole discretion, or (ii) if the Development is behind the Construction Schedule by more than one hundred twenty (120) days, as determined by Owner, or (iii) if Project Developer fails to comply with any other terms or conditions set forth in this Agreement not specifically mentioned in this Section 8.1;

(c)      if Owner receives any notice of default from Lender, and such default was caused by Project Developer's failure to comply with this Agreement, or any other action or inaction on the part of Project Developer;

- 11 -

CONFIDENTIAL

(d)     the occurrence of a Material Casualty or Material Condemnation to the Project or (B) the occurrence of any other Casualty or Condemnation to the Project, if the Restoration Conditions are not satisfied;

(e)     Project Developer shall commence any case, proceeding or other action (i) under any Bankruptcy Law seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (ii) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for any substantial portion of its assets, or Project Developer shall make a general assignment for the benefit of its creditors;

(f)     Project Developer shall not, or shall be unable to, or shall admit in writing its inability to, pay its debts generally as they become due;

(g)     if one or more final judgments or decrees shall be entered against Project Developer which is not fully paid within sixty (60) days;

(h)     if Substantial Completion does not occur by the Required Completion Date, or the work required to be completed by any phased Completion Date is not complete by such phased Completion Date or if any Punch List Items are not completed within one hundred twenty (120) days of the Substantial Completion Date;

(i)     if due to the acts or omissions of Project Developer, any Gross Receipts fail to be deposited into the proper Owner's Account or such Gross Receipts are used or applied in violation of the Loan Agreement;

(j)     if Project Developer misapplies or converts any Advances or Loss Proceeds;

(k)     if Project Developer or Affiliate of Project Developer shall interfere with any right to cure granted to Lender in any of the Loan Documents;

(l)     if an event occurs under the terms of the Loan Document, which by such terms constitute an "Event of Default" under such Loan Document, unless due solely to the acts or omissions of Owner;

(m)     The development of the Project falls materially behind the Construction Schedule; or

(n)     The project budget attached hereto as Exhibit B is not adhered to by Project Developer;

it being understood and agreed that if any event or circumstance occurs or exists which is an Event of Default under any one subsection of subsections (a) through (n) (inclusive) of this Section 8.1, then an Event of Default under this Agreement shall immediately exist regardless of

- 12 -

CONFIDENTIAL                                                                 DANSKE_0012856

whether any other term or provision of this Agreement provides any, or any different, notice, grace period and/or cure rights.

Section 8.2.   Notice and Cure.  Prior to termination of this Agreement under Section 5.2 or Section 8.3 and prior to the exercise of Owner's other remedies under Section 8.3, Project Developer shall receive written notice from Owner and thirty (30) calendar day to cure (beginning on the date of such notice) the following circumstances: (i) the cost of the Development exceeds or is expected to exceed the Construction Budget by fifteen percent (15%) or more; (ii) breach of the Representations and Warranties set forth in Section 7.1 of this Agreement; (iii) occurrence of any Event of Default, except an Event of Default arising under Sections 7.1 (c)(i), 7.1 (c)(ii), 7.1 (c)(iv) of this Agreement; or (iv) any actions or omissions of the Project Developer violate or fail to comply with the terms of the Loan Agreement.  Prior to the existence of an Event of Default arising under Section 7.1 (c)(i), 7.1 (c)(ii) of this Agreement, Project Developer shall receive written notice from Owner and forty-five (45) calendar days to cure (beginning on the date of such notice).  Notwithstanding the foregoing, in the event Lender has given notice of or declares a default under the Loan Documents, and in the sole discretion of Owner, the foregoing cure periods of Project Developer shall remain as stated above or be limited to the length of the cure period of Owner under the Loan Documents, if any.  Owner shall promptly give Project Developer notice of any written notices or declarations of default from Lender under the Loan Documents

Section 8.3.   Remedies.  Upon the occurrence of any Event of Default and a failure on the part of the Project Developer to cure within the applicable cure period, in addition to all other rights and remedies which Owner may have at law or equity, Owner may, at its sole option, terminate this Agreement upon written notice to Project Developer.

Section 8.4.   In lieu of noticing a default under Section 8.1(b) or Section 8.1(m), Owner may provide written notice to Project Developer that the Construction Schedule has fallen materially behind, and if the same is not corrected by Project Developer within thirty days of such notice, until such time as the Construction Schedule is back on time, no fees as provided for elsewhere in this Agreement shall be payable to Project Developer.  Notice of a default under this Section 8.4 shall not preclude Owner from subsequently giving notice of default under Section 8.1(b) or 8.1(m) arising out of the same or different circumstances.

# ARTICLE IX

## MISCELLANEOUS

Section 9.1.   All capitalized terms not otherwise defined in this Agreement shall have the meaning given to them in the Loan Documents.

Section 9.2.   The Owner reserves the right, at all times, to place all insurance policies with respect to the Property and its operation.  The Owner agrees that the Project Developer shall be included as an additional insured in the policies maintained by Owner or any affiliate or

CONFIDENTIAL

DANSKE_0012857

subsidiary thereof pertaining to the Property or Project.  Owner shall deliver to Project Developer evidence of such policies promptly upon request.

**Section 9.3.**   Where consent of the Owner is herein required, such consent may be given or denied only by any of the following persons or such other representatives as Owner may designated from time to time: Kenneth A. Jowdy or Fernando Garcia.  Where consent of the Project Developer is herein required, such consent may be given or denied only by any of the following persons or such other representatives as Owner may designated from time to time: Kenneth A. Jowdy or William J. Najam, Jr.

**Section 9.4.**   Notices.  Except to the extent specifically provided to the contrary in this Agreement, all notices given or required to be given hereunder shall be in writing and addressed to the parties as set out below.  Any notices, requests, demands, payments or other communications hereunder shall be deemed given upon personal delivery or, if not personally delivered, when sent by U.S. Mail registered or certified, postage prepaid, return receipt requested, by overnight courier service such as Federal Express or Airborne Express, or by electronic email or facsimile transmission with reliable confirmation of receipt, addressed to the respective parties as follows:

Project Developer:                      Kenneth A. Jowdy, Managing Member

                                        Legacy Properties, LLC
                                        131 Deer Hill Avenue Suite B
                                        Danbury, CT 06810
                                        kj@legacyproperties.com

      Owner:                      Kenneth A. Jowdy, General Administrator

                                          Diamante Cabo San Lucas S. De R.L. De
                                          C.V.Boulevard Diamante s/n Col. Los Cangrejos,
                                          Carretera Cabo San Lucas a Todos Santos Km.6.8,
                                          Cabo San Lucas B.C.S., C.P.
                                          kj@legacyproperties.com

                                          With a copy to:

                                          William J. Najam, Jr.,Vice President

                                          Legacy Properties, LLC
                                          131 Deer Hill Avenue Suite B

CONFIDENTIAL                                                                                          DANSKE_0012858

Danbury, CT 06810
bn@legacyproperties.com

Either Party may, by giving written notice to the other in the manner provided above, designate a different address for receiving notices under this Agreement.

**Section 9.5.**   Where this Agreement requires approval of Owner, all requests for approval by Project Developer and approval by Owner shall be made in writing and delivered pursuant to Section 9.4, or requests and approvals may be communicated through e-mail, provided that the other party confirms by e-mail that the party has received the e-mail.

**Section 9.6.**   Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision hereof.

**Section 9.7.**   This Agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings of the parties in connection therewith.  No covenant, representation or condition not expressed in this Agreement shall affect, or be effective to interpret, change or restrict, the express provisions of this Agreement.

**Section 9.8.**   This Agreement may not be modified, amended or terminated, except by a written instrument, and no waiver shall be given except by a written instrument signed by the person granting the waiver.

**Section 9.9.**   Nothing in this Agreement shall be deemed to create any right in any person not a party hereto (other than the successors and permitted assigns of a party hereto), and this instrument shall not be construed in any respect to be a contract in whole or in part for the benefit of any third party except as aforesaid.

**Section 9.10.** This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same instrument.  Transmission of executed signature pages by facsimile shall be as effective as delivery of an original manually-executed signature page hereto.

**Section 9.11.** In the event any one or more of the provisions contained in this Agreement is held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.  The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

**Section 9.12.** This Agreement shall be binding upon and inure to the benefit of the successors and permitted assigns of the parties hereto.

- 15 -

DANSKE_0012859

**Section 9.13.** This Agreement shall be construed and interpreted in accordance with the laws of the State of New York.

**Section 9.14.** WITH RESPECT TO ANY CLAIM OR ACTION ARISING HEREUNDER, PROJECT DEVELOPER (I) IRREVOCABLY SUBMITS TO THE NON EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND THE UNITED STATES DISTRICT COURT LOCATED IN THE BOROUGH OF MANHATTAN IN NEW YORK, NEW YORK, (II) AGREES THAT ALL SUCH CLAIMS OR ACTIONS MAY BE HEARD AND DETERMINED IN SUCH COURTS OF THE STATE OF NEW YORK OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT AND (III) IRREVOCABLY WAIVE ANY (A) OBJECTION WHICH IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT BROUGHT IN ANY SUCH COURT AND (B) ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. NOTHING IN THIS AGREEMENT WILL BE DEEMED TO PRECLUDE OWNER FROM BRINGING AN ACTION OR PROCEEDING WITH RESPECT HERETO IN ANY OTHER JURISDICTION.

**Section 9.15.** Nothing in this Agreement or in the relationship between the Owner and the Project Developer hereunder shall be deemed to constitute a partnership or joint venture, and the Project Developer shall not be deemed to be a construction Developer or general contractor with respect to the Development.

**Section 9.16.** If Project Developer shall be prevented or delayed from punctually performing any obligation or satisfying any condition under this Agreement by any strike, lockout, labor dispute, Act of God, adverse weather condition, new governmental restriction, regulation or control, civil commotion, fire or other casualty or by any other event similar to the foregoing but in all events beyond the reasonable control of Project Developer, and not the fault of the Project Developer in performing such obligation or satisfying such condition, then the time to perform such obligation or satisfy such condition shall be postponed by the period of time consumed by the delay, provided that Lender agrees to extend the payment obligations and performance times of Owner under the Loan Documents for a comparable period of time.

**Section 9.17.** Notwithstanding any other provision of this Agreement, the Owner shall indemnify the Project Developer and any and all persons who may serve or who have served at any time as directors or officers, and their respective heirs, administrators, successors, and assigns, against any and all expenses, including amounts paid upon judgments, counsel fees, and amounts paid in settlement (before or after suit is commenced), in each case with Owner's prior consent, actually and necessarily incurred by such persons in connection with the defense or settlement of any claim, action, suit, or proceeding in which they, or any of them, are made parties, or a party, or which may be asserted against them or any of them, in each case by reason of their actions in carrying out the intent of this Agreement, provided that no such indemnification shall be required if (i) Project Developer has not acted in accordance with the standards set out in the first two paragraphs of Section 1.1 hereof, (ii) Project Developer has acted in contravention of a decision made by the Owner; (iii) Project Developer is in default of

- 16 -

DANSKE_0012860

its obligations under this Agreement; or (iv) the act giving rise to the indemnification obligation was not an act authorized by this Agreement.

**Section 9.18.**  Notwithstanding any other provision of this Agreement, the Project Developer shall indemnify the Owner and any and all persons who may serve or who have served at any time as members, directors or officers, and their respective heirs, administrators, successors, and assigns, against any and all expenses, including amounts paid upon judgments, counsel fees, and amounts paid in settlement (before or after suit is commenced), actually and necessarily incurred by such persons in connection with the defense or settlement of any claim, action, suit, or proceeding in which they, or any of them, are made parties, or a party, or which may be asserted against them or any of them, in each case by reason of the acts or omissions of Project Developer or its agents which (i) are not in accordance with the standards set out in the first two paragraphs of Section 1.1 hereof, (ii) are in contravention of a decision made by the Owner; (iii) results from the default by Project Developer of its obligations under this Agreement; or (iv) was not authorized by this Agreement.

[signatures on following page]

- 17 -

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

OWNER:

DIAMANTE CABO SAN LUCAS S. DE R.L. DE C.V.

By: _____

Kenneth A. Jowdy, General Administrator

PROJECT DEVELOPER:

LEGACY PROPERTIES, LLC

By: _____

Kenneth A. Jowdy, Managing Member

TERMS OF AGREEMENT APPROVED:

DANSKE BANK A/S, LONDON BRANCH, the London Branch of a company incorporated in the Kingdom of Denmark

By: _____

Its:

- 18 -

DANSKE_0012862

## DIAMANTE CABO SAN LUCAS

### LEGACY OPERATIONS MANAGEMENT AGREEMENT

This Agreement for the management of operations of the Diamante Cabo San Lucas Resort ("Legacy Operations Management Agreement") is entered into as of November 1, 2013, by and between DIAMANTE CABO SAN LUCAS S. De R.L. De C.V., a Mexican limited liability Company ("Owner"), having an office at Boulevard Diamante s/n Col. Los Cangrejos, Carretera Cabo San Lucas a Todos Santos Km.6.8, Cabo San Lucas B.C.S., C.P. and LEGACY PROPERTIES, LLC, a Delaware limited liability company ("Legacy" or "Project Manager"), having an office at 131 Deer Hill Avenue, Suite B, Danbury, CT. 06810.

RECITALS

Owner is the designated developer and beneficial owner of approximately 1,500 acres of land located in Cabo San Lucas, BCS, Mexico (the "Diamante Resort" or the "Property");

Owner is in the process of developing a private resort community on the Property with a Davis Love III designed championship golf course and clubhouse, a Tiger Woods designed championship golf course and clubhouse, one additional private Member only golf course and clubhouse, golf and social Memberships, lot, villa, and casita real estate sales, Residence Club (time share) Membership Units, a spa, fitness center, swimmable lagoon and other business, residential, recreational and social amenities (collectively, the "Project");

Owner engaged Project Manager in 2007 to render various management and supervisory services, as well as certain marketing and sales services in connection with the operation of the Project, and Owner now seeks to formalize such engagement with this Legacy Operations Management Agreement ("Operations Management Agreement"); and

Project Manager has been so engaged in providing and performing the management and supervisory services, as well as the marketing and sales oversight services related to the Project, and Project Manager agrees to formalize such engagement and in addition, Project Manager agrees to assume certain financial obligations of Owner with regard to the operating deficit and certain accrued salaries due to Legacy employees, all as more particularly set forth herein;

NOW, THEREFORE, in consideration of the premises and the mutual undertakings herein contained, the Owner and the Project Manager hereby agree as follows:

ARTICLE I

MANAGEMENT SERVICES

**Section 1.1.** Project Manager, as independent contractor, shall perform the management services (as hereinafter defined) on behalf of Owner keeping Owner's best interest in mind. In

DANSKE_0012870

performing the management services, the Project Manager shall be authorized to use not only its own employees but also such third-party providers of labor, material or services, including, without limitation, management personnel, contractors, subcontractors, suppliers, consultants and other similar experts, as the Project Manager shall deem reasonably necessary, provided same are approved in advance by Owner and Lender.

The Project Manager, using its best efforts, will perform the management services set forth in this Section 1.1, as well as the marketing and sales services set forth in Exhibit B attached hereto (collectively, "Management Services") for each of the phases of the Project. Project Manager and Owner acknowledge that some of the Management Services may be performed on an overlapping basis, as approved by Owner, in order to facilitate the coordination of operations for the Diamante Resort, and that various elements of the Management Services may be performed on a staggered or phased basis (as approved by Owner), such that the various elements may be in different stages of completion at any given time. The identification of certain Management Services as being part of one particular phase below shall not absolve Project Manager from responsibility for performing such Management Services during other phases of the Project, if in the prudent exercise of prevailing professional operating standards, the Project Manager should also perform such Management Services throughout other phases of the Project, as approved by Owner.

Project Management Responsibilities:

(i)    The Project Manager shall be responsible for the day to day management of all operations of the Project, including but not limited to: the operation of the Davis Love III designed championship golf course; the Tiger Woods designed El Cardonal championship golf course; all Project related roads, utilities and infrastructure constructed or to be constructed in the future; the spa, fitness center, Lagoon and all other recreational and social facilities and amenities constructed or to be constructed in the future; the management, maintenance and repair of all homes, villas, casitas, leased product, Residence Club units either owned or managed by Owner; the security for the Project; supervision of all real estate sales, Residence Club Membership Interest sales, golf and social membership sales, including but not limited to, the supervision of the marketing and sales through Ironman Marketing or any other third party marketing and sales entity engaged by Owner.

(ii)   The Project Manager shall be responsible for the management of the Master Condominium Regime and all condominium regimes, including but not limited to the provision of all services through the Master Condominium Home Owner Association (HOA) and any sub condominium HOAs; cause counsel to prepare a draft of all documents necessary to create and govern homeowners associations at the Property ("Homeowner Documents"), which drafts shall be subject to approval by the Owner and Lender (as herein defined), and the Project Manager shall negotiate and revise the Homeowner Documents, as may be necessary, subject to the approval of the Owner and Lender.

(iii)  The Project Manager shall take all actions as may be necessary to cause the Project and the operation thereof to meet all requirements set forth in the Loan

- 2 -

DANSKE_0012871

Documents, as amended, between Owner and DANSKE BANK A/S, LONDON BRANCH, the London Branch of a company incorporated in the Kingdom of Denmark ("Lender" or "Danske Bank") including, without limitation, operations, marketing and sales reports, delivery of services and operations draw requests.

(iv)    The Project Manager shall strictly adhere to the operations budget, as modified from time to time (Operations Budget"), and the Project Manager shall revise the same when necessary as determined by Owner with the approval of Lender.  The Project Manager shall promptly advise the Owner, Lender and appropriate Owner and Lender consultants if it becomes aware that the Operations Budget is not being met, or is in danger of not being met, and make recommendations for corrective action.  The performance of Project Manager's Services relating to the creation and monitoring of the Operations Budget shall continue throughout all phases of the Project until completion.

(v)     The Project Manager shall develop and implement a system of cost controls and inform the Owner as to any material variances between actual costs and estimates thereof or the amounts budgeted in the Operations Budget promptly after it becomes aware of the same.

(vi)    The Project Manager shall inform the Owner as to consultants the Project Manager deems reasonably necessary in connection with the management of the Project, including but not limited to consultants for marketing and sale of real estate product and Residence Club Memberships.  In addition, the Project Manager shall supervise and coordinate the activities of and direct the consultants in connection with the management of the Project.

(vii)   The Project Manager shall also advise Owner with regard to agreements with potential tenants with respect to homes, villas, casitas, Residence Club time share interests within the Project.  The Project Manager shall advise Owner with regard to agreements with adjoining landowners (to the extent necessary) utility companies and municipalities, all of which shall be subject to the approval of Owner and Lender and execution by Owner.

(viii)  The Project Manager shall, in consultation with Owner, annually prepare the Operations Budget for the operation of the entire Project, as well as Operations Budgets for the Master Condominium HOA and for each sub regime condominium HOA and shall revise the same when necessary with Owner's and Lender's prior approval.  The Operations Budget shall include the Project Manager's estimates of necessary replacement reserve funds and all hard and soft costs and reimbursable expenses.

(ix)    The Project Manager shall advise and consult with the Owner as to the proper implementation of the Operating Budget for the Project, including, but not limited

- 3 -

to, security provisions, marketing strategies and creation of incentive packages for potential tenants and/or purchasers.

(x)     The Project Manager shall coordinate the process for the selection by Owner of the general manager, the director of golf, the superintendent, the director of food and beverages, the director of Residence Club services and all other staff related to the management and operation of the Diamante Resort. The Project Manager shall recommend the major trade contractors and subcontractors related to maintenance and repair of all completed Project facilities, and when necessary, coordinate the bid process involving qualified bidders for major maintenance or repair work. The Project Manager shall review bids for the work by contractors, subcontractors and suppliers. After analyzing the bids, the Project Manager shall recommend to the Owner the parties to whom it should award such contracts and subcontracts. The Project Manager shall coordinate the transfer of various construction phases of the Project as they are completed with Project Developer. The Project Manager shall negotiate contracts with local unions and with the operations personnel selected by Owner, all of which contracts shall be subject to Owner's prior review, approval and execution.

(xi)    The Project Manager shall develop and implement a system of operations cost control and inform the Owner as to any material variances between projected revenue and actual costs and estimates thereof or the amounts budgeted in the Operations Budget promptly after it becomes aware of the same, and the Project Manager shall advise the Owner and the appropriate consultants whenever revenue projections are less than, or projected costs exceed, estimates of the amounts budgeted in the Operations Budget.

(xii)   The Project Manager shall perform a comprehensive analysis and make specific recommendations for proper traffic circulation and access.

In addition to the foregoing, the "Management Services" shall include (x) maintenance of detailed files, records and books of account pertaining to the operation of the Project and the marketing and sale of the real estate and the Residence Club interests, (y) such other services, if any, as are customarily provided by professional operating managers in the development of projects similar to the Project, and (z) otherwise operating and maintaining the Property in a prudent manner during the course of development of the Project. The performance of any of these services herein stated by the Project Manager shall not relieve the architect, construction manager, general contractor, trade contractors or subcontractors or any other consultants of their responsibilities under their respective contracts, for the safety of persons and property or for compliance with all applicable statutes, rules, regulations and orders applicable to the conduct of the work performed.

Section 1.2.  In the event a third-party provider of labor, material or services to the Project does not perform the services such third party is required to perform, the Project Manager shall take such remedial action as the Project Manager deems necessary or appropriate, or as Owner may direct, to

- 4 -

DANSKE_0012873

remedy such circumstance, provided that such action is in compliance with the Operations Budget and approved by the Owner.

## ARTICLE II

### COVENANTS OF THE PROJECT MANAGER

**Section 2.1.**  The Project Manager covenants and agrees that it shall faithfully and diligently perform the Management Services and use its best efforts to ensure the timely completion and fulfillment of all aspects of the Project.

**Section 2.2.**  The Project Manager covenants and agrees that it shall not at any time during the term of this Agreement:

(a)     Sell, assign, transfer, pledge or hypothecate this Agreement or any of its rights or obligations hereunder without the prior approval of the Owner and Lender.

(b)     Engage or employ, without the Owner's prior approval, any real estate brokers or agree to pay or obligate the Owner to pay any compensation, fee or commission to any real estate broker or make any representation with respect to brokerage commissions to any real estate broker without the prior consent of Owner.  It is further understood that neither the Project Manager nor its employees nor any affiliated or related (i.e., parent or subsidiary companies or corporations or companies or corporations in which the equity holders of the Project Manager are equity holders) companies of the Project Manager shall claim any brokerage compensation, fee or commission by reason of this Agreement, except as expressly provided herein or in such other agreements executed by Owner.

## ARTICLE III

### MANAGEMENT FEE AND OTHER FEES

**Section 3.1.**  In addition to the Owner's agreement to pay Legacy a Development Fee as Project Developer pursuant to the Development Management Agreement between Legacy and Owner as approved by Lender, Lender has agreed to make available the following sums to Owner from the aggregate Sales Proceeds and Accounts Receivable of the Project toward the payment of the operating, marketing and sales costs related to the Project: (i) twenty percent (20%) of the aggregate Sales Proceeds and Accounts receivable when received with regard to all real estate lot and villa sales at the Project; and (ii) fifty percent (50%) of the aggregate Sales Proceeds and Accounts Receivable when received with regard to all Residence Club timeshare sales at the Project (collectively "Available Working Capital").  The parties agree that prior to any distribution by Owner to Project Manager of net profits from Available Working Capital pursuant to the terms of this Agreement all such Available Working Capital shall first be retained by the Owner and used to pay the following:

(a)     Working Capital Contribution of ten percent (10.0%) from such Available Working Capital to pay for the day to day operating costs associated with the Project as

- 5 -

described in this Operations Management Agreement and in the 2014 Operations Budget and subsequent annual budgets, which Working Capital Contribution, together with other sums received by Owner from the day to day operations of the Project, shall be used by Owner for the payment of operating expenses, including without limitation, management and operating staff payroll, amounts due vendors and service providers, inventories, prepaid expenses, and the maintenance of change and petty cash funds;

      (b)    All Commissions due to Ironman Marketing for real estate sales Residence Club time share sales and golf and social membership sales on terms to be mutually agreed upon between Owner and Ironman, and all Commissions or payments due to any outside brokers or sales or marketing entities otherwise retained by Owner;

      (c)    All Commissions, royalties and fees due under the Crystal Lagoons Agreement and the Tiger Woods Design Agreement.

**Section 3.2.**   As compensation for the Management Services performed and the obligations assumed by Project Manager, and provided that no Event of Default is outstanding, the Owner shall pay the Project Manager a Project management fee ("Management Fee") to be determined as follows: (i) the operating net profit shall be the surplus, if any, of Available Working Capital after the payment of any and all operating expenses and obligations of the Project for the prior twelve month period, including without limitation the expenses and obligations of the Project pursuant to sub-sections (a) through (c) above ("Operating Net Profit"). The Operating Net Profit shall be distributed by Owner to Project Manager annually on the first day of November in each year as compensation for the Management Services rendered to the Project pursuant to the terms of this Operations Management Agreement. In consideration of the Owner's agreement to distribute the Operating Net Profit from Available Working Capital to Project Manager each year, the Project Manager hereby agrees to operate the Project as a five star Resort and to assume responsibility for the payment of any annual operating deficit which may accrue beyond the Working Capital Contribution made each year by Owner.

The Owner and the Project Manager agree that the amounts set forth in the 2014 Operations Budget represent a full and complete itemization by category of all costs, expenses and fees which Managing Member reasonably expects to pay or reasonably anticipates becoming obligated to pay with respect to the operating costs associated with the Project and the date or dates for disbursements to pay all or any portion of each category of such costs and expenses of the Project.

**Section 3.3.**   Promptly following the completion of the Project, the parties may elect to cause a final accounting to be performed, and any necessary adjustments to the amounts previously paid to Project Manager shall promptly be reconciled (i.e., Project Manager shall be paid any deficiency or Project Manager shall refund any excess payments previously made).

## ARTICLE IV

### REIMBURSEMENT OF EXPENSES

**Section 4.1.**   Except to provide the Management Services contemplated hereby, the Project Manager shall not be required to advance any of its own funds for the payment of any costs and

- 6 -

CONFIDENTIAL

DANSKE_0012875

expenses incurred by or on behalf of Owner in connection with the operation of the Project.  In addition to the fees provided in Article III, the Owner shall provide funds to the Project Manager pursuant to line items in the Operations Budget to cover its out-of-pocket costs, expenses, fees, charges and outlays, incurred in connection with the proper performance by the Project Manager of its operational duties under this Agreement, including reimbursement for: (i) all compensation and other expenses of the Project Manager's non management level employees engaged in the Project,  (ii) operational expenses specifically benefiting and properly allocable to the Project, (iii) all amounts payable by the Project Manager for the account of the Owner to any firm, corporation, person or entity engaged by the Project Manager (with Owner's approval) for the Project or any part or phase thereof.  All reimbursements pursuant to this Article IV shall be subject to the amounts set forth in the line items of the Operations Budget approved by the Owner and Lender, as same may be increased for the incurrence of necessary or emergency expenditures.

Section 4.2.   Reimbursable costs shall not include: (i) any cost due to the default, gross negligence or willful misconduct of the Project Manager, or failure to abide by the terms of this Agreement; and (ii) any cost or expense to the extent the Project Manager or any affiliate of the Project Manager has been reimbursed by the Owner or any affiliate thereof pursuant to any agreement other than this Agreement.

Section 4.3.   Reimbursable costs shall be due and payable by the Owner to the Project Manager at such time as Owner approves and disburses the funds to cover such costs.  The Project Manager shall provide the Owner with such supporting documentation as the Owner and Lender may reasonably request.  The Owner may, during business hours and upon reasonable advance notice, review so much of the Project Manager's books and records as may be necessary, at any time, in order to verify the accuracy of any such invoice for reimbursable costs.

## ARTICLE V

### TERM AND TERMINATION

Section 5.1.   The term of this Agreement shall commence on the date hereof, and unless sooner terminated as provided herein, the Agreement shall terminate on the date which is thirty (30) days after the closing of the last retail sale of the last Lot or Residence Club interest (the "Term") or as otherwise set forth in this Article V.

Section 5.2.   Owner may terminate this Agreement upon ten (10) days notice to Project Manager in the event that (i) the operating costs of the Project exceeds or is expected to exceed the Operations Budget by fifteen percent (15%) percent or more and Project Manager has not covered such operating deficit with its own funds, (ii) Project Manager defaults in any of its other obligations set forth in this Agreement, or (iii) the Project, or any actions or inactions of Project Manager, violates or does not comply with any of the terms of the Loan Documents.

Section 5.3.   Upon the termination of this Agreement, the Project Manager shall, within ten (10) days of the date of such termination, deliver to the Owner: (i) all records and documents relating to the Project, including, without limitation, all permits, contracts, leases, sales agreements, agreements to

CONFIDENTIAL

lease and other agreements with contractors, governmental agencies, tenants and prospective tenants or purchasers or prospective purchasers of the Project, and any financial records maintained by the Project Manager with respect to the Project, provided, however, that the Project Manager may retain copies of any of the foregoing for its records; and (ii) materials and supplies with respect to the Project which have been paid for by the Owner and are in the possession or control of the Project Manager.

## ARTICLE VI

### ASSIGNMENT

The Project Manager shall not assign any of its rights and responsibilities hereunder without the prior written consent of the Owner and the Lender.

## ARTICLE VII

### MISCELLANEOUS

**Section 7.1.**  The Owner reserves the right, at all times, to place all insurance policies with respect to the Property and its operation, including Workers' Compensation insurance with respect to the Project Manager's employees.  The Owner agrees that the Project Manager shall be included as an additional insured in the policies maintained by Owner or any affiliate or subsidiary thereof pertaining to the Property or Project.  Owner shall deliver evidence to Project Manager of such policies promptly upon request.  In the event the Project Manager is authorized by the Owner to place insurance policies, the companies, the general agents, the amounts of coverage and the risks insured, shall all be subject to the approval of the Owner, and Project Manager shall deliver to Owner evidence of such policies promptly upon request.

**Section 7.2.**   Where consent of the Owner is herein required, such consent may be given or denied only by any of the following persons or such other representatives as Owner may designated from time to time: Kenneth A. Jowdy or Fernando Garcia Campuzano.  Where consent of the Project Manager is herein required, such consent may be given or denied only by any of the following persons or such other representatives as Project Manager may designated from time to time: Kenneth A. Jowdy or William J. Najam, Jr.

**Section 7.3.**  All notices, demands, consents or approvals hereunder shall be in writing and shall be effective only if delivered (a) by certified or registered mail, postage prepaid, return receipt requested, (b) by hand or transmitted by facsimile or email (but facsimile or email transmissions shall only be effective if followed by a hard copy sent by an additional delivery method set forth herein) or (c) by a nationally-recognized overnight courier service, with acknowledgement of receipt, in each case, to the parties at their respective addresses set forth at the beginning of this Agreement.

**Section 7.4.**  Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision hereof.

- 8 -

DANSKE_0012877

**Section 7.5.**  This Agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings of the parties in connection therewith.  No covenant, representation or condition not expressed in this Agreement shall affect, or be effective to interpret, change or restrict, the express provisions of this Agreement.

**Section 7.6.**  This Agreement may not be modified, amended or terminated, except by a written instrument, and no waiver shall be given except by a written instrument signed by the person granting the waiver.

**Section 7.7.**  Nothing in this Agreement shall be deemed to create any right in any person not a party hereto (other than the successors and permitted assigns of a party hereto), and this instrument shall not be construed in any respect to be a contract in whole or in part for the benefit of any third party except as aforesaid.

**Section 7.8.**  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same instrument.  Transmission of executed signature pages by facsimile shall be as effective as delivery of an original manually-executed signature page hereto.

**Section 7.9.**  In the event any one or more of the provisions contained in this Agreement is held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.  The parties hereto shall endeavor in good faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

**Section 7.10.** This Agreement shall be binding upon and inure to the benefit of the successors and permitted assigns of the parties hereto.

**Section 7.11.** This Agreement shall be construed and interpreted in accordance with the laws of the State of New York.

**Section 7.12.** Nothing in this Agreement or in the relationship between the Owner and the Project Manager hereunder shall be deemed to constitute a partnership or joint venture, and the Project Manager shall not be deemed to be a construction manager or general contractor with respect to the Project pursuant to the terms of this Agreement.

**Section 7.13.** WITH RESPECT TO ANY CLAIM OR ACTION ARISING HEREUNDER, PROJECT MANAGER (I) IRREVOCABLY SUBMITS TO THE NON EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND THE UNITED STATES DISTRICT COURT LOCATED IN THE BOROUGH OF MANHATTAN IN NEW YORK, NEW YORK, (II) AGREES THAT ALL SUCH CLAIMS OR ACTIONS MAY BE HEARD AND DETERMINED IN SUCH COURTS OF THE STATE OF NEW YORK OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT AND (III) IRREVOCABLY WAIVE ANY (A) OBJECTION WHICH

- 9 -

CONFIDENTIAL

DANSKE_0012878

IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT BROUGHT IN ANY SUCH COURT AND (B) ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. NOTHING IN THIS AGREEMENT WILL BE DEEMED TO PRECLUDE OWNER FROM BRINGING AN ACTION OR PROCEEDING WITH RESPECT HERETO IN ANY OTHER JURISDICTION.

**Section 7.14.** If Project Manager shall be prevented or delayed from punctually performing any obligation or satisfying any condition under this Agreement by any strike, lockout, labor dispute, Act of God, adverse weather condition, new governmental restriction, regulation or control, civil commotion, fire or other casualty or by any other event similar to the foregoing but in all events beyond the reasonable control of Project Manager, and not the fault of the Project Manager in performing such obligation or satisfying such condition, then the time to perform such obligation or satisfy such condition shall be postponed by the period of time consumed by the delay, provided that Lender agrees to extend the payment obligations and performance times of Owner under the Loan Documents for a comparable period of time.

**Section 7.15.** Notwithstanding any other provision of this Agreement, the Owner shall indemnify the Project Manager and any and all persons who may serve or who have served at any time as directors or officers, and their respective heirs, administrators, successors, and assigns, against any and all expenses, including amounts paid upon judgments, counsel fees, and amounts paid in settlement (before or after suit is commenced), in each case with Owner's prior consent, actually and necessarily incurred by such persons in connection with the defense or settlement of any claim, action, suit, or proceeding in which they, or any of them, are made parties, or a party, or which may be asserted against them or any of them, in each case by reason of their actions in carrying out the intent of this Agreement, provided that no such indemnification shall be required if (i) Project Manager has not acted in accordance with the standards set out in the first two paragraphs of Section 1.1 hereof, (ii) Project Manager has acted in contravention of a decision made by the Owner; (iii) Project Manager is in default of its obligations under this Agreement; or (iv) the act giving rise to the indemnification obligation was not an act authorized by this Agreement.

Notwithstanding any other provision of this Agreement, the Project Manager shall indemnify the Owner and any and all persons who may serve or who have served at any time as members, directors or officers, and their respective heirs, administrators, successors, and assigns, against any and all expenses, including amounts paid upon judgments, counsel fees, and amounts paid in settlement (before or after suit is commenced), actually and necessarily incurred by such persons in connection with the defense or settlement of any claim, action, suit, or proceeding in which they, or any of them, are made parties, or a party, or which may be asserted against them or any of them, in each case by reason of the acts or omissions of Project Manager or its agents which (i) are not in accordance with the standards set out in the first two paragraphs of Section 1.1 hereof, (ii) are in contravention of a decision made by the Owner; (iii) results from the default by Project Manager of its obligations under this Agreement; or (iv) was not authorized by this Agreement.

- 10 -

DANSKE_0012879

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

OWNER:                          Diamante S. De R.L. De C. V.

By: _____
Kenneth A. Jowdy, General Administrator

PROJECT MANAGER:                LEGACY PROPERTIES, LLC

By: _____
Kenneth A. Jowdy, Managing Member

TERMS OF AGREEMENT APPROVED:

DANSKE BANK A/S, LONDON BRANCH, the London Branch of a company incorporated in the Kingdom of Denmark

By: _____

Its: _____

- 11 -