

750 E. PRATT STREET   SUITE 900   BALTIMORE, MD 21202
T 410.244.7400   F 410.244.7742   www.Venable.com

August 23, 2018

**VIA EMAIL**
Diane Beckmann, AUSA
Madeline O'Connor, AUSA
Laura Mantell, AUSA
U.S. Attorney's Office for the
    Eastern District of New York
610 Federal Plaza
Central Islip, New York 11722

   Re: U.S. v. Kenner, et al., 13-CR-607 (E.D.N.Y)

Dear Counsel:

  As you know, we represent Danske Bank A/S, London Branch ("Danske Bank") in connection with the forfeiture proceeding in the case of United States of America v. Kenner, who has a senior secured lien and other legal interests in or relating to the resort project known as Diamante Cabo San Lucas Resort ("Project") that is the subject of forfeiture in the above-referenced matter. As we discussed at our meeting on September 14, 2017 in your offices Central Islip, one of the loans issued by Danske Bank referred to as Facility C was due to mature on October 31, 2017 and it was our client's expectation that the loan would not be paid in full at that time, but that our client would likely enter into a loan modification extending the maturity date. We write to advise you that Facility C matured as of October 31, 2017 and, after considering its rights and remedies under the loan documents upon such maturity, Danske Bank has determined that its on-going support of the Project, exemplified by granting an extension of the maturity date of Facility C, is in Danske Bank's best interest for maximizing its recovery of its investment in the Project. This extension is consistent with the plan of support that Danske Bank articulated to you at our meetings in September 2017. The parties have been working over the towards completing the documentation to reflect the terms of the extension. We write to advise you that Danske Bank intends to enter into a loan modification that extends the maturity date of Facility C and makes certain other modifications to the loan agreement.

  Additionally, as we discussed in our last meeting and as the government recognized, it is instrumental to keep the current development team in place for a number of reasons. In order to ensure that the developer, led by Kenneth Jowdy, remains with the Project if Mr. Jowdy loses equity in the Project pursuant to the forfeiture process, Mr. Jowdy has committed to enter into an agreement with Danske Bank for certain sales services. The agreement only is applicable if Mr.



Jowdy loses a significant equity interest and Mr. Jowdy would then be paid for his services by Danske Bank from Danske' Bank's own funds. This arrangement is consistent with the plan of support that Danske Bank articulated to you at our meetings in September 2017. Danske Bank believes such arrangement ensures the best prospect for repayment of the Loan and Danske Bank intends to enter into the contingent agreement when it enters into the Second Amendment. The following provides additional details with respect to both the Second Amendment and contingent agreement regarding certain Jowdy services ("Contingent Agreement").

*Second Amendment*

With respect to the Second Amendment, specifically, Danske Bank intends to modify the loan agreement to accomplish the following goals: (1) extend the maturity date of Facility C from October 31, 2017 to December 31, 2018; (2) defer certain amortization payments due under Facility A and Facility C until December 31, 2018; (3) provide for weekly cash sweeps from Borrower to Danske Bank of net time share proceeds and net whole ownership sale proceeds; and (4) update the Loan Agreement for certain defined terms and other matters pertaining to the Project, Borrower or Danske Bank that have evolved since the modifications completed in 2014.

We include below a more detailed explanation of these key features of the proposed amendment. Initially capitalized terms used herein and not defined shall have the meaning ascribed to such terms in the Second Amendment.

1. Extension of Maturity Date of Facility C.

    Facility C is a $15 million revolving construction line of credit made available to Borrower for the completion of certain construction costs pursuant to construction budgets approved by Danske Bank. Facility C was scheduled to mature on October 31, 2017 such that the entire $15 million was to be due and payable to Danske Bank. After payment in full, Facility C would have been cancelled and the funds no longer made available for construction use at the Project. In order to continue to provide the Project liquidity needed to carry-on and complete certain phases of construction obligations and budgeted construction goals, Danske Bank has agreed to extend the Maturity Date of Facility C from October 31, 2017 to December 31, 2018 subject to satisfaction of certain terms and conditions more particularly set forth in the Second Amendment, including but not limited to the Borrower agreeing to certain weekly cash sweeps of net proceeds more particularly described below.

2. Defer the amortization payments due under Facility A and Facility C during 2018 until December 31, 2018.

    The Loan Agreement currently provides for certain principal amortization payments of Facility A to be made by Borrower on a quarterly basis in 2018 in a total amount of $10,300,000. In order to ease the burden of cash flow on the Project through the 2018 calendar year, Danske Bank has agreed to defer the due date of each of these principal amortization payments as more particularly set forth in the Second Amendment.

# VENABLE LLP

3. <u>Weekly cash sweeps from Borrower to Danske Bank of Net Time Share Proceeds and Net Whole Ownership Sale Proceeds.</u>

   The Loan Agreement currently provides as a covenant of Borrower to Danske Bank that Borrower is to deposit with Danske Bank on a periodic basis certain percentages of net sales proceeds. As more particularly set forth in the Second Amendment, Danske Bank now requires a weekly cash sweep in order to provide tighter controls on the net proceeds otherwise being held by Borrower and used in connection with the construction and operation of the Project. .

4. <u>Update the Loan Agreement for Certain Defined Terms and Other Matters Pertaining to the Project, Borrower or Danske Bank</u>.

   Many of the other modifications to the Loan Agreement pertain to updating defined terms and concepts that are required given the evolution of the Project since 2014.

*Contingent Agreement with Jowdy*

Pursuant to the Contingent Agreement, Danske Bank would agree to pay Mr. Jowdy a fee at the rate of ten percent (10%) of the actual principal paydown proceeds received by Danske Bank pursuant to (i) a sale of the Property (or any part thereof), or (ii) a sale of Danske Bank's loan secured by the Property and the Project, only if the proceeds are applied by Lender towards the permanent reduction of principal of the Loan. Danske Bank would pay the fee from the proceeds it receives from the disposition event and such fee would <u>not</u> reduce the amount of proceeds actually applied towards the permanent reduction of principal of the loan. If Mr. Jowdy were to retain any equity interest and receive a distribution of equity proceeds after a fee is paid, then Mr. Jowdy would have the obligation to pay to Danske Bank an amount up to the actual fees paid by Danske Bank over the term of the Contingent Agreement.

The term of the Contingent Agreement would commence only if and when Mr. Jowdy loses a significant portion of his equity stake in the Borrower pursuant to the forfeiture process. The term of the Contingent Agreement would terminate at the earlier to occur of (i) the date that is two years after it commences (with an option of Danske Bank to extend the term); or (ii) upon Danske Bank's election to terminate pursuant to certain termination triggers more particularly described in the Contingent Agreement.

In summary, although Danske Bank is prepared to enter into the Second Amendment and Contingent Agreement based on the terms and conditions outlined in each, it does so reluctantly as Danske Bank continues to have concern regarding potential impact on its collateral of the prolonged and protracted forfeiture proceedings. Danske Bank views the Second Amendment and Contingent Agreement as currently being in its best interest in terms of preserving its collateral, preserving and incentivizing the project management team, and providing a path toward its debt recovery. However, Danske Bank continues to have doubts about how the Government's attempted forfeiture of the Diamante Cabo San Lucas project would be in the best



interests of its victims and to date the Government has not articulate a clear path towards monetizing the forfeited assets.

We request that you treat the Second Amendment and Contingent Agreement as confidential and not disclose information about the documents and their contents to other parties. Danske Bank intends to enter into these agreements by September 7, 2018. If you have any questions regarding the proposed Second Amendment or the proposed Contingent Agreement with Mr. Jowdy or want to schedule a meeting to review the enclosed, please contact us before then to discuss.

Very truly yours,

*Kelly Weiner /KS*

Kelly Shubic Weiner

Enclosures

cc:  Doreen Martin (*by email*)
George Kostolampros (*by email*)

**Execution Copy**

# AGREEMENT

**THIS AGREEMENT** (the "Agreement") made and entered into as of _____, 2018, by and between (i) Legacy Cabo LLC, a Delaware limited liability company ("Agent")[1] and (ii) Danske Bank, A/S London Bank, the London branch of a company incorporated in Denmark ("Lender").

## W I T N E S S E T H:

WHEREAS, Lender holds that certain loan more particularly described on Exhibit A-1 attached hereto and incorporated herein (the "Loan" and all documents described on Exhibit A-1 the "Loan Documents"), which Loan is secured by that certain resort project located in the City of Cabo San Lucas, Baja, California, Sur Mexico, which resort project is more particularly described on Exhibit A-2 (the "Property").

WHEREAS, the Property, including certain equity interest in the Property owned by Kenneth A. Jowdy ("Jowdy"), is subject to forfeiture proceedings in the Eastern District of New York;

WHEREAS, Lender and Jowdy agree that in order to maximize the value of the Property there is continuity of the development of the Property and in order to ensure such continuity, subject to the conditions set forth herein, if Jowdy's equity interest is forfeited as described more fully below, Lender seeks to obtain Jowdy's agreement to continue to act as Agent and perform certain services with respect to the sale of the Property; and

WHEREAS, Agent accepts such responsibilities and duties subject to and in accordance with the terms and provisions contained herein

NOW, THEREFORE, in consideration of the mutual agreements hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending legally to be bound, hereby covenant and agree as follows:

1. <u>Defined Terms</u>. In addition to the terms defined above, the following capitalized terms shall have the following meanings (terms defined in the singular are to have the same meaning when used in the plural and vice versa) and initially capitalized terms not defined herein shall have the meaning assigned to such term in the Loan Documents:

"<u>Affiliate</u>" means, with respect to any specified Person (i) any Person that directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with such specified Person, (i) any Person owning or controlling five percent (5%) or more of the outstanding voting securities of or other ownership interests in such specified Person or (iii) any officer, director, member or general partner of such specified Person. For the purposes of this definition, "control" when used with respect to any specified Person means the

---

[1] Entity is wholly owned by Kenneth A. Jowdy.

18961748-v18

power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Business Day" means any day other than a Saturday, Sunday or any other day on which banks in New York or London are required or permitted to be closed.

"Confidential Information" means information regarding the Property provided to Agent by Lender and any of its employees or agents, in connection with Agent's activities hereunder and any proprietary information regarding Lender or its Affiliates, including, technical information, trade secrets, know-how, processes, programs, schematics, software source documents and financial information, disclosed by Lender or its Affiliates to Agent, whether before or after the date of this Agreement and whether oral or written in whatever form. Notwithstanding anything to the contrary herein, the term Confidential Information shall not include any such information that was known to Agent prior to the date hereof and that is or becomes available on a non-confidential basis from a source other than Lender, or its employees or agents, or is or becomes generally available to the public other than as a result of an unauthorized disclosure by Agent.

"Disposition Event" means the occurrence of either (i) the sale of the Property (or any part thereof, including but not limited to day-to-day sales of time share interests in the Property or the transfer of legal title to lots, homes, casitas, condominium units parcels or any other real estate sales); or (ii) the sale of the Loan by Lender or any portion thereof or interest therein. In no event shall a Disposition Event include a credit bid by Lender in connection with any forfeiture or foreclosure of the Property or forfeiture of the Property by the United States Government. If a Disposition Event occurs after Lender, or its affiliate, becomes the owner of the Property as a result of a credit bid by Lender in connection with any forfeiture or foreclosure of the Property, then the terms of this Agreement will govern whether a Principal Paydown Commission is due from the Lender to Agent as the result of any such Disposition Event if this Agreement has not expired or otherwise been terminated as provided herein.

"Disposition Event PSA" means a purchase and sale agreement approved by Lender that results in a Disposition Event.

"Hard Deposit Contract Date" means with respect to a Disposition Event PSA, the date on which any diligence period in such Disposition Event PSA expires or is waived in writing by the buyer under the Disposition Event PSA and such buyer's deposit is non-refundable except for certain conditions to closing approved by Lender

2.  Term.  The term of this Agreement (the "Term") shall begin on the Forfeiture Date (such date, the "Commencement Date") and continue until the first to occur of (i) a Termination Event (defined below); and (ii) the date that is two (2) years from the Commencement Date (such date, the "Expiration Date").  For purposes of this Agreement, the "Forfeiture Date" shall mean the date on which at least 28.5% or more of the membership interests owned by Jowdy individually or through KAJ Holdings, LLC and Diamante Properties, LLC or such combination thereof (such interest, the "Forfeited Interest") are Forfeited. "Forfeited" shall mean (a) if Jowdy defends his rights to the Forfeited Interest during any

2

ancillary proceeding, when the U.S. Government has obtained final forfeiture of such Forfeited Interest in the Borrower as evidenced by the issuance of a final order of forfeiture with respect to Jowdy Interest, or (b) if Jowdy elects not to defend his right to the Forfeited Interest during any ancillary proceeding, when the statutory period for such defense has lapsed such that the preliminary order is deemed to be final with respect to the Forfeited Interests owned by Jowdy. For purposes of this Agreement, the parties agree that such statutory period shall be thirty (30) days after the issuance of the preliminary order of forfeiture. Danske Bank shall have the right to extend the term of this Agreement for successive one year periods in is sole, subjective discretion.

3. <u>Agent Obligations</u>. Agent shall use its best efforts to achieve a principal paydown and permanent reduction of the Loan (or any part thereof) for Lender, all on terms and conditions acceptable to Lender in its sole discretion. Agent shall cooperate with any licensed independent outside real estate sales agent or Agent ("<u>Cooperating Sales Agent</u>") and Borrower in respect of any sale transaction. Agent shall indemnify and hold harmless Lender from any claims for commission in respect of transactions involving the Property, except for those commission claims that arise directly and solely through acts of the Lender engaging different brokers. Agent shall meet with Lender as necessary or appropriate in order to plan the marketing program for the Property in order to achieve the principal paydown and permanent reduction of the Loan and shall keep Lender fully advised and informed as to the status of such program, including without limitation providing to Lender a list of all respondents that execute confidentiality agreements with respect to the marketing materials provided by Agent. Agent shall inform Lender, in writing, within ten (10) days after taking such a listing, of all listings taken by Agent in respect to land or projects competing with the Property.

4. <u>Commissions Agreement</u>. Commencing on the Commencement Date, subject to the fee cap described herein, Lender hereby agrees to pay to Agent a commission at the rate of ten percent (10%) (the "<u>Principal Paydown Commission</u>") of the actual principal paydown proceeds received by Lender from a Disposition Event and applied by Lender towards the permanent reduction of principal of the Loan or other permanent reduction of obligations due Lender (such amount, the "<u>Permanent Principal Reduction Amount</u>"); <u>provided however</u>, (i) in no event shall Lender's liability with respect to payment of such fee exceed an amount equal to $10,000,000 USD ("<u>Commission Fee Cap</u>") regardless of the amount of permanent reduction of principal payment achieved by Lender; and (ii) in no event shall Lender have an obligation to pay any commission with respect to any portion of the Loan written down by Lender for which it receives no actual principal paydown proceeds. The Principal Paydown Commission shall be deemed earned by Agent on the Hard Deposit Contract Date. The Principal Paydown Commission shall be deemed payable by Lender to Agent on the date that is ten (10) business days after Lender's receipt of the Permanent Principal Reduction Amount. In no event shall any Principal Paydown Commission be due and payable from Lender to Agent in the event of proceeds (or portion thereof) received by Lender from a Disposition Event that are not applied towards the permanent reduction of principal of the Loan or such permanent reduction of obligations due Lender.

(a) <u>Termination</u>. Lender shall have the right to terminate this Agreement upon written notice to Agent under any one or more of the following circumstances (any such

3

18961748-v18

termination event, a "<u>Termination Event</u>").  In such event, the termination shall be effective immediately unless otherwise provided below:

(i) If Agent defaults in the performance of its obligations under this Agreement and such default shall remain uncured for more than ten (10) days after written notice thereof; <u>provided</u>, <u>however</u>, that in the case of a default which is susceptible of being cured but not within a ten (10) day period, such ten (10) day period shall be extended to such longer period of time as is reasonably necessary (but in no event exceeding sixty (60) days after the occurrence of the default), to cure such default by the exercise of diligent efforts if curative action is commenced during such ten (10) day period and proceeds diligently thereafter until such default is cured.

(ii) If a receiver, trustee or liquidator is appointed over all or a substantial part of Agent 's, or any direct or indirect owner of Agent 's, assets or any of its direct or indirect affiliates' assets, and such receiver, trustee or liquidator is not dismissed within ninety (90) days of its appointment.

(iii) If Agent is dissolved or if Agent or any of its direct or indirect owners or affiliates (A) files a voluntary petition in bankruptcy, (B) makes a general assignment for the benefit of creditors, (C) is not able, or admits in writing its inability, to pay its debts generally as they become due or (D) files a petition or an answer seeking reorganization or an arrangement with creditors.

(iv) If an involuntary bankruptcy proceeding, receivership proceeding or a similar regulatory action has been commenced against Agent or any of its direct or indirect owners or affiliates and has remained undismissed or undischarged for a period of ninety (90) consecutive days.

(v) The entry of any order, judgment or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating Agent or any of its direct or indirect owners or affiliates as bankrupt or insolvent or approving a petition seeking reorganization of Agent or any of its direct or indirect affiliates or of all or a substantial part of Agent 's assets or all or a substantial part of the assets of any of its direct or indirect affiliates assets, and such order, judgment or decree shall continue unstayed and in effect for any period of ninety (90) consecutive days.

(vi) If Agent, or any of its owners or affiliates, commits fraud, criminal conduct, intentional misconduct or misappropriation or intentional misapplication of proceeds received from the Property or by Lender, or makes material misrepresentations.

(vii) If Agent knowingly commits a violation of law and such violation has or is reasonably likely to have a material adverse effect on the Agent, Lender or the Property; <u>provided</u>, <u>however</u>, this provision will not apply in circumstances where Agent is contesting in good faith whether it has violated such law and/or is diligently implementing corrective action.

4

(viii)   If there is a Transfer (defined hereinbelow) without Lender's prior written consent.

(b)   <u>Removal of Agent</u>.  Upon any Termination Event, Agent shall be removed from its duties and obligations as Agent under this Agreement and Agent shall immediately cease and desist from performing same.  Agent shall promptly deliver or cause to be delivered to Lender all books, records, files and documents relating to the Property that Agent has maintained on behalf of Lender pursuant to this Agreement, if any.  In all cases, Agent agrees to reasonably cooperate in good faith with any such replacement Agent, if applicable

(c)   <u>No further Lender Liability for Payment</u>.  Upon a Termination Event or the Expiration Date, Lender shall have no further liability under this Agreement to pay any Principal Paydown Commission, and this Agreement shall be deemed null and void.  Notwithstanding the forgoing, if (a) the Termination Event was with respect to any of the Termination Events described in Sections 4(a)(i),(ii),(iii),(iv), or (v), or (b) the Expiration Date has occurred, then Lender's obligation to pay the Principal Paydown Commission shall survive for a period of three (3) years and Lender shall be obligated to pay at the time of receipt of the Permanent Principal Reduction Amount the Principal Paydown Commission earned by Agent pursuant to the terms of Section 4 hereof prior to such Termination Event or Expiration Date so long as such amount is received prior to the expiration of the three (3) year survival period.

(d)   <u>No Further Obligations</u>.  Upon termination of this Agreement, neither party hereto shall have any further rights, privileges, duties and/or obligations hereunder except as otherwise expressly set forth in this <u>Section 4</u> or as otherwise expressly set forth herein.

5.   <u>Confidentiality</u>.

(a)   Without Lender's prior written consent, Agent shall not disclose to any person or entity any Confidential Information, except to the extent that it is appropriate to do so in working with legal counsel, auditors and taxing authorities; provided, however, that Agent may disclose any portion of the Confidential Information that Agent is required to disclose pursuant to applicable law, rule, regulation, subpoena, or similar court process; provided that Agent shall (i) notify, to the extent permitted under law, Lender in writing prior to any such disclosure so as to provide Lender with a reasonable opportunity to seek to enjoin, prevent, stay or defer such disclosures, (ii) to the extent permissible under law, consult and cooperate with Lender as to the content, nature, and timing of such disclosure, and (iii) in the event a protective order or another remedy is not timely obtained, disclose only such part or portion of such Confidential Information as is reasonably required pursuant to such law, rule, regulation, subpoena, or other similar process based on consultation and advice of its counsel to be disclosed.  Agent shall reasonably cooperate with any of Lender's efforts to obtain reasonable assurance that confidential treatment will be accorded the Confidential Information so disclosed.

(b)   <u>Damages</u>.  Agent acknowledges that money damages may not be a sufficient remedy for any breach of <u>Section 6(a)</u> by Agent.  Accordingly, in the event of any such breach of <u>Section 6(a)</u>, in addition to any other remedies at law or in equity that Lender may

5

18961748-v18

have, Lender shall be entitled to seek equitable relief, including injunctive relief or specific performance or both.

(c) <u>Survival</u>. The provisions of this <u>Section 6</u> shall terminate two (2) years after the termination of this Agreement.

6. <u>Representations, Warranties and Covenants of Agent</u>. Agent, as a condition to the consummation of the transactions contemplated hereby, hereby makes the following representations and warranties to Lender as of the date hereof:

(a) <u>Due Organization and Authority</u>. Agent is a limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation and has all licenses necessary to carry on its business as now being conducted; Agent has the full limited liability company power and authority to execute and deliver this Agreement and to perform in accordance herewith; the execution, delivery and performance of this Agreement (including all instruments of transfer to be delivered pursuant to this Agreement) by Agent and the consummation of the transactions contemplated hereby have been duly and validly authorized; each individual signing this Agreement on behalf of Agent has the authority to execute this Agreement on Agent's behalf and to bind Agent to the terms hereof; this Agreement evidences the valid, binding and enforceable obligation of Agent and all requisite corporate action has been taken by Agent to make this Agreement valid and binding upon Agent in accordance with its terms.

(b) <u>No Conflicts</u>. Neither the execution and delivery of this Agreement, the acquisition of the servicing responsibilities by Agent or the transactions contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of Agent's operating agreement or any legal restriction or any agreement or instrument to which Agent is now a party or by which it is bound, or (i) constitute a default or result in an acceleration under any of the foregoing, (ii) result in the violation of any law, rule, regulation, order, judgment or decree to which Agent or its property is subject, or (iii) impair the ability of Agent to perform its obligations as required under this Agreement.

(c) <u>No Consent Required</u>. No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by Agent of or compliance by Agent with this Agreement, or if required, such consent, approval, authorization or order has been obtained prior to the date hereof.

(d) <u>Valid Agreement</u>. This Agreement constitutes the valid, legal and binding obligation of Agent, enforceable against it in accordance with the terms hereof, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general principles of equity (whether considered in a proceeding or action in equity or at law).

(e) <u>Prohibition on Transfers</u>. Agent represents and warrants that Ken Jowdy, individually, owns 100% of the membership interest in Agent and solely controls Agent. Agent

6

shall not assign its rights under this Agreement and any purported assignment shall be void. Agent shall not suffer or permit (a) any change in the management (whether direct or indirect) or control of Agent or (b) any Transfer. Notwithstanding the foregoing to the contrary, the following Transfers shall be permitted without the need for any such Lender approval: Transfers of direct or indirect ownership interests in Agent by Jowdy as of the date hereof if made to effect bona fide estate planning needs approved by Lender in advance, so long as following any such transfer pursuant to this clause Agent shall deliver to Lender: (i) all documentation evidencing the Transfer; (ii) all documentation reasonably required by Lender for Lender to satisfy its "know your customer" requirements, and (iii) payment for all out-of-pocket expenses incurred by Lender in connection with its review of the Transfer documentation. Any Transfer made in contravention of this Agreement shall be null and void and of no force or effect and shall constitute a default under this Agreement. For purposes of this Agreement: (1) "Transfer" shall mean any sale, transfer, lease, conveyance, alienation, pledge, assignment, mortgage, encumbrance, hypothecation or other disposition of any interest in Agent or any interest in any entity which directly or indirectly holds an interest in, or directly or indirectly controls, Agent ; and (2) "Control" shall mean Jowdy has the power to direct or cause the direction of the management policies of Agent and owns at least 50% or more of the direct and indirect interests of Agent .

(f)    Obligation to Repay Principal Paydown Commission. It is the intention of Agent and Lender that if the actual Forfeited Interest is less than 100% of the membership interests owned by Jowdy individually or through KAJ Holdings, LLC and Diamante Properties, LLC, then at such time that Jowdy (individually or through KAJ Holdings, LLC and/or Diamante Properties, LLC) receives any distributions to the direct and indirect owners of the membership interests in the Borrower (such distribution, an "Equity Distribution"), then Agent shall pay and reimburse to Lender on a dollar-for-dollar basis an amount equal to the Equity Distribution up to and not exceeding the Principal Paydown Commission actually paid to Agent under this Agreement. Such payment shall be made to Lender no later than ten (10) business days after Jowdy's receipt of any such Equity Distribution. Jowdy joins this Agreement to acknowledge his obligation to pay the same. Agent's and Jowdy's obligations under this Section 6(f) shall survive the termination of this Agreement pursuant to a Termination Event and the Expiration Date; provided, however, that Agent's and Jowdy's obligations to pay and reimburse Lender shall terminate if Danske Bank A/S London Branch is no longer the "Lender" under the Loan Documents at the time of receipt by Jowdy of any such Equity Distribution, and provided further, that the obligations of Agent and Jowdy to pay and reimburse Lender may not be assigned by Lender to any other Lender or third party.

7.    Representations and Warranties of Lender. Lender, as a condition to the consummation of the transactions contemplated hereby, hereby makes the following representations and warranties to Agent as of the date hereof:

(a)    Due Organization and Authority. Lender is a limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation and has all licenses necessary to carry on its business as now being conducted; Lender has the full limited liability company power and authority to execute and deliver this Agreement and to perform in accordance herewith; the execution, delivery and performance of this

7

18961748-v18

Agreement (including all instruments of transfer to be delivered pursuant to this Agreement) by Lender and the consummation of the transactions contemplated hereby have been duly and validly authorized; each individual signing this Agreement on behalf of Lender has the authority to execute this Agreement on Lender's behalf and to bind Lender to the terms hereof; this Agreement evidences the valid, binding and enforceable obligation of Lender and all requisite corporate action has been taken by Lender to make this Agreement valid and binding upon Lender in accordance with its terms.

(b)     <u>No Conflicts</u>.  Neither the execution and delivery of this Agreement, the acquisition of the servicing responsibilities by Lender or the transactions contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of Lender's operating agreement or any legal restriction or any agreement or instrument to which Lender is now a party or by which it is bound, or (i) constitute a default or result in an acceleration under any of the foregoing, or (ii) result in the violation of any law, rule, regulation, order, judgment or decree to which Lender or its property is subject.

(c)     <u>Valid Agreement</u>. This Agreement constitutes the valid, legal and binding obligation of Lender, enforceable against it in accordance with the terms hereof, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general principles of equity (whether considered in a proceeding or action in equity or at law).

8.     <u>Indemnification and Liability</u>.  Agent agrees to indemnify, defend and hold harmless Lender and Lender's officers, directors, employees, members, Affiliates and shareholders, from and against any actual damages, costs or expenses (including reasonable out-of-pocket attorneys' fees and disbursements) incurred as a result of any liability, claim, action, suit or proceeding, incurred by such person directly arising out of or in connection with (i) any act or omission of Agent or any agent or employee of Agent which constitutes negligence or willful misconduct, (ii) any default by Agent in the performance of Agent 's obligations under this Agreement including any action by an employee or agent of Agent which gives rise to such default, (iii) any claim by a third party relating to Agent 's performance of its obligations and services to the extent that such loss, liability, claim, damage, cost or expense with respect to such third party claim is not the direct result of Lender's negligence or willful misconduct or (iv) any claim or dispute between Agent and its employees or agents.  The foregoing provisions of this <u>Section 9</u> shall survive the expiration or termination of this Agreement for one (1) year to the extent the action resulting in such liability, claim, action, suit or proceeding arises prior to such termination or expiration.

9.     <u>Personnel</u>.  Agent shall employ such personnel, as employees of Agent, as may be necessary in order for Agent to perform its obligations hereunder.  All wages, salaries, fringe benefits, other salary expenses and payroll taxes with respect to said employees shall be paid by Agent.

10. <u>Licensing</u>.  Agent shall, at its expense, obtain and keep in full force and effect throughout the Term all licenses and permits required to be maintained by Agent in connection with the performance of its obligations hereunder.

11. <u>Nondiscrimination; Compliance With Laws</u>.  Agent hereby covenants and agrees that it shall comply with all applicable federal, state and local laws, regulations, codes, ordinances and administrative orders having jurisdiction over the parties, the Property or the subject matter of this Agreement.

12. <u>Miscellaneous</u>.

(a) <u>Notices</u>.  All demands, notices and communications hereunder shall be in writing and shall be hand delivered or mailed by first class, certified mail, return receipt requested, postage prepaid, or transmitted by telecopy (with the original to be sent the same day by FedEx or other recognized overnight delivery service) or sent by FedEx or other recognized overnight delivery service addressed to the recipient at its address set forth below or such other address as may hereafter be furnished to the other party by like notice):

    (i)    if to Lender:

    Danske Bank
    A/S London Branch
    75 King William Street
    LONDON, EC4N 7DT
    Attn:  David Daniel

    With concurrent copies (which shall
    not constitute notice) to:

    Venable LLP
    750 E. Pratt Street, Suite 900
    Baltimore, MD  21202
    Attention:  Kelly Shubic Weiner, Esq.
    Fax:  (410) 244-7742

    (ii)    if to Agent :

    c/o Kenneth A. Jowdy, Managing Member
    131 Deer Hill Avenue, Suite B
    Danbury, CT  06810

    With concurrent copies (which shall
    not constitute notice) to:

>Gibson, Dunn & Crutcher LLP
>200 Park Avenue
>New York, NY 10166-0193
>Steven Klein, Esquire

Any notice pursuant to this Agreement shall be deemed to be delivered, given, and received for all purposes as of the date received; provided, however, that (i) notices sent by telecopy shall not be effective unless such notices are also sent by mail or courier as set forth herein; and (ii) mail sent via Certified Mail, Return Receipt Requested, certified fee and normal postage prepaid, shall be deemed to have been received on the earlier of actual receipt thereof or the date of refusal or inability to deliver, indicated on the Receipt for Certified Mail.

(b) Severability Clause. Any part, provision, representation or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereto. To the extent permitted by applicable law, the parties hereto waive any provision of law that prohibits or renders void or unenforceable any provision hereof. If the invalidity of any part, provision, representation or warranty of this Agreement shall deprive any party of the economic benefit intended to be conferred by this Agreement, the parties shall negotiate, in good-faith, to develop a structure the economic effect of which is as close as possible to the economic effect of this Agreement without regard to such invalidity.

(c) Counterparts. This Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.

(d) Governing Law. This Agreement shall be construed in accordance with the laws of the State of New York and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with the laws of the State of New York.

(e) Further Agreements. Lender and Agent each agrees to execute and deliver to the others such reasonable and appropriate additional documents, instruments or agreements as may be necessary or appropriate to effectuate the purposes of this Agreement.

(f) Successors and Assigns; Assignment of Agreement. This Agreement shall bind and inure to the benefit of and be enforceable by Agent and Lender and the respective successors and assigns of Agent and Lender. This Agreement shall not be assigned, pledged or hypothecated by Agent to a third party without the prior written consent of Lender, which consent shall be given at the sole discretion of Lender.

(g) Waivers. No term or provision of this Agreement may be waived or modified unless such waiver or modification is in writing and signed by the party against whom such waiver or modification is sought to be enforced.

18961748-v18

(h) <u>Relationship between Parties</u>.  Any and all work performed by Agent under this Agreement shall be as an independent contractor and not as an employee or agent of Lender.  Unless specifically authorized pursuant to the terms of this Agreement and as strictly limited by the terms of this Agreement, neither Lender nor Agent shall act as an agent, partner, joint venturer of the other, and this Agreement shall not be construed to create an agency relationship, partnership, or joint venture between Lender and Agent .  Neither Lender nor Agent shall enter into any contracts or incur any obligations on behalf of the other or commit the other in any manner not expressly authorized by this Agreement.

(i) <u>General Interpretive Principles</u>.  For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires: (i) the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender; (ii) accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles; (iii) references herein to "Articles", "Sections", "Subsections", "Paragraphs", and other subdivisions without reference to a document are to designated Articles, Sections, Subsections, Paragraphs and other subdivisions of this Agreement; (iv) a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions; (v) the words "herein", "hereof", "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and (vi) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".

[Remainder of page intentionally left blank]

18961748-v18

**IN WITNESS WHEREOF**, the parties have executed this Agreement on the day and year first herein above written.

        **AGENT:**

        LEGACY CABO LLC

        By: _____
        Name: Kenneth A. Jowdy
        Title: Managing Member and Sole Member

**JOINDER BY JOWDY:**

Kenneth A. Jowdy joins in the execution of this Agreement to acknowledge his agreements and obligations pursuant to Section 7(f) of this Agreement.

_____
Name: Kenneth A. Jowdy, individually

*Agent's Signature Page Agreement*

18961748-v18

**LENDER:**

DANSKE BANK A/S LONDON BRANCH

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

CONFIDENTIAL

*Lender's Signature Page to Agreement*

18961748-v18

## EXHIBIT A-1

Loan Documents

## EXHIBIT A-2

Property Description